Exhibit 4(uuu)

## THIRD SUPPLEMENTAL INDENTURE

Third Supplemental Indenture (this "Third Supplemental Indenture"), dated as of January 30, 2013, among Energy Future Intermediate Holding Company LLC, a Delaware limited liability company ("EFIH"), and EFIH Finance Inc., a Delaware corporation ("EFIH Finance" and, together with EFIH, the "Issuer"), and The Bank of New York Mellon Trust Company, N.A., as trustee (the "Trustee").

### W I T N E S S E T H

WHEREAS, the Issuer has heretofore executed and delivered to the Trustee an Indenture, dated as of December 5, 2012 (the "Base Indenture"), providing for the issuance of $1,144,770,000 aggregate principal amount of 11.25%/12.25% Senior Toggle Notes due 2018 (the "Initial Toggle Notes"), a First Supplemental Indenture, dated as of December 19, 2012 (the "First Supplemental Indenture"), providing for the issuance of $159,032,000 aggregate principal amount of 11.25%/12.25% Senior Toggle Notes due 2018 (the "December 2012 Additional Toggle Notes"), and a Second Supplemental Indenture, dated as of January 29, 2013 (the "Second Supplemental Indenture" and, together with the Base Indenture and the First Supplemental Indenture, the "Indenture"), providing for the issuance of $63,930,000 aggregate principal amount of 11.25%/12.25% Senior Toggle Notes due 2018 as Additional Notes (the "January 2013 Additional Toggle Notes" and, together with the Initial Toggle Notes and the December 2012 Additional Toggle Notes, the "Existing Toggle Notes");

WHEREAS, on December 5, 2012, the Issuer issued the Initial Toggle Notes;

WHEREAS, on December 19, 2012, the Issuer issued the December 2012 Additional Toggle Notes;

WHEREAS, on January 29, 2013, the Issuer issued the January 2013 Additional Toggle Notes;

WHEREAS, Section 2.01(d) of the Indenture provides for the issuance from time to time of Additional Notes by the Issuer;

WHEREAS, the Issuer desires to issue $24,713,000 aggregate principal amount of Additional Notes on the date hereof (the "New Toggle Notes"); WHEREAS, pursuant to the terms of the Indenture, the New Toggle Notes shall rank pari passu and be consolidated with, and form a single class with, the Existing Toggle Notes;

WHEREAS, Section 9.01(9) of the Indenture provides that the Issuer, the Guarantors and the Trustee may amend or supplement the Indenture without the consent of any Holder to provide for the issuance of Additional Notes in accordance with the Indenture; provided that such Additional Notes are issued in compliance with the provisions of the Indenture;

WHEREAS, there are no Guarantors under the Indenture as of the date hereof;

WHEREAS, the New Toggle Notes shall be issued in compliance with the Indenture; WHEREAS, all conditions necessary to authorize the execution and delivery of this Third Supplemental Indenture and to make this Third Supplemental Indenture valid and binding have been complied with or have been done or performed; and

WHEREAS, pursuant to Section 9.01 of the Indenture, the Trustee is authorized to execute and deliver this Third Supplemental Indenture and the Trustee has received the request of the Issuer to join with the Issuer in the execution of this Third Supplemental Indenture accompanied by a resolution of its Board of Directors authorizing the execution of this Third Supplemental Indenture and the documents referred to in the Indenture.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties mutually covenant and agree for the equal and ratable benefit of all Persons who are now or hereafter become Holders of the New Toggle Notes as follows:

1. CAPITALIZED TERMS. Capitalized terms used herein without definition shall have the meanings assigned to them in the Indenture.

2. ADDITIONAL NOTES. Pursuant to this Third Supplemental Indenture, the New Toggle Notes are hereby created and established under the Indenture, and shall constitute "Additional Notes" thereunder, and are being issued by the Issuer on the date hereof in an aggregate principal amount of $24,713,000, which shall increase the aggregate principal amount of, and shall form part of the same series as, the Existing Toggle Notes. The New Toggle Notes issued hereunder shall rank pari passu and be consolidated with and form a single class with the Existing Toggle Notes and shall have the same terms as to status, redemption or otherwise as the Existing Toggle Notes for all purposes under the Indenture, including, among other things, for purposes of waivers, amendments and offers to purchase. Unless the context requires otherwise, references to "Notes" for all purposes under the Indenture, as supplemented by this Third Supplemental Indenture, shall include the New Toggle Notes. The New Toggle Notes shall be issued in global form in minimum denominations of $2,000 and integral multiples of $1,000 in excess thereof in substantially the form of  Exhibit A hereto. The terms and provisions of the New Toggle Notes set forth in Exhibit A hereto shall constitute and are expressly made a part of this Third Supplemental Indenture.

3. MANDATORY EXCHANGE OF REGULATION S GLOBAL NOTES. New Toggle Notes issued in the form of Regulation S Global Notes (collectively, the "Initial Regulation S Global Notes") shall bear the Temporary Regulation S Note CUSIP set forth on Exhibit A hereto until the 40th day after the date hereof. Notwithstanding the provisions of Section 2.06 of the Indenture, on or after such 40 th day, at the option of the Issuer, upon instruction of the Issuer to the Trustee, beneficial interests in the Initial Regulation S Global Notes shall automatically be exchanged for beneficial interests in one or more Regulation S Global Notes bearing the Permanent Regulation S Note CUSIP set forth on  Exhibit A herein in accordance with such procedures as the Depositary shall require. Upon such exchange of beneficial interests pursuant to this Section 3, the Registrar shall reflect on its books and records the date of such exchange 3 and a decrease and increase in the principal amount of the applicable Regulation S Global Notes, equal to the principal amount of beneficial interests exchanged. Following any such exchange pursuant to this Section 3, the Initial Regulation S Global Notes shall be cancelled.

4. MANDATORY REDEMPTION. The provisions of Section 3.08 and paragraph 6 of the Notes shall apply to the New Toggle Notes.

5. NO EXCHANGE OF EXISTING NOTES REQUIRED. The execution of this Third Supplemental Indenture shall not require the exchange of or modification to the certificates representing Notes issued and outstanding prior to the date hereof.

6. GOVERNING LAW.  THIS THIRD SUPPLEMENTAL INDENTURE WILL BE GOVERNED BY,  AND CONSTRUED IN ACCORDANCE WITH ,  THE LAWS OF THE STATE OF NEW YORK.

7. RATIFICATION, CONFIRMATION AND PRESERVATION OF INDENTURE. Except as expressly supplemented hereby, the Indenture continues in full force and effect and is in all respects confirmed, ratified and preserved and the provisions thereof shall be applicable to the New Toggle Notes and this Third Supplemental Indenture. Upon the execution and delivery of this Third Supplemental Indenture by the Issuer and the Trustee, this Third Supplemental Indenture shall form a part of the Indenture for all purposes, and the Issuer, each Guarantor, the Trustee and every Holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby. Any and all references to the "Indenture," whether within the Indenture or in any notice, certificate or other instrument or document, shall be deemed to include a reference to this Third Supplemental Indenture (whether or not made), unless the context shall otherwise require.

8. INDENTURE AND THIRD SUPPLEMENTAL INDENTURE CONSTRUED TOGETHER. This Third Supplemental Indenture is an indenture supplemental to the Indenture, and the Indenture and this Third Supplemental Indenture shall henceforth be read and construed together for all purposes.

9. BENEFITS OF THIRD SUPPLEMENTAL INDENTURE. Nothing in this Third Supplemental Indenture, the Indenture or the Notes, express or implied, shall give to any Person other than the parties hereto and thereto and each Guarantor and their respective successors hereunder and thereunder, any Paying Agent, any Registrar and the Holders, any benefit of any legal or equitable right, remedy or claim under the Indenture, this Third Supplemental Indenture or the Notes.

10. SUCCESSORS. All agreements of the Issuer in this Third Supplemental Indenture shall bind its successors. All agreements of the Trustee in this Third Supplemental Indenture shall bind its successors.

11. THE TRUSTEE. The Trustee shall not be responsible in any manner whatsoever for or in respect of the validity or sufficiency of this Third Supplemental Indenture or the New Toggle Notes or for or in respect of the recitals or statements contained herein or therein, all of which recitals and statements are made solely by the Issuer.

12. COUNTERPARTS. The parties may sign any number of copies of this Third Supplemental Indenture. Each signed copy shall be an original, but all of them together represent the same agreement.

13. EFFECT OF HEADINGS. The Section headings herein are for convenience only and shall not affect the construction hereof.

*[Remainder of Page Left Intentionally Blank]*

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental indenture to be duly executed, all as of the date first above written.

ENERGY FUTURE INTERMEDIATE HOLDING
COMPANY LLC

By: /s/ Anthony R. Horton
Name: Anthony R. Horton
Title: Senior Vice President and Treasurer

EFIH FINANCE INC.

By: /s/ Anthony R. Horton
Name: Anthony R. Horton
Title: Senior Vice President and Treasurer

THE BANK OF NEW YORK MELLON TRUST
COMPANY, N.A., as Trustee

By: /s/ Julie Hoffman Ramos
Name: Julie Hoffman-Ramos
Title: Vice President

[Supplemental Indenture - Private Exchange]

EXHIBIT A

*[Insert the Global Note Legend, if applicable pursuant to the provisions of the Indenture* ]

*[Insert the Private Placement Legend, if applicable pursuant to the provisions of the Indenture* ]

*[Insert the Tax Legend, if applicable pursuant to the provisions of the Indenture*]

CUSIP: [ ][1]
ISIN: [ ]

[RULE 144A] [[TEMPORARY] REGULATION S] GLOBAL NOTE

11.25%/12.25% Senior Toggle Notes due 2018

No. [R-1][S-1][TS-1]                               [$ ]

**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC**
**EFIH FINANCE INC.**

promise to pay to [ ] or registered assigns, the principal sum [set forth on the Schedule of Exchanges of Interests in the Global Note attached hereto] [of [ ] United States Dollars ($[ ])] on December 1, 2018.

Interest Payment Dates: June 1 and December 1, commencing on June 1, 2013.

Record Dates: May 15 and November 15

**[SIGNATURE PAGE FOLLOWS]**

---

1    Rule 144A Note CUSIP: 29269Q AG2
     Rule 144A Note ISIN: US29269QAG29
     Permanent Regulation S Note CUSIP: U29197 AF4
     Permanent Regulation S Note ISIN: USU29197AF40
     Temporary Regulation S Note CUSIP: U29197 AH0
     Temporary Regulation S Note ISIN: USU29197AH06 A-2

IN WITNESS HEREOF, the Issuer has caused this instrument to be duly executed.

Dated:

ENERGY FUTURE INTERMEDIATE
HOLDING COMPANY LLC

By:
Name:
Title:

EFIH FINANCE INC.

By:
Name:
Title:

This is one of the Notes referred to in the within-mentioned Indenture:

THE BANK OF NEW YORK MELLON
TRUST COMPANY, N.A., as Trustee

By:
Authorized Signatory

Dated:

[Back of Note]

This Note is one of a duly authorized series of notes of the Issuer designated as the "11.25%/12.25% Senior Toggle Notes due 2018" (the "Notes"), previously issued in an aggregate principal amount of $1,144,770,000 on December 5, 2012, in an aggregate principal amount of $159,032,000 on December 19, 2012 and in an aggregate principal amount of $63,930,000 on January 29, 2013, for a total aggregate principal amount of $1,367,732,000, and as a result of a further issuance of $24,713,000 aggregate principal amount of Notes on January 30, 2013, now issued in an aggregate principal amount of $1,392,445,000 under the Indenture referred to below.

Capitalized terms used herein shall have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

(1) *INTEREST*. Energy Future Intermediate Holding Company LLC, a Delaware limited liability company (" EFIH"), and EFIH Finance Inc., a Delaware corporation (collectively, the "Issuer"), promise to pay interest on the principal amount of this Note at a rate  per annum set forth below from December 5, 2012 until maturity and shall pay Additional Interest, if any, payable pursuant to the Registration Rights Agreement referred to below. The Issuer will pay interest (including Additional Interest, if any) semi-annually in arrears on June 1 and December 1 of each year, commencing on June 1, 2013, or if any such day is not a Business Day, on the next succeeding Business Day (each, an " Interest Payment Date") without interest accruing on the amount then so payable from such day that is not a Business Day until such Business Day. Interest on the Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from and including December 5, 2012. The Issuer will pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principal and premium, if any, from time to time on demand at the interest rate on the Notes; it shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest (including Additional Interest, if any)(without regard to any applicable grace periods) from time to time on demand at the interest rate on the Notes. Interest will be computed on the basis of a 360-day year comprised of twelve 30-day months.

Cash Interest on the Notes will accrue at a rate of 11.25%  per annum and be payable in cash. PIK Interest on the Notes will accrue at a rate of 12.25% per annum and be payable (x) with respect to Notes represented by one or more global notes registered in the name of, or held by, The Depository Trust Company ("DTC") or its nominee on the relevant Record Date, by increasing the principal amount of the outstanding global Note by an amount equal to the amount of PIK Interest for the applicable interest period (rounded up to the nearest $1,000) (or, if necessary, pursuant to the requirements of DTC or otherwise, to authenticate new global Notes executed by the Issuer with such increased principal amounts) and (y) with respect to Notes represented by certificated notes, by issuing PIK Notes in certificated form in an aggregate principal amount equal to the amount of PIK Interest for the applicable period (rounded up to the nearest whole dollar), and the Trustee will, at the request of the Issuer, authenticate and deliver such PIK Notes in certificated form for original issuance to the Holders on the relevant Record Date, as shown by the records of the register of Holders. In the event that the Issuer elects to pay Partial PIK Interest for any interest period, each Holder will be entitled to receive Cash Interest   A-4 in respect of 50% of the principal amount of the Notes held by such Holder on the relevant Record Date and PIK Interest in respect of 50% of the principal amount of the Notes held by such Holder on the relevant Record Date. Following an increase in the principal amount of the outstanding global Notes as a result of a PIK Payment, the global Notes will bear interest on such increased principal amount from and after the date of such PIK Payment. Any PIK Notes issued in certificated form will be dated as of the applicable Interest Payment Date and will bear interest from and after such date. All Notes issued pursuant to a PIK Payment will mature on December 1, 2018 and will be governed by, and subject to the terms, provisions and conditions of, the Indenture and shall have the same rights and benefits as the Notes issued on the Issue Date. Any certificated PIK Notes will be issued with the description PIK on the face of such PIK Note.

(2) *METHOD OF PAYMENT*. For any interest payment period ending prior to June 1, 2016, the Issuer may, at its option elect to pay interest on the Notes:

(i) entirely in cash ("Cash Interest");

(ii) entirely by increasing the principal amount of the outstanding Notes or by issuing PIK Notes (" PIK Interest"); or

(iii) on 50% of the outstanding principal amount of the Notes in cash and on 50% of the outstanding principal amount by increasing the principal amount of the outstanding Notes or by issuing PIK Notes ("Partial PIK Interest").

The Issuer must elect the form of interest payment with respect to each interest period by delivering a notice to the Trustee prior to the beginning of such interest period; provided that the interest payment with respect to the first interest period shall be payable entirely in PIK Interest, and the Issuer shall not be required to deliver a notice to the Trustee with respect to the election for such first interest period. The Trustee shall promptly deliver a corresponding notice to the Holder of this Note. In the absence of such an election for any interest period, interest on this Note shall be payable according to the election for the previous interest period. Beginning with the June 1, 2016 Interest Payment Date, the Issuer will make all interest payments on this Note entirely in cash. Notwithstanding anything to the contrary, the payment of accrued interest in connection with any redemption of Notes as described under Sections 3.07, 4.10 and 4.14 of the Indenture shall be made solely in cash.

The Issuer will pay Cash Interest on the Notes (including Additional Interest, if any) to the Persons who are registered Holders of Notes at the close of business on the May 15 or November 15 (whether or not a Business Day), as the case may be, next preceding the Interest Payment Date, even if such Notes are canceled after such Record Date and on or before such Interest Payment Date, except as provided in Section 2.12 of the Indenture with respect to defaulted interest. Payment of Cash Interest (including Additional Interest, if any) may be made by check mailed to the Holders at their addresses set forth in the register of Holders; provided that payment by wire transfer of immediately available funds will be required with respect to principal of, and premium, if any, and interest (including Additional Interest, if any) on, all Global Notes and all other Notes the Holders of which shall have provided wire transfer instructions to the Issuer or the Paying Agent. Such payment shall be in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts.

(3) *PAYING AGENT AND REGISTRAR*. Initially, The Bank of New York Mellon Trust Company, N.A., the Trustee under the Indenture, will act as Paying Agent and Registrar. The Issuer may change any Paying Agent or Registrar without notice to the Holders. The Issuer or any of its Subsidiaries may act in any such capacity.

(4) *INDENTURE*. The Issuer issued the Notes under an Indenture, dated as of December 5, 2012, as supplemented by a First Supplemental Indenture, dated as of December 19, 2012, a Second Supplemental Indenture, dated as of January 29, 2013, and a Third Supplemental Indenture, dated as of January 30, 2013, each between the Issuer and the Trustee (as so supplemented, the " Indenture"). This Note is one of a duly authorized issue of notes of the Issuer designated as its 11.25%/12.25% Senior Toggle Notes due 2018 (the " Notes"). The Issuer shall be entitled to issue Additional Notes pursuant to Sections 2.01, 4.09 and 4.12 of the Indenture. The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939, as amended. The Notes are subject to all such terms, and Holders are referred to the Indenture and such Act for a statement of such terms. To the extent any provision of this Note conflicts with the express provisions of the Indenture, the provisions of the Indenture shall govern and be controlling.

(5) *OPTIONAL REDEMPTION*.

(a) Except as set forth below, the Issuer will not be entitled to redeem Notes at its option prior to December 1, 2014.

(b) At any time prior to December 1, 2014, the Issuer may redeem the Notes, in whole or in part, upon not less than 30 nor more than 60 days' prior notice mailed by first class mail to the registered address of each Holder of Notes or otherwise delivered in accordance with procedures of DTC, at a redemption price equal to 100% of the principal amount of the Notes redeemed  plus the Applicable Premium, plus accrued and unpaid interest (including Additional Interest, if any) to the applicable date of redemption (the " Redemption Date"), subject to the right of Holders of Notes of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date.

(c) From and after December 1, 2014, the Issuer may redeem the Notes, in whole or in part, upon not less than 30 nor more than 60 days' prior notice mailed by first class mail to the registered address of each Holder of Notes, or otherwise delivered in accordance with the procedures of DTC, at the redemption prices (expressed as percentages of principal amount of the Notes to be redeemed) set forth below, plus accrued and unpaid interest (including Additional Interest, if any) to the applicable Redemption Date, subject to the right of Holders of Notes of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date, if redeemed during the twelve-month period beginning on December 1 of each of the years indicated below:

| Year | Percentage |
|------|------------|
| 2014 | 105.6250% |
| 2015 | 105.6250% |
| 2016 and thereafter | 102.8125% |

(d) Prior to December 1, 2014, the Issuer may, at its option, on one or more occasions, redeem up to 35% of the aggregate principal amount of all Notes at a redemption price equal to 111.25% of the aggregate principal amount thereof, plus accrued and unpaid interest (including Additional Interest, if any) to the Redemption Date, subject to the right of Holders of Notes of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date, with the net cash proceeds of one or more Equity Offerings; provided that at least 50% of the sum of the original aggregate principal amount of Initial Notes and any Additional Notes issued under the Indenture after the Issue Date remains outstanding immediately after the occurrence of each such redemption; provided further that each such redemption occurs within 90 days of the date of closing of each such Equity Offering. Notice of any redemption upon any Equity Offerings may be given prior to the redemption thereof, and any such redemption or notice may, at the Issuer's discretion, be subject to one or more conditions precedent, including, but not limited to, completion of the related Equity Offering.

(e) If the Issuer redeems less than all of the outstanding Notes, the Trustee shall select the Notes to be redeemed in the manner described under Section 3.02 of the Indenture.

(f) Any redemption pursuant to this paragraph 5 shall be made pursuant to the provisions of Sections 3.01 through 3.06 of the Indenture.

(6) *MANDATORY REDEMPTION*. Except as set forth below, the Issuer shall not be required to make mandatory redemption or sinking fund payments with respect to the Notes.

If the Notes would otherwise constitute "applicable high yield discount obligations" within the meaning of Section 163(i)(1) of the Code, at the end of each "accrual period" (as defined in Section 1272(a)(5) of the Code) ending after the fifth anniversary of the Issue Date (each, an " AHYDO Redemption Date"), the Issuer will be required to redeem for cash a portion of the then outstanding Notes equal to the "Mandatory Principal Redemption Amount" (each such redemption, a "Mandatory Principal Redemption"). The redemption price for the portion of the Notes redeemed pursuant to any Mandatory Principal Redemption will be 100% of the aggregate principal amount of such portion of the Notes to be redeemed plus any accrued interest thereon (including Additional Interest, if any) on the date of the redemption. " Mandatory Principal Redemption Amount" means, as of each AHYDO Redemption Date, the portion of the Notes required to be redeemed at such date to prevent the Notes from being treated as "applicable high yield discount obligations" within the meaning of Section 163(i)(1) of the Code. No partial redemption or repurchase of the Notes prior to any AHYDO Redemption Date pursuant to any other provision of the Indenture will alter the Issuer's obligation to make any Mandatory Principal Redemption with respect to the Notes that remain outstanding on such AHYDO Redemption Date.

(7) *NOTICE OF REDEMPTION*. Subject to Section 3.03 of the Indenture, notice of redemption will be mailed by first-class mail at least 30 days but not more than 60 days before the Redemption Date (except that redemption notices may be mailed or delivered more than 60 days prior to a Redemption Date if the notice is issued in connection with Article 8 or Article 11 of the Indenture) to each Holder whose Notes are to be redeemed at its registered address or otherwise delivered in accordance with the procedures of DTC. Notes in denominations larger than $2,000 may be redeemed in part but only in whole multiples of $1,000 A-10 in excess thereof, unless all of the Notes held by a Holder are to be redeemed. On and after the Redemption Date interest ceases to accrue on Notes or portions thereof called for redemption.

(8) *OFFERS TO REPURCHASE*.

(a) If a Change of Control or EFIH/EFH Merger occurs, the Issuer shall make an offer (in the case of a Change of Control, a " Change of Control Offer"; and, in the case of an EFIH/EFH Merger, an "EFIH/EFH Merger Offer") to each Holder to purchase all or any part (equal to $2,000 or an integral multiple of $1,000 in excess thereof) of each Holder's Notes at a purchase price equal to 101% of the aggregate principal amount thereof plus accrued and unpaid interest (including Additional Interest, if any) to the date of purchase (in the case of a Change of Control, the "Change of Control Payment"; and, in the case of an EFIH/EFH Merger, the "EFIH/EFH Merger Payment"), subject to the right of Holders of Notes of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date. The Change of Control Offer or EFIH/EFH Merger Offer, as applicable, shall be made in accordance with Section 4.14 of the Indenture.

(b) If EFIH or any of its Restricted Subsidiaries consummates an Asset Sale (other an Asset Sale of Collateral or Other Oncor Assets), within 10 Business Days of each date that the aggregate amount of Excess Proceeds exceeds $200.0 million, EFIH shall make an offer to all Holders of the Notes, and if required or permitted by the terms of any Senior Indebtedness, to the holders of such Senior Indebtedness (an " Asset Sale Offer"), to purchase the maximum aggregate principal amount of the Notes and such Senior Indebtedness that is a minimum of $2,000 or an integral multiple of $1,000 in excess thereof that may be purchased out of the Excess Proceeds at an offer price in cash in an amount equal to 100% of the principal amount thereof, plus accrued and unpaid interest (including Additional Interest, if any) to the date fixed for the closing of such offer, in accordance with the procedures set forth in the Indenture. To the extent that the aggregate amount of Notes, and such Senior Indebtedness tendered pursuant to an Asset Sale Offer is less than the Excess Proceeds, EFIH may use any remaining Excess Proceeds for general corporate purposes, subject to other covenants contained in the Indenture. If the aggregate principal amount of Notes or such Senior Indebtedness surrendered by such holders thereof exceeds the amount of Excess Proceeds, the Notes and such Senior Indebtedness will be purchased on a  pro rata basis based on the accreted value or principal amount of the Notes or such Senior Indebtedness tendered.

(c) EFIH may, at its option, make an Asset Sale Offer using proceeds from any Asset Sale at any time after consummation of such Asset Sale (other than an Asset Sale of Collateral or other Oncor-related Assets); provided that such Asset Sale Offer shall be in an aggregate amount of not less than $25.0 million. Upon consummation of such Asset Sale Offer, any Net Proceeds not required to be used to purchase Notes shall not be deemed Excess Proceeds.

(d) If EFIH or any of its Restricted Subsidiaries consummates an Asset Sale of Collateral or other Oncor-related Assets and a Collateral Asset Sales Offer, or sequential Collateral Asset Sales Offers to holders of Senior Lien Debt and Junior Lien Debt, EFIH or any Restricted Subsidiary shall make an offer to all Holders of the Notes and, if required or permitted by the terms of any of any other unsecured Senior Indebtedness of EFIH, to the holders of such other unsecured Senior Indebtedness (a " Collateral Asset Sale Excess Proceeds Offer ") to A-10 purchase the maximum aggregate principal amount of such unsecured Senior Indebtedness that is a minimum of $2,000 or an integral multiple of $1,000 in excess thereof that may be purchased out of the Collateral Offer Excess Proceeds at an offer price in cash in an amount equal to 100% of the principal amount thereof, plus accrued and unpaid interest (including Additional Interest, if any) to the date fixed for the closing of such offer, in accordance with the terms and procedures set forth in this Indenture and the other applicable indentures or agreements.

(e) The Issuer (and, if applicable, EFH Corp.) may, at its option, make a Collateral Asset Sale Excess Proceeds Offer using proceeds from any Asset Sale of Collateral or other Oncor-related Assets at any time after consummation of such Asset Sale of Collateral; provided that such Collateral Asset Sale Excess Proceeds Offer shall be in an aggregate amount of not less than $25.0 million. Upon consummation of such Collateral Asset Sale Excess Proceeds Offer, any Net Proceeds not required to be used to purchase the Notes and such unsecured Senior Indebtedness shall not be deemed Collateral Offer Excess Proceeds and EFIH and its Restricted Subsidiaries may use any remaining Net Proceeds for general corporate purposes, subject to the other covenants contained in this Indenture.

(9) DENOMINATIONS, TRANSFER, EXCHANGE. The Notes are in registered form without coupons in denominations of $2,000 and integral multiples of $1,000 in excess thereof. The transfer of Notes may be registered and Notes may be exchanged as provided in the Indenture. The Registrar and the Trustee may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and the Issuer may require a Holder to pay any taxes and fees required by law or permitted by the Indenture. The Issuer need not exchange or register the transfer of any Notes or portion of Notes selected for redemption, except for the unredeemed portion of any Notes being redeemed in part. Also, the Issuer need not exchange or register the transfer of any Notes for a period of 15 days before a selection of Notes to be redeemed.

(10) PERSONS DEEMED OWNERS. The registered Holder of a Note may be treated as its owner for all purposes.

(11) AMENDMENT, SUPPLEMENT AND WAIVER. The Indenture, the Guarantees or the Notes may be amended or supplemented as provided in the Indenture.

(12) DEFAULTS AND REMEDIES. The Events of Default relating to the Notes are defined in Section 6.01 of the Indenture. If any Event of Default occurs and is continuing, the Trustee or the Required Holders of at least 30% in aggregate principal amount of the then outstanding Required Debt may declare the principal of and premium, if any, interest (including Additional Interest, if any) and any other monetary obligations on all the then outstanding Notes to be due and payable immediately. Notwithstanding the foregoing, in the case of an Event of Default arising from certain events of bankruptcy or insolvency, all principal of, and premium, if any, interest (including Additional Interest, if any) and any other monetary obligations on, all the then outstanding Notes will become due and payable immediately without further action or notice. Holders may not enforce the Indenture, the Notes or the Guarantees except as provided in the Indenture. Subject to certain limitations, Required Holders of a majority in aggregate principal amount of the then outstanding Required Debt may direct the Trustee in its exercise of any trust or power. The Trustee may withhold from Holders of the Notes notice of any continuing Default (except a Default relating to the payment of principal, premium, if any, or interest (including Additional Interest, if any)) if it determines that withholding notice is in their interest. The Required Holders of a majority in aggregate principal amount of the then outstanding Required Debt by notice to the Trustee may on behalf of the Required Holders of all of the Required Debt waive any existing Default or and its consequences under the Indenture except a continuing Default in payment of the principal of, or

premium, if any, or interest (including Additional Interest, if any) on, any of the Notes held by a non-consenting Holder. EFIH is required to deliver to the Trustee annually a statement regarding compliance with the Indenture, and EFIH is required within five Business Days after becoming aware of any Default, to deliver to the Trustee a statement specifying such Default and what action EFIH proposes to take with respect thereto.

(13) *AUTHENTICATION*. This Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose until authenticated by the manual signature of the Trustee.

(14) *ADDITIONAL RIGHTS OF HOLDERS OF RESTRICTED GLOBAL NOTES AND RESTRICTED DEFINITIVE NOTES*. In addition to the rights provided to Holders of Notes under the Indenture, Holders of Restricted Global Notes and Restricted Definitive Notes shall have all the rights set forth in the Registration Rights Agreement, dated as of December 5, 2012, among the Issuer and the other parties named on the signature pages thereof (the "Registration Rights Agreement"), including the right to receive Additional Interest, if any (as defined in the Registration Rights Agreement).

(15) *GOVERNING LAW*. THE INDENTURE, THE NOTES AND THE GUARANTEES WILL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

(16) *CUSIP/ISIN NUMBERS*. Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Issuer has caused CUSIP/ISIN numbers to be printed on the Notes and the Trustee may use CUSIP/ISIN numbers in notices of redemption as a convenience to Holders. No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

The Issuer will furnish to any Holder upon written request and without charge a copy of the Indenture and/or the Registration Rights Agreement. Requests may be made to the Issuer at the following address:

Energy Future Intermediate Holding Company LLC
Energy Plaza
1601 Bryan Street
Dallas, Texas 75201-3411
Facsimile No.: (214) 812-6032
Attention: General Counsel
and
Facsimile No.: (214) 812-4097
Attention: Treasurer

and

EFIH Finance Inc.
Energy Plaza
1601 Bryan Street
Dallas, Texas 75201-3411
Facsimile No.: (214) 812-6032
Attention: General Counsel
or
Facsimile No.: (214) 812-4097
Attention: Treasurer

**ASSIGNMENT FORM**

To assign this Note, fill in the form below:

(I) or (we) assign and transfer this Note to:_____

(Insert assignee's legal name)

_____

Insert assignee's Soc. Sec. or tax I.D. no.)

_____

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint _____
to transfer this Note on the books of the Issuer.  The agent may substitute another to act for him.

Date:_____

Your Signature_____

(Sign exactly as your name appears on the face of this Note)

Signature Guarantee*_____

_____

*     Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee)

**OPTION OF HOLDER TO ELECT PURCHASE**

If you want to elect to have this Note purchased by the Issuer pursuant to Section 4.10(d), 4.10(f) or 4.14 of the Indenture, check the appropriate box below:

☐  Section 4.10(d)   ☐  Section 4.10(f)   ☐  Section 4.14

If you want to elect to have only part of this Note purchased by the Issuer pursuant to Section 4.10(d), 4.10(f) or Section 4.14 of the Indenture, state the amount you elect to have purchased:

$_____

Date:_____

Your Signature_____
(Sign exactly as your name appears on the face of this Note)

Tax Identification No.:_____

Signature Guarantee *_____

_____
\*    Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee)

**SCHEDULE OF EXCHANGES OF INTERESTS IN THE GLOBAL NOTE**

The initial outstanding principal amount of this Global Note is $[ ]. The following exchanges of a part of this Global Note for an interest in another Global Note or for a Definitive Note, or exchanges of a part of another Global or Definitive Note for an interest in this Global Note, have been made:

| Date of Exchange | Amount of decrease in Principal Amount | Amount of increase in Principal Amount of this Global Note | Principal Amount of this Global Note following each decrease or increase | Signature of authorized officer of Trustee or Custodian |
|---|---|---|---|---|

Exhibit 10(dd)

## AMENDED AND RESTATED EMPLOYMENT AGREEMENT

by and between ENERGY FUTURE HOLDINGS CORP. (the "***Company***") and JOHN YOUNG ("***Executive***") (individually, each a "***Party***" and collectively, the "***Parties***").

### WITNESSETH

**WHEREAS**, the Parties previously entered into an employment agreement dated January 6, 2008 and effective January 31, 2008 ("***Original Effective Date***") and most recently amended and restated effective July 1, 2011; and

**WHEREAS**, the Parties desire to amend and restate the employment agreement, in each case on the terms and conditions set forth herein.

**NOW, THEREFORE**, in consideration of the mutual promises, covenants and obligations contained herein, the Company and Executive agree as follows:

1.        **Term of Employment**. Subject to the provisions of Section 7 of this Agreement, this Agreement, as restated, and Executive's employment hereunder shall be effective as of December 26, 2012 (" ***Effective Date***") and shall end as of 11:59:59 P.M. on June 30, 2015 (the "***Initial Term***"). Subject to the provisions of Section 7 of this Agreement, this Agreement shall automatically renew for an additional one (1) year period commencing immediately following the last day of the Initial Term and each one (1) year period thereafter (each, a "***Renewal Term***"), unless, the Company or Executive provides the other Party written notice of non-renewal at least sixty (60) days prior to the end of the applicable term. The period during which Executive is employed by the Company hereunder is hereinafter referred to as the "***Employment Term***."

2.        **Position and Duties**.

(a)        During the Employment Term, Executive shall serve as Chief Executive Officer ("CEO") of the Company. Executive shall also serve as a member of the board of directors of the Company (as used herein, the term " ***Board***" shall mean the board of directors of the Company or a committee designated by such board), without additional compensation.  In such position, Executive shall have such duties, authority and responsibilities as shall be determined from time to time by the Board, which duties, authority and responsibilities shall be customary for Executive's position in a business of similar size, type and nature to that of the Company. Executive shall be the senior most executive officer of the Company and shall report to the Board with respect to his responsibilities to the Company.

(b)        During the Employment Term, Executive will devote Executive's full business time and best efforts to performance of the duties described in Section 2(a) and will not engage in any other business, profession or occupation for compensation or otherwise which would conflict or interfere, directly or indirectly, with performance of Executive's duties; provided, however, that nothing herein shall preclude Executive from participating in civic and charitable activities and boards and from serving on the outside board of directors of one other company and, subject to the prior approval of the Board which approval shall not be unreasonably withheld, from accepting appointment to or continuing to serve on such additional boards of directors or trustees of any other business or corporation; <u>provided</u>, <u>further</u>, that, in each case, such activities do not conflict or interfere with the performance of Executive's duties hereunder or conflict with Section 8.

3.      **Base Salary**. From the Effective Date and during the remainder of the Employment Term, the Company shall pay Executive a base salary of $1,350,000 annually, payable in regular installments in accordance with the Company's usual payment practices. Executive may be entitled to increases in his base salary in the sole discretion of the Board, which shall make such determinations following its annual review process for executives. Executive's annual base salary, as in effect from time to time, is hereinafter referred to as the "*Base Salary*."

4.      **Annual Bonus**. Beginning January 1, 2013 and with respect to each fiscal year during the remainder of the Employment Term, Executive shall have the opportunity to earn an annual bonus award (the "*Annual Bonus*") pursuant to the terms and conditions of the EFH Executive Annual Incentive Plan ("*AIP*") of 125% of Base Salary ("*Target Award*"). The amount of the Annual Bonus shall be based upon the achievement of annual business performance targets and Executive's individual performance, both as approved by the Board; provided, however, if the Company and/or Executive achieve superior performance targets as established by the Board, then Executive shall be eligible to receive a bonus award constituting 200% of his Target Award. Each Annual Bonus, if any, shall be paid to Executive within two and one-half (2½) months after the end of the applicable fiscal year.

5.      **Employee Benefits; Perquisites; Fringe Benefits**.

(a)      Welfare, Savings and Retirement Benefits. During the Employment Term, Executive shall be entitled to participate in the Company's group health, life, disability, and all tax qualified and nonqualified benefit plans, as in effect from time to time (collectively "*Employee Benefits*"), on a basis which is no less favorable than is offered to other members of the Strategy and Policy Committee, to the extent consistent with applicable law and the terms of the applicable plans.

(b)      Fringe Benefits; Perquisites. During the Employment Term, Executive shall be entitled to fringe benefits and perquisites consistent with the practices of the Company (including, without limitation, the Company's payment on behalf of Executive of monthly dues of a country club selected by Executive) to the extent the Company provides similar benefits or perquisites (or both) to other members of the Strategy and Policy Committee and Executive is otherwise eligible to participate.

(c)      At the beginning of each calendar year during the Employment Term, Executive shall be entitled to the greater of: five (5) weeks of paid vacation, or the maximum number of days Executive is entitled to under the Company's vacation or paid time off policy, as applicable. Executive shall be entitled to carry over up to five (5) days of unused vacation from one calendar year to the next; provided that, any carryover vacation days not used in the next calendar year shall be forfeited. Executive shall also be entitled to paid sick leave benefits in accordance with those provided to other similarly situated executives during the Employment Term.

(d)      Executive shall be entitled to the additional benefits and compensation set forth in Exhibits I and II attached hereto, subject to the terms and conditions thereof.

6.      **Business Expenses**. Subject to the Company's standard policies and procedures with respect to expense reimbursement, the Company shall reimburse Executive for, or pay on behalf of Executive, reasonable and appropriate expenses incurred by Executive for business related purposes, provided claims for reimbursement are submitted timely and with appropriate supporting documentation.

7.      **Termination**. Executive's employment hereunder may be terminated by either the Company or Executive at any time and for any reason; provided that, unless otherwise provided herein, either Party

will be required to give the other Party at least sixty (60) days advance written notice of termination of Executive's employment. Notwithstanding the foregoing, the Company may, in lieu of providing sixty (60) days advance written notice of termination, immediately terminate Executive's employment for Cause; provided, that, the Company provides Executive with the compensation and benefits then in effect at the time of such termination to which Executive would have been entitled had he continued employment with the Company for such sixty (60) day period.  The provisions of this Section 7 shall exclusively govern Executive's rights upon termination of employment with the Company and its Affiliates (as defined in Section 8(c) below).

      (a)      <u>By the Company for Cause or by Executive Due to Voluntary Resignation without Good Reason</u>.

      (i)      Executive's employment may be terminated by the Company for Cause (as defined below) or by Executive's voluntary resignation without Good Reason (as defined below) and, in either case, Executive shall be entitled to receive:

      (A)      within six (6) calendar days following the date of termination, accrued, but unpaid Base Salary and unused vacation, earned through the date of termination;

      (B)      in accordance with Section 4 (except to the extent payment is otherwise deferred pursuant to any applicable deferred compensation arrangement with the Company), any accrued but unpaid Annual Bonus earned for any previously completed fiscal year;

      (C)      within sixty (60) days of Executive's claim for reimbursement, payment for any unreimbursed business expenses properly incurred by Executive in accordance with the Company's policies prior to the date of Executive's termination; provided that claims for reimbursement are accompanied by appropriate supporting documentation and are submitted to the Company within ninety (90) days following the date of Executive's termination of employment;

      (D)      Employee Benefits and equity compensation, if any, as to which Executive may be entitled under the employee benefit plans of the Company and its Affiliates or any agreement between the Company (and/or its Affiliates) and Executive; and

      (E)      any amounts payable or that may become payable pursuant to Section 7(g) and/or Section 9(g) (the amounts described in clauses (A) through (E) hereof being referred to as the "***Accrued Rights***").

Following termination of Executive's employment by the Company for Cause or voluntary resignation by Executive without Good Reason, except as set forth in this Section 7(a)(i) and for any rights to indemnification and claims for liability insurance coverage under officer and director policies, Executive shall have no further rights to any compensation or any other benefits under this Agreement.

      (ii)      For purposes of this Agreement, the terms:

      (A)      ***"Cause"*** shall mean (i) if, in carrying out his duties to the Company, Executive engages in conduct that constitutes (a) a material breach of his fiduciary duty to the Company or its shareholders (including, without limitation, a material breach or attempted breach of the provisions under Section 8), (b) gross neglect, or (c) gross misconduct resulting in material economic harm to the Company; provided that any such conduct described in (a), (b) or (c) is not cured within ten (10) business days after

Executive receives from the Company written notice thereof; or (ii) Executive's conviction of, or entry of a plea of guilty or nolo contendere for, a felony or other crime involving moral turpitude.

(B) ***"Good Reason"*** shall mean, provided that Executive has not previously given the Company his written consent, (i) a reduction in Executive's Base Salary or Executive's annual incentive compensation opportunity (other than a general reduction in base salary or annual incentive compensation opportunities that affects all salaried employees of the Company proportionally); (ii) a transfer of Executive's primary workplace by more than fifty (50) miles from the workplace on the Effective Date; (iii) a substantial adverse change in Executive's title, duties or responsibilities; (iv) any material breach of this Agreement; or (v) an adverse change in Executive's reporting responsibilities pursuant to the terms of this Agreement; provided, however, that any isolated, insubstantial and inadvertent failure by the Company that is not in bad faith and is cured within ten (10) business days after Executive gives the Company written notice of any such event set forth above, shall not constitute Good Reason.

(b)    <u>Disability or Death</u>.

(i)    Executive's employment shall terminate upon Executive's death and may be terminated by the Company if Executive has a Disability (as defined below) and, in either case, Executive or Executive's estate (as the case may be) shall be entitled to receive:

(A)    the Accrued Rights;

(B)    a portion of the Target Award that Executive would have been entitled to receive pursuant to Section 4 hereof for the fiscal year of termination, such portion to be determined by multiplying the Target Award by a fraction, the numerator of which is the number of days during which Executive was employed by the Company in the fiscal year of Executive's termination, and the denominator of which is 365 (the "***Pro-Rata Bonus"***), with such Pro-Rata Bonus payable to Executive pursuant to Section 4 as if Executive's employment had not terminated; and

(C)    any additional benefits and compensation set forth in Exhibits I and II attached hereto, subject to the terms and conditions thereof.

Following Executive's termination of employment due to death or Disability, except as set forth in this Section 7(b)(i) and for any rights to indemnification and claims for liability insurance coverage under officer and director policies, Executive shall have no further rights to any compensation or any other benefits under this Agreement.

(ii)    "***Disability"*** shall mean Executive's physical or mental incapacitation and consequent inability, with reasonable accommodation, for a period of six consecutive months to perform Executive's duties;  <u>provided</u>, <u>however</u>, in the event the Company temporarily replaces Executive, or transfers Executive's duties or responsibilities to another individual, on account of Executive's inability to perform such duties due to a mental or physical incapacity which is, or is reasonably expected to become, a long-term disability, then Executive's employment shall not be deemed terminated by the Company and Executive shall not be able to resign with Good Reason. Any question as to the existence of a Disability as to which Executive and the Company cannot agree shall be determined in writing by a qualified independent physician mutually acceptable to Executive and the Company. If Executive and the Company cannot agree on a qualified independent physician, each shall appoint a physician and those two physicians shall select a third who shall make such determination in writing. The determination of Disability made in writing to the Company and

Executive shall be final and conclusive for all purposes of the Agreement and any other agreement with Executive that incorporates this definition of Disability.

        (c)        <u>By the Company Without Cause; Resignation by Executive for Good Reason</u> . Executive's employment hereunder may be terminated by the Company without Cause (other than by reason of death or Disability) or upon Executive's resignation for Good Reason and, in either case (except as otherwise provided in Section 7(e)), Executive shall be entitled to receive:

        (i)        the Accrued Rights;

        (ii)        provided Executive (x) does not violate the restrictions set forth in Section 8 of this Agreement and (y) executes, delivers and does not revoke a general release of claims against the Company and its Affiliates (excluding claims for indemnification, claims for coverage under officer and director policies, and claims as a stockholder of the Company):

        (A)        a lump sum payment equal to: (I) three (3) times Executive's Base Salary, and (II) the Pro-Rata Bonus, payable as soon as practicable but no later than the earlier of: (a) March 15 following the calendar year in which termination occurs or (b) ninety (90) days following termination; and

        (B)        Executive, his spouse and eligible dependents (to the extent covered immediately prior to such termination) shall continue to be eligible to participate in all of the Company's group health plans on the same terms and conditions as active employees of the Company until the earlier of (x) thirty (30) months from the date of termination of Executive's employment (the "***Severance Period***"), to the extent that Executive was eligible to participate in such plans immediately prior to the date of termination, or (y) until Executive is, or becomes, eligible for comparable coverage (determined on a coverage by coverage and benefit by benefit basis) under the group health plans of a subsequent employer.  If Executive continues to receive benefits pursuant to this Section 7(c)(ii)(B) when, in the absence of the benefits provided in this Section 7(c)(ii)(B), Executive would not be entitled to continuation coverage under Section 4980B of the Internal Revenue Code of 1986, as amended (the " ***Code***"), Executive shall receive reimbursement for all medical expenses no later than the end of the calendar year immediately following the calendar year in which the applicable expenses were incurred. The health care continuation coverage period under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("***COBRA***"), Code Section 4980B, or any replacement or successor provision of United States tax law, shall run concurrently with the Severance Period; and

        (iii)        any additional benefits and compensation set forth in Exhibits I and II attached hereto, subject to the terms and conditions thereof.

Following Executive's termination of employment by the Company without Cause (other than by reason of Executive's death or Disability) or upon Executive's resignation for Good Reason, except as set forth in this Section 7(c) or otherwise provided in Section 7(e) and for any rights to indemnification and claims for liability insurance coverage under officer and director policies, Executive shall have no further rights to any compensation or any other benefits under this Agreement.

        (d)        <u>Expiration of Employment Term</u>.

        (i)        In the event Executive elects not to extend the Employment Term pursuant to Section 1 and Executive's employment has not been earlier terminated pursuant to Sections 7(a), (b), (c), or (e), the Employment Term shall expire and Executive's employment hereunder shall terminate as of the end of the day immediately preceding the commencement of a subsequent Renewal Term, and Executive shall

be entitled to receive the Accrued Rights.  Except as set forth in this Section 7(d)(i) and for any rights to indemnification and claims for liability insurance coverage under officer and director policies, Executive shall have no further rights to any compensation or any other benefits under this Agreement.

(ii)    In the event the Company elects not to extend the Employment Term pursuant to Section 1 and Executive's employment has not been earlier terminated pursuant to Sections 7(a), (b), (c), or (e), the Employment Term shall expire and Executive's employment hereunder shall terminate as of the end of the day immediately preceding the commencement of a subsequent Renewal Term, and Executive shall be entitled to receive the payments and benefits applicable to a termination of Executive's employment without Cause pursuant to Section 7(c) or Section 7(e), as applicable.  Except as set forth in this Section 7(d)(ii) and for any rights to indemnification and claims for liability insurance coverage under officer and director policies, Executive shall have no further rights to any compensation or any other benefits under this Agreement.

(e)    Change in Control.  Notwithstanding any provision contained herein, if Executive's employment is terminated by the Company without Cause (other than by reason of death or Disability) or if Executive resigns for Good Reason, in either case, within twenty-four (24) months following a Change in Control (as defined in the 2007 Stock Incentive Plan for Key Employees of Energy Future Holdings Corp. and its Affiliates), Executive shall be entitled to receive:

(i)    the Accrued Rights;

(ii)    provided Executive (x) does not violate the restrictions set forth in Section 8 of this Agreement and (y) executes, delivers and does not revoke a general release of claims against the Company and its Affiliates (excluding claims for indemnification, claims for coverage under officer and director policies, and claims as a stockholder of the Company), a lump sum payment equal to three (3) times the sum of Executive's annualized Base Salary and Executive's Target Award, payable as soon as practicable but no later than the earlier of: (i) March 15 following the calendar year in which termination occurs or (ii) ninety (90) days following termination;

(iii)    provided Executive (x) does not violate the restrictions set forth in Section 8 of this Agreement and (y) executes, delivers and does not revoke a general release of claims against the Company and its Affiliates (excluding claims for indemnification, claims for coverage under officer and director policies, and claims as a stockholder of the Company), Executive, his spouse and eligible dependents (to the extent covered immediately prior to such termination) shall continue to be eligible to participate in all of the Company's group health plans on the same terms and conditions as active employees of the Company until the earlier of (A) termination of the Severance Period, to the extent that Executive was eligible to participate in such plans immediately prior to the date of termination, or (B) until Executive is, or becomes, eligible for comparable coverage (determined on a coverage by coverage and benefit by benefit basis) under the group health plans of a subsequent employer.  If Executive continues to receive benefits pursuant to this Section 7(e)(iii) when, in the absence of the benefits provided in this Section 7(e)(iii) Executive would not be entitled to continuation coverage under Code Section 4980B, Executive shall receive reimbursement for all medical expenses no later than the end of the calendar year immediately following the calendar year in which the applicable expenses were incurred. The health care continuation coverage period under COBRA, Code Section 4980B, or any replacement or successor provision of United States tax law, shall run concurrently with the Severance Period; and

(iv)    any additional benefits and compensation set forth in Exhibits I and II attached hereto, subject to the terms and conditions thereof.

Following Executive's termination of employment without Cause (other than by reason of Executive's death or Disability) or upon Executive's resignation for Good Reason, in either case, within twenty-four (24) months following a Change in Control, except as set forth in this Section 7(e) and for any rights to indemnification and claims for liability insurance coverage under officer and director policies, Executive shall have no further rights to any compensation or any other benefits under this Agreement.

(f)    Notice of Termination. Any purported termination of employment by the Company or by Executive (other than due to Executive's death) shall be communicated by written Notice of Termination to the other Party in accordance with Section 9(j) hereof. For purposes of this Agreement, a "**Notice of Termination**" shall mean a notice indicating the specific termination provision in this Agreement relied upon and shall set forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of employment under the provision so indicated.

(g)    Code Section 4999.

(i)    If, by reason of, or in connection with, any transaction that occurs after the Original Effective Date, Executive would be subject to the imposition of the excise tax imposed by Code Section 4999 related to Executive's employment with the Company, whether before or after termination of Executive's employment, but the imposition of such tax could be avoided by approval of shareholders described in Code Section 280G(b)(5)(B), then Executive may ask the Company to seek such approval, in which case the Company will use its reasonable best efforts to cause such approval to be obtained and Executive will cooperate and execute such waivers as may be necessary so that such approval avoids imposition of any excise tax under Code Section 4999.  If Executive fails to request that the Company seek such approval, or if Executive does request that the Company seek such approval, but fails to cooperate and execute such waivers as may be necessary in the approval process, Section 7(g)(ii) shall not apply and Executive shall not be entitled to any gross-up payment for any resulting tax under Code Section 4999. If such approval, even if sought and obtained, would not avoid imposition of the excise tax imposed under Code Section 4999, then the provisions of Section 7(g)(ii) shall apply without any precedent obligation of Executive to seek such approval.

(ii)    Gross-Up Payment.

(A)    In the event it shall be determined that any payment, benefit or distribution (or combination thereof) by the Company, any Affiliate, or one or more trusts established by the Company or any Affiliate for the benefit of their employees, to or for the benefit of Executive (whether paid or payable or distributed or distributable pursuant to the terms of this Agreement, or otherwise) (a "**Payment**") is subject to the excise tax imposed by Code Section 4999 or any interest or penalties are incurred by Executive with respect to such excise tax (such excise tax, together with any such interest and penalties, hereinafter collectively referred to as the "**Excise Tax**"), Executive shall be entitled to receive an additional payment (a "**Gross-Up Payment**") in an amount such that after payment by Executive of all taxes (including any interest or penalties imposed with respect to such taxes), including, without limitation, any federal, state and local income taxes and employment taxes (and any interest and penalties imposed with respect thereto) and the Excise Tax imposed upon the Gross-Up Payment, Executive retains an amount of the Gross-Up Payment equal to the Excise Tax imposed upon the Payments.

(B)    All determinations required to be made under this Section 7(g)(ii), including whether and when a Gross-Up Payment is required and the amount of such Gross-Up Payment and the assumptions to be utilized in arriving at such determination, shall be made by Deloitte & Touche LLP, Alvarez & Marsal, or such other nationally recognized accounting firm as may be designated by the

Company (the "***Accounting Firm***"), which shall provide detailed supporting calculations both to the Company and Executive within ten (10) business days of the receipt of notice from Executive that there has been a Payment, or such earlier time as is requested by the Company; provided that for purposes of determining the amount of any Gross-Up Payment, Executive shall be deemed to pay federal income tax at the highest marginal rates applicable to individuals in the calendar year in which any such Gross-Up Payment is to be made and deemed to pay state and local income taxes at the highest effective rates applicable to individuals in the state or locality of Executive's residence or place of employment in the calendar year in which any such Gross-Up Payment is to be made, net of the maximum reduction in federal income taxes that can be obtained from deduction of such state and local taxes, taking into account limitations applicable to individuals subject to federal income tax at the highest marginal rates. All fees and expenses of the Accounting Firm shall be borne solely by the Company. Any Gross-Up Payment, as determined pursuant to this Section 7(g)(ii), shall be paid by the Company to Executive (or to the appropriate taxing authority on Executive's behalf) when due. If the Accounting Firm determines that no Excise Tax is payable by Executive, it shall so indicate to Executive in writing. Any determination by the Accounting Firm shall be binding upon the Company and Executive (subject to Section 7(g)(ii)(C)). As a result of the uncertainty in the application of Code Section 4999, it is possible that the amount of the Gross-Up Payment determined by the Accounting Firm to be due to (or on behalf of) Executive was lower than the amount actually due ("***Underpayment***"). In the event that the Company exhausts its remedies pursuant to Section 7(g)(ii)(C) and Executive thereafter is required to make a payment of any Excise Tax, the Accounting Firm shall determine the amount of the Underpayment that has occurred, and any such Underpayment shall be promptly paid by the Company to or for the benefit of Executive (but in any case no later than the calendar year following the calendar year in which such tax was payable).

(C)        Executive shall notify the Company in writing of any claim by the Internal Revenue Service that, if successful, would require the payment by the Company of any Gross-Up Payment. Such notification shall be given as soon as practicable but no later than ten (10) business days after Executive is informed in writing of such claim and shall apprise the Company of the nature of such claim and the date on which such claim is requested to be paid. Executive shall not pay such claim prior to the expiration of the thirty (30) day period following the date on which he gives such notice to the Company (or such shorter period ending on the date that any payment of taxes with respect to such claim is due). If the Company notifies Executive in writing prior to the expiration of such period that it desires to contest such claim, Executive shall (i) give the Company any information reasonably requested by the Company relating to such claim, (ii) take such action in connection with contesting such claim as the Company shall reasonably request in writing from time to time, including, without limitation, accepting legal representation with respect to such claim by an attorney reasonably selected by the Company, (iii) cooperate with the Company in good faith in order to effectively contest such claim and (iv) permit the Company to participate in any proceedings relating to such claim; provided, however, that the Company shall bear and pay directly all costs and expenses (including additional interest and penalties) incurred in connection with such contest and shall indemnify and hold Executive harmless, on an after-tax basis, for any Excise Tax or income tax (including interest and penalties with respect thereto) imposed as a result of such representation and payment of costs and expenses. Without limitation on the foregoing provisions of this Section 7(g)(ii)(C), the Company shall control all proceedings taken in connection with such contest and, at its sole option, may pursue or forego any and all administrative appeals, proceedings, hearings and conferences with the taxing authority in respect of such claim and may, at its sole option, either direct Executive to pay the tax claimed and sue for a refund or contest the claim in any permissible manner, and Executive agrees to prosecute such contest to a determination before any administrative tribunal, in a court of initial jurisdiction and in one (1) or more appellate courts, as the Company shall determine; provided that if the Company directs Executive to pay such claim and sue for a refund, the Company shall advance the amount of such payment to Executive, on an interest-free basis, and shall indemnify and hold Executive harmless, on an after-tax basis, from any Excise Tax or income tax (including interest or penalties with respect thereto) imposed with respect to such advance or with respect

to any imputed income with respect to such advance; provided, further, that if Executive is required to extend the statute of limitations to enable the Company to contest such claim, Executive may limit this extension solely to such contested amount. The Company's control of the contest shall be limited to issues with respect to which a Gross-Up Payment would be payable hereunder and Executive shall be entitled to settle or contest, as the case may be, any other issue raised by the Internal Revenue Service or any other taxing authority.

        (D)        If, after the receipt by Executive of an amount paid or advanced by the Company pursuant to this Section 7(g)(ii), Executive becomes entitled to receive any refund with respect to a Gross-Up Payment, Executive shall (subject to the Company's complying with the requirements of Section 7(g)(ii)(C)) promptly pay to the Company the amount of such refund received (together with any interest paid or credited thereon after taxes applicable thereto). If, after the receipt by Executive of an amount advanced by the Company pursuant to Section 7(g)(ii)(C), a determination is made that Executive shall not be entitled to any refund with respect to such claim, and the Company does not notify Executive in writing of its intent to contest such denial of refund prior to the expiration of thirty (30) days after such determination, then such advance shall be forgiven and shall not be required to be repaid, and the amount of such advance shall offset, to the extent thereof, the amount of the Gross-Up Payment required to be paid.

        (E)        For the avoidance of doubt, all payments to or for the benefit of Executive provided for in this Section 7(g)(ii) shall be made no later than the end of the calendar year in which the applicable Excise Tax has become due, or if as a result a tax audit or litigation, it is determined that no additional Excise Tax has become due, the end of the calendar year in which the audit is completed or there is a final and non-appealable settlement or other resolution.

8.      **Restrictive Covenants**.

      (a).      In consideration of the Company entering into this Agreement with Executive and hereby promising and committing itself to provide Executive with Confidential Information and/or specialized training after Executive executes this Agreement, Executive shall not, directly or indirectly:

      (i).      at any time during or after the Employment Term, disclose any Confidential Information pertaining to the business of the Company, the Sponsor Group, or any of their respective Affiliates, except when required to perform his duties to the Company or one of its Affiliates, or by law or judicial process, provided that Executive gives the Company reasonable notice of any legal or judicial proceeding requiring Executive to disclose Confidential Information and an opportunity to challenge the disclosure of any such information, and Executive agrees to provide such reasonable notice in writing to:

General Counsel
Energy Future Holdings Corp.
1601 Bryan Street, 41st Floor
Dallas, Texas 75201
(214) 812-5153 (facsimile);

      (ii).      at any time during the Employment Term and for a period of twenty-four (24) months  thereafter (the "***Non-Compete Period***"), directly or indirectly, act as a proprietor, investor, director, officer, employee, substantial stockholder, consultant, or partner in any Competing Business in Texas or any other geographic area in which Texas Energy Future Holdings Limited Partnership, the Company or any of their respective subsidiaries operates or conducts business; or

(iii).        at any time during the Employment Term and for a period of twenty-four (24) months  thereafter, directly or indirectly (A) solicit customers or clients of the Company or any of its Affiliates to terminate their relationship with the Company or any of its Affiliates or otherwise solicit such customers or clients to compete with any business of the Company or any of its Affiliates, or (B) solicit or offer employment to any person who is, or has been at any time during the twelve (12) months immediately preceding the termination of Executive's employment, employed by the Company or any of its Affiliates;

provided that in each of (ii) and (iii) above, such restrictions shall not apply with respect to any member of the Sponsor Group or any of its Affiliates that is not engaged in any business that competes, directly or indirectly, with the Company or any of its subsidiaries in any geographic area where they operate. Notwithstanding the foregoing, for the purposes of this Section 8(a), (A) Executive may, directly or indirectly own, solely as an investment, securities of any Person engaged in the business of the Company or its Affiliates that are publicly traded on a national or regional stock exchange or quotation system or on the over-the-counter market if Executive (I) is not a controlling person of, or a member of a group which controls, such Person and (II) does not, directly or indirectly, own 5% or more of any class of securities of such Person, and (B) Section 8(a)(ii) shall not be violated by reason of any exercise of tag-along rights under the Sale Participation Agreement, by and between the Company (and related parties) and Executive (the " *Sale Participation Agreement"*) or Drag Transaction (as defined in the Sale Participation Agreement) that may occur after the date hereof.

(b).        Notwithstanding clause (a) above, if at any time a court holds that the restrictions stated in such clause (a) are unreasonable or otherwise unenforceable under circumstances then existing, the Parties hereto agree that the maximum period, scope or geographic area determined to be reasonable under such circumstances by such court will be substituted for the stated period, scope or area. Because Executive's services are unique and because Executive has had access to Confidential Information, the Parties hereto agree that money damages will be an inadequate remedy for any breach of this Agreement. In the event of a breach or threatened breach of this Agreement, the Company or its successors or assigns may, in addition to other rights and remedies existing in their favor, apply to any court of competent jurisdiction for specific performance and/or injunctive relief in order to enforce, or prevent any violations of, the provisions hereof (without the posting of a bond or other security). Notwithstanding the foregoing, in the event Executive breaches the covenants set forth in this Section 8, the Company's rights and remedies with respect Executive's Options, Option Stock, and Stock and payments related thereto, as those terms are defined in the Management Stockholder's Agreement, by and between the Company (and related parties) and Executive (the "*Management Stockholder's Agreement"* ) shall be limited to those set forth in Section 22(c) of the Management Stockholder's Agreement.

(c).        For purposes of this Agreement, the terms listed below shall be defined as follows:

(i).        *"Affiliate"* shall mean with respect to any Person, any entity directly or indirectly controlling, controlled by or under common control with such Person; provided, however, for purposes of this Agreement, Texas Energy Future Co-Invest, LP shall not be deemed to be an Affiliate of the Sponsor Group or any member of the Sponsor Group.

(ii).        *"Competing Business"* shall mean any business that directly or indirectly competes, at the relevant determination date, with one or more of the businesses of the Company or any of its Affiliates in any geographic area where Texas Energy Future Holdings Limited Partnership, the Company, or any of their respective subsidiaries operates.

(iii).        ***"Confidential Information"*** shall mean information: (A) disclosed to or known by Executive as a consequence of or through his employment with the Company or any Affiliate; (B) not publicly available or not generally known outside the Company or any Affiliate; and (C) that relates to the business and/or development of the Company or any Affiliate. Any information that does not meet each of the criteria listed above (in subsections (A) - (C)) shall not constitute Confidential Information. By way of example, Confidential Information shall include but not be limited to the following: all non-public information or trade secrets of the Company, or any Affiliate that gives the Company or any Affiliate a competitive business advantage or the opportunity of obtaining such advantage, or disclosure of which might be detrimental to the interests of the Company or any Affiliate; information regarding the Company's or any Affiliate's business operations, such as financial and sales data (including budgets, forecasts, and historical financial data), operational information, plans, and strategies; business and marketing strategies and plans for various products and services; rate and regulatory strategy and plans; information regarding suppliers, consultants, employees, and contractors; technical information concerning products, equipment, services, and processes; procurement procedures; pricing and pricing techniques; information concerning past, current and prospective customers, investors, and business affiliates; plans or strategies for expansion or acquisitions; budgets; research; trading methodologies and terms; communications information; evaluations, opinions, and interpretations of information and data; marketing and merchandising techniques; electronic databases; models; specifications; computer programs; contracts; bids or proposals; technologies and methods; training methods and processes; organizational structure; personnel information; payments or rates paid to consultants or other service providers; and the Company's or any Affiliate's files, physical or electronic documents, equipment, and proprietary data or material in whatever form including all copies of all such materials. By way of clarification (but not limitation), information that Executive conceived or developed during his employment with the Company or an Affiliate or learned from other employees or contractors of the Company or an Affiliate that meets the definition of Confidential Information shall be treated as such.

(iv).        ***"Person"*** shall mean "person," as such term is used for purposes of Section 13(d) or 14(d) of the Securities Exchange Act of 1934, as amended (or any successor thereto).

(v).        ***"Restricted Group"*** shall mean, collectively the Company, its subsidiaries, the members of the Sponsor Group and their respective Affiliates.

(vi).        ***"Sponsor Group"*** shall mean Kohlberg Kravis Roberts & Co. L.P., TPG Capital L.P., and Goldman, Sachs & Co.

9.        **Miscellaneous**.

(a).        <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas without regard to conflicts of laws principles thereof.

(b).        <u>Entire Agreement</u>. Except as otherwise provided herein, this Agreement contains the entire understanding of the Parties with respect to the employment of Executive by the Company and/or its Affiliates and supersedes all prior agreements and understandings. There are no restrictions, agreements, promises, warranties, covenants or undertakings between the Parties with respect to the subject matter herein other than those expressly set forth herein.

(c).        <u>No Waiver</u>. The failure of a Party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver of such Party's rights or deprive such Party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

(d).      Severability. In the event that any one or more of the provisions of this Agreement shall be or become invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions of this Agreement shall not be affected thereby.

(e).      Assignment. This Agreement, and all of Executive's rights and duties hereunder, shall not be assignable or delegable by Executive. Any purported assignment or delegation by Executive in violation of the foregoing shall be null and void ab initio and of no force and effect. This Agreement may be assigned by the Company to a person or entity which is an Affiliate or a successor in interest to substantially all of the business operations of the Company, provided that the assignee expressly assumes all obligations of the Company under this Agreement and all other related agreements to which Executive and the Company are parties. Upon such assignment, the rights and obligations of the Company hereunder shall become the rights and obligations of such Affiliate or successor person or entity.

(f).      Set Off; Mitigation. Except as otherwise provided in Section 9(o), the obligations of the Company to pay Executive the amounts provided and to make the arrangements provided hereunder shall not be subject to setoff, counterclaim or recoupment of amounts owed by Executive to the Company and/or its Affiliates.  Executive shall not be required to mitigate the amount of any payment provided for pursuant to this Agreement by seeking other employment and, except as expressly provided herein, no amount payable hereunder shall be reduced by any payments or benefits received from such subsequent employment.

(g).      Compliance with Code Section 409A. Notwithstanding anything herein to the contrary, if, at the time of Executive's termination of employment, the Company has securities that are publicly traded on an established securities market, and Executive is a "specified employee" (as defined in Code Section 409A), and the deferral of the commencement of any payments or benefits otherwise payable pursuant to Section 7 is necessary in order to prevent any accelerated or additional tax under Code Section 409A, then, to the extent permitted by Code Section 409A, the Company will defer any such payments or benefits hereunder (without any reduction in the payments or benefits ultimately paid or provided to Executive) until the date that is six (6) months following Executive's termination of employment with the Company (or the earliest date as is permitted under Code Section 409A), provided that amounts which do not exceed the limits set forth in Code Section 402(g)(1)(B) in the year of such termination shall be payable immediately upon termination. Any payments or benefits deferred due to such requirements will be paid in a lump sum to Executive at the end of such six (6) month period. The Company shall consult with Executive in good faith regarding the implementation of the provisions of this Section 9(g).

(h).      Indemnity. The Company and its subsidiaries shall indemnify and hold Executive harmless for all acts and omissions occurring during his employment or service as a member of the board of directors or managers (as applicable) of any of the Company and/or its subsidiaries, to the maximum extent provided under each of the Company's and such subsidiaries' charter, certificate of formation, limited partnership agreement, by-laws and applicable law. During the Employment Term and for a term of six (6) years thereafter, the Company, or any successor to the Company, the Company's subsidiaries (to the extent not covered under the terms of the Company's insurance policy), and each of their respective successors, shall purchase and maintain, at their own expense, directors' and officers' liability insurance providing coverage for Executive in the same amount as, and with terms no less favorable than, for members of their respective boards of directors or managers (as applicable).

(i).      Successors; Binding Agreement. This Agreement shall inure to the benefit of and be binding upon personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees and legatees. In the event of Executive's death before receiving all amounts and benefits due to him

hereunder, such amounts shall be payable to Executive's estate or as otherwise provided under applicable benefit plans or arrangements.

(j).    <u>Notice</u>. For the purpose of this Agreement, notices and all other communications provided for in the Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or overnight courier or three (3) days after it has been mailed by United States registered mail, return receipt requested, postage prepaid, addressed to the respective addresses set forth below in this Agreement, or to such other address as either Party may have furnished to the other in writing in accordance herewith, except that notice of change of address shall be effective only upon receipt.

If to the Company: Energy Future Holdings Corp.
                  1601 Bryan Street, 41st Floor
                  Dallas, Texas 75201-3411
                  Attention: General Counsel

If to Executive: The most recent address on file with the Company

(k).    <u>Executive Representation</u>. Executive hereby represents to the Company that his execution and delivery of this Agreement and performance of his duties hereunder shall not constitute a breach of, or otherwise contravene, the terms of any employment agreement, separation agreement or other agreement or policy to which Executive is a party or otherwise bound.

(l).    <u>Captions; Section References</u>. The captions included herein are for convenience of reference only and shall be ignored in the construction or interpretation hereof. All references to sections of statutes, regulations or rules shall be deemed to be references to any successor sections.

(m).    <u>Further Assurances</u>. The Parties shall, with reasonable diligence, do all things and provide all reasonable assurances as may be required to complete the transactions contemplated by this Agreement, and each Party shall provide such further documents or instruments required by the other Party as may be reasonably necessary or desirable to give effect to this Agreement and carry out its provisions.

(n).    <u>Cooperation</u>. For a period of six (6) years after his termination, Executive shall provide Executive's reasonable cooperation in connection with any action or proceeding (or any appeal from any action or proceeding) which relates to events occurring during Executive's employment hereunder, provided that the Company and its Affiliates shall use reasonable efforts to avoid material interference with Executive's business or personal activities. The Company shall pay all of Executive's reasonable expenses incurred in connection with providing such cooperation.

(o).    <u>Withholding</u>. The Company may withhold from any amounts payable under this Agreement such federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.  In addition, Executive expressly authorizes and agrees that any amounts he owes in relation to any travel or credit cards issued or sponsored by the Company, the energy conservation program, the appliance purchase program, or salary, bonus, vacation or other benefit overpayments, may be offset and deducted from any payments due to Executive pursuant to this Agreement.

(p).    <u>Counterparts</u>. This Agreement may be signed in counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

(q).        <u>Amendments</u>. This Agreement may not be altered, modified, or amended except by written instrument signed by the Parties hereto.

(r).        <u>Return of Property</u>. Executive agrees that if Executive's employment with the Company is terminated (for any reason), Executive shall not take with Executive, but will leave with the Company, all computers, cell phones, access cards, computer or electronic storage devices, any other Company property and all Confidential Information, work product, records, files, electronic mail, memoranda, reports, documents and other information that is the property of the Company, in whatever form (including on computer disk or any electronic storage device), and any copies thereof, or if such items are not on the premises of the Company, Executive agrees to return such items immediately upon Executive's termination (regardless of the reason) or any time at the request of the Company. Executive acknowledges that all such items are and remain the property of the Company.

**IN WITNESS WHEREOF**, the Parties hereto have duly executed this Agreement as of the day and year first above written.

**ENERGY FUTURE HOLDINGS CORP** .

By:   /s/ Donald L. Evans

Donald L. Evans
Chairman of the Board of Directors

**EXECUTIVE:**

/s/ John Young

John Young

**Exhibit I**

In addition to the benefits, perquisites and compensation set forth in the Agreement, Executive shall be entitled to receive the benefits, perquisites and compensation set forth in this Exhibit I, subject to the terms and conditions set forth herein:

(a)        Executive shall have the opportunity to earn the retention awards set forth in this Exhibit I, collectively referred to herein as the "***Retention Award***", subject to the terms and conditions set forth herein:

(i)        Executive shall earn a long-term cash bonus award equal to 100% of the aggregate Annual Bonus amount actually earned by Executive in respect of fiscal years 2009, 2010, and 2011 (the "***First Retention Award***"). The First Retention Award earned by Executive shall be paid to Executive in a lump sum on September 30, 2012; provided, that, subject to the provisions of sub-paragraph (a)(v) of this Exhibit I, Executive is employed by the Company or an Affiliate thereof on September 30, 2012.

(ii)        Executive shall earn an additional long-term cash bonus award in an amount between $750,000 and $1,500,000 determined by the Company's performance as indicated by the level of EFH Management EBITDA actually achieved for the fiscal year ended December 31, 2011 relative to the EFH Management EBITDA threshold and target amounts set by the Board for such fiscal year (the "***Second Retention Award***"). For the achievement of the threshold level of EFH Management EBITDA in respect of such year, Executive shall earn $750,000, for the achievement of at least the target level of EFH Management EBITDA in respect of such year, Executive shall earn $1,500,000 (the "***Second Retention Target Award***"), and for the achievement of EFH Management EBITDA in between the threshold and target levels in respect of such year, Executive shall earn an amount between $750,000 and $1,500,000 as determined by linear interpolation.  The Second Retention Award, if earned, shall be paid to Executive in two equal installments on September 30, 2012 and September 30, 2013; provided, that, subject to the provisions of sub-paragraph (a)(v) of this Exhibit I, Executive is employed by the Company or an Affiliate thereof on the applicable payment date.

(iii)        Executive shall earn an additional long-term cash bonus award in an amount between $1,350,000 and $2,700,000 per fiscal year determined by the Company's performance as indicated by the level of EFH Management EBITDA actually achieved for the fiscal years ended December 31, 2012, December 31, 2013, and December 31, 2014 relative to the EFH Management EBITDA threshold and target amounts set by the Board for each respective fiscal year (the "***Third Retention Award***"). For the achievement of the threshold level of EFH Management EBITDA in respect of any such year, Executive shall earn $1,350,000, for the achievement of at least the target level of EFH Management EBITDA in respect of any such year, Executive shall earn $2,700,000 (the "***Third Retention Target Award***"), and for the achievement of EFH Management EBITDA in between the threshold and target levels in respect of any such year, Executive shall earn an amount between $1,350,000 and $2,700,000 as determined by linear interpolation. The Third Retention Award, if earned, shall be paid to Executive in a lump sum on March 13, 2015; provided, that, subject to the provisions of sub-paragraph (a)(v) of this Exhibit I, Executive is employed by the Company or an Affiliate thereof on March 13, 2015.

(iv)        The process followed by the O&C Committee in establishing the EFH Management EBITDA threshold and target amounts for purposes of the Second Retention Award and the Third Retention Award shall be consistent with the O&C Committee's prior practice.

(v)        In the event Executive's employment is terminated pursuant to Section 7(b), 7(c), 7(d)(ii), or 7(e) hereof, in any case, prior to the payment date of an applicable Retention Award, Executive shall be entitled to receive the Retention Award, or a portion thereof, that Executive would otherwise have been entitled to receive pursuant to sub-paragraphs (a)(i), (a)(ii), and (a)(iii) of this Exhibit I, calculated as set forth below (the sum of such amounts referred to herein as the " *Pro-Rata Retention Award*"), with such Pro-Rata Retention Award payable to Executive as soon as practical but no later than the earlier of: (a) March 15 following the calendar year in which termination occurs or (b) ninety (90) days following termination; provided, that, in the case of a termination of employment pursuant to Section 7(c), 7(d)(ii), or 7(e), Executive (x) does not violate the restrictions set forth in Section 8 of this Agreement and (y) executes, delivers and does not revoke a general release of claims against the Company and its Affiliates (excluding claims for indemnification, claims for coverage under officer and director policies, and claims as a stockholder of the Company).

(A)        with respect to the First Retention Award, (x) 100% of the aggregate Annual Bonus amount(s) actually earned by Executive in respect of any applicable fiscal year completed prior to the date of Executive's termination, plus (y) if the termination occurs prior to January 1, 2012, 100% of the Pro-Rata Bonus amount calculated pursuant to Section 7(b)(i)(B) above (for avoidance of doubt, the First Retention Award payment shall not be based on any Annual Bonus or Pro-Rata Bonus earned by or paid to Executive with respect to fiscal year 2012); plus

(B)        with respect to the Second Retention Award, (x) if the termination occurs prior to January 1, 2012, a portion of the Second Retention Award to be determined by multiplying the Second Retention Target Award by a fraction, the numerator of which is the number of days during which Executive was employed by the Company or an Affiliate thereof in the fiscal year of Executive's termination, and the denominator of which is 365, or (y) if the termination occurs on or after January 1, 2012, the actual earned amount of the Second Retention Award; plus

(C)        with respect to the Third Retention Award, (x) if the termination occurs prior to January 1, 2015, a portion of the Third Retention Award equal to (1) the amount that would have been payable under sub-paragraph (a)(iii) of this Exhibit I for any completed fiscal year, plus (2) a portion of the Third Retention Award to be determined by multiplying the Third Retention Target Award for the year of Executive's termination by a fraction, the numerator of which is the number of days during which Executive was employed by the Company or an Affiliate thereof in the fiscal year of Executive's termination, and the denominator of which is 365, or (y) if the termination occurs on or after January 1, 2015, the actual earned amount of the Third Retention Award.

(vi)       Notwithstanding any provision of this Exhibit I to the contrary, in the event of a Change in Control, Executive's entitlement to the Retention Awards shall be determined without regard to the achievement of EFH Management EBITDA in respect of the fiscal year in which such Change in Control occurs and any subsequent year, and the amount earned by Executive shall be determined as if target level of EFH Management EBITDA were achieved for any such year, but to the extent the Retention Award is attributable to any prior fiscal year, actual EFH Management EBITDA for such prior year shall be used.

(vii)      To assure payment of the Company's obligations under sub-paragraphs (a)(ii) and (a)(iii) above, the Company has obtained the issuance of an Irrevocable Standby Letter of Credit (the " *LOC*") for the benefit of Executive from a bank (the "*Issuer*") on the following terms:

(A)        The LOC shall be in the amount of $9,600,000.

(B)        The LOC shall expire on .

(C)        The LOC shall not be transferable.

(D)        Partial and multiple draws shall be permitted under the LOC.  [Information Omitted.]

(viii)        A copy of the LOC so issued is attached hereto as Exhibit I(A).

(ix)        Any amount paid under the LOC to the United States Treasury in respect of the Company's tax account shall be credited as withheld income and payroll taxes with respect to Executive, and the Company shall properly report such amount on IRS Form W-2 issued to Executive for the applicable tax year.

(x)        For purposes hereof, "***EFH Management EBITDA***" shall mean Energy Future Holdings Corp. consolidated EBITDA; where:

(A)        "***EBITDA***" shall mean earnings before interest, taxes, depreciation and amortization plus transaction, management and/or similar fees paid to the Sponsor Group and/or its Affiliates, together with such adjustments as the O&C Committee shall determine appropriate in its discretion after good faith consultation with the Chief Executive Officer and/or Chief Financial Officer. Such adjustments will be consistent with those included in the definition of EBITDA in the Energy Future Holdings Corp. Indenture related to its 10.000% Senior Secured Notes due 2020, as such indenture is in effect on the Effective Date, to the extent considered appropriate for management compensation purposes, which will include but are not limited to, adjustments to reflect unrealized mark-to-market valuations of hedging instruments; fees and expenses relating to the Company's receivables financing facilities; the amortization of nuclear fuel costs; and any effects of adjustments in the financial statements resulting from the application of purchase accounting; but which for clarification will not include, without limitation, adjustments to reflect unrealized cost savings and planned and unplanned outages.  In any event and notwithstanding anything herein to the contrary, the O&C Committee shall have the discretion to make any further adjustments to the calculation of EBITDA as it deems fair and appropriate after good faith consultation with the Chief Executive Officer and/or Chief Financial Officer.

(B)        The O&C Committee shall, fairly and appropriately, following the O&C Committee's good faith consultation with the Chief Executive Officer and/or Chief Financial Officer, adjust the calculation of EBITDA to reflect the following: acquisitions, divestitures, any change required by GAAP relating to share-based compensation or for other changes in GAAP promulgated by accounting standard setters that, in each case, the O&C Committee in good faith determines require adjustment of EBITDA. The O&C Committee's determination of such adjustment shall be based on the effect of such event on the Company's consolidated financial statements.

(b)       As soon as administratively practicable following the February O&C Committee meeting in 2013, provided Executive remains continuously employed by the Company or an Affiliate thereof through the grant date, Executive shall be entitled to receive on such date, a grant of 1,500,000 restricted stock units under the 2007 Stock Incentive Plan for Key Employees of Energy Future Holdings Corp. and its Affiliates and the Restricted Stock Unit Agreement, in such form and substance as attached hereto as Exhibit I(B), to be entered into by and between the Company and Executive with respect to the grant.  In the event of a Change in Control prior to such grant date, the restricted stock units that would have been granted under this sub-paragraph (b) of this Exhibit I shall be issued and shall be vested immediately prior to the effective date of the Change in Control.  The rights and obligations of Executive and the Company shall be governed by the 2007 Stock Incentive Plan for Key Employees of Energy Future Holdings Corp. and its Affiliates and the Restricted Stock Unit Agreement entered into incident to such grant.

**Exhibit I(A)**

DATE: _____

IRREVOCABLE STANDBY LETTER OF CREDIT NO.

BENEFICIARY:
JOHN YOUNG
[ON RECORD WITH THE COMPANY]

APPLICANT:
TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC
ON BEHALF OF ENERGY FUTURE HOLDINGS CORP.
1601 BRYAN STREET, 44TH FLOOR
DALLAS, TX 75201-3411

AMOUNT:   USD 9,600,000.00 (NINE MILLION SIX HUNDRED THOUSAND AND 00/100 U.S. DOLLARS)

EXPIRY DATE:

LADIES AND GENTLEMEN:

BY ORDER OF OUR CLIENT, TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC FOR THE ACCOUNT OF ENERGY FUTURE HOLDINGS CORP. (THE "ACCOUNT PARTY"), WE HEREBY ESTABLISH OUR IRREVOCABLE STANDBY LETTER OF CREDIT NO. (THIS "LETTER OF CREDIT") IN YOUR FAVOR FOR DRAWINGS NOT TO EXCEED THE AGGREGATE SUM OF NINE MILLION SIX HUNDRED THOUSAND U.S. DOLLARS ($9,600,000.00), EFFECTIVE IMMEDIATELY. THIS LETTER OF CREDIT IS ISSUED, PRESENTABLE AND PAYABLE AT THE OFFICE OF OUR SERVICER, CITICORP NORTH AMERICA, INC., 3800 CITIBANK CENTER, BUILDING B, 3RD FLOOR TAMPA, FL 33610, AND, SUBJECT TO THE FURTHER TERMS HEREOF, EXPIRES WITH OUR CLOSE OF BUSINESS ON .

FUNDS UNDER THIS LETTER OF CREDIT ARE AVAILABLE TO YOU AGAINST YOUR SIGHT DRAFT(S), DRAWN ON US, PURPORTEDLY SIGNED BY YOU (OR YOUR SUCCESSOR(S) OR HEIR(S) AT LAW), AND OTHERWISE IN THE FORM ATTACHED HERETO AS EXHIBIT A APPROPRIATELY COMPLETED.

FUNDS UNDER THIS LETTER OF CREDIT WILL BE AVAILABLE FOR DRAWING IN ACCORDANCE WITH THE FOLLOWING SCHEDULE; HOWEVER, IN NO EVENT SHALL THE TOTAL AMOUNT OF ALL PAYMENTS MADE UNDER THIS LETTER OF CREDIT EXCEED THE AMOUNT OF $9,600,000.00:

| AVAILABILITY PERIODS | | AMOUNT AVAILABLE IN U.S. DOLLARS |
|---|---|---|
| FROM AND INCLUDING [ ] | THROUGH AND INCLUDING [ ] | [ ] |

FOR THE AVOIDANCE OF DOUBT, ANY UNUTILIZED AMOUNT IN ANY GIVEN AVAILABILITY PERIOD WILL BE CUMMULATIVELY ADDED TO THE AMOUNT AVAILABLE IN THE IMMEDIATELY SUCCEEDING AVAILABILITY PERIOD.

FURTHERMORE, THE MAXIMUM AGGREGATE AMOUNT THAT MAY BE DRAWN BY YOU DURING THE TERM OF THIS LETTER OF CREDIT SHALL BE AUTOMATICALLY REDUCED BY THE AGGREGATE AMOUNT OF ANY PRIOR PAYMENTS MADE UNDER THIS LETTER OF CREDIT.

PARTIAL AND MULTIPLE DRAWINGS ARE PERMITTED HEREUNDER. THIS LETTER OF CREDIT SHALL AUTOMATICALLY TERMINATE AFTER PAYMENT OF ANY DRAW MADE UNDER STATEMENT (B) IN THE FORM OF SIGHT DRAFT ATTACHED HERETO AS EXHIBIT A.

THIS LETTER OF CREDIT IS NOT TRANSFERABLE.

WE HEREBY ENGAGE WITH YOU THAT ALL DRAFTS DRAWN UNDER AND IN STRICT COMPLIANCE WITH THE TERMS OF THIS LETTER OF CREDIT WILL BE DULY HONORED IF DRAWN AND PRESENTED FOR PAYMENT ON OR BEFORE THE EXPIRY DATE OF THIS LETTER OF CREDIT. WE SHALL EFFECT PAYMENT THREE BUSINESS DAYS AFTER OUR RECEIPT OF DOCUMENTS IN STRICT CONFORMITY WITH THE TERMS OF THIS LETTER OF CREDIT. AS USED HEREIN "BUSINESS DAY" SHALL MEAN ANY DAY OTHER THAN A SATURDAY OR SUNDAY OR A DAY ON WHICH BANKING INSTITUTIONS IN NEW YORK CITY ARE AUTHORIZED OR REQUIRED TO CLOSE BY LAW.

PAYMENT OF DRAWINGS MADE HEREUNDER SHALL BE MADE IN TWO PARTS, BY WIRE TRANSFER, PURSUANT TO THE FOLLOWING WIRE INSTRUCTIONS:

- SIXTY PERCENT (60%) OF EACH SUCH DRAWING SHALL BE PAYABLE PURSUANT TO BENEFICIARY'S (OR HIS SUCCESSOR(S) OR HEIR(S) AT LAW) WRITTEN WIRE INSTRUCTIONS SET FORTH IN THE APPROPRIATELY COMPLETED AND PRESENTED SIGHT DRAFT(S), AND

- FORTY PERCENT (40%) OF EACH SUCH DRAWING (FOR PURPOSES OF APPLICABLE PAYROLL AND INCOME TAX WITHHOLDING) SHALL BE PAYABLE TO:

  ABA REFERENCE #: [ON RECORD WITH THE COMPANY]
  NAME OF BANK DEPOSITORY: US TREAS SINGLE TX
  EMPLOYER'S TIN: 75-2669310
  NAME CONTROL: ENER
  EMPLOYER'S FULL NAME: ENERGY FUTURE HOLDINGS CORP.
  TAX TYPE: 94105
  TAX YEAR: [INSERT 2 DIGIT TAX YEAR]
  TAX MONTH: [INSERT 03, 06, 09, OR 12 FOR CALENDAR QUARTER IN WHICH DRAWING OCCURS]

THIS LETTER OF CREDIT IS SUBJECTED TO AND GOVERNED BY LAWS OF THE STATE OF NEW YORK AND THE 2007 REVISION OF THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS OF THE INTERNATIONAL CHAMBER OF COMMERCE (PUBLICATION NO. 600). IN THE EVENT OF ANY CONFLICT, THE LAWS OF THE STATE OF NEW YORK WILL CONTROL.

SHOULD YOU HAVE OCCASION TO COMMUNICATE WITH US REGARDING THIS LETTER OF CREDIT, KINDLY DIRECT YOUR COMMUNICATIONS TO THE ATTENTION OF OUR LETTER OF CREDIT DEPARTMENT, 3800 CITIBANK CENTER, BUILDING B, 3RD FLOOR, TAMPA, FL 33610, MAKING SPECIFIC REFERENCE TO OUR LETTER OF CREDIT NO. _____.

VERY TRULY YOURS,

CITIBANK, N.A.
BY: JOSEPH CHESAKIS, VICE PRESIDENT


BY:    /s/ Joseph Chesakis
     AUTHORIZED SIGNATURE

EXHIBIT A TO
LETTER OF CREDIT NO. _____

<u>FORM OF SIGHT DRAFT</u>

VIA OVERNIGHT MAIL

_____, 20__

CITIBANK, N.A.
C/O CITICORP NORTH AMERICA, INC., AS SERVICER
3800 CITIBANK CENTER, BUILDING B
3RD FLOOR
TAMPA, FLORIDA 33610
ATTENTION: LETTER OF CREDIT DEPT.

        RE: LETTER OF CREDIT NO. _____

[STATE ONE OF THE FOLLOWING (A) OR (B):]

(A)    I HEREBY CERTIFY THAT (1) I AM ENTITLED TO DRAW ON IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____ UNDER
THE PROVISIONS OF THE AMENDED AND RESTATED EMPLOYMENT AGREEMENT DATED AS OF _____ (THE
"EMPLOYMENT AGREEMENT"), BETWEEN ENERGY FUTURE HOLDINGS CORP. ("EFH CORP") AND ME, (2) THE FULL AMOUNT
EARNED BY AND PAYABLE TO ME UNDER THE RETENTION AWARD AS OF _____ IS
$_____, WHICH AMOUNT IS CONSISTENT WITH, AND NOT IN EXCESS OF, THE AMOUNT
EARNED BY AND CURRENTLY PAYABLE TO ME UNDER THE RETENTION AWARD, AND (3) I REMAIN EMPLOYED BY EFH CORP, TH
ACCOUNT PARTY (AS DEFINED IN IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____) OR AN AFFILIATE OF EFH CORP
AND/OR THE ACCOUNT PARTY AS OF THE DATE OF THIS DRAW AND I AM ENTITLED TO THE FULL AMOUNT EARNED AND PAYABLE
I HEREBY ACKNOWLEDGE THAT ANY AMOUNT OF THIS DRAW THAT IS PAID TO ME AND LATER DETERMINED TO BE IN EXCESS O
THE AMOUNT ACTUALLY EARNED BY AND PAYABLE TO ME UNDER THE RETENTION AWARD SHALL CREATE A CAUSE OF ACTIO
IN FAVOR OF EFH CORP, THE ACCOUNT PARTY AND/OR AN AFFILIATE OF EFH CORP OR THE ACCOUNT PARTY TO RECOVER TH
EXCESS PAYMENT.

OR

(B)    I HEREBY CERTIFY THAT (1) I AM ENTITLED TO DRAW ON IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____
UNDER THE PROVISIONS OF THE AMENDED AND RESTATED EMPLOYMENT AGREEMENT DATED AS OF
_____ (THE "EMPLOYMENT AGREEMENT"), BETWEEN ENERGY FUTURE HOLDINGS CORP. ("EFH CORP")
AND ME, (2) THE FULL AMOUNT EARNED BY AND PAYABLE TO ME UNDER THE RETENTION AWARD AS O
_____ IS $_____, WHICH AMOUNT IS CONSISTENT WITH, AND NOT
IN EXCESS OF, THE AMOUNT EARNED BY AND CURRENTLY PAYABLE TO ME UNDER THE RETENTION AWARD, AND (3) M
EMPLOYMENT WAS TERMINATED PURSUANT TO SECTION 7(B), 7(C), 7(D)(II), OR 7(E) OF THE EMPLOYMENT AGREEMENT PRIOR TO
THE DATE OF THIS DRAW AND I AM ENTITLED TO EITHER THE FULL AMOUNT EARNED OR A PRO-RATED AMOUNT (PURSUANT TO
SUB-PARAGRAPH (A)(V) OF EXHIBIT I TO THE EMPLOYMENT AGREEMENT). I HEREBY ACKNOWLEDGE THAT ANY AMOUNT OF THIS
DRAW THAT IS PAID TO ME AND LATER DETERMINED TO BE IN EXCESS OF THE AMOUNT ACTUALLY EARNED BY AND PAYABLE T
ME UNDER THE RETENTION AWARD SHALL CREATE A CAUSE OF ACTION IN FAVOR OF EFH CORP, THE ACCOUNT PARTY AND/OR A
AFFILIATE OF EFH CORP OR THE ACCOUNT PARTY TO RECOVER THE EXCESS PAYMENT.

YOU ARE HEREBY INSTRUCTED TO REMIT THE PAYMENT OF $_____ IN TWO PARTS, BY WIRE TRANSFER, PURSUANT
TO THE FOLLOWING WIRE INSTRUCTIONS:

    •    SIXTY PERCENT (60%) OF SUCH AMOUNT, OR $_____, SHALL BE PAYABLE TO

        ACCOUNT NAME: [INSERT]
        ACCOUNT #: [INSERT]
        ABA REFERENCE #: [INSERT]
        NAME OF BANK DEPOSITORY: [INSERT]

- FORTY PERCENT (40%) OF EACH SUCH DRAWING (FOR PURPOSES OF APPLICABLE PAYROLL AND INCOME TAX WITHHOLDING) SHALL BE PAYABLE TO:

  > ABA REFERENCE #: [ON RECORD WITH THE COMPANY]
  > NAME OF BANK DEPOSITORY: US TREAS SINGLE TX
  > EMPLOYER'S TIN: 75-2669310
  > NAME CONTROL:  ENER
  > EMPLOYER'S FULL NAME: ENERGY FUTURE HOLDINGS CORP.
  > TAX TYPE: 94105
  > TAX YEAR: [INSERT 2 DIGIT TAX YEAR]
  > TAX MONTH: [INSERT 03, 06, 09, OR 12 FOR CALENDAR QUARTER IN WHICH DRAWING OCCURS]

[IF STATEMENT B ABOVE IS UTILIZED INCLUDE THE FOLLOWING STATEMENT][THE UNDERSIGNED HEREBY ACKNOWLEDGES THAT IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____ SHALL AUTOMATICALLY TERMINATE AFTER SUCH PAYMENT I DULY MADE].

By: _____
[BENEFICIARY] OR
[BENEFICIARY'S SUCCESSOR(S) OR HEIR(S) AT LAW]

**Exhibit I(B)**

**2007 STOCK INCENTIVE PLAN FOR KEY EMPLOYEES OF
ENERGY FUTURE HOLDINGS CORP. AND ITS AFFILIATES**

**RESTRICTED STOCK UNIT AGREEMENT**

To: **[Name]**        Date of Grant: **[Date]**        Number of Shares: **[#]**

      This Agreement is made and entered into as of the Date of Grant set forth above by and between Energy Future Holdings Corp., a Texas corporation (the "***Company***"), and you;

      **WHEREAS**, the Company adopted the 2007 Stock Incentive Plan for Key Employees of Energy Future Holdings Corp. and its Affiliates, as it may be amended from time to time (the "***Plan***") under which the Company is authorized to grant restricted stock units to certain employees, directors and other service providers of the Company or a Subsidiary;

      **WHEREAS**, a "***Restricted Stock Unit***" shall represent your right to receive one share of common stock of the Company (the "***Stock***") upon the lapse of the restrictions on your award, plus the additional rights to receive dividend equivalents (" ***Dividend Equivalent Right,***" or "***DER***"), in accordance with the terms and conditions set forth herein and in the Plan (the " *Award*");

      **WHEREAS**, a copy of the Plan has been made available to you and shall be deemed a part of this Restricted Stock Unit Agreement ("***Agreement***") as if fully set forth herein; and

      **WHEREAS**, you desire to accept the Award made pursuant to this Agreement.

      **NOW, THEREFORE,** in consideration of the mutual covenants set forth herein and for other valuable consideration hereinafter set forth, you and the Company agree as follows:

      1.     The Grant. Subject to the conditions set forth below, the Company hereby grants you, effective as of the Date of Grant set forth above, an award consisting of **[#]** Restricted Stock Units (subject to any adjustment made to this Award pursuant to Section 8 of the Plan in connection with a stock split, spin-off, recapitalization or other transaction that affects the Company's equity securities). To the extent that any provision of this Agreement conflicts with the expressly applicable terms of the Plan, you acknowledge and agree that those terms of the Plan shall control and, if necessary, the applicable terms of this Agreement shall be deemed amended so as to carry out the purpose and intent of the Plan.  Terms that have their initial letter capitalized, but that are not otherwise defined in this Agreement shall have the meanings given to them in the Plan.

      2.     No Shareholder Rights. The Restricted Stock Units granted pursuant to this Agreement do not and shall not entitle you to any rights of a holder of Stock prior to the date shares of Stock are issued to you in settlement of the Award.  Your rights with respect to the Restricted Stock Units shall remain forfeitable at all times prior to the date on which rights become vested and the restrictions with respect to the Restricted Stock Units lapse in accordance with Section 6 or 7, as the case may be.

3.      _Dividend Equivalent Rights_. In the event that the Company declares and pays a dividend in respect of its outstanding shares of Stock and, on the record date for such dividend, you hold Restricted Stock Units granted pursuant to this Agreement that have not been settled, the Company shall create a bookkeeping account that will track, (a) to the extent the dividend paid to stockholders generally was a cash dividend, the cash value you would have been entitled to receive as if you had been the holder of record of the number of shares of Stock related to the Restricted Stock Units that have not been settled as of the record date, or (b) to the extent the dividend paid to stockholders generally was paid in the form of property, the property you would have been entitled to receive as if you had been the holder of record of the number of shares of Stock related to the Restricted Stock Units that have not been settled as of the record date. All DER amounts credited to your bookkeeping account pursuant to this Section 3, if any, shall be deemed converted into shares of Stock on the date that the Restricted Stock Units vest (based on the Fair Market Value (as such term is defined in the Management Stockholder's Agreement) of Stock on such date and rounded down to the nearest whole share of Stock) and paid to you in the form of additional shares of Stock on the date that the underlying Restricted Stock Units associated with such DER amounts are settled pursuant to Section 5 below. In the event that the Restricted Stock Units are forfeited to the Company without settlement to you, you will also forfeit any associated DER amounts. No interest will be payable with respect to DER amounts credited to your bookkeeping account, if any, that represent cash dividends. Property, if any, deemed credited to DER bookkeeping accounts representing dividends paid in property will be deemed invested in such property until the DER amounts are deemed converted to shares of Stock pursuant to this Section 3. The bookkeeping accounts, if any, created to track DER amounts are phantom accounts and the Company is under no obligation to set aside cash or property with respect to any DER amounts. Valuations made pursuant to this Section 3 (including any valuation of property deemed credited to a bookkeeping account) will be made by the Committee, or its designee, in its sole discretion and such valuation will be final and binding.

4.      _Restrictions; Forfeiture_. The Restricted Stock Units are restricted in that they may not be sold, transferred or otherwise alienated or hypothecated until these restrictions are removed or expire as contemplated in Section 6 or 7 of this Agreement and Stock is issued to you as described in Section 5 of this Agreement. The Restricted Stock Units are also subject to forfeiture to the Company (the "***Forfeiture Restrictions***") pursuant to Section 7 of this Agreement.

5.      _Issuance of Stock_.

(a)      No shares of Stock shall be issued to you prior to the date on which the Restricted Stock Units vest and the restrictions, including the Forfeiture Restrictions, with respect to the Restricted Stock Units lapse, in accordance with Section 6 or 7. After the Restricted Stock Units vest pursuant to Section 6 or 7, as applicable, the Company shall, subject to any conditions described in subsection (b) below, promptly and within 30 days of such vesting date, cause to be issued Stock registered in your name in payment of such vested Restricted Stock Units upon receipt by the Company of any required tax withholding. Such issuance shall be made as soon as administratively practicable, but may be delayed, in the sole discretion of the Committee, if required by applicable securities law; provided, that, in no event shall the issuance of Stock be made later than March 15th of the year following the year of vesting, or as otherwise may be permitted under Treasury Regulation § 1.409A-1(b)(4)(ii). The Company shall evidence the Stock to be issued in payment of such vested Restricted Stock Units in the manner it deems appropriate. The value of any fractional Restricted Stock Units shall be rounded down at the time Stock is issued to you in connection with the Restricted Stock Units. No fractional shares of Stock, nor the cash value of any fractional shares of Stock, will be issuable or payable to you pursuant to this Agreement. The value of such shares of Stock shall not bear any interest owing to the passage of time. Neither this Section 5 nor any action taken pursuant to or in accordance with this Section 5 shall be construed to create a trust or a funded or secured obligation of any kind.

(b)        You hereby acknowledge that by accepting this Award, the issuance of Stock pursuant to the settlement of your Restricted Stock Units pursuant to this Agreement shall be subject to all the terms and conditions of any Management Stockholder's Agreement and Sale Participation Agreement previously executed by you, as such forms may be modified under the terms of such agreements; provided, however, that if you have not previously executed a Management Stockholder's Agreement and/or a Sale Participation Agreement with the Company, you agree that, prior to the Company's issuance of Stock to you pursuant to this Agreement, you will execute such documents in the form required by the Company.  All Stock issued to you pursuant to this Agreement will (a) constitute "Stock" (as such term is defined in the Management Stockholder's Agreement) for all purposes under the Management Stockholder's Agreement, and (b) be treated as "Common Stock" underlying "Options" (as such terms are defined in the Sale Participation Agreement) for all purposes under the Sale Participation Agreement.

(c)        The shares of Stock deliverable upon vesting of the Restricted Stock Units, may be either previously authorized but unissued shares or issued shares, which have then been reacquired by the Company. Such shares shall be fully paid and nonassessable.

6.        Expiration of Restrictions and Risk of Forfeiture.  Unless otherwise provided in Section 7 below, the restrictions on the Restricted Stock Units granted pursuant to this Agreement, including the Forfeiture Restrictions, will expire on September 30, 2014, and shares of Stock that are nonforfeitable and transferable will be issued to you in payment of your vested Restricted Stock Units as set forth in Section 5, provided that you remain in the continuous employ of, or a service provider to, the Company or its Subsidiaries until September 30, 2014.

7.        Termination of Services or Change in Control Events.

(a)        Termination of Employment Other Than without Cause, for Good Reason, or Due to Death or Disability.  In the event your service relationship with the Company or any of its Subsidiaries is terminated for any reason other than by the Company or any of its Subsidiaries without Cause, by your voluntary resignation for Good Reason, or due to your death or Disability ("Cause", "Good Reason", and "Disability" as defined in your employment agreement with the Company or any of its Subsidiaries then in effect at the time of your termination of employment) prior to September 30, 2014, then those Restricted Stock Units for which the restrictions have not lapsed as of the date of your termination shall become null and void and those Restricted Stock Units shall be forfeited to the Company.

(b)        Termination of Employment without Cause, for Good Reason, or Due to Death or Disability.  In the event your service relationship with the Company or any of its Subsidiaries is terminated by the Company or any of its Subsidiaries without Cause, by your voluntary resignation for Good Reason, or due to your death or Disability prior to September 30, 2014, a portion of the Restricted Stock Units shall vest and all Forfeiture Restrictions shall lapse with respect to such Restricted Stock Units on the effective date of your termination of employment. The portion of the Restricted Stock Units that shall become vested upon your termination of employment shall be determined by multiplying the number of Restricted Stock Units set forth in Section 1 by a fraction, the numerator of which is the number of days you were employed by the Company or any of its Subsidiaries from [February __, 20__] through the effective date of your termination of employment, and the denominator of which is the number of days between [February __, 20__] and September 30, 2014; all remaining Restricted Stock Units shall become null and void and shall be forfeited to the Company upon your termination of employment. The Restricted Stock Units that become vested pursuant to this Section 7(b) will be settled in accordance with Section 5 above.

(c)        Change in Control. In the event that the Company undergoes a Change in Control (as defined in the Plan) prior to September 30, 2014, the Restricted Stock Units shall vest and all Forfeiture Restrictions shall lapse on the effective date of such a Change in Control, provided that you have remained in the continuous employ of, or a service provider to, the Company or its Subsidiaries from the Date of Grant until the effective date of the Change in Control. Upon a Change in Control, your Restricted Stock Units will be settled in accordance with Section 5 above.

8.        Leave of Absence. With respect to the Award, the Company may, in its sole discretion, determine that if you are on leave of absence for any reason you will not be considered as having terminated employment with the Company; however, your rights to the Restricted Stock Units during a leave of absence will be limited to the extent to which those rights were earned or vested when the leave of absence began.

9.        Payment of Taxes. It shall be a condition of the obligations of the Company upon delivery of the Stock pursuant to Section 5 above that you pay to the Company such amount as may be requested by the Company for the purpose of satisfying any liability for any federal, state or local income or other taxes required by law to be withheld with respect to such Stock. The Company may, in its sole discretion, and you hereby authorize the Company to take such actions as may be necessary, in the opinion of the Company's counsel (including, without limitation, withholding Stock otherwise deliverable to you hereunder through a net settlement and/or withholding amounts from any compensation or other amount owing to you from the Company), to satisfy the obligations for payment of the minimum amount of any such taxes. Notwithstanding the foregoing provisions of this Section 9, you may, at your election, be permitted to elect to use Stock otherwise deliverable to you hereunder, having an equivalent Fair Market Value (as such term is defined in the Management Stockholder's Agreement) to the payment that would otherwise be made by you to the Company pursuant to the foregoing provisions of this Section 9, to satisfy such obligations. You are hereby advised to seek your own tax counsel regarding the taxation of the Restricted Stock Units made hereunder.

10.        Compliance with Securities Law. Notwithstanding any provision of this Agreement to the contrary, the issuance of Stock will be subject to compliance with all applicable requirements of federal, state, or foreign law with respect to such securities and with the requirements of any stock exchange or market system upon which the Stock may then be listed. No Stock will be issued hereunder if such issuance would constitute a violation of any applicable federal, state, or foreign securities laws or other law or regulations or the requirements of any stock exchange or market system upon which the Stock may then be listed. In addition, Stock will not be issued hereunder unless (a) a registration statement under the Securities Act of 1933, as amended (the " **Securities Act**"), is, at the time of issuance, in effect with respect to such shares or (a) in the opinion of legal counsel to the Company, such shares may be issued in accordance with the terms of an applicable exemption from the registration requirements of the Securities Act. YOU ARE CAUTIONED THAT ISSUANCE OF STOCK UPON THE VESTING OF RESTRICTED STOCK UNITS GRANTED PURSUANT TO THIS AGREEMENT MAY NOT OCCUR UNLESS THE FOREGOING CONDITIONS ARE SATISFIED. The inability of the Company to obtain from any regulatory body having jurisdiction the authority, if any, deemed by the Company's legal counsel to be necessary to the lawful issuance and sale of any shares subject to the Award will relieve the Company of any liability in respect of the failure to issue such shares as to which such requisite authority has not been obtained. As a condition to any issuance hereunder, the Company may require you to satisfy any qualifications that may be necessary or appropriate to evidence compliance with any applicable law or regulation and to make any representation or warranty with respect to such compliance as may be requested by the Company. From time to time, the Board and appropriate officers of the Company are authorized to take the actions necessary and appropriate to file required documents with governmental authorities, stock exchanges, and other appropriate Persons to make shares of Stock available for issuance.

11.      Lock-Up Period. You hereby agree that, if so requested by the Company or any representative of the underwriters (the "**Managing Underwriter**") in connection with any registration of the offering of any securities of the Company under the Securities Act, you will not sell or otherwise transfer any Stock acquired hereunder or other securities of the Company during the 180 day period (or such other period as may be requested in writing by the Managing Underwriter and agreed to in writing by the Company) (the "**Market Standoff Period**") following the effective date of a registration statement of the Company filed under the Securities Act. The Company may impose stop-transfer instructions with respect to securities subject to the foregoing restrictions until the end of such Market Standoff Period.

12.      Legends. The Company may at any time place legends referencing any restrictions imposed on the shares pursuant to Sections 5(b), 10 and 11 of this Agreement on all certificates representing shares issued with respect to this Award.

13.      Right of the Company and Subsidiaries to Terminate Services. Nothing in this Agreement confers upon you the right to continue in the employ of or to perform services for the Company or any Subsidiary, or interfere in any way with the rights of the Company or any Subsidiary to terminate your employment or service relationship at any time.

14.      Furnish Information. You agree to furnish to the Company all information reasonably requested by the Company to enable it to comply with any reporting or other requirements imposed upon the Company by or under any applicable statute or regulation with respect to the transactions contemplated by this Agreement.

15.      No Liability for Good Faith Determinations. The Company and the members of the Board shall not be liable for any act, omission or determination taken or made in good faith with respect to this Agreement or the Restricted Stock Units granted hereunder.

16.      Execution of Receipts and Releases. Any payment of cash or any issuance or transfer of shares of Stock or other property to you, or to your legal representative, heir, legatee or distributee, in accordance with the provisions hereof, shall, to the extent thereof, be in full satisfaction of all claims of such Persons hereunder. The Company may require you or your legal representative, heir, legatee or distributee, as a condition precedent to such payment or issuance, to execute a release and receipt therefor in such form as it shall determine.

17.      No Guarantee of Interests. The Board and the Company do not guarantee the Stock of the Company from loss or depreciation.

18.      Company Records. Records of the Company or its Subsidiaries regarding your period of service, termination of service and the reason(s) therefor, and other matters shall be conclusive for all purposes hereunder, unless determined by the Company to be incorrect.

19.      Notice. All notices required or permitted under this Agreement must be in writing and personally delivered or sent by mail and shall be deemed to be delivered on the date on which it is actually received by the person to whom it is properly addressed or if earlier the date it is sent via certified United States mail.

20.      Waiver of Notice. Any person entitled to notice hereunder may waive such notice in writing.

21.     <u>Information Confidential</u>. As partial consideration for the granting of the Award hereunder, you hereby agree to keep confidential all information and knowledge, except that which has been disclosed in any public filings required by law, that you have relating to the terms and conditions of this Agreement; provided, however, that such information may be disclosed as required by law and may be given in confidence to your spouse and tax, legal and financial advisors.  In the event any breach of this promise comes to the attention of the Company, it shall take into consideration that breach in determining whether to recommend the grant of any future similar award to you and as a factor weighing against the advisability of granting any such future award to you.

22.     <u>Successors</u>. This Agreement shall be binding upon you, your legal representatives, heirs, legatees and distributees, and upon the Company, its successors and assigns.

23.     <u>Severability</u>.  If any provision of this Agreement is held to be illegal or invalid for any reason, the illegality or invalidity shall not affect the remaining provisions hereof, but such provision shall be fully severable and this Agreement shall be construed and enforced as if the illegal or invalid provision had never been included herein.

24.     <u>Company Action</u>. Any action required of the Company under this Agreement shall be by resolution of the Board or the Committee or by a person or entity authorized to act by resolution of the Board.

25.     <u>Headings</u>.  The titles and headings of Sections are included for convenience of reference only and are not to be considered in construction of the provisions hereof.

26.     <u>Governing Law</u>.  All questions arising with respect to the provisions of this Agreement shall be determined by application of the laws of Texas, without giving any effect to any conflict of law provisions thereof, except to the extent Texas state law is preempted by federal law. The obligation of the Company to sell and deliver Stock hereunder is subject to applicable laws and to the approval of any governmental authority required in connection with the authorization, issuance, sale, or delivery of such Stock.

27.     <u>Consent to Texas Jurisdiction and Venue</u>. You hereby consent and agree that state courts located in Dallas County, Texas and the United States District Court for the Northern District of Texas (Dallas Division) each shall have personal jurisdiction and proper venue with respect to any dispute between you and the Company arising in connection with the Restricted Stock Units, the Plan, or this Agreement. In any such dispute, each of you and the Company agree not to raise, and do hereby expressly waive, any objection or defense to such jurisdiction as an inconvenient forum.

28.     <u>Amendment</u>. This Agreement may be amended in accordance with the terms of the Plan.

29.     <u>The Plan</u>. This Agreement is subject to all the terms, conditions, limitations and restrictions contained in the Plan.

[Remainder of page intentionally left blank]

In Witness Whereof, this Agreement has been executed and delivered by the parties hereto.

ENERGY FUTURE HOLDINGS CORP.

By: _____

Its: _____

GRANTEE

_____

Name: _____

Address: _____

_____

**Exhibit II**

In addition to the benefits, perquisites and compensation set forth in the Agreement, Executive shall be entitled to receive the benefits, perquisites and compensation set forth in this Exhibit II, subject to the terms and conditions set forth herein:

(a)      <u>Service Crediting</u>. For purposes of eligibility to receive retiree medical benefits under any retiree medical benefit plan or program of the Company or its Affiliates, Executive shall be deemed eligible for such benefits upon retirement at any time after reaching age 55, so long as Executive has completed five (5) years of service with the Company and its Affiliates following January 31, 2008; provided that in all other respects Executive shall be subject to the terms and conditions of any such retiree medical plan (including with respect to any requirement for employee contributions).

(b)      <u>Life Insurance</u>. During the Employment Term, the Company shall maintain in effect, at the Company's cost, a ten (10) year term life insurance policy on the life of Executive in the amount of $10,000,000, payable to such beneficiary as designated by Executive. If Executive terminates employment prior to the expiration of the ten (10) year term of such policy, he may continue to maintain the policy at his own expense or the policy may be allowed to lapse.

(c)      <u>Annuity Benefit</u>. Provided Executive remains continuously employed by the Company through December 31, 2014, the Company shall purchase on Executive's behalf, as soon as administratively feasible, but in no event later than March 15, 2015, a single premium annuity contract from an insurance company acceptable to Executive, providing an annual annuity commencing on such date thereafter and payable in such form (e.g., life annuity, term certain and life annuity or joint and survivor annuity) as specified by Executive (the "***Annuity Contract***"). The Annuity Contract shall provide the specified annuity in the amount which may be provided by a single premium of the net amount remaining after withholding all applicable income and payroll taxes, from a non-periodic payment of $3,000,000. If, prior to December 31, 2014, Executive has been terminated without Cause by the Company, resigns for Good Reason, or terminates employment due to death or Disability, Executive (or his personal representative, as the case may be) shall be entitled to such Annuity Contract as soon as administratively practicable following Executive's termination of employment, but in no event later than March 15th of the year following such termination of employment.  If Executive is terminated by the Company for Cause or resigns without Good Reason prior to December 31, 2014, he shall forfeit his right to the Annuity Contract.

(d)      <u>Additional Cooperation</u>. Notwithstanding anything in Section 9(n) to the contrary, (i) Executive and the Company shall coordinate with Executive's schedule so as to minimize the extent to which any cooperation obligation under Section 9(n) interferes with Executive's other business activities, and (ii) the Company shall pay Executive's travel expenses (transportation, lodging, meals, etc.) in a level of comfort comparable to that enjoyed while employed hereunder and reasonable attorneys' fees of counsel selected by him, incurred in order to satisfy Executive's obligations under Section 9(n).

Exhibit 10 (qq)

## AMENDED AND RESTATED EMPLOYMENT AGREEMENT

by and between LUMINANT HOLDING COMPANY LLC ("*Luminant*"), ENERGY FUTURE HOLDINGS CORP. (the parent entity of Luminant, referred to herein as the "*Company*") and MARK ALLEN MCFARLAND ("*Executive*") (individually, each a "*Party*" and collectively, the "*Parties*").

## WITNESSETH

**WHEREAS**, the Parties previously entered into an employment agreement dated July 7, 2008 ( *"Original Effective Date"*) and most recently amended and restated effective July 1, 2011; and

**WHEREAS**, Executive has been appointed as Chief Executive Officer of Luminant effective January 1, 2013; and

**WHEREAS**, the Parties desire to amend and restate the employment agreement, in each case on the terms and conditions set forth herein.

**NOW, THEREFORE**, in consideration of the mutual promises, covenants and obligations contained herein, the Company, Luminant and Executive agree as follows:

1.     **Term of Employment**. Subject to the provisions of Section 7 of this Agreement, this Agreement, as restated, and Executive's employment hereunder shall be effective as of January 1, 2013 (" *Effective Date*") and shall end as of 11:59:59 P.M. on June 30, 2015 (the "*Initial Term*"). Subject to the provisions of Section 7 of this Agreement, this Agreement shall automatically renew for an additional one (1) year period commencing immediately following the last day of the Initial Term and each one (1) year period thereafter (each, a "*Renewal Term*"), unless, the Company or Executive provides the other Party written notice of non-renewal at least sixty (60) days prior to the end of the applicable term. The period during which Executive is employed by Luminant hereunder is hereinafter referred to as the "*Employment Term*."

2.     **Position and Duties**.

(a)     From the Effective Date and during the remainder of the Employment Term, Executive shall serve as Chief Executive Officer of Luminant and as Executive Vice President of the Company. In both positions, Executive shall have such duties, authority and responsibilities as shall be determined from time to time by the President and CEO of the Company, which duties, authority and responsibilities shall be customary for Executive's position in a business of similar size, type and nature to that of Luminant or the Company, as appropriate. Executive shall report to the President and CEO of the Company with respect to his responsibilities to Luminant and the Company. Executive shall also serve as a member of the Strategy and Policy Committee for the Company.

(b)     During the Employment Term, Executive will devote Executive's full business time and best efforts to performance of the duties described in Section 2(a) and will not engage in any other business, profession or occupation for compensation or otherwise which would conflict or interfere, directly or indirectly, with performance of Executive's duties. Executive may participate in civic and charitable activities and may serve on the board of non-profit organizations and on the board of one outside company,

provided that Executive obtains prior approval of the board of directors of the Company (as used herein, the term "***Board***" shall mean the board of directors of the Company or a committee designated by such board), which shall not be unreasonably withheld, prior to accepting appointment or reappointment to a board of directors or trustees of any other business, corporation or charitable organization; provided, further, that, in each case, such activities do not conflict or interfere with the performance of Executive's duties hereunder or conflict with Section 8.

3.      **Base Salary**. From the Effective Date and during the remainder of the Employment Term, Luminant shall pay Executive a base salary of $675,000 annually, payable in regular installments in accordance with Luminant's usual payment practices. Executive may be entitled to increases in his base salary in the sole discretion of the Board, which shall make such determinations following its annual review process for executives. Executive's annual base salary, as in effect from time to time, is hereinafter referred to as the "***Base Salary***."

4.      **Annual Bonus**. With respect to each fiscal year during the Employment Term, Executive shall have the opportunity to earn an annual bonus award (the "***Annual Bonus***") pursuant to the terms and conditions of the EFH Executive Annual Incentive

business performance targets and Executive's individual performance, both as approved by the Board; provided, however, if Luminant, the Company and/or Executive achieve superior performance targets as established by the Board, then Executive shall be eligible to receive a bonus award of up to 200% of his Target Award. Each Annual Bonus, if any, shall be paid to Executive within two and one-half (2½) months after the end of the applicable fiscal year.

5.      **Employee Benefits; Perquisites; Fringe Benefits**.

(a)      During the Employment Term, Executive shall be entitled to participate in the Company's group health, life, disability, and all tax qualified and nonqualified benefit plans, as in effect from time to time (collectively "***Employee Benefits***"), on a basis which is no less favorable than is offered to other members of the Strategy and Policy Committee (with the exception of the CEO of the Company), to the extent consistent with applicable law and the terms of the applicable plans.

(b)      During the Employment Term, Executive shall be entitled to fringe benefits consistent with the practices of the Company to the extent the Company provides similar benefits to other members of the Strategy and Policy Committee (with the exception of the CEO of the Company) and Executive is otherwise eligible to participate in such fringe benefit programs.

(c)      At the beginning of each calendar year during the Employment Term, Executive shall be entitled to the greater of: five (5) weeks of paid vacation, or the maximum number of days Executive is entitled to under the Company's vacation or paid time off policy, as applicable. Executive shall be entitled to carry over up to five (5) days of unused vacation from one calendar year to the next; provided that, any carryover vacation days not used in the next calendar year shall be forfeited.  Executive shall also be entitled to paid sick leave benefits in accordance with those provided to other similarly situated executives during the Employment Term.

(d)      Executive shall be entitled to the additional benefits and compensation set forth in Exhibits I and II attached hereto, subject to the terms and conditions thereof.

6.　　**Business Expenses**. Subject to Luminant's standard policies and procedures with respect to expense reimbursement, Luminant shall reimburse Executive for, or pay on behalf of Executive, reasonable and appropriate expenses incurred by Executive for business related purposes, provided claims for reimbursement are submitted timely and with appropriate supporting documentation.

7.　　**Termination**. Executive's employment hereunder may be terminated by either the Company or Executive at any time and for any reason; provided that, unless otherwise provided herein, either Party will be required to give the other Party at least sixty (60) days advance written notice of termination of Executive's employment. Notwithstanding the foregoing, the Company may, in lieu of providing sixty (60) days advance written notice of termination, immediately terminate Executive's employment for Cause; provided, that, the Company provides Executive with the compensation and benefits then in effect at the time of such termination to which Executive would have been entitled had he continued employment with the Company for such sixty (60) day period.   The provisions of this Section 7 shall exclusively govern Executive's rights upon termination of employment with Luminant and its Affiliates (as defined in Section 8(c) below).

(a)　　By the Company for Cause or by Executive Due to Voluntary Resignation without Good Reason.

(i)　　Executive's employment may be terminated by the Company for Cause (as defined below) or by Executive's voluntary resignation without Good Reason (as defined below) and, in either case, Executive shall be entitled to receive:

(A)　　within six (6) calendar days following the date of termination, accrued, but unpaid Base Salary and unused vacation, earned through the date of termination;

(B)　　in accordance with Section 4 (except to the extent payment is otherwise deferred pursuant to any applicable deferred compensation arrangement with Luminant or the Company), any accrued but unpaid Annual Bonus earned for any previously completed fiscal year;

(C)　　within sixty (60) days of Executive's claim for reimbursement, payment for any unreimbursed business expenses properly incurred by Executive in accordance with Luminant's policies prior to the date of Executive's termination; provided that claims for reimbursement are accompanied by appropriate supporting documentation and are submitted to Luminant within ninety (90) days following the date of Executive's termination of employment;

(D)　　Employee Benefits and equity compensation, if any, as to which Executive may be entitled under the employee benefit plans of Luminant and its Affiliates or any agreement between Luminant (and/or its Affiliates) and Executive; and

(E)　　any amounts payable or that may become payable pursuant to Section 7(g) and/or Section 9(g) (the amounts described in clauses (A) through (E) hereof being referred to as the "*Accrued Rights*").

Following termination of Executive's employment by the Company for Cause or voluntary resignation by Executive without Good Reason, except as set forth in this Section 7(a)(i) and for any rights to indemnification and claims for liability insurance coverage under officer and director policies, Executive shall have no further rights to any compensation or any other benefits under this Agreement.

(ii)        For purposes of this Agreement, the terms:

(A)        "***Cause***" shall mean (i) if, in performing his duties to Luminant, Executive engages in conduct that constitutes (a) a material breach of his fiduciary duty to Luminant, the Company, or their shareholders (including, without limitation, a material breach or attempted breach of the provisions under Section 8), (b) gross neglect, or (c) gross misconduct resulting in material economic harm to Luminant or the Company; provided that any such conduct described in (a), (b) or (c) is not cured within ten (10) business days after Executive receives from the Company written notice thereof; or (ii) Executive's conviction of, or entry of a plea of guilty or nolo contendere for, a felony or other crime involving moral turpitude.

(B)        "***Good Reason***" shall mean, provided that Executive has not previously given the Company his written consent, (i) a reduction in Executive's Base Salary or Executive's annual incentive compensation opportunity (other than a general reduction in base salary or annual incentive compensation opportunities that affects all salaried employees of the Company proportionately); (ii) a transfer of Executive's primary workplace by more than fifty (50) miles from the workplace on the Effective Date; (iii) a substantial adverse change in Executive's duties or responsibilities; (iv) any material breach of this Agreement; or (v) an adverse change in Executive's line of reporting to superior officers pursuant to the terms of this Agreement;  provided,  however, that any isolated, insubstantial or inadvertent failure by Luminant or the Company that is not in bad faith and is cured within ten (10) business days after Executive gives the Company written notice of any such event set forth above, shall not constitute Good Reason.

(b)        Disability or Death.

(i)        Executive's employment shall terminate upon Executive's death and may be terminated by the Company if Executive has a Disability (as defined below) and, in either case, Executive or Executive's estate (as the case may be) shall be entitled to receive:

(A)        the Accrued Rights;

(B)        a portion of the Target Award that Executive would have been entitled to receive pursuant to Section 4 hereof for the fiscal year of termination, such portion to be determined by multiplying the Target Award by a fraction, the numerator of which is the number of days during which Executive was employed by Luminant in the fiscal year of Executive's termination, and the denominator of which is 365 (the "***Pro-Rata Bonus***"), with such Pro-Rata Bonus payable to Executive pursuant to Section 4 as if Executive's employment had not terminated; and

(C)        any additional benefits and compensation set forth in Exhibits I and II attached hereto, subject to the terms and conditions thereof.

Following Executive's termination of employment due to death or Disability, except as set forth in this Section 7(b)(i) and for any rights to indemnification and claims for liability insurance coverage under officer and director policies, Executive shall have no further rights to any compensation or any other benefits under this Agreement.

(ii)        "***Disability***" shall mean Executive's physical or mental incapacitation and consequent inability, with reasonable accommodation, for a period of six consecutive months to perform Executive's duties;  provided, however, in the event the Company temporarily replaces Executive, or transfers Executive's duties or responsibilities to another individual, on account of Executive's inability to perform such duties due to a mental or physical incapacity which is, or is reasonably expected to become, a long-

term disability, then Executive's employment shall not be deemed terminated by the Company and Executive shall not be able to resign with Good Reason. Any question as to the existence of a Disability as to which Executive and the Company cannot agree shall be determined in writing by a qualified independent physician mutually acceptable to Executive and the Company. If Executive and the Company cannot agree on a qualified independent physician, each shall appoint a physician and those two physicians shall select a third who shall make such determination in writing. The determination of Disability made in writing to the Company and Executive shall be final and conclusive for all purposes of the Agreement and any other agreement with Executive that incorporates this definition of Disability.

        (c)      By the Company Without Cause; Resignation by Executive for Good Reason . Executive's employment hereunder may be terminated by the Company without Cause (other than by reason of death or Disability) or upon Executive's resignation for Good Reason and, in either case (except as otherwise provided in Section 7(e)), Executive shall be entitled to receive:

        (i)      the Accrued Rights;

        (ii)      provided Executive (x) does not violate the restrictions set forth in Section 8 of this Agreement and (y) executes, delivers and does not revoke a general release of claims against Luminant, the Company and its Affiliates (excluding claims for indemnification, claims for coverage under officer and director policies, and claims as a stockholder of the Company):

        (A)      a lump sum payment equal to: (I) two (2) times Executive's Base Salary, and (II) the Pro-Rata Bonus, payable as soon as practicable but no later than the earlier of: (a) March 15 following the calendar year in which termination occurs or (b) ninety (90) days following termination; and

        (B)      Executive, his spouse and eligible dependents (to the extent covered immediately prior to such termination) shall continue to be eligible to participate in all of the Company's group health plans on the same terms and conditions as active employees of the Company until the earlier of (x) two (2) years from the date of termination of Executive's employment (the "*Severance Period*"), to the extent that Executive was eligible to participate in such plans immediately prior to the date of termination, or (y) until Executive is, or becomes, eligible for comparable coverage under the group health plans of a subsequent employer.  If Executive continues to receive benefits pursuant to this Section 7(c)(ii)(B) when, in the absence of the benefits provided in this Section 7(c)(ii)(B), Executive would not be entitled to continuation coverage under Section 4980B of the Internal Revenue Code of 1986, as amended (the "*Code*"), Executive shall receive reimbursement for all medical expenses no later than the end of the calendar year immediately following the calendar year in which the applicable expenses were incurred. The health care continuation coverage period under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended (" *COBRA*"), Code Section 4980B, or any replacement or successor provision of United States tax law, shall run concurrently with the Severance Period; and

        (iii)    any additional benefits and compensation set forth in Exhibits I and II attached hereto, subject to the terms and conditions thereof.

Following Executive's termination of employment by the Company without Cause (other than by reason of Executive's death or Disability) or upon Executive's resignation for Good Reason, except as set forth in this Section 7(c) or otherwise provided in Section 7(e) and for any rights to indemnification and claims for liability insurance coverage under officer and director policies, Executive shall have no further rights to any compensation or any other benefits under this Agreement.

(d)    Expiration of Employment Term.

(i)    In the event Executive elects not to extend the Employment Term pursuant to Section 1 and Executive's employment has not been earlier terminated pursuant to Sections 7(a), (b), (c), or (e), the Employment Term shall expire and Executive's employment hereunder shall terminate as of the end of the day immediately preceding the commencement of a subsequent Renewal Term, and Executive shall be entitled to receive the Accrued Rights.  Except as set forth in this Section 7(d)(i) and for any rights to indemnification and claims for liability insurance coverage under officer and director policies, Executive shall have no further rights to any compensation or any other benefits under this Agreement.

(ii)    In the event the Company elects not to extend the Employment Term pursuant to Section 1 and Executive's employment has not been earlier terminated pursuant to Sections 7(a), (b), (c), or (e), the Employment Term shall expire and Executive's employment hereunder shall terminate as of the end of the day immediately preceding the commencement of a subsequent Renewal Term, and Executive shall be entitled to receive the payments and benefits applicable to a termination of Executive's employment without Cause pursuant to Section 7(c) or Section 7(e), as applicable.  Except as set forth in this Section 7(d)(ii) and for any rights to indemnification and claims for liability insurance coverage under officer and director policies, Executive shall have no further rights to any compensation or any other benefits under this Agreement.

(e)    Change in Control. Notwithstanding any provision contained herein, if Executive's employment is terminated by the Company without Cause (other than by reason of death or Disability) or if Executive resigns for Good Reason, in either case, within twenty-four (24) months following a Change in Control (as defined in the 2007 Stock Incentive Plan for Key Employees of Energy Future Holdings Corp. and its Affiliates), Executive shall be entitled to receive:

(i)    the Accrued Rights;

(ii)    provided Executive (x) does not violate the restrictions set forth in Section 8 of this Agreement and (y) executes, delivers and does not revoke a general release of claims against Luminant, the Company and its Affiliates (excluding claims for indemnification, claims for coverage under officer and director policies, and claims as a stockholder of the Company), a lump sum payment equal to two (2) times the sum of Executive's annualized Base Salary and Executive's Target Award, payable as soon as practicable but no later than the earlier of: (i) March 15 following the calendar year in which termination occurs or (ii) ninety (90) days following termination;

(iii)    provided Executive (x) does not violate the restrictions set forth in Section 8 of this Agreement and (y) executes, delivers and does not revoke a general release of claims against Luminant, the Company and its Affiliates (excluding claims for indemnification, claims for coverage under officer and director policies, and claims as a stockholder of the Company), Executive, his spouse and eligible dependents (to the extent covered immediately prior to such termination) shall continue to be eligible to participate in all of the Company's group health plans on the same terms and conditions as active employees of the Company until the earlier of (A) termination of the Severance Period, to the extent that Executive was eligible to participate in such plans immediately prior to the date of termination, or (B) until Executive is, or becomes, eligible for comparable coverage under the group health plans of a subsequent employer. If Executive continues to receive benefits pursuant to this Section 7(e)(iii) when, in the absence of the benefits provided in this Section 7(e)(iii) Executive would not be entitled to continuation coverage under Code Section 4980B, Executive shall receive reimbursement for all medical expenses no later than the end of the calendar year

immediately following the calendar year in which the applicable expenses were incurred. The health care continuation coverage period under COBRA, Code Section 4980B, or any replacement or successor provision of United States tax law, shall run concurrently with the Severance Period; and

        (iv)      any additional benefits and compensation set forth in Exhibits I and II attached hereto, subject to the terms and conditions thereof.

Following Executive's termination of employment without Cause (other than by reason of Executive's death or Disability) or upon Executive's resignation for Good Reason, in either case, within twenty-four (24) months following a Change in Control, except as set forth in this Section 7(e) and for any rights to indemnification and claims for liability insurance coverage under officer and director policies, Executive shall have no further rights to any compensation or any other benefits under this Agreement.

     (f)   Notice of Termination. Any purported termination of employment by the Company or by Executive (other than due to Executive's death) shall be communicated by written Notice of Termination to the other Party in accordance with Section 9(j) hereof. For purposes of this Agreement, a "***Notice of Termination***" shall mean a notice indicating the specific termination provision in this Agreement relied upon and shall set forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of employment under the provision so indicated.

     (g)   Code Section 4999.

      (i)   If, by reason of, or in connection with, any transaction that occurs after the Original Effective Date, Executive would be subject to the imposition of the excise tax imposed by Code Section 4999 related to Executive's employment with the Company, whether before or after termination of Executive's employment, but the imposition of such tax could be avoided by approval of shareholders described in Code Section 280G(b)(5)(B), then Executive may ask the Company to seek such approval, in which case the Company will use its reasonable best efforts to cause such approval to be obtained and Executive will cooperate and execute such waivers as may be necessary so that such approval avoids imposition of any excise tax under Code Section 4999. If Executive fails to request that the Company seek such approval, or if Executive does request that the Company seek such approval, but fails to cooperate and execute such waivers as may be necessary in the approval process, Section 7(g)(ii) shall not apply and Executive shall not be entitled to any gross-up payment for any resulting tax under Code Section 4999. If such approval, even if sought and obtained, would not avoid imposition of the excise tax imposed under Code Section 4999, then the provisions of Section 7(g)(ii) shall apply without any precedent obligation of Executive to seek such approval.

      (ii)   Gross-Up Payment.

        (A)      In the event it shall be determined that any payment, benefit or distribution (or combination thereof) by the Company, any Affiliate, or one or more trusts established by the Company or any Affiliate for the benefit of their employees, to or for the benefit of Executive (whether paid or payable or distributed or distributable pursuant to the terms of this Agreement, or otherwise) (a "***Payment***") is subject to the excise tax imposed by Code Section 4999 or any interest or penalties are incurred by Executive with respect to such excise tax (such excise tax, together with any such interest and penalties, hereinafter collectively referred to as the "***Excise Tax***"), Executive shall be entitled to receive an additional payment (a "***Gross-Up Payment***") in an amount such that after payment by Executive of all taxes (including any interest or penalties imposed with respect to such taxes), including, without limitation, any federal, state and local income taxes and employment taxes (and any interest and penalties imposed with respect thereto) and the

Excise Tax imposed upon the Gross-Up Payment, Executive retains an amount of the Gross-Up Payment equal to the Excise Tax imposed upon the Payments.

(B)        All determinations required to be made under this Section 7(g)(ii), including whether and when a Gross-Up Payment is required and the amount of such Gross-Up Payment and the assumptions to be utilized in arriving at such determination, shall be made by Deloitte & Touche LLP, Alvarez & Marsal, or such other nationally recognized accounting firm as may be designated by the Company (the "***Accounting Firm***"), which shall provide detailed supporting calculations both to the Company and Executive within ten (10) business days of the receipt of notice from Executive that there has been a Payment, or such earlier time as is requested by the Company; provided that for purposes of determining the amount of any Gross-Up Payment, Executive shall be deemed to pay federal income tax at the highest marginal rates applicable to individuals in the calendar year in which any such Gross-Up Payment is to be made and deemed to pay state and local income taxes at the highest effective rates applicable to individuals in the state or locality of Executive's residence or place of employment in the calendar year in which any such Gross-Up Payment is to be made, net of the maximum reduction in federal income taxes that can be obtained from deduction of such state and local taxes, taking into account limitations applicable to individuals subject to federal income tax at the highest marginal rates. All fees and expenses of the Accounting Firm shall be borne solely by the Company. Any Gross-Up Payment, as determined pursuant to this Section 7(g)(ii), shall be paid by the Company to Executive (or to the appropriate taxing authority on Executive's behalf) when due. If the Accounting Firm determines that no Excise Tax is payable by Executive, it shall so indicate to Executive in writing. Any determination by the Accounting Firm shall be binding upon the Company and Executive (subject to Section 7(g)(ii)(C)). As a result of the uncertainty in the application of Code Section 4999, it is possible that the amount of the Gross-Up Payment determined by the Accounting Firm to be due to (or on behalf of) Executive was lower than the amount actually due (" ***Underpayment***"). In the event that the Company exhausts its remedies pursuant to Section 7(g)(ii)(C) and Executive thereafter is required to make a payment of any Excise Tax, the Accounting Firm shall determine the amount of the Underpayment that has occurred, and any such Underpayment shall be promptly paid by the Company to or for the benefit of Executive (but in any case no later than the calendar year following the calendar year in which such tax was payable).

(C)        Executive shall notify the Company in writing of any claim by the Internal Revenue Service that, if successful, would require the payment by the Company of any Gross-Up Payment. Such notification shall be given as soon as practicable but no later than ten (10) business days after Executive is informed in writing of such claim and shall apprise the Company of the nature of such claim and the date on which such claim is requested to be paid. Executive shall not pay such claim prior to the expiration of the thirty (30) day period following the date on which he gives such notice to the Company (or such shorter period ending on the date that any payment of taxes with respect to such claim is due). If the Company notifies Executive in writing prior to the expiration of such period that it desires to contest such claim, Executive shall (i) give the Company any information reasonably requested by the Company relating to such claim, (ii) take such action in connection with contesting such claim as the Company shall reasonably request in writing from time to time, including, without limitation, accepting legal representation with respect to such claim by an attorney reasonably selected by the Company, (iii) cooperate with the Company in good faith in order to effectively contest such claim and (iv) permit the Company to participate in any proceedings relating to such claim; provided, however, that the Company shall bear and pay directly all costs and expenses (including additional interest and penalties) incurred in connection with such contest and shall indemnify and hold Executive harmless, on an after-tax basis, for any Excise Tax or income tax (including interest and penalties with respect thereto) imposed as a result of such representation and payment of costs and expenses. Without limitation on the foregoing provisions of this Section 7(g)(ii)(C), the Company shall control all proceedings taken in connection with such contest and, at its sole option, may pursue or forego any and all

administrative appeals, proceedings, hearings and conferences with the taxing authority in respect of such claim and may, at its sole option, either direct Executive to pay the tax claimed and sue for a refund or contest the claim in any permissible manner, and Executive agrees to prosecute such contest to a determination before any administrative tribunal, in a court of initial jurisdiction and in one (1) or more appellate courts, as the Company shall determine; provided that if the Company directs Executive to pay such claim and sue for a refund, the Company shall advance the amount of such payment to Executive, on an interest-free basis, and shall indemnify and hold Executive harmless, on an after-tax basis, from any Excise Tax or income tax (including interest or penalties with respect thereto) imposed with respect to such advance or with respect to any imputed income with respect to such advance; provided, further, that if Executive is required to extend the statute of limitations to enable the Company to contest such claim, Executive may limit this extension solely to such contested amount. The Company's control of the contest shall be limited to issues with respect to which a Gross-Up Payment would be payable hereunder and Executive shall be entitled to settle or contest, as the case may be, any other issue raised by the Internal Revenue Service or any other taxing authority.

(D)    If, after the receipt by Executive of an amount paid or advanced by the Company pursuant to this Section 7(g)(ii), Executive becomes entitled to receive any refund with respect to a Gross-Up Payment, Executive shall (subject to the Company's complying with the requirements of Section 7(g)(ii)(C)) promptly pay to the Company the amount of such refund received (together with any interest paid or credited thereon after taxes applicable thereto). If, after the receipt by Executive of an amount advanced by the Company pursuant to Section 7(g)(ii)(C), a determination is made that Executive shall not be entitled to any refund with respect to such claim, and the Company does not notify Executive in writing of its intent to contest such denial of refund prior to the expiration of thirty (30) days after such determination, then such advance shall be forgiven and shall not be required to be repaid, and the amount of such advance shall offset, to the extent thereof, the amount of the Gross-Up Payment required to be paid.

(E)    For the avoidance of doubt, all payments to or for the benefit of Executive provided for in this Section 7(g)(ii) shall be made no later than the end of the calendar year in which the applicable Excise Tax has become due, or if as a result a tax audit or litigation, it is determined that no additional Excise Tax has become due, the end of the calendar year in which the audit is completed or there is a final and non-appealable settlement or other resolution.

8.    **Restrictive Covenants**.

(a)    In consideration of the Company and Luminant entering into this Agreement with Executive and hereby promising and committing themselves to provide Executive with Confidential Information and/or specialized training after Executive executes this Agreement, Executive shall not, directly or indirectly:

(i)    at any time during or after the Employment Term, disclose any Confidential Information pertaining to the business of Luminant, the Company, the Sponsor Group, or any of their respective Affiliates, except when required to perform his duties to Luminant, the Company or one of its Affiliates, or by law or judicial process, provided that Executive gives the Company reasonable notice of any legal or judicial proceeding requiring Executive to disclose Confidential Information and an opportunity to challenge the disclosure of any such information, and Executive agrees to provide such reasonable notice in writing to:

General Counsel
Energy Future Holdings Corp.
1601 Bryan Street, 41st Floor
Dallas, Texas 75201
(214) 812-5153 (facsimile);

(ii)        at any time during the Employment Term and for a period of eighteen (18) months  thereafter (the "**Non-Compete Period**"), directly or indirectly, act as a proprietor, investor, director, officer, employee, substantial stockholder, consultant, or partner in any Competing Business in Texas or any other geographic area in which Texas Energy Future Holdings Limited Partnership, the Company or any of their respective subsidiaries operates or conducts business; or

(iii)        at any time during the Employment Term and for a period of eighteen (18) months  thereafter, directly or indirectly (A) solicit customers or clients of Luminant, the Company or any of its Affiliates to terminate their relationship with Luminant, the Company or any of its Affiliates or otherwise solicit such customers or clients to compete with any business of Luminant, the Company or any of its Affiliates, or (B) solicit or offer employment to any person who is, or has been at any time during the twelve (12) months immediately preceding the termination of Executive's employment, employed by Luminant, the Company or any of its Affiliates;

provided that in each of (ii) and (iii) above, such restrictions shall not apply with respect to any member of the Sponsor Group or any of its Affiliates that is not engaged in any business that competes, directly or indirectly, with the Company or any of its subsidiaries in any geographic area where they operate. Notwithstanding the foregoing, for the purposes of this Section 8(a), (A) Executive may, directly or indirectly own, solely as an investment, securities of any Person engaged in the business of Luminant, the Company or its Affiliates that are publicly traded on a national or regional stock exchange or quotation system or on the over-the-counter market if Executive (I) is not a controlling person of, or a member of a group which controls, such Person and (II) does not, directly or indirectly, own 5% or more of any class of securities of such Person, and (B) Section 8(a)(ii) shall not be violated by reason of any exercise of tag-along rights under the Sale Participation Agreement, by and between the Company (and related parties) and Executive (the "**Sale Participation Agreement**") or Drag Transaction (as defined in the Sale Participation Agreement) that may occur after the date hereof.

(b)        Notwithstanding clause (a) above, if at any time a court holds that the restrictions stated in such clause (a) are unreasonable or otherwise unenforceable under circumstances then existing, the Parties hereto agree that the maximum period, scope or geographic area determined to be reasonable under such circumstances by such court will be substituted for the stated period, scope or area. Because Executive's services are unique and because Executive has had access to Confidential Information, the Parties hereto agree that money damages will be an inadequate remedy for any breach of this Agreement. In the event of a breach or threatened breach of this Agreement, Luminant, the Company or their respective successors or assigns may, in addition to other rights and remedies existing in their favor, apply to any court of competent jurisdiction for specific performance and/or injunctive relief in order to enforce, or prevent any violations of, the provisions hereof (without the posting of a bond or other security). Notwithstanding the foregoing, in the event Executive breaches the covenants set forth in this Section 8, the Company's rights and remedies with respect Executive's Options, Option Stock, and Stock and payments related thereto, as those terms are defined in the Management Stockholder's Agreement, by and between the Company (and related parties)

and Executive (the "***Management Stockholder's Agreement***") shall be limited to those set forth in Section 22(c) of the Management Stockholder's Agreement.

      (c)      For purposes of this Agreement, the terms listed below shall be defined as follows:

      (i)      "***Affiliate***" shall mean with respect to any Person, any entity directly or indirectly controlling, controlled by or under common control with such Person; and, by way of clarification and not by limitation, the Company and Luminant are Affiliates of each other; provided, however, for purposes of this Agreement, Texas Energy Future Co-Invest, LP shall not be deemed to be an Affiliate of the Sponsor Group or any member of the Sponsor Group.

      (ii)      "***Competing Business***" shall mean any business that directly or indirectly competes, at the relevant determination date, with one or more of the businesses of Luminant, the Company or any of its Affiliates in any geographic area where Texas Energy Future Holdings Limited Partnership, the Company, or any of their respective subsidiaries operates.

      (iii)      "***Confidential Information***" shall mean information: (A) disclosed to or known by Executive as a consequence of or through his employment with Luminant, the Company or any Affiliate; (B) not publicly available or not generally known outside Luminant, the Company or any Affiliate; and (C) that relates to the business and/or development of Luminant, the Company or any Affiliate. Any information that does not meet each of the criteria listed above (in subsections (A) - (C)) shall not constitute Confidential Information. By way of example, Confidential Information shall include but not be limited to the following: all non-public information or trade secrets of Luminant, the Company, or any Affiliate that gives Luminant, the Company or any Affiliate a competitive business advantage or the opportunity of obtaining such advantage, or disclosure of which might be detrimental to the interests of Luminant, the Company or any Affiliate; information regarding Luminant's, the Company's or any Affiliate's business operations, such as financial and sales data (including budgets, forecasts, and historical financial data), operational information, plans, and strategies; business and marketing strategies and plans for various products and services; rate and regulatory strategy and plans; information regarding suppliers, consultants, employees, and contractors; technical information concerning products, equipment, services, and processes; procurement procedures; pricing and pricing techniques; information concerning past, current and prospective customers, investors, and business affiliates; plans or strategies for expansion or acquisitions; budgets; research; trading methodologies and terms; communications information; evaluations, opinions, and interpretations of information and data; marketing and merchandising techniques; electronic databases; models; specifications; computer programs; contracts; bids or proposals; technologies and methods; training methods and processes; organizational structure; personnel information; payments or rates paid to consultants or other service providers; and Luminant's, the Company's or any Affiliate's files, physical or electronic documents, equipment, and proprietary data or material in whatever form including all copies of all such materials. By way of clarification (but not limitation), information that Executive conceived or developed during his employment with Luminant, the Company or an Affiliate or learned from other employees or contractors of Luminant, the Company or an Affiliate that meets the definition of Confidential Information shall be treated as such.

      (iv)      "***Person***" shall mean "person," as such term is used for purposes of Section 13(d) or 14(d) of the Securities Exchange Act of 1934, as amended (or any successor thereto).

      (v)      "***Restricted Group***" shall mean, collectively the Company, its subsidiaries, the members of the Sponsor Group and their respective Affiliates.

(vi)        "**_Sponsor Group_**" shall mean Kohlberg Kravis Roberts & Co. L.P., TPG Capital L.P., and Goldman, Sachs & Co.

9.    <u>Miscellaneous</u>.

(a)        <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas without regard to conflicts of laws principles thereof.

(b)        <u>Entire Agreement</u>. Except as otherwise provided herein, this Agreement contains the entire understanding of the Parties with respect to the employment of Executive by Luminant, the Company and/or its Affiliates and supersedes all prior agreements and understandings. There are no restrictions, agreements, promises, warranties, covenants or undertakings between the Parties with respect to the subject matter herein other than those expressly set forth herein.

(c)        <u>No Waiver</u>. The failure of a Party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver of such Party's rights or deprive such Party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

(d)        <u>Severability</u>. In the event that any one or more of the provisions of this Agreement shall be or become invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions of this Agreement shall not be affected thereby.

(e)        <u>Assignment</u>. This Agreement, and all of Executive's rights and duties hereunder, shall not be assignable or delegable by Executive. Any purported assignment or delegation by Executive in violation of the foregoing shall be null and void ab initio and of no force and effect. This Agreement may be assigned by Luminant or the Company to a person or entity which is an Affiliate or a successor in interest to substantially all of the business operations of Luminant or the Company, provided that the assignee expressly assumes all obligations of Luminant and/or the Company under this Agreement and all other related agreements to which Executive, the Company and/or Luminant are parties. Upon such assignment, the rights and obligations of Luminant and/or the Company hereunder shall become the rights and obligations of such Affiliate or successor person or entity.

(f)        <u>Set Off; Mitigation</u>. Except as otherwise provided in Section 9(o), the obligations of Luminant and the Company to pay Executive the amounts provided and to make the arrangements provided hereunder shall not be subject to setoff, counterclaim or recoupment of amounts owed by Executive to Luminant, the Company and/or their Affiliates.  Executive shall not be required to mitigate the amount of any payment provided for pursuant to this Agreement by seeking other employment and, except as expressly provided herein, no amount payable hereunder shall be reduced by any payments or benefits received from such subsequent employment.

(g)        <u>Compliance with Code Section 409A</u>. Notwithstanding anything herein to the contrary, if, at the time of Executive's termination of employment, the Company has securities that are publicly traded on an established securities market, and Executive is a "specified employee" (as defined in Code Section 409A), and the deferral of the commencement of any payments or benefits otherwise payable pursuant to Section 7 is necessary in order to prevent any accelerated or additional tax under Code Section 409A, then, to the extent permitted by Code Section 409A, the Company will defer any such payments or benefits hereunder (without any reduction in the payments or benefits ultimately paid or provided to Executive) until the date that is six (6) months following Executive's termination of employment with the Company (or the earliest date as is permitted under Code Section 409A), provided that amounts which do not exceed the limits

set forth in Code Section 402(g)(1)(B) in the year of such termination shall be payable immediately upon termination. Any payments or benefits deferred due to such requirements will be paid in a lump sum to Executive at the end of such six (6) month period.  The Company shall consult with Executive in good faith regarding the implementation of the provisions of this Section 9(g).

(h)    Indemnity.  The Company and its subsidiaries shall indemnify and hold Executive harmless for all acts and omissions occurring during his employment or service as a member of the board of directors or managers (as applicable) of any of the Company and/or its subsidiaries, to the maximum extent provided under each of the Company's and such subsidiaries' charter, certificate of formation, limited partnership agreement, by-laws and applicable law. During the Employment Term and for a term of six (6) years thereafter, the Company, or any successor to the Company, the Company's subsidiaries (to the extent not covered under the terms of the Company's insurance policy), and each of their respective successors, shall purchase and maintain, at their own expense, directors' and officers' liability insurance providing coverage for Executive in the same amount as, and with terms no less favorable than, for members of their respective boards of directors or managers (as applicable).

(i)    Successors; Binding Agreement.  This Agreement shall inure to the benefit of and be binding upon personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees and legatees. In the event of Executive's death before receiving all amounts and benefits due to him hereunder, such amounts shall be payable to Executive's estate or as otherwise provided under applicable benefit plans or arrangements.

(j)    Notice.  For the purpose of this Agreement, notices and all other communications provided for in the Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or overnight courier or three (3) days after it has been mailed by United States registered mail, return receipt requested, postage prepaid, addressed to the respective addresses set forth below in this Agreement, or to such other address as either Party may have furnished to the other in writing in accordance herewith, except that notice of change of address shall be effective only upon receipt.

|  |  |
|---|---|
| If to the Company or Luminant: | Energy Future Holdings Corp. 1601 Bryan Street, 41st Floor Dallas, Texas 75201-3411 Attention: General Counsel |
| If to Executive: | The most recent address on file with the Company |

(k)    Executive Representation.  Executive hereby represents to Luminant and the Company that his execution and delivery of this Agreement and performance of his duties hereunder shall not constitute a breach of, or otherwise contravene, the terms of any employment agreement, separation agreement or other agreement or policy to which Executive is a party or otherwise bound.

(l)    Captions; Section References.  The captions included herein are for convenience of reference only and shall be ignored in the construction or interpretation hereof. All references to sections of statutes, regulations or rules shall be deemed to be references to any successor sections.

(m)  <u>Further Assurances</u>.  The Parties shall, with reasonable diligence, do all things and provide all reasonable assurances as may be required to complete the transactions contemplated by this Agreement, and each Party shall provide such further documents or instruments required by the other Party as may be reasonably necessary or desirable to give effect to this Agreement and carry out its provisions.

(n)  <u>Cooperation</u>.  For a period of six (6) years after his termination, Executive shall provide Executive's reasonable cooperation in connection with any action or proceeding (or any appeal from any action or proceeding) which relates to events occurring during Executive's employment hereunder, provided that the Company and its Affiliates shall use reasonable efforts to avoid material interference with Executive's business or personal activities. The Company shall pay all of Executive's reasonable expenses incurred in connection with providing such cooperation.

(o)  <u>Withholding</u>.  Luminant may withhold from any amounts payable under this Agreement such federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.  In addition, Executive expressly authorizes and agrees that any amounts he owes in relation to any travel or credit cards issued or sponsored by Luminant or the Company, the energy conservation program, the appliance purchase program, or salary, bonus, vacation or other benefit overpayments, may be offset and deducted from any payments due to Executive pursuant to this Agreement.

(p)  <u>Counterparts</u>.  This Agreement may be signed in counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

(q)  <u>Amendments</u>.  This Agreement may not be altered, modified, or amended except by written instrument signed by the Parties hereto.

(r)  <u>Return of Property</u>.  Executive agrees that if Executive's employment with Luminant or the Company is terminated (for any reason), Executive shall not take with Executive, but will leave with the Company, all computers, cell phones, access cards, computer or electronic storage devices, any other Company property and all Confidential Information, work product, records, files, electronic mail, memoranda, reports, documents and other information that is the property of the Company, in whatever form (including on computer disk or any electronic storage device), and any copies thereof, or if such items are not on the premises of the Company, Executive agrees to return such items immediately upon Executive's termination (regardless of the reason) or any time at the request of the Company. Executive acknowledges that all such items are and remain the property of the Company.

**IN WITNESS WHEREOF**, the Parties hereto have duly executed this Agreement as of the day and year first above written.

**ENERGY FUTURE HOLDINGS CORP**.


By:  /s/ John F. Young
     John F. Young
     President and Chief Executive Officer


**LUMINANT HOLDING COMPANY LLC**


By:  /s/ Carrie L. Kirby
     Carrie L. Kirby
     Senior Vice President


**EXECUTIVE:**


                              /s/ Mark Allen McFarland
                              Mark Allen McFarland

**Exhibit I**

In addition to the benefits, perquisites and compensation set forth in the Agreement, Executive shall be entitled to receive the benefits, perquisites and compensation set forth in this Exhibit I, subject to the terms and conditions set forth herein:

        (a)        Executive shall have the opportunity to earn the retention awards set forth in this Exhibit I, collectively referred to herein as the "***Retention Award***", subject to the terms and conditions set forth herein:

        (i)        Executive shall earn a long-term cash bonus award equal to 75% of the aggregate Annual Bonus amount actually earned by Executive in respect of fiscal years 2009, 2010, and 2011 (the "***First Retention Award***"). The First Retention Award earned by Executive shall be paid to Executive in a lump sum on September 30, 2012; provided, that, subject to the provisions of sub-paragraph (a)(v) of this Exhibit I, Executive is employed by Luminant, the Company or an Affiliate thereof on September 30, 2012.

        (ii)        Executive shall earn an additional long-term cash bonus award in an amount between $650,000 and $1,300,000 determined by the Company's performance as indicated by the level of Competitive Management EBITDA actually achieved for the fiscal year ended December 31, 2011 relative to the Competitive Management EBITDA threshold and target amounts set by the Board for such fiscal year (the "***Second Retention Award***"). For the achievement of the threshold level of Competitive Management EBITDA in respect of such year, Executive shall earn $650,000, for the achievement of at least the target level of Competitive Management EBITDA in respect of such year, Executive shall earn $1,300,000 (the "***Second Retention Target Award***"), and for the achievement of Competitive Management EBITDA in between the threshold and target levels in respect of such year, Executive shall earn an amount between $650,000 and $1,300,000 as determined by linear interpolation. The Second Retention Award, if earned, shall be paid to Executive in two equal installments on September 30, 2012 and September 30, 2013; provided, that, subject to the provisions of sub-paragraph (a)(v) of this Exhibit I, Executive is employed by Luminant, the Company or an Affiliate thereof on the applicable payment date.

        (iii)        Executive shall earn an additional long-term cash bonus award in an amount between $500,000 and $1,000,000 per fiscal year determined by the Company's performance as indicated by the level of Competitive Management EBITDA actually achieved for the fiscal years ended December 31, 2012, December 31, 2013, and December 31, 2014 relative to the Competitive Management EBITDA threshold and target amounts set by the Board for each respective fiscal year (the "***Third Retention Award***"). For the achievement of the threshold level of Competitive Management EBITDA in respect of any such year, Executive shall earn $500,000, for the achievement of at least the target level of Competitive Management EBITDA in respect of any such year, Executive shall earn $1,000,000 (the "***Third Retention Target Award***"), and for the achievement of Competitive Management EBITDA in between the threshold and target levels in respect of any such year, Executive shall earn an amount between $500,000 and $1,000,000 as determined by linear interpolation. The Third Retention Award, if earned, shall be paid to Executive in a lump sum on March 13, 2015; provided, that, subject to the provisions of sub-paragraph (a)(v) of this Exhibit I, Executive is employed by Luminant, the Company or an Affiliate thereof on March 13, 2015.

        (iv)        The process followed by the O&C Committee in establishing the Competitive Management EBITDA threshold and target amounts for purposes of the Second Retention Award and the Third Retention Award shall be consistent with the O&C Committee's prior practice.

(v)        In the event Executive's employment is terminated pursuant to Section 7(b), 7(c), 7(d)(ii), or 7(e) hereof, in any case, prior to the payment date of an applicable Retention Award, Executive shall be entitled to receive the Retention Award, or a portion thereof, that Executive would otherwise have been entitled to receive pursuant to sub-paragraphs (a)(i), (a)(ii), and (a)(iii) of this Exhibit I, calculated as set forth below (the sum of such amounts referred to herein as the " ***Pro-Rata Retention Award***"), with such Pro-Rata Retention Award payable to Executive as soon as practical but no later than the earlier of: (a) March 15 following the calendar year in which termination occurs or (b) ninety (90) days following termination; provided, that, in the case of a termination of employment pursuant to Section 7(c), 7(d)(ii), or 7(e), Executive (x) does not violate the restrictions set forth in Section 8 of this Agreement and (y) executes, delivers and does not revoke a general release of claims against Luminant, the Company and its Affiliates (excluding claims for indemnification, claims for coverage under officer and director policies, and claims as a stockholder of the Company).

(A)        with respect to the First Retention Award, (x) 75% of the aggregate Annual Bonus amount(s) actually earned by Executive in respect of any applicable fiscal year completed prior to the date of Executive's termination, plus (y) if the termination occurs prior to January 1, 2012, 75% of the Pro-Rata Bonus amount calculated pursuant to Section 7(b)(i)(B) above (for avoidance of doubt, the First Retention Award payment shall not be based on any Annual Bonus or Pro-Rata Bonus earned by or paid to Executive with respect to fiscal year 2012); plus

(B)        with respect to the Second Retention Award, (x) if the termination occurs prior to January 1, 2012, a portion of the Second Retention Award to be determined by multiplying the Second Retention Target Award by a fraction, the numerator of which is the number of days during which Executive was employed by Luminant, the Company or an Affiliate thereof in the fiscal year of Executive's termination, and the denominator of which is 365, or (y) if the termination occurs on or after January 1, 2012, the actual earned amount of the Second Retention Award; plus

(C)        with respect to the Third Retention Award, (x) if the termination occurs prior to January 1, 2015, a portion of the Third Retention Award equal to (1) the amount that would have been payable under sub-paragraph (a)(iii) of this Exhibit I for any completed fiscal year, plus (2) a portion of the Third Retention Award to be determined by multiplying the Third Retention Target Award for the year of Executive's termination by a fraction, the numerator of which is the number of days during which Executive was employed by Luminant, the Company or an Affiliate thereof in the fiscal year of Executive's termination, and the denominator of which is 365, or (y) if the termination occurs on or after January 1, 2015, the actual earned amount of the Third Retention Award.

(vi)        Notwithstanding any provision of this Exhibit I to the contrary, in the event of a Change in Control, Executive's entitlement to the Retention Awards shall be determined without regard to the achievement of Competitive Management EBITDA in respect of the fiscal year in which such Change in Control occurs and any subsequent year, and the amount earned by Executive shall be determined as if target level of Competitive Management EBITDA were achieved for any such year, but to the extent the Retention Award is attributable to any prior fiscal year, actual Competitive Management EBITDA for such prior year shall be used.

(vii)        To assure payment of the Company's obligations under sub-paragraphs (a)(ii) and (a)(iii) above, the Company has obtained the issuance of an Irrevocable Standby Letter of Credit (the " ***LOC***") for the benefit of Executive from a bank (the "***Issuer***") on the following terms:

(A)        The LOC shall be in the amount of $4,300,000.

(B)        The LOC shall expire on .

(C)        The LOC shall not be transferable.

(D)        Partial and multiple draws shall be permitted under the LOC.  [Information Omitted.]

(viii)        A copy of the LOC so issued is attached hereto as Exhibit I(A).

(ix)        Any amount paid under the LOC to the United States Treasury in respect of the Company's tax account shall be credited as withheld income and payroll taxes with respect to Executive, and the Company shall properly report such amount on IRS Form W-2 issued to Executive for the applicable tax year.

(x)        For purposes hereof, "***Competitive Management EBITDA***" shall mean the sum of Energy Future Holdings Corp. consolidated EBITDA less Oncor Electric Delivery Holdings Company LLC EBITDA; where:

(A)        "***EBITDA***" shall mean earnings before interest, taxes, depreciation and amortization plus transaction, management and/or similar fees paid to the Sponsor Group and/or its Affiliates, together with such adjustments as the O&C Committee shall determine appropriate in its discretion after good faith consultation with the Chief Executive Officer and/or Chief Financial Officer. Such adjustments will be consistent with those included in the definition of EBITDA in the Energy Future Holdings Corp. Indenture related to its 10.000% Senior Secured Notes due 2020, as such indenture is in effect on the Effective Date, to the extent considered appropriate for management compensation purposes, which will include but are not limited to, adjustments to reflect unrealized mark-to-market valuations of hedging instruments; fees and expenses relating to the Company's receivables financing facilities; the amortization of nuclear fuel costs; and any effects of adjustments in the financial statements resulting from the application of purchase accounting; but which for clarification will not include, without limitation, adjustments to reflect unrealized cost savings and planned and unplanned outages.  In any event and notwithstanding anything herein to the contrary, the O&C Committee shall have the discretion to make any further adjustments to the calculation of EBITDA as it deems fair and appropriate after good faith consultation with the Chief Executive Officer and/or Chief Financial Officer.

(B)        The O&C Committee shall, fairly and appropriately, following the O&C Committee's good faith consultation with the Chief Executive Officer and/or Chief Financial Officer, adjust the calculation of EBITDA to reflect the following: acquisitions, divestitures, any change required by GAAP relating to share-based compensation or for other changes in GAAP promulgated by accounting standard setters that, in each case, the O&C Committee in good faith determines require adjustment of EBITDA. The O&C Committee's determination of such adjustment shall be based on the effect of such event on the Company's consolidated financial statements.

(b)        As soon as administratively practicable following the February O&C Committee meeting in 2013, provided Executive remains continuously employed by Luminant, the Company or an Affiliate thereof through each applicable grant date, Executive shall be entitled to receive on such date, a grant of 500,000 restricted stock units under the 2007 Stock Incentive Plan for Key Employees of Energy Future Holdings Corp. and its Affiliates and the Restricted Stock Unit Agreement, in such form and substance as attached hereto as Exhibit I(B), to be entered into by and between the Company and Executive with respect to each annual grant.   In the event of a Change in Control prior to such grant date, the restricted stock units

that would have been granted under this sub-paragraph (b) of this Exhibit I shall be issued and shall be vested immediately prior to the effective date of the Change in Control.  The rights and obligations of Executive and the Company shall be governed by the 2007 Stock Incentive Plan for Key Employees of Energy Future Holdings Corp. and its Affiliates and the Restricted Stock Unit Agreement entered into incident to each such grant.

**Exhibit I(A)**

DATE: _____

IRREVOCABLE STANDBY LETTER OF CREDIT NO.

BENEFICIARY:
MARK ALLEN MCFARLAND
[ON RECORD WITH THE COMPANY]

APPLICANT:
TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC
ON BEHALF OF LUMINANT HOLDING COMPANY LLC
1601 BRYAN STREET, 44TH FLOOR
DALLAS, TX 75201-3411

AMOUNT:   USD 4,300,000.00 (FOUR MILLION THREE HUNDRED THOUSAND AND 00/100 U.S. DOLLARS)

EXPIRY DATE:

LADIES AND GENTLEMEN:

BY ORDER OF OUR CLIENT, TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC FOR THE ACCOUNT OF LUMINANT HOLDING COMPANY LLC (THE "ACCOUNT PARTY"), WE HEREBY ESTABLISH OUR IRREVOCABLE STANDBY LETTER OF CREDIT NO. (THIS "LETTER OF CREDIT") IN YOUR FAVOR FOR DRAWINGS NOT TO EXCEED THE AGGREGATE SUM OF FOUR MILLION THREE HUNDRED THOUSAND U.S. DOLLARS ($4,300,000.00), EFFECTIVE IMMEDIATELY. THIS LETTER OF CREDIT IS ISSUED, PRESENTABLE AND PAYABLE AT THE OFFICE OF OUR SERVICER, CITICORP NORTH AMERICA, INC., 3800 CITIBANK CENTER, BUILDING B, 3RD FLOOR, TAMPA, FL 33610, AND, SUBJECT TO THE FURTHER TERMS HEREOF, EXPIRES WITH OUR CLOSE OF BUSINESS ON .

FUNDS UNDER THIS LETTER OF CREDIT ARE AVAILABLE TO YOU AGAINST YOUR SIGHT DRAFT(S), DRAWN ON US, PURPORTEDLY SIGNED BY YOU (OR YOUR SUCCESSOR(S) OR HEIR(S) AT LAW), AND OTHERWISE IN THE FORM ATTACHED HERETO AS EXHIBIT A APPROPRIATELY COMPLETED.

FUNDS UNDER THIS LETTER OF CREDIT WILL BE AVAILABLE FOR DRAWING IN ACCORDANCE WITH THE FOLLOWING SCHEDULE; HOWEVER, IN NO EVENT SHALL THE TOTAL AMOUNT OF ALL PAYMENTS MADE UNDER THIS LETTER OF CREDIT EXCEED THE AMOUNT OF $4,300,000.00:

| AVAILABILITY PERIODS | | AMOUNT AVAILABLE IN U.S. DOLLARS |
|---|---|---|
| | | |
| FROM AND INCLUDING [_____] | THROUGH AND INCLUDING [_____][ | [_____] |
| | | |
| | | |
| | | |

FOR THE AVOIDANCE OF DOUBT, ANY UNUTILIZED AMOUNT IN ANY GIVEN AVAILABILITY PERIOD WILL BE CUMMULATIVELY ADDED TO THE AMOUNT AVAILABLE IN THE IMMEDIATELY SUCCEEDING AVAILABILITY PERIOD.

FURTHERMORE, THE MAXIMUM AGGREGATE AMOUNT THAT MAY BE DRAWN BY YOU DURING THE TERM OF THIS LETTER OF CREDIT SHALL BE AUTOMATICALLY REDUCED BY THE AGGREGATE AMOUNT OF ANY PRIOR PAYMENTS MADE UNDER THIS LETTER OF CREDIT.

PARTIAL AND MULTIPLE DRAWINGS ARE PERMITTED HEREUNDER.THIS LETTER OF CREDIT SHALL AUTOMATICALLY TERMINATE AFTER PAYMENT OF ANY DRAW MADE UNDER STATEMENT (B) IN THE FORM OF SIGHT DRAFT ATTACHED HERETO AS EXHIBIT A.

THIS LETTER OF CREDIT IS NOT TRANSFERABLE.

WE HEREBY ENGAGE WITH YOU THAT ALL DRAFTS DRAWN UNDER AND IN STRICT COMPLIANCE WITH THE TERMS OF THIS LETTER OF CREDIT WILL BE DULY HONORED IF DRAWN AND PRESENTED FOR PAYMENT ON OR BEFORE THE EXPIRY DATE OF THIS LETTER OF CREDIT. WE SHALL EFFECT PAYMENT THREE BUSINESS DAYS AFTER OUR RECEIPT OF DOCUMENTS IN STRICT CONFORMITY WITH THE TERMS OF THIS LETTER OF CREDIT. AS USED HEREIN "BUSINESS DAY" SHALL MEAN ANY DAY OTHER THAN A SATURDAY OR SUNDAY OR A DAY ON WHICH BANKING INSTITUTIONS IN NEW YORK CITY ARE AUTHORIZED OR REQUIRED TO CLOSE BY LAW.

PAYMENT OF DRAWINGS MADE HEREUNDER SHALL BE MADE IN TWO PARTS, BY WIRE TRANSFER, PURSUANT TO THE FOLLOWING WIRE INSTRUCTIONS:

•  SIXTY PERCENT (60%) OF EACH SUCH DRAWING SHALL BE PAYABLE PURSUANT TO BENEFICIARY'S (OR HIS SUCCESSOR(S) OR HEIR(S) AT LAW) WRITTEN WIRE INSTRUCTIONS SET FORTH IN THE APPROPRIATELY COMPLETED AND PRESENTED SIGHT DRAFT(S), AND

•  FORTY PERCENT (40%) OF EACH SUCH DRAWING (FOR PURPOSES OF APPLICABLE PAYROLL AND INCOME TAX WITHHOLDING) SHALL BE PAYABLE TO:

        ABA REFERENCE #: [ON RECORD WITH THE COMPANY]
        NAME OF BANK DEPOSITORY: US TREAS SINGLE TX
        EMPLOYER'S TIN: 54-2127719
        NAME CONTROL: LUMI
        EMPLOYER'S FULL NAME: LUMINANT HOLDING COMPANY LLC
        TAX TYPE: 94105
        TAX YEAR: [INSERT 2 DIGIT TAX YEAR]
        TAX MONTH: [INSERT 03, 06, 09, OR 12 FOR CALENDAR QUARTER IN WHICH
        DRAWING OCCURS]

THIS LETTER OF CREDIT IS SUBJECTED TO AND GOVERNED BY LAWS OF THE STATE OF NEW YORK AND THE 2007 REVISION OF THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS OF THE INTERNATIONAL CHAMBER OF COMMERCE (PUBLICATION NO. 600). IN THE EVENT OF ANY CONFLICT, THE LAWS OF THE STATE OF NEW YORK WILL CONTROL.

SHOULD YOU HAVE OCCASION TO COMMUNICATE WITH US REGARDING THIS LETTER OF CREDIT, KINDLY DIRECT YOUR COMMUNICATIONS TO THE ATTENTION OF OUR LETTER OF CREDIT DEPARTMENT, 3800 CITIBANK CENTER, BUILDING B, 3RD FLOOR, TAMPA, FL 33610, MAKING SPECIFIC REFERENCE TO OUR LETTER OF CREDIT NO. .

VERY TRULY YOURS,


CITIBANK, N.A.
BY: JOSEPH CHESAKIS, VICE PRESIDENT


BY:    / s / Joseph Chesakis
    AUTHORIZED SIGNATURE

EXHIBIT A TO
LETTER OF CREDIT NO.
FORM OF SIGHT DRAFT

VIA OVERNIGHT MAIL

_____, 20__

CITIBANK, N.A.
C/O CITICORP NORTH AMERICA, INC., AS SERVICER
3800 CITIBANK CENTER, BUILDING B
3rd FLOOR
TAMPA, FLORIDA 33610
ATTENTION: LETTER OF CREDIT DEPT.

        RE: LETTER OF CREDIT NO.

[STATE ONE OF THE FOLLOWING (A) OR (B):]

(A)    I HEREBY CERTIFY THAT (1) I AM ENTITLED TO DRAW ON IRREVOCABLE STANDBY LETTER OF CREDIT NO. UNDER THE PROVISIONS OF THE AMENDED AND RESTATED EMPLOYMENT AGREEMENT DATED AS OF _____ (THE "EMPLOYMENT AGREEMENT"), BETWEEN LUMINANT HOLDING COMPANY LLC ("LUMINANT HOLDING LLC") AND ME, (2) THE FULL AMOUNT EARNED BY AND PAYABLE TO ME UNDER THE RETENTION AWARD AS OF _____ IS $_____, WHICH AMOUNT IS CONSISTENT WITH, AND NOT IN EXCESS OF, THE AMOUNT EARNED BY AND CURRENTLY PAYABLE TO ME UNDER THE RETENTION AWARD, AND (3) I REMAIN EMPLOYED BY LUMINANT HOLDING LLC, THE ACCOUNT PARTY (AS DEFINED IN IRREVOCABLE STANDBY LETTER OF CREDIT NO. ) OR AN AFFILIATE OF LUMINANT HOLDING LLC AND/OR THE ACCOUNT PARTY AS OF THE DATE OF THIS DRAW AND I AM ENTITLED TO THE FULL AMOUNT EARNED AND PAYABLE.I HEREBY ACKNOWLEDGE THAT ANY AMOUNT OF THIS DRAW THAT IS PAID TO ME AND LATE DETERMINED TO BE IN EXCESS OF THE AMOUNT ACTUALLY EARNED BY AND PAYABLE TO ME UNDER THE RETENTION AWARD SHALL CREATE A CAUSE OF ACTION IN FAVOR OF LUMINANT HOLDING LLC, THE ACCOUNT PARTY AND/OR AN AFFILIATE O LUMINANT HOLDING LLC OR THE ACCOUNT PARTY TO RECOVER THE EXCESS PAYMENT.

OR

(B)    I HEREBY CERTIFY THAT (1) I AM ENTITLED TO DRAW ON IRREVOCABLE STANDBY LETTER OF CREDIT NO. UNDER THE PROVISIONS OF THE AMENDED AND RESTATED EMPLOYMENT AGREEMENT DATED AS OF _____ (THE "EMPLOYMENT AGREEMENT"), BETWEEN LUMINANT HOLDING COMPANY LLC ("LUMINANT HOLDING LLC") AND ME, (2) THE FULL AMOUNT EARNED BY AND PAYABLE TO ME UNDER THE RETENTION AWARD AS OF _____ IS $_____, WHICH AMOUNT IS CONSISTENT WITH, AND NOT IN EXCESS OF, THE AMOUNT EARNED BY AND CURRENTLY PAYABLE TO ME UNDER THE RETENTION AWARD, AND (3) MY EMPLOYMENT WAS TERMINATE PURSUANT TO SECTION 7(B), 7(C), 7(D)(II), or 7(E) OF THE EMPLOYMENT AGREEMENT PRIOR TO THE DATE OF THIS DRAW AND I AM ENTITLED TO EITHER THE FULL AMOUNT EARNED OR A PRO-RATED AMOUNT (PURSUANT TO SUB-PARAGRAPH (A)(V) OF EXHIBIT I TO THE EMPLOYMENT AGREEMENT). I HEREBY ACKNOWLEDGE THAT ANY AMOUNT OF THIS DRAW THAT IS PAID TO ME AND LATER DETERMINED TO BE IN EXCESS OF THE AMOUNT ACTUALLY EARNED BY AND PAYABLE TO ME UNDER THE RETENTION AWARD SHALL CREATE A CAUSE OF ACTION IN FAVOR OF LUMINANT HOLDING LLC, THE ACCOUNT PARTY AND/OR AN AFFILIAT OF LUMINANT HOLDING LLC OR THE ACCOUNT PARTY TO RECOVER THE EXCESS PAYMENT.

YOU ARE HEREBY INSTRUCTED TO REMIT THE PAYMENT OF $_____ IN TWO PARTS, BY WIRE TRANSFER, PURSUANT TO THE FOLLOWING WIRE INSTRUCTIONS:

- SIXTY PERCENT (60%) OF SUCH AMOUNT, OR $_____, SHALL BE PAYABLE TO

  ACCOUNT NAME: [INSERT]
  ACCOUNT #: [INSERT]
  ABA REFERENCE #: [INSERT]
  NAME OF BANK DEPOSITORY: [INSERT]

- FORTY PERCENT (40%) OF EACH SUCH DRAWING (FOR PURPOSES OF APPLICABLE PAYROLL AND INCOME TAX WITHHOLDING) SHALL BE PAYABLE TO:

  ABA REFERENCE #: [ON RECORD WITH THE COMPANY]
  NAME OF BANK DEPOSITORY: US TREAS SINGLE TX
  EMPLOYER'S TIN: 54-2127719
  NAME CONTROL: LUMI
  EMPLOYER'S FULL NAME: LUMINANT HOLDING COMPANY LLC
  TAX TYPE: 94105
  TAX YEAR: **[INSERT 2 DIGIT TAX YEAR]**
  TAX MONTH: **[INSERT 03, 06, 09, OR 12 FOR CALENDAR QUARTER IN WHICH DRAWING OCCURS]**

[IF STATEMENT B ABOVE IS UTILIZED INCLUDE THE FOLLOWING STATEMENT][THE UNDERSIGNED HEREBY ACKNOWLEDGES THAT IRREVOCABLE STANDBY LETTER OF CREDIT NO. SHALL AUTOMATICALLY TERMINATE AFTER SUCH PAYMENT IS DULY MADE].


By: _____
[BENEFICIARY] OR
[BENEFICIARY'S SUCCESSOR(S) OR HEIR(S) AT LAW]

Exhibit I(B)

## 2007 STOCK INCENTIVE PLAN FOR KEY EMPLOYEES OF
## ENERGY FUTURE HOLDINGS CORP. AND ITS AFFILIATES

### RESTRICTED STOCK UNIT AGREEMENT

To: **[Name]**        Date of Grant: **[Date]**        Number of Shares: **[#]**

This Agreement is made and entered into as of the Date of Grant set forth above by and between Energy Future Holdings Corp., a Texas corporation (the "***Company***"), and you;

**WHEREAS**, the Company adopted the 2007 Stock Incentive Plan for Key Employees of Energy Future Holdings Corp. and its Affiliates, as it may be amended from time to time (the "***Plan***") under which the Company is authorized to grant restricted stock units to certain employees, directors and other service providers of the Company or a Subsidiary;

**WHEREAS**, a "***Restricted Stock Unit***" shall represent your right to receive one share of common stock of the Company (the "***Stock***") upon the lapse of the restrictions on your award, plus the additional rights to receive dividend equivalents (" ***Dividend Equivalent Right,***" or "***DER***"), in accordance with the terms and conditions set forth herein and in the Plan (the " ***Award***");

**WHEREAS**, a copy of the Plan has been made available to you and shall be deemed a part of this Restricted Stock Unit Agreement ("***Agreement***") as if fully set forth herein; and

**WHEREAS**, you desire to accept the Award made pursuant to this Agreement.

**NOW, THEREFORE,** in consideration of the mutual covenants set forth herein and for other valuable consideration hereinafter set forth, you and the Company agree as follows:

1.        The Grant. Subject to the conditions set forth below, the Company hereby grants you, effective as of the Date of Grant set forth above, an award consisting of **[#]** Restricted Stock Units (subject to any adjustment made to this Award pursuant to Section 8 of the Plan in connection with a stock split, spin-off, recapitalization or other transaction that affects the Company's equity securities). To the extent that any provision of this Agreement conflicts with the expressly applicable terms of the Plan, you acknowledge and agree that those terms of the Plan shall control and, if necessary, the applicable terms of this Agreement shall be deemed amended so as to carry out the purpose and intent of the Plan. Terms that have their initial letter capitalized, but that are not otherwise defined in this Agreement shall have the meanings given to them in the Plan.

2.        No Shareholder Rights. The Restricted Stock Units granted pursuant to this Agreement do not and shall not entitle you to any rights of a holder of Stock prior to the date shares of Stock are issued to you in settlement of the Award.  Your rights with respect to the Restricted Stock Units shall remain forfeitable at all times prior to the date on which rights become vested and the restrictions with respect to the Restricted Stock Units lapse in accordance with Section 6 or 7, as the case may be.

3.        Dividend Equivalent Rights. In the event that the Company declares and pays a dividend in respect of its outstanding shares of Stock and, on the record date for such dividend, you hold Restricted Stock Units granted pursuant to this Agreement that have not been settled, the Company shall create a bookkeeping account that will track, (a) to the extent the dividend paid to stockholders generally was a cash dividend, the cash value you would have been entitled to receive as if you had been the holder of record of the number of

shares of Stock related to the Restricted Stock Units that have not been settled as of the record date, or (b) to the extent the dividend paid to stockholders generally was paid in the form of property, the property you would have been entitled to receive as if you had been the holder of record of the number of shares of Stock related to the Restricted Stock Units that have not been settled as of the record date. All DER amounts credited to your bookkeeping account pursuant to this Section 3, if any, shall be deemed converted into shares of Stock on the date that the Restricted Stock Units vest (based on the Fair Market Value (as such term is defined in the Management Stockholder's Agreement) of Stock on such date and rounded down to the nearest whole share of Stock) and paid to you in the form of additional shares of Stock on the date that the underlying Restricted Stock Units associated with such DER amounts are settled pursuant to Section 5 below. In the event that the Restricted Stock Units are forfeited to the Company without settlement to you, you will also forfeit any associated DER amounts. No interest will be payable with respect to DER amounts credited to your bookkeeping account, if any, that represent cash dividends. Property, if any, deemed credited to DER bookkeeping accounts representing dividends paid in property will be deemed invested in such property until the DER amounts are deemed converted to shares of Stock pursuant to this Section 3. The bookkeeping accounts, if any, created to track DER amounts are phantom accounts and the Company is under no obligation to set aside cash or property with respect to any DER amounts. Valuations made pursuant to this Section 3 (including any valuation of property deemed credited to a bookkeeping account) will be made by the Committee, or its designee, in its sole discretion and such valuation will be final and binding.

      4.      <u>Restrictions; Forfeiture</u>.  The Restricted Stock Units are restricted in that they may not be sold, transferred or otherwise alienated or hypothecated until these restrictions are removed or expire as contemplated in Section 6 or 7 of this Agreement and Stock is issued to you as described in Section 5 of this Agreement.  The Restricted Stock Units are also subject to forfeiture to the Company (the "***Forfeiture Restrictions***") pursuant to Section 7 of this Agreement.

      5.      <u>Issuance of Stock</u>.

      (a)      No shares of Stock shall be issued to you prior to the date on which the Restricted Stock Units vest and the restrictions, including the Forfeiture Restrictions, with respect to the Restricted Stock Units lapse, in accordance with Section 6 or 7. After the Restricted Stock Units vest pursuant to Section 6 or 7, as applicable, the Company shall, subject to any conditions described in subsection (b) below, promptly and within 30 days of such vesting date, cause to be issued Stock registered in your name in payment of such vested Restricted Stock Units upon receipt by the Company of any required tax withholding.  Such issuance shall be made as soon as administratively practicable, but may be delayed, in the sole discretion of the Committee, if required by applicable securities law; provided, that, in no event shall the issuance of Stock be made later than March 15th of the year following the year of vesting, or as otherwise may be permitted under Treasury Regulation § 1.409A-1(b)(4)(ii).  The Company shall evidence the Stock to be issued in payment of such vested Restricted Stock Units in the manner it deems appropriate.  The value of any fractional Restricted Stock Units shall be rounded down at the time Stock is issued to you in connection with the Restricted Stock Units.  No fractional shares of Stock, nor the cash value of any fractional shares of Stock, will be issuable or payable to you pursuant to this Agreement.  The value of such shares of Stock shall not bear any interest owing to the passage of time.  Neither this Section 5 nor any action taken pursuant to or in accordance with this Section 5 shall be construed to create a trust or a funded or secured obligation of any kind.

      (b)      You hereby acknowledge that by accepting this Award, the issuance of Stock pursuant to the settlement of your Restricted Stock Units pursuant to this Agreement shall be subject to all the terms and conditions of any Management Stockholder's Agreement and Sale Participation Agreement previously executed by you, as such forms may be modified under the terms of such agreements; provided, however,

that if you have not previously executed a Management Stockholder's Agreement and/or a Sale Participation Agreement with the Company, you agree that, prior to the Company's issuance of Stock to you pursuant to this Agreement, you will execute such documents in the form required by the Company. All Stock issued to you pursuant to this Agreement will (a) constitute "Stock" (as such term is defined in the Management Stockholder's Agreement) for all purposes under the Management Stockholder's Agreement, and (b) be treated as "Common Stock" underlying "Options" (as such terms are defined in the Sale Participation Agreement) for all purposes under the Sale Participation Agreement.

(c)        The shares of Stock deliverable upon vesting of the Restricted Stock Units, may be either previously authorized but unissued shares or issued shares, which have then been reacquired by the Company. Such shares shall be fully paid and nonassessable.

6.        Expiration of Restrictions and Risk of Forfeiture. Unless otherwise provided in Section 7 below, the restrictions on the Restricted Stock Units granted pursuant to this Agreement, including the Forfeiture Restrictions, will expire on September 30, 2014, and shares of Stock that are nonforfeitable and transferable will be issued to you in payment of your vested Restricted Stock Units as set forth in Section 5, provided that you remain in the continuous employ of, or a service provider to, the Company or its Subsidiaries until September 30, 2014.

7.        Termination of Services or Change in Control Events.

(a)        Termination of Employment Other Than without Cause, for Good Reason, or Due to Death or Disability. In the event your service relationship with the Company or any of its Subsidiaries is terminated for any reason other than by the Company or any of its Subsidiaries without Cause, by your voluntary resignation for Good Reason, or due to your death or Disability ("Cause", "Good Reason", and "Disability" as defined in your employment agreement with the Company or any of its Subsidiaries then in effect at the time of your termination of employment) prior to September 30, 2014, then those Restricted Stock Units for which the restrictions have not lapsed as of the date of your termination shall become null and void and those Restricted Stock Units shall be forfeited to the Company.

(b)        Termination of Employment without Cause, for Good Reason, or Due to Death or Disability. In the event your service relationship with the Company or any of its Subsidiaries is terminated by the Company or any of its Subsidiaries without Cause, by your voluntary resignation for Good Reason, or due to your death or Disability prior to September 30, 2014, a portion of the Restricted Stock Units shall vest and all Forfeiture Restrictions shall lapse with respect to such Restricted Stock Units on the effective date of your termination of employment. The portion of the Restricted Stock Units that shall become vested upon your termination of employment shall be determined by multiplying the number of Restricted Stock Units set forth in Section 1 by a fraction, the numerator of which is the number of days you were employed by the Company or any of its Subsidiaries from [February __, 20__] through the effective date of your termination of employment, and the denominator of which is the number of days between [February __, 20__] and September 30, 2014; all remaining Restricted Stock Units shall become null and void and shall be forfeited to the Company upon your termination of employment. The Restricted Stock Units that become vested pursuant to this Section 7(b) will be settled in accordance with Section 5 above.

(c)        Change in Control. In the event that the Company undergoes a Change in Control (as defined in the Plan) prior to September 30, 2014, the Restricted Stock Units shall vest and all Forfeiture Restrictions shall lapse on the effective date of such a Change in Control, provided that you have remained in the continuous employ of, or a service provider to, the Company or its Subsidiaries from the Date of Grant

until the effective date of the Change in Control.  Upon a Change in Control, your Restricted Stock Units will be settled in accordance with Section 5 above.

8.    Leave of Absence.  With respect to the Award, the Company may, in its sole discretion, determine that if you are on leave of absence for any reason you will not be considered as having terminated employment with the Company; however, your rights to the Restricted Stock Units during a leave of absence will be limited to the extent to which those rights were earned or vested when the leave of absence began.

9.    Payment of Taxes.  It shall be a condition of the obligations of the Company upon delivery of the Stock pursuant to Section 5 above that you pay to the Company such amount as may be requested by the Company for the purpose of satisfying any liability for any federal, state or local income or other taxes required by law to be withheld with respect to such Stock.   The Company may, in its sole discretion, and you hereby authorize the Company to take such actions as may be necessary, in the opinion of the Company's counsel (including, without limitation, withholding Stock otherwise deliverable to you hereunder through a net settlement and/or withholding amounts from any compensation or other amount owing to you from the Company), to satisfy the obligations for payment of the minimum amount of any such taxes.  Notwithstanding the foregoing provisions of this Section 9, you may, at your election, be permitted to elect to use Stock otherwise deliverable to you hereunder, having an equivalent Fair Market Value (as such term is defined in the Management Stockholder's Agreement) to the payment that would otherwise be made by you to the Company pursuant to the foregoing provisions of this Section 9, to satisfy such obligations.  You are hereby advised to seek your own tax counsel regarding the taxation of the Restricted Stock Units made hereunder.

10.    Compliance with Securities Law.  Notwithstanding any provision of this Agreement to the contrary, the issuance of Stock will be subject to compliance with all applicable requirements of federal, state, or foreign law with respect to such securities and with the requirements of any stock exchange or market system upon which the Stock may then be listed.   No Stock will be issued hereunder if such issuance would constitute a violation of any applicable federal, state, or foreign securities laws or other law or regulations or the requirements of any stock exchange or market system upon which the Stock may then be listed.   In addition, Stock will not be issued hereunder unless (a) a registration statement under the Securities Act of 1933, as amended (the " *Securities Act*"), is, at the time of issuance, in effect with respect to such shares or (a) in the opinion of legal counsel to the Company, such shares may be issued in accordance with the terms of an applicable exemption from the registration requirements of the Securities Act.   YOU ARE CAUTIONED THAT ISSUANCE OF STOCK UPON THE VESTING OF RESTRICTED STOCK UNITS GRANTED PURSUANT TO THIS AGREEMENT MAY NOT OCCUR UNLESS THE FOREGOING CONDITIONS ARE SATISFIED. The inability of the Company to obtain from any regulatory body having jurisdiction the authority, if any, deemed by the Company's legal counsel to be necessary to the lawful issuance and sale of any shares subject to the Award will relieve the Company of any liability in respect of the failure to issue such shares as to which such requisite authority has not been obtained.   As a condition to any issuance hereunder, the Company may require you to satisfy any qualifications that may be necessary or appropriate to evidence compliance with any applicable law or regulation and to make any representation or warranty with respect to such compliance as may be requested by the Company. From time to time, the Board and appropriate officers of the Company are authorized to take the actions necessary and appropriate to file required documents with governmental authorities, stock exchanges, and other appropriate Persons to make shares of Stock available for issuance.

11.    Lock-Up Period.  You hereby agree that, if so requested by the Company or any representative of the underwriters (the "*Managing Underwriter*") in connection with any registration of the offering of any securities of the Company under the Securities Act, you will not sell or otherwise transfer any Stock acquired hereunder or other securities of the Company during the 180 day period (or such other period as may be

requested in writing by the Managing Underwriter and agreed to in writing by the Company) (the " *Market Standoff Period*") following the effective date of a registration statement of the Company filed under the Securities Act. The Company may impose stop-transfer instructions with respect to securities subject to the foregoing restrictions until the end of such Market Standoff Period.

12. <u>Legends</u>. The Company may at any time place legends referencing any restrictions imposed on the shares pursuant to Sections 5(b), 10 and 11 of this Agreement on all certificates representing shares issued with respect to this Award.

13. <u>Right of the Company and Subsidiaries to Terminate Services</u>. Nothing in this Agreement confers upon you the right to continue in the employ of or to perform services for the Company or any Subsidiary, or interfere in any way with the rights of the Company or any Subsidiary to terminate your employment or service relationship at any time.

14. <u>Furnish Information</u>. You agree to furnish to the Company all information reasonably requested by the Company to enable it to comply with any reporting or other requirements imposed upon the Company by or under any applicable statute or regulation with respect to the transactions contemplated by this Agreement.

15. <u>No Liability for Good Faith Determinations</u>. The Company and the members of the Board shall not be liable for any act, omission or determination taken or made in good faith with respect to this Agreement or the Restricted Stock Units granted hereunder.

16. <u>Execution of Receipts and Releases</u>. Any payment of cash or any issuance or transfer of shares of Stock or other property to you, or to your legal representative, heir, legatee or distributee, in accordance with the provisions hereof, shall, to the extent thereof, be in full satisfaction of all claims of such Persons hereunder. The Company may require you or your legal representative, heir, legatee or distributee, as a condition precedent to such payment or issuance, to execute a release and receipt therefor in such form as it shall determine.

17. <u>No Guarantee of Interests</u>. The Board and the Company do not guarantee the Stock of the Company from loss or depreciation.

18. <u>Company Records</u>. Records of the Company or its Subsidiaries regarding your period of service, termination of service and the reason(s) therefor, and other matters shall be conclusive for all purposes hereunder, unless determined by the Company to be incorrect.

19. <u>Notice</u>. All notices required or permitted under this Agreement must be in writing and personally delivered or sent by mail and shall be deemed to be delivered on the date on which it is actually received by the person to whom it is properly addressed or if earlier the date it is sent via certified United States mail.

20. <u>Waiver of Notice</u>. Any person entitled to notice hereunder may waive such notice in writing.

21. <u>Information Confidential</u>. As partial consideration for the granting of the Award hereunder, you hereby agree to keep confidential all information and knowledge, except that which has been disclosed in any public filings required by law, that you have relating to the terms and conditions of this Agreement; provided, however, that such information may be disclosed as required by law and may be given in confidence to your spouse and tax, legal and financial advisors. In the event any breach of this promise comes to the

attention of the Company, it shall take into consideration that breach in determining whether to recommend the grant of any future similar award to you and as a factor weighing against the advisability of granting any such future award to you.

22.        Successors. This Agreement shall be binding upon you, your legal representatives, heirs, legatees and distributees, and upon the Company, its successors and assigns.

23.        Severability. If any provision of this Agreement is held to be illegal or invalid for any reason, the illegality or invalidity shall not affect the remaining provisions hereof, but such provision shall be fully severable and this Agreement shall be construed and enforced as if the illegal or invalid provision had never been included herein.

24.        Company Action. Any action required of the Company under this Agreement shall be by resolution of the Board or the Committee or by a person or entity authorized to act by resolution of the Board.

25.        Headings. The titles and headings of Sections are included for convenience of reference only and are not to be considered in construction of the provisions hereof.

26.        Governing Law. All questions arising with respect to the provisions of this Agreement shall be determined by application of the laws of Texas, without giving any effect to any conflict of law provisions thereof, except to the extent Texas state law is preempted by federal law. The obligation of the Company to sell and deliver Stock hereunder is subject to applicable laws and to the approval of any governmental authority required in connection with the authorization, issuance, sale, or delivery of such Stock.

27.        Consent to Texas Jurisdiction and Venue. You hereby consent and agree that state courts located in Dallas County, Texas and the United States District Court for the Northern District of Texas (Dallas Division) each shall have personal jurisdiction and proper venue with respect to any dispute between you and the Company arising in connection with the Restricted Stock Units, the Plan, or this Agreement. In any such dispute, each of you and the Company agree not to raise, and do hereby expressly waive, any objection or defense to such jurisdiction as an inconvenient forum.

28.        Amendment. This Agreement may be amended in accordance with the terms of the Plan.

29.        The Plan. This Agreement is subject to all the terms, conditions, limitations and restrictions contained in the Plan.

[Remainder of page intentionally left blank]

In Witness Whereof, this Agreement has been executed and delivered by the parties hereto.

ENERGY FUTURE HOLDINGS CORP.

By: _____

Its: _____

GRANTEE

_____

Name: _____

Address: _____

_____

**Exhibit II**

In addition to the benefits and compensation set forth in the Agreement, Executive shall be entitled to receive the benefits and compensation set forth in this Exhibit II, subject to the terms and conditions set forth herein:

<u>Survival of Prior Agreements</u>.  Notwithstanding Section 9(b), this Agreement shall not supersede the Deferred Share Agreement, by and among the Company and Executive, dated July 7, 2008.

EXHIBIT 12(a)

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2012** | **2011** | **2010** | **2009** | **2008** |
| EARNINGS: | | | | | |
| Income (loss) from continuing operations | $ (3,360) | $ (1,913) | $ (2,812) | $ 408 | $ (9,998) |
| Subtract: Equity in earnings of unconsolidated subsidiaries (net of tax) | (270) | (286) | (277) | | |
| Add: Total federal income tax expense (benefit) | (1,232) | (1,134) | 389 | 367 | (471) |
| Fixed charges (see detail below) | 3,578 | 4,360 | 3,646 | 3,225 | 5,280 |
| Distributed income of equity investees | 147 | 116 | 169 | — | — |
| Total earnings (loss) | $ (1,137) | $ 1,143 | $ 1,115 | $ 4,000 | $ (5,189) |
| FIXED CHARGES: | | | | | |
| Interest expense | $ 3,544 | $ 4,326 | $ 3,614 | $ 3,190 | $ 5,246 |
| Rentals representative of the interest factor | 34 | 34 | 32 | 35 | 34 |
| Total fixed charges | $ 3,578 | $ 4,360 | $ 3,646 | $ 3,225 | $ 5,280 |
| RATIO OF EARNINGS TO FIXED CHARGES (a) | — | — | — | 1.24 | — |

_____

(a) Fixed charges exceeded earnings by $4.715, $3.217 billion, $2.531 billion and $10.469 billion for the years ended December 31, 2012, 2011, 2010 and 2008, respectively.

Exhibit 21(a)

**ENERGY FUTURE HOLDINGS CORP.**
**SUBSIDIARY HIERARCHY**
**Effective December 31, 2012**

| | Jurisdiction |
|---|---|
| Energy Future Holdings Corp. | Texas |
| Energy Future Competitive Holdings Company | Texas |
| Texas Competitive Electric Holdings LLC | Delaware |
| TCEH Finance, Inc. | Delaware |
| Generation MT Company LLC | Delaware |
| Luminant Holding Company LLC | Delaware |
| Luminant Energy Company LLC | Texas |
| Luminant ET Services Company | Texas |
| Luminant Energy Trading California Company | Texas |
| Luminant Generation Company LLC | Texas |
| Nuclear Energy Future Holdings LLC | Delaware |
| Nuclear Energy Future Holdings II LLC | Delaware |
| Comanche Peak Nuclear Power Company LLC [1] | Delaware |
| Valley NG Power Company LLC | Texas |
| Luminant Renewables Company LLC | Texas |
| Generation SVC Company | Texas |
| Big Brown 3 Power Company LLC | Texas |
| Big Brown Power Company LLC | Texas |
| Collin Power Company LLC | Delaware |
| DeCordova Power Company LLC | Texas |
| DeCordova II Power Company LLC | Delaware |
| Lake Creek 3 Power Company LLC | Texas |
| Martin Lake 4 Power Company LLC | Texas |
| Monticello 4 Power Company LLC | Texas |
| Morgan Creek 7 Power Company LLC | Texas |
| Oak Grove Management Company LLC | Delaware |
| Oak Grove Power Company LLC | Texas |
| Sandow Power Company LLC | Texas |
| Tradinghouse 3 & 4 Power Company LLC | Texas |
| Tradinghouse Power Company LLC | Texas |
| Valley Power Company LLC | Texas |
| Big Brown Lignite Company LLC | Texas |
| Luminant Big Brown Mining Company LLC | Texas |
| Luminant Mining Company LLC | Texas |
| Oak Grove Mining Company LLC | Texas |
| Luminant Mineral Development Company LLC | Texas |
| NCA Resources Development Company LLC | Texas |
| Greenway Development Holding Company LLC | Delaware |
| TXU Energy Receivables Company LLC | Delaware |
| TXU Energy Retail Company LLC | Texas |
| TXU Retail Services Company | Delaware |
| TXU Energy Solutions Company LLC | Texas |
| TXU SEM Company | Delaware |
| 4Change Energy Holdings LLC | Texas |
| 4Change Energy Company | Texas |
| Brighten Holdings LLC | Delaware |
| Brighten Energy LLC | Delaware |

| | |
|---|---|
| Energy Future Intermediate Holding Company LLC | Delaware |
| EFIH Finance Inc. | Delaware |
| Oncor Electric Delivery Holdings Company LLC | Delaware |
| Oncor Electric Delivery Company LLC [2] | Delaware |
| Oncor Management Investment LLC [3] | Delaware |
| Oncor Electric Delivery Transition Bond Company LLC | Delaware |
| Oncor Electric Delivery Administration Corp. | Texas |
| Oncor License Holdings Company LLC | Texas |
| Oncor Communications Holdings Company LLC | Delaware |
| EFH Renewables Company LLC | Delaware |
| EFH Corporate Services Company | Texas |
| EFH CG Management Company LLC | Texas |
| Generation Development Company LLC | Delaware |
| NCA Development Company LLC | Texas |
| EFH Properties Company | Texas |
| Basic Resources Inc. | Texas |
| TXU Receivables Company | Delaware |
| EFH Vermont Insurance Company | Vermont |
| LSGT Gas Company LLC | Texas |
| LSGT SACROC, Inc. | Texas |
| Humphreys & Glasgow Limited | United Kingdom |
| EEC Holdings, Inc | Nevada |
| EECI, Inc. | Nevada |
| Ebasco Services of Canada, Ltd | Canada |

_____

(1)   88% ownership interest

(2)   80.033% ownership interest

(3)   Oncor Management Investment LLC owns 0.217% of Oncor Electric Delivery Company LLC.  Regarding the ownership of Oncor Management Investment LLC, Oncor Electric Delivery Company LLC owns 100% of the Class A membership interests.  Certain management employees of Oncor Electric Delivery Company LLC own 100% of the Class B membership interests.

**Exhibit 23(a)**

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We consent to the incorporation by reference in Registration Statement No. 333-172332 on Form S-8 of our reports dated February 19, 2013, relating to the consolidated financial statements of Energy Future Holdings Corp. and subsidiaries ("EFH Corp.") (which report expresses an unqualified opinion and includes an emphasis of a matter paragraph related to EFH Corp.'s continued net losses, substantial indebtedness and significant cash interest requirements as well as EFH Corp.'s ability to satisfy its obligations in October 2014, which include the maturities of the $3.8 billion of TCEH Term Loan Facilities, being dependent upon the completion of one or more actions described in Note 1 to the consolidated financial statements) and the effectiveness of EFH Corp.'s internal control over financial reporting, appearing in this Annual Report on Form 10-K of EFH Corp. for the year ended December 31, 2012.

/s/ Deloitte & Touche LLP

Dallas, Texas
February 19, 2013

**Exhibit 23(b)**

**CONSENT OF INDEPENDENT AUDITORS**

We consent to the incorporation by reference in the Energy Future Holdings Corp. Registration Statement  No. 333-172332 on Form S-8 of our report dated February 19, 2013 , related to the financial statements of Oncor Electric Delivery Holdings Company LLC and subsidiaries, appearing in the Annual Report on Form 10-K of Energy Future Holdings Corp . for the year ended December 31, 2012.

/s/ Deloitte & Touche LLP

Dallas, Texas
February 19, 2013

Exhibit 31(a)

## ENERGY FUTURE HOLDINGS CORP.
### Certificate Pursuant to Section 302
### of Sarbanes - Oxley Act of 2002

I, John F. Young certify that:

1.  I have reviewed this annual report on Form 10-K of Energy Future Holdings Corp.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f))  for the registrant and have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 19, 2013

/s/ JOHN F. YOUNG

Name:    John F. Young
Title:    President and Chief Executive Officer

Exhibit 31(b)

**ENERGY FUTURE HOLDINGS CORP.**
**Certificate Pursuant to Section 302**
**of Sarbanes - Oxley Act of 2002**

I, Paul M. Keglevic, certify that:

1. I have reviewed this annual report on Form 10-K of Energy Future Holdings Corp.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f))  for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 19, 2013                                          /s/ PAUL M. KEGLEVIC

                                             Name:    Paul M. Keglevic
                                             Title:    Executive Vice President and Chief Financial Officer

Exhibit 32(a)

**ENERGY FUTURE HOLDINGS CORP.**
**Certificate Pursuant to Section 906**
**of Sarbanes - Oxley Act of 2002**
**CERTIFICATION OF CEO**

The undersigned, John F. Young, President and Chief Executive Officer of Energy Future Holdings Corp. (the "Company"), DOES HEREBY CERTIFY that, to his knowledge:

1.  The Company's Annual Report on Form 10-K for the period ended December 31, 2012 (the "Report") fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2.  Information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

IN WITNESS WHEREOF, the undersigned has caused this instrument to be executed this 19th day of February, 2013.

|  |  |
|---|---|
|  | /s/ JOHN F. YOUNG |
| Name: | John F. Young |
| Title: | President and Chief Executive Officer |

A signed original of this written statement required by Section 906 has been provided to Energy Future Holdings Corp. and will be retained by Energy Future Holdings Corp. and furnished to the Securities and Exchange Commission or its staff upon request.

Exhibit 32(b)

**ENERGY FUTURE HOLDINGS CORP.**
**Certificate Pursuant to Section 906**
**of Sarbanes - Oxley Act of 2002**
**CERTIFICATION OF CFO**

The undersigned, Paul M. Keglevic, Executive Vice President and Chief Financial Officer of Energy Future Holdings Corp. (the "Company"), DOES HEREBY CERTIFY that, to his knowledge:

1.  The Company's Annual Report on Form 10-K for the period ended December 31, 2012 (the "Report") fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2.  Information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

IN WITNESS WHEREOF, the undersigned has caused this instrument to be executed this 19th day of February, 2013.

|  |  |
|---|---|
|  | /s/ PAUL M. KEGLEVIC |
| Name: | Paul M. Keglevic |
| Title: | Executive Vice President and Chief Financial Officer |

A signed original of this written statement required by Section 906 has been provided to Energy Future Holdings Corp. and will be retained by Energy Future Holdings Corp. and furnished to the Securities and Exchange Commission or its staff upon request.

Exhibit 95(a)

*Mine Safety Disclosures*

Safety is a top priority in all our businesses, and accordingly, it is a key component of our focus on operational excellence, our employee performance reviews and employee compensation. Our health and safety program objectives are to prevent workplace accidents and ensure that all employees return home safely and comply with all regulations.

We currently own and operate 12 surface lignite coal mines in Texas to provide fuel for our electricity generation facilities. These mining operations are regulated by the US Mine Safety and Health Administration (MSHA) under the Federal Mine Safety and Health Act of 1977, as amended (the Mine Act), as well as other regulatory agencies such as the RRC. The MSHA inspects US mines, including ours, on a regular basis and if it believes a violation of the Mine Act or any health or safety standard or other regulation has occurred, it may issue a citation or order, generally accompanied by a proposed fine or assessment. Such citations and orders can be contested and appealed to the Federal Mine Safety and Health Review Commission (FMSHRC), which often results in a reduction of the severity and amount of fines and assessments and sometimes results in dismissal. The number of citations, orders and proposed assessments vary depending on the size of the mine as well as other factors.

Disclosures related to specific mines pursuant to Section 1503 of the Dodd-Frank Wall Street Reform and Consumer Protection Act and Item 104 of Regulation S-K sourced from data documented at January 3, 2013 in the MSHA Data Retrieval System for the twelve months ended December 31, 2012 (except pending legal actions, which are at December 31, 2012), are as follows:

| Mine (a) | Section 104 S and S Citations (b) | Section 104(b) Orders | Section 104(d) Citations and Orders | Section 110(b)(2) Violations | Section 107(a) Orders | Total Dollar Value of MSHA Assessments Proposed (c) | Total Number of Mining Related Fatalities | Received Notice of Pattern of Violations Under Section 104(e) | Received Notice of Potential to Have Pattern Under Section 104(e) | Legal Actions Pending at Last Day of Period (d) | Legal Actions Initiated During Period | Legal Actions Resolved During Period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beckville | 2 | — | — | — | — | 25 | — | — | — | 6 | 2 | 2 |
| Big Brown | 7 | — | — | — | — | 6 | — | — | — | 3 | 3 | 2 |
| Kosse | 10 | — | — | — | — | 144 | — | — | — | 5 | 2 | — |
| Oak Hill | — | — | — | — | — | 1 | — | — | — | 2 | — | — |
| Sulphur Springs | 4 | — | — | — | — | 6 | — | — | — | 1 | 1 | 4 |
| Tatum | 3 | — | — | — | — | 5 | — | — | — | 2 | — | — |
| Three Oaks | 8 | — | 1 | — | — | 76 | — | — | — | 3 | 2 | 1 |
| Turlington | — | — | — | — | — | — | — | — | — | 1 | 1 | — |
| Winfield South | 1 | — | — | — | — | 1 | — | — | — | 1 | 1 | 1 |

(a)  Excludes mines for which there were no applicable events.
(b)  Includes MSHA citations for health or safety standards that could significantly and substantially contribute to a serious injury if left unabated.
(c)  Total value in thousands of dollars for proposed assessments received from MSHA for all citations and orders issued in the twelve months ended December 31, 2012, including but not limited to Sections 104, 107 and 110 citations and orders that are not required to be reported.
(d)  Pending actions before the FMSHRC involving a coal or other mine. All 24 are contests of proposed penalties.

Exhibit 99(b)

**Energy Future Holdings Corp. Consolidated**
**Adjusted EBITDA Reconciliation**
**(millions of dollars)**

| | Year Ended December 31, | |
|---|---|---|
| | 2012 | 2011 |
| **Net loss** | $ (3,360) | $ (1,913) |
| **Income tax benefit** | (1,232) | (1,134) |
| **Interest expense and related charges** | 3,508 | 4,294 |
| **Depreciation and amortization** | 1,373 | 1,499 |
| **EBITDA** | $ 289 | $ 2,746 |
| Oncor Holdings distributions of earnings | 147 | 116 |
| Interest income | (2) | (2) |
| Amortization of nuclear fuel | 156 | 142 |
| Purchase accounting adjustments (a) | 74 | 204 |
| Impairment of goodwill | 1,200 | — |
| Impairment and write-down of other assets (b) | 48 | 433 |
| Debt extinguishment gains | — | (51) |
| Equity in earnings of unconsolidated subsidiary | (270) | (286) |
| Unrealized net (gain) loss resulting from commodity hedging and trading transactions | 1,526 | (58) |
| EBITDA amount attributable to consolidated unrestricted subsidiaries | 4 | — |
| Noncash compensation expense (c) | 11 | 13 |
| Transition and business optimization costs (d) | 35 | 39 |
| Transaction and merger expenses (e) | 39 | 37 |
| Restructuring and other (f) | 15 | 80 |
| Charges related to pension plan actions (g) | 285 | — |
| Expenses incurred to upgrade or expand a generation station (h) | 100 | 100 |
| **Adjusted EBITDA per Incurrence Covenant** | $ 3,657 | $ 3,513 |
| **Add Oncor Adjusted EBITDA (reduced by Oncor Holdings distributions)** | 1,600 | 1,523 |
| **Adjusted EBITDA per Restricted Payments Covenant** | $ 5,257 | $ 5,036 |

_____

(a) Purchase accounting adjustments include amortization of the intangible net asset value of retail and wholesale power sales agreements, environmental credits, coal purchase contracts, nuclear fuel contracts and power purchase agreements and the stepped up value of nuclear fuel. Also include certain credits and gains on asset sales not recognized in net income due to purchase accounting. Adjustments in 2011 include $46 million related to an asset sale.

(b) Impairment of assets in 2011 includes impairment of emission allowances and certain mining assets due to EPA rule issued in July 2011.

(c) Noncash compensation expenses represent amounts recorded under stock-based compensation accounting standards and exclude capitalized amounts.

(d) Transition and business optimization costs include certain incentive compensation expenses, as well as professional fees and other costs related to generation plant reliability and supply chain efficiency initiatives.

(e) Transaction and merger expenses primarily represent Sponsor Group management fees.

(f) Restructuring and other in 2011 includes gains on termination of a long-term power sales contract and settlement of amounts due from hedging/trading counterparty, fees related to the amendment and extension of the TCEH Senior Secured Facilities, and reversal of certain liabilities accrued in purchase accounting.

(g) Charges related to pension plan actions resulted from the termination and payout of pension obligations for active nonunion employees of EFH Corp.'s competitive businesses and the assumption by Oncor under a new Oncor pension plan of all of EFH Corp.'s pension obligations to retirees and terminated vested participants. The charges represent actuarial losses previously recorded as other comprehensive income.

(h) Expenses incurred to upgrade or expand a generation station represent noncapital outage costs.

**Exhibit 99(c)**

**Texas Competitive Electric Holdings Company LLC Consolidated**
**Adjusted EBITDA Reconciliation**
**(millions of dollars)**

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| **Net loss** | $ (2,948) | $ (1,740) |
| **Income tax benefit** | (894) | (917) |
| **Interest expense and related charges** | 2,752 | 3,699 |
| **Depreciation and amortization** | 1,343 | 1,470 |
| **EBITDA** | $ 253 | $ 2,512 |
| Interest income | (46) | (87) |
| Amortization of nuclear fuel | 156 | 142 |
| Purchase accounting adjustments (a) | 55 | 157 |
| Impairment of goodwill | 1,200 | — |
| Impairment and write-down of other assets (b) | 6 | 430 |
| Unrealized net (gain) loss resulting from commodity hedging and trading transactions | 1,526 | (58) |
| EBITDA amount attributable to consolidated unrestricted subsidiaries | (4) | (7) |
| Corporate depreciation, interest and income tax expenses included in SG&A expense | 17 | 16 |
| Noncash compensation expense (c) | 7 | 12 |
| Transition and business optimization costs (d) | 33 | 42 |
| Transaction and merger expenses (e) | 38 | 37 |
| Restructuring and other (f) | 14 | 72 |
| Charges related to pension plan actions (g) | 141 | — |
| Expenses incurred to upgrade or expand a generation station (h) | 100 | 100 |
| **Adjusted EBITDA per Incurrence Covenant** | $ 3,496 | $ 3,368 |
| Expenses related to unplanned generation station outages | 78 | 181 |
| Pro forma adjustment for Oak Grove 2 reaching 70% capacity in Q2 2011 (i) | — | 27 |
| Other adjustments allowed to determine Adjusted EBITDA per Maintenance Covenant (j) | — | 8 |
| **Adjusted EBITDA per Maintenance Covenant** | $ 3,574 | $ 3,584 |

_____

(a)   Purchase accounting adjustments include amortization of the intangible net asset value of retail and wholesale power sales agreements, environmental credits, coal purchase contracts, nuclear fuel contracts and power purchase agreements and the stepped up value of nuclear fuel.  Also include certain credits and gains on asset sales not recognized in net income due to purchase accounting.  Adjustments in 2011 include $46 million related to an asset sale.

(b)   Impairment of assets in 2011 includes impairment of emission allowances and certain mining assets due to EPA rule issued in July 2011.

(c)   Noncash compensation expenses represent amounts recorded under stock-based compensation accounting standards and exclude capitalized amounts.

(d)   Transition and business optimization costs include certain incentive compensation expenses, as well as professional fees and other costs related to generation plant reliability and supply chain efficiency initiatives.

(e)   Transaction and merger expenses primarily represent Sponsor Group management fees.

(f)   Restructuring and other in 2011 includes gains on termination of a long-term power sales contract and settlement of amounts due from hedging/trading counterparty, fees related to the amendment and extension of the TCEH Senior Secured Facilities, and reversal of certain liabilities accrued in purchase accounting.

(g)   Charges related to pension plan actions resulted from the termination and payout of pension obligations for active nonunion employees of EFH Corp.'s competitive businesses and the assumption by Oncor under a new Oncor pension plan of all of EFH Corp.'s pension obligations to retirees and terminated vested participants.  The charges represent actuarial losses previously recorded as other comprehensive income.

(h)   Expenses incurred to upgrade or expand a generation station represent noncapital outage costs.

(i)   Pro forma adjustment for the year ended 2011 represents the annualization of the actual nine months ended December 31, 2011 EBITDA results for Oak Grove 2, which achieved the requisite 70% average capacity factor in the second quarter 2011.

(j)   Primarily pre-operating expenses relating to Oak Grove and Sandow 5.

Exhibit 99(d)

**Energy Future Intermediate Holding Company LLC Consolidated**
**Adjusted EBITDA Reconciliation**
**(millions of dollars)**

| | Year Ended December 31, | |
|---|---|---|
| | 2012 | 2011 |
| **Net income** | $ 315 | $ 417 |
| **Income tax expense** | 27 | 73 |
| **Interest expense and related charges** | 526 | 348 |
| **EBITDA** | $ 868 | $ 838 |
| Oncor Holdings distributions of earnings | 147 | 116 |
| Interest income | (598) | (552) |
| Equity in earnings of unconsolidated subsidiary (net of tax) | (270) | (286) |
| **Adjusted EBITDA per Incurrence Covenant** | $ 147 | $ 116 |
| **Add Oncor Adjusted EBITDA (reduced by Oncor Holdings distributions)** | 1,600 | 1,523 |
| **Adjusted EBITDA per Restricted Payments Covenant** | $ 1,747 | $ 1,639 |

**Exhibit 99(e)**

# ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC

# AN ENERGY FUTURE HOLDINGS CORP. ENTERPRISE

# CONSOLIDATED FINANCIAL STATEMENTS

# AS OF DECEMBER 31, 2012

# AND

# INDEPENDENT AUDITORS' REPORT

# GLOSSARY

When the following terms and abbreviations appear in the text of this report, they have the meanings indicated below.

| | |
|---|---|
| **Bondco** | Refers to Oncor Electric Delivery Transition Bond Company LLC, a wholly-owned consolidated bankruptcy-remote financing subsidiary of Oncor that has issued securitization (transition) bonds to recover certain regulatory assets and other costs. |
| **CREZ** | Competitive Renewable Energy Zone |
| **Deed of Trust** | Deed of Trust, Security Agreement and Fixture Filing, dated as of May 15, 2008, made by Oncor to and for the benefit of The Bank of New York Mellon Trust Company, N.A. (as successor to The Bank of New York Mellon, formerly The Bank of New York), as collateral agent, as amended |
| **EFH Corp.** | Refers to Energy Future Holdings Corp., a holding company, and/or its subsidiaries, depending on context.  Its major subsidiaries include Oncor and TCEH. |
| **EFH Retirement Plan** | Refers to the defined benefit pension plan sponsored by EFH Corp., in which Oncor participates.  In 2012, EFH Corp. made various changes to the EFH Retirement Plan, including splitting off all of the assets and liabilities associated with Oncor employees and all retirees and terminated vested participants of EFH Corp. and its subsidiaries (including discontinued businesses) into a new plan.  See Oncor Retirement Plan below. |
| **EFIH** | Refers to Energy Future Intermediate Holding Company LLC, a direct, wholly-owned subsidiary of EFH Corp. and the direct parent of Oncor Holdings. |
| **ERCOT** | Electric Reliability Council of Texas, Inc., the independent system operator and the regional coordinator of various electricity systems within Texas |
| **ERISA** | Employee Retirement Income Security Act of 1974, as amended |
| **Fitch** | Fitch Ratings, Ltd. (a credit rating agency) |
| **GAAP** | generally accepted accounting principles |
| **Investment LLC** | Refers to Oncor Management Investment LLC, a limited liability company and minority membership interest owner (approximately 0.22%) of Oncor, whose managing member is Oncor and whose Class B Interests are owned by certain members of the management team and independent directors of Oncor. |
| **IRS** | US Internal Revenue Service |
| **LIBOR** | London Interbank Offered Rate. an interest rate at which banks can borrow funds, in marketable size, from other banks in the London interbank market. |
| **Limited Liability Company Agreement** | The Second Amended and Restated Limited Liability Company Agreement of Oncor, dated as of November 5, 2008, by and among Oncor Holdings, Texas Transmission and Investment LLC, as amended |
| **Luminant** | Refers to subsidiaries of TCEH engaged in competitive market activities consisting of electricity generation and wholesale energy sales and purchases as well as commodity risk management and trading activities, all largely in Texas. |
| **Moody's** | Moody's Investors Services, Inc. (a credit rating agency) |
| **Oncor** | Refers to Oncor Electric Delivery Company LLC, a direct, majority-owned subsidiary of Oncor Holdings, and/or its wholly-owned consolidated bankruptcy-remote financing subsidiary, Bondco, depending on context. |
| **Oncor Holdings** | Refers to Oncor Electric Delivery Holdings Company LLC, a direct, wholly-owned subsidiary of EFIH and the direct majority owner (approximately 80.03%) of Oncor, and/or its subsidiaries, depending on context. |
| **Oncor Retirement Plan** | Refers to the defined benefit pension plan sponsored by Oncor.  In 2012, EFH Corp. made various changes to the EFH Retirement Plan, including splitting off all of the assets and liabilities associated with Oncor employees and all retirees and terminated vested participants of EFH Corp. and its subsidiaries (including discontinued businesses) into a new plan.  Effective January 1, 2013, Oncor assumed sponsorship of this new plan. |
| **Oncor Ring-Fenced Entities** | Refers to Oncor Holdings and its direct and indirect subsidiaries, including Oncor. |
| **OPEB** | other postretirement employee benefits |
| **OPEB Plan** | Refers to an EFH Corp.-sponsored plan (in which Oncor participates) that offers certain health care and life insurance benefits to eligible employees and their eligible dependents upon the retirement of such employees from Oncor. |

| | |
|---|---|
| **PUCT** | Public Utility Commission of Texas |
| **PURA** | Texas Public Utility Regulatory Act |
| **purchase accounting** | The purchase method of accounting for a business combination as prescribed by US GAAP, whereby the cost or "purchase price" of a business combination, including the amount paid for the equity and direct transaction costs, are allocated to identifiable assets and liabilities (including intangible assets) based upon their fair values. The excess of the purchase price over the fair values of assets and liabilities is recorded as goodwill. |
| **REP** | retail electric provider |
| **S&P** | Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies, Inc. (a credit rating agency) |
| **SARs** | Stock Appreciation Rights |
| **SARs Plan** | Refers to the Oncor Stock Appreciation Rights Plan. |
| **Sponsor Group** | Refers collectively to certain investment funds affiliated with Kohlberg Kravis Roberts & Co. L.P. (KKR), TPG Global, LLC (together with its affiliates, TPG) and GS Capital Partners, an affiliate of Goldman, Sachs & Co., that have an ownership interest in Texas Holdings. |
| **TCEH** | Refers to Texas Competitive Electric Holdings Company LLC, a direct, wholly-owned subsidiary of Energy Future Competitive Holdings Company and an indirect subsidiary of EFH Corp., and/or its subsidiaries, depending on context. Its major subsidiaries include Luminant and TXU Energy. |
| **TCRF** | transmission cost recovery factor |
| **Texas Holdings** | Refers to Texas Energy Future Holdings Limited Partnership, a limited partnership controlled by the Sponsor Group that owns substantially all of the common stock of EFH Corp. |
| **Texas Holdings Group** | Refers to Texas Holdings and its direct and indirect subsidiaries other than the Oncor Ring-Fenced Entities. |
| **Texas Transmission** | Refers to Texas Transmission Investment LLC, a limited liability company that owns a 19.75% equity interest in Oncor. Texas Transmission is an entity indirectly owned by a private investment group led by OMERS Administration Corporation, acting through its infrastructure investment entity, Borealis Infrastructure Management Inc., and the Government of Singapore Investment Corporation, acting through its private equity and infrastructure arm, GIC Special Investments Pte Ltd. Texas Transmission is not affiliated with EFH Corp., any of EFH Corp.'s subsidiaries or any member of the Sponsor Group. |
| **TXU Energy** | Refers to TXU Energy Retail Company LLC, a direct, wholly-owned subsidiary of TCEH engaged in the retail sale of electricity to residential and business customers. TXU Energy is a REP in competitive areas of ERCOT. |
| **US** | United States of America |
| **VIE** | variable interest entity |

These consolidated financial statements occasionally make references to Oncor Holdings or Oncor when describing actions, rights or obligations of their respective subsidiaries. References to "we," "our," "us" and "the company" are to Oncor Holdings and/or its direct or indirect subsidiaries as apparent in the context. These references reflect the fact that the subsidiaries are consolidated with their respective parent companies for financial reporting purposes. However, these references should not be interpreted to imply that the parent company is actually undertaking the action or has the rights or obligations of the relevant subsidiary company or that the subsidiary company is undertaking an action or has the rights or obligations of its parent company or any other affiliate.

3

**INDEPENDENT AUDITORS' REPORT**

To the Board of Directors and Member of
Oncor Electric Delivery Holdings Company LLC
Dallas, Texas

We have audited the accompanying consolidated financial statements of Oncor Electric Delivery Holdings Company LLC and its subsidiary (the "Company") which comprise the consolidated balance sheets as of December 31, 2012 and 2011, and the related statements of consolidated income, comprehensive income, membership interests and cash flows for each of the three years in the period ended December 31, 2012, and the related notes to the consolidated financial statements.

**Management's Responsibility for the Consolidated Financial Statements**

Management is responsible for the preparation and fair presentation of these consolidated financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

**Auditors' Responsibility**

Our responsibility is to express an opinion on these consolidated financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the Company's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Oncor Electric Delivery Holdings Company LLC and its subsidiary as of December 31, 2012 and 2011, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2012, in accordance with accounting principles generally accepted in the United States of America.

/s/ Deloitte & Touche LLP

Dallas, Texas
February 19, 2013

4

**ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC**
**STATEMENTS OF CONSOLIDATED INCOME**
**(millions of dollars)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2012** | **2011** | **2010** |
| Operating revenues: | | | |
| Affiliated | $ 962 | $ 1,026 | $ 1,061 |
| Nonaffiliated | 2,366 | 2,092 | 1,853 |
| Total operating revenues | 3,328 | 3,118 | 2,914 |
| Operating expenses: | | | |
| Wholesale transmission service | 502 | 439 | 393 |
| Operation and maintenance | 669 | 658 | 616 |
| Depreciation and amortization | 771 | 719 | 673 |
| Income taxes (Note 3) | 240 | 209 | 193 |
| Taxes other than income taxes | 415 | 400 | 384 |
| Total operating expenses | 2,597 | 2,425 | 2,259 |
| Operating income | 731 | 693 | 655 |
| Other income and deductions: | | | |
| Other income (Note 13) | 26 | 30 | 36 |
| Other deductions (Note 13) | 64 | 9 | 8 |
| Nonoperating income taxes (Note 3) | 3 | 27 | 27 |
| Interest income | 24 | 32 | 38 |
| Interest expense and related charges (Note 13) | 374 | 359 | 347 |
| Net income | 340 | 360 | 347 |
| Net income attributable to noncontrolling interests | (70) | (74) | (70) |
| Net income attributable to Oncor Holdings | $ 270 | $ 286 | $ 277 |

See Notes to Financial Statements.

**STATEMENTS OF CONSOLIDATED COMPREHENSIVE INCOME**
**(millions of dollars)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2012** | **2011** | **2010** |
| Net income | $ 340 | $ 360 | $ 347 |
| Other comprehensive income (loss): | | | |
| Cash flow hedges (Notes 1 and 6): | | | |
| Net decrease in fair value of derivatives (net of tax benefit of — ,$17,and —) | — | (29) | — |
| Derivative value net loss recognized in net income (net of tax benefit of $1, — and — ) | 3 | — | — |
| Total cash flow hedges | 3 | (29) | — |
| Defined benefit pension and OPEB plans (net of tax benefit of $1, — and —) (Note 10) | (3) | — | — |
| Total other comprehensive loss | — | (29) | — |
| Comprehensive income | 340 | 331 | 347 |
| Comprehensive income attributable to noncontrolling interests | (70) | (68) | (70) |
| Comprehensive income attributable to Oncor Holdings | $ 270 | $ 263 | $ 277 |

See Notes to Financial Statements.

5

**ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC**
**STATEMENTS OF CONSOLIDATED CASH FLOWS**
**(millions of dollars)**

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2012** | **2011** | **2010** |
| Cash flows — operating activities: | | | |
| Net income | $ 340 | $ 360 | $ 347 |
| Adjustments to reconcile net income to cash provided by operating activities: | | | |
| Depreciation and amortization | 802 | 732 | 682 |
| Deferred income taxes — net | 182 | 229 | 155 |
| Amortization of investment tax credits | (4) | (5) | (5) |
| Other — net | — | 2 | — |
| Changes in operating assets and liabilities: | | | |
| Accounts receivable - trade (including affiliates) | 52 | (36) | (1) |
| Inventories | (3) | 25 | (4) |
| Accounts payable — trade (including affiliates) | (9) | 17 | (17) |
| Deferred revenues (Note 4) | (101) | (16) | 11 |
| Other — assets | (15) | 147 | 3 |
| Other — liabilities | (8) | (160) | (74) |
| Cash provided by operating activities | 1,236 | 1,295 | 1,097 |
| Cash flows — financing activities: | | | |
| Issuances of long-term debt (Note 6) | 900 | 300 | 475 |
| Repayments of long-term debt (Note 6) | (1,018) | (113) | (108) |
| Net increase (decrease) in short term borrowings (Note 5) | 343 | 15 | (239) |
| Distributions to parent (Note 8) | (147) | (116) | (169) |
| Distributions to noncontrolling interests | (45) | (29) | (42) |
| Decrease in note receivable from TCEH (Note 12) | 20 | 40 | 37 |
| Sale of related-party agreements (Note 12) | 159 | — | — |
| Debt discount, financing and reacquisition expenses — net | (46) | (17) | (15) |
| Other | (1) | — | — |
| Cash provided by (used in) financing activities | 165 | 80 | (61) |
| Cash flows — investing activities: | | | |
| Capital expenditures | (1,389) | (1,362) | (1,020) |
| Other — net | 21 | (34) | (12) |
| Cash used in investing activities | (1,368) | (1,396) | (1,032) |
| Net change in cash and cash equivalents | 33 | (21) | 4 |
| Cash and cash equivalents — beginning balance | 12 | 33 | 29 |
| Cash and cash equivalents — ending balance | $ 45 | $ 12 | $ 33 |

See Notes to Financial Statements.

6

**ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC**
**CONSOLIDATED BALANCE SHEETS**
**(millions of dollars)**

| | At December 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $      45 | $      12 |
| Restricted cash — Bondco (Note 13) | 55 | 57 |
| Trade accounts receivable from nonaffiliates — net (Note 13) | 338 | 303 |
| Trade accounts and other receivables from affiliates (Note 12) | 53 | 179 |
| Materials and supplies inventories — at average cost | 73 | 71 |
| Accumulated deferred income taxes (Note 3) | 26 | 73 |
| Prepayments and other current assets | 82 | 74 |
| Total current assets | 672 | 769 |
| Restricted cash — Bondco (Note 13) | 16 | 16 |
| Investments and other property (Note 13) | 83 | 73 |
| Property, plant and equipment — net (Note 13) | 11,318 | 10,569 |
| Goodwill (Notes 1 and 13) | 4,064 | 4,064 |
| Note receivable from TCEH (Note 12) | — | 138 |
| Regulatory assets — net — Oncor (Note 4) | 1,453 | 1,303 |
| Regulatory assets — net — Bondco (Note 4) | 335 | 427 |
| Other noncurrent assets | 78 | 73 |
| Total assets | $   18,019 | $   17,432 |
| **LIABILITIES AND MEMBERSHIP INTERESTS** | | |
| Current liabilities: | | |
| Short-term borrowings (Note 5) | $    735 | $    392 |
| Long-term debt due currently — Oncor (Note 6) | — | 376 |
| Long-term debt due currently — Bondco (Note 6) | 125 | 118 |
| Trade accounts payable | 121 | 197 |
| Income taxes payable to EFH Corp. (Note 12) | 34 | 2 |
| Accrued taxes other than income taxes | 153 | 151 |
| Accrued interest | 95 | 108 |
| Other current liabilities | 110 | 112 |
| Total current liabilities | 1,373 | 1,456 |
| Long-term debt, less amounts due currently — Oncor (Note 6) | 5,090 | 4,711 |
| Long-term debt, less amounts due currently — Bondco (Note 6) | 310 | 433 |
| Accumulated deferred income taxes (Notes 1, 3 and 12) | 1,736 | 1,688 |
| Investment tax credits | 24 | 28 |
| Other noncurrent liabilities and deferred credits (Notes 12 and 13) | 1,999 | 1,832 |
| Total liabilities | 10,532 | 10,148 |
| Commitments and contingencies (Note 7) | | |
| Membership interests (Note 8): | | |
| Capital account | 5,867 | 5,745 |
| Accumulated other comprehensive loss, net of tax effects | (25) | (25) |
| Oncor Holdings membership interest | 5,842 | 5,720 |
| Noncontrolling interests in subsidiary | 1,645 | 1,564 |
| Total membership interests | 7,487 | 7,284 |
| Total liabilities and membership interests | $   18,019 | $   17,432 |

See Notes to Financial Statements.

7

**ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC**
**STATEMENTS OF CONSOLIDATED MEMBERSHIP INTERESTS**
**(millions of dollars)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2012** | **2011** | **2010** |
| Capital account: | | | |
| Balance at beginning of period | $    5,745 | $    5,546 | $    5,397 |
| Net income attributable to Oncor Holdings | 270 | 286 | 277 |
| Distributions paid to parent | (147) | (116) | (169) |
| Sale of related-party agreements (net of tax benefit of $1, — and — ) (Note 12) | (1) | — | — |
| Capital contributions (a) | — | 29 | 40 |
| Other | — | — | 1 |
| Balance at end of period | 5,867 | 5,745 | 5,546 |
| Accumulated other comprehensive income (loss), net of tax effects: | | | |
| Balance at beginning of period | (25) | (2) | (2) |
| Net effects of cash flow hedges (net of tax expense (benefit) of $1, $(13) and — ) (Note 6) | 2 | (23) | — |
| Defined benefit pension and OPEB plans (net of tax benefit of $1, — and —) (Note 10) | (2) | — | — |
| Balance at end of period | (25) | (25) | (2) |
| Oncor Holdings membership interest at end of period | 5,842 | 5,720 | 5,544 |
| Noncontrolling interests in subsidiary (Note 9): | | | |
| Balance at beginning of period | 1,564 | 1,452 | 1,363 |
| Net income attributable to noncontrolling interests | 70 | 74 | 70 |
| Distributions to noncontrolling interests | (45) | (29) | (42) |
| Change related to future tax distributions from Oncor | 5 6 | 73 | 61 |
| Net effects of cash flow hedges (net of tax benefit of — , $4, and — ) | 1 | (6) | — |
| Defined benefit pension and OPEB plans (net of tax) (Note 10) | (1) | — | — |
| Noncontrolling interests in subsidiary at end of period | 1,645 | 1,564 | 1,452 |
| Total membership interests at end of period | $    7,487 | $    7,284 | $    6,996 |

_____
(a)   Reflects noncash settlement of certain income taxes payable arising as a result of the sale of noncontrolling interests in Oncor.

See Notes to Financial Statements.

8

ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## 1.    BUSINESS AND SIGNIFICANT ACCOUNTING POLICIES

*Description of Business*

References in this report to "we," "our," "us" and "the company" are to Oncor Holdings and/or its direct or indirect subsidiaries as apparent in the context. The financial statements reflect almost entirely the operations of Oncor; consequently, there are no separate reportable business segments.  See "Glossary" for definition of terms and abbreviations.

We are a Dallas, Texas-based holding company whose financial statements reflect almost entirely the operations of our direct, majority (approximately 80%) owned subsidiary, Oncor. Oncor is a regulated electricity transmission and distribution company principally engaged in providing delivery services to REPs, including subsidiaries of TCEH, that sell power in the north-central, eastern and western parts of Texas.  Revenues from TCEH represented 29%, 33% and 36% of total operating revenues for the years ended December 31, 2012, 2011 and 2010, respectively.  We are a direct, wholly-owned subsidiary of EFIH, a direct, wholly-owned subsidiary of EFH Corp.  EFH Corp. is a subsidiary of Texas Holdings, which is controlled by the Sponsor Group.

Our consolidated financial statements include our indirect, bankruptcy-remote financing subsidiary, Bondco, a VIE (see Note 13).  This financing subsidiary was organized for the limited purpose of issuing certain transition bonds in 2003 and 2004.  Bondco issued $1.3 billion principal amount of transition bonds to recover generation-related regulatory asset stranded costs and other qualified costs under an order issued by the PUCT in 2002.

Various "ring-fencing" measures have been taken to enhance the separateness between the Oncor Ring-Fenced Entities and the Texas Holdings Group and our credit quality. These measures serve to mitigate our and Oncor's credit exposure to the Texas Holdings Group and to reduce the risk that our assets and liabilities or those of Oncor would be substantively consolidated with the assets and liabilities of the Texas Holdings Group in the event of a bankruptcy of one or more of those entities. Such measures include, among other things: Oncor's sale of a 19.75% equity interest to Texas Transmission in November 2008; maintenance of separate books and records for the Oncor Ring-Fenced Entities; our board of directors and Oncor's board of directors being comprised of a majority of independent directors; and prohibitions on the Oncor Ring-Fenced Entities providing credit support to, or receiving credit support from, any member of the Texas Holdings Group. The assets and liabilities of the Oncor Ring-Fenced Entities are separate and distinct from those of the Texas Holdings Group, including TXU Energy and Luminant, and none of the assets of the Oncor Ring-Fenced Entities are available to satisfy the debt or contractual obligations of any member of the Texas Holdings Group. We and Oncor do not bear any liability for debt or contractual obligations of the Texas Holdings Group, and vice versa. Accordingly, our operations are conducted, and our cash flows are managed, independently from the Texas Holdings Group.

See Note 9 for discussion of noncontrolling interests.

*Basis of Presentation*

Our consolidated financial statements have been prepared in accordance with US GAAP and on the same basis as our audited financial statements for the year ended December 31, 2011 included in EFH Corp.'s Annual Report on Form 10-K for the year ended December 31, 2011 filed on February 21, 2012 (Commission File No. 001-12833). All intercompany items and transactions have been eliminated in consolidation.  All dollar amounts in the financial statements and tables in the notes are stated in millions of US dollars unless otherwise indicated.  Subsequent events have been evaluated through the date these consolidated financial statements were issued.

From time to time, certain prior period amounts are reclassified to conform to the current period presentation.  In the statements of consolidated cash flows included in this report, amounts previously reported as changes in deferred advanced metering system revenues for the years ended December 31, 2011 and 2010 are included in and reported as deferred revenues to conform to the current period presentation.  In addition to deferred advanced metering system revenues, other reconcilable revenues (TCRF and energy efficiency surcharges), which were previously reported as changes in other operating assets and liabilities, are included in and reported as deferred revenues.

As discussed in Note 12, the balance sheet at December 31, 2011 has been restated to remove the regulatory liability for nuclear plant decommissioning and related receivable from TCEH related to nuclear plant decommissioning.

9

*Consolidation of Variable Interest Entities*

A VIE is an entity with which we have a relationship or arrangement that indicates some level of control over the entity or results in economic risks to us. We consolidate a VIE if we have: a) the power to direct the significant activities of the VIE and b) the right or obligation to absorb profit and loss from the VIE (primary beneficiary). See Note 13.

*Income Taxes*

EFH Corp. files a consolidated federal income tax return.  Effective with the November 2008 sale of equity interests in Oncor, Oncor became a partnership for US federal income tax purposes, and subsequently only EFH Corp.'s share of partnership income is included in its consolidated federal income tax return.  Our tax sharing agreement with Oncor and EFH Corp. was amended in November 2008 to include Texas Transmission and Investment LLC. The tax sharing agreement provides for the calculation of tax liability substantially as if we and Oncor file our own income tax returns, and requires tax payments to members determined on that basis (without duplication for any income taxes paid by our subsidiaries).   Deferred income taxes are provided for temporary differences between our book and tax bases of assets and liabilities.

Amounts of deferred income tax assets and liabilities, as well as current and noncurrent accruals, are determined in accordance with the provisions of accounting guidance for income taxes and for uncertainty in income taxes.  The accounting guidance for rate-regulated enterprises requires the recognition of regulatory assets or liabilities if it is probable such deferred tax amounts will be recovered from, or returned to customers in future rates.   Investment tax credits are amortized to income over the estimated lives of the related properties.

We classify interest and penalties expense related to uncertain tax positions as current accumulated deferred income taxes as discussed in Note 3.

*Use of Estimates*

Preparation of our financial statements requires management to make estimates and assumptions about future events that affect the reporting of assets and liabilities at the balance sheet dates and the reported amounts of revenue and expense, including fair value measurements.   In the event estimates and/or assumptions prove to be different from actual amounts, adjustments are made in subsequent periods to reflect more current information.   No material adjustments, other than those disclosed elsewhere herein, were made to previous estimates or assumptions during the current year.

*Derivative Instruments and Mark-to-Market Accounting*

Oncor has from time-to-time entered into derivative instruments to hedge interest rate risk.  If the instrument meets the definition of a derivative under accounting standards related to derivative instruments and hedging activities, the fair value of each derivative is required to be recognized on the balance sheet as a derivative asset or liability and changes in the fair value are recognized in net income, unless criteria for certain exceptions are met.   This recognition is referred to as "mark-to-market" accounting.

Because derivative instruments are frequently used as economic hedges, accounting standards related to derivative instruments and hedging activities allow for "hedge accounting," which provides for the designation of such instruments as cash flow or fair value hedges if certain conditions are met.   A cash flow hedge mitigates the risk associated with the variability of the future cash flows related to an asset or liability (e.g., debt with variable interest rate payments), while a fair value hedge mitigates risk associated with fixed future cash flows (e.g., debt with fixed interest rate payments).   In accounting for cash flow hedges, derivative assets and liabilities are recorded on the balance sheet at fair value with an offset to other comprehensive income to the extent the hedges are effective. Amounts remain in accumulated other comprehensive income and are reclassified into net income as the related transactions (hedged items) settle and affect net income. If the hedged transaction becomes probable of not occurring, hedge accounting is discontinued and the amount recorded in other comprehensive income is immediately reclassified into net income.  Fair value hedges are recorded as derivative assets or liabilities with an offset to net income, and the carrying value of the related asset or liability (hedged item) is adjusted for changes in fair value with an offset to net income.  If the fair value hedge is settled prior to the maturity of the hedged item, the cumulative fair value gain or loss associated with the hedge is amortized into income over the remaining life of the hedged item. To qualify for hedge accounting, a hedge must be considered highly effective in offsetting changes in fair value of the hedged item. Assessment of the hedge's effectiveness is tested at least quarterly throughout its term to continue to qualify for hedge accounting.  Hedge ineffectiveness, even if the hedge continues to be assessed as effective, is immediately recognized in net income.  Ineffectiveness is generally measured as the cumulative excess, if any, of the change in value of the hedging instrument over the change in value of the hedged item.

10

*Reconcilable Tariffs*

The PUCT has designated certain tariffs (TCRF, energy efficiency and advanced meter surcharges and charges related to transition bonds) as reconcilable, which means the differences between amounts billed under these tariffs and the related incurred expenses are deferred as either regulatory assets or regulatory liabilities. Accordingly, at prescribed intervals, future tariffs are adjusted to either repay regulatory liabilities or collect regulatory assets.

*Revenue Recognition*

Revenue from delivery services are recorded under the accrual method of accounting.  Revenues are recognized when delivery services are provided to customers on the basis of periodic cycle meter readings and include an estimate for revenues earned from the meter reading date to the end of the period adjusted for the impact of weather (unbilled revenue).

*Impairment of Long-Lived Assets and Goodwill*

We evaluate long-lived assets (including intangible assets with finite lives) for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable.

We also evaluate goodwill for impairment annually (at December 1) or whenever events or changes in circumstances indicate that an impairment may exist.

Goodwill impairment tests performed in 2012 and 2010 were based on determinations of enterprise value using discounted cash flow analyses, comparable company equity values and any relevant transactions indicative of enterprise values (quantitative assessment).

Effective with the December 1, 2011 test, we adopted new accounting guidance that provides the option of using a qualitative assessment in which we may consider macroeconomic conditions, industry and market considerations, cost factors, overall financial performance and other relevant events.   Based on the results of the qualitative assessment performed, we concluded that no further testing for impairment was required in 2011.

*System of Accounts*

Our accounting records have been maintained in accordance with the US Federal Energy Regulatory Commission Uniform System of Accounts as adopted by the PUCT.

*Defined Benefit Pension Plans and Other Postretirement Employee Benefit (OPEB) Plans*

Oncor participates in pension plans that offer benefits based on either a traditional defined benefit formula or a cash balance formula and the OPEB Plan that offers certain health care and life insurance benefits to eligible employees and their eligible dependents upon the retirement of such employees from the company. Costs of pension and OPEB plans are dependent upon numerous factors, assumptions and estimates.  In 2012, EFH Corp. made various changes to the EFH Retirement Plan, including splitting off into a new plan all of the assets and liabilities associated with Oncor employees and all retirees and terminated vested participants of EFH Corp. and its subsidiaries (including discontinued businesses).  See Note 10 for additional information regarding the pension plans and the OPEB Plan

*Stock-Based Incentive Compensation*

In 2008, Oncor implemented the SARs Plan for certain management that purchased equity interests in the company indirectly by investing in Investment LLC. Oncor implemented the Director SARs Plan in 2009.  SARs have been awarded under the SARs Plan and are being accounted for based upon the provisions of guidance for share-based payment.  See Note 11 for information regarding stock-based compensation, including SARs granted to certain members of Oncor's board of directors and a 2012 early exercise of all outstanding SARS under both the SARs Plan and Director SARs Plan.

*Fair Value of Nonderivative Financial Instruments*

The carrying amounts for financial assets classified as current assets and the carrying amounts for financial liabilities classified as current liabilities approximate fair value due to the short maturity of such instruments.  The fair values of other financial instruments, for which carrying amounts and fair values have not been presented, are not materially different than their related carrying amounts.  The following discussion of fair value accounting standards applies primarily to our determination of the fair value of assets in the pension and OPEB plan trusts as presented in Note 10.

Accounting standards related to the determination of fair value define fair value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.  We use a "mid-market" valuation convention (the mid-point price between bid and ask prices) as a practical expedient to measure fair value for the majority of our assets and liabilities subject to fair value measurement on a recurring basis. We primarily use the market approach for recurring fair value measurements and use valuation techniques to maximize the use of observable inputs and minimize the use of unobservable inputs.

We categorize our assets and liabilities recorded at fair value based upon the following fair value hierarchy:

• Level 1 valuations use quoted prices in active markets for identical assets or liabilities that are accessible at the measurement date.   An active market is a market in which transactions for the asset or liability occur with sufficient frequency and volume to provide pricing information on an ongoing basis.

• Level 2 valuations use inputs that, in the absence of actively quoted market prices, are observable for the asset or liability, either directly or indirectly. Level 2 inputs include: (a) quoted prices for similar assets or liabilities in active markets, (b) quoted prices for identical or similar assets or liabilities in markets that are not active, (c) inputs other than quoted prices that are observable for the asset or liability such as interest rates and yield curves observable at commonly quoted intervals and (d) inputs that are derived principally from or corroborated by observable market data by correlation or other means. Our Level 2 valuations utilize over-the-counter broker quotes, quoted prices for similar assets or liabilities that are corroborated by correlations or other mathematical means and other valuation inputs.

• Level 3 valuations use unobservable inputs for the asset or liability.  Unobservable inputs are used to the extent observable inputs are not available, thereby allowing for situations in which there is little, if any, market activity for the asset or liability at the measurement date.   We use the most meaningful information available from the market combined with internally developed valuation methodologies to develop our best estimate of fair value.

We utilize several different valuation techniques to measure the fair value of assets and liabilities, relying primarily on the market approach of using prices and other market information for identical and/or comparable assets and liabilities for those items that are measured on a recurring basis.

*Franchise Taxes*

Franchise taxes are assessed to Oncor by local governmental bodies, based on kilowatt-hours delivered and are the principal component of "taxes other than income taxes" as reported in the income statement.  Franchise taxes are not a "pass through" item. Rates charged to customers by Oncor are intended to recover the franchise taxes, but Oncor is not acting as an agent to collect the taxes from customers.

*Cash and Cash Equivalents*

For purposes of reporting cash and cash equivalents, temporary cash investments purchased with a remaining maturity of three months or less are considered to be cash equivalents.  See Note 13 for details regarding restricted cash.

*Property, Plant and Equipment*

Properties are stated at original cost. The cost of self-constructed property additions includes materials and both direct and indirect labor and applicable overhead and an allowance for funds used during construction.

Depreciation of property, plant and equipment is calculated on a straight-line basis over the estimated service lives of the properties based on depreciation rates approved by the PUCT. As is common in the industry, depreciation expense is recorded using composite depreciation rates that reflect blended estimates of the lives of major asset groups as compared to depreciation expense calculated on a component asset-by-asset basis. Depreciation rates include plant removal costs as a component of depreciation expense, consistent with regulatory treatment. Actual removal costs incurred are charged to accumulated depreciation. When accrued removal costs exceed incurred removal costs, the difference is reclassified as a regulatory obligation to retire assets in the future.

*Allowance for Funds Used During Construction (AFUDC)*

AFUDC is a regulatory cost accounting procedure whereby both interest charges on borrowed funds and a return on equity capital used to finance construction are included in the recorded cost of utility plant and equipment being constructed. AFUDC is capitalized on all projects involving construction periods lasting greater than thirty days. The equity portion of capitalized AFUDC is accounted for as other income. Oncor recorded $1 million of equity AFUDC in the year ended December 31, 2012 and none for each of the years ended December 31, 2011 and 2010. See Note 13 for detail of amounts charged to interest expense.

*Regulatory Assets and Liabilities*

Our financial statements reflect regulatory assets and liabilities under cost-based rate regulation in accordance with accounting standards related to the effect of certain types of regulation. Regulatory decisions can have an impact on the recovery of costs, the rate earned on invested capital and the timing and amount of assets to be recovered by rates. See Note 4 for details of regulatory assets and liabilities.

*Sale of Noncontrolling Interests*

See Note 9 for discussion of noncontrolling interests.

## 2.    REGULATORY MATTERS

*2011 Rate Review*

In January 2011, Oncor filed a rate review with the PUCT and 203 original jurisdiction cities based on a test year ended June 30, 2010 (PUCT Docket No. 38929). In April 2011, Oncor and the other parties reached a Memorandum of Settlement that would settle and resolve all issues in the rate review. Oncor filed a stipulation (including a proposed order and proposed tariffs) in May 2011 that incorporated the Memorandum of Settlement along with pleadings and other documentation (Stipulation) for the purpose of obtaining final approval of the settlement. The terms of the Stipulation include an approximate $137 million base rate increase and additional provisions to address franchise fees (discussed below) and other expenses. Approximately $93 million of the increase became effective July 1, 2011, and the remainder became effective January 1, 2012. Under the Stipulation, amortization of regulatory assets increased by approximately $24 million ($14 million of which will be recognized as tax expense) annually beginning January 1, 2012. The Stipulation did not change Oncor's authorized regulatory capital structure of 60% debt and 40% equity or its authorized return on equity of 10.25%. Under the terms of the Stipulation, Oncor cannot file another general base rate review prior to July 1, 2013, but is not restricted from filing wholesale transmission rate, TCRF, distribution-related investment and other rate updates and adjustments permitted by Texas state law and PUCT rules.

In response to concerns raised by PUCT Commissioners at a July 2011 PUCT open meeting regarding the Stipulation, Oncor filed a modified stipulation that removed from the Stipulation a one-time payment to certain cities it serves for retrospective franchise fees (Modified Stipulation). Instead, pursuant to the terms of a separate agreement with certain cities it serves, through December 31, 2012, Oncor has made $22 million in retrospective franchise fee payments to cities that accepted the terms of the separate agreement. The payments are subject to refund from the cities or recovery from customers after final resolution of proceedings related to the appeals from Oncor's June 2008 rate review filing (discussed below). No other significant terms of the Stipulation were revised. In August 2011, the PUCT issued a final order approving the settlement terms contained in the Modified Stipulation.

13

Effective July 1, 2011, pursuant to the PUCT's final order, Oncor no longer recovers the cost of wholesale transmission service through base rates, and wholesale transmission service expenses incurred are reconcilable to revenues billed under the TCRF rider. For this purpose, all wholesale transmission service expenses consist of amounts charged under a PUCT-approved transmission tariff including Oncor's own wholesale transmission tariff. Oncor accounts for the difference between amounts charged under the TCRF rate and wholesale transmission service expense as a regulatory asset or regulatory liability (under- or over-recovered wholesale transmission service expense (see Note 1)). At December 31, 2012, approximately $60 million ($40 million after tax) was deferred as under-recovered wholesale transmission service expense (see Note 4).

*2008 Rate Review*

In August 2009, the PUCT issued a final order with respect to Oncor's June 2008 rate review filing with the PUCT and 204 cities based on a test year ended December 31, 2007 (PUCT Docket No. 35717), and new rates were implemented in September 2009. In November 2009, the PUCT issued an order on rehearing that established a new rate class but did not change the revenue requirements. Oncor and four other parties appealed various portions of the rate review final order to a state district court, and oral argument was held in October 2010. In January 2011, the district court signed its judgment reversing the PUCT with respect to two issues: the PUCT's disallowance of certain franchise fees and the PUCT's decision that PURA no longer requires imposition of a rate discount for state colleges and universities. Oncor filed an appeal with the Texas Third Court of Appeals (Austin Court of Appeals) in February 2011 with respect to the issues it appealed to the district court and did not prevail upon, as well as the district court's decision to reverse the PUCT with respect to discounts for state colleges and universities. Oral argument before the Austin Court of Appeals was completed in April 2012. There is no deadline for the court to act. Oncor is unable to predict the outcome of the appeal.

*Stipulation Approved by the PUCT*

In April 2008, the PUCT entered an order (PUCT Docket No. 34077), which became final in June 2008, approving the terms of a stipulation relating to a filing in 2007 by Oncor and Texas Holdings with the PUCT pursuant to Section 14.101(b) of PURA and PUCT Substantive Rule 25.75. Among other things, the stipulation required Oncor to file a rate review no later than July 1, 2008 based on a test year ended December 31, 2007, which it filed in June 2008. The PUCT issued a final order with respect to the rate review in August 2009. In July 2008, Nucor Steel filed an appeal of the PUCT's order in the 200th District Court of Travis County, Texas (District Court). A hearing on the appeal was held in June 2010, and the District Court affirmed the PUCT order in its entirety. Nucor Steel appealed that ruling to the Austin Court of Appeals in July 2010. In March 2012, the Austin Court of Appeals affirmed the District Court's ruling, which is now final

In addition to commitments Oncor made in its filings in the PUCT review, the stipulation included the following provisions, among others:

- Oncor provided a one-time $72 million refund to its REP customers in the September 2008 billing cycle. The refund was in the form of a credit on distribution fee billings. The liability for the refund was previously recorded as part of purchase accounting.
- Cash distributions paid by Oncor were limited through December 31, 2012, to an amount not to exceed its net income (determined in accordance with US GAAP, subject to certain defined adjustments) for the period beginning October 11, 2007 and ending December 31, 2012, and continue to be limited by an agreement that Oncor's regulatory capital structure, as determined by the PUCT, will be at or below the assumed debt-to-equity ratio established periodically by the PUCT for ratemaking purposes, which is currently set at 60% debt to 40% equity (see Note 8).
- Oncor committed to minimum capital spending of $3.6 billion over the five-year period ending December 31, 2012, subject to certain defined conditions. This spending did not include the capital spending on CREZ facilities. Oncor satisfied this spending commitment in 2012.
- Oncor committed to an additional $100 million in spending over the five-year period ending December 31, 2012 on demand-side management or other energy efficiency initiatives. These additional expenditures will not be recoverable in rates, and this amount was recorded as a regulatory liability as part of purchase accounting and consistent with accounting standards related to the effect of certain types of regulation. Oncor satisfied this spending commitment in 2012.
- If Oncor's credit rating is below investment grade with two or more rating agencies, TCEH will post a letter of credit in an amount of $170 million to secure TXU Energy's payment obligations to Oncor.
- Oncor agreed not to request recovery of goodwill or any future impairment of the goodwill in its rates.

3.  **INCOME TAXES**

The components of our income tax expense (benefit) are as follows:

| | Year Ended December 31, | | |
| | 2012 | 2011 | 2010 |
|---|---|---|---|
| Reported in operating expenses: | | | |
| Current: | | | |
| US federal | $ 23 | $ (55) | $ (6) |
| State | 21 | 21 | 21 |
| Deferred: | | | |
| US federal | 200 | 248 | 183 |
| State | — | — | — |
| Amortization of investment tax credits | (4) | (5) | (5) |
| Total | 240 | 209 | 193 |
| Reported in other income and deductions: | | | |
| Current: | | | |
| US federal | 21 | 45 | 55 |
| State | — | 1 | 1 |
| Deferred federal | (18) | (19) | (29) |
| Total | 3 | 27 | 27 |
| Total income tax expense | $ 243 | $ 236 | $ 220 |

Reconciliation of income taxes computed at the US federal statutory rate to income taxes:

| | Year Ended December 31, | | |
| | 2012 | 2011 | 2010 |
|---|---|---|---|
| Income before income taxes | $ 583 | $ 596 | $ 567 |
| Income taxes at the US federal statutory rate of 35% | $ 204 | $ 209 | $ 198 |
| Amortization of investment tax credits — net of deferred tax effect | (4) | (5) | (5) |
| Amortization (under regulatory accounting) of statutory tax rate changes | (3) | (3) | (3) |
| Amortization of Medicare subsidy regulatory asset | 14 | — | — |
| Texas margin tax, net of federal tax benefit | 14 | 14 | 13 |
| Medicare subsidy | — | — | (1) |
| Nondeductible losses (gains) on benefit plan investments | (2) | (1) | (1) |
| Other, including audit settlements | 20 | 22 | 19 |
| Income tax expense | $ 243 | $ 236 | $ 220 |
| Effective rate | 41.7% | 39.6% | 38.8% |

At December 31, 2012 and 2011, net amounts of $1.710 billion and $1.615 billion, respectively, were reported in the balance sheets as accumulated deferred income taxes. These amounts include $1.713 billion and $1.605 billion, respectively, related to our investment in the Oncor partnership.

We also have AMT credit carryforwards and NOL carryforwards related to our investment in the Oncor partnership. At December 31, 2012 and 2011, we had $52 million and $49 million of alternative minimum tax (AMT) credit carryforwards, respectively, available to offset future tax sharing payments. The AMT credit carryforwards have no expiration date. At December 31, 2012, we had net operating loss (NOL) carryforwards for federal income tax purposes of $217 million that expire between 2028 and 2032. The NOL carryforwards can be used to offset future taxable income. We expect to use all of our NOL carryforwards prior to their expiration date.

15

*Accounting For Uncertainty in Income Taxes*

EFH Corp. and its subsidiaries file or have filed income tax returns in US federal, state and foreign jurisdictions and are subject to examinations by the IRS and other taxing authorities. Examinations of EFH Corp. and its subsidiaries' income tax returns for the years ending prior to January 1, 2007 are complete, but the tax years 1997 through 2006 remain in appeals with the IRS. Texas franchise and margin tax returns are under examination or still open for examination for tax years beginning after 2002.

The IRS audit for the years 2003 through 2006 was concluded in June 2011. A number of proposed adjustments are in appeals with the IRS. The results of the audit did not affect management's assessment of issues for purposes of determining the liability for uncertain tax positions.

We have been advised by EFH Corp. that the conclusion of all issues contested from the 1997 through 2002 IRS audit, including Joint Committee review, could occur during the first quarter of 2013. Upon such conclusion, we would expect to further reduce the liability for uncertain tax positions by approximately $29 million with a cash payment to EFH Corp. as required under the tax sharing agreement. Other than these items, we do not expect the total amount of liabilities recorded related to uncertain tax positions will change significantly in the next 12 months.

The following table summarizes the changes to the uncertain tax positions, reported in other noncurrent liabilities in our consolidated balance sheet, during the years ended December 31, 2012, 2011 and 2010:

|  | 2012 | 2011 | 2010 |
|---|---|---|---|
| Balance at January 1, excluding interest and penalties | $ 126 | $ 82 | $ 71 |
| Additions based on tax positions related to prior years | 18 | 44 | 31 |
| Reductions based on tax positions related to prior years | — | — | (20) |
| Balance at December 31, excluding interest and penalties | $ 144 | $ 126 | $ 82 |

Of the balances at December 31, 2012 and 2011, $133 million and $115 million, respectively, represent tax positions for which the uncertainty relates to the timing of recognition for tax purposes. The disallowance of such positions would not affect the effective tax rate, but would accelerate the payment of cash under the tax sharing agreement to an earlier period.

Noncurrent liabilities included a total of $25 million and $21 million in accrued interest at December 31, 2012 and 2011, respectively. Amounts recorded related to interest and penalties totaled an expense of $3 million and $2 million in the years ended December 31, 2012 and 2011, respectively, and a benefit of $1 million in the year ended December 31, 2010, as a result of reversals of previously accrued amounts (all amounts after tax). The federal income tax benefit on the interest accrued on uncertain tax positions is recorded as accumulated deferred income taxes.

With respect to tax positions for which the ultimate deductibility is uncertain (permanent items), should EFH Corp. or we sustain such positions on income tax returns previously filed, our liabilities recorded would be reduced by $11 million, resulting in increased net income and a favorable impact on the effective tax rate.

## 4.    REGULATORY ASSETS AND LIABILITIES

Recognition of regulatory assets and liabilities and the amortization periods over which they are expected to be recovered or refunded through rate regulation reflect the decisions of the PUCT.  Components of the regulatory assets and liabilities are provided in the table below.  Regulatory liabilities at December 31, 2011 have been restated to remove the $225 million regulatory liability for nuclear plant decommissioning (see Note 12).  Amounts not earning a return through rate regulation are noted

| | Remaining Rate Recovery/Amortization Period at December 31, 2012 | Carrying Amount | |
| --- | --- | --- | --- |
| | | December 31, 2012 | December 31, 2011 |
| Regulatory assets: | | | |
| Generation-related regulatory assets securitized by transition bonds (a)(e) | 4 years | $    409 | $    531 |
| Employee retirement costs | 7 years | 87 | 103 |
| Employee retirement costs to be reviewed (b)(c) | To be determined | 186 | 74 |
| Employee retirement liability (a)(c)(d) | To be determined | 738 | 707 |
| Self-insurance reserve (primarily storm recovery costs) — net | 7 years | 190 | 221 |
| Self-insurance reserve to be reviewed (b)(c) | To be determined | 128 | 71 |
| Securities reacquisition costs (pre-industry restructure) | 5 years | 41 | 48 |
| Securities reacquisition costs (post-industry restructure) — net | Terms of related debt | 22 | 2 |
| Recoverable amounts in lieu of deferred income taxes — net | Life of related asset or liability | 71 | 104 |
| Rate review expenses (a) | Largely 3 years | 6 | 11 |
| Rate review expenses to be reviewed (b)(c) | To be determined | 1 | 1 |
| Advanced meter customer education costs (c) | 7 years | 10 | 9 |
| Deferred conventional meter depreciation | 8 years | 152 | 107 |
| Deferred advanced metering system costs | 7 years | 2 | — |
| Energy efficiency performance bonus (a) | 1 year | 9 | 8 |
| Under-recovered wholesale transmission service expense (a)(c) | 1 year | 40 | — |
| Wholesale transmission settlement costs | Not applicable | — | 9 |
| Energy efficiency programs (a) | Not applicable | 1 | — |
| Other regulatory assets | Not applicable | — | 1 |
| Total regulatory assets | | 2,093 | 2,007 |
| Regulatory liabilities: | | | |
| Estimated net removal costs | Life of utility plant | 244 | 115 |
| Investment tax credit and protected excess deferred taxes | Various | 28 | 33 |
| Over-collection of transition bond revenues (a)(e) | 4 years | 33 | 37 |
| Deferred advanced metering system revenues | 7 years | — | 52 |
| Committed spending for demand-side management initiatives (a) | Not applicable | — | 25 |
| Over-recovered wholesale transmission service expense (a)(c) | 1 year | — | 13 |
| Energy efficiency programs (a) | Not applicable | — | 2 |
| Total regulatory liabilities | | 305 | 277 |
| Net regulatory asset | | $    1,788 | $    1,730 |

(a)   Not earning a return in the regulatory rate-setting process.
(b)   Costs incurred since the period covered under the last rate review.
(c)   Recovery is specifically authorized by statute or by the PUCT, subject to reasonableness review.
(d)   Represents unfunded liabilities recorded in accordance with pension and OPEB accounting standards.
(e)   Bondco net regulatory assets of $335 million at December 31, 2012 consist of $368 million included in generation-related regulatory assets net of the regulatory liability for over-collection of transition bond revenues of $33 million.  Bondco net regulatory assets of $427 million at December 31, 2011 consist of $464 million included in generation-related regulatory assets net of the regulatory liability for over-collection of transition bond revenues of $37 million.

The Patient Protection and Affordable Care Act and the Health Care and Education Reconciliation Act enacted in March 2010 reduce, effective 2013, the amount of OPEB costs deductible for federal income tax purposes by the amount of the Medicare Part D subsidy received by the EFH Corp. OPEB plans in which we participate. Under income tax accounting rules, deferred tax assets related to accrued OPEB liabilities must be reduced immediately for the future effect of the legislation. Accordingly, in the first quarter of 2010, our deferred tax assets were reduced by $42 million. All of this amount was recorded as a regulatory asset (before gross-up for liability in lieu of deferred income taxes) as the additional amounts due related to income taxes are being recovered in our rates beginning January 1, 2012.

As a result of purchase accounting, in 2007 the carrying value of certain generation-related regulatory assets securitized by transition bonds, which have been reviewed and approved by the PUCT for recovery but without earning a rate of return, was reduced by $213 million. This amount will be accreted to other income over the recovery period remaining at October 10, 2007 (approximately nine years). In August 2011, the PUCT issued a final order in Oncor's rate review filed in January 2011. The rate review included a determination of the recoverability of regulatory assets at June 30, 2010, including the recoverability period of those assets deemed allowable by the PUCT.

In September 2008, the PUCT approved a settlement for Oncor to recover its estimated future investment for advanced metering deployment. Oncor began billing the advanced metering surcharge in the January 2009 billing month cycle. The surcharge is expected to total $1.023 billion over the 11-year recovery period and includes a cost recovery factor of $2.19 per month per residential retail customer and $2.39 to $5.15 per month for non-residential retail customers. Oncor accounts for the difference between the surcharge billings for advanced metering facilities and the allowed revenues under the surcharge provisions, which are based on expenditures and an allowed return, as a regulatory asset or liability. Such differences arise principally as a result of timing of expenditures. As indicated in the table above, the regulatory asset at December 31, 2012 totaled $2 million and the regulatory liability at December 31, 2011 totaled $52 million.

In accordance with the PUCT's August 2009 order in Oncor's rate review, the remaining net book value and anticipated removal cost of existing conventional meters that are being replaced by advanced meters are being charged to depreciation and amortization expense over an 11-year cost recovery period.

See Note 12 for additional information regarding nuclear decommissioning cost recovery.

## 5.    BORROWINGS UNDER CREDIT FACILITIES

At December 31, 2012, Oncor had a $2.4 billion secured revolving credit facility (reflecting a May 2012 $400 million commitment increase as discussed below) to be used for working capital and general corporate purposes, issuances of letters of credit and support for any commercial paper issuances. The revolving credit facility expires in October 2016, and Oncor has the option of requesting up to two one-year extensions, with such extensions subject to certain conditions and lender approval. Pursuant to the terms of the revolving credit facility, Oncor requested and received a $400 million increase in commitments under the revolving credit facility effective May 15, 2012. The terms of the revolving credit facility allow Oncor to request an additional increase in its borrowing capacity of $100 million, provided certain conditions are met, including lender approval.

Borrowings under the revolving credit facility are classified as short-term on the balance sheet and are secured equally and ratably with all of Oncor's other secured indebtedness by a first priority lien on property acquired or constructed for the transmission and distribution of electricity. The property is mortgaged under the Deed of Trust.

At December 31, 2012, Oncor had outstanding borrowings under the revolving credit facility totaling $735 million with an interest rate of 1.46% and outstanding letters of credit totaling $6 million. At December 31, 2011, Oncor had outstanding borrowings under the revolving credit facility totaling $392 million with an interest rate of 1.40% and outstanding letters of credit totaling $6 million.

Borrowings under the revolving credit facility bear interest at per annum rates equal to, at Oncor's option, (i) LIBOR plus a spread ranging from 1.00% to 1.75% depending on credit ratings assigned to Oncor's senior secured non-credit enhanced long-term debt or (ii) an alternate base rate (the highest of (1) the prime rate of JPMorgan Chase, (2) the federal funds effective rate plus 0.50%, and (3) daily one-month LIBOR plus 1.00%) plus a spread ranging from 0.00% to 0.75% depending on credit ratings assigned to Oncor's senior secured non-credit enhanced long-term debt. At December 31, 2012, all outstanding borrowings bore interest at LIBOR plus 1.25%. Amounts borrowed under the facility, once repaid, can be borrowed again from time to time.

An unused commitment fee is payable quarterly in arrears and upon termination or commitment reduction at a rate equal to 0.100% to 0.275% (such spread depending on certain credit ratings assigned to Oncor's senior secured debt) of the daily unused commitments under the revolving credit facility.  Letter of credit fees on the stated amount of letters of credit issued under the revolving credit facility are payable to the lenders quarterly in arrears and upon termination at a rate per annum equal to the spread over adjusted LIBOR.  Customary fronting and administrative fees are also payable to letter of credit fronting banks.  At December 31, 2012, letters of credit bore interest at 1.25%, and a commitment fee (at a rate of 0.175% per annum) was payable on the unfunded commitments under the facility, each based on Oncor's current credit ratings.

Subject to the limitations described below, borrowing capacity available under the credit facility at December 31, 2012 and 2011 was $1.659 billion and $1.602 billion, respectively.  Generally, Oncor's indentures and revolving credit facility limit the incurrence of other secured indebtedness except for indebtedness secured equally and ratably with the indentures and revolving credit facility and certain permitted exceptions.  As described further in Note 6, the Deed of Trust permits Oncor to secure indebtedness (including borrowings under its revolving credit facility) with the lien of the Deed of Trust up to the aggregate of (i) the amount of available bond credits, and (ii) 85% of the lower of the fair value or cost of certain property additions that could be certified to the Deed of Trust collateral agent.  At December 31, 2012, the available borrowing capacity of the revolving credit facility could be fully drawn.

The revolving credit facility contains customary covenants for facilities of this type, restricting, subject to certain exceptions, Oncor and its subsidiaries from, among other things: incurring additional liens; entering into mergers and consolidations; and sales of substantial assets.  In addition, the revolving credit facility requires that Oncor maintain a consolidated senior debt-to-capitalization ratio of no greater than 0.65 to 1.00 and observe certain customary reporting requirements and other affirmative covenants.  For purposes of the ratio, debt is calculated as indebtedness defined in the revolving credit facility (principally, the sum of long-term debt, any capital leases, short-term debt and debt due currently in accordance with US GAAP).  The debt calculation excludes transition bonds issued by Bondco, but includes the unamortized fair value discount related to Bondco.  Capitalization is calculated as membership interests determined in accordance with US GAAP plus indebtedness described above.  At December 31, 2012, Oncor was in compliance with this covenant with a debt-to-capitalization ratio of 0.44 to 1.00 and with all other covenants.

The revolving credit facility also contains customary events of default for facilities of this type, the occurrence of which would allow the lenders to accelerate all outstanding loans and terminate their commitments, including certain changes in control that are not permitted transactions, cross-default provisions in the event Oncor or any of its subsidiaries (other than Bondco) defaults on indebtedness in a principal amount in excess of $100 million or receives judgments for the payment of money in excess of $50 million that are not discharged within 60 days.

19

6.   **LONG-TERM DEBT**

At December 31, 2012 and 2011, our long-term debt consisted of the following:

| | December 31, | |
| | 2012 | 2011 |
|---|---|---|
| Oncor (a): | | |
| 6.375% Fixed Senior Notes due May 1, 2012 | $        — | $        376 |
| 5.950% Fixed Senior Notes due September 1, 2013 | — | 524 |
| 6.375% Fixed Senior Notes due January 15, 2015 | 500 | 500 |
| 5.000% Fixed Senior Notes due September 30, 2017 | 324 | 324 |
| 6.800% Fixed Senior Notes due September 1, 2018 | 550 | 550 |
| 5.750% Fixed Senior Notes due September 30, 2020 | 126 | 126 |
| 4.100% Fixed Senior Notes due June 1, 2022 | 400 | — |
| 7.000% Fixed Debentures due September 1, 2022 | 800 | 800 |
| 7.000% Fixed Senior Notes due May 1, 2032 | 500 | 500 |
| 7.250% Fixed Senior Notes due January 15, 2033 | 350 | 350 |
| 7.500% Fixed Senior Notes due September 1, 2038 | 300 | 300 |
| 5.250% Fixed Senior Notes due September 30, 2040 | 475 | 475 |
| 4.550% Fixed Senior Notes due December 1, 2041 | 300 | 300 |
| 5.300% Fixed Senior Notes due June 1, 2042 | 500 | — |
| Unamortized discount | (35) | (38) |
| Less amounts due currently | — | (376) |
| Total Oncor | 5,090 | 4,711 |
| Oncor Electric Delivery Transition Bond Company LLC (b): | | |
| 4.950% Fixed Series 2003 Bonds due in semiannual installments through February 15, 2013 | 10 | 5 6 |
| 5.420% Fixed Series 2003 Bonds due in semiannual installments through August 15, 2015 (c) | 145 | 145 |
| 4.810% Fixed Series 2004 Bonds due in semiannual installments through November 15, 2012 | — | 63 |
| 5.290% Fixed Series 2004 Bonds due in semiannual installments through May 15, 2016 | 281 | 290 |
| Unamortized fair value discount related to transition bonds | (1) | (3) |
| Less amounts due currently | (125) | (118) |
| Total Oncor Electric Delivery Transition Bond Company LLC | 310 | 433 |
| Total long-term debt (d) | $    5,400 | $    5,144 |

_____

(a)   Secured by first priority lien on certain transmission and distribution assets equally and ratably with all of Oncor's other secured indebtedness.   See "Deed of Trust" below for additional information.

(b)   The transition bonds are nonrecourse to Oncor and were issued to securitize a regulatory asset.

(c)   Principal payments commence in February 2013.

(d)   According to our organizational documents, Oncor Holdings (parent) is prohibited from directly incurring indebtedness for borrowed money.

*Debt-Related Activity in 2012*

*Debt Repayments*

Repayments of long-term debt in 2012 totaled $1.018 billion and represented $376 million principal amount of 6.375% senior secured notes paid at the scheduled maturity date of May 1, 2012, the redemption of $524 million principal amount of 5.950% senior secured notes due September 1, 2013 (2013 Notes) as discussed below and $118 million principal amount of transition bonds paid at scheduled maturity dates.

In June 2012, pursuant to the terms of the indenture and officer's certificate governing the 2013 Notes, Oncor redeemed all of the 2013 Notes.  Oncor paid a redemption price equal to 100% of the principal amount of the 2013 Notes plus a make-whole amount of $33 million.  For accounting purposes, the make-whole amount has been deferred as a regulatory asset and will be amortized to interest expense until September 1, 2013, the original maturity date of the 2013 Notes (see Note 4).

*Issuance of New Senior Secured Notes*

In May 2012, Oncor issued $400 million aggregate principal amount of 4.100% senior secured notes maturing in June 2022 (2022 Notes) and $500 million aggregate principal amount of 5.300% senior secured notes maturing in June 2042 (2042 Notes, and collectively with the 2022 Notes, the Notes).  Oncor used the proceeds (net of the initial purchasers' discount, fees and expenses) of approximately $890 million from the sale of the Notes to repay borrowings under its revolving credit facility, redeem the 2013 Notes (as discussed above) and for other general corporate purposes.  The Notes are secured equally and ratably with all of Oncor's other secured indebtedness pursuant to the Deed of Trust by a first priority lien on property acquired or constructed for the transmission and distribution of electricity.

Interest on the Notes is payable in cash semiannually in arrears on June 1 and December 1 of each year, beginning on December 1, 2012.  Oncor may at its option at any time and from time to time redeem all or part of the Notes at a price equal to 100% of their principal amount, plus accrued and unpaid interest and a make-whole premium.  The Notes also contain customary events of default, including failure to pay principal or interest on the Notes when due.

The Notes were issued in a private placement, and in August 2012 Oncor offered holders of the Notes the opportunity to exchange their respective Notes for notes that have terms identical in all material respects to the Notes (Exchange Notes), except that the Exchange Notes do not contain terms with respect to transfer restrictions, registration rights and payment of additional interest for failure to observe certain obligations in a certain registration rights agreement. The Exchange Notes were registered on a Form S-4, which was declared effective in July 2012.

*Deed of Trust*

Oncor's secured indebtedness, including the 2022 and 2042 Notes described above and the revolving credit facility described in Note 5, are secured equally and ratably by a first priority lien on property Oncor acquired or constructed for the transmission and distribution of electricity.  The property is mortgaged under the Deed of Trust. The Deed of Trust permits Oncor to secure indebtedness (including borrowings under our revolving credit facility) with the lien of the Deed of Trust up to the aggregate of (i) the amount of available bond credits, and (ii) 85% of the lower of the fair value or cost of certain property additions that could be certified to the Deed of Trust collateral agent.  At December 31, 2012, the amount of available bond credits was approximately $2.2 billion and the amount of future debt Oncor could secure with property additions, subject to those property additions being certified to the Deed of Trust collateral agent, was $731 million.

**Debt-Related Activity in 2011**

*Debt Repayments*

Repayments of long-term debt in 2011 totaled $113 million and represented transition bond principal payments at scheduled maturity dates.

*Interest Rate Hedge Transaction*

In August 2011, Oncor entered into an interest rate hedge transaction hedging the variability of treasury bond rates used to determine interest rates on an anticipated issuance of senior secured notes (see below for information regarding the debt issuance).  The hedges were terminated in November 2011 upon the issuance of the senior secured notes. In 2011, Oncor recognized the $46 million ($29 million after tax) loss related to the fair value of the hedge transaction in other comprehensive income, which is expected to be reclassified into net income over the life of the senior secured notes issued, which mature in 2041.

*Issuance of New Senior Secured Notes*

In November 2011, Oncor issued $300 million aggregate principal amount of 4.550% senior secured notes maturing in December 2041 (2041 Notes). Oncor used the net proceeds of approximately $297 million from the sale of the notes to repay borrowings under its revolving credit facility, including loans under the revolving credit facility and for general corporate purposes. The notes are secured by the first priority lien described below, and are secured equally and ratably with all of Oncor's other secured indebtedness.

Interest on the 2041 Notes is payable in cash semiannually in arrears on June 1 and December 1 of each year, beginning on June 1, 2012. Oncor may at its option redeem the notes, in whole or in part, at any time, at a price equal to 100% of their principal amount, plus accrued and unpaid interest and a "make-whole" premium. The notes also contain customary events of default, including failure to pay principal or interest on the notes when due.

The 2041 Notes were issued in a private placement, and in August 2012 Oncor offered holders of the 2041 Notes the opportunity to exchange their respective 2041 Notes for notes that have terms identical in all material respects to the 2041 Notes (2041 Exchange Notes), except that the 2041 Exchange Notes do not contain terms with respect to transfer restrictions, registration rights and payment of additional interest for failure to observe certain obligations in a certain registration rights agreement. The 2041 Exchange Notes were registered on a Form S-4, which was declared effective in July 2012.

*Maturities*

Long-term debt maturities at December 31, 2012 are as follows:

| Year: | Amount |
|---|---|
| 2013 | $    125 |
| 2014 | 131 |
| 2015 | 639 |
| 2016 | 41 |
| 2017 | 324 |
| Thereafter | 4,301 |
| Unamortized fair value discount | (1) |
| Unamortized discount | (35) |
| Total | $    5,525 |

*Fair Value of Long-Term Debt*

The estimated fair value of our long-term debt (including current maturities) totaled $6.568 billion and $6.705 billion at December 31, 2012 and 2011, respectively, and the carrying amount totaled $5.525 billion and $5.638 billion, respectively. The fair value is estimated based upon the market value as determined by quoted market prices, representing Level 1 valuations under accounting standards related to the determination of fair value.

22

7.    **COMMITMENTS AND CONTINGENCIES**

*Leases*

    At December 31, 2012, future minimum lease payments under operating leases (with initial or remaining noncancelable lease terms in excess of one year) were as follows:

| Year | Amount |
|------|-------:|
| 2013 | $         7 |
| 2014 | 5 |
| 2015 | 4 |
| 2016 | 3 |
| 2017 | 1 |
| Thereafter | — |
| Total future minimum lease payments | $        20 |

    Rent charged to operation and maintenance expense totaled $15 million for each of the years ended December 31, 2012, 2011 and 2010.

*Capital Expenditures*

    Oncor and Texas Holdings agreed with major interested parties to the terms of a stipulation that was approved by the PUCT in 2008 as discussed in Note 2. As one of the provisions of this stipulation, Oncor committed to minimum capital spending of $3.6 billion over the five-year period ending December 31, 2012, subject to certain defined conditions.  At December 31, 2012, Oncor had satisfied this spending commitment.  These expenditures did not include the CREZ facilities.

*Efficiency Spending*

    Oncor is required to annually invest in programs designed to improve customer electricity demand efficiencies to satisfy ongoing regulatory requirements. The 2013 requirement is $62 million.

*Guarantees*

    Oncor has entered into contracts that contain guarantees to unaffiliated parties that could require performance or payment under certain conditions as discussed below.

    Oncor is the lessee under various operating leases that obligate it to guarantee the residual values of the leased assets.  At December 31, 2012, both the aggregate maximum amount of residual values guaranteed and the estimated residual recoveries totaled $7 million.  These leased assets consist primarily of vehicles used in distribution activities.  The average life of the residual value guarantees under the lease portfolio is approximately 1.7 years.

    For the purpose of obtaining greater access to materials, Oncor has guaranteed the repayment of borrowings under a nonaffiliated party's $7 million credit facility maturing on March 31, 2013.  The nonaffiliated party's borrowings under the credit facility are limited to inventory produced solely to satisfy the terms of a contract with Oncor. Oncor would be entitled to the related inventory upon repayment of the credit facility (or payment to the nonaffiliated party).  At December 31, 2012, the nonaffiliated party had borrowings of $4 million under the facility.

*Legal/Regulatory Proceedings*

In October 2010, the PUCT established Docket No. 38780 for the remand of Docket No. 20381, the 1999 wholesale transmission charge matrix case.  A joint settlement agreement was entered into effective October 6, 2003.  This settlement resolves disputes regarding wholesale transmission pricing and charges for the period of January 1997 through August 1999, the period prior to the September 1, 1999 effective date of the legislation that authorized 100% postage stamp pricing for ERCOT wholesale transmission.  After a series of appeals became final, the 1999 matrix docket was remanded to the PUCT to address two additional issues.

The first issue is the wholesale transmission transition mechanism for the period of September 1999 through December 1999.  The disputed issue is whether the PUCT should have allowed the transition mechanism to continue for the last four months of 1999.  The appealing parties (Texas Municipal Power Agency, the City of Denton, the City of Garland and GEUS (formerly known as Greenville Electric Utility System)) argued that the transition mechanism was not authorized in the September 1, 1999 100% postage stamp pricing legislation.  Oncor's transmission deficit position was mitigated by approximately $8 million in the last four months of 1999 through the transition mechanism.  In October 2011, certain parties filed a proposed settlement of this issue, subject to PUCT approval, in which Oncor would pay approximately $9 million including interest through October 9, 2003.  The PUCT approved the settlement in January 2012. No appeals were filed prior to the appeals deadline, and the PUCT order became final in February 2012.  Oncor made the payment in accordance with the settlement in February 2012.  In November 2012, the PUCT gave its final approval of the TCRF application allowing Oncor recovery of the $9 million settlement payment through TCRF billings during the period of September 2012 through February 2013.

The second issue is the San Antonio City Public Service Board's (CPSB) claim that the PUCT did not have the authority to reduce CPSB's requested transmission cost of service (TCOS) revenue requirement.  CPSB's initial TCOS rate was in effect from 1997 through 2000.  Since the period of January 1997 through August 1999 is incorporated in the joint settlement, CPSB's remaining claim is for the period of September 1999 through December 2000.  In January 2011, CPSB made a filing with the PUCT (PUCT Docket No. 39068), seeking an additional $22 million of TCOS revenue, including interest, for the 16-month period, of which Oncor would be responsible for approximately $11 million.  In late 2011, Oncor intervened in the proceeding and, along with several other parties, filed motions to dismiss CPSB's request.  In January 2012, the PUCT upheld an administrative law judge's earlier decision to dismiss CPSB's request. No appeals were filed prior to the appeals deadline, and the PUCT order became final in February 2012.

We are involved in other various legal and administrative proceedings in the normal course of business, the ultimate resolution of which, in the opinion of management, should not have a material effect upon our financial position, results of operations or cash flows.

*Labor Contracts*

Certain Oncor employees are represented by a labor union and covered by a collective bargaining agreement with an expiration date of October 25, 2013.

*Environmental Contingencies*

Oncor must comply with environmental laws and regulations applicable to the handling and disposal of hazardous waste.  Oncor is in compliance with all current laws and regulations; however, the impact, if any, of changes to existing regulations or the implementation of new regulations is not determinable. The costs to comply with environmental regulations can be significantly affected by the following external events or conditions:

- changes to existing state or federal regulation by governmental authorities having jurisdiction over control of toxic substances and hazardous and solid wastes, and other environmental matters, and
- the identification of additional sites requiring clean-up or the filing of other complaints in which Oncor may be asserted to be a potential responsible party.

8.    **MEMBERSHIP INTERESTS**

On February 13, 2013, our board of directors declared a cash distribution of $31 million , which was paid to EFIH on February 15, 2013.

During 2012, our board of directors declared, and we paid, the following cash distributions to EFIH:

| Declaration Date | Payment Date | Amount Paid |
|---|---|---|
| October 24, 2012 | October 30, 2012 | $47 |
| July 25, 2012 | July 31, 2012 | 31 |
| April 25, 2012 | May 1, 2012 | 33 |
| February 14, 2012 | February 21, 2012 | 36 |

During 2011, our board of directors declared, and we paid, the following cash distributions to EFIH:

| Declaration Date | Payment Date | Amount Paid |
|---|---|---|
| October 25, 2011 | October 26, 2011 | $52 |
| July 27, 2011 | July 28, 2011 | 32 |
| April 27, 2011 | April 28, 2011 | 16 |
| February 15, 2011 | February 16, 2011 | 16 |

While there are no direct restrictions on our ability to distribute our net income that are currently material, substantially all of our net income is derived from Oncor. Our board of directors and Oncor's board of directors, which are composed of a majority of independent directors, can withhold distributions to the extent the boards determine that it is necessary to retain such amounts to meet our expected future requirements.

Until December 31, 2012, Oncor's distributions were limited to its cumulative net income and regulatory capital structure restrictions.   Effective January 1, 2013, distributions are limited only to the extent Oncor maintains a required regulatory capital structure as discussed below.

Oncor's distributions continue to be limited by its required regulatory capital structure to be at or below the assumed debt-to-equity ratio established periodically by the PUCT for ratemaking purposes, which is currently set at 60% debt to 40% equity.   At December 31, 2012, Oncor's regulatory capitalization ratio was 58.8% debt and 41.2% equity. The PUCT has the authority to determine what types of debt and equity are included in a utility's debt-to-equity ratio. For purposes of this ratio, debt is calculated as long-term debt plus unamortized gains on reacquired debt less unamortized issuance expenses, premiums and losses on reacquired debt.  The debt calculation excludes transition bonds issued by Bondco.  Equity is calculated as membership interests determined in accordance with US GAAP, excluding the effects of purchase accounting (which included recording the initial goodwill and fair value adjustments and the subsequent related impairments and amortization).  At December 31, 2012, $167 million was available for distribution to Oncor's members under the capital structure restriction, of which approximately 80% relates to Oncor's ownership interest.

For the period beginning October 11, 2007 and ending December 31, 2012, Oncor's cash distributions (other than distributions of the proceeds of any issuance of limited liability company units) were limited by the Limited Liability Company Agreement and a stipulation agreement with the PUCT to an amount not to exceed Oncor's cumulative net income determined in accordance with US GAAP, as adjusted by applicable orders of the PUCT.  Adjustments consisted of the removal of noncash impacts of purchase accounting and deducting two specific cash commitments.  The noncash impacts consisted of removing the effect of an $860 million goodwill impairment charge in 2008 and the cumulative amount of net accretion of fair value adjustments.   The two specific cash commitments were the $72 million ($46 million after tax) one-time refund to customers in September 2008 and the funds spent as part of the $100 million commitment for additional energy efficiency initiatives that was completed in 2012.  See Note 2 for additional information regarding the two cash commitments. At December 31, 2012, $420 million of membership interests was available for distribution under the cumulative net income restriction of which approximately 80% relates to our ownership interest. However, as discussed above, this restriction is no longer applicable.

9.    **NONCONTROLLING INTERESTS**

At December 31, 2012, Oncor's ownership was as follows: 80.03% held by us, 19.75% held by Texas Transmission and 0.22% held indirectly by certain members of Oncor's management team and board of directors.

10.   **PENSION AND OTHER POSTRETIREMENT EMPLOYEE BENEFITS (OPEB) PLANS**

*Regulatory Recovery of Pension and OPEB Costs*

PURA provides for Oncor's recovery of pension and OPEB costs applicable to services of its active and retired employees, as well as services of other EFH Corp. active and retired employees prior to the deregulation and disaggregation of EFH Corp.'s electric utility businesses effective January 1, 2002 (recoverable service). Accordingly, Oncor entered into an agreement with EFH Corp. whereby it assumed responsibility for applicable pension and OPEB costs related to those personnel's recoverable service.

Oncor is authorized to establish a regulatory asset or liability for the difference between the amounts of pension and OPEB costs approved in current billing rates and the actual amounts that would otherwise have been recorded as charges or credits to earnings related to recoverable service.  Amounts deferred are ultimately subject to regulatory approval. At December 31, 2012 and 2011, Oncor had recorded regulatory assets totaling $1.011 billion and $884 million, respectively, related to pension and OPEB costs, including amounts related to deferred expenses as well as amounts related to unfunded liabilities that otherwise would be recorded as other comprehensive income.

In a 2012 agreement described below, Oncor assumed primary responsibility for retirement costs related to certain non-recoverable service.  Any retirement costs associated with non-recoverable service is not recoverable through rates.

*Pension Plan*

Oncor participates in two defined benefit pension plans.  The EFH Retirement Plan and the Oncor Retirement Plan are qualified pension plans under Section 401(a) of the Internal Revenue Code of 1986, as amended (Code), and are subject to the provisions of ERISA.  All benefits are funded by the participating employers. The pension plans provide benefits to participants under one of two formulas: (i) a Cash Balance Formula under which participants earn monthly contribution credits based on their compensation and a combination of their age and years of service, plus monthly interest credits or (ii) a Traditional Retirement Plan Formula based on years of service and the average earnings of the three years of highest earnings.  The interest component of the Cash Balance Formula is variable and is determined using the yield on 30-year Treasury bonds.  Under the Cash Balance Formula, future increases in earnings will not apply to prior service costs.

All eligible employees hired after January 1, 2001 participate under the Cash Balance Formula.  Certain employees, who, prior to January 1, 2002, participated under the Traditional Retirement Plan Formula, continue their participation under that formula.  It is the participating employers' policy to fund the plans on a current basis to the extent deductible under existing federal tax regulations.

In August 2012, EFH Corp. approved certain amendments to the EFH Retirement Plan.  These actions were completed in the fourth quarter of 2012, and the amendments resulted in:

- the splitting off of assets and liabilities under the plan associated with Oncor's employees and all retirees and terminated vested participants of EFH Corp. and its subsidiaries (including discontinued businesses) to a new qualified pension plan that provides benefits identical to those provided under the EFH Retirement Plan, for which Oncor assumed sponsorship from EFH Corp. effective January 1, 2013 (Oncor Retirement Plan);

- maintaining assets and liabilities under the plan associated with active collective bargaining unit (union) employees of EFH Corp.'s competitive subsidiaries under the current plan;

- the splitting off of assets and liabilities under the plan associated with all other plan participants (active nonunion employees of EFH Corp.'s competitive businesses) to a terminating plan, freezing benefits and vesting all accrued plan benefits for these participants, and

- the termination of, distributions of benefits under, and settlement of all of EFH Corp.'s liabilities under the terminating plan.

26

As a result of these actions and in connection with assuming sponsorship of the Oncor Retirement Plan, Oncor entered into an agreement with EFH Corp. to assume primary responsibility for benefits of certain participants for whom EFH Corp. bore primary funding responsibility (a closed group of retired and terminated vested plan participants not related to Oncor's regulated utility business) at December 31, 2012.   As Oncor received a corresponding amount of assets with the assumed liabilities, execution of the agreement did not have a material impact on its reported results of operations or financial condition.   In the fourth quarter of 2012, EFH Corp. made cash contributions totaling $259 million to settle the terminating plan obligations and fully fund its obligations under the Oncor Retirement Plan.

Oncor also has supplemental pension plans for certain employees whose retirement benefits cannot be fully earned under the qualified retirement plan, the information for which is included below.

In July 2012, the US Congress enacted legislation that includes, among other things, pension funding stabilization provisions.  These provisions are expected to reduce required minimum pension plan contributions in the near term, but have no impact on long-term funding levels absent a sustained low interest rate environment.

### OPEB Plan

Oncor participates with EFH Corp. and other subsidiaries of EFH Corp. to offer certain health care and life insurance benefits to eligible employees and their eligible dependents upon the retirement of such employees (OPEB Plan).  For employees retiring on or after January 1, 2002, the retiree contributions required for such coverage vary based on a formula depending on the retiree's age and years of service.

### Pension and OPEB Costs Recognized as Expense

The pension and OPEB amounts provided herein include Oncor's allocated amounts related to EFH Corp.'s plans based on actuarial computations and reflect Oncor's employee and retiree demographics as described above.  Oncor recognized the following net pension and OPEB costs as expense:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2012 | 2011 | 2010 |
| Components of net pension costs: | | | |
| Pension costs (a) | $ 179 | $ 95 | $ 67 |
| OPEB costs | 27 | 74 | 63 |
| Total benefit costs | 206 | 169 | 130 |
| Less amounts deferred as a regulatory asset or property | (169) | (132) | (93) |
| Net amounts recognized as expense | $ 37 | $ 37 | $ 37 |

Oncor and EFH Corp. use the calculated value method to determine the market-related value of the assets held in the trust for purposes of calculating pension cost. Oncor and EFH Corp. include the realized and unrealized gains or losses in the market-related value of assets over a rolling four-year period. Each year, 25% of such gains and losses for the current year and for each of the preceding three years is included in the market-related value.  Each year, the market-related value of assets is increased for contributions to the plan and investment income and is decreased for benefit payments and expenses for that year.

Oncor and EFH Corp. use the fair value method to determine the market-related value of the assets held in the trust for purposes of calculating OPEB cost.

27

*Detailed Information Regarding Pension and OPEB Benefits*

The following pension and OPEB information is based on December 31, 2012, 2011 and 2010 measurement dates:

| | Pension Plan | | | OPEB Plan | | |
|---|---|---|---|---|---|---|
| | Year Ended December 31, | | | Year Ended December 31, | | |
| | 2012 | 2011 | 2010 | 2012 | 2011 | 2010 |
| ***Assumptions Used to Determine Net Periodic Pension and Benefit Cost:*** | | | | | | |
| Discount rate (a) | 5.00% | 5.50% | 5.90% | 4.95% | 5.55% | 5.90% |
| Expected return on plan assets | 7.40% | 7.70% | 8.00% | 6.80% | 7.10% | 7.60% |
| Rate of compensation increase | 3.81% | 3.74% | 3.71% | — | — | — |
| ***Components of Net Pension and Benefit Cost:*** | | | | | | |
| Service cost | $  23 | $  20 | $  19 | $  5 | $  7 | $  6 |
| Interest cost | 106 | 110 | 106 | 39 | 54 | 52 |
| Expected return on assets | (109) | (99) | (97) | (12) | (14) | (15) |
| Amortization of net transition obligation | — | — | — | 1 | 1 | 1 |
| Amortization of prior service cost (credit) | — | 1 | 1 | (20) | (1) | (1) |
| Amortization of net loss | 78 | 63 | 38 | 14 | 27 | 20 |
| Settlement charges | 81 | — | — | — | | |
| Net periodic pension and benefit cost | 179 | 95 | 67 | 27 | 74 | 63 |
| ***Other Changes in Plan Assets and Benefit Obligations Recognized as Regulatory Assets or in Other Comprehensive Income:*** | | | | | | |
| Net loss (gain) | 110 | 106 | 124 | 83 | (91) | 75 |
| Prior service cost (credit) | — | — | — | — | (127) | 1 |
| Amortization of net loss | (78) | (63) | (38) | (14) | (27) | (20) |
| Amortization of transition obligation (asset) | — | — | — | (1) | (1) | (1) |
| Amortization of prior service (cost) credit | — | (1) | (1) | 20 | 1 | — |
| Settlement charges | (81) | — | — | — | — | — |
| Curtailment | (5) | — | — | — | — | — |
| Total recognized as regulatory assets or other comprehensive income | (54) | 42 | 85 | 88 | (245) | 55 |
| Total recognized in net periodic pension and benefit costs and as regulatory assets or other comprehensive income | $  125 | $  137 | $  152 | $  115 | $  (171) | $  118 |

_____

(a)   As a result of the amendments discussed above, the discount rate reflected in net pension costs for January through July 2012 was 5.00%, for August through September 2012 was 4.15% and for October through December 2012 was 4.20% .

| | Pension Plans | | | OPEB Plan | | |
|---|---|---|---|---|---|---|
| | Year Ended December 31, | | | Year Ended December 31, | | |
| | 2012 | 2011 | 2010 | 2012 | 2011 | 2010 |
| ***Assumptions Used to Determine Benefit Obligations at Period End:*** | | | | | | |
| Discount rate | 4.10% | 5.00% | 5.50% | 4.10% | 4.95% | 5.55% |
| Rate of compensation increase | 3.94% | 3.81% | 3.74% | — | — | — |

| | Pension Plan | | OPEB Plan | |
| --- | --- | --- | --- | --- |
| | Year Ended December 31, | | Year Ended December 31, | |
| | 2012 | 2011 | 2012 | 2011 |
| ***Change in Projected Benefit Obligation:*** | | | | |
| Projected benefit obligation at beginning of year | $ 2,215 | $ 2,052 | $ 809 | $ 1,004 |
| Service cost | 23 | 20 | 5 | 7 |
| Interest cost | 106 | 110 | 39 | 54 |
| Participant contributions | — | — | 15 | 14 |
| Medicare Part D reimbursement | — | — | 3 | 5 |
| Plan amendments | — | — | — | (127) |
| Settlement | (268) | — | — | — |
| Curtailment | (5) | — | — | — |
| Assumption of liabilities | 860 | — | 6 | — |
| Actuarial (gain) loss | 198 | 119 | 94 | (97) |
| Benefits paid | (91) | (86) | (58) | (51) |
| Projected benefit obligation at end of year | $ 3,038 | $ 2,215 | $ 913 | $ 809 |
| Accumulated benefit obligation at end of year | $ 2,908 | $ 2,063 | $ — | $ — |
| | | | | |
| ***Change in Plan Assets:*** | | | | |
| Fair value of assets at beginning of year | $ 1,542 | $ 1,341 | $ 197 | $ 208 |
| Actual return (loss) on assets | 199 | 112 | 25 | 8 |
| Employer contributions | 93 | 175 | 11 | 18 |
| Settlement | (268) | — | — | — |
| Assets related to assumed liabilities | 852 | — | — | — |
| Participant contributions | — | — | 15 | 14 |
| Benefits paid | (91) | (86) | (58) | (51) |
| Fair value of assets at end of year | 2,327 | 1,542 | 190 | 197 |
| | | | | |
| ***Funded Status:*** | | | | |
| Projected benefit obligation at end of year | $ (3,038) | $ (2,215) | $ (913) | $ (809) |
| Fair value of assets at end of year | 2,327 | 1,542 | 190 | 197 |
| Funded status at end of year | $ (711) | $ (673) | $ (723) | $ (612) |

29

| | Pension Plan | | OPEB Plan | |
| | Year Ended December 31, | | Year Ended December 31, | |
| *Amounts Recognized in the Balance Sheet Consist of :* | 2012 | 2011 | 2012 | 2011 |
|---|---|---|---|---|
| Liabilities: | | | | |
| Other current liabilities | $ (3) | $ (3) | $ — | $ — |
| Other noncurrent liabilities | (708) | (670) | (723) | (612) |
| Net liability recognized | $ (711) | $ (673) | $ (723) | $ (612) |
| Regulatory assets: | | | | |
| Net loss | $ 602 | $ 659 | $ 247 | $ 178 |
| Prior service cost (credit) | — | — | (111) | (131) |
| Net transition obligation | — | — | — | 1 |
| Net regulatory asset recognized | 602 | 659 | 136 | 48 |
| Accumulated other comprehensive net loss | $ 3 | $ — | $ 1 | $ — |

The following tables provide information regarding the assumed health care cost trend rates

| | Year Ended December 31, | |
| | 2012 | 2011 |
|---|---|---|
| *Assumed Health Care Cost Trend Rates - Not Medicare Eligible:* | | |
| Health care cost trend rate assumed for next year | 8.50% | 9.00% |
| Rate to which the cost trend is expected to decline (the ultimate trend rate) | 5.00% | 5.00% |
| Year that the rate reaches the ultimate trend rate | 2022 | 2022 |
| | | |
| *Assumed Health Care Cost Trend Rates - Medicare Eligible:* | | |
| Health care cost trend rate assumed for next year | 7.50% | 8.00% |
| Rate to which the cost trend is expected to decline (the ultimate trend rate) | 5.00% | 5.00% |
| Year that the rate reaches the ultimate trend rate | 2022 | 2022 |

| | 1-Percentage Point Increase | 1-Percentage Point Decrease |
|---|---|---|
| *Sensitivity Analysis of Assumed Health Care Cost Trend Rates:* | | |
| Effect on accumulated postretirement obligation | $ 115 | $ (99) |
| Effect on postretirement benefits cost | 6 | (5) |

The following table provides information regarding pension plans with projected benefit obligations (PBO) and accumulated benefit obligations (ABO) in excess of the fair value of plan assets.

| | At December 31, | |
| | 2012 | 2011 |
|---|---|---|
| *Pension Plans with PBO and ABO in Excess of Plan Assets:* | | |
| Projected benefit obligations | $ 3,038 | $ 2,215 |
| Accumulated benefit obligations | 2,908 | 2,063 |
| Plan assets | 2,327 | 1,542 |

*Pension Plans and OPEB Plan Investment Strategy and Asset Allocations*

Oncor's investment objective for the retirement plans is to invest in a suitable mix of assets to meet the future benefit obligations at an acceptable level of risk, while minimizing the volatility of contributions. Equity securities are held to achieve returns in excess of passive indexes by participating in a wide range of investment opportunities. International equity securities are used to further diversify the equity portfolio and may include investments in both developed and emerging international markets. Fixed income securities include primarily corporate bonds from a diversified range of companies, US Treasuries and agency securities and money market instruments. The investment strategy for fixed income investments is to maintain a high grade portfolio of securities, which assists Oncor in managing the volatility and magnitude of plan contributions and expense while maintaining sufficient cash and short-term investments to pay near-term benefits and expenses.

The retirement plans' investments are managed in two pools: one associated with the recoverable service portion of plan obligations related to Oncor's regulated utility business, and the other associated with plan obligations for the closed group of retired and terminated plan participants not related to Oncor's regulated utility business that it assumed from EFH Corp. in connection with Oncor's sponsorship of the Oncor Plan, as discussed above. The recoverable service portion is invested in a broadly diversified portfolio of equity and fixed income securities. The nonrecoverable service portion is invested in fixed income securities intended to fully hedge the obligations, within practical limitations.

The target asset allocation ranges of pension plan investments by asset category are as follows:

| Asset Category | Target Allocation Ranges | |
|---|---|---|
| | Recoverable | Nonrecoverable |
| US equities | 24%-31% | — |
| International equities | 20%-25% | — |
| Fixed income | 45%-57% | 100% |

The investment objective for the OPEB Plan primarily follows the objectives of the pension plans discussed above, while maintaining sufficient cash and short-term investments to pay near-term benefits and expenses. The actual amounts at December 31, 2012 provided below are consistent with the asset allocation targets

*Fair Value Measurement of Pension Plan Assets*

At December 31, 2012 and 2011, pension plan assets measured at fair value on a recurring basis consisted of the following:

| Asset Category | At December 31, 2012 | | | | At December 31, 2011 | | | |
|---|---|---|---|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Total | Level 1 | Level 2 | Level 3 | Total |
| Interest-bearing cash | $    — | $    134 | $    — | $    134 | $    — | $    60 | $    — | $    60 |
| Equity securities: | | | | | | | | |
|   US | 206 | 95 | — | 301 | 263 | 54 | — | 317 |
|   International | 280 | 7 | — | 287 | 152 | 50 | — | 202 |
| Fixed income securities: | | | | | | | | |
|   Corporate bonds (a) | — | 1,319 | — | 1,319 | — | 859 | — | 859 |
|   US Treasuries | — | 206 | — | 206 | — | 34 | — | 34 |
|   Other (b) | — | 73 | — | 73 | — | 61 | — | 61 |
| Preferred securities | — | — | 7 | 7 | — | — | 9 | 9 |
|   Total assets | $    486 | $ 1,834 | $    7 | $ 2,327 | $    415 | $ 1,118 | $    9 | $ 1,542 |

_____
(a) Substantially all corporate bonds are rated investment grade by a major ratings agency such as Moody's.
(b) Other consists primarily of US agency securities.

There was no significant change in the fair value of Level 3 assets in the periods presented.

31

*Fair Value Measurement of OPEB Plan Assets*

At December 31, 2012 and 2011, OPEB Plan assets measured at fair value on a recurring basis consisted of the following:

| | At December 31, 2012 | | | | At December 31, 2011 | | | |
|---|---|---|---|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Total | Level 1 | Level 2 | Level 3 | Total |
| **Asset Category** | | | | | | | | |
| Interest-bearing cash | $ — | $ 10 | $ — | $ 10 | $ — | $ 10 | $ — | $ 10 |
| Equity securities: | | | | | | | | |
| US | 49 | 6 | — | 55 | 52 | 3 | — | 55 |
| International | 31 | — | — | 31 | 23 | 3 | — | 26 |
| Fixed income securities: | | | | | | | | |
| Corporate bonds (a) | — | 42 | — | 42 | — | 54 | — | 54 |
| US Treasuries | — | 4 | — | 4 | — | 2 | — | 2 |
| Other (b) | 45 | 3 | — | 48 | 46 | 3 | — | 49 |
| Preferred securities | — | — | — | — | — | — | 1 | 1 |
| Total assets | $ 125 | $ 65 | $ — | $ 190 | $ 121 | $ 75 | $ 1 | $ 197 |

_____
(a) Substantially all corporate bonds are rated investment grade by a major ratings agency such as Moody's.
(b) Other consists primarily of US agency securities.

There was no significant change in the fair value of Level 3 assets in the periods presented.

*Expected Long-Term Rate of Return on Assets Assumption*

The retirement plans' strategic asset allocation is determined in conjunction with the plans' advisors and utilizes a comprehensive Asset-Liability modeling approach to evaluate potential long-term outcomes of various investment strategies.  The modeling incorporates long-term rate of return assumptions for each asset class based on historical and future expected asset class returns, current market conditions, rate of inflation, current prospects for economic growth, and taking into account the diversification benefits of investing in multiple asset classes and potential benefits of employing active investment management.

| Pension Plans | | OPEB Plan | |
|---|---|---|---|
| Asset Class | Expected Long-Term Rate of Return | Plan Type | Expected Long-Term Returns |
| US equity securities | 7.7% | 401(h) accounts | 7.4% |
| International equity securities | 9.3% | Life Insurance VEBA | 6.4% |
| Fixed income securities | 4.1% | Union VEBA | 6.4% |
| Other | 0.6% | Non-Union VEBA | 3.2% |
| Weighted average (a) | 7.4% | Weighted average | 6.7% |

_____
(a) The 2013 expected long-term rate of return for the nonregulated portion of the Oncor Retirement Plan is 4.10%.

*Significant Concentrations of Risk*

The plans' investments are exposed to risks such as interest rate, capital market and credit risks.  Oncor and EFH Corp. seek to optimize return on investment consistent with levels of liquidity and investment risk which are prudent and reasonable, given prevailing capital market conditions and other factors specific to participating employers.  While Oncor and EFH Corp. recognize the importance of return, investments will be diversified in order to minimize the risk of large losses unless, under the circumstances, it is clearly prudent not to do so.  There are also various restrictions and guidelines in place including limitations on types of investments allowed and portfolio weightings for certain investment securities to assist in the mitigation of the risk of large losses.

### Assumed Discount Rate

Oncor and EFH Corp. selected the assumed discount rate using the Aon Hewitt AA Above Median yield curve, which is based on corporate bond yields and at December 31, 2012 consisted of 332 corporate bonds with an average rating of AA using Moody's, S&P and Fitch ratings.

### Amortization in 2013

In 2013, amortization of the net actuarial loss and prior service cost for the defined benefit pension plans from regulatory assets into net periodic benefit cost is expected to be $70 million and less than $1 million, respectively. Amortization of the net actuarial loss and prior service credit for the OPEB Plan from regulatory assets into net periodic benefit cost is expected to be $26 million and a $20 million credit, respectively.

### Pension and OPEB Plan Cash Contributions

Oncor's contributions to the benefit plans were as follows:

|  | Year Ended December 31, | | |
|  | 2012 | 2011 | 2010 |
| --- | --- | --- | --- |
| Pension plans contributions | $ 93 | $ 175 | $ 43 |
| OPEB Plan contributions | 11 | 18 | 18 |
| Total contributions | $ 104 | $ 193 | $ 61 |

Oncor's funding of the pension plans and the OPEB Plan is expected to be $10 million and $12 million, respectively, in 2013. Oncor's funding for the pension plans (based on the funded status at December 31, 2012) and the OPEB Plan is expected to total approximately $395 million and $115 million, respectively, for the 2013 to 2017 period.

### Future Benefit Payments

Estimated future benefit payments to beneficiaries are as follows:

|  | 2013 | 2014 | 2015 | 2016 | 2017 | 2018-22 |
| --- | --- | --- | --- | --- | --- | --- |
| Pension benefits | $ 153 | $ 157 | $ 158 | $ 164 | $ 168 | $ 910 |
| OPEB | $ 43 | $ 45 | $ 48 | $ 51 | $ 53 | $ 291 |

### Thrift Plan

Oncor's employees may participate in a qualified savings plan, the EFH Corp. Thrift Plan (Thrift Plan). This plan is a participant-directed defined contribution plan intended to qualify under Section 401(a) of the Code, and is subject to the provisions of ERISA. Under the terms of the Thrift Plan, employees who do not earn more than the IRS threshold compensation limit used to determine highly compensated employees may contribute, through pre-tax salary deferrals and/or after-tax applicable payroll deductions, the lesser of 75% of their regular salary or wages or the maximum amount permitted under law. Employees who earn more than such threshold may contribute from 1% to 16% of their regular salary or wages. Employer matching contributions are also made in an amount equal to 100% of the first 6% of employee contributions for employees who are covered under the Cash Balance Formula of the Oncor Retirement Plan, and 75% of the first 6% of employee contributions for employees who are covered under the Traditional Retirement Plan Formula of the Oncor Retirement Plan. Employer matching contributions are made in cash and may be allocated by participants to any of the plan's investment options. Oncor's contributions to the Thrift Plan totaled $12 million, $12 million and $11 million for the years ended December 31, 2012, 2011 and 2010, respectively.

## 11.  STOCK-BASED COMPENSATION

In 2008, Oncor established the SARs Plan under which certain of its executive officers and key employees may be granted stock appreciation rights payable in cash, or in some circumstances, Oncor membership interests.  In February 2009, Oncor established the Oncor Electric Delivery Company LLC Director Stock Appreciation Rights Plan (the Director SARs Plan) under which certain non-employee members of its board of directors and other persons having a relationship with Oncor may be granted SARs payable in cash, or in some circumstances, Oncor membership interests.  SARs under the SARs Plan and the Director SARs Plan are generally payable in cash based on the fair market value of the SAR on the date of exercise.  There were no SARs under either plan eligible for exercise at December 31, 2011.

During the year ended December 31, 2012, Oncor granted no SARS under the SARs Plan.  In November 2012, Oncor accepted the early exercise of all outstanding SARs (both vested and unvested, totaling 14,322,219 SARs under the SARs Plan and 55,000 SARs under the Director SARs Plan) issued to date pursuant to both SARs Plans.  The early exercise was permitted by Oncor's board of directors pursuant to the provision of the SARs Plan that permits the board to accelerate the vesting and exercisability of SARs.  The early exercise of SARs entitled each participant in the SARs Plan to: (1) an exercise payment (Exercise Payment) equal to the number of SARs exercised multiplied by the difference between $14.54 and the base price of the SARs (as stated in the award letter for each SARs grant); and (2) the accrual of interest on all dividends declared to date with respect to the SARs, but no further dividend accruals.  Additionally, each current executive officer agreed to defer payment of a portion of his/her Exercise Payment until the earlier of November 7, 2016 or the occurrence of an event triggering SAR exercisability pursuant to Section 5(c)(ii) of the SARs Plan.  These deferred payments totaled approximately $6 million in the aggregate.  As a result of the early exercise, in 2012 Oncor paid an aggregate of approximately $64 million related to Exercise Payments ($57 million charged to expense), and began accruing interest on approximately $18 million in aggregate dividends.  As a result of the early exercise, no SARs are currently outstanding under either the SARs Plan or the Director SARs Plan.

Under both SARs plans, dividends that are paid in respect of Oncor membership interests while the SARs were outstanding were credited to the SARs holder's account as if the SARs were units, payable upon the earliest to occur of death, disability, separation from service, unforeseeable emergency, a change in control, or the exercise of the SARs.  As a result, in 2012 Oncor recorded compensation expense of approximately $6 million relating to dividend accruals through November 2012.  For accounting purposes, the liability is discounted based on an employee's or director's expected retirement date.

## 12.  RELATED-PARTY TRANSACTIONS

The following represent our significant related-party transactions:

• Oncor records revenue from TCEH, principally for electricity delivery fees, which totaled $1.0 billion for each of the years ended December 31, 2012 and 2011 and $1.1 billion for the year December 31, 2010.  The fees are based on rates regulated by the PUCT that apply to all REPs.  These revenues included approximately $2 million for each of the years ended December 31, 2012, 2011 and 2010 pursuant to a transformer maintenance agreement with TCEH. The balance sheets at December 31, 2012 and 2011 reflect receivables from affiliates totaling $53 million and $138 million, respectively, primarily consisting of trade receivables from TCEH related to these electricity delivery fees.

• Oncor recognized interest income from TCEH under an agreement related to its generation-related regulatory assets, which have been securitized through the issuance of transition bonds by Bondco.  The interest income, which served to offset Oncor's interest expense on the transition bonds, totaled $16 million, $32 million and $37 million for the years ended December 31, 2012, 2011 and 2010, respectively.

  Incremental amounts payable related to income taxes as a result of Oncor's delivery fee surcharges to customers related to transition bonds were reimbursed by TCEH. Prior to the August 2012 sale to EFIH disclosed below, our financial statements reflected a note receivable from TCEH that totaled $179 million ($41 million reported as current in trade accounts and other receivables from affiliates) at December 31, 2011 related to these income taxes.

  In August 2012, Oncor sold to EFIH all future interest reimbursements and the remaining $159 million obligation under the note with TCEH.  As a result, EFIH paid, and Oncor received, an aggregate $159 million for the agreements.  The sale of the related-party agreements was reported as a $2 million (after tax) decrease in total membership interests in 2012 in accordance with accounting rules for related-party matters.

- EFH Corp. subsidiaries charge Oncor for certain administrative services.  EFH Corp. and Oncor also charge each other for shared facilities at cost.  These net costs, which are primarily reported in operation and maintenance expenses, totaled $35 million, $38 million and $40 million for the years ended December 31, 2012, 2011 and 2010, respectively.

- Under Texas regulatory provisions, the trust fund for decommissioning TCEH's Comanche Peak nuclear generation facility is funded by a delivery fee surcharge Oncor collects from REPs and remits monthly to TCEH.  Delivery fee surcharges totaled $16 million, $17 million and $16 million for the years ended December 31, 2012, 2011 and 2010, respectively.  Oncor's sole obligation with regard to nuclear decommissioning is as the collection agent of funds charged to ratepayers for nuclear decommissioning activities.  If, at the time of decommissioning, actual decommissioning costs exceed available trust funds, Oncor would not be obligated to pay any shortfalls but would be required to collect any rates approved by the PUCT to recover any additional decommissioning costs.  Further, if there were to be a surplus when decommissioning is complete, such surplus would be returned to ratepayers under terms prescribed by the PUCT.

    Prior to 2012, Oncor reflected the difference between the trust fund assets and the decommissioning liability (both reported on TCEH's balance sheet) in its financial statements as a regulatory liability or asset with an offsetting receivable from or payable to TCEH (the beneficiary of the nuclear decommissioning trust).  However, amounts associated with nuclear decommissioning activities were not included in Oncor's net income or accumulated other comprehensive income.  During 2012, Oncor determined that due to its role as the collection agent of funds, the recording of a regulatory liability or asset in its financial statements was an error.  As such, the balance sheet at December 31, 2011 has been restated to remove both the $225 million receivable from TCEH related to the Comanche Peak nuclear plant decommissioning and the associated regulatory liability of $225 million.  This restatement reduced the receivable from TCEH to zero and increased regulatory assets by $225 million.  This error did not have a material impact on our reported results of operations, cash flows or financial condition.

- Oncor has a 19.5% limited partnership interest, with a carrying value of less than $1 million at December 31, 2012 and 2011, in an EFH Corp. subsidiary holding principally software-related assets.  Equity losses related to this interest are reported in other deductions and totaled less than $1 million for each of the years ended December 31, 2012 and 2011, and $2 million for the year ended December 31, 2010.  These losses primarily represent amortization of software assets held by the subsidiary.

- We are a member of EFH Corp.'s consolidated tax group, though Oncor is not, and EFH Corp.'s consolidated federal income tax return includes our results.  Under the terms of a tax sharing agreement, we are obligated to make payments to EFH Corp. in an aggregate amount that is substantially equal to the amount of federal income taxes that we would have been required to pay if we were filing our own corporate income tax return.  Also under the terms of the tax sharing agreement, Oncor makes similar payments to Texas Transmission and Investment LLC, pro rata in accordance with their respective membership interests in Oncor, in an aggregate amount that is substantially equal to the amount of federal income taxes that Oncor would have been required to pay if it were filing its own corporate income tax return.  EFH corp. also includes Oncor's results in its consolidated Texas state margin tax return, and consistent with the tax sharing agreement, Oncor remits to EFH Corp.  Texas margin tax payments, which are accounted for as income taxes and calculated as if Oncor was filing its own return.  Our results are also included in the consolidated Texas state margin tax return filed by EFH Corp.  See discussion in Note 1 to Financial Statements under "Income Taxes."  At December 31, 2012 and 2011, we had amounts due to EFH Corp. under the agreements totaling $34 million and $2 million, respectively.  In the year ended December 31, 2012, we made income tax payments to EFH Corp. totaling $35 million (including net payments of $2 million made by Oncor to EFH Corp.).  Income tax refunds from EFH Corp. in the year ended December 31, 2011 totaled $89 million.  Income tax payments to EFH Corp. in the year ended December 31, 2010 totaled $107 million. Income tax refunds from noncontrolling interests in the years ended December 31, 2012 and 2011 totaled $5 million and $25 million, respectively, and income tax payments to noncontrolling interests in the year ended December 31, 2010 totaled $21 million.

- Certain transmission and distribution utilities in Texas have tariffs in place to assure adequate credit worthiness of any REP to support the REP's obligation to collect transition bond-related charges on behalf of the utility.  Under these tariffs, as a result of TCEH's credit rating being below investment grade, TCEH is required to post collateral support in an amount equal to estimated transition charges over specified time periods.  Accordingly, at December 31, 2012 and 2011, TCEH had posted letters of credit in the amount of $11 million and $12 million, respectively, for Oncor's benefit.

- In connection with assuming sponsorship of the Oncor Retirement Plan, Oncor entered into an agreement with EFH Corp. to assume primary responsibility for retirement benefits of a closed group of retired and terminated vested retirement plan participants not related to its regulated utility business. As the Oncor Retirement Plan received an amount of plan assets equal to the liabilities Oncor assumed for those participants, execution of the agreement did not have a material impact on its reported results of operations or financial condition.  See Note 10 for further information regarding funding for the pension plans.

- Affiliates of the Sponsor Group have, and from time-to-time may in the future (1) sell, acquire or participate in the offerings of Oncor's debt or debt securities in open market transactions or through loan syndications, and (2) perform various financial advisory, dealer, commercial banking and investment banking services for Oncor and certain of our affiliates for which they have received or will receive customary fees and expenses.

See Notes 3, 8 and 10 for information regarding the tax sharing agreement, distributions to EFIH and the allocation of EFH Corp.'s pension and OPEB costs, respectively.

## 13.  SUPPLEMENTARY FINANCIAL INFORMATION

### *Variable Interest Entities*

Oncor is the primary beneficiary and consolidates a wholly-owned VIE, Bondco, which was organized for the limited purpose of issuing specific transition bonds and purchasing and owning transition property acquired from Oncor that is pledged as collateral to secure the bonds.  Oncor acts as the servicer for this entity to collect transition charges authorized by the PUCT.  These funds are remitted to the trustee and used for interest and principal payments on the transition bonds and related costs.

The material assets and liabilities of Bondco are presented separately on the face of our Consolidated Balance Sheet because the assets are restricted and can only be used to settle the obligations of Bondco, and Bondco's creditors do not have recourse to our general credit or assets.

Our maximum exposure does not exceed our equity investment in Bondco, which was $16 million at both December 31, 2012 and 2011.  We did not provide any financial support to Bondco during the years ended December 31, 2012 and 2011.

### *Major Customers*

Revenues from TCEH represented 29%, 33% and 36% of total operating revenues for the years ended December 31, 2012, 2011 and 2010, respectively. Revenues from REP subsidiaries of a nonaffiliated entity collectively represented 15% of total operating revenues for each of the years ended December 31, 2012, 2011 and 2010. No other customer represented 10% or more of total operating revenues in the years ended December 31, 2012, 2011 or 2010.

### *Other Income and Deductions*

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2012 | | 2011 | | 2010 | |
| Other income: | | | | | | |
| Accretion of adjustment (discount) to regulatory assets due to purchase accounting | $ | 23 | $ | 29 | $ | 34 |
| Net gain on sale of other properties and investments | | 3 | | 1 | | 2 |
| Total other income | $ | 26 | $ | 30 | $ | 36 |
| Other deductions: | | | | | | |
| Professional fees | $ | 3 | $ | 4 | $ | 4 |
| Equity losses in unconsolidated affiliate (Note 12) | | — | | — | | 2 |
| SARs early exercise (Note 11) | | 57 | | — | | — |
| Other | | 4 | | 5 | | 2 |
| Total other deductions | $ | 64 | $ | 9 | $ | 8 |

*Interest Expense and Related Charges*

| | | Year Ended December 31, | | | |
| | | 2012 | 2011 | 2010 | |
|---|---|---|---|---|---|
| Interest expense | $ | 366 | $ 359 | $ 342 | |
| Amortization of fair value debt discounts resulting from purchase accounting | | — | — | 2 | |
| Amortization of debt issuance costs and discounts | | 18 | 3 | 5 | |
| Allowance for funds used during construction -capitalized interest portion | | (10) | (3) | (2) | |
| Total interest expense and related charges | $ | 374 | $ 359 | $ 347 | |

*Restricted Cash*

Restricted cash amounts reported on our balance sheet consisted of the following:

| | At December 31, 2012 | | At December 31, 2011 | |
| | Current Assets | Noncurrent Assets | Current Assets | Noncurrent Assets |
|---|---|---|---|---|
| Customer collections related to transition bonds used only to service debt and pay expenses | $ 55 | $ — | $ 57 | $ — |
| Reserve for fees associated with transition bonds | — | 10 | — | 10 |
| Reserve for shortfalls of transition bond charges | — | 6 | — | 6 |
| Total restricted cash | $ 55 | $ 16 | $ 57 | $ 16 |

*Trade Accounts Receivable*

Trade accounts receivable reported on our balance consisted of the following:

| | At December 31, | | |
| | | 2012 | 2011 |
|---|---|---|---|
| Gross trade accounts receivable | $ | 395 | $ 436 |
| Trade accounts receivable from TCEH | | (55) | (131) |
| Allowance for uncollectible accounts | | (2) | (2) |
| Trade accounts receivable from nonaffiliates - net | $ | 338 | $ 303 |

Gross trade accounts receivable at December 31, 2012 and 2011 included unbilled revenues of $147 million and $127 million, respectively.

Under a PUCT rule relating to the Certification of Retail Electric Providers, write-offs of uncollectible amounts owed by REPs are deferred as a regulatory asset. Due to commitments made to the PUCT in 2007, we are not allowed to recover bad debt expense, or certain other costs and expenses, from ratepayers in the event of a default or bankruptcy by an affiliate REP.

37

*Investments and Other Property*

Investments and other property reported on our balance consisted of the following:

|  | At December 31, | |
|---|---|---|
|  | **2012** | **2011** |
| Assets related to employee benefit plans, including employee savings programs, net of distributions | $ 80 | $ 70 |
| Land | 3 | 3 |
| Total investments and other property | $ 83 | $ 73 |

The majority of these assets represent cash surrender values of life insurance policies that are purchased to fund liabilities under deferred compensation plans. At December 31, 2012 and 2011, the face amount of these policies totaled $152 million and $137 million, respectively, and the net cash surrender values (determined using a Level 2 valuation technique) totaled $65 million and $46 million, respectively. Changes in cash surrender value are netted against premiums paid. Other investment assets held to satisfy deferred compensation liabilities are recorded at market value.

*Property, Plant and Equipment*

Property, plant and equipment reported on our balance consisted of the following:

|  | Composite Depreciation Rate/ Avg. Life at December 31, 2012 | At December 31, | |
|---|---|---|---|
|  |  | **2012** | **2011** |
| Assets in service: |  |  |  |
| Distribution | 4.1% / 24.5 years | $ 9,745 | $ 9,486 |
| Transmission | 2.8% / 35.2 years | 5,482 | 4,919 |
| Other assets | 9.3% / 10.8 years | 856 | 822 |
| Total |  | 16,083 | 15,227 |
| Less accumulated depreciation |  | 5,407 | 5,203 |
| Net of accumulated depreciation |  | 10,676 | 10,024 |
| Construction work in progress |  | 627 | 530 |
| Held for future use |  | 15 | 15 |
| Property, plant and equipment - net |  | $ 11,318 | $ 10,569 |

Depreciation expense as a percent of average depreciable property approximated 3.9% for the year ended December 31, 2012 and 4.0% for each of the years ended December 31, 2011 and 2010.

*Intangible Assets*

Intangible assets (other than goodwill) reported on our balance sheet consisted of the following:

|  | At December 31, 2012 | | | At December 31, 2011 | | |
|---|---|---|---|---|---|---|
|  | Gross Carrying Amount | Accumulated Amortization | Net | Gross Carrying Amount | Accumulated Amortization | Net |
| Identifiable intangible assets subject to amortization included in property, plant and equipment: |  |  |  |  |  |  |
| Land easements | $ 295 | $ 79 | $ 216 | $ 248 | $ 77 | $ 171 |
| Capitalized software | 409 | 220 | 189 | 378 | 181 | 197 |
| Total | $ 704 | $ 299 | $ 405 | $ 626 | $ 258 | $ 368 |

38

Aggregate amortization expense for intangible assets totaled $53 million, $48 million and $39 million for the years ended December 31, 2012, 2011 and 2010, respectively. At December 31, 2012, the weighted average remaining useful lives of capitalized land easements and software were 89 years and 5 years, respectively. The estimated aggregate amortization expense for each of the next five fiscal years is as follows:

| Year | Amortization Expense |
|---|---|
| 2013 | $56 |
| 2014 | 56 |
| 2015 | 56 |
| 2016 | 53 |
| 2017 | 45 |

At both December 31, 2012 and 2011, goodwill totaling $4.1 billion was reported on the balance sheet.  None of this goodwill is being deducted for tax purposes (see Note 1 regarding goodwill impairment assessment and testing).  In the fourth quarter of 2008, Oncor recorded a goodwill impairment charge of $860 million, which was not deductible for income tax-related purposes.

### Other Noncurrent Liabilities and Deferred Credits

Other noncurrent liabilities and deferred credits reported on our balance sheet consisted of the following:

|  | At December 31, | |
|---|---|---|
|  | 2012 | 2011 |
| Retirement plans and other employee benefits | $ 1,495 | $ 1,340 |
| Liabilities related to subsidiary tax sharing agreement | 278 | 286 |
| Uncertain tax positions (including accrued interest) | 169 | 147 |
| Other | 57 | 59 |
| Total | $ 1,999 | $ 1,832 |

### Supplemental Cash Flow Information

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2012 | 2011 | 2010 |
| Cash payments (receipts) related to: | | | |
| Interest | $ 360 | $ 339 | $ 337 |
| Capitalized interest | (3) | (2) | (2) |
| Interest (net of amounts capitalized). | 357 | 337 | 335 |
| Income taxes | | | |
| Federal | 9 | (134) | 109 |
| State | 21 | 20 | 19 |
| Total income taxes | 30 | (114) | 128 |
| SARs early exercise | 64 | — | — |
| Noncash investing and financing activities: | | | |
| Construction expenditures (a) | 103 | 140 | 78 |
| Capital contribution related to settlement of certain income taxes payable (b) | — | 30 | 40 |
| Debt exchange transactions - Oncor | — | — | 324 |

_____

(a)  Represents end-of-period accruals.

(b)  Reflects noncash settlement of certain income taxes payable arising as a result of the sale of noncontrolling interests in Oncor.

14    CONDENSED FINANCIAL INFORMATION

**ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC**
**CONDENSED FINANCIAL INFORMATION**

**CONDENSED STATEMENTS OF COMPREHENSIVE INCOME**
**(millions of dollars)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2012 | 2011 | 2010 |
| Income tax expense | $ (9) | $ (7) | $ (5) |
| Equity in earnings of subsidiary | 279 | 293 | 282 |
| Net income | 270 | 286 | 277 |
| Other comprehensive income (net of tax benefit of — , $14, and — ) | — | (23) | — |
| Comprehensive income | 270 | 263 | 277 |

See Notes to Financial Statements.

**CONDENSED STATEMENTS OF CASH FLOWS**
**(millions of dollars)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2012 | 2011 | 2010 |
| Cash provided by operating activities | $ 146 | $ 116 | $ 169 |
| Cash used in financing activities — distributions paid to parent | (147) | (116) | (169) |
| Net change in cash and cash equivalents | (1) | — | — |
| Cash and cash equivalents - beginning balance | $ 1 | $ 1 | $ 1 |
| Cash and cash equivalents - ending balance | $ — | 1 | 1 |

See Notes to Financial Statements.

**CONDENSED BALANCE SHEETS**
**(millions of dollars)**

| | At December 31, | |
|---|---|---|
| | 2012 | 2011 |
| **ASSETS** | | |
| Cash and cash equivalents — current | $ — | $ 1 |
| Investments | 6,133 | 6,028 |
| Total assets | $ 6,133 | $ 6,029 |
| **LIABILITIES AND MEMBERSHIP INTEREST** | | |
| Income taxes payable to EFH Corp. — current | $ 9 | $ — |
| Accumulated deferred income taxes | 4 | 23 |
| Other noncurrent liabilities and deferred credits | 278 | 286 |
| Total liabilities | 291 | 309 |
| Membership interest | 5,842 | 5,720 |
| Total liabilities and membership interest | $ 6,133 | $ 6,029 |

See Notes to Financial Statements.

40

**ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC**
**CONDENSED FINANCIAL INFORMATION**
**NOTES TO CONDENSED FINANCIAL STATEMENTS**

*Basis of Presentation*

References herein to "we," "our," "us" and "the company" are to Oncor Holdings and/or its direct or indirect subsidiaries as apparent in the context.

The accompanying unconsolidated condensed balance sheets are presented at December 31, 2012 and 2011, and the accompanying unconsolidated statements of income and cash flows are presented for the years ended December 31, 2012, 2011 and 2010. We are a Delaware limited liability company wholly-owned by EFIH, which is a wholly owned subsidiary of EFH Corp. As of December 31, 2012, we own approximately 80% of the membership interests in Oncor. Certain information and footnote disclosures normally included in financial statements prepared in accordance with US GAAP have been omitted pursuant to the rules of the US Securities and Exchange Commission. Because the unconsolidated condensed financial statements do not include all of the information and footnotes required by US GAAP, they should be read in conjunction with the consolidated financial statements and Notes 1 through 13. Our subsidiary has been accounted for under the equity method. All dollar amounts in the financial statements are stated in millions of US dollars unless otherwise indicated.

*Distribution Restrictions*

While there are no direct restrictions on our ability to distribute our net income that are currently material, substantially all of our net income is derived from Oncor. Our board of directors and Oncor's board of directors, which are composed of a majority of independent directors, can withhold distributions to the extent the boards determine that it is necessary to retain such amounts to meet our expected future requirements.

Until December 31, 2012, Oncor's distributions were limited to its cumulative net income and regulatory capital structure restrictions. Effective January 1, 2013, distributions are limited only to the extent Oncor maintains a required regulatory capital structure as discussed below.

Oncor's distributions continue to be limited by its required regulatory capital structure to be at or below the assumed debt-to-equity ratio established periodically by the PUCT for ratemaking purposes, which is currently set at 60% debt to 40% equity. At December 31, 2012, Oncor's regulatory capitalization ratio was 58.8% debt and 41.2% equity. The PUCT has the authority to determine what types of debt and equity are included in a utility's debt-to-equity ratio. For purposes of this ratio, debt is calculated as long-term debt plus unamortized gains on reacquired debt less unamortized issuance expenses, premiums and losses on reacquired debt. The debt calculation excludes transition bonds issued by Bondco. Equity is calculated as membership interests determined in accordance with US GAAP, excluding the effects of purchase accounting (which included recording the initial goodwill and fair value adjustments and the subsequent related impairments and amortization). At December 31, 2012, $167 million was available for distribution to Oncor's members under the capital structure restriction, of which approximately 80% relates to our ownership interest.

For the period beginning October 11, 2007 and ending December 31, 2012, Oncor's cash distributions (other than distributions of the proceeds of any issuance of limited liability company units) were limited by the Limited Liability Company Agreement and a stipulation agreement with the PUCT to an amount not to exceed Oncor's cumulative net income determined in accordance with US GAAP, as adjusted by applicable orders of the PUCT. Adjustments consisted of the removal of noncash impacts of purchase accounting and deducting two specific cash commitments. The noncash impacts consisted of removing the effect of an $860 million goodwill impairment charge in 2008 and the cumulative amount of net accretion of fair value adjustments. The two specific cash commitments were the $72 million ($46 million after tax) one-time refund to customers in September 2008 and the funds spent as part of the $100 million commitment for additional energy efficiency initiatives that was completed in 2012. See Note 2 for additional information regarding the two cash commitments. At December 31, 2012, $420 million of membership interests was available for distribution under the cumulative net income restriction of which approximately 80% relates to our ownership interest. However, as discussed above, this restriction is no longer applicable.

On February 13, 2013, Oncor's board of directors declared a cash distribution of $31, which was paid to us on February 15, 2013. During 2012, 2011 and 2010, Oncor's board of directors declared, and Oncor paid to us cash distributions totaling $147 million, $116 million and $169 million, respectively.

*Supplemental Cash Flow Information*

|  | Year Ended December 31, | | |
|  | 2012 | 2011 | 2010 |
|---|---|---|---|
| Cash payments to EFH Corp. related to federal income taxes | $ 33 | $ — | $ — |
| Capital contribution related to settlement of certain income taxes payable (a) | $ — | $ 30 | $ 40 |

_____

(a)  Reflects noncash settlement of certain income taxes payable arising as a result of the sale of noncontrolling interests in Oncor.

# **Appendix B**

About ERCOT

# About ERCOT



**Related Content**

**On the web**

- [Texas Electric Choice](#)
- [Public Utility Commission of Texas (PUCT)](#)
- [PUCT Conservation Alert](#)

**RSS Feeds**

- [Press Releases](#)
- [RSS Content Help](#)

The Electric Reliability Council of Texas (ERCOT) manages the flow of electric power to 23 million Texas customers - representing 85 percent of the state's electric load. As the independent system operator for the region, ERCOT schedules power on an electric grid that connects 40,500 miles of transmission lines and more than 550 generation units. ERCOT also performs financial settlement for the competitive wholesale bulk-power market and administers retail switching for 6.7 million premises in competitive choice areas. ERCOT is a membership-based 501(c)(4) nonprofit corporation, governed by a board of directors and subject to oversight by the Public Utility Commission of Texas and the Texas Legislature. ERCOT's members include consumers, cooperatives, generators, power marketers, retail electric providers, investor-owned electric utilities (transmission and distribution providers), and municipal-owned electric utilities.

This page requires the free [Macromedia Flash Player plug-in](#). View [HTML version](#)

# **Appendix C**

News Release: Energy Future Holdings Corporation

# ENERGY FUTURE HOLDINGS



# NEWS RELEASES

08.28.13

Luminant Response to Ongoing Environmental Activism Campaign
Dallas -

Today, a small group of physicians from the Dallas County Medical Society, along with environmental activists, filed at the Texas Commission on Environmental Quality for more emissions regulations at three Luminant coal plants in East Texas. This filing, the latest in an ongoing campaign, was completely unnecessary.

With Texas air becoming cleaner, the record is clear that existing laws and regulations are working.

We certainly share in everyone's concern and desire for cleaner air. That's why Luminant has a strong and proud history of meeting or exceeding the requirements of all state and federal emissions standards at Big Brown, Martin Lake and Monticello and all of our power plants.

In today's case, the doctors' diagnosis is wrong and misleading. The reason the Dallas-Fort Worth area does not meet the federal ozone standard is largely because of nitrogen oxide emissions from vehicles, not our coal plants. In fact, the TCEQ reports, more than 80 percent of NOx, the emission that leads to ozone formation, comes from mobile sources.

But blaming the real cause doesn't fit with these activists' narrow agenda of trying to close coal plants and force Texans to pay higher costs for their electric power from less reliable sources. Even the report by Rice University Associate Professor Dr. Daniel Cohan estimates the cost of replacing the capacity of these plants with wind power at well over $50 billion and solar energy at $40 billion.

The Cohan report isn't a realistic plan for a rapidly growing state like Texas that must have reliable electric generation as power demand increases.With the Texas electric grid operating close to its targeted reserve margin, plants of this size are critical to ensure the stability of the grid year-round and especially during hot Texas summers.

**The Facts**

With a combined capacity of nearly 5,300 megawatts, these three plants generate enough electricity to power more than **one million Texas homes** in periods of peak demand and more than **2.6 million Texas homes** in normal conditions.

In the last five years, Energy Future Holdings has spent **more than $10 billion** in investments across Texas for new projects and to improve our facilities.

Of that $10 billion, **$850 million has been spent for environmental technology** and other improvements to provide cleaner generation from our coal-fueled power plants.

Further, we will continue to invest in our plants and mines **to comply with all environmental laws** and to safely and economically power Texas.
**Resources**
**Luminant 2012 Environmental Review:** http://bit.ly/16QRsPd
**Luminant "By the Numbers":** http://bit.ly/15gGzZU

* * *

**About Luminant**

Luminant, a subsidiary of Energy Future Holdings Corp., is a competitive power generation business, including mining, wholesale marketing and trading, and development operations. Luminant has more than 15,400 megawatts of generation in Texas, including 2,300 MW fueled by nuclear power and 8,000 MW fueled by coal. The company is also one of the largest purchasers of wind-generated electricity in Texas and the nation. EFH is a Dallas-based energy holding company that has a portfolio of competitive and regulated energy subsidiaries, primarily in Texas. Visit http://www.luminant.com/ or http://www.energyfutureholdings.com/ for additional information.

**Media**
Media Relations
media.relations@luminant.com

- Back to the Press Releases Index

©2014 Energy Future Holdings. All Rights Reserved.

# **Appendix D**

Physicians' Petition the State to Require EFH's Legacy Coal-Fired Power Plants to Reduce Emissions to Current Standards to Protect Health of North Texans



**Physicians Petition the State to Require EFH's Legacy Coal-Fired Power Plants
to Reduce Emissions to Current  Standards to Protect Health of North Texans**

**FOR IMMEDIATE RELEASE**
**Wednesday, August 28, 2013**

Dallas — Today the Dallas County Medical Society filed a petition with the Texas Commission on Environmental Quality asking the agency to adopt rules to reduce the pollution from three old coal-fired power plants that contribute disproportionately to high ozone levels in Dallas-Fort Worth and East Texas.

"Evidence is overwhelming that our high ozone levels are causing increasing numbers of area children to develop asthma, and are contributing to the many asthma attacks, chronic lung disease exacerbations, and heart attacks we see every day in our emergency rooms, clinics and hospitals," said Robert Haley, MD, a Dallas internist and epidemiologist. "A large body of medical research shows that more people of all ages develop respiratory illnesses and die prematurely in cities with high ozone levels, and we have among the highest ozone levels in the country."

To address this issue, DCMS and the Texas Medical Association sponsored a study by Daniel Cohan, PhD, an environmental engineering scientist at Rice University, to review all the scientific information about ozone pollution in North Texas and identify ways to reduce ozone levels without compromising the state's energy grid or jobs.

"The Cohan Report identified these three very old coal-fired power plants south and east of Dallas, built in the 1970s, that have never been required to meet current emission limits and which contribute disproportionately to ozone levels in the Dallas-Fort Worth area," according to Cynthia Sherry, MD, DCMS president. "With the impending bankruptcy of the plants' owner, Energy Future Holdings, the plants likely will change hands." The petition asks that the TCEQ require these plants to meet the same low emission levels for ozone-forming gasses that are required of the company's two newer lignite-fired power plants. "This is the time to require that the plants lower their emissions to protect the health of North Texans," Dr. Sherry said.

The three power plants are Big Brown near Fairfield, Martin Lake near Longview, and Monticello near Mount Pleasant.



"Because of their age, these three plants emit large amounts of pollution for a relatively small amount of electricity produced," said   Cohan, the report's author. "Today's technologies offer economically more attractive alternatives that would be far less polluting."

According to the report, a combination of natural gas, geothermal, coastal wind, and solar production could replace the energy production capacity — and the East Texas jobs — of the three old coal plants at equivalent prices to Texas ratepayers. East Texas, where the three coal plants operate, has uniquely amenable geologic characteristics that make geothermal power generation unusually attractive.

Energy Future Holdings, an investment group that purchased the power plants from TXU, is facing bankruptcy because the drop in energy prices from the boom in natural gas production has reduced the profitability of coal. It also faces new requirements to control mercury emissions, and the Environmental Protection Agency is formulating additional requirements for controls on $CO_2$ emissions.

"The financial press is predicting bankruptcy or restructuring of Energy Future Holdings," according to Tom "Smitty" Smith of Public Citizen's Texas office.  "The petition by the physicians and environmental groups will put the company or new owners on notice that they can't keep running these old, polluting plants without investing in new pollution controls. Concerned citizens can add their names to the petition by visiting http://www.ipetitions.com/petition/tceq-please-clean-up-northeast-texas/."

**IMPORTANT LINKS:**

- The scientific report can be found at www.dallas-cms.org/news/coalplants.pdf.
- "Bad air day: Report details power plant dangers," *Texas Medicine*, June 2013, pp. 45-49, accessed at:
  http://www.texmed.org/Template.aspx?id=27429

##

**About DCMS:** The Dallas County Medical Society unites and empowers physicians to support the health of all residents in the metropolitan region. DCMS is a professional organization of approximately 6,800 local physicians, medical students and residents dedicated to serving Dallas area patients.

**Contact:**
**Lauren Cowling, director of communications**
**Dallas County Medical Society**
**lauren@dallas-cms.org**
**214.413.1447**

# **Appendix E**

*In re Goldking Holdings, LLC* (Transcript)

1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF DELAWARE

3   Case No. 13-12820(BLS)

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   GOLDKING HOLDINGS, LLC, ET AL.,

8

9         Debtors.

10

11   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12

13                          United States Bankruptcy Court

14                          824 North Market Street

15                          Wilmington, Delaware

16

17                          November 20, 2013

18                          11:48 AM

19

20

21   B E F O R E :

22   HON BRENDAN L. SHANNON

23   U.S. BANKRUPTCY JUDGE

24

25   ECR OPERATOR:  DANA MOORE

1    HEARING re Motion of Leonard C. Tallerine, Jr. and Goldking

2    LT Capital Corp. to Transfer Venue of These Cases [D.I. 46,

3    11/7/13]

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Jamie Gallagher and Dawn South

```
 1    A P P E A R A N C E S :

 2    YOUNG CONAWAY STARGATT & TAYLOR, LLC

 3         Attorneys for the Debtors

 4         Rodney Square

 5         1000 North King Street

 6         Wilmington, DE 19801

 7

 8    BY:  EDMON MORTON, ESQ.

 9         BOB BRADY, ESQ.

10         ROB POPPITI, ESQ.

11         MICHAEL S. NEIBURG, ESQ.

12

13    MORRIS, NOCHOLS, ARSHT & TUNNELL LLP

14         Attorneys for Leonard C. Tallerine Jr. and Goldking LT

15         Capital Corp.

16         1201 North Market Street

17         16th Floor

18         Wilmington, DE 19899-1347

19

20    BY:  GREGORY W. WERKHEISER, ESQ.

21         ANNIE CORDO, ESQ.

22

23

24

25
```

Page 4

1   RICHARDS, LAYTON & FINGER, PA

2       Attorneys for Wayzata Opportunities Fund II, LP

3       One Rodney Square

4       920 North King Street

5       Wilmington, DE 19801

6

7   BY:   JOHN H. KNIGHT, ESQ.

8       WILLIAM ROMANOWICZ, ESQ.

9

10   FOX ROTHSCHILD, LLP

11       Attorney for White Oak

12       Citizens Bank Center

13       919 North Market Street

14       Suite 1300

15       Wilmington, DE 19899

16

17   BY:   JEFFREY SCHLERF, ESQ.

18

19

20

21

22

23

24

25

1   UNITED STATES DEPARTMENT OF JUSTICE

2        Attorney for the U.S. Trustee

3        Office of the U.S. Trustee

4        844 King Street

5        Suite 2207

6        Wilmington, DE 19801

7

8   BY:  JANE LEAMY, ESQ.

9

10   ALSO APPEARING TELEPHONICALLY:

11   STEWART F. PECK, ESQ.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE CLERK:  All rise.

3              THE COURT:  Please be seated.  Apologies for the

4    delay in starting.  Mr. Morton, good morning.

5              MR. MORTON:  Good morning, Your Honor.  For the

6    record, Edmon Morton on behalf of the Debtors, Goldking

7    Holdings, et al.

8              Your Honor, we're here today pursuant to Your

9    Honor's order on an emergency motion to transfer venue that

10   was filed by Mr. Leonard Tallerine and certain of his

11   affiliates.  First and foremost, Mr. Werkheiser wanted me to

12   confirm that Your Honor had seen the reply that they filed

13   yesterday --

14             THE COURT:  I did.

15             MR. MORTON:  -- around noon.

16             THE COURT:  I received it, so thank you for

17   getting that in.  I appreciate it.

18             MR. MORTON:  Thank you, Your Honor.  And the

19   parties have conferred about the manner in which we're going

20   to proceed today.  So subject to the Court's pleasure, I

21   think the way we would propose to go is as follows: there's

22   a moderate amount of testimony that Mr. Werkheiser wants to

23   elicit from the company's CEO.  We may or may not have a few

24   follow up questions, just depending upon what's elicited in

25   regards to that and then we'll -- and then we can proceed to

1    argument.

2              We did also want to make one representation that

3    Mr. Werkheiser asked and we were fine with, which is the

4    testimony he'll be eliciting from the CEO will be about,

5    what I would call kind of additional matters, the more nuts

6    and bolts points that were made in the papers about

7    percentage of, you know, the people on the creditor matrix

8    and things like that.  We're not going to obviously require

9    Mr. Werkheiser to go through the facts that are calling the

10   sky blue.  We're happy to --

11             THE COURT:  Sure.

12             MR. MORTON:  -- call the sky blue.  And this will

13   really just be elicited additional testimony.

14             THE COURT:  On those issues that are in dispute.

15             MR. MORTON:  That's correct, Your Honor.

16             THE COURT:  Okay, I think I understand.

17             MR. MORTON:  Okay?  If that's acceptable then I'll

18   cede the podium to Mr. Werkheiser.

19             THE COURT:  That sounds fine.  Mr. Werkheiser.

20             MR. WERKHEISER:  Good morning, Your Honor.  For

21   the record, Gregory Werkheiser, Morris, Nichols, Arsht &

22   Tunnell, LLP, appearing today on behalf of Leonard C.

23   Tallerine, Jr. and Goldking LT Capital Corp.

24             Your Honor, what Mr. Morton said is generally

25   correct.  I wanted to make sure because I know Your Honor

1    has had a very short time with our papers that --

2              THE COURT:  No, I've been through them.

3              MR. WERKHEISER:  Okay, and I want to expedite

4    things to the extent that we can, so I didn't want to rehash

5    all of our points unnecessarily.  I would like to make a

6    couple of preliminary comments before we start with the

7    presentation of evidence --

8              THE COURT:  Okay.

9              MR. WERKHEISER:  -- and then one other point that

10   we didn't address is we have a number of exhibits that were

11   attached to our motion papers --

12             THE COURT:  And then Ms. Cordo's affidavit, as

13   well, with additional documents, right?

14             MR. WERKHEISER:  Correct, Your Honor.

15             And then some additional documents that were

16   attached as exhibits to our reply and then there are a few

17   additional exhibits that we've identified to the other

18   parties this morning.  So, I know there is one exhibit that

19   I've been told is objectionable to, at least, to Wayzata's

20   counsel, which is a demonstrative we prepared about their

21   appearances in the case.  I would just ask, before we get

22   started with the presentation of testimony, if any of those

23   other exhibits are things that are going to elicit

24   objections because I may or may not need to question the

25   witness with respect to those to establish their

1    admissibility.

2            THE COURT:  Counsel?

3            MR. NEIBURG:  Good morning, Your Honor.

4            THE COURT:  Still morning.

5            MR. NEIBURG:  Michael Neiburg from Young, Conaway,

6    Stargatt & Taylor on behalf of the Debtors.

7            I think of the new documents we were just

8    presented with, there may be potential objection to a

9    document that was apparently printed off of a Louisiana

10   State website, which talks about enforcement actions.  And

11   really all it does is identify some dates and shows like pdf

12   and Excel links, but it doesn't give any additional flavor

13   about the nature of the enforcement action, or the status of

14   the enforcement action.  So, I guess we'll get to it, I just

15   want to raise the issue in the instance that we may have

16   objection to the use of this document.

17           THE COURT:  Okay, but the other ones that were

18   attached to the applications, et cetera, and the motion

19   papers, they're generally --

20           MR. NEIBURG:  Yeah, I think they're generally all

21   fine, Your Honor.

22           THE COURT:  Okay, all right.  I appreciate that

23   and obviously you're welcome to raise objections as to, you

24   know, any additional documents or the document you

25   identified at an appropriate time, and if we need to deal

1    with it, then I will.  Okay?

2            MR. NEIBURG:  Thank you, Your Honor.

3            THE COURT:  Great, thank you.

4            MR. WERKHEISER:  Thank you, Your Honor.  Just a

5    couple of preliminary comments about our motion and then try

6    to get into the presentation of testimony.

7            THE COURT:  Sure.

8            MR. WERKHEISER:  Your Honor, just by way of

9    background, our client, Goldking LT Capital Corporation is

10   the approximate 6 percent membership interest holder in

11   Goldking Holdings, LLC, and in addition Mr. Tallerine and

12   Goldking LT have asserted claims in the Texas litigation and

13   otherwise for, among other things, indemnity, advancement of

14   expenses, breach of contract, and fraud.  These are largely

15   sort of ancillary issues, but I did want to bring those up

16   because there was some suggestion in the papers that they

17   were not a real party in interest or didn't have standing to

18   pursue the venue transfer.

19           I don't think as a factual matter those things are

20   disputed, but I did want to get that before Your Honor

21   upfront.

22           THE COURT:  Okay.

23           MR. WERKHEISER:  And then I also do not intend in

24   mentioning those things to sort of get into the meat of the

25   parties' dispute in the Texas litigation.  I think it's been

1    our view, and we've tried to steer clear of it that the

2    parties obviously have their differences.  There are

3    obviously strong feelings about who did what to whom.  You

4    know, those issues have been joined to some extent in the

5    Texas litigation, although the Debtors and Wayzata seem to

6    repeatedly want to inject those issues into the case here.

7    I'm not going to, any more than is absolutely necessary

8    today, try to address those and just want to make clear for

9    the record that in not addressing those, we're certainly not

10   conceding any of those allegations --

11            THE COURT:  Yeah, I want to be clear about that

12   because I expect that there will reference to that

13   litigation and the issues that have arisen, obviously,

14   between your client and the Debtor.  My understanding, and I

15   think I said something similar at the first day is that

16   those matters are pending in another court at this point.

17   They're not before me, certainly substantively.  The

18   existence of that litigation is something that I think was

19   -- I was apprised of, and I think that's appropriate, but

20   it's not my intention or expectation that these proceedings

21   have a material effect on that litigation one way or the

22   other.  And to the extent that it's appropriate for me to

23   note that I am approaching it that way and that all parties'

24   rights are reserved, then I'm happy to do so.

25            Because, again, I'm sensitive to the concern you

1    raised, and I think this came up at the first day on both

2    sides that nobody wanted, you know, a statement or a failure

3    to respond in this proceeding to be sort of waived in front

4    of a Judge in another jurisdiction saying, you know, they

5    stipulated that, you know, we're bad people or anything

6    else.  And so I think that that's sensible to put that issue

7    to bed if the parties wish, and I would note that those

8    rights are reserved, and I expect, frankly, on both sides.

9    Is that fair?

10             MR. WERKHEISER:  Yes, Your Honor.  Yes.

11             MR. NEIBURG:  Yes, thank you, Your Honor.

12             THE COURT:  So noted.

13             MR. WERKHEISER:  Yeah, I don't intend to really

14   touch on the Texas litigation other than its existence and

15   how it got initiated, but the substance of it is not

16   something we want to get into today.

17             THE COURT:  Okay.

18             MR. WERKHEISER:  Your Honor, with that, I can --

19   we can start with testimony.  Again, I want to reserve an

20   opportunity subject to Your Honor's wishes for argument once

21   this testimony is put into the record --

22             THE COURT:  Yeah, I think that's the game plan is

23   that we'll take the testimony.  I mean, if -- and I'll take

24   the argument from each of the parties that think Mr. Morton

25   touched on it that most of the facts are probably not in

1    dispute, and -- but I'm happy to hear the testimony and then

2    I'll hear from any party that wishes to present argument.

3            MR. WERKHEISER:  Okay.  Thank you, Your Honor.

4    With that, we would respectfully call Mr. Edward Hebert to

5    the stand.

6            THE COURT:  All right, Mr. Hebert, welcome back,

7    sir.

8            MR. HEBERT:  Thank you, sir.

9            THE COURT:  All right, we'll swear the witness.

10   Please remain standing.

11       (Witness sworn)

12           THE CLERK:  Please state and spell your name for

13   the record.

14           THE WITNESS:  Edward J. Hebert.

15           THE COURT:  Spell your last name, please.

16           THE WITNESS:  H-E-B-E-R-T.

17           THE COURT:  Very good.  Mr. Werkheiser, you may

18   proceed.

19           MR. WERKHEISER:  Thank you, Your Honor.  One other

20   just preliminary comment, we have a confidentiality

21   agreement and protective order in this case, and especially

22   in light of the expedited nature of the proceedings, much of

23   the discovery that has been produced thus far has been

24   designated as confidential, as well as a deposition that we

25   took of Mr. Hebert yesterday.  That entire record at this

1    point in time has been designated as confidential.

2              As the hearing develops today, we may have a need

3    to touch on some of the things that have been confidential.

4    I'll do my best to sort of limit the need to do that, but I

5    wanted to preview for Your Honor that those types of issues

6    come up and at some point we may either need to be creative

7    in referring to things in the record and/or ask the

8    courtroom to be cleared, at least, momentarily.

9              THE COURT:  Yeah, and we've had this dance before.

10   My preference would be for the former and not the latter.

11   Clearing a courtroom is an extreme remedy.  I've done it,

12   but it's not something that I'd be inclined to lean toward

13   in the context of a venue hearing.  The other thing is,

14   again, one of the luxuries I have is able and experienced

15   counsel.  If we need to be creative about, you know,

16   pointing -- look three lines down on this document, do you

17   recognize that --

18             MR. WERKHEISER:  Yes, sir.

19             THE COURT:  -- we've all done that before and

20   you're welcome to confer with Mr. Neiburg, and if you need a

21   moment -- if you feel like you're treading towards something

22   that's going to give him heartburn, then you're welcome

23   again to take a moment.

24             I do, from the -- at least from the colloquy, it's

25   my expectation that the timing of this is going to be fine,

1    but I do have pretty much a hard stop right around 2:00, and

2    from the, at least the vibe I'm getting on the examination

3    is probably not going to be that long, and Mr. Hebert, as I

4    understand it, is the only witness, right?

5                THE COURT:  Yes, Your Honor.

6                THE COURT:  Okay, so then I think we're fine with

7    respect to timing, but I did want to lay that out there for

8    you folks, but it sounds like we'll be fine with that.

9    Okay?

10               MR. WERKHEISER:  Okay.  Thank you, Your Honor.

11               THE COURT:  You may proceed.

12               MR. WERKHEISER:  Okay.

13   DIRECT EXAMINATION

14   BY MR. WERKHEISER:

15   Q    If it's still morning, good morning, Mr. Hebert.

16   A    Good morning.

17   Q    Mr. Hebert, could you state for the record by whom you

18   are currently employed?

19   A    Goldking Holdings.

20   Q    And how long have you been employed by Goldking

21   Holdings?

22   A    Since October 2011.

23   Q    And what positions have you held with Goldking

24   Holdings?

25   A    Chief financial officer prior, and now currently chief

1    executive officer.

2    Q    When did you assume the position of chief executive

3    officer?

4    A    May of this year.

5    Q    Prior to joining Goldking Holdings, by whom were you

6    employed?

7    A    I was employed by Saratoga Resources.

8    Q    And what was Saratoga Resources?

9    A    It was an oil and gas company.

10   Q    And what was your position with Saratoga Resources?

11   A    I was vice-president of finance and chief accounting

12   officer.

13   Q    Did there come a time that Saratoga Resources was

14   involved in a bankruptcy proceeding as a debtor?

15   A    Correct.

16   Q    And were you employed by them in that capacity at that

17   time?

18   A    Yes.

19   Q    Mr. Hebert, could you generally describe your

20   responsibilities as chief financial officer of Goldking

21   Holdings?

22   A    Sure, I manage all departments of the company, being --

23   we manage operations, land, accounting, and set strategic

24   direction for the company.

25   Q    And what are your job duties as chief executive officer

1    since this May of 2013?

2    A    As I just said, I manage the employees of the company,

3    ensure that our strategy is being followed, and set strategy

4    of the company.  Right now, we've -- our strategy has been

5    to prepare the company for sale.

6    Q    I'm sorry, I may have misspoke.  I initially had asked

7    what were your duties when you were chief financial officer

8    of Goldking Holdings?

9    A    I'm sorry.  There we reported to the Board the

10   financials.  We set the financial model, the budgets,

11   forecast of the company, and overlooked the accounting

12   department.

13   Q    During the period of time that you were chief financial

14   officer of Goldking Holdings, who was the chief executive

15   officer?

16   A    That was Leonard Tallerine --

17   Q    Did there come a --

18   A    -- and --

19   Q    I'm sorry, go ahead.

20   A    Leonard Tallerine at first, and the Mike Strain.

21   Q    And approximately what time did Mike Strain become

22   chief executive officer of the company?

23   A    That was December of 2012.

24   Q    Does Mr. Strain have any other professional

25   affiliations other than as Goldking Holdings chief executive

1    officer during that period?

2    A    Yes, he is an employee of Wayzata.

3    Q    And Wayzata, is it not, is the approximately 94 percent

4    majority holder of Goldking Holdings?

5    A    Yes.

6    Q    Wayzata, is it not, currently holds all of the

7    prepetition secured debt under the B of A facility that was

8    assigned to it?

9    A    Correct.

10   Q    Mr. Hebert, where does Mr. Strain reside?

11   A    He is in Houston.

12   Q    And from what Wayzata office was Mr. Strain based?

13   A    The Houston office.

14   Q    Mr. Hebert, from December of 2012 through

15   September 2013, who was on the Board of Managers of Goldking

16   Holdings?

17   A    Blake Carlson and Mike Strain.

18   Q    And who is Blake Carlson?

19   A    Blake Carlson is a partner for Wayzata.

20   Q    Did there come a time that you were also made a member

21   of the Board of Managers?

22   A    I was made a member, along with Gene Davis, we replaced

23   Blake Carlson and Mike Strain, I believe it was in September

24   of this year.

25   Q    Would it refresh your recollection if I noted that

1    there were corporate minutes from October 10th?

2    A    Okay, it's October of this year, then, we became board

3    members.  Gene and I replaced Mike and Blake.

4    Q    And was Eugene Davis an individual known to you prior

5    to that point in time?

6    A    I had met him one time.

7    Q    In what capacity did you meet him?

8    A    I was introduced to him a couple of weeks before he

9    came on the board.

10   Q    Did Mr. Davis express any reluctance to you about

11   providing director services for a Texas and Louisiana based

12   company?

13   A    No.

14   Q    Did Mr. Davis ever travel to Houston to meet with you?

15   A    Yes, I met him in Houston.

16   Q    Okay, and this was when you interviewed him for the

17   position?

18   A    Correct.

19   Q    Had he been to Houston since that date?

20   A    He -- not to our office.  I'm not sure if he's been to

21   Houston, but he hasn't been to our office.

22   Q    Has he been to Houston in connection with his duties as

23   a board member for Goldking Holdings?

24   A    No.

25   Q    Did Mr. Davis give you an indication -- strike that.

1   Did Mr. Davis indicate to you whether he had -- was

2   currently or had previously been serving on the boards of

3   any Texas or Louisiana based companies?

4   A    Mr. Davis, I know, serves on the board for Stallion

5   Oilfield.

6   Q    And where is Stallion Oilfield based?

7   A    I believe Stallion's in -- located in Houston,

8   headquartered in Houston.

9   Q    And does Wayzata have an interest in Stallion Oilfield?

10  A    Yes.

11  Q    And what's the nature of that interest?

12  A    I believe they own about 40 percent equity interest in

13  Stallion.

14  Q    Did Mr. Davis identify any other companies for which he

15  serves as an officer or director?

16  A    I've seen the companies that he works as a director,

17  but I don't recall all of them.  There's a couple I recall,

18  but not all of them.

19       (Pause)

20           MR. WERKHEISER:  Just a moment.

21           THE COURT:  Sure.

22       (Pause)

23           MR. WERKHEISER:  Your Honor, I'd like to offer for

24  identification an exhibit that we'll mark, I guess, as

25  Tallerine 1.

1        (Tallerine's Exhibit 1 marked)

2            THE COURT:  Okay.

3            MR. WERKHEISER:  May I approach, Your Honor --

4            THE COURT:  Sure.

5            MR. WERKHEISER:  -- and approach the witness?

6            THE COURT:  Yeah.  Thanks.  Yeah, please.

7    Tallerine 1.

8    BY MR. WERKHEISER:

9    Q    Mr. Hebert, are you familiar with this map?

10   A    Yes.

11   Q    Where have you seen this map before?

12   A    Well, this is a map of our properties that would either

13   be in the -- it's probably the Lantana marketing package.

14           MR. WERKHEISER:  If I could represent that, we

15   extracted this from the cover of the Lantana marketing

16   package and enlarged it slightly.  I also will just

17   represent for the record that because the version we got was

18   in grey scale, we did alter this by highlighting --

19           THE COURT:  I see that.

20           MR. WERKHEISER:  -- the properties that are

21   identified on the map as Debtor-owned properties.

22   BY MR. WERKHEISER:

23   Q    Mr. Hebert, looking at his map, where are the majority

24   of the Debtor-owned oil and gas properties located?

25   A    They are Texas and Louisiana, Gulf coast.

1    Q    And do you see a particular concentration of the

2    properties evident on this map?

3    A    Well, yes, on here Louisiana has a concentration of the

4    properties on the fields.

5    Q    And do you see the two properties that are highlighted

6    in blue that are close to the Texas/Louisiana border?

7    A    Yes.

8    Q    Are those geographically part of the same region as the

9    Louisiana properties?

10   A    Yes.

11   Q    And then, Mr. Hebert, I note there's one property that

12   is a bit remote from the others in Aransas County, is that

13   correct?

14   A    Aransas Bay, yes, that's correct.

15   Q    And what is the name of that property?

16   A    It's Nine Mile Point.

17   Q    Mr. Hebert, where are -- strike that.  How many oil

18   wells do the Debtors have at this time?

19   A    We have approximately 47, 50 wells.

20   Q    And what, approximately, is the breakdown of this?

21   A    I believe about a third -- I have to go back and look

22   at the numbers.  There's 25 producing, about 20, 25

23   producing wells right now.  We have a total of about 50

24   wells.  I would -- I believe about 25 percent to a third is

25   out of the (indiscernible) which is in Hardin, in Jasper

1    County, east Texas.  We have probably a third out of

2    Louisiana and maybe a third down at Nine Mile Point.

3    Q    So, you would agree that about two-thirds of those are

4    in the east Texas/south Louisiana portion of the holdings?

5    A    Yes, that's correct.

6    Q    And just to clarify for the record, when you say they

7    are producing wells, what do you mean?

8    A    They're producing hydrocarbons.

9    Q    So, you're able to extract oil, and gas, and natural

10   gas from -- forgive my imprecise terminology --

11   A    No, that's okay.  Correct, that's right.

12   Q    And that means you're able to sell those products and

13   generate revenue from those wells, is that correct?

14   A    Yes.

15   Q    Are there additional well sites that are currently in

16   development?

17   A    No, we do not have any currently in development.

18   Q    Are -- geologically speaking, are the east Texas and

19   south Louisiana well sites a geologically distinct region?

20   A    The south Louisiana down at Nine Mile Point is in the

21   general geological region.  The properties in east Texas up

22   in Jasper and Hardin County are in a little different

23   geological region.

24   Q    With respect to the wells that are being actively

25   operated, what does that entail in terms of having a

1    personnel on site?

2    A    We have -- it's contractors we use, pumpers and

3    gaugers.

4    Q    And you're -- so you're hiring those from third

5    parties?

6    A    Yes.

7    Q    Did -- was there a prior time when the Debtor had

8    employees to provide those functions?

9    A    No, we have one superintendent out there in the field

10   that manages it, and that's all we've ever had out there.

11   Q    If a well is a producing well, how often are the

12   pumpers and gaugers on site?

13   A    They're out there pretty frequently.

14   Q    How frequently, can you --

15   A    Well, the gaugers are out there daily and the pumpers,

16   that's pretty frequent.

17   Q    What sort of things might go wrong with a producing

18   well if a gauger was not out there, say, for a week or two

19   weeks?

20   A    Well, to keep the well aligned, we might have to add

21   certain chemicals to it.  The gaugers are just checking to

22   see what type of pressures and hydrocarbons we're pulling

23   out of the well.

24   Q    And if the pumpers were not on site for let's say a

25   week or more?

1   A      We could have a well plug up.

2   Q      And what would happen if a well got plugged up?

3   A      We'd lose production.

4   Q      Would that create a risk of a discharge into the

5   environment?

6   A      No, not necessarily.  It would just lower our revenues

7   that we receive in the company.

8   Q      Well, just to be clear, I didn't ask if it definitely

9   would create a risk.  Does it heighten the risk of a

10  potential environmental discharge if the wells are not

11  actively attended?

12  A      Certainly, yeah.

13  Q      Mr. Hebert, is your business subject to regulation by

14  environmental agencies?

15  A      Yes.

16  Q      And which agencies are those?

17  A      There's state regulatory agencies, we have the EPA.

18  Q      Does the Louisiana Department of Environmental Quality

19  have regulatory oversight?

20  A      Yes.

21  Q      What's the agency in Texas that has regulatory

22  oversight over your business?

23  A      I don't recall the name.  I have a compliance officer

24  at the company that manages that for me.

25  Q      Is permitting required to operate within your business?

1   A    Yes.

2   Q    And is that a significant burden on the business to

3   maintain a regulatory compliance?

4   A    Not necessarily.

5   Q    But it's enough of a burden, is it not, that you have a

6   full time compliance officer?

7   A    No, we don't have a full time compliance officer, we

8   have a senior VP of operations who handles my compliance for

9   the company.

10  Q    And who is that individual?

11  A    That's James Anheisser (ph).

12  Q    Can you estimate approximately how many hours per month

13  Mr. Anheisser spends on compliance issues?

14  A    I can't at this time, I don't know.

15  Q    Mr. Hebert, did there come a time that there was a

16  spill at one of the oil mills in the last 12 months?

17  A    Yes.

18  Q    And when was that?

19  A    I believe that was around the summer, June, July

20  timeframe.

21  Q    And what location was that, sir?

22  A    That was in the Live Oak Field.

23  Q    And did that require remediation?

24  A    Yes.

25  Q    And was there involvement by any environmental agency

1    in that instance?

2    A    Yes.

3    Q    What was the nature of their involvement?

4    A    They came out to prove the site from the remediation,

5    to see if it would -- approve their standards of being

6    cleaned up.

7    Q    Was the company required to give notice to the

8    environmental agency when it became aware of the discharge?

9    A    Yes.

10   Q    And which agency was that?

11   A    That was the Louisiana Department of Environment or so.

12           MR. WERKHEISER:  May I approach, Your Honor?

13           THE COURT:  Sure.  Thank you.

14       (Pause)

15           THE COURT:  Mr. Neiburg, I believe this was the

16   one you expressed some concerns about, am I right?

17           MR. NEIBURG:  This is it, Your Honor.

18           THE COURT:  All right, well, I'll tell you what,

19   we'll find out what we're using it for and then we'll go

20   from there.

21           MR. WERKHEISER:  For the record, Your Honor, I

22   believe this has been identified as Tallerine 2, and the

23   exhibit is a printout from the website of the LDEQ, the web

24   address appears at the bottom and it was printed yesterday.

25       (Tallerine's Exhibit 2 was marked)

1   BY MR. WERKHEISER:

2   Q    Mr. Hebert, are you familiar with the website

3   maintained by the Louisiana Department of Environmental

4   Quality?

5   A    I know there's a website out there.  I don't use it,

6   myself.  I don't use it individually.

7   Q    Are you aware that information about enforcement

8   actions can be obtained from that website?

9   A    Yes.

10  Q    Have you ever accessed that website to obtain such

11  information?

12  A    Not myself, not personally.

13  Q    Do you know if Mr. Anheisser has done that?

14  A    I'm pretty sure he has.

15  Q    Mr. Hebert, I'd like you to turn to the attachment that

16  appears at -- after the printout of the webpage.

17  A    Page 1 of 6?

18  Q    Yes, sir.

19  A    Okay.

20  Q    And do you see the yellow highlighted text?

21  A    Yes.

22          MR. WERKHEISER:  I will represent that for ease of

23  everyone to view this, we did add the highlighting that was

24  not printed out from the Court's website.

25          MR. NEIBURG:  Sorry, Your Honor, just for

1    additional clarification, if you don't mind, was this

2    printout actually from the website?

3              MR. WERKHEISER:  Yes, I'm going to make that

4    representation.  This printout was actually from the

5    website.  The printout of the webpage itself, which is the

6    first four pages of this exhibit lists all of the available

7    reports of enforcement actions, as noted on it, the attached

8    pdf file, Tempo verification, April 2013.  This was the pdf

9    file that we were able to extract from the link that is

10   identified on this -- on the first page of this printout of

11   the website page.  So, if you scroll down, you'll see the

12   month of April 2013, and there's an option to obtain it

13   through pdf file or through an Excel file.  We accessed it

14   through the pdf file.

15             MR. NEIBURG:  Your Honor, I'll just object to this

16   document on hearsay grounds to the extent counsel is trying

17   to using for the truth of (indiscernible - 12:19:31) matter

18   asserted therein, but if it's really just to say this is

19   what the website says, I guess that's okay.  I'm not sure

20   where we're going.

21             MR. WERKHEISER:  Your Honor, I would offer it for

22   a couple of reasons.  One, I want to talk to the witness

23   about it and see what his knowledge is of what's indicated

24   on here.

25             THE COURT:  I think the witness testified that

1    he's not been on this website.  The -- but okay.

2              MR. WERKHEISER:  And then I would just offer it,

3    not necessarily for the truth of the matter asserted that

4    there were, in fact, violations of any environmental

5    regulations or laws, but the fact that there is -- simply

6    for the fact that there is environmental oversight by this

7    agency and that Goldking is --

8              THE COURT:  Do you need to ask him about that?

9              MR. WERKHEISER:  I was about to say, I think, Your

10   Honor --

11             THE COURT:  I'm pretty certain this is an industry

12   that's subject to regulations.

13             MR. NEIBURG:  The Debtors are willing to stipulate

14   to that fact, Your Honor.

15             MR. WERKHEISER:  So, perhaps we could put off the

16   issue of whether the exhibit actually comes in, I guess,

17   whether there are some questions that are related to it and

18   we'll move on.

19             THE COURT:  Yeah, I mean, I think that's fine, and

20   I wasn't trying to be flip.  You know, the witness first

21   testified that he's got a compliance guy and that the

22   compliance guy handles the compliance issues from his point

23   of view.

24             And again, I heard the stipulation and I don't

25   think it's in dispute that this Debtor's business is

Page 31

1    operated in Louisiana and in Texas and is subject to

2    regulatory oversight in Louisiana and Texas, and I assume

3    that's sort of the upshot of your presentation, have I got

4    that right?

5              MR. WERKHEISER:  It is and there's been a lot of

6    argument in the papers how it's not really important in the

7    context of these cases that they are property in those

8    states and so, you know, we're simply trying to make a

9    record to establish a point that these are actively operated

10   oil sites and that these states have a particular interest

11   given the nature of the business in exerting their

12   regulatory oversight over the activities there and --

13             THE COURT:  Okay.

14             MR. WERKHEISER:  -- that it's not purely

15   theoretical.

16             THE COURT:  Okay, well, I'll allow some further

17   examination.  If it gives counsel concern then, obviously, I

18   invite you to raise an objection.  But to me, though, the

19   proposition is not really likely to be in material dispute,

20   especially if we're not looking into the specifics of

21   individual events then, you know, again if the upshot is

22   this business is regulated by states that, you know, have an

23   interest and again, from my prior proceedings, I am aware of

24   the state's interests in these --

25             MR. WERKHEISER:  Understood, Your Honor.

1        THE COURT:  -- they've beaten me about the head

2    and shoulders with these issues.  So, I will overrule the

3    threshold objection.  I'll permit some examination, but I

4    don't it's going to -- that we need to go too far with it.

5    You may proceed.

6        MR. WERKHEISER:  Thank you, Your Honor.

7    BY MR. WERKHEISER:

8    Q    Mr. Hebert, I would just ask you to look at the

9    highlighted text on page 1 of the attachment labeled Tempo

10   Verification April 2013.

11   A    Okay.

12   Q    You see that those entries all have an issue date of

13   April 29, 2013?

14   A    Yes.

15   Q    And do you see the first row of those entries that

16   refers to Live Oak Field Central Facility?

17   A    Yes.

18   Q    Do you have an understanding of what that would refer

19   to?

20   A    No.

21   Q    Are you familiar with any of the other master AI names

22   that are identified on here?

23   A    No.

24   Q    Kent Bayou Production Facility, does that ring a bell

25   to you?

1  A    I don't know what the violation is, no.  We don't even

2  own the Kent Bayou Production Facility anymore, so I don't

3  know what these violations are for.  I'd have to ask James

4  Anheisser what they are, what we've done, or what we're

5  doing about them.

6  Q    Mr. Hebert, are you aware of any other violations that

7  have been issued to the Debtors by any state or federal

8  regulatory authority in the last 12 months?

9  A    We had a -- some violations issued by the State of

10  Louisiana back in May, I believe, it was a letter and it was

11  for some air quality control compliance certificates that

12  weren't filed timely that were legacy issues --

13  Q    Yes, sir.

14  A    -- that went all the way back to 2005.  James Anheisser

15  has hired contractors to negotiate with the State and come

16  up with a very small settlement.  I believe that was the

17  only other violation that we had, but we took care of it.

18  Q    Okay, thank you, sir.  I apologize if I ask an obvious

19  question, but, Mr. Hebert, who is your bankruptcy counsel

20  for the company in this case?

21  A    Young Conaway.

22  Q    And when was Young Conaway engaged (indiscernible -

23  12:25:09) counsel for the Debtors in this case?

24  A    I believe it was about the third week of October.

25  Q    Had the Debtors ever previously engaged Young Conaway

1    as counsel on any matter?

2    A    No.

3    Q    To your knowledge, have the Debtors ever retained a

4    Delaware based law firm for any matter?

5    A    No.

6    Q    How did the Debtors come to identify Young Conaway as

7    potential bankruptcy counsel for this case?

8    A    It was Gene Davis that recommended Young Conaway, the

9    other board member.

10   Q    Mr. Hebert, did -- approximately when did the Debtors

11   engage Lantana -- I'm sorry, it's Lantana Oil and --

12   A    And Gas Partners, yeah.

13   Q    Gas Partners.

14   A    Correct.  We engaged Lantana, I would say around June

15   of this year.

16   Q    And where is Lantana based?

17   A    They're out of Houston.

18   Q    And did Lantana personnel ever come to the Debtors'

19   headquarters in Houston in connection with that engagement?

20   A    Yes.

21   Q    Without naming specific names -- I'll move to another

22   question.  Approximately how many potential purchasers for

23   the Debtors' assets has Lantana contacted to date?

24   A    I don't know the actual amount that they contacted.

25   They were working off of a list that had about 50 companies

1   on it.

2   Q    And without naming names, do you know approximately how

3   many of those companies were based in Texas?

4   A    No, I don't -- I didn't get into the list in that

5   detail.

6   Q    Is Lantana currently engaged by the Debtors?

7   A    No.

8   Q    At what point in time did they cease being the

9   financial advisor (indiscernible - 12:27:52) to the Debtors?

10  A    I believe it was around October 31st, November -- first

11  week in November, somewhere around there.

12  Q    Would it refresh your recollection if you knew there

13  were statements in your counsel papers that indicated the

14  date was November 7th?

15  A    First week of November, okay, yes, maybe that's

16  correct.

17  Q    And have the Debtors engaged anyone to perform the

18  functions that Lantana was providing since then?

19  A    Yes.

20  Q    And who was that?

21  A    Energy Spectrum Advisors.

22  Q    And when were they engaged?

23  A    They were brought on, I think we decided to bring

24  Energy Spectrum on last week, and I think the engagement

25  letter was formally signed this week.

1    Q    And where is Energy Spectrum Advisors based?

2    A    They're -- where are they?

3    Q    Yes, sir.

4    A    They have offices in Houston and Dallas.  They're out

5    of Texas.

6    Q    Are they staffing this engagement from a particular

7    office?

8    A    That would be from the Houston office, yeah.

9    Q    And -- I'm sorry, and have you met with them on site at

10   your headquarters in Houston?

11   A    Yes.

12   Q    On more than one occasion?

13   A    Just one occasion right now.

14   Q    Do you expect to have future meetings with them there

15   in connection with their engagement at your headquarters?

16   A    Possibly so.

17   Q    Mr. Hebert, how long does it take you to travel from

18   Houston to Delaware?

19   A    Two hours and 45 minutes.

20   Q    And that's by airplane, sir?

21   A    Yes.

22   Q    Just to have a clear record.  I'm assuming you don't

23   have wings yourself.

24   A    No, just United Airlines.

25   Q    And are you referring just to the actual flight time,

1    is that correct?

2    A    Yes.

3    Q    And -- the Debtors have represented in their papers

4    that you are willing and able to come to Delaware, is that

5    correct?

6    A    Correct.

7    Q    And, Mr. Hebert, are you a party to any retention or

8    severance agreement with the Debtors --

9         MR. WERKHEISER:  -- and let me just stop here.  Is

10   this anything that we need to place --

11        (Pause)

12        MR. WERKHEISER:  Your Honor, we're having a little

13   bit of a disagreement over the line of questioning that I

14   want to pursue here and Mr. Hebert and his counsel have

15   taken the position that he's willing and able to come to

16   Delaware.  It's no inconvenience.  It's no burden on him.  I

17   simply want to address the credibility of those statements

18   to show that in addition to whatever, you know,

19   responsibility he may have as an officer or just willingness

20   to be cooperative that he has a financial incentive over and

21   above that based on retention agreement, that's in place.

22   And I guess there's some dispute as to the relevance of that

23   line of inquiry.

24        THE COURT:  Let me ask, I mean, does the incentive

25   agreement relate to prosecution of a case in Delaware?  I

1    mean, I assume that he's hired to be -- or he's obviously

2    had responsibilities with the company.  He's now a senior

3    officer and the face of the company, to be blunt, in a

4    Chapter 11 proceeding.  If that proceeding is here, he's got

5    to come here.

6              MR. WERKHEISER:  Correct.

7              THE COURT:  If that proceeding is somewhere else,

8    he's going to go there.  I don't -- is the venue of the

9    forum tied -- somehow relate to his compensation structure?

10             MR. WERKHEISER:  I think, Your Honor, I would say

11   it certainly colors his testimony because one way or the

12   other, he has an individual financial incentive to be very

13   cooperative with --

14             THE COURT:  I would hope so.

15             MR. WERKHEISER:  -- the agenda that has been set

16   in this case, which right now involves prosecuting the case

17   in Delaware.

18             THE COURT:  You know something, I don't think that

19   that -- I understand the point.  I don't think it's got any

20   traction.  You know, the point -- as I read the operative

21   considerations, I mean, you know, his incentive to come to

22   Delaware, I think your point is made if it's made by the

23   difference between coming to Houston versus coming to

24   Delaware.  If the problem that you're talking about is the

25   CORCO factors that the parties have briefed in the other

1    cases, is about the relative convenience or proximity to one

2    Court or another, the fact that the witness has testified

3    that it's a two and a half hour flight, plus, and you

4    implied this, plus, you know, you've got to get to the

5    airport, you've got to get through the airport, you've got

6    to get out of the airport, you've got to get to

7    Philadelphia.

8              But, I mean, the witness seems to be an

9    experienced executive who's going to go wherever he needs to

10   on business.  I don't think that his incentive program

11   relates to Delaware.  If it does, then we ought to talk

12   about that.  If it just means that he wants to prosecute the

13   case, and achieve a good result in order to obtain the

14   incentive that's built into whatever his compensation

15   structure is, to me that seems to be -- doesn't weigh one

16   way or the other in the venue matter --

17             MR. WERKHEISER:  Right.

18             THE COURT:  -- if I'm reading your analysis right.

19             MR. NEIBURG:  Your Honor, just from the Debtor's

20   perspective, I think what you're saying is correct.  There

21   is no location provision --

22             THE COURT:  Okay.

23             MR. NEIBURG:  -- in this contract.  It was a

24   prepetition agreement.  He is simply acting in his capacity

25   as CEO, prosecute the Debtor's cases wherever they may be.

1          THE COURT:  Yeah, okay.  I think we can move on.

2          MR. WERKHEISER:  Thank you, Your Honor.  I would

3     just offer one thing, Your Honor, in response to Your

4     Honor's comments and I appreciate them, but there is a time-

5     based element to that.  And so, you know, without getting

6     into the details of confidential -- potentially confidential

7     information, you know, certainly Mr. Hebert has a motivation

8     to want to stay here to the extent there might be some

9     limited delay involved in transferring the case that might

10    (indiscernible - 12:35:48) his ability to bar that time --

11         THE COURT:  Yeah, I'm okay with that.

12         MR. WERKHEISER:  -- based element of that issue.

13         THE COURT:  I mean, I understand that and I think

14    my expectation is that as we get to argument that the

15    parties will argue risk of delay and that's a consideration

16    in any of these cases.  And that's -- you know, if you think

17    about it, that's the overriding theme of the leading

18    decision in the -- on venue is probably the Enron decision

19    and that was probably one of the biggest issues that

20    Judge Gonzales was dealing with is the disruption to a very,

21    very large case, obviously different circumstances --

22         MR. WERKHEISER:  Yes, Your Honor.

23         THE COURT:  -- than we have here, but I think that

24    argument can be made without getting into his comp issues.

25    Okay.

```
 1              MR. WERKHEISER:  All right, I'll move on.  Thank
 2      you, Your Honor.
 3      BY MR. WERKHEISER:
 4      Q    Mr. Hebert, was -- at the time that Lantana was engaged
 5      as the investment banker for the Debtors, was there an
 6      outside date contemplated by which the Debtors would
 7      complete the sale process?
 8      A    At the time that they were -- at the beginning at the
 9      time -- what --
10      Q    Well, let me withdraw that question, I'll try it again.
11      At the time the bankruptcy cases were filed, had the Debtors
12      agreed to an outside date with Wayzata by which they would
13      conclude the sale process?
14      A    We had a -- we did have a calendar date, yes -- dates
15      on the calendar to process, correct.
16      Q    And what date is that?
17      A    There were several dates.  There were dates to go to
18      the market, dates for the data room to close.  I don't have
19      the exact dates, they're in that Lantana book.
20      Q    Okay.
21      A    There's dates when the bids were due and then dates
22      that we would have a PSA sign and the deal would be closed.
23      I think we're trying to get everything done by the end of
24      the year.
25      Q    Do you recall agreeing to an outside date with Wayzata
```

1    pursuant to the ratification agreement of 150 days from the

2    petition date to the close of sale?

3    A    I believe that's correct.

4          MR. WERKHEISER:  Your Honor, I'd like to mark for

5    identification this exhibit as Lantana 3.

6          THE COURT:  Okay, you mean Tallerine 3?

7          MR. WERKHEISER:  Yeah, sorry, Tallerine.

8          THE COURT:  Yeah.

9      (Tallerine's Exhibit 3 was marked)

10         MR. WERKHEISER:  Can I just take a moment, Your

11   Honor, just to confirm that they don't view this piece

12   confidential?

13     (Pause)

14         MR. WERKHEISER:  Okay, I think that's acceptable.

15   BY MR. WERKHEISER:

16   Q    All right, Mr. Hebert, why don't you set this aside for

17   the moment.  I think we have an agreement to stipulate to

18   the fact that the original schedule that was put in place

19   with Lantana contemplated closing the sale by the end of the

20   year based on subsequent developments, including Lantana's

21   withdrawal from the engagement.  The Debtors acknowledge

22   that that schedule is no longer workable and that the sale

23   process would extend beyond the end of the year.

24         THE COURT:  Okay.

25         MR. WERKHEISER:  Is that acceptable to you?

1          MR. NEIBURG:  That is agreed, Your Honor.

2          THE COURT:  Okay.

3          MR. WERKHEISER:  Just one minute, Your Honor.  I

4     just want to consult with Ms. Cordo for a second.

5          (Pause)

6     BY MR. WERKHEISER:

7     Q    Mr. Hebert, are you familiar with the law firm of Baker

8     & Hostetler?

9     A    Yes.

10    Q    And how do you know those folks?

11    A    They acted as some general counsel for the company.

12    Q    And were they owed money as of the petition date?

13    A    Yes.

14    Q    Are you aware that the list of the top 30 unsecured

15    creditors in the case identified a Cleveland, Ohio address

16    for Baker & Hostetler?

17    A    I'm not aware that that address was on there, but --

18    Q    From what office did Baker & Hostetler perform legal

19    services primarily for the debtor?

20    A    There from the Houston office.

21    Q    Do you know approximately how many people they have in

22    that Houston office?

23    A    Baker, no, I don't.  It's a big firm.

24    Q    Yes, it is.

25          Mr. Hebert, approximately how long does it take

1    you -- strike that.

2              Mr. Hebert have you had occasion to drive from

3    Houston to Lafayette, Louisiana?

4    A    Yes.

5    Q    And approximately how long does it take you to drive

6    that distance?

7    A    It's about three and a half, four hours.  It's 250

8    miles.

9         (Pause)

10             MR. WERKHEISER:  Your Honor, I'd like to mark for

11   identification as Tallerine Exhibit 4, this is docket item

12   12 from this case, certification of debtors' consolidated

13   creditors matrix.

14             THE COURT:  Okay.

15        (Tallerine's Exhibit No. 4 was marked)

16             THE COURT:  Thanks.

17             UNIDENTIFIED SPEAKER:  Your Honor, just initially

18   before we get into the document, from our perspective it's

19   this type of information that we thought we had agreed to

20   where the percentage of creditors in the publicly filed

21   documents.

22             So, you know, to the extent Mr. Werkheiser feels

23   the need to rehash things that we thought we agreed to I

24   guess what Your Honor --

25             MR. WERKHEISER:  Well, I think certainly the

1    percentage that is actually listed on this document is not

2    in dispute.

3            There were arguments made in the papers that, you

4    know, some undefined portion of the creditors were not

5    really creditors of the debtors at this time, and -- and

6    Your Honor shouldn't give that any weight whatsoever.

7            So my intention was simply just to ask the witness

8    whether he was aware of any information that makes this list

9    inaccurate.

10           THE COURT:  Okay.  I'm going to allow that.

11           But again, I think that, you know, the point has

12   been largely stipulated to by the debtor, and if there are

13   issues you're welcome to probe them, but I don't think it

14   requires a -- unless there are issues with the answers we'll

15   go from there, so --

16           MR. WERKHEISER:  Yeah.

17           THE COURT:  -- I'll allow it.

18           MR. WERKHEISER:  There's one question and then the

19   examination on this point, Your Honor, unless his answer

20   takes me some place else.

21   BY MR. WERKHEISER:

22   Q    Mr. Hebert, is it correct that you signed this creditor

23   certification on October 30th?

24   A    Correct.

25   Q    Have you become aware of any information since

1    October 30th that would make your certification in this

2    document inaccurate?

3    A    No, I do not believe so.

4    Q    Okay.

5         MR. WERKHEISER:  Thank you.  I have no further

6    questions as to this particular exhibit.

7         THE COURT:  Okay.

8         MR. WERKHEISER:  Your Honor, I will cede the

9    witness subject to, you know, recross, if necessary, and

10   then, you know, again, if there's any disputes that come up

11   with respect to our exhibits may need to recall him for that

12   purpose just to deal with those.

13        THE COURT:  Very good.

14        MR. WERKHEISER:  Thank you, Your Honor.

15        THE COURT:  Mr. Neiburg?

16        MR. NEIBURG:  Thank you, Your Honor.  Again,

17   Michael Neiburg for the debtors.

18        Your Honor, I think we'll be brief and --

19        THE COURT:  Okay.

20        MR. NEIBURG:  -- just may have to bounce around a

21   little bit just to cover some of the items.

22        THE COURT:  Take your time, and I'm happy to give

23   you a measure of latitude.

24   CROSS-EXAMINATION

25   BY MR. NEIBURG:

1    Q      Good afternoon, Mr. Hebert.

2    A      Good afternoon.

3    Q      Mr. Hebert, who ultimately made the decision to

4    commence the debtors' bankruptcy cases?

5    A      That would be myself and Gene Davis.

6    Q      Members of the board of managers?

7    A      Correct.

8    Q      And what is Gene's role -- sorry -- what is Mr. Davis'

9    role on the board of managers?

10   A      He was brought on because he has significant

11   restructuring experience.

12   Q      And where is Mr. Davis based?

13   A      He is -- he's in New Jersey.

14   Q      Mr. Hebert, what are the goals and purposes of the

15   debtors' bankruptcy cases in your perspective?

16   A      Well, Chapter 11 -- Chapter 11 insures that we get a --

17   we can get a free title to the debtors' assets passed along

18   to the purchasers.  The -- when we're using a Chapter 11 to

19   pursue an open and transparent sales process to get the

20   highest value we can for the debtors' assets.  This is not

21   an operational restructuring and we're going to allow

22   interested parties to take a look and bid on the assets of

23   the process.

24   Q      Mr. Hebert, why did the debtors file their cases in

25   Delaware?

1    A    We're a Delaware entity.  The debtors are a Delaware

2    entity.  We're under the Delaware laws.  So it made logical

3    sense to do that.  Mr. Davis has experience in restructuring

4    and felt comfortable with the Delaware court system.  And

5    it's been my understanding that there's a good track record

6    here in Delaware for selling assets.

7    Q    Now if we could switch gears just a little bit.

8         Do you have an understanding as to the amount of

9    Wayzata's prepetition secured claim?

10   A    Yes.

11   Q    And what do you believe that amount is?

12   A    It's approximately 11.5, 11.6 million.

13   Q    And do you have an understanding as to the aggregate

14   amount of all potential claims asserted against the debtors,

15   both Wayzata and other potential creditors?

16   A    I believe it's around 16 million.

17   Q    So as of the petition date what approximate percentage

18   of the overall $16 million does Wayzata's secured claim

19   represent?

20   A    It's about 75 percent.

21   Q    Has that percentage increased since the petition date?

22   A    Yes.

23   Q    And why is that?

24   A    We are paying off unsecured critical vendors, royalty

25   owners, taxes.  We're paying off some of the debt of the

1    other claims.

2    Q    And do you have an understanding as to what the

3    approximate percentage will be after those payments you just

4    referenced?

5    A    We've estimated it to be about 90 percent.

6    Q    Mr. Hebert, in your own words, will transferring these

7    cases from Delaware have a detrimental effect to the

8    debtors?

9    A    I believe it will.  I believe that we've already lost

10   our investment banker and in the marketing process it's, you

11   know, my understanding with the investment bankers and just

12   seeing processes go through you can't change things too

13   much, you don't want people to start getting cooled off in

14   the process.

15            We've got Energy Spectrum back on, so our

16   investment bankers are getting back on track, and changing

17   the venue from Delaware down to Texas or Louisiana I think

18   could cause people to back off or back away from the deal.

19   Q    When you say people who do you mean?

20   A    Potential buyers of the assets.

21            MR. NEIBURG:  Your Honor, at this time the debtors

22   have no further questions.

23            THE COURT:  Okay.  Any redirect -- recross?  Oh,

24   sure, Mr. Knight.

25            MR. CAWOOD:  Very briefly.

1            THE COURT:  Sure thing.

2    CROSS-EXAMINATION

3    BY MR. KNIGHT:

4    Q    Good afternoon, Mr. Hebert.  My name is John Knight

5    from the law firm of Richards, Layton & Finger, I represent

6    Wayzata in these proceedings.

7    A    Good afternoon.

8    Q    Good afternoon.

9            Do you know when Wayzata took out the Bank of

10   America senior secured loan?

11   A    Yes.

12   Q    When was that?

13   A    It was January 24th, 2013.  This year.

14   Q    Do you know what Wayzata paid for the Bank of America

15   senior secured debt?

16   A    Yes.

17   Q    What did they pay?

18   A    They paid par.  They paid the -- it was --

19   Q    Full face value?

20   A    Full face value.

21   Q    Okay.

22   A    10.3, 10.4 million.

23           MR. KNIGHT:  No further questions.  Thank you.

24           THE COURT:  Okay.

25           MR. WERKHEISER:  Your Honor, I have a limited

1    amount of recross.

2              THE COURT:  Sure.

3    REDIRECT EXAMINATION

4    BY MR. WERKHEISER:

5    Q    Mr. Hebert, who made the decision to appoint Mr. Davis

6    to the board of managers?

7    A    That would have been Wayzata and myself.

8    Q    You say Wayzata and yourself.  Who at Wayzata?

9    A    Blake Carleson (ph), Mike Strain (ph), and myself.

10   Q    Mr. Hebert, is it the debtors' intention to continue

11   operating those wells that are already operating between now

12   and the conclusion of the sale process?

13   A    I'm sorry, could you repeat that?

14   Q    I said, do the debtors plan on operating those wells

15   that are already operating between now and the conclusion of

16   the sale process?

17   A    Correct.

18   Q    And you testified earlier, did you not, that that --

19   or, well you didn't testify -- but I think the record

20   reflects that that sale process will now extend beyond the

21   end of the year; is that correct?

22   A    I believe so.

23   Q    Mr. Hebert, did Mr. Davis express any reservations

24   about the competence or fairness of the courts in Texas or

25   Louisiana to administer this case?

1    A    No.

2    Q    Do you have any reservations about the courts in Texas

3    and Louisiana being able to administer this case?

4    A    I have only experience from Louisiana, not Texas

5    courts, and I have --

6    Q    And based on your experience you have reservations

7    about the ability of a Louisiana court to administer this

8    case?

9    A    I don't have reservations from the courts, I have

10   reservations about moving it because of --

11   Q    That's not the question I asked you.

12            Mr. Hebert, when -- approximately when was it that

13   Wayzata took assignment of the debt under the Bank of

14   America facility?

15   A    It was January 24th, 2013.

16   Q    And at that time were there any amendments to the

17   creditors' agreement put into effect?

18   A    Yes.

19   Q    And did --

20            UNIDENTIFIED SPEAKER:  Your Honor, I'm sorry, I'm

21   going to object to relevance of this line of questioning at

22   least as with respect to the venue transfer motion.

23            MR. WERKHEISER:  Well the testimony was just

24   elicited about the amount of the Wayzata claim as of the

25   petition date and I simply want to point out that that claim

1    would be a fair bit smaller but for some of these amendments

2    that occurred over the last year.

3              THE COURT:  I'll allow it.

4              MR. WERKHEISER:  Thank you, Your Honor.

5    BY MR. WERKHEISER:

6    Q    Mr. Hebert, did one of those amendments have the affect

7    that increasing the interest rate to 15 percent on an annual

8    basis?

9    A    Correct.

10   Q    And was that -- and in that amendment was it not -- was

11   it active as of January 24th, 2013?

12   A    Yes.

13   Q    Do you know how -- approximately how much interest has

14   accrued on the Wayzata debt since January 24th, 2013?

15   A    Approximately a million one.

16   Q    And, Mr. Hebert, who was the interest rate prior to the

17   effective date of that amendment?

18   A    I think it was around five percent or so.

19   Q    So is it fair to say that the claim is probably 7- to

20   $800,000 larger than it would have been in the absence of

21   that amendment?

22   A    Oh, I don't know where that number comes from.

23   Q    I'm -- and I apologize, I don't mean to lead you

24   inappropriately, but I just -- would you agree, would you

25   not that the interest rate was effectively tripled by virtue

1    of that amendment?

2    A    Based on the calculations and the math it yeah,

3    tripled.

4    Q    Yes.  Mr. Hebert, what was the original amount of

5    critical vendor claims proposed to be paid in this case?

6    A    1.3 I believe.

7    Q    Would it refresh your recollection --

8    A    Or 1.5.  I think maybe 1.5.

9    Q    Maybe 1.6, maybe?

10   A    Could be 1.5, 1.6, maybe that's the number.

11          MR. WERKHEISER:  And I guess before I ask the next

12   question I want to make sure.

13        (Pause)

14          MR. WERKHEISER:  Thank you, Your Honor.

15   BY MR. WERKHEISER:

16   Q    Mr. Hebert, at this time how much do the debtors

17   anticipate paying out on account of alleged critical vendor

18   claims over the duration of the bankruptcy case?

19   A    Total or --

20   Q    Total, sir.

21   A    About a million.

22   Q    And did they -- what is the total amount they've

23   distributed on account of critical vendor claims?

24   A    Roughly 400,000.

25   Q    Mr. Hebert, what's the debtors' cash position as of

1   yesterday?

2   A    1. -- 1.3 million.

3   Q    And as of yesterday how much have they drawn under the

4   DIP facility?

5   A    I think it's about 400,000.

6   Q    Mr. Hebert, is it not true that one of the reasons

7   Lantana gave for discontinuing its engagement that it did

8   not want to have to deal with having to report its hours and

9   to deal with the fee application process in the bankruptcy

10  case?

11  A    Correct.

12  Q    And, Mr. Hebert, do you have any reason to believe that

13  Energy Spectrum Partners would be less able to perform its

14  duties if it had to appear in connection with those duties

15  in a Houston bankruptcy court versus one in Delaware?

16  A    I don't believe -- yeah, I don't have any reason to

17  believe that.

18  Q    How about if they had to appear in a Louisiana

19  bankruptcy court rather than Delaware?

20  A    I don't know, I'd have to ask them.

21  Q    Have they expressed any reluctance to you to continue

22  as financial advisor to the debtors if this case is in

23  Houston or Louisiana?

24  A    The only thing they've expressed to me when I told them

25  we were in Delaware is Corey Gallenton (ph) over there said

1    Delaware is a good place to be in bankruptcy.

2    Q    Okay.  But that's not the question I asked.

3             Did they have any reservation about performing

4    their services in Houston bankruptcy -- in the Southern

5    District of Texas Bankruptcy Court?

6    A    No, he didn't mention anything about Houston, Texas, or

7    Louisiana.

8    Q    Did he express any reservations about performing those

9    services in the Western District of Louisiana Bankruptcy

10   Court?

11   A    No.  No mention or comments about that.

12   Q    Okay.

13            MR. WERKHEISER:  Just one moment, Your Honor.

14            THE COURT:  Sure.

15            MR. WERKHEISER:  No further questions, Your Honor.

16   Thank you.

17            THE COURT:  Okay.

18            UNIDENTIFIED SPEAKER:  Nothing further from the

19   debtor, Your Honor.

20            THE COURT:  Mr. Knight?

21            MR. KNIGHT:  Just one question?

22            THE COURT:  Sure.

23            MR. KNIGHT:  Thank you.  For the record John

24   Knight for Wayzata.

25   RECROSS-EXAMINATION

1   BY MR. KNIGHT:

2   Q    Mr. Hebert, when Mr. Werkheiser asked you about the

3   amendment to the credit agreement when Wayzata acquired the

4   Bank of America debt that increased the interest rate was

5   that interest currently payable at that time or --

6   A    No, it was paid in (indiscernible – 12:59:13).

7   Q    So it became a PIC (ph) interest rate?

8   A    Correct.

9   Q    What affect did that have on the company's cash to make

10  the interest under that facility PIC?

11  A    It preserved our cash.

12  Q    Okay.

13          MR. KNIGHT:  No further questions.  Thank you.

14          THE COURT:  Anything further?

15          All right.  Thank you, Mr. Hebert, you may step

16  down, sir.

17          MR. WERKHEISER:  Your Honor, how would you like to

18  proceed?  I could offer our exhibits for the record at this

19  time and then we could deal with those or we could go

20  straight to argument and then deal with them?

21          THE COURT:  Well, I think we only have one issue

22  with respect to the exhibits.  Am I mistaken?

23          MR. KNIGHT:  Yeah.  Substantively, Your Honor, it

24  was really the issue of the printout from the website from

25  the (indiscernible – 12:59:59) agency.

1          And in terms of confidentiality issues the one

2    document was -- and I don't think he actually used it.

3          THE COURT:  That was Tallerine 1.

4          MR. KNIGHT:  We stipulated, so I don't know why

5    this needs to be part of the official record.

6          MR. WERKHEISER:  As long as --

7          THE COURT:  I can maintain confidentiality, so I

8    wouldn't worry about that.  The matter -- these items will

9    not wind up on the docket, and I'm certainly prepared to

10   respect that, especially in the context of an ongoing sale

11   process.

12         The issue with respect to the printout, I'm going

13   to sustain that objection, and I'll tell you why.

14         First because I think as a practical matter the

15   point that -- that you were look to go make with it,

16   Mr. Werkheiser --

17         MR. WERKHEISER:  Yes, Your Honor.

18         THE COURT:  -- is it is made or is not in material

19   dispute.  And again, this was a document presented to the

20   witness.  The witness was called as a hostile witness I

21   guess under Rule 611, so you've got substantial latitude

22   effectively cross-examining him, but I'm not certain how you

23   could lay a foundation, and I'm not satisfied that a

24   foundation was laid through this witness relating to this

25   document.  He didn't pull the document, he didn't prepare

1    it, he hadn't seen it.  So on that I will sustain the

2    objection.

3           But I think the overriding principal that is in my

4    mind on this is really that I don't think it -- it enhances

5    the analysis one way or the other.  I think that the point

6    is probably -- is again made for purposes of the record.

7           This is a regulated industry and the operations

8    that are regulated are subject to regulation by entities

9    based in Texas and Louisiana, and so I think we can move

10   from there.

11          MR. WERKHEISER:  Thank you, Your Honor.

12          And maybe just so our record is clear what's

13   coming in can I just run through the list I think of

14   exhibits that we have --

15          THE COURT:  Sure.

16          MR. WERKHEISER:  -- and -- so we have 1, the

17   Goldking Holdings, LLC Chapter 11 petition and all the

18   attachments thereto, which was not previously offered, so --

19   yes, that was attached to the recorded declaration.  Would

20   you like us to remark those --

21          THE COURT:  No.

22          MR. WERKHEISER:  -- for purposes of today or just

23   reference where they were actually --

24          THE COURT:  No, I think we can reference them

25   through Ms. Cordo's affidavit.

1          MR. WERKHEISER:  Okay.  Let me just get that list

2     to make sure I don't confuse the record.

3          All right.  Your Honor, we would offer as well the

4     Chapter 11 petitions of Goldking Onshore Operating, LLC,

5     Goldking Resources, LLC, which are Exhibits B and C to the

6     Cordo declaration.

7          THE COURT:  Any objections?  Very well, they're

8     admitted.

9        (Tallerine's Exhibit Nos. 1 through 3 were admitted)

10         MR. WERKHEISER:  We would offer the debtors'

11    consolidated creditors' matrix, which was also put in the

12    record today -- or examined today as Tallerine 4.

13         MR. KNIGHT:  For that, Your Honor, I would just

14    note subject to all the caveats and reservations set forth

15    on certification.

16         THE COURT:  Yeah.  I mean whether that

17    certification is -- whether I take judicial notice of it as

18    a matter that's on the docket of the Court or whether I

19    admit it, but I'll admit it as Tallerine 4.

20       (Tallerine's Exhibit No. 4 was admitted)

21         MR. WERKHEISER:  Thank you, Your Honor.

22         Your Honor, we'd offer Mr. Hebert's declaration

23    into the record with respect to paragraphs 1 through 17, but

24    not the ballots or the attachments.

25         UNIDENTIFIED SPEAKER:  That's fine, Your Honor.

1           THE COURT:  All right.  They're admitted.

2      (Tallerine's Exhibit No. 5 was admitted)

3           MR. WERKHEISER:  Thank you, Your Honor.

4           THE COURT:  That was 1 through 17?

5           MR. WERKHEISER:  Yes, Your Honor.

6           THE COURT:  Okay.

7           UNIDENTIFIED SPEAKER:  Makes me curious to want to

8    look at 18 though.

9           MR. WERKHEISER:  I believe, Your Honor, 18 is when

10   we start getting into allegations against our client, so.

11          THE COURT:  Uh-huh.

12          MR. WERKHEISER:  Your Honor, and that was

13   Exhibit E to the Cordo declaration.

14          Your Honor, we'd offer Exhibit F, which is the

15   Goldking Holdings, LLC amended and restated limited company

16   agreement.

17          UNIDENTIFIED SPEAKER:  No objection, Your Honor.

18          THE COURT:  That's admitted.

19      (Tallerine's Exhibit No. 6 was admitted)

20          MR. WERKHEISER:  Your Honor, we would offer

21   Exhibit G, which is a copy of the Texas franchise tax

22   information report for Goldking holdings, LLC dated

23   July 25th, 2013.

24          UNIDENTIFIED SPEAKER:  No issue, Your Honor.

25          THE COURT:  Okay, no objection.  It's admitted.

1          (Tallerine's Exhibit No. 7 was admitted)

2               MR. WERKHEISER:  Thank you, Your Honor.

3               Exhibit H, which was a copy of the credit

4     agreement itself without the amendments.

5               UNIDENTIFIED SPEAKER:  No objection.

6               THE COURT:  Admitted.

7          (Tallerine's Exhibit No. 8 was admitted)

8               MR. WERKHEISER:  Exhibit I, which is a copy of

9     amendment 3.

10              UNIDENTIFIED SPEAKER:  No objection.

11              MR. WERKHEISER:  J, Your Honor, we would offer

12    which is amendment 4 in the creditor agreement.

13              UNIDENTIFIED SPEAKER:  No objection.

14              MR. WERKHEISER:  And Exhibit K, which is the

15    ratification amendment to the security agreement.

16              UNIDENTIFIED SPEAKER:  No objection.

17              MR. WERKHEISER:  Your Honor, Exhibit L is the

18    reproduction of the web page for Lantana.

19              THE COURT:  Hang on.  Is there anything that they

20    object to?  As illuminating as this is --

21              MR. WERKHEISER:  I'm sorry.  I'm sorry, Your

22    Honor, I'm just trying to move --

23              THE COURT:  No, and I'm not busting your chops,

24    but I just want to --

25              MR. WERKHEISER:  Sure.  Sure.  If L and M do not

1    draw an objection then I would just simply offer those and

2    we don't need to discuss those.

3         (Pause)

4              UNIDENTIFIED SPEAKER:  No objection, Your Honor.

5              THE COURT:  Very well, they're admitted.

6         (Tallerine's Exhibit Nos. 8 through 13 were admitted)

7              MR. WERKHEISER:  Thank you, Your Honor.

8              Your Honor, we would offer the Lantana partners'

9    confidential information memorandum as an exhibit to be

10   admitted, but to be maintained as confidential.

11             THE COURT:  I think that's already been admitted.

12   That's Tallerine 3?

13             MR. WERKHEISER:  I believe so.

14             UNIDENTIFIED SPEAKER:  Yeah, that's where Your

15   Honor said that you can maintain confidentiality --

16             THE COURT:  Yeah.

17             UNIDENTIFIED SPEAKER:  -- and we don't dispute

18   that at all, Your Honor.

19             THE COURT:  That's admitted.

20        (Tallerine's Exhibit No. 14 was admitted)

21             MR. WERKHEISER:  Thank you, Your Honor.

22             Your Honor, attached to our reply --

23             THE COURT:  Yeah, we'll return the exhibits in a

24   minute.  Let me ask you a question.

25             MR. WERKHEISER:  Yes, Your Honor.

1          THE COURT:  One of the themes that you saw in the

2     objections is the -- is frankly the nature of the litigation

3     with your client, and I want to be clear that litigation is

4     pending somewhere else, and other than knowing that it's

5     been filed and generally having references to the issues

6     that's not before me today, and we've covered that as a

7     reservation at the outset.

8          But to be blunt, one of the arguments or the

9     upshot or the theme of the objection is that your client is

10     a litigation defendant that the debtor alleges and its

11     creditors -- or its creditor alleges or primary equity as

12     well, has harmed the company and that this venue transfer

13     motion is a -- is one, should be discounted by the nature of

14     your client.

15          MR. WERKHEISER:  Yes, Your Honor.

16          THE COURT:  Okay?  And second that this is a

17     litigation tactic not necessarily related to whether or not,

18     you know, this matter should be pending in another forum,

19     but rather is again sort of a skirmish or a battle and at a

20     war between your client and this creditor -- and the debtor.

21          How do I deal with that?  Because obviously any

22     venue motion --

23          MR. WERKHEISER:  Yes, Your Honor.

24          THE COURT:  -- has these issues, typically of

25     creditors saying, look, you know, we're based somewhere

1    else, we want to be somewhere else, we need to litigate.  If

2    we're going to be in court we'd rather not come all the way

3    to Delaware, we'd like to be in California or Texas or

4    wherever.  But we have an overlay here that is the

5    litigation.

6             Should I discount your client's motion?  Should I

7    consider the movant in evaluating the factors?

8             MR. WERKHEISER:  Yes, Your Honor.

9             So let me first say we're certainly not alone in

10   this effort.  I know Your Honor has probably seen filings by

11   certain Texas taxing authorities.

12            THE COURT:  In fact I saw the (indiscernible –

13   1:09:41) firm.

14            MR. WERKHEISER:  And then a more detailed similar

15   response from --

16            THE COURT:  Mr. Schlerf.

17            MR. WERKHEISER:  -- White Oak who identifies

18   itself as both a secured and unsecured creditor --

19            THE COURT:  Similarly.

20            MR. WERKHEISER:  -- of the debtor.

21            So, you know, this issue, putting that aside for

22   one moment, should not define this transfer motion because

23   there are other parties in interest who have expressed a

24   view that this should be in Texas.

25            As to my client, you know, we absolutely dispute

1    the allegations.  I tendered to Your Honor our amended

2    answer and counterclaim in the Texas proceeding we were here

3    at the first day hearing, which made that clear.  And I

4    think the natural inference Your Honor can draw from the

5    fact that my client, in addition to having whatever

6    litigation claims he has, his requests set forth in that

7    action for advancement and indemnification in connection

8    with the claims that have been made against him is

9    indisputably an approximately six percent minority holder of

10   this company.  And you know, the debtors have represented in

11   their petitions and elsewhere that their assets are north of

12   $50 million, the reports prepared by Lantana substantiate

13   those types of values, and this is very likely a case with a

14   return for equity at the end of the day.

15          And I can tell you our goals of this case are two

16   things.

17          One, my client owns a stake in the company and he

18   wants to make sure that he gets as much as he's entitled to

19   on account of that ownership interest.

20          So we do not oppose in concept setting the assets

21   of the company.

22          We have very significant concerns with why they

23   ran away from Texas and Louisiana to this Court when there

24   is no connection other than it's an incorporation, and we

25   have very significant concerns with how the process will be

1    conducted given the fact that Wayzata wears multiple hats in

2    this deal, has reversed a right to credit bid, and given

3    what we know of the history certainly between our client and

4    Wayzata in connection with this business.

5            So you don't have to take those statements as true

6    and not, you know, the other side doesn't have the ability

7    to challenge those, but they gave us great concern about how

8    the process would be run by these parties and gave us great

9    concern why they did not just simply do it in Texas or

10   Louisiana where -- and I know Your Honor has experience with

11   these types of cases and I have every faith that Your Honor

12   would apply all your intellect and diligence to making this

13   work, but those courts see these cases day in and day out.

14   And so it is those sorts of things that give us pause.

15           THE COURT:  Yeah, there's a -- you've touched on

16   something that I guess I would respond to.  It came up a

17   little bit in the discussion.

18           To me I don't view this Court's experience or lack

19   thereof as a material consideration one way or the other.  I

20   have no doubt regarding the abilities of my sister courts in

21   other jurisdictions, and while I'm certainly proud of the

22   work that we do, I don't believe that the experience,

23   ability, or procedures available in this Court are a

24   legitimate factor for purposes of a venue analysis, and I

25   don't believe that that was argued, particularly in this

1    case.  I've seen it in other cases.

2              MR. WERKHEISER:  Yes, Judge.

3              THE COURT:  Judge Carey actually I think stated an

4    opinion that he categorically rejects the idea that, you

5    know, that this Court, because of its experience, is a

6    better forum.

7              But I want to circle back though because I

8    understand and I will acknowledge that these issues are in

9    litigation, but in this case, or let's talk about it as a

10   general proposition, should I consider the nature of the

11   movant and the movant's relationship?

12             Look --

13             MR. WERKHEISER:  Uh-huh.

14             THE COURT:  -- let's be blunt, they've said your

15   client is a bad guy.

16             MR. WERKHEISER:  Right.

17             THE COURT:  All right?  That's not before me, I

18   don't have a record one way or the other, but you know,

19   that's not an element that's normally in a venue fight.  You

20   know, we see utility companies move for venue or, you know,

21   a creditor --

22             MR. WERKHEISER:  Right.

23             THE COURT:  -- of one stripe or another, and

24   that's not a -- that's not an unusual situation.

25             This is a little bit different.  This is a

1    substantial litigation claimant, you know, with big

2    allegations in both directions.

3              Does that weigh -- should I weigh that into any

4    analysis?  Because I think I'm going to hear that in part,

5    you know.

6              MR. WERKHEISER:  Yes.  Well, I don't think it

7    ultimately is relevant here, because at the end of the day

8    maybe we get a recovery against Wayzata in the litigation.

9    But the surest way for us to get a recovery is that of a

10   successful sale process or to have a reorganization that

11   produces a return for equity.

12             And so, you know, yes, that's out there, but I

13   don't think that is the driving force here, and I don't

14   think even without Mr. Tallerine here today can say that,

15   you know, subjectively is his motivation.  You could draw

16   any other conclusion respectfully, Your Honor, from the

17   record that exists.

18             THE COURT:  Okay.

19             MR. WERKHEISER:  The -- you know, as far as the

20   allegations in Texas, I mean we said they're bad guys too.

21   They're --

22             THE COURT:  I understand.

23             MR. WERKHEISER:  -- I have just tried to stay away

24   from that because I thought it didn't play much of a role

25   here.

1            THE COURT:  Well, and it is.  The -- and I'm not

2    asking to get into those allegations.  My question was sort

3    of -- and I think you've answered it -- was how do I factor

4    that in?

5            Everybody has agreed that I can't make a decision,

6    you know, whether somebody is good, bad, or indifferent, but

7    again, this is not a typical situation of a major litigation

8    --

9            MR. WERKHEISER:  Yeah.

10            THE COURT:  -- a major litigant being the primary

11    movant.  And so -- but I think you've answered my question

12    in that regard.

13            MR. WERKHEISER:  Okay.  And I just wanted to sort

14    of add one point, because I think it touches on the

15    arguments that they've made, which is, you know, they've

16    taken us to task because we have put them to their proofs on

17    critical vendor motion.

18            And, you know, the original motivation for that

19    and it remains a motivation of that was our significant

20    concern that a lot of those deals did not need to be made,

21    that they were in the budget because it created an

22    artificial need for borrowing under the DIP facility that

23    didn't really exist.

24            We do not oppose people getting paid that are

25    essential to the business.  I think to take one example,

1    Source Environmental, we certainly had concerns about it

2    from the outset – I'm sorry --

3              MR. KNIGHT:  Objection, Your Honor.  I would ask

4    that be stricken from the record.

5              MR. WERKHEISER:  Yes, I'm sorry, I did misspeak.

6              So there was a -- there was a partner provider of

7    Environmental Related Services that we had concerns about

8    from the outset, and that entity ended up receiving a

9    payment.

10             THE COURT:  Uh-huh.

11             MR. WERKHEISER:  We had obviously some difficulty

12   getting the diligence information related to that.  We

13   ultimately did.  We do not object to that entity being paid

14   at this time.

15             So, you know, I just again wanted to make that

16   clear.  We have concerns about other payments that are

17   budgeted that, you know, if we get to a final DIP hearing we

18   address -- or a final hearing on the critical vendor motion

19   we can address with Your Honor, but again, our concern not

20   is that we want the business to fail and we want to

21   therefore keep other creditors from getting paid.  That is

22   absolutely the opposite of what we want.

23             What we don't want to see is the DIP motion to

24   become a vehicle for releases for extinguishing our interest

25   in the company and for running the sale process in a way

1    that is not in the best interest of everybody.  So I just

2    wanted to address that piece.

3             I think as Your Honor has indicated we probably

4    beat this horse to death by now.

5             THE COURT:  Okay.

6             MR. WERKHEISER:  Your Honor, I think there are a

7    handful of other notes that we just wanted to get into the

8    record, and I'll move this along as quickly as possible.

9             But we offered as Exhibit C to our reply documents

10   that one was a Texas franchise public information report

11   that indicated that Mr. Davis was a director of a Texas-

12   based company.

13            MR. KNIGHT:  I'm sorry, what's the relevance?

14            MR. WERKHEISER:  Well, the relevance was that it's

15   been argued that we should consider the fact that Eugene

16   Davis has his residence in New Jersey and bases his

17   consulting business out of New Jersey, but we found

18   government records that indicate that he is currently more

19   recently the director of companies that are based in Texas.

20            UNIDENTIFIED SPEAKER:  No objection.

21            THE COURT:  Admitted.

22        (Tallerine's Exhibit No. 15 was admitted)

23            MR. WERKHEISER:  Thank you, Your Honor.  And that

24   is Exhibit C to our reply.

25            THE COURT:  Okay.

1            UNIDENTIFIED SPEAKER:  Is that it?

2            MR. WERKHEISER:  There's just a couple more.

3            THE COURT:  Here's what we'll do.  Why don't you

4    give him a list of the exhibits.

5            MR. WERKHEISER:  Okay.

6            THE COURT:  I will hear from the debtor.

7            MR. WERKHEISER:  I think he has everything, Your

8    Honor.

9            THE COURT:  Well, you tell him what you want.

10           MR. WERKHEISER:  Okay.

11           THE COURT:  I'll hear from the debtor.

12           MR. MORTON:  Good afternoon, Your Honor.  Edmon

13   Morton from Young Conaway on behalf of the debtors.

14           Your Honor, I think -- I think the most important

15   thing for Your Honor to keep in mind when looking at a

16   motion like this --

17           THE COURT:  Uh-huh.

18           MR. MORTON:  -- is -- and Your Honor has

19   acknowledged it in Carey (ph) Limousine, and many other

20   courts have acknowledged it as well, that there's a

21   fundamental presumption that the debtor has the right to

22   utilize the courts in the state of its own residence and

23   that that is not a presumption that should be discarded

24   lightly.

25           THE COURT:  Agreed.

1          MR. MORTON:  And I know I'm not stating anything

2     novel, but it leads to one of my next points, and probably a

3     point that's of particular importance in Delaware.  And that

4     is, I mean what we've heard today and what we've seen is an

5     array of assets across an area that's actually item large

6     geographically, but actually -- but is actually against two

7     states with juxtaposing legal structures based upon --

8          THE COURT:  Yeah.

9          MR. MORTON:  -- their -- you know, where they --

10    from whence they came in their origination and whatnot, and

11    that is actually a fairly common thing to justify why

12    Delaware is an acceptable venue.  It's not that Delaware has

13    to be -- the venue has to be proper in some respect before

14    you can utilize it, but --

15         THE COURT:  I -- right.  And your point is that

16    courts have looked at it and said there is not a court that

17    is superior, you know, because you've got an entity, that's

18    you know, perhaps regional.

19         MR. MORTON:  Uh-huh.

20         THE COURT:  And if we have operations in Louisiana

21    and Texas, Arkansas, Oklahoma, Nebraska, you know, is any

22    one of them superior to Delaware, you know, in terms of

23    convenience in the analysis?  Is that the point?

24         MR. MORTON:  Sort of, but I think also too when --

25    you know, where Delaware's -- where Delaware's venue is at

1    its -- is at its peak is when there really isn't another

2    specific single identifiable forum that makes sense relative

3    to the parties, and that's why the case of QualTech is a

4    little bit different --

5              THE COURT:  Sure.

6              MR. MORTON:  -- than the case we have today.

7              I mean one of the examples is, I mean it's our

8    understanding that the Texas counties that file supporting

9    statements with respect to this motion wouldn't support a

10   transfer of venue to Louisiana, and I suspect the same is

11   true of parishes in Louisiana.

12             So oftentimes that's when you actually -- and when

13   you're balancing and tilting these factors if it doesn't

14   tilt very solidly toward another jurisdiction that's all the

15   more reason to afford our decision to avail ourselves of

16   corporate citizenship here.

17             THE COURT:  Obviously this case doesn't fall into

18   this category, but I mean given nature of the business what

19   the debtor is -- the debtors' business and its assets center

20   around real property interest or real property rights,

21   mineral rights that it's got in Louisiana and Texas.

22             And so the question then comes up, you know, would

23   I or should I look at this as being analogous to a single

24   asset real estate case?  Now it's obviously not, you're

25   going to tell me it's two different states, I got it.

1              MR. MORTON:  Uh-huh.

2              THE COURT:  And that may be dispositive, but you

3     know, we're talking about real property rights and

4     interests, and limited operations, a handful -- or you know,

5     a number of wells --

6              MR. MORTON:  Uh-huh.

7              THE COURT:  -- most of which are run or maintained

8     by contractors with the oversight of an employee or two.

9              Tell me why I shouldn't regard this as being again

10    analogous to something that's a single asset real estate

11    case, or you know, a DERC (ph) case?

12             MR. MORTON:  Well, Your Honor, the answer is --

13    well, I'll state the obvious answer, which is that we had

14    had a lot of them and that they're spread over states --

15             THE COURT:  Yeah.

16             MR. MORTON:  -- because you said that that's not

17    -- you're asking for the next level.

18             THE COURT:  So it's not a perfect analogy.

19             MR. MORTON:  Sure.  Sure.

20             THE COURT:  I confess.

21             MR. MORTON:  But what I would say is, and I'll use

22    the Banning Lewis case that we cited as an example.

23             THE COURT:  Uh-huh.

24             MR. MORTON:  The answer is, as you've pointed out,

25    there are some minimal operations, there is some minimal

1    analysis that would up the ante, if you will, on who we're

2    trying to solicit as a purchaser, and that I believe -- that

3    the bankruptcy strategy that's being employed is something

4    that is meaningful in the context of the venue motions.  Is

5    it something that is operational and specific to the

6    jurisdiction or is it something that is -- that is being

7    conducted on a more regional, national, I'm not going to say

8    international scope because that's actually -- and that's

9    one of the very basis for the reason that Judge Carey

10   respected the debtor's decision Banning Lewis Ranch despite

11   the fact that you had, you know, some developed and

12   undeveloped parcels of land, and that was really what was

13   being sold.

14          And so I think, Your Honor, that that -- it's the

15   bankruptcy strategy that's being employed that is every bit

16   important as the asset itself, and I think what you are

17   talking about is a business.  This is a business that has

18   some operations.

19          Now I should be clear, and this is as much to talk

20   about the Texas, you know, county statements, but also the

21   regulatory angle of the testimony that you heard, you know,

22   you are talking about some operational overlay that occurs

23   in these cases.  It's fairly minimal, these actions aren't

24   stayed, it's not our position that -- that Your Honor is

25   from the debtors' perspective we're not going use this Court

1    as some sort of a shield against our environmental

2    obligations, and frankly, you know, while we've had some

3    discussion today about what the exact sale time line is

4    going to be -- and that does bring me to what I believe is

5    one of the more important --

6              THE COURT:  Okay.

7              MR. MORTON:  -- things for Your Honor to consider

8    from the testimony today -- the operating aspect of our case

9    is going to be under your guard for a very short period of

10   time.  It's our goal to have a sale process get back up and

11   running.  We did hit a, you know, a fairly significant

12   hiccup in that process as our investment bankers basically

13   got cold feet as they started seeing the arrows flying and

14   looking at what their requirements were in the bankruptcy,

15   but I think we're -- you know, where we're going with this

16   is that the level of involvement you may need to have on

17   that would be pretty minimal in any event, and it's

18   particularly minimal in the time frame that we're talking

19   about, which is a sale that's going to conclude in January.

20             And I'm aware that counties may have their own

21   idea --

22             THE COURT:  Uh-huh.

23             MR. MORTON:  -- about how involved they're going

24   to try to make you, and I'm not suggesting that, I'm simply

25   saying that it's certainly the debtors' projective that

1    we're going to involve this Court as minimally as we can,

2    because we don't believe that we get any -- that we get any

3    relief from stay or other protections with respect to our

4    ongoing environmental obligations.

5              And, Your Honor, that brings me to two points that

6    I think are very important for consideration with today's

7    motion.

8              The first is what you've heard, and it's

9    uncontroverted, because there have been no other witnesses

10   today, what you heard the company's CEO talking about the

11   sale process that he believes he's going to -- to run for

12   the benefit of all creditors, and as Mr. Werkheiser points

13   out, and you know, I note that the podium is wood so we can

14   knock on it, equity, that he believes that that process has

15   already had some degree of harm based upon the exit of our

16   investment banker.  And what you're now seeing is him

17   saying, you know, we have another potentially chilling,

18   potentially market cooling event that could happen if they

19   don't think we have our ducks in a row on venue.

20             If what happens here, Judge, is that -- is that

21   you do as you did in Carey and you deny the motion for now

22   without prejudice, with the idea that you're going to be

23   able to keep your finger on the pulse of how the case is

24   playing out, who is deciding their own level of involvement

25   and the like --

1           THE COURT:  But I think Carey was a little bit

2   different because -- and you gave me the -- the transcript,

3   but I remember the case, because the difference in Carey was

4   I didn't have any understanding of where the case was

5   actually going to go, and not whether it was a sale case or

6   not, but rather Carey was the California franchise, right,

7   of a company based in D.C., and the question was going to be

8   whether or not -- or at least my question was going to be is

9   this a financial restructuring between the creditors of the

10  California sub and the -- and the east coast parent --

11          MR. MORTON:  Uh-huh.

12          THE COURT:  -- in which case venue here probably

13  made more sense than anything, or is this going to be a

14  brawl over an operational restructuring and a lengthy

15  bankruptcy?  And at the time that the motion was brought in

16  that case by an official committee --

17          MR. MORTON:  Uh-huh.

18          THE COURT:  -- I felt that I didn't know the

19  direction the case was going.  And so you're right, I denied

20  it without prejudice.

21          But in this case at least the path -- the flight

22  path of the case -- of this case is fairly clear, and I'm

23  sensitive to Mr. Hebert's concerns about market effects of

24  transfer venue or any other issue that creates a hiccup.

25  But I'm not certain that it's a perfectly apt analogy to

1    Carey.

2           MR. MORTON:  Oh, and, Your Honor, I wasn't

3    necessarily --

4           THE COURT:  Sure.

5           MR. MORTON:  -- analogizing it to the facts of

6    Carey.  What I was indicating was I think it's a -- it --

7    what you observed in Carey and what Judge Carey, to keep

8    things straight --

9           THE COURT:  Yeah, in QualTech.

10          MR. MORTON:  -- what Judge Carey observed in both

11   QualTech -- well actually in Banning Lewis --

12          THE COURT:  Right.

13          MR. MORTON:  -- because QualTech he transferred --

14   in Banning Lewis was look, this is where -- because he did

15   have the road map as to where the case was going to go and

16   it was going to be a sale case, and he specifically said in

17   that case, you know, if I get the sense that there's this

18   local overlay that's burgeoning I'm going to transfer venue.

19          And an interesting footnote to that case is that

20   he did with respect to one piece of it.  The sale, after it

21   went through, they actually were relatively successful

22   relative to what the parties believed at the beginning of

23   the case, and there was one small issue about certain

24   covenants flowing through with the sale, a dispute between

25   the buyer and the county developed that what they were able

1    to carve off with a very minimal set aside and that -- and

2    they -- they commenced an adversary proceeding and

3    transferred the venue of only that adversary proceeding --

4              THE COURT:  Of that adversary.

5              MR. MORTON:  -- to Colorado.

6              So my point is simply this, what you have in terms

7    of testimony from the CEO is that there's a sale process

8    that's at a very delicate stage and that -- and that he

9    believes in his business judgment will be harmed by the

10   transfer of venue at this time rather than -- than allowing

11   this Court to do what this Court has done numerous times

12   before and what our state citizenship permits us to do, and

13   at the same time the idea that you'll be able to keep an eye

14   on the process.  And if things outside of the sale context

15   start to push this case one way or the other relative to

16   what people are going to argue about on the proceeds of the

17   sale -- the results of the sale, which again, we hope are

18   going to be fruitful enough that there will be the ability

19   to have argument, Your Honor can call audibles at that time,

20   but that at this stage of the case you are facing a real

21   incognizable harm to the debtors.

22              And I'm not talking about things like I understand

23   that Your Honor doesn't give much weight to whether or not

24   professionals have to fly around and things like that, and

25   I'm not -- I'm not -- that's not the harm I'm speaking of,

1    the harm I'm speaking of is the sale process that we have

2    ongoing.

3                THE COURT:  And I think Mr. Hebert's testimony on

4    that was pretty clear.

5                MR. MORTON:  And I appreciate that.

6                And, Your Honor, if I may the -- just a couple of

7    other small points to hit.

8                I think you asked whether or not you need to

9    discount the motion with respect to the movant, and I think

10   it's important here for you to understand what the debtors

11   at least are saying when they -- when they say you have to

12   consider the movant.

13               We do have a process that we believe we're going

14   to be able to run openingly and fairly.  We're not running

15   away from Texas or the litigation that's there because much

16   different than QualTech we commenced it.  So we chose that

17   forum, we have no issues with that forum.

18               The sole issue for Mr. Hebert, as you heard him

19   testify, was where am I going to be able to conduct the best

20   process based upon my options?  And he believed it was

21   Delaware, and what I don't believe you've seen is a showing

22   that there is a superior forum that is going to mean more to

23   the constituencies that are likely to participate.

24               And Your Honor yourself observed in Carey

25   Limousine, as Judge Gross about observed in Caribbean

1    Petroleum, that typically speaking individual creditors are

2    not those that participate the most meaningful in a sale

3    case.  And so that's why, you know, we believe that

4    resting jurisdiction from Delaware and transferring in a

5    potential detriment of the sale process is something that is

6    simply not advisable at this time.

7             And then turning back briefly to the -- to the

8    location of the assets and the other prongs.  I mean, I know

9    that that's been the subject of heavy treatment in the

10   pleadings and it's pretty clear from the Court's comments

11   today that you considered those pleadings very carefully,

12   but I do think it's important in just one moment, you know,

13   and everybody has done their Googling and Mapquesting and

14   stuff like that and I tried really hard not to, Your Honor,

15   but I had to do it just one time and that was when I took

16   the map that you were presented in the context of I think it

17   was T1 or T2 and you just -- you just figure out how far --

18   how far the span is of our assets.  And the span of our

19   assets is over 600 miles.

20            So I mean to some extent while I understand that

21   they're trying to say it's not here, you know, it would be

22   the same as saying Your Honor and my grandfather in northern

23   Georgia come from the same place.  I mean the reality is

24   that's a fairly massive span of both geography and culture.

25            But having said all that, Your Honor, the reason I

1    bring that up is that if you're talking about things like

2    convenience of the parties and availability of witnesses

3    what they have to show to upset our choice of venue is that

4    there is a single forum that is just clearly better.  And is

5    answer is that that's not the case.  And we've given you

6    real reasons why we think this forum is better.  And we're

7    not talking about, you know, while I'd love to make some

8    flip comments right now about how all knowing and wise Your

9    Honor is and whatnot and like that, I want to be clear our

10   papers very purposefully didn't tout your experience

11   relative to others.

12            THE COURT:  And I -- yeah, I noted -- and I noted

13   that.  It came up -- or implicitly and it's something that,

14   you know, I've -- you know, I appreciate that argument not

15   being made --

16            MR. MORTON:  Uh-huh.

17            THE COURT:  -- because I don't think it's a proper

18   argument.  I understand the temptation to make it because --

19   especially when you talk about process --

20            MR. MORTON:  Uh-huh.

21            THE COURT:  -- when you simply say, you know, well

22   this has been done here.  But I understand the argument.

23            MR. MORTON:  Yeah.

24            THE COURT:  Let me ask you, is there -- when we

25   look at these standards and the factors, you know, the

1    multifactor test --

2              MR. MORTON:  Uh-huh.

3              THE COURT:  -- for convenience of the parties

4    there's a lot of history to those factors which have been

5    employed I think for years, if not decades.

6              MR. MORTON:  Uh-huh.

7              THE COURT:  I guess I'd be interested in your

8    thoughts about the extent to which, you know, the -- that

9    technology changes that analysis or limits the significance

10   of these issues compared to -- you know, when I think of

11   just even over the course of my career --

12             MR. MORTON:  Uh-huh.

13             THE COURT:  -- you know, that there were times

14   where you had to go and you went and you got documents and

15   you brought them back and things like that, and that simply

16   doesn't happen.

17             MR. MORTON:  Uh-huh.

18             THE COURT:  How much does technology factor into

19   this?  And it may not have a significant impact on this

20   particular case, but it occurs to me as I factor these in,

21   you know, things like the economical administration of the

22   case --

23             MR. MORTON:  Uh-huh.

24             THE COURT:  -- when, you know, it is a flight of a

25   few hours, documents move at the speed of light, you know,

1    and there's a relative measure of seamlessness between, you

2    know, professionals or witnesses -- well witness is a little

3    different -- but how significant is technology to this?

4              MR. MORTON:  Uh-huh.

5              Well, Your Honor, I think it's actually quite

6    Significant, and you bring me to one of the points I was

7    going to address in their reply about the -- about the

8    Walwrath on the Trans Texas case that was cited, because I

9    think that that's a very important distinguishing feature as

10   she observed that moms and pops aren't able to participate

11   in the process, and I think about my 90-year old grandfather

12   who now has a Yahoo account.  And I mean it truly is a

13   different world.

14             And an interesting side note, that case is from

15   1999, it's the year I started practicing law school when I

16   didn't even have a dial up access to our firm, and you know,

17   any new case was -- was a marital death sentence of a few

18   weeks out in some, you know, document review, you know,

19   exercise with the company.  And now you've heard Mr. Hebert

20   getting his new investment bankers up to speed and they've

21   had to meet in person once.

22             Now there's data rooms being, you know, shifted

23   around and flung up and whatnot, but I mean, you know, the

24   days of bidders coming and sitting in your offices for ten

25   days going through your books and records are over.

1          And where I think that matters for purposes of

2     this Court is that I would submit to you two thing, one of

3     which is a true point and the other is a bit of conjuncture,

4     but I think it's still -- it's still something that is

5     important.

6          The first is that there's no question this Court

7     in particular, and again, I'm trying to stay away from

8     touting this --

9          THE COURT:  Yeah.

10         MR. MORTON:  -- this Court, but I do think this

11    Court has always paid a lot of attention to making access

12    easy.  We're required to have websites where the docket can

13    be accessed for free by parties.  We're required to --

14    government attorneys do not have to associate with local

15    counsel.  Litigants -- claimants are allowed to appear pro

16    se over the phone.  You know, the noticing requirements and

17    the information requirements that we're required to go

18    through are -- are all designed to allow people to not have

19    to leave their home in order to understand what's going on

20    in the bankruptcy case and in order to meaningful

21    participate in it.

22         And this is the part I was going to tell you that

23    is somewhat of conjecture, but I do believe if you're

24    talking about that 600-mile span of assets and vendors that

25    you see over the region of our assets, I submit to you that

1    before someone undertakes the three and a half to four-hour

2    car ride to go to a court if the court has telephonic

3    procedures and they've been able to look at everything

4    that's been failed online I submit they're likely not going

5    to make even that drive.

6              And so, you know, that you know, rushes us right

7    back to the company having made the appropriate decision to

8    file in a venue where there's precedent and faith in a sale

9    process that's predictable, and that is the thing, Your

10   Honor, that I believe is going to be undermined if venue is

11   transferred.

12             THE COURT:  Okay.

13             MR. MORTON:  Unless Your Honor has any questions

14   for other I think I've loosely most of the points I planned

15   to make, so.

16             THE COURT:  I think so.  I have no further

17   questions.

18             Mr. Knight?

19             MR. KNIGHT:  Sure.  Thank you, Your Honor.  For

20   the record John Knight from Richard, Layton for Wayzata.

21             You know the motion essentially looks at the top

22   30 creditors and creates a chart, looks at a map of the oil

23   and gas properties and prints the map and basically

24   concludes that because there are other bankruptcy courts

25   closer to those things that they're a superior court.  And

1    that's an interesting argument, but it's not the law, Your

2    Honor.  The law requires more than that, and we've gone

3    through in our objection and listed all the factors and the

4    cases that consider them.

5           But I'd like to focus on the two I think biggies,

6    and they are the convenience of the parties and the interest

7    of justice.

8           And first the convenience of the parties.  First

9    you've got to figure out who are the parties.  And I think

10   Your Honor raised that earlier, does it matter who are the

11   parties?  Well, I think it does if the standard is

12   convenience of the parties.  I think implicitly you have to

13   look at who are the parties.  And we pointed out that the

14   movant is the fired ex-CEO, owns six percent interest in the

15   company, and is a litigant.  Obviously you have two

16   creditors that have filed joinders.  You have the debtors

17   and you have Wayzata, who's a 94 percent equity owner, the

18   senior secured lender that they paid full face value for,

19   and after the first day payments now represents 90 percent

20   of the debt on this company.

21          THE COURT:  Let me ask you, and I can anticipate

22   what the answer is, but you know, part of the argument here

23   your client is or was a principal or somebody at your client

24   from Wayzata is an officer of the company, right?

25          MR. KNIGHT:  Not anymore, Your Honor.

1               THE COURT:  Not anymore.

2               MR. KNIGHT:  I think that was the restructuring

3     that Mr. Hebert discussed that the board became independent

4     at that time.

5               THE COURT:  Okay.  You know, when we talk about

6     the convenience of the parties, you know, part of -- or an

7     argument you could anticipate as to Wayzata would be Wayzata

8     shouldn't be heard to complain about having to go and

9     represent its substantial -- I mean nobody is arguing that

10    they don't have a substantial stake in this, and -- but that

11    they shouldn't be heard to complain about having to deal

12    with this in Texas because frankly they made an investment

13    in Texas that's governed by Texas law, as pointed out by the

14    parties, that they're already litigating in Texas on

15    separate issues relating to this credit or this investment.

16               How do I deal with that?

17               MR. KNIGHT:  I think Your Honor is right, but you

18    have it flipped in that if the debtor in its business

19    judgment has chosen to file in Texas you're absolutely

20    right, Wayzata would not have grounds to stand up here and

21    say this case doesn't belong in Texas.

22               But on the same side once the debtor has made the

23    business decision to file properly in the Delaware

24    Bankruptcy Court there's nothing wrong with Wayzata

25    supporting the debtors' business judgment, and that's what

1    we're doing here.

2           We're not saying that the Louisiana court or the

3    Texas court couldn't do an excellent job on these cases.  I

4    personally don't know the courts down there, but I have the

5    utmost respect for the bankruptcy court system in general,

6    and I'm sure they would be fine courts.  That's not what

7    we're explaining about.

8           What we're saying to Your Honor is there's a

9    threshold that you have to meet to undo that business

10   judgment of the debtor.  And here, other than creating maps

11   and charts, they really haven't met that burden, and that's

12   why we're arguing in favor of keeping the case here.

13          I think just briefly, you know, the reply stated

14   that Wayzata bought the debt -- distressed debt on the eve

15   of bankruptcy.  The evidence showed, Your Honor, that's not

16   true.  We bought it in January for full face amount.

17          The reply said we're seeking to run a hasty sale

18   process with the intent on purchasing the debtors' assets.

19   We already own 94 percent of the debtors' assets -- or of

20   the debtor.  We have -- we're not wavering any rights here

21   today, but certainly I can represent to Your Honor a credit

22   bid is not Wayzata's intent, that would be crazy to go out

23   and pay full face value for bank debt to repurchase assets

24   that you already own 94 percent of.  It sounds absurd and

25   that's not what this case is about.

1           This case is about Wayzata supporting the debtor

2      in their business judgment to be here to conduct a sale

3      process to maximize the value of their assets for all the

4      creditors and all the stakeholders.

5           So what does -- so we talked about parties, what

6      does convenience mean?  Well let's look at that.  In a 363

7      sale case what does it mean convenience?  I think Your Honor

8      mentioned technology changes that a little bit because you

9      can appear telephonically if you just want to keep tabs on

10     things.  And in a sale case we know that typically you have

11     a first day hearing, we've had that.  The second day/final

12     DIP, that's scheduled for next week.  Thereafter the next

13     meaningful hearing is the bidding procedures hearing.

14     Thereafter an auction, maybe, if there's bids.  And then

15     thereafter a sale hearing.  So those are the -- those are

16     the real key hearings in a 363 sale case, which this case

17     is, Your Honor.  And is it inconvenient to subject other

18     parties to that sale process in Delaware?  Well why?  Why?

19     This isn't a financial restructuring, this isn't a complex

20     operational restructuring, this isn't a valuation fight with

21     witnesses.  It's not a long, drawn out, court intensive

22     process.  In fact the current DIP proposal contemplates a

23     sale within 150 days, most of that time will clearly be

24     spent shopping the company.

25           The bottom line, Your Honor, is there's just no

1    evidence that shows that this process is a significant

2    burden on anybody, and it's certainly not a sufficient

3    reason to change venue and upset the debtors' boards --

4    independent boards' business judgment.

5            Movant said there's a clear center of gravity to

6    this case, but they can't even point to the actual venue

7    that this case belongs other than the broad statement of

8    near the gulf coast.

9            Their center of gravity theory ignores the fact

10   that the vast majority of the debt and equity in this case

11   is held by an entity from Minnesota.  And to be clear, Your

12   Honor, we are not asking to go to Minnesota in the winter

13   for this case.

14   (Laughter)

15           MR. KNIGHT:  But further, after the sale, Your

16   Honor -- after the sale happens the location of the assets

17   and the operations become irrelevant, because all we'll have

18   -- hopefully we'll have a pot of money and we know we'll

19   have claims.  So really what we're talking about is a two-

20   step process.

21           Step one, maximize value for these assets.  And

22   there's no reason, and no one has said a good reason why we

23   can't do that in Delaware as the debtors' independent board

24   wants to do.

25           Step two, deal with claims.  That's where we can

1    certainly go back to state court.  Wayzata has no problem

2    going back to state court and litigating with Mr. Tallerine

3    in the action that the debtors commenced.  We're not running

4    from that in any way.  In fact Mr. Tallerine's counsel is

5    the one that filed a pleading, they're seeking to stay that.

6    So we have no problem with step two if Your Honor feels it's

7    appropriate going back there and liquidating claims.

8            The other prong, interest of justice.  What does

9    that mean?  Well the courts say to look at efficiency,

10   judicial economy, timeliness, and fairness.  As I said, the

11   debtors aren't running to escape any venue.  Here the first

12   days hearing is complete, the DIP will be complete by next

13   week, there's no good reason to do that again before another

14   court.

15           Fairness.  Delaware is a fair venue for this case.

16   All us counsel here in this room we're all up to speed on

17   that matter.  There's no reason to repeat that anywhere

18   else.

19           I once heard Judge Walsh say that a 363 sale is a

20   very important tool for our economy because it provides for

21   the efficient transfer of multi-state assets.  And I think

22   that is exactly what the debtors are seeking to do here.

23           The United States Bankruptcy Code will determine

24   the parties' rights in this sale process.  The debtors will

25   seek to sell their assets to what they believe is the

1    highest and best bidder and then the Court, applying Section

2    363 and the relevant case law, will determine if that sale

3    should be approved.  And so the interest of justice do not

4    merit a transfer.

5              We would ask, Your Honor, that Your Honor deny the

6    motion to transfer venue, allow the debtors to continue on

7    their path to value maximization, and to conduct a two-step

8    process where the first thing we do is create a big pile of

9    money and then later we can fight over it.

10             Thank you.

11             THE COURT:  Thank you.

12             MR. WERKHEISER:  Your Honor, you had indicated a

13   hard stop at 2 o'clock --

14             THE COURT:  Yeah.

15             MR. WERKHEISER:  -- I see we're getting quite

16   close to that --

17             THE COURT:  Yeah.

18             MR. WERKHEISER:  -- and we've not had much of an

19   opportunity --

20             THE COURT:  Speak quickly.

21             MR. WERKHEISER:  All right.

22             With respect to exhibits I think we're in general

23   --

24             THE COURT:  Skip the exhibits.

25             MR. WERKHEISER:  Okay.  Let's roll.  All right,

1    Your Honor.

2            Let me walk through some of the points that the

3    other parties had attempted to make here.

4            Okay.  This is not a financial restructuring in a

5    typical sense that the Court sees and this is not a

6    prepackaged plan or prenegotiated plan, this is not

7    bondholders looking to have the equity.  This is a company

8    that is operating oil wells, it has an undefined time frame

9    at this point to complete a sale.  There's no stalking horse

10   in place.  They are just now retaining a new investment

11   banker.  And that means that this Court is essentially going

12   to be supervising an operating company which has real

13   property and oil and gas assets primarily located in Texas,

14   and to some degree Louisiana — or sorry, in both Louisiana

15   and Texas.

16           This is not, for example, even a Corco (ph) case

17   where the court denied ultimately the motion to transfer

18   venue.  The operational assets were located elsewhere, but

19   the -- which is where the creditors wanted the motion

20   transferred to, but the debtor's headquarter was -- wherein

21   the court where the case was pending at that time, and the

22   court made the statement that a corporate arrangement or

23   reorganization is primarily a financial proceeding, the

24   debtors maintain is a going concern that it's finances are

25   put back in order, where the corporation transactions

1    corporate business is a logical place for a venue in such

2    proceedings.  That was the headquarters of the company.

3              Your Honor, I just -- I don't think this idea that

4    this is somehow national in the scope because the oil wells

5    might span up to 600 miles along the Texas and Louisiana

6    coast really holds any water.  And to that point this is not

7    -- I think our argument has been characterized anywhere but

8    Delaware.  This is not what that is.  This is -- we did not

9    presume to impose on Your Honor which of those two superior

10   forums to pick.  I think if you were counting contacts and

11   looking at the factors under the Corco test and the test

12   that this Court that has applied Texas probably certainly

13   has the stronger link.  We didn't -- we didn't take a

14   position on Texas or Louisiana because frankly as far as our

15   client is concerned either is fine.

16             Our co-counsel is based in New Orleans, they have

17   a office in Texas, so we were neutral on that, but that does

18   not mean that there's not a clear nexus of contacts and

19   relevant factors that this Court should consider that points

20   to Houston particularly and to Louisiana as a secondary

21   forum, which is either being far superior, not in terms of

22   the quality of the court, but in terms of the quality of the

23   connections required by the venue test.

24             This case has been equated to Enron in the papers.

25   This is not Enron.  This is not multi-billion dollars worth

1    of financial instruments that are in play in the case and

2    banks from all over the country and all over the world.

3              THE COURT:  Yeah, I didn't read -- actually I mean

4    I didn't read their papers to say that it was Enron.

5              MR. WERKHEISER:  Right.

6              THE COURT:  Anymore than this sale case is General

7    Motors.  You know, Enron -- I mean I said it actually in

8    passing that I mean I think Enron is probably one of the

9    most important decisions on venue.  It's cited to by

10   everybody and it's exhaustive, but it's obviously a venue is

11   as you put in your papers and they responded is an

12   intensively fact -- fact driven analysis.

13             So I don't think you need to sort of distinguish

14   this from Enron factually, but the analysis and the

15   considerations were certainly laid out by Judge Gonzales.

16             MR. WERKHEISER:  Yes.  Yes, I mean I don't

17   disagree that certainly aspects of the test are consistent

18   with what this Court should do and has done.

19             This idea that the debtors should have deference

20   to their venue choice and that Wayzata supports it.  I mean

21   let's be clear, there's not a lot of distinction between the

22   two parties.  You have the same Wayzata entity both as

23   equity, as DIP lender, and as prepetition lender, and a 94

24   percent owner of the parent debtor.  And, you know, they

25   went through the motions of appointing Mr. Hebert who came

1   to the debtors' --

2              THE COURT:  Let me ask you, because I did touch on

3   this with Mr. Knight, and you know, you've just laid out the

4   significance of the stakes that they have in this.

5   Obviously the secured debt, the DIP, the equity

6   piece.  You know, if -- how do I deal with that?

7              You know, and this is different from the question

8   of the nature of the character of movant, but when I've got

9   a -- the overwhelming economic stake in the case, right,

10  you're not going to dispute that, right?

11             MR. WERKHEISER:  In pure dollars, no --

12             THE COURT:  Yeah.

13             MR. WERKHEISER:  -- they have the largest stake.

14             THE COURT:  Is supporting venue here, how much

15  significance should I attribute to that?

16             MR. WERKHEISER:  It's entitled to some weight,

17  Your Honor, but the fact of the matter is this is a case

18  that is being run primarily for their benefit, and it should

19  not then be run in a way that prejudices the rights of

20  anyone else associated with the case.

21             So, you know, to the extent that it is more

22  difficult for us to be here, that it is more difficult for

23  White Oak or any other creditor to be here, you know, I

24  don't think that gets very much weight, and certainly

25  Wayzata has not told you that they have a particular problem

1    with Texas or Louisiana, just that they like it better here.

2              THE COURT:  Sure.  Okay.

3              MR. WERKHEISER:  And then I also want to point out

4    that if Your Honor consults the LLC agreement, which I think

5    we've offered into the record as an exhibit, and this really

6    ultimately is not the debtors' position, is they went

7    through the motion of appointing somebody nominally

8    independent (indiscernible - 1:54:41) managers, but Section

9    6.6 of this agreement specifies a number of actions that

10   require the approval of the Wayzata member, one of which is

11   to commence a voluntary bankruptcy proceeding by the

12   company, to merge the company or consolidate it, or in fact

13   anything that would be a change of control, another is to

14   mortgage or pledge the company's assets, so --

15             THE COURT:  I don't think any of that is

16   remarkable though.

17             MR. WERKHEISER:  Well, but they had absolute

18   control over this at the end of the day, even though they

19   inserted someone who facially doesn't have a direct

20   connection with Wayzata onto the board of managers.  He was

21   not free to tell them no.

22             THE COURT:  Okay.

23             MR. WERKHEISER:  Or to tell them that he was going

24   to go to Minnesota with the bankruptcy case.

25             And it also means that the debtors really didn't

1   have an opportunity to exercise independent business

2   judgment.  Excuse me.

3              This idea that the market is going to have a

4   problem with the case being in Texas.  I just -- I don't

5   think there's any legitimacy to that.  We heard --

6              THE COURT:  I don't think that was his testimony.

7   His testimony was regardless of where it is was that the

8   disruption or the message that it would send to the

9   marketplace, that first the investment banker was gone, and

10  then second, the case has been moved from one jurisdiction

11  to another would not be helpful to the analysis.

12             MR. WERKHEISER:  Uh-huh.

13             THE COURT:  I don't think his testimony was

14  expressly that it would be impaired in the Texas court.

15  Maybe that's the next step of that analysis --

16             MR. WERKHEISER:  Okay.

17             THE COURT:  -- but I mean his testimony was I

18  think a little bit more precise than that.

19             MR. WERKHEISER:  Okay.  Well, and Your Honor for

20  that point, so they right now are in the process of

21  transitioning.  If Your Honor were to transfer it today I

22  expect given -- or the electronic capabilities of the Court

23  we could have all the record down in Texas or Louisiana by

24  tomorrow, and I'm sure they would assign a judge immediately

25  to deal with the case.

1           So in terms of any real impact on the case when

2      there currently is an investment banker appointed, they

3      haven't set a schedule specifically for the sale, they don't

4      have a stalking horse, it's just all highly theoretical I

5      believe, Your Honor.

6           THE COURT:  I understand.

7           MR. WERKHEISER:  Your Honor, the debtors and

8      Wayzata both raise a point (indiscernible - 1:57:12)

9      counsel, we've heard the record that Young Conaway was

10     retained all of two weeks before and had no prior connection

11     and they've never used Delaware counsel for the company

12     before.

13          I have an exhibit that I wanted to offer to Your

14     Honor, which I understand is disputed, which was intended to

15     be a demonstrative based on a review of the Court's CMES ECF

16     records.  We conducted a search under the name Wayzata of

17     every case since 2007 and --

18          THE COURT:  No, I don't need that.

19          MR. WERKHEISER:  -- and the upshot was every time

20     Wayzata has appeared in a case they've had in addition to

21     Delaware counsel an outside firm involved.

22          THE COURT:  Yeah, I don't need that.  I mean I can

23     -- I don't know what I would do with that if I took it.

24          MR. WERKHEISER:  Okay.

25          THE COURT:  And it's disputed right now.  So I

1    don't think -- I don't think I'm going to --

2              MR. WERKHEISER:  Well, it --

3              THE COURT:  -- travel down that path.

4              MR. WERKHEISER:  Certainly, Your Honor, to the

5    weight that you would give to their choice of Delaware

6    counsel if they've never done that before.

7              THE COURT:  Well to that point and then I'll hear

8    from Mr. Schlerf.  To that point, yeah, it's of limited

9    significance to me.  In any case there will be, you know, in

10   a case of a venue motion in a Delaware court there's going

11   to be Delaware lawyers, and the fact that they've got

12   lawyers in Delaware goes to the point of, you know, the case

13   being set up and moving forward and the potential for

14   disruption if it's transferred --

15             MR. WERKHEISER:  Yes.

16             THE COURT:  -- but it doesn't mean, you know, we

17   got lawyers here and we'll never get lawyers anywhere else.

18   That's not really the argument, and I think it's of limited

19   significance.

20             But I'm going to ask to hear from Mr. Schlerf now.

21             MR. WERKHEISER:  Okay.  And if I can, I just have

22   a couple more points to try to get across, Your Honor.

23             Thank you.

24             THE COURT:  Yeah.

25             MR. SCHLERF:  Good afternoon, Your Honor.

1          I had very brief --

2          THE COURT:  Good.

3          MR. SCHLERF:  -- comments and I'm going to make it

4   even briefly, Your Honor, and I think I'm going to focus on

5   just our relation to this case and the debtor I think that

6   will make Your Honor better appreciate who White Oak is and

7   particularly I think it's important here that there's not a

8   creditors' committee appointed.

9          Your Honor, Jeffrey Suhlel from Fox Rothschild for

10  White Oak Energy V along with White Oak Operating Company.

11          Obviously debtors and their former CEO are in

12  battle mode, Your Honor, we have absolutely no dog in that

13  fight whatsoever.  White Oak only wants to protect its

14  interest as effectively as possible in the bankruptcy

15  process.

16          There are different components to our claims and

17  potential claims, Your Honor.

18          In 2010 White Oak sold certain oil and gas

19  producing properties in Louisiana to Goldking Holdings.  In

20  connection with that there is still an unpaid hold-back

21  amount.

22          THE COURT:  It's in your joinder.

23          MR. SCHLERF:  Yes.  In addition to that, Your

24  Honor, there are unfulfilled performance obligations that

25  are backstopped by a performance bond.

1              There's a recent forbearance agreement, Your

2      Honor, where there is a deed of trust that was issued.

3              There's also, Your Honor, though, just to explain,

4      our unsecured claim, which was on the petition, there's an

5      ongoing relationship as to certain oil and gas properties

6      where the debtors and White Oak share an interest in the

7      property, and that's where our unsecured claim arises.

8              And finally, Your Honor, there are four wells in

9      Louisiana in the Kent Bayou Field that were sold to the

10     debtors in 2010 for which Goldking has not completed its

11     abandonment work.

12             We've heard from the property owner recently and

13     who is now looking to White Oak if now that the debtor is in

14     bankruptcy cannot complete its performance obligation in

15     capping wells.

16             So, Your Honor, from our perspective there are

17     some issues and claims that are very unique to us where we

18     would try to work things out outside of court and possibly

19     going inside of court, but also we have concerns as a

20     creditor, and there is no creditors' committee in the case,

21     so otherwise we'd be more involved in the proceeding than we

22     would be if there was a creditors' committee.

23             So we submit, Your Honor, that from our standpoint

24     the first prong of the statute weighs in favor of

25     transferring venue.

1           The other thing I wanted to mention, Your Honor,

2    and the -- this is a very new client to me -- the client has

3    not made any commitments on this, but it's under

4    consideration, obviously this is a sale case and there's a

5    possibility that our client would be involved in that

6    process.  And from that standpoint as well we'd much prefer

7    to be appearing in a court in Louisiana or Texas.

8           Our client is headquartered in Texas and the oil

9    and gas properties that it currently has a relationship with

10   are in Louisiana.

11          So from that standpoint as well, Your Honor, they

12   would prefer to have the case in either Texas or Louisiana.

13          THE COURT:  Very good.  I'm going to take a few

14   minutes and review my notes.  I will return and we'll stand

15   the recess.

16      (Recess)

17          THE COURT:  Be seated.

18          The matter before the Court is the motion to

19   transfer venue of this case, and based upon the record

20   before me and for the reasons I will state I am going to

21   grant the motion and I will transfer venue of these Chapter

22   11 proceedings to the United States Bankruptcy for the

23   Southern District of Texas, which I believe is based in

24   Houston.

25          The operative statutory predicate is not in

1    dispute, it's 28 U.S.C. Section 1412, which contemplates

2    transfer of venue where it would be in the interest of

3    justice or for the convenience of the parties.

4           Case law identifies a number of factors that

5    courts consider in construing the convenience of the parties

6    prong.  I will address these factors, but I note as a

7    threshold matter that venue in Delaware, as the case was

8    filed was proper, and as the debtor is incorporated in

9    Delaware.

10          Case law further teaches that a debtor's choice of

11   venue is in fact entitled to substantial deference.

12          Notwithstanding that deference, which I accord, I

13   am satisfied that the movant has carried its burden as to

14   relief requested in the motion and the motion will be

15   granted.

16          The first prongs relate to the proximity of

17   creditors and the debtor to this court, and I note that the

18   great majority of creditors in this -- in these cases are

19   located in Texas and Louisiana, and that the debtor itself

20   is headquartered in Houston.  Relevant witnesses are located

21   in Houston, consisting of the debtors' offices and likely

22   testimony at least previously of Lantana but now as well the

23   debtors' new proposed investment banker.

24          The proximity of assets to Delaware versus Texas

25   is clear.  These debtors' assets are located in Louisiana

1    and in Texas, and I acknowledge that they are in fact

2    somewhat spread out, but I don't think that that is

3    dispositive of the question of whether or not Delaware

4    versus Texas is a superior forum for purposes of a venue

5    analysis.

6            As for economic administration of the estate this

7    weighs for a transfer, but probably not as heavily frankly

8    as a movant thinks.  Other than a number of people flying

9    back and forth for hearings from Houston I think that

10   experience teaches that a case involving a debtor

11   headquartered somewhere away from Delaware can none the less

12   be administered efficiently given communication advances and

13   information technology that we discussed on the record.

14           But clearly the marketing and sale process, which

15   is the thrust of this case, will be run out of Houston, and

16   in addition and importantly given the timeline that the

17   proposed I'm satisfied that there is not a material risk of

18   disruption to the case or to the purposes of the case from

19   transferring it.

20           I note that if this debtor were in a more advanced

21   or a more mature sale process that that would weigh heavily

22   in my analysis and could lead me to a different ruling, but

23   under the circumstances, and as I'll touch on in a moment,

24   this is a sale process that is ongoing, the investment

25   banker has just been proposed to be retained, and there's a

1    switch over.  I'm sympathetic to the disruption associated

2    with that, but again, I don't think that that really changes

3    the analysis here very much either.

4             This debtor, there's not a stalking horse which

5    would -- is a feature we would often typically see, and

6    there's welcome, and blessedly, not a terribly tight

7    timeline here for a sale process.

8             So that again, my consideration there is that the

9    risk of material disruption to a process that is well under

10   way or mature is reduced here.

11            The necessity for ancillary administration in the

12   context of a liquidation is a factor that I don't think

13   really weighs either way in this case, as I simply don't

14   have a sense or sufficient information at this point to

15   determine whether there in fact would be any need for such

16   relief in these cases.

17            Balancing and considering each of these factors I

18   am satisfied that the convenience of the parties supports

19   transfer to the Houston Bankruptcy Court.

20            Similarly I'm satisfied that this comports with

21   the interest of justice in a case where substantially all of

22   the assets are essentially real property interests that are

23   located in Texas and Louisiana, and a sale process that I

24   said is on a timeline more extensive than other cases that

25   we have seen that will be able to, by my estimation any way,