**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Energy Future Holdings Corporation, *et al.*, | Case No. 14-10979(---) |
| Debtors. | Joint Administration Pending |
| | **Objection Deadline: TBD**<br>**Hearing Date: TBD** |

**MOTION OF WILMINGTON SAVINGS FUND SOCIETY, FSB FOR
LEAVE TO CONDUCT DISCOVERY PURSUANT TO RULE 2004 OF THE
FEDERAL RULES OF BANKRUPTCY PROCEDURE OF ENERGY FUTURE
HOLDINGS CORPORATION, ITS AFFILIATES, AND CERTAIN THIRD PARTIES**

Wilmington Savings Fund Society, FSB (the "Trustee" or "WSFS"), as successor trustee under that certain indenture, dated as of October 6, 2010 (as amended or supplemented), among Texas Competitive Electric Holdings, LLC ("TCEH"), TCEH Finance, Inc., the guarantors party thereto, and The Bank of New York Mellon Trust Co., N.A., as trustee (as amended or supplemented, the "Indenture"),  pursuant to section 105(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 2004 of the Federal Rules of Bankruptcy Procedure ("Rule 2004"), hereby moves this Court for the entry of an Order authorizing and directing discovery relating to, *inter alia*: a) historic and ongoing mismanagement of the Debtors; b) disabling conflicts of interest affecting management and these cases; and c) potential efforts by the Debtors' senior management, for the benefit of Senior Lenders,[1] to artificially depress enterprise value for restructuring purposes – at the expense of holders of the Second Liens[2] and other parties in interest.  In support of this motion, the Trustee respectfully represents as follows:

---

[1]      Hereinafter, the term "Senior Lenders" shall refer to holders of first lien debt issued by TCEH.

[2]      Creditors under the Indenture are hereinafter referred to as the "Second Liens."

## PRELIMINARY STATEMENT

1.      The Debtors are the product of the $45 billion 2007 leveraged buyout (the "LBO") of TXU Corporation – the largest leveraged buyout transaction in this country's history – led by GS Capital Partners ("Goldman"), TPG Capital ("TPG") and KKR & Co., L.P. ("KKR" and, together with Goldman and TPG, the "Sponsors" or the "Sponsor Group").[3]   That transaction was predicated on acquisition indebtedness that was acknowledged at the time as record-breaking and has proved to be unsustainable.[4]   Since the close of the LBO, and despite TCEH's admitted insolvency, the Sponsor Group and management have materially increased the Debtors' risks through their subsequent actions and inactions.

2.      The Debtors have been in a state of business restructuring since 2000 as reflected in a series of major divestitures, assumption of a monumental level of indebtedness incurred in the LBO in 2007, several changes in senior executives and an apparent lack of focus on the core business – power generation and sales.[5]   Since the LBO, management appears to have focused on executing a strategy of supporting and extending a crippling debt load long enough to benefit the Sponsor Group's speculative investment predicated on substantially higher natural gas prices than have prevailed since 2007.[6]

---

[3]     *See* Energy Future Holdings Corp. (hereinafter, "EFH") Form 8-K filed Oct. 11, 2007 (**Appendix A**), p.2.

[4]     On February 18, 2011, EFH filed its 10K for fiscal year 2010, in which it revealed "recent valuation analyses of TCEH's business indicate that the principal amount of its outstanding debt currently exceeds its enterprise value."   *See* EFH Form 10-K filed Feb. 18, 2011 (the "2010 EFH 10K") (**Appendix B**), p. 23.

[5]     *See* EFH Form 10-K filed Feb. 19, 2013 (the "2012 EFH 10K") (**Appendix C**), Exhibit 99(c) (stating $72 million of restructuring-related expenses in FY 2011 alone).

[6]     *See* 2012 EFH 10K (**Appendix C**), p. 21 (noting downward trend in natural gas prices since mid-2008).

3.      Through negotiating a series of debt amendments and extensions that have further increased debt, the Debtors are now devoting virtually all free cash from operations to debt service and have a record level of debt per megawatt of nameplate capacity.[7]  Compounding the extraordinary risks inherent in the debt burden assumed to effect the Sponsor Group's speculative investment, management has failed to deal with key operational imperatives, which explains in large measure the Debtors' immediate financial predicament.  These failures include, *inter alia*, a) to effectively address a significant decline post-LBO in the Debtors' once commanding retail market share (where even relatively modest recoveries would result in meaningful improvements to cash flows and a resulting increase of measurable enterprise value);[8] and b) to take prudent and necessary steps to bring overhead in line with comparable metrics (including by shedding the approximate $50 million/year in fees paid to the Sponsor Group).  The failure to resolve these business imperatives has resulted in lost cash flow and, coupled with the current debt burden, impairs the Debtors' competitive posture and potentially, long term viability.

4.      Achievable improvements in these areas, coupled with additional revenue from other potential increases in energy pricing by the Public Utility Commission of Texas (PUCT) of so called "price adders" in the Debtors' market would result in multiple billions of dollars in

---

[7]     *See* Energy Future Competitive Holdings Co. LLC (hereinafter, "EFCH") Form 10-Q filed Nov. 1, 2013 (the "Q313 EFCH 10Q") (**Appendix D**), debt of $33,474 million including Swap Liability and Pollution Control Revenue Bonds; EFCH Form 10-K filed Feb. 19, 2013 (the "2012 EFCH 10K") (**Appendix E**), nameplate capacity of 13,772 adjusted for mothballed facilities (does not adjust for seasonal curtailments).

[8]     *See* 2012 EFH 10K (**Appendix C**), p. 36 (noting 21% decline in retail customers over last four years).

incremental enterprise value. Any improvement in the natural gas markets over the Debtors' forecasts would enhance that value exponentially.[9]

5.      Compounding the deleterious impact of the Debtors' apparent gross mismanagement, their controlling owners and managers have promulgated a series of projections (most recently in October 2013) that appear purposefully designed to curry favor with their Senior Lenders and line their own pockets. The resulting artificially depressed valuation derived from these projections appears intended to allow the Senior Lenders and management to print cheap reorganized equity and wipe out billions in legitimate creditor claims. Adjusting the arbitrarily conservative enterprise value implied by management's own projections to reflect: a) market pricing adders adopted by the PUCT, b) apparent improvements in the natural gas markets, c) benefits of announced curtailments at the Debtors' Monticello and Martin Lake facilities, d) correcting Debtor assumptions that understate the Debtors' sensitivity to such improvements, and e) adding in unrestricted cash, indicates an enterprise value range that may exceed the claims of the Senior Lenders and extend meaningfully into the Second Liens. Accounting for other value enhancers (e.g., right-sizing the Debtors' overhead cost structure and recovery of lost retail market share) would only increase the Second Liens' value entitlement.

6.      For example, the Debtors themselves have been very active in the push towards implementation of capacity pricing in the ERCOT market.[10] Yet, the Debtors' projections fail to

---

[9]      *See* EFH Form 10-Q filed Nov. 1, 2013 (the "3Q13 EFH 10Q") (**Appendix F**), p. 4 (noting that wholesale electricity prices, which move generally with price of natural gas, have significant implications on TCEH's profitability and cash flows).

[10]      ERCOT is the Electric Reliability Council of Texas. ERCOT is a membership-based nonprofit corporation subject to oversight by the Public Utility Commission of Texas and the Texas Legislature. ERCOT's members include consumers, cooperatives, generators,

reflect any consideration for market pricing increases based on widely understood and accepted pressures of continued growth in the demand for power and lack of adequate, dependable new generating capacity.  It appears the Debtors have ignored in their projections the implication from current review being undertaken by the PUCT of new pricing formulas for the ERCOT market intended to address critical generation resource adequacy in the future through forms of capacity price payments similar to those adopted in other service areas of the country or other means under discussion.  The PUCT is currently in active, public discussion of these options to address an acknowledged issue confronting ERCOT of declining reserve margins due to lack of adequate new investment.  Indicative of the likely beneficial outcome of these deliberations, the PUCT has recently approved an interim measure in ERCOT of an operating reserve demand curve (ORDC) price mechanism in order to provide a source of revenue meant to support new generation.[11]  To be adopted in June 2014, this formulation, referred to as "Interim Solution B+," is estimated to add in the range of $1.2 billion[12] to the Debtors implied enterprise value based on projections.  The Debtors have been consistent advocates for some form of capacity pricing.  Based on the estimates of various industry analysts,[13] the adoption of a standard form of capacity

---

power marketers, retail electric providers, investor-owned electric utilities (transmission and distribution providers), and municipal-owned electric utilities.

[11]    *See* 3Q13 EFH 10Q (**Appendix F**), p. 58 (highlighting recent PUCT/ERCOT actions).

[12]    ORDC B+ or Interim Solution B+ are incentive pricing alternatives to be adopted in June 2014 in the Debtors' primary market.  In basic terms, they are pricing regimes designed to incentivize power generators to maintain capacity that, while not always needed, is necessary to ensure peak periods are adequately covered and for stability of the power grid. The incremental value of the Option B+ adder is based on ERCOT Back Cast published October 2013.  The estimated value increase assumes a median ERCOT Back Cast Spot Price Adder and Capacity Adder, a discount period of 1 year, and certain other assumptions.

[13]    *See* UBS Global Research, Calpine Corporation, February 19, 2014, Julien Dumoulin-Smith; RBC Capital Markets, Calpine Corporation, February 14, 2014, Shelby Tucker

pricing over a 3 or 4-year time frame would result in increased revenue streams for generators, including the Debtors, which would be substantially greater than that provided by Interim Solution B+. If the Debtors choose to continue to ignore the inevitable uplift from Interim Solution B+ or the ultimate adoption of standard capacity pricing, it would certainly suggest the intentional manipulation of their projections for the purpose of artificially depressing enterprise value.

7. Having ineptly "kicked the can down the road" for the past six years, management has now steered the Debtors into chapter 11 with pending deals with Senior Lenders and creditors of the Debtors' regulated business segment. These Debtors effectively wasted nearly a year and many hundreds of millions of dollars pursuing their doomed "Project Olympus," a proposal aimed at retaining value for the Sponsor Group by keeping the Debtors' merchant power and transmission businesses together under the EFH banner.[14] With the failure of that effort and faced with the inevitable split of the regulated business from the non-regulated business, the Sponsors and the Debtors' management have shifted gears and appear to have refused to meaningfully consider any restructuring that would expose EFH (the Sponsors' investment vehicle) to tax liabilities that might result from a separation of the merchant power and transmission business, despite the unambiguous economic interests of subsidiary creditor groups.[15] This refusal appears designed to avoid the reputational repercussions to the Sponsors from having massive tax liabilities go unfunded at EFH. Instead of addressing fiduciary

---

and Ellen Ngai; Morgan Stanley, ERCOT: Brattle Study Shows Only Modest Costs For Higher Reliability & Capacity, February 3, 2014, Stephen Byrd.

[14]  *See* "EFH 'Project Olympus' fails as bid/ask stays wide," DEBTWIRE Oct. 31, 2013 (**Appendix G**).

[15]  *See* "EFH restructuring plan could lead to critical tax issue," DEBTWIRE Mar. 12, 2014 (**Appendix H**).

responsibility of TCEH's management to TCEH's creditors, the Debtors now appear, with the approval of Senior Lenders, intent on saddling TCEH with future tax liabilities – via a "tax free spinoff" of the unregulated business that would be to the direct detriment of the Second Liens and other junior creditors largely excluded from restructuring discussions to date.  With expected recoveries in excess of their claims, the Senior Lenders appear all too willing to accept such future tax liability in exchange for a quick trip through Chapter 11 that would extinguish junior interests.

8.    The restructuring agenda seems all too clear and all too common. The Trustee believes that management and the Senior Lenders hope to be able to extinguish junior obligations and reward themselves with newly-minted, underpriced equity, predicated on an intentionally depressed valuation measured at a historic industry trough.[16]  Collusion between management and senior lenders to deprive junior creditors of due value is not novel; but neither should it be condoned.[17]  It is a strategy that, if left unchecked, distorts the reorganization process to inequitably allocate value according to management's self-interested agenda.

9.    The Debtors will no doubt treat this Court to the traditional arguments of senior lenders and management that the market (*i.e.*, the current trading prices of the Debtors' debt securities) has spoken, and that this Court should simply ignore "out of the money" constituencies.  That the "market" is easily manipulated and has historically proven to be a poor

---

[16]    *See* "Natural gas and coal supplies may reach six year lows as cold weather drives power futures to the highest since 2008," DEBTWIRE Mar. 5, 2014 (**Appendix I**).

[17]    *See e.g.*, Michael T. Roberts, THE BANKRUPTCY DISCOUNT: PROFITING AT THE EXPENSE OF OTHERS IN CHAPTER 11, 21 AM. BANKR. INST. L. REV. 157, 159 (2013) (noting the potential perversion of the absolute priority rule effected by management and senior lender tendencies to undervalue enterprise and equity value in order to overcompensate themselves) (**Appendix J**); Stuart C. Gilson, et al., VALUATION OF BANKRUPT FIRMS, 13 Rev. Fin. Stud. 43, 64-67 (2000) (discussing senior claimants' bias towards undervaluing companies in bankruptcy).

indicator of corporate value in the bankruptcy context is of no moment to those who would line their pockets with underpriced equity.  Management and Senior Lenders will insist that this Court rush to judgment on enterprise value, in the hope that it will ignore, *inter alia*, significant developments in energy market pricing in ERCOT and an inevitable improvement in natural gas prices (which, based on recent investment activities, is likely expected by holders of large senior debt positions in this case).  Management and Senior Lenders may be expected to demand that the Court skip the more difficult and necessary exercise of ascribing value to the Debtors based on a rigorous and appropriate analysis of future earning potential, including but not limited to a recovery in retail market share and addressing bloated overhead.  If this Court allows for a full exploration of the facts and circumstances leading to the Debtors' spectacular failure and permits a reasonable and fair valuation exercise, the Trustee firmly believes such a valuation will substantiate that the Second Liens are the fulcrum security in the TCEH estate and entitled to a fair distribution on their claims.

10.     The Court is entitled to assess the operative facts before reaching its conclusion, including: a) the propriety of the restructuring agenda management wants to pursue in these cases; and b) whether historic mismanagement is the result of an intentional effort to depress perceived enterprise value entering into this proceeding.  In making its judgments, the Court should have the benefit of a full exposition of the significant conflicts of interest that infect these cases and management – even beyond the equity stakes and rich employment contracts awaiting management if they were to deliver the business to the Senior Lenders.  Those conflicts result from interlocking boards, lucrative compensation packages, certain of the Debtors holding significant positions in the public debt of other Debtors, and pervasive ties to members of the Sponsor Group (some of whom are believed to own positions in the senior debt and all of whom

are poised to be further enriched through shedding the same junior obligations they caused the Debtors to incur in the LBO transaction).

11.     By this motion, the Trustee seeks to conduct Rule 2004 discovery designed to, *inter alia*: a) illuminate the mismanagement and conflicts that abound in this case; and b) begin to bring to light the significant enterprise value that, if properly measured, shows the Second Liens to be the fulcrum security.  The Trustee believes this type of information will be crucially important to all facets of this Court's oversight of the Debtors' reorganization process, including as this Court weighs requests aimed at entrenching the self-serving restructuring agendas of management and Senior Lenders.  As such, it is critically important the relief requested hereby be granted immediately.   Further, based upon conflicts apparent from currently-available information and what may be developed through Rule 2004 discovery, the Court and certain parties in interest might conclude appointment of one or more trustees or an examiner is appropriate.

## JURISDICTION, VENUE, AND STATUTORY PREDICATES

12.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue may be proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.[18]  The predicates for the relief requested herein are Section 105(a) of the Bankruptcy Code and Rule 2004.

## BACKGROUND

13.     Since May 2013, certain holders of the Second Liens (the "Consortium") have attempted to enter into a consensual restructuring dialogue with the Debtors and Senior Lenders,

---

[18]     As discussed in the Trustee's concurrently-filed motion, venue for these cases should be transferred to the Northern District of Texas in the interests of justice and for the convenience of the parties.

and requested access to the type of diligence normally afforded in connection with such discussions.  Since its assumption of the Trustee role for the Second Liens in November 2013, WSFS has similarly attempted to engage with the Debtors and Senior Lenders.  The Debtors and Senior Lenders chose not to engage in any meaningful sense.  The Debtors refused to pay the reasonable expenses of professionals engaged by the Second Liens and/or the Trustee, while at the same time paying millions of dollars in fees and expenses to other creditor constituencies (some junior to the Second Liens).  And, the Debtors refused to provide the Trustee, Consortium or their professionals access to any significant non-public information.[19]  Over the course of the last few months, the Trustee and Second Liens made numerous outreaches to the Debtors and Senior Lenders to explore bases on which these cases might be resolved consensually, or at least might proceed in an orderly manner without the need for immediate discovery and litigation.  Such efforts were, essentially, rebuffed.  The Trustee is, therefore, forced to file this Motion to obtain information necessary to permit a fruitful restructuring dialogue and/or to allow the Trustee to properly contest the expected undervaluation of the Debtors if such dialogue fails to produce consensus.

14.    To date, the Second Liens have been shut out of restructuring discussions and left to review only publicly-available information in order to develop views as to an appropriate restructuring path.  The results of that review, coupled with management's suspected agenda to deliver significantly all estate value to Senior Lenders, raise serious concerns as to the propriety of the Debtors' restructuring agenda and management's ability to operate the Debtors' affairs without conflict.

---

[19]    While the Consortium and Trustee have thus far been denied access to meaningful non-public information, the views expressed herein has been informed by available public information and consultation with advisors Peter J. Solomon Corporation, Concentric Energy Advisors and Stratus Energy Group.

A.      <u>**Observable Mismanagement**</u>.

15.      The Trustee understands that, even prior to the LBO, the Debtors engaged in a continuing series of restructurings and shakeups in an apparent attempt to address excessive costs, marginally profitable acquisitions, and the general lack of a coherent strategy.  Since the LBO, management appears to have focused on meeting payments due on an overwhelming debt load, rather than attending to their duties to run the Debtors' business in a competent and rational manner.[20]  The Trustee believes that the failure to focus on the "blocking and tackling" of running a merchant power business has compounded the effects of the significant debt burden from the LBO, the current aberrational natural gas environment and increased leverage through management's amend and extend campaign.

16.      The Debtors' base load assets, including coal-fired and nuclear power plant units, constitute three-quarters of their generating capacity, far exceeding the relative base load mixes of other ERCOT competitors.[21]  With base load assets designed for continuous operations, regardless of market conditions, this lack of diversity and flexibility has left the Debtors exposed to the significant drop in power prices coincident with a drop in natural gas prices. A preponderance of base load capacity heightens sensitivity to changes in unit power prices, which left the Debtors in an untenable position relative to peers in ERCOT.  Conversely, as natural gas and power prices inevitably increase, this concentration will magnify the benefit to the Debtors relative to peers.  Nevertheless, it appears that the Debtors are understating this sensitivity,

---

[20]      *See* 2012 EFH 10K (**Appendix C**), p. 20 (discussing risks, and consequences, of Company's substantial indebtedness).

[21]      *See* 2012 EFH 10K (**Appendix C**), p. 29.

masking the magnitude of the impact of any recovery in natural gas prices.[22]  Coupled with improvements in generating fleet performance based on announced and likely additional curtailments, as well as adopting industry standard dispatching and increased forward sales should result in hundreds of millions of dollars in additional cash flow nowhere in evidence in the Debtors' depressed projections.  Inquiry should be made into why the Debtors have failed to optimize (or at least improve) their dispatching, retail-wholesale mix, and balance price-volume to optimize cash flow, and whether such failures reflect an intentional effort to depress valuation in advance of this restructuring.

17.    Pursuant to a "liability management" program, management appears to have focused its efforts on trying to meet the Debtors' huge debt financing expenses by extending debt maturities and placating senior creditors long enough for the current depressed natural gas market to recover.[23]  The result has been a net increase in the Debtors' debt load since the LBO to $33.5 billion.  As management incrementally increased the debt load, and failed to competently manage the Debtors' businesses, the capital markets have reacted by repeatedly downgrading TCEH's credit rating, making successive returns to the credit markets increasingly expensive.  Nonetheless, management continued its "amend and pretend" campaign, while continuing to fail to address the underlying problems in the Debtors' businesses.

18.    Of particular concern is the January 2013 amendment to extend the maturity date of the 2013 TCEH Revolving Credit Loans and 2013 TCEH Revolving Credit Commitments (approximately $645 million) to October 2016 in return for a $340 million extension fee (in the

---

[22]    *See* 2012 EFH 10K (**Appendix C**), p. 55 (highlighting Company's high sensitivity to fluctuations in natural gas prices).

[23]    *See* 2012 EFH 10K (**Appendix C**), p. 48.

form of incremental term loan obligations incurred by TCEH) – a fee which appears to be an astonishing **54%** of the face amount of the debt extended.[24]    An examination into the circumstances, lenders involved, costs and benefits of this transaction (and other "amend and extend" transactions) should be undertaken to determine whether there are: a) claims or options to avoid fees paid and/or commitments incurred by TCEH and related entities; or b) claims against management under a breach of fiduciary duty or similar theory.

19.    The Trustee believes that the Debtors' speculative grade credit rating bears not only on a high cost of capital but may be contributing to a significant impairment of performance of the Debtors' retail marketing operations and limits the Debtors' ability to sell power forward. The Debtors' decline in credit coincides with a material loss in retail market share and corresponding increase in dependence on spot market wholesale transactions.  Since 2011, the Debtors' wholesale / retail sales mix has shifted from 42% / 58% to its most recent reporting period (September 30, 2013) of 48% / 52%.[25]  Loss in retail likely reflects market concerns for the Debtors' financial condition, the inability to retain sales staff, and lack of financial resources to retain accounts.  Despite a growing retail electricity market in Texas, TXU Energy has lost substantial retail market share since the LBO.[26]  The Trustee believes that a recovery of even one-third of the Debtors' lost retail market share since the LBO, at 2013 price levels would increase annual EBITDA by more than $150 million.

20.    An area to be explored though the requested Rule 2004 discovery will be the causes for erosion of the Debtors' once dominant retail market share (which, with its less volatile

---

[24]    *See* 2012 EFCH 10K (**Appendix E**), p. 122.

[25]    *See* Q313 EFCH 10Q (**Appendix D**), p. 60 and EFCH Form 10-K filed Feb. 18, 2011 (the "2010 EFCH 10K") (**Appendix K**), p.   57.

[26]    Based on ERCOT Total Retail Volume and TCEH reported retail volume.

pricing dynamic, would provide a natural hedge against falling natural gas prices).  Possible causes for the loss in retail customers include: a) the Debtors' recent failing financial condition and lack of credit, while competitors continue to offer more competitive products and lure away the Debtors' retail customers; and b) the turmoil and marketing taint of a looming reorganization. Inquiry should be made as to, *inter alia*: x) what management has done to reverse the trend of declining retail volume; y) whether management allowed retail volume to degrade in order to artificially depress value and secure underpriced equity for themselves in this restructuring; and z) management's own expectations as to revenue opportunities from improvement in the retail/wholesale mix.

21.    Next, inquiry as to the Debtors' excessive overhead structure is needed.  The Debtors have disposed of a number of businesses since 2000, but failed to achieve overhead cost levels comparable to competitors.  The Debtors' Selling, General and Administrative costs (SG&A) as a percentage of Operating Revenue for the last nine months (as of September 30, 2013) stand at 11.0%.[27]  This is more than 200 basis points higher than the nearest comparable company, NRG Energy.  This level of excess overhead is a significant drag on the Debtors' cash flow and implied value.  The Debtors acknowledge that approximately $50 million per year of SG&A includes management fees paid to the Sponsor Group.[28]  Bringing costs to a level conforming with NRG Energy's ratio would yield a savings in excess of $100 million.  Inquiry into why management has allowed the Debtors' overhead to reach existing levels should occur before the Court is asked to consider the propriety of proposed creditor concessions.

---

[27]    *See* 3Q13 EFH 10Q (**Appendix F**), p. 1.

[28]    *See* 2012 EFH 10K (**Appendix C**), Exhibit 99(b).

22.     In addition to operating issues directly under management's control, market factors that significantly affect the Debtors' enterprise value must be evaluated and taken into account before pursuing or implementing a restructuring that appears designed to favor the Sponsor Group, management, the Senior Lenders, or creditors at structurally-subordinated EFH — to the detriment of the Second Liens.  As noted above, the PUCT is actively evaluating in open forum alternative pricing structures intended to ensure more adequate reserve margins for generation resource adequacy in future years.[29]  As a first step in that regard, Interim Solution B+ will be applied beginning in June 2014 as a price support to ensure an adequate level and stable supply of power.[30] As recently as December 16, 2013, the Debtors expressed in a filing to the PUCT that in addition to Interim Solution B+ they "continue to support a centralized forward capacity market as the best solution for the resource adequacy problem facing ERCOT, because this market design could best achieve a specified required reserve margin."[31]  Wall Street estimates of the resulting increase in the Debtors' free cash flow from such capacity payments, should these payments be instituted by the PUCT, range from $20 to $100 per Megawatt-Day,[32]

---

[29]     *See* 3Q13 EFH 10Q (**Appendix F**), p. 58.

[30]     *See* NRG Energy, Inc. Form 10-K filed Feb. 28, 2014 (**Appendix M**), p. 31. At its September 12, 2013 open meeting, the PUCT directed ERCOT to implement an operating reserve demand curve by the summer of 2014, known as ORDC B+. As part of prior market reforms, system wide offer caps (currently $5,000) will increase to $7,000 per MWh in June 2014 and $9,000 per MWh in June 2015.

[31]     *See* Luminant's Response to Request for Comments Regarding Potential Market Design Changes to Address Resource Adequacy in ERCOT, p. 3.

[32]     *See* UBS, US Electric Utilities & IPPs: Texas Mandates Reserve Margin, October 25, 2013; Morgan Stanley, ERCOT: Brattle Study Shows Only Modest Costs For Higher Reliability & Capacity, February 3, 2014; Bank of America Merrill Lynch, Texas regulators may move towards capacity market, October 27, 2013.

which would imply increases in incremental EBITDA of approximately $100 million to $500 million per year.[33]

23.    It is also anticipated in the market that natural gas prices, which have been at historically depressed levels since April 2012, are rising.[34]  This reflects the anticipated impact of increasing exports, growth in domestic demand, and the long term clearing cost of production.[35]  The Debtors acknowledge that even a $1.00/MMBtu increase in natural gas yields a $475 million increase per year in EBITDA.[36]  This admitted incremental gain appears to substantially understate the sensitivity.  In one estimate, this gain is $700 million/year/$1.00.[37] The implied increase in the Debtors' enterprise value is several billions of dollars.  Investigation should be made into whether, and to what extent, these market improvements have been considered for incorporation into management's planning and forecasting.

---

[33]    Assumes installed nameplate capacity of 14,017 MW (15,427 MW adjusted for seasonal curtailments of Monticello and Martin Lake).

[34]    *See* UBS, *Power's Never Looked So Good*, March 26, 2014, Julien Dumoulin-Smith, p. 32; Henry Hub Natural Gas Spot Prices, http://www.eia.gov/dnav/ng/hist/rngwhhdd.htm (last visited April 26, 2014) (**Appendix N**); Wall Street Journal, Nicole Friedman, *Natural Gas Soars as Stockpiles Drop*, February 13, 2014 (**Appendix O**); Financial Post, *Natural gas drillers wary as some see year-long supply squeeze*, February 10, 2014 (**Appendix P**); IB Times, Nat Rudarakanchana, *Natural Gas: Hottest Monthly Moves Since 2009, On Cold Snap*, January 19, 2014 (**Appendix Q**); *see also* 3Q13 EFH 10Q (**Appendix F**), p. 54 (noting forward market prices for natural gas expected to increase from $3.60 to $4.70 by FY 2016).

[35]    *See* UBS, 1Q14 Earnings Playbook: Commodity Recovery Underway, April 17, 2014, Julien Dumoulin-Smith; Market Oracle, Andrew McKillop, *US Natural Gas Glut To Gas Panic – Time For A Bull Run*, January 27, 2014 (**Appendix R**); Wall Street Journal, Brett Philbin, *Natural-Gas Futures Rise on Record Storage Withdrawal*, January 16, 2014 (**Appendix S**); The Street, Mike Norman, *Natural Gas Boom Is Bullish for Prices*, December 9, 2013 (**Appendix T**).

[36]    *See* 3Q13 EFH 10Q (**Appendix F**), p. 54.

[37]    *See* CreditSights, Andy DeVries, *TXU: Recent Pros (Gas prices) & Cons (Cap. Paymts)*¸ February 19, 2014, p. 3.

24.     The investment decisions of two of the Senior Lenders reported to be directly involved in negotiations with management and the Sponsor Group appear to signal that these parties expect natural gas prices to rise in the future.  First, Oaktree Capital Management ("Oaktree"), a major holder of TCEH first lien securities, has accumulated an 8.2% equity stake in Dynegy Corporation ("Dynegy"), currently worth approximately $185 million as of February 20, 2014. [38]  Dynegy is a member of the Debtors' peer group with cash flows similarly tied to natural gas prices.  Second, Apollo Global Management ("Apollo"), also a significant holder of TCEH first lien claims, recently sold a controlling ownership interest in LyondellBasell, a petrochemical company, whose cash flows move inversely with natural gas prices, thus signaling Apollo's opinion that gas prices are poised to rise.[39]

## B.    Pervasive Conflicts Infecting These Cases.

25.     This Court should be made aware of the significant conflicts of interests affecting management, the Sponsor Group, and the Debtors' professionals.[40]  As an initial matter, the boards of TCEH and the other Debtors are laden with conflicting financial incentives and competing duties/interests:

---

[38]     *See* Oaktree Capital Management LP Form 13F filed Feb 11, 2014 (**Appendix U**), p. 5 (reporting holdings of 8,245,986 shares of Dynegy common stock).

[39]     *See* "Chemical IG bondholders find refuge in Lyondell, activists drag Dow, DuPont," DEBTWIRE Feb. 5, 2015 (**Appendix V**).

[40]     *See* 2012 EFH 10K (**Appendix C**), p. 214.

| Name | EFH Board | EFIH Board | EFCH Board | TCEH Board | Equity Holdings |
|------|-----------|------------|------------|------------|-----------------|
| Arcilia C. Acosta | x | | x | x | 323,529 shares of EFH |
| Billie I. Williamson | x | | | | |
| Brandon A. Freiman[41] | x | | | | |
| David Bonderman[42] | x | | | | |
| Donald L. Evans | x | | | | 2.1 million shares of EFH |
| Jeffrey Liaw | | x | | | |
| John F. Young[43] | x | x | x | x | 1,012,222 shares of EFH |
| Jonathan D. Smidt[44] | x | | x | x | |
| Kenneth Pontarelli[45] | x | x | | | |
| Kneeland Youngblood | x | x | | | 393,529 shares of EFH |
| Michael MacDougall[46] | x | | x | x | |
| Paul M. Keglevic[47] | | x | x | x | |
| Scott Lebovitz[48] | x | | x | x | |
| Thomas  D. Ferguson[49] | x | x | | | |
| William  K. Reilly[50] | x | | | | 453,529 shares of EFH |

26.    It is notable that: a) three of TCEH's six directors have ties to the Sponsor Group, and all are members of boards of other entities within the EFH group; b) two of TCEH's

---

[41]    Director at KKR.

[42]    Founding partner of TPG.

[43]    Chairman of the Board, Chief Executive Officer, President, Chief Executive Officer of EFH Corp, President of EFH Corp and Director of EFH Corp; Chair, President, and CEO of EFCH.

[44]    Partner at KKR.

[45]    Managing director at Goldman Sachs.

[46]    Partner of TPG Capital; formerly vice president at Goldman Sachs.

[47]    Executive Vice President and Chief Financial Officer of EFH.

[48]    Managing director at Goldman Sachs.

[49]    Managing director at Goldman Sachs.

[50]    Senior advisor at TPG.

directors hold significant equity stakes in EFH;[51] c) two of TCEH's directors are employees of other Debtors, slated to earn substantial salaries, bonuses, and payouts upon a change in control;[52] and d) of the EFH board (thirteen members): four are or have been affiliated with Goldman Sachs; three are or have been affiliated with TPG, and two are or have been affiliated with KKR (some directors have been affiliated with more than one member of the Sponsor Group).[53]

27.    On top of the fees they receive for their board participation, the officer/directors also receive significant employment-related compensation from other entities in the EFH corporate group.  In the last reported fiscal year prior to the filing of these cases, John Young was paid a cash "performance" bonus of $2.3 million, and Mr. Keglevic received a "performance" bonus of $1 million.[54]  On September 30, 2012, Mr. Keglevic received a cash payment in the amount of $3.2 million upon amendment of his deferred share agreement.  In June of 2013, Mr. Keglevic received another cash bonus in the amount of $375,000.[55]  Other benefits accorded the officer/directors include golf and social club memberships, spousal travel expenses, anytime personal and private physician access and health care for Messrs. Young and

---

[51]    Acosta (323,529 shares), Keglevic (492,740 shares), and Young (1,012,222 shares).

[52]    Upon a change in control, director John Young will receive $14.3 million, and director Paul Keglevic will receive $5.3 million.

[53]    On January 17, 2014, Marc S. Lipschultz, global head of KKR's energy and infrastructure business, resigned from the board of EFH.

[54]    *See* 2012 EFH 10K (**Appendix C**), p. 192.  Mr. Young is eligible for long-term cash incentive awards of $675,000 on a quarterly basis and $2.7 million on an annual basis. Messrs. Keglevic, and McFarland are each eligible for long-term cash awards of $250,000 on a quarterly basis and $1.0 million on an annual basis. *See* EFH Form 8-K, filed Jan. 24, 2014 (**Appendix W**), p. 3.

[55]    *See* 2012 EFH 10K (**Appendix C**), p. 188.

Keglevic.[56]   Discovery should be taken as to the breadth of the conflicts under which management operates, any efforts to ameliorate such conflicts and the effect those conflicts have had on the conduct of the Debtors' businesses and the development of management's restructuring agenda.

28.     Emblematic of the conflicts under which the board and management are operating are the facts underlying litigation that, until recently, was pending in the District Court for the Northern District of Texas.  In that litigation, *Aurelius Capital Master, LTD, et al. v. Arcilia C. Acosta, et al.*, Case No. 13-cv-01173 (N.D. Tex), creditors of TCEH brought suit against the conflicted board and TCEH's immediate parent, EFCH.[57]  The basis of the litigation was that, for years management caused TCEH to make billions of dollars in loans to EFH (even as EFH's credit rating eroded and the risk of default grew), but failed to ensure TCEH received an appropriate rate of interest.[58]  In the face of that litigation, the conflicted board caused the loans to EFH to be repaid.  But, it has been alleged, TCEH received approximately $725 million less in interest than it should have received had the corporate separateness between EFH and TCEH been respected.  There has been no indication that such value will be returned to the TCEH estate for the benefit of its creditors.  Discovery into these claims, and as to other claims the TCEH estate may have against other Debtors is warranted, including as it applies to the propriety of one

---

[56]     *Id.* (**Appendix C**) at 196.

[57]     Historically, EFCH was a Texas corporation.  In April 2013, management caused EFCH to be converted to a Delaware limited liability company.  Investigation into the motives for that conversion is warranted.

[58]     On January 28, 2014, the District Court for the Northern District of Texas dismissed the litigation on the basis that, under Texas law, the creditor-plaintiffs did not have standing to bring a derivative action against officers and directors.  The dismissal was without prejudice and did not address the merits of the claims asserted.  With the filing of these cases, such claims may be asserted on behalf of the estate.  (**Appendix X**).

counsel representing multiple estates with adverse interests.[59]    Discovery should also be conducted into the use of the proceeds of the forced loans, and the opportunity costs incurred by TCEH (including as to lost opportunities to diversify its generation fleet, implement efficiency changes, and otherwise take steps to optimize performance and revenues).[60]

29.    The conflicts are only exacerbated by entities within the EFH group amassing significant positions in the public debt of other Debtors and related entities.    More specifically, the following chart shows the currently-known cross-ownerships of debt issued at various levels of the corporate structure:

|  | EFH (issuer) | EFCH (issuer) | EFIH (issuer) | TCEH (issuer) |
|---|---|---|---|---|
| EFH (holder) |  | $87 million LIBOR + 500 demand note |  | $19 million 4.709% Term Loan Facilities maturing October 10, 2017[61]<br><br>$213 million TCEH 10.25% Fixed Senior Notes due November 1, 2015[62]<br><br>$150 million TCEH 10.25% Fixed Senior Notes due November 1, 2015, Series B[63]<br><br>Or[64]<br><br>$284 million 10.25% Fixed Senior Notes[65] |

---

[59]    In light of the conflicting interests of the Debtors' various estates, the Trustee expects to interpose an objection to the joint retention of professionals by those estates.

[60]    *See* 2012 EFH 10K (**Appendix C**), p. 20 (highlighting, as a consequence of the Debtors' substantial indebtedness, a reduced ability to fund operations, make capital investments, and grow the businesses).

[61]    *See* 3Q13 EFH 10Q (**Appendix F**), p. 15.

[62]    *See id.*

[63]    *See id.*

[64]    Reflects conflicting information between identified sources.

[65]    *See* EFCH September 2013 10-Q (**Appendix D**), p. 36.

| | EFH (issuer) | EFCH (issuer) | EFIH (issuer) | TCEH (issuer) |
|---|---|---|---|---|
| EFIH (holder) | $281 million  Fixed Series P Senior Notes due November 15, 2014[66] <br><br> $545 million 6.50% Fixed Series Q Senior Notes due November 15, 2024[67] <br><br> $456 million 6.55% Fixed Series R Senior Notes due November 15, 2034[68] | | | $79 million 10.25% Fixed Senior Notes due November 1, 2015[69] |

Any restructuring of EFH, EFIH, EFCH, or TCEH will impact the value of securities issued by those entities and held by other entities in the EFH group.  The adversity of interests created by these interlinked creditor/debtor relationships (and the ripple effects to be felt by outside holders of the same securities) cannot be reconciled, and management cannot fulfill its fiduciary obligations to both sides of those creditor/debtor relationships.  Investigation into these conflicts, and the impact they have had on management conduct to date, including as to development of management's restructuring agenda, should be conducted.

30.      At the same time, the Sponsor Group, with control of the relevant boards, has been enriching itself on the backs of creditors – including, presumably, with proceeds of the below market loans TCEH was forced to make to EFH.  EFH paid annual management fees to the members of the Sponsor Group totaling $38 million, $37 million, and $37 million for the years ended December 31, 2012, 2011, and 2010, respectively, and $19 million for the six

---

[66]      See Energy Future Intermediate Holding Co. LLC (hereinafter, "EFIH") Form 10-Q filed Nov. 1, 2013 (**Appendix Y**), p. 13.

[67]      See id.

[68]      Id.

[69]      Id.

months ended June 30, 2013.[70]   In January 2013, fees paid to Goldman, Sachs & Co. ("GSC"), an affiliate of sponsor GS Capital Partners, for services related to debt exchanges totaled $2 million.   For the year ended December 31, 2012, fees paid to GSC related to various amend/extend transactions totaled $10 million; a broker-dealer affiliate of KKR and an affiliate of TPG each received a total of $4 million.  For the year ended December 31, 2011, fees paid to GSC related to debt issuances, exchanges, amendments, and extensions totaled $26 million; affiliates of KKR and TPG each received $5 million in connection therewith.  For the year ended December 31, 2010, fees paid to GSC related to debt issuances and exchanges totaled $11 million.  Examination into these fees should be conducted to determine whether, and to what extent, they may be avoidable and recovered for the benefit of the estates.

C.    **Frailties In The "Observable Market" Approach.**

31.    It is expected that management and the Senior Lenders will point to the current trading prices of TCEH's debt securities (in large part, currently trading below par) as indicative of the intrinsic value of TCEH's assets.  The "market" value of a distressed company's publicly traded debt in advance of a Chapter 11 filing, however, may suffer from a downward bias as a result of the "stigma of bankruptcy."  *See In re Penn Central Transp. Co.*, 596 F.2d 1102, 1115-16 (3d Cir. 1979) (opining that the market perception may be "unduly distorted" with regard to equity or long-term debt of the reorganized debtor).   Furthermore, the pre-petition market "valuation" of a distressed company's debt can be a poor measure of the eventual recoveries to creditors for several other reasons:

> a.  the market necessarily factors in the risk and uncertainty that a plan of reorganization will not be confirmed, and the creditors will not be entitled to any recoveries;

---

[70]    *See* 2012 EFH 10K (**Appendix C**), Exhibit 99(c).

  b. the market cannot accurately account for numerous benefits of a Chapter 11 reorganization – such as resolving ongoing litigation, settling claims, rejecting contracts, and exercising avoidance powers of a trustee (or debtor in possession) – all of which will positively affect the reorganized Debtors' cash flows; and

  c. the market disregards the benefits of deleveraging that necessarily occurs as a result of a court-supervised reorganization in Chapter 11.

*See In re Mirant Corp.*, 334 B.R. 800, 832-835 (Bankr. N.D. Texas 2005) (discussing these factors and concluding that contemporaneous market valuation was too pessimistic early in the bankruptcy process); *see also In re Exide Techs.*, 303 B.R. 48, 65-66 (Bankr. D. Del. 2003) (criticizing the debtors' expert for bringing his valuation in line with the current market value, observing that the "'taint' of bankruptcy will cause the market to undervalue the securities and future earning capacity of the [d]ebtor.") (*citing Penn Central*, 596 F.2d at 1115-16). The market may also underestimate additional business opportunities that become available to the reorganized debtor. *See In re Wash. Mut., Inc.*, 442 B.R. 314, 360-61 (Bankr. D. Del. 2011) (finding the debtors' expert valuation to be too low because the expert failed to take into account additional business that the debtors may acquire with the proceeds of a rights offering).

  32. Management and Senior Lenders will likely argue that current trading prices of debt securities are indicative of enterprise value, and that the court should not engage in a more searching inquiry for the benefit of "out of the money" creditors. Given the common disconnect between the "market" for distressed securities and ultimate enterprise value, such arguments should be heavily discounted.

**D. <u>Management And Senior Lender Incentives To Undervalue The Debtors</u>.**

  33. Courts and commentators have recognized that, in bankruptcy, management and senior lenders share a common incentive to minimize the Debtors' valuation. *See In re Exide Techs.*, 303 B.R. at 61 (rejecting the debtor-proposed valuation and setting the value closest to

the range proposed by the creditors' committee, "keeping in mind each side's incentive to overvalue or undervalue the [d]ebtor"); *see also* Stuart C. Gilson, *et al*., VALUATION OF BANKRUPT FIRMS, 13 Rev. Fin. Stud. 43, 64-67 (2000) (discussing senior claimants' bias towards undervaluing companies in bankruptcy). Management incentives are clear – upon the Debtors' emergence from chapter 11, management is likely to receive a fixed number of stock options of the reorganized debtor. If the valuation is suppressed, what may otherwise appear to be a modest at-the-money grant, immediately translates to an in-the-money windfall. See Gilson at 67-68.

34. As one commentator noted after analyzing valuations in the context of large Chapter 11 cases:

> Difficulty arising out of equity valuations reveals the Achilles' heel of the "fair and equitable" standard. Artificially low equity valuations may compensate senior creditors, who receive equity on account of their allowed claims, with value in excess of their allowed claims. Artificially low equity valuations, therefore, could mask from the Court wealth transfers from junior to senior creditors and provide the Court with justifications to ignore junior creditors' otherwise credible objections. In sum, artificially low valuations undermine the purpose of the "fair and equitable" standard.

Michael T. Roberts, THE BANKRUPTCY DISCOUNT: PROFITING AT THE EXPENSE OF OTHERS IN CHAPTER 11, 21 AM. BANKR. INST. L. REV. 157, 159 (2013) (internal citations omitted) (finding that, on average, debtors' valuations are discounted by one "full turn" on EBITDA; enterprise and equity values discounted by 12% and 20%, respectively, relative to non-bankruptcy peers) (**Appendix J**).

35. There are numerous examples of cases in which management and senior lenders have tried (sometimes successfully) to use the Chapter 11 process to obtain underpriced equity,

*via* a depressed valuation thesis, at the expense to more junior stakeholders who otherwise would have been "in the money" themselves, including, *inter alia*:

- *In re Premier Int'l Holdings, Inc*. (Six Flags Amusement Parks), Case no. 09-12019 (Bankr. D. Del). Management and structurally senior lenders prosecuted a plan predicated on substantially all new equity going to senior lenders and management, based on a business plan prepared by management. After a lengthy valuation trial, during which management's projections and motives were called into question, the court approved an alternative proposal supported by the unsecured creditors committee and subordinated noteholders that provided for substantial distributions to junior creditors.

- *In re Mirant Corp*., Case No. 03-46590 (Bankr. N.D. Tex. 2003). After a lengthy valuation trial during which management and lenders claimed equity holders were billions of dollars "out of the money," parties arrived at a settlement whereby existing equity received approximately $1 billion in value. Post-emergence, the Debtors' equity appreciated further, even beyond the valuation argued by the official equity committee at trial.

- *In re E-II Holdings Inc*., Case No. 92-43614 (Bankr. S.D.N.Y. 1992). After confirmation proceedings during which allegations of collusion between senior lenders and management were made, the court crammed down on objecting junior creditors a plan premised on an implied enterprise valuation of $824 million. Following emergence, the enterprise was valued at approximately $950 million.

- *In re National Gypsum Co.*, Case No. 90-37214 (Bankr. N.D. Tex. 1990). Debtors confirmed a plan, over the objection of junior creditors, that provided for a full recovery for senior creditors and nothing for junior creditors, at an adjudicated enterprise valuation of $250 million. Following emergence from bankruptcy, the company raised product prices and reduced expenses. Within eight months of emergence, the market valued National Gypsum at $1,021 million.

In order to evaluate requests for relief by management and the Senior Lenders that may serve to "lock in" delivery of substantially all estate value to those parties early in these cases, this Court should have the benefit of a full exposition of the motives of management and Senior Lenders, conflicts of interest that may affect those motives, and an appreciation of the actions and inactions of management that have led to the Debtors' current financial condition.

## RELIEF REQUESTED

36.    By this Motion, the Trustee seeks an Order compelling the Debtors, the Debtors'

boards of directors, the members of the Sponsor Group, and certain holders of the Debtors' First

Lien debt (collectively, the "2004 Parties") to produce documents and designate person(s) most

knowledgeable for depositions in accordance with the attached schedules:

- Debtors – Schedule 1

- Boards of directors of the Debtors – Schedule 2

- Members of the Sponsor Group – Schedule 3

- Senior Lenders – Schedule 4

## BASIS FOR RELIEF REQUESTED

**A.    Legal Standard.**

37.    "On motion of any party in interest, the court may order the examination of any

entity." See Fed. R. Bankr. P. 2004(a).  A Rule 2004 examination may be made of a debtor or

any other entity with knowledge of the Debtors' acts, property, liabilities, and financial

condition. *See In re Summit Global Logistics*, No. 08-11566, 2008 WL 1446722, at *2 (Bankr.

D.N.J. Apr. 9, 2008); *In re Valley Forge Plaza Assocs.*, 109 B.R. 669, 674 (Bankr. E.D. Pa.

1990); *In re Fearn*, 96 B.R. 135, 138 (Bankr. S.D. Ohio 1989).  Such an examination "allows

parties with an interest in the bankruptcy estate to conduct discovery into matters affecting the

estate." *Teleglobe USA Inc. v. BCE Inc. (In re Teleglobe Commc'ns Corp.)*, 493 F.3d 345, 354

n.6 (3d Cir. 2007).  "The purpose of such a broad discovery tool is to assist the trustee in

revealing the nature and extent of the estate, and to discover assets of the debtor which may have

been intentionally or unintentionally concealed." *In re Bennett Funding Grp., Inc.*, 203 B.R. 24,

28 (Bankr. N.D.N.Y. 1996); *see also* Fed. R. Bankr. P. 2004(b) (examination may relate to,

among other things, "the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the Debtors' estate"). Rule 2004(c) provides that "the attendance of an entity for examination and for the production of documents . . . may be compelled as provided in Rule 9016," which permits the issuance of a subpoena. *See* Fed. R. Bankr. P. 2004, 9016.

38.     Rule 2004 discovery is not limited to use by debtors and official committees. To the contrary, courts have repeatedly recognized that creditors and other parties in interest may obtain Rule 2004 discovery consistent with the express language of Rule 2004. *See In re Lehman Bros. Inc.*, No. 08-01420, 2008 WL 5423214, at *2-3 (Bankr. S.D.N.Y. Nov. 26, 2008) (granting motion filed by individual creditors to conduct Rule 2004 examination for the purpose of "determining what is owed to these individuals" and whether there are other parties entitled to relief); *People's Bank v. Poirier (In re Poirier)*, 214 B.R. 53, 58 (Bankr. D. Conn. 1997) ("The broad scope and ready availability of a Rule 2004 Examination *provides a forum for an individual creditor* to question a debtor at great length on all matters relevant to the Debtors' financial affairs . . . .") (emphasis added); *Valley Forge*, 109 B.R. at 674 ("[T]he particular purpose for which [Rule] 2004 and its predecessor provisions under the Bankruptcy Act were promulgated. . . . is to allow a Trustee, *or others interested in accomplishing the same ends*, to discover and investigate how to bring to light possession of assets of the debtor which might be intentionally concealed or overlooked in ignorance or haste.") (emphasis added). The Trustee and each holder of Second Lien Notes is a "party in interest" with standing to seek authorization for, and to undertake, a Rule 2004 examination. *See* 11 U.S.C. § 1109(b) ("A party in interest, including . . . a creditor . . . may raise and may be appear and be heard on any issue in a case under this chapter.").

B.    <u>Scope Of Rule 2004 Examination</u>.

39.    The scope of a Rule 2004 examination is to be "unfettered and broad," as the plain language of the rule indicates.  *In re Wash. Mut., Inc.*, 408 B.R. 45, 49-50 (Bankr. D. Del. 2009) (noting that a "Rule 2004 examination is commonly recognized as more in the nature of a fishing expedition") (internal citations and quotations omitted); *see 9 Collier on Bankruptcy* ¶ 2004.02[1] (16th ed. rev. 2013) (quoting *In re Table Talk, Inc.*, 51 B.R. 143, 145 (Bankr. D. Mass. 1985)); *see also In re Drexel Burnham Lambert Grp., Inc.*, 123 B.R. 702, 711 (Bankr. S.D.N.Y. 1991) ("The understanding generally acceptable today is that the scope of a Rule 2004 examination is very broad."); *In re Cont'l Forge Co.*, 73 B.R. 1005, 1007 (Bankr. W.D. Pa. 1987) (noting that the general purpose of Rule 2004 is to locate assets and to make those assets available for creditors).  Courts have described a Rule 2004 examination as "the basic discovery device used in bankruptcy cases."  *In re French*, 145 B.R. 991, 992 (Bankr. D.S.D. 1992).  It is well-settled that the scope of examination allowed under Rule 2004 is broader than discovery allowed under the Federal Rules of Civil Procedure.  *See In re Countrywide Home Loans, Inc.*, 384 B.R. 373, 404 (Bankr. W.D. Pa. 2008) ("[T]he scope of the examination is so much broader for Rule 2004 (i.e., a 'fishing expedition') discovery that falls within the traditional scope of litigation discovery and is not otherwise offensive to the Federal Rules of Civil Procedure . . . ."); *see also Air Line Pilots Assoc., Int'l v. Am. Nat'l Bank & Trust Co. of Chicago (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414, 432 (S.D.N.Y. 1993), *aff'd sub nom, Sobchack v. Am. Nat'l Bank & Trust Co. (In re Ionosphere Clubs)*, 17 F.3d 600 (2d Cir. 1994); *In re Duratech Indus.*, 241 B.R. 283, 289 (Bankr. E.D.N.Y. 1999); *Drexel Burnham*, 123 B.R. at 711.

40.    Examinations under Rule 2004 may include within their scope, among many other things, any matter which may affect the "administration of the Debtors' estate," and, in a chapter

11 case, any matter relevant to the case or to the formulation of a plan.  *See Wash. Mut.*, 408 B.R. at 50 ("Legitimate goals of Rule 2004 examinations include discovering assets, examining transactions, and determining whether wrongdoing has occurred.") (internal citation and quotations omitted); *2435 Plainfield Ave., Inc. v. Twp. of Scotch Plains (In re 2435 Plainfield Ave., Inc.)*, 223 B.R. 440, 456 (Bankr. D.N.J. 1998) ("A Rule 2004 exam has been explained as a broad investigation into the financial affairs of the debtor for the purpose of the discovery of assets of the estate and the exposure of fraudulent conduct.").  In fact, the well-settled scope of discovery conducted under Rule 2004 is so fundamental to the process and so permissibly broad that courts have gone so far as to use with approval words and phrases such as "fishing expedition," "exploratory and groping," and "inquisition."  *See, e.g.*, *Keene Corp. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 42 B.R. 362, 364 (S.D.N.Y. 1984) (noting that "the rule contemplates a broad and far-reaching inquiry, even a fishing expedition"); *Wash. Mut.*, 408 B.R. at 50 ("Rule 2004 examination is commonly recognized as more in the nature of a fishing expedition."); *Summit Global Logistics*, 2008 WL 1446722, at *2 ("Courts . . . recognize that Rule 2004 examinations are broad, unfettered and in the nature of fishing expeditions."); *Countrywide Home Loans*, 384 B.R. at 400 (same); *Jacobson v. Jacobson (In re Lev)*, Nos. 05-35847, 06-2945, 2008 WL 207523, at *3 (Bankr. D.N.J. Jan. 23, 2008) (same).

41.     Thus, a Rule 2004 examination affords a party in interest an opportunity to conduct a wide-ranging examination with respect to a Debtors' financial affairs.  *See In re Texaco, Inc.*, 79 B.R. 551, 553 (Bankr. S.D.N.Y. 1987).  And, any third party who can be shown to have a relationship with the debtor can be made subject to a Rule 2004 examination.  *See In re Mattera*, No. 05-39171, 2007 WL 1813763, at *2 (Bankr. D.N.J. June 13, 2007) ("[T]hird parties having knowledge of the Debtors' affairs, as well as a debtor itself, are subject to examination.")

(citation and quotations omitted); *In re Cinderella Clothing Indus., Inc.*, 93 B.R. 373, 378-79 (Bankr. E.D. Pa. 1988) (granting creditor's request to conduct a Rule 2004 examination on third party after noting that "third parties as well as the debtor can be examined under Rule 2004" where those third parties are shown to have "knowledge of a Debtors' acts, conduct or financial affairs so far as this relates to a Debtors' proceeding in bankruptcy").

## C.    The Discovery.

42.    Given the extensive relief requested by the Debtors early in these cases, which could serve to lock in a restructuring agenda prejudicial to the rights of creditors junior to the Senior Lenders, it is critical that the discovery requested hereby commence immediately.  The Trustee is well positioned to pursue the inquiries described herein.  The Trustee, its counsel and its financial advisors[71] have already expended considerable efforts gathering and analyzing all publicly available information about the Debtors and their management.  It would take an official committee or any other party in interest a substantial amount of time (and with respect to a committee, at the immediate expense of the Debtors' estates) to climb the learning curve just to position themselves to ask the right questions.  Nevertheless, the Trustee is committed to work with any committee or committees appointed in these cases to ensure the areas of inquiry are efficiently pursued and that the results thereof are made available to the Court and other parties in interest.    Respectfully, the Trustee submits that, at the present time, it is in the best position to pursue the areas of inquiry set forth herein.

43.    The Trustee seeks authority to request from the 2004 Parties the production of documents as outlined in the schedules attached hereto (collectively, the "Document Requests").

---

[71]    The Trustee is represented by Brown Rudnick LLP, Dentons US LLP, and Ashby & Geddes, P.A., and has also retained Peter J. Solomon Company and Concentric Energy Advisors, Inc.

The Trustee may also seek to conduct depositions of the 2004 Parties and certain of their representatives with respect to the topics of examination outlined in the schedules attached hereto (collectively, the "Deposition Topics"). Therefore, the Trustee requests that the Court compel the 2004 Parties to make their respective representatives with knowledge of any of the Deposition Topics listed in the respective schedules available for deposition on five (5) days' written notice made to counsel to the 2004 Parties.

44.      Upon receiving and reviewing the documents responsive to and written responses to the Document Requests, the Trustee may determine that further document discovery from the 2004 Parties and/or other parties is necessary to complete the Trustee's investigation. Because the scope of such additional discovery will not be fully determined until after the Trustee has had a meaningful opportunity to review the documents and written responses to the Document Requests, the Trustee respectfully requests that this Court also authorize the Trustee to conduct, without further Order of this Court, additional discovery beyond that specifically requested in the Document Requests and the Deposition Topics, including, without limitation, additional document requests and depositions, from the 2004 Parties or any other person or entity, to the extent the Trustee deems necessary and to the extent such additional discovery relates to the above-described inquiries.

## NO PRIOR REQUEST

45.      No prior motion for the relief requested herein has been made to this Court or any other court.

## CERTIFICATION OF CONFERENCE

46.      As noted above, for approximately the past year, the Consortium and then the Trustee attempted to initiate a constructive restructuring dialogue with the Debtors, Senior

Lenders and other discovery targets.    But, such efforts were rebuffed.    On multiple prior occasions, the Consortium attempted to obtain reasonable, targeted diligence from the Debtors. Such efforts were either ignored, or were largely met with references to SEC filings and other publicly-available materials.    Given the history of such efforts to obtain information consensually, the Trustee believes further conferencing with the discovery targets would lead only to unnecessary delay and expense.  As such, the Trustee requests that the Court deem the requirements of Local Bankruptcy Rule 2004-1 to have been satisfied.

## NOTICE

47.    Notice of this Motion has been given to (a) counsel to the Debtors; (b) the Office of the United States Trustee; (c) the 2004 Parties; and (d) all other parties on the regular service list in these cases.  The Trustee respectfully submits that no other or further notice need be given.

## RESERVATION OF RIGHTS

48.    The Trustee reserves its right to request and/or to conduct any other discovery, pursuant to Rule 2004 or other applicable law, from any person or entity, including, without limitation, the 2004 Parties.

## CONCLUSION

**WHEREFORE**, for the reasons stated herein, the Trustee respectfully requests that this Court enter an Order, pursuant to Rule 2004, in the form attached hereto as Exhibit A: (i) requiring the production of documents from the 2004 Parties responsive to the document requests; (ii) requiring the 2004 Parties to submit to examination under oath by the Trustee, from day to day until completed; and (iii) granting the Trustee such other and further relief as this Court may deem just and proper.

Dated:  April 29, 2014
Wilmington, Delaware

*/s/William P. Bowden*
ASHBY & GEDDES, P.A.
William P. Bowden [I.D. #2553]
Gregory A. Taylor [I.D. #4008]
500 Delaware Avenue
P.O. Box 1150
Wilmington, Delaware 19899
Telephone: (302) 654-1888
Facsimile: (302) 654-2067

- and -

BROWN RUDNICK LLP
Edward S. Weisfelner (pro hac vice
pending)
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801

- and -

Jeffrey L. Jonas (pro hac vice pending)
Andrew P. Strehle (pro hac vice pending)
Jeremy B. Coffey (pro hac vice pending)
One Financial Center
Boston, Massachusetts 02111
Telephone: (617) 856-8200
Facsimile: (617) 856-8201

- and -

Howard L. Siegel (pro hac vice pending)
185 Asylum Street
Hartford, CT 06103
Telephone: (860) 509-6500
Facsimile: (860) 509-6501

*Counsel to Wilmington Savings Fund*
*Society, FSB, solely in its capacity as*
*successor Indenture Trustee for the Second*
*Liens*