Table of Contents

   *Liabilities Related to Subsidiary Tax Sharing Agreement* — Amount represents the previously recorded net deferred tax liabilities of Oncor related to the noncontrolling interests. Upon the sale of noncontrolling interests in Oncor (see Note 14), Oncor became a partnership for US federal income tax purposes, and the temporary differences that gave rise to the deferred taxes will, over time, become taxable to the noncontrolling interests. Under a tax sharing agreement among Oncor and its equity holders, Oncor reimburses the equity holders for federal income taxes as the partnership earnings become taxable to such holders. Accordingly, as the temporary differences become taxable, the equity holders will be reimbursed by Oncor. In the unlikely event such amounts are not reimbursed under the tax sharing agreement, it is probable they would be refunded to rate payers.

### Supplemental Cash Flow Information

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2010 | 2009 | 2008 |
| Cash payments (receipts) related to: | | | |
| Interest paid (a) | $2,693 | $ 2,972 | $3,495 |
| Capitalized interest | (60) | (277) | (311) |
| Interest paid (net of capitalized interest) (a) | 2,633 | 2,695 | 3,184 |
| Income taxes | 64 | (42) | (204) |
| Noncash investing and financing activities: | | | |
| Noncash construction expenditures (b) | 84 | 197 | 183 |
| Capital leases | 9 | 15 | 16 |
| Gain on termination of long-term power sales contract (Note 9) | (116) | — | — |

(a)   Net of interest received on interest rate swaps.
(b)   Represents end-of-period accruals.

   See Note 11 for noncash exchanges of debt and issuance of toggle notes in lieu of cash interest.

**Table of Contents**

**25.   SUPPLEMENTAL GUARANTOR CONDENSED FINANCIAL INFORMATION**

As of December 31, 2010, EFH Corp. had outstanding $359 million principal amount of EFH Corp. 10.875% Notes and $571 million principal amount of EFH Corp. Toggle Notes (collectively, the EFH Corp. Senior Notes) and $115 million principal amount of EFH Corp. 9.75% Notes and $1.061 billion principal amount of EFH Corp. 10% Notes (collectively, the EFH Corp. Senior Secured Notes). The EFH Corp. Senior Notes and Senior Secured Notes are unconditionally guaranteed by EFCH and EFIH, 100% owned subsidiaries of EFH Corp. (collectively, the Guarantors) on an unsecured basis except for EFIH's guarantee of the EFH Corp. Senior Secured Notes, which is secured by a pledge of all membership interests and other investments EFIH owns or holds in Oncor Holdings or any of Oncor Holdings' subsidiaries as described in Note 11. The guarantees issued by the Guarantors are full and unconditional, joint and several guarantees of the EFH Corp. Senior Notes and Senior Secured Notes. The guarantees by EFCH and the guarantee of the EFH Corp. Senior Notes by EFIH rank equally with any senior unsecured indebtedness of the Guarantors and rank effectively junior to all of the secured indebtedness of the Guarantors to the extent of the assets securing that indebtedness. All other subsidiaries of EFH Corp., either direct or indirect, do not guarantee the EFH Corp. Senior Notes and EFH Corp. Senior Secured Notes (collectively, the Non-Guarantors). The indentures governing the EFH Corp. Senior Notes and EFH Corp. Senior Secured Notes contain certain restrictions, subject to certain exceptions, on EFH Corp.'s ability to pay dividends or make investments. See Note 13.

The following tables have been prepared in accordance with Regulation S-X Rule 3-10, "Financial Statements of Guarantors and Issuers of Guaranteed Securities Registered or Being Registered" in order to present the condensed consolidating statements of income and cash flows of EFH Corp. (the Parent/Issuer), the Guarantors and the Non-Guarantors for the years ended December 31, 2010, 2009 and 2008 and the consolidating balance sheets as of December 31, 2010 and 2009 of the Parent/Issuer, the Guarantors and the Non-Guarantors. Investments in consolidated subsidiaries are accounted for under the equity method. The presentations reflect the application of SEC Staff Accounting Bulletin Topic 5-J, "Push Down Basis of Accounting Required in Certain Limited Circumstances," including the effects of the push down of the $930 million and $4.63 billion principal amount of EFH Corp. Senior Notes and $771 million and $115 million principal amount of the EFH Corp. Senior Secured Notes to the Guarantors as of December 31, 2010 and 2009, respectively (see Note 11). Amounts pushed down reflect Merger-related debt and additional debt guaranteed by the Guarantors that was issued by EFH Corp. to refinance Merger-related or other debt existing at the time of the Merger.

EFH Corp. (Parent) received dividends/distributions from its consolidated subsidiaries totaling $2 million, $216 million and $329 million for the years ended December 31, 2010, 2009 and 2008, respectively. EFH Corp. also received a distribution of $1.253 billion indirectly from Oncor in 2008 as discussed in Note 14.

205

Table of Contents

**ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES**

**Condensed Consolidating Statements of Income (Loss)**
**For the Year Ended December 31, 2010**
**(Millions of Dollars)**

| | Parent/Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Operating revenues | $ — | $ — | $ 8,235 | $ — | $ 8,235 |
| Fuel, purchased power costs and delivery fees | — | — | (4,371) | — | (4,371) |
| Net gain from commodity hedging and trading activities | — | — | 2,161 | — | 2,161 |
| Operating costs | — | — | (837) | — | (837) |
| Depreciation and amortization | — | — | (1,407) | — | (1,407) |
| Selling, general and administrative expenses | (32) | — | (719) | — | (751) |
| Franchise and revenue-based taxes | — | — | (106) | — | (106) |
| Impairment of goodwill | — | — | (4,100) | — | (4,100) |
| Other income | 137 | — | 920 | 994 | 2,051 |
| Other deductions | — | — | (33) | 2 | (31) |
| Interest income | 178 | 209 | 327 | (704) | 10 |
| Interest expense and related charges | (1,082) | (545) | (3,057) | 1,130 | (3,554) |
| Income (loss) before income taxes and equity in earnings of subsidiaries | (799) | (336) | (2,987) | 1,422 | (2,700) |
| Income tax (expense) benefit | 305 | 125 | (309) | (510) | (389) |
| Equity in earnings of consolidated subsidiaries | (2,595) | (3,383) | — | 5,978 | — |
| Equity in earnings of unconsolidated subsidiaries (net of tax) | 277 | 277 | — | (277) | 277 |
| Net loss | (2,812) | (3,317) | (3,296) | 6,613 | (2,812) |
| Net (income) loss attributable to noncontrolling interests | — | — | — | — | — |
| Net loss attributable to EFH Corp. | $ (2,812) | $ (3,317) | $ (3,296) | $ 6,613 | $ (2,812) |

206

Table of Contents

**ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES**

**Condensed Consolidating Statements of Income**
**For the Year Ended December 31, 2009**
**(Millions of Dollars)**

| | Parent/Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Operating revenues | $ — | $ — | $ 9,546 | $ — | $ 9,546 |
| Fuel, purchased power costs and delivery fees | — | — | (2,878) | — | (2,878) |
| Net gain from commodity hedging and trading activities | — | — | 1,736 | — | 1,736 |
| Operating costs | — | — | (1,598) | — | (1,598) |
| Depreciation and amortization | — | — | (1,754) | — | (1,754) |
| Selling, general and administrative expenses | (123) | — | (945) | — | (1,068) |
| Franchise and revenue-based taxes | — | — | (359) | — | (359) |
| Impairment of goodwill | — | — | (90) | — | (90) |
| Other income | 49 | — | 114 | 41 | 204 |
| Other deductions | (6) | — | (91) | — | (97) |
| Interest income | 235 | 5 | 149 | (344) | 45 |
| Interest expense and related charges | (981) | (570) | (2,258) | 897 | (2,912) |
| Income (loss) before income taxes and equity earnings of subsidiaries | (826) | (565) | 1,572 | 594 | 775 |
| Income tax (expense) benefit | 268 | 188 | (622) | (201) | (367) |
| Equity earnings of subsidiaries | 902 | 965 | — | (1,867) | — |
| Net income | 344 | 588 | 950 | (1,474) | 408 |
| Net income attributable to noncontrolling interests | — | — | (64) | — | (64) |
| Net income attributable to EFH Corp. | $ 344 | $ 588 | $ 886 | $ (1,474) | $ 344 |

207

**Table of Contents**

### ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES

**Condensed Consolidating Statements of Income (Loss)**
**For the Year Ended December 31, 2008**
**(Millions of Dollars)**

| | Parent/Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Operating revenues | $ — | $ — | $ 11,364 | $ — | $ 11,364 |
| Fuel, purchased power costs and delivery fees | — | — | (4,595) | — | (4,595) |
| Net gain from commodity hedging and trading activities | — | — | 2,184 | — | 2,184 |
| Operating costs | — | — | (1,503) | — | (1,503) |
| Depreciation and amortization | — | — | (1,610) | — | (1,610) |
| Selling, general and administrative expenses | (105) | — | (852) | — | (957) |
| Franchise and revenue-based taxes | — | 1 | (364) | — | (363) |
| Impairment of goodwill | — | — | (8,860) | — | (8,860) |
| Other income | — | — | 80 | — | 80 |
| Other deductions | (22) | — | (1,279) | — | (1,301) |
| Interest income | 168 | 7 | 147 | (295) | 27 |
| Interest expense and related charges | (919) | (537) | (4,298) | 819 | (4,935) |
| Income (loss) before income taxes and equity earnings of subsidiaries | (878) | (529) | (9,586) | 524 | (10,469) |
| Income tax (expense) benefit | 291 | 180 | 176 | (176) | 471 |
| Equity earnings of subsidiaries | (9,251) | (9,184) | — | 18,435 | — |
| Net loss | (9,838) | (9,533) | (9,410) | 18,783 | (9,998) |
| Net loss attributable to noncontrolling interests | — | — | 160 | — | 160 |
| Net loss attributable to EFH Corp. | $ (9,838) | $ (9,533) | $ (9,250) | $ 18,783 | $ (9,838) |

208

Table of Contents

**ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES**

**Condensed Consolidating Statements of Cash Flows**
**For the Year Ended December 31, 2010**
**(Millions of Dollars)**

| | Parent/Issuer | Guarantors | Non-guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Cash provided by operating activities | $  168 | $  111 | $  835 | $  (8) | $  1,106 |
| Cash flows — financing activities: | | | | | |
| Issuances of long-term borrowings | 500 | — | 353 | — | 853 |
| Repayments/repurchases of long-term borrowings | (96) | (8) | (642) | (605) | (1,351) |
| Net short-term borrowings under accounts receivable securitization program | — | — | 96 | — | 96 |
| Change in other short-term borrowings | — | — | 172 | — | 172 |
| Capital contribution from parent | — | 440 | — | (440) | — |
| Contributions from noncontrolling interests | — | — | 32 | — | 32 |
| Cash dividends paid | — | (2) | — | 2 | — |
| Repayment of note — affiliate | 770 | — | (770) | — | — |
| Change in notes/advances — affiliates | (785) | 33 | 733 | (18) | (37) |
| Other, net | (28) | (31) | 24 | 6 | (29) |
| Cash provided by (used in) financing activities | 361 | 432 | (2) | (1,055) | (264) |
| Cash flows — investing activities: | | | | | |
| Capital expenditures and nuclear fuel purchases | — | — | (944) | — | (944) |
| Capital contribution to subsidiary | (440) | — | — | 440 | — |
| Investment in affiliate debt | (105) | (500) | — | 605 | — |
| Investment redeemed from derivative counterparty | 400 | — | — | — | 400 |
| Proceeds from sale of assets | — | — | 147 | — | 147 |
| Proceeds from sale of environmental allowances and credits | — | — | 12 | — | 12 |
| Purchases of environmental allowances and credits | — | — | (30) | — | (30) |
| Proceeds from sales of nuclear decommissioning trust fund securities | — | — | 974 | — | 974 |
| Investments in nuclear decommissioning trust fund securities | — | — | (990) | — | (990) |
| Change in notes/advances — affiliates | — | — | (18) | 18 | — |
| Other, net | — | — | (37) | — | (37) |
| Cash used in investing activities | (145) | (500) | (886) | 1,063 | (468) |
| Net change in cash and cash equivalents | 384 | 43 | (53) | — | 374 |
| Effects of deconsolidation of Oncor Holdings | — | — | (29) | — | (29) |
| Cash and cash equivalents — beginning balance | 1,059 | — | 130 | — | 1,189 |
| Cash and cash equivalents — ending balance | $  1,443 | $  43 | $  48 | $  — | $  1,534 |

209

Table of Contents

**ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES**

**Condensed Consolidating Statements of Cash Flows**
**For the Year Ended December 31, 2009**
**(Millions of Dollars)**

| | Parent/Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Cash provided by (used in) operating activities | $ (42) | $ 208 | $ 1,977 | $ (432) | $ 1,711 |
| Cash flows — financing activities: | | | | | |
| Issuances of long-term borrowings | — | — | 522 | — | 522 |
| Retirements of long-term borrowings | (4) | (7) | (385) | — | (396) |
| Change in short-term borrowings | — | — | 332 | — | 332 |
| Contributions from noncontrolling interests | — | — | 48 | — | 48 |
| Distributions paid to noncontrolling interests | — | — | (56) | — | (56) |
| Cash dividends paid | — | (216) | (216) | 432 | — |
| Change in notes/advances — affiliates | 425 | 15 | — | (440) | — |
| Other, net | 5 | — | (33) | — | (28) |
| Cash provided by (used in) financing activities | 426 | (208) | 212 | (8) | 422 |
| Cash flows — investing activities: | | | | | |
| Capital expenditures and nuclear fuel purchases | — | — | (2,545) | — | (2,545) |
| Money market fund redemptions | — | — | 142 | — | 142 |
| Investment posted with derivative counterparty | (400) | — | — | — | (400) |
| Proceeds from sale of assets | — | — | 42 | — | 42 |
| Reduction of restricted cash related to letter of credit facility | — | — | 115 | — | 115 |
| Proceeds from sale of environmental allowances and credits | — | — | 19 | — | 19 |
| Purchases of environmental allowances and credits | — | — | (19) | — | (19) |
| Proceeds from sales of nuclear decommissioning trust fund securities | — | — | 3,064 | — | 3,064 |
| Investments in nuclear decommissioning trust fund securities | — | — | (3,080) | — | (3,080) |
| Change in notes/advances — affiliates | — | — | (440) | 440 | — |
| Other, net | — | — | 29 | — | 29 |
| Cash used in investing activities | (400) | — | (2,673) | 440 | (2,633) |
| Net change in cash and cash equivalents | (16) | — | (484) | — | (500) |
| Cash and cash equivalents — beginning balance | 1,075 | — | 614 | — | 1,689 |
| Cash and cash equivalents — ending balance | $ 1,059 | $ — | $ 130 | $ — | $ 1,189 |

Table of Contents

**ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES**

**Condensed Consolidating Statements of Cash Flows**
**For the Year Ended December 31, 2008**
**(Millions of Dollars)**

| | Parent/Issuer | Guarantors | Non-guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Cash provided by (used in) operating activities | $    (251) | $    (924) | $    832 | $   1,848 | $   1,505 |
| Cash flows — financing activities: | | | | | |
| Issuances of long-term borrowings/securities: | | | | | |
| Long-term debt | — | — | 3,185 | — | 3,185 |
| Common stock | 34 | — | — | — | 34 |
| Repayments/repurchases of long-term borrowings/ securities: | | | | | |
| Long-term debt | (200) | (7) | (960) | — | (1,167) |
| Common stock | (3) | — | — | — | (3) |
| Change in short-term borrowings | — | — | (481) | — | (481) |
| Proceeds from sale of noncontrolling interests, net of transaction costs | 1,253 | 1,253 | 1,253 | (2,506) | 1,253 |
| Cash dividends paid | — | (329) | (329) | 658 | — |
| Change in notes/advances — affiliates | 205 | 7 | — | (212) | — |
| Other, net | — | — | 16 | — | 16 |
| Cash provided by financing activities | 1,289 | 924 | 2,684 | (2,060) | 2,837 |
| Cash flows — investing activities: | | | | | |
| Capital expenditures and nuclear fuel purchases | — | — | (2,978) | — | (2,978) |
| Money market fund investments | — | — | (142) | — | (142) |
| Proceeds from sale of environmental allowances and credits | — | — | 39 | — | 39 |
| Purchases of environmental allowances and credits | — | — | (34) | — | (34) |
| Proceeds from sales of nuclear decommissioning trust fund securities | — | — | 1,623 | — | 1,623 |
| Investments in nuclear decommissioning trust fund securities | — | — | (1,639) | — | (1,639) |
| Change in notes/advances — affiliates | — | — | (212) | 212 | — |
| Other, net | 5 | — | 192 | — | 197 |
| Cash provided by (used in) investing activities | 5 | — | (3,151) | 212 | (2,934) |
| Net change in cash and cash equivalents | 1,043 | — | 365 | — | 1,408 |
| Cash and cash equivalents — beginning balance | 32 | — | 249 | — | 281 |
| Cash and cash equivalents — ending balance | $   1,075 | $    — | $    614 | $    — | $   1,689 |

211

Table of Contents

**ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES**

**Condensed Consolidating Balance Sheets**
**As of December 31, 2010**
**(Millions of Dollars)**

| ASSETS | Parent/Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Current assets: | | | | | |
| Cash and cash equivalents | $ 1,443 | $ 43 | $ 48 | $ — | $ 1,534 |
| Restricted cash | — | — | 33 | — | 33 |
| Advances to affiliates | — | — | 219 | (219) | — |
| Trade accounts receivable — net | 12 | 73 | 991 | (77) | 999 |
| Income taxes receivable | 47 | — | — | (47) | — |
| Accounts receivable from affiliates | 26 | — | — | (26) | — |
| Notes receivable from affiliates | 165 | — | 1,921 | (2,086) | — |
| Inventories | — | — | 395 | — | 395 |
| Commodity and other derivative contractual assets | 92 | — | 2,640 | — | 2,732 |
| Accumulated deferred income taxes | — | 3 | — | (3) | — |
| Margin deposits related to commodity positions | — | — | 166 | — | 166 |
| Other current assets | 2 | — | 58 | — | 60 |
| Total current assets | 1,787 | 119 | 6,471 | (2,458) | 5,919 |
| Restricted cash | — | — | 1,135 | — | 1,135 |
| Receivables from unconsolidated subsidiary | 1,463 | — | — | — | 1,463 |
| Investments in unconsolidated subsidiaries | — | 5,544 | — | — | 5,544 |
| Other investments | 2,924 | (2,300) | 628 | (555) | 697 |
| Property, plant and equipment — net | — | — | 20,366 | — | 20,366 |
| Notes receivable from affiliates | 12 | — | 1,282 | (1,294) | — |
| Goodwill | — | — | 6,152 | — | 6,152 |
| Identifiable intangible assets — net | — | — | 2,400 | — | 2,400 |
| Commodity and other derivative contractual assets | — | — | 2,071 | — | 2,071 |
| Accumulated deferred income taxes | 714 | — | — | (714) | — |
| Other noncurrent assets, principally unamortized issuance costs | 95 | 53 | 577 | (84) | 641 |
| Total assets | $ 6,995 | $ 3,416 | $ 41,082 | $ (5,105) | $ 46,388 |

| LIABILITIES AND EQUITY | | | | | |
|---|---|---|---|---|---|
| Current liabilities: | | | | | |
| Short-term borrowings | $ — | $ — | $ 1,221 | $ — | $ 1,221 |
| Notes/advances from affiliates | 211 | 8 | — | (219) | — |
| Long-term debt due currently | — | 9 | 660 | — | 669 |
| Trade accounts payable | 1 | 1 | 679 | — | 681 |
| Payables to affiliates/unconsolidated subsidiary | 1,921 | 46 | 326 | (2,039) | 254 |
| Commodity and other derivative contractual liabilities | 119 | — | 2,164 | — | 2,283 |
| Margin deposits related to commodity positions | — | — | 631 | — | 631 |
| Accumulated deferred income taxes | 12 | — | 2 | (3) | 11 |
| Accrued interest | 165 | 72 | 302 | (128) | 411 |
| Other current liabilities | 3 | 46 | 507 | (114) | 442 |
| Total current liabilities | 2,432 | 182 | 6,492 | (2,503) | 6,603 |
| Accumulated deferred income taxes | — | 159 | 5,738 | (547) | 5,350 |
| Commodity and other derivative contractual liabilities | — | — | 869 | — | 869 |
| Notes or other liabilities due affiliates/unconsolidated subsidiary | 1,282 | — | 396 | (1,294) | 384 |
| Long-term debt, less amounts due currently | 7,286 | 4,106 | 28,617 | (5,783) | 34,226 |
| Other noncurrent liabilities and deferred credits | 1,985 | 12 | 2,870 | — | 4,867 |
| Total liabilities | 12,985 | 4,459 | 44,982 | (10,127) | 52,299 |
| EFH Corp. shareholders' equity | (5,990) | (1,043) | (3,987) | 5,030 | (5,990) |
| Noncontrolling interests in subsidiaries | — | — | 87 | (8) | 79 |
| Total equity | (5,990) | (1,043) | (3,900) | 5,022 | (5,911) |
| Total liabilities and equity | $ 6,995 | $ 3,416 | $ 41,082 | $ (5,105) | $ 46,388 |

Table of Contents

**ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES**

**Condensed Consolidating Balance Sheets**
**As of December 31, 2009**
**(Millions of Dollars)**

| | Parent/Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Current assets: | | | | | |
| Cash and cash equivalents | $ 1,059 | $ — | $ 130 | $ — | $ 1,189 |
| Investment posted with counterparty | 425 | — | — | — | 425 |
| Restricted cash | — | — | 48 | — | 48 |
| Advances to affiliates | 471 | 5 | — | (476) | — |
| Trade accounts receivable — net | 8 | 2 | 1,253 | (3) | 1,260 |
| Income taxes receivable | 23 | 2 | — | (25) | — |
| Accounts receivable from affiliates | — | — | 22 | (22) | — |
| Notes receivable from affiliates | 114 | — | 1,469 | (1,583) | — |
| Inventories | — | — | 485 | — | 485 |
| Commodity and other derivative contractual assets | 52 | — | 2,339 | — | 2,391 |
| Accumulated deferred income taxes | — | 3 | 11 | (9) | 5 |
| Margin deposits related to commodity positions | — | — | 187 | — | 187 |
| Other current assets | 2 | — | 134 | — | 136 |
| Total current assets | 2,154 | 12 | 6,078 | (2,118) | 6,126 |
| Restricted cash | — | — | 1,149 | — | 1,149 |
| Investments in unconsolidated subsidiaries | — | — | 44 | — | 44 |
| Other investments | 4,586 | 3,634 | 638 | (8,152) | 706 |
| Property, plant and equipment — net | — | — | 30,108 | — | 30,108 |
| Notes receivable from affiliates | 12 | — | 2,236 | (2,248) | — |
| Goodwill | — | — | 14,316 | — | 14,316 |
| Identifiable intangible assets — net | — | — | 2,876 | — | 2,876 |
| Regulatory assets — net | — | — | 1,959 | — | 1,959 |
| Commodity and other derivative contractual assets | — | — | 1,533 | — | 1,533 |
| Accumulated deferred income taxes | 647 | 111 | — | (758) | — |
| Noncurrent assets, principally unamortized debt issuance costs | 108 | 99 | 733 | (95) | 845 |
| Total assets | $ 7,507 | $ 3,856 | $ 61,670 | $(13,371) | $59,662 |
| **LIABILITIES AND EQUITY** | | | | | |
| Current liabilities: | | | | | |
| Short-term borrowings | $ — | $ — | $ 1,569 | $ — | $ 1,569 |
| Notes/advances from affiliates | — | — | 476 | (476) | — |
| Long-term debt due currently | — | 8 | 409 | — | 417 |
| Trade accounts payable | 4 | — | 892 | — | 896 |
| Accounts payable to affiliates | 16 | 6 | — | (22) | — |
| Notes payable to affiliates | 1,406 | 27 | 150 | (1,583) | — |
| Commodity and other derivative contractual liabilities | 82 | — | 2,310 | — | 2,392 |
| Margin deposits related to commodity positions | — | — | 520 | — | 520 |
| Accumulated deferred income taxes | 9 | — | — | (9) | — |
| Accrued interest | 119 | 93 | 408 | (94) | 526 |
| Other current liabilities | 7 | — | 761 | (24) | 744 |
| Total current liabilities | 1,643 | 134 | 7,495 | (2,208) | 7,064 |
| Accumulated deferred income taxes | — | — | 6,764 | (633) | 6,131 |
| Investment tax credits | — | — | 37 | — | 37 |
| Commodity and other derivative contractual liabilities | — | — | 1,060 | — | 1,060 |
| Notes or other liabilities due affiliates | 2,019 | — | 229 | (2,248) | — |
| Long-term debt, less amounts due currently | 6,626 | 4,975 | 34,740 | (4,901) | 41,440 |
| Other noncurrent liabilities and deferred credits | 466 | 3 | 5,297 | — | 5,766 |
| Total liabilities | 10,754 | 5,112 | 55,622 | (9,990) | 61,498 |
| EFH Corp. shareholders' equity | (3,247) | (1,256) | 4,637 | (3,381) | (3,247) |
| Noncontrolling interests in subsidiaries | — | — | 1,411 | — | 1,411 |
| Total equity | (3,247) | (1,256) | 6,048 | (3,381) | (1,836) |
| Total liabilities and equity | $ 7,507 | $ 3,856 | $ 61,670 | $(13,371) | $59,662 |

Table of Contents

**Item 9.**     **CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

None.

**Item 9A.**     **CONTROLS AND PROCEDURES**

An evaluation was performed under the supervision and with the participation of our management, including the principal executive officer and principal financial officer, of the effectiveness of the design and operation of the disclosure controls and procedures in effect as of December 31, 2010. Based on the evaluation performed, our management, including the principal executive officer and principal financial officer, concluded that the disclosure controls and procedures were effective.

There has been no change in our internal control over financial reporting during the most recently completed fiscal quarter that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

214

Table of Contents

**ENERGY FUTURE HOLDINGS CORP.**
**MANAGEMENT'S ANNUAL REPORT ON**
**INTERNAL CONTROL OVER FINANCIAL REPORTING**

The management of Energy Future Holdings Corp. is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934) for the company. Energy Future Holdings Corp.'s internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in condition or the deterioration of compliance with procedures or policies.

The management of Energy Future Holdings Corp. performed an evaluation as of December 31, 2010 of the effectiveness of the company's internal control over financial reporting based on the Committee of Sponsoring Organizations of the Treadway Commission's (COSO's)  *Internal Control—Integrated Framework*. Based on the review performed, management believes that as of December 31, 2010 Energy Future Holdings Corp.'s internal control over financial reporting was effective.

The independent registered public accounting firm of Deloitte & Touche LLP as auditors of the consolidated financial statements of Energy Future Holdings Corp. has issued an attestation report on Energy Future Holdings Corp.'s internal control over financial reporting.

|  |  |
|---|---|
| /s/ JOHN F. YOUNG | /s/ PAUL M. KEGLEVIC |
| John F. Young, President and<br>Chief Executive Officer | Paul M. Keglevic, Executive Vice President<br>and Chief Financial Officer |

February 17, 2011

215

**Table of Contents**

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Shareholders of Energy Future Holdings Corp.
Dallas, Texas

We have audited the internal control over financial reporting of Energy Future Holdings Corp. and subsidiaries ("EFH Corp.") as of December 31, 2010 based on criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. EFH Corp.'s management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Annual Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on EFH Corp.'s internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of the inherent limitations of internal control over financial reporting, including the possibility of collusion or improper management override of controls, material misstatements due to error or fraud may not be prevented or detected on a timely basis. Also, projections of any evaluation of the effectiveness of the internal control over financial reporting to future periods are subject to the risk that the controls may become inadequate because of the changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, EFH Corp. maintained, in all material respects, effective internal control over financial reporting as of December 31, 2010, based on the criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated financial statements as of December 31, 2010 and for the year ended December 31, 2010 of EFH Corp. and our report dated February 17, 2011 expressed an unqualified opinion on those financial statements and included an explanatory paragraph regarding EFH Corp's adoption of amended consolidation accounting standards related to variable interest entities and EFH Corp.'s adoption of amended guidance regarding transfers of financial assets effective January 1, 2010, on a prospective basis.

/s/ Deloitte & Touche LLP

Dallas, Texas
February 17, 2011

216

**Table of Contents**

**Item 9B.       OTHER INFORMATION**

On February 15, 2011, the Organization and Compensation Committee (O&C Committee) of the Board approved several modifications to our executive officers' compensation arrangements, including certain amendments to their employment agreements. After considering relevant market data and other pertinent considerations, the O&C Committee made these modifications to provide additional incentives to ensure strong performance and retention, and to maintain alignment between our executive officers and our shareholders.

**Long Term Cash Incentive Awards**

The O&C Committee approved a modification to the retention incentive awards that were granted to the Named Executive Officers in October 2009 (February 2010, with respect to Mr. Young). Under the terms of the original retention incentive award, each of the Named Executive Officers will be entitled to receive on September 30, 2012, to the extent such Named Executive Officer remains employed by EFH Corp. on such date, a one-time, lump-sum cash payment equal to 75% (100% with respect to Mr. Young) of the aggregate AIP award received by such executive officer for fiscal years 2009, 2010 and 2011 (the Initial LTI Award). As modified, the Initial LTI Award will include an additional amount (such additional amount, the 2011 LTI Award) of between $650,000.00 and $1,300,000.00 ($750,000.00 and $1,500,000.00 with respect to Mr. Young), which is only payable if the executive is paid the full Initial LTI Award. The actual amount of the 2011 LTI Award will be determined (subject to interpolation) by company performance as indicated by the level of management EBITDA actually achieved for the fiscal year ended December 31, 2011 relative to the management EBITDA threshold and target amounts set by the O&C Committee for the fiscal year ended December 31, 2011. Provided that the executive remains employed by EFH Corp. on such dates, half of the 2011 LTI Award will be deferred and paid on September 30, 2012, and the other half of the 2011 LTI Award will be deferred and paid on September 30, 2013.

In addition, each of the Named Executive Officers will be entitled to receive additional retention incentive awards (collectively, the 2014 LTI Award) as follows:

- An award of between $500,000 and $1,000,000 ($1,350,000 and $2,700,000 with respect to Mr. Young), with the actual amount of the award to be determined (subject to interpolation) by company performance as indicated by the level of management EBITDA actually achieved for the fiscal year ended December 31, 2012 relative to the management EBITDA threshold and target amounts set by the O&C Committee for the fiscal year ended December 31, 2012; and

- An award of between $500,000 and $1,000,000 ($1,350,000 and $2,700,000 with respect to Mr. Young), with the actual amount of the award to be determined (subject to interpolation) by company performance as indicated by the level of management EBITDA actually achieved for the fiscal year ended December 31, 2013 relative to the management EBITDA threshold and target amounts set by the O&C Committee for the fiscal year ended December 31, 2013; and

- An award of between $500,000 and $1,000,000 ($1,350,000 and $2,700,000 with respect to Mr. Young), with the actual amount of the award to be determined (subject to interpolation) by company performance as indicated by the level of management EBITDA actually achieved for the fiscal year ended December 31, 2014 relative to the management EBITDA threshold and target amounts set by the O&C Committee for the fiscal year ended December 31, 2014.

Payment of the 2014 LTI Award will be deferred until March 13, 2015, and will be subject to the condition that the Named Executive Officer continues to be employed by EFH Corp. on such date. Both the 2011 LTI Award and the 2014 LTI Award will be subject, in limited circumstances, to acceleration and/or pro-ration in the event of the Named Executive Officer's termination without "cause" or resignation for "good reason," or in the event of such Named Executive Officer's death or disability, as described in greater detail in the Named Executive Officer's amended employment agreement.

**Exchange of Stock Options for Restricted Stock Units**

The O&C Committee also approved an exchange program, pursuant to which each of its executive officers, including the Named Executive Officers, would be entitled to receive a one-time lump sum grant of restricted stock units that cliff-vest 100% on September 30, 2014 (the Exchange RSUs) under and subject to the terms of the 2007 Stock Incentive Plan for Key Employees of EFH Corp. and Affiliates (the 2007 Plan), in exchange for forfeiting all rights in respect of any and all options to purchase shares of EFH Corp.'s common stock that were granted to the executive officers under the 2007 Plan as set forth below:

| Executive Officer | Surrendered Options | Exchange RSUs |
|---|---|---|
| John F. Young | 9,000,000 | 4,500,000 |
| Paul M. Keglevic | 3,000,000 | 1,500,000 |
| David A. Campbell | 4,800,000 | 2,400,000 |
| James A. Burke | 2,650,000 | 1,325,000 |
| M.A. McFarland | 2,400,000 | 1,200,000 |

The grant of Exchange RSUs will be made as soon as reasonably practical following an exchange period, and will be evidenced by a written agreement that is approved by the O&C Committee with the concurrence of the executive officer.

**Annual Grant of RSUs:**

In addition, under the terms of their amended employment agreements, the Company's executive officers, including each of the Named Executive Officers, will be entitled to receive annual grants of restricted stock units (the Annual RSUs) under and subject to the terms of the 2007 Plan, in each of 2011, 2012 and 2013. For the Named Executive Officers, the grant of Annual RSUs for each of the 2011, 2012 and 2013 calendar years will consist of 500,000 cliff-vesting restricted stock units (666,667 with respect to Mr. Campbell and 1,500,000 with respect to Mr. Young) that will vest 100% on September 30, 2014. The initial Annual RSU grant for 2011 will be made as soon as reasonably practical, and the annual awards for 2012 and 2013 will be made following, and in connection with such year's February meeting of the O&C Committee.

The Annual RSU awards will be subject to such terms, conditions and restrictions contained in the executive officer's amended employment agreement, including, but not limited to, a provision that if there is a Change in Control (as that term is defined in the agreement) of EFH Corp., all ungranted Annual RSUs that would have been made to the executive in each of 2011, 2012 and 2013 will be immediately granted and vested.

## PART III

## Item 10.    DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE

### Directors

The names of EFH Corp.'s directors and information about them, as furnished by the directors themselves, are set forth below:

| Name | Age | Served As Director Since | Business Experience |
|---|---|---|---|
| Arcilia C. Acosta (1)(4) | 45 | 2008 | Arcilia C. Acosta has served as a Director of EFH Corp. since May 2008. During the last seven years, Ms. Acosta's principal occupation and employment has been serving as the CEO of CARCON Industries & Construction, L.L.C. (CARCON) and its subsidiaries. She is also the CEO of Southwestern Testing Laboratories, L.L.C. (STL). CARCON's principal business is commercial, institutional and transportation construction. STL's principal business is geotechnical engineering, construction materials testing and environmental consulting. Ms. Acosta is a former Chair of the State of Texas Hispanic chambers organization known as the Texas Association of Mexican American Chambers of Commerce (TAMACC) and the Greater Dallas Hispanic Chamber of Commerce. Ms. Acosta serves on the Board of Advisors for BBVA Compass Bank and the Board of Directors of the Dallas Citizens Council. |
| David Bonderman | 68 | 2007 | David Bonderman has served as a Director of EFH Corp. since October 2007. He is a founding partner of TPG Capital, L.P. (TPG). Mr. Bonderman serves on the boards of the following companies: Armstrong World Industries, Inc., Ceasars Entertainment Corporation (formerly Harrah's Entertainment), CoStar Group, Inc., General Motors Company, Ryanair Holdings plc, for which he serves as Chairman of the Board, and Univision Communications, Inc. During the past five years, Mr. Bonderman also served on the boards of Burger King Corporation, Burger King Holdings, Inc., Ducati Motor Holding S.P.A., Gemplus International S.A. (predecessor to Gemalto N.V.), Gemalto N.V., IASIS Healthcare Corporation, and Washington Mutual, Inc. |
| Donald L. Evans (2)(3)(4) | 64 | 2007 | Donald L. Evans has served as a Director and Non-Executive Chairman of EFH Corp. since October 2007. He is also a Senior Partner at Quintana Energy Partners, L.P. He was CEO of the Financial Services Forum from 2005 to 2007, after serving as the 34th secretary of the U.S. Department of Commerce. Before serving as Secretary of Commerce, Mr. Evans was the former CEO of Tom Brown, Inc., a large independent energy company. He also previously served as a member and chairman of the Board of Regents of the University of Texas System. |

Table of Contents

| Name | Age | Served As Director Since | Business Experience |
|------|-----|--------------------------|---------------------|
| Thomas D. Ferguson (3) | 57 | 2008 | Thomas D. Ferguson has served as a Director of EFH Corp. since December 2008. He is a Managing Director of Goldman, Sachs & Co., having joined the firm in 2002. Mr. Ferguson heads the asset management efforts for the merchant bank's U.S. real estate and infrastructure investment activity. He currently serves on the board of Carrix, one of the largest private container terminal operators in the world, American Golf, for which he serves as the company's non-executive Chairman, Agriculture Company of America, EFIH and Oncor. He formerly held board seats at Associated British Ports, the largest port company in the UK, as well as Red de Carreteras, a toll road concessionaire in Mexico. |
| Frederick M. Goltz (2)(3) | 39 | 2007 | Frederick M. Goltz has served as a Director of EFH Corp. since October 2007. He has been with Kohlberg Kravis Roberts and Co., L.P. (KKR) for 15 years. Mr. Goltz has played a significant role in the development of many of the themes pursued by KKR in the energy space, including those related to integrated utilities, merchant generation, and oil and gas exploration and production. He now heads KKR's Mezzanine Fund headquartered in San Francisco. He is a director of EFCH and TCEH. During the past five years, Mr. Goltz also served on the boards of Accuride Corp. and Texas Genco Holdings, Inc. |
| James R. Huffines (1)(3) | 59 | 2007 | James R. Huffines has served as a Director of EFH Corp. since October 2007. He is President and Chief Operating Officer of PlainsCapital Corporation, a $5.5 billion bank and financial service firm. He previously served as Chairman, Central and South Texas Region, of PlainsCapital Bank and Senior Executive Vice President of Plains Capital Corporation from March 2001 to November 2010, Chairman of the University of Texas System Board of Regents from April 2009 to July 2010, Vice Chairman from November 2007 to April 2009 and Chairman from June 2004 to November 2007. Mr. Huffines is a director of Andrew Harper Travel Publications, Inc., EFIH and PlainsCapital Bank. |
| Scott Lebovitz | 35 | 2007 | Scott Lebovitz has served as a Director of EFH Corp. since October 2007. He is a Managing Director of Goldman, Sachs & Co. in its Principal Investment Area since 2007 having joined Goldman, Sachs & Co. in 1997. Mr. Lebovitz serves on the boards of both public and private companies, including CVR Energy, Inc., EFCH and TCEH. |
| Jeffrey Liaw | 34 | 2007 | Jeffrey Liaw has served as a Director of EFH Corp. since October 2007. He is a principal of TPG and is active in TPG's energy and industrial investing practice areas. Before joining TPG in 2005, he worked for Bain Capital in its industrials practice. Mr. Liaw serves on the boards of both public and private companies, including EFIH, Graphic Packaging Holding Company, American Tire Distributors, Inc. and Oncor. |

218

**Table of Contents**

| Name | Age | Served As Director Since | Business Experience |
|---|---|---|---|
| Marc S. Lipschultz (4) | 42 | 2007 | Marc S. Lipschultz has served as a Director of EFH Corp. since October 2007. He joined KKR in 1995 and is the global head of KKR's Energy and Infrastructure business. Mr. Lipschultz serves on KKR's Management Committee and its Infrastructure Investment Committee. Currently, he is on the board of Accel-KKR Company. During the past five years, Mr. Lipschultz also served on the boards of Texas Genco Holdings, Inc. and The Boyds Collection, Ltd.. |
| Michael MacDougall (2)(3) | 40 | 2007 | Michael MacDougall has served as a Director of EFH Corp. since October 2007. He is a partner of TPG. Mr. MacDougall leads the firm's global energy and natural resources investing efforts. Prior to joining TPG in 2002, Mr. MacDougall was a vice president in the Principal Investment Area of the Merchant Banking Division of Goldman, Sachs & Co., where he focused on private equity and mezzanine investments. Mr. MacDougall is a director of both public and private companies, including Copano Energy, L.L.C., Graphic Packaging Holding Company, Harvester Holdings, LLC and its two subsidiaries, Petro Harvester Oil and Gas, LLC and 2CO Energy Limited, Kraton Performance Polymers Inc., Northern Tier Energy, LLC, EFCH, and TCEH and is a director of the general partner of Valerus Compression Services, L.P. During the past five years, he also served on the boards of Aleris International and Texas Genco LLC prior to its sale to NRG Energy, Inc. in February 2006. Mr. MacDougall also serves as the Chairman of the Board of The Opportunity Network and is a member of the Board of the Dwight School Foundation and Islesboro Affordable Property. |
| Lyndon L. Olson, Jr. (3) | 63 | 2007 | Lyndon L. Olson, Jr. has served as a Director of EFH Corp. since October 2007. He was a Senior Advisor with Citigroup Inc. from 2002 to 2008, after serving as United States Ambassador to Sweden from 1998 to 2001. He previously was affiliated with Citigroup from 1990 to 1998, as President and CEO of Travelers Insurance Holdings and the Associated Madison Companies, predecessor companies. Before joining Citigroup, he had been President of the National Group Corporation and CEO of its National Group Insurance Company. Ambassador Olson also is a former Chairman and a Member of the Texas 173 State Board of Insurance, former President of the National Association of Insurance Commissioners, and a former member of the Texas House of Representatives. Ambassador Olson also serves on the board of First Acceptance Corporation, Sammons Enterprises and Texas Meter and Device Company. |
| Kenneth Pontarelli (2)(4) | 40 | 2007 | Kenneth Pontarelli has served as a Director of EFH Corp. since October 2007. He is a Managing Director of Goldman, Sachs & Co. in its Principal Investment Area. He transferred to the Principal Investment Area in 1999 and was promoted to Managing Director in 2004. Mr. Pontarelli serves as a director of both public and private companies, including CCS, Inc., Cobalt International Energy, L.P., EFIH, Expro International Group Ltd. and Kinder Morgan, Inc. During the past five years, he also served on the board of CVR Energy, Inc. |

219

**Table of Contents**

| Name | Age | Served As Director Since | Business Experience |
|---|---|---|---|
| William K. Reilly | 71 | 2007 | William K. Reilly has served as a Director of EFH Corp. since October 2007. He is a Senior Advisor to TPG and a founding partner of Aqua International Partners, an investment group that invests in companies that serve the water and renewable energy sectors, having previously served as the seventh Administrator of the EPA. Mr. Reilly is a director of the following public companies: E.I DuPont de Nemours and Company, ConocoPhillips and Royal Caribbean International. During the past five years, he also served on the board of Eden Springs, Ltd. of Israel. Before serving as EPA Administrator, Mr. Reilly was President of World Wildlife Fund and President of The Conservation Foundation. He previously served as Executive Director of the Rockefeller Task Force on Land Use and Urban Growth, a senior staff member of the President's Council on Environmental Quality, Associate Director of the Urban Policy Center and the National Urban Coalition and Co-Chairman of the National Commission on Energy Policy. Mr. Reilly was appointed by the President to serve as Co-Chair of the National Commission on the Deepwater Horizon Oil Spill and Offshore Drilling. |
| Jonathan D. Smidt | 38 | 2007 | Jonathan D. Smidt has served as a Director of EFH Corp. since October 2007. He has been with KKR since 2000, where he is a partner and senior member of the firm's Energy and Infrastructure team and leads KKR Natural Resources, the firm's platform to acquire and operate oil and natural gas assets. Currently, he is a director of Laureate Education Inc. |
| John F. Young (2)(3) | 54 | 2008 | John F. Young has served as a Director and President and Chief Executive of EFH Corp. since January 2008. Before joining EFH Corp., Mr. Young served in many leadership roles at Exelon Corporation from March 2003 to January 2008 including Executive Vice President of Finance and Markets and Chief Financial Officer of Exelon Corporation; President of Exelon Generation; and President and Chief Operating Officer of Exelon Power. Prior to joining Exelon Corporation, Mr. Young was Senior Vice President of Sierra Pacific Resources Corporation. Mr. Young is also a director of EFCH, EFIH, TCEH and Luminant. |
| Kneeland Youngblood (1) | 5 5 | 2007 | Kneeland Youngblood has served as a Director of EFH Corp. since October 2007. He is a founding partner of Pharos Capital Group, a private equity firm that focuses on providing growth and expansion capital to businesses in technology, business services and health care services. Mr. Youngblood is a director of the following public companies: Starwood Hotels and Resorts Worldwide, Inc. and Gap Inc. During the last five years, he served on the board of Burger King Holdings, Inc. Mr. Youngblood is a member of the Council on Foreign Relations. |

(1)    Member of Audit Committee.
(2)    Member of Executive Committee.
(3)    Member of Governance and Public Affairs Committee
(4)    Member of Organization and Compensation Committee

There is no family relationship between any of the above-named directors.

220

**Table of Contents**

**Director Qualifications**

In October 2007, David Bonderman, Donald L. Evans, Frederick M. Goltz, James R. Huffines, Scott Lebovitz, Jeffrey Liaw, Marc S. Lipschultz, Michael MacDougall, Lyndon L. Olson, Jr., Kenneth Pontarelli, William K. Reilly, Jonathan D. Smidt, and Kneeland Youngblood were elected to EFH Corp.'s board of directors (the Board). Arcilia C. Acosta, Thomas D. Ferguson and John F. Young joined the Board in 2008. Messrs. Bonderman, Ferguson, Goltz, Liaw, Lipschultz, MacDougall, Pontarelli, and Smidt are collectively referred to as the "Sponsor Directors." Ms. Acosta and Messrs. Evans, Huffines, Olson, Reilly, Young, and Youngblood are collectively referred to as the "Non-Sponsor Directors."

Each of the Sponsor Directors was elected to the Board pursuant to the Limited Partnership Agreement of Texas Energy Future Holdings Limited Partnership, the holder of a majority of the outstanding capital stock of EFH Corp. Pursuant to this agreement, Messrs. Goltz, Lipschultz and Smidt were appointed to the Board as a consequence of their relationships with Kohlberg Kravis Roberts & Co.; Messrs. Bonderman, Liaw and MacDougall were appointed to the Board as a consequence of their relationships with TPG Capital, L.P., and Messrs. Ferguson, Lebovitz and Pontarelli were appointed to the Board as a consequence of their relationships with GS Capital Partners.

When considering whether the Board's directors and nominees have the experience, qualifications, attributes and skills, taken as a whole, to enable the Board to satisfy its oversight responsibilities effectively in light of EFH Corp.'s business and structure, the Board focused primarily on the qualifications summarized in each of the Board member's or nominee's biographical information set forth on the pages above. In addition, EFH Corp. believes that each of its directors possesses high ethical standards, acts with integrity, and exercises careful judgment. Each is committed to employing his/her skills and abilities in the long-term interests of EFH Corp and its stakeholders. Finally, our directors are knowledgeable and experienced in business, governmental, and civic endeavors, further qualifying them for service as members of the Board.

The Sponsor Directors possess experience in owning and managing privately held enterprises and are familiar with corporate finance and strategic business planning activities of highly-leveraged companies such as EFH Corp. Some of the Sponsor Directors also have experience advising and overseeing the operations of large industrial, manufacturing or retail companies similar to our businesses. Finally, several of the Sponsor Directors possess substantial expertise in advising and managing companies in segments of energy industry, including, among others, power generation, oil and gas, and energy infrastructure and transportation.

As a group and individually, the Non-Sponsor Directors possess extensive experience in governmental and civic endeavors and in the business community, in each case, in the markets where our businesses operate.

Mr. Young's employment agreement provides that he will serve as a member of the Board during the time he is employed by EFH Corp. Before joining EFH Corp. as President and Chief Executive Officer, he held various senior management positions at other companies in the energy industry over twenty years, including, most recently, his role as Executive Vice President of Finance and Markets and Chief Financial Officer of Exelon Corporation.

221

Table of Contents

Ms. Acosta manages the operations of a large commercial construction company in Texas and has significant experience within the local Hispanic business community, having served as the chair of the Greater Dallas Hispanic Chamber of Commerce and the Texas Association of Mexican American Chambers of Commerce. Mr. Evans has demonstrated ability and achievement in both the private and public sectors, serving as U.S. Secretary of Commerce during the Bush Administration, and both before and after his government service, acting as Chairman and Chief Executive Officer of a publicly-owned energy company, Tom Brown, Inc. Mr. Huffines has demonstrated achievement in both business and academic endeavors, and, given his employment in various senior management positions in the banking industry, has sufficient experience and expertise in financial matters to qualify him to serve as EFH Corp.'s "audit committee financial expert." Mr. Olson possesses substantial experience in both federal and state government through, among other things, his service as the former US Ambassador to Sweden and as a former member of the Texas House of Representatives, and has advised and overseen the operations of large companies, in particular his service in the insurance industry. Mr. Reilly possesses a distinguished record of public service and extensive policy-making experience as a former administrator of the EPA, lectures extensively on environmental issues facing companies operating in the energy industry and has served as Co-Chairman of the National Commission on Energy Policy. Mr. Youngblood has served on numerous boards for large public companies, has extensive experience managing and advising companies in his capacity as a partner in a private equity firm (not affiliated with the Sponsor Group), is highly knowledgeable of federal and state political matters, and has served on the board of directors of the United States Enrichment Corporation, a company that contracts with the US Department of Energy to produce enriched uranium for use in nuclear power plants.

222

**Table of Contents**

**Executive Officers**

The names and information regarding EFH Corp.'s executive officers are set forth below:

| Name of Officer | Age | Positions and Offices Presently Held | Date First Elected to Present Offices | Business Experience (Preceding Five Years) |
|---|---|---|---|---|
| John F. Young | 54 | President and Chief Executive Officer of EFH Corp. | January 2008 | John F. Young was elected President and Chief Executive Officer of EFH Corp. in January 2008. Before joining EFH Corp., Mr. Young served in many leadership roles at Exelon Corporation from March 2003 to January 2008, including Executive Vice President of Finance and Markets and Chief Financial Officer of Exelon Corporation; President of Exelon Generation; and President and Chief Operating Officer of Exelon Power. Prior to joining Exelon, Mr. Young was Senior Vice President of Sierra Pacific Resources Corporation. |
| James A. Burke | 42 | President and Chief Executive of TXU Energy | August 2005 | James A. Burke was elected President and Chief Executive of TXU Energy in August 2005. Previously, Mr. Burke was Senior Vice President Consumer Markets of TXU Energy. |
| David A. Campbell | 42 | President and Chief Executive of Luminant | June 2008 | David A. Campbell was elected President and Chief Executive of Luminant in June 2008. Mr. Campbell was Executive Vice President and Chief Financial Officer of EFH Corp. from April 2007 to June 2008 having previously served as Acting Chief Financial Officer beginning in March 2006 and as Executive Vice President for Corporate Planning, Strategy & Risk when he joined EFH Corp. in May 2004. |
| Joel D. Kaplan | 41 | Executive Vice President of EFH Corp. | November 2009 | Joel D. Kaplan was elected Executive Vice President of EFH Corp. in November 2009 and oversees the company's public affairs organization. Prior to joining EFH Corp., Mr. Kaplan served as Deputy Chief of Staff in the George W. Bush White House from 2006 to 2008 and Deputy Director of the Office of Management and Budget from 2003 to 2006. |
| Paul M. Keglevic | 57 | Executive Vice President and Chief Financial Officer of EFH Corp. | July 2008 | Paul M. Keglevic was elected Executive Vice President and Chief Financial Officer of EFH Corp. in July 2008. Before joining EFH Corp., he was an audit partner at PricewaterhouseCoopers. Mr. Keglevic was PricewaterhouseCoopers' Utility Sector Leader from 2002 to 2008 and Clients and Sector Assurance Leader from 2007 to 2008. |

Table of Contents

| Name of Officer | Age | Positions and Offices Presently Held | Date First Elected to Present Offices | Business Experience (Preceding Five Years) |
|---|---|---|---|---|
| Richard J. Landy | 6 5 | Executive Vice President of EFH Corp. | February 2010 | Richard J. Landy was elected Executive Vice President of EFH Corp. in February 2010 and oversees human resources. Prior to joining EFH Corp., Mr. Landy was owner and consultant of Richard J. Landy, LLC from 2007 to 2009 and Senior Vice President of Exelon Corporation from 2002 to 2007. |
| M. A. McFarland | 41 | Executive Vice President and Chief Commercial Officer of Luminant and Executive Vice President of EFH Corp. | July 2008 | M. A. McFarland was elected Executive Vice President and Chief Commercial Officer of Luminant and Executive Vice President of EFH Corp. in July 2008. Before joining Luminant, Mr. McFarland served as Senior Vice President of Mergers, Acquisitions and Divestitures and as a Vice President in the wholesale marketing and trading division power team at Exelon Corporation. |
| Robert C. Walters (1) | 52 | Executive Vice President and General Counsel of EFH Corp. | March 2008 | Robert C. Walters was elected Executive Vice President and General Counsel of EFH Corp. in March 2008. Prior to joining EFH Corp., Mr. Walters was a Partner of Vinson & Elkins LLP and served on the firm's management committee. Mr. Walters was co-managing partner of the Dallas office of Vinson & Elkins LLP from 1998 through 2005. |

(1)    Mr. Walters has announced his plan to resign from EFH Corp. during the first quarter 2011.

There is no family relationship between any of the above-named executive officers.

**Audit Committee Financial Expert**

The Board has determined that James R. Huffines is an "Audit Committee Financial Expert" as defined in Item 407(d)(5) of SEC Regulation S-K and Mr. Huffines is independent under the New York Stock Exchange's audit committee independence requirements for issuers of debt securities.

**Code of Conduct**

EFH Corp. maintains certain corporate governance documents on EFH Corp's website at *www.energyfutureholdings.com*. EFH Corp.'s Code of Conduct can be accessed by selecting "Investor Relations" on the EFH Corp. website. EFH Corp.'s Code of Conduct applies to all of its employees, officers (including the Chief Executive Officer, Chief Financial Officer and Principal Accounting Officer) and directors. Any amendments to the Code of Conduct will be posted on EFH Corp.'s website. Printed copies of the corporate governance documents that are posted on EFH Corp.'s website are also available to any investor upon request to the Secretary of EFH Corp. at 1601 Bryan Street, Dallas, Texas 75201-3411.

Table of Contents

**Procedures for Shareholders to Nominate Directors; Arrangement to Serve as Directors**

The Amended and Restated Limited Liability Company Agreement of Texas Energy Future Capital Holdings LLC, the general partner of Texas Holdings, generally requires that the members of Texas Energy Future Capital Holdings LLC take all necessary action to ensure that the persons who serve as its managers also serve on the EFH Corp. Board. In addition, Mr. John Young's employment agreement provides that he will be elected as a member of the Board during the time he is employed by EFH Corp.

Because of these requirements, together with Texas Holdings' controlling ownership of EFH Corp.'s outstanding common stock, there is no policy or procedure with respect to shareholder recommendations for nominees to the EFH Corp. Board.

225

**Table of Contents**

**Item 11.        EXECUTIVE COMPENSATION**

### Organization and Compensation Committee

The Organization and Compensation Committee (the "O&C Committee") of EFH Corp.'s Board of Directors (the "Board") is comprised of four non-employee directors: Arcilia C. Acosta, Donald L. Evans, Marc S. Lipschultz and Kenneth Pontarelli. The primary responsibility of the O&C Committee is to:

- • determine and oversee the compensation program of EFH Corp. and its subsidiaries (other than the Oncor Ring-Fenced Entities), including making recommendations to the Board with respect to the adoption, amendment or termination of compensation and benefits plans, arrangements, policies and practices;

- • evaluate the performance of EFH Corp.'s Chief Executive Officer (the "CEO") and the other executive officers of EFH Corp. and its subsidiaries (other than the Oncor Ring-Fenced Entities) (collectively, the "executive officers"), including all of the executive officers named in the Summary Compensation Table (the "Named Executive Officers"), and

- • approve executive compensation based on those evaluations.

### Compensation Risk Assessment

EFH Corp.'s management has determined that the risks arising from EFH Corp.'s compensation policies and practices are not reasonably likely to have a material adverse effect on EFH Corp. This determination was based upon, among other things, the following: (1) the mix of cash and equity payouts at various compensation levels; (2) the performance time horizons used by our plans; (3) the use of financial performance metrics that are readily monitored and reviewed; (4) the equity investment that most of our senior and middle management employees have in EFH Corp. common stock; (5) the lack of an active trading market and other impediments to liquidity associated with EFH Corp. common stock; (6) the incorporation of both operational and financial goals and individual performance modifiers; (7) the inclusion of maximum caps and other plan-based mitigants on the amount of certain of our awards; (8) multiple levels of review and approval of awards (including approval of our O&C Committee with respect to awards to executive officers and awards to other employees that exceed monetary thresholds); and (9) our internal risk review and assessment processes.

### Compensation Discussion and Analysis

#### Compensation of the CEO

In determining the compensation of the CEO, the O&C Committee annually follows a thorough and detailed process. At the end of each year, the O&C Committee reviews a self-assessment prepared by the CEO regarding his performance and the performance of our businesses and meets (with and without the CEO) to evaluate and discuss his performance and the performance of our businesses.

In addition to conducting an annual review of the CEO's performance, the O&C Committee periodically uses independent compensation consultants to assess the compensation of the CEO against a variety of market reference points and competitive data, including the compensation practices of a number of companies that we consider to comprise our peer group, size-adjusted energy services industry survey data and size-adjusted general industry survey data. While the O&C Committee tries to ensure that the bulk of the CEO's compensation is directly linked to his performance and the performance of our businesses, the O&C Committee also seeks to set his compensation in a manner that is competitive for retention purposes. The most recent assessment of the CEO's compensation was performed in late 2010, when the O&C Committee engaged Pay Governance LLC to perform a competitive analysis of the CEO's compensation. In December 2010, Pay Governance delivered its report to the O&C Committee, which report included market data for a peer group composed of the following companies:

| | | |
|---|---|---|
| Allegheny Energy, Inc. | Ameren Corp. | American Electric Power Co. Inc |
| Calpine Corp. | Constellation Energy Group Inc. | Dominion Resources Inc. |
| Duke Energy Corp. | Edison International | Entergy Corp. |
| Exelon Corp. | FirstEnergy Corp. | GenOn Energy, Inc. |
| NextEra Energy, Inc. | NRG Energy, Inc. | PPL Corp. |
| Progress Energy Inc. | Public Service Enterprise Group Inc. | Southern Co. |
| Xcel Energy Inc. | | |

226

Table of Contents

The data for CEO compensation of the peer group was developed at both the 50th and 75th percentiles of market in order to provide the O&C Committee with a broad market view and multiple benchmarks. The O&C Committee targets total direct compensation at approximately the 75 [th] percentile of the peer group.

While the O&C Committee considers market reference points and competitive data in determining the appropriate compensation of the CEO (and the other executive officers), the O&C Committee also considers qualitative and subjective factors that are more specific to EFH Corp. in making such determinations. One such factor is that EFH Corp. is a highly-leveraged, privately-owned company.

After a comprehensive review of the CEO's performance and the performance of our businesses in 2010, and taking into consideration the Pay Governance report, the sustained decline in ERCOT wholesale power prices and forward natural gas prices, and other qualitative and subjective factors as described above, the O&C Committee approved certain changes to the long-term incentive compensation for the CEO in February 2011. The O&C Committee made these changes, which are described in more detail in Item 9B above, to provide incentives for retention and performance and to maintain a strong alignment between the CEO and our shareholders. We believe these changes are consistent with our compensation philosophy as described below.

**Compensation of Other Executive Officers**

In determining whether to make any adjustments to the compensation of any of our executive officers (other than the CEO), the O&C Committee seeks the input of the CEO. At the end of each year, the CEO reviews a self-assessment prepared by each of these executive officers and assesses the executive officer's performance against business unit and individual goals and objectives. The O&C Committee and the CEO then review the CEO's assessments and, in that context, the O&C Committee approves any adjustments to the compensation for each of these executive officers.

In addition to these annual reviews/assessments, the CEO periodically assesses the compensation of each of these executive officers. The last assessment of the compensation of the executive officers by the CEO was performed in late 2010. Following that assessment, and taking into consideration the sustained decline in ERCOT wholesale power prices and forward natural gas prices, and other qualitative and subjective factors as described above, the CEO suggested certain changes to the long-term incentive compensation for certain of our executive officers in order to provide incentives for retention and performance and to maintain alignment between our executive officers and shareholders. These changes, which are described in more detail in Item 9B above, were approved by the O&C Committee in February 2011 with respect to such executive officers, including each of Messrs. Keglevic, Campbell, Burke and McFarland. We believe these changes are consistent with our compensation philosophy as described below.

**Compensation Philosophy**

We have a pay-for-performance compensation philosophy, which places an emphasis on pay-at-risk. In other words, a significant portion of an executive officer's compensation is comprised of variable, at-risk incentive compensation. Our compensation program is intended to compensate executive officers appropriately for their contribution to the attainment of our financial, operational and strategic objectives. In addition, we believe it is important to retain our executive officers and strongly align their interests with EFH Corp.'s shareholders by emphasizing long-term incentive compensation, including equity-based compensation.

227

Table of Contents

To achieve the goals of our compensation philosophy, we believe that:

- compensation plans should balance both long-term and short-term objectives;

- the overall compensation program should emphasize variable compensation elements that have a direct link to overall corporate performance and shareholder value, and

- an executive officer's individual compensation level should be based upon an evaluation of the financial and operational performance of that executive officer's business unit as well as the executive officer's individual performance.

We believe our compensation philosophy supports our businesses by:

- aligning performance measures with our business objectives to drive the financial and operational performance of EFH Corp. and its business units;

- rewarding business unit and individual performance by providing compensation levels consistent with the level of contribution and degree of accountability;

- attracting and retaining the best performers, and

- strengthening the correlation between the long-term interests of our executive officers and shareholders.

*Elements of Compensation*

The material elements of our executive compensation program are:

- a base salary;

- the opportunity to earn an annual performance-based cash bonus based on the achievement of specific corporate, business unit and individual performance goals, and

- long-term incentive awards, primarily in the form of (i) long-term cash incentive awards, including the modifications to these awards approved by the O&C Committee in February 2011, as described in more detail in Item 9B above, and (ii) equity awards granted pursuant to our 2007 Stock Incentive Plan for Key Employees of EFH Corp. and Affiliates (the "2007 Stock Incentive Plan"), including options to purchase shares of EFH Corp.'s common stock (the "Stock Option Awards") and restricted stock units (the "Restricted Stock Units").

In addition, executive officers generally have the opportunity to participate in certain of our broad-based employee compensation plans, including our Thrift (401(k)) Plan, retirement plans and non-qualified benefit plans, and to receive certain perquisites.

*Assessment of Compensation Elements*

We design the majority of an executive officer's compensation to be directly linked to corporate and business unit performance. For example, an executive officer's annual performance-based cash bonus is primarily based on the achievement of certain corporate and business unit financial and operational targets (such as management EBITDA, cost management, generation output and customer satisfaction). In addition, each executive officer's long-term cash incentive award (described below) is based on achievement of certain operational and financial performance metrics. We also try to ensure that our executive compensation program is competitive in order to reduce the risk of losing our executive officers.

228

Table of Contents

The following is a detailed discussion of the principal compensation elements provided to our executive officers. More detail about each of the elements can be found in the compensation tables, including the footnotes to the tables, and the narrative discussion following certain of the tables.

### Base Salary

Base salary should reward executive officers for the scope and complexity of their position and the level of responsibility required. We believe that a competitive level of base salary is required to attract and retain qualified talent.

The O&C Committee annually reviews base salaries and periodically uses independent compensation consultants to ensure the base salaries are market-competitive. The O&C Committee may also review an executive officer's base salary from time to time during a year, including if the executive officer is given a promotion or if his responsibilities are significantly modified.

We want to ensure our cash compensation is competitive and sufficient to incent executive officers to remain with us, recognizing our high performance expectations across a broad set of operational, financial, customer service and community-oriented goals and objectives and the higher risk levels associated with being a significantly-leveraged company.

In light of the significant market dislocation and uncertainty that began in late 2008 and continued into 2009, our Named Executive Officers' base salaries were increased, effective January 1, 2010. These increases reflect, in part, that none of the Named Executive Officers received a salary increase in 2009. The following table indicates the Named Executive Officers' base salaries for 2010.

| Name | Title | Base Salary—2010 |
|------|-------|-----------------:|
| John F. Young | President and Chief Executive Officer of EFH Corp. | $ 1,200,000 |
| Paul M. Keglevic | Executive Vice President and Chief Financial Officer of EFH Corp. | $ 650,000 |
| David A. Campbell | Chief Executive Officer of Luminant | $ 700,000 |
| James A. Burke | Chief Executive Officer of TXU Energy | $ 630,000 |
| M.A. McFarland | Executive Vice President of EFH Corp. and Executive Vice President and Chief Commercial Officer of Luminant | $ 600,000 |

### Annual Performance-Based Cash Bonus - Executive Annual Incentive Plan

The Executive Annual Incentive Plan ("EAIP") provides an annual performance-based cash bonus for the successful attainment of certain annual financial and operational performance targets that are established annually at each of the corporate and business unit levels by the O&C Committee. Under the terms of the EAIP, performance against these targets, which are generally set at challenging levels to incent high performance, drives bonus funding. Based on the level of attainment of these performance targets, an aggregate EAIP funding percentage amount for all participants is determined.

229

Table of Contents

Our financial performance targets typically include "management" EBITDA, a non-GAAP financial measure. When the O&C Committee reviews management EBITDA for purposes of determining our performance against the applicable management EBITDA target, it includes our earnings before interest, taxes, depreciation and amortization plus transaction, management and/or similar fees paid to the Sponsor Group, together with such adjustments as the O&C Committee shall determine appropriate in its discretion after good faith consultation with the CEO and the Chief Financial Officer, including adjustments consistent with those included in the comparable definitions in TCEH's Senior Secured Facilities (to the extent considered appropriate for executive compensation purposes). Our management EBITDA targets are also expected to be adjusted for acquisitions, divestitures or major capital investment initiatives to the extent that they were not contemplated in our financial plan (the "Financial Plan"). The management EBITDA targets are intended to measure achievement of the Financial Plan and the adjustments to management EBITDA described above primarily represent elements of our performance that are either beyond the control of management or were not predictable at the time the Financial Plan was approved. Under the terms of the EAIP, the O&C Committee has broad authority to make these or any other adjustments to EBITDA that it deems appropriate in connection with its evaluation and compensation of our executive officers. Management EBITDA is an internal measure used only for performance management purposes, and EFH Corp. does not intend for management EBITDA to be an alternative to any measure of financial performance presented in accordance with GAAP. Management EBITDA is not the same as Adjusted EBITDA, which is disclosed elsewhere in this Form 10-K and defined in the glossary to this Form 10-K.

*Financial and Operational Performance Targets*

The following table provides a summary of the performance targets for each of the Named Executive Officers.

| Name | EFH Corp. Management EBITDA[1] | EFH Business Services Scorecard Multiplier | Luminant Scorecard Multiplier | TXU Energy Scorecard Multiplier | Luminant Energy Scorecard Multiplier | Total | Payout |
|------|------|------|------|------|------|------|------|
| John F. Young | 50% | 50% | | | | 100% | 131% |
| Paul M. Keglevic | 50% | 50% | | | | 100% | 130% |
| David A. Campbell | 25% | | 75% | | | 100% | 132% |
| James A. Burke | 25% | | | 75% | | 100% | 134% |
| M.A. McFarland | 25% | 25% | 25% | | 25% | 100% | 143% |

(1)    Mr. Young is measured on EFH Corp. Management EBITDA, including Oncor, while the remainder of the Named Executive Officers is measured on EFH Corp. Management EBITDA, excluding Oncor.

Table of Contents

The following table provides a summary of the performance targets included in the EFH Business Services Scorecard Multiplier.

| EFH Business Services Scorecard Multiplier | Weight | Performance(1) | Payout |
|---|---|---|---|
| EFH Corp. Management EBITDA (excluding Oncor) | 20.0% | 126% | 25% |
| Luminant Scorecard Multiplier(2) | 20.0% | 134% | 27% |
| TXU Energy Scorecard Multiplier(2) | 20.0% | 137% | 27% |
| EFH Corp. (excluding Oncor) Total Spend | 20.0% | 129% | 26% |
| EFH Business Services Costs | 20.0% | 139% | 28% |
| Total | 100.0% | | 133% |

(1)  Performance payouts equal 100% if the target amount is achieved for a particular metric, 50% if the threshold amount is achieved and 200% if the superior amount is achieved. The actual performance payouts are interpolated between threshold and target or target and superior, as applicable, with a maximum performance payout for any particular metric being equal to 200%.

(2)  The performance targets included in the Luminant Scorecard Multiplier and the TXU Energy Scorecard Multiplier are summarized below.

The following table provides a summary of the performance targets included in the Luminant Scorecard Multiplier.

| Luminant Scorecard Multiplier | Weight | Performance(1) | Payout |
|---|---|---|---|
| Luminant Management EBITDA (excluding Oak Grove and Sandow 5) | 35.0% | 177% | 62% |
| Luminant Baseload Generation - Coal (excluding Oak Grove and Sandow 5) | 16.0% | 99% | 16% |
| Luminant Generation – Nuclear | 9.0% | 109% | 10% |
| Luminant O&M/SG&A | 15.0% | 124% | 18% |
| Luminant Capital Expenditures | 5.0% | 200% | 10% |
| Luminant Fossil Fuel Costs | 10.0% | 111% | 11% |
| Management EBITDA for Oak Grove and Sandow 5 | 10.0% | 67% | 7% |
| Total | 100.0% | | 134% |

(1)  Performance payouts equal 100% if the target amount is achieved for a particular metric, 50% if the threshold amount is achieved and 200% if the superior amount is achieved. The actual performance payouts are interpolated between threshold and target or target and superior, as applicable, with a maximum performance payout for any particular metric being equal to 200%.

Table of Contents

The following table provides a summary of the performance targets included in the TXU Energy Scorecard Multiplier.

| TXU Energy Scorecard Multiplier | Weight | Performance(1) | Payout |
|---|---|---|---|
| TXU Energy Management EBITDA | 40.0% | 179% | 72% |
| Contribution Margin | 15.0% | 200% | 30% |
| TXU Energy Total Costs | 20.0% | 79% | 16% |
| Residential Customer Count | 10.0% | 50% | 5% |
| Residential Days Meter to Cash | 5.0% | 100% | 5% |
| PUCT Complaints | 5.0% | 84% | 4% |
| Customer Satisfaction | 5.0% | 100% | 5% |
| Total | 100.0% | | 137% |

(1)    Performance payouts equal 100% if the target amount is achieved for a particular metric, 50% if the threshold amount is achieved and 200% if the superior amount is achieved. The actual performance payouts are interpolated between threshold and target or target and superior, as applicable, with a maximum performance payout for any particular metric being equal to 200%.

The following table provides a summary of the performance targets included in the Luminant Energy Scorecard Multiplier.

| Luminant Energy Scorecard Multiplier | Weight | Performance(1) | Payout(2) |
|---|---|---|---|
| Luminant Management EBITDA (excluding Oak Grove and Sandow 5) | 30.0% | 177% | 53% |
| Management EBITDA for Oak Grove and Sandow 5 | 10.0% | 79% | 8% |
| Luminant Energy SG&A | 10.0% | 200% | 20% |
| Incremental Value Created | 40.0% | 200% | 80% |
| Liquidity Utilization | 10.0% | 200% | 20% |
| Total | 100.0% | | 181% |
| | | Adjusted Total | 178% |

(1)    Performance payouts equal 100% if the target amount is achieved for a particular metric, 50% if the threshold amount is achieved and 200% if the superior amount is achieved. The actual performance payouts are interpolated between threshold and target or target and superior, as applicable, with a maximum performance payout for any particular metric being equal to 200%.

(2)    Due to plan funding limitations, the actual payout related to the Luminant Energy Scorecard Multiplier has been reduced from 181% to 178%.

*Individual Performance Modifier*

After approving the actual performance against the applicable targets under the plan, the O&C Committee and/or the CEO reviews the performance of each of our executive officers on an individual and comparative basis. Based on this review, which includes an analysis of both objective and subjective criteria, including the CEO's recommendations (with respect to all executive officers other than himself), the O&C Committee approves an individual modifier for each executive officer. Under the terms of the EAIP, the individual performance modifier can range from an outstanding rating (150%) to an unacceptable rating (0%). To calculate an executive officer's final performance-based cash bonus, the executive officer's corporate/business unit payout percentages are multiplied by the executive officer's target incentive level, which is computed as a percentage of annualized base salary, and then by the executive officer's individual performance modifier.

Table of Contents

*Actual Award*

The following table provides a summary of the 2010 performance-based cash bonus for each Named Executive Officer under the EAIP.

| Name | Target (% of salary) (1) | Target Award ($ Value) | Actual Award |
|---|---|---|---|
| John F. Young (2) | 100% | $1,200,000 | 2,043,600 |
| Paul M. Keglevic (3) | 85% | $ 552,500 | 933,725 |
| David A. Campbell (4) | 85% | $ 595,000 | 981,750 |
| James A. Burke (5) | 85% | $ 535,500 | 932,841 |
| M.A. McFarland (6) | 85% | $ 510,000 | 948,090 |

(1) Effective with the 2010 award period, the O&C Committee approved an increase in the annual target award under the EAIP from 75% of base salary to 85% of base salary for Messrs. Keglevic, Campbell and McFarland.

(2) Mr. Young's incentive award is based on the successful achievement of the financial performance targets for EFH Corp. and the financial and operational performance targets for Luminant and TXU Energy and an individual performance modifier that increased his incentive award. In 2010, Mr. Young successfully led the company in a difficult year in which wholesale power prices continued to decline. Notwithstanding the difficulties that accompany a sustained decline in forward natural gas prices, Mr. Young created value in many parts of the company's businesses. In particular, Mr. Young led the company's efforts in, among other things: liquidity and liability management efforts that captured long-term debt discounts of approximately $2 billion and extended the maturity date for approximately $5 billion of our long-term debt; improving financial and operational results for our legacy baseload generation fleet, including top decile safety, generation and cost performance by our nuclear facility; providing strong contributions to the state and national debates regarding legislative and regulatory issues facing the company, including proposals on federal climate change legislation and resolution of critical regulatory matters between the EPA and the TCEQ; transitioning our generation and wholesale energy businesses to operate successfully within ERCOT's new nodal wholesale market structure; our continued commitment to build a strong retail brand and customer-focused culture at TXU Energy; and exceeding EFH Corp.'s planned EBITDA for 2010. Given these and other significant achievements, the O&C Committee approved an individual performance modifier that increased Mr. Young's incentive award.

(3) Mr. Keglevic's incentive award is based on the successful achievement of the financial performance targets for EFH Corp. and EFH Business Services and the financial and operational performance targets for Luminant and TXU Energy and an individual performance modifier that increased his incentive award. In 2010, Mr. Keglevic successfully managed several new financial processes at EFH Corp. and its business units, including processes for managing the varied risks of our businesses and preserving effective liquidity levels. In addition, Mr. Keglevic led the company's liquidity and liability management efforts, including capturing long-term debt discounts of approximately $2 billion, extending the maturity date for approximately $5 billion of our long-term debt, and a resulting reduction in our interest expense of approximately $1.2 billion. Given these significant accomplishments and other achievements (including the successful resolution of a significant tax matter related to our discontinued Europe business), the O&C Committee approved an individual performance modifier that increased Mr. Keglevic's incentive award.

(4) Mr. Campbell's incentive award is based on the successful achievement of a financial performance target for EFH Corp. and the financial and operational performance targets for Luminant and an individual performance modifier that increased his incentive award. In 2010, Mr. Campbell was successful in overseeing strong financial and operational results, primarily at Luminant's nuclear and lignite/coal-fueled plants and in Luminant's wholesale energy organization. Also, Mr. Campbell continued to provide significant contributions in the public affairs arena on a local, state and national level, particularly with regard to environmental issues facing Luminant. In addition, under Mr. Campbell's leadership, Luminant had a strong year for safety in its nuclear and mining operations, while implementing improved safety processes and metrics for its gas and lignite/coal-fueled plants and mines. Given these significant accomplishments and other achievements (including his focus on developing a collaborative, team-oriented culture across the organization), the O&C Committee approved an individual performance modifier that increased Mr. Campbell's incentive award.

(5) Mr. Burke's incentive award is based on the successful achievement of a financial performance target for EFH Corp. and the financial and operational performance targets for TXU Energy and an individual performance modifier that increased his incentive award. In 2010, Mr. Burke continued to build on TXU Energy's brand and reputation with its customers and public stakeholders, while driving continuous improvement in customer service, billing, marketing and retention activities. Given these significant accomplishments and other achievements (including his continued commitment to build a strong retail and customer-focused culture at TXU Energy), the O&C Committee approved an individual performance modifier that increased Mr. Burke's incentive award.

(6) Mr. McFarland's incentive award is based on the successful achievement of the financial performance targets for EFH Corp., the financial and operational performance targets for Luminant and Luminant Energy and an individual performance modifier that increased his incentive award. In 2010, Mr. McFarland successfully transitioned our generation and wholesale energy businesses to operate successfully within ERCOT's new nodal wholesale market structure, successfully managed Luminant's fuel strategy, and developed several new processes for managing Luminant's long-term hedging strategy with minimal impacts to liquidity. Given these significant accomplishments and other achievements (including his strategic contributions with regard to a number of development opportunities), the O&C Committee approved an individual performance modifier that increased Mr. McFarland's incentive award.

Table of Contents

### Long-Term Incentive Awards

#### Long-Term Cash Incentive

In October 2009 (and in February 2010, with respect to Mr. Young), each of our Named Executive Officers was granted a long-term cash incentive award (the "LTI") that entitles such Named Executive Officer to receive on September 30, 2012, to the extent such Named Executive Officer remains employed by EFH Corp. on such date (with customary exceptions in limited circumstances, including death, disability, and leaving for "good reason" or termination without "cause"), an additional one-time, lump-sum cash payment equal to 75% (100% with respect to Mr. Young) of the aggregate EAIP award received by such executive officer for fiscal years 2009, 2010 and 2011. These awards provide significant retentive value because an award is not paid to an executive officer unless the executive officer remains employed with us until September 30, 2012 (subject to the customary exceptions described above). In addition, these awards provide additional incentive to our executive officers to achieve top operational and financial performance because the award is based on a percentage of the executive officers' annual performance-based cash bonuses.

#### Long-Term Equity Incentives

We believe it is important to strongly align the interests of our executive officers and shareholders through equity-based compensation. In December 2007, our Board approved and adopted our 2007 Stock Incentive Plan pursuant to which we granted Stock Option Awards to our executive officers. The purpose of the 2007 Stock Incentive Plan is to:

- promote our long-term financial interests and growth by attracting and retaining management and other personnel with the training, experience and ability to make a substantial contribution to our success;

- motivate management and other personnel by means of growth-related incentives to achieve long-range goals, and

- strengthen the correlation between the long-term interests of our shareholders and the interests of our executive officers through opportunities for stock (or stock-based) ownership in EFH Corp.

Please refer to the outstanding Equity Awards at Fiscal Year-End—2010 table, including the footnotes thereto, for a more detailed description of the outstanding Stock Option Awards held by each of the Named Executive Officers. In the future, we may make additional discretionary grants of stock options or other equity-based compensation to reward high performance or achievement.

As described in greater detail in Item 9B above, the O&C Committee recently approved an exchange program pursuant to which our executive officers, including the Named Executive Officers, may exchange any and all of their outstanding Stock Option Awards for restricted stock units that cliff-vest on September 30, 2014.

### Other Elements of Compensation

#### General

Our executive officers generally have the opportunity to participate in certain of our broad-based employee compensation plans, including our Thrift (401(k)) Plan, retirement plans and non-qualified benefit plans. Please refer to the footnotes to the Summary Compensation table for a more detailed description of our Thrift Plan, the narrative that follows the Pension Benefits table for a more detailed description of our Retirement Plan and Supplemental Retirement Plan and the footnotes to the Nonqualified Deferred Compensation table for a more detailed description of our Salary Deferral Program. However, beginning in 2010, our Named Executive Officers are no longer eligible to participate in the Salary Deferral Program.

234

Table of Contents

*Perquisites*

We provide our executives with certain perquisites on a limited basis. Those perquisites that exist are generally intended to enhance our executive officers' ability to conduct company business. These benefits include, financial planning, preventive health maintenance, and reimbursement for certain club memberships and certain spousal travel expenses. Expenditures for the perquisites described below are disclosed by individual in footnotes to the Summary Compensation Table. The following is a summary of perquisites offered to our Named Executive Officers that are not available to all employees:

**Executive Financial Planning:** We pay for our executive officers to receive financial planning services. This service is intended to support them in managing their financial affairs, which we consider especially important given the high level of time commitment and performance expectation required of our executive officers. Furthermore, we believe that such service helps ensure greater accuracy and compliance with individual tax regulations by our executive officers.

**Health Services:** We pay for our executive officers to receive annual physical health exams. Also, in 2010, we purchased an annual membership for Messrs. Young and Keglevic to participate in a comprehensive health plan that provides anytime personal and private physician access and health care. The health of our executive officers is important given the vital leadership role they play in directing and operating the company. Our executive officers are important assets of EFH Corp., and these benefits are designed to help ensure their health and long-term ability to serve our shareholders.

**Club Memberships:** We reimburse certain of our executives for the cost of golf and social club memberships, provided that the club membership provides for a business-use opportunity, such as client networking and entertainment. The club membership reimbursements are provided to assist the executives in cultivating business relationships.

**Spouse Travel Expenses:** From time to time, we pay for an executive officer's spouse to travel with the executive officer when taking a business trip.

**Contingent Payments**

We have entered into employment agreements with Messrs. Young, Keglevic, Campbell, Burke and McFarland. Each of the employment agreements provides that certain payments and benefits will be paid upon the expiration or termination of the agreement under various circumstances, including termination without cause, resignation for good reason and termination of employment within a fixed period of time following a change in control. We believe these provisions are important in order to attract and retain the caliber of executive officers that our business requires and provide incentive for our executive officers to fully consider potential changes that are in our and our shareholders' best interest, even if such changes would result in the executive officers' termination of employment. For a description of the applicable provisions in the employment agreements of our Named Executive Officers see "Potential Payments upon Termination or Change in Control."

*Other*

After a comprehensive review of the CEO's performance and the performance of our businesses in 2009, the O&C Committee approved several changes to Mr. Young's compensation arrangement in February 2010, each of which was described in greater detail in last year's annual report on Form 10-K. In connection with these changes, Mr. Young's employment arrangement was amended to provide him a 10-year term life insurance policy in an insured amount equal to $10,000,000 and a supplemental retirement plan that vests on December 31, 2014 (with customary exceptions for death, disability and leaving for "good reason" or termination "without cause") with a value of $3,000,000.

Table of Contents

**Accounting and Tax Considerations**

*Accounting Considerations*

Under FASB ASC Topic 718, the total amount of compensation expense to be recorded for stock-based awards (e.g., Stock Option Awards granted under the 2007 Stock Incentive Plan) is based on the fair value of the award on the grant date. This fair value is then recorded as expense over the vesting period, with an offsetting increase in paid-in capital. The amount of compensation expense is not subsequently adjusted for changes in our share price, for the actual number of shares distributed, or for any other factors except for true-ups related to estimated forfeitures compared to actual forfeitures.

As previously disclosed, in connection with a grant of new stock options in February 2010, Mr. Young surrendered unvested performance-related stock options that were granted to him when he joined EFH Corp. The shares surrendered by Mr. Young in February 2010 are considered modifications to the original awards and are treated as an exchange of the original award for a new award. The compensation expense related to the new award represents the incremental costs of the new award over the surrendered award and is based on the new grant date fair value and is recognized over its new vesting period.

*Income Tax Considerations*

Section 162(m) of the Code limits the tax deductibility by a publicly held company of compensation in excess of $1 million paid to the CEO or any other of its three most highly compensated executive officers other than the principal financial officer. Because EFH Corp. is a privately-held company, Section 162(m) will not limit the tax deductibility of any executive compensation for 2010.

The O&C Committee administers our compensation programs with the good faith intention of complying with Section 409A of the Code.

**Organization and Compensation Committee Report**

The O&C Committee has reviewed and discussed with management the Compensation Discussion and Analysis set forth in this Form 10-K. Based on this review and discussions, the committee recommended to the Board that the Compensation Discussion and Analysis be included in this Form 10-K.

Organization and Compensation Committee

Donald L. Evans, Chair
Arcilia C. Acosta
Marc S. Lipschultz
Kenneth Pontarelli

236

[Table of Contents](#)

*Summary Compensation Table—2010*

The following table provides information for the fiscal years ended December 31, 2010, 2009 and 2008 regarding the aggregate compensation paid to our Named Executive Officers.

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($)[6] | Non-Equity Incentive Plan Compensation ($)[7] | Change in Pension Value and Non-qualified Deferred Compensation Earnings ($)[8] | All Other Compensation ($)[9] | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| **John F. Young**[1] | 2010 | 1,200,000 | — | — | 3,405,000 | 2,043,600 | 2,761 | 210,826 | 6,862,187 |
| President & CEO of EFH Corp. | 2009 | 1,000,000 | — | — | — | 1,469,000 | — | 105,291 | 2,574,291 |
| | 2008 | 912,500 | — | 3,000,000 | 13,635,000 | 1,418,000 | — | 462,258 | 19,427,758 |
| **Paul M. Keglevic**[2] | 2010 | 650,000 | 50,000 | — | — | 933,725 | 3,185 | 39,416 | 1,676,326 |
| EVP & Chief Financial Officer of | 2009 | 600,000 | 150,000 | — | 1,325,000 | 664,200 | — | 73,320 | 2,812,520 |
| EFH Corp. | 2008 | 293,182 | 250,000 | 1,125,000 | 6,442,500 | 613,800 | — | 88,508 | 8,812,990 |
| **David A. Campbell**[3] | 2010 | 700,000 | — | — | — | 981,750 | 76,485 | 17,911 | 1,776,146 |
| President & CEO of Luminant | 2009 | 600,000 | — | — | 2,120,000 | 642,600 | 68,861 | 15,020 | 3,446,481 |
| | 2008 | 545,500 | 5,092,250 | 2,500,000 | 7,272,000 | 625,950 | 22,779 | 3,395,878 | 19,454,357 |
| **James A. Burke**[4] | 2010 | 630,000 | — | — | — | 932,841 | 76,713 | 17,305 | 1,656,859 |
| President & CEO of TXU Energy | 2009 | 600,000 | — | — | 933,100 | 856,800 | 55,931 | 23,885 | 2,469,716 |
| | 2008 | 600,000 | — | — | 4,454,100 | 473,918 | 25,501 | 639,136 | 6,192,655 |
| **M.A. McFarland**[5] | 2010 | 600,000 | — | — | — | 948,090 | — | 17,418 | 1,565,508 |
| EVP-EFH Corp. & EVP & Chief | 2009 | 500,000 | — | — | 1,060,000 | 687,750 | — | 7,424 | 2,255,174 |
| Commercial Officer of Luminant | 2008 | 236,744 | 150,000 | 500,000 | 5,114,000 | 529,032 | — | 87,725 | 6,617,501 |

(1) Mr. Young commenced employment with EFH Corp. in January 2008. The amounts for 2010 reported as "All Other Compensation" for Mr. Young represent (i) the costs of providing certain perquisites, including $3,299 for an executive physical, $11,169 for an annual membership in a comprehensive personal physician care program, $140,922 for the cost of his country club membership, including the one-time initiation fee, $10,120 for financial planning, $17,185 for insurance premiums in respect of a 10-year term life insurance policy, $1,121 for personal use of a car service and $12,310 of taxable reimbursements partially related to his spouse's travel and (ii) $14,700 for our matching contributions to the EFH Thrift Plan.

(2) Mr. Keglevic commenced employment with EFH Corp. in July 2008. Mr. Keglevic's employment agreement provides that we pay him a signing bonus equal to $550,000 as follows: (i) $250,000 payable in July 2008; (ii) $150,000 payable in July 2009 and (iii) $50,000 payable in July 2010, 2011 and 2012. The amount for 2010 reported as "Bonus" for Mr. Keglevic represents the 2010 portion of his signing bonus. The amounts for 2010 reported as "All Other Compensation" for Mr. Keglevic represent (i) the costs of providing certain perquisites, including $11,026 for an annual membership in a comprehensive personal physician care program, and $18,853 for the cost of his country club membership, including a pro-rated portion of his initiation fee and (ii) $9,537 for our matching contributions to the EFH Thrift Plan.

(3) The amount reported as "All Other Compensation" in 2010 for Mr. Campbell represents the costs of providing certain perquisites, including $10,120 for financial planning and $2,891 for an executive physical and (ii) $4,900 for our matching contributions to the EFH Thrift Plan.

(4) The amounts for 2010 reported as "All Other Compensation" for Mr. Burke represent (i) the costs of providing certain perquisites, including $8,875 for financial planning, and (ii) $8,430 for our matching contributions to the EFH Thrift Plan.

(5) Mr. McFarland commenced employment with EFH Corp. in July 2008. The amounts for 2010 reported as "All Other Compensation" for Mr. McFarland represent (i) the costs of providing certain perquisites, including $2,718 for an executive physical and (ii) $14,700 for our matching contributions to the EFH Thrift Plan.

(6) The amounts reported as "Option Awards" represent the grant date fair value of Stock Option Awards granted in the fiscal year computed for the stock options awarded under the 2007 Stock Incentive Plan in accordance with FASB ASC Topic 718 and do not take into account estimated forfeitures. Mr. Young's 2010 options were granted with an exercise price of $3.50 per share. Please refer to the table below entitled "Grants of Plan-Based Awards – 2010" for more information.

(7) The amounts in 2010 reported as "Non-Equity Incentive Plan Compensation" were earned by the executive officers in 2010 under the EAIP and are expected to be paid in March 2011.

Table of Contents

(8)   The amounts in 2010 reported under "Change in Pension Value and Nonqualified Deferred Compensation Earnings" include the aggregate increase in actuarial value of EFH Corp.'s Retirement Plan and Supplemental Retirement Plan. For a more detailed description of EFH Corp.'s retirement plans, including the transfers of certain assets and liabilities from the Supplemental Retirement Plan and/or Salary Deferral Program to the cash balance component of the Retirement Plan, please refer to the narrative that follows the table titled "Pension Benefits". There are no above market earnings for nonqualified deferred compensation that is deferred under the Salary Deferral Program.

(9)   For purposes of preparing this column, all perquisites are valued on the basis of the actual cost to the company. As described above, "All Other Compensation" includes amounts associated with our matching contributions to the EFH Thrift Plan. Our Thrift Plan allows participating employees to contribute a portion of their regular salary or wages to the plan. Under the EFH Thrift Plan, EFH Corp. matches a portion of an employee's contributions. This matching contribution is 100% of each Named Executive Officer's contribution up to 6% of the named Executive Officer's salary up to the IRS annual compensation limit. All matching contributions are invested in Thrift Plan investments as directed by the participant.

238

Table of Contents

*Grants of Plan-Based Awards – 2010*

The following table sets forth information regarding grants of compensatory awards to our Named Executive Officers during the fiscal year ended December 31, 2010.

| Name | Grant Date | Date of Board Action | Estimated Possible Payouts Under Non-Equity Incentive Plan Awards[1] | | | All Other Option Awards: # of Securities Underlying Options (#)[2] | Exercise or Base Price of Option Awards ($/sh)[3] | Grant Date Fair Value of Stock and Option Awards[4] |
|---|---|---|---|---|---|---|---|---|
| | | | Threshold ($) | Target ($) | Max. ($) | | | |
| John F. Young | 02/18/10 | 02/18/10 | 600,000 | 1,200,000 | 2,400,000 | 3,000,000 | 3.50 | 3,405,000 |
| Paul M. Keglevic | | 02/18/10 | 276,250 | 552,500 | 1,105,000 | | | |
| David A. Campbell | | 02/18/10 | 297,500 | 595,000 | 1,190,000 | | | |
| James A. Burke | | 02/18/10 | 267,750 | 535,500 | 1,071,000 | | | |
| M.A. McFarland | | 02/18/10 | 255,000 | 510,000 | 1,020,000 | | | |

(1) The amounts disclosed under the heading "Estimated Possible Payouts under Non-Equity Incentive Plan Awards" reflect the threshold, target and maximum amounts available under the EAIP for each executive officer and each executive officer's employment agreement. The actual awards for the 2010 plan year are expected to be paid in March 2011 and are reported in the Summary Compensation Table under the heading "Non-Equity Incentive Plan Compensation" and described above under the section entitled "Annual Performance Bonus - EAIP".

(2) Represents grants of new Time Vested Options and Cliff Vested Options under the 2007 Stock Incentive Plan, as described above under "Long-Term Incentive Awards."

(3) There is no established public market for our common stock. Our board of directors values our common stock on a semi-annual basis (on June 30 th and December 31st of each year). The valuation is primarily done to set the exercise or base price of awards granted under the 2007 Stock Incentive Plan. In determining the valuation of our common stock, our Board, with the assistance of third party valuation experts, utilizes several valuation techniques, including discounted cash flow and comparable company analysis.

(4) The amounts reported under "Grant Date Fair Value of Stock and Option Awards" represent the grant date fair value of stock options related to the 2010 Awards in accordance with FASB ASC Topic 718.

For a discussion of certain material terms of the employment agreements with the Named Executive Officers, please see "Assessment of Compensation Elements" and "Potential Payments upon Termination or Change in Control."

239

Table of Contents

*Outstanding Equity Awards at Fiscal Year-End– 2010*

| | Option Awards (1) | | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|---|
| | # of Securities Underlying Unexercised Options | | Equity Incentive Plan Awards: # of Securities Underlying Unexercised Unearned Options (5) | Option Exercise Price | Option Expiration Date | # of Shares or Units of Stock That Have Not Vested (6) | Market Value of Shares or Units of Stock That Have Not Vested (7) | Equity Incentive Plan Awards: # of Unearned Shares, Units or Other Rights That Have Not Vested | Equity Incentive Plan Awards: Market Payout Value of Unearned Shares, Units or Rights That Have Not Vested |
| Name | Exercisable | Unexercisable | | | | | | | |
| John F. Young | 3,375,000 | 1,500,000(2) | 1,125,000 | 5.00 | 02/01/2018 | | | | |
| | 300,000 | 1,200,000(3) | | 3.50 | 02/18/2020 | | | | |
| | | 1,500,000(4) | | 3.50 | 02/18/2020 | | | | |
| Paul M. Keglevic | 1,125,000 | 500,000(2) | 375,000 | 5.00 | 12/22/2018 | | | | |
| | 100,000 | 400,000(3) | | 3.50 | 12/17/2019 | | | | |
| | | 500,000(4) | | 3.50 | 12/17/2019 | 225,000 | 281,250 | | |
| David A. Campbell | 1,800,000 | 800,000(2) | 600,000 | 5.00 | 05/20/2018 | | | | |
| | 160,000 | 640,000(3) | | 3.50 | 12/17/2019 | | | | |
| | | 800,000(4) | | 3.50 | 12/17/2019 | | | | |
| James A. Burke | 1,102,500 | 490,000(2) | 367,500 | 5.00 | 05/20/2018 | | | | |
| | 40,000 | 160,000(3) | | 3.50 | 12/17/2019 | | | | |
| | | 490,000(4) | | 3.50 | 12/17/2019 | | | | |
| M.A. McFarland | 900,000 | 400,000(2) | 300,000 | 5.00 | 12/22/2018 | | | | |
| | 80,000 | 320,000(3) | | 3.50 | 12/17/2019 | | | | |
| | | 400,000(4) | | 3.50 | 12/17/2019 | | | | |

(1)   In 2008, Messrs. Young, Keglevic, Campbell, Burke and McFarland were granted 7,500,000, 2,500,000, 4,000,000, 2,450,000 and 2,000,000 Stock Option Awards, respectively, half of which were "Time Vested Options" and half of which were "Performance Vested Options". The exercise price of the Stock Option Awards granted in 2008 (the fair market value on the grant date) is $5.00 per share. In late 2009 (February 2010, with respect to Mr. Young), the O&C Committee granted Messrs. Young, Keglevic, Campbell, Burke and McFarland 1,500,000, 500,000, 800,000, 200,000 and 400,000 new Time Vested Options, respectively, and 1,500,000, 500,000, 800,000, 490,000 and 400,000 "Cliff Vested Options," respectively. In connection with these new Stock Option Award grants, each Named Executive Officer surrendered to EFH Corp. a portion of the Performance Vested Options that were granted to him in 2008. The exercise price of the Stock Option Awards granted in 2009 (2010, with respect to Mr. Young) is $3.50 per share. As described in greater detail in Item 9B above, the O&C Committee recently approved an exchange program pursuant to which our executive officers, including the Named Executive Officers, may exchange any and all of their outstanding Stock Option Awards for restricted stock units that cliff-vest on September 30, 2014.

(2)   The Time Vested Options vest in 20% increments on each of the first five anniversaries of September 30, 2007 and September 30, 2009, respectively. Accordingly, the Time Vested Options granted in 2008 are scheduled to become exercisable ratably in September 2010, 2011 and 2012 provided the Named Executive Officer has remained continuously employed by EFH Corp. through the applicable vesting date (with customary exceptions for death, disability, and leaving for "good reason" or termination without "cause").

(3)   The Time Vested Options granted in 2009 (2010, with respect to Mr. Young) are scheduled to become exercisable ratably in September 2010, 2011, 2012, 2013 and 2014 provided the Named Executive Officer has remained continuously employed by EFH Corp. through the applicable vesting date (with customary exceptions for death, disability, and leaving for "good reason" or termination without "cause").

(4)   The Cliff Vested Options are scheduled to become exercisable in September 2014 provided the Named Executive Officer has remained continuously employed by EFH Corp. through that date (with customary exceptions for death, disability, and leaving for "good reason" or termination without "cause").

240

Table of Contents

(5)  The Performance Vested Options vest in 20% increments on each of the first five anniversaries of December 31, 2007, subject to our achievement of the annual management EBITDA target for the given fiscal year (or certain cumulative performance targets) as detailed in the stock option agreements. In deciding whether to vest the Performance Vested Options, the O&C Committee considers EFH Corp.'s quantitative performance against certain management EBITDA targets. The method of calculating management EBITDA for purposes of vesting the Performance Vested Options is the same as the method for calculating management EBITDA for purposes of the EAIP, as described above. The O&C Committee also has broad discretion to consider other qualitative and quantitative criteria that it deems appropriate in connection with its decision to vest the Performance Vested Options.

(6)  This column reflects restricted stock units described above under "Long-Term Incentive Awards-Equity Investment." Pursuant to his employment arrangement, Mr. Keglevic is entitled to receive 225,000 shares of EFH Corp.'s common stock if he is employed by EFH Corp. on September 30, 2012, or if his employment terminates for any reason prior to September 30, 2012, other than for "cause" or without "good reason." If Mr. Keglevic receives the 225,000 shares, he has the right to sell the shares to EFH Corp. for $3,140,000, at any time during the period beginning on September 30, 2012 and ending on the sixtieth business day following his termination of employment (or, in the event Mr. Keglevic receives the shares upon his termination of employment, at any time during the period ending on the sixtieth business day following his termination of employment).

(7)  There is no established public market for our common stock. Our board of directors values our common stock on a semi-annual basis (on June 30th and December 31st of each year). The valuation is primarily done to set the exercise or base price of awards granted under the 2007 Stock Incentive Plan. In determining the valuation of our common stock, our Board, with the assistance of third party valuation experts, utilizes several valuation techniques, including discounted cash flow and comparable company analysis. The amount reported above under the heading "Market Value of Shares or Units of Stock That Have Not Vested" reflects the fair market value (as determined by our Board) of our common stock as of December 31, 2010.

*Options Exercised and Stock Vested – 2010*

The table sets forth information regarding the vesting of equity awards held by the Named Executive Officers during 2010:

| Name | Option Awards | | Stock Awards | |
|---|---|---|---|---|
| | Number of Shares Acquired or Exercised | Value Realized on Exercise($) | Number of Shares Acquired on Vesting | Value Realized on Vesting ($) |
| John F. Young (1) | 0 | 0 | 600,000 | 1,950,000 |
| Paul M. Keglevic | 0 | 0 | 0 | 0 |
| David A. Campbell | 0 | 0 | 0 | 0 |
| James A. Burke | 0 | 0 | 0 | 0 |
| M.A. McFarland (1) (2) | 0 | 0 | 100,000 | 200,000 |

(1)  As described in greater detail above, our board of directors values our common stock on a semi-annual basis (on June 30th and December 31st of each year). The valuation is conducted, in part, to set the price of shares granted under the 2007 Stock Incentive Plan. At the time that Mr. Young's shares vested, our board of directors valued our common stock at $3.25 per share. At the time that Mr. McFarland's shares vested, our board of directors valued our common stock at $2.00 per share.

(2)  Mr. McFarland's deferred shares were distributed to him in October 2010, but they remain subject to a substantial risk of forfeiture.

**Table of Contents**

*Pension Benefits – 2010*

The table set forth below illustrates present value on December 31, 2010 of each Named Executive Officer's Retirement Plan benefit and benefits payable under the Supplemental Retirement Plan, based on their years of service and remuneration through December 31, 2010:

| Name | Plan Name | Number of Years Credited Service (#)[1] | PV of Accumulated Benefit ($) |
|------|-----------|----------------------------------------|-------------------------------|
| John F. Young | Retirement Plan | — | 36,074 |
|  | Supplemental Retirement Plan |  | 0 |
| Paul M. Keglevic | Retirement Plan | — | 47,594 |
|  | Supplemental Retirement Plan |  |  |
| David A. Campbell | Retirement Plan | 5.5833 | 135,418 |
|  | Supplemental Retirement Plan | 8.5000 | 85,817 |
| James A. Burke | Retirement Plan | 5.1667 | 123,253 |
|  | Supplemental Retirement Plan | 5.1667 | 82,253 |
| M.A. McFarland | Retirement Plan | — | 0 |
|  | Supplemental Retirement Plan | — | 0 |

(1)    Because they were hired after October 1, 2007, Messrs. Young, Keglevic and McFarland are not eligible to receive monthly contribution credits under the cash balance component of our Retirement Plan. However, as described further in the narrative that follows, Messrs. Young and Keglevic participate in the cash balance component of the Retirement Plan solely with respect to amounts that were transferred from the Salary Deferral Program in 2009.

EFH Corp. and its participating subsidiaries maintain the Retirement Plan, which is intended to be qualified under applicable provisions of the Code and covered by ERISA. The Retirement Plan contains both a traditional defined benefit component and a cash balance component. Only employees hired before January 1, 2002 may participate in the traditional defined benefit component. Because none of our Named Executive Officers were hired before January 1, 2002, no Named Executive Officer participates in the traditional defined benefit component. Employees hired after January 1, 2002 and before October 1, 2007 are eligible to participate in the cash balance component and receive monthly contribution credits based on age and years of accredited service. In addition, effective December 31, 2009, certain assets and liabilities under the Salary Deferral Program and the Supplemental Retirement Plan were transferred to the cash balance component of the Retirement Plan. Because they were hired in 2004, Messrs. Campbell and Burke have participated and may continue to participate in the cash balance component of the Retirement Plan, and because they were hired after October 2007, Messrs. Young and Keglevic participate in the cash balance component of the Retirement Plan solely with respect to amounts that were transferred from the Salary Deferral Program.

Under the cash balance component of the Retirement Plan, hypothetical accounts are established for participants and credited with monthly contribution credits equal to a percentage of the participant's compensation (3.5%, 4.5%, 5.5% or 6.5% depending on the participant's combined age and years of accredited service), contribution credits equal to the amounts transferred from the Salary Deferral Program and/or the Supplemental Retirement Plan in 2009 and interest credits on all of such amounts based on the average yield of the 30-year Treasury bond for the 12 months ending November 30 of the prior year.

The Supplemental Retirement Plan provides for the payment of retirement benefits, which would otherwise be limited by the Code or the definition of earnings under the Retirement Plan. Under the Supplemental Retirement Plan, retirement benefits under the cash balance component are calculated in accordance with the same formula used under the Retirement Plan. Participation in EFH Corp.'s Supplemental Retirement Plan has been limited to employees of all of its businesses other than Oncor, who were employed by EFH Corp. (or its participating subsidiaries) on or before October 1, 2007. Because they were hired in 2004, Messrs. Campbell and Burke participate in the Supplemental Retirement Plan, and because they were hired after October 2007, Messrs. Young, Keglevic and McFarland are not eligible to participate in the Supplemental Retirement Plan.

Table of Contents

Benefits accrued under the Supplemental Retirement Plan after December 31, 2004, are subject to Section 409A of the Code. Accordingly, certain provisions of the Supplemental Retirement Plan have been modified in order to comply with the requirements of Section 409A and related guidance.

The present value of the accumulated benefit for the Retirement Plan (the cash balance component) was calculated as the value of their cash balance account projected to age 65 at an assumed growth rate of 4.75% and then discounted back to December 31, 2010 at 5.5%. No mortality or turnover assumptions were applied.

*Nonqualified Deferred Compensation – 2010(1)*

The following table sets forth information regarding plans that provide for the deferral of the Named Executive Officers' compensation on a basis that is not tax-qualified for the fiscal year ended December 31, 2010:

| Name | Executive Contributions in Last FY ($) | Registrant Contributions in Last FY ($) | Aggregate Earnings in Last FY ($) | Aggregate Withdrawals/ Distributions ($) | Aggregate Balance at Last FYE ($)(2) |
|---|---|---|---|---|---|
| John F. Young | 0 | 0 | 27,686 | | 309,402 |
| Paul M. Keglevic | 0 | 0 | (46) | | 87,656 |
| David A. Campbell (3) | 0 | 0 | 42,965 | | 863,856 |
| James A. Burke (3) | 0 | 0 | 44,135 | | 839,898 |
| M.A. McFarland | 0 | 0 | 0 | 0 | 0 |

(1)  The amounts reported in the Nonqualified Deferred Compensation table include deferrals and the company match under the Salary Deferral Program. Under EFH Corp.'s Salary Deferral Program each employee of EFH Corp. and its participating subsidiaries who is in a designated job level and whose annual salary is equal to or greater than an amount established under the Salary Deferral Program ($110,840 for the program year beginning January 1, 2010) may elect to defer up to 50% of annual base salary, and/or up to 85% of the annual incentive award, for a maturity period of seven years, for a maturity period ending with the retirement of such employee, or for a combination thereof. EFH Corp. provided no matching contributions for 2010. Deferrals are credited with earnings or losses based on the performance of investment alternatives under the Salary Deferral Program selected by each participant. At the end of the applicable maturity period, the trustee for the Salary Deferral Program distributes the deferred compensation, any vested matching awards and the applicable earnings in cash as a lump sum or in annual installments at the participant's election made at the time of deferral. EFH Corp. is financing the retirement option portion of the Salary Deferral Program through the purchase of corporate-owned life insurance on the lives of participants. The proceeds from such insurance are expected to allow EFH Corp. to fully recover the cost of the retirement option. Beginning in 2010, certain executive officers, including the Named Executive Officers, are not eligible to participate in the Salary Deferral Program.

(2)  A portion of the amounts reported as "Aggregate Balance at Last FYE" are also included in the Summary Compensation Table as follows: for Mr. Young, $80,000 and $66,667 of executive contributions are included as "Salary" for 2009 and 2008, respectively, and $80,000 and $66,667 of company matching contributions are included as "All Other Compensation" for 2009 and 2008, respectively; for Mr. Keglevic, $48,000 and $20,000 of executive contributions are included as "Salary" for, 2009 and 2008, respectively, and $48,000 and $20,000 of company matching contributions are included as "All Other Compensation" for 2009 and 2008, respectively; for Mr. Burke, $48,000 and $27,417 of executive contributions are included as "Salary" for 2009 and 2008, respectively, and $48,000 and $27,417 of company matching contributions are included as "All Other Compensation" for 2009 and 2008, respectively.

(3)  The amounts reported as "Aggregate Balance at Last FYE" for Messrs. Campbell and Burke include the fair market value of deferred shares (500,000 with respect to Mr. Campbell and 450,000 with respect to Mr. Burke) that each of them is entitled to receive on the earlier to occur of their termination of employment or a change in the effective control of EFH Corp.

Table of Contents

*Potential Payments upon Termination or Change in Control*

The tables and narrative below provide information for payments to each of the Named Executive Officers (or, as applicable, enhancements to payments or benefits) in the event of his termination, including if such termination is voluntary, for cause, as a result of death, as a result of disability, without cause or for good reason or without cause or for good reason in connection with a change in control.

The information in the tables below is presented in accordance with SEC rules, assuming termination of employment as of December 31, 2010.

**Employment Arrangements with Contingent Payments**

As of December 31, 2010, each of Messrs. Young, Keglevic, Campbell, Burke and McFarland had employment agreements with change in control and severance provisions as described in the following tables. In addition, in 2010, the O&C Committee approved certain changes to the compensation arrangements for Messrs. Young and Keglevic, which changes were effective on or before December 31, 2010 but not yet documented in such Named Executive Officers' employment agreements. Certain of these changes affected the potential payments of Messrs. Young and Keglevic and are reflected in the following tables.

With respect to each Named Executive Officer's employment agreement, a change in control is generally defined as (i) a transaction that results in a sale of substantially all of our assets to another person and such person having more seats on our Board than the Sponsor Group, (ii) a transaction that results in a person not in the Sponsor Group owning more than 50% of our common stock and such person having more seats on our Board than the Sponsor Group or (iii) a transaction that results in the Sponsor Group owning less than 20% of our common stock and the Sponsor Group not being able to appoint a majority of the directors to our Board.

Each Named Executive Officer's employment agreement includes customary non-compete and non-solicitation provisions that generally restrict the Named Executive Officer's ability to compete with us or solicit our customers or employees for his own personal benefit during the term of the employment agreement and 24 months (with respect to Mr. Young) or 18 months (with respect to Messrs. Keglevic, Campbell, Burke and McFarland) after the employment agreement expires or is terminated.

Each of our Named Executive Officers has been granted a long-term cash incentive award (the "LTI") that entitles such Named Executive Officer to receive on September 30, 2012, to the extent such Named Executive Officer remains employed by EFH Corp. on such date (with customary exceptions for death, disability, and leaving for "good reason" or termination without "cause"), an additional one-time, lump-sum cash payment equal to 75% (100% with respect to Mr. Young) of the aggregate EAIP award received by such executive officer for fiscal years 2009, 2010 and 2011.

As of December 31, 2010, each of Messrs. Young, Keglevic, Campbell, Burke and McFarland had stock option agreements. Under the stock option agreement for each Named Executive Officer, in the event of such Named Executive Officer's termination without cause or resignation for good reason (or in certain circumstances when the Named Executive Officer's employment term is not extended) following a change in control of EFH Corp., such Named Executive Officer's Time Vested Options would become immediately exercisable as to 100% of the shares of EFH Corp. common stock subject to such options immediately prior to the change in control. As of December 31, 2010, the fair market value of the shares of EFH Corp. common stock underlying each Named Executive Officer's Time Vested Options (as determined from time to time by our Board) was less than the exercise price of such options.

244

Table of Contents

**1. Mr. Young**

**Potential Payments to Mr. Young upon Termination as of December 31, 2010 (per employment agreement, restricted stock agreement and stock option agreement, each in effect as of December 31, 2010, and revisions to such employment agreement that were adopted by the O&C Committee and effective as of December 31, 2010)**

| Benefit | Voluntary | For Cause | Death | Disability | Without Cause Or For Good Reason | Without Cause Or For Good Reason In Connection With Change in Control |
|---|---|---|---|---|---|---|
| Cash Severance | N/A | N/A | | | $6,869,000 | $ 9,869,000 |
| EAIP | N/A | N/A | $ 1,200,000 | $ 1,200,000 | | |
| Annuity | N/A | N/A | $ 3,000,000 | $ 3,000,000 | $ 3,000,000 | $ 3,000,000 |
| LTI Cash Retention Award | N/A | N/A | $2,669,000 | $2,669,000 | | |
| Deferred Compensation | | | | | | |
| - Salary Deferral Program | N/A | N/A | $ 175,346 | $ 175,346 | | $ 175,346 |
| Health & Welfare | | | | | | |
| - Medical/COBRA | N/A | N/A | | | $ 33,323 | $ 33,323 |
| - Dental/COBRA | N/A | N/A | | | $ 2,990 | $ 2,990 |
| **Totals** | **N/A** | **N/A** | **$ 7,044,346** | **$ 7,044,346** | **$ 9,905,313** | **$ 13,080,659** |

Mr. Young has entered into an employment agreement that provides for certain payments and benefits upon the expiration or termination of the agreement under the following circumstances:

1.  In the event of Mr. Young's death or disability:

    a.  a prorated annual incentive bonus for the year of termination;

    b.  value of supplemental retirement plan (the "Annuity") for Mr. Young that vests on December 31, 2014

    c.  the pro-rata retention award earned prior to termination date, and

    d.  payment of employee benefits, including stock compensation, if any, to which Mr. Young may be entitled.

2.  In the event of Mr. Young's termination without cause or resignation for good reason:

    a.  a lump sum payment equal to two and one-half times the sum of (i) his annualized base salary and (ii) a prorated annual incentive bonus for the year of termination;

    b.  value of supplemental retirement plan (the "Annuity") for Mr. Young that vests on December 31, 2014

    c.  the pro-rata retention award earned prior to termination date;

    d.  payment of employee benefits, including stock compensation, if any, to which Mr. Young may be entitled, and

    e.  certain continuing health care and company benefits.

3.  In the event of Mr. Young's termination without cause or resignation for good reason within 24 months following a change in control of EFH Corp.:

    a.  a lump sum payment equal to two and one-half times the sum of (i) his annualized base salary and (ii) his annual bonus target;

    b.  value of supplemental retirement plan (the "Annuity") for Mr. Young that vests on December 31, 2014

    c.  the pro-rata retention award earned prior to termination date;

    d.  a prorated annual incentive bonus for the year of termination;

    e.  payment of employee benefits, including stock compensation, if any, to which Mr. Young may be entitled;

    f.  certain continuing health care and company benefits, and

    g.  a tax gross-up payment to offset any excise tax which may result from the change in control payments.

Table of Contents

**2. Mr. Keglevic**

**Potential Payments to Mr. Keglevic upon Termination as of December 31, 2010 (per employment agreement, deferred share agreement and stock option agreement, each in effect as of December 31, 2010, and revisions to such employment agreement that were adopted by the O&C Committee and effective as of December 31, 2010)**

| Benefit | Voluntary | For Cause | Death | Disability | Without Cause Or For Good Reason | Without Cause Or For Good Reason In Connection With Change in Control |
|---|---|---|---|---|---|---|
| Cash Severance | N/A | N/A | | | $2,765,025 | $3,317,525 |
| EAIP | N/A | N/A | $ 552,500 | $ 552,500 | | |
| Payment of EFH Corp. Common Stock in respect of Restricted Stock Units (1) | N/A | N/A | $3,140,000 | $3,140,000 | $ 3,140,000 | $ 3,140,000 |
| Acceleration of Stock Option Awards | N/A | N/A | | | | |
| LTI Cash Retention Award | N/A | N/A | $912,525 | $912,525 | | |
| Deferred Compensation | | | | | | |
|    - Salary Deferral Program | N/A | N/A | $ 68,071 | $ 68,071 | | $ 68,071 |
| Health & Welfare | | | | | | |
|    - Dental/COBRA | N/A | N/A | | | $ 1,590 | $ 1,590 |
| **Totals** | **N/A** | **N/A** | **$ 4,673,096** | **$ 4,673,096** | **$ 5,906,615** | **$ 6,527,186** |

(1)  Pursuant to his amended employment arrangement, Mr. Keglevic is entitled to receive 225,000 shares of EFH Corp.'s common stock if he is employed by EFH Corp. on September 30, 2012, or if his employment terminates for any reason prior to September 30, 2012, other than for "cause" or without "good reason." If Mr. Keglevic receives the 225,000 shares, he has the right to sell the shares to EFH Corp. for $3,140,000, at any time during the period beginning on September 30, 2012 and ending on the sixtieth business day following his termination of employment (or, in the event Mr. Keglevic receives the shares upon his termination of employment, at any time during the period ending on the sixtieth business day following his termination of employment).

Mr. Keglevic entered into an employment agreement that provides for certain payments and benefits upon the expiration or termination of the agreement under the following circumstances:

1.  In the event of Mr. Keglevic's death or disability:

    a.  a prorated annual incentive bonus for the year of termination;

    b.  the pro-rata retention award earned prior to termination, and

    c.  payment of employee benefits, including stock compensation, if any, to which Mr. Keglevic may be entitled.

2. In the event of Mr. Keglevic's termination without cause or resignation for good reason:

    a.  a lump sum payment equal to (i) two times his annualized base salary, (ii) a prorated annual incentive bonus for the year of termination;

    b.  the pro-rata retention award earned prior to termination;

    c.  payment of employee benefits, including stock compensation, if any, to which Mr. Keglevic may be entitled, and

    d.  certain continuing health care and company benefits.

3. In the event of Mr. Keglevic's termination without cause or resignation for good reason within 24 months following a change in control of EFH Corp.:

    a.  a lump sum payment equal to two times the sum of (i) his annualized base salary and (ii) his annual bonus target;

    b.  the pro-rata retention award earned prior to termination;

    c.  payment of employee benefits, including stock compensation, if any, to which Mr. Keglevic may be entitled;

    d.  certain continuing health care and company benefits, and

    e.  a tax gross-up payment to offset any excise tax which may result from the change in control payments.

Table of Contents

**3. Mr. Campbell**

**Potential Payments to Mr. Campbell upon Termination as of December 31, 2010 (per employment agreement, deferred share agreement and stock option agreement, each in effect as of December 31, 2010)**

| Benefit | Voluntary | For Cause | Death | Disability | Without Cause Or For Good Reason | Without Cause Or For Good Reason In Connection With Change in Control |
|---|---|---|---|---|---|---|
| Cash Severance | | | | | $2,923,200 | $3,518,200 |
| EAIP | | | $ 595,000 | $ 595,000 | | |
| Distribution of Deferred Shares (1) | $625,000 | $625,000 | $ 625,000 | $ 625,000 | $ 625,000 | $ 625,000 |
| Acceleration of Stock Option Awards | | | | | | |
| LTI Cash Retention Award | | | $ 928,200 | $ 928,200 | | |
| Retirement Benefits | | | | | | |
|    - Supplemental Retirement Plan | $ 99,096 | $ 99,096 | $ 99,096 | $ 99,096 | $ 99,096 | $ 99,096 |
| Deferred Compensation | | | | | | |
|    - Salary Deferral Program (2) | | | | | | |
| Health & Welfare | | | | | | |
|    - Medical/COBRA | | | | | $ 25,873 | $ 25,873 |
|    - Dental/COBRA | | | | | $ 2,392 | $ 2,392 |
| **Totals** | **$ 725,096** | **$ 725,096** | **$2,247,296** | **$2,247,296** | **$ 3,675,561** | **$ 4,270,561** |

(1) The amount reported under the heading "Distribution of Deferred Shares" represents the fair market value of 500,000 shares of EFH Corp. common stock that Mr. Campbell is entitled to receive, pursuant to the terms of his deferred share agreement, on the earlier to occur of his termination of employment for any reason or a change in the effective control of EFH Corp.

(2) Mr. Campbell is fully vested in the company matching portion of the Salary Deferral Plan.

Mr. Campbell entered into an employment agreement that provides for certain payments and benefits upon the expiration or termination of the agreement under the following circumstances:

1. In the event of Mr. Campbell's death or disability:

    a. a prorated annual incentive bonus for the year of termination,

    b. the pro-rata retention award earned prior to the date of termination, and

    c. payment of employee benefits, including stock compensation, if any, to which Mr. Campbell may be entitled.

2. In the event of Mr. Campbell's termination without cause or resignation for good reason:

    a. a lump sum payment equal to (i) two times his annualized base salary, (ii) a prorated annual incentive bonus for the year of termination and (iii) the pro-rata retention award earned prior to the date of termination;

    b. payment of employee benefits, including stock compensation, if any, to which Mr. Campbell may be entitled, and

    c. certain continuing health care and company benefits.

3. In the event of Mr. Campbell's termination without cause or resignation for good reason within 24 months following a change in control of EFH Corp.:

    a. a lump sum payment equal to two times the sum of (i) his annualized base salary and (ii) his annual bonus target;

    b. the pro-rata retention award;

    c. payment of employee benefits, including stock compensation, if any, to which Mr. Campbell may be entitled;

    d. certain continuing health care and company benefits, and

    e. a tax gross-up payment to offset any excise tax which may result from the change in control payments.

[Table of Contents](#)

**4. Mr. Burke**

**Potential Payments to Mr. Burke upon Termination as of December 31, 2010 (per employment agreement and stock option agreement, each in effect as of December 31, 2010)**

| Benefit | Voluntary | For Cause | Death | Disability | Without Cause Or For Good Reason | Without Cause Or For Good Reason In Connection With Change in Control |
|---|---|---|---|---|---|---|
| Cash Severance | | | | | $2,839,725 | $3,375,225 |
| EAIP | | | $ 535,500 | $ 535,500 | | |
| Acceleration of Stock Option Awards Vesting of Options | | | | | | |
|    Distribution of Deferred Shares (1) | $562,500 | $562,500 | $ 562,500 | $ 562,500 | $ 562,500 | $ 562,500 |
| LTI Cash Retention Award | | | $1,044,225 | $1,044,225 | | |
| Retirement Benefits | | | | | | |
|    - Supplemental Retirement Plan | $ 93,464 | $ 93,464 | $ 93,464 | $ 93,464 | $ 93,464 | $ 93,464 |
| Deferred Compensation | | | | | | |
|    - Salary Deferral Program | | | $ 74,077 | $ 74,077 | | $ 74,077 |
| Health & Welfare | | | | | | |
|    - Medical/COBRA | | | | | $ 25,873 | $ 25,873 |
|    - Dental/COBRA | | | | | $ 2,392 | $ 2,392 |
| **Totals** | **$ 655,964** | **$ 655,964** | **$ 2,309,766** | **$ 2,309,766** | **$ 3,523,954** | **$ 4,133,531** |

(1)    The amount reported under the heading "Distribution of Deferred Shares" represents the fair market value of 450,000 shares of EFH Corp. common stock that Mr. Burke is entitled to receive, pursuant to the terms of his deferred share agreement, on the earlier to occur of his termination of employment for any reason or a change in the effective control of EFH Corp.

Mr. Burke entered into an employment agreement that provides for certain payments and benefits upon the expiration or termination of the agreement under the following circumstances:

1.    In the event of Mr. Burke's death or disability:

    a.    a prorated annual incentive bonus for the year of termination;

    b.    the pro-rata retention award earned prior to termination, and

    c.    payment of employee benefits, including stock compensation, if any, to which Mr. Burke may be entitled.

2. In the event of Mr. Burke's termination without cause or resignation for good reason:

    a.    a lump sum payment equal to (i) two times his annualized base salary, (ii) a prorated annual incentive bonus for the year of termination;

    b.    the pro-rata retention award earned prior to termination;

    c.    payment of employee benefits, including stock compensation, if any, to which Mr. Burke may be entitled, and

    d.    certain continuing health care and company benefits.

3. In the event of Mr. Burke's termination without cause or resignation for good reason within 24 months following a change in control of EFH Corp.:

    a.    a lump sum payment equal to two times the sum of (i) his annualized base salary and (ii) his annual bonus target;

    b.    the pro-rata retention award earned prior to termination;

    c.    payment of employee benefits, including stock compensation, if any, to which Mr. Burke may be entitled;

    d.    certain continuing health care and company benefits and

    e.    a tax gross-up payment to offset any excise tax which may result from the change in control payments.

Table of Contents

**5. Mr. McFarland**

**Potential Payments to Mr. McFarland upon Termination as of December 31, 2010 (per employment agreement and stock option agreement, each in effect as of December 31, 2010)**

| Benefit | Voluntary | For Cause | Death | Disability | Without Cause Or For Good Reason | Without Cause Or For Good Reason In Connection With Change in Control |
|---|---|---|---|---|---|---|
| Cash Severance | N/A | N/A | | | $2,608,313 | $3,118,313 |
| EAIP | N/A | N/A | $ 510,000 | $ 510,000 | | |
| Acceleration of Stock Option Awards | N/A | N/A | | | | |
| LTI Cash Retention Award | N/A | N/A | $ 898,313 | $ 898,313 | | |
| Lump Sum Payment | N/A | N/A | | | | |
| Deferred Compensation | | | | | | |
|    - Salary Deferral Program | N/A | N/A | | | | |
| Health & Welfare | | | | | | |
|    - Medical/COBRA | N/A | N/A | | | $ 25,873 | $ 25,873 |
|    - Dental/COBRA | N/A | N/A | | | $ 2,392 | $ 2,392 |
| **Totals** | **N/A** | **N/A** | **$1,408,313** | **$1,408,313** | **$ 2,636,578** | **$ 3,146,578** |

Mr. McFarland entered into an employment agreement that provides for certain payments and benefits upon the expiration or termination of the agreement under the following circumstances:

1.    In the event of Mr. McFarland's death or disability:

       a.    a prorated annual incentive bonus for the year of termination;

       b.    the pro-rata retention award earned prior to termination, and

       c.    payment of employee benefits, including stock compensation, if any, to which Mr. McFarland may be entitled.

2. In the event of Mr. McFarland's termination without cause or resignation for good reason:

       a.    a lump sum payment equal to (i) two times his annualized base salary, (ii) a prorated annual incentive bonus for the year of termination;

       b.    the pro-rata retention award earned prior to termination;

       c.    payment of employee benefits, including stock compensation, if any, to which Mr. McFarland may be entitled, and

       d.    certain continuing health care and company benefits.

3. In the event of Mr. McFarland's termination without cause or resignation for good reason within 24 months following a change in control of EFH Corp.:

       a.    a lump sum payment equal to two times the sum of (i) his annualized base salary and (ii) his annual bonus target;

       b.    the pro-rata retention award earned prior to termination;

       c.    payment of employee benefits, including stock compensation, if any, to which Mr. McFarland may be entitled;

       d.    certain continuing health care and company benefits, and

       e.    a tax gross-up payment to offset any excise tax which may result from the change in control payments.

**Table of Contents**

*Excise Tax Gross-Ups*

Pursuant to their employment agreements, if any of our Named Executive Officers would be subject to the imposition of the excise tax imposed by Section 4999 of the Code, related to the executive's employment, but the imposition of such tax could be avoided by approval of our shareholders as described in Section 280G(b)(5)(B) of the Code, then such executive may cause EFH Corp. to seek such approval, in which case EFH Corp. will use its reasonable best efforts to cause such approval to be obtained and such executive will cooperate and execute such waivers as may be necessary so that such approval avoids imposition of any excise tax under Section 4999. If such executive fails to cause EFH Corp. to seek such approval or fails to cooperate and execute the waivers necessary in the approval process, such executive shall not be entitled to any gross-up payment for any resulting tax under Section 4999.

*Compensation Committee Interlocks and Insider Participation*

There are no relationships among our executive officers, members of the O&C Committee or entities whose executives served on the O&C Committee that required disclosure under applicable SEC rules and regulations. For a description of related person transactions involving members of the O&C Committee, see Item 13, entitled "Related Person Transactions."

250

Table of Contents

### Director Compensation

The table below sets forth information regarding the aggregate compensation paid to the members of the Board during the year ended December 31, 2010. Directors who are officers of EFH Corp. or members of the Sponsor Group (or their respective affiliates) do not receive any fees for service as a director. EFH Corp. reimburses directors for certain reasonable expenses incurred in connection with their services as directors.

| Name | Fees Earned or Paid in Cash ($) | Stock Awards ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|
| Arcilia C. Acosta (1) | 150,000 | 100,000 | — | 250,000 |
| David Bonderman | — | — | — | — |
| Donald L. Evans (2) | 2,000,000 | — | — | 2,000,000 |
| Thomas D. Ferguson | — | — | — | — |
| Frederick M. Goltz | — | — | — | — |
| James R. Huffines (1) | 150,000 | 100,000 | — | 250,000 |
| Scott Lebovitz | — | — | — | — |
| Jeffrey Liaw | — | — | — | — |
| Marc S. Lipschultz | — | — | — | — |
| Michael MacDougall | — | — | — | — |
| Lyndon L. Olson, Jr. (1) | 150,000 | 100,000 | — | 250,000 |
| Kenneth Pontarelli | — | — | — | — |
| William K. Reilly (1) | 150,000 | 100,000 | — | 250,000 |
| Jonathan D. Smidt | — | — | — | — |
| John F. Young | — | — | — | — |
| Kneeland Youngblood (1) | 150,000 | 100,000 | — | 250,000 |

(1)  Ms. Acosta and Messrs. Huffines, Olson, Reilly and Youngblood receive $150,000 annually and an annual equity award (paid in shares of EFH Corp. common stock) valued at $100,000 (the grant date fair value) for their service as a director.

(2)  In February 2010, EFH Corp. entered into a new consulting agreement with Mr. Evans effective retroactively to October 10, 2009, pursuant to which Mr. Evans receives an annual fee of $2,000,000. The term of the new consulting agreement expires in October 2012.

251

Table of Contents

Item 12.    **SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS**

The following table presents information concerning stock-based compensation plans as of December 31, 2010. (See Note 21 to Financial Statements.)

| | (a)<br>Number of securities to be issued upon exercise of outstanding options, warrants and rights | (b)<br>Weighted-average exercise price of outstanding options, warrants and rights | (c)<br>Number of securities remaining available for future issuance under equity compensation plans, excluding securities reflected in column (a) |
|---|---|---|---|
| Equity compensation plans approved by security holders | — | $          — | — |
| Equity compensation plans not approved by security holders | 65,333,309 | $        4.29 | 6,666,691 |
| Total | 65,333,309 | $        4.29 | 6,666,691 |

Note:    Includes 48.4 million stock options with a weighted average exercise price of $4.50.

Includes 8.4 million vested and unvested restricted shares, deferred shares and stock granted to directors as part of their compensation plan.

252

Table of Contents

**Beneficial Ownership of Common Stock of Energy Future Holdings Corp.**

The following table lists the number of shares of common stock of EFH Corp. beneficially owned by each director and certain executive officers of EFH Corp. and the holders of more than 5% of EFH Corp.'s common stock as of February 1, 2011.

| Name | Number of Shares Beneficially Owned | Percent of Class |
|------|------:|------:|
| Texas Energy Future Holdings Limited Partnership (1) | 1,657,600,000 | 97.81% |
| Arcilia C. Acosta (2) | 100,770 | * |
| David Bonderman (3) | 1,657,600,000 | 97.81% |
| Donald L. Evans (4) | 1,000,000 | * |
| Thomas D. Ferguson (5) | 1,657,600,000 | 97.81% |
| Frederick M. Goltz (6) | 1,657,600,000 | 97.81% |
| James R. Huffines | 390,770 | * |
| Scott Lebovitz (5) | 1,657,600,000 | 97.81% |
| Jeffrey Liaw (3) | 1,657,600,000 | 97.81% |
| Marc S. Lipschultz (6) | 1,657,600,000 | 97.81% |
| Michael MacDougall (3) | 1,657,600,000 | 97.81% |
| Lyndon L. Olson, Jr. | 250,770 | * |
| Kenneth Pontarelli (5) | 1,657,600,000 | 97.81% |
| William K. Reilly | 230,770 | * |
| Jonathan D. Smidt (6) | 1,657,600,000 | 97.81% |
| John F. Young (7) | 5,062,009 | * |
| Kneeland Youngblood | 170,770 | * |
| James A. Burke (8) | 1,715,000 | * |
| David A. Campbell (9) | 2,660,000 | * |
| Paul M. Keglevic (10) | 1,575,000 | |
| M. A. McFarland (11) | 1,143,550 | * |
| All directors and current executive officers as a group (24 persons) (12) | 1,674,219,409 | 98.79% |

\*    Less than 1%.

(1)    Texas Holdings beneficially owns 1,657,600,000 shares of EFH Corp. The sole general partner of Texas Holdings is Texas Energy Future Capital Holdings LLC (Texas Capital), which, pursuant to the Amended and Restated Limited Partnership Agreement of Texas Holdings, has the right to vote all of the EFH Corp. shares owned by Texas Holdings. The address of both Texas Holdings and Texas Capital is 301 Commerce Street, Suite 3300, Fort Worth, Texas 76102.

(2)    70,000 shares held in a family limited partnership, ACA Family LP.

(3)    Includes the 1,657,600,000 shares owned by Texas Holdings, over which TPG Partners V, L.P., TPG Partners IV, L.P., TPG FOF V-A, L.P. and TPG FOF V-B, L.P. (TPG Entities) may be deemed, as a result of their ownership of 27.01% of Texas Capital's outstanding units and certain provisions of Texas Capital's Amended and Restated Limited Liability Company Agreement (TC LLC Agreement), to have shared voting or dispositive power. The ultimate general partners of the TPG Entities are TPG Advisors IV, Inc. and TPG Advisors V, Inc. David Bonderman and James Coulter are the sole shareholders and directors of TPG Advisors IV Inc. and TPG Advisors V Inc., and therefore, Messrs. Bonderman and Coulter, TPG Advisors IV Inc. and TPG Advisors V Inc. may each be deemed to beneficially own the shares held by the TPG Entities. Messrs. Bonderman, Liaw and MacDougall are managers of Texas Capital. By virtue of their position in relation to Texas Capital and the TPG Entities, Messrs. Bonderman, Liaw and MacDougall may be deemed to have beneficial ownership with respect to the shares of EFH Corp. common stock owned by Texas Holdings. Each of Messrs. Liaw and MacDougall disclaims beneficial ownership of such shares except to the extent of their pecuniary interest in those shares. The address of each entity and individual listed in this footnote is 301 Commerce Street, Suite 3300, Fort Worth, Texas 76102.

253

Table of Contents

(4)   Includes 600,000 shares issuable upon exercise of vested options.

(5)   Includes the 1,657,600,000 shares owned by Texas Holdings, over which GS Capital Partners VI Fund, L.P., GSCP VI Offshore TXU Holdings, L.P., GSCP VI Germany TXU Holdings, L.P., GS Capital Partners VI Parallel, L.P., GS Global Infrastructure Partners I, L.P., GS Infrastructure Offshore TXU Holdings, L.P. (GSIP International Fund), GS Institutional Infrastructure Partners I, L.P., Goldman Sachs TXU Investors L.P. and Goldman Sachs TXU Investors Offshore Holdings, L.P. (collectively, Goldman Entities) may be deemed, as a result of their ownership of 27.02% of Texas Capital's outstanding units and certain provision of the TC LLC Agreement, to have shared voting or dispositive power. Affiliates of The Goldman Sachs Group, Inc. (Goldman Sachs) are the general partner, managing general partner or investment manager of each of the Goldman Entities, and each of the Goldman Entities shares voting and investment power with certain of their respective affiliates. Each of Goldman Sachs and the Goldman Entities disclaims beneficial ownership of such shares of common stock except to the extent of its pecuniary interest therein. Messrs. Ferguson, Lebovitz and Pontarelli are managers of Texas Capital and executives with affiliates of Goldman Sachs. By virtue of their position in relation to Texas Capital and the Goldman Entities, Messrs. Ferguson, Lebovitz and Pontarelli may be deemed to have beneficial ownership with respect to the shares of EFH Corp. common stock owned by Texas Holdings. Each of Messrs. Ferguson, Lebovitz and Pontarelli disclaims beneficial ownership of such shares except to the extent of their pecuniary interest in those shares. The address of each entity and individual listed in this footnote is c/o Goldman, Sachs & Co., 85 Broad Street, New York, New York 10004.

(6)   Includes the 1,657,600,000 shares owned by Texas Holdings, over which KKR 2006 Fund L.P., KKR PEI Investments, L.P., KKR Partners III, L.P., KKR North American Co-Invest Fund I L.P. and TEF TFO Co-Invest, LP (KKR Entities) may be deemed, as a result of their ownership of 37.05% of Texas Capital's outstanding units and certain provision of the TC LLC Agreement, to have shared voting or dispositive power. The KKR Entities disclaim beneficial ownership of any shares of our common stock in which they do not have a pecuniary interest. Messrs. Goltz, Lipschultz and Smidt are managers of Texas Capital and executives of Kohlberg Kravis Roberts & Co. L.P. By virtue of their position in relation to Texas Capital and the KKR Entities, Messrs. Goltz, Lipschultz and Smidt may be deemed to have beneficial ownership with respect to the shares of EFH Corp. common stock owned by Texas Holdings. Each of Messrs. Goltz, Lipschultz and Smidt disclaims beneficial ownership of such shares except to the extent of their pecuniary interest in those shares. The address of each entity and individual listed in this footnote is c/o Kohlberg Kravis Roberts & Co. L.P., 9 West 57th Street, Suite 4200, New York, New York 10019.

(7)   Includes 4,050,000 shares issuable upon exercise of vested options.

(8)   Includes 450,000 deferred shares which, in accordance with the terms of the Deferred Share Agreement, will be settled in shares of EFH Corp. common stock upon the earlier of termination of employment or a change in control of EFH Corp. and 1,265,00 shares issuable upon exercise of vested options.

(9)   Includes 500,000 deferred shares which, in accordance with the terms of the Deferred Share Agreement, will be settled in shares of EFH Corp. common stock upon the earlier of termination of employment or a change in control of EFH Corp. and 2,160,000 shares issuable upon exercise of vested options.

(10)   Includes 225,000 deferred shares which, in accordance with the terms of the Deferred Share Agreement, will be settled in shares of EFH Corp. common stock upon the earlier of termination of employment or a change in control of EFH Corp. and 1,350,000 shares issuable upon exercise of vested options.

(11)   Includes 1,080,000 shares issuable upon exercise of vested options.

(12)   The Organization and Compensation Committee of EFH Corp.'s Board of Directors recently approved an exchange program pursuant to which EFH Corp.'s executive officers may exchange any and all of their outstanding options for restricted stock units that cliff-vest on September 30, 2014.

Table of Contents

**Item 13.      CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE**

**Policies and Procedures Relating to Related Party Transactions**

The Board has adopted a policy regarding related person transactions. Under this policy, a related person transaction shall be consummated or shall continue only if:

1. the Audit Committee of the Board approves or ratifies such transaction in accordance with the policy and determines that the transaction is on terms comparable to those that could be obtained in arm's length dealings with an unrelated third party;

2. the transaction is approved by the disinterested members of the Board or the Executive Committee; or

3. the transaction involves compensation approved by the Organization and Compensation Committee of the Board.

For purposes of this policy, the term "related person" includes EFH Corp.'s directors, executive officers, 5% shareholders and their immediate family members. "Immediate family members" means any child, stepchild, parent, stepparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law or sister-in-law or any person (other than a tenant or employee) sharing the household of a director, executive officer or 5% shareholder.

A "related person transaction" is a transaction between EFH Corp. or its subsidiaries and a related person, other than the types of transactions described below, which are deemed to be pre-approved by the Audit Committee of the Board:

1. any compensation paid to a director if the compensation is required to be reported under Item 402 of Regulation S-K of the Securities Act;

2. any transaction with another company at which a related person's only relationship is as an employee (other than an executive officer), director or beneficial owner of less than 10% of that company's ownership interests;

3. any charitable contribution, grant or endowment by EFH Corp. to a charitable organization, foundation or university at which a related person's only relationship is as an employee (other than an executive officer) or director;

4. transactions where the related person's interest arises solely from the ownership of EFH Corp.'s equity securities and all holders of that class of equity securities received the same benefit on a pro rata basis;

5. transactions involving a related party where the rates or charges involved are determined by competitive bids;

6. any transaction with a related party involving the rendering of services as a common or contract carrier, or public utility, as rates or charges fixed in conformity with law or governmental authority;

7. any transaction with a related party involving services as a bank depositary of funds, transfer agent, registrar, trustee under a trust indenture, or similar service;

8. transactions available to all employees or customers generally (unless required to be disclosed under Item 404 of Regulation S-K of the Securities Act, if applicable);

9. transactions involving less than $100,000 when aggregated with all similar transactions;

10. transactions between EFH Corp. and its subsidiaries or between subsidiaries of EFH Corp.;

11. transactions not required to be disclosed under Item 404 of Regulation S-K under the Securities Act of 1933, and

12. open market purchases of the EFH Corp. or its subsidiaries' debt or equity securities and interest payments on such debt.

255

**Table of Contents**

The Board has determined that it is appropriate for the Audit Committee of the Board to review and approve or ratify related person transactions. Accordingly, at least annually, management reviews related person transactions to be entered into by EFH Corp. or its subsidiaries, if any. After review, the Audit Committee of the Board approves/ratifies or disapproves such transactions. Management updates the Audit Committee of the Board as to any material changes to such related person transactions. In unusual circumstances, EFH Corp. or its subsidiaries may enter into related person transactions in advance of receiving approval, provided that such related person transactions are reviewed and ratified as soon as reasonably practicable by the Audit Committee of the Board. If the Audit Committee of the Board determines not to ratify such transactions, EFH Corp. makes all reasonable efforts to cancel or otherwise terminate the affected transactions.

The related person transactions described below under "Related Person Transactions – Business Affiliations," were ratified by the Audit Committee of the Board pursuant to the policy described above. All other related person transactions were approved prior to the Board's adoption of this policy, but were approved by either the Board or its Executive Committee. Transactions described below under "Related Person Transactions – Transactions with Sponsor Affiliates" are not related person transactions under the EFH Corp. policy because they are not with a director, executive officer, 5% shareholder or any of their immediate family members, but are described in the interest of greater disclosure.

## Related Person Transactions

### *Limited Partnership Agreement of Texas Energy Future Holdings Limited Partnership; Limited Liability Company Agreement of Texas Energy Future Capital Holdings LLC*

The Sponsor Group and certain investors who agreed to co-invest with the Sponsor Group or through a vehicle jointly controlled by the Sponsor Group to provide equity financing for the Merger (Co-Investors) entered into (i) a limited partnership agreement (LP Agreement) in respect of EFH Corp.'s parent company, Texas Holdings and (ii) the LLC Agreement in respect of Texas Holdings' sole general partner, Texas Capital. The LP Agreement provides that Texas Capital has the right to vote or execute consents with respect to any shares of EFH Corp.'s common stock owned by Texas Holdings. The LLC Agreement and LP Agreement contain agreements among the parties with respect to the election of EFH Corp.'s directors, restrictions on the issuance or transfer of interests in EFH Corp., including tag-along rights and drag-along rights, and other corporate governance provisions (including the right to approve various corporate actions).

The LLC Agreement provides that Texas Capital and its members will take all action required to ensure that the managers of Texas Capital are also members of EFH Corp.'s Board. Pursuant to the LLC Agreement each of (i) KKR 2006 Fund L.P. and affiliated investment funds, (ii) TPG Partners V, L.P. and affiliated investment funds and (iii) certain funds affiliated with Goldman Sachs, has the right to designate three managers of Texas Capital. These rights are subject to maintenance of certain investment levels in Texas Holdings.

### *Registration Rights Agreement*

The Sponsor Group and the Co-Investors entered into a registration rights agreement with EFH Corp. upon completion of the Merger. Pursuant to this agreement, in certain circumstances, the Sponsor Group can cause EFH Corp. to register shares of EFH Corp.'s common stock owned directly or indirectly by them under the Securities Act. In certain circumstances, the Sponsor Group and the Co-Investors are also entitled to participate on a pro rata basis in any registration of EFH Corp.'s common stock under the Securities Act that it may undertake. In 2008 and 2009, Ms. Acosta and Messrs. Evans, Huffines, Olson, Reilly and Youngblood, each of whom are members of our Board, and Messrs. Young, Campbell, Walters, Burke, Keglevic, McFarland, Kaplan and Landy, each of whom are executive officers of EFH Corp., became parties to this agreement.

Table of Contents

### Management Services Agreement

In October 2007, in connection with the Merger, the Sponsor Group and Lehman Brothers Inc. entered into a management agreement with EFH Corp. (Management Agreement), pursuant to which affiliates of the Sponsor Group provide management, consulting, financial and other advisory services to EFH Corp. Pursuant to the Management Agreement, affiliates of the Sponsor Group are entitled to receive an aggregate annual management fee of $35 million, which amount increases 2% annually, and reimbursement of out-of-pocket expenses incurred in connection with the provision of services pursuant to the Management Agreement. The Management Agreement will continue in effect from year to year, unless terminated upon a change of control of EFH Corp. or in connection with an initial public offering of EFH Corp. or if the parties thereto mutually agree to terminate the Management Agreement. Pursuant to the Management Agreement, affiliates of the Sponsor Group and Lehman Brothers Inc. were paid transaction fees an aggregate $300 million for certain services provided in connection with the Merger and related transactions. In addition, the Management Agreement provides that the Sponsor Group will be entitled to receive a fee equal to a percentage of the gross transaction value in connection with certain subsequent financing, acquisition, disposition, merger combination and change of control transactions, as well as a termination fee based on the net present value of future payment obligations under the Management Agreement in the event of an initial public offering or under certain other circumstances. Under terms of the Management Agreement, EFH Corp. paid approximately $37 million, inclusive of expenses, to the Sponsor Group during 2010.

### Indemnification Agreement

Concurrently with entering into the Management Agreement, the Sponsor Group, Texas Holdings and EFH Corp. entered into an indemnification agreement (Indemnification Agreement), pursuant to which EFH Corp. and Texas Holdings agree to indemnify the Sponsor Group and their affiliates against any claims relating to (i) certain securities and financing transactions relating to the Merger, (ii) the performance of transaction services pursuant to the Management Agreement, (iii) actions or failures to act by EFH Corp., Texas Holdings, Texas Capital or their subsidiaries or affiliates (collectively, Company Group), (iv) service as an officer or director of, or at the request of, any member of the Company Group, and (v) any breach or alleged breach of fiduciary duty as a director or officer of any member of the Company Group.

### Sale Participation Agreement

Ms. Acosta and Messrs. Evans, Huffines, Olson, Reilly and Youngblood, each of whom are members of our Board, and Messrs. Young, Campbell, Walters, Burke, Keglevic, McFarland, Kaplan and Landry, each of whom are executive officers, entered into sale participation agreements with EFH Corp. Pursuant to the terms of these agreements, among other things, shares of EFH Corp.'s common stock held by these individuals are subject to tag-along and drag-along rights in the event of a sale by the Sponsor Group of shares of EFH Corp.'s common stock held by the Sponsor Group.

### Certain Charter Provisions

EFH Corp.'s restated certificate of formation contains provisions limiting our directors' obligations in respect of corporate opportunities.

### Management Stockholders' Agreement

Subject to a management stockholders' agreement, certain members of management, including EFH Corp.'s directors, executive officers, along with other members of management, elected to invest in EFH Corp. by contributing cash or common stock, or a combination of both, to EFH Corp. prior to or following the Merger and receiving common stock in EFH Corp. in exchange therefore. The net aggregate amount of this investment as of December 31, 2010 is approximately $40.5 million. The management stockholders' agreement creates certain rights and restrictions on these shares of common stock, including transfer restrictions and tag-along, drag-along, put, call and registration rights in certain circumstances.

257

Table of Contents

*Director Stockholders' Agreement*

Certain members of our Board have entered into a stockholders' agreement with EFH Corp. These stockholders' agreements create certain rights and restrictions on the equity, including transfer restrictions and tag-along, drag-along, put, call and registration rights in certain circumstances.

*Business Affiliations*

Mr. Olson, a member of our board, has an ownership interest in Texas Meter and Device Company (TMD), a company that conducts tests on Oncor's high voltage personal protective equipment. Mr. Olson and his brother collectively directly own approximately 24% of TMD. This entity is majority owned by its chief executive officer who is not related to Mr. Olson. In 2010, Oncor paid TMD approximately $1 million. The business relationship with TMD commenced several years prior to Mr. Olson joining the Board.

*Transactions with Sponsor Affiliates*

TCEH has entered into the TCEH Senior Secured Facilities, and Oncor has entered into a revolving credit facility, each with syndicates of financial institutions and other lenders. These syndicates included affiliates of GS Capital Partners. These transactions were approved by the Board.

Goldman participated in the issuance of new senior secured notes by EFH Corp. in January 2010 and senior secured second lien notes by TCEH in October 2010 and was paid fees in the amounts of approximately $3 million and $1 million, respectively, as compensation for its services. Also, Goldman acted as dealer manager and solicitation agent in connection with the debt exchange offers completed in August 2010 by EFIH and EFIH Finance and was paid a fee in the amount of $7 million for its services (see Note 22 to Financial Statements for additional information).

Affiliates of GS Capital Partners have from time to time engaged in commercial and investment banking and financial advisory transactions with EFH Corp. in the normal course of business. Affiliates of Goldman are party to certain commodity and interest rate hedging transactions with EFH Corp. in the normal course of business.

From time to time affiliates of the Sponsor Group may acquire debt or debt securities issued by EFH Corp. or its subsidiaries in open market transactions or through loan syndications.

Members of the Sponsor Group and/or their respective affiliates have from time to time entered into, and may continue to enter into, arrangements with us to use our products and services in the ordinary course of their business, which often result in revenues to us in excess of $120,000 annually. In addition, we have entered into, and may continue to enter into, arrangements with members of the Sponsor Group and/or their respective affiliates to use their products and services in the ordinary course of their business, which often result in revenues to members of the Sponsor Group or their respective affiliates in excess of $120,000 annually.

Table of Contents

*Director Independence*

Though not formally considered by the Board because EFH Corp.'s common stock is not currently registered under the Exchange Act of 1934 with the SEC or traded on any national securities exchange, based upon the listing standards for issuers of equity securities on the New York Stock Exchange (NYSE), the national securities exchange upon which EFH Corp.'s common stock was traded prior to the Merger, only Ms. Acosta and Mr. Youngblood would be considered independent. Because of their relationships with the Sponsor Group or with EFH Corp. directly, none of the other directors would be considered independent under the NYSE listing standards for issuers of equity securities. See "Certain Relationships and Related Party Transactions" and Item 11, "Executive Compensation – Director Compensation." Accordingly, we believe that Ms. Acosta is the only member of the Organization and Compensation Committee who would meet the NYSE's independence requirements for issuers of equity securities. We believe that none of the members of EFH Corp.'s Governance and Public Affairs Committee would meet the NYSE's independence requirements for issuers of equity securities. Under the NYSE's audit committee independence requirement for issuers of debt securities, Messrs. Huffines and Youngblood and Ms. Acosta, who constitute the Audit Committee, are considered independent.

**Table of Contents**

**Item 14.        PRINCIPAL ACCOUNTING FEES AND SERVICES**

Deloitte & Touche LLP has been the independent auditor for EFH Corp. and for its Predecessor (TXU Corp.) since its organization in 1996.

The Audit Committee of the EFH Corp. Board of Directors has adopted a policy relating to the engagement of EFH Corp.'s independent auditor. The policy provides that in addition to the audit of the financial statements, related quarterly reviews and other audit services, and providing services necessary to complete SEC filings, EFH Corp.'s independent auditor may be engaged to provide non-audit services as described herein. Prior to engagement, all services to be rendered by the independent auditor must be authorized by the Audit Committee in accordance with pre-approval procedures which are defined in the policy. The pre-approval procedures require:

1.    The annual review and pre-approval by the Audit Committee of all anticipated audit and non-audit services; and

2.    The quarterly pre-approval by the Audit Committee of services, if any, not previously approved and the review of the status of previously approved services.

The Audit Committee may also approve certain on-going non-audit services not previously approved in the limited circumstances provided for in the SEC rules. All services performed by Deloitte & Touche LLP, the member firms of Deloitte Touche Tohmatsu and their respective affiliates (Deloitte & Touche) for EFH Corp. in 2010 were pre-approved by the Audit Committee.

The policy defines those non-audit services which EFH Corp.'s independent auditor may also be engaged to provide as follows:

1.    Audit-related services, including:

a.    due diligence accounting consultations and audits related to mergers, acquisitions and divestitures;

b.    employee benefit plan audits;

c.    accounting and financial reporting standards consultation;

d.    internal control reviews, and

e.    attest services, including agreed-upon procedures reports that are not required by statute or regulation.

2.    Tax-related services, including:

a.    tax compliance;

b.    general tax consultation and planning;

c.    tax advice related to mergers, acquisitions, and divestitures, and

d.    communications with and request for rulings from tax authorities.

3.    Other services, including:

a.    process improvement, review and assurance;

b.    litigation and rate case assistance;

c.    forensic and investigative services, and

d.    training services.

Table of Contents

The policy prohibits EFH Corp. from engaging its independent auditor to provide:

1. Bookkeeping or other services related to EFH Corp.'s accounting records or financial statements;

2. Financial information systems design and implementation services;

3. Appraisal or valuation services, fairness opinions, or contribution-in-kind reports;

4. Actuarial services;

5. Internal audit outsourcing services;

6. Management or human resource functions;

7. Broker-dealer, investment advisor, or investment banking services;

8. Legal and expert services unrelated to the audit, and

9. Any other service that the Public Company Accounting Oversight Board determines, by regulation, to be impermissible.

In addition, the policy prohibits EFH Corp.'s independent auditor from providing tax or financial planning advice to any officer of EFH Corp.

Compliance with the Audit Committee's policy relating to the engagement of Deloitte & Touche is monitored on behalf of the Audit Committee by EFH Corp.'s chief accounting officer. Reports describing the services provided by Deloitte & Touche and fees for such services are provided to the Audit Committee no less often than quarterly.

For the years ended December 31, 2010 and 2009, fees billed to EFH Corp. by Deloitte & Touche were as follows:

| | 2010 (a) | 2009 |
|---|---|---|
| **Audit Fees.** Fees for services necessary to perform the annual audit, review SEC filings, fulfill statutory and other service requirements, provide comfort letters and consents | $ 5,833,000 | $ 7,549,000 |
| **Audit-Related Fees.** Fees for services including employee benefit plan audits, due diligence related to mergers, acquisitions and divestitures, accounting consultations and audits in connection with acquisitions, internal control reviews, attest services that are not required by statute or regulation, and consultation concerning financial accounting and reporting standards | 706,000 | 1,811,000 |
| **Tax Fees.** Fees for tax compliance, tax planning, and tax advice related to mergers and acquisitions, divestitures, and communications with and requests for rulings from taxing authorities | 102,000 | 904,000 |
| **All Other Fees.** Fees for services including process improvement reviews, forensic accounting reviews, litigation and rate case assistance, and training services | 0 | 0 |
| **Total** | $6,641,000 | $10,264,000 |

**(a)** See Notes 1 and 3 to Financial Statements for discussion of the deconsolidation of Oncor Holdings effective January 1, 2010.

261

Table of Contents

PART IV

**Item 15.      EXHIBITS AND FINANCIAL STATEMENT SCHEDULES**

(a) Oncor Holdings Financial Statements are presented pursuant to Rules 3–09 and 3–16 of Regulation S-X as Exhibit 99(e).

(b) Exhibits:

**EFH Corp. Exhibits to Form 10-K for the Fiscal Year Ended December 31, 2010**

| Exhibits | Previously Filed* With File Number | As Exhibit | | |
|---|---|---|---|---|
| **(2)** | **Plan of Acquisition, Reorganization, Arrangement, Liquidation, or Succession** | | | |
| 2(a) | Form 8-K (filed February 26, 2007) | 2.1 | — | Agreement and Plan of Merger, dated February 25, 2007, by and among Energy Future Holdings Corp. (formerly known as TXU Corp.), Texas Energy Future Holdings Limited Partnership and Texas Energy Future Merger Sub Corp. |
| **(3)(i)** | **Articles of Incorporation** | | | |
| 3(a) | 1-12833 Form 8-K (filed October 11, 2007) | 3.1 | — | Restated Certificate of Formation of Energy Future Holdings Corp. |
| **(3)(ii)** | **By-laws** | | | |
| 3(b) | 1-12833 Form 10-Q (Quarter ended March 31, 2008) (filed May 15, 2008) | 3(a) | — | Amended and Restated Bylaws of Energy Future Holdings Corp. |
| **(4)** | **Instruments Defining the Rights of Security Holders, Including Indentures**** | | | |
| | **Energy Future Holdings Corp.** | | | |
| 4(a) | 1-12833 Form 10-K (2007) (filed March 31, 2008) | 4(c) | — | Indenture (For Unsecured Debt Securities Series P), dated November 1, 2004, between Energy Future Holdings Corp. and The Bank of New York Mellon, as trustee. |
| 4(b) | 1-12833 Form 8-K (filed July 7, 2010) | 99.1 | — | Supplemental Indenture, dated July 1, 2010, to Indenture (For Unsecured Debt Securities Series P), dated November 1, 2004. |

262

Table of Contents

| Exhibits | Previously Filed* With File Number | As Exhibit | | |
|---|---|---|---|---|
| 4(c) | 1-12833 Form 10-K (2004)(filed March 16, 2005) | 4(q) | — | Officers' Certificate, dated November 26, 2004, establishing the form and certain terms of Energy Future Holdings Corp.'s 5.55% Series P Senior Notes due 2014. |
| 4(d) | | | — | Indenture (For Unsecured Debt Securities Series Q), dated November 1, 2004, between Energy Future Holdings Corp. and The Bank of New York Mellon, as trustee. Energy Future Holdings Corp.'s Indentures for its Series R Senior Notes are not filed as it is substantially similar to this Indenture. |
| 4(e) | 1-12833 Form 10-K (2004) (filed March 16, 2005) | 4(r) | — | Officer's Certificate, dated November 26, 2004, establishing the form and certain terms of Energy Future Holdings Corp.'s 6.50% Series Q Senior Notes due 2024. |
| 4(f) | 1-12833 Form 10-K (2004) (filed March 16, 2005) | 4(s) | — | Officer's Certificate, dated November 26, 2004, establishing the form and certain terms of Energy Future Holdings Corp.'s 6.55% Series R Senior Notes due 2034. |
| 4(g) | 1-12833 Form 8-K (filed October 31, 2007) | 4.1 | — | Indenture, dated October 31, 2007, among Energy Future Holdings Corp., the guarantors named therein and The Bank of New York Mellon, as trustee, relating to Senior Notes due 2017 and Senior Toggle Notes due 2017. |
| 4(h) | 1-12833 Form 10-K (2009) (filed February 19, 2010) | 4(f) | — | Supplemental Indenture, dated July 8, 2008, to Indenture, dated October 31, 2007. |
| 4(i) | 1-12833 Form 10-Q (Quarter ended June 30, 2009) (filed August 4, 2009) | 4(a) | — | Second Supplemental Indenture, dated August 3, 2009, to Indenture, dated October 31, 2007. |
| 4(j) | 1-12833 Form 8-K (filed July 30, 2010) | 99.1 | — | Third Supplemental Indenture, dated July 29, 2010, to Indenture, dated October 31, 2007. |
| 4(k) | 1-12833 Form 8-K (filed November 20, 2009) | 4.1 | — | Indenture, dated November 16, 2009, among Energy Future Holdings Corp., the guarantors named therein and The Bank of New York Mellon Trust Company, N.A., as trustee, relating to 9.75% Senior Secured Notes due 2019. |
| 4(l) | 333-171253 Form S-4 (filed January 24, 2011) | 4(k) | — | Indenture, dated January 12, 2010, among Energy Future Holdings Corp., the guarantors named therein and The Bank of New York Mellon Trust Company, N.A., as trustee, relating to 10.000% Senior Secured Notes due 2020. |

Table of Contents

| Exhibits | Previously Filed* With File Number | As Exhibit | | |
|---|---|---|---|---|
| 4(m) | 333-165860 Form S-3 (filed April 1, 2010) | 4(j) | — | First Supplemental Indenture, dated March 16, 2010, to Indenture, dated January 12, 2010. |
| 4(n) | 1-12833 Form 10-Q (Quarter ended June 30, 2010) (filed August 2, 2010) | 4(a) | — | Second Supplemental Indenture, dated April 13, 2010, to Indenture, dated January 12, 2010. |
| 4(o) | 1-12833 Form 10-Q (Quarter ended June 30, 2010) (filed August 2, 2010) | 4(b) | — | Third Supplemental Indenture, dated April 14, 2010, to Indenture, dated January 12, 2010. |
| 4(p) | 1-12833 Form 10-Q (Quarter ended June 30, 2010) (filed August 2, 2010) | 4(c) | — | Fourth Supplemental Indenture, dated May 21, 2010, to Indenture, dated January 12, 2010. |
| 4(q) | 1-12833 Form 10-Q (Quarter ended June 30, 2010) (filed August 2, 2010) | 4(d) | — | Fifth Supplemental Indenture, dated July 2, 2010, to Indenture, dated January 12, 2010. |
| 4(r) | 1-12833 Form 10-Q (Quarter ended June 30, 2010) (filed August 2, 2010) | 4(e) | — | Sixth Supplemental Indenture, dated July 6, 2010, to Indenture, dated January 12, 2010. |
| 4(s) | 333-171253 Form S-4 (filed January 24, 2011) | 4(r) | — | Seventh Supplemental Indenture, dated July 7, 2010, to Indenture, dated January 12, 2010. |
| 4(t) | 1-12833 Form 8-K (filed January 19, 2010) | 4.2 | — | Registration Rights Agreement, dated January 12, 2010, among Energy Future Holdings Corp., the guarantors named therein and the initial purchasers named therein, relating to 10.000% Senior Secured Notes due 2020. |
| 4(u) | 333-165860 Form S-3 (filed April 1, 2010) | 4(l) | — | Registration Rights Agreement, dated March 16, 2010, among Energy Future Holdings Corp., the guarantors named therein and the initial purchasers named therein, relating to 10.000% Senior Secured Notes due 2020. |

Table of Contents

| Exhibits | Previously Filed* With File Number | As Exhibit | | |
|---|---|---|---|---|
| 4(v) | 1-12833 Form 10-Q (Quarter ended June 30, 2010) (filed August 2, 2010) | 4(h) | — | Registration Rights Agreement, dated April 12, 2010, among Energy Future Holdings Corp., the guarantors named therein and the initial purchasers named therein, relating to 10.000% Senior Secured Notes due 2020. |
| 4(w) | 1-12833 Form 10-Q (Quarter ended June 30, 2010) (filed August 2, 2010) | 4(i) | — | Registration Rights Agreement, dated April 13, 2010, among Energy Future Holdings Corp., the guarantors named therein and the initial purchasers named therein, relating to 10.000% Senior Secured Notes due 2020. |
| 4(x) | 1-12833 Form 10-Q (Quarter ended June 30, 2010) (filed August 2, 2010) | 4(j) | — | Registration Rights Agreement, dated May 20, 2010, among Energy Future Holdings Corp., the guarantors named therein and the initial purchasers named therein, relating to 10.000% Senior Secured Notes due 2020. |
| 4(y) | 1-12833 Form 10-Q (Quarter ended June 30, 2010) (filed August 2, 2010) | 4(k) | — | Registration Rights Agreement, dated July 2, 2010, among Energy Future Holdings Corp., the guarantors named therein and the initial purchasers named therein, relating to 10.000% Senior Secured Notes due 2020. |
| 4(z) | 1-12833 Form 10-Q (Quarter ended June 30, 2010) (filed August 2, 2010) | 4(l) | — | Registration Rights Agreement, dated July 6, 2010, among Energy Future Holdings Corp., the guarantors named therein and the initial purchasers named therein, relating to 10.000% Senior Secured Notes due 2020. |
| 4(aa) | 1-12833 Form 10-Q (Quarter ended June 30, 2010) (filed August 2, 2010) | 4(m) | — | Registration Rights Agreement, dated July 7, 2010, among Energy Future Holdings Corp., the guarantors named therein and the initial purchasers named therein, relating to 10.000% Senior Secured Notes due 2020. |

**Oncor Electric Delivery Company LLC**

| | | | | |
|---|---|---|---|---|
| 4(bb) | 333-100240 Form S-4(filed October 2, 2002) | 4(a) | — | Indenture and Deed of Trust, dated as of May 1, 2002, between Oncor Electric Delivery Company LLC and The Bank of New York Mellon, as trustee. |
| 4(cc) | 1-12833 Form 8-K (filed October 31, 2005) | 10.1 | — | Supplemental Indenture No. 1, dated October 25, 2005, to Indenture and Deed of Trust, dated as of May 1, 2002, between Oncor Electric Delivery Company LLC and The Bank of New York Mellon. |

Table of Contents

| Exhibits | Previously Filed* With File Number | As Exhibit | | |
|---|---|---|---|---|
| 4(dd) | 333-100240 Form 10-Q (Quarter ended March 31, 2008) (filed May 15, 2008) | 4(b) | — | Supplemental Indenture No. 2, dated October 25, 2005, to Indenture and Deed of Trust, dated as of May 1, 2002, between Oncor Electric Delivery Company LLC and The Bank of New York Mellon. |
| 4(ee) | 333-100240 Form S-4 (filed October 2, 2002) | 4(b) | — | Officer's Certificate, dated May 6, 2002, establishing the form and certain terms of Oncor Electric Delivery Company LLC's 6.375% Senior Notes due 2012 and 7.000% Senior Notes due 2032. |
| 4(ff) | 333-100242 Form S-4 (filed October 2, 2002) | 4(a) | — | Indenture (for Unsecured Debt Securities), dated August 1, 2002, between Oncor Electric Delivery Company LLC and The Bank of New York Mellon, as trustee. |
| 4(gg) | 333-100240 Form 10-Q (Quarter ended March 31, 2008) (filed May 15, 2008) | 4(c) | — | Supplemental Indenture No. 1, dated May 15, 2008, to Indenture and Deed of Trust, dated August 1, 2002, between Oncor Electric Delivery Company LLC and The Bank of New York. |
| 4(hh) | 333-100242 Form S-4 (filed October 2, 2002) | 4(b) | — | Officer's Certificate, dated August 30, 2002, establishing the form and certain terms of Oncor Electric Delivery Company LLC's 5% Debentures due 2007 and 7% Debentures due 2022. |
| 4(ii) | 333-106894 Form S-4 (filed July 9, 2003) | 4(c) | — | Officer's Certificate, dated December 20, 2002, establishing the form and certain terms of Oncor Electric Delivery Company LLC's 6.375% Senior Notes due 2015 and 7.250% Senior Notes due 2023. |
| 4(jj) | 333-100240 Form 10-Q (Quarter ended March 31, 2008) (filed May 15, 2008) | 4(a) | — | Deed of Trust, Security Agreement and Fixture Filing, dated May 15, 2008, by Oncor Electric Delivery Company LLC, as grantor, to and for the benefit of, The Bank of New York Mellon Trust, as collateral agent and trustee. |
| 4(kk) | 333-100240 Form 10-K (2008) (filed March 2, 2009) | 4(n) | — | First Amendment, dated March 2, 2009, to Deed of Trust, Security Agreement and Fixture Filing, dated May 15, 2008. |
| 4(ll) | 333-100240 Form 8-K (filed September 3, 2010) | 10.1 | — | Second Amendment, dated September 3, 2010, to Deed of Trust, Security Agreement and Fixture Filing, dated September 3, 2010. |

266

Table of Contents

| Exhibits | Previously Filed* With File Number | As Exhibit | | |
|---|---|---|---|---|
| 4(mm) | 333-100242 Form 8-K (filed September 9, 2008) | 4.1 | — | Officer's Certificate, dated September 8, 2008, establishing the form and certain terms of Oncor Electric Delivery Company LLC's 5.95% Senior Secured Notes due 2013, 6.80% Senior Secured Notes due 2018 and 7.50% Senior Secured Notes due 2038. |
| 4(nn) | 333-100240 Form 8-K (filed September 16, 2010) | 4.1 | — | Officer's Certificate, dated September 13, 2010, establishing the form and certain terms of Oncor Electric Delivery Company LLC's 5.25% Senior Secured Notes due 2040. |
| 4(oo) | 333-100240 Form 8-K (filed September 16, 2010) | 4.2 | — | Registration Rights Agreement, dated September 13, 2010, among Oncor Electric Delivery Company LLC, Barclays Capital Inc., Citigroup Global Markets Inc., Banc of America Securities LLC and Credit Suisse Securities (USA) LLC, as representatives of the initial purchasers of Oncor Electric Delivery Company LLC's 5.25% Senior Secured Notes due 2040, relating to 5.25% Senior Secured Notes due 2040. |
| 4(pp) | 333-100240 Form 8-K (filed October 12, 2010) | 4.1 | — | Officer's Certificate, dated October 8, 2010, establishing the form and certain terms of Oncor Electric Delivery Company LLC's 5.00% Senior Secured Notes due 2017 and 5.75% Senior Secured Notes due 2020. |
| 4(qq) | 333-100240 Form 8-K (filed October 12, 2010) | 4.2 | — | Registration Rights Agreement, dated October 8, 2010, among Oncor Electric Delivery Company LLC and the dealer managers named therein, relating to 5.00% Senior Secured Notes due 2017 and 5.75% Senior Secured Notes due 2020. |
| **Texas Competitive Electric Holdings Company LLC** | | | | |
| 4(rr) | 333-108876 Form 8-K(filed October 31, 2007) | 4.2 | — | Indenture, dated October 31, 2007, among Texas Competitive Electric Holdings Company LLC and TCEH Finance, Inc., the guarantors and The Bank of New York Mellon Trust Company, N.A., as trustee, relating to 10.25% Senior Notes due 2015. |
| 4(ss) | 1-12833 Form 8-K(filed December 12, 2007) | 4.1 | — | First Supplemental Indenture, dated December 6, 2007, to Indenture, dated October 31, 2007, relating to Texas Competitive Electric Holdings Company LLC's and TCEH Finance, Inc.'s 10.25% Senior Notes due 2015, Series B, and 10.50%/11.25% Senior Toggle Notes due 2016. |
| 4(tt) | 1-12833 Form 10-Q(Quarter ended June 30, 2009) (filed August 4, 2009) | 4(b) | — | Second Supplemental Indenture, dated August 3, 2009, to Indenture, dated October 31, 2007, relating to Texas Competitive Electric Holdings Company LLC's and TCEH Finance, Inc.'s 10.25% Senior Notes due 2015, 10.25% Senior Notes due 2015, Series B, and 10.50%/11.25% Senior Toggle Notes due 2016. |

Table of Contents

| Exhibits | Previously Filed* With File Number | As Exhibit | | |
|---|---|---|---|---|
| 4(uu) | 1-12833 Form 8-K(filed October 8, 2010) | 4.1 | — | Indenture, dated October 6, 2010, among Texas Competitive Electric Holdings Company LLC and TCEH Finance, Inc., the guarantors and The Bank of New York Mellon Trust Company, N.A., as trustee, relating to 15% Senior Secured Second Lien Notes due 2021. |
| 4(vv) | 1-12833 Form 8-K(filed October 26, 2010) | 4.1 | — | First Supplemental Indenture, dated October 20, 2010, to the Indenture, dated October 6, 2010. |
| 4(ww) | 1-12833 Form 8-K(filed November 17, 2010) | 4.1 | — | Second Supplemental Indenture, dated November 15, 2010, to the Indenture, dated October 6, 2010. |
| 4(xx) | 1-12833 Form 8-K(filed October 8, 2010) | 4.3 | — | Second Lien Pledge Agreement, dated October 6, 2010, among Texas Competitive Electric Holdings Company LLC, TCEH Finance, Inc., the subsidiary guarantors named therein and The Bank of New York Mellon Trust Company, N.A., as collateral agent for the benefit of the second lien secured parties. |
| 4(yy) | 1-12833 Form 8-K(filed October 8, 2010) | 4.4 | — | Second Lien Security Agreement, dated October 6, 2010, among Texas Competitive Electric Holdings Company LLC, TCEH Finance, Inc., the subsidiary guarantors named therein and The Bank Of New York Mellon Trust Company, N.A., as collateral agent and as the initial second priority representative for the benefit of the second lien secured parties. |
| 4(zz) | 1-12833 Form 8-K(filed October 8, 2010) | 4.5 | — | Second Lien Intercreditor Agreement, dated October 6, 2010, among Texas Competitive Electric Holdings Company LLC, TCEH Finance, Inc., the subsidiary guarantors named therein, Citibank, N.A., as collateral agent for the senior collateral agent and the administrative agent, The Bank of New York Mellon Trust Company, N.A., as the initial second priority representative. |
| 4(aaa) | | | — | Form of Second Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing to Fidelity National Title Insurance Company, as trustee, for the benefit of The Bank of New York Mellon Trust Company, N.A., as Collateral Agent and Initial Second Priority Representative for the benefit of the Second Lien Secured Parties, as Beneficiary. |
| 4(bbb) | 1-12833 Form 8-K(filed October 8, 2010) | 4.2 | — | Registration Rights Agreement, dated October 6, 2010, among Texas Competitive Electric Holdings Company LLC, TCEH Finance, Inc., the holders named therein and the guarantors named therein, relating to 15% Senior Secured Second Lien Notes due 2021. |
| 4(ccc) | 1-12833 Form 8-K(filed October 26, 2010) | 4.2 | — | Registration Rights Agreement, dated October 20, 2010, among Texas Competitive Electric Holdings Company LLC, TCEH Finance, Inc., the initial purchasers and the guarantors named therein, relating to 15% Senior Secured Second Lien Notes due 2021, Series B. |

268

Table of Contents

| Exhibits | Previously Filed* With File Number | As Exhibit | | |
|---|---|---|---|---|
| | | | **Energy Future Intermediate Holding Company LLC** | |
| 4(ddd) | 1-12833 Form 8-K(filed November 20, 2009) | 4.2 | — | Indenture, dated November 16, 2009, among Energy Future Intermediate Holding Company LLC, EFIH Finance Inc. and The Bank of New York Mellon Trust Company, N.A., as trustee. |
| 4(eee) | 1-12833 Form 8-K(filed August 18, 2010) | 4.1 | — | Indenture, dated August 17, 2010, among Energy Future Intermediate Holding Company LLC, EFIH Finance Inc. and The Bank of New York Mellon Trust Company, N.A., as trustee, relating to 10.000% Senior Secured Notes due 2020. |
| **(10)** | | | **Material Contracts** | |
| | | | **Management Contracts; Compensatory Plans, Contracts and Arrangements** | |
| 10(a) | 1-12833 Form 8-K (filed May 23, 2005) | 10.6 | — | Energy Future Holdings Corp. Executive Change in Control Policy effective May 20, 2005. |
| 10(b) | 333-153529 Amendment No. 2 to Form S-4 (filed December 23, 2008) | 10(p) | — | Amendment to the Energy Future Holdings Corp. Executive Change in Control Policy, dated December 23, 2008. |
| 10(c) | | | — | Amendment to the Energy Future Holdings Corp. Executive Change in Control Policy, dated December 20, 2010. |
| 10(d) | 1-12833 Form 8-K (filed May 23, 2005) | 10.7 | — | Energy Future Holdings Corp. 2005 Executive Severance Plan and Summary Plan Description. |
| 10(e) | 333-153529 Amendment No. 2 to Form S-4 (filed December 23, 2008) | 10(n) | — | Amendment to the Energy Future Holdings Corp. 2005 Executive Severance Plan and Summary Plan Description, dated December 23, 2008. |
| 10(f) | | | — | Amendment to the Energy Future Holdings Corp. 2005 Executive Severance Plan and Summary Plan Description, dated December 10, 2010. |
| 10(g) | 1-12833 Form 10-K (2007) (filed March 31, 2008) | 10(a) | — | 2007 Stock Incentive Plan for Key Employees of Energy Future Holdings Corp. and its affiliates. |
| 10(h) | 1-12833 Form 10-K (2009) (filed February 19, 2010) | 10(ii) | — | Amendment No. 1 to the 2007 Stock Incentive Plan for Key Employees of Energy Future Holdings Corp. and its Affiliates, dated July 14, 2009, effective as of December 23, 2008. |
| 10(i) | | | — | EFH Executive Annual Incentive Plan, effective as of January 1, 2010. |

269

Table of Contents

| Exhibits | Previously Filed* With File Number | As Exhibit | | |
|---|---|---|---|---|
| 10(j) | 1-12833 Form 10-K (2008) (filed March 3, 2009) | 10(q) | — | EFH Second Supplemental Retirement Plan, effective as of October 10, 2007. |
| 10(k) | 1-12833 Form 10-K (2009) (filed February 19, 2010) | 10(ee) | — | Amendment to EFH Second Supplemental Retirement Plan, dated July 31, 2009. |
| 10(l) | | | — | Second Amendment to EFH Second Supplemental Retirement Plan, dated April 9, 2010 with effect as of January 1, 2010. |
| 10(m) | | | — | Third Amendment to EFH Second Supplemental Retirement Plan, dated April 21, 2010 with effect as of January 1, 2010. |
| 10(n) | 1-12833 Form 10-K (2009) (filed February 19, 2010) | 10(dd) | — | EFH Salary Deferral Program, effective January 1, 2010. |
| 10(o) | | | — | Amendment to EFH Salary Deferral Program, effective January 20, 2011. |
| 10(p) | 1-12833 Form 10-K (2007) (filed March 31, 2008) | 10(b) | — | Registration Rights Agreement, dated October 10, 2007, among Texas Energy Future Holdings Limited Partnership, Energy Future Holdings Corp. and the stockholders party thereto. |
| 10(q) | 1-12833 Form 10-Q (Quarter ended March 31, 2008) (filed May 15, 2008) | 10(a) | — | Form of Stockholder's Agreement (for Directors) among Energy Future Holdings Corp., Texas Energy Future Holdings Limited Partnership and the stockholder party thereto. |
| 10(r) | 1-12833 Form 10-Q (Quarter ended March 31, 2008) (filed May 15, 2008) | 10(b) | — | Form of Sale Participation Agreement (for Directors) between Texas Energy Future Holdings Limited Partnership and the stockholder party hereto. |
| 10(s) | 1-12833 Form 10-Q (Quarter ended June 30, 2008) (filed August 14, 2008) | 10(f) | — | Form of Management Stockholder's Agreement (For Executive Officers) among Energy Future Holdings Corp., Texas Energy Future Holdings Limited Partnership and the stockholder party thereto. |

270

Table of Contents

| Exhibits | Previously Filed* With File Number | As Exhibit | | |
|---|---|---|---|---|
| 10(t) | 1-12833 Form 10-Q (Quarter ended June 30, 2008) (filed August 14, 2008) | 10(g) | — | Form of Sale Participation Agreement (For Executive Officers) between Texas Energy Future Holdings Limited Partnership and the stockholder party thereto. |
| 10(u) | 1-12833 Form 10-K (2009) (filed February 19, 2010) | 10(m) | — | Form of Amended and Restated Non-Qualified Stock Option Agreement (For Executive Officers) between Energy Future Holdings Corp. and the optionee thereto. |
| 10(v) | 1-12833 Form 10-K (2007) (filed March 31, 2008) | 10(f) | — | Energy Future Holdings Corp. Non-Employee Director Compensation Arrangements. |
| 10(w) | 1-12833 Form 10-K (2009) (filed February 19, 2010) | 10(nn) | — | Consulting Agreement, dated February 18, 2010, between Energy Future Holdings Corp. and Donald L. Evans. |
| 10(x) | 1-12833 Form 10-K (2007) (filed March 31, 2008) | 10(p) | — | Employment Agreement, dated January 6, 2008, between Energy Future Holdings Corp. and John Young. |
| 10(y) | 1-12833 Form 10-K (2009) (filed February 19, 2010) | 10(jj) | — | Employment Arrangement with John Young. |
| 10(z) | 1-12833 Form 10-K (2007) (filed March 31, 2008) | 10(r) | — | Management Stockholder's Agreement, dated February 1, 2008, among Energy Future Holdings Corp., Texas Energy Future Holdings Limited Partnership and John Young. |
| 10(aa) | 1-12833 Form 10-K (2007) (filed March 31, 2008) | 10(s) | — | Sale Participation Agreement, dated February 1, 2008, between Texas Energy Future Holdings Limited Partnership and John F. Young. |
| 10(bb) | 1-12833 Form 10-K (2009) (filed February 19, 2010) | 10(hh) | — | Restricted Stock Unit Award Agreement, effective as of January 6, 2008, between Energy Future Holdings Corp. and John Young. |
| 10(cc) | 1-12833 Form 10-K (2008) (filed March 3, 2009) | 10(y) | — | Amended and Restated Employment Agreement, dated July 1, 2008, between Energy Future Holdings Corp. and Paul M. Keglevic. |

271

Table of Contents

| Exhibits | Previously Filed* With File Number | As Exhibit | | |
|---|---|---|---|---|
| 10(dd) | | | — | Employment Arrangement with Paul Keglevic. |
| 10(ee) | | | — | Deferred Share Agreement, dated July 1, 2008, between Energy Future Holdings Corp. and Paul Keglevic. |
| 10(ff) | 1-12833 Form 10-Q (Quarter ended June 30, 2010) (filed August 2, 2010) | 10(d) | — | Amended and Restated Employment Agreement, effective January 1, 2010, between Luminant Holding Company LLC, Energy Future Holdings Corp. and David A. Campbell. |
| 10(gg) | 1-12833 Form 10-K (2007) (filed March 31, 2008) | 10(y) | — | Additional Payment Agreement, dated October 10, 2007, among Energy Future Holdings Corp., Texas Energy Future Holdings Limited Partnership, Texas Competitive Electric Holdings Company LLC and David Campbell. |
| 10(hh) | | | — | Deferred Share Agreement, dated May 20, 2008, between Energy Future Holdings Corp. and David Campbell. |
| 10(ii) | 1-12833 Form 10-Q (Quarter ended June 30, 2010) (filed August 2, 2010) | 10(c) | — | Amended and Restated Employment Agreement, effective January 1, 2010, between TXU Retail Company LLC, Energy Future Holdings Corp. and James A. Burke. |
| 10(jj) | 1-12833 Form 10-K (2007) (filed March 31, 2008) | 10(ff) | — | Additional Payment Agreement, dated October 10, 2007, among Energy Future Holdings Corp., Texas Energy Future Holdings Limited Partnership, Texas Competitive Electric Holdings Company LLC and James Burke. |
| 10(kk) | 1-12833 Form 10-K (2007) (filed March 31, 2008) | 10(nn) | — | Deferred Share Agreement, dated October 9, 2007, between Texas Energy Future Holdings Limited Partnership and James Burke. |
| 10(ll) | 1-12833 Form 10-Q (Quarter ended June 30, 2010) (filed August 2, 2010) | 10(a) | — | Amended and Restated Employment Agreement, effective January 1, 2010, between EFH Corporate Services Company, Energy Future Holdings Corp. and Robert C. Walters. |
| 10(mm) | 1-12833 Form 10-Q (Quarter ended June 30, 2010) (filed August 2, 2010) | 10(b) | — | Amended and Restated Employment Agreement, effective January 1, 2010, between Luminant Holding Company LLC, Energy Future Holdings Corp. and Mark Allen McFarland. |

272

Table of Contents

| Exhibits | Previously Filed* With File Number | As Exhibit | | |
|---|---|---|---|---|
| 10(nn) | 1-12833 Form 10-Q (Quarter ended June 30, 2010) (filed August 2, 2010) | 10(e) | — | Employment Agreement, effective January 1, 2010, between EFH Corporate Services Company, Energy Future Holdings Corp. and Richard J. Landy. |
| 10(oo) | 1-12833 Form 10-K (2009) (filed February 19, 2010) | 10(gg) | — | Energy Future Holdings Corp. Key Employee Non-Qualified Stock Option Agreement, dated January 26, 2010, between Energy Future Holdings Corp. and Richard Landy. |
| 10(pp) | 1-12833 Form 10-Q (Quarter ended June 30, 2010) (filed August 2, 2010) | 10(f) | — | Employment Agreement, effective January 1, 2010, between EFH Corporate Services Company, Energy Future Holdings Corp. and Joel D. Kaplan. |
| 10(qq) | 1-12833 Form 10-K (2009) (filed February 19, 2010) | 10(ff) | — | Energy Future Holdings Corp. Key Employee Non-Qualified Stock Option Agreement, dated December 17, 2009, between Energy Future Holdings Corp. and Joel Kaplan. |

### Credit Agreements and Related Agreements

| | | | | |
|---|---|---|---|---|
| 10(rr) | 333-100240 Form 10-Q (Quarter ended September 30, 2007) (filed November 14, 2007) | 10(a) | — | $2,000,000,000 Revolving Credit Agreement, dated October 10, 2007, among Oncor Electric Delivery Company LLC, as the borrower; the several lenders from time to time parties thereto; JPMorgan Chase Bank, N.A., as administrative agent, fronting bank and swingline lender, Citibank, N.A., as syndication agent and fronting bank; Credit Suisse, Cayman Islands Branch, Goldman Sachs Credit Partners L.P., Lehman Commercial Paper Inc., Morgan Stanley Senior Funding, Inc., as co-documentation agents; J.P. Morgan Securities Inc., Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Goldman Sachs Credit Partners L.P., Lehman Brothers Inc. and Morgan Stanley Senior Funding, Inc., as joint lead arrangers and bookrunners. |

273

Table of Contents

| Exhibits | Previously Filed* With File Number | As Exhibit | | |
|---|---|---|---|---|
| 10(ss) | 333-171253 Post-Effective Amendment #1 to Form S-4 (filed February 7, 2011) | 10(rr) | — | $24,500,000,000 Credit Agreement, dated October 10, 2007, among Energy Future Competitive Holdings Company; Texas Competitive Electric Holdings Company LLC, as the borrower; the several lenders from time to time parties thereto; Citibank, N.A., as administrative agent, collateral agent, swingline lender, revolving letter of credit issuer and deposit letter of credit issuer; Goldman Sachs Credit Partners L.P., as posting agent, posting syndication agent and posting documentation agent; JPMorgan Chase Bank, N.A., as syndication agent and revolving letter of credit issuer; Citigroup Global Markets Inc., J.P. Morgan Securities Inc., Goldman Sachs Credit Partners L.P., Lehman Brothers Inc., Morgan Stanley Senior Funding, Inc. and Credit Suisse Securities (USA) LLC, as joint lead arrangers and bookrunners; Goldman Sachs Credit Partners L.P., as posting lead arranger and bookrunner; Credit Suisse, Goldman Sachs Credit Partners L.P., Lehman Commercial Paper Inc., Morgan Stanley Senior Funding, Inc., as co-documentation agents; and J. Aron & Company, as posting calculation agent. |
| 10(tt) | 1-12833 Form 8-K (filed August 10, 2009) | 10.1 | — | Amendment No. 1, dated August 7, 2009, to the $24,500,000,000 Credit Agreement. |
| 10(uu) | 1-12833 Form 10-K (2007) (filed March 31, 2008) | 10(ss) | — | Guarantee, dated October 10, 2007, by the guarantors party thereto in favor of Citibank, N.A., as collateral agent for the benefit of the secured parties under the $24,500,000,000 Credit Agreement, dated October 10, 2007. |
| 10(vv) | 1-12833 Form 10-K (2007) (filed March 31, 2008) | 10(vv) | — | Form of Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing to Fidelity National Title Insurance Company, as trustee, for the benefit of Citibank, N.A., as beneficiary. |
| 10(ww) | 1-12833 Form 8-K (filed August 10, 2009) | 10.2 | — | Amended and Restated Collateral Agency and Intercreditor Agreement, dated October 10, 2007, as amended and restated as of August 7, 2009, among Energy Future Competitive Holdings Company; Texas Competitive Electric Holdings Company LLC; the subsidiary guarantors party thereto; Citibank, N.A., as administrative agent and collateral agent; Credit Suisse Energy LLC, J. Aron & Company, Morgan Stanley Capital Group Inc., Citigroup Energy Inc., each as a secured hedge counterparty; and any other person that becomes a secured party pursuant thereto. |
| 10(xx) | 1-12833 Form 8-K (filed August 10, 2009) | 10.3 | — | Amended and Restated Security Agreement, dated October 10, 2007, as amended and restated as of August 7, 2009, among Texas Competitive Electric Holdings Company LLC, the subsidiary grantors party thereto, and Citibank, N.A., as collateral agent for the benefit of the first lien secured parties, including the secured parties under the $24,500,000,000 Credit Agreement, dated October 10, 2007. |

Table of Contents

| Exhibits | Previously Filed* With File Number | As Exhibit | |
|---|---|---|---|
| 10(yy) | 1-12833 Form 8-K (filed August 10, 2009) | 10.4 | — Amended and Restated Pledge Agreement, dated October 10, 2007, as amended and restated as of August 7, 2009, among Energy Future Competitive Holdings Company, Texas Competitive Electric Holdings Company LLC, the subsidiary pledgors party thereto, and Citibank, N.A., as collateral agent for the benefit first lien secured parties, including the secured parties under the $24,500,000,000 Credit Agreement, dated October 10, 2007. |
| 10(zz) | 1-12833 Form 8-K (filed November 20, 2009) | 4.3 | — Pledge Agreement, dated November 16, 2009, made by Energy Future Intermediate Holding Company LLC and the additional pledgers to The Bank of New York Mellon Trust Company, N.A., as collateral trustee for the holders of parity lien obligations. |
| 10(aaa) | 1-12833 Form 8-K (filed November 20, 2009) | 4.4 | — Collateral Trust Agreement, dated November 16, 2009, among Energy Future Intermediate Holding Company LLC, The Bank of New York Mellon Trust Company, N.A., as first lien trustee and as collateral trustee, and the other secured debt representatives party thereto. |

### Other Material Contracts

| Exhibits | Previously Filed* With File Number | As Exhibit | |
|---|---|---|---|
| 10(bbb) | 1-12833 Form 10-K (2003) (filed March 15, 2004) | 10(qq) | — Lease Agreement, dated February 14, 2002, between State Street Bank and Trust Company of Connecticut, National Association, a owner trustee of ZSF/Dallas Tower Trust, a Delaware grantor trust, as lessor and EFH Properties Company, as Lessee (Energy Plaza Property). |
| 10(ccc) | 1-12833 Form 10-Q (Quarter ended June 30, 2007) (filed August 9, 2007) | 10.1 | — First Amendment, dated June 1, 2007, to Lease Agreement, dated February 14, 2002. |
| 10(ddd) | 333-100240 Form 10-K (2004) (filed March 23, 2005) | 10(i) | — Agreement, dated March 10, 2005, between Oncor Electric Delivery Company LLC and TXU Energy Company LLC, allocating to Oncor Electric Delivery Company LLC the pension and post-retirement benefit costs for all Oncor Electric Delivery Company LLC employees who had retired or had terminated employment as vested employees prior to January 1, 2002. |
| 10(eee) | 1-12833 Form 10-K (2006) (filed March 2, 2007) | 10(iii) | — Amended and Restated Transaction Confirmation by Generation Development Company LLC, dated February 2007 (subsequently assigned to Texas Competitive Electric Holdings Company LLC on October 10, 2007) (confidential treatment has been requested for portions of this exhibit). |
| 10(fff) | 1-12833 Form 10-K (2007) (filed March 31, 2008) | 10(eee) | — Stipulation as approved by the PUCT in Docket No. 34077. |

Table of Contents

| Exhibits | Previously Filed* With File Number | As Exhibit | | |
|---|---|---|---|---|
| 10(ggg) | 1-12833 Form 10-K (2007) (filed March 31, 2008) | 10(fff) | — | Amendment to Stipulation Regarding Section 1, Paragraph 35 and Exhibit B in Docket No. 34077. |
| 10(hhh) | 333-100240 Form 10-K (2010) (filed February 18, 2011) | 10(ae) | — | PUCT Order on Rehearing in Docket No. 34077. |
| 10(iii) | 1-12833 Form 10-K (2007) (filed March 31, 2008) | 10(sss) | — | ISDA Master Agreement, dated October 25, 2007, between Texas Competitive Electric Holdings Company LLC and Goldman Sachs Capital Markets, L.P. |
| 10(jjj) | 1-12833 Form 10-K (2007) (filed March 31, 2008) | 10(ttt) | — | Schedule to the ISDA Master Agreement, dated October 25, 2007, between Texas Competitive Electric Holdings Company LLC and Goldman Sachs Capital Markets, L.P. |
| 10(kkk) | 1-12833 Form 10-K (2007) (filed March 31, 2008) | 10(uuu) | — | Form of Confirmation between Texas Competitive Electric Holdings Company LLC and Goldman Sachs Capital Markets, L.P. |
| 10(lll) | 1-12833 Form 10-K (2007) (filed March 31, 2008) | 10(vvv) | — | ISDA Master Agreement, dated October 29, 2007, between Texas Competitive Electric Holdings Company LLC and Credit Suisse International. |
| 10(mmm) | 1-12833 Form 10-K (2007) (filed March 31, 2008) | 10(www) | — | Schedule to the ISDA Master Agreement, dated October 29, 2007, between Texas Competitive Electric Holdings Company LLC and Credit Suisse International. |
| 10(nnn) | 1-12833 Form 10-K (2007) (filed March 31, 2008) | 10(xxx) | — | Form of Confirmation between Texas Competitive Electric Holdings Company LLC and Credit Suisse International. |
| 10(ooo) | 1-12833 Form 10-K (2007) (filed March 31, 2008) | 10(yyy) | — | Management Agreement, dated October 10, 2007, among Energy Future Holdings Corp., Texas Energy Future Holdings Limited Partnership, Kohlberg Kravis Roberts & Co. L.P., TPG Capital, L.P., Goldman, Sachs & Co. and Lehman Brothers Inc. |
| 10(ppp) | 1-12833 Form 10-K (2007) (filed March 31, 2008) | 10(cccc) | — | Indemnification Agreement, dated October 10, 2007, among Texas Energy Future Holdings Limited Partnership, Energy Future Holdings Corp., Kohlberg Kravis Roberts & Co., L.P., TPG Capital, L.P. and Goldman, Sachs & Co. |
| 10(qqq) | 333-100240 Form 8-K (filed August 13, 2008) | 10.1 | — | Contribution and Subscription Agreement, dated August 12, 2008, between Oncor Electric Delivery Company LLC and Texas Transmission Investment LLC. |

276

Table of Contents

| Exhibits | Previously Filed* With File Number | As Exhibit | | |
|---|---|---|---|---|
| 10(rrr) | 1-12833 Form 10-Q (Quarter ended September 30, 2008) (filed November 6, 2008) | 10(g) | — | Second Amended and Restated Limited Liability Company Agreement of Oncor Electric Delivery Holdings Company LLC, dated November 5, 2008. |
| 10(sss) | 333-100240 Form 10-K (2008) (filed March 3, 2009) | 3(c) | — | Amendment No. 1, dated February 18, 2009, to Second Amended and Restated Limited Liability Company Agreement of Oncor Electric Delivery LLC. |
| 10(ttt) | 333-100240 Form 10-Q (Quarter ended September 30, 2008) (filed November 6, 2008) | 4(c) | — | Investor Rights Agreement, dated November 5, 2008, among Oncor Electric Delivery Company LLC, Oncor Electric Delivery Holdings Company LLC, Texas Transmission Investment LLC and Energy Future Holdings Corp. |
| 10(uuu) | 333-100240 Form 10-Q (Quarter ended September 30, 2008) (filed November 6, 2008) | 4(d) | — | Registration Rights Agreement, dated November 5, 2008, among Oncor Electric Delivery Company LLC, Oncor Electric Delivery Holdings Company LLC, Texas Transmission Investment LLC and Energy Future Holdings Corp. |
| 10(vvv) | 333-100240 Form 10-Q (Quarter ended September 30, 2008) (filed November 6, 2008) | 10(b) | — | Amended and Restated Tax Sharing Agreement, dated November 5, 2008, among Oncor Electric Delivery Company LLC, Oncor Electric Delivery Holdings Company LLC, Oncor Management Investment LLC, Texas Transmission Investment LLC, Energy Future Intermediate Holding Company LLC and Energy Future Holdings Corp. |
| **(12)** | **Statement Regarding Computation of Ratios** | | | |
| 12(a) | | | — | Computation of Ratio of Earnings to Fixed Charges. |
| **(21)** | **Subsidiaries of the Registrant** | | | |
| 21(a) | | | — | Subsidiaries of Energy Future Holdings Corp. |
| **(23)** | **Consent of Experts** | | | |
| 23(a) | | | — | Consent of Deloitte & Touche LLP, an independent registered public accounting firm, relating to the consolidated financial statements of Energy Future Holdings Corp. |
| 23(b) | | | — | Consent of Deloitte & Touche LLP, an independent registered public accounting firm, relating to the consolidated financial statements of Oncor Electric Delivery Holdings Company LLC |

277

Table of Contents

| Exhibits | Previously Filed* With File Number | As Exhibit | | |
|---|---|---|---|---|
| **(31)** | **Rule 13a - 14(a)/15d - 14(a) Certifications** | | | |
| 31(a) | | | — | Certification of John Young, principal executive officer of Energy Future Holdings Corp., pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31(b) | | | — | Certification of Paul M. Keglevic, principal financial officer of Energy Future Holdings Corp., pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| **32** | **Section 1350 Certifications** | | | |
| 32(a) | | | — | Certification of John Young, principal executive officer of Energy Future Holdings Corp., pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32(b) | | | — | Certification of Paul M. Keglevic, principal financial officer of Energy Future Holdings Corp., pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| **(99)** | **Additional Exhibits** | | | |
| 99(a) | 33-55408 Post-Effective Amendment No. 1 to Form S-3 (filed July, 1993) | 99(b) | — | Amended Agreement dated January 30, 1990, between Energy Future Competitive Holdings Company and Tex-La Electric Cooperative of Texas, Inc. |
| 99(b) | | | — | Energy Future Holdings Corp. Consolidated Adjusted EBITDA reconciliation for the years ended December 31, 2010 and 2009. |
| 99(c) | | | — | Texas Competitive Electric Holdings Company LLC Consolidated Adjusted EBITDA reconciliation for the years ended December 31, 2010 and 2009. |
| 99(d) | | | — | Energy Future Intermediate Holding Company LLC Consolidated Adjusted EBITDA reconciliation for the years ended December 31, 2010 and 2009. |
| 99(e) | | | — | Oncor Electric Delivery Holdings Company LLC financial statements presented pursuant to Rules 3–09 and 3–16 of Regulation S–X. |

\*    Incorporated herein by reference

\*\*    Certain instruments defining the rights of holders of long-term debt of the Company's subsidiaries included in the financial statements filed herewith have been omitted because the total amount of securities authorized thereunder does not exceed 10 percent of the total assets of the Company and its subsidiaries on a consolidated basis. The Company hereby agrees, upon request of the SEC, to furnish a copy of any such omitted instrument.

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, Energy Future Holdings Corp. has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**ENERGY FUTURE HOLDINGS CORP.**

Date: February 17, 2011

By   /s/ JOHN F. YOUNG

(John F. Young, President and Chief Executive Officer)

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of Energy Future Holdings Corp. and in the capacities and on the date indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ JOHN F. YOUNG<br>(John F. Young, President and Chief Executive Officer) | Principal Executive Officer and Director | February 17, 2011 |
| /s/ PAUL M. KEGLEVIC<br>(Paul M. Keglevic, Executive Vice President and Chief Financial Officer) | Principal Financial Officer | February 17, 2011 |
| /s/ STANLEY J. SZLAUDERBACH<br>(Stanley J. Szlauderbach, Senior Vice President and Controller) | Principal Accounting Officer | February 17, 2011 |
| /s/ DONALD L. EVANS<br>(Donald L. Evans, Chairman of the Board) | Director | February 17, 2011 |
| /s/ ARCILIA C. ACOSTA<br>(Arcilia C. Acosta) | Director | February 17, 2011 |
| /s/ DAVID BONDERMAN<br>(David Bonderman) | Director | February 17, 2011 |
| /s/ THOMAS D. FERGUSON<br>(Thomas D. Ferguson) | Director | February 17, 2011 |
| /s/ FREDERICK M. GOLTZ<br>(Frederick M. Goltz) | Director | February 17, 2011 |
| /s/ JAMES R. HUFFINES<br>(James R. Huffines) | Director | February 17, 2011 |
| /s/ SCOTT LEBOVITZ<br>(Scott Lebovitz) | Director | February 17, 2011 |
| /s/ JEFFREY LIAW<br>(Jeffrey Liaw) | Director | February 17, 2011 |
| /s/ MARC S. LIPSCHULTZ<br>(Marc S. Lipschultz) | Director | February 17, 2011 |
| /s/ MICHAEL MACDOUGALL<br>(Michael MacDougall) | Director | February 17, 2011 |

279

**Table of Contents**

| Signature | Title | Date |
|---|---|---|
| /S/ LYNDON L. OLSON, JR. | Director | February 17, 2011 |
| (Lyndon L. Olson, Jr.) | | |
| /S/ KENNETH PONTARELLI | Director | February 17, 2011 |
| (Kenneth Pontarelli) | | |
| /S/ WILLIAM K. REILLY | Director | February 17, 2011 |
| (William K. Reilly) | | |
| /S/ JONATHAN D. SMIDT | Director | February 17, 2011 |
| (Jonathan D. Smidt) | | |
| /S/ KNEELAND YOUNGBLOOD | Director | February 17, 2011 |
| (Kneeland Youngblood) | | |

280

Exhibit 4(d)

**TXU CORP.**

**TO**

**THE BANK OF NEW YORK**

**Trustee**

*Indenture*
**(For Unsecured Debt Securities Series Q)**

**Dated as of November 1, 2004**

**TABLE OF CONTENTS**

PARTIES                                                                      1
RECITAL OF THE COMPANY                                                       1

ARTICLE ONE Definitions and Other Provisions of General Application          1

    SECTION 101. Definitions.                            1
        Act                          2
        Affiliate                    2
        Authenticating Agent         2
        Authorized Officer           2
        Board of Directors           2
        Board Resolution             2
        Business Day                 2
        Commission                   2
        Company                      3
        Company Request or Company Order   3
        Corporate Trust Office       3
        corporation                  3
        Defaulted Interest           3
        Discount Security            3
        Dollar or $                  3
        Eligible Obligations         3
        Event of Default             3
        Governmental Authority       3
        Government Obligations        3
        Holder                       4
        Indenture                    4
        Interest Payment Date        4
        Maturity                     4
        Officer's Certificate        4
        Opinion of Counsel           4
        Outstanding                  4
        Paying Agent                 5
        Periodic Offering            5
        Person                       6
        Place of Payment             6
        Predecessor Security         6
        Redemption Date              6
        Redemption Price             6
        Regular Record Date          6
        Required Currency            6
        Responsible Officer          6
        Securities                   6
        Security Register and Security Registrar   6

Note: This table of contents shall not, for any purpose, be deemed to be part of the Indenture.

Special Record Date   6
Stated Interest Rate   6
Stated Maturity   7
Subsidiary   7
Tranche   7
Trust Indenture Act   7
Trustee   7
United States   7
SECTION 102. Compliance Certificates and Opinions.   7
SECTION 103. Form of Documents Delivered to Trustee.   8
SECTION 104. Acts of Holders.   9
SECTION 105. Notices, etc. to Trustee and Company.   10
SECTION 106. Notice to Holders of Securities; Waiver.   11
SECTION 107. Conflict with Trust Indenture Act.   12
SECTION 108. Effect of Headings and Table of Contents.   12
SECTION 109. Successors and Assigns.   12
SECTION 110. Separability Clause.   12
SECTION 111. Benefits of Indenture.   12
SECTION 112. Governing Law.   12
SECTION 113. Legal Holidays.   12

ARTICLE TWO Security Forms   13

SECTION 201. Forms Generally.   13
SECTION 202. Form of Trustee's Certificate of Authentication.   13

ARTICLE THREE The Securities   14

SECTION 301. Amount Unlimited; Issuable in Series.   14
SECTION 302. Denominations.   17
SECTION 303. Execution, Authentication, Delivery and Dating.   17
SECTION 304. Temporary Securities.   20
SECTION 305. Registration, Registration of Transfer and Exchange.   21
SECTION 306. Mutilated, Destroyed, Lost and Stolen Securities.   22
SECTION 307. Payment of Interest; Interest Rights Preserved.   23
SECTION 308. Persons Deemed Owners.   24
SECTION 309. Cancellation by Security Registrar.   24
SECTION 310. Computation of Interest.   24
SECTION 311. Payment to Be in Proper Currency.   24
SECTION 312. Extension of Interest Payment.   25

ARTICLE FOUR Redemption of Securities   25

SECTION 401. Applicability of Article.   25
SECTION 402. Election to Redeem; Notice to Trustee.   25
SECTION 403. Selection of Securities to Be Redeemed.   25
SECTION 404. Notice of Redemption.   26

SECTION 405. Securities Payable on Redemption Date.    27
SECTION 406. Securities Redeemed in Part.    28

ARTICLE FIVE Sinking Funds    28

SECTION 501. Applicability of Article.    28
SECTION 502. Satisfaction of Sinking Fund Payments with Securities.    28
SECTION 503. Redemption of Securities for Sinking Fund.    29

ARTICLE SIX Covenants    30

SECTION 601. Payment of Principal, Premium and Interest.    30
SECTION 602. Maintenance of Office or Agency.    30
SECTION 603. Money for Securities Payments to Be Held in Trust.    30
SECTION 604. Corporate Existence.    32
SECTION 605. Maintenance of Properties.    32
SECTION 606. Annual Officer's Certificate as to Compliance.    32
SECTION 607. Waiver of Certain Covenants.    32
SECTION 608. Limitation on Liens.    33

ARTICLE SEVEN Satisfaction and Discharge    35

SECTION 701. Satisfaction and Discharge of Securities.    35
SECTION 702. Satisfaction and Discharge of Indenture.    38
SECTION 703. Application of Trust Money.    38

ARTICLE EIGHT Events of Default; Remedies    39

SECTION 801. Events of Default.    39
SECTION 802. Acceleration of Maturity; Rescission and Annulment.    40
SECTION 803. Collection of Indebtedness and Suits for Enforcement by Trustee.    41
SECTION 804. Trustee May File Proofs of Claim.    42
SECTION 805. Trustee May Enforce Claims Without Possession of Securities.    42
SECTION 806. Application of Money Collected.    43
SECTION 807. Limitation on Suits.    43
SECTION 808. Unconditional Right of Holders to Receive Principal, Premium and Interest.    44
SECTION 809. Restoration of Rights and Remedies.    44
SECTION 810. Rights and Remedies Cumulative.    44
SECTION 811. Delay or Omission Not Waiver.    44
SECTION 812. Control by Holders of Securities.    44
SECTION 813. Waiver of Past Defaults.    45
SECTION 814. Undertaking for Costs.    45
SECTION 815. Waiver of Stay or Extension Laws.    46

ARTICLE NINE The Trustee                                                                                                46

    SECTION 901. Certain Duties and Responsibilities.                                                46
    SECTION 902. Notice of Defaults.                                                                 47
    SECTION 903. Certain Rights of Trustee.                                                          47
    SECTION 904. Not Responsible for Recitals or Issuance of Securities.                             48
    SECTION 905. May Hold Securities.                                                                48
    SECTION 906. Money Held in Trust.                                                                49
    SECTION 907. Compensation and Reimbursement.                                                     49
    SECTION 908. Disqualification; Conflicting Interests.                                            50
    SECTION 909. Corporate Trustee Required; Eligibility.                                            51
    SECTION 910. Resignation and Removal; Appointment of Successor.                                  51
    SECTION 911. Acceptance of Appointment by Successor.                                             53
    SECTION 912. Merger, Conversion, Consolidation or Succession to Business.                        54
    SECTION 913. Preferential Collection of Claims Against Company.                                  54
    SECTION 914. Co-trustees and Separate Trustees.                                                  55
    SECTION 915. Appointment of Authenticating Agent.                                                56

ARTICLE TEN Holders' Lists and Reports by Trustee and Company                                           58

    SECTION 1001. Lists of Holders.                                                                  58
    SECTION 1002. Reports by Trustee and Company.                                                    58

ARTICLE ELEVEN Consolidation, Merger, Conveyance or Other Transfer                                      58

    SECTION 1101. Company May Consolidate, etc., Only on Certain Terms.                              58
    SECTION 1102. Successor Corporation Substituted.                                                 59
    SECTION 1103. Limitations.                                                                       59

ARTICLE TWELVE Supplemental Indentures                                                                  60

    SECTION 1201. Supplemental Indentures Without Consent of Holders.                                60
    SECTION 1202. Supplemental Indentures With Consent of Holders.                                   62
    SECTION 1203. Execution of Supplemental Indentures.                                              63
    SECTION 1204. Effect of Supplemental Indentures.                                                 63
    SECTION 1205. Conformity With Trust Indenture Act.                                               64
    SECTION 1206. Reference in Securities to Supplemental Indentures.                                64
    SECTION 1207. Modification Without Supplemental Indenture.                                       64

ARTICLE THIRTEEN Meetings of Holders; Action Without Meeting                                            64

    SECTION 1301. Purposes for Which Meetings May Be Called.                                         64
    SECTION 1302. Call, Notice and Place of Meetings.                                                64
    SECTION 1303. Persons Entitled to Vote at Meetings.                                              65
    SECTION 1304. Quorum; Action.                                                                    65
    SECTION 1305. Attendance at Meetings; Determination of Voting Rights;                            66
    SECTION 1306. Counting Votes and Recording Action of Meetings.                                   67
    SECTION 1307. Action Without Meeting.                                                            68

ARTICLE FOURTEEN Immunity of Incorporators, Shareholders, Members, Officers, Managers and Directors          68

     SECTION 1401. Liability Solely Corporate.          68

ARTICLE FIFTEEN Series Q Notes          68

     SECTION 1501. Designation of Series Q Notes.          68

**TXU CORP.**

**Reconciliation and tie between Trust Indenture Act of 1939
and Indenture, dated as of November 1, 2004**

| Trust Indenture Act Section | | Indenture Section |
|---|---|---|
| §310 | (a)(1) | 909 |
| | (a)(2) | 909 |
| | (a)(3) | 914 |
| | (a)(4) | Not Applicable |
| | (b) | 908 |
| | | 910 |
| §311 | (a) | 913 |
| | (b) | 913 |
| | (c) | 913 |
| §312 | (a) | 1001 |
| | (b) | 1001 |
| | (c) | 1001 |
| §313 | (a) | 1002 |
| | (b) | 1002 |
| | (c) | 1002 |
| §314 | (a) | 1002 |
| | (a)(4) | 606 |
| | (b) | Not Applicable |
| | (c)(1) | 102 |
| | (c)(2) | 102 |
| | (c)(3) | Not Applicable |
| | (d) | Not Applicable |
| | (e) | 102 |
| §315 | (a) | 901 |
| | | 903 |
| | (b) | 902 |
| | (c) | 901 |
| | (d) | 901 |
| | (e) | 814 |
| §316 | (a) | 812 |
| | | 813 |
| | (a)(1)(A) | 802 |
| | | 812 |
| | (a)(1)(B) | 813 |
| | (a)(2) | Not Applicable |
| | (b) | 808 |
| §317 | (a)(1) | 803 |
| | (a)(2) | 804 |
| | (b) | 603 |
| §318 | (a) | 107 |

**INDENTURE**, dated as of November 1, 2004, between **TXU CORP.**, a corporation duly organized and existing under the laws of the State of Texas (herein called the "Company"), having its principal office at Energy Plaza, 1601 Bryan Street, Dallas, Texas 75201, and **THE BANK OF NEW YORK**, a New York banking corporation, having its principal corporate trust office at 101 Barclay Street, New York, New York 10286, as Trustee (herein called the "Trustee").

RECITAL OF THE COMPANY

The Company has duly authorized the execution and delivery of this Indenture to provide for the issuance from time to time of its unsecured debentures, notes or other evidences of indebtedness (herein called the "Securities"), in an unlimited aggregate principal amount to be issued in one or more series as contemplated herein; and all acts necessary to make this Indenture a valid agreement of the Company have been performed.

For all purposes of this Indenture, except as otherwise expressly provided herein or unless the context otherwise requires, capitalized terms used herein shall have the meanings assigned to them in Article One of this Indenture.

NOW, THEREFORE, THIS INDENTURE WITNESSETH:

For and in consideration of the premises and the purchase of the Securities by the Holders thereof, it is mutually covenanted and agreed, for the equal and proportionate benefit of all Holders of the Securities or of any series thereof, as follows:

**ARTICLE ONE**

**Definitions and Other Provisions of General Application**

**SECTION 101. Definitions.**

For all purposes of this Indenture, except as otherwise expressly provided or unless the context otherwise requires:

(a) the terms defined in this Article have the meanings assigned to them in this Article and include the plural as well as the singular;

(b) all terms used herein without definition which are defined in the Trust Indenture Act, either directly or by reference therein, have the meanings assigned to them therein;

(c) all accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles in the United States, and, except as otherwise herein expressly provided, the term "generally accepted accounting principles" with respect to any computation required or permitted hereunder shall mean such accounting principles as are generally accepted in the United States at the date of such computation or, at the election of the Company from time to time, at the date of the execution and delivery of this Indenture; provided, however, that in determining generally accepted accounting principles applicable to the Company, the Company shall, to the extent required, conform to any order, rule or regulation of any administrative agency, regulatory authority or other governmental body having jurisdiction over the Company;

(d) any reference to an "Article" or a "Section" refers to an Article or a Section, as the case may be, of this Indenture; and

(e) the words "herein", "hereof" and "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section or other subdivision.

Certain terms, used principally in Article Nine, are defined in that Article.

"**Act**", when used with respect to any Holder of a Security, has the meaning specified in Section 104.

"**Affiliate**" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "**control**" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or through one or more intermediaries, whether through the ownership of voting securities, by contract or otherwise; and the terms "**controlling**" and "**controlled**" have meanings correlative to the foregoing.

"**Authenticating Agent**" means any Person (other than the Company or an Affiliate of the Company) authorized by the Trustee pursuant to Section 915 to act on behalf of the Trustee to authenticate one or more series of Securities or Tranche thereof.

"**Authorized Officer**" means the Chairman of the Board, the Vice Chairman, the President, any Vice President, the Treasurer, any Assistant Treasurer, or any other officer or agent of the Company duly authorized by the Board of Directors to act in respect of matters relating to this Indenture.

"**Board of Directors**" means either the board of directors of the Company or any committee thereof duly authorized to act in respect of matters relating to this Indenture.

"**Board Resolution**" means a copy of a resolution certified by the Secretary or an Assistant Secretary of the Company to have been duly adopted by the Board of Directors and to be in full force and effect on the date of such certification, and delivered to the Trustee.

"**Business Day**", when used with respect to a Place of Payment or any other particular location specified in the Securities or this Indenture, means any day, other than a Saturday or Sunday, which is not a day on which banking institutions or trust companies in such Place of Payment or other location are generally authorized or required by law, regulation or executive order to remain closed, except as may be otherwise specified as contemplated by Section 301.

"**Commission**" means the Securities and Exchange Commission, as from time to time constituted, created under the Securities Exchange Act of 1934, as amended, or, if at any

-2-

time after the date of execution and delivery of this Indenture such Commission is not existing and performing the duties now assigned to it under the Trust Indenture Act, then the body, if any, performing such duties at such time.

"**Company**" means the Person named as the "Company" in the first paragraph of this Indenture until a successor Person shall have become such pursuant to the applicable provisions of this Indenture, and thereafter "Company" shall mean such successor Person.

"**Company Request**" or "**Company Order**" means a written request or order signed in the name of the Company by an Authorized Officer and delivered to the Trustee.

"**Corporate Trust Office**" means the office of the Trustee at which at any particular time its corporate trust business shall be principally administered, which office at the date of execution and delivery of this Indenture is located at 101 Barclay Street, Floor 8 W, New York, New York 10286.

"**corporation**" means a corporation, association, company, limited liability company, partnership, joint stock company, business or statutory trust or other business entity, and references to "corporate" and other derivations of "corporation" herein shall be deemed to include appropriate derivations of such entities.

"**Defaulted Interest**" has the meaning specified in Section 307.

"**Discount Security**" means any Security which provides for an amount less than the principal amount thereof to be due and payable upon a declaration of acceleration of the Maturity thereof pursuant to Section 802. "Interest" with respect to a Discount Security means interest, if any, borne by such Security at a Stated Interest Rate.

"**Dollar**" or "**$**" means a dollar or other equivalent unit in such coin or currency of the United States as at the time shall be legal tender for the payment of public and private debts.

"**Eligible Obligations**" means:

(a) with respect to Securities denominated in Dollars, Government Obligations; or

(b) with respect to Securities denominated in a currency other than Dollars or in a composite currency, such other obligations or instruments as shall be specified with respect to such Securities, as contemplated by Section 301.

"**Event of Default**" has the meaning specified in Section 801.

"**Governmental Authority**" means the government of the United States or of any State or territory thereof or of the District of Columbia or of any county, municipality or other political subdivision of any of the foregoing, or any department, agency, authority or other instrumentality of any of the foregoing.

"**Government Obligations**" means:

(a) direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States and entitled to the benefit of the full faith and credit thereof; and

-3-

(b) certificates, depositary receipts or other instruments which evidence a direct ownership interest in obligations described in clause (a) above or in any specific interest or principal payments due in respect thereof; provided, however, that the custodian of such obligations or specific interest or principal payments shall be a bank or trust company (which may include the Trustee or any Paying Agent) subject to Federal or state supervision or examination with a combined capital and surplus of at least $50,000,000; and provided, further, that except as may be otherwise required by law, such custodian shall be obligated to pay to the holders of such certificates, depositary receipts or other instruments the full amount received by such custodian in respect of such obligations or specific payments and shall not be permitted to make any deduction therefrom.

"**Holder**" means a Person in whose name a Security is registered in the Security Register.

"**Indenture**" means this instrument as originally executed and delivered and as it may from time to time be supplemented or amended by one or more indentures supplemental hereto entered into pursuant to the applicable provisions hereof, including, for all purposes of this instrument and any such supplemental indenture, the provisions of the Trust Indenture Act that are deemed to be a part of and govern this Indenture and any such supplemental indenture, respectively. The term "Indenture" shall also include the provisions or terms of particular series of Securities established as contemplated by Section 301.

"**Interest Payment Date**", when used with respect to any Security, means the Stated Maturity of an installment of interest on such Security.

"**Maturity**", when used with respect to any Security, means the date on which the principal of such Security or an installment of principal becomes due and payable as provided in such Security or in this Indenture, whether at the Stated Maturity, by declaration of acceleration, upon call for redemption or otherwise.

"**Officer's Certificate**" means a certificate signed by an Authorized Officer and delivered to the Trustee.

"**Opinion of Counsel**" means a written opinion of counsel, who may be counsel for the Company, or other counsel reasonably acceptable to the Trustee.

"**Outstanding**", when used with respect to Securities, means, as of the date of determination, all Securities theretofore authenticated and delivered under this Indenture, except:

(a) Securities theretofore canceled or delivered to the Security Registrar for cancellation;

(b) Securities deemed to have been paid in accordance with Section 701; and

-4-

(c) Securities which have been paid pursuant to Section 306 or in exchange for or in lieu of which other Securities have been authenticated and delivered pursuant to this Indenture, other than any such Securities in respect of which there shall have been presented to the Trustee proof satisfactory to it and the Company that such Securities are held by a bona fide purchaser or purchasers in whose hands such Securities are valid obligations of the Company;

provided, however, that in determining whether or not the Holders of the requisite principal amount of the Securities Outstanding under this Indenture, or the Outstanding Securities of any series or Tranche, have given any request, demand, authorization, direction, notice, consent or waiver hereunder or whether or not a quorum is present at a meeting of Holders of Securities,

(x) Securities owned by the Company or any other obligor upon the Securities or any Affiliate of the Company or of such other obligor (unless the Company, such Affiliate or such obligor owns all Securities Outstanding under this Indenture, or (except for the purposes of actions to be taken by Holders of (i) more than one series voting as a class under Section 812 or (ii) more than one series or more than one Tranche, as the case may be, voting as a class under Section 1202) all Outstanding Securities of each such series and each such Tranche, as the case may be, determined without regard to this clause (x)) shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver or upon any such determination as to the presence of a quorum, only Securities which a Responsible Officer of the Trustee actually knows to be so owned shall be so disregarded; provided, however, that Securities so owned which have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Trustee the pledgee's right so to act with respect to such Securities and that the pledgee is not the Company or any other obligor upon the Securities or any Affiliate of the Company or of such other obligor; and

(y) the principal amount of a Discount Security that shall be deemed to be Outstanding for such purposes shall be the amount of the principal thereof that would be due and payable as of the date of such determination upon a declaration of acceleration of the Maturity thereof pursuant to Section 802;

provided, further, that, in the case of any Security the principal of which is payable from time to time without presentment or surrender, the principal amount of such Security that shall be deemed to be Outstanding at any time for all purposes of this Indenture shall be the original principal amount thereof less the aggregate amount of principal thereof theretofore paid.

"**Paying Agent**" means any Person, including the Company, authorized by the Company to pay the principal of, and premium, if any, or interest, if any, on any Securities on behalf of the Company.

"**Periodic Offering**" means an offering of Securities of a series from time to time any or all of the specific terms of which Securities, including without limitation the rate or rates

-5-

of interest, if any, thereon, the Stated Maturity or Maturities thereof and the redemption provisions, if any, with respect thereto, are to be determined by the Company or its agents from time to time subsequent to the initial request for the authentication and delivery of such Securities by the Trustee, as contemplated in Section 301 and clause (b) of Section 303.

"**Person**" means any individual, corporation, joint venture, trust or unincorporated organization or any Governmental Authority.

"**Place of Payment**", when used with respect to the Securities of any series, or any Tranche thereof, means the place or places, specified as contemplated by Section 301, at which, subject to Section 602, principal of and premium, if any, and interest, if any, on the Securities of such series or Tranche are payable.

"**Predecessor Security**" of any particular Security means every previous Security evidencing all or a portion of the same debt as that evidenced by such particular Security; and, for the purposes of this definition, any Security authenticated and delivered under Section 306 in exchange for or in lieu of a mutilated, destroyed, lost or stolen Security shall be deemed (to the extent lawful) to evidence the same debt as the mutilated, destroyed, lost or stolen Security.

"**Redemption Date**", when used with respect to any Security to be redeemed, means the date fixed for such redemption by or pursuant to this Indenture.

"**Redemption Price**", when used with respect to any Security to be redeemed, means the price at which it is to be redeemed pursuant to this Indenture, exclusive of accrued and unpaid interest.

"**Regular Record Date**" for the interest payable on any Interest Payment Date on the Securities of any series means the date specified for that purpose as contemplated by Section 301.

"**Required Currency**" has the meaning specified in Section 311.

"**Responsible Officer**", when used with respect to the Trustee, means any Vice President, Assistant Vice President, Trust Officer or other officer of the Trustee who, in the case of each of the foregoing, is assigned by the Trustee to its corporate trust department responsible for the administration of this Indenture that is located in the Corporate Trust Office.

"**Securities**" has the meaning stated in the first recital of this Indenture and more particularly means any securities authenticated and delivered under this Indenture.

"**Security Register**" and "**Security Registrar**" have the respective meanings specified in Section 305.

"**Special Record Date**" for the payment of any Defaulted Interest on the Securities of any series means a date fixed by the Trustee pursuant to Section 307.

"**Stated Interest Rate**" means a rate (whether fixed or variable) at which an obligation by its terms is stated to bear simple interest. Any calculation or other determination to

-6-

be made under this Indenture by reference to the Stated Interest Rate on a Security shall be made without regard to the effective interest cost to the Company of such Security and without regard to the Stated Interest Rate on, or the effective cost to the Company of, any other indebtedness in respect of which the Company's obligations are evidenced or secured in whole or in part by such Security.

"**Stated Maturity**", when used with respect to any obligation or any installment of principal thereof or interest thereon, means the date on which the principal of such obligation or such installment of principal or interest is stated to be due and payable (without regard to any provisions for redemption, prepayment, acceleration, purchase or extension).

"**Subsidiary**" means a corporation more than 50% of the outstanding voting stock of which is owned, directly or indirectly, by the Company or by one or more other Subsidiaries, or by the Company and one or more other Subsidiaries. For the purposes of this definition, "voting stock" means stock (or other interests) of a corporation having voting power for the election of directors, managers or trustees thereof, whether at all times or only so long as no senior class of stock (or other interests) has such voting power by reason of any contingency.

"**Tranche**" means a group of Securities which (a) are of the same series and (b) have identical terms except as to principal amount and/or date of issuance.

"**Trust Indenture Act**" means, as of any time, the Trust Indenture Act of 1939, or any successor statute, as in effect at such time.

"**Trustee**" means the Person named as the "Trustee" in the first paragraph of this Indenture until a successor Trustee shall have become such with respect to one or more series of Securities pursuant to the applicable provisions of this Indenture, and thereafter "Trustee" shall mean or include each Person who is then a Trustee hereunder, and if at any time there is more than one such Person, "Trustee" as used with respect to the Securities of any series shall mean the Trustee with respect to Securities of that series.

"**United States**" means the United States of America, its territories, its possessions and other areas subject to its political jurisdiction.

**SECTION 102. Compliance Certificates and Opinions.**

Except as otherwise expressly provided in this Indenture, upon any application or request by the Company to the Trustee to take any action under any provision of this Indenture, the Company shall, if requested by the Trustee, furnish to the Trustee an Officer's Certificate stating that in the opinion of the Authorized Officer executing such Officer's Certificate all conditions precedent, if any, provided for in this Indenture relating to the proposed action (including any covenants compliance with which constitutes a condition precedent) have been complied with and an Opinion of Counsel stating that in the opinion of such counsel all such conditions precedent, if any, have been complied with, except that in the case of any such application or request as to which the furnishing of such documents is specifically required by any provision of this Indenture relating to such particular application or request, no additional certificate or opinion need be furnished.

-7-

Every certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture shall include:

(a) a statement that each Person signing such certificate or opinion has read such covenant or condition and the definitions herein relating thereto;

(b) a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(c) a statement that, in the opinion of each such Person, such Person has made such examination or investigation as is necessary to enable such Person to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(d) a statement as to whether, in the opinion of each such Person, such condition or covenant has been complied with.

**SECTION 103. Form of Documents Delivered to Trustee.**

In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any certificate or opinion of an officer of the Company may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which such officer's certificate or opinion are based are erroneous. Any such certificate or Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an officer or officers of the Company stating that the information with respect to such factual matters is in the possession of the Company, unless such counsel knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to such matters are erroneous.

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

Whenever, subsequent to the receipt by the Trustee of any Board Resolution, Officer's Certificate, Opinion of Counsel or other document or instrument, a clerical, typographical or other inadvertent or unintentional error or omission shall be discovered therein, a new document or instrument may be substituted therefor in corrected form with the same force and effect as if originally filed in the corrected form and, irrespective of the date or dates of the actual execution and/or delivery thereof, such substitute document or instrument shall be deemed to have been executed and/or delivered as of the date or dates required with respect to the document or instrument for which it is substituted. Anything in this Indenture to the contrary

notwithstanding, if any such corrective document or instrument indicates that action has been taken by or at the request of the Company which could not have been taken had the original document or instrument not contained such error or omission, the action so taken shall not be invalidated or otherwise rendered ineffective but shall be and remain in full force and effect, except to the extent that such action was a result of willful misconduct or bad faith. Without limiting the generality of the foregoing, any Securities issued under the authority of such defective document or instrument shall nevertheless be the valid obligations of the Company entitled to the benefits of this Indenture equally and ratably with all other Outstanding Securities, except as aforesaid.

**SECTION 104. Acts of Holders.**

(a) Any request, demand, authorization, direction, notice, consent, election, waiver or other action provided by this Indenture to be made, given or taken by Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Holders in person or by an agent duly appointed in writing or, alternatively, may be embodied in and evidenced by the record of Holders voting in favor thereof, either in person or by proxies duly appointed in writing, at any meeting of Holders duly called and held in accordance with the provisions of Article Thirteen, or a combination of such instruments and any such record. Except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments or record or both are delivered to the Trustee and, where it is hereby expressly required, to the Company. Such instrument or instruments and any such record (and the action embodied therein and evidenced thereby) are herein sometimes referred to as the "Act" of the Holders signing such instrument or instruments and so voting at any such meeting. Proof of execution of any such instrument or of a writing appointing any such agent, or of the holding by any Person of a Security, shall be sufficient for any purpose of this Indenture and (subject to Section 901) conclusive in favor of the Trustee and the Company, if made in the manner provided in this Section. The record of any meeting of Holders shall be proved in the manner provided in Section 1306.

(b) The fact and date of the execution by any Person of any such instrument or writing may be proved by the affidavit of a witness of such execution or by a certificate of a notary public or other officer authorized by law to take acknowledgments of deeds, certifying that the individual signing such instrument or writing acknowledged to him the execution thereof or may be proved in any other manner which the Trustee and the Company deem sufficient. Where such execution is by a signer acting in a capacity other than his individual capacity, such certificate or affidavit shall also constitute sufficient proof of his authority.

(c) The ownership, principal amount (except as otherwise contemplated in clause (y) of the first proviso to the definition of Outstanding) and serial numbers of Securities held by any Person, and the date of holding the same, shall be proved by the Security Register.

(d) Any request, demand, authorization, direction, notice, consent, election, waiver or other Act of a Holder shall bind every future Holder of the same Security and the Holder of every Security issued upon the registration of transfer thereof or in exchange therefor or in

-9-

lieu thereof in respect of anything done, omitted or suffered to be done by the Trustee or the Company in reliance thereon, whether or not notation of such action is made upon such Security.

(e) Until such time as written instruments shall have been delivered to the Trustee with respect to the requisite percentage of principal amount of Securities for the action contemplated by such instruments, any such instrument executed and delivered by or on behalf of a Holder may be revoked with respect to any or all of such Securities by written notice by such Holder or any subsequent Holder, proven in the manner in which such instrument was proven.

(f) Securities of any series, or any Tranche thereof, authenticated and delivered after any Act of Holders may, and shall if required by the Trustee, bear a notation in form approved by the Trustee as to any action taken by such Act of Holders. If the Company shall so determine, new Securities of any series, or any Tranche thereof, so modified as to conform, in the opinion of the Trustee and the Company, to such action may be prepared and executed by the Company and authenticated and delivered by the Trustee in exchange for Outstanding Securities of such series or Tranche.

(g) If the Company shall solicit from Holders any request, demand, authorization, direction, notice, consent, waiver or other Act, the Company may, at its option, fix in advance a record date for the determination of Holders entitled to give such request, demand, authorization, direction, notice, consent, waiver or other Act, but the Company shall have no obligation to do so. If such a record date is fixed, such request, demand, authorization, direction, notice, consent, waiver or other Act may be given before or after such record date, but only the Holders of record at the close of business on the record date shall be deemed to be Holders for the purposes of determining whether Holders of the requisite proportion of the Outstanding Securities have authorized or agreed or consented to such request, demand, authorization, direction, notice, consent, waiver or other Act, and for that purpose the Outstanding Securities shall be computed as of the record date.

**SECTION 105. Notices, etc. to Trustee and Company.**

Any request, demand, authorization, direction, notice, consent, election, waiver or Act of Holders or other document provided or permitted by this Indenture to be made upon, given or furnished to, or filed with, the Trustee by any Holder or by the Company, or the Company by the Trustee or by any Holder, shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and delivered personally to an officer or other responsible employee of the addressee at the applicable location set forth below or at such other location as such party may from time to time designate by written notice, or transmitted by facsimile transmission or other direct written electronic means to such telephone number or other electronic communications address as the parties hereto shall from time to time designate by written notice, or transmitted by certified or registered mail, charges prepaid, to the applicable address set forth below or to such other address as either party hereto may from time to time designate by written notice:

-10-

If to the Trustee, to:

The Bank of New York
Corporate Trust Division, Corporate Finance Unit
101 Barclay Street, Floor 8W
New York, New York 10286

| | |
|---|---|
| Attention: | Remo J. Reale |
| Telephone: | (212) 815-2492 |
| Telecopy: | (212) 815-5707 |

If to the Company, to:

TXU Corp.
Energy Plaza
1601 Bryan Street
Dallas, Texas 75201

| | |
|---|---|
| Attention: | Treasurer |
| Telephone: | (214) 812-5565 |
| Telecopy: | (214) 812-8998 |

Any communication contemplated herein shall be deemed to have been made, given, furnished and filed if personally delivered, on the date of delivery, if transmitted by facsimile transmission or other direct written electronic means, on the date of receipt, and if transmitted by certified or registered mail, on the date of receipt.

**SECTION 106. Notice to Holders of Securities; Waiver.**

Except as otherwise expressly provided herein, where this Indenture provides for notice to Holders of any event, such notice shall be sufficiently given, and shall be deemed given, to Holders if in writing and mailed, first-class postage prepaid, to each Holder affected by such event, at the address of such Holder as it appears in the Security Register, not later than the latest date, if any, and not earlier than the earliest date, if any, prescribed for the giving of such notice.

In case by reason of the suspension of regular mail service or by reason of any other cause it shall be impracticable to give such notice to Holders by mail, then such notification as shall be made with the approval of the Trustee shall constitute a sufficient notification for every purpose hereunder. In any case where notice to Holders is given by mail, neither the failure to mail such notice, nor any defect in any notice so mailed, to any particular Holder shall affect the sufficiency of such notice with respect to other Holders.

Any notice required by this Indenture may be waived in writing by the Person entitled to receive such notice, either before or after the event otherwise to be specified therein, and such waiver shall be the equivalent of such notice. Waivers of notice by Holders shall be filed with the Trustee, but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

-11-

**SECTION 107. Conflict with Trust Indenture Act.**

 In the event this Indenture becomes subject to the Trust Indenture Act, (a) if any provision of this Indenture limits, qualifies or conflicts with another provision hereof which is required or deemed to be included in this Indenture by, or is otherwise governed by, any of the provisions of the Trust Indenture Act, such other provision shall control; and (b) if any provision hereof otherwise conflicts with the Trust Indenture Act, the Trust Indenture Act shall control unless otherwise provided as contemplated by Section 301 with respect to any series of Securities.

**SECTION 108. Effect of Headings and Table of Contents.**

 The Article and Section headings in this Indenture and the Table of Contents are for convenience only and shall not affect the construction hereof.

**SECTION 109. Successors and Assigns.**

 All covenants and agreements in this Indenture by the Company and Trustee shall bind their respective successors and assigns, whether so expressed or not.

**SECTION 110. Separability Clause.**

 In case any provision in this Indenture or the Securities shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

**SECTION 111. Benefits of Indenture.**

 Nothing in this Indenture or the Securities, express or implied, shall give to any Person, other than the parties hereto, their successors hereunder and the Holders, any benefit or any legal or equitable right, remedy or claim under this Indenture.

**SECTION 112. Governing Law.**

 **This Indenture and the Securities shall be governed by and construed in accordance with the law of the State of New York (including, without limitation, Section 5-1401 of the New York General Obligations Law or any successor to such statute), except to the extent that the Trust Indenture Act shall be applicable.**

**SECTION 113. Legal Holidays.**

 In any case where any Interest Payment Date, Redemption Date or Stated Maturity of any Security shall not be a Business Day at any Place of Payment, then (notwithstanding any other provision of this Indenture or of the Securities other than a provision in Securities of any series, or any Tranche thereof, or in the indenture supplemental hereto, Board Resolution or Officer's Certificate which establishes the terms of the Securities of such series or Tranche, which specifically states that such provision shall apply in lieu of this Section) payment of interest or principal and premium, if any, need not be made at such Place of Payment

-12-

on such date, but may be made on the next succeeding Business Day at such Place of Payment, with the same force and effect, and in the same amount, as if made on the Interest Payment Date or Redemption Date, or at the Stated Maturity, as the case may be, and, if such payment is made or duly provided for on such Business Day, no interest shall accrue on the amount so payable for the period from and after such Interest Payment Date, Redemption Date or Stated Maturity, as the case may be, to such Business Day.

**ARTICLE TWO**
**Security Forms**

**SECTION 201. Forms Generally.**

        The definitive Securities of each series shall be in substantially the form or forms thereof established in the indenture supplemental hereto establishing such series or in a Board Resolution establishing such series, or in an Officer's Certificate pursuant to such supplemental indenture or Board Resolution, in each case with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture, and may have such letters, numbers or other marks of identification and such legends or endorsements placed thereon as may be required to comply with the rules of any securities exchange or as may, consistently herewith, be determined by the officers executing such Securities, as evidenced by their execution thereof. If the form or forms of Securities of any series are established in a Board Resolution or in an Officer's Certificate pursuant to a supplemental indenture or a Board Resolution, such Board Resolution and Officer's Certificate, if any, shall be delivered to the Trustee at or prior to the delivery of the Company Order contemplated by Section 303 for the authentication and delivery of such Securities.

        Unless otherwise specified as contemplated by Section 301 or clause (g) of Section 1201, the Securities of each series shall be issuable in registered form without coupons. The definitive Securities shall be produced in such manner as shall be determined by the officers executing such Securities, as evidenced by their execution thereof.

**SECTION 202. Form of Trustee's Certificate of Authentication.**

        The Trustee's certificate of authentication shall be in substantially the form set forth below:

        This is one of the Securities of the series designated therein referred to in the within-mentioned Indenture.

Dated:

 

                     _____

                     as Trustee

                     By: _____

                         Authorized Signatory

-13-

**ARTICLE THREE**

**The Securities**

**SECTION 301. Amount Unlimited; Issuable in Series.**

The aggregate principal amount of Securities which may be authenticated and delivered under this Indenture is unlimited.

The Securities may be issued in one or more series. Subject to the last paragraph of this Section, prior to the authentication and delivery of Securities of any series there shall be established by specification in a supplemental indenture or in a Board Resolution, or in an Officer's Certificate pursuant to a supplemental indenture or a Board Resolution:

(a) the title of the Securities of such series (which shall distinguish the Securities of such series from Securities of all other series);

(b) any limit upon the aggregate principal amount of the Securities of such series which may be authenticated and delivered under this Indenture (except for Securities authenticated and delivered upon registration of transfer of, or in exchange for, or in lieu of, other Securities of such series pursuant to Section 304, 305, 306, 406 or 1206 and except for any Securities which, pursuant to Section 303, are deemed never to have been authenticated and delivered hereunder);

(c) the Person or Persons (without specific identification) to whom interest on Securities of such series, or any Tranche thereof, shall be payable on any Interest Payment Date, if other than the Persons in whose names such Securities (or one or more Predecessor Securities) are registered at the close of business on the Regular Record Date for such interest;

(d) the date or dates on which the principal of the Securities of such series, or any Tranche thereof, is payable or any formulary or other method or other means by which such date or dates shall be determined, by reference to an index or other fact or event ascertainable outside of this Indenture or otherwise (without regard to any provisions for redemption, prepayment, acceleration, purchase or extension);

(e) the rate or rates at which the Securities of such series, or any Tranche thereof, shall bear interest, if any (including the rate or rates at which overdue principal shall bear interest, if different from the rate or rates at which such Securities shall bear interest prior to Maturity, and, if applicable, the rate or rates at which overdue premium or interest shall bear interest, if any), or any formulary or other method or other means by which such rate or rates shall be determined, by reference to an index or other fact or event ascertainable outside of this Indenture or otherwise; the date or dates from which such interest shall accrue; the Interest Payment Dates on which such interest shall be payable and the Regular Record Date, if any, for the interest payable on such Securities on any Interest Payment Date; the right of the Company, if any, to extend the interest payment periods and the duration of any such extension as contemplated by Section 312; and the basis of computation of interest, if other than as provided in Section 310;

-14-

(f) the place or places at which or methods by which (1) the principal of and premium, if any, and interest, if any, on Securities of such series, or any Tranche thereof, shall be payable, (2) registration of transfer of Securities of such series, or any Tranche thereof, may be effected, (3) exchanges of Securities of such series, or any Tranche thereof, may be effected and (4) notices and demands to or upon the Company in respect of the Securities of such series, or any Tranche thereof, and this Indenture may be served; the Security Registrar and any Paying Agent or Agents for such series or Tranche; and if such is the case, that the principal of such Securities shall be payable without presentment or surrender thereof;

(g) the period or periods within which, or the date or dates on which, the price or prices at which and the terms and conditions upon which the Securities of such series, or any Tranche thereof, may be redeemed, in whole or in part, at the option of the Company and any restrictions on such redemptions, including but not limited to a restriction on a partial redemption by the Company of the Securities of any series, or any Tranche thereof, resulting in delisting of such Securities from any national exchange;

(h) the obligation or obligations, if any, of the Company to redeem or purchase the Securities of such series, or any Tranche thereof, pursuant to any sinking fund or other mandatory redemption provisions or at the option of a Holder thereof and the period or periods within which or the date or dates on which, the price or prices at which and the terms and conditions upon which such Securities shall be redeemed or purchased, in whole or in part, pursuant to such obligation, and applicable exceptions to the requirements of Section 404 in the case of mandatory redemption or redemption at the option of the Holder;

(i) the denominations in which Securities of such series, or any Tranche thereof, shall be issuable if other than denominations of $1,000 and any integral multiple thereof;

(j) the currency or currencies, including composite currencies, in which payment of the principal of and premium, if any, and interest, if any, on the Securities of such series, or any Tranche thereof, shall be payable (if other than in Dollars);

(k) if the principal of or premium, if any, or interest, if any, on the Securities of such series, or any Tranche thereof, are to be payable, at the election of the Company or a Holder thereof, in a coin or currency other than that in which the Securities are stated to be payable, the period or periods within which and the terms and conditions upon which, such election may be made;

(l) if the principal of or premium, if any, or interest, if any, on the Securities of such series, or any Tranche thereof, are to be payable, or are to be payable at the election of the Company or a Holder thereof, in securities or other property, the type and amount of such securities or other property, or the formulary or other method or other means by which such amount shall be determined, and the period or periods within which, and the terms and conditions upon which, any such election may be made;

-15-

(m) if the amount payable in respect of principal of or premium, if any, or interest, if any, on the Securities of such series, or any Tranche thereof, may be determined with reference to an index or other fact or event ascertainable outside of this Indenture, the manner in which such amounts shall be determined to the extent not established pursuant to clause (e) of this paragraph;

(n) if other than the principal amount thereof, the portion of the principal amount of Securities of such series, or any Tranche thereof, which shall be payable upon declaration of acceleration of the Maturity thereof pursuant to Section 802;

(o) any Events of Default, in addition to those specified in Section 801, with respect to the Securities of such series, and any covenants of the Company for the benefit of the Holders of the Securities of such series, or any Tranche thereof, in addition to those set forth in Article Six;

(p) the terms, if any, pursuant to which the Securities of such series, or any Tranche thereof, may be converted into or exchanged for shares of capital stock or other securities of the Company or any other Person;

(q) the obligations or instruments, if any, which shall be considered to be Eligible Obligations in respect of the Securities of such series, or any Tranche thereof, denominated in a currency other than Dollars or in a composite currency, and any additional or alternative provisions for the reinstatement of the Company's indebtedness in respect of such Securities after the satisfaction and discharge thereof as provided in Section 701;

(r) if the Securities of such series, or any Tranche thereof, are to be issued in global form, (i) any limitations on the rights of the Holder or Holders of such Securities to transfer or exchange the same or to obtain the registration of transfer thereof, (ii) any limitations on the rights of the Holder or Holders thereof to obtain certificates therefor in definitive form in lieu of temporary form and (iii) any and all other matters incidental to such Securities;

(s) if the Securities of such series, or any Tranche thereof, are to be issuable as bearer securities, any and all matters incidental thereto which are not specifically addressed in a supplemental indenture as contemplated by clause (g) of Section 1201;

(t) to the extent not established pursuant to clause (r) of this paragraph, any limitations on the rights of the Holders of the Securities of such Series, or any Tranche thereof, to transfer or exchange such Securities or to obtain the registration of transfer thereof; and if a service charge will be made for the registration of transfer or exchange of Securities of such series, or any Tranche thereof, the amount or terms thereof;

(u) any exceptions to Section 113, or variation in the definition of Business Day, with respect to the Securities of such series, or any Tranche thereof;

(v) any collateral security, assurance or guarantee for the Securities of such series;

-16-

(w) any non-applicability of Section 608 to the Securities of such series or any exceptions or modifications of Section 608 with respect to the Securities of such series;

(x) any rights or duties of another Person to assume the obligations of the Company with respect to the Securities of such series (whether as joint obligor, primary obligor, secondary obligor or substitute obligor) and any rights or duties to discharge and release any obligor with respect to the Securities of such series or the Indenture to the extent related to such series; and

(y) any other terms of the Securities of such series, or any Tranche thereof, not inconsistent with the provisions of this Indenture.

With respect to Securities of a series subject to a Periodic Offering, the indenture supplemental hereto or the Board Resolution which establishes such series, or the Officer's Certificate pursuant to such supplemental indenture or Board Resolution, as the case may be, may provide general terms or parameters for Securities of such series and provide either that the specific terms of Securities of such series, or any Tranche thereof, shall be specified in a Company Order or that such terms shall be determined by the Company or its agents in accordance with procedures specified in a Company Order as contemplated by clause (b) of Section 303.

Unless otherwise provided with respect to a series of Securities as contemplated in Section 301(b), the aggregate principal amount of a series of Securities may be increased and additional Securities of such series may be issued up to the maximum aggregate principal amount authorized with respect to such series as increased.

## SECTION 302. Denominations.

Unless otherwise provided as contemplated by Section 301 with respect to any series of Securities, or any Tranche thereof, the Securities of each series shall be issuable in denominations of $1,000 and any integral multiple thereof.

## SECTION 303. Execution, Authentication, Delivery and Dating.

Unless otherwise provided as contemplated by Section 301 with respect to any series of Securities, or any Tranche thereof, the Securities shall be executed on behalf of the Company by an Authorized Officer and may have the corporate seal of the Company affixed thereto or reproduced thereon attested by any other Authorized Officer or by the Secretary or an Assistant Secretary of the Company. The signature of any or all of these officers on the Securities may be manual or facsimile.

Securities bearing the manual or facsimile signatures of individuals who were at the time of execution Authorized Officers or the Secretary or an Assistant Secretary of the Company shall bind the Company, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Securities or did not hold such offices at the date of such Securities.

-17-

The Trustee shall authenticate and deliver Securities of a series, for original issue, at one time or from time to time in accordance with the Company Order referred to below, upon receipt by the Trustee of:

(a) the instrument or instruments establishing the form or forms and terms of such series, as provided in Sections 201 and 301;

(b) a Company Order requesting the authentication and delivery of such Securities and, to the extent that the terms of such Securities shall not have been established in an indenture supplemental hereto or in a Board Resolution, or in an Officer's Certificate pursuant to a supplemental indenture or Board Resolution, all as contemplated by Sections 201 and 301, either (i) establishing such terms or (ii) in the case of Securities of a series subject to a Periodic Offering, specifying procedures, acceptable to the Trustee, by which such terms are to be established (which procedures may provide, to the extent acceptable to the Trustee, for authentication and delivery pursuant to oral or electronic instructions from the Company or any agent or agents thereof, which oral instructions are to be promptly confirmed electronically or in writing), in either case in accordance with the instrument or instruments delivered pursuant to clause (a) above;

(c) the Securities of such series, executed on behalf of the Company by an Authorized Officer;

(d) an Opinion of Counsel to the effect that:

(i) the form or forms of such Securities have been duly authorized by the Company and have been established in conformity with the provisions of this Indenture;

(ii) the terms of such Securities have been duly authorized by the Company and have been established in conformity with the provisions of this Indenture; and

(iii) when such Securities shall have been authenticated and delivered by the Trustee and issued and delivered by the Company in the manner and subject to any conditions specified in such Opinion of Counsel, such Securities will have been duly issued under this Indenture and will constitute valid and legally binding obligations of the Company, entitled to the benefits provided by this Indenture, and enforceable in accordance with their terms, subject, as to enforcement, to laws relating to or affecting generally the enforcement of mortgagees' and other creditors' rights, including, without limitation, bankruptcy, insolvency, reorganization, receivership, moratorium and other laws affecting the rights and remedies of creditors and mortgagees' generally and general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law);

-18-

provided, however, that, with respect to Securities of a series subject to a Periodic Offering, the Trustee shall be entitled to receive such Opinion of Counsel only once at or prior to the time of the first authentication of such Securities (provided that such Opinion of Counsel addresses the authentication and delivery of all Securities of such series) and that in lieu of the opinions described in clauses (ii) and (iii) above Counsel may opine that:

(x) when the terms of such Securities shall have been established pursuant to a Company Order or Orders or pursuant to such procedures (acceptable to the Trustee) as may be specified from time to time by a Company Order or Orders, all as contemplated by and in accordance with the instrument or instruments delivered pursuant to clause (a) above, such terms will have been duly authorized by the Company and will have been established in conformity with the provisions of this Indenture; and

(y) such Securities, when (1) executed by the Company, (2) authenticated and delivered by the Trustee in accordance with this Indenture, (3) issued and delivered by the Company and (4) paid for, all as contemplated by and in accordance with the aforesaid Company Order or Orders, as the case may be, will have been duly issued under this Indenture and will constitute valid and legally binding obligations of the Company, entitled to the benefits provided by the Indenture, and enforceable in accordance with their terms, subject, as to enforcement, to laws relating to or affecting generally the enforcement of mortgagees' and other creditors' rights, including, without limitation, bankruptcy, insolvency, reorganization, receivership, moratorium and other laws affecting the rights and remedies of creditors and mortgagees generally and general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

With respect to Securities of a series subject to a Periodic Offering, the Trustee may conclusively rely, as to the authorization by the Company of any of such Securities, the form and terms thereof and the legality, validity, binding effect and enforceability thereof, and compliance of the authentication and delivery thereof with the terms and conditions of this Indenture, upon the Opinion of Counsel and other documents delivered pursuant to Sections 201 and 301 and this Section, as applicable, at or prior to the time of the first authentication of Securities of such series unless and until such opinion or other documents have been superseded or revoked or expire by their terms. In connection with the authentication and delivery of Securities of a series subject to a Periodic Offering, the Trustee shall be entitled to assume that the Company's instructions to authenticate and deliver such Securities do not violate any applicable law or any applicable rule, regulation or order of any Governmental Authority having jurisdiction over the Company.

If the form or terms of the Securities of any series have been established by or pursuant to a Board Resolution or an Officer's Certificate as permitted by Sections 201 or 301, the Trustee shall not be required to authenticate such Securities if the issuance of such Securities pursuant to this Indenture will materially or adversely affect the Trustee's own rights, duties or immunities under the Securities and this Indenture or otherwise in a manner which is not reasonably acceptable to the Trustee.

-19-

Unless otherwise specified as contemplated by Section 301 with respect to any series of Securities, or any Tranche thereof, each Security shall be dated the date of its authentication.

Unless otherwise specified as contemplated by Section 301 with respect to any series of Securities, or any Tranche thereof, no Security shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose unless there appears on such Security a certificate of authentication substantially in the form provided for herein executed by the Trustee or an Authenticating Agent by manual signature, and such certificate upon any Security shall be conclusive evidence, and the only evidence, that such Security has been duly authenticated and delivered hereunder and is entitled to the benefits of this Indenture. Notwithstanding the foregoing, if any Security shall have been authenticated and delivered hereunder to the Company, or any Person acting on its behalf, but shall never have been issued and sold by the Company, and the Company shall deliver such Security to the Security Registrar for cancellation as provided in Section 309 together with a written statement (which need not comply with Section 102 and need not be accompanied by an Opinion of Counsel) stating that such Security has never been issued and sold by the Company, for all purposes of this Indenture such Security shall be deemed never to have been authenticated and delivered hereunder and shall never be entitled to the benefits hereof.

**SECTION 304. Temporary Securities.**

Pending the preparation of definitive Securities of any series, or any Tranche thereof, the Company may execute, and upon Company Order the Trustee shall authenticate and deliver, temporary Securities which are printed, lithographed, typewritten, mimeographed or otherwise produced, in any authorized denomination, substantially of the tenor of the definitive Securities in lieu of which they are issued, with such appropriate insertions, omissions, substitutions and other variations as any officer executing such Securities may determine, as evidenced by such officer's execution of such Securities; provided, however, that temporary Securities need not recite specific redemption, sinking fund, conversion or exchange provisions.

Unless otherwise specified as contemplated by Section 301 with respect to the Securities of any series, or any Tranche thereof, after the preparation of definitive Securities of such series or Tranche, the temporary Securities of such series or Tranche shall be exchangeable, without charge to the Holder thereof, for definitive Securities of such series or Tranche upon surrender of such temporary Securities at the office or agency of the Company maintained pursuant to Section 602 in a Place of Payment for such Securities. Upon such surrender of temporary Securities for such exchange, the Company shall, except as aforesaid, execute and the Trustee shall authenticate and deliver in exchange therefor definitive Securities of the same series and Tranche of authorized denominations and of like tenor and aggregate principal amount.

Until exchanged in full as hereinabove provided, temporary Securities shall in all respects be entitled to the same benefits under this Indenture as definitive Securities of the same series and Tranche and of like tenor authenticated and delivered hereunder.

-20-

**SECTION 305. Registration, Registration of Transfer and Exchange.**

The Company shall cause to be kept in each office designated pursuant to Section 602, with respect to the Securities of each series, a register (all registers kept in accordance with this Section being collectively referred to as the "Security Register") in which, subject to such reasonable regulations as it may prescribe, the Company shall provide for the registration of Securities of such series, or any Tranche thereof, and the registration of transfer thereof. The Company shall designate one Person to maintain the Security Register for the Securities of each series on a consolidated basis, and such Person is referred to herein, with respect to such series, as the "Security Registrar." Anything herein to the contrary notwithstanding, the Company may designate one or more of its offices as an office in which a register with respect to the Securities of one or more series shall be maintained, and the Company may designate itself the Security Registrar with respect to one or more of such series. The Security Register shall be open for inspection by the Trustee and the Company at all reasonable times.

Except as otherwise specified as contemplated by Section 301 with respect to the Securities of any series, or any Tranche thereof, upon surrender for registration of transfer of any Security of such series or Tranche at the office or agency of the Company maintained pursuant to Section 602 in a Place of Payment for such series or Tranche, the Company shall execute, and the Trustee shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Securities of the same series and Tranche, of authorized denominations and of like tenor and aggregate principal amount.

Except as otherwise specified as contemplated by Section 301 with respect to the Securities of any series, or any Tranche thereof, any Security of such series or Tranche may be exchanged at the option of the Holder, for one or more new Securities of the same series and Tranche, of authorized denominations and of like tenor and aggregate principal amount, upon surrender of the Securities to be exchanged at any such office or agency. Whenever any Securities are so surrendered for exchange, the Company shall execute, and the Trustee shall authenticate and deliver, the Securities which the Holder making the exchange is entitled to receive.

All Securities delivered upon any registration of transfer or exchange of Securities shall be valid obligations of the Company, evidencing the same debt, and entitled to the same benefits under this Indenture, as the Securities surrendered upon such registration of transfer or exchange.

Every Security presented or surrendered for registration of transfer or for exchange shall (if so required by the Company, the Trustee or the Security Registrar) be duly endorsed or shall be accompanied by a written instrument of transfer in form satisfactory to the Company, the Trustee or the Security Registrar, as the case may be, duly executed by the Holder thereof or his attorney duly authorized in writing.

Unless otherwise specified as contemplated by Section 301 with respect to Securities of any series, or any Tranche thereof, no service charge shall be made for any registration of transfer or exchange of Securities, but the Company may require payment of a

-21-

sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer or exchange of Securities, other than exchanges pursuant to Section 304, 406 or 1206 not involving any transfer.

The Company shall not be required to execute or to provide for the registration of transfer of or the exchange of (a) Securities of any series, or any Tranche thereof, during a period of 15 days immediately preceding the date notice is to be given identifying the serial numbers of the Securities of such series or Tranche called for redemption or (b) any Security so selected for redemption in whole or in part, except the unredeemed portion of any Security being redeemed in part.

**SECTION 306. Mutilated, Destroyed, Lost and Stolen Securities.**

If any mutilated Security is surrendered to the Trustee, the Company shall execute and the Trustee shall authenticate and deliver in exchange therefor a new Security of the same series and Tranche, and of like tenor and principal amount and bearing a number not contemporaneously outstanding.

If there shall be delivered to the Company and the Trustee (a) evidence to their satisfaction of the ownership of and the destruction, loss or theft of any Security and (b) such security or indemnity as may be reasonably required by them to save each of them and any agent of either of them harmless, then, in the absence of notice to the Company or the Trustee that such Security is held by a Person purporting to be the owner of such Security, the Company shall execute and the Trustee shall authenticate and deliver, in lieu of any such destroyed, lost or stolen Security, a new Security of the same series and Tranche, and of like tenor and principal amount and bearing a number not contemporaneously outstanding.

Notwithstanding the foregoing, in case any such mutilated, destroyed, lost or stolen Security has become or is about to become due and payable, the Company in its discretion may, instead of issuing a new Security, pay such Security.

Upon the issuance of any new Security under this Section, the Company may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other reasonable expenses (including the fees and expenses of the Trustee) connected therewith.

Every new Security of any series issued pursuant to this Section in lieu of any destroyed, lost or stolen Security shall constitute an original additional contractual obligation of the Company, whether or not the destroyed, lost or stolen Security shall be at any time enforceable by anyone other than the Holder of such new Security, and any such new Security shall be entitled to all the benefits of this Indenture equally and proportionately with any and all other Securities of such series duly issued hereunder.

The provisions of this Section are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Securities.

-22-

**SECTION 307. Payment of Interest; Interest Rights Preserved.**

Unless otherwise specified as contemplated by Section 301 with respect to the Securities of any series, or any Tranche thereof, interest on any Security which is payable, and is punctually paid or duly provided for, on any Interest Payment Date shall be paid to the Person in whose name that Security (or one or more Predecessor Securities) is registered at the close of business on the Regular Record Date for such interest.

Subject to Section 312, any interest on any Security of any series which is payable, but is not punctually paid or duly provided for, on any Interest Payment Date (herein called "Defaulted Interest") shall forthwith cease to be payable to the Holder on the related Regular Record Date by virtue of having been such Holder, and such Defaulted Interest may be paid by the Company, at its election in each case, as provided in clause (a) or (b) below:

(a) The Company may elect to make payment of any Defaulted Interest to the Persons in whose names the Securities of such series (or their respective Predecessor Securities) are registered at the close of business on a date (herein called a "Special Record Date") for the payment of such Defaulted Interest, which shall be fixed in the following manner. The Company shall notify the Trustee in writing of the amount of Defaulted Interest proposed to be paid on each Security of such series and the date of the proposed payment, and at the same time the Company shall deposit with the Trustee an amount of money equal to the aggregate amount proposed to be paid in respect of such Defaulted Interest or shall make arrangements satisfactory to the Trustee for such deposit on or prior to the date of the proposed payment, such money when deposited to be held in trust for the benefit of the Persons entitled to such Defaulted Interest as in this clause provided. Thereupon the Trustee shall fix a Special Record Date for the payment of such Defaulted Interest which shall be not more than 15 days and not less than 10 days prior to the date of the proposed payment and not less than 10 days after the receipt by the Trustee of the notice of the proposed payment. The Trustee shall promptly notify the Company of such Special Record Date and, in the name and at the expense of the Company, shall promptly cause notice of the proposed payment of such Defaulted Interest and the Special Record Date therefor to be mailed, first-class postage prepaid, to each Holder of Securities of such series at the address of such Holder as it appears in the Security Register, not less than 10 days prior to such Special Record Date. Notice of the proposed payment of such Defaulted Interest and the Special Record Date therefor having been so mailed, such Defaulted Interest shall be paid to the Persons in whose names the Securities of such series (or their respective Predecessor Securities) are registered at the close of business on such Special Record Date.

(b) The Company may make payment of any Defaulted Interest on the Securities of any series in any other lawful manner not inconsistent with the requirements of any securities exchange on which such Securities may be listed, and upon such notice as may be required by such exchange, if, after notice given by the Company to the Trustee of the proposed payment pursuant to this clause, such manner of payment shall be deemed practicable by the Trustee.

-23-

Subject to the foregoing provisions of this Section and Section 305, each Security delivered under this Indenture upon registration of transfer of or in exchange for or in lieu of any other Security shall carry the rights to interest accrued and unpaid, and to accrue, which were carried by such other Security.

**SECTION 308. Persons Deemed Owners.**

Prior to due presentment of a Security for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name such Security is registered as the absolute owner of such Security for the purpose of receiving payment of principal of and premium, if any, and (subject to Sections 305 and 307) interest, if any, on such Security and for all other purposes whatsoever, whether or not such Security be overdue, and neither the Company, the Trustee nor any agent of the Company or the Trustee shall be affected by notice to the contrary.

**SECTION 309. Cancellation by Security Registrar.**

All Securities surrendered for payment, redemption, registration of transfer or exchange or for credit against any sinking fund payment shall, if surrendered to any Person other than the Security Registrar, be delivered to the Security Registrar and, if not theretofore canceled, shall be promptly canceled by the Security Registrar. The Company may at any time deliver to the Security Registrar for cancellation any Securities previously authenticated and delivered hereunder which the Company may have acquired in any manner whatsoever or which the Company shall not have issued and sold, and all Securities so delivered shall be promptly canceled by the Security Registrar. No Securities shall be authenticated in lieu of or in exchange for any Securities canceled as provided in this Section, except as expressly permitted by this Indenture. All canceled Securities held by the Security Registrar shall be disposed of in accordance with the customary practices of the Security Registrar at the time in effect, and the Security Registrar shall not be required to destroy any such certificates. The Security Registrar shall promptly deliver a certificate of disposition to the Trustee and the Company unless, by a Company Order, similarly delivered, the Company shall direct that canceled Securities be returned to it. The Security Registrar shall promptly deliver evidence of any cancellation of a Security in accordance with this Section 309 to the Trustee and the Company.

**SECTION 310. Computation of Interest.**

Except as otherwise specified as contemplated by Section 301 for Securities of any series, or Tranche thereof, interest on the Securities of each series shall be computed on the basis of a three hundred and sixty (360) day year consisting of twelve (12) 30-day months and, with respect to any period less than a full month, on the basis of the actual number of days elapsed during such period. For example, the interest for a period running from the 15th day of one month to the 15th day of the next month would be calculated on the basis of one 30-day month.

**SECTION 311. Payment to Be in Proper Currency.**

In the case of the Securities of any series, or any Tranche thereof, denominated in any currency other than Dollars or in a composite currency (the "Required Currency"), except as

-24-

otherwise specified with respect to such Securities as contemplated by Section 301, the obligation of the Company to make any payment of the principal thereof, or the premium or interest thereon, shall not be discharged or satisfied by any tender by the Company, or recovery by the Trustee, in any currency other than the Required Currency, except to the extent that such tender or recovery shall result in the Trustee timely holding the full amount of the Required Currency then due and payable. If any such tender or recovery is in a currency other than the Required Currency, the Trustee may take such actions as it considers appropriate to exchange such currency for the Required Currency. The costs and risks of any such exchange, including without limitation the risks of delay and exchange rate fluctuation, shall be borne by the Company, the Company shall remain fully liable for any shortfall or delinquency in the full amount of Required Currency then due and payable, and in no circumstances shall the Trustee be liable therefor except in the case of its negligence or willful misconduct.

**SECTION 312. Extension of Interest Payment.**

The Company shall have the right at any time, so long as the Company is not in default in the payment of interest on the Securities of any series hereunder, to extend interest payment periods on all Securities of one or more series, if so specified as contemplated by Section 301 with respect to such Securities and upon such terms as may be specified as contemplated by Section 301 with respect to such Securities.

## ARTICLE FOUR

### Redemption of Securities

**SECTION 401. Applicability of Article.**

Securities of any series, or any Tranche thereof, which are redeemable before their Stated Maturity shall be redeemable in accordance with their terms and (except as otherwise specified as contemplated by Section 301 for Securities of such series or Tranche) in accordance with this Article.

**SECTION 402. Election to Redeem; Notice to Trustee.**

The election of the Company to redeem any Securities shall be evidenced by a Board Resolution or an Officer's Certificate. The Company shall, at least 45 days prior to the Redemption Date fixed by the Company (unless a shorter notice shall be satisfactory to the Trustee), notify the Trustee in writing of such Redemption Date and of the principal amount of such Securities to be redeemed. In the case of any redemption of Securities (a) prior to the expiration of any restriction on such redemption provided in the terms of such Securities or elsewhere in this Indenture or (b) pursuant to an election of the Company which is subject to a condition specified in the terms of such Securities, the Company shall furnish the Trustee with an Officer's Certificate evidencing compliance with such restriction or condition.

**SECTION 403. Selection of Securities to Be Redeemed.**

If less than all the Securities of any series, or any Tranche thereof, are to be redeemed, the particular Securities to be redeemed shall be selected by the Trustee from the

-25-

Outstanding Securities of such series or Tranche not previously called for redemption, by such method as shall be provided for any particular series, or, in the absence of any such provision, by such method as the Trustee shall deem fair and appropriate and which may provide for the selection for redemption of portions (equal to the minimum authorized denomination for Securities of such series or Tranche or any integral multiple thereof) of the principal amount of Securities of such series or Tranche of a denomination larger than the minimum authorized denomination for Securities of such series or Tranche; provided, however, that if, as indicated in an Officer's Certificate, the Company shall have offered to purchase all or any principal amount of the Securities then Outstanding of any series, or any Tranche thereof, and less than all of such Securities as to which such offer was made shall have been tendered to the Company for such purchase, the Trustee, if so directed by Company Order, shall select for redemption all or any principal amount of such Securities which have not been so tendered.

The Trustee shall promptly notify the Company and the Security Registrar in writing of the Securities selected for redemption and, in the case of any Securities selected to be redeemed in part, the principal amount thereof to be redeemed.

For all purposes of this Indenture, unless the context otherwise requires, all provisions relating to the redemption of Securities shall relate, in the case of any Securities redeemed or to be redeemed only in part, to the portion of the principal amount of such Securities which has been or is to be redeemed.

**SECTION 404. Notice of Redemption.**

Except as otherwise specified as contemplated by Section 301 for Securities of any series, notice of redemption shall be given in the manner provided in Section 106 to the Holders of the Securities to be redeemed not less than 30 nor more than 60 days prior to the Redemption Date.

Except as otherwise specified as contemplated by Section 301 for Securities of any series, all notices of redemption shall state:

(a) the Redemption Date,

(b) the Redemption Price (if known),

(c) if less than all the Securities of any series or Tranche are to be redeemed, the identification of the particular Securities to be redeemed and the portion of the principal amount of any Security to be redeemed in part,

(d) that on the Redemption Date the Redemption Price, together with accrued interest, if any, to the Redemption Date, will become due and payable upon each such Security to be redeemed and, if applicable, that interest thereon will cease to accrue on and after said date,

(e) the place or places where such Securities are to be surrendered for payment of the Redemption Price and accrued interest, if any, unless it shall have been specified as contemplated by Section 301 with respect to such Securities that such surrender shall not be required,

-26-

(f) that the redemption is for a sinking or other fund, if such is the case,

(g) the CUSIP, ISIN or other similar numbers, if any, assigned to such Securities; provided, however, that such notice may state that no representation is made as to the correctness of CUSIP, ISIN or other similar numbers, in which case none of the Company, the Trustee or any agent of the Company or the Trustee shall have any liability in respect of the use of any CUSIP, ISIN or other similar number or numbers on such notices, and the redemption of such Securities shall not be affected by any defect in or omission of such numbers, and

(h) such other matters as the Company shall deem desirable or appropriate.

Unless otherwise specified with respect to any Securities in accordance with Section 301, with respect to any notice of redemption of Securities at the election of the Company, unless, upon the giving of such notice, such Securities shall be deemed to have been paid in accordance with Section 701, such notice may state that such redemption shall be conditional upon the receipt by the Paying Agent or Agents for such Securities, on or prior to the date fixed for such redemption, of money sufficient to pay the principal of and premium, if any, and interest, if any, on such Securities and that if such money shall not have been so received such notice shall be of no force or effect and the Company shall not be required to redeem such Securities. In the event that such notice of redemption contains such a condition and such money is not so received, the redemption shall not be made and within a reasonable time thereafter notice shall be given, in the manner in which the notice of redemption was given, that such money was not so received and such redemption was not required to be made, and the Paying Agent or Agents for the Securities otherwise to have been redeemed shall promptly return to the Holders thereof any of such Securities which had been surrendered for payment upon such redemption.

Notice of redemption of Securities to be redeemed at the election of the Company, and any notice of non-satisfaction of a condition for redemption as aforesaid, shall be given by the Company or, at the Company's request, by the Security Registrar in the name and at the expense of the Company. Notice of mandatory redemption of Securities shall be given by the Security Registrar in the name and at the expense of the Company.

**SECTION 405. Securities Payable on Redemption Date.**

Notice of redemption having been given as aforesaid, and the conditions, if any, set forth in such notice having been satisfied, the Securities or portions thereof so to be redeemed shall, on the Redemption Date, become due and payable at the Redemption Price therein specified, and from and after such date (unless, in the case of an unconditional notice of redemption, the Company shall default in the payment of the Redemption Price and accrued interest, if any) such Securities or portions thereof, if interest-bearing, shall cease to bear interest. Upon surrender of any such Security for redemption in accordance with such notice, such Security or portion thereof shall be paid by the Company at the Redemption Price, together with

-27-

accrued interest, if any, to the Redemption Date; provided, however, that no such surrender shall be a condition to such payment if so specified as contemplated by Section 301 with respect to such Security; and provided, further, that except as otherwise specified as contemplated by Section 301 with respect to such Security, any installment of interest on any Security the Stated Maturity of which installment is on or prior to the Redemption Date shall be payable to the Holder of such Security, or one or more Predecessor Securities, registered as such at the close of business on the related Regular Record Date according to the terms of such Security and subject to the provisions of Section 307.

**SECTION 406. Securities Redeemed in Part.**

Upon the surrender of any Security which is to be redeemed only in part at a Place of Payment therefor (with, if the Company or the Trustee so requires, due endorsement by, or a written instrument of transfer in form satisfactory to the Company and the Trustee duly executed by, the Holder thereof or his attorney duly authorized in writing), the Company shall execute, and the Trustee shall authenticate and deliver to the Holder of such Security, without service charge, a new Security or Securities of the same series and Tranche, of any authorized denomination requested by such Holder and of like tenor and in aggregate principal amount equal to and in exchange for the unredeemed portion of the principal of the Security so surrendered.

**ARTICLE FIVE**

**Sinking Funds**

**SECTION 501. Applicability of Article.**

The provisions of this Article shall be applicable to any sinking fund for the retirement of the Securities of any series, or any Tranche thereof, except as otherwise specified as contemplated by Section 301 for Securities of such series or Tranche.

The minimum amount of any sinking fund payment provided for by the terms of Securities of any series, or any Tranche thereof, is herein referred to as a "mandatory sinking fund payment", and any payment in excess of such minimum amount provided for by the terms of Securities of any series, or any Tranche thereof, is herein referred to as an "optional sinking fund payment". If provided for by the terms of Securities of any series, or any Tranche thereof, the cash amount of any sinking fund payment may be subject to reduction as provided in Section 502. Each sinking fund payment shall be applied to the redemption of Securities of the series or Tranche in respect of which it was made as provided for by the terms of such Securities.

**SECTION 502. Satisfaction of Sinking Fund Payments with Securities.**

The Company (a) may deliver to the Trustee Outstanding Securities (other than any previously called for redemption) of a series or Tranche in respect of which a mandatory sinking fund payment is to be made and (b) may apply as a credit Securities of such series or Tranche which have been redeemed either at the election of the Company pursuant to the terms of such Securities or through the application of permitted optional sinking fund payments pursuant to the terms of such Securities, in each case in satisfaction of all or any part of such

-28-

mandatory sinking fund payment with respect to the Securities of such series; provided, however, that no Securities shall be applied in satisfaction of a mandatory sinking fund payment if such Securities shall have been previously so applied. Securities so applied shall be received and credited for such purpose by the Trustee at the Redemption Price specified in such Securities for redemption through operation of the sinking fund and the amount of such mandatory sinking fund payment shall be reduced accordingly.

**SECTION 503. Redemption of Securities for Sinking Fund.**

Not less than 45 days prior to each sinking fund payment date for the Securities of any series, or any Tranche thereof, the Company shall deliver to the Trustee an Officer's Certificate specifying:

(a) the amount of the next succeeding mandatory sinking fund payment for such series or Tranche;

(b) the amount, if any, of the optional sinking fund payment to be made together with such mandatory sinking fund payment;

(c) the aggregate sinking fund payment;

(d) the portion, if any, of such aggregate sinking fund payment which is to be satisfied by the payment of cash; and

(e) the portion, if any, of such aggregate sinking fund payment which is to be satisfied by delivering and crediting Securities of such series or Tranche pursuant to Section 502 and stating the basis for such credit and that such Securities have not previously been so credited, and the Company shall also deliver to the Trustee any Securities to be so delivered.

If the Company shall have not delivered such Officer's Certificate and, to the extent applicable, all such Securities, the next succeeding sinking fund payment for such series or Tranche shall be made entirely in cash in the amount of the mandatory sinking fund payment. Not less than 30 days before each such sinking fund payment date the Trustee shall select the Securities to be redeemed upon such sinking fund payment date in the manner specified in Section 403 and cause notice of the redemption thereof to be given in the name of and at the expense of the Company in the manner provided in Section 404. Such notice having been duly given, the redemption of such Securities shall be made upon the terms and in the manner stated in Sections 405 and 406.

**ARTICLE SIX**

**Covenants**

**SECTION 601. Payment of Principal, Premium and Interest.**

  The Company shall pay the principal of and premium, if any, and interest, if any, on the Securities of each series in accordance with the terms of such Securities and this Indenture.

**SECTION 602. Maintenance of Office or Agency.**

  The Company shall maintain in each Place of Payment for the Securities of each series, or any Tranche thereof, an office or agency where payment of such Securities shall be made, where the registration of transfer or exchange of such Securities may be effected and where notices and demands to or upon the Company in respect of such Securities and this Indenture may be served. The Company shall give prompt written notice to the Trustee of the location, and any change in the location, of each such office or agency and prompt notice to the Holders of any such change in the manner specified in Section 106. If at any time the Company shall fail to maintain any such required office or agency in respect of Securities of any series, or any Tranche thereof, or shall fail to furnish the Trustee with the address thereof, payment of such Securities shall be made, registration of transfer or exchange thereof may be effected and notices and demands in respect thereof may be served at the Corporate Trust Office of the Trustee, and the Company hereby appoints the Trustee as its agent for all such purposes in any such event.

  The Company may also from time to time designate one or more other offices or agencies with respect to the Securities of one or more series, or any Tranche thereof, for any or all of the foregoing purposes and may from time to time rescind such designations; provided, however, that, unless otherwise specified as contemplated by Section 301 with respect to the Securities of such series or Tranche, no such designation or rescission shall in any manner relieve the Company of its obligation to maintain an office or agency for such purposes in each Place of Payment for such Securities in accordance with the requirements set forth above. The Company shall give prompt written notice to the Trustee, and prompt notice to the Holders in the manner specified in Section 106, of any such designation or rescission and of any change in the location of any such other office or agency.

  Anything herein to the contrary notwithstanding, any office or agency required by this Section may be maintained at an office of the Company or an Affiliate of the Company, in which event the Company or such Affiliate shall perform all functions to be performed at such office or agency.

**SECTION 603. Money for Securities Payments to Be Held in Trust.**

  If the Company shall at any time act as its own Paying Agent with respect to the Securities of any series, or any Tranche thereof, it shall, on or before each due date of the principal of and premium, if any, and interest, if any, on any of such Securities, segregate and hold in trust for the benefit of the Persons entitled thereto a sum sufficient to pay the principal and premium or interest so becoming due until such sums shall be paid to such Persons or

-30-

otherwise disposed of as herein provided. The Company shall promptly notify the Trustee of any failure by the Company (or any other obligor on such Securities) to make any payment of principal of or premium, if any, or interest, if any, on such Securities.

Whenever the Company shall have one or more Paying Agents for the Securities of any series, or any Tranche thereof, it shall, on or before each due date of the principal of and premium, if any, and interest, if any, on such Securities, deposit with such Paying Agents sums sufficient (without duplication) to pay the principal and premium or interest so becoming due, such sums to be held in trust for the benefit of the Persons entitled to such principal, premium or interest, and (unless such Paying Agent is the Trustee) the Company shall promptly notify the Trustee of any failure by it so to act.

The Company shall cause each Paying Agent for the Securities of any series, or any Tranche thereof, other than the Company or the Trustee, to execute and deliver to the Trustee an instrument in which such Paying Agent shall agree with the Trustee, subject to the provisions of this Section, that such Paying Agent shall:

(a) hold all sums held by it for the payment of the principal of and premium, if any, or interest, if any, on such Securities in trust for the benefit of the Persons entitled thereto until such sums shall be paid to such Persons or otherwise disposed of as herein provided;

(b) give the Trustee notice of any failure by the Company (or any other obligor upon such Securities) to make any payment of principal of or premium, if any, or interest, if any, on such Securities; and

(c) at any time during the continuance of any such failure, upon the written request of the Trustee, forthwith pay to the Trustee all sums so held in trust by such Paying Agent and furnish to the Trustee such information as it possesses regarding the names and addresses of the Persons entitled to such sums.

The Company may at any time pay, or by Company Order direct any Paying Agent to pay, to the Trustee all sums held in trust by the Company or such Paying Agent, such sums to be held by the Trustee upon the same trusts as those upon which such sums were held by the Company or such Paying Agent and, if so stated in a Company Order delivered to the Trustee, in accordance with the provisions of Article Seven; and, upon such payment by any Paying Agent to the Trustee, such Paying Agent shall be released from all further liability with respect to such money.

Any money deposited with the Trustee or any Paying Agent, or then held by the Company, in trust for the payment of the principal of and premium, if any, or interest, if any, on any Security and remaining unclaimed for two years after such principal and premium, if any, or interest, if any, has become due and payable shall to the extent permitted by law be paid to the Company on Company Request, or, if then held by the Company, shall be discharged from such trust; and, upon such payment or discharge, the Holder of such Security shall, as an unsecured general creditor and not as the Holder of an Outstanding Security, look only to the Company for payment of the amount so due and payable and remaining unpaid unless the applicable law provides otherwise, and all liability of the Trustee or such Paying Agent with respect to such

-31-

trust money, and all liability of the Company as trustee thereof, shall thereupon cease; provided, however, that the Trustee or such Paying Agent, before being required to make any such payment to the Company, may at the expense of the Company cause to be mailed, on one occasion only, notice to such Holder that such money remains unclaimed and that, after a date specified therein, which shall not be less than thirty (30) days from the date of such mailing, any unclaimed balance of such money then remaining will be paid to the Company.

**SECTION 604. Corporate Existence.**

       Subject to the rights of the Company under Article Eleven, the Company shall do or cause to be done all things necessary to preserve and keep in full force and effect its corporate existence.

**SECTION 605. Maintenance of Properties.**

       The Company shall cause (or, with respect to property owned in common with others, make reasonable effort to cause) all its properties used or useful in the conduct of its business to be maintained and kept in good condition, repair and working order and shall cause (or, with respect to property owned in common with others, make reasonable effort to cause) to be made all necessary repairs, renewals, replacements, betterments and improvements thereof, all as, in the judgment of the Company, may be necessary so that the business carried on in connection therewith may be properly conducted; provided, however, that nothing in this Section shall prevent the Company from discontinuing, or causing the discontinuance of, the operation and maintenance of any of its properties if such discontinuance is, in the judgment of the Company, desirable in the conduct of its business.

**SECTION 606. Annual Officer's Certificate as to Compliance.**

       Not later than June 1 in each year, commencing June 1, 2005, the Company shall deliver to the Trustee an Officer's Certificate which need not comply with Section 102, executed by the principal executive officer, the principal financial officer or the principal accounting officer of the Company, as to such officer's knowledge of the Company's compliance with all conditions and covenants under this Indenture, such compliance to be determined without regard to any period of grace or requirement of notice under this Indenture, and making any other statements as may be required by the provisions of Section 314(a)(4) of the Trust Indenture Act.

**SECTION 607. Waiver of Certain Covenants.**

       The Company may omit in any particular instance to comply with any term, provision or condition set forth in (a) Section 602 or any additional covenant or restriction specified with respect to the Securities of any series, or any Tranche thereof, as contemplated by Section 301, if before the time for such compliance the Holders of a majority in aggregate principal amount of the Outstanding Securities of all series and Tranches with respect to which compliance with Section 602 or such additional covenant or restriction is to be omitted, considered as one class, shall, by Act of such Holders, either waive such compliance in such instance or generally waive compliance with such term, provision or condition and (b) Section 604, 605 or Article Eleven if before the time for such compliance the Holders of a majority in principal amount of Securities Outstanding under this Indenture shall, by Act of such

-32-

Holders, either waive such compliance in such instance or generally waive compliance with such term, provision or condition; but, in the case of (a) or (b), no such waiver shall extend to or affect such term, provision or condition except to the extent so expressly waived, and, until such waiver shall become effective, the obligations of the Company and the duties of the Trustee in respect of any such term, provision or condition shall remain in full force and effect.

**SECTION 608. Limitation on Liens.**

    (a) Except as otherwise specified as contemplated by Section 301 for Securities of any series, so long as any Securities of any series are Outstanding, the Company will not pledge, mortgage, hypothecate or grant a security interest in, or permit any mortgage, pledge, security interest or other lien upon, any capital stock of any Subsidiary now or hereafter owned by the Company, to secure any Indebtedness (hereinafter defined) without concurrently making effective provision whereby the Outstanding Securities shall (so long as such other Indebtedness shall be so secured) be equally and ratably secured with any and all such other Indebtedness and any other indebtedness similarly entitled to be equally and ratably secured; provided, however, that this restriction shall not apply to nor prevent the creation or existence of:

        (1) any mortgage, pledge, security interest, lien or encumbrance upon any such capital stock created at the time of the acquisition of such capital stock by the Company or within 270 days after such time to secure all or a portion of the purchase price for such capital stock;

        (2) any mortgage, pledge, security interest, lien or encumbrance upon any such capital stock existing thereon at the time of the acquisition thereof by the Company (whether or not the obligations secured thereby are assumed by the Company);

        (3) any extension, renewal or refunding of any mortgage, pledge, security interest, lien or encumbrance permitted by Subsection (1) or (2) above on capital stock of any Subsidiary theretofore subject thereto (or substantially the same capital stock) or any portion thereof; or

        (4) any judgment, levy, execution, attachment or other similar lien arising in connection with court proceedings, provided that either

        (ii)    the execution or enforcement of each such lien is effectively stayed within 30 days after entry of the corresponding judgment (or the corresponding judgment has been discharged within such 30 day period) and the claims secured thereby are being contested in good faith by appropriate proceedings timely commenced and diligently prosecuted;

        (iii)    the payment of each such lien is covered in full by insurance and the insurance company has not denied or contested coverage thereof; or

(iv)    so long as each such lien is adequately bonded, any appropriate legal proceedings that may have been duly initiated for the review of the corresponding judgment, decree or order shall not have been fully terminated or the period within which such proceedings may be initiated shall not have expired.

For purposes of this Section 608, "Indebtedness" means all indebtedness, whether or not represented by bonds, debentures, notes or other securities, created or assumed by the Company for the repayment of money borrowed. All indebtedness for money borrowed secured by a lien upon property owned by the Company and upon which indebtedness for money borrowed the Company customarily pays interest, although the Company has not assumed or become liable for the payment of such indebtedness for money borrowed, shall for purposes of this Section 608 be deemed to be Indebtedness of the Company. All indebtedness of others for money borrowed which is guaranteed as to payment of principal by the Company or in effect guaranteed by the Company through a contingent agreement to purchase such indebtedness for money borrowed shall for purposes of this Section 608 be deemed to be Indebtedness of the Company, but no other contingent obligation of the Company in respect of indebtedness for money borrowed or other obligations incurred by others shall for purposes of this Section 608 be deemed to be Indebtedness of the Company.

In case the Company shall propose to pledge, mortgage, hypothecate or grant a security interest in any capital stock of any Subsidiary owned by the Company to secure any Indebtedness, other than as permitted by Subsections (a)(1) to (a)(3), inclusive, of this Section, the Company will prior thereto give written notice thereof to the Trustee, and the Company will prior to or simultaneously with such pledge, mortgage, hypothecation or grant of security interest, by supplemental indenture executed to the Trustee (or to the extent legally necessary to another trustee or an additional or separate trustee), in form satisfactory to the Trustee, effectively secure (for so long as such other Indebtedness shall be so secured) all the Securities equally and ratably with such Indebtedness and with any other indebtedness for money borrowed similarly entitled to be equally and ratably secured.

(b) Except as otherwise specified as contemplated by Section 301 for Securities of any series, the provisions of Subsection (a) of this Section 608 shall not apply in the event that the Company shall pledge, mortgage, hypothecate or grant a security interest in or other lien upon any capital stock of any Subsidiary now or hereafter owned by the Company to secure any Indebtedness which would otherwise be subject to the foregoing restriction up to an aggregate amount that, together with all other Indebtedness (other than mortgages, pledges, security interests, liens or encumbrances permitted by Subsection (a) of this Section 608) which would otherwise be subject to the foregoing restriction, does not at the time exceed 5% of Consolidated Capitalization.

For purposes of this Section 608:

(1) The term "Consolidated Capitalization" means the sum obtained by adding (i) Consolidated Shareholders' Equity, (ii) Consolidated Indebtedness for money borrowed (exclusive of any thereof which is due and payable within one year of the date such sum is determined) and, without duplication, (iii) any preference or preferred stock of the Company or any Consolidated Subsidiary which is subject to mandatory redemption or sinking fund provisions.

-34-

(2) The term "Consolidated Shareholders' Equity" means the total Assets of the Company and its Consolidated Subsidiaries less all liabilities of the Company and its Consolidated Subsidiaries. As used in this definition, "liabilities" means all obligations which would, in accordance with generally accepted accounting principles, be classified on a balance sheet as liabilities, including without limitation, (i) indebtedness secured by property of the Company or any of its Consolidated Subsidiaries whether or not the Company or such Consolidated Subsidiary is liable for the payment thereof unless, in the case that the Company or such Consolidated Subsidiary is not so liable, such property has not been included among the Assets of the Company or such Consolidated Subsidiary on such balance sheet, (ii) deferred liabilities, (iii) indebtedness of the Company or any of its Consolidated Subsidiaries that is expressly subordinated in right and priority of payment to other liabilities of the Company or such Consolidated Subsidiary. As used in this definition, "liabilities" includes preference or preferred stock of the Company or any Consolidated Subsidiary only to the extent of any such preference or preferred stock that is subject to mandatory redemption or sinking fund provisions.

(3) The term "Consolidated Subsidiary" means at any date any Subsidiary the financial statements of which under generally accepted accounting principles would be consolidated with those of the Company in its consolidated financial statements as of such date.

(4) The "Assets" of any Person means the whole or any part of its business, property, assets, cash and receivables.

The term "Consolidated Indebtedness" means total indebtedness as shown on the consolidated balance sheet of the Company and its Consolidated Subsidiaries.

## ARTICLE SEVEN

### Satisfaction and Discharge

**SECTION 701. Satisfaction and Discharge of Securities.**

Any Security or Securities, or any portion of the principal amount thereof, shall be deemed to have been paid for all purposes of this Indenture, and the entire indebtedness of the Company in respect thereof shall be deemed to have been satisfied and discharged, if there shall have been irrevocably deposited with the Trustee or any Paying Agent (other than the Company), in trust:

(a) money in an amount which shall be sufficient, or

(b) in the case of a deposit made prior to the Maturity of such Securities or portions thereof, Eligible Obligations, which shall not contain provisions permitting the redemption

-35-

or other prepayment thereof at the option of the issuer thereof, the principal of and the interest on which when due, without any regard to reinvestment thereof, will provide moneys which, together with the money, if any, deposited with or held by the Trustee or such Paying Agent, shall be sufficient, or

(c) a combination of (a) or (b) which shall be sufficient,

to pay when due the principal of and premium, if any, and interest, if any, due and to become due on such Securities or portions thereof on or prior to Maturity; provided, however, that in the case of the provision for payment or redemption of less than all the Securities of any series or Tranche, such Securities or portions thereof shall have been selected by the Trustee as provided herein and, in the case of a redemption, the notice requisite to the validity of such redemption shall have been given or irrevocable authority shall have been given by the Company to the Trustee to give such notice, under arrangements satisfactory to the Trustee; and provided, further, that the Company shall have delivered to the Trustee and such Paying Agent:

(x) if such deposit shall have been made prior to the Maturity of such Securities, a Company Order stating that the money and Eligible Obligations deposited in accordance with this Section shall be held in trust, as provided in Section 703; and

(y) if Eligible Obligations shall have been deposited, an Opinion of Counsel that the obligations so deposited constitute Eligible Obligations and do not contain provisions permitting the redemption or other prepayment at the option of the issuer thereof, and an opinion of an independent public accountant of nationally recognized standing, selected by the Company, to the effect that the requirements set forth in clause (b) above have been satisfied; and

(z) if such deposit shall have been made prior to the Maturity of such Securities, an Officer's Certificate stating the Company's intention that, upon delivery of such Officer's Certificate, its indebtedness in respect of such Securities or portions thereof will have been satisfied and discharged as contemplated in this Section.

Upon the deposit of money or Eligible Obligations, or both, in accordance with this Section, together with the documents required by clauses (x), (y) and (z) above, the Trustee shall, upon receipt of a Company Request, acknowledge in writing that the Security or Securities or portions thereof with respect to which such deposit was made are deemed to have been paid for all purposes of this Indenture and that the entire indebtedness of the Company in respect thereof has been satisfied and discharged as contemplated in this Section. In the event that all of the conditions set forth in the preceding paragraph shall have been satisfied in respect of any Securities or portions thereof except that, for any reason, the Officer's Certificate specified in clause (z) shall not have been delivered, such Securities or portions thereof shall nevertheless be deemed to have been paid for all purposes of this Indenture, and the Holders of such Securities or portions thereof shall nevertheless be no longer entitled to the benefits of this Indenture or of any of the covenants of the Company under Article Six (except the covenants contained in Sections 602 and 603) or any other covenants made in respect of such Securities or portions thereof as

-36-

contemplated by Section 301, but the indebtedness of the Company in respect of such Securities or portions thereof shall not be deemed to have been satisfied and discharged prior to Maturity for any other purpose, and the Holders of such Securities or portions thereof shall continue to be entitled to look to the Company for payment of the indebtedness represented thereby; and, upon Company Request, the Trustee shall acknowledge in writing that such Securities or portions thereof are deemed to have been paid for all purposes of this Indenture.

If payment at Stated Maturity of less than all of the Securities of any series, or any Tranche thereof, is to be provided for in the manner and with the effect provided in this Section, the Security Registrar shall select such Securities, or portions of principal amount thereof, in the manner specified by Section 403 for selection for redemption of less than all the Securities of a series or Tranche.

In the event that Securities which shall be deemed to have been paid for purposes of this Indenture, and, if such is the case, in respect of which the Company's indebtedness shall have been satisfied and discharged, all as provided in this Section do not mature and are not to be redeemed within the 60 day period commencing with the date of the deposit of moneys or Eligible Obligations, as aforesaid, the Company shall, as promptly as practicable, give a notice, in the same manner as a notice of redemption with respect to such Securities, to the Holders of such Securities to the effect that such deposit has been made and the effect thereof.

Notwithstanding that any Securities shall be deemed to have been paid for purposes of this Indenture, as aforesaid, the obligations of the Company and the Trustee in respect of such Securities under Sections 304, 305, 306, 404, 503 (as to notice of redemption), 602, 603, 907 and 915 and this Article Seven shall survive.

The Company shall pay, and shall indemnify the Trustee or any Paying Agent with which Eligible Obligations shall have been deposited as provided in this Section against, any tax, fee or other charge imposed on or assessed against such Eligible Obligations or the principal or interest received in respect of such Eligible Obligations, including, but not limited to, any such tax payable by any entity deemed, for tax purposes, to have been created as a result of such deposit.

Anything herein to the contrary notwithstanding, (a) if, at any time after a Security would be deemed to have been paid for purposes of this Indenture, and, if such is the case, the Company's indebtedness in respect thereof would be deemed to have been satisfied or discharged, pursuant to this Section (without regard to the provisions of this paragraph), the Trustee or any Paying Agent, as the case may be, shall be required to return the money or Eligible Obligations, or combination thereof, deposited with it as aforesaid to the Company or its representative under any applicable Federal or State bankruptcy, insolvency or other similar law, such Security shall thereupon be deemed retroactively not to have been paid and any satisfaction and discharge of the Company's indebtedness in respect thereof shall retroactively be deemed not to have been effected, and such Security shall be deemed to remain Outstanding and (b) any satisfaction and discharge of the Company's indebtedness in respect of any Security shall be subject to the provisions of the last paragraph of Section 603.

-37-

**SECTION 702. Satisfaction and Discharge of Indenture.**

This Indenture shall upon Company Request cease to be of further effect (except as hereinafter expressly provided), and the Trustee, at the expense of the Company, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture, when

(a) no Securities remain Outstanding hereunder; and

(b) the Company has paid or caused to be paid all other sums payable hereunder by the Company;

provided, however, that if, in accordance with the last paragraph of Section 701, any Security, previously deemed to have been paid for purposes of this Indenture, shall be deemed retroactively not to have been so paid, this Indenture shall thereupon be deemed retroactively not to have been satisfied and discharged, as aforesaid, and to remain in full force and effect, and the Company shall execute and deliver such instruments as the Trustee shall reasonably request to evidence and acknowledge the same.

Notwithstanding the satisfaction and discharge of this Indenture as aforesaid, the obligations of the Company and the Trustee under Sections 304, 305, 306, 404, 503 (as to notice of redemption), 602, 603, 907 and 915 and this Article Seven shall survive.

Upon satisfaction and discharge of this Indenture as provided in this Section, the Trustee shall assign, transfer and turn over to the Company, subject to the lien provided by Section 907, any and all money, securities and other property then held by the Trustee for the benefit of the Holders of the Securities other than money and Eligible Obligations held by the Trustee pursuant to Section 703 and shall execute and deliver to the Company such instruments as, in the judgment of the Company, shall be necessary, desirable or appropriate to effect or evidence the satisfaction and discharge of this Indenture.

**SECTION 703. Application of Trust Money.**

Neither the Eligible Obligations nor the money deposited pursuant to Section 701, nor the principal or interest payments on any such Eligible Obligations, shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of the principal of and premium, if any, and interest, if any, on the Securities or portions of principal amount thereof in respect of which such deposit was made, all subject, however, to the provisions of Section 603; provided, however, that, so long as there shall not have occurred and be continuing an Event of Default, any cash received from such principal or interest payments on such Eligible Obligations, if not then needed for such purpose, shall, to the extent practicable and upon Company Request, be invested in Eligible Obligations of the type described in clause (b) in the first paragraph of Section 701 maturing at such times and in such amounts as shall be sufficient, together with any other moneys and the principal of and interest on any other Eligible Obligations then held by the Trustee, to pay when due the principal of and premium, if any, and interest, if any, due and to become due on such Securities or portions thereof on and prior to the Maturity thereof, and interest earned from such reinvestment shall be paid over to the Company as received, free and clear of any trust, lien or pledge under this Indenture except the lien provided by Section 907; and provided, further, that, so long as there shall not have occurred and be continuing an Event

of Default, any moneys held in accordance with this Section on the Maturity of all such Securities in excess of the amount required to pay the principal of and premium, if any, and interest, if any, then due on such Securities shall be paid over to the Company free and clear of any trust, lien or pledge under this Indenture except the lien provided by Section 907; and provided, further, that if an Event of Default shall have occurred and be continuing, moneys to be paid over to the Company pursuant to this Section shall be held until such Event of Default shall have been waived or cured.

## ARTICLE EIGHT

### Events of Default; Remedies

**SECTION 801. Events of Default.**

"Event of Default", wherever used herein with respect to Securities of any series, means any one of the following events:

(a) failure to pay interest, if any, on any Security of such series within 30 days after the same becomes due and payable; provided, however, that a valid extension of the interest payment period by the Company as contemplated in Section 312 of this Indenture shall not constitute a failure to pay interest for this purpose; or

(b) failure to pay the principal of or premium, if any, on any Security of such series at its Maturity; or

(c) failure to perform or breach of any covenant or warranty of the Company in this Indenture (other than a covenant or warranty a default in the performance of which or breach of which is elsewhere in this Section specifically dealt with or which has expressly been included in this Indenture solely for the benefit of one or more series of Securities other than such series) for a period of 90 days after there been given, by registered or certified mail, to the Company by the Trustee, or to the Company and the Trustee by the Holders of at least 33% in aggregate principal amount of the Outstanding Securities of such series, a written notice specifying such default or breach and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder, unless the Trustee, or the Trustee and the Holders of a principal amount of Securities of such series not less than the principal amount of Securities the Holders of which gave such notice, as the case may be, shall agree in writing to an extension of such period prior to its expiration; provided, however, that the Trustee, or the Trustee and the Holders of such principal amount of Securities of such series, as the case may be, shall be deemed to have agreed to an extension of such period if corrective action is initiated by the Company within such period and is being diligently pursued; or

(d) the entry by a court having jurisdiction in the premises of (1) a decree or order for relief in respect of the Company in an involuntary case or proceeding under any applicable Federal or State bankruptcy, insolvency, reorganization or other similar law or (2) a decree or order adjudging the Company a bankrupt or insolvent, or approving as properly filed a petition by one or more Persons other than the Company seeking reorganization,

-39-

arrangement, adjustment or composition of or in respect of the Company under any applicable Federal or State bankruptcy, insolvency or similar law, or appointing a custodian, receiver, liquidator, assignee, trustee, sequestrator or other similar official for the Company or for any substantial part of its property, or ordering the winding up or liquidation of its affairs, and any such decree or order for relief or any such other decree or order shall have remained unstayed and in effect for a period of 90 consecutive days; or

(e) the commencement by the Company of a voluntary case or proceeding under any applicable Federal or State bankruptcy, insolvency, reorganization or other similar law or of any other case or proceeding to be adjudicated a bankrupt or insolvent, or the consent by the Company to the entry of a decree or order for relief in respect of the Company in a case or proceeding under any applicable Federal or State bankruptcy, insolvency, reorganization or other similar law or to the commencement of any bankruptcy or insolvency case or proceeding against the Company, or the filing by the Company of a petition or answer or consent seeking reorganization or relief under any applicable Federal or State bankruptcy, insolvency, reorganization or similar law, or the consent by the Company to the filing of such petition or to the appointment of or taking possession by a custodian, receiver, liquidator, assignee, trustee, sequestrator or similar official of the Company or of any substantial part of its property, or the making by the Company of a general assignment for the benefit of creditors, or the admission by the Company in writing of its inability to pay its debts generally as they become due, or the authorization of such action by the Board of Directors of the Company; or

(f) any other Event of Default specified with respect to Securities of such series as contemplated by Section 301(o).

## SECTION 802. Acceleration of Maturity; Rescission and Annulment.

If an Event of Default due to the default in payment of principal of, or interest on, any series of Securities or due to the default in the performance of any other covenant or breach of any other covenant or warranty of the Company applicable to the Securities of such series but not applicable to all Outstanding Securities shall have occurred and be continuing, either the Trustee or the Holders of not less than 33% in principal amount of the Securities of such series may then declare the principal amount (or, if any of the Securities of such series are Discount Securities, such portion of the principal amount as may be specified in the terms thereof as contemplated by Section 301) of all Securities of such series and interest accrued thereon to be due and payable immediately by a written notice to the Company (and to the Trustee if given by the Holders). If an Event of Default due to default in the performance of any other of the covenants or agreements herein applicable to all Outstanding Securities or an Event of Default specified in Section 801(d) or (e) shall have occurred and be continuing, either the Trustee or the Holders of not less than 33% in principal amount of all Securities then Outstanding (considered as one class), and not the Holders of the Securities of any one of such series, may declare the principal of all Securities and interest accrued thereon to be due and payable immediately by a written notice to the Company (and to the Trustee if given by the Holders). As a consequence of each such declaration (herein referred to as a declaration of acceleration) with respect to Securities of any series, the principal amount (or portion thereof in the case of Discount Securities) of such Securities and interest accrued thereon shall become due and payable immediately.

-40-

At any time after such a declaration of acceleration with respect to Securities of any series shall have been made and before a judgment or decree for payment of the money due shall have been obtained by the Trustee as hereinafter in this Article provided, the Event or Events of Default giving rise to such declaration of acceleration shall, without further act, be deemed to have been waived, and such declaration and its consequences shall, without further act, be deemed to have been rescinded and annulled, if

(a) the Company shall have paid or deposited with the Trustee a sum sufficient to pay

(1) all overdue interest on all Securities of such series;

(2) the principal of and premium, if any, on any Securities of such series which have become due otherwise than by such declaration of acceleration and interest thereon at the rate or rates prescribed therefor in such Securities;

(3) to the extent that payment of such interest is lawful, interest upon overdue interest, if any, at the rate or rates prescribed therefor in such Securities;

(4) all amounts due to the Trustee under Section 907;

and

(b) any other Event or Events of Default with respect to Securities of such series, other than the nonpayment of the principal of Securities of such series which shall have become due solely by such declaration of acceleration, shall have been cured or waived as provided in Section 813.

No such rescission shall affect any subsequent Event of Default or impair any right consequent thereon.

**SECTION 803. Collection of Indebtedness and Suits for Enforcement by Trustee.**

If an Event of Default described in clause (a) or (b) of Section 801 shall have occurred and be continuing, the Company shall, upon demand of the Trustee, pay to it, for the benefit of the Holders of the Securities of the series with respect to which such Event of Default shall have occurred, the whole amount then due and payable on such Securities for principal and premium, if any, and interest, if any, and, to the extent permitted by law, interest on any overdue principal, premium and interest, at the rate or rates prescribed therefor in such Securities, and, in addition thereto, such further amount as shall be sufficient to cover any amounts due to the Trustee under Section 907.

If the Company shall fail to pay such amounts forthwith upon such demand, the Trustee, in its own name and as trustee of an express trust, may institute a judicial proceeding for the collection of the sums so due and unpaid, may prosecute such proceeding to judgment or final decree and may enforce the same against the Company or any other obligor upon such Securities and collect the moneys adjudged or decreed to be payable in the manner provided by law out of the property of the Company or any other obligor upon such Securities, wherever situated.

-41-

If an Event of Default with respect to Securities of any series shall have occurred and be continuing, the Trustee may in its discretion proceed to protect and enforce its rights and the rights of the Holders of Securities of such series by such appropriate judicial proceedings as the Trustee shall deem most effectual to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Indenture or in aid of the exercise of any power granted herein, or to enforce any other proper remedy.

## SECTION 804. Trustee May File Proofs of Claim.

In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to the Company or any other obligor upon the Securities or the property of the Company or of such other obligor or their creditors, the Trustee (irrespective of whether the principal of the Securities shall then be due and payable as therein expressed or by declaration or otherwise and irrespective of whether the Trustee shall have made any demand on the Company for the payment of overdue principal or interest) shall be entitled and empowered, by intervention in such proceeding or otherwise,

(a) to file and prove a claim for the whole amount of principal, premium, if any, and interest, if any, owing and unpaid in respect of the Securities and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for amounts due to the Trustee under Section 907) and of the Holders allowed in such judicial proceeding, and

(b) to collect and receive any moneys or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee and, in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amounts due it under Section 907.

Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Securities or the rights of any Holder thereof or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

## SECTION 805. Trustee May Enforce Claims Without Possession of Securities.

All rights of action and claims under this Indenture or the Securities may be prosecuted and enforced by the Trustee without the possession of any of the Securities or the production thereof in any proceeding relating thereto, and any such proceeding instituted by the Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment shall, after provision for the payment of the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, be for the ratable benefit of the Holders in respect of which such judgment has been recovered.

-42-

**SECTION 806. Application of Money Collected.**

   Any money or property collected or received by the Trustee pursuant to this Article and distributable in respect of the Company's obligations under this Indenture shall be applied in the following order, to the extent permitted by law, at the date or dates fixed by the Trustee and, in case of the distribution of such money on account of principal or premium, if any, or interest, if any, upon presentation of the Securities in respect of which or for the benefit of which such money shall have been collected and the notation thereon of the payment if only partially paid and upon surrender thereof if fully paid:

   **First:** To the payment of all amounts due the Trustee (including any predecessor Trustee) under Section 907;

   **Second:** To the payment of the amounts then due and unpaid upon the Securities for principal of and premium, if any, and interest, if any, in respect of which or for the benefit of which such money has been collected, ratably, without preference or priority of any kind, according to the amounts due and payable on such Securities for principal, premium, if any, and interest, if any, respectively; and

   **Third:** To the payment of the remainder, if any, to the Company or to whomsoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

**SECTION 807. Limitation on Suits.**

   No Holder shall have any right to institute any proceeding, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless:

   (a) such Holder shall have previously given written notice to the Trustee of a continuing Event of Default with respect to the Securities of such series;

   (b) the Holders of a majority in aggregate principal amount of the Outstanding Securities of all series in respect of which an Event of Default shall have occurred and be continuing, considered as one class, shall have made written request to the Trustee to institute proceedings in respect of such Event of Default in its own name as Trustee hereunder;

   (c) such Holder or Holders shall have offered to the Trustee reasonable indemnity against the costs, expenses and liabilities to be incurred in compliance with such request;

   (d) the Trustee for 60 days after its receipt of such notice, request and offer of indemnity shall have failed to institute any such proceeding; and

   (e) no direction inconsistent with such written request shall have been given to the Trustee during such 60-day period by the Holders of a majority in aggregate principal amount of the Outstanding Securities of all series in respect of which an Event of Default shall have occurred and be continuing, considered as one class;

it being understood and intended that no one or more of such Holders shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other of such Holders or to obtain or to seek to obtain priority or preference over any other of such Holders or to enforce any right under this Indenture, except in the manner herein provided and for the equal and ratable benefit of all of such Holders.

**SECTION 808. Unconditional Right of Holders to Receive Principal, Premium and Interest.**

Notwithstanding any other provision in this Indenture, the Holder of any Security shall have the right, which is absolute and unconditional, to receive payment of the principal of and premium, if any, and (subject to Sections 307 and 312) interest, if any, on such Security on the Stated Maturity or Maturities expressed in such Security (or, in the case of redemption, on the Redemption Date) and to institute suit for the enforcement of any such payment, and such rights shall not be impaired without the consent of such Holder.

**SECTION 809. Restoration of Rights and Remedies.**

If the Trustee or any Holder has instituted any proceeding to enforce any right or remedy under this Indenture and such proceeding shall have been discontinued or abandoned for any reason, or shall have been determined adversely to the Trustee or to such Holder, then and in every such case, subject to any determination in such proceeding, the Company, the Trustee and such Holder shall be restored severally and respectively to their former positions hereunder and thereafter all rights and remedies of the Trustee and such Holder shall continue as though no such proceeding had been instituted.

**SECTION 810. Rights and Remedies Cumulative.**

Except as otherwise provided in the last paragraph of Section 306, no right or remedy herein conferred upon or reserved to the Trustee or to the Holders is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

**SECTION 811. Delay or Omission Not Waiver.**

No delay or omission of the Trustee or of any Holder to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein. Every right and remedy given by this Article or by law to the Trustee or to the Holders may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Holders, as the case may be.

**SECTION 812. Control by Holders of Securities.**

If an Event of Default shall have occurred and be continuing in respect of a series of Securities, the Holders of a majority in principal amount of the Outstanding Securities of such

-44-

series shall have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred on the Trustee, with respect to the Securities of such series; provided, however, that if an Event of Default shall have occurred and be continuing with respect to more than one series of Securities, the Holders of a majority in aggregate principal amount of the Outstanding Securities of all such series, considered as one class, shall have the right to make such direction, and not the Holders of the Securities of any one of such series; and provided, further, that

(a) such direction shall not be in conflict with any rule of law or with this Indenture, and could not involve the Trustee in personal liability in circumstances where indemnity would not, in the Trustee's sole discretion, be adequate, and

(b) the Trustee may take any other action deemed proper by the Trustee that is not inconsistent with such direction.

**SECTION 813. Waiver of Past Defaults.**

The Holders of not less than a majority in principal amount of the Outstanding Securities of any series may on behalf of the Holders of all the Securities of such series waive any past default hereunder with respect to such series and its consequences, except a default

(a) in the payment of the principal of or premium, if any, or interest, if any, on any Security of such series, or

(b) in respect of a covenant or provision hereof which under Section 1202 cannot be modified or amended without the consent of the Holder of each Outstanding Security of such series affected.

Upon any such waiver, such default shall cease to exist, and any and all Events of Default arising therefrom shall be deemed to have been cured, for every purpose of this Indenture; but no such waiver shall extend to any subsequent or other default or impair any right consequent thereon.

**SECTION 814. Undertaking for Costs.**

The Company and the Trustee agree, and each Holder by his acceptance thereof shall be deemed to have agreed, that any court may in its discretion require, in any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Trustee for any action taken, suffered or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this Section shall not apply to any suit instituted by the Company, to any suit instituted by the Trustee, to any suit instituted by any Holder, or group of Holders, holding in the aggregate more than 10% in aggregate principal amount of the Outstanding Securities of all series in respect of which such suit may be brought, considered as one class, or to any suit instituted by any Holder for the enforcement of the payment of the principal of or premium, if any, or interest, if any, on any Security on or after the Stated Maturity or Maturities expressed in such Security (or, in the case of redemption, on or after the Redemption Date).

-45-

**SECTION 815. Waiver of Stay or Extension Laws.**

The Company covenants (to the extent that it may lawfully do so) that it will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, which may affect the covenants or the performance of this Indenture; and the Company (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law and covenants that it will not hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

## ARTICLE NINE

### The Trustee

**SECTION 901. Certain Duties and Responsibilities.**

(a) The Trustee shall have and be subject to all the duties and responsibilities specified with respect to an indenture trustee in the Trust Indenture Act and no implied covenants or obligations shall be read into this Indenture against the Trustee. For purposes of Sections 315(a) and 315(c) of the Trust Indenture Act, the term "default" is hereby defined as an Event of Default which has occurred and is continuing.

(b) No provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(c) Notwithstanding anything contained in this Indenture to the contrary, the duties and responsibilities of the Trustee under this Indenture shall be subject to the protections, exculpations and limitations on liability afforded to an indenture trustee under the provisions of the Trust Indenture Act. For the purposes of Sections 315(b) and 315(d)(2) of the Trust Indenture Act, the term "responsible officer" is hereby defined as a Responsible Officer and the chairman or vice chairman of the board of directors, the chairman or vice chairman of the executive committee of the board of directors, the president, any vice president, the secretary, any assistant secretary, the treasurer any assistant treasurer, the cashier, any assistant cashier, any trust officer or assistant trust officer, the controller and any assistant controller of the Trustee, or any other officer of the Trustee customarily performing functions similar to those performed by a Responsible Officer or any of the above designated officers and also means, with respect to a particular corporate trust matter, any other officer to whom such matter is referred because of his or her knowledge of and familiarity with the particular subject.

-46-

(d) Whether or not therein expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Section.

**SECTION 902. Notice of Defaults.**

The Trustee shall give notice of any default hereunder known to the Trustee with respect to the Securities of any series to the Holders of Securities of such series in the manner and to the extent that it would be required to do so if the Indenture were qualified under the Trust Indenture Act, unless such default shall have been cured or waived; provided, however, that in the case of any default of the character specified in Section 801(c), no such notice to Holders shall be given until at least 45 days after the occurrence thereof. For the purpose of this Section and clause (h) of Section 903, the term "default" means any event which is, or after notice or lapse of time, or both, would become, an Event of Default.

**SECTION 903. Certain Rights of Trustee.**

Subject to the provisions of Section 901 and to the applicable provisions of the Trust Indenture Act:

(a) the Trustee may conclusively rely and shall be fully protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties;

(b) any request or direction of the Company mentioned herein shall be sufficiently evidenced by a Company Request or Company Order, or as otherwise expressly provided herein, and any resolution of the Board of Directors may be sufficiently evidenced by a Board Resolution;

(c) whenever in the administration of this Indenture the Trustee shall deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Trustee (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, conclusively rely upon an Officer's Certificate;

(d) the Trustee may consult with counsel and the written advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon;

(e) the Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of any Holder pursuant to this Indenture, unless such Holder shall have offered to the Trustee reasonable security or indemnity against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction;

-47-

(f) the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall (subject to applicable legal requirements) be entitled to examine, during normal business hours, the books, records and premises of the Company, personally or by agent or attorney;

(g) the Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys, and the Trustee shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care by it hereunder;

(h) the rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder;

(i) the Trustee shall not be charged with knowledge of any default (as defined in Section 902) or Event of Default, as the case may be, with respect to the Securities of any series for which it is acting as Trustee unless either (1) a Responsible Officer of the Trustee shall have actual knowledge that such default or Event of Default, as the case may be, exists and constitutes a default or Event of Default under this Indenture or (2) written notice of such default or Event of Default, as the case may be, shall have been given in the manner provided in Section 105 hereof to the Trustee by the Company, any other obligor on such Securities or by any Holder of such Securities; and

(j) the Trustee shall not be liable for any action it takes or omits to take in good faith which it believes to be authorized or within its rights or powers conferred upon it under this Indenture.

**SECTION 904. Not Responsible for Recitals or Issuance of Securities.**

The recitals contained herein and in the Securities (except the Trustee's certificates of authentication) shall be taken as the statements of the Company, and neither the Trustee nor any Authenticating Agent assumes responsibility for their correctness. The Trustee makes no representations as to the validity or sufficiency of this Indenture or of the Securities. Neither the Trustee nor any Authenticating Agent shall be accountable for the use or application by the Company of Securities or the proceeds thereof.

**SECTION 905. May Hold Securities.**

Each of the Trustee, any Authenticating Agent, any Paying Agent, any Security Registrar or any other agent of the Company, in its individual or any other capacity, may become the owner or pledgee of Securities and, subject to Sections 908 and 913, may otherwise deal with the Company with the same rights it would have if it were not the Trustee, Authenticating Agent, Paying Agent, Security Registrar or such other agent.

-48-

**SECTION 906. Money Held in Trust.**

Money held by the Trustee in trust hereunder need not be segregated from other funds, except to the extent required by law. The Trustee shall be under no liability for interest on any money received by it hereunder except as expressly provided herein or otherwise agreed with, and for the sole benefit of, the Company.

**SECTION 907. Compensation and Reimbursement.**

The Company shall

(a) pay to the Trustee from time to time reasonable compensation for all services rendered by it hereunder (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust);

(b) except as otherwise expressly provided herein, reimburse the Trustee upon its request for all reasonable expenses, disbursements and advances reasonably incurred or made by the Trustee in accordance with any provision of this Indenture (including the reasonable compensation and the expenses and disbursements of its agents and counsel), except to the extent that any such expense, disbursement or advance may be attributable to the Trustee's negligence, willful misconduct or bad faith; and

(c) indemnify the Trustee for, and hold it harmless from and against, any loss, liability or expense reasonably incurred by it arising out of or in connection with the acceptance or administration of the trust or trusts hereunder or the performance of its duties hereunder, including the reasonable costs and expenses of defending itself against any claim or liability in connection with the exercise or performance of any of its powers or duties hereunder, except to the extent any such loss, liability or expense may be attributable to its negligence, willful misconduct or bad faith.

As security for the performance of the obligations of the Company under this Section, the Trustee shall have a lien prior to the Securities upon all property and funds held or collected by the Trustee as such other than property and funds held in trust under Section 703 (except as otherwise provided in Section 703).

In addition and without prejudice to the rights provided to the Trustee under any of the provisions of this Indenture, when the Trustee incurs expenses or renders services in connection with an Event of Default specified in Section 801(d) or Section 801(e), the expenses (including the reasonable charges and expenses of its counsel) and the compensation for the services are intended to constitute expenses of administration under any applicable Federal or State bankruptcy, insolvency or other similar law.

The Company's obligations under this Section 907 and the lien referred to in this Section 907 shall survive the resignation or removal of the Trustee, the discharge of the Company's obligations under Article Seven of this Indenture and/or the termination of this Indenture.

-49-

"Trustee" for purposes of this Section shall include any predecessor Trustee; provided, however, that the negligence, willful misconduct or bad faith of any Trustee hereunder shall not affect the rights of any other Trustee hereunder.

**SECTION 908. Disqualification; Conflicting Interests.**

If the Trustee shall have or acquire any conflicting interest within the meaning of the Trust Indenture Act, it shall either eliminate such conflicting interest or resign to the extent, in the manner and with the effect, and subject to the conditions, provided in the Trust Indenture Act and this Indenture. For purposes of Section 310(b)(1) of the Trust Indenture Act and to the extent permitted thereby, the Trustee, in its capacity as trustee in respect of the Securities of any series, shall not be deemed to have a conflicting interest arising from its capacity as trustee in respect of the Securities of any other series or any securities of any series issued under the Indenture (For Unsecured Debt Securities Series A), dated as of October 1, 1997, of the Company to The Bank of New York, as trustee, the Indenture (For Unsecured Debt Securities Series B), dated as of October 1, 1997, of the Company to The Bank of New York, as trustee, the Indenture (For Unsecured Debt Securities Series C), dated as of January 1, 1998, of the Company to The Bank of New York, as trustee, the Purchase Contract Agreement dated as of July 1, 1998 of the Company to The Bank of New York, as agent, attorney-in-fact and trustee, the Indenture (For Unsecured Debt Securities Series D and Series E), dated as of July 1, 1998, of the Company to The Bank of New York, as trustee, the Indenture (For Unsecured Debt Securities Series F), dated as of October 1, 1998 of the Company to The Bank of New York, as trustee, the Indenture (For Unsecured Debt Securities Series G), dated as of October 1, 1998, of the Company to The Bank of New York, as trustee, the Indenture (For Unsecured Debt Securities Series H), dated as of June 1, 1999, of the Company to The Bank of New York, as trustee, the Indenture (For Unsecured Debt Securities Series I), dated as of September 1, 1999, of the Company to The Bank of New York, as trustee, the Indenture (For Unsecured Debt Securities Series J), dated as of July 1, 2001, of the Company to The Bank of New York, as trustee, the Purchase Contract Agreement, dated as of October 1, 2001, of the Company to The Bank of New York, as agent, attorney-in-fact and trustee, the Indenture (For Unsecured Debt Securities Series K and Series L), dated as of October 1, 2001, of the Company to The Bank of New York, as trustee, the Purchase Contract Agreement dated as of June 1, 2002 of the Company to The Bank of New York, as agent, attorney-in-fact and trustee, the Indenture (For Unsecured Debt Securities Series M), dated as of June 1, 2002, of the Company to The Bank of New York, as trustee, the Indenture (For Unsecured Debt Securities Series N), dated as of July 1, 2003, of the Company to The Bank of New York, as trustee, the Indenture (For Unsecured Debt Securities Series O), dated as of November 1, 2004, of the Company to The Bank of New York, as trustee, the Indenture (For Unsecured Debt Securities Series P), dated as of November 1, 2004, of the Company to The Bank of New York, as trustee, or the Indenture (For Unsecured Debt Securities Series R), dated as of November 1, 2004, of the Company to The Bank of New York, as trustee.

-50-

**SECTION 909. Corporate Trustee Required; Eligibility.**

There shall at all times be a Trustee hereunder which shall be

(a) a corporation organized and doing business under the laws of the United States, any State or territory thereof or the District of Columbia, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus of at least $50,000,000 and subject to supervision or examination by Federal, State or District of Columbia authority, or

(b) if and to the extent permitted by the Commission by rule, regulation or order upon application, a corporation or other Person organized and doing business under the laws of a foreign government, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus of at least $50,000,000 or the Dollar equivalent of the applicable foreign currency and subject to supervision or examination by authority of such foreign government or a political subdivision thereof substantially equivalent to supervision or examination applicable to United States institutional trustees,

and, in either case, qualified and eligible under this Article and the Trust Indenture Act. If such corporation publishes reports of condition at least annually, pursuant to law or to the requirements of such supervising or examining authority, then for the purposes of this Section, the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section, it shall resign immediately in the manner and with the effect hereinafter specified in this Article.

**SECTION 910. Resignation and Removal; Appointment of Successor.**

(a) No resignation or removal of the Trustee and no appointment of a successor Trustee pursuant to this Article shall become effective until the acceptance of appointment by the successor Trustee in accordance with the applicable requirements of Section 911.

(b) The Trustee may resign at any time with respect to the Securities of one or more series by giving written notice thereof to the Company. If the instrument of acceptance by a successor Trustee required by Section 911 shall not have been delivered to the Trustee within 30 days after the giving of such notice of resignation, the resigning Trustee may petition any court of competent jurisdiction for the appointment of a successor Trustee with respect to the Securities of such series.

(c) The Trustee may be removed at any time with respect to the Securities of any series by Act of the Holders of a majority in principal amount of the Outstanding Securities of such series delivered to the Trustee and to the Company.

(d) If at any time:

(1) the Trustee shall fail to comply with Section 908 after written request therefor by the Company or by any Holder who has been a bona fide Holder for at least six months, or

(2) the Trustee shall cease to be eligible under Section 909 or Section 310(a) of the Trust Indenture Act and shall fail to resign after written request therefor by the Company or by any such Holder, or

-51-

(3) the Trustee shall become incapable of acting or shall be adjudged a bankrupt or insolvent or a receiver of the Trustee or of its property shall be appointed or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation,

then, in any such case, (x) the Company by a Board Resolution may remove the Trustee with respect to all Securities or (y) subject to Section 814, any Holder who has been a bona fide Holder for at least six months may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Trustee with respect to all Securities and the appointment of a successor Trustee or Trustees.

(e) If the Trustee shall resign, be removed or become incapable of acting, or if a vacancy shall occur in the office of Trustee for any cause (other than as contemplated in clause (y) in Subsection (d) of this Section), with respect to the Securities of one or more series, the Company, by a Board Resolution, shall promptly appoint a successor Trustee or Trustees with respect to the Securities of that or those series (it being understood that any such successor Trustee may be appointed with respect to the Securities of one or more or all of such series and that at any time there shall be only one Trustee with respect to the Securities of any particular series) and shall comply with the applicable requirements of Section 911. If, within one year after such resignation, removal or incapability, or the occurrence of such vacancy, a successor Trustee with respect to the Securities of any series shall be appointed by Act of the Holders of a majority in principal amount of the Outstanding Securities of such series delivered to the Company and the retiring Trustee, the successor Trustee so appointed shall, forthwith upon its acceptance of such appointment in accordance with the applicable requirements of Section 911, become the successor Trustee with respect to the Securities of such series and to that extent supersede the successor Trustee appointed by the Company. If no successor Trustee with respect to the Securities of any series shall have been so appointed by the Company or the Holders and accepted appointment in the manner required by Section 911, any Holder who has been a bona fide Holder of a Security of such series for at least six months may, on behalf of itself and all others similarly situated, petition any court of competent jurisdiction for the appointment of a successor Trustee with respect to the Securities of such series.

(f) So long as no event which is, or after notice or lapse of time, or both, would become, an Event of Default shall have occurred and be continuing, and except with respect to a Trustee appointed by Act of the Holders of a majority in principal amount of the Outstanding Securities pursuant to Subsection (e) of this Section, if the Company shall have delivered to the Trustee (i) a Board Resolution appointing a successor Trustee, effective as of a date specified therein, and (ii) an instrument of acceptance of such appointment, effective as of such date, by such successor Trustee in accordance with Section 911, the Trustee shall be deemed to have resigned as contemplated in Subsection (b) of this Section, the successor Trustee shall be deemed to have been appointed by the Company pursuant to Subsection (e) of this Section and such appointment shall be deemed to have been accepted as contemplated in Section 911, all as of such date, and all other provisions of this Section and Section 911 shall be applicable to such resignation, appointment and acceptance except to the extent inconsistent with this Subsection (f).

-52-

(g) The Company (or, should the Company fail so to act promptly, the successor trustee at the expense of the Company) shall give notice of each resignation and each removal of the Trustee with respect to the Securities of any series and each appointment of a successor Trustee with respect to the Securities of any series by mailing written notice of such event by first-class mail, postage prepaid, to all Holders of Securities of such series as their names and addresses appear in the Security Register. Each notice shall include the name of the successor Trustee with respect to the Securities of such series and the address of its corporate trust office.

**SECTION 911. Acceptance of Appointment by Successor.**

(a) In case of the appointment hereunder of a successor Trustee with respect to the Securities of all series, every such successor Trustee so appointed shall execute, acknowledge and deliver to the Company and to the retiring Trustee an instrument accepting such appointment, and thereupon the resignation or removal of the retiring Trustee shall become effective and such successor Trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers, trusts and duties of the retiring Trustee; but, on the request of the Company or the successor Trustee, such retiring Trustee shall, upon payment of all sums owed to it, execute and deliver an instrument transferring to such successor Trustee all the rights, powers and trusts of the retiring Trustee and shall duly assign, transfer and deliver to such successor Trustee all property and money held by such retiring Trustee hereunder, subject nevertheless to its lien provided for in Section 907.

(b) In case of the appointment hereunder of a successor Trustee with respect to the Securities of one or more (but not all) series, the Company, the retiring Trustee and each successor Trustee with respect to the Securities of one or more series shall execute and deliver an indenture supplemental hereto wherein each successor Trustee shall accept such appointment and which (1) shall contain such provisions as shall be necessary or desirable to transfer and confirm to, and to vest in, each successor Trustee all the rights, powers, trusts and duties of the retiring Trustee with respect to the Securities of that or those series to which the appointment of such successor Trustee relates, (2) if the retiring Trustee is not retiring with respect to all Securities, shall contain such provisions as shall be deemed necessary or desirable to confirm that all the rights, powers, trusts and duties of the retiring Trustee with respect to the Securities of that or those series as to which the retiring Trustee is not retiring shall continue to be vested in the retiring Trustee and (3) shall add to or change any of the provisions of this Indenture as shall be necessary to provide for or facilitate the administration of the trusts hereunder by more than one Trustee, it being understood that nothing herein or in such supplemental indenture shall constitute such Trustees co-trustees of the same trust and that each such Trustee shall be trustee of a trust or trusts hereunder separate and apart from any trust or trusts hereunder administered by any other such Trustee; and upon the execution and delivery of such supplemental indenture the resignation or removal of the retiring Trustee shall become effective to the extent provided therein and each such successor Trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers, trusts and duties of the retiring Trustee with respect to the Securities of that or those series to which the appointment of such successor Trustee relates; but, on request of the Company or any

-53-

successor Trustee, such retiring Trustee, upon payment of all sums owed to it, shall duly assign, transfer and deliver to such successor Trustee all property and money held by such retiring Trustee hereunder with respect to the Securities of that or those series to which the appointment of such successor Trustee relates, subject nevertheless to its lien provided for in Section 907.

(c) Upon request of any such successor Trustee, the Company shall execute any instruments which fully vest in and confirm to such successor Trustee all such rights, powers and trusts referred to in Subsection (a) or (b) of this Section, as the case may be.

(d) No successor Trustee shall accept its appointment unless at the time of such acceptance such successor Trustee shall be qualified and eligible under this Article.

**SECTION 912. Merger, Conversion, Consolidation or Succession to Business.**

Any Person into which the Trustee may be merged or converted or with which it may be consolidated, or any Person resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any Person succeeding to all or substantially all the corporate trust business of the Trustee, shall be the successor of the Trustee hereunder, provided such Person shall be otherwise qualified and eligible under this Article, without the execution or filing of any paper or any further act on the part of any of the parties hereto. In case any Securities shall have been authenticated, but not delivered, by the Trustee then in office, any successor by merger, conversion or consolidation to such authenticating Trustee may adopt such authentication and deliver the Securities so authenticated with the same effect as if such successor Trustee had itself authenticated such Securities.

**SECTION 913. Preferential Collection of Claims Against Company.**

If the Trustee shall be or become a creditor of the Company or any other obligor upon the Securities (other than by reason of a relationship described in Section 311(b) of the Trust Indenture Act), the Trustee shall be subject to any and all applicable provisions of the Trust Indenture Act regarding the collection of claims against the Company or such other obligor. For purposes of Section 311(b) of the Trust Indenture Act:

(a) the term "cash transaction" means any transaction in which full payment for goods or securities sold is made within seven days after delivery of the goods or securities in currency or in checks or other orders drawn upon banks or bankers and payable upon demand;

(b) the term "self-liquidating paper" means any draft, bill of exchange, acceptance or obligation which is made, drawn, negotiated or incurred by the Company for the purpose of financing the purchase, processing, manufacturing, shipment, storage or sale of goods, wares or merchandise and which is secured by documents evidencing title to, possession of, or a lien upon, the goods, wares or merchandise or the receivables or proceeds arising from the sale of the goods, wares or merchandise previously constituting the security, provided the security is received by the Trustee simultaneously with the creation of the creditor relationship with the Company arising from the making, drawing, negotiating or incurring of the draft, bill of exchange, acceptance or obligation.

-54-

**SECTION 914. Co-trustees and Separate Trustees.**

At any time or times, for the purpose of meeting the legal requirements of any applicable jurisdiction, the Company and the Trustee shall have power to appoint, and, upon the written request of the Trustee or of the Holders of at least 33% in principal amount of the Securities then Outstanding, the Company shall for such purpose join with the Trustee in the execution and delivery of all instruments and agreements necessary or proper to appoint, one or more Persons approved by the Trustee either to act as co-trustee, jointly with the Trustee, or to act as separate trustee, in either case with such powers as may be provided in the instrument of appointment, and to vest in such Person or Persons, in the capacity aforesaid, any property, title, right or power deemed necessary or desirable, subject to the other provisions of this Section. If the Company does not join in such appointment within 15 days after the receipt by it of a request so to do, or if an Event of Default shall have occurred and be continuing, the Trustee alone shall have power to make such appointment.

Should any written instrument or instruments from the Company be required by any co-trustee or separate trustee so appointed to more fully confirm to such co-trustee or separate trustee such property, title, right or power, any and all such instruments shall, on request, be executed, acknowledged and delivered by the Company.

Every co-trustee or separate trustee shall, to the extent permitted by law, but to such extent only, be appointed subject to the following conditions:

(a) the Securities shall be authenticated and delivered, and all rights, powers, duties and obligations hereunder in respect of the custody of securities, cash and other personal property held by, or required to be deposited or pledged with, the Trustee hereunder, shall be exercised solely, by the Trustee;

(b) the rights, powers, duties and obligations hereby conferred or imposed upon the Trustee in respect of any property covered by such appointment shall be conferred or imposed upon and exercised or performed either by the Trustee or by the Trustee and such co-trustee or separate trustee jointly, as shall be provided in the instrument appointing such co-trustee or separate trustee, except to the extent that under any law of any jurisdiction in which any particular act is to be performed, the Trustee shall be incompetent or unqualified to perform such act, in which event such rights, powers, duties and obligations shall be exercised and performed by such co-trustee or separate trustee;

(c) the Trustee at any time, by an instrument in writing executed by it, with the concurrence of the Company, may accept the resignation of or remove any co-trustee or separate trustee appointed under this Section, and, if an Event of Default shall have occurred and be continuing, the Trustee shall have power to accept the resignation of, or remove, any such co-trustee or separate trustee without the concurrence of the Company. Upon the written request of the Trustee, the Company shall join with the Trustee in the execution and delivery of all instruments and agreements necessary or proper to effectuate such resignation or removal. A successor to any co-trustee or separate trustee so resigned or removed may be appointed in the manner provided in this Section;

-55-

(d) no co-trustee or separate trustee hereunder shall be personally liable by reason of any act or omission of the Trustee, or any other such trustee hereunder; and the Trustee shall not be personally liable by reason of any act or omission of any such co-trustee or separate trustee; and

(e) any Act of Holders delivered to the Trustee shall be deemed to have been delivered to each such co-trustee and separate trustee.

**SECTION 915. Appointment of Authenticating Agent.**

The Trustee may appoint an Authenticating Agent or Agents with respect to the Securities of one or more series, or Tranche thereof, which shall be authorized to act on behalf of the Trustee to authenticate Securities of such series or Tranche issued upon original issuance and upon exchange, registration of transfer or partial redemption thereof or pursuant to Section 306, and Securities so authenticated shall be entitled to the benefits of this Indenture and shall be valid and obligatory for all purposes as if authenticated by the Trustee hereunder. Wherever reference is made in this Indenture to the authentication and delivery of Securities by the Trustee or the Trustee's certificate of authentication, such reference shall be deemed to include authentication and delivery on behalf of the Trustee by an Authenticating Agent and a certificate of authentication executed on behalf of the Trustee by an Authenticating Agent. Each Authenticating Agent shall be acceptable to the Company and shall at all times be a corporation organized and doing business under the laws of the United States, any State or territory thereof or the District of Columbia, authorized under such laws to act as Authenticating Agent, having a combined capital and surplus of not less than $50,000,000 and subject to supervision or examination by Federal or State authority. If such Authenticating Agent publishes reports of condition at least annually, pursuant to law or to the requirements of said supervising or examining authority, then for the purposes of this Section, the combined capital and surplus of such Authenticating Agent shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. If at any time an Authenticating Agent shall cease to be eligible in accordance with the provisions of this Section, such Authenticating Agent shall resign immediately in the manner and with the effect specified in this Section.

Any corporation into which an Authenticating Agent may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which such Authenticating Agent shall be a party, or any corporation succeeding to the corporate agency or corporate trust business of an Authenticating Agent, shall continue to be an Authenticating Agent, provided such corporation shall be otherwise eligible under this Section, without the execution or filing of any paper or any further act on the part of the Trustee or the Authenticating Agent.

An Authenticating Agent may resign at any time by giving written notice thereof to the Trustee and to the Company. The Trustee may at any time terminate the agency of an Authenticating Agent by giving written notice thereof to such Authenticating Agent and to the Company. Upon receiving such a notice of resignation or upon such a termination, or in case at any time such Authenticating Agent shall cease to be eligible in accordance with the provisions of this Section, the Trustee may appoint a successor Authenticating Agent which shall be acceptable to the Company. Any successor Authenticating Agent upon acceptance of its

-56-

appointment hereunder shall become vested with all the rights, powers and duties of its predecessor hereunder, with like effect as if originally named as an Authenticating Agent. No successor Authenticating Agent shall be appointed unless eligible under the provisions of this Section.

The Trustee agrees to pay to each Authenticating Agent from time to time reasonable compensation for its services under this Section, and the Trustee shall be entitled to be reimbursed for such payments, in accordance with, and subject to the provisions of, Section 907.

The provisions of Sections 308, 904 and 905 shall be applicable to each Authenticating Agent.

If an appointment with respect to the Securities of one or more series shall be made pursuant to this Section, the Securities of such series may have endorsed thereon, in addition to the Trustee's certificate of authentication, an alternate certificate of authentication substantially in the following form:

This is one of the Securities of the series designated therein referred to in the within-mentioned Indenture.

THE BANK OF NEW YORK
As Trustee

By _____
As Authenticating Agent

By _____
Authorized Signatory

If all of the Securities of a series may not be originally issued at one time, and if the Trustee does not have an office capable of authenticating Securities upon original issuance located in a Place of Payment where the Company wishes to have Securities of such series authenticated upon original issuance, the Trustee, if so requested by the Company in writing (which writing need not comply with Section 102 and need not be accompanied by an Opinion of Counsel), shall appoint, in accordance with this Section and in accordance with such procedures as shall be acceptable to the Trustee, an Authenticating Agent having an office in a Place of Payment designated by the Company with respect to such series of Securities.

-57-

## ARTICLE TEN

### Holders' Lists and Reports by Trustee and Company

**SECTION 1001. Lists of Holders.**

Semiannually, not later than June 1 and December 1 in each year, commencing June 1, 2005, and at such other times as the Trustee may request in writing, the Company shall furnish or cause to be furnished to the Trustee information as to the names and addresses of the Holders, and the Trustee shall preserve such information and similar information received by it in any other capacity and afford to the Holders access to information so preserved by it, all to such extent, if any, and in such manner as shall be required by the Trust Indenture Act; provided, however, that no such list need be furnished so long as the Trustee shall be the Security Registrar.

**SECTION 1002. Reports by Trustee and Company.**

Not later than November 1 in each year, commencing with the year 2005, the Trustee shall transmit to the Holders, the Commission and each securities exchange upon which any Securities are listed, a report, dated as of the next preceding September 15, with respect to any events and other matters described in Section 313(a) of the Trust Indenture Act, in such manner and to the extent required by the Trust Indenture Act. The Trustee shall transmit to the Holders, the Commission and each securities exchange upon which any Securities are listed, and the Company shall file with the Trustee (within 30 days after filing with the Commission in the case of reports which pursuant to the Trust Indenture Act must be filed with the Commission and furnished to the Trustee) and transmit to the Holders, such other information, reports and other documents, if any, at such times and in such manner, as shall be required by the Trust Indenture Act. The Company shall notify the Trustee of the listing of any Securities on any securities exchange and of any delisting thereof.

Delivery of such reports, information and documents filed with the Commission pursuant to the Securities Exchange Act of 1934, as amended, to the Trustee is for informational purposes only, and the Trustee's receipt of such shall not constitute notice or constructive notice of any information contained therein or determinable from information contained therein, including the Company's compliance with any of its covenants hereunder (as to which the Trustee is entitled to rely exclusively on Officer's Certificates).

## ARTICLE ELEVEN

### Consolidation, Merger, Conveyance or Other Transfer

**SECTION 1101. Company May Consolidate, etc., Only on Certain Terms.**

The Company shall not consolidate with or merge into any other corporation, in each case in a transaction in which it is not the successor corporation, or convey, transfer or lease its properties and assets as an entirety or substantially as an entirety to any Person, unless

(a) the corporation formed by such consolidation or into which the Company is merged, or the corporation that acquires by conveyance or transfer, or which leases, the properties and assets of the Company as an entirety or substantially as an entirety, shall be a corporation organized and validly existing under the laws of the United States, any State thereof or the District of Columbia, and shall expressly assume, by an indenture supplemental hereto, executed and delivered to the Trustee, in form satisfactory to the Trustee, the due and punctual payment of the principal of and premium, if any, and interest, if any, on all Outstanding Securities and the performance of every covenant of this Indenture on the part of the Company to be performed or observed;

-58-

(b) immediately after giving effect to such transaction, no Event of Default, and no event which, after notice or lapse of time or both, would become an Event of Default, shall have occurred and be continuing; and

(c) the Company shall have delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that such consolidation, merger, conveyance or other transfer or lease and such indenture supplemental hereto comply with this Article and that all conditions precedent herein provided for relating to such transactions have been complied with.

**SECTION 1102. Successor Corporation Substituted.**

Upon any consolidation by the Company with or merger by the Company into any other corporation, or any conveyance or other transfer or lease of the properties and assets of the Company as an entirety or substantially as an entirety in accordance with Section 1101, the successor corporation formed by such consolidation or into which the Company is merged or the Person to which such conveyance, or other transfer or lease is made shall succeed to, and be substituted for, and may exercise every right and power of, the Company under this Indenture with the same effect as if such successor Person had been named as the Company herein, and thereafter, except in the case of a lease, the predecessor Person shall be relieved of and released from all obligations and covenants under this Indenture and the Securities Outstanding hereunder (unless the Company shall have delivered to the Trustee an instrument waiving such relief and release), and the Trustee shall acknowledge in writing that the Company has been so relieved and released.

**SECTION 1103. Limitations.**

For purposes of clarification and not in limitation of the provisions of Section 1101, unless otherwise provided in a supplemental indenture or Officer's Certificate, nothing in this Indenture shall be deemed to prevent or restrict:

(a) any consolidation or merger after the consummation of which the Company would be the surviving or resulting corporation, or

(b) any conveyance or other transfer, or lease of any part of the properties of the Company which does not constitute the entirety, or substantially the entirety, thereof, or

(c) the approval by the Company of, or the consent by the Company to, any consolidation or merger of any direct or indirect subsidiary or affiliate of the Company, or any conveyance, transfer or lease by any such subsidiary or affiliate of any of its assets.

## ARTICLE TWELVE

### Supplemental Indentures

**SECTION 1201. Supplemental Indentures Without Consent of Holders.**

Without the consent of any Holders, the Company and the Trustee, at any time and from time to time, may enter into one or more indentures supplemental hereto, in form satisfactory to the Trustee, for any of the following purposes:

(a) to evidence the succession of another Person to the Company and the assumption by any such successor of the covenants of the Company herein and in the Securities, all as provided in Article Eleven; or

(b) to add one or more covenants of the Company or other provisions for the benefit of all Holders or for the benefit of the Holders of, or to remain in effect only so long as there shall be Outstanding, Securities of one or more specified series, or one or more specified Tranches thereof, or to surrender any right or power herein conferred upon the Company; or

(c) to add any additional Events of Default with respect to all or any series of Securities Outstanding hereunder; or

(d) to change or eliminate any provision of this Indenture or to add any new provision to this Indenture; provided, however, that if such change, elimination or addition shall adversely affect the interests of the Holders of Securities of any series or Tranche Outstanding on the date of such indenture supplemental hereto in any material respect, such change, elimination or addition shall become effective with respect to such series or Tranche only pursuant to the provisions of Section 1202 hereof or when no Security of such series or Tranche remains Outstanding; or

(e) to provide collateral security for all but not part of the Securities; or

(f) to establish the form or terms of Securities of any series or Tranche as contemplated by Sections 201 and 301; or

(g) to provide for the authentication and delivery of bearer securities and coupons appertaining thereto representing interest, if any, thereon and for the procedures for the registration, exchange and replacement thereof and for the giving of notice to, and the solicitation of the vote or consent of, the holders thereof, and for any and all other matters incidental thereto; or

(h) to evidence and provide for the acceptance of appointment hereunder by a separate or successor Trustee or co-trustee with respect to the Securities of one or more

-60-

series and to add to or change any of the provisions of this Indenture as shall be necessary to provide for or facilitate the administration of the trusts hereunder by more than one Trustee, pursuant to the requirements of Section 911(b); or

(i) to provide for the procedures required to permit the Company to utilize, at its option, a noncertificated system of registration for all, or any series or Tranche of, the Securities; or

(j) to change any place or places where (1) the principal of and premium, if any, and interest, if any, on all or any series of Securities, or any Tranche thereof, shall be payable, (2) all or any series of Securities, or any Tranche thereof, may be surrendered for registration of transfer, (3) all or any series of Securities, or any Tranche thereof, may be surrendered for exchange and (4) notices and demands to or upon the Company in respect of all or any series of Securities, or any Tranche thereof, and this Indenture may be served; or

(k) to cure any ambiguity, to correct or supplement any provision herein which may be defective or inconsistent with any other provision herein, or to make any other changes to the provisions hereof or to add other provisions with respect to matters or questions arising under this Indenture, provided that such other changes or additions shall not adversely affect the interests of the Holders of Securities of any series or Tranche in any material respect.

Without limiting the generality of the foregoing, if the Trust Indenture Act as in effect at the date of the execution and delivery of this Indenture or at any time thereafter shall be amended and

(x) if any such amendment shall require one or more changes to any provisions hereof or the inclusion herein of any additional provisions, or shall by operation of law be deemed to effect such changes or incorporate such provisions by reference or otherwise, this Indenture shall be deemed to have been amended so as to conform to such amendment to the Trust Indenture Act, and the Company and the Trustee may, without the consent of any Holders, enter into an indenture supplemental hereto to effect or evidence such changes or additional provisions; or

(y) if any such amendment shall permit one or more changes to, or the elimination of, any provisions hereof which, at the date of the execution and delivery hereof or at any time thereafter, are required by the Trust Indenture Act to be contained herein, this Indenture shall be deemed to have been amended to effect such changes or elimination, and the Company and the Trustee may, without the consent of any Holders, enter into an indenture supplemental hereto to evidence such amendment hereof.

-61-

**SECTION 1202. Supplemental Indentures With Consent of Holders.**

      Subject to the provisions of Section 1201, with the consent of the Holders of a majority in aggregate principal amount of the Securities of all series then Outstanding under this Indenture, considered as one class, by Act of said Holders delivered to the Company and the Trustee, the Company, when authorized by a Board Resolution, and the Trustee may enter into an indenture or indentures supplemental hereto for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, this Indenture or modifying in any manner the rights of the Holders of Securities of such series under the Indenture; provided, however, that if there shall be Securities of more than one series Outstanding hereunder and if a proposed supplemental indenture shall directly affect the rights of the Holders of Securities of one or more, but less than all, of such series, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Securities of all series so directly affected, considered as one class, shall be required; and provided, further, that if the Securities of any series shall have been issued in more than one Tranche and if the proposed supplemental indenture shall directly affect the rights of the Holders of Securities of one or more, but less than all, of such Tranches, then the consent only of the Holders of a majority in aggregate principal amount of the Outstanding Securities of all Tranches so directly affected, considered as one class, shall be required; and provided, further, that no such supplemental indenture shall:

      (a) change the Stated Maturity of the principal of, or any installment of principal of or interest on, any Security (other than pursuant to the terms hereof), or reduce the principal amount thereof or the rate of interest thereon (or the amount of any installment of interest thereon) or change the method of calculating such rate or reduce any premium payable upon the redemption thereof, or reduce the amount of the principal of a Discount Security that would be due and payable upon a declaration of acceleration of the Maturity thereof pursuant to Section 802, or change the coin or currency (or other property), in which any Security or any premium or the interest thereon is payable, or impair the right to institute suit for the enforcement of any such payment on or after the Stated Maturity of any Security (or, in the case of redemption, on or after the Redemption Date), without, in any such case, the consent of the Holder of such Security, or

      (b) reduce the percentage in principal amount of the Outstanding Securities of any series, or any Tranche thereof, the consent of the Holders of which is required for any such supplemental indenture, or the consent of the Holders of which is required for any waiver of compliance with any provision of this Indenture or of any default hereunder and its consequences, or reduce the requirements of Section 1304 for quorum or voting, without, in any such case, the consent of the Holders of each Outstanding Security of such series or Tranche, or

      (c) modify any of the provisions of this Section, Section 607 or Section 813 with respect to the Securities of any series, or any Tranche thereof, except to increase the percentages in principal amount referred to in this Section or such other Sections or to provide that other provisions of this Indenture cannot be modified or waived without the consent of the Holder of each Outstanding Security affected thereby; provided, however, that this clause shall not be deemed to require the consent of any Holder with respect to changes in the references to "the Trustee" and concomitant changes in this Section, or the deletion of this proviso, in accordance with the requirements of Sections 911(b), 914 and 1201(h).

A supplemental indenture which changes or eliminates any covenant or other provision of this Indenture which has expressly been included solely for the benefit of one or more particular series of Securities, or one or more Tranches thereof, or which modifies the rights of the Holders of Securities of such series with respect to such covenant or other provision, shall be deemed not to affect the rights under this Indenture of the Holders of Securities of any other series or Tranche.

It shall not be necessary for any Act of Holders under this Section to approve the particular form of any proposed supplemental indenture, but it shall be sufficient if such Act shall approve the substance thereof. A waiver by a Holder of such Holder's right to consent under this Section shall be deemed to be a consent of such Holder.

Anything in this Indenture to the contrary notwithstanding, if the Officer's Certificate, supplemental indenture or Board Resolution, as the case may be, establishing the Securities of any series or Tranche shall provide that the Company may make certain specified additions, changes or eliminations to or from the Indenture which shall be specified in such Officer's Certificate, supplemental indenture or Board Resolution establishing such series or Tranche, (a) the Holders of Securities of such series or Tranche shall be deemed to have consented to a supplemental indenture containing such additions, changes or eliminations to or from the Indenture which shall be specified in such Officer's Certificate, supplemental indenture or Board Resolution establishing such series or Tranche, (b) no Act of such Holders shall be required to evidence such consent and (c) such consent may be counted in the determination of whether or not the Holders of the requisite principal amount of Securities shall have consented to such supplemental indenture.

## SECTION 1203. Execution of Supplemental Indentures.

In executing, or accepting the additional trusts created by, any supplemental indenture permitted by this Article or the modifications thereby of the trusts created by this Indenture, the Trustee shall be entitled to receive, and (subject to Section 901) shall be fully protected in relying upon, an Opinion of Counsel stating that the execution of such supplemental indenture is authorized or permitted by this Indenture. The Trustee may, but shall not be obligated to, enter into any such supplemental indenture which affects the Trustee's own rights, duties, immunities or liabilities under this Indenture or otherwise.

## SECTION 1204. Effect of Supplemental Indentures.

Upon the execution of any supplemental indenture under this Article, this Indenture shall be modified in accordance therewith, and such supplemental indenture shall form a part of this Indenture for all purposes; and every Holder of Securities theretofore or thereafter authenticated and delivered hereunder shall be bound thereby. Any supplemental indenture permitted by this Article may restate this Indenture in its entirety, and, upon the execution and delivery thereof, any such restatement shall supersede this Indenture as theretofore in effect for all purposes.

-63-

**SECTION 1205. Conformity With Trust Indenture Act.**

Every supplemental indenture executed pursuant to this Article shall conform to the requirements of the Trust Indenture Act as then in effect, if applicable.

**SECTION 1206. Reference in Securities to Supplemental Indentures.**

Securities of any series, or any Tranche thereof, authenticated and delivered after the execution of any supplemental indenture pursuant to this Article may, and shall if required by the Trustee, bear a notation in form approved by the Trustee as to any matter provided for in such supplemental indenture. If the Company shall so determine, new Securities of any series, or any Tranche thereof, so modified as to conform, in the opinion of the Trustee and the Company, to any such supplemental indenture may be prepared and executed by the Company and authenticated and delivered by the Trustee in exchange for Outstanding Securities of such series or Tranche.

**SECTION 1207. Modification Without Supplemental Indenture.**

If the terms of any particular series of Securities shall have been established in a Board Resolution or an Officer's Certificate as contemplated by Section 301, and not in an indenture supplemental hereto, additions to, changes in or the elimination of any of such terms may be effected by means of a supplemental Board Resolution or Officer's Certificate, as the case may be, delivered to, and accepted by, the Trustee; provided, however, that such supplemental Board Resolution or Officer's Certificate shall not be accepted by the Trustee or otherwise be effective unless all conditions set forth in this Indenture which would be required to be satisfied if such additions, changes or elimination were contained in a supplemental indenture shall have been appropriately satisfied. Upon the acceptance thereof by the Trustee, any such supplemental Board Resolution or Officer's Certificate shall be deemed to be a "supplemental indenture" for purposes of Sections 1204 and 1206.

## ARTICLE THIRTEEN

### Meetings of Holders; Action Without Meeting

**SECTION 1301. Purposes for Which Meetings May Be Called.**

A meeting of Holders of Securities of one or more, or all, series, or any Tranche or Tranches thereof, may be called at any time and from time to time pursuant to this Article to make, give or take any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be made, given or taken by Holders of Securities of such series or Tranches.

**SECTION 1302. Call, Notice and Place of Meetings.**

(a) The Trustee may at any time call a meeting of Holders of Securities of one or more, or all, series, or any Tranche or Tranches thereof, for any purpose specified in Section 1301, to be held at such time and at such place in the Borough of Manhattan, The City of New York, as the Trustee shall determine, or, with the approval of the Company, at

-64-

any other place. Notice of every such meeting, setting forth the time and the place of such meeting and in general terms the action proposed to be taken at such meeting, shall be given, in the manner provided in Section 106, not less than 21 nor more than 180 days prior to the date fixed for the meeting.

(b) If the Trustee shall have been requested to call a meeting of the Holders of Securities of one or more, or all, series, or any Tranche or Tranches thereof, by the Company or by the Holders of 33% in aggregate principal amount of all of such series and Tranches, considered as one class, for any purpose specified in Section 1301, by written request setting forth in reasonable detail the action proposed to be taken at the meeting, and the Trustee shall not have given the notice of such meeting within 21 days after receipt of such request or shall not thereafter proceed to cause the meeting to be held as provided herein, then the Company or the Holders of Securities of such series and Tranches in the amount above specified, as the case may be, may determine the time and the place in the Borough of Manhattan, The City of New York, or in such other place as shall be determined or approved by the Company, for such meeting and may call such meeting for such purposes by giving notice thereof as provided in Subsection (a) of this Section.

(c) Any meeting of Holders of Securities of one or more, or all, series, or any Tranche or Tranches thereof, shall be valid without notice if the Holders of all Outstanding Securities of such series or Tranches are present in person or by proxy and if representatives of the Company and the Trustee are present, or if notice is waived in writing before or after the meeting by the Holders of all Outstanding Securities of such series, or any Tranche or Tranches thereof, or by such of them as are not present at the meeting in person or by proxy, and by the Company and the Trustee.

## SECTION 1303. Persons Entitled to Vote at Meetings.

To be entitled to vote at any meeting of Holders of Securities of one or more, or all, series, or any Tranche or Tranches thereof, a Person shall be (a) a Holder of one or more Outstanding Securities of such series or Tranches, or (b) a Person appointed by an instrument in writing as proxy for a Holder or Holders of one or more Outstanding Securities of such series or Tranches by such Holder or Holders. The only Persons who shall be entitled to attend any meeting of Holders of Securities of any series or Tranche shall be the Persons entitled to vote at such meeting and their counsel, any representatives of the Trustee and its counsel and any representatives of the Company and its counsel.

## SECTION 1304. Quorum; Action.

The Persons entitled to vote a majority in aggregate principal amount of the Outstanding Securities of the series and Tranches with respect to which a meeting shall have been called as hereinbefore provided, considered as one class, shall constitute a quorum for a meeting of Holders of Securities of such series and Tranches; provided, however, that if any action is to be taken at such meeting which this Indenture expressly provides may be taken by the Holders of a specified percentage, which is less than a majority, in principal amount of the Outstanding Securities of such series and Tranches, considered as one class, the Persons entitled to vote such specified percentage in principal amount of the Outstanding Securities of such series

-65-

and Tranches, considered as one class, shall constitute a quorum. In the absence of a quorum within one hour of the time appointed for any such meeting, the meeting shall, if convened at the request of Holders of Securities of such series and Tranches, be dissolved. In any other case the meeting may be adjourned for such period as may be determined by the chairman of the meeting prior to the adjournment of such meeting. In the absence of a quorum at any such adjourned meeting, such adjourned meeting may be further adjourned for such period as may be determined by the chairman of the meeting prior to the adjournment of such adjourned meeting. Except as provided by Section 1305(e), notice of the reconvening of any meeting adjourned for more than 30 days shall be given as provided in Section 1302(a) not less than 10 days prior to the date on which the meeting is scheduled to be reconvened. Notice of the reconvening of an adjourned meeting shall state expressly the percentage, as provided above, of the principal amount of the Outstanding Securities of such series and Tranches which shall constitute a quorum.

Except as limited by Section 1202, any resolution presented to a meeting or adjourned meeting duly reconvened at which a quorum is present as aforesaid may be adopted only by the affirmative vote of the Holders of a majority in aggregate principal amount of the Outstanding Securities of the series and Tranches with respect to which such meeting shall have been called, considered as one class; provided, however, that, except as so limited, any resolution with respect to any action which this Indenture expressly provides may be taken by the Holders of a specified percentage, which is less than a majority, in principal amount of the Outstanding Securities of such series and Tranches, considered as one class, may be adopted at a meeting or an adjourned meeting duly reconvened and at which a quorum is present as aforesaid by the affirmative vote of the Holders of such specified percentage in principal amount of the Outstanding Securities of such series and Tranches, considered as one class.

Any resolution passed or decision taken at any meeting of Holders of Securities duly held in accordance with this Section shall be binding on all the Holders of Securities of the series and Tranches with respect to which such meeting shall have been held, whether or not present or represented at the meeting.

**SECTION 1305. Attendance at Meetings; Determination of Voting Rights;**

**Conduct and Adjournment of Meetings.**

(a) Attendance at meetings of Holders of Securities may be in person or by proxy; and, to the extent permitted by law, any such proxy shall remain in effect and be binding upon any future Holder of the Securities with respect to which it was given unless and until specifically revoked by the Holder or future Holder of such Securities before being voted.

(b) Notwithstanding any other provisions of this Indenture, the Trustee may make such reasonable regulations as it may deem advisable for any meeting of Holders of Securities in regard to proof of the holding of such Securities and of the appointment of proxies and in regard to the appointment and duties of inspectors of votes, the submission and examination of proxies, certificates and other evidence of the right to vote, and such other matters concerning the conduct of the meeting as it shall deem appropriate. Except as otherwise permitted or required by any such regulations, the holding of Securities shall be proved in the manner specified in Section 104 and the appointment of any proxy shall

-66-

be proved in the manner specified in Section 104. Such regulations may provide that written instruments appointing proxies, regular on their face, may be presumed valid and genuine without the proof specified in Section 104 or other proof.

(c) The Trustee shall, by an instrument in writing, appoint a temporary chairman of the meeting, unless the meeting shall have been called by the Company or by Holders as provided in Section 1302(b), in which case the Company or the Holders of Securities of the series and Tranches calling the meeting, as the case may be, shall in like manner appoint a temporary chairman. A permanent chairman and a permanent secretary of the meeting shall be elected by vote of the Persons entitled to vote a majority in aggregate principal amount of the Outstanding Securities of all series and Tranches represented at the meeting, considered as one class.

(d) At any meeting each Holder or proxy shall be entitled to one vote for each $1 principal amount of Securities held or represented by him; provided, however, that no vote shall be cast or counted at any meeting in respect of any Security challenged as not Outstanding and ruled by the chairman of the meeting to be not Outstanding. The chairman of the meeting shall have no right to vote, except as a Holder of a Security or proxy.

(e) Any meeting duly called pursuant to Section 1302 at which a quorum is present may be adjourned from time to time by Persons entitled to vote a majority in aggregate principal amount of the Outstanding Securities of all series and Tranches represented at the meeting, considered as one class; and the meeting may be held as so adjourned without further notice.

**SECTION 1306. Counting Votes and Recording Action of Meetings.**

The vote upon any resolution submitted to any meeting of Holders shall be by written ballots on which shall be subscribed the signatures of the Holders or of their representatives by proxy and the principal amounts and serial numbers of the Outstanding Securities, of the series and Tranches with respect to which the meeting shall have been called, held or represented by them. The permanent chairman of the meeting shall appoint two inspectors of votes who shall count all votes cast at the meeting for or against any resolution and who shall make and file with the secretary of the meeting their verified written reports of all votes cast at the meeting. A record of the proceedings of each meeting of Holders shall be prepared by the secretary of the meeting and there shall be attached to said record the original reports of the inspectors of votes on any vote by ballot taken thereat and affidavits by one or more persons having knowledge of the facts setting forth a copy of the notice of the meeting and showing that said notice was given as provided in Section 1302 and, if applicable, Section 1304. Each copy shall be signed and verified by the affidavits of the permanent chairman and secretary of the meeting and one such copy shall be delivered to the Company, and another to the Trustee to be preserved by the Trustee, the latter to have attached thereto the ballots voted at the meeting. Any record so signed and verified shall be conclusive evidence of the matters therein stated.

-67-

**SECTION 1307. Action Without Meeting.**

In lieu of a vote of Holders at a meeting as hereinbefore contemplated in this Article, any request, demand, authorization, direction, notice, consent, waiver or other action may be made, given or taken by Holders by written instruments as provided in Section 104.

## ARTICLE FOURTEEN

### Immunity of Incorporators, Shareholders, Members, Officers, Managers and Directors

**SECTION 1401. Liability Solely Corporate.**

No recourse shall be had for the payment of the principal of or premium, if any, or interest, if any, on any Securities or any part thereof, or for any claim based thereon or otherwise in respect thereof, or of the indebtedness represented thereby, or upon any obligation, covenant or agreement under this Indenture, against any incorporator, shareholder, member, limited partner, officer, manager or director, as such, past, present or future of the Company or of any predecessor or successor of the Company (either directly or through the Company or a predecessor or successor of the Company), whether by virtue of any constitutional provision, statute or rule of law, or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that this Indenture and all the Securities are solely corporate obligations, and that no personal liability whatsoever shall attach to, or be incurred by, any incorporator, shareholder, member, limited partner, officer, manager or director, past, present or future, of the Company or of any predecessor or successor of the Company, either directly or indirectly through the Company or any predecessor or successor of the Company, because of the indebtedness hereby authorized or under or by reason of any of the obligations, covenants or agreements contained in this Indenture or in any of the Securities or to be implied herefrom or therefrom, and that any such personal liability is hereby expressly waived and released as a condition of, and as part of the consideration for, the execution of this Indenture and the issuance of the Securities.

## ARTICLE FIFTEEN

### Series Q Notes

**SECTION 1501. Designation of Series Q Notes.**

There is hereby created a series of Securities designated "6.50% Series Q Senior Notes due November 15, 2024" (herein sometimes referred to as "Series Q Notes"). The form and terms of the Series Q Notes shall be established in an Officer's Certificate pursuant to Sections 201 and 301.

———————————

This instrument may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

-68-

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed, all as of the day and year first above written.

TXU CORP.

By: /s/    ANTHONY R. HORTON
       Name: Anthony Horton
       Title: Senior Vice President and Treasurer

THE BANK OF NEW YORK, Trustee

By: /s/    REMO J. REALE
       Name: Remo J. Reale
       Title: Vice President

-69-

Exhibit 4(aaa)

**THIS DEED OF TRUST IS, AMONG OTHER THINGS, A FINANCING STATEMENT UNDER THE UNIFORM COMMERCIAL CODE COVERING MINERALS, TIMBER, AS-EXTRACTED COLLATERAL AND THE LIKE, ACCOUNTS RESULTING FROM THE SALE OF MINERALS, TIMBER, AS-EXTRACTED COLLATERAL AND THE LIKE, AND GOOD WHICH ARE, OR ARE TO BECOME, FIXTURES ON THE REAL/IMMOVABLE PROPERTY DESCRIBED IN EXHIBITS A, B AND C ATTACHED HERETO. THIS DEED OF TRUST IS TO BE RECORDED IN THE REAL ESTATE RECORDS AND AS A FIXTURES, TIMBER AND AS-EXTRACTED COLLATERAL FILING OF THE COUNTY IN WHICH IS SITUATED ANY OF THE REAL PROPERTY COLLATERAL COVERED HEREBY.**

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

When Recorded Return To:                                    TO BE RECORDED IN

Vinson & Elkins L.L.P.                                       _____ COUNTIES, TEXAS
2001 Ross Avenue, Suite 3700
Dallas, TX 75201                                            **[NAME OF PLANT]**
Attention: Jason B. Myers

                                                           Recorder's Use

**SECOND DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS,
SECURITY AGREEMENT AND FIXTURE FILING**

**by**

**[NAME OF EFH GRANTOR], as Grantor**

**to**

**FIDELITY NATIONAL TITLE INSURANCE COMPANY, as Trustee**

**for the benefit of**

**THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., as Collateral Agent
and Initial Second Priority Representative for the benefit of the Second Lien Secured
Parties, as Beneficiary**

**Dated as of December ___, 2010**

## TABLE OF CONTENTS

Page

1.  DEFINITIONS                                                                                   2
2.  GRANT                                                                                         5
3.  WARRANTIES, REPRESENTATIONS AND COVENANTS                                                     6
    3.1   Title to Mortgaged Property and Lien of this Instrument; Warranties Regarding Warranty Property   6
    3.2   Payment of Obligations                                                                  6
    3.3   Requirements                                                                            7
    3.4   Payment of Taxes and Other Impositions                                                  7
    3.5   Insurance                                                                               7
    3.6   Restrictions on Liens and Encumbrances                                                  7
    3.7   Due on Sale and Other Transfer Restrictions                                             7
    3.8   Condemnation/Eminent Domain                                                             8
    3.9   Leases                                                                                  8
    3.10  Further Assurances                                                                      8
    3.11  Beneficiary's Right to Perform                                                          8
4.  LIMITATION ON AMOUNT OBLIGATED; CONTRIBUTION BY OTHER PERSONS                                 8
5.  REMEDIES                                                                                      9
6.  RIGHT OF BENEFICIARY TO CREDIT SALE                                                          11
7.  APPOINTMENT OF RECEIVER                                                                      11
8.  EXTENSION, RELEASE, ETC                                                                      11
9.  SECURITY AGREEMENT UNDER UNIFORM COMMERCIAL CODE; FIXTURE FILING                             12
10. ASSIGNMENT OF RENTS                                                                          13
11. ADDITIONAL RIGHTS                                                                            14
12. NOTICES                                                                                      14
13. NO ORAL MODIFICATION                                                                         14
14. PARTIAL INVALIDITY                                                                           14
15. GRANTOR'S WAIVER OF RIGHTS                                                                   15
16. REMEDIES NOT EXCLUSIVE                                                                       15
17. MULTIPLE SECURITY                                                                            17
18. SUCCESSORS AND ASSIGNS                                                                       18
19. NO WAIVERS, ETC.                                                                             18
20. GOVERNING LAW, ETC.                                                                          19
21. DUTY OF BENEFICIARY; AUTHORITY OF BENEFICIARY                                                19
22. LAST DOLLARS SECURED; PRIORITY                                                               20
23. ENFORCEMENT EXPENSES; INDEMNIFICATION                                                        20
24. RELEASE                                                                                      21
25. SUBSTITUTE TRUSTEE                                                                           21
26. INDEMNIFICATION OF TRUSTEE                                                                   22
27. ACCEPTANCE BY TRUSTEE                                                                        22
28. ENTIRE AGREEMENT                                                                             22

i

29.  MATURITY OF OBLIGATIONS                                          23
30.  EVIDENCE OF INSURANCE                                            23
31.  FUTURE ADVANCES                                                  23
32.  MULTIPLE GRANTORS                                                23
33.  ONCOR SEPARATENESS                                               23
34.  MORTGAGED LEASES                                                 24

Exhibit A:     Description of Fee Owned Land
Exhibit B:     Description of Mortgaged Leases and Mortgaged Leased Land
Exhibit C:     Description of Easements and Easement Land
Exhibit D:     Description of Certificates of Adjudication and Other Water Rights

**SECOND DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS,
SECURITY AGREEMENT AND FIXTURE FILING**

This Second Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing (this " Deed of Trust") executed to be effective as of December __, 2010, by **[NAME OF OWNER OF PLANT AND STATE AND TYPE OF ENTITY]** ("Grantor"), having an organizational identification number of _____ and an office at c/o Texas Competitive Electric Holdings Company LLC, Energy Plaza, 1601 Bryan Street, Dallas, Texas 75201, Attention: General Counsel, to FIDELITY NATIONAL TITLE INSURANCE COMPANY, as Trustee ("Trustee"), whose address is c/o Alamo Title Insurance Company, 10010 San Pedro, Suite 440, San Antonio, Texas 78216 (Attention: Stanley Keeton), and its substitutes or successors, for the benefit of THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A. ("Beneficiary"), as Collateral Agent under and as defined in the hereinafter described Security Agreement and as Initial Second Priority Representative under and as defined in the hereinafter described Intercreditor Agreement, in each case for the benefit of the Second Lien Secured Parties, whose address is c/o Corporate Trust Division, 601 Travis Street – 16 th Floor, Houston, Texas 77002 (Attention: TCEH Trustee).

**RECITALS**

1. TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC, a Delaware limited liability company (" TCEH"), TCEH FINANCE, INC., a Delaware corporation ("TCEH Finance", and together with TCEH, the "Issuer"), ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY, a Texas corporation (the "Parent Guarantor"), the Subsidiary Guarantors (as defined in the Indenture (as defined below)), and THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., as Trustee, have entered into the Indenture dated October 6, 2010, as supplemented by that certain First Supplemental Indenture dated as of October 20, 2010, and that certain Second Supplemental Indenture dated November 15, 2010, (as the same has or may be amended, restated, supplemented or otherwise modified, refinanced or replaced from time to time, the " Indenture") pursuant to which certain of the Second Lien Secured Parties have severally agreed to advance funds to or purchase certain notes from Issuer (together with any such advances or purchases by any other Second Lien Secured Parties under any Additional Second Lien Agreement, the "Extensions of Credit") upon the terms and subject to the conditions set forth therein. This Deed of Trust is being executed and delivered in accordance with Section 11.05(a) of the Indenture.

2. In addition to serving as the Collateral Agent under the Security Agreement, as Trustee under the Indenture and as Initial Second Priority Representative under the Intercreditor Agreement, Beneficiary may also serve as a Second Priority Representative for any additional Second Priority Debt Facility, under and as each of the foregoing terms are defined in the Intercreditor Agreement (as defined below).

3. Certain subsidiaries of TCEH, including Grantor, have agreed to guarantee all of Issuer's obligations under the Indenture in accordance with the terms thereof and may guarantee Additional Second Lien Obligations to the extent permitted by the Indenture and any Additional Second Lien Agreement. Grantor is a Subsidiary Guarantor.

1

4. Grantor acknowledges that it will derive substantial direct and indirect benefit from the Extensions of Credit and has agreed to secure its obligations with respect thereto pursuant to this Deed of Trust.

**AGREEMENT**

In consideration of the premises and to induce each present or future Second Lien Secured Party to make their respective Extensions of Credit, Grantor hereby agrees with Beneficiary, for the ratable benefit of the Second Lien Secured Parties, as follows:

1.    <u>DEFINITIONS</u>

As used herein, the following terms shall have the following meanings:

"<u>Additional Second Lien Agreement</u>" has the meaning given to it in the Security Agreement.

"<u>Additional Second Lien Obligations</u>" has the meaning given to it in the Security Agreement.

"<u>Excluded Property</u>" means Excluded Property, Excluded Lease Rights (each as defined in the Security Agreement) and other personal property to the extent (and only to the extent) excluded from the grant of the security interest pursuant to the proviso at the end of Section 2(a) of the Security Agreement or excluded in the definitions of the items constituting "Collateral" under the Security Agreement.

"<u>Intercreditor Agreement</u>" means that certain Second Lien Intercreditor Agreement, dated as of October 6, 2010, as supplemented by that certain Representative Supplement No. 1 dated as of October 20, 2010 (as has been and may be amended, amended and restated, supplemented or otherwise modified from time to time), among Citibank, N.A., as first lien administrative agent and collateral agent, The Bank of New York Mellon Trust Company, N.A., as the Initial Second Priority Representative (as defined therein), Grantor and such other parties as may from time to time become party thereto.

"<u>Material Adverse Effect</u>" shall mean any circumstances or conditions affecting the business, assets, operations, properties or financial condition of the Issuer and its Subsidiaries, taken as a whole, that would, individually or in the aggregate, materially adversely affect (a) the ability of the Issuer and the Guarantors, taken as a whole, to perform their payment obligations under any Second Lien Security Documents or (b) the rights and remedies of Beneficiary and any Second Lien Secured Party under any Second Lien Security Documents.

"<u>Mortgaged Property</u>" means: (1) the real property described in <u>Exhibit A</u>, together with any greater estate therein as hereafter may be acquired by Grantor (the "<u>Land</u>"); (2) the tenant's or lessee's interests (the "<u>Leasehold Estate</u>") created by any lease or sublease (as amended to date and as amended, amended and restated, supplemented, renewed or otherwise modified from time to time in accordance with the provisions of this Deed of Trust, the " <u>Mortgaged Leases</u>"), described in <u>Exhibit B</u>, which <u>Exhibit B</u> describes the properties demised under each such Mortgaged Lease (the " <u>Mortgaged Leased Land</u>"); (3) all buildings, structures and other

2

improvements, now or at any time situated, placed or constructed upon the Land, and all of Grantor's interests in any buildings, structures and other improvements, now or at any time situated, placed or constructed upon the Mortgaged Leased Land or the Easement Land (but in each case excluding any portion thereof (the "Unbundled Exception Portion") conveyed to TXU Electric Delivery Company [ *or TXU Mining Company*] in Special Warranty Deed dated effective as of January 1, 2002 conveying the Land to TXU Generation Company LP, together with any greater estate therein as hereafter may be acquired by Grantor (the "Improvements"), (4) all goods that constitute fixtures under the UCC that are installed in or attached to the Land, the Mortgaged Leased Land, the Easement Land or the Improvements (the "Fixtures"); (5) Grantor's interest in any and all now existing or hereafter acquired easements and rights-of-way, including, without limitation, those described in Exhibit C hereto (as amended to date and as amended, amended and restated, supplemented, renewed or otherwise modified from time to time in accordance with the provisions of this Deed of Trust, the "Easement Rights"), with the real property interest covered thereby, including, without limitation, those described in Exhibit C being herein called the "Easement Land"); (6) Grantor's interest in, to and under all now existing or hereafter acquired certificates of adjudication, water rights permits, water rights agreements and similar agreements, including, without limitation, those described in Exhibit D (as amended to date and as amended, amended and restated, supplemented, renewed or otherwise modified from time to time in accordance with the provisions of this Deed of Trust, the "Water Rights"); (7) Grantor's interest in, to and under all, whether now existing or hereafter acquired, leases, subleases, licenses, concessions, occupancy agreements or other agreements which grant to a Person other than Grantor a possessory interest in, or the right to use, all or any part of the Mortgaged Property, together with all related security and other deposits (as amended to date and as amended, amended and restated, supplemented, renewed or otherwise modified from time to time in accordance with the provisions of this Deed of Trust, the "Leases"); (8) Grantor's interest in and to all of the rents, revenues, income, proceeds, profits, security and other types of deposits, and other benefits paid or payable by parties to the Leases other than Grantor for using, leasing, licensing, possessing, operating from, residing in, selling or otherwise enjoying the Mortgaged Property (in each case whether now existing or hereafter acquired, the "Rents"); (9) all rights, privileges, tenements, hereditaments, rights-of-way, easements, appendages and appurtenances appertaining to the foregoing, and all right, title and interest, if any, of Grantor in and to any streets, ways, alleys, strips or gores of land adjoining the Land, the Mortgaged Leased Land, the Easement Land or any part thereof, in each case whether now or hereafter existing; (10) Grantor's interest in and to all timber to be cut and mineral, coal, lignite, oil and gas rights now or hereafter acquired and relating to all or any part of the Mortgaged Property; (11) any awards, remunerations, reimbursements, settlements or compensation heretofore made to Grantor or hereafter to be made to Grantor by any governmental authority pertaining to the Land, Improvements or Fixtures; and (12) all accessions, replacements and substitutions for any of the foregoing and all proceeds thereof. The term "Mortgaged Property" shall mean all or, where the context permits or requires, any portion of the above items or any interest therein. The Mortgaged Property does not include any Excluded Property.

"Obligations" means the Second Lien Obligations as defined in the Security Agreement.

"Owned Land" means the portion of the Land fee simple title to which is owned by Grantor.

3

"Permitted Liens" means: (1) Permitted Liens as defined in the Indenture; (2) in any event, any title exceptions shown in the mortgagee policy of title insurance issued or to be issued by Fidelity National Title Insurance Company to Beneficiary with respect to the Mortgaged Property in accordance with Section 11.05(b) of the Indenture (the "Title Policy"), and (3) in any event, any First Lien Obligations.

"Real Estate" means the Owned Land, the Mortgaged Leased Land, the Easement Land and the Improvements and Fixtures located thereon.

"Related Parties" shall mean, with respect to any specified Person, such Person's Affiliates and the directors, officers, employees, agents, trustees and advisors of such Person and any Person that possesses, directly or indirectly, the power to direct or cause the direction of the management or policies of such Person, whether through the ability to exercise voting power, by contract or otherwise.

"Second Lien Security Documents" means the Indenture, any Additional Second Lien Agreement, and any of the Security Documents.

"Second Lien Secured Parties" has the meaning given to it in the Security Agreement.

"Security Agreement" means that Second Lien Security Agreement dated as of October 6, 2010, among Issuer, Grantor, the Subsidiary Grantors (as defined therein) party thereto, and the Bank of New York Mellon Trust Company, N.A. as Beneficiary and the Initial Second Priority Representative (as defined in the Intercreditor Agreement).

"UCC" means the Uniform Commercial Code as in effect in the State of Texas, as amended from time to time.

"Warranty Property" means: (i) the Land described in Exhibit A (the "Warranty Land"); (ii) the Leasehold Estate described in Exhibit B (the "Warranty Leasehold Estate"); (iii) the Easement Rights described in Exhibit C (the "Warranty Easement Rights"); (iv) all buildings, structures and other improvements now located on the Warranty Land, excluding the Unbundling Exception Portion (the "Warranty Fee Improvements"); (v) the buildings, structures and other improvements now located on the Mortgaged Leased Land, excluding the reversionary interest therein of the landlord of the Mortgaged Lease or its successor in interest as owner of the Mortgaged Leased Land (the "Warranty Leasehold Improvements"); (vi) the buildings, structures and other improvements now located on the Easement Land, excluding the reversionary interest therein of the grantor of the Easement Rights or its successor in interest as owner of the Easement Land (the "Warranty Easement Improvements"); (vii) all goods that constitute fixtures under the UCC that are now installed in or attached to the Warranty Land, the Mortgaged Leased Land, the Easement Land or the Improvements, subject to the exclusions in clauses (iv), (v) and (vi) of this definition (the "Warranty Fixtures"); and (viii) the Water Rights derived from each certificate of adjudication described in Exhibit D (the "Warranty Water Rights").

4

In addition:

(a) All capitalized terms used in this Deed of Trust but not defined herein shall have the meanings given to them in the Indenture;

(b) The words "hereof, "herein", "hereto" and "hereunder" and words of similar import when used in this Deed of Trust shall refer to this Deed of Trust as a whole and not to any particular provision of this Deed of Trust, and Section, subsection and Schedule references are to this Deed of Trust unless otherwise specified;

(c) The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation"; and

(d) Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Deed of Trust shall be used interchangeably in singular or plural form and the word "Grantor" shall mean "each Grantor or any subsequent owner or owners of the Mortgaged Property or any part thereof or interest therein," the word "Beneficiary" shall mean "Beneficiary or any successor collateral agent for the Second Lien Secured Parties," (or such other capacities under any Additional Second Lien Agreement and any successors to such other capacities), the word "Trustee" shall mean "Trustee and any successor trustee hereunder," the word "person" shall include any individual, corporation, partnership, limited liability company, trust, unincorporated association, government, governmental authority, or other entity, and the words "Mortgaged Property" shall include any portion of the Mortgaged Property or interest therein. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa. The captions in this Deed of Trust are for convenience of reference only and in no way limit or amplify the provisions hereof.

2.    GRANT

For the ratable benefit of the Second Lien Secured Parties and to secure the full and timely payment and performance of the Obligations, Grantor MORTGAGES, GRANTS, BARGAINS, SELLS and CONVEYS, to Trustee, IN TRUST, WITH POWER OF SALE, the Mortgaged Property, subject, however, only to Permitted Liens; TO HAVE AND TO HOLD the Mortgaged Property together with the rights, privileges and appurtenances thereto belonging to Trustee and to its substitutes or successors, forever; and Grantor does hereby bind itself, its successors and assigns to WARRANT AND FOREVER DEFEND the title to the Mortgaged Property, subject to Permitted Liens, unto Trustee and to its substitutes or successors against the claim or claims of every person whomsoever lawfully claiming or to claim the same or any part thereof.

TO HAVE AND TO HOLD the Mortgaged Property unto the Trustee and/or Beneficiary, their respective successors and assigns for the uses and purposes set forth, until the Obligations are fully paid and performed, provided, however, that the condition of this Deed of Trust is such that if the Obligations are fully paid and performed in accordance with the provisions of the Second Lien Security Documents, then the estate hereby granted shall cease, terminate and become void but shall otherwise remain in full force and effect.

5

The liens and security interests created by this Deed of Trust shall be, until such time as all First Lien Obligations have been satisfied in full, a second priority lien (subject to Permitted Liens), subordinate in all respects (including the exercise of remedies with respect to the Mortgaged Property covered hereby) to the prior lien of the applicable mortgage encumbering the Mortgage Property and securing the First Lien Obligations on and subject to the terms and conditions set forth in the Intercreditor Agreement. Notwithstanding anything herein to the contrary, the lien and security interest granted hereunder and the exercise of any rights or remedies by Trustee and Beneficiary hereunder are subject to the provisions of the Intercreditor Agreement. In the event of any conflict or inconsistency between the terms of the Intercreditor Agreement and this Deed of Trust, the terms of the Intercreditor Agreement shall govern.

To the extent this Deed of Trust secures Additional Second Lien Obligations pursuant to any Additional Second Lien Agreement, such Additional Second Lien Obligations shall be so secured if and when made in accordance with the conditions set forth in Section 8.17 of the Security Agreement, at which time Grantor will execute and record a supplement or amendment to this Deed of Trust in confirmation of and to secure such Additional Second Lien Obligations. It is the express intention of Grantor hereunder that any and all Additional Second Lien Obligations shall be secured with the same priority as if made on the date of execution of this Deed of Trust.

3.    WARRANTIES, REPRESENTATIONS AND COVENANTS

Grantor warrants, represents and covenants to Trustee and Beneficiary as follows:

3.1 Title to Mortgaged Property and Lien of this Instrument; Warranties Regarding Warranty Property. Grantor warrants that Grantor has good title in fee simple in and to the Warranty Land, a valid leasehold estate under the Mortgaged Leases described in  Exhibit B, a valid easement estate under the Warranty Easements Rights, and good title to the Warranty Fee Improvements, the Warranty Leasehold Improvements and the Warranty Easement Improvements, the Warranty Fixtures and the Warranty Water Rights, and upon acquisition thereof by Grantor, will have good title in fee simple, leasehold or easement estate, as applicable, in the portion of the Mortgage Property hereafter acquired by Grantor, in each case free and clear of any Liens except for Permitted Liens, except where the failure to have such good title could not reasonably be expected to have a Material Adverse Effect. This Deed of Trust creates valid, enforceable liens and security interests against the Mortgaged Property, subject to Permitted Liens, and upon recording of this Deed of Trust in the real property records of the county or counties in which the Mortgaged Property is situated and this Deed of Trust being indexed as a fixture, timber and as-extracted collateral filing in such records, this Deed of Trust will create and constitute a valid and enforceable mortgage Lien on and UCC security interest in the portion of the Mortgaged Property that is fixtures, timber to be cut and as-extracted collateral, subject to Permitted Liens. Grantor shall preserve and protect the Lien (including the priority thereof) and security interest of this Deed of Trust and the other Second Lien Security Documents insofar as they refer to the Mortgaged Property, subject only to Permitted Liens, to the extent necessary to avoid causing a Material Adverse Effect.

3.2 Payment of Obligations. Grantor shall pay and perform the Obligations at the times and places and in the manner specified in the Second Lien Security Documents.

6

3.3 <u>Requirements</u>. Grantor shall comply with all covenants, restrictions and conditions now or later of record which may be applicable to any of the Mortgaged Property, or to the use, manner of use, occupancy, possession, operation, maintenance, alteration, repair or reconstruction of any of the Mortgaged Property, except where a failure to do so could not reasonably be expected to have a Material Adverse Effect.

3.4 <u>Payment of Taxes and Other Impositions</u>. (a) Except as prohibited by the Indenture, Grantor shall, prior to the date on which any fine, penalty, interest or cost may be added thereto or imposed, pay and discharge all taxes, charges and assessments of every kind and nature, all charges for any easement or agreement maintained for the benefit of any of the Real Estate, all general and special assessments, levies, permits, inspection and license fees, all water and sewer rents and charges, all vault taxes and all other public charges even if unforeseen or extraordinary, imposed upon or assessed against or that may become a material lien on any of the Real Estate, or arising in respect of the occupancy, use or possession thereof, together with any penalties or interest on any of the foregoing (all of the foregoing are collectively referred to herein as the " <u>Impositions</u>"), except where the validity or amount thereof is being contested in good faith and by proper proceedings, so long as Grantor maintains adequate reserves (in the good faith judgment of the management of the Issuer) with respect thereto in accordance with GAAP and the failure to pay could not reasonably be expected to result in a Material Adverse Effect. If by law any Imposition may be paid in installments (whether or not interest shall accrue on the unpaid balance of such Imposition), Grantor may elect to pay such Imposition in such installments and shall be responsible for the payment of such installments with interest, if any.

(b) Nothing herein shall affect any right or remedy of Trustee or Beneficiary under this Deed of Trust or otherwise, following the occurrence and during the continuance of an Event of Default, without notice or demand to Grantor, to pay any Imposition after the date such Imposition shall have become delinquent, and add to the Obligations the amount so paid, together with interest from the time of payment at the default rate determined in accordance with Section 2.12 of the Indenture (interest accrued at such rate being referred to herein as " <u>Default Interest</u>"). Any sums paid by Trustee or Beneficiary in discharge of any Impositions shall be (i) a lien on the Premises secured hereby prior to any right or title to, interest in, or claim upon the Premises subordinate to the lien of this Deed of Trust, and (ii) payable on demand by Grantor to Trustee or Beneficiary, as the case may be, together with Default Interest.

3.5 <u>Insurance</u>. Mortgagor will keep or cause to be kept the Mortgaged Property insured against such risks and shall purchase such additional insurance to the extent that is required from time to time pursuant to Section 4.17 of the Indenture.

3.6 <u>Restrictions on Liens and Encumbrances</u>. Except for the lien of this Deed of Trust and the Permitted Liens, Grantor shall not further mortgage, nor otherwise encumber the Mortgaged Property nor create or suffer to exist any lien, charge or encumbrance on the Mortgaged Property, or any part thereof, whether superior or subordinate to the lien of this Deed of Trust and whether recourse or non-recourse.

3.7 <u>Due on Sale and Other Transfer Restrictions</u>. Except as expressly permitted under the Indenture or herein, Grantor shall not sell, transfer, convey or assign all or any portion of, or any interest in, the Mortgaged Property.

7

3.8 <u>Condemnation/Eminent Domain</u>. Promptly upon obtaining knowledge of the institution of any proceedings for the condemnation of the Mortgaged Property, or any material portion thereof, Grantor will notify Beneficiary of the pendency of such proceedings. All awards and proceeds relating to such condemnation shall be deemed Net Proceeds and applied in the manner specified in Section 4.10 of the Indenture.

3.9 <u>Leases</u>. Except as expressly permitted under the Indenture, Grantor shall not (a) execute an assignment or pledge of any Lease relating to all or any portion of the Mortgaged Property other than in favor of Beneficiary, or (b) execute or permit to exist any Lease of any of the Mortgaged Property.

3.10 <u>Further Assurances</u>. To the extent required under the terms of the Indenture, to further assure Beneficiary's rights under this Deed of Trust, Grantor agrees promptly upon demand of Beneficiary to do any act or execute any additional documents (including, but not limited to, security agreements on any personalty included or to be included in the Mortgaged Property and a separate assignment of each Lease in recordable form) as may be reasonably required by Beneficiary to confirm the lien of this Deed of Trust and all other rights or benefits conferred on Beneficiary by this Deed of Trust.

3.11 <u>Beneficiary's Right to Perform</u>. Upon the occurrence and during the continuance of an Event of Default, Beneficiary or Trustee, may, at any time upon 5 days' notice to Grantor (but shall be under no obligation to) pay or perform any delinquent obligations of Grantor hereunder, and the amount or cost thereof, with Default Interest, shall immediately be due from Grantor to Beneficiary or Trustee (as the case may be) and the same shall be secured by this Deed of Trust and shall be a lien on the Mortgaged Property prior to any right, title to, interest in, or claim upon the Mortgaged Property attaching subsequent to the lien of this Deed of Trust. No payment or advance of money by Beneficiary or Trustee under this Section shall be deemed or construed to cure Grantor's default or waive any right or remedy of Beneficiary or Trustee.

4.    <u>LIMITATION ON AMOUNT OBLIGATED; CONTRIBUTION BY OTHER PERSONS</u>

Anything contained in this Deed of Trust to the contrary notwithstanding, if any Fraudulent Transfer Law (as hereinafter defined) is determined by a court of competent jurisdiction to be applicable to the obligations of Grantor under this Deed of Trust, such obligations shall be limited to the maximum aggregate amount that would not render Grantor's obligations under this Deed of Trust subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Code or any applicable provisions of comparable state law (collectively, the "<u>Fraudulent Transfer Laws</u>"), in each case after giving effect to all other liabilities of Grantor, contingent or otherwise, that are relevant under the Fraudulent Transfer Laws, and giving effect as assets to the value (as determined under the applicable provisions of the Fraudulent Transfer Laws) of any rights to subrogation, reimbursement, indemnification, or contribution of Grantor pursuant to applicable law or pursuant to the terms of any agreement.

5.    <u>REMEDIES</u>

(a) Upon the occurrence and during the continuance of any Event of Default, Beneficiary may immediately take such action, without notice or demand, as it deems advisable to protect and enforce its rights against Grantor and in and to the Mortgaged Property, including, but not limited to, the following actions, each of which may be pursued concurrently or otherwise, at such time and in such manner as Trustee or Beneficiary (as the case may be) may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of Beneficiary:

(i) Upon the occurrence and during the continuance of an Event of Default, Trustee is hereby authorized and empowered to sell or offer for sale at one or more sales, as an entirety or in parcels, as Trustee may elect, all or any part of the Mortgaged Property located in the State of Texas, with or without having first taken possession of same, to the highest bidder for cash at public auction. Such sale or sales shall be made at the courthouse of the county in Texas in which the Mortgaged Property or any part thereof is situated, as herein described, between the hours of 10:00 a.m. and 4:00 p.m. on the first Tuesday of any month, beginning within three (3) hours of the time provided in the notices described herein. Trustee shall post a written or printed notice or notices of the place, earliest time at which the sale will begin and the terms of said sale, and the portion of the Mortgaged Property to be sold, for at least twenty-one (21) days preceding the date of the sale, at the courthouse door of said county in which the sale is to be made; and if such Mortgaged Property lies in more than one county, one such notice of sale shall be posted at the courthouse door of each county in which such Mortgaged Property is situated and such Mortgaged Property may be sold at the area designated by the commissioners court of any one of such counties, and the notice so posted shall designate in which county such property shall be sold. In addition to such posting of notice, Beneficiary, Trustee or the other holder of the secured indebtedness (or some person or persons acting for the Trustee, Beneficiary, or other such holder) shall, at least twenty-one (21) days preceding the date of sale, file a copy of such notice(s) in the office of the county clerk in each of such counties and serve or cause to be served written notice of the proposed sale by certified mail on Grantor and on each other party, if any, obligated to pay the secured indebtedness according to the records of Beneficiary. Service of such notice shall be completed upon deposit of the notice, enclosed in a postpaid wrapper properly addressed to Grantor and such other parties at their most recent address or addresses as shown by the records of Beneficiary, in a post office or official depository under the care and custody of the United States Postal Service. The affidavit of any person having knowledge of the facts to the effect that such a service was completed shall be prima facie evidence of the fact of service. Grantor agrees that no notice of any sale, other than as set out in this paragraph, need be given by Trustee, Beneficiary, or any other person. Grantor authorizes and empowers Trustee to sell the Mortgaged Property in lots or parcels or in its entirety as Trustee shall deem expedient; and to execute and deliver to the purchaser or purchasers thereof good and sufficient deeds of conveyance thereto, with evidence of general warranty by Grantor. Trustee may postpone the sale of all or any part of the Mortgaged Property by public announcement at the time and place of such sale, and from time to time thereafter may further postpone such sale by public announcement made at the time of sale fixed by the preceding postponement. The right

9

of sale hereunder shall not be exhausted by one or any sale, and Trustee may make other and successive sales until all of the trust estate be legally sold. The provisions hereof with respect to the posting and giving of notices of sale are intended to comply with the provisions of Section 51.002 of the Texas Property Code as in effect on the date hereof, and in the event that the requirements of Section 51.002 of the Texas Property Code shall be modified or repealed in the future, by amendment, superceding statute or otherwise, and such amendment, statute or other action applies to the enforcement of pre-existing instruments, then the terms of this Section shall be deemed to be modified accordingly, effective as of the effective date of such modification or repeal;

(ii) Beneficiary may, to the extent permitted by applicable law, (A) institute and maintain an action of mortgage foreclosure against all or any part of the Mortgaged Property, (B) institute and maintain an action on the Second Lien Security Documents, or (C) take such other action at law or in equity for the enforcement of this Deed of Trust or any of the Second Lien Security Documents as the law may allow. Beneficiary may proceed in any such action to final judgment and execution thereon for all sums due hereunder, together with Default Interest thereon and all costs of suit, including, without limitation, reasonable attorneys' fees and disbursements. Default Interest, to the extent permitted by applicable law, shall be due on any judgment obtained by Beneficiary from the date of judgment until actual payment is made of the full amount of the judgment; and

(iii) Beneficiary may personally, or by its agents, attorneys and employees and without regard to the adequacy or inadequacy of the Mortgaged Property or any other collateral as security for the Obligations enter into and upon the Mortgaged Property and each and every part thereof and exclude Grantor and its agents and employees therefrom without liability for trespass, damage or otherwise (Grantor hereby agreeing to surrender possession of the Mortgaged Property to Beneficiary upon demand at any such time) and use, operate, manage, maintain and control the Mortgaged Property and every part thereof. Following such entry and taking of possession, Beneficiary shall be entitled, without limitation, (x) to lease all or any part or parts of the Mortgaged Property for such periods of time and upon such conditions as Beneficiary may, in its discretion, deem proper, (y) to enforce, cancel or modify any Lease and (z) generally to execute, do and perform any other act, deed, matter or thing concerning the Mortgaged Property as Beneficiary shall deem appropriate as fully as Grantor might do.

(b) In case of a foreclosure sale, the Real Estate may be sold, at Trustee's election, in one parcel or in more than one parcel and Trustee is specifically empowered (without being required to do so, and in its sole and absolute discretion) to cause successive sales of portions of the Mortgaged Property to be held.

(c) In the event of any breach of any of the covenants, agreements, terms or conditions contained in this Deed of Trust, Beneficiary, and to the extent permitted by applicable law and principles of equity, shall be entitled to enjoin such breach and/or obtain specific performance of any covenant, agreement, term or condition and Beneficiary shall have the right to invoke any equitable right or remedy as though other remedies were not provided for in this Deed of Trust.

10

(d) It is agreed that if an Event of Default shall occur and be continuing, any and all proceeds of the Mortgaged Property received by Trustee or Beneficiary shall be held by Trustee for Beneficiary for the benefit of the Second Lien Secured Parties or by Beneficiary for the benefit of the Second Lien Secured Parties as collateral security for the Obligations (whether matured or unmatured), and shall be applied in payment of the Obligations in the manner set forth in Section 5.3 of the Security Agreement.

6.  RIGHT OF BENEFICIARY TO CREDIT SALE

Upon the occurrence of any sale made under this Deed of Trust, whether made under the power of sale or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, Beneficiary may bid for and acquire the Mortgaged Property or any part thereof. In lieu of paying cash therefor, Beneficiary may make settlement for the purchase price by crediting upon the Obligations or other sums secured by this Deed of Trust, the net sales price after deducting therefrom the expenses of sale and the cost of the action and any other sums which Beneficiary is authorized to deduct under this Deed of Trust. In such event, this Deed of Trust, the Second Lien Security Documents and all other documents evidencing expenditures secured hereby may be presented to the person or persons conducting the sale in order that the amount so used or applied may be credited upon the Obligations as having been paid.

7.  APPOINTMENT OF RECEIVER

If an Event of Default shall have occurred and be continuing, Beneficiary as a matter of right and without notice to Grantor, unless otherwise required by applicable law, and without regard to the adequacy or inadequacy of the Mortgaged Property or any other collateral or the interest of Grantor therein as security for the Obligations, shall have the right to apply to any court having jurisdiction to appoint a receiver or receivers of the Mortgaged Property, without requiring the posting of a surety bond, and without reference to the adequacy of the value of the Mortgaged Property or the solvency or insolvency of Grantor or any other party obligated for payment of all or any part of the Obligations, and whether or not waste has occurred with respect to the Mortgaged Property, and Grantor hereby irrevocably consents to such appointment and waives notice of any application therefor (except as may be required by law). Any such receiver or receivers shall have all the usual powers and duties of receivers in like or similar cases and all the powers and duties of Beneficiary in case of entry as provided in this Deed of Trust, including, without limitation and to the extent permitted by law, the right to enter into leases of all or any part of the Mortgaged Property, and shall continue as such and exercise all such powers until the date of confirmation of sale of the Mortgaged Property unless such receivership is sooner terminated.

8.  EXTENSION, RELEASE, ETC

(a) Without affecting the lien or charge of this Deed of Trust upon any portion of the Mortgaged Property not then or theretofore released as security for the full amount of the Obligations, Beneficiary may, from time to time and without notice, agree to (i) release any person liable for the indebtedness borrowed or guaranteed under the Second Lien Security Documents, (ii) extend the maturity or alter any of the terms of the indebtedness borrowed or guaranteed under the Second Lien Security Documents or any other guaranty thereof, (iii) grant

11

other indulgences, (iv) release or reconvey, or cause to be released or reconveyed at any time at Beneficiary's option any parcel, portion or all of the Mortgaged Property, (v) take or release any other or additional security for any obligation herein mentioned, or (vi) make compositions or other arrangements with debtors in relation thereto.

(b) No recovery of any judgment by Beneficiary and no levy of an execution under any judgment upon the Mortgaged Property or upon any other property of Grantor shall affect the lien of this Deed of Trust or any liens, rights, powers or remedies of Beneficiary hereunder, and such liens, rights, powers and remedies shall continue unimpaired.

(c) If Beneficiary shall have the right to foreclose this Deed of Trust or to direct the Trustee to exercise its power of sale, Grantor authorizes Beneficiary at its option to foreclose the lien of this Deed of Trust (or direct the Trustee to sell the Mortgaged Property, as the case may be) subject to the rights of any tenants of the Mortgaged Property. The failure to make any such tenants parties defendant to any such foreclosure proceeding and to foreclose their rights, or to provide notice to such tenants as required in any statutory procedure governing a sale of the Mortgaged Property, or to terminate such tenant's rights in such sale will not be asserted by Grantor as a defense to any proceeding instituted by Beneficiary to collect the Obligations or to foreclose the lien of this Deed of Trust.

(d) Unless expressly provided otherwise, in the event that Beneficiary's interest in this Deed of Trust and title to the Mortgaged Property or any estate therein shall become vested in the same person or entity, this Deed of Trust shall not merge in such title but shall continue as a valid lien on the Mortgaged Property for the amount secured hereby.

9.    SECURITY AGREEMENT UNDER UNIFORM COMMERCIAL CODE; FIXTURE FILING

(a) It is the intention of the parties hereto that this Deed of Trust shall constitute a "security agreement" within the meaning of the UCC. To that end, Grantor hereby grants to Trustee and Beneficiary, for the ratable benefit of the Second Lien Secured Parties, a security interest in the Fixtures, Leases, Rents, timber to be cut and as-extracted collateral, all to secure payment and performance of the Obligations. If an Event of Default shall occur and be continuing, then in addition to having any other right or remedy available at law or in equity, Beneficiary shall have the option of either (i) proceeding under the UCC and exercising such rights and remedies as may be provided to a secured party by the UCC with respect to all or any portion of the Mortgaged Property that is personal property (including, without limitation, taking possession of and selling such property) or (ii) treating such property as real property and proceeding with respect to both the real and personal property constituting the Mortgaged Property in accordance with Beneficiary's rights, powers and remedies with respect to the Real Estate (in which event the default provisions of the UCC shall not apply). If Beneficiary shall elect to proceed under the UCC, then ten (10) days' notice of sale of the personal property shall be deemed reasonable notice and the reasonable expenses of retaking, holding, preparing for sale, selling and the like incurred by Beneficiary shall include, but not be limited to, attorneys' fees and legal expenses. At Beneficiary's request, Grantor shall assemble the personal property and make it available to Beneficiary at a place designated by Beneficiary which is reasonably convenient to both parties.

12

(b) Certain portions of the Mortgaged Property are or will become "fixtures", "timber to be cut" or "as-extracted collateral" (as defined in the UCC) on the Owned Land, the Mortgage Leased Land, the Easement Land or the Improvements located thereon, and this Deed of Trust, upon being filed for record in the real estate records of the county wherein such fixtures, timber to be cut or as-extracted collateral are situated, shall operate also as a financing statement filed as a fixture filing in accordance with the applicable provisions of said UCC upon such portions of the Mortgaged Property that are or become fixtures. The Land, Mortgaged Leased Land and Easement Land to which the fixtures relate is described in  Exhibit A,  Exhibit B and  Exhibit C respectively hereto. The record owner of (i) the Land described in  Exhibit A hereto is the Grantor, (ii) the Mortgaged Leased Land described in  Exhibit B hereto is the landlord under the Mortgaged Leases described in such exhibit or its successor in interest as owner of the Mortgaged Leased Land, and (iii) the Easement Land described in  Exhibit C hereto is grantor of the Easement Rights described in such exhibit or its successor in interest as owner of the Easement Land. The name, type of organization and jurisdiction of organization of the debtor for purposes of this financing statement are the name, type of organization and jurisdiction of organization of the Grantor set forth in the first paragraph of this Deed of Trust, and the name of the secured party for purposes of this financing statement is the name of Beneficiary set forth in the first paragraph of this Deed of Trust. The mailing address of the Grantor/debtor is the address of the Grantor set forth in the first paragraph of this Deed of Trust. The mailing address of Beneficiary/the secured party from which information concerning the security interest hereunder may be obtained is the address of Beneficiary set forth in the first paragraph of this Deed of Trust. Grantor's organizational identification number is set forth in the first paragraph of this Deed of Trust.

10.    ASSIGNMENT OF RENTS

(a) Grantor hereby assigns to Beneficiary the Rents as further security for the payment of and performance of the Obligations, and Grantor grants to Beneficiary the right to enter the Mortgaged Property for the purpose of collecting the same and to let the Mortgaged Property or any part thereof, and to apply the Rents on account of the Obligations. The foregoing assignment and grant is present and absolute and shall continue in effect until the Obligations are fully paid and performed, but Beneficiary hereby waives the right to enter the Mortgaged Property for the purpose of collecting the Rents and Grantor shall be entitled to collect, receive, use and retain the Rents unless an Event of Default has occurred and for so long as such Event of Default continues; such right of Grantor to collect, receive, use and retain the Rents may be revoked by Beneficiary upon the occurrence and during the continuance of any Event of Default by giving not less than five days' written notice of such revocation to Grantor. In the event such notice is given, Grantor shall pay over to Beneficiary, or to any receiver appointed to collect the Rents, any lease security deposits, and shall pay monthly in advance to Beneficiary, or to any such receiver, the fair and reasonable rental value as determined by Beneficiary for the use and occupancy of such part of the Mortgaged Property as may be in the possession of Grantor or any affiliate of Grantor, and upon default in any such payment Grantor and any such affiliate will vacate and surrender the possession of the Mortgaged Property to Beneficiary or to such receiver, and in default thereof may be evicted by summary proceedings or otherwise. Grantor shall not accept prepayments of installments of Rent to become due for a period of more than one month in advance (except for security deposits and estimated payments of percentage rent, if any).

13

(b) Grantor has not affirmatively done any act that would prevent Beneficiary from, or limit Beneficiary in, acting under any of the provisions of the foregoing assignment.

(c) Except for any matter disclosed in the Indenture, no action has been brought or, so far as is known to Grantor, is threatened, that would interfere in any way with the right of Grantor to execute the foregoing assignment and perform all of Grantor's obligations contained in this Section and in the Leases.

11.    <u>ADDITIONAL RIGHTS</u>

The holder of any subordinate lien or subordinate deed of trust on the Mortgaged Property shall have no right to terminate any Lease whether or not such Lease is subordinate to this Deed of Trust nor shall Grantor consent to any holder of any subordinate lien or subordinate deed of trust joining any tenant under any Lease in any trustee's sale or action to foreclose such subordinate lien or modify, interfere with, disturb or terminate the rights of any tenant under any Lease. By recordation of this Deed of Trust all subordinate lienholders and the trustees and beneficiaries under subordinate mortgages are subject to and notified of this provision, and any action taken by any such lienholder or beneficiary contrary to this provision shall be null and void. Any such application shall not be construed to cure or waive any Default or Event of Default or invalidate any act taken by Beneficiary on account of such Default or Event of Default.

12.    <u>NOTICES</u>

All notices, requests and demands to or upon Beneficiary or the Grantor hereunder shall be effected in the manner provided for in Section 13.02 of the Indenture; provided that any such notice, request or demand to or upon Grantor shall be addressed to Grantor at its address set forth above.

13.    <u>NO ORAL MODIFICATION</u>

This Deed of Trust may not be amended, supplemented or otherwise modified except in accordance with the provisions of Article 9 of the Indenture. Any agreement made by Grantor and Beneficiary after the date of this Deed of Trust relating to this Deed of Trust shall be superior to the rights of the holder of any intervening or subordinate lien or encumbrance. Trustee's execution of any written agreement between Grantor and Beneficiary shall not be required for the effectiveness thereof as between Grantor and Beneficiary.

14.    <u>PARTIAL INVALIDITY</u>

In the event any one or more of the provisions contained in this Deed of Trust shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision hereof, but each shall be construed as if such invalid, illegal or unenforceable provision had never been included. Notwithstanding anything to the contrary contained in this Deed of Trust or in any provisions of any Second Lien Security Document, the obligations of Grantor and of any other obligor under any Second Lien Security Document shall be subject to the limitation that Beneficiary shall not charge, take or receive, nor shall Grantor or any other obligor be obligated to pay to Beneficiary, any amounts constituting interest in excess of the maximum rate permitted by law to be charged by Beneficiary.

14

15.  <u>GRANTOR'S WAIVER OF RIGHTS</u>

(a) Grantor hereby voluntarily and knowingly releases and waives any and all rights to retain possession of the Mortgaged Property upon the occurrence and during the continuance of an Event of Default and any and all rights of redemption from sale under any order or decree of foreclosure (whether full or partial), pursuant to rights, if any, therein granted, as allowed under any applicable law, on its own behalf, on behalf of all persons claiming or having an interest (direct or indirectly) by, through or under Grantor and on behalf of each and every person acquiring any interest in the Mortgaged Property subsequent to the date hereof, it being the intent hereof that any and all such rights of redemption of Grantor and all such other persons are and shall be deemed to be hereby waived to the fullest extent permitted by applicable law or replacement statute. To the fullest extent permitted by applicable law, Grantor shall not invoke or utilize any such law or laws or otherwise hinder, delay, or impede the execution of any right, power, or remedy herein or otherwise granted or delegated to Beneficiary, but shall permit the execution of every such right, power, and remedy as though no such law or laws had been made or enacted.

(b) To the fullest extent permitted by law, Grantor waives the benefit of all laws now existing or that may subsequently be enacted providing for (i) any appraisement before sale of any portion of the Mortgaged Property, (ii) any extension of the time for the enforcement of the collection of the Obligations or the creation or extension of a period of redemption from any sale made in collecting such debt and (iii) exemption of the Mortgaged Property from attachment, levy or sale under execution or exemption from civil process. To the full extent Grantor may do so, Grantor agrees that Grantor will not at any time insist upon, plead, claim or take the benefit or advantage of any law now or hereafter in force providing for any appraisement, valuation, stay, exemption, extension or redemption, or requiring foreclosure of this Deed of Trust before exercising any other remedy granted hereunder and Grantor, for Grantor and its successors and assigns, and for any and all persons ever claiming any interest in the Mortgaged Property, to the extent permitted by law, hereby waives and releases all rights of redemption, valuation, appraisement, stay of execution, notice of election to mature (except as expressly provided in the Indenture) or declare due the whole of the secured indebtedness and marshalling in the event of exercise by Trustee or Beneficiary of the foreclosure rights, power of sale, or other rights hereby created.

16.  <u>REMEDIES NOT EXCLUSIVE</u>

(a) Beneficiary and Trustee shall be entitled to enforce payment and performance of the Obligations and to exercise all rights and powers under this Deed of Trust or under any of the other Second Lien Security Documents or other agreement or any laws now or hereafter in force, notwithstanding some or all of the Obligations may now or hereafter be otherwise secured, whether by deed of trust, mortgage, security agreement, pledge, lien, assignment or otherwise. Neither the acceptance of this Deed of Trust nor its enforcement, shall prejudice or in any manner affect Beneficiary's or Trustee's right to realize upon or enforce any other security now or hereafter held by Beneficiary or Trustee, it being agreed that Beneficiary and Trustee shall be

15

entitled to enforce this Deed of Trust and any other security now or hereafter held by Beneficiary or Trustee in such order and manner as Beneficiary or Trustee may determine in its absolute discretion. No remedy herein conferred upon or reserved to Trustee or Beneficiary is intended to be exclusive of any other remedy herein or by law provided or permitted, but each shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute. Every power or remedy given by any of the Second Lien Security Documents to Beneficiary or Trustee or to which either may otherwise be entitled, may be exercised, concurrently or independently, from time to time and as often as may be deemed expedient by Beneficiary or Trustee, as the case may be. In no event shall Beneficiary or Trustee, in the exercise of the remedies provided in this Deed of Trust (including, without limitation, in connection with the assignment of Rents to Beneficiary, or the appointment of a receiver and the entry of such receiver on to all or any part of the Mortgaged Property), be deemed a "mortgagee in possession," and neither Beneficiary nor Trustee shall in any way be made liable for any act, either of commission or omission, in connection with the exercise of such remedies.

(b) Without limiting the generality of Section 16(a), except as otherwise provided in Section 16(c) below, neither the enforcement of any of the remedies under Sections 5 and 16 hereof, the security interests under Section 9, the assignment of Rents under Section 10, nor any other remedies afforded to Beneficiary under the Second Lien Security Documents, at law or in equity shall cause Beneficiary, any Second Lien Secured Party or Trustee to be deemed or construed to be a mortgagee in possession of the Mortgaged Property, to obligate Beneficiary, any Second Lien Secured Party or Trustee to lease the Mortgaged Property or attempt to do so, or to take any action, incur any expense, or perform or discharge any obligation, duty or liability whatsoever under any of the Leases or otherwise.

(c) Notwithstanding the provisions of Section 16(b) above, Beneficiary shall not obtain title to a deed in lieu of foreclosure or otherwise, or take any other action with respect to the Mortgaged Property, if, as a result of any such action, Beneficiary could, in its reasonable judgment be considered to hold title to, to be a "mortgagee-in-possession" of, or to be an "owner" or "operator" of the Mortgaged Property within the meaning of Comprehensive Environmental Response, Compensation and Liability Act Of 1980 (42 U.S.C. Sections 9601 et seq.), as amended, or any comparable law, unless:

(i) Beneficiary has previously and reasonably determined, based on a Phase I environmental site assessment (and any additional environmental testing that Beneficiary deems necessary and prudent) of such Mortgaged Property conducted by an independent third party who regularly conducts Phase I environmental site assessments and performed during the 12-month period preceding any such acquisition of title or other action, that the Mortgaged Property is in compliance with applicable environmental laws and regulations and there are no circumstances or conditions present at the Mortgaged Property relating to the use, management or disposal of Hazardous Materials for which investigation, testing, monitoring, containment, clean-up or remediation could be required under any applicable environmental laws and regulations; or

(ii) in the event that the determination described in clause (i) above cannot be made, Beneficiary has previously and reasonably determined, on the same basis as

16

described in clause (i) above, that it would maximize the recovery to the Second Lien Secured Parties on a present value basis to acquire title to or possession of the Mortgaged Property and to take such remedial, corrective and/or other further actions as are necessary to bring the Mortgaged Property into compliance with applicable environmental laws and regulations and to appropriately address any of the circumstances and conditions referred to in clause (i) above.

(d) Beneficiary shall undertake, in good faith, reasonable efforts to make the determination referred to in clause (ii) above, and may conclusively rely on the Phase I environmental site assessment referred to above, and upon an opinion of counsel, in making such determination. The cost of any such Phase I environmental site assessment and any such opinion of counsel, and the cost of any Phase II environmental site assessment, additional environmental testing and remedial, corrective or other further action contemplated by clause (i) or clause (ii) above, shall be paid at the sole expense of Grantor.

(e) If the environmental testing contemplated by Section 16(b) above establishes that any of the conditions set forth in clause (i) have not been satisfied with respect to the Mortgaged Property, Beneficiary shall take such action (other than proceeding against the Mortgaged Property) and, at such time as it deems appropriate, may release all or a portion of such Mortgaged Property from the lien of this Deed of Trust, provided that prior to the release of all or a portion of the Mortgaged Property from the lien of this Deed of Trust (i) Beneficiary shall have notified the Second Lien Secured Parties in writing of its intention to so release all or a portion of such Mortgaged Property and (ii) the holders of a majority of the outstanding principal balance of the Obligations shall not have objected to such release within thirty (30) days of the distribution of the last of such notices.

17.  <u>MULTIPLE SECURITY</u>

If (a) the Land shall consist of one or more parcels, whether or not contiguous and whether or not located in the same county, or (b) in addition to this Deed of Trust, Beneficiary shall now or hereafter hold or be the beneficiary of one or more additional mortgages, liens, deeds of trust or other security (directly or indirectly) for the Obligations upon other property in the State in which the Land is located (whether or not such property is owned by Grantor or by others) or (c) both the circumstances described in clauses (a) and (b) shall be true, then to the fullest extent permitted by law, and after giving all notices required by law, Beneficiary may, at its election, commence or consolidate in a single trustee's sale or foreclosure action all trustee's sale or foreclosure proceedings against all such collateral securing the Obligations (including the Mortgaged Property), which action may be brought or consolidated in the courts of, or sale conducted in, any county in which any of such collateral is located. Grantor acknowledges that the right to maintain a consolidated trustee's sale or foreclosure action is a specific inducement to Beneficiary to extend the indebtedness borrowed pursuant to or guaranteed by the Second Lien Security Documents, and Grantor expressly and irrevocably waives any objections to the commencement or consolidation of the foreclosure proceedings in a single action and any objections to the laying of venue or based on the grounds of forum non conveniens which it may now or hereafter have. Grantor further agrees that if Trustee or Beneficiary shall be prosecuting one or more foreclosure or other proceedings against a portion of the Mortgaged Property or against any collateral other than the Mortgaged Property, which collateral directly or indirectly

17

secures the Obligations, or if Beneficiary shall have obtained a judgment of foreclosure and sale or similar judgment against such collateral (or, in the case of a trustee's sale, shall have met the statutory requirements therefor with respect to such collateral), then, whether or not such proceedings are being maintained or judgments were obtained in or outside the State in which the Premises are located, Beneficiary may commence or continue any foreclosure proceedings and exercise its other remedies granted in this Deed of Trust against all or any part of the Mortgaged Property and Grantor waives any objections to the commencement or continuation of a foreclosure of this Deed of Trust or exercise of any other remedies hereunder based on such other proceedings or judgments, and waives any right to seek to dismiss, stay, remove, transfer or consolidate either any action under this Deed of Trust or such other proceedings on such basis. The commencement or continuation of proceedings to sell the Mortgaged Property in a trustee's sale to foreclose this Deed of Trust, or the exercise of any other rights hereunder or the recovery of any judgment by Beneficiary in any such proceedings or the occurrence of any sale by the Trustee in any such proceedings shall not prejudice, limit or preclude Beneficiary's right to commence or continue one or more trustee's sales, foreclosure or other proceedings or obtain a judgment against (or, in the case of a trustee's sale, to meet the statutory requirements for, any such sale of) any other collateral (either in or outside the State in which the Premises are located) which directly or indirectly secures the Obligations, and Grantor expressly waives any objections to the commencement of, continuation of, or entry of a judgment in such other sales or proceedings or exercise of any remedies in such sales or proceedings based upon any action or judgment connected to this Deed of Trust, and Grantor also waives any right to seek to dismiss, stay, remove, transfer or consolidate either such other sales or proceedings or any sale or action under this Deed of Trust on such basis. It is expressly understood and agreed that to the fullest extent permitted by law, Beneficiary may, at its election, cause the sale of all collateral that is the subject of a single foreclosure action at either a single sale or at multiple sales conducted simultaneously and take such other measures as are appropriate in order to effect the agreement of the parties to dispose of and administer all collateral securing the Obligations (directly or indirectly) in the most economical and least time-consuming manner.

18.  SUCCESSORS AND ASSIGNS

     All covenants of Grantor contained in this Deed of Trust are imposed solely and exclusively for the benefit of Beneficiary, and its successors and assigns, and no other person or entity shall have standing to require compliance with such covenants or be deemed, under any circumstances, to be a beneficiary of such covenants, any or all of which may be freely waived in whole or in part by Beneficiary at any time if in the sole discretion of either of them such a waiver is deemed advisable. All such covenants of Grantor shall run with the land and bind Grantor, the successors and assigns of Grantor (and each of them) and all subsequent owners, encumbrances and tenants of the Mortgaged Property, and shall inure to the benefit of Trustee and Beneficiary and their respective successors and assigns. The word "Grantor" shall be construed as if it read "Grantors" whenever the sense of this Deed of Trust so requires and if there shall be more than one Grantor, the obligations of the Grantors shall be joint and several.

19.  NO WAIVERS, ETC.

     Any failure by Beneficiary to insist upon the strict performance by Grantor of any of the terms and provisions of this Deed of Trust shall not be deemed to be a waiver of any of the terms

18

and provisions hereof, and Beneficiary, notwithstanding any such failure, shall have the right thereafter to insist upon the strict performance by Grantor of any and all of the terms and provisions of this Deed of Trust to be performed by Grantor. Beneficiary may release, regardless of consideration and without the necessity for any notice to or consent by the holder of any subordinate lien on the Mortgaged Property, any part of the security held for the obligations secured by this Deed of Trust without, as to the remainder of the security, in any way impairing or affecting the lien of this Deed of Trust or the priority of such lien over any subordinate lien or deed of trust.

20.   GOVERNING LAW, ETC.

This Deed of Trust shall be governed by and construed and interpreted in accordance with the laws of the State of Texas, except that Grantor expressly acknowledges that by their respective terms the Second Lien Security Documents (unless otherwise specified therein) shall be governed and construed in accordance with the laws of the State of New York.

21.   DUTY OF BENEFICIARY; AUTHORITY OF BENEFICIARY

(a) Beneficiary's sole duty with respect to the custody, safekeeping and physical preservation of the Mortgaged Property that is in its possession, or otherwise, shall be to deal with it in the same manner as Beneficiary deals with similar property for its own account. Neither Beneficiary, any Second Lien Secured Party nor any of their respective officers, directors, employees or agents shall be liable for failure to demand, collect or realize upon any of the Mortgaged Property or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Mortgaged Property upon the request of Grantor or any other Person or to take any other action whatsoever with regard to the Mortgaged Property or any part thereof. The powers conferred on Beneficiary and the Second Lien Secured Parties hereunder are solely to protect Beneficiary's and the Second Lien Secured Parties' interests in the Mortgaged Property and shall not impose any duty upon Beneficiary or any Second Lien Secured Party to exercise any such powers. BENEFICIARY AND THE SECOND LIEN SECURED PARTIES SHALL BE ACCOUNTABLE ONLY FOR AMOUNTS THAT THEY ACTUALLY RECEIVE AS A RESULT OF THE EXERCISE OF SUCH POWERS, AND NEITHER THEY NOR ANY OF THEIR OFFICERS, DIRECTORS, EMPLOYEES OR AGENTS SHALL BE RESPONSIBLE TO GRANTOR FOR ANY ACT OR FAILURE TO ACT HEREUNDER, EXCEPT FOR THEIR OWN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

(b) Grantor acknowledges that the rights and responsibilities of Beneficiary under this Deed of Trust with respect to any action taken by Beneficiary or the exercise or non-exercise by Beneficiary of any option, voting right, request, judgment or other right or remedy provided for herein or resulting or arising out of this Deed of Trust shall, as between Beneficiary and any Second Lien Secured Party, be governed by the Indenture or appropriate Additional Second Lien Agreement, as applicable, and by such other agreements with respect thereto as may exist from time to time among them, but, as between Beneficiary and Grantor, Beneficiary shall be conclusively presumed to be acting as agent for the Second Lien Secured Parties with full and valid authority so to act or refrain from acting, and Grantor shall be under no obligation, or entitlement, to make any inquiry respecting such authority.

19

22.    <u>LAST DOLLARS SECURED; PRIORITY</u>

To the extent that this Deed of Trust secures only a portion of the indebtedness owing or that may be owing by Grantor to any Second Lien Secured Party, the parties agree that any payments or repayments of such indebtedness shall be and be deemed to be applied first to the portion of the indebtedness that is not secured hereby, it being the parties' intent that the portion of the indebtedness last remaining unpaid shall be secured hereby. If at any time this Deed of Trust shall secure less than all of the principal amount of the Obligations, it is expressly agreed that any repayments of the principal amount of the Obligations shall not reduce the amount of the lien of this Deed of Trust until the lien amount shall equal the principal amount of the Obligations outstanding.

23.    <u>ENFORCEMENT EXPENSES; INDEMNIFICATION</u>

(a) Grantor agrees to pay any and all reasonable and documented out-of-pocket costs and expenses (including all reasonable and documented fees, disbursements and other charges of one firm of counsel, and, if necessary, one firm of regulatory counsel and/or one firm of local counsel in each appropriate jurisdiction, in each case to Beneficiary (and, in the case of an actual or perceived conflict of interest where the Person affected by such conflict informs the Issuer of such conflict and thereafter, retains its own counsel, of another firm of counsel for such affected Person)) that may be paid or incurred by any Second Lien Secured Party in enforcing, or obtaining advice of counsel in respect of, any rights with respect to, or collecting, any or all of the Obligations and/or enforcing any rights with respect to, or collecting against, such Grantor under this Deed of Trust.

(b) Grantor agrees to pay, and to save Beneficiary and the Second Lien Secured Parties harmless from, any and all liabilities with respect to, or resulting from any delay in paying, any and all stamp, excise, sales or other taxes which may be payable or determined to be payable with respect to any of the Mortgaged Property or in connection with any of the transactions contemplated by this Deed of Trust.

(c) Grantor agrees to pay, and to save Beneficiary harmless from, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Deed of Trust to the extent Issuer would be required to do so pursuant to Section 7.07 of the Indenture,  **AND SUBJECT TO THE PARAGRAPH BELOW, WHETHER OR NOT CAUSED BY, OR ARISING IN WHOLE OR IN PART OUT OF, THE COMPARATIVE, CONTRIBUTORY, OR SOLE NEGLIGENCE OF BENEFICIARY OR THE SECOND LIEN SECURED PARTIES; PROVIDED, HOWEVER, NOTWITHSTANDING ANYTHING IN SECTION 7.07 OF THE INDENTURE TO THE CONTRARY, BENEFICIARY MAY BE INDEMNIFIED FOR MATTERS CAUSED BY OR THAT ARISE OUT OF THE NEGLIGENCE OF BENEFICIARY UNDER BUT SUBJECT TO THE PROVISIONS OF THIS SECTION 23(c).**

In no event shall Beneficiary be responsible or liable for special, indirect or consequential loss or damage of any kind whatsoever, irrespective of whether Beneficiary has been informed of

20

the likelihood of such loss or damages and regardless of the form of action. Neither Issuer, Parent Guarantor, nor any Subsidiary Guarantor shall have any obligation hereunder to Beneficiary or any of its Related Parties (the " Indemnified Parties") with respect to indemnified liabilities to the extent it has been determined by a final non-appealable judgment of a court of competent jurisdiction to have resulted from (A) the gross negligence, bad faith or willful misconduct of any Indemnified Party (other than trustees and advisors), (B) a breach of the obligations of any Indemnified Party (other than trustees and advisors) under the Second Lien Security Documents or (C) disputes not involving an act or omission of any of Issuer, Parent Guarantor, or any Subsidiary Guarantor or any of their respective Affiliates and that is brought by any Indemnified Party against any other Indemnified Party.

(d) The agreements in this Section 23 shall survive repayment of the Obligations and all other amounts payable under the Second Lien Security Documents.

24.    RELEASE

If any of the Mortgaged Property shall be sold, transferred or otherwise disposed of by any Grantor in a transaction permitted by the Second Lien Security Documents and the Net Proceeds are applied in accordance with any applicable requirement (if any) of the Indenture, then Beneficiary, at the request and sole expense of such Grantor, shall execute and deliver to such Grantor all releases or other documents reasonably necessary or desirable for the release of the Liens created hereby on such Mortgaged Property. The Grantor shall deliver to Beneficiary, at least five Business Days prior to the date of the proposed release, a written request for release identifying the sale or other disposition in reasonable detail, including the price thereof and any expenses in connection therewith, together with a certification by the Grantor stating that such transaction is in compliance with, and permitted by, the Second Lien Security Documents. In addition, upon the execution by Grantor of an easement, right-of-way or other real property interest that constitutes a Permitted Lien pursuant to clause (5) of the definition of Permitted Liens in the Indenture (a " Permitted Real Property Interest"), Beneficiary will subordinate the Liens created hereby to the rights of third parties with respect to such Permitted Real Property Interest.

25.    SUBSTITUTE TRUSTEE

In case of the resignation of the Trustee, or the inability (through death or otherwise), refusal or failure of the Trustee to act, or at the option of Beneficiary or the holder(s) of a majority of the Obligations for any other reason (which reason need not be stated), a substitute Trustee (" Substitute Trustee") may be named, constituted and appointed by Beneficiary or the holder(s) of a majority of the Obligations, without other formality than an appointment and designation in writing, which appointment and designation shall be full evidence of the right and authority to make the same and of all facts therein recited, and this conveyance shall vest in the Substitute Trustee the title, powers and duties herein conferred on the Trustee originally named herein, and the conveyance of the Substitute Trustee to the purchaser(s) at any sale of the Mortgaged Property of any part thereof shall be equally valid and effective. The right to appoint a Substitute Trustee shall exist as often and whenever from any of said causes, the Trustee, original or Substitute Trustee, resigns or cannot, will not or does not act, or Beneficiary or the holder(s) of a majority of the Obligations desires to appoint a new Trustee. No bond shall ever

21

be required of the Trustee, original or Substitute Trustee. The recitals in any conveyance made by the Trustee, original or Substitute, shall be accepted and construed in court and elsewhere as prima facie evidence and proof of the facts recited, and no other proof shall be required as to the request by Beneficiary or the holders(s) of a majority of Obligations to the Trustee to enforce this Deed of Trust, or as to the notice of or holding of the sale, or as to any particulars thereof, or as to the resignation of the Trustee, original or Substitute, or as to the inability, refusal or failure of the Trustee, original or Substitute Trustee, to act, or as to the election of Beneficiary or the holder(s) of a majority of the Obligations to appoint a new Trustee, or as to appointment of a Substitute Trustee, and all prerequisites of said sale shall be presumed to have been performed; and each sale made under the powers herein granted shall be a perpetual bar against Grantor and the heirs, personal representatives, successors and assigns of Grantor. Trustee, original or substitute, is hereby authorized and empowered to appoint any one or more persons as attorney-in-fact to act as Trustee under it and in its name, place and stead in order to take any actions that Trustee is authorized and empowered to do hereunder, such appointment to be evidenced by an instrument signed and acknowledged by said Trustee, original or Substitute Trustee; and all acts done by said attorney-in-fact shall be valid, lawful and binding as if done by said Trustee, original or Substitute Trustee, in person.

26.    INDEMNIFICATION OF TRUSTEE

EXCEPT FOR GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, TRUSTEE SHALL NOT BE LIABLE FOR ANY ACT OR OMISSION OR ERROR OF JUDGMENT. TRUSTEE MAY RELY ON ANY DOCUMENT BELIEVED BY IT IN GOOD FAITH TO BE GENUINE. ALL MONEY RECEIVED BY TRUSTEE SHALL, UNTIL USED OR APPLIED AS HEREIN PROVIDED, BE HELD IN TRUST, AND TRUSTEE SHALL NOT BE LIABLE FOR INTEREST THEREON. GRANTOR SHALL INDEMNIFY TRUSTEE AGAINST ALL LIABILITY AND EXPENSES THAT IT MAY INCUR IN THE PERFORMANCE OF ITS DUTIES HEREUNDER EXCEPT FOR GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

27.    ACCEPTANCE BY TRUSTEE

Trustee accepts its duties and obligations under this Deed of Trust and the Second Lien Security Documents when this Deed of Trust, duly executed and acknowledged, is made a public record as provided by law.

28.    ENTIRE AGREEMENT

THIS DEED OF TRUST AND THE OTHER SECOND LIEN SECURITY DOCUMENTS IN EFFECT AS OF THE DATE HEREOF REPRESENT THE FINAL AGREEMENT AS OF THE DATE HEREOF BETWEEN THE PARTIES RELATING TO THE FINANCING TRANSACTION DESCRIBED IN THE INDENTURE AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

22

29. <u>MATURITY OF OBLIGATIONS</u>

The maturity date of the Obligations under the Indenture is April 1, 2021. The maturity date of any Obligations under any Additional Second Lien Agreement, if different from the foregoing date, shall be specified in a supplement to this Deed of Trust.

30. <u>EVIDENCE OF INSURANCE</u>

Notwithstanding any provision herein or in the Indenture or any other Second Lien Security Document to the contrary, pursuant to Section 549.054 of the Texas Insurance Code, Grantor shall not be required to furnish evidence of insurance more than fifteen (15) days prior to the termination date of an existing insurance policy, and pursuant to Section 549.052 of the Texas Insurance Code, Grantor shall not be required to obtain an insurance policy from or through a particular agent, insurer or other person or a particular type or class of agent, insurer or other person.

31. <u>FUTURE ADVANCES</u>

This Deed of Trust is given for the purpose of creating a lien on the Mortgaged Property and expressly used to secure not only the existing Obligations, but also (i) all extensions, renewals, modifications or re-amortizations of the Obligations, all increases or additions to the Obligations, all loans and future advances and re-advances made by any existing or future Second Lien Secured Party to the Grantor or the Issuer pursuant to the Second Lien Security Documents, including any such advances evidenced and/or secured by Additional Notes and supplements to the Indenture and/or any Additional Second Lien Agreement, and (ii) future advances, whether such advances are obligatory or to be made at the option of any Second Lien Secured Party or otherwise, to the same extent as if such future advances were made, whether under the Indenture, any of the other Second Lien Security Documents or otherwise on the date of the execution of this Deed of Trust, and creates a lien for all advances regardless of who is the owner of the Mortgaged Property at the time such advances are made.

32. <u>MULTIPLE GRANTORS</u>

If this Deed of Trust is executed by two or more Grantors, each Exhibit shall include a designation identifying which Grantor owns an interest in each tract of Land, each Mortgaged Lease and each Easement Right. The representations, warranties, and covenants made by a Grantor herein shall apply to each Grantor as to its respective Mortgaged Property.

33. <u>ONCOR SEPARATENESS</u>

(a) Beneficiary, on behalf of itself and the Second Lien Secured Parties, acknowledges (i) the legal separateness of the Issuer and the Grantor from the Subsidiaries of Energy Future Intermediate Holding Company LLC, a Delaware limited liability company (the " <u>Oncor Subsidiaries</u>"), (ii) that the lenders under the Oncor Credit Facility and the noteholders under the Oncor Subsidiaries' indentures have likely advanced funds thereunder in reliance upon the separateness of the Oncor Subsidiaries from the Issuer and the Grantors, (iii) that the Oncor Subsidiaries have assets and liabilities that are separate from those of Parent Guarantor and its Subsidiaries, (iv) that the Obligations owing under the Second Lien Security Documents are

23

obligations and liabilities of the Issuer and the Guarantors only, and are not the obligations or liabilities of the Oncor Subsidiaries, (v) that the Second Lien Secured Parties shall look solely to the Issuer, the Guarantors and their assets, and not to any assets, or to the pledge of any assets, owned by the Oncor Subsidiaries, for the repayment of any amounts payable pursuant to the Second Lien Security Documents and for satisfaction of any other Obligations owing to the Second Lien Secured Parties under the Second Lien Security Documents, and (vi) that none of the Oncor Subsidiaries shall be personally liable to the Second Lien Secured Parties for any amounts payable, or any other liability, under the Second Lien Security Documents.

(b) Beneficiary, on behalf of itself and the Second Lien Secured Parties, shall not (i) initiate any legal proceeding to procure the appointment of an administrative receiver, or (ii) institute any bankruptcy, reorganization, insolvency, winding up, liquidation, or any like proceeding under applicable law, against any of the Oncor Subsidiaries, or against any of the Oncor Subsidiaries' assets. Beneficiary, on behalf of itself and the Second Lien Secured Parties, acknowledges and agrees that each of the Oncor Subsidiaries is a third party beneficiary of the forgoing covenant and shall have the right to specifically enforce such covenant in any proceeding at law or in equity.

34.  MORTGAGED LEASES

(a) Representations, Warranties and Covenants. Grantor represents and warrants to Beneficiary that, with respect to each Mortgaged Lease, (i) the Mortgaged Lease is unmodified and in full force and effect, (ii) all rent and other charges therein have been paid to the extent they are payable to the date hereof, (iii) Grantor enjoys the quiet and peaceful possession of the property demised thereby, (iv) Grantor is not in default under any of the terms thereof and there are no circumstances which, with the passage of time or the giving of notice or both, would constitute an event of default thereunder, and (v) the lessor thereunder is not in default under any of the terms or provisions thereof on the part of the lessor to be observed or performed (but this statement is made for the benefit of and may only be relied upon by Beneficiary and the Second Lien Secured Parties) except in the case of each of the matters described in clauses (i) through (v) of this sentence, where the failure of such statements to be true could not reasonably be expected to have a Material Adverse Effect. Grantor shall promptly pay, when due and payable, the rent and other charges payable pursuant to the Mortgaged Lease, and will timely perform and observe all of the other terms, covenants and conditions required to be performed and observed by Grantor as lessee under the Mortgaged Lease. Grantor shall notify Beneficiary in writing of any default by Grantor in the performance or observance of any terms, covenants or conditions on the part of Grantor to be performed or observed under the Mortgaged Lease within ten (10) days after Grantor knows of such default. Grantor shall, promptly following the receipt thereof, deliver a copy of any notice of default given to Grantor by the lessor pursuant to the Mortgaged Lease and promptly notify Beneficiary in writing of any default by the lessor in the performance or observance of any of the terms, covenants or conditions on the part of the lessor to be performed or observed thereunder. Unless required under the terms of the Mortgaged Lease, except as set forth in the Indenture, Grantor shall not, without the prior written consent of Beneficiary (which may be granted or withheld in Beneficiary's sole and absolute discretion) (A) terminate, or surrender the Mortgaged Lease, or (B) enter into any modification of the Mortgaged Lease which materially impairs the practical realization of the security interests granted by this Deed of Trust, and any such attempted termination, modification or surrender

24

without Beneficiary's written consent shall be void. Grantor shall, within thirty (30) days after written request from Beneficiary, use commercially reasonable efforts to obtain from the lessor and deliver to Beneficiary a certificate setting forth the name of the tenant thereunder and stating that the Mortgaged Lease is in full force and effect, is unmodified or, if the Mortgaged Lease has been modified, the date of each modification (together with copies of each such modification), that no notice of termination thereof has been served on Grantor, stating that to the best of lessor's knowledge, no default or event which with notice or lapse of time (or both) would become a default is existing under the Mortgaged Lease, stating the date to which rent has been paid, and specifying the nature of any defaults, if any, and containing such other statements and representations as may be reasonably requested by Beneficiary.

(b) <u>No Merger; Acquisition; Power of Attorney</u>. So long as any of the Obligations remain unpaid or unperformed, the fee title to and the leasehold estate in the premises subject to each Mortgaged Lease shall not merge but shall always be kept separate and distinct notwithstanding the union of such estates in the lessor or Grantor, or in a third party, by purchase or otherwise. If Grantor acquires the fee title or any other estate, title or interest in the property demised by the Mortgaged Lease, or any part thereof, the lien of this Deed of Trust shall attach to, cover and be a lien upon such acquired estate, title or interest and the same shall thereupon be and become a part of the Mortgaged Property with the same force and effect as if specifically encumbered herein. Grantor agrees to execute all instruments and documents that Beneficiary may reasonably require to ratify, confirm and further evidence the lien of this Deed of Trust on the acquired estate, title or interest. Furthermore, Grantor hereby appoints Beneficiary as its true and lawful attorney-in-fact to execute and deliver, following an Event of Default, all such instruments and documents in the name and on behalf of Grantor. This power, being coupled with an interest, shall be irrevocable as long as any portion of the Obligations remains unpaid.

(c) <u>New Leases</u>. If the Mortgaged Lease shall be terminated prior to the natural expiration of its term due to default by Grantor or any tenant thereunder, and if, pursuant to the provisions of the Mortgaged Lease, Beneficiary or its designee shall acquire from the lessor a new lease of the premises subject to the Mortgaged Lease, Grantor shall have no right, title or interest in or to such new lease or the leasehold estate created thereby, or renewal privileges therein contained.

(d) <u>No Assignment</u>. Notwithstanding anything to the contrary contained herein, this Deed of Trust shall not constitute an assignment of any Mortgaged Lease within the meaning of any provision thereof prohibiting its assignment and Beneficiary shall have no liability or obligation thereunder by reason of its acceptance of this Deed of Trust. Beneficiary shall be liable for the obligations of the tenant arising out of any Mortgaged Lease for only that period of time for which Beneficiary is in possession of the premises demised thereunder or has acquired, by foreclosure or otherwise, and is holding all of Grantor's right, title and interest therein.

This Deed of Trust has been duly executed by Grantor as of the date first above written and is intended to be effective as of such date.

*[Remainder of Page Intentionally Left Blank.*

*Signature Page Follows.]*

25

[SAMPLE SIGNATURE PAGE]

LUMINANT GENERATION COMPANY LLC, a
Texas limited liability company

By: _____

Name: _____

Title: _____

THE STATE OF TEXAS    §
                      §
COUNTY OF DALLAS      §

    This instrument was acknowledged before me on December ___, 2010 by (name of officer), (title of officer) of [**LUMINANT GENERATION COMPANY LLC, a Texas limited liability company**), on behalf of said limited liability company.

_____
Notary Public in and for
The State of Texas

My Commission Expires: _____

[Signature Page – Second Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing]

**EXHIBIT A**

Owned Land

A-1

**EXHIBIT B**

Mortgaged Leases and Mortgaged Leased Land

B-1

**EXHIBIT C**

Easements and Easement Land

C-1

**EXHIBIT D**

Certificates of Adjudication and Other Water Rights

D-1

Exhibit 10(c)

**AMENDMENT TO THE ENERGY FUTURE HOLDINGS CORP.**
**EXECUTIVE CHANGE IN CONTROL POLICY**

THIS AMENDMENT to the Energy Future Holdings Corp. Executive Change in Control Policy (the "Policy"), originally effective as of May 20, 2005, is made by Energy Future Holdings Corp. (the "Company") this 20 th day of December 2010, to be effective as of January 1, 2009.

**WITNESSETH:**

WHEREAS, the Company desires to amend the Policy to clarify the applicability of the exemption from Section 409A of the Internal Revenue Code of 1986, as amended for certain separation pay plans and, where necessary, to comply with Code Section 409A and the regulations and other guidance promulgated thereunder; and

WHEREAS, the Company has the sole discretion to change, modify, alter or amend the Policy at any time;

NOW, THEREFORE, in consideration of the premises contained herein, the Company shall amend the Policy as follows, effective as of January 1, 2009.

1. Subsection a, of Section 3, entitled "Available Benefits", is hereby amended in its entirety to read as follows:

"a. Cash Severance Payment. Eligible Executives will receive a one-time lump sum cash severance payment in an amount equal to a multiple of the aggregate of: (i) the Eligible Executive's annualized base salary in effect immediately before the termination or resignation, or the Executive's annualized base salary in effect as of the effective date of the Change in Control, whichever is greater; plus (ii) the Eligible Executive's target annual incentive award for the year of the termination or resignation. The multiple will be determined as set forth in the following chart, and will be based on the Eligible Executive's position with the Company immediately prior to the termination or resignation, or the Eligible Executive's position as of the effective date of the Change in Control, whichever position is more senior:

| Position | Multiple of Base Salary + Target Annual Incentive |
|---|---|
| Chief Executive Officer | 3x |
| Member of Senior Leadership Team | 2x |
| Member of Leadership Team | 1x |

1

The severance payment will be made within the 90-day period following the Eligible Executive's termination of employment; provided that if the 90-day period begins in one taxable year of the Eligible Executive and ends in a subsequent taxable year of the Eligible Executive, such payment shall be made in the subsequent taxable year. Notwithstanding the foregoing, if the Eligible Executive is a "specified employee" within the meaning of Section 409A of the Internal Revenue Code of 1986, as amended, the severance payment will, to the extent required under Code Section 409A, be made on the first business day following the expiration of six (6) months following the date of the Eligible Executive's termination of employment.

The severance payment will be subject to all applicable tax withholdings and will also be reduced by the amount of any obligations which the Eligible Executive owes to the Company. Such obligations may include, but are not limited to, some or all of the following:

> (1) The entire balance, if any, that the Eligible Executive owes under the Company's appliance purchase plan, energy conservation program or employee relocation plan; and

> (2) Any balance on Company-issued or sponsored travel or credit cards or any other expenses or payments for which the Company should be reimbursed."

2. Subsection c, of Section 3, entitled "Available Benefits", is hereby amended in its entirety to read as follows:

"c. Health Care Benefits. Eligible Executives will be eligible for continued health care coverage under the Company's health care plans for the applicable COBRA period. The required contribution by the Eligible Executive for such continued coverage will be the applicable employee rate, for the period

2

shown in the following table, unless and until the end of such period, or until the Eligible Executive becomes eligible for coverage for a particular type of benefit through employment with another employer, at which time the required contribution for continuing such benefit coverage hereunder shall be the applicable COBRA rate for such benefit. The period of continued health care coverage provided for herein shall run concurrently with the Eligible Executive's available COBRA coverage period.

| Position | Period of Subsidized Premium for Health Care Coverage |
| --- | --- |
| Chief Executive Officer of EFH | 18 months |
| Member of Senior Leadership Team | 18 months |
| Member of Leadership Team | 1 year |

If an Eligible Executive who is the Chief Executive Officer of EFH or a member of the Senior Leadership Team is covered under the Company's health care plans through the end of such eighteen (18) month period, then such Eligible Executive shall receive an additional payment on the last day of such eighteen (18) month period, in an amount equal to the monthly cost of such coverage (determined as of such date) for the period provided in the following table:

| Position | Period of Subsidized Premium for Health Care Coverage |
| --- | --- |
| Chief Executive Officer of EFH | 18 months |
| Member of Senior Leadership Team | 6 months |

Such payment shall be made in a lump sum."

3. Subsection g, of Section 3, entitled "Available Benefits", is hereby amended in its entirety to read as follows:

"g. Tax Gross-up. If any payment, distribution or provision of a benefit hereunder (a "Payment") would be subject to an excise tax pursuant to Sections 280G and 4999 of the Internal Revenue Code of 1986, as amended ("Code"), or any interest or penalties with respect to such excise or other additional tax (such excise tax, together with any such interest or penalties, are hereinafter collectively referred to as the "Excise Tax"), the Company, Parent Corporation, Surviving Corporation or any subsidiary thereof, as applicable (for purposes of this Section, all such entities are referred to as the "Surviving

3

Company") shall pay to the Eligible Executive an additional payment ("Gross-up Payment") in an amount such that, after payment by the Eligible Executive of all taxes, including any income taxes and Excise Taxes imposed on any Gross-up Payment (including any interest or penalties imposed with respect to such taxes), the Eligible Executive retains an amount of the Gross-up Payment equal to the Excise Tax imposed upon the Payments. Notwithstanding the foregoing, however, if the aggregate value of the Payments (as determined in accordance with Code Section 28OG) is less than 110% of the product (such product to be referred to herein as the "Excise Tax Threshold") of three times the Eligible Executive's "base amount" (as such term is defined in Code Section 280G), then the Eligible Executive shall not be entitled to a Gross-up Payment, and the Payments shall be reduced so that their aggregate value is equal to $1.00 less than the Excise Tax Threshold, first, by reducing the Health Care Benefits provided following the expiration of the 18-month COBRA coverage period, if applicable and, second, by reducing the Cash Severance Payment. The Surviving Company will coordinate with the Eligible Executive to make an initial determination as to whether a Gross-up Payment is required and the amount of any such Gross-up Payment. The Eligible Executive shall notify the Surviving Company in writing of any claim by the Internal Revenue Service which, if successful, would require a Gross-up Payment (or a Gross-up Payment in excess of that initially determined). The Surviving Company shall notify the Eligible Executive in writing at least ten (10) business days prior to the due date of any response required with respect to such claim if it plans to contest the claim. If the Surviving Company decides to contest such claim, the Eligible Executive shall cooperate with the Surviving Company in such action; provided, however, the Surviving Company shall bear and pay all costs and expenses (including additional interest and penalties) incurred in connection with such action and shall indemnify and hold the Eligible Executive harmless, on an after-tax basis, for any Excise Tax or income lax, including interest and penalties with respect thereto, imposed as a result of the Surviving Company's action. If, as a result of the Surviving Company's action with respect to any such claim, the Eligible Executive receives a refund of any amount paid by the Surviving Company with respect to such claim, the Eligible Executive shall promptly pay such refund to the Surviving Company. If the Surviving Company fails to timely notify the Eligible Executive whether it will contest such claim or the Surviving Company determines not to contest such claim, then the Surviving Company shall immediately pay to the Eligible Executive the portion of such claim, if any, which it has not previously paid to the Eligible Executive.

Any Gross-Up Payment, as determined pursuant to this Section, shall be paid by the Surviving Company to the Executive within five days of the determination of the amount of the Gross-Up Payment; provided that, the Gross-Up Payment shall in all events be paid no later than the end of the Executive's taxable year next following the Executive's taxable year in which the Excise Tax (and any income or other related taxes or interest or penalties thereon) on a Payment are remitted to the Internal Revenue Service or any other applicable

4

taxing authority or, in the case of amounts relating to a claim that does not result in the remittance of any federal, state, local and foreign income, excise, social security and other taxes, the calendar year in which the claim is finally settled or otherwise resolved. Notwithstanding any other provision of this Section, the Surviving Company may, in its sole discretion, withhold and pay over to the Internal Revenue Service or any other applicable taxing authority, for the benefit of the Executive, all or any portion of any Gross-Up Payment, and the Executive hereby consents to such withholding."

4. Subsection h, of Section 3, entitled "<u>Available Benefits</u>", is hereby added to read as follows:

"h. <u>Administrative Delay in Payment</u>. Benefits hereunder shall be paid on the date specified in accordance with the foregoing provisions of this Section 3; provided that, in the case of administrative necessity, the payment of such benefits may be delayed up to the last day of the calendar year in which payment would otherwise be made or, if later, the 15th day of the third calendar month following the date on which payment would otherwise be made."

5. Section 4, entitled "<u>Agreement and Release</u>", is hereby amended in its entirety to read as follows:

"4. **<u>Agreement and Release</u>**. Except as otherwise provided under Section 9, each Eligible Executive's eligibility for any of the benefits described herein will be subject to, and conditioned upon, the Surviving Company's receipt of an executed Agreement and Release, in the form provided by the Surviving Company, on or prior to the ninetieth (90th) day following the Eligible Executive's termination of employment."

6. Section 7, entitled "Change in Control", is hereby amended in its entirety to read as follows:

"7. **<u>Change in Control</u>**. For purposes of this Policy, the term "Change in Control" shall mean the occurrence of any one or more of the following events: (i) the sale (or combined sales within the 12-month period ending on the date of the most recent sale) of all or substantially all of the consolidated assets or capital stock of the Company, or an Affiliate, to a person (or group of persons acting in concert) who is not an Affiliate of the Company or any member of the Sponsor Group; (ii) a merger, recapitalization or other sale by the Company, any member of the Sponsor Group or its Affiliates to a person (or group of persons acting in concert) of the common stock of the Company that results in more than 50% of the common stock of the Company (or any resulting company after a merger (the "Surviving Corporation")) being held by a person (or group of persons acting in concert) who is not an Affiliate of the Company or any member of the Sponsor Group; or (iii) a merger, recapitalization or other sale (or combined sales within the 12-month period ending on the date of the most recent sale) by the Company, any member of the Sponsor Group or their Affiliates of the common stock of the

5

Company, after which the Sponsor Group owns less than 20% of the common stock of, and has the ability to appoint less than a majority of the directors to the Board of Directors ("the Board") of, the Company (or any Surviving Corporation) and at least one person (or group of persons acting in concert) has acquired 30% or more of such common stock; and with respect to any of the events described in clauses (i) through (ii) above, such event results in any person (or group of persons acting in concert) gaining control of more seats on the Board than the Sponsor Group.

Notwithstanding any provision of this Policy to the contrary, for purposes of this Section, the term "Affiliate" shall have the meaning ascribed to it under applicable provisions of Section 409A of the Code and, for purposes of clause (i) shall include any such entity for whom the Eligible Executive is performing services at the time of the Change in Control event, an entity that is liable for the payment of the benefits hereunder, or an entity that is a majority shareholder of the foregoing entities. The determination of whether a Change in Control has occurred under this Policy shall be made by EFH in accordance with the provisions of Code Section 409A and the regulations promulgated thereunder."

7. Section 10, entitled "Termination of Employment", is hereby added to read as follows:

"10. **Termination of Employment**. Except to the extent otherwise provided in Section 9, no benefits will be paid until the Eligible Executive has experienced a termination of employment. For purposes of this Policy, an Eligible Executive shall be treated as having experienced a termination of employment on the date on which the Surviving Company and the Eligible Executive reasonably anticipate that no further services will be performed by the Eligible Executive for the Surviving Company or any person with whom the Surviving Company would be considered a single employer under Treasury Regulations §1.409A-1(h)(3)."

8. Section 11, entitled "Compliance with Tax Laws", is hereby added to read as follows:

"11. **Compliance with Tax Laws**. Notwithstanding any provision in this Policy to the contrary, if any portion of this Policy does not constitute a separation pay plan exempt from the requirements of Code Section 409A and an ambiguity exists with respect to any benefit under this Policy that constitutes a deferral of compensation under a nonqualified deferred compensation plan, as such term is described under Section 409A of the Code, the Company shall interpret the Policy in such manner as it, in its sole and absolute discretion, deems necessary to comply with the requirements of Section 409A of the Code and applicable guidance published in the Internal Revenue Bulletin."

6

IN WITNESS WHEREOF, and as conclusive evidence of the adoption of the foregoing instrument comprising an Amendment to the Energy Future Holdings Corp. Executive Change in Control Policy, Energy Future Holdings Corp. has caused these presents to be duly executed in its name and on its behalf this 20th day of December, 2010.

By:   /s/   RICHARD LANDY
      Richard Landy
      Executive Vice President, Human Resources

7

Exhibit 10(f)

**AMENDMENT TO THE ENERGY FUTURE HOLDINGS CORP. 2005
EXECUTIVE SEVERANCE PLAN AND SUMMARY PLAN DESCRIPTION**

THIS AMENDMENT to the Energy Future Holdings Corp. 2005 Executive Severance Plan and Summary Plan Description (the "Plan"), originally effective as of May 20, 2005, is made by Energy Future Holdings Corp. (the "Company") this 10 th day of December 2010, to be effective as of January 1, 2009.

**WITNESSETH:**

WHEREAS, the Company desires to amend the Plan to clarify the applicability of the exemption from Section 409A of the Internal Revenue Code of 1986, as amended for certain separation pay plans and, where necessary, to comply with Code Section 409A and the regulations and other guidance promulgated thereunder; and

WHEREAS, the Company has the sole discretion to change, modify, alter or amend the Plan at any time;

NOW, THEREFORE, in consideration of the premises contained herein, the Company shall amend the Plan as follows, effective as of January 1, 2009.

1. The Section entitled "Eligibility to Participate In the Plan" shall be amended by adding the following questions and answers to the end to read as follows:

"- When will I be treated as having terminated employment under this Executive Severance Plan?

For purposes of this Executive Severance Plan, you are treated as having experienced a termination of employment on the date on which you and the Company reasonably anticipate that you will perform no further services for the Company or any affiliate of the Company.

1

- What is Section 409A of the Internal Revenue Code and when will it apply to my benefits under this Executive Severance Plan?

Section 409A of the Code governs benefits that constitute a "deferral of compensation" under a nonqualified deferred compensation plan, as described thereunder. For benefits subject to Code Section 409A, the Executive Severance Plan must be designed and operated in accordance with the requirements of Code Section 409A. In the event that all or any portion of the benefits under this Executive Severance Plan do not satisfy the requirements of Code Section 409A, either in form or operation, you may be required to pay an excise tax.

To the extent that any portion of this Executive Severance Plan does not constitute a separation pay plan exempt from the requirements of Code Section 409A, and an ambiguity exists with respect to any benefit under this Executive Severance Plan, the Company will interpret the Executive Severance Plan in such manner as it, in its sole and absolute discretion, deems necessary to comply with the requirements of Section 409A of the Code."

2. The introductory sentence to the first question and answer of the Section entitled " <u>Benefits Available Under this Executive Severance Plan</u> ", is hereby amended in its entirety to read as follows:

"Subject to the Company's timely receipt of an executed Agreement and Release, a Participant under this Executive Severance Plan will receive the following benefits:"

3. Paragraph 1 of the first question and answer of the Section entitled " <u>Benefits Available Under this Executive Severance Plan</u> ", is hereby amended in its entirety to read as follows:

"1. <u>Severance Payment</u>

Participants in this Executive Severance Plan will receive a one-time lump sum cash severance payment in an amount equal to: (i) a multiple of the Participant's annualized base salary, such multiple to be based on the Participant's position with the Company immediately prior to the termination as set forth in the following chart plus (ii) the Participant's target annual incentive award for the year of the termination, prorated for the portion of the year prior to such termination.

| Position | Multiple of Base Salary |
|---|---|
| Chief Executive Officer | 3x |
| Member of Senior Leadership Team | 2x |
| Member of Leadership Team | 1x |

The severance payment will be made within the 90-day period following the Participant's termination of employment; provided that if the 90-day period begins in one taxable year of the Participant and ends in a subsequent taxable year of the Participant, such payment shall be made in the subsequent taxable year. Notwithstanding the foregoing, if the Participant is a "specified employee" within the meaning of Code Section 409A, the severance payment will, to the extent required under Code Section 409A, be made on the first business day following the expiration of six months from the date of Participant's termination of employment.

The severance payment will be subject to all applicable tax withholdings and will also be reduced by the amount of any obligations which the Participant owes to the Company. Such obligations may include, but are not limited to, some or all of the following:

(1)    The entire balance, if any, owed under the Company's appliance purchase plan, energy conservation program or employee relocation plan; and

(2)    Any amounts owed on Company issued or sponsored travel or credit cards or any other expenses or payments for which the Company should be reimbursed."

4. Paragraph 2 of the first question and answer of the Section entitled "Benefits Available Under this Executive Severance Plan", is hereby amended in its entirety to read as follows:

"2.    Health Care Benefits

Participants who, under the terms and conditions of the applicable health care plans covering them immediately prior to their severance, are eligible for retiree health care coverage will be able to participate in, and receive, such retiree health care coverage subject to the terms and conditions of the relevant health care plan documents as they may be amended (or terminated) from time to time. Participants who are not eligible for, or who do not choose coverage under, the Company's retiree health care coverage, will

3

be eligible for continued health care coverage in accordance with applicable law. The required contribution by the Participant for such continued coverage for the period set forth in the following chart will be the applicable employee rate, unless and until the Participant becomes eligible for coverage for a particular type of benefit through employment with another employer, at which time the required contribution for continuing such benefit coverage hereunder shall be the applicable COBRA rate for such benefit. The period of continued health care coverage provided for herein shall run concurrently with the Participant's available COBRA coverage period.

| Position | Period of Subsidized Premium for Health Care Coverage |
|---|---|
| Chief Executive Officer | 18 months |
| Member of Senior Leadership Team | 18 months |
| Member of Leadership Team | 1 year |

If a Participant who is the Chief Executive Officer or a member of the Senior Leadership Team is covered under the Company's health care plans through the end of such eighteen (18) month period, then such Participant shall receive an additional payment, on the last day of such eighteen (18) month period, in an amount equal to the monthly cost of such coverage (determined as of such date) for the period provided in the following table:

| Position | Period of Subsidized Premium for Health Care Coverage |
|---|---|
| Chief Executive Officer | 18 months |
| Member of Senior Leadership Team | 6 months |

Such payment shall be made in a lump sum."

5. Paragraph 7 of the first question and answer of the Section entitled " Benefits Available Under this Executive Severance Plan ", is hereby added to read as follows:

"7. Administrative Delay in Payment. Benefits under this Executive Severance Plan shall be paid on the date specified hereunder; provided that, in the case of administrative necessity, the payment of such benefits may be delayed up to the last day

4

of the calendar year in which payment would otherwise be made or, if later, the 15th day of the third calendar month following the date on which payment would otherwise be made."

IN WITNESS WHEREOF, and as conclusive evidence of the adoption of the foregoing instrument comprising an Amendment to the Energy Future Holdings Corp. Executive Severance Plan, Energy Future Holdings Corp. has caused these presents to be duly executed in its name and on its behalf this 20th day of December, 2010.

By:   /s/   RICHARD LANDY
     Richard Landy
     Executive Vice President, Human Resources

5

Exhibit 10(i)

**EFH EXECUTIVE ANNUAL INCENTIVE PLAN**

**Plan Document**

**Amended, effective as of January 1, 2010**

Contents

| | | |
|---|---|---|
| Article I. | Purpose. | 1 |
| Article II. | Definitions. | 1 |
| Article III. | Eligibility and Participation. | 3 |
| Article IV. | Establishment of Performance Goals. | 3 |
| Article V. | Establishment of Awards. | 3 |
| Article VI. | Application of Individual Performance Modifier and Determination of Individual Participant Awards. | 3 |
| Article VII. | Payment of Awards. | 4 |
| Article VIII. | Termination of Employment and Partial Awards. | 4 |
| Article IX. | Administrative Provisions. | 5 |

# EFH EXECUTIVE ANNUAL INCENTIVE PLAN

**Article I. <u>Purpose</u>.**

The EFH Executive Annual Incentive Plan (the "Plan") is amended effective as of January 1, 2010. The Plan, as herein amended, supersedes and replaces all other Plan documents. The Plan provides for annual bonus incentive award opportunities for eligible Participants payable in cash. This Plan, as herein amended, supersedes and replaces all other Plan documents.

The principal purposes of the Plan are to attract, motivate and retain key employees; to align the interests of Participants, Participating Employers and Company shareholders by rewarding performance that satisfies established performance goals; to motivate Participant behaviors that drive successful results at the corporate, business unit and individual levels; and to support collaboration across essential organizational interfaces.

**Article II. <u>Definitions</u>.**

When used in the Plan, the following terms shall have the meanings set forth below:

(a) "<u>Additional Persons</u>" means such other individuals who are not Executive Officers under the Plan, but who are senior officers and key employees identified by the O&C Committee, in consultation with the Company's Chief Executive Officer.

(b) "<u>Aggregate Incentive Pool</u>" means the amount equal to the Target Incentive Pool multiplied by the Weighted Funding Percentage.

(c) "<u>Award</u>" means the amount payable to a Participant under this Plan for any Plan Year, as determined in accordance with the terms of the Plan.

(e) "<u>Base Salary</u>" means the annualized base salary designated for the Participant in the applicable payroll records of the Participating Employer, prior to any deferrals, and excluding any overtime pay, bonuses, incentive compensation, expense reimbursements and fringe benefits of any kind for the applicable Plan Year.

(f) "<u>Business Unit</u>" means, individually, or "Business Units" means, collectively, the "TXU Energy", "Luminant" and "Corporate Services" business units of the Company, which are the participating Employers in this Plan.

(g) "<u>Company</u>" means Energy Future Holdings Corp., and its successors and assigns. With respect to a particular Participant, Company means such Participant's employer.

(h) "<u>Disability</u>" or "<u>Disabled</u>" means disability as determined under the EFH Long-Term Disability Income Plan, or any successor plan covering Participants.

(i) "<u>Executive Officers</u>" means the Company's Chief Executive Officer and other Executive Officers, as defined under the charter of the O&C Committee.

(j) "Financial Performance Criteria" means various measures of financial performance of the Company established by the O&C Committee for the Plan Year.

(k) "Financial Performance Funding Percentage" means a percentage used to calculate the Aggregate Incentive Pool established by the O&C Committee based on the performance of the Company against the Financial Performance Criteria established for the particular Plan Year.

(l) "Individual Performance Modifier" means individual Participant performance approved by the SPC or O&C Committee (with respect to Executive Officers and Additional Persons) and used in determining a Participant's Award.

(m) "O&C Committee" means the Organization and Compensation Committee of the Board of Directors of the Company.

(n) "Operational Metrics" means non-financial objectives established by each Business Unit that are critical to the function and success of the business.

(o) "Operational Metrics Funding Percentage" means a percentage used to calculate Aggregate Incentive Pool established by the O&C Committee based on the accomplishment of Operational Metrics for the particular Plan Year.

(p) "Participant" means an individual who is an officer of a Participating Employer having a title of vice president or above and who is employed by the Company for a period of three full months during the Plan Year.

(q) "Participating Employer" means, the Company and each of the Business Units. Additional Participating Employers may be added with the approval of the O&C Committee, and participation in the Plan by any such additional Participating Employers will commence as of the effective date designated by the O&C Committee.

(r) "Plan" means this EFH Executive Annual Incentive Plan.

(s) "Plan Year" means the twelve (12) month period beginning January 1 and ending December 31.

(t) "Retirement" means retirement from active employment with the Company upon attaining at least age 55 and completing at least 16 years of service with the Company and any of its subsidiaries.

(u) "SPC" means the group of executive officers of the Company referred to internally as the Strategy & Policy Committee.

(v) "Target Award" means an Award level of an individual Participant, expressed as a percentage of the Participant's Base Salary,. The Target Award shall be used in calculating an individual's actual Award for a Plan year.

2

(w) "Target Incentive Pool" means the amount equal to the aggregate of the Target Awards for all Participants, or a selected group of Participants, as the context may require.

(x) "Weighted Funding Percentage" means the percentage that is the sum of the Financial Performance Funding Percentage and the Operational Metrics Funding Percentage.

**Article III. Eligibility and Participation.**

All individuals who, as of the first day of a Plan Year, meet the definition of a Participant hereunder, shall be eligible to participate in this Plan for such Plan Year. Awards, if any, for individuals who become Participants during the Plan Year or whose participation in this Plan is terminated during the Plan Year, shall be determined under, and in accordance with, Article VIII hereof. Participation in this Plan for any Plan Year shall not entitle an individual to future participation.

**Article IV. Establishment of Performance Goals.**

For each Plan Year, the O&C Committee establishes (i) the Financial Performance Criteria, (ii) the Operational Metrics, and (iii) the Target Incentive Pool. Such determinations by the O&C Committee shall be made at such times and shall be based on such criteria as the O&C Committee shall determine, respectively, in their sole discretion. The O&C Committee shall have full authority and discretion, for any particular Plan Year, to modify any of its determinations hereunder, with respect to all Participants or any individual Participant, including determinations which affect the calculation or amount of Awards, in order to take into consideration other benefit programs and/or extraordinary events affecting the financial results of the Company or a Business Unit. Once determined, or modified, such determinations shall be communicated to the affected Participants in such form and manner as the O&C Committee determines to be appropriate.

**Article V. Establishment of Awards.**

After the end of the Plan Year, the O&C Committee shall determine the Financial Performance Funding Percentage and the Operational Metrics Funding Percentage for each Plan Year. The O&C Committee shall further determine the Weighted Funding Percentage and the resulting Aggregate Incentive Pool for the Plan Year.

**Article VI. Application of Individual Performance Modifier and Determination of Individual Participant Awards.**

A.    Individual Participant Awards.

The SPC shall determine each Participant's Award, other than for Executive Officers and Additional Persons, for a Plan Year by: (i) multiplying the Participant's Target Award by the Weighted Funding Percentage; and (ii) multiplying such amount by the applicable Individual Performance Modifier determined in accordance with Article VI.B. below.

B.    <u>Application of Individual Performance Modifier</u>.

As described in Article VI.A. above, the amount determined by applying the formula set forth in Article VI.A. shall be adjusted by applying the Individual Performance Modifier for each Participant. The SPC, in its sole discretion, shall determine a Participant's Individual Performance Modifier, other than for Executive Officers and Additional Persons, based on the Participant's performance, which may range from 0% to 150%.

In no event may the aggregate of all Awards determined to be payable to all Participants exceed the Aggregate Incentive Pool.

C.    <u>Determination of Awards for Executive Officers and Additional Persons</u>.

The O&C Committee shall determine the individual Participant Awards in accordance with Article VI.A. above, and the Individual Performance Modifier in accordance with Article VI.B. above, with respect to Executive Officers and Additional Persons who are Participants in the Plan.

**Article VII. <u>Payment of Awards</u>.**

All Awards will be paid in cash to Participants by March 15 of the year following the applicable Plan Year, subject to applicable tax withholding requirements.

**Article VIII. <u>Termination of Employment and Partial Awards</u>.**

Participation in the Plan shall cease immediately upon a Participant's resignation or termination of employment for any reason (with or without cause), or upon the Participant's death, Disability or Retirement. In such event, the Participant may be eligible for a partial award for such Plan Year in accordance with and subject to the provisions of this Article VIII.

A.    <u>Resignation or Termination</u>.

If a Participant resigns or his/her employment with a Participating Employer is terminated (with or without cause) prior to the submission of the Award to payroll for payment for reasons other than death, Disability, Retirement, or transfer to an affiliate of the Company, such Participant shall forfeit any right to receive such Award.

B.    <u>Death, Disability or Retirement</u>.

If a Participant dies, becomes Disabled or Retires during a Plan Year after having attained at least three (3) full months of participation in the Plan during such Plan Year, the Participant, or the Participant's beneficiary in the case of the Participant's death, may, in the sole discretion of the SPC or O&C Committee (with respect to Executive Officers and Additional Persons), be entitled to receive a partial Award, prorated for the number of months that the individual was a Participant hereunder during the Plan Year. For purposes of applying this proration, a month shall include each month during which the individual was employed by a Participating Employer through at least the 15 $^{\text{th}}$ day of such month prior to the individual's death, Disability or Retirement. Any such Award shall be paid at the time and in the form that

4

all other Awards are paid for such Plan Year. The decisions of the SPC and O&C Committee with respect to such Awards shall be final and binding on all parties. For purposes of this provision, a Participant's beneficiary shall be his/her surviving spouse or, if he/she has no surviving spouse, his/her estate.

C.    Transfers.

If a Participant (i) transfers from a Participating Employer to an affiliate of the Company after having attained at least three (3) full months of participation in the Plan during the Plan Year, and (ii) continues to be employed by an affiliate of the Company through the remainder of the Plan Year, such individual may, in the sole discretion of the SPC or O&C Committee (with respect to Executive Officers and Additional Persons), be entitled to receive a partial Award hereunder, prorated on the basis of the number of months such individual was employed by the Participating Employer during the Plan Year. For purposes of applying this proration, a Participant shall be deemed to have been employed by the Participating Employer for a month if such Participant was employed by the Participating Employer on the 15th day of such month. Any such Award shall be paid at the time and in the form that all other Awards are paid for such Plan Year. The decisions of the SPC and O&C Committee with respect to such Awards shall be final and binding on all parties.

D.    Participant Status Attained During Plan Year.

If an individual becomes a Participant during a Plan Year, the Participant, may, in the sole and absolute discretion of the SPC or O&C Committee (with respect to Executive Officers and Additional Persons), be eligible to receive a partial Award hereunder, prorated on the basis of the number of months such individual was a Participant during the Plan Year, provided that the Participant attained at least three (3) full months of participation in the Plan during the Plan Year. For purposes of applying this proration, a Participant shall be deemed to have been employed by the Participating Employer for a month if such Participant was employed by the Participating Employer on the 15th day of such month. Any such Award shall be paid at the time and in the form that all other Awards are paid for such Plan Year. The decisions of the SPC and O&C with respect to such Awards shall be final and binding on all parties.

**Article IX. Administrative Provisions.**

A.    Administration.

The Plan shall be administered and interpreted by the Participating Employers through the individuals who have been provided authority hereunder to carry out the administration of this Plan. The O&C Committee and its members, the SPC and its members, and any other individual to whom the O&C and/or SPC has delegated their responsibilities regarding the administration of this Plan, shall have full authority, discretion and power necessary or desirable to administer and interpret this Plan. Without in any way limiting the foregoing, all such individuals shall have complete authority, discretion and power to: (i) determine the Participants for each Plan Year; (ii) determine the Individual Performance Modifier applicable to each Participant; (iii) evaluate and determine the performance of Participants; (iv) determine the amount of the Award for each Participant; (v) interpret the provisions of this Plan and any other

5

documentation used in connection with this Plan, including documentation specifying individual Performance Goals, Award opportunities and the like; (vi) establish and interpret rules and procedures (written or by practice) for the administration of the Plan; and (vii) make all other determinations and take all other actions necessary or desirable for the administration or interpretation of this Plan. All actions, decisions and interpretations of such individuals shall be final, conclusive and binding on all parties.

B.    <u>No Right to Continued Employment</u>.

Nothing in this Plan shall be deemed by implication, action or otherwise to constitute a contract of employment, or otherwise to provide a Participant with any right of continued employment or impose any limitation on any right of a Participating Employer to terminate a Participant's employment at any time.

C.    <u>No Assignment</u>.

A Participant or Participant's beneficiary shall have no right to anticipate, alienate, sell, transfer, assign, pledge or encumber any right to receive any incentive made under the Plan, nor will any Participant or Participant's beneficiary have any lien on any assets of any Participating Employer, or any affiliate thereof, by reason of any Award made under the Plan.

D.    <u>Withholding</u>.

The Participating Employers shall have the right to deduct or withhold, or require a Participant to remit to the applicable Participating Employer, any taxes required by law to be withheld from Awards made under this Plan.

E.    <u>Amendment of Plan</u>.

The Plan may be amended, suspended or terminated at any time and from time to time, by action of the O&C Committee. In order to be effective, any amendment of this Plan or any Award must be in writing. No oral statement, representation or the like shall have the effect of amending or modifying this Plan or any Award, or otherwise have any binding effect on the Company, the O&C Committee, the SPC, or any individual who has been delegated authority by the O&C Committee or the SPC to administer this Plan.

6

F.    No Obligation to Continue Plan.

The adoption of the Plan does not imply any commitment to continue to maintain the Plan, or any modified version of the Plan, or any other plan for incentive compensation for any succeeding year.

G.    Governing Law.

The Plan shall be construed in accordance with, and governed by, the laws of the State of Texas. Any disputes arising under this Plan and any action to enforce any provisions hereof, shall be maintained exclusively in the appropriate courts of Dallas County, Texas.

H.    Severability.

In case any provision of the Plan shall be held illegal or void, such illegality or invalidity shall not affect the remaining provisions of this Plan, but shall be fully severable, and the Plan shall be construed and enforced as if said illegal or invalid provisions had never been inserted herein.

I.    Limitation of Liability.

Except for their own gross negligence or willful misconduct regarding the performance of the duties specifically assigned to them under, or their willful breach of the terms of this Plan, the Participating Employer, the O&C Committee and its members, the SPC and its members, and any other entity or individual administering any aspect of this Plan shall be held harmless by the Participants and their respective representatives, heirs, successors, and assigns, against liability or losses occurring by reason of any act or omission under the Plan.

J.    Section 409A Compliance

To the extent applicable, the Plan is intended to comply with, or be exempt from, section 409A of the Internal Revenue Code of 1986 as amended (the "Code"), and shall be administered, construed, and interpreted in accordance with such intent. Payments under this Plan shall be made in a manner that will comply with, or be exempt from, section 409A of the Code, including regulations or other guidance issued with respect thereto, except as otherwise determined by the Company. The applicable provisions of section 409A of the Code are hereby incorporated by reference and shall control over any contrary provisions herein that conflict therewith.

Executed August 3, 2010 to be effective as January 1, 2010.

Energy Future Holdings Corp.

By: /s/    RICHARD LANDY
     Rich Landy
     Executive Vice President, Human Resources

8

**Exhibit 10(l)**

## SECOND AMENDMENT TO EFH SECOND SUPPLEMENTAL RETIREMENT PLAN

Pursuant to the authority of the Board of Directors of Energy Future Holdings Corp., and the provisions of Section 5.1 thereof, the EFH Second Supplemental Retirement Plan ("Plan"), as amended and restated as of October 10, 2007, is hereby amended in the following respects only, effective as of January 1, 2010.

(1)    Section 2.9 of the Plan is hereby amended in its entirety to read as follows:

"2.9 "Participant" shall mean each person who is entitled to receive a benefit on or after January 1, 1983, under the Retirement Plan and whose Retirement Benefit is less than his Adjusted Retirement Benefit, but excluding any Participant who is eligible to receive benefits under (1) the Retirement Income Restoration Plan of ENSERCH Corporation and Participating Subsidiary Companies or (2) the Oncor Supplemental Retirement Plan, to the extent of any benefit attributable to service with Oncor Electric Delivery Company LLC."

(2)    Section 2.10 of the Plan is hereby amended in its entirety to read as follows:

"2.10 "Participating Employer" shall mean the Company or any Affiliated Entity which has been approved for participation in, and which has adopted, the Plan. "Participating Employers" shall be used to refer to such entities jointly or severally. Effective as of January 1, 2010, Oncor Electric Delivery Company LLC shall no longer be a Participating Employer in this Plan."

(3)    Section 2.19 of the Plan is hereby amended by adding the following sentences to the end of existing Section 2.19:

"Notwithstanding the foregoing, the Supplemental Retirement Benefit shall not include any amount attributable to service with Oncor Electric Delivery Company LLC, as determined by the actuary, which benefit shall be provided under the Oncor Supplemental Retirement Plan. In no event shall a Participant's total Benefit under this Plan and the Oncor Supplemental Retirement Plan exceed the Benefit such Participant would be entitled to receive under this Plan, if such Participant's service with Oncor Electric Delivery Company LLC were taken into account under this Plan."

IN WITNESS WHEREOF, and as conclusive evidence of the adoption of the foregoing instrument Amendment to the EFH Second Supplemental Retirement Plan, the Board of Directors of Energy Future Holdings Corp. has caused these presents to be duly executed in the name and on the behalf of Energy Future Holdings Corp., by an authorized officer thereof, thereunto duly authorized this 9th day of April, 2010.

**ENERGY FUTURE HOLDINGS CORP.**

/s/    PAUL KEGLEVIC
_____
Paul Keglevic,
Executive Vice President &
Chief Financial Officer

**REVIEWED & APPROVED**

_____
Richard Landy,
Executive Vice President, Human Resources

_____
Russell Graves,
Director, Total Rewards

**Exhibit 10(m)**

### THIRD AMENDMENT TO EFH SECOND SUPPLEMENTAL RETIREMENT PLAN

Pursuant to the authority of the Board of Directors of Energy Future Holdings Corp., and the provisions of Section 5.1 thereof, the EFH Second Supplemental Retirement Plan ("Plan"), as amended and restated as of October 10, 2007, is hereby amended in the following respects only, effective, except as otherwise stated, as of January 1, 2010.

(1)    The Plan is hereby amended by adding a new subsection (c) to Section 4.2 to read as follows:

"(c) Notwithstanding subsection (b), effective with respect to any Participant who experiences a Separation from Service on or after March 1, 2010, if the lump sum present value of a Participant's entire vested Supplemental Retirement Benefit under the Plan is $5,000 or less upon his or her Separation from Service, the present value of such Participant's Supplemental Retirement Benefit shall be paid to such Participant in a single lump sum upon such Participant's Separation from Service."

IN WITNESS WHEREOF, and as conclusive evidence of the adoption of the foregoing instrument Amendment to the EFH Second Supplemental Retirement Plan, the Board of Directors of Energy Future Holdings Corp. has caused these presents to be duly executed in the name and on the behalf of Energy Future Holdings Corp., by an authorized officer thereof, thereunto duly authorized this 21 ˢᵗ day of April, 2010.

**ENERGY FUTURE HOLDINGS CORP.**

/s/    RICHARD LANDY
Richard Landy,
Executive Vice President, Human Resources

**Exhibit 10(o)**

### Amendment to EFH Salary Deferral Program

Pursuant to Section 14 of the EFH Salary Deferral Program ("Plan") and the authority delegated to the Non-Qualified Plan ("NQP") Committee by the Board of Directors of Energy Future Holdings Corp. (the "Company") to amend the Plan, the NQP Committee approves the following amendments to the Plan:

**WHEREAS**, the Company wishes to amend the Plan to provide for cashout of small accounts and to eliminate certain provisions applicable to amounts contributed to the Plan prior to April 1, 1998.

**NOW, THEREFORE**, the Plan is hereby amended as follows:

1.  The Plan is amended by adding a new sentence at the end of existing Section 6.1 to read as follows:

    Notwithstanding the foregoing, effective as of January 1, 2011, this Section 6.1 shall apply to the entirety of each Participant's Account under the Plan, without regard to the date on which any amounts were deferred or contributed to the Plan.

2.  The Plan is amended by adding a new sentence at the end of existing Section 6.2 to read as follows:

    Notwithstanding the foregoing, effective as of January 1, 2011, the provisions of this Section 6.2 shall no longer apply and all Accounts under the Plan shall be invested in accordance with the provisions of Section 6.1.

3.  The Plan is amended by adding a new sentence at the end of existing Section 8.1(a) to read as follows:

    Notwithstanding the foregoing, effective as of January 1, 2011, this Section 8.1(a) shall apply to the entirety of each Participant's Account under the Plan, without regard to the date on which any amounts were deferred or contributed to the Plan.

4.  The Plan is amended by adding a new sentence at the end of existing Section 8.1(b) to read as follows:

    Notwithstanding the foregoing, effective as of January 1, 2011, the provisions of this Section 8.1(b) shall no longer apply and all Accounts under the Plan shall be valued in accordance with the provisions of Section 8.1(a).

5.  The Plan is amended by adding a new Section 8.2(b)(vi) to read as follows:

    (vi) Notwithstanding the foregoing, with respect to any Participant who experiences a Separation from Service on or after January 1, 2011, if the aggregate balance of such

Participant's Accounts at such time is $5,000 or less, then the full value of such Participant's Accounts shall be paid as a lump sum as soon as practicable, but in no event later than 60 days following such Separation from Service, subject to Section 8.3.

6.    The Plan is amended by adding a new Section 9.3 to read as follows:

9.3  Elimination of Special Provisions.

Notwithstanding the foregoing, from and after January 1, 2011, Exhibit B shall no longer apply.

7.    Except as amended hereby, the Plan shall remain in full force and effect.

| /s/   TONY HORTON | January 13, 2011 | |
| --- | --- | --- |
| Tony Horton | | Date |
| Senior Vice President, Treasurer | | |
| Energy Future Holdings Corp. | | |

| /s/   LINDA JOJO | January 19, 2011 | |
| --- | --- | --- |
| Linda Jojo | | Date |
| Senior Vice President, Chief Information Officer | | |
| Energy Future Holdings Corp. | | |

| /s/   RICHARD LANDY | January 20, 2011 | |
| --- | --- | --- |
| Rich Landy | | Date |
| Executive Vice President, Human Resources | | |
| Energy Future Holdings Corp. | | |

**Exhibit 10(dd)**

Paul Keglevic
Employment Arrangement

In October 2009, the Organization and Compensation Committee (O&C Committee) of the Board approved several changes to Paul Keglevic's compensation arrangement. Pursuant to Mr. Keglevic's amended employment arrangement, effective January 1, 2010, Mr. Keglevic's base salary was increased from $600,000 to $650,000, and Mr. Keglevic was granted a new cash-based retention incentive award (Retention Award). Under the terms of the Retention Award, Mr. Keglevic is entitled to receive on September 30, 2012, to the extent Mr. Keglevic remains employed by EFH Corp. on such date (with customary exceptions for death, disability and leaving for "good reason" or termination without "cause"), an additional one-time, lump-sum cash payment equal to 75% of the aggregate Executive Annual Incentive Plan award received by (or otherwise payable to) Mr. Keglevic for fiscal years 2009, 2010 and 2011. As described in greater detail in Item 9B of EFH Corp.'s annual report on Form 10-K for the fiscal year ended December 31, 2010, the O&C Committee recently approved a modification of the Retention Award.

Pursuant to Mr. Keglevic's amended employment arrangement, Mr. Keglevic received a grant of 1,000,000 new stock options under the 2007 Stock Incentive Plan for Key Employees of Energy Future Holdings Corp. and Affiliates (Stock Option Plan) at a strike price of $3.50 per share. Half of Mr. Keglevic's new stock options are cliff-vested options that will vest 100% on September 30, 2014, and the other half are time-vested options that will vest 20% per year over a five-year period beginning September 30, 2009. In connection with the grant of these new stock options, Mr. Keglevic surrendered to EFH Corp. 500,000 unvested performance-related stock options that were granted to Mr. Keglevic when he joined EFH Corp. As described in greater detail in Item 9B of EFH Corp.'s annual report on Form 10-K for the fiscal year ended December 31, 2010, the O&C Committee recently approved an exchange program pursuant to which our executive officers, including Mr. Keglevic, may exchange any and all of their outstanding stock option awards.

Mr. Paul Keglevic forfeited his rights to the deferred shares granted to him in July 2008, and on July 28, 2010, the Organization and Compensation Committee of the Board of Directors of EFH Corp. approved certain changes to Mr. Keglevic's compensation arrangement. Pursuant to the new arrangement, Mr. Keglevic will receive 225,000 shares of EFH Corp.'s common stock if he is employed by EFH Corp. on September 30, 2012. If Mr. Keglevic's employment with EFH Corp. terminates for any reason prior to September 30, 2012 (other than for "cause" or without "good reason"), he will also be entitled to receive the 225,000 shares. If Mr. Keglevic receives the 225,000 shares in accordance with the terms of his new arrangement, he has the right to sell the shares to EFH Corp. for $3,140,000, at any time during the period beginning on September 30, 2012 and ending on the sixtieth business day following his termination of employment (or, in the event Mr. Keglevic receives the shares upon his termination of employment, at any time during the period ending on the sixtieth business day following his termination of employment).

Exhibit 10(ee)

**DEFERRED SHARE AGREEMENT**

This Deferred Share Agreement, dated as of July 1, 2008 (this " Agreement") by and among Energy Future Holdings Corp. (" EFH Corp.") and Paul Keglevic (the " Executive").

WHEREAS, the Executive is employed by EFH Corp., pursuant to an employment agreement dated July 1, 2008 (the " Employment Agreement");

WHEREAS, in connection with Executive's continued employment with EFH Corp., EFH Corp. has agreed to deliver 225,000 shares of common stock, no par value, of EFH Corp. (" Shares") under the terms of this Agreement;

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth in this Agreement, and intending to be legally bound hereby, the parties hereto agree as follows:

<u>ARTICLE I</u>

<u>DEFERRED SHARE AWARD</u>

1.1 <u>Number of Shares</u>. Subject to the vesting requirements under Section 1.2(a), EFH Corp. shall deliver 225,000 Shares to the Executive on the Distribution Date; provided, however, that if, after the date hereof and prior to the Distribution Date, there is a merger, spin-off, stock dividend, recapitalization, reorganization, stock split or other similar event that results in an adjustment to an outstanding Share, the number of Shares to be delivered on the Distribution Date pursuant to this Section 1.1 shall be adjusted by the Board of Directors of EFH Corp. (or a committee thereof) in a manner which is necessary to reflect the effect of such event on the Shares, consistent with the treatment of stockholders of EFH Corp.

1.2 <u>Distribution Date</u>.

(a) Provided the Executive is employed on the third anniversary of the Effective Date (as defined by the Employment Agreement) of Executive's Employment Agreement with EFH Corp., the Shares shall vest and become nonforfeitable as to (i) 112,500 of the Shares on the date that is the third anniversary date of this Agreement and (ii) provided Executive is employed on the fifth anniversary of the Effective Date of Executive's Employment, the remaining 112,500 of the Shares shall vest and become nonforfeitable on the date that is the fifth anniversary date of this Agreement; provided that any shares not yet vested shall become 100% vested and become nonforfeitable upon the first to occur of (x) immediately prior to a Change of Control (as defined in the 2007 Stock Incentive Plan for Key Employees of EFH Corp.) or (y) a termination of Executive's employment by EFH Corp. without Cause, by Executive for Good Reason or due to Executive's death or Disability ("Cause," "Good Reason" and "Disability" are defined as provided in the Employment Agreement). The Shares shall be delivered to the Executive on the " Distribution Date", which, subject to Section 3.3 below, shall be the earliest of the following dates:

(1) the occurrence of Executive's separation of service for any reason, or, if necessary to meet the distribution requirement of Section 409A of the Internal Revenue Code of 1986, as amended (the " Code"), the date that is six months and one day following such separation; and

(2) the occurrence of a change in the ownership or effective control of EFH Corp., or in the ownership of a substantial portion of the assets of EFH Corp., occurring prior to Executive's separation from service; and

(3) the 90th day following the fifth anniversary date of the Agreement.

in each case within the meaning of, and interpreted in a manner consistent with regulations under, Section 409A of the Code.

(b) In the event of the Executive's death, any distribution to which the Executive would be entitled shall be made to the Executive's estate or in accordance with the Executive's will, the designated beneficiary.

1.3 <u>Dividends</u>. If there is any dividend or distribution in respect of outstanding Shares, the Executive shall be entitled to receive a payment in respect of the Shares in the amount and form, and at the time, that such payment would have been made had the Executive actually held the underlying Shares, subject to applicable withholding taxes.

1.4 <u>Right to Diversify</u>. If, prior to the Distribution Date, any of the Shares, had they been delivered to the Executive, would be released from the transfer restrictions contained in the Management Stockholders Agreement and could have been sold by the Executive without violation of applicable law or EFH Corp.'s trading policy, then upon and following the time of such release, the Executive shall have the right (a "<u>Diversification Right</u>"), exercisable by written notice to EFH Corp. and subject to reasonable administrative limitations, to convert his right to receive any or all of the Shares on the Distribution Date into a right to receive cash on the Distribution Date. In addition, the Executive shall have a Diversification Right with respect to any Shares that he would have been permitted to sell under the Sale Participation Agreement had he actually owned the Shares. In the event the Executive exercises a Diversification Right with respect to any Shares, the cash to be delivered to him on the Distribution Date shall equal the Fair Market Value (as defined in the Management Stockholders Agreement) of the Shares as to which the Diversification Right was exercised on the date of such exercise, as subsequently credited with investment returns based on notional investments as selected by the Executive from time to time following exercise of the Diversification Right from among those that EFH Corp. shall make available from among those notional investments under any nonqualified deferred compensation plan then maintained by EFH Corp. (or, if no such notional investments are made available, with compound annual interest equal to the prevailing prime rate plus 2 percentage points, but in no event shall it exceed EFH Corp.'s borrowing rate).

2

## ARTICLE II

## ADDITIONAL AGREEMENTS

2.1 <u>Additional Agreements</u>. Simultaneously with the execution of this Agreement, the parties shall execute a Management Stockholders Agreement and a Sale Participation Agreement each of which shall apply to the Shares subject to this Agreement.

2.2 <u>Special Put Right</u>. If the Executive's employment with EFH Corp. terminates for any reason prior to July 1, 2013, other than for Cause or without Good Reason (as defined in the Employment Agreement), he shall have the right (but not the obligation) to sell to EFH Corp. all (but not less than all) of the Shares delivered pursuant to Section 1.2 for a purchase price of $3,200,000 (the " <u>Special Put Right</u>"). In the event the Executive intends to exercise the Special Put Right, he shall send written notice, postmarked on or prior to the sixtieth day following termination of his employment, to EFH Corp. of his intention to sell the Shares in exchange for the applicable purchase price (" <u>Put Option Notice</u>"). The completion of the purchase shall take place at the principal office of EFH Corp. no later than the twentieth business day (such date to be determined by EFH Corp.) after the giving of the Put Option Notice. The applicable purchase price shall be paid by delivery to the Executive of a check payable to the order of the Executive against delivery of duly executed stock powers transferring the Shares.

## ARTICLE III

## TAX MATTERS

3.1 <u>Tax Withholding and Reporting</u>. Upon any Distribution Date, EFH Corp. shall be entitled to withhold from any payment or distribution to the Executive an amount necessary to satisfy applicable withholding taxes that become due by reason of such payment or distribution. EFH Corp. acknowledges that for income tax purposes, the Executive will not include into income any amount payable on the Distribution Date until payment is actually made on the Distribution Date. EFH Corp. shall report and file all EFH Corp. tax returns and information reports (including Form W-2) consistent with such position.

3.2 <u>Delivery Before Liquidity</u>. If, on the Distribution Date, (i) Shares are to be delivered to the Executive, and (ii) the Executive cannot resell promptly within a reasonable time thereafter such Shares either because there is no public market for the Shares, or the Executive is restricted under the Management Stockholders Agreement, EFH Corp. trading policies or applicable securities law from selling the Shares, EFH Corp. shall, immediately repurchase such number of Shares that, on the Distribution Date, have a Fair Market Value equal to the minimum statutory tax withholding obligation attributable to delivery of the Shares.

3.3 <u>Tax Assessment Prior to Distribution Date</u>. If there is a final tax assessment against the Executive that any amount otherwise payable under this Agreement is taxable in a year prior to the year that includes the Distribution Date, EFH Corp. shall immediately pay or distribute the cash or Shares that otherwise would have been paid or delivered on the Distribution Date, and if the Executive cannot promptly within a reasonable time thereafter resell such Shares either because there is no public market for the Shares, or the Executive is restricted under the Management Stockholders Agreement, EFH Corp. trading policies or applicable securities law from selling the Shares, EFH Corp. shall immediately repurchase such number of Shares that, on the Distribution Date, have a Fair Market Value equal to the amount of such tax assessment (or, if such assessment exceeds the Fair Market Value of all of the Shares, then all of the Shares will be repurchased).

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF EFH CORP.

EFH Corp. hereby represents and warrants to the Executive as of the date hereof and the date of the Closing that:

4.1 Corporate Existence and Power. EFH Corp. is a corporation duly formed, validly existing and in good standing under the laws of the State of Delaware.

4.2 Authorization. The execution, delivery and performance by EFH Corp. of this Agreement and the consummation of the transactions contemplated hereby are within EFH Corp.'s corporate powers and have been duly authorized by all necessary action on the part of EFH Corp. This Agreement has been duly and validly executed and delivered by EFH Corp. Assuming this Agreement is the valid and binding agreement of each of the Executive, this Agreement constitutes the legal, valid and binding agreement of EFH Corp., enforceable against EFH Corp. in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other laws of general application affecting enforcement or creditors' rights generally and general equitable principles.

4.3 Noncontravention. The execution, delivery and performance by EFH Corp. of this Agreement does not and will not (a) violate the certificate of incorporation of EFH Corp., (b) violate any law, rule, regulation, judgment, injunction, order or decree applicable to or binding upon EFH Corp., (c) require any consent or other action by any person under, constitute a default under (with due notice or lapse of time or both), or give rise to any right of termination, cancellation or acceleration of any right or obligation of EFH Corp. or to a loss of any benefit to which EFH Corp. is entitled under any provisions of any agreement or other instrument binding upon EFH Corp. or any of its assets or properties or (d) result in the creation or imposition of any material mortgage, lien, pledge, charge, security interest or encumbrance on any property or asset of EFH Corp.

4.4 Valid Issuance of Securities. The Shares which may be issued to the Executive hereunder will, when issued and delivered in accordance with the terms hereof, have been duly and validly authorized and issued and will be fully paid and nonassessable.

## ARTICLE V

## MISCELLANEOUS

5.1 Notices. All notices and other communications required or permitted hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed facsimile if sent during normal business hours of the recipient, if not, then on the next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid or (d) one (1) business day after deposit with a nationally recognized overnight

4

courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to such party's address as set forth below or at such other address or to such other person as the party shall have furnished to each other party in writing in accordance with this provision:

if to EFH Corp., to:

Energy Future Holdings Corp.
c/o Kohlberg Kravis Roberts & Co. L.P.
9 West 57th Street, Suite 4200
New York, New York 10019
Attention: Marc Lipschultz
Facsimile: (212) 750-0003

and

TPG Capital, L.P.
301 Commerce Street, Suite 3300
Forth Worth, Texas 76102
Attention: Clive Bode
Facsimile:(817) 871-4000

with copies to:

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017
Attention: Andrew W. Smith
Facsimile: (212) 455-2502

if to the Executive, at the Executive's address on file with EFH Corp.

5.2 <u>Amendments and Waivers</u>. Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each party to this Agreement, or in the case of a waiver, by the party against whom the waiver is to be effective. No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

5.3 <u>Successors and Assigns</u>. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, <u>provided</u> that no party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of (a) EFH Corp., in the case of assignment, delegation or transfer of any rights or obligations hereunder by the Executive, and (b) the Executive, in the case of assignment, delegation or transfer of any rights or obligations hereunder by EFH Corp.

5

5.4 <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the law of the State of Delaware, without giving effect to any otherwise governing principles of conflicts of law.

5.5 <u>Jurisdiction; Arbitration</u>.

(a) In the event of any controversy among the parties hereto arising out of, or relating to, this Agreement which cannot be settled amicably by the parties, such controversy shall be finally, exclusively and conclusively settled by mandatory arbitration conducted expeditiously in accordance with the American Arbitration Association rules by a single independent arbitrator. Such arbitration process shall take place in Dallas, Texas. The decision of the arbitrator shall be final and binding upon all parties hereto and shall be rendered pursuant to a written decision, which contains a detailed recital of the arbitrator's reasoning. Judgment upon the award rendered may be entered in any court having jurisdiction thereof.

(b) In the event of any arbitration or other disputes with regard to this Agreement or any other document or agreement referred to herein, each party to this Agreement shall pay its own legal fees and expenses, unless otherwise determined by the arbitrator. If the Executive substantially prevails on any of his substantive legal claims, then EFH Corp. shall reimburse all legal fees and arbitration fees incurred by the Executive to arbitrate the dispute.

5.6 <u>Waiver Of Jury Trial</u>. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

5.7 <u>Counterparts; Third Party Beneficiaries</u>. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. No provision of this Agreement shall confer upon any person other than the parties hereto any rights or remedies hereunder.

5.8 <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the parties with respect to the subject matter of this Agreement and supersedes all prior agreements and understandings, both oral and written, between the parties with respect to the subject matter of this Agreement.

5.9 <u>Captions</u>. The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.

5.10 <u>Severability</u>. If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provision shall be deemed to be excluded from this Agreement and the balance of this Agreement shall be interpreted as if such provision were so excluded and shall be enforced in accordance with its terms to the maximum extent permitted by law.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, each of the undersigned has executed this Agreement as of the date first above written.

ENERGY FUTURE HOLDINGS CORP.

By:  /s/   RIZWAN CHAND
       Name:  Rizwan Chand
       Title:    Executive Vice President

/s/   PAUL KEGLEVIC
       Paul Keglevic

[Signature Page to Deferred Share Agreement]

7

**Exhibit 10(hh)**

### DEFERRED SHARE AGREEMENT

This Deferred Share Agreement, dated as of May 20, 2008 (this " <u>Agreement</u>") by and among Energy Future Holdings Corp. (" <u>Parent</u>") and David A. Campbell (the " <u>Executive</u>").

WHEREAS, the Executive is employed by Parent and Luminant Holding Company LLC (" <u>Luminant</u>"), a subsidiary of Parent, pursuant to an employment agreement dated May 9, 2008 (the " <u>Employment Agreement</u>");

WHEREAS, in connection with Executive's continued employment with Parent and Luminant, Parent has agreed to deliver 500,000 shares of common stock, no par value, of Parent (" <u>Shares</u>") on the Distribution Date, as defined below;

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth in this Agreement, and intending to be legally bound hereby, the parties hereto agree as follows:

### <u>ARTICLE I</u>

### <u>DEFERRED SHARE AWARD</u>

1.1 <u>Number of Shares</u>. Parent shall deliver 500,000 Shares to the Executive on the Distribution Date; provided, however, that if, after the date hereof and prior to the Distribution Date, there is a merger, spin-off, stock dividend, recapitalization, reorganization, stock split or other similar event that results in an adjustment to an outstanding Share, the number of Shares to be delivered on the Distribution Date pursuant to Section 1.1 shall be adjusted by the Board of Directors of Parent (or a committee thereof) in a manner which is necessary to reflect the effect of such event on the Shares, consistent with the treatment of stockholders of Parent.

1.2 <u>Distribution Date</u>.

(a) The Shares shall be delivered to the Executive on the " <u>Distribution Date</u>", which, subject to Section 3.3 below, shall be the earlier of the following dates:

(1) the occurrence of Executive's separation of service for any reason, or, if necessary to meet the distribution requirement of Section 409A of the Internal Revenue Code of 1986, as amended (the " <u>Code</u>"), the date that is six months and one day following such separation; and

(2) the later of January 2, 2009 or the occurrence of a change in the ownership or effective control of Parent, or in the ownership of a substantial portion of the assets of Parent;

in each case within the meaning of, and interpreted in a manner consistent with regulations under, Section 409A of the Code.

(b) In the event of the Executive's death, any distribution to which the Executive would be entitled shall be made to the Executive's estate or in accordance with the Executive's will, the designated beneficiary.

1.3 <u>Dividends</u>. If there is any dividend or distribution in respect of outstanding Shares, the Executive shall be entitled to receive a payment in respect of the Shares in the amount and form, and at the time, that such payment would have been made had the Executive actually held the underlying Shares, subject to applicable withholding taxes.

1.4 <u>Right to Diversify</u>. If, prior to the Distribution Date, any of the Shares, had they been delivered to the Executive, would be released from the transfer restrictions contained in the Management Stockholders Agreement and could have been sold by the Executive without violation of applicable law or Parent's trading policy, then upon and following the time of such release, the Executive shall have the right (a "<u>Diversification Right</u>"), exercisable by written notice to Parent and subject to reasonable administrative limitations, to convert his right to receive any or all of the Shares on the Distribution Date into a right to receive cash on the Distribution Date. In addition, the Executive shall have a Diversification Right with respect to any Shares that he would have been permitted to sell under the Sale Participation Agreement had he actually owned the Shares. In the event the Executive exercises a Diversification Right with respect to any Shares, the cash to be delivered to him on the Distribution Date shall equal the Fair Market Value (as defined in the Management Stockholders Agreement) of the Shares as to which the Diversification Right was exercised on the date of such exercise, as subsequently credited with investment returns based on notional investments as selected by the Executive from time to time following exercise of the Diversification Right from among those that Parent shall make available from among those notional investments under any nonqualified deferred compensation plan then maintained by Parent (or, if no such notional investments are made available, with compound annual interest equal to the prevailing prime rate plus 2 percentage points, but in no event shall it exceed Parent's borrowing rate).

## ARTICLE II

## ADDITIONAL AGREEMENTS

2.1 <u>Additional Agreements</u>. Simultaneously with the execution of this Agreement, the parties shall execute a Management Stockholders Agreement and a Sale Participation Agreement each of which shall apply to the Shares subject to this Agreement

2.2 <u>Special Put Right</u>. If the Executive's employment with Parent and Luminant terminates for any reason prior to January 31, 2009, other than for Cause (as defined in the Employment Agreement), he shall have the right (but not the obligation) to sell to Parent all (but not less than all) of the Shares delivered pursuant to Section 1.2 for a purchase price of $2,500,000 (the "<u>Special Put Right</u>"). In the event the Executive intends to exercise the Special Put Right, he shall send written notice, postmarked on or prior to the sixtieth day following termination of his employment, to Parent of his intention to sell the Shares in exchange for the applicable purchase price ("<u>Put Option Notice</u>"). The completion of the purchase shall take place at the principal office of Parent no later than the twentieth business day (such date to be determined by Parent) after the giving of the Put Option Notice. The applicable purchase price shall be paid by delivery to the Executive of a check payable to the order of the Executive against delivery of duly executed stock powers transferring the Shares.

## ARTICLE III

## TAX MATTERS

3.1 <u>Tax Withholding and Reporting</u>. Upon any Distribution Date, Parent shall be entitled to withhold from any payment or distribution to the Executive an amount necessary to satisfy applicable withholding taxes that become due by reason of such payment or distribution. Parent acknowledges that for income tax purposes, the Executive will not include into income any amount payable on the Distribution Date until payment is actually made on the Distribution Date. Parent shall report and file all Parent tax returns and information reports (including Form W-2) consistent with such position.

3.2 <u>Delivery Before Liquidity</u>. If, on the Distribution Date, (i) Shares are to be delivered to the Executive, and (ii) the Executive cannot resell promptly within a reasonable time thereafter such Shares either because there is no public market for the Shares, or the Executive is restricted under the Management Stockholders Agreement, Parent trading policies or applicable securities law from selling the Shares, Parent shall, immediately repurchase such number of Shares that, on the Distribution Date, have a Fair Market Value equal to the minimum statutory tax withholding obligation attributable to delivery of the Shares.

3.3 <u>Tax Assessment Prior to Distribution Date</u>. If there is a final tax assessment against the Executive that any amount otherwise payable under this Agreement is taxable in a year prior to the year that includes the Distribution Date, Parent shall immediately pay or distribute the cash or Shares that otherwise would have been paid or delivered on the Distribution Date, and if the Executive cannot promptly within a reasonable time thereafter resell such Shares either because there is no public market for the Shares, or the Executive is restricted under the Management Stockholders Agreement, Parent trading policies or applicable securities law from selling the Shares, Parent shall immediately repurchase such number of Shares that, on the Distribution Date, have a Fair Market Value equal to the amount of such tax assessment (or, if such assessment exceeds the Fair Market Value of all of the Shares, then all of the Shares will be repurchased).

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF PARENT

Parent hereby represents and warrants to the Executive as of the date hereof and the date of the Closing that:

4.1 <u>Corporate Existence and Power</u>. Parent is a corporation duly formed, validly existing and in good standing under the laws of the State of Delaware.

3

4.2 <u>Authorization</u>. The execution, delivery and performance by Parent of this Agreement and the consummation of the transactions contemplated hereby are within Parent's corporate powers and have been duly authorized by all necessary action on the part of Parent. This Agreement has been duly and validly executed and delivered by Parent. Assuming this Agreement is the valid and binding agreement of each of the Executive, this Agreement constitutes the legal, valid and binding agreement of Parent, enforceable against Parent in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other laws of general application affecting enforcement or creditors' rights generally and general equitable principles.

4.3 <u>Noncontravention</u>. The execution, delivery and performance by Parent of this Agreement does not and will not (a) violate the certificate of incorporation of Parent, (b) violate any law, rule, regulation, judgment, injunction, order or decree applicable to or binding upon Parent, (c) require any consent or other action by any person under, constitute a default under (with due notice or lapse of time or both), or give rise to any right of termination, cancellation or acceleration of any right or obligation of Parent or to a loss of any benefit to which Parent is entitled under any provisions of any agreement or other instrument binding upon Parent or any of its assets or properties or (d) result in the creation or imposition of any material mortgage, lien, pledge, charge, security interest or encumbrance on any property or asset of Parent.

4.4 <u>Valid Issuance of Securities</u>. The Shares which may be issued to the Executive hereunder will, when issued and delivered in accordance with the terms hereof, have been duly and validly authorized and issued and will be fully paid and nonassessable.

## <u>ARTICLE V</u>

## <u>MISCELLANEOUS</u>

5.1 <u>Notices</u>. All notices and other communications required or permitted hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed facsimile if sent during normal business hours of the recipient, if not, then on the next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid or (d) one (1) business day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to such party's address as set forth below or at such other address or to such other person as the party shall have furnished to each other party in writing in accordance with this provision:

if to Parent, to:

Energy Future Holdings Corp.
c/o Kohlberg Kravis Roberts & Co. L.P.
9 West 57th Street, Suite 4200
New York, New York 10020
Attention: Marc Lipschultz
Facsimile: (212) 750-0003

4

and

TPG Capital, L.P.
301 Commerce Street, Suite 3300
Forth Worth, Texas 76102
Attention: Clive Bode
Facsimile: (817) 871-4000

with copies to:

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017
Attention: Andrew W. Smith
Facsimile: (212) 455-2502

if to the Executive, at the Executive's address on file with Parent.

5.2 <u>Amendments and Waivers</u>. Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each party to this Agreement, or in the case of a waiver, by the party against whom the waiver is to be effective. No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

5.3 <u>Successors and Assigns</u>. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, <u>provided</u> that no party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of (a) Parent, in the case of assignment, delegation or transfer of any rights or obligations hereunder by the Executive, and (b) the Executive, in the case of assignment, delegation or transfer of any rights or obligations hereunder by Parent.

5.4 <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the law of the State of Delaware, without giving effect to any otherwise governing principles of conflicts of law.

5.5 <u>Jurisdiction; Arbitration</u>.

(a) In the event of any controversy among the parties hereto arising out of, or relating to, this Agreement which cannot be settled amicably by the parties, such controversy shall be finally, exclusively and conclusively settled by mandatory arbitration conducted expeditiously in accordance with the American Arbitration Association rules by a single independent arbitrator. Such arbitration process shall take place in Dallas, Texas. The decision of the arbitrator shall be final and binding upon all parties hereto and shall be rendered pursuant to a written decision, which contains a detailed recital of the arbitrator's reasoning. Judgment upon the award rendered may be entered in any court having jurisdiction thereof.

5

(b) In the event of any arbitration or other disputes with regard to this Agreement or any other document or agreement referred to herein, each party to this Agreement shall pay its own legal fees and expenses, unless otherwise determined by the arbitrator. If the Executive substantially prevails on any of his substantive legal claims, then Parent shall reimburse all legal fees and arbitration fees incurred by the Executive to arbitrate the dispute.

5.6 Waiver Of Jury Trial. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

5.7 Counterparts; Third Party Beneficiaries. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. No provision of this Agreement shall confer upon any person other than the parties hereto any rights or remedies hereunder.

5.8 Entire Agreement. This Agreement constitutes the entire agreement between the parties with respect to the subject matter of this Agreement and supersedes all prior agreements and understandings, both oral and written, between the parties with respect to the subject matter of this Agreement.

5.9 Captions. The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.

5.10 Severability. If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provision shall be deemed to be excluded from this Agreement and the balance of this Agreement shall be interpreted as if such provision were so excluded and shall be enforced in accordance with its terms to the maximum extent permitted by law.

[Remainder of page intentionally left blank]

6

IN WITNESS WHEREOF, each of the undersigned has executed this Agreement as of the date first above written.

ENERGY FUTURE HOLDINGS CORP.

By: /s/    RIZWAN CHAND
    Name:  Rizwan Chand
    Title:    Executive Vice President

/s/    DAVID CAMPBELL
    David Campbell

[Signature Page to Deferred Share Agreement]

7

Exhibit 12 (a)

**ENERGY FUTURE HOLDINGS CORP.**
**COMPUTATION OF RATIO OF EARNINGS TO FIXED CHARGES**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | Successor | | | Predecessor | |
| | **2010** | **2009** | **2008** | **Period from October 11, 2007 Through December 31, 2007** | **Period from January 1, 2007 through October 10, 2007** | **2006** |
| EARNINGS: | | | | | | |
| Income (loss) from continuing operations | $(2,812) | $ 408 | $(9,998) | $ (1,361) | $ 699 | $2,465 |
| Subtract: Equity in earnings of unconsolidated subsidiaries (net of tax) | (277) | — | — | — | — | — |
| Add: Total federal income tax expense (benefit) | 389 | 367 | (471) | (673) | 309 | 1,263 |
| Fixed charges (see detail below) | 3,646 | 3,225 | 5,280 | 905 | 777 | 907 |
| Distributed income of equity investees | 169 | — | — | — | — | — |
| Total earnings (loss) | $ 1,115 | $ 4,000 | $(5,189) | $ (1,129) | $ 1,785 | $4,635 |
| | | | | | | |
| FIXED CHARGES: | | | | | | |
| Interest expense | $ 3,614 | $3,190 | $ 5,246 | $ 899 | $ 750 | $ 877 |
| Rentals representative of the interest factor | 32 | 35 | 34 | 6 | 27 | 30 |
| Total fixed charges | $ 3,646 | $3,225 | $ 5,280 | $ 905 | $ 777 | $ 907 |
| | | | | | | |
| RATIO OF EARNINGS TO FIXED CHARGES (a) | — | 1.24 | — | — | 2.30 | 5.11 |

(a)    Fixed charges exceeded earnings by $2.531 billion, $10.469 billion and $2.034 billion for the years ended December 31, 2010 and 2008 and for the period from October 11, 2007 through December 31, 2007, respectively.

EXHIBIT 21

**ENERGY FUTURE HOLDINGS CORP.**
**SUBSIDIARY HIERARCHY**
**Effective December 31, 2010**

| | Jurisdiction |
|---|---|
| Energy Future Holdings Corp. | Texas |
| Energy Future Competitive Holdings Company | Texas |
| Texas Competitive Electric Holdings LLC | Delaware |
| TCEH Finance, Inc. | Delaware |
| Generation MT Company LLC | Delaware |
| Luminant Holding Company LLC | Delaware |
| Luminant Energy Company LLC | Texas |
| Luminant ET Services Company | Texas |
| Luminant Energy Trading California Company | Texas |
| Luminant Energy Services Company | Texas |
| Luminant Generation Company LLC | Texas |
| Nuclear Energy Future Holdings LLC | Delaware |
| Nuclear Energy Future Holdings II LLC | Delaware |
| Comanche Peak Nuclear Power Company LLC [1] | Delaware |
| Valley NG Power Company LLC | Texas |
| Luminant Renewables Company LLC | Texas |
| | Texas |
| Generation SVC Company | Texas |
| Luminant Power Services Company | Delaware |
| Big Brown 3 Power Company LLC | Texas |
| Big Brown Power Company LLC | Texas |
| Collin Power Company LLC | Delaware |
| DeCordova Power Company LLC | Texas |
| Lake Creek 3 Power Company LLC | Texas |
| Martin Lake 4 Power Company LLC | Texas |
| Monticello 4 Power Company LLC | Texas |
| Morgan Creek 7 Power Company LLC | Texas |
| Oak Grove Management Company LLC | Delaware |
| Oak Grove Power Company LLC | Texas |
| Sandow Power Company LLC | Texas |
| Tradinghouse 3 & 4 Power Company LLC | Texas |
| Tradinghouse Power Company LLC | Texas |
| Valley Power Company LLC | Texas |
| Luminant Mining Services Company | Delaware |
| Big Brown Lignite Company LLC | Texas |
| Luminant Big Brown Mining Company LLC | Texas |
| Luminant Mining Company LLC | Texas |
| Oak Grove Mining Company LLC | Texas |
| Luminant Mineral Development Company LLC | Texas |
| NCA Resources Development Company LLC | Texas |
| TXU Energy Retail Company LLC | Texas |
| TXU Retail Services Company | Delaware |
| TXU SESCO Company LLC | Texas |
| TXU SESCO Energy Services Company | Texas |
| TXU Energy Solutions Company LLC | Texas |
| TXU SEM Company | Delaware |
| Brighten Holdings LLC | Delaware |
| Brighten Energy LLC | Delaware |
| Energy Future Intermediate Holding Company LLC | Delaware |
| EFIH Finance Inc. | Delaware |
| Oncor Electric Delivery Holdings Company LLC | Delaware |
| Oncor Electric Delivery Company LLC [2] | Delaware |
| Oncor Management Investment LLC [3] | Delaware |

| | Jurisdiction |
|---|---|
| Oncor Electric Delivery Transition Bond Company LLC | Delaware |
| Oncor Electric Delivery Administration Corp. | Texas |
| Oncor License Holdings Company LLC | Texas |
| Oncor Communications Holdings Company LLC | Delaware |
| EFH Renewables Company LLC | Delaware |
| EFH Corporate Services Company | Texas |
| EFH CG Management Company LLC | Texas |
| Generation Development Company LLC | Delaware |
| NCA Development Company LLC | Texas |
| EFH Properties Company | Texas |
| Basic Resources Inc. | Texas |
| TXU Receivables Company | Delaware |
| EFH Vermont Insurance Company | Vermont |
| LSGT Gas Company LLC | Texas |
| LSGT SACROC, Inc. | Texas |
| Humphreys & Glasgow Limited | United Kingdom |
| EEC Holdings, Inc | Nevada |
| EECI, Inc. | Nevada |
| Ebasco Services of Canada, Ltd | Canada |
| | United Kingdom |

1   88% ownership interest

2   80.033% ownership interest

3   Oncor Management Investment LLC owns 0.217% of Oncor Electric Delivery Company LLC. Regarding the ownership of Oncor Management Investment LLC, Oncor Electric Delivery Company LLC owns 100% of the Class A membership interests. Certain management employees of Oncor Electric Delivery Company LLC own 100% of the Class B membership interests.

**Exhibit 23(a)**

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We consent to the incorporation by reference in Registration Statement No. 333-165860 on Form S-3 of our reports dated February 17, 2011, relating to the consolidated financial statements of Energy Future Holdings Corp. and subsidiaries ("EFH Corp.") (which report expresses an unqualified opinion and includes an explanatory paragraph regarding EFH Corp.'s adoption of amended consolidation accounting standards related to variable interest entities and EFH Corp.'s adoption of amended guidance regarding transfers of financial assets effective January 1, 2010, on a prospective basis) and the effectiveness of EFH Corp.'s internal control over financial reporting, appearing in this Annual Report on Form 10-K of EFH Corp. for the year ended December 31, 2010.

/s/ Deloitte & Touche LLP

Dallas, Texas
February 17, 2011

**Exhibit 23(b)**

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We consent to the incorporation by reference in the Energy Future Holdings Corp. Registration Statement No. 333-165860 on Form S-3 of our report dated February 17, 2011, relating to the financial statements of Oncor Electric Delivery Holdings Company LLC and subsidiaries, appearing in the Annual Report on Form 10-K of Energy Future Holdings Corp. for the year ended December 31, 2010.

/s/ Deloitte & Touche LLP

Dallas, Texas
February 17, 2011

**Exhibit 31(a)**

**ENERGY FUTURE HOLDINGS CORP.**
**Certificate Pursuant to Section 302**
**of Sarbanes – Oxley Act of 2002**

I, John F. Young, certify that:

1.  I have reviewed this annual report on Form 10-K of Energy Future Holdings Corp.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 17, 2011

/s/ JOHN F. YOUNG

Signature:  John F. Young
Title:         President and Chief Executive Officer

Exhibit 31(b)

**ENERGY FUTURE HOLDINGS CORP.**
**Certificate Pursuant to Section 302**
**of Sarbanes – Oxley Act of 2002**

I, Paul M. Keglevic, certify that:

1. I have reviewed this annual report on Form 10-K of Energy Future Holdings Corp.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 17, 2011

/s/ PAUL M. KEGLEVIC

Signature:   Paul M. Keglevic
Title:         Executive Vice President and Chief Financial Officer

Exhibit 32(a)

**ENERGY FUTURE HOLDINGS CORP.**
**Certificate Pursuant to Section 906**
**of Sarbanes – Oxley Act of 2002**
**CERTIFICATION OF CEO**

The undersigned, John F. Young, President and Chief Executive Officer of Energy Future Holdings Corp. (the "Company"), DOES HEREBY CERTIFY that:

1. The Company's Annual Report on Form 10-K for the period ended December 31, 2010 (the "Report") fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2. Information contained in the Report fairly presents, in all material respects, the financial condition and results of operation of the Company.

IN WITNESS WHEREOF, the undersigned has caused this instrument to be executed this 17th day of February 2011.

/s/ JOHN F. YOUNG

Name: John F. Young
Title:   President and Chief Executive Officer

A signed original of this written statement required by Section 906 has been provided to Energy Future Holdings Corp. and will be retained by Energy Future Holdings Corp. and furnished to the Securities and Exchange Commission or its staff upon request.

Exhibit 32(b)

**ENERGY FUTURE HOLDINGS CORP.**
**Certificate Pursuant to Section 906**
**of Sarbanes – Oxley Act of 2002**
**CERTIFICATION OF CFO**

The undersigned, Paul M. Keglevic, Executive Vice President and Chief Financial Officer of Energy Future Holdings Corp. (the "Company"), DOES HEREBY CERTIFY that:

1.  The Company's Annual Report on Form 10-K for the period ended December 31, 2010 (the "Report") fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2.  Information contained in the Report fairly presents, in all material respects, the financial condition and results of operation of the Company.

IN WITNESS WHEREOF, the undersigned has caused this instrument to be executed this 17th day of February 2011.

/s/ PAUL M. KEGLEVIC

Name:  Paul M. Keglevic
Title:   Executive Vice President and Chief Financial Officer

A signed original of this written statement required by Section 906 has been provided to Energy Future Holdings Corp. and will be retained by Energy Future Holdings Corp. and furnished to the Securities and Exchange Commission or its staff upon request.

Exhibit 99(b)

**Energy Future Holdings Corp. Consolidated**
**Adjusted EBITDA Reconciliation**

| | Year Ended December 31, | |
|---|---|---|
| | 2010 | 2009 |
| | (millions of dollars) | |
| **Net income (loss) attributable to EFH Corp.** | $(2,812) | $    344 |
| **Income tax expense** | 389 | 367 |
| **Interest expense and related charges** | 3,554 | 2,912 |
| **Depreciation and amortization** | 1,407 | 1,754 |
| **EBITDA** | $ 2,538 | $ 5,377 |
| Oncor EBITDA | — | (1,354) |
| Oncor Holdings distributions | 169 | 216 |
| Interest income | (10) | (45) |
| Amortization of nuclear fuel | 140 | 101 |
| Purchase accounting adjustments (a) | 210 | 340 |
| Impairment of goodwill | 4,100 | 90 |
| Impairment of assets and inventory write down (b) | 15 | 42 |
| Net gain on debt exchange offers | (1,814) | (87) |
| Net income attributable to noncontrolling interests | — | 64 |
| Equity in earnings of unconsolidated subsidiary | (277) | — |
| EBITDA amount attributable to consolidated unrestricted subsidiaries | 1 | 3 |
| Unrealized net gain resulting from hedging transactions | (1,221) | (1,225) |
| Amortization of "day one" net loss on Sandow 5 power purchase agreement | (22) | (10) |
| Losses on sale of receivables | — | 12 |
| Noncash compensation expenses (c) | 18 | 11 |
| Severance expense (d) | 4 | 10 |
| Transition and business optimization costs (e) | 4 | 22 |
| Transaction and merger expenses (f) | 48 | 81 |
| Restructuring and other (g) | (117) | (14) |
| Expenses incurred to upgrade or expand a generation station (h) | 100 | 100 |
| **Adjusted EBITDA per Incurrence Covenant** | $ 3,886 | $  3,734 |
| **Add Oncor Adjusted EBITDA (reduced by Oncor distributions/ dividends)** | $ 1,354 | $  1,123 |
| **Adjusted EBITDA per Restricted Payments Covenant** | $ 5,240 | $  4,857 |

(a)  Purchase accounting adjustments include amortization of the intangible net asset value of retail and wholesale power sales agreements, environmental credits, coal purchase contracts, nuclear fuel contracts and power purchase agreements and the stepped up value of nuclear fuel. Also include certain credits not recognized in net income due to purchase accounting.

(b)  Impairment of assets includes impairments of land and charges related to the cancelled development of coal-fueled generation facilities.

(c)  Noncash compensation expenses are accounted for under accounting standards related to stock compensation and exclude capitalized amounts.

(d)  Severance expense includes amounts incurred related to outsourcing, restructuring and other amounts deemed to be in excess of normal recurring amounts.

(e)  Transition and business optimization costs include professional fees primarily for retail billing and customer care systems enhancements and incentive compensation.

(f)  Transaction and merger expenses include costs related to the Merger and abandoned strategic transactions, outsourcing transition costs, administrative costs related to the cancelled program to develop coal-fueled generation facilities, the Sponsor Group management fee and costs related to certain growth initiatives.

(g)  Restructuring and other for 2010 includes a gain on termination of a long-term power sales contract and for 2009 primarily represents reversal of certain liabilities accrued in purchase accounting and recorded as other income, partially offset by restructuring and nonrecurring activities.

(h)  Expenses incurred to upgrade or expand a generation station reflect noncapital outage costs.

**Exhibit 99(c)**

**Texas Competitive Electric Holdings Company LLC Consolidated**
**Adjusted EBITDA Reconciliation**

| | Year Ended December 31 | |
|---|---:|---:|
| | 2010 | 2009 |
| | (millions of dollars) | |
| **Net income (loss)** | $ (3,383) | $   709 |
| **Income tax expense** | 402 | 447 |
| **Interest expense and related charges** | 2,837 | 1,833 |
| **Depreciation and amortization** | 1,380 | 1,172 |
| **EBITDA** | $ 1,236 | $ 4,161 |
| Interest income | (91) | (64) |
| Amortization of nuclear fuel | 140 | 101 |
| Purchase accounting adjustments (a) | 163 | 293 |
| Impairment of goodwill | 4,100 | 70 |
| Impairment of assets and inventory write down (b) | 13 | 36 |
| Net gain on debt exchange offers | (687) | — |
| EBITDA amount attributable to consolidated unrestricted subsidiaries | 1 | 3 |
| Unrealized net gain resulting from hedging transactions | (1,221) | (1,225) |
| Amortization of "day one" net loss on Sandow 5 power purchase agreement | (22) | (10) |
| Corporate depreciation, interest and income tax expenses included in SG&A expense | 9 | 6 |
| Losses on sale of receivables | — | 12 |
| Noncash compensation expense (c) | 14 | 1 |
| Severance expense (d) | 3 | 10 |
| Transition and business optimization costs (e) | 9 | 25 |
| Transaction and merger expenses (f) | 38 | 5 |
| Restructuring and other (g) | (116) | (19) |
| Expenses incurred to upgrade or expand a generation station (h) | 100 | 100 |
| **Adjusted EBITDA per Incurrence Covenant** | $ 3,689 | $ 3,505 |
| Expenses related to unplanned generation station outages | 132 | 91 |
| Other adjustments allowed to determine Adjusted EBITDA per Maintenance Covenant (i) | 29 | 38 |
| **Adjusted EBITDA per Maintenance Covenant** | $ 3,850 | $ 3,634 |

(a)  Purchase accounting adjustments include amortization of the intangible net asset value of retail and wholesale power sales agreements, environmental credits, coal purchase contracts, nuclear fuel contracts and power purchase agreements and the stepped up value of nuclear fuel. Also include certain credits not recognized in net income due to purchase accounting.

(b)  Impairment of assets includes impairment of land.

(c)  Noncash compensation expenses are accounted for under accounting standards related to stock compensation and exclude capitalized amounts.

(d)  Severance expense includes amounts incurred related to outsourcing, restructuring and other amounts deemed to be in excess of normal recurring amounts.

(e)  Transition and business optimization costs include professional fees primarily for retail billing and customer care systems enhancements and incentive compensation.

(f)  Transaction and merger expenses include costs related to the Merger, outsourcing transition costs and costs related to certain growth initiatives.

(g)  Restructuring and other for 2010 includes a gain on termination of a long-term power sales contract and for 2009 primarily represents reversal of certain liabilities accrued in purchase accounting and recorded as other income, partially offset by restructuring and nonrecurring activities.

(h)  Expenses incurred to upgrade or expand a generation station reflect noncapital outage costs.

(i)  Primarily pre-operating expenses relating to Oak Grove and Sandow 5.

Exhibit 99(d)

**Energy Future Intermediate Holding Company LLC Consolidated**
**Adjusted EBITDA Reconciliation**

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2010 | 2009 |
| | (millions of dollars) | |
| **Net income** | $ 213 | $ 74 |
| **Income tax benefit** | (42) | (93) |
| **Interest expense and related charges** | 315 | 279 |
| **Depreciation and amortization** | — | — |
| **EBITDA** | $ 486 | $ 260 |
| | | |
| Oncor Holdings distributions | 169 | 216 |
| Interest income | (209) | (4) |
| Equity in earnings of unconsolidated subsidiary (net of tax) | (277) | (256) |
| Other | — | (1) |
| **Adjusted EBITDA per Incurrence Covenant** | $ 169 | $ 215 |
| **Add Oncor Adjusted EBITDA (reduced by Oncor Holdings distributions)** | $ 1,354 | $ 1,123 |
| **Adjusted EBITDA per Restricted Payments Covenants** | $ 1,523 | $ 1,338 |

**Exhibit 99(e)**

# ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC

# AN ENERGY FUTURE HOLDINGS CORP. ENTERPRISE

# CONSOLIDATED FINANCIAL STATEMENTS

# AS OF DECEMBER 31, 2010

# AND

# REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

## GLOSSARY

When the following terms and abbreviations appear in the text of this report, they have the meanings indicated below.

| | |
|---|---|
| **2009 Audited Financial Statements** | Oncor Holdings' audited financial statements for the year ended December 31, 2009 included in EFH Corp.'s Annual Report on Form 10-K for the year ended December 31, 2009 filed on February 19, 2010 (Commission File No. 001-12833) |
| **Bondco** | Refers to Oncor Electric Delivery Transition Bond Company LLC, a wholly-owned consolidated bankruptcy-remote financing subsidiary of Oncor that has issued securitization (transition) bonds to recover certain regulatory assets and other costs. |
| **Capgemini** | Capgemini Energy LP, a provider of business process support services to Oncor |
| **Deed of Trust** | Deed of Trust, Security Agreement and Fixture Filing, dated as of May 15, 2008, made by Oncor to and for the benefit of The Bank of New York Mellon (formerly The Bank of New York), as collateral agent, as amended |
| **EBITDA** | Refers to earnings (net income) before interest expense, income taxes, depreciation and amortization. |
| **EFH Corp.** | Refers to Energy Future Holdings Corp., a holding company, and/or its subsidiaries, depending on context. Its major subsidiaries include Oncor and TCEH. |
| **EFH Retirement Plan** | Refers to the defined benefit pension plan sponsored by EFH Corp., in which Oncor is a participating subsidiary. |
| **EFIH** | Refers to Energy Future Intermediate Holding Company LLC, a direct, wholly-owned subsidiary of EFH Corp. and the direct parent of Oncor Holdings. |
| **ERCOT** | Electric Reliability Council of Texas, the independent system operator and the regional coordinator of the various electricity systems within Texas |
| **ERISA** | Employee Retirement Income Security Act of 1974, as amended |
| **FASB** | Financial Accounting Standards Board, the designated organization in the private sector for establishing standards for financial accounting and reporting |
| **FERC** | US Federal Energy Regulatory Commission |
| **GAAP** | generally accepted accounting principles |
| **Investment LLC** | Refers to Oncor Management Investment LLC, a limited liability company and minority membership interest owner of Oncor (approximately 0.22%), whose managing member is Oncor and whose Class B Interests are owned by certain members of the management team and independent directors of Oncor. |
| **IRS** | US Internal Revenue Service |
| **kWh** | kilowatt-hours |
| **LIBOR** | London Interbank Offered Rate. An interest rate at which banks can borrow funds, in marketable size, from other banks in the London interbank market. |
| **Limited Liability Company Agreement** | The Second Amended and Restated Limited Liability Company Agreement of Oncor, dated as of November 5, 2008, by and among Oncor Holdings, Texas Transmission and Investment LLC, as amended |
| **Luminant** | Refers to subsidiaries of TCEH engaged in competitive market activities consisting of electricity generation and wholesale energy sales and purchases as well as commodity risk management and trading activities, all largely in Texas. |
| **Merger** | The transaction referred to in "Merger Agreement" (defined immediately below) that was completed on October 10, 2007. |

i

| | |
|---|---|
| **Merger Agreement** | Agreement and Plan of Merger, dated February 25, 2007, under which Texas Holdings agreed to acquire EFH Corp. |
| **Moody's** | Moody's Investors Services, Inc. (a credit rating agency) |
| **Oncor** | Refers to Oncor Electric Delivery Company LLC, a direct, majority-owned subsidiary of Oncor Holdings, and/or its wholly-owned consolidated bankruptcy-remote financing subsidiary, Bondco, depending on context. |
| **Oncor Holdings** | Refers to Oncor Electric Delivery Holdings Company LLC, a direct, wholly-owned subsidiary of EFIH and the direct majority owner of Oncor, and/or its subsidiaries, depending on context. |
| **Oncor Plan** | Refers to the Oncor Supplemental Retirement Plan, also referred to herein as the "Supplemental Retirement Plan." |
| **Oncor Ring-Fenced Entities** | Refers to Oncor Holdings and its direct and indirect subsidiaries. |
| **OPEB** | other postretirement employee benefits |
| **OPEB plan** | Refers to an EFH Corp.-sponsored plan, in which Oncor is a participating subsidiary, that offers certain health care and life insurance benefits to eligible employees and their eligible dependents upon the retirement of such employees from the company. |
| **PUCT** | Public Utility Commission of Texas |
| **PURA** | Texas Public Utility Regulatory Act |
| **purchase accounting** | The purchase method of accounting for a business combination as prescribed by US GAAP, whereby the cost or "purchase price" of a business combination, including the amount paid for the equity and direct transaction costs, are allocated to identifiable assets and liabilities (including intangible assets) based upon their fair values. The excess of the purchase price over the fair values of assets and liabilities is recorded as goodwill. |
| **REP** | retail electric provider |
| **S&P** | Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies, Inc. (a credit rating agency) |
| **SARs** | Stock Appreciation Rights |
| **SARs Plan** | Refers to the Oncor Electric Delivery Company LLC Stock Appreciation Rights Plan. |
| **SEC** | US Securities and Exchange Commission |
| **Securities Act** | Securities Act of 1933, as amended |
| **Sponsor Group** | Refers collectively to the investment funds affiliated with Kohlberg Kravis Roberts & Co. L.P. (KKR), TPG Capital, L.P. and GS Capital Partners, an affiliate of Goldman Sachs & Co. (See Texas Holdings below.) |
| **TCEH** | Refers to Texas Competitive Electric Holdings Company LLC, a direct, wholly-owned subsidiary of Energy Future Competitive Holdings Company and an indirect subsidiary of EFH Corp., and/or its subsidiaries, depending on context. |
| **Texas Holdings** | Refers to Texas Energy Future Holdings Limited Partnership, a limited partnership controlled by the Sponsor Group that owns substantially all of the common stock of EFH Corp. |
| **Texas Holdings Group** | Refers to Texas Holdings and its direct and indirect subsidiaries other than the Oncor Ring-Fenced Entities. |
| **Texas Transmission** | Refers to Texas Transmission Investment LLC, a limited liability company that owns a 19.75% equity interest in Oncor. Texas Transmission is not affiliated with EFH Corp., any of EFH Corp.'s subsidiaries or any member of the Sponsor Group. |
| **TXU Energy** | Refers to TXU Energy Retail Company LLC, a direct, wholly-owned subsidiary of TCEH engaged in the retail sale of electricity to residential and business customers. TXU Energy is a REP in competitive areas of ERCOT. |

| | |
|---|---|
| **US** | United States of America |
| **VIE** | variable interest entity |

This Annual Report occasionally makes references to Oncor Holdings or Oncor when describing actions, rights or obligations of their respective subsidiaries. References to "we," "our," "us," and "the company" are to Oncor Holdings and/or its direct or indirect subsidiaries as apparent in the context. These references reflect the fact that the subsidiaries are consolidated with their respective parent companies for financial reporting purposes. However, these references should not be interpreted to imply that the parent company is actually undertaking the action or has the rights or obligations of the relevant subsidiary company or that the subsidiary company is undertaking an action or has the rights or obligations of its parent company or any other affiliate.

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Member of
Oncor Electric Delivery Holdings Company LLC
Dallas, Texas

We have audited the accompanying consolidated balance sheets of Oncor Electric Delivery Holdings Company LLC and subsidiaries (the "Company") as of December 31, 2010 and 2009, and the related statements of consolidated income (loss), comprehensive income (loss), cash flows and membership interests for each of the three years in the period ended December 31, 2010. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Oncor Electric Delivery Holdings Company LLC and subsidiaries as of December 31, 2010 and 2009, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2010, in conformity with accounting principles generally accepted in the United States of America.

/s/ Deloitte & Touche LLP

Dallas, Texas
February 17, 2011

1

## ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC
## STATEMENTS OF CONSOLIDATED INCOME (LOSS)
### (millions of dollars)

| | Year Ended December 31, | | |
| | 2010 | 2009 | 2008 |
|---|---|---|---|
| Operating revenues: | | | |
| Affiliated | $ 1,061 | $ 1,018 | $ 1,000 |
| Nonaffiliated | 1,853 | 1,672 | 1,580 |
| Total operating revenues | 2,914 | 2,690 | 2,580 |
| Operating expenses: | | | |
| Operation and maintenance | 1,009 | 962 | 852 |
| Depreciation and amortization | 673 | 557 | 492 |
| Write off of regulatory assets (Note 5) | — | 25 | — |
| Income taxes | 193 | 145 | 191 |
| Taxes other than income taxes | 384 | 385 | 391 |
| Total operating expenses | 2,259 | 2,074 | 1,926 |
| Operating income | 655 | 616 | 654 |
| Other income and deductions: | | | |
| Impairment of goodwill (Note 2) | — | — | 860 |
| Other income (Note 16) | 36 | 49 | 45 |
| Other deductions (Note 16) | 8 | 14 | 25 |
| Nonoperating income taxes | 27 | 28 | 26 |
| Interest income | 38 | 43 | 45 |
| Interest expense and related charges (Note 16) | 347 | 346 | 316 |
| Net income (loss) | 347 | 320 | (483) |
| Net (income) loss attributable to noncontrolling interests | (70) | (64) | 160 |
| Net income (loss) attributable to Oncor Holdings | $ 277 | $ 256 | $ (323) |

See Notes to Financial Statements.

## STATEMENTS OF CONSOLIDATED COMPREHENSIVE INCOME (LOSS)
### (millions of dollars)

| | Year Ended December 31, | | |
| | 2010 | 2009 | 2008 |
|---|---|---|---|
| Net income (loss) | $ 347 | $ 320 | $ (483) |
| Other comprehensive income, net of tax effects: | | | |
| Cash flow hedges: | | | |
| Net decrease in fair value of derivatives (net of tax benefit of —, — and $1) | — | — | (2) |
| Comprehensive income (loss) | 347 | 320 | (485) |
| Comprehensive (income) loss attributable to noncontrolling interests | (70) | (64) | 160 |
| Comprehensive income (loss) attributable to Oncor Holdings | $ 277 | $ 256 | $ (325) |

See Notes to Financial Statements.

2

# ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC
## STATEMENTS OF CONSOLIDATED CASH FLOWS
### (millions of dollars)

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2010** | **2009** | **2008** |
| Cash flows — operating activities: | | | |
| Net income (loss) | $ 347 | $ 320 | $ (483) |
| Adjustments to reconcile net income to cash provided by operating activities: | | | |
| Depreciation and amortization | 682 | 522 | 451 |
| Write off of regulatory assets (Note 5) | — | 25 | — |
| Deferred income taxes – net taxes – net | 155 | 78 | 159 |
| Amortization of investment tax credits | (5) | (5) | (5) |
| Reversal of reserve recorded in purchase accounting | — | (10) | — |
| Impairment of goodwill (Note 2) | — | — | 860 |
| Bad debt expense | (1) | (3) | 1 |
| Other, net | 1 | 2 | 5 |
| Changes in operating assets and liabilities: | | | |
| Accounts receivable – trade (including affiliates) | (1) | (29) | (1) |
| Inventories | (4) | (29) | (12) |
| Accounts payable – trade (including affiliates) | (17) | 7 | 6 |
| Deferred advanced metering system revenues (Note 5) | 11 | 57 | — |
| Other – assets | 3 | (40) | (141) |
| Other – liabilities | (74) | 55 | (11) |
| Cash provided by operating activities | 1,097 | 950 | 829 |
| | | | |
| Cash flows — financing activities: | | | |
| Issuance of long-term debt (Note 7) | 475 | — | 1,500 |
| Repayments of long-term debt (Note 7) | (108) | (104) | (99) |
| Net increase (decrease) in short-term borrowings (Note 6) | (239) | 279 | (943) |
| Proceeds from sale of noncontrolling interests, net of transaction costs (Note 10) | — | — | 1,253 |
| Distribution to parent of equity sale net proceeds | — | — | (1,253) |
| Distributions to parent (Note 9) | (169) | (216) | (330) |
| Distributions to noncontrolling interests | (42) | (56) | — |
| Decrease in income tax-related note receivable from TCEH | 37 | 35 | 34 |
| Excess tax benefit on stock-based incentive compensation | — | — | 10 |
| Debt discount, financing and reacquisition expenses – net | (15) | (3) | (18) |
| Cash provided by (used in) financing activities | (61) | (65) | 154 |
| | | | |
| Cash flows — investing activities: | | | |
| Capital expenditures | (1,020) | (998) | (919) |
| Cash settlements related to outsourcing contract termination (Note 12) | — | — | 20 |
| Other | (12) | 16 | 20 |
| Cash used in investing activities | (1,032) | (982) | (879) |
| | | | |
| Net change in cash and cash equivalents | 4 | (97) | 104 |
| | | | |
| Cash and cash equivalents — beginning balance | 29 | 126 | 22 |
| | | | |
| Cash and cash equivalents — ending balance | $ 33 | $ 29 | $ 126 |

See Notes to Financial Statements.

3

## ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC
## CONSOLIDATED BALANCE SHEETS
### (millions of dollars)

| | At December 31, | |
| --- | ---: | ---: |
| | 2010 | 2009 |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 33 | $ 29 |
| Restricted cash — Bondco (Note 11) | 53 | 47 |
| Trade accounts receivable from nonaffiliates — net (Note 16) | 254 | 243 |
| Trade accounts and other receivables from affiliates | 182 | 188 |
| Income taxes receivable from EFH Corp. (Note 15) | 72 | — |
| Materials and supplies inventories — at average cost | 96 | 92 |
| Accumulated deferred income taxes (Note 4) | 10 | 10 |
| Prepayments | 75 | 76 |
| Other current assets | 5 | 8 |
| Total current assets | 780 | 693 |
| Restricted cash — Bondco (Note 11) | 16 | 14 |
| Investments and other property (Note 11) | 78 | 72 |
| Property, plant and equipment — net (Note 16) | 9,676 | 9,174 |
| Goodwill (Notes 2 and 16) | 4,064 | 4,064 |
| Note receivable due from TCEH (Note 15) | 178 | 217 |
| Regulatory assets – net — Oncor (Note 5) | 1,266 | 1,363 |
| Regulatory assets – net — Bondco (Note 5) | 516 | 596 |
| Other noncurrent assets | 264 | 51 |
| Total assets | $ 16,838 | $ 16,244 |
| **LIABILITIES AND MEMBERSHIP INTERESTS** | | |
| Current liabilities: | | |
| Short-term borrowings (Note 6) | $ 377 | $ 616 |
| Long-term debt due currently — Bondco (Note 7) | 113 | 108 |
| Trade accounts payable | 125 | 129 |
| Income taxes payable to EFH Corp. (Note 15) | — | 5 |
| Accrued taxes other than income taxes | 133 | 137 |
| Accrued interest | 108 | 104 |
| Other current liabilities | 109 | 106 |
| Total current liabilities | 965 | 1,205 |
| Long-term debt, less amounts due currently — Oncor (Note 7) | 4,783 | 4,335 |
| Long-term debt, less amounts due currently — Bondco (Note 7) | 550 | 661 |
| Accumulated deferred income taxes (Notes 1 and 4) | 1,516 | 1,369 |
| Investment tax credits | 32 | 37 |
| Other noncurrent liabilities and deferred credits (Note 16) | 1,996 | 1,879 |
| Total liabilities | 9,842 | 9,486 |
| Commitments and contingencies (Note 8) | | |
| Membership interests (Note 9): | | |
| Capital account | 5,546 | 5,397 |
| Accumulated other comprehensive income (loss), net of tax effects | (2) | (2) |
| Oncor Holdings membership interest | 5,544 | 5,395 |
| Noncontrolling interests in subsidiary | 1,452 | 1,363 |
| Total membership interests | 6,996 | 6,758 |
| Total liabilities and membership interests | $ 16,838 | $ 16,244 |

See Notes to Financial Statements.

4