Table of Contents

## 1. Mr. Young

**Potential Payments to Mr. Young upon Termination as of December 31, 2012 (per employment agreement and restricted stock agreements, each in effect as of December 31, 2012)**

| Benefit | Voluntary | | For Cause | | Death | | Disability | | Without Cause Or For Good Reason | | Without Cause Or For Good Reason In Connection With Change in Control | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Severance | | | | | | | | | $ | 4,800,000 | $ | 7,200,000 |
| EAIP[(1)] | $ | 552,000 | $ | 552,000 | $ | 552,000 | $ | 552,000 | | | | |
| Supplemental Retirement Benefit | | | | | $ | 3,000,000 | $ | 3,000,000 | $ | 3,000,000 | $ | 3,000,000 |
| LTI Cash Retention Award: | | | | | | | | | | | | |
|    - 2011 LTI Award | | | | | $ | 750,000 | $ | 750,000 | $ | 750,000 | $ | 750,000 |
|    - 2015 LTI Award | | | | | $ | 2,700,000 | $ | 2,700,000 | $ | 2,700,000 | $ | 2,700,000 |
| LTI Equity Incentive Award: | | | | | | | | | | | | |
|    - Annual RSUs | | | | | $ | 511,710 | $ | 511,710 | $ | 511,710 | $ | 1,800,000 |
|    - Exchange RSUs | | | | | $ | 932,628 | $ | 932,628 | $ | 932,628 | $ | 1,800,000 |
| Health & Welfare: | | | | | | | | | | | | |
|    - Medical/COBRA | | | | | | | | | $ | 36,428 | $ | 36,428 |
|    - Dental/COBRA | | | | | | | | | $ | 3,088 | $ | 3,088 |
| **Totals** | $ | **552,000** | $ | **552,000** | $ | **8,446,338** | $ | **8,446,338** | $ | **12,733,854** | $ | **17,289,516** |

_____

(1)    The EAIP amount represents the remaining portion of Mr. Young's 2012 EAIP bonus, which is to be paid in March 2013.

    Mr. Young has entered into an employment agreement that provides for certain payments and benefits upon the expiration or termination of the agreement under the following circumstances:

1.   In the event of Mr. Young's voluntary resignation without good reason or termination with cause:
    a.   accrued but unpaid base salary and unused vacation earned through the date of termination;
    b.   accrued but unpaid annual bonus earned for the previously completed year;
    c.   unreimbursed business expenses; and
    d.   payment of employee benefits, including equity compensation, if any, to which Mr. Young may be entitled.
2.   In the event of Mr. Young's death or disability:
    a.   a prorated annual incentive bonus for the year of termination;
    b.   value of supplemental retirement benefit for Mr. Young, payment of which would commence on December 31, 2014;
    c.   the pro-rata cash retention award earned prior to the date of termination;
    d.   the pro-rata equity incentive award earned prior to the date of termination; and
    e.   payment of employee benefits, including equity compensation, if any, to which Mr. Young may be entitled.
3.   In the event of Mr. Young's termination without cause or resignation for good reason:
    a.   a lump sum payment equal to (i) three times his annualized base salary and (ii) a prorated annual incentive bonus for the year of termination;
    b.   value of supplemental retirement benefit for Mr. Young, payment of which would commence on December 31, 2014;
    c.   the pro-rata cash retention award earned prior to the date of termination;
    d.   the pro-rata equity incentive award earned prior to the date of termination;
    e.   payment of employee benefits, including equity compensation, if any, to which Mr. Young may be entitled; and
    f.   certain continuing health care and company benefits.
4.   In the event of Mr. Young's termination without cause or resignation for good reason within 24 months following a change in control of EFH Corp.:
    a.   a lump sum payment equal to three times the sum of (i) his annualized base salary and (ii) his annual bonus target;
    b.   value of supplemental retirement benefit for Mr. Young, payment of which would commence on December 31, 2014;
    c.   the pro-rata cash retention award earned prior to the date of termination;
    d.   all Exchange RSUs;
    e.   all Annual RSUs;
    f.   payment of employee benefits, including equity compensation, if any, to which Mr. Young may be entitled; and
    g.   certain continuing health care and company benefits.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## 2. Mr. Keglevic

**Potential Payments to Mr. Keglevic upon Termination as of December 31, 2012 (per employment agreement and restricted stock unit agreements, each in effect as of December 31, 2012)**

| Benefit | Voluntary[1] | | For Cause | | Death | | Disability | | Without Cause Or For Good Reason | | Without Cause Or For Good Reason In Connection With Change in Control | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Severance | | | | | | | | | $ | 1,852,500 | $ | 2,405,000 |
| EAIP[2] | $ | 254,150 | $ | 254,150 | $ | 254,150 | $ | 254,150 | | | | |
| LTI Cash Retention Award: | | | | | | | | | | | | |
| - 2011 LTI Award | | | | | $ | 650,000 | $ | 650,000 | $ | 650,000 | | 650,000 |
| - 2015 LTI Award | | | | | $ | 1,000,000 | $ | 1,000,000 | $ | 1,000,000 | $ | 1,000,000 |
| LTI Equity Incentive Award: | | | | | | | | | | | | |
| - Annual RSUs | | | | | $ | 170,570 | $ | 170,570 | $ | 170,570 | $ | 600,000 |
| - Exchange RSUs | | | | | $ | 310,876 | $ | 310,876 | $ | 310,876 | $ | 600,000 |
| Health & Welfare | | | | | | | | | | | | |
| - Dental/COBRA | | | | | | | | | $ | 1,642 | $ | 1,642 |
| **Totals** | $ | 254,150 | $ | 254,150 | $ | 2,385,596 | $ | 2,385,596 | $ | 3,985,588 | $ | 5,256,642 |

(1)  Pursuant to his employment agreement, if Mr. Keglevic voluntarily resigned on or before December 31, 2012, he would have been required to return to EFH Corp. the $50,000 portion of his signing bonus he received in July 2012.

(2)  The EAIP amount represents the remaining portion of Mr. Keglevic's 2012 EAIP bonus, which is to be paid in March 2013.

Mr. Keglevic has entered into an employment agreement that provides for certain payments and benefits upon the expiration or termination of the agreement under the following circumstances:

1.  In the event of Mr. Keglevic's voluntary resignation without good reason or termination with cause:
    a.  accrued but unpaid base salary and unused vacation earned through the date of termination;
    b.  accrued but unpaid annual bonus earned for the previously completed year;
    c.  unreimbursed business expenses; and
    d.  payment of employee benefits, including equity compensation, if any, to which Mr. Keglevic may be entitled.
2.  In the event of Mr. Keglevic's death or disability:
    a.  a prorated annual incentive bonus for the year of termination;
    b.  the pro-rata cash retention award earned prior to the date of termination;
    c.  the pro-rata equity incentive award earned prior to the date of termination; and
    d.  payment of employee benefits, including stock compensation, if any, to which Mr. Keglevic may be entitled.
3.  In the event of Mr. Keglevic's termination without cause or resignation for good reason:
    a.  a lump sum payment equal to (i) two times his annualized base salary, (ii) a prorated annual incentive bonus for the year of termination;
    b.  the pro-rata cash retention award earned prior to the date of termination;
    c.  the pro-rata equity incentive award earned prior to the date of termination;
    d.  payment of employee benefits, including stock compensation, if any, to which Mr. Keglevic may be entitled; and
    e.  certain continuing health care and company benefits.
4.  In the event of Mr. Keglevic's termination without cause or resignation for good reason within 24 months following a change in control of EFH Corp.:
    a.  a lump sum payment equal to two times the sum of (i) his annualized base salary and (ii) his annual bonus target;
    b.  the pro-rata cash retention award earned prior to the date of termination;
    c.  all Exchange RSUs;
    d.  all Annual RSUs;
    e.  payment of employee benefits, including stock compensation, if any, to which Mr. Keglevic may be entitled; and
    f.  certain continuing health care and company benefits.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### 3. Mr. Campbell

**Potential Payments to Mr. Campbell upon Termination as of December 31, 2012 (per employment agreement, deferred share agreement and restricted stock unit agreements, each in effect as of December 31, 2012). Because Mr. Campbell resigned, effective January 1, 2013, Mr. Campbell forfeited certain compensation as discussed above and received the amount reflected in the "Total" cell for the "Voluntary" column below.**

| Benefit | Voluntary |
|---|---|
| Cash Severance | |
| EAIP[1] | $ 309,400 |
| Distribution of Deferred Shares[2] | $ 197,100 |
| LTI Cash Retention Award: | |
|    - 2011 LTI Award | |
|    - 2015 LTI Award | |
| LTI Equity Incentive Award: | |
|    - Annual RSUs | |
|    - Exchange RSUs | |
| Health & Welfare | |
|    - Medical/COBRA | |
|    - Dental/COBRA | |
| **Totals** | **$ 506,500** |

_____

(1)  The EAIP amount represents the remaining portion of Mr. Campbell's 2012 EAIP bonus, which is to be paid in March 2013.

(2)  The amount reported under the heading "Distribution of Deferred Shares" represents the fair market value of 492,750 shares of EFH Corp. common stock as of December 31, 2012, that Mr. Campbell is entitled to receive, pursuant to the terms of his deferred share agreement, on the earlier to occur of his termination of employment for any reason or a change in the effective control of EFH Corp.

Mr. Campbell has entered into an employment agreement that provides for certain payments and benefits upon the expiration or termination of the agreement under the following circumstances:

1.  In the event of Mr. Campbell's voluntary resignation without good reason or termination with cause:
    a.  accrued but unpaid base salary and unused vacation earned through the date of termination;
    b.  accrued but unpaid annual bonus earned for the previously completed year;
    c.  unreimbursed business expenses; and
    d.  payment of employee benefits, including equity compensation, if any, to which Mr. Campbell may be entitled.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### 4. Mr. Burke

**Potential Payments to Mr. Burke upon Termination as of December 31, 2012 (per employment agreement, deferred share agreement and restricted stock unit agreements, each in effect as of December 31, 2012)**

| Benefit | Voluntary | | For Cause | | Death | | Disability | | Without Cause Or For Good Reason | | Without Cause Or For Good Reason In Connection With Change in Control | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Severance | | | | | | | | | $ | 1,795,500 | $ | 2,331,000 |
| EAIP[1] | $ | 337,365 | $ | 337,365 | $ | 337,365 | $ | 337,365 | | | | |
| Distribution of Deferred Shares [2] | $ | 177,390 | $ | 177,390 | $ | 177,390 | $ | 177,390 | $ | 177,390 | $ | 177,390 |
| LTI Cash Retention Award: | | | | | | | | | | | | |
|   - 2011 LTI Award | | | | | $ | 650,000 | $ | 650,000 | $ | 650,000 | $ | 650,000 |
|   - 2015 LTI Award | | | | | $ | 1,000,000 | $ | 1,000,000 | $ | 1,000,000 | $ | 1,000,000 |
| LTI Equity Incentive Award: | | | | | | | | | | | | |
|   - Annual RSUs | | | | | $ | 170,570 | $ | 170,570 | $ | 170,570 | $ | 600,000 |
|   - Exchange RSUs | | | | | $ | 274,607 | $ | 274,607 | $ | 274,607 | $ | 530,000 |
| Health & Welfare | | | | | | | | | | | | |
|   - Medical/COBRA | | | | | | | | | $ | 27,885 | $ | 27,885 |
|   - Dental/COBRA | | | | | | | | | $ | 2,470 | | 2,470 |
| **Totals** | $ | **514,755** | $ | **514,755** | $ | **2,609,932** | $ | **2,609,932** | $ | **4,098,422** | $ | **5,318,745** |

(1) The EAIP amount represents the remaining portion of Mr. Burke's 2012 EAIP bonus, which is to be paid in March 2013.

(2) The amount reported under the heading "Distribution of Deferred Shares" represents the fair market value of 443,474 shares of EFH Corp. common stock as of December 31, 2012 that Mr. Burke is entitled to receive, pursuant to the terms of his deferred share agreement, on the earlier to occur of his termination of employment for any reason or a change in the effective control of EFH Corp.

Mr. Burke has entered into an employment agreement that provides for certain payments and benefits upon the expiration or termination of the agreement under the following circumstances.

1. In the event of Mr. Burke's voluntary resignation without good reason or termination with cause:
   a. accrued but unpaid base salary and unused vacation earned through the date of termination;
   b. accrued but unpaid annual bonus earned for the previously completed year;
   c. unreimbursed business expenses; and
   d. payment of employee benefits, including equity compensation, if any, to which Mr. Burke may be entitled.
2. In the event of Mr. Burke's death or disability:
   a. a prorated annual incentive bonus for the year of termination;
   b. the pro-rata cash retention award earned prior to the date of termination;
   c. the pro-rata equity incentive award earned prior to the date of termination; and
   d. payment of employee benefits, including stock compensation, if any, to which Mr. Burke may be entitled.
3. In the event of Mr. Burke's termination without cause or resignation for good reason:
   a. a lump sum payment equal to (i) two times his annualized base salary, (ii) a prorated annual incentive bonus for the year of termination;
   b. the pro-rata cash retention award earned prior to the date of termination;
   c. the pro-rata equity incentive award earned prior to the date of termination;
   d. payment of employee benefits, including stock compensation, if any, to which Mr. Burke may be entitled; and
   e. certain continuing health care and company benefits.
4. In the event of Mr. Burke's termination without cause or resignation for good reason within 24 months following a change in control of EFH Corp.:
   a. a lump sum payment equal to two times the sum of (i) his annualized base salary and (ii) his annual bonus target;
   b. the pro-rata retention award earned prior to the date of termination;
   c. all Exchange RSUs;
   d. all Annual RSUs;
   e. payment of employee benefits, including stock compensation, if any, to which Mr. Burke may be entitled; and
   f. certain continuing health care and company benefits.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## 5. Mr. McFarland

**Potential Payments to Mr. McFarland upon Termination as of December 31, 2012 (per employment agreement and restricted stock unit agreements, each in effect as of December 31, 2012)**

| Benefit | Voluntary | For Cause | Death | Disability | Without Cause Or For Good Reason | Without Cause Or For Good Reason In Connection With Change in Control |
|---|---|---|---|---|---|---|
| Cash Severance | | | | | $ 1,710,000 | $ 2,220,000 |
| EAIP[1] | $ 306,000 | $ 306,000 | $ 306,000 | $ 306,000 | | |
| LTI Cash Retention Award: | | | | | | |
| - 2011 LTI Award | | | $ 650,000 | $ 650,000 | $ 650,000 | $ 650,000 |
| - 2015 LTI Award | | | $ 1,000,000 | $ 1,000,000 | $ 1,000,000 | $ 1,000,000 |
| LTI Equity Incentive Award: | | | | | | |
| - Annual RSUs | | | $ 170,570 | $ 170,570 | $ 170,570 | $ 600,000 |
| - Exchange RSUs | | | $ 248,701 | $ 248,701 | $ 248,701 | $ 480,000 |
| Health & Welfare | | | | | | |
| - Medical/COBRA | | | | | $ 27,885 | $ 27,885 |
| - Dental/COBRA | | | | | $ 2,470 | $ 2,470 |
| **Totals** | **$ 306,000** | **$ 306,000** | **$ 2,375,271** | **$ 2,375,271** | **$ 3,809,626** | **$ 4,980,355** |

(1)   The EAIP amount represents the remaining portion of Mr. McFarland's 2012 EAIP bonus, which is to be paid in March 2013.

Mr. McFarland entered into an employment agreement that provides for certain payments and benefits upon the expiration or termination of the agreement under the following circumstances:

1. In the event of Mr. McFarland's voluntary resignation without good reason or termination with cause:
   a.   accrued but unpaid base salary and unused vacation earned through the date of termination;
   b.   accrued but unpaid annual bonus earned for the previously completed year;
   c.   unreimbursed business expenses; and
   d.   payment of employee benefits, including equity compensation, if any, to which Mr. McFarland may be entitled.
2. In the event of Mr. McFarland's death or disability:
   a.   a prorated annual incentive bonus for the year of termination;
   b.   the pro-rata cash retention award earned prior to the date of termination;
   c.   the pro-rata equity incentive award earned prior to the date of termination; and
   d.   payment of employee benefits, including stock compensation, if any, to which Mr. McFarland may be entitled.
3. In the event of Mr. McFarland's termination without cause or resignation for good reason:
   a.   a lump sum payment equal to (i) two times his annualized base salary, (ii) a prorated annual incentive bonus for the year of termination;
   b.   the pro-rata cash retention award earned prior to the date of termination;
   c.   the pro-rata equity incentive award earned prior to the date of termination;
   d.   payment of employee benefits, including stock compensation, if any, to which Mr. McFarland may be entitled; and
   e.   certain continuing health care and company benefits.
4. In the event of Mr. McFarland's termination without cause or resignation for good reason within 24 months following a change in control of EFH Corp.:
   a.   a lump sum payment equal to two times the sum of (i) his annualized base salary and (ii) his annual bonus target;
   b.   the pro-rata cash retention award earned prior to the date of termination;
   c.   all Exchange RSUs;
   d.   all Annual RSUs;
   e.   payment of employee benefits, including stock compensation, if any, to which Mr. McFarland may be entitled; and
   f.   certain continuing health care and company benefits.

211

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Compensation Committee Interlocks and Insider Participation

There are no relationships among our executive officers, members of the O&C Committee or entities whose executives served on the O&C Committee that required disclosure under applicable SEC rules and regulations.  For a description of related person transactions involving members of the O&C Committee, see Item 13, entitled "Related Person Transactions."

### Director Compensation

The table below sets forth information regarding the aggregate compensation paid to the members of the Board during the year ended December 31, 2012.  Directors who are officers of EFH Corp. or members of the Sponsor Group (or their respective affiliates) do not receive any fees for service as a director.   EFH Corp. reimburses directors for reasonable expenses incurred in connection with their services as directors.

| Name | Fees Earned or Paid in Cash ($) | Stock Awards ($) | Option Awards ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|
| Arcilia C. Acosta (1) | 187,500 | 100,000 | — | — | 287,500 |
| David Bonderman | — | — | — | — | — |
| Donald L. Evans (2) | — | — | 748,000 | 2,600,000 | 3,348,000 |
| Thomas D. Ferguson | — | — | — | — | — |
| Brandon Freiman (4) | — | — | — | — | — |
| Frederick M. Goltz (3) | — | — | — | — | — |
| James R. Huffines (1)(3) | 125,000 | 100,000 | — | — | 225,000 |
| Scott Lebovitz | — | — | — | — | — |
| Jeffrey Liaw (3) | — | — | — | — | — |
| Marc S. Lipschultz | — | — | — | — | — |
| Michael MacDougall | — | — | — | — | — |
| Lyndon L. Olson, Jr. (1)(3) | 191,667 | 100,000 | — | — | 291,667 |
| Kenneth Pontarelli | — | — | — | — | — |
| William K. Reilly (1) | 187,500 | 100,000 | — | — | 287,500 |
| Jonathan D. Smidt | — | — | — | — | — |
| John F. Young | — | — | — | — | — |
| Kneeland Youngblood (1) | 187,500 | 100,000 | — | — | 287,500 |

(1)  In the second quarter of 2012, the fees Ms. Acosta and Messrs. Huffines, Olson, Reilly and Youngblood receive for their service as directors increased from $150,000 to $200,000 annually. Ms. Acosta and Messrs. Huffines, Olson, Reilly and Youngblood also receive an annual equity award (paid in shares of EFH Corp. common stock) valued at $100,000 (the grant date fair value) for their service as a director.  The amount for Mr. Huffines reflects the pro-rated portion of his fees received prior to his resignation on July 2, 2012.  The amount for Mr. Olson reflects the pro-rated portion of his fees received prior to his decision not to stand for re-election in October 2012.

(2)  Effective January 1, 2012, we entered into a consulting agreement with Mr. Evans, pursuant to which Mr. Evans receives an annual fee of $2,500,000. Under the terms of the consulting agreement, Mr. Evans also received (i) a grant of 4,400,000 options to purchase the common stock of EFH Corp. at a strike price of $0.50 per share, which vest in four equal installments from December 2012 to December 2015, (ii) a modification of the strike price of his 600,000 vested options to purchase the common stock of EFH Corp. to $0.50 per share, and (iii) payment by EFH Corp. of (a) $100,000 annually for office expenses and administrative support, (b) up to $200,000 annually in salary payments to a chief of staff, and (c) executive assistant services in Dallas and Midland, Texas. The amount reported as "All Other Compensation" includes Mr. Evan's annual fee, and annual office expenses and administrative support. The amount reported as "Option Awards" includes the grant date fair value of Mr. Evan's 4,400,000 options and the incremental fair value of his 600,000 options.

(3)  Messrs Goltz, Huffines, and Liaw resigned from the Board effective May 3, 2012, July 2, 2012, and December 31, 2012, respectively.  On October 26, 2012, Mr. Olson notified the Company that he declined to stand for reelection to the Board.

(4)  Mr. Freiman was elected to the Board pursuant to the Limited Partnership Agreement of Texas Energy Future Holdings Limited Partnership and the Limited Liability Company Agreement of Texas Energy Future Capital Holdings LLC, its general partner, to fill the vacancy left upon the resignation of Mr. Goltz in May of 2012.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Item 12.   SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS**

The following table presents information concerning stock-based compensation plans as of December 31, 2012.  (See Note 14 to Financial Statements.)

|  | (a)<br>Number of securities to be issued upon exercise of outstanding options, warrants and rights[1] | (b)<br>Weighted-average exercise price of outstanding options, warrants and rights[2] | (c)<br>Number of securities remaining available for future issuance under equity compensation plans, excluding securities reflected in column (a) |
|---|---|---|---|
| Equity compensation plans approved by security holders | — | $          — | — |
| Equity compensation plans not approved by security holders[3] | 45,798,184 | $          1.85 | 18,526,105 |
| Total | 45,798,184 | $          1.85 | 18,526,105 |

_____

(1)   Includes 19.6 million restricted stock units issued in exchange for previously issued stock options.

(2)   The weighted average exercise price does not take into account the shares subject to outstanding restricted stock units which have no exercise price.

(3)   See Note 14 to Financial Statements for a description of the material features of equity compensation plans.

213

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

**Beneficial Ownership of Common Stock of Energy Future Holdings Corp.**

The following table lists the number of shares of common stock of EFH Corp. beneficially owned by each director and certain executive officers of EFH Corp. and the holders of more than 5% of EFH Corp.'s common stock as of February 1, 2013.

The amounts and percentages of shares of common stock of EFH Corp. beneficially owned are reported on the basis of SEC regulations governing the determination of beneficial ownership of securities. Under SEC rules, a person is deemed to be a "beneficial owner" of a security if that person has or shares voting power or investment power, which includes the power to dispose of or to direct the disposition of such security. A person is also deemed to be a beneficial owner of any securities of which that person has a right to acquire beneficial ownership within 60 days. Securities that can be so acquired are deemed to be outstanding for purposes of computing such person's ownership percentage, but not for purposes of computing any other person's percentage. Under these rules, more than one person may be deemed to be a beneficial owner of the same securities, and a person may be deemed to be a beneficial owner of securities as to which such person has no economic interest.

| Name | Number of Shares Beneficially Owned | Percent of Class |
|---|---|---|
| Texas Holdings (1)(2)(3)(4) | 1,657,600,000 | 98.48% |
| Arcilia C. Acosta (6) | 323,529 | * |
| David Bonderman (2) | 1,657,600,000 | 98.48% |
| Donald L. Evans (7) | 2,100,000 | * |
| Thomas D. Ferguson (3) | 1,657,600,000 | 98.48% |
| Brandon Freiman (5) | — | —% |
| Scott Lebovitz (3) | 1,657,600,000 | 98.48% |
| Marc S. Lipschultz (5) | — | —% |
| Michael MacDougall (8) | — | —% |
| Kenneth Pontarelli (3) | 1,657,600,000 | 98.48% |
| William K. Reilly (9) | 453,529 | * |
| Jonathan D. Smidt (5) | — | —% |
| John F. Young | 1,012,222 | * |
| Kneeland Youngblood (11) | 393,529 | * |
| James A. Burke (10) | 443,474 | * |
| M. A. McFarland | 63,550 | * |
| David A. Campbell | 492,750 | * |
| Paul M. Keglevic | — | —% |
| All directors and current executive officers as a group (20 persons) | 1,662,882,583 | 98.79% |

_____
\* Less than 1%.

(1) Texas Holdings beneficially owns 1,657,600,000 shares of EFH Corp. The sole general partner of Texas Holdings is Texas Energy Future Capital Holdings LLC ("Texas Capital"), which, pursuant to the Amended and Restated Limited Partnership Agreement of Texas Holdings, has the right to vote all of the EFH Corp. shares owned by Texas Holdings. The TPG Funds, the Goldman Entities and the KKR Entities (each as defined below, and collectively, the "Texas Capital Funds") collectively own 91.08% of the outstanding units of Texas Capital. The Texas Capital Funds exercise control over Texas Capital, and each has the right to designate and remove the managers of Texas Capital appointed by such Texas Capital Fund. Because of these relationships, each of the Texas Capital Funds may be deemed to have beneficial ownership of the shares of EFH Corp. held by Texas Holdings, but each disclaims beneficial ownership of such shares. The address of both Texas Holdings and Texas Capital is 301 Commerce Street, Suite 3300, Fort Worth, Texas 76102.

214

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

(2)   The TPG Funds (as defined below) beneficially own 302,923,439.752 units of Texas Capital, representing 27.01% of the outstanding units, including (i) 271,639,218.931 units held by TPG Partners V, L.P., a Delaware limited partnership ("TPG Partners V"), whose general partner is TPG GenPar V, L.P., a Delaware limited partnership ("TPG GenPar V"), whose general partner is TPG GenPar V Advisors, LLC, a Delaware limited liability company, whose sole member is TPG Holdings I, L.P., a Delaware limited partnership ("TPG Holdings"), (ii) 29,999,994.650 units held by TPG Partners IV, L.P., a Delaware limited partnership ("TPG Partners IV"), whose general partner is TPG GenPar IV, L.P., a Delaware limited partnership, whose general partner is TPG GenPar IV Advisors, LLC, a Delaware limited liability company, whose sole member is TPG Holdings, (iii) 710,942.673 units held by TPG FOF V-A, L.P., a Delaware limited partnership ("TPG FOF A"), whose general partner is TPG GenPar V and (iv) 573,283.498 units held by TPG FOF V-B, L.P., a Delaware limited partnership ("TPG FOF B" and, together with TPG Partners V, TPG Partners IV and TPG FOF A, the "TPG Funds"), whose general partner is TPG GenPar V. The general partner of TPG Holdings is TPG Holdings I-A, LLC, a Delaware limited liability company, whose sole member is TPG Group Holdings (SBS), L.P., a Delaware limited partnership, whose general partner is TPG Group Holdings (SBS) Advisors, Inc., a Delaware corporation ("Group Advisors"). David Bonderman and James G. Coulter are directors, officers and sole shareholders of Group Advisors and may therefore be deemed to beneficially own the units held by the TPG Funds. David Bonderman is also a manager of Texas Capital. Messrs. Bonderman and Coulter disclaim beneficial ownership of the shares of EFH Corp. held by Texas Holdings except to the extent of their pecuniary interest therein. The address of Group Advisors and Messrs. Bonderman and Coulter is c/o TPG Capital, L.P., 301 Commerce Street, Suite 3300, Fort Worth, Texas 76102.

(3)   GS Capital Partners VI Fund, L.P., GSCP VI Offshore TXU Holdings, L.P., GSCP VI Germany TXU Holdings, L.P., GS Capital Partners VI Parallel, L.P., GS Global Infrastructure Partners I, L.P., GS Infrastructure Offshore TXU Holdings, L.P. (GSIP International Fund), GS Institutional Infrastructure Partners I, L.P., Goldman Sachs TXU Investors L.P. and Goldman Sachs TXU Investors Offshore Holdings, L.P. (collectively, the "Goldman Entities") beneficially own 303,094,945.954 units of Texas Capital, representing 27.02% of the outstanding units.  Affiliates of The Goldman Sachs Group, Inc. ("Goldman Sachs") are the general partner, managing general partner or investment manager of each of the Goldman Entities, and each of the Goldman Entities shares voting and investment power with certain of their respective affiliates.  Each of Goldman Sachs and the Goldman Entities disclaims beneficial ownership of such shares of common stock except to the extent of its pecuniary interest therein.  Messrs. Ferguson, Lebovitz and Pontarelli are managers of Texas Capital and executives with affiliates of Goldman Sachs.  By virtue of their position in relation to Texas Capital and the Goldman Entities, Messrs. Ferguson, Lebovitz and Pontarelli may be deemed to have beneficial ownership with respect to the units of Texas Capital held by the Goldman Entities. Each of Messrs. Ferguson, Lebovitz and Pontarelli disclaims beneficial ownership of the shares of EFH Corp. held by Texas Holdings except to the extent of their pecuniary interest in those shares.  The address of each entity and individual listed in this footnote is c/o Goldman, Sachs & Co., 85 Broad Street, New York, New York 10004.

(4)   KKR 2006 Fund L.P., KKR PEI Investments, L.P., KKR Partners III, L.P., KKR North American Co-Invest Fund I L.P. and TEF TFO Co-Invest, LP (collectively, the "KKR Entities") beneficially own 415,473,419.680 units of Texas Capital, representing 37.05% of the outstanding units.  The KKR Entities disclaim beneficial ownership of any shares of our common stock in which they do not have a pecuniary interest.  KKR & Co. L.P., as the holding company of affiliates that directly or indirectly control the KKR Entities, other than KKR Partners III, L.P., may be deemed to share voting and dispositive power with respect to the shares beneficially owned by such KKR Entities, but disclaims beneficial ownership of such shares except to the extent of its pecuniary interest in those shares. As the designated members of KKR Management LLC (which is the general partner of KKR & Co. L.P.) and the managing members of KKR III GP LLC (which is the general partner of KKR Partners III, L.P.), Henry R. Kravis and George R. Roberts may be deemed to share voting and dispositive power with respect to the shares beneficially owned by the KKR Entities but disclaim beneficial ownership of such shares except to the extent of their pecuniary interest in those shares. The address of each entity and individual listed in this footnote is c/o Kohlberg Kravis Roberts & Co. L.P., 9 West 57th Street, Suite 4200, New York, New York 10019.

(5)   Messrs. Freiman, Lipschultz and Smidt are managers of Texas Capital and executives of Kohlberg Kravis Roberts & Co. L.P. and/or one or more of its affiliates. None of Messrs. Freiman, Lipschultz or Smidt have voting or investment power over and each disclaim beneficial ownership of the units held by the KKR Entities and the shares of EFH Corp. held by Texas Holdings, except in each case to the extent of their pecuniary interest. The address of each individual listed in this footnote is c/o Kohlberg Kravis Roberts & Co. L.P., 9 West 57th Street, Suite 4200, New York, New York 10019.

(6)   70,000 shares held in a family limited partnership, ACA Family LP.

(7)   Includes 1,700,000 shares issuable upon exercise of vested options.

(8)   Michael MacDougall is a TPG partner. Mr. MacDougall is a manager of Texas Capital. Mr. MacDougall does not have voting or investment power over and disclaims beneficial ownership of the units of Texas Capital held by the TPG Funds and the shares of EFH Corp. held by Texas Holdings.  The address of Mr. MacDougall is c/o Global, LLC, 301 Commerce Street, Suite 3300, Fort Worth, TX 76102.

(9)   William K. Reilly is a TPG senior advisor. Mr. Reilly does not have voting or investment power over and disclaims beneficial ownership of the units of Texas Capital held by the TPG Funds. The address of Mr. Reilly is c/o Global, LLC, 301 Commerce Street, Suite 3300, Fort Worth, TX 76102.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

(10)  Shares consist of 443,474 vested deferred shares which, in accordance with the terms of the Deferred Share Agreement, will be settled in shares of EFH Corp. common stock upon the earlier of termination of employment or a change in control of EFH Corp.

(11)  100,000 shares held in a limited partnership, Burton Hills Limited, LP.

## Item 13.    CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE

### Policies and Procedures Relating to Related Party Transactions

The Board has adopted a related person transactions policy.  Under this policy, a related person transaction shall be consummated or shall continue only if:

1. the Audit Committee of the Board approves or ratifies such transaction in accordance with the policy and determines that the transaction is on terms comparable to those that could be obtained in arm's length dealings with an unrelated third party;
2. the transaction is approved by the disinterested members of the Board or the Executive Committee; or
3. the transaction involves compensation approved by the Organization and Compensation Committee of the Board.

For purposes of this policy, the term "related person" includes EFH Corp.'s directors, executive officers, 5% shareholders and their immediate family members. "Immediate family members" means any child, stepchild, parent, stepparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law or sister-in-law or any person (other than a tenant or employee) sharing the household of a director, executive officer or 5% shareholder.

A "related person transaction" is a transaction between EFH Corp. or its subsidiaries and a related person, other than the types of transactions described below, which are deemed to be pre-approved by the Audit Committee of the Board:

1. any compensation paid to a director if the compensation is required to be reported under Item 402 of Regulation S-K of the Securities Act;
2. any transaction with another company at which a related person's only relationship is as an employee (other than an executive officer), director or beneficial owner of less than 10% of that company's ownership interests;
3. any charitable contribution, grant or endowment by EFH Corp. to a charitable organization, foundation or university at which a related person's only relationship is as an employee (other than an executive officer) or director;
4. transactions where the related person's interest arises solely from the ownership of EFH Corp.'s equity securities and all holders of that class of equity securities received the same benefit on a pro rata basis;
5. transactions involving a related party where the rates or charges involved are determined by competitive bids;
6. any transaction with a related party involving the rendering of services as a common or contract carrier, or public utility, as rates or charges fixed in conformity with law or governmental authority;
7. any transaction with a related party involving services as a bank depositary of funds, transfer agent, registrar, trustee under a trust indenture, or similar service;
8. transactions available to all employees or customers generally (unless required to be disclosed under Item 404 of Regulation S-K of the Securities Act, if applicable);
9. transactions involving less than $100,000 when aggregated with all similar transactions;
10. transactions between EFH Corp. and its subsidiaries or between subsidiaries of EFH Corp.;
11. transactions not required to be disclosed under Item 404 of Regulation S-K under the Securities Act of 1933, and
12. open market purchases of EFH Corp.'s or its subsidiaries' debt or equity securities and interest payments on such debt.

The Board has determined that it is appropriate for the Audit Committee of the Board to review and approve or ratify related person transactions. Accordingly, at least annually, management reviews related person transactions to be entered into, or previously entered into, by EFH Corp. or its subsidiaries, if any. After review, the Audit Committee of the Board approves, ratifies or disapproves such transactions. Management updates the Audit Committee of the Board as to any material changes to such related person transactions.  In unusual circumstances, EFH Corp. or its subsidiaries may enter into related person transactions in advance of receiving approval, provided that such related person transactions are reviewed as soon as reasonably practicable by the Audit Committee of the Board. If the Audit Committee of the Board determines not to ratify such transactions, EFH Corp. makes all reasonable efforts to cancel or otherwise terminate the affected transactions.

216

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The related person transactions described below under "Related Person Transactions - Business Affiliations," were ratified by the Audit Committee of the Board pursuant to the policy described above. All other related person transactions were approved prior to the Board's adoption of this policy, but were approved by either the Board or its Executive Committee. Transactions described below under "Related Person Transactions - Transactions with Sponsor Affiliates" are not related person transactions under the EFH Corp. policy because they are not with a director, executive officer, 5% shareholder or any of their immediate family members, but are described in the interest of greater disclosure.

## Related Person Transactions

### *Limited Partnership Agreement of Texas Energy Future Holdings Limited Partnership; Limited Liability Company Agreement of Texas Energy Future Capital Holdings LLC*

The Sponsor Group and certain investors who agreed to co-invest with the Sponsor Group or through a vehicle jointly controlled by the Sponsor Group to provide equity financing for the Merger (Co-Investors) entered into (i) a limited partnership agreement (LP Agreement) in respect of EFH Corp.'s parent company, Texas Holdings and (ii) the LLC Agreement in respect of Texas Holdings' sole general partner, Texas Capital. The LP Agreement provides that Texas Capital has the right to vote or execute consents with respect to any shares of EFH Corp.'s common stock owned by Texas Holdings. The LLC Agreement and LP Agreement contain agreements among the parties with respect to the election of EFH Corp.'s directors, restrictions on the issuance or transfer of interests in EFH Corp., including tag-along rights and drag-along rights, and other corporate governance provisions (including the right to approve various corporate actions).

The LLC Agreement provides that Texas Capital and its members will take all action required to ensure that the managers of Texas Capital are also members of EFH Corp.'s Board. Pursuant to the LLC Agreement each of (i) KKR 2006 Fund L.P. and affiliated investment funds, (ii) TPG Partners V, L.P. and affiliated investment funds and (iii) certain funds affiliated with Goldman, Sachs & Co. (Goldman), an affiliate of GS Capital Partners, has the right to designate three managers of Texas Capital. These rights are subject to maintenance of certain investment levels in Texas Holdings.

### *Registration Rights Agreement*

The Sponsor Group and the Co-Investors entered into a registration rights agreement with EFH Corp. upon completion of the Merger. Pursuant to this agreement, in certain circumstances, the Sponsor Group can cause EFH Corp. to register shares of EFH Corp.'s common stock owned directly or indirectly by them under the Securities Act. In certain circumstances, the Sponsor Group and the Co-Investors are also entitled to participate on a pro rata basis in any registration of EFH Corp.'s common stock under the Securities Act that it may undertake. Ms. Acosta and Messrs. Evans, Reilly and Youngblood, each of whom are members of our Board, and Messrs. Young, Burke, Keglevic, McFarland, and O'Brien, each of whom are executive officers of EFH Corp., are parties to this agreement.

### *Management Services Agreement*

In October 2007, in connection with the Merger, the Sponsor Group and Lehman Brothers Inc. entered into a management agreement with EFH Corp. (Management Agreement), pursuant to which affiliates of the Sponsor Group provide management, consulting, financial and other advisory services to EFH Corp. Pursuant to the Management Agreement, affiliates of the Sponsor Group are entitled to receive an aggregate annual management fee of $35 million, which amount increases 2% annually, and reimbursement of out-of-pocket expenses incurred in connection with the provision of services pursuant to the Management Agreement. The Management Agreement will continue in effect from year to year, unless terminated upon a change of control of EFH Corp. or in connection with an initial public offering of EFH Corp. or if the parties thereto mutually agree to terminate the Management Agreement. In addition, the Management Agreement provides that the Sponsor Group will be entitled to receive a fee equal to a percentage of the gross transaction value in connection with certain subsequent financing, acquisition, disposition, merger combination and change of control transactions, as well as a termination fee based on the net present value of future payment obligations under the Management Agreement in the event of an initial public offering or under certain other circumstances. Under terms of the Management Agreement, EFH Corp. paid $38 million, inclusive of expenses, to the Sponsor Group during 2012.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Indemnification Agreement*

Concurrently with entering into the Management Agreement, the Sponsor Group, Texas Holdings and EFH Corp. entered into an indemnification agreement (Indemnification Agreement), pursuant to which EFH Corp. and Texas Holdings agree to indemnify the Sponsor Group and their affiliates against any claims relating to (i) certain securities and financing transactions relating to the Merger, (ii) the performance of transaction services pursuant to the Management Agreement, (iii) actions or failures to act by EFH Corp., Texas Holdings, Texas Capital or their subsidiaries or affiliates (collectively, Company Group), (iv) service as an officer or director of, or at the request of, any member of the Company Group, and (v) any breach or alleged breach of fiduciary duty as a director or officer of any member of the Company Group.

*Sale Participation Agreement*

Ms. Acosta and Messrs. Evans, Reilly and Youngblood, each of whom are members of our Board, and Mmes. Doré and Kirby and Messrs. Young, Burke, Keglevic, McFarland, and O'Brien, each of whom are executive officers, entered into sale participation agreements with EFH Corp.  Pursuant to the terms of these agreements, among other things, shares of EFH Corp.'s common stock held by these individuals are subject to tag-along and drag-along rights in the event of a sale by the Sponsor Group of shares of EFH Corp.'s common stock held by the Sponsor Group.

*Certain Certificate of Formation Provisions*

EFH Corp.'s restated certificate of formation contains provisions limiting our directors' obligations in respect of corporate opportunities.

*Management Stockholders' Agreement*

Subject to a management stockholders' agreement, certain members of management, including EFH Corp.'s directors, executive officers, along with other members of management, elected to invest in EFH Corp. by contributing cash or common stock, or a combination of both, to EFH Corp. prior to or following the Merger and receiving common stock in EFH Corp. in exchange therefore.  The net aggregate amount of this investment as of December 31, 2012 is approximately $42 million. The management stockholders' agreement creates certain rights and restrictions on these shares of common stock, including transfer restrictions and tag-along, drag-along, put, call and registration rights in certain circumstances.

*Director Stockholders' Agreement*

Certain members of our Board have entered into a stockholders' agreement with EFH Corp.  These stockholders' agreements create certain rights and restrictions on the equity, including transfer restrictions and tag-along, drag-along, put, call and registration rights in certain circumstances.

*Business Affiliations*

Mr. Olson, a member of our board until October 26, 2012, has an ownership interest in and serves on the board of Texas Meter and Device Company (TMD), a company that conducts tests on Oncor's high voltage personal protective equipment.  Mr. Olson and his brother collectively directly own approximately 24% of TMD. This entity is majority owned by its chief executive officer.  In 2012, Oncor paid TMD approximately $795,000 for its services. The business relationship with TMD commenced several years prior to Mr. Olson joining the Board.

Mr. Olsen has an ownership interest in and serves on the board of Metrum Technologies (MT), a company that is a subsidiary of Texas Meter and Device Company and provides Oncor with certain technology based products for Oncor's advanced metering devices.  Mr. Olson and his brother collectively directly own approximately 19% of MT. This entity is majority owned by its chief executive officer.  In 2012, Oncor paid MT approximately $565,000 for its services. The business relationship with MT commenced several years prior to Mr. Olson joining the Board.

Mr. Olsen is chairman of the New York and Sweden offices of Hill+Knowlton Strategies (HKS). Mr. Olsen is also a member of HKS' Global Counsel. HKS is the parent company of Public Strategies Inc. (PSI).  PSI performs certain consulting services for EFH Corp. and its subsidiaries, primarily in the areas of public relations and public advocacy. Mr. Olsen does not have any ownership interest in HKS or its subsidiaries.  In 2012, EFH Corp. and its subsidiaries paid approximately $2.3 million to PSI for its services and approximately $64,000 to HKS for its services.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Transactions with Sponsor Affiliates

In December 2012 and January 2013, Goldman acted as a dealer manager for the offers by EFIH to exchange EFIH 10% Senior Secured Notes due 2020 for EFH Corp. 9.75% Senior Secure Notes due 2019, EFH Corp. 10% Senior Secured Notes due 2020, and EFIH 9.75% Senior Secured Notes due 2019 (collectively, the Old Notes) and as a solicitation agent in the solicitation of consents by EFH Corp. and EFIH to amendments to the Old Notes and indentures governing the Old Notes and received fees totaling approximately $1 million. In December 2012 and January 2013, Goldman acted as a dealer manager for the offers by EFIH to exchange EFIH 11.25%/12.25% Senior Toggle Notes due 2018 for EFH Corp. 10.875% Senior Notes due 2017 and EFH Corp. 11.25%/12.00% Senior Toggle Notes due 2017 and received fees totaling approximately $100,000.

Goldman acted as a joint book-running manager and initial purchaser in the February 2012 issuance of $1.15 billion principal amount of EFIH 11.750% Senior Secured Second Lien Notes due 2022 and received fees totaling approximately $7 million. Further, Goldman acted as a joint book-running manager and initial purchaser in the August 2012 issuance of $250 million principal amount of EFIH 6.875% Senior Secured Notes due 2017 and $600 million principal amount of EFIH 11.750% Senior Secured Second Lien Notes due 2022 and received fees totaling approximately $3 million. In addition, Goldman acted as a joint book-running manager and initial purchaser in the October 2012 issuance of $253 million principal amount of EFIH 6.875% Notes due 2017 and received fees totaling approximately $1 million.

An affiliate of Kohlberg Kravis Roberts & Co. L.P. served as a co-manager and initial purchaser in, and an affiliate of TPG served as an advisor in, each of the above transactions and each received fees totaling approximately $4 million.

TCEH has entered into the TCEH Senior Secured Facilities, and Oncor has entered into a revolving credit facility, each with syndicates of financial institutions and other lenders. These syndicates included affiliates of GS Capital Partners.

Affiliates of GS Capital Partners have from time to time engaged in commercial and investment banking and financial advisory transactions with EFH Corp. in the normal course of business. Affiliates of Goldman are party to certain commodity and interest rate hedging transactions with EFH Corp. in the normal course of business.

From time to time affiliates of the Sponsor Group may acquire debt or debt securities issued by EFH Corp. or its subsidiaries in open market transactions or through loan syndications.

Members of the Sponsor Group and/or their respective affiliates have from time to time entered into, and may continue to enter into, arrangements with the Company to use our products and services in the ordinary course of their business, which often result in revenues to the Company in excess of $120,000 annually. In addition, the Company has entered into, and may continue to enter into, arrangements with members of the Sponsor Group and/or their respective affiliates to use their products and services in the ordinary course of their business, which often result in revenues to members of the Sponsor Group or their respective affiliates in excess of $120,000 annually.

### Director Independence

Though not formally considered by the Board because EFH Corp.'s common stock is not currently registered under the Securities Exchange Act of 1934, as amended, with the SEC or traded on any national securities exchange, based upon the listing standards for issuers of equity securities on the New York Stock Exchange (NYSE), the national securities exchange upon which EFH Corp.'s common stock was traded prior to the Merger, only Ms. Acosta and Mr. Youngblood would be considered independent. Because of their relationships with the Sponsor Group or with EFH Corp. directly, none of the other directors would be considered independent under the NYSE listing standards for issuers of equity securities. See "Certain Relationships and Related Party Transactions" and Item 11, "Executive Compensation - Director Compensation." Accordingly, we believe that Ms. Acosta is the only member of the Organization and Compensation Committee who would meet the NYSE's independence requirements for issuers of equity securities. We believe that none of the members of EFH Corp.'s Executive Committee, which now functions as the nominating/governance committee, would meet the NYSE's independence requirements for issuers of equity securities. Under the NYSE's audit committee independence requirement for issuers of debt securities, Ms. Acosta and Mr. Youngblood, who constitute the Audit Committee, are considered independent.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## Item 14.    PRINCIPAL ACCOUNTING FEES AND SERVICES

Deloitte & Touche LLP has been the independent auditor for EFH Corp. and for its Predecessor (TXU Corp.) since its organization in 1996.

The Audit Committee of the EFH Corp. Board of Directors has adopted a policy relating to the engagement of EFH Corp.'s independent auditor.  The policy provides that in addition to the audit of the financial statements, related quarterly reviews and other audit services, and providing services necessary to complete SEC filings, EFH Corp.'s independent auditor may be engaged to provide non-audit services as described herein.  Prior to engagement, all services to be rendered by the independent auditor must be authorized by the Audit Committee in accordance with preapproval procedures which are defined in the policy. The preapproval procedures require:

1. The annual review and preapproval by the Audit Committee of all anticipated audit and non-audit services; and
2. The quarterly preapproval by the Audit Committee of services, if any, not previously approved and the review of the status of previously approved services.

The Audit Committee may also approve certain on-going non-audit services not previously approved in the limited circumstances provided for in the SEC rules. All services performed by Deloitte & Touche LLP, the member firms of Deloitte Touche Tohmatsu and their respective affiliates (Deloitte & Touche) for EFH Corp. in 2012 were preapproved by the Audit Committee.

The policy defines those non-audit services which EFH Corp.'s independent auditor may also be engaged to provide as follows:

1. Audit-related services, including:
   a. due diligence accounting consultations and audits related to mergers, acquisitions and divestitures;
   b. employee benefit plan audits;
   c. accounting and financial reporting standards consultation;
   d. internal control reviews, and
   e. attest services, including agreed-upon procedures reports that are not required by statute or regulation.
2. Tax-related services, including:
   a. tax compliance;
   b. general tax consultation and planning;
   c. tax advice related to mergers, acquisitions, and divestitures, and
   d. communications with and request for rulings from tax authorities.
3. Other services, including:
   a. process improvement, review and assurance;
   b. litigation and rate case assistance;
   c. forensic and investigative services, and
   d. training services.

The policy prohibits EFH Corp. from engaging its independent auditor to provide:

1. Bookkeeping or other services related to EFH Corp.'s accounting records or financial statements;
2. Financial information systems design and implementation services;
3. Appraisal or valuation services, fairness opinions, or contribution-in-kind reports;
4. Actuarial services;
5. Internal audit outsourcing services;
6. Management or human resource functions;
7. Broker-dealer, investment advisor, or investment banking services;
8. Legal and expert services unrelated to the audit, and
9. Any other service that the Public Company Accounting Oversight Board determines, by regulation, to be impermissible.

In addition, the policy prohibits EFH Corp.'s independent auditor from providing tax or financial planning advice to any officer of EFH Corp.

Compliance with the Audit Committee's policy relating to the engagement of Deloitte & Touche is monitored on behalf of the Audit Committee by EFH Corp.'s chief accounting officer. Reports describing the services provided by Deloitte & Touche and fees for such services are provided to the Audit Committee no less often than quarterly.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

For the years ended December 31, 2012 and 2011, fees billed (in US dollars) to EFH Corp. by Deloitte & Touche were as follows:

| | 2012 | 2011 |
|---|---|---|
| **Audit Fees.** Fees for services necessary to perform the annual audit, review SEC filings, fulfill statutory and other service requirements, provide comfort letters and consents | $    6,449,000 | $    6,298,000 |
| **Audit-Related Fees.** Fees for services including employee benefit plan audits, due diligence related to mergers, acquisitions and divestitures, accounting consultations and audits in connection with acquisitions, internal control reviews, attest services that are not required by statute or regulation, and consultation concerning financial accounting and reporting standards | 628,000 | 445,000 |
| **Tax Fees.** Fees for tax compliance, tax planning, and tax advice related to mergers and acquisitions, divestitures, and communications with and requests for rulings from taxing authorities | — | 19,000 |
| **All Other Fees.** Fees for services including process improvement reviews, forensic accounting reviews, litigation assistance and training services | 256,000 | — |
| **Total** | $    7,333,000 | $    6,762,000 |

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**PART IV.**

**Item 15.    EXHIBITS AND FINANCIAL STATEMENT SCHEDULES**

**(a) Schedule I — CONDENSED FINANCIAL INFORMATION OF REGISTRANT**

**ENERGY FUTURE HOLDINGS CORP. (PARENT)**
**SCHEDULE I — CONDENSED FINANCIAL INFORMATION OF REGISTRANT**
**CONDENSED STATEMENTS OF COMPREHENSIVE INCOME (LOSS)**
**(Millions of Dollars)**

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2012** | **2011** | **2010** |
| Selling, general and administrative expenses | $ (25) | $ (26) | $ (32) |
| Other income | 1 | 10 | 137 |
| Other deductions | (1) | (14) | — |
| Interest income | 164 | 132 | 178 |
| Interest expense and related charges | (1,115) | (1,114) | (1,082) |
| Loss before income taxes and equity in earnings of unconsolidated subsidiaries | (976) | (1,012) | (799) |
| Income tax benefit | 340 | 341 | 305 |
| Equity in losses of consolidated subsidiaries | (2,994) | (1,528) | (2,595) |
| Equity in earnings of unconsolidated subsidiaries (net of tax) | 270 | 286 | 277 |
| Net loss | (3,360) | (1,913) | (2,812) |
| Other comprehensive income (net of tax expense of $94 million, $21 million and $23 million) | 175 | 41 | 46 |
| Comprehensive income (loss) | $ (3,185) | $ (1,872) | $ (2,766) |

See Notes to Financial Statements.

222

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**ENERGY FUTURE HOLDINGS CORP. (PARENT)**
**SCHEDULE I — CONDENSED FINANCIAL INFORMATION OF REGISTRANT**
**CONDENSED STATEMENTS OF CASH FLOWS**
**(Millions of Dollars)**

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2012** | **2011** | **2010** |
| Cash flows — operating activities | | | |
| Net loss | $ (3,360) | $ (1,913) | $ (2,812) |
| Adjustments to reconcile net loss to cash provided by (used in) operating activities: | | | |
| Equity in losses of consolidated subsidiaries | 2,994 | 1,528 | 2,595 |
| Equity in earnings of unconsolidated subsidiaries | (270) | (286) | (277) |
| Deferred income tax benefit — net | (235) | (218) | (56) |
| Interest expense on toggle notes payable in additional principal | 334 | 361 | 333 |
| Impairment of investment in long-term debt of affiliates | 27 | 53 | 40 |
| Amortization of debt related costs | 48 | 52 | 74 |
| Debt extinguishment gains | — | (3) | (133) |
| Charges related to pension plan actions | 1 | — | — |
| Other, net | (4) | 9 | 7 |
| Changes in operating assets and liabilities: | | | |
| Distributions received from subsidiaries | — | — | 2 |
| Other – net assets | 94 | — | 328 |
| Other – net liabilities | (68) | (50) | 67 |
| Cash provided by (used in) operating activities | $ (439) | $ (467) | $ 168 |
| Cash flows — financing activities | | | |
| Issuances of long-term debt | $ — | $ — | $ 500 |
| Repayments/repurchases of long-term debt | — | (5) | (96) |
| Repayment of note — affiliate | — | — | 770 |
| Distributions received from subsidiaries | 950 | — | — |
| Change in notes/advances — affiliate | (871) | (292) | (785) |
| Other, net | — | (16) | (28) |
| Cash provided by (used in) financing activities | $ 79 | $ (313) | $ 361 |
| Cash flows — investing activities | | | |
| Capital contribution to subsidiary | — | — | (440) |
| Investment in affiliate debt | — | (15) | (105) |
| Investment (posted with) redeemed from derivative counterparty | — | — | 400 |
| Other, net | — | 11 | — |
| Cash used in investing activities | $ — | $ (4) | $ (145) |
| Net change in cash and cash equivalents | (360) | (784) | 384 |
| Cash and cash equivalents — beginning balance | 659 | 1,443 | 1,059 |
| Cash and cash equivalents — ending balance | $ 299 | $ 659 | $ 1,443 |

See Notes to Financial Statements.

223

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**ENERGY FUTURE HOLDINGS CORP. (PARENT)**
**SCHEDULE I — CONDENSED FINANCIAL INFORMATION OF REGISTRANT**
**CONDENSED BALANCE SHEETS**
**(Millions of Dollars)**

| | December 31, | |
|---|---|---|
| | 2012 | 2011 |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 299 | $ 659 |
| Trade accounts receivable — net | 13 | 13 |
| Income taxes receivable — net | 60 | 37 |
| Accounts receivable from affiliates | 222 | 33 |
| Notes receivable from affiliates | 212 | 182 |
| Commodity and other derivative contractual assets | 132 | 142 |
| Other current assets | 2 | 3 |
| Total current assets | 940 | 1,069 |
| Receivables from unconsolidated subsidiary | 825 | 1,235 |
| Equity investment in consolidated subsidiaries | (2,339) | 1,407 |
| Investment in long-term debt of subsidiaries | 92 | 115 |
| Other investments | 55 | 58 |
| Income taxes receivable from affiliate | — | 119 |
| Notes receivable from affiliates | 20 | 12 |
| Accumulated deferred income taxes | 970 | 902 |
| Other noncurrent assets, principally unamortized issuance costs | 70 | 77 |
| Total assets | $ 633 | $ 4,994 |
| **LIABILITIES AND EQUITY** | | |
| Current liabilities: | | |
| Notes/advances from affiliates | $ 315 | $ 263 |
| Trade accounts payable | 2 | 1 |
| Notes payable to affiliates | 698 | 1,592 |
| Commodity and other derivative contractual liabilities | 150 | 166 |
| Accumulated deferred income taxes | 3 | 3 |
| Accrued interest | 172 | 171 |
| Other current liabilities | 5 | 5 |
| Total current liabilities | 1,345 | 2,201 |
| Notes or other liabilities due affiliates/unconsolidated subsidiary | 1,282 | 1,282 |
| Long-term debt, less amounts due currently | 7,895 | 7,619 |
| Other noncurrent liabilities and deferred credits | 1,136 | 1,744 |
| Total liabilities | 11,658 | 12,846 |
| Shareholders' equity | (11,025) | (7,852) |
| Total liabilities and equity | $ 633 | $ 4,994 |

See Notes to Financial Statements.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

**ENERGY FUTURE HOLDINGS CORP. (PARENT)**
**SCHEDULE I — CONDENSED FINANCIAL INFORMATION OF REGISTRANT**
**NOTES TO CONDENSED FINANCIAL STATEMENTS**

## 1.  BASIS OF PRESENTATION

The accompanying unconsolidated condensed balance sheets, statements of income (loss) and cash flows present results of operations and cash flows of EFH Corp. (Parent). Certain information and footnote disclosures normally included in financial statements prepared in accordance with US GAAP have been omitted pursuant to the rules of the SEC. Because the unconsolidated condensed financial statements do not include all of the information and footnotes required by US GAAP, they should be read in conjunction with the financial statements and related notes of Energy Future Holdings Corp. and Subsidiaries included in Item 8 of this Annual Report on Form 10-K. EFH Corp.'s subsidiaries have been accounted for under the equity method. All dollar amounts in the financial statements and tables in the notes are stated in millions of US dollars unless otherwise indicated.

## 2.  INVESTMENT IN LONG-TERM DEBT OF SUBSIDIARY

As a result of debt exchanges and purchases in 2009 through 2011, EFH Corp. (Parent) holds debt securities of TCEH with carrying values totaling $92 million and $115 million at December 31, 2012 and 2011, respectively, reported as investment in long-term debt of subsidiaries.

As of December 31, 2012 and 2011, all of these debt securities are classified as available-for-sale. In accordance with accounting guidance for investments classified as available-for-sale, at December 31, 2012 the securities are recorded at fair value and unrealized gains or losses are recorded in other comprehensive income unless such losses are other than temporary, in which case they are reported as impairments. The principal amounts, coupon rates, maturities and carrying value are as follows:

|  | December 31, 2012 | | December 31, 2011 | |
| --- | --- | --- | --- | --- |
|  | Principal Amount | Carrying Value (a) | Principal Amount | Carrying Value (a) |
| Available-for-sale securities: | | | | |
| TCEH 4.746% Term Loan Facilities maturing October 10, 2017 (b) | $      19 | $      12 | $      19 | $      16 |
| TCEH 10.25% Fixed Senior Notes due November 1, 2015 (both periods include $102 million principal amount of Series B Notes) | 284 | 80 | 284 | 99 |
| Total available-for-sale securities | $     303 | $      92 | $     303 | $     115 |

(a)  Carrying value equals fair value.
(b)  Interest rates in effect at December 31, 2012.

*Impairments* — In 2012, we deemed the declines in values of the TCEH securities were other than temporary and recorded a $27 million impairment recorded as a reduction of interest income. In 2011, we deemed the declines in values of TCEH securities were other than temporary and recorded a $53 million impairment recorded as a reduction of interest income. We considered that the securities were in a loss position for more than 12 months and that declines in natural gas prices and other corresponding effects on the profitability and cash flows of TCEH (which has below investment grade credit ratings) were unlikely to reverse in the near term. In 2010, we recorded a $40 million impairment of TCEH securities. As a result of the impairments, no cumulative unrealized losses were recorded in accumulated other comprehensive income at December 31, 2012, 2011 and 2010.

225

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Interest income recorded on these investments was as follows:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2012** | **2011** | **2010** |
| Held-to-maturity securities: | | | |
| Interest received/accrued | $ — | $ — | $ 18 |
| PIK interest received related TCEH toggle notes | — | — | 4 |
| Accretion of purchase discount | — | — | 11 |
| Total interest income related to held-to-maturity securities | — | — | 33 |
| Available-for-sale securities: | | | |
| Interest received/accrued | 30 | 26 | — |
| Accretion of purchase discount | 1 | 2 | — |
| Impairments related to issuer credit | (27) | (53) | (40) |
| Total interest income related to available-for-sale securities | 4 | (25) | (40) |
| Total interest income | $ 4 | $ (25) | $ (7) |

We determine value under the fair value hierarchy established in accounting standards. Under the fair value hierarchy, Level 2 valuations are based on evaluated prices that reflect observable market information, such as actual trade information of similar securities, adjusted for observable differences. The fair value of our investment in long-term debt of subsidiaries is estimated at the lesser of either the call price or the market value as determined by broker quotes and quoted market prices for similar securities in active markets. For the periods presented, the fair values of our investment in long-term debt of subsidiaries represent Level 2 valuations.

3. **GUARANTEES**

As discussed below, EFH Corp. (Parent) has entered into contracts that contain guarantees to unaffiliated parties that could require performance or payment under certain conditions. Material guarantees are discussed below.

***Disposed TXU Gas Company Operations*** — In connection with the sale of the assets of TXU Gas Company to Atmos Energy Corporation (Atmos) in October 2004, EFH Corp. agreed to indemnify Atmos, until October 1, 2014, for up to $500 million for any liability related to assets retained by TXU Gas Company, including certain inactive gas plant sites not acquired by Atmos, and up to $1.4 billion for contingent liabilities associated with preclosing tax and employee related matters. The maximum aggregate amount under these indemnities that we may be required to pay is $1.9 billion. To date, we have not been required to make any payments to Atmos under any of these indemnity obligations, and no such payments are currently anticipated.

***Assumption of Indebtedness*** — In 1990, EFCH purchased an electric co-op's minority ownership interest in the Comanche Peak nuclear generation facilities and assumed the co-op's indebtedness to the US government related to the co-op's investment in the facilities (without the co-op being released from its obligations under such indebtedness). EFCH is making principal and interest payments in an amount sufficient to satisfy the co-op's requirements under the indebtedness. In the event that payments on the indebtedness are not made in a timely manner, the US government would be entitled to enforce the payment of the debt against EFCH. At December 31, 2012, the balance of the indebtedness on EFCH's balance sheet was $74 million with maturities of principal and interest extending to December 2021. The indebtedness is secured by a lien on the purchased facilities. EFH Corp. (Parent) has guaranteed EFCH's obligation under this agreement.

226

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**4.    DIVIDEND RESTRICTIONS**

The indenture governing the EFH Corp. Senior Notes includes covenants that, among other things and subject to certain exceptions, restrict our ability to pay dividends or make other distributions in respect of our common stock.  Accordingly, our net income is restricted from being used to make distributions on our common stock unless such distributions are expressly permitted under these indentures and/or on a pro forma basis, after giving effect to such distribution, EFH Corp. (Parent)'s consolidated leverage ratio is equal to or less than  7.0 to 1.0. For purposes of this calculation, "consolidated leverage ratio" is defined as the ratio of consolidated total debt (as defined in the indenture) to Adjusted EBITDA, in each case, consolidated with its subsidiaries other than Oncor Holdings and its subsidiaries.  EFH Corp. (Parent)'s consolidated leverage ratio was  10.1 to 1.0 at December 31, 2012.

The indentures governing the EFIH Notes generally restrict EFIH from making any cash distribution to EFH Corp. for the ultimate purpose of making a cash dividend on our common stock unless at the time, and after giving effect to such dividend, EFIH's consolidated leverage ratio is equal to or less than  6.0 to 1.0. Under the indentures governing the EFIH Notes, the term "consolidated leverage ratio" is defined as the ratio of EFIH's consolidated total debt (as defined in the indentures) to EFIH's Adjusted EBITDA on a consolidated basis (including Oncor's Adjusted EBITDA).  EFIH's consolidated leverage ratio was 7.0 to 1.0 at December 31, 2012.  In addition, the EFIH Notes generally restrict EFIH's ability to make distributions or loans to EFH Corp., unless such distributions or loans are expressly permitted under the indentures governing the EFIH Notes.

The TCEH Senior Secured Facilities generally restrict TCEH from making any cash distribution to any of its parent companies for the ultimate purpose of making a cash dividend on our common stock unless at the time, and after giving effect to such dividend, its consolidated total debt (as defined in the TCEH Senior Secured Facilities) to Adjusted EBITDA would be equal to or less than  6.5 to 1.0. At December 31, 2012, the ratio was 8.5 to 1.0.

In addition, the TCEH Senior Secured Facilities and indentures governing the TCEH Senior Notes, TCEH Senior Secured Notes and TCEH Senior Secured Second Lien Notes generally restrict TCEH's ability to make distributions or loans to any of its parent companies, EFCH and EFH Corp., unless such distributions or loans are expressly permitted under the TCEH Senior Secured Facilities and the indentures governing such notes.

Under applicable law, we are prohibited from paying any dividend to the extent that immediately following payment of such dividend, there would be no statutory surplus or we would be insolvent.

EFH Corp. (Parent) has not declared or paid any dividends since the Merger.

EFH Corp. (Parent) received dividends from its consolidated subsidiaries totaling  $950 million and $2 million for the years ended December 31, 2012 and 2010, respectively. EFH Corp. (Parent) did not receive any dividends from its consolidated subsidiaries in the year ended  December 31, 2011.

**5.    SUPPLEMENTAL CASH FLOW INFORMATION**

|  | | Year Ended December 31, | | | | |
|  | | 2012 | | 2011 | | 2010 |
|---|---|---|---|---|---|---|
| Cash payments (receipts) related to: | | | | | | |
| Interest paid | $ | 675 | $ | 1,097 | $ | 1,022 |
| Income taxes | | (227) | | (91) | | (4) |
| Noncash investing and financing activities: | | | | | | |
| Debt exchange transactions | | — | | 12 | | 200 |
| Principal amount of toggle notes issued in lieu of cash | | 398 | | 355 | | 324 |

_____

(a)    Represents end-of-period accruals.

227

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

(b) Oncor Holdings Financial Statements are presented pursuant to Rules 3–09 and 3–16 of Regulation S-X as Exhibit 99(e).

(c) Exhibits:

## EFH Corp. Exhibits to Form 10-K for the Fiscal Year Ended December 31, 2012

| Exhibits | Previously Filed* With File Number | As Exhibit | |
|---|---|---|---|
| **(2)** | **Plan of Acquisition, Reorganization, Arrangement, Liquidation, or Succession** | | |
| 2(a) | 1-12833 Form 8-K (filed February 26, 2007) | 2.1 | — Agreement and Plan of Merger, dated February 25, 2007, by and among Energy Future Holdings Corp. (formerly known as TXU Corp.), Texas Energy Future Holdings Limited Partnership and Texas Energy Future Merger Sub Corp. |
| **(3)(i)** | **Articles of Incorporation** | | |
| 3(a) | 1-12833 Form 8-K (filed October 11, 2007) | 3.1 | — Restated Certificate of Formation of Energy Future Holdings Corp. |
| **(3)(ii)** | **By-laws** | | |
| 3(b) | 1-12833 Form 10-Q (Quarter ended June 30, 2012) (filed July 31, 2012) | 3(b) | — Amended and Restated Bylaws of Energy Future Holdings Corp. |
| **(4)** | **Instruments Defining the Rights of Security Holders, Including Indentures**** | | |
| | **Energy Future Holdings Corp.** | | |
| 4(a) | 1-12833 Form 10-K (2007) (filed March 31, 2008) | 4(c) | — Indenture (For Unsecured Debt Securities Series P), dated November 1, 2004, between Energy Future Holdings Corp. and The Bank of New York Mellon, as trustee. |
| 4(b) | 1-12833 Form 8-K (filed July 7, 2010) | 99.1 | — Supplemental Indenture, dated July 1, 2010, to Indenture (For Unsecured Debt Securities Series P), dated November 1, 2004. |
| 4(c) | 1-12833 Form 10-K (2004) (filed March 16, 2005) | 4(q) | — Officers' Certificate, dated November 26, 2004, establishing the form and certain terms of Energy Future Holdings Corp.'s 5.55% Series P Senior Notes due 2014. |
| 4(d) | 1-12833 Form 10-K (2010) (filed February 18, 2011) | 4(d) | — Indenture (For Unsecured Debt Securities Series Q), dated November 1, 2004, between Energy Future Holdings Corp. and The Bank of New York Mellon, as trustee. Energy Future Holdings Corp.'s Indentures for its Series R Senior Notes are not filed as it is substantially similar to this Indenture. |
| 4(e) | 1-12833 Form 10-K (2004) (filed March 16, 2005) | 4(r) | — Officer's Certificate, dated November 26, 2004, establishing the form and certain terms of Energy Future Holdings Corp.'s 6.50% Series Q Senior Notes due 2024. |
| 4(f) | 1-12833 Form 8-K (filed December 5, 2012) | 4.3 | — Supplemental Indenture, dated December 5, 2012, to the indenture, dated November 1, 2004, between Energy Future Holdings Corp. and The Bank of New York Mellon, as trustee (For Unsecured Debt Securities Series Q). |
| 4(g) | 1-12833 Form 10-K (2004) (filed March 16, 2005) | 4(s) | — Officer's Certificate, dated November 26, 2004, establishing the form and certain terms of Energy Future Holdings Corp.'s 6.55% Series R Senior Notes due 2034. |
| 4(h) | 1-12833 Form 8-K (filed December 5, 2012) | 4.4 | — Supplemental Indenture, dated December 5, 2012, to the indenture, dated November 1, 2004, between Energy Future Holdings Corp. and The Bank of New York Mellon, as trustee (For Unsecured Debt Securities Series R). |
| 4(i) | 1-12833 Form 8-K (filed October 31, 2007) | 4.1 | — Indenture, dated October 31, 2007, among Energy Future Holdings Corp., the guarantors named therein and The Bank of New York Mellon, as trustee, relating to Senior Notes due 2017 and Senior Toggle Notes due 2017. |

228

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| Exhibits | Previously Filed* With File Number | As Exhibit | |
|---|---|---|---|
| 4(j) | 1-12833<br>Form 10-K (2009)<br>(filed February 19, 2010) | 4(f) | — Supplemental Indenture, dated July 8, 2008, to Indenture, dated October 31, 2007. |
| 4(k) | 1-12833<br>Form 10-Q (Quarter ended June 30, 2009) (filed August 4, 2009) | 4(a) | — Second Supplemental Indenture, dated August 3, 2009, to Indenture, dated October 31, 2007. |
| 4(l) | 1-12833<br>Form 8-K<br>(filed July 30, 2010) | 99.1 | — Third Supplemental Indenture, dated July 29, 2010, to Indenture, dated October 31, 2007. |
| 4(m) | 1-12833<br>Form 10-Q (Quarter ended September 30, 2011) (filed October 28, 2011) | 4(b) | — Fourth Supplemental Indenture, dated October 18, 2011, to Indenture dated October 31, 2007. |
| 4(n) | 1-12833<br>Form 8-K<br>(filed November 20, 2009) | 4.1 | — Indenture, dated November 16, 2009, among Energy Future Holdings Corp., the guarantors named therein and The Bank of New York Mellon Trust Company, N.A., as trustee, relating to 9.75% Senior Secured Notes due 2019. |
| 4(o) | 1-12833<br>Form 8-K<br>(January 30, 2013) | 4.1 | — Supplemental Indenture, dated January 25, 2013, to the Indenture, dated November 16, 2009, among Energy Future Holdings Corp., the guarantors named therein and The Bank of New York Mellon Trust Company, N.A., as trustee, relating to 9.75% Senior Secured Notes due 2019. |
| 4(p) | 333-171253<br>Form S-4<br>(filed January 24, 2011) | 4(k) | — Indenture, dated January 12, 2010, among Energy Future Holdings Corp., the guarantors named therein and The Bank of New York Mellon Trust Company, N.A., as trustee, relating to 10.000% Senior Secured Notes due 2020. |
| 4(q) | 333-165860<br>Form S-3<br>(filed April 1, 2010) | 4(j) | — First Supplemental Indenture, dated March 16, 2010, to the Indenture, dated January 12, 2010, among Energy Future Holdings Corp., the guarantors named therein and The Bank of New York Mellon Trust Company, N.A., as trustee, relating to 10.000% Senior Secured Notes due 2020. |
| 4(r) | 1-12833<br>Form 10-Q (Quarter ended June 30, 2010) (filed August 2, 2010) | 4(a) | — Second Supplemental Indenture, dated April 13, 2010, to the Indenture, dated January 12, 2010, among Energy Future Holdings Corp., the guarantors named therein and The Bank of New York Mellon Trust Company, N.A., as trustee, relating to 10.000% Senior Secured Notes due 2020. |
| 4(s) | 1-12833<br>Form 10-Q (Quarter ended June 30, 2010) (filed August 2, 2010) | 4(b) | — Third Supplemental Indenture, dated April 14, 2010, to the Indenture, dated January 12, 2010, among Energy Future Holdings Corp., the guarantors named therein and The Bank of New York Mellon Trust Company, N.A., as trustee, relating to 10.000% Senior Secured Notes due 2020. |
| 4(t) | 1-12833<br>Form 10-Q (Quarter ended June 30, 2010) (filed August 2, 2010) | 4(c) | — Fourth Supplemental Indenture, dated May 21, 2010, to the Indenture, dated January 12, 2010, among Energy Future Holdings Corp., the guarantors named therein and The Bank of New York Mellon Trust Company, N.A., as trustee, relating to 10.000% Senior Secured Notes due 2020. |
| 4(u) | 1-12833<br>Form 10-Q (Quarter ended June 30, 2010) (filed August 2, 2010) | 4(d) | — Fifth Supplemental Indenture, dated July 2, 2010, to the Indenture, dated January 12, 2010, among Energy Future Holdings Corp., the guarantors named therein and The Bank of New York Mellon Trust Company, N.A., as trustee, relating to 10.000% Senior Secured Notes due 2020. |

229

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| Exhibits | Previously Filed* With File Number | As Exhibit | | |
|---|---|---|---|---|
| 4(v) | 1-12833<br>Form 10-Q (Quarter ended June 30, 2010) (filed August 2, 2010) | 4(e) | — | Sixth Supplemental Indenture, dated July 6, 2010, to the Indenture, dated January 12, 2010, among Energy Future Holdings Corp., the guarantors named therein and The Bank of New York Mellon Trust Company, N.A., as trustee, relating to 10.000% Senior Secured Notes due 2020. |
| 4(w) | 333-171253<br>Form S-4<br>(filed January 24, 2011) | 4(r) | — | Seventh Supplemental Indenture, dated July 7, 2010, to the Indenture, dated January 12, 2010, among Energy Future Holdings Corp., the guarantors named therein and The Bank of New York Mellon Trust Company, N.A., as trustee, relating to 10.000% Senior Secured Notes due 2020. |
| 4(x) | 1-12833<br>Form 8-K<br>(January 30, 2013) | 4.2 | — | Eighth Supplemental Indenture, dated January 25, 2013, to the Indenture, dated January 12, 2010, among Energy Future Holdings Corp., the guarantors named therein and The Bank of New York Mellon Trust Company, N.A., as trustee, relating to 10.000% Senior Secured Notes due 2020. |
| | **Oncor Electric Delivery Company LLC** | | | |
| 4(y) | 333-100240<br>Form S-4<br>(filed October 2, 2002) | 4(a) | — | Indenture and Deed of Trust, dated as of May 1, 2002, between Oncor Electric Delivery Company LLC and The Bank of New York Mellon, as trustee. |
| 4(z) | 1-12833 Form 8-K<br>(filed October 31, 2005) | 10.1 | — | Supplemental Indenture No. 1, dated October 25, 2005, to Indenture and Deed of Trust, dated as of May 1, 2002, between Oncor Electric Delivery Company LLC and The Bank of New York Mellon. |
| 4(aa) | 333-100240<br>Form 10-Q (Quarter ended March 31, 2008) (filed May 15, 2008) | 4(b) | — | Supplemental Indenture No. 2, dated May 15, 2008, to Indenture and Deed of Trust, dated as of May 1, 2002, between Oncor Electric Delivery Company LLC and The Bank of New York Mellon. |
| 4(bb) | 333-100240<br>Form S-4<br>(filed October 2, 2002) | 4(b) | — | Officer's Certificate, dated May 6, 2002, establishing the form and certain terms of Oncor Electric Delivery Company LLC's 6.375% Senior Notes due 2012 and 7.000% Senior Notes due 2032. |
| 4(cc) | 333-100242<br>Form S-4<br>(filed October 2, 2002) | 4(a) | — | Indenture (for Unsecured Debt Securities), dated August 1, 2002, between Oncor Electric Delivery Company LLC and The Bank of New York Mellon, as trustee. |
| 4(dd) | 333-100240<br>Form 10-Q (Quarter ended March 31, 2008) (filed May 15, 2008) | 4(c) | — | Supplemental Indenture No. 1, dated May 15, 2008, to Indenture and Deed of Trust, dated August 1, 2002, between Oncor Electric Delivery Company LLC and The Bank of New York. |
| 4(ee) | 333-100242<br>Form S-4<br>(filed October 2, 2002) | 4(b) | — | Officer's Certificate, dated August 30, 2002, establishing the form and certain terms of Oncor Electric Delivery Company LLC's 5% Debentures due 2007 and 7% Debentures due 2022. |
| 4(ff) | 333-106894<br>Form S-4<br>(filed July 9, 2003) | 4(c) | — | Officer's Certificate, dated December 20, 2002, establishing the form and certain terms of Oncor Electric Delivery Company LLC's 6.375% Senior Notes due 2015 and 7.250% Senior Notes due 2023. |
| 4(gg) | 333-100240<br>Form 10-Q (Quarter ended March 31, 2008) (filed May 15, 2008) | 4(a) | — | Deed of Trust, Security Agreement and Fixture Filing, dated May 15, 2008, by Oncor Electric Delivery Company LLC, as grantor, to and for the benefit of, The Bank of New York Mellon Trust, as collateral agent and trustee. |
| 4(hh) | 333-100240<br>Form 10-K (2008)<br>(filed March 2, 2009) | 4(n) | — | First Amendment, dated March 2, 2009, to Deed of Trust, Security Agreement and Fixture Filing, dated May 15, 2008. |
| 4(ii) | 333-100240<br>Form 8-K<br>(filed September 3, 2010) | 10.1 | — | Second Amendment, dated September 3, 2010, to Deed of Trust, Security Agreement and Fixture Filing, dated May 15, 2008. |

230

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| Exhibits | Previously Filed* With File Number | As Exhibit | | |
|---|---|---|---|---|
| 4(jj) | 333-100240<br>Form 8-K<br>(filed November 15, 2011) | 10.1 | — | Third Amendment, dated November 10, 2011, to Deed of Trust, Security Agreement and Fixture Filing, dated May 15, 2008. |
| 4(kk) | 333-100242<br>Form 8-K<br>(filed September 9, 2008) | 4.1 | — | Officer's Certificate, dated September 8, 2008, establishing the form and certain terms of Oncor Electric Delivery Company LLC's 5.95% Senior Secured Notes due 2013, 6.80% Senior Secured Notes due 2018 and 7.50% Senior Secured Notes due 2038. |
| 4(ll) | 333-100240<br>Form 8-K<br>(filed September 16, 2010) | 4.1 | — | Officer's Certificate, dated September 13, 2010, establishing the form and certain terms of Oncor Electric Delivery Company LLC's 5.25% Senior Secured Notes due 2040. |
| 4(mm) | 333-100240<br>Form 8-K<br>(filed October 12, 2010) | 4.1 | — | Officer's Certificate, dated October 8, 2010, establishing the form and certain terms of Oncor Electric Delivery Company LLC's 5.00% Senior Secured Notes due 2017 and 5.75% Senior Secured Notes due 2020. |
| 4(nn) | 333-100240<br>Form 8-K<br>(filed November 23, 2011) | 4.1 | — | Officer's Certificate, dated November 23, 2011, establishing the terms of Oncor's 4.55% Senior Secured Notes due 2041. |
| 4(oo) | 333-100240<br>Form 8-K<br>(filed November 23, 2011) | 4.2 | — | Registration Rights Agreement, dated November 23, 2011, among Oncor Electric Delivery Company LLC and the representatives of the initial purchasers of Oncor's 4.55% Senior Secured Notes due 2041. |
| 4(pp) | 333-100240<br>Form 8-K<br>(filed May 18, 2012) | 4.1 | — | Officer's Certificate, dated May 18, 2012, establishing the terms of Oncor's 4.10% Senior Secured Notes due 2022 and 5.30% Senior Secured Notes due 2042. |
| 4(qq) | 333-100240<br>Form 8-K<br>(filed May 18, 2012) | 4.2 | — | Registration Rights Agreement, dated May 18, 2012, among Oncor Electric Delivery Company LLC and the representatives of the initial purchasers of Oncor's 4.10% Senior Secured Notes due 2022 and 5.30% Senior Secured Notes due 2042. |
| **Texas Competitive Electric Holdings Company LLC** | | | | |
| 4(rr) | 333-108876<br>Form 8-K<br>(filed October 31, 2007) | 4.2 | — | Indenture, dated October 31, 2007, among Texas Competitive Electric Holdings Company LLC and TCEH Finance, Inc., the guarantors and The Bank of New York Mellon Trust Company, N.A., as trustee, relating to 10.25% Senior Notes due 2015. |
| 4(ss) | 1-12833<br>Form 8-K<br>(filed December 12, 2007) | 4.1 | — | First Supplemental Indenture, dated December 6, 2007, to Indenture, dated October 31, 2007, relating to Texas Competitive Electric Holdings Company LLC's and TCEH Finance, Inc.'s 10.25% Senior Notes due 2015, Series B, and 10.50%/11.25% Senior Toggle Notes due 2016. |
| 4(tt) | 1-12833<br>Form 10-Q (Quarter ended June 30, 2009) (filed August 4, 2009) | 4(b) | — | Second Supplemental Indenture, dated August 3, 2009, to Indenture, dated October 31, 2007, relating to Texas Competitive Electric Holdings Company LLC's and TCEH Finance, Inc.'s 10.25% Senior Notes due 2015, 10.25% Senior Notes due 2015, Series B, and 10.50%/11.25% Senior Toggle Notes due 2016. |
| 4(uu) | 1-12833<br>Form 8-K<br>(filed October 8, 2010) | 4.1 | — | Indenture, dated October 6, 2010, among Texas Competitive Electric Holdings Company LLC and TCEH Finance, Inc., the guarantors and The Bank of New York Mellon Trust Company, N.A., as trustee, relating to 15% Senior Secured Second Lien Notes due 2021. |
| 4(vv) | 1-12833<br>Form 8-K<br>(filed October 26, 2010) | 4.1 | — | First Supplemental Indenture, dated October 20, 2010, to the Indenture, dated October 6, 2010. |

231

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

| Exhibits | Previously Filed* With File Number | As Exhibit | | |
|---|---|---|---|---|
| 4(ww) | 1-12833 Form 8-K (filed November 17, 2010) | 4.1 | — | Second Supplemental Indenture, dated November 15, 2010, to the Indenture, dated October 6, 2010. |
| 4(xx) | 1-12833 Form 10-Q (Quarter ended September 30, 2011) (filed October 28, 2011) | 4(a) | — | Third Supplemental Indenture, dated as of September 26, 2011, to the Indenture, dated October 6, 2010. |
| 4(yy) | 1-12833 Form 8-K (filed October 8, 2010) | 4.3 | — | Second Lien Pledge Agreement, dated October 6, 2010, among Texas Competitive Electric Holdings Company LLC, TCEH Finance, Inc., the subsidiary guarantors named therein and The Bank of New York Mellon Trust Company, N.A., as collateral agent for the benefit of the second lien secured parties. |
| 4(zz) | 1-12833 Form 8-K (filed October 8, 2010) | 4.4 | — | Second Lien Security Agreement, dated October 6, 2010, among Texas Competitive Electric Holdings Company LLC, TCEH Finance, Inc., the subsidiary guarantors named therein and The Bank Of New York Mellon Trust Company, N.A., as collateral agent and as the initial second priority representative for the benefit of the second lien secured parties. |
| 4(aaa) | 1-12833 Form 8-K (filed October 8, 2010) | 4.5 | — | Second Lien Intercreditor Agreement, dated October 6, 2010, among Texas Competitive Electric Holdings Company LLC, TCEH Finance, Inc., the subsidiary guarantors named therein, Citibank, N.A., as collateral agent for the senior collateral agent and the administrative agent, The Bank of New York Mellon Trust Company, N.A., as the initial second priority representative. |
| 4(bbb) | 1-12833 Form 10-K (2010) (filed February 18, 2011) | 4(aaa) | — | Form of Second Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing to Fidelity National Title Insurance Company, as trustee, for the benefit of The Bank of New York Mellon Trust Company, N.A., as Collateral Agent and Initial Second Priority Representative for the benefit of the Second Lien Secured Parties, as Beneficiary. |
| 4(ccc) | 1-12833 Form 8-K (filed April 20, 2011) | 4.1 | — | Indenture, dated as of April 19, 2011, among Texas Competitive Electric Holdings Company LLC, TCEH Finance Inc., the Guarantors party thereto and The Bank of New York Mellon Trust Company, N.A., as trustee, relating to 11.5% Senior Secured Notes due 2020. |
| 4(ddd) | 1-12833 Form 8-K (filed April 20, 2011) | 4.2 | — | Form of Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Fling to Fidelity National Title Insurance Company, as trustee, for the benefit of Citibank, N.A., as Collateral Agent for the benefit of the Holders of the 11.5% Senior Secured Notes due 2020, as Beneficiary. |
| 4(eee) | 1-12833 Form 8-K (filed April 20, 2011) | 4.3 | — | Form of Deed of Trust and Security Agreement to Fidelity National Title Insurance Company, as trustee, for the benefit of Citibank, N.A., as Collateral Agent for the benefit of the Holders of the 11.5% Senior Secured Notes dues 2020, as Beneficiary. |
| 4(fff) | 1-12833 Form 8-K (filed April 20, 2011) | 4.4 | — | Form of Subordination and Priority Agreement, among Citibank, N.A., as beneficiary under the First Lien Credit Deed of Trust, The Bank of New York Mellon Trust Company, N.A., as beneficiary under the Second Lien Indenture Deed of Trust, Citibank, N.A., as beneficiary under the First Lien Indenture Deed of Trust, Texas Competitive Electric Holdings Company LLC and the subsidiary guarantors party thereto. |
| | **Energy Future Intermediate Holding Company LLC** | | | |
| 4(ggg) | 1-12833 Form 8-K (filed November 20, 2009) | 4.2 | — | Indenture, dated November 16, 2009, among Energy Future Intermediate Holding Company LLC, EFIH Finance Inc. and The Bank of New York Mellon Trust Company, N.A., as trustee, relating to 9.75% Senior Secured Notes due 2019. |

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

| Exhibits | Previously Filed* With File Number | As Exhibit | | |
|---|---|---|---|---|
| 4(hhh) | 1-12833<br>Form 8-K<br>(filed January 30, 2013) | 4.3 | — | Supplemental Indenture, dated January 25, 2013, to the indenture, dated November 16, 2009, among Energy Future Intermediate Holding Company LLC, EFIH Finance Inc. and The Bank of New York Mellon Trust Company, N.A., as trustee, relating to 9.75% Senior Secured Notes due 2019. |
| 4(iii) | 1-12833<br>Form 8-K<br>(filed August 18, 2010) | 4.1 | — | Indenture, dated August 17, 2010, among Energy Future Intermediate Holding Company LLC, EFIH Finance Inc. and The Bank of New York Mellon Trust Company, N.A., as trustee, relating to 10.000% Senior Secured Notes due 2020. |
| 4(jjj) | 1-12833<br>Form 8-K<br>(filed January 30, 2013) | 4.4 | — | First Supplemental Indenture, dated January 29, 2013, to the indenture, dated August 17, 2010, among Energy Future Intermediate Holding Company LLC, EFIH Finance Inc. and The Bank of New York Mellon Trust Company, N.A., as trustee, relating to 10.000% Senior Secured Notes due 2020. |
| 4(kkk) | 1-12833<br>Form 10-Q (Quarter ended March 31, 2011)<br>(filed April 29, 2011) | 4(e) | — | Indenture, dated as of April 25, 2011, among Energy Future Intermediate Holding Company LLC, EFIH Finance, Inc. and The Bank of New York Mellon Trust Company, N.A., as trustee, relating to 11% Senior Secured Second Lien Notes due 2021. |
| 4(lll) | 1-12833<br>Form 8-K<br>(filed February 7, 2012) | 4.1 | — | First Supplemental Indenture, dated February 6, 2012, to the indenture dated April 25, 2011, among Energy Future Intermediate Holding Company LLC, EFIH Finance Inc. and The Bank of New York Mellon Trust Company, N.A., as Trustee, relating to 11.750% Senior Secured Second Lien Notes due 2022. |
| 4(mmm) | 1-12833<br>Form 8-K<br>(filed February 29, 2012) | 4.1 | — | Second Supplemental Indenture, dated February 28, 2012, to the indenture dated April 25, 2011, among Energy Future Intermediate Holding Company LLC, EFIH Finance Inc. and The Bank of New York Mellon Trust Company, N.A., as Trustee, relating to 11.750% Senior Secured Second Lien Notes due 2022. |
| 4(nnn) | 1-12833<br>Form 10-Q (Quarter ended June 30, 2012)<br>(filed July 31, 2012) | 4(a) | — | Third Supplemental Indenture, dated May 31, 2012, to the indenture dated April 25, 2011, among Energy Future Intermediate Holding Company LLC, EFIH Finance Inc. and The Bank of New York Mellon Trust Company, N.A., as Trustee, relating to 11.750% Senior Secured Second Lien Notes due 2022. |
| 4(ooo) | 1-12833<br>Form 8-K<br>(filed August 17, 2012) | 4.2 | — | Fourth Supplemental Indenture, dated August 14, 2012, among Energy Future Intermediate Holding Company LLC, EFIH Finance Inc. and the Bank of New York Mellon Trust Company, N.A., as trustee, relating to 11.75% Senior Secured Second Lien Notes due 2022. |
| 4(ppp) | 1-12833<br>Form 8-K<br>(filed August 17, 2012) | 4.1 | — | Indenture, dated August 14, 2012, among Energy Future Intermediate Holding Company LLC, EFIH Finance Inc. and the Bank of New York Mellon Trust Company, N.A., as trustee, relating to 6.875% Senior Secured Notes due 2017. |
| 4(qqq) | 1-12833<br>Form 8-K<br>(filed October 24, 2012) | 4.1 | — | First Supplemental Indenture, dated October 23, 2012, to the indenture dated August 14, 2012, among Energy Future Intermediate Holding Company LLC, EFIH Finance Inc., and the Bank of New York Mellon Trust Company, N.A., as trustee, relating to 6.875% Senior Secured Notes due 2017. |
| 4(rrr) | 1-12833<br>Form 8-K<br>(filed December 5, 2012) | 4.1 | — | Indenture, dated December 5, 2012, among Energy Future Intermediate Holding Company LLC, EFIH Finance Inc. and the Bank of New York Mellon Trust Company, N.A., as trustee, relating to 11.25%/12.25% Senior Toggle Notes due 2018. |
| 4(sss) | 1-12833<br>Form 8-K<br>(filed December 21, 2012) | 4.1 | — | First Supplemental Indenture, dated December 19, 2012, to the indenture dated December 5, 2012, among Energy Future Intermediate Holding Company LLC, EFIH Finance Inc., and the Bank of New York Mellon Trust Company, N.A., as trustee, relating to 11.25%/12.25% Senior Toggle Notes due 2018. |

233

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| Exhibits | Previously Filed* With File Number | As Exhibit | | |
|---|---|---|---|---|
| 4(ttt) | 1-12833<br>Form 8-K<br>(filed January 30, 2013) | 4.5 | — | Second Supplemental Indenture, dated January 29, 2013, to the indenture dated December 5, 2012, among Energy Future Intermediate Holding Company LLC, EFIH Finance Inc., and the Bank of New York Mellon Trust Company, N.A., as trustee, relating to 11.25%/12.25% Senior Toggle Notes due 2018. |
| 4(uuu) | | | — | Third Supplemental Indenture, dated January 30, 2013, to the indenture dated December 5, 2012, among Energy Future Intermediate Holding Company LLC, EFIH Finance Inc., and the Bank of New York Mellon Trust Company, N.A., as trustee, relating to 11.25%/12.25% Senior Toggle Notes due 2018. |
| 4(vvv) | 1-12833<br>Form 10-Q (Quarter ended March 31, 2011)<br>(filed April 29, 2011) | 4(f) | — | Junior Lien Pledge Agreement, dated as of April 25, 2011, from Energy Future Intermediate Holding Company LLC, as pledgor, to The Bank of New York Mellon Trust Company, N.A., as collateral trustee. |
| 4(www) | 1-12833<br>Form 8-K<br>(filed February 7, 2012) | 4.2 | — | Registration Rights Agreement, dated February 6, 2012, among Energy Future Intermediate Holding Company LLC, EFIH Finance Inc. and the initial purchasers named therein, relating to 11.750% Senior Secured Second Lien Notes due 2022. |
| 4(xxx) | 1-12833<br>Form 8-K<br>(filed February 29, 2012) | 4.2 | — | Registration Rights Agreement, dated February 28, 2012, among Energy Future Intermediate Holding Company LLC, EFIH Finance Inc. and the initial purchasers named therein, relating to 11.750% Senior Secured Second Lien Notes due 2022. |
| 4(yyy) | 1-12833<br>Form 8-K<br>(filed August 17, 2012) | 4.3 | — | Registration Rights Agreement, dated August 14, 2012, among Energy Future Intermediate Holding Company LLC, EFIH Finance Inc. and the initial purchasers named therein. |
| 4(zzz) | 1-12833<br>Form 8-K<br>(filed October 24, 2012) | 4.2 | — | Registration Rights Agreement, dated October 23, 2012, among Energy Future Intermediate Holding Company LLC, EFIH Finance Inc. and the initial purchasers named therein. |
| 4(aaaa) | 1-12833<br>Form 8-K<br>(filed December 5, 2012) | 4.2 | — | Registration Rights Agreement, dated as of December 5, 2012, among Energy Future Intermediate Holding Company LLC, EFIH Finance Inc. and the exchange holders named therein. |
| **(10)** | **Material Contracts** | | | |
| | **Management Contracts; Compensatory Plans, Contracts and Arrangements** | | | |
| 10(a) | 1-12833<br>Form 8-K<br>(filed May 23, 2005) | 10.6 | — | Energy Future Holdings Corp. Executive Change in Control Policy effective May 20, 2005. |
| 10(b) | 333-153529<br>Amendment No. 2 to Form S-4<br>(filed December 23, 2008) | 10(p) | — | Amendment to the Energy Future Holdings Corp. Executive Change in Control Policy, dated December 23, 2008. |
| 10(c) | 1-12833<br>Form 10-K (2010)<br>(filed February 18, 2011) | 10(e) | — | Amendment to the Energy Future Holdings Corp. Executive Change in Control Policy, dated December 20, 2010. |
| 10(d) | 1-12833<br>Form 8-K<br>(filed May 23, 2005) | 10.7 | — | Energy Future Holdings Corp. 2005 Executive Severance Plan and Summary Plan Description. |
| 10(e) | 333-153529<br>Amendment No. 2 to Form S-4<br>(filed December 23, 2008) | 10(n) | — | Amendment to the Energy Future Holdings Corp. 2005 Executive Severance Plan and Summary Plan Description, dated December 23, 2008. |
| 10(f) | 1-12833<br>Form 10-K (2010)<br>(filed February 18, 2011) | 10(f) | — | Amendment to the Energy Future Holdings Corp. 2005 Executive Severance Plan and Summary Plan Description, dated December 10, 2010. |

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| Exhibits | Previously Filed* With File Number | As Exhibit | | |
|---|---|---|---|---|
| 10(g) | 1-12833<br>Form 10-K (2007)<br>(filed March 31, 2008) | 10(a) | — | 2007 Stock Incentive Plan for Key Employees of Energy Future Holdings Corp. and its affiliates. |
| 10(h) | 1-12833<br>Form 10-K (2009)<br>(filed February 19, 2010) | 10(ii) | — | Amendment No. 1 to the 2007 Stock Incentive Plan for Key Employees of Energy Future Holdings Corp. and its Affiliates, dated July 14, 2009, effective as of December 23, 2008. |
| 10(i) | 1-12833<br>Form 10-K (2010)<br>(filed February 18, 2011) | 10(i) | — | EFH Executive Annual Incentive Plan, effective as of January 1, 2010. |
| 10(j) | 1-12833<br>Form 10-K (2008)<br>(filed March 3, 2009) | 10(q) | — | EFH Second Supplemental Retirement Plan, effective as of October 10, 2007. |
| 10(k) | 1-12833<br>Form 10-K (2009)<br>(filed February 19, 2010) | 10(ee) | — | Amendment to EFH Second Supplemental Retirement Plan, dated July 31, 2009. |
| 10(l) | 1-12833<br>Form 10-K (2010)<br>(filed February 18, 2011) | 10(l) | — | Second Amendment to EFH Second Supplemental Retirement Plan, dated April 9, 2010 with effect as of January 1, 2010. |
| 10(m) | 1-12833<br>Form 10-K (2010)<br>(filed February 18, 2011) | 10(m) | — | Third Amendment to EFH Second Supplemental Retirement Plan, dated April 21, 2010 with effect as of January 1, 2010. |
| 10(n) | 1-12833<br>Form 10-K (2011)<br>(filed February 21, 2012) | 10(n) | — | Fourth Amendment to EFH Second Supplemental Retirement Plan, dated June 17, 2011. |
| 10(o) | 1-12833<br>Form 10-K (2009)<br>(filed February 19, 2010) | 10(dd) | — | EFH Salary Deferral Program, effective January 1, 2010. |
| 10(p) | 1-12833<br>Form 10-K (2010)<br>(filed February 18, 2011) | 10(o) | — | Amendment to EFH Salary Deferral Program, effective January 20, 2011. |
| 10(q) | 1-12833<br>Form 10-K (2011)<br>(filed February 21, 2012) | 10(q) | — | Second Amendment to EFH Salary Deferral Program, dated June 17, 2011. |
| 10(r) | 1-12833<br>Form 10-Q (Quarter ended September 30, 2012)<br>(filed October 30, 2012) | 10(a) | — | Third Amendment to the EFH Salary Deferral Program, effective September 20, 2012. |
| 10(s) | 1-12833<br>Form 10-K (2007)<br>(filed March 31, 2008) | 10(b) | — | Registration Rights Agreement, dated October 10, 2007, among Texas Energy Future Holdings Limited Partnership, Energy Future Holdings Corp. and the stockholders party thereto. |
| 10(t) | 1-12833<br>Form 10-Q (Quarter ended March 31, 2008) (filed May 15, 2008) | 10(a) | — | Form of Stockholder's Agreement (for Directors) among Energy Future Holdings Corp., Texas Energy Future Holdings Limited Partnership and the stockholder party thereto. |
| 10(u) | 1-12833<br>Form 10-Q (Quarter ended March 31, 2008) (filed May 15, 2008) | 10(b) | — | Form of Sale Participation Agreement (for Directors) between Texas Energy Future Holdings Limited Partnership and the stockholder party hereto. |
| 10(v) | 1-12833<br>Form 10-Q (Quarter ended June 30, 2008) (filed August 14, 2008) | 10(f) | — | Form of Management Stockholder's Agreement (For Executive Officers) among Energy Future Holdings Corp., Texas Energy Future Holdings Limited Partnership and the stockholder party thereto. |

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

| Exhibits | Previously Filed* With File Number | As Exhibit | | |
|---|---|---|---|---|
| 10(w) | 1-12833 Form 10-Q (Quarter ended June 30, 2008) (filed August 14, 2008) | 10(g) | — | Form of Sale Participation Agreement (For Executive Officers) between Texas Energy Future Holdings Limited Partnership and the stockholder party thereto. |
| 10(x) | 1-12833 Form 10-K (2009) (filed February 19, 2010) | 10(m) | — | Form of Amended and Restated Non-Qualified Stock Option Agreement (For Executive Officers) between Energy Future Holdings Corp. and the optionee thereto. |
| 10(y) | 1-12833 Form 10-Q (Quarter ended September 30, 2011) (filed October 28, 2011) | 10(i) | — | Form of Restricted Stock Unit Agreement between Energy Future Holdings Corp. and the stockholder party thereto. |
| 10(z) | 1-12833 Form 10-K (2011) (filed February 21, 2012) | 10(y) | — | EFH Corp. Retention Award Plan (For Key Employees), effective December 20, 2011. |
| 10(aa) | 1-12833 Form 10-K (2011) (filed February 21, 2012) | 10(z) | — | Form of Participation Agreement (For Key Employees) between Energy Future Holdings Corp. and the participant party thereto. |
| 10(bb) | 1-12833 Form 10-K (2007) (filed March 31, 2008) | 10(f) | — | Energy Future Holdings Corp. Non-Employee Director Compensation Arrangements. |
| 10(cc) | 1-12833 Form 10-K (2011) (filed February 21, 2012) | 10(bb) | — | Second Amended and Restated Consulting Agreement, dated January 1, 2012, between Energy Future Holdings Corp. and Donald L. Evans. |
| 10(dd) | | | — | Amended and Restated Employment Agreement, dated effective December 26, 2012, between Energy Future Holdings Corp. and John Young. |
| 10(ee) | 1-12833 Form 10-K (2007) (filed March 31, 2008) | 10(r) | — | Management Stockholder's Agreement, dated February 1, 2008, among Energy Future Holdings Corp., Texas Energy Future Holdings Limited Partnership and John Young. |
| 10(ff) | 1-12833 Form 10-K (2007) (filed March 31, 2008) | 10(s) | — | Sale Participation Agreement, dated February 1, 2008, between Texas Energy Future Holdings Limited Partnership and John F. Young. |
| 10(gg) | 1-12833 Form 10-Q (Quarter ended September 30, 2011) (filed October 28, 2011) | 10(b) | — | Amended and Restated Employment Agreement, dated October 17, 2011, among EFH Corporate Services Company, Energy Future Holdings Corp. and Paul M. Keglevic. |
| 10(hh) | 1-12833 Form 10-K (2010) (filed February 18, 2011) | 10(ee) | — | Deferred Share Agreement, dated July 1, 2008, between Energy Future Holdings Corp. and Paul Keglevic. |
| 10(ii) | 1-12833 Form 10-Q (Quarter ended September 30, 2011) (filed October 28, 2011) | 10(h) | — | First Amendment to Deferred Share Agreement, dated October 17, 2011, between Energy Future Holdings Corp. and Paul Keglevic. |
| 10(jj) | 1-12833 Form 10-Q (Quarter ended June 30, 2012) (filed July 31, 2012) | 10(a) | — | Second Amendment to Deferred Share Agreement, dated July 25, 2012, between Energy Future Holdings Corp. and Paul M. Keglevic. |
| 10(kk) | 1-12833 Form 10-Q (Quarter ended September 30, 2011) (filed October 28, 2011) | 10(e) | — | Amended and Restated Employment Agreement, dated October 17, 2011, among Luminant Holding Company LLC, Energy Future Holdings Corp. and David A. Campbell. |

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| Exhibits | Previously Filed* With File Number | As Exhibit | | |
|---|---|---|---|---|
| 10(ll) | 1-12833 Form 10-K (2007) (filed March 31, 2008) | 10(y) | — | Additional Payment Agreement, dated October 10, 2007, among Energy Future Holdings Corp., Texas Energy Future Holdings Limited Partnership, Texas Competitive Electric Holdings Company LLC and David Campbell. |
| 10(mm) | 1-12833 Form 10-K (2010) (filed February 18, 2011) | 10(hh) | — | Deferred Share Agreement, dated May 20, 2008, between Energy Future Holdings Corp. and David Campbell. |
| 10(nn) | 1-12833 Form 10-Q (Quarter ended September 30, 2011) (filed October 28, 2011) | 10(d) | — | Amended and Restated Employment Agreement, dated October 17, 2011, among TXU Retail Company LLC, Energy Future Holdings Corp. and James A. Burke. |
| 10(oo) | 1-12833 Form 10-K (2007) (filed March 31, 2008) | 10(ff) | — | Additional Payment Agreement, dated October 10, 2007, among Energy Future Holdings Corp., Texas Energy Future Holdings Limited Partnership, Texas Competitive Electric Holdings Company LLC and James Burke. |
| 10(pp) | 1-12833 Form 10-K (2007) (filed March 31, 2008) | 10(nn) | — | Deferred Share Agreement, dated October 9, 2007, between Texas Energy Future Holdings Limited Partnership and James Burke. |
| 10(qq) | | | — | Amended and Restated Employment Agreement, dated effective January 1, 2013, among Luminant Holding Company LLC, Energy Future Holdings Corp. and Mark Allen McFarland. |
| 10(rr) | | | — | Not used. |
| 10(ss) | 1-12833 Form 10-Q (Quarter ended September 30, 2011) (filed October 28, 2011) | 10(g) | — | Employment Agreement, dated October 17, 2011, among EFH Corporate Services Company, Energy Future Holdings Corp., and John D. O'Brien, Jr. |
| 10(tt) | 1-12833 Form 10-Q (Quarter ended March 31, 2012) (filed May 1, 2012) | 10(a) | — | Employment Agreement, dated April 27, 2012, among EFH Corporate Services Company, Energy Future Holdings Corp., and Stacey H. Doré. |
| 10(uu) | 1-12833 Form 10-Q (Quarter ended March 31, 2012) (filed May 1, 2012) | 10(b) | — | Employment Agreement, dated April 27, 2012, among EFH Corporate Services Company, Energy Future Holdings Corp., and Carrie L. Kirby. |
| | **Credit Agreements and Related Agreements** | | | |
| 10(vv) | 333-100240 Form 8-K (filed October 11, 2011) | 10.1 | — | Amended and Restated Revolving Credit Agreement, dated as of October 11, 2011, among Oncor Electric Delivery Company LLC, as borrower, the lenders listed therein, JPMorgan Chase Bank, N.A., as administrative agent for the lenders, JPMorgan Chase Bank, N.A., as swingline lender, and JPMorgan Chase Bank, N.A., Barclays Bank PLC, The Royal Bank of Scotland plc, Bank of America, N.A. and Citibank N.A., as fronting banks for letters of credit issued thereunder. |
| 10(ww) | 333-100240 Form 8-K (filed May 15, 2012) | 10.1 | — | Joinder Agreement, dated as of May 15, 2012, by and among Oncor, as Borrower, JPMorgan Chase Bank, N.A., as administrative agent under the Credit Agreement, swingline lender and fronting bank, Barclays Bank PLC, Bank of America, N.A., Citibank, N.A. and The Royal Bank of Scotland PLC, as fronting banks, and each party identified as an "Incremental Lender" on the signature pages thereto. |

237

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

| Exhibits | Previously Filed* With File Number | As Exhibit | | |
|---|---|---|---|---|
| 10(xx) | 333-171253<br>Post-Effective Amendment #1 to Form S-4<br>(filed February 7, 2011) | 10(rr) | — | $24,500,000,000 Credit Agreement, dated October 10, 2007, among Energy Future Competitive Holdings Company; Texas Competitive Electric Holdings Company LLC, as the borrower; the several lenders from time to time parties thereto; Citibank, N.A., as administrative agent, collateral agent, swingline lender, revolving letter of credit issuer and deposit letter of credit issuer; Goldman Sachs Credit Partners L.P., as posting agent, posting syndication agent and posting documentation agent; JPMorgan Chase Bank, N.A., as syndication agent and revolving letter of credit issuer; Citigroup Global Markets Inc., J.P. Morgan Securities Inc., Goldman Sachs Credit Partners L.P., Lehman Brothers Inc., Morgan Stanley Senior Funding, Inc. and Credit Suisse Securities (USA) LLC, as joint lead arrangers and bookrunners; Goldman Sachs Credit Partners L.P., as posting lead arranger and bookrunner; Credit Suisse, Goldman Sachs Credit Partners L.P., Lehman Commercial Paper Inc., Morgan Stanley Senior Funding, Inc., as co-documentation agents; and J. Aron & Company, as posting calculation agent. |
| 10(yy) | 1-12833<br>Form 8-K<br>(filed August 10, 2009) | 10.1 | — | Amendment No. 1, dated August 7, 2009, to the $24,500,000,000 Credit Agreement. |
| 10(zz) | 1-12833<br>Form 8-K<br>(filed April 20, 2011) | 10.1 | — | Amendment No. 2, dated April 7, 2011, to the $24,500,000,000 Credit Agreement. |
| 10(aaa) | 1-12833<br>Form 8-K<br>(filed January 7, 2013) | 10.1 | — | December 2012 Extension Amendment, dated January 4, 2013, to the $24,500,000,000 Credit Agreement. |
| 10(bbb) | 1-12833<br>Form 8-K<br>(filed January 7, 2013) | 10.2 | — | Incremental Amendment No. 1, dated January 4, 2013, to the $24,500,000,000 Credit Agreement. |
| 10(ccc) | 1-12833<br>Form 10-K (2007)<br>(filed March 31, 2008) | 10(ss) | — | Guarantee, dated October 10, 2007, by the guarantors party thereto in favor of Citibank, N.A., as collateral agent for the benefit of the secured parties under the $24,500,000,000 Credit Agreement, dated October 10, 2007. |
| 10(ddd) | 1-12833<br>Form 10-K (2007)<br>(filed March 31, 2008) | 10(vv) | — | Form of Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing to Fidelity National Title Insurance Company, as trustee, for the benefit of Citibank, N.A., as beneficiary. |
| 10(eee) | 1-12833<br>Form 10-Q (Quarter ended March 31, 2011) (filed April 29, 2011) | 10(b) | — | Form of First Amendment to Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing to Fidelity National Title Insurance Company, as trustee, for the benefit of Citibank, N.A., as Beneficiary. |
| 10(fff) | 1-12833<br>Form 8-K<br>(filed August 10, 2009) | 10.2 | — | Amended and Restated Collateral Agency and Intercreditor Agreement, dated October 10, 2007, as amended and restated as of August 7, 2009, among Energy Future Competitive Holdings Company; Texas Competitive Electric Holdings Company LLC; the subsidiary guarantors party thereto; Citibank, N.A., as administrative agent and collateral agent; Credit Suisse Energy LLC, J. Aron & Company, Morgan Stanley Capital Group Inc., Citigroup Energy Inc., each as a secured hedge counterparty; and any other person that becomes a secured party pursuant thereto. |
| 10(ggg) | 1-12833<br>Form 8-K<br>(filed August 10, 2009) | 10.3 | — | Amended and Restated Security Agreement, dated October 10, 2007, as amended and restated as of August 7, 2009, among Texas Competitive Electric Holdings Company LLC, the subsidiary grantors party thereto, and Citibank, N.A., as collateral agent for the benefit of the first lien secured parties, including the secured parties under the $24,500,000,000 Credit Agreement, dated October 10, 2007. |

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| Exhibits | Previously Filed* With File Number | As Exhibit | | |
|---|---|---|---|---|
| 10(hhh) | 1-12833 Form 8-K (filed August 10, 2009) | 10.4 | — | Amended and Restated Pledge Agreement, dated October 10, 2007, as amended and restated as of August 7, 2009, among Energy Future Competitive Holdings Company, Texas Competitive Electric Holdings Company LLC, the subsidiary pledgors party thereto, and Citibank, N.A., as collateral agent for the benefit first lien secured parties, including the secured parties under the $24,500,000,000 Credit Agreement, dated October 10, 2007. |
| 10(iii) | 1-12833 Form 8-K filed November 20, 2009) | 4.3 | — | Pledge Agreement, dated November 16, 2009, made by Energy Future Intermediate Holding Company LLC and the additional pledgers to The Bank of New York Mellon Trust Company, N.A., as collateral trustee for the holders of parity lien obligations. |
| 10(jjj) | 1-12833 Form 8-K (filed November 20, 2009) | 4.4 | — | Collateral Trust Agreement, dated November 16, 2009, among Energy Future Intermediate Holding Company LLC, The Bank of New York Mellon Trust Company, N.A., as first lien trustee and as collateral trustee, and the other secured debt representatives party thereto. |
| | **Other Material Contracts** | | | |
| 10(kkk) | 1-12833 Form 10-K (2003) (filed March 15, 2004) | 10(qq) | — | Lease Agreement, dated February 14, 2002, between State Street Bank and Trust Company of Connecticut, National Association, an owner trustee of ZSF/Dallas Tower Trust, a Delaware grantor trust, as lessor and EFH Properties Company, as Lessee (Energy Plaza Property). |
| 10(lll) | 1-12833 Form 10-Q (Quarter ended June 30, 2007) (filed August 9, 2007) | 10.1 | — | First Amendment, dated June 1, 2007, to Lease Agreement, dated February 14, 2002. |
| 10(mmm) | 333-100240 Form 10-K (2004) (filed March 23, 2005) | 10(i) | — | Agreement, dated March 10, 2005, between Oncor Electric Delivery Company LLC and TXU Energy Company LLC, allocating to Oncor Electric Delivery Company LLC the pension and post-retirement benefit costs for all Oncor Electric Delivery Company LLC employees who had retired or had terminated employment as vested employees prior to January 1, 2002. |
| 10(nnn) | 1-12833 Form 10-K (2006) (filed March 2, 2007) | 10(iii) | — | Amended and Restated Transaction Confirmation by Generation Development Company LLC, dated February 2007 (subsequently assigned to Texas Competitive Electric Holdings Company LLC on October 10, 2007) (confidential treatment has been requested for portions of this exhibit). |
| 10(ooo) | 1-12833 Form 10-K (2007) (filed March 31, 2008) | 10(eee) | — | Stipulation as approved by the PUCT in Docket No. 34077. |
| 10(ppp) | 1-12833 Form 10-K (2007) (filed March 31, 2008) | 10(fff) | — | Amendment to Stipulation Regarding Section 1, Paragraph 35 and Exhibit B in Docket No. 34077. |
| 10(qqq) | 333-100240 Form 10-K (2010) (filed February 18, 2011) | 10(ae) | — | PUCT Order on Rehearing in Docket No. 34077. |
| 10(rrr) | 1-12833 Form 10-K (2007) (filed March 31, 2008) | 10(sss) | — | ISDA Master Agreement, dated October 25, 2007, between Texas Competitive Electric Holdings Company LLC and Goldman Sachs Capital Markets, L.P. |
| 10(sss) | 1-12833 Form 10-K (2007) (filed March 31, 2008) | 10(ttt) | — | Schedule to the ISDA Master Agreement, dated October 25, 2007, between Texas Competitive Electric Holdings Company LLC and Goldman Sachs Capital Markets, L.P. |
| 10(ttt) | 1-12833 Form 10-K (2007) (filed March 31, 2008) | 10(uuu) | — | Form of Confirmation between Texas Competitive Electric Holdings Company LLC and Goldman Sachs Capital Markets, L.P. |

239

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| Exhibits | Previously Filed* With File Number | As Exhibit | | |
|---|---|---|---|---|
| 10(uuu) | 1-12833<br>Form 10-K (2007)<br>(filed March 31, 2008) | 10(vvv) | — | ISDA Master Agreement, dated October 29, 2007, between Texas Competitive Electric Holdings Company LLC and Credit Suisse International. |
| 10(vvv) | 1-12833<br>Form 10-K (2007)<br>(filed March 31, 2008) | 10(www) | — | Schedule to the ISDA Master Agreement, dated October 29, 2007, between Texas Competitive Electric Holdings Company LLC and Credit Suisse International. |
| 10(www) | 1-12833<br>Form 10-K (2007)<br>(filed March 31, 2008) | 10(xxx) | — | Form of Confirmation between Texas Competitive Electric Holdings Company LLC and Credit Suisse International. |
| 10(xxx) | 1-12833<br>Form 10-K (2007)<br>(filed March 31, 2008) | 10(yyy) | — | Management Agreement, dated October 10, 2007, among Energy Future Holdings Corp., Texas Energy Future Holdings Limited Partnership, Kohlberg Kravis Roberts & Co. L.P., TPG Capital, L.P., Goldman, Sachs & Co. and Lehman Brothers Inc. |
| 10(yyy) | 1-12833<br>Form 10-K (2007)<br>(filed March 31, 2008) | 10(cccc) | — | Indemnification Agreement, dated October 10, 2007, among Texas Energy Future Holdings Limited Partnership, Energy Future Holdings Corp., Kohlberg Kravis Roberts & Co., L.P., TPG Capital, L.P. and Goldman, Sachs & Co. |
| 10(zzz) | 1-12833<br>Form 10-Q (Quarter ended September 30, 2008) (filed November 6, 2008) | 10(g) | — | Second Amended and Restated Limited Liability Company Agreement of Oncor Electric Delivery Holdings Company LLC, dated November 5, 2008. |
| 10(aaaa) | 333-100240<br>Form 10-K (2008)<br>(filed March 3, 2009) | 3(c) | — | Amendment No. 1, dated February 18, 2009, to Second Amended and Restated Limited Liability Company Agreement of Oncor Electric Delivery LLC. |
| 10(bbbb) | 333-100240<br>Form 10-Q (Quarter ended September 30, 2008) (filed November 6, 2008) | 4(c) | — | Investor Rights Agreement, dated November 5, 2008, among Oncor Electric Delivery Company LLC, Oncor Electric Delivery Holdings Company LLC, Texas Transmission Investment LLC and Energy Future Holdings Corp. |
| 10(cccc) | 333-100240<br>Form 10-Q (Quarter ended September 30, 2008) (filed November 6, 2008) | 4(d) | — | Registration Rights Agreement, dated November 5, 2008, among Oncor Electric Delivery Company LLC, Oncor Electric Delivery Holdings Company LLC, Texas Transmission Investment LLC and Energy Future Holdings Corp. |
| 10(dddd) | 333-100240<br>Form 10-Q (Quarter ended September 30, 2008) (filed November 6, 2008) | 10(b) | — | Amended and Restated Tax Sharing Agreement, dated November 5, 2008, among Oncor Electric Delivery Company LLC, Oncor Electric Delivery Holdings Company LLC, Oncor Management Investment LLC, Texas Transmission Investment LLC, Energy Future Intermediate Holding Company LLC and Energy Future Holdings Corp. |
| 10(eeee) | 1-12833<br>Form 10-Q (Quarter ended September 30, 2012)<br>(filed October 30, 2012) | 10(b) | — | Federal and State Income Tax Allocation Agreement, effective January 1, 2010, by and among members of the Energy Future Holdings Corp. consolidated group. |
| 10(ffff) | 1-12833<br>Form 8-K<br>(filed December 6, 2012) | 10.1 | — | First Lien Trade Receivables Financing Agreement, dated as of November 30, 2012, among TXU Energy Receivables Company LLC, as Borrower, TXU Energy Retail Company LLC, as Collection Agent, certain Investors, CitiBank, N.A., as the Initial Bank, and CitiBank, N.A., as Administrative Agent and as a Group Managing Agent. |

240

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| Exhibits | Previously Filed* With File Number | As Exhibit | | |
|---|---|---|---|---|
| 10(gggg) | 1-12833<br>Form 8-K<br>(filed December 6, 2012) | 10.2 | — | Trade Receivables Sale Agreement, dated as of November 30, 2012, among TXU Energy Retail Company LLC, as Originator, as Collection Agent and as Originator Agent and TXU Energy Receivables Company LLC, as Buyer, and Energy Future Holdings Corp. |
| **(12)** | **Statement Regarding Computation of Ratios** | | | |
| 12(a) | | | — | Computation of Ratio of Earnings to Fixed Charges. |
| **(21)** | **Subsidiaries of the Registrant** | | | |
| 21(a) | | | — | Subsidiaries of Energy Future Holdings Corp. |
| **(23)** | **Consent of Experts** | | | |
| 23(a) | | | — | Consent of Deloitte & Touche LLP, an independent registered public accounting firm, relating to the consolidated financial statements of Energy Future Holdings Corp. |
| 23(b) | | | — | Consent of Deloitte & Touche LLP, an independent registered public accounting firm, relating to the consolidated financial statements of Oncor Electric Delivery Holdings Company LLC |
| **31** | **Rule 13a - 14(a)/15d-14(a) Certifications** | | | |
| 31(a) | | | — | Certification of John F. Young, principal executive officer of Energy Future Holdings Corp., pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31(b) | | | — | Certification of Paul M. Keglevic, principal financial officer of Energy Future Holdings Corp., pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| **32** | **Section 1350 Certifications** | | | |
| 32(a) | | | — | Certification of John F. Young, principal executive officer of Energy Future Holdings Corp., pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32(b) | | | — | Certification of Paul M. Keglevic, principal financial officer of Energy Future Holdings Corp., pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| **(95)** | **Mine Safety Disclosures** | | | |
| 95(a) | | | — | Mine Safety Disclosures |
| **(99)** | **Additional Exhibits** | | | |
| 99(a) | 33-55408<br>Post-Effective<br>Amendment No. 1 to Form S-3<br>(filed July, 1993) | 99(b) | — | Amended Agreement dated January 30, 1990, between Energy Future Competitive Holdings Company and Tex-La Electric Cooperative of Texas, Inc. |
| 99(b) | | | — | Energy Future Holdings Corp. Consolidated Adjusted EBITDA reconciliation for the years ended December 31, 2012 and 2011. |
| 99(c) | | | — | Texas Competitive Electric Holdings Company LLC Consolidated Adjusted EBITDA reconciliation for the years ended December 31, 2012 and 2011. |
| 99(d) | | | — | Energy Future Intermediate Holding Company LLC Consolidated Adjusted EBITDA reconciliation for the years ended December 31, 2012 and 2011. |

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| Exhibits | Previously Filed* With File Number | As Exhibit | |
|---|---|---|---|
| 99(e) | | — | Oncor Electric Delivery Holdings Company LLC financial statements presented pursuant to Rules 3–09 and 3–16 of Regulation S–X. |
| | **XBRL Data Files** | | |
| 101.INS | | — | XBRL Instance Document |
| 101.SCH | | — | XBRL Taxonomy Extension Schema Document |
| 101.CAL | | — | XBRL Taxonomy Extension Calculation Document |
| 101.DEF | | — | XBRL Taxonomy Extension Definition Document |
| 101.LAB | | — | XBRL Taxonomy Extension Labels Document |
| 101.PRE | | — | XBRL Taxonomy Extension Presentation Document |

---

\*    Incorporated herein by reference

\*\*   Certain instruments defining the rights of holders of long-term debt of the Company's subsidiaries included in the financial statements filed herewith have been omitted because the total amount of securities authorized thereunder does not exceed 10 percent of the total assets of the Company and its subsidiaries on a consolidated basis.   The Company hereby agrees, upon request of the SEC, to furnish a copy of any such omitted instrument.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, Energy Future Holdings Corp. has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

### ENERGY FUTURE HOLDINGS CORP.

Date:             February 19, 2013    By    /s/ JOHN F. YOUNG

(John F. Young, President and Chief Executive Officer)

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of Energy Future Holdings Corp. and in the capacities and on the date indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ JOHN F. YOUNG<br>(John F. Young, President and Chief Executive Officer) | Principal Executive Officer and Director | February 19, 2013 |
| /s/ PAUL M. KEGLEVIC<br>(Paul M. Keglevic, Executive Vice President and Chief Financial Officer) | Principal Financial Officer | February 19, 2013 |
| /s/ STANLEY J. SZLAUDERBACH<br>(Stanley J. Szlauderbach, Senior Vice President and Controller) | Principal Accounting Officer | February 19, 2013 |
| /s/ DONALD L. EVANS<br>(Donald L. Evans, Chairman of the Board) | Director | February 19, 2013 |
| /s/ ARCILIA C. ACOSTA<br>(Arcilia C. Acosta) | Director | February 19, 2013 |
| /s/ DAVID BONDERMAN<br>(David Bonderman) | Director | February 19, 2013 |
| /s/ THOMAS D. FERGUSON<br>(Thomas D. Ferguson) | Director | February 19, 2013 |
| /s/ BRANDON A. FREIMAN<br>(Brandon A. Freiman) | Director | February 19, 2013 |
| /s/ SCOTT LEBOVITZ<br>(Scott Lebovitz) | Director | February 19, 2013 |
| /s/ MARC S LIPSCHULTZ<br>(Marc S. Lipschultz) | Director | February 19, 2013 |
| /s/ MICHAEL MACDOUGALL<br>(Michael MacDougall) | Director | February 19, 2013 |
| /s/ KENNETH PONTARELLI<br>(Kenneth Pontarelli) | Director | February 19, 2013 |
| /s/ WILLIAM K. REILLY<br>(William K. Reilly) | Director | February 19, 2013 |
| /s/ JONATHAN D. SMIDT<br>(Jonathan D. Smidt) | Director | February 19, 2013 |
| /s/ KNEELAND YOUNGBLOOD<br>(Kneeland Youngblood) | Director | February 19, 2013 |

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Exhibit 4(uuu)

### THIRD SUPPLEMENTAL INDENTURE

Third Supplemental Indenture (this "Third Supplemental Indenture"), dated as of January 30, 2013, among Energy Future Intermediate Holding Company LLC, a Delaware limited liability company ("EFIH"), and EFIH Finance Inc., a Delaware corporation ("EFIH Finance" and, together with EFIH, the "Issuer"), and The Bank of New York Mellon Trust Company, N.A., as trustee (the "Trustee").

### W I T N E S S E T H

WHEREAS, the Issuer has heretofore executed and delivered to the Trustee an Indenture, dated as of December 5, 2012 (the " Base Indenture"), providing for the issuance of $1,144,770,000 aggregate principal amount of 11.25%/12.25% Senior Toggle Notes due 2018 (the "Initial Toggle Notes"), a First Supplemental Indenture, dated as of December 19, 2012 (the " First Supplemental Indenture"), providing for the issuance of $159,032,000 aggregate principal amount of 11.25%/12.25% Senior Toggle Notes due 2018 (the " December 2012 Additional Toggle Notes"), and a Second Supplemental Indenture, dated as of January 29, 2013 (the " Second Supplemental Indenture" and, together with the Base Indenture and the First Supplemental Indenture, the " Indenture"), providing for the issuance of $63,930,000 aggregate principal amount of 11.25%/12.25% Senior Toggle Notes due 2018 as Additional Notes (the "January 2013 Additional Toggle Notes" and, together with the Initial Toggle Notes and the December 2012 Additional Toggle Notes, the "Existing Toggle Notes");

WHEREAS, on December 5, 2012, the Issuer issued the Initial Toggle Notes;

WHEREAS, on December 19, 2012, the Issuer issued the December 2012 Additional Toggle Notes;

WHEREAS, on January 29, 2013, the Issuer issued the January 2013 Additional Toggle Notes;

WHEREAS, Section 2.01(d) of the Indenture provides for the issuance from time to time of Additional Notes by the Issuer;

WHEREAS, the Issuer desires to issue $24,713,000 aggregate principal amount of Additional Notes on the date hereof (the " New Toggle Notes"); WHEREAS, pursuant to the terms of the Indenture, the New Toggle Notes shall rank pari passu and be consolidated with, and form a single class with, the Existing Toggle Notes;

WHEREAS, Section 9.01(9) of the Indenture provides that the Issuer, the Guarantors and the Trustee may amend or supplement the Indenture without the consent of any Holder to provide for the issuance of Additional Notes in accordance with the Indenture; provided that such Additional Notes are issued in compliance with the provisions of the Indenture;

WHEREAS, there are no Guarantors under the Indenture as of the date hereof;

WHEREAS, the New Toggle Notes shall be issued in compliance with the Indenture; WHEREAS, all conditions necessary to authorize the execution and delivery of this Third Supplemental Indenture and to make this Third Supplemental Indenture valid and binding have been complied with or have been done or performed; and

WHEREAS, pursuant to Section 9.01 of the Indenture, the Trustee is authorized to execute and deliver this Third Supplemental Indenture and the Trustee has received the request of the Issuer to join with the Issuer in the execution of this Third Supplemental Indenture accompanied by a resolution of its Board of Directors authorizing the execution of this Third Supplemental Indenture and the documents referred to in the Indenture.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties mutually covenant and agree for the equal and ratable benefit of all Persons who are now or hereafter become Holders of the New Toggle Notes as follows:

1. CAPITALIZED TERMS. Capitalized terms used herein without definition shall have the meanings assigned to them in the Indenture.

2. ADDITIONAL NOTES. Pursuant to this Third Supplemental Indenture, the New Toggle Notes are hereby created and established under the Indenture, and shall constitute "Additional Notes" thereunder, and are being issued by the Issuer on the date hereof in an aggregate principal amount of $24,713,000, which shall increase the aggregate principal amount of, and shall form part of the same series as, the Existing Toggle Notes. The New Toggle Notes issued hereunder shall rank pari passu and be consolidated with and form a single class with the Existing Toggle Notes and shall have the same terms as to status, redemption or otherwise as the Existing Toggle Notes for all purposes under the Indenture, including, among other things, for purposes of waivers, amendments and offers to purchase. Unless the context requires otherwise, references to "Notes" for all purposes under the Indenture, as supplemented by this Third Supplemental Indenture, shall include the New Toggle Notes. The New Toggle Notes shall be issued in global form in minimum denominations of $2,000 and integral multiples of $1,000 in excess thereof in substantially the form of  Exhibit A hereto. The terms and provisions of the New Toggle Notes set forth in Exhibit A hereto shall constitute and are expressly made a part of this Third Supplemental Indenture.

3. MANDATORY EXCHANGE OF REGULATION S GLOBAL NOTES. New Toggle Notes issued in the form of Regulation S Global Notes (collectively, the "Initial Regulation S Global Notes") shall bear the Temporary Regulation S Note CUSIP set forth on Exhibit A hereto until the 40th day after the date hereof. Notwithstanding the provisions of Section 2.06 of the Indenture, on or after such 40 th day, at the option of the Issuer, upon instruction of the Issuer to the Trustee, beneficial interests in the Initial Regulation S Global Notes shall automatically be exchanged for beneficial interests in one or more Regulation S Global Notes bearing the Permanent Regulation S Note CUSIP set forth on Exhibit A hereto in accordance with such procedures as the Depositary shall require. Upon such exchange of beneficial interests pursuant to this Section 3, the Registrar shall reflect on its books and records the date of such exchange 3 and a decrease and increase in the principal amount of the applicable Regulation S Global Notes, equal to the principal amount of beneficial interests exchanged. Following any such exchange pursuant to this Section 3, the Initial Regulation S Global Notes shall be cancelled.

4. MANDATORY REDEMPTION. The provisions of Section 3.08 and paragraph 6 of the Notes shall apply to the New Toggle Notes.

5. NO EXCHANGE OF EXISTING NOTES REQUIRED. The execution of this Third Supplemental Indenture shall not require the exchange of or modification to the certificates representing Notes issued and outstanding prior to the date hereof.

6. GOVERNING LAW. THIS THIRD SUPPLEMENTAL INDENTURE WILL BE GOVERNED BY , AND CONSTRUED IN ACCORDANCE WITH , THE LAWS OF THE STATE OF NEW YORK.

7. RATIFICATION, CONFIRMATION AND PRESERVATION OF INDENTURE. Except as expressly supplemented hereby, the Indenture continues in full force and effect and is in all respects confirmed, ratified and preserved and the provisions thereof shall be applicable to the New Toggle Notes and this Third Supplemental Indenture. Upon the execution and delivery of this Third Supplemental Indenture by the Issuer and the Trustee, this Third Supplemental Indenture shall form a part of the Indenture for all purposes, and the Issuer, each Guarantor, the Trustee and every Holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby. Any and all references to the "Indenture," whether within the Indenture or in any notice, certificate or other instrument or document, shall be deemed to include a reference to this Third Supplemental Indenture (whether or not made), unless the context shall otherwise require.

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

8.  INDENTURE AND THIRD SUPPLEMENTAL INDENTURE CONSTRUED TOGETHER. This Third Supplemental Indenture is an indenture supplemental to the Indenture, and the Indenture and this Third Supplemental Indenture shall henceforth be read and construed together for all purposes.

9.  BENEFITS OF THIRD SUPPLEMENTAL INDENTURE. Nothing in this Third Supplemental Indenture, the Indenture or the Notes, express or implied, shall give to any Person other than the parties hereto and thereto and each Guarantor and their respective successors hereunder and thereunder, any Paying Agent, any Registrar and the Holders, any benefit of any legal or equitable right, remedy or claim under the Indenture, this Third Supplemental Indenture or the Notes.

10. SUCCESSORS. All agreements of the Issuer in this Third Supplemental Indenture shall bind its successors. All agreements of the Trustee in this Third Supplemental Indenture shall bind its successors.

11. THE TRUSTEE. The Trustee shall not be responsible in any manner whatsoever for or in respect of the validity or sufficiency of this Third Supplemental Indenture or the New Toggle Notes or for or in respect of the recitals or statements contained herein or therein, all of which recitals and statements are made solely by the Issuer.

12. COUNTERPARTS. The parties may sign any number of copies of this Third Supplemental Indenture. Each signed copy shall be an original, but all of them together represent the same agreement.

13. EFFECT OF HEADINGS. The Section headings herein are for convenience only and shall not affect the construction hereof.

*[Remainder of Page Left Intentionally Blank]*

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental indenture to be duly executed, all as of the date first above written.

ENERGY FUTURE INTERMEDIATE HOLDING
COMPANY LLC

By: /s/ Anthony R. Horton
Name: Anthony R. Horton
Title: Senior Vice President and Treasurer


EFIH FINANCE INC.

By: /s/ Anthony R. Horton
Name: Anthony R. Horton
Title: Senior Vice President and Treasurer


THE BANK OF NEW YORK MELLON TRUST
COMPANY, N.A., as Trustee

By: /s/ Julie Hoffman Ramos
Name: Julie Hoffman-Ramos
Title: Vice President

[Supplemental Indenture - Private Exchange]

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

EXHIBIT A

*[Insert the Global Note Legend, if applicable pursuant to the provisions of the Indenture* ]

*[Insert the Private Placement Legend, if applicable pursuant to the provisions of the Indenture* ]

*[Insert the Tax Legend, if applicable pursuant to the provisions of the Indenture*]

CUSIP: [ ][1]
ISIN: [ ]

[RULE 144A] [[TEMPORARY] REGULATION S] GLOBAL NOTE

11.25%/12.25% Senior Toggle Notes due 2018

No. [R-1][S-1][TS-1]                           [$ ]

**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC**
**EFIH FINANCE INC.**

promise to pay to [ ] or registered assigns, the principal sum [set forth on the Schedule of Exchanges of Interests in the Global Note attached hereto] [of [ ] United States Dollars ($[ ])] on December 1, 2018.

Interest Payment Dates: June 1 and December 1, commencing on June 1, 2013.

Record Dates: May 15 and November 15

[**SIGNATURE PAGE FOLLOWS**]

---

1    Rule 144A Note CUSIP: 29269Q AG2
      Rule 144A Note ISIN: US29269QAG29
      Permanent Regulation S Note CUSIP: U29197 AF4
      Permanent Regulation S Note ISIN: USU29197AF40
      Temporary Regulation S Note CUSIP: U29197 AH0
      Temporary Regulation S Note ISIN: USU29197AH06 A-2

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

IN WITNESS HEREOF, the Issuer has caused this instrument to be duly executed.

Dated:

ENERGY FUTURE INTERMEDIATE
HOLDING COMPANY LLC

By:
Name:
Title:

EFIH FINANCE INC.

By:
Name:
Title:

This is one of the Notes referred to in the within-mentioned Indenture:

THE BANK OF NEW YORK MELLON
TRUST COMPANY, N.A., as Trustee

By:
Authorized Signatory

Dated:

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

[Back of Note]

This Note is one of a duly authorized series of notes of the Issuer designated as the "11.25%/12.25% Senior Toggle Notes due 2018" (the "Notes"), previously issued in an aggregate principal amount of $1,144,770,000 on December 5, 2012, in an aggregate principal amount of $159,032,000 on December 19, 2012 and in an aggregate principal amount of $63,930,000 on January 29, 2013, for a total aggregate principal amount of $1,367,732,000, and as a result of a further issuance of $24,713,000 aggregate principal amount of Notes on January 30, 2013, now issued in an aggregate principal amount of $1,392,445,000 under the Indenture referred to below.

Capitalized terms used herein shall have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

(1) INTEREST. Energy Future Intermediate Holding Company LLC, a Delaware limited liability company (" EFIH"), and EFIH Finance Inc., a Delaware corporation (collectively, the "Issuer"), promise to pay interest on the principal amount of this Note at a rate  per annum set forth below from December 5, 2012 until maturity and shall pay Additional Interest, if any, payable pursuant to the Registration Rights Agreement referred to below. The Issuer will pay interest (including Additional Interest, if any) semi-annually in arrears on June 1 and December 1 of each year, commencing on June 1, 2013, or if any such day is not a Business Day, on the next succeeding Business Day (each, an " Interest Payment Date") without interest accruing on the amount then so payable from such day that is not a Business Day until such Business Day. Interest on the Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from and including December 5, 2012. The Issuer will pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principal and premium, if any, from time to time on demand at the interest rate on the Notes; it shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest (including Additional Interest, if any)(without regard to any applicable grace periods) from time to time on demand at the interest rate on the Notes. Interest will be computed on the basis of a 360-day year comprised of twelve 30-day months.

Cash Interest on the Notes will accrue at a rate of 11.25%  per annum and be payable in cash. PIK Interest on the Notes will accrue at a rate of 12.25% per annum and be payable (x) with respect to Notes represented by one or more global notes registered in the name of, or held by, The Depository Trust Company ("DTC") or its nominee on the relevant Record Date, by increasing the principal amount of the outstanding global Note by an amount equal to the amount of PIK Interest for the applicable interest period (rounded up to the nearest $1,000) (or, if necessary, pursuant to the requirements of DTC or otherwise, to authenticate new global Notes executed by the Issuer with such increased principal amounts) and (y) with respect to Notes represented by certificated notes, by issuing PIK Notes in certificated form in an aggregate principal amount equal to the amount of PIK Interest for the applicable period (rounded up to the nearest whole dollar), and the Trustee will, at the request of the Issuer, authenticate and deliver such PIK Notes in certificated form for original issuance to the Holders on the relevant Record Date, as shown by the records of the register of Holders. In the event that the Issuer elects to pay Partial PIK Interest for any interest period, each Holder will be entitled to receive Cash Interest   A-4 in respect of 50% of the principal amount of the Notes held by such Holder on the relevant Record Date and PIK Interest in respect of 50% of the principal amount of the Notes held by such Holder on the relevant Record Date. Following an increase in the principal amount of the outstanding global Notes as a result of a PIK Payment, the global Notes will bear interest on such increased principal amount from and after the date of such PIK Payment. Any PIK Notes issued in certificated form will be dated as of the applicable Interest Payment Date and will bear interest from and after such date. All Notes issued pursuant to a PIK Payment will mature on December 1, 2018 and will be governed by, and subject to the terms, provisions and conditions of, the Indenture and shall have the same rights and benefits as the Notes issued on the Issue Date. Any certificated PIK Notes will be issued with the description PIK on the face of such PIK Note.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

(2) *METHOD OF PAYMENT*. For any interest payment period ending prior to June 1, 2016, the Issuer may, at its option elect to pay interest on the Notes:

(i) entirely in cash ("Cash Interest");

(ii) entirely by increasing the principal amount of the outstanding Notes or by issuing PIK Notes (" PIK Interest"); or

(iii) on 50% of the outstanding principal amount of the Notes in cash and on 50% of the outstanding principal amount by increasing the principal amount of the outstanding Notes or by issuing PIK Notes ("Partial PIK Interest").

The Issuer must elect the form of interest payment with respect to each interest period by delivering a notice to the Trustee prior to the beginning of such interest period; provided that the interest payment with respect to the first interest period shall be payable entirely in PIK Interest, and the Issuer shall not be required to deliver a notice to the Trustee with respect to the election for such first interest period. The Trustee shall promptly deliver a corresponding notice to the Holder of this Note. In the absence of such an election for any interest period, interest on this Note shall be payable according to the election for the previous interest period. Beginning with the June 1, 2016 Interest Payment Date, the Issuer will make all interest payments on this Note entirely in cash. Notwithstanding anything to the contrary, the payment of accrued interest in connection with any redemption of Notes as described under Sections 3.07, 4.10 and 4.14 of the Indenture shall be made solely in cash.

The Issuer will pay Cash Interest on the Notes (including Additional Interest, if any) to the Persons who are registered Holders of Notes at the close of business on the May 15 or November 15 (whether or not a Business Day), as the case may be, next preceding the Interest Payment Date, even if such Notes are canceled after such Record Date and on or before such Interest Payment Date, except as provided in Section 2.12 of the Indenture with respect to defaulted interest. Payment of Cash Interest (including Additional Interest, if any) may be made by check mailed to the Holders at their addresses set forth in the register of Holders; provided that payment by wire transfer of immediately available funds will be required with respect to principal of, and premium, if any, and interest (including Additional Interest, if any) on, all Global Notes and all other Notes the Holders of which shall have provided wire transfer instructions to the Issuer or the Paying Agent. Such payment shall be in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts.

(3) *PAYING AGENT AND REGISTRAR*. Initially, The Bank of New York Mellon Trust Company, N.A., the Trustee under the Indenture, will act as Paying Agent and Registrar. The Issuer may change any Paying Agent or Registrar without notice to the Holders. The Issuer or any of its Subsidiaries may act in any such capacity.

(4) *INDENTURE*. The Issuer issued the Notes under an Indenture, dated as of December 5, 2012, as supplemented by a First Supplemental Indenture, dated as of December 19, 2012, a Second Supplemental Indenture, dated as of January 29, 2013, and a Third Supplemental Indenture, dated as of January 30, 2013, each between the Issuer and the Trustee (as so supplemented, the " Indenture"). This Note is one of a duly authorized issue of notes of the Issuer designated as its 11.25%/12.25% Senior Toggle Notes due 2018 (the " Notes"). The Issuer shall be entitled to issue Additional Notes pursuant to Sections 2.01, 4.09 and 4.12 of the Indenture. The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939, as amended. The Notes are subject to all such terms, and Holders are referred to the Indenture and such Act for a statement of such terms. To the extent any provision of this Note conflicts with the express provisions of the Indenture, the provisions of the Indenture shall govern and be controlling.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

(5) *OPTIONAL REDEMPTION*.

(a) Except as set forth below, the Issuer will not be entitled to redeem Notes at its option prior to December 1, 2014.

(b) At any time prior to December 1, 2014, the Issuer may redeem the Notes, in whole or in part, upon not less than 30 nor more than 60 days' prior notice mailed by first class mail to the registered address of each Holder of Notes or otherwise delivered in accordance with procedures of DTC, at a redemption price equal to 100% of the principal amount of the Notes redeemed  plus the Applicable Premium,  plus accrued and unpaid interest (including Additional Interest, if any) to the applicable date of redemption (the " Redemption Date"), subject to the right of Holders of Notes of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date.

(c) From and after December 1, 2014, the Issuer may redeem the Notes, in whole or in part, upon not less than 30 nor more than 60 days' prior notice mailed by first class mail to the registered address of each Holder of Notes, or otherwise delivered in accordance with the procedures of DTC, at the redemption prices (expressed as percentages of principal amount of the Notes to be redeemed) set forth below, plus accrued and unpaid interest (including Additional Interest, if any) to the applicable Redemption Date, subject to the right of Holders of Notes of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date, if redeemed during the twelve-month period beginning on December 1 of each of the years indicated below:

| Year | Percentage |
|------|------------|
| 2014 | 105.6250% |
| 2015 | 105.6250% |
| 2016 and thereafter | 102.8125% |

(d) Prior to December 1, 2014, the Issuer may, at its option, on one or more occasions, redeem up to 35% of the aggregate principal amount of all Notes at a redemption price equal to 111.25% of the aggregate principal amount thereof, plus accrued and unpaid interest (including Additional Interest, if any) to the Redemption Date, subject to the right of Holders of Notes of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date, with the net cash proceeds of one or more Equity Offerings;  provided that at least 50% of the sum of the original aggregate principal amount of Initial Notes and any Additional Notes issued under the Indenture after the Issue Date remains outstanding immediately after the occurrence of each such redemption;  provided further that each such redemption occurs within 90 days of the date of closing of each such Equity Offering. Notice of any redemption upon any Equity Offerings may be given prior to the redemption thereof, and any such redemption or notice may, at the Issuer's discretion, be subject to one or more conditions precedent, including, but not limited to, completion of the related Equity Offering.

(e) If the Issuer redeems less than all of the outstanding Notes, the Trustee shall select the Notes to be redeemed in the manner described under Section 3.02 of the Indenture.

(f) Any redemption pursuant to this paragraph 5 shall be made pursuant to the provisions of Sections 3.01 through 3.06 of the Indenture.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(6) *MANDATORY REDEMPTION*. Except as set forth below, the Issuer shall not be required to make mandatory redemption or sinking fund payments with respect to the Notes.

If the Notes would otherwise constitute "applicable high yield discount obligations" within the meaning of Section 163(i)(1) of the Code, at the end of each "accrual period" (as defined in Section 1272(a)(5) of the Code) ending after the fifth anniversary of the Issue Date (each, an " AHYDO Redemption Date"), the Issuer will be required to redeem for cash a portion of the then outstanding Notes equal to the "Mandatory Principal Redemption Amount" (each such redemption, a "Mandatory Principal Redemption"). The redemption price for the portion of the Notes redeemed pursuant to any Mandatory Principal Redemption will be 100% of the aggregate principal amount of such portion of the Notes to be redeemed plus any accrued interest thereon (including Additional Interest, if any) on the date of the redemption. " Mandatory Principal Redemption Amount" means, as of each AHYDO Redemption Date, the portion of the Notes required to be redeemed at such date to prevent the Notes from being treated as "applicable high yield discount obligations" within the meaning of Section 163(i)(1) of the Code. No partial redemption or repurchase of the Notes prior to any AHYDO Redemption Date pursuant to any other provision of the Indenture will alter the Issuer's obligation to make any Mandatory Principal Redemption with respect to the Notes that remain outstanding on such AHYDO Redemption Date.

(7) *NOTICE OF REDEMPTION*. Subject to Section 3.03 of the Indenture, notice of redemption will be mailed by first-class mail at least 30 days but not more than 60 days before the Redemption Date (except that redemption notices may be mailed or delivered more than 60 days prior to a Redemption Date if the notice is issued in connection with Article 8 or Article 11 of the Indenture) to each Holder whose Notes are to be redeemed at its registered address or otherwise delivered in accordance with the procedures of DTC. Notes in denominations larger than $2,000 may be redeemed in part but only in whole multiples of $1,000 A-10 in excess thereof, unless all of the Notes held by a Holder are to be redeemed. On and after the Redemption Date interest ceases to accrue on Notes or portions thereof called for redemption.

(8) *OFFERS TO REPURCHASE*.

(a) If a Change of Control or EFIH/EFH Merger occurs, the Issuer shall make an offer (in the case of a Change of Control, a " Change of Control Offer"; and, in the case of an EFIH/EFH Merger, an "EFIH/EFH Merger Offer") to each Holder to purchase all or any part (equal to $2,000 or an integral multiple of $1,000 in excess thereof) of each Holder's Notes at a purchase price equal to 101% of the aggregate principal amount thereof plus accrued and unpaid interest (including Additional Interest, if any) to the date of purchase (in the case of a Change of Control, the "Change of Control Payment"; and, in the case of an EFIH/EFH Merger, the "EFIH/EFH Merger Payment"), subject to the right of Holders of Notes of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date. The Change of Control Offer or EFIH/EFH Merger Offer, as applicable, shall be made in accordance with Section 4.14 of the Indenture.

(b) If EFIH or any of its Restricted Subsidiaries consummates an Asset Sale (other an Asset Sale of Collateral or Other Oncor Assets), within 10 Business Days of each date that the aggregate amount of Excess Proceeds exceeds $200.0 million, EFIH shall make an offer to all Holders of the Notes, and if required or permitted by the terms of any Senior Indebtedness, to the holders of such Senior Indebtedness (an " Asset Sale Offer"), to purchase the maximum aggregate principal amount of the Notes and such Senior Indebtedness that is a minimum of $2,000 or an integral multiple of $1,000 in excess thereof that may be purchased out of the Excess Proceeds at an offer price in cash in an amount equal to 100% of the principal amount thereof, plus accrued and unpaid interest (including Additional Interest, if any) to the date fixed for the closing of such offer, in accordance with the procedures set forth in the Indenture. To the extent that the aggregate amount of Notes, and such Senior Indebtedness tendered pursuant to an Asset Sale Offer is less than the Excess Proceeds, EFIH may use any remaining Excess Proceeds for general corporate purposes, subject to other covenants contained in the Indenture. If the aggregate principal amount of Notes or such Senior Indebtedness surrendered by such holders thereof exceeds the amount of Excess Proceeds, the Notes and such Senior Indebtedness will be purchased on a  pro rata basis based on the accreted value or principal amount of the Notes or such Senior Indebtedness tendered.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(c) EFIH may, at its option, make an Asset Sale Offer using proceeds from any Asset Sale at any time after consummation of such Asset Sale (other than an Asset Sale of Collateral or other Oncor-related Assets); provided that such Asset Sale Offer shall be in an aggregate amount of not less than $25.0 million. Upon consummation of such Asset Sale Offer, any Net Proceeds not required to be used to purchase Notes shall not be deemed Excess Proceeds.

(d) If EFIH or any of its Restricted Subsidiaries consummates an Asset Sale of Collateral or other Oncor-related Assets and a Collateral Asset Sales Offer, or sequential Collateral Asset Sales Offers to holders of Senior Lien Debt and Junior Lien Debt, EFIH or any Restricted Subsidiary shall make an offer to all Holders of the Notes and, if required or permitted by the terms of any of any other unsecured Senior Indebtedness of EFIH, to the holders of such other unsecured Senior Indebtedness (a " Collateral Asset Sale Excess Proceeds Offer ") to A-10 purchase the maximum aggregate principal amount of such unsecured Senior Indebtedness that is a minimum of $2,000 or an integral multiple of $1,000 in excess thereof that may be purchased out of the Collateral Offer Excess Proceeds at an offer price in cash in an amount equal to 100% of the principal amount thereof, plus accrued and unpaid interest (including Additional Interest, if any) to the date fixed for the closing of such offer, in accordance with the terms and procedures set forth in this Indenture and the other applicable indentures or agreements.

(e) The Issuer (and, if applicable, EFH Corp.) may, at its option, make a Collateral Asset Sale Excess Proceeds Offer using proceeds from any Asset Sale of Collateral or other Oncor-related Assets at any time after consummation of such Asset Sale of Collateral; provided that such Collateral Asset Sale Excess Proceeds Offer shall be in an aggregate amount of not less than $25.0 million. Upon consummation of such Collateral Asset Sale Excess Proceeds Offer, any Net Proceeds not required to be used to purchase the Notes and such unsecured Senior Indebtedness shall not be deemed Collateral Offer Excess Proceeds and EFIH and its Restricted Subsidiaries may use any remaining Net Proceeds for general corporate purposes, subject to the other covenants contained in this Indenture.

(9) DENOMINATIONS, TRANSFER, EXCHANGE. The Notes are in registered form without coupons in denominations of $2,000 and integral multiples of $1,000 in excess thereof. The transfer of Notes may be registered and Notes may be exchanged as provided in the Indenture. The Registrar and the Trustee may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and the Issuer may require a Holder to pay any taxes and fees required by law or permitted by the Indenture. The Issuer need not exchange or register the transfer of any Notes or portion of Notes selected for redemption, except for the unredeemed portion of any Notes being redeemed in part. Also, the Issuer need not exchange or register the transfer of any Notes for a period of 15 days before a selection of Notes to be redeemed.

(10) PERSONS DEEMED OWNERS. The registered Holder of a Note may be treated as its owner for all purposes.

(11) AMENDMENT, SUPPLEMENT AND WAIVER. The Indenture, the Guarantees or the Notes may be amended or supplemented as provided in the Indenture.

(12) DEFAULTS AND REMEDIES. The Events of Default relating to the Notes are defined in Section 6.01 of the Indenture. If any Event of Default occurs and is continuing, the Trustee or the Required Holders of at least 30% in aggregate principal amount of the then outstanding Required Debt may declare the principal of and premium, if any, interest (including Additional Interest, if any) and any other monetary obligations on all the then outstanding Notes to be due and payable immediately. Notwithstanding the foregoing, in the case of an Event of Default arising from certain events of bankruptcy or insolvency, all principal of, and premium, if any, interest (including Additional Interest, if any) and any other monetary obligations on, all the then outstanding Notes will become due and payable immediately without further action or notice. Holders may not enforce the Indenture, the Notes or the Guarantees except as provided in the Indenture. Subject to certain limitations, Required Holders of a majority in aggregate principal amount of the then outstanding Required Debt may direct the Trustee in its exercise of any trust or power. The Trustee may withhold from Holders of the Notes notice of any continuing Default (except a Default relating to the payment of principal, premium, if any, or interest (including Additional Interest, if any)) if it determines that withholding notice is in their interest. The Required Holders of a majority in aggregate principal amount of the then outstanding Required Debt by notice to the Trustee may on behalf of the Required Holders of all of the Required Debt waive any existing Default or and its consequences under the Indenture except a continuing Default in payment of the principal of, or

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

premium, if any, or interest (including Additional Interest, if any) on, any of the Notes held by a non-consenting Holder. EFIH is required to deliver to the Trustee annually a statement regarding compliance with the Indenture, and EFIH is required within five Business Days after becoming aware of any Default, to deliver to the Trustee a statement specifying such Default and what action EFIH proposes to take with respect thereto.

(13) *AUTHENTICATION.* This Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose until authenticated by the manual signature of the Trustee.

(14) *ADDITIONAL RIGHTS OF HOLDERS OF RESTRICTED GLOBAL NOTES AND RESTRICTED DEFINITIVE NOTES.* In addition to the rights provided to Holders of Notes under the Indenture, Holders of Restricted Global Notes and Restricted Definitive Notes shall have all the rights set forth in the Registration Rights Agreement, dated as of December 5, 2012, among the Issuer and the other parties named on the signature pages thereof (the "Registration Rights Agreement"), including the right to receive Additional Interest, if any (as defined in the Registration Rights Agreement).

(15) *GOVERNING LAW.* THE INDENTURE, THE NOTES AND THE GUARANTEES WILL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

(16) *CUSIP/ISIN NUMBERS.* Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Issuer has caused CUSIP/ISIN numbers to be printed on the Notes and the Trustee may use CUSIP/ISIN numbers in notices of redemption as a convenience to Holders. No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

The Issuer will furnish to any Holder upon written request and without charge a copy of the Indenture and/or the Registration Rights Agreement. Requests may be made to the Issuer at the following address:

Energy Future Intermediate Holding Company LLC
Energy Plaza
1601 Bryan Street
Dallas, Texas 75201-3411
Facsimile No.: (214) 812-6032
Attention: General Counsel
and
Facsimile No.: (214) 812-4097
Attention: Treasurer

and

EFIH Finance Inc.
Energy Plaza
1601 Bryan Street
Dallas, Texas 75201-3411
Facsimile No.: (214) 812-6032
Attention: General Counsel
or
Facsimile No.: (214) 812-4097
Attention: Treasurer

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**ASSIGNMENT FORM**

To assign this Note, fill in the form below:

(I) or (we) assign and transfer this Note to:_____
(Insert assignee's legal name)

_____
Insert assignee's Soc. Sec. or tax I.D. no.)

_____

_____

_____

_____
(Print or type assignee's name, address and zip code)

and irrevocably appoint _____
to transfer this Note on the books of the Issuer.  The agent may substitute another to act for him.

Date:_____

Your Signature_____
(Sign exactly as your name appears on the face of this Note)

Signature Guarantee*_____

_____

*    Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee)

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**OPTION OF HOLDER TO ELECT PURCHASE**

If you want to elect to have this Note purchased by the Issuer pursuant to Section 4.10(d), 4.10(f) or 4.14 of the Indenture, check the appropriate box below:

☐   Section 4.10(d)    ☐   Section 4.10(f)    ☐   Section 4.14

If you want to elect to have only part of this Note purchased by the Issuer pursuant to Section 4.10(d), 4.10(f) or Section 4.14 of the Indenture, state the amount you elect to have purchased:

$_____

Date:_____

Your Signature_____
(Sign exactly as your name appears on the face of this Note)

Tax Identification No.:_____

Signature Guarantee *_____

_____

*    Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee)

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**SCHEDULE OF EXCHANGES OF INTERESTS IN THE GLOBAL NOTE**

The initial outstanding principal amount of this Global Note is $[ ]. The following exchanges of a part of this Global Note for an interest in another Global Note or for a Definitive Note, or exchanges of a part of another Global or Definitive Note for an interest in this Global Note, have been made:

| Date of Exchange | Amount of decrease in Principal Amount | Amount of increase in Principal Amount of this Global Note | Principal Amount of this Global Note following each decrease or increase | Signature of authorized officer of Trustee or Custodian |
| --- | --- | --- | --- | --- |

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Exhibit 10(dd)

## AMENDED AND RESTATED EMPLOYMENT AGREEMENT

by and between ENERGY FUTURE HOLDINGS CORP. (the "**Company**") and JOHN YOUNG ("**Executive**") (individually, each a "**Party**" and collectively, the "**Parties**").

## WITNESSETH

**WHEREAS**, the Parties previously entered into an employment agreement dated January 6, 2008 and effective January 31, 2008 ("**Original Effective Date**") and most recently amended and restated effective July 1, 2011; and

**WHEREAS**, the Parties desire to amend and restate the employment agreement, in each case on the terms and conditions set forth herein.

**NOW, THEREFORE**, in consideration of the mutual promises, covenants and obligations contained herein, the Company and Executive agree as follows:

1.      **Term of Employment**. Subject to the provisions of Section 7 of this Agreement, this Agreement, as restated, and Executive's employment hereunder shall be effective as of December 26, 2012 (" **Effective Date**") and shall end as of 11:59:59 P.M. on June 30, 2015 (the "**Initial Term**"). Subject to the provisions of Section 7 of this Agreement, this Agreement shall automatically renew for an additional one (1) year period commencing immediately following the last day of the Initial Term and each one (1) year period thereafter (each, a "**Renewal Term**"), unless, the Company or Executive provides the other Party written notice of non-renewal at least sixty (60) days prior to the end of the applicable term. The period during which Executive is employed by the Company hereunder is hereinafter referred to as the "**Employment Term**."

2.      **Position and Duties**.

(a)      During the Employment Term, Executive shall serve as Chief Executive Officer ("CEO") of the Company. Executive shall also serve as a member of the board of directors of the Company (as used herein, the term " **Board**" shall mean the board of directors of the Company or a committee designated by such board), without additional compensation.  In such position, Executive shall have such duties, authority and responsibilities as shall be determined from time to time by the Board, which duties, authority and responsibilities shall be customary for Executive's position in a business of similar size, type and nature to that of the Company. Executive shall be the senior most executive officer of the Company and shall report to the Board with respect to his responsibilities to the Company.

(b)      During the Employment Term, Executive will devote Executive's full business time and best efforts to performance of the duties described in Section 2(a) and will not engage in any other business, profession or occupation for compensation or otherwise which would conflict or interfere, directly or indirectly, with performance of Executive's duties; provided, however, that nothing herein shall preclude Executive from participating in civic and charitable activities and boards and from serving on the outside board of directors of one other company and, subject to the prior approval of the Board which approval shall not be unreasonably withheld, from accepting appointment to or continuing to serve on such additional boards of directors or trustees of any other business or corporation; provided, further, that, in each case, such activities do not conflict or interfere with the performance of Executive's duties hereunder or conflict with Section 8.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

3.    **Base Salary**. From the Effective Date and during the remainder of the Employment Term, the Company shall pay Executive a base salary of $1,350,000 annually, payable in regular installments in accordance with the Company's usual payment practices. Executive may be entitled to increases in his base salary in the sole discretion of the Board, which shall make such determinations following its annual review process for executives. Executive's annual base salary, as in effect from time to time, is hereinafter referred to as the "*Base Salary*."

4.    **Annual Bonus**. Beginning January 1, 2013 and with respect to each fiscal year during the remainder of the Employment Term, Executive shall have the opportunity to earn an annual bonus award (the "*Annual Bonus*") pursuant to the terms and conditions of the EFH Executive Annual Incentive Plan ("*AIP*") of 125% of Base Salary ("*Target Award*"). The amount of the Annual Bonus shall be based upon the achievement of annual business performance targets and Executive's individual performance, both as approved by the Board; provided, however, if the Company and/or Executive achieve superior performance targets as established by the Board, then Executive shall be eligible to receive a bonus award constituting 200% of his Target Award. Each Annual Bonus, if any, shall be paid to Executive within two and one-half (2½) months after the end of the applicable fiscal year.

5.    **Employee Benefits; Perquisites; Fringe Benefits**.

(a)    <u>Welfare, Savings and Retirement Benefits</u>. During the Employment Term, Executive shall be entitled to participate in the Company's group health, life, disability, and all tax qualified and nonqualified benefit plans, as in effect from time to time (collectively "***Employee Benefits***"), on a basis which is no less favorable than is offered to other members of the Strategy and Policy Committee, to the extent consistent with applicable law and the terms of the applicable plans.

(b)    <u>Fringe Benefits; Perquisites</u>. During the Employment Term, Executive shall be entitled to fringe benefits and perquisites consistent with the practices of the Company (including, without limitation, the Company's payment on behalf of Executive of monthly dues of a country club selected by Executive) to the extent the Company provides similar benefits or perquisites (or both) to other members of the Strategy and Policy Committee and Executive is otherwise eligible to participate.

(c)    At the beginning of each calendar year during the Employment Term, Executive shall be entitled to the greater of: five (5) weeks of paid vacation, or the maximum number of days Executive is entitled to under the Company's vacation or paid time off policy, as applicable. Executive shall be entitled to carry over up to five (5) days of unused vacation from one calendar year to the next; provided that, any carryover vacation days not used in the next calendar year shall be forfeited. Executive shall also be entitled to paid sick leave benefits in accordance with those provided to other similarly situated executives during the Employment Term.

(d)    Executive shall be entitled to the additional benefits and compensation set forth in Exhibits I and II attached hereto, subject to the terms and conditions thereof.

6.    **Business Expenses**. Subject to the Company's standard policies and procedures with respect to expense reimbursement, the Company shall reimburse Executive for, or pay on behalf of Executive, reasonable and appropriate expenses incurred by Executive for business related purposes, provided claims for reimbursement are submitted timely and with appropriate supporting documentation.

7.    **Termination**. Executive's employment hereunder may be terminated by either the Company or Executive at any time and for any reason; provided that, unless otherwise provided herein, either Party

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

will be required to give the other Party at least sixty (60) days advance written notice of termination of Executive's employment. Notwithstanding the foregoing, the Company may, in lieu of providing sixty (60) days advance written notice of termination, immediately terminate Executive's employment for Cause; provided, that, the Company provides Executive with the compensation and benefits then in effect at the time of such termination to which Executive would have been entitled had he continued employment with the Company for such sixty (60) day period. The provisions of this Section 7 shall exclusively govern Executive's rights upon termination of employment with the Company and its Affiliates (as defined in Section 8(c) below).

(a)    <u>By the Company for Cause or by Executive Due to Voluntary Resignation without Good Reason</u>.

(i)    Executive's employment may be terminated by the Company for Cause (as defined below) or by Executive's voluntary resignation without Good Reason (as defined below) and, in either case, Executive shall be entitled to receive:

(A)    within six (6) calendar days following the date of termination, accrued, but unpaid Base Salary and unused vacation, earned through the date of termination;

(B)    in accordance with Section 4 (except to the extent payment is otherwise deferred pursuant to any applicable deferred compensation arrangement with the Company), any accrued but unpaid Annual Bonus earned for any previously completed fiscal year;

(C)    within sixty (60) days of Executive's claim for reimbursement, payment for any unreimbursed business expenses properly incurred by Executive in accordance with the Company's policies prior to the date of Executive's termination; provided that claims for reimbursement are accompanied by appropriate supporting documentation and are submitted to the Company within ninety (90) days following the date of Executive's termination of employment;

(D)    Employee Benefits and equity compensation, if any, as to which Executive may be entitled under the employee benefit plans of the Company and its Affiliates or any agreement between the Company (and/or its Affiliates) and Executive; and

(E)    any amounts payable or that may become payable pursuant to Section 7(g) and/or Section 9(g) (the amounts described in clauses (A) through (E) hereof being referred to as the "***Accrued Rights***").

Following termination of Executive's employment by the Company for Cause or voluntary resignation by Executive without Good Reason, except as set forth in this Section 7(a)(i) and for any rights to indemnification and claims for liability insurance coverage under officer and director policies, Executive shall have no further rights to any compensation or any other benefits under this Agreement.

(ii)    For purposes of this Agreement, the terms:

(A)    ***"Cause"*** shall mean (i) if, in carrying out his duties to the Company, Executive engages in conduct that constitutes (a) a material breach of his fiduciary duty to the Company or its shareholders (including, without limitation, a material breach or attempted breach of the provisions under Section 8), (b) gross neglect, or (c) gross misconduct resulting in material economic harm to the Company; provided that any such conduct described in (a), (b) or (c) is not cured within ten (10) business days after

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Executive receives from the Company written notice thereof; or (ii) Executive's conviction of, or entry of a plea of guilty or nolo contendere for, a felony or other crime involving moral turpitude.

(B)    ***"Good Reason"*** shall mean, provided that Executive has not previously given the Company his written consent, (i) a reduction in Executive's Base Salary or Executive's annual incentive compensation opportunity (other than a general reduction in base salary or annual incentive compensation opportunities that affects all salaried employees of the Company proportionately); (ii) a transfer of Executive's primary workplace by more than fifty (50) miles from the workplace on the Effective Date; (iii) a substantial adverse change in Executive's title, duties or responsibilities; (iv) any material breach of this Agreement; or (v) an adverse change in Executive's reporting responsibilities pursuant to the terms of this Agreement; provided, however, that any isolated, insubstantial and inadvertent failure by the Company that is not in bad faith and is cured within ten (10) business days after Executive gives the Company written notice of any such event set forth above, shall not constitute Good Reason.

(b)    <u>Disability or Death</u>.

(i)    Executive's employment shall terminate upon Executive's death and may be terminated by the Company if Executive has a Disability (as defined below) and, in either case, Executive or Executive's estate (as the case may be) shall be entitled to receive:

(A)    the Accrued Rights;

(B)    a portion of the Target Award that Executive would have been entitled to receive pursuant to Section 4 hereof for the fiscal year of termination, such portion to be determined by multiplying the Target Award by a fraction, the numerator of which is the number of days during which Executive was employed by the Company in the fiscal year of Executive's termination, and the denominator of which is 365 (the "***Pro-Rata Bonus"***), with such Pro-Rata Bonus payable to Executive pursuant to Section 4 as if Executive's employment had not terminated; and

(C)    any additional benefits and compensation set forth in Exhibits I and II attached hereto, subject to the terms and conditions thereof.

Following Executive's termination of employment due to death or Disability, except as set forth in this Section 7(b)(i) and for any rights to indemnification and claims for liability insurance coverage under officer and director policies, Executive shall have no further rights to any compensation or any other benefits under this Agreement.

(ii)    ***"Disability"*** shall mean Executive's physical or mental incapacitation and consequent inability, with reasonable accommodation, for a period of six consecutive months to perform Executive's duties; <u>provided</u>, <u>however</u>, in the event the Company temporarily replaces Executive, or transfers Executive's duties or responsibilities to another individual, on account of Executive's inability to perform such duties due to a mental or physical incapacity which is, or is reasonably expected to become, a long-term disability, then Executive's employment shall not be deemed terminated by the Company and Executive shall not be able to resign with Good Reason. Any question as to the existence of a Disability as to which Executive and the Company cannot agree shall be determined in writing by a qualified independent physician mutually acceptable to Executive and the Company. If Executive and the Company cannot agree on a qualified independent physician, each shall appoint a physician and those two physicians shall select a third who shall make such determination in writing. The determination of Disability made in writing to the Company and

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Executive shall be final and conclusive for all purposes of the Agreement and any other agreement with Executive that incorporates this definition of Disability.

      (c)      <u>By the Company Without Cause; Resignation by Executive for Good Reason</u> . Executive's employment hereunder may be terminated by the Company without Cause (other than by reason of death or Disability) or upon Executive's resignation for Good Reason and, in either case (except as otherwise provided in Section 7(e)), Executive shall be entitled to receive:

      (i)      the Accrued Rights;

      (ii)      provided Executive (x) does not violate the restrictions set forth in Section 8 of this Agreement and (y) executes, delivers and does not revoke a general release of claims against the Company and its Affiliates (excluding claims for indemnification, claims for coverage under officer and director policies, and claims as a stockholder of the Company):

      (A)      a lump sum payment equal to: (I) three (3) times Executive's Base Salary, and (II) the Pro-Rata Bonus, payable as soon as practicable but no later than the earlier of: (a) March 15 following the calendar year in which termination occurs or (b) ninety (90) days following termination; and

      (B)      Executive, his spouse and eligible dependents (to the extent covered immediately prior to such termination) shall continue to be eligible to participate in all of the Company's group health plans on the same terms and conditions as active employees of the Company until the earlier of (x) thirty (30) months from the date of termination of Executive's employment (the "**Severance Period**"), to the extent that Executive was eligible to participate in such plans immediately prior to the date of termination, or (y) until Executive is, or becomes, eligible for comparable coverage (determined on a coverage by coverage and benefit by benefit basis) under the group health plans of a subsequent employer.  If Executive continues to receive benefits pursuant to this Section 7(c)(ii)(B) when, in the absence of the benefits provided in this Section 7(c)(ii)(B), Executive would not be entitled to continuation coverage under Section 4980B of the Internal Revenue Code of 1986, as amended (the " **Code**"), Executive shall receive reimbursement for all medical expenses no later than the end of the calendar year immediately following the calendar year in which the applicable expenses were incurred. The health care continuation coverage period under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("**COBRA**"), Code Section 4980B, or any replacement or successor provision of United States tax law, shall run concurrently with the Severance Period; and

      (iii)      any additional benefits and compensation set forth in Exhibits I and II attached hereto, subject to the terms and conditions thereof.

Following Executive's termination of employment by the Company without Cause (other than by reason of Executive's death or Disability) or upon Executive's resignation for Good Reason, except as set forth in this Section 7(c) or otherwise provided in Section 7(e) and for any rights to indemnification and claims for liability insurance coverage under officer and director policies, Executive shall have no further rights to any compensation or any other benefits under this Agreement.

      (d)      <u>Expiration of Employment Term</u>.

      (i)      In the event Executive elects not to extend the Employment Term pursuant to Section 1 and Executive's employment has not been earlier terminated pursuant to Sections 7(a), (b), (c), or (e), the Employment Term shall expire and Executive's employment hereunder shall terminate as of the end of the day immediately preceding the commencement of a subsequent Renewal Term, and Executive shall

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

be entitled to receive the Accrued Rights.  Except as set forth in this Section 7(d)(i) and for any rights to indemnification and claims for liability insurance coverage under officer and director policies, Executive shall have no further rights to any compensation or any other benefits under this Agreement.

(ii)        In the event the Company elects not to extend the Employment Term pursuant to Section 1 and Executive's employment has not been earlier terminated pursuant to Sections 7(a), (b), (c), or (e), the Employment Term shall expire and Executive's employment hereunder shall terminate as of the end of the day immediately preceding the commencement of a subsequent Renewal Term, and Executive shall be entitled to receive the payments and benefits applicable to a termination of Executive's employment without Cause pursuant to Section 7(c) or Section 7(e), as applicable.  Except as set forth in this Section 7(d)(ii) and for any rights to indemnification and claims for liability insurance coverage under officer and director policies, Executive shall have no further rights to any compensation or any other benefits under this Agreement.

(e)        <u>Change in Control</u>.  Notwithstanding any provision contained herein, if Executive's employment is terminated by the Company without Cause (other than by reason of death or Disability) or if Executive resigns for Good Reason, in either case, within twenty-four (24) months following a Change in Control (as defined in the 2007 Stock Incentive Plan for Key Employees of Energy Future Holdings Corp. and its Affiliates), Executive shall be entitled to receive:

(i)        the Accrued Rights;

(ii)        provided Executive (x) does not violate the restrictions set forth in Section 8 of this Agreement and (y) executes, delivers and does not revoke a general release of claims against the Company and its Affiliates (excluding claims for indemnification, claims for coverage under officer and director policies, and claims as a stockholder of the Company), a lump sum payment equal to three (3) times the sum of Executive's annualized Base Salary and Executive's Target Award, payable as soon as practicable but no later than the earlier of: (i) March 15 following the calendar year in which termination occurs or (ii) ninety (90) days following termination;

(iii)        provided Executive (x) does not violate the restrictions set forth in Section 8 of this Agreement and (y) executes, delivers and does not revoke a general release of claims against the Company and its Affiliates (excluding claims for indemnification, claims for coverage under officer and director policies, and claims as a stockholder of the Company), Executive, his spouse and eligible dependents (to the extent covered immediately prior to such termination) shall continue to be eligible to participate in all of the Company's group health plans on the same terms and conditions as active employees of the Company until the earlier of (A) termination of the Severance Period, to the extent that Executive was eligible to participate in such plans immediately prior to the date of termination, or (B) until Executive is, or becomes, eligible for comparable coverage (determined on a coverage by coverage and benefit by benefit basis) under the group health plans of a subsequent employer.  If Executive continues to receive benefits pursuant to this Section 7(e)(iii) when, in the absence of the benefits provided in this Section 7(e)(iii) Executive would not be entitled to continuation coverage under Code Section 4980B, Executive shall receive reimbursement for all medical expenses no later than the end of the calendar year immediately following the calendar year in which the applicable expenses were incurred. The health care continuation coverage period under COBRA, Code Section 4980B, or any replacement or successor provision of United States tax law, shall run concurrently with the Severance Period; and

(iv)        any additional benefits and compensation set forth in Exhibits I and II attached hereto, subject to the terms and conditions thereof.

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Following Executive's termination of employment without Cause (other than by reason of Executive's death or Disability) or upon Executive's resignation for Good Reason, in either case, within twenty-four (24) months following a Change in Control, except as set forth in this Section 7(e) and for any rights to indemnification and claims for liability insurance coverage under officer and director policies, Executive shall have no further rights to any compensation or any other benefits under this Agreement.

   (f)  <u>Notice of Termination</u>. Any purported termination of employment by the Company or by Executive (other than due to Executive's death) shall be communicated by written Notice of Termination to the other Party in accordance with Section 9(j) hereof. For purposes of this Agreement, a **"*Notice of Termination*"** shall mean a notice indicating the specific termination provision in this Agreement relied upon and shall set forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of employment under the provision so indicated.

   (g)  <u>Code Section 4999</u>.

    (i)  If, by reason of, or in connection with, any transaction that occurs after the Original Effective Date, Executive would be subject to the imposition of the excise tax imposed by Code Section 4999 related to Executive's employment with the Company, whether before or after termination of Executive's employment, but the imposition of such tax could be avoided by approval of shareholders described in Code Section 280G(b)(5)(B), then Executive may ask the Company to seek such approval, in which case the Company will use its reasonable best efforts to cause such approval to be obtained and Executive will cooperate and execute such waivers as may be necessary so that such approval avoids imposition of any excise tax under Code Section 4999.   If Executive fails to request that the Company seek such approval, or if Executive does request that the Company seek such approval, but fails to cooperate and execute such waivers as may be necessary in the approval process, Section 7(g)(ii) shall not apply and Executive shall not be entitled to any gross-up payment for any resulting tax under Code Section 4999. If such approval, even if sought and obtained, would not avoid imposition of the excise tax imposed under Code Section 4999, then the provisions of Section 7(g)(ii) shall apply without any precedent obligation of Executive to seek such approval.

    (ii)  <u>Gross-Up Payment</u>.

     (A)  In the event it shall be determined that any payment, benefit or distribution (or combination thereof) by the Company, any Affiliate, or one or more trusts established by the Company or any Affiliate for the benefit of their employees, to or for the benefit of Executive (whether paid or payable or distributed or distributable pursuant to the terms of this Agreement, or otherwise) (a "***Payment***") is subject to the excise tax imposed by Code Section 4999 or any interest or penalties are incurred by Executive with respect to such excise tax (such excise tax, together with any such interest and penalties, hereinafter collectively referred to as the "***Excise Tax***"), Executive shall be entitled to receive an additional payment (a "***Gross-Up Payment***") in an amount such that after payment by Executive of all taxes (including any interest or penalties imposed with respect to such taxes), including, without limitation, any federal, state and local income taxes and employment taxes (and any interest and penalties imposed with respect thereto) and the Excise Tax imposed upon the Gross-Up Payment, Executive retains an amount of the Gross-Up Payment equal to the Excise Tax imposed upon the Payments.

     (B)  All determinations required to be made under this Section 7(g)(ii), including whether and when a Gross-Up Payment is required and the amount of such Gross-Up Payment and the assumptions to be utilized in arriving at such determination, shall be made by Deloitte & Touche LLP, Alvarez & Marsal, or such other nationally recognized accounting firm as may be designated by the

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Company (the "***Accounting Firm***""), which shall provide detailed supporting calculations both to the Company and Executive within ten (10) business days of the receipt of notice from Executive that there has been a Payment, or such earlier time as is requested by the Company; provided that for purposes of determining the amount of any Gross-Up Payment, Executive shall be deemed to pay federal income tax at the highest marginal rates applicable to individuals in the calendar year in which any such Gross-Up Payment is to be made and deemed to pay state and local income taxes at the highest effective rates applicable to individuals in the state or locality of Executive's residence or place of employment in the calendar year in which any such Gross-Up Payment is to be made, net of the maximum reduction in federal income taxes that can be obtained from deduction of such state and local taxes, taking into account limitations applicable to individuals subject to federal income tax at the highest marginal rates. All fees and expenses of the Accounting Firm shall be borne solely by the Company. Any Gross-Up Payment, as determined pursuant to this Section 7(g)(ii), shall be paid by the Company to Executive (or to the appropriate taxing authority on Executive's behalf) when due. If the Accounting Firm determines that no Excise Tax is payable by Executive, it shall so indicate to Executive in writing. Any determination by the Accounting Firm shall be binding upon the Company and Executive (subject to Section 7(g)(ii)(C)). As a result of the uncertainty in the application of Code Section 4999, it is possible that the amount of the Gross-Up Payment determined by the Accounting Firm to be due to (or on behalf of) Executive was lower than the amount actually due (" ***Underpayment***""). In the event that the Company exhausts its remedies pursuant to Section 7(g)(ii)(C) and Executive thereafter is required to make a payment of any Excise Tax, the Accounting Firm shall determine the amount of the Underpayment that has occurred, and any such Underpayment shall be promptly paid by the Company to or for the benefit of Executive (but in any case no later than the calendar year following the calendar year in which such tax was payable).

        (C)        Executive shall notify the Company in writing of any claim by the Internal Revenue Service that, if successful, would require the payment by the Company of any Gross-Up Payment. Such notification shall be given as soon as practicable but no later than ten (10) business days after Executive is informed in writing of such claim and shall apprise the Company of the nature of such claim and the date on which such claim is requested to be paid. Executive shall not pay such claim prior to the expiration of the thirty (30) day period following the date on which he gives such notice to the Company (or such shorter period ending on the date that any payment of taxes with respect to such claim is due). If the Company notifies Executive in writing prior to the expiration of such period that it desires to contest such claim, Executive shall (i) give the Company any information reasonably requested by the Company relating to such claim, (ii) take such action in connection with contesting such claim as the Company shall reasonably request in writing from time to time, including, without limitation, accepting legal representation with respect to such claim by an attorney reasonably selected by the Company, (iii) cooperate with the Company in good faith in order to effectively contest such claim and (iv) permit the Company to participate in any proceedings relating to such claim; provided, however, that the Company shall bear and pay directly all costs and expenses (including additional interest and penalties) incurred in connection with such contest and shall indemnify and hold Executive harmless, on an after-tax basis, for any Excise Tax or income tax (including interest and penalties with respect thereto) imposed as a result of such representation and payment of costs and expenses. Without limitation on the foregoing provisions of this Section 7(g)(ii)(C), the Company shall control all proceedings taken in connection with such contest and, at its sole option, may pursue or forego any and all administrative appeals, proceedings, hearings and conferences with the taxing authority in respect of such claim and may, at its sole option, either direct Executive to pay the tax claimed and sue for a refund or contest the claim in any permissible manner, and Executive agrees to prosecute such contest to a determination before any administrative tribunal, in a court of initial jurisdiction and in one (1) or more appellate courts, as the Company shall determine; provided that if the Company directs Executive to pay such claim and sue for a refund, the Company shall advance the amount of such payment to Executive, on an interest-free basis, and shall indemnify and hold Executive harmless, on an after-tax basis, from any Excise Tax or income tax (including interest or penalties with respect thereto) imposed with respect to such advance or with respect

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

to any imputed income with respect to such advance; provided, further, that if Executive is required to extend the statute of limitations to enable the Company to contest such claim, Executive may limit this extension solely to such contested amount. The Company's control of the contest shall be limited to issues with respect to which a Gross-Up Payment would be payable hereunder and Executive shall be entitled to settle or contest, as the case may be, any other issue raised by the Internal Revenue Service or any other taxing authority.

(D)    If, after the receipt by Executive of an amount paid or advanced by the Company pursuant to this Section 7(g)(ii), Executive becomes entitled to receive any refund with respect to a Gross-Up Payment, Executive shall (subject to the Company's complying with the requirements of Section 7(g)(ii)(C)) promptly pay to the Company the amount of such refund received (together with any interest paid or credited thereon after taxes applicable thereto). If, after the receipt by Executive of an amount advanced by the Company pursuant to Section 7(g)(ii)(C), a determination is made that Executive shall not be entitled to any refund with respect to such claim, and the Company does not notify Executive in writing of its intent to contest such denial of refund prior to the expiration of thirty (30) days after such determination, then such advance shall be forgiven and shall not be required to be repaid, and the amount of such advance shall offset, to the extent thereof, the amount of the Gross-Up Payment required to be paid.

(E)    For the avoidance of doubt, all payments to or for the benefit of Executive provided for in this Section 7(g)(ii) shall be made no later than the end of the calendar year in which the applicable Excise Tax has become due, or if as a result a tax audit or litigation, it is determined that no additional Excise Tax has become due, the end of the calendar year in which the audit is completed or there is a final and non-appealable settlement or other resolution.

8.    **Restrictive Covenants**.

(a).    In consideration of the Company entering into this Agreement with Executive and hereby promising and committing itself to provide Executive with Confidential Information and/or specialized training after Executive executes this Agreement, Executive shall not, directly or indirectly:

(i).    at any time during or after the Employment Term, disclose any Confidential Information pertaining to the business of the Company, the Sponsor Group, or any of their respective Affiliates, except when required to perform his duties to the Company or one of its Affiliates, or by law or judicial process, provided that Executive gives the Company reasonable notice of any legal or judicial proceeding requiring Executive to disclose Confidential Information and an opportunity to challenge the disclosure of any such information, and Executive agrees to provide such reasonable notice in writing to:

General Counsel
Energy Future Holdings Corp.
1601 Bryan Street, 41st Floor
Dallas, Texas 75201
(214) 812-5153 (facsimile);

(ii).    at any time during the Employment Term and for a period of twenty-four (24) months  thereafter (the "***Non-Compete Period***"), directly or indirectly, act as a proprietor, investor, director, officer, employee, substantial stockholder, consultant, or partner in any Competing Business in Texas or any other geographic area in which Texas Energy Future Holdings Limited Partnership, the Company or any of their respective subsidiaries operates or conducts business; or

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(iii).        at any time during the Employment Term and for a period of twenty-four (24) months  thereafter, directly or indirectly (A) solicit customers or clients of the Company or any of its Affiliates to terminate their relationship with the Company or any of its Affiliates or otherwise solicit such customers or clients to compete with any business of the Company or any of its Affiliates, or (B) solicit or offer employment to any person who is, or has been at any time during the twelve (12) months immediately preceding the termination of Executive's employment, employed by the Company or any of its Affiliates;

provided that in each of (ii) and (iii) above, such restrictions shall not apply with respect to any member of the Sponsor Group or any of its Affiliates that is not engaged in any business that competes, directly or indirectly, with the Company or any of its subsidiaries in any geographic area where they operate. Notwithstanding the foregoing, for the purposes of this Section 8(a), (A) Executive may, directly or indirectly own, solely as an investment, securities of any Person engaged in the business of the Company or its Affiliates that are publicly traded on a national or regional stock exchange or quotation system or on the over-the-counter market if Executive (I) is not a controlling person of, or a member of a group which controls, such Person and (II) does not, directly or indirectly, own 5% or more of any class of securities of such Person, and (B) Section 8(a)(ii) shall not be violated by reason of any exercise of tag-along rights under the Sale Participation Agreement, by and between the Company (and related parties) and Executive (the " *Sale Participation Agreement"*) or Drag Transaction (as defined in the Sale Participation Agreement) that may occur after the date hereof.

(b).        Notwithstanding clause (a) above, if at any time a court holds that the restrictions stated in such clause (a) are unreasonable or otherwise unenforceable under circumstances then existing, the Parties hereto agree that the maximum period, scope or geographic area determined to be reasonable under such circumstances by such court will be substituted for the stated period, scope or area. Because Executive's services are unique and because Executive has had access to Confidential Information, the Parties hereto agree that money damages will be an inadequate remedy for any breach of this Agreement. In the event of a breach or threatened breach of this Agreement, the Company or its successors or assigns may, in addition to other rights and remedies existing in their favor, apply to any court of competent jurisdiction for specific performance and/or injunctive relief in order to enforce, or prevent any violations of, the provisions hereof (without the posting of a bond or other security). Notwithstanding the foregoing, in the event Executive breaches the covenants set forth in this Section 8, the Company's rights and remedies with respect Executive's Options, Option Stock, and Stock and payments related thereto, as those terms are defined in the Management Stockholder's Agreement, by and between the Company (and related parties) and Executive (the "*Management Stockholder's Agreement"* ) shall be limited to those set forth in Section 22(c) of the Management Stockholder's Agreement.

(c).        For purposes of this Agreement, the terms listed below shall be defined as follows:

(i).        *"Affiliate"* shall mean with respect to any Person, any entity directly or indirectly controlling, controlled by or under common control with such Person; provided, however, for purposes of this Agreement, Texas Energy Future Co-Invest, LP shall not be deemed to be an Affiliate of the Sponsor Group or any member of the Sponsor Group.

(ii).        *"Competing Business"* shall mean any business that directly or indirectly competes, at the relevant determination date, with one or more of the businesses of the Company or any of its Affiliates in any geographic area where Texas Energy Future Holdings Limited Partnership, the Company, or any of their respective subsidiaries operates.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(iii).    ***"Confidential Information"*** shall mean information: (A) disclosed to or known by Executive as a consequence of or through his employment with the Company or any Affiliate; (B) not publicly available or not generally known outside the Company or any Affiliate; and (C) that relates to the business and/or development of the Company or any Affiliate. Any information that does not meet each of the criteria listed above (in subsections (A) - (C)) shall not constitute Confidential Information. By way of example, Confidential Information shall include but not be limited to the following: all non-public information or trade secrets of the Company, or any Affiliate that gives the Company or any Affiliate a competitive business advantage or the opportunity of obtaining such advantage, or disclosure of which might be detrimental to the interests of the Company or any Affiliate; information regarding the Company's or any Affiliate's business operations, such as financial and sales data (including budgets, forecasts, and historical financial data), operational information, plans, and strategies; business and marketing strategies and plans for various products and services; rate and regulatory strategy and plans; information regarding suppliers, consultants, employees, and contractors; technical information concerning products, equipment, services, and processes; procurement procedures; pricing and pricing techniques; information concerning past, current and prospective customers, investors, and business affiliates; plans or strategies for expansion or acquisitions; budgets; research; trading methodologies and terms; communications information; evaluations, opinions, and interpretations of information and data; marketing and merchandising techniques; electronic databases; models; specifications; computer programs; contracts; bids or proposals; technologies and methods; training methods and processes; organizational structure; personnel information; payments or rates paid to consultants or other service providers; and the Company's or any Affiliate's files, physical or electronic documents, equipment, and proprietary data or material in whatever form including all copies of all such materials. By way of clarification (but not limitation), information that Executive conceived or developed during his employment with the Company or an Affiliate or learned from other employees or contractors of the Company or an Affiliate that meets the definition of Confidential Information shall be treated as such.

(iv).    ***"Person"*** shall mean "person," as such term is used for purposes of Section 13(d) or 14(d) of the Securities Exchange Act of 1934, as amended (or any successor thereto).

(v).    ***"Restricted Group"*** shall mean, collectively the Company, its subsidiaries, the members of the Sponsor Group and their respective Affiliates.

(vi).    ***"Sponsor Group"*** shall mean Kohlberg Kravis Roberts & Co. L.P., TPG Capital L.P., and Goldman, Sachs & Co.

9.    **Miscellaneous**.

(a).    Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas without regard to conflicts of laws principles thereof.

(b).    Entire Agreement. Except as otherwise provided herein, this Agreement contains the entire understanding of the Parties with respect to the employment of Executive by the Company and/or its Affiliates and supersedes all prior agreements and understandings. There are no restrictions, agreements, promises, warranties, covenants or undertakings between the Parties with respect to the subject matter herein other than those expressly set forth herein.

(c).    No Waiver. The failure of a Party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver of such Party's rights or deprive such Party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(d).     Severability. In the event that any one or more of the provisions of this Agreement shall be or become invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions of this Agreement shall not be affected thereby.

(e).     Assignment. This Agreement, and all of Executive's rights and duties hereunder, shall not be assignable or delegable by Executive. Any purported assignment or delegation by Executive in violation of the foregoing shall be null and void ab initio and of no force and effect. This Agreement may be assigned by the Company to a person or entity which is an Affiliate or a successor in interest to substantially all of the business operations of the Company, provided that the assignee expressly assumes all obligations of the Company under this Agreement and all other related agreements to which Executive and the Company are parties. Upon such assignment, the rights and obligations of the Company hereunder shall become the rights and obligations of such Affiliate or successor person or entity.

(f).     Set Off; Mitigation. Except as otherwise provided in Section 9(o), the obligations of the Company to pay Executive the amounts provided and to make the arrangements provided hereunder shall not be subject to setoff, counterclaim or recoupment of amounts owed by Executive to the Company and/or its Affiliates.  Executive shall not be required to mitigate the amount of any payment provided for pursuant to this Agreement by seeking other employment and, except as expressly provided herein, no amount payable hereunder shall be reduced by any payments or benefits received from such subsequent employment.

(g).     Compliance with Code Section 409A. Notwithstanding anything herein to the contrary, if, at the time of Executive's termination of employment, the Company has securities that are publicly traded on an established securities market, and Executive is a "specified employee" (as defined in Code Section 409A), and the deferral of the commencement of any payments or benefits otherwise payable pursuant to Section 7 is necessary in order to prevent any accelerated or additional tax under Code Section 409A, then, to the extent permitted by Code Section 409A, the Company will defer any such payments or benefits hereunder (without any reduction in the payments or benefits ultimately paid or provided to Executive) until the date that is six (6) months following Executive's termination of employment with the Company (or the earliest date as is permitted under Code Section 409A), provided that amounts which do not exceed the limits set forth in Code Section 402(g)(1)(B) in the year of such termination shall be payable immediately upon termination. Any payments or benefits deferred due to such requirements will be paid in a lump sum to Executive at the end of such six (6) month period.  The Company shall consult with Executive in good faith regarding the implementation of the provisions of this Section 9(g).

(h).     Indemnity. The Company and its subsidiaries shall indemnify and hold Executive harmless for all acts and omissions occurring during his employment or service as a member of the board of directors or managers (as applicable) of any of the Company and/or its subsidiaries, to the maximum extent provided under each of the Company's and such subsidiaries' charter, certificate of formation, limited partnership agreement, by-laws and applicable law. During the Employment Term and for a term of six (6) years thereafter, the Company, or any successor to the Company, the Company's subsidiaries (to the extent not covered under the terms of the Company's insurance policy), and each of their respective successors, shall purchase and maintain, at their own expense, directors' and officers' liability insurance providing coverage for Executive in the same amount as, and with terms no less favorable than, for members of their respective boards of directors or managers (as applicable).

(i).     Successors; Binding Agreement. This Agreement shall inure to the benefit of and be binding upon personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees and legatees. In the event of Executive's death before receiving all amounts and benefits due to him

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

hereunder, such amounts shall be payable to Executive's estate or as otherwise provided under applicable benefit plans or arrangements.

(j).    Notice. For the purpose of this Agreement, notices and all other communications provided for in the Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or overnight courier or three (3) days after it has been mailed by United States registered mail, return receipt requested, postage prepaid, addressed to the respective addresses set forth below in this Agreement, or to such other address as either Party may have furnished to the other in writing in accordance herewith, except that notice of change of address shall be effective only upon receipt.

If to the Company: Energy Future Holdings Corp.
                   1601 Bryan Street, 41st Floor
                   Dallas, Texas 75201-3411
                   Attention: General Counsel

If to Executive: The most recent address on file with the Company

(k).    Executive Representation. Executive hereby represents to the Company that his execution and delivery of this Agreement and performance of his duties hereunder shall not constitute a breach of, or otherwise contravene, the terms of any employment agreement, separation agreement or other agreement or policy to which Executive is a party or otherwise bound.

(l).    Captions; Section References. The captions included herein are for convenience of reference only and shall be ignored in the construction or interpretation hereof. All references to sections of statutes, regulations or rules shall be deemed to be references to any successor sections.

(m).    Further Assurances. The Parties shall, with reasonable diligence, do all things and provide all reasonable assurances as may be required to complete the transactions contemplated by this Agreement, and each Party shall provide such further documents or instruments required by the other Party as may be reasonably necessary or desirable to give effect to this Agreement and carry out its provisions.

(n).    Cooperation. For a period of six (6) years after his termination, Executive shall provide Executive's reasonable cooperation in connection with any action or proceeding (or any appeal from any action or proceeding) which relates to events occurring during Executive's employment hereunder, provided that the Company and its Affiliates shall use reasonable efforts to avoid material interference with Executive's business or personal activities. The Company shall pay all of Executive's reasonable expenses incurred in connection with providing such cooperation.

(o).    Withholding. The Company may withhold from any amounts payable under this Agreement such federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.  In addition, Executive expressly authorizes and agrees that any amounts he owes in relation to any travel or credit cards issued or sponsored by the Company, the energy conservation program, the appliance purchase program, or salary, bonus, vacation or other benefit overpayments, may be offset and deducted from any payments due to Executive pursuant to this Agreement.

(p).    Counterparts. This Agreement may be signed in counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(q).     <u>Amendments</u>. This Agreement may not be altered, modified, or amended except by written instrument signed by the Parties hereto.

(r).     <u>Return of Property</u>. Executive agrees that if Executive's employment with the Company is terminated (for any reason), Executive shall not take with Executive, but will leave with the Company, all computers, cell phones, access cards, computer or electronic storage devices, any other Company property and all Confidential Information, work product, records, files, electronic mail, memoranda, reports, documents and other information that is the property of the Company, in whatever form (including on computer disk or any electronic storage device), and any copies thereof, or if such items are not on the premises of the Company, Executive agrees to return such items immediately upon Executive's termination (regardless of the reason) or any time at the request of the Company. Executive acknowledges that all such items are and remain the property of the Company.

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**IN WITNESS WHEREOF**, the Parties hereto have duly executed this Agreement as of the day and year first above written.

**ENERGY FUTURE HOLDINGS CORP** .

By:   /s/ Donald L. Evans
      Donald L. Evans
      Chairman of the Board of Directors


**EXECUTIVE:**


/s/ John Young
John Young

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit I**

In addition to the benefits, perquisites and compensation set forth in the Agreement, Executive shall be entitled to receive the benefits, perquisites and compensation set forth in this Exhibit I, subject to the terms and conditions set forth herein:

      (a)      Executive shall have the opportunity to earn the retention awards set forth in this Exhibit I, collectively referred to herein as the "***Retention Award***", subject to the terms and conditions set forth herein:

      (i)      Executive shall earn a long-term cash bonus award equal to 100% of the aggregate Annual Bonus amount actually earned by Executive in respect of fiscal years 2009, 2010, and 2011 (the "***First Retention Award***"). The First Retention Award earned by Executive shall be paid to Executive in a lump sum on September 30, 2012; provided, that, subject to the provisions of sub-paragraph (a)(v) of this Exhibit I, Executive is employed by the Company or an Affiliate thereof on September 30, 2012.

      (ii)      Executive shall earn an additional long-term cash bonus award in an amount between $750,000 and $1,500,000 determined by the Company's performance as indicated by the level of EFH Management EBITDA actually achieved for the fiscal year ended December 31, 2011 relative to the EFH Management EBITDA threshold and target amounts set by the Board for such fiscal year (the "***Second Retention Award***"). For the achievement of the threshold level of EFH Management EBITDA in respect of such year, Executive shall earn $750,000, for the achievement of at least the target level of EFH Management EBITDA in respect of such year, Executive shall earn $1,500,000 (the "***Second Retention Target Award***"), and for the achievement of EFH Management EBITDA in between the threshold and target levels in respect of such year, Executive shall earn an amount between $750,000 and $1,500,000 as determined by linear interpolation. The Second Retention Award, if earned, shall be paid to Executive in two equal installments on September 30, 2012 and September 30, 2013; provided, that, subject to the provisions of sub-paragraph (a)(v) of this Exhibit I, Executive is employed by the Company or an Affiliate thereof on the applicable payment date.

      (iii)      Executive shall earn an additional long-term cash bonus award in an amount between $1,350,000 and $2,700,000 per fiscal year determined by the Company's performance as indicated by the level of EFH Management EBITDA actually achieved for the fiscal years ended December 31, 2012, December 31, 2013, and December 31, 2014 relative to the EFH Management EBITDA threshold and target amounts set by the Board for each respective fiscal year (the "***Third Retention Award***"). For the achievement of the threshold level of EFH Management EBITDA in respect of any such year, Executive shall earn $1,350,000, for the achievement of at least the target level of EFH Management EBITDA in respect of any such year, Executive shall earn $2,700,000 (the "***Third Retention Target Award***"), and for the achievement of EFH Management EBITDA in between the threshold and target levels in respect of any such year, Executive shall earn an amount between $1,350,000 and $2,700,000 as determined by linear interpolation. The Third Retention Award, if earned, shall be paid to Executive in a lump sum on March 13, 2015; provided, that, subject to the provisions of sub-paragraph (a)(v) of this Exhibit I, Executive is employed by the Company or an Affiliate thereof on March 13, 2015.

      (iv)      The process followed by the O&C Committee in establishing the EFH Management EBITDA threshold and target amounts for purposes of the Second Retention Award and the Third Retention Award shall be consistent with the O&C Committee's prior practice.

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(v)        In the event Executive's employment is terminated pursuant to Section 7(b), 7(c), 7(d)(ii), or 7(e) hereof, in any case, prior to the payment date of an applicable Retention Award, Executive shall be entitled to receive the Retention Award, or a portion thereof, that Executive would otherwise have been entitled to receive pursuant to sub-paragraphs (a)(i), (a)(ii), and (a)(iii) of this Exhibit I, calculated as set forth below (the sum of such amounts referred to herein as the "**Pro-Rata Retention Award**"), with such Pro-Rata Retention Award payable to Executive as soon as practical but no later than the earlier of: (a) March 15 following the calendar year in which termination occurs or (b) ninety (90) days following termination; provided, that, in the case of a termination of employment pursuant to Section 7(c), 7(d)(ii), 7(e), Executive (x) does not violate the restrictions set forth in Section 8 of this Agreement and (y) executes, delivers and does not revoke a general release of claims against the Company and its Affiliates (excluding claims for indemnification, claims for coverage under officer and director policies, and claims as a stockholder of the Company).

(A)        with respect to the First Retention Award, (x) 100% of the aggregate Annual Bonus amount(s) actually earned by Executive in respect of any applicable fiscal year completed prior to the date of Executive's termination, plus (y) if the termination occurs prior to January 1, 2012, 100% of the Pro-Rata Bonus amount calculated pursuant to Section 7(b)(i)(B) above (for avoidance of doubt, the First Retention Award payment shall not be based on any Annual Bonus or Pro-Rata Bonus earned by or paid to Executive with respect to fiscal year 2012); plus

(B)        with respect to the Second Retention Award, (x) if the termination occurs prior to January 1, 2012, a portion of the Second Retention Award to be determined by multiplying the Second Retention Target Award by a fraction, the numerator of which is the number of days during which Executive was employed by the Company or an Affiliate thereof in the fiscal year of Executive's termination, and the denominator of which is 365, or (y) if the termination occurs on or after January 1, 2012, the actual earned amount of the Second Retention Award; plus

(C)        with respect to the Third Retention Award, (x) if the termination occurs prior to January 1, 2015, a portion of the Third Retention Award equal to (1) the amount that would have been payable under sub-paragraph (a)(iii) of this Exhibit I for any completed fiscal year, plus (2) a portion of the Third Retention Award to be determined by multiplying the Third Retention Target Award for the year of Executive's termination by a fraction, the numerator of which is the number of days during which Executive was employed by the Company or an Affiliate thereof in the fiscal year of Executive's termination, and the denominator of which is 365, or (y) if the termination occurs on or after January 1, 2015, the actual earned amount of the Third Retention Award.

(vi)        Notwithstanding any provision of this Exhibit I to the contrary, in the event of a Change in Control, Executive's entitlement to the Retention Awards shall be determined without regard to the achievement of EFH Management EBITDA in respect of the fiscal year in which such Change in Control occurs and any subsequent year, and the amount earned by Executive shall be determined as if target level of EFH Management EBITDA were achieved for any such year, but to the extent the Retention Award is attributable to any prior fiscal year, actual EFH Management EBITDA for such prior year shall be used.

(vii)        To assure payment of the Company's obligations under sub-paragraphs (a)(ii) and (a)(iii) above, the Company has obtained the issuance of an Irrevocable Standby Letter of Credit (the "**LOC**") for the benefit of Executive from a bank (the "**Issuer**") on the following terms:

(A)        The LOC shall be in the amount of $9,600,000.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(B)        The LOC shall expire on .

(C)        The LOC shall not be transferable.

(D)        Partial and multiple draws shall be permitted under the LOC.  [Information Omitted.]

(viii)        A copy of the LOC so issued is attached hereto as Exhibit I(A).

(ix)        Any amount paid under the LOC to the United States Treasury in respect of the Company's tax account shall be credited as withheld income and payroll taxes with respect to Executive, and the Company shall properly report such amount on IRS Form W-2 issued to Executive for the applicable tax year.

(x)        For purposes hereof, "***EFH Management EBITDA***" shall mean Energy Future Holdings Corp. consolidated EBITDA; where:

(A)        "***EBITDA***" shall mean earnings before interest, taxes, depreciation and amortization plus transaction, management and/or similar fees paid to the Sponsor Group and/or its Affiliates, together with such adjustments as the O&C Committee shall determine appropriate in its discretion after good faith consultation with the Chief Executive Officer and/or Chief Financial Officer. Such adjustments will be consistent with those included in the definition of EBITDA in the Energy Future Holdings Corp. Indenture related to its 10.000% Senior Secured Notes due 2020, as such indenture is in effect on the Effective Date, to the extent considered appropriate for management compensation purposes, which will include but are not limited to, adjustments to reflect unrealized mark-to-market valuations of hedging instruments; fees and expenses relating to the Company's receivables financing facilities; the amortization of nuclear fuel costs; and any effects of adjustments in the financial statements resulting from the application of purchase accounting; but which for clarification will not include, without limitation, adjustments to reflect unrealized cost savings and planned and unplanned outages. In any event and notwithstanding anything herein to the contrary, the O&C Committee shall have the discretion to make any further adjustments to the calculation of EBITDA as it deems fair and appropriate after good faith consultation with the Chief Executive Officer and/or Chief Financial Officer.

(B)        The O&C Committee shall, fairly and appropriately, following the O&C Committee's good faith consultation with the Chief Executive Officer and/or Chief Financial Officer, adjust the calculation of EBITDA to reflect the following: acquisitions, divestitures, any change required by GAAP relating to share-based compensation or for other changes in GAAP promulgated by accounting standard setters that, in each case, the O&C Committee in good faith determines require adjustment of EBITDA. The O&C Committee's determination of such adjustment shall be based on the effect of such event on the Company's consolidated financial statements.

Powered by Morningstar ® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(b)        As soon as administratively practicable following the February O&C Committee meeting in 2013, provided Executive remains continuously employed by the Company or an Affiliate thereof through the grant date, Executive shall be entitled to receive on such date, a grant of 1,500,000 restricted stock units under the 2007 Stock Incentive Plan for Key Employees of Energy Future Holdings Corp. and its Affiliates and the Restricted Stock Unit Agreement, in such form and substance as attached hereto as Exhibit I(B), to be entered into by and between the Company and Executive with respect to the grant.  In the event of a Change in Control prior to such grant date, the restricted stock units that would have been granted under this sub-paragraph (b) of this Exhibit I shall be issued and shall be vested immediately prior to the effective date of the Change in Control.  The rights and obligations of Executive and the Company shall be governed by the 2007 Stock Incentive Plan for Key Employees of Energy Future Holdings Corp. and its Affiliates and the Restricted Stock Unit Agreement entered into incident to such grant.

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit I(A)**

DATE: _____

IRREVOCABLE STANDBY LETTER OF CREDIT NO.

BENEFICIARY:
JOHN YOUNG
[ON RECORD WITH THE COMPANY]

APPLICANT:
TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC
ON BEHALF OF ENERGY FUTURE HOLDINGS CORP.
1601 BRYAN STREET, 44TH FLOOR
DALLAS, TX 75201-3411

AMOUNT:   USD 9,600,000.00 (NINE MILLION SIX HUNDRED THOUSAND AND 00/100 U.S. DOLLARS)

EXPIRY DATE:

LADIES AND GENTLEMEN:

BY ORDER OF OUR CLIENT, TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC FOR THE ACCOUNT OF ENERGY FUTURE HOLDINGS CORP. (THE "ACCOUNT PARTY"), WE HEREBY ESTABLISH OUR IRREVOCABLE STANDBY LETTER OF CREDIT NO. (THIS "LETTER OF CREDIT") IN YOUR FAVOR FOR DRAWINGS NOT TO EXCEED THE AGGREGATE SUM OF NINE MILLION SIX HUNDRED THOUSAND U.S. DOLLARS ($9,600,000.00), EFFECTIVE IMMEDIATELY. THIS LETTER OF CREDIT IS ISSUED, PRESENTABLE AND PAYABLE AT THE OFFICE OF OUR SERVICER, CITICORP NORTH AMERICA, INC., 3800 CITIBANK CENTER, BUILDING B, 3RD FLOOR TAMPA, FL 33610, AND, SUBJECT TO THE FURTHER TERMS HEREOF, EXPIRES WITH OUR CLOSE OF BUSINESS ON .

FUNDS UNDER THIS LETTER OF CREDIT ARE AVAILABLE TO YOU AGAINST YOUR SIGHT DRAFT(S), DRAWN ON US, PURPORTEDLY SIGNED BY YOU (OR YOUR SUCCESSOR(S) OR HEIR(S) AT LAW), AND OTHERWISE IN THE FORM ATTACHED HERETO AS EXHIBIT A APPROPRIATELY COMPLETED.

FUNDS UNDER THIS LETTER OF CREDIT WILL BE AVAILABLE FOR DRAWING IN ACCORDANCE WITH THE FOLLOWING SCHEDULE; HOWEVER, IN NO EVENT SHALL THE TOTAL AMOUNT OF ALL PAYMENTS MADE UNDER THIS LETTER OF CREDIT EXCEED THE AMOUNT OF $9,600,000.00:

| AVAILABILITY PERIODS | | AMOUNT AVAILABLE IN U.S. DOLLARS |
| --- | --- | --- |
| FROM AND INCLUDING [ ] | THROUGH AND INCLUDING [ ] | [ ] |

FOR THE AVOIDANCE OF DOUBT, ANY UNUTILIZED AMOUNT IN ANY GIVEN AVAILABILITY PERIOD WILL BE CUMMULATIVELY ADDED TO THE AMOUNT AVAILABLE IN THE IMMEDIATELY SUCCEEDING AVAILABILITY PERIOD.

FURTHERMORE, THE MAXIMUM AGGREGATE AMOUNT THAT MAY BE DRAWN BY YOU DURING THE TERM OF THIS LETTER OF CREDIT SHALL BE AUTOMATICALLY REDUCED BY THE AGGREGATE AMOUNT OF ANY PRIOR PAYMENTS MADE UNDER THIS LETTER OF CREDIT.

PARTIAL AND MULTIPLE DRAWINGS ARE PERMITTED HEREUNDER. THIS LETTER OF CREDIT SHALL AUTOMATICALLY TERMINATE AFTER PAYMENT OF ANY DRAW MADE UNDER STATEMENT (B) IN THE FORM OF SIGHT DRAFT ATTACHED HERETO AS EXHIBIT A.

THIS LETTER OF CREDIT IS NOT TRANSFERABLE.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document ResearchSM

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

WE HEREBY ENGAGE WITH YOU THAT ALL DRAFTS DRAWN UNDER AND IN STRICT COMPLIANCE WITH THE TERMS OF THIS LETTER OF CREDIT WILL BE DULY HONORED IF DRAWN AND PRESENTED FOR PAYMENT ON OR BEFORE THE EXPIRY DATE OF THIS LETTER OF CREDIT. WE SHALL EFFECT PAYMENT THREE BUSINESS DAYS AFTER OUR RECEIPT OF DOCUMENTS IN STRICT CONFORMITY WITH THE TERMS OF THIS LETTER OF CREDIT. AS USED HEREIN "BUSINESS DAY" SHALL MEAN ANY DAY OTHER THAN A SATURDAY OR SUNDAY OR A DAY ON WHICH BANKING INSTITUTIONS IN NEW YORK CITY ARE AUTHORIZED OR REQUIRED TO CLOSE BY LAW.

PAYMENT OF DRAWINGS MADE HEREUNDER SHALL BE MADE IN TWO PARTS, BY WIRE TRANSFER, PURSUANT TO THE FOLLOWING WIRE INSTRUCTIONS:

- SIXTY PERCENT (60%) OF EACH SUCH DRAWING SHALL BE PAYABLE PURSUANT TO BENEFICIARY'S (OR HIS SUCCESSOR(S) OR HEIR(S) AT LAW) WRITTEN WIRE INSTRUCTIONS SET FORTH IN THE APPROPRIATELY COMPLETED AND PRESENTED SIGHT DRAFT(S), AND

- FORTY PERCENT (40%) OF EACH SUCH DRAWING (FOR PURPOSES OF APPLICABLE PAYROLL AND INCOME TAX WITHHOLDING) SHALL BE PAYABLE TO:

  ABA REFERENCE #: [ON RECORD WITH THE COMPANY]
  NAME OF BANK DEPOSITORY: US TREAS SINGLE TX
  EMPLOYER'S TIN: 75-2669310
  NAME CONTROL: ENER
  EMPLOYER'S FULL NAME: ENERGY FUTURE HOLDINGS CORP.
  TAX TYPE: 94105
  TAX YEAR: [INSERT 2 DIGIT TAX YEAR]
  TAX MONTH: [INSERT 03, 06, 09, OR 12 FOR CALENDAR QUARTER IN WHICH DRAWING OCCURS]

THIS LETTER OF CREDIT IS SUBJECTED TO AND GOVERNED BY LAWS OF THE STATE OF NEW YORK AND THE 2007 REVISION OF THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS OF THE INTERNATIONAL CHAMBER OF COMMERCE (PUBLICATION NO. 600). IN THE EVENT OF ANY CONFLICT, THE LAWS OF THE STATE OF NEW YORK WILL CONTROL.

SHOULD YOU HAVE OCCASION TO COMMUNICATE WITH US REGARDING THIS LETTER OF CREDIT, KINDLY DIRECT YOUR COMMUNICATIONS TO THE ATTENTION OF OUR LETTER OF CREDIT DEPARTMENT, 3800 CITIBANK CENTER, BUILDING B, 3RD FLOOR, TAMPA, FL 33610, MAKING SPECIFIC REFERENCE TO OUR LETTER OF CREDIT NO. _____.

VERY TRULY YOURS,

CITIBANK, N.A.
BY: JOSEPH CHESAKIS, VICE PRESIDENT


BY:    /s/ Joseph Chesakis
   AUTHORIZED SIGNATURE

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

EXHIBIT A TO
LETTER OF CREDIT NO. _____

<u>FORM OF SIGHT DRAFT</u>

VIA OVERNIGHT MAIL

_____, 20__

CITIBANK, N.A.
C/O CITICORP NORTH AMERICA, INC., AS SERVICER
3800 CITIBANK CENTER, BUILDING B
3RD FLOOR
TAMPA, FLORIDA 33610
ATTENTION: LETTER OF CREDIT DEPT.

      RE: LETTER OF CREDIT NO. _____

[STATE ONE OF THE FOLLOWING (A) OR (B):]

(A)    I HEREBY CERTIFY THAT (1) I AM ENTITLED TO DRAW ON IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____ UNDER THE PROVISIONS OF THE AMENDED AND RESTATED EMPLOYMENT AGREEMENT DATED AS OF _____ (THE "EMPLOYMENT AGREEMENT"), BETWEEN ENERGY FUTURE HOLDINGS CORP. ("EFH CORP") AND ME, (2) THE FULL AMOUNT EARNED BY AND PAYABLE TO ME UNDER THE RETENTION AWARD AS OF _____ IS $_____, WHICH AMOUNT IS CONSISTENT WITH, AND NOT IN EXCESS OF, THE AMOUNT EARNED BY AND CURRENTLY PAYABLE TO ME UNDER THE RETENTION AWARD, AND (3) I REMAIN EMPLOYED BY EFH CORP, TH ACCOUNT PARTY (AS DEFINED IN IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____) OR AN AFFILIATE OF EFH CORP AND/OR THE ACCOUNT PARTY AS OF THE DATE OF THIS DRAW AND I AM ENTITLED TO THE FULL AMOUNT EARNED AND PAYABLE I HEREBY ACKNOWLEDGE THAT ANY AMOUNT OF THIS DRAW THAT IS PAID TO ME AND LATER DETERMINED TO BE IN EXCESS O THE AMOUNT ACTUALLY EARNED BY AND PAYABLE TO ME UNDER THE RETENTION AWARD SHALL CREATE A CAUSE OF ACTIO IN FAVOR OF EFH CORP, THE ACCOUNT PARTY AND/OR AN AFFILIATE OF EFH CORP OR THE ACCOUNT PARTY TO RECOVER TH EXCESS PAYMENT.

OR

(B)    I HEREBY CERTIFY THAT (1) I AM ENTITLED TO DRAW ON IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____ UNDER THE PROVISIONS OF THE AMENDED AND RESTATED EMPLOYMENT AGREEMENT DATED AS OF _____ (THE "EMPLOYMENT AGREEMENT"), BETWEEN ENERGY FUTURE HOLDINGS CORP. ("EFH CORP") AND ME, (2) THE FULL AMOUNT EARNED BY AND PAYABLE TO ME UNDER THE RETENTION AWARD AS O _____ IS $_____, WHICH AMOUNT IS CONSISTENT WITH, AND NOT IN EXCESS OF, THE AMOUNT EARNED BY AND CURRENTLY PAYABLE TO ME UNDER THE RETENTION AWARD, AND (3) M EMPLOYMENT WAS TERMINATED PURSUANT TO SECTION 7(B), 7(C), 7(D)(II), OR 7(E) OF THE EMPLOYMENT AGREEMENT PRIOR TO THE DATE OF THIS DRAW AND I AM ENTITLED TO EITHER THE FULL AMOUNT EARNED OR A PRO-RATED AMOUNT (PURSUANT TO SUB-PARAGRAPH (A)(V) OF EXHIBIT I TO THE EMPLOYMENT AGREEMENT). I HEREBY ACKNOWLEDGE THAT ANY AMOUNT OF THIS DRAW THAT IS PAID TO ME AND LATER DETERMINED TO BE IN EXCESS OF THE AMOUNT ACTUALLY EARNED BY AND PAYABLE T ME UNDER THE RETENTION AWARD SHALL CREATE A CAUSE OF ACTION IN FAVOR OF EFH CORP, THE ACCOUNT PARTY AND/OR A AFFILIATE OF EFH CORP OR THE ACCOUNT PARTY TO RECOVER THE EXCESS PAYMENT.

YOU ARE HEREBY INSTRUCTED TO REMIT THE PAYMENT OF $_____ IN TWO PARTS, BY WIRE TRANSFER, PURSUANT TO THE FOLLOWING WIRE INSTRUCTIONS:

    •   SIXTY PERCENT (60%) OF SUCH AMOUNT, OR $_____, SHALL BE PAYABLE TO

        ACCOUNT NAME: [INSERT]
        ACCOUNT #: [INSERT]
        ABA REFERENCE #: [INSERT]
        NAME OF BANK DEPOSITORY: [INSERT]

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

• FORTY PERCENT (40%) OF EACH SUCH DRAWING (FOR PURPOSES OF APPLICABLE PAYROLL AND INCOME TAX WITHHOLDING) SHALL BE PAYABLE TO:

> ABA REFERENCE #: [ON RECORD WITH THE COMPANY]
> NAME OF BANK DEPOSITORY: US TREAS SINGLE TX
> EMPLOYER'S TIN: 75-2669310
> NAME CONTROL:  ENER
> EMPLOYER'S FULL NAME: ENERGY FUTURE HOLDINGS CORP.
> TAX TYPE: 94105
> TAX YEAR: [INSERT 2 DIGIT TAX YEAR]
> TAX MONTH: [INSERT 03, 06, 09, OR 12 FOR CALENDAR QUARTER IN WHICH DRAWING OCCURS]

[IF STATEMENT B ABOVE IS UTILIZED INCLUDE THE FOLLOWING STATEMENT][THE UNDERSIGNED HEREBY ACKNOWLEDGES THAT IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____ SHALL AUTOMATICALLY TERMINATE AFTER SUCH PAYMENT I DULY MADE].

By: _____
[BENEFICIARY] OR
[BENEFICIARY'S SUCCESSOR(S) OR HEIR(S) AT LAW]

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Exhibit I(B)

## 2007 STOCK INCENTIVE PLAN FOR KEY EMPLOYEES OF ENERGY FUTURE HOLDINGS CORP. AND ITS AFFILIATES

## RESTRICTED STOCK UNIT AGREEMENT

To: **[Name]**          Date of Grant: **[Date]**          Number of Shares: **[#]**

This Agreement is made and entered into as of the Date of Grant set forth above by and between Energy Future Holdings Corp., a Texas corporation (the "***Company***"), and you;

**WHEREAS**, the Company adopted the 2007 Stock Incentive Plan for Key Employees of Energy Future Holdings Corp. and its Affiliates, as it may be amended from time to time (the "***Plan***") under which the Company is authorized to grant restricted stock units to certain employees, directors and other service providers of the Company or a Subsidiary;

**WHEREAS**, a "***Restricted Stock Unit***" shall represent your right to receive one share of common stock of the Company (the "***Stock***") upon the lapse of the restrictions on your award, plus the additional rights to receive dividend equivalents (" ***Dividend Equivalent Right,***" or "***DER***"), in accordance with the terms and conditions set forth herein and in the Plan (the " ***Award***");

**WHEREAS**, a copy of the Plan has been made available to you and shall be deemed a part of this Restricted Stock Unit Agreement ("***Agreement***") as if fully set forth herein; and

**WHEREAS**, you desire to accept the Award made pursuant to this Agreement.

**NOW, THEREFORE,** in consideration of the mutual covenants set forth herein and for other valuable consideration hereinafter set forth, you and the Company agree as follows:

1.    <u>The Grant</u>. Subject to the conditions set forth below, the Company hereby grants you, effective as of the Date of Grant set forth above, an award consisting of **[#]** Restricted Stock Units (subject to any adjustment made to this Award pursuant to Section 8 of the Plan in connection with a stock split, spin-off, recapitalization or other transaction that affects the Company's equity securities). To the extent that any provision of this Agreement conflicts with the expressly applicable terms of the Plan, you acknowledge and agree that those terms of the Plan shall control and, if necessary, the applicable terms of this Agreement shall be deemed amended so as to carry out the purpose and intent of the Plan.  Terms that have their initial letter capitalized, but that are not otherwise defined in this Agreement shall have the meanings given to them in the Plan.

2.    <u>No Shareholder Rights</u>. The Restricted Stock Units granted pursuant to this Agreement do not and shall not entitle you to any rights of a holder of Stock prior to the date shares of Stock are issued to you in settlement of the Award.  Your rights with respect to the Restricted Stock Units shall remain forfeitable at all times prior to the date on which rights become vested and the restrictions with respect to the Restricted Stock Units lapse in accordance with Section 6 or 7, as the case may be.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

3.    <u>Dividend Equivalent Rights</u>. In the event that the Company declares and pays a dividend in respect of its outstanding shares of Stock and, on the record date for such dividend, you hold Restricted Stock Units granted pursuant to this Agreement that have not been settled, the Company shall create a bookkeeping account that will track, (a) to the extent the dividend paid to stockholders generally was a cash dividend, the cash value you would have been entitled to receive as if you had been the holder of record of the number of shares of Stock related to the Restricted Stock Units that have not been settled as of the record date, or (b) to the extent the dividend paid to stockholders generally was paid in the form of property, the property you would have been entitled to receive as if you had been the holder of record of the number of shares of Stock related to the Restricted Stock Units that have not been settled as of the record date. All DER amounts credited to your bookkeeping account pursuant to this Section 3, if any, shall be deemed converted into shares of Stock on the date that the Restricted Stock Units vest (based on the Fair Market Value (as such term is defined in the Management Stockholder's Agreement) of Stock on such date and rounded down to the nearest whole share of Stock) and paid to you in the form of additional shares of Stock on the date that the underlying Restricted Stock Units associated with such DER amounts are settled pursuant to Section 5 below. In the event that the Restricted Stock Units are forfeited to the Company without settlement to you, you will also forfeit any associated DER amounts. No interest will be payable with respect to DER amounts credited to your bookkeeping account, if any, that represent cash dividends. Property, if any, deemed credited to DER bookkeeping accounts representing dividends paid in property will be deemed invested in such property until the DER amounts are deemed converted to shares of Stock pursuant to this Section 3. The bookkeeping accounts, if any, created to track DER amounts are phantom accounts and the Company is under no obligation to set aside cash or property with respect to any DER amounts. Valuations made pursuant to this Section 3 (including any valuation of property deemed credited to a bookkeeping account) will be made by the Committee, or its designee, in its sole discretion and such valuation will be final and binding.

4.    <u>Restrictions; Forfeiture</u>. The Restricted Stock Units are restricted in that they may not be sold, transferred or otherwise alienated or hypothecated until these restrictions are removed or expire as contemplated in Section 6 or 7 of this Agreement and Stock is issued to you as described in Section 5 of this Agreement. The Restricted Stock Units are also subject to forfeiture to the Company (the "***Forfeiture Restrictions***") pursuant to Section 7 of this Agreement.

5.    <u>Issuance of Stock</u>.

(a)    No shares of Stock shall be issued to you prior to the date on which the Restricted Stock Units vest and the restrictions, including the Forfeiture Restrictions, with respect to the Restricted Stock Units lapse, in accordance with Section 6 or 7. After the Restricted Stock Units vest pursuant to Section 6 or 7, as applicable, the Company shall, subject to any conditions described in subsection (b) below, promptly and within 30 days of such vesting date, cause to be issued Stock registered in your name in payment of such vested Restricted Stock Units upon receipt by the Company of any required tax withholding. Such issuance shall be made as soon as administratively practicable, but may be delayed, in the sole discretion of the Committee, if required by applicable securities law; provided, that, in no event shall the issuance of Stock be made later than March 15th of the year following the year of vesting, or as otherwise may be permitted under Treasury Regulation § 1.409A-1(b)(4)(ii). The Company shall evidence the Stock to be issued in payment of such vested Restricted Stock Units in the manner it deems appropriate. The value of any fractional Restricted Stock Units shall be rounded down at the time Stock is issued to you in connection with the Restricted Stock Units. No fractional shares of Stock, nor the cash value of any fractional shares of Stock, will be issuable or payable to you pursuant to this Agreement. The value of such shares of Stock shall not bear any interest owing to the passage of time. Neither this Section 5 nor any action taken pursuant to or in accordance with this Section 5 shall be construed to create a trust or a funded or secured obligation of any kind.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(b)        You hereby acknowledge that by accepting this Award, the issuance of Stock pursuant to the settlement of your Restricted Stock Units pursuant to this Agreement shall be subject to all the terms and conditions of any Management Stockholder's Agreement and Sale Participation Agreement previously executed by you, as such forms may be modified under the terms of such agreements; provided, however, that if you have not previously executed a Management Stockholder's Agreement and/or a Sale Participation Agreement with the Company, you agree that, prior to the Company's issuance of Stock to you pursuant to this Agreement, you will execute such documents in the form required by the Company.  All Stock issued to you pursuant to this Agreement will (a) constitute "Stock" (as such term is defined in the Management Stockholder's Agreement) for all purposes under the Management Stockholder's Agreement, and (b) be treated as "Common Stock" underlying "Options" (as such terms are defined in the Sale Participation Agreement) for all purposes under the Sale Participation Agreement.

(c)        The shares of Stock deliverable upon vesting of the Restricted Stock Units, may be either previously authorized but unissued shares or issued shares, which have then been reacquired by the Company. Such shares shall be fully paid and nonassessable.

6.        <u>Expiration of Restrictions and Risk of Forfeiture</u>.  Unless otherwise provided in Section 7 below, the restrictions on the Restricted Stock Units granted pursuant to this Agreement, including the Forfeiture Restrictions, will expire on September 30, 2014, and shares of Stock that are nonforfeitable and transferable will be issued to you in payment of your vested Restricted Stock Units as set forth in Section 5, provided that you remain in the continuous employ of, or a service provider to, the Company or its Subsidiaries until September 30, 2014.

7.        <u>Termination of Services or Change in Control Events</u>.

(a)        <u>Termination of Employment Other Than without Cause, for Good Reason, or Due to Death or Disability</u>.  In the event your service relationship with the Company or any of its Subsidiaries is terminated for any reason other than by the Company or any of its Subsidiaries without Cause, by your voluntary resignation for Good Reason, or due to your death or Disability ("Cause", "Good Reason", and "Disability" as defined in your employment agreement with the Company or any of its Subsidiaries then in effect at the time of your termination of employment) prior to September 30, 2014, then those Restricted Stock Units for which the restrictions have not lapsed as of the date of your termination shall become null and void and those Restricted Stock Units shall be forfeited to the Company.

(b)        <u>Termination of Employment without Cause, for Good Reason, or Due to Death or Disability</u>.  In the event your service relationship with the Company or any of its Subsidiaries is terminated by the Company or any of its Subsidiaries without Cause, by your voluntary resignation for Good Reason, or due to your death or Disability prior to September 30, 2014, a portion of the Restricted Stock Units shall vest and all Forfeiture Restrictions shall lapse with respect to such Restricted Stock Units on the effective date of your termination of employment. The portion of the Restricted Stock Units that shall become vested upon your termination of employment shall be determined by multiplying the number of Restricted Stock Units set forth in Section 1 by a fraction, the numerator of which is the number of days you were employed by the Company or any of its Subsidiaries from [February __, 20__] through the effective date of your termination of employment, and the denominator of which is the number of days between [February __, 20__] and September 30, 2014; all remaining Restricted Stock Units shall become null and void and shall be forfeited to the Company upon your termination of employment. The Restricted Stock Units that become vested pursuant to this Section 7(b) will be settled in accordance with Section 5 above.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(c)    Change in Control. In the event that the Company undergoes a Change in Control (as defined in the Plan) prior to September 30, 2014, the Restricted Stock Units shall vest and all Forfeiture Restrictions shall lapse on the effective date of such a Change in Control, provided that you have remained in the continuous employ of, or a service provider to, the Company or its Subsidiaries from the Date of Grant until the effective date of the Change in Control.  Upon a Change in Control, your Restricted Stock Units will be settled in accordance with Section 5 above.

8.    Leave of Absence. With respect to the Award, the Company may, in its sole discretion, determine that if you are on leave of absence for any reason you will not be considered as having terminated employment with the Company; however, your rights to the Restricted Stock Units during a leave of absence will be limited to the extent to which those rights were earned or vested when the leave of absence began.

9.    Payment of Taxes. It shall be a condition of the obligations of the Company upon delivery of the Stock pursuant to Section 5 above that you pay to the Company such amount as may be requested by the Company for the purpose of satisfying any liability for any federal, state or local income or other taxes required by law to be withheld with respect to such Stock.  The Company may, in its sole discretion, and you hereby authorize the Company to take such actions as may be necessary, in the opinion of the Company's counsel (including, without limitation, withholding Stock otherwise deliverable to you hereunder through a net settlement and/or withholding amounts from any compensation or other amount owing to you from the Company), to satisfy the obligations for payment of the minimum amount of any such taxes.  Notwithstanding the foregoing provisions of this Section 9, you may, at your election, be permitted to elect to use Stock otherwise deliverable to you hereunder, having an equivalent Fair Market Value (as such term is defined in the Management Stockholder's Agreement) to the payment that would otherwise be made by you to the Company pursuant to the foregoing provisions of this Section 9, to satisfy such obligations.  You are hereby advised to seek your own tax counsel regarding the taxation of the Restricted Stock Units made hereunder.

10.    Compliance with Securities Law. Notwithstanding any provision of this Agreement to the contrary, the issuance of Stock will be subject to compliance with all applicable requirements of federal, state, or foreign law with respect to such securities and with the requirements of any stock exchange or market system upon which the Stock may then be listed.  No Stock will be issued hereunder if such issuance would constitute a violation of any applicable federal, state, or foreign securities laws or other law or regulations or the requirements of any stock exchange or market system upon which the Stock may then be listed.  In addition, Stock will not be issued hereunder unless (a) a registration statement under the Securities Act of 1933, as amended (the " **Securities Act**"), is, at the time of issuance, in effect with respect to such shares or (a) in the opinion of legal counsel to the Company, such shares may be issued in accordance with the terms of an applicable exemption from the registration requirements of the Securities Act.  YOU ARE CAUTIONED THAT ISSUANCE OF STOCK UPON THE VESTING OF RESTRICTED STOCK UNITS GRANTED PURSUANT TO THIS AGREEMENT MAY NOT OCCUR UNLESS THE FOREGOING CONDITIONS ARE SATISFIED. The inability of the Company to obtain from any regulatory body having jurisdiction the authority, if any, deemed by the Company's legal counsel to be necessary to the lawful issuance and sale of any shares subject to the Award will relieve the Company of any liability in respect of the failure to issue such shares as to which such requisite authority has not been obtained.  As a condition to any issuance hereunder, the Company may require you to satisfy any qualifications that may be necessary or appropriate to evidence compliance with any applicable law or regulation and to make any representation or warranty with respect to such compliance as may be requested by the Company. From time to time, the Board and appropriate officers of the Company are authorized to take the actions necessary and appropriate to file required documents with governmental authorities, stock exchanges, and other appropriate Persons to make shares of Stock available for issuance.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

11.      Lock-Up Period. You hereby agree that, if so requested by the Company or any representative of the underwriters (the "**Managing Underwriter**") in connection with any registration of the offering of any securities of the Company under the Securities Act, you will not sell or otherwise transfer any Stock acquired hereunder or other securities of the Company during the 180 day period (or such other period as may be requested in writing by the Managing Underwriter and agreed to in writing by the Company) (the "**Market Standoff Period**") following the effective date of a registration statement of the Company filed under the Securities Act. The Company may impose stop-transfer instructions with respect to securities subject to the foregoing restrictions until the end of such Market Standoff Period.

12.      Legends. The Company may at any time place legends referencing any restrictions imposed on the shares pursuant to Sections 5(b), 10 and 11 of this Agreement on all certificates representing shares issued with respect to this Award.

13.      Right of the Company and Subsidiaries to Terminate Services. Nothing in this Agreement confers upon you the right to continue in the employ of or to perform services for the Company or any Subsidiary, or interfere in any way with the rights of the Company or any Subsidiary to terminate your employment or service relationship at any time.

14.      Furnish Information. You agree to furnish to the Company all information reasonably requested by the Company to enable it to comply with any reporting or other requirements imposed upon the Company by or under any applicable statute or regulation with respect to the transactions contemplated by this Agreement.

15.      No Liability for Good Faith Determinations. The Company and the members of the Board shall not be liable for any act, omission or determination taken or made in good faith with respect to this Agreement or the Restricted Stock Units granted hereunder.

16.      Execution of Receipts and Releases. Any payment of cash or any issuance or transfer of shares of Stock or other property to you, or to your legal representative, heir, legatee or distributee, in accordance with the provisions hereof, shall, to the extent thereof, be in full satisfaction of all claims of such Persons hereunder. The Company may require you or your legal representative, heir, legatee or distributee, as a condition precedent to such payment or issuance, to execute a release and receipt therefor in such form as it shall determine.

17.      No Guarantee of Interests. The Board and the Company do not guarantee the Stock of the Company from loss or depreciation.

18.      Company Records. Records of the Company or its Subsidiaries regarding your period of service, termination of service and the reason(s) therefor, and other matters shall be conclusive for all purposes hereunder, unless determined by the Company to be incorrect.

19.      Notice. All notices required or permitted under this Agreement must be in writing and personally delivered or sent by mail and shall be deemed to be delivered on the date on which it is actually received by the person to whom it is properly addressed or if earlier the date it is sent via certified United States mail.

20.      Waiver of Notice. Any person entitled to notice hereunder may waive such notice in writing.

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

21.    <u>Information Confidential</u>. As partial consideration for the granting of the Award hereunder, you hereby agree to keep confidential all information and knowledge, except that which has been disclosed in any public filings required by law, that you have relating to the terms and conditions of this Agreement; provided, however, that such information may be disclosed as required by law and may be given in confidence to your spouse and tax, legal and financial advisors.  In the event any breach of this promise comes to the attention of the Company, it shall take into consideration that breach in determining whether to recommend the grant of any future similar award to you and as a factor weighing against the advisability of granting any such future award to you.

22.    <u>Successors</u>. This Agreement shall be binding upon you, your legal representatives, heirs, legatees and distributees, and upon the Company, its successors and assigns.

23.    <u>Severability</u>. If any provision of this Agreement is held to be illegal or invalid for any reason, the illegality or invalidity shall not affect the remaining provisions hereof, but such provision shall be fully severable and this Agreement shall be construed and enforced as if the illegal or invalid provision had never been included herein.

24.    <u>Company Action</u>. Any action required of the Company under this Agreement shall be by resolution of the Board or the Committee or by a person or entity authorized to act by resolution of the Board.

25.    <u>Headings</u>. The titles and headings of Sections are included for convenience of reference only and are not to be considered in construction of the provisions hereof.

26.    <u>Governing Law</u>. All questions arising with respect to the provisions of this Agreement shall be determined by application of the laws of Texas, without giving any effect to any conflict of law provisions thereof, except to the extent Texas state law is preempted by federal law. The obligation of the Company to sell and deliver Stock hereunder is subject to applicable laws and to the approval of any governmental authority required in connection with the authorization, issuance, sale, or delivery of such Stock.

27.    <u>Consent to Texas Jurisdiction and Venue</u>. You hereby consent and agree that state courts located in Dallas County, Texas and the United States District Court for the Northern District of Texas (Dallas Division) each shall have personal jurisdiction and proper venue with respect to any dispute between you and the Company arising in connection with the Restricted Stock Units, the Plan, or this Agreement. In any such dispute, each of you and the Company agree not to raise, and do hereby expressly waive, any objection or defense to such jurisdiction as an inconvenient forum.

28.    <u>Amendment</u>. This Agreement may be amended in accordance with the terms of the Plan.

29.    <u>The Plan</u>. This Agreement is subject to all the terms, conditions, limitations and restrictions contained in the Plan.

[Remainder of page intentionally left blank]

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

In Witness Whereof, this Agreement has been executed and delivered by the parties hereto.

ENERGY FUTURE HOLDINGS CORP.

By: _____

Its: _____

GRANTEE

_____

Name: _____

Address: _____

_____

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

## Exhibit II

In addition to the benefits, perquisites and compensation set forth in the Agreement, Executive shall be entitled to receive the benefits, perquisites and compensation set forth in this Exhibit II, subject to the terms and conditions set forth herein:

      (a)    <u>Service Crediting</u>. For purposes of eligibility to receive retiree medical benefits under any retiree medical benefit plan or program of the Company or its Affiliates, Executive shall be deemed eligible for such benefits upon retirement at any time after reaching age 55, so long as Executive has completed five (5) years of service with the Company and its Affiliates following January 31, 2008; provided that in all other respects Executive shall be subject to the terms and conditions of any such retiree medical plan (including with respect to any requirement for employee contributions).

      (b)    <u>Life Insurance</u>. During the Employment Term, the Company shall maintain in effect, at the Company's cost, a ten (10) year term life insurance policy on the life of Executive in the amount of $10,000,000, payable to such beneficiary as designated by Executive. If Executive terminates employment prior to the expiration of the ten (10) year term of such policy, he may continue to maintain the policy at his own expense or the policy may be allowed to lapse.

      (c)    <u>Annuity Benefit</u>. Provided Executive remains continuously employed by the Company through December 31, 2014, the Company shall purchase on Executive's behalf, as soon as administratively feasible, but in no event later than March 15, 2015, a single premium annuity contract from an insurance company acceptable to Executive, providing an annual annuity commencing on such date thereafter and payable in such form (e.g., life annuity, term certain and life annuity or joint and survivor annuity) as specified by Executive (the "***Annuity Contract***"). The Annuity Contract shall provide the specified annuity in the amount which may be provided by a single premium of the net amount remaining after withholding all applicable income and payroll taxes, from a non-periodic payment of $3,000,000. If, prior to December 31, 2014, Executive has been terminated without Cause by the Company, resigns for Good Reason, or terminates employment due to death or Disability, Executive (or his personal representative, as the case may be) shall be entitled to such Annuity Contract as soon as administratively practicable following Executive's termination of employment, but in no event later than March 15th of the year following such termination of employment.  If Executive is terminated by the Company for Cause or resigns without Good Reason prior to December 31, 2014, he shall forfeit his right to the Annuity Contract.

      (d)    <u>Additional Cooperation</u>. Notwithstanding anything in Section 9(n) to the contrary, (i) Executive and the Company shall coordinate with Executive's schedule so as to minimize the extent to which any cooperation obligation under Section 9(n) interferes with Executive's other business activities, and (ii) the Company shall pay Executive's travel expenses (transportation, lodging, meals, etc.) in a level of comfort comparable to that enjoyed while employed hereunder and reasonable attorneys' fees of counsel selected by him, incurred in order to satisfy Executive's obligations under Section 9(n).

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Exhibit 10 (qq)

## AMENDED AND RESTATED EMPLOYMENT AGREEMENT

by and between LUMINANT HOLDING COMPANY LLC ("***Luminant***"), ENERGY FUTURE HOLDINGS CORP. (the parent entity of Luminant, referred to herein as the "***Company***") and MARK ALLEN MCFARLAND ("***Executive***") (individually, each a "***Party***" and collectively, the "***Parties***").

### WITNESSETH

WHEREAS, the Parties previously entered into an employment agreement dated July 7, 2008 ( ***"Original Effective Date"***) and most recently amended and restated effective July 1, 2011; and

WHEREAS, Executive has been appointed as Chief Executive Officer of Luminant effective January 1, 2013; and

WHEREAS, the Parties desire to amend and restate the employment agreement, in each case on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual promises, covenants and obligations contained herein, the Company, Luminant and Executive agree as follows:

1.  **Term of Employment**. Subject to the provisions of Section 7 of this Agreement, this Agreement, as restated, and Executive's employment hereunder shall be effective as of January 1, 2013 (" ***Effective Date***") and shall end as of 11:59:59 P.M. on June 30, 2015 (the "***Initial Term***"). Subject to the provisions of Section 7 of this Agreement, this Agreement shall automatically renew for an additional one (1) year period commencing immediately following the last day of the Initial Term and each one (1) year period thereafter (each, a "***Renewal Term***"), unless, the Company or Executive provides the other Party written notice of non-renewal at least sixty (60) days prior to the end of the applicable term. The period during which Executive is employed by Luminant hereunder is hereinafter referred to as the "***Employment Term***."

2.  **Position and Duties**.

(a)     From the Effective Date and during the remainder of the Employment Term, Executive shall serve as Chief Executive Officer of Luminant and as Executive Vice President of the Company. In both positions, Executive shall have such duties, authority and responsibilities as shall be determined from time to time by the President and CEO of the Company, which duties, authority and responsibilities shall be customary for Executive's position in a business of similar size, type and nature to that of Luminant or the Company, as appropriate. Executive shall report to the President and CEO of the Company with respect to his responsibilities to Luminant and the Company. Executive shall also serve as a member of the Strategy and Policy Committee for the Company.

(b)     During the Employment Term, Executive will devote Executive's full business time and best efforts to performance of the duties described in Section 2(a) and will not engage in any other business, profession or occupation for compensation or otherwise which would conflict or interfere, directly or indirectly, with performance of Executive's duties. Executive may participate in civic and charitable activities and may serve on the board of non-profit organizations and on the board of one outside company,

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

provided that Executive obtains prior approval of the board of directors of the Company (as used herein, the term "**Board**" shall mean the board of directors of the Company or a committee designated by such board), which shall not be unreasonably withheld, prior to accepting appointment or reappointment to a board of directors or trustees of any other business, corporation or charitable organization; provided, further, that, in each case, such activities do not conflict or interfere with the performance of Executive's duties hereunder or conflict with Section 8.

3.    **Base Salary**. From the Effective Date and during the remainder of the Employment Term, Luminant shall pay Executive a base salary of $675,000 annually, payable in regular installments in accordance with Luminant's usual payment practices. Executive shall be entitled to increases in his base salary in the sole discretion of the Board, which shall make such determinations following its annual review process for executives. Executive's annual base salary, as in effect from time to time, is hereinafter referred to as the "**Base Salary**."

4.    **Annual Bonus**. With respect to each fiscal year during the Employment Term, Executive shall have the opportunity to earn an annual bonus award (the "**Annual Bonus**") pursuant to the terms and conditions of the EFH Executive Annual Incentive

business performance targets and Executive's individual performance, both as approved by the Board; provided, however, if Luminant, the Company and/or Executive achieve superior performance targets as established by the Board, then Executive shall be eligible to receive a bonus award of up to 200% of his Target Award. Each Annual Bonus, if any, shall be paid to Executive within two and one-half (2½) months after the end of the applicable fiscal year.

5.    **Employee Benefits; Perquisites; Fringe Benefits**.

(a)    During the Employment Term, Executive shall be entitled to participate in the Company's group health, life, disability, and all tax qualified and nonqualified benefit plans, as in effect from time to time (collectively "**Employee Benefits**"), on a basis which is no less favorable than is offered to other members of the Strategy and Policy Committee (with the exception of the CEO of the Company), to the extent consistent with applicable law and the terms of the applicable plans.

(b)    During the Employment Term, Executive shall be entitled to fringe benefits consistent with the practices of the Company to the extent the Company provides similar benefits to other members of the Strategy and Policy Committee (with the exception of the CEO of the Company) and Executive is otherwise eligible to participate in such fringe benefit programs.

(c)    At the beginning of each calendar year during the Employment Term, Executive shall be entitled to the greater of: five (5) weeks of paid vacation, or the maximum number of days Executive is entitled to under the Company's vacation or paid time off policy, as applicable. Executive shall be entitled to carry over up to five (5) days of unused vacation from one calendar year to the next; provided that, any carryover vacation days not used in the next calendar year shall be forfeited.  Executive shall also be entitled to paid sick leave benefits in accordance with those provided to other similarly situated executives during the Employment Term.

(d)    Executive shall be entitled to the additional benefits and compensation set forth in Exhibits I and II attached hereto, subject to the terms and conditions thereof.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

6.     **Business Expenses**. Subject to Luminant's standard policies and procedures with respect to expense reimbursement, Luminant shall reimburse Executive for, or pay on behalf of Executive, reasonable and appropriate expenses incurred by Executive for business related purposes, provided claims for reimbursement are submitted timely and with appropriate supporting documentation.

7.     **Termination**. Executive's employment hereunder may be terminated by either the Company or Executive at any time and for any reason; provided that, unless otherwise provided herein, either Party will be required to give the other Party at least sixty (60) days advance written notice of termination of Executive's employment. Notwithstanding the foregoing, the Company may, in lieu of providing sixty (60) days advance written notice of termination, immediately terminate Executive's employment for Cause; provided, that, the Company provides Executive with the compensation and benefits then in effect at the time of such termination to which Executive would have been entitled had he continued employment with the Company for such sixty (60) day period. The provisions of this Section 7 shall exclusively govern Executive's rights upon termination of employment with Luminant and its Affiliates (as defined in Section 8(c) below).

(a)     <u>By the Company for Cause or by Executive Due to Voluntary Resignation without Good Reason</u>.

(i)     Executive's employment may be terminated by the Company for Cause (as defined below) or by Executive's voluntary resignation without Good Reason (as defined below) and, in either case, Executive shall be entitled to receive:

(A)     within six (6) calendar days following the date of termination, accrued, but unpaid Base Salary and unused vacation, earned through the date of termination;

(B)     in accordance with Section 4 (except to the extent payment is otherwise deferred pursuant to any applicable deferred compensation arrangement with Luminant or the Company), any accrued but unpaid Annual Bonus earned for any previously completed fiscal year;

(C)     within sixty (60) days of Executive's claim for reimbursement, payment for any unreimbursed business expenses properly incurred by Executive in accordance with Luminant's policies prior to the date of Executive's termination; provided that claims for reimbursement are accompanied by appropriate supporting documentation and are submitted to Luminant within ninety (90) days following the date of Executive's termination of employment;

(D)     Employee Benefits and equity compensation, if any, as to which Executive may be entitled under the employee benefit plans of Luminant and its Affiliates or any agreement between Luminant (and/or its Affiliates) and Executive; and

(E)     any amounts payable or that may become payable pursuant to Section 7(g) and/or Section 9(g) (the amounts described in clauses (A) through (E) hereof being referred to as the "***Accrued Rights***").

Following termination of Executive's employment by the Company for Cause or voluntary resignation by Executive without Good Reason, except as set forth in this Section 7(a)(i) and for any rights to indemnification and claims for liability insurance coverage under officer and director policies, Executive shall have no further rights to any compensation or any other benefits under this Agreement.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(ii)    For purposes of this Agreement, the terms:

(A)    "*Cause*" shall mean (i) if, in performing his duties to Luminant, Executive engages in conduct that constitutes (a) a material breach of his fiduciary duty to Luminant, the Company, or their shareholders (including, without limitation, a material breach or attempted breach of the provisions under Section 8), (b) gross neglect, or (c) gross misconduct resulting in material economic harm to Luminant or the Company; provided that any such conduct described in (a), (b) or (c) is not cured within ten (10) business days after Executive receives from the Company written notice thereof; or (ii) Executive's conviction of, or entry of a plea of guilty or nolo contendere for, a felony or other crime involving moral turpitude.

(B)    "*Good Reason*" shall mean, provided that Executive has not previously given the Company his written consent, (i) a reduction in Executive's Base Salary or Executive's annual incentive compensation opportunity (other than a general reduction in base salary or annual incentive compensation opportunities that affects all salaried employees of the Company proportionately); (ii) a transfer of Executive's primary workplace by more than fifty (50) miles from the workplace on the Effective Date; (iii) a substantial adverse change in Executive's duties or responsibilities; (iv) any material breach of this Agreement; or (v) an adverse change in Executive's line of reporting to superior officers pursuant to the terms of this Agreement;  provided,  however, that any isolated, insubstantial or inadvertent failure by Luminant or the Company that is not in bad faith and is cured within ten (10) business days after Executive gives the Company written notice of any such event set forth above, shall not constitute Good Reason.

(b)    Disability or Death.

(i)    Executive's employment shall terminate upon Executive's death and may be terminated by the Company if Executive has a Disability (as defined below) and, in either case, Executive or Executive's estate (as the case may be) shall be entitled to receive:

(A)    the Accrued Rights;

(B)    a portion of the Target Award that Executive would have been entitled to receive pursuant to Section 4 hereof for the fiscal year of termination, such portion to be determined by multiplying the Target Award by a fraction, the numerator of which is the number of days during which Executive was employed by Luminant in the fiscal year of Executive's termination, and the denominator of which is 365 (the " *Pro-Rata Bonus*"), with such Pro-Rata Bonus payable to Executive pursuant to Section 4 as if Executive's employment had not terminated; and

(C)    any additional benefits and compensation set forth in Exhibits I and II attached hereto, subject to the terms and conditions thereof.

Following Executive's termination of employment due to death or Disability, except as set forth in this Section 7(b)(i) and for any rights to indemnification and claims for liability insurance coverage under officer and director policies, Executive shall have no further rights to any compensation or any other benefits under this Agreement.

(ii)    "*Disability*" shall mean Executive's physical or mental incapacitation and consequent inability, with reasonable accommodation, for a period of six consecutive months to perform Executive's duties;  provided, however, in the event the Company temporarily replaces Executive, or transfers Executive's duties or responsibilities to another individual, on account of Executive's inability to perform such duties due to a mental or physical incapacity which is, or is reasonably expected to become, a long-

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

term disability, then Executive's employment shall not be deemed terminated by the Company and Executive shall not be able to resign with Good Reason. Any question as to the existence of a Disability as to which Executive and the Company cannot agree shall be determined in writing by a qualified independent physician mutually acceptable to Executive and the Company. If Executive and the Company cannot agree on a qualified independent physician, each shall appoint a physician and those two physicians shall select a third who shall make such determination in writing. The determination of Disability made in writing to the Company and Executive shall be final and conclusive for all purposes of the Agreement and any other agreement with Executive that incorporates this definition of Disability.

      (c)      <u>By the Company Without Cause; Resignation by Executive for Good Reason</u>. Executive's employment hereunder may be terminated by the Company without Cause (other than by reason of death or Disability) or upon Executive's resignation for Good Reason and, in either case (except as otherwise provided in Section 7(e)), Executive shall be entitled to receive:

      (i)      the Accrued Rights;

      (ii)      provided Executive (x) does not violate the restrictions set forth in Section 8 of this Agreement and (y) executes, delivers and does not revoke a general release of claims against Luminant, the Company and its Affiliates (excluding claims for indemnification, claims for coverage under officer and director policies, and claims as a stockholder of the Company):

      (A)      a lump sum payment equal to: (I) two (2) times Executive's Base Salary, and (II) the Pro-Rata Bonus, payable as soon as practicable but no later than the earlier of: (a) March 15 following the calendar year in which termination occurs or (b) ninety (90) days following termination; and

      (B)      Executive, his spouse and eligible dependents (to the extent covered immediately prior to such termination) shall continue to be eligible to participate in all of the Company's group health plans on the same terms and conditions as active employees of the Company until the earlier of (x) two (2) years from the date of termination of Executive's employment (the "*Severance Period*"), to the extent that Executive was eligible to participate in such plans immediately prior to the date of termination, or (y) until Executive is, or becomes, eligible for comparable coverage under the group health plans of a subsequent employer.   If Executive continues to receive benefits pursuant to this Section 7(c)(ii)(B) when, in the absence of the benefits provided in this Section 7(c)(ii)(B), Executive would not be entitled to continuation coverage under Section 4980B of the Internal Revenue Code of 1986, as amended (the "*Code*"), Executive shall receive reimbursement for all medical expenses no later than the end of the calendar year immediately following the calendar year in which the applicable expenses were incurred. The health care continuation coverage period under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("*COBRA*"), Code Section 4980B, or any replacement or successor provision of United States tax law, shall run concurrently with the Severance Period; and

      (iii)      any additional benefits and compensation set forth in Exhibits I and II attached hereto, subject to the terms and conditions thereof.

Following Executive's termination of employment by the Company without Cause (other than by reason of Executive's death or Disability) or upon Executive's resignation for Good Reason, except as set forth in this Section 7(c) or otherwise provided in Section 7(e) and for any rights to indemnification and claims for liability insurance coverage under officer and director policies, Executive shall have no further rights to any compensation or any other benefits under this Agreement.

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(d)    Expiration of Employment Term.

(i)    In the event Executive elects not to extend the Employment Term pursuant to Section 1 and Executive's employment has not been earlier terminated pursuant to Sections 7(a), (b), (c), or (e), the Employment Term shall expire and Executive's employment hereunder shall terminate as of the end of the day immediately preceding the commencement of a subsequent Renewal Term, and Executive shall be entitled to receive the Accrued Rights.  Except as set forth in this Section 7(d)(i) and for any rights to indemnification and claims for liability insurance coverage under officer and director policies, Executive shall have no further rights to any compensation or any other benefits under this Agreement.

(ii)    In the event the Company elects not to extend the Employment Term pursuant to Section 1 and Executive's employment has not been earlier terminated pursuant to Sections 7(a), (b), (c), or (e), the Employment Term shall expire and Executive's employment hereunder shall terminate as of the end of the day immediately preceding the commencement of a subsequent Renewal Term, and Executive shall be entitled to receive the payments and benefits applicable to a termination of Executive's employment without Cause pursuant to Section 7(c) or Section 7(e), as applicable.  Except as set forth in this Section 7(d)(ii) and for any rights to indemnification and claims for liability insurance coverage under officer and director policies, Executive shall have no further rights to any compensation or any other benefits under this Agreement.

(e)    Change in Control. Notwithstanding any provision contained herein, if Executive's employment is terminated by the Company without Cause (other than by reason of death or Disability) or if Executive resigns for Good Reason, in either case, within twenty-four (24) months following a Change in Control (as defined in the 2007 Stock Incentive Plan for Key Employees of Energy Future Holdings Corp. and its Affiliates), Executive shall be entitled to receive:

(i)    the Accrued Rights;

(ii)    provided Executive (x) does not violate the restrictions set forth in Section 8 of this Agreement and (y) executes, delivers and does not revoke a general release of claims against Luminant, the Company and its Affiliates (excluding claims for indemnification, claims for coverage under officer and director policies, and claims as a stockholder of the Company), a lump sum payment equal to two (2) times the sum of Executive's annualized Base Salary and Executive's Target Award, payable as soon as practicable but no later than the earlier of: (i) March 15 following the calendar year in which termination occurs or (ii) ninety (90) days following termination;

(iii)    provided Executive (x) does not violate the restrictions set forth in Section 8 of this Agreement and (y) executes, delivers and does not revoke a general release of claims against Luminant, the Company and its Affiliates (excluding claims for indemnification, claims for coverage under officer and director policies, and claims as a stockholder of the Company), Executive, his spouse and eligible dependents (to the extent covered immediately prior to such termination) shall continue to be eligible to participate in all of the Company's group health plans on the same terms and conditions as active employees of the Company until the earlier of (A) termination of the Severance Period, to the extent that Executive was eligible to participate in such plans immediately prior to the date of termination, or (B) until Executive is, or becomes, eligible for comparable coverage under the group health plans of a subsequent employer. If Executive continues to receive benefits pursuant to this Section 7(e)(iii) when, in the absence of the benefits provided in this Section 7(e)(iii) Executive would not be entitled to continuation coverage under Code Section 4980B, Executive shall receive reimbursement for all medical expenses no later than the end of the calendar year

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

immediately following the calendar year in which the applicable expenses were incurred. The health care continuation coverage period under COBRA, Code Section 4980B, or any replacement or successor provision of United States tax law, shall run concurrently with the Severance Period; and

        (iv)      any additional benefits and compensation set forth in Exhibits I and II attached hereto, subject to the terms and conditions thereof.

Following Executive's termination of employment without Cause (other than by reason of Executive's death or Disability) or upon Executive's resignation for Good Reason, in either case, within twenty-four (24) months following a Change in Control, except as set forth in this Section 7(e) and for any rights to indemnification and claims for liability insurance coverage under officer and director policies, Executive shall have no further rights to any compensation or any other benefits under this Agreement.

    (f)   Notice of Termination. Any purported termination of employment by the Company or by Executive (other than due to Executive's death) shall be communicated by written Notice of Termination to the other Party in accordance with Section 9(j) hereof. For purposes of this Agreement, a "***Notice of Termination***" shall mean a notice indicating the specific termination provision in this Agreement relied upon and shall set forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of employment under the provision so indicated.

    (g)   Code Section 4999.

    (i)   If, by reason of, or in connection with, any transaction that occurs after the Original Effective Date, Executive would be subject to the imposition of the excise tax imposed by Code Section 4999 related to Executive's employment with the Company, whether before or after termination of Executive's employment, but the imposition of such tax could be avoided by approval of shareholders described in Code Section 280G(b)(5)(B), then Executive may ask the Company to seek such approval, in which case the Company will use its reasonable best efforts to cause such approval to be obtained and Executive will cooperate and execute such waivers as may be necessary so that such approval avoids imposition of any excise tax under Code Section 4999.   If Executive fails to request that the Company seek such approval, or if Executive does request that the Company seek such approval, but fails to cooperate and execute such waivers as may be necessary in the approval process, Section 7(g)(ii) shall not apply and Executive shall not be entitled to any gross-up payment for any resulting tax under Code Section 4999. If such approval, even if sought and obtained, would not avoid imposition of the excise tax imposed under Code Section 4999, then the provisions of Section 7(g)(ii) shall apply without any precedent obligation of Executive to seek such approval.

    (ii)   Gross-Up Payment.

        (A)      In the event it shall be determined that any payment, benefit or distribution (or combination thereof) by the Company, any Affiliate, or one or more trusts established by the Company or any Affiliate for the benefit of their employees, to or for the benefit of Executive (whether paid or payable or distributed or distributable pursuant to the terms of this Agreement, or otherwise) (a "***Payment***") is subject to the excise tax imposed by Code Section 4999 or any interest or penalties are incurred by Executive with respect to such excise tax (such excise tax, together with any such interest and penalties, hereinafter collectively referred to as the "***Excise Tax***"), Executive shall be entitled to receive an additional payment (a "***Gross-Up Payment***") in an amount such that after payment by Executive of all taxes (including any interest or penalties imposed with respect to such taxes), including, without limitation, any federal, state and local income taxes and employment taxes (and any interest and penalties imposed with respect thereto) and the

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Excise Tax imposed upon the Gross-Up Payment, Executive retains an amount of the Gross-Up Payment equal to the Excise Tax imposed upon the Payments.

(B)       All determinations required to be made under this Section 7(g)(ii), including whether and when a Gross-Up Payment is required and the amount of such Gross-Up Payment and the assumptions to be utilized in arriving at such determination, shall be made by Deloitte & Touche LLP, Alvarez & Marsal, or such other nationally recognized accounting firm as may be designated by the Company (the "**_Accounting Firm_**"), which shall provide detailed supporting calculations both to the Company and Executive within ten (10) business days of the receipt of notice from Executive that there has been a Payment, or such earlier time as is requested by the Company; provided that for purposes of determining the amount of any Gross-Up Payment, Executive shall be deemed to pay federal income tax at the highest marginal rates applicable to individuals in the calendar year in which any such Gross-Up Payment is to be made and deemed to pay state and local income taxes at the highest effective rates applicable to individuals in the state or locality of Executive's residence or place of employment in the calendar year in which any such Gross-Up Payment is to be made, net of the maximum reduction in federal income taxes that can be obtained from deduction of such state and local taxes, taking into account limitations applicable to individuals subject to federal income tax at the highest marginal rates. All fees and expenses of the Accounting Firm shall be borne solely by the Company. Any Gross-Up Payment, as determined pursuant to this Section 7(g)(ii), shall be paid by the Company to Executive (or to the appropriate taxing authority on Executive's behalf) when due. If the Accounting Firm determines that no Excise Tax is payable by Executive, it shall so indicate to Executive in writing. Any determination by the Accounting Firm shall be binding upon the Company and Executive (subject to Section 7(g)(ii)(C)). As a result of the uncertainty in the application of Code Section 4999, it is possible that the amount of the Gross-Up Payment determined by the Accounting Firm to be due to (or on behalf of) Executive was lower than the amount actually due (" **_Underpayment_**"). In the event that the Company exhausts its remedies pursuant to Section 7(g)(ii)(C) and Executive thereafter is required to make a payment of any Excise Tax, the Accounting Firm shall determine the amount of the Underpayment that has occurred, and any such Underpayment shall be promptly paid by the Company to or for the benefit of Executive (but in any case no later than the calendar year following the calendar year in which such tax was payable).

(C)       Executive shall notify the Company in writing of any claim by the Internal Revenue Service that, if successful, would require the payment by the Company of any Gross-Up Payment. Such notification shall be given as soon as practicable but no later than ten (10) business days after Executive is informed in writing of such claim and shall apprise the Company of the nature of such claim and the date on which such claim is requested to be paid. Executive shall not pay such claim prior to the expiration of the thirty (30) day period following the date on which he gives such notice to the Company (or such shorter period ending on the date that any payment of taxes with respect to such claim is due). If the Company notifies Executive in writing prior to the expiration of such period that it desires to contest such claim, Executive shall (i) give the Company any information reasonably requested by the Company relating to such claim, (ii) take such action in connection with contesting such claim as the Company shall reasonably request in writing from time to time, including, without limitation, accepting legal representation with respect to such claim by an attorney reasonably selected by the Company, (iii) cooperate with the Company in good faith in order to effectively contest such claim and (iv) permit the Company to participate in any proceedings relating to such claim; provided, however, that the Company shall bear and pay directly all costs and expenses (including additional interest and penalties) incurred in connection with such contest and shall indemnify and hold Executive harmless, on an after-tax basis, for any Excise Tax or income tax (including interest and penalties with respect thereto) imposed as a result of such representation and payment of costs and expenses. Without limitation on the foregoing provisions of this Section 7(g)(ii)(C), the Company shall control all proceedings taken in connection with such contest and, at its sole option, may pursue or forego any and all

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

administrative appeals, proceedings, hearings and conferences with the taxing authority in respect of such claim and may, at its sole option, either direct Executive to pay the tax claimed and sue for a refund or contest the claim in any permissible manner, and Executive agrees to prosecute such contest to a determination before any administrative tribunal, in a court of initial jurisdiction and in one (1) or more appellate courts, as the Company shall determine; provided that if the Company directs Executive to pay such claim and sue for a refund, the Company shall advance the amount of such payment to Executive, on an interest-free basis, and shall indemnify and hold Executive harmless, on an after-tax basis, from any Excise Tax or income tax (including interest or penalties with respect thereto) imposed with respect to such advance or with respect to any imputed income with respect to such advance; provided, further, that if Executive is required to extend the statute of limitations to enable the Company to contest such claim, Executive may limit this extension solely to such contested amount. The Company's control of the contest shall be limited to issues with respect to which a Gross-Up Payment would be payable hereunder and Executive shall be entitled to settle or contest, as the case may be, any other issue raised by the Internal Revenue Service or any other taxing authority.

(D)        If, after the receipt by Executive of an amount paid or advanced by the Company pursuant to this Section 7(g)(ii), Executive becomes entitled to receive any refund with respect to a Gross-Up Payment, Executive shall (subject to the Company's complying with the requirements of Section 7(g)(ii)(C)) promptly pay to the Company the amount of such refund received (together with any interest paid or credited thereon after taxes applicable thereto). If, after the receipt by Executive of an amount advanced by the Company pursuant to Section 7(g)(ii)(C), a determination is made that Executive shall not be entitled to any refund with respect to such claim, and the Company does not notify Executive in writing of its intent to contest such denial of refund prior to the expiration of thirty (30) days after such determination, then such advance shall be forgiven and shall not be required to be repaid, and the amount of such advance shall offset, to the extent thereof, the amount of the Gross-Up Payment required to be paid.

(E)        For the avoidance of doubt, all payments to or for the benefit of Executive provided for in this Section 7(g)(ii) shall be made no later than the end of the calendar year in which the applicable Excise Tax has become due, or if as a result a tax audit or litigation, it is determined that no additional Excise Tax has become due, the end of the calendar year in which the audit is completed or there is a final and non-appealable settlement or other resolution.

8.    **Restrictive Covenants**.

(a)        In consideration of the Company and Luminant entering into this Agreement with Executive and hereby promising and committing themselves to provide Executive with Confidential Information and/or specialized training after Executive executes this Agreement, Executive shall not, directly or indirectly:

(i)        at any time during or after the Employment Term, disclose any Confidential Information pertaining to the business of Luminant, the Company, the Sponsor Group, or any of their respective Affiliates, except when required to perform his duties to Luminant, the Company or one of its Affiliates, or by law or judicial process, provided that Executive gives the Company reasonable notice of any legal or judicial proceeding requiring Executive to disclose Confidential Information and an opportunity to challenge the disclosure of any such information, and Executive agrees to provide such reasonable notice in writing to:

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

General Counsel
Energy Future Holdings Corp.
1601 Bryan Street, 41st Floor
Dallas, Texas 75201
(214) 812-5153 (facsimile);

(ii)          at any time during the Employment Term and for a period of eighteen (18) months  thereafter (the "**Non-Compete Period**"), directly or indirectly, act as a proprietor, investor, director, officer, employee, substantial stockholder, consultant, or partner in any Competing Business in Texas or any other geographic area in which Texas Energy Future Holdings Limited Partnership, the Company or any of their respective subsidiaries operates or conducts business; or

(iii)          at any time during the Employment Term and for a period of eighteen (18) months  thereafter, directly or indirectly (A) solicit customers or clients of Luminant, the Company or any of its Affiliates to terminate their relationship with Luminant, the Company or any of its Affiliates or otherwise solicit such customers or clients to compete with any business of Luminant, the Company or any of its Affiliates, or (B) solicit or offer employment to any person who is, or has been at any time during the twelve (12) months immediately preceding the termination of Executive's employment, employed by Luminant, the Company or any of its Affiliates;

provided that in each of (ii) and (iii) above, such restrictions shall not apply with respect to any member of the Sponsor Group or any of its Affiliates that is not engaged in any business that competes, directly or indirectly, with the Company or any of its subsidiaries in any geographic area where they operate. Notwithstanding the foregoing, for the purposes of this Section 8(a), (A) Executive may, directly or indirectly own, solely as an investment, securities of any Person engaged in the business of Luminant, the Company or its Affiliates that are publicly traded on a national or regional stock exchange or quotation system or on the over-the-counter market if Executive (I) is not a controlling person of, or a member of a group which controls, such Person, and (II) does not, directly or indirectly, own 5% or more of any class of securities of such Person, and (B) Section 8(a)(ii) shall not be violated by reason of any exercise of tag-along rights under the Sale Participation Agreement, by and between the Company (and related parties) and Executive (the " *Sale Participation Agreement*") or Drag Transaction (as defined in the Sale Participation Agreement) that may occur after the date hereof.

(b)          Notwithstanding clause (a) above, if at any time a court holds that the restrictions stated in such clause (a) are unreasonable or otherwise unenforceable under circumstances then existing, the Parties hereto agree that the maximum period, scope or geographic area determined to be reasonable under such circumstances by such court will be substituted for the stated period, scope or area. Because Executive's services are unique and because Executive has had access to Confidential Information, the Parties hereto agree that money damages will be an inadequate remedy for any breach of this Agreement. In the event of a breach or threatened breach of this Agreement, Luminant, the Company or their respective successors or assigns may, in addition to other rights and remedies existing in their favor, apply to any court of competent jurisdiction for specific performance and/or injunctive relief in order to enforce, or prevent any violations of, the provisions hereof (without the posting of a bond or other security). Notwithstanding the foregoing, in the event Executive breaches the covenants set forth in this Section 8, the Company's rights and remedies with respect Executive's Options, Option Stock, and Stock and payments related thereto, as those terms are defined in the Management Stockholder's Agreement, by and between the Company (and related parties)

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

and Executive (the "***Management Stockholder's Agreement***") shall be limited to those set forth in Section 22(c) of the Management Stockholder's Agreement.

      (c)      For purposes of this Agreement, the terms listed below shall be defined as follows:

      (i)      "***Affiliate***" shall mean with respect to any Person, any entity directly or indirectly controlling, controlled by or under common control with such Person; and, by way of clarification and not by limitation, the Company and Luminant are Affiliates of each other; provided, however, for purposes of this Agreement, Texas Energy Future Co-Invest, LP shall not be deemed to be an Affiliate of the Sponsor Group or any member of the Sponsor Group.

      (ii)      "***Competing Business***" shall mean any business that directly or indirectly competes, at the relevant determination date, with one or more of the businesses of Luminant, the Company or any of its Affiliates in any geographic area where Texas Energy Future Holdings Limited Partnership, the Company, or any of their respective subsidiaries operates.

      (iii)      "***Confidential Information***" shall mean information: (A) disclosed to or known by Executive as a consequence of or through his employment with Luminant, the Company or any Affiliate; (B) not publicly available or not generally known outside Luminant, the Company or any Affiliate; and (C) that relates to the business and/or development of Luminant, the Company or any Affiliate. Any information that does not meet each of the criteria listed above (in subsections (A) - (C)) shall not constitute Confidential Information. By way of example, Confidential Information shall include but not be limited to the following: all non-public information or trade secrets of Luminant, the Company, or any Affiliate that gives Luminant, the Company or any Affiliate a competitive business advantage or the opportunity of obtaining such advantage, or disclosure of which might be detrimental to the interests of Luminant, the Company or any Affiliate; information regarding Luminant's, the Company's or any Affiliate's business operations, such as financial and sales data (including budgets, forecasts, and historical financial data), operational information, plans, and strategies; business and marketing strategies and plans for various products and services; rate and regulatory strategy and plans; information regarding suppliers, consultants, employees, and contractors; technical information concerning products, equipment, services, and processes; procurement procedures; pricing and pricing techniques; information concerning past, current and prospective customers, investors, and business affiliates; plans or strategies for expansion or acquisitions; budgets; research; trading methodologies and terms; communications information; evaluations, opinions, and interpretations of information and data; marketing and merchandising techniques; electronic databases; models; specifications; computer programs; contracts; bids or proposals; technologies and methods; training methods and processes; organizational structure; personnel information; payments or rates paid to consultants or other service providers; and Luminant's, the Company's or any Affiliate's files, physical or electronic documents, equipment, and proprietary data or material in whatever form including all copies of all such materials. By way of clarification (but not limitation), information that Executive conceived or developed during his employment with Luminant, the Company or an Affiliate or learned from other employees or contractors of Luminant, the Company or an Affiliate that meets the definition of Confidential Information shall be treated as such.

      (iv)      "***Person***" shall mean "person," as such term is used for purposes of Section 13(d) or 14(d) of the Securities Exchange Act of 1934, as amended (or any successor thereto).

      (v)      "***Restricted Group***" shall mean, collectively the Company, its subsidiaries, the members of the Sponsor Group and their respective Affiliates.

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(vi)    "***Sponsor Group***" shall mean Kohlberg Kravis Roberts & Co. L.P., TPG Capital L.P., and Goldman, Sachs & Co.

9.    **Miscellaneous**.

(a)    <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas without regard to conflicts of laws principles thereof.

(b)    <u>Entire Agreement</u>. Except as otherwise provided herein, this Agreement contains the entire understanding of the Parties with respect to the employment of Executive by Luminant, the Company and/or its Affiliates and supersedes all prior agreements and understandings. There are no restrictions, agreements, promises, warranties, covenants or undertakings between the Parties with respect to the subject matter herein other than those expressly set forth herein.

(c)    <u>No Waiver</u>. The failure of a Party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver of such Party's rights or deprive such Party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

(d)    <u>Severability</u>. In the event that any one or more of the provisions of this Agreement shall be or become invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions of this Agreement shall not be affected thereby.

(e)    <u>Assignment</u>. This Agreement, and all of Executive's rights and duties hereunder, shall not be assignable or delegable by Executive. Any purported assignment or delegation by Executive in violation of the foregoing shall be null and void ab initio and of no force and effect. This Agreement may be assigned by Luminant or the Company to a person or entity which is an Affiliate or a successor in interest to substantially all of the business operations of Luminant or the Company, provided that the assignee expressly assumes all obligations of Luminant and/or the Company under this Agreement and all other related agreements to which Executive, the Company and/or Luminant are parties. Upon such assignment, the rights and obligations of Luminant and/or the Company hereunder shall become the rights and obligations of such Affiliate or successor person or entity.

(f)    <u>Set Off; Mitigation</u>. Except as otherwise provided in Section 9(o), the obligations of Luminant and the Company to pay Executive the amounts provided and to make the arrangements provided hereunder shall not be subject to setoff, counterclaim or recoupment of amounts owed by Executive to Luminant, the Company and/or their Affiliates.  Executive shall not be required to mitigate the amount of any payment provided for pursuant to this Agreement by seeking other employment and, except as expressly provided herein, no amount payable hereunder shall be reduced by any payments or benefits received from such subsequent employment.

(g)    <u>Compliance with Code Section 409A</u>. Notwithstanding anything herein to the contrary, if, at the time of Executive's termination of employment, the Company has securities that are publicly traded on an established securities market, and Executive is a "specified employee" (as defined in Code Section 409A), and the deferral of the commencement of any payments or benefits otherwise payable pursuant to Section 7 is necessary in order to prevent any accelerated or additional tax under Code Section 409A, then, to the extent permitted by Code Section 409A, the Company will defer any such payments or benefits hereunder (without any reduction in the payments or benefits ultimately paid or provided to Executive) until the date that is six (6) months following Executive's termination of employment with the Company (or the earliest date as is permitted under Code Section 409A), provided that amounts which do not exceed the limits

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

set forth in Code Section 402(g)(1)(B) in the year of such termination shall be payable immediately upon termination. Any payments or benefits deferred due to such requirements will be paid in a lump sum to Executive at the end of such six (6) month period.   The Company shall consult with Executive in good faith regarding the implementation of the provisions of this Section 9(g).

(h)   Indemnity.  The Company and its subsidiaries shall indemnify and hold Executive harmless for all acts and omissions occurring during his employment or service as a member of the board of directors or managers (as applicable) of any of the Company and/or its subsidiaries, to the maximum extent provided under each of the Company's and such subsidiaries' charter, certificate of formation, limited partnership agreement, by-laws and applicable law. During the Employment Term and for a term of six (6) years thereafter, the Company, or any successor to the Company, the Company's subsidiaries (to the extent not covered under the terms of the Company's insurance policy), and each of their respective successors, shall purchase and maintain, at their own expense, directors' and officers' liability insurance providing coverage for Executive in the same amount as, and with terms no less favorable than, for members of their respective boards of directors or managers (as applicable).

(i)   Successors; Binding Agreement. This Agreement shall inure to the benefit of and be binding upon personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees and legatees. In the event of Executive's death before receiving all amounts and benefits due to him hereunder, such amounts shall be payable to Executive's estate or as otherwise provided under applicable benefit plans or arrangements.

(j)   Notice. For the purpose of this Agreement, notices and all other communications provided for in the Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or overnight courier or three (3) days after it has been mailed by United States registered mail, return receipt requested, postage prepaid, addressed to the respective addresses set forth below in this Agreement, or to such other address as either Party may have furnished to the other in writing in accordance herewith, except that notice of change of address shall be effective only upon receipt.

|  |  |
|---|---|
| If to the Company or Luminant: | Energy Future Holdings Corp.<br>1601 Bryan Street, 41st Floor<br>Dallas, Texas 75201-3411<br>Attention: General Counsel |
| If to Executive: | The most recent address on file with the Company |

(k)   Executive Representation. Executive hereby represents to Luminant and the Company that his execution and delivery of this Agreement and performance of his duties hereunder shall not constitute a breach of, or otherwise contravene, the terms of any employment agreement, separation agreement or other agreement or policy to which Executive is a party or otherwise bound.

(l)   Captions; Section References. The captions included herein are for convenience of reference only and shall be ignored in the construction or interpretation hereof. All references to sections of statutes, regulations or rules shall be deemed to be references to any successor sections.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

(m)  <u>Further Assurances</u>. The Parties shall, with reasonable diligence, do all things and provide all reasonable assurances as may be required to complete the transactions contemplated by this Agreement, and each Party shall provide such further documents or instruments required by the other Party as may be reasonably necessary or desirable to give effect to this Agreement and carry out its provisions.

(n)  <u>Cooperation</u>. For a period of six (6) years after his termination, Executive shall provide Executive's reasonable cooperation in connection with any action or proceeding (or any appeal from any action or proceeding) which relates to events occurring during Executive's employment hereunder, provided that the Company and its Affiliates shall use reasonable efforts to avoid material interference with Executive's business or personal activities. The Company shall pay all of Executive's reasonable expenses incurred in connection with providing such cooperation.

(o)  <u>Withholding</u>. Luminant may withhold from any amounts payable under this Agreement such federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.  In addition, Executive expressly authorizes and agrees that any amounts he owes in relation to any travel or credit cards issued or sponsored by Luminant or the Company, the energy conservation program, the appliance purchase program, or salary, bonus, vacation or other benefit overpayments, may be offset and deducted from any payments due to Executive pursuant to this Agreement.

(p)  <u>Counterparts</u>. This Agreement may be signed in counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

(q)  <u>Amendments</u>. This Agreement may not be altered, modified, or amended except by written instrument signed by the Parties hereto.

(r)  <u>Return of Property</u>.  Executive agrees that if Executive's employment with Luminant or the Company is terminated (for any reason), Executive shall not take with Executive, but will leave with the Company, all computers, cell phones, access cards, computer or electronic storage devices, any other Company property and all Confidential Information, work product, records, files, electronic mail, memoranda, reports, documents and other information that is the property of the Company, in whatever form (including on computer disk or any electronic storage device), and any copies thereof, or if such items are not on the premises of the Company, Executive agrees to return such items immediately upon Executive's termination (regardless of the reason) or any time at the request of the Company. Executive acknowledges that all such items are and remain the property of the Company.

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**IN WITNESS WHEREOF**, the Parties hereto have duly executed this Agreement as of the day and year first above written.

**ENERGY FUTURE HOLDINGS CORP** .


By:    /s/ John F. Young
      John F. Young
      President and Chief Executive Officer


**LUMINANT HOLDING COMPANY LLC**


By:    /s/ Carrie L. Kirby
      Carrie L. Kirby
      Senior Vice President


**EXECUTIVE:**


         /s/ Mark Allen McFarland
         Mark Allen McFarland

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit I**

In addition to the benefits, perquisites and compensation set forth in the Agreement, Executive shall be entitled to receive the benefits, perquisites and compensation set forth in this Exhibit I, subject to the terms and conditions set forth herein:

(a)      Executive shall have the opportunity to earn the retention awards set forth in this Exhibit I, collectively referred to herein as the "*Retention Award*", subject to the terms and conditions set forth herein:

(i)      Executive shall earn a long-term cash bonus award equal to 75% of the aggregate Annual Bonus amount actually earned by Executive in respect of fiscal years 2009, 2010, and 2011 (the "*First Retention Award*"). The First Retention Award earned by Executive shall be paid to Executive in a lump sum on September 30, 2012; provided, that, subject to the provisions of sub-paragraph (a)(v) of this Exhibit I, Executive is employed by Luminant, the Company or an Affiliate thereof on September 30, 2012.

(ii)      Executive shall earn an additional long-term cash bonus award in an amount between $650,000 and $1,300,000 determined by the Company's performance as indicated by the level of Competitive Management EBITDA actually achieved for the fiscal year ended December 31, 2011 relative to the Competitive Management EBITDA threshold and target amounts set by the Board for such fiscal year (the "*Second Retention Award*"). For the achievement of the threshold level of Competitive Management EBITDA in respect of such year, Executive shall earn $650,000, for the achievement of at least the target level of Competitive Management EBITDA in respect of such year, Executive shall earn $1,300,000 (the "*Second Retention Target Award*"), and for the achievement of Competitive Management EBITDA in between the threshold and target levels in respect of such year, Executive shall earn an amount between $650,000 and $1,300,000 as determined by linear interpolation. The Second Retention Award, if earned, shall be paid to Executive in two equal installments on September 30, 2012 and September 30, 2013; provided, that, subject to the provisions of sub-paragraph (a)(v) of this Exhibit I, Executive is employed by Luminant, the Company or an Affiliate thereof on the applicable payment date.

(iii)      Executive shall earn an additional long-term cash bonus award in an amount between $500,000 and $1,000,000 per fiscal year determined by the Company's performance as indicated by the level of Competitive Management EBITDA actually achieved for the fiscal years ended December 31, 2012, December 31, 2013, and December 31, 2014 relative to the Competitive Management EBITDA threshold and target amounts set by the Board for each respective fiscal year (the "*Third Retention Award*"). For the achievement of the threshold level of Competitive Management EBITDA in respect of any such year, Executive shall earn $500,000, for the achievement of at least the target level of Competitive Management EBITDA in respect of any such year, Executive shall earn $1,000,000 (the "*Third Retention Target Award*"), and for the achievement of Competitive Management EBITDA in between the threshold and target levels in respect of any such year, Executive shall earn an amount between $500,000 and $1,000,000 as determined by linear interpolation. The Third Retention Award, if earned, shall be paid to Executive in a lump sum on March 13, 2015; provided, that, subject to the provisions of sub-paragraph (a)(v) of this Exhibit I, Executive is employed by Luminant, the Company or an Affiliate thereof on March 13, 2015.

(iv)      The process followed by the O&C Committee in establishing the Competitive Management EBITDA threshold and target amounts for purposes of the Second Retention Award and the Third Retention Award shall be consistent with the O&C Committee's prior practice.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(v)          In the event Executive's employment is terminated pursuant to Section 7(b), 7(c), 7(d)(ii), or 7(e) hereof, in any case, prior to the payment date of an applicable Retention Award, Executive shall be entitled to receive the Retention Award, or a portion thereof, that Executive would otherwise have been entitled to receive pursuant to sub-paragraphs (a)(i), (a)(ii), and (a)(iii) of this Exhibit I, calculated as set forth below (the sum of such amounts referred to herein as the " ***Pro-Rata Retention Award***"), with such Pro-Rata Retention Award payable to Executive as soon as practical but no later than the earlier of: (a) March 15 following the calendar year in which termination occurs or (b) ninety (90) days following termination; provided, that, in the case of a termination of employment pursuant to Section 7(c), 7(d)(ii), or 7(e), Executive (x) does not violate the restrictions set forth in Section 8 of this Agreement and (y) executes, delivers and does not revoke a general release of claims against Luminant, the Company and its Affiliates (excluding claims for indemnification, claims for coverage under officer and director policies, and claims as a stockholder of the Company).

(A)          with respect to the First Retention Award, (x) 75% of the aggregate Annual Bonus amount(s) actually earned by Executive in respect of any applicable fiscal year completed prior to the date of Executive's termination, plus (y) if the termination occurs prior to January 1, 2012, 75% of the Pro-Rata Bonus amount calculated pursuant to Section 7(b)(i)(B) above (for avoidance of doubt, the First Retention Award payment shall not be based on any Annual Bonus or Pro-Rata Bonus earned by or paid to Executive with respect to fiscal year 2012); plus

(B)          with respect to the Second Retention Award, (x) if the termination occurs prior to January 1, 2012, a portion of the Second Retention Award to be determined by multiplying the Second Retention Target Award by a fraction, the numerator of which is the number of days during which Executive was employed by Luminant, the Company or an Affiliate thereof in the fiscal year of Executive's termination, and the denominator of which is 365, or (y) if the termination occurs on or after January 1, 2012, the actual earned amount of the Second Retention Award; plus

(C)          with respect to the Third Retention Award, (x) if the termination occurs prior to January 1, 2015, a portion of the Third Retention Award equal to (1) the amount that would have been payable under sub-paragraph (a)(iii) of this Exhibit I for any completed fiscal year, plus (2) a portion of the Third Retention Award to be determined by multiplying the Third Retention Target Award for the year of Executive's termination by a fraction, the numerator of which is the number of days during which Executive was employed by Luminant, the Company or an Affiliate thereof in the fiscal year of Executive's termination, and the denominator of which is 365, or (y) if the termination occurs on or after January 1, 2015, the actual earned amount of the Third Retention Award.

(vi)          Notwithstanding any provision of this Exhibit I to the contrary, in the event of a Change in Control, Executive's entitlement to the Retention Awards shall be determined without regard to the achievement of Competitive Management EBITDA in respect of the fiscal year in which such Change in Control occurs and any subsequent year, and the amount earned by Executive shall be determined as if target level of Competitive Management EBITDA were achieved for any such year, but to the extent the Retention Award is attributable to any prior fiscal year, actual Competitive Management EBITDA for such prior year shall be used.

(vii)          To assure payment of the Company's obligations under sub-paragraphs (a)(ii) and (a)(iii) above, the Company has obtained the issuance of an Irrevocable Standby Letter of Credit (the " ***LOC***") for the benefit of Executive from a bank (the "***Issuer***") on the following terms:

(A)          The LOC shall be in the amount of $4,300,000.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(B)        The LOC shall expire on .

(C)        The LOC shall not be transferable.

(D)        Partial and multiple draws shall be permitted under the LOC.  [Information Omitted.]

(viii)        A copy of the LOC so issued is attached hereto as Exhibit I(A).

(ix)        Any amount paid under the LOC to the United States Treasury in respect of the Company's tax account shall be credited as withheld income and payroll taxes with respect to Executive, and the Company shall properly report such amount on IRS Form W-2 issued to Executive for the applicable tax year.

(x)        For purposes hereof, "***Competitive Management EBITDA***" shall mean the sum of Energy Future Holdings Corp. consolidated EBITDA less Oncor Electric Delivery Holdings Company LLC EBITDA; where:

(A)        "***EBITDA***" shall mean earnings before interest, taxes, depreciation and amortization plus transaction, management and/or similar fees paid to the Sponsor Group and/or its Affiliates, together with such adjustments as the O&C Committee shall determine appropriate in its discretion after good faith consultation with the Chief Executive Officer and/or Chief Financial Officer. Such adjustments will be consistent with those included in the definition of EBITDA in the Energy Future Holdings Corp. Indenture related to its 10.000% Senior Secured Notes due 2020, as such indenture is in effect on the Effective Date, to the extent considered appropriate for management compensation purposes, which will include but are not limited to, adjustments to reflect unrealized mark-to-market valuations of hedging instruments; fees and expenses relating to the Company's receivables financing facilities; the amortization of nuclear fuel costs; and any effects of adjustments in the financial statements resulting from the application of purchase accounting; but which for clarification will not include, without limitation, adjustments to reflect unrealized cost savings and planned and unplanned outages.  In any event and notwithstanding anything herein to the contrary, the O&C Committee shall have the discretion to make any further adjustments to the calculation of EBITDA as it deems fair and appropriate after good faith consultation with the Chief Executive Officer and/or Chief Financial Officer.

(B)        The O&C Committee shall, fairly and appropriately, following the O&C Committee's good faith consultation with the Chief Executive Officer and/or Chief Financial Officer, adjust the calculation of EBITDA to reflect the following: acquisitions, divestitures, any change required by GAAP relating to share-based compensation or for other changes in GAAP promulgated by accounting standard setters that, in each case, the O&C Committee in good faith determines require adjustment of EBITDA. The O&C Committee's determination of such adjustment shall be based on the effect of such event on the Company's consolidated financial statements.

(b)        As soon as administratively practicable following the February O&C Committee meeting in 2013, provided Executive remains continuously employed by Luminant, the Company or an Affiliate thereof through each applicable grant date, Executive shall be entitled to receive on such date, a grant of 500,000 restricted stock units under the 2007 Stock Incentive Plan for Key Employees of Energy Future Holdings Corp. and its Affiliates and the Restricted Stock Unit Agreement, in such form and substance as attached hereto as Exhibit I(B), to be entered into by and between the Company and Executive with respect to each annual grant.   In the event of a Change in Control prior to such grant date, the restricted stock units

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

that would have been granted under this sub-paragraph (b) of this Exhibit I shall be issued and shall be vested immediately prior to the effective date of the Change in Control.  The rights and obligations of Executive and the Company shall be governed by the 2007 Stock Incentive Plan for Key Employees of Energy Future Holdings Corp. and its Affiliates and the Restricted Stock Unit Agreement entered into incident to each such grant.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit I(A)**

DATE: _____

IRREVOCABLE STANDBY LETTER OF CREDIT NO.

BENEFICIARY:
MARK ALLEN MCFARLAND
[ON RECORD WITH THE COMPANY]

APPLICANT:
TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC
ON BEHALF OF LUMINANT HOLDING COMPANY LLC
1601 BRYAN STREET, 44TH FLOOR
DALLAS, TX 75201-3411

AMOUNT:   USD 4,300,000.00.00 (FOUR MILLION THREE HUNDRED THOUSAND AND 00/100 U.S. DOLLARS)

EXPIRY DATE:

LADIES AND GENTLEMEN:

BY ORDER OF OUR CLIENT, TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC FOR THE ACCOUNT OF LUMINANT HOLDING COMPANY LLC (THE "ACCOUNT PARTY"), WE HEREBY ESTABLISH OUR IRREVOCABLE STANDBY LETTER OF CREDIT NO. (THIS "LETTER OF CREDIT") IN YOUR FAVOR FOR DRAWINGS NOT TO EXCEED THE AGGREGATE SUM OF FOUR MILLION THREE HUNDRED THOUSAND U.S. DOLLARS ($4,300,000.00), EFFECTIVE IMMEDIATELY. THIS LETTER OF CREDIT IS ISSUED, PRESENTABLE AND PAYABLE AT THE OFFICE OF OUR SERVICER, CITICORP NORTH AMERICA, INC., 3800 CITIBANK CENTER, BUILDING B, 3RD FLOOR, TAMPA, FL 33610, AND, SUBJECT TO THE FURTHER TERMS HEREOF, EXPIRES WITH OUR CLOSE OF BUSINESS ON .

FUNDS UNDER THIS LETTER OF CREDIT ARE AVAILABLE TO YOU AGAINST YOUR SIGHT DRAFT(S), DRAWN ON US, PURPORTEDLY SIGNED BY YOU (OR YOUR SUCCESSOR(S) OR HEIR(S) AT LAW), AND OTHERWISE IN THE FORM ATTACHED HERETO AS EXHIBIT A APPROPRIATELY COMPLETED.

FUNDS UNDER THIS LETTER OF CREDIT WILL BE AVAILABLE FOR DRAWING IN ACCORDANCE WITH THE FOLLOWING SCHEDULE; HOWEVER, IN NO EVENT SHALL THE TOTAL AMOUNT OF ALL PAYMENTS MADE UNDER THIS LETTER OF CREDIT EXCEED THE AMOUNT OF $4,300,000.00:

| AVAILABILITY PERIODS | | AMOUNT AVAILABLE IN U.S. DOLLARS |
|---|---|---|
| | | |
| FROM AND INCLUDING [_____] | THROUGH AND INCLUDING [_____] | [_____] |
| | | |
| | | |
| | | |

FOR THE AVOIDANCE OF DOUBT, ANY UNUTILIZED AMOUNT IN ANY GIVEN AVAILABILITY PERIOD WILL BE CUMMULATIVEL ADDED TO THE AMOUNT AVAILABLE IN THE IMMEDIATELY SUCCEEDING AVAILABILITY PERIOD.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FURTHERMORE, THE MAXIMUM AGGREGATE AMOUNT THAT MAY BE DRAWN BY YOU DURING THE TERM OF THIS LETTER OF CREDIT SHALL BE AUTOMATICALLY REDUCED BY THE AGGREGATE AMOUNT OF ANY PRIOR PAYMENTS MADE UNDER THIS LETTER OF CREDIT.

PARTIAL AND MULTIPLE DRAWINGS ARE PERMITTED HEREUNDER.THIS LETTER OF CREDIT SHALL AUTOMATICALLY TERMINATE AFTER PAYMENT OF ANY DRAW MADE UNDER STATEMENT (B) IN THE FORM OF SIGHT DRAFT ATTACHED HERETO AS EXHIBIT A.

THIS LETTER OF CREDIT IS NOT TRANSFERABLE.

WE HEREBY ENGAGE WITH YOU THAT ALL DRAFTS DRAWN UNDER AND IN STRICT COMPLIANCE WITH THE TERMS OF THIS LETTER OF CREDIT WILL BE DULY HONORED IF DRAWN AND PRESENTED FOR PAYMENT ON OR BEFORE THE EXPIRY DATE OF THIS LETTER OF CREDIT. WE SHALL EFFECT PAYMENT THREE BUSINESS DAYS AFTER OUR RECEIPT OF DOCUMENTS IN STRICT CONFORMITY WITH THE TERMS OF THIS LETTER OF CREDIT. AS USED HEREIN "BUSINESS DAY" SHALL MEAN ANY DAY OTHER THAN A SATURDAY OR SUNDAY OR A DAY ON WHICH BANKING INSTITUTIONS IN NEW YORK CITY ARE AUTHORIZED OR REQUIRED TO CLOSE BY LAW.

PAYMENT OF DRAWINGS MADE HEREUNDER SHALL BE MADE IN TWO PARTS, BY WIRE TRANSFER, PURSUANT TO THE FOLLOWING WIRE INSTRUCTIONS:

- SIXTY PERCENT (60%) OF EACH SUCH DRAWING SHALL BE PAYABLE PURSUANT TO BENEFICIARY'S (OR HIS SUCCESSOR(S) OR HEIR(S) AT LAW) WRITTEN WIRE INSTRUCTIONS SET FORTH IN THE APPROPRIATELY COMPLETED AND PRESENTED SIGHT DRAFT(S), AND

- FORTY PERCENT (40%) OF EACH SUCH DRAWING (FOR PURPOSES OF APPLICABLE PAYROLL AND INCOME TAX WITHHOLDING) SHALL BE PAYABLE TO:

        ABA REFERENCE #: [ON RECORD WITH THE COMPANY]
        NAME OF BANK DEPOSITORY: US TREAS SINGLE TX
        EMPLOYER'S TIN: 54-2127719
        NAME CONTROL: LUMI
        EMPLOYER'S FULL NAME: LUMINANT HOLDING COMPANY LLC
        TAX TYPE: 94105
        TAX YEAR: [INSERT 2 DIGIT TAX YEAR]
        TAX MONTH: [INSERT 03, 06, 09, OR 12 FOR CALENDAR QUARTER IN WHICH
        DRAWING OCCURS]

THIS LETTER OF CREDIT IS SUBJECTED TO AND GOVERNED BY LAWS OF THE STATE OF NEW YORK AND THE 2007 REVISION OF THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS OF THE INTERNATIONAL CHAMBER OF COMMERCE (PUBLICATION NO. 600). IN THE EVENT OF ANY CONFLICT, THE LAWS OF THE STATE OF NEW YORK WILL CONTROL.

SHOULD YOU HAVE OCCASION TO COMMUNICATE WITH US REGARDING THIS LETTER OF CREDIT, KINDLY DIRECT YOUR COMMUNICATIONS TO THE ATTENTION OF OUR LETTER OF CREDIT DEPARTMENT, 3800 CITIBANK CENTER, BUILDING B, 3RD FLOOR, TAMPA, FL 33610, MAKING SPECIFIC REFERENCE TO OUR LETTER OF CREDIT NO. .

VERY TRULY YOURS,


CITIBANK, N.A.
BY: JOSEPH CHESAKIS, VICE PRESIDENT


BY:    / s / Joseph Chesakis
    AUTHORIZED SIGNATURE

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

EXHIBIT A TO
LETTER OF CREDIT NO.
<u>FORM OF SIGHT DRAFT</u>

VIA OVERNIGHT MAIL

_____, 20___

CITIBANK, N.A.
C/O CITICORP NORTH AMERICA, INC., AS SERVICER
3800 CITIBANK CENTER, BUILDING B
3rd FLOOR
TAMPA, FLORIDA 33610
ATTENTION: LETTER OF CREDIT DEPT.

   RE: LETTER OF CREDIT NO.

[STATE ONE OF THE FOLLOWING (A) OR (B):]

(A) I HEREBY CERTIFY THAT (1) I AM ENTITLED TO DRAW ON IRREVOCABLE STANDBY LETTER OF CREDIT NO. UNDER THE PROVISIONS OF THE AMENDED AND RESTATED EMPLOYMENT AGREEMENT DATED AS OF _____ (THE "EMPLOYMENT AGREEMENT"), BETWEEN LUMINANT HOLDING COMPANY LLC ("LUMINANT HOLDING LLC") AND ME, (2) THE FULL AMOUNT EARNED BY AND PAYABLE TO ME UNDER THE RETENTION AWARD AS OF _____ IS $_____, WHICH AMOUNT IS CONSISTENT WITH, AND NOT IN EXCESS OF, THE AMOUNT EARNED BY AND CURRENTLY PAYABLE TO ME UNDER THE RETENTION AWARD, AND (3) I REMAIN EMPLOYED BY LUMINANT HOLDING LLC, THE ACCOUNT PARTY (AS DEFINED IN IRREVOCABLE STANDBY LETTER OF CREDIT NO. ) OR AN AFFILIATE OF LUMINANT HOLDING LLC AND/OR THE ACCOUNT PARTY AS OF THE DATE OF THIS DRAW AND I AM ENTITLED TO THE FULL AMOUNT EARNED AND PAYABLE.I HEREBY ACKNOWLEDGE THAT ANY AMOUNT OF THIS DRAW THAT IS PAID TO ME AND LATE DETERMINED TO BE IN EXCESS OF THE AMOUNT ACTUALLY EARNED BY AND PAYABLE TO ME UNDER THE RETENTION AWARD SHALL CREATE A CAUSE OF ACTION IN FAVOR OF LUMINANT HOLDING LLC, THE ACCOUNT PARTY AND/OR AN AFFILIATE OF LUMINANT HOLDING LLC OR THE ACCOUNT PARTY TO RECOVER THE EXCESS PAYMENT.

OR

(B) I HEREBY CERTIFY THAT (1) I AM ENTITLED TO DRAW ON IRREVOCABLE STANDBY LETTER OF CREDIT NO. UNDER THE PROVISIONS OF THE AMENDED AND RESTATED EMPLOYMENT AGREEMENT DATED AS OF _____ (THE "EMPLOYMENT AGREEMENT"), BETWEEN LUMINANT HOLDING COMPANY LLC ("LUMINANT HOLDING LLC") AND ME, (2) THE FULL AMOUNT EARNED BY AND PAYABLE TO ME UNDER THE RETENTION AWARD AS OF _____ IS $_____, WHICH AMOUNT IS CONSISTENT WITH, AND NOT IN EXCESS OF, THE AMOUNT EARNED BY AND CURRENTLY PAYABLE TO ME UNDER THE RETENTION AWARD, AND (3) MY EMPLOYMENT WAS TERMINATE PURSUANT TO SECTION 7(B), 7(C), 7(D)(II), or 7(E) OF THE EMPLOYMENT AGREEMENT PRIOR TO THE DATE OF THIS DRAW AND I AM ENTITLED TO EITHER THE FULL AMOUNT EARNED OR A PRO-RATED AMOUNT (PURSUANT TO SUB-PARAGRAPH (A)(V) OF EXHIBIT I TO THE EMPLOYMENT AGREEMENT). I HEREBY ACKNOWLEDGE THAT ANY AMOUNT OF THIS DRAW THAT IS PAID TO ME ANI LATER DETERMINED TO BE IN EXCESS OF THE AMOUNT ACTUALLY EARNED BY AND PAYABLE TO ME UNDER THE RETENTION AWARD SHALL CREATE A CAUSE OF ACTION IN FAVOR OF LUMINANT HOLDING LLC, THE ACCOUNT PARTY AND/OR AN AFFILIAT OF LUMINANT HOLDING LLC OR THE ACCOUNT PARTY TO RECOVER THE EXCESS PAYMENT.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

YOU ARE HEREBY INSTRUCTED TO REMIT THE PAYMENT OF $_____ IN TWO PARTS, BY WIRE TRANSFER, PURSUANT TO THE FOLLOWING WIRE INSTRUCTIONS:

- SIXTY PERCENT (60%) OF SUCH AMOUNT, OR $_____, SHALL BE PAYABLE TO

   ACCOUNT NAME: [INSERT]
   ACCOUNT #: [INSERT]
   ABA REFERENCE #: [INSERT]
   NAME OF BANK DEPOSITORY: [INSERT]

- FORTY PERCENT (40%) OF EACH SUCH DRAWING (FOR PURPOSES OF APPLICABLE PAYROLL AND INCOME TAX WITHHOLDING) SHALL BE PAYABLE TO:

   ABA REFERENCE #: [ON RECORD WITH THE COMPANY]
   NAME OF BANK DEPOSITORY: US TREAS SINGLE TX
   EMPLOYER'S TIN: 54-2127719
   NAME CONTROL: LUMI
   EMPLOYER'S FULL NAME: LUMINANT HOLDING COMPANY LLC
   TAX TYPE: 94105
   TAX YEAR: **[INSERT 2 DIGIT TAX YEAR]**
   TAX MONTH: **[INSERT 03, 06, 09, OR 12 FOR CALENDAR QUARTER IN WHICH DRAWING OCCURS]**

[IF STATEMENT B ABOVE IS UTILIZED INCLUDE THE FOLLOWING STATEMENT][THE UNDERSIGNED HEREBY ACKNOWLEDGES THAT IRREVOCABLE STANDBY LETTER OF CREDIT NO. SHALL AUTOMATICALLY TERMINATE AFTER SUCH PAYMENT IS DULY MADE].


By: _____
[BENEFICIARY] OR
[BENEFICIARY'S SUCCESSOR(S) OR HEIR(S) AT LAW]

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit I(B)**

**2007 STOCK INCENTIVE PLAN FOR KEY EMPLOYEES OF
ENERGY FUTURE HOLDINGS CORP. AND ITS AFFILIATES**

**RESTRICTED STOCK UNIT AGREEMENT**

To: **[Name]**        Date of Grant: **[Date]**        Number of Shares: **[#]**

This Agreement is made and entered into as of the Date of Grant set forth above by and between Energy Future Holdings Corp., a Texas corporation (the "***Company***"), and you;

**WHEREAS**, the Company adopted the 2007 Stock Incentive Plan for Key Employees of Energy Future Holdings Corp. and its Affiliates, as it may be amended from time to time (the "***Plan***") under which the Company is authorized to grant restricted stock units to certain employees, directors and other service providers of the Company or a Subsidiary;

**WHEREAS**, a "***Restricted Stock Unit***" shall represent your right to receive one share of common stock of the Company (the "***Stock***") upon the lapse of the restrictions on your award, plus the additional rights to receive dividend equivalents (" ***Dividend Equivalent Right,***" or "***DER***"), in accordance with the terms and conditions set forth herein and in the Plan (the " ***Award***");

**WHEREAS**, a copy of the Plan has been made available to you and shall be deemed a part of this Restricted Stock Unit Agreement ("***Agreement***") as if fully set forth herein; and

**WHEREAS**, you desire to accept the Award made pursuant to this Agreement.

**NOW, THEREFORE,** in consideration of the mutual covenants set forth herein and for other valuable consideration hereinafter set forth, you and the Company agree as follows:

1.    The Grant. Subject to the conditions set forth below, the Company hereby grants you, effective as of the Date of Grant set forth above, an award consisting of **[#]** Restricted Stock Units (subject to any adjustment made to this Award pursuant to Section 8 of the Plan in connection with a stock split, spin-off, recapitalization or other transaction that affects the Company's equity securities). To the extent that any provision of this Agreement conflicts with the expressly applicable terms of the Plan, you acknowledge and agree that those terms of the Plan shall control and, if necessary, the applicable terms of this Agreement shall be deemed amended so as to carry out the purpose and intent of the Plan.  Terms that have their initial letter capitalized, but that are not otherwise defined in this Agreement shall have the meanings given to them in the Plan.

2.    No Shareholder Rights. The Restricted Stock Units granted pursuant to this Agreement do not and shall not entitle you to any rights of a holder of Stock prior to the date shares of Stock are issued to you in settlement of the Award.  Your rights with respect to the Restricted Stock Units shall remain forfeitable at all times prior to the date on which rights become vested and the restrictions with respect to the Restricted Stock Units lapse in accordance with Section 6 or 7, as the case may be.

3.    Dividend Equivalent Rights. In the event that the Company declares and pays a dividend in respect of its outstanding shares of Stock and, on the record date for such dividend, you hold Restricted Stock Units granted pursuant to this Agreement that have not been settled, the Company shall create a bookkeeping account that will track, (a) to the extent the dividend paid to stockholders generally was a cash dividend, the cash value you would have been entitled to receive as if you had been the holder of record of the number of

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

shares of Stock related to the Restricted Stock Units that have not been settled as of the record date, or (b) to the extent the dividend paid to stockholders generally was paid in the form of property, the property you would have been entitled to receive as if you had been the holder of record of the number of shares of Stock related to the Restricted Stock Units that have not been settled as of the record date. All DER amounts credited to your bookkeeping account pursuant to this Section 3, if any, shall be deemed converted into shares of Stock on the date that the Restricted Stock Units vest (based on the Fair Market Value (as such term is defined in the Management Stockholder's Agreement) of Stock on such date and rounded down to the nearest whole share of Stock) and paid to you in the form of additional shares of Stock on the date that the underlying Restricted Stock Units associated with such DER amounts are settled pursuant to Section 5 below. In the event that the Restricted Stock Units are forfeited to the Company without settlement to you, you will also forfeit any associated DER amounts. No interest will be payable with respect to DER amounts credited to your bookkeeping account, if any, that represent cash dividends. Property, if any, deemed credited to DER bookkeeping accounts representing dividends paid in property will be deemed invested in such property until the DER amounts are deemed converted to shares of Stock pursuant to this Section 3. The bookkeeping accounts, if any, created to track DER amounts are phantom accounts and the Company is under no obligation to set aside cash or property with respect to any DER amounts.  Valuations made pursuant to this Section 3 (including any valuation of property deemed credited to a bookkeeping account) will be made by the Committee, or its designee, in its sole discretion and such valuation will be final and binding.

4.      <u>Restrictions; Forfeiture</u>.  The Restricted Stock Units are restricted in that they may not be sold, transferred or otherwise alienated or hypothecated until these restrictions are removed or expire as contemplated in Section 6 or 7 of this Agreement and Stock is issued to you as described in Section 5 of this Agreement.  The Restricted Stock Units are also subject to forfeiture to the Company (the "***Forfeiture Restrictions***") pursuant to Section 7 of this Agreement.

5.      <u>Issuance of Stock</u>.

(a)      No shares of Stock shall be issued to you prior to the date on which the Restricted Stock Units vest and the restrictions, including the Forfeiture Restrictions, with respect to the Restricted Stock Units lapse, in accordance with Section 6 or 7. After the Restricted Stock Units vest pursuant to Section 6 or 7, as applicable, the Company shall, subject to any conditions described in subsection (b) below, promptly and within 30 days of such vesting date, cause to be issued Stock registered in your name in payment of such vested Restricted Stock Units upon receipt by the Company of any required tax withholding.  Such issuance shall be made as soon as administratively practicable, but may be delayed, in the sole discretion of the Committee, if required by applicable securities law; provided, that, in no event shall the issuance of Stock be made later than March 15th of the year following the year of vesting, or as otherwise may be permitted under Treasury Regulation § 1.409A-1(b)(4)(ii).  The Company shall evidence the Stock to be issued in payment of such vested Restricted Stock Units in the manner it deems appropriate.  The value of any fractional Restricted Stock Units shall be rounded down at the time Stock is issued to you in connection with the Restricted Stock Units.  No fractional shares of Stock, nor the cash value of any fractional shares of Stock, will be issuable or payable to you pursuant to this Agreement.  The value of such shares of Stock shall not bear any interest owing to the passage of time.  Neither this Section 5 nor any action taken pursuant to or in accordance with this Section 5 shall be construed to create a trust or a funded or secured obligation of any kind.

(b)      You hereby acknowledge that by accepting this Award, the issuance of Stock pursuant to the settlement of your Restricted Stock Units pursuant to this Agreement shall be subject to all the terms and conditions of any Management Stockholder's Agreement and Sale Participation Agreement previously executed by you, as such forms may be modified under the terms of such agreements; provided, however,

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

that if you have not previously executed a Management Stockholder's Agreement and/or a Sale Participation Agreement with the Company, you agree that, prior to the Company's issuance of Stock to you pursuant to this Agreement, you will execute such documents in the form required by the Company. All Stock issued to you pursuant to this Agreement will (a) constitute "Stock" (as such term is defined in the Management Stockholder's Agreement) for all purposes under the Management Stockholder's Agreement, and (b) be treated as "Common Stock" underlying "Options" (as such terms are defined in the Sale Participation Agreement) for all purposes under the Sale Participation Agreement.

(c)     The shares of Stock deliverable upon vesting of the Restricted Stock Units, may be either previously authorized but unissued shares or issued shares, which have then been reacquired by the Company. Such shares shall be fully paid and nonassessable.

6.     Expiration of Restrictions and Risk of Forfeiture. Unless otherwise provided in Section 7 below, the restrictions on the Restricted Stock Units granted pursuant to this Agreement, including the Forfeiture Restrictions, will expire on September 30, 2014, and shares of Stock that are nonforfeitable and transferable will be issued to you in payment of your vested Restricted Stock Units as set forth in Section 5, provided that you remain in the continuous employ of, or a service provider to, the Company or its Subsidiaries until September 30, 2014.

7.     Termination of Services or Change in Control Events.

(a)     Termination of Employment Other Than without Cause, for Good Reason, or Due to Death or Disability. In the event your service relationship with the Company or any of its Subsidiaries is terminated for any reason other than by the Company or any of its Subsidiaries without Cause, by your voluntary resignation for Good Reason, or due to your death or Disability ("Cause", "Good Reason", and "Disability" as defined in your employment agreement with the Company or any of its Subsidiaries then in effect at the time of your termination of employment) prior to September 30, 2014, then those Restricted Stock Units for which the restrictions have not lapsed as of the date of your termination shall become null and void and those Restricted Stock Units shall be forfeited to the Company.

(b)     Termination of Employment without Cause, for Good Reason, or Due to Death or Disability. In the event your service relationship with the Company or any of its Subsidiaries is terminated by the Company or any of its Subsidiaries without Cause, by your voluntary resignation for Good Reason, or due to your death or Disability prior to September 30, 2014, a portion of the Restricted Stock Units shall vest and all Forfeiture Restrictions shall lapse with respect to such Restricted Stock Units on the effective date of your termination of employment. The portion of the Restricted Stock Units that shall become vested upon your termination of employment shall be determined by multiplying the number of Restricted Stock Units set forth in Section 1 by a fraction, the numerator of which is the number of days you were employed by the Company or any of its Subsidiaries from [February __, 20__] through the effective date of your termination of employment, and the denominator of which is the number of days between [February __, 20__] and September 30, 2014; all remaining Restricted Stock Units shall become null and void and shall be forfeited to the Company upon your termination of employment. The Restricted Stock Units that become vested pursuant to this Section 7(b) will be settled in accordance with Section 5 above.

(c)     Change in Control. In the event that the Company undergoes a Change in Control (as defined in the Plan) prior to September 30, 2014, the Restricted Stock Units shall vest and all Forfeiture Restrictions shall lapse on the effective date of such a Change in Control, provided that you have remained in the continuous employ of, or a service provider to, the Company or its Subsidiaries from the Date of Grant

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

until the effective date of the Change in Control.  Upon a Change in Control, your Restricted Stock Units will be settled in accordance with Section 5 above.

8.   <u>Leave of Absence</u>. With respect to the Award, the Company may, in its sole discretion, determine that if you are on leave of absence for any reason you will not be considered as having terminated employment with the Company; however, your rights to the Restricted Stock Units during a leave of absence will be limited to the extent to which those rights were earned or vested when the leave of absence began.

9.   <u>Payment of Taxes</u>. It shall be a condition of the obligations of the Company upon delivery of the Stock pursuant to Section 5 above that you pay to the Company such amount as may be requested by the Company for the purpose of satisfying any liability for any federal, state or local income or other taxes required by law to be withheld with respect to such Stock.   The Company may, in its sole discretion, and you hereby authorize the Company to take such actions as may be necessary, in the opinion of the Company's counsel (including, without limitation, withholding Stock otherwise deliverable to you hereunder through a net settlement and/or withholding amounts from any compensation or other amount owing to you from the Company), to satisfy the obligations for payment of the minimum amount of any such taxes.  Notwithstanding the foregoing provisions of this Section 9, you may, at your election, be permitted to elect to use Stock otherwise deliverable to you hereunder, having an equivalent Fair Market Value (as such term is defined in the Management Stockholder's Agreement) to the payment that would otherwise be made by you to the Company pursuant to the foregoing provisions of this Section 9, to satisfy such obligations.  You are hereby advised to seek your own tax counsel regarding the taxation of the Restricted Stock Units made hereunder.

10.   <u>Compliance with Securities Law</u>. Notwithstanding any provision of this Agreement to the contrary, the issuance of Stock will be subject to compliance with all applicable requirements of federal, state, or foreign law with respect to such securities and with the requirements of any stock exchange or market system upon which the Stock may then be listed.   No Stock will be issued hereunder if such issuance would constitute a violation of any applicable federal, state, or foreign securities laws or other law or regulations or the requirements of any stock exchange or market system upon which the Stock may then be listed.   In addition, Stock will not be issued hereunder unless (a) a registration statement under the Securities Act of 1933, as amended (the " ***Securities Act***"), is, at the time of issuance, in effect with respect to such shares or (a) in the opinion of legal counsel to the Company, such shares may be issued in accordance with the terms of an applicable exemption from the registration requirements of the Securities Act.   YOU ARE CAUTIONED THAT ISSUANCE OF STOCK UPON THE VESTING OF RESTRICTED STOCK UNITS GRANTED PURSUANT TO THIS AGREEMENT MAY NOT OCCUR UNLESS THE FOREGOING CONDITIONS ARE SATISFIED. The inability of the Company to obtain from any regulatory body having jurisdiction the authority, if any, deemed by the Company's legal counsel to be necessary to the lawful issuance and sale of any shares subject to the Award will relieve the Company of any liability in respect of the failure to issue such shares as to which such requisite authority has not been obtained.   As a condition to any issuance hereunder, the Company may require you to satisfy any qualifications that may be necessary or appropriate to evidence compliance with any applicable law or regulation and to make any representation or warranty with respect to such compliance as may be requested by the Company. From time to time, the Board and appropriate officers of the Company are authorized to take the actions necessary and appropriate to file required documents with governmental authorities, stock exchanges, and other appropriate Persons to make shares of Stock available for issuance.

11.   <u>Lock-Up Period</u>. You hereby agree that, if so requested by the Company or any representative of the underwriters (the "***Managing Underwriter***") in connection with any registration of the offering of any securities of the Company under the Securities Act, you will not sell or otherwise transfer any Stock acquired hereunder or other securities of the Company during the 180 day period (or such other period as may be

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

requested in writing by the Managing Underwriter and agreed to in writing by the Company) (the " *Market Standoff Period*") following the effective date of a registration statement of the Company filed under the Securities Act.  The Company may impose stop-transfer instructions with respect to securities subject to the foregoing restrictions until the end of such Market Standoff Period.

12. <u>Legends</u>. The Company may at any time place legends referencing any restrictions imposed on the shares pursuant to Sections 5(b), 10 and 11 of this Agreement on all certificates representing shares issued with respect to this Award.

13. <u>Right of the Company and Subsidiaries to Terminate Services</u>. Nothing in this Agreement confers upon you the right to continue in the employ of or to perform services for the Company or any Subsidiary, or interfere in any way with the rights of the Company or any Subsidiary to terminate your employment or service relationship at any time.

14. <u>Furnish Information</u>. You agree to furnish to the Company all information reasonably requested by the Company to enable it to comply with any reporting or other requirements imposed upon the Company by or under any applicable statute or regulation with respect to the transactions contemplated by this Agreement.

15. <u>No Liability for Good Faith Determinations</u>. The Company and the members of the Board shall not be liable for any act, omission or determination taken or made in good faith with respect to this Agreement or the Restricted Stock Units granted hereunder.

16. <u>Execution of Receipts and Releases</u>. Any payment of cash or any issuance or transfer of shares of Stock or other property to you, or to your legal representative, heir, legatee or distributee, in accordance with the provisions hereof, shall, to the extent thereof, be in full satisfaction of all claims of such Persons hereunder. The Company may require you or your legal representative, heir, legatee or distributee, as a condition precedent to such payment or issuance, to execute a release and receipt therefor in such form as it shall determine.

17. <u>No Guarantee of Interests</u>. The Board and the Company do not guarantee the Stock of the Company from loss or depreciation.

18. <u>Company Records</u>. Records of the Company or its Subsidiaries regarding your period of service, termination of service and the reason(s) therefor, and other matters shall be conclusive for all purposes hereunder, unless determined by the Company to be incorrect.

19. <u>Notice</u>. All notices required or permitted under this Agreement must be in writing and personally delivered or sent by mail and shall be deemed to be delivered on the date on which it is actually received by the person to whom it is properly addressed or if earlier the date it is sent via certified United States mail.

20. <u>Waiver of Notice</u>. Any person entitled to notice hereunder may waive such notice in writing.

21. <u>Information Confidential</u>. As partial consideration for the granting of the Award hereunder, you hereby agree to keep confidential all information and knowledge, except that which has been disclosed in any public filings required by law, that you have relating to the terms and conditions of this Agreement; provided, however, that such information may be disclosed as required by law and may be given in confidence to your spouse and tax, legal and financial advisors.  In the event any breach of this promise comes to the

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

attention of the Company, it shall take into consideration that breach in determining whether to recommend the grant of any future similar award to you and as a factor weighing against the advisability of granting any such future award to you.

22.    <u>Successors</u>. This Agreement shall be binding upon you, your legal representatives, heirs, legatees and distributees, and upon the Company, its successors and assigns.

23.    <u>Severability</u>. If any provision of this Agreement is held to be illegal or invalid for any reason, the illegality or invalidity shall not affect the remaining provisions hereof, but such provision shall be fully severable and this Agreement shall be construed and enforced as if the illegal or invalid provision had never been included herein.

24.    <u>Company Action</u>. Any action required of the Company under this Agreement shall be by resolution of the Board or the Committee or by a person or entity authorized to act by resolution of the Board.

25.    <u>Headings</u>. The titles and headings of Sections are included for convenience of reference only and are not to be considered in construction of the provisions hereof.

26.    <u>Governing Law</u>. All questions arising with respect to the provisions of this Agreement shall be determined by application of the laws of Texas, without giving any effect to any conflict of law provisions thereof, except to the extent Texas state law is preempted by federal law. The obligation of the Company to sell and deliver Stock hereunder is subject to applicable laws and to the approval of any governmental authority required in connection with the authorization, issuance, sale, or delivery of such Stock.

27.    <u>Consent to Texas Jurisdiction and Venue</u>. You hereby consent and agree that state courts located in Dallas County, Texas and the United States District Court for the Northern District of Texas (Dallas Division) each shall have personal jurisdiction and proper venue with respect to any dispute between you and the Company arising in connection with the Restricted Stock Units, the Plan, or this Agreement. In any such dispute, each of you and the Company agree not to raise, and do hereby expressly waive, any objection or defense to such jurisdiction as an inconvenient forum.

28.    <u>Amendment</u>. This Agreement may be amended in accordance with the terms of the Plan.

29.    <u>The Plan</u>. This Agreement is subject to all the terms, conditions, limitations and restrictions contained in the Plan.

[Remainder of page intentionally left blank]

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

In Witness Whereof, this Agreement has been executed and delivered by the parties hereto.

ENERGY FUTURE HOLDINGS CORP.

By: _____

Its: _____

GRANTEE

_____

Name: _____

Address: _____

_____

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit II**

In addition to the benefits and compensation set forth in the Agreement, Executive shall be entitled to receive the benefits and compensation set forth in this Exhibit II, subject to the terms and conditions set forth herein:

<u>Survival of Prior Agreements</u>.  Notwithstanding Section 9(b), this Agreement shall not supersede the Deferred Share Agreement, by and among the Company and Executive, dated July 7, 2008.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

EXHIBIT 12(a)

| | Year Ended December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2012** | | **2011** | | **2010** | | **2009** | | **2008** |
| EARNINGS: | | | | | | | | | |
| Income (loss) from continuing operations | $ | (3,360) | $ | (1,913) | $ | (2,812) | $ | 408 | $ | (9,998) |
| Subtract: Equity in earnings of unconsolidated subsidiaries (net of tax) | | (270) | | (286) | | (277) | | — | | — |
| Add: Total federal income tax expense (benefit) | | (1,232) | | (1,134) | | 389 | | 367 | | (471) |
| Fixed charges (see detail below) | | 3,578 | | 4,360 | | 3,646 | | 3,225 | | 5,280 |
| Distributed income of equity investees | | 147 | | 116 | | 169 | | — | | — |
| Total earnings (loss) | $ | (1,137) | $ | 1,143 | $ | 1,115 | $ | 4,000 | $ | (5,189) |
| FIXED CHARGES: | | | | | | | | | |
| Interest expense | $ | 3,544 | $ | 4,326 | $ | 3,614 | $ | 3,190 | $ | 5,246 |
| Rentals representative of the interest factor | | 34 | | 34 | | 32 | | 35 | | 34 |
| Total fixed charges | $ | 3,578 | $ | 4,360 | $ | 3,646 | $ | 3,225 | $ | 5,280 |
| RATIO OF EARNINGS TO FIXED CHARGES (a) | | — | | — | | — | | 1.24 | | — |

_____

(a)  Fixed charges exceeded earnings by $4.715, $3.217 billion, $2.531 billion and $10.469 billion for the years ended December 31, 2012, 2011, 2010 and 2008, respectively.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Exhibit 21(a)

**ENERGY FUTURE HOLDINGS CORP.**
**SUBSIDIARY HIERARCHY**
**Effective December 31, 2012**

| | Jurisdiction |
|---|---|
| Energy Future Holdings Corp. | Texas |
| Energy Future Competitive Holdings Company | Texas |
| Texas Competitive Electric Holdings LLC | Delaware |
| TCEH Finance, Inc. | Delaware |
| Generation MT Company LLC | Delaware |
| Luminant Holding Company LLC | Delaware |
| Luminant Energy Company LLC | Texas |
| Luminant ET Services Company | Texas |
| Luminant Energy Trading California Company | Texas |
| Luminant Generation Company LLC | Texas |
| Nuclear Energy Future Holdings LLC | Delaware |
| Nuclear Energy Future Holdings II LLC | Delaware |
| Comanche Peak Nuclear Power Company LLC [1] | Delaware |
| Valley NG Power Company LLC | Texas |
| Luminant Renewables Company LLC | Texas |
| Generation SVC Company | Texas |
| Big Brown 3 Power Company LLC | Texas |
| Big Brown Power Company LLC | Texas |
| Collin Power Company LLC | Delaware |
| DeCordova Power Company LLC | Texas |
| DeCordova II Power Company LLC | Delaware |
| Lake Creek 3 Power Company LLC | Texas |
| Martin Lake 4 Power Company LLC | Texas |
| Monticello 4 Power Company LLC | Texas |
| Morgan Creek 7 Power Company LLC | Texas |
| Oak Grove Management Company LLC | Delaware |
| Oak Grove Power Company LLC | Texas |
| Sandow Power Company LLC | Texas |
| Tradinghouse 3 & 4 Power Company LLC | Texas |
| Tradinghouse Power Company LLC | Texas |
| Valley Power Company LLC | Texas |
| Big Brown Lignite Company LLC | Texas |
| Luminant Big Brown Mining Company LLC | Texas |
| Luminant Mining Company LLC | Texas |
| Oak Grove Mining Company LLC | Texas |
| Luminant Mineral Development Company LLC | Texas |
| NCA Resources Development Company LLC | Texas |
| Greenway Development Holding Company LLC | Delaware |
| TXU Energy Receivables Company LLC | Delaware |
| TXU Energy Retail Company LLC | Texas |
| TXU Retail Services Company | Delaware |
| TXU Energy Solutions Company LLC | Texas |
| TXU SEM Company | Delaware |
| 4Change Energy Holdings LLC | Texas |
| 4Change Energy Company | Texas |
| Brighten Holdings LLC | Delaware |
| Brighten Energy LLC | Delaware |

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

| | |
|---|---|
| Energy Future Intermediate Holding Company LLC | Delaware |
| EFIH Finance Inc. | Delaware |
| Oncor Electric Delivery Holdings Company LLC | Delaware |
| Oncor Electric Delivery Company LLC [2] | Delaware |
| Oncor Management Investment LLC [3] | Delaware |
| Oncor Electric Delivery Transition Bond Company LLC | Delaware |
| Oncor Electric Delivery Administration Corp. | Texas |
| Oncor License Holdings Company LLC | Texas |
| Oncor Communications Holdings Company LLC | Delaware |
| EFH Renewables Company LLC | Delaware |
| EFH Corporate Services Company | Texas |
| EFH CG Management Company LLC | Texas |
| Generation Development Company LLC | Delaware |
| NCA Development Company LLC | Texas |
| EFH Properties Company | Texas |
| Basic Resources Inc. | Texas |
| TXU Receivables Company | Delaware |
| EFH Vermont Insurance Company | Vermont |
| LSGT Gas Company LLC | Texas |
| LSGT SACROC, Inc. | Texas |
| Humphreys & Glasgow Limited | United Kingdom |
| EEC Holdings, Inc | Nevada |
| EECI, Inc. | Nevada |
| Ebasco Services of Canada, Ltd | Canada |

_____

(1)  88% ownership interest

(2)  80.033% ownership interest

(3)  Oncor Management Investment LLC owns 0.217% of Oncor Electric Delivery Company LLC.  Regarding the ownership of Oncor Management Investment LLC, Oncor Electric Delivery Company LLC owns 100% of the Class A membership interests.  Certain management employees of Oncor Electric Delivery Company LLC own 100% of the Class B membership interests.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 23(a)**

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We consent to the incorporation by reference in Registration Statement No. 333-172332 on Form S-8 of our reports dated February 19, 2013, relating to the consolidated financial statements of Energy Future Holdings Corp. and subsidiaries ("EFH Corp.") (which report expresses an unqualified opinion and includes an emphasis of a matter paragraph related to EFH Corp.'s continued net losses, substantial indebtedness and significant cash interest requirements as well as EFH Corp.'s ability to satisfy its obligations in October 2014, which include the maturities of the $3.8 billion of TCEH Term Loan Facilities, being dependent upon the completion of one or more actions described in Note 1 to the consolidated financial statements) and the effectiveness of EFH Corp.'s internal control over financial reporting, appearing in this Annual Report on Form 10-K of EFH Corp. for the year ended December 31, 2012.

/s/ Deloitte & Touche LLP

Dallas, Texas
February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 23(b)**

**CONSENT OF INDEPENDENT AUDITORS**

We consent to the incorporation by reference in the Energy Future Holdings Corp. Registration Statement  No. 333-172332 on Form S-8 of our report dated February 19, 2013, related to the financial statements of Oncor Electric Delivery Holdings Company LLC and subsidiaries, appearing in the Annual Report on Form 10-K of Energy Future Holdings Corp. for the year ended December 31, 2012.

/s/ Deloitte & Touche LLP

Dallas, Texas
February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 31(a)**

# ENERGY FUTURE HOLDINGS CORP.
## Certificate Pursuant to Section 302
## of Sarbanes - Oxley Act of 2002

I, John F. Young certify that:

1. I have reviewed this annual report on Form 10-K of Energy Future Holdings Corp.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f))  for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 19, 2013

/s/ JOHN F. YOUNG

Name:    John F. Young
Title:    President and Chief Executive Officer

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 31(b)**

# ENERGY FUTURE HOLDINGS CORP.
## Certificate Pursuant to Section 302
## of Sarbanes - Oxley Act of 2002

I, Paul M. Keglevic, certify that:

1. I have reviewed this annual report on Form 10-K of Energy Future Holdings Corp.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f))  for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 19, 2013

/s/ PAUL M. KEGLEVIC

Name:    Paul M. Keglevic

Title:    Executive Vice President and Chief Financial Officer

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 32(a)**

## ENERGY FUTURE HOLDINGS CORP.
### Certificate Pursuant to Section 906
### of Sarbanes - Oxley Act of 2002
### CERTIFICATION OF CEO

The undersigned, John F. Young, President and Chief Executive Officer of Energy Future Holdings Corp. (the "Company"), DOES HEREBY CERTIFY that, to his knowledge:

1.  The Company's Annual Report on Form 10-K for the period ended December 31, 2012 (the "Report") fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2.  Information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

IN WITNESS WHEREOF, the undersigned has caused this instrument to be executed this 19th day of February, 2013.

/s/ JOHN F. YOUNG
_____

Name:  John F. Young

Title:  President and Chief Executive Officer

A signed original of this written statement required by Section 906 has been provided to Energy Future Holdings Corp. and will be retained by Energy Future Holdings Corp. and furnished to the Securities and Exchange Commission or its staff upon request.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Exhibit 32(b)

## ENERGY FUTURE HOLDINGS CORP.
### Certificate Pursuant to Section 906
### of Sarbanes - Oxley Act of 2002
### CERTIFICATION OF CFO

The undersigned, Paul M. Keglevic, Executive Vice President and Chief Financial Officer of Energy Future Holdings Corp. (the "Company"), DOES HEREBY CERTIFY that, to his knowledge:

1.  The Company's Annual Report on Form 10-K for the period ended December 31, 2012 (the "Report") fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2.  Information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

IN WITNESS WHEREOF, the undersigned has caused this instrument to be executed this 19th day of February, 2013.

/s/ PAUL M. KEGLEVIC

Name:   Paul M. Keglevic
Title:   Executive Vice President and Chief Financial Officer

A signed original of this written statement required by Section 906 has been provided to Energy Future Holdings Corp. and will be retained by Energy Future Holdings Corp. and furnished to the Securities and Exchange Commission or its staff upon request.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 95(a)**

*Mine Safety Disclosures*

Safety is a top priority in all our businesses, and accordingly, it is a key component of our focus on operational excellence, our employee performance reviews and employee compensation. Our health and safety program objectives are to prevent workplace accidents and ensure that all employees return home safely and comply with all regulations.

We currently own and operate 12 surface lignite coal mines in Texas to provide fuel for our electricity generation facilities. These mining operations are regulated by the US Mine Safety and Health Administration (MSHA) under the Federal Mine Safety and Health Act of 1977, as amended (the Mine Act), as well as other regulatory agencies such as the RRC. The MSHA inspects US mines, including ours, on a regular basis and if it believes a violation of the Mine Act or any health or safety standard or other regulation has occurred, it may issue a citation or order, generally accompanied by a proposed fine or assessment. Such citations and orders can be contested and appealed to the Federal Mine Safety and Health Review Commission (FMSHRC), which often results in a reduction of the severity and amount of fines and assessments and sometimes results in dismissal. The number of citations, orders and proposed assessments vary depending on the size of the mine as well as other factors.

Disclosures related to specific mines pursuant to Section 1503 of the Dodd-Frank Wall Street Reform and Consumer Protection Act and Item 104 of Regulation S-K sourced from data documented at January 3, 2013 in the MSHA Data Retrieval System for the twelve months ended December 31, 2012 (except pending legal actions, which are at December 31, 2012), are as follows:

| Mine (a) | Section 104 S and S Citations (b) | Section 104(b) Orders | Section 104(d) Citations and Orders | Section 110(b)(2) Violations | Section 107(a) Orders | Total Dollar Value of MSHA Assessments Proposed (c) | Total Number of Mining Related Fatalities | Received Notice of Pattern of Violations Under Section 104(e) | Received Notice of Potential to Have Pattern Under Section 104(e) | Legal Actions Pending at Last Day of Period (d) | Legal Actions Initiated During Period | Legal Actions Resolved During Period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beckville | 2 | — | — | — | — | 25 | — | — | — | 6 | 2 | 2 |
| Big Brown | 7 | — | — | — | — | 6 | — | — | — | 3 | 3 | 2 |
| Kosse | 10 | — | — | — | — | 144 | — | — | — | 5 | 2 | — |
| Oak Hill | — | — | — | — | — | 1 | — | — | — | 2 | — | — |
| Sulphur Springs | 4 | — | — | — | — | 6 | — | — | — | 1 | 1 | 4 |
| Tatum | 3 | — | — | — | — | 5 | — | — | — | 2 | — | — |
| Three Oaks | 8 | — | 1 | — | — | 76 | — | — | — | 3 | 2 | 1 |
| Turlington | — | — | — | — | — | — | — | — | — | 1 | 1 | — |
| Winfield South | 1 | — | — | — | — | 1 | — | — | — | 1 | 1 | 1 |

_____

(a)  Excludes mines for which there were no applicable events.

(b)  Includes MSHA citations for health or safety standards that could significantly and substantially contribute to a serious injury if left unabated.

(c)  Total value in thousands of dollars for proposed assessments received from MSHA for all citations and orders issued in the twelve months ended December 31, 2012, including but not limited to Sections 104, 107 and 110 citations and orders that are not required to be reported.

(d)  Pending actions before the FMSHRC involving a coal or other mine. All 24 are contests of proposed penalties.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Exhibit 99(b)

**Energy Future Holdings Corp. Consolidated**
**Adjusted EBITDA Reconciliation**
**(millions of dollars)**

| | Year Ended December 31, | |
| --- | ---: | ---: |
| | 2012 | 2011 |
| **Net loss** | $ (3,360) | $ (1,913) |
| **Income tax benefit** | (1,232) | (1,134) |
| **Interest expense and related charges** | 3,508 | 4,294 |
| **Depreciation and amortization** | 1,373 | 1,499 |
| **EBITDA** | $ 289 | $ 2,746 |
| Oncor Holdings distributions of earnings | 147 | 116 |
| Interest income | (2) | (2) |
| Amortization of nuclear fuel | 156 | 142 |
| Purchase accounting adjustments (a) | 74 | 204 |
| Impairment of goodwill | 1,200 | — |
| Impairment and write-down of other assets (b) | 48 | 433 |
| Debt extinguishment gains | — | (51) |
| Equity in earnings of unconsolidated subsidiary | (270) | (286) |
| Unrealized net (gain) loss resulting from commodity hedging and trading transactions | 1,526 | (58) |
| EBITDA amount attributable to consolidated unrestricted subsidiaries | 4 | — |
| Noncash compensation expense (c) | 11 | 13 |
| Transition and business optimization costs (d) | 35 | 39 |
| Transaction and merger expenses (e) | 39 | 37 |
| Restructuring and other (f) | 15 | 80 |
| Charges related to pension plan actions (g) | 285 | — |
| Expenses incurred to upgrade or expand a generation station (h) | 100 | 100 |
| **Adjusted EBITDA per Incurrence Covenant** | $ 3,657 | $ 3,513 |
| **Add Oncor Adjusted EBITDA (reduced by Oncor Holdings distributions)** | 1,600 | 1,523 |
| **Adjusted EBITDA per Restricted Payments Covenant** | $ 5,257 | $ 5,036 |

(a)  Purchase accounting adjustments include amortization of the intangible net asset value of retail and wholesale power sales agreements, environmental credits, coal purchase contracts, nuclear fuel contracts and power purchase agreements and the stepped up value of nuclear fuel.  Also include certain credits and gains on asset sales not recognized in net income due to purchase accounting.  Adjustments in 2011 include $46 million related to an asset sale.

(b)  Impairment of assets in 2011 includes impairment of emission allowances and certain mining assets due to EPA rule issued in July 2011.

(c)  Noncash compensation expenses represent amounts recorded under stock-based compensation accounting standards and exclude capitalized amounts.

(d)  Transition and business optimization costs include certain incentive compensation expenses, as well as professional fees and other costs related to generation plant reliability and supply chain efficiency initiatives.

(e)  Transaction and merger expenses primarily represent Sponsor Group management fees.

(f)  Restructuring and other in 2011 includes gains on termination of a long-term power sales contract and settlement of amounts due from hedging/trading counterparty, fees related to the amendment and extension of the TCEH Senior Secured Facilities, and reversal of certain liabilities accrued in purchase accounting.

(g)  Charges related to pension plan actions resulted from the termination and payout of pension obligations for active nonunion employees of EFH Corp.'s competitive businesses and the assumption by Oncor under a new Oncor pension plan of all of EFH Corp.'s pension obligations to retirees and terminated vested participants.  The charges represent actuarial losses previously recorded as other comprehensive income.

(h)  Expenses incurred to upgrade or expand a generation station represent noncapital outage costs.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 99(c)**

**Texas Competitive Electric Holdings Company LLC Consolidated**
**Adjusted EBITDA Reconciliation**
**(millions of dollars)**

| | Year Ended December 31, | |
|---|---|---|
| | 2012 | 2011 |
| **Net loss** | $ (2,948) | $ (1,740) |
| **Income tax benefit** | (894) | (917) |
| **Interest expense and related charges** | 2,752 | 3,699 |
| **Depreciation and amortization** | 1,343 | 1,470 |
| **EBITDA** | $ 253 | $ 2,512 |
| Interest income | (46) | (87) |
| Amortization of nuclear fuel | 156 | 142 |
| Purchase accounting adjustments (a) | 55 | 157 |
| Impairment of goodwill | 1,200 | — |
| Impairment and write-down of other assets (b) | 6 | 430 |
| Unrealized net (gain) loss resulting from commodity hedging and trading transactions | 1,526 | (58) |
| EBITDA amount attributable to consolidated unrestricted subsidiaries | (4) | (7) |
| Corporate depreciation, interest and income tax expenses included in SG&A expense | 17 | 16 |
| Noncash compensation expense (c) | 7 | 12 |
| Transition and business optimization costs (d) | 33 | 42 |
| Transaction and merger expenses (e) | 38 | 37 |
| Restructuring and other (f) | 14 | 72 |
| Charges related to pension plan actions (g) | 141 | — |
| Expenses incurred to upgrade or expand a generation station (h) | 100 | 100 |
| **Adjusted EBITDA per Incurrence Covenant** | $ 3,496 | $ 3,368 |
| Expenses related to unplanned generation station outages | 78 | 181 |
| Pro forma adjustment for Oak Grove 2 reaching 70% capacity in Q2 2011 (i) | — | 27 |
| Other adjustments allowed to determine Adjusted EBITDA per Maintenance Covenant (j) | — | 8 |
| **Adjusted EBITDA per Maintenance Covenant** | $ 3,574 | $ 3,584 |

---

(a)  Purchase accounting adjustments include amortization of the intangible net asset value of retail and wholesale power sales agreements, environmental credits, coal purchase contracts, nuclear fuel contracts and power purchase agreements and the stepped up value of nuclear fuel.  Also include certain credits and gains on asset sales not recognized in net income due to purchase accounting.  Adjustments in 2011 include $46 million related to an asset sale.

(b)  Impairment of assets in 2011 includes impairment of emission allowances and certain mining assets due to EPA rule issued in July 2011.

(c)  Noncash compensation expenses represent amounts recorded under stock-based compensation accounting standards and exclude capitalized amounts.

(d)  Transition and business optimization costs include certain incentive compensation expenses, as well as professional fees and other costs related to generation plant reliability and supply chain efficiency initiatives.

(e)  Transaction and merger expenses primarily represent Sponsor Group management fees.

(f)  Restructuring and other in 2011 includes gains on termination of a long-term power sales contract and settlement of amounts due from hedging/trading counterparty, fees related to the amendment and extension of the TCEH Senior Secured Facilities, and reversal of certain liabilities accrued in purchase accounting.

(g)  Charges related to pension plan actions resulted from the termination and payout of pension obligations for active nonunion employees of EFH Corp.'s competitive businesses and the assumption by Oncor under a new Oncor pension plan of all of EFH Corp.'s pension obligations to retirees and terminated vested participants.   The charges represent actuarial losses previously recorded as other comprehensive income.

(h)  Expenses incurred to upgrade or expand a generation station represent noncapital outage costs.

(i)  Pro forma adjustment for the year ended 2011 represents the annualization of the actual nine months ended December 31, 2011 EBITDA results for Oak Grove 2, which achieved the requisite 70% average capacity factor in the second quarter 2011.

(j)  Primarily pre-operating expenses relating to Oak Grove and Sandow 5.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 99(d)**

**Energy Future Intermediate Holding Company LLC Consolidated**
**Adjusted EBITDA Reconciliation**
**(millions of dollars)**

| | Year Ended December 31, | |
|---|---|---|
| | 2012 | 2011 |
| **Net income** | $ 315 | $ 417 |
| **Income tax expense** | 27 | 73 |
| **Interest expense and related charges** | 526 | 348 |
| **EBITDA** | $ 868 | $ 838 |
| Oncor Holdings distributions of earnings | 147 | 116 |
| Interest income | (598) | (552) |
| Equity in earnings of unconsolidated subsidiary (net of tax) | (270) | (286) |
| **Adjusted EBITDA per Incurrence Covenant** | $ 147 | $ 116 |
| **Add Oncor Adjusted EBITDA (reduced by Oncor Holdings distributions)** | 1,600 | 1,523 |
| **Adjusted EBITDA per Restricted Payments Covenant** | $ 1,747 | $ 1,639 |

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Exhibit 99(e)

# ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC

# AN ENERGY FUTURE HOLDINGS CORP. ENTERPRISE

# CONSOLIDATED FINANCIAL STATEMENTS

# AS OF DECEMBER 31, 2012

# AND

# INDEPENDENT AUDITORS' REPORT

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

# GLOSSARY

When the following terms and abbreviations appear in the text of this report, they have the meanings indicated below.

| | |
|---|---|
| **Bondco** | Refers to Oncor Electric Delivery Transition Bond Company LLC, a wholly-owned consolidated bankruptcy-remote financing subsidiary of Oncor that has issued securitization (transition) bonds to recover certain regulatory assets and other costs. |
| **CREZ** | Competitive Renewable Energy Zone |
| **Deed of Trust** | Deed of Trust, Security Agreement and Fixture Filing, dated as of May 15, 2008, made by Oncor to and for the benefit of The Bank of New York Mellon Trust Company, N.A. (as successor to The Bank of New York Mellon, formerly The Bank of New York), as collateral agent, as amended |
| **EFH Corp.** | Refers to Energy Future Holdings Corp., a holding company, and/or its subsidiaries, depending on context.  Its major subsidiaries include Oncor and TCEH. |
| **EFH Retirement Plan** | Refers to the defined benefit pension plan sponsored by EFH Corp., in which Oncor participates.  In 2012, EFH Corp. made various changes to the EFH Retirement Plan, including splitting off all of the assets and liabilities associated with Oncor employees and all retirees and terminated vested participants of EFH Corp. and its subsidiaries (including discontinued businesses) into a new plan.  See Oncor Retirement Plan below. |
| **EFIH** | Refers to Energy Future Intermediate Holding Company LLC, a direct, wholly-owned subsidiary of EFH Corp. and the direct parent of Oncor Holdings. |
| **ERCOT** | Electric Reliability Council of Texas, Inc., the independent system operator and the regional coordinator of various electricity systems within Texas |
| **ERISA** | Employee Retirement Income Security Act of 1974, as amended |
| **Fitch** | Fitch Ratings, Ltd. (a credit rating agency) |
| **GAAP** | generally accepted accounting principles |
| **Investment LLC** | Refers to Oncor Management Investment LLC, a limited liability company and minority membership interest owner (approximately 0.22%) of Oncor, whose managing member is Oncor and whose Class B Interests are owned by certain members of the management team and independent directors of Oncor. |
| **IRS** | US Internal Revenue Service |
| **LIBOR** | London Interbank Offered Rate. an interest rate at which banks can borrow funds, in marketable size, from other banks in the London interbank market. |
| **Limited Liability Company Agreement** | The Second Amended and Restated Limited Liability Company Agreement of Oncor, dated as of November 5, 2008, by and among Oncor Holdings, Texas Transmission and Investment LLC, as amended |
| **Luminant** | Refers to subsidiaries of TCEH engaged in competitive market activities consisting of electricity generation and wholesale energy sales and purchases as well as commodity risk management and trading activities, all largely in Texas. |
| **Moody's** | Moody's Investors Services, Inc. (a credit rating agency) |
| **Oncor** | Refers to Oncor Electric Delivery Company LLC, a direct, majority-owned subsidiary of Oncor Holdings, and/or its wholly-owned consolidated bankruptcy-remote financing subsidiary, Bondco, depending on context. |
| **Oncor Holdings** | Refers to Oncor Electric Delivery Holdings Company LLC, a direct, wholly-owned subsidiary of EFIH and the direct majority owner (approximately 80.03%) of Oncor, and/or its subsidiaries, depending on context. |
| **Oncor Retirement Plan** | Refers to the defined benefit pension plan sponsored by Oncor.  In 2012, EFH Corp. made various changes to the EFH Retirement Plan, including splitting off all of the assets and liabilities associated with Oncor employees and all retirees and terminated vested participants of EFH Corp. and its subsidiaries (including discontinued businesses) into a new plan.  Effective January 1, 2013, Oncor assumed sponsorship of this new plan. |
| **Oncor Ring-Fenced Entities** | Refers to Oncor Holdings and its direct and indirect subsidiaries, including Oncor. |
| **OPEB** | other postretirement employee benefits |
| **OPEB Plan** | Refers to an EFH Corp.-sponsored plan (in which Oncor participates) that offers certain health care and life insurance benefits to eligible employees and their eligible dependents upon the retirement of such employees from Oncor. |

2

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

| | |
|---|---|
| **PUCT** | Public Utility Commission of Texas |
| **PURA** | Texas Public Utility Regulatory Act |
| **purchase accounting** | The purchase method of accounting for a business combination as prescribed by US GAAP, whereby the cost or "purchase price" of a business combination, including the amount paid for the equity and direct transaction costs, are allocated to identifiable assets and liabilities (including intangible assets) based upon their fair values. The excess of the purchase price over the fair values of assets and liabilities is recorded as goodwill. |
| **REP** | retail electric provider |
| **S&P** | Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies, Inc. (a credit rating agency) |
| **SARs** | Stock Appreciation Rights |
| **SARs Plan** | Refers to the Oncor Stock Appreciation Rights Plan. |
| **Sponsor Group** | Refers collectively to certain investment funds affiliated with Kohlberg Kravis Roberts & Co. L.P. (KKR), TPG Global, LLC (together with its affiliates, TPG) and GS Capital Partners, an affiliate of Goldman, Sachs & Co., that have an ownership interest in Texas Holdings. |
| **TCEH** | Refers to Texas Competitive Electric Holdings Company LLC, a direct, wholly-owned subsidiary of Energy Future Competitive Holdings Company and an indirect subsidiary of EFH Corp., and/or its subsidiaries, depending on context. Its major subsidiaries include Luminant and TXU Energy. |
| **TCRF** | transmission cost recovery factor |
| **Texas Holdings** | Refers to Texas Energy Future Holdings Limited Partnership, a limited partnership controlled by the Sponsor Group that owns substantially all of the common stock of EFH Corp. |
| **Texas Holdings Group** | Refers to Texas Holdings and its direct and indirect subsidiaries other than the Oncor Ring-Fenced Entities. |
| **Texas Transmission** | Refers to Texas Transmission Investment LLC, a limited liability company that owns a 19.75% equity interest in Oncor. Texas Transmission is an entity indirectly owned by a private investment group led by OMERS Administration Corporation, acting through its infrastructure investment entity, Borealis Infrastructure Management Inc., and the Government of Singapore Investment Corporation, acting through its private equity and infrastructure arm, GIC Special Investments Pte Ltd. Texas Transmission is not affiliated with EFH Corp., any of EFH Corp.'s subsidiaries or any member of the Sponsor Group. |
| **TXU Energy** | Refers to TXU Energy Retail Company LLC, a direct, wholly-owned subsidiary of TCEH engaged in the retail sale of electricity to residential and business customers. TXU Energy is a REP in competitive areas of ERCOT. |
| **US** | United States of America |
| **VIE** | variable interest entity |

These consolidated financial statements occasionally make references to Oncor Holdings or Oncor when describing actions, rights or obligations of their respective subsidiaries. References to "we," "our," "us" and "the company" are to Oncor Holdings and/or its direct or indirect subsidiaries as apparent in the context. These references reflect the fact that the subsidiaries are consolidated with their respective parent companies for financial reporting purposes. However, these references should not be interpreted to imply that the parent company is actually undertaking the action or has the rights or obligations of the relevant subsidiary company or that the subsidiary company is undertaking an action or has the rights or obligations of its parent company or any other affiliate.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

**INDEPENDENT AUDITORS' REPORT**

To the Board of Directors and Member of
Oncor Electric Delivery Holdings Company LLC
Dallas, Texas

We have audited the accompanying consolidated financial statements of Oncor Electric Delivery Holdings Company LLC and its subsidiary (the "Company") which comprise the consolidated balance sheets as of December 31, 2012 and 2011, and the related statements of consolidated income, comprehensive income, membership interests and cash flows for each of the three years in the period ended December 31, 2012, and the related notes to the consolidated financial statements.

**Management's Responsibility for the Consolidated Financial Statements**

Management is responsible for the preparation and fair presentation of these consolidated financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

**Auditors' Responsibility**

Our responsibility is to express an opinion on these consolidated financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the Company's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Oncor Electric Delivery Holdings Company LLC and its subsidiary as of December 31, 2012 and 2011, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2012, in accordance with accounting principles generally accepted in the United States of America.

/s/ Deloitte & Touche LLP

Dallas, Texas
February 19, 2013

4

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC**
**STATEMENTS OF CONSOLIDATED INCOME**
**(millions of dollars)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2012 | 2011 | 2010 |
| Operating revenues: | | | |
| Affiliated | $      962 | $    1,026 | $    1,061 |
| Nonaffiliated | 2,366 | 2,092 | 1,853 |
| Total operating revenues | 3,328 | 3,118 | 2,914 |
| Operating expenses: | | | |
| Wholesale transmission service | 502 | 439 | 393 |
| Operation and maintenance | 669 | 658 | 616 |
| Depreciation and amortization | 771 | 719 | 673 |
| Income taxes (Note 3) | 240 | 209 | 193 |
| Taxes other than income taxes | 415 | 400 | 384 |
| Total operating expenses | 2,597 | 2,425 | 2,259 |
| Operating income | 731 | 693 | 655 |
| Other income and deductions: | | | |
| Other income (Note 13) | 26 | 30 | 36 |
| Other deductions (Note 13) | 64 | 9 | 8 |
| Nonoperating income taxes (Note 3) | 3 | 27 | 27 |
| Interest income | 24 | 32 | 38 |
| Interest expense and related charges (Note 13) | 374 | 359 | 347 |
| Net income | 340 | 360 | 347 |
| Net income attributable to noncontrolling interests | (70) | (74) | (70) |
| Net income attributable to Oncor Holdings | $      270 | $      286 | $      277 |

See Notes to Financial Statements.

**STATEMENTS OF CONSOLIDATED COMPREHENSIVE INCOME**
**(millions of dollars)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2012 | 2011 | 2010 |
| Net income | $      340 | $      360 | $      347 |
| Other comprehensive income (loss): | | | |
| Cash flow hedges (Notes 1 and 6): | | | |
| Net decrease in fair value of derivatives (net of tax benefit of — ,$17,and —) | — | (29) | — |
| Derivative value net loss recognized in net income (net of tax benefit of $1, — and — ) | 3 | — | — |
| Total cash flow hedges | 3 | (29) | — |
| Defined benefit pension and OPEB plans (net of tax benefit of $1, — and —) (Note 10) | (3) | — | — |
| Total other comprehensive loss | — | (29) | — |
| Comprehensive income | 340 | 331 | 347 |
| Comprehensive income attributable to noncontrolling interests | (70) | (68) | (70) |
| Comprehensive income attributable to Oncor Holdings | $      270 | $      263 | $      277 |

See Notes to Financial Statements.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC**
**STATEMENTS OF CONSOLIDATED CASH FLOWS**
**(millions of dollars)**

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2012** | **2011** | **2010** |
| Cash flows — operating activities: | | | |
| Net income | $ 340 | $ 360 | $ 347 |
| Adjustments to reconcile net income to cash provided by operating activities: | | | |
| Depreciation and amortization | 802 | 732 | 682 |
| Deferred income taxes — net | 182 | 229 | 155 |
| Amortization of investment tax credits | (4) | (5) | (5) |
| Other — net | — | 2 | — |
| Changes in operating assets and liabilities: | | | |
| Accounts receivable - trade (including affiliates) | 52 | (36) | (1) |
| Inventories | (3) | 25 | (4) |
| Accounts payable — trade (including affiliates) | (9) | 17 | (17) |
| Deferred revenues (Note 4) | (101) | (16) | 11 |
| Other — assets | (15) | 147 | 3 |
| Other — liabilities | (8) | (160) | (74) |
| Cash provided by operating activities | 1,236 | 1,295 | 1,097 |
| Cash flows — financing activities: | | | |
| Issuances of long-term debt (Note 6) | 900 | 300 | 475 |
| Repayments of long-term debt (Note 6) | (1,018) | (113) | (108) |
| Net increase (decrease) in short term borrowings (Note 5) | 343 | 15 | (239) |
| Distributions to parent (Note 8) | (147) | (116) | (169) |
| Distributions to noncontrolling interests | (45) | (29) | (42) |
| Decrease in note receivable from TCEH (Note 12) | 20 | 40 | 37 |
| Sale of related-party agreements (Note 12) | 159 | — | — |
| Debt discount, financing and reacquisition expenses — net | (46) | (17) | (15) |
| Other | (1) | — | — |
| Cash provided by (used in) financing activities | 165 | 80 | (61) |
| Cash flows — investing activities: | | | |
| Capital expenditures | (1,389) | (1,362) | (1,020) |
| Other — net | 21 | (34) | (12) |
| Cash used in investing activities | (1,368) | (1,396) | (1,032) |
| Net change in cash and cash equivalents | 33 | (21) | 4 |
| Cash and cash equivalents — beginning balance | 12 | 33 | 29 |
| Cash and cash equivalents — ending balance | $ 45 | $ 12 | $ 33 |

See Notes to Financial Statements.

6

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC**
**CONSOLIDATED BALANCE SHEETS**
**(millions of dollars)**

| | At December 31, | |
|---|---|---|
| | 2012 | 2011 |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 45 | $ 12 |
| Restricted cash — Bondco (Note 13) | 55 | 57 |
| Trade accounts receivable from nonaffiliates — net (Note 13) | 338 | 303 |
| Trade accounts and other receivables from affiliates (Note 12) | 53 | 179 |
| Materials and supplies inventories — at average cost | 73 | 71 |
| Accumulated deferred income taxes (Note 3) | 26 | 73 |
| Prepayments and other current assets | 82 | 74 |
| Total current assets | 672 | 769 |
| Restricted cash — Bondco (Note 13) | 16 | 16 |
| Investments and other property (Note 13) | 83 | 73 |
| Property, plant and equipment — net (Note 13) | 11,318 | 10,569 |
| Goodwill (Notes 1 and 13) | 4,064 | 4,064 |
| Note receivable from TCEH (Note 12) | — | 138 |
| Regulatory assets — net — Oncor (Note 4) | 1,453 | 1,303 |
| Regulatory assets — net — Bondco (Note 4) | 335 | 427 |
| Other noncurrent assets | 78 | 73 |
| Total assets | $ 18,019 | $ 17,432 |
| **LIABILITIES AND MEMBERSHIP INTERESTS** | | |
| Current liabilities: | | |
| Short-term borrowings (Note 5) | $ 735 | $ 392 |
| Long-term debt due currently — Oncor (Note 6) | — | 376 |
| Long-term debt due currently — Bondco (Note 6) | 125 | 118 |
| Trade accounts payable | 121 | 197 |
| Income taxes payable to EFH Corp. (Note 12) | 34 | 2 |
| Accrued taxes other than income taxes | 153 | 151 |
| Accrued interest | 95 | 108 |
| Other current liabilities | 110 | 112 |
| Total current liabilities | 1,373 | 1,456 |
| Long-term debt, less amounts due currently — Oncor (Note 6) | 5,090 | 4,711 |
| Long-term debt, less amounts due currently — Bondco (Note 6) | 310 | 433 |
| Accumulated deferred income taxes (Notes 1, 3 and 12) | 1,736 | 1,688 |
| Investment tax credits | 24 | 28 |
| Other noncurrent liabilities and deferred credits (Notes 12 and 13) | 1,999 | 1,832 |
| Total liabilities | 10,532 | 10,148 |
| Commitments and contingencies (Note 7) | | |
| Membership interests (Note 8): | | |
| Capital account | 5,867 | 5,745 |
| Accumulated other comprehensive loss, net of tax effects | (25) | (25) |
| Oncor Holdings membership interest | 5,842 | 5,720 |
| Noncontrolling interests in subsidiary | 1,645 | 1,564 |
| Total membership interests | 7,487 | 7,284 |
| Total liabilities and membership interests | $ 18,019 | $ 17,432 |

See Notes to Financial Statements.

7

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

**ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC**
**STATEMENTS OF CONSOLIDATED MEMBERSHIP INTERESTS**
**(millions of dollars)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2012 | 2011 | 2010 |
| Capital account: | | | |
| Balance at beginning of period | $    5,745 | $    5,546 | $    5,397 |
| Net income attributable to Oncor Holdings | 270 | 286 | 277 |
| Distributions paid to parent | (147) | (116) | (169) |
| Sale of related-party agreements (net of tax benefit of $1, — and — ) (Note 12) | (1) | — | — |
| Capital contributions (a) | — | 29 | 40 |
| Other | — | — | 1 |
| Balance at end of period | 5,867 | 5,745 | 5,546 |
| Accumulated other comprehensive income (loss), net of tax effects: | | | |
| Balance at beginning of period | (25) | (2) | (2) |
| Net effects of cash flow hedges (net of tax expense (benefit) of $1, $(13) and — ) (Note 6) | 2 | (23) | — |
| Defined benefit pension and OPEB plans (net of tax benefit of $1, — and —) (Note 10) | (2) | — | — |
| Balance at end of period | (25) | (25) | (2) |
| Oncor Holdings membership interest at end of period | 5,842 | 5,720 | 5,544 |
| Noncontrolling interests in subsidiary (Note 9): | | | |
| Balance at beginning of period | 1,564 | 1,452 | 1,363 |
| Net income attributable to noncontrolling interests | 70 | 74 | 70 |
| Distributions to noncontrolling interests | (45) | (29) | (42) |
| Change related to future tax distributions from Oncor | 5 6 | 73 | 6 1 |
| Net effects of cash flow hedges (net of tax benefit of — , $4, and — ) | 1 | (6) | — |
| Defined benefit pension and OPEB plans (net of tax) (Note 10) | (1) | — | — |
| Noncontrolling interests in subsidiary at end of period | 1,645 | 1,564 | 1,452 |
| Total membership interests at end of period | $    7,487 | $    7,284 | $    6,996 |

_____

(a) Reflects noncash settlement of certain income taxes payable arising as a result of the sale of noncontrolling interests in Oncor.

See Notes to Financial Statements.

8

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

## ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### 1.    BUSINESS AND SIGNIFICANT ACCOUNTING POLICIES

*Description of Business*

References in this report to "we," "our," "us" and "the company" are to Oncor Holdings and/or its direct or indirect subsidiaries as apparent in the context. The financial statements reflect almost entirely the operations of Oncor; consequently, there are no separate reportable business segments.  See "Glossary" for definition of terms and abbreviations.

We are a Dallas, Texas-based holding company whose financial statements reflect almost entirely the operations of our direct, majority (approximately 80%) owned subsidiary, Oncor. Oncor is a regulated electricity transmission and distribution company principally engaged in providing delivery services to REPs, including subsidiaries of TCEH, that sell power in the north-central, eastern and western parts of Texas.  Revenues from TCEH represented 29%, 33% and 36% of total operating revenues for the years ended December 31, 2012, 2011 and 2010, respectively.  We are a direct, wholly-owned subsidiary of EFIH, a direct, wholly-owned subsidiary of EFH Corp.  EFH Corp. is a subsidiary of Texas Holdings, which is controlled by the Sponsor Group.

Our consolidated financial statements include our indirect, bankruptcy-remote financing subsidiary, Bondco, a VIE (see Note 13).  This financing subsidiary was organized for the limited purpose of issuing certain transition bonds in 2003 and 2004.  Bondco issued $1.3 billion principal amount of transition bonds to recover generation-related regulatory asset stranded costs and other qualified costs under an order issued by the PUCT in 2002.

Various "ring-fencing" measures have been taken to enhance the separateness between the Oncor Ring-Fenced Entities and the Texas Holdings Group and our credit quality. These measures serve to mitigate our and Oncor's credit exposure to the Texas Holdings Group and to reduce the risk that our assets and liabilities or those of Oncor would be substantively consolidated with the assets and liabilities of the Texas Holdings Group in the event of a bankruptcy of one or more of those entities. Such measures include, among other things: Oncor's sale of a 19.75% equity interest to Texas Transmission in November 2008; maintenance of separate books and records for the Oncor Ring-Fenced Entities; our board of directors and Oncor's board of directors being comprised of a majority of independent directors; and prohibitions on the Oncor Ring-Fenced Entities providing credit support to, or receiving credit support from, any member of the Texas Holdings Group. The assets and liabilities of the Oncor Ring-Fenced Entities are separate and distinct from those of the Texas Holdings Group, including TXU Energy and Luminant, and none of the assets of the Oncor Ring-Fenced Entities are available to satisfy the debt or contractual obligations of any member of the Texas Holdings Group. We and Oncor do not bear any liability for debt or contractual obligations of the Texas Holdings Group, and vice versa. Accordingly, our operations are conducted, and our cash flows are managed, independently from the Texas Holdings Group.

See Note 9 for discussion of noncontrolling interests.

*Basis of Presentation*

Our consolidated financial statements have been prepared in accordance with US GAAP and on the same basis as our audited financial statements for the year ended December 31, 2011 included in EFH Corp.'s Annual Report on Form 10-K for the year ended December 31, 2011 filed on February 21, 2012 (Commission File No. 001-12833). All intercompany items and transactions have been eliminated in consolidation.  All dollar amounts in the financial statements and tables in the notes are stated in millions of US dollars unless otherwise indicated.  Subsequent events have been evaluated through the date these consolidated financial statements were issued.

From time to time, certain prior period amounts are reclassified to conform to the current period presentation.  In the statements of consolidated cash flows included in this report, amounts previously reported as changes in deferred advanced metering system revenues for the years ended December 31, 2011 and 2010 are included in and reported as deferred revenues to conform to the current period presentation.  In addition to deferred advanced metering system revenues, other reconcilable revenues (TCRF and energy efficiency surcharges), which were previously reported as changes in other operating assets and liabilities, are included in and reported as deferred revenues.

As discussed in Note 12, the balance sheet at December 31, 2011 has been restated to remove the regulatory liability for nuclear plant decommissioning and related receivable from TCEH related to nuclear plant decommissioning.

9

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

### Consolidation of Variable Interest Entities

A VIE is an entity with which we have a relationship or arrangement that indicates some level of control over the entity or results in economic risks to us. We consolidate a VIE if we have: a) the power to direct the significant activities of the VIE and b) the right or obligation to absorb profit and loss from the VIE (primary beneficiary). See Note 13.

### Income Taxes

EFH Corp. files a consolidated federal income tax return. Effective with the November 2008 sale of equity interests in Oncor, Oncor became a partnership for US federal income tax purposes, and subsequently only EFH Corp.'s share of partnership income is included in its consolidated federal income tax return. Our tax sharing agreement with Oncor and EFH Corp. was amended in November 2008 to include Texas Transmission and Investment LLC. The tax sharing agreement provides for the calculation of tax liability substantially as if we and Oncor file our own income tax returns, and requires tax payments to members determined on that basis (without duplication for any income taxes paid by our subsidiaries). Deferred income taxes are provided for temporary differences between our book and tax bases of assets and liabilities.

Amounts of deferred income tax assets and liabilities, as well as current and noncurrent accruals, are determined in accordance with the provisions of accounting guidance for income taxes and for uncertainty in income taxes. The accounting guidance for rate-regulated enterprises requires the recognition of regulatory assets or liabilities if it is probable such deferred tax amounts will be recovered from, or returned to customers in future rates. Investment tax credits are amortized to income over the estimated lives of the related properties.

We classify interest and penalties expense related to uncertain tax positions as current accumulated deferred income taxes as discussed in Note 3.

### Use of Estimates

Preparation of our financial statements requires management to make estimates and assumptions about future events that affect the reporting of assets and liabilities at the balance sheet dates and the reported amounts of revenue and expense, including fair value measurements. In the event estimates and/or assumptions prove to be different from actual amounts, adjustments are made in subsequent periods to reflect more current information. No material adjustments, other than those disclosed elsewhere herein, were made to previous estimates or assumptions during the current year.

### Derivative Instruments and Mark-to-Market Accounting

Oncor has from time-to-time entered into derivative instruments to hedge interest rate risk. If the instrument meets the definition of a derivative under accounting standards related to derivative instruments and hedging activities, the fair value of each derivative is required to be recognized on the balance sheet as a derivative asset or liability and changes in the fair value are recognized in net income, unless criteria for certain exceptions are met. This recognition is referred to as "mark-to-market" accounting.

Because derivative instruments are frequently used as economic hedges, accounting standards related to derivative instruments and hedging activities allow for "hedge accounting," which provides for the designation of such instruments as cash flow or fair value hedges if certain conditions are met. A cash flow hedge mitigates the risk associated with the variability of the future cash flows related to an asset or liability (e.g., debt with variable interest rate payments), while a fair value hedge mitigates risk associated with fixed future cash flows (e.g., debt with fixed interest rate payments). In accounting for cash flow hedges, derivative assets and liabilities are recorded on the balance sheet at fair value with an offset to other comprehensive income to the extent the hedges are effective. Amounts remain in accumulated other comprehensive income and are reclassified into net income as the related transactions (hedged items) settle and affect net income. If the hedged transaction becomes probable of not occurring, hedge accounting is discontinued and the amount recorded in other comprehensive income is immediately reclassified into net income. Fair value hedges are recorded as derivative assets or liabilities with an offset to net income, and the carrying value of the related asset or liability (hedged item) is adjusted for changes in fair value with an offset to net income. If the fair value hedge is settled prior to the maturity of the hedged item, the cumulative fair value gain or loss associated with the hedge is amortized into income over the remaining life of the hedged item. To qualify for hedge accounting, a hedge must be considered highly effective in offsetting changes in fair value of the hedged item. Assessment of the hedge's effectiveness is tested at least quarterly throughout its term to continue to qualify for hedge accounting. Hedge ineffectiveness, even if the hedge continues to be assessed as effective, is immediately recognized in net income. Ineffectiveness is generally measured as the cumulative excess, if any, of the change in value of the hedging instrument over the change in value of the hedged item.

10

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

### Reconcilable Tariffs

The PUCT has designated certain tariffs (TCRF, energy efficiency and advanced meter surcharges and charges related to transition bonds) as reconcilable, which means the differences between amounts billed under these tariffs and the related incurred expenses are deferred as either regulatory assets or regulatory liabilities. Accordingly, at prescribed intervals, future tariffs are adjusted to either repay regulatory liabilities or collect regulatory assets.

### Revenue Recognition

Revenue from delivery services are recorded under the accrual method of accounting. Revenues are recognized when delivery services are provided to customers on the basis of periodic cycle meter readings and include an estimate for revenues earned from the meter reading date to the end of the period adjusted for the impact of weather (unbilled revenue).

### Impairment of Long-Lived Assets and Goodwill

We evaluate long-lived assets (including intangible assets with finite lives) for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable.

We also evaluate goodwill for impairment annually (at December 1) or whenever events or changes in circumstances indicate that an impairment may exist.

Goodwill impairment tests performed in 2012 and 2010 were based on determinations of enterprise value using discounted cash flow analyses, comparable company equity values and any relevant transactions indicative of enterprise values (quantitative assessment).

Effective with the December 1, 2011 test, we adopted new accounting guidance that provides the option of using a qualitative assessment in which we may consider macroeconomic conditions, industry and market considerations, cost factors, overall financial performance and other relevant events. Based on the results of the qualitative assessment performed, we concluded that no further testing for impairment was required in 2011.

### System of Accounts

Our accounting records have been maintained in accordance with the US Federal Energy Regulatory Commission Uniform System of Accounts as adopted by the PUCT.

### Defined Benefit Pension Plans and Other Postretirement Employee Benefit (OPEB) Plans

Oncor participates in pension plans that offer benefits based on either a traditional defined benefit formula or a cash balance formula and the OPEB Plan that offers certain health care and life insurance benefits to eligible employees and their eligible dependents upon the retirement of such employees from the company. Costs of pension and OPEB plans are dependent upon numerous factors, assumptions and estimates. In 2012, EFH Corp. made various changes to the EFH Retirement Plan, including splitting off into a new plan all of the assets and liabilities associated with Oncor employees and all retirees and terminated vested participants of EFH Corp. and its subsidiaries (including discontinued businesses). See Note 10 for additional information regarding the pension plans and the OPEB Plan

### Stock-Based Incentive Compensation

In 2008, Oncor implemented the SARs Plan for certain management that purchased equity interests in the company indirectly by investing in Investment LLC. Oncor implemented the Director SARs Plan in 2009. SARs have been awarded under the SARs Plan and are being accounted for based upon the provisions of guidance for share-based payment. See Note 11 for information regarding stock-based compensation, including SARs granted to certain members of Oncor's board of directors and a 2012 early exercise of all outstanding SARS under both the SARs Plan and Director SARs Plan.

11

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Fair Value of Nonderivative Financial Instruments*

The carrying amounts for financial assets classified as current assets and the carrying amounts for financial liabilities classified as current liabilities approximate fair value due to the short maturity of such instruments.  The fair values of other financial instruments, for which carrying amounts and fair values have not been presented, are not materially different than their related carrying amounts.  The following discussion of fair value accounting standards applies primarily to our determination of the fair value of assets in the pension and OPEB plan trusts as presented in Note 10.

Accounting standards related to the determination of fair value define fair value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.  We use a "mid-market" valuation convention (the mid-point price between bid and ask prices) as a practical expedient to measure fair value for the majority of our assets and liabilities subject to fair value measurement on a recurring basis.  We primarily use the market approach for recurring fair value measurements and use valuation techniques to maximize the use of observable inputs and minimize the use of unobservable inputs.

We categorize our assets and liabilities recorded at fair value based upon the following fair value hierarchy:

- Level 1 valuations use quoted prices in active markets for identical assets or liabilities that are accessible at the measurement date.  An active market is a market in which transactions for the asset or liability occur with sufficient frequency and volume to provide pricing information on an ongoing basis.

- Level 2 valuations use inputs that, in the absence of actively quoted market prices, are observable for the asset or liability, either directly or indirectly. Level 2 inputs include: (a) quoted prices for similar assets or liabilities in active markets, (b) quoted prices for identical or similar assets or liabilities in markets that are not active, (c) inputs other than quoted prices that are observable for the asset or liability such as interest rates and yield curves observable at commonly quoted intervals and (d) inputs that are derived principally from or corroborated by observable market data by correlation or other means. Our Level 2 valuations utilize over-the-counter broker quotes, quoted prices for similar assets or liabilities that are corroborated by correlations or other mathematical means and other valuation inputs.

- Level 3 valuations use unobservable inputs for the asset or liability.  Unobservable inputs are used to the extent observable inputs are not available, thereby allowing for situations in which there is little, if any, market activity for the asset or liability at the measurement date.  We use the most meaningful information available from the market combined with internally developed valuation methodologies to develop our best estimate of fair value.

We utilize several different valuation techniques to measure the fair value of assets and liabilities, relying primarily on the market approach of using prices and other market information for identical and/or comparable assets and liabilities for those items that are measured on a recurring basis.

*Franchise Taxes*

Franchise taxes are assessed to Oncor by local governmental bodies, based on kilowatt-hours delivered and are the principal component of "taxes other than income taxes" as reported in the income statement. Franchise taxes are not a "pass through" item. Rates charged to customers by Oncor are intended to recover the franchise taxes, but Oncor is not acting as an agent to collect the taxes from customers.

*Cash and Cash Equivalents*

For purposes of reporting cash and cash equivalents, temporary cash investments purchased with a remaining maturity of three months or less are considered to be cash equivalents. See Note 13 for details regarding restricted cash.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Property, Plant and Equipment*

Properties are stated at original cost. The cost of self-constructed property additions includes materials and both direct and indirect labor and applicable overhead and an allowance for funds used during construction.

Depreciation of property, plant and equipment is calculated on a straight-line basis over the estimated service lives of the properties based on depreciation rates approved by the PUCT. As is common in the industry, depreciation expense is recorded using composite depreciation rates that reflect blended estimates of the lives of major asset groups as compared to depreciation expense calculated on a component asset-by-asset basis.  Depreciation rates include plant removal costs as a component of depreciation expense, consistent with regulatory treatment.  Actual removal costs incurred are charged to accumulated depreciation. When accrued removal costs exceed incurred removal costs, the difference is reclassified as a regulatory obligation to retire assets in the future.

*Allowance for Funds Used During Construction  (AFUDC)*

AFUDC is a regulatory cost accounting procedure whereby both interest charges on borrowed funds and a return on equity capital used to finance construction are included in the recorded cost of utility plant and equipment being constructed.  AFUDC is capitalized on all projects involving construction periods lasting greater than thirty days.  The equity portion of capitalized AFUDC is accounted for as other income.  Oncor recorded $1 million of equity AFUDC in the year ended December 31, 2012 and none for each of the years ended December 31, 2011 and 2010.  See Note 13 for detail of amounts charged to interest expense.

*Regulatory Assets and Liabilities*

Our financial statements reflect regulatory assets and liabilities under cost-based rate regulation in accordance with accounting standards related to the effect of certain types of regulation.  Regulatory decisions can have an impact on the recovery of costs, the rate earned on invested capital and the timing and amount of assets to be recovered by rates.  See Note 4 for details of regulatory assets and liabilities.

*Sale of Noncontrolling Interests*

See Note 9 for discussion of noncontrolling interests.

## 2.    REGULATORY MATTERS

*2011 Rate Review*

In January 2011, Oncor filed a rate review with the PUCT and 203 original jurisdiction cities based on a test year ended June 30, 2010 (PUCT Docket No. 38929). In April 2011, Oncor and the other parties reached a Memorandum of Settlement that would settle and resolve all issues in the rate review.  Oncor filed a stipulation (including a proposed order and proposed tariffs) in May 2011 that incorporated the Memorandum of Settlement along with pleadings and other documentation (Stipulation) for the purpose of obtaining final approval of the settlement.  The terms of the Stipulation include an approximate $137 million base rate increase and additional provisions to address franchise fees (discussed below) and other expenses.  Approximately $93 million of the increase became effective July 1, 2011, and the remainder became effective January 1, 2012.  Under the Stipulation, amortization of regulatory assets increased by approximately $24 million ($14 million of which will be recognized as tax expense) annually beginning January 1, 2012.  The Stipulation did not change Oncor's authorized regulatory capital structure of 60% debt and 40% equity or its authorized return on equity of 10.25%.  Under the terms of the Stipulation, Oncor cannot file another general base rate review prior to July 1, 2013, but is not restricted from filing wholesale transmission rate, TCRF, distribution-related investment and other rate updates and adjustments permitted by Texas state law and PUCT rules.

In response to concerns raised by PUCT Commissioners at a July 2011 PUCT open meeting regarding the Stipulation, Oncor filed a modified stipulation that removed from the Stipulation a one-time payment to certain cities it serves for retrospective franchise fees (Modified Stipulation).  Instead, pursuant to the terms of a separate agreement with certain cities it serves, through December 31, 2012, Oncor has made $22 million in retrospective franchise fee payments to cities that accepted the terms of the separate agreement.  The payments are subject to refund from the cities or recovery from customers after final resolution of proceedings related to the appeals from Oncor's June 2008 rate review filing (discussed below).  No other significant terms of the Stipulation were revised. In August 2011, the PUCT issued a final order approving the settlement terms contained in the Modified Stipulation.

13

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Effective July 1, 2011, pursuant to the PUCT's final order, Oncor no longer recovers the cost of wholesale transmission service through base rates, and wholesale transmission service expenses incurred are reconcilable to revenues billed under the TCRF rider.  For this purpose, all wholesale transmission service expenses consist of amounts charged under a PUCT-approved transmission tariff including Oncor's own wholesale transmission tariff.  Oncor accounts for the difference between amounts charged under the TCRF rate and wholesale transmission service expense as a regulatory asset or regulatory liability (under- or over-recovered wholesale transmission service expense (see Note 1)).  At December 31, 2012, approximately $60 million ($40 million after tax) was deferred as under-recovered wholesale transmission service expense (see Note 4).

*2008 Rate Review*

In August 2009, the PUCT issued a final order with respect to Oncor's June 2008 rate review filing with the PUCT and 204 cities based on a test year ended December 31, 2007 (PUCT Docket No. 35717), and new rates were implemented in September 2009.  In November 2009, the PUCT issued an order on rehearing that established a new rate class but did not change the revenue requirements.  Oncor and four other parties appealed various portions of the rate review final order to a state district court, and oral argument was held in October 2010.  In January 2011, the district court signed its judgment reversing the PUCT with respect to two issues: the PUCT's disallowance of certain franchise fees and the PUCT's decision that PURA no longer requires imposition of a rate discount for state colleges and universities.  Oncor filed an appeal with the Texas Third Court of Appeals (Austin Court of Appeals) in February 2011 with respect to the issues it appealed to the district court and did not prevail upon, as well as the district court's decision to reverse the PUCT with respect to discounts for state colleges and universities.  Oral argument before the Austin Court of Appeals was completed in April 2012. There is no deadline for the court to act. Oncor is unable to predict the outcome of the appeal.

*Stipulation Approved by the PUCT*

In April 2008, the PUCT entered an order (PUCT Docket No. 34077), which became final in June 2008, approving the terms of a stipulation relating to a filing in 2007 by Oncor and Texas Holdings with the PUCT pursuant to Section 14.101(b) of PURA and PUCT Substantive Rule 25.75.  Among other things, the stipulation required Oncor to file a rate review no later than July 1, 2008 based on a test year ended December 31, 2007, which it filed in June 2008. The PUCT issued a final order with respect to the rate review in August 2009.  In July 2008, Nucor Steel filed an appeal of the PUCT's order in the 200th District Court of Travis County, Texas (District Court). A hearing on the appeal was held in June 2010, and the District Court affirmed the PUCT order in its entirety. Nucor Steel appealed that ruling to the Austin Court of Appeals in July 2010.  In March 2012, the Austin Court of Appeals affirmed the District Court's ruling, which is now final

In addition to commitments Oncor made in its filings in the PUCT review, the stipulation included the following provisions, among others:

- Oncor provided a one-time $72 million refund to its REP customers in the September 2008 billing cycle.  The refund was in the form of a credit on distribution fee billings. The liability for the refund was previously recorded as part of purchase accounting.
- Cash distributions paid by Oncor were limited through December 31, 2012, to an amount not to exceed its net income (determined in accordance with US GAAP, subject to certain defined adjustments) for the period beginning October 11, 2007 and ending December 31, 2012, and continue to be limited by an agreement that Oncor's regulatory capital structure, as determined by the PUCT, will be at or below the assumed debt-to-equity ratio established periodically by the PUCT for ratemaking purposes, which is currently set at 60% debt to 40% equity (see Note 8).
- Oncor committed to minimum capital spending of $3.6 billion over the five-year period ending December 31, 2012, subject to certain defined conditions. This spending did not include the capital spending on CREZ facilities.  Oncor satisfied this spending commitment in 2012.
- Oncor committed to an additional $100 million in spending over the five-year period ending December 31, 2012 on demand-side management or other energy efficiency initiatives. These additional expenditures will not be recoverable in rates, and this amount was recorded as a regulatory liability as part of purchase accounting and consistent with accounting standards related to the effect of certain types of regulation.  Oncor satisfied this spending commitment in 2012.
- If Oncor's credit rating is below investment grade with two or more rating agencies, TCEH will post a letter of credit in an amount of $170 million to secure TXU Energy's payment obligations to Oncor.
- Oncor agreed not to request recovery of goodwill or any future impairment of the goodwill in its rates.

14

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

## 3.   INCOME TAXES

The components of our income tax expense (benefit) are as follows:

| | Year Ended December 31, | | |
| | 2012 | 2011 | 2010 |
|---|---|---|---|
| Reported in operating expenses: | | | |
| Current: | | | |
| US federal | $ 23 | $ (55) | $ (6) |
| State | 21 | 21 | 21 |
| Deferred: | | | |
| US federal | 200 | 248 | 183 |
| State | — | — | — |
| Amortization of investment tax credits | (4) | (5) | (5) |
| Total | 240 | 209 | 193 |
| Reported in other income and deductions: | | | |
| Current: | | | |
| US federal | 21 | 45 | 55 |
| State | — | 1 | 1 |
| Deferred federal | (18) | (19) | (29) |
| Total | 3 | 27 | 27 |
| Total income tax expense | $ 243 | $ 236 | $ 220 |

Reconciliation of income taxes computed at the US federal statutory rate to income taxes:

| | Year Ended December 31, | | |
| | 2012 | 2011 | 2010 |
|---|---|---|---|
| Income before income taxes | $ 583 | $ 596 | $ 567 |
| Income taxes at the US federal statutory rate of 35% | $ 204 | $ 209 | $ 198 |
| Amortization of investment tax credits — net of deferred tax effect | (4) | (5) | (5) |
| Amortization (under regulatory accounting) of statutory tax rate changes | (3) | (3) | (3) |
| Amortization of Medicare subsidy regulatory asset | 14 | — | — |
| Texas margin tax, net of federal tax benefit | 14 | 14 | 13 |
| Medicare subsidy | — | — | (1) |
| Nondeductible losses (gains) on benefit plan investments | (2) | (1) | (1) |
| Other, including audit settlements | 20 | 22 | 19 |
| Income tax expense | $ 243 | $ 236 | $ 220 |
| Effective rate | 41.7% | 39.6% | 38.8% |

At December 31, 2012 and 2011, net amounts of $1.710 billion and $1.615 billion, respectively, were reported in the balance sheets as accumulated deferred income taxes. These amounts include $1.713 billion and $1.605 billion, respectively, related to our investment in the Oncor partnership.

We also have AMT credit carryforwards and NOL carryforwards related to our investment in the Oncor partnership. At December 31, 2012 and 2011, we had $52 million and $49 million of alternative minimum tax (AMT) credit carryforwards, respectively, available to offset future tax sharing payments. The AMT credit carryforwards have no expiration date. At December 31, 2012, we had net operating loss (NOL) carryforwards for federal income tax purposes of $217 million that expire between 2028 and 2032. The NOL carryforwards can be used to offset future taxable income. We expect to use all of our NOL carryforwards prior to their expiration date.

15

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Accounting For Uncertainty in Income Taxes*

EFH Corp. and its subsidiaries file or have filed income tax returns in US federal, state and foreign jurisdictions and are subject to examinations by the IRS and other taxing authorities. Examinations of EFH Corp. and its subsidiaries' income tax returns for the years ending prior to January 1, 2007 are complete, but the tax years 1997 through 2006 remain in appeals with the IRS. Texas franchise and margin tax returns are under examination or still open for examination for tax years beginning after 2002.

The IRS audit for the years 2003 through 2006 was concluded in June 2011. A number of proposed adjustments are in appeals with the IRS. The results of the audit did not affect management's assessment of issues for purposes of determining the liability for uncertain tax positions.

We have been advised by EFH Corp. that the conclusion of all issues contested from the 1997 through 2002 IRS audit, including Joint Committee review, could occur during the first quarter of 2013. Upon such conclusion, we would expect to further reduce the liability for uncertain tax positions by approximately $29 million with a cash payment to EFH Corp. as required under the tax sharing agreement. Other than these items, we do not expect the total amount of liabilities recorded related to uncertain tax positions will change significantly in the next 12 months.

The following table summarizes the changes to the uncertain tax positions, reported in other noncurrent liabilities in our consolidated balance sheet, during the years ended December 31, 2012, 2011 and 2010:

|  | 2012 | 2011 | 2010 |
|---|---|---|---|
| Balance at January 1, excluding interest and penalties | $ 126 | $ 82 | $ 71 |
| Additions based on tax positions related to prior years | 18 | 44 | 31 |
| Reductions based on tax positions related to prior years | — | — | (20) |
| Balance at December 31, excluding interest and penalties | $ 144 | $ 126 | $ 82 |

Of the balances at December 31, 2012 and 2011, $133 million and $115 million, respectively, represent tax positions for which the uncertainty relates to the timing of recognition for tax purposes. The disallowance of such positions would not affect the effective tax rate, but would accelerate the payment of cash under the tax sharing agreement to an earlier period.

Noncurrent liabilities included a total of $25 million and $21 million in accrued interest at December 31, 2012 and 2011, respectively. Amounts recorded related to interest and penalties totaled an expense of $3 million and $2 million in the years ended December 31, 2012 and 2011, respectively, and a benefit of $1 million in the year ended December 31, 2010, as a result of reversals of previously accrued amounts (all amounts after tax). The federal income tax benefit on the interest accrued on uncertain tax positions is recorded as accumulated deferred income taxes.

With respect to tax positions for which the ultimate deductibility is uncertain (permanent items), should EFH Corp. or we sustain such positions on income tax returns previously filed, our liabilities recorded would be reduced by $11 million, resulting in increased net income and a favorable impact on the effective tax rate.

16

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

## 4.   REGULATORY ASSETS AND LIABILITIES

Recognition of regulatory assets and liabilities and the amortization periods over which they are expected to be recovered or refunded through rate regulation reflect the decisions of the PUCT.  Components of the regulatory assets and liabilities are provided in the table below.  Regulatory liabilities at December 31, 2011 have been restated to remove the $225 million regulatory liability for nuclear plant decommissioning (see Note 12).   Amounts not earning a return through rate regulation are noted

| | Remaining Rate Recovery/Amortization Period at December 31, 2012 | Carrying Amount | |
| --- | --- | --- | --- |
| | | December 31, 2012 | December 31, 2011 |
| Regulatory assets: | | | |
| Generation-related regulatory assets securitized by transition bonds (a)(e) | 4 years | $        409 | $        531 |
| Employee retirement costs | 7 years | 87 | 103 |
| Employee retirement costs to be reviewed (b)(c) | To be determined | 186 | 74 |
| Employee retirement liability (a)(c)(d) | To be determined | 738 | 707 |
| Self-insurance reserve (primarily storm recovery costs) — net | 7 years | 190 | 221 |
| Self-insurance reserve to be reviewed (b)(c) | To be determined | 128 | 71 |
| Securities reacquisition costs (pre-industry restructure) | 5 years | 41 | 48 |
| Securities reacquisition costs (post-industry restructure) — net | Terms of related debt | 22 | 2 |
| Recoverable amounts in lieu of deferred income taxes — net | Life of related asset or liability | 71 | 104 |
| Rate review expenses (a) | Largely 3 years | 6 | 11 |
| Rate review expenses to be reviewed (b)(c) | To be determined | 1 | 1 |
| Advanced meter customer education costs (c) | 7 years | 10 | 9 |
| Deferred conventional meter depreciation | 8 years | 152 | 107 |
| Deferred advanced metering system costs | 7 years | 2 | — |
| Energy efficiency performance bonus (a) | 1 year | 9 | 8 |
| Under-recovered wholesale transmission service expense (a)(c) | 1 year | 40 | — |
| Wholesale transmission settlement costs | Not applicable | — | 9 |
| Energy efficiency programs (a) | Not applicable | 1 | — |
| Other regulatory assets | Not applicable | — | 1 |
| Total regulatory assets | | 2,093 | 2,007 |
| Regulatory liabilities: | | | |
| Estimated net removal costs | Life of utility plant | 244 | 115 |
| Investment tax credit and protected excess deferred taxes | Various | 28 | 33 |
| Over-collection of transition bond revenues (a)(e) | 4 years | 33 | 37 |
| Deferred advanced metering system revenues | 7 years | — | 52 |
| Committed spending for demand-side management initiatives (a) | Not applicable | — | 25 |
| Over-recovered wholesale transmission service expense (a)(c) | 1 year | — | 13 |
| Energy efficiency programs (a) | Not applicable | — | 2 |
| Total regulatory liabilities | | 305 | 277 |
| Net regulatory asset | | $     1,788 | $     1,730 |

---

(a)   Not earning a return in the regulatory rate-setting process.
(b)   Costs incurred since the period covered under the last rate review.
(c)   Recovery is specifically authorized by statute or by the PUCT, subject to reasonableness review.
(d)   Represents unfunded liabilities recorded in accordance with pension and OPEB accounting standards.
(e)   Bondco net regulatory assets of $335 million at December 31, 2012 consist of $368 million included in generation-related regulatory assets net of the regulatory liability for over-collection of transition bond revenues of $33 million.  Bondco net regulatory assets of $427 million at December 31, 2011 consist of $464 million included in generation-related regulatory assets net of the regulatory liability for over-collection of transition bond revenues of $37 million.

17

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

The Patient Protection and Affordable Care Act and the Health Care and Education Reconciliation Act enacted in March 2010 reduce, effective 2013, the amount of OPEB costs deductible for federal income tax purposes by the amount of the Medicare Part D subsidy received by the EFH Corp. OPEB plans in which we participate. Under income tax accounting rules, deferred tax assets related to accrued OPEB liabilities must be reduced immediately for the future effect of the legislation. Accordingly, in the first quarter of 2010, our deferred tax assets were reduced by $42 million. All of this amount was recorded as a regulatory asset (before gross-up for liability in lieu of deferred income taxes) as the additional amounts due related to income taxes are being recovered in our rates beginning January 1, 2012.

As a result of purchase accounting, in 2007 the carrying value of certain generation-related regulatory assets securitized by transition bonds, which have been reviewed and approved by the PUCT for recovery but without earning a rate of return, was reduced by $213 million. This amount will be accreted to other income over the recovery period remaining at October 10, 2007 (approximately nine years). In August 2011, the PUCT issued a final order in Oncor's rate review filed in January 2011. The rate review included a determination of the recoverability of regulatory assets at June 30, 2010, including the recoverability period of those assets deemed allowable by the PUCT.

In September 2008, the PUCT approved a settlement for Oncor to recover its estimated future investment for advanced metering deployment. Oncor began billing the advanced metering surcharge in the January 2009 billing month cycle. The surcharge is expected to total $1.023 billion over the 11-year recovery period and includes a cost recovery factor of $2.19 per month per residential retail customer and $2.39 to $5.15 per month for non-residential retail customers. Oncor accounts for the difference between the surcharge billings for advanced metering facilities and the allowed revenues under the surcharge provisions, which are based on expenditures and an allowed return, as a regulatory asset or liability. Such differences arise principally as a result of timing of expenditures. As indicated in the table above, the regulatory asset at December 31, 2012 totaled $2 million and the regulatory liability at December 31, 2011 totaled $52 million.

In accordance with the PUCT's August 2009 order in Oncor's rate review, the remaining net book value and anticipated removal cost of existing conventional meters that are being replaced by advanced meters are being charged to depreciation and amortization expense over an 11-year cost recovery period.

See Note 12 for additional information regarding nuclear decommissioning cost recovery.

## 5.    BORROWINGS UNDER CREDIT FACILITIES

At December 31, 2012, Oncor had a $2.4 billion secured revolving credit facility (reflecting a May 2012 $400 million commitment increase as discussed below) to be used for working capital and general corporate purposes, issuances of letters of credit and support for any commercial paper issuances. The revolving credit facility expires in October 2016, and Oncor has the option of requesting up to two one-year extensions, with such extensions subject to certain conditions and lender approval. Pursuant to the terms of the revolving credit facility, Oncor requested and received a $400 million increase in commitments under the revolving credit facility effective May 15, 2012. The terms of the revolving credit facility allow Oncor to request an additional increase in its borrowing capacity of $100 million, provided certain conditions are met, including lender approval.

Borrowings under the revolving credit facility are classified as short-term on the balance sheet and are secured equally and ratably with all of Oncor's other secured indebtedness by a first priority lien on property acquired or constructed for the transmission and distribution of electricity. The property is mortgaged under the Deed of Trust.

At December 31, 2012, Oncor had outstanding borrowings under the revolving credit facility totaling $735 million with an interest rate of 1.46% and outstanding letters of credit totaling $6 million. At December 31, 2011, Oncor had outstanding borrowings under the revolving credit facility totaling $392 million with an interest rate of 1.40% and outstanding letters of credit totaling $6 million.

Borrowings under the revolving credit facility bear interest at per annum rates equal to, at Oncor's option, (i) LIBOR plus a spread ranging from 1.00% to 1.75% depending on credit ratings assigned to Oncor's senior secured non-credit enhanced long-term debt or (ii) an alternate base rate (the highest of (1) the prime rate of JPMorgan Chase, (2) the federal funds effective rate plus 0.50%, and (3) daily one-month LIBOR plus 1.00%) plus a spread ranging from 0.00% to 0.75% depending on credit ratings assigned to Oncor's senior secured non-credit enhanced long-term debt. At December 31, 2012, all outstanding borrowings bore interest at LIBOR plus 1.25%. Amounts borrowed under the facility, once repaid, can be borrowed again from time to time.

18

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

An unused commitment fee is payable quarterly in arrears and upon termination or commitment reduction at a rate equal to 0.100% to 0.275% (such spread depending on certain credit ratings assigned to Oncor's senior secured debt) of the daily unused commitments under the revolving credit facility.  Letter of credit fees on the stated amount of letters of credit issued under the revolving credit facility are payable to the lenders quarterly in arrears and upon termination at a rate per annum equal to the spread over adjusted LIBOR.  Customary fronting and administrative fees are also payable to letter of credit fronting banks.  At December 31, 2012, letters of credit bore interest at 1.25%, and a commitment fee (at a rate of 0.175% per annum) was payable on the unfunded commitments under the facility, each based on Oncor's current credit ratings.

Subject to the limitations described below, borrowing capacity available under the credit facility at December 31, 2012 and 2011 was $1.659 billion and $1.602 billion, respectively.  Generally, Oncor's indentures and revolving credit facility limit the incurrence of other secured indebtedness except for indebtedness secured equally and ratably with the indentures and revolving credit facility and certain permitted exceptions.  As described further in Note 6, the Deed of Trust permits Oncor to secure indebtedness (including borrowings under its revolving credit facility) with the lien of the Deed of Trust up to the aggregate of (i) the amount of available bond credits, and (ii) 85% of the lower of the fair value or cost of certain property additions that could be certified to the Deed of Trust collateral agent.  At December 31, 2012, the available borrowing capacity of the revolving credit facility could be fully drawn.

The revolving credit facility contains customary covenants for facilities of this type, restricting, subject to certain exceptions, Oncor and its subsidiaries from, among other things: incurring additional liens; entering into mergers and consolidations; and sales of substantial assets.  In addition, the revolving credit facility requires that Oncor maintain a consolidated senior debt-to-capitalization ratio of no greater than 0.65 to 1.00 and observe certain customary reporting requirements and other affirmative covenants.  For purposes of the ratio, debt is calculated as indebtedness defined in the revolving credit facility (principally, the sum of long-term debt, any capital leases, short-term debt and debt due currently in accordance with US GAAP).  The debt calculation excludes transition bonds issued by Bondco, but includes the unamortized fair value discount related to Bondco.  Capitalization is calculated as membership interests determined in accordance with US GAAP plus indebtedness described above.  At December 31, 2012, Oncor was in compliance with this covenant with a debt-to-capitalization ratio of 0.44 to 1.00 and with all other covenants.

The revolving credit facility also contains customary events of default for facilities of this type, the occurrence of which would allow the lenders to accelerate all outstanding loans and terminate their commitments, including certain changes in control that are not permitted transactions, cross-default provisions in the event Oncor or any of its subsidiaries (other than Bondco) defaults on indebtedness in a principal amount in excess of $100 million or receives judgments for the payment of money in excess of $50 million that are not discharged within 60 days.

19

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

## 6.   LONG-TERM DEBT

At December 31, 2012 and 2011, our long-term debt consisted of the following:

| | December 31, | |
|---|---|---|
| | **2012** | **2011** |
| Oncor (a): | | |
| 6.375% Fixed Senior Notes due May 1, 2012 | $        — | $        376 |
| 5.950% Fixed Senior Notes due September 1, 2013 | — | 524 |
| 6.375% Fixed Senior Notes due January 15, 2015 | 500 | 500 |
| 5.000% Fixed Senior Notes due September 30, 2017 | 324 | 324 |
| 6.800% Fixed Senior Notes due September 1, 2018 | 550 | 550 |
| 5.750% Fixed Senior Notes due September 30, 2020 | 126 | 126 |
| 4.100% Fixed Senior Notes due June 1, 2022 | 400 | — |
| 7.000% Fixed Debentures due September 1, 2022 | 800 | 800 |
| 7.000% Fixed Senior Notes due May 1, 2032 | 500 | 500 |
| 7.250% Fixed Senior Notes due January 15, 2033 | 350 | 350 |
| 7.500% Fixed Senior Notes due September 1, 2038 | 300 | 300 |
| 5.250% Fixed Senior Notes due September 30, 2040 | 475 | 475 |
| 4.550% Fixed Senior Notes due December 1, 2041 | 300 | 300 |
| 5.300% Fixed Senior Notes due June 1, 2042 | 500 | — |
| Unamortized discount | (35) | (38) |
| Less amounts due currently | — | (376) |
| Total Oncor | 5,090 | 4,711 |
| Oncor Electric Delivery Transition Bond Company LLC (b): | | |
| 4.950% Fixed Series 2003 Bonds due in semiannual installments through February 15, 2013 | 10 | 5 6 |
| 5.420% Fixed Series 2003 Bonds due in semiannual installments through August 15, 2015 (c) | 145 | 145 |
| 4.810% Fixed Series 2004 Bonds due in semiannual installments through November 15, 2012 | — | 63 |
| 5.290% Fixed Series 2004 Bonds due in semiannual installments through May 15, 2016 | 281 | 290 |
| Unamortized fair value discount related to transition bonds | (1) | (3) |
| Less amounts due currently | (125) | (118) |
| Total Oncor Electric Delivery Transition Bond Company LLC | 310 | 433 |
| Total long-term debt (d) | $   5,400 | $   5,144 |

_____

(a)  Secured by first priority lien on certain transmission and distribution assets equally and ratably with all of Oncor's other secured indebtedness.  See "Deed of Trust" below for additional information.

(b)  The transition bonds are nonrecourse to Oncor and were issued to securitize a regulatory asset.

(c)  Principal payments commence in February 2013.

(d)  According to our organizational documents, Oncor Holdings (parent) is prohibited from directly incurring indebtedness for borrowed money.

***Debt-Related Activity in 2012***

*Debt Repayments*

Repayments of long-term debt in 2012 totaled $1.018 billion and represented $376 million principal amount of 6.375% senior secured notes paid at the scheduled maturity date of May 1, 2012, the redemption of $524 million principal amount of 5.950% senior secured notes due September 1, 2013 (2013 Notes) as discussed below and $118 million principal amount of transition bonds paid at scheduled maturity dates.

20

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

In June 2012, pursuant to the terms of the indenture and officer's certificate governing the 2013 Notes, Oncor redeemed all of the 2013 Notes. Oncor paid a redemption price equal to 100% of the principal amount of the 2013 Notes plus a make-whole amount of $33 million. For accounting purposes, the make-whole amount has been deferred as a regulatory asset and will be amortized to interest expense until September 1, 2013, the original maturity date of the 2013 Notes (see Note 4).

*Issuance of New Senior Secured Notes*

In May 2012, Oncor issued $400 million aggregate principal amount of 4.100% senior secured notes maturing in June 2022 (2022 Notes) and $500 million aggregate principal amount of 5.300% senior secured notes maturing in June 2042 (2042 Notes, and collectively with the 2022 Notes, the Notes). Oncor used the proceeds (net of the initial purchasers' discount, fees and expenses) of approximately $890 million from the sale of the Notes to repay borrowings under its revolving credit facility, redeem the 2013 Notes (as discussed above) and for other general corporate purposes. The Notes are secured equally and ratably with all of Oncor's other secured indebtedness pursuant to the Deed of Trust by a first priority lien on property acquired or constructed for the transmission and distribution of electricity.

Interest on the Notes is payable in cash semiannually in arrears on June 1 and December 1 of each year, beginning on December 1, 2012. Oncor may at its option at any time and from time to time redeem all or part of the Notes at a price equal to 100% of their principal amount, plus accrued and unpaid interest and a make-whole premium. The Notes also contain customary events of default, including failure to pay principal or interest on the Notes when due.

The Notes were issued in a private placement, and in August 2012 Oncor offered holders of the Notes the opportunity to exchange their respective Notes for notes that have terms identical in all material respects to the Notes (Exchange Notes), except that the Exchange Notes do not contain terms with respect to transfer restrictions, registration rights and payment of additional interest for failure to observe certain obligations in a certain registration rights agreement. The Exchange Notes were registered on a Form S-4, which was declared effective in July 2012.

*Deed of Trust*

Oncor's secured indebtedness, including the 2022 and 2042 Notes described above and the revolving credit facility described in Note 5, are secured equally and ratably by a first priority lien on property Oncor acquired or constructed for the transmission and distribution of electricity. The property is mortgaged under the Deed of Trust. The Deed of Trust permits Oncor to secure indebtedness (including borrowings under our revolving credit facility) with the lien of the Deed of Trust up to the aggregate of (i) the amount of available bond credits, and (ii) 85% of the lower of the fair value or cost of certain property additions that could be certified to the Deed of Trust collateral agent. At December 31, 2012, the amount of available bond credits was approximately $2.2 billion and the amount of future debt Oncor could secure with property additions, subject to those property additions being certified to the Deed of Trust collateral agent, was $731 million.

**Debt-Related Activity in 2011**

*Debt Repayments*

Repayments of long-term debt in 2011 totaled $113 million and represented transition bond principal payments at scheduled maturity dates.

*Interest Rate Hedge Transaction*

In August 2011, Oncor entered into an interest rate hedge transaction hedging the variability of treasury bond rates used to determine interest rates on an anticipated issuance of senior secured notes (see below for information regarding the debt issuance). The hedges were terminated in November 2011 upon the issuance of the senior secured notes. In 2011, Oncor recognized the $46 million ($29 million after tax) loss related to the fair value of the hedge transaction in other comprehensive income, which is expected to be reclassified into net income over the life of the senior secured notes issued, which mature in 2041.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Issuance of New Senior Secured Notes*

In November 2011, Oncor issued $300 million aggregate principal amount of 4.550% senior secured notes maturing in December 2041 (2041 Notes). Oncor used the net proceeds of approximately $297 million from the sale of the notes to repay borrowings under its revolving credit facility, including loans under the revolving credit facility and for general corporate purposes.  The notes are secured by the first priority lien described below, and are secured equally and ratably with all of Oncor's other secured indebtedness.

Interest on the 2041 Notes is payable in cash semiannually in arrears on June 1 and December 1 of each year, beginning on June 1, 2012.  Oncor may at its option redeem the notes, in whole or in part, at any time, at a price equal to 100% of their principal amount, plus accrued and unpaid interest and a "make-whole" premium.  The notes also contain customary events of default, including failure to pay principal or interest on the notes when due.

The 2041 Notes were issued in a private placement, and in August 2012 Oncor offered holders of the 2041 Notes the opportunity to exchange their respective 2041 Notes for notes that have terms identical in all material respects to the 2041 Notes (2041 Exchange Notes), except that the 2041 Exchange Notes do not contain terms with respect to transfer restrictions, registration rights and payment of additional interest for failure to observe certain obligations in a certain registration rights agreement.  The 2041 Exchange Notes were registered on a Form S-4, which was declared effective in July 2012.

*Maturities*

Long-term debt maturities at December 31, 2012 are as follows:

| Year: | Amount |
|---|---:|
| 2013 | $ 125 |
| 2014 | 131 |
| 2015 | 639 |
| 2016 | 41 |
| 2017 | 324 |
| Thereafter | 4,301 |
| Unamortized fair value discount | (1) |
| Unamortized discount | (35) |
| Total | $ 5,525 |

*Fair Value of Long-Term Debt*

The estimated fair value of our long-term debt (including current maturities) totaled $6.568 billion and $6.705 billion at December 31, 2012 and 2011, respectively, and the carrying amount totaled $5.525 billion and $5.638 billion, respectively.  The fair value is estimated based upon the market value as determined by quoted market prices, representing Level 1 valuations under accounting standards related to the determination of fair value.

22

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

## 7.    COMMITMENTS AND CONTINGENCIES

### Leases

At December 31, 2012, future minimum lease payments under operating leases (with initial or remaining noncancelable lease terms in excess of one year) were as follows:

| Year | Amount |
|------|-------:|
| 2013 | $           7 |
| 2014 | 5 |
| 2015 | 4 |
| 2016 | 3 |
| 2017 | 1 |
| Thereafter | — |
| Total future minimum lease payments | $          20 |

Rent charged to operation and maintenance expense totaled $15 million for each of the years ended December 31, 2012, 2011 and 2010.

### Capital Expenditures

Oncor and Texas Holdings agreed with major interested parties to the terms of a stipulation that was approved by the PUCT in 2008 as discussed in Note 2. As one of the provisions of this stipulation, Oncor committed to minimum capital spending of $3.6 billion over the five-year period ending December 31, 2012, subject to certain defined conditions. At December 31, 2012, Oncor had satisfied this spending commitment. These expenditures did not include the CREZ facilities.

### Efficiency Spending

Oncor is required to annually invest in programs designed to improve customer electricity demand efficiencies to satisfy ongoing regulatory requirements. The 2013 requirement is $62 million.

### Guarantees

Oncor has entered into contracts that contain guarantees to unaffiliated parties that could require performance or payment under certain conditions as discussed below.

Oncor is the lessee under various operating leases that obligate it to guarantee the residual values of the leased assets. At December 31, 2012, both the aggregate maximum amount of residual values guaranteed and the estimated residual recoveries totaled $7 million. These leased assets consist primarily of vehicles used in distribution activities. The average life of the residual value guarantees under the lease portfolio is approximately 1.7 years.

For the purpose of obtaining greater access to materials, Oncor has guaranteed the repayment of borrowings under a nonaffiliated party's $7 million credit facility maturing on March 31, 2013. The nonaffiliated party's borrowings under the credit facility are limited to inventory produced solely to satisfy the terms of a contract with Oncor. Oncor would be entitled to the related inventory upon repayment of the credit facility (or payment to the nonaffiliated party). At December 31, 2012, the nonaffiliated party had borrowings of $4 million under the facility.

23

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Legal/Regulatory Proceedings*

In October 2010, the PUCT established Docket No. 38780 for the remand of Docket No. 20381, the 1999 wholesale transmission charge matrix case.  A joint settlement agreement was entered into effective October 6, 2003.  This settlement resolves disputes regarding wholesale transmission pricing and charges for the period of January 1997 through August 1999, the period prior to the September 1, 1999 effective date of the legislation that authorized 100% postage stamp pricing for ERCOT wholesale transmission.  After a series of appeals became final, the 1999 matrix docket was remanded to the PUCT to address two additional issues.

The first issue is the wholesale transmission transition mechanism for the period of September 1999 through December 1999.  The disputed issue is whether the PUCT should have allowed the transition mechanism to continue for the last four months of 1999.  The appealing parties (Texas Municipal Power Agency, the City of Denton, the City of Garland and GEUS (formerly known as Greenville Electric Utility System)) argued that the transition mechanism was not authorized in the September 1, 1999 100% postage stamp pricing legislation.  Oncor's transmission deficit position was mitigated by approximately $8 million in the last four months of 1999 through the transition mechanism.  In October 2011, certain parties filed a proposed settlement of this issue, subject to PUCT approval, in which Oncor would pay approximately $9 million including interest through October 9, 2003.  The PUCT approved the settlement in January 2012. No appeals were filed prior to the appeals deadline, and the PUCT order became final in February 2012.  Oncor made the payment in accordance with the settlement in February 2012.  In November 2012, the PUCT gave its final approval of the TCRF application allowing Oncor recovery of the $9 million settlement payment through TCRF billings during the period of September 2012 through February 2013.

The second issue is the San Antonio City Public Service Board's (CPSB) claim that the PUCT did not have the authority to reduce CPSB's requested transmission cost of service (TCOS) revenue requirement.  CPSB's initial TCOS rate was in effect from 1997 through 2000.  Since the period of January 1997 through August 1999 is incorporated in the joint settlement, CPSB's remaining claim is for the period of September 1999 through December 2000.  In January 2011, CPSB made a filing with the PUCT (PUCT Docket No. 39068), seeking an additional $22 million of TCOS revenue, including interest, for the 16-month period, of which Oncor would be responsible for approximately $11 million.  In late 2011, Oncor intervened in the proceeding and, along with several other parties, filed motions to dismiss CPSB's request.  In January 2012, the PUCT upheld an administrative law judge's earlier decision to dismiss CPSB's request.  No appeals were filed prior to the appeals deadline, and the PUCT order became final in February 2012.

We are involved in other various legal and administrative proceedings in the normal course of business, the ultimate resolution of which, in the opinion of management, should not have a material effect upon our financial position, results of operations or cash flows.

*Labor Contracts*

Certain Oncor employees are represented by a labor union and covered by a collective bargaining agreement with an expiration date of October 25, 2013.

*Environmental Contingencies*

Oncor must comply with environmental laws and regulations applicable to the handling and disposal of hazardous waste.  Oncor is in compliance with all current laws and regulations; however, the impact, if any, of changes to existing regulations or the implementation of new regulations is not determinable.  The costs to comply with environmental regulations can be significantly affected by the following external events or conditions:

- changes to existing state or federal regulation by governmental authorities having jurisdiction over control of toxic substances and hazardous and solid wastes, and other environmental matters, and
- the identification of additional sites requiring clean-up or the filing of other complaints in which Oncor may be asserted to be a potential responsible party.

24

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

## 8.    MEMBERSHIP INTERESTS

On February 13, 2013, our board of directors declared a cash distribution of $31 million , which was paid to EFIH on February 15, 2013.

During 2012, our board of directors declared, and we paid, the following cash distributions to EFIH:

| Declaration Date | Payment Date | Amount Paid |
|---|---|---|
| October 24, 2012 | October 30, 2012 | $47 |
| July 25, 2012 | July 31, 2012 | 31 |
| April 25, 2012 | May 1, 2012 | 33 |
| February 14, 2012 | February 21, 2012 | 36 |

During 2011, our board of directors declared, and we paid, the following cash distributions to EFIH:

| Declaration Date | Payment Date | Amount Paid |
|---|---|---|
| October 25, 2011 | October 26, 2011 | $52 |
| July 27, 2011 | July 28, 2011 | 32 |
| April 27, 2011 | April 28, 2011 | 16 |
| February 15, 2011 | February 16, 2011 | 16 |

While there are no direct restrictions on our ability to distribute our net income that are currently material, substantially all of our net income is derived from Oncor. Our board of directors and Oncor's board of directors, which are composed of a majority of independent directors, can withhold distributions to the extent the boards determine that it is necessary to retain such amounts to meet our expected future requirements.

Until December 31, 2012, Oncor's distributions were limited to its cumulative net income and regulatory capital structure restrictions.   Effective January 1, 2013, distributions are limited only to the extent Oncor maintains a required regulatory capital structure as discussed below.

Oncor's distributions continue to be limited by its required regulatory capital structure to be at or below the assumed debt-to-equity ratio established periodically by the PUCT for ratemaking purposes, which is currently set at 60% debt to 40% equity.   At December 31, 2012, Oncor's regulatory capitalization ratio was 58.8% debt and 41.2% equity. The PUCT has the authority to determine what types of debt and equity are included in a utility's debt-to-equity ratio. For purposes of this ratio, debt is calculated as long-term debt plus unamortized gains on reacquired debt less unamortized issuance expenses, premiums and losses on reacquired debt.  The debt calculation excludes transition bonds issued by Bondco.  Equity is calculated as membership interests determined in accordance with US GAAP, excluding the effects of purchase accounting (which included recording the initial goodwill and fair value adjustments and the subsequent related impairments and amortization).  At December 31, 2012, $167 million was available for distribution to Oncor's members under the capital structure restriction, of which approximately 80% relates to Oncor's ownership interest.

For the period beginning October 11, 2007 and ending December 31, 2012, Oncor's cash distributions (other than distributions of the proceeds of any issuance of limited liability company units) were limited by the Limited Liability Company Agreement and a stipulation agreement with the PUCT to an amount not to exceed Oncor's cumulative net income determined in accordance with US GAAP, as adjusted by applicable orders of the PUCT.  Adjustments consisted of the removal of noncash impacts of purchase accounting and deducting two specific cash commitments.  The noncash impacts consisted of removing the effect of an $860 million goodwill impairment charge in 2008 and the cumulative amount of net accretion of fair value adjustments.  The two specific cash commitments were the $72 million ($46 million after tax) one-time refund to customers in September 2008 and the funds spent as part of the $100 million commitment for additional energy efficiency initiatives that was completed in 2012.  See Note 2 for additional information regarding the two cash commitments. At December 31, 2012, $420 million of membership interests was available for distribution under the cumulative net income restriction of which approximately 80% relates to our ownership interest. However, as discussed above, this restriction is no longer applicable.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**9.    NONCONTROLLING INTERESTS**

At December 31, 2012, Oncor's ownership was as follows: 80.03% held by us, 19.75% held by Texas Transmission and 0.22% held indirectly by certain members of Oncor's management team and board of directors.

**10.    PENSION AND OTHER POSTRETIREMENT EMPLOYEE BENEFITS (OPEB) PLANS**

*Regulatory Recovery of Pension and OPEB Costs*

PURA provides for Oncor's recovery of pension and OPEB costs applicable to services of its active and retired employees, as well as services of other EFH Corp. active and retired employees prior to the deregulation and disaggregation of EFH Corp.'s electric utility businesses effective January 1, 2002 (recoverable service). Accordingly, Oncor entered into an agreement with EFH Corp. whereby it assumed responsibility for applicable pension and OPEB costs related to those personnel's recoverable service.

Oncor is authorized to establish a regulatory asset or liability for the difference between the amounts of pension and OPEB costs approved in current billing rates and the actual amounts that would otherwise have been recorded as charges or credits to earnings related to recoverable service.  Amounts deferred are ultimately subject to regulatory approval. At December 31, 2012 and 2011, Oncor had recorded regulatory assets totaling $1.011 billion and $884 million, respectively, related to pension and OPEB costs, including amounts related to deferred expenses as well as amounts related to unfunded liabilities that otherwise would be recorded as other comprehensive income.

In a 2012 agreement described below, Oncor assumed primary responsibility for retirement costs related to certain non-recoverable service.  Any retirement costs associated with non-recoverable service is not recoverable through rates.

*Pension Plan*

Oncor participates in two defined benefit pension plans.  The EFH Retirement Plan and the Oncor Retirement Plan are qualified pension plans under Section 401(a) of the Internal Revenue Code of 1986, as amended (Code), and are subject to the provisions of ERISA.  All benefits are funded by the participating employers. The pension plans provide benefits to participants under one of two formulas: (i) a Cash Balance Formula under which participants earn monthly contribution credits based on their compensation and a combination of their age and years of service, plus monthly interest credits or (ii) a Traditional Retirement Plan Formula based on years of service and the average earnings of the three years of highest earnings.  The interest component of the Cash Balance Formula is variable and is determined using the yield on 30-year Treasury bonds.  Under the Cash Balance Formula, future increases in earnings will not apply to prior service costs.

All eligible employees hired after January 1, 2001 participate under the Cash Balance Formula.  Certain employees, who, prior to January 1, 2002, participated under the Traditional Retirement Plan Formula, continue their participation under that formula.  It is the participating employers' policy to fund the plans on a current basis to the extent deductible under existing federal tax regulations.

In August 2012, EFH Corp. approved certain amendments to the EFH Retirement Plan.  These actions were completed in the fourth quarter of 2012, and the amendments resulted in:

- the splitting off of assets and liabilities under the plan associated with Oncor's employees and all retirees and terminated vested participants of EFH Corp. and its subsidiaries (including discontinued businesses) to a new qualified pension plan that provides benefits identical to those provided under the EFH Retirement Plan, for which Oncor assumed sponsorship from EFH Corp. effective January 1, 2013 (Oncor Retirement Plan);

- maintaining assets and liabilities under the plan associated with active collective bargaining unit (union) employees of EFH Corp.'s competitive subsidiaries under the current plan;

- the splitting off of assets and liabilities under the plan associated with all other plan participants (active nonunion employees of EFH Corp.'s competitive businesses) to a terminating plan, freezing benefits and vesting all accrued plan benefits for these participants, and

- the termination of, distributions of benefits under, and settlement of all of EFH Corp.'s liabilities under the terminating plan.

26

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

As a result of these actions and in connection with assuming sponsorship of the Oncor Retirement Plan, Oncor entered into an agreement with EFH Corp. to assume primary responsibility for benefits of certain participants for whom EFH Corp. bore primary funding responsibility (a closed group of retired and terminated vested plan participants not related to Oncor's regulated utility business) at December 31, 2012. As Oncor received a corresponding amount of assets with the assumed liabilities, execution of the agreement did not have a material impact on its reported results of operations or financial condition. In the fourth quarter of 2012, EFH Corp. made cash contributions totaling $259 million to settle the terminating plan obligations and fully fund its obligations under the Oncor Retirement Plan.

Oncor also has supplemental pension plans for certain employees whose retirement benefits cannot be fully earned under the qualified retirement plan, the information for which is included below.

In July 2012, the US Congress enacted legislation that includes, among other things, pension funding stabilization provisions. These provisions are expected to reduce required minimum pension plan contributions in the near term, but have no impact on long-term funding levels absent a sustained low interest rate environment.

### OPEB Plan

Oncor participates with EFH Corp. and other subsidiaries of EFH Corp. to offer certain health care and life insurance benefits to eligible employees and their eligible dependents upon the retirement of such employees (OPEB Plan). For employees retiring on or after January 1, 2002, the retiree contributions required for such coverage vary based on a formula depending on the retiree's age and years of service.

### Pension and OPEB Costs Recognized as Expense

The pension and OPEB amounts provided herein include Oncor's allocated amounts related to EFH Corp.'s plans based on actuarial computations and reflect Oncor's employee and retiree demographics as described above. Oncor recognized the following net pension and OPEB costs as expense:

|  | Year Ended December 31, | | |
|  | 2012 | 2011 | 2010 |
|---|---|---|---|
| Components of net pension costs: | | | |
| Pension costs (a) | $ 179 | $ 95 | $ 67 |
| OPEB costs | 27 | 74 | 63 |
| Total benefit costs | 206 | 169 | 130 |
| Less amounts deferred as a regulatory asset or property | (169) | (132) | (93) |
| Net amounts recognized as expense | $ 37 | $ 37 | $ 37 |

Oncor and EFH Corp. use the calculated value method to determine the market-related value of the assets held in the trust for purposes of calculating pension cost. Oncor and EFH Corp. include the realized and unrealized gains or losses in the market-related value of assets over a rolling four-year period. Each year, 25% of such gains and losses for the current year and for each of the preceding three years is included in the market-related value. Each year, the market-related value of assets is increased for contributions to the plan and investment income and is decreased for benefit payments and expenses for that year.

Oncor and EFH Corp. use the fair value method to determine the market-related value of the assets held in the trust for purposes of calculating OPEB cost.

27

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Detailed Information Regarding Pension and OPEB Benefits*

The following pension and OPEB information is based on December 31, 2012, 2011 and 2010 measurement dates:

| | Pension Plan | | | OPEB Plan | | |
|---|---|---|---|---|---|---|
| | Year Ended December 31, | | | Year Ended December 31, | | |
| | 2012 | 2011 | 2010 | 2012 | 2011 | 2010 |
| ***Assumptions Used to Determine Net Periodic Pension and Benefit Cost:*** | | | | | | |
| Discount rate (a) | 5.00% | 5.50% | 5.90% | 4.95% | 5.55% | 5.90% |
| Expected return on plan assets | 7.40% | 7.70% | 8.00% | 6.80% | 7.10% | 7.60% |
| Rate of compensation increase | 3.81% | 3.74% | 3.71% | — | — | — |
| ***Components of Net Pension and Benefit Cost:*** | | | | | | |
| Service cost | $ 23 | $ 20 | $ 19 | $ 5 | $ 7 | $ 6 |
| Interest cost | 106 | 110 | 106 | 39 | 54 | 52 |
| Expected return on assets | (109) | (99) | (97) | (12) | (14) | (15) |
| Amortization of net transition obligation | — | — | — | 1 | 1 | 1 |
| Amortization of prior service cost (credit) | — | 1 | 1 | (20) | (1) | (1) |
| Amortization of net loss | 78 | 63 | 38 | 14 | 27 | 20 |
| Settlement charges | 81 | — | — | — | | |
| Net periodic pension and benefit cost | 179 | 95 | 67 | 27 | 74 | 63 |
| ***Other Changes in Plan Assets and Benefit Obligations Recognized as Regulatory Assets or in Other Comprehensive Income:*** | | | | | | |
| Net loss (gain) | 110 | 106 | 124 | 83 | (91) | 75 |
| Prior service cost (credit) | — | — | — | — | (127) | 1 |
| Amortization of net loss | (78) | (63) | (38) | (14) | (27) | (20) |
| Amortization of transition obligation (asset) | — | — | — | (1) | (1) | (1) |
| Amortization of prior service (cost) credit | — | (1) | (1) | 20 | 1 | — |
| Settlement charges | (81) | — | — | — | — | — |
| Curtailment | (5) | — | — | — | — | — |
| Total recognized as regulatory assets or other comprehensive income | (54) | 42 | 85 | 88 | (245) | 55 |
| Total recognized in net periodic pension and benefit costs and as regulatory assets or other comprehensive income | $ 125 | $ 137 | $ 152 | $ 115 | $ (171) | $ 118 |

_____

(a)  As a result of the amendments discussed above, the discount rate reflected in net pension costs for January through July 2012 was 5.00%, for August through September 2012 was 4.15% and for October through December 2012 was 4.20% .

| | Pension Plans | | | OPEB Plan | | |
|---|---|---|---|---|---|---|
| | Year Ended December 31, | | | Year Ended December 31, | | |
| | 2012 | 2011 | 2010 | 2012 | 2011 | 2010 |
| ***Assumptions Used to Determine Benefit Obligations at Period End:*** | | | | | | |
| Discount rate | 4.10% | 5.00% | 5.50% | 4.10% | 4.95% | 5.55% |
| Rate of compensation increase | 3.94% | 3.81% | 3.74% | — | — | — |

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

| | Pension Plan | | OPEB Plan | |
| | Year Ended December 31, | | Year Ended December 31, | |
| | 2012 | 2011 | 2012 | 2011 |
|---|---|---|---|---|
| **Change in Projected Benefit Obligation:** | | | | |
| Projected benefit obligation at beginning of year | $ 2,215 | $ 2,052 | $ 809 | $ 1,004 |
| Service cost | 23 | 20 | 5 | 7 |
| Interest cost | 106 | 110 | 39 | 54 |
| Participant contributions | — | — | 15 | 14 |
| Medicare Part D reimbursement | — | — | 3 | 5 |
| Plan amendments | — | — | — | (127) |
| Settlement | (268) | — | — | — |
| Curtailment | (5) | — | — | — |
| Assumption of liabilities | 860 | — | 6 | — |
| Actuarial (gain) loss | 198 | 119 | 94 | (97) |
| Benefits paid | (91) | (86) | (58) | (51) |
| Projected benefit obligation at end of year | $ 3,038 | $ 2,215 | $ 913 | $ 809 |
| Accumulated benefit obligation at end of year | $ 2,908 | $ 2,063 | $ — | $ — |
| **Change in Plan Assets:** | | | | |
| Fair value of assets at beginning of year | $ 1,542 | $ 1,341 | $ 197 | $ 208 |
| Actual return (loss) on assets | 199 | 112 | 25 | 8 |
| Employer contributions | 93 | 175 | 11 | 18 |
| Settlement | (268) | — | — | — |
| Assets related to assumed liabilities | 852 | — | — | — |
| Participant contributions | — | — | 15 | 14 |
| Benefits paid | (91) | (86) | (58) | (51) |
| Fair value of assets at end of year | 2,327 | 1,542 | 190 | 197 |
| **Funded Status:** | | | | |
| Projected benefit obligation at end of year | $ (3,038) | $ (2,215) | $ (913) | $ (809) |
| Fair value of assets at end of year | 2,327 | 1,542 | 190 | 197 |
| Funded status at end of year | $ (711) | $ (673) | $ (723) | $ (612) |

29

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

|  | Pension Plan | | OPEB Plan | |
|  | Year Ended December 31, | | Year Ended December 31, | |
| *Amounts Recognized in the Balance Sheet Consist of :* | 2012 | 2011 | 2012 | 2011 |
|---|---|---|---|---|
| Liabilities: | | | | |
| Other current liabilities | $ (3) | $ (3) | $ — | $ — |
| Other noncurrent liabilities | (708) | (670) | (723) | (612) |
| Net liability recognized | $ (711) | $ (673) | $ (723) | $ (612) |
| Regulatory assets: | | | | |
| Net loss | $ 602 | $ 659 | $ 247 | $ 178 |
| Prior service cost (credit) | — | — | (111) | (131) |
| Net transition obligation | — | — | — | 1 |
| Net regulatory asset recognized | 602 | 659 | 136 | 48 |
| Accumulated other comprehensive net loss | $ 3 | $ — | $ 1 | $ — |

The following tables provide information regarding the assumed health care cost trend rates

|  | Year Ended December 31, | |
|  | 2012 | 2011 |
|---|---|---|
| *Assumed Health Care Cost Trend Rates - Not Medicare Eligible:* | | |
| Health care cost trend rate assumed for next year | 8.50% | 9.00% |
| Rate to which the cost trend is expected to decline (the ultimate trend rate) | 5.00% | 5.00% |
| Year that the rate reaches the ultimate trend rate | 2022 | 2022 |
| | | |
| *Assumed Health Care Cost Trend Rates - Medicare Eligible:* | | |
| Health care cost trend rate assumed for next year | 7.50% | 8.00% |
| Rate to which the cost trend is expected to decline (the ultimate trend rate) | 5.00% | 5.00% |
| Year that the rate reaches the ultimate trend rate | 2022 | 2022 |

|  | 1-Percentage Point Increase | 1-Percentage Point Decrease |
|---|---|---|
| *Sensitivity Analysis of Assumed Health Care Cost Trend Rates:* | | |
| Effect on accumulated postretirement obligation | $ 115 | $ (99) |
| Effect on postretirement benefits cost | 6 | (5) |

The following table provides information regarding pension plans with projected benefit obligations (PBO) and accumulated benefit obligations (ABO) in excess of the fair value of plan assets.

|  | At December 31, | |
|  | 2012 | 2011 |
|---|---|---|
| *Pension Plans with PBO and ABO in Excess of Plan Assets:* | | |
| Projected benefit obligations | $ 3,038 | $ 2,215 |
| Accumulated benefit obligations | 2,908 | 2,063 |
| Plan assets | 2,327 | 1,542 |

30

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Pension Plans and OPEB Plan Investment Strategy and Asset Allocations*

Oncor's investment objective for the retirement plans is to invest in a suitable mix of assets to meet the future benefit obligations at an acceptable level of risk, while minimizing the volatility of contributions. Equity securities are held to achieve returns in excess of passive indexes by participating in a wide range of investment opportunities. International equity securities are used to further diversify the equity portfolio and may include investments in both developed and emerging international markets. Fixed income securities include primarily corporate bonds from a diversified range of companies, US Treasuries and agency securities and money market instruments. The investment strategy for fixed income investments is to maintain a high grade portfolio of securities, which assists Oncor in managing the volatility and magnitude of plan contributions and expense while maintaining sufficient cash and short-term investments to pay near-term benefits and expenses.

The retirement plans' investments are managed in two pools: one associated with the recoverable service portion of plan obligations related to Oncor's regulated utility business, and the other associated with plan obligations for the closed group of retired and terminated plan participants not related to Oncor's regulated utility business that it assumed from EFH Corp. in connection with Oncor's sponsorship of the Oncor Plan, as discussed above. The recoverable service portion is invested in a broadly diversified portfolio of equity and fixed income securities.  The nonrecoverable service portion is invested in fixed income securities intended to fully hedge the obligations, within practical limitations.

The target asset allocation ranges of pension plan investments by asset category are as follows:

| | Target Allocation Ranges | |
| Asset Category | Recoverable | Nonrecoverable |
|---|---|---|
| US equities | 24%-31% | — |
| International equities | 20%-25% | — |
| Fixed income | 45%-57% | 100% |

The investment objective for the OPEB Plan primarily follows the objectives of the pension plans discussed above, while maintaining sufficient cash and short-term investments to pay near-term benefits and expenses.  The actual amounts at December 31, 2012 provided below are consistent with the asset allocation targets

*Fair Value Measurement of Pension Plan Assets*

At December 31, 2012 and 2011, pension plan assets measured at fair value on a recurring basis consisted of the following:

| | At December 31, 2012 | | | | At December 31, 2011 | | | |
| Asset Category | Level 1 | Level 2 | Level 3 | Total | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|---|---|---|---|
| Interest-bearing cash | $   — | $   134 | $   — | $   134 | $   — | $   60 | $   — | $   60 |
| Equity securities: | | | | | | | | |
|   US | 206 | 9 5 | — | 301 | 263 | 54 | — | 317 |
|   International | 280 | 7 | — | 287 | 152 | 50 | — | 202 |
| Fixed income securities: | | | | | | | | |
|   Corporate bonds (a) | — | 1,319 | — | 1,319 | — | 859 | — | 859 |
|   US Treasuries | — | 206 | — | 206 | — | 34 | — | 34 |
|   Other (b) | — | 73 | — | 73 | — | 61 | — | 61 |
| Preferred securities | — | — | 7 | 7 | — | — | 9 | 9 |
|   Total assets | $   486 | $ 1,834 | $   7 | $ 2,327 | $   415 | $1,118 | $   9 | $ 1,542 |

_____
(a) Substantially all corporate bonds are rated investment grade by a major ratings agency such as Moody's.

(b) Other consists primarily of US agency securities.

There was no significant change in the fair value of Level 3 assets in the periods presented.

31

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Fair Value Measurement of OPEB Plan Assets*

At December 31, 2012 and 2011, OPEB Plan assets measured at fair value on a recurring basis consisted of the following:

| Asset Category | At December 31, 2012 | | | | At December 31, 2011 | | | |
|---|---|---|---|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Total | Level 1 | Level 2 | Level 3 | Total |
| Interest-bearing cash | $ — | $ 10 | $ — | $ 10 | $ — | $ 10 | $ — | $ 10 |
| Equity securities: | | | | | | | | |
| US | 49 | 6 | — | 5 5 | 52 | 3 | — | 5 5 |
| International | 31 | — | — | 31 | 23 | 3 | — | 26 |
| Fixed income securities: | | | | | | | | |
| Corporate bonds (a) | — | 42 | — | 42 | — | 54 | — | 54 |
| US Treasuries | — | 4 | — | 4 | — | 2 | — | 2 |
| Other (b) | 45 | 3 | — | 48 | 46 | 3 | — | 49 |
| Preferred securities | — | — | — | — | — | — | 1 | 1 |
| Total assets | $ 125 | $ 6 5 | $ — | $ 190 | $ 121 | $ 75 | $ 1 | $ 197 |

_____
(a) Substantially all corporate bonds are rated investment grade by a major ratings agency such as Moody's.
(b) Other consists primarily of US agency securities.

There was no significant change in the fair value of Level 3 assets in the periods presented.

*Expected Long-Term Rate of Return on Assets Assumption*

The retirement plans' strategic asset allocation is determined in conjunction with the plans' advisors and utilizes a comprehensive Asset-Liability modeling approach to evaluate potential long-term outcomes of various investment strategies.  The modeling incorporates long-term rate of return assumptions for each asset class based on historical and future expected asset class returns, current market conditions, rate of inflation, current prospects for economic growth, and taking into account the diversification benefits of investing in multiple asset classes and potential benefits of employing active investment management.

| Pension Plans | | OPEB Plan | |
|---|---|---|---|
| Asset Class | Expected Long-Term Rate of Return | Plan Type | Expected Long-Term Returns |
| US equity securities | 7.7% | 401(h) accounts | 7.4% |
| International equity securities | 9.3% | Life Insurance VEBA | 6.4% |
| Fixed income securities | 4.1% | Union VEBA | 6.4% |
| Other | 0.6% | Non-Union VEBA | 3.2% |
| Weighted average (a) | 7.4% | Weighted average | 6.7% |

_____
(a) The 2013 expected long-term rate of return for the nonregulated portion of the Oncor Retirement Plan is 4.10%.

*Significant Concentrations of Risk*

The plans' investments are exposed to risks such as interest rate, capital market and credit risks.  Oncor and EFH Corp. seek to optimize return on investment consistent with levels of liquidity and investment risk which are prudent and reasonable, given prevailing capital market conditions and other factors specific to participating employers.  While Oncor and EFH Corp. recognize the importance of return, investments will be diversified in order to minimize the risk of large losses unless, under the circumstances, it is clearly prudent not to do so.  There are also various restrictions and guidelines in place including limitations on types of investments allowed and portfolio weightings for certain investment securities to assist in the mitigation of the risk of large losses.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Assumed Discount Rate*

Oncor and EFH Corp. selected the assumed discount rate using the Aon Hewitt AA Above Median yield curve, which is based on corporate bond yields and at December 31, 2012 consisted of 332 corporate bonds with an average rating of AA using Moody's, S&P and Fitch ratings.

*Amortization in 2013*

In 2013, amortization of the net actuarial loss and prior service cost for the defined benefit pension plans from regulatory assets into net periodic benefit cost is expected to be $70 million and less than $1 million, respectively. Amortization of the net actuarial loss and prior service credit for the OPEB Plan from regulatory assets into net periodic benefit cost is expected to be $26 million and a $20 million credit, respectively.

*Pension and OPEB Plan Cash Contributions*

Oncor's contributions to the benefit plans were as follows:

|  | Year Ended December 31, | | |
| --- | --- | --- | --- |
|  | **2012** | **2011** | **2010** |
| Pension plans contributions | $ 93 | $ 175 | $ 43 |
| OPEB Plan contributions | 11 | 18 | 18 |
| Total contributions | $ 104 | $ 193 | $ 61 |

Oncor's funding of the pension plans and the OPEB Plan is expected to be $10 million and $12 million, respectively, in 2013. Oncor's funding for the pension plans (based on the funded status at December 31, 2012) and the OPEB Plan is expected to total approximately $395 million and $115 million, respectively, for the 2013 to 2017 period.

*Future Benefit Payments*

Estimated future benefit payments to beneficiaries are as follows:

|  | **2013** | **2014** | **2015** | **2016** | **2017** | **2018-22** |
| --- | --- | --- | --- | --- | --- | --- |
| Pension benefits | $ 153 | $ 157 | $ 158 | $ 164 | $ 168 | $ 910 |
| OPEB | $ 43 | $ 45 | $ 48 | $ 51 | $ 53 | $ 291 |

*Thrift Plan*

Oncor's employees may participate in a qualified savings plan, the EFH Corp. Thrift Plan (Thrift Plan). This plan is a participant-directed defined contribution plan intended to qualify under Section 401(a) of the Code, and is subject to the provisions of ERISA. Under the terms of the Thrift Plan, employees who do not earn more than the IRS threshold compensation limit used to determine highly compensated employees may contribute, through pre-tax salary deferrals and/or after-tax applicable payroll deductions, the lesser of 75% of their regular salary or wages or the maximum amount permitted under law. Employees who earn more than such threshold may contribute from 1% to 16% of their regular salary or wages. Employer matching contributions are also made in an amount equal to 100% of the first 6% of employee contributions for employees who are covered under the Cash Balance Formula of the Oncor Retirement Plan, and 75% of the first 6% of employee contributions for employees who are covered under the Traditional Retirement Plan Formula of the Oncor Retirement Plan. Employer matching contributions are made in cash and may be allocated by participants to any of the plan's investment options. Oncor's contributions to the Thrift Plan totaled $12 million, $12 million and $11 million for the years ended December 31, 2012, 2011 and 2010, respectively.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

## 11.  STOCK-BASED COMPENSATION

In 2008, Oncor established the SARs Plan under which certain of its executive officers and key employees may be granted stock appreciation rights payable in cash, or in some circumstances, Oncor membership interests.  In February 2009, Oncor established the Oncor Electric Delivery Company LLC Director Stock Appreciation Rights Plan (the Director SARs Plan) under which certain non-employee members of its board of directors and other persons having a relationship with Oncor may be granted SARs payable in cash, or in some circumstances, Oncor membership interests.  SARs under the SARs Plan and the Director SARs Plan are generally payable in cash based on the fair market value of the SAR on the date of exercise.  There were no SARs under either plan eligible for exercise at December 31, 2011.

During the year ended December 31, 2012, Oncor granted no SARS under the SARs Plan.  In November 2012, Oncor accepted the early exercise of all outstanding SARs (both vested and unvested, totaling 14,322,219 SARs under the SARs Plan and 55,000 SARs under the Director SARs Plan) issued to date pursuant to both SARs Plans.  The early exercise was permitted by Oncor's board of directors pursuant to the provision of the SARs Plan that permits the board to accelerate the vesting and exercisability of SARs.  The early exercise of SARs entitled each participant in the SARs Plan to: (1) an exercise payment (Exercise Payment) equal to the number of SARs exercised multiplied by the difference between $14.54 and the base price of the SARs (as stated in the award letter for each SARs grant); and (2) the accrual of interest on all dividends declared to date with respect to the SARs, but no further dividend accruals. Additionally, each current executive officer agreed to defer payment of a portion of his/her Exercise Payment until the earlier of November 7, 2016 or the occurrence of an event triggering SAR exercisability pursuant to Section 5(c)(ii) of the SARs Plan.  These deferred payments totaled approximately $6 million in the aggregate.  As a result of the early exercise, in 2012 Oncor paid an aggregate of approximately $64 million related to Exercise Payments ($57 million charged to expense), and began accruing interest on approximately $18 million in aggregate dividends.  As a result of the early exercise, no SARs are currently outstanding under either the SARs Plan or the Director SARs Plan.

Under both SARs plans, dividends that are paid in respect of Oncor membership interests while the SARs were outstanding were credited to the SARs holder's account as if the SARs were units, payable upon the earliest to occur of death, disability, separation from service, unforeseeable emergency, a change in control, or the exercise of the SARs.  As a result, in 2012 Oncor recorded compensation expense of approximately $6 million relating to dividend accruals through November 2012.  For accounting purposes, the liability is discounted based on an employee's or director's expected retirement date.

## 12.  RELATED-PARTY TRANSACTIONS

The following represent our significant related-party transactions:

• Oncor records revenue from TCEH, principally for electricity delivery fees, which totaled $1.0 billion for each of the years ended December 31, 2012 and 2011 and $1.1 billion for the year December 31, 2010.  The fees are based on rates regulated by the PUCT that apply to all REPs.  These revenues included approximately $2 million for each of the years ended December 31, 2012, 2011 and 2010 pursuant to a transformer maintenance agreement with TCEH.  The balance sheets at December 31, 2012 and 2011 reflect receivables from affiliates totaling $53 million and $138 million, respectively, primarily consisting of trade receivables from TCEH related to these electricity delivery fees.

• Oncor recognized interest income from TCEH under an agreement related to its generation-related regulatory assets, which have been securitized through the issuance of transition bonds by Bondco.  The interest income, which served to offset Oncor's interest expense on the transition bonds, totaled $16 million, $32 million and $37 million for the years ended December 31, 2012, 2011 and 2010, respectively.

Incremental amounts payable related to income taxes as a result of Oncor's delivery fee surcharges to customers related to transition bonds were reimbursed by TCEH. Prior to the August 2012 sale to EFIH disclosed below, our financial statements reflected a note receivable from TCEH that totaled $179 million ($41 million reported as current in trade accounts and other receivables from affiliates) at December 31, 2011 related to these income taxes.

In August 2012, Oncor sold to EFIH all future interest reimbursements and the remaining $159 million obligation under the note with TCEH.  As a result, EFIH paid, and Oncor received, an aggregate $159 million for the agreements.  The sale of the related-party agreements was reported as a $2 million (after tax) decrease in total membership interests in 2012 in accordance with accounting rules for related-party matters.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

- EFH Corp. subsidiaries charge Oncor for certain administrative services. EFH Corp. and Oncor also charge each other for shared facilities at cost. These net costs, which are primarily reported in operation and maintenance expenses, totaled $35 million, $38 million and $40 million for the years ended December 31, 2012, 2011 and 2010, respectively.

- Under Texas regulatory provisions, the trust fund for decommissioning TCEH's Comanche Peak nuclear generation facility is funded by a delivery fee surcharge Oncor collects from REPs and remits monthly to TCEH. Delivery fee surcharges totaled $16 million, $17 million and $16 million for the years ended December 31, 2012, 2011 and 2010, respectively. Oncor's sole obligation with regard to nuclear decommissioning is as the collection agent of funds charged to ratepayers for nuclear decommissioning activities. If, at the time of decommissioning, actual decommissioning costs exceed available trust funds, Oncor would not be obligated to pay any shortfalls but would be required to collect any rates approved by the PUCT to recover any additional decommissioning costs. Further, if there were to be a surplus when decommissioning is complete, such surplus would be returned to ratepayers under terms prescribed by the PUCT.

  Prior to 2012, Oncor reflected the difference between the trust fund assets and the decommissioning liability (both reported on TCEH's balance sheet) in its financial statements as a regulatory liability or asset with an offsetting receivable from or payable to TCEH (the beneficiary of the nuclear decommissioning trust). However, amounts associated with nuclear decommissioning activities were not included in Oncor's net income or accumulated other comprehensive income. During 2012, Oncor determined that due to its role as the collection agent of funds, the recording of a regulatory liability or asset in its financial statements was an error. As such, the balance sheet at December 31, 2011 has been restated to remove both the $225 million receivable from TCEH related to the Comanche Peak nuclear plant decommissioning and the associated regulatory liability of $225 million. This restatement reduced the receivable from TCEH to zero and increased regulatory assets by $225 million. This error did not have a material impact on our reported results of operations, cash flows or financial condition.

- Oncor has a 19.5% limited partnership interest, with a carrying value of less than $1 million at December 31, 2012 and 2011, in an EFH Corp. subsidiary holding principally software-related assets. Equity losses related to this interest are reported in other deductions and totaled less than $1 million for each of the years ended December 31, 2012 and 2011, and $2 million for the year ended December 31, 2010. These losses primarily represent amortization of software assets held by the subsidiary.

- We are a member of EFH Corp.'s consolidated tax group, though Oncor is not, and EFH Corp.'s consolidated federal income tax return includes our results. Under the terms of a tax sharing agreement, we are obligated to make payments to EFH Corp. in an aggregate amount that is substantially equal to the amount of federal income taxes that we would have been required to pay if we were filing our own corporate income tax return. Also under the terms of the tax sharing agreement, Oncor makes similar payments to Texas Transmission and Investment LLC, pro rata in accordance with their respective membership interests in Oncor, in an aggregate amount that is substantially equal to the amount of federal income taxes that Oncor would have been required to pay if it were filing its own corporate income tax return. EFH corp. also includes Oncor's results in its consolidated Texas state margin tax return, and consistent with the tax sharing agreement, Oncor remits to EFH Corp. Texas margin tax payments, which are accounted for as income taxes and calculated as if Oncor was filing its own return. Our results are also included in the consolidated Texas state margin tax return filed by EFH Corp. See discussion in Note 1 to Financial Statements under "Income Taxes." At December 31, 2012 and 2011, we had amounts due to EFH Corp. under the agreements totaling $34 million and $2 million, respectively. In the year ended December 31, 2012, we made income tax payments to EFH Corp. totaling $35 million (including net payments of $2 million made by Oncor to EFH Corp.). Income tax refunds from EFH Corp. in the year ended December 31, 2011 totaled $89 million. Income tax payments to EFH Corp. in the year ended December 31, 2010 totaled $107 million. Income tax refunds from noncontrolling interests in the years ended December 31, 2012 and 2011 totaled $5 million and $25 million, respectively, and income tax payments to noncontrolling interests in the year ended December 31, 2010 totaled $21 million.

- Certain transmission and distribution utilities in Texas have tariffs in place to assure adequate credit worthiness of any REP to support the REP's obligation to collect transition bond-related charges on behalf of the utility. Under these tariffs, as a result of TCEH's credit rating being below investment grade, TCEH is required to post collateral support in an amount equal to estimated transition charges over specified time periods. Accordingly, at December 31, 2012 and 2011, TCEH had posted letters of credit in the amount of $11 million and $12 million, respectively, for Oncor's benefit.

35

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

- In connection with assuming sponsorship of the Oncor Retirement Plan, Oncor entered into an agreement with EFH Corp. to assume primary responsibility for retirement benefits of a closed group of retired and terminated vested retirement plan participants not related to its regulated utility business. As the Oncor Retirement Plan received an amount of plan assets equal to the liabilities Oncor assumed for those participants, execution of the agreement did not have a material impact on its reported results of operations or financial condition.  See Note 10 for further information regarding funding for the pension plans.

- Affiliates of the Sponsor Group have, and from time-to-time may in the future (1) sell, acquire or participate in the offerings of Oncor's debt or debt securities in open market transactions or through loan syndications, and (2) perform various financial advisory, dealer, commercial banking and investment banking services for Oncor and certain of our affiliates for which they have received or will receive customary fees and expenses.

See Notes 3, 8 and 10 for information regarding the tax sharing agreement, distributions to EFIH and the allocation of EFH Corp.'s pension and OPEB costs, respectively.

## 13.  SUPPLEMENTARY FINANCIAL INFORMATION

### Variable Interest Entities

Oncor is the primary beneficiary and consolidates a wholly-owned VIE, Bondco, which was organized for the limited purpose of issuing specific transition bonds and purchasing and owning transition property acquired from Oncor that is pledged as collateral to secure the bonds.  Oncor acts as the servicer for this entity to collect transition charges authorized by the PUCT.  These funds are remitted to the trustee and used for interest and principal payments on the transition bonds and related costs.

The material assets and liabilities of Bondco are presented separately on the face of our Consolidated Balance Sheet because the assets are restricted and can only be used to settle the obligations of Bondco, and Bondco's creditors do not have recourse to our general credit or assets.

Our maximum exposure does not exceed our equity investment in Bondco, which was $16 million at both December 31, 2012 and 2011.  We did not provide any financial support to Bondco during the years ended December 31, 2012 and 2011.

### Major Customers

Revenues from TCEH represented 29%, 33% and 36% of total operating revenues for the years ended December 31, 2012, 2011 and 2010, respectively. Revenues from REP subsidiaries of a nonaffiliated entity collectively represented 15% of total operating revenues for each of the years ended December 31, 2012, 2011 and 2010. No other customer represented 10% or more of total operating revenues in the years ended December 31, 2012, 2011 or 2010.

### Other Income and Deductions

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2012 | 2011 | 2010 |
| Other income: | | | |
| Accretion of adjustment (discount) to regulatory assets due to purchase accounting | $         23 | $         29 | $         34 |
| Net gain on sale of other properties and investments | 3 | 1 | 2 |
| Total other income | $         26 | $         30 | $         36 |
| Other deductions: | | | |
| Professional fees | $          3 | $          4 | $          4 |
| Equity losses in unconsolidated affiliate (Note 12) | — | — | 2 |
| SARs early exercise (Note 11) | 57 | — | — |
| Other | 4 | 5 | 2 |
| Total other deductions | $         64 | $          9 | $          8 |

36

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Interest Expense and Related Charges*

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2012 | 2011 | 2010 |
| Interest expense | $ 366 | $ 359 | $ 342 |
| Amortization of fair value debt discounts resulting from purchase accounting | — | — | 2 |
| Amortization of debt issuance costs and discounts | 18 | 3 | 5 |
| Allowance for funds used during construction -capitalized interest portion | (10) | (3) | (2) |
| Total interest expense and related charges | $ 374 | $ 359 | $ 347 |

*Restricted Cash*

Restricted cash amounts reported on our balance sheet consisted of the following:

| | At December 31, 2012 | | At December 31, 2011 | |
| --- | --- | --- | --- | --- |
| | Current Assets | Noncurrent Assets | Current Assets | Noncurrent Assets |
| Customer collections related to transition bonds used only to service debt and pay expenses | $ 55 | $ — | $ 57 | $ — |
| Reserve for fees associated with transition bonds | — | 10 | — | 10 |
| Reserve for shortfalls of transition bond charges | — | 6 | — | 6 |
| Total restricted cash | $ 55 | $ 16 | $ 57 | $ 16 |

*Trade Accounts Receivable*

Trade accounts receivable reported on our balance consisted of the following:

| | At December 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| Gross trade accounts receivable | $ 395 | $ 436 |
| Trade accounts receivable from TCEH | (55) | (131) |
| Allowance for uncollectible accounts | (2) | (2) |
| Trade accounts receivable from nonaffiliates - net | $ 338 | $ 303 |

Gross trade accounts receivable at December 31, 2012 and 2011 included unbilled revenues of $147 million and $127 million, respectively.

Under a PUCT rule relating to the Certification of Retail Electric Providers, write-offs of uncollectible amounts owed by REPs are deferred as a regulatory asset. Due to commitments made to the PUCT in 2007, we are not allowed to recover bad debt expense, or certain other costs and expenses, from ratepayers in the event of a default or bankruptcy by an affiliate REP.

37

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

### Investments and Other Property

Investments and other property reported on our balance consisted of the following:

| | At December 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| Assets related to employee benefit plans, including employee savings programs, net of distributions | $ 80 | $ 70 |
| Land | 3 | 3 |
| Total investments and other property | $ 83 | $ 73 |

The majority of these assets represent cash surrender values of life insurance policies that are purchased to fund liabilities under deferred compensation plans. At December 31, 2012 and 2011, the face amount of these policies totaled $152 million and $137 million, respectively, and the net cash surrender values (determined using a Level 2 valuation technique) totaled $65 million and $46 million, respectively.  Changes in cash surrender value are netted against premiums paid. Other investment assets held to satisfy deferred compensation liabilities are recorded at market value.

### Property, Plant and Equipment

Property, plant and equipment reported on our balance consisted of the following:

| | Composite Depreciation Rate/ Avg. Life at December 31, 2012 | At December 31, | |
| --- | --- | --- | --- |
| | | 2012 | 2011 |
| Assets in service: | | | |
| Distribution | 4.1% / 24.5 years | $ 9,745 | $ 9,486 |
| Transmission | 2.8% / 35.2 years | 5,482 | 4,919 |
| Other assets | 9.3% / 10.8 years | 856 | 822 |
| Total | | 16,083 | 15,227 |
| Less accumulated depreciation | | 5,407 | 5,203 |
| Net of accumulated depreciation | | 10,676 | 10,024 |
| Construction work in progress | | 627 | 530 |
| Held for future use | | 15 | 15 |
| Property, plant and equipment - net | | $ 11,318 | $ 10,569 |

Depreciation expense as a percent of average depreciable property approximated 3.9% for the year ended December 31, 2012 and 4.0% for each of the years ended December 31, 2011 and 2010.

### Intangible Assets

Intangible assets (other than goodwill) reported on our balance sheet consisted of the following:

| | At December 31, 2012 | | | At December 31, 2011 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Gross Carrying Amount | Accumulated Amortization | Net | Gross Carrying Amount | Accumulated Amortization | Net |
| Identifiable intangible assets subject to amortization included in property, plant and equipment: | | | | | | |
| Land easements | $ 295 | $ 79 | $ 216 | $ 248 | $ 77 | $ 171 |
| Capitalized software | 409 | 220 | 189 | 378 | 181 | 197 |
| Total | $ 704 | $ 299 | $ 405 | $ 626 | $ 258 | $ 368 |

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Aggregate amortization expense for intangible assets totaled $53 million, $48 million and $39 million for the years ended December 31, 2012, 2011 and 2010, respectively. At December 31, 2012, the weighted average remaining useful lives of capitalized land easements and software were 89 years and 5 years, respectively. The estimated aggregate amortization expense for each of the next five fiscal years is as follows:

| Year | Amortization Expense |
|---|---|
| 2013 | $56 |
| 2014 | 56 |
| 2015 | 56 |
| 2016 | 53 |
| 2017 | 45 |

At both December 31, 2012 and 2011, goodwill totaling $4.1 billion was reported on the balance sheet. None of this goodwill is being deducted for tax purposes (see Note 1 regarding goodwill impairment assessment and testing). In the fourth quarter of 2008, Oncor recorded a goodwill impairment charge of $860 million, which was not deductible for income tax-related purposes.

### *Other Noncurrent Liabilities and Deferred Credits*

Other noncurrent liabilities and deferred credits reported on our balance sheet consisted of the following:

| | At December 31, | |
|---|---|---|
| | **2012** | **2011** |
| Retirement plans and other employee benefits | $ 1,495 | $ 1,340 |
| Liabilities related to subsidiary tax sharing agreement | 278 | 286 |
| Uncertain tax positions (including accrued interest) | 169 | 147 |
| Other | 57 | 59 |
| Total | $ 1,999 | $ 1,832 |

### *Supplemental Cash Flow Information*

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2012** | **2011** | **2010** |
| Cash payments (receipts) related to: | | | |
| Interest | $ 360 | $ 339 | $ 337 |
| Capitalized interest | (3) | (2) | (2) |
| Interest (net of amounts capitalized). | 357 | 337 | 335 |
| Income taxes | | | |
| Federal | 9 | (134) | 109 |
| State | 21 | 20 | 19 |
| Total income taxes | 30 | (114) | 128 |
| SARs early exercise | 64 | — | — |
| Noncash investing and financing activities: | | | |
| Construction expenditures (a) | 103 | 140 | 78 |
| Capital contribution related to settlement of certain income taxes payable (b) | — | 30 | 40 |
| Debt exchange transactions - Oncor | — | — | 324 |

(a)  Represents end-of-period accruals.
(b)  Reflects noncash settlement of certain income taxes payable arising as a result of the sale of noncontrolling interests in Oncor.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

14    **CONDENSED FINANCIAL INFORMATION**

**ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC**
**CONDENSED FINANCIAL INFORMATION**

**CONDENSED STATEMENTS OF COMPREHENSIVE INCOME**
(millions of dollars)

|  | Year Ended December 31, | | |
|  | 2012 | 2011 | 2010 |
|---|---|---|---|
| Income tax expense | $ (9) | $ (7) | $ (5) |
| Equity in earnings of subsidiary | 279 | 293 | 282 |
| Net income | 270 | 286 | 277 |
| Other comprehensive income (net of tax benefit of — , $14, and — ) | — | (23) | — |
| Comprehensive income | 270 | 263 | 277 |

See Notes to Financial Statements.

**CONDENSED STATEMENTS OF CASH FLOWS**
(millions of dollars)

|  | Year Ended December 31, | | |
|  | 2012 | 2011 | 2010 |
|---|---|---|---|
| Cash provided by operating activities | $ 146 | $ 116 | $ 169 |
| Cash used in financing activities — distributions paid to parent | (147) | (116) | (169) |
| Net change in cash and cash equivalents | (1) | — | — |
| Cash and cash equivalents - beginning balance | $ 1 | $ 1 | $ 1 |
| Cash and cash equivalents - ending balance | $ — | 1 | 1 |

See Notes to Financial Statements.

**CONDENSED BALANCE SHEETS**
(millions of dollars)

|  | At December 31, | |
|  | 2012 | 2011 |
|---|---|---|
| **ASSETS** | | |
| Cash and cash equivalents — current | $ — | $ 1 |
| Investments | 6,133 | 6,028 |
| Total assets | $ 6,133 | $ 6,029 |
| **LIABILITIES AND MEMBERSHIP INTEREST** | | |
| Income taxes payable to EFH Corp. — current | $ 9 | $ — |
| Accumulated deferred income taxes | 4 | 23 |
| Other noncurrent liabilities and deferred credits | 278 | 286 |
| Total liabilities | 291 | 309 |
| Membership interest | 5,842 | 5,720 |
| Total liabilities and membership interest | $ 6,133 | $ 6,029 |

See Notes to Financial Statements.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**ONCOR ELECTRIC DELIVERY HOLDINGS COMPANY LLC**
**CONDENSED FINANCIAL INFORMATION**
**NOTES TO CONDENSED FINANCIAL STATEMENTS**

*Basis of Presentation*

References herein to "we," "our," "us" and "the company" are to Oncor Holdings and/or its direct or indirect subsidiaries as apparent in the context.

The accompanying unconsolidated condensed balance sheets are presented at December 31, 2012 and 2011, and the accompanying unconsolidated statements of income and cash flows are presented for the years ended December 31, 2012, 2011 and 2010. We are a Delaware limited liability company wholly-owned by EFIH, which is a wholly owned subsidiary of EFH Corp. As of December 31, 2012, we own approximately 80% of the membership interests in Oncor. Certain information and footnote disclosures normally included in financial statements prepared in accordance with US GAAP have been omitted pursuant to the rules of the US Securities and Exchange Commission. Because the unconsolidated condensed financial statements do not include all of the information and footnotes required by US GAAP, they should be read in conjunction with the consolidated financial statements and Notes 1 through 13. Our subsidiary has been accounted for under the equity method. All dollar amounts in the financial statements are stated in millions of US dollars unless otherwise indicated.

*Distribution Restrictions*

While there are no direct restrictions on our ability to distribute our net income that are currently material, substantially all of our net income is derived from Oncor. Our board of directors and Oncor's board of directors, which are composed of a majority of independent directors, can withhold distributions to the extent the boards determine that it is necessary to retain such amounts to meet our expected future requirements.

Until December 31, 2012, Oncor's distributions were limited to its cumulative net income and regulatory capital structure restrictions. Effective January 1, 2013, distributions are limited only to the extent Oncor maintains a required regulatory capital structure as discussed below.

Oncor's distributions continue to be limited by its required regulatory capital structure to be at or below the assumed debt-to-equity ratio established periodically by the PUCT for ratemaking purposes, which is currently set at 60% debt to 40% equity. At December 31, 2012, Oncor's regulatory capitalization ratio was 58.8% debt and 41.2% equity. The PUCT has the authority to determine what types of debt and equity are included in a utility's debt-to-equity ratio. For purposes of this ratio, debt is calculated as long-term debt plus unamortized gains on reacquired debt less unamortized issuance expenses, premiums and losses on reacquired debt. The debt calculation excludes transition bonds issued by Bondco. Equity is calculated as membership interests determined in accordance with US GAAP, excluding the effects of purchase accounting (which included recording the initial goodwill and fair value adjustments and the subsequent related impairments and amortization). At December 31, 2012, $167 million was available for distribution to Oncor's members under the capital structure restriction, of which approximately 80% relates to our ownership interest.

For the period beginning October 11, 2007 and ending December 31, 2012, Oncor's cash distributions (other than distributions of the proceeds of any issuance of limited liability company units) were limited by the Limited Liability Company Agreement and a stipulation agreement with the PUCT to an amount not to exceed Oncor's cumulative net income determined in accordance with US GAAP, as adjusted by applicable orders of the PUCT. Adjustments consisted of the removal of noncash impacts of purchase accounting and deducting two specific cash commitments. The noncash impacts consisted of removing the effect of an $860 million goodwill impairment charge in 2008 and the cumulative amount of net accretion of fair value adjustments. The two specific cash commitments were the $72 million ($46 million after tax) one-time refund to customers in September 2008 and the funds spent as part of the $100 million commitment for additional energy efficiency initiatives that was completed in 2012. See Note 2 for additional information regarding the two cash commitments. At December 31, 2012, $420 million of membership interests was available for distribution under the cumulative net income restriction of which approximately 80% relates to our ownership interest. However, as discussed above, this restriction is no longer applicable.

On February 13, 2013, Oncor's board of directors declared a cash distribution of $31, which was paid to us on February 15, 2013. During 2012, 2011 and 2010, Oncor's board of directors declared, and Oncor paid to us cash distributions totaling $147 million, $116 million and $169 million, respectively.

41

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Supplemental Cash Flow Information*

|  | Year Ended December 31, | | |
|  | 2012 | 2011 | 2010 |
|---|---|---|---|
| Cash payments to EFH Corp. related to federal income taxes | $ 33 | $ — | $ — |
| Capital contribution related to settlement of certain income taxes payable (a) | $ — | $ 30 | $ 40 |

———————

(a)   Reflects noncash settlement of certain income taxes payable arising as a result of the sale of noncontrolling interests in Oncor.

42

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Source: Energy Future Holdings Corp /TX/, 10-K, February 19, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

**<u>Appendix D</u>**

Energy Future Competitive Holdings Co. LLC Form 10-Q filed Nov. 1, 2013

Morningstar® Document Research℠

# FORM 10-Q

## Energy Future Competitive Holdings Co LLC - N/A

**Filed: November 01, 2013 (period: September 30, 2013)**

Quarterly report with a continuing view of a company's financial position

*The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.*

Table of Contents

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# FORM 10-Q

☒ QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**FOR THE QUARTERLY PERIOD ENDED SEPTEMBER 30, 2013**

— OR —

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

Commission File Number 001-34543

# Energy Future Competitive Holdings Company LLC

**(formerly Energy Future Competitive Holdings Company)**

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| Delaware | 75-1837355 |
| (State of incorporation or organization) | (I.R.S. Employer Identification No.) |
| 1601 Bryan Street, Dallas, TX 75201-3411 | (214) 812-4600 |
| (Address of principal executive offices) (Zip Code) | (Registrant's telephone number, including area code) |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. Yes ☒  No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).  Yes ☒  No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐     Accelerated filer ☐     Non-Accelerated filer ☒ (Do not check if a smaller reporting company)
Smaller reporting company ☐

Indicate by check mark if the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes  ☐   No ☒

At October 31, 2013, the outstanding membership interest in Energy Future Competitive Holdings Company LLC was directly held by Energy Future Holdings Corp.

Energy Future Competitive Holdings Company LLC meets the conditions set forth in General Instructions (H)(1)(a) and (b) of Form 10-Q and is therefore filing this report with the reduced disclosure format.

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## TABLE OF CONTENTS

| | | PAGE |
|---|---|---|
| **GLOSSARY** | | ii |
| **PART I.** | **FINANCIAL INFORMATION** | |
| **Item 1.** | **Financial Statements (Unaudited)** | |
| | **Condensed Statements of Consolidated Income (Loss) —** **Three and Nine Months Ended September 30, 2013 and 2012** | 1 |
| | **Condensed Statements of Consolidated Comprehensive Income (Loss) —** **Three and Nine Months Ended September 30, 2013 and 2012** | 1 |
| | **Condensed Statements of Consolidated Cash Flows —** **Nine Months Ended September 30, 2013 and 2012** | 2 |
| | **Condensed Consolidated Balance Sheets —** **September 30, 2013 and December 31, 2012** | 3 |
| | **Notes to Condensed Consolidated Financial Statements** | 4 |
| **Item 2.** | **Management's Discussion and Analysis of Financial Condition and Results of Operations** | 52 |
| **Item 3.** | **Quantitative and Qualitative Disclosures About Market Risk** | 75 |
| **Item 4.** | **Controls and Procedures** | 80 |
| **PART II.** | **OTHER INFORMATION** | |
| **Item 1.** | **Legal Proceedings** | 80 |
| **Item 1A.** | **Risk Factors** | 80 |
| **Item 4.** | **Mine Safety Disclosures** | 80 |
| **Item 6.** | **Exhibits** | 82 |
| **SIGNATURE** | | 84 |

Energy Future Competitive Holdings Company LLC's (EFCH) (formerly known as Energy Future Holdings Company) annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and any amendments to those reports are made available to the public, free of charge, on the Energy Future Holdings Corp. (EFH Corp.) website at *http://www.energyfutureholdings.com*, as soon as reasonably practicable after they have been filed with or furnished to the Securities and Exchange Commission. EFCH also from time to time makes available to the public, free of charge, on the EFH Corp. website certain financial statements of its wholly owned subsidiary, Texas Competitive Electric Holdings Company LLC. The information on EFH Corp.'s website shall not be deemed a part of, or incorporated by reference into, this quarterly report on Form 10-Q. The representations and warranties contained in any agreement that EFCH has filed as an exhibit to this quarterly report on Form 10-Q or that EFCH has or may publicly file in the future may contain representations and warranties made by and to the parties thereto at specific dates. Such representations and warranties may be subject to exceptions and qualifications contained in separate disclosure schedules, may represent the parties' risk allocation in the particular transaction, or may be qualified by materiality standards that differ from what may be viewed as material for securities law purposes.

This quarterly report on Form 10-Q and other Securities and Exchange Commission filings of EFCH and its subsidiaries occasionally make references to EFH Corp., EFCH (or "we," "our," "us" or "the company"), TCEH, TXU Energy or Luminant when describing actions, rights or obligations of their respective subsidiaries. These references reflect the fact that the subsidiaries are consolidated with, or otherwise reflected in, their respective parent company's financial statements for financial reporting purposes. However, these references should not be interpreted to imply that the relevant parent company is actually undertaking the action or has the rights or obligations of the relevant subsidiary company or vice versa.

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

# GLOSSARY

When the following terms and abbreviations appear in the text of this report, they have the meanings indicated below.

| | |
|---|---|
| **2012 Form 10-K** | EFCH's Annual Report on Form 10-K for the year ended December 31, 2012 |
| **Adjusted EBITDA** | Adjusted EBITDA means EBITDA adjusted to exclude noncash items, unusual items and other adjustments allowable under certain debt arrangements of TCEH and EFH Corp.  See the definition of EBITDA below. Adjusted EBITDA and EBITDA are not recognized terms under US GAAP and, thus, are non-GAAP financial measures. We are providing TCEH's and EFH Corp.'s Adjusted EBITDA in this Form 10-Q (see reconciliations in Exhibits 99(b) and 99(c)) solely because of the important role that Adjusted EBITDA plays in respect of certain covenants contained in the debt arrangements. We do not intend for Adjusted EBITDA (or EBITDA) to be an alternative to net income as a measure of operating performance or an alternative to cash flows from operating activities as a measure of liquidity or an alternative to any other measure of financial performance presented in accordance with US GAAP. Additionally, we do not intend for Adjusted EBITDA (or EBITDA) to be used as a measure of free cash flow available for management's discretionary use, as the measure excludes certain cash requirements such as interest payments, tax payments and other debt service requirements. Because not all companies use identical calculations, our presentation of Adjusted EBITDA (and EBITDA) may not be comparable to similarly titled measures of other companies. |
| **CAIR** | Clean Air Interstate Rule |
| **CFTC** | US Commodity Futures Trading Commission |
| **CSAPR** | the final Cross-State Air Pollution Rule issued by the EPA in July 2011, vacated by the US Court of Appeals for the District of Columbia Circuit in August 2012 and accepted for review by the US Supreme Court in June 2013 (see Note 6 to Financial Statements) |
| **D.C. Circuit Court** | US Court of Appeals for the District of Columbia Circuit |
| **EBITDA** | earnings (net income) before interest expense, income taxes, depreciation and amortization |
| **EFCH** | Energy Future Competitive Holdings Company LLC, a direct, wholly owned subsidiary of EFH Corp. and the direct parent of TCEH, and/or its subsidiaries, depending on context |
| **EFH Corp.** | Energy Future Holdings Corp., a holding company, and/or its subsidiaries depending on context, whose major subsidiaries include TCEH and Oncor |
| **EFIH** | Energy Future Intermediate Holding Company LLC, a direct, wholly owned subsidiary of EFH Corp. and the direct parent of Oncor Holdings |
| **EFIH Finance** | EFIH Finance Inc., a direct, wholly owned subsidiary of EFIH, formed for the sole purpose of serving as co-issuer with EFIH of certain debt securities |
| **EPA** | US Environmental Protection Agency |
| **ERCOT** | Electric Reliability Council of Texas, Inc., the independent system operator and the regional coordinator of various electricity systems within Texas |
| **Fifth Circuit Court** | US Court of Appeals for the Fifth Circuit |
| **GAAP** | generally accepted accounting principles |
| **GWh** | gigawatt-hours |
| **ICE** | the IntercontinentalExchange, a commodity exchange |
| **IRS** | US Internal Revenue Service |
| **LIBOR** | London Interbank Offered Rate, an interest rate at which banks can borrow funds, in marketable size, from other banks in the London interbank market |

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| | |
|---|---|
| **Luminant** | subsidiaries of TCEH engaged in competitive market activities consisting of electricity generation and wholesale energy sales and purchases as well as commodity risk management and trading activities, all largely in Texas |
| **market heat rate** | Heat rate is a measure of the efficiency of converting a fuel source to electricity.  Market heat rate is the implied relationship between wholesale electricity prices and natural gas prices and is calculated by dividing the wholesale market price of electricity, which is based on the price offer of the marginal supplier in ERCOT (generally natural gas plants), by the market price of natural gas. Forward wholesale electricity market price quotes in ERCOT are generally limited to two or three years; accordingly, forward market heat rates are generally limited to the same time period. Forecasted market heat rates for time periods for which market price quotes are not available are based on fundamental economic factors and forecasts, including electricity supply, demand growth, capital costs associated with new construction of generation supply, transmission development and other factors. |
| **MATS** | the Mercury and Air Toxics Standard established by the EPA |
| **Merger** | The transaction referred to in the Agreement and Plan of Merger, dated February 25, 2007, under which Texas Holdings agreed to acquire EFH Corp., which was completed on October 10, 2007. |
| **MMBtu** | million British thermal units |
| **MW** | megawatts |
| **MWh** | megawatt-hours |
| **NERC** | North American Electric Reliability Corporation |
| **NOx** | nitrogen oxides |
| **NRC** | US Nuclear Regulatory Commission |
| **NYMEX** | the New York Mercantile Exchange, a physical commodity futures exchange |
| **Oncor** | Oncor Electric Delivery Company LLC, a direct, majority-owned subsidiary of Oncor Holdings and an indirect subsidiary of EFH Corp., and/or its consolidated bankruptcy-remote financing subsidiary, Oncor Electric Delivery Transition Bond Company LLC, depending on context, that is engaged in regulated electricity transmission and distribution activities |
| **Oncor Holdings** | Oncor Electric Delivery Holdings Company LLC, a direct, wholly owned subsidiary of EFIH and the direct majority owner of Oncor, and/or its subsidiaries, depending on context |
| **OPEB** | other postretirement employee benefits |
| **PUCT** | Public Utility Commission of Texas |
| **purchase accounting** | The purchase method of accounting for a business combination as prescribed by US GAAP, whereby the cost or "purchase price" of a business combination, including the amount paid for the equity and direct transaction costs are allocated to identifiable assets and liabilities (including intangible assets) based upon their fair values.  The excess of the purchase price over the fair values of assets and liabilities is recorded as goodwill. |
| **REP** | retail electric provider |
| **RCT** | Railroad Commission of Texas, which among other things, has oversight of lignite mining activity in Texas |
| **S&P** | Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies Inc. (a credit rating agency) |
| **SEC** | US Securities and Exchange Commission |
| **SG&A** | selling, general and administrative |
| **SO2** | sulfur dioxide |

iii

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| | |
|---|---|
| **Sponsor Group** | Refers, collectively, to certain investment funds affiliated with Kohlberg Kravis Roberts & Co. L.P., TPG Global, LLC (together with its affiliates, TPG) and GS Capital Partners, an affiliate of Goldman, Sachs & Co., that have an ownership interest in Texas Holdings. |
| **TCEH** | Texas Competitive Electric Holdings Company LLC, a direct, wholly owned subsidiary of EFCH and an indirect subsidiary of EFH Corp., and/or its subsidiaries, depending on context, that are engaged in electricity generation and wholesale and retail energy markets activities, and whose major subsidiaries include Luminant and TXU Energy |
| **TCEH Demand Notes** | Refers to certain loans from TCEH to EFH Corp. in the form of demand notes to finance EFH Corp. debt principal and interest payments and, until April 2011, other general corporate purposes of EFH Corp., that were guaranteed on a senior unsecured basis by EFCH and EFIH and were settled by EFH Corp. in January 2013. |
| **TCEH Finance** | TCEH Finance, Inc., a direct, wholly owned subsidiary of TCEH, formed for the sole purpose of serving as co-issuer with TCEH of certain debt securities |
| **TCEH Senior Notes** | Refers, collectively, to TCEH's and TCEH Finance's 10.25% Senior Notes due November 1, 2015 and 10.25% Senior Notes due November 1, 2015, Series B (collectively, TCEH 10.25% Notes) and TCEH's and TCEH Finance's 10.50%/11.25% Senior Toggle Notes due November 1, 2016 (TCEH Toggle Notes). |
| **TCEH Senior Secured Facilities** | Refers, collectively, to the TCEH Term Loan Facilities, TCEH Revolving Credit Facility and TCEH Letter of Credit Facility. See Note 5 to Financial Statements for details of these facilities. |
| **TCEH Senior Secured Notes** | TCEH's and TCEH Finance's 11.5% Senior Secured Notes due October 1, 2020 |
| **TCEH Senior Secured Second Lien Notes** | Refers, collectively, to TCEH's and TCEH Finance's 15% Senior Secured Second Lien Notes due April 1, 2021 and TCEH's and TCEH Finance's 15% Senior Secured Second Lien Notes due April 1, 2021, Series B. |
| **TCEQ** | Texas Commission on Environmental Quality |
| **Texas Holdings** | Texas Energy Future Holdings Limited Partnership, a limited partnership controlled by the Sponsor Group, that owns substantially all of the common stock of EFH Corp. |
| **TXU Energy** | TXU Energy Retail Company LLC, a direct, wholly owned subsidiary of TCEH that is a REP in competitive areas of ERCOT and is engaged in the retail sale of electricity to residential and business customers |
| **US** | United States of America |
| **VIE** | variable interest entity |

iv

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## PART I. FINANCIAL INFORMATION

**Item 1.  FINANCIAL STATEMENTS**

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY LLC**
**CONDENSED STATEMENTS OF CONSOLIDATED INCOME (LOSS)**
**(Unaudited)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2013 | 2012 | 2013 | 2012 |
| | (millions of dollars) | | | |
| Operating revenues | $ 1,893 | $ 1,752 | $ 4,572 | $ 4,358 |
| Fuel, purchased power costs and delivery fees | (852) | (850) | (2,175) | (2,153) |
| Net gain (loss) from commodity hedging and trading activities | 58 | (3) | 29 | 229 |
| Operating costs | (189) | (201) | (685) | (636) |
| Depreciation and amortization | (331) | (328) | (1,012) | (992) |
| Selling, general and administrative expenses | (175) | (174) | (502) | (484) |
| Franchise and revenue-based taxes | (18) | (19) | (51) | (55) |
| Other income (Note 12) | 1 | 2 | 7 | 12 |
| Other deductions (Note 12) | (8) | (30) | (12) | (37) |
| Interest income | 1 | 10 | 5 | 36 |
| Interest expense and related charges (Note 12) | (340) | (772) | (1,338) | (2,268) |
| Income (loss) before income taxes | 40 | (613) | (1,162) | (1,990) |
| Income tax benefit | 17 | 228 | 476 | 692 |
| Net income (loss) | $ 57 | $ (385) | $ (686) | $ (1,298) |

See Notes to Financial Statements.

**CONDENSED STATEMENTS OF CONSOLIDATED COMPREHENSIVE INCOME (LOSS)**
**(Unaudited)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2013 | 2012 | 2013 | 2012 |
| | (millions of dollars) | | | |
| Net income (loss) | $ 57 | $ (385) | $ (686) | $ (1,298) |
| Other comprehensive income, net of tax effects – cash flow hedges derivative value net loss related to hedged transactions recognized during the period and reported in interest expense and related charges (net of tax benefit of $1, $1, $3 and $3) | 1 | 1 | 5 | 5 |
| Comprehensive income (loss) | $ 58 | $ (384) | $ (681) | $ (1,293) |

See Notes to Financial Statements.

1

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY LLC**
**CONDENSED STATEMENTS OF CONSOLIDATED CASH FLOWS**
**(Unaudited)**

| | Nine Months Ended September 30, | |
|---|---|---|
| | 2013 | 2012 |
| | (millions of dollars) | |
| Cash flows — operating activities: | | |
| Net loss | $ (686) | $ (1,298) |
| Adjustments to reconcile net loss to cash provided by (used in) operating activities: | | |
| Depreciation and amortization | 1,142 | 1,137 |
| Deferred income tax benefit, net | (401) | (716) |
| Income tax benefit due to audit resolutions (Note 12) | (80) | — |
| Unrealized net loss from mark-to-market valuations of commodity positions | 693 | 1,290 |
| Unrealized net (gain) loss from mark-to-market valuations of interest rate swaps (Note 5) | (899) | 16 |
| Interest expense on toggle notes payable in additional principal (Notes 5 and 12) | — | 136 |
| Amortization of debt related costs, discounts, fair value discounts and losses on dedesignated cash flow hedges (Note 12) | 209 | 152 |
| Interest expense related to pushed-down debt of parent (Notes 5 and 12) | 5 | 57 |
| Asset impairments (Note 12) | 3 | 24 |
| Bad debt expense (Note 4) | 23 | 20 |
| Accretion expense related primarily to mining reclamation obligations (Note 12) | 24 | 27 |
| Stock-based incentive compensation expense | 1 | 5 |
| Other, net | 2 | 10 |
| Changes in operating assets and liabilities: | | |
| Margin deposits, net | (197) | (321) |
| Other operating assets and liabilities | 40 | (210) |
| Cash provided by (used in) operating activities | (121) | 329 |
| Cash flows — financing activities: | | |
| Repayments/repurchases of long-term debt (Note 5) | (94) | (30) |
| Net short-term borrowings under accounts receivable securitization program (Note 4) | 90 | 80 |
| Decrease in other short-term borrowings (Note 5) | — | (385) |
| Notes/advances due to affiliates | 4 | — |
| Decrease in income tax-related note payable to Oncor (Note 11) | — | (20) |
| Settlement of reimbursement agreements with Oncor (Note 11) | — | (159) |
| Contributions from noncontrolling interests (Note 7) | 3 | 6 |
| Sale/leaseback of equipment | — | 15 |
| Other, net | (10) | — |
| Cash used in financing activities | (7) | (493) |
| Cash flows — investing activities: | | |
| Capital expenditures | (353) | (498) |
| Nuclear fuel purchases | (59) | (155) |
| Settlements of notes due from affiliates | 698 | 922 |
| Purchase of right to use certain computer-related assets from parent (Note 11) | (6) | — |
| Proceeds from sales of assets | 3 | 1 |
| Acquisition of combustion turbine trust interest (Note 5) | (40) | — |
| Changes in restricted cash | — | 112 |
| Purchases of environmental allowances and credits | (13) | (19) |
| Proceeds from sales of nuclear decommissioning trust fund securities | 128 | 56 |
| Investments in nuclear decommissioning trust fund securities | (140) | (68) |
| Other, net | (3) | 2 |
| Cash provided by investing activities | 215 | 353 |
| Net change in cash and cash equivalents | 87 | 189 |
| Cash and cash equivalents — beginning balance | 1,175 | 120 |
| Cash and cash equivalents — ending balance | $ 1,262 | $ 309 |

See Notes to Financial Statements.

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY LLC**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(Unaudited)**

| | | September 30, 2013 | | December 31, 2012 |
|---|---|---|---|---|
| | | (millions of dollars) | | |
| **ASSETS** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 1,262 | $ | 1,175 |
| Trade accounts receivable — net (includes $573 and $445 in pledged amounts related to a VIE (Notes 2 and 4)) | | 796 | | 710 |
| Notes receivable from parent (Note 11) | | — | | 698 |
| Income taxes receivable from parent | | 7 | | — |
| Inventories (Note 12) | | 400 | | 393 |
| Commodity and other derivative contractual assets (Note 9) | | 973 | | 1,463 |
| Margin deposits related to commodity positions | | 21 | | 71 |
| Other current assets | | 34 | | 120 |
| Total current assets | | 3,493 | | 4,630 |
| Restricted cash (Note 12) | | 947 | | 947 |
| Investments (Note 12) | | 787 | | 710 |
| Property, plant and equipment — net (Note 12) | | 17,961 | | 18,556 |
| Goodwill (Note 3) | | 4,952 | | 4,952 |
| Identifiable intangible assets — net (Note 3) | | 1,736 | | 1,781 |
| Commodity and other derivative contractual assets (Note 9) | | 159 | | 586 |
| Other noncurrent assets, primarily unamortized debt amendment and issuance costs | | 859 | | 811 |
| Total assets | $ | 30,894 | $ | 32,973 |
| **LIABILITIES AND MEMBERSHIP INTERESTS/EQUITY** | | | | |
| Current liabilities: | | | | |
| Short-term borrowings (includes $172 and $82 related to a VIE (Notes 2 and 5)) | $ | 2,226 | $ | 2,136 |
| Long-term debt due currently (Note 5) | | 32 | | 96 |
| Trade accounts payable | | 354 | | 389 |
| Trade accounts and other payables to affiliates | | 205 | | 139 |
| Notes payable to parent (Note 11) | | 92 | | 81 |
| Commodity and other derivative contractual liabilities (Note 9) | | 594 | | 894 |
| Margin deposits related to commodity positions | | 353 | | 600 |
| Accumulated deferred income taxes | | 36 | | 49 |
| Accrued income taxes payable to parent (Note 11) | | — | | 31 |
| Accrued taxes other than income | | 95 | | 17 |
| Accrued interest | | 532 | | 407 |
| Other current liabilities | | 219 | | 255 |
| Total current liabilities | | 4,738 | | 5,094 |
| Accumulated deferred income taxes | | 3,347 | | 3,759 |
| Commodity and other derivative contractual liabilities (Note 9) | | 782 | | 1,556 |
| Notes or other liabilities due to affiliates | | 2 | | 5 |
| Long-term debt held by affiliates (Note 11) | | 382 | | 382 |
| Long-term debt, less amounts due currently (Note 5) | | 29,770 | | 29,928 |
| Affiliate tax sharing liability (Note 12) | | 723 | | — |
| Other noncurrent liabilities and deferred credits (Note 12) | | 1,793 | | 2,643 |
| Total liabilities | | 41,537 | | 43,367 |
| Commitments and Contingencies (Note 6) | | | | |
| Membership interests/equity (Note 7): | | | | |
| EFCH shareholder's equity | | — | | (10,506) |
| EFCH membership interests | | (10,748) | | — |
| Noncontrolling interests in subsidiaries | | 105 | | 112 |
| Total membership interests/equity | | (10,643) | | (10,394) |
| Total liabilities and membership interests/equity | $ | 30,894 | $ | 32,973 |

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

See Notes to Financial Statements.

3

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

[Table of Contents]

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY LLC**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

## 1. BUSINESS AND SIGNIFICANT ACCOUNTING POLICIES

### Description of Business

References in this report to "we," "our," "us" and "the company" are to EFCH and/or its subsidiaries, as apparent in the context.  See "Glossary" for defined terms.

EFCH, a wholly owned subsidiary of EFH Corp., is a Dallas, Texas-based holding company.  In April 2013, EFCH was converted from a Texas corporation to a Delaware limited liability company.  The conversion did not result in a change in the management, assets, businesses or operations of EFCH.  We conduct our operations almost entirely through our wholly owned subsidiary, TCEH.  TCEH is a holding company for subsidiaries engaged in competitive electricity market activities largely in Texas, including electricity generation, wholesale energy sales and purchases, commodity risk management and trading activities and retail electricity sales.  Key management activities, including commodity risk management and electricity sourcing for our retail and wholesale customers, are performed on an integrated basis; consequently, there are no reportable business segments.

TCEH operates largely in the ERCOT market, and wholesale electricity prices in that market have generally moved with the price of natural gas.  Wholesale electricity prices have significant implications to TCEH's profitability and cash flows and, accordingly, the value of its business.

### Liquidity Considerations

EFCH has been and is expected to continue to be adversely affected by the sustained decline in natural gas prices and its effect on wholesale and retail electricity prices in ERCOT. Further, the remaining natural gas hedges that TCEH entered into when forward market prices of natural gas were significantly higher than current prices will mature in 2013 and 2014.  These market conditions challenge the long-term profitability and operating cash flows of EFCH's and its subsidiaries' business and the ability to support their significant interest payments and debt maturities, and could adversely impact their ability to obtain additional liquidity and service, refinance and/or extend the maturities of their outstanding debt.

Note 5 provides the details of debt activity in 2013 and the principal amounts and maturity dates of EFCH's and its consolidated subsidiaries' short-term borrowings and long-term debt, which includes the maturity of  $3.8 billion of the TCEH Term Loan Facilities in October 2014. At September 30, 2013, TCEH has $1.3 billion of cash and cash equivalents and  $171 million of available capacity under its letter of credit facility. Based on forward wholesale power prices in ERCOT, which are subject to the effects of changing market conditions, TCEH may not have sufficient liquidity, absent any financing transactions, to meet its obligations within the next twelve months.

### EFH Corp. Discussions with Creditors

EFH Corp. and its subsidiaries, other than Oncor Holdings and its subsidiaries (the Oncor Ring-Fenced Entities) continue to consider and evaluate possible transactions and initiatives to address their highly leveraged balance sheets and significant cash interest requirements and have entered into discussions with their lenders and bondholders with respect to such transactions and initiatives.  These transactions and initiatives may include, among others, debt for debt exchanges, recapitalizations, amendments to and extensions of debt obligations and exchanges or conversions of debt for preferred or common equity or warrants, including exchanges or conversions of debt of EFH Corp., EFIH, EFCH and TCEH into preferred or common equity or warrants of EFH Corp., EFIH, EFCH, TCEH and/or any of their subsidiaries.  These actions could result in holders of EFH Corp., EFIH, EFCH and TCEH debt instruments not recovering the full principal amount of those obligations.

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

In March and April 2013, EFH Corp. engaged in discussions with certain unaffiliated holders of first lien senior secured claims against EFCH, TCEH and certain of TCEH's subsidiaries (the TCEH Creditors) with respect to proposed changes to its capital structure.  No agreement was reached as part of those discussions, and in September and October 2013, EFH Corp. engaged in further discussions with the TCEH Creditors, certain unaffiliated holders of unsecured claims against EFIH and a significant creditor with claims against TCEH, EFCH, EFIH and EFH Corp. (collectively, the Creditors) with respect to its capital structure, including the possibility of a consensual, prepackaged restructuring transaction.  EFH Corp.'s objectives in these discussions were to promote a sustainable capital structure and maximize enterprise value of EFH Corp. and its subsidiaries by, among other things, encouraging agreement on a restructuring plan that would minimize time spent in a restructuring through a proactive and organized solution; minimizing any potential adverse tax impacts of a restructuring; maintaining EFH Corp. in one consolidated group; maintaining focus on operating its businesses, and maintaining EFH Corp.'s high-performing work force.

EFH Corp. and the Creditors discussed a number of proposed changes to EFH Corp.'s capital structure.  Certain proposals contemplated that some combination of EFH Corp. and certain of its subsidiaries (including EFIH, EFCH and TCEH but excluding the Oncor Ring-Fenced Entities) would implement a plan of reorganization by commencing one or more voluntary cases under Chapter 11 of the United States Bankruptcy Code (the Code).  Such proposals would have resulted in a prenegotiated restructuring of EFCH's approximately  $32.2 billion principal amount of debt, EFH Corp.'s approximately  $650 million principal amount of debt and EFIH's approximately  $7.6 billion principal amount of debt (each as of September 30, 2013 and excluding debt held by affiliates) and contemplated that after the restructuring EFH Corp. would continue to hold all of the equity interests in EFCH and EFIH; EFCH would continue to hold all of the equity interests in TCEH; and EFIH would continue to hold all of the equity interests in Oncor Holdings.  Another proposal contemplated that EFIH (excluding Oncor Holdings and its subsidiaries) would implement a plan of reorganization by commencing a stand-alone voluntary case under the Code.  Such proposal contemplated that after the restructuring certain creditors of EFIH would own a substantial majority of, and certain creditors of EFH Corp. and the equity holders of EFH Corp. would collectively own a minority of, the equity interests in EFIH.  The confirmation of any plans of reorganization in such cases would be subject to applicable regulatory approvals.  EFH Corp. and the Creditors have not reached agreement on the terms of any change in our capital structure.

EFH Corp. is not currently engaged in ongoing negotiations with the principals of any of the Creditors.  Although the Creditors are not currently engaged in ongoing negotiations with EFH Corp., certain of the Creditors have directed their advisors to continue to work with EFH Corp. and its advisors to explore further whether the parties can reach an agreement on the terms of a consensual restructuring.  EFH Corp. will continue to consider and evaluate a range of future changes to its capital structure, in addition to the proposed changes described above, which may include filing a voluntary case under Chapter 11 of the Code for some or all of EFH Corp. and its subsidiaries (excluding the Oncor Ring-Fenced Entities).

### Basis of Presentation

The condensed consolidated financial statements have been prepared in accordance with US GAAP and on the same basis as the audited financial statements included in our 2012 Form 10-K. Adjustments (consisting of normal recurring accruals) necessary for a fair presentation of the results of operations and financial position have been included therein.  All intercompany items and transactions have been eliminated in consolidation.  Any acquisitions of outstanding debt for cash, including notes that had been issued in lieu of cash interest, are presented in the financing activities section of the statement of cash flows. Certain information and footnote disclosures normally included in annual consolidated financial statements prepared in accordance with US GAAP have been omitted pursuant to the rules and regulations of the SEC.  Because the condensed consolidated interim financial statements do not include all of the information and footnotes required by US GAAP, they should be read in conjunction with the audited financial statements and related notes included in our 2012 Form 10-K. The results of operations for an interim period may not give a true indication of results for a full year.  All dollar amounts in the financial statements and tables in the notes are stated in millions of US dollars unless otherwise indicated.

### Use of Estimates

Preparation of financial statements requires estimates and assumptions about future events that affect the reporting of assets and liabilities at the balance sheet dates and the reported amounts of revenue and expense, including fair value measurements.  In the event estimates and/or assumptions prove to be different from actual amounts, adjustments are made in subsequent periods to reflect more current information.

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## 2. VARIABLE INTEREST ENTITIES

A variable interest entity (VIE) is an entity with which we have a relationship or arrangement that indicates some level of control over the entity or results in economic risks to us.  Accounting standards require consolidation of a VIE if we have (a) the power to direct the significant activities of the VIE and (b) the right or obligation to absorb profit and loss from the VIE (primary beneficiary).  In determining the appropriateness of consolidation of a VIE, we evaluate its purpose, governance structure, decision making processes and risks that are passed on to its interest holders.  We also examine the nature of any related party relationships among the interest holders of the VIE and the nature of any special rights granted to the interest holders of the VIE.  There are no material investments accounted for under the equity or cost method.

As discussed below, our balance sheet includes assets and liabilities of VIEs that meet the consolidation standards.  The maximum exposure to loss from our interests in VIEs does not exceed our carrying value.

### *Consolidated VIEs*

See discussion in Note 4 regarding the VIE related to our accounts receivable securitization program that is consolidated under the accounting standards. We also consolidate Comanche Peak Nuclear Power Company LLC (CPNPC), which was formed by subsidiaries of TCEH and Mitsubishi Heavy Industries Ltd. (MHI) for the purpose of developing two new nuclear generation units at our existing Comanche Peak nuclear-fueled generation facility using MHI's US-Advanced Pressurized Water Reactor technology and to obtain a combined operating license from the NRC.  CPNPC is currently financed through capital contributions from the subsidiaries of TCEH and MHI that hold 88% and 12% of CPNPC's equity interests, respectively (see Note 7).

The carrying amounts and classifications of the assets and liabilities related to our consolidated VIEs are as follows:

| Assets: | September 30, 2013 | December 31, 2012 | Liabilities: | September 30, 2013 | December 31, 2012 |
|---|---|---|---|---|---|
| Cash and cash equivalents | $ 37 | $ 43 | Short-term borrowings | $ 172 | $ 82 |
| Accounts receivable | 573 | 445 | Trade accounts payable | 1 | 1 |
| Property, plant and equipment | 138 | 134 | Other current liabilities | 13 | 7 |
| Other assets, including $3 million and $12 million of current assets | 12 | 16 | | | |
| Total assets | $ 760 | $ 638 | Total liabilities | $ 186 | $ 90 |

The assets of our consolidated VIEs can only be used to settle the obligations of the VIE, and the creditors of our consolidated VIEs do not have recourse to our assets to settle the obligations of the VIE.

6

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## 3. GOODWILL AND IDENTIFIABLE INTANGIBLE ASSETS

### Goodwill

The following table provides information regarding our goodwill balance, which arose in connection with accounting for the Merger.  There were no changes to the goodwill balance for the three and nine months ended September 30, 2013.  None of the goodwill is being deducted for tax purposes.

| | |
|---|---:|
| Goodwill before impairment charges | $ 18,322 |
| Accumulated impairment charges | (13,370) |
| Balance at September 30, 2013 and December 31, 2012 | $ 4,952 |

In the first quarter 2013, we finalized the fair value calculations supporting the  $1.2 billion noncash goodwill impairment charge that was recorded in the fourth quarter 2012. No additional impairment was recorded.

We have determined that in consideration of our most recent forecasts of wholesale power prices in ERCOT, the likelihood of a goodwill impairment has increased. We have initiated an evaluation of goodwill as of September 30, 2013, which will be completed in the fourth quarter 2013 and could result in a noncash goodwill impairment charge in that period.

### Identifiable Intangible Assets

Identifiable intangible assets, including amounts that arose in connection with accounting for the Merger, are comprised of the following:

| Identifiable Intangible Asset | September 30, 2013 | | | December 31, 2012 | | |
|---|---:|---:|---:|---:|---:|---:|
| | Gross Carrying Amount | Accumulated Amortization | Net | Gross Carrying Amount | Accumulated Amortization | Net |
| Retail customer relationship | $ 463 | $ 396 | $ 67 | $ 463 | $ 378 | $ 85 |
| Favorable purchase and sales contracts | 551 | 333 | 218 | 552 | 314 | 238 |
| Software and other computer-related assets | 348 | 145 | 203 | 320 | 112 | 208 |
| Environmental allowances and credits | 598 | 407 | 191 | 594 | 393 | 201 |
| Mining development costs | 196 | 105 | 91 | 163 | 82 | 81 |
| Total identifiable intangible assets subject to amortization | $ 2,156 | $ 1,386 | 770 | $ 2,092 | $ 1,279 | 813 |
| Retail trade name (not subject to amortization) | | | 955 | | | 955 |
| Mineral interests (not currently subject to amortization) | | | 11 | | | 13 |
| Total identifiable intangible assets | | | $ 1,736 | | | $ 1,781 |

Amortization expense related to identifiable intangible assets (including income statement line item) consisted of:

| Identifiable Intangible Asset | Income Statement Line | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---:|---:|---:|---:|
| | | 2013 | 2012 | 2013 | 2012 |
| Retail customer relationship | Depreciation and amortization | $ 6 | $ 8 | $ 18 | $ 25 |
| Favorable purchase and sales contracts | Operating revenues/fuel, purchased power costs and delivery fees | 6 | 5 | 19 | 20 |
| Software and other computer-related assets | Depreciation and amortization | 14 | 9 | 33 | 24 |
| Environmental allowances and credits | Fuel, purchased power costs and delivery fees | 5 | 6 | 11 | 15 |
| Mining development costs | Depreciation and amortization | 8 | 7 | 23 | 20 |
| Total amortization expense | | $ 39 | $ 35 | $ 104 | $ 104 |

7

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

***Estimated Amortization of Identifiable Intangible Assets*** — The estimated aggregate amortization expense of identifiable intangible assets for each of the next five fiscal years is as follows:

| Year | Estimated Amortization Expense | |
|---|---|---|
| 2013 | $ | 143 |
| 2014 | $ | 138 |
| 2015 | $ | 126 |
| 2016 | $ | 101 |
| 2017 | $ | 78 |

8

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**4. TRADE ACCOUNTS RECEIVABLE AND ACCOUNTS RECEIVABLE SECURITIZATION PROGRAM**

On October 29, 2013, we terminated the Accounts Receivable Securitization Program, described in the following paragraphs, and repaid all outstanding obligations under the program. In connection with the termination of the program, TXU Energy repurchased $491 million in accounts receivable from TXU Energy Receivables Company LLC (TXU Energy Receivables Company) for an aggregate purchase price of $474 million, TXU Energy Receivables Company paid TXU Energy $11 million, constituting repayment in full of its outstanding obligations under its subordinated note with TXU Energy, and TXU Energy Receivables Company repaid all of its borrowings from a financial institution providing the financing for the program totaling $126 million.

Under the Accounts Receivable Securitization Program, TXU Energy (originator) sold all of its trade accounts receivable to TXU Energy Receivables Company, which was an entity created for the special purpose of purchasing receivables from the originator and is a consolidated, wholly owned, bankruptcy-remote subsidiary of TCEH. TXU Energy Receivables Company borrowed funds from a financial institution using the accounts receivable as collateral.

The trade accounts receivable amounts under the program are reported in the financial statements as pledged balances, and the related funding amounts are reported as short-term borrowings.

The maximum funding amount available under the program at September 30, 2013 was $200 million, which approximated the expected usage and applied only to receivables related to non-executory retail sales contracts. Program funding increased to $172 million at September 30, 2013 from $82 million at December 31, 2012. Because TCEH's credit ratings were lower than Ba3/BB-, under the terms of the program available funding was reduced by the amount of customer deposits held by the originator, which totaled $33 million at September 30, 2013.

TXU Energy Receivables Company issued a subordinated note payable to the originator in an amount equal to the difference between the face amount of the accounts receivable purchased, less a discount, and cash paid to the originator. Because the subordinated note was limited to 25% of the uncollected accounts receivable purchased, and the amount of borrowings was limited by terms of the financing agreement, any additional funding to purchase the receivables was sourced from cash on hand, which totaled $37 million at September 30, 2013, and/or capital contributions from TCEH. Under the program, the subordinated note issued by TXU Energy Receivables Company was subordinated to the security interests of the financial institution. The balance of the subordinated note payable, which was eliminated in consolidation, totaled $93 million and $97 million at September 30, 2013 and December 31, 2012, respectively.

All new trade receivables under the program generated by the originator were continuously purchased by TXU Energy Receivables Company with the proceeds from collections of receivables previously purchased and, as necessary, increased borrowings or funding sources as described immediately above. Changes in the amount of borrowings by TXU Energy Receivables Company reflected seasonal variations in the level of accounts receivable, changes in collection trends and other factors such as changes in sales prices and volumes.

The discount from face amount on the purchase of receivables from the originator principally funded program fees paid to the financial institution. The program fees consisted primarily of interest costs on the underlying financing and are reported as interest expense and related charges. The discount also funded a servicing fee, which is reported as SG&A expense, paid by TXU Energy Receivables Company to TXU Energy, which provided recordkeeping services and was the collection agent under the program.

Program fee amounts were as follows:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2013 | 2012 | 2013 | 2012 |
| Program fees | $    3 | $    2 | $    6 | $    6 |
| Program fees as a percentage of average funding (annualized) | 5.1% | 4.9% | 5.8% | 6.2% |

9

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Activities of TXU Energy Receivables Company and its predecessor, TXU Receivables Company, were as follows:

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2013 | 2012 |
| Cash collections on accounts receivable | $ 3,200 | $ 3,501 |
| Face amount of new receivables purchased (a) | (3,328) | (3,571) |
| Discount from face amount of purchased receivables | 29 | 8 |
| Program fees paid to financial institution | (6) | (6) |
| Servicing fees paid for recordkeeping and collection services | — | (2) |
| Decrease in subordinated notes payable | (4) | (10) |
| Increase in cash held | 17 | — |
| Other — net | 2 | — |
| Cash flows provided to originator under the program | $ (90) | $ (80) |

_____
(a)  Net of allowance for uncollectible accounts.

### Trade Accounts Receivable

| | September 30, 2013 | December 31, 2012 |
| --- | --- | --- |
| Wholesale and retail trade accounts receivable | $ 813 | $ 719 |
| Allowance for uncollectible accounts | (17) | (9) |
| Trade accounts receivable — reported in balance sheet, including $573 and $445 in pledged retail receivables | $ 796 | $ 710 |

Gross trade accounts receivable at September 30, 2013 and December 31, 2012 included unbilled revenues of $272 million and $260 million, respectively.

### Allowance for Uncollectible Accounts Receivable

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2013 | 2012 |
| Allowance for uncollectible accounts receivable at beginning of period | $ 9 | $ 27 |
| Increase for bad debt expense | 23 | 20 |
| Decrease for account write-offs | (15) | (32) |
| Allowance for uncollectible accounts receivable at end of period | $ 17 | $ 15 |

10

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## 5. SHORT-TERM BORROWINGS AND LONG-TERM DEBT

### Short-Term Borrowings

At September 30, 2013, outstanding short-term borrowings totaled $2.226 billion, which included $2.054 billion under the TCEH Revolving Credit Facility at a weighted average interest rate of 4.68%, excluding customary fees, and $172 million under the accounts receivable securitization program. On October 29, 2013, we terminated the accounts receivable securitization program and repaid all outstanding obligations under the program (see Note 4).

At December 31, 2012, outstanding short-term borrowings totaled $2.136 billion, which included $2.054 billion under the TCEH Revolving Credit Facility at a weighted average interest rate of 4.40%, excluding customary fees, and $82 million under the accounts receivable securitization program.

### Credit Facilities

Credit facilities and related cash borrowings at September 30, 2013 are presented below.  Available letter of credit capacity totaled $171 million at September 30, 2013 as discussed below. The facilities are all senior secured facilities of TCEH.

| Facility | Maturity Date | September 30, 2013 | | | |
| | | Facility Limit | Letters of Credit | Cash Borrowings | Availability |
|---|---|---|---|---|---|
| TCEH Revolving Credit Facility (a) | October 2016 | $ 2,054 | $ — | $ 2,054 | $ — |
| TCEH Letter of Credit Facility (b) | October 2017 (b) | 1,062 | — | 1,062 | |
| Total TCEH | | $ 3,116 | $ — | $ 3,116 | $ — |

_____

(a)   Facility used for borrowings for general corporate purposes.  Borrowings are classified as short-term borrowings.  At September 30, 2013, borrowings under the facility bear interest at LIBOR plus 4.50%, and a commitment fee is payable quarterly in arrears at a rate per annum equal to 1.00% of the average daily unused portion of the facility.  In January 2013, commitments previously maturing in 2013 were extended to 2016 as discussed below.

(b)   Facility, $42 million of which matures in October 2014, used for issuing letters of credit for general corporate purposes, including, but not limited to, providing collateral support under hedging arrangements and other commodity transactions that are not secured by a first-lien interest in the assets of TCEH. The borrowings under this facility have been recorded by TCEH as restricted cash that supports issuances of letters of credit and are classified as long-term debt. At September 30, 2013, the restricted cash totaled $947 million, after reduction for a $115 million letter of credit drawn in 2009 related to an office building financing. At September 30, 2013, the restricted cash supports $776 million in letters of credit outstanding, leaving $171 million in available letter of credit capacity.

*Amendment and Extension of TCEH Revolving Credit Facility* — In January 2013, the Credit Agreement governing the TCEH Senior Secured Facilities was amended to extend the maturity date of the $645 million of commitments maturing in October 2013 to October 2016, bringing the maturity date of all commitments under the TCEH Revolving Credit Facility totaling $2.054 billion to October 2016. The extended commitments have the same terms and conditions as the existing commitments expiring in October 2016 under the Credit Agreement.  Fees in consideration for the extension were settled through the incurrence of $340 million principal amount of incremental term loans under the TCEH Term Loan Facilities maturing in October 2017.  In connection with the extension request, TCEH eliminated its ability to draw letters of credit under the TCEH Revolving Credit Facility.  At the date of the extension, there were no outstanding letters of credit under the TCEH Revolving Credit Facility.

11

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

**Long-Term Debt**

At September 30, 2013 and December 31, 2012, long-term debt consisted of the following:

| | September 30, 2013 | December 31, 2012 |
|---|---|---|
| **TCEH** | | |
| Senior Secured Facilities: | | |
| 3.710% TCEH Term Loan Facilities maturing October 10, 2014 (a)(b) | $ 3,809 | $ 3,809 |
| 3.679% TCEH Letter of Credit Facility maturing October 10, 2014 (b) | 42 | 42 |
| 4.709% TCEH Term Loan Facilities maturing October 10, 2017 (a)(b)(c) | 15,710 | 15,370 |
| 4.679% TCEH Letter of Credit Facility maturing October 10, 2017 (b) | 1,020 | 1,020 |
| 11.5% Fixed Senior Secured Notes due October 1, 2020 | 1,750 | 1,750 |
| 15% Fixed Senior Secured Second Lien Notes due April 1, 2021 | 336 | 336 |
| 15% Fixed Senior Secured Second Lien Notes due April 1, 2021, Series B | 1,235 | 1,235 |
| 10.25% Fixed Senior Notes due November 1, 2015 (c) | 2,046 | 2,046 |
| 10.25% Fixed Senior Notes due November 1, 2015, Series B (c) | 1,442 | 1,442 |
| 10.50 / 11.25% Senior Toggle Notes due November 1, 2016 | 1,749 | 1,749 |
| Pollution Control Revenue Bonds: | | |
| Brazos River Authority: | | |
| 5.40% Fixed Series 1994A due May 1, 2029 | 39 | 39 |
| 7.70% Fixed Series 1999A due April 1, 2033 | 111 | 111 |
| 6.75% Fixed Series 1999B due September 1, 2034, remarketing date April 1, 2013 (d) | — | 16 |
| 7.70% Fixed Series 1999C due March 1, 2032 | 50 | 50 |
| 8.25% Fixed Series 2001A due October 1, 2030 | 71 | 71 |
| 8.25% Fixed Series 2001D-1 due May 1, 2033 | 171 | 171 |
| 0.089% Floating Series 2001D-2 due May 1, 2033 (e) | 97 | 97 |
| 0.210% Floating Taxable Series 2001I due December 1, 2036 (f) | 62 | 62 |
| 0.089% Floating Series 2002A due May 1, 2037 (e) | 45 | 45 |
| 6.75% Fixed Series 2003A due April 1, 2038, remarketing date April 1, 2013 (d) | — | 44 |
| 6.30% Fixed Series 2003B due July 1, 2032 | 39 | 39 |
| 6.75% Fixed Series 2003C due October 1, 2038 | 52 | 52 |
| 5.40% Fixed Series 2003D due October 1, 2029, remarketing date October 1, 2014 (d) | 31 | 31 |
| 5.00% Fixed Series 2006 due March 1, 2041 | 100 | 100 |
| Sabine River Authority of Texas: | | |
| 6.45% Fixed Series 2000A due June 1, 2021 | 51 | 51 |
| 5.20% Fixed Series 2001C due May 1, 2028 | 70 | 70 |
| 5.80% Fixed Series 2003A due July 1, 2022 | 12 | 12 |
| 6.15% Fixed Series 2003B due August 1, 2022 | 45 | 45 |
| Trinity River Authority of Texas: | | |
| 6.25% Fixed Series 2000A due May 1, 2028 | 14 | 14 |
| Unamortized fair value discount related to pollution control revenue bonds (g) | (107) | (112) |
| Other: | | |
| 7.48% Fixed Secured Facility Bonds with amortizing payments through January 2017 | 36 | — |
| 7.46% Fixed Secured Facility Bonds with amortizing payments through January 2015 | 4 | 12 |
| 7% Fixed Senior Notes due March 15, 2013 | — | 5 |
| Capital leases | 56 | 64 |
| Other | 3 | 3 |
| Unamortized discount | (110) | (10) |
| Unamortized fair value discount (g) | — | (1) |
| Total TCEH | 30,081 | 29,880 |

12

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| | September 30, 2013 | December 31, 2012 |
|---|---:|---:|
| EFCH (parent entity) | | |
| 9.58% Fixed Notes due in annual installments through December 4, 2019 (h) | $ 35 | $ 35 |
| 8.254% Fixed Notes due in quarterly installments through December 31, 2021 (h) | 35 | 39 |
| 1.065% Floating Rate Junior Subordinated Debentures, Series D due January 30, 2037 (b) | 1 | 1 |
| 8.175% Fixed Junior Subordinated Debentures, Series E due January 30, 2037 | 8 | 8 |
| Unamortized fair value discount (g) | (6) | (7) |
| Subtotal | 73 | 76 |
| EFH Corp. debt pushed down (i) | | |
| 10% Fixed Senior Notes due January 15, 2020 | — | 330 |
| 9.75% Fixed Senior Notes due October 15, 2019 | — | 58 |
| 10.875% Fixed Senior Notes due November 1, 2017 | 16 | 32 |
| 11.25 / 12.00% Senior Toggle Notes due November 1, 2017 | 14 | 30 |
| Subtotal — EFH Corp. debt pushed down | 30 | 450 |
| Total EFCH (parent entity) | 103 | 526 |
| Total EFCH consolidated | 30,184 | 30,406 |
| Less amount due currently | (32) | (96) |
| Less amount held by affiliates (Note 11) | (382) | (382) |
| Total long-term debt | $ 29,770 | $ 29,928 |

---

(a)   Interest rate swapped to fixed on $18.140 billion principal amount of maturities through October 2014 and up to an aggregate $12.6 billion principal amount from October 2014 through October 2017.

(b)   Interest rates in effect at September 30, 2013.

(c)   As discussed below and in Note 11, principal amounts of notes/term loans totaling $382 million at both September 30, 2013 and December 31, 2012 were held by EFH Corp. and EFIH.

(d)   These series are in the multiannual interest rate mode and are subject to mandatory tender prior to maturity on the mandatory remarketing date.  On such date, the interest rate and interest rate period will be reset for the bonds.

(e)   Interest rates in effect at September 30, 2013. These series are in a daily interest rate mode and are classified as long-term as they are supported by long-term irrevocable letters of credit.

(f)   Interest rate in effect at September 30, 2013. This series is in a weekly interest rate mode and is classified as long-term as it is supported by long-term irrevocable letters of credit.

(g)   Amount represents unamortized fair value adjustments recorded under purchase accounting.

(h)   EFCH's obligations with respect to these financings are guaranteed by EFH Corp. and secured on a first-priority basis by, among other things, an undivided interest in the Comanche Peak nuclear generation facility.

(i)   Represents 50% of the amount of these EFH Corp. securities guaranteed by, and pushed down to (pushed-down debt), EFCH (parent entity) per the discussion below under "Guarantees and Push Down of EFH Corp. Debt."

*Debt Amounts Due Currently*

Amounts due currently (within twelve months) at September 30, 2013 total $32 million and consist of scheduled installment payments on capital leases and debt securities.

*Debt Related Activity in 2013*

Principal amounts of long-term debt issued in the nine months ended September 30, 2013 consisted of $340 million principal amount of incremental term loans under the TCEH Term Loan Facilities discussed in "Amendment and Extension of TCEH Revolving Credit Facility" above.

Repayments of long-term debt in the nine months ended September 30, 2013 totaled $94 million and consisted of $86 million of payments of principal at scheduled maturity or mandatory tender and remarketing dates (including $60 million of pollution control revenue bond and $17 million of fixed secured facility bond payments) and $8 million of contractual payments under capital leases.

13

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

In April 2013, TCEH acquired for $40 million in cash the owner participant interest in a trust established to lease six natural gas-fueled combustion turbines to TCEH. The interest in the trust was held by an unaffiliated party. The trust was consolidated in the second quarter 2013. No gain or loss was recognized on the transaction. The estimated fair value of the combustion turbine assets of $83 million approximated the total of the estimated fair value of the debt assumed and cash paid. In recording the combustion turbine assets, the fair value was reduced by the remaining deferred lease liability and the unamortized lease valuation reserve established in accounting for the Merger, which were reversed and totaled $18 million. At June 30, 2013, the principal amount of the trust's debt totaled $45 million and is payable in semiannual installments through January 1, 2017.

***EFIH Debt Exchanges and Distributions Involving EFH Corp. Debt Guaranteed by EFCH*** (see discussion of debt guarantee below) — In exchanges in January 2013, EFIH and EFIH Finance issued $1.302 billion principal amount of EFIH 10% Senior Secured Notes due 2020 (EFIH 10% Notes) in exchange for $1.310 billion total principal amount of EFH Corp. and EFIH senior secured notes consisting of: (i) $113 million principal amount of EFH Corp. 9.75% Senior Secured Notes due 2019 (EFH Corp. 9.75% Notes), (ii) $1.058 billion principal amount of EFH Corp. 10% Senior Secured Notes due 2020 (EFH Corp. 10% Notes), and (iii) $139 million principal amount of EFIH senior secured notes.

In connection with these debt exchange transactions, EFH Corp. received the requisite consents from holders of the EFH Corp. 9.75% Notes and EFH Corp. 10% Notes to certain amendments to the respective indentures governing these notes. These amendments, among other things, made EFCH and EFIH unrestricted subsidiaries under the EFH Corp. 9.75% Notes and EFH Corp. 10% Notes, thereby eliminating EFCH's and EFIH's guarantees of the notes.

In additional exchanges in January 2013, EFIH and EFIH Finance issued $89 million principal amount of 11.25/12.25% Toggle Notes due 2018 (EFIH Toggle Notes) in exchange for $95 million total principal amount of EFH Corp. senior notes consisting of: (i) $31 million principal amount of EFH Corp. 10.875% Senior Notes due 2017 (EFH Corp. 10.875% Notes), (ii) $33 million principal amount of EFH Corp. 11.25%/12.00% Senior Toggle Notes due 2017 (EFH Corp. Toggle Notes) and (iii) $31 million principal amount of other EFH Corp. unsecured debt.

EFIH received a total of $1.266 billion principal amount of EFH Corp. debt in these exchanges.

In the first quarter 2013, EFIH distributed $6.360 billion principal amount of EFH Corp. debt guaranteed by EFCH that EFIH previously received in debt exchanges, including $1.235 billion (of the $1.266 billion) received in January 2013, as a dividend to EFH Corp., which cancelled the notes. The dividend included $1.715 billion principal amount of EFH Corp. 10.875% Notes, $3.474 billion principal amount of EFH Corp. Toggle Notes, $1.058 billion principal amount of EFH Corp. 10% Notes and $113 million principal amount of EFH Corp. 9.75% Notes.

### Guarantee and Push Down of EFH Corp. Debt

Merger-related debt of EFH Corp. and its subsidiaries consists of debt issued or existing at the time of the Merger. Debt issued in exchange for Merger-related debt is considered Merger-related. Debt issuances for cash are considered Merger-related debt to the extent the proceeds are used to repurchase Merger-related debt. EFCH and EFIH (excluding their subsidiaries) fully and unconditionally guarantee on a joint and several basis the Merger-related debt of EFH Corp. (parent). Such debt is subject to push down in accordance with SEC Staff Accounting Bulletin Topic 5-J, and as a result, a portion of such debt and related interest expense is reflected in our financial statements. Merger-related debt of EFH Corp. held by its subsidiaries is not subject to push down.

As a result of transactions in the first quarter 2013 discussed above, debt guaranteed and subject to push down at September 30, 2013 totals $60 million and consists of $33 million principal amount of EFH Corp. 10.875% Senior Notes and $27 million principal amount of EFH Corp. 11.25%/12.00% Senior Toggle Notes. The amount reflected in our balance sheet as pushed down debt ($30 million and $450 million at September 30, 2013 and December 31, 2012, respectively, as shown in the long-term debt table above) represents 50% of the principal amount of the EFH Corp. Merger-related debt guaranteed. This percentage reflects the fact that at the time of the Merger, the equity investments of EFCH and EFIH in their respective operating subsidiaries were essentially equal amounts. Because payment of principal and interest on the debt is the responsibility of EFH Corp., we record the settlement of such amounts as noncash capital contributions from EFH Corp.

14

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The following table presents an analysis of the total outstanding principal amount of EFH Corp. debt guaranteed by EFCH and EFIH at December 31, 2012 and September 30, 2013, respectively.

| | December 31, 2012 | | | | | |
|---|---|---|---|---|---|---|
| Securities Guaranteed (principal amounts) | Held by EFIH | Subject to Push Down | Not Merger-Related | Total Guaranteed | Debt Cancelled in 2013 | Total Guaranteed September 30, 2013 (c) |
| EFH Corp. 9.75% Senior Notes (a) | $ — | $ 115 | $ — | $ 115 | 113 | $ — |
| EFH Corp. 10% Senior Notes (a) | — | 661 | 400 | 1,061 | 1,058 | — |
| EFH Corp. 10.875% Senior Notes | 1,685 | 64 | — | 1,749 | 1,715 | 33 |
| EFH Corp. 11.25/12.00% Senior Toggle Notes | 3,441 | 60 | — | 3,501 | 3,474 | 27 |
| Subtotal | $ 5,126 | $ 900 | $ 400 | 6,426 | $ 6,360 | 60 |
| TCEH Demand Notes (b) | | | | 698 | | — |
| Total | | | | $ 7,124 | | $ 60 |

_____

(a) As a result of transactions completed in the first quarter 2013, as discussed above, the guarantees of the EFH Corp. 9.75% Notes and EFH Corp. 10% Notes were eliminated.

(b) The TCEH Demand Notes were settled in January 2013. See Note 11.

(c) These amounts are subject to push down.

*Information Regarding Other Significant Outstanding Debt*

*TCEH Senior Secured Facilities* — Borrowings under the TCEH Senior Secured Facilities totaled $22.635 billion at September 30, 2013 and consisted of:

- $3.809 billion of TCEH Term Loan Facilities maturing in October 2014 with interest payable at LIBOR plus 3.50%;
- $15.710 billion of TCEH Term Loan Facilities maturing in October 2017 with interest payable at LIBOR plus 4.50%;
- $42 million of cash borrowed under the TCEH Letter of Credit Facility maturing in October 2014 with interest payable at LIBOR plus 3.50% (see discussion under "Credit Facilities" above);
- $1.020 billion of cash borrowed under the TCEH Letter of Credit Facility maturing in October 2017 with interest payable at LIBOR plus 4.50% (see discussion under "Credit Facilities" above), and
- Amounts borrowed under the TCEH Revolving Credit Facility, which may be reborrowed from time to time until October 2016 and represent the entire amount of commitments under the facility totaling $2.054 billion at September 30, 2013. See "Credit Facilities" above for discussion regarding the maturity date extension of $645 million in commitments from 2013 to 2016.

Each of the loans described above that matures in 2016 or 2017 includes a "springing maturity" provision pursuant to which (i) in the event that more than $500 million aggregate principal amount of the TCEH 10.25% Notes due in 2015 (other than notes held by EFH Corp. or its controlled affiliates at March 31, 2011 to the extent held at the determination date as defined in the Credit Agreement) or more than $150 million aggregate principal amount of the TCEH Toggle Notes due in 2016 (other than notes held by EFH Corp. or its controlled affiliates at March 31, 2011 to the extent held at the determination date as defined in the Credit Agreement), as applicable, remain outstanding as of 91 days prior to the maturity date of the applicable notes and (ii) TCEH's total debt to Adjusted EBITDA ratio (as defined in the TCEH Senior Secured Facilities) is greater than 6.00 to 1.00 at the applicable determination date, then the maturity date of the extended loans will automatically change to 90 days prior to the maturity date of the applicable notes.

Under the terms of the TCEH Senior Secured Facilities, the commitments of the lenders to make loans to TCEH are several and not joint. Accordingly, if any lender fails to make loans to TCEH, TCEH's available liquidity could be reduced by an amount up to the aggregate amount of such lender's commitments under the TCEH Senior Secured Facilities.

The TCEH Senior Secured Facilities are fully and unconditionally guaranteed jointly and severally on a senior secured basis by EFCH, and subject to certain exceptions, each existing and future direct or indirect wholly owned US subsidiary of TCEH. The TCEH Senior Secured Facilities, along with the TCEH Senior Secured Notes and certain commodity hedging transactions and the interest rate swaps described under "TCEH Interest Rate Swap Transactions" below, are secured on a first-priority basis by (i) substantially all of the current and future assets of TCEH and TCEH's subsidiaries who are guarantors of such facilities and (ii) pledges of the capital stock of TCEH and certain current and future direct or indirect subsidiaries of TCEH.

15

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

***TCEH 11.5% Senior Secured Notes*** — At September 30, 2013, the principal amount of the TCEH 11.5% Senior Secured Notes totaled  $1.750 billion. The notes mature in October 2020, with interest payable in cash quarterly in arrears on January 1, April 1, July 1 and October 1, at a fixed rate of 11.5% per annum. The notes are fully and unconditionally guaranteed on a joint and several basis by EFCH and each subsidiary of TCEH that guarantees the TCEH Senior Secured Facilities (collectively, the Guarantors).  The notes are secured, on a first-priority basis, by security interests in all of the assets of TCEH, and the guarantees are secured on a first-priority basis by all of the assets and equity interests held by the Guarantors, in each case, to the extent such assets and equity interests secure obligations under the TCEH Senior Secured Facilities (the TCEH Collateral), subject to certain exceptions and permitted liens.

The notes are (i) senior obligations and rank equally in right of payment with all senior indebtedness of TCEH, (ii) senior in right of payment to all existing or future unsecured and second-priority secured debt of TCEH to the extent of the value of the TCEH Collateral and (iii) senior in right of payment to any future subordinated debt of TCEH.  These notes are effectively subordinated to all secured obligations of TCEH that are secured by assets other than the TCEH Collateral, to the extent of the value of the assets securing such obligations.

***TCEH 15% Senior Secured Second Lien Notes  (including Series B)*** — At September 30, 2013, the principal amount of the TCEH 15% Senior Secured Second Lien Notes totaled $1.571 billion. These notes mature in April 2021, with interest payable in cash quarterly in arrears on January 1, April 1, July 1 and October 1 at a fixed rate of 15% per annum. The notes are fully and unconditionally guaranteed on a joint and several basis by EFCH and, subject to certain exceptions, each subsidiary of TCEH that guarantees the TCEH Senior Secured Facilities.  The notes are secured, on a second-priority basis, by security interests in all of the assets of TCEH, and the guarantees (other than the guarantee of EFCH) are secured on a second-priority basis by all of the assets and equity interests of all of the Guarantors other than EFCH (collectively, the Subsidiary Guarantors), in each case, to the extent such assets and security interests secure obligations under the TCEH Senior Secured Facilities on a first-priority basis, subject to certain exceptions (including the elimination of the pledge of equity interests of any Subsidiary Guarantor to the extent that separate financial statements would be required to be filed with the SEC for such Subsidiary Guarantor under Rule 3-16 of Regulation S-X) and permitted liens.  The guarantee from EFCH is not secured.

The notes are senior obligations of the issuer and rank equally in right of payment with all senior indebtedness of TCEH, are senior in right of payment to all existing or future unsecured debt of TCEH to the extent of the value of the TCEH Collateral (after taking into account any first-priority liens on the TCEH Collateral) and are senior in right of payment to any future subordinated debt of TCEH.  These notes are effectively subordinated to TCEH's obligations under the TCEH Senior Secured Facilities, the TCEH Senior Secured Notes and TCEH's commodity and interest rate hedges that are secured by a first-priority lien on the TCEH Collateral and any future obligations subject to first-priority liens on the TCEH Collateral, to the extent of the value of the TCEH Collateral, and to all secured obligations of TCEH that are secured by assets other than the TCEH Collateral, to the extent of the value of the assets securing such obligations.

***TCEH 10.25% Senior Notes (including Series B) and 10.50/11.25% Senior Toggle Notes (collectively, the TCEH Senior Notes*** ) — At September 30, 2013, the principal amount of the TCEH Senior Notes totaled $5.237 billion, including $363 million aggregate principal amount held by EFH Corp. and EFIH, and the notes are fully and unconditionally guaranteed on a joint and several unsecured basis by TCEH's direct parent, EFCH (which owns 100% of TCEH), and by each subsidiary that guarantees the TCEH Senior Secured Facilities.  The TCEH 10.25% Notes mature in November 2015, with interest payable in cash semi-annually in arrears on May 1 and November 1 at a fixed rate of 10.25% per annum.  The TCEH Toggle Notes mature in November 2016, with interest payable semi-annually in arrears on May 1 and November 1 at a fixed rate of 10.50% per annum.

### Fair Value of Long-Term Debt

At September 30, 2013 and December 31, 2012, the estimated fair value of our long-term debt (excluding capital leases) totaled  $15.873 billion and $17.858 billion, respectively, and the carrying amount totaled $30.128 billion and $30.342 billion, respectively. At September 30, 2013 and December 31, 2012, the estimated fair value of our short-term borrowings under the TCEH Revolving Credit Facilities totaled  $1.371 billion a n d $1.500 billion, respectively, and the carrying amount totaled $2.054 billion. We determine fair value in accordance with accounting standards as discussed in Note 8, and at September 30, 2013, our debt fair value represents Level 2 valuations.  We obtain security pricing from a vendor who uses broker quotes and third-party pricing services to determine fair values.  Where relevant, these prices are validated through subscription services such as Bloomberg.

16

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### TCEH Interest Rate Swap Transactions

TCEH employs interest rate swaps to hedge exposure to its variable rate debt.  As reflected in the table below, at September 30, 2013, TCEH has entered into the following series of interest rate swap transactions that effectively fix the interest rates at between  5.5% and 9.3%.

| Fixed Rates | Expiration Dates | Notional Amount |
|---|---|---|
| 5.5%  -  9.3% | October 2013 through October 2014 | $ 18.140  billion (a) |
| 6.8%  -  9.0% | October 2015 through October 2017 | $12.600  billion (b) |

(a)  Swaps related to an aggregate $1.6 billion principal amount of debt expired in 2013.  Per the terms of the transactions, the notional amount of swaps entered into in 2011 grew by $1.280 billion in 2013, substantially offsetting the expired swaps.

(b)  These swaps are effective from October 2014 through October 2017.  The $12.6 billion notional amount of swaps includes $3 billion that expires in October 2015 with the remainder expiring in October 2017.

TCEH has also entered into interest rate basis swap transactions that further reduce the fixed borrowing costs achieved through the interest rate swaps. Basis swaps in effect at September 30, 2013 totaled $11.967 billion notional amount. The basis swaps relate to debt outstanding through 2014.

The interest rate swap counterparties are secured on an equal and ratable basis by the same collateral pledged to the lenders under the TCEH Senior Secured Facilities and the TCEH Senior Secured Notes.

The interest rate swaps have resulted in net gains (losses) reported in interest expense and related charges as follows:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2013 | 2012 | 2013 | 2012 |
| Realized net loss | $          (160) | $          (168) | $          (466) | $          (505) |
| Unrealized net gain (loss) | 413 | (20) | 899 | (16) |
| Total | $          253 | $          (188) | $          433 | $          (521) |

The cumulative unrealized mark-to-market net liability related to all TCEH interest rate swaps totaled  $1.167 billion and $2.065 billion at September 30, 2013 and December 31, 2012, respectively, of which $57 million and $65 million (both pretax), respectively, were reported in accumulated other comprehensive income. See Note 8.

17

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

## 6. COMMITMENTS AND CONTINGENCIES

*Guarantees*

We have entered into contracts that contain guarantees to unaffiliated parties that could require performance or payment under certain conditions.  Material guarantees are discussed below.

See Note 5 for discussion of guarantees and security for certain of our debt and EFCH guarantees of certain EFH Corp. debt.

*Letters of Credit*

At September 30, 2013, TCEH had outstanding letters of credit under its credit facilities totaling  $776 million as follows:

- $353 million to support risk management and trading margin requirements in the normal course of business, including over-the-counter hedging transactions and collateral postings with ERCOT;
- $208 million to support floating rate pollution control revenue bond debt with an aggregate principal amount of  $204 million (the letters of credit are available to fund the payment of such debt obligations and expire in 2014);
- $65 million to support TCEH's REP financial requirements with the PUCT, and
- $150 million for miscellaneous credit support requirements.

*Litigation*

Aurelius Capital Master, Ltd. and ACP Master, Ltd. (Aurelius) filed a lawsuit in March 2013, amended in May 2013, in the United States District Court for the Northern District of Texas (Dallas Division) against EFCH as a nominal defendant and each of the current directors and a former director of EFCH. In the lawsuit, Aurelius, as a creditor under the TCEH Senior Secured bonds, both of which are guaranteed by EFCH, filed a derivative claim against EFCH and its directors. Aurelius alleges that the directors of EFCH breached their fiduciary duties to EFCH and its creditors, including Aurelius, by permitting TCEH to make certain loans "without collecting fair and reasonably equivalent value."  The lawsuit seeks recovery for the benefit of EFCH. EFCH and the directors have filed a motion to dismiss this lawsuit, which has been fully briefed and is pending before the district court. We cannot predict the outcome of this proceeding, including the financial effects, if any.

***Litigation Related to Generation Facilities*** — In November 2010, an administrative appeal challenging the decision of the TCEQ to renew and amend Oak Grove Management Company LLC's (Oak Grove) (a wholly owned subsidiary of TCEH) Texas Pollutant Discharge Elimination System (TPDES) permit related to water discharges was filed by Robertson County: Our Land, Our Lives and Roy Henrichson in the Travis County, Texas District Court. Plaintiffs sought a reversal of the TCEQ's order and a remand back to the TCEQ for further proceedings.  The district court affirmed the TCEQ's issuance of the TPDES permit to Oak Grove. In December 2012, plaintiffs appealed the district court's decision to the Third Court of Appeals in Austin, Texas.  The case has been fully briefed, but the Court has not issued a decision and no date for oral argument has been scheduled.  While we cannot predict the timing or outcome of this proceeding, we believe the renewal and amendment of the Oak Grove TPDES permit are protective of the environment and were in accordance with applicable law.

In September 2010, the Sierra Club filed a lawsuit in the United States District Court for the Eastern District of Texas (Texarkana Division) against EFH Corp. and Luminant Generation Company LLC (a wholly owned subsidiary of TCEH) for alleged violations of the Clean Air Act (CAA) at Luminant's Martin Lake generation facility. In May 2012, the Sierra Club filed a lawsuit in the US District Court for the Western District of Texas (Waco Division) against EFH Corp. and Luminant Generation Company LLC for alleged violations of the CAA at Luminant's Big Brown generation facility.  The Big Brown case is currently scheduled for trial in February 2014.  The Martin Lake case does not have a trial date.  While we are unable to estimate any possible loss or predict the outcome, we believe that the Sierra Club's claims are without merit, and we intend to vigorously defend these lawsuits.  In addition, in December 2010 and again in October 2011, the Sierra Club informed Luminant that it may sue Luminant for allegedly violating CAA provisions in connection with Luminant's Monticello generation facility. In May 2012, the Sierra Club informed us that it may sue us for allegedly violating CAA provisions in connection with Luminant's Sandow 4 generation facility. While we cannot predict whether the Sierra Club will actually file suit regarding Monticello or Sandow 4 or the outcome of any resulting proceedings, we believe we have complied with the requirements of the CAA at all of our generation facilities.

18

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

*Litigation Related to EPA Reviews* — In June 2008, the EPA issued an initial request for information to TCEH under the EPA's authority under Section 114 of the CAA. The stated purpose of the request is to obtain information necessary to determine compliance with the CAA, including New Source Review Standards and air permits issued by the TCEQ for the Big Brown, Monticello and Martin Lake generation facilities.  In April 2013, we received an additional information request from the EPA under Section 114 related to the Big Brown, Martin Lake and Monticello facilities as well as an initial information request related to the Sandow 4 generation facility.  Historically, as the EPA has pursued its New Source Review enforcement initiative, companies that have received a large and broad request under Section 114, such as the request received by TCEH, have in many instances subsequently received a notice of violation from the EPA, which has in some cases progressed to litigation or settlement.

In July 2012, the EPA sent us a notice of violation alleging noncompliance with the CAA's New Source Review Standards and the air permits at our Martin Lake and Big Brown generation facilities.  In September 2012, we filed a petition for review in the United States Court of Appeals for the Fifth Circuit (Fifth Circuit Court) seeking judicial review of the EPA's notice of violation.  Given recent legal precedent subjecting agency orders like the notice of violation to judicial review, we filed the petition for review to preserve our ability to challenge the EPA's issuance of the notice and its defects.  In October 2012, the EPA filed a motion to dismiss our petition.  In December 2012, the Fifth Circuit Court issued an order that will delay a ruling on the EPA's motion to dismiss until after the case has been fully briefed and oral argument, if any, is held.

In July 2013, the EPA sent us a second notice of violation alleging noncompliance with the CAA's New Source Review Standards at our Martin Lake and Big Brown generation facilities.  In July 2013, we filed a petition for review in the Fifth Circuit Court seeking judicial review of the EPA's July 2013 notice of violation.  In September 2013, the Fifth Circuit Court consolidated the petitions for review of the July 2012 and July 2013 notices of violation and established a briefing schedule for the consolidated cases.

In August 2013, the United States Department of Justice, acting as the attorneys for the EPA, filed a civil enforcement lawsuit against Luminant Generation Company LLC and Big Brown Power Company LLC in federal district court in Dallas, alleging violations of the CAA at our Big Brown and Martin Lake generation facilities.  In September 2013, we filed a motion to stay this lawsuit pending the outcome of the Fifth Circuit Court's review of the July 2012 and July 2013 notices of violation.  We believe that we have complied with all requirements of the CAA and intend to vigorously defend these allegations. We cannot predict the outcome of these proceedings, including the financial effects, if any.

### Cross-State Air Pollution Rule (CSAPR)

In July 2011, the EPA issued the CSAPR, compliance with which would have required significant additional reductions of sulfur dioxide ($SO_2$) and nitrogen oxides ($NO_x$) emissions from our fossil-fueled generation units.  In September 2011, we filed a petition for review in the US Court of Appeals for the District of Columbia Circuit (D.C. Circuit Court) challenging the CSAPR as it applies to Texas.  If the CSAPR had taken effect, it would have caused us to, among other actions, idle two lignite/coal-fueled generation units and cease certain lignite mining operations by the end of 2011.

In February 2012, the EPA released a final rule (Final Revisions) and a proposed rule revising certain aspects of the CSAPR, including increases in the emissions budgets for Texas and our generation assets as compared to the July 2011 version of the rule.  In April 2012, we filed in the D.C. Circuit Court a petition for review of the Final Revisions on the ground, among others, that the rules do not include all of the budget corrections we requested from the EPA. The parties to the case agreed that the case should be held in abeyance pending the conclusion of the CSAPR rehearing proceeding discussed below.   In June 2012, the EPA finalized the proposed rule (Second Revised Rule).  As compared to the proposed revisions to the CSAPR issued by the EPA in October 2011, the Final Revisions and the Second Revised Rule finalize emissions budgets for our generation assets that are approximately  6% lower for $SO_2$, 3% higher for annual $NO_x$ and 2% higher for seasonal $NO_x$.

In August 2012, the D.C. Circuit Court vacated the CSAPR, remanding it to the EPA for further proceedings.  As a result, the CSAPR, the Final Revisions and the Second Revised Rule do not impose any immediate requirements on us, the State of Texas, or other affected parties.  The D.C. Circuit Court's order stated that the EPA was expected to continue administering the CAIR (the predecessor rule to the CSAPR) pending the EPA's further consideration of the rule. In October 2012, the EPA and certain other parties that supported the CSAPR filed petitions with the D.C. Circuit Court seeking review by the full court of the panel's decision to vacate and remand the CSAPR.  In January 2013, the D.C. Circuit Court denied these requests for rehearing, concluding the CSAPR rehearing proceeding.  In March 2013, the EPA and certain other parties that supported the CSAPR submitted petitions to the US Supreme Court seeking its review of the D.C. Circuit Court decision.  In June 2013, the US Supreme Court granted review of the D.C. Circuit Court's decision.  The court is scheduled to hear oral arguments in the case in December 2013.  We cannot predict the outcome of the review by the US Supreme Court.

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

[Table of Contents](#)

### State Implementation Plan (SIP)

In September 2010, the EPA disapproved a portion of the SIP pursuant to which the TCEQ implements its program to achieve the requirements of the CAA. The EPA disapproved the Texas standard permit for pollution control projects (PCP). We hold several permits issued pursuant to the TCEQ standard permit conditions for pollution control projects. We challenged the EPA's disapproval by filing a lawsuit in the Fifth Circuit Court arguing that the TCEQ's adoption of the standard permit conditions for pollution control projects was consistent with the CAA. In March 2012, the Fifth Circuit Court vacated the EPA's disapproval of the Texas standard permit for pollution control projects and remanded the matter to the EPA for expedited reconsideration. In September 2013, the State of Texas filed a motion with the Fifth Circuit Court requesting that the Court amend and enforce its judgment in this case by requiring the EPA to satisfy the Court's judgment by taking action on the pending SIP revision regarding Texas' PCP standard permit no later than December 31, 2013. We cannot predict the timing or outcome of the EPA's reconsideration, including the financial effects, if any.

In November 2010, the EPA disapproved a different portion of the SIP under which the TCEQ had been phasing out a long-standing exemption for certain emissions that unavoidably occur during startup, shutdown and maintenance activities and replacing that exemption with a more limited affirmative defense that will itself be phased out and replaced by TCEQ-issued generation facility-specific permit conditions. We, like many other electricity generation facility operators in Texas, have asserted applicability of the exemption or affirmative defense, and the TCEQ has not objected to that assertion. We have also applied for and received the generation facility-specific permit amendments. We challenged the EPA's disapproval of Texas' affirmative defense for planned maintenance, startup and shutdown by filing a lawsuit in the Fifth Circuit Court arguing that the TCEQ's adoption of the affirmative defense and phase-out of that affirmative defense as permits are issued is consistent with the CAA. In July 2012, the Fifth Circuit Court denied our challenge and ruled that the EPA's actions were in accordance with the CAA. In October 2012, the Fifth Circuit Court panel withdrew its opinion and issued a second, expanded opinion that again upheld the EPA's disapproval. In November 2012, we filed a petition with the Fifth Circuit Court asking for review by the full Fifth Circuit Court of the panel's second opinion. Other parties to the proceedings also filed a petition with the Fifth Circuit Court asking the panel to reconsider its decision. In March 2013, the Fifth Circuit Court panel withdrew its second opinion and issued a third opinion that again upheld the EPA's actions. In April 2013, the Fifth Circuit Court also denied our November 2012 petition for rehearing of the panel's second opinion and denied the request by other parties for the panel to reconsider its second decision. Following the issuance of the mandate, we filed a motion to recall the mandate, which was denied in a single-judge order. In June 2013, we submitted a petition to the US Supreme Court seeking its review of the Fifth Circuit Court's decision to uphold EPA's disapproval of Texas' affirmative defense for planned maintenance, startup and shutdown. In October 2013, the US Supreme Court denied our petition for review of that portion of the Fifth Circuit Court's decision. The decision is not anticipated to have a material effect on our results of operations, liquidity or financial condition.

### Other Matters

We are involved in various legal and administrative proceedings in the normal course of business, the ultimate resolutions of which, in the opinion of management, are not anticipated to have a material effect on our results of operations, liquidity or financial condition.

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

## 7. MEMBERSHIP INTERESTS/EQUITY

### Dividend Restrictions

While EFCH has no contractual dividend restrictions, the TCEH Senior Secured Facilities generally restrict TCEH from making any cash distribution to any of its parent companies for the ultimate purpose of making a cash distribution on their ownership interests unless at the time, and after giving effect to such distribution, TCEH's consolidated total debt (as defined in the TCEH Senior Secured Facilities) to Adjusted EBITDA would be equal to or less than 6.5 to 1.0. At September 30, 2013, the ratio was 10.6 to 1.0.

In addition, the TCEH Senior Secured Facilities and indentures governing the TCEH Senior Notes, TCEH Senior Secured Notes and TCEH Senior Secured Second Lien Notes generally restrict TCEH's ability to make distributions or loans to any of its parent companies, EFCH and EFH Corp., unless such distributions or loans are expressly permitted under the TCEH Senior Secured Facilities and the indentures governing such notes.

In addition, under applicable law, we are prohibited from paying any distribution to the extent that immediately following payment of such distribution, we would be insolvent.

### Noncontrolling Interests

As discussed in Note 2, we consolidate a joint venture formed in 2009 for the purpose of developing two new nuclear generation units, which results in a noncontrolling interests component of equity. Net loss attributable to the noncontrolling interests was immaterial for the nine months ended September 30, 2013 and 2012.

### Membership Interests/Equity

In April 2013, EFCH was converted from a Texas corporation to a Delaware limited liability company. The following tables present the changes to membership interests/equity for the nine months ended September 30, 2013 and 2012.

| | Nine Months Ended September 30, 2013 | | | | | |
|---|---|---|---|---|---|---|
| | EFCH Shareholder's Equity/Membership Interests | | | | | |
| | Common Stock | Retained Earnings (Deficit) | Membership Interests | Accumulated Other Comprehensive Income (Loss) | Noncontrolling Interests | Total Equity |
| Balance at December 31, 2012 | $ 7,665 | $ (18,129) | $ — | $ (42) | $ 112 | $ (10,394) |
| Net loss | — | (526) | (160) | — | — | (686) |
| Net effect of cash flow hedges | — | — | — | 5 | — | 5 |
| Investment by noncontrolling interests | — | — | — | — | 3 | 3 |
| Effect of debt push-down from EFH Corp. (a) | 434 | — | 3 | — | — | 437 |
| Dissolution of TXU Receivables Company | — | — | — | — | (10) | (10) |
| Capital structure conversion | (8,099) | 18,655 | (10,556) | — | — | — |
| Other | — | — | 2 | — | — | 2 |
| Balance at September 30, 2013 | $ — | $ — | $ (10,711) | $ (37) | $ 105 | $ (10,643) |

21

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Nine Months Ended September 30, 2012**

| | EFCH Shareholder's Equity | | | | |
| | Common Stock | Retained Earnings (Deficit) | Accumulated Other Comprehensive Income (Loss) | Noncontrolling Interests | Total Equity |
|---|---|---|---|---|---|
| Balance at December 31, 2011 | $ 7,351 | $ (15,121) | $ (49) | $ 103 | $ (7,716) |
| Net loss | — | (1,298) | — | — | (1,298) |
| Gain on settlement of reimbursement agreement with Oncor (Note 11) | 2 | — | — | — | 2 |
| Effect of stock-based incentive compensation plans | 6 | — | — | — | 6 |
| Net effect of cash flow hedges | — | — | 5 | — | 5 |
| Investment by noncontrolling interests | — | — | — | 6 | 6 |
| Effect of debt push-down from EFH Corp. (a) | 30 | — | — | — | 30 |
| Other | (1) | — | — | 1 | — |
| Balance at September 30, 2012 | $ 7,388 | $ (16,419) | $ (44) | $ 110 | $ (8,965) |

_____

(a)  Represents the interest and income tax effects of debt pushed down from EFH Corp. (Note 5).

22

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## 8. FAIR VALUE MEASUREMENTS

Accounting standards related to the determination of fair value define fair value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.  We use a "mid-market" valuation convention (the mid-point price between bid and ask prices) as a practical expedient to measure fair value for the majority of our assets and liabilities subject to fair value measurement on a recurring basis. We primarily use the market approach for recurring fair value measurements and use valuation techniques to maximize the use of observable inputs and minimize the use of unobservable inputs.

We categorize our assets and liabilities recorded at fair value based upon the following fair value hierarchy:

- Level 1 valuations use quoted prices in active markets for identical assets or liabilities that are accessible at the measurement date.  An active market is a market in which transactions for the asset or liability occur with sufficient frequency and volume to provide pricing information on an ongoing basis. Our Level 1 assets and liabilities include exchange-traded commodity contracts.  For example, some of our derivatives are NYMEX or ICE futures and swaps transacted through clearing brokers for which prices are actively quoted.

- Level 2 valuations use inputs that, in the absence of actively quoted market prices, are observable for the asset or liability, either directly or indirectly. Level 2 inputs include: (a) quoted prices for similar assets or liabilities in active markets, (b) quoted prices for identical or similar assets or liabilities in markets that are not active, (c) inputs other than quoted prices that are observable for the asset or liability such as interest rates and yield curves observable at commonly quoted intervals and (d) inputs that are derived principally from or corroborated by observable market data by correlation or other means. Our Level 2 valuations utilize over-the-counter broker quotes, quoted prices for similar assets or liabilities that are corroborated by correlations or other mathematical means and other valuation inputs.  For example, our Level 2 assets and liabilities include forward commodity positions at locations for which over-the-counter broker quotes are available.

- Level 3 valuations use unobservable inputs for the asset or liability. Unobservable inputs are used to the extent observable inputs are not available, thereby allowing for situations in which there is little, if any, market activity for the asset or liability at the measurement date.  We use the most meaningful information available from the market combined with internally developed valuation methodologies to develop our best estimate of fair value. For example, our Level 3 assets and liabilities include certain derivatives whose values are derived from pricing models that utilize multiple inputs to the valuations, including inputs that are not observable or easily corroborated through other means.  See further discussion below.

Our valuation policies and procedures are developed, maintained and validated by an EFH Corp. centralized risk management group that reports to the EFH Corp. Chief Financial Officer, who also functions as the Chief Risk Officer.  Risk management functions include commodity price reporting and validation, valuation model validation, risk analytics, risk control, credit risk management and risk reporting.

We utilize several different valuation techniques to measure the fair value of assets and liabilities, relying primarily on the market approach of using prices and other market information for identical and/or comparable assets and liabilities for those items that are measured on a recurring basis.   These methods include, among others, the use of broker quotes and statistical relationships between different price curves.

In utilizing broker quotes, we attempt to obtain multiple quotes from brokers (generally non-binding) that are active in the commodity markets in which we participate (and require at least one quote from two brokers to determine a pricing input as observable); however, not all pricing inputs are quoted by brokers. The number of broker quotes received for certain pricing inputs varies depending on the depth of the trading market, each individual broker's publication policy, recent trading volume trends and various other factors.  In addition, for valuation of interest rate swaps, we use generally accepted interest rate swap valuation models utilizing month-end interest rate curves.

Probable loss of default by either us or our counterparties is considered in determining the fair value of derivative assets and liabilities.   These non-performance risk adjustments take into consideration credit enhancements and the credit risks associated with our credit standing and the credit standing of our counterparties (see Note 9 for additional information regarding credit risk associated with our derivatives).  We utilize published credit ratings, default rate factors and bond trading values in calculating these fair value measurement adjustments.

23

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Certain derivatives and financial instruments are valued utilizing option pricing models that take into consideration multiple inputs including, but not limited to, commodity prices, volatility factors, discount rates and other market based factors.  Additionally, when there is not a sufficient amount of observable market data, valuation models are developed that incorporate proprietary views of market factors.  Significant unobservable inputs used to develop the valuation models include volatility curves, correlation curves, illiquid pricing locations and credit/non-performance risk assumptions.   Those valuation models are generally used in developing long-term forward price curves for certain commodities.  We believe the development of such curves is consistent with industry practice; however, the fair value measurements resulting from such curves are classified as Level 3.

The significant unobservable inputs and valuation models are developed by employees trained and experienced in market operations and fair value measurement and validated by the company's risk management group, which also further analyzes any significant changes in Level 3 measurements.  Significant changes in the unobservable inputs could result in significant upward or downward changes in the fair value measurement.

With respect to amounts presented in the following fair value hierarchy tables, the fair value measurement of an asset or liability (e.g., a contract) is required to fall in its entirety in one level, based on the lowest level input that is significant to the fair value measurement.   Certain assets and liabilities would be classified in Level 2 instead of Level 3 of the hierarchy except for the effects of credit reserves and non-performance risk adjustments, respectively.  Assessing the significance of a particular input to the fair value measurement in its entirety requires judgment, considering factors specific to the asset or liability being measured.

Assets and liabilities measured at fair value consisted of the following:

| | September 30, 2013 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Level 1 | | Level 2 | | Level 3 (a) | | Reclassification (b) | | Total |
| Assets: | | | | | | | | | |
| Commodity contracts | $ | 140 | $ | 941 | $ | 48 | $ | 2 | $ | 1,131 |
| Interest rate swaps | | — | | 1 | | — | | — | | 1 |
| Nuclear decommissioning trust – equity securities (c) | | 299 | | 172 | | — | | — | | 471 |
| Nuclear decommissioning trust – debt securities (c) | | — | | 266 | | — | | — | | 266 |
| Total assets | $ | 439 | $ | 1,380 | $ | 48 | $ | 2 | $ | 1,869 |
| Liabilities: | | | | | | | | | |
| Commodity contracts | $ | 129 | $ | 26 | $ | 52 | $ | 2 | $ | 209 |
| Interest rate swaps | | — | | — | | 1,167 | | — | | 1,167 |
| Total liabilities | $ | 129 | $ | 26 | $ | 1,219 | $ | 2 | $ | 1,376 |

| | December 31, 2012 | | | | | | |
|---|---|---|---|---|---|---|---|
| | Level 1 | | Level 2 | | Level 3 (a) | | Total |
| Assets: | | | | | | | |
| Commodity contracts | $ | 180 | $ | 1,784 | $ | 83 | $ | 2,047 |
| Interest rate swaps | | — | | 2 | | — | | 2 |
| Nuclear decommissioning trust – equity securities (c) | | 249 | | 144 | | — | | 393 |
| Nuclear decommissioning trust – debt securities (c) | | — | | 261 | | — | | 261 |
| Total assets | $ | 429 | $ | 2,191 | $ | 83 | $ | 2,703 |
| Liabilities: | | | | | | | |
| Commodity contracts | $ | 208 | $ | 121 | $ | 54 | $ | 383 |
| Interest rate swaps | | — | | 2,067 | | — | | 2,067 |
| Total liabilities | $ | 208 | $ | 2,188 | $ | 54 | $ | 2,450 |

_____
(a)   See table below for description of Level 3 assets and liabilities.
(b)   Fair values are determined on a contract basis, but certain contracts result in a current asset and a noncurrent liability, or vice versa, as presented in the balance sheet.
(c)   The nuclear decommissioning trust investment is included in the investments line in the balance sheet.  See Note 12.

Commodity contracts consist primarily of natural gas, electricity, fuel oil, uranium and coal derivative instruments entered into for hedging purposes and include physical contracts that have not been designated "normal" purchases or sales.  See Note 9 for further discussion regarding the company's use of derivative instruments.

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Interest rate swaps include variable-to-fixed rate swap instruments that are economic hedges of interest on long-term debt as well as interest rate basis swaps designed to effectively reduce the hedged borrowing costs.  See Note 5 for discussion of interest rate swaps.

Nuclear decommissioning trust assets represent securities held for the purpose of funding the future retirement and decommissioning of the nuclear generation units. These investments include equity, debt and other fixed-income securities consistent with investment rules established by the NRC and the PUCT.

There were no significant transfers between Level 1 and Level 2 of the fair value hierarchy for the three and nine months ended September 30, 2013 and 2012. See the table of changes in fair values of Level 3 assets and liabilities below for discussion of transfers between Level 2 and Level 3.

The following tables present the fair value of the Level 3 assets and liabilities by major contract type and the significant unobservable inputs used in the valuations at September 30, 2013 and December 31, 2012:

September 30, 2013

| | Fair Value | | | | | |
| Contract Type (a) | Assets | Liabilities | Total | Valuation Technique | Significant Unobservable Input | Range (b) |
|---|---|---|---|---|---|---|
| Electricity purchases and sales | $ 5 | $ (2) | $ 3 | Valuation Model | Illiquid pricing locations (c) | $30 to $45/MWh |
| | | | | | Hourly price curve shape (d) | $20 to $70/MWh |
| Electricity spread options | — | (19) | (19) | Option Pricing Model | Gas to power correlation (e) | 45% to 100% |
| | | | | | Power volatility (f) | 10% to 30% |
| Electricity congestion revenue rights | 37 | (5) | 32 | Market Approach (g) | Illiquid price differences between settlement points (h) | $0.00 to $30.00 |
| Coal purchases | 1 | (12) | (11) | Market Approach (g) | Illiquid price variances between mines (i) | $0.00 to $1.00 |
| | | | | | Probability of default (j) | 0% to 40% |
| | | | | | Recovery rate (k) | 0% to 40% |
| Interest rate swaps | — | (1,167) | (1,167) | Valuation Model | Nonperformance risk adjustment (l) | 30% to 35% |
| Other | 5 | (14) | (9) | | | |
| Total | $ 48 | $ (1,219) | $ (1,171) | | | |

25

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013                                                   Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**December 31, 2012**

| Contract Type (a) | Fair Value | | | Valuation Technique | Significant Unobservable Input | Range (b) |
|---|---|---|---|---|---|---|
| | Assets | Liabilities | Total | | | |
| Electricity purchases and sales | $ 5 | $ (9) | $ (4) | Valuation Model | Illiquid pricing locations (c) | $20 to $40/MWh |
| | | | | | Hourly price curve shape (d) | $20 to $50/MWh |
| Electricity spread options | 34 | (10) | 24 | Option Pricing Model | Gas to power correlation (e) | 20% to 90% |
| | | | | | Power volatility (f) | 20% to 40% |
| Electricity congestion revenue rights | 41 | (2) | 39 | Market Approach (g) | Illiquid price differences between settlement points (h) | $0.00 to $0.50 |
| Coal purchases | — | (32) | (32) | Market Approach (g) | Illiquid price variances between mines (i) | $0.00 to $1.00 |
| | | | | | Probability of default (j) | 5% to 40% |
| | | | | | Recovery rate (k) | 0% to 40% |
| Other | 3 | (1) | 2 | | | |
| Total | $ 83 | $ (54) | $ 29 | | | |

_____

(a)  Electricity purchase and sales contracts include wind generation agreements and hedging positions in the ERCOT west region as well as power contracts, the valuations of which include unobservable inputs related to the hourly shaping of the price curve.  Electricity spread option contracts consist of physical electricity call options. Electricity congestion revenue rights contracts consist of forward purchase contracts (swaps and options) used to hedge electricity price differences between settlement points within ERCOT.  Coal purchase contracts relate to western (Powder River Basin) coal.  Interest rate swaps are held by TCEH to hedge exposure to its variable rate debt.

(b)  The range of the inputs may be influenced by factors such as time of day, delivery period, season and location.

(c)  Based on the historical range of forward average monthly ERCOT West Hub prices.

(d)  Based on the historical range of forward average hourly ERCOT North Hub prices.

(e)  Estimate of the historical range based on forward natural gas and on-peak power prices for the ERCOT hubs most relevant to our spread options.

(f)  Based on historical forward price changes.

(g)  While we use the market approach, there is either insufficient market data to consider the valuation liquid or the significance of credit reserves or non-performance risk adjustments results in a Level 3 designation.

(h)  Based on the historical price differences between settlement points in the ERCOT North Hub and the ERCOT West Hub.

(i)  Based on the historical range of price variances between mine locations.

(j)  Estimate of the range of probabilities of default based on past experience and the length of the contract as well as our and counterparties' credit ratings.

(k)  Estimate of the default recovery rate based on historical corporate rates.

(l)  Estimate of nonperformance risk adjustment based on TCEH senior secured bond trading values.  See discussion immediately below regarding transfers into Level 3.

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The following table presents the changes in fair value of the Level 3 assets and liabilities for the three and nine months ended September 30, 2013 and 2012. Transfers into Level 3 during 2013 as noted below reflect a nonperformance risk adjustment in the valuation of the TCEH interest rate swaps, which are secured by a first-lien interest in the same assets of TCEH (on a pari passu basis) with the TCEH Senior Secured Facilities and the TCEH Senior Secured Notes (see Note 5). At September 30, 2013, the estimated fair value of these interest rate swaps totaled $1.518 billion before consideration of nonperformance risk adjustment and $1.167 billion after consideration of such adjustment. The amount of the nonperformance risk adjustment was after consideration of derivative assets related to contracts with the same counterparties that are also secured by a first-lien interest in the assets of TCEH, and a master netting agreement is in place that provides for netting and setoff of amounts related to these contracts.

| | Three Months Ended September 30, | | | | Nine Months Ended September 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2013 | | 2012 | | 2013 | | 2012 | |
| Net asset balance at beginning of period | $ | 88 | $ | 12 | $ | 29 | $ | 53 |
| Total unrealized valuation gains (losses) | | (24) | | 12 | | (41) | | (5) |
| Purchases, issuances and settlements (a): | | | | | | | | |
| Purchases | | 6 | | 17 | | 66 | | 30 |
| Issuances | | — | | (4) | | (6) | | (15) |
| Settlements | | (62) | | (56) | | (45) | | (34) |
| Transfers into Level 3 (b) | | (1,179) | | 3 | | (1,178) | | (42) |
| Transfers out of Level 3 (b) | | — | | — | | 4 | | (3) |
| Net change (c) | | (1,259) | | (28) | | (1,200) | | (69) |
| Net liability balance at end of period | $ | (1,171) | $ | (16) | $ | (1,171) | $ | (16) |
| Unrealized valuation gains (losses) relating to instruments held at end of period | $ | 254 | $ | 15 | $ | 280 | $ | (22) |

_____

(a) Settlements reflect reversals of unrealized mark-to-market valuations previously recognized in net income. Purchases and issuances reflect option premiums paid or received.

(b) Includes transfers due to changes in the observability of significant inputs. Transfers in and out occur at the end of each quarter, which is when the assessments are performed. All Level 3 transfers during the periods presented are in and out of Level 2.

(c) Substantially all changes in values of commodity contracts are reported in the income statement in net gain (loss) from commodity hedging and trading activities. Changes in values of interest rate swaps are reported in the income statement in interest expense and related charges. Activity excludes changes in fair value in the month the position settled as well as amounts related to positions entered into and settled in the same month.

27

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## 9. COMMODITY AND OTHER DERIVATIVE CONTRACTUAL ASSETS AND LIABILITIES

### Strategic Use of Derivatives

We transact in derivative instruments, such as options, swaps, futures and forward contracts, primarily to manage electricity price risk and interest rate risk exposure. Our principal activities involving derivatives consist of a natural gas hedging program and the hedging of interest costs on our long-term debt. See Note 8 for a discussion of the fair value of all derivatives.

**Natural Gas Hedging Program** — TCEH has a natural gas hedging program designed to reduce exposure to changes in future electricity prices due to changes in the price of natural gas, thereby hedging future revenues from electricity sales and related cash flows. In ERCOT, the wholesale price of electricity has generally moved with the price of natural gas. Under the program, TCEH has entered into market transactions involving natural gas-related financial instruments and has sold forward natural gas through 2014. These transactions are intended to hedge a portion of electricity price exposure related to expected lignite/coal- and nuclear-fueled generation for this period. Unrealized gains and losses arising from changes in the fair value of the instruments under the program as well as realized gains and losses upon settlement of the instruments are reported in the income statement in net gain (loss) from commodity hedging and trading activities.

**Interest Rate Swap Transactions** — Interest rate swap agreements are used to reduce exposure to interest rate changes by converting floating-rate debt to fixed rates, thereby hedging future interest costs and related cash flows. Interest rate basis swaps are used to effectively reduce the hedged borrowing costs. Unrealized gains and losses arising from changes in the fair value of the swaps as well as realized gains and losses upon settlement of the swaps are reported in the income statement in interest expense and related charges. See Note 5 for additional information about interest rate swap agreements.

**Other Commodity Hedging and Trading Activity** — TCEH also enters into derivatives, including electricity, natural gas, fuel oil, uranium, emission and coal instruments, generally for shorter-term hedging purposes. To a limited extent, TCEH also enters into derivative transactions for proprietary trading purposes, principally in natural gas and electricity markets.

### Financial Statement Effects of Derivatives

Substantially all derivative contractual assets and liabilities arise from mark-to-market accounting consistent with accounting standards related to derivative instruments and hedging activities. The following tables provide detail of commodity and other derivative contractual assets and liabilities (with the column totals representing the net positions of the contracts) as reported in the balance sheets at September 30, 2013 and December 31, 2012:

| | September 30, 2013 | | | | | |
|---|---|---|---|---|---|---|
| | Derivative assets | | Derivative liabilities | | | |
| | Commodity contracts | Interest rate swaps | Commodity contracts | Interest rate swaps | Total | |
| Current assets | $ 972 | $ 1 | $ — | $ — | $ 973 | |
| Noncurrent assets | 159 | — | — | — | 159 | |
| Current liabilities | (2) | — | (204) | (388) | (594) | |
| Noncurrent liabilities | — | — | (3) | (779) | (782) | |
| Net assets (liabilities) | $ 1,129 | $ 1 | $ (207) | $ (1,167) | $ (244) | |

| | December 31, 2012 | | | | | |
|---|---|---|---|---|---|---|
| | Derivative assets | | Derivative liabilities | | | |
| | Commodity contracts | Interest rate swaps | Commodity contracts | Interest rate swaps | Total | |
| Current assets | $ 1,461 | $ 2 | $ — | $ — | $ 1,463 | |
| Noncurrent assets | 586 | — | — | — | 586 | |
| Current liabilities | — | — | (366) | (528) | (894) | |
| Noncurrent liabilities | — | — | (17) | (1,539) | (1,556) | |
| Net assets (liabilities) | $ 2,047 | $ 2 | $ (383) | $ (2,067) | $ (401) | |

28

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

At September 30, 2013 and December 31, 2012, there were no derivative positions accounted for as cash flow or fair value hedges.

The following table presents the pretax effect of derivatives on net income (gains (losses)), including realized and unrealized effects:

| Derivative (income statement presentation) | Three Months Ended September 30, | | | | Nine Months Ended September 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2013 | | 2012 | | 2013 | | 2012 | |
| Commodity contracts (Net gain (loss) from commodity hedging and trading activities) (a) | $ | 98 | $ | (95) | $ | 54 | $ | 130 |
| Interest rate swaps (Interest expense and related charges) (b) | | 253 | | (188) | | 433 | | (521) |
| Net gain (loss) | $ | 351 | $ | (283) | $ | 487 | $ | (391) |

(a) Amount represents changes in fair value of positions in the derivative portfolio during the period, as realized amounts related to positions settled are assumed to equal reversals of previously recorded unrealized amounts.

(b) Includes unrealized mark-to-market gain (loss) as well as the net realized effect on interest paid/accrued, both reported in "Interest Expense and Related Charges" (see Note 12).

The following table presents the pretax effect (all losses) on net income and other comprehensive income (OCI) of derivative instruments previously accounted for as cash flow hedges. There were no amounts recognized in OCI for the three and nine months ended September 30, 2013 and 2012.

| Derivative (income statement presentation) | Three Months Ended September 30, | | | | Nine Months Ended September 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2013 | | 2012 | | 2013 | | 2012 | |
| Interest rate swaps (Interest expense and related charges) | $ | (1) | $ | (1) | $ | (6) | $ | (6) |
| Interest rate swaps (Depreciation and amortization) | | (1) | | (1) | | (2) | | (2) |
| Total | $ | (2) | $ | (2) | $ | (8) | $ | (8) |

Accumulated other comprehensive income related to cash flow hedges at September 30, 2013 and December 31, 2012 totaled $37 million and $42 million in net losses (after-tax), respectively, substantially all of which relates to interest rate swaps previously accounted for as cash flow hedges. We expect that $2 million of net losses (after-tax) related to cash flow hedges included in accumulated other comprehensive income at September 30, 2013 will be reclassified into net income during the next twelve months as the related hedged transactions affect net income.

### Balance Sheet Presentation of Derivatives

Consistent with elections under US GAAP to present amounts on a gross basis, we report derivative assets and liabilities in the balance sheet without taking into consideration netting arrangements we have with counterparties. This presentation can result in significant volatility in derivative assets and liabilities because we may enter into offsetting positions with the same counterparties, resulting in both assets and liabilities, and the underlying commodity prices can change significantly from period to period.

Margin deposits that contractually offset these derivative instruments are reported separately in the balance sheet. Margin deposits received from counterparties are either used for working capital or other corporate purposes or are deposited in a separate restricted cash account. At September 30, 2013 and December 31, 2012, essentially all margin deposits held were unrestricted.

We maintain standardized master netting agreements with certain counterparties that allow for the netting of positive and negative exposures. Generally, we utilize the International Swaps and Derivatives Association (ISDA) standardized contract for financial transactions, the Edison Electric Institute standardized contract for physical power transactions and the North American Energy Standards Board (NAESB) standardized contract for physical natural gas transactions. These contain credit enhancements that allow for the right to offset assets and liabilities with other financial instruments and collateral received in order to reduce credit exposure between us and the counterparty. These agreements contain specific language related to margin requirements, monthly settlement netting, cross-commodity netting and early termination netting, which is negotiated with the contract counterparty.

Certain entities are counterparties to both our natural gas hedge program positions and our interest rate swaps and have entered into master agreements that provide for netting and setoff of amounts related to these positions.

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The following tables reconcile our derivative assets and liabilities as presented in the consolidated balance sheet to net amounts after taking into consideration netting arrangements with counterparties and financial collateral:

**September 30, 2013**

| | Amounts Presented in Balance Sheet | Offsetting Financial Instruments (a) | Financial Collateral (Received) Pledged (b) | Net Amounts (c) |
|---|---|---|---|---|
| Derivative assets: | | | | |
| Commodity contracts | $ 1,131 | $ (613) | $ (351) | $ 167 |
| Interest rate swaps | 1 | (1) | — | — |
| Total derivative assets | 1,132 | (614) | (351) | 167 |
| Derivative liabilities: | | | | |
| Commodity contracts | (209) | 180 | 11 | (18) |
| Interest rate swaps | (1,167) | 434 | — | (733) |
| Total derivative liabilities | (1,376) | 614 | 11 | (751) |
| Net amounts | $ (244) | $ — | $ (340) | $ (584) |

**December 31, 2012**

| | Amounts Presented in Balance Sheet | Offsetting Financial Instruments (a) | Financial Collateral (Received) Pledged (b) | Net Amounts |
|---|---|---|---|---|
| Derivative assets: | | | | |
| Commodity contracts | $ 2,047 | $ (1,263) | $ (597) | $ 187 |
| Interest rate swaps | 2 | (2) | — | — |
| Total derivative assets | 2,049 | (1,265) | (597) | 187 |
| Derivative liabilities: | | | | |
| Commodity contracts | (383) | 319 | 29 | (35) |
| Interest rate swaps | (2,067) | 946 | — | (1,121) |
| Total derivative liabilities | (2,450) | 1,265 | 29 | (1,156) |
| Net amounts | $ (401) | $ — | $ (568) | $ (969) |

_____

(a) Offsetting financial instruments with respect to commodity contracts include amounts related to interest rate swaps and vice versa. Amounts exclude trade accounts receivable and payable related to settled financial instruments.

(b) Financial collateral consists entirely of cash margin deposits.

(c) Includes net liability positions totaling approximately $1.2 billion (before nonperformance risk adjustment) related to counterparties with positions that are secured by a first-lien interest in the same assets of TCEH (on a pari passu basis) with the TCEH Senior Secured Facilities and the TCEH Senior Secured Notes.

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

***Derivative Volumes*** — The following table presents the gross notional amounts of derivative volumes at September 30, 2013 and December 31, 2012:

| Derivative type | September 30, 2013 | December 31, 2012 | Unit of Measure |
|---|---|---|---|
| | Notional Volume | | |
| Interest rate swaps: | | | |
| Floating/fixed (a) | $ 30,740 | $ 31,060 | Million US dollars |
| Basis | $ 11,967 | $ 11,967 | Million US dollars |
| Natural gas: | | | |
| Natural gas forward sales and purchases (b) | 452 | 875 | Million MMBtu |
| Locational basis swaps | 337 | 495 | Million MMBtu |
| All other | 2,021 | 1,549 | Million MMBtu |
| Electricity | 21,663 | 76,767 | GWh |
| Congestion Revenue Rights (c) | 82,156 | 111,185 | GWh |
| Coal | 11 | 14 | Million US tons |
| Fuel oil | 28 | 47 | Million gallons |
| Uranium | 575 | 441 | Thousand pounds |

_____

(a) Includes notional amount of interest rate swaps with maturity dates through October 2014 as well as notional amount of swaps effective from October 2014 with maturity dates through October 2017 (see Note 5).

(b) Represents gross notional forward sales, purchases and options transactions in the natural gas hedging program.  The net amount of these transactions was approximately 210 million MMBtu and 360 million MMBtu at September 30, 2013 and December 31, 2012, respectively.

(c) Represents gross forward purchases associated with instruments used to hedge electricity price differences between settlement points within ERCOT.

***Credit Risk-Related Contingent Features of Derivatives***

The agreements that govern our derivative instrument transactions may contain certain credit risk-related contingent features that could trigger liquidity requirements in the form of cash collateral, letters of credit or some other form of credit enhancement.  Certain of these agreements require the posting of collateral if our credit rating is downgraded by one or more credit rating agencies; however, due to our credit ratings being below investment grade, substantially all of such collateral posting requirements are already effective.

At September 30, 2013 and December 31, 2012, the fair value of liabilities related to derivative instruments under agreements with credit risk-related contingent features that were not fully cash collateralized totaled $40 million and $58 million, respectively. The liquidity exposure associated with these liabilities was reduced by cash and letter of credit postings with the counterparties totaling  $9 million and $12 million at September 30, 2013 and December 31, 2012, respectively. If all the credit risk-related contingent features related to these derivatives had been triggered, including cross default provisions, at September 30, 2013 and December 31, 2012, the remaining liquidity requirements would have totaled  $8 million and none, respectively.

In addition, certain derivative agreements that are collateralized primarily with liens on certain of our assets include indebtedness cross-default provisions that could result in the settlement of such contracts if there were a failure under other financing arrangements to meet payment terms or to comply with other covenants that could result in the acceleration of such indebtedness.  At September 30, 2013 and December 31, 2012, the fair value of derivative liabilities subject to such cross-default provisions, largely related to interest rate swaps, totaled  $1.192 billion and $2.150 billion, respectively, before consideration of the amount of assets subject to the liens.  No cash collateral or letters of credit were posted with these counterparties at September 30, 2013 and December 31, 2012 to reduce the liquidity exposure.  If all the credit risk-related contingent features related to these derivatives, including amounts related to cross-default provisions, had been triggered at September 30, 2013 and December 31, 2012, the remaining related liquidity requirement after reduction for derivative assets under netting arrangements but before consideration of the amount of assets subject to the liens would have totaled  $1.087 billion and $1.122 billion, respectively. See Note 5 for a description of other obligations that are supported by liens on certain of our assets.

31

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

As discussed immediately above, the aggregate fair values of liabilities under derivative agreements with credit risk-related contingent features, including cross-default provisions, totaled $1.232 billion and $2.208 billion at September 30, 2013 and December 31, 2012, respectively. These amounts are before consideration of cash and letter of credit collateral posted, net accounts receivable and derivative assets under netting arrangements and assets subject to related liens.

Some commodity derivative contracts contain credit risk-related contingent features that do not provide for specific amounts to be posted if the features are triggered. These provisions include material adverse change, performance assurance, and other clauses that generally provide counterparties with the right to request additional credit enhancements. The amounts disclosed above exclude credit risk-related contingent features that do not provide for specific amounts or exposure calculations.

### Concentrations of Credit Risk Related to Derivatives

TCEH has concentrations of credit risk with the counterparties to its derivative contracts. At September 30, 2013, total credit risk exposure to all counterparties related to derivative contracts totaled $1.258 billion (including associated accounts receivable). The net exposure to those counterparties totaled $275 million at September 30, 2013 after taking into effect netting arrangements, setoff provisions and collateral. At September 30, 2013, the credit risk exposure to the banking and financial sector represented 88% of the total credit risk exposure and 59% of the net exposure, a significant amount of which is related to the natural gas hedging program, and the largest net exposure to a single counterparty totaled $50 million.

Exposure to banking and financial sector counterparties is considered to be within an acceptable level of risk tolerance because all of this exposure is with counterparties with investment grade credit ratings. However, this concentration increases the risk that a default by any of these counterparties would have a material effect on our financial condition, results of operations and liquidity. The transactions with these counterparties contain certain provisions that would require the counterparties to post collateral in the event of a material downgrade in their credit rating.

We maintain credit risk policies with regard to our counterparties to minimize overall credit risk. These policies authorize specific risk mitigation tools including, but not limited to, use of standardized master agreements that allow for netting of positive and negative exposures associated with a single counterparty. Credit enhancements such as parent guarantees, letters of credit, surety bonds, liens on assets and margin deposits are also utilized. Prospective material changes in the payment history or financial condition of a counterparty or downgrade of its credit quality result in the reassessment of the credit limit with that counterparty. The process can result in the subsequent reduction of the credit limit or a request for additional financial assurances. An event of default by one or more counterparties could subsequently result in termination-related settlement payments that reduce available liquidity if amounts are owed to the counterparties related to the derivative contracts or delays in receipts of expected settlements if the counterparties owe amounts to us.

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## 10. PENSION AND OTHER POSTRETIREMENT EMPLOYEE BENEFITS (OPEB) PLANS

Our subsidiaries are participating employers in the EFH Retirement Plan, a defined benefit pension plan sponsored by EFH Corp. that is described further below. Our subsidiaries also participate with EFH Corp. and certain other subsidiaries of EFH Corp. to offer certain health care and life insurance benefits to eligible employees and their eligible dependents upon the retirement of such employees. The net allocated pension and OPEB costs applicable to us totaled $3 million and $10 million for the three months ended September 30, 2013 and 2012, respectively, and $9 million and $31 million for the nine months ended September 30, 2013 and 2012, respectively.

The decrease in pension costs in 2013 reflects the implementation of certain amendments to EFH Corp.'s pension plan completed in the fourth quarter 2012 that resulted in:

- splitting off assets and liabilities under the plan associated with employees of Oncor and all retirees and terminated vested participants of EFH Corp. and its subsidiaries (including discontinued businesses) to a new plan sponsored and administered by Oncor (the Oncor Plan) and

- the termination of, distributions of benefits under, and settlement of all of EFH Corp.'s liabilities associated with active employees of EFH Corp.'s competitive businesses other than collective bargaining unit employees.

The discount rates reflected in net pension and OPEB costs for 2013 are 4.30% and 4.10%, respectively. The expected rates of return on pension and OPEB plan assets reflected in the 2013 cost amounts are 5.4% and 6.7%, respectively.

In the first nine months of 2013 we made a $50 million payment to EFH Corp. to settle TCEH's allocation of 2012 pension-related charges resulting from the amendments. We expect to make additional contributions in 2013 of $2 million for the pension and OPEB plans.

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## 11. RELATED-PARTY TRANSACTIONS

The following represent our significant related-party transactions.

- TCEH's retail operations pay Oncor for services it provides, principally the delivery of electricity. Expenses recorded for these services, reported in fuel, purchased power costs and delivery fees, totaled $273 million and $281 million for the three months ended September 30, 2013 and 2012, respectively, and $728 million and $746 million for the nine months ended September 30, 2013 and 2012, respectively. The fees are based on rates regulated by the PUCT that apply to all REPs. The balance sheets at September 30, 2013 and December 31, 2012 reflect amounts due currently to Oncor totaling $158 million and $53 million, respectively, (included in trade accounts and other payables to affiliates) largely related to these electricity delivery fees.

- In August 2012, TCEH and Oncor agreed to settle at a discount two agreements related to securitization (transition) bonds issued by Oncor's bankruptcy-remote financing subsidiary in 2003 and 2004 to recover generation-related regulatory assets. Under the agreements, TCEH had been reimbursing Oncor as described immediately below. Under the settlement, TCEH paid, and Oncor received, $159 million in cash.

  Oncor collects transition surcharges from its customers to recover the transition bond payment obligations. Oncor's incremental income taxes related to the transition surcharges it collects had been reimbursed by TCEH quarterly under a noninterest bearing note payable to Oncor that was to mature in 2016. TCEH's payments on the note prior to the August 2012 settlement totaled zero and $20 million for the three and nine months ended September 30, 2012, respectively.

  Under an interest reimbursement agreement, TCEH had reimbursed Oncor on a monthly basis for interest expense on the transition bonds. Only the monthly accrual of interest under this agreement was reported as a liability. This interest expense prior to the August 2012 settlement totaled $2 million and $16 million for the three and nine months ended September 30, 2012, respectively.

- Notes receivable from EFH Corp. were payable to TCEH on demand (TCEH Demand Notes) and arose from cash loaned for debt principal and interest payments and other general corporate purposes of EFH Corp. At September 30, 2013 and December 31, 2012, the notes consisted of:

| | September 30, 2013 | December 31, 2012 |
|---|---|---|
| Note related to debt principal and interest payments (P&I Note) | $ — | $ 465 |
| Note related to general corporate purposes (SG&A Note) | — | 233 |
| Total | $ — | $ 698 |

The TCEH Demand Notes were guaranteed by EFIH and EFCH on a senior unsecured basis. The TCEH Demand Notes were pledged as collateral under the TCEH Senior Secured Facilities. In January 2013, EFIH used $680 million of the proceeds from its August 2012 debt issuance to pay a dividend to EFH Corp., which EFH Corp. used with cash on hand to repay the entire balance of the TCEH Demand Notes. The average daily balance of the TCEH Demand Notes totaled $683 million for the three months ended September 30, 2012 and $77 million and $822 million for the nine months ended September 30, 2013 and 2012, respectively. The TCEH Demand Notes carried interest at a rate based on the one-month LIBOR rate plus 5.00%, and interest income related to the TCEH Demand Notes totaled $9 million for the three months ended September 30, 2012 and $3 million and $33 million for the nine months ended September 30, 2013 and 2012, respectively.

- EFCH has a demand note payable to EFH Corp., the proceeds from which were used to repay outstanding debt. The note totaled $92 million and $81 million at September 30, 2013 and December 31, 2012, respectively, and carried interest at a rate based on the one-month LIBOR rate plus 5.00%. Interest expense related to this note totaled $1 million for both the three months ended September 30, 2013 and 2012 and $3 million for both the nine months ended September 30, 2013 and 2012.

- Receivables from affiliates are measured at historical cost and primarily consisted of notes receivable for cash loaned to EFH Corp. for debt principal and interest payments and other general corporate purposes of EFH Corp. as discussed above. TCEH reviews economic conditions, counterparty credit scores and historical payment activity to assess the overall collectability of its affiliated receivables. There were no credit loss allowances at September 30, 2013 and December 31, 2012.

34

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

- A subsidiary of EFH Corp. bills our subsidiaries for information technology, financial, accounting and other administrative services at cost.  These charges, which are settled in cash and primarily reported in SG&A expenses, totaled  $59 million and $61 million for the three months ended September 30, 2013 and 2012, respectively, and $176 million and $178 million for the nine months ended September 30, 2013 and 2012, respectively. Beginning in the fourth quarter 2012, TCEH reimburses a subsidiary of EFH Corp. for an allocated share of computer equipment purchased by the subsidiary. Amounts paid by TCEH in the nine months ended September 30, 2013 related to new computer equipment totaled  $6 million and were accounted for as an intangible asset to be amortized over the life of the equipment.  Previously, the depreciation of such equipment was included in the administrative cost billings.

- Under Texas regulatory provisions, the trust fund for decommissioning the Comanche Peak nuclear generation facility is funded by a delivery fee surcharge billed to REPs by Oncor, as collection agent, and remitted monthly to TCEH for contribution to the trust fund with the intent that the trust fund assets, reported in investments in our balance sheet, will ultimately be sufficient to fund the actual future decommissioning liability, reported in noncurrent liabilities in our balance sheet.  The delivery fee surcharges remitted to TCEH totaled $5 million for both the three months ended September 30, 2013 and 2012 and $12 million for both the nine months ended September 30, 2013 and 2012.  Income and expenses associated with the trust fund and the decommissioning liability incurred by TCEH are offset by a net change in a receivable/payable that ultimately will be settled through changes in Oncor's delivery fee rates.  At September 30, 2013 and December 31, 2012, the excess of the trust fund balance over the decommissioning liability resulted in a payable totaling  $352 million and $284 million, respectively, reported in other noncurrent liabilities.

- EFH Corp. files consolidated federal income tax and Texas state margin tax returns that include our results; however, under a tax sharing agreement, our federal income tax and Texas margin tax expense and related balance sheet amounts, including income taxes payable to or receivable from EFH Corp., are recorded as if we file our own corporate income tax return.  As of September 30, 2013, we had current income tax receivables of  $7 million and noncurrent income tax liabilities of $723 million payable to EFH Corp. As of December 31, 2012, we had current income tax liabilities of  $31 million payable to EFH Corp. (see Note 12). We made tax payments to EFH Corp. of $134 million and $83 million for the nine months ended September 30, 2013 and 2012, respectively. The 2013 payment included $84 million related to the 1997 through 2002 IRS appeals settlement.

- Certain transmission and distribution utilities in Texas have requirements in place to assure adequate creditworthiness of any REP to support the REP's obligation to collect securitization bond-related (transition) charges on behalf of the utility.  Under these requirements, as a result of TCEH's credit rating being below investment grade, TCEH is required to post collateral support in an amount equal to estimated transition charges over specified time periods. Accordingly, at September 30, 2013 and December 31, 2012, TCEH had posted letters of credit in the amount of  $10 million and $11 million, respectively, for the benefit of Oncor.

- Oncor and Texas Holdings agreed to the terms of a stipulation with major interested parties to resolve all outstanding issues in the PUCT review related to the Merger. As part of this stipulation, TCEH would be required to post a letter of credit in an amount equal to  $170 million to secure its payment obligations to Oncor in the event, which has not occurred,  two or more rating agencies downgrade Oncor's credit rating below investment grade.

- In 2007, TCEH entered into the TCEH Senior Secured Facilities with syndicates of financial institutions and other lenders.   These syndicates included affiliates of GS Capital Partners, which is a member of the Sponsor Group.  Affiliates of each member of the Sponsor Group have from time to time engaged in commercial banking transactions with us and/or provided financial advisory services to us, in each case in the normal course of business.

- Affiliates of GS Capital Partners are parties to certain commodity and interest rate hedging transactions with us in the normal course of business.

- Affiliates of the Sponsor Group have sold or acquired, and in the future may sell or acquire, debt or debt securities issued by us in open market transactions or through loan syndications.

35

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- As a result of debt repurchase and exchange transactions in 2009 through 2011, EFH Corp. and EFIH held TCEH debt securities as follows (principal amounts):

| | September 30, 2013 | December 31, 2012 |
|---|---|---|
| TCEH Senior Notes: | | |
| Held by EFH Corp. | $         284 | $         284 |
| Held by EFIH | 79 | 79 |
| TCEH Term Loan Facilities: | | |
| Held by EFH Corp. | 19 | 19 |
| Total | $         382 | $         382 |

Interest expense on the notes totaled $10 million for both the three months ended September 30, 2013 and 2012 and $29 million for both the nine months ended September, 30, 2013 and 2012.

See Notes 5 and 6 for guarantees and push-down of certain EFH Corp. debt and Note 10 for allocation of EFH Corp. pension and OPEB costs to us.

36

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

## 12. SUPPLEMENTARY FINANCIAL INFORMATION

*Other Income*

| | Three Months Ended September 30, | | | | Nine Months Ended September 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2013 | | 2012 | | 2013 | | 2012 | |
| Other income: | | | | | | | | |
| Consent fee related to novation of hedge positions between counterparties | $ | — | $ | — | $ | — | $ | 6 |
| Insurance/litigation settlements | | — | | — | | 2 | | 2 |
| All other | | 1 | | 2 | | 5 | | 4 |
| Total other income | $ | 1 | $ | 2 | $ | 7 | $ | 12 |
| Other deductions: | | | | | | | | |
| Impairment of mineral interests | $ | — | $ | 24 | $ | — | $ | 24 |
| Other asset impairments | | 3 | | — | | 3 | | — |
| Counterparty contract settlement | | — | | 4 | | — | | 4 |
| Other | | 5 | | 2 | | 9 | | 9 |
| Total other deductions | $ | 8 | $ | 30 | $ | 12 | $ | 37 |

*Interest Expense and Related Charges*

| | Three Months Ended September 30, | | | | Nine Months Ended September 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2013 | | 2012 | | 2013 | | 2012 | |
| Interest paid/accrued (including net amounts settled/accrued under interest rate swaps) | $ | 688 | $ | 647 | $ | 2,042 | $ | 1,938 |
| Interest related to pushed down debt | | 1 | | 19 | | 5 | | 57 |
| Interest payable with additional toggle notes (Note 5) | | — | | 47 | | — | | 136 |
| Unrealized mark-to-market net (gain) loss on interest rate swaps | | (413) | | 20 | | (899) | | 16 |
| Amortization of interest rate swap losses at dedesignation of hedge accounting | | 2 | | 2 | | 6 | | 7 |
| Amortization of fair value debt discounts resulting from purchase accounting | | 3 | | 3 | | 8 | | 8 |
| Amortization of debt issuance, amendment and extension costs and discounts | | 64 | | 45 | | 195 | | 137 |
| Capitalized interest | | (5) | | (11) | | (19) | | (31) |
| Total interest expense and related charges | $ | 340 | $ | 772 | $ | 1,338 | $ | 2,268 |

*Restricted Cash*

At September 30, 2013 and December 31, 2012, all restricted cash on the balance sheet related to TCEH's Letter of Credit Facility (see Note 5).

*Inventories by Major Category*

| | September 30, 2013 | | December 31, 2012 | |
| --- | --- | --- | --- | --- |
| Materials and supplies | $ | 216 | $ | 201 |
| Fuel stock | | 155 | | 168 |
| Natural gas in storage | | 29 | | 24 |
| Total inventories | $ | 400 | $ | 393 |

37

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Investments

| | September 30, 2013 | December 31, 2012 |
|---|---|---|
| Nuclear plant decommissioning trust | $ 737 | $ 654 |
| Assets related to employee benefit plans, including employee savings programs, net of distributions | 1 | 8 |
| Land | 40 | 41 |
| Miscellaneous other | 9 | 7 |
| Total investments | $ 787 | $ 710 |

**Nuclear Decommissioning Trust** — Investments in a trust that will be used to fund the costs to decommission the Comanche Peak nuclear generation plant are carried at fair value. Decommissioning costs are being recovered from Oncor's customers as a delivery fee surcharge over the life of the plant and deposited by TCEH in the trust fund. Income and expense associated with the trust fund and the decommissioning liability are offset by a corresponding change in a receivable/payable (currently a payable reported in noncurrent liabilities) that will ultimately be settled through changes in Oncor's delivery fees rates (see Note 11). A summary of investments in the fund follows:

| | September 30, 2013 | | | |
|---|---|---|---|---|
| | Cost (a) | Unrealized gain | Unrealized loss | Fair market value |
| Debt securities (b) | $ 261 | $ 9 | $ (4) | $ 266 |
| Equity securities (c) | 252 | 227 | (8) | 471 |
| Total | $ 513 | $ 236 | $ (12) | $ 737 |

| | December 31, 2012 | | | |
|---|---|---|---|---|
| | Cost (a) | Unrealized gain | Unrealized loss | Fair market value |
| Debt securities (b) | $ 246 | $ 16 | $ (1) | $ 261 |
| Equity securities (c) | 245 | 161 | (13) | 393 |
| Total | $ 491 | $ 177 | $ (14) | $ 654 |

_____

(a)   Includes realized gains and losses on securities sold.

(b)   The investment objective for debt securities is to invest in a diversified tax efficient portfolio with an overall portfolio rating of AA or above as graded by S&P or Aa2 by Moody's Investors Services, Inc. The debt securities are heavily weighted with municipal bonds. The debt securities had an average coupon rate of 3.97% and 4.38% at September 30, 2013 and December 31, 2012, respectively, and an average maturity of 6 years at both September 30, 2013 and December 31, 2012.

(c)   The investment objective for equity securities is to invest tax efficiently and to match the performance of the S&P 500 Index.

Debt securities held at September 30, 2013 mature as follows: $103 million in one to five years, $58 million in five to ten years and $105 million after ten years.

The following table summarizes proceeds from sales of available-for-sale securities and the related realized gains and losses from such sales.

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2013 | 2012 | 2013 | 2012 |
| Realized gains | $ 1 | $ — | $ 2 | $ 1 |
| Realized losses | $ (3) | $ (1) | $ (3) | $ (2) |
| Proceeds from sales of securities | $ 23 | $ 25 | $ 128 | $ 56 |
| Investments in securities | $ (28) | $ (30) | $ (140) | $ (68) |

### Property, Plant and Equipment

At September 30, 2013 and December 31, 2012, property, plant and equipment of $18.0 billion and $18.6 billion, respectively, is stated net of accumulated depreciation and amortization of $7.7 billion and $6.8 billion, respectively.

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Asset Retirement and Mining Reclamation Obligations*

These liabilities primarily relate to nuclear generation plant decommissioning, land reclamation related to lignite mining, removal of lignite/coal-fueled plant ash treatment facilities and generation plant asbestos removal and disposal costs.  There is no earnings impact with respect to changes in the nuclear plant decommissioning liability, as all costs are recoverable through the regulatory process as part of Oncor's delivery fees.

The following table summarizes the changes to these obligations, reported in other current liabilities and other noncurrent liabilities and deferred credits in the balance sheet, for the nine months ended September 30, 2013:

| | Nuclear Plant Decommissioning | Mining Land Reclamation | Other | Total |
|---|---|---|---|---|
| Liability at December 31, 2012 | $ 368 | $ 135 | $ 33 | $ 536 |
| Additions: | | | | |
|   Accretion | 17 | 23 | 1 | 41 |
| Reductions: | | | | |
|   Payments | — | (72) | (1) | (73) |
| Liability at September 30, 2013 | 385 | 86 | 33 | 504 |
|   Less amounts due currently | — | (60) | — | (60) |
| Noncurrent liability at September 30, 2013 | $ 385 | $ 26 | $ 33 | $ 444 |

*Other Noncurrent Liabilities and Deferred Credits*

The balance of other noncurrent liabilities and deferred credits consists of the following:

| | September 30, 2013 | December 31, 2012 |
|---|---|---|
| Uncertain tax positions (including accrued interest) | $ 384 | $ 1,250 |
| Asset retirement and mining reclamation obligations | 444 | 452 |
| Unfavorable purchase and sales contracts | 596 | 620 |
| Nuclear decommissioning cost over-recovery (Note 11) | 352 | 284 |
| Other, including retirement and other employee benefits | 17 | 37 |
| Total other noncurrent liabilities and deferred credits | $ 1,793 | $ 2,643 |

***Liability for Uncertain Tax Positions*** — In May 2013, EFH Corp. received approval from the Joint Committee on Taxation of the IRS appeals settlement of all issues arising from the 1997 through 2002 IRS audit.  The settlement also affected federal and state returns for periods subsequent to 2002.  In the second quarter 2013, we reduced the liability for uncertain tax positions to reflect the effects of the settlement, resulting in a  $411 million reclassification to the accumulated deferred income tax liability and the recording of a  $20 million income tax expense. Other effects included the recording of current federal income tax and state income tax liabilities to EFH Corp. of  $78 million and $14 million, respectively, and a reduction of $392 million of the noncurrent federal income tax liability to EFH Corp., all under the tax sharing agreement (see Note 11).  In the third quarter 2013, we recorded an additional $38 million tax benefit, with an offset to accumulated deferred income tax liability, related to the settlement.

In March 2013, EFH Corp. and the IRS agreed on terms to resolve disputed adjustments related to the IRS audit for the years 2003 through 2006, which was concluded in June 2011. The IRS proposed a significant number of adjustments to the originally filed returns for such years.  The adjustments relate to one significant accounting method issue and other less significant issues.  In the first quarter 2013, we reduced the liability for uncertain tax positions to reflect the terms of the agreement, resulting in a net reduction of the liability for uncertain tax positions totaling  $794 million. This reduction consisted of a $685 million reclassification to a noncurrent affiliate tax sharing liability and a net adjustment of  $109 million ($62 million after tax), largely representing a reversal of accrued interest and reported as an increase in income tax benefit.  In addition, in accordance with the provisions of the tax sharing agreement with EFH Corp., amounts previously recorded as accumulated deferred income taxes totaling  $430 million were reclassified to the affiliate tax sharing liability, the total amount of which is not expected to be settled within the next twelve months.

39

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Unfavorable Purchase and Sales Contracts* – The amortization of unfavorable purchase and sales contracts totaled $6 million for both the three months ended September 30, 2013 and 2012 and $19 million and $20 million for the nine months ended September 30, 2013 and 2012, respectively. See Note 3 for intangible assets related to favorable purchase and sales contracts.

The estimated amortization of unfavorable purchase and sales contracts for each of the next five fiscal years is as follows:

| Year | | Amount |
|------|---|--------|
| 2013 | $ | 25 |
| 2014 | $ | 24 |
| 2015 | $ | 23 |
| 2016 | $ | 23 |
| 2017 | $ | 23 |

### Supplemental Cash Flow Information

| | | Nine Months Ended September 30, | | |
|---|---|---|---|---|
| | | **2013** | | **2012** |
| Cash payments (receipts) related to: | | | | |
| Interest paid (a) | $ | 1,901 | $ | 1,788 |
| Capitalized interest | | (19) | | (31) |
| Interest paid (net of capitalized interest) (a) | $ | 1,882 | $ | 1,757 |
| Income taxes | $ | 134 | $ | 83 |
| Noncash investing and financing activities: | | | | |
| Effect of Parent's payment of interest, net of tax, on pushed down debt | $ | 21 | $ | 30 |
| Principal amount of TCEH Toggle Notes issued in lieu of cash interest | $ | — | $ | 88 |
| Construction expenditures (b) | $ | 62 | $ | 52 |
| Contribution related to EFH Corp. stock-based compensation | $ | 1 | $ | 6 |
| Debt assumed related to acquisition of combustion turbine trust interest | $ | (45) | $ | — |
| Effect of push down of debt from parent | $ | (420) | $ | — |
| Debt extension transactions | $ | (340) | $ | — |

(a) Net of amounts received under interest rate swap agreements.
(b) Represents end-of-period accruals.

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

[Table of Contents](#)

### 13. SUPPLEMENTAL GUARANTOR CONDENSED FINANCIAL INFORMATION

At September 30, 2013 TCEH and TCEH Finance, as Co-Issuers, had outstanding $5.237 billion aggregate principal amount of 10.25% Senior Notes Due 2015, 10.25% Senior Notes due 2015 Series B and Toggle Notes (collectively, the TCEH Senior Notes) and $1.571 billion aggregate principal amount of 15% Senior Secured Second Lien Notes due 2021 and 15% Senior Secured Second Lien Notes due 2021 (Series B) (collectively, the TCEH Senior Secured Second Lien Notes). The TCEH Senior Notes and the TCEH Senior Secured Second Lien Notes are unconditionally guaranteed by EFCH and by each subsidiary (all 100% owned by TCEH) that guarantees the TCEH Senior Secured Facilities (collectively, the Guarantors). The guarantees issued by the Guarantors are full and unconditional, joint and several guarantees of the TCEH Senior Notes and the TCEH Senior Secured Second Lien Notes. The guarantees of the TCEH Senior Notes rank equally with any senior unsecured indebtedness of the Guarantors and rank effectively junior to all of the secured indebtedness of the Guarantors to the extent of the assets securing that indebtedness. The guarantees of the TCEH Senior Secured Second Lien Notes rank equally in right of payment with all senior indebtedness of TCEH, are senior in right of payment to all existing or future unsecured debt of TCEH to the extent of the value of the TCEH Collateral (after taking into account any first-priority liens on the TCEH Collateral) and are senior in right of payment to any future subordinated debt of TCEH. These notes are effectively subordinated to TCEH's obligations under the TCEH Senior Secured Facilities, the TCEH Senior Secured Notes and TCEH's commodity and interest rate hedges that are secured by a first-priority lien on the TCEH Collateral and any future obligations subject to first-priority liens on the TCEH Collateral, to the extent of the value of the TCEH Collateral (see Note 5). All other subsidiaries of EFCH, either direct or indirect, do not guarantee the TCEH Senior Notes or TCEH Senior Secured Second Lien Notes (collectively the Non-Guarantors). The indentures governing the TCEH Senior Notes and the TCEH Senior Secured Second Lien Notes contain certain restrictions, subject to certain exceptions, on EFCH's ability to pay dividends or make investments. See Note 7.

The following tables have been prepared in accordance with Regulation S-X Rule 3-10, "Financial Statements of Guarantors and Issuers of Guaranteed Securities Registered or Being Registered" in order to present the condensed consolidating statements of income for the three and nine months ended September 30, 2013 and 2012 and of cash flows (after the nine months ended September 30, 2013 and 2012 of EFCH (Parent), TCEH (Issuer), the Guarantors and the Non-Guarantors and the condensed consolidating balance sheets at September 30, 2013 and December 31, 2012 of the Parent, Issuer, the Guarantors and the Non-Guarantors. Investments in consolidated subsidiaries are accounted for under the equity method. The presentations reflect the application of SEC Staff Accounting Bulletin Topic 5J, "Push Down Basis of Accounting Required in Certain Limited Circumstances," including the effects of the push down of $30 million and $62 million of the EFH Corp. 10.875% Notes and Toggle Notes to the Parent at September 30, 2013 and December 31, 2012, respectively, $388 million of the EFH Corp. 9.75% Notes and 10% Notes to the Parent at December 31, 2012, and the TCEH Senior Notes, TCEH Senior Secured Notes, TCEH Senior Secured Second Lien Notes and TCEH Senior Secured Facilities to the Other Guarantors at September 30, 2013 and December 31, 2012 (see Note 5 for further details of this debt, including the elimination of EFCH's guarantees of the EFH Corp. 9.75% Notes and 10% Notes in January 2013). TCEH Finance's sole function is to be the co-issuer of the certain TCEH debt securities; therefore, it has no other independent assets, liabilities or operations.

EFCH received no dividends/distributions from its consolidated subsidiaries for the three or nine months ended September 30, 2013 and 2012.

41

---

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY LLC AND SUBSIDIARIES**
**Condensed Consolidating Statements of Income (Loss)**
**Three Months Ended September 30, 2013**
**(millions of dollars)**

| | Parent Guarantor | Issuer | Other Guarantors | Non-guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|---|
| Operating revenues | $ — | $ — | $ 1,893 | $ 27 | $ (27) | $ 1,893 |
| Fuel, purchased power costs and delivery fees | — | — | (852) | — | — | (852) |
| Net gain from commodity hedging and trading activities | — | 20 | 38 | — | — | 58 |
| Operating costs | — | — | (192) | — | 3 | (189) |
| Depreciation and amortization | — | — | (332) | 1 | — | (331) |
| Selling, general and administrative expenses | — | (14) | (173) | (11) | 23 | (175) |
| Franchise and revenue-based taxes | — | — | (18) | — | — | (18) |
| Other income | — | — | 1 | — | — | 1 |
| Other deductions | — | — | (8) | — | — | (8) |
| Interest income | — | 62 | 206 | — | (267) | 1 |
| Interest expense and related charges | (4) | (541) | (619) | (4) | 828 | (340) |
| Income (loss) before income taxes | (4) | (473) | (56) | 13 | 560 | 40 |
| Income tax (expense) benefit | 1 | 165 | 46 | (5) | (190) | 17 |
| Equity earnings of subsidiaries | 60 | 368 | 1 | — | (429) | — |
| Net income (loss) | 57 | 60 | (9) | 8 | (59) | 57 |
| Other comprehensive income | 1 | 1 | — | — | (1) | 1 |
| Comprehensive income (loss) | $ 58 | $ 61 | $ (9) | $ 8 | $ (60) | $ 58 |

42

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY LLC AND SUBSIDIARIES**
**Condensed Consolidating Statements of Income (Loss)**
**Three Months Ended September 30, 2012**
**(millions of dollars)**

| | Parent Guarantor | Issuer | Other Guarantors | Non-guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|---|
| Operating revenues | $      — | $      — | $   1,752 | $      3 | $      (3) | $   1,752 |
| Fuel, purchased power costs and delivery fees | — | — | (850) | — | — | (850) |
| Net gain (loss) from commodity hedging and trading activities | — | (98) | 9 5 | — | — | (3) |
| Operating costs | — | — | (201) | — | — | (201) |
| Depreciation and amortization | — | — | (328) | — | — | (328) |
| Selling, general and administrative expenses | — | (4) | (172) | (1) | 3 | (174) |
| Franchise and revenue-based taxes | — | — | (19) | — | — | (19) |
| Other income | — | — | 2 | — | — | 2 |
| Other deductions | — | — | (30) | — | — | (30) |
| Interest income | — | 91 | 232 | — | (313) | 10 |
| Interest expense and related charges | (24) | (982) | (606) | (2) | 842 | (772) |
| Loss before income taxes | (24) | (993) | (125) | — | 529 | (613) |
| Income tax benefit | 8 | 347 | 54 | — | (181) | 228 |
| Equity earnings (losses) of subsidiaries | (369) | 277 | — | — | 92 | — |
| Net loss | (385) | (369) | (71) | — | 440 | (385) |
| Other comprehensive income | 1 | 1 | — | — | (1) | 1 |
| Comprehensive loss | $   (384) | $   (368) | $   (71) | $      — | $   439 | $   (384) |

43

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY LLC AND SUBSIDIARIES**
**Condensed Consolidating Statements of Income (Loss)**
**Nine Months Ended September 30, 2013**
**(millions of dollars)**

| | Parent Guarantor | Issuer | Other Guarantors | Non-guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|---|
| Operating revenues | $ — | $ — | $ 4,572 | $ 59 | $ (59) | $ 4,572 |
| Fuel, purchased power costs and delivery fees | — | — | (2,175) | — | — | (2,175) |
| Net gain (loss) from commodity hedging and trading activities | — | (3) | 32 | — | — | 29 |
| Operating costs | — | — | (690) | — | 5 | (685) |
| Depreciation and amortization | — | — | (1,011) | (1) | — | (1,012) |
| Selling, general and administrative expenses | — | (49) | (481) | (25) | 53 | (502) |
| Franchise and revenue-based taxes | — | — | (51) | — | — | (51) |
| Other income | — | — | 7 | — | — | 7 |
| Other deductions | — | — | (12) | — | — | (12) |
| Interest income | 1 | 182 | 591 | — | (769) | 5 |
| Interest expense and related charges | (15) | (1,920) | (1,842) | (8) | 2,447 | (1,338) |
| Income (loss) before income taxes | (14) | (1,790) | (1,060) | 25 | 1,677 | (1,162) |
| Income tax (expense) benefit | 7 | 630 | 420 | (9) | (572) | 476 |
| Equity earnings (losses) of subsidiaries | (679) | 481 | 1 | — | 197 | — |
| Net income (loss) | (686) | (679) | (639) | 16 | 1,302 | (686) |
| Other comprehensive income | 5 | 5 | — | — | (5) | 5 |
| Comprehensive income (loss) | $ (681) | $ (674) | $ (639) | $ 16 | $ 1,297 | $ (681) |

44

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY LLC AND SUBSIDIARIES**
**Condensed Consolidating Statements of Income (Loss)**
**Nine Months Ended September 30, 2012**
**(millions of dollars)**

| | Parent Guarantor | Issuer | Other Guarantors | Non-guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|---|
| Operating revenues | $ — | $ — | $ 4,358 | $ 8 | $ (8) | $ 4,358 |
| Fuel, purchased power costs and delivery fees | — | — | (2,153) | — | — | (2,153) |
| Net gain from commodity hedging and trading activities | — | 173 | 56 | — | — | 229 |
| Operating costs | — | — | (636) | — | — | (636) |
| Depreciation and amortization | — | — | (992) | — | — | (992) |
| Selling, general and administrative expenses | — | (4) | (486) | (2) | 8 | (484) |
| Franchise and revenue-based taxes | — | — | (55) | — | — | (55) |
| Other income | — | 6 | 6 | — | — | 12 |
| Other deductions | — | — | (36) | (1) | — | (37) |
| Interest income | — | 242 | 593 | — | (799) | 36 |
| Interest expense and related charges | (69) | (2,794) | (1,778) | (5) | 2,378 | (2,268) |
| Loss before income taxes | (69) | (2,377) | (1,123) | — | 1,579 | (1,990) |
| Income tax benefit | 23 | 829 | 379 | — | (539) | 692 |
| Equity earnings (losses) of subsidiaries | (1,252) | 296 | — | — | 956 | — |
| Net loss | (1,298) | (1,252) | (744) | — | 1,996 | (1,298) |
| Other comprehensive income | 5 | 5 | — | — | (5) | 5 |
| Comprehensive loss | $ (1,293) | $ (1,247) | $ (744) | $ — | $ 1,991 | $ (1,293) |

45

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY LLC AND SUBSIDIARIES**
**Condensed Consolidating Statements of Cash Flows**
**Nine Months Ended September 30, 2013**
**(millions of dollars)**

| | Parent/ Guarantor | Issuer | Other Guarantors | Non-guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|---|
| Cash provided by (used in) operating activities | $ (8) | $ (1,764) | $ 1,736 | $ (85) | $ — | $ (121) |
| Cash flows – financing activities: | | | | | | |
| Notes/advances due to affiliates | 11 | 1,913 | — | — | (1,920) | 4 |
| Repayments/repurchases of long-term debt | (3) | (64) | (27) | — | — | (94) |
| Net short-term borrowings under accounts receivable securitization program | — | — | — | 90 | — | 90 |
| Contributions from noncontrolling interests | — | — | — | 3 | — | 3 |
| Other, net | — | — | — | (10) | — | (10) |
| Cash provided by (used in) financing activities | 8 | 1,849 | (27) | 83 | (1,920) | (7) |
| Cash flows – investing activities: | | | | | | |
| Capital expenditures | — | — | (349) | (4) | — | (353) |
| Nuclear fuel purchases | — | — | (59) | — | — | (59) |
| Notes due from affiliates | — | — | (1,222) | — | 1,920 | 698 |
| Purchase of right to use certain computer-related assets from parent | — | — | (6) | — | — | (6) |
| Proceeds from sales of assets | — | — | 3 | — | — | 3 |
| Acquisition of combustion turbine trust interest | — | — | (40) | — | — | (40) |
| Purchases of environmental allowances and credits | — | — | (13) | — | — | (13) |
| Proceeds from sales of nuclear decommissioning trust fund securities | — | — | 128 | — | — | 128 |
| Investments in nuclear decommissioning trust fund securities | — | — | (140) | — | — | (140) |
| Other, net | — | — | (3) | — | — | (3) |
| Cash provided by (used in) investing activities | — | — | (1,701) | (4) | 1,920 | 215 |
| Net change in cash and cash equivalents | — | 85 | 8 | (6) | — | 87 |
| Cash and cash equivalents – beginning balance | — | 1,115 | 15 | 45 | — | 1,175 |
| Cash and cash equivalents – ending balance | $ — | $ 1,200 | $ 23 | $ 39 | $ — | $ 1,262 |

46

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY LLC AND SUBSIDIARIES**
**Condensed Consolidating Statements of Cash Flows**
**Nine Months Ended September 30, 2012**
**(millions of dollars)**

| | Parent/ Guarantor | Issuer | Other Guarantors | Non-guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|---|
| Cash provided by (used in) operating activities | $ (7) | $ (471) | $ 885 | $ (78) | $ — | $ 329 |
| Cash flows – financing activities: | | | | | | |
| Notes due to affiliates | 11 | 1,029 | — | — | (1,040) | — |
| Repayments/repurchases of long-term debt | (4) | — | (26) | — | — | (30) |
| Net short-term borrowings under accounts receivable securitization program | — | — | — | 80 | — | 80 |
| Decrease in other short-term borrowings | — | (385) | — | — | — | (385) |
| Decrease in income tax-related note payable to Oncor | — | — | (20) | — | — | (20) |
| Settlement of reimbursement agreements with Oncor | — | — | (159) | — | — | (159) |
| Contributions from noncontrolling interests | — | — | — | 6 | — | 6 |
| Sale/leaseback of equipment | — | — | 15 | — | — | 15 |
| Cash provided by (used in) financing activities | 7 | 644 | (190) | 86 | (1,040) | (493) |
| Cash flows – investing activities: | | | | | | |
| Capital expenditures | — | — | (491) | (7) | — | (498) |
| Nuclear fuel purchases | — | — | (155) | — | — | (155) |
| Notes/loans due from affiliates | — | — | (118) | — | 1,040 | 922 |
| Proceeds from sales of assets | — | — | 1 | — | — | 1 |
| Changes in restricted cash | — | — | 112 | — | — | 112 |
| Purchases of environmental allowances and credits | — | — | (19) | — | — | (19) |
| Proceeds from sales of nuclear decommissioning trust fund securities | — | — | 56 | — | — | 56 |
| Investments in nuclear decommissioning trust fund securities | — | — | (68) | — | — | (68) |
| Other, net | — | — | 2 | — | — | 2 |
| Cash provided by (used in) investing activities | — | — | (680) | (7) | 1,040 | 353 |
| Net change in cash and cash equivalents | — | 173 | 15 | 1 | — | 189 |
| Cash and cash equivalents – beginning balance | — | 87 | 23 | 10 | — | 120 |
| Cash and cash equivalents – ending balance | $ — | $ 260 | $ 38 | $ 11 | $ — | $ 309 |

47

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY LLC AND SUBSIDIARIES**
**Condensed Consolidating Balance Sheets**
**September 30, 2013**
**(millions of dollars)**

| | Parent Guarantor | Issuer | Other Guarantors | Non-guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | |
| Current assets: | | | | | | |
| Cash and cash equivalents | $ — | $ 1,200 | $ 23 | $ 39 | $ — | $ 1,262 |
| Advances to affiliates | — | — | 74 | — | (74) | — |
| Trade accounts receivable – net | — | 1 | 315 | 574 | (94) | 796 |
| Income taxes receivable | 7 | — | 84 | — | (84) | 7 |
| Accounts receivable from affiliates | — | 13 | — | 5 | (18) | — |
| Inventories | — | — | 400 | — | — | 400 |
| Commodity and other derivative contractual assets | — | 726 | 247 | — | — | 973 |
| Accumulated deferred income taxes | 3 | — | — | 3 | (6) | — |
| Margin deposits related to commodity positions | — | — | 21 | — | — | 21 |
| Other current assets | — | 2 | 32 | — | — | 34 |
| Total current assets | 10 | 1,942 | 1,196 | 621 | (276) | 3,493 |
| Restricted cash | — | 947 | — | — | — | 947 |
| Investments | (10,467) | 23,885 | 867 | 9 | (13,507) | 787 |
| Property, plant and equipment – net | — | — | 17,760 | 201 | — | 17,961 |
| Advances to affiliates | — | — | 9,972 | — | (9,972) | — |
| Goodwill | — | 4,952 | — | — | — | 4,952 |
| Identifiable intangible assets – net | — | — | 1,736 | 5 | (5) | 1,736 |
| Commodity and other derivative contractual assets | — | 147 | 12 | — | — | 159 |
| Accumulated deferred income taxes | — | 490 | — | 3 | (493) | — |
| Other noncurrent assets, principally unamortized amendment/issuance costs | — | 834 | 849 | 7 | (831) | 859 |
| Total assets | $ (10,457) | $ 33,197 | $ 32,392 | $ 846 | $ (25,084) | $ 30,894 |
| **LIABILITIES AND MEMBERSHIP INTERESTS** | | | | | | |
| Current liabilities: | | | | | | |
| Short-term borrowings | $ — | $ 2,054 | $ 2,054 | $ 172 | $ (2,054) | $ 2,226 |
| Notes/advances from affiliates | 1 | 10,045 | — | — | (10,046) | |
| Long-term debt due currently | 11 | — | 10 | 11 | — | 32 |
| Trade accounts payable | — | 5 | 348 | 95 | (94) | 354 |
| Trade accounts and other payables to affiliates | — | — | 223 | — | (18) | 205 |
| Notes payable to parent | 92 | — | — | — | — | 92 |
| Commodity and other derivative contractual liabilities | — | 413 | 181 | — | — | 594 |
| | | | | | | |
| | | | | | | |

48

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY LLC AND SUBSIDIARIES**
**Condensed Consolidating Balance Sheets**
**September 30, 2013**
**(millions of dollars)**

| | Parent Guarantor | Issuer | Other Guarantors | Non-guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|---|
| Margin deposits related to commodity positions | $ — | $ 335 | $ 18 | $ — | $ — | $ 353 |
| Accumulated deferred income taxes | — | 3 | 39 | — | (6) | 36 |
| Accrued income taxes payable to parent | — | 70 | — | 14 | (84) | — |
| Accrued taxes other than income | — | — | 95 | — | — | 95 |
| Accrued interest | 3 | 528 | 401 | 1 | (401) | 532 |
| Other current liabilities | — | — | 219 | — | — | 219 |
| Total current liabilities | 107 | 13,453 | 3,588 | 293 | (12,703) | 4,738 |
| Accumulated deferred income taxes | 84 | — | 2,782 | — | 481 | 3,347 |
| Commodity and other derivative contractual liabilities | — | 779 | 3 | — | — | 782 |
| Notes or other liabilities due affiliates | — | — | 2 | — | — | 2 |
| Long-term debt held by affiliates | — | 382 | — | — | — | 382 |
| Long-term debt, less amounts due currently | 92 | 29,604 | 28,704 | 22 | (28,652) | 29,770 |
| Affiliate tax sharing liability | — | (571) | 1,294 | — | — | 723 |
| Other noncurrent liabilities and deferred credits | 8 | 17 | 1,774 | — | (6) | 1,793 |
| Total liabilities | 291 | 43,664 | 38,147 | 315 | (40,880) | 41,537 |
| EFCH membership interests | (10,748) | (10,467) | (5,755) | 426 | 15,796 | (10,748) |
| Noncontrolling interests in subsidiaries | — | — | — | 105 | — | 105 |
| Total membership interests | (10,748) | (10,467) | (5,755) | 531 | 15,796 | (10,643) |
| Total liabilities and membership interests | $ (10,457) | $ 33,197 | $ 32,392 | $ 846 | $ (25,084) | $ 30,894 |

49

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY LLC AND SUBSIDIARIES**
**Condensed Consolidating Balance Sheets**
**December 31, 2012**
**(millions of dollars)**

| | Parent Guarantor | Issuer | Other Guarantors | Non-guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | |
| Current assets: | | | | | | |
| Cash and cash equivalents | $ — | $ 1,115 | $ 15 | $ 45 | $ — | $ 1,175 |
| Advances to affiliates | — | — | 36 | — | (36) | — |
| Trade accounts receivable – net | — | 2 | 360 | 445 | (97) | 710 |
| Notes receivable from parent | — | 698 | — | — | — | 698 |
| Income taxes receivable | — | — | 410 | — | (410) | — |
| Accounts receivable from affiliates | — | 95 | — | — | (95) | — |
| Inventories | — | — | 393 | — | — | 393 |
| Commodity and other derivative contractual assets | — | 1,127 | 336 | — | — | 1,463 |
| Accumulated deferred income taxes | 3 | — | — | 3 | (6) | — |
| Margin deposits related to commodity positions | — | — | 71 | — | — | 71 |
| Other current assets | — | — | 112 | 8 | — | 120 |
| Total current assets | 3 | 3,037 | 1,733 | 501 | (644) | 4,630 |
| Restricted cash | — | 947 | — | — | — | 947 |
| Investments | (9,794) | 23,382 | 747 | 9 | (13,634) | 710 |
| Property, plant and equipment – net | — | — | 18,422 | 134 | — | 18,556 |
| Advances to affiliates | — | — | 8,794 | — | (8,794) | — |
| Goodwill | — | 4,952 | — | — | — | 4,952 |
| Identifiable intangible assets – net | — | — | 1,781 | — | — | 1,781 |
| Commodity and other derivative contractual assets | — | 575 | 11 | — | — | 586 |
| Accumulated deferred income taxes | — | 828 | — | 3 | (831) | — |
| Other noncurrent assets, principally unamortized amendment/issuance costs | 4 | 781 | 806 | 3 | (783) | 811 |
| Total assets | $ (9,787) | $ 34,502 | $ 32,294 | $ 650 | $ (24,686) | $ 32,973 |
| **LIABILITIES AND EQUITY** | | | | | | |
| Current liabilities: | | | | | | |
| Short-term borrowings | $ — | $ 2,054 | $ 2,054 | $ 82 | $ (2,054) | $ 2,136 |
| Notes/advances from affiliates | — | 8,830 | — | — | (8,830) | — |
| Long-term debt due currently | 11 | 64 | 21 | — | — | 96 |
| Trade accounts payable | — | 2 | 387 | 97 | (97) | 389 |
| Trade accounts and other payables to affiliates | — | — | 231 | 3 | (95) | 139 |
| Notes payable to parent/affiliate | 80 | — | 1 | — | — | 81 |
| Commodity and other derivative contractual liabilities | — | 610 | 284 | — | — | 894 |

50

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY LLC AND SUBSIDIARIES**
**Condensed Consolidating Balance Sheets**
**December 31, 2012**
**(millions of dollars)**

| | Parent Guarantor | Issuer | Other Guarantors | Non-guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|---|
| Margin deposits related to commodity positions | $ — | $ 596 | $ 4 | $ — | $ — | $ 600 |
| Accumulated deferred income taxes | — | 3 | 52 | — | (6) | 49 |
| Accrued income taxes payable to parent | 2 | 433 | — | 6 | (410) | 31 |
| Accrued taxes other than income | — | — | 17 | — | — | 17 |
| Accrued interest | 18 | 389 | 281 | — | (281) | 407 |
| Other current liabilities | 1 | 4 | 253 | — | — | 255 |
| Total current liabilities | 112 | 12,985 | 3,585 | 188 | (11,776) | 5,094 |
| Accumulated deferred income taxes | 79 | — | 3,569 | — | 111 | 3,759 |
| Commodity and other derivative contractual liabilities | — | 1,539 | 17 | — | — | 1,556 |
| Notes or other liabilities due affiliates | — | — | 5 | — | — | 5 |
| Long-term debt held by affiliates | — | 382 | — | — | — | 382 |
| Long-term debt, less amounts due currently | 515 | 29,355 | 28,486 | — | (28,428) | 29,928 |
| Other noncurrent liabilities and deferred credits | 13 | 36 | 2,594 | — | — | 2,643 |
| Total liabilities | 719 | 44,297 | 38,256 | 188 | (40,093) | 43,367 |
| EFCH shareholder's equity | (10,506) | (9,795) | (5,962) | 350 | 15,407 | (10,506) |
| Noncontrolling interests in subsidiaries | — | — | — | 112 | — | 112 |
| Total equity | (10,506) | (9,795) | (5,962) | 462 | 15,407 | (10,394) |
| Total liabilities and equity | $ (9,787) | $ 34,502 | $ 32,294 | $ 650 | $ (24,686) | $ 32,973 |

51

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

**Item 2.  MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

The following discussion and analysis of our financial condition and results of operations for the three and nine months ended September 30, 2013 and 2012 should be read in conjunction with our condensed consolidated financial statements and the notes to those statements.

All dollar amounts in the tables in the following discussion and analysis are stated in millions of US dollars unless otherwise indicated.

*Business*

EFCH, a wholly owned subsidiary of EFH Corp., is a Dallas, Texas-based holding company.  In April 2013, EFCH was converted from a Texas corporation to a Delaware limited liability company; the directors and officers and consolidated assets, businesses and operations are unchanged.   We conduct our operations almost entirely through our wholly owned subsidiary, TCEH.  TCEH is a holding company for subsidiaries engaged in competitive electricity market activities largely in Texas, including electricity generation, wholesale energy sales and purchases, commodity risk management and trading activities and retail electricity sales. Key management activities, including commodity risk management and electricity sourcing for our retail and wholesale customers, are performed on an integrated basis; consequently, there are no reportable business segments.

*Significant Activities and Events and Items Influencing Future Performance*

See Note 1 to Financial Statements for discussion of TCEH liquidity and description of EFH Corp.'s discussions with creditors.

*Income Tax Matters* — See Note 12 to Financial Statements for discussion of the agreement EFH Corp. reached with the IRS Appeals in March 2013 that resolved disputed adjustments from the IRS audit for the years 2003 through 2006 and the approval EFH Corp. received from the Joint Committee on Taxation of the IRS appeals settlement in May 2013 that resolved all issues from the IRS audit for the years 1997 through 2002.  See "Financial Condition — Income Tax Matters" for discussion of the private letter ruling EFH Corp. received from the IRS in April 2013 and its subsequent consummation of internal corporate transactions involving EFH Corp. and EFCH that resulted in the elimination of an excess loss account and a deferred intercompany gain.

*Natural Gas Hedging Program and Other Hedging Activities* — Because wholesale electricity prices in ERCOT have generally moved with natural gas prices, TCEH has a natural gas hedging program designed to mitigate the effect of natural gas price changes on future electricity revenues.  Under the program, we have entered into market transactions involving natural gas-related financial instruments, and at September 30, 2013, have effectively sold forward approximately 210 million MMBtu of natural gas (equivalent to the natural gas exposure of approximately 25,000 GWh at an assumed 8.5 market heat rate) at weighted average annual hedge prices as shown in the table below; at December 31, 2012, March 31, 2013 and June 30, 2013, the comparable hedge volumes totaled approximately 360 million MMBtu, 310 million MMBtu and 270 million MMBtu, respectively.  Volumes and hedge values associated with the hedging program are inclusive of offsetting purchases entered into to take into account new wholesale and retail electricity sales contracts and avoid over-hedging. This activity results in both commodity contract asset and liability balances pending the maturity and settlement of the offsetting transactions.

Taking together forward wholesale and retail electricity sales with the natural gas positions in the hedging program, we have effectively hedged an estimated 96% and 78% of the price exposure, on a natural gas equivalent basis, related to TCEH's expected generation output for 2013 and 2014 , respectively (assuming an 8.5 market heat rate).  The natural gas positions were entered into with the continuing expectation that wholesale electricity prices in ERCOT will generally move with prices of natural gas, which we expect to be the marginal fuel for the purpose of setting electricity prices generally 70% to 90% of the time in the ERCOT market. If the relationship changes in the future, the cash flows targeted under the natural gas hedging program may not be achieved.

TCEH has entered into related put and call transactions (referred to as collars), primarily for 2014, that result in hedge prices that fall within a range. These transactions represented 71% (in MMBtu) of the positions in the hedging program at September 30, 2013, with the approximate weighted average strike prices under the collars being a floor of $7.80 per MMBtu and a ceiling of $11.75 per MMBtu.

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

We currently have no natural gas positions in the hedging program that mature after 2014. The following table summarizes the positions in the program at September 30, 2013:

|  | Measure | Balance 2013 (a) | 2014 | Total |
|---|---|---|---|---|
| Natural gas hedge volumes (b) | mm MMBtu | ~65 | ~146 | ~211 |
| Weighted average hedge price (c) | $/MMBtu | ~6.89 | ~7.80 | — |
| Average market price (d) | $/MMBtu | ~3.60 | ~3.86 | — |
| Realization of hedge gains (e) | $ billions | ~0.2 | ~0.6 | ~0.8 |

(a)  Balance of 2013 is from October 1, 2013 through December 31, 2013.
(b)  Where collars are reflected, the volumes are based on the delta equivalent short position of approximately 150 million MMBtu in 2014.
(c)  Weighted average hedge prices are based on prices of positions in the natural gas hedging program (excluding offsetting purchases to avoid over-hedging). Where collars are reflected, sales price represents the collar floor price.
(d)  Based on NYMEX Henry Hub prices.
(e)  Based on cumulative unrealized mark-to-market gain at September 30, 2013.

Changes in the fair value of the instruments in the hedging program are recorded as unrealized gains and losses in net gain (loss) from commodity hedging and trading activities in the statement of income, which has and could continue to result in significant volatility in reported net income. Based on the size of the hedging program at September 30, 2013, a $1.00/MMBtu change in natural gas prices across the hedged period would result in the recognition of up to approximately $210 million in pretax unrealized mark-to-market gains or losses.

The hedging program has resulted in reported net gains (losses) as follows:

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
|  | 2013 | 2012 | 2013 | 2012 |
| Realized net gain | $ 276 | $ 440 | $ 756 | $ 1,459 |
| Unrealized net loss including reversals of previously recorded amounts related to positions settled | (258) | (539) | (739) | (1,244) |
| Total | $ 18 | $ (99) | $ 17 | $ 215 |

The cumulative unrealized mark-to-market net gain related to positions in the natural gas hedging program totaled $845 million and $1.584 billion at September 30, 2013 and December 31, 2012, respectively. The decline was driven by settlement of maturing positions.

Given the volatility of natural gas prices, it is not possible to predict future reported unrealized mark-to-market gains or losses and the actual gains or losses that will ultimately be realized upon settlement of the hedge positions in the future. If natural gas prices at settlement are lower than the prices of the hedge positions, the hedges are expected to mitigate the otherwise negative effect on earnings of lower wholesale electricity prices. However, if natural gas prices at settlement are higher than the prices of the hedge positions, the hedges are expected to dampen the otherwise positive effect on earnings of higher wholesale electricity prices and will in this context be viewed as having resulted in an opportunity cost.

53

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The significant cumulative unrealized mark-to-market net gain related to positions in the hedging program reflects the sustained decline in forward market natural gas prices as presented in the table below.  Forward natural gas prices have generally trended downward over the past several years.  While the hedging program is designed to mitigate the effect on earnings of low wholesale electricity prices, depressed forward natural gas prices are challenging to our liquidity and the long-term profitability of our business.  Specifically, low natural gas prices and their effect in ERCOT on wholesale electricity prices could have a material impact on our liquidity and TCEH's overall profitability for periods in which TCEH does not have significant hedge positions.  See Note 1 to Financial Statements.

| | Forward Market Prices for Calendar Year ($/MMBtu) (a) | | | |
| Date | 2013 (b) | 2014 | 2015 | 2016 |
|---|---|---|---|---|
| December 31, 2008 | $   7.15 | $   7.15 | $   7.21 | $   7.30 |
| December 31, 2009 | $   6.67 | $   6.84 | $   7.05 | $   7.24 |
| December 31, 2010 | $   5.33 | $   5.49 | $   5.64 | $   5.79 |
| December 31, 2011 | $   3.94 | $   4.34 | $   4.60 | $   4.85 |
| March 31, 2012 | $   3.47 | $   3.96 | $   4.26 | $   4.51 |
| June 30, 2012 | $   3.58 | $   3.95 | $   4.13 | $   4.29 |
| September 30, 2012 | $   3.84 | $   4.18 | $   4.37 | $   4.55 |
| December 31, 2012 | $   3.54 | $   4.03 | $   4.23 | $   4.42 |
| March 31, 2013 | $   4.12 | $   4.23 | $   4.30 | $   4.38 |
| June 30, 2013 | $   3.64 | $   3.91 | $   4.14 | $   4.33 |
| September 30, 2013 | $   3.60 | $   3.86 | $   4.06 | $   4.17 |

_____
(a)   Based on NYMEX Henry Hub prices.
(b)   For March 31, 2013, June 30, 2013 and September 30, 2013, natural gas prices for 2013 represent the average of forward prices for April through December, July through December and October through December, respectively.

The following sensitivity table provides estimates of the potential impact (in $ millions) of movements in natural gas prices, market heat rates and diesel fuel prices on realized pretax earnings for the periods presented.  The estimates related to price sensitivity are based on TCEH's unhedged position and forward prices at September 30, 2013, which for natural gas reflects estimates of electricity generation less amounts hedged through the natural gas hedging program and amounts under existing wholesale and retail sales contracts.  On a rolling basis, generally twelve-months, the substantial majority of retail sales under month-to-month arrangements are deemed to be under contract.

| | | Balance 2013 (a) | 2014 | 2015 |
|---|---|---|---|---|
| $1.00/MMBtu change in natural gas price (b) | | $ ~3 | $ ~115 | $ ~475 |
| 0.1/MMBtu/MWh change in market heat rate (c) | $ | — | $ ~20 | $ ~30 |
| $1.00/gallon change in diesel fuel price | | $ ~1 | $ ~15 | $ ~45 |

_____
(a)   Balance of 2013 is from November 1, 2013 through December 31, 2013.
(b)   Assumes conversion of electricity positions based on an approximate 8.5 market heat rate with natural gas generally being on the margin 70% to 90% of the time in the ERCOT market (i.e., when coal is forecast to be on the margin, no natural gas position is assumed to be generated).   Excludes the impact of economic backdown.
(c)   Based on Houston Ship Channel natural gas prices at September 30, 2013.

***TCEH Interest Rate Swap Transactions*** — TCEH employs interest rate swaps to hedge exposure to its variable rate debt.  As reflected in the table below, as of September 30, 2013, TCEH has entered into the following series of interest rate swap transactions that effectively fix the interest rates at between 5.5% and 9.3%.

| Fixed Rates | Expiration Dates | Notional Amount |
|---|---|---|
| 5.5%  -  9.3% | October 2013 through October 2014 | $ 18.140 billion (a) |
| 6.8%  -  9.0% | October 2015 through October 2017 | $ 12.600 billion (b) |

_____
(a)   Swaps related to an aggregate $1.6 billion principal amount of debt expired in 2013.  Per the terms of the transactions, the notional amount of swaps entered into in 2011 grew by $1.280 billion in 2013, substantially offsetting the expired swaps.
(b)   These swaps are effective from October 2014 through October 2017.  The $12.6 billion notional amount of swaps includes $3 billion that expires in October 2015 with the remainder expiring in October 2017.

54

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

We may enter into additional interest rate hedges from time to time.

TCEH has also entered into interest rate basis swap transactions that further reduce the fixed borrowing costs achieved through the interest rate swaps. Basis swaps in effect at September 30, 2013 totaled $11.967 billion notional amount.  The basis swaps relate to debt outstanding through 2014.

The interest rate swaps have resulted in net gains (losses) reported in interest expense and related charges as presented in the table below.  See Note 8 to Financial Statements for discussion of nonperformance risk adjustments included in unrealized net gain in 2013.

|  | Three Months Ended September 30, | | | | Nine Months Ended September 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
|  | 2013 | | 2012 | | 2013 | | 2012 | |
| Realized net loss | $ | (160) | $ | (168) | $ | (466) | $ | (505) |
| Unrealized net gain (loss) including reversals of previously recorded amounts related to settled positions |  | 413 |  | (20) |  | 899 |  | (16) |
| Total | $ | 253 | $ | (188) | $ | 433 | $ | (521) |

The cumulative unrealized mark-to-market net liability related to all TCEH interest rate swaps totaled $1.518 billion (before nonperformance risk adjustment) and $2.065 billion at September 30, 2013 and December 31, 2012, respectively.  The decline in the net liability reflected unrealized gains due to higher interest rates and swap settlements.  This mark-to-market position can change materially in value as market conditions change, which could result in significant volatility in reported net income.  For example, at September 30, 2013, a one percent change in interest rates would result in an increase or decrease of approximately $525 million in our cumulative unrealized mark-to-market net liability.

***First-Lien Security for Natural Gas Hedging Program and Interest Rate Swaps*** — Approximately 95% of the positions in the natural gas hedging program and all of the TCEH interest rate swaps are secured by a first-lien interest in the assets of TCEH on a pari passu basis with the TCEH Senior Secured Facilities and the TCEH Senior Secured Notes.  Certain entities are counterparties to both our natural gas hedging program positions and our interest rate swaps and have entered into master agreements that provide for netting and setoff of amounts related to these positions.   At September 30, 2013, our net liability positions related to these counterparties together with liability positions related to entities that are counterparties to only our interest rate swaps totaled approximately $1.2 billion (before nonperformance risk adjustment).  This amount is subject to change based on changes in interest rates and natural gas prices.

***Seasonal Suspension of Certain Generation Operations*** — In October 2013, ERCOT approved our notice of intent (filed in September 2013) to suspend operations at one of the three generation units at our Martin Lake generation facility for approximately six months beginning December 2013 due to low wholesale power prices and other market conditions.  The unit is expected to return to service during the peak demand months in the summer of 2014.  Our mines that support the Martin Lake facility are expected to continue year-round operations.

In August 2013, ERCOT approved our notice of intent, as previously disclosed, to suspend operations beginning October 1, 2013 at two of the three generation units at our Monticello generation facility due to low wholesale power prices and other market conditions.  The two Monticello units are expected to return to service during the peak demand months in the summer of 2014.  Our mines that support the Monticello generation facility are expected to continue year-round operations.

At current wholesale market prices of electricity, we do not expect the suspension of operations to significantly impact our results of operations, liquidity or financial condition.  The previously disclosed seasonal suspension of two generation units at Monticello that began December 1, 2012 ended June 1, 2013 as planned.

***Natural Gas-Fueled Generation Development*** — In August 2013, the TCEQ granted air permits to Luminant to build two natural gas combustion turbines totaling 420 MW to 460 MW at its existing DeCordova generation facility. In May 2013, Luminant filed an air permit application with the TCEQ to build two natural gas combustion turbines totaling 420 MW to 460 MW at its existing Tradinghouse generation facility.  While we believe current market conditions do not provide adequate economic returns for the development or construction of these facilities, we believe additional generation resources will be needed to support future electricity demand growth and reliability in the ERCOT market.

55

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Liability Management Program* — At September 30, 2013, we had $30.4 billion principal amount of long-term debt outstanding, including $30 million pushed down from EFH Corp. We and EFH Corp. have implemented a liability management program designed to reduce debt, capture debt discount and extend debt maturities through debt exchanges, repurchases and extensions.

Amendments to the TCEH Senior Secured Facilities completed in April 2011 and January 2013 resulted in the extension of $16.4 billion in loan maturities under the TCEH Term Loan Facilities and the TCEH Letter of Credit Facility from October 2014 to October 2017 and $2.05 billion of commitments under the TCEH Revolving Credit Facility from October 2013 to October 2016.

Other liability management activities since 2009 related to TCEH debt include debt exchange, issuance and repurchase activities as follows (all transactions occurred prior to 2012):

| Security (except where noted, debt amounts are principal amounts) | Debt Acquired | | Debt Issued/Cash Paid | |
|---|---|---|---|---|
| TCEH 10.25% Notes due 2015 | $ | 1,513 | $ | — |
| TCEH Toggle Notes due 2016 | | 758 | | — |
| TCEH Senior Secured Facilities due 2013 and 2014 | | 1,604 | | — |
| TCEH 15% Notes due 2021 | | — | | 1,221 |
| TCEH 11.5% Notes due 2020 (a) | | — | | 1,604 |
| Cash paid, including use of proceeds from debt issuances in 2010 (b) | | — | | 343 |
| Total | $ | 3,875 | $ | 3,168 |

_____

(a)  Debt issued amount represents $1.750 billion principal amount less $12 million in debt discount and $134 million in proceeds used for transaction costs related to the issuance of these notes and the amendment and extension of the TCEH Senior Secured Facilities. The net proceeds amount of $1.604 billion was used to repay borrowings under the TCEH Senior Secured Facilities, and the remaining transaction costs were funded with cash on hand.

(b)  Includes $343 million of the proceeds from the October 2010 issuance of $350 million principal amount of TCEH 15% Senior Secured Second Lien Notes due 2021 that were used to repurchase debt, including $53 million used to repurchase debt held by EFH Corp.

Since inception, TCEH's transactions in the liability management program resulted in the capture of approximately $700 million of debt discount and the extension of approximately $19.6 billion of debt maturities to 2017-2021.

As the result of EFH Corp. and EFIH liability management transactions in December 2012 and the first quarter 2013, substantially all EFH Corp. debt guaranteed by EFCH was cancelled or amended to remove EFCH's guarantee, such that EFCH now guarantees $60 million principal amount of EFH Corp. debt. See Note 5 to Financial Statements for discussion of these and other debt-related transactions and Note 1 to Financial Statements regarding "Liquidity Considerations" and "Discussions with Creditors."

EFH Corp. and its subsidiaries (other than the Oncor Ring-Fenced Entities) continue to consider and evaluate possible transactions and initiatives to address their highly leveraged balance sheets and significant cash interest requirements and have entered into discussions with their lenders and bondholders with respect to such transactions and initiatives. These transactions and initiatives may include, among others, debt for debt exchanges, recapitalizations, amendments to and extensions of debt obligations and exchanges or conversions of debt for preferred or common equity or warrants, including exchanges or conversions of debt of EFH Corp., EFIH, EFCH and TCEH into preferred or common equity or warrants of EFH Corp., EFIH, EFCH, TCEH and/or any of their subsidiaries.

In evaluating whether to undertake any liability management transaction, EFH Corp. will take into account, among other things, liquidity requirements, prospects for future access to capital, contractual restrictions, tax consequences, the market price and maturity dates of its outstanding debt and potential transaction costs. Any liability management transaction, including any refinancing or extension, may occur on a stand-alone basis or in connection with, or immediately following, other liability management transactions.

*Environmental Matters* — See Note 6 to Financial Statements for a discussion of the CSAPR and other EPA actions as well as related litigation.

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

*Greenhouse Gas Emissions* — In September 2013, the EPA issued a proposed rule for greenhouse gas emission standards for new electricity generation units. We are currently reviewing this proposed rule; however, at this time it is uncertain how (if at all) the proposed rule, if finalized, would affect our results of operations, liquidity or financial condition.

President Obama has also directed the EPA to propose standards, regulations, or guidelines that address greenhouse gas emissions from modified, reconstructed, and existing power plants by June 2014 and finalize them by June 2015. The proposed rule is to include guidelines that require states to submit to the EPA their implementing plans and regulations by June 2016. We cannot predict the outcome of this rulemaking. It is uncertain how (if at all) any such proposed rule, if finalized, would affect our results of operations, liquidity or financial condition.

In addition, the US Supreme Court (Supreme Court) recently granted review in *Am. Chemistry Council, et al* v. *EPA, et al.* In that case, the Supreme Court will consider whether EPA's regulation of greenhouse gas emissions from new motor vehicles allow it to require permits under the CAA for stationary sources that emit greenhouse gases. We are not a party to that case. It is uncertain how (if at all) any decision by the Supreme Court would affect our results of operations, liquidity or financial condition.

*Mercury and Air Toxics Standard (MATS)* — In December 2011 the EPA finalized the MATS rule, which regulates the emissions of mercury, nonmercury metals, hazardous organic compounds and acid gases. Any additional control equipment retrofits on our lignite/coal-fueled generation units required to comply with the MATS rule as finalized would need to be installed within three to four years from the April 2012 effective date of the rule. In April 2012, we filed a petition for review of the MATS rule in the D.C. Circuit Court. Certain states and industry participants have also filed petitions for review in the D.C. Circuit Court. We cannot predict the timing or outcome of the D.C. Circuit Court's review of these petitions. In November 2012, the EPA proposed revised standards for new coal-fired generation units and other minor changes to the MATS rule, including changes to the work practice standards affecting all units. In March 2013, the EPA finalized the revised standards for new coal-fired units and certain other minor changes but did not address the work practice standards. In June 2013, the EPA solicited comments on certain proposed changes to these work practice standards. We cannot predict the outcome of this rulemaking.

*Regional Haze* — $SO_2$ and $NO_X$ reductions required under the proposed regional haze/visibility rule (or so-called BART rule) only apply to units built between 1962 and 1977. The reductions are required either on a unit-by-unit basis or by state participation in an EPA-approved regional trading program such as the CAIR. In February 2009, the TCEQ submitted a State Implementation Plan (SIP) concerning regional haze to the EPA, which we believe would not have a material impact on our generation facilities. In December 2011, the EPA proposed a limited disapproval of the SIP due to its reliance on the CAIR and a Federal Implementation Plan for Texas providing that the inclusion in the CSAPR programs meets the regional haze requirements for $SO_2$ and $NO_X$ reductions. In June 2012, the EPA finalized the limited disapproval of the Texas regional haze SIP, but did not finalize a Federal Implementation Plan for Texas. We cannot predict whether or when the EPA will finalize a Federal Implementation Plan for Texas regarding regional haze or its impact on our results of operations, liquidity or financial condition. In August 2012, we filed a petition for review in the Fifth Circuit Court challenging the EPA's limited disapproval of the Texas regional haze SIP on the grounds that the CAIR continued in effect pending the D.C. Circuit Court's decision in the CSAPR litigation. In September 2012, we filed a petition to intervene in a case filed by industry groups and other states and private parties in the D.C. Circuit Court challenging the EPA's limited disapproval and issuance of Federal Implementation Plans regarding regional haze. The Fifth Circuit Court case has since been transferred to the D.C. Circuit Court and consolidated with other pending regional haze appeals. The consolidated cases now in the D.C. Circuit Court are held in abeyance pending completion of the CSAPR rehearing proceeding described in Note 6 to Financial Statements. We cannot predict when or how the D.C. Circuit Court will rule on these petitions. In May 2013, the TCEQ finalized a required five-year revision to its Regional Haze (SIP), and a court-ordered deadline for the EPA to propose a decision on the Texas Regional Haze SIP was extended to May 2014.

**Financial Services Reform Legislation** — In July 2010, the US Congress enacted financial reform legislation known as the Dodd-Frank Wall Street Reform and Consumer Protection Act (the Financial Reform Act). The primary purposes of the Financial Reform Act are, among other things: to address systemic risk in the financial system; to establish a Bureau of Consumer Financial Protection with broad powers to enforce consumer protection laws and promulgate rules against unfair, deceptive or abusive practices; to enhance regulation of the derivatives markets, including the requirement for central clearing of over-the-counter derivative instruments and additional capital and margin requirements for certain derivative market participants and to implement a number of new corporate governance requirements for companies with listed or, in some cases, publicly traded securities. While the legislation is broad and detailed, a few key rulemaking decisions remain to be made by federal governmental agencies to fully implement the Financial Reform Act.

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Title VII of the Financial Reform Act provides for the regulation of the over-the-counter (OTC) derivatives (Swaps) market.  The Financial Reform Act generally requires OTC derivatives (including the types of asset-backed OTC derivatives that we use to hedge risks associated with commodity and interest rate exposure) to be cleared by a derivatives clearing organization.  However, under the end-user clearing exemption, entities are exempt from these clearing requirements if they (i) are not "Swap Dealers" or "Major Swap Participants" and (ii) use Swaps to hedge or mitigate commercial risk.  Existing swaps are grandfathered from the clearing requirements.  The legislation mandates significant compliance requirements for any entity that is determined to be a Swap Dealer or Major Swap Participant and additional reporting and recordkeeping requirements for all entities that participate in the derivative markets.

In May 2012, the CFTC published its final rule defining the terms Swap Dealer and Major Swap Participant.  Additionally, in July 2012, the CFTC approved the final rules defining the term Swap and the end-user clearing exemption.  The definition of the term Swap and the Swap Dealer/Major Swap Participant rule became effective in October 2012.  Accordingly, we are required to continually assess our activity to determine if we will be required to register as a Swap Dealer or Major Swap Participant.  Based on our assessments to date, we are not a Swap Dealer or Major Swap Participant.

The reporting requirements under the Financial Reform Act for entities that are not Swap Dealers or Major Swap Participants became effective in August 2013, and we are in compliance with these rules.

In September 2012, the District Court for the District of Columbia issued an order that vacated and remanded to the CFTC its Position Limit Rule (PLR), which would have been effective in October 2012.  The PLR provided for specific position limits related to 28 Core Referenced Futures Contracts, including the NYMEX Henry Hub Natural Gas Futures Contract, the NYMEX Light Sweet Crude Oil Futures Contract and the NYMEX New York Harbor No. 2 Heating Oil Futures Contract. If the PLR had been approved by the court, we would have been required to comply with the portion of the PLR applicable to the contracts noted above, which would result in increased monitoring and reporting requirements.  We cannot predict when, or in what form, the CFTC will change the PLR.

The Financial Reform Act also requires the posting of cash collateral for uncleared swaps.  However, the final rule for margin requirements for Swap Dealers and Major Swap Participants has not been issued, thus we have not been able to assess the impact of the final rule on our operations.  If we were required to post cash collateral on our swap transactions with Swap Dealers and Major Swap Participants, our liquidity would likely be materially impacted, and our ability to enter into OTC derivatives to hedge our commodity and interest rate risks would be significantly limited.

***Recent PUCT/ERCOT Actions*** — In May 2013, ERCOT published an updated Capacity, Demand, and Reserves report.  The May 2013 report showed declining reserve margins in the ERCOT market that fall below the current 13.75% target reserve margin to 11.6% in 2015 and 10.4% in 2016.  A number of changes to the ERCOT market rules have been implemented for the stated purpose of sending appropriate price signals to encourage development of generation resources in ERCOT. These changes, among others, include an increased system-wide offer cap that applies to wholesale power offers in ERCOT (from its previous level of $3,000 per MWh to $4,500 per MWh effective August 2012, $5,000 per MWh effective June 2013 and $7,000 and $9,000 per MWh in the summers of 2014 and 2015, respectively).

In September 2013, the PUCT directed ERCOT to develop the processes necessary to implement a new price mechanism, "the operating reserve demand curve" (also known as "ORDC" and "Hogan B+"), which would provide for an increasing price adder to real-time wholesale power prices as reserves decline. The market rules implementing the operating reserve demand curve require approval by the ERCOT Board and could be appealed to the PUCT.  Although two of the three PUCT commissioners indicated in October 2013 that ERCOT should have a required reserve margin instead of a target reserve margin, discussions are expected to continue among the PUCT, ERCOT, market participants and other stakeholders regarding the level of the reserve margin and additional actions necessary to meet a required reserve margin.

***Sunset Review/2013 Texas Legislative Session*** — Sunset review is the regular assessment of the continuing need for a state agency to exist, and is grounded in the premise that an agency will be abolished unless legislation is passed to continue its functions.  On a specified time schedule, the Texas Sunset Advisory Commission (Sunset Commission) closely reviews each agency and recommends action on each agency to the Texas Legislature, which action may include modifying or even abolishing the agency.  The PUCT and the RCT were subject to review by the Sunset Commission in 2013.

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

During the 2013 legislative session that ended in May 2013, the Texas Legislature passed the PUCT Sunset bill and extended the life of the PUCT for 10 years through 2023. The bill did not fundamentally change the management or operation of the PUCT related to electricity issues. The bill included various electric service regulation changes, including clarification on PUCT oversight of ERCOT, protections regarding customer privacy related to advanced meter data and new PUCT authority to issue cease and desist orders. The Legislature did not pass the RCT Sunset bill, but it did extend the life of the RCT until 2017 at which time the RCT will undergo another full Sunset review.

No legislation passed during the 2013 Texas legislative session, including the Sunset Review actions described above, is expected to have a material impact on our results of operations, liquidity or financial condition. The Texas Legislature is scheduled to convene its next legislative session in January 2015.

*Summary* — We cannot predict future regulatory or legislative actions or any changes in economic and securities market conditions. Such actions or changes could significantly affect our results of operations, liquidity or financial condition.

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## RESULTS OF OPERATIONS

### *Sales Volume and Customer Count Data*

| | Three Months Ended September 30, | | | Nine Months Ended September 30, | | |
|---|---|---|---|---|---|---|
| | **2013** | **2012** | **% Change** | **2013** | **2012** | **% Change** |
| **Sales volumes:** | | | | | | |
| Retail electricity sales volumes – (GWh): | | | | | | |
|   Residential | 7,657 | 7,891 | (3.0)% | 17,737 | 18,682 | (5.1)% |
|   Small business (a) | 1,635 | 1,757 | (6.9)% | 4,156 | 4,694 | (11.5)% |
|   Large business and other customers | 2,679 | 2,846 | (5.9)% | 7,478 | 7,892 | (5.2)% |
|     Total retail electricity | 11,971 | 12,494 | (4.2)% | 29,371 | 31,268 | (6.1)% |
| Wholesale electricity sales volumes (b) | 11,029 | 9,337 | 18.1 % | 28,566 | 24,085 | 18.6 % |
|     Total sales volumes | 23,000 | 21,831 | 5.4 % | 57,937 | 55,353 | 4.7 % |
| | | | | | | |
| **Average volume (kilowatt-hours) per residential customer (c)** | 5,010 | 5,019 | (0.2)% | 11,500 | 11,707 | (1.8)% |
| | | | | | | |
| **Weather (North Texas average) – percent of normal (d):** | | | | | | |
|   Cooling degree days | 106.5% | 105.5% | 0.9 % | 103.5% | 113.7% | (9.0)% |
|   Heating degree days | — | — | — | 104.1% | 74.6% | 39.5 % |
| | | | | | | |
| **Customer counts:** | | | | | | |
| Retail electricity customers (end of period, in thousands) (e): | | | | | | |
|   Residential | | | | 1,524 | 1,566 | (2.7)% |
|   Small business (a) | | | | 176 | 176 | — % |
|   Large business and other customers | | | | 17 | 17 | — % |
|     Total retail electricity customers | | | | 1,717 | 1,759 | (2.4)% |

_____

(a)   Customers with demand of less than 1 MW annually.

(b)   Includes net amounts related to sales and purchases of balancing energy in the ERCOT real-time market.

(c)   Calculated using average number of customers for the period.

(d)   Weather data is obtained from Weatherbank, Inc., an independent company that collects and archives weather data from reporting stations of the National Oceanic and Atmospheric Administration (a federal agency under the US Department of Commerce).  Normal is defined as the average over the 10-year period from 2000 to 2010.

(e)   Based on number of meters.  Typically, large business and other customers have more than one meter; therefore, number of meters does not reflect the number of individual customers.

60

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Revenue and Commodity Hedging and Trading Activities*

| | Three Months Ended September 30, | | | Nine Months Ended September 30, | | |
|---|---|---|---|---|---|---|
| | 2013 | 2012 | % Change | 2013 | 2012 | % Change |
| **Operating revenues:** | | | | | | |
| Retail electricity revenues: | | | | | | |
| Residential | $ 998 | $ 982 | 1.6 % | $ 2,310 | $ 2,322 | (0.5)% |
| Small business (a) | 197 | 214 | (7.9)% | 523 | 583 | (10.3)% |
| Large business and other customers | 181 | 195 | (7.2)% | 517 | 549 | (5.8)% |
| Total retail electricity revenues | 1,376 | 1,391 | (1.1)% | 3,350 | 3,454 | (3.0)% |
| Wholesale electricity revenues (b) (c) | 449 | 291 | 54.3 % | 1,019 | 715 | 42.5 % |
| Amortization of intangibles (d) | 4 | 7 | (42.9)% | 15 | 15 | — % |
| Other operating revenues | 64 | 63 | 1.6 % | 188 | 174 | 8.0 % |
| Total operating revenues | $ 1,893 | $ 1,752 | 8.0 % | $ 4,572 | $ 4,358 | 4.9 % |
| | | | | | | |
| **Net gain (loss) from commodity hedging and trading activities:** | | | | | | |
| Realized net gains on settled positions | $ 228 | $ 538 | (57.6)% | $ 739 | $ 1,553 | (52.4)% |
| Unrealized net losses | (170) | (541) | (68.6)% | (710) | (1,324) | (46.4)% |
| Total | $ 58 | $ (3) | — % | $ 29 | $ 229 | — % |

(a)  Customers with demand of less than 1 MW annually.

(b)  Upon settlement of physical derivative commodity contracts that we mark-to-market in net income, such as certain electricity sales and purchase agreements and coal purchase contracts, wholesale electricity revenues and fuel and purchased power costs are reported at approximated market prices, as required by accounting rules, rather than contract price.  As a result, these line item amounts include a noncash component that we deem "unrealized." (The offsetting differences between contract and market prices are reported in net gain (loss) from commodity hedging and trading activities.)   These amounts are as follows:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2013 | 2012 | 2013 | 2012 |
| Reported in revenues | $ — | $ 4 | $ (1) | $ — |
| Reported in fuel and purchased power costs | 7 | 11 | 18 | 34 |
| Net gain | $ 7 | $ 15 | $ 17 | $ 34 |

(c)  Includes net amounts related to sales and purchases of balancing energy in the ERCOT real-time market.

(d)  Represents amortization of the intangible net asset value of retail and wholesale power sales agreements resulting from purchase accounting.

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Production, Purchased Power and Delivery Cost Data*

| | Three Months Ended September 30, | | | Nine Months Ended September 30, | | |
|---|---|---|---|---|---|---|
| | 2013 | 2012 | % Change | 2013 | 2012 | % Change |
| **Fuel, purchased power costs and delivery fees ($ millions):** | | | | | | |
| Fuel for nuclear facilities | $ 45 | $ 47 | (4.3)% | $ 128 | $ 139 | (7.9)% |
| Fuel for lignite/coal facilities | 273 | 251 | 8.8 % | 674 | 606 | 11.2 % |
| Total nuclear and lignite/coal facilities | 318 | 298 | 6.7 % | 802 | 745 | 7.7 % |
| Fuel for natural gas facilities and purchased power costs (a) | 94 | 97 | (3.1)% | 219 | 248 | (11.7)% |
| Amortization of intangibles (b) | 9 | 14 | (35.7)% | 29 | 39 | (25.6)% |
| Other costs | 48 | 58 | (17.2)% | 146 | 147 | (0.7)% |
| Fuel and purchased power costs | 469 | 467 | 0.4 % | 1,196 | 1,179 | 1.4 % |
| Delivery fees | 383 | 383 | — % | 979 | 974 | 0.5 % |
| Total | $ 852 | $ 850 | 0.2 % | $ 2,175 | $ 2,153 | 1.0 % |
| **Fuel and purchased power costs (which excludes generation facilities operating costs) per MWh:** | | | | | | |
| Nuclear facilities | $ 8.50 | $ 8.85 | (4.0)% | $ 8.47 | $ 8.83 | (4.1)% |
| Lignite/coal facilities (c) | $ 19.25 | $ 20.21 | (4.8)% | $ 19.95 | $ 21.01 | (5.0)% |
| Natural gas facilities and purchased power (d) | $ 46.61 | $ 44.98 | 3.6 % | $ 46.74 | $ 45.26 | 3.3 % |
| **Delivery fees per MWh** | $ 31.88 | $ 30.56 | 4.3 % | $ 33.19 | $ 31.06 | 6.9 % |
| **Production and purchased power volumes (GWh):** | | | | | | |
| Nuclear facilities | 5,273 | 5,276 | (0.1)% | 15,170 | 15,772 | (3.8)% |
| Lignite/coal facilities (e) | 16,474 | 15,179 | 8.5 % | 40,004 | 35,929 | 11.3 % |
| Total nuclear and lignite/coal-facilities | 21,747 | 20,455 | 6.3 % | 55,174 | 51,701 | 6.7 % |
| Natural gas-facilities | 525 | 594 | (11.6)% | 767 | 1,117 | (31.3)% |
| Purchased power (f) | 728 | 782 | (6.9)% | 1,996 | 2,535 | (21.3)% |
| Total energy supply volumes | 23,000 | 21,831 | 5.4 % | 57,937 | 55,353 | 4.7 % |
| **Capacity factors:** | | | | | | |
| Nuclear facilities | 103.8% | 103.9% | (0.1)% | 100.7% | 104.3% | (3.5)% |
| Lignite/coal facilities (e) | 93.1% | 85.7% | 8.6 % | 76.2% | 68.2% | 11.7 % |
| Total | 95.5% | 89.8% | 6.3 % | 81.6% | 76.2% | 7.1 % |

(a)  See note (b) to the "Revenue and Commodity Hedging and Trading Activities" table on previous page.

(b)  Represents amortization of the intangible net asset values of emission credits, coal purchase contracts, nuclear fuel contracts and power purchase agreements and the stepped up value of nuclear fuel resulting from purchase accounting.

(c)  Includes depreciation and amortization of lignite mining assets, which is reported in the depreciation and amortization expense line item, but is part of overall fuel costs and excludes unrealized amounts as discussed in footnote (b) to the "Revenue and Commodity Hedging and Trading Activities" table on previous page.

(d)  Excludes volumes related to line loss and power imbalances and unrealized amounts referenced in footnote (c) immediately above.

(e)  Includes the estimated effects of economic backdown (including seasonal operations) of lignite/coal-fueled units totaling 860 GWh and 2,510 GWh for the three months ended September 30, 2013 and 2012, respectively, and 7,790 GWh and 7,480 GWh for the nine months ended September 30, 2013 and 2012, respectively.

(f)  Includes amounts related to line loss and power imbalances.

62

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Financial Results — Three Months Ended September 30, 2013 Compared to Three Months Ended September  30, 2012*

Operating revenues increased $141 million, or 8%, to $1.893 billion in 2013.

Retail electricity revenues decreased $15 million, or 1%, to $1.376 billion reflecting a $58 million decline in sales volumes partially offset by $43 million in higher average prices.  Sales volumes fell 4% reflecting declines in both the residential and business markets.  Residential volumes reflected a 3% decline in customer counts.  Business markets volumes declined 6% reflecting competitive intensity and changes in customer mix.   Weather did not have a significant effect on volume changes.  Overall average retail pricing increased 3% driven by residential markets and due in part to higher delivery fees incurred and passed on to customers.

Wholesale electricity revenues increased $158 million, or 54%, to $449 million in 2013 reflecting a $105 million increase driven by higher average prices and a $53 million increase in sales volumes.  Higher average prices reflected an increase in natural gas prices.  Sales volumes increased 18% reflecting higher available generation due to lower economic backdown and lower volumes sold in our retail operations.

Fuel, purchased power costs and delivery fees increased $2 million to $852 million in 2013.  Lignite/coal fuel costs increased $22 million driven by higher generation volumes.  Natural gas fuel costs decreased $10 million reflecting lower generation volumes, partially offset by increased fuel prices, and other costs decreased $10 million primarily due to lower net charges from ERCOT.

A 9% increase in lignite/coal-fueled generation volumes was driven by less economic backdown in 2013 reflecting higher wholesale power prices.

Following is an analysis of amounts reported as net gain (loss) from commodity hedging and trading activities, which totaled $58 million in net gains and $3 million in net losses for the three months ended September 30, 2013 and 2012, respectively, and is largely reflective of the natural gas hedging program discussed above under "Significant Activities and Events and Items Influencing Future Performance – Natural Gas Hedging Program and Other Hedging Activities":

| | Three Months Ended September 30, 2013 | | |
|---|---|---|---|
| | Net Realized Gains | Net Unrealized Losses | Total |
| Hedging positions | $       203 | $       (146) | $       57 |
| Trading positions | 25 | (24) | 1 |
| Total | $       228 | $       (170) | $       58 |

| | Three Months Ended September 30, 2012 | | |
|---|---|---|---|
| | Net Realized Gains | Net Unrealized Losses | Total |
| Hedging positions | $       494 | $       (475) | $       19 |
| Trading positions | 44 | (66) | (22) |
| Total | $       538 | $       (541) | $       (3) |

The decreases in net realized gains and unrealized losses reflected lower volumes and prices of maturing positions in the natural gas hedging program.

Unrealized gains and losses that are related to physical derivative commodity contracts and are reported as revenues and purchased power costs, as required by accounting rules, totaled $7 million in net gains in 2013 and $15 million in net gains in 2012 (as discussed in footnote (b) to the "Revenue and Commodity Hedging and Trading Activities" table above).

Operating costs decreased $12 million, or 6%, to $189 million in 2013.  The decrease included $8 million in lower nuclear generation maintenance costs reflecting activities performed for the fall refueling outage completed in the fourth quarter of 2012 (and no refueling outage in the fall of 2013) and $3 million in lower lease expense due to purchase of the interest in a trust holding certain combustion turbines (see Note 5 to Financial Statements).

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

[Table of Contents](#)

SG&A expenses increased $1 million to $175 million in 2013.  The increase reflected $14 million in legal and consulting costs in the third quarter associated with our liability management program, compared to $4 million in the third quarter 2012.  This increase is partially offset by $11 million in lower employee-related expenses reflecting lower benefit costs and incentive compensation expense.

Other deductions totaled $8 million in 2013 and $30 million in 2012.  Other deductions in 2013 included $3 million of asset impairments.  Other deductions in 2012 included a $24 million impairment of mineral interests.  See Note 12 to Financial Statements.

Interest income decreased $9 million to $1 million in 2013.  The decrease was driven by EFH Corp.'s settlement of the TCEH Demand Notes.  See Note 12 to Financial Statements.

Interest expense and related charges decreased $432 million to $340 million in 2013.  The decrease was driven by $413 million in unrealized mark-to-market net gains on interest rate swaps in 2013 compared to $20 million in net losses in 2012 and $18 million in lower interest expense due to a reduction in debt pushed down (see Note 5 to Financial Statements).  See Note 8 to Financial Statements regarding nonperformance risk adjustment related to interest rate swaps. These changes were partially offset by $19 million in higher amortization of debt issuance costs and discounts reflecting the January 2013 amendment and extension of the TCEH Revolving Credit Facility.

Income tax benefit totaled $17 million and $228 million on pretax income in 2013 and pretax losses in 2012, respectively.  Excluding the $38 million in total income tax benefit recorded in 2013 related to resolution of IRS audit matters (see Note 12 to Financial Statements regarding uncertain tax positions), the effective rate was 52.5% and 37.2%, respectively. The change in the effective tax rate reflected a decrease in the lignite depletion deduction, partially offset by lower Texas margin tax expense and lower nondeductible interest on debt.

EFCH had after-tax net income of $57 million in 2013 compared to an after-tax net loss of $385 million in 2012.  The change was driven by unrealized gains on interest rate swaps compared to unrealized losses in 2012, and lower unrealized losses on commodity hedging activities.

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

*Financial Results — Nine Months Ended September 30, 2013 Compared to Nine Months Ended September 30, 2012*

Operating revenues increased $214 million, or 5%, to $4.572 billion in 2013.

Retail electricity revenues decreased $104 million, or 3%, to $3.350 billion reflecting a $210 million decline in sales volumes partially offset by $106 million in higher average prices. Sales volumes fell 6% reflecting declines in both the residential and business markets. Residential volumes declined 5% reflecting a 3% decrease in customer counts and milder weather in the second quarter. Business market volumes declined 8% reflecting competitive intensity and changes in customer mix. Overall average retail pricing increased 3% driven by residential markets and due in part to higher delivery fees incurred and passed on to customers.

Wholesale electricity revenues increased $304 million, or 43%, to $1.019 billion in 2013 reflecting a $171 million increase due to higher average prices and a $133 million increase in sales volumes. Higher average prices reflected an increase in natural gas prices. Sales volumes increased 19% reflecting higher generation volumes and lower volumes sold in our retail operations.

Fuel, purchased power costs and delivery fees increased $22 million, or 1%, to $2.175 billion in 2013. Lignite/coal fuel costs increased $68 million driven by higher generation volumes. Natural gas fuel costs decreased $27 million reflecting decreases in generation volumes, partially offset by increased fuel prices. Nuclear fuel costs decreased $11 million reflecting a decrease in generation volumes and lower prices.

An 11% increase in lignite/coal-fueled generation volumes was driven by fewer unplanned and planned outage days, while nuclear-fueled generation volumes decreased 4% reflecting a planned refueling outage in the spring of 2013.

Following is an analysis of amounts reported as net gain (loss) from commodity hedging and trading activities, which totaled $29 million and $229 million in net gains for the nine months ended September 30, 2013 and 2012, respectively, and is largely reflective of the natural gas hedging program discussed above under "Significant Activities and Events and Items Influencing Future Performance - Natural Gas Hedging Program and Other Hedging Activities."

|  | Nine Months Ended September 30, 2013 | | |
|  | Net Realized Gains (Losses) | Net Unrealized Losses | Total |
| --- | --- | --- | --- |
| Hedging positions | $ 751 | $ (709) | $ 42 |
| Trading positions | (12) | (1) | (13) |
| Total | $ 739 | $ (710) | $ 29 |

|  | Nine Months Ended September 30, 2012 | | |
|  | Net Realized Gains | Net Unrealized Losses | Total |
| --- | --- | --- | --- |
| Hedging positions | $ 1,504 | $ (1,310) | $ 194 |
| Trading positions | 49 | (14) | 35 |
| Total | $ 1,553 | $ (1,324) | $ 229 |

The decreases in net realized gains and unrealized losses reflected lower volumes and prices of maturing positions in the natural gas hedging program. Net unrealized losses in 2012 were mitigated by the effect of unrealized gains on unsettled positions due to decreases in forward natural gas prices.

Unrealized gains and losses that are related to physical derivative commodity contracts and are reported as revenues and purchased power costs, as required by accounting rules, totaled $17 million in net gains in 2013 and $34 million in net gains in 2012 (as discussed in footnote (b) to the "Revenue and Commodity Hedging and Trading Activities" table above).

65

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

[Table of Contents](#)

Operating costs increased $49 million, or 8%, to $685 million in 2013.  The increase reflected $42 million in higher nuclear generation outage costs driven by the planned refueling outage in the spring of 2013.  The balance of the increase was driven by higher maintenance costs associated with lignite/coal-fueled generation unit outages of $18 million, reflecting timing and scope of the activities, partially offset by $6 million in lower lease expense due to purchase of the interest in a trust holding certain combustion turbines and $6 million in lower information technology project costs.

Depreciation and amortization increased $20 million, or 2%, to $1.012 billion in 2013.  The increase reflected retirement of coal plant assets and capital investment.

SG&A expenses increased $18 million, or 4%, to $502 million in 2013.  The increase reflected $48 million in legal and consulting costs in the nine months ending September 30, 2013 associated with our liability management program, compared to $4 million in 2012.  This increase is partially offset by $21 million lower employee-related costs primarily reflecting lower incentive compensation expense.

Other deductions totaled $12 million in 2013 and $37 million in 2012.  Other deductions in 2013 included $3 million of asset impairments.  Other deductions in 2012 included a $24 million impairment of mineral interests and a $4 million counterparty contract settlement.  See Note 12 to Financial Statements.

Interest income decreased $31 million to $5 million in 2013.  The decrease was driven by EFH Corp.'s settlement of the TCEH Demand Notes.  See Note 12 to Financial Statements.

Interest expense and related charges decreased $930 million, or 41%, to $1.338 billion in 2013.  The decrease was driven by $899 million in unrealized mark-to-market net gains on interest rate swaps in 2013 compared to $16 million in net losses in 2012 and $52 million in lower interest expense due to a reduction in debt pushed down (see Note 5 to Financial Statements).  See Note 8 to Financial Statements regarding nonperformance risk adjustment related to interest rate swaps. This change was partially offset by $58 million in higher amortization of debt issuance costs and discounts reflecting the January 2013 amendment and extension of the TCEH Revolving Credit Facility.

Income tax benefit totaled $476 million and $692 million on pretax losses in 2013 and 2012, respectively.  Excluding the $80 million in total income tax benefit recorded in the nine months ended September 30, 2013 related to resolution of IRS audit matters (see Note 12 to Financial Statements regarding uncertain tax positions), the effective tax rate was 34.1% and 34.8% in 2013 and 2012, respectively.  The decrease in the effective tax rate reflected a decrease in the lignite depletion deduction, partially offset by lower Texas margin tax expense and lower nondeductible interest on debt.

After-tax loss decreased $612 million to $686 million in 2013 driven by unrealized mark-to-market net gains on interest rate swaps, compared to net losses in 2012, and the income tax benefit related to audit resolutions, partially offset by lower net gains from commodity hedging activities.

66

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

### Energy-Related Commodity Contracts and Mark-to-Market Activities

The table below summarizes the changes in commodity contract assets and liabilities for the nine months ended September 30, 2013 and 2012.   The net change in these assets and liabilities, excluding "other activity" as described below, reflects $695 million and $1.290 billion in unrealized net losses in 2013 and 2012, respectively, arising from mark-to-market accounting for positions in the commodity contract portfolio.  The portfolio consists primarily of economic hedges but also includes proprietary trading positions.

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2013 | 2012 |
| Commodity contract net asset at beginning of period | $ 1,664 | $ 3,190 |
| Settlements of positions (a) | (749) | (1,420) |
| Changes in fair value of positions in the portfolio (b) | 54 | 130 |
| Other activity (c) | (47) | (36) |
| Commodity contract net asset at end of period | $ 922 | $ 1,864 |

_____

(a)  Represents reversals of previously recognized unrealized gains and losses upon settlement (offsets realized gains and losses recognized in the settlement period). Excludes changes in fair value in the month the position settled as well as amounts related to positions entered into and settled in the same month.

(b)  Represents unrealized net gains (losses) recognized, reflecting the effect of changes in forward natural gas prices on the value of positions in the natural gas hedging program (see discussion above under "Significant Activities and Events and Items Influencing Future Performance – Natural Gas Hedging Program and Other Hedging Activities"), as well as changes in value of other hedging positions.  Excludes changes in fair value in the month the position settled as well as amounts related to positions entered into and settled in the same month.

(c)  These amounts do not represent unrealized gains or losses.  Includes initial values of positions involving the receipt or payment of cash or other consideration, generally related to options purchased/sold.

*Maturity Table* — The following table presents the net commodity contract asset arising from recognition of fair values at September 30, 2013, scheduled by the source of fair value and contractual settlement dates of the underlying positions.

| | Maturity dates of unrealized commodity contract net asset at September 30, 2013 | | |
| --- | --- | --- | --- |
| Source of fair value | Less than 1 year | 1-3 years | Total |
| Prices actively quoted | $ 20 | $ (9) | $ 11 |
| Prices provided by other external sources | 764 | 151 | 915 |
| Prices based on models | (9) | 5 | (4) |
| Total | $ 775 | $ 147 | $ 922 |
| Percentage of total fair value | 84% | 16% | 100% |

The "prices actively quoted" category reflects only exchange-traded contracts for which active quotes are readily available.  The "prices provided by other external sources" category represents forward commodity positions valued using prices for which over-the-counter broker quotes are available in active markets. Over-the-counter quotes for power in ERCOT's North Hub that are deemed active markets extend through 2015 and over-the-counter quotes for natural gas generally extend through 2016, depending upon delivery point.  The "prices based on models" category contains the value of all non-exchange-traded options valued using option pricing models.  In addition, this category contains other contractual arrangements that may have both forward and option components, as well as other contracts that are valued using proprietary long-term pricing models that utilize certain market based inputs.  See Note 8 to Financial Statements for fair value disclosures and discussion of fair value measurements.

67

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**FINANCIAL CONDITION**

***Cash Flows*** — *Nine Months Ended September 30, 2013 Compared to Nine Months Ended September 30, 2012* — Cash used in operating activities totaled $121 million in 2013 compared to cash provided by operating activities of $329 million in 2012.  The change of $450 million reflected a decrease of $703 million in net realized gains from the natural gas hedging program.  Favorable changes in margin deposits totaling $124 million and favorable net changes in various working capital and other asset and liability accounts due in large part to timing of payments were largely offset by higher interest payments.

Depreciation and amortization expense reported in the statement of cash flows exceeded the amount reported in the statement of income by $130 million and $145 million for the nine months ended September 30, 2013 and 2012, respectively.  The difference represented amortization of nuclear fuel, which is reported as fuel costs in the statement of income consistent with industry practice, and amortization of intangible net assets arising from purchase accounting that is reported in various other income statement line items including operating revenues and fuel and purchased power costs and delivery fees.

Cash used in financing activities totaled $7 million in 2013 compared to $493 million used in 2012.  Activity in 2012 reflected repayments of borrowings under the TCEH Revolving Credit Facility and a $159 million payment to settle transition bond reimbursement agreements with Oncor (see Note 11 to Financial Statements).

See Note 5 to Financial Statements for further detail of short-term borrowings and long-term debt.

Cash provided by investing activities totaled $215 million in 2013 compared to $353 million in 2012.  Amounts provided in 2013 and 2012 reflect EFH Corp. repayments of TCEH Demand Notes, which totaled $698 million and $950 million, respectively, (see Note 11 to Financial Statements).  Capital expenditures (excluding nuclear fuel purchases) decreased $145 million to $353 million in 2013 reflecting decreased environmental-related spending, partially offset by increased spending on lignite mine development and generation plant projects.  Nuclear fuel purchases decreased $96 million to $59 million due to timing of refueling cycles.  Cash used in investing activities in 2013 also included $40 million used to acquire the owner participant interest in a trust established to lease six natural gas-fired combustion turbines to TCEH.

***Debt Activity*** — Activities related to short-term borrowings and long-term debt during the nine months ended September 30, 2013 are as follows (all amounts presented are principal, and settlements include amounts related to capital leases and exclude amounts related to debt discount, financing and reacquisition expenses):

|  | Borrowings | Settlements |
|---|---|---|
| TCEH (a) | $         385 | $         (90) |
| EFCH | — | (4) |
| EFH Corp. (pushed down to EFCH) (b) | — | 420 |
| Total long-term | 385 | 326 |
| Total short-term – TCEH (c) | 90 | — |
| Total | $         475 | $         326 |

_____

(a)  Borrowings represent noncash principal increases of TCEH Term Loan Facilities as fees in consideration for the extension of $645 million of commitments under the TCEH Revolving Credit Facility, as well as debt assumed of $45 million in connection with the purchase of the interest in a trust holding certain combustion turbines as discussed above.  Settlements represent $82 million of payments of principal at scheduled maturity or mandatory tender dates and $8 million of payments of capital lease liabilities.

(b)  Settlements represent the effects of debt cancellations and other transactions discussed in Note 5 to Financial Statements.

(c)  Short-term amount represents net borrowings under the accounts receivable securitization program (see Note 4 to Financial Statements).

See Note 5 to Financial Statements for further detail of long-term debt and other financing arrangements.

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

*Available Liquidity* — The following table summarizes changes in available liquidity for the nine months ended September 30, 2013.

| | Available Liquidity | | |
| --- | --- | --- | --- |
| | September 30, 2013 | December 31, 2012 | Change |
| Cash and cash equivalents | $ 1,262 | $ 1,175 | $ 87 |
| TCEH Letter of Credit Facility | 171 | 183 | (12) |
| Total liquidity | $ 1,433 | $ 1,358 | $ 75 |

The increase in available liquidity of $75 million in the nine months ended September 30, 2013 was driven by EFH Corp.'s settlement of its borrowings from TCEH under the TCEH Demand Notes, which totaled $698 million at December 31, 2012, partially offset by $412 million in cash used for capital expenditures, including nuclear fuel purchases, $128 million in cash used in operating activities and $40 million used to acquire the interest in a combustion turbine lease trust. Based on forward wholesale power prices in ERCOT, which are subject to the effects of changing market conditions, TCEH may not have sufficient liquidity, absent any financing transactions, to meet its obligations within the next twelve months.

*Debt Capacity* — We believe that TCEH is permitted under its applicable debt agreements to issue additional senior secured debt (in each case, subject to certain exceptions and conditions set forth in its applicable debt documents) as follows:

- approximately $2.3 billion of additional aggregate principal amount of debt secured by substantially all of the assets of TCEH and certain of its subsidiaries (of which $410 million can be on a first-priority basis and the remainder on a second-priority basis) and
- an unlimited amount of additional first-priority debt in order to refinance the first-priority debt outstanding under the TCEH Senior Secured Facilities.

*Investment Capacity* — We believe that TCEH is permitted under applicable debt agreements to make "investments" that could result in, among other things, additional liquidity through financings secured by existing assets (subject to certain exceptions and conditions set forth in the applicable debt documents). TCEH is permitted under the TCEH Senior Secured Facilities to make additional investments of approximately $1.4 billion, of which approximately $915 million may include investments in unrestricted subsidiaries and joint ventures (as defined). The balance is a general restricted payment basket that limits the aggregate amount of investments and dividends and redemptions of certain debt.

These debt capacity and investment capacity amounts are estimates based on our current interpretation of the covenants set forth in our debt agreements and do not take into account exceptions in the debt agreements that may allow for the incurrence of (i) additional secured or unsecured debt, including, but not limited to, acquisition debt, refinancing debt, capital leases and hedging obligations and (ii) additional investments, including but not limited to, permitted investments. Moreover, such amounts could change from time to time as a result of, among other things, the termination of any debt agreement (or specific terms therein) or amendments to the debt agreements that result from negotiations with new or existing lenders. In addition, covenants included in agreements governing additional future debt may impose greater restrictions on our incurrence of secured or unsecured debt. Consequently, the actual amount of senior secured or unsecured debt that we are permitted to incur and the investments we are permitted to make under our debt agreements could be materially different than the amounts provided above.

*Pension and OPEB Plan Funding* — See Note 10 to Financial Statements.

*Liquidity Effects of Commodity Hedging and Trading Activities* — Commodity hedging and trading transactions typically require a counterparty to post collateral if the forward price of the underlying commodity moves such that the hedging or trading instrument held by such counterparty has declined in value. TCEH uses cash, letters of credit, asset-backed liens and other forms of credit support to satisfy such collateral posting obligations. At September 30, 2013, approximately 95% of the natural gas hedging program transactions were secured by a first-lien interest in the assets of TCEH that is pari passu with the TCEH Senior Secured Facilities, the effect of which is a significant reduction in the liquidity exposure associated with collateral posting requirements for those hedging transactions. See Note 5 to Financial Statements for more information about the TCEH Senior Secured Facilities.

Source: Energy Future Competitive Holdings Co LLC, 10-Q, November 01, 2013

Powered by Morningstar® Document Research℠

The information herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Exchange cleared transactions typically require initial margin (i.e., the upfront cash and/or letter of credit posted to take into account the size and maturity of the positions and credit quality) in addition to variance margin (i.e., the daily cash margin posted to take into account changes in the value of the underlying commodity). The amount of initial margin required is generally defined by exchange rules. Clearing agents, however, typically have the right to request additional initial margin based on various factors including market depth, volatility and credit quality, which may be in the form of cash, letters of credit, a guaranty or other forms as negotiated with the clearing agent. Cash collateral received from counterparties is either used for working capital and other corporate purposes, including reducing short-term borrowings under credit facilities, or is required to be deposited in a separate account and restricted from being used for working capital and other purposes. At September 30, 2013, essentially all cash collateral held was unrestricted. With respect to over-the-counter transactions, counterparties generally have the right to substitute letters of credit for such cash collateral. In such event, the cash collateral previously posted would be returned to such counterparties, which would reduce liquidity in the event the cash was not restricted.

At September 30, 2013, an insignificant amount of positions related to the natural gas hedging program were not directly secured on an asset-lien basis and thus are subject to cash collateral or letter of credit posting requirements if natural gas prices increase.

At September 30, 2013, TCEH received or posted cash and letters of credit for commodity hedging and trading activities as follows:

- For exchange cleared transactions (including initial margin), $4 million in cash has been posted with counterparties, net of $16 million in cash received, as compared to $69 million posted at December 31, 2012;
- For over-the-counter and other non-exchange cleared transactions, $336 million in cash has been received from counterparties, net of $1 million in cash posted, as compared to $598 million received, net of $2 million in cash posted, at December 31, 2012;
- $353 million in letters of credit have been posted with counterparties, as compared to $376 million posted at December 31, 2012, and
- $30 million in letters of credit have been received from counterparties, as compared to $22 million received at December 31, 2012.

**_Income Tax Matters_** — EFH Corp. files a US federal income tax return that includes the results of EFCH and TCEH. EFH Corp. is a corporate member of the EFH Corp. consolidated group, while each of EFCH and TCEH is classified as a disregarded entity for US federal income tax purposes. Prior to the restructuring transaction in April 2013 discussed below, EFCH was a corporate member of the group. Pursuant to applicable US Treasury regulations and published guidance of the IRS, corporations that are members of a consolidated group have joint and several liability for the taxes of such group.

EFH Corp. and its subsidiaries (including EFCH and TCEH) are parties to a Federal and State Income Tax Allocation Agreement, which provides, among other things, that any corporate member or disregarded entity in the group is required to make payments to EFH Corp. in an amount calculated to approximate the amount of tax liability such entity would have owed if it filed a separate corporate tax return.

In April 2013, EFH Corp. received a private letter ruling from the IRS in which the IRS ruled that upon the consummation of certain internal corporate transactions (the Transactions) involving EFH Corp. and EFCH, an excess loss account (ELA) and a deferred intercompany gain (DIG), described immediately below, would be eliminated without causing the recognition of tax gain or loss. On April 15, 2013, EFH Corp. and EFCH completed the Transactions, resulting in the elimination of the ELA and the DIG.

An ELA and a DIG were reflected in the tax basis of the EFCH stock held by EFH Corp. The ELA, totaling approximately $19 billion, was created in connection with financing transactions related to the Merger. The DIG, totaling approximately $4 billion, was created as a result of an internal corporate reorganization prior to the Merger. The financing transactions and internal corporate reorganization that created the ELA and DIG involved TCEH and its assets. The difference between EFH Corp.'s tax basis in the stock of EFCH and the amount of the stock investment for financial reporting purposes represented an outside basis difference. Because EFH Corp. had tax strategies available to it that it believed would avoid triggering income tax payments upon a transaction involving its investment in EFCH, EFH Corp. did not record deferred income tax liabilities with respect to this outside basis difference.

70

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.