NRG is also affected by legislative and regulatory changes, as well as changes to market design, market rules, tariffs, cost allocations, and bidding rules that occur in the existing ISOs. The ISOs that oversee most of the wholesale power markets impose, and in the future may continue to impose, mitigation, including price limitations, offer caps, and other mechanisms to address some of the volatility and the potential exercise of market power in these markets. These types of price limitations and other regulatory mechanisms may have an adverse effect on the profitability of NRG's generation facilities that sell energy and capacity into the wholesale power markets.

The regulatory environment has undergone significant changes in the last several years due to state and federal policies affecting wholesale and retail competition and the creation of incentives for the addition of large amounts of new renewable generation and, in some cases, transmission. These changes are ongoing and the Company cannot predict the future design of the wholesale power markets or the ultimate effect that the changing regulatory environment will have on NRG's business. In addition, in some of these markets, interested parties have proposed material market design changes, including the elimination of a single clearing price mechanism, as well as proposals to re-regulate the markets or require divestiture by generating companies to reduce their market share. Other proposals to re-regulate may be made and legislative or other attention to the electric power market restructuring process may delay or reverse the deregulation process. If competitive restructuring of the electric power markets is reversed, discontinued, or delayed, the Company's business prospects and financial results could be negatively impacted.

NRG continuously monitors the ongoing efforts of the CFTC to implement the Dodd-Frank Act and to otherwise revise the rules and regulations applicable to the futures and over-the-counter derivatives markets. The CFTC's remaining efforts in this regard concern, among other things, the implementation of the Volcker rule and of other new rules relating to margin collateral and position limits for futures and other derivatives. Such changes could negatively impact NRG's ability to hedge its portfolio in an efficient, cost-effective manner by, among other things, potentially limiting NRG's ability to utilize liens as collateral for derivatives transactions and decreasing liquidity in the forward commodity and derivatives markets. The Company expects that, in 2014, the CFTC will further clarify the scope of the Dodd-Frank Act and issue additional final rules.

***Government regulations providing incentives for renewable generation could change at any time and such changes may adversely impact our business, revenues, margins, results of operations and cash flows.***

The Company's growth strategy depends in part on government policies that support renewable generation and enhance the economic viability of owning renewable electric generation assets. Renewable generation assets currently benefit from various federal, state and local governmental incentives such as ITCs, cash grants in lieu of ITCs, loan guarantees, RPS programs, modified accelerated cost-recovery system of depreciation and bonus depreciation. For example, the U.S. Internal Revenue Code of 1986, as amended, provides an ITC of 30% of the cost-basis of an eligible resource, including solar energy facilities placed in service prior to the end of 2016, which percentage is currently scheduled to be reduced to 10% for solar energy systems placed in service after December 31, 2016.

Many states have adopted RPS programs mandating that a specified percentage of electricity sales come from eligible sources of renewable energy. However, the regulations that govern the RPS programs, including pricing incentives for renewable energy, or reasonableness guidelines for pricing that increase valuation compared to conventional power (such as a projected value for carbon reduction or consideration of avoided integration costs), may change. If the RPS requirements are reduced or eliminated, it could lead to fewer future power contracts or lead to lower prices for the sale of power in future power contracts, which could have a material adverse effect on the Company's future growth prospects.

Such material adverse effects may result from decreased revenues, reduced economic returns on certain project company investments, increased financing costs, and/or difficulty obtaining financing. Furthermore, the ARRA included incentives to encourage investment in the renewable energy sector, such as cash grants in lieu of ITCs, bonus depreciation and expansion of the U.S. DOE loan guarantee program. It is uncertain what loan guarantees may be made by the U.S. DOE loan guarantee program in the future. In addition, the cash grant in lieu of ITCs program only applies to facilities that commenced construction prior to December 31, 2011, which commencement date may be determined in accordance with the safe harbor if more than 5% of the total cost of the eligible property was paid or incurred by December 31, 2011.

If the Company is unable to utilize various federal, state and local government incentives to acquire additional renewable assets in the future, or the terms of such incentives are revised in a manner that is less favorable to the Company, it may suffer a material adverse effect on the business, financial condition, results of operations and cash flows.

A significant reduction or elimination of government subsidies under the 1603 Cash Grant Program may have a material adverse effect on the Company's existing operations and may reduce the Company's cash flows. The ARRA section 1603 Cash Grant Program provides a cash payment from the federal government in lieu of ITCs for eligible renewable generation sources for which construction commenced prior to December 31, 2011, which commencement date may be determined in accordance with the 5% safe harbor. The amount of the 1603 Cash Grant Proceeds received is based on an application filed with the U.S. Treasury Department after a facility has reached COD. The applications are reviewed by, and are subject to approval of, the U.S. Treasury Department. In addition, the U.S. Treasury Department has said that it may reduce the amount of an applicant's cash grant award in cases where project costs exceed certain per watt cost benchmarks or in cases where project costs exceed certain percentage thresholds. The amount of 1603 Cash Grant Proceeds that the Company actually receives may differ materially from the amount expected and/or may be received at a later time than expected. On March 1, 2013, the federal sequestration went into effect, and, as a result, 1603 Cash Grant Proceeds for approved applications through September 30, 2013 were subject to an 8.7% reduction and approved applications after September 30, 2013 were subject to a 7.2% reduction.

As of December 31, 2013, the Company had outstanding applications for cash grants with the U.S Treasury in the aggregate amount of $539 million (net of sequestration). In January 2014, the U.S. Treasury Department awarded cash grants on the CVSR project of $307 million ($285 million net of sequestration), which is approximately 75% of the cash grant amount for which the Company had applied. In addition, in January 2014, the U.S. Treasury Department awarded cash grants on the Alpine project of $72 million ($66 million net of sequestration). As of the date hereof, NRG has outstanding with the U.S. Treasury Department applications for cash grants in the aggregate amount of $93 million, of which the Company expects to receive $86 million net of sequestration.

If the Company does not receive the expected 1603 Cash Grant Proceeds, or if the U.S. Treasury Department approves awards for amounts materially less than the amounts for which the Company has applied, our financial position could be materially adversely affected. Additionally, reductions in or eliminations or expirations of, the 1603 Cash Grant Program, or the U.S. Treasury Department's rejection of the Company's applications for cash grants could also have a material adverse effect on our business, financial condition, results of operations and cash flows.

***NRG's long-term contracts may be challenged or declared invalid by a court of competent jurisdiction.***

A significant portion of NRG's revenues are derived from long-term bilateral contracts. Those contracts may be subject to challenge under a variety of legal doctrines. If NRG's contracts were to be declared invalid, profitability may suffer and the Company would be exposed to increased merchant market risk.

***NRG's ownership interest in a nuclear power facility subjects the Company to regulations, costs and liabilities uniquely associated with these types of facilities.***

Under the Atomic Energy Act of 1954, as amended, or AEA, ownership and operation of STP, of which NRG indirectly owns a 44% interest, is subject to regulation by the NRC. Such regulation includes licensing, inspection, enforcement, testing, evaluation and modification of all aspects of nuclear reactor power plant design and operation, environmental and safety performance, technical and financial qualifications, decommissioning funding assurance and transfer and foreign ownership restrictions. The current facility operating licenses for STP expire on August 20, 2027 (Unit 1) and December 15, 2028 (Unit 2). STP has applied for the renewal of such licenses for a period of 20 years beyond the expirations of the current licenses. The NRC may decline to issue such renewals or may modify or otherwise condition such license renewals in a manner that results in substantial increased capital or operating costs, or that otherwise results in a material adverse effect on STP's economics and NRG's results of operations, financial condition or cash flow.

46

There are unique risks to owning and operating a nuclear power facility. These include liabilities related to the handling, treatment, storage, disposal, transport, release and use of radioactive materials, particularly with respect to spent nuclear fuel, and uncertainties regarding the ultimate, and potential exposure to, technical and financial risks associated with modifying or decommissioning a nuclear facility. The NRC could require the shutdown of the plant for safety reasons or refuse to permit restart of the unit after unplanned or planned outages. New or amended NRC safety and regulatory requirements may give rise to additional operation and maintenance costs and capital expenditures. The on-going industry response to the accident at Fukushima is an example of an external event with the potential for requiring significant increases in capital expenditures in order to comply with the yet-to-be-determined consequences of, and regulatory response to, an adverse event, such as mitigating steps that might be required after the seismic re-analysis in progress at all nuclear generating facilities. Additionally, aging equipment may require more capital expenditures to keep each of these nuclear power plants operating efficiently. This equipment is also likely to require periodic upgrading and improvement. Any unexpected failure, including failure associated with breakdowns, forced outages, or any unanticipated capital expenditures, could result in reduced profitability. STP will be obligated to continue storing spent nuclear fuel if the U.S. DOE continues to fail to meet its contractual obligations to STP made pursuant to the U.S. Nuclear Waste Policy Act of 1982 to accept and dispose of STP's spent nuclear fuel. See also Item 1 — *Regulatory Matters - Nuclear Operations- Decommissioning Trusts* and Item 1 — *Environmental Matters — U.S. Federal Environmental Initiatives — Nuclear Waste* for further discussion. Costs associated with these risks could be substantial and could have a material adverse effect on NRG's results of operations, financial condition or cash flow to the extent not covered by the Decommissioning Trusts or recovered from ratepayers. In addition, to the extent that all or a part of STP is required by the NRC to permanently or temporarily shut down or modify its operations, or is otherwise subject to a forced outage, NRG may incur additional costs to the extent it is obligated to provide power from more expensive alternative sources — either NRG's own plants, third party generators or the ERCOT — to cover the Company's then existing forward sale obligations. Such shutdown or modification could also lead to substantial costs related to the storage and disposal of radioactive materials and spent nuclear fuel.

While STP maintains property and liability insurance for losses related to nuclear operations, there may be limitations on the amounts and types of insurance commercially available. See also Item 15 — Note 22, *Commitments and Contingencies, Nuclear Insurance*. An accident at STP or another nuclear facility could have a material adverse effect on NRG's financial condition, its operational results, or liquidity as losses may exceed the insurance coverage available and/or may result in the obligation to pay retrospective premium obligations.

***NRG is subject to environmental laws that impose extensive and increasingly stringent requirements on the Company's ongoing operations, as well as potentially substantial liabilities arising out of environmental contamination. These environmental requirements and liabilities could adversely impact NRG's results of operations, financial condition and cash flows.***

NRG is subject to the environmental laws of foreign and U.S., federal, state and local authorities. The Company must comply with numerous environmental laws and obtain numerous governmental permits and approvals to build and operate the Company's plants. Should NRG fail to comply with any environmental requirements that apply to its operations, the Company could be subject to administrative, civil and/or criminal liability and fines, and regulatory agencies could take other actions seeking to curtail the Company's operations. In addition, when new requirements take effect or when existing environmental requirements are revised, reinterpreted or subject to changing enforcement policies, NRG's business, results of operations, financial condition and cash flows could be adversely affected.

Environmental laws generally have become more stringent, and the Company expects this trend to continue.

***Policies at the national, regional and state levels to regulate GHG emissions, as well as climate change, could adversely impact NRG's results of operations, financial condition and cash flows.***

NRG's GHG emissions for 2013 can be found in Item 1, *Business - Environmental Matters*. The impact of further legislation or regulation of GHGs on the Company's financial performance will depend on a number of factors, including the level of GHG standards, the extent to which mitigation is required, the availability of offsets, and the extent to which NRG would be entitled to receive $CO_2$ emissions credits without having to purchase them in an auction or on the open market.

The Company operates generating units in Connecticut, Delaware, Maryland, Massachusetts, and New York that are subject to RGGI, which is a regional cap and trade system. In 2013, each of these states finalized a rule that reduced and will continue to reduce the number of allowances, which the Company believes will increase the price of each allowance. These new rules could adversely impact NRG's results of operations, financial condition and cash flows.

California has a $CO_2$ cap and trade program for electric generating units greater than 25 MW. The impact on the Company depends on the cost of the allowances and the ability to pass these costs through to customers.

47

In January 2014, the EPA re-proposed the NSPS for $CO_2$ emissions from new fossil-fuel-fired electric generating units that had been previously proposed in April 2012. The re-proposed standards are 1,000 pounds of $CO_2$ per MWh for large gas units and 1,100 pounds of $CO_2$ per MWh for coal units and small gas units. Proposed standards are in effect until a final rule is published or another rule is re-proposed. In 2014, the EPA intends to propose another rule that would require states to develop $CO_2$ standards that would apply to existing fossil-fueled generating facilities. These rules could adversely impact NRG's results of operations, financial condition and cash flows.

Hazards customary to the power production industry include the potential for unusual weather conditions, which could affect fuel pricing and availability, the Company's route to market or access to customers, i.e., transmission and distribution lines, or critical plant assets. To the extent that climate change contributes to the frequency or intensity of weather related events, NRG's operations and planning process could be affected.

***NRG's business, financial condition and results of operations could be adversely impacted by strikes or work stoppages by its unionized employees or inability to replace employees as they retire.***

As of December 31, 2013, approximately 58.8% of NRG's employees at its U.S. generation plants were covered by collective bargaining agreements. In the event that the Company's union employees strike, participate in a work stoppage or slowdown or engage in other forms of labor strife or disruption, NRG would be responsible for procuring replacement labor or the Company could experience reduced power generation or outages. NRG's ability to procure such labor is uncertain. Strikes, work stoppages or the inability to negotiate future collective bargaining agreements on favorable terms could have a material adverse effect on the Company's business, financial condition, results of operations and cash flow. In addition, a number of the Company's employees at NRG's plants are close to retirement. The Company's inability to replace those workers could create potential knowledge and expertise gaps as those workers retire.

***Changes in technology may impair the value of NRG's power plants.***

Research and development activities are ongoing to provide alternative and more efficient technologies to produce power, including "clean" coal and coal gasification, wind, photovoltaic (solar) cells, energy storage, and improvements in traditional technologies and equipment, such as more efficient gas turbines. Advances in these or other technologies could reduce the costs of power production to a level below what the Company has currently forecasted, which could adversely affect its cash flow, results of operations or competitive position.

***Risks that are beyond NRG's control, including but not limited to acts of terrorism or related acts of war, natural disaster, hostile cyber intrusions or other catastrophic events could have a material adverse effect on NRG's financial condition, results of operations and cash flows.***

NRG's generation facilities and the facilities of third parties on which they rely may be targets of terrorist activities, as well as events occurring in response to or in connection with them, that could cause environmental repercussions and/or result in full or partial disruption of the facilities ability to generate, transmit, transport or distribute electricity or natural gas. Strategic targets, such as energy-related facilities, may be at greater risk of future terrorist activities than other domestic targets. Hostile cyber intrusions, including those targeting information systems as well as electronic control systems used at the generating plants and for the distribution systems, could severely disrupt business operations and result in loss of service to customers, as well as significant expense to repair security breaches or system damage. Any such environmental repercussions or disruption could result in a significant decrease in revenues or significant reconstruction or remediation costs, beyond what could be recovered through insurance policies which could have a material adverse effect on the Company's financial condition, results of operations and cash flow.

***NRG's level of indebtedness could adversely affect its ability to raise additional capital to fund its operations, or return capital to stockholders. It could also expose it to the risk of increased interest rates and limit its ability to react to changes in the economy or its industry.***

NRG's substantial debt could have negative consequences, including:

- increasing NRG's vulnerability to general economic and industry conditions;

- requiring a substantial portion of NRG's cash flow from operations to be dedicated to the payment of principal and interest on its indebtedness, therefore reducing NRG's ability to pay dividends to holders of its preferred or common stock or to use its cash flow to fund its operations, capital expenditures and future business opportunities;

- limiting NRG's ability to enter into long-term power sales or fuel purchases which require credit support;

- exposing NRG to the risk of increased interest rates because certain of its borrowings, including borrowings under its senior secured credit facility are at variable rates of interest;

- limiting NRG's ability to obtain additional financing for working capital including collateral postings, capital expenditures, debt service requirements, acquisitions and general corporate or other purposes; and

- limiting NRG's ability to adjust to changing market conditions and placing it at a competitive disadvantage compared to its competitors who have less debt.

The indentures for NRG's notes and senior secured credit facility contain financial and other restrictive covenants that may limit the Company's ability to return capital to stockholders or otherwise engage in activities that may be in its long-term best interests. Furthermore, financial and other restrictive covenants contained in any project level subsidiary debt may limit the ability of NRG to receive distributions from such subsidiary. NRG's failure to comply with those covenants could result in an event of default which, if not cured or waived, could result in the acceleration of all of the Company's indebtedness.

In addition, NRG's ability to arrange financing, either at the corporate level or at a non-recourse project-level subsidiary, and the costs of such capital, are dependent on numerous factors, including:

- general economic and capital market conditions;

- credit availability from banks and other financial institutions;

- investor confidence in NRG, its partners and the regional wholesale power markets;

- NRG's financial performance and the financial performance of its subsidiaries;

- NRG's level of indebtedness and compliance with covenants in debt agreements;

- maintenance of acceptable credit ratings;

- cash flow; and

- provisions of tax and securities laws that may impact raising capital.

NRG may not be successful in obtaining additional capital for these or other reasons. The failure to obtain additional capital from time to time may have a material adverse effect on its business and operations.

***Goodwill and/or other intangible assets not subject to amortization that NRG has recorded in connection with its acquisitions are subject to mandatory annual impairment evaluations and as a result, the Company could be required to write off some or all of this goodwill and other intangible assets, which may adversely affect the Company's financial condition and results of operations.***

In accordance with ASC 350, *Intangibles — Goodwill and Other*, or ASC 350, goodwill is not amortized but is reviewed annually or more frequently for impairment and other intangibles are also reviewed at least annually or more frequently, if certain conditions exist, and may be amortized. Any reduction in or impairment of the value of goodwill or other intangible assets will result in a charge against earnings which could materially adversely affect NRG's reported results of operations and financial position in future periods.

***A valuation allowance may be required for NRG's deferred tax assets.***

A valuation allowance may need to be recorded against deferred tax assets that the Company estimates are more likely than not to be unrealizable, based on available evidence at the time the estimate is made. A valuation allowance related to deferred tax assets can be affected by changes to tax laws, statutory tax rates and future taxable income levels. In the event that the Company determines that it would not be able to realize all or a portion of its net deferred tax assets in the future, the Company would reduce such amounts through a charge to income tax expense in the period in which that determination was made, which could have a material adverse impact on the Company's financial condition and results of operations.

***Volatile power supply costs and demand for power could adversely affect the financial performance of NRG's Retail Business.***

Although NRG is the primary provider of the Retail Business supply requirements, the Retail Business purchases a significant portion of its supply requirements from third parties. As a result, financial performance depends on its ability to obtain adequate supplies of electric generation from third parties at prices below the prices it charges its customers. Consequently, the Company's earnings and cash flows could be adversely affected in any period in which the Retail Business power supply costs rise at a greater rate than the rates it charges to customers. The price of power supply purchases associated with the Retail Business's energy commitments can be different than that reflected in the rates charged to customers due to, among other factors:

- varying supply procurement contracts used and the timing of entering into related contracts;

- subsequent changes in the overall price of natural gas;

- daily, monthly or seasonal fluctuations in the price of natural gas relative to the 12-month forward prices;

- transmission constraints and the Company's ability to move power to its customers; and

- changes in market heat rate (i.e., the relationship between power and natural gas prices).

The Company's earnings and cash flows could also be adversely affected in any period in which the demand for power significantly varies from the forecasted supply, which could occur due to, among other factors, weather events, competition and economic conditions.

***Significant events beyond the Company's control, such as hurricanes and other weather-related problems or acts of terrorism, could cause a loss of load and customers and thus have a material adverse effect on the Company's Retail Business.***

The uncertainty associated with events beyond the Company's control, such as significant weather events and the risk of future terrorist activity, could cause a loss of load and customers and may affect the Company's results of operations and financial condition in unpredictable ways. In addition, significant weather events or terrorist actions could damage or shut down the power transmission and distribution facilities upon which the Retail Business is dependent. Power supply may be sold at a loss if these events cause a significant loss of retail customer load.

***The Company's Retail Business may lose a significant number of retail customers due to competitive marketing activity by other retail electricity providers which could adversely affect the financial performance of NRG's Retail Business.***

The Retail Business faces competition for customers. Competitors may offer lower prices and other incentives, which may attract customers away from the Retail Business. In some retail electricity markets, the principal competitor may be the incumbent retail electricity provider. The incumbent retail electricity provider has the advantage of long-standing relationships with its customers, including well-known brand recognition. Furthermore, the Retail Business may face competition from a number of other energy service providers, other energy industry participants, or nationally branded providers of consumer products and services who may develop businesses that will compete with NRG and its Retail Business.

***The Company's Retail Business is subject to the risk that sensitive customer data may be compromised, which could result in an adverse impact to its reputation and/or the results of operations of the Retail Business.***

The Retail Business requires access to sensitive customer data in the ordinary course of business. Examples of sensitive customer data are names, addresses, account information, historical electricity usage, expected patterns of use, payment history, credit bureau data, credit and debit card account numbers, drivers license numbers, social security numbers and bank account information. The Retail Business may need to provide sensitive customer data to vendors and service providers who require access to this information in order to provide services, such as call center operations, to the Retail Business. If a significant breach occurred, the reputation of NRG and the Retail Business may be adversely affected, customer confidence may be diminished, or NRG and the Retail Business may be subject to legal claims, any of which may contribute to the loss of customers and have a negative impact on the business and/or results of operations.

**CAUTIONARY STATEMENT REGARDING FORWARD LOOKING INFORMATION**

This Annual Report on Form 10-K of NRG Energy, Inc., or NRG or the Company, includes forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, or Securities Act, and Section 21E of the Securities Exchange Act of 1934, as amended, or Exchange Act. The words "believes," "projects," "anticipates," "plans," "expects," "intends," "estimates" and similar expressions are intended to identify forward-looking statements. These forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause NRG's actual results, performance and achievements, or industry results, to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements. These factors, risks and uncertainties include the factors described under Item 1A — *Risk Factors Related to NRG Energy, Inc.* and the following:

- General economic conditions, changes in the wholesale power markets and fluctuations in the cost of fuel;
- Volatile power supply costs and demand for power;
- Hazards customary to the power production industry and power generation operations such as fuel and electricity price volatility, unusual weather conditions, catastrophic weather-related or other damage to facilities, unscheduled generation outages, maintenance or repairs, unanticipated changes to fuel supply costs or availability due to higher demand, shortages, transportation problems or other developments, environmental incidents, or electric transmission or gas pipeline system constraints and the possibility that NRG may not have adequate insurance to cover losses as a result of such hazards;
- The effectiveness of NRG's risk management policies and procedures, and the ability of NRG's counterparties to satisfy their financial commitments;
- Counterparties' collateral demands and other factors affecting NRG's liquidity position and financial condition;
- NRG's ability to operate its businesses efficiently, manage capital expenditures and costs tightly, and generate earnings and cash flows from its asset-based businesses in relation to its debt and other obligations;
- NRG's ability to enter into contracts to sell power and procure fuel on acceptable terms and prices;
- The liquidity and competitiveness of wholesale markets for energy commodities;
- Government regulation, including compliance with regulatory requirements and changes in market rules, rates, tariffs and environmental laws and increased regulation of carbon dioxide and other greenhouse gas emissions;
- Price mitigation strategies and other market structures employed by ISOs or RTOs that result in a failure to adequately compensate NRG's generation units for all of its costs;
- NRG's ability to borrow additional funds and access capital markets, as well as NRG's substantial indebtedness and the possibility that NRG may incur additional indebtedness going forward;
- NRG's ability to receive Federal loan guarantees or cash grants to support development projects;
- Operating and financial restrictions placed on NRG and its subsidiaries that are contained in the indentures governing NRG's outstanding notes, in NRG's Senior Credit Facility, and in debt and other agreements of certain of NRG subsidiaries and project affiliates generally;
- NRG's ability to implement its strategy of developing and building new power generation facilities, including new solar projects;
- NRG's ability to implement its econrg strategy of finding ways to address environmental challenges while taking advantage of business opportunities;
- NRG's ability to implement its *FOR*NRG strategy to increase cash from operations through operational and commercial initiatives, corporate efficiencies, asset strategy, and a range of other programs throughout the company to reduce costs or generate revenues;
- NRG's ability to achieve its strategy of regularly returning capital to stockholders;
- NRG's ability to maintain retail market share;
- NRG's ability to successfully evaluate investments in new business and growth initiatives;
- NRG's ability to successfully integrate, realize cost savings and manage any acquired businesses; and
- NRG's ability to develop and maintain successful partnering relationships.

Forward-looking statements speak only as of the date they were made, and NRG Energy, Inc. undertakes no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise. The foregoing review of factors that could cause NRG's actual results to differ materially from those contemplated in any forward-looking statements included in this Annual Report on Form 10-K should not be construed as exhaustive.

**Item 1B — Unresolved Staff Comments**

None.

**Item 2 — Properties**

Listed below are descriptions of NRG's interests in facilities, operations and/or projects owned or leased as of December 31, 2013. The MW figures provided represent nominal summer net megawatt capacity of power generated as adjusted for the Company's owned or leased interest excluding capacity from inactive/mothballed units as of December 31, 2013. The following table summarizes NRG's power production and cogeneration facilities by region:

| Name and Location of Facility | Power Market | % Owned[a][b] | Net Generation Capacity (MW)[c] | Primary Fuel-type |
|---|---|---|---|---|
| **Texas Region:** | | | | |
| Cedar Bayou, Baytown, TX | ERCOT | 100.0 | 1,495 | Natural Gas |
| Cedar Bayou 4, Baytown, TX | ERCOT | 50.0 | 249 | Natural Gas |
| Greens Bayou, Houston, TX | ERCOT | 100.0 | 651 | Natural Gas |
| Gregory, Corpus Christi, TX | ERCOT | 100.0 | 388 | Natural Gas |
| Limestone, Jewett, TX | ERCOT | 100.0 | 1,689 | Coal |
| San Jacinto, LaPorte, TX | ERCOT | 100.0 | 162 | Natural Gas |
| South Texas Project, Bay City, TX [d] | ERCOT | 44.0 | 1,176 | Nuclear |
| S. R. Bertron, Deer Park, TX [e] | ERCOT | 100.0 | 727 | Natural Gas |
| T. H. Wharton, Houston, TX | ERCOT | 100.0 | 1,025 | Natural Gas |
| W. A. Parish, Thompsons, TX | ERCOT | 100.0 | 2,504 | Coal |
| W. A. Parish, Thompsons, TX | ERCOT | 100.0 | 1,220 | Natural Gas |
| | | **Total net Texas Region** | 11,286 | |
| **East Region:** | | | | |
| Arthur Kill, Staten Island, NY | NYISO | 100.0 | 858 | Natural Gas |
| Astoria Gas Turbines, Queens, NY | NYISO | 100.0 | 508 | Natural Gas |
| Aurora, IL | PJM | 100.0 | 878 | Natural Gas |
| Avon Lake, OH [f] | PJM | 100.0 | 732 | Coal |
| Avon Lake, OH | PJM | 100.0 | 21 | Oil |
| Blossburg, PA | PJM | 100.0 | 19 | Natural Gas |
| Bowline, West Haverstraw, NY | NYISO | 100.0 | 758 | Natural Gas |
| Brunot Island, Pittsburg, PA | PJM | 100.0 | 259 | Natural Gas |
| Canal, Sandwich, MA | ISO-NE | 100.0 | 1,112 | Oil |
| Chalk Point, Aquasco, MD [g] | PJM | 100.0 | 667 | Coal |
| Chalk Point, Aquasco, MD | PJM | 100.0 | 1,690 | Natural Gas |
| Cheswick, Springdale, PA | PJM | 100.0 | 565 | Coal |
| Conemaugh, New Florence, PA | PJM | 20.2 [a] | 343 | Coal |
| Conemaugh, New Florence, PA | PJM | 20.2 [a] | 2 | Oil |
| Connecticut Jet Power, CT (four sites) | ISO-NE | 100.0 | 142 | Oil |
| Devon, Milford, CT | ISO-NE | 100.0 | 133 | Oil |
| Dickerson, MD [g] | PJM | 100.0 [b] | 537 | Coal |
| Dickerson, MD | PJM | 100.0 [b] | 312 | Natural Gas |
| Dunkirk, NY [f] | NYISO | 100.0 | 75 | Coal |
| Gilbert, Milford, NJ [h] | PJM | 100.0 | 536 | Natural Gas |
| Glen Gardner, NJ [h] | PJM | 100.0 | 160 | Natural Gas |
| Hamilton, East Berlin, PA | PJM | 100.0 | 20 | Oil |
| Hunterstown CCGT, Gettysburg, PA | PJM | 100.0 | 810 | Natural Gas |
| Hunterstown CTS, Gettysburg, PA | PJM | 100.0 | 60 | Natural Gas |
| Huntley, Tonawanda, NY | NYISO | 100.0 | 380 | Coal |
| Indian River, Millsboro, DE | PJM | 100.0 | 400 | Coal |
| Indian River, Millsboro, DE | PJM | 100.0 | 16 | Oil |

| | | | | |
|---|---|---|---|---|
| Kendall, Cambridge, MA | ISO-NE | 100.0 | 256 | Natural Gas |
| Keystone, Shelocta, PA | PJM | 20.4 [a] | 346 | Coal |
| Keystone, Shelocta, PA | PJM | 20.4 [a] | 2 | Oil |
| Martha's Vineyard, MA | ISO-NE | 100.0 | 14 | Oil |
| Middletown, CT | ISO-NE | 100.0 | 770 | Oil |
| Montville, Uncasville, CT | ISO-NE | 100.0 | 494 | Oil |
| Morgantown, Newburg, MD | PJM | 100.0 [b] | 1,229 | Coal |
| Morgantown, Newburg, MD | PJM | 100.0 [b] | 248 | Oil |
| Mountain, Mount Holly Springs, PA | PJM | 100.0 | 40 | Oil |
| New Castle, West Pittsburgh, PA [f] | PJM | 100.0 | 325 | Coal |
| New Castle, West Pittsburgh, PA | PJM | 100.0 | 3 | Oil |
| Niles, OH | PJM | 100.0 | 25 | Oil |
| Orrtana, PA | PJM | 100.0 | 20 | Oil |
| Oswego, NY | NYISO | 100.0 | 1,628 | Oil |
| Osceola, Holopaw, FL | FRCC | 100.0 | 463 | Natural Gas |
| Portland, Mount Bethel, PA [h] | PJM | 100.0 | 158 | Coal |
| Portland, Mount Bethel, PA | PJM | 100.0 | 169 | Oil |
| Sayreville, NJ | PJM | 100.0 | 224 | Natural Gas |
| Seward, New Florence, PA | PJM | 100.0 | 525 | Coal |
| Shawnee, East Stroudsburg, PA | PJM | 100.0 | 20 | Oil |
| Shawville, PA [i] | PJM | 100.0 [b] | 597 | Coal |
| Shawville, PA | PJM | 100.0 [b] | 6 | Oil |
| Titus, Birdsboro, PA | PJM | 100.0 | 31 | Oil |
| Tolna, Stewartstown, PA | PJM | 100.0 | 39 | Oil |
| Vienna, MD | PJM | 100.0 | 167 | Oil |
| Warren, PA | PJM | 100.0 | 57 | Natural Gas |
| Werner, South Amboy, NJ [h] | PJM | 100.0 | 212 | Oil |
| | | **Total net East Region** | 20,061 | |
| **South Central Region:** | | | | |
| Bayou Cove, Jennings, LA | MISO | 100.0 | 300 | Natural Gas |
| Big Cajun I, Jarreau, LA | MISO | 100.0 | 430 | Natural Gas |
| Big Cajun II, New Roads, LA [f] | MISO | 85.8 [j] | 1,496 | Coal |
| Choctaw, French Camp, MS | MISO | 100.0 | 800 | Natural Gas |
| Cottonwood, Deweyville, TX | MISO | 100.0 | 1,263 | Natural Gas |
| Rockford, IL | PJM | 100.0 | 450 | Natural Gas |
| Sabine Cogen, Orange, TX | MISO | 50.0 | 54 | Natural Gas |
| Shelby County, Neoga, IL | MISO | 100.0 | 344 | Natural Gas |
| Sterlington, LA | MISO | 100.0 | 176 | Natural Gas |
| | | **Total net South Central Region** | 5,313 | |
| **West Region:** | | | | |
| Coolwater, Dagget, CA | CAISO | 100.0 | 636 | Natural Gas |
| El Segundo Power, CA | CAISO | 100.0 | 335 | Natural Gas |
| El Segundo Energy Center, CA | CAISO | 100.0 | 550 | Natural Gas |
| Ellwood, Goleta, CA | CAISO | 100.0 | 54 | Natural Gas |
| Encina, Carlsbad, CA | CAISO | 100.0 | 965 | Natural Gas |
| Etiwanda, Rancho Cucamonga, CA | CAISO | 100.0 | 640 | Natural Gas |
| Long Beach, CA | CAISO | 100.0 | 260 | Natural Gas |
| Mandalay, Oxnard, CA | CAISO | 100.0 | 560 | Natural Gas |
| Ormond Beach, Oxnard, CA | CAISO | 100.0 | 1,516 | Natural Gas |
| Pittsburg, CA | CAISO | 100.0 | 1,029 | Natural Gas |
| Saguaro Power Co., Henderson, NV | WECC | 50.0 | 46 | Natural Gas |
| San Diego Combustion Turbines, CA (three sites) [k] | CAISO | 100.0 | 188 | Natural Gas |

| Total net West Region | 6,779 |
|---|---|

**Alternative Energy:**

| | | | | |
|---|---|---|---|---|
| Agua Caliente, Dateland, AZ | CAISO/WECC | 51.0 | 290 | Solar |
| California Valley Solar Ranch, San Luis Obispo County, CA | CAISO/WECC | 51.1 | 128 | Solar |
| Distributed Solar | AZNMSNV/WECC | 100.0 | 37 | Solar |
| Elbow Creek Wind Farm, Howard County, TX | ERCOT | 100.0 | 122 | Wind |
| High Desert, Lancaster, CA | CAISO | 100.0 | 20 | Solar |
| Ivanpah, Ivanpah Dry Lake, CA | CAISO | 50.1 | 378 | Solar |
| Kansas South, Kings County, CA | CAISO | 100.0 | 20 | Solar |
| Langford Wind Farm, Christoval, TX | ERCOT | 100.0 | 150 | Wind |
| Sherbino Wind Farm, Pecos County, TX | ERCOT | 50.0 | 75 | Wind |
| | | **Total Alternative Energy** | 1,220 | |
| | | **Alternative Energy capacity attributable to noncontrolling interest** | (331) | |
| | | **Total net Alternative Energy** | 889 | |

**NRG Yield:**

| | | | | |
|---|---|---|---|---|
| Avenal, CA | CAISO | 50.0 | 23 | Solar |
| Avra Valley, Pima County, AZ | CAISO | 100.0 | 25 | Solar |
| Alpine, Lancaster, CA | CAISO | 100.0 | 66 | Solar |
| Blythe, CA | CAISO | 100.0 | 21 | Solar |
| Borrego, Borrego Springs, CA | CAISO | 100.0 | 26 | Solar |
| California Valley Solar Ranch, San Luis Obispo County, CA | CAISO/WECC | 49.0 | 122 | Solar |
| Dover Cogeneration, DE | PJM | 100.0 | 104 | Natural Gas |
| Distributed Solar, AZ | AZNMSNV | 100.0 | 5 | Solar |
| Distributed Solar, CA | WECC | 51.0 | 5 | Solar |
| GenConn Devon, Milford, CT | ISO-NE | 50.0 | 95 | Dual-fuel |
| GenConn Middletown, CT | ISO-NE | 50.0 | 95 | Dual-fuel |
| Marsh Landing, Antioch, CA | CAISO | 100.0 | 720 | Natural Gas |
| Paxton Creek Cogeneration, Harrisburg, PA | PJM | 100.0 | 12 | Natural Gas |
| Princeton Hospital, NJ [1] | PJM | 100.0 | 5 | Natural Gas |
| Roadrunner, Santa Teresa, NM | WECC | 100.0 | 20 | Solar |
| South Trent Wind Farm, Sweetwater, TX | ERCOT | 100.0 | 101 | Wind |
| Tucson Convention Center, Tucson, AZ | WECC | 100.0 | 2 | Natural Gas |
| | | **Total NRG Yield** | 1,447 | |
| | | **NRG Yield capacity attributable to noncontrolling interest** | (499) | |
| | | **Total net NRG Yield** | 948 | |

**Other Conventional Generation:**

| | | | | |
|---|---|---|---|---|
| Gladstone Power Station, Queensland, Australia | Enertrade/Boyne Smelter | 37.5 | 605 | Coal |
| | | **Total net Other** | 605 | |
| | | | | |
| | | **Total generation capacity** | 46,711 | |
| | | **Total capacity attributable to noncontrolling interest** | (830) | |
| | | **Total net generation capacity** | 45,881 | |

(a)  NRG has 16.5% and 16.7% leased interests in the Conemaugh and Keystone facilities, respectively, as well as 3.7% ownership interests in each facility. NRG operates the Conemaugh and Keystone facilities.

(b)  NRG leases 100% interests in the Dickerson and Morgantown coal generation units through facility lease agreements expiring in 2029 and 2034, respectively. NRG owns 310 MW and 250 MW of peaking capacity at the Dickerson and Morgantown generating facilities, respectively. NRG also leases a 100% interest in Shawville through a facility lease agreement expiring in 2026. NRG operates the Dickerson, Morgantown and Shawville facilities.

(c)  Actual capacity can vary depending on factors including weather conditions, operational conditions, and other factors. Additionally, ERCOT requires periodic demonstration of capability, and the capacity may vary individually and in the aggregate from time to time.

(d)  Generation capacity figure consists of the Company's 44% individual interest in the two units at STP.

(e)  The four S. R. Bertron steam units and blackstart unit are currently mothballed according to ERCOT protocols, but all operated in 2013.

(f)  NRG intends to add natural gas capabilities at the Avon Lake and New Castle facilities, which projects are expected to be completed by the summer of 2016. NRG also intends to add natural gas capabilities at the Big Cajun II and Dunkirk plants which projects are expected to be completed by the spring of 2015 and the fall of 2015, respectively.

(g)  On November 29, 2013, NRG submitted a notice of deactivation to retire Chalk Point Units 1 and 2, and Dickerson Units 1, 2, and 3 on May 31, 2017. The deactivation is based on draft environmental regulations that, if adopted, could require uneconomic capital investment and render the units uneconomic to operate going forward.

(h)  NRG has submitted deactivation notices for net generation capacity at the following facilities acquired through the GenOn Merger:

| Facility | Expected Deactivation Date | Net Generation Capacity (MW) |
|---|---|---|
| Gilbert | May 2015 | 98 |
| Glen Gardner | May 2015 | 160 |
| Portland | June 2014 | 158 |
| Werner | May 2015 | 210 |

(i)  NRG expects to place the coal-fired units at the Shawville generating facility (597 MW) in long-term protective layup in April 2015.

(j)  Units 1 and 2 owned 100.0%, Unit 3 owned 58.0%.

(k)  NRG operates these units, located on property owned by San Diego Gas & Electric, under a license agreement which is set to end on December 31, 2015.

(l)  The output of Princeton Hospital is primarily dedicated to serving the hospital.  Excess power is sold to the local utility under its state-jurisdictional tariff.

## Thermal Facilities

The Company's thermal businesses in Pittsburgh, Harrisburg and San Francisco are regulated by their respective state's Public Utility Commission. The other thermal businesses are subject to contract terms with their customers. The Company's thermal businesses are owned by NRG Yield LLC.

The following table summarizes NRG's thermal steam and chilled water facilities as of December 31, 2013:

| Name and Location of Facility | % Owned | Thermal Energy Purchaser | Megawatt Thermal Equivalent Capacity (MWt) | Generating Capacity |
|---|---|---|---|---|
| NRG Energy Center Minneapolis, MN | 100.0 | Approx. 100 steam and 50 chilled water customers | 334<br>141 | Steam: 1,140 MMBtu/hr.<br>Chilled water: 40,200 tons |
| NRG Energy Center San Francisco, CA | 100.0 | Approx 175 steam customers | 133 | Steam: 454 MMBtu/hr. |
| NRG Energy Center Omaha, NE | 100.0<br>12.0<br>100.0 | Approx 60 steam and 60 chilled water customers | 142<br>9<br>77 | Steam: 485 MMBtu/hr<br>Steam: 30 MMBtu/hr<br>Chilled water: 22,000 tons |
| NRG Energy Center Harrisburg, PA | 100.0 | Approx 140 steam and 3 chilled water customers | 129<br>12 | Steam: 440 MMBtu/hr.<br>Chilled water: 3,600 tons |
| NRG Energy Center Phoenix, AZ | 100.0<br>0%[a] | Approx 35 chilled water customers | 106<br>28 | Chilled water: 30,100 tons<br>Chilled water: 8,000 tons |
| NRG Energy Center Pittsburgh, PA | 100.0 | Approx 25 steam and 25 chilled water customers | 87<br>46 | Steam: 296 MMBtu/hr.<br>Chilled water: 12,920 tons |
| NRG Energy Center San Diego, CA | 100.0 | Approx 20 chilled water customers | 26 | Chilled water: 7,425 tons |
| NRG Energy Center Dover, DE | 100.0 | Kraft Foods Inc. and Procter & Gamble Company | 66 | Steam: 225 MMBtu/hr. |
| NRG Energy Center Princeton, NJ | 100.0 | Princeton HealthCare System | 21<br>17 | Steam: 72 MMBtu/hr.<br>Chilled water: 4,700 tons |
| | | Total Generating Capacity (MWt) | 1,374 | |

(a)  Capacity available under right-to-use provision of the Chilled Water Service Agreement.

## Other Properties

NRG owns, net of noncontrolling interest, 50 MW of Distributed Solar facilities, 44 MW of which is operational, at various locations throughout the United States, concentrated primarily in the West Region.

In addition, NRG owns several real properties and facilities relating to its generation assets, other vacant real property unrelated to the Company's generation assets, interests in construction projects, and properties not used for operational purposes. NRG believes it has satisfactory title to its plants and facilities in accordance with standards generally accepted in the electric power industry, subject to exceptions that, in the Company's opinion, would not have a material adverse effect on the use or value of its portfolio.

NRG leases its financial and commercial corporate headquarters offices at 211 Carnegie Center, Princeton, New Jersey, its operational headquarters in Houston, TX, its Retail Business offices and call centers, and various other office space.

**Item 3 — Legal Proceedings**

     See Item 15 — Note 22, *Commitments and Contingencies*, to the Consolidated Financial Statements for discussion of the material legal proceedings to which NRG is a party.

**Item 4 — Mine Safety Disclosures**

**Not applicable**

# PART II

### Item 5 — Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities

### Market Information and Holders

NRG's authorized capital stock consists of 500,000,000 shares of NRG common stock and 10,000,000 shares of preferred stock. A total of 22,000,000 shares of the Company's common stock are available for issuance under the NRG LTIP. A total of 5,558,390 shares of NRG common stock were authorized for issuance under the NRG GenOn LTIP. For more information about the NRG LTIP and the NRG GenOn LTIP, refer to Item 15 —Note 20, *Stock-Based Compensation.* NRG has also filed with the Secretary of State of Delaware a Certificate of Designation for the 3.625% Convertible Perpetual Preferred Stock.

NRG's common stock is listed on the New York Stock Exchange and has been assigned the symbol: NRG. The high and low sales prices, as well as the closing price for the Company's common stock on a per share basis for 2013 and 2012 are set forth below:

| Common Stock Price | Fourth Quarter 2013 | Third Quarter 2013 | Second Quarter 2013 | First Quarter 2013 | Fourth Quarter 2012 | Third Quarter 2012 | Second Quarter 2012 | First Quarter 2012 |
|---|---|---|---|---|---|---|---|---|
| High | $ 30.28 | $ 29.19 | $ 28.67 | $ 26.51 | $ 23.78 | $ 22.92 | $ 17.49 | $ 18.46 |
| Low | 26.30 | 25.24 | 24.86 | 22.60 | 19.15 | 16.66 | 14.29 | 15.53 |
| Closing | 28.72 | 27.33 | 26.70 | 26.49 | 22.99 | 21.39 | 17.36 | 15.67 |
| Dividends Per Common Share | $ 0.12 | $ 0.12 | $ 0.12 | $ 0.09 | $ 0.09 | $ 0.09 | — | — |

NRG had 323,779,252 shares outstanding as of December 31, 2013**.** As of February 26, 2014, there were 325,217,179 shares outstanding, and there were 30,064 common stockholders of record.

### Dividends

On February 17, 2014, NRG paid a quarterly dividend on the Company's common stock of $0.12 per share.

### Repurchase of equity securities

| For the year ended December 31, 2013 | Total number of shares purchased | Average price paid per share[a] | Total number of shares purchased under the 2013 Capital Allocation Program | Dollar value of shares that may be purchased under the 2013 Capital Allocation Program[b] |
|---|---|---|---|---|
| First quarter 2013 | 972,292 | $ 25.88 | 972,292 | $ 174,828,171 |
| Year-to-date 2013 | 972,292 | $ 25.88 | 972,292 | $ 174,828,171 |

(a) The average price paid per share excludes commissions of $0.015 per share paid in connection with the share repurchases.

(b) Includes commissions of $0.015 per share paid in connection with the share repurchases.

On February 27, 2013, the Company announced a plan to repurchase $200 million of its common stock in 2013 under the 2013 Capital Allocation Program. During the first quarter, the Company purchased 972,292 shares of NRG common stock for $25 million at an average cost of $25.88 per share. As a result of the proposed acquisition of EME, the Company did not complete the remaining $175 million of share repurchases under the 2013 Capital Allocation Program.

**Stock Performance Graph**

The performance graph below compares NRG's cumulative total stockholder return on the Company's common stock for the period December 31, 2008, through December 31, 2013, with the cumulative total return of the Standard & Poor's 500 Composite Stock Price Index, or S&P 500, and the Philadelphia Utility Sector Index, or UTY. NRG's common stock trades on the New York Stock Exchange under the symbol "NRG."

The performance graph shown below is being furnished and compares each period assuming that $100 was invested on December 31, 2008 in each of the common stock of NRG, the stocks included in the S&P 500 and the stocks included in the UTY, and that all dividends were reinvested.

Comparison of Cumulative Total Return



| | Dec-2008 | Dec-2009 | Dec-2010 | Dec-2011 | Dec-2012 | Dec-2013 |
|---|---|---|---|---|---|---|
| NRG Energy, Inc. | $    100.00 | $    101.21 | $    83.76 | $    77.67 | $    99.41 | $    126.26 |
| S&P 500 | 100.00 | 126.48 | 145.52 | 148.59 | 172.37 | 228.19 |
| UTY | 100.00 | 110.05 | 116.31 | 138.73 | 137.95 | 153.12 |

**Item 6 — Selected Financial Data**

    The following table presents NRG's historical selected financial data. The data included in the following table has been recast to reflect the assets, liabilities and results of operations of certain projects that have met the criteria for treatment as discontinued operations in 2009. This historical data should be read in conjunction with the Consolidated Financial Statements and the related notes thereto in Item 15 and Item 7, *Management's Discussion and Analysis of Financial Condition and Results of Operations.* The Company has completed several acquisitions and dispositions, as described in Item 15 - Note 3, *Business Acquisitions and Dispositions*.

| | | | Year Ended December 31, | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | **2013** | | **2012** | | **2011** | | **2010** | | **2009** |
| | | | | | (In millions except ratios and per share data) | | | | | |
| **Statement of income data:** | | | | | | | | | | |
| Total operating revenues | $ | 11,295 | $ | 8,422 | $ | 9,079 | $ | 8,849 | $ | 8,952 |
| Total operating costs and expenses, and other expenses [(b)] | | 11,929 | | 8,434 | | 9,725 | | 8,119 | | 7,283 |
| (Loss)/Income from continuing operations, net | | (352) | | 315 | | 197 | | 476 | | 941 |
| Net (loss)/income attributable to NRG Energy, Inc. | $ | (386) | $ | 295 | $ | 197 | $ | 477 | $ | 942 |
| **Common share data:** | | | | | | | | | | |
| Basic shares outstanding — average | | 323 | | 232 | | 240 | | 252 | | 246 |
| Diluted shares outstanding — average | | 323 | | 234 | | 241 | | 254 | | 271 |
| Shares outstanding — end of year | | 324 | | 323 | | 228 | | 247 | | 254 |
| **Per share data:** | | | | | | | | | | |
| Net (loss)/income attributable to NRG — basic | | (1.22) | | 1.23 | | 0.78 | | 1.86 | | 3.70 |
| Net (loss)/income attributable to NRG — diluted | | (1.22) | | 1.22 | | 0.78 | | 1.84 | | 3.44 |
| Dividends declared per common share | $ | 0.45 | $ | 0.18 | $ | — | $ | — | $ | — |
| Book value | $ | 32.33 | $ | 31.83 | $ | 33.71 | $ | 32.65 | $ | 29.72 |
| **Business metrics:** | | | | | | | | | | |
| Cash flow from operations | $ | 1,270 | $ | 1,149 | $ | 1,166 | $ | 1,623 | $ | 2,106 |
| Liquidity position [(a)] | $ | 3,695 | $ | 3,362 | $ | 2,328 | $ | 4,660 | $ | 3,971 |
| Ratio of earnings to fixed charges | | 0.30 | | 0.86 | | 0.77 | | 2.03 | | 3.27 |
| Ratio of earnings to fixed charges and preferred dividends | | 0.29 | | 0.85 | | 0.76 | | 1.99 | | 3.04 |
| Return on equity | | (3.69)% | | 2.87% | | 2.57% | | 5.91% | | 12.24% |
| Ratio of debt to total capitalization | | 57.60 % | | 56.74% | | 52.43% | | 42.94% | | 43.49% |
| **Balance sheet data:** | | | | | | | | | | |
| Current assets | $ | 7,596 | $ | 7,972 | $ | 7,749 | $ | 7,137 | $ | 6,208 |
| Current liabilities | | 4,204 | | 4,670 | | 5,861 | | 4,220 | | 3,762 |
| Property, plant and equipment, net | | 19,851 | | 20,153 | | 13,621 | | 12,517 | | 11,564 |
| Total assets | | 33,902 | | 34,983 | | 26,900 | | 26,896 | | 23,378 |
| Long-term debt, including current maturities, capital leases, and funded letter of credit | | 16,817 | | 15,883 | | 9,832 | | 10,511 | | 8,418 |
| Total stockholders' equity | $ | 10,469 | $ | 10,269 | $ | 7,669 | $ | 8,072 | $ | 7,697 |

(a)    Liquidity position is determined as disclosed in Item 7, *Management's Discussion and Analysis of Financial Condition and Results of Operations, Liquidity and Capital Resources, Liquidity Position*. It includes funds deposited by counterparties of $63 million, $271 million, and $258 million as of December 31, 2013, 2012, and 2011, respectively, which represents cash held as collateral from hedge counterparties in support of energy risk management activities. It is the Company's intention to limit the use of these funds for repayment of the related current liability for collateral received in support of energy risk management activities.

(b)    The Company recorded impairment losses in 2013 and 2011 as further described in Item 15 - Note 10, *Asset Impairments*.

The following table provides the details of NRG's operating revenues:

| | Year Ended December 31, | | | | |
| | 2013 | 2012 | 2011 | 2010 | 2009 |
|---|---|---|---|---|---|
| | (In millions) | | | | |
| Energy revenue | $ 5,606 | $ 3,776 | $ 3,804 | $ 4,063 | $ 4,087 |
| Capacity revenue | 1,860 | 800 | 750 | 840 | 1,070 |
| Retail revenue | 6,297 | 5,888 | 5,807 | 5,277 | 4,440 |
| Mark-to-market for economic hedging activities | (542) | (450) | 325 | (199) | (107) |
| Contract amortization | (32) | (97) | (159) | (195) | (179) |
| Other revenues | 433 | 302 | 342 | 361 | 62 |
| Eliminations | (2,327) | (1,797) | (1,790) | (1,298) | (421) |
| Total operating revenues | $ 11,295 | $ 8,422 | $ 9,079 | $ 8,849 | $ 8,952 |

Energy revenue consists of revenues received from third parties for sales of electricity in the day-ahead and real-time markets, as well as bilateral sales. It also includes energy sold through long-term PPAs for renewable facilities. In addition, energy revenue includes revenues from the settlement of financial instruments and net realized trading revenues.

Capacity revenue consists of revenues received from a third party at either the market or negotiated contract rates for making installed generation capacity available in order to satisfy system integrity and reliability requirements. Capacity revenue also includes revenues from the settlement of financial instruments. In addition, capacity revenue includes revenues received under tolling arrangements, which entitle third parties to dispatch NRG's facilities and assume title to the electrical generation produced from that facility.

Retail revenue, representing operating revenues of NRG's Retail Business, consists of revenues from retail sales to residential, small business, commercial, industrial and governmental/institutional customers, as well as revenues from the sale of excess supply into various markets, primarily in Texas.

Mark-to-market for economic hedging activities includes asset-backed hedges that have not been designated as cash flow hedges and ineffectiveness on cash flow hedges.

Contract amortization revenue consists of the amortization of the intangible assets for net in-market C&I contracts established in connection with the acquisitions of Reliant Energy and Green Mountain Energy, as well as acquired power contracts, gas derivative instruments, and certain power sales agreements assumed at Fresh Start and Texas Genco purchase accounting dates related to the sale of electric capacity and energy in future periods. These amounts are amortized into revenue over the term of the underlying contracts based on actual generation or contracted volumes.

Other revenues include revenues generated by the Thermal business consisting of revenues received from the sale of steam, hot and chilled water generally produced at a central district energy plant and sold to commercial, governmental and residential buildings for space heating, domestic hot water heating and air conditioning. It also includes the sale of high-pressure steam produced and delivered to industrial customers that is used as part of an industrial process. Other revenues also consists of operations and maintenance fees, or O&M fees, construction management services, or CMA fees, sale of natural gas and emission allowances, and revenues from ancillary services. O&M fees consist of revenues received from providing certain unconsolidated affiliates with services under long-term operating agreements. CMA fees are earned where NRG provides certain management and oversight of construction projects pursuant to negotiated agreements such as for the GenConn, Cedar Bayou 4 and certain solar construction projects. Ancillary services are comprised of the sale of energy-related products associated with the generation of electrical energy such as spinning reserves, reactive power and other similar products. Other revenues also includes unrealized trading activities.

**Item 7 — Management's Discussion and Analysis of Financial Condition and Results of Operations**

The discussion and analysis below has been organized as follows:

• Executive Summary, including business strategy, the business environment in which NRG operates, how regulation, weather, competition and other factors affect the business, and significant events that are important to understanding the results of operations and financial condition for the 2013 period;

• Results of operations, including an explanation of significant differences between the periods in the specific line items of NRG's Consolidated Statements of Operations;

• Financial condition addressing credit ratings, liquidity position, sources and uses of cash, capital resources and requirements, commitments, and off-balance sheet arrangements; and

• Critical accounting policies which are most important to both the portrayal of the Company's financial condition and results of operations, and which require management's most difficult, subjective or complex judgment.

As you read this discussion and analysis, refer to NRG's Consolidated Statements of Operations to this Form 10-K, which presents the results of the Company's operations for the years ended December 31, 2013, 2012, and 2011, and also refer to Item 1 to this Form 10-K for more detailed discussion about the Company's business.

**Executive Summary**

**NRG's Business Strategy**

The Company's business is focused on: (i) excellence in operating performance of its existing assets; (ii) serving the energy needs of end-use residential, commercial and industrial customers in competitive markets through multiple brands and channels with a variety of retail energy products and services differentiated by innovative features, premium service, sustainability, and loyalty/affinity programs; (iii) optimal hedging of generation assets and retail load operations; (iv) repowering of power generation assets at premium sites; (v) investing in, and deploying, alternative energy technologies both in its wholesale and, particularly, in and around its Retail Business and its customers; (vi) pursuing selective acquisitions, joint ventures, divestitures and investments; and (vii) engaging in a proactive capital allocation plan focused on achieving the regular return of and on stockholder capital within the dictates of prudent balance sheet management. Underlying each aspect of the Company's business is the Company's commitment to safety for its employees, customers and partners.

In addition, the Company's subsidiary, NRG Yield, Inc., is focused on enhancing value for its stockholders by: (i) providing investors with a more competitive source of equity capital that would accelerate NRG's long-term growth and acquisition strategy and optimize NRG's capital structure; and (ii) highlighting the reduced market exposure associated with the contracted conventional and renewable generation and thermal infrastructure assets embedded with NRG's merchant portfolio.

The Company believes that the U.S. energy industry is going to be increasingly impacted by the long-term societal trend towards sustainability, which is both generational and irreversible. Moreover, it further believes the information technology-driven revolution, which has enabled greater and easier personal choice in other sectors of the consumer economy, will do the same in the U.S. energy sector over the years to come. Finally, NRG believes that the aging transmission and distribution infrastructure of the national grid is becoming increasingly inadequate in the face of the more extreme weather demands of the 21st century. As a result, energy consumers are expected to have increasing personal control over whom they buy their energy from, how that energy is generated and used (including their ability to self-generate from their own primarily sustainable energy resources) and what environmental impact individual choices will have. The Company's initiatives in this area of future growth are focused on: (i) renewables, with a concentration in solar and wind development; (ii) electric vehicle ecosystems; (iii) customer-facing energy products and services, including smart energy services that give consumers individual energy insights, choices and convenience, a variety of renewable and energy efficiency products, and numerous loyalty and affinity options and tailored product and service bundles sold through unique retail sales channels; and (iv) construction of other forms of on-site clean power generation. The Company's advances in each of these areas are driven by select acquisitions, joint ventures, and investments that are more fully described in Item 1, *Business - New and On-going Company Initiatives and Development Projects* and in *Management's Discussion and Analysis of Financial Condition and Results of Operations, New and On-going Company Initiatives and Development Projects,* in this Form 10-K.

In summary, NRG's business strategy is intended to maximize stockholder value through the production and sale of safe, reliable and affordable power to its customers in the markets served by the Company, while aggressively positioning the Company to meet the market's increasing demand for sustainable and low carbon energy solutions individualized for the benefit of the end use energy consumer. This strategy is designed to enhance the Company's core business of competitive power generation and mitigate the risk of declining power prices. The Company is a leading provider of sustainable energy solutions that promote both consumer welfare and national energy security.

*Business Environment*

The industry dynamics and external influences affecting the Company and the power generation industry in 2013 and for the future medium term include:

*Natural Gas Market* — The price of natural gas plays an important role in setting the price of electricity in many of the regions where NRG operates power plants. Natural gas prices are driven by variables including demand from the industrial, residential, and electric sectors, productivity across natural gas supply basins, costs of natural gas production, changes in pipeline infrastructure, and the financial and hedging profile of natural gas consumers and producers. In 2013, average natural gas prices at Henry Hub were 31% higher than 2012. Although supply continues to increase, reflecting increased production from mainly the shale basins, winter weather in January 2014 caused natural gas within several Northeastern points to trade in excess of $100/MMbtu. Coordination between gas pipelines, local distribution company home heating load, gas generators, and ISOs needs to improve to ensure there are no reliability issues in the winter when home heating demands and the increased reliance on gas generation come into conflict.

If long-term gas prices decrease or remain depressed, the Company is likely to encounter lower realized energy prices, leading to lower energy revenues as higher priced hedge contracts mature and are replaced by contracts with lower gas and power prices. The Retail Business's gross margins have historically improved as natural gas prices decline and are likely to partially offset the impact of declining gas prices on conventional wholesale power generation. To further mitigate this impact, NRG may

increase its percentage of coal and nuclear capacity sold forward using a variety of hedging instruments, as described under the heading Energy Related Commodities in Item 15 — Note 5, *Accounting for Derivative Instruments and Hedging Activities,* to the Consolidated Financial Statements. The Company also mitigates declines in long term gas prices through its increased investment in renewable power generation supported by PPAs as well as through the increasing portion of the fleet which benefits from capacity payments.

*Electricity Prices* — The price of electricity is a key determinant of the profitability of the Company's generation portfolio. Many variables such as the price of different fuels, weather, load growth and unit availability all coalesce to impact the final price for electricity and the Company's profitability. In 2013, electricity prices in the Company's core markets were generally higher than 2012 primarily due to higher natural gas prices. Prices were lower in 2012 compared to 2011 mainly due to lower gas prices, lack of weather and negligible demand growth. The following table summarizes average on-peak power prices for each of the major markets in which NRG operates for the years ended December 31, 2013, 2012, and 2011:

| | Average on Peak Power Price ($/MWh) | | |
|---|---|---|---|
| **Region** | **2013** | **2012** | **2011** |
| Texas[a] | $ 34.12 | $ 29.10 | $ 57.42 |
| East | 52.99 | 41.50 | 53.09 |
| NY J/NYC | 62.31 | 46.90 | 62.34 |
| NY A/West NY | 44.71 | 36.27 | 42.14 |
| NEPOOL | 65.32 | 41.61 | 52.80 |
| PEPCO (PJM) | 48.65 | 42.62 | 56.40 |
| PJM West Hub | 45.21 | 39.87 | 51.33 |
| South Central[b] | 33.32 | 28.72 | 37.38 |
| West[c] | 46.13 | 33.44 | 36.39 |

(a) Average on-peak market power prices calculated based on average settled market prices in ERCOT - Houston and ERCOT - North.
(b) Average on-peak market power prices for South Central region are calculated based on average day ahead market prices for "into Entergy" as published in the Platts Megawatt Daily report.
(c) Average on-peak market power prices calculated based on average settled market prices in CAISO - NP15 and CAISO - SP15.

*Capacity Markets* — Capacity markets are a major source of revenue for the Company. There are both bilateral markets and ISO auctions, depending on the region. In the Northeast, ISOs use a forward auction to procure the capacity necessary to meet reliability standards, to forge unit commitments, and to set the price of capacity. These auctions are either an annual market held three years ahead of the delivery period as in the case of PJM and ISO-NE, or six months to one month ahead as in the case of New York. Many variables play into the prices derived in these auctions. These variables include the load forecast, the target reserve margin, rules surrounding demand response, capacity imports and exports from the region, new generation entrants, slope of the demand curve, generation retirements, the cost of retrofitting old generation to meet new environmental rules, expected profitability of the plant itself in the energy market, rules about the transfer of capacity within the ISO but between different regions and various other auction rules. In theory, a high capacity price should be an indication that the ISO doesn't have sufficient generation capacity against its needed reserve margin and new constuction should enter the market. Similarly, a low capacity price suggests the market is over-built and units should retire. The Company has seen many swings in the pricing for capacity markets. The PJM auction held last May for delivery in 2016/2017 cleared lower than expected. The ISO-NE auction for the same time-frame cleared at the market floor. However, the very next ISO-NE auction (for 2017/2018) cleared at the administrative ceiling after several plants retired. Many changes are being considered for the upcoming PJM auction for 2017/2018, these include limits on imports and changes to the demand response rules, both of which may have a positive effect on clearing prices.

*Consolidation* — There were several mergers and acquisitions in the U.S. power sector over the last three years. Over the long term, industry consolidation is expected to continue.

*Environmental Regulatory Landscape* — The MATS rule, finalized in 2012, is the driving regulatory force behind the decision to retrofit, repower or retire uncontrolled coal fired power plants. Across the nation, companies are moving from the planning stages to implementation in order to meet the 2015 compliance date. A number of regulations on GHGs, ambient air quality, coal combustion byproducts and water use with the potential for increased capital costs or operational impacts have been finalized or are still in development and under review by the EPA. The design, timing and stringency of these regulations will affect the framework for the retrofit or retirement of existing fossil plants and deployment of new, cleaner technologies in the next decade. See Item 1, Business — *Environmental Matters*, for further discussion.

*Public Policy Support and Government Financial Incentives for Clean Infrastructure Development* — Policy mechanisms including production and investment tax credits, cash grants, loan guarantees, accelerated depreciation tax benefits, RPS, and carbon trading plans have been implemented at the state and federal levels to support the development of renewable generation, demand-side and smart grid, and other clean infrastructure technologies. The availability and continuation of public policy support mechanisms will drive a significant part of the economics of the Company's development program and expansion into clean energy investments.

### Weather

Weather conditions in the regions of the United States in which NRG does business influence the Company's financial results. Weather conditions can affect the supply and demand for electricity and fuels. Changes in energy supply and demand may impact the price of these energy commodities in both the spot and forward markets, which may affect the Company's results in any given period. Typically, demand for and the price of electricity is higher in the summer and the winter seasons, when temperatures are more extreme. The demand for and price of natural gas are higher in the winter. However, all regions of the United States typically do not experience extreme weather conditions at the same time, thus NRG is typically not exposed to the effects of extreme weather in all parts of its business at once.

### Other Factors

A number of other factors significantly influence the level and volatility of prices for energy commodities and related derivative products for NRG's business. These factors include:

- seasonal, daily and hourly changes in demand;
- extreme peak demands;
- available supply resources;
- transportation and transmission availability and reliability within and between regions;
- location of NRG's generating facilities relative to the location of its load-serving opportunities;
- procedures used to maintain the integrity of the physical electricity system during extreme conditions; and
- changes in the nature and extent of federal and state regulations.

These factors can affect energy commodity and derivative prices in different ways and to different degrees. These effects may vary throughout the country as a result of regional differences in:

- weather conditions;
- market liquidity;
- capability and reliability of the physical electricity and gas systems;
- local transportation systems; and
- the nature and extent of electricity deregulation.

### Environmental Matters, Regulatory Matters and Legal Proceedings

Details of other environmental matters are presented in Item 15 — Note 24, *Environmental Matters*, to the Consolidated Financial Statements and Item 1, *Business — Environmental Matters,* section. Details of regulatory matters are presented in Item 15 — Note 23, *Regulatory Matters*, to the Consolidated Financial Statements and Item 1, *Business — Regulatory Matters,* section. Details of legal proceedings are presented in Item 15 — Note 22, *Commitments and Contingencies*, to the Consolidated Financial Statements. Some of this information relates to costs that may be material to the Company's financial results.

### Impact of inflation on NRG's results

For the years ended December 31, 2013, 2012 and 2011, the impact of inflation and changing prices (due to changes in exchange rates) on NRG's revenues and net income was immaterial.

## Significant events during the year ended December 31, 2013

### Results of Operations and Financial Condition

- *Lower net income* — Net income decreased $667 million, as discussed in further detail below.
- *GenOn acquisition* — On December 14, 2012, NRG completed the acquisition of GenOn and recorded a bargain purchase gain on the acquisition. In December 2013, the Company finalized acquisition accounting for the acquisition, as discussed in more detail in Item 15 - Note 3 - *Business Acquisitions and Dispositions*.
- *Long-term debt* — During 2013, the Company increased its non-recourse debt by approximately $669 million primarily in connection with the financing of the construction and acquisition of various solar facilities and the construction of the ESEC and Marsh Landing natural gas facilities.
- *Impairment Losses* — During the fourth quarter of 2013, the Company recognized impairment losses on its Indian River facility and Gladstone investment, as discussed in more detail in Item 15 - Note 10, *Asset Impairments*.
- *NRG Yield, Inc. initial public offering* — During the third quarter of 2013, NRG Yield, Inc. completed its initial public offering of its Class A common shares at a price of $22 per share, which represents 34.5% of NRG Yield.

**Consolidated Results of Operations**

*2013 compared to 2012*

The following table provides selected financial information for the Company:

| (In millions except otherwise noted) | | 2013 | | 2012 [(a)] | Change % |
|---|---|---|---|---|---|
| | | Year Ended December 31, | | | |
| **Operating Revenues** | | | | | |
| Energy revenue [(b)] | $ | 3,530 | $ | 2,114 | 67 % |
| Capacity revenue [(b)] | | 1,800 | | 762 | 136 |
| Retail revenue | | 6,292 | | 5,888 | 7 |
| Mark-to-market for economic hedging activities | | (578) | | (450) | (28) |
| Contract amortization | | (31) | | (97) | 68 |
| Other revenues [(c)] | | 282 | | 205 | 38 |
| Total operating revenues | | 11,295 | | 8,422 | 34 |
| **Operating Costs and Expenses** | | | | | |
| Generation cost of sales [(b)] | | 3,411 | | 2,123 | 61 |
| Retail cost of sales [(b)] | | 2,861 | | 2,828 | 1 |
| Mark-to-market for economic hedging activities | | (293) | | (182) | (61) |
| Contract and emissions credit amortization [(d)] | | 32 | | 39 | (18) |
| Other cost of operations | | 2,110 | | 1,332 | 58 |
| Total cost of operations | | 8,121 | | 6,140 | 32 |
| Depreciation and amortization | | 1,256 | | 950 | 32 |
| Impairment losses | | 459 | | — | (100) |
| Selling, general and administrative | | 904 | | 807 | 12 |
| Acquisition-related transaction and integration costs | | 128 | | 107 | 100 |
| Development costs | | 84 | | 68 | 24 |
| Total operating costs and expenses | | 10,952 | | 8,072 | 36 |
| **Operating Income** | | 343 | | 350 | (2) |
| **Other Income/(Expense)** | | | | | |
| Equity in earnings of unconsolidated affiliates | | 7 | | 37 | (81) |
| Bargain purchase gain related to GenOn acquisition | | — | | 296 | 100 |
| Impairment losses on investments | | (99) | | (2) | N/A |
| Other income, net | | 13 | | 19 | (32) |
| Loss on debt extinguishment | | (50) | | (51) | (2) |
| Interest expense | | (848) | | (661) | 28 |
| Total other expense | | (977) | | (362) | 170 |
| **Loss before income tax expense** | | (634) | | (12) | 5,183 |
| Income tax benefit | | (282) | | (327) | (14) |
| **Net (Loss)/Income** | | (352) | | 315 | (212) |
| Less: Net income attributable to noncontrolling interest | | 34 | | 20 | 100 |
| **Net (loss)/income attributable to NRG Energy, Inc.** | $ | (386) | $ | 295 | (231) |
| **Business Metrics** | | | | | |
| Average natural gas price — Henry Hub ($/MMBtu) | | 3.65 | | 2.79 | 31 % |

(a)   Includes the results of GenOn from December 15, 2012 to December 31, 2012.
(b)   Includes realized gains and losses from financially settled transactions.
(c)   Includes unrealized trading gains and losses.
(d)   Includes amortization of $SO_2$ and $NO_x$ credits and excludes amortization of RGGI credits.
N/A - Not Applicable

**Management's discussion of the results of operations for the years ended December 31, 2013, and 2012**

*Loss before income tax expense* — The pre-tax loss of $634 million for the year ended December 31, 2013, compared to a pre-tax loss of $12 million for the year ended December 31, 2012, primarily reflects:

- in the current year, impairment losses associated with the Indian River facility and the investment in Gladstone;

- increased operating costs of $1,218 million including operations and maintenance expense, depreciation and amortization, selling, general and administrative costs and development costs as well as acquisition-related transaction and integration costs, primarily associated with the acquisition of GenOn; and

- a decrease from net mark-to-market results for economic hedging activities of $17 million;

offset by:

- an increase in gross margin of $1,599 million comprised of an increase in Conventional Generation gross margin of $1,402 million, primarily associated with the acquisition of GenOn, an increase in NRG Yield gross margin of $135 million and an increase in Alternative Energy gross margin of $101 million, offset by a decrease in Retail gross margin of $39 million; and

- the bargain purchase gain related to the GenOn acquisition.

*Net (loss)/income* — The net loss of $352 million compared to net income in the prior year of $315 million primarily reflects the drivers discussed above.

*Conventional Generation gross margin*

The following is a discussion of gross margin for NRG's Conventional Generation businesses, adjusted to eliminate intersegment activity, primarily with NRG's Retail Business segment.

### For the Year Ended December 31, 2013

| (In millions except otherwise noted) | Conventional Generation | | | | | | Alternative Energy | NRG Yield (a) | Eliminations/Corporate | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | Texas | East | South Central | West | Other | Subtotal | | | | |
| Energy revenue | $ 2,190 | $ 2,400 | $ 566 | $ 155 | $ — | $ 5,311 | $ 209 | $ 86 | $ (2,076) | $ 3,530 |
| Capacity revenue | 103 | 1,099 | 245 | 314 | 5 | 1,766 | 3 | 91 | (60) | 1,800 |
| Other revenue | 28 | 76 | (1) | 4 | 148 | 255 | 22 | 137 | (132) | 282 |
| Generation revenue | 2,321 | 3,575 | 810 | 473 | 153 | 7,332 | 234 | 314 | (2,268) | 5,612 |
| Generation cost of sales | (1,156) | (1,492) | (623) | (119) | (63) | (3,453) | (8) | (62) | $ 112 | $ (3,411) |
| Generation gross margin | $ 1,165 | $ 2,083 | $ 187 | $ 354 | $ 90 | $ 3,879 | $ 226 | $ 252 | | |
| **Business Metrics** | | | | | | | | | | |
| MWh sold (in thousands)(b) | 46,250 | 35,104 | 17,178 | 1,695 | | | 2,667 | 963 | | |
| MWh generated (in thousands) | 40,734 | 34,211 | 16,329 | 3,528 | | | 2,159 | 1,109 | | |

### For the Year Ended December 31, 2012

| (In millions except otherwise noted) | Conventional Generation | | | | | | Alternative Energy | NRG Yield (a) | Eliminations/Corporate | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | Texas | East | South Central | West | Other | Subtotal | | | | |
| Energy revenue | $ 2,406 | $ 533 | $ 527 | $ 121 | $ 39 | $ 3,626 | $ 117 | $ 33 | $ (1,662) | $ 2,114 |
| Capacity revenue | 81 | 314 | 240 | 124 | 41 | 800 | — | — | (38) | 762 |
| Other revenue | 28 | 19 | (10) | 4 | 93 | 134 | 8 | 142 | (79) | 205 |
| Generation revenue | 2,515 | 866 | 757 | 249 | 173 | 4,560 | 125 | 175 | (1,779) | 3,081 |
| Generation cost of sales | (958) | (440) | (519) | (88) | (78) | (2,083) | — | (58) | 18 | (2,123) |
| Generation gross margin | $ 1,557 | $ 426 | $ 238 | $ 161 | $ 95 | $ 2,477 | $ 125 | $ 117 | | |
| **Business Metrics** | | | | | | | | | | |
| MWh sold (in thousands)(b) | 43,707 | 8,172 | 17,935 | 2,146 | | | 1,524 | 464 | | |
| MWh generated (in thousands) | 37,695 | 6,469 | 15,927 | 2,146 | | | 1,524 | 464 | | |

### Years ended December 31,

| Weather Metrics | Texas | East | South Central | West |
|---|---|---|---|---|
| **2013** | | | | |
| CDDs (c) | 2,872 | 713 | 1,587 | 879 |
| HDDs (c) | 2,055 | 6,124 | 3,642 | 2,924 |
| **2012** | | | | |
| CDDs | 3,134 | 754 | 1,782 | 904 |
| HDDs | 1,452 | 5,317 | 2,861 | 2,988 |
| **30 year average** | | | | |
| CDDs | 2,940 | 660 | 1,758 | 831 |
| HDDs | 1,800 | 5,937 | 3,377 | 3,049 |

(a) Yield MWh generated excludes thermal facilities.

(b) MWh sold excludes generation at facilities that generate revenue under capacity agreements.

(c) National Oceanic and Atmospheric Administration-Climate Prediction Center - A Cooling Degree Day, or CDD, represents the number of degrees that the mean temperature for a particular day is above 65 degrees Fahrenheit in each region. A Heating Degree Day, or HDD, represents the number of degrees that the mean temperature for a particular day is below 65 degrees Fahrenheit in each region. The CDDs/HDDs for a period of time are calculated by adding the CDDs/HDDs for each day during the period.

*Conventional Generation gross margin* — increased by $1,402 million, including intercompany sales, during the years ended December 31, 2013, compared to the same period in 2012, due to:

| | | |
|---|---|---:|
| Decrease in Texas region | $ | (392) |
| Increase in East region | | 1,657 |
| Decrease in South Central region | | (51) |
| Increase in West region | | 193 |
| Other [a] | | (5) |
| | $ | 1,402 |

(a)   Other gross margin primarily represents revenues from the maintenance services business, which are eliminated in consolidation.

The decrease in gross margin in the Texas region was driven by:

| | | |
|---|---|---:|
| Lower gross margin from a decrease in average realized prices | $ | (431) |
| Lower gross margin from a 4% decrease in nuclear generation due to more planned outage hours in 2013 | | (28) |
| Lower gross margin from a 22% decrease in gas generation due to milder weather in the summer months of 2013 | | (27) |
| Higher gross margin driven by a 13% increase in coal generation driven by 4% less outage hours in 2013 | | 85 |
| Higher gross margin due to the acquisition of the Gregory cogeneration plant in August 2013 | | 17 |
| Change in unrealized commercial optimization activities and other | | (8) |
| | $ | (392) |

The increase in gross margin in the East region was driven by:

| | | |
|---|---|---:|
| Higher gross margin from the acquisition of GenOn in December 2012 | $ | 1,572 |
| Higher revenue due to a 32% increase in New York and PJM hedged capacity prices and the Dunkirk RSS contract | | 83 |
| Higher gross margin from coal plants due to an increase in generation and realized prices | | 39 |
| Lower margins realized on certain load-serving contracts due to increased pricing for power purchases | | (33) |
| Lower gross margin from oil and gas plants due primarily to a 20% decrease in generation offset by a 46% increase in realized energy prices. | | (3) |
| Change in unrealized commercial optimization activities and other | | (1) |
| | $ | 1,657 |

The decrease in gross margin in the South Central region was driven by:

| | | |
|---|---|---:|
| Lower gross margin from higher gas prices | $ | (66) |
| Lower gross margin from higher coal transportation costs | | (16) |
| Higher revenue from an increase in average realized energy prices | | 28 |
| Change in unrealized commercial optimization activities and other | | 3 |
| | $ | (51) |

The increase in gross margin in the West region was driven by:

| | | |
|---|---|---:|
| Higher gross margin from the acquisition of GenOn in December 2012 | $ | 169 |
| Higher gross margin due to an increase in capacity prices related primarily to El Segundo Energy Center reaching COD in 2013 | | 17 |
| Higher gross margin due to a 43% increase in realized prices offset by a 50% decrease in generation due to new plants coming on line and fewer competitor outages in the region | | 11 |
| Lower gross margin due to new California emissions program | | (11) |
| Change in unrealized commercial optimization activities and other | | 7 |
| | $ | 193 |

*Alternative Energy gross margin*

NRG's Alternative Energy business segment, which is comprised mainly of the solar and wind businesses that are not part of NRG Yield, had gross margin of $226 million for the year ended December 31, 2013, compared to gross margin of $125 million for the same period in 2012. The increase in gross margin was primarily the result of new project phases reaching COD during the period including 37 MW for Agua Caliente, 66 MW for Alpine and 126 MW for CVSR.

*NRG Yield gross margin*

NRG Yield had gross margin of $252 million for the year ended December 31, 2013 compared to gross margin of $117 million for the same period in 2012, primarily as a result of new projects reaching COD during late 2012 and in the first half of 2013 including Avra Valley, Alpine, Borrego and Marsh Landing.

*Retail gross margin*

The following is a discussion of retail gross margin for NRG's Retail Business.

*Selected Income Statement Data*

| | Years ended December 31, | |
|---|---|---|
| (In millions except otherwise noted) | 2013 | 2012 |
| **Operating Revenues** | | |
| Mass revenues | $    4,115 | $    3,813 |
| Commercial and Industrial revenues | 1,946 | 1,929 |
| Supply management revenues | 236 | 151 |
| **Retail operating revenues** [(a)(b)] | 6,297 | 5,893 |
| Retail cost of sales [(c)] | 4,958 | 4,515 |
| **Retail gross margin** | $    1,339 | $    1,378 |
| | | |
| **Business Metrics** | | |
| Electricity sales volume — GWh | | |
| Mass [(e)] | 32,773 | 31,373 |
| Commercial and Industrial [(d)] | 27,118 | 27,812 |
| Electricity sales volume — GWh | | |
| Texas | 50,937 | 53,451 |
| All other regions | 8,955 | 5,734 |
| Average retail customers count (in thousands, metered locations) | | |
| Mass [(e)] | 2,147 | 2,054 |
| Commercial and Industrial [(d)] | 102 | 91 |
| Retail customers count (in thousands, metered locations) | | |
| Mass [(e)] | 2,169 | 2,108 |
| Commercial and Industrial [(d)] | 106 | 102 |

(a)    Includes customers of the Texas General Land Office for which the Company provides services, as well as sales to utility partner customers.
(b)    Includes intercompany sales of $5 million in both 2013 and 2012, representing sales from Retail to the Texas region.
(c)    Includes intercompany purchases of $2,097 million and $1,687 million, respectively.
(d)    Includes customers of the Texas General Land Office for which the Company provides services.
(e)    Excludes utility partner and natural gas customers.

•    *Retail gross margin* — Retail gross margin decreased $39 million for the year ended December 31, 2013, compared to the same period in 2012, driven by

| | |
|---|---|
| Decrease in unit margins due to higher supply costs and customer mix offset by higher pricing and higher revenues from home and business services | $    (59) |
| Milder weather in 2013 as compared to 2012 | (29) |
| Increase in customer count and usage | 49 |
| | $    (39) |

•    *Trends* — Customer counts increased by approximately 65,000 since December 31, 2012. Competition and higher supply costs based on forward natural gas prices and higher heat rates could drive lower unit margins in the future.

*Mark-to-market for Economic Hedging Activities*

Mark-to-market for economic hedging activities includes asset-backed hedges that have not been designated as cash flow hedges and ineffectiveness on cash flow hedges. Total net mark-to-market results decreased by $17 million during the year ended December 31, 2013, compared to the same period in 2012.

The breakdown of gains and losses included in operating revenues and operating costs and expenses by region was as follows:

| | | | | | For the Year Ended December 31, 2013 | | | |
|---|---|---|---|---|---|---|---|---|
| | Retail | Texas | East | South Central | West | Alternative Energy | Elimination[a] | Total |
| | | | | (In millions) | | | | |
| **Mark-to-market results in operating revenues** | | | | | | | | |
| Reversal of previously recognized unrealized (gains)/losses on settled positions related to economic hedges | $ (6) | $ (326) | $ (4) | $ 35 | $ (3) | $ — | $ (11) | $ (315) |
| Reversal of gain positions acquired as part of the GenOn acquisition | — | — | (401) | — | (2) | — | — | (403) |
| Net unrealized gains/(losses) on open positions related to economic hedges | 1 | 109 | 39 | 10 | 7 | (1) | (25) | 140 |
| **Total mark-to-market (losses)/gains in operating revenues** | $ (5) | $ (217) | $ (366) | $ 45 | $ 2 | $ (1) | $ (36) | $ (578) |
| **Mark-to-market results in operating costs and expenses** | | | | | | | | |
| Reversal of previously recognized unrealized losses on settled positions related to economic hedges | $ 144 | $ 21 | $ 13 | $ 21 | $ — | $ — | $ 11 | $ 210 |
| Reversal of loss positions acquired as part of the Reliant Energy, Green Mountain Energy and GenOn acquisitions | 6 | — | 40 | — | — | — | — | 46 |
| Net unrealized gains/(losses) on open positions related to economic hedges | 6 | 19 | (11) | 1 | — | — | 22 | 37 |
| **Total mark-to-market gains in operating costs and expenses** | $ 156 | $ 40 | $ 42 | $ 22 | $ — | $ — | $ 33 | $ 293 |

(a)   Represents the elimination of the intercompany activity between the Retail Business and the Conventional Generation regions.

Mark-to-market results consist of unrealized gains and losses. The settlement of these transactions is reflected in the same caption as the items being hedged.

For the year ended December 31, 2013, the $140 million gain in operating revenues from open positions was due primarily to decreases in forward natural gas and power prices. The $37 million gain in operating costs and expenses from open positions was due primarily to increases in coal prices.

In accordance with ASC 815, the following table represents the results of the Company's financial and physical trading of energy commodities for the year ended December 31, 2013, and 2012. The realized and unrealized financial and physical trading results are included in operating revenue. The Company's trading activities are subject to limits within the Company's Risk Management Policy.

| | Year ended December 31, | |
|---|---|---|
| (In millions) | 2013 | 2012 |
| Trading gains/(losses) | | |
| Realized | $ 66 | $ 83 |
| Unrealized | (43) | (14) |
| Total trading gains | $ 23 | $ 69 |

*Contract Amortization Revenue*

Contract amortization represents the roll-off of in-market customer contracts valued under acquisition accounting and the favorable change of $66 million, as compared to 2012, related primarily to lower contract amortization of $54 million and $11 million for Reliant Energy and Green Mountain Energy, respectively.

*Other Operating Costs*

| | Retail | Texas | East | South Central | West | Other[a] | Alternative Energy | NRG Yield | Eliminations/Corporate | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | (In millions) | | | | |
| Year Ended December 31, 2013 | $ 265 | $ 534 | $ 917 | $ 121 | $ 174 | $ 61 | $ 39 | $ 63 | $ (64) | $ 2,110 |
| Year Ended December 31, 2012 | $ 241 | $ 559 | $ 274 | $ 118 | $ 67 | $ 68 | $ 18 | $ 53 | $ (66) | $ 1,332 |

(a) The majority of Other is intercompany in nature and eliminates in consolidation.

Other operating costs increased by $778 million for the year ended December 31, 2013, compared to the same period in 2012, due to:

| | | |
|---|---|---|
| Increase in operations and maintenance expense for GenOn plants acquired in December 2012 | $ | 773 |
| Decrease as 2012 reflected return to service costs for S.R. Bertron | | (14) |
| Gain on sale of land recorded in other operating costs in 2013 | | (10) |
| Increase in Alternative Energy operations and maintenance expenses as phases of Agua Caliente and CVSR reached commercial operations in 2013 | | 17 |
| Increase in NRG Yield operations and maintenance as Marsh Landing, Avra Valley and Borrego reached commercial operations in 2013 | | 7 |
| Other | | 5 |
| | $ | 778 |

*Depreciation and Amortization Expense*

Depreciation and amortization expense increased by $306 million for the year ended December 31, 2013, compared to the same period in 2012, due primarily to $237 million from the acquisition of GenOn in December 2012 and additional depreciation from solar facilities that reached commercial operations in 2013.

*Impairment Losses*

In the fourth quarter 2013, the Company recorded an impairment loss of $459 million related to the Indian River facility. The impairment loss resulted from a change in management's long-term view on the economics of the facility, as further described in Item 15 — Note 10, *Asset Impairments.*

*Selling, General and Administrative Expenses*

| | For the year ended December 31, | |
|---|---|---|
| (In millions) | 2013 | 2012 |
| General and administrative expenses | $ 594 | $ 504 |
| Selling and marketing expenses | 310 | 303 |
| | $ 904 | $ 807 |

General and administrative expenses increased by $90 million for the year ended December 31, 2013, compared to the same period in 2012, which was due primarily to the following:

- Increase in general and administrative costs for GenOn, which was acquired in December 2012, offset by cost savings as a result of realized synergies for the combined company, offset by;

- Impact of prior year EPA settlement regarding LaGen of $14 million and CDWR settlement of $20 million; and

- Impact in prior year of $9 million of transaction costs associated with the sale of 49% of Agua Caliente

Selling and marketing expenses increased due to customer growth efforts and new market expansion, offset in part by the elimination of the Independence Energy sales channel and lower employee costs.

### Acquisition-related Transaction and Integration Costs

Transaction and integration costs, primarily in connection with the acquisition of GenOn and consisting mostly of severance costs, increased $21 million for the year ended December 31, 2013, compared to the same period in 2012.

### Equity in Earnings of Unconsolidated Affiliates

NRG's equity in earnings of unconsolidated affiliates was $7 million for the year ended December 31, 2013, compared to $37 million for the same period in 2012, primarily resulting from a long-term natural gas hedge entered into by Saguaro in July 2013 as well as additional losses from a hedge associated with the investment in Sherbino and losses associated with certain technology investments.

### Bargain purchase gain related to GenOn acquisition

In connection with the acquisition of GenOn in December 2012, the Company recorded a bargain purchase gain of $296 million in the year ended December 31, 2012. The gain is primarily representative of the undiscounted value of the deferred tax assets generated by the reduction in book basis of the net assets recorded in connection with acquisition accounting as well as the undiscounted value of GenOn's net operating losses and other deferred tax benefits that the combined company has the ability to realize in the post-acquisition period.

### Impairment Losses on Investments

In the fourth quarter 2013, the Company recorded impairment losses of $99 million, primarily related to the Company's Gladstone equity method investment. The Company determined that losses associated with the investments were other than temporary and accordingly, an impairment loss was recorded. Impairments are discussed in more detail in Item 15 — Note 10, *Asset Impairments*, to the Consolidated Financial Statements,

### Loss on Debt Extinguishment

A loss on debt extinguishment of $50 million was recorded in the year ended December 31, 2013, including $28 million related to open market repurchases of the 2018 Senior Notes, 2019 Senior Notes and 2020 Senior Notes in the first quarter of 2013. These losses primarily consisted of the premiums paid on redemption and the write-off of previously deferred financing costs. In the second quarter of 2013, a $21 million loss on debt extinguishment was recorded and included $11 million related to the redemption of the 2014 GenOn Senior Notes, which consisted of redemption premiums offset by the write-off of the remaining unamortized premium, and $10 million related to the amendments to the Senior Credit Facility, which consisted primarily of the write-off of previously deferred financing costs.

A loss on debt extinguishment of the 2017 Senior Notes of $51 million was recorded in the year ended December 31, 2012, which primarily consisted of the premiums paid on redemption and the write-off of previously deferred financing costs.

### Interest Expense

NRG's interest expense increased by $187 million for the year ended December 31, 2013, compared to the same period in 2012 due to the following:

| Increase/(decrease) in interest expense | (In millions) | |
|---|---|---|
| Increase for acquisition of GenOn in December 2012 | $ | 203 |
| Increase from additional project financings and the reduction in capitalized interest as projects were placed in service | | 80 |
| Decrease for 2017 Senior Notes redeemed in September 2012 | | (60) |
| Increase for 2023 Senior Notes issued in September 2012 | | 48 |
| Decrease for the repricing of the term loan in 2013 | | (35) |
| Decrease for derivative interest expense primarily from losses on Alpine in the prior year compared to gains in the current year | | (24) |
| Other | | (25) |
| **Total** | $ | 187 |

*Income Tax Benefit*

For the year ended December 31, 2013, NRG recorded an income tax benefit of $282 million on pre-tax loss of $634 million. For the same period in 2012, NRG recorded an income tax benefit of $327 million on a pre-tax loss of $12 million. The effective tax rate was 44.5% and 2,725.0% for the years ended December 31, 2013, and 2012, respectively.

For the year ended December 31, 2013, NRG's overall effective tax rate was different than the statutory rate of 35% primarily due to the generation of ITCs from the Company's Agua Caliente solar project in Arizona of $36 million and production tax credits, or PTCs, generated from Texas wind facilities of $14 million.

| | Year Ended December 31, | |
|---|---|---|
| | 2013 | 2012 |
| | (In millions except as otherwise stated) | |
| (Loss)/Income Before Income Taxes | $ (634) | $ (12) |
| Tax at 35% | (222) | (4) |
| State taxes, including changes in rate, net of federal benefit | 11 | 1 |
| Foreign operations | 5 | (24) |
| Federal and state tax credits, including investment tax credits (ITC) | (36) | (158) |
| Valuation allowance | (5) | 5 |
| Expiration/utilization of capital losses | 10 | — |
| Reversal of valuation allowance on expired/utilized capital losses | (10) | — |
| Impact of non-taxable entity earnings | (14) | (7) |
| Bargain purchase gain related to GenOn acquisition | — | (104) |
| Interest accrued on uncertain tax positions | (3) | 2 |
| Production tax credits | (14) | (14) |
| Reversal of uncertain tax position reserves | (11) | (13) |
| Tax expense attributable to consolidated partnerships | 8 | — |
| Other | (1) | (11) |
| Income tax benefit | $ (282) | $ (327) |
| Effective income tax rate | 44.5% | 2,725.0% |

The effective income tax rate may vary from period to period depending on, among other factors, the geographic and business mix of earnings and losses and changes in valuation allowances in accordance with ASC 740, *Income Taxes,* or ASC 740. These factors and others, including the Company's history of pre-tax earnings and losses, are taken into account in assessing the ability to realize deferred tax assets.

**Consolidated Results of Operations**

*2012 compared to 2011*

The following table provides selected financial information for the Company:

| (In millions except otherwise noted) | | Year Ended December 31, | | Change % |
|---|---|---|---|---|
| | | 2012[a] | 2011 | |
| **Operating Revenues** | | | | |
| Energy revenue [b] | $ | 2,114 $ | 2,069 | 2 % |
| Capacity revenue [b] | | 762 | 736 | 4 |
| Retail revenue | | 5,888 | 5,807 | 1 |
| Mark-to-market for economic hedging activities | | (450) | 325 | 238 |
| Contract amortization | | (97) | (159) | 39 |
| Other revenues [c] | | 205 | 301 | (32) |
| Total operating revenues | | 8,422 | 9,079 | (7) |
| **Operating Costs and Expenses** | | | | |
| Generation cost of sales [b] | | 2,123 | 2,488 | (15) |
| Retail cost of sales [b] | | 2,828 | 2,815 | — |
| Mark-to-market for economic hedging activities | | (182) | 169 | 208 |
| Contract and emissions credit amortization [d] | | 39 | 47 | (17) |
| Other cost of operations | | 1,332 | 1,226 | 9 |
| Total cost of operations | | 6,140 | 6,745 | (9) |
| Depreciation and amortization | | 950 | 896 | 6 |
| Impairment losses | | — | 160 | N/A |
| Selling, general and administrative | | 807 | 586 | 38 |
| Acquisition-related transaction and integration costs | | 107 | — | 100 |
| Development costs | | 68 | 57 | 19 |
| Total operating costs and expenses | | 8,072 | 8,444 | (4) |
| **Operating Income** | | 350 | 635 | (45) |
| **Other Income/(Expense)** | | | | |
| Equity in earnings of unconsolidated affiliates | | 37 | 35 | 6 |
| Bargain purchase gain related to GenOn acquisition | | 296 | — | 100 |
| Impairment losses on investments | | (2) | (495) | N/A |
| Other income, net | | 19 | 19 | — |
| Loss on debt extinguishment | | (51) | (175) | (71) |
| Interest expense | | (661) | (665) | (1) |
| Total other expense | | (362) | (1,281) | (72) |
| **Loss before income tax expense** | | (12) | (646) | (98) |
| Income tax benefit | | (327) | (843) | (61) |
| **Net Income** | | 315 | 197 | 60 |
| Less: Net income attributable to noncontrolling interest | | 20 | — | 100 |
| **Net income attributable to NRG Energy, Inc.** | $ | 295 $ | 197 | 50 |
| **Business Metrics** | | | | |
| Average natural gas price — Henry Hub ($/MMBtu) | | 2.79 | 4.04 | (31)% |

(a)  Includes the results of GenOn from December 15, 2012 to December 21, 2012.
(b)  Includes realized gains and losses from financially settled transactions.
(c)  Includes unrealized trading gains and losses.
(d)  Includes amortization of $SO_2$ and $NO_x$ credits and excludes amortization of RGGI.
N/A - Not Applicable

**Management's discussion of the results of operations for the years ended December 31, 2012 and 2011**

*Conventional Generation gross margin*

The following is a discussion of gross margin for NRG's Conventional Generation businesses, adjusted to eliminate intersegment activity primarily with the Retail Business.

| | Year Ended December 31, 2012 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Conventional Generation | | | | | | | | | |
| (In millions except otherwise noted) | Texas | East | South Central | West | Other | Subtotal | Alternative Energy | NRG Yield (a) | Eliminations/Corporate | Consolidated Total |
| Energy revenue | $ 2,406 | $ 533 | $ 527 | $ 121 | $ 39 | $ 3,626 | $ 117 | $ 33 | $ (1,662) | $ 2,114 |
| Capacity revenue | 81 | 314 | 240 | 124 | 41 | 800 | — | — | (38) | 762 |
| Other revenue | 28 | 19 | (10) | 4 | 93 | 134 | 8 | 142 | (79) | 205 |
| Generation revenue | 2,515 | 866 | 757 | 249 | 173 | 4,560 | 125 | 175 | (1,779) | $ 3,081 |
| Generation cost of sales | (958) | (440) | (519) | (88) | (78) | (2,083) | — | (58) | $ 18 | $ (2,123) |
| Generation gross margin | $ 1,557 | $ 426 | $ 238 | $ 161 | $ 95 | $ 2,477 | $ 125 | $ 117 | | |
| **Business Metrics** | | | | | | | | | | |
| MWh sold (in thousands) (b) | 43,707 | 8,172 | 17,935 | 2,146 | | | 1,524 | 464 | | |
| MWh generated (in thousands) | 37,695 | 6,469 | 15,927 | 2,146 | | | 1,524 | 464 | | |

| | Year Ended December 31, 2011 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Conventional Generation | | | | | | | | | |
| (In millions except otherwise noted) | Texas | East | South Central | West | Other | Subtotal | Alternative Energy | NRG Yield (a) | Eliminations/Corporate | Consolidated Total |
| Energy revenue | $ 2,545 | $ 579 | $ 548 | $ 31 | $ 58 | $ 3,761 | $ 18 | $ 25 | $ (1,735) | $ 2,069 |
| Capacity revenue | 28 | 291 | 243 | 118 | 70 | 750 | — | — | (14) | 736 |
| Other revenue | 86 | 26 | 18 | 4 | 58 | 192 | 1 | 138 | (30) | 301 |
| Generation revenue | 2,659 | 896 | 809 | 153 | 186 | 4,703 | 19 | 163 | (1,779) | $ 3,106 |
| Generation cost of sales | (1,228) | (527) | (547) | (16) | (125) | (2,443) | — | (61) | $ 16 | $ (2,488) |
| Generation gross margin | $ 1,431 | $ 369 | $ 262 | $ 137 | $ 61 | $ 2,260 | $ 19 | $ 102 | | |
| **Business Metrics** | | | | | | | | | | |
| MWh sold (in thousands) (b) | 48,078 | 9,317 | 17,131 | 215 | | | 843 | 420 | | |
| MWh generated (in thousands) | 45,165 | 7,361 | 16,000 | 215 | | | 843 | 420 | | |

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | Texas | East | South Central | West |
| **Weather Metrics** | | | | |
| **2012** | | | | |
| CDDs (c) | 3,134 | 754 | 1,782 | 904 |
| HDDs (c) | 1,452 | 5,317 | 2,861 | 2,988 |
| **2011** | | | | |
| CDDs | 3,440 | 750 | 1,817 | 717 |
| HDDs | 1,911 | 5,770 | 3,387 | 3,364 |
| **30 year average** | | | | |
| CDDs | 2,692 | 540 | 1,554 | 711 |
| HDDs | 1,950 | 6,206 | 3,575 | 3,259 |

(a)  Yield MWh generated excludes thermal facilities.

(b)  MWh sold excludes generation at facilities that generate revenue under capacity agreements.

(c)  National Oceanic and Atmospheric Administration-Climate Prediction Center — A Cooling Degree Day, or CDD, represents the number of degrees that the mean temperature for a particular day is above 65 degrees Fahrenheit in each region. A Heating Degree Day, or HDD, represents the number of degrees that the mean temperature for a particular day is below 65 degrees Fahrenheit in each region. The CDDs/HDDs for a period of time are calculated by adding the CDDs/HDDs for

each day during the period.

*Conventional Generation gross margin* — increased by $217 million, including intercompany sales, during the year ended December 31, 2012, compared to the same period in 2011, due to:

| | | |
|---|---|---:|
| Increase in Texas region | $ | 126 |
| Increase in East region | | 57 |
| Decrease in South Central region | | (24) |
| Increase in West region | | 24 |
| Other [a] | | 34 |
| | $ | 217 |

(a) Other gross margin primarily represents revenues from the maintenance services business, which are eliminated in consolidation.

The increase in gross margin in the Texas region was driven by:

| | | |
|---|---|---:|
| Impact of fewer unplanned outages during periods of high scarcity pricing as well as more effective hedging and trading optimization activities | $ | 96 |
| Higher gross margin driven by higher average realized energy prices and a decrease in delivered coal costs | | 93 |
| Higher revenue due to additional bi-lateral contracts with load serving entities and contracts with the Retail Business | | 53 |
| Lower gross margin from a decrease in coal and nuclear generation driven by more unplanned outage hours in 2012 | | (73) |
| Change in unrealized commercial optimization activities | | (56) |
| Other | | 13 |
| | $ | 126 |

The increase in gross margin in the East region was driven by:

| | | |
|---|---|---:|
| Higher gross margin from the acquisition of GenOn in December 2012 | $ | 43 |
| Higher gross margin from favorable pricing on certain load-serving contracts, as well as additional load contracts with the Retail Business | | 31 |
| Lower capacity revenue due to 3% lower realized prices, due mainly to an 11% decrease in NEPOOL FCM prices offset in part by an increase in capacity prices in PJM and New York | | (19) |
| Higher revenue due to RSS contract revenues in western New York. | | 18 |
| Lower gross margin from coal plants due primarily to a 15% increase in delivered coal prices | | (12) |
| Other | | (4) |
| | | 57 |

The decrease in gross margin in the South Central region was driven by:

| | | |
|---|---|---:|
| Higher gross margin from an increase in gas generation as a result of lower gas prices | $ | 117 |
| Lower gross margin from a decrease in average realized merchant prices | | (61) |
| Lower gross margin from decrease in coal generation due to several plants switching from coal to gas generation | | (51) |
| Change in unrealized commercial optimization activities and other | | (29) |
| | $ | (24) |

The increase in gross margin in the West region was driven by:

| | | |
|---|---|---:|
| Higher gross margin from increased run time at Encina driven by competitor's plant outages in the region and increased run time at the remaining plants in the region | $ | 22 |
| Higher capacity margin due to the recognition of contingent rent for Long Beach | | 6 |
| Decreased capacity revenue due to lower pricing and outage penalties for Encina, El Segundo and Cabrillo II | | (6) |
| Higher gross margin from the acquisition of GenOn in December 2012 | | 6 |
| Decrease in fuel sales compared to 2011 | | (4) |
| | $ | 24 |

*Alternative Energy gross margin*

NRG's Alternative Energy business segment, which is comprised mainly of the solar and wind businesses that are not part of NRG Yield, had gross margin of $125 million for the year ended December 31, 2012, compared to gross margin of $19 million for the same period in 2011. The increase in gross margin primarily resulted from the addition of the first 230 MW of Agua Caliente, which reached commercial operations in 2012, and the addition of the first 127 MW of the CVSR facility.

*NRG Yield gross margin*

NRG Yield had gross margin of $117 million for the year ended December 31, 2012 compared to gross margin of $102 million for the same period in 2011, primarily as a result of the Roadrunner project reaching commercial operations in late 2011 and additional revenue from Distributed Solar projects.

*Retail gross margin*

The following is a discussion of retail gross margin for NRG's Retail Business.

| | Year ended December 31, | |
|---|---|---|
| **(In millions except otherwise noted)** | **2012** | **2011** |
| **Operating Revenues** | | |
| Mass revenues | $ 3,813 | $ 3,545 |
| Commercial and Industrial revenues | 1,929 | 2,079 |
| Supply management revenues | 151 | 188 |
| **Retail operating revenues** [a][b] | 5,893 | 5,812 |
| Retail cost of sales [c] | 4,515 | 4,558 |
| **Retail gross margin** | $ 1,378 | $ 1,254 |
| **Business Metrics** | | |
| Electricity sales volume — GWh | | |
| Mass [e] | 31,373 | 28,035 |
| Commercial and Industrial [d] | 27,812 | 28,567 |
| Electricity sales volume — GWh | | |
| Texas | 53,451 | 55,085 |
| All other regions | 5,734 | 1,517 |
| Average retail customers count (in thousands, metered locations) | | |
| Mass | 2,054 | 1,946 |
| Commercial and Industrial [d] | 91 | 85 |
| Retail customers count (in thousands, metered locations) | | |
| Mass [e] | 2,108 | 1,977 |
| Commercial and Industrial [d] | 102 | 91 |

(a)   Includes customers of the Texas General Land Office, for whom the Company provides services, as well as sales to utility partner customers.
(b)   Includes intercompany sales of $5 million in both 2012 and 2011, representing sales from Retail to the Texas region.
(c)   Includes intercompany purchases of $1,687 million and $1,743 million, respectively.
(d)   Includes customers of the Texas General Land Office for which the Company provides services.
(e)   Excludes utility partner and natural gas customers.

- *Retail gross margin* — Retail gross margin increased $124 million for the year ended December 31, 2012, compared to the same period in 2011, driven by:

| | |
|---|---|
| Gross margin for an additional nine months of Energy Plus as it was acquired in September 2011 | $ 112 |
| Increase in usage and customer count | 54 |
| Decrease in unit margins driven by the impact of lower pricing and lower supply costs on acquisitions and renewals | (48) |
| Favorable impact of fewer scarcity price increases during times of excessive load compared to prior year, partially offset by generally milder weather in 2012 | 27 |
| Unfavorable impact of weather-related risk management activities | (21) |
| | $ 124 |

- *Trends* — Customer counts increased by approximately 142,000 from 2011 to 2012, which was primarily due to expansion into new territories and marketing efforts. While cooling and heating degree days in both periods resulted in higher than normal customer usage, weather in 2012 was milder than in 2011. The weather resulted in higher customer usage of 4% and 13% in 2012 and 2011, respectively, when compared to ten-year normal weather. In addition, there were increases in Texas in Transmission and Distribution Service Provider rates that will remain in effect for several years. These costs are passed through to Retail customers.

77

*Mark-to-market for Economic Hedging Activities*

Mark-to-market for economic hedging activities includes asset-backed hedges that have not been designated as cash flow hedges and ineffectiveness on cash flow hedges. Total net mark-to-market results decreased by $424 million in the year ended December 31, 2012, compared to the same period in 2011.

The breakdown of gains and losses included in operating revenues and operating costs and expenses by region are as follows:

| | Year Ended December 31, 2012 | | | | | | |
|---|---|---|---|---|---|---|---|
| | Retail | Texas | East | South Central | West | Elimination [a] | Total |
| | | | | (In millions) | | | |
| **Mark-to-market results in operating revenues** | | | | | | | |
| Reversal of previously recognized unrealized (gains)/losses on settled positions related to economic hedges | $ (7) | $ (501) | $ 2 | $ 40 | $ 8 | $ 19 | $ (439) |
| Reversal of gain positions acquired as part of the GenOn acquisition | — | — | (13) | — | — | — | $ (13) |
| Net unrealized gains/(losses) on open positions related to economic hedges | 2 | 60 | (1) | (10) | 2 | (51) | 2 |
| **Total mark-to-market (losses)/gains in operating revenues** | $ (5) | $ (441) | $ (12) | $ 30 | $ 10 | $ (32) | $ (450) |
| **Mark-to-market results in operating costs and expenses** | | | | | | | |
| Reversal of previously recognized unrealized losses/ (gains) on settled positions related to economic hedges | $ 181 | $ 15 | $ 12 | $ 3 | $ — | $ (19) | $ 192 |
| Reversal of loss positions acquired as part of the Reliant Energy and Green Mountain Energy acquisitions | 24 | — | 9 | — | — | — | 33 |
| Net unrealized losses on open positions related to economic hedges | (34) | (38) | (6) | (16) | — | 51 | (43) |
| **Total mark-to-market gains/(losses) in operating costs and expenses** | $ 171 | $ (23) | $ 15 | $ (13) | $ — | $ 32 | $ 182 |

(a) Represents the elimination of the intercompany activity between the Retail Business and the Conventional Generation regions.

Mark-to-market results consist of unrealized gains and losses. The settlement of these transactions is reflected in the same caption as the items being hedged.

For the year ended December 31, 2012, the net losses on open positions were due primarily to decreases in forward coal prices.

In accordance with ASC 815, the following table represents the results of the Company's financial and physical trading of energy commodities for the years ended December 31, 2012, and 2011. The realized and unrealized financial and physical trading results are included in operating revenues. The Company's trading activities are subject to limits within the Company's Risk Management Policy.

| | Year Ended December 31, | |
|---|---|---|
| | 2012 | 2011 |
| | (In millions) | |
| Trading gains/(losses) | | |
| Realized | $ 83 | $ (31) |
| Unrealized | (14) | 63 |
| Total trading gains | $ 69 | $ 32 |

*Contract Amortization Revenue*

Contract amortization represents the roll-off of in-market customer contracts valued under purchase accounting and the favorable change of $62 million, as compared to 2011, related primarily to lower contract amortization of $43 million and $19 million for Reliant Energy and Green Mountain Energy, respectively.

*Other Operating Costs*

| | Retail | Texas | East | South Central | West | Other | Alternative Energy | NRG Yield | Corporate/Eliminations | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | (In millions) | | | |
| Year ended December 31, 2012 | $ 241 | $559 | $ 274 | $ 118 | $ 67 | $ 68 | $ 18 | $ 53 | $ (66) | $1,332 |
| Year ended December 31, 2011 | $ 216 | $515 | $ 253 | $ 112 | $ 60 | $ 34 | $ 15 | $ 47 | $ (26) | $1,226 |

Other operating costs increased by $106 million for the year ended December 31, 2012, compared to the same period in 2011, due to:

| | (In millions) |
|---|---|
| Increase in Retail operations and maintenance expense | $ 25 |
| Increase in Texas region operations and maintenance expense | 44 |
| Increase in East region operations and maintenance expense | 16 |
| Increase in Alternative Energy and NRG Yield operations and maintenance expense | 9 |
| Increase in property tax expense and other | 12 |
| | $ 106 |

◦ *Retail operations and maintenance expense* — increased $12 million due to the acquisition of Energy Plus in September 2011 and approximately $13 million due to expansion into new markets, products and channels.

◦ *Texas operations and maintenance* — increased primarily due to maintenance spending and outage work in 2012 at Limestone and W.A. Parish as well as additional costs at S.R. Bertron to return two units to service.

◦ *East operations and maintenance expense* — increased due to additional costs of $30 million from the acquisition of GenOn, offset by a decrease in part because the prior year reflects incremental costs associated with headcount reductions.

◦ *Alternative Energy and NRG Yield operations and maintenance expense* — increased as additional solar facilities, including 253 MW of Agua Caliente and 127 MW of CVSR, and Roadrunner began commercial operations in late 2011 and in 2012.

◦ *Property tax expense* — increased primarily for $5 million in the East region due to a reduction in property tax benefit from the New York State Empire Zone program, which reflects a change in the criteria used in determining the amount of the tax credit and an annual reduction of 20%. The remaining increases are primarily due to the acquisition of GenOn.

### Depreciation and Amortization

NRG's depreciation and amortization expense increased by $54 million during the year ended December 31, 2012, compared to the same period in 2011. This was primarily due to additional depreciation related to solar facilities which commenced commercial operations in late 2011 and in 2012, as well as additional depreciation in the East due to Indian River AQCS assets placed in service and the acquisition of GenOn.

### Impairment Losses

As described in Item 15 — Note 24, *Environmental Matters,* the Company recorded an impairment loss of $160 million in the year ended December 31, 2011, on the Company's Acid Rain Program $SO_2$ emission allowances, which were recorded as an intangible asset on the Company's balance sheet. The impairment loss reflects the write-off of the value of emission allowances in excess of those required for compliance with the Acid Rain Program.

### *Selling, General and Administrative Expenses*

Selling, general and administrative expenses increased by $221 million during the year ended December 31, 2012, compared to the same period in 2011, which was primarily due to:

- Selling, general and administrative costs of $66 million for an additional nine months of Energy Plus which was acquired in September 2011;

- Cash payment related to the CDWR settlement of $20 million expensed during the period and paid in January 2013;

- Transaction costs of $9 million associated with the sale of 49% of Agua Caliente;

- Increase in marketing and selling costs of $51 million associated with customer growth efforts and new market expansion by corporate and the Retail Business;

- Increase of $13 million related to additional solar projects and acquired Distributed Solar businesses;

- The impact of a settlement with the EPA regarding LaGen of $14 million; and

- Additional costs associated with new business initiatives of $13 million, consulting and legal costs of $15 million and $16 million of additional labor costs, as well an additional $7 million of expense incurred in the post-acquisition period as GenOn was acquired in December 2012.

### *Acquisition-related Transaction and Integration Costs*

NRG acquired GenOn in December 2012. In connection with the transaction, NRG incurred transaction and integration costs of $107 million in the year ended December 31, 2012, consisting primarily of severance associated with headcount reductions, financial consulting fees and legal expenses.

### *Bargain purchase gain related to GenOn acquisition*

In connection with the acquisition of GenOn in December 2012, the Company recorded a bargain purchase gain of $296 million in the year ended December 31, 2012. The gain is primarily representative of the undiscounted value of the deferred tax assets generated by the reduction in book basis of the net assets recorded in connection with acquisition accounting as well as the undiscounted value of GenOn's net operating losses and other deferred tax benefits that the combined company has the ability to realize in the post-acquisition period.

### *Impairment Losses on Investments*

As discussed in more detail in Item 15 — Note 10, *Asset Impairments*, to the Consolidated Financial Statements, the March 2011 earthquake and tsunami in Japan, which in turn triggered a nuclear incident at the Fukushima Daiichi Nuclear Power Station, caused NRG to evaluate its investment in NINA for impairment. Consequently, NRG deconsolidated its investment in NINA and took an impairment charge in the first quarter of 2011 equal to the balance of its investment in NINA. To support NINA's ongoing work, NRG contributed an additional $14 million into NINA during the year ended December 31, 2011. As a result, NRG recorded an impairment charge of $495 million in the year ended December 31, 2011. During the year ended December 31, 2012, NRG contributed an additional $2 million and recorded this amount as an impairment charge.

### *Loss on Debt Extinguishment*

A loss on debt extinguishment of the 2017 Senior Notes of $51 million was recorded in the year ended December 31, 2012, while a loss on debt extinguishment of the 2014 Senior Notes, the 2016 Senior Notes and the senior credit facility of $175 million was recorded in the year ended December 31, 2011. These losses primarily consisted of the premiums paid on redemption and the write-off of previously deferred financing costs.

### Interest Expense

NRG's interest expense decreased by $4 million during the year ended December 31, 2012, compared to the same period in 2011, due to the following:

| Increase/(decrease) in interest expense | (In millions) | |
|---|---|---|
| Increase for 2023 Senior Notes issued in September 2012 | $ | 18 |
| Increase for 2018 Senior Notes issued in January of 2011 and 2019 and 2021 Senior Notes issued in May of 2011 | | 65 |
| Decrease for 2017 Senior Notes redeemed in September 2012 | | (20) |
| Decrease for 2014 Senior Notes and 2016 Senior Notes redeemed in 2011 | | (82) |
| Decrease for higher capitalized interest | | (58) |
| Increase from additional project financings | | 47 |
| Increase in derivative interest expense primarily for the Alpine interest rate swaps | | 10 |
| Increase for GenOn senior notes | | 9 |
| Other | | 7 |
| **Total** | $ | (4) |

### Income Tax Benefit

For the year ended December 31, 2012, NRG recorded an income tax benefit of $327 million on pre-tax loss of $12 million. For the same period in 2011, NRG recorded an income tax benefit of $843 million on a pre-tax loss of $646 million. The effective tax rate was 2,725.0% and 130.5% for the year ended December 31, 2012, and 2011, respectively.

For the year ended December 31, 2012, NRG's overall effective tax rate was different than the statutory rate of 35% primarily due to the generation of ITCs from the Company's Agua Caliente solar project in Arizona of $158 million, a benefit of $104 million resulting from the gain on bargain purchase of GenOn, and the PTCs generated from certain Texas wind facilities of $14 million.

| | Year Ended December 31, | |
|---|---|---|
| | 2012 | 2011 |
| | (In millions except as otherwise stated) | |
| Income/(Loss) Before Income Taxes | $ (12) | $ (646) |
| Tax at 35% | (4) | (226) |
| State taxes, including changes in rate, net of federal benefit | 1 | 15 |
| Foreign operations | (24) | (3) |
| Federal and state tax credits | (158) | (1) |
| Valuation allowance | 5 | (63) |
| Expiration/utilization of capital losses | — | 45 |
| Reversal of valuation allowance on expired/utilized capital losses | — | (45) |
| Foreign earnings | — | 4 |
| Impact of non-taxable entity earnings | (7) | — |
| Bargain purchase gain related to GenOn acquisition | (104) | — |
| Interest accrued on uncertain tax positions | 2 | 2 |
| Production tax credits | (14) | (14) |
| Reversal of uncertain tax position reserves | (13) | (561) |
| Other | (11) | 4 |
| Income tax benefit | $ (327) | $ (843) |
| Effective income tax rate | 2,725.0% | 130.5% |

The effective income tax rate may vary from period to period depending on, among other factors, the geographic and business mix of earnings and losses and changes in valuation allowances in accordance with ASC 740, *Income Taxes*, or ASC 740. These factors and others, including the Company's history of pre-tax earnings and losses, are taken into account in assessing the ability to realize deferred tax assets.

**Liquidity and Capital Resources**

*Liquidity Position*

    As of December 31, 2013 and 2012, NRG's liquidity, excluding collateral received, was approximately $3.7 billion and $3.4 billion, respectively, comprised of the following:

|  | As of December 31, | |
|---|---|---|
|  | **2013** | **2012** |
|  | (In millions) | |
| Cash and cash equivalents | $    2,254 | $    2,087 |
| Restricted cash | 268 | 217 |
| Total | 2,522 | 2,304 |
| Total credit facility availability | 1,173 | 1,058 |
| Total liquidity, excluding collateral received | $    3,695 | $    3,362 |

    For the year ended December 31, 2013, total liquidity, excluding collateral received, increased by $333 million. Changes in cash and cash equivalent balances are further discussed hereinafter under the heading *Cash Flow Discussion*. Cash and cash equivalents at December 31, 2013 were predominantly held in money market funds invested in treasury securities, treasury repurchase agreements or government agency debt.

    Management believes that the Company's liquidity position and cash flows from operations will be adequate to finance operating and maintenance capital expenditures, to fund dividends to NRG's common and preferred stockholders, and other liquidity commitments. Management continues to regularly monitor the Company's ability to finance the needs of its operating, financing and investing activity within the dictates of prudent balance sheet management.

    *Restricted Payments Tests*

    The ability of certain of GenOn's and GenOn Americas Generation's subsidiaries to pay dividends and make distributions is restricted under the terms of certain agreements, including the Gen-On Mid-Atlantic and REMA operating leases.  Under their respective operating leases, GenOn Mid-Atlantic and REMA are not permitted to make any distributions and other restricted payments unless:  (a) they satisfy the fixed charge coverage ratio for the most recently ended period of four fiscal quarters; (b) they are projected to satisfy the fixed charge coverage ratio for each of the two following periods of four fiscal quarters, commencing with the fiscal quarter in which such payment is proposed to be made; and (c) no significant lease default or event of default has occurred and is continuing. At December 31, 2013, GenOn Mid‑Atlantic and REMA did not satisfy the restricted payments tests.

    The GenOn Senior Notes due 2018 and 2020 and the related indentures restrict the ability of GenOn to incur additional liens and make certain restricted payments, including dividends. In the event of a default or if restricted payment tests are not satisfied, GenOn would not be able to distribute cash to its parent, NRG. At December 31, 2013, GenOn did not meet the consolidated debt ratio component of the restricted payments test and, therefore, the ability of GenOn to make restricted payments, including dividends, loans and advances to NRG, is limited to specified exclusions, including up to $250 million of such restricted payments.

82

### Credit Ratings

Credit rating agencies rate a firm's public debt securities. These ratings are utilized by the debt markets in evaluating a firm's credit risk. Ratings influence the price paid to issue new debt securities by indicating to the market the Company's ability to pay principal, interest and preferred dividends. Rating agencies evaluate a firm's industry, cash flow, leverage, liquidity, and hedge profile, among other factors, in their credit analysis of a firm's credit risk.

The following table summarizes the credit ratings for NRG Energy, Inc., its Term Loan Facility and its Senior Notes, GenOn Senior Notes, and GenOn Americas Generation Senior Notes as of December 31, 2013:

|  | S&P | Moody's |
|---|---|---|
| NRG Energy, Inc. | BB- Stable | Ba3 Stable |
| 7.375% Senior Notes, due 2017 | BB- | B |
| 7.625% Senior Notes, due 2018 | BB- | B |
| 7.625% Senior Notes, due 2019 | BB- | B |
| 8.5% Senior Notes, due 2019 | BB- | B |
| 8.25% Senior Notes, due 2020 | BB- | B |
| 7.875% Senior Notes, due 2021 | BB- | B |
| 6.625% Senior Notes, due 2023 | BB- | B |
| Term Loan Facility, due 2018 | BB+ | Baa3 |
| GenOn 7.875% Senior Notes, due 2017 | B | B3[a] |
| GenOn 9.500% Senior Notes, due 2018 | B | B3[a] |
| GenOn 9.875% Senior Notes, due 2020 | B | B3[a] |
| GenOn Americas Generation 8.500% Senior Notes, due 2021 | BB- | B3[a] |
| GenOn Americas Generation 9.125% Senior Notes, due 2031 | BB- | B3[a] |

(a) On January 24, 2014, Moody's placed GenOn's ratings under review for downgrade.

### Sources of Liquidity

The principal sources of liquidity for NRG's future operating and capital expenditures are expected to be derived from new and existing financing arrangements, existing cash on hand, cash flows from operations and cash proceeds from futures sales of assets to NRG Yield, Inc. As described in Item 15 — Note 12, *Debt and Capital Leases,* to the Consolidated Financial Statements, the Company's financing arrangements consist mainly of the Senior Credit Facility, the Senior Notes, the GenOn Senior Notes, the GenOn Americas Generation Senior Notes, and project-related financings.

#### Issuance of 2022 Senior Notes

On January 27, 2014, NRG issued $1.1 billion in aggregate principal amount at par of 6.25% Senior Notes due 2022. The notes are senior unsecured obligations of NRG and are guaranteed by certain of its subsidiaries. Interest is payable semi-annually beginning on July 15, 2014, until the maturity date of July 15, 2022. A portion of the cash proceeds was used to redeem $400 million of the Company's Senior Notes as discussed in *Uses of Liquidity* and the remaining $700 million of the cash proceeds is expected to be used to finance the EME acquisition.

#### Cash Proceeds from Future Sales of Assets to NRG Yield, Inc.

The Company expects to offer NRG Yield, Inc. the right to acquire certain of its assets in 2014, including El Segundo Energy Center, High Desert and Kansas South. The cash portion of any consideration to be paid to NRG by NRG Yield, Inc. for these assets has yet to be determined.

*First Lien Structure*

In addition, NRG has granted first liens to certain counterparties on substantially all of the Company's assets, excluding assets acquired in the GenOn acquisition and NRG's assets that have project-level financing. NRG uses the first lien structure to reduce the amount of cash collateral and letters of credit that it would otherwise be required to post from time to time to support its obligations under out-of-the-money hedge agreements for forward sales of power or gas used as a proxy for power. To the extent that the underlying hedge positions for a counterparty are out-of-the-money to NRG, the counterparty would have claim under the lien program. The lien program limits the volume that can be hedged, not the value of underlying out-of-the-money positions. The first lien program does not require NRG to post collateral above any threshold amount of exposure. Within the first lien structure, the Company can hedge up to 80% of its coal and nuclear capacity, excluding GenOn coal capacity, and 10% of its other assets, excluding GenOn's other assets, with these counterparties for the first 60 months and then declining thereafter. Net exposure to a counterparty on all trades must be positively correlated to the price of the relevant commodity for the first lien to be available to that counterparty. The first lien structure is not subject to unwind or termination upon a ratings downgrade of a counterparty and has no stated maturity date.

The Company's lien counterparties may have a claim on its assets to the extent market prices exceed the hedged prices. As of December 31, 2013, all hedges under the first liens were out-of-the-money on a counterparty aggregate basis.

The following table summarizes the amount of MWs hedged against the Company's coal and nuclear assets and as a percentage relative to the Company's coal and nuclear capacity under the first lien structure as of December 31, 2013:

| Equivalent Net Sales Secured by First Lien Structure [a] | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|
| In MW [b] | 1,747 | 938 | 373 | 209 |
| As a percentage of total net coal and nuclear capacity [c] | 26% | 15% | 6% | 3% |

(a)    Equivalent Net Sales include natural gas swaps converted using a weighted average heat rate by region.
(b)    2014 MW value consists of February through December positions only.
(c)    Net coal and nuclear capacity represents 80% of the Company's total coal and nuclear assets eligible under the first lien, which excludes coal assets acquired in the GenOn acquisition.

*Uses of Liquidity*

The Company's requirements for liquidity and capital resources, other than for operating its facilities, can generally be categorized by the following: (i) commercial operations activities; (ii) debt service obligations, as described more fully in Item 15 — Note 12, *Debt and Capital Leases*, to the Consolidated Financial Statements; (iii) capital expenditures, including repowering and renewable development, and environmental; and (iv) corporate transactions including return of capital and dividend payments to stockholders, as described in Item 15 — Note 15, *Capital Structure*, to the Consolidated Financial Statements.

**Commercial Operations**

The Company's commercial operations activities require a significant amount of liquidity and capital resources. These liquidity requirements are primarily driven by: (i) margin and collateral posted with counterparties; (ii) margin and collateral required to participate in physical markets and commodity exchanges; (iii) timing of disbursements and receipts (i.e. buying fuel before receiving energy revenues); (iv) initial collateral for large structured transactions; and (v) collateral for project development. As of December 31, 2013, commercial operations had total cash collateral outstanding of $276 million, and $902 million outstanding in letters of credit to third parties primarily to support its commercial activities for both wholesale and retail transactions (includes a $37 million letter of credit relating to deposits at the PUCT that cover outstanding customer deposits and residential advance payments). As of December 31, 2013, total collateral held from counterparties was $63 million in cash, and $6 million of letters of credit.

Future liquidity requirements may change based on the Company's hedging activities and structures, fuel purchases, and future market conditions, including forward prices for energy and fuel and market volatility. In addition, liquidity requirements are dependent on the Company's credit ratings and general perception of its creditworthiness.

**Cash Grant Bridge Loans**

As of December 31, 2013, the Company has submitted applications for reimbursement of approximately $539 million, in the aggregate, net of sequestration adjustment, with the U.S. Treasury under the 1603 Cash Grant Program in connection with the following projects: CVSR, Alpine, Borrego, High Desert, Kansas South, Lincoln Financial Field, Gillette Stadium, and various Distributed Solar projects. The Company expects to submit applications for reimbursement of approximately $558 million, in the aggregate, net of sequestration adjustment, with the U.S. Treasury under the 1603 Cash Grant Program for Ivanpah and upon completion of various Distributed Solar projects.

With respect to certain projects, the Company obtained cash grant bridge loans to fund the construction costs of such projects, which were to be repaid upon receipt of the related cash grant proceeds. As of December 31, 2013, there are approximately $854 million outstanding under the cash grant bridge loans, which will become due and payable as follows:

| <u>Three months ending:</u> | Cash due and payable | |
|---|---|---|
| | (In millions) | |
| March 31, 2014 | $ | 228 |
| June 30, 2014 | | 202 |
| September 30, 2014 | | 176 |
| December 31, 2014 | | 117 |
| March 31, 2015 | | 132 |
| Total cash grant bridge loans due, including interest accrued to principal | $ | 855 |

The Company has complied with all obligations under the 1603 Cash Grant Program and is working with the U.S. Treasury Department to obtain payment on the 1603 applications the Company or its subsidiaries have submitted. In January 2014, the Company was awarded a cash grant for the CVSR project in the amount of $307 million, which is approximately 75% of the anticipated cash grant as applied for by the Company, and received $285 million as a result of sequestration. NRG is evaluating the basis for the award and all of its options for recovering the full amount to which the Company believes it is entitled. In January 2014, the Company was awarded the full cash grant of $72 million as applied for, relating to the Alpine project, and has received the post-sequestration funds of $66 million.

**Debt Service Obligations**

Principal payments on debt and capital leases as of December 31, 2013, are due in the following periods:

| Description | 2014 | 2015 | 2016 | 2017 | 2018 | Thereafter | Total |
|---|---|---|---|---|---|---|---|
| | | | | (In millions) | | | |
| **NRG Recourse Debt:** | | | | | | | |
| Senior notes, due 2018 | $ — | $ — | $ — | $ — | $ 1,130 | $ — | $ 1,130 |
| Senior notes, due 2019 | — | — | — | — | — | 800 | 800 |
| Senior notes, due 2019 | — | — | — | — | — | 607 | 607 |
| Senior notes, due 2020 | — | — | — | — | — | 1,062 | 1,062 |
| Senior notes, due 2021 | — | — | — | — | — | 1,128 | 1,128 |
| Senior notes, due 2023 | — | — | — | — | — | 990 | 990 |
| Term loan facility, due 2018 | 20 | 20 | 20 | 21 | 1,926 | — | 2,007 |
| Indian River Power LLC, tax exempt bonds, due 2040 and 2045 | — | — | — | — | — | 247 | 247 |
| Dunkirk Power LLC, tax exempt bonds, due 2042 | — | — | — | — | — | 59 | 59 |
| Fort Bend County, tax-exempt bonds, due 2038 and 2042 | 1 | — | — | — | — | 66 | 67 |
| Subtotal NRG Recourse Debt | 21 | 20 | 20 | 21 | 3,056 | 4,959 | 8,097 |
| **NRG Non-Recourse Debt:** | | | | | | | |
| GenOn senior notes, due 2017 | — | — | — | 725 | — | — | 725 |
| GenOn senior notes, due 2018 | — | — | — | — | 675 | — | 675 |
| GenOn senior notes, due 2020 | — | — | — | — | — | 550 | 550 |
| GenOn Americas Generation senior notes, due 2021 | — | — | — | — | — | 450 | 450 |
| GenOn Americas Generation senior notes, due 2031 | — | — | — | — | — | 400 | 400 |
| NRG Marsh Landing senior secured term loans, due 2017 and 2023 [b] | 42 | 43 | 45 | 47 | 49 | 247 | 473 |
| CVSR - High Plains Ranch II LLC, due 2037 [a] | 348 | 18 | 19 | 23 | 25 | 671 | 1,104 |
| NRG West Holdings LLC, term loan, due 2023 | 32 | 37 | 41 | 40 | 45 | 317 | 512 |
| Agua Caliente Solar, LLC, due 2037 | 24 | 28 | 28 | 29 | 30 | 738 | 877 |
| Ivanpah financing, due 2014 and 2038 [a] | 407 | 33 | 36 | 39 | 40 | 1,019 | 1,574 |
| South Trent Wind LLC, financing agreement, due 2020 [b] | 4 | 4 | 4 | 4 | 4 | 49 | 69 |
| NRG Peaker Finance Co. LLC, bonds, due 2019 | 29 | 31 | 33 | 35 | 19 | 19 | 166 |
| NRG Energy Center Minneapolis LLC, senior secured notes, due 2013, 2017, and 2025 [b] | 7 | 12 | 12 | 13 | 8 | 75 | 127 |
| NRG Solar Alpine, due 2014 and 2022 [b] | 69 | 7 | 8 | 8 | 7 | 122 | 221 |
| NRG Solar Borrego I LLC, due 2024 and 2038 [b] | 3 | 3 | 3 | 2 | 2 | 65 | 78 |
| NRG Solar Avra Valley LLC [b] | 3 | 3 | 3 | 3 | 3 | 48 | 63 |
| TA - High Desert LLC, due 2023 and 2033 | 25 | 3 | 3 | 3 | 3 | 43 | 80 |
| NRG Solar Kansas South LLC, due 2031 | 23 | 2 | 2 | 2 | 2 | 26 | 57 |
| Other [c] | 13 | 14 | 17 | 42 | 11 | 109 | 206 |
| Subtotal NRG Non-Recourse Debt | 1,029 | 238 | 254 | 1,015 | 923 | 4,948 | 8,407 |
| **Capital Lease:** | | | | | | | |
| Chalk Point capital lease, due 2015 | 5 | 5 | — | — | — | — | 10 |
| Other Capital Leases | — | — | — | 1 | 1 | 1 | 3 |
| Subtotal NRG Capital Leases | 5 | 5 | — | 1 | 1 | 1 | 13 |
| Total Debt and Capital Leases | $ 1,055 | $ 263 | $ 274 | $ 1,037 | $ 3,980 | $ 9,908 | $ 16,517 |

(a) Principal payments in 2014 include the expected repayment of cash grant loans upon receipt of cash grants.
(b) Debt related to projects in NRG Yield
(c) Includes $102M of debt related to projects in NRG Yield

In addition to the debt and capital leases shown in the preceding table, NRG had issued $1.3 billion of letters of credit under the Company's $2.5 billion Revolving Credit Facility as of December 31, 2013.

**Capital Expenditures**

The following tables and descriptions summarize the Company's capital expenditures, including accruals, for maintenance, environmental, and growth investments, for the year ended December 31, 2013, and the estimated capital expenditure and growth investments forecast for 2014.

| | Maintenance | Environmental | Growth Investments | Total |
|---|---|---|---|---|
| | (In millions) | | | |
| East | $ 148 | $ 68 | $ — | $ 216 |
| Texas | 118 | 3 | — | 121 |
| South Central | 42 | 33 | — | 75 |
| West | 6 | — | 133 | 139 |
| Other Conventional | 5 | 1 | 5 | 11 |
| Alternative Energy | — | — | 1,146 | 1,146 |
| Retail | 30 | — | — | 30 |
| Yield | 8 | — | 229 | 237 |
| Corporate | 12 | — | — | 12 |
| Total cash capital expenditures for the year ended December 31, 2013 | 369 | 105 | 1,513 | 1,987 |
| Other investments[a] | — | — | 111 | 111 |
| Funding from debt financing, net of fees | (13) | (1) | (1,294) | (1,308) |
| Funding from third party equity partners | — | — | (89) | (89) |
| Total capital expenditures and investments, net | $ 356 | $ 104 | $ 241 | $ 701 |
| | | | | |
| Estimated capital expenditures for 2014 | $ 395 | $ 232 | $ 650 | $ 1,277 |
| Other investments[a] | — | — | 375 | 375 |
| Funding from debt financing, net of fees | (38) | — | (448) | (486) |
| Funding from third party equity partners | — | — | (247) | (247) |
| NRG estimated capital expenditures for 2014, net of financings | $ 357 | $ 232 | $ 330 | $ 919 |

(a) Other investments includes restricted cash activity and proceeds from cash grants.

- *Maintenance and Environmental capital expenditures* — For the year ended December 31, 2013, the Company's environmental capital expenditures included $38 million related to the upgrades at Conemaugh including the installation of selective catalytic reduction technology on both units for enhanced mercury oxidation and removal as well as reduction in $NO_x$ emissions and the completion of upgrades to the existing flue-gas desulfurization systems for enhanced performance.

- *Growth Investments capital expenditures* — For the year ended December 31, 2013, the Company's growth investment expenditures included $1.2 billion for solar projects and $279 million for the Company's other growth projects.

**Environmental Capital Expenditures Estimate**

Based on current (and in some cases proposed) rules, technology and preliminary plans based on some proposed rules, NRG estimates that environmental capital expenditures from 2014 through 2018 required to comply with environmental laws will be approximately $332 million, which includes $120 million for GenOn facilities. These costs are primarily associated with (i) controls to satisfy MATS and recent NSR settlement at Big Cajun II; (ii) controls to satisfy MATS at W.A. Parish, Limestone and Conemaugh; and (iii) $NO_x$ controls for Sayreville and Gilbert. In connection with the proposed acquisition of EME, the Company expects to incur additional environmental capital expenditures. NRG continues to explore cost-effective compliance alternatives to further reduce costs.

NRG's current contracts with the Company's rural electric cooperative customers in the South Central region allow for recovery of a portion of the region's capital costs once in operation, along with a capital return, incurred by complying with any change in law, including interest over the asset life of the required expenditures. The actual recoveries will depend, among other things, on the timing of the completion of the capital projects and the remaining duration of the contracts.

The table below summarizes the status of NRG's coal fleet with respect to air quality controls. Planned investments are either in construction or budgeted in the existing capital expenditures budget. Changes to regulations could result in changes to planned installation dates. NRG uses an integrated approach to fuels, controls and emissions markets to meet environmental standards.

| Units [a] | $SO_2$ Control Equipment | $SO_2$ Install Date | $NO_x$ Control Equipment | $NO_x$ Install Date | Mercury Control Equipment | Mercury Install Date | Particulate Control Equipment | Particulate Install Date |
|---|---|---|---|---|---|---|---|---|
| Huntley 67 | DSI/FF | 2009 | LNBOFA/SNCR | 1994/2009 | ACI | 2009 | FF | 2009 |
| Huntley 68 | DSI/FF | 2009 | LNBOFA/SNCR | 1995/2009 | ACI | 2009 | FF | 2009 |
| Dunkirk 1 | DSI/FF | 2010 | LNBOFA/SNCR | 1994/2010 | ACI | 2010 | FF | 2010 |
| Dunkirk 2 | DSI/FF | 2010 | LNBOFA/SNCR | 1993/2010 | ACI | 2010 | FF | 2010 |
| Dunkirk 3 | DSI/FF | 2009 | LNBOFA/SNCR | 1994/2009 | ACI | 2009 | FF | 2009 |
| Dunkirk 4 | DSI/FF | 2009 | LNBOFA/SNCR | 1994/2009 | ACI | 2009 | FF | 2009 |
| Chalk Point 1 | FGD | 2009 | SCR | 2008 | FGD/ESP | 2009 | ESP/upgrade | 1964/1980 |
| Chalk Point 2 | FGD | 2009 | SACR | 2006 | FGD/ESP | 2009 | ESP/upgrade | 1964/1980 |
| Dickerson 1-3 | FGD | 2009 | SNCR | 2009 | FGD/FF | 2009 | ESP/FF | 1959,1960,1962/2003 |
| Morgantown 1-2 | FGD | 2009 | SCR | 2007-2008 | FGD/ESP | 2009 | ESP | 1970, 1971 |
| Cheswick 1 | FGD | 2010 | SCR | 2003 | FGD/ESP | 2010 | ESP | 1970 |
| Conemaugh 1-2 | FGD | 1994, 95 | SCR | 2014 | FGD/ESP/SCR | 1994,95/2015 | ESP | 1970, 1971 |
| Keystone 1-2 | FGD | 2009 | SCR | 2003 | FGD/ESP | 2009 | ESP | 1967, 1968 |
| Seward | FBL/CDS | 2004 | SNCR | 2004 | FBL/FF | 2004 | FF | 2004 |
| Indian River 4 | CDS | 2011 | LNBOFA/SCR | 1999/2011 | ACI | 2008 | ESP/FF | 1980/2011 |
| Big Cajun II 1 | DSI | 2015 | LNBOFA/SNCR | 2005/2014 | ACI | 2015 | ESP/upgrade | 1981/2015 |
| Big Cajun II 2 | Gas Conversion | 2014 | LNBOFA/SNCR | 2004/2014 | Gas Conversion | 2014 | ESP | 1981 |
| Big Cajun II 3 | PAL | 2013 | LNBOFA/SNCR | 2002/2014 | ACI | 2015 | ESP/upgrade | 1983/2015 |
| Limestone 1-2 | Wet Scrubbers | 1985-86 | LNBOFA/SNCR | 2002/2017 | ACI | 2015 | ESP | 1985-1986 |
| W.A. Parish 5, 6, 7 | FF co-benefit | 1988 | SCR | 2004 | ACI | 2015 | FF | 1988 |
| W.A. Parish 8 | Wet Scrubber | 1982 | SCR | 2004 | ACI | 2015 | FF | 1988 |

(a) NRG plans to add natural gas capabilities at its Avon Lake, New Castle, Dunkirk, and Big Cajun II facilities and intends to retire the coal units at Portland and Shawville in 2014 and 2015, respectively. NRG retired all Titus coal units and Indian River Unit 3 in 2013.

| | |
|---|---|
| ACI -  Activated Carbon Injection | FBL - Fluidized Bed Limestone Injection |
| CDS - Circulating Dry Scrubber | LNBOFA - Low $NO_x$ Burner with Overfire Air |
| DSI - Dry Sorbent Injection with Trona | PAL - Plant Average Limit |
| ESP - Electrostatic Precipitator | SCR - Selective Catalytic Reduction |
| FGD - Flue Gas Desulfurization (wet) | SACR - Selective Auto-Catalytic Reduction |
| FF- Fabric Filter | SNCR - Selective Non-Catalytic Reduction |

The following table summarizes the estimated environmental capital expenditures for the referenced periods by region:

| | Texas | East - legacy NRG | East - GenOn | South Central | Total |
|---|---|---|---|---|---|
| | | | (in millions) | | |
| 2014 | $ 25 | $ 5 | $ 84 | $ 118 | $ 232 |
| 2015 | 21 | 1 | 27 | 25 | 74 |
| 2016 | 16 | — | 4 | — | 20 |
| 2017 | — | — | 1 | — | 1 |
| 2018 | — | 1 | 4 | — | 5 |
| Total | $ 62 | $ 7 | $ 120 | $ 143 | $ 332 |

NRG's current contracts with the Company's rural electrical customers in the South Central region allow for recovery of a portion of the regions' capital costs once in operation, along with a capital return incurred by complying with any change in law, including interest over the asset life of the required expenditures. The actual recoveries will depend, among other things, on the timing of the completion of the capital projects and the remaining duration of the contracts.

### Corporate Transactions

With respect to the proposed acquisition of EME, the Company expects to pay an aggregate purchase price of $2.6 billion (subject to adjustment), which will be partially financed by the cash proceeds from the issuance of the $700 million of 2022 Senior Notes and the issuance of 12,671,977 shares of NRG common stock (valued at $350 million based upon the volume-weighted average trading price over the 20 trading days prior to October 18, 2013) with the balance to be paid in cash The remaining purchase price is expected to be funded by cash on hand, including acquired cash on hand of $1.1 billion. In connection with the acquisition, the Company also expects to assume debt related to acquired project assets of approximately $1.5 billion, which will be non-recourse to NRG. The proposed acquisition of EME is further described in Note 3, *Business Acquisitions and Dispositions*.

### 2013 Capital Allocation Program

During the first quarter of 2013, the Company paid $80 million, $104 million, and $42 million at an average price of 114.179%, 111.700%, and 113.082% of face value, for open market repurchases of the Company's 2018 Senior Notes, 2019 Senior Notes, and 2020 Senior Notes, respectively.

In June 2013, the Company redeemed all of its 2014 GenOn Senior Notes, which had an aggregate outstanding principal amount of $575 million, at a redemption price of 106.778% as well as any accrued and unpaid interest as of the redemption date, with the proceeds of the additional Term Loan Facility borrowings and cash on hand.

In August 2013, the Company increased the annual common stock dividend by 33%, to $0.48 per share. The following table lists the dividends paid during 2013:

| | First Quarter 2013 | Second Quarter 2013 | Third Quarter 2013 | Fourth Quarter 2013 |
|---|---|---|---|---|
| **Dividends per Common Share** | $ 0.09 | $ 0.12 | $ 0.12 | $ 0.12 |

The Company was authorized to repurchase $200 million of its common stock in 2013 under the 2013 Capital Allocation Program. During the first quarter, the Company purchased 972,292 shares of NRG common stock for approximately $25 million at an average cost of $25.88 per share. As a result of the proposed acquisition of EME, the Company did not complete the remaining $175 million of share repurchases under the 2013 Capital Allocation Program.

The Company's common stock dividend and share repurchases are subject to available capital, market conditions, and compliance with associated laws and regulations.

### 2014 Capital Allocation Program

On February 17, 2014, NRG paid a quarterly dividend on the Company's common stock of $0.12 per share.

On February 28, 2014, the Company announced its intention to increase NRG's annual common stock dividend by 17% from $0.48 to $0.56 per share, commencing with the next quarterly payment.

On February 10, 2014, the Company redeemed $308 million of its 8.5% 2019 Senior Notes and $91 million of its 7.625% Senior Notes through a tender offer and call, at an average early redemption percentage of 106.992% and 105.500%, respectively, with a portion of the proceeds from the 2022 Senior Notes borrowing.

Share repurchases and debt reduction under the 2014 Capital Allocation Program are subject to market prices, financial restrictions under the Company's debt facilities, securities laws, and the proposed acquisition of EME.

### Preferred Stock Dividend Payments

For the year ended December 31, 2013, NRG paid $9 million in dividend payments to holders of the Company's 3.625% Preferred Stock.

**Cash Flow Discussion**

The following table reflects the changes in cash flows for the comparative years:

**(In millions)**

| Year ended December 31, | 2013 | 2012 | Change |
|---|---|---|---|
| Net cash provided by operating activities | $ 1,270 | $ 1,149 | $ 121 |
| Net cash used by investing activities | (2,528) | (2,262) | (266) |
| Net cash provided by financing activities | 1,427 | 2,099 | (672) |

*Net Cash Provided By Operating Activities*

Changes to net cash provided by operating activities were driven by:

| | |
|---|---|
| Increase in operating income adjusted for non-cash items | $ 482 |
| Change in cash paid in support of risk management activities | (278) |
| Other changes in working capital | (83) |
| | $ 121 |

*Net Cash Used By Investing Activities*

Changes to net cash used by investing activities were driven by:

| | |
|---|---|
| Decrease in capital expenditures due to reduced spending on growth projects | $ 1,409 |
| Increase in cash paid for acquisitions, which primarily reflects the acquisitions of High Desert, Kansas South, and Gregory in 2013 | (413) |
| Cash acquired in 2012 from GenOn acquisition | (983) |
| Increase in restricted cash, which mainly supports equity requirements for U.S. DOE funded projects | (146) |
| Decrease in proceeds from sale of assets, primarily related to the sale of Schkopau in 2012 | (124) |
| Other | (9) |
| | $ (266) |

*Net Cash Provided By Financing Activities*

Changes in net cash provided by financing activities were driven by:

| | |
|---|---|
| Net increase in debt payments primarily related to open market repurchases of Senior Notes and redemption of GenOn Senior Notes | $ (1,063) |
| Increase in net receipts from settlement of acquired derivatives that include financing elements primarily from the acquisition of GenOn | 335 |
| Increase in proceeds from noncontrolling interest related primarily to NRG Yield, Inc. IPO | 184 |
| Payment of dividends to common stockholders in 2013 | (104) |
| Cash paid for repurchase of treasury stock in 2013 | (25) |
| Other | 1 |
| | $ (672) |

**NOLs, Deferred Tax Assets and Uncertain Tax Position Implications, under ASC 740**

As of December 31, 2013, the Company had a domestic pre-tax book loss of $549 million and foreign pre-tax book loss of $85 million. For the year ended December 31, 2013, the Company generated an NOL of $1.4 billion which is available to offset taxable income in future periods. As of December 31, 2013, the Company has cumulative domestic Federal NOL carryforwards of $3.1 billion and cumulative state NOL carryforwards of $3.0 billion for financial statement purposes. In addition, NRG has cumulative foreign NOL carryforwards of $270 million, of which $15 million will expire through 2016 and of which $255 million do not have an expiration date.

In addition to these amounts, the Company has $115 million of tax effected uncertain tax benefits. As a result of the Company's tax position, and based on current forecasts, NRG anticipates income tax payments, primarily due to state and local jurisdictions, of up to $50 million in 2014.

However, as the position remains uncertain for the $115 million of tax effected uncertain tax benefits, the Company has recorded a non-current tax liability of $61 million and may accrue the remaining balance as an increase to non-current liabilities until final resolution with the related taxing authority. The $61 million non-current tax liability for uncertain tax benefits is primarily from positions taken on various state returns, including accrued interest.

Prior to the GenOn acquisition in December 2012, the Company was not subject to U.S. federal income tax examinations for years prior to 2007. GenOn is no longer subject to U.S. federal income tax examinations for years prior to 2010. With few exceptions, state and local income tax examinations are no longer open for years before 2007. The Company's significant foreign operations are also no longer subject to examination by local jurisdictions for years prior to 2008.

**Off-Balance Sheet Arrangements**

**Obligations under Certain Guarantee Contracts**

NRG and certain of its subsidiaries enter into guarantee arrangements in the normal course of business to facilitate commercial transactions with third parties. These arrangements include financial and performance guarantees, stand-by letters of credit, debt guarantees, surety bonds and indemnifications. See also Item 15 — Note 26, *Guarantees,* to the Consolidated Financial Statements for additional discussion.

**Retained or Contingent Interests**

NRG does not have any material retained or contingent interests in assets transferred to an unconsolidated entity.

**Derivative Instrument Obligation**

The Company's 3.625% Preferred Stock includes a feature which is considered an embedded derivative per ASC 815. Although it is considered an embedded derivative, it is exempt from derivative accounting as it is excluded from the scope pursuant to ASC 815. As of December 31, 2013, based on the Company's stock price, the embedded derivative was out-of-the-money and had no redemption value. See also Item 15 — Note 15, *Capital Structure,* to the Consolidated Financial Statements for additional discussion.

**Obligations Arising Out of a Variable Interest in an Unconsolidated Entity**

*Variable interest in Equity investments* — As of December 31, 2013, NRG has several investments with an ownership interest percentage of 50% or less in energy and energy-related entities that are accounted for under the equity method of accounting. Several of these investments are variable interest entities for which NRG is not the primary beneficiary.

NRG's pro-rata share of non-recourse debt held by unconsolidated affiliates was approximately $273 million as of December 31, 2013. This indebtedness may restrict the ability of these subsidiaries to issue dividends or distributions to NRG. See also Item 15 — Note 16, *Investments Accounted for by the Equity Method and Variable Interest Entities,* to the Consolidated Financial Statements for additional discussion.

**Contractual Obligations and Commercial Commitments**

NRG has a variety of contractual obligations and other commercial commitments that represent prospective cash requirements in addition to the Company's capital expenditure programs. The following tables summarize NRG's contractual obligations and contingent obligations for guarantee. See also Item 15 — Note 12, *Debt and Capital Leases*, Note 22, *Commitments and Contingencies*, and Note 26, *Guarantees*, to the Consolidated Financial Statements for additional discussion.

| | By Remaining Maturity at December 31, | | | | | |
| | 2013 | | | | | |
| **Contractual Cash Obligations** | **Under 1 Year** | **1-3 Years** | **3-5 Years** | **Over 5 Years** | **Total**[a] | **2012 Total** |
| | (In millions) | | | | | |
| Long-term debt (including estimated interest) | $ 2,066 | $ 2,509 | $ 6,797 | $ 12,108 | $ 23,480 | $ 22,772 |
| Capital lease obligations (including estimated interest) | 6 | 6 | 1 | 2 | 15 | 16 |
| Operating leases | 273 | 518 | 446 | 1,224 | 2,461 | 2,880 |
| Fuel purchase and transportation obligations | 963 | 526 | 356 | 719 | 2,564 | 3,126 |
| Fixed purchased power commitments | 24 | 30 | 11 | — | 65 | 77 |
| Pension minimum funding requirement [b] | 82 | 115 | 118 | 115 | 430 | 475 |
| Other postretirement benefits minimum funding requirement [c] | 11 | 24 | 27 | 82 | 144 | 86 |
| Other liabilities [d] | 150 | 249 | 163 | 661 | 1,223 | 1,235 |
| Total | $ 3,575 | $ 3,977 | $ 7,919 | $ 14,911 | $ 30,382 | $ 30,667 |

(a)  Excludes $60 million non-current payable relating to NRG's uncertain tax benefits under ASC 740 as the period of payment cannot be reasonably estimated. Also excludes $629 million of asset retirement obligations which are discussed in Item 15 — Note 13, *Asset Retirement Obligations*, to the Consolidated Financial Statements.

(b)  These amounts represent the Company's estimated minimum pension contributions required under the Pension Protection Act of 2006. These amounts represent estimates that are based on assumptions that are subject to change.

(c)  These amounts represent estimates that are based on assumptions that are subject to change. The minimum required contribution for years after 2020 are currently not available.

(d)  Includes water right agreements, service and maintenance agreements, stadium naming rights, LTSA commitments and other contractual obligations.

| | By Remaining Maturity at December 31, | | | | | |
| | 2013 | | | | | |
| **Guarantees** | **Under 1 Year** | **1-3 Years** | **3-5 Years** | **Over 5 Years** | **Total** | **2012 Total** |
| | (In millions) | | | | | |
| Letters of credit and surety bonds | $ 1,654 | $ 47 | $ — | $ — | $ 1,701 | $ 1,594 |
| Asset sales guarantee obligations | — | — | 275 | — | 275 | 275 |
| Commercial sales arrangements | 81 | 112 | 23 | 1,338 | 1,554 | 1,579 |
| Other guarantees | 78 | 4 | — | 469 | 551 | 356 |
| Total guarantees | $ 1,813 | $ 163 | $ 298 | $ 1,807 | $ 4,081 | $ 3,804 |

**Fair Value of Derivative Instruments**

NRG may enter into long-term power purchase and sales contracts, fuel purchase contracts and other energy-related financial instruments to mitigate variability in earnings due to fluctuations in spot market prices and to hedge fuel requirements at generation facilities or retail load obligations. In addition, in order to mitigate interest rate risk associated with the issuance of the Company's variable rate and fixed rate debt, NRG enters into interest rate swap agreements.

NRG's trading activities are subject to limits in accordance with the Company's Risk Management Policy. These contracts are recognized on the balance sheet at fair value and changes in the fair value of these derivative financial instruments are recognized in earnings.

The tables below disclose the activities that include both exchange and non-exchange traded contracts accounted for at fair value in accordance with ASC 820, *Fair Value Measurements and Disclosures*, or ASC 820. Specifically, these tables disaggregate realized and unrealized changes in fair value; disaggregate estimated fair values at December 31, 2013, based on their level within the fair value hierarchy defined in ASC 820; and indicate the maturities of contracts at December 31, 2013. For a full discussion of the Company's valuation methodology of its contracts, see *Derivative Fair Value Measurements* in Item 15 — Note 4, *Fair Value of Financial Instruments*, to the Consolidated Financial Statements.

| Derivative Activity Gains/(Losses) | (In millions) |
|---|---|
| Fair value of contracts as of December 31, 2012 | $    825 |
| Contracts realized or otherwise settled during the period | (550) |
| Changes in fair value | 114 |
| Fair value of contracts as of December 31, 2013 | $    389 |

| | Fair Value of Contracts as of December 31, 2013 | | | | |
|---|---|---|---|---|---|
| | Maturity | | | | |
| Fair value hierarchy Gains/(Losses) | 1 Year or Less | Greater Than 1 Year to 3 Years | Greater Than 3 Years to 5 Years | Greater Than 5 Years | Total Fair Value |
| | (In millions) | | | | |
| Level 1 | $    53 | $    68 | $    9 | $    — | $    130 |
| Level 2 | 208 | 2 | (2) | 38 | 246 |
| Level 3 | 12 | 1 | — | — | 13 |
| Total | $    273 | $    71 | $    7 | $    38 | $    389 |

The Company has elected to disclose derivative assets and liabilities on a trade-by-trade basis and does not offset amounts at the counterparty master agreement level. Also, collateral received or paid on the Company's derivative assets or liabilities are recorded on a separate line item on the balance sheet. Consequently, the magnitude of the changes in individual current and non-current derivative assets or liabilities is higher than the underlying credit and market risk of the Company's portfolio. As discussed in Item 7A — *Quantitative and Qualitative Disclosures About Market Risk, Commodity Price Risk*, NRG measures the sensitivity of the Company's portfolio to potential changes in market prices using VaR a statistical model which attempts to predict risk of loss based on market price and volatility. NRG's risk management policy places a limit on one-day holding period VaR, which limits the Company's net open position. As the Company's trade-by-trade derivative accounting results in a gross-up of the Company's derivative assets and liabilities, the net derivative assets and liability position is a better indicator of NRG's hedging activity. As of December 31, 2013, NRG's net derivative asset was $389 million, a decrease to total fair value of $436 million as compared to December 31, 2012. This decrease was primarily driven by the roll off of contracts that settled during the period, partially offset by an increase in fair value of existing contracts due to the decreases in gas and power prices.

Based on a sensitivity analysis using simplified assumptions, the impact of a $0.50 per MMBtu increase in natural gas prices across the term of the derivative contracts would result in a decrease of approximately $279 million in the net value of derivatives as of December 31, 2013.

The impact of a $0.50 per MMBtu decrease in natural gas prices across the term of the derivative contracts would result in an increase of approximately $251 million in the net value of derivatives as of December 31, 2013.

**Critical Accounting Policies and Estimates**

NRG's discussion and analysis of the financial condition and results of operations are based upon the consolidated financial statements, which have been prepared in accordance with U.S. GAAP. The preparation of these financial statements and related disclosures in compliance with U.S. GAAP requires the application of appropriate technical accounting rules and guidance as well as the use of estimates and judgments that affect the reported amounts of assets, liabilities, revenues and expenses, and related disclosures of contingent assets and liabilities. The application of these policies involves judgments regarding future events, including the likelihood of success of particular projects, legal and regulatory challenges, and the fair value of certain assets and liabilities. These judgments, in and of themselves, could materially affect the financial statements and disclosures based on varying assumptions, which may be appropriate to use. In addition, the financial and operating environment may also have a significant effect, not only on the operation of the business, but on the results reported through the application of accounting measures used in preparing the financial statements and related disclosures, even if the nature of the accounting policies have not changed.

On an ongoing basis, NRG evaluates these estimates, utilizing historic experience, consultation with experts and other methods the Company considers reasonable. In any event, actual results may differ substantially from the Company's estimates. Any effects on the Company's business, financial position or results of operations resulting from revisions to these estimates are recorded in the period in which the information that gives rise to the revision becomes known.

NRG's significant accounting policies are summarized in Item 15 — Note 2, *Summary of Significant Accounting Policies*, to the Consolidated Financial Statements. The Company identifies its most critical accounting policies as those that are the most pervasive and important to the portrayal of the Company's financial position and results of operations, and that require the most difficult, subjective and/or complex judgments by management regarding estimates about matters that are inherently uncertain.

| Accounting Policy | Judgments/Uncertainties Affecting Application |
|---|---|
| Derivative Instruments | Assumptions used in valuation techniques |
| | Assumptions used in forecasting generation |
| | Market maturity and economic conditions |
| | Contract interpretation |
| | Market conditions in the energy industry, especially the effects of price volatility on contractual commitments |
| Income Taxes and Valuation Allowance for Deferred Tax Assets | Ability to be sustained upon audit examination of taxing authorities |
| | Interpret existing tax statute and regulations upon application to transactions |
| | Ability to utilize tax benefits through carry backs to prior periods and carry forwards to future periods |
| Impairment of Long Lived Assets | Recoverability of investment through future operations |
| | Regulatory and political environments and requirements |
| | Estimated useful lives of assets |
| | Environmental obligations and operational limitations |
| | Estimates of future cash flows |
| | Estimates of fair value |
| | Judgment about triggering events |
| Goodwill and Other Intangible Assets | Estimated useful lives for finite-lived intangible assets |
| | Judgment about impairment triggering events |
| | Estimates of reporting unit's fair value |
| | Fair value estimate of intangible assets acquired in business combinations |
| Contingencies | Estimated financial impact of event(s) |
| | Judgment about likelihood of event(s) occurring |
| | Regulatory and political environments and requirements |

*Derivative Instruments*

The Company follows the guidance of ASC 815 to account for derivative instruments. ASC 815 requires the Company to mark-to-market all derivative instruments on the balance sheet, and recognize changes in the fair value of non-hedge derivative instruments immediately in earnings. In certain cases, NRG may apply hedge accounting to the Company's derivative instruments. The criteria used to determine if hedge accounting treatment is appropriate are: (i) the designation of the hedge to an underlying exposure; (ii) whether the overall risk is being reduced; and (iii) if there is a correlation between the changes in fair value of the derivative instrument and the underlying hedged item. Changes in the fair value of derivatives instruments accounted for as hedges are either recognized in earnings as an offset to the changes in the fair value of the related hedged item, or deferred and recorded as a component of OCI and subsequently recognized in earnings when the hedged transactions occur.

For purposes of measuring the fair value of derivative instruments, NRG uses quoted exchange prices and broker quotes. When external prices are not available, NRG uses internal models to determine the fair value. These internal models include assumptions of the future prices of energy commodities based on the specific market in which the energy commodity is being purchased or sold, using externally available forward market pricing curves for all periods possible under the pricing model. In order to qualify derivative instruments for hedged transactions, NRG estimates the forecasted generation and forecasted borrowings for interest rate swaps occurring within a specified time period. Judgments related to the probability of forecasted generation occurring are based on available baseload capacity, internal forecasts of sales and generation, and historical physical delivery on similar contracts. Judgments related to the probability of forecasted borrowings are based on the estimated timing of project construction, which can vary based on various factors. The probability that hedged forecasted generation and forecasted borrowings will occur by the end of a specified time period could change the results of operations by requiring amounts currently classified in OCI to be reclassified into earnings, creating increased variability in the Company's earnings. These estimations are considered to be critical accounting estimates.

Certain derivative instruments that meet the criteria for derivative accounting treatment also qualify for a scope exception to derivative accounting, as they are considered to be NPNS. The availability of this exception is based upon the assumption that NRG has the ability and it is probable to deliver or take delivery of the underlying item. These assumptions are based on available baseload capacity, internal forecasts of sales and generation and historical physical delivery on contracts. Derivatives that are considered to be NPNS are exempt from derivative accounting treatment, and are accounted for under accrual accounting. If it is determined that a transaction designated as NPNS no longer meets the scope exception due to changes in estimates, the related contract would be recorded on the balance sheet at fair value combined with the immediate recognition through earnings.

*Income Taxes and Valuation Allowance for Deferred Tax Assets*

As of December 31, 2013, NRG had a valuation allowance of $291 million. This amount is comprised of foreign net operating loss carryforwards of $74 million, foreign capital loss carryforwards of approximately $1 million and U.S. domestic state NOLs of $216 million. The Company believes it is more likely than not that the results of future operations will generate sufficient taxable income which includes the future reversal of existing taxable temporary differences to realize deferred tax assets, net of valuation allowances. In arriving at this conclusion to utilize projections of future profit before tax in our estimate of future taxable income, the Company considered the profit before tax generated in recent years.

NRG continues to be under audit for multiple years by taxing authorities in other jurisdictions. Considerable judgment is required to determine the tax treatment of a particular item that involves interpretations of complex tax laws. NRG is subject to examination by taxing authorities for income tax returns filed in the U.S. federal jurisdiction and various state and foreign jurisdictions including operations located in Australia.

Prior to the GenOn acquisition in December 2012, the Company was not subject to U.S. federal income tax examinations for years prior to 2007. GenOn is no longer subject to U.S. federal income tax examinations for years prior to 2010. With few exceptions, state and local income tax examinations are no longer open for years before 2007. The Company's significant foreign operations are also no longer subject to examination by local jurisdictions for years prior to 2008.

*Evaluation of Assets for Impairment and Other Than Temporary Decline in Value*

In accordance with ASC 360, *Property, Plant, and Equipment*, or ASC 360, NRG evaluates property, plant and equipment and certain intangible assets for impairment whenever indicators of impairment exist. Examples of such indicators or events are:

- Significant decrease in the market price of a long-lived asset;

- Significant adverse change in the manner an asset is being used or its physical condition;

- Adverse business climate;

- Accumulation of costs significantly in excess of the amount originally expected for the construction or acquisition of an asset;

- Current-period loss combined with a history of losses or the projection of future losses; and

- Change in the Company's intent about an asset from an intent to hold to a greater than 50% likelihood that an asset will be sold or disposed of before the end of its previously estimated useful life.

Recoverability of assets to be held and used is measured by a comparison of the carrying amount of the assets to the future net cash flows expected to be generated by the asset, through considering project specific assumptions for long-term power pool prices, escalated future project operating costs and expected plant operations. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the assets exceeds the fair value of the assets by factoring in the probability weighting of different courses of action available to the Company. Generally, fair value will be determined using valuation techniques such as the present value of expected future cash flows. NRG uses its best estimates in making these evaluations and considers various factors, including forward price curves for energy, fuel costs and operating costs. However, actual future market prices and project costs could vary from the assumptions used in the Company's estimates, and the impact of such variations could be material.

For assets to be held and used, if the Company determines that the undiscounted cash flows from the asset are less than the carrying amount of the asset, NRG must estimate fair value to determine the amount of any impairment loss. Assets held-for-sale are reported at the lower of the carrying amount or fair value less the cost to sell. The estimation of fair value under ASC 360, whether in conjunction with an asset to be held and used or with an asset held-for-sale, and the evaluation of asset impairment are, by their nature, subjective. NRG considers quoted market prices in active markets to the extent they are available. In the absence of such information, the Company may consider prices of similar assets, consult with brokers, or employ other valuation techniques. NRG will also discount the estimated future cash flows associated with the asset using a single interest rate representative of the risk involved with such an investment or employ an expected present value method that probability-weights a range of possible outcomes. The use of these methods involves the same inherent uncertainty of future cash flows as previously discussed with respect to undiscounted cash flows. Actual future market prices and project costs could vary from those used in the Company's estimates, and the impact of such variations could be material.

Annually during the fourth quarter, the Company revises its views of power and fuel prices including the Company's fundamental view for long term prices in connection with the preparation of its annual budget. Changes to the Company's views of long term power and fuel prices impacted the Company's projections of profitability, based on management's estimate of supply and demand within the sub-markets for each plant and the physical and economic characteristics of each plant. The Company's revised views of projected profitability for Indian River resulted in a significant adverse change in the extent to which the assets are expected to be used. As a result, the Company considered this to be an indicator of impairment and performed an impairment test for these assets under ASC 360, *Property, Plant and Equipment*. The carrying amount of the assets was lower than the future net cash flows expected to be generated by the asset, considering project specific assumptions for long-term power pool prices, escalated future project operating costs and expected plant operations. As a result, the assets are considered to be impaired, and the Company measured the impairment loss as the difference between the carrying amount and the fair value of the assets. The fair value of the assets was determined by factoring in the probability weighting of different courses of action available to the Company and included both an income approach and a market approach. The Company recorded an impairment loss related to Indian River in the fourth quarter of 2013 of $459 million, as described in Note 10, *Asset Impairments*.

NRG is also required to evaluate its equity-method and cost-method investments to determine whether or not they are impaired. ASC 323, *Investments - Equity Method and Joint Ventures*, or ASC 323, provides the accounting requirements for these investments. The standard for determining whether an impairment must be recorded under ASC 323 is whether the value is considered an "other than a temporary" decline in value. The evaluation and measurement of impairments under ASC 323 involves the same uncertainties as described for long-lived assets that the Company owns directly and accounts for in accordance with ASC 360. Similarly, the estimates that NRG makes with respect to its equity and cost-method investments are subjective, and the impact of variations in these estimates could be material. Additionally, if the projects in which the Company holds these investments recognize an impairment under the provisions of ASC 360, NRG would record its proportionate share of that impairment loss and would evaluate its investment for an other than temporary decline in value under ASC 323.

During the fourth quarter, the Company reviewed its 37.5% interest in Gladstone for impairment utilizing the other-than-temporary impairment model under ASC 820, *Fair Value Measurements*, due to future market expectations as well as discussions with the managing joint venture participants regarding the plant's expected life. In determining fair value, the Company considered project specific assumptions for future project operating revenues and costs and expected plant operations. The carrying amount of the Company's equity method investment exceeded the fair value of the investment and the Company concluded that the decline is considered to be other than temporary. As a result, the Company measured the impairment loss as the difference between the carrying amount and fair value of the investment and recorded an impairment loss in the fourth quarter of 2013 of $92 million, as described in Note 10, *Asset Impairments*.

### Goodwill and Other Intangible Assets

At December 31, 2013, NRG reported goodwill of $2.0 billion, consisting of $1.7 billion in its Texas operating segment, or NRG Texas, that is associated with the acquisition of Texas Genco in 2006, and $272 million primarily in its retail operating segment that is associated with other business acquisitions. The Company has also recorded intangible assets in connection with its business acquisitions, measured primarily based on significant inputs that are not observable in the market and thus represent a Level 3 measurement as defined in ASC 820. See Item 15 — Note 3, *Business Acquisitions and Dispositions*, and Note 11, *Goodwill and Other Intangibles*, to the Consolidated Financial Statements for further discussion.

The Company applies ASC 805, *Business Combinations*, or ASC 805, and ASC 350, to account for its goodwill and intangible assets. Under these standards, the Company amortizes all finite-lived intangible assets over their respective estimated weighted-average useful lives, while goodwill has an indefinite life and is not amortized. However, goodwill and all intangible assets not subject to amortization are tested for impairments at least annually, or more frequently whenever an event or change in circumstances occurs that would more likely than not reduce the fair value of a reporting unit below its carrying amount. The Company tests goodwill for impairment at the reporting unit level, which is identified by assessing whether the components of the Company's operating segments constitute businesses for which discrete financial information is available and whether segment management regularly reviews the operating results of those components. The Company performs the annual goodwill impairment assessment as of December 31 or when events or changes in circumstances indicate that the carrying value may not be recoverable. In 2011, NRG adopted the provisions of ASU 2011-08, *Intangibles - Goodwill and Other (Topic 350) Testing Goodwill for Impairment*, or ASU 2011-08, which allows the consideration of qualitative factors to determine if it is more likely than not that impairment has occurred. In the absence of sufficient qualitative factors, goodwill impairment is determined utilizing a two-step process. If it is determined that the fair value of a reporting unit is below its carrying amount, where necessary, the Company's goodwill and/or intangible asset with indefinite lives will be impaired at that time.

The Company performed step one of the two-step impairment test for its Retail Business reporting units, Green Mountain and Energy Plus, which is at the operating segment level. The Company determined the fair value of these reporting units using primarily an income approach. Under the income approach, the Company estimated the fair value of Green Mountain and Energy Plus to exceed its carrying value by approximately 68% and 24%, respectively, at December 31, 2013. As such, the Company concluded that goodwill associated with the Retail Business reporting units is not impaired as of December 31, 2013.

The Company performed step one of the two-step impairment test for its Texas reporting unit, NRG Texas, which is at the operating segment level. The Company determined the fair value of this reporting unit using primarily an income approach and then applied an overall market approach reasonableness test to reconcile that fair value with NRG's overall market capitalization. The Company believes the methodology and assumptions used in the valuation are consistent with the views of market participants. Significant inputs to the determination of fair value were as follows:

- The Company applied a discounted cash flow methodology to the long-term budgets for all of the plants in the region. This approach is consistent with that used to determine fair value associated with the Company's three solid-fuel plants and the Cedar Bayou facility in prior years. For the current year, the Company applied this methodology to all of the plants. The significant assumptions used to derive the long-term budgets used in the income approach are affected by the following key inputs:

  - The Company's views of power and fuel prices considers market prices for the first five year period and the Company's fundamental view for the longer term. Hedging is included to the extent of contracts already in place;

  - The terminal value in year 2019 is calculated using the Gordon Growth Model, which assumes that the terminal value grows at a constant rate in perpetuity;

  - Projected generation and resulting energy gross margin in the long-term budgets is based on an hourly dispatch that simulates dispatch of each unit into the power market. The dispatch simulation is based on power prices, fuel prices, and the physical and economic characteristics of each plant.

- The additional significant assumptions used in overall valuation of NRG Texas are as follows:

  - The discount rate applied to internally developed cash flow projections for the NRG Texas reporting unit represents the weighted average cost of capital consistent with the risk inherent in future cash flows and based upon an assumed capital structure, cost of long-term debt and cost of equity consistent with comparable companies in the integrated utility industry.

  - The intangible value to NRG Texas for synergies it provides to the Retail Business was determined by capitalizing estimated annual collateral charge and supply cost savings.

Under step one, if the fair value of a reporting unit exceeds its carrying value, goodwill of the reporting unit is not considered impaired. Under the income approach described above, the Company estimated the fair value of NRG Texas' invested capital to exceed its carrying value by approximately 16% at December 31, 2013. The Company also evaluated various market-derived data including market research forecasts, recent merger and acquisition activity and earnings multiples, and together with its estimate of fair value, concluded that NRG Texas's goodwill is not impaired at December 31, 2013.

To reconcile the fair value determined under the income approach with NRG's market capitalization, the Company considered historical and future budgeted earnings measures to estimate the average percentage of total company value represented by NRG Texas, and applied this percentage to an adjusted business enterprise value of NRG. To derive this adjusted business enterprise value, the Company applied a range of control premiums based on recent market transactions to the business enterprise value of NRG on a non-controlling, marketable basis, and also made adjustments for some non-operating assets. The Company was able to reconcile the proportional value of NRG Texas to NRG's market capitalization at a value that would not indicate an impairment.

The Company's estimate of fair value under the income approach described above is affected by assumptions about projected power prices, generation, fuel costs, capital expenditure requirements and environmental regulations, and the Company believes that the most significant impact arises from future power prices. The price of natural gas plays an important role in setting the price of electricity in many of the regions where NRG operates power plants. Due to downward trends in natural gas prices, the Company performed a sensitivity scenario by using a hypothetical $0.50 per MMBtu drop in the natural gas market price for the first five year period and a $0.50 per MMBtu drop in the Company's longer-term fundamental view as used in the Company's long-term budgets and the resulting impact to the implied heat rate that would support new build of combined cycle gas plant in the Texas markets, coal and transportation charges, contracted hedges, and the impact on forecasted generation for the baseload plants during the budget period. Under this sensitivity scenario, the fair value of NRG Texas was 5% above its carrying value as of December 31, 2013. While not required, the Company further performed a high-level hypothetical step two analysis for this sensitivity scenario. Step two requires an allocation of fair value to the individual asset and liabilities using a hypothetical purchase price allocation in order to determine the implied fair value of goodwill. If the implied fair value of goodwill is less than the carrying amount, an impairment loss is recorded. Under the hypothetical step two for the sensitivity scenario it was determined that no goodwill impairment was necessary as of December 31, 2013.

Fair value determinations require considerable judgment and are sensitive to changes in underlying assumptions and factors. As a result, there can be no assurance that the estimates and assumptions made for purposes of the annual goodwill impairment test will prove to be accurate predictions of the future. Examples of events or circumstances that could reasonably be expected to negatively affect the underlying key assumptions and ultimately impact the estimated fair value of the NRG Texas reporting unit may include such items as follows:

- Falling or depressed long-term natural gas prices which may result in lower power prices in the markets in which the Texas reporting unit operates;

- A significant change to power plants' new-build/retirement economics and reserve margins resulting primarily from unexpected environmental or regulatory changes; and/or

- Macroeconomic factors that significantly differ from the Company's assumptions in timing or degree.

If long-term natural gas prices for periods beyond 2014 remain depressed for an extended period, the Company's goodwill may become impaired in the future, which would result in a non-cash charge, not to exceed $1.7 billion, related to the NRG Texas reporting unit.

### Contingencies

NRG records a loss contingency when management determines it is probable that a liability has been incurred and the amount of the loss can be reasonably estimated. Gain contingencies are not recorded until management determines it is certain that the future event will become or does become a reality. Such determinations are subject to interpretations of current facts and circumstances, forecasts of future events, and estimates of the financial impacts of such events. NRG describes in detail its contingencies in Item 15 — Note 22, *Commitments and Contingencies,* to the Consolidated Financial Statements.

### Recent Accounting Developments

See Item 15 — Note 2, *Summary of Significant Accounting Policies,* to the Consolidated Financial Statements for a discussion of recent accounting developments.

**Item 7A — Quantitative and Qualitative Disclosures About Market Risk**

NRG is exposed to several market risks in the Company's normal business activities. Market risk is the potential loss that may result from market changes associated with the Company's merchant power generation or with an existing or forecasted financial or commodity transaction. The types of market risks the Company is exposed to are commodity price risk, interest rate risk, liquidity risk, credit risk and currency exchange risk. In order to manage these risks the Company uses various fixed-price forward purchase and sales contracts, futures and option contracts traded on NYMEX, and swaps and options traded in the over-the-counter financial markets to:

- Manage and hedge fixed-price purchase and sales commitments;

- Manage and hedge exposure to variable rate debt obligations;

- Reduce exposure to the volatility of cash market prices, and

- Hedge fuel requirements for the Company's generating facilities.

*Commodity Price Risk*

Commodity price risks result from exposures to changes in spot prices, forward prices, volatilities, and correlations between various commodities, such as natural gas, electricity, coal, oil, and emissions credits. NRG manages the commodity price risk of the Company's merchant generation operations and load serving obligations by entering into various derivative or non-derivative instruments to hedge the variability in future cash flows from forecasted sales and purchases of electricity and fuel. These instruments include forwards, futures, swaps, and option contracts traded on various exchanges, such as NYMEX and Intercontinental Exchange, or ICE, as well as over-the-counter markets. The portion of forecasted transactions hedged may vary based upon management's assessment of market, weather, operation and other factors.

While some of the contracts the Company uses to manage risk represent commodities or instruments for which prices are available from external sources, other commodities and certain contracts are not actively traded and are valued using other pricing sources and modeling techniques to determine expected future market prices, contract quantities, or both. NRG uses the Company's best estimates to determine the fair value of those derivative contracts. However, it is likely that future market prices could vary from those used in recording mark-to-market derivative instrument valuation, and such variations could be material.

NRG measures the risk of the Company's portfolio using several analytical methods, including sensitivity tests, scenario tests, stress tests, position reports, and VaR. NRG uses a Monte Carlo simulation based VaR model to estimate the potential loss in the fair value of the Company's energy assets and liabilities, which includes generation assets, load obligations, and bilateral physical and financial transactions. The key assumptions for the Company's VaR model include: (i) lognormal distribution of prices; (ii) one-day holding period; (iii) 95% confidence interval; (iv) rolling 36-month forward looking period; and (v) market implied volatilities and historical price correlations.

As of December 31, 2013, the VaR for NRG's commodity portfolio, including generation assets, load obligations and bilateral physical and financial transactions calculated using the VaR model, was $76 million.

The following table summarizes average, maximum and minimum VaR for NRG for the years ended December 31, 2013, and 2012:

| (In millions) | 2013 | | 2012 | |
|---|---|---|---|---|
| **VaR as of December 31,** | $ | 76 | $ | 92 |
| For the year ended December 31, | | | | |
| Average | $ | 88 | $ | 66 |
| Maximum | | 104 | | 96 |
| Minimum | | 72 | | 24 |

Due to the inherent limitations of statistical measures such as VaR, the evolving nature of the competitive markets for electricity and related derivatives, and the seasonality of changes in market prices, the VaR calculation may not capture the full extent of commodity price exposure. As a result, actual changes in the fair value of mark-to-market energy assets and liabilities could differ from the calculated VaR, and such changes could have a material impact on the Company's financial results.

In order to provide additional information, the Company also uses VaR to estimate the potential loss of derivative financial instruments that are subject to mark-to-market accounting. These derivative instruments include transactions that were entered into for both asset management and trading purposes. The VaR for the derivative financial instruments calculated using the diversified VaR model as of December 31, 2013, for the entire term of these instruments entered into for both asset management and trading, was $32 million, primarily driven by asset-backed transactions.

### Interest Rate Risk

NRG is exposed to fluctuations in interest rates through the Company's issuance of fixed rate and variable rate debt. Exposures to interest rate fluctuations may be mitigated by entering into derivative instruments known as interest rate swaps, caps, collars and put or call options. These contracts reduce exposure to interest rate volatility and result in primarily fixed rate debt obligations when taking into account the combination of the variable rate debt and the interest rate derivative instrument. NRG's risk management policies allow the Company to reduce interest rate exposure from variable rate debt obligations.

NRG entered into interest rate swaps, which became effective on April 1, 2011, and were intended to hedge the risks associated with floating interest rates. For the interest rate swaps, the Company paid its counterparty the equivalent of a fixed interest payment on a predetermined notional value, and NRG received the monthly equivalent of a floating interest payment based on a 1-month LIBOR calculated on the same notional value. All interest rate swap payments by NRG and its counterparties were made monthly and the LIBOR was determined in advance of each interest period. The total notional amount of the swaps, which matured on February 1, 2013, was $900 million.

In addition to those discussed above, the Company's project subsidiaries enter into interest rate swaps, intended to hedge the risks associated with interest rates on non-recourse project level debt. See Item 15 - Note 12, *Debt and Capital Leases*, to the Consolidated Financial Statements, for more information about interest rate swaps of the Company's project subsidiaries.

If all of the above swaps had been discontinued on December 31, 2013, the Company would have owed the counterparties $51 million. Based on the investment grade rating of the counterparties, NRG believes its exposure to credit risk due to nonperformance by counterparties to its hedge contracts to be insignificant.

As part of the CVSR financing, the Company entered into swaptions with a notional value of $686 million in order to hedge the project interest rate risk. All of the swaptions expired prior to December 31, 2013.

NRG has both long and short-term debt instruments that subject the Company to the risk of loss associated with movements in market interest rates. As of December 31, 2013, a 1% change in interest rates would result in a $22 million change in interest expense on a rolling twelve month basis.

As of December 31, 2013, the Company's debt fair value was $17.2 billion and the carrying value was $16.8 billion. NRG estimates that a 1% decrease in market interest rates would have increased the fair value of the Company's long-term debt by $1.3 billion.

### Liquidity Risk

Liquidity risk arises from the general funding needs of the Company's activities and in the management of the Company's assets and liabilities. The Company is currently exposed to additional collateral posting if natural gas prices decline primarily due to the long natural gas equivalent position at various exchanges used to hedge NRG's retail supply load obligations.

Based on a sensitivity analysis for power and gas positions under marginable contracts, a $0.50 per MMBtu change in natural gas prices across the term of the marginable contracts would cause a change in margin collateral posted of approximately $51 million as of December 31, 2013 and a 1.00 MMBtu/MWh change in heat rates for heat rate positions would result in a change in margin collateral posted of approximately $65 million as of December 31, 2013. This analysis uses simplified assumptions and is calculated based on portfolio composition and margin-related contract provisions as of December 31, 2013.

### Counterparty Credit Risk

Credit risk relates to the risk of loss resulting from non-performance or non-payment by counterparties pursuant to the terms of their contractual obligations. The Company monitors and manages credit risk through credit policies that include: (i) an established credit approval process; (ii) a daily monitoring of counterparties' credit limits; (iii) the use of credit mitigation measures such as margin, collateral, prepayment arrangements, or volumetric limits; (iv) the use of payment netting agreements; and (v) the use of master netting agreements that allow for the netting of positive and negative exposures of various contracts associated with a single counterparty. Risks surrounding counterparty performance and credit could ultimately impact the amount and timing of expected cash flows. The Company seeks to mitigate counterparty risk by having a diversified portfolio of counterparties. The Company also has credit protection within various agreements to call on additional collateral support if and when necessary. Cash margin is collected and held at the Company to cover the credit risk of the counterparty until positions settle.

As of December 31, 2013, aggregate counterparty credit exposure to a significant portion of the Company's counterparties totaled $813 million, of which the Company held collateral (cash and letters of credit) against those positions of $5 million resulting in a net exposure of $808 million. Approximately 87% of the Company's exposure before collateral is expected to roll off by the end of 2015. The following table highlights the Company's portfolio credit quality and aggregated net counterparty credit exposure by industry sector. Net counterparty credit exposure is defined as the aggregate net asset position with counterparties where netting is permitted under the enabling agreement and includes all cash flow, mark-to-market and NPNS, and non-derivative transactions. As of December 31, 2013, the aggregate credit exposure is shown net of collateral held, and includes amounts net of receivables or payables.

| Category | Net Exposure [a] (% of Total) |
|---|---|
| Financial institutions | 52% |
| Utilities, energy merchants, marketers and other | 29 |
| Coal and emissions | 1 |
| ISOs | 18 |
| Total | 100% |

| Category | Net Exposure [a] (% of Total) |
|---|---|
| Investment grade | 94% |
| Non-Rated | 6 |
| Total | 100% |

(a)    Counterparty credit exposure excludes coal transportation contracts because of the unavailability of market prices.

The Company has credit exposure to certain wholesale counterparties representing more than 10% of the total net exposure discussed above and the aggregate credit exposure to such counterparties was $349 million. Changes in hedge positions and market prices will affect credit exposure and counterparty concentration. Given the credit quality, diversification and term of the exposure in the portfolio, the Company does not anticipate a material impact on its financial position or results of operations from nonperformance by any counterparty.

Counterparty credit exposure described above excludes credit risk exposure under certain long term contracts, including California tolling agreements, South Central load obligations, solar PPAs and a coal supply agreement. As external sources or observable market quotes are not available to estimate such exposure, the Company valued these contracts based on various techniques including but not limited to internal models based on a fundamental analysis of the market and extrapolation of observable market data with similar characteristics. Based on these valuation techniques, as of December 31, 2013, credit exposure to these counterparties was approximately $2.3 billion, including $797 million related to assets of NRG Yield, Inc., for the next five years. This amount excludes potential credit exposures for projects with long term PPAs that have not reached commercial operations. The majority of these power contracts are with utilities or public power entities with strong credit quality and public utility commission or other regulatory support. However, such regulated utility counterparties can be impacted by changes in government regulations, which NRG is unable to predict. In the case of the coal supply agreement, NRG holds a lien against the underlying asset which significantly reduces the risk of loss.

### Retail Customer Credit Risk

NRG is exposed to retail credit risk through its retail electricity providers, which serve C&I customers and the Mass market. Retail credit risk results when a customer fails to pay for services rendered. The losses could be incurred from nonpayment of customer accounts receivable and any in-the-money forward value. NRG manages retail credit risk through the use of established credit policies that include monitoring of the portfolio, and the use of credit mitigation measures such as deposits or prepayment arrangements.

As of December 31, 2013, the Company's retail customer credit exposure to C&I customers was diversified across many customers and various industries, as well as government entities.

NRG is also exposed to credit risk relating to its Mass customers, which may result in a write-off of bad debt. The Company's bad debt expense was $67 million and $45 million for the years ending December 31, 2013 and 2012, respectively. Current economic conditions may affect the Company's customers' ability to pay bills in a timely manner, which could increase customer delinquencies and may lead to an increase in bad debt expense.

### *Credit Risk Related Contingent Features*

Certain of the Company's hedging agreements contain provisions that require the Company to post additional collateral if the counterparty determines that there has been deterioration in credit quality, generally termed "adequate assurance" under the agreements, or require the Company to post additional collateral if there were a one notch downgrade in the Company's credit rating. The collateral required for contracts that have adequate assurance clauses that are in a net liability position as of December 31, 2013, was $85 million. The collateral required for contracts with credit rating contingent features that are in a net liability position as of December 31, 2013, was $15 million. The Company is also a party to certain marginable agreements under which it has a net liability position but the counterparty has not called for the collateral due, which is approximately $34 million as of December 31, 2013.

### *Currency Exchange Risk*

NRG's foreign earnings and investments may be subject to foreign currency exchange risk, which NRG generally does not hedge. As these earnings and investments are not material to NRG's consolidated results, the Company's foreign currency exposure is limited.

### Item 8 — Financial Statements and Supplementary Data

The financial statements and schedules are listed in Part IV, Item 15 of this Form 10-K.

**Item 9 — Changes in and Disagreements With Accountants on Accounting and Financial Disclosure**

None.

**Item 9A - Controls and Procedures**

**Conclusion Regarding the Effectiveness of Disclosure Controls and Procedures and Internal Control Over Financial Reporting**

Under the supervision and with the participation of NRG's management, including its principal executive officer, principal financial officer and principal accounting officer, NRG conducted an evaluation of the effectiveness of the design and operation of its disclosure controls and procedures, as such term is defined in Rules 13a-15(e) or 15d-15(e) of the Exchange Act. Based on this evaluation, the Company's principal executive officer, principal financial officer and principal accounting officer concluded that the disclosure controls and procedures were effective as of the end of the period covered by this annual report on Form 10-K. Management's report on the Company's internal control over financial reporting and the report of the Company's independent registered public accounting firm are incorporated under the caption "Management's Report on Internal Control over Financial Reporting" and under the caption "Report of Independent Registered Public Accounting Firm" in this Annual Report on Form 10-K for the fiscal year ended December 31, 2013.

**Changes in Internal Control over Financial Reporting**

There were no changes in NRG's internal control over financial reporting (as such term is defined in Rule 13a-15(f) under the Exchange Act) that occurred in the fourth quarter of 2013 that materially affected, or are reasonably likely to materially affect, NRG's internal control over financial reporting.

**Inherent Limitations over Internal Controls**

NRG's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements for external purposes in accordance with U.S. GAAP. The Company's internal control over financial reporting includes those policies and procedures that:

1.  Pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the Company's assets;

2.  Provide reasonable assurance that transactions are recorded as necessary to permit preparation of consolidated financial statements in accordance with U.S. GAAP, and that the Company's receipts and expenditures are being made only in accordance with authorizations of its management and directors; and

3.  Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the consolidated financial statements.

Internal control over financial reporting cannot provide absolute assurance of achieving financial reporting objectives because of its inherent limitations, including the possibility of human error and circumvention by collusion or overriding of controls. Accordingly, even an effective internal control system may not prevent or detect material misstatements on a timely basis. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions or that the degree of compliance with the policies or procedures may deteriorate.

**Item 9B — Other Information**

None.

PART III

**Item 10 — Directors, Executive Officers and Corporate Governance**

**Directors**

*E. Spencer Abraham* has been a director of NRG since December 2012. Previously, he served as a director of GenOn Energy, Inc. from January 2012 to December 2012. He is Chairman and Chief Executive Officer of The Abraham Group, an international strategic consulting firm based in Washington, D.C which he founded in 2005. Prior to that, Secretary Abraham served as Secretary of Energy under President George W. Bush from 2001 through January 2005 and was a U.S. Senator for the State of Michigan from 1995 to 2001. Secretary Abraham serves on the board of Occidental Petroleum Corporation, PBF Energy, and the following private companies: C3 Energy Resource Management, International Battery and Sindicatum Sustainable Resources. Secretary Abraham also serves as chairman of the advisory committee of Lynx Global Realty Asset Fund and Uranium Energy Corporation. Secretary Abraham previously served as the non-executive chairman of AREVA, Inc., the U.S. subsidiary of the French-owned nuclear company, and as a director of Deepwater Wind LLC, International Battery, Green Rock Energy, ICx Technologies and PetroTiger. He also previously served on the advisory board or committees of Midas Medici (Utilipoint), Millennium Private Equity, Sunovia and Wetherly Capital.

*Kirbyjon H. Caldwell* has been a director of NRG since March 2009. He was a director of Reliant Energy, Inc. from August 2003 to March 2009. Since 1982, he has served as Senior Pastor at the 16,000-member Windsor Village United Methodist Church in Houston, Texas. Pastor Caldwell was also a director of United Continental Holdings, Inc. (formerly Continental Airlines, Inc.) from 1999 to September 2011.

*Lawrence S. Coben* has been a director of NRG since December 2003. He is currently Chairman and Chief Executive Officer of Tremisis Energy Corporation LLC. Dr. Coben was Chairman and Chief Executive Officer of Tremisis Energy Acquisition Corporation II, a publicly held company, from July 2007 through March 2009 and of Tremisis Energy Acquisition Corporation from February 2004 to May 2006. From January 2001 to January 2004, he was a Senior Principal of Sunrise Capital Partners L.P., a private equity firm. From 1997 to January 2001, Dr. Coben was an independent consultant. From 1994 to 1996, Dr. Coben was Chief Executive Officer of Bolivian Power Company. Dr. Coben is also Executive Director of the Sustainable Preservation Initiative and a Consulting Scholar at the University of Pennsylvania Museum of Archaeology and Anthropology.

*Howard E. Cosgrove* has served as Chairman of the Board and a director of NRG since December 2003. He was Chairman and Chief Executive Officer of Conectiv and its predecessor Delmarva Power and Light Company from December 1992 to August 2002. Prior to December 1992, Mr. Cosgrove held various positions with Delmarva Power and Light including Chief Operating Officer and Chief Financial Officer. Mr. Cosgrove serves on the Board of Trustees of the University of Delaware and the Hagley Museum and Library.

*David Crane* has served as the President, Chief Executive Officer and a director of NRG since December 2003. Mr. Crane also serves as the President, Chief Executive Officer and a director of NRG Yield, Inc. since December 2012, and was appointed Chairman of the Board of Directors of NRG Yield, Inc. in connection with its initial public offering in July 2013. Prior to joining NRG, Mr. Crane served as Chief Executive Officer of International Power plc, a UK-domiciled wholesale power generation company, from January 2003 to November 2003, and as Chief Operating Officer from March 2000 through December 2002. Mr. Crane was Senior Vice President - Global Power New York at Lehman Brothers Inc., an investment banking firm, from January 1999 to February 2000, and was Senior Vice President - Global Power Group, Asia (Hong Kong) at Lehman Brothers from June 1996 to January 1999. Mr. Crane was also a director of El Paso Corporation from December 2009 to May 2012.

*Terry G. Dallas* has been a director of NRG since December 2012. Previously, he served as a director of GenOn Energy, Inc. from December 2010 to December 2012. Mr. Dallas served as a director of Mirant Corporation from 2006 until December 2010. Mr. Dallas was also the former Executive Vice President and Chief Financial Officer of Unocal Corporation, an oil and gas exploration and production company prior to its merger with Chevron Corporation, from 2000 to 2005. Prior to that, Mr. Dallas held various executive finance positions in his 21-year career with Atlantic Richfield Corporation, an oil and gas company with major operations in the United States, Latin America, Asia, Europe and the Middle East.

*William E. Hantke* has been a director of NRG since March 2006. Mr. Hantke served as Executive Vice President and Chief Financial Officer of Premcor, Inc., a refining company, from February 2002 until December 2005. Mr. Hantke was Corporate Vice President of Development of Tosco Corporation, a refining and marketing company, from September 1999 until September 2001, and he also served as Corporate Controller from December 1993 until September 1999. Prior to that position, he was employed by Coopers & Lybrand as Senior Manager, Mergers and Acquisitions from 1989 until 1990. He also held various positions from 1975 until 1988 with AMAX, Inc., including Corporate Vice President, Operations Analysis and Senior Vice President, Finance and Administration, Metals and Mining. He was employed by Arthur Young from 1970 to 1975 as Staff/Senior Accountant. Mr. Hantke was Non-Executive Chairman of Process Energy Solutions, a private alternative energy company until March 31, 2008 and served as director and Vice-Chairman of NTR Acquisition Co., an oil refining start-up, until January 2009.

*Paul W. Hobby* has been a director of NRG since March 2006. Mr. Hobby is the Managing Partner of Genesis Park, L.P., a Houston-based private equity business specializing in technology and communications investments which he helped to form in 2000. In that capacity, he serves as the Chief Executive Officer of Alpheus Communications, Inc., a Texas wholesale telecommunications provider, and as Former Chairman of CapRock Services Corp., the largest provider of satellite services to the global energy business. From November 1992 until January 2001, he served as Chairman and Chief Executive Officer of Hobby Media Services and was Chairman of Columbine JDS Systems, Inc. from 1995 until 1997. He was an Assistant U.S. Attorney for the Southern District of Texas from 1989 to 1992, Chief of Staff to the Lieutenant Governor of Texas, Bob Bullock, in 1991 and an Associate at Fulbright & Jaworski from 1986 to 1989. Mr. Hobby is also a director of Stewart Information Services Corporation (Stewart Title).

*Gerald Luterman* has been a director of NRG since April 2009. He also served as Interim Chief Financial Officer of the Company from November 2009 through May 2010. Mr. Luterman was Executive Vice President and Chief Financial Officer of KeySpan Corporation from August 1999 to September 2007. Prior to this time, Mr. Luterman had more than 30 years experience in senior financial positions with companies including American Express, Booz Allen & Hamilton, Emerson Electric Company and Arrow Electronics. Mr. Luterman serves as a director of Harbinger Group Inc. since April 2013. Mr. Luterman also served as a director of IKON Office Solutions, Inc. from November 2003 until August 2008 and U.S. Shipping Partners L.P. from May 2006 until November 2009.

*Edward R. Muller* has served as Vice Chairman of the Board and a director of NRG since December 2012. Previously, he served as the Chairman and Chief Executive Officer of GenOn Energy, Inc from December 2010 to December 2012. He also served as President of GenOn from August 2011to December 2012. Prior to that, Mr. Muller served as the Chairman, President and Chief Executive Officer of Mirant Corporation from 2005 to December 2010. He served as President and Chief Executive Officer of Edison Mission Energy, a California-based independent power producer from 1993 to 2000. Mr. Muller is also a director of Transocean Ltd. and AeroVironment, Inc.

*Anne C. Schaumburg* has been a director of NRG since April 2005. From 1984 until her retirement in 2002, she was Managing Director of Credit Suisse First Boston and a Senior Banker in the Global Energy Group. From 1979 to 1984, she was in the Utilities Group at Dean Witter Financial Services Group, where she last served as Managing Director. From 1971 to 1978, she was at The First Boston Corporation in the Public Utilities Group. Ms. Schaumburg is also a director of Brookfield Infrastructure Partners L.P.

*Evan J. Silverstein* has been a director of NRG since December 2012. Previously, he served as a director of GenOn Energy, Inc. from August 2006 to December 2012. He served as General Partner and Portfolio Manager of SILCAP LLC, a market-neutral hedge fund that principally invests in utilities and energy companies, from January 1993 until his retirement in December 2005. Previously, he served as portfolio manager specializing in utilities and energy companies and as senior equity utility analyst. Mr. Silverstein has given numerous speeches and has testified before Congress on a variety of energy-related issues. He is an audit committee financial expert.

*Thomas H. Weidemeyer* has been a director of NRG since December 2003. Until his retirement in December 2003, Mr. Weidemeyer served as Director, Senior Vice President and Chief Operating Officer of United Parcel Service, Inc., the world's largest transportation company and President of UPS Airlines. Mr. Weidemeyer became Manager of the Americas International Operation in 1989, and in that capacity directed the development of the UPS delivery network throughout Central and South America. In 1990, Mr. Weidemeyer became Vice President and Airline Manager of UPS Airlines and, in 1994, was elected its President and Chief Operating Officer. Mr. Weidemeyer became Senior Vice President and a member of the Management Committee of United Parcel Service, Inc. that same year, and he became Chief Operating Officer of United Parcel Service, Inc. in January 2001. Mr. Weidemeyer also serves as a director of The Goodyear Tire & Rubber Co., Waste Management, Inc. and Amsted Industries Incorporated.

106

*Walter R. Young* has been a director of NRG since December 2003. From May 1990 to June 2003, Mr. Young was Chairman, Chief Executive Officer and President of Champion Enterprises, Inc., an assembler and manufacturer of manufactured homes. Mr. Young has held senior management positions with The Henley Group, The Budd Company and BFGoodrich.

**Executive Officers**

*David Crane* has served as the President, Chief Executive Officer and a director of NRG since December 2003. For additional biographical information for Mr. Crane, see above under "Directors."

*Kirkland Andrews* has served as Executive Vice President and Chief Financial Officer of NRG Energy since September 2011. Mr. Andrews also has served as the Executive Vice President, Chief Financial Officer and a director of NRG Yield, Inc. since December 2012. Prior to joining NRG, he served as Managing Director and Co-Head Investment Banking, Power and Utilities - Americas at Deutsche Bank Securities from June 2009 to September 2011. Prior to this, he served in several capacities at Citigroup Global Markets Inc., including Managing Director, Group Head, North American Power from November 2007 to June 2009, and Head of Power M&A, Mergers and Acquisitions from July 2005 to November 2007. In his banking career, Mr. Andrews led multiple large and innovative strategic, debt, equity and commodities transactions.

*Mauricio Gutierrez* has served as Executive Vice President and Chief Operating Officer since July 2010. In this capacity, Mr. Gutierrez oversees NRG's Plant Operations, Commercial Operations, Environmental Compliance, as well as the Engineering, Procurement and Construction division. Mr. Gutierrez also has served as the Executive Vice President, Chief Operating Officer and a director of NRG Yield, Inc. since December 2012. He previously served as Executive Vice President, Commercial Operations of NRG, from January 2009 to July 2010 and Senior Vice President, Commercial Operations of NRG, from March 2008 to January 2009. In this capacity, he was responsible for the optimization of the Company's asset portfolio and fuel requirements. Prior to this, Mr. Gutierrez served as Vice President Commercial Operations Trading of NRG from May 2006 to March 2008. Prior to joining NRG in August 2004, Mr. Gutierrez held various positions within Dynegy, Inc., including Managing Director, Trading - Southeast and Texas, Senior Trader East Power and Asset Manager. Prior to Dynegy, Mr. Gutierrez served as senior consultant and project manager at DTP involved in various energy and infrastructure projects in Mexico.

*David R. Hill* has served as Executive Vice President and General Counsel since September 2012. Mr. Hill also has served as the Executive Vice President and General Counsel of NRG Yield, Inc. since December 2012. Prior to joining NRG, Mr. Hill was a partner and co-head of Sidley Austin LLP's global energy practice group. Prior to this, Mr. Hill served as General Counsel of the U.S. Department of Energy from August 2005 to January 2009 and, for the three years prior to that, as Deputy General Counsel for Energy Policy of the U.S. Department of Energy. Before his federal government service, Mr. Hill was a partner in major law firms in Washington, D.C. and Kansas City, Missouri, and handled a variety of regulatory, litigation and corporate matters. He received his law degree from Northwestern University School of Law in Chicago.

*John W. Ragan* has served as Executive Vice President and Regional President, Gulf Coast since July 2010. In this capacity, Mr. Ragan is responsible for managing NRG's largest regional power generation portfolio, totaling over 10,500 megawatts of power in Texas and NRG's retail electric provider, Reliant Energy. He previously served as Executive Vice President and Chief Operating Officer from February 2009 to July 2010, overseeing NRG's Plant Operations, Commercial Operations, Environmental Compliance, as well as the Engineering, Procurement and Construction division. He previously served as Executive Vice President and Regional President, Northeast from December 2006 to February 2009. Prior to joining NRG, Mr. Ragan was Vice President of Trading, Transmission, and Operations at FPL Energy in 2006 and also served as Vice President of Business Management for FPL Energy's Northeast Region from August 2005 through July 2006. Prior to this, Mr. Ragan served as General Manager - Containerboard and Packaging for Georgia Pacific Corporation from October 2004 through July 2005. He also served in increasing roles of responsibility for Mirant Corporation from 1996 through 2004, notably as Senior Vice President and Chief Executive Officer of Mirant's International Group from August 2003 to July 2004.

*Ronald B. Stark* has served as Vice President and Chief Accounting Officer since March 2012. In this capacity, Mr. Stark is responsible for directing NRG's financial accounting and reporting activities. Mr. Stark also has served as the Vice President and Chief Accounting Officer of NRG Yield, Inc. since December 2012. Prior to March 2012, Mr. Stark served as the Company's Vice President, Internal Audit from August 2011 to February 2012. He previously served as Director, Financial Reporting of NRG from October 2007 through July 2011. Mr. Stark joined the Company in January 2007. Mr. Stark previously held various executive and managerial accounting positions at Pegasus Communications and Berlitz International and began his career with Deloitte and Touche.

*Denise M. Wilson* has served as Executive Vice President and President, Alternative Energy Services since July 2011. In this capacity, Ms. Wilson is responsible for the oversight of all alternative energy ventures and development. Prior to this, Ms. Wilson served as Executive Vice President and Chief Administrative Officer ("CAO") from September 2008 to July 2011. As CAO, Ms. Wilson had oversight for several key corporate functions including Human Resources, Investor Relations, Communications and Information Technology. Ms. Wilson originally joined NRG in 2000 and served as Vice President, Human Resources from 2004 until she was named CAO in July 2006. She served in that position until March 2007 when she joined Nash-Finch Company, a leading national food distributor as Senior Vice President, Human Resources. Ms. Wilson left Nash-Finch in June 2008 to retire and then rejoined NRG in September 2008. Ms. Wilson has also served as Vice President, Human Resources Operations with Metris Companies Inc. and Director, Human Resources with General Electric ITS.

**Code of Ethics**

NRG has adopted a code of ethics entitled "NRG Code of Conduct" that applies to directors, officers and employees, including the chief executive officer and senior financial officers of NRG. It may be accessed through the Corporate Governance section of the Company's website at *http://www.nrgenergy.com/investor/corpgov.htm.* NRG also elects to disclose the information required by Form 8-K, Item 5.05, "Amendments to the Registrant's Code of Ethics, or Waiver of a Provision of the Code of Ethics," through the Company's website, and such information will remain available on this website for at least a 12-month period. A copy of the "NRG Energy, Inc. Code of Conduct" is available in print to any stockholder who requests it.

Other information required by this Item will be incorporated by reference to the similarly named section of NRG's definitive Proxy Statement for its 2014 Annual Meeting of Stockholders.

**Item 11 — Executive Compensation**

Other information required by this Item will be incorporated by reference to the similarly named section of NRG's Definitive Proxy Statement for its 2014 Annual Meeting of Stockholders.

**Item 12 — Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

**Securities Authorized for Issuance under Equity Compensation Plans**

| Plan Category | (a)<br>Number of Securities<br>to be Issued Upon<br>Exercise of<br>Outstanding Options,<br>Warrants and Rights | | (b)<br>Weighted-Average<br>Exercise<br>Price of Outstanding<br>Options, Warrants and<br>Rights | | (c)<br>Number of Securities<br>Remaining Available<br>for Future Issuance<br>Under Equity<br>Compensation<br>Plans (Excluding<br>Securities Reflected<br>in Column (a)) | |
|---|---|---|---|---|---|---|
| Equity compensation plans approved by security holders | 9,614,132 | (1) | $ 25.68 | | 8,126,453 | |
| Equity compensation plans not approved by security holders | 842,426 | (2) | 25.65 | | 1,053,485 | |
| Total | 10,456,558 | | $ 25.68 | | 9,179,938 | (3) |

(1) Consists of shares issuable under the NRG LTIP and the ESPP. The NRG LTIP became effective upon the Company's emergence from bankruptcy. On July 28, 2010, the NRG LTIP was amended to increase the number of shares available for issuance to 22,000,000. The ESPP was approved by the Company's stockholders on May 14, 2008. As of December 31, 2013, there were 888,388 shares reserved from the Company's treasury shares for the ESPP.

(2) Consists of shares issuable under the NRG GenOn LTIP. On December 14, 2012, in connection with the Merger, NRG assumed the GenOn Energy, Inc. 2010 Omnibus Incentive Plan, and changed the name to the NRG 2010 Stock Plan for GenOn Employees, or the NRG GenOn LTIP. While the GenOn Energy, Inc. 2010 Omnibus Incentive Plan was previously approved by stockholders of RRI Energy, Inc. before it became GenOn, the plan is listed as "not approved" because the NRG GenOn LTIP was not subject to separate line item approval by NRG's stockholders when the Merger (which included the assumption of this plan) was approved. NRG intends to make subsequent grants under the NRG GenOn LTIP. As part of the Merger, NRG also assumed the GenOn Energy, Inc. 2002 Long-Term Incentive Plan, the GenOn Energy, Inc. 2002 Stock Plan, and the Mirant Corporation 2005 Omnibus Incentive Compensation Plan. NRG has no intention of making any grants or awards of its own equity securities under these plans. The number of securities to be issued upon the exercise of outstanding awards under these plans is 1,053,719 at a weighted-average exercise price of $56.79. See Item 15 — Note 20, *Stock-Based Compensation*, to Consolidated Financial Statements for a discussion of the NRG GenOn LTIP.

(3) Consists of 7,238,065 shares of common stock under NRG's LTIP, 1,053,485 shares of common stock under the NRG GenOn LTIP, and 888,388 shares of treasury stock reserved for issuance under the ESPP. In the first quarter of 2014, 71,478 were issued to employees' accounts from the treasury stock reserve for the ESPP.

Both the NRG LTIP and the NRG GenOn LTIP provide for grants of stock options, stock appreciation rights, restricted stock, performance units, deferred stock units and dividend equivalent rights. NRG's directors, officers and employees, as well as other individuals performing services for, or to whom an offer of employment has been extended by the Company, are eligible to receive grants under the NRG LTIP and the NRG GenOn LTIP. However, participants eligible for the NRG LTIP at the time of the Merger are not eligible to receive grants under the NRG GenOn LTIP. The purpose of the NRG LTIP and the NRG GenOn LTIP is to promote the Company's long-term growth and profitability by providing these individuals with incentives to maximize stockholder value and otherwise contribute to the Company's success and to enable the Company to attract, retain and reward the best available persons for positions of responsibility. The Compensation Committee of the Board of Directors administers the NRG LTIP and the NRG GenOn LTIP.

Other information required by this Item will be incorporated by reference to the similarly named section of NRG's Definitive Proxy Statement for its 2014 Annual Meeting of Stockholders.

**Item 13 — Certain Relationships and Related Transactions, and Director Independence**

Other information required by this Item will be incorporated by reference to the similarly named section of NRG's Definitive Proxy Statement for its 2014 Annual Meeting of Stockholders.

**Item 14 — Principal Accounting Fees and Services**

Other information required by this Item will be incorporated by reference to the similarly named section of NRG's Definitive Proxy Statement for its 2014 Annual Meeting of Stockholders.

**PART IV**

**Item 15 — Exhibits, Financial Statement Schedules**

(a)(1) Financial Statements

The following consolidated financial statements of NRG Energy, Inc. and related notes thereto, together with the reports thereon of KPMG LLP, are included herein:

Consolidated Statements of Operations — Years ended December 31, 2013, 2012, and 2011

Consolidated Statements of Comprehensive Income/(Loss) — Years ended December 31, 2013, 2012, and 2011

Consolidated Balance Sheets — December 31, 2013 and 2012

Consolidated Statements of Cash Flows — Years ended December 31, 2013, 2012, and 2011

Consolidated Statement of Stockholders' Equity — Years ended December 31, 2013, 2012, and 2011

Notes to Consolidated Financial Statements

(a)(2) Financial Statement Schedule

The following Consolidated Financial Statement Schedule of NRG Energy, Inc. is filed as part of Item 15(d) of this report and should be read in conjunction with the Consolidated Financial Statements.

Schedule II — Valuation and Qualifying Accounts

All other schedules for which provision is made in the applicable accounting regulation of the Securities and Exchange Commission are not required under the related instructions or are inapplicable, and therefore, have been omitted.

(a)(3) Exhibits: See Exhibit Index submitted as a separate section of this report.

(b) Exhibits

See Exhibit Index submitted as a separate section of this report.

(c) Not applicable

**MANAGEMENT'S REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING**

NRG Energy Inc.'s management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of the Company's management, including its principal executive officer, principal financial officer and principal accounting officer, the Company conducted an evaluation of the effectiveness of its internal control over financial reporting based on the framework in Internal Control — Integrated Framework (1992) issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on the Company's evaluation under the framework in Internal Control — Integrated Framework (1992), the Company's management concluded that its internal control over financial reporting was effective as of December 31, 2013.

The effectiveness of the Company's internal control over financial reporting as of December 31, 2013, has been audited by KPMG LLP, the Company's independent registered public accounting firm, as stated in its report which is included in this Form 10‑K.

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

The Board of Directors and Stockholders

NRG Energy, Inc.:

We have audited the accompanying consolidated balance sheets of NRG Energy, Inc. and subsidiaries as of December 31, 2013 and 2012, and the related consolidated statements of operations, comprehensive income/(loss), cash flows, and stockholders' equity for each of the years in the three-year period ended December 31, 2013. In connection with our audits of the consolidated financial statements, we also have audited financial statement schedule "Schedule II. Valuation and Qualifying Accounts." These consolidated financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of NRG Energy, Inc. and subsidiaries as of December 31, 2013 and 2012, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 2013, in conformity with U.S. generally accepted accounting principles. Also in our opinion, the related financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, present fairly, in all material respects, the information set forth therein.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), NRG Energy, Inc.'s internal control over financial reporting as of December 31, 2013, based on criteria established in *Internal Control - Integrated Framework (1992)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated February 28, 2014 expressed an unqualified opinion on the effectiveness of the Company's internal control over financial reporting.

/s/ KPMG LLP

KPMG LLP

Philadelphia, Pennsylvania

February 28, 2014

112

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The Board of Directors and Stockholders

NRG Energy, Inc.:

We have audited the accompanying consolidated balance sheets of NRG Energy, Inc. and subsidiaries as of December 31, 2013 and 2012, and the related consolidated statements of operations, comprehensive income/(loss), cash flows, and stockholders' equity for each of the years in the three-year period ended December 31, 2013. In connection with our audits of the consolidated financial statements, we also have audited financial statement schedule "Schedule II. Valuation and Qualifying Accounts." These consolidated financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of NRG Energy, Inc. and subsidiaries as of December 31, 2013 and 2012, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 2013, in conformity with U.S. generally accepted accounting principles. Also in our opinion, the related financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of NRG Energy, Inc. and subsidiaries internal control over financial reporting as of December 31, 2013, based on criteria established in Internal Control - Integrated Framework (1992) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated February 28, 2014 expressed an unqualified opinion on the effectiveness of the Company's internal control over financial reporting.

/s/ KPMG LLP

KPMG LLP

Philadelphia, Pennsylvania
February 28, 2014

113

**NRG ENERGY, INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | For the Year Ended December 31, | | |
|---|---|---|---|
| (In millions, except per share amounts) | 2013 | 2012 | 2011 |
| **Operating Revenues** | | | |
| Total operating revenues | $ 11,295 | $ 8,422 | $ 9,079 |
| **Operating Costs and Expenses** | | | |
| Cost of operations | 8,121 | 6,140 | 6,745 |
| Depreciation and amortization | 1,256 | 950 | 896 |
| Impairment losses | 459 | — | 160 |
| Selling, general and administrative | 904 | 807 | 586 |
| Acquisition-related transaction and integration costs | 128 | 107 | — |
| Development activity expenses | 84 | 68 | 57 |
| Total operating costs and expenses | 10,952 | 8,072 | 8,444 |
| **Operating Income** | 343 | 350 | 635 |
| **Other Income/(Expense)** | | | |
| Equity in earnings of unconsolidated affiliates | 7 | 37 | 35 |
| Bargain purchase gain related to GenOn acquisition | — | 296 | — |
| Impairment losses on investments | (99) | (2) | (495) |
| Other income, net | 13 | 19 | 19 |
| Loss on debt extinguishment | (50) | (51) | (175) |
| Interest expense | (848) | (661) | (665) |
| Total other expense | (977) | (362) | (1,281) |
| **Loss Before Income Taxes** | (634) | (12) | (646) |
| Income tax benefit | (282) | (327) | (843) |
| **Net (Loss)/Income** | (352) | 315 | 197 |
| Less: Net income attributable to noncontrolling interest | 34 | 20 | — |
| **Net (Loss)/Income Attributable to NRG Energy, Inc.** | (386) | 295 | 197 |
| Dividends for preferred shares | 9 | 9 | 9 |
| **(Loss)/Income Available for Common Stockholders** | $ (395) | $ 286 | $ 188 |
| **(Loss)/Earnings Per Share Attributable to NRG Energy, Inc. Common Stockholders** | | | |
| Weighted average number of common shares outstanding — basic | 323 | 232 | 240 |
| **Net (Loss)/Income per Weighted Average Common Share — Basic** | $ (1.22) | $ 1.23 | $ 0.78 |
| Weighted average number of common shares outstanding — diluted | 323 | 234 | 241 |
| **Net (Loss)/Income per Weighted Average Common Share — Diluted** | $ (1.22) | $ 1.22 | $ 0.78 |
| **Dividends Per Common Share** | $ 0.45 | $ 0.18 | $ — |

See notes to Consolidated Financial Statements.

114

**NRG ENERGY, INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF COMPREHENSIVE (LOSS)/INCOME**

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | 2013 | 2012 | 2011 |
| | (In millions) | | |
| Net (Loss)/Income | $ (352) | $ 315 | $ 197 |
| Other Comprehensive Income/(Loss), net of tax | | | |
| Unrealized gain/(loss) on derivatives, net of income tax benefit of $6, $94, and $181 | 8 | (163) | (309) |
| Foreign currency translation adjustments, net of income tax benefit of $14, $1, and $1 | (24) | (1) | (2) |
| Reclassification adjustment for translation gain realized upon sale of Schkopau, net of income tax benefit of $0, $6, and $0 | — | (11) | — |
| Available-for-sale securities, net of income tax expense of $2, $1, and $0 | 3 | 3 | (1) |
| Defined benefit plan, net of income tax (expense)/benefit of $(100), $21, and $27 | 168 | (52) | (46) |
| Other comprehensive income/(loss) | 155 | (224) | (358) |
| Comprehensive (Loss)/Income | (197) | 91 | (161) |
| Less: Comprehensive income attributable to noncontrolling interest | 34 | 20 | — |
| Comprehensive (Loss)/Income Attributable to NRG Energy, Inc. | (231) | 71 | (161) |
| Dividends for preferred shares | 9 | 9 | 9 |
| Comprehensive (Loss)/Income Available for Common Stockholders | $ (240) | $ 62 | $ (170) |

See notes to Consolidated Financial Statements.

115

**NRG ENERGY, INC. AND SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEETS**

| | As of December 31, | |
| --- | --- | --- |
| | **2013** | **2012** |
| | (In millions) | |
| **ASSETS** | | |
| **Current Assets** | | |
| Cash and cash equivalents | $ 2,254 | $ 2,087 |
| Funds deposited by counterparties | 63 | 271 |
| Restricted cash | 268 | 217 |
| Accounts receivable — trade, less allowance for doubtful accounts of $40 and $32 | 1,214 | 1,061 |
| Inventory | 898 | 903 |
| Derivative instruments | 1,328 | 2,644 |
| Cash collateral paid in support of energy risk management activities | 276 | 229 |
| Deferred income taxes | 258 | 56 |
| Renewable energy grant receivable | 539 | 58 |
| Prepayments and other current assets | 498 | 446 |
| Total current assets | 7,596 | 7,972 |
| **Property, Plant and Equipment** | | |
| In service | 23,649 | 21,133 |
| Under construction | 2,775 | 4,428 |
| Total property, plant and equipment | 26,424 | 25,561 |
| Less accumulated depreciation | (6,573) | (5,408) |
| Net property, plant and equipment | 19,851 | 20,153 |
| **Other Assets** | | |
| Equity investments in affiliates | 453 | 676 |
| Notes receivable, less current portion | 73 | 79 |
| Goodwill | 1,985 | 1,956 |
| Intangible assets, net of accumulated amortization of $1,977 and $1,706 | 1,140 | 1,210 |
| Nuclear decommissioning trust fund | 551 | 473 |
| Derivative instruments | 311 | 662 |
| Deferred income taxes | 1,202 | 1,203 |
| Other non-current assets | 740 | 599 |
| Total other assets | 6,455 | 6,858 |
| **Total Assets** | $ 33,902 | $ 34,983 |

See notes to Consolidated Financial Statements.

**NRG ENERGY, INC. AND SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEETS (Continued)**

| | As of December 31, | |
|---|---|---|
| | 2013 | 2012 |
| | (In millions, except share data) | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **Current Liabilities** | | |
| Current portion of long-term debt and capital leases | $ 1,050 | $ 147 |
| Accounts payable | 1,038 | 1,172 |
| Derivative instruments | 1,055 | 1,981 |
| Cash collateral received in support of energy risk management activities | 63 | 271 |
| Accrued interest expense | 185 | 191 |
| Other accrued expenses | 480 | 539 |
| Other current liabilities | 333 | 369 |
| Total current liabilities | 4,204 | 4,670 |
| **Other Liabilities** | | |
| Long-term debt and capital leases | 15,767 | 15,736 |
| Nuclear decommissioning reserve | 294 | 354 |
| Nuclear decommissioning trust liability | 324 | 273 |
| Postretirement and other benefit obligations | 506 | 803 |
| Deferred income taxes | 22 | 55 |
| Derivative instruments | 195 | 500 |
| Out-of-market contracts | 1,177 | 1,278 |
| Other non-current liabilities | 695 | 796 |
| Total non-current liabilities | 18,980 | 19,795 |
| **Total Liabilities** | 23,184 | 24,465 |
| 3.625% convertible perpetual preferred stock; $0.01 par value; 250,000 shares issued and outstanding (at liquidation value of $250, net of issuance costs) | 249 | 249 |
| **Commitments and Contingencies** | | |
| **Stockholders' Equity** | | |
| Common stock; $0.01 par value; 500,000,000 shares authorized; 401,126,780 and 399,112,616 shares issued and 323,779,252 and 322,606,898 shares outstanding at December 31, 2013 and 2012 | 4 | 4 |
| Additional paid-in capital | 7,840 | 7,587 |
| Retained earnings | 3,695 | 4,230 |
| Less treasury stock, at cost; 77,347,528 and 76,505,718 shares at December 31, 2013 and 2012 | (1,942) | (1,920) |
| Accumulated other comprehensive income/(loss) | 5 | (150) |
| Noncontrolling interest | 867 | 518 |
| **Total Stockholders' Equity** | 10,469 | 10,269 |
| **Total Liabilities and Stockholders' Equity** | $ 33,902 | $ 34,983 |

See notes to Consolidated Financial Statements.

**NRG ENERGY, INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | 2013 | 2012 | 2011 |
| | (In millions) | | |
| **Cash Flows from Operating Activities** | | | |
| Net (loss)/income | $ (352) | $ 315 | $ 197 |
| Adjustments to reconcile net (loss)/income to net cash provided by operating activities: | | | |
| Distributions and equity in earnings of unconsolidated affiliates | 84 | 2 | 9 |
| Bargain purchase gain related to GenOn acquisition | — | (296) | — |
| Depreciation and amortization | 1,256 | 950 | 896 |
| Provision for bad debts | 67 | 45 | 59 |
| Amortization of nuclear fuel | 36 | 39 | 39 |
| Amortization of financing costs and debt discount/premiums | (33) | 31 | 32 |
| Adjustment to loss on debt extinguishment | (15) | 9 | 58 |
| Amortization of intangibles and out-of-market contracts | 49 | 146 | 167 |
| Amortization of unearned equity compensation | 38 | 41 | 28 |
| (Gain)/Loss on disposals and sales of assets, net | (3) | 11 | 14 |
| Impairment losses | 558 | — | 657 |
| Changes in derivative instruments | 164 | 124 | (138) |
| Changes in deferred income taxes and liability for uncertain tax benefits | (67) | (353) | (859) |
| Changes in nuclear decommissioning trust liability | 15 | 37 | 20 |
| Cash (used)/provided by changes in other working capital, net of acquisition and disposition effects: | | | |
| Accounts receivable - trade | (224) | (131) | (119) |
| Inventory | 11 | (172) | 145 |
| Prepayments and other current assets | (22) | (26) | 59 |
| Accounts payable | 275 | (132) | 9 |
| Accrued expenses and other current liabilities | (114) | 231 | (111) |
| Other assets and liabilities | (453) | 278 | 4 |
| **Net Cash Provided by Operating Activities** | 1,270 | 1,149 | 1,166 |
| **Cash Flows from Investing Activities** | | | |
| Acquisition of businesses, net of cash acquired | (494) | (81) | (377) |
| Cash acquired in GenOn acquisition | — | 983 | — |
| Capital expenditures | (1,987) | (3,396) | (2,310) |
| Increase in restricted cash, net | (22) | (66) | (35) |
| (Increase)/decrease in restricted cash to support equity requirements for U.S. DOE funded projects | (26) | 164 | (215) |
| (Increase)/decrease in notes receivable | (11) | (24) | 12 |
| Proceeds from renewable energy grants | 55 | 62 | — |
| Purchases of emission allowances, net of proceeds | 5 | (1) | (19) |
| Investments in nuclear decommissioning trust fund securities | (514) | (436) | (406) |
| Proceeds from sales of nuclear decommissioning trust fund securities | 488 | 399 | 385 |
| Proceeds from sale of assets, net | 13 | 137 | 7 |
| Investments in unconsolidated affiliates | — | (25) | (66) |
| Other | (35) | 22 | (23) |
| **Net Cash Used by Investing Activities** | (2,528) | (2,262) | (3,047) |
| **Cash Flows from Financing Activities** | | | |
| Payment of dividends to preferred and common stockholders | (154) | (50) | (9) |
| Net receipts/(payments for) from settlement of acquired derivatives that include financing elements | 267 | (68) | (83) |
| Payment for treasury stock | (25) | — | (430) |
| Sales proceeds and other contributions from noncontrolling interests in subsidiaries | 531 | 347 | 29 |
| Proceeds from issuance of common stock | 16 | — | 2 |
| Proceeds from issuance of long-term debt | 1,777 | 3,165 | 6,224 |

| | | | |
|---|---|---|---|
| Payments for term loan for funded letter of credit facility | — | — | (1,300) |
| Decrease in restricted cash supporting funded letter of credit facility | — | — | 1,300 |
| Payment of debt issuance and hedging costs | (50) | (35) | (207) |
| Payments for short and long-term debt | (935) | (1,260) | (5,493) |
| **Net Cash Provided by Financing Activities** | 1,427 | 2,099 | 33 |
| Effect of exchange rate changes on cash and cash equivalents | (2) | (4) | 2 |
| **Net Increase/(Decrease) in Cash and Cash Equivalents** | 167 | 982 | (1,846) |
| **Cash and Cash Equivalents at Beginning of Period** | 2,087 | 1,105 | 2,951 |
| **Cash and Cash Equivalents at End of Period** | $ 2,254 | $ 2,087 | $ 1,105 |

See notes to Consolidated Financial Statements.

118

**NRG ENERGY, INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENT OF STOCKHOLDERS' EQUITY**

| | Preferred Stock | Common Stock | Additional Paid-In Capital | Retained Earnings | Treasury Stock | Accumulated Other Comprehensive Income/(Loss) | Noncontrolling Interest | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| | | | | (In millions) | | | | |
| **Balances at December 31, 2010** | $ — | $ 3 | $ 5,323 | $ 3,800 | $ (1,503) | $ 432 | $ 17 | $ 8,072 |
| Net income | | | | 197 | | | — | 197 |
| Other comprehensive income | | | | | | (358) | | (358) |
| Equity-based compensation | | | 28 | | | | | 28 |
| Purchase of treasury stock | | | | | (430) | | | (430) |
| Preferred stock dividends | | | | (9) | | | | (9) |
| ESPP share purchases | | | (5) | (1) | 9 | | | 3 |
| NINA deconsolidation | | | | | | | (17) | (17) |
| Ivanpah contribution | | | | | | | 183 | 183 |
| **Balances at December 31, 2011** | $ — | $ 3 | $ 5,346 | $ 3,987 | $ (1,924) | $ 74 | $ 183 | $ 7,669 |
| Net income | | | | 295 | | | 20 | 315 |
| Other comprehensive loss | | | | | | (224) | | (224) |
| Issuance of shares for acquisition of GenOn | | 1 | 2,176 | | | | | 2,177 |
| Equity-based compensation | | | 34 | | | | | 34 |
| Preferred stock dividends | | | | (9) | | | | (9) |
| Common stock dividends | | | | (41) | | | | (41) |
| ESPP share purchases | | | (1) | (2) | 4 | | | 1 |
| Sales proceeds and other contributions from noncontrolling interests | | | 32 | | | | 315 | 347 |
| **Balances at December 31, 2012** | $ — | $ 4 | $ 7,587 | $ 4,230 | $ (1,920) | $ (150) | $ 518 | $ 10,269 |
| Net loss | | | | (386) | | | 34 | (352) |
| Other comprehensive income | | | | | | 155 | | 155 |
| Equity-based compensation | | | 36 | | | | | 36 |
| Purchase of treasury stock | | | | | (25) | | | (25) |
| Preferred stock dividends | | | | (9) | | | | (9) |
| Common stock dividends | | | | (145) | | | | (145) |
| ESPP share purchases | | | | 5 | 3 | | | 8 |
| NRG Yield IPO | | | 217 | | | | 240 | 457 |
| Sales proceeds and other contributions from noncontrolling interests | | | | | | | 75 | 75 |
| **Balances at December 31, 2013** | $ — | $ 4 | $ 7,840 | $ 3,695 | $ (1,942) | $ 5 | $ 867 | $ 10,469 |

See notes to Consolidated Financial Statements.

119

**NRG ENERGY, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

### Note 1 — Nature of Business

#### *General*

NRG Energy, Inc., or NRG or the Company, is a competitive power and energy company that aspires to be a leader in the way residential, industrial and commercial consumers think about, use, produce and deliver energy and energy services in major competitive power markets in the United States. NRG engages in the ownership and operation of power generation facilities; the trading of energy, capacity and related products; the transacting in and trading of fuel and transportation services and the direct sale of energy, services, and innovative, sustainable products to retail customers. The Company sells retail electric products and services under the name "NRG" and various brands owned by NRG. Finally, NRG aspires to be a clean energy leader and is focused on the deployment and commercialization of potentially transformative technologies, like electric vehicles, Distributed Solar and smart meter/home automation technology that collectively have the potential to fundamentally change the nature of the power industry, including a substantial change in the role of the national electric transmission grid and distribution system.

NRG's domestic generation facilities consist of intermittent, baseload, intermediate, and peaking power generation facilities. The following table summarizes NRG's global generation portfolio by operating segment, which includes 88 fossil fuel and nuclear plants, eleven Utility Scale Solar facilities and four wind farms, as well as Distributed Solar facilities. Also included is one Utility Scale Solar facility and additional Distributed Solar facilities currently under construction. All Utility Scale Solar and Distributed Solar facilities are described in megawatts on an alternating current basis. MW figures provided represent nominal summer net megawatt capacity of power generated as adjusted for the Company's owned or leased interest excluding capacity from inactive/mothballed units:

| | | | | | Fossil Fuel, Nuclear, and Renewable | | | | |
| | | | | | (In MW) | | | | |
| Generation Type | Texas | East | South Central | West | Alternative Energy | NRG Yield | Total Domestic | Other (Inter-national) | Total Global |
|---|---|---|---|---|---|---|---|---|---|
| Natural gas | 5,917 | 7,651 | 3,817 | 6,779 | — | 843 | 25,007 | — | 25,007 |
| Coal | 4,193 | 6,879 | 1,496 | — | — | — | 12,568 | 605 | 13,173 |
| Oil(a) | — | 5,531 | — | — | — | 190 | 5,721 | — | 5,721 |
| Nuclear | 1,176 | — | — | — | — | — | 1,176 | — | 1,176 |
| Wind | — | — | — | — | 347 | 101 | 448 | — | 448 |
| Utility Scale Solar | — | — | — | — | 836 | 303 | 1,139 | — | 1,139 |
| Distributed Solar | — | — | — | — | 37 | 10 | 47 | — | 47 |
| Total generation capacity | 11,286 | 20,061 | 5,313 | 6,779 | 1,220 | 1,447 | 46,106 | 605 | 46,711 |
| Capacity attributable to noncontrolling interest | — | — | — | — | (331) | (499) | (830) | — | (830) |
| Total net generation capacity | 11,286 | 20,061 | 5,313 | 6,779 | 889 | 948 | 45,276 | 605 | 45,881 |
| **Under Construction** | | | | | | | | | |
| Utility Scale Solar | — | — | — | — | 26 | | 26 | — | 26 |
| Distributed Solar | — | — | — | — | 6 | — | 6 | — | 6 |
| Total under construction | — | — | — | — | 32 | — | 32 | — | 32 |

(a) The NRG Yield operating segment consists of two dual-fuel (natural gas and oil) simple-cycle generation facilities.

In addition, the Company's thermal assets provide steam and chilled water capacity of approximately 1,374 MWt through its district energy business, 28 MWt of which is available under the right-to-use provision of the Chilled Water Service Agreement at NRG Energy Center Phoenix, AZ.

NRG sells power from its generation portfolio, offers capacity or similar products to retail electric providers and others, and provides ancillary services to support system reliability.

The Retail Business provides energy and related services to residential, commercial and institutional customers primarily located in Texas and selected Northeast markets. Products and services range from system power to home services, to bundled products which combine system power with protection products, energy efficiency and renewable energy solutions. Based on metered locations, as of December 31, 2013, NRG's Retail Business served approximately 2.3 million residential, small business, commercial and industrial customers.

NRG was incorporated as a Delaware corporation on May 29, 1992. NRG's common stock is listed on the New York Stock Exchange under the symbol "NRG". The Company's principal executive offices are located at 211 Carnegie Center, Princeton, New Jersey 08540. NRG is dual headquartered, with financial and commercial headquarters in Princeton, New Jersey and operational headquarters in Houston, Texas. NRG's telephone number is (609) 524-4500. The address of the Company's website is *www.nrgenergy.com*. NRG's recent annual reports, quarterly reports, current reports, and other periodic filings are available free of charge through the Company's website.

### Initial Public Offering of NRG Yield, Inc.

The Company formed NRG Yield, Inc. to own and operate a portfolio of contracted generation assets and thermal infrastructure assets that have historically been owned and/or operated by NRG and its subsidiaries. On July 22, 2013, NRG Yield, Inc. closed its initial public offering of 22,511,250 shares of Class A common stock at a price of $22 per share. Net proceeds to NRG Yield, Inc. from the sale of the Class A common stock were approximately $468 million, net of underwriting discounts and commissions of $27 million. The Company retained 42,738,250 shares of Class B common stock of NRG Yield, Inc. As a result, the Company owns a controlling interest in NRG Yield, Inc. and will consolidate this entity for financial reporting purposes. In addition, the Company retained a 65.5% interest in NRG Yield LLC. The initial public offering represented the sale of a 34.5% interest in NRG Yield LLC. NRG Yield LLC's initial assets consisted of three natural gas or dual-fired facilities, eight utility-scale solar and wind generation facilities, two portfolios of distributed solar facilities that collectively represent 1,324 net MW, and thermal infrastructure assets with an aggregate steam and chilled water capacity of 1,098 net MWt and electric generation capacity of 123 net MW. On December 31, 2013, NRG Yield LLC acquired Energy Systems, as described in Note 3, *Business Acquisitions and Dispositions*. The following table represents the structure of NRG Yield, Inc. after the initial public offering:



**Note 2 — Summary of Significant Accounting Policies**

*Basis of Presentation and Principles of Consolidation*

The Company's consolidated financial statements have been prepared in accordance with U.S. GAAP. The ASC, established by the FASB, is the source of authoritative U.S. GAAP to be applied by nongovernmental entities. In addition, the rules and interpretative releases of the SEC under authority of federal securities laws are also sources of authoritative U.S. GAAP for SEC registrants.

The consolidated financial statements include NRG's accounts and operations and those of its subsidiaries in which the Company has a controlling interest. All significant intercompany transactions and balances have been eliminated in consolidation. The usual condition for a controlling financial interest is ownership of a majority of the voting interests of an entity. However, a controlling financial interest may also exist through arrangements that do not involve controlling voting interests. As such, NRG applies the guidance of ASC 810, *Consolidations,* or ASC 810, to determine when an entity that is insufficiently capitalized or not controlled through its voting interests, referred to as a VIE should be consolidated.

*Segment Reporting*

Effective June 2013, the Company's segment structure and its allocation of corporate expenses were updated to reflect how management currently makes financial decisions and allocates resources. The Company has recast data from prior periods to reflect this change in reportable segments to conform to the current year presentation. The Company's businesses are primarily segregated based on the Retail Business, conventional power generation, alternative energy businesses, NRG Yield, and corporate activities. Within NRG's conventional power generation, there are distinct components with separate operating results and management structures for the following geographical regions: Texas, East, South Central, West and Other, which includes international businesses and maintenance services. The Company's alternative energy segment includes solar and wind assets, excluding those in the NRG Yield segment, electric vehicle services and the carbon capture business. NRG Yield includes certain of the Company's contracted generation assets including three natural gas or dual-fired facilities, eight utility-scale solar and wind generation facilities, two portfolios of distributed solar facilities and thermal infrastructure assets.

*Cash and Cash Equivalents*

Cash and cash equivalents include highly liquid investments with an original maturity of three months or less at the time of purchase.

*Funds Deposited by Counterparties*

Funds deposited by counterparties consist of cash held by the Company as a result of collateral posting obligations from its counterparties. Some amounts are segregated into separate accounts that are not contractually restricted but, based on the Company's intention, are not available for the payment of general corporate obligations. Depending on market fluctuations and the settlement of the underlying contracts, the Company will refund this collateral to the hedge counterparties pursuant to the terms and conditions of the underlying trades. Since collateral requirements fluctuate daily and the Company cannot predict if any collateral will be held for more than twelve months, the funds deposited by counterparties are classified as a current asset on the Company's balance sheet, with an offsetting liability for this cash collateral received within current liabilities. Changes in funds deposited by counterparties are closely associated with the Company's operating activities, and are classified as an operating activity in the Company's consolidated statements of cash flows.

*Restricted Cash*

Restricted cash consists primarily of funds held to satisfy the requirements of certain debt agreements and funds held within the Company's projects that are restricted in their use. These funds are used to pay for current operating expenses and current debt service payments as well as to fund required equity contributions, per the restrictions of the debt agreements.

*Trade Receivables and Allowance for Doubtful Accounts*

Trade receivables are reported in the balance sheet at outstanding principal adjusted for any write-offs and the allowance for doubtful accounts. For its Retail Business, the Company accrues an allowance for doubtful accounts based on estimates of uncollectible revenues by analyzing counterparty credit ratings (for commercial and industrial customers), historical collections, accounts receivable aging and other factors. The Retail Business writes-off accounts receivable balances against the allowance for doubtful accounts when it determines a receivable is uncollectible.

122

### Inventory

Inventory is valued at the lower of weighted average cost or market, and consists principally of fuel oil, coal and raw materials used to generate electricity or steam. The Company removes these inventories as they are used in the production of electricity or steam. Spare parts inventory is valued at a weighted average cost, since the Company expects to recover these costs in the ordinary course of business. The Company removes these inventories when they are used for repairs, maintenance or capital projects. Sales of inventory are classified as an operating activity in the consolidated statements of cash flows.

### Property, Plant and Equipment

Property, plant and equipment are stated at cost; however impairment adjustments are recorded whenever events or changes in circumstances indicate that their carrying values may not be recoverable. NRG also classifies nuclear fuel related to the Company's 44% ownership interest in STP as part of the Company's property, plant, and equipment. Significant additions or improvements extending asset lives are capitalized as incurred, while repairs and maintenance that do not improve or extend the life of the respective asset are charged to expense as incurred. Depreciation other than nuclear fuel is computed using the straight-line method, while nuclear fuel is amortized based on units of production over the estimated useful lives. Certain assets and their related accumulated depreciation amounts are adjusted for asset retirements and disposals with the resulting gain or loss included in cost of operations in the consolidated statements of operations.

### Asset Impairments

Long-lived assets that are held and used are reviewed for impairment whenever events or changes in circumstances indicate carrying values may not be recoverable. Such reviews are performed in accordance with ASC 360. An impairment loss is recognized if the total future estimated undiscounted cash flows expected from an asset are less than its carrying value. An impairment charge is measured by the difference between an asset's carrying amount and fair value with the difference recorded in operating costs and expenses in the statements of operations. Fair values are determined by a variety of valuation methods, including third-party appraisals, sales prices of similar assets and present value techniques.

Investments accounted for by the equity method are reviewed for impairment in accordance with ASC 323, *Investments-Equity Method and Joint Ventures*, or ASC 323, which requires that a loss in value of an investment that is other than a temporary decline should be recognized. The Company identifies and measures losses in the value of equity method investments based upon a comparison of fair value to carrying value.

For further discussion of these matters, refer to Note 10, *Asset Impairments*.

### Development Activity Expenses and Capitalized Interest

Project development costs are expensed in the preliminary stages of a project and capitalized when the project is deemed to be commercially viable. Commercial viability is determined by one or a series of actions including among others, Board of Director approval pursuant to a formal project plan that subjects the Company to significant future obligations that can only be discharged by the use of a Company asset.

Development activity expenses include project development costs, which are expensed in the preliminary stages of a project and capitalized when the project is deemed to be commercially viable. Commercial viability is determined by one or a series of actions including, among others, Board of Director approval pursuant to a formal project plan that subjects the Company to significant future obligations that can only be discharged by the use of a Company asset. When a project is available for operations, capitalized project development costs are reclassified to property, plant and equipment and amortized on a straight-line basis over the estimated useful life of the project's related assets. Capitalized costs are charged to expense if a project is abandoned or management otherwise determines the costs to be unrecoverable.

Development activity expenses also include selling, general, and administrative expenses associated with the current operations of certain developing businesses including residential solar, electric vehicles, waste-to-energy, carbon capture and other emerging technologies. The revenue associated with these businesses was immaterial for the years ended December 31, 2013, 2012, and 2011. When it is determined that a business will remain an ongoing part of the Company's operations or when operating revenues become material relative to the operating costs of the underlying business, the Company no longer classifies a business as a development activity.

Interest incurred on funds borrowed to finance capital projects is capitalized until the project under construction is ready for its intended use. The amount of interest capitalized for the years ended December 31, 2013, 2012, and 2011, was $64 million, $104 million, and $80 million, respectively.

When a project is available for operations, capitalized interest and project development costs are reclassified to property, plant and equipment and amortized on a straight-line basis over the estimated useful life of the project's related assets. Capitalized costs are charged to expense if a project is abandoned or management otherwise determines the costs to be unrecoverable.

### Debt Issuance Costs

Debt issuance costs are capitalized and amortized as interest expense on a basis which approximates the effective interest method over the term of the related debt.

### Intangible Assets

Intangible assets represent contractual rights held by NRG. The Company recognizes specifically identifiable intangible assets including customer contracts, customer relationships, energy supply contracts, marketing partnerships, development rights, trade names, emission allowances, and fuel contracts when specific rights and contracts are acquired. In addition, NRG also established values for emission allowances and power contracts upon adoption of Fresh Start reporting. These intangible assets are amortized based on expected volumes, expected delivery, expected discounted future net cash flows, straight line or units of production basis.

Intangible assets determined to have indefinite lives are not amortized, but rather are tested for impairment at least annually or more frequently if events or changes in circumstances indicate that such acquired intangible assets have been determined to have finite lives and should now be amortized over their useful lives. NRG had no intangible assets with indefinite lives recorded as of December 31, 2013.

Emission allowances held-for-sale, which are included in other non-current assets on the Company's consolidated balance sheet, are not amortized; they are carried at the lower of cost or fair value and reviewed for impairment in accordance with ASC 360.

### Goodwill

In accordance with ASC 350, the Company recognizes goodwill for the excess cost of an acquired entity over the net value assigned to assets acquired and liabilities assumed. NRG performs goodwill impairment tests annually, during the fourth quarter, and when events or changes in circumstances indicate that the carrying value may not be recoverable.

In September 2011, the FASB issued ASU No. 2011-08, *Intangibles - Goodwill and Other (Topic 350) Testing Goodwill for Impairment*, or ASU No. 2011-08. The objective of ASU 2011-08 is to simplify how entities test goodwill for impairment. The amendments in ASU No. 2011-08 permit an entity to first assess qualitative factors to determine whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount as a basis for determining whether it is necessary to perform the two-step goodwill impairment test described in Topic 350. The more-likely-than-not threshold is defined as having a likelihood of more than 50 percent. The Company adopted the provisions of ASU No. 2011-08, effective January 1, 2011, with no impact on its results of operations, financial position or cash flows.

In the absence of sufficient qualitative factors, goodwill impairment is determined using a two step process:

Step one —   Identify potential impairment by comparing the fair value of a reporting unit to the book value, including goodwill. If the fair value exceeds book value, goodwill of the reporting unit is not considered impaired. If the book value exceeds fair value, proceed to step two.

Step two —   Compare the implied fair value of the reporting unit's goodwill to the book value of the reporting unit goodwill. If the book value of goodwill exceeds fair value, an impairment charge is recognized for the sum of such excess.

### Income Taxes

NRG accounts for income taxes using the liability method in accordance with ASC 740, which requires that the Company use the asset and liability method of accounting for deferred income taxes and provide deferred income taxes for all significant temporary differences.

NRG has two categories of income tax expense or benefit — current and deferred, as follows:

- Current income tax expense or benefit consists solely of current taxes payable less applicable tax credits, and

- Deferred income tax expense or benefit is the change in the net deferred income tax asset or liability, excluding amounts charged or credited to accumulated other comprehensive income.

NRG reports some of the Company's revenues and expenses differently for financial statement purposes than for income tax return purposes, resulting in temporary and permanent differences between the Company's financial statements and income tax returns. The tax effects of such temporary differences are recorded as either deferred income tax assets or deferred income tax liabilities in the Company's consolidated balance sheets. NRG measures the Company's deferred income tax assets and deferred income tax liabilities using income tax rates that are currently in effect. The Company believes it is more likely than not that the results of future operations will generate sufficient taxable income which includes the future reversal of existing taxable temporary differences to realize deferred tax assets, net of valuation allowances. In arriving at this conclusion to utilize projections of future profit before tax in our estimate of future taxable income, the Company considered the profit before tax generated in recent years. A valuation allowance is recorded to reduce the Company's net deferred tax assets to an amount that is more-likely-than-not to be realized.

NRG reduces its current income tax expense in the consolidated statement of operations for any investment tax credits, or ITCs, that are not convertible into cash grants, as well as other tax credits, in the period the tax credit is generated. ITCs that are convertible into cash grants, as well as the deferred income tax benefit generated by the difference in the financial statement and tax basis of the related assets, are recorded as a reduction to the carrying value of the underlying property and subsequently amortized to earnings on a straight-line basis over the useful life of each underlying property.

The Company accounts for uncertain tax positions in accordance with ASC 740, which applies to all tax positions related to income taxes. Under ASC 740, tax benefits are recognized when it is more-likely-than-not that a tax position will be sustained upon examination by the authorities. The benefit recognized from a position that has surpassed the more-likely-than-not threshold is the largest amount of benefit that is more than 50% likely to be realized upon settlement. The Company recognizes interest and penalties accrued related to uncertain tax benefits as a component of income tax expense.

In accordance with ASC 805 and as discussed further in Note 19, *Income Taxes*, changes to existing net deferred tax assets or valuation allowances or changes to uncertain tax benefits, are recorded to income tax expense.

### Revenue Recognition

*Energy* — Both physical and financial transactions are entered into to optimize the financial performance of NRG's generating facilities. Electric energy revenue is recognized upon transmission to the customer. Physical transactions, or the sale of generated electricity to meet supply and demand, are recorded on a gross basis in the Company's consolidated statements of operations. Financial transactions, or the buying and selling of energy for trading purposes, are recorded net within operating revenues in the consolidated statements of operations in accordance with ASC 815.

*Capacity* — Capacity revenues are recognized when contractually earned, and consist of revenues billed to a third party at either the market or a negotiated contract price for making installed generation capacity available in order to satisfy system integrity and reliability requirements.

*Sale of Emission Allowances* — NRG records the Company's bank of emission allowances as part of the Company's intangible assets. From time to time, management may authorize the transfer of emission allowances in excess of usage from the Company's emission bank to intangible assets held-for-sale for trading purposes. NRG records the sale of emission allowances on a net basis within operating revenue in the Company's consolidated statements of operations.

*Contract Amortization* — Assets and liabilities recognized from power sales agreements assumed at Fresh Start and through acquisitions related to the sale of electric capacity and energy in future periods for which the fair value has been determined to be significantly less (more) than market are amortized to revenue over the term of each underlying contract based on actual generation and/or contracted volumes.

*Retail revenues* — Gross revenues for energy sales and services to retail customers are recognized upon delivery under the accrual method. Energy sales and services that have been delivered but not billed by period end are estimated. Gross revenues also includes energy revenues from resales of purchased power, which were $166 million, $151 million and $186 million for the years ended December 31, 2013, 2012, and 2011, respectively. These revenues represent the sale of excess supply to third parties in the market.

Accrued unbilled revenues are based on estimates of customer usage since the date of the last meter reading provided by the independent system operators or electric distribution companies. Volume estimates are based on daily forecasted volumes and estimated customer usage by class. Unbilled revenues are calculated by multiplying these volume estimates by the applicable rate by customer class. Estimated amounts are adjusted when actual usage is known and billed. NRG recorded receivables for unbilled revenues of $356 million, $338 million and $318 million as of December 31, 2013, 2012, and 2011, respectively, for retail energy sales and services.

*PPAs* — Certain of the Company's revenues are currently obtained through PPAs or other contractual arrangements. All of these PPAs are recorded as operating leases in accordance with ASC 840, *Leases*, or ASC 840. ASC 840 requires minimum lease payments received to be amortized over the term of the lease and contingent rentals are recorded when the achievement of the contingency becomes probable. These leases have no minimum lease payments and all the rent is recorded as contingent rent on an actual basis when the electricity is delivered. The contingent rental income recognized in the years ended December 31, 2013, 2012, and 2011 was $400 million, $130 million, and $27 million, respectively.

### Gross Receipts and Sales Taxes

In connection with its Retail Business, the Company records gross receipts taxes on a gross basis in revenues and cost of operations in its consolidated statements of operations. During the years ended December 31, 2013, 2012, and 2011, NRG's revenues and cost of operations included gross receipts taxes of $88 million, $79 million, and $78 million respectively. Additionally, the Retail Business records sales taxes collected from its taxable customers and remitted to the various governmental entities on a net basis, thus, there is no impact on the Company's consolidated statement of operations.

### Cost of Energy for Retail Operations

The cost of energy for electricity sales and services to retail customers is based on estimated supply volumes for the applicable reporting period. A portion of the cost of energy ($90 million, $97 million and $87 million as of December 31, 2013, 2012, and 2011, respectively) was accrued and consisted of estimated transmission and distribution charges not yet billed by the transmission and distribution utilities. In estimating supply volumes, the Company considers the effects of historical customer volumes, weather factors and usage by customer class. Transmission and distribution delivery fees are estimated using the same method used for electricity sales and services to retail customers. In addition, ISO fees are estimated based on historical trends, estimated supply volumes and initial ERCOT ISO settlements. Volume estimates are then multiplied by the supply rate and recorded as cost of operations in the applicable reporting period.

### Derivative Financial Instruments

NRG accounts for derivative financial instruments under ASC 815, which requires the Company to record all derivatives on the balance sheet at fair value unless they qualify for a NPNS exception. Changes in the fair value of non-hedge derivatives are immediately recognized in earnings. Changes in the fair value of derivatives accounted for as hedges, if elected for hedge accounting, are either:

- Recognized in earnings as an offset to the changes in the fair value of the related hedged assets, liabilities and firm commitments; or

- Deferred and recorded as a component of accumulated OCI until the hedged transactions occur and are recognized in earnings.

NRG's primary derivative instruments are power sales contracts, fuels purchase contracts, other energy related commodities, and interest rate instruments used to mitigate variability in earnings due to fluctuations in market prices and interest rates. On an ongoing basis, NRG assesses the effectiveness of all derivatives that are designated as hedges for accounting purposes in order to determine that each derivative continues to be highly effective in offsetting changes in fair values or cash flows of hedged items. Internal analyses that measure the statistical correlation between the derivative and the associated hedged item determine the effectiveness of such an energy contract designated as a hedge. If it is determined that the derivative instrument is not highly effective as a hedge, hedge accounting will be discontinued prospectively. Hedge accounting will also be discontinued on contracts related to commodity price risk previously accounted for as cash flow hedges when it is probable that delivery will not be made against these contracts. In this case, the gain or loss previously deferred in accumulated OCI would be immediately reclassified into earnings. If the derivative instrument is terminated, the effective portion of this derivative deferred in accumulated OCI will be frozen until the underlying hedged item is delivered.

Revenues and expenses on contracts that qualify for the NPNS exception are recognized when the underlying physical transaction is delivered. While these contracts are considered derivative financial instruments under ASC 815, they are not recorded at fair value, but on an accrual basis of accounting. If it is determined that a transaction designated as NPNS no longer meets the scope exception, the fair value of the related contract is recorded on the balance sheet and immediately recognized through earnings.

NRG's trading activities are subject to limits in accordance with the Company's Risk Management Policy. These contracts are recognized on the balance sheet at fair value and changes in the fair value of these derivative financial instruments are recognized in earnings.

*Foreign Currency Translation and Transaction Gains and Losses*

The local currencies are generally the functional currency of NRG's foreign operations. Foreign currency denominated assets and liabilities are translated at end-of-period rates of exchange. Revenues, expenses, and cash flows are translated at the weighted-average rates of exchange for the period. The resulting currency translation adjustments are not included in the Company's statements of operations for the period, but are accumulated and reported as a separate component of stockholders' equity until sale or complete or substantially complete liquidation of the net investment in the foreign entity takes place. Foreign currency transaction gains or losses are reported within other income/(expense) in the Company's statements of operations. For the years ended December 31, 2013, 2012, and 2011, amounts recognized as foreign currency transaction gains (losses) were immaterial. The Company's cumulative translation adjustment balances as of December 31, 2013, 2012, and 2011 were $15 million, $53 million and $72 million, respectively.

*Concentrations of Credit Risk*

Financial instruments which potentially subject the Company to concentrations of credit risk consist primarily of trust funds, accounts receivable, notes receivable, derivatives, and investments in debt securities. Trust funds are held in accounts managed by experienced investment advisors. Certain accounts receivable, notes receivable, and derivative instruments are concentrated within entities engaged in the energy industry. These industry concentrations may impact the Company's overall exposure to credit risk, either positively or negatively, in that the customers may be similarly affected by changes in economic, industry or other conditions. Receivables and other contractual arrangements are subject to collateral requirements under the terms of enabling agreements. However, the Company believes that the credit risk posed by industry concentration is offset by the diversification and creditworthiness of its customer base. See Note 4, *Fair Value of Financial Instruments,* for a further discussion of derivative concentrations.

*Fair Value of Financial Instruments*

The carrying amount of cash and cash equivalents, funds deposited by counterparties, receivables, accounts payables, and accrued liabilities approximate fair value because of the short-term maturity of these instruments. See Note 4, *Fair Value of Financial Instruments* for a further discussion of fair value of financial instruments.

*Asset Retirement Obligations*

NRG accounts for its AROs in accordance with ASC 410-20, *Asset Retirement Obligations,* or ASC 410-20. Retirement obligations associated with long-lived assets included within the scope of ASC 410-20 are those for which a legal obligation exists under enacted laws, statutes, and written or oral contracts, including obligations arising under the doctrine of promissory estoppel, and for which the timing and/or method of settlement may be conditional on a future event. ASC 410-20 requires an entity to recognize the fair value of a liability for an ARO in the period in which it is incurred and a reasonable estimate of fair value can be made.

Upon initial recognition of a liability for an ARO, NRG capitalizes the asset retirement cost by increasing the carrying amount of the related long-lived asset by the same amount. Over time, the liability is accreted to its future value, while the capitalized cost is depreciated over the useful life of the related asset. See Note 13, *Asset Retirement Obligations,* for a further discussion of AROs.

*Pensions and Other Postretirement Benefits*

NRG offers pension benefits through a defined benefit pension plan. In addition, the Company provides postretirement health and welfare benefits for certain groups of employees. NRG accounts for pension and other postretirement benefits in accordance with ASC 715, *Compensation — Retirement Benefits.* NRG recognizes the funded status of the Company's defined benefit plans in the statement of financial position and records an offset for gains and losses as well as all prior service costs that have not been included as part of the Company's net periodic benefit cost to other comprehensive income. The determination of NRG's obligation and expenses for pension benefits is dependent on the selection of certain assumptions. These assumptions determined by management include the discount rate, the expected rate of return on plan assets and the rate of future compensation increases. NRG's actuarial consultants determine assumptions for such items as retirement age. The assumptions used may differ materially from actual results, which may result in a significant impact to the amount of pension obligation or expense recorded by the Company.

NRG measures the fair value of its pension assets in accordance with ASC 820, *Fair Value Measurements and Disclosures,* or ASC 820.

### Stock-Based Compensation

NRG accounts for its stock-based compensation in accordance with ASC 718, *Compensation — Stock Compensation,* or ASC 718. The fair value of the Company's non-qualified stock options and performance units are estimated on the date of grant using the Black-Scholes option-pricing model and the Monte Carlo valuation model, respectively. NRG uses the Company's common stock price on the date of grant as the fair value of the Company's restricted stock units and deferred stock units. Forfeiture rates are estimated based on an analysis of NRG's historical forfeitures, employment turnover, and expected future behavior. The Company recognizes compensation expense for both graded and cliff vesting awards on a straight-line basis over the requisite service period for the entire award.

### Investments Accounted for by the Equity Method

NRG has investments in various domestic energy projects, as well as one Australian project. The equity method of accounting is applied to such investments in affiliates, which include joint ventures and partnerships, because the ownership structure prevents NRG from exercising a controlling influence over the operating and financial policies of the projects. Under this method, equity in pre-tax income or losses of domestic partnerships and, generally, in the net income or losses of its Australian project, are reflected as equity in earnings of unconsolidated affiliates.

### Marketing and Advertising Costs

The Company expenses its advertising and marketing costs as incurred. The costs of tangible assets used in advertising campaigns are recorded as fixed assets or deferred advertising costs and amortized as advertising costs over the shorter of the useful life of the asset or the advertising campaign. The Company has several long-term sponsorship arrangements. Payments related to these arrangements are deferred and expensed over the term of the arrangement. Marketing and advertising expenses included within selling, general and administrative expense for the years ended December 31, 2013, 2012, and 2011 were $195 million, $197 million, and $127 million respectively.

### Business Combinations

The Company accounts for its business combinations in accordance with ASC 805, *Business Combinations,* or ASC 805. ASC 805 requires an acquirer to recognize and measure in its financial statements the identifiable assets acquired, the liabilities assumed, and any noncontrolling interest in the acquiree at fair value at the acquisition date. It also recognizes and measures the goodwill acquired or a gain from a bargain purchase in the business combination and determines what information to disclose to enable users of an entity's financial statements to evaluate the nature and financial effects of the business combination. In addition, transaction costs are expensed as incurred.

### Use of Estimates

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements, disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from these estimates.

In recording transactions and balances resulting from business operations, NRG uses estimates based on the best information available. Estimates are used for such items as plant depreciable lives, tax provisions, uncollectible accounts, actuarially determined benefit costs, and the valuation of energy commodity contracts, environmental liabilities, legal costs incurred in connection with recorded loss contingencies, and assets acquired and liabilities assumed in business combinations, among others. In addition, estimates are used to test long-lived assets and goodwill for impairment and to determine the fair value of impaired assets. As better information becomes available or actual amounts are determinable, the recorded estimates are revised. Consequently, operating results can be affected by revisions to prior accounting estimates.

### Reclassifications

Certain prior-year amounts have been reclassified for comparative purposes.

128

*Recent Accounting Developments*

*ASU 2011-11* - Effective January 1, 2013, the Company adopted the provisions of ASU No. 2011-11, *Balance Sheet (Topic 210) Disclosures about Offsetting Assets and Liabilities*, or ASU No. 2011-11, and began providing enhanced disclosures regarding the effect or potential effect of netting arrangements on an entity's financial position by improving information about financial instruments and derivative instruments that either (1) offset in accordance with either ASC 210-20-45 or ASC 810-20-45 or (2) are subject to an enforceable master netting arrangement or similar agreement, irrespective of whether they are offset. Reporting entities are required to disclose both gross and net information about both instruments and transactions eligible for offset in the statement of financial position and instruments and transactions subject to an agreement similar to a master netting arrangement. The disclosures required by ASU No. 2011-11 are required to be adopted retroactively. As this guidance provides only disclosure requirements, the adoption of this standard did not impact the Company's results of operations, cash flows or financial position.

*ASU 2013-02* - Effective January 1, 2013, the Company adopted the provisions of ASU No. 2013-02, *Other Comprehensive Income (Topic 220) Reporting of Amounts Reclassified Out of Accumulated Other Comprehensive Income*, or ASU No. 2013-02, and began reporting the effect of significant reclassifications out of accumulated other comprehensive income on the respective line items in net income within the notes to the financial statements if the amount being reclassified is required under U.S. GAAP to be reclassified in its entirety to net income in the same reporting period. For other amounts not required by U.S. GAAP to be reclassified in their entirety to net income in the same reporting period, an entity is required to cross-reference other disclosures which provide additional information about the amounts. The provisions of ASU No. 2013-02 are required to be adopted prospectively. As this guidance provides only presentation requirements, the adoption of this standard did not impact the Company's results of operations, cash flows or financial position.

*Other* - The following accounting standard was issued in 2013 and was adopted January 1, 2014:

•   *ASU 2013-11* - In July 2013, the FASB issued ASU No. 2013-11, *Income Taxes (Topic 740) Presentation of an Unrecognized Tax Benefit When a Net Operating Loss Carryforward, a Similar Tax Loss, or a Tax Credit Carryforward Exists*, or ASU No. 2013-11. The amendments of ASU 2013-11 requires an entity to present an unrecognized tax benefit, or a portion of an unrecognized tax benefit, as a reduction of a deferred tax asset for a net operating loss, or NOL, a similar tax loss or tax credit carryforwards rather than a liability when the uncertain tax position would reduce the NOL or other carryforward under the tax law of the applicable jurisdiction and the entity intends to use the deferred tax asset for that purpose. The guidance is effective for fiscal years, and interim periods within those years, beginning after December 15, 2013 with early adoption permitted. The Company adopted this standard effective December 31, 2013. The adoption of this standard did not impact the Company's results of operations or cash flows as the unrecognized tax benefits relate to state issues and the Company either has no NOL's or the NOL's are limited for that particular jurisdiction.

## Note 3 — Business Acquisitions and Dispositions

*2013 Acquisitions*

**Pending Acquisition** — On October 18, 2013, the Company entered into an agreement to acquire substantially all of the assets of Edison Mission Energy, or EME. EME, through its subsidiaries and affiliates, owns, operates, and leases a portfolio of 8,000 MW consisting of wind energy facilities and coal- and gas-fired generating facilities. On December 17, 2012, EME and certain of its direct and indirect subsidiaries filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, or the Bankruptcy Code. EME was deconsolidated from its parent company, Edison International, for financial statement purposes but not for tax purposes on December 17, 2012. On May 2, 2013, certain other subsidiaries of EME filed voluntary petitions for relief under the Bankruptcy Code.

The Company expects to pay an aggregate purchase price of $2.6 billion (subject to adjustment), which will consist of 12,671,977 shares of NRG common stock (valued at $350 million based upon the volume-weighted average trading price over the 20 trading days prior to October 18, 2013) with the balance to be paid in cash. The Company expects to fund the net cash portion of the purchase price using a combination of cash on hand, including acquired cash on hand of $1.1 billion, and approximately $700 million in newly-issued corporate debt. The Company also expects to assume debt related to acquired project assets of approximately $1.5 billion, which will be non-recourse to NRG.

In connection with the transaction, NRG has agreed to certain conditions with the parties to the Powerton and Joliet, or POJO, sale-leaseback transaction subject to which an NRG subsidiary will assume the POJO leveraged leases and NRG will guarantee the remaining payments under each lease. In connection with this agreement, NRG has committed to fund up to $350 million in capital expenditures for plant modifications at Powerton and Joliet to install controls to comply with MATS.

The acquisition is subject to customary conditions, including approval of the U.S. Bankruptcy Court for the Northern District of Illinois and required regulatory approvals, and is expected to close by the end of the first quarter of 2014.  Under certain circumstances, including if EME enters into an alternative transaction, NRG will receive a cash fee of $65 million plus expense reimbursement.  There are no assurances that the conditions to the acquisition of EME will be satisfied, that EME will not enter into an alternative transaction, or that the acquisition of EME will be consummated on the terms agreed to, if at all.

*Energy Systems* — On December 31, 2013, NRG Energy Center Omaha Holdings, LLC, an indirect wholly owned subsidiary of NRG Yield LLC, acquired 100% of Energy Systems Company, or Energy Systems, for approximately $120 million. The acquisition was financed from cash on hand. Energy Systems is an operator of steam and chilled thermal facilities that provides heating and cooling services to nonresidential customers in Omaha, Nebraska. The acquisition was recorded as a business combination under ASC 805, with identifiable assets acquired and liabilities assumed provisionally recorded at their estimated fair values on the acquisition date. The purchase price was primarily allocated to property, plant and equipment of $60 million, customer relationships of $59 million, and working capital of $1 million. The initial accounting for the business combination is not complete because the evaluations necessary to assess the fair values of certain net assets acquired and the amount of goodwill to be recognized are still in process. The provisional amounts are subject to revision until the evaluations are completed to the extent that additional information is obtained about the facts and circumstances that existed as of the acquisition date.

The provisional fair values of the intangible assets at the acquisition date were measured primarily based on significant inputs that are not observable in the market and thus represent a Level 3 measurement as defined in ASC 820. Significant inputs were as follows:

•   *Customer relationships* - The customer relationships were valued using a variation of the income approach. Under this approach, the present value of the expected future cash flows resulting from existing customer relationships, considering attrition and charges for contributory assets (such as working capital, fixed assets, and workforce) utilized in the business were estimated and then discounted back at an integrated utility peer group's weighted average cost of capital adjusted to be consistent with the risk inherent in the cash flows. The customer relationships are amortized to depreciation and amortization expense, on a straight-line basis, over 33 years.

Significant considerations in determining fair value measurements as defined in ASC 820 of the assets acquired and liabilities assumed are as follows:

•   *Property, plant & equipment* - The fair value of property, plant and equipment acquired were valued utilizing the cost approach. Under this approach, the fair value approximates the current cost of replacing an asset with another of equivalent economic utility adjusted for functional obsolescence and physical depreciation.

*Gregory* — On August 7, 2013, NRG Texas Gregory, LLC, a wholly owned subsidiary of NRG, acquired Gregory Power Partners, L.P. for approximately $245 million in cash, net of $32 million cash acquired. Gregory is a cogeneration plant located in Corpus Christi, Texas, which has generation capacity of 388 MW and steam capacity of 160 MWt. The Gregory cogeneration plant provides steam, processed water and a small percentage of its electrical generation to the Corpus Christi Sherwin Alumina plant. The majority of the plant's generation is available for sale in the ERCOT market. The acquisition was recorded as a business combination under ASC 805, with identifiable assets acquired and liabilities assumed provisionally recorded at their estimated fair values on the acquisition date. The purchase price was provisionally allocated to property, plant, and equipment of $248 million, current assets of $13 million, and other liabilities of $16 million. The initial accounting for the business combination is not complete because the evaluations necessary to assess the fair value of certain net assets acquired are still in process. The provisional amounts are subject to revision until the evaluations are completed to the extent that additional information is obtained about the facts and circumstances that existed as of the acquisition date.

Significant considerations in determining fair value measurements as defined in ASC 820 of the assets acquired and liabilities assumed are as follows:

•   *Property, plant & equipment* - The fair value of property, plant and equipment acquired were valued utilizing the cost approach. Under this approach, the fair value approximates the current cost of replacing an asset with another of equivalent economic utility adjusted for functional obsolescence and physical depreciation.

130

*2012 Acquisitions*

**GenOn Energy, Inc.** — On December 14, 2012, NRG acquired GenOn Energy, Inc., or GenOn.  GenOn, a generator of wholesale electricity, has baseload, intermediate and peaking power generation facilities using coal, natural gas and oil, totaling approximately 21,440 MW. The Company issued, as consideration for the acquisition, 0.1216 shares of NRG common stock for each outstanding share of GenOn, including restricted stock units outstanding, on the acquisition date, except for fractional shares which were paid in cash.  The Company issued approximately 93.9 million shares of NRG common stock, or 29% of total common shares outstanding following the closing of the transaction. The acquisition was recorded as a business combination under ASC 805, with identifiable assets acquired and liabilities assumed provisionally recorded at their estimated fair values on the acquisition date. The accounting for the GenOn acquisition was completed on December 13, 2013 at which point the fair values became final. The provisional amounts were subject to revision until the evaluations were completed to the extent that additional information was obtained about the facts and circumstances that existed as of the acquisition date. Any changes made to the fair value assessments affected the gain on bargain purchase.

The following table summarizes the provisional amounts recognized for assets acquired and liabilities assumed as of the acquisition date as well as adjustments made through December 13, 2013 to the amounts initially recorded in 2012 due to the ongoing evaluation of initial estimates. The measurement period adjustments were recorded as an adjustment to the gain on bargain purchase and did not have a significant impact on the Company's consolidated cash flows or financial position in any period. The purchase price of $2.2 billion was allocated as follows:

| (In millions) | Amounts Recognized as of Acquisition Date (as previously reported) | | Measurement Period Adjustments | | Amounts Recognized as of Acquisition Date (as adjusted) | |
|---|---|---|---|---|---|---|
| **Assets** | | | | | | |
| Cash | $ | 983 | $ | — | $ | 983 |
| Current and non-current assets | | 1,385 | | 28 | | 1,413 |
| Property, plant and equipment | | 3,936 | | (115) | | 3,821 |
| Derivative assets | | 1,157 | | — | | 1,157 |
| Deferred income taxes | | 2,265 | | (58) | | 2,207 |
| Total assets acquired | $ | 9,726 | $ | (145) | $ | 9,581 |
| | | | | | | |
| **Liabilities** | | | | | | |
| Current and non-current liabilities | $ | 1,312 | $ | 54 | $ | 1,366 |
| Out-of-market contracts and leases | | 1,064 | | 62 | | 1,126 |
| Derivative liabilities | | 399 | | — | | 399 |
| Long-term debt and capital leases | | 4,203 | | 3 | | 4,206 |
| Total liabilities assumed | | 6,978 | | 119 | | 7,097 |
| Net assets acquired | | 2,748 | | (264) | | 2,484 |
| Consideration paid | | 2,188 | | | | 2,188 |
| Gain on bargain purchase | $ | 560 | $ | (264) | $ | 296 |

The measurement period adjustments for property, plant and equipment and out-of market liabilities primarily reflect revisions of various estimates based on additional information available. In addition, measurement period adjustments were recorded for additional environmental reserves resulting from further review and revisions to various estimates. The difference between the historical tax basis of the assets and liabilities over the net amount assigned to the assets and liabilities in acquisition accounting was recorded as a net deferred tax asset. In addition, the deferred tax assets associated with net operating losses and other deferred tax benefits were adjusted to reflect the amount expected to be realized in the post-acquisition period.

*2012 Dispositions*

**Agua Caliente** — On January 18, 2012, the Company completed the sale of a 49% interest in NRG Solar AC Holdings LLC, the indirect owner of the Agua Caliente project, to MidAmerican Energy Holdings Company, or MidAmerican. A majority of the $122 million of cash consideration received at closing represented 49% of construction costs funded by NRG's equity contributions. The excess of the consideration over the carrying value of the divested interest was recorded to additional paid-in capital. MidAmerican will fund its proportionate share of future equity contributions and other credit support for the project. NRG continues to hold a majority interest in and consolidate the project.

*Saale Energie GmbH* — On July 17, 2012, the Company completed the sale of its 100% interest in Saale Energie GmbH, or SEG, which holds a 41.9% interest in Kraftwerke Schkopau GbR and a 44.4% interest in Kraftwerke Schkopau Betriebsgesllschaft mbH, collectively, Schkopau. Schkopau holds a fixed 400 MW participation in the 900 MW Schkopau Power Station located in Germany. In connection with the sale of Schkopau, NRG entered into a foreign currency swap contract to hedge the impact of exchange rate fluctuations on the sale proceeds of €141 million. The Company received cash consideration, net of selling expenses, of $174 million, which included $4 million related to the settlement of the swap contract that was recorded as a gain within Other income, net in the quarter ended September 30, 2012. The cash consideration approximated the book value of the net assets, including cash of $38 million, on the date of the sale.

### 2011 Acquisitions

*Energy Plus* — On September 30, 2011, NRG acquired Energy Plus for $194 million in cash, net of $5 million cash acquired, funded from cash on hand. Energy Plus is a retail electricity provider with 188,000 customers as of December 31, 2011, concentrated in the Northeast markets, and a unique sales channel involving exclusive loyalty and affinity program partnerships. The acquisition was recorded as a business combination under ASC 805, with identifiable assets acquired and liabilities assumed provisionally recorded at their estimated fair values on the acquisition date. The purchase price was primarily allocated to customer relationships of $63 million, marketing partnerships of $88 million, trade names of $10 million and goodwill of $29 million. The factors that resulted in goodwill arising from the acquisition include the revenues associated with expanding the Energy Plus retail business and its unique sales channel in new regions, expanding its loyalty and affinity program partnerships and the synergies associated with combining the business with NRG's generation assets. The accounting for the Energy Plus acquisition was completed as of March 31, 2012, at which point the provisional fair values became final with no material changes.

*Solar Acquisitions* — During the year ended December 31, 2011, NRG acquired stakes in three Utility Scale Solar facilities for approximately $165 million in cash consideration, as part of the Company's initiative to capture opportunities for future growth in renewables. Subsequent to the acquisition dates in 2011, NRG made capital contributions into these projects of $868 million. In addition, NRG has a commitment to contribute additional amounts into the projects, comprised of $66 million in letters of credit as of December 31, 2013. The Company may increase its letters of credit to replace the restricted cash at its discretion. NRG's minority partners had contributed approximately $413 million of equity subsequent to the acquisition through December 31, 2013 and had additional equity commitments of $64 million as of December 31, 2013. These acquisitions were recorded as business combinations under ASC 805, with identifiable assets acquired and liabilities assumed provisionally recorded at their estimated fair values on the acquisition date.

The acquisitions of these three solar facilities are further described below:

*California Valley Solar Ranch* — On September 30, 2011, NRG Solar LLC, a wholly-owned subsidiary of NRG, acquired 100% of the 250 MW California Valley Solar Ranch project, or CVSR, in eastern San Luis Obispo County, California. During the second quarter of 2012, the Company met the conditions necessary to permit loan disbursements under the CVSR Financing Agreement, as discussed in Note 12, *Debt and Capital Leases*. Operations commenced on the first 22 MW phase in September 2012 and 105 MWs for Phases 2 and 4 in December 2012. For the completion of the final phase, 21 MWs commenced operation in the third quarter of 2013 and 102 MWs commenced operation in October 2013. Power generated from CVSR is sold to PG&E under a 25 year PPA.

*Agua Caliente* — On August 5, 2011, NRG, through its wholly-owned subsidiary, NRG Solar PV LLC, acquired 100% of the 290 MW Agua Caliente solar project in Yuma, AZ. On January 18, 2012, the Company completed the sale of a 49% interest to MidAmerican Energy Holdings Company as discussed above. Power generated from Agua Caliente is sold to PG&E under a 25 year PPA. Full commercial operations of the entire 290 MW project was achieved as of September 30, 2013.

*Ivanpah* — On April 5, 2011, NRG acquired a 50.1% stake in the 378 MW Ivanpah Solar Electric Generation System, or Ivanpah, from BrightSource Energy, Inc., or BSE. BSE maintained a 21.8% interest in Ivanpah and the remaining 28.1% was acquired by a wholly-owned subsidiary of Google. Ivanpah is composed of three separate facilities - Ivanpah 1 (126 MW), Ivanpah 2 (133 MW), and Ivanpah 3 (133 MW). Ivanpah achieved operations as of December 31, 2013. Power generated from Ivanpah is sold to Southern California Edison and Pacific Gas and Electric, under multiple 20 to 25 year PPAs.

The purchase price for these acquisitions, considered business combinations, was primarily allocated to $767 million of property, plant and equipment, $489 million of accrued expenses, $60 million of other assets, including restricted cash, and $19 million of other liabilities. The accounting for these acquisitions was completed as of March 31, 2012, at which point the provisional fair values became final with no material changes.

**Note 4 — Fair Value of Financial Instruments**

For cash and cash equivalents, funds deposited by counterparties, accounts and other receivables, accounts payable, restricted cash, and cash collateral paid and received in support of energy risk management activities, the carrying amount approximates fair value because of the short-term maturity of those instruments and are classified as Level 1 within the fair value hierarchy.

The estimated carrying values and fair values of NRG's recorded financial instruments not carried at fair market value are as follows:

| | As of December 31, | | | |
| | 2013 | | 2012 | |
| | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
| | (In millions) | | | |
| **Assets** | | | | |
| Notes receivable [(a)] | $ 99 | $ 99 | $ 88 | $ 88 |
| **Liabilities** | | | | |
| Long-term debt, including current portion | 16,804 | 17,222 | 15,866 | 16,492 |

(a) Includes the current portion of notes receivable which is recorded in prepayments and other current assets on the Company's consolidated balance sheets.

The fair value of the Company's publicly-traded long-term debt is based on quoted market prices and is classified as Level 2 within the fair value hierarchy. The fair value of debt securities, non publicly-traded long-term debt, and certain notes receivable of the Company are based on expected future cash flows discounted at market interest rates, or current interest rates for similar instruments with equivalent credit quality and are classified as Level 3 within the fair value hierarchy.

*Fair Value Accounting under ASC 820*

ASC 820 establishes a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value into three levels as follows:

- Level 1 — quoted prices (unadjusted) in active markets for identical assets or liabilities that the Company has the ability to access as of the measurement date. NRG's financial assets and liabilities utilizing Level 1 inputs include active exchange-traded securities, energy derivatives, and trust fund investments.

- Level 2 — inputs other than quoted prices included within Level 1 that are directly observable for the asset or liability or indirectly observable through corroboration with observable market data. NRG's financial assets and liabilities utilizing Level 2 inputs include fixed income securities, exchange-based derivatives, and over the counter derivatives such as swaps, options and forward contracts.

- Level 3 — unobservable inputs for the asset or liability only used when there is little, if any, market activity for the asset or liability at the measurement date. NRG's financial assets and liabilities utilizing Level 3 inputs include infrequently-traded, non-exchange-based derivatives and commingled investment funds, and are measured using present value pricing models.

In accordance with ASC 820, the Company determines the level in the fair value hierarchy within which each fair value measurement in its entirety falls, based on the lowest level input that is significant to the fair value measurement in its entirety.

*Recurring Fair Value Measurements*

Debt securities, equity securities, and trust fund investments, which are comprised of various U.S. debt and equity securities, and derivative assets and liabilities, are carried at fair market value.

The following tables present assets and liabilities measured and recorded at fair value on the Company's consolidated balance sheets on a recurring basis and their level within the fair value hierarchy:

| | As of December 31, 2013 | | | |
| | Fair Value | | | |
| | Level 1 | Level 2 | Level 3 | Total |
| | (In millions) | | | |
| Investment in available-for-sale securities (classified within other non-current assets): | | | | |
| Debt securities | $ — | $ — | $ 16 | $ 16 |
| Available-for-sale securities | 2 | — | — | 2 |
| Other [a] | 37 | — | 10 | 47 |
| Nuclear trust fund investments: | | | | |
| Cash and cash equivalents | 26 | — | — | 26 |
| U.S. government and federal agency obligations | 40 | 5 | — | 45 |
| Federal agency mortgage-backed securities | — | 62 | — | 62 |
| Commercial mortgage-backed securities | — | 14 | — | 14 |
| Corporate debt securities | — | 70 | — | 70 |
| Equity securities | 276 | — | 56 | 332 |
| Foreign government fixed income securities | — | 2 | — | 2 |
| Other trust fund investments: | | | | |
| U.S. government and federal agency obligations | 1 | — | — | 1 |
| Derivative assets: | | | | |
| Commodity contracts | 346 | 1,126 | 147 | 1,619 |
| Interest rate contracts | — | 20 | — | 20 |
| Total assets | $ 728 | $ 1,299 | $ 229 | $ 2,256 |
| Derivative liabilities: | | | | |
| Commodity contracts | $ 216 | $ 831 | $ 134 | $ 1,181 |
| Interest rate contracts | — | 69 | — | 69 |
| Total liabilities | $ 216 | $ 900 | $ 134 | $ 1,250 |

(a) Consists primarily of mutual funds held in a Rabbi Trust for non-qualified deferred compensation plans for some key and highly compensated employees and a total return swap that does not meet the definition of a derivative.

| | As of December 31, 2012 | | | |
| | Fair Value | | | |
| | Level 1 | Level 2 | Level 3 | Total |
| | (In millions) | | | |
| Investment in available-for-sale securities (classified within other non-current assets): | | | | |
| Debt securities | $  — | $  — | $  12 | $  12 |
| Other [a] | 22 | — | — | 22 |
| Nuclear trust fund investments: | | | | |
| Cash and cash equivalents | 10 | — | — | 10 |
| U.S. government and federal agency obligations | 33 | — | — | 33 |
| Federal agency mortgage-backed securities | — | 59 | — | 59 |
| Commercial mortgage-backed securities | — | 9 | — | 9 |
| Corporate debt securities | — | 80 | — | 80 |
| Equity securities | 233 | — | 47 | 280 |
| Foreign government fixed income securities | — | 2 | — | 2 |
| Other trust fund investments: | | | | |
| U.S. government and federal agency obligations | 1 | — | — | 1 |
| Derivative assets: | | | | |
| Commodity contracts | 1,457 | 1,711 | 135 | 3,303 |
| Interest rate contracts | — | 3 | — | 3 |
| Total assets | $  1,756 | $  1,864 | $  194 | $  3,814 |
| Derivative liabilities: | | | | |
| Commodity contracts | $  1,144 | $  1,047 | $  147 | $  2,338 |
| Interest rate contracts | — | 143 | — | 143 |
| Total liabilities | $  1,144 | $  1,190 | $  147 | $  2,481 |

(a)    Consists primarily of mutual funds held in a Rabbi Trust for non-qualified deferred compensation plans for some key and highly compensated employees.

There have been no transfers during the year ended December 31, 2013, between Levels 1 and 2. The following tables reconcile, for the years ended December 31, 2013, and 2012, the beginning and ending balances for financial instruments that are recognized at fair value in the consolidated financial statements at least annually using significant unobservable inputs:

| | For the Year Ended December 31, 2013 | | | | |
| | Fair Value Measurement Using Significant Unobservable Inputs (Level 3) | | | | |
| | Debt Securities | Other | Trust Fund Investments | Derivatives [a] | Total |
| | (In millions) | | | | |
| Beginning balance as of January 1, 2013 | $  12 | $  — | $  47 | $  (12) | $  47 |
| Total gains and losses (realized/unrealized): | | | | | |
| Included in OCI | 4 | — | — | — | 4 |
| Included in earnings | — | — | — | (12) | (12) |
| Included in nuclear decommissioning obligations | — | — | 10 | — | 10 |
| Purchases | — | 10 | 2 | 4 | 16 |
| Sales | — | — | (3) | — | (3) |
| Transfers into Level 3 [b] | — | — | — | 6 | 6 |
| Transfers out of Level 3 [b] | — | — | — | 27 | 27 |
| Ending balance as of December 31, 2013 | $  16 | $  10 | $  56 | $  13 | $  95 |
| Gains for the period included in earnings attributable to the change in unrealized gains or losses relating to assets or liabilities still held as of December 31, 2013 | $  — | $  — | $  — | $  1 | $  1 |

(a)    Consists of derivatives assets and liabilities, net.

(b)    Transfers in/out of Level 3 are related to the availability of external broker quotes, and are valued as of the end of the reporting period. All transfers in/out are with Level 2.

135

| | For the Year Ended December 31, 2012 | | | |
| | Fair Value Measurement Using Significant Unobservable Inputs (Level 3) | | | |
| | Debt Securities | Trust Fund Investments | Derivatives [a] | Total |
| | (In millions) | | | |
| Beginning balance as of January 1, 2012 | $ 7 | $ 42 | $ 8 | $ 57 |
| Total gains and losses (realized/unrealized): | | | | |
| Included in OCI | 5 | — | — | 5 |
| Included in earnings | — | — | (13) | (13) |
| Included in nuclear decommissioning obligations | — | 5 | — | 5 |
| Purchases | — | — | 8 | 8 |
| Contracts acquired in GenOn acquisition | — | — | 18 | 18 |
| Transfers into Level 3 [b] | — | — | (33) | (33) |
| Transfer out of Level 3 [b] | — | — | — | — |
| Ending balance as of December 31, 2012 | $ 12 | $ 47 | $ (12) | $ 47 |
| Losses for the period included in earnings attributable to the change in unrealized gains or losses relating to assets or liabilities still held as of December 31, 2012 | $ — | $ — | $ (3) | $ (3) |

(a) Consists of derivatives assets and liabilities, net.

(b) Transfers in/out of Level 3 are related to the availability of external broker quotes, and are valued as of the end of the reporting period. All transfers in/out are with Level 2.

Realized and unrealized gains and losses included in earnings that are related to the energy derivatives are recorded in operating revenues and cost of operations.

*Non-derivative fair value measurements*

NRG's investments in debt securities are classified as Level 3 and consist of non-traded debt instruments that are valued based on third-party market value assessments.

The trust fund investments are held primarily to satisfy NRG's nuclear decommissioning obligations. These trust fund investments hold debt and equity securities directly and equity securities indirectly through commingled funds. The fair values of equity securities held directly by the trust funds are based on quoted prices in active markets and are categorized in Level 1. In addition, U.S. government and federal agency obligations are categorized as Level 2 because they trade in a highly liquid and transparent market. The fair values of corporate debt securities are based on evaluated prices that reflect observable market information, such as actual trade information of similar securities, adjusted for observable differences and are categorized in Level 2. Certain equity securities, classified as commingled funds, are analogous to mutual funds, are maintained by investment companies, and hold certain investments in accordance with a stated set of fund objectives. The fair value of the equity securities classified as commingled funds are based on net asset values per fund share (the unit of account), derived from the quoted prices in active markets of the underlying equity securities. However, because the shares in the commingled funds are not publicly quoted, not traded in an active market and are subject to certain restrictions regarding their purchase and sale, the commingled funds are categorized in Level 3. See also Note 6, *Nuclear Decommissioning Trust Fund.*

136

### Derivative fair value measurements

A portion of NRG's contracts are exchange-traded contracts with readily available quoted market prices. A majority of NRG's contracts are non-exchange-traded contracts valued using prices provided by external sources, primarily price quotations available through brokers or over-the-counter and on-line exchanges. For the majority of NRG markets, the Company receives quotes from multiple sources. To the extent that NRG receives multiple quotes, the Company's prices reflect the average of the bid-ask mid-point prices obtained from all sources that NRG believes provide the most liquid market for the commodity. If the Company receives one quote, then the mid-point of the bid-ask spread for that quote is used. The terms for which such price information is available vary by commodity, region and product. A significant portion of the fair value of the Company's derivative portfolio is based on price quotes from brokers in active markets who regularly facilitate those transactions and the Company believes such price quotes are executable. The Company does not use third party sources that derive price based on proprietary models or market surveys. The remainder of the assets and liabilities represents contracts for which external sources or observable market quotes are not available. These contracts are valued based on various valuation techniques including but not limited to internal models based on a fundamental analysis of the market and extrapolation of observable market data with similar characteristics. Contracts valued with prices provided by models and other valuation techniques make up 9% of derivative assets and 11% of derivative liabilities. The fair value of each contract is discounted using a risk free interest rate. In addition, the Company applies a credit reserve to reflect credit risk which is calculated based on published default probabilities. To the extent that NRG's net exposure under a specific master agreement is an asset, the Company uses the counterparty's default swap rate. If the exposure under a specific master agreement is a liability, the Company uses NRG's default swap rate. The credit reserve is added to the discounted fair value to reflect the exit price that a market participant would be willing to receive to assume NRG's liabilities or that a market participant would be willing to pay for NRG's assets. As of December 31, 2013, the credit reserve resulted in a $1 million decrease in fair value which is reflected as a $1 million loss in operating revenue and cost of operations.

The fair values in each category reflect the level of forward prices and volatility factors as of December 31, 2013, and may change as a result of changes in these factors. Management uses its best estimates to determine the fair value of commodity and derivative contracts NRG holds and sells. These estimates consider various factors including closing exchange and over-the-counter price quotations, time value, volatility factors and credit exposure. It is possible, however, that future market prices could vary from those used in recording assets and liabilities from energy marketing and trading activities and such variations could be material.

Under the guidance of ASC 815, entities may choose to offset cash collateral paid or received against the fair value of derivative positions executed with the same counterparties under the same master netting agreements. The Company has chosen not to offset positions as defined in ASC 815. As of December 31, 2013, the Company recorded $276 million of cash collateral paid and $63 million of cash collateral received on its balance sheet.

### Concentration of Credit Risk

In addition to the credit risk discussion as disclosed in Note 2, *Summary of Significant Accounting Policies*, the following item is a discussion of the concentration of credit risk for the Company's financial instruments. Credit risk relates to the risk of loss resulting from non-performance or non-payment by counterparties pursuant to the terms of their contractual obligations. The Company monitors and manages credit risk through credit policies that include: (i) an established credit approval process; (ii) a daily monitoring of counterparties' credit limits; (iii) the use of credit mitigation measures such as margin, collateral, prepayment arrangements, or volumetric limits; (iv) the use of payment netting agreements; and (v) the use of master netting agreements that allow for the netting of positive and negative exposures of various contracts associated with a single counterparty. Risks surrounding counterparty performance and credit could ultimately impact the amount and timing of expected cash flows. The Company seeks to mitigate counterparty risk by having a diversified portfolio of counterparties. The Company also has credit protection within various agreements to call on additional collateral support if and when necessary. Cash margin is collected and held at NRG to cover the credit risk of the counterparty until positions settle.

As of December 31, 2013, counterparty credit exposure, excluding credit risk exposure under certain long term agreements, was $813 million and NRG held collateral (cash and letters of credit) against those positions of $5 million, resulting in a net exposure of $808 million. Approximately 87% of the Company's exposure before collateral is expected to roll off by the end of 2015. Counterparty credit exposure is valued through observable market quotes and discounted at a risk free interest rate. The following tables highlight net counterparty credit exposure by industry sector and by counterparty credit quality. Net counterparty credit exposure is defined as the aggregate net asset position for NRG with counterparties where netting is permitted under the enabling agreement and includes all cash flow, mark-to-market and NPNS, and non-derivative transactions. The exposure is shown net of collateral held, and includes amounts net of receivables or payables.

| Category | Net Exposure (a) (% of Total) |
|---|---|
| Financial institutions | 52% |
| Utilities, energy merchants, marketers and other | 29 |
| Coal and emissions | 1 |
| ISOs | 18 |
| Total | 100% |

| Category | Net Exposure [a] (% of Total) |
|---|---|
| Investment grade | 94% |
| Non-Rated | 6 |
| Total | 100% |

(a)   Counterparty credit exposure excludes uranium and coal transportation contracts because of the unavailability of market prices.

NRG has counterparty credit risk exposure to certain counterparties, each of which represent more than 10% of total net exposure discussed above. The aggregate of such counterparties' exposure was $349 million. Changes in hedge positions and market prices will affect credit exposure and counterparty concentration. Given the credit quality, diversification and term of the exposure in the portfolio, NRG does not anticipate a material impact on the Company's financial position or results of operations from nonperformance by any of NRG's counterparties.

Counterparty credit exposure described above excludes credit risk exposure under certain long term agreements, including California tolling agreements, South Central load obligations, solar PPAs, and a coal supply agreement. As external sources or observable market quotes are not available to estimate such exposure, the Company values these contracts based on various techniques including, but not limited to, internal models based on a fundamental analysis of the market and extrapolation of observable market data with similar characteristics. Based on these valuation techniques, as of December 31, 2013, aggregate credit risk exposure managed by NRG to these counterparties was approximately $2.3 billion, including $797 million related to assets of NRG Yield, Inc., for the next five years. This amount excludes potential credit exposures for projects with long term PPAs that have not reached commercial operations. The majority of these power contracts are with utilities or public power entities with strong credit quality and public utility commission or other regulatory support. However, such regulated utility counterparties can be impacted by changes in government regulations, which NRG is unable to predict. In the case of the coal supply agreement, NRG holds a lien against the underlying asset which significantly reduces the risk of loss.

### Retail Customer Credit Risk

NRG is exposed to retail credit risk through the Company's retail electricity providers, which serve C&I customers and the Mass market. Retail credit risk results when a customer fails to pay for services rendered. The losses may result from both nonpayment of customer accounts receivable and the loss of in-the-money forward value. NRG manages retail credit risk through the use of established credit policies that include monitoring of the portfolio and the use of credit mitigation measures such as deposits or prepayment arrangements.

As of December 31, 2013, the Company's retail customer credit exposure to C&I customers was diversified across many customers and various industries, as well as government entities.

NRG is also exposed to retail customer credit risk relating to its Mass customers, which may result in a write-off of bad debt. The Company's bad debt expense was $67 million and $45 million for the years ending December 31, 2013 and 2012, respectively. Current economic conditions may affect the Company's customers' ability to pay bills in a timely manner, which could increase customer delinquencies and may lead to an increase in bad debt expense.

**Note 5 — Accounting for Derivative Instruments and Hedging Activities**

ASC 815 requires NRG to recognize all derivative instruments on the balance sheet as either assets or liabilities and to measure them at fair value each reporting period unless they qualify for a NPNS exception. NRG may elect to designate certain derivatives as cash flow hedges, if certain conditions are met, and defer the effective portion of the change in fair value of the derivatives to accumulated OCI, until the hedged transactions occur and are recognized in earnings. The ineffective portion of a cash flow hedge is immediately recognized in earnings.

For derivatives designated as hedges of the fair value of assets or liabilities, the changes in fair value of both the derivative and the hedged transaction are recorded in current earnings.

For derivatives that are not designated as cash flow hedges or do not qualify for hedge accounting treatment, the changes in the fair value will be immediately recognized in earnings. Certain derivative instruments may qualify for the NPNS exception and are therefore exempt from fair value accounting treatment. ASC 815 applies to NRG's energy related commodity contracts, interest rate swaps, and foreign exchange contracts.

As the Company engages principally in the trading and marketing of its generation assets and Retail Business, some of NRG's commercial activities qualify for hedge accounting. In order for the generation assets to qualify, the physical generation and sale of electricity should be highly probable at inception of the trade and throughout the period it is held, as is the case with the Company's baseload plants. For this reason, many trades in support of NRG's baseload units normally qualify for NPNS or cash flow hedge accounting treatment, and trades in support of NRG's peaking unit's asset optimization will generally not qualify for hedge accounting treatment, with any changes in fair value likely to be reflected on a mark-to-market basis in the statement of operations. Most of the retail load contracts either qualify for the NPNS exception or fail to meet the criteria for a derivative and the majority of the retail supply and fuels supply contracts are recorded under mark-to-market accounting. All of NRG's hedging and trading activities are subject to limits within the Company's Risk Management Policy.

*Energy-Related Commodities*

To manage the commodity price risk associated with the Company's competitive supply activities and the price risk associated with wholesale power sales from the Company's electric generation facilities and retail power sales from the Retail Business, NRG enters into a variety of derivative and non-derivative hedging instruments, utilizing the following:

- Forward contracts, which commit NRG to purchase or sell energy commodities or purchase fuels in the future.

- Futures contracts, which are exchange-traded standardized commitments to purchase or sell a commodity or financial instrument.

- Swap agreements, which require payments to or from counter-parties based upon the differential between two prices for a predetermined contractual, or notional, quantity.

- Option contracts, which convey to the option holder the right but not the obligation to purchase or sell a commodity.

- Extendable swaps, which include a combination of swaps and options executed simultaneously for different periods. This combination of instruments allows NRG to sell out-year volatility through call options in exchange for natural gas swaps with fixed prices in excess of the market price for natural gas at that time. The above-market swap combined with its later-year call option are priced in aggregate at market at the trade's inception.

- Weather and hurricane derivative products used to mitigate a portion of Reliant Energy's lost revenue due to weather.

The objectives for entering into derivative contracts designated as hedges include:

- Fixing the price for a portion of anticipated future electricity sales that provides an acceptable return on the Company's electric generation operations.

- Fixing the price of a portion of anticipated fuel purchases for the operation of NRG's power plants.

- Fixing the price of a portion of anticipated power purchases for the Company's retail sales.

NRG's trading and hedging activities are subject to limits within the Company's Risk Management Policy. These contracts are recognized on the balance sheet at fair value and changes in the fair value of these derivative financial instruments are recognized in earnings.

As of December 31, 2013, NRG's derivative assets and liabilities consisted primarily of the following:

- Forward and financial contracts for the purchase/sale of electricity and related products economically hedging NRG's generation assets' forecasted output or NRG's retail load obligations through 2019.
- Forward and financial contracts for the purchase of fuel commodities relating to the forecasted usage of NRG's generation assets through 2017.
- Cash flow hedge energy-related derivative financial instruments extending through December 2015.

Also, as of December 31, 2013, NRG had other energy-related contracts that did not meet the definition of a derivative instrument or qualified for the NPNS exception and were therefore exempt from fair value accounting treatment as follows:

- Load-following forward electric sale contracts extending through 2026;
- Power Tolling contracts through 2038;
- Coal purchase contract through 2020;
- Power transmission contracts through 2015;
- Natural gas transportation contracts and storage agreements through 2028; and
- Coal transportation contracts through 2020.

### *Interest Rate Swaps*

NRG is exposed to changes in interest rates through the Company's issuance of variable and fixed rate debt. In order to manage the Company's interest rate risk, NRG enters into interest rate swap agreements. As of December 31, 2013, NRG had interest rate derivative instruments on non-recourse debt extending through 2030, the majority of which are designated as cash flow hedges.

### *Volumetric Underlying Derivative Transactions*

The following table summarizes the net notional volume buy/(sell) of NRG's open derivative transactions broken out by commodity, excluding those derivatives that qualified for the NPNS exception as of December 31, 2013 and 2012. Option contracts are reflected using delta volume. Delta volume equals the notional volume of an option adjusted for the probability that the option will be in-the-money at its expiration date.

|  |  | Total Volume | |
| --- | --- | --- | --- |
| **Commodity** | **Units** | **December 31, 2013** | **December 31, 2012** |
|  |  | (In millions) | |
| Emissions | Short Ton | — | (1) |
| Coal | Short Ton | 51 | 37 |
| Natural Gas | MMBtu | (166) | (413) |
| Oil | Barrel | 1 | 1 |
| Power | MWh | (27) | (14) |
| Interest | Dollars | $ 1,444 | $ 2,612 |

The decrease in the natural gas position was the result of additional purchases entered into during the year to hedge our retail portfolio as well as the settlement of positions during the period. These amounts were slightly offset by natural gas sales entered into during the year to hedge our conventional power generation. The decrease in the interest rate position was primarily the result of the settlement of interest rate swaps.

140

**Fair Value of Derivative Instruments**

The following table summarizes the fair value within the derivative instrument valuation on the balance sheet:

| | Fair Value | | | |
|---|---|---|---|---|
| | Derivative Assets | | Derivative Liabilities | |
| (In millions) | December 31, 2013 | December 31, 2012 | December 31, 2013 | December 31, 2012 |
| **Derivatives Designated as Cash Flow or Fair Value Hedges**: | | | | |
| Interest rate contracts current | $ — | $ — | $ 35 | $ 29 |
| Interest rate contracts long-term | 14 | 3 | 29 | 96 |
| Commodity contracts current | — | — | 1 | 3 |
| Commodity contracts long-term | — | — | 1 | 1 |
| **Total Derivatives Designated as Cash Flow or Fair Value Hedges** | 14 | 3 | 66 | 129 |
| **Derivatives Not Designated as Cash Flow or Fair Value Hedges**: | | | | |
| Interest rate contracts current | — | — | 4 | 7 |
| Interest rate contracts long-term | 6 | — | 1 | 11 |
| Commodity contracts current | 1,328 | 2,644 | 1,015 | 1,942 |
| Commodity contracts long-term | 291 | 659 | 164 | 392 |
| **Total Derivatives Not Designated as Cash Flow or Fair Value Hedges** | 1,625 | 3,303 | 1,184 | 2,352 |
| **Total Derivatives** | $ 1,639 | $ 3,306 | $ 1,250 | $ 2,481 |

The Company has elected to present derivative assets and liabilities on the balance sheet on a trade-by-trade basis and does not offset amounts at the counterparty master agreement level. In addition, collateral received or paid on the Company's derivative assets or liabilities are recorded on a separate line item on the balance sheet. The following table summarizes the offsetting derivatives by counterparty master agreement level and collateral received or paid:

| | | Gross Amounts Not Offset in the Statement of Financial Position | | |
|---|---|---|---|---|
| | Gross Amounts of Recognized Assets/Liabilities | Derivative Instruments | Cash Collateral (Held)/Posted | Net Amount |
| **As of December 31, 2013** | | (in millions) | | |
| **Commodity contracts:** | | | | |
| Derivative assets | $ 1,619 | $ (1,032) | $ (62) | $ 525 |
| Derivative liabilities | (1,181) | 1,032 | 18 | (131) |
| **Total commodity contracts** | 438 | — | (44) | 394 |
| **Interest rate contracts:** | | | | |
| Derivative assets | 20 | (12) | — | 8 |
| Derivative liabilities | (69) | 12 | — | (57) |
| **Total interest rate contracts** | (49) | — | — | (49) |
| **Total derivative instruments** | $ 389 | $ — | $ (44) | $ 345 |

141

|  | Gross Amounts of Recognized Assets/Liabilities | Gross Amounts Not Offset in the Statement of Financial Position | | Net Amount |
|  |  | Derivative Instruments | Cash Collateral (Held)/Posted |  |
| **As of December 31, 2012** |  | (in millions) | | |
| **Commodity contracts:** |  |  |  |  |
| Derivative assets | $ 3,303 | $ (2,024) | $ (374) | $ 905 |
| Derivative liabilities | (2,338) | 2,024 | 28 | (286) |
| **Total commodity contracts** | 965 | — | (346) | 619 |
| **Interest rate contracts:** |  |  |  |  |
| Derivative assets | 3 | — | — | 3 |
| Derivative liabilities | (143) | — | — | (143) |
| **Total interest rate contracts** | (140) | — | — | (140) |
| **Total derivative instruments** | $ 825 | $ — | $ (346) | $ 479 |

**Accumulated Other Comprehensive Income**

The following tables summarize the effects on NRG's accumulated OCI balance attributable to cash flow hedge derivatives, net of tax:

|  | Year Ended December 31, 2013 | | |
|  | Energy Commodities | Interest Rate | Total |
|  | (In millions) | | |
| Accumulated OCI balance at December 31, 2012 | $ 41 | $ (72) | $ (31) |
| Reclassified from accumulated OCI to income: |  |  |  |
| Due to realization of previously deferred amounts | (51) | 20 | (31) |
| Mark-to-market of cash flow hedge accounting contracts | 9 | 30 | 39 |
| Accumulated OCI balance at December 31, 2013, net of $14 tax | (1) | (22) | (23) |
| Losses expected to be realized from OCI during the next 12 months, net of $8 tax | $ (1) | $ (14) | $ (15) |

There were no gains or losses recognized in income from the ineffective portion of cash flow hedges for the year ended December 31, 2013.

|  | Year Ended December 31, 2012 | | |
|  | Energy Commodities | Interest Rate | Total |
|  | (In millions) | | |
| Accumulated OCI balance at December 31, 2011 | $ 188 | $ (56) | $ 132 |
| Reclassified from accumulated OCI to income: |  |  |  |
| Due to realization of previously deferred amounts | (144) | 23 | (121) |
| Mark-to-market of cash flow hedge accounting contracts | (3) | (39) | (42) |
| Accumulated OCI balance at December 31, 2012, net of $7 tax | $ 41 | $ (72) | $ (31) |
| Losses recognized in income from the ineffective portion of cash flow hedges | $ (51) | $ — | $ (51) |

142

|  | Year Ended December 31, 2011 | | | | |
|  | Energy Commodities | | Interest Rate Contracts | | Total |
|  | (In millions) | | | | |
| Accumulated OCI balance at December 31, 2010 | $ | 488 | $ | (47) | $ | 441 |
| Reclassified from accumulated OCI to income: | | | | | |
| Due to realization of previously deferred amounts | | (374) | | 12 | | (362) |
| Mark-to-market of cash flow hedge accounting contracts | | 74 | | (21) | | 53 |
| Accumulated OCI balance at December 31, 2011, net of $87 tax | $ | 188 | $ | (56) | $ | 132 |
| Gains recognized in income from the ineffective portion of cash flow hedges | $ | 28 | $ | 3 | $ | 31 |

Amounts reclassified from accumulated OCI into income and amounts recognized in income from the ineffective portion of cash flow hedges are recorded to operating revenue for commodity contracts and interest expense for interest rate contracts.

Accounting guidelines require a high degree of correlation between the derivative and the hedged item throughout the period in order to qualify as a cash flow hedge. As of April 30, 2012, the Company's regression analysis for natural gas prices to ERCOT power prices, while positively correlated, did not meet the required threshold for cash flow hedge accounting for calendar year 2012. As a result, the Company de-designated its 2012 ERCOT cash flow hedges as of April 30, 2012, and prospectively marked these derivatives to market through the income statement.

### Impact of Derivative Instruments on the Statement of Operations

Unrealized gains and losses associated with changes in the fair value of derivative instruments not accounted for as cash flow hedges and ineffectiveness of hedge derivatives are reflected in current period earnings.

The following table summarizes the pre-tax effects of economic hedges that have not been designated as cash flow hedges, ineffectiveness on cash flow hedges, and trading activity on NRG's statement of operations. The effect of commodity hedges is included within operating revenues and cost of operations and the effect of interest rate hedges is included in interest expense.

|  | Year Ended December 31, | | | | | |
|  | 2013 | | 2012 | | 2011 | |
|  | (In millions) | | | | | |
| **Unrealized mark-to-market results** | | | | | | |
| Reversal of previously recognized unrealized (gains)/losses on settled positions related to economic hedges | $ | (105) | $ | (247) | $ | 54 |
| Reversal of (gain)/loss positions acquired as part of the Reliant Energy, Green Mountain Energy and GenOn acquisitions | | (357) | | 20 | | 107 |
| Net unrealized gains/(losses) on open positions related to economic hedges | | 177 | | 10 | | (33) |
| (Losses)/gains on ineffectiveness associated with open positions treated as cash flow hedges | | — | | (51) | | 28 |
| Total unrealized mark-to-market (losses)/gains for economic hedging activities | | (285) | | (268) | | 156 |
| Reversal of previously recognized unrealized (gains)/losses on settled positions related to trading activity | | (50) | | (60) | | 21 |
| Net unrealized gains on open positions related to trading activity | | 7 | | 46 | | 42 |
| Total unrealized mark-to-market (losses)/gains for trading activity | | (43) | | (14) | | 63 |
| **Total unrealized (losses)/gains** | $ | (328) | $ | (282) | $ | 219 |

|  | Year Ended December 31, | | | | | |
|  | 2013 | | 2012 | | 2011 | |
|  | (In millions) | | | | | |
| Unrealized (losses)/gains included in operating revenues | $ | (621) | $ | (464) | $ | 388 |
| Unrealized gains/(losses) included in cost of operations | | 293 | | 182 | | (169) |
| **Total impact to statement of operations — energy commodities** | $ | (328) | $ | (282) | $ | 219 |
| **Total impact to statement of operations — interest rate contracts** | $ | 15 | $ | (8) | $ | 2 |

The reversal of gain or loss positions acquired as part of the Reliant Energy, Green Mountain Energy and GenOn acquisitions were valued based upon the forward prices on the acquisition dates. The roll-off amounts were offset by realized gains or losses at the settled prices and are reflected in revenue or cost of operations during the same period.

For the year ended December 31, 2013, the $177 million gain from economic hedge positions was primarily the result of an increase in value of forward sales of natural gas and electricity due to a decrease in forward power and gas prices and an increase in value of forward purchases of coal due to an increase in forward coal prices.

As of June 30, 2013, NRG had interest rate swaps designated as cash flow hedges on the CVSR solar project. The notional amount on the swaps exceeded the actual debt draws on the project. As such, NRG discontinued cash flow hedge accounting for these contracts and $5 million of loss previously deferred in OCI was recognized in earnings for the year ended December 31, 2013.

For the year ended December 31, 2012, the $10 million gain from economic hedge positions was the result of an increase in value of forward sales of natural gas and electricity due to a decrease in forward power and gas prices offset by a decrease in value of forward purchases of coal due to a decrease in forward coal prices.

As of June 30, 2012 NRG had interest rate swaps designated as cash flow hedges on the Alpine solar project. The notional amount of the swaps exceeded the actual debt draws on the project. As such, NRG discontinued cash flow hedge accounting for these contracts and $4 million of loss previously deferred in OCI was recognized in earnings for the year ended December 31, 2012.

**Credit Risk Related Contingent Features**

Certain of the Company's hedging agreements contain provisions that require the Company to post additional collateral if the counterparty determines that there has been deterioration in credit quality, generally termed "adequate assurance" under the agreements, or require the Company to post additional collateral if there were a one notch downgrade in the Company's credit rating. The collateral required for contracts that have adequate assurance clauses that are in net liability positions as of December 31, 2013, was $85 million. The collateral required for contracts with credit rating contingent features that are in a net liability position as of December 31, 2013, was $15 million. The Company is also a party to certain marginable agreements under which it has a net liability position, but the counterparty has not called for the collateral due, of approximately $34 million as of December 31, 2013.

See Note 4, *Fair Value of Financial Instruments,* for discussion regarding concentration of credit risk.

**Note 6 — Nuclear Decommissioning Trust Fund**

NRG's nuclear decommissioning trust fund assets, which are for the decommissioning of STP, are comprised of securities classified as available-for-sale and recorded at fair value based on actively quoted market prices. Although NRG is responsible for managing the decommissioning of its 44% interest in STP, the predecessor utilities that owned STP are authorized by the PUCT to collect decommissioning funds from their ratepayers to cover decommissioning costs on behalf of NRG. NRC requirements determine the decommissioning cost estimate which is the minimum required level of funding. In the event that funds from the ratepayers that accumulate in the nuclear decommissioning trust are ultimately determined to be inadequate to decommission the STP facilities, the utilities will be required to collect through rates charged to rate payers all additional amounts, with no obligation from NRG, provided that NRG has complied with PUCT rules and regulations regarding decommissioning trusts. Following completion of the decommissioning, if surplus funds remain in the decommissioning trusts, any excess will be refunded to the respective ratepayers of the utilities.

NRG accounts for the nuclear decommissioning trust fund in accordance with ASC 980, *Regulated Operations*, or ASC 980 because the Company's nuclear decommissioning activities are subject to approval by the PUCT, with regulated rates that are designed to recover all decommissioning costs and that can be charged to and collected from the ratepayers per PUCT mandate. Since the Company is in compliance with PUCT rules and regulations regarding decommissioning trusts and the cost of decommissioning is the responsibility of the Texas ratepayers, not NRG, all realized and unrealized gains or losses (including other-than-temporary impairments) related to the Nuclear Decommissioning Trust Fund are recorded to the Nuclear Decommissioning Trust Liability and are not included in net income or accumulated other comprehensive income, consistent with regulatory treatment.

The following table summarizes the aggregate fair values and unrealized gains and losses (including other-than-temporary impairments) for the securities held in the trust funds, as well as information about the contractual maturities of those securities.

| (In millions, except otherwise noted) | | As of December 31, 2013 | | | | As of December 31, 2012 | | |
|---|---|---|---|---|---|---|---|---|
| | Fair Value | Unrealized Gains | Unrealized Losses | Weighted-average maturities (in years) | Fair Value | Unrealized Gains [a] | Weighted-average maturities (in years) |
| Cash and cash equivalents | $ 26 | $ — | $ — | — | $ 10 | $ — | — |
| U.S. government and federal agency obligations | 45 | 1 | 1 | 9 | 33 | 2 | 10 |
| Federal agency mortgage-backed securities | 62 | 1 | 1 | 24 | 59 | 2 | 23 |
| Commercial mortgage-backed securities | 14 | — | — | 29 | 9 | — | 30 |
| Corporate debt securities | 70 | 1 | 1 | 9 | 80 | 4 | 11 |
| Equity securities | 332 | 204 | — | — | 280 | 143 | — |
| Foreign government fixed income securities | 2 | — | — | 9 | 2 | — | 6 |
| Total | $ 551 | $ 207 | $ 3 | | $ 473 | $ 151 | |

(a) There are no unrealized losses as of December 31, 2012.

The following table summarizes proceeds from sales of available-for-sale securities and the related realized gains and losses from these sales. The cost of securities sold is determined on the specific identification method.

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2013 | 2012 | 2011 |
| | | (In millions) | |
| Realized gains | $ 25 | $ 12 | $ 4 |
| Realized losses | (8) | (7) | (3) |
| Proceeds from sale of securities | 488 | 399 | 385 |

**Note 7 — Inventory**

Inventory consisted of:

|  | As of December 31, | |
|---|---|---|
|  | 2013 | 2012 |
|  | (In millions) | |
| Fuel oil | $ 259 | $ 181 |
| Coal/Lignite | 290 | 405 |
| Natural gas | 15 | 12 |
| Spare parts | 316 | 301 |
| Other | 18 | 4 |
| Total Inventory | $ 898 | $ 903 |

**Note 8 — Notes Receivable**

Notes receivable primarily consisted of fixed and variable rate notes secured by equity interests in partnerships and joint ventures. NRG's notes receivable and capital leases were as follows:

|  | As of December 31, | |
|---|---|---|
|  | 2013 | 2012 |
|  | (In millions) | |
| Notes receivable — non-affiliates [a] | $ 97 | $ 82 |
| Notes receivable — affiliate | | |
| Avenal Solar Holdings LLC, indefinite maturity date, 4.5% [b] | 2 | 6 |
| Total notes receivable | 99 | 88 |
| Less current maturities[c] | 26 | 9 |
| Total notes receivable — noncurrent | $ 73 | $ 79 |

(a)   Primarily relates to Agua Caliente, Alpine, Borrego, El Segundo Energy Center and CVSR's agreements with their respective transmission owners to provide financing for required network upgrades. The notes will be repaid within a five year period following the date each facility reaches commercial operations.

(b)   NRG entered into a long-term $35 million note receivable facility with Avenal Solar Holdings LLC, to fund project liquidity needs in 2011.

(c)   The current portion of notes receivable is recorded in prepayments and other current assets on the consolidated balance sheets.

**Note 9 — Property, Plant and Equipment**

NRG's major classes of property, plant, and equipment were as follows:

|  | As of December 31, | | Depreciable |
|---|---|---|---|
|  | 2013 | 2012 | Lives |
|  | (In millions) | | |
| Facilities and equipment | $ 22,087 | $ 19,571 | 1-40 Years |
| Land and improvements | 801 | 793 | |
| Nuclear fuel | 463 | 414 | 5 Years |
| Office furnishings and equipment | 298 | 355 | 2-10 Years |
| Construction in progress | 2,775 | 4,428 | |
| Total property, plant, and equipment | 26,424 | 25,561 | |
| Accumulated depreciation | (6,573) | (5,408) | |
| Net property, plant, and equipment | $ 19,851 | $ 20,153 | |

**Note 10 — Asset Impairments**

*2013 Impairment Losses*

*Indian River* - Annually during the fourth quarter, the Company revises its views of power and fuel prices including the Company's fundamental view for long term prices in connection with the preparation of its annual budget. Changes to the Company's views of long term power and fuel prices impacted the Company's projections of profitability, based on management's estimate of supply and demand within the sub-markets for each plant and the physical and economic characteristics of each plant. The Company's revised views of projected profitability for Indian River resulted in a significant adverse change in the extent to which the assets are expected to be used. As a result, the Company considered this to be an indicator of impairment and performed an impairment test for these assets under ASC 360, *Property, Plant and Equipment*. The carrying amount of the assets was lower than the future net cash flows expected to be generated by the asset, considering project specific assumptions for long-term power pool prices, escalated future project operating costs and expected plant operations. As a result, the assets are considered to be impaired, and the Company measured the impairment loss as the difference between the carrying amount and the fair value of the assets. The fair value of the assets was determined by factoring in the probability weighting of different courses of action available to the Company and included both an income approach and a market approach. The Company recorded an impairment loss related to Indian River in the fourth quarter of 2013 of $459 million.

*Gladstone* - During the fourth quarter of 2013, the Company reviewed its 37.5% interest in Gladstone for impairment utilizing the other-than-temporary impairment model under ASC 820, *Fair Value Measurements*, due to future market expectations as well as discussions with the managing joint venture participants regarding the plant's expected life. In determining fair value, the Company utilized an income approach and considered project specific assumptions for future project operating revenues and costs and expected plant operations. The carrying amount of the Company's equity method investment exceeded the fair value of the investment and the Company concluded that the decline is considered to be other than temporary. As a result, the Company measured the impairment loss as the difference between the carrying amount and fair value of the investment and recorded an impairment loss in the fourth quarter of 2013 of $92 million.

*2011 Impairment Losses*

*Emissions Allowances* - Under CSAPR, use of discounted Acid Rain $SO_2$ and CAIR $NO_x$ allowances would have been discontinued and replaced with completely distinct allowance programs. Acid Rain allowances would still be required on a 1:1 basis under the Acid Rain Program. During the year ended December 31, 2011, the Company recorded an impairment charge of $160 million on the Company's Acid Rain Program $SO_2$ emission allowances in order to comply with the Acid Rain Program as discussed in Note 24, *Environmental Matters*.

*Nuclear Innovation North America, LLC (NINA)* - NINA is majority-owned subsidiary of NRG established to develop, finance and invest in new advanced design nuclear projects in select markets across North America, including the planned South Texas Project Units 3 and 4 Project, or STP 3 & 4. On March 11, 2011, Japan was hit by a devastating earthquake and tsunami which, in turn, triggered a nuclear incident at the Fukushima Daiichi Nuclear Power Station. The nuclear incident in Japan introduced multiple and substantial uncertainties around new nuclear development in the United States and the availability of debt and equity financing to NINA. Consequently, NINA announced, on March 21, 2011, that it was reducing the scope of development at the STP 3 & 4 expansion and suspended indefinitely all detailed engineering work and other pre-construction activities. As a result, NRG announced that, while it will cooperate with and support its current partners and any prospective future partners in attempting to develop STP 3 & 4 successfully, it was withdrawing from further financial participation in NINA's development of STP 3 & 4.

Due to the events described above, NRG evaluated its investment in NINA for impairment. As part of this process, NRG evaluated the contractual rights and economic interests held by the various stakeholders in NINA, and concluded that while it continues to hold majority legal ownership, NRG ceased to have a controlling financial interest in NINA at the end of the first quarter of 2011. Consequently, NRG deconsolidated NINA as of March 31, 2011, in accordance with ASC 810. Furthermore, NRG concluded it was remote that NRG would recover any portion of the carrying amount of its equity investment in NINA and, consequently, recorded impairment charges related to the full amount of its investment, as well as additional contributions made to support the reduced scope of work. The impairment charges totaled $495 million for the year ended December 31, 2011. In 2012, NRG recorded an additional impairment charge related to additional contributions made of $2 million.

**Note 11 — Goodwill and Other Intangibles**

*Goodwill* — NRG's goodwill balance was $2.0 billion as of December 31, 2013 and 2012. The Company recorded approximately $1.7 billion of goodwill in connection with the acquisition of Texas Genco in 2006. The Company recorded $144 million of goodwill in connection with the 2010 acquisition of Green Mountain Energy, and $29 million in connection with the 2011 acquisition of Energy Plus. In 2013 and 2012, the Company recorded additional goodwill for several business acquisitions. The Energy Plus acquisition is discussed further in Note 3, *Business Acquisitions and Dispositions.* As of December 31, 2013, there was no impairment to goodwill. As of December 31, 2013, 2012, and 2011, NRG had approximately $573 million, $609 million, and $594 million, respectively, of goodwill that is deductible for U.S. income tax purposes in future periods.

*Intangible Assets* — The Company's intangible assets as of December 31, 2013, primarily reflect intangible assets established with the acquisitions of various companies in 2013, 2012, 2011, 2010, 2009, and 2006, and are comprised of the following:

- *Emission Allowances* — These intangibles primarily consist of $SO_2$ and $NO_x$ emission allowances established with the 2012 GenOn acquisition and 2006 Texas Genco acquisition and also include RGGI emission credits which NRG began purchasing in 2009. These emission allowances are held-for-use and are amortized to cost of operations, with $NO_x$ allowances amortized on a straight-line basis and $SO_2$ allowances and RGGI credits amortized based on units of production. During the year ended December 31, 2011, the Company recorded an impairment charge of $160 million on the Company's Acid Rain Program $SO_2$ emission allowances in order to comply with the Acid Rain Program as discussed in Note 24, *Environmental Matters.*

- *Development rights* — Arising primarily from the acquisition of solar businesses in 2010 and 2011, these intangibles are amortizable to depreciation and amortization expense on a straight-line basis over the estimated life of the related project portfolio.

- *Energy supply contracts* — Established with the acquisitions of Reliant Energy and Green Mountain Energy, these represent the fair value at the acquisition date of in-market contracts for the purchase of energy to serve retail electric customers. The contracts are amortized to cost of operations based on the expected delivery under the respective contracts.

- *In-market fuel (gas and nuclear) contracts* — These intangibles were established with the Texas Genco acquisition in 2006 and are amortized to cost of operations over expected volumes over the life of each contract.

- *Customer contracts* — Established with the acquisitions of Reliant Energy, Green Mountain Energy, and Northwind Phoenix, these intangibles represent the fair value at the acquisition date of contracts that primarily provide electricity to Reliant Energy's and Green Mountain Energy's C&I customers. These contracts are amortized to revenues based on expected volumes to be delivered for the portfolio.

- *Customer relationships* — These intangibles represent the fair value at the acquisition date of acquired businesses' customer base, primarily for Energy Alternatives, Energy Plus, Reliant Energy, Green Mountain Energy, Energy Systems and Energy Curtailment Specialists. The customer relationships are amortized to depreciation and amortization expense based on the expected discounted future net cash flows by year.

- *Marketing partnerships* — Established with the acquisition of Energy Plus, as further discussed in Note 3, *Business Acquisitions and Dispositions*, these intangibles represent the fair value at the acquisition date of existing agreements with loyalty and affinity partners. The marketing partnerships are amortized to depreciation and amortization expense based on the expected discounted future net cash flows by year.

- *Trade names* — Established with the Reliant Energy, Green Mountain and Energy Plus acquisitions, these intangibles are amortized to depreciation and amortization expense, on a straight-line basis.

- *Other* — Consists of renewable energy credits, wind intangible assets, costs to extend the operating license for STP Units 1 and 2, the intangible asset related to a purchased ground lease and the value of acquired power purchase agreements.

148

The following tables summarize the components of NRG's intangible assets subject to amortization:

| Year Ended December 31, 2013 | Emission Allowances | Development Rights | Contracts | | | Customer Relationships | Marketing Partnerships | Trade Names | Other | Total |
| | | | Energy Supply | Fuel | Customer | | | | | |
| | | | | | (In millions) | | | | | |
| January 1, 2013 | $ 793 | $ 24 | $ 54 | $ 72 | $ 859 | $ 640 | $ 88 | $ 318 | $ 68 | $ 2,916 |
| Purchases | 76 | — | — | — | — | 14 | — | — | 28 | 118 |
| Acquisition of businesses | — | — | — | — | — | 89 | — | — | 10 | 99 |
| Usage | — | — | — | — | — | — | — | — | (14) | (14) |
| Other | 2 | (5) | — | — | — | — | — | — | 1 | (2) |
| December 31, 2013 | 871 | 19 | 54 | 72 | 859 | 743 | 88 | 318 | 93 | 3,117 |
| Less accumulated amortization | (433) | — | (36) | (61) | (847) | (487) | (12) | (93) | (8) | (1,977) |
| Net carrying amount | $ 438 | $ 19 | $ 18 | $ 11 | $ 12 | $ 256 | $ 76 | $ 225 | $ 85 | $ 1,140 |

| Year Ended December 31, 2012 | Emission Allowances | Development Rights | Contracts | | | Customer Relationships | Marketing Partnerships | Trade Names | Other | Total |
| | | | Energy Supply | Fuel | Customer | | | | | |
| | | | | | (In millions) | | | | | |
| January 1, 2012 | $ 783 | $ 24 | $ 54 | $ 72 | $ 859 | $ 634 | $ 88 | $ 318 | $ 39 | $ 2,871 |
| Purchases | 18 | — | — | — | — | — | — | — | 18 | 36 |
| Acquisition of businesses | 53 | — | — | — | — | 6 | — | — | 10 | 69 |
| Usage | — | — | — | — | — | — | — | — | (13) | (13) |
| Sales | (4) | — | — | — | — | — | — | — | — | (4) |
| Write-off of fully amortized balances | (56) | — | — | — | — | — | — | — | — | (56) |
| Other | (1) | — | — | — | — | — | — | — | 14 | 13 |
| December 31, 2012 | 793 | 24 | 54 | 72 | 859 | 640 | 88 | 318 | 68 | 2,916 |
| Less accumulated amortization(a) | (329) | — | (30) | (59) | (794) | (415) | (4) | (72) | (3) | (1,706) |
| Net carrying amount | $ 464 | $ 24 | $ 24 | $ 13 | $ 65 | $ 225 | $ 84 | $ 246 | $ 65 | $ 1,210 |

(a) Adjusted for write-off of fully amortized emission allowances of $56 million

The following table presents NRG's amortization of intangible assets for each of the past three years:

| Amortization | Years Ended December 31, | | |
| | 2013 | 2012 | 2011 |
| | (In millions) | | |
| Emission allowances | $ 104 | $ 50 | $ 66 |
| Energy supply contracts | 6 | 5 | 4 |
| Fuel contracts | 2 | 2 | 2 |
| Customer contracts | 53 | 119 | 185 |
| Customer relationships | 72 | 98 | 109 |
| Marketing partnerships | 8 | 4 | — |
| Trade names | 29 | 30 | 22 |
| Other | 5 | 2 | — |
| Total amortization | $ 279 | $ 310 | $ 388 |

The following table presents estimated amortization of NRG's intangible assets for each of the next five years:

| Year Ended December 31, | Emission Allowances | Development Rights | Contracts | | | Customer Relationships | Marketing Partnerships | Trade Names | Total |
| | | | Energy Supply | Fuel | Customer | | | | |
| | | | (In millions) | | | | | | |
| 2014 | $ 77 | $ 1 | $ 6 | $ 2 | $ 1 | $ 61 | $ 15 | $ 21 | $ 184 |
| 2015 | 65 | 1 | 6 | 2 | 1 | 45 | 14 | 21 | 155 |
| 2016 | 64 | 1 | 6 | 2 | 1 | 31 | 9 | 21 | 135 |
| 2017 | 65 | 1 | — | — | 1 | 21 | 5 | 21 | 114 |
| 2018 | 68 | 1 | — | — | 1 | 10 | 5 | 21 | 106 |

The following table presents the weighted average remaining amortization period related to NRG's intangible assets purchased in 2013 business acquisitions:

| As of December 31, 2013 | Customer Relationships |
| | (In years) |
| Weighted average remaining amortization period | 28 |

*Intangible assets held for sale* — From time to time, management may authorize the transfer from the Company's emission bank of emission allowances held-for-use to intangible assets held-for-sale. Emission allowances held-for-sale are included in other non current assets on the Company's consolidated balance sheet and are not amortized, but rather expensed as sold. As of December 31, 2013, the value of emission allowances held-for-sale is $24 million and is managed within the Corporate segment. Once transferred to held-for-sale, these emission allowances are prohibited from moving back to held-for-use.

*Out-of-market contracts* — Due primarily to business acquisitions, NRG acquired certain out-of-market contracts, which are classified as non-current liabilities on NRG's consolidated balance sheet. These include out-of-market lease contracts of $790 million and out-of-market gas transportation and storage contracts of $327 million acquired in the acquisition of GenOn. These out-of-market contracts are amortized to cost of operations. In addition, the power and customer contracts are amortized to revenues, while the energy supply contracts are amortized to cost of operations.

The following table summarizes the estimated amortization related to NRG's out-of-market contracts:

| Year Ended December 31, | Power Contracts | Leases | Gas Transportation | Total |
| | (In millions) | | | |
| 2014 | $ 17 | 39 | $ 36 | $ 92 |
| 2015 | 17 | 39 | 37 | 93 |
| 2016 | 18 | 39 | 42 | 99 |
| 2017 | 18 | 39 | 37 | 94 |
| 2018 | 19 | 39 | 32 | 90 |

150

**Note 12 — Debt and Capital Leases**

Long-term debt and capital leases consisted of the following:

| | | As of December 31, | | Interest Rate % [a] |
|---|---|---|---|---|
| | | **2013** | **2012** | |
| | | (In millions except rates) | | |
| **NRG Recourse Debt:** | | | | |
| Senior notes, due 2018 | $ | 1,130 | $ 1,200 | 7.625 |
| Senior notes, due 2019 | | 800 | 800 | 7.625 |
| Senior notes, due 2019 | | 602 | 693 | 8.500 |
| Senior notes, due 2020 | | 1,062 | 1,100 | 8.250 |
| Senior notes, due 2021 | | 1,128 | 1,128 | 7.875 |
| Senior notes, due 2023 | | 990 | 990 | 6.625 |
| Term loan facility, due 2018 | | 2,002 | 1,573 | L+3.00/L+2.00 |
| Indian River Power LLC, tax exempt bonds, due 2040 and 2045 | | 247 | 247 | 5.375 - 6.00 |
| Dunkirk Power LLC, tax exempt bonds, due 2042 | | 59 | 59 | 5.875 |
| Fort Bend County, tax-exempt bonds, due 2038 and 2042 | | 67 | 28 | 4.750 |
| Subtotal NRG Recourse Debt | | 8,087 | 7,818 | |
| **NRG Non-Recourse Debt:** | | | | |
| GenOn senior notes, due 2014 | | — | 617 | 7.625 |
| GenOn senior notes, due 2017 | | 782 | 800 | 7.875 |
| GenOn senior notes, due 2018 | | 780 | 801 | 9.500 |
| GenOn senior notes, due 2020 | | 621 | 631 | 9.875 |
| GenOn Americas Generation senior notes, due 2021 | | 503 | 509 | 8.500 |
| GenOn Americas Generation senior notes, due 2031 | | 435 | 437 | 9.125 |
| NRG Marsh Landing term loan, due 2017 and 2023 [b] | | 473 | 390 | L+2.75 - 3.00 |
| CVSR - High Plains Ranch II LLC, due 2014 and 2037 [b] | | 1,104 | 786 | 0.611 - 3.579 |
| NRG West Holdings LLC, term loan, due 2023 | | 512 | 350 | L+2.25 - 2.75 |
| Agua Caliente Solar, LLC, due 2037 | | 878 | 640 | 2.395 - 3.633 |
| Ivanpah Financing, due 2014 and 2038 | | 1,575 | 1,437 | 1.116 - 4.256 |
| South Trent Wind LLC, due 2020 | | 69 | 72 | L+ 2.625 |
| NRG Peaker Finance Co. LLC, bonds, due 2019 | | 154 | 173 | L+1.07 |
| NRG Energy Center Minneapolis LLC, senior secured notes, due 2013, 2017, and 2025 [b] | | 127 | 137 | 5.95 - 7.31 |
| NRG Solar Alpine LLC, due 2014 and 2022 [b] | | 221 | 2 | L+2.25 - 2.50 |
| NRG Solar Borrego I LLC, due 2024 and 2038 [b] | | 78 | — | L+2.50/5.65 |
| NRG Solar Avra Valley LLC [b] | | 63 | 66 | L+2.25 |
| TA - High Desert LLC, due 2014, 2023 and 2033 | | 80 | — | L+2.50/5.15 |
| NRG Solar Kansas South LLC, due 2014 and 2031 | | 58 | — | L+2.00 - 2.625 |
| Other | | 204 | 200 | various |
| Subtotal NRG Non-Recourse Debt | | 8,717 | 8,048 | |
| Subtotal Long Term Debt | | 16,804 | 15,866 | |
| **Capital leases:** | | | | |
| Chalk Point capital lease, due 2015 | | 10 | 14 | 8.190 |
| Other | | 3 | 3 | various |
| Subtotal Capital Leases | | 13 | 17 | |
| Subtotal | | 16,817 | 15,883 | |
| Less current maturities | | 1,050 | 147 | |
| Total long-term debt and capital leases | $ | 15,767 | $ 15,736 | |

(a)   As of December 31, 2013, L+ equals 3 month LIBOR plus x%, with the exception of NRG Solar Alpine LLC cash grant loan and NRG Solar Kansas South LLC and TA - High Desert LLC cash grant bridge loan which are 1 month LIBOR plus x% and NRG Solar Kansas South LLC term loan which is 3 month LIBOR plus x%

(b)   Debt related to projects in NRG Yield

151

Long-term debt includes the following premiums/(discounts):

|  | As of December 31, | |
|---|---|---|
|  | 2013 | 2012 |
|  | (in millions) | |
| Senior notes, due 2019 | $ (5) | $ (7) |
| Term loan facility, due 2018 [a] | (5) | (3) |
| NRG Peaker Finance Co. LLC, bonds, due 2019 [b] | (11) | (15) |
| GenOn senior notes, due 2014 [c] | — | 42 |
| GenOn senior notes, due 2017 [c] | 58 | 75 |
| GenOn senior notes, due 2018 [c] | 104 | 126 |
| GenOn senior notes, due 2020 [c] | 71 | 81 |
| GenOn Americas Generation senior notes, due 2021 [c] | 53 | 59 |
| GenOn Americas Generation senior notes, due 2031 [c] | 35 | 37 |
| Total premium/(discount) | $ 300 | $ 395 |

(a)   Discount of $1 million is related to current maturities in 2013 and 2012.

(b)   Discounts of $4 million and $5 million are related to current maturities in 2013 and 2012, respectively.

(c) Premiums for long-term debt acquired in the GenOn acquisition represent adjustments to record the debt at fair value in connection with the acquisition, as described further in Note 3, *Business Acquisitions and Dispositions*.

## NRG Recourse Debt

### Senior Notes

#### Issuance of 2022 Senior Notes

On January 27, 2014, NRG issued $1.1 billion in aggregate principal amount at par of 6.25% senior notes due 2022. The notes are senior unsecured obligations of NRG and are guaranteed by certain of its subsidiaries. Interest is payable semi-annually beginning on July 15, 2014, until the maturity date of July 15, 2022. The proceeds were utilized to redeem the 8.5% and 7.625% 2019 Senior Notes, as described below, and are also expected to be utilized to fund the acquisition of EME.

In connection with the 2022 Senior Notes, NRG entered into a registration payment arrangement. For the first 90-day period immediately following a registration default, additional interest will be paid in an amount equal to 0.25% per annum of the principal amount of 2022 Senior Notes outstanding, as applicable. The amount of interest paid will increase by an additional 0.25% per annum with respect to each subsequent 90-day period until all registration defaults are cured, up to a maximum amount of interest of 1.0% per annum of the principal amount of the 2022 Senior Notes outstanding, as applicable. The additional interest is paid on the next scheduled interest payment date and following the cure of the registration default, the additional interest payment will cease.

#### Redemption of 8.5% and 7.625% 2019 Senior Notes

On February 10, 2014, the Company redeemed $308 million of its 8.5% 2019 Senior Notes and $91 million of its 7.625% 2019 Senior Notes through a tender offer and call, at an average early redemption percentage of 106.992% and 105.500%, respectively. A $33 million loss on debt extinguishment of the 8.5% and 7.625% Senior Notes was recorded in the first quarter of 2014, primarily consisting of the premiums paid on the redemption and the write-off of previously deferred financing costs.

#### Redemption of Senior Notes

In 2012, the Company redeemed its $1.1 billion 2017 Senior Notes through a tender offer and call, at an average early redemption percentage of 104.016%. A $51 million loss on debt extinguishment of the 2017 Senior Notes was recorded, primarily consisting of the premiums paid on the redemption and the write-off of previously deferred financing costs.

In 2011, the Company redeemed its $1.2 billion Senior Notes due 2014 and its $2.4 billion Senior Notes due 2016 at an average redemption percentage of 102.007% and 103.868%, respectively, and recorded a loss on debt extinguishment of $28 million and $115 million, respectively, primarily consisting of the premiums paid on the redemption and the write-off of previously deferred financing costs.

*Senior Notes Outstanding*

As of December 31, 2013, NRG had six outstanding issuances of senior notes, or Senior Notes, under an Indenture, dated February 2, 2006, or the Indenture, between NRG and Law Debenture Trust Company of New York, as trustee:

(i.)    8.500% senior notes, issued June 5, 2009 and due June 15, 2019, or the 2019 Senior Notes;

(ii.)   8.250% senior notes, issued August 20, 2010 and due September 1, 2020, or the 2020 Senior Notes;

(iii.)  7.625% senior notes, issued January 26, 2011 and due January 15, 2018, or the 2018 Senior Notes;

(iv.)   7.625% senior notes, issued May 24, 2011 and due May 15, 2019, or the 7.625% 2019 Senior Notes;

(v.)    7.875% senior notes, issued May 24, 2011 and due May 15, 2021, or the 2021 Senior Notes; and

(vi.)   6.625% senior notes, issued September 24, 2012 and due March 15, 2023, or the 2023 Senior Notes.

The Company periodically enters into supplemental indentures for the purpose of adding entities under the Senior Notes as guarantors.

The Indentures and the form of notes provide, among other things, that the Senior Notes will be senior unsecured obligations of NRG. The Indentures also provide for customary events of default, which include, among others: nonpayment of principal or interest; breach of other agreements in the Indentures; defaults in failure to pay certain other indebtedness; the rendering of judgments to pay certain amounts of money against NRG and its subsidiaries; the failure of certain guarantees to be enforceable; and certain events of bankruptcy or insolvency. Generally, if an event of default occurs, the Trustee or the Holders of at least 25% in principal amount of the then outstanding series of Senior Notes may declare all of the Senior Notes of such series to be due and payable immediately. The terms of the Indentures, among other things, limit NRG's ability and certain of its subsidiaries' ability to return capital to stockholders, grant liens on assets to lenders and incur additional debt. Interest is payable semi-annually on the Senior Notes until their maturity dates.

*Senior Notes Repurchases*

On December 17, 2012, NRG entered into an agreement with a financial institution to repurchase up to $200 million of the Senior Notes in the open market by February 27, 2013. In the first quarter of 2013, the Company paid $80 million, $104 million, and $42 million, at an average price of 114.179%, 111.700%, and 113.082% of face value, for repurchases of the Company's 2018 Senior Notes, 2019 Senior Notes and 2020 Senior Notes, respectively. A $28 million loss on the debt extinguishment of the 2018 Senior Notes, 2019 Senior Notes and 2020 Senior Notes was recorded during the three months ended March 31, 2013 which primarily consisted of the premiums paid on the repurchases and the write-off of previously deferred financing costs.

*2019 Senior Notes*

Prior to June 15, 2014, NRG may redeem all or a portion of the 2019 Senior Notes at a price equal to 100% of the principal amount plus a premium and accrued and unpaid interest. The premium is the greater of: (i) 1% of the principal amount of the notes; or (ii) the excess of the principal amount of the note over the following: the present value of 104.25% of the note, plus interest payments due on the note from the date of redemption through June 15, 2014, discounted at a Treasury rate plus 0.50%. In addition, on or after June 15, 2014, NRG may redeem some or all of the notes at redemption prices expressed as percentages of principal amount as set forth in the following table, plus accrued and unpaid interest on the notes redeemed to the first applicable redemption date:

| Redemption Period | Redemption Percentage |
| --- | --- |
| June 15, 2014 to June 14, 2015 | 104.250% |
| June 15, 2015 to June 14, 2016 | 102.830% |
| June 15, 2016 to June 14, 2017 | 101.420% |
| June 15, 2017 and thereafter | 100.000% |

*2020 Senior Notes*

Prior to September 1, 2015, NRG may redeem all or a portion of the 2020 Senior Notes at a price equal to 100% of the principal amount plus a premium and accrued and unpaid interest. The premium is the greater of (i) 1% of the principal amount of the note; or (ii) the excess of the principal amount of the note over the following: the present value of 104.125% of the note, plus interest payments due on the note from the date of redemption through September 1, 2015, discounted at a Treasury rate plus 0.50%. In addition, on or after September 1, 2015, NRG may redeem some or all of the notes at redemption prices expressed as percentages of principal amount as set forth in the following table, plus accrued and unpaid interest on the notes redeemed to the first applicable redemption date:

| Redemption Period | Redemption Percentage |
|---|---|
| On or after September 1, 2015 | 104.125% |
| On or after September 1, 2016 | 102.750% |
| On or after September 1, 2017 | 101.375% |
| September 1, 2018 and thereafter | 100.000% |

*2018 Senior Notes*

Prior to maturity, NRG may redeem all or a portion of the 2018 Senior Notes at a redemption price equal to 100% of the principal amount of the notes redeemed plus a premium and accrued and unpaid interest. The premium is the greater of (i) 1% of the principal amount of the note or (ii) the excess of the present value of the principal amount at maturity plus all required interest payments due on the note through the maturity date discounted at a Treasury rate plus 0.50%.

*7.625% 2019 Senior Notes*

Prior to May 15, 2014, NRG may redeem up to 35% of the aggregate principal amount of the 7.625% 2019 Senior Notes with the net proceeds of certain equity offerings, at a redemption price of 107.625% of the principal amount. Prior to May 15, 2014, NRG may redeem all or a portion of the 7.625% 2019 Senior Notes at a price equal to 100% of the principal amount plus a premium and accrued and unpaid interest. The premium is the greater of: (i) 1% of the principal amount of the notes; or (ii) the excess of the principal amount of the note over the following: the present value of 103.813% of the note, plus interest payments due on the note from the date of redemption through May 15, 2014, discounted at a Treasury rate plus 0.50%. In addition, on or after May 15, 2014, NRG may redeem some or all of the notes at redemption prices expressed as percentages of principal amount as set forth in the following table, plus accrued and unpaid interest on the notes redeemed to the first applicable redemption date:

| Redemption Period | Redemption Percentage |
|---|---|
| May 15, 2014 to May 14, 2015 | 103.813% |
| May 15, 2015 to May 14, 2016 | 101.906% |
| May 15, 2016 and thereafter | 100.000% |

*2021 Senior Notes*

Prior to May 15, 2016, NRG may redeem up to 35% of the aggregate principal amount of the 2021 Senior Notes with the net proceeds of certain equity offerings, at a redemption price of 107.875% of the principal amount. Prior to May 15, 2016, NRG may redeem all or a portion of the 2021 Senior Notes at a price equal to 100% of the principal amount plus a premium and accrued and unpaid interest. The premium is the greater of: (i) 1% of the principal amount of the notes; or (ii) the excess of the principal amount of the note over the following: the present value of 103.938% of the note, plus interest payments due on the note from the date of redemption through May 15, 2016, discounted at a Treasury rate plus 0.50%. In addition, on or after May 15, 2016, NRG may redeem some or all of the notes at redemption prices expressed as percentages of principal amount as set forth in the following table, plus accrued and unpaid interest on the notes redeemed to the first applicable redemption date:

| Redemption Period | Redemption Percentage |
|---|---|
| May 15, 2016 to May 14, 2017 | 103.938% |
| May 15, 2017 to May 14, 2018 | 102.625% |
| May 15, 2018 to May 14, 2019 | 101.313% |
| May 15, 2019 and thereafter | 100.000% |

*2023 Senior Notes*

On September 24, 2012, NRG issued $990 million aggregate principal amount at par of 6.625% Senior Notes due 2023, or the 2023 Senior Notes. The 2023 Senior Notes were issued under the Indenture. The Indenture and the form of the notes provide, among other things, that the 2023 Senior Notes will be senior unsecured obligations of NRG. The proceeds, net of issuance costs, of $978 million for the 2023 Senior Notes were used to complete the tender offer of the 2017 Senior Notes.

Prior to September 15, 2015, NRG may redeem up to 35% of the aggregate principal amount of the 2023 Senior Notes with the net proceeds of certain equity offerings, at a redemption price of 106.625% of the principal amount. Prior to September 15, 2017, NRG may redeem all or a portion of the 2023 Senior Notes at a price equal to 100% of the principal amount plus a premium and accrued and unpaid interest. The premium is the greater of: (i) 1% of the principal amount of the notes; or (ii) the excess of the principal amount of the note over the following: the present value of 103.313% of the note, plus interest payments due on the note from the date of redemption through September 15, 2017, discounted at a Treasury rate plus 0.50%. In addition, on or after September 15, 2017, NRG may redeem some or all of the notes at redemption prices expressed as percentages of principal amount as set forth in the following table, plus accrued and unpaid interest on the notes redeemed to the first applicable redemption date:

| Redemption Period | Redemption Percentage |
|---|---|
| September 15, 2017 to September 14, 2018 | 103.313% |
| September 15, 2018 to September 14, 2019 | 102.208% |
| September 15, 2019 to September 14, 2020 | 101.104% |
| September 15, 2020 and thereafter | 100.000% |

In connection with the 2023 Senior Notes, NRG entered into a registration payment arrangement. For the first 90-day period immediately following a registration default, additional interest will be paid in an amount equal to 0.25% per annum of the principal amount of 2023 Senior Notes outstanding, as applicable. The amount of interest paid will increase by an additional 0.25% per annum with respect to each subsequent 90-day period until all registration defaults are cured, up to a maximum amount of interest of 1.0% per annum of the principal amount of the 2023 Senior Notes outstanding, as applicable. The additional interest is paid on the next scheduled interest payment date and following the cure of the registration default, the additional interest payment will cease.

### Senior Credit Facility

On June 4, 2013, NRG amended the Term Loan Facility to (i) obtain additional financing of $450 million, which was issued at a discount of 99.5%; and (ii) adjust the interest rate from LIBOR plus 2.50% to LIBOR plus 2.00%. In addition, the Company redeemed and re-issued $407 million of the Term Loan Facility to new lenders resulting in a $7 million loss on debt extinguishment, recorded during the second quarter 2013, which primarily consisted of the write-off of previously deferred financing costs and unamortized discount. The proceeds from the additional $450 million borrowed were used for general corporate purposes. Debt issuance costs of $23 million and a discount on debt issuance of $4 million will be amortized to interest expense through the maturity date of the Term Loan Facility. Repayments under the Term Loan Facility will consist of 0.25% per quarter, with the remainder due at maturity.

The Company also amended the Revolving Credit Facility to (i) increase the capacity by $211 million to a total of $2.5 billion; (ii) adjust the interest rate to LIBOR plus 2.25%; and (iii) extend the maturity date to July 1, 2018 to coincide with the maturity date of the Term Loan Facility. As a result of the amended Revolving Credit Facility, the Company capitalized debt issuance costs of $4 million, which will be amortized to interest expense through the maturity date of the Revolving Credit Facility. A $3 million loss on debt extinguishment was recorded during the three months ended June 30, 2013 related to the write-off of previously deferred financing costs. As of December 31, 2013, a total of $1.3 billion letters of credit were issued under the Revolving Credit Facility, with $1.2 billion remaining available to be issued. Commitment fees of 0.50% are charged on the unused portion of the Revolving Credit Facility.

The Senior Credit Facility replaced an existing senior credit facility in 2011, and NRG recorded a $32 million loss on extinguishment, which consisted of the write-off of previously deferred financing costs.

The Senior Credit Facility is guaranteed by substantially all of NRG's existing and future direct and indirect subsidiaries, with certain customary or agreed-upon exceptions for unrestricted foreign subsidiaries, project subsidiaries, and certain other subsidiaries, including GenOn and its subsidiaries. The capital stock of these guarantor subsidiaries has been pledged for the benefit of the Senior Credit Facility's lenders.

The Senior Credit Facility is also secured by first-priority perfected security interests in substantially all of the property and assets owned or acquired by NRG and its subsidiaries, other than certain limited exceptions. These exceptions include assets of certain unrestricted subsidiaries, equity interests in certain of NRG's affiliates that have non-recourse debt financing, including GenOn and its subsidiaries, and voting equity interests in excess of 66% of the total outstanding voting equity interest of certain of NRG's foreign subsidiaries.

The Senior Credit Facility contains customary covenants, which, among other things, require NRG to meet certain financial tests, including minimum interest coverage ratio and a maximum leverage ratio on a consolidated basis, and limit NRG's ability to:

- incur indebtedness and liens and enter into sale and lease-back transactions;
- make investments, loans and advances; and
- return capital to stockholders.

*Interest Rate Swaps* — NRG entered into interest rate swaps, which became effective on April 1, 2011, and are intended to hedge the risks associated with floating interest rates. The Company pays its counterparty the equivalent of a fixed interest payment on a predetermined notional value, and NRG receives the monthly equivalent of a floating interest payment based on a 1 month LIBOR calculated on the same notional value. All interest rate swap payments by NRG and its counterparty are made monthly and the LIBOR is determined in advance of each interest period. The total notional amount of the swaps, which matured on February 1, 2013, was $900 million with changes in the fair value through June 30, 2011 recorded in OCI and subsequent changes in the fair value reported in interest expense.

### Fort Bend County Tax Exempt Bonds

On May 3, 2012, NRG executed a $54 million tax-exempt bond financing with a maturity date of May 1, 2038, issued by the Fort Bend County Industrial Development Corporation, or the Fort Bend County Tranche A Bonds. The Fort Bend County Tranche A Bonds will be used for the construction of a peaking unit with one or more components of a carbon capture system at the W.A. Parish Generating Station in Thompsons, TX, or W.A. Parish. The bonds initially bore weekly interest based on the SIFMA rate, and were enhanced by a letter of credit under the Company's Revolving Credit Facility covering amounts drawn. On October 18, 2012, NRG fixed the rate on the Fort Bend County Tranche A Bonds at 4.75% payable semiannually, and the letter of credit was canceled and replaced with an NRG guarantee. As of December 31, 2013 the full $54 million was drawn.

On October 18, 2012, NRG executed an additional $73 million tax-exempt bond financing, with a maturity date of November 1, 2042, also issued by the Fort Bend County Industrial Development Corporation, or the Fort Bend County Tranche B Bonds. The Fort Bend County Tranche B Bonds will be used for environmental and maintenance upgrades at W.A. Parish. The bonds were issued at a fixed rate of 4.75% payable semiannually, and are supported by an NRG guarantee. The proceeds drawn through December 31, 2013 were $12 million and the remaining balance will be drawn over time as qualifying expenditures are paid.

### NRG Non-Recourse Debt

The following are descriptions of certain indebtedness of NRG's subsidiaries that are outstanding as of December 31, 2013. All of NRG's non-recourse debt is secured by the assets in the respective GenOn subsidiaries and project subsidiaries as further described below. The net assets in the GenOn and project subsidiaries are subject to restrictions, including the ability to transfer assets out of the subsidiaries. As of December 31, 2013, NRG had net assets of $3.2 billion that were deemed restricted for purposes of Rule 4-08(e)(3)(iii) of Regulation S-X.

The indebtedness described below is non-recourse to NRG, unless otherwise noted.

### GenOn Senior Notes

Under the GenOn Senior Notes and the related indentures, the GenOn Senior Notes are the sole obligation of GenOn and are not guaranteed by any subsidiary or affiliate of GenOn. The GenOn Senior Notes are senior unsecured obligations of GenOn having no recourse to any subsidiary or affiliate of GenOn. The GenOn Senior Notes restrict the ability of GenOn and its subsidiaries to encumber their assets. The GenOn Senior Notes are subject to acceleration of GenOn's obligations thereunder upon the occurrence of certain events of default, including: (a) default in interest payment for 30 days, (b) default in the payment of principal or premium, if any, (c) failure after 90 days of specified notice to comply with any other agreements in the indenture, (d) certain cross-acceleration events, (e) failure by GenOn or its significant subsidiaries to pay certain final and non-appealable judgments after 90 days and (f) certain events of bankruptcy and insolvency.

*Redemption of 2014 GenOn Senior Notes*

In June 2013, the Company redeemed all of the 2014 GenOn Senior Notes with an aggregate outstanding principal amount of $575 million at a redemption price of 106.778% of face value as well as any accrued and unpaid interest as of the redemption date. In connection with the redemption, an $11 million loss on the debt extinguishment of the 2014 GenOn Senior Notes was recorded during the three months ended June 30, 2013 which primarily consisted of a make whole premium payment offset by the write-off of unamortized premium.

The GenOn Senior Notes due 2014, which had a face value of $575 million, were recorded at their fair value of $618 million on the GenOn acquisition date. The related $43 million premium was being amortized to interest expense until the notes were redeemed in June 2013, as previously discussed.

*2018 and 2020 GenOn Senior Notes*

The GenOn Senior Notes due 2018 and 2020 and the related indentures restrict the ability of GenOn to incur additional liens and make certain restricted payments, including dividends. In the event of a default or if restricted payment tests are not satisfied, GenOn would not be able to distribute cash to its parent, NRG. At December 31, 2013, GenOn did not meet the consolidated debt ratio component of the restricted payments test and, therefore, the ability of GenOn to make restricted payments, including dividends, loans and advances to NRG, is limited to specified exclusions, including up to $250 million of such restricted payments. As of December 31, 2013, GenOn net assets of $0 billion were deemed restricted for purposes of Rule 4-08(e)(3)(iii) of Regulation S-X.

Prior to maturity, GenOn may redeem the senior notes due 2018, in whole or in part, at a redemption price equal to 100% of the principal amount plus a premium and accrued and unpaid interest. The premium is the greater of: (i) 1% of the principal amount of the notes; or (ii) the excess of the following: the present value of 100% of the note, plus interest payments due on the note through maturity, discounted at a Treasury rate plus 0.50% over the principal amount of the note.

Prior to October 15, 2015, GenOn may redeem the senior notes due 2020, in whole or in part, at a redemption price equal to 100% of the principal amount of the notes plus a premium and accrued and unpaid interest. The premium is the greater of: (i) 1% of the principal amount of the notes; or (ii) the excess of the following: the present value of 100% of the note, plus interest payments due on the note through maturity, discounted at a Treasury rate plus 0.50% over the principal amount of the note. In addition, on or after October 15, 2015, GenOn may redeem some or all of the notes at redemption prices expressed as percentages of principal amount as set forth in the following table, plus accrued and unpaid interest on the notes redeemed to the first applicable redemption rate:

| Redemption Period | Redemption Percentage |
|---|---|
| October 15, 2015 to October 14, 2016 | 104.938% |
| October 15, 2016 to October 14, 2017 | 103.292% |
| October 15, 2017 to October 14, 2018 | 101.646% |
| October 15, 2018 and thereafter | 100.000% |

The GenOn Senior Notes due 2018 and 2020, which have a face value of $675 million and $550 million, respectively, were recorded at their fair values of $802 million and $632 million, respectively, on the GenOn acquisition date. The $127 million and $82 million premiums are being amortized to interest expense over the life of the related notes.

*2017 GenOn Senior Notes*

Prior to maturity, GenOn may redeem all or a part of the GenOn Senior Notes due 2017 at a redemption price equal to 100% of the notes plus a premium and accrued and unpaid interest. The premium is the greater of: (i) 1% of the principal amount of the notes; or (ii) the excess of the following: the present value of 100% of the note, plus interest payments due on the note through maturity, discounted at a Treasury rate plus 0.50% over the principal amount of the note.

The GenOn Senior Notes due 2017, which have a face value of $725 million, were recorded at their fair value of $800 million, on the GenOn acquisition date. The $75 million premium is being amortized to interest expense over the life of the notes.

### GenOn Americas Generation Senior Notes

The GenOn Americas Generation Senior Notes due 2021 and 2031 are senior unsecured obligations of GenOn Americas Generation, a wholly owned subsidiary of NRG, having no recourse to any subsidiary or affiliate of GenOn Americas Generation.

Prior to maturity, GenOn Americas Generation may redeem all or a part of the senior notes due 2021 and 2031 at a redemption price equal to 100% of the notes plus a premium and accrued and unpaid interest. The premium is the greater of: (i) the discounted present value of the then-remaining scheduled payments of principal and interest on the outstanding notes, discounted at a Treasury rate plus 0.375%, less the unpaid principal amount; and (ii) zero.

The GenOn Americas Generation Senior Notes, which have a face value of $450 million and $400 million, respectively, were recorded at their fair values of $510 million and $437 million, respectively, on the GenOn acquisition date. The $60 million and $37 million premiums are being amortized to interest expense over the life of the related notes.

### NRG Yield, Inc. Convertible Notes

On February 11, 2014, NRG Yield, Inc. closed on its offering of $300 million aggregate principal amount of 3.50% Convertible Senior Notes due 2019, or the NRG Yield Senior Notes. The initial purchasers exercised their option to purchase up to an additional $45 million in aggregate principal amount of the NRG Yield Senior Notes. NRG Yield, Inc. expects to receive the proceeds in early March. The NRG Yield Senior Notes are convertible, under certain circumstances, into NRG Yield, Inc. common stock, cash or a combination thereof at an initial conversion price of $46.55 per Class A common share, which is equivalent to an initial conversion rate of approximately 21.4822 shares of Class A common stock per $1,000 principal amount of NRG Yield Senior Notes. Interest on the NRG Yield Senior Notes is payable semi-annually in arrears on February 1 and August 1 of each year, commencing on August 1, 2014. The NRG Yield Senior Notes will mature on February 1, 2019, unless earlier repurchased or converted in accordance with their terms. Prior to the close of business on the business day immediately preceding August 1, 2018, the NRG Yield Senior Notes will be convertible only upon the occurrence of certain events and during certain periods, and thereafter, at any time until the close of business on the second scheduled trading day immediately preceding the maturity date.

### Project Financings

The following are descriptions of certain indebtedness of NRG's project subsidiaries that are outstanding as of December 31, 2013.

### Dandan Financing

In December 2013, with respect to the Guam solar project, NRG, through its wholly-owned subsidiary, NRG Solar Dandan LLC, or Dandan, entered into a credit agreement with a bank, or the Dandan Financing Agreement, for a $81 million construction loan that converts to a term loan in September 2014 and a $23 million cash grant loan. The construction loans have interest rates of LIBOR plus an applicable margin of 2.25% or base rate plus 1.25% and the cash grant loans have an interest rate of LIBOR plus an applicable margin of 1.75%. The term loan has an interest rate of LIBOR plus an applicable margin of 2.25%, which escalates 0.25% on the fifth, tenth, and fifteenth anniversary of the term conversion. The term loan, which is secured by all the assets of Dandan, matures on the 18th anniversary of the term conversion and amortizes based upon a predetermined schedule. The Dandan Financing Agreement also includes a letter of credit facility on behalf of Dandan of up to $5 million. Dandan pays an availability fee of 2.25% from the closing date until the 5th anniversary of the term conversion date and 2.50% from the 5th anniversary of the term conversion date on issued letters of credit. As of December 31, 2013, $19 million was outstanding under the term loan, and $5 million in letters of credit in support of the project were issued.

### Kansas South Facility

In the second quarter of 2013, the Company, through its wholly owned subsidiary, NRG Solar PV LLC, acquired Kansas South, a 20 MW utility-scale photovoltaic solar facility located in Kings County, California, shortly before commercial operation. In June 2013, NRG recorded $59 million of non-recourse project level debt under the Kansas South Facility which includes a $38 million term loan due 2031 and a $21 million cash grant bridge loan due the earlier of 10 days after receipt of the cash grant or March 2014. The term loan has an interest rate of 3 month LIBOR plus an applicable margin of 2.625% and increases by 0.25% every four years. The cash grant bridge loan has an interest rate of 1 month LIBOR plus an applicable margin of 2.00%. The term loan amortizes on a predetermined schedule and is secured by all of the assets of Kansas South. As of December 31, 2013, $4 million of letters of credit were issued under the Kansas South Facility.

*NRG Repowering Holdings LLC Facility*

In June 2013, $82 million of letters of credit issued under the NRG Repowering Holdings LLC Facility were returned to the Company. In July 2013, the NRG Repowering Holding LLC Facility was terminated and the Company issued replacement letters of credit under its Revolving Credit Facility.

*Marsh Landing Credit Agreement*

In October 2010, Marsh Landing entered into a credit agreement for up to approximately $650 million of commitments to provide construction and permanent financing for the Marsh Landing generating facility. The credit facility consisted of a $155 million tranche A senior secured term loan facility, due 2017, a $345 million tranche B senior secured term loan facility, due 2023, a $50 million senior secured letter of credit facility to support debt service reserve requirements and a $100 million senior secured letter of credit facility to support collateral requirements under its PPA with PG&E. In May 2013, Marsh Landing met the conditions under the credit agreement to convert the construction loan for the facility to a term loan, which will amortize on a predetermined basis. Prior to term conversion, the Company drew the remaining funds available under the facility in order to pay costs due for construction. The Company issued a $24 million letter of credit under the facility in support of its debt service requirements. As of December 31, 2013, Marsh Landing had $473 million outstanding.

*Avra Valley Financing*

On August 30, 2012, NRG, through its subsidiary, NRG Solar Avra Valley LLC, or Avra Valley, entered into a credit agreement with a bank, or the Avra Valley Financing Agreement, for a $66 million construction loan that converted to a term loan in January 2013 and an $8 million cash grant loan. Both the construction and cash grant loans have interest rates of LIBOR plus an applicable margin of 2.25%. The term loan has an interest rate of LIBOR plus an applicable margin of 2.25%, which escalates 0.25% on the fifth, tenth, and fifteenth anniversary of the term conversion. The term loan, which is secured by all the assets of Avra Valley, matures on the 18th anniversary of the term conversion and amortizes based upon a predetermined schedule. The cash grant was received and the cash grant loan was repaid in June 2013. The Avra Valley Financing Agreement also includes a letter of credit facility on behalf of Avra Valley of up to $4 million. Avra Valley pays an availability fee of 100% of the applicable margin on issued letters of credit. As of December 31, 2013, $63 million was outstanding under the term loan, and $4 million in letters of credit in support of the project were issued.

*Alpine Financing*

On March 16, 2012, NRG, through its wholly-owned subsidiary, NRG Solar Alpine LLC, or Alpine, entered into a credit agreement with a group of lenders, or the Alpine Financing Agreement, for a $166 million construction loan, which converted to a term loan in March 2013, and a $68 million cash grant loan. On January 15, 2013 the credit agreement was amended reducing the cash grant loan to $63 million. The construction loan had an interest rate of LIBOR plus an applicable margin of 2.50% and the cash grant loan has an interest rate of 1 month LIBOR plus an applicable margin of 2.25%. The term loan has an interest rate of LIBOR plus an applicable margin of 2.50%, which escalates 0.25% on the fifth anniversary of the term conversion. The term loan, which is secured by all the assets of Alpine, amortizes based upon a predetermined schedule with final maturity in November 2022. The Alpine Financing Agreement also includes a letter of credit facility on behalf of Alpine of up to $37 million. Alpine pays an availability fee of 100% of the applicable margin on issued letters of credit. As of December 31, 2013, $159 million was outstanding under the term loans, and $37 million in letters of credit in support of the project were issued. In January, 2014, the Company was awarded the full cash grant of $72 million as applied for, relating to the Alpine project, and has received the post-sequestration funds of $66 million, and subsequently repaid the balance of the cash grant loan.

*High Desert Facility*

In the first quarter of 2013, the Company, through its wholly owned subsidiary, NRG Solar PV LLC, acquired High Desert, a 20 MW utility-scale photovoltaic solar facility located in Lancaster, California, shortly before commercial operation. As part of the acquisition of High Desert, NRG recorded $82 million of non-recourse project level debt in March 2013 issued under the High Desert Facility which is comprised of $53 million of fixed rate notes due 2033 at an interest rate of 5.15%, $7 million of floating rate notes due 2023, $22 million of bridge notes due the earlier of 10 days after receipt of the cash grant or May 2014 and a revolving facility of $12 million. The floating rate notes have an interest rate of 3 month LIBOR while the bridge notes have an interest rate of 1 month LIBOR plus 2.50%. The revolving facility can be used for cash or for the issuance of up to $9 million in letters of credit. As of December 31, 2013, $9 million of letters of credit were issued under the revolving facility. The notes amortize on predetermined schedules and are secured by all of the assets of High Desert.

159

#### NRG Yield Revolving Credit Facility

In connection with the initial public offering of Class A common stock of NRG Yield, Inc. in July 2013, as further described in Note 1, *Nature of Business*, NRG Yield LLC and its direct wholly owned subsidiary, NRG Yield Operating LLC, entered into a senior secured revolving credit facility, which provides a revolving line of credit of $60 million. The NRG Yield revolving credit facility can be used for cash or for the issuance of letters of credit. There was no cash drawn or letters of credit issued under the NRG Yield revolving credit facility as of December 31, 2013.

#### CVSR Financing

On September 30, 2011, NRG acquired CVSR, as discussed in Note 3, *Business Acquisitions and Dispositions*. In connection with the acquisition, High Plains Ranch II LLC, a wholly owned subsidiary of NRG, entered into the CVSR Financing Agreement with the FFB, to borrow up to $1.2 billion to finance the costs of constructing this solar facility. The CVSR Financing Agreement, which matures in 2037, is non-recourse to NRG. Funding requests will be submitted to the FFB on a monthly basis and the loans provided by the FFB are guaranteed by the U.S. DOE. Amounts borrowed under the CVSR Financing Agreement accrue interest at a fixed rate based on U.S. Treasury rates plus a spread of 0.375%, and are secured by the assets of CVSR. As of December 31, 2013, $1,104 million was outstanding under the loan.

In January 2014, the U.S. Treasury Department awarded the Company cash grants for the CVSR project of $307 million, or $285 million net of sequestration, which was approximately 75% of the cash grant for which the Company had applied. NRG is evaluating the basis for the award and all of its options with respect to recovering the full amount of the award. Proceeds received in January 2014 were utilized to repay the borrowings due on February 5, 2014.

Under the terms of the CVSR Financing Agreement, on November 17, 2011, CVSR entered into a series of swaptions with a notional value of $686 million, or 80% of the guaranteed term loan amount, in order to hedge the project interest rate risk. These swaptions matured over a series of seven scheduled settlement dates to correspond with the completion dates of the project. As of December 31, 2013, all of the swaptions have expired.

#### NRG West Holdings Credit Agreement

On August 23, 2011, NRG, through its wholly-owned subsidiary, NRG West Holdings LLC, or West Holdings, entered into a credit agreement with a group of lenders in respect to the El Segundo Energy Center, or the West Holdings Credit Agreement. The West Holdings Credit Agreement, which establishes a $540 million, two tranche construction loan facility with additional facilities for the issuance of letters of credit or working capital loans, is secured by the assets of West Holdings.

The two tranche construction loan facility consists of the $480 million Tranche A Construction Facility, or the Tranche A Facility, and the $60 million Tranche B Construction Facility, or the Tranche B Facility. The Tranche A and Tranche B Facilities, which mature in August 2023, convert to a term loan and have an interest rate of LIBOR, plus an applicable margin which increases by 0.125% periodically from conversion through year eight for the Tranche A Facility and increases by 0.125% upon term conversion and on the third and sixth anniversary of the term conversion and by 0.250% on the eighth anniversary of the term conversion for the Tranche B Facility. The Tranche A and Tranche B Facilities amortize based upon a predetermined schedule over the term of the loan with the balance payable at maturity.

The West Holdings Credit Agreement also provides for the issuance of letters of credit and working capital loans to support the El Segundo Energy Center collateral needs. This includes letter of credit facilities on behalf of West Holdings of up to $90 million in support of the PPA, up to $48 million in support of the collateral agent, and a working capital facility which permits loans or the issuance of letters of credit of up to $10 million.

As of December 31, 2013, under the West Holdings Credit Agreement, West Holdings borrowed $480 million under the Tranche A Facility, $32 million under the Tranche B Facility, issued a $33 million letter of credit in support of the PPA, and issued a $1 million letter of credit under the working capital facility.

#### Agua Caliente Financing

On August 5, 2011, NRG acquired Agua Caliente, as discussed in Note 3, *Business Acquisitions and Dispositions*. In connection with the acquisition, Agua Caliente Solar LLC, a wholly-owned subsidiary of NRG, entered into the Agua Caliente Financing Agreement with the FFB, to borrow up to $967 million to finance the costs of constructing this solar facility. The Agua Caliente Financing Agreement, which matures in 2037, is non-recourse to NRG. Funding requests will be submitted to the FFB on a monthly basis and the loans provided by the FFB are guaranteed by the U.S. DOE. Amounts borrowed under the Agua Caliente Financing Agreement accrue interest at a fixed rate based on U.S. Treasury rates plus a spread of 0.375%, and are secured by the assets of Agua Caliente. As of December 31, 2013, $878 million had been drawn under this agreement.

*Ivanpah Financing*

On April 5, 2011, NRG acquired a majority interest in Ivanpah, as discussed in Note 3, *Business Acquisitions and Dispositions*. On April 5, 2011, Ivanpah entered into the Ivanpah Credit Agreement with the FFB to borrow up to $1.6 billion to finance the costs of constructing the Ivanpah solar facilities. Each phase of the project is governed by a separate financing agreement and is non-recourse to both the other projects and to NRG. Funding requests are submitted to the FFB on a monthly basis and the loans provided by the FFB are guaranteed by the U.S. DOE. Amounts borrowed under the Ivanpah Credit Agreement accrue interest at a fixed rate based on U.S. Treasury rates plus a spread of 0.375% and are secured by all the assets of Ivanpah. On February 27, 2014, Solar Partners II received an extension with respect to its borrowings previously due in 2014, which are subsequently due in 2015. Solar Partners II intends to submit an application to the U.S. Department of Treasury for a cash grant; any proceeds received will be utilized to repay the borrowings that mature in 2015.

The following table reflects the borrowings under the Ivanpah Credit Agreement as of December 31, 2013:

| | Maximum borrowings available under Ivanpah Credit Agreement | Amounts borrowed | Weighted average interest rate on amounts borrowed |
|---|---|---|---|
| | | (In millions, except rates) | |
| Solar Partners I, due June 27, 2014 [a] | $ 159 | $ 159 | 1.680% |
| Solar Partners I, due June 27, 2033 | 392 | 371 | 2.808% |
| Solar Partners II, due February 27, 2014 [a] | 132 | 132 | 1.611% |
| Solar Partners II, due February 27, 2038 | 387 | 377 | 3.132% |
| Solar Partners VIII, due October 27, 2014 [a] | 117 | 116 | 1.998% |
| Solar Partners VIII, due October 27, 2038 | 440 | 420 | 3.097% |
| | $ 1,627 | $ 1,575 | |

(a)   The cash portion of the loan is fully drawn; additional amounts will be utilized for capitalized interest.

*Peakers*

In June 2002, NRG Peaker Finance Company LLC, or Peakers, an indirect wholly-owned subsidiary of NRG, issued $325 million in floating rate bonds due June 2019. Peakers subsequently swapped such floating rate debt for fixed rate debt at an all-in cost of 6.67% per annum. Principal, interest, and swap payments were originally guaranteed by Syncora Guarantee Inc., successor in interest to XL Capital Assurance, through a financial guaranty insurance policy. In 2009, Assured Guaranty Mutual Corp assumed the responsibility as the bond insurer and controlling party. Syncora Guarantee Inc. continues to be the swap insurer. These notes are also secured by, among other things, substantially all of the assets of and membership interests in Bayou Cove Peaking Power LLC, Big Cajun I Peaking Power LLC, NRG Sterlington Power LLC, NRG Rockford LLC, NRG Rockford II LLC, and NRG Rockford Equipment LLC. As of December 31, 2013, $165 million in principal remained outstanding on these bonds. Upon emergence from bankruptcy, NRG issued a $36 million letter of credit to Peakers' collateral agent. The letter of credit may be drawn if the project is unable to meet principal or interest payments. There are no provisions requiring NRG to replenish the letter of credit if it is drawn. On December 10, 2012, the collateral agent drew the remaining $4 million on the letter of credit, and NRG contributed $19 million in equity to Peakers to meet its debt service requirements. On December 10, 2013, NRG contributed an additional $32 million in equity to Peakers to meet its debt service requirements. As of December 31, 2013, nothing remains available for additional letters of credit issuances.

On February 21, 2014, NRG Peaker Finance Company LLC elected to redeem approximately $30 million of the outstanding bonds at a redemption price equal to the principal amount plus a redemption premium, accrued and unpaid interest, and other fees, totaling approximately $35 million in connection with the removal of Bayou Cove Peaking Power LLC from the peaker financing collateral package, which also involved limited commitments for certain repairs on other assets that were funded concurrently with the making of the December 10, 2013 debt service payment. The removal of Bayou Cove Peaking Power LLC from the collateral package provides the Company flexibility on future transactions with respect to this asset.

### Interest Rate Swaps — Project Financings

Many of NRG's project subsidiaries entered into interest rate swaps, intended to hedge the risks associated with interest rates on non-recourse project level debt. These swaps amortize in proportion to their respective loans and are floating for fixed where the project subsidiary pays its counterparty the equivalent of a fixed interest payment on a predetermined notional value and will receive quarterly the equivalent of a floating interest payment based on the same notional value. All interest rate swap payments by the project subsidiary and its counterparty are made quarterly and the LIBOR is determined in advance of each interest period. The following table summarizes the swaps, some of which are forward starting as indicated, related to NRG's project level debt as of December 31, 2013.

| Non-Recourse Debt | % of Principal | Fixed Interest Rate | Floating Interest Rate | Notional Amount at December 31, 2013 (In millions) | Effective Date | Maturity Date |
|---|---|---|---|---|---|---|
| NRG Peaker Finance Co. LLC | 100% | 6.673% | 3-mo. LIBOR + 1.07% | $ 165 | June 18, 2002 | June 10, 2019 |
| NRG West Holdings LLC | 75% | 2.417% | 3-mo. LIBOR | 405 | November 30, 2011 | August 31, 2023 |
| South Trent Wind LLC | 75% | 3.265% | 3-mo. LIBOR | 51 | June 15, 2010 | June 14, 2020 |
| South Trent Wind LLC | 75% | 4.95% | 3-mo. LIBOR | 21 | June 30, 2020 | June 14, 2028 |
| NRG Solar Roadrunner LLC | 75% | 4.313% | 3-mo. LIBOR | 33 | September 30, 2011 | December 31, 2029 |
| NRG Solar Alpine LLC | 85% | 2.744% | 3-mo. LIBOR | 135 | December 31, 2012 | December 31, 2029 |
| NRG Solar Avra Valley LLC | 90% | 2.333% | 3-mo. LIBOR | 56 | November 30, 2012 | November 30, 2030 |
| NRG Marsh Landing | 75% | 3.244% | 3-mo. LIBOR | 472 | June 28, 2013 | June 30, 2023 |
| Other | 75% | various | various | 104 | various | various |

### Consolidated Annual Maturities

Annual payments based on the maturities of NRG's debt, for the years ending after December 31, 2013, are as follows:

|  | (In millions) |
|---|---|
| 2014 | $ 1,045 |
| 2015 | 254 |
| 2016 | 270 |
| 2017 | 1,034 |
| 2018 | 4,035 |
| Thereafter | 10,166 |
| Total | $ 16,804 |

### Note 13 — Asset Retirement Obligations

NRG's AROs are primarily related to the future dismantlement of equipment on leased property and environmental obligations related to nuclear decommissioning, ash disposal, site closures, and fuel storage facilities. In addition, NRG has also identified conditional AROs for asbestos removal and disposal, which are specific to certain power generation operations.

See Note 6, *Nuclear Decommissioning Trust Fund,* for a further discussion of NRG's nuclear decommissioning obligations. Accretion for the nuclear decommissioning ARO and amortization of the related ARO asset are recorded to the Nuclear Decommissioning Trust Liability to the ratepayers and are not included in net income, consistent with regulatory treatment.

The following table represents the balance of ARO obligations as of December 31, 2013, and 2012, along with the additions, reductions and accretion related to the Company's ARO obligations for the year ended December 31, 2013:

|  | (In millions) |
|---|---|
| **Balance as of December 31, 2012** | $ 646 |
| Revisions in estimates for current obligations | (77) |
| Additions | 29 |
| Spending for current obligations | (5) |
| Accretion — Expense | 19 |
| Accretion — Nuclear decommissioning | 17 |
| **Balance as of December 31, 2013** | $ 629 |

**Note 14 — Benefit Plans and Other Postretirement Benefits**

NRG sponsors and operates defined benefit pension and other postretirement plans. As part of the GenOn acquisition, discussed in Note 3, *Business Acquisitions and Dispositions*, NRG assumed GenOn's defined benefit pension plans and other postretirement benefit plans, and GenOn's benefit plan obligations were recorded at fair value at the time of the acquisition. NRG expects to contribute $78 million to the Company's pension plans in 2014.

NRG pension benefits are available to eligible non-union and union employees through various defined benefit pension plans. These benefits are based on pay, service history and age at retirement. Most pension benefits are provided through tax-qualified plans. Certain executive pension benefits that cannot be provided by the tax-qualified plans are provided through unfunded non-tax-qualified plans. NRG also provides postretirement health and welfare benefits for certain groups of employees. Cost sharing provisions vary by the terms of any applicable collective bargaining agreements.

As part of the change in control associated with the GenOn acquisition, NRG has decided to terminate/settle the nonqualified legacy GenOn Benefit Restoration Plan and Supplemental Executive Retirement Plan. Final settlement payments totaling $12 million will be paid to remaining participants in the first quarter of 2014.

*NRG Defined Benefit Plans*

The annual net periodic benefit cost related to NRG's pension and other postretirement benefit plans include the following components:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | Pension Benefits | | | | | |
| | 2013 | | 2012 | | 2011 | |
| | (In millions) | | | | | |
| Service cost benefits earned | $ | 30 | $ | 14 | $ | 14 |
| Interest cost on benefit obligation | | 47 | | 23 | | 21 |
| Expected return on plan assets | | (55) | | (23) | | (21) |
| Amortization of unrecognized net loss | | 9 | | 4 | | — |
| Curtailment | | (1) | | — | | — |
| Net periodic benefit cost | $ | 30 | $ | 18 | $ | 14 |

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | Other Postretirement Benefits | | | | | |
| | 2013 | | 2012 | | 2011 | |
| | (In millions) | | | | | |
| Service cost benefits earned | $ | 4 | $ | 2 | $ | 2 |
| Interest cost on benefit obligation | | 9 | | 6 | | 6 |
| Amortization of unrecognized net loss | | — | | 1 | | — |
| Net periodic benefit cost | $ | 13 | $ | 9 | $ | 8 |

A comparison of the pension benefit obligation, other postretirement benefit obligations and related plan assets for NRG's plans on a combined basis is as follows:

| | As of December 31, | | | |
|---|---|---|---|---|
| | Pension Benefits | | Other Postretirement Benefits | |
| | 2013 | 2012 | 2013 | 2012 |
| | (In millions) | | | |
| Benefit obligation at January 1 | $ 1,147 | $ 456 | $ 220 | $ 122 |
| Obligations assumed in the GenOn acquisition | — | 596 | — | 87 |
| Service cost | 30 | 14 | 4 | 2 |
| Interest cost | 47 | 23 | 9 | 6 |
| Plan amendments | 5 | — | (4) | (1) |
| Actuarial (gain)/loss | (125) | 75 | (29) | 6 |
| Employee and retiree contributions | — | — | 2 | 1 |
| Benefit payments | (43) | (17) | (11) | (3) |
| Curtailment | (1) | — | — | — |
| Benefit obligation at December 31 | 1,060 | 1,147 | 191 | 220 |
| Fair value of plan assets at January 1 | 757 | 308 | — | — |
| Assets acquired in the GenOn acquisition | — | 402 | — | — |
| Actual return on plan assets | 116 | 41 | — | — |
| Employee contributions | — | — | 2 | 1 |
| Employer contributions | 50 | 23 | 9 | 2 |
| Benefit payments | (43) | (17) | (11) | (3) |
| Fair value of plan assets at December 31 | 880 | 757 | — | — |
| Funded status at December 31 — excess of obligation over assets | $ (180) | $ (390) | $ (191) | $ (220) |

Amounts recognized in NRG's balance sheets were as follows:

| | As of December 31, | | | |
|---|---|---|---|---|
| | Pension Benefits | | Other Postretirement Benefits | |
| | 2013 | 2012 | 2013 | 2012 |
| | (In millions) | | | |
| Current liabilities | $ 12 | $ 1 | $ 9 | $ 9 |
| Non-current liabilities | 166 | 389 | 182 | 211 |

Amounts recognized in NRG's accumulated OCI that have not yet been recognized as components of net periodic benefit cost were as follows:

| | As of December 31, | | | |
|---|---|---|---|---|
| | Pension Benefits | | Other Postretirement Benefits | |
| | 2013 | 2012 | 2013 | 2012 |
| | (In millions) | | | |
| Unrecognized (gain)/loss | $ (57) | $ 140 | $ (12) | $ 17 |
| Prior service cost/(credit) | 4 | (2) | (6) | (2) |

164

Other changes in plan assets and benefit obligations recognized in OCI were as follows:

| | Year Ended December 31, | | | |
| | Pension Benefits | | Other Postretirement Benefits | |
| | 2013 | 2012 | 2013 | 2012 |
| | (In millions) | | | |
| Unrecognized (gain)/loss | $ (188) | $ 56 | $ (29) | $ 7 |
| Amortization of net actuarial gain | (9) | (4) | — | (1) |
| Prior service credit | 5 | — | (4) | (1) |
| Curtailment | 1 | — | — | — |
| Total recognized in other comprehensive loss | $ (191) | $ 52 | $ (33) | $ 5 |
| Total recognized in net periodic pension cost and other comprehensive income | $ (161) | $ 71 | $ (20) | $ 13 |

The Company's estimated unrecognized gain and unrecognized prior service cost for NRG's pension plan that will be amortized from accumulated OCI to net periodic cost over the next fiscal year is approximately $5 million. The Company's estimated unrecognized gain and unrecognized prior service cost for NRG's postretirement plan that will be amortized from accumulated OCI to net periodic cost over the next fiscal year is $2 million.

The following table presents the balances of significant components of NRG's pension plan:

| | As of December 31, | |
| | Pension Benefits | |
| | 2013 | 2012 |
| | (In millions) | |
| Projected benefit obligation | $ 1,060 | $ 1,147 |
| Accumulated benefit obligation | 967 | 1,024 |
| Fair value of plan assets | 880 | 757 |

NRG's market-related value of its plan assets is the fair value of the assets. The fair values of the Company's pension plan assets by asset category and their level within the fair value hierarchy are as follows:

| | Fair Value Measurements as of December 31, 2013 | | |
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Observable Inputs (Level 2) | Total |
| | (In millions) | | |
| Common/collective trust investment — U.S. equity | — | 370 | 370 |
| Common/collective trust investment — non-U.S. equity | — | 212 | 212 |
| Common/collective trust investment — fixed income | — | 296 | 296 |
| Short-term investment fund | 2 | — | 2 |
| Total | $ 2 | $ 878 | $ 880 |

| | Fair Value Measurements as of December 31, 2012 | | |
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Observable Inputs (Level 2) | Total |
| | (In millions) | | |
| U.S. equity investment | $ — | $ 26 | $ 26 |
| Non-U.S. equity investment | 24 | 44 | 68 |
| Corporate bond investment — fixed income | — | 32 | 32 |
| Common/collective trust investment — U.S. equity | — | 290 | 290 |
| Common/collective trust investment — non-U.S. equity | — | 111 | 111 |
| Common/collective trust investment — fixed income | — | 228 | 228 |
| Short-term investment fund | — | 2 | 2 |
| Total | $ 24 | $ 733 | $ 757 |

165

In accordance with ASC 820, the Company determines the level in the fair value hierarchy within which each fair value measurement in its entirety falls, based on the lowest level input that is significant to the fair value measurement in its entirety. The fair value of the U.S. and non-U.S. equity investments and the corporate bond investment is based on quoted prices in active markets, and is categorized as Level 1. All equity investments are valued at the net asset value of shares held at year end. The fair value of the corporate bond investment is based on the closing price reported on the active market on which the individual securities are traded. The fair value of the common/collective trusts is valued at fair value which is equal to the sum of the market value of all of the fund's underlying investments, and is categorized as Level 2. There are no investments categorized as Level 3.

The following table presents the significant assumptions used to calculate NRG's benefit obligations:

| | As of December 31, | | | |
|---|---|---|---|---|
| | Pension Benefits | | Other Postretirement Benefits | |
| **Weighted-Average Assumptions** | **2013** | **2012** | **2013** | **2012** |
| Discount rate | 4.99% | 4.16% | 5.06% | 4.31% |
| Rate of compensation increase | 3.65% | 3.57% | N/A | N/A |
| Health care trend rate | — | — | 8.5% grading to 5.5% in 2019 | 8.0% grading to 5.0% in 2019 |

The following table presents the significant assumptions used to calculate NRG's benefit expense:

| | As of December 31, | | | | | |
|---|---|---|---|---|---|---|
| | Pension Benefits | | | Other Postretirement Benefits | | |
| **Weighted-Average Assumptions** | **2013** | **2012** | **2011** | **2013** | **2012** | **2011** |
| Discount rate | 4.16% | 4.95% | 5.47% | 4.31% | 5.15% | 5.77% |
| Expected return on plan assets | 7.12% | 6.96% | 7.34% | — | — | — |
| Rate of compensation increase | 3.57% | 4.34% | 4.4% | — | — | — |
| Health care trend rate | — | — | — | 8.3% grading to 5.3% in 2019 | 8.0% grading to 5.0% in 2019 | 8.0% grading to 5.0% in 2019 |

NRG uses December 31 of each respective year as the measurement date for the Company's pension and other postretirement benefit plans. The Company sets the discount rate assumptions on an annual basis for each of NRG's retirement related benefit plans at their respective measurement date. This rate is determined by NRG's Investment Committee based on information provided by the Company's actuary. The discount rate assumptions reflect the current rate at which the associated liabilities could be effectively settled at the end of the year. The discount rate assumptions used to determine the future pension obligation as of December 31, 2013, 2012 and 2011 were based on the Aon Hewitt AA Above Median, or AAM, yield curve, which was designed by Aon Hewitt to provide a means for corporate plan sponsors to value the liabilities of defined pension benefit and other post retirement benefit plans. The AAM is a hypothetical Aa yield curve represented by a series of annualized individual discount rates from 0.5 to 99 years. Each bond issue is required to have an average rating of AA, when averaging all available ratings by Moody's Investor Services, Standard & Poor's and Fitch.

NRG employs a total return investment approach, whereby a mix of equities and fixed income investments are used to maximize the long-term return of plan assets for a prudent level of risk. Risk tolerance is established through careful consideration of plan liabilities, plan funded status, and corporate financial condition. The Investment Committee reviews the asset mix periodically and as the plan assets increase in future years, the Investment Committee may examine other asset classes such as real estate or private equity. NRG employs a building block approach to determining the long-term rate of return for plan assets, with proper consideration given to diversification and rebalancing. Historical markets are studied and long-term historical relationships between equities and fixed income are preserved, consistent with the widely accepted capital market principle that assets with higher volatility generate a greater return over the long run. Current factors such as inflation and interest rates are evaluated before long-term capital market assumptions are determined. Peer data and historical returns are reviewed to check for reasonableness and appropriateness.

The target allocations of NRG's pension plan assets were as follows for the years ended December 31, 2013 and 2012:

| | |
|---|---|
| U.S. equity | 38.5 - 45.5% |
| Non-U.S. equity | 16.5 - 28% |
| U.S. fixed income | 30 - 45% |

Plan assets are currently invested in a diversified blend of equity and fixed-income investments. Furthermore, equity investments are diversified across U.S. and non-U.S. equities, as well as among growth, value, small and large capitalization stocks.

NRG's expected future benefit payments for each of the next five years, and in the aggregate for the five years thereafter, are as follows:

| | Pension Benefit Payments | Other Postretirement Benefit | |
| | | Benefit Payments | Medicare Prescription Drug Reimbursements |
|---|---|---|---|
| | | (In millions) | |
| 2014 | $ 60 | $ 9 | $ — |
| 2015 | 53 | 10 | — |
| 2016 | 58 | 10 | — |
| 2017 | 59 | 10 | — |
| 2018 | 63 | 11 | — |
| 2019-2023 | 362 | 62 | 2 |

Assumed health care cost trend rates have a significant effect on the amounts reported for the health care plans. A one-percentage-point change in assumed health care cost trend rates would have the following effect:

| | 1-Percentage-Point Increase | 1-Percentage-Point Decrease |
|---|---|---|
| | (In millions) | |
| Effect on total service and interest cost components | $ 1 | $ (1) |
| Effect on postretirement benefit obligation | 14 | (11) |

### STP Defined Benefit Plans

NRG has a 44% undivided ownership interest in STP, as discussed further in Note 27, *Jointly Owned Plants*. STPNOC, which operates and maintains STP, provides its employees a defined benefit pension plan as well as postretirement health and welfare benefits. Although NRG does not sponsor the STP plan, it reimburses STPNOC for 44% of the contributions made towards its retirement plan obligations. For the years ending December 31, 2013 and 2012, NRG reimbursed STPNOC $14 million and $15 million, respectively, towards its defined benefit plans. In 2014, NRG expects to reimburse STPNOC $18 million for its contributions towards the plans.

The Company has recognized the following in its statement of financial position, statement of operations and accumulated OCI related to its 44% interest in STP:

| | As of December 31, | | | |
| | Pension Benefits | | Other Postretirement Benefits | |
| | 2013 | 2012 | 2013 | 2012 |
|---|---|---|---|---|
| | (In millions) | | | |
| Funded status — STPNOC benefit plans | $ (42) | $ (76) | $ (52) | $ (56) |
| Net periodic benefit costs | 11 | 10 | 8 | 8 |
| Other changes in plan assets and benefit obligations recognized in other comprehensive income | (31) | 14 | (10) | 1 |

### Defined Contribution Plans

NRG's employees are also eligible to participate in defined contribution 401(k) plans. Upon completion of the GenOn acquisition, NRG assumed GenOn's defined contribution 401(k) plans and amended the plan covering the majority of employees with NRG 401(k) plan features, effective January 1, 2013. On July 5, 2013, the GenOn defined contribution 401(k) plans were merged into the NRG 401(k) plan.

The Company's contributions to these plans were as follows:

| | Year Ended December 31, | | |
| | 2013 | 2012 [a] | 2011 |
|---|---|---|---|
| | (In millions) | | |
| Company contributions to defined contribution plans | $ 34 | $ 24 | $ 24 |

(a)   Includes contributions to former GenOn plans for the period of December 15, 2012 to December 31, 2012.

**Note 15 — Capital Structure**

For the period from December 31, 2010 to December 31, 2013, the Company had 10,000,000 shares of preferred stock authorized, 500,000,000 shares of common stock authorized and 250,000 shares of preferred stock issued and outstanding. The following table reflects the changes in NRG's common shares issued and outstanding for each period presented:

| | Common | | |
|---|---|---|---|
| | Issued | Treasury | Outstanding |
| **Balance as of December 31, 2010** | 304,006,027 | (56,808,672) | 247,197,355 |
| Shares issued under ESPP | — | 120,127 | 120,127 |
| Shares issued from LTIP | 177,693 | — | 177,693 |
| Share repurchases | — | (19,975,654) | (19,975,654) |
| **Balance as of December 31, 2011** | 304,183,720 | (76,664,199) | 227,519,521 |
| Shares issued under ESPP | — | 158,481 | 158,481 |
| Shares issued under LTIPs | 996,262 | — | 996,262 |
| Shares issued through GenOn acquisition | 93,932,634 | — | 93,932,634 |
| **Balance as of December 31, 2012** | 399,112,616 | (76,505,718) | 322,606,898 |
| Shares issued under ESPP | — | 130,482 | 130,482 |
| Shares issued under LTIPs | 2,014,164 | — | 2,014,164 |
| Share repurchases | — | (972,292) | (972,292) |
| **Balance as of December 31, 2013** | 401,126,780 | (77,347,528) | 323,779,252 |

**Common Stock**

The following table summarizes NRG's common stock reserved for the maximum number of shares potentially issuable based on the conversion and redemption features of outstanding equity instruments and the long-term incentive plans as of December 31, 2013:

| Equity Instrument | Common Stock Reserve Balance |
|---|---|
| 3.625% Convertible perpetual preferred | 16,000,000 |
| Long-term incentive plans | 21,121,160 |
| Total | 37,121,160 |

*Common stock dividends* — NRG paid its first quarterly dividend on the Company's common stock of $0.09 per share, or $0.36 per share on an annualized basis, on August 15, 2012. In 2013, the Company increased its annual common stock dividend by 33% to $0.48 per share. The following table lists the dividends paid per common share during 2013 and 2012:

| | First Quarter | | Second Quarter | | Third Quarter | | Fourth Quarter | |
|---|---|---|---|---|---|---|---|---|
| 2013 | $ | 0.09 | $ | 0.12 | $ | 0.12 | $ | 0.12 |
| 2012 | $ | — | $ | — | $ | 0.09 | $ | 0.09 |

On February 17, 2014, NRG paid a quarterly dividend on the Company's common stock of $0.12 per share.

*Employee Stock Purchase Plan* — Under the ESPP eligible employees may elect to withhold up to 10% of their eligible compensation to purchase shares of NRG common stock at 85% of its fair market value on the exercise date. An exercise date occurs each June 30 and December 31. As of December 31, 2013, there remained 888,388 shares of treasury stock reserved for issuance under the ESPP, and in the first quarter of 2014, 71,478 shares of common stock were issued to employee accounts from treasury stock.

*2013 Capital Allocation Program* — The Company was authorized to repurchase $200 million of its common stock in 2013 under the 2013 Capital Allocation Program. During the first quarter, the Company purchased 972,292 shares of NRG common stock for approximately $25 million at an average cost of $25.88 per share. As a result of the proposed acquisition of EME, the Company did not complete the remaining $175 million of share repurchases under the 2013 Capital Allocation Program.

**Preferred Stock**

*3.625% Redeemable Preferred Stock*

On August 11, 2005, NRG issued 250,000 shares of 3.625% Convertible Perpetual Preferred Stock, or 3.625% Preferred Stock, which is treated as Redeemable Preferred Stock, to the Credit Suisse Group in a private placement. The 3.625% Preferred Stock amount is located after the liabilities but before the stockholders' equity section on the balance sheet, due to the fact that the preferred shares can be redeemed in cash by the stockholder. The 3.625% Preferred Stock has a liquidation preference of $1,000 per share. Holders of the 3.625% Preferred Stock are entitled to receive, out of legally available funds, cash dividends at the rate of 3.625% per annum, or $36.25 per share per year, payable in cash quarterly in arrears commencing on December 15, 2005.

Each share of the 3.625% Preferred Stock is convertible during the 90-day period beginning August 11, 2015, at the option of NRG or the holder. Holders tendering the 3.625% Preferred Stock for conversion shall be entitled to receive, for each share of 3.625% Preferred Stock converted, $1,000 in cash and a number of shares of NRG common stock equal in value to the product of (a) the greater of (i) the difference between the average closing share price of NRG common stock on each of the twenty consecutive scheduled trading days starting on the date thirty exchange business days immediately prior to the conversion date, or the Market Price, and $29.54 and (ii) zero, times (b) 50.77. The number of shares of NRG common stock to be delivered under the conversion feature is limited to 16,000,000 shares. If upon conversion, the Market Price is less than $19.69, then the Holder will deliver to NRG cash or a number of shares of NRG common stock equal in value to the product of (i) $19.69 minus the Market Price, times (ii) 50.77. NRG may elect to make a cash payment in lieu of delivering shares of NRG common stock in connection with such conversion, and NRG may elect to receive cash in lieu of shares of common stock, if any, from the Holder in connection with such conversion. The conversion feature is considered an embedded derivative per ASC 815 that is exempt from derivative accounting as it is excluded from the scope pursuant to ASC 815.

If a fundamental change occurs, the holders will have the right to require NRG to repurchase all or a portion of the 3.625% Preferred Stock for a period of time after the fundamental change at a purchase price equal to 100% of the liquidation preference, plus accumulated and unpaid dividends. The 3.625% Preferred Stock is senior to all classes of common stock, and junior to all of the Company's existing and future debt obligations and all of NRG subsidiaries' existing and future liabilities and capital stock held by persons other than NRG or its subsidiaries.

**Note 16 — Investments Accounted for by the Equity Method and Variable Interest Entities**

NRG accounts for the Company's significant investments using the equity method of accounting. NRG's carrying value of equity investments can be impacted by impairments, unrealized gains and losses on derivatives and movements in foreign currency exchange rates, as well as other adjustments.

The following table summarizes NRG's equity method investments as of December 31, 2013:

| Name | Geographic Area | Economic Interest |
|------|-----------------|-------------------|
| Avenal Solar Holdings LLC | United States | 50.0% |
| GenConn Energy LLC | United States | 50.0% |
| Saguaro Power Company | United States | 50.0% |
| Sherbino I Wind Farm LLC | United States | 50.0% |
| Texas Coastal Ventures, LLC | United States | 50.0% |
| Sabine CoGen, LP | United States | 50.0% |
| Sunora Energy Solutions I LLC | United States | 50.0% |
| Gladstone Power Station | Australia | 37.5% |

| | As of December 31, | | | |
|------|------|------|------|------|
| | 2013 | | 2012 | |
| | (In millions) | | | |
| **Undistributed earnings from equity investments** | $ | 94 | $ | 149 |

**Variable Interest Entities**

NRG accounts for its interests in certain entities that are considered VIEs under ASC 810, but NRG is not the primary beneficiary, under the equity method.

*GenConn Energy LLC* — NRG owns a 50% interest in GenConn, a limited liability company formed to construct, own and operate two 190MW peaking generation facilities in Connecticut at NRG's Devon and Middletown sites. Each of these facilities was constructed pursuant to 30-year cost of service type contracts with the Connecticut Light & Power Company. All four units at the GenConn Devon facility reached commercial operation in 2010 and were released to the ISO-NE by July 2010. In June 2011, the GenConn Middletown facility reached commercial operation and was released to the ISO-NE. The project was funded through equity contributions from the owners and non-recourse, project level debt. As of December 31, 2013, NRG had a $118 million equity investment in GenConn. NRG's maximum exposure to loss is limited to its equity investment.

In April 2009, GenConn secured financing for 50% of the Devon and Middletown project construction costs through a seven-year term loan facility, and also entered into a five-year revolving working capital loan and letter of credit facility, which collectively with the term loan is referred to as the GenConn Facility. The aggregate credit amount secured under the GenConn Facility, which is non-recourse to NRG, is $291 million, including $48 million for the working capital facility. In March 2012, the working capital facility was amended to $35 million. On September 17, 2013, GenConn refinanced its existing project financing facility. The refinanced facility is comprised of a $237 million note with an interest rate of 4.73% and a maturity date of July 2041 and a 5-year, $35 million working capital facility which can be used to issue letters of credit at an interest rate of 1.875%. The refinancing is secured by all of the GenConn assets.

As discussed in Note 21, *Related Party Transactions*, in 2010 and 2011, NRG earned revenues from construction management agreements with Devon and Middletown and interest income from a note receivable with GenConn.

*Sherbino I Wind Farm LLC* — NRG owns a 50% interest in Sherbino, a joint venture with BP Wind Energy North America Inc. Sherbino is a 150 MW wind farm, which commenced commercial operations in October 2008. In December 2008, Sherbino entered into a 15-year term loan facility which is non-recourse to NRG. As of December 31, 2013, the outstanding principal balance of the term loan facility was $114 million, and is secured by substantially all of Sherbino's assets and membership interests. NRG's maximum exposure to loss is limited to its equity investment, which was $87 million as of December 31, 2013.

*Texas Coastal Ventures, LLC* — NRG owns a 50% interest in Texas Coastal Ventures, LLC, or TCV, a joint venture with Hilcorp Energy I, L.P., through its subsidiary Petra Nova LLC. Texas Coastal Ventures was formed by Petra Nova and Hilcorp for the purpose of using carbon dioxide captured from flue gas from certain of NRG's coal-generating power plants in the United States Gulf Coast in an enhanced oil recovery process. TCV is managed by the joint venture participants and operated by Hilcorp. TCV entered into service agreements with Petra Nova LLC, which include a management services agreement for the operation and management of the joint venture's pipeline assets, as well as a $CO_2$ supply agreement having an initial term of twenty years. NRG's maximum exposure to loss is limited to its equity investment, which was $63 million as of December 31, 2013.

**Other Equity Investments**

*Gladstone* — Through a joint venture, NRG owns a 37.5% interest in Gladstone, a 1,613 megawatt coal-fueled power generation facility in Queensland, Australia. The power generation facility is managed by the joint venture participants and the facility is operated by NRG. Operating expenses incurred in connection with the operation of the facility are funded by each of the participants in proportion to their ownership interests. Coal is sourced from local mines in Queensland. NRG and the joint venture participants receive their respective share of revenues directly from the off takers in proportion to the ownership interests in the joint venture. Power generated by the facility is primarily sold to an adjacent aluminum smelter, with excess power sold to the Queensland Government owned utility under long term supply contracts. The Company recorded an impairment loss for Gladstone in the fourth quarter of 2013 of $92 million, as described in Note 10, *Asset Impairments.* NRG's investment in Gladstone was $188 million as of December 31, 2013.

**Note 17 — (Loss)/Earnings Per Share**

Basic (loss)/earnings per common share is computed by dividing net (loss)/income less accumulated preferred stock dividends by the weighted average number of common shares outstanding. Shares issued and treasury shares repurchased during the year are weighted for the portion of the year that they were outstanding. Diluted (loss)/earnings per share is computed in a manner consistent with that of basic (loss)/earnings per share while giving effect to all potentially dilutive common shares that were outstanding during the period.

*Dilutive effect for equity compensation and other equity instruments* — The outstanding non-qualified stock options, non-vested restricted stock units, deferred stock units, market stock units and performance units are not considered outstanding for purposes of computing basic (loss)/earnings per share. However, these instruments are included in the denominator for purposes of computing diluted (loss)/earnings per share under the treasury stock method. The if-converted method is used to determine the dilutive effect of embedded derivatives in the Company's 3.625% Preferred Stock.

The reconciliation of NRG's basic (loss)/earnings per share to diluted (loss)/earnings per share is shown in the following table:

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2013** | **2012** | **2011** |
| | **(In millions, except per share amounts)** | | |
| **Basic (loss)/earnings per share attributable to NRG common stockholders** | | | |
| Net (loss)/income attributable to NRG Energy, Inc. | $ (386) | $ 295 | $ 197 |
| Dividends for preferred shares | 9 | 9 | 9 |
| (Loss)/Income Available to Common Stockholders | $ (395) | $ 286 | $ 188 |
| Weighted average number of common shares outstanding | 323 | 232 | 240 |
| **(Loss)/Earnings per weighted average common share — basic** | $ (1.22) | $ 1.23 | $ 0.78 |
| **Diluted (loss)/earnings per share attributable to NRG common stockholders** | | | |
| Weighted average number of common shares outstanding | 323 | 232 | 240 |
| Incremental shares attributable to the issuance of equity compensation (treasury stock method) | — | 2 | 1 |
| Total dilutive shares | 323 | 234 | 241 |
| **(Loss)/Earnings per weighted average common share — diluted** | $ (1.22) | $ 1.22 | $ 0.78 |

The following table summarizes NRG's outstanding equity instruments that are anti-dilutive and were not included in the computation of the Company's diluted (loss)/earnings per share:

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2013** | **2012** | **2011** |
| | **(In millions of shares)** | | |
| Equity compensation | 9 | 8 | 7 |
| Embedded derivative of 3.625% redeemable perpetual preferred stock | 16 | 16 | 16 |
| Total | 25 | 24 | 23 |

**Note 18 — Segment Reporting**

Effective June 2013, the Company's segment structure and its allocation of corporate expenses were updated to reflect how management currently makes financial decisions and allocates resources. The Company has recast data from prior periods to reflect this change in reportable segments to conform to the current year presentation. The Company's businesses are primarily segregated based on the Retail Business, conventional power generation, alternative energy businesses, NRG Yield, and corporate activities. Within NRG's conventional power generation, there are distinct components with separate operating results and management structures for the following geographical regions: Texas, East, South Central, West and Other, which includes international businesses and maintenance services. The Company's alternative energy segment includes solar and wind assets (excluding those in the NRG Yield segment), electric vehicle services and the carbon capture business. NRG Yield includes certain of the Company's contracted generation assets including three natural gas or dual-fired facilities, eight utility-scale solar and wind generation facilities, two portfolios of distributed solar facilities and thermal infrastructure assets. Intersegment sales are accounted for at market.

For the years ended December 31, 2013, 2012, and 2011, there were no customers from whom the Company derived more than 10% of the Company's consolidated revenues.

| | | | | Year Ended December 31, 2013 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | **Conventional Power Generation** | | | | | | | | | |
| | **Retail** | **Texas** | **East** | **South Central** | **West** | **Other** | **Alternative Energy** | **NRG Yield** | **Corporate** | **Eliminations** | **Total** |
| | | | | | (In millions) | | | | | | |
| **Operating revenues** [(a)] | $ 6,241 | $ 2,106 | $ 3,209 | $ 874 | $ 475 | $ 153 | $ 233 | $ 313 | $ 7 | $ (2,316) | $ 11,295 |
| Operating expenses | 5,535 | 1,826 | 2,512 | 750 | 318 | 144 | 147 | 134 | 50 | (2,307) | 9,109 |
| Depreciation and amortization | 142 | 457 | 320 | 98 | 55 | 4 | 108 | 51 | 21 | — | 1,256 |
| Impairment charges | — | — | 459 | — | — | — | — | — | — | — | 459 |
| Acquisition-related transaction and integration costs | — | — | — | — | — | — | — | — | 128 | — | 128 |
| Operating income/ (loss) | 564 | (177) | (82) | 26 | 102 | 5 | (22) | 128 | (192) | (9) | 343 |
| Equity in earnings/ (loss) of unconsolidated affiliates | — | — | — | 4 | (11) | 6 | (4) | 22 | — | (10) | 7 |
| Impairment losses on investments | — | — | — | — | — | (99) | — | — | — | — | (99) |
| Other income, net | — | 1 | 28 | 1 | 1 | 3 | 2 | 2 | 74 | (99) | 13 |
| Loss on debt extinguishment | — | — | — | — | — | — | — | — | (50) | — | (50) |
| Interest expense | (2) | (1) | (85) | (18) | (14) | — | (57) | (35) | (735) | 99 | (848) |
| Income/(loss) before income taxes | 562 | (177) | (139) | 13 | 78 | (85) | (81) | 117 | (903) | (19) | (634) |
| Income tax (benefit)/expense | — | — | — | — | — | (29) | — | 8 | (261) | — | (282) |
| **Net income/(loss)** | $ 562 | $ (177) | $ (139) | $ 13 | $ 78 | $ (56) | $ (81) | $ 109 | $ (642) | $ (19) | $ (352) |
| Less: Net income attributable to noncontrolling interest | $ — | $ — | $ — | $ — | $ — | $ — | $ 27 | $ 13 | $ — | $ (6) | $ 34 |
| **Net income/(loss) attributable to NRG Energy, Inc.** | $ 562 | $ (177) | $ (139) | $ 13 | $ 78 | $ (56) | $ (108) | $ 96 | $ (642) | $ (13) | $ (386) |
| **Balance sheet** | | | | | | | | | | | |
| Equity investments in affiliates | — | — | 5 | 17 | (35) | 188 | 150 | 227 | — | (99) | 453 |
| Capital expenditures [(a)] | 30 | 119 | 181 | 88 | 136 | 15 | 818 | 116 | 73 | — | 1,576 |
| Goodwill | 260 | 1,713 | — | — | — | — | 12 | — | — | — | 1,985 |
| **Total assets** | 4,717 | 11,656 | 8,437 | 2,431 | 1,638 | 468 | 6,213 | 2,313 | 25,290 | (29,261) | 33,902 |

(b) Operating revenues include inter-segment

sales and net
derivative gains and
losses of:              $     9  $  2,058  $   87  $     16  $     4  $    64  $     23  $   —  $     7

(a) Includes accruals.

**Year Ended December 31, 2012**

| | | Conventional Power Generation | | | | | Alternative Energy | NRG Yield | Corporate(d) | Eliminations | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Retail | Texas | East(d) | South Central(d) | West(d) | Other | | | | | |
| | | | | | | (In millions) | | | | | |
| **Operating revenues**[(c)] | $ 5,772 | $ 2,074 | $ 854 | $ 807 | $ 259 | $ 173 | $ 125 | $ 175 | $ 17 | $ (1,834) | $ 8,422 |
| Operating expenses | 5,065 | 1,712 | 754 | 695 | 194 | 161 | 87 | 119 | 47 | (1,819) | 7,015 |
| Depreciation and amortization | 162 | 458 | 137 | 93 | 12 | 2 | 49 | 25 | 12 | — | 950 |
| Acquisition-related transaction and integration costs | — | — | — | — | — | — | — | — | 107 | — | 107 |
| Operating income/ (loss) | 545 | (96) | (37) | 19 | 53 | 10 | (11) | 31 | (149) | (15) | 350 |
| Equity in earnings/ (loss) of unconsolidated affiliates | — | — | — | — | 7 | 13 | — | 19 | (2) | | 37 |
| Impairment losses on investments | — | — | — | — | — | — | — | — | (2) | | (2) |
| Bargain purchase gain related to GenOn acquisition | — | — | — | — | — | — | — | — | 296 | — | 296 |
| Other income, net | — | 2 | 2 | 1 | 1 | 4 | — | 1 | 26 | (18) | 19 |
| Loss on debt extinguishment | — | — | — | — | — | — | — | — | (51) | — | (51) |
| Interest expense | (4) | — | (20) | (18) | (2) | (3) | (26) | (28) | (578) | 18 | (661) |
| Income/(loss) before income taxes | 541 | (94) | (55) | 2 | 59 | 24 | (37) | 23 | (460) | (15) | (12) |
| Income tax expense/ (benefit) | — | — | — | — | — | 3 | — | 10 | (340) | | (327) |
| **Net income/ (loss)** | 541 | (94) | (55) | 2 | 59 | 21 | (37) | 13 | (120) | (15) | 315 |
| Less: Net income attributable to noncontrolling interest | — | — | — | — | — | — | 20 | | — | — | 20 |
| **Net income/ (loss) attributable to NRG Energy, Inc.** | $ 541 | $ (94) | $ (55) | $ 2 | $ 59 | $ 21 | $ (57) | 13 | $ (120) | (15) | $ 295 |
| **Balance sheet** | | | | | | | | | | | |
| Equity investments in affiliates | $ — | $ — | $ 7 | $ 19 | $ 27 | $ 322 | $ 163 | $ 220 | $ 10 | $ (92) | $ 676 |
| Capital expenditures [(e)] | 19 | 117 | 71 | 36 | 244 | 16 | 2,700 | 478 | 12 | — | 3,693 |
| Goodwill | 231 | 1,713 | — | — | — | — | 12 | — | — | — | 1,956 |
| **Total assets** | $ 3,122 | $ 10,988 | $ 6,972 | $ 1,935 | $ 1,313 | $ 442 | $ 5,367 | $ 1,964 | 28,330 | $ (25,450) | $ 34,983 |

(c) Operating revenues include inter-segment sales and net derivative gains and losses of:

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | $ 5 | $ 1,657 | $ 73 | $ — | $ — | $ 69 | $ 20 | $ — | 10 | | |

(d) Includes GenOn results for the period December 15, 2012 to December 31, 2012.

(e) Includes accruals.

173

| | Retail[f)(g)] | Texas[f)] | East[f)] | South Central[f)] | West[f)] | Other[f)] | Alternative Energy[f)] | NRG Yield[f)] | Corporate[f)] | Eliminations | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | (In millions) | | | | |
| **Operating revenues** | $ 5,642 | $ 2,832 | $ 924 | $ 817 | $ 149 | $ 183 | $ 22 | $ 164 | $ 11 | $ (1,665) | $ 9,079 |
| Operating expenses | 5,113 | 1,910 | 859 | 703 | 92 | 178 | 62 | 114 | 30 | (1,673) | 7,388 |
| Depreciation and amortization | 159 | 463 | 118 | 89 | 10 | — | 23 | 22 | 12 | — | 896 |
| Impairment losses | — | 160 | — | — | — | — | — | — | — | — | 160 |
| Operating income/ (loss) | 370 | 299 | (53) | 25 | 47 | 5 | (63) | 28 | (31) | 8 | 635 |
| Equity in earnings of unconsolidated affiliates | — | — | — | — | 9 | 9 | 4 | 13 | — | — | 35 |
| Impairment losses on investments | — | — | — | — | — | — | — | — | (495) | — | (495) |
| Other income, net | — | 1 | 2 | 2 | — | 5 | 3 | 2 | 21 | (17) | 19 |
| Loss on debt extinguishment | — | — | — | — | — | — | — | — | (175) | — | (175) |
| Interest (expense)/income | (4) | 16 | (47) | (41) | (2) | (6) | (7) | (19) | (571) | 16 | (665) |
| Income/(loss) before income taxes | 366 | 316 | (98) | (14) | 54 | 13 | (63) | 24 | (1,251) | 7 | (646) |
| Income tax (benefit)/expense | (3) | — | — | — | — | — | — | 9 | (847) | (2) | (843) |
| **Net income/ (loss)** | 369 | 316 | (98) | (14) | 54 | 13 | (63) | 15 | (404) | 9 | 197 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| (f) Operating revenues include inter-segment sales and net derivative gains and losses of: | $ 5 | $ 1,586 | $ 43 | $ — | $ — | $ 25 | $ 23 | $ — | $ — |

(g) Includes Green Mountain Energy results and Energy Plus results for the period October 1, 2011 to December 31, 2011.

## Note 19 — Income Taxes

The income tax provision from continuing operations consisted of the following amounts:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2013 | 2012 | 2011 |
| | (In millions, except percentages) | | |
| Current | | | |
| U.S. Federal | $ — | $ — | $ (538) |
| State | 11 | 20 | 10 |
| Foreign | — | 13 | 16 |
| Total — current | 11 | 33 | (512) |
| Deferred | | | |
| U.S. Federal | (207) | (326) | (317) |
| State | (57) | (24) | (5) |
| Foreign | (29) | (10) | (9) |
| Total — deferred | (293) | (360) | (331) |
| Total income tax benefit | $ (282) | $ (327) | $ (843) |
| Effective tax rate | 44.5% | 2,725.0% | 130.5% |

174

The following represents the domestic and foreign components of loss before income tax benefit:

| | Year Ended December 31, | | |
| | 2013 | 2012 | 2011 |
| | (In millions) | | |
| U.S. | $ (549) | $ (41) | $ (680) |
| Foreign | (85) | 29 | 34 |
| Total | $ (634) | $ (12) | $ (646) |

A reconciliation of the U.S. federal statutory rate of 35% to NRG's effective rate is as follows:

| | Year Ended December 31, | | |
| | 2013 | 2012 | 2011 |
| | (In millions, except percentages) | | |
| Loss Before Income Taxes | $ (634) | $ (12) | $ (646) |
| Tax at 35% | (222) | (4) | (226) |
| State taxes, including change in rate, net of federal benefit | 11 | 1 | 15 |
| Foreign operations | 5 | (24) | (3) |
| Federal and state tax credits | (36) | (158) | (1) |
| Valuation allowance | (5) | 5 | (63) |
| Expiration/utilization of capital losses | 10 | — | 45 |
| Reversal of valuation allowance on expired/utilized capital losses | (10) | — | (45) |
| Impact of non-taxable equity earnings | (14) | (7) | — |
| Bargain purchase gain related to GenOn acquisition | — | (104) | — |
| Foreign earnings | — | — | 4 |
| Interest accrued on uncertain tax positions | (3) | 2 | 2 |
| Production tax credit | (14) | (14) | (14) |
| Reversal of uncertain tax position reserves | (11) | (13) | (561) |
| Tax expense attributable to consolidated partnerships | 8 | — | — |
| Other | (1) | (11) | 4 |
| Income tax benefit | $ (282) | $ (327) | $ (843) |
| Effective income tax rate | 44.5% | 2,725.0% | 130.5% |

For the year ended December 31, 2013, NRG's overall effective tax rate was different than the statutory rate of 35% primarily due to generation of ITCs from the Company's Agua Caliente solar project in Arizona of $36 million and production tax credits, or PTCs, generated from certain Texas wind facilities of $14 million.

For the year ended December 31, 2012, NRG's overall effective tax rate was different than the statutory rate of 35% primarily due to the generation of ITCs from the Company's Agua Caliente solar project in Arizona of $158 million, a benefit of $104 million resulting from the gain on bargain purchase of GenOn, and PTCs generated from certain Texas wind facilities of $14 million.

The effective tax rate for the year ended December 31, 2011, differs from the statutory rate of 35% primarily due to a benefit of $633 million resulting from the resolution of the federal tax audit. The benefit is predominantly due to the recognition of previously uncertain tax benefits that were settled upon audit in 2011 and that were mainly composed of net operating losses of $536 million which had been classified as capital loss carryforwards for financial statement purposes.

The temporary differences, which gave rise to the Company's deferred tax assets and liabilities consisted of the following:

| | As of December 31, | |
| --- | --- | --- |
| | 2013 | 2012 |
| | (In millions) | |
| Deferred tax liabilities: | | |
| Emissions allowances | $ 15 | $ 15 |
| Difference between book and tax basis of property | 22 | 123 |
| Derivatives, net | 334 | 323 |
| Goodwill | 191 | 165 |
| Cumulative translation adjustments | 9 | 19 |
| Intangibles amortization (excluding goodwill) | — | 85 |
| Investment in projects | 540 | 52 |
| Other | — | — |
| **Total deferred tax liabilities** | 1,111 | 782 |
| Deferred tax assets: | | |
| Deferred compensation, pension, accrued vacation and other reserves | 203 | 232 |
| Discount/premium on notes | 111 | 156 |
| Differences between book and tax basis of contracts | 285 | 343 |
| Pension and other postretirement benefits | 168 | 274 |
| Equity compensation | 57 | 57 |
| Bad debt reserve | 18 | 14 |
| U.S. capital loss carryforwards | 1 | 1 |
| U.S. Federal net operating loss carryforwards | 1,381 | 605 |
| Foreign net operating loss carryforwards | 77 | 89 |
| State net operating loss carryforwards | 161 | 89 |
| Foreign capital loss carryforwards | 1 | 1 |
| Deferred financing costs | 3 | 33 |
| Federal and state tax credits | 308 | 258 |
| Federal benefit on state uncertain tax positions | 23 | 18 |
| Intangibles amortization (excluding goodwill) | 20 | — |
| Other | 23 | 7 |
| **Total deferred tax assets** | 2,840 | 2,177 |
| Valuation allowance | (291) | (191) |
| **Total deferred tax assets, net of valuation allowance** | 2,549 | 1,986 |
| **Net deferred tax asset** | $ 1,438 | $ 1,204 |

The following table summarizes NRG's net deferred tax position:

| | As of December 31, | |
| --- | --- | --- |
| | 2013 | 2012 |
| | (In millions) | |
| Net deferred tax asset — current | $ 258 | $ 56 |
| Net deferred tax asset — noncurrent | 1,202 | 1,203 |
| Net deferred tax liability — noncurrent | $ (22) | $ (55) |
| **Net deferred tax asset** | $ 1,438 | $ 1,204 |

### Deferred tax assets and valuation allowance

*Net deferred tax balance* — As of December 31, 2013, and 2012, NRG recorded a net deferred tax asset of $1.4 billion and $1.2 billion, respectively. The Company believes it is more likely than not that the results of future operations will generate sufficient taxable income which includes the future reversal of existing taxable temporary differences to realize deferred tax assets, net of valuation allowances. In arriving at this conclusion to utilize projections of future profit before tax in our estimate of future taxable income, we considered the profit before tax generated in recent years. Based on our assessment of positive and negative evidence, including available tax planning strategies, NRG believes that it is more likely than not that a benefit will not be realized on $291 million and $191 million of tax assets as of December 31, 2013 and 2012, respectively, thus a valuation allowance has been recorded. The Company estimates it will need to generate future taxable income of approximately $3.1 billion, to fully realize the net federal deferred tax asset before expiration commencing in 2026.

In connection with the accounting for the GenOn acquisition, the Company recorded the realizable deferred tax assets and liabilities acquired, primarily consisting of net operating losses and other temporary differences. In addition, the excess of GenOn's historical tax basis of assets and liabilities over the amount assigned to the fair value of the assets acquired and liabilities assumed generated deferred tax assets and liabilities that were recorded on the acquisition date.

*NOL carryforwards* — At December 31, 2013, the Company had tax effected cumulative domestic NOLs consisting of carryforwards for federal income tax purposes of $1.4 billion and state of $161 million. In addition, NRG has cumulative foreign NOL carryforwards of $77 million of which $4 million will expire through 2016 and of which $73 million do not have an expiration date.

*Valuation allowance* — As of December 31, 2013, the Company's tax effected valuation allowance was $291 million, consisting of $216 million for state deferred tax assets, primarily operating loss carryovers, and $75 million for foreign deferred tax assets, primarily operating loss carryovers for which there is insufficient earnings to support future realization.

### Taxes Receivable and Payable

As of December 31, 2013, NRG recorded a current tax payable of $12 million that represents a tax liability due for domestic state taxes of $11 million, as well as foreign taxes payable of $1 million. NRG has a domestic tax receivable of $551 million, of which $539 million relates to federal cash grants applied for eligible solar energy projects net of sequestration of $42 million; the balance of $12 million is related to federal refunds anticipated from multiple income tax carry-back claims to prior tax years. In addition, a $65 million non-current receivable has been established relating to property tax refunds due to the New York State Empire Zone program generated in years 2010 through 2013.

### Uncertain tax benefits

NRG has identified uncertain tax benefits whose after-tax value was $115 million that if recognized, would impact the Company's income tax expense.

As of December 31, 2013, and 2012, NRG has recorded a non-current tax liability of $61 million and $72 million, respectively. As of December 31, 2012 and 2011, the balance primarily related to positions taken on various state returns, including accrued interest.

The Company recognizes interest and penalties related to uncertain tax benefits in income tax expense. During the year ended December 31, 2013, the Company recognized a benefit of $5 million in interest and penalties and accrued interest of $2 million. For the year ended December 31, 2012, the Company accrued interest of $3 million. As of December 31, 2013, and 2012, NRG had cumulative interest and penalties related to these uncertain tax benefits of $14 million and $15 million, respectively.

*Tax jurisdictions* — NRG is subject to examination by taxing authorities for income tax returns filed in the U.S. federal jurisdiction and various state and foreign jurisdictions including operations located in Australia.

Prior to the GenOn acquisition in December 2012, the Company was not subject to U.S. federal income tax examinations for years prior to 2007. GenOn is no longer subject to U.S. federal income tax examinations for years prior to 2010. With few exceptions, state and local income tax examinations are no longer open for years before 2007. The Company's significant foreign operations are also no longer subject to examination by local jurisdictions for years prior to 2008.

During 2011, the Company settled the Internal Revenue Service's audit examination for the years 2004 through 2006 and recognized a benefit of $633 million. The benefit is predominantly due to the recognition of previously uncertain tax benefits mainly composed of net operating losses of $536 million which had been classified as capital loss carryforwards for financial statement purposes. The Company continues to be under examination for various state jurisdictions for multiple years.

The following table reconciles the total amounts of uncertain tax benefits:

| | As of December 31, | | | |
|---|---|---|---|---|
| | **2013** | | **2012** | |
| | (In millions) | | | |
| Balance as of January 1 | $ | 193 | $ | 178 |
| Increase due to current year positions | | 2 | | 21 |
| Decrease due to current year positions | | — | | (3) |
| Increase due to prior year positions | | 4 | | 13 |
| Decrease due to prior year positions | | (40) | | (21) |
| Increase due to acquisitions | | — | | 5 |
| Decrease due to settlements and payments | | (44) | | — |
| Uncertain tax benefits as of December 31 | $ | 115 | $ | 193 |

## Note 20 — Stock-Based Compensation

### NRG Energy, Inc. Long-Term Incentive Plan

As of December 31, 2013, and 2012, a total of 22,000,000 shares of NRG common stock were authorized for issuance under the NRG LTIP, subject to adjustments in the event of reorganization, recapitalization, stock split, reverse stock split, stock dividend, and a combination of shares, merger or similar change in NRG's structure or outstanding shares of common stock. There were 7,238,065 and 7,580,318 shares of common stock remaining available for grants under the NRG LTIP as of December 31, 2013, and 2012, respectively.

### GenOn Acquisition

Effective December 14, 2012, in connection with the GenOn acquisition, as discussed in Note 3, *Business Acquisitions and Dispositions,* NRG assumed the GenOn Energy, Inc. 2010 Omnibus Incentive Plan, and the name was changed to the NRG 2010 Stock Plan for GenOn Employees, or the NRG GenOn LTIP. As of December 31, 2013, 5,558,390 shares of NRG common stock were authorized for issuance under the NRG GenOn LTIP, and there were 1,053,485 shares of common stock remaining available for grants under the NRG GenOn LTIP. In addition, NRG assumed certain other terminated GenOn plans, under which NRG will not grant any further awards. All outstanding awards under the NRG GenOn LTIP and the terminated plans were appropriately adjusted based on the Exchange Ratio, and remain subject to the terms and conditions of the applicable plans prior to the acquisition.

In addition, upon completion of the GenOn acquisition, the following occurred to GenOn's outstanding stock-based incentive awards: (i) each outstanding and unvested RSU that was granted under the GenOn plans before 2012 vested in full and was exchanged for shares of NRG common stock in the acquisition based on the Exchange Ratio; (ii) each outstanding and unvested GenOn NQSO that was granted under the GenOn plans before 2012 vested in full and converted into an option to purchase NRG common stock; (iii) each outstanding and unvested RSU that was granted under the GenOn plans in 2012, was converted into an unvested RSU of NRG, and (iv) each outstanding and unvested GenOn NQSO that was granted under the GenOn plans during 2012 was converted into an NQSO to purchase NRG common stock on the same vesting schedule.

Under the acquisition method of accounting, GenOn employee NQSOs and RSUs which vested upon close of the acquisition were measured and recorded at acquisition-date fair value, resulting in additional purchase price consideration of $28 million. As of December 14, 2012, unvested NQSOs that were converted to options to purchase NRG common stock and RSUs that were converted to NRG RSUs were recorded in NRG's consolidated balance sheet.

### Non-Qualified Stock Options

NQSOs granted under the NRG LTIP and the NRG GenOn LTIP typically have three-year graded vesting schedules beginning on the grant date and become exercisable at the end of the requisite service period. NRG recognizes compensation costs for NQSOs over the requisite service period for the entire award. The maximum contractual term is ten years for 2.8 million of NRG's outstanding NQSOs, and six years for the remaining 1.2 million NQSOs. No NQSOs were granted in 2013.

The following table summarizes the Company's NQSO activity and changes during the year:

| | Shares | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term (In years) | Aggregate Intrinsic Value (In millions) |
|---|---|---|---|---|
| | (In whole) | | | |
| Outstanding at December 31, 2012 | 6,677,885 | $ 28.85 | 4 | $ 17 |
| Forfeited | (1,044,902) | 27.75 | | |
| Exercised | (1,656,002) | 14.28 | | |
| Outstanding at December 31, 2013 | 3,976,981 | 35.20 | 2 | 17 |
| Exercisable at December 31, 2013 | 3,592,810 | 31.80 | 2 | 13 |

The following table summarizes the weighted average grant date fair value of options granted, the total intrinsic value of options exercised, and the cash received from the exercises of options:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2013 | 2012 | 2011 |
| | (In millions, except for weighted average) | | |
| Weighted average grant date fair value per option granted | $ — | $ — | $ 8.73 |
| Total intrinsic value of options exercised | 19 | 0.3 | 0.2 |
| Cash received from options exercised | 33 | 1 | 2 |

### Restricted Stock Units

As of December 31, 2013, RSUs granted under the Company's LTIPs fully vest three years from the date of issuance. Fair value of the RSUs is based on the closing price of NRG common stock on the date of grant. The following table summarizes the Company's non-vested RSU awards and changes during the year:

| | Units | Weighted Average Grant-Date Fair Value per Unit |
|---|---|---|
| | | (In whole) |
| Non-vested at December 31, 2012 | 2,608,551 | $ 21.28 |
| Granted | 617,009 | 23.37 |
| Forfeited | (322,448) | 21.34 |
| Vested | (879,933) | 22.64 |
| Non-vested at December 31, 2013 | 2,023,179 | 21.22 |

The total fair value of RSUs vested during the years ended December 31, 2013, 2012, and 2011, was $22 million, $18 million and $2 million, respectively. The weighted average grant date fair value of RSUs granted during the years ended December 31, 2013, 2012, and 2011 was $23.37, $17.90, and $22.78, respectively.

### Deferred Stock Units

DSUs represent the right of a participant to be paid one share of NRG common stock at the end of a deferral period established under the terms of the award. DSUs granted under the Company's LTIPs are fully vested at the date of issuance. Fair value of the DSUs, which is based on the closing price of NRG common stock on the date of grant, is recorded as compensation expense in the period of grant.

The following table summarizes the Company's outstanding DSU awards and changes during the year:

| | Units | Weighted Average Grant-Date Fair Value per Unit |
|---|---|---|
| | | (In whole) |
| Outstanding at December 31, 2012 | 697,515 | $ 20.91 |
| Granted | 205,667 | 23.18 |
| Conversions [a] | (524,636) | 22.55 |
| Outstanding at December 31, 2013 | 378,546 | 19.78 |

(a) 52,864 Deferred Stock Units were converted to cash for the year ended December 31, 2013.

The aggregate intrinsic values for DSUs outstanding as of December 31, 2013, 2012, and 2011 were approximately $7 million, $15 million, and $8 million respectively. The aggregate intrinsic values for DSUs converted to common stock for the years ended December 31, 2013, 2012, and 2011 were $12 million, $1.4 million and $0.4 million, respectively. The weighted average grant date fair value of DSUs granted during the years ended December 31, 2013, 2012, and 2011 was $23.18, $16.33 and $24.31, respectively.

*Market Stock Units*

MSUs are restricted grants where the quantity of shares increases and decreases alongside the Company's Total Shareholder Return, or TSR. Each MSU represents the potential to receive NRG common stock after the completion of three years of service from the date of grant. The number of shares of NRG common stock to be paid (if any) as of the vesting date for each MSU will depend on the TSR. The number of shares of common stock to be paid as of the vesting date for each MSU is equal to: (i) one half of one share of common stock if the TSR has decreased by no more than 50% of the value of the common stock on the date of grant; (ii) one share of common stock, if the TSR equals the value of the common stock on the date of grant; and (iii) two shares of common stock if the TSR is 200% or greater of the value of the common stock on the date of grant. If the TSR is less than 50% of the value of the common stock on the date of grant, no common stock will be paid. If the TSR is between 50% and 200%, shares awarded are interpolated. The value of the common stock on the date of grant is based on the 20-day average of the common stock closing price.

The following table summarizes the Company's non-vested MSU awards and changes during the year:

|  | Units | Weighted Average Grant-Date Fair Value per Unit |
|---|---|---|
|  |  | (in whole) |
| Non-vested at December 31, 2012 | 1,003,920 | $ 22.43 |
| Granted | 1,066,626 | 27.46 |
| Vested | (20,000) | 26.64 |
| Forfeited | (214,040) | 24.16 |
| Non-vested at December 31, 2013 | 1,836,506 | 24.72 |

The weighted average grant date fair value of MSUs granted during the years ended December 31, 2013, 2012 and 2011, was $27.46, $22.11 and $27.59, respectively.

The fair value of MSUs is estimated on the date of grant using a Monte Carlo simulation model and expensed over the service period, which equals the vesting period. Significant assumptions used in the fair value model with respect to the Company's MSUs are summarized below:

|  | 2013 | 2012 |
|---|---|---|
| Expected volatility | 27.12%-29.11% | 29.60%-35.98% |
| Expected term (in years) | 3 | 3 |
| Risk free rate | 0.37%-0.59% | 0.29%-0.40% |

For the years ended December 31, 2013 and 2012, expected volatility is calculated based on NRG's historical stock price volatility data over the period commensurate with the expected term of the MSU, which equals the vesting period.

*Performance Units*

PUs granted under the Company's LTIP fully vest three years from the date of issuance. PUs are paid out upon vesting if the Measurement Price is equal to or greater than Threshold Price. The Threshold Price, Target Price and Maximum Price are determined on the date of issuance. The payout for each PU will be equal to: (i) a pro-rata amount between 0.5 and 1 share of common stock, if the Measurement Price is equal to or greater than the target Threshold Price but less than the Target Price; (ii) one share of common stock, if the Measurement Price equals the Target Price; (iii) a pro-rata amount between one and two shares of common stock, if the Measurement Price is greater than the Target Price but less than the Maximum Price; and (iv) two shares of common stock, if the Measurement Price is equal to, or greater than, the Maximum Price.

180

The following table summarizes the Company's non-vested PU awards and changes during the year:

| | Outstanding Units | Weighted Average Grant-Date Fair Value per Unit |
|---|---|---|
| | | (In whole) |
| Non-vested at December 31, 2012 | 647,200 | $ 21.88 |
| Vested | (36,700) | 19.89 |
| Forfeited | (296,200) | 23.28 |
| Non-vested at December 31, 2013 | 314,300 | 20.80 |

The weighted average grant date fair value of PUs granted during the year ended December 31, 2011 was $20.80. No PUs were granted in 2013 or 2012.

The fair value of PUs is estimated on the date of grant using a Monte Carlo simulation model and expensed over the service period, which equals the vesting period.

*Supplemental Information*

The following table summarizes NRG's total compensation expense recognized for the years presented as well as total non-vested compensation costs not yet recognized and the period over which this expense is expected to be recognized as of December 31, 2013, for each of the five types of awards issued under the LTIPs. Minimum tax withholdings of $13 million, $6 million, and $1 million for the years ended December 31, 2013, 2012, and 2011, respectively, are reflected as a reduction to Additional Paid-in Capital on the Company's Consolidated Balance Sheet, and are reflected as operating activities on the Company's Consolidated Statement of Cash Flows.

| | | | | | | Non-vested Compensation Cost | |
|---|---|---|---|---|---|---|---|
| | Compensation Expense | | | | | Unrecognized Total Cost | Weighted Average Recognition Period Remaining (In years) |
| | Year Ended December 31 | | | | | As of December 31 | |
| Award | 2013 | | 2012 | | 2011 | 2013 | 2013 |
| | (In millions, except weighted average data) | | | | | | |
| NQSOs | $ 4 | $ | 6 | $ | 8 | $ 1 | 1.1 |
| RSUs | 18 | | 21 | | 12 | 18 | 1.4 |
| DSUs | 2 | | 2 | | 2 | — | 0 |
| MSUs | 14 | | 7 | | — | 28 | 1.7 |
| PUs | 2 | | 4 | | 5 | — | 0 |
| Total | $ 40 | $ | 40 | $ | 27 | $ 47 | |
| Tax detriment recognized | $ (12) | $ | 8 | $ | 1 | | |

181

**Note 21 — Related Party Transactions**

The following table summarizes NRG's material related party transactions with affiliates that are included in the Company's operating revenues, operating costs and other income and expense:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2013** | | **2012** | | **2011** | |
| | | | (In millions) | | | |
| *Revenues from Related Parties Included in Operating Revenues* | | | | | | |
| Gladstone | $ | 6 | $ | 7 | $ | 7 |
| GenConn [a] | | 5 | | 6 | | 3 |
| Total | $ | 11 | $ | 13 | $ | 10 |
| *Interest income from Related Parties Included in Other Income and Expense* | | | | | | |
| GenConn [a] | $ | — | $ | — | $ | 1 |
| Kraftwerke Schkopau GBR [b] | | — | | 2 | | 4 |
| Total | $ | — | $ | 2 | $ | 5 |

(a)  The period in 2011 is from January 1, 2011 to June 30, 2011.
(b)  The period in 2012 is from January 1, 2012 to July 17, 2012.

*Gladstone* — NRG provides services to Gladstone, an equity method investment, under an operations and maintenance agreement. Fees for services under this contract primarily include recovery of NRG's costs of operating the plant as approved in the annual budget, as well as, a base monthly fee.

*GenConn* — NRG has O&M agreements with GenConn Devon and GenConn Middletown that began in June 2011. Under a construction management agreement with GenConn, NRG had received fees for management, design and construction services. The construction at GenConn was completed in June 2011. In addition, NRG entered into a loan agreement with GenConn during 2009, pursuant to which it received interest income, which was converted into equity during 2011. See further discussion in Note 16, *Investments Accounted for by the Equity Method and Variable Interest Entities.*

*Kraftwerke Schkopau GBR* — SEG had a loan agreement with Kraftwerke Schkopau GBR, a partnership between Saale Energie GmbH and E.ON Kraftwerke GmbH, pursuant to which NRG received interest income. On July 17, 2012, the Company completed the sale of its 100% interest in Saale Energie GmbH, as discussed in Note 3, *Business Acquisitions and Dispositions.*

*Conemaugh and Keystone facilities* — The Company operates the Conemaugh and Keystone facilities under five-year agreements that expire in December 2015 that, subject to certain provisions and notifications, could be terminated annually with one year's notice. The Company is reimbursed by the other owners for the cost of direct services provided to the Conemaugh and Keystone facilities. Additionally, the Company received fees of $10 million during 2013 and $1 million in 2012 subsequent to the GenOn acquisition. These fees, which are recorded in O&M expense in the consolidated statements of operations, are primarily to cover NRG REMA LLC's administrative support costs of providing these services.

182

**Note 22 — Commitments and Contingencies**

*Operating Lease Commitments*

*GenOn Mid-Atlantic Leases*

The Company leases a 100% interest in the Dickerson and Morgantown coal generation units and associated property through 2029 and 2034, respectively, through its indirect subsidiary, GenOn MidAtlantic, LLC. The Company accounts for these leases as operating leases and records lease expense on a straight-line basis over the lease term. As further described in Note 3, *Business Acquisitions and Dispositions*, in connection with the acquisition of GenOn, the Company recorded the out-of-market value as a liability in out-of-market contracts of $604 million. The liability will be amortized through rent expense on a straight-line basis over the term of the lease. The Company expects to record lease expense, net of amortization of the out-of-market liability, of approximately $44 million per year through the term of the lease.

Future minimum lease commitments under the GenOn Mid-Atlantic operating leases for the years ending after December 31, 2013, are as follows:

| Period | (In millions) |
|---|---|
| 2014 | $ 131 |
| 2015 | 110 |
| 2016 | 150 |
| 2017 | 144 |
| 2018 | 105 |
| Thereafter | 686 |
| Total | $ 1,326 |

*REMA Leases*

The Company, through its indirect subsidiary, NRG REMA, LLC, leases a 100% interest in the Shawville coal generation facility through 2026 and leases 16.5% and 16.7% interest in the Keystone and Conemaugh coal generation facilities through 2034, and expects to make payments under the lease through 2029. The Company accounts for these leases as operating leases and records lease expense on a straight-line basis over the lease term. As further described in Note 3, *Business Acquisitions and Dispositions*, in connection with the acquisition of GenOn, the Company recorded the out-of-market value as a liability in out-of-market contracts of $186 million. The liability will be amortized through rent expense on a straight-line basis over the term of the lease. The Company expects to record lease expense, net of amortization of the out-of-market liability, of approximately $33 million per year through the term of the lease.

During 2011, GenOn completed an analysis of the cost of environmental controls required for the Shawville generating facility, including the installation of cooling towers. After evaluation of the forecasted energy and capacity prices, expected capital expenditures, operating costs, property taxes and other factors, GenOn concluded that the forecasted returns on investments necessary to comply with the environmental regulations are insufficient. Accordingly, NRG plans to place the coal-fired units at the Shawville generating facility in a long-term protective layup in April 2015. Under the lease agreement for Shawville, NRG's obligations generally are to pay the required rent and to maintain the leased assets in accordance with the lease documentation, including in compliance with prudent competitive electric generating industry practice and applicable laws. NRG will continue to evaluate options under the lease, including termination of the lease for economic obsolescence and/or keeping the facility in long-term protective layup during the term of the lease, or continuing operations with a different fuel.

Future minimum lease commitments under the REMA operating leases for the years ending after December 31, 2013, are as follows:

| Period | (In millions) |
|---|---|
| 2014 | $ 63 |
| 2015 | 56 |
| 2016 | 61 |
| 2017 | 63 |
| 2018 | 55 |
| Thereafter | 400 |
| Total | $ 698 |

*Other Operating Leases*

NRG leases certain Company facilities and equipment under operating leases, some of which include escalation clauses, expiring on various dates through 2041. NRG also has certain tolling arrangements to purchase power which qualifies as operating leases. Certain operating lease agreements over their lease term include provisions such as scheduled rent increases, leasehold incentives, and rent concessions. The Company recognizes the effects of these scheduled rent increases, leasehold incentives, and rent concessions on a straight-line basis over the lease term unless another systematic and rational allocation basis is more representative of the time pattern in which the leased property is physically employed. Lease expense under operating leases was $88 million, $67 million, and $81 million for the years ended December 31, 2013, 2012, and 2011, respectively.

Future minimum lease commitments under operating leases for the years ending after December 31, 2013, are as follows:

| Period | (In millions) | |
| --- | --- | --- |
| 2014 | $ | 79 |
| 2015 | | 78 |
| 2016 | | 63 |
| 2017 | | 41 |
| 2018 | | 38 |
| Thereafter | | 138 |
| Total [a] | $ | 437 |

(a) Amounts in the table exclude future sublease income of $20 million associated with GenOn's long-term lease for its corporate headquarters in Houston, Texas.

*Coal, Gas and Transportation Commitments*

NRG has entered into long-term contractual arrangements to procure fuel and transportation services for the Company's generation assets and for the years ended December 31, 2013, 2012, and 2011, the Company purchased $2.8 billion, $1.4 billion, and $1.6 billion, respectively, under such arrangements.

As of December 31, 2013, the Company's commitments under such outstanding agreements are estimated as follows:

| Period | (In millions) | |
| --- | --- | --- |
| 2014 | $ | 963 |
| 2015 | | 272 |
| 2016 | | 254 |
| 2017 | | 220 |
| 2018 | | 136 |
| Thereafter | | 719 |
| Total | $ | 2,564 |

*Purchased Power Commitments*

NRG has purchased power contracts of various quantities and durations that are not classified as derivative assets and liabilities and do not qualify as operating leases. These contracts are not included in the consolidated balance sheet as of December 31, 2013. Minimum purchase commitment obligations are as follows as of December 31, 2013:

| Period | (In millions) | |
| --- | --- | --- |
| 2014 | $ | 24 |
| 2015 | | 18 |
| 2016 | | 12 |
| 2017 | | 10 |
| 2018 | | 1 |
| Thereafter | | — |
| Total [a] | $ | 65 |

(a)    As of December 31, 2013, the maximum remaining term under any individual purchased power contract is five years.

*Lignite Contract with Texas Westmoreland Coal Co.*

The lignite used to fuel the Texas region's Limestone facility is obtained from the Jewett mine, a surface mine adjacent to the Limestone facility, under a long-term contract with Texas Westmoreland Coal Co., or TWCC. The contract is based on a cost-plus arrangement with incentives and penalties to ensure proper management of the mine. NRG has the flexibility to increase or decrease lignite purchases from the mine within certain ranges, including the ability to suspend or terminate lignite purchases with adequate notice. The mining period extends through 2018 with an option to further extend the mining period by two five-year intervals.

TWCC is responsible for performing ongoing reclamation activities at the mine until all lignite reserves have been produced. When production is completed at the mine, NRG will be responsible for final mine reclamation obligations. The Railroad Commission of Texas has imposed a bond obligation of $107.5 million on TWCC for the reclamation of this lignite mine. Pursuant to the contract with TWCC, NRG supports this obligation as follows: $76 million is guaranteed by NRG Energy, Inc., and $31.5 million is supported by surety bonds posted by NRG. Additionally, NRG is required to provide additional performance assurance over TWCC's current bond obligations if required by the Railroad Commission of Texas.

*First Lien Structure*

NRG has granted first liens to certain counterparties on substantially all of the Company's assets, excluding assets acquired in the GenOn acquisition, to reduce the amount of cash collateral and letters of credit that it would otherwise be required to post from time to time to support its obligations under out-of-the-money hedge agreements for forward sales of power or MWh equivalents. The Company's lien counterparties may have a claim on NRG's assets to the extent market prices exceed the hedged price. As of December 31, 2013, the first lien exposure of net out-of-the-money positions to counterparties on hedges was $61 million.

*Nuclear Insurance*

STP maintains required insurance coverage for liability claims arising from nuclear incidents pursuant to the Price-Anderson Amendment to the Energy Policy Act of 2005, referred to as the Price-Anderson Act. Effective September 30, 2013, the current liability limit per incident was $13.6 billion, subject to change to account for the effects of inflation and the number of licensed reactors. An inflation adjustment must be made at least once every five years with the most recent adjustment effective September 2013. Under the Price-Anderson Act, owners of nuclear power plants in the U.S. are required to purchase primary insurance limits of $375 million for each operating site. In addition, the Price-Anderson Act requires an additional layer of protection through mandatory participation in a retrospective rating plan for power reactors resulting in an additional $13.2 billion in funds available for public liability claims. The current maximum assessment per incident, per reactor, is approximately $127 million, taking into account a 5% adjustment for administrative fees, payable at no more than $19 million per year, per reactor. NRG would be responsible for 44% of the maximum assessment, or $8 million per year, per reactor, and a maximum of $112 million per incident. In addition, the U.S. Congress retains the ability to impose additional financial requirements on the nuclear industry to pay liability claims that exceed $13.6 billion for a single incident. The liabilities of the co-owners of STP with respect to the retrospective premium assessments for nuclear liability insurance are joint and several.

STP purchases insurance for property damage and site decontamination cleanup costs from Nuclear Electric Insurance Limited, or NEIL, an industry mutual insurance company, of which STP is a member. STP has purchased $2.75 billion in limits for nuclear events and $1.5 billion in limits for non-nuclear events, the maximum available from NEIL. The upper $1 billion in limits (excess of the first $1.75 billion in limits) is a single limit blanket policy shared with two Diablo Canyon nuclear reactors, which have no affiliation with the Company. This shared limit is not subject to automatic reinstatement in the event of a loss. The NEIL policy covers both nuclear and non-nuclear property damage events, and includes coverage for six weeks of lost revenue following a property damage event, at a weekly indemnity limit of $4 million, subject to a seventeen week waiting period. NRG also purchased an Accidental Outage policy from NEIL, which provides protection for lost revenue due to an insurable event. This coverage allows for reimbursement up to $1.98 million per week per unit up to a maximum of $215.6 million nuclear and $144 million non-nuclear, and is subject to an eight week waiting period. Under the terms of the NEIL policies, member companies may be assessed up to ten times their annual premium if the NEIL Board of Directors determines their surplus has been depleted due to the payment of property losses at any of the licensed reactors in a single policy year. NEIL requires that its members maintain an investment grade credit rating or insure their annual retrospective obligation by providing a financial guarantee, letter of credit, deposit premium, or an insurance policy. NRG has purchased an insurance policy from NEIL to guarantee the Company's obligation; however this insurance will only respond to retrospective premium adjustments assessed within twenty-four months after the policy term, whereas NEIL's Board of Directors can make such an adjustment up to six years after the policy expires.

185

## Contingencies

The Company's material legal proceedings are described below. The Company believes that it has valid defenses to these legal proceedings and intends to defend them vigorously. NRG records reserves for estimated losses from contingencies when information available indicates that a loss is probable and the amount of the loss, or range of loss, can be reasonably estimated. In addition, legal costs are expensed as incurred. Management has assessed each of the following matters based on current information and made a judgment concerning its potential outcome, considering the nature of the claim, the amount and nature of damages sought, and the probability of success. Unless specified below, the Company is unable to predict the outcome of these legal proceedings or reasonably estimate the scope or amount of any associated costs and potential liabilities. As additional information becomes available, management adjusts its assessment and estimates of such contingencies accordingly. Because litigation is subject to inherent uncertainties and unfavorable rulings or developments, it is possible that the ultimate resolution of the Company's liabilities and contingencies could be at amounts that are different from its currently recorded reserves and that such difference could be material.

In addition to the legal proceedings noted below, NRG and its subsidiaries are party to other litigation or legal proceedings arising in the ordinary course of business. In management's opinion, the disposition of these ordinary course matters will not materially adversely affect NRG's consolidated financial position, results of operations, or cash flows.

### California Department of Water Resources

This matter concerned, among other contracts and other defendants, CDWR and its wholesale power contract with subsidiaries of WCP (Generation) Holdings, Inc., or WCP. The case originated with a 2002 complaint filed by the State of California alleging that many parties, including WCP subsidiaries, overcharged the State of California. For WCP, the alleged overcharges totaled approximately $940 million for 2001 and 2002. The complaint demanded that FERC abrogate the CDWR contract and sought refunds associated with revenues collected under the contract. In 2003, FERC rejected this complaint, denied rehearing, and the case was appealed to the U.S. Court of Appeals for the Ninth Circuit.

On December 19, 2006, the Ninth Circuit decided that in FERC's review of the contracts at issue, FERC could not rely on the *Mobile-Sierra* standard presumption of just and reasonable rates, where such contracts were not reviewed by FERC with full knowledge of the then existing market conditions. WCP and others sought review by the U.S. Supreme Court. WCP's appeal was not selected, but instead held by the Supreme Court. In the appeal that was selected by the Supreme Court, on June 26, 2008, the Supreme Court ruled: (i) that the *Mobile-Sierra* public interest standard of review applied to contracts made under a seller's market-based rate authority; (ii) that the public interest "bar" required to set aside a contract remains a very high one to overcome; and (iii) that the *Mobile-Sierra* presumption of contract reasonableness applies when a contract is formed during a period of market dysfunction unless (a) such market conditions were caused by the illegal actions of one of the parties or (b) the contract negotiations were tainted by fraud or duress.

This matter was extensively litigated and on March 22, 2012, NRG reached an agreement in principle with the CPUC to settle and resolve this matter, including all related claims, on behalf of NRG and on behalf of Dynegy. The settlement agreement contains three material elements to be fulfilled over a four to six year period, depending upon several factors. First, the settlement agreement includes a $20 million cash payment due 30 days after FERC approval. Second, it includes the construction and operation of a fee-based charging network, to be owned and operated by NRG subsidiary, eVgo, which will consist of at least 200 publicly available fast-charging electric vehicle stations installed at locations across California. Last, it calls for the wiring and associated work required to improve at least 10,000 individual parking spaces to allow for the charging of electric vehicles in at least 1,000 multi-family complexes, worksites, and public interest locations such as community colleges, public universities, and public or non-profit hospitals. Although these improved newly wired parking spaces will continue to be owned by the local property owner, eVgo will have an 18-month exclusive right to obtain customers from these locations starting from the date of each completed installation. The expected $20 million cash payment was accrued and expensed in the statement of operations for the three months ended March 31, 2012. In addition, the Company expects to spend approximately $100 million over the ensuing four to six year period, during which the Company will fulfill the other elements of the settlement, and will capitalize a substantial majority of the costs as property, plant and equipment, representing the costs to construct the charging network and the wiring, which will be productive assets. The Company will expense the costs to operate the assets as incurred. The documented agreement was executed and submitted to FERC on April 27, 2012 for its approval. The settlement agreement was approved by FERC on November 2, 2012. Final settlement payment of $20 million was made on January 16, 2013. Given that there was no challenge to the FERC order approving the settlement in the statutory period, the order became final and non-appealable.

### Louisiana Generating, LLC

In 2009, the U.S. DOJ, on behalf of the EPA, and later the Louisiana Department of Environmental Quality, or LDEQ, on behalf of the State of Louisiana, sued Louisiana Generating, LLC, or LaGen, a wholly owned subsidiary of NRG, in federal district court in the Middle District of Louisiana alleging violations of the CAA at the Big Cajun II power plant. On March 6, 2013, the court entered a Consent Decree resolving the matter. In addition to imposing a fine of $3.5 million and requiring LaGen to carry out mitigation projects totaling $10.5 million, the Consent Decree requires: (i) specified annual emission caps for $NO_x$ and $SO_2$;(ii) installation of selective non-catalytic reduction on Units 1, 2 and 3 by May 1, 2014; (iii) installation of dry sorbent injection on Unit 1 by April 15, 2015 followed by a further reduction in $SO_2$ in March 2025; (iv) conversion of Unit 2 to natural gas; and (v) surrender of any excess allowances associated with the NRG owned portion of the plant. Further discussion of this matter can be found in Note 24, *Environmental Matters - South Central Region*.

In a related matter, soon after the filing of the above referenced U.S. DOJ lawsuit, LaGen sought insurance coverage from its insurance carrier, Illinois Union Insurance Company, or ILU. ILU denied coverage and refused to provide a defense for LaGen, and thereafter LaGen filed a lawsuit in federal district court in the Middle District of Louisiana (which was consolidated with a prior suit filed by ILU) seeking a declaration that ILU must provide coverage to LaGen for the defense costs incurred in defending the U.S. DOJ lawsuit as well as indemnity costs.  LaGen and ILU both filed motions for summary judgment and on January 30, 2012, the district court issued an order granting LaGen's motion finding that ILU had a duty to defend LaGen. On May 25, 2012, ILU filed a petition with the U.S. Court of Appeals for the Fifth Circuit seeking to appeal the trial court's summary judgment ruling. The Fifth Circuit heard oral argument on March 6, 2013. On May 15, 2013, the Fifth Circuit affirmed the district court's ruling that ILU had a duty to defend LaGen against the U.S. DOJ lawsuit and subsequently denied ILU's petition for rehearing. On October 2, 2013, LaGen filed a motion for summary judgment in the U.S. District Court for the Middle District of Louisiana for recovery of LaGen's fees and costs related to the U.S. DOJ lawsuit, as well as its fees and costs related to the insurance coverage action.

*Big Cajun II Alleged Opacity Violations* — On September 7, 2012, LaGen received a Consolidated Compliance Order & Notice of Potential Penalty, or CCO&NPP, from the LDEQ.  The CCO&NPP alleges there were opacity exceedance events from the Big Cajun II Power Plant on certain dates during the years 2007-2012.  On October 8, 2012, LaGen filed a Request for Administrative Adjudicatory hearing. LaGen and LDEQ have since reached an agreement to resolve the matter for approximately $47,000. The settlement has been published for public comment, and is subject to approval by the Louisiana Attorney General within 90 days of the notice.

### Global Warming

In February 2008, the Native Village of Kivalina and the City of Kivalina, Alaska filed a suit in the U.S. District Court for the Northern District of California against GenOn and 23 other electric generating and oil and gas companies. The lawsuit sought damages of up to $400 million for the cost of relocating the village allegedly because of global warming caused by the GHG emissions of the defendants. In late 2009, the District Court ordered that the case be dismissed and the plaintiffs appealed. In September 2012, the U.S. Court of Appeals for the Ninth Circuit dismissed plaintiffs' appeal. In October 2012, the plaintiffs petitioned for en banc rehearing of the case, which petition was denied in November 2012. In February 2013, plaintiffs filed a petition for certiorari with the U.S. Supreme Court seeking review of the decision of the U.S. Court of Appeals. In May 2013, the U.S. Supreme Court denied plaintiffs' petition, thereby ending the case.

### Actions Pursued by MC Asset Recovery

With Mirant Corporation's emergence from bankruptcy protection in 2006, certain actions filed by GenOn Energy Holdings and some of its subsidiaries against third parties were transferred to MC Asset Recovery, a wholly owned subsidiary of GenOn Energy Holdings.  MC Asset Recovery is governed by a manager who is independent of NRG and GenOn.  MC Asset Recovery is a disregarded entity for income tax purposes.

Under the remaining action transferred to MC Asset Recovery, MC Asset Recovery seeks to recover damages from Commerzbank AG and various other banks, or the Commerzbank Defendants, for alleged fraudulent transfers that occurred prior to GenOn Energy Holdings' bankruptcy proceedings.  In December 2010, the U.S. District Court for the Northern District of Texas dismissed MC Asset Recovery's complaint against the Commerzbank Defendants.  In January 2011, MC Asset Recovery appealed the District Court's dismissal of its complaint against the Commerzbank Defendants to the U.S. Court of Appeals for the Fifth Circuit.  In March 2012, the Court of Appeals reversed the District Court's dismissal and reinstated MC Asset Recovery's amended complaint against the Commerzbank Defendants.  If MC Asset Recovery succeeds in obtaining any recoveries from the Commerzbank Defendants, the Commerzbank Defendants have asserted that they will seek to file claims in GenOn Energy Holdings' bankruptcy proceedings for the amount of those recoveries. GenOn Energy Holdings would vigorously contest the allowance of any such claims. If the Commerzbank Defendants were to receive an allowed claim as a result of a recovery by MC Asset Recovery on its claims against them, GenOn Energy Holdings would retain from the net amount recovered by MC Asset Recovery an amount equal to the dollar amount of the resulting allowed claim.

*Pending Natural Gas Litigation*

GenOn is party to several lawsuits, certain of which are class action lawsuits, in state and federal courts in Kansas, Missouri, Nevada and Wisconsin. These lawsuits were filed in the aftermath of the California energy crisis in 2000 and 2001 and the resulting FERC investigations and relate to alleged conduct to increase natural gas prices in violation of antitrust and similar laws. The lawsuits seek treble or punitive damages, restitution and/or expenses. The lawsuits also name as parties a number of energy companies unaffiliated with NRG. In July 2011, the U.S. District Court for the District of Nevada, which is handling four of the five cases, granted the defendants' motion for summary judgment and dismissed all claims against GenOn in those cases. The plaintiffs appealed to the U.S. Court of Appeals for the Ninth Circuit. The Ninth Circuit reversed the decision of the U.S. District Court for the District of Nevada. On August 26, 2013, GenOn along with the other defendants in the lawsuit filed a petition for certiorari to the U.S. Supreme Court challenging the Ninth Circuit's decision. On December 2, 2013, the United States Supreme Court requested the views of the U.S. Solicitor General on the petition for certiorari. In September 2012, the State of Nevada Supreme Court, which is handling the remaining case, affirmed dismissal by the Eighth Judicial District Court for Clark County, Nevada of all plaintiffs' claims against GenOn. In February 2013, the plaintiffs in the Nevada case filed a petition for certiorari to the U.S. Supreme Court. In June 2013, the U.S. Supreme Court denied the petition for certiorari, thereby ending one of the five lawsuits. GenOn has agreed to indemnify CenterPoint against certain losses relating to these lawsuits.

*New Source Review Matters*

The EPA and various states are investigating compliance of electric generating facilities with the pre-construction permitting requirements of the CAA known as "new source review." Since 2000, the EPA has made information requests concerning several of the Company's subsidiaries' plants. The Company continues to correspond with the EPA regarding some of these requests. The EPA agreed to share information relating to its investigations with state environmental agencies. In 2005 and 2006, the Company received an NOV from the EPA alleging that past work at Big Cajun II violated regulations regarding new source review. Further discussion of this matter can be found in Note 24, *Environmental Matters - South Central Region.* In January 2009, the EPA issued an NOV alleging that past work at the Shawville, Portland and Keystone generating facilities violated regulations regarding new source review. In June 2011, the EPA issued an NOV alleging that past work at the Niles and Avon Lake generating facilities violated regulations regarding new source review. In April 2013, the Connecticut Department of Energy and Environmental Protection issued four NOVs alleging that past work at combustion turbines at three of the Company's Connecticut Jet Power facilities and Middletown facility violated regulations regarding new source review.

In December 2007, the NJDEP sued GenOn in the U.S. District Court for the Eastern District of Pennsylvania, alleging that new source review violations occurred at the Portland generating facility. The suit sought installation of BACT for each pollutant, to enjoin GenOn from operating the generating facility if it is not in compliance with the CAA and civil penalties. The suit also named past owners of the plant as defendants, but the claims against the past owners were dismissed. In March 2009, the Connecticut Department of Energy and Environmental Protection became an intervening party to the suit. In July 2013, the court entered a Consent Decree which generally requires the cessation of coal combustion at Portland Units 1 and 2 and the payment of $1 million to benefit the environment in New Jersey and Connecticut. The entry of the Consent Decree resolved this matter.

*Cheswick Class Action Complaint*

In April 2012, a putative class action lawsuit was filed against GenOn in the Court of Common Pleas of Allegheny County, Pennsylvania alleging that emissions from the Cheswick generating facility have damaged the property of neighboring residents. The Company disputes these allegations. Plaintiffs have brought nuisance, negligence, trespass and strict liability claims seeking both damages and injunctive relief. Plaintiffs seek to certify a class that consists of people who own property or live within one mile of the Company's plant. In July 2012, the Company removed the lawsuit to the U.S. District Court for the Western District of Pennsylvania. In October 2012, the court granted the Company's motion to dismiss, which Plaintiffs appealed to the U.S. Court of Appeals for the Third Circuit. On August 20, 2013, the Third Circuit reversed the decision of the District Court. On September 3, 2013, the Company filed a petition for rehearing with the Third Circuit which was subsequently denied. In February 2014, the Company filed a petition for a writ of certiorari to the U.S. Supreme Court seeking review and reversal of the Third Circuit Decision. The District Court has stayed further proceedings in the case pending a decision on the petition for writ of certiorari.

*Cheswick Monarch Mine NOV*

In 2008, the PADEP issued an NOV related to the Monarch mine located near the Cheswick generating facility. This mine has not been mined for many years. The Company uses it for disposal of low-volume wastewater from the Cheswick generating facility and for disposal of leachate collected from ash disposal facilities. The NOV addresses the alleged requirement to maintain a minimum pumping volume from the mine. The PADEP indicated it will seek a civil penalty of approximately $200,000. The Company contests the allegations in the NOV and has not agreed to such penalty. The Company is currently planning capital expenditures in connection with wastewater from Cheswick and leachate from ash disposal facilities.

*Ormond Beach Alleged Federal Clean Water Act Violations*

In October 2012, the Wishtoyo Foundation, a California-based cultural and environmental advocacy organization, through its Ventura Coastkeeper Program, filed suit in the U.S. District Court for the Central District of California regarding alleged violations of the CWA associated with discharges of stormwater from the Ormond Beach generating facility. The Wishtoyo Foundation alleged that elevated concentrations of pollutants in stormwater discharged from the Ormond Beach generating facility were affecting adjacent aquatic resources in violation of (i) the Statewide General Industrial Stormwater permit (a general National Pollution Discharge Elimination System permit issued by the California State Water Resources Control Board that authorizes stormwater discharges from industrial facilities in California) and (ii) the state's Porter-Cologne Water Quality Control Act. The Wishtoyo Foundation further alleged that the Company had not implemented effective stormwater control and treatment measures and that the Company had not complied with the sampling and reporting requirements of the General Industrial Stormwater permit. The Company settled this matter in May 2013 and agreed to make operational changes and pay $79,000 in legal fees, $65,000 for supplemental environmental projects, and $15,000 for monitoring costs.

*Maryland Fly Ash Facilities*

The Company has three fly ash facilities in Maryland: Faulkner, Westland and Brandywine. Fly ash from the Morgantown and Chalk Point generating facilities is disposed of at Brandywine. Fly ash from the Dickerson generating facility is disposed of at Westland. Fly ash is no longer disposed of at the Faulkner facility. As described below, the MDE had sued NRG MD Ash Management and GenOn Mid-Atlantic regarding Faulkner, Brandywine and Westland. The MDE also had threatened not to renew the water discharge permits for all three facilities.

*Faulkner Litigation* — In May 2008, the MDE sued GenOn MidAtlantic and NRG MD Ash Management in the Circuit Court for Charles County, Maryland alleging violations of Maryland's water pollution laws at Faulkner. The MDE contended that the operation of Faulkner had resulted in the discharge of pollutants that exceeded Maryland's water quality criteria and without the appropriate NPDES permit. The MDE also alleged that GenOn failed to perform certain sampling and reporting required under an applicable NPDES permit. The MDE complaint requested that the court (i) prohibit continuation of the alleged unpermitted discharges, (ii) require GenOn to cease from further disposal of any coal combustion byproducts at Faulkner and close and cap the existing disposal cells and (iii) assess civil penalties. In July 2008, GenOn filed a motion to dismiss the complaint, arguing that the discharges are permitted by a December 2000 Consent Order. In January 2011, the MDE dismissed without prejudice its complaint and informed GenOn that it intended to file a similar lawsuit in federal court. In May 2011, the MDE filed a complaint against GenOn Mid-Atlantic and NRG MD Ash Management in the U.S. District Court for the District of Maryland alleging violations at Faulkner of the Clean Water Act and Maryland's Water Pollution Control Law. The MDE contends that (i) certain of GenOn's water discharges are not authorized by the existing permit and (ii) operation of the Faulkner facility has resulted in discharges of pollutants that violate water quality criteria. The complaint asked the court to, among other things, (i) enjoin further disposal of coal ash; (ii) enjoin discharges that are not authorized by the existing permit; (iii) require numerous technical studies; (iv) impose civil penalties and (v) award MDE attorneys' fees. The Company disputed these allegations.

*Brandywine Litigation* — In April 2010, the MDE filed a complaint against GenOn MidAtlantic and NRG MD Ash Management in the U.S. District Court for the District of Maryland asserting violations at Brandywine of the CWA and Maryland's Water Pollution Control Law. The MDE contended that the operation of Brandywine has resulted in discharges of pollutants that violate Maryland's water quality criteria. The complaint requested that the court, among other things, (i) enjoin further disposal of coal combustion waste at Brandywine, (ii) require the existing open disposal cells to be closed and capped within one year, (iii) impose civil penalties, and (iv) award MDE attorneys' fees. In September 2010, four environmental advocacy groups became intervening parties in the proceeding.

*Westland Litigation* — In January 2011, the MDE informed GenOn that it intended to sue for alleged violations at Westland of Maryland's water pollution laws, which suit was filed in U.S. District Court for the District of Maryland in December 2012.

*Permit Renewals* — In March 2011, the MDE tentatively decided to deny NRG MD Ash Management's application for renewal of the water discharge permit for Brandywine, which could have resulted in a significant increase in operating expenses for GenOn Mid Atlantic's Chalk Point and Morgantown generating facilities. The MDE also had indicated that it was planning to deny the Company's applications for renewal of the water discharge permits for Faulkner and Westland. Denial of the renewal of the water discharge permit for the latter facility could have resulted in a significant increase in operating expenses for the Dickerson generating facility.

*Settlement* — In April 2013, NRG MD Ash Management and MDE signed a Consent Decree settling the disputes at each of the three ash facilities. GenOn agreed to pay a civil penalty of $1.9 million for alleged past violations and an additional $0.6 million (for agreed prospective penalties while the settlement is implemented). GenOn agreed to develop a technical solution, which includes installing synthetic caps on the closed cells of each of the three ash facilities, for which $47 million has been reserved, and to remediate the site. At this time, the Company cannot reasonably estimate the upper range of its obligation for remediating the sites because the Company has not: (i) finished assessing each site including identifying the full impacts to both ground and surface water and the impacts to the surrounding habitat; (ii) finalized with the MDE the standards to which it must remediate; and (iii) identified the technologies required, if any, to meet the yet to be determined remediation standards at each site nor the timing of the design and installation of such technologies.

### Energy Plus Holdings Purported Class Actions

Energy Plus Holdings was sued in six purported class action lawsuits, two in New York, two in New Jersey, and two in Pennsylvania. On February 28, 2013, Energy Plus Holdings entered into a settlement agreement with plaintiffs to resolve all of the claims in the six pending suits, subject to court approval. On September 17, 2013, the U.S. District Court for the Southern District of New York entered an order approving the settlement. This settlement became final and nonappealable on October 27, 2013. Energy Plus Holdings continues to cooperate with the Connecticut Office of Attorney General and Office of Consumer Counsel and the State of New York Office of Attorney General to resolve certain issues related to Energy Plus Holdings sales, marketing and business practices. Energy Plus Holdings and the Connecticut Office of Attorney General and Office of Consumer Counsel have been involved in settlement discussions and their efforts to reach a resolution continue.

### Purported Class Actions related to July 22, 2012 Announcement of NRG/GenOn Merger Agreement

NRG was named as a defendant in eight purported class actions in Texas and Delaware related to its announcement of its agreement to acquire all outstanding shares of GenOn. These cases were consolidated into one state court case in each of Delaware and Texas and a federal court case in Texas. The plaintiffs generally alleged breach of fiduciary duties, as well as conspiracy, aiding and abetting breaches of fiduciary duties. Plaintiffs generally sought to: be certified as a class; enjoin the merger; direct the defendants to exercise their fiduciary duties; rescind the acquisition; and be awarded attorneys' fees costs and other relief that the court deems appropriate. Plaintiffs also demanded that there be additional disclosures regarding the merger terms. On October 24, 2012, the parties to the Delaware state court case executed a Memorandum of Understanding to resolve the Delaware purported class action lawsuit. In March 2013, the parties finalized the settlement of the Delaware action. On June 3, 2013, the court approved the Delaware class action settlement thereby ending the Delaware lawsuit. The remaining Texas state and federal court cases were dismissed in July 2013 and August 2013, respectively, thereby ending these matters.

### Maryland Department of the Environment v. GenOn Chalk Point and GenOn Mid-Atlantic

On January 25, 2013, Food & Water Watch, the Patuxent Riverkeeper and the Potomac Riverkeeper (together, the Citizens Group) sent NRG a letter alleging that the Chalk Point, Dickerson and Morgantown generating facilities were violating the terms of the three National Pollution Discharge Elimination System permits by discharging nitrogen and phosphorous in excess of the limits in each permit. On March 21, 2013, the MDE sent the Company a similar letter with respect to the Chalk Point and Dickerson facilities, threatening to sue within 60 days if the Company did not bring itself into compliance. On June 11, 2013, the Maryland Attorney General on behalf of the MDE filed a complaint in the U.S. District Court for the District of Maryland alleging violations of the Clean Water Act and Maryland environmental laws related to water. The lawsuit seeks injunctive relief and civil penalties in excess of $100,000.

### Huntley Power LLC Subpoena

Huntley Power LLC was served with a subpoena on May 13, 2013 from the U.S. Department of Justice requesting information regarding the plant's use and handling of diesel fuel. The Company cooperated with the U.S Department of Justice inquiry into the issues related to the use and handling of diesel fuel. The U.S. Department of Justice has advised that it is not pursuing information related to this subpoena and has closed its file, thereby ending the matter.

### Texas Franchise Audit

During the second quarter of 2013, the Company settled the Texas Franchise tax dispute with the state relating to years 2001 through 2007. Prior to the GenOn acquisition, the State of Texas issued franchise tax assessments against GenOn as a result of its audit indicating an underpayment of franchise tax of $72 million (including interest and penalties through June 30, 2013 of $29 million). These assessments relate primarily to a claim by Texas that would change the sourcing of intercompany receipts thereby increasing the amount of tax due. GenOn disagreed with most of the State's assessment and its determination and had accordingly accrued a portion of the liability but had protested the entire assessment. In June 2013, the Company settled the matter with the State by agreeing to pay $11 million on issues arising from the audit, and reversed the remainder of the accrual. The reversal was recorded as a measurement period adjustment to the amounts recognized on the acquisition date.

**Note 23 — Regulatory Matters**

NRG operates in a highly regulated industry and is subject to regulation by various federal and state agencies. As such, NRG is affected by regulatory developments at both the federal and state levels and in the regions in which NRG operates. In addition, NRG is subject to the market rules, procedures, and protocols of the various ISO and RTO markets in which NRG participates. These power markets are subject to ongoing legislative and regulatory changes that may impact NRG's wholesale and retail businesses.

In addition to the regulatory proceedings noted below, NRG and its subsidiaries are a party to other regulatory proceedings arising in the ordinary course of business or have other regulatory exposure. In management's opinion, the disposition of these ordinary course matters will not materially adversely affect NRG's consolidated financial position, results of operations, or cash flows.

### East Region

*Reliability Must Run Agreements for Elrama and Niles* — In May 2012, GenOn filed with FERC an RMR rate schedule governing operation of unit 4 of the Elrama generating facility and unit 1 of the Niles generating facility. PJM determined that each of these units was needed past its planned deactivation date of June 1, 2012 to maintain transmission system reliability on the PJM system pending the completion of transmission upgrades. The RMR rate schedule sets forth the terms, conditions and cost-based rates under which GenOn operated the units for reliability purposes through September 30, 2012, the date PJM indicated the units would no longer be needed for reliability. In July 2012, FERC accepted GenOn's RMR rate schedule subject to hearing and settlement procedures. In the settlement discussions ordered by FERC, or in any subsequent hearing, the Company's RMR rate schedule may be modified from that which was filed. The rates GenOn charged are subject to refund pending a ruling or settlement. The Company filed a settlement of all outstanding issues in May 2013, which several parties are contesting. The matter is pending before FERC.

*Montgomery County Station Power Tax* — On December 20, 2013, the Company received a letter from Montgomery County, Maryland requesting payment of an energy tax for the consumption of station power at the Dickerson Facility over the last three years. The letter seeks payment in the amount of $14.6 million, which includes tax, interest and penalty. The Company is disputing the applicability of the tax and GenOn Mid-Atlantic, LLC filed suit against the County in Maryland Tax Court and the Circuit Court for Montgomery County on January 21, 2014. The parties jointly filed on February 25, 2014, to stay the Circuit Court proceeding pending resolution of the Tax Court proceeding. The Tax Court proceeding is still pending.

### Retail

*MISO SECA* — Green Mountain Energy previously provided competitive retail energy supply in the MISO region during the relevant period of January 1, 2002, to December 31, 2005. By order dated November 18, 2004, FERC eliminated certain regional through-and-out transmission rates charged by transmission owners in MISO and PJM. In order to temporarily compensate the transmission owners for lost revenues, FERC ordered MISO, PJM and their respective transmission owners to revamp the way that ISOs manage certain cross-system congestion costs, known as Seams Elimination Charge/Cost Adjustments/Assignments, or SECA, charges effective December 1, 2004, through March 31, 2006. The tariff amendments filed by MISO and the MISO transmission owners allocated certain SECA charges to various zones and sub-zones within MISO, including a sub-zone called the Green Mountain Energy Company Sub-zone. During several years of extensive litigation before FERC, several transmission owners sought to recover SECA charges from Green Mountain Energy. Green Mountain Energy denied responsibility for any SECA charges and did not pay any asserted SECA charges.

On May 21, 2010, FERC issued two orders, including its Order on Initial Decision, in which FERC determined that approximately $22 million plus interest of SECA charges were owed not by Green Mountain Energy but rather by BP Energy - one of Green Mountain Energy's suppliers during the period at issue. On August 19, 2010, the transmission owners and MISO made compliance filings in accordance with FERC's Orders allocating SECA charges to a BP Energy Sub-zone, and making no allocation to a Green Mountain Energy sub-zone. FERC has not yet ruled on those compliance filings.

On September 30, 2011, FERC issued orders denying all requests for rehearing and again determined that SECA charges were not owed by Green Mountain Energy. Numerous parties, including BP Energy, sought judicial review of FERC's orders, and Green Mountain Energy was granted intervenor status in the consolidated appeals. Most appellants subsequently settled with the transmission owners and withdrew their appeals, including BP Energy, which agreed to pay approximately $24 million to the three transmission owners signing the agreement, with another $1 million offered to the remaining PJM transmission owners, should they choose to join the settlement; all chose to do so. FERC approved the settlement, and BP Energy moved to dismiss its appeals; its motions to dismiss were granted by the Court.

191

*West Region*

*California Station Power* — On December 18, 2012, in *Calpine Corporation v. FERC,* the U.S. Court of Appeals for the D.C. Circuit upheld a decision by FERC disclaiming jurisdiction over how the states impose retail station power charges. The CPUC may now establish retail charges for future station power consumption. Due to reservation-of-rights language in the California utilities' state-jurisdictional station power tariffs, the court's ruling arguably requires California generators to pay state-imposed retail charges back to the date of enrollment by the facilities in the CAISO's station power program (February 1, 2009, for the Company's Encina and El Segundo facilities; March 1, 2009, for the Company's Long Beach facility).

On November 18, 2011, Southern California Edison Company filed with the CPUC, seeking authorization to begin charging generators station power charges, and to assess such charges retroactively, which the Company and other generators have challenged. On August 13, 2012, the CPUC Energy Division issued a draft resolution in which it rejected the Company's arguments and approved Southern California Edison's proposed station power charges, including retroactive implementation, but proposing a credit to generators for some portion of their retail station power bill. However, the CPUC withdrew the draft resolution from the calendar and consideration of the measure has not yet been rescheduled. The Company believes it has established an appropriate reserve.

## Note 24 — Environmental Matters

NRG is subject to a wide range of environmental regulations in the development, ownership, construction and operation of projects in the United States and Australia. These laws and regulations generally require that governmental permits and approvals be obtained before construction and during operation of power plants. Environmental regulations have become increasingly stringent and NRG expects this trend to continue. The electric generation industry is likely to face new requirements to address various emissions, including greenhouse gases, as well as combustion byproducts, water discharge and use, and threatened and endangered species. In general, future laws and regulations are expected to require the addition of emissions controls or other environmental controls or to impose certain restrictions on the operations of the Company's facilities, which could have a material effect on the Company's operations.

The EPA released CSAPR on July 7, 2011, which was scheduled to replace CAIR on January 1, 2012. On August 21, 2012, the U.S. Court of Appeals for the D.C. Circuit issued an opinion vacating CSAPR and keeping CAIR in place until the EPA can replace it. The EPA petitioned the U.S. Supreme Court seeking review of this decision, which petition was granted. The Supreme Court heard oral argument in the case on December 10, 2013. The Court of Appeals decision was beneficial to the Company as it eliminated an $SO_2$ allowance reduction which was to have occurred before the MATS compliance date. While NRG is unable to predict the final outcome of the ongoing litigation, the Company's investment in pollution controls and cleaner technologies coupled with planned strategic plant retirements leaves the fleet well positioned for compliance.

Under CSAPR, use of discounted Acid Rain $SO_2$ and CAIR $NO_x$ allowances would have been discontinued and replaced with completely distinct allowance programs. Acid Rain allowances would still be required on a 1:1 basis under the Acid Rain Program. Consequently, in the third quarter 2011, the Company recorded an impairment charge of $160 million on the Company's Acid Rain Program $SO_2$ emission allowances, which were recorded as an intangible asset on the Company's balance sheet. The impairment charge reflects the write-off of the value of emission allowances in excess of those required for compliance with the Acid Rain Program.

In January 2014, EPA re-proposed the NSPS for $CO_2$ emissions from new fossil-fuel-fired electric generating units that had been previously proposed in April 2012. The re-proposed standards are 1,000 pounds of $CO_2$ per MWh for large gas units and 1,100 pounds of $CO_2$ per MWh for coal units and small gas units. Proposed standards are in effect until a final rule is published or another rule is re-proposed. In 2014, EPA intends to propose another rule that would require states to develop $CO_2$ standards that would apply to existing fossil-fueled generating facilities.

*Environmental Capital Expenditures*

Based on current (and in some cases proposed) rules, technology and preliminary plans based on some proposed rules, NRG estimates that environmental capital expenditures from 2014 through 2018 required to comply with environmental laws will be approximately $332 million, which includes $120 million for GenOn. These costs are primarily associated with (i) controls to satisfy MATS and the recent NSR settlement at Big Cajun II; (ii) controls to satisfy MATS at W.A. Parish, Limestone and Conemaugh; and (iii) $NO_x$ controls for Sayreville and Gilbert. NRG continues to explore cost-effective compliance alternatives to further reduce costs.

NRG's contracts with its rural electric cooperative customers in the South Central region allow for recovery of a portion of the region's environmental capital costs incurred as the result of complying with any change in environmental law. Cost recoveries begin once the environmental equipment becomes operational and include a return on capital. The actual recoveries will depend, among other things, on the timing of the completion of the capital projects and the remaining duration of the contracts.

### East Region

The EPA and various states are investigating compliance of electric generating facilities with the pre-construction permitting requirements of the CAA known as "new source review," or NSR. In January 2009, GenOn received an NOV from the EPA alleging that past work at Keystone, Portland and Shawville generating facilities violated regulations regarding NSR. In June 2011, GenOn received an NOV from the EPA alleging that past work at Avon Lake and Niles generating stations violated NSR. In December 2007, the NJDEP filed suit alleging that NSR violations occurred at the Portland generating station, which suit was resolved pursuant to a July 2013 Consent Decree. The Shawville and Portland generating units that are the subject of the NOVs are scheduled for retirement soon. The Niles coal generating unit, also subject to the NOV, was retired in 2012. Additionally, in April 2013, the Connecticut Department of Energy and Environmental Protection issued four NOVs alleging that past work at oil-fired combustion turbines at the Torrington Terminal, Franklin, Branford and Middletown violated regulations regarding NSR.

In 2008, the PADEP issued an NOV related to the inactive Monarch mine where low-volume wastewater from the Cheswick Generating Station and ash leachate was historically disposed. Resolution of the NOV could result in operational requirements such as pumping a minimum volume of water from the mine and a penalty of approximately $200,000.

In January 2006, NRG's Indian River Operations, Inc. was notified that it may be a potentially responsible party with respect to Burton Island Old Ash Landfill, a historic captive landfill located at the Indian River facility. On October 1, 2007, NRG signed an agreement with DNREC to investigate the site through the Voluntary Clean-up Program. On February 4, 2008, DNREC issued findings that no further action is required in relation to surface water and that a previously planned shoreline stabilization project would satisfactorily address shoreline erosion. The landfill itself required a Remedial Investigation and Feasibility Study to determine the type and scope of any additional required work. The DNREC approved the Feasibility Study in December 2012. In January 2013, DNREC proposed a remediation plan based on the Feasibility Study. The remediation plan was approved in October 2013. The cost of completing the work required by the approved remediation plan is consistent with amounts previously budgeted. On May 29, 2008, DNREC requested that NRG's Indian River Operations, Inc. participate in the development and performance of a Natural Resource Damage Assessment at the Burton Island Old Ash Landfill. NRG is currently working with DNREC and other trustees to close out the assessment process.

The MDE sued GenOn for alleged violations of water pollution laws at three fly ash disposal sites in Maryland: Faulkner (2008/2011), Brandywine (2010) and Westland (2012). On April 30, 2013, the court approved the consent decree resolving these issues. GenOn has discontinued use of the Faulkner disposal site and opened a new, state of the art carbon burnout facility at its Morgantown plant that allows greater beneficial reuse (as a cement substitute).

In addition, the MDE has announced that it intends to promulgate more stringent regulations regarding $NO_x$ emissions, which could negatively affect certain of the Company's coal facilities located in Maryland.

In 2013, each of the RGGI member states finalized a rule that collectively reduced the $CO_2$ emissions cap from 165 million tons to 91 million tons in 2014 with a 2.5% reduction each year from 2015 to 2020. The Company expects earnings at its plants in Massachusetts, New York, and particularly those in Maryland, to be negatively affected. The extent to which the Company would be negatively affected depends on the price of the $CO_2$ emissions allowances, which in turn will be significantly influenced by future natural gas prices, power prices, generation resource mix, dispatch order, and any nuclear plant retirements.

For further discussion of these matters, refer to Note 22, *Commitments and Contingencies*.

### South Central Region

In 2009, the U.S. DOJ, on behalf of the EPA, and later the Louisiana Department of Environmental Quality on behalf of the state of Louisiana, sued LaGen in federal district court in the Middle District of Louisiana alleging violations of the CAA at the Big Cajun II power plant. On March 6, 2013, the court entered a Consent Decree resolving the matter. In addition to a fine of $3.5 million and mitigation projects totaling $10.5 million the Consent Decree includes: (i) annual emission caps for $NO_x$ and $SO_2$; (ii) installation of selective non-catalytic reduction on Units 1, 2 and 3 by May 1, 2014; (iii) installation of dry sorbent injection on Unit 1 by April 15, 2015 followed by a further reduction in $SO_2$ in March 2025; (iv) conversion of Unit 2 to natural gas; and (v) surrender of any excess allowances associated with the NRG owned portion of the plant. For further discussion of this matter, refer to Note 22, *Commitments and Contingencies*.

**Note 25 — Cash Flow Information**

Detail of supplemental disclosures of cash flow and non-cash investing and financing information was:

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2013** | **2012** | **2011** |
| | (In millions) | | |
| Interest paid, net of amount capitalized | $ 836 | $ 579 | $ 642 |
| Income taxes (refunded)/paid (a) | (60) | 17 | 26 |
| **Non-cash investing and financing activities:** | | | |
| Additions to fixed assets for accrued capital expenditures | 405 | 563 | 292 |
| Decrease to fixed assets for accrued grants and related tax impact | (681) | (87) | (32) |
| Decrease to notes receivable for equity conversion | — | — | 63 |
| Issuance of shares for GenOn acquisition | — | (2,188) | — |

(a) In 2013, the net income taxes refunded are net of $28 million income taxes paid and $87 million income tax refunds. No tax refunds were received in 2012. In 2011, income taxes paid are net of $8 million of income tax refunds received.

**Note 26 — Guarantees**

NRG and its subsidiaries enter into various contracts that include indemnification and guarantee provisions as a routine part of the Company's business activities. Examples of these contracts include asset purchases and sale agreements, commodity sale and purchase agreements, retail contracts, joint venture agreements, EPC agreements, operation and maintenance agreements, service agreements, settlement agreements, and other types of contractual agreements with vendors and other third parties, as well as affiliates. These contracts generally indemnify the counterparty for tax, environmental liability, litigation and other matters, as well as breaches of representations, warranties and covenants set forth in these agreements. The Company is obligated with respect to customer deposits associated with the Retail Business. NRG has also assumed guarantees for some non-qualified benefits of existing retirees resulting from the acquisition of GenOn. In some cases, NRG's maximum potential liability cannot be estimated, since the underlying agreements contain no limits on potential liability.

In accordance with ASC 460, *Guarantees*, or ASC 460, NRG has estimated that the current fair value for issuing these guarantees was $5.4 million as of December 31, 2013, and the liability in this amount is included in the Company's non-current liabilities.

The following table summarizes the maximum potential exposures that can be estimated for NRG's guarantees, indemnities, and other contingent liabilities by maturity:

| | By Remaining Maturity at December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2013 | | | | | |
| **Guarantees** | **Under 1 Year** | **1-3 Years** | **3-5 Years** | **Over 5 Years** | **Total** | **2012 Total** |
| | (In millions) | | | | | |
| Letters of credit and surety bonds | $ 1,654 | $ 47 | $ — | $ — | $ 1,701 | $ 1,594 |
| Asset sales guarantee obligations | — | — | 275 | — | 275 | 275 |
| Commercial sales arrangements | 81 | 112 | 23 | 1,338 | 1,554 | 1,579 |
| Other guarantees | 78 | 4 | — | 469 | 551 | 356 |
| Total guarantees | $ 1,813 | $ 163 | $ 298 | $ 1,807 | $ 4,081 | $ 3,804 |

*Letters of credit and surety bonds* — As of December 31, 2013, NRG and its consolidated subsidiaries were contingently obligated for a total of $1.8 billion under letters of credit and surety bonds. Most of these letters of credit and surety bonds are issued in support of the Company's obligations to perform under commodity agreements and in support of equity contribution requirements for solar projects in construction, as well as for financing or other arrangements. A majority of these letters of credit and surety bonds expire within one year of issuance, and it is typical for the Company to renew them on similar terms.

194

The material indemnities, within the scope of ASC 460, are as follows:

*Asset purchases and divestitures* — The purchase and sale agreements which govern NRG's asset or share investments and divestitures customarily contain guarantees and indemnifications of the transaction to third parties. The contracts indemnify the parties for liabilities incurred as a result of a breach of a representation or warranty by the indemnifying party, or as a result of a change in tax laws. These obligations generally have a discrete term and are intended to protect the parties against risks that are difficult to predict or estimate at the time of the transaction. In several cases, the contract limits the liability of the indemnifier. NRG has no reason to believe that the Company currently has any material liability relating to such routine indemnification obligations.

*Commercial sales arrangements* — In connection with the purchase and sale of fuel, emission allowances and power generation products to and from third parties with respect to the operation of some of NRG's generation facilities in the United States, the Company may be required to guarantee a portion of the obligations of certain of its subsidiaries. These obligations may include liquidated damages payments or other unscheduled payments.

*Other guarantees* — NRG has issued guarantees of obligations that its subsidiaries may incur as a provision for environmental site remediation, payment of debt obligations, rail car leases, performance under purchase, EPC and operating and maintenance agreements. The Company does not believe that it will be required to perform under these guarantees.

*Other indemnities* — Other indemnifications NRG has provided cover operational, tax, litigation and breaches of representations, warranties and covenants. NRG has also indemnified, on a routine basis in the ordinary course of business, consultants or other vendors who have provided services to the Company. NRG's maximum potential exposure under these indemnifications can range from a specified dollar amount to an indeterminate amount, depending on the nature of the transaction. Total maximum potential exposure under these indemnifications is not estimable due to uncertainty as to whether claims will be made or how they will be resolved. NRG does not have any reason to believe that the Company will be required to make any material payments under these indemnity provisions.

Because many of the guarantees and indemnities NRG issues to third parties and affiliates do not limit the amount or duration of its obligations to perform under them, there exists a risk that the Company may have obligations in excess of the amounts described above. For those guarantees and indemnities that do not limit the Company's liability exposure, it may not be able to estimate what the Company's liability would be, until a claim is made for payment or performance, due to the contingent nature of these contracts.

## Note 27 — Jointly Owned Plants

Certain NRG subsidiaries own undivided interests in jointly-owned plants, as described below. These plants are maintained and operated pursuant to their joint ownership participation and operating agreements. NRG is responsible for its subsidiaries' share of operating costs and direct expenses and includes its proportionate share of the facilities and related revenues and direct expenses in these jointly-owned plants in the corresponding balance sheet and income statement captions of the Company's consolidated financial statements.

The following table summarizes NRG's proportionate ownership interest in the Company's jointly-owned facilities:

| As of December 31, 2013 | Ownership Interest | Property, Plant & Equipment | Accumulated Depreciation | Construction in Progress |
|---|---|---|---|---|
| | | (In millions unless otherwise stated) | | |
| South Texas Project Units 1 and 2, Bay City, TX | 44.00% | $       2,679 | $       (1,293) | $       19 |
| Big Cajun II Unit 3, New Roads, LA | 58.00% | 178 | (95) | 18 |
| Cedar Bayou Unit 4, Baytown, TX | 50.00% | 215 | (49) | — |
| Keystone, Shelocta, PA | 3.70% | 92 | (35) | 1 |
| Conemaugh, New Florence, PA | 3.72% | 82 | (38) | 14 |

**Note 28 — Unaudited Quarterly Financial Data**

Refer to Note 3, *Business Acquisitions and Dispositions*, and Note 10, *Asset Impairments*, for a description of the effect of unusual or infrequently occurring events during the quarterly periods. Summarized unaudited quarterly financial data is as follows:

| | Quarter Ended | | | |
| | 2013 | | | |
| | December 31 | September 30 | June 30 | March 31 |
| | (In millions, except per share data) | | | |
| Operating revenues | $ 2,795 | $ 3,490 | $ 2,930 | $ 2,081 |
| Operating (loss)/income | (205) | 527 | 287 | (266) |
| Net (loss)/income | (283) | $ 135 | 130 | (334) |
| Net (loss)/income attributable to NRG Energy, Inc. | $ (290) | $ 116 | $ 122 | $ (334) |
| Weighted average number of common shares outstanding — basic | 323 | 323 | 323 | 323 |
| Net (loss)/income per weighted average common share — basic | $ (0.90) | $ 0.36 | $ 0.38 | $ (1.03) |
| Weighted average number of common shares outstanding — diluted | 323 | 327 | 327 | 323 |
| Net (loss)/income per weighted average common share — diluted | $ (0.90) | $ 0.35 | $ 0.37 | $ (1.03) |

| | Quarter Ended | | | |
| | 2012 | | | |
| | December 31 | September 30 | June 30 | March 31 |
| | (In millions, except per share data) | | | |
| Operating revenues | $ 2,063 | $ 2,331 | $ 2,166 | $ 1,862 |
| Operating income/(loss) | 37 | 86 | 397 | (170) |
| Net income/(loss) | 254 | 8 | 259 | (206) |
| Net income/(loss) attributable to NRG Energy, Inc. | $ 252 | $ (1) | $ 251 | $ (207) |
| Weighted average number of common shares outstanding — basic | 247 | 228 | 228 | 228 |
| Net income/(loss) per weighted average common share — basic | $ 1.02 | $ (0.01) | $ 1.09 | $ (0.92) |
| Weighted average number of common shares outstanding — diluted | 249 | 228 | 229 | 228 |
| Net income/(loss) per weighted average common share — diluted | $ 1.01 | $ (0.01) | $ 1.08 | $ (0.92) |

**Note 29 — Condensed Consolidating Financial Information**

As of December 31, 2013, the Company had outstanding $5.7 billion of Senior Notes due 2018 - 2023, as shown in Note 12, *Debt and Capital Leases*. These Senior Notes are guaranteed by certain of NRG's current and future 100% owned domestic subsidiaries, or guarantor subsidiaries. These guarantees are both joint and several. The non-guarantor subsidiaries include all of NRG's foreign subsidiaries and certain domestic subsidiaries, including GenOn and its subsidiaries.

Unless otherwise noted below, each of the following guarantor subsidiaries fully and unconditionally guaranteed the Senior Notes as of December 31, 2013:

| | | |
|---|---|---|
| Ace Energy, Inc. | Middletown Power LLC | NRG Oswego Harbor Power Operations Inc. |
| Allied Warranty LLC | Montville Power LLC | NRG PacGen Inc. |
| Allied Home Warranty GP LLC | NEO Corporation | NRG Power Marketing LLC |
| Arthur Kill Power LLC | NEO Freehold-Gen LLC | NRG Reliability Solutions LLC |
| Astoria Gas Turbine Power LLC | NEO Power Services Inc. | NRG Renter's Protection LLC |
| BidURenergy, Inc. | New Genco GP, LLC | NRG Retail LLC |
| Cabrillo Power I LLC | Norwalk Power LLC | NRG Retail Northeast LLC |
| Cabrillo Power II LLC | NRG Affiliate Services Inc. | NRG Rockford Acquisition LLC |
| Carbon Management Solutions LLC | NRG Artesian Energy LLC | NRG Saguaro Operations Inc. |
| Clean Edge Energy LLC | NRG Arthur Kill Operations Inc. | NRG Security LLC |
| Conemaugh Power LLC | NRG Astoria Gas Turbine Operations Inc. | NRG Services Corporation |
| Connecticut Jet Power LLC | NRG Bayou Cove LLC | NRG SimplySmart Solutions LLC |
| Cottonwood Development LLC | NRG Cabrillo Power Operations Inc. | NRG South Central Affiliate Services Inc. |
| Cottonwood Energy Company LP | NRG California Peaker Operations LLC | NRG South Central Generating LLC |
| Cottonwood Generating Partners I LLC | NRG Cedar Bayou Development Company, LLC | NRG South Central Operations Inc. |
| Cottonwood Generating Partners II LLC | NRG Connecticut Affiliate Services Inc. | NRG South Texas LP |
| Cottonwood Generating Partners III LLC | NRG Construction LLC | NRG Texas C&I Supply LLC |
| Cottonwood Technology Partners LP | NRG Curtailment Solutions LLC | NRG Texas Gregory LLC |
| Devon Power LLC | NRG Development Company Inc. | NRG Texas Holding Inc. |
| Dunkirk Power LLC | NRG Devon Operations Inc. | NRG Texas LLC |
| Eastern Sierra Energy Company LLC | NRG Dispatch Services LLC | NRG Texas Power LLC |
| El Segundo Power, LLC | NRG Dunkirk Operations Inc. | NRG Unemployment Protection LLC |
| El Segundo Power II LLC | NRG El Segundo Operations Inc. | NRG Warranty Services LLC |
| Elbow Creek Wind Project LLC | NRG Energy Labor Services LLC | NRG West Coast LLC |
| Energy Alternatives Wholesale, LLC | NRG Energy Services Group LLC | NRG Western Affiliate Services Inc. |
| Energy Curtailment Specialists, Inc. | NRG Energy Services International Inc. | O'Brien Cogeneration, Inc. II |
| Energy Plus Holdings LLC | NRG Energy Services LLC | ONSITE Energy, Inc. |
| Energy Plus Natural Gas LLC | NRG Generation Holdings, Inc. | Oswego Harbor Power LLC |
| Energy Protection Insurance Company | NRG Home & Business Solutions LLC | RE Retail Receivables, LLC |
| Everything Energy LLC | NRG Home Solutions LLC | Reliant Energy Northeast LLC |
| GCP Funding Company, LLC | NRG Home Solutions Product LLC | Reliant Energy Power Supply, LLC |
| Green Mountain Energy Company | NRG Homer City Services LLC | Reliant Energy Retail Holdings, LLC |
| Green Mountain Energy Company (NY Com) LLC | NRG Huntley Operations Inc. | Reliant Energy Retail Services, LLC |
| | NRG Identity Protect LLC | RERH Holdings LLC |
| Green Mountain Energy Company (NY Res) LLC | NRG Ilion Limited Partnership | Saguaro Power LLC |
| | NRG Ilion LP LLC | Somerset Operations Inc. |
| Gregory Partners, LLC | NRG International LLC | Somerset Power LLC |
| Gregory Power Partners LLC | NRG Maintenance Services LLC | Texas Genco Financing Corp. |
| Huntley Power LLC | NRG Mextrans Inc. | Texas Genco GP, LLC |
| Independence Energy Alliance LLC | NRG MidAtlantic Affiliate Services Inc. | Texas Genco Holdings, Inc. |
| Independence Energy Group LLC | NRG Middletown Operations Inc. | Texas Genco LP, LLC |
| Independence Energy Natural Gas LLC | NRG Montville Operations Inc. | Texas Genco Operating Services, LLC |
| Indian River Operations Inc. | NRG New Jersey Energy Sales LLC | Texas Genco Services, LP |
| Indian River Power LLC | NRG New Roads Holdings LLC | US Retailers LLC |
| Keystone Power LLC | NRG North Central Operations Inc. | Vienna Operations Inc. |

| | | |
|---|---|---|
| Langford Wind Power, LLC | NRG Northeast Affiliate Services Inc. | Vienna Power LLC |
| Lone Star A/C & Appliance Repairs, LLC | NRG Norwalk Harbor Operations Inc. | WCP (Generation) Holdings LLC |
| Louisiana Generating LLC | NRG Operating Services, Inc. | West Coast Power LLC |
| Meriden Gas Turbines LLC | | |

197

The non-guarantor subsidiaries include all of NRG's foreign subsidiaries and certain domestic subsidiaries, including GenOn and its subsidiaries. NRG conducts much of its business through and derives much of its income from its subsidiaries. Therefore, the Company's ability to make required payments with respect to its indebtedness and other obligations depends on the financial results and condition of its subsidiaries and NRG's ability to receive funds from its subsidiaries. Except for NRG Bayou Cove, LLC, which is subject to certain restrictions under the Company's Peaker financing agreements, there are no restrictions on the ability of any of the guarantor subsidiaries to transfer funds to NRG. In addition, there may be restrictions for certain non-guarantor subsidiaries.

The following condensed consolidating financial information presents the financial information of NRG Energy, Inc., the guarantor subsidiaries and the non-guarantor subsidiaries in accordance with Rule 3-10 under the Securities and Exchange Commission's Regulation S-X. The financial information may not necessarily be indicative of results of operations or financial position had the guarantor subsidiaries or non-guarantor subsidiaries operated as independent entities.

In this presentation, NRG Energy, Inc. consists of parent company operations. Guarantor subsidiaries and non-guarantor subsidiaries of NRG are reported on an equity basis. For companies acquired, the fair values of the assets and liabilities acquired have been presented on a push-down accounting basis.

In addition, the condensed parent company financial statements are provided in accordance with Rule 12-04, Schedule I of Regulation S-X, as the restricted net assets of NRG Energy, Inc.'s subsidiaries exceed 25 percent of the consolidated net assets of NRG Energy, Inc. These statements should be read in conjunction with the consolidated statements and notes thereto of NRG Energy, Inc. For a discussion of NRG Energy, Inc.'s long-term debt, see Note 12, *Debt and Capital Leases* to the consolidated financial statements. For a discussion of NRG Energy, Inc.'s contingencies, see Note 22, *Commitments and Contingencies* to the consolidated financial statements. For a discussion of NRG Energy, Inc.'s guarantees, see Note 26, *Guarantees* to the consolidated financial statements.

**NRG ENERGY, INC. AND SUBSIDIARIES**

**CONDENSED CONSOLIDATING STATEMENTS OF OPERATIONS**

**For the Year Ended December 31, 2013**

| | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | NRG Energy, Inc. (Note Issuer) | Eliminations [a] | Consolidated Balance |
|---|---|---|---|---|---|
| | | | (In millions) | | |
| **Operating Revenues** | | | | | |
| Total operating revenues | $ 8,223 | $ 3,211 | $ — | $ (139) | $ 11,295 |
| **Operating Costs and Expenses** | | | | | |
| Cost of operations | 6,150 | 2,104 | — | (133) | 8,121 |
| Depreciation and amortization | 837 | 407 | 12 | | 1,256 |
| Impairment losses | 459 | — | — | — | 459 |
| Selling, general and administrative | 446 | 230 | 234 | (6) | 904 |
| Acquisition-related transaction and integration costs | — | 70 | 58 | | 128 |
| Development activity expenses | — | 34 | 50 | — | 84 |
| Total operating costs and expenses | 7,892 | 2,845 | 354 | (139) | 10,952 |
| **Operating Income/(Loss)** | 331 | 366 | (354) | — | 343 |
| **Other Income/(Expense)** | | | | | |
| Equity in earnings/(losses) of consolidated subsidiaries | (67) | (14) | 221 | (140) | — |
| Equity in earnings/(losses) of unconsolidated affiliates | (11) | 22 | — | (4) | 7 |
| Impairment charge on investment | — | (99) | | | (99) |
| Other income, net | 6 | 11 | (2) | (2) | 13 |
| Loss on debt extinguishment | | (12) | (38) | — | (50) |
| Interest expense | (24) | (318) | (506) | — | (848) |
| Total other income/(expense) | (96) | (410) | (325) | (146) | (977) |
| **Income/(Loss) Before Income Taxes** | 235 | (44) | (679) | (146) | (634) |
| Income tax expense/(benefit) | 114 | (89) | (307) | — | (282) |
| **Net Income** | 121 | 45 | (372) | (146) | (352) |
| Less: Net income attributable to noncontrolling interest | — | 27 | 13 | (6) | 34 |
| **Net Income attributable to NRG Energy, Inc** | $ 121 | $ 18 | $ (385) | $ (140) | $ (386) |

(a)   All significant intercompany transactions have been eliminated in consolidation.

199

**NRG ENERGY, INC. AND SUBSIDIARIES**

**CONDENSED CONSOLIDATING STATEMENTS OF COMPREHENSIVE INCOME**

**For the Year Ended December 31, 2013**

| | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | NRG Energy, Inc. (Note Issuer) | Eliminations[a] | Consolidated Balance |
|---|---|---|---|---|---|
| | | | (In millions) | | |
| **Net Income** | $   121 | $   45 | $   (372) | $   (146) | $   (352) |
| **Other comprehensive (loss)/income, net of tax** | | | | | |
|    Unrealized loss on derivatives, net | (71) | 50 | 120 | (91) | 8 |
|    Foreign currency translation adjustments, net | — | (20) | (4) | — | (24) |
|    Available-for-sale securities, net | — | — | 3 | — | 3 |
|    Defined benefit plan, net | 75 | 63 | 30 | — | 168 |
|    Other comprehensive loss | 4 | 93 | 149 | (91) | 155 |
| **Comprehensive income** | 125 | 138 | (223) | (237) | (197) |
| Less: Comprehensive income attributable to noncontrolling interest | — | 27 | 13 | (6) | 34 |
| **Comprehensive income attributable to NRG Energy, Inc.** | 125 | 111 | (236) | (231) | (231) |
|    Dividends for preferred shares | — | — | 9 | — | 9 |
| **Comprehensive income available for common stockholders** | $   125 | $   111 | $   (245) | $   (231) | $   (240) |

(a)   All significant intercompany transactions have been eliminated in consolidation.

200

**NRG ENERGY, INC. AND SUBSIDIARIES**

**CONDENSED CONSOLIDATING BALANCE SHEETS**

**December 31, 2013**

| | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | NRG Energy, Inc. | Eliminations [a] | Consolidated Balance |
|---|---|---|---|---|---|
| | | | (In millions) | | |
| **ASSETS** | | | | | |
| **Current Assets** | | | | | |
| Cash and cash equivalents | $ 56 | $ 870 | $ 1,328 | $ — | $ 2,254 |
| Funds deposited by counterparties | 7 | 56 | — | — | 63 |
| Restricted cash | 12 | 252 | 4 | — | 268 |
| Accounts receivable - trade, net | 965 | 249 | — | — | 1,214 |
| Inventory | 436 | 462 | — | — | 898 |
| Derivative instruments | 866 | 470 | — | (8) | 1,328 |
| Deferred income taxes | — | 41 | 217 | — | 258 |
| Cash collateral paid in support of energy risk management activities | 214 | 62 | — | — | 276 |
| Renewable energy grant receivable | — | 539 | — | — | 539 |
| Prepayments and other current assets | 4,778 | 379 | (3,802) | (857) | 498 |
| Total current assets | 7,334 | 3,380 | (2,253) | (865) | 7,596 |
| **Net Property, Plant and Equipment** | 9,116 | 10,604 | 153 | (22) | 19,851 |
| **Other Assets** | | | | | |
| Investment in subsidiaries | 32 | 422 | 18,266 | (18,720) | — |
| Equity investments in affiliates | (30) | 583 | — | (100) | 453 |
| Notes receivable, less current portion | — | 62 | 105 | (94) | 73 |
| Goodwill | 1,973 | 12 | — | — | 1,985 |
| Intangible assets, net | 925 | 232 | 4 | (21) | 1,140 |
| Nuclear decommissioning trust fund | 551 | | | | 551 |
| Deferred income taxes | — | 681 | 521 | — | 1,202 |
| Derivative instruments | 110 | 202 | — | (1) | 311 |
| Other non-current assets | 76 | 281 | 383 | — | 740 |
| Total other assets | 3,637 | 2,475 | 19,279 | (18,936) | 6,455 |
| **Total Assets** | $ 20,087 | $ 16,459 | $ 17,179 | $ (19,823) | $ 33,902 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | | |
| **Current Liabilities** | | | | | |
| Current portion of long-term debt and capital leases | $ 1 | $ 1,029 | $ 20 | $ — | $ 1,050 |
| Accounts payable | 652 | 352 | 34 | — | 1,038 |
| Accounts payable - affiliate | 1,350 | 760 | (1,253) | (857) | — |
| Derivative instruments | 859 | 204 | — | (8) | 1,055 |
| Deferred income taxes | — | — | — | — | — |
| Cash collateral received in support of energy risk management activities | 6 | 57 | — | — | 63 |
| Accrued expenses and other current liabilities | 297 | 410 | 291 | — | 998 |
| Total current liabilities | 3,165 | 2,812 | (908) | (865) | 4,204 |
| **Other Liabilities** | | | | | |
| Long-term debt and capital leases | 317 | 7,837 | 7,707 | (94) | 15,767 |
| Nuclear decommissioning reserve | 294 | — | — | — | 294 |
| Nuclear decommissioning trust liability | 324 | — | — | — | 324 |
| Postretirement and other benefit obligations | 218 | 194 | 94 | — | 506 |
| Deferred income taxes | 1,024 | (1,002) | — | — | 22 |
| Derivative instruments | 147 | 49 | — | (1) | 195 |
| Out-of-market contracts | 127 | 1,050 | — | — | 1,177 |
| Other non-current liabilities | 194 | 421 | 80 | — | 695 |
| Total non-current liabilities | 2,645 | 8,549 | 7,881 | (95) | 18,980 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Total liabilities** | | 5,810 | | 11,361 | | 6,973 | | (960) | | 23,184 |
| **3.625% Preferred Stock** | | | | | | 249 | | | | 249 |
| **Stockholders' Equity** | | 14,277 | | 5,098 | | 9,957 | | (18,863) | | 10,469 |
| **Total Liabilities and Stockholders' Equity** | $ | 20,087 | $ | 16,459 | $ | 17,179 | $ | (19,823) | $ | 33,902 |

(a)   All significant intercompany transactions have been eliminated in consolidation.

201

**NRG ENERGY, INC. AND SUBSIDIARIES**

**CONDENSED CONSOLIDATING STATEMENTS OF CASH FLOWS**

**For the Year Ended December 31, 2013**

| | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | NRG Energy, Inc. | Eliminations [a] | Consolidated Balance |
|---|---|---|---|---|---|
| | | | (In millions) | | |
| **Net Cash Provided/(Used) by Operating Activities** | 2,318 | (217) | (2,546) | 1,715 | 1,270 |
| **Cash Flows from Investing Activities** | | | | | |
| Intercompany loans to subsidiaries | (1,722) | 7 | 1,715 | — | — |
| Acquisition of business, net of cash acquired | | (179) | (315) | — | (494) |
| Capital expenditures | (528) | (1,413) | (46) | — | (1,987) |
| Increase in restricted cash, net | (1) | (22) | 1 | — | (22) |
| Decrease in restricted cash - U.S. DOE projects | | (31) | 5 | — | (26) |
| Increase in notes receivable | 2 | (7) | (6) | — | (11) |
| Proceeds from renewable energy grants | | 55 | — | — | 55 |
| Purchases of emission allowances, net of proceeds | 5 | — | — | — | 5 |
| Investments in nuclear decommissioning trust fund securities | (514) | — | — | — | (514) |
| Proceeds from sales of nuclear decommissioning trust fund securities | 488 | — | — | — | 488 |
| Proceeds/(purchases) from sale of assets, net | 13 | — | — | — | 13 |
| Other | (4) | (11) | (20) | — | (35) |
| **Net Cash Used by Investing Activities** | (2,261) | (1,601) | 1,334 | — | (2,528) |
| **Cash Flows from Financing Activities** | | | | | |
| Proceeds/(payments) from intercompany loans | — | — | 1,715 | (1,715) | — |
| Payment of dividends to preferred stockholders | | | (154) | — | (154) |
| Payments of intercompany dividends | — | — | — | — | — |
| Payment for treasury stock | — | — | (25) | — | (25) |
| Payments for settlement of acquired derivatives that include financing elements | (79) | 346 | — | — | 267 |
| Proceeds from issuance of long-term debt | — | 1,292 | 485 | — | 1,777 |
| Sale proceeds and other contributions from noncontrolling interests in subsidiaries | — | 531 | — | — | 531 |
| Proceeds from issuance of common stock | — | — | 16 | — | 16 |
| Payment of debt issuance and hedging costs | — | (21) | (29) | — | (50) |
| Payments for short and long-term debt | — | (716) | (219) | — | (935) |
| **Net Cash (Used)/Provided by Financing Activities** | (79) | 1,432 | 1,789 | (1,715) | 1,427 |
| Effect of exchange rate changes on cash and cash equivalents | — | (2) | — | — | (2) |
| **Net Increase/(decrease) in Cash and Cash Equivalents** | (22) | (388) | 577 | — | 167 |
| **Cash and Cash Equivalents at Beginning of Period** | 78 | 1,258 | 751 | — | 2,087 |
| **Cash and Cash Equivalents at End of Period** | $ 56 | $ 870 | $ 1,328 | $ — | $ 2,254 |

(a)    All significant intercompany transactions have been eliminated in consolidation.

**NRG ENERGY, INC. AND SUBSIDIARIES**

**CONDENSED CONSOLIDATING STATEMENTS OF OPERATIONS**

**For the Year Ended December 31, 2012**

| | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | NRG Energy, Inc. (Note Issuer) | Eliminations [a] | Consolidated Balance |
|---|---|---|---|---|---|
| | | | (In millions) | | |
| **Operating Revenues** | | | | | |
| Total operating revenues | $ 7,998 | $ 509 | $ — | $ (85) | $ 8,422 |
| **Operating Costs and Expenses** | | | | | |
| Cost of operations | 5,916 | 300 | — | (76) | 6,140 |
| Depreciation and amortization | 860 | 79 | 11 | — | 950 |
| Selling, general and administrative | 466 | 45 | 307 | (11) | 807 |
| Acquisition-related transactions and integration costs | — | 53 | 54 | — | 107 |
| Development activity expense | — | 32 | 36 | — | 68 |
| Total operating costs and expenses | 7,242 | 509 | 408 | (87) | 8,072 |
| **Operating Income/(Loss)** | 756 | — | (408) | 2 | 350 |
| **Other (Expense)/Income** | | | | | |
| Equity in earnings/(losses) of consolidated subsidiaries | 30 | (15) | 620 | (635) | — |
| Equity in earnings/(losses) of unconsolidated affiliates | 8 | 31 | (2) | — | 37 |
| Bargain purchase gain related to GenOn acquisition | — | — | 296 | — | 296 |
| Impairment charge on investment | (2) | — | — | — | (2) |
| Other income, net | 6 | 6 | 9 | (2) | 19 |
| Loss on debt extinguishment | — | — | (51) | — | (51) |
| Interest expense | (26) | (90) | (545) | — | (661) |
| Total other income/(expense) | 16 | (68) | 327 | (637) | (362) |
| **Income/(Loss) Before Income Taxes** | 772 | (68) | (81) | (635) | (12) |
| Income tax expense/(benefit) | 237 | (188) | (376) | — | (327) |
| **Net Income** | $ 535 | $ 120 | $ 295 | $ (635) | $ 315 |
| Less: Net income attributable to noncontrolling interest | — | 20 | — | — | 20 |
| **Net Income attributable to NRG Energy, Inc** | $ 535 | $ 100 | $ 295 | $ (635) | $ 295 |

(a)   All significant intercompany transactions have been eliminated in consolidation.

203

**NRG ENERGY, INC. AND SUBSIDIARIES**

**CONDENSED CONSOLIDATING STATEMENTS OF COMPREHENSIVE INCOME**

**For the Year Ended December 31, 2012**

| | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | NRG Energy, Inc. (Note Issuer) | Eliminations[a] | Consolidated Balance |
|---|---|---|---|---|---|
| | | | (In millions) | | |
| **Net Income** | $ 535 | $ 120 | $ 295 | $ (635) | $ 315 |
| **Other comprehensive income/(loss), net of tax** | | | | | |
| Unrealized loss on derivatives, net | (160) | (30) | (214) | 241 | (163) |
| Foreign currency translation adjustments, net | — | (2) | 1 | — | (1) |
| Reclassification adjustment for translation loss realized upon sale of Schkopau, net | — | (11) | — | — | (11) |
| Available-for-sale securities, net | — | — | 3 | — | 3 |
| Defined benefit plan, net | (38) | — | (14) | — | (52) |
| Other comprehensive loss | (198) | (43) | (224) | 241 | (224) |
| **Comprehensive income** | 337 | 77 | 71 | (394) | 91 |
| Less: Comprehensive income attributable to noncontrolling interest | — | 20 | — | — | 20 |
| **Comprehensive income attributable to NRG Energy, Inc.** | 337 | 57 | 71 | (394) | 71 |
| Dividends for preferred shares | — | — | 9 | — | 9 |
| **Comprehensive income available for common stockholders** | $ 337 | $ 57 | $ 62 | $ (394) | $ 62 |

(a)   All significant intercompany transactions have been eliminated in consolidation.

204

**NRG ENERGY, INC. AND SUBSIDIARIES**

**CONDENSED CONSOLIDATING BALANCE SHEETS**
**December 31, 2012**

| | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | NRG Energy, Inc. | Eliminations[a] | Consolidated Balance |
|---|---|---|---|---|---|
| | | | (In millions) | | |
| **ASSETS** | | | | | |
| **Current Assets** | | | | | |
| Cash and cash equivalents | $ 78 | $ 1,258 | $ 751 | $ — | $ 2,087 |
| Funds deposited by counterparties | 131 | 140 | — | — | 271 |
| Restricted cash | 11 | 196 | 10 | — | 217 |
| Accounts receivable - trade, net | 807 | 254 | — | — | 1,061 |
| Inventory | 472 | 431 | — | — | 903 |
| Derivative instruments | 2,058 | 604 | — | (18) | 2,644 |
| Deferred income taxes | (153) | 10 | 199 | — | 56 |
| Cash collateral paid in support of energy risk management activities | 81 | 148 | — | — | 229 |
| Renewable energy grant receivable | — | 58 | — | — | 58 |
| Prepayments and other current assets | 2,966 | (12) | (2,518) | 10 | 446 |
| Total current assets | 6,451 | 3,087 | (1,558) | (8) | 7,972 |
| **Net Property, Plant and Equipment** | 9,905 | 10,147 | 121 | (20) | 20,153 |
| **Other Assets** | | | | | |
| Investment in subsidiaries | 244 | (102) | 17,565 | (17,707) | — |
| Equity investments in affiliates | 33 | 633 | 10 | — | 676 |
| Notes receivable, less current portion | 3 | 74 | 531 | (529) | 79 |
| Goodwill | 1,944 | 12 | — | — | 1,956 |
| Intangible assets, net | 1,042 | 187 | 33 | (52) | 1,210 |
| Nuclear decommissioning trust fund | 473 | — | — | — | 473 |
| Deferred income taxes | (915) | 1,886 | 232 | — | 1,203 |
| Derivative instruments | 149 | 515 | — | (2) | 662 |
| Other non-current assets | 85 | 304 | 210 | — | 599 |
| Total other assets | 3,058 | 3,509 | 18,581 | (18,290) | 6,858 |
| **Total Assets** | $ 19,414 | $ 16,743 | $ 17,144 | $ (18,318) | $ 34,983 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | | |
| **Current Liabilities** | | | | | |
| Current portion of long-term debt and capital leases | $ 1 | $ 137 | $ 15 | $ (6) | $ 147 |
| Accounts payable | 541 | 585 | 46 | — | 1,172 |
| Accounts payable - affiliate | (55) | 1,421 | (1,366) | — | — |
| Derivative instruments | 1,726 | 271 | 2 | (18) | 1,981 |
| Cash collateral received in support of energy risk management activities | 131 | 140 | — | — | 271 |
| Accrued expenses and other current liabilities | 354 | 502 | 243 | — | 1,099 |
| Total current liabilities | 2,698 | 3,056 | (1,060) | (24) | 4,670 |
| **Other Liabilities** | | | | | |
| Long-term debt and capital leases | 310 | 8,459 | 7,496 | (529) | 15,736 |
| Nuclear decommissioning reserve | 354 | — | — | — | 354 |
| Nuclear decommissioning trust liability | 273 | — | — | — | 273 |
| Postretirement and other benefit obligations | 431 | 326 | 46 | — | 803 |
| Deferred income taxes | — | — | 55 | — | 55 |
| Derivative instruments | 312 | 190 | — | (2) | 500 |
| Out-of-market commodity contracts | 180 | 1,129 | — | (31) | 1,278 |
| Other non-current liabilities | 187 | 520 | 89 | — | 796 |
| Total non-current liabilities | 2,047 | 10,624 | 7,686 | (562) | 19,795 |

| | | | | | |
|---|---|---|---|---|---|
| Total liabilities | 4,745 | 13,680 | 6,626 | (586) | 24,465 |
| 3.625% Preferred Stock | — | — | 249 | — | 249 |
| Stockholders' Equity | 14,669 | 3,063 | 10,269 | (17,732) | 10,269 |
| Total Liabilities and Stockholders' Equity | $ 19,414 | $ 16,743 | $ 17,144 | $ (18,318) | $ 34,983 |

(a)  All significant intercompany transactions have been eliminated in consolidation.

205

**NRG ENERGY, INC. AND SUBSIDIARIES**

**CONDENSED CONSOLIDATING STATEMENTS OF CASH FLOWS**

**For the Year Ended December 31, 2012**

| | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | NRG Energy, Inc. | Eliminations [a] | Consolidated Balance |
|---|---|---|---|---|---|
| | | | (In millions) | | |
| **Cash Flows from Operating Activities** | | | | | |
| Net Cash Provided/Used by Operating Activities | 2,163 | 66 | (902) | (178) | 1,149 |
| **Cash Flows from Investing Activities** | | | | | |
| Intercompany loans to subsidiaries | (1,792) | 792 | — | 1,000 | — |
| Acquisition of businesses, net of cash acquired | — | (17) | (64) | — | (81) |
| Cash acquired in GenOn acquisition | — | 983 | — | — | 983 |
| Capital expenditures | (241) | (3,091) | (64) | — | (3,396) |
| Increase in restricted cash, net | (3) | (63) | — | — | (66) |
| Decrease in restricted cash - U.S. DOE projects | — | 121 | 43 | — | 164 |
| Increase in notes receivable | (1) | (21) | (2) | — | (24) |
| Purchases of emission allowances, net of proceeds | (1) | — | — | — | (1) |
| Investments in nuclear decommissioning trust fund securities | (436) | — | — | — | (436) |
| Proceeds from sales of nuclear decommissioning trust fund securities | 399 | — | — | — | 399 |
| Proceeds from renewable energy grants | 3 | 59 | — | — | 62 |
| Proceeds from sale of assets, net | 133 | — | 4 | — | 137 |
| Equity investment in unconsolidated affiliate | (1) | (12) | (12) | — | (25) |
| Other | 24 | — | (2) | — | 22 |
| **Net Cash Used by Investing Activities** | (1,916) | (1,249) | (97) | 1,000 | (2,262) |
| **Cash Flows from Financing Activities** | | | | | |
| Proceeds from intercompany loans | — | — | 1,000 | (1,000) | — |
| Payment of dividends to preferred stockholders | — | — | (50) | — | (50) |
| Payment of intercompany dividends | (172) | (6) | — | 178 | — |
| Net (payments of)/receipts from acquired derivatives that include financing elements | (83) | 15 | — | — | (68) |
| Proceeds from issuance of long-term debt | 42 | 2,105 | 1,018 | — | 3,165 |
| Cash proceeds from sale of noncontrolling interest in subsidiary | — | 347 | — | — | 347 |
| Payment of debt issuance and hedging costs | — | (19) | (16) | — | (35) |
| Payments of short and long-term debt | — | (82) | (1,178) | — | (1,260) |
| **Net Cash (Used)/Provided by Financing Activities** | (213) | 2,360 | 774 | (822) | 2,099 |
| Effect of exchange rate changes on cash and cash equivalents | — | (4) | — | — | (4) |
| **Net Increase/(Decrease) in Cash and Cash Equivalents** | 34 | 1,173 | (225) | — | 982 |
| **Cash and Cash Equivalents at Beginning of Period** | 44 | 85 | 976 | — | 1,105 |
| **Cash and Cash Equivalents at End of Period** | $ 78 | $ 1,258 | $ 751 | $ — | $ 2,087 |

(a)   All significant intercompany transactions have been eliminated in consolidation.

**NRG ENERGY, INC. AND SUBSIDIARIES**

**CONDENSED CONSOLIDATING STATEMENTS OF OPERATIONS**

**For the Year Ended December 31, 2011**

| | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | NRG Energy, Inc. | Eliminations [a] | Consolidated Balance |
|---|---|---|---|---|---|
| | | | (In millions) | | |
| **Operating Revenues** | | | | | |
| Total operating revenues | $ 8,730 | $ 381 | $ — | $ (32) | $ 9,079 |
| **Operating Costs and Expenses** | | | | | |
| Cost of operations | 6,489 | 277 | — | (21) | 6,745 |
| Depreciation and amortization | 843 | 40 | 13 | — | 896 |
| Impairment losses | 160 | — | — | — | 160 |
| Selling, general and administrative | 334 | 4 | 252 | (4) | 586 |
| Development activity expenses | — | 11 | 46 | — | 57 |
| Total operating costs and expenses | 7,826 | 332 | 311 | (25) | 8,444 |
| **Operating Income/(Loss)** | 904 | 49 | (311) | (7) | 635 |
| **Other Income** | | | | | |
| Equity in earnings/(losses) of consolidated subsidiaries | 24 | (7) | 593 | (610) | — |
| Equity in earnings of unconsolidated affiliates | 10 | 25 | — | — | 35 |
| Impairment charge on investment | (495) | — | — | — | (495) |
| Other income, net | 2 | 13 | 4 | — | 19 |
| Loss on debt extinguishment | — | — | (175) | — | (175) |
| Interest expense | (59) | (56) | (550) | — | (665) |
| Total other expense | (518) | (25) | (128) | (610) | (1,281) |
| **Income/(Loss) Before Income Taxes** | 386 | 24 | (439) | (617) | (646) |
| Income tax (benefit)/expense | (214) | 7 | (636) | | (843) |
| **Net Income attributable to NRG Energy, Inc** | $ 600 | $ 17 | $ 197 | $ (617) | $ 197 |

(a)   All significant intercompany transactions have been eliminated in consolidation.

**NRG ENERGY, INC. AND SUBSIDIARIES**

**CONDENSED CONSOLIDATING STATEMENTS OF COMPREHENSIVE INCOME/(LOSS)**

**For the Year Ended December 31, 2011**

| | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | NRG Energy, Inc. (Note Issuer) | Eliminations[a] | Consolidated Balance |
|---|---|---|---|---|---|
| | | | (In millions) | | |
| **Net Income** | $ 600 | $ 17 | $ 197 | $ (617) | $ 197 |
| **Other comprehensive income/(loss), net of tax** | | | | | |
| Unrealized loss on derivatives, net | (303) | (27) | (345) | 366 | (309) |
| Foreign currency translation adjustments, net | — | (2) | — | — | (2) |
| Available-for-sale securities, net | — | — | (1) | — | (1) |
| Defined benefit plan, net | (34) | — | (12) | — | (46) |
| Other comprehensive loss | (337) | (29) | (358) | 366 | (358) |
| **Comprehensive income/(loss) attributable to NRG Energy, Inc.** | 263 | (12) | (161) | (251) | (161) |
| Dividends for preferred shares | — | — | 9 | — | 9 |
| **Comprehensive income/(loss) available for common stockholders** | $ 263 | $ (12) | $ (170) | $ (251) | $ (170) |

(a)   All significant intercompany transactions have been eliminated in consolidation.

208

**NRG ENERGY, INC. AND SUBSIDIARIES**

**CONDENSED CONSOLIDATING STATEMENTS OF CASH FLOWS**

**For the Year Ended December 31, 2011**

| | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | NRG Energy, Inc. | Elimin-ations [a] | Consolidated Balance |
|---|---|---|---|---|---|
| | | | (In millions) | | |
| **Cash Flows from Operating Activities** | | | | | |
| Net Cash Provided by Operating Activities | 621 | 294 | 1,620 | (1,369) | 1,166 |
| **Cash Flows from Investing Activities** | | | | | |
| Intercompany loans to subsidiaries | 796 | — | 287 | (1,083) | — |
| Investment in subsidiaries | — | (1,300) | — | 1,300 | — |
| Capital expenditures | (383) | (1,882) | (45) | — | (2,310) |
| Acquisition of business, net of cash acquired | — | (115) | (262) | — | (377) |
| Increase in restricted cash | (5) | (29) | (1) | — | (35) |
| Increase in restricted cash to support equity requirements for U.S. DOE funded projects | — | (162) | (53) | — | (215) |
| Decrease in notes receivable | — | 12 | — | — | 12 |
| Purchases of emission allowances, net of proceeds | (19) | — | — | — | (19) |
| Investments in nuclear decommissioning trust fund securities | (406) | — | — | — | (406) |
| Proceeds from sales of nuclear decommissioning trust fund securities | 385 | — | — | — | 385 |
| Proceeds from sale of assets, net | 13 | (6) | — | — | 7 |
| Equity investment in unconsolidated affiliates, net | (2) | (64) | — | — | (66) |
| Other | (2) | (8) | (13) | — | (23) |
| Net Cash Provided/(Used) by Investing Activities | 377 | (3,554) | (87) | 217 | (3,047) |
| **Cash Flows from Financing Activities** | | | | | |
| (Payments of)/proceeds from intercompany loans | (1,112) | 825 | (796) | 1,083 | — |
| Payment of intercompany dividends | (65) | (4) | — | 69 | — |
| Payment for dividends to preferred stockholders | — | — | (9) | — | (9) |
| Payments for acquired derivatives including financing elements | (83) | — | — | — | (83) |
| Payment for treasury stock | — | — | (430) | — | (430) |
| Installment proceeds from sale of noncontrolling interest of subsidiary | — | 29 | — | — | 29 |
| Proceeds from issuance of common stock | — | — | 2 | — | 2 |
| Proceeds from issuance of long-term debt | 138 | 1,290 | 4,796 | — | 6,224 |
| Proceeds from issuance of term loan for funded letter of credit facility | — | 1,300 | — | — | 1,300 |
| Increase in restricted cash supporting funded letter of credit facility | — | — | (1,300) | — | (1,300) |
| Payment of debt issuance and hedging costs | — | (92) | (115) | — | (207) |
| Payments of short and long-term debt | — | (116) | (5,377) | — | (5,493) |
| Net Cash (Used)/Provided by Financing Activities | (1,122) | 3,232 | (3,229) | 1,152 | 33 |
| Effect of exchange rate changes on cash and cash equivalents | — | 2 | — | — | 2 |
| Net Decrease in Cash and Cash Equivalents | (124) | (26) | (1,696) | — | (1,846) |
| Cash and Cash Equivalents at Beginning of Period | 168 | 111 | 2,672 | — | 2,951 |
| Cash and Cash Equivalents at End of Period | $ 44 | $ 85 | $ 976 | $ — | $ 1,105 |

(a)   All significant intercompany transactions have been eliminated in consolidation.

### SCHEDULE II. VALUATION AND QUALIFYING ACCOUNTS

### For the Years Ended December 31, 2013, 2012, and 2011

| | Balance at Beginning of Period | | Charged to Costs and Expenses | | Charged to Other Accounts | | Deductions | | Balance at End of Period |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | (In millions) | | | | |
| **Allowance for doubtful accounts, deducted from accounts receivable** | | | | | | | | | |
| Year Ended December 31, 2013 | $ | 32 | $ | 66 | $ | — | $ | (58) (a) | 40 |
| Year Ended December 31, 2012 | | 23 | | 46 | | — | | (37) (a) | 32 |
| Year Ended December 31, 2011 | | 25 | | 60 | | — | | (62) (a) | 23 |
| **Income tax valuation allowance, deducted from deferred tax assets** | | | | | | | | | |
| Year Ended December 31, 2013 | $ | 191 | $ | 32 | $ | 68 | $ | — | 291 |
| Year Ended December 31, 2012 | | 83 | | 5 | | 103 | | — | 191 |
| Year Ended December 31, 2011 | | 191 | | (63) | | (45) | | — | 83 |

(a)   Represents principally net amounts charged as uncollectible.

210

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

NRG ENERGY, INC.
(Registrant)


By:    /s/ DAVID W. CRANE

David W. Crane
*Chief Executive Officer*


Date: February 28, 2014

**POWER OF ATTORNEY**

Each person whose signature appears below constitutes and appoints David W. Crane, David R. Hill and Brian E. Curci, each or any of them, such person's true and lawful attorney-in-fact and agent with full power of substitution and resubstitution for such person and in such person's name, place and stead, in any and all capacities, to sign any and all amendments to this report on Form 10-K, and to file the same with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing necessary or desirable to be done in and about the premises, as fully to all intents and purposes as such person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them or his or their substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

In accordance with the Exchange Act, this report has been signed by the following persons on behalf of the registrant in the capacities indicated on February 28, 2014.

| Signature | Title | Date |
|---|---|---|
| /s/ DAVID W. CRANE<br>David W. Crane | President, Chief Executive Officer and Director (Principal Executive Officer) | February 28, 2014 |
| /s/ KIRKLAND B. ANDREWS<br>Kirkland B. Andrews | Chief Financial Officer (Principal Financial Officer) | February 28, 2014 |
| /s/ RONALD B. STARK<br>Ronald B. Stark | Chief Accounting Officer (Principal Accounting Officer) | February 28, 2014 |
| /s/ HOWARD E. COSGROVE<br>Howard E. Cosgrove | Chairman of the Board | February 28, 2014 |
| /s/ EDWARD R. MULLER<br>Edward R. Muller | Vice Chairman of the Board | February 28, 2014 |
| /s/ E. SPENCER ABRAHAM<br>E. Spencer Abraham | Director | February 28, 2014 |
| /s/ KIRBYJON H. CALDWELL<br>Kirbyjon H. Caldwell | Director | February 28, 2014 |
| /s/ LAWRENCE S. COBEN<br>Lawrence S. Coben | Director | February 28, 2014 |
| /s/ TERRY G. DALLAS<br>Terry G. Dallas | Director | February 28, 2014 |
| /s/ WILLIAM E. HANTKE<br>William E. Hantke | Director | February 28, 2014 |
| /s/ PAUL W. HOBBY<br>Paul W. Hobby | Director | February 28, 2014 |
| /s/ GERALD LUTERMAN<br>Gerald Luterman | Director | February 28, 2014 |
| /s/ ANNE C. SCHAUMBURG<br>Anne C. Schaumburg | Director | February 28, 2014 |
| /s/ EVAN J. SILVERSTEIN<br>Evan J. Silverstein | Director | February 28, 2014 |
| /s/ THOMAS H. WEIDEMEYER<br>Thomas H. Weidemeyer | Director | February 28, 2014 |
| /s/ WALTER R. YOUNG<br>Walter R. Young | Director | February 28, 2014 |

**EXHIBIT INDEX**

| Number | Description | Method of Filing |
|---|---|---|
| 2.1 | Third Amended Joint Plan of Reorganization of NRG Energy, Inc., NRG Power Marketing, Inc., NRG Capital LLC, NRG Finance Company I LLC, and NRGenerating Holdings (No. 23) B.V. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on November 19, 2003. |
| 2.2 | First Amended Joint Plan of Reorganization of NRG Northeast Generating LLC (and certain of its subsidiaries), NRG South Central Generating (and certain of its subsidiaries) and Berrians I Gas Turbine Power LLC. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on November 19, 2003. |
| 2.3 | Acquisition Agreement, dated as of September 30, 2005, by and among NRG Energy, Inc., Texas Genco LLC and the Direct and Indirect Owners of Texas Genco LLC. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on October 3, 2005. |
| 2.4 | Purchase and Sale Agreement by and between Denali Merger Sub and NRG Energy, Inc. dated as of August 13, 2010. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on August 13, 2010. |
| 2.5 | Agreement and Plan of Merger, dated as of July 20, 2012, by and among NRG Energy, Inc., Plus Energy Corporation and GenOn Energy, Inc. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on July 23, 2012. |
| 2.6 | Plan Sponsor Agreement, dated October 18, 2013, by and among NRG Energy, Inc., NRG Energy Holdings, Inc., Edison Mission Energy, certain of Edison Mission Energy's debtor subsidiaries, the Official Committee of Unsecured Creditors of Edison Mission Energy and its debtor subsidiaries, the PoJo Parties (as defined therein) and the proponent noteholders thereto. | Incorporated herein by reference to Exhibit 2.1 to Amendment No. 1 to the Registrant's current report on Form 8-K filed on October 21, 2013. |
| 2.7 | Asset Purchase Agreement, dated October 18, 2013, by and among NRG Energy, Inc., Edison Mission Energy and NRG Energy Holdings Inc. | Incorporated herein by reference to Exhibit 2.2 to Amendment No. 1 to the Registrant's current report on Form 8-K filed on October 21, 2013. |
| 3.1 | Amended and Restated Certificate of Incorporation. | Incorporated herein by reference to the Registrant's quarterly report on Form 10-Q filed on May 3, 2012. |
| 3.2 | Certificate of Amendment of Amended and Restated Certificate of Incorporation. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on December 14, 2012. |
| 3.3 | Second Amended and Restated By-Laws. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on December 14, 2012. |
| 3.4 | Certificate of Designations of 3.625% Convertible Perpetual Preferred Stock, as filed with the Secretary of State of the State of Delaware on August 11, 2005. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on August 11, 2005. |
| 3.5 | Certificate of Designations relating to the Series 1 Exchangeable Limited Liability Company Preferred Interests of NRG Common Stock Finance I LLC, as filed with the Secretary of State of Delaware on August 4, 2006. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on August 10, 2006. |
| 3.6 | Certificate of Amendment to Certificate of Designations relating to the Series 1 Exchangeable Limited Liability Company Preferred Interests of NRG Common Stock Finance I LLC, as filed with the Secretary of State of Delaware on February 27, 2008. | Incorporated herein by reference to the Registrant's quarterly report on Form 10-Q filed on May 1, 2008. |
| 3.7 | Second Certificate of Amendment to Certificate of Designations relating to the Series 1 Exchangeable Limited Liability Company Preferred Interests of NRG Common Stock Finance I LLC, as filed with the Secretary of State of Delaware on August 8, 2008. | Incorporated herein by reference to the Registrant's quarterly report on Form 10-Q filed on October 30, 2008. |
| 4.1 | Supplemental Indenture dated as of December 30, 2005, among NRG Energy, Inc., the subsidiary guarantors named on Schedule A thereto and Law Debenture Trust Company of New York, as trustee. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on January 4, 2006. |
| 4.2 | Amended and Restated Common Agreement among XL Capital Assurance Inc., Goldman Sachs Mitsui Marine Derivative Products, L.P., Law Debenture Trust Company of New York, as Trustee, The Bank of New York, as Collateral Agent, NRG Peaker Finance Company LLC and each Project Company Party thereto dated as of January 6, 2004, together with Annex A to the Common Agreement. | Incorporated herein by reference to the Registrant's annual report on Form 10-K filed on March 16, 2004. |
| 4.3 | Amended and Restated Security Deposit Agreement among NRG Peaker Finance Company, LLC and each Project Company party thereto, and the Bank of New York, as Collateral Agent and Depositary Agent, dated as of January 6, 2004. | Incorporated herein by reference to the Registrant's annual report on Form 10-K filed on March 16, 2004. |
| 4.4 | NRG Parent Agreement by NRG Energy, Inc. in favor of the Bank of New York, as Collateral Agent, dated as of January 6, 2004. | Incorporated herein by reference to the Registrant's annual report on Form 10-K filed on March 16, 2004. |

| | | |
|---|---|---|
| 4.5 | Indenture dated June 18, 2002, between NRG Peaker Finance Company LLC, as Issuer, Bayou Cove Peaking Power LLC, Big Cajun I Peaking Power LLC, NRG Rockford LLC, NRG Rockford II LLC and Sterlington Power LLC, as Guarantors, XL Capital Assurance Inc., as Insurer, and Law Debenture Trust Company as Successor Trustee to the Bank of New York. | Incorporated herein by reference to the Registrant's annual report on Form 10-K filed on March 31, 2003. |
| 4.6 | Specimen of Certificate representing common stock of NRG Energy, Inc. | Incorporated herein by reference to the Registrant's quarterly report on Form 10-Q filed on August 4, 2006. |
| 4.7 | Indenture, dated February 2, 2006, among NRG Energy, Inc. and Law Debenture Trust Company of New York. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on February 6, 2006. |
| 4.8 | Form of 8.5% Senior Note due 2019. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on June 5, 2009. |
| 4.9 | Twenty-Second Supplemental Indenture, dated June 5, 2009, among NRG Energy, Inc., the guarantors named therein and Law Debenture Trust Company of New York as Trustee, re: NRG Energy, Inc.'s 8.5% Senior Notes due 2019. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on June 5, 2009. |
| 4.10 | Twenty-Third Supplemental Indenture, dated July 14, 2009, among NRG Energy, Inc., the guarantors named therein and Law Debenture Trust Company of New York as Trustee, re: NRG Energy, Inc.'s 8.5% Senior Notes due 2019. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on July 15, 2009. |
| 4.11 | Twenty-Seventh Supplemental Indenture, dated October 5, 2009, among NRG Energy, Inc., the existing guarantors named therein, the guaranteeing subsidiaries named therein and Law Debenture Trust Company of New York as Trustee, re: NRG Energy, Inc.'s 8.5% Senior Notes due 2019. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on October 6, 2009. |
| 4.12 | Thirty-First Supplemental Indenture, dated as of April 16, 2010, among NRG Energy, Inc., the existing guarantors named therein, the guaranteeing subsidiaries named therein and Law Debenture Trust Company of New York as Trustee, re: NRG Energy, Inc.'s 8.50% Senior Notes due 2019. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on April 21, 2010. |
| 4.13 | Thirty-Fifth Supplemental Indenture, dated as of June 23, 2010, among NRG Energy, Inc., the existing guarantors named therein, the guaranteeing subsidiaries named therein and Law Debenture Trust Company of New York as Trustee, re: NRG Energy, Inc.'s 8.50% Senior Notes due 2019. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on June 29, 2010. |
| 4.14 | Thirty-Sixth Supplemental Indenture, dated August 20, 2010, among NRG Energy, Inc., the guarantors named therein and Law Debenture Trust Company of New York as Trustee, re: NRG Energy, Inc.'s 8.25% Senior Notes due 2020. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on August 20, 2010. |
| 4.15 | Form of 8.25% Senior Note due 2020. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on August 20, 2010. |
| 4.16 | Registration Rights Agreement, dated August 20, 2010, among NRG Energy, Inc., the guarantors named therein and Citigroup Global Markets Inc., Banc of America Securities LLC and Deutsche Bank Securities Inc., as representatives of the several initial purchasers. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on August 20, 2010. |
| 4.17 | Fortieth Supplemental Indenture, dated as of December 15, 2010, among NRG Energy, Inc., the existing guarantors named therein, the guaranteeing subsidiaries named therein and Law Debenture Trust Company of New York as Trustee, re: NRG Energy, Inc.'s 8.50% Senior Notes due 2019. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on December 16, 2010. |
| 4.18 | Forty-First Supplemental Indenture, dated as of December 15, 2010, among NRG Energy, Inc., the existing guarantors named therein, the guaranteeing subsidiaries named therein and Law Debenture Trust Company of New York as Trustee, re: NRG Energy, Inc.'s 8.25% Senior Notes due 2020. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on December 16, 2010. |
| 4.19 | Forty-Second Supplemental Indenture, dated January 26, 2011, among NRG Energy, Inc., the existing guarantors named therein, the guaranteeing subsidiaries named therein and Law Debenture Trust Company of New York as Trustee, re: NRG Energy, Inc.'s 7.625% Senior Notes due 2018. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on January 28, 2011. |
| 4.20 | Form of 7.625% Senior Note due 2018. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on January 28, 2011. |
| 4.21 | Registration Rights Agreement, dated January 26, 2011, among NRG Energy, Inc., the guarantors named therein and J.P. Morgan Securities LLC, as initial purchaser. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on January 28, 2011. |

| 4.22 | Forty-Third Supplemental Indenture, dated April 22, 2011, among NRG Energy, Inc., the existing guarantors named therein, the guaranteeing subsidiaries named therein and Law Debenture Trust Company of New York as Trustee, re: NRG Energy, Inc.'s 8.25% Senior Notes due 2020. | Incorporated herein by reference to the Registrant's Registration Statement on Form S-4 filed on July 11, 2011. |
|---|---|---|
| 4.23 | Forty-Seventh Supplemental Indenture, dated May 20, 2011, among NRG Energy, Inc., the existing guarantors named therein, the guaranteeing subsidiaries named therein and Law Debenture Trust Company of New York as Trustee, re: NRG Energy, Inc.'s 8.5% Senior Notes due 2019. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on May 25, 2011. |
| 4.24 | Forty-Eighth Supplemental Indenture, dated May 20, 2011, among NRG Energy, Inc., the existing guarantors named therein, the guaranteeing subsidiaries named therein and Law Debenture Trust Company of New York as Trustee, re: NRG Energy, Inc.'s 8.25% Senior Notes due 2020. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on May 25, 2011. |
| 4.25 | Forty-Ninth Supplemental Indenture, dated May 20, 2011, among NRG Energy, Inc., the existing guarantors named therein, the guaranteeing subsidiaries named therein and Law Debenture Trust Company of New York as Trustee, re: NRG Energy, Inc.'s 7.625% Senior Notes due 2018. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on May 25, 2011. |
| 4.26 | Fiftieth Supplemental Indenture, dated May 24, 2011, among NRG Energy, Inc., the existing guarantors named therein, the guaranteeing subsidiaries named therein and Law Debenture Trust Company of New York as Trustee, re: NRG Energy, Inc.'s 7.625% Senior Notes due 2019. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on May 25, 2011. |
| 4.27 | Form of 7.625% Senior Note due 2019. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on May 25, 2011. |
| 4.28 | Fifty-First Supplemental Indenture, dated May 24, 2011, among NRG Energy, Inc., the existing guarantors named therein, the guaranteeing subsidiaries named therein and Law Debenture Trust Company of New York as Trustee, re: NRG Energy, Inc.'s 7.875% Senior Notes due 2021. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on May 25, 2011. |
| 4.29 | Form of 7.875% Senior Note due 2021. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on May 25, 2011. |
| 4.30 | Registration Rights Agreement, dated May 24, 2011, among NRG Energy, Inc., the guarantors named therein and Morgan Stanley & Co. Incorporated, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Barclays Capital Inc., Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc., Goldman, Sachs & Co., J.P. Morgan Securities LLC and RBS Securities Inc., as representatives of the initial purchasers. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on May 25, 2011. |
| 4.31 | Fifty-Third Supplemental Indenture, dated November 8, 2011, among NRG Energy, Inc., the existing guarantors named therein, the guaranteeing subsidiaries named therein and Law Debenture Trust Company of New York as Trustee, re: NRG Energy, Inc.'s 8.5% Senior Notes due 2019. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on November 8, 2011. |
| 4.32 | Fifty-Fourth Supplemental Indenture, dated November 8, 2011, among NRG Energy, Inc., the existing guarantors named therein, the guaranteeing subsidiaries named therein and Law Debenture Trust Company of New York as Trustee, re: NRG Energy, Inc.'s 8.25% Senior Notes due 2020. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on November 8, 2011. |
| 4.33 | Fifty-Fifth Supplemental Indenture, dated November 8, 2011, among NRG Energy, Inc., the existing guarantors named therein, the guaranteeing subsidiaries named therein and Law Debenture Trust Company of New York as Trustee, re: NRG Energy, Inc.'s 7.625% Senior Notes due 2018. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on November 8, 2011. |
| 4.34 | Fifty-Sixth Supplemental Indenture, dated November 8, 2011, among NRG Energy, Inc., the existing guarantors named therein, the guaranteeing subsidiaries named therein and Law Debenture Trust Company of New York as Trustee, re: NRG Energy, Inc.'s 7.625% Senior Notes due 2019. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on November 8, 2011. |
| 4.35 | Fifty-Seventh Supplemental Indenture, dated November 8, 2011, among NRG Energy, Inc., the existing guarantors named therein, the guaranteeing subsidiaries named therein and Law Debenture Trust Company of New York as Trustee, re: NRG Energy, Inc.'s 7.875% Senior Notes due 2021. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on November 8, 2011. |

| | | |
|---|---|---|
| 4.36 | Fifty-Ninth Supplemental Indenture, dated April 5, 2012, among NRG Energy, Inc., the existing guarantors named therein, the guaranteeing subsidiaries named therein and Law Debenture Trust Company of New York as Trustee, re: NRG Energy, Inc.'s 8.5% Senior Notes due 2019. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on April 6, 2012. |
| 4.37 | Sixtieth Supplemental Indenture, dated April 5, 2012, among NRG Energy, Inc., the existing guarantors named therein, the guaranteeing subsidiaries named therein and Law Debenture Trust Company of New York as Trustee, re: NRG Energy, Inc.'s 8.25% Senior Notes due 2020. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on April 6, 2012. |
| 4.38 | Sixty-First Supplemental Indenture, dated April 5, 2012, among NRG Energy, Inc., the existing guarantors named therein, the guaranteeing subsidiaries named therein and Law Debenture Trust Company of New York as Trustee, re: NRG Energy, Inc.'s 7.625% Senior Notes due 2018. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on April 6, 2012. |
| 4.39 | Sixty-Second Supplemental Indenture, dated April 5, 2012, among NRG Energy, Inc., the existing guarantors named therein, the guaranteeing subsidiaries named therein and Law Debenture Trust Company of New York as Trustee, re: NRG Energy, Inc.'s 7.625% Senior Notes due 2019. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on April 6, 2012. |
| 4.40 | Sixty-Third Supplemental Indenture, dated April 5, 2012, among NRG Energy, Inc., the existing guarantors named therein, the guaranteeing subsidiaries named therein and Law Debenture Trust Company of New York as Trustee, re: NRG Energy, Inc.'s 7.875% Senior Notes due 2021. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on April 6, 2012. |
| 4.41 | Sixty-Fifth Supplemental Indenture, dated May 9, 2012, among NRG Energy, Inc., the existing guarantors named therein, the guaranteeing subsidiaries named therein and Law Debenture Trust Company of New York as Trustee, re: NRG Energy, Inc.'s 8.5% Senior Notes due 2019. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on May 11, 2012. |
| 4.42 | Sixty-Sixth Supplemental Indenture, dated May 9, 2012, among NRG Energy, Inc., the existing guarantors named therein, the guaranteeing subsidiaries named therein and Law Debenture Trust Company of New York as Trustee, re: NRG Energy, Inc.'s 8.25% Senior Notes due 2020. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on May 11, 2012. |
| 4.43 | Sixty-Seventh Supplemental Indenture, dated May 9, 2012, among NRG Energy, Inc., the existing guarantors named therein, the guaranteeing subsidiaries named therein and Law Debenture Trust Company of New York as Trustee, re: NRG Energy, Inc.'s 7.625% Senior Notes due 2018. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on May 11, 2012. |
| 4.44 | Sixty-Eighth Supplemental Indenture, dated May 9, 2012, among NRG Energy, Inc., the existing guarantors named therein, the guaranteeing subsidiaries named therein and Law Debenture Trust Company of New York as Trustee, re: NRG Energy, Inc.'s 7.625% Senior Notes due 2019. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on May 11, 2012. |
| 4.45 | Sixty-Ninth Supplemental Indenture, dated May 9, 2012, among NRG Energy, Inc., the existing guarantors named therein, the guaranteeing subsidiaries named therein and Law Debenture Trust Company of New York as Trustee, re: NRG Energy, Inc.'s 7.875% Senior Notes due 2021. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on May 11, 2012. |
| 4.46 | Seventieth Supplemental Indenture, dated September 24, 2012, among NRG Energy, Inc., the existing guarantors named therein, the guaranteeing subsidiaries named therein and Law Debenture Trust Company of New York as Trustee, re: NRG Energy, Inc.'s 6.625% Senior Notes due 2023. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on September 24, 2012. |
| 4.47 | Form of 6.625% Senior Note due 2023. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on September 24, 2012. |
| 4.48 | Seventy-First Supplemental Indenture, dated October 9, 2012, among NRG Energy, Inc., the existing guarantors named therein, the guaranteeing subsidiaries named therein and Law Debenture Trust Company of New York as Trustee, re: NRG Energy, Inc.'s 8.5% Senior Notes due 2019. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on October 12, 2012. |
| 4.49 | Seventy-Second Supplemental Indenture, dated October 9, 2012, among NRG Energy, Inc., the existing guarantors named therein, the guaranteeing subsidiaries named therein and Law Debenture Trust Company of New York as Trustee, re: NRG Energy, Inc.'s 8.25% Senior Notes due 2020. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on October 12, 2012. |
| 4.50 | Seventy-Third Supplemental Indenture, dated October 9, 2012, among NRG Energy, Inc., the existing guarantors named therein, the guaranteeing subsidiaries named therein and Law Debenture Trust Company of New York as Trustee, re: NRG Energy, Inc.'s 7.625% Senior Notes due 2018. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on October 12, 2012. |

| | | |
|---|---|---|
| 4.51 | Seventy-Fourth Supplemental Indenture, dated October 9, 2012, among NRG Energy, Inc., the existing guarantors named therein, the guaranteeing subsidiaries named therein and Law Debenture Trust Company of New York as Trustee, re: NRG Energy, Inc.'s 7.625% Senior Notes due 2019. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on October 12, 2012. |
| 4.52 | Seventy-Fifth Supplemental Indenture, dated October 9, 2012, among NRG Energy, Inc., the existing guarantors named therein, the guaranteeing subsidiaries named therein and Law Debenture Trust Company of New York as Trustee, re: NRG Energy, Inc.'s 7.875% Senior Notes due 2021. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on October 12, 2012. |
| 4.53 | Seventy-Sixth Supplemental Indenture, dated October 9, 2012, among NRG Energy, Inc., the existing guarantors named therein, the guaranteeing subsidiaries named therein and Law Debenture Trust Company of New York as Trustee, re: NRG Energy, Inc.'s 6.625% Senior Notes due 2023. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on October 12, 2012. |
| 4.54 | Senior Indenture, dated December 22, 2004, between Reliant Energy, Inc. and Wilmington Trust Company. | Incorporated herein by reference to GenOn Energy, Inc.'s current report on Form 8-K filed on December 27, 2004. |
| 4.55 | Fourth Supplemental Indenture, dated June 13, 2007, among Reliant Energy, Inc., the Guarantors listed therein and Wilmington Trust Company as Trustee, re: GenOn Energy, Inc.'s 7.625% Senior Notes due 2014. | Incorporated herein by reference to GenOn Energy Inc.'s current report on Form 8-K filed on June 15, 2007. |
| 4.56 | Fifth Supplemental Indenture, dated June 13, 2007, among Reliant Energy, Inc., the Guarantors listed therein and Wilmington Trust Company as Trustee, re: GenOn Energy, Inc.'s 7.875% Senior Notes due 2017. | Incorporated herein by reference to Exhibit 4.2 to GenOn Energy Inc.'s current report on Form 8-K filed June 15, 2007. |
| 4.57 | Indenture, dated May 1, 2001, between Mirant Americas Generation, Inc. and Bankers Trust Company as Trustee. | Incorporated herein by reference to Exhibit 4.1 to Mirant Americas Generation, Inc.'s Registration Statement on Form S-4 filed on June 18, 2001. |
| 4.58 | Third Supplemental Indenture, dated May 1, 2001, between Mirant Americas Generation, Inc. and Bankers Trust Company as Trustee, re: GenOn Americas Generation, LLC's 9.125% Senior Notes due 2031. | Incorporated herein by reference to Exhibit 4.4 to Mirant Americas Generation, Inc.'s Registration Statement on Form S-4 filed on June 18, 2001. |
| 4.59 | Fifth Supplemental Indenture, dated October 9, 2001, between Mirant Americas Generation, Inc. and Bankers Trust Company as Trustee, re: GenOn Americas Generation, LLC's 8.5% Senior Notes due 2021. | Incorporated herein by reference to Exhibit 4.6 to Mirant Americas Generation, Inc.'s Registration Statement on Form S-4/A filed on May 7, 2002. |
| 4.60 | Sixth Supplemental Indenture, dated November 1, 2001, between Mirant Americas Generation LLC and Bankers Trust Company, re: Indenture, dated May 1, 2001. | Incorporated herein by reference to Exhibit 4.6 to Mirant Corporation's annual report on Form 10-K filed on February 27, 2009. |
| 4.61 | Seventh Supplemental Indenture, dated January 3, 2006, between Mirant Americas Generation LLC and Wells Fargo Bank National Association (as successor to Bankers Trust Company), re: Indenture, dated May 1, 2001. | Incorporated herein by reference to Exhibit 4.1 to Mirant Americas Generation, LLC's quarterly report on Form 10-Q filed on May 14, 2007. |
| 4.62 | Senior Notes Indenture, dated October 4, 2010, by GenOn Escrow Corp. and Wilmington Trust Company as trustee, re: GenOn Energy, Inc.'s 9.5% Senior Notes due 2018 and 9.875% Senior Notes due 2020. | Incorporated by reference to Exhibit 4.4 to Mirant Corporation's quarterly report on Form 10-Q filed on November 5, 2010. |
| 4.63 | Supplemental Indenture, dated December 3, 2010, between GenOn Energy, Inc. and Wilmington Trust Company as trustee, re: GenOn Energy, Inc.'s 9.5% Senior Notes due 2018 and 9.875% Senior Notes due 2020. | Incorporated by reference to Exhibit 4.2 to GenOn Energy Inc.'s current report on Form 8-K filed on December 7, 2010. |
| 4.64 | Seventy-Seventh Supplemental Indenture, dated as of January 3, 2013, among NRG Energy, Inc., the guarantors named therein and Law Debenture Trust Company of New York as trustee, re: NRG Energy, Inc.'s 8.5% Senior Notes due 2019. | Incorporated herein by reference to Exhibit 4.1 to the Registrant's current report on Form 8-K filed on January 9, 2013. |
| 4.65 | Seventy-Eighth Supplemental Indenture, dated as of January 3, 2013, among NRG Energy, Inc., the guarantors named therein and Law Debenture Trust Company of New York as trustee, re: NRG Energy, Inc.'s 8.25% Senior Notes due 2020. | Incorporated herein by reference to Exhibit 4.2 to the Registrant's current report on Form 8-K filed on January 9, 2013. |
| 4.66 | Seventy-Ninth Supplemental Indenture, dated as of January 3, 2013, among NRG Energy, Inc., the guarantors named therein and Law Debenture Trust Company of New York as trustee, re: NRG Energy, Inc.'s 7.625% Senior Notes due 2018. | Incorporated herein by reference to Exhibit 4.3 to the Registrant's current report on Form 8-K filed on January 9, 2013. |
| 4.67 | Eightieth Supplemental Indenture, dated as of January 3, 2013, among NRG Energy, Inc., the guarantors named therein and Law Debenture Trust Company of New York as trustee, re: NRG Energy, Inc.'s 7.625% Senior Notes due 2019. | Incorporated herein by reference to Exhibit 4.4 to the Registrant's current report on Form 8-K filed on January 9, 2013. |

| | | |
|---|---|---|
| 4.68 | Eighty-First Supplemental Indenture, dated as of January 3, 2013, among NRG Energy, Inc., the guarantors named therein and Law Debenture Trust Company of New York as trustee, re: NRG Energy, Inc.'s 7.875% Senior Notes due 2021. | Incorporated herein by reference to Exhibit 4.5 to the Registrant's current report on Form 8-K filed on January 9, 2013. |
| 4.69 | Eighty-Second Supplemental Indenture, dated as of January 3, 2013, among NRG Energy, Inc., the guarantors named therein and Law Debenture Trust Company of New York as trustee, re: NRG Energy, Inc.'s 6.625% Senior Notes due 2023. | Incorporated herein by reference to Exhibit 4.6 to the Registrant's current report on Form 8-K filed on January 9, 2013. |
| 4.70 | Eighty-Third Supplemental Indenture, dated as of March 13, 2013, among NRG Energy, Inc., the guarantors named therein and Law Debenture Trust Company of New York as trustee, re: NRG Energy, Inc.'s 8.5% Senior Notes due 2019. | Incorporated herein by reference to Exhibit 4.1 to the Registrant's current report on Form 8-K filed on March 13, 2013. |
| 4.71 | Eighty-Fourth Supplemental Indenture, dated as of March 13, 2013, among NRG Energy, Inc., the guarantors named therein and Law Debenture Trust Company of New York as trustee, re: NRG Energy, Inc.'s 8.25% Senior Notes due 2020. | Incorporated herein by reference to Exhibit 4.2 to the Registrant's current report on Form 8-K filed on March 13, 2013. |
| 4.72 | Eighty-Fifth Supplemental Indenture, dated as of March 13, 2013, among NRG Energy, Inc., the guarantors named therein and Law Debenture Trust Company of New York as trustee, re: NRG Energy, Inc.'s 7.625% Senior Notes due 2018. | Incorporated herein by reference to Exhibit 4.3 to the Registrant's current report on Form 8-K filed on March 13, 2013. |
| 4.73 | Eighty-Sixth Supplemental Indenture, dated as of March 13, 2013, among NRG Energy, Inc., the guarantors named therein and Law Debenture Trust Company of New York as trustee, re: NRG Energy, Inc.'s 7.625% Senior Notes due 2019. | Incorporated herein by reference to Exhibit 4.4 to the Registrant's current report on Form 8-K filed on March 13, 2013. |
| 4.74 | Eighty-Seventh Supplemental Indenture, dated as of March 13, 2013, among NRG Energy, Inc., the guarantors named therein and Law Debenture Trust Company of New York as trustee, re: NRG Energy, Inc.'s 7.875% Senior Notes due 2021. | Incorporated herein by reference to Exhibit 4.5 to the Registrant's current report on Form 8-K filed on March 13, 2013. |
| 4.75 | Eighty-Eighth Supplemental Indenture, dated as of March 13, 2013, among NRG Energy, Inc., the guarantors named therein and Law Debenture Trust Company of New York as trustee, re: NRG Energy, Inc.'s 6.625% Senior Notes due 2023. | Incorporated herein by reference to Exhibit 4.6 to the Registrant's current report on Form 8-K filed on March 13, 2013. |
| 4.76 | Eighty-Ninth Supplemental Indenture, dated as of March 13, 2013, among NRG Energy, Inc., the guarantors named therein and Law Debenture Trust Company of New York. | Incorporated herein by reference to Exhibit 4.7 to the Registrant's current report on Form 8-K filed on March 13, 2013. |
| 4.77 | Ninetieth Supplemental Indenture, dated as of May 2, 2013, among NRG Energy, Inc., the guarantors named therein and Law Debenture Trust Company of New York as trustee, re: NRG Energy, Inc.'s 8.5% Senior Notes due 2019. | Incorporated herein by reference to Exhibit 4.1 to the Registrant's current report on Form 8-K filed on May 3, 2013. |
| 4.78 | Ninety-First Supplemental Indenture, dated as of May 2, 2013, among NRG Energy, Inc., the guarantors named therein and Law Debenture Trust Company of New York as trustee, re: NRG Energy, Inc.'s 8.25% Senior Notes due 2020. | Incorporated herein by reference to Exhibit 4.2 to the Registrant's current report on Form 8-K filed on May 3, 2013. |
| 4.79 | Ninety-Second Supplemental Indenture, dated as of May 2, 2013, among NRG Energy, Inc., the guarantors named therein and Law Debenture Trust Company of New York as trustee, re: NRG Energy, Inc.'s 7.625% Senior Notes due 2018. | Incorporated herein by reference to Exhibit 4.3 to the Registrant's current report on Form 8-K filed on May 3, 2013. |
| 4.8 | Ninety-Third Supplemental Indenture, dated as of May 2, 2013, among NRG Energy, Inc., the guarantors named therein and Law Debenture Trust Company of New York as trustee, re: NRG Energy, Inc.'s 7.625% Senior Notes due 2019. | Incorporated herein by reference to Exhibit 4.4 to the Registrant's current report on Form 8-K filed on May 3, 2013. |
| 4.81 | Ninety-Fourth Supplemental Indenture, dated as of May 2, 2013, among NRG Energy, Inc., the guarantors named therein and Law Debenture Trust Company of New York as trustee, re: NRG Energy, Inc.'s 7.875% Senior Notes due 2021. | Incorporated herein by reference to Exhibit 4.5 to the Registrant's current report on Form 8-K filed on May 3, 2013. |
| 4.82 | Ninety-Fifth Supplemental Indenture, dated as of May 2, 2013, among NRG Energy, Inc., the guarantors named therein and Law Debenture Trust Company of New York as trustee, re: NRG Energy, Inc.'s 6.625% Senior Notes due 2023. | Incorporated herein by reference to Exhibit 4.6 to the Registrant's current report on Form 8-K filed on May 3, 2013. |
| 4.83 | Ninety-Sixth Supplemental Indenture, dated as of September 4, 2013, among NRG Energy, Inc., the guarantors named therein and Law Debenture Trust Company of New York as trustee, re: NRG Energy, Inc.'s 8.5% Senior Notes | Incorporated herein by reference to Exhibit 4.1 to the Registrant's current report on Form 8-K filed on September 6, 2013. |

due 2019.

| | | |
|---|---|---|
| 4.84 | Ninety-Seventh Supplemental Indenture, dated as of September 4, 2013, among NRG Energy, Inc., the guarantors named therein and Law Debenture Trust Company of New York as trustee, re: NRG Energy, Inc.'s 8.25% Senior Notes due 2020. | Incorporated herein by reference to Exhibit 4.2 to the Registrant's current report on Form 8-K filed on September 6, 2013. |

218

| | | |
|---|---|---|
| 4.85 | Ninety-Eighth Supplemental Indenture, dated as of September 4, 2013, among NRG Energy, Inc., the guarantors named therein and Law Debenture Trust Company of New York as trustee, re: NRG Energy, Inc.'s 7.625% Senior Notes due 2018 | Incorporated herein by reference to Exhibit 4.3 to the Registrant's current report on Form 8-K filed on September 6, 2013. |
| 4.86 | Ninety-Ninth Supplemental Indenture, dated as of September 4, 2013, among NRG Energy, Inc., the guarantors named therein and Law Debenture Trust Company of New York as trustee, re: NRG Energy, Inc.'s 7.625% Senior Notes due 2019. | Incorporated herein by reference to Exhibit 4.4 to the Registrant's current report on Form 8-K filed on September 6, 2013. |
| 4.87 | One Hundredth Supplemental Indenture, dated as of September 4, 2013, among NRG Energy, Inc., the guarantors named therein and Law Debenture Trust Company of New York as trustee, re: NRG Energy, Inc.'s 7.875% Senior Notes due 2021. | Incorporated herein by reference to Exhibit 4.5 to the Registrant's current report on Form 8-K filed on September 6, 2013. |
| 4.88 | One Hundred-First Supplemental Indenture, dated as of September 4, 2013, among NRG Energy, Inc., the guarantors named therein and Law Debenture Trust Company of New York as trustee, re: NRG Energy, Inc.'s 6.625% Senior Notes due 2023. | Incorporated herein by reference to Exhibit 4.6 to the Registrant's current report on Form 8-K filed on September 6, 2013. |
| 4.89 | One Hundred-Second Supplemental Indenture, dated as of October 7, 2013, among NRG Energy, Inc., the guarantors named therein and Law Debenture Trust Company of New York as trustee, re: NRG Energy, Inc.'s 8.5% Senior Notes due 2019. | Incorporated herein by reference to Exhibit 4.1 to the Registrant's current report on Form 8-K filed on October 8, 2013. |
| 4.90 | One Hundred-Third Supplemental Indenture, dated as of October 7, 2013, among NRG Energy, Inc., the guarantors named therein and Law Debenture Trust Company of New York as trustee, re: NRG Energy, Inc.'s 8.25% Senior Notes due 2020. | Incorporated herein by reference to Exhibit 4.2 to the Registrant's current report on Form 8-K filed on October 8, 2013. |
| 4.91 | One Hundred-Fourth Supplemental Indenture, dated as of October 7, 2013, among NRG Energy, Inc., the guarantors named therein and Law Debenture Trust Company of New York as trustee, re: NRG Energy, Inc.'s 7.625% Senior Notes due 2018. | Incorporated herein by reference to Exhibit 4.3 to the Registrant's current report on Form 8-K filed on October 8, 2013. |
| 4.92 | One Hundred-Fifth Supplemental Indenture, dated as of October 7, 2013, among NRG Energy, Inc., the guarantors named therein and Law Debenture Trust Company of New York as trustee, re: NRG Energy, Inc.'s 7.625% Senior Notes due 2019. | Incorporated herein by reference to Exhibit 4.4 to the Registrant's current report on Form 8-K filed on October 8, 2013. |
| 4.93 | One Hundred-Sixth Supplemental Indenture, dated as of October 7, 2013, among NRG Energy, Inc., the guarantors named therein and Law Debenture Trust Company of New York as trustee, re: NRG Energy, Inc.'s 7.875% Senior Notes due 2021. | Incorporated herein by reference to Exhibit 4.5 to the Registrant's current report on Form 8-K filed on October 8, 2013. |
| 4.94 | One Hundred-Seventh Supplemental Indenture, dated as of October 7, 2013, among NRG Energy, Inc., the guarantors named therein and Law Debenture Trust Company of New York as trustee, re: NRG Energy, Inc.'s 6.626% Senior Notes due 2023. | Incorporated herein by reference to Exhibit 4.6 to the Registrant's current report on Form 8-K filed on October 8, 2013. |
| 4.95 | One Hundred-Eighth Supplemental Indenture, dated as of November 13, 2013, among NRG Energy, Inc., the guarantors named therein and Law Debenture Trust Company of New York as trustee, re: NRG Energy, Inc.'s 8.5% Senior Notes due 2019, 8.25% Senior Notes due 2020, 7.625% Senior Notes due 2018, 7.625% Senior Notes due 2019, 7.875% Senior Notes due 2021 and 6.625% Senior Notes due 2023. | Incorporated herein by reference to Exhibit 4.6 to the Registrant's current report on Form 8-K filed on November 13, 2013. |
| 10.1 | Note Agreement, dated August 20, 1993, between NRG Energy, Inc., Energy Center, Inc. and each of the purchasers named therein. | Incorporated herein by reference to the Registrant's Registration Statement on Form S-1, as amended, Registration No. 333-33397. |
| 10.2 | Master Shelf and Revolving Credit Agreement, dated August 20, 1993, between NRG Energy, Inc., Energy Center, Inc., The Prudential Insurance Registrants of America and each Prudential Affiliate, which becomes party thereto. | Incorporated herein by reference to the Registrant's Registration Statement on Form S-1, as amended, Registration No. 333-33397. |
| 10.3* | Form of NRG Energy Inc. Long-Term Incentive Plan Deferred Stock Unit Agreement for Officers and Key Management. | Incorporated herein by reference to the Registrant's annual report on Form 10-K filed on March 30, 2005. |
| 10.4* | Form of NRG Energy, Inc. Long-Term Incentive Plan Deferred Stock Unit Agreement for Directors. | Incorporated herein by reference to the Registrant's annual report on Form 10-K filed on March 30, 2005. |
| 10.5* | Form of NRG Energy, Inc. Long-Term Incentive Plan Non-Qualified Stock Option Agreement. | Incorporated herein by reference to the Registrant's quarterly report on Form 10-Q filed on November 9, 2004. |
| 10.6* | Form of NRG Energy, Inc. Long-Term Incentive Plan Restricted Stock Unit Agreement. | Incorporated herein by reference to the Registrant's quarterly report on Form 10-Q filed on November 9, 2004. |

| 10.7* | Form of NRG Energy, Inc. Long-Term Incentive Plan Performance Unit Agreement. | Incorporated herein by reference to the Registrant's annual report on Form 10-K filed on February 23, 2010. |

219

| | | |
|---|---|---|
| 10.8* | Amended and Restated Annual Incentive Plan for Designated Corporate Officers. | Incorporated herein by reference to the Registrant's 2009 proxy statement on Schedule 14A filed on June 16, 2009. |
| 10.9 | Railroad Car Full Service Master Leasing Agreement, dated as of February 18, 2005, between General Electric Railcar Services Corporation and NRG Power Marketing Inc. | Incorporated herein by reference to the Registrant's annual report on Form 10-K for the quarter ended March 30, 2005. |
| 10.10 | Purchase Agreement (West Coast Power) dated as of December 27, 2005, by and among NRG Energy, Inc., NRG West Coast LLC (Buyer), DPC II Inc. (Seller) and Dynegy, Inc. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on December 28, 2005. |
| 10.11 | Purchase Agreement (Rocky Road Power), dated as of December 27, 2005, by and among Termo Santander Holding, L.L.C.(Buyer), Dynegy, Inc., NRG Rocky Road LLC (Seller) and NRG Energy, Inc. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on December 28, 2005. |
| 10.12 | Stock Purchase Agreement, dated as of August 10, 2005, by and between NRG Energy, Inc. and Credit Suisse First Boston Capital LLC. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on August 11, 2005. |
| 10.13 | Agreement with respect to the Stock Purchase Agreement, dated December 19, 2008, by and between NRG Energy, Inc. and Credit Suisse First Boston Capital LLC. | Incorporated herein by reference to the Registrant's annual report on Form 10-K filed on February 12, 2009. |
| 10.14 | Investor Rights Agreement, dated as of February 2, 2006, by and among NRG Energy, Inc. and Certain Stockholders of NRG Energy, Inc. set forth therein. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on February 8, 2006. |
| 10.15† | Terms and Conditions of Sale, dated as of October 5, 2005, between Texas Genco II LP and Freight Car America, Inc., (including the Proposal Letter and Amendment thereto). | Incorporated herein by reference to the Registrant's annual report on Form 10-K filed on March 7, 2006. |
| 10.16* | Amended and Restated Employment Agreement, dated December 4, 2008, between NRG Energy, Inc. and David Crane. | Incorporated herein by reference to the Registrant's annual report on Form 10-K filed on February 12, 2009. |
| 10.17* | CEO Compensation Table. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on December 9, 2009. |
| 10.18 | Limited Liability Company Agreement of NRG Common Stock Finance I LLC. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on August 10, 2006. |
| 10.19 | Note Purchase Agreement, dated August 4, 2006, between NRG Common Stock Finance I LLC, Credit Suisse International and Credit Suisse Securities (USA) LLC. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on August 10, 2006. |
| 10.20 | Amendment Agreement, dated February 27, 2008, to the Note Purchase Agreement by and among NRG Common Stock Finance I LLC, Credit Suisse International, and Credit Suisse Securities (USA) LLC. | Incorporated herein by reference to the Registrant's quarterly report on Form 10-Q filed on May 1, 2008. |
| 10.21 | Amendment Agreement, dated December 19, 2008, to the Note Purchase Agreement by and among NRG Common Stock Finance I LLC, Credit Suisse International, and Credit Suisse Securities (USA) LLC. | Incorporated herein by reference to the Registrant's annual report on Form 10-K filed on February 12, 2009. |
| 10.22 | Amendment Agreement, dated December 19, 2008, to the Note Purchase Agreement by and among NRG Common Stock Finance II LLC, Credit Suisse International, and Credit Suisse Securities (USA) LLC. | Incorporated herein by reference to the Registrant's annual report on Form 10-K filed on February 12, 2009. |
| 10.23 | Agreement with respect to Note Purchase Agreement, dated December 19, 2008, by and among NRG Common Stock Finance I LLC, Credit Suisse International, and Credit Suisse Securities (USA) LLC. | Incorporated herein by reference to the Registrant's annual report on Form 10-K filed on February 12, 2009. |
| 10.24 | Agreement with respect to Note Purchase Agreement, dated December 19, 2008, by and among NRG Common Stock Finance II LLC, Credit Suisse International, and Credit Suisse Securities (USA) LLC. | Incorporated herein by reference to the Registrant's annual report on Form 10-K filed on February 12, 2009. |
| 10.25 | Preferred Interest Purchase Agreement, dated August 4, 2006, between NRG Common Stock Finance I LLC, Credit Suisse Capital LLC and Credit Suisse Securities (USA) LLC, as agent. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on August 10, 2006. |
| 10.26 | Preferred Interest Amendment Agreement, dated February 27, 2008, by and among NRG Common Stock Finance I LLC, Credit Suisse International, and Credit Suisse Securities (USA) LLC. | Incorporated herein by reference to the Registrant's quarterly report on Form 10-Q filed on May 1, 2008. |
| 10.27 | Preferred Interest Amendment Agreement, dated December 19, 2008, by and among NRG Common Stock Finance I LLC, Credit Suisse International, and Credit Suisse Securities (USA) LLC. | Incorporated herein by reference to the Registrant's annual report on Form 10-K filed on February 12, 2009. |
| 10.28 | Preferred Interest Amendment Agreement, dated December 19, 2008, by and among NRG Common Stock Finance II LLC, Credit Suisse International, and Credit Suisse Securities (USA) LLC. | Incorporated herein by reference to the Registrant's annual report on Form 10-K filed on February 12, 2009. |

| | | |
|---|---|---|
| 10.28 | Agreement with respect to Preferred Interest Purchase Agreement, dated December 19, 2008, by and among NRG Common Stock Finance I LLC, Credit Suisse International, and Credit Suisse Securities (USA) LLC. | Incorporated herein by reference to the Registrant's annual report on Form 10-K filed on February 12, 2009. |
| 10.29 | Agreement with respect to Preferred Interest Purchase Agreement, dated December 19, 2008, by and among NRG Common Stock Finance II LLC, Credit Suisse International, and Credit Suisse Securities (USA) LLC. | Incorporated herein by reference to the Registrant's annual report on Form 10-K filed on February 12, 2009. |
| 10.30* | Amended and Restated Long-Term Incentive Plan. | Incorporated herein by reference to the Registrant's 2009 proxy statement on Schedule 14A filed on June 16, 2009. |
| 10.31* | NRG Energy, Inc. Executive Change-in-Control and General Severance Agreement, dated December 9, 2008. | Incorporated herein by reference to the Registrant's annual report on Form 10-K filed on February 12, 2009. |
| 10.32† | Amended and Restated Contribution Agreement (NRG), dated March 25, 2008, by and among Texas Genco Holdings, Inc., NRG South Texas LP and NRG Nuclear Development Company LLC and Certain Subsidiaries Thereof. | Incorporated herein by reference to the Registrant's quarterly report on Form 10-Q filed on May 1, 2008. |
| 10.33† | Contribution Agreement (Toshiba), dated February 29, 2008, by and between Toshiba Corporation and NRG Nuclear Development Company LLC. | Incorporated herein by reference to the Registrant's quarterly report on Form 10-Q filed on May 1, 2008. |
| 10.34† | Multi-Unit Agreement, dated February 29, 2008, by and among Toshiba Corporation, NRG Nuclear Development Company LLC and NRG Energy, Inc. | Incorporated herein by reference to the Registrant's quarterly report on Form 10-Q filed on May 1, 2008. |
| 10.35† | Amended and Restated Operating Agreement of Nuclear Innovation North America LLC, dated May 1, 2008. | Incorporated herein by reference to the Registrant's quarterly report on Form 10-Q filed on May 1, 2008. |
| 10.37† | LLC Membership Purchase Agreement between Reliant Energy, Inc. and NRG Retail LLC, dated as of February 28, 2009. | Incorporated herein by reference to the Registrant's quarterly report on Form 10-Q filed on April 30, 2009. |
| 10.38 | Project Agreement, Settlement Agreement and Mutual Release, dated March 1, 2010, by and among by and among Nuclear Innovation North America LLC, the City of San Antonio acting by and through the City Public Service Board of San Antonio, a Texas municipal utility, NINA Texas 3 LLC and NINA Texas 4 LLC, and solely for purposes of certain sections of the Settlement Agreement, by NRG Energy, Inc and NRG South Texas LP. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on March 2, 2010. |
| 10.39† | STP 3 & 4 Owners Agreement, dated March 1, 2010, by and among Nuclear Innovation North America LLC, the City of San Antonio, NINA Texas 3 LLC and NINA Texas 4 LLC. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on March 2, 2010. |
| 10.40* | 2009 Executive Change-in-Control and General Severance Plan. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on April 1, 2010. |
| 10.41† | Investment and Option Agreement by and among Nuclear Innovation North America LLC, Nuclear Innovation North America Investments Holdings LLC and TEPCO Nuclear Energy America LLC, dated as of May 10, 2010. | Incorporated herein by reference to the Registrant's quarterly report on Form 10-Q filed on August 2, 2010. |
| 10.42† | Parent Company Agreement by and among NRG Energy, Inc., Nuclear Innovation North America LLC, TEPCO and TEPCO Nuclear Energy America LLC, dated as of May 10, 2010. | Incorporated herein by reference to the Registrant's quarterly report on Form 10-Q filed on August 2, 2010. |
| 10.44(a) | Letter of Credit and Reimbursement Agreement, dated as of June 30, 2010. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on July 1, 2010. |
| 10.44(b) | Letter of Credit and Reimbursement Agreement, dated as of June 30, 2010. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on July 1, 2010. |
| 10.45* | The NRG Energy, Inc. Amended and Restated Long Term Incentive Plan. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on August 3, 2010. |
| 10.46 | Amended and Restated Credit Agreement, dated July 1, 2011, by and among NRG Energy, Inc., the lenders party thereto, and the joint lead bookrunners and joint lead arrangers party thereto. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on July 5, 2011. |
| 10.47* | Form of Market Stock Unit Grant Agreement. | Incorporated herein by reference to the Registrant's current report on Form 8-K/A filed on September 12, 2011. |
| 10.48 | Registration Rights Agreement, dated September 24, 2012, among NRG Energy, Inc., the guarantors named therein and Deutsche Bank Securities Inc., Merrill, Lynch, Pierce, Fenner & Smith Incorporated, Barclays Capital Inc., Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Goldman, Sachs & Co., J.P. Morgan Securities LLC, Morgan Stanley & Co. Incorporated and RBS Securities Inc., as initial purchasers. | Incorporated herein by reference to the Registrant's current report on Form 8-K filed on September 24, 2012. |

| | | |
|---|---|---|
| 10.49* | NRG 2010 Stock Plan for GenOn Employees | Incorporated herein by reference to Exhibit 10-.49 to the Registrant's annual report on Form 10-K filed on February 27, 2013. |
| 10.50 | Revolving Credit Agreement among GenOn Energy, Inc., as Borrower, GenOn Americas, Inc., as Borrower, the several lenders from time to time parties hereto, and NRG Energy, Inc., as Administrative Agent, dated as of December 14, 2012. | Incorporated herein by reference to Exhibit 10-.49 to the Registrant's annual report on Form 10-K filed on February 27, 2013. |
| 10.51 | First Amendment Agreement, dated as of February 6, 2013, to the Amended and Restated Credit Agreement and the Second Amended and Restated Collateral Trust Agreement. | Incorporated herein by reference to Exhibit 10.1 to the Registrant's quarterly report on Form 10-Q filed on May 7, 2013. |
| 10.52 | Second Amendment Agreement, dated as of June 4, 2013, to the Amended and Restated Credit Agreement and the Second Amended and Restated Collateral Trust Agreement. | Incorporated herein by reference to Exhibit 10.1 to the Registrant's current report on Form 8-K filed on June 10, 2013. |
| 10.53* | NRG Energy, Inc. Long-Term Incentive Plan Market Stock Unit Agreement | Filed herewith. |
| 10.54* | NRG Energy, Inc. 2010 Stock Plan For GenOn Employees Market Stock Unit Agreement | Filed herewith. |
| 12.1 | NRG Energy, Inc. Computation of Ratio of Earnings to Fixed Charges. | Filed herewith. |
| 12.2 | NRG Energy, Inc. Computation of Ratio of Earnings to Fixed Charges and Preferred Stock Dividend Requirements. | Filed herewith. |
| 21.1 | Subsidiaries of NRG Energy. Inc. | Filed herewith. |
| 23.1 | Consent of KPMG LLP. | Filed herewith. |
| 31.1 | Rule 13a-14(a)/15d-14(a) certification of David W. Crane. | Filed herewith. |
| 31.2 | Rule 13a-14(a)/15d-14(a) certification of Kirkland B. Andrews. | Filed herewith. |
| 31.3 | Rule 13a-14(a)/15d-14(a) certification of Ronald B. Stark. | Filed herewith. |
| 32 | Section 1350 Certification. | Filed herewith. |
| 101 INS | XBRL Instance Document | Filed herewith. |
| 101 SCH | XBRL Taxonomy Extension Schema | Filed herewith. |
| 101 CAL | XBRL Taxonomy Extension Calculation Linkbase | Filed herewith. |
| 101 DEF | XBRL Taxonomy Extension Definition Linkbase | Filed herewith. |
| 101 LAB | XBRL Taxonomy Extension Label Linkbase | Filed herewith. |
| 101 PRE | XBRL Taxonomy Extension Presentation Linkbase | Filed herewith. |

| | |
|---|---|
| * | Exhibit relates to compensation arrangements. |
| † | Portions of this exhibit have been redacted and are subject to a confidential treatment request filed with the Secretary of the Securities and Exchange Commission pursuant to Rule 24b-2 under the Securities Exchange Act of 1934, as amended. |

# NRG ENERGY, INC. LONG-TERM INCENTIVE PLAN MARKET STOCK UNIT AGREEMENT

**Name**
**Address**
**City, ST Zip**

Congratulations on your selection as a Participant under the Long-Term Incentive Compensation Plan ("Plan") of NRG Energy, Inc. (the "Company"). You have been chosen to receive Market Stock Units ("MSUs") under the Plan.

This Market Stock Unit Agreement (this "Agreement") constitutes the Grant Agreement pursuant to Section 9 of the Plan. If there is any inconsistency between the terms of this Agreement and the terms of the Plan, the Plan's terms shall completely supersede and replace the conflicting terms of this Agreement. Capitalized terms used but not defined in this Agreement shall have the meaning assigned to them in the Plan. You are sometimes referred to as the "Participant" in this Agreement.

**If you disagree with any of the terms of this Award or choose not to accept this Award, please contact Jennifer Wallace at 713.537.2182 by February 14, 2013. Otherwise, you will be deemed to have accepted this Award under the terms and conditions set forth in this Agreement and the Plan.**

1. **Grant of MSU.**

   You are hereby granted MSUs as follows:

   | | |
   |---|---|
   | Date of Grant: | **January 2, 2014** |
   | Vesting Commencement Date: | Date of Grant |
   | Vesting Period: | Please refer to Section 2 of this Agreement |
   | Performance Period: | **January 2, 2014 through January 2, 2017** |
   | | **Amount** (the "**Target MSUs**") |
   | Target Number of MSUs: | |

2. **Vesting Schedule.**

   Notwithstanding anything to the contrary in the Plan, the MSUs shall vest in accordance with the provisions set forth in this Section 2.

   Provided that you have been continuously employed by the Company during the respective vesting period, the MSUs will vest on the third anniversary of the Date of Grant based upon NRG's Total Shareholder Return ("TSR") during the Performance Period, in accordance with the following schedule:

**Third Anniversary**

| Goal | TSR | Number of MSUs that Vest[1] |
|------|-----|----------------------------|
| Maximum | +100% (a 100% increase in TSR during the Performance Period) | 200% of the Target MSUs = Number of Target MSUs in Section 1 of this agreement multiplied by 2. |
| Target | 0% (no change in TSR during the Performance Period) | 100% of the Target MSUs = Number of Target MSUs in Section 1. |
| Threshold | -25% (a 25% reduction in TSR during the Performance Period) | 75% of the Target MSUs = Number of Target MSUs in Section 1 divided by 2. |
| < Threshold | More than a 25% reduction in TSR during the Performance Period | 0% of the Target MSUs |

1- Payout (# of MSUs) is interpolated for performance falling between Threshold, Target, and Maximum levels.

For purposes of this Agreement, the term "Total Shareholder Return" shall be calculated by dividing (i) the Closing Average Share Value by (ii) the Opening Average Share Value and subtracting 1 from the resulting quotient. For purposes of the preceding sentence, the Closing Average Share Value and the Opening Average Share Value shall mean the average of the closing price of a share of Common Stock multiplied by the Accumulated Shares for each trading day over the 20 trading day period preceding and including the first and the last day of the Performance Period, respectively. Accumulated Shares shall mean the sum of one share and the accumulated partial shares, as of each trading day, that are the result of the assumption that all dividends issued during the Opening Average Period and the Performance Period are immediately reinvested in the Company's Common Stock at the closing price on the ex-dividend date.

Notwithstanding the foregoing, if the Company terminates your employment without Cause (as defined in the Plan) in connection with a Change in Control (as defined in the Plan), the MSUs shall vest in full immediately upon the later of such Change in Control or such termination of employment. The Company's termination of your employment may be treated as being in connection with a Change in Control only if such termination occurs during the period beginning six months prior to the Change in Control and ending twelve months following the Change in Control.

3.      **Conversion of MSU and Issuance of Shares**

Upon vesting of the Award, one share of Common Stock shall be issued for each MSU that vests on such vesting date, subject to the terms and conditions of this Agreement and the Plan.

4.      **Dividend Equivalent Rights**

Cash dividends on shares of Common Stock issuable hereunder shall be credited to a dividend book entry account on behalf of the Participant with respect to each MSU granted to the Participant, provided that such cash dividends shall be deemed to be reinvested in shares of Common Stock immediately following the time declared at the then fair market value of the Common Stock and shall vest and be paid at the same time that the shares of Common Stock underlying the MSUs vest and are delivered to the Participant in accordance with the provisions hereof. Stock dividends on shares of Common Stock issuable hereunder shall be credited to a dividend book entry account on behalf of the Participant with respect to each MSU granted to the Participant, provided that such stock dividends shall vest and be paid at the same time that the shares of Common Stock underlying the MSU vest and are delivered to the Participant in accordance with the provisions hereof. Notwithstanding the foregoing, in the event that there are insufficient shares of Common Stock available in the Plan to settle the accrued dividends in shares of Common Stock, such shares shall be settled in cash in an amount equal to the fair market of such shares of Common Stock at the time of settlement. Except as otherwise provided herein, the Participant shall have no rights as a stockholder with respect to any shares of Common Stock covered by any MSU unless and until the Participant has become the holder of record of such shares.

5.      **Transfer of MSUs**

Unless otherwise permitted by the Committee (as defined in the Plan) or Section 14 of the Plan, the MSUs may not be sold, transferred, pledged, assigned or otherwise alienated or hypothecated, other than pursuant to a will or the laws of descent and distribution. Any attempted disposition in violation of this Section 4 and Section 14 of the Plan shall be void.

6.      **Status of Participant**

The Participant shall not be, or have rights as, a stockholder of the Company with respect to any of the shares of Common Stock subject to the Award unless such Award has vested, and shares underlying the MSU have been issued and delivered to him or her. The Company shall not be required to issue or transfer any certificates for shares of Common Stock upon vesting of the Award until all applicable requirements of law have been complied with and such shares have been duly listed on any securities exchange on which the Common Stock may then be listed.

7.      **No Effect on Capital Structure**

The Award shall not affect the right of the Company or any Subsidiary to reclassify, recapitalize or otherwise change its capital or debt structure or to merge, consolidate, convey any or all of its assets, dissolve, liquidate, windup, or otherwise reorganize.

8.      **Expiration and Forfeiture of Award**

Your Award shall vest and/or expire in the circumstances described below in this Section 8. As used herein, "***Termination of Service***" means termination of a Participant's employment by or service to the Company, including any of its Subsidiaries.

(a)   ***Death.***

Upon a Termination of Service by reason of death, the Award shall vest in full and the Common Stock underlying the Award shall be issued and delivered to the Participant's legal representatives, heirs, legatees, or distributees.

(b) ***Termination of Service other than as a result of Death.***

Upon a Termination of Service by any reason other than death, including without limitation as a result of Disability, Retirement, voluntary resignation or termination for Cause, any unvested portion of the Award shall expire and be forfeited to the Company.

(c) ***Forfeiture as a result of misconduct.***

Unless otherwise determined by the Committee, if the Company is required to prepare a material restatement of its financial statements as a result of misconduct, and the Committee determines that you knowingly engaged in the misconduct, were grossly negligent with respect to such misconduct, or knowingly or grossly negligently failed to prevent the misconduct, or the Committee concludes that you engaged in willful fraud, embezzlement or other similar activity (including acts of omission) materially detrimental to the Company, the Company may require you (or your beneficiary) to reimburse the Company for all or any portion of your Award, and/or to forfeit the proceeds of the sale (including sales to the Company) during the 12-month period following the first public filing of the financial document requiring restatement, or during the 12-month period following the date of your misconduct, of any Company securities acquired by or on behalf of you (or your beneficiary) pursuant to an Award under this Agreement.

9. **Committee Authority**

Any question concerning the interpretation of this Agreement, any adjustments required to be made under the Plan, and any controversy that may arise under the Plan or the Grant Agreement shall be determined by the Committee in its sole discretion. Any decisions by the Committee regarding the Plan or this Agreement shall be final and binding.

10. **Plan Controls**

The terms of this Agreement are governed by the terms of the Plan, as it exists on the date of the grant and as the Plan is amended from time to time. In the event of any conflict between the provisions of this Agreement and the provisions of the Plan, the terms of the Plan shall control.

11.    **Limitation on Rights; No Right to Future Grants; Extraordinary Item.**

By entering into this Agreement and accepting the Award, the Participant acknowledges that: (a) the Plan is discretionary and may be modified, suspended or terminated by the Company at any time as provided in the Plan, provided that, except as provided in Section 17 of the Plan, no amendment to this Agreement shall adversely affect in a material manner the Participant's rights under this Agreement without his or her written consent; (b) the grant of the Award is a one-time benefit and does not create any contractual or other right to receive future grants of awards or benefits in lieu of awards; (c) all determinations with respect to any such future grants, including, but not limited to, the times when awards will be granted, the number of shares subject to each award, the award price, if any, and the time or times when each award will be settled, will be at the sole discretion of the Company; (d) participation in the Plan is voluntary; (e) the value of the Award is an extraordinary item which is outside the scope of the Participant's employment contract, if any, unless expressly provided for in any such employment contract; (f) the Award is not part of normal or expected compensation for any purpose, including without limitation for calculating any benefits, severance, resignation, termination, redundancy, end of service payments, bonuses, long-service awards, pension or retirement benefits or similar payments, and the Participant will have no entitlement to compensation or damages as a consequence of the forfeiture of any unvested portion of the Award as a result of the Participant's Termination of Service for any reason; (g) the future value of the Common Stock subject to the Award is unknown and cannot be predicted with certainty, (h) neither the Plan, the Award nor the issuance of the shares underlying the Award confers upon the Participant any right to continue in the employ or service of (or any other relationship with) the Company or any Subsidiary, nor do they limit in any respect the right of the Company or any Subsidiary to terminate the Participant's employment or other relationship with the Company or any Subsidiary, as the case may be, at any time with or without Cause, and (i) the grant of the Award will not be interpreted to form an employment relationship with the Company or any Subsidiary; and furthermore, the grant of the Award will not be interpreted to form an employment contract with the Company or any Subsidiary.

12.    **General Provisions**

(a) *Notice*

Whenever any notice is required or permitted hereunder, such notice must be in writing and delivered in person or by mail (to the address set forth below if notice is being delivered to the Company) or electronically. Any notice delivered in person or by mail shall be deemed to be delivered on the date on which it is personally delivered, or, whether actually received or not, on the third business day after it is deposited in the United States mail, certified or registered, postage prepaid, addressed to the person who is to receive it at the address set forth in this Agreement. Notices delivered to the Participant in person or by mail shall be addressed to the address for the Participant in the records of the Company. Notices delivered to the Company in person or by mail shall be addressed as follows:

Company:   NRG Energy, Inc.
            Attn: Senior Vice President, Human Resources
            211 Carnegie Center
            Princeton, NJ 08450

The Company or the Participant may change, by written notice to the other, the address previously specified for receiving notices.

(b) ***No Waiver***

No waiver of any provision of this Agreement will be valid unless in writing and signed by the person against whom such waiver is sought to be enforced, nor will failure to enforce any right under this Agreement constitute a continuing waiver of the same or a waiver of any other right hereunder.

(c) ***Undertaking***

The Participant hereby agrees to take whatever additional action and execute whatever additional documents the Company may deem necessary or advisable in order to carry out or effect one or more of the obligations or restrictions imposed on either the Participant or the Award pursuant to the express provisions of this Agreement.

(d) ***Entire Contract***

This Agreement and the Plan constitute the entire contract between the parties hereto with regard to the subject matter hereof. This Agreement is made pursuant to the provisions of the Plan and will in all respects be construed in conformity with the express terms and provisions of the Plan.

(e) ***Successors and Assigns***

The provisions of this Agreement shall inure to the benefit of, and be binding on, the Company and its successors and assigns and Participant and Participant's legal representatives, heirs, legatees, distributees, assigns and transferees by operation of law.

(f) ***Securities Law Compliance***

The Company currently has an effective registration statement on file with the Securities and Exchange Commission with respect to the shares of Common Stock subject to the Award. The Company intends to maintain this registration but has no obligation to the Participant to do so. If the registration ceases to be effective, the Participant will not be able to transfer or sell shares of Common Stock issued pursuant to the Award unless exemptions from registration under applicable securities laws are available. Such exemptions from registration are very limited and might be unavailable. Participant agrees that any resale of the shares of Common Stock issued pursuant to the Award shall comply in all respects with the requirements of all applicable securities laws, rules and regulations (including, without limitation, the provisions of the Securities Act of 1933, the Securities Exchange Act of 1934 and the respective rules and regulations promulgated thereunder) and any other law, rule or regulation applicable thereto, as such laws, rules, and regulations may be amended from time to time. The Company shall not be obligated to either issue shares of Common Stock or permit the resale of any such shares if such issuance or resale would violate any such requirements.

(g) *Taxes*

Participant acknowledges that the removal of restrictions with respect to an MSU will give rise to a withholding tax liability, and that no shares of Common Stock are issuable hereunder until such withholding obligation is satisfied in full. The Participant agrees to remit to the Company the amount of any taxes required to be withheld. The Committee, in its sole discretion, may permit Participant to satisfy all or part of such tax obligation through withholding of the number of shares of Common Stock otherwise issued to him or her hereunder and/or by the Participant transferring to the Company nonrestricted shares of Common Stock previously owned by the Participant for at least six (6) months prior to the vesting of the Award hereunder, with the amount of the withholding to be credited based on the current Fair Market Value of the Common Stock as of the date the amount of tax to be withheld is determined.

(h) *Information Confidential*

As partial consideration for the granting of the Award, the Participant agrees that he or she will keep confidential all information and knowledge that the Participant has relating to the manner and amount of his or her participation in the Plan; provided, however, that such information may be disclosed as required by law and may be given in confidence to the Participant's spouse, tax and financial advisors, or to a financial institution to the extent that such information is necessary to secure a loan.

(i) *Governing Law*

Except as may otherwise be provided in the Plan, the provisions of this Agreement shall be governed by the laws of the state of Delaware, without giving effect to principles of conflicts of law.

(j) *Code Section 409A Compliance*

Notwithstanding any provision of this Agreement, to the extent that the Committee determines that any Award granted under this Agreement is subject to Section 409A of the Code and fails to comply with the requirements of Section 409A of the Code, notwithstanding anything to the contrary contained in the Plan or in this Agreement, the Committee reserves the right to amend, restructure, terminate or replace the Award in order to cause the Award to either not be subject to Section 409A of the Code or to comply with the applicable provisions of such section.

## NRG ENERGY, INC.

/s/ David Crane
Name: David Crane
Title: President & CEO

# NRG ENERGY, INC. 2010 STOCK PLAN FOR GENON EMPLOYEES
# MARKET STOCK UNIT AGREEMENT

**Name**
**Address**
**City, ST Zip**

Congratulations on your selection as a Participant under the NRG Energy, Inc. 2010 Stock Plan for GenOn Employees (the "Plan") of NRG Energy, Inc. (the "Company"). You have been chosen to receive Market Stock Units ("MSUs") under the Plan.

This Market Stock Unit Agreement (this "Agreement") constitutes an Award Agreement pursuant to Section 8 of the Plan. If there is any inconsistency between the terms of this Agreement and the terms of the Plan, the Plan's terms shall completely supersede and replace the conflicting terms of this Agreement. Capitalized terms used but not defined in this Agreement shall have the meaning assigned to them in the Plan; provided that the Company shall mean NRG Energy, Inc. in this Agreement and the for purposes of this Agreement, all references to the Company or GenOn Energy, Inc. in the Plan shall be deemed to refer to NRG Energy, Inc. You are sometimes referred to as the "Participant" in this Agreement.

**If you disagree with any of the terms of this Award or choose not to accept this Award, please contact Jennifer Wallace at 713-537-2182 by February 14, 2014. Otherwise, you will be deemed to have accepted this Award under the terms and conditions set forth in this Agreement and the Plan.**

1.    **Grant of MSU.**

     You are hereby granted MSUs as follows:

| | |
|---|---|
| Date of Grant: | **January 2, 2014** |
| Vesting Commencement Date: | Date of Grant |
| Vesting Period: | Please refer to Section 2 of this Agreement |
| Performance Period: | **January 2, 2014 through January 2, 2017** |
| | **Amount (the "Target MSUs")** |
| Target Number of MSUs: | |

2.    **Vesting Schedule.**

     Notwithstanding anything to the contrary in the Plan, the MSUs shall vest in accordance with the provisions set forth in this Section 2.

     Provided that you have been continuously employed by the Company during the respective vesting period, the MSUs will vest on the third anniversary of the Date of Grant based upon NRG's Total Shareholder Return ("TSR") during the Performance Period, in accordance with the following schedule:

**Third Anniversary**

| Goal | TSR | **Number of MSUs that Vest** Payout (# of MSUs) is interpolated for performance falling between Threshold, Target, and Maximum levels. |
|---|---|---|
| Maximum | #VALUE! | **200% of the Target MSUs**<br><br>= Number of Target MSUs in Section 1 of this agreement multiplied by 2. |
| Target | **0%** (no change in TSR during the Performance Period) | **100% of the Target MSUs**<br><br>= Number of Target MSUs in Section 1. |
| Threshold | #VALUE! | **75% of the Target MSUs**<br><br>= Number of Target MSUs in Section 1 divided by 2. |
| < Threshold | More than a **25**% reduction in TSR during the Performance Period | **0% of the Target MSUs** |

For purposes of this Agreement, the term "Total Shareholder Return" shall be calculated by dividing (i) the Closing Average Share Value by (ii) the Opening Average Share Value and subtracting 1 from the resulting quotient. For purposes of the preceding sentence, the Closing Average Share Value and the Opening Average Share Value shall mean the average of the closing price of a share of Common Stock multiplied by the Accumulated Shares for each trading day over the 20 trading day period preceding and including the first and the last day of the Performance Period, respectively. Accumulated Shares shall mean the sum of one share and the accumulated partial shares, as of each trading day, that are the result of the assumption that all dividends issued during the Opening Average Period and the Performance Period are immediately reinvested in the Company's Common Stock at the closing price on the ex-dividend date.

Notwithstanding the foregoing, if the Company terminates your employment without Cause (as defined in the Plan) in connection with a Change in Control (as defined in the Plan), the MSUs shall vest in full immediately upon the later of such Change in Control or such termination of employment. The Company's termination of your employment may be treated as being in connection with a Change in Control only if such termination occurs during the period beginning six months prior to the Change in Control and ending twelve months following the Change in Control.

3. **Conversion of MSU and Issuance of Shares**

Upon vesting of the Award, one share of Common Stock shall be issued for each MSU that vests on such vesting date, subject to the terms and conditions of this Agreement and the Plan.

4. **Dividend Equivalent Rights**

Cash dividends on shares of Common Stock issuable hereunder shall be credited to a dividend book entry account on behalf of the Participant with respect to each MSU granted to the Participant, provided that such cash dividends shall be deemed to be reinvested in shares of Common Stock immediately following the time declared at the then fair market value of the Common Stock and shall vest and be paid at the

same time that the shares of Common Stock underlying the MSUs vest and are delivered to the Participant in accordance with the provisions hereof. Stock dividends on shares of Common Stock issuable hereunder shall be credited to a dividend book entry account on behalf of the Participant with respect to each MSU granted to the Participant, provided that such stock dividends shall vest and be paid at the same time that the shares of Common Stock underlying the MSU vest and are delivered to the Participant in accordance with the provisions hereof. Notwithstanding the foregoing, in the event that there are insufficient shares of Common Stock available in the Plan to settle the accrued dividends in shares of Common Stock, such shares shall be settled in cash in an amount equal to the fair market of such shares of Common Stock at the time of settlement. Except as otherwise provided herein, the Participant shall have no rights as a stockholder with respect to any shares of Common Stock covered by any MSU unless and until the Participant has become the holder of record of such shares.

5.    **Transfer of MSUs**

Unless otherwise permitted by the Committee (as defined in the Plan) or Section 14 of the Plan, the MSUs may not be sold, transferred, pledged, assigned or otherwise alienated or hypothecated, other than pursuant to a will or the laws of descent and distribution. Any attempted disposition in violation of this Section 5 and Section 14 of the Plan shall be void.

6.    **Status of Participant**

The Participant shall not be, or have rights as, a stockholder of the Company with respect to any of the shares of Common Stock subject to the Award unless such Award has vested, and shares underlying the MSU have been issued and delivered to him or her. The Company shall not be required to issue or transfer any certificates for shares of Common Stock upon vesting of the Award until all applicable requirements of law have been complied with and such shares have been duly listed on any securities exchange on which the Common Stock may then be listed.

7.    **No Effect on Capital Structure**

The Award shall not affect the right of the Company or any Subsidiary to reclassify, recapitalize or otherwise change its capital or debt structure or to merge, consolidate, convey any or all of its assets, dissolve, liquidate, windup, or otherwise reorganize.

8.    **Expiration and Forfeiture of Award**

Your Award shall vest and/or expire in the circumstances described below in this Section 8. As used herein, "***Termination of Service***" means termination of a Participant's employment by or service to the Company, including any of its Subsidiaries.

(a)    ***Death.***

Upon a Termination of Service by reason of death, the Award shall vest in full and the Common Stock underlying the Award shall be issued and delivered to the Participant's legal representatives, heirs, legatees, or distributees.

(b)    ***Termination of Service other than as a result of Death.***

Upon a Termination of Service by any reason other than death, including without limitation as a result of Disability, Retirement, voluntary resignation or termination for Cause, any unvested portion of the Award shall expire and be forfeited to the Company.

(c)    ***Forfeiture as a result of misconduct.***

Unless otherwise determined by the Committee, if the Company is required to prepare a material restatement of its financial statements as a result of misconduct, and the Committee determines that you knowingly engaged in the misconduct, were grossly negligent with respect to such

misconduct, or knowingly or grossly negligently failed to prevent the misconduct, or the Committee concludes that you engaged in willful fraud, embezzlement or other similar activity (including acts of omission) materially detrimental to the Company, the Company may require you (or your beneficiary) to reimburse the Company for all or any portion of your Award, and/or to forfeit the proceeds of the sale (including sales to the Company) during the 12-month period following the first public filing of the financial document requiring restatement, or during the 12-month period following the date of your misconduct, of any Company securities acquired by or on behalf of you (or your beneficiary) pursuant to an Award under this Agreement.

9.    **Committee Authority**

Any question concerning the interpretation of this Agreement, any adjustments required to be made under the Plan, and any controversy that may arise under the Plan or this Agreement shall be determined by the Committee in its sole discretion. Any decisions by the Committee regarding the Plan or this Agreement shall be final and binding.

10.    **Plan Controls**

The terms of this Agreement are governed by the terms of the Plan, as it exists on the date of the grant and as the Plan is amended from time to time. In the event of any conflict between the provisions of this Agreement and the provisions of the Plan, the terms of the Plan shall control.

11.    **Limitation on Rights; No Right to Future Grants; Extraordinary Item.**

By entering into this Agreement and accepting the Award, the Participant acknowledges that: (a) the Plan is discretionary and may be modified, suspended or terminated by the Company at any time as provided in the Plan, provided that, except as expressly provided in the Plan, no amendment to this Agreement shall adversely affect in a material manner the Participant's rights under this Agreement without his or her written consent; (b) the grant of the Award is a one-time benefit and does not create any contractual or other right to receive future grants of awards or benefits in lieu of awards; (c) all determinations with respect to any such future grants, including, but not limited to, the times when awards will be granted, the number of shares subject to each award, the award price, if any, and the time or times when each award will be settled, will be at the sole discretion of the Company; (d) participation in the Plan is voluntary; (e) the value of the Award is an extraordinary item which is outside the scope of the Participant's employment contract, if any, unless expressly provided for in any such employment contract; (f) the Award is not part of normal or expected compensation for any purpose, including without limitation for calculating any benefits, severance, resignation, termination, redundancy, end of service payments, bonuses, long-service awards, pension or retirement benefits or similar payments, and the Participant will have no entitlement to compensation or damages as a consequence of the forfeiture of any unvested portion of the Award as a result of the Participant's Termination of Service for any reason; (g) the future value of the Common Stock subject to the Award is unknown and cannot be predicted with certainty, (h) neither the Plan, the Award nor the issuance of the shares underlying the Award confers upon the Participant any right to continue in the employ or service of (or any other relationship with) the Company or any Subsidiary, nor do they limit in any respect the right of the Company or any Subsidiary to terminate the Participant's employment or other relationship with the Company or any Subsidiary, as the case may be, at any time for any reason or no reason, and (i) the grant of the Award will not be interpreted to form an employment relationship with the Company or any Subsidiary; and furthermore, the grant of the Award will not be interpreted to form an employment contract with the Company or any Subsidiary.

12.     **General Provisions**

  (a)  *Notice*

      Whenever any notice is required or permitted hereunder, such notice must be in writing and delivered in person or by mail (to the address set forth below if notice is being delivered to the Company) or electronically. Any notice delivered in person or by mail shall be deemed to be delivered on the date on which it is personally delivered, or, whether actually received or not, on the third business day after it is deposited in the United States mail, certified or registered, postage prepaid, addressed to the person who is to receive it at the address set forth in this Agreement. Notices delivered to the Participant in person or by mail shall be addressed to the address for the Participant in the records of the Company. Notices delivered to the Company in person or by mail shall be addressed as follows:

      Company:  NRG Energy, Inc.

               Attn: Vice President, Human Resources

               211 Carnegie Center

               Princeton, NJ 08450

      The Company or the Participant may change, by written notice to the other, the address previously specified for receiving notices.

  (b)  *No Waiver*

      No waiver of any provision of this Agreement will be valid unless in writing and signed by the person against whom such waiver is sought to be enforced, nor will failure to enforce any right under this Agreement constitute a continuing waiver of the same or a waiver of any other right hereunder.

  (c)  *Undertaking*

      The Participant hereby agrees to take whatever additional action and execute whatever additional documents the Company may deem necessary or advisable in order to carry out or effect one or more of the obligations or restrictions imposed on either the Participant or the Award pursuant to the express provisions of this Agreement.

  (d)  *Entire Contract*

      This Agreement and the Plan constitute the entire contract between the parties hereto with regard to the subject matter hereof. This Agreement is made pursuant to the provisions of the Plan and will in all respects be construed in conformity with the express terms and provisions of the Plan.

  (e)  *Successors and Assigns*

      The provisions of this Agreement shall inure to the benefit of, and be binding on, the Company and its successors and assigns and Participant and Participant's legal representatives, heirs, legatees, distributees, assigns and transferees by operation of law.

  (f)  *Securities Law Compliance*

      The Company currently has an effective registration statement on file with the Securities and Exchange Commission with respect to the shares of Common Stock subject to the Award. The Company intends to maintain this registration but has no obligation to the Participant to do so. If the registration ceases to be effective, the Participant will not be able to transfer or sell shares of Common Stock issued pursuant to the Award unless exemptions from registration under

applicable securities laws are available. Such exemptions from registration are very limited and might be unavailable. Participant agrees that any resale of the shares of Common Stock issued pursuant to the Award shall comply in all respects with the requirements of all applicable securities laws, rules and regulations (including, without limitation, the provisions of the Securities Act of 1933, the Securities Exchange Act of 1934 and the respective rules and regulations promulgated thereunder) and any other law, rule or regulation applicable thereto, as such laws, rules, and regulations may be amended from time to time. The Company shall not be obligated to either issue shares of Common Stock or permit the resale of any such shares if such issuance or resale would violate any such requirements.

(g) *Taxes*

Participant acknowledges that the removal of restrictions with respect to an MSU will give rise to a withholding tax liability, and that no shares of Common Stock are issuable hereunder until such withholding obligation is satisfied in full. The Participant agrees to remit to the Company the amount of any taxes required to be withheld. The Committee, in its sole discretion, may permit Participant to satisfy all or part of such tax obligation through withholding of the number of shares of Common Stock otherwise issued to him or her hereunder and/or by the Participant transferring to the Company nonrestricted shares of Common Stock previously owned by the Participant for at least six (6) months prior to the vesting of the Award hereunder, with the amount of the withholding to be credited based on the current Fair Market Value of the Common Stock as of the date the amount of tax to be withheld is determined.

(h) *Information Confidential*

As partial consideration for the granting of the Award, the Participant agrees that he or she will keep confidential all information and knowledge that the Participant has relating to the manner and amount of his or her participation in the Plan; provided, however, that such information may be disclosed as required by law and may be given in confidence to the Participant's spouse, tax and financial advisors, or to a financial institution to the extent that such information is necessary to secure a loan.

(i) *Governing Law*

Except as may otherwise be provided in the Plan, the provisions of this Agreement shall be governed by the laws of the state of Delaware, without giving effect to principles of conflicts of law.

(j) *Code Section 409A Compliance*

Notwithstanding any provision of this Agreement, to the extent that the Committee determines that any Award granted under this Agreement is subject to Section 409A of the Code and fails to comply with the requirements of Section 409A of the Code, notwithstanding anything to the contrary contained in the Plan or in this Agreement, the Committee reserves the right to amend, restructure, terminate or replace the Award in order to cause the Award to either not be subject to Section 409A of the Code or to comply with the applicable provisions of such section.

**NRG ENERGY, INC.**

Name:    David Crane

Title:    President & CEO

**EXHIBIT 12.1**

**NRG ENERGY, INC. AND SUBSIDIARIES**
**COMPUTATION OF RATIO OF EARNINGS TO FIXED CHARGES**

| | For the Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2013** | **2012** | **2011**[a] | **2010** | **2009** |
| | (in millions except ratio) | | | | |
| **Earnings:** | | | | | |
| Income/(loss) from continuing operations before income tax | $ (634) | $ (12) | $ (646) | $ 753 | $ 1,669 |
| Net income/(loss) attributable to noncontrolling interest | 34 | 20 | — | (1) | (1) |
| **Less:** | | | | | |
| Distributions and equity in earnings of unconsolidated affiliates | 84 | 2 | 9 | (19) | (41) |
| Impairment charge on equity method investment | (99) | 2 | 495 | — | — |
| Capitalized interest | (130) | (140) | (80) | (36) | (37) |
| **Add:** | | | | | |
| Fixed charges | 1,037 | 864 | 931 | 678 | 703 |
| Amortization of capitalized interest | 14 | 11 | 7 | 4 | 3 |
| **Total Earnings:** | $ 306 | $ 747 | $ 716 | $ 1,379 | $ 2,296 |
| | | | | | |
| **Fixed Charges:** | | | | | |
| Interest expense | $ 815 | $ 671 | $ 808 | $ 600 | $ 610 |
| Interest capitalized | 130 | 140 | 80 | 36 | 37 |
| Amortization of debt issuance costs | 33 | 32 | 26 | 25 | 31 |
| Amortization of debt discount | 50 | 9 | 6 | 7 | 13 |
| Approximation of interest in rental expense | 9 | 12 | 11 | 10 | 12 |
| **Total Fixed Charges:** | $ 1,037 | $ 864 | $ 931 | $ 678 | $ 703 |
| **Ratio of Earnings to Combined Fixed Charges** | 0.30 | 0.86 | 0.77 | 2.03 | 3.27 |

(a)   The ratio coverage for the year ended December 31, 2013 and 2011 was less than 1:1. NRG would have needed to generate additional earnings of $678 million and $215 million, respectively, to achieve a ratio coverage of 1:1 for those years.

EXHIBIT 12.2

**NRG ENERGY, INC. AND SUBSIDIARIES**
**COMPUTATION OF RATIO OF EARNINGS TO FIXED CHARGES**
**AND PREFERRED STOCK DIVIDEND REQUIREMENTS**

| | For the Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2013** | **2012** | **2011**[a] | **2010** | **2009** |
| | (in millions except ratio) | | | | |
| **Earnings:** | | | | | |
| Income/(loss) from continuing operations before income tax | $ (634) | $ (12) | $ (646) | $ 753 | $ 1,669 |
| Net income/(loss) attributable to noncontrolling interest | 34 | 20 | — | (1) | (1) |
| **Less:** | | | | | |
| Distributions and equity in earnings of unconsolidated affiliates | 84 | 2 | 9 | (19) | (41) |
| Impairment charge on equity method investment | (99) | 2 | 495 | — | — |
| Capitalized interest | (130) | (140) | (80) | (36) | (37) |
| Preference dividends - tax effected | (9) | (14) | (9) | (14) | (52) |
| **Add:** | | | | | |
| Fixed charges | 1,046 | 878 | 940 | 692 | 755 |
| Amortization of capitalized interest | 14 | 11 | 7 | 4 | 3 |
| **Total Earnings:** | $ 306 | $ 747 | $ 716 | $ 1,379 | $ 2,296 |
| | | | | | |
| **Fixed Charges:** | | | | | |
| Interest expense | $ 815 | $ 671 | $ 808 | $ 600 | $ 610 |
| Interest capitalized | 130 | 140 | 80 | 36 | 37 |
| Amortization of debt issuance costs | 33 | 32 | 26 | 25 | 31 |
| Amortization of debt discount | 50 | 9 | 6 | 7 | 13 |
| Approximation of interest in rental expense | 9 | 12 | 11 | 10 | 12 |
| Preference dividends - tax effected | 9 | 14 | 9 | 14 | 52 |
| **Total Fixed Charges:** | $ 1,046 | $ 878 | $ 940 | $ 692 | $ 755 |
| **Ratio of Earnings to Combined Fixed Charges and Preference Dividends** | 0.29 | 0.85 | 0.76 | 1.99 | 3.04 |

(a) The ratio coverage for the year ended December 31, 2013 and 2011 was less than 1:1. NRG would have needed to generate additional earnings of $687 million and $224 million, respectively, to achieve a ratio coverage of 1:1.

EXHIBIT 21.1

**SUBSIDIARIES OF NRG ENERGY, INC.**

| Entity Name | Jurisdiction |
|---|---|
| AC Solar Holdings LLC | Delaware |
| Ace Energy, Inc. | New York |
| AFE Marquette LLC | Wisconsin |
| Agua Caliente Solar Holdings LLC | Delaware |
| Agua Caliente Solar, LLC | Delaware |
| Allied Home Warranty GP LLC | Delaware |
| Allied Warranty LLC | Texas |
| Alta Vista SunTower, LLC | Delaware |
| Arthur Kill Gas Turbines LLC | Delaware |
| Arthur Kill Power LLC | Delaware |
| Astoria Gas Turbine Power LLC | Delaware |
| Avenal Park LLC | Delaware |
| Avenal Solar Holdings LLC | Delaware |
| Bayou Cove Peaking Power, LLC | Delaware |
| Berrians I Gas Turbine Power LLC | Delaware |
| BidURenergy, Inc. | New York |
| Big Cajun I Peaking Power LLC | Delaware |
| Big Cajun II Unit 4 LLC | Delaware |
| Big Rock SunTower, LLC | Delaware |
| bioNRG Tonawanda Inc. | Delaware |
| Bluewater Wind Delaware LLC | Delaware |
| Bluewater Wind Maryland LLC | Delaware |
| Bluewater Wind New Jersey Energy LLC | Delaware |
| Cabrillo Power I LLC | Delaware |
| Cabrillo Power II LLC | Delaware |
| Camas Power Boiler Limited Partnership | Oregon |
| Camas Power Boiler, Inc. | Oregon |
| Carbon Management Solutions LLC | Delaware |
| Carlsbad Energy Center LLC | Delaware |
| Cheng Power Systems, Inc. | Delaware |
| Chickahominy River Energy Corp. | Virginia |
| Clean Edge Energy LLC | Delaware |
| Cody SunTower, LLC | Delaware |
| Commonwealth Atlantic Power LLC | Delaware |
| Conemaugh Fuels, LLC | Delaware |
| Conemaugh Power LLC | Delaware |
| Connecticut Jet Power LLC | Delaware |
| Continental Energy, LLC | Arizona |

| | |
|---|---|
| Cottonwood Development LLC | Delaware |
| Cottonwood Energy Company LP | Delaware |
| Cottonwood Generating Partners I LLC | Delaware |
| Cottonwood Generating Partners II LLC | Delaware |
| Cottonwood Generating Partners III LLC | Delaware |
| Cottonwood Technology Partners LP | Delaware |
| Delaware Power Development LLC | Delaware |
| Desert View SunTower, LLC | Delaware |
| Devon Power LLC | Delaware |
| Dunkirk Power LLC | Delaware |
| Eastern Sierra Energy Company LLC | California |
| El Mirage Energy, LLC | Arizona |
| El Segundo Energy Center II LLC | Delaware |
| El Segundo Energy Center LLC | Delaware |
| El Segundo Power II LLC | Delaware |
| El Segundo Power, LLC | Delaware |
| Elbow Creek Wind Project LLC | Texas |
| Energy Alternatives Wholesale, LLC | Delaware |
| Energy Curtailment Specialists, Inc. | New York |
| Energy Investors Fund, L.P. | Delaware |
| Energy National, Inc. | Utah |
| Energy Plus Holdings LLC | Delaware |
| Energy Plus Natural Gas LLC | Delaware |
| Energy Protection Insurance Company | Vermont |
| Enifund, Inc. | Utah |
| Enigen, Inc. | Utah |
| ESOCO Molokai, Inc. | Utah |
| ESOCO, Inc. | Utah |
| eV2g LLC | Delaware |
| Everything Energy LLC | Delaware |
| Fairmont SunTower, LLC | Delaware |
| FUSD Energy, LLC | Arizona |
| GCE Holding LLC | Connecticut |
| GCP Funding Company, LLC | Delaware |
| GenConn Devon LLC | Connecticut |
| GenConn Energy LLC | Connecticut |
| GenConn Middletown LLC | Connecticut |
| GenOn Americas Generation, LLC | Delaware |
| GenOn Americas Procurement, Inc. | Delaware |
| GenOn Asset Management, LLC | Delaware |
| GenOn Capital Inc. | Delaware |

| | |
|---|---|
| GenOn Energy Holdings, Inc. | Delaware |
| GenOn Energy Management, LLC | Delaware |
| GenOn Energy Services, LLC | Delaware |
| GenOn Energy, Inc. | Delaware |
| GenOn Fund 2001 LLC | Delaware |
| GenOn Key/Con Fuels, LLC | Delaware |
| GenOn Mid-Atlantic Development, LLC | Delaware |
| GenOn Mid-Atlantic, LLC | Delaware |
| GenOn Northeast Management Company | Pennsylvania |
| GenOn Power Operating Services Midwest, Inc. | Delaware |
| GenOn REMA Services, Inc. | Delaware |
| GenOn Special Procurement, Inc. | Delaware |
| Geostellar, Inc. | Delaware |
| Gladstone Power Station Joint Venture | Australia |
| Granite II Holding, LLC | Delaware |
| Granite Power Partners II, L.P. | Delaware |
| Green Mountain Energy Company | Delaware |
| Green Mountain Energy Company (NY COM) LLC | Delaware |
| Green Mountain Energy Company (NY RES) LLC | Delaware |
| Gregory Partners, LLC | Delaware |
| Gregory Power Partners LLC | Delaware |
| Gröbener Logistick GmbH - Spedition, Handel und Transport | Germany |
| Hanover Energy Company | California |
| High Plains Ranch II, LLC | Delaware |
| HLE Solar Holdings, LLC | Delaware |
| HSD Solar Holdings, LLC | California |
| Hudson Valley Gas Corporation | New York |
| Huntley IGCC LLC | Delaware |
| Huntley Power LLC | Delaware |
| Independence Energy Alliance LLC | Delaware |
| Independence Energy Group LLC | Delaware |
| Independence Energy Natural Gas LLC | Delaware |
| Indian River Operations Inc. | Delaware |
| Indian River Power LLC | Delaware |
| Ivanpah Master Holdings, LLC | Delaware |
| Ivanpah Project I Holdings, LLC | Delaware |
| Ivanpah Project II Holdings, LLC | Delaware |
| Ivanpah Project III Holdings, LLC | Delaware |
| Jackson Valley Energy Partners, L.P. | California |
| James River Power LLC | Delaware |
| Kaufman Cogen LP | Delaware |

| | |
|---|---|
| Keystone Fuels, LLC | Delaware |
| Keystone Power LLC | Delaware |
| Lake Erie Properties Inc. | Delaware |
| Lambique Beheer B.V. | Netherlands |
| Langford Wind Power, LLC | Texas |
| Lone Star A/C & Appliance Repair, LLC | Texas |
| Long Beach Generation LLC | Delaware |
| Long Beach Peakers LLC | Delaware |
| Long Beach Power LLC | Delaware |
| Longhorn Energy, LLC | Arizona |
| Lot 59, LLC | Arizona |
| Louisiana Generating LLC | Delaware |
| LSP-Nelson Energy, LLC | Delaware |
| MC Asset Recovery LLC | Delaware |
| Meriden Gas Turbines LLC | Delaware |
| Middletown Power LLC | Delaware |
| Mirant (Bermuda), Ltd. | Bermuda |
| Mirant (Navotas II) Corporation | Philippines |
| Mirant AP Investments Limited | British Virgin Islands |
| Mirant Asia-Pacific Construction Limited (Hong Kong) | Hong Kong |
| Mirant Asia-Pacific Ventures, LLC | Delaware |
| Mirant Intellectual Asset Management and Marketing, LLC | Delaware |
| Mirant International Investments, Inc. | Delaware |
| Mirant Navotas Corporation | Philippines |
| Mirant New York Services, LLC | Delaware |
| Mirant Power Purchase, LLC | Delaware |
| Mirant Trust I | Delaware |
| Mirant Wrightsville Investments, Inc. | Delaware |
| Mirant Wrightsville Management, Inc. | Delaware |
| MNA Finance Corp. | Delaware |
| Monster Energy, LLC | Arizona |
| Montville IGCC LLC | Delaware |
| Montville Power LLC | Delaware |
| Natural Gas Repowering LLC | Delaware |
| NEO Chester-Gen LLC | Delaware |
| NEO Corporation | Minnesota |
| NEO Freehold-Gen LLC | Delaware |
| NEO Power Services Inc. | Delaware |
| Netherlands Antilles Holdco | Netherlands Antilles |
| Netherlands Holdco | Netherlands |
| New Genco GP, LLC | Delaware |

| | |
|---|---|
| New Jersey Power Development LLC | Delaware |
| Nexamp Winchendon Solar, LLC | Delaware |
| NINA Construction LLC | Delaware |
| NINA Investments Holdings LLC | Delaware |
| NINA Modularization LLC | Delaware |
| NINA Nuclear Training LLC | Delaware |
| NINA Steel Investments LLC | Delaware |
| NINA Texas 3 LLC | Delaware |
| NINA Texas 4 LLC | Delaware |
| Norwalk Power LLC | Delaware |
| NR GSolar Mayfair LLC | Delaware |
| NRG Acquisition Holdings Inc. | Delaware |
| NRG Affiliate Services Inc. | Delaware |
| NRG Alta Vista LLC | Delaware |
| NRG Americas, Inc. | Delaware |
| NRG Artesian Energy LLC | Delaware |
| NRG Arthur Kill Operations Inc. | Delaware |
| NRG Asia-Pacific, Ltd. | Delaware |
| NRG Astoria Gas Turbine Operations Inc. | Delaware |
| NRG Astoria Power LLC | Delaware |
| NRG Audrain Generating LLC | Delaware |
| NRG Audrain Holding LLC | Delaware |
| NRG Bayou Cove LLC | Delaware |
| NRG Bluewater Holdings LLC | Delaware |
| NRG Bluewater Wind Massachusetts LLC | Delaware |
| NRG Bourbonnais Equipment LLC | Delaware |
| NRG Bourbonnais LLC | Illinois |
| NRG Bowline, LLC | Delaware |
| NRG Brazos Valley GP LLC | Delaware |
| NRG Brazos Valley LP LLC | Delaware |
| NRG Cabrillo Power Operations Inc. | Delaware |
| NRG Cadillac Inc. | Delaware |
| NRG Cadillac Operations Inc. | Delaware |
| NRG California North, LLC | Delaware |
| NRG California Peaker Operations LLC | Delaware |
| NRG California South GP, LLC | Delaware |
| NRG California South, LP | Delaware |
| NRG Canal, LLC | Delaware |
| NRG Capital II LLC | Delaware |
| NRG Caymans Company | Cayman Islands |
| NRG Caymans-C | Cayman Islands |

| | |
|---|---|
| NRG Caymans-P | Cayman Islands |
| NRG Cedar Bayou Development Company, LLC | Delaware |
| NRG Chalk Point CT LLC | Delaware |
| NRG Chalk Point, LLC | Delaware |
| NRG CleanTech Investments LLC | Delaware |
| NRG Coal Development Company LLC | Delaware |
| NRG ComLease LLC | Delaware |
| NRG Common Stock Finance I LLC | Delaware |
| NRG Common Stock Finance II LLC | Delaware |
| NRG Connecticut Affiliate Services Inc. | Delaware |
| NRG Connecticut Peaking Development LLC | Delaware |
| NRG Construction LLC | Delaware |
| NRG Curtailment Solutions LLC | Delaware |
| NRG Delta, LLC | Delaware |
| NRG Development Company Inc. | Delaware |
| NRG Devon Operations Inc. | Delaware |
| NRG DISPATCH SERVICES LLC | Delaware |
| NRG Dunkirk Operations Inc. | Delaware |
| NRG El Segundo Operations Inc. | Delaware |
| NRG Electricity Sales Princeton LLC | Delaware |
| NRG Energy Center Corpus Christi LLC | Delaware |
| NRG Energy Center Dover LLC | Delaware |
| NRG Energy Center Eagles LLC | Delaware |
| NRG Energy Center Harrisburg LLC | Delaware |
| NRG Energy Center HCEC LLC | Delaware |
| NRG Energy Center Minneapolis LLC | Delaware |
| NRG Energy Center Omaha Holdings LLC | Delaware |
| NRG Energy Center Oxnard LLC | Delaware |
| NRG Energy Center Paxton LLC | Delaware |
| NRG Energy Center Phoenix LLC | Delaware |
| NRG Energy Center Pittsburgh LLC | Delaware |
| NRG Energy Center Princeton LLC | Delaware |
| NRG Energy Center San Diego LLC | Delaware |
| NRG Energy Center San Francisco LLC | Delaware |
| NRG Energy Center Smyrna LLC | Delaware |
| NRG Energy Center Tucson LLC | Arizona |
| NRG Energy Holdings Inc. | Delaware |
| NRG Energy Jackson Valley I, Inc. | California |
| NRG Energy Jackson Valley II, Inc. | California |
| NRG Energy Labor Services LLC | Delaware |
| NRG Energy Services Group LLC | Delaware |

| | |
|---|---|
| NRG Energy Services International Inc. | Delaware |
| NRG Energy Services LLC | Delaware |
| NRG Equipment Company LLC | Nevada |
| NRG ESA Joint Development LLC | Delaware |
| NRG EV Services LLC | Delaware |
| NRG Florida GP, LLC | Delaware |
| NRG Florida, LP | Delaware |
| NRG Gas Development Company, LLC | Delaware |
| NRG Gaskell LLC | Delaware |
| NRG Generation Holdings, Inc. | Delaware |
| NRG Gibbons Road, LLC | Delaware |
| NRG Gladstone Operating Services Pty Ltd | Australia |
| NRG Granite Acquisition LLC | Delaware |
| NRG Harrisburg Cooling LLC | Delaware |
| NRG Holdings, Inc. | Delaware |
| NRG Home & Business Solutions LLC | Delaware |
| NRG Home Solutions LLC | Delaware |
| NRG Home Solutions Product LLC | Delaware |
| NRG Homer City Services LLC | Delaware |
| NRG Huntley Operations Inc. | Delaware |
| NRG Identity Protect LLC | Delaware |
| NRG Ilion Limited Partnership | Delaware |
| NRG Ilion LP LLC | Delaware |
| NRG Independence Solar LLC | Delaware |
| NRG International II Inc. | Delaware |
| NRG International III Inc. | Delaware |
| NRG International LLC | Delaware |
| NRG Kaufman LLC | Delaware |
| NRG Kendall, LLC | Delaware |
| NRG Latin America Inc. | Delaware |
| NRG LC Facility Company LLC | Delaware |
| NRG Limestone 3, LLC | Delaware |
| NRG Lovett Development I LLC | Delaware |
| NRG Lovett, LLC | Delaware |
| NRG Maintenance Services LLC | Delaware |
| NRG Marsh Landing Holdings, LLC | Delaware |
| NRG Marsh Landing, LLC | Delaware |
| NRG MD Ash Management, LLC | Delaware |
| NRG Merger Sub, Inc. | Delaware |
| NRG Mesquite LLC | Delaware |
| NRG Mextrans Inc. | Delaware |

| | |
|---|---|
| NRG MidAtlantic Affiliate Services Inc. | Delaware |
| NRG Middletown Operations Inc. | Delaware |
| NRG Montville Operations Inc. | Delaware |
| NRG Nelson Turbines LLC | Delaware |
| NRG New Jersey Energy Sales LLC | Delaware |
| NRG New Roads Holdings LLC | Delaware |
| NRG New York, LLC | Delaware |
| NRG NM Suntower LLC | Delaware |
| NRG North America, LLC | Delaware |
| NRG North Central Operations Inc. | Delaware |
| NRG Northeast Affiliate Services Inc. | Delaware |
| NRG Northeast Generation, Inc. | Delaware |
| NRG Northeast Holdings, Inc. | Delaware |
| NRG Norwalk Harbor Operations Inc. | Delaware |
| NRG Ohio Pipeline Company LLC | Delaware |
| NRG Operating Services, Inc. | Delaware |
| NRG Oswego Harbor Power Operations Inc. | Delaware |
| NRG PacGen Inc. | Delaware |
| NRG Peaker Finance Company LLC | Delaware |
| NRG Pennsylvania Pipeline Company LLC | Delaware |
| NRG Piney Point, LLC | Delaware |
| NRG Potomac River, LLC | Delaware |
| NRG Potrero Development LLC | Delaware |
| NRG Potrero, LLC | Delaware |
| NRG Power Generation Assets, LLC | Delaware |
| NRg Power Generation, LLC | Delaware |
| NRG Power Marketing LLC | Delaware |
| NRG Power Midwest GP, LLC | Delaware |
| NRG Power Midwest, LP | Delaware |
| NRG Procurement Company LLC | Nevada |
| NRG Reliability Solutions LLC | Delaware |
| NRG REMA, LLC | Delaware |
| NRG Renter's Protection LLC | Delaware |
| NRG Repowering Holdings LLC | Delaware |
| NRG Residential Solar Solutions Leasing II LLC | Delaware |
| NRG Residential Solar Solutions LLC | Delaware |
| NRG Retail LLC | Delaware |
| NRG Retail Northeast LLC | Delaware |
| NRG Rockford Acquisition LLC | Delaware |
| NRG Rockford Equipment II LLC | Illinois |
| NRG Rockford Equipment LLC | Illinois |

| | |
|---|---|
| NRG Rockford II LLC | Illinois |
| NRG Rockford LLC | Illinois |
| NRG Rocky Road LLC | Delaware |
| NRG Sabine (Delaware), Inc. | Delaware |
| NRG Sabine (Texas), Inc. | Delaware |
| NRG Saguaro Operations Inc. | Delaware |
| NRG San Gabriel Power Generation, LLC | Delaware |
| NRG SanGencisco LLC | Delaware |
| NRG Security LLC | Delaware |
| NRG Services Corporation | Delaware |
| NRG Sherbino LLC | Delaware |
| NRG Silver City Bond Purchaser LLC | Delaware |
| NRG SimplySmart Solutions LLC | Delaware |
| NRG Solar Alpine II LLC | Delaware |
| NRG Solar Alpine LLC | Delaware |
| NRG Solar Anasco LLC | Delaware |
| NRG Solar Apple II LLC | Delaware |
| NRG Solar Apple LLC | Delaware |
| NRG Solar Arrowhead LLC | Delaware |
| NRG Solar Asset Management LLC | Delaware |
| NRG Solar AV Holdco LLC | Delaware |
| NRG Solar Avra Valley LLC | Delaware |
| NRG Solar Blythe II LLC | Delaware |
| NRG Solar Blythe III LLC | Delaware |
| NRG Solar Blythe IV LLC | Delaware |
| NRG Solar Blythe LLC | Delaware |
| NRG Solar Blythe V LLC | Delaware |
| NRG Solar Borrego Holdco LLC | Delaware |
| NRG Solar Borrego I LLC | Delaware |
| NRG Solar Borrego II LLC | Delaware |
| NRG Solar Caribe LLC | Delaware |
| NRG Solar Community Holdco LLC | Delaware |
| NRG Solar CVSR Holdings 2 LLC | Delaware |
| NRG Solar CVSR Holdings LLC | Delaware |
| NRG Solar Desert Center II LLC | Delaware |
| NRG Solar Desert Center LLC | Delaware |
| NRG Solar DG LLC | Delaware |
| NRG Solar DOD 1 LLC | Delaware |
| NRG Solar Gaskell LLC | Delaware |
| NRG Solar Gecko LLC | Delaware |
| NRG Solar Green Valley LLC | Delaware |

| | |
|---|---|
| NRG Solar Guam LLC | Delaware |
| NRG Solar Hyder I LLC | Delaware |
| NRG Solar Hyder II LLC | Delaware |
| NRG Solar Hyder III LLC | Delaware |
| NRG Solar Iguana LLC | Delaware |
| NRG Solar Isabela LLC | Delaware |
| NRG Solar Ivanpah LLC | Delaware |
| NRG Solar Juncos LLC | Delaware |
| NRG Solar Kansas South Holdings LLC | Delaware |
| NRG Solar Kansas South LLC | Delaware |
| NRG Solar Las Vegas MB 1 LLC | Delaware |
| NRG Solar LLC | Delaware |
| NRG Solar Mayfair LLC | |
| NRG Solar Montecristi LLC | Delaware |
| NRG Solar Oasis LLC | Delaware |
| NRG Solar Pacific LLC | Delaware |
| NRG Solar PV LLC | Delaware |
| NRG Solar Ring LLC | Delaware |
| NRG Solar Roadrunner Holdings LLC | Delaware |
| NRG Solar Roadrunner LLC | Delaware |
| NRG Solar Sabana Grande LLC | Delaware |
| NRG Solar Santiago LLC | Delaware |
| NRG Solar SBV LLC | Delaware |
| NRG Solar SC Stadium LLC | Delaware |
| NRG Solar Star LLC | Delaware |
| NRG Solar Sunora LLC | Delaware |
| NRG Solar Sunrise LLC | Delaware |
| NRG Solar Tabernacle LLC | Delaware |
| NRG Solar Ventures LLC | Delaware |
| NRG Solar Wharton LLC | Delaware |
| NRG South Central Affiliate Services Inc. | Delaware |
| NRG South Central Generating LLC | Delaware |
| NRG South Central Operations Inc. | Delaware |
| NRG South Texas LP | Texas |
| NRG South Trent Holdings LLC | Delaware |
| NRG Southaven LLC | Delaware |
| NRG Sterlington Power LLC | Delaware |
| NRG SunCap Leasing I LLC | Delaware |
| NRG Switchyard Energy LLC | Delaware |
| NRG Tank Farm, LLC | Delaware |
| NRG Telogia Power LLC | Delaware |

| | |
|---|---|
| NRG Texas C&I Supply LLC | Delaware |
| NRG Texas Gregory LLC | Delaware |
| NRG Texas Holding Inc. | Delaware |
| NRG Texas LLC | Delaware |
| NRG Texas Power LLC | Delaware |
| NRG Texas Retail LLC | Delaware |
| NRG Thermal LLC | Delaware |
| NRG Thermal Solar LLC | Delaware |
| NRG Transmission Holdings LLC | Delaware |
| NRG UNEMPLOYMENT PROTECTION LLC | Delaware |
| NRG Victoria I Pty Ltd | Australia |
| NRG WARRANTY SERVICES LLC | Delaware |
| NRG West Coast LLC | Delaware |
| NRG West Holdings LLC | Delaware |
| NRG Western Affiliate Services Inc. | Delaware |
| NRG Wholesale Generation GP, LLC | Delaware |
| NRG Wholesale Generation, LP | Delaware |
| NRG Willow Pass, LLC | Delaware |
| NRG Wind Development Company, LLC | Delaware |
| NRG Yield LLC | Delaware |
| NRG Yield Operating LLC | Delaware |
| NRG Yield, Inc. | Delaware |
| NRGenerating German Holdings GmbH | Switzerland |
| NRGenerating International B.V. | Netherlands |
| NRGenerating Luxembourg (No. 1) S.a.r.l. | Luxembourg |
| NRGenerating Luxembourg (No. 2) S.a.r.l. | Luxembourg |
| Nuclear Innovation North America Investments LLC | Delaware |
| Nuclear Innovation North America LLC | Delaware |
| O Brien Cogeneration, Inc. II | Delaware |
| OC Solar 2010, LLC | California |
| ONSITE Energy, Inc. | Oregon |
| Orion Power New York GP, Inc. | Delaware |
| Orion Power New York LP, LLC | Delaware |
| Orion Power New York, L.P. | Delaware |
| Oswego Harbor Power LLC | Delaware |
| Pacific Crockett Holdings, Inc. | Oregon |
| Pacific Generation Company | Oregon |
| Pacific Generation Holdings Company | Oregon |
| Pacific-Mt. Poso Corporation | Oregon |
| PESD Energy, LLC | Arizona |
| Petra Nova CCS I LLC | Delaware |

| | |
|---|---|
| Petra Nova Holdings LLC | Delaware |
| Petra Nova LLC | Delaware |
| Petra Nova Parish Holdings LLC | Delaware |
| Petra Nova Power I LLC | Delaware |
| PFMG 2011 Finance Holdco, LLC | Delaware |
| PFMG Apple I LLC | Delaware |
| PM Solar Holdings, LLC | California |
| Project Finance Fund III, L.P. | Delaware |
| ProSun Solar Development Company, LLC | Delaware |
| RE Retail Receivables, LLC | Delaware |
| Reliant Energy Charitable Foundation | Delaware |
| Reliant Energy Northeast LLC | Delaware |
| Reliant Energy Power Supply, LLC | Delaware |
| Reliant Energy Retail Holdings, LLC | Delaware |
| Reliant Energy Retail Services, LLC | Delaware |
| RERH Holdings, LLC | Delaware |
| Roadrunner SunTower, LLC | Delaware |
| RRI Energy Broadband, Inc. | Delaware |
| RRI Energy Channelview (Delaware), LLC | Delaware |
| RRI Energy Channelview (Texas), LLC | Delaware |
| RRI Energy Channelview LP | Delaware |
| RRI Energy Communications, Inc. | Delaware |
| RRI Energy Services Channelview LLC | Delaware |
| RRI Energy Services Desert Basin, LLC | Delaware |
| RRI Energy Services, LLC | Delaware |
| RRI Energy Solutions East, LLC | Delaware |
| RRI Energy Trading Exchange, Inc. | Delaware |
| RRI Energy Ventures, Inc. | Delaware |
| Sabine Cogen, L.P. | Delaware |
| Sachsen Holding B.V. | Netherlands |
| Saguaro Power Company, a Limited Partnership | California |
| Saguaro Power LLC | Delaware |
| San Joaquin Valley Energy I, Inc. | California |
| San Joaquin Valley Energy IV, Inc. | California |
| San Joaquin Valley Energy Partners I, L.P | California |
| Sand Drag LLC | Delaware |
| SCWFD Energy, LLC | Arizona |
| Seawall Solar 1 LLC | Delaware |
| Seawall Solar 10 LLC | Delaware |
| Seawall Solar 2 LLC | Delaware |
| Seawall Solar 3 LLC | Delaware |

| | |
|---|---|
| Seawall Solar 4 LLC | Delaware |
| Seawall Solar 5 LLC | Delaware |
| Seawall Solar 6 LLC | Delaware |
| Seawall Solar 7 LLC | Delaware |
| Seawall Solar 8 LLC | Delaware |
| Seawall Solar 9 LLC | Delaware |
| Seawall Solar Holdings LLC | Delaware |
| Sherbino I Wind Farm LLC | Delaware |
| Sol Orchard Community 1 LLC | Delaware |
| Solar Flagstaff One LLC | Delaware |
| Solar Pacific LLC | Delaware |
| Solar Partners I, LLC | Delaware |
| Solar Partners II, LLC | Delaware |
| Solar Partners VIII, LLC | Delaware |
| Solar Power Partners, Inc. | Delaware |
| Somerset Operations Inc. | Delaware |
| Somerset Power LLC | Delaware |
| South Trent Wind LLC | Delaware |
| SPP AMCo, LLC | Delaware |
| SPP Asset Holdings, LLC | Delaware |
| SPP DG DevCo 3a, LLC | Delaware |
| SPP DG DevCo 4a, LLC | Delaware |
| SPP DU DevCo, LLC | Delaware |
| SPP Fund II Holdings, LLC | Delaware |
| SPP Fund II Master Tenant, LLC | Delaware |
| SPP Fund II Mgmt, LLC | Delaware |
| SPP Fund II, LLC | Delaware |
| SPP Fund II-B, LLC | Delaware |
| SPP Fund III Construction Holdings, LLC | Delaware |
| SPP Fund III Holdings, LLC | Delaware |
| SPP Fund III Master Tenant, LLC | Delaware |
| SPP Fund III Mgmt, LLC | Delaware |
| SPP Fund III, LLC | Delaware |
| SPP GALAXY, INC. | Delaware |
| SPP III Fundings, LLC | Delaware |
| SPP Lease Holdings, LLC | Delaware |
| SPP OpCo, LLC | Delaware |
| SPP P-IV Construction, LLC | Delaware |
| SPP P-IV Master Lessee, LLC | Delaware |
| SPP Selco, LLC | Delaware |
| Statoil Energy Power/Pennsylvania, Inc. | Pennsylvania |

| | |
|---|---|
| Sun City Project LLC | Delaware |
| Sunora Energy Construction Holdings LLC | Delaware |
| Sunora Energy Solutions I LLC | Delaware |
| Sunora Energy Solutions II LLC | Delaware |
| Sunora Energy Solutions Limited Partnership | Delaware |
| Sunora PA Construction Services LLC | Delaware |
| Sunshine State Power (No. 2) B.V. | Netherlands |
| Sunshine State Power B.V. | Netherlands |
| TA- High Desert, LLC | California |
| Tacoma Energy Recovery Company | Delaware |
| TCV Pipeline, LLC | Delaware |
| Texas Coastal Ventures, LLC | Delaware |
| Texas Genco Financing Corp. | Delaware |
| Texas Genco GP, LLC | Texas |
| Texas Genco Holdings, Inc. | Texas |
| Texas Genco LP, LLC | Delaware |
| Texas Genco Operating Services, LLC | Delaware |
| Texas Genco Services, LP | Texas |
| Turners Falls Limited Partnership | Delaware |
| US Retailers LLC | Delaware |
| USSV Land Company LLC | Delaware |
| Vail Energy, LLC | Arizona |
| Vienna Operations Inc. | Delaware |
| Vienna Power LLC | Delaware |
| WCP (Generation) Holdings LLC | Delaware |
| West Coast Power LLC | Delaware |
| Wildcat Energy, LLC | Arizona |
| WSD Solar Holdings, LLC | Delaware |

**EXHIBIT 23.1**

**Consent of Independent Registered Public Accounting Firm**

The Board of Directors
NRG Energy, Inc.:

We consent to the incorporation by reference in the registration statement (No. 333-185501) on Form S-8, (No. 333-182379) on Form S-8, (No. 333-171318) on Form S-8, (No. 333-151992) on Form S-8, (No. 333-135973) on Form S-8, (No. 333-114007) on Form S-8, (No. 333-123677) on Form S-3, (No. 333-183334) on Form S-4, (No. 333-178024) on Form S-4, (No. 333-175470) on Form S-4, (No. 333-171323) on Form S-4, and (No. 333-187445) on Form S-4 of NRG Energy, Inc. of our reports dated February 28, 2014, with respect to the consolidated balance sheets of NRG Energy, Inc. and subsidiaries as of December 31, 2013 and 2012, and the related consolidated statements of operations, comprehensive income/(loss), cash flows, and stockholders' equity for each of the years in the three-year period ended December 31, 2013, and the related financial statement schedule, and the effectiveness of internal control over financial reporting as of December 31, 2013, which reports appear in the December 31, 2013 annual report on Form 10-K of NRG Energy, Inc.

/s/ KPMG LLP
KPMG LLP

Philadelphia, Pennsylvania
February 28, 2014

**EXHIBIT 31.1**

**CERTIFICATION**

I, David W. Crane, certify that:

1.      I have reviewed this annual report on Form 10-K of NRG Energy, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

      (a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

      (b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

      (c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

      (d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

      (a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

      (b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/ DAVID W. CRANE

David W. Crane
*Chief Executive Officer*
*(Principal Executive Officer)*

Date: February 28, 2014

**EXHIBIT 31.2**

**CERTIFICATION**

I, Kirkland B. Andrews, certify that:

1. I have reviewed this annual report on Form 10-K of NRG Energy, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/ KIRKLAND B. ANDREWS
Kirkland B. Andrews
*Chief Financial Officer*
*(Principal Financial Officer)*

Date: February 28, 2014

**EXHIBIT 31.3**

**CERTIFICATION**

I, Ronald B. Stark, certify that:

1.     I have reviewed this annual report on Form 10-K of NRG Energy, Inc.;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/ RONALD B. STARK
_____

Ronald B. Stark
*Chief Accounting Officer*
*(Principal Accounting Officer)*

Date: February 28, 2014

**EXHIBIT 32**

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of NRG Energy, Inc. on Form 10-K for the year ended December 31, 2013, as filed with the Securities and Exchange Commission on the date hereof (the "Form 10-K"), each of the undersigned officers of the Company certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to such officer's knowledge:

(1)  The Form 10-K fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)  The information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods expressed in the Form 10-K.

Date: February 28, 2014

/s/ DAVID W. CRANE
_____
David W. Crane
*Chief Executive Officer*
*(Principal Executive Officer)*

/s/ KIRKLAND B. ANDREWS
_____
Kirkland B. Andrews
*Chief Financial Officer*
*(Principal Financial Officer)*

/s/ RONALD B. STARK
_____
Ronald B. Stark
*Chief Accounting Officer*
*(Principal Accounting Officer)*

The foregoing certification is being furnished solely pursuant to 18 U.S.C. Section 1350 and is not being filed as part of this Form 10-K or as a separate disclosure document.

A signed original of this written statement required by Section 906, or other document authenticating, acknowledging or otherwise adopting the signature that appears in typed form within the electronic version of this written statement required by Section 906, has been provided to NRG Energy, Inc. and will be retained by NRG Energy, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

## **Appendix N**

Henry Hub Natural Gas Spot Prices,http://www.eia.gov/dnav/ng/hist/rngwhhdd.htm (last visited April 26, 2014)



U.S. Energy Information
Administration

## NATURAL GAS

OVERVIEW | DATA | ANALYSIS & PROJECTIONS                 GLOSSARY ›   FAQS ›

View History:  ◉ Daily  ○ Weekly  ○ Monthly  ○ Annual        Download Data (XLS File)

**Henry Hub Natural Gas Spot Price**

Dollars per Million Btu



— Henry Hub Natural Gas Spot Price

Source: U.S. Energy Information Administration

Chart Tools

no analysis applied ▾

### Henry Hub Natural Gas Spot Price (Dollars per Million Btu)

| Week Of | Mon | Tue | Wed | Thu | Fri |
|---|---|---|---|---|---|
| 1997 Jan- 6 to Jan-10 | | 3.82 | 3.80 | 3.61 | 3.92 |
| 1997 Jan-13 to Jan-17 | 4.00 | 4.01 | 4.34 | 4.71 | 3.91 |
| 1997 Jan-20 to Jan-24 | 3.26 | 2.99 | 3.05 | 2.96 | 2.62 |
| 1997 Jan-27 to Jan-31 | 2.98 | 3.05 | 2.91 | 2.86 | 2.77 |
| 1997 Feb- 3 to Feb- 7 | 2.49 | 2.59 | 2.65 | 2.51 | 2.39 |
| 1997 Feb-10 to Feb-14 | 2.42 | 2.34 | 2.42 | 2.22 | 2.12 |
| 1997 Feb-17 to Feb-21 | | 1.84 | 1.95 | 1.92 | 1.92 |
| 1997 Feb-24 to Feb-28 | 1.92 | 1.77 | 1.81 | 1.80 | 1.78 |
| 1997 Mar- 3 to Mar- 7 | 1.80 | 1.87 | 1.92 | 1.82 | 1.89 |
| 1997 Mar-10 to Mar-14 | 1.95 | 1.92 | 1.96 | 1.98 | 1.97 |
| 1997 Mar-17 to Mar-21 | 2.01 | 1.91 | 1.88 | 1.88 | 1.87 |
| 1997 Mar-24 to Mar-28 | 1.80 | 1.85 | 1.85 | 1.84 | |
| 1997 Mar-31 to Apr- 4 | 1.84 | 1.95 | 1.85 | 1.87 | 1.91 |
| 1997 Apr- 7 to Apr-11 | 1.99 | 2.01 | 1.96 | 1.97 | 1.98 |
| 1997 Apr-14 to Apr-18 | 2.00 | 2.00 | 2.02 | 2.08 | 2.10 |
| 1997 Apr-21 to Apr-25 | 2.09 | 2.10 | 2.22 | 2.11 | 2.16 |
| 1997 Apr-28 to May- 2 | 2.10 | 2.09 | 2.16 | 2.19 | 2.21 |
| 1997 May- 5 to May- 9 | 2.23 | 2.25 | 2.34 | 2.33 | 2.30 |
| 1997 May-12 to May-16 | 2.27 | 2.18 | 2.22 | 2.25 | 2.19 |
| 1997 May-19 to May-23 | 2.25 | 2.22 | 2.21 | 2.22 | 2.20 |
| 1997 May-26 to May-30 | | 2.29 | 2.34 | 2.29 | 2.23 |
| 1997 Jun- 2 to Jun- 6 | 2.20 | 2.11 | 2.19 | 2.18 | 2.19 |
| 1997 Jun- 9 to Jun-13 | 2.19 | 2.16 | 2.16 | 2.14 | 2.15 |
| 1997 Jun-16 to Jun-20 | 2.20 | 2.20 | 2.22 | 2.23 | 2.25 |
| 1997 Jun-23 to Jun-27 | 2.29 | 2.32 | 2.32 | 2.23 | 2.17 |
| 1997 Jun-30 to Jul- 4 | 2.17 | 2.16 | 2.14 | 2.11 | |
| 1997 Jul- 7 to Jul-11 | 2.13 | 2.13 | 2.16 | 2.15 | 2.16 |
| 1997 Jul-14 to Jul-18 | 2.18 | 2.21 | 2.24 | 2.29 | 2.26 |

| Period | | | | | |
|---|---|---|---|---|---|
| 1997 Jul-21 to Jul-25 | 2.17 | 2.18 | 2.20 | 2.24 | 2.22 |
| 1997 Jul-28 to Aug- 1 | 2.19 | 2.23 | 2.19 | 2.23 | 2.24 |
| 1997 Aug- 4 to Aug- 8 | 2.26 | 2.33 | 2.38 | 2.50 | 2.38 |
| 1997 Aug-11 to Aug-15 | 2.53 | 2.56 | 2.45 | 2.57 | 2.53 |
| 1997 Aug-18 to Aug-22 | 2.56 | 2.61 | 2.62 | 2.45 | 2.47 |
| 1997 Aug-25 to Aug-29 | 2.53 | 2.58 | 2.51 | 2.57 | 2.69 |
| 1997 Sep- 1 to Sep- 5 | | 2.82 | 2.86 | 2.73 | 2.67 |
| 1997 Sep- 8 to Sep-12 | 2.67 | 2.74 | 2.74 | 2.78 | 2.86 |
| 1997 Sep-15 to Sep-19 | 2.88 | 2.83 | 2.75 | 2.84 | 2.94 |
| 1997 Sep-22 to Sep-26 | 2.98 | 3.09 | 3.03 | 3.05 | 3.24 |
| 1997 Sep-29 to Oct- 3 | 3.09 | 2.96 | 3.08 | 2.97 | 2.91 |
| 1997 Oct- 6 to Oct-10 | 2.96 | 2.81 | 2.80 | 2.80 | 2.78 |
| 1997 Oct-13 to Oct-17 | 2.87 | 2.84 | 2.84 | 2.94 | 2.97 |
| 1997 Oct-20 to Oct-24 | 3.05 | 3.13 | 3.24 | 3.34 | 3.29 |
| 1997 Oct-27 to Oct-31 | 3.46 | 3.61 | 3.45 | 3.34 | 3.22 |
| 1997 Nov- 3 to Nov- 7 | 3.23 | 3.15 | 3.18 | 3.20 | 3.05 |
| 1997 Nov-10 to Nov-14 | 3.20 | 3.26 | 3.28 | 3.27 | 3.25 |
| 1997 Nov-17 to Nov-21 | 3.10 | 3.00 | 2.97 | 2.77 | 2.59 |
| 1997 Nov-24 to Nov-28 | 2.63 | 2.51 | 2.50 | | |
| 1997 Dec- 1 to Dec- 5 | 2.52 | 2.61 | 2.53 | 2.48 | 2.42 |
| 1997 Dec- 8 to Dec-12 | 2.30 | 2.35 | 2.45 | 2.30 | 2.30 |
| 1997 Dec-15 to Dec-19 | 2.25 | 2.29 | 2.38 | 2.37 | 2.39 |
| 1997 Dec-22 to Dec-26 | 2.36 | 2.24 | 2.06 | | 2.18 |
| 1997 Dec-29 to Jan- 2 | 2.33 | 2.27 | 2.27 | | 2.16 |
| 1998 Jan- 5 to Jan- 9 | 2.05 | 2.16 | 2.13 | 2.11 | 2.09 |
| 1998 Jan-12 to Jan-16 | 2.01 | 2.03 | 2.05 | 2.07 | 2.11 |
| 1998 Jan-19 to Jan-23 | | 2.12 | 2.09 | 2.10 | 2.14 |
| 1998 Jan-26 to Jan-30 | 2.09 | 2.06 | 2.09 | 2.07 | 2.09 |
| 1998 Feb- 2 to Feb- 6 | 2.23 | 2.27 | 2.23 | 2.31 | 2.35 |
| 1998 Feb- 9 to Feb-13 | 2.25 | 2.18 | 2.21 | 2.20 | 2.22 |
| 1998 Feb-16 to Feb-20 | | 2.18 | 2.19 | 2.22 | 2.20 |
| 1998 Feb-23 to Feb-27 | 2.20 | 2.19 | 2.21 | 2.28 | 2.23 |
| 1998 Mar- 2 to Mar- 6 | 2.26 | 2.24 | 2.19 | 2.12 | 2.10 |
| 1998 Mar- 9 to Mar-13 | 2.17 | 2.25 | 2.25 | 2.23 | 2.21 |
| 1998 Mar-16 to Mar-20 | 2.20 | 2.20 | 2.21 | 2.25 | 2.28 |
| 1998 Mar-23 to Mar-27 | 2.33 | 2.29 | 2.33 | 2.29 | 2.26 |
| 1998 Mar-30 to Apr- 3 | 2.32 | 2.34 | 2.45 | 2.43 | 2.51 |
| 1998 Apr- 6 to Apr-10 | 2.51 | 2.51 | 2.65 | 2.61 | |
| 1998 Apr-13 to Apr-17 | 2.52 | 2.42 | 2.48 | 2.48 | 2.40 |
| 1998 Apr-20 to Apr-24 | 2.40 | 2.46 | 2.46 | 2.35 | 2.31 |
| 1998 Apr-27 to May- 1 | 2.29 | 2.27 | 2.29 | 2.18 | 2.11 |
| 1998 May- 4 to May- 8 | 2.10 | 2.19 | 2.12 | 2.16 | 2.11 |
| 1998 May-11 to May-15 | 2.19 | 2.23 | 2.24 | 2.18 | 2.18 |
| 1998 May-18 to May-22 | 2.19 | 2.17 | 2.18 | 2.11 | 2.02 |
| 1998 May-25 to May-29 | | 2.10 | 2.10 | 2.04 | 2.10 |
| 1998 Jun- 1 to Jun- 5 | 2.10 | 2.20 | 2.13 | 2.04 | 2.01 |
| 1998 Jun- 8 to Jun-12 | 2.00 | 2.01 | 1.98 | 1.99 | 2.01 |
| 1998 Jun-15 to Jun-19 | 2.08 | 2.10 | 2.05 | 2.14 | 2.20 |
| 1998 Jun-22 to Jun-26 | 2.35 | 2.35 | 2.40 | 2.39 | 2.40 |
| 1998 Jun-29 to Jul- 3 | 2.36 | 2.39 | 2.46 | 2.36 | |
| 1998 Jul- 6 to Jul-10 | 2.38 | 2.35 | 2.39 | 2.38 | 2.32 |
| 1998 Jul-13 to Jul-17 | 2.30 | 2.23 | 2.21 | 2.15 | 2.15 |
| 1998 Jul-20 to Jul-24 | 2.18 | 2.09 | 2.00 | 2.00 | 1.97 |
| 1998 Jul-27 to Jul-31 | 2.00 | 1.97 | 1.99 | 1.95 | 1.85 |
| 1998 Aug- 3 to Aug- 7 | 1.84 | 1.90 | 1.91 | 1.85 | 1.82 |
| 1998 Aug-10 to Aug-14 | 1.87 | 1.87 | 1.85 | 1.83 | 1.83 |
| 1998 Aug-17 to Aug-21 | 1.93 | 1.94 | 1.96 | 1.90 | 1.93 |
| 1998 Aug-24 to Aug-28 | 1.90 | 1.89 | 1.83 | 1.76 | 1.66 |
| 1998 Aug-31 to Sep- 4 | 1.61 | 1.84 | 1.72 | 1.71 | 1.71 |
| 1998 Sep- 7 to Sep-11 | | 1.81 | 1.78 | 1.88 | 1.86 |
| 1998 Sep-14 to Sep-18 | 1.86 | 1.94 | 2.15 | 2.12 | 2.27 |
| 1998 Sep-21 to Sep-25 | 2.18 | 2.29 | 2.19 | 2.17 | 2.38 |
| 1998 Sep-28 to Oct- 2 | 2.23 | 2.06 | 2.22 | 2.33 | 2.14 |
| 1998 Oct- 5 to Oct- 9 | 2.09 | 2.01 | 2.05 | 2.02 | 1.80 |
| 1998 Oct-12 to Oct-16 | 1.75 | 1.70 | 1.80 | 1.75 | 1.64 |
| 1998 Oct-19 to Oct-23 | 1.74 | 1.95 | 2.04 | 1.95 | 1.84 |
| 1998 Oct-26 to Oct-30 | 1.92 | 1.85 | 1.70 | 2.00 | 2.00 |
| 1998 Nov- 2 to Nov- 6 | 1.84 | 2.10 | 2.11 | 2.26 | 2.25 |

| | | | | |
|---|---|---|---|---|
| 1998 Nov- 9 to Nov-13 | 2.28 | 2.30 | 2.33 | 2.21 | 2.21 |
| 1998 Nov-16 to Nov-20 | 2.19 | 2.12 | 2.10 | 2.10 | 2.07 |
| 1998 Nov-23 to Nov-27 | 2.02 | 2.08 | 2.13 | | |
| 1998 Nov-30 to Dec- 4 | 1.63 | 1.41 | 1.40 | 1.21 | 1.05 |
| | | | | | |
| 1998 Dec- 7 to Dec-11 | 1.44 | 1.79 | 1.64 | 1.59 | 1.55 |
| 1998 Dec-14 to Dec-18 | 1.80 | 1.86 | 1.95 | 2.02 | 2.02 |
| 1998 Dec-21 to Dec-25 | 2.05 | 1.96 | 1.88 | 1.89 | |
| 1998 Dec-28 to Jan- 1 | 1.79 | 1.82 | 1.81 | 1.95 | |
| 1999 Jan- 4 to Jan- 8 | 2.10 | 2.05 | 2.04 | 1.91 | 1.90 |
| | | | | | |
| 1999 Jan-11 to Jan-15 | 1.83 | 1.82 | 1.87 | 1.77 | 1.78 |
| 1999 Jan-18 to Jan-22 | | 1.77 | 1.81 | 1.85 | 1.82 |
| 1999 Jan-25 to Jan-29 | 1.76 | 1.73 | 1.75 | 1.75 | 1.83 |
| 1999 Feb- 1 to Feb- 5 | 1.75 | 1.78 | 1.80 | 1.79 | 1.81 |
| 1999 Feb- 8 to Feb-12 | 1.81 | 1.82 | 1.80 | 1.78 | 1.82 |
| | | | | | |
| 1999 Feb-15 to Feb-19 | | 1.79 | 1.79 | 1.80 | 1.79 |
| 1999 Feb-22 to Feb-26 | 1.77 | 1.75 | 1.73 | 1.64 | 1.63 |
| 1999 Mar- 1 to Mar- 5 | 1.65 | 1.67 | 1.68 | 1.72 | 1.74 |
| 1999 Mar- 8 to Mar-12 | 1.87 | 1.86 | 1.94 | 1.87 | 1.81 |
| 1999 Mar-15 to Mar-19 | 1.75 | 1.75 | 1.75 | 1.75 | 1.73 |
| | | | | | |
| 1999 Mar-22 to Mar-26 | 1.74 | 1.80 | 1.79 | 1.80 | 1.83 |
| 1999 Mar-29 to Apr- 2 | 1.80 | 1.89 | 2.02 | 1.95 | |
| 1999 Apr- 5 to Apr- 9 | 2.03 | 1.98 | 2.03 | 2.07 | 2.10 |
| 1999 Apr-12 to Apr-16 | 2.06 | 2.14 | 2.11 | 2.14 | 2.14 |
| 1999 Apr-19 to Apr-23 | 2.10 | 2.18 | 2.17 | 2.24 | 2.23 |
| | | | | | |
| 1999 Apr-26 to Apr-30 | 2.23 | 2.32 | 2.31 | 2.37 | 2.25 |
| 1999 May- 3 to May- 7 | 2.23 | 2.32 | 2.36 | 2.32 | 2.25 |
| 1999 May-10 to May-14 | 2.25 | 2.29 | 2.19 | 2.21 | 2.28 |
| 1999 May-17 to May-21 | 2.31 | 2.30 | 2.27 | 2.26 | 2.21 |
| 1999 May-24 to May-28 | 2.19 | 2.18 | 2.22 | 2.27 | 2.29 |
| | | | | | |
| 1999 May-31 to Jun- 4 | | 2.34 | 2.36 | 2.35 | 2.31 |
| 1999 Jun- 7 to Jun-11 | 2.41 | 2.38 | 2.39 | 2.37 | 2.30 |
| 1999 Jun-14 to Jun-18 | 2.29 | 2.28 | 2.28 | 2.24 | 2.24 |
| 1999 Jun-21 to Jun-25 | 2.22 | 2.23 | 2.25 | 2.26 | 2.27 |
| 1999 Jun-28 to Jul- 2 | 2.25 | 2.33 | 2.34 | 2.29 | 2.26 |
| | | | | | |
| 1999 Jul- 5 to Jul- 9 | | 2.29 | 2.20 | 2.19 | 2.17 |
| 1999 Jul-12 to Jul-16 | 2.12 | 2.14 | 2.16 | 2.12 | 2.18 |
| 1999 Jul-19 to Jul-23 | 2.20 | 2.24 | 2.25 | 2.32 | 2.42 |
| 1999 Jul-26 to Jul-30 | 2.55 | 2.55 | 2.58 | 2.67 | 2.55 |
| 1999 Aug- 2 to Aug- 6 | 2.51 | 2.61 | 2.64 | 2.69 | 2.69 |
| | | | | | |
| 1999 Aug- 9 to Aug-13 | 2.73 | 2.77 | 2.79 | 2.73 | 2.71 |
| 1999 Aug-16 to Aug-20 | 2.73 | 2.70 | 2.75 | 2.87 | 2.97 |
| 1999 Aug-23 to Aug-27 | 2.95 | 3.01 | 3.10 | 2.97 | 2.87 |
| 1999 Aug-30 to Sep- 3 | 2.85 | 2.84 | 2.71 | 2.56 | 2.47 |
| 1999 Sep- 6 to Sep-10 | | 2.56 | 2.66 | 2.75 | 2.84 |
| | | | | | |
| 1999 Sep-13 to Sep-17 | 2.80 | 2.66 | 2.52 | 2.47 | 2.45 |
| 1999 Sep-20 to Sep-24 | 2.49 | 2.33 | 2.30 | 2.45 | 2.54 |
| 1999 Sep-27 to Oct- 1 | 2.51 | 2.52 | 2.57 | 2.31 | 2.39 |
| 1999 Oct- 4 to Oct- 8 | 2.49 | 2.45 | 2.48 | 2.49 | 2.35 |
| 1999 Oct-11 to Oct-15 | 2.53 | 2.65 | 2.81 | 2.70 | 2.66 |
| | | | | | |
| 1999 Oct-18 to Oct-22 | 2.82 | 2.89 | 2.90 | 2.99 | 3.00 |
| 1999 Oct-25 to Oct-29 | 2.98 | 2.96 | 3.02 | 2.97 | 2.76 |
| 1999 Nov- 1 to Nov- 5 | 2.73 | 2.81 | 2.82 | 2.75 | 2.62 |
| 1999 Nov- 8 to Nov-12 | 2.59 | 2.44 | 2.39 | 2.38 | 2.16 |
| 1999 Nov-15 to Nov-19 | 2.33 | 2.23 | 2.24 | 2.22 | 2.16 |
| | | | | | |
| 1999 Nov-22 to Nov-26 | 2.05 | 1.99 | 1.96 | | |
| 1999 Nov-29 to Dec- 3 | 2.25 | 2.22 | 2.17 | 2.18 | 2.16 |
| 1999 Dec- 6 to Dec-10 | 2.19 | 2.16 | 2.23 | 2.20 | 2.27 |
| 1999 Dec-13 to Dec-17 | 2.35 | 2.49 | 2.54 | 2.52 | 2.55 |
| 1999 Dec-20 to Dec-24 | 2.67 | 2.59 | 2.45 | 2.42 | |
| | | | | | |
| 1999 Dec-27 to Dec-31 | 2.36 | 2.32 | 2.34 | 2.30 | |
| 2000 Jan- 3 to Jan- 7 | | 2.16 | 2.17 | 2.18 | 2.19 |
| 2000 Jan-10 to Jan-14 | 2.20 | 2.23 | 2.25 | 2.29 | 2.28 |
| 2000 Jan-17 to Jan-21 | | 2.35 | 2.40 | 2.53 | 2.55 |
| 2000 Jan-24 to Jan-28 | 2.55 | 2.66 | 2.73 | 2.76 | 2.84 |
| | | | | | |
| 2000 Jan-31 to Feb- 4 | 2.69 | 2.81 | 2.91 | 2.85 | 2.78 |
| 2000 Feb- 7 to Feb-11 | 2.81 | 2.60 | 2.62 | 2.65 | 2.65 |
| 2000 Feb-14 to Feb-18 | 2.61 | 2.61 | 2.65 | 2.66 | 2.65 |
| 2000 Feb-21 to Feb-25 | | 2.55 | 2.50 | 2.52 | 2.51 |
| 2000 Feb-28 to Mar- 3 | 2.60 | 2.65 | 2.71 | 2.80 | 2.72 |

| | | | | |
|---|---|---|---|---|
| 2000 Mar- 6 to Mar-10 | 2.76 | 2.78 | 2.74 | 2.69 | |
| 2000 Mar-13 to Mar-17 | 2.79 | 2.83 | 2.76 | 2.84 | 2.81 |
| 2000 Mar-20 to Mar-24 | 2.73 | 2.74 | 2.78 | 2.76 | 2.82 |
| 2000 Mar-27 to Mar-31 | 2.82 | 2.94 | 2.92 | 2.83 | 2.88 |
| 2000 Apr- 3 to Apr- 7 | 2.92 | 2.87 | 2.86 | 2.98 | 2.99 |
| 2000 Apr-10 to Apr-14 | 2.97 | 2.98 | 3.05 | 3.05 | 3.11 |
| 2000 Apr-17 to Apr-21 | 3.13 | 3.12 | 3.12 | 3.07 | |
| 2000 Apr-24 to Apr-28 | 3.12 | 3.18 | 3.12 | 3.06 | 3.09 |
| 2000 May- 1 to May- 5 | 3.16 | 3.20 | 3.18 | 3.09 | 3.11 |
| 2000 May- 8 to May-12 | 3.12 | 3.25 | 3.20 | 3.37 | 3.35 |
| 2000 May-15 to May-19 | 3.37 | 3.45 | 3.49 | 3.73 | 3.76 |
| 2000 May-22 to May-26 | 3.95 | 3.85 | 3.94 | 4.18 | 4.29 |
| 2000 May-29 to Jun- 2 | | 4.35 | 4.52 | 4.39 | 4.21 |
| 2000 Jun- 5 to Jun- 9 | 4.17 | 4.48 | 4.23 | 3.96 | 4.14 |
| 2000 Jun-12 to Jun-16 | 4.22 | 4.27 | 4.16 | 4.38 | 4.45 |
| 2000 Jun-19 to Jun-23 | 4.38 | 4.02 | 4.14 | 4.44 | 4.42 |
| 2000 Jun-26 to Jun-30 | 4.37 | 4.55 | 4.44 | 4.25 | 4.36 |
| 2000 Jul- 3 to Jul- 7 | 4.36 | | 4.24 | 4.02 | 4.00 |
| 2000 Jul-10 to Jul-14 | 4.19 | 4.17 | 4.29 | 4.08 | 4.17 |
| 2000 Jul-17 to Jul-21 | 4.13 | 3.99 | 4.07 | 3.86 | 3.88 |
| 2000 Jul-24 to Jul-28 | 3.74 | 3.63 | 3.59 | 3.75 | 3.89 |
| 2000 Jul-31 to Aug- 4 | 3.75 | 3.78 | 4.05 | 4.23 | 4.25 |
| 2000 Aug- 7 to Aug-11 | 4.39 | 4.46 | 4.48 | 4.43 | 4.44 |
| 2000 Aug-14 to Aug-18 | 4.42 | 4.24 | 4.24 | 4.35 | 4.38 |
| 2000 Aug-21 to Aug-25 | 4.60 | 4.80 | 4.67 | 4.53 | 4.55 |
| 2000 Aug-28 to Sep- 1 | 4.62 | 4.60 | 4.61 | 4.76 | 4.70 |
| 2000 Sep- 4 to Sep- 8 | | 4.81 | 4.89 | 4.85 | 4.74 |
| 2000 Sep-11 to Sep-15 | 4.85 | 4.96 | 5.06 | 5.10 | 5.28 |
| 2000 Sep-18 to Sep-22 | 5.06 | 5.22 | 5.24 | 5.16 | 5.16 |
| 2000 Sep-25 to Sep-29 | 5.12 | 5.28 | 5.34 | 5.20 | 5.10 |
| 2000 Oct- 2 to Oct- 6 | 5.24 | 5.29 | 5.22 | 5.21 | 5.04 |
| 2000 Oct- 9 to Oct-13 | 5.09 | 5.16 | 5.10 | 5.54 | 5.43 |
| 2000 Oct-16 to Oct-20 | 5.34 | 5.27 | 5.36 | 5.04 | 4.84 |
| 2000 Oct-23 to Oct-27 | 4.82 | 4.84 | 4.64 | 4.61 | 4.48 |
| 2000 Oct-30 to Nov- 3 | 4.56 | 4.37 | 4.40 | 4.50 | 4.64 |
| 2000 Nov- 6 to Nov-10 | 4.60 | 4.68 | 4.92 | 5.34 | 5.24 |
| 2000 Nov-13 to Nov-17 | 5.59 | 5.81 | 5.95 | 5.94 | 5.62 |
| 2000 Nov-20 to Nov-24 | 6.23 | 6.35 | 6.30 | | |
| 2000 Nov-27 to Dec- 1 | 6.24 | 5.90 | 5.93 | 6.31 | 6.53 |
| 2000 Dec- 4 to Dec- 8 | 7.41 | 8.03 | 8.75 | 8.48 | 8.13 |
| 2000 Dec-11 to Dec-15 | 9.96 | 8.58 | 7.80 | 7.48 | 8.03 |
| 2000 Dec-18 to Dec-22 | 9.28 | 9.11 | 9.95 | 10.49 | 10.48 |
| 2000 Dec-25 to Dec-29 | | 10.23 | 9.58 | 9.22 | 10.48 |
| 2001 Jan- 1 to Jan- 5 | | 9.97 | 9.71 | 9.45 | 10.03 |
| 2001 Jan- 8 to Jan-12 | 10.31 | 9.95 | 9.91 | 8.95 | 8.75 |
| 2001 Jan-15 to Jan-19 | | 8.16 | 7.85 | 7.09 | 7.61 |
| 2001 Jan-22 to Jan-26 | 7.70 | 7.02 | 6.81 | 6.81 | 7.00 |
| 2001 Jan-29 to Feb- 2 | 6.76 | 5.96 | 5.83 | 5.82 | 6.76 |
| 2001 Feb- 5 to Feb- 9 | 6.15 | 5.59 | 5.67 | 6.24 | 6.24 |
| 2001 Feb-12 to Feb-16 | 5.74 | 5.58 | 5.89 | 5.35 | 5.57 |
| 2001 Feb-19 to Feb-23 | | 5.17 | 5.20 | 5.11 | 5.05 |
| 2001 Feb-26 to Mar- 2 | 5.07 | 5.07 | 5.25 | 5.25 | 5.06 |
| 2001 Mar- 5 to Mar- 9 | 5.32 | 5.27 | 5.22 | 5.25 | 5.13 |
| 2001 Mar-12 to Mar-16 | 4.98 | 5.08 | 4.99 | 5.27 | 5.27 |
| 2001 Mar-19 to Mar-23 | 5.27 | 5.27 | 5.16 | 5.16 | 5.16 |
| 2001 Mar-26 to Mar-30 | 5.23 | 5.47 | 5.60 | 5.31 | 5.35 |
| 2001 Apr- 2 to Apr- 6 | 5.25 | 5.25 | 5.24 | 5.27 | 5.33 |
| 2001 Apr- 9 to Apr-13 | 5.45 | 5.55 | 5.45 | 5.32 | |
| 2001 Apr-16 to Apr-20 | 5.48 | 5.36 | 5.15 | 5.06 | 5.00 |
| 2001 Apr-23 to Apr-27 | 5.09 | 5.13 | 4.98 | 4.92 | 4.83 |
| 2001 Apr-30 to May- 4 | 4.73 | 4.55 | 4.54 | 4.46 | 4.50 |
| 2001 May- 7 to May-11 | 4.33 | 4.22 | 4.15 | 4.17 | 4.25 |
| 2001 May-14 to May-18 | 4.28 | 4.46 | 4.46 | 4.20 | 4.15 |
| 2001 May-21 to May-25 | 4.14 | 4.04 | 4.11 | 4.12 | 3.83 |
| 2001 May-28 to Jun- 1 | | 3.86 | 3.66 | 3.73 | 3.70 |
| 2001 Jun- 4 to Jun- 8 | 3.98 | 3.93 | 3.76 | 3.68 | 3.62 |
| 2001 Jun-11 to Jun-15 | 3.91 | 4.05 | 4.13 | 3.92 | 3.86 |
| 2001 Jun-18 to Jun-22 | 3.91 | 3.96 | 3.83 | 3.69 | 3.68 |
| 2001 Jun-25 to Jun-29 | 3.56 | 3.46 | 3.39 | 3.20 | 2.91 |

| | | | | | |
|---|---|---|---|---|---|
| 2001 Jul- 2 to Jul- 6 | 2.92 | 3.00 | | 3.09 | 2.99 |
| 2001 Jul- 9 to Jul-13 | 3.10 | 3.20 | 3.21 | 3.29 | 3.15 |
| 2001 Jul-16 to Jul-20 | 3.08 | 3.14 | 3.15 | 3.01 | 2.97 |
| 2001 Jul-23 to Jul-27 | 3.02 | 3.00 | 3.06 | 3.26 | 3.06 |
| 2001 Jul-30 to Aug- 3 | 3.28 | 3.31 | 3.27 | 3.15 | 3.06 |
| 2001 Aug- 6 to Aug-10 | 3.07 | 3.16 | 3.11 | 3.10 | 2.99 |
| 2001 Aug-13 to Aug-17 | 3.00 | 3.05 | 3.15 | 3.46 | 3.24 |
| 2001 Aug-20 to Aug-24 | 3.17 | 3.18 | 3.20 | 2.87 | 2.77 |
| 2001 Aug-27 to Aug-31 | 2.61 | 2.57 | 2.46 | 2.47 | 2.15 |
| 2001 Sep- 3 to Sep- 7 | | 2.23 | 2.34 | 2.43 | 2.36 |
| 2001 Sep-10 to Sep-14 | 2.38 | 2.38 | 2.44 | 2.39 | 2.41 |
| 2001 Sep-17 to Sep-21 | 2.36 | 2.18 | 2.13 | 2.06 | 2.04 |
| 2001 Sep-24 to Sep-28 | 1.99 | 1.94 | 1.88 | 1.90 | 1.80 |
| 2001 Oct- 1 to Oct- 5 | 1.74 | 1.83 | 1.97 | 2.13 | 2.11 |
| 2001 Oct- 8 to Oct-12 | 2.02 | 2.11 | 2.22 | 2.41 | 2.28 |
| 2001 Oct-15 to Oct-19 | 2.26 | 2.51 | 2.61 | 2.39 | 2.31 |
| 2001 Oct-22 to Oct-26 | 2.61 | 2.82 | 2.67 | 3.15 | 3.06 |
| 2001 Oct-29 to Nov- 2 | 3.21 | 3.11 | 3.07 | 2.99 | 2.93 |
| 2001 Nov- 5 to Nov- 9 | 2.87 | 2.72 | 2.73 | 2.68 | 2.61 |
| 2001 Nov-12 to Nov-16 | 2.45 | 2.38 | 2.29 | 1.99 | 1.69 |
| 2001 Nov-19 to Nov-23 | 2.08 | 2.55 | 1.91 | | |
| 2001 Nov-26 to Nov-30 | 1.79 | 1.87 | 2.30 | 2.19 | 1.83 |
| 2001 Dec- 3 to Dec- 7 | 2.10 | 2.00 | 1.89 | 1.81 | 2.11 |
| 2001 Dec-10 to Dec-14 | 2.28 | 2.58 | 2.57 | 2.40 | 2.40 |
| 2001 Dec-17 to Dec-21 | 2.40 | 2.40 | 2.40 | 2.40 | 2.40 |
| 2001 Dec-24 to Dec-28 | | | 2.40 | 2.40 | 2.40 |
| 2001 Dec-31 to Jan- 4 | 2.40 | | 2.55 | 2.58 | 2.58 |
| 2002 Jan- 7 to Jan-11 | 2.58 | 2.39 | 2.31 | 2.32 | 2.32 |
| 2002 Jan-14 to Jan-18 | 2.32 | 2.32 | 2.38 | 2.40 | 2.28 |
| 2002 Jan-21 to Jan-25 | | 2.28 | 2.28 | 2.13 | 2.03 |
| 2002 Jan-28 to Feb- 1 | 2.03 | 2.03 | 2.28 | 2.28 | 2.28 |
| 2002 Feb- 4 to Feb- 8 | 2.28 | 2.28 | 2.14 | 2.17 | 2.21 |
| 2002 Feb-11 to Feb-15 | 2.22 | 2.39 | 2.37 | 2.26 | 2.18 |
| 2002 Feb-18 to Feb-22 | | 2.32 | 2.41 | 2.40 | 2.40 |
| 2002 Feb-25 to Mar- 1 | 2.40 | 2.46 | 2.49 | 2.49 | 2.51 |
| 2002 Mar- 4 to Mar- 8 | 2.66 | 2.63 | 2.52 | 2.73 | 2.82 |
| 2002 Mar-11 to Mar-15 | 2.90 | 2.94 | 2.97 | 2.78 | 2.99 |
| 2002 Mar-18 to Mar-22 | 3.15 | 3.33 | 3.29 | 3.20 | 3.57 |
| 2002 Mar-25 to Mar-29 | 3.46 | 3.59 | 3.35 | 3.18 | |
| 2002 Apr- 1 to Apr- 5 | 3.43 | 3.72 | 3.68 | 3.56 | 3.31 |
| 2002 Apr- 8 to Apr-12 | 3.36 | 3.25 | 3.25 | 3.14 | 3.07 |
| 2002 Apr-15 to Apr-19 | 3.27 | 3.44 | 3.40 | 3.50 | 3.40 |
| 2002 Apr-22 to Apr-26 | 3.58 | 3.63 | 3.53 | 3.46 | 3.32 |
| 2002 Apr-29 to May- 3 | 3.44 | 3.65 | 3.79 | 3.65 | 3.71 |
| 2002 May- 6 to May-10 | 3.61 | 3.50 | 3.74 | 3.72 | 3.70 |
| 2002 May-13 to May-17 | 3.62 | 3.75 | 3.60 | 3.45 | 3.41 |
| 2002 May-20 to May-24 | 3.44 | 3.33 | 3.39 | 3.38 | 3.21 |
| 2002 May-27 to May-31 | | 3.18 | 3.30 | 3.33 | 3.15 |
| 2002 Jun- 3 to Jun- 7 | 3.18 | 3.31 | 3.29 | 3.29 | 3.11 |
| 2002 Jun-10 to Jun-14 | 3.14 | 3.11 | 3.15 | 3.04 | 3.13 |
| 2002 Jun-17 to Jun-21 | 3.34 | 3.23 | 3.24 | 3.33 | 3.18 |
| 2002 Jun-24 to Jun-28 | 3.33 | 3.49 | 3.92 | 3.22 | 3.20 |
| 2002 Jul- 1 to Jul- 5 | 3.28 | 3.17 | 3.08 | | |
| 2002 Jul- 8 to Jul-12 | 3.06 | 2.97 | 3.04 | 2.85 | 2.87 |
| 2002 Jul-15 to Jul-19 | 2.83 | 2.89 | 2.97 | 2.85 | 2.95 |
| 2002 Jul-22 to Jul-26 | 3.01 | 2.95 | 2.91 | 3.05 | 2.94 |
| 2002 Jul-29 to Aug- 2 | 3.07 | 2.97 | 3.02 | 3.07 | 2.90 |
| 2002 Aug- 5 to Aug- 9 | 2.81 | 2.80 | 2.73 | 2.75 | 2.83 |
| 2002 Aug-12 to Aug-16 | 2.91 | 3.01 | 3.03 | 2.92 | 3.10 |
| 2002 Aug-19 to Aug-23 | 3.10 | 3.25 | 3.22 | 3.36 | 3.48 |
| 2002 Aug-26 to Aug-30 | 3.51 | 3.47 | 3.31 | 3.25 | 3.12 |
| 2002 Sep- 2 to Sep- 6 | | 3.10 | 3.13 | 3.20 | 3.39 |
| 2002 Sep- 9 to Sep-13 | 3.24 | 3.35 | 3.33 | 3.22 | 3.37 |
| 2002 Sep-16 to Sep-20 | 3.45 | 3.46 | 3.80 | 3.90 | 3.95 |
| 2002 Sep-23 to Sep-27 | 3.87 | 4.00 | 3.76 | 3.61 | 3.76 |
| 2002 Sep-30 to Oct- 4 | 4.09 | 4.41 | 4.27 | 4.23 | 3.86 |
| 2002 Oct- 7 to Oct-11 | 3.77 | 3.86 | 3.91 | 3.93 | 3.80 |
| 2002 Oct-14 to Oct-18 | 4.19 | 4.19 | 4.10 | 4.10 | 4.11 |

| | | | | | |
|---|---|---|---|---|---|
| 2002 Oct-21 to Oct-25 | 4.23 | 4.20 | 4.24 | 4.30 | 4.12 |
| 2002 Oct-28 to Nov- 1 | 4.16 | 4.20 | 4.34 | 4.39 | 4.07 |
| 2002 Nov- 4 to Nov- 8 | 3.94 | 3.90 | 3.92 | 3.90 | 3.76 |
| 2002 Nov-11 to Nov-15 | 3.83 | 3.83 | 3.83 | 3.90 | 3.92 |
| 2002 Nov-18 to Nov-22 | 4.18 | 4.25 | 4.27 | 4.24 | 4.32 |
| 2002 Nov-25 to Nov-29 | 4.34 | 4.23 | 4.19 | | |
| 2002 Dec- 2 to Dec- 6 | 4.23 | 4.35 | 4.44 | 4.35 | 4.39 |
| 2002 Dec- 9 to Dec-13 | 4.32 | 4.40 | 4.63 | 4.81 | 5.05 |
| 2002 Dec-16 to Dec-20 | 5.31 | 5.13 | 4.98 | 5.14 | 5.05 |
| 2002 Dec-23 to Dec-27 | 5.03 | 5.03 | | 4.98 | 4.81 |
| 2002 Dec-30 to Jan- 3 | 4.74 | 4.59 | | 4.93 | 5.13 |
| 2003 Jan- 6 to Jan-10 | 4.94 | 4.89 | 5.07 | 5.05 | 5.19 |
| 2003 Jan-13 to Jan-17 | 5.23 | 5.25 | 5.21 | 5.50 | 5.66 |
| 2003 Jan-20 to Jan-24 | | 5.47 | 5.72 | 6.55 | 5.91 |
| 2003 Jan-27 to Jan-31 | 5.91 | 5.52 | 5.61 | 5.76 | 5.58 |
| 2003 Feb- 3 to Feb- 7 | 5.71 | 6.26 | 6.22 | 6.08 | 6.30 |
| 2003 Feb-10 to Feb-14 | 6.35 | 6.19 | 6.19 | 5.81 | 5.88 |
| 2003 Feb-17 to Feb-21 | | 6.09 | 6.10 | 6.38 | 6.73 |
| 2003 Feb-24 to Feb-28 | 11.98 | 18.48 | 10.47 | 8.42 | 10.81 |
| 2003 Mar- 3 to Mar- 7 | 8.51 | 7.71 | 7.80 | 7.57 | 7.42 |
| 2003 Mar-10 to Mar-14 | 6.78 | 6.25 | 5.80 | 5.71 | 5.17 |
| 2003 Mar-17 to Mar-21 | 5.32 | 5.13 | 5.20 | 5.20 | 5.05 |
| 2003 Mar-24 to Mar-28 | 5.07 | 5.07 | 4.90 | 4.87 | 5.06 |
| 2003 Mar-31 to Apr- 4 | 5.01 | 4.90 | 4.89 | 4.91 | 4.86 |
| 2003 Apr- 7 to Apr-11 | 4.98 | 5.21 | 5.11 | 5.18 | 5.28 |
| 2003 Apr-14 to Apr-18 | 5.29 | 5.53 | 5.62 | 5.54 | |
| 2003 Apr-21 to Apr-25 | 5.55 | 5.58 | 5.58 | 5.46 | 5.39 |
| 2003 Apr-28 to May- 2 | 5.30 | 5.12 | 5.25 | 5.32 | 5.24 |
| 2003 May- 5 to May- 9 | 5.36 | 5.64 | 5.49 | 5.65 | 5.73 |
| 2003 May-12 to May-16 | 5.91 | 5.98 | 6.17 | 6.24 | 5.96 |
| 2003 May-19 to May-23 | 6.08 | 5.93 | 6.08 | 6.09 | 5.92 |
| 2003 May-26 to May-30 | | 5.84 | 5.71 | 5.76 | 5.99 |
| 2003 Jun- 2 to Jun- 6 | 6.22 | 6.25 | 6.40 | 6.17 | 6.25 |
| 2003 Jun- 9 to Jun-13 | 6.25 | 6.08 | 6.06 | 5.86 | 5.44 |
| 2003 Jun-16 to Jun-20 | 5.45 | 5.66 | 5.53 | 5.53 | 5.68 |
| 2003 Jun-23 to Jun-27 | 5.89 | 5.84 | 5.64 | 5.49 | 5.19 |
| 2003 Jun-30 to Jul- 4 | 5.31 | 5.22 | 5.05 | 4.96 | |
| 2003 Jul- 7 to Jul-11 | 5.20 | 5.40 | 5.56 | 5.40 | 5.22 |
| 2003 Jul-14 to Jul-18 | 5.15 | 5.17 | 5.00 | 4.96 | 5.01 |
| 2003 Jul-21 to Jul-25 | 5.11 | 5.04 | 4.88 | 4.86 | 4.68 |
| 2003 Jul-28 to Aug- 1 | 4.68 | 4.72 | 4.68 | 4.63 | 4.71 |
| 2003 Aug- 4 to Aug- 8 | 4.81 | 4.71 | 4.74 | 4.85 | 5.02 |
| 2003 Aug-11 to Aug-15 | 5.08 | 5.06 | 5.17 | 5.10 | 4.83 |
| 2003 Aug-18 to Aug-22 | 4.94 | 4.99 | 5.03 | 5.14 | 5.24 |
| 2003 Aug-25 to Aug-29 | 5.26 | 5.09 | 5.11 | 4.94 | 4.86 |
| 2003 Sep- 1 to Sep- 5 | | 4.62 | 4.68 | 4.70 | 4.76 |
| 2003 Sep- 8 to Sep-12 | 4.82 | 4.70 | 4.78 | 4.85 | 4.66 |
| 2003 Sep-15 to Sep-19 | 4.66 | 4.67 | 4.61 | 4.52 | 4.33 |
| 2003 Sep-22 to Sep-26 | 4.38 | 4.51 | 4.58 | 4.55 | 4.42 |
| 2003 Sep-29 to Oct- 3 | 4.57 | 4.66 | 4.47 | 4.42 | 4.34 |
| 2003 Oct- 6 to Oct-10 | 4.40 | 4.66 | 4.84 | 4.78 | 4.92 |
| 2003 Oct-13 to Oct-17 | 4.96 | 4.84 | 4.93 | 4.92 | 4.53 |
| 2003 Oct-20 to Oct-24 | 4.30 | 4.64 | 4.89 | 4.90 | 4.78 |
| 2003 Oct-27 to Oct-31 | 4.56 | 4.45 | 4.51 | 4.40 | 3.98 |
| 2003 Nov- 3 to Nov- 7 | 4.12 | 4.01 | 4.46 | 4.74 | 4.48 |
| 2003 Nov-10 to Nov-14 | 4.42 | 4.52 | 4.77 | 4.60 | 4.62 |
| 2003 Nov-17 to Nov-21 | 4.49 | 4.35 | 4.46 | 4.35 | 4.15 |
| 2003 Nov-24 to Nov-28 | 4.57 | 4.49 | 4.86 | | |
| 2003 Dec- 1 to Dec- 5 | 5.02 | 5.45 | 5.45 | 5.70 | 6.27 |
| 2003 Dec- 8 to Dec-12 | 6.06 | 6.52 | 6.67 | 6.56 | 6.73 |
| 2003 Dec-15 to Dec-19 | 6.63 | 6.58 | 6.56 | 6.98 | 6.92 |
| 2003 Dec-22 to Dec-26 | 6.32 | 5.58 | 5.50 | | |
| 2003 Dec-29 to Jan- 2 | 5.46 | 5.96 | 5.76 | | |
| 2004 Jan- 5 to Jan- 9 | 6.28 | 7.04 | 6.61 | 6.41 | 6.91 |
| 2004 Jan-12 to Jan-16 | 6.29 | 6.26 | 5.73 | 6.02 | 5.43 |
| 2004 Jan-19 to Jan-23 | | 6.15 | 6.26 | 6.03 | 5.82 |
| 2004 Jan-26 to Jan-30 | 5.70 | 5.87 | 6.04 | 5.99 | 5.80 |
| 2004 Feb- 2 to Feb- 6 | 5.51 | 5.69 | 5.74 | 5.54 | 5.38 |

| | | | | |
|---|---|---|---|---|
| 2004 Feb- 9 to Feb-13 | 5.44 | 5.49 | 5.34 | 5.35 | 5.62 |
| 2004 Feb-16 to Feb-20 | | 5.43 | 5.33 | 5.28 | 5.19 |
| 2004 Feb-23 to Feb-27 | 5.10 | 5.08 | 5.10 | 5.13 | 5.27 |
| 2004 Mar- 1 to Mar- 5 | 5.17 | 5.37 | 5.34 | 5.17 | 5.32 |
| 2004 Mar- 8 to Mar-12 | 5.42 | 5.34 | 5.33 | 5.33 | 5.52 |
| 2004 Mar-15 to Mar-19 | 5.59 | 5.60 | 5.61 | 5.63 | 5.49 |
| 2004 Mar-22 to Mar-26 | 5.46 | 5.36 | 5.35 | 5.22 | 5.16 |
| 2004 Mar-29 to Apr- 2 | 5.25 | 5.40 | 5.63 | 5.82 | 5.69 |
| 2004 Apr- 5 to Apr- 9 | 5.81 | 5.70 | 5.76 | 5.84 | |
| 2004 Apr-12 to Apr-16 | 5.85 | 5.92 | 5.73 | 5.68 | 5.62 |
| 2004 Apr-19 to Apr-23 | 5.57 | 5.46 | 5.52 | 5.59 | 5.53 |
| 2004 Apr-26 to Apr-30 | 5.60 | 5.81 | 5.80 | 5.78 | 5.81 |
| 2004 May- 3 to May- 7 | 5.80 | 6.21 | 6.09 | 6.22 | 6.18 |
| 2004 May-10 to May-14 | 6.14 | 6.24 | 6.41 | 6.42 | 6.43 |
| 2004 May-17 to May-21 | 6.41 | 6.28 | 6.18 | 6.44 | 6.35 |
| 2004 May-24 to May-28 | 6.48 | 6.73 | 6.70 | 6.51 | 6.45 |
| 2004 May-31 to Jun- 4 | | 6.45 | 6.51 | 6.44 | 6.15 |
| 2004 Jun- 7 to Jun-11 | 6.09 | 6.19 | 6.04 | 6.00 | |
| 2004 Jun-14 to Jun-18 | 6.15 | 6.35 | 6.38 | 6.57 | 6.48 |
| 2004 Jun-21 to Jun-25 | 6.42 | 6.29 | 6.30 | 6.41 | 6.28 |
| 2004 Jun-28 to Jul- 2 | 6.13 | 6.02 | 6.03 | 5.95 | 5.88 |
| 2004 Jul- 5 to Jul- 9 | | 6.16 | 6.27 | 6.19 | 5.89 |
| 2004 Jul-12 to Jul-16 | 5.95 | 5.85 | 5.91 | 5.92 | 5.77 |
| 2004 Jul-19 to Jul-23 | 5.75 | 5.80 | 5.90 | 5.85 | 5.98 |
| 2004 Jul-26 to Jul-30 | 5.94 | 5.87 | 5.77 | 5.93 | 6.03 |
| 2004 Aug- 2 to Aug- 6 | 5.86 | 5.77 | 5.70 | 5.54 | 5.42 |
| 2004 Aug- 9 to Aug-13 | 5.58 | 5.78 | 5.64 | 5.46 | 5.27 |
| 2004 Aug-16 to Aug-20 | 5.34 | 5.27 | 5.36 | 5.34 | 5.39 |
| 2004 Aug-23 to Aug-27 | 5.34 | 5.23 | 5.32 | 5.19 | 5.05 |
| 2004 Aug-30 to Sep- 3 | 5.05 | 5.04 | 5.02 | 4.75 | 4.32 |
| 2004 Sep- 6 to Sep-10 | | 4.41 | 4.69 | 4.57 | 4.57 |
| 2004 Sep-13 to Sep-17 | 5.12 | 5.15 | 5.17 | 4.82 | 4.95 |
| 2004 Sep-20 to Sep-24 | 5.22 | 5.43 | 5.58 | 5.58 | 5.41 |
| 2004 Sep-27 to Oct- 1 | 5.22 | 5.45 | 6.26 | 6.36 | 5.38 |
| 2004 Oct- 4 to Oct- 8 | 5.72 | 6.07 | 6.00 | 6.24 | 5.59 |
| 2004 Oct-11 to Oct-15 | 5.63 | 5.63 | 5.38 | 5.76 | 5.64 |
| 2004 Oct-18 to Oct-22 | 5.64 | 6.13 | 7.27 | 7.35 | 7.11 |
| 2004 Oct-25 to Oct-29 | 7.75 | 7.78 | 8.12 | 6.80 | 6.43 |
| 2004 Nov- 1 to Nov- 5 | 6.98 | 6.88 | 7.25 | 7.40 | 6.08 |
| 2004 Nov- 8 to Nov-12 | 6.62 | 5.79 | 6.12 | 6.19 | 5.90 |
| 2004 Nov-15 to Nov-19 | 6.02 | 6.57 | 6.06 | 5.59 | 4.81 |
| 2004 Nov-22 to Nov-26 | 5.24 | 5.24 | 5.01 | | |
| 2004 Nov-29 to Dec- 3 | 6.76 | 6.79 | 6.78 | 6.69 | 6.04 |
| 2004 Dec- 6 to Dec-10 | 6.05 | 6.03 | 5.98 | 6.04 | 6.29 |
| 2004 Dec-13 to Dec-17 | 6.89 | 7.10 | 7.04 | 6.88 | 7.26 |
| 2004 Dec-20 to Dec-24 | 7.14 | 6.83 | 7.05 | 6.98 | |
| 2004 Dec-27 to Dec-31 | 6.57 | 6.27 | 6.18 | 6.02 | |
| 2005 Jan- 3 to Jan- 7 | 5.53 | 5.71 | 5.84 | 5.79 | 5.82 |
| 2005 Jan-10 to Jan-14 | 6.21 | 5.96 | 5.89 | 6.06 | 6.45 |
| 2005 Jan-17 to Jan-21 | | 6.69 | 6.19 | 6.27 | 6.43 |
| 2005 Jan-24 to Jan-28 | 6.41 | 6.44 | 6.44 | 6.50 | 6.23 |
| 2005 Jan-31 to Feb- 4 | 6.14 | 6.28 | 6.38 | 6.32 | 6.12 |
| 2005 Feb- 7 to Feb-11 | 6.02 | 5.95 | 6.20 | 6.21 | 6.02 |
| 2005 Feb-14 to Feb-18 | 5.95 | 6.01 | 6.10 | 6.05 | 5.88 |
| 2005 Feb-21 to Feb-25 | | 5.92 | 6.02 | 6.33 | 6.24 |
| 2005 Feb-28 to Mar- 4 | 6.62 | 6.63 | 6.61 | 6.71 | 6.51 |
| 2005 Mar- 7 to Mar-11 | 6.66 | 6.81 | 6.99 | 6.91 | 6.73 |
| 2005 Mar-14 to Mar-18 | 6.86 | 7.16 | 7.08 | 7.25 | 7.12 |
| 2005 Mar-21 to Mar-25 | 7.16 | 7.24 | 7.11 | 7.07 | |
| 2005 Mar-28 to Apr- 1 | 6.94 | 6.93 | 7.18 | 7.46 | 7.57 |
| 2005 Apr- 4 to Apr- 8 | 7.80 | 7.44 | 7.46 | 7.50 | 7.26 |
| 2005 Apr-11 to Apr-15 | 7.17 | 7.34 | 7.07 | 7.02 | 6.95 |
| 2005 Apr-18 to Apr-22 | 6.95 | 6.95 | 7.10 | 6.93 | 7.06 |
| 2005 Apr-25 to Apr-29 | 7.27 | 7.08 | 7.10 | 6.67 | 6.64 |
| 2005 May- 2 to May- 6 | 6.50 | 6.61 | 6.49 | 6.65 | 6.67 |
| 2005 May- 9 to May-13 | 6.56 | 6.67 | 6.63 | 6.62 | 6.47 |
| 2005 May-16 to May-20 | 6.45 | 6.41 | 6.50 | 6.39 | 6.36 |
| 2005 May-23 to May-27 | 6.33 | 6.45 | 6.33 | 6.30 | 6.22 |
| 2005 May-30 to Jun- 3 | | 6.31 | 6.36 | 6.63 | 6.65 |

| | | | | |
|---|---|---|---|---|
| 2005 Jun- 6 to Jun-10 | 7.05 | 7.13 | 7.22 | 7.05 | 7.09 |
| 2005 Jun-13 to Jun-17 | 7.08 | 7.32 | 7.39 | 7.41 | 7.61 |
| 2005 Jun-20 to Jun-24 | 7.80 | 7.46 | 7.39 | 7.51 | 7.45 |
| 2005 Jun-27 to Jul- 1 | 7.29 | 7.04 | 7.08 | 7.01 | 7.01 |
| 2005 Jul- 4 to Jul- 8 | | 7.38 | 7.69 | 7.62 | 7.87 |
| 2005 Jul-11 to Jul-15 | 7.35 | 7.79 | 7.78 | 7.99 | 8.02 |
| 2005 Jul-18 to Jul-22 | 7.77 | 7.70 | 7.75 | 7.64 | 7.41 |
| 2005 Jul-25 to Jul-29 | 7.38 | 7.45 | 7.52 | 7.69 | 7.76 |
| 2005 Aug- 1 to Aug- 5 | 8.03 | 8.38 | 8.75 | 8.55 | 8.60 |
| 2005 Aug- 8 to Aug-12 | 8.93 | 8.70 | 8.82 | 9.29 | 9.59 |
| 2005 Aug-15 to Aug-19 | 9.53 | 9.66 | 9.99 | 9.38 | 9.09 |
| 2005 Aug-22 to Aug-26 | 9.44 | 9.96 | 10.02 | 9.77 | 9.86 |
| 2005 Aug-29 to Sep- 2 | 9.86 | 12.36 | 12.69 | 11.36 | 11.75 |
| 2005 Sep- 5 to Sep- 9 | | 11.56 | 11.03 | 10.92 | 11.03 |
| 2005 Sep-12 to Sep-16 | 10.68 | 10.71 | 10.80 | 11.24 | 11.25 |
| 2005 Sep-19 to Sep-23 | 11.99 | 12.76 | 14.26 | 14.84 | |
| 2005 Oct- 3 to Oct- 7 | | | | | 13.67 |
| 2005 Oct-10 to Oct-14 | 13.29 | 13.67 | 13.77 | 13.48 | 12.80 |
| 2005 Oct-17 to Oct-21 | 13.89 | 13.41 | 13.52 | 13.24 | 12.73 |
| 2005 Oct-24 to Oct-28 | 12.95 | 13.90 | 14.68 | 13.90 | 13.10 |
| 2005 Oct-31 to Nov- 4 | 12.18 | 10.80 | 10.85 | 10.79 | 9.67 |
| 2005 Nov- 7 to Nov-11 | 8.77 | 9.15 | 9.31 | 9.66 | 9.20 |
| 2005 Nov-14 to Nov-18 | 9.15 | 9.21 | 11.03 | 11.92 | 10.01 |
| 2005 Nov-21 to Nov-25 | 10.48 | 11.15 | 11.02 | | |
| 2005 Nov-28 to Dec- 2 | 11.01 | 11.17 | 11.73 | 12.58 | 12.95 |
| 2005 Dec- 5 to Dec- 9 | 14.27 | 13.57 | 13.95 | 14.25 | 15.02 |
| 2005 Dec-12 to Dec-16 | 14.82 | 15.39 | 14.81 | 14.07 | 13.36 |
| 2005 Dec-19 to Dec-23 | 13.73 | 13.79 | 13.56 | 13.03 | 11.17 |
| 2005 Dec-26 to Dec-30 | | 10.22 | 9.90 | 10.07 | 9.52 |
| 2006 Jan- 2 to Jan- 6 | | 9.90 | 9.25 | 9.24 | 9.30 |
| 2006 Jan- 9 to Jan-13 | 8.79 | 8.60 | 8.55 | 8.70 | 8.50 |
| 2006 Jan-16 to Jan-20 | | 8.82 | 8.86 | 8.21 | 8.80 |
| 2006 Jan-23 to Jan-27 | 8.29 | 8.27 | 8.50 | 7.86 | 8.19 |
| 2006 Jan-30 to Feb- 3 | 8.36 | 8.73 | 8.71 | 8.01 | 8.01 |
| 2006 Feb- 6 to Feb-10 | 8.24 | 7.74 | 7.88 | 7.55 | 7.57 |
| 2006 Feb-13 to Feb-17 | 7.36 | 7.03 | 7.31 | 7.16 | 7.39 |
| 2006 Feb-20 to Feb-24 | | 7.40 | 7.55 | 7.23 | 7.39 |
| 2006 Feb-27 to Mar- 3 | 6.97 | 6.69 | 6.62 | 6.69 | 6.59 |
| 2006 Mar- 6 to Mar-10 | 6.50 | 6.53 | 6.47 | 6.31 | 6.40 |
| 2006 Mar-13 to Mar-17 | 6.77 | 7.15 | 7.10 | 7.12 | 7.17 |
| 2006 Mar-20 to Mar-24 | 7.00 | 6.83 | 7.06 | 7.16 | 7.43 |
| 2006 Mar-27 to Mar-31 | 7.05 | 7.15 | 7.16 | 7.19 | 6.98 |
| 2006 Apr- 3 to Apr- 7 | 7.08 | 7.04 | 6.89 | 7.06 | 6.81 |
| 2006 Apr-10 to Apr-14 | 6.83 | 6.99 | 6.78 | 6.64 | |
| 2006 Apr-17 to Apr-21 | 7.22 | 7.60 | 7.72 | 7.95 | 7.65 |
| 2006 Apr-24 to Apr-28 | 7.73 | 7.37 | 7.17 | 6.94 | 6.64 |
| 2006 May- 1 to May- 5 | 6.53 | 6.68 | 6.56 | 6.47 | 6.80 |
| 2006 May- 8 to May-12 | 6.54 | 6.55 | 6.50 | 6.80 | 6.35 |
| 2006 May-15 to May-19 | 5.92 | 5.99 | 6.15 | 5.79 | 5.77 |
| 2006 May-22 to May-26 | 5.91 | 6.27 | 6.01 | 5.85 | 5.78 |
| 2006 May-29 to Jun- 2 | | 6.20 | 5.97 | 6.25 | 6.23 |
| 2006 Jun- 5 to Jun- 9 | 6.40 | 6.16 | 5.82 | 5.84 | 6.10 |
| 2006 Jun-12 to Jun-16 | 6.02 | 5.95 | 6.08 | 6.43 | 7.03 |
| 2006 Jun-19 to Jun-23 | 6.71 | 6.62 | 6.50 | 6.51 | 6.14 |
| 2006 Jun-26 to Jun-30 | 5.89 | 5.97 | 6.04 | 6.09 | 5.84 |
| 2006 Jul- 3 to Jul- 7 | | | 5.70 | 5.28 | 5.18 |
| 2006 Jul-10 to Jul-14 | 5.32 | 5.51 | 5.66 | 5.92 | 6.28 |
| 2006 Jul-17 to Jul-21 | 6.27 | 6.02 | 5.89 | 6.14 | 5.90 |
| 2006 Jul-24 to Jul-28 | 6.33 | 6.78 | 6.71 | 7.03 | 7.24 |
| 2006 Jul-31 to Aug- 4 | 8.04 | 8.66 | 8.65 | 7.61 | 7.44 |
| 2006 Aug- 7 to Aug-11 | 6.97 | 7.06 | 7.60 | 7.95 | 7.56 |
| 2006 Aug-14 to Aug-18 | 6.89 | 6.90 | 7.01 | 6.73 | 6.66 |
| 2006 Aug-21 to Aug-25 | 6.72 | 6.86 | 7.19 | 7.22 | 7.48 |
| 2006 Aug-28 to Sep- 1 | 6.51 | 6.24 | 6.40 | 5.80 | 5.24 |
| 2006 Sep- 4 to Sep- 8 | | 5.45 | 5.70 | 5.64 | 5.31 |
| 2006 Sep-11 to Sep-15 | 5.29 | 5.57 | 5.40 | 5.09 | 4.40 |
| 2006 Sep-18 to Sep-22 | 5.02 | 4.99 | 4.87 | 4.65 | 4.47 |
| 2006 Sep-25 to Sep-29 | 4.31 | 4.36 | 4.35 | 4.15 | 3.66 |

| | | | | | |
|---|---|---|---|---|---|
| 2006 Oct- 2 to Oct- 6 | 4.11 | 4.01 | 4.38 | 4.69 | 4.41 |
| 2006 Oct- 9 to Oct-13 | 5.06 | 5.16 | 5.66 | 5.17 | 4.30 |
| 2006 Oct-16 to Oct-20 | 5.13 | 6.26 | 6.07 | 6.77 | 6.88 |
| 2006 Oct-23 to Oct-27 | 7.29 | 7.13 | 7.20 | 7.91 | 7.41 |
| 2006 Oct-30 to Nov- 3 | 6.99 | 6.64 | 7.15 | 7.32 | 7.43 |
| 2006 Nov- 6 to Nov-10 | 6.72 | 6.59 | 7.39 | 7.35 | 7.16 |
| 2006 Nov-13 to Nov-17 | 7.26 | 7.42 | 7.45 | 7.59 | 7.23 |
| 2006 Nov-20 to Nov-24 | 7.79 | 7.57 | 7.42 | | |
| 2006 Nov-27 to Dec- 1 | 7.58 | 7.61 | 7.74 | 8.32 | 8.42 |
| 2006 Dec- 4 to Dec- 8 | 7.84 | 7.32 | 7.32 | 7.61 | 7.45 |
| 2006 Dec-11 to Dec-15 | 6.81 | 6.93 | 7.21 | 7.26 | 6.82 |
| 2006 Dec-18 to Dec-22 | 6.62 | 6.27 | 6.43 | 6.09 | 5.88 |
| 2006 Dec-25 to Dec-29 | | 5.72 | 5.54 | 5.63 | 5.50 |
| 2007 Jan- 1 to Jan- 5 | | 5.40 | 5.47 | 5.60 | 5.52 |
| 2007 Jan- 8 to Jan-12 | 6.02 | 6.15 | 6.42 | 6.09 | 5.97 |
| 2007 Jan-15 to Jan-19 | | 6.82 | 6.57 | 6.29 | 6.40 |
| 2007 Jan-22 to Jan-26 | 7.20 | 7.53 | 7.58 | 7.18 | 6.95 |
| 2007 Jan-29 to Feb- 2 | 7.35 | 7.32 | 7.76 | 7.93 | 8.17 |
| 2007 Feb- 5 to Feb- 9 | 9.14 | 8.29 | 7.90 | 8.06 | 8.16 |
| 2007 Feb-12 to Feb-16 | 7.78 | 8.09 | 8.90 | 8.91 | 8.45 |
| 2007 Feb-19 to Feb-23 | | 7.34 | 7.51 | 7.47 | 7.53 |
| 2007 Feb-26 to Mar- 2 | 7.73 | 7.44 | 7.23 | 7.07 | 7.22 |
| 2007 Mar- 5 to Mar- 9 | 7.36 | 7.55 | 7.50 | 7.14 | 7.05 |
| 2007 Mar-12 to Mar-16 | 6.81 | 6.78 | 6.86 | 7.02 | 6.84 |
| 2007 Mar-19 to Mar-23 | 6.70 | 6.81 | 6.82 | 7.07 | 7.16 |
| 2007 Mar-26 to Mar-30 | 7.15 | 7.15 | 7.47 | 7.34 | 7.50 |
| 2007 Apr- 2 to Apr- 6 | 7.62 | 7.57 | 7.46 | 7.53 | |
| 2007 Apr- 9 to Apr-13 | 7.65 | 7.65 | 7.97 | 7.95 | 7.93 |
| 2007 Apr-16 to Apr-20 | 7.66 | 7.50 | 7.54 | 7.54 | 7.32 |
| 2007 Apr-23 to Apr-27 | 7.24 | 7.57 | 7.60 | 7.56 | 7.44 |
| 2007 Apr-30 to May- 4 | 7.71 | 7.64 | 7.64 | 7.58 | 7.82 |
| 2007 May- 7 to May-11 | 7.69 | 7.50 | 7.46 | 7.63 | 7.53 |
| 2007 May-14 to May-18 | 7.85 | 7.68 | 7.62 | 7.69 | 7.87 |
| 2007 May-21 to May-25 | 7.66 | 7.60 | 7.51 | 7.56 | 7.47 |
| 2007 May-28 to Jun- 1 | | 7.51 | 7.71 | 7.80 | 7.57 |
| 2007 Jun- 4 to Jun- 8 | 7.73 | 7.83 | 7.83 | 7.89 | 7.52 |
| 2007 Jun-11 to Jun-15 | 7.42 | 7.45 | 7.60 | 7.48 | 7.58 |
| 2007 Jun-18 to Jun-22 | 7.69 | 7.46 | 7.39 | 7.24 | 7.04 |
| 2007 Jun-25 to Jun-29 | 6.77 | 6.85 | 6.74 | 6.79 | 6.40 |
| 2007 Jul- 2 to Jul- 6 | 6.24 | 6.37 | | 6.30 | 6.15 |
| 2007 Jul- 9 to Jul-13 | 6.39 | 6.44 | 6.66 | 6.26 | 6.27 |
| 2007 Jul-16 to Jul-20 | 6.32 | 6.34 | 6.23 | 6.50 | 6.46 |
| 2007 Jul-23 to Jul-27 | 6.00 | 5.66 | 5.56 | 5.83 | 5.77 |
| 2007 Jul-30 to Aug- 3 | 6.31 | 6.53 | 6.19 | 6.34 | 6.11 |
| 2007 Aug- 6 to Aug-10 | 6.10 | 6.38 | 6.24 | 6.45 | 6.57 |
| 2007 Aug-13 to Aug-17 | 7.15 | 6.86 | 7.30 | 6.96 | 7.14 |
| 2007 Aug-20 to Aug-24 | 6.47 | 5.92 | 5.84 | 5.73 | 5.69 |
| 2007 Aug-27 to Aug-31 | 5.34 | 5.56 | 5.64 | 5.54 | 5.49 |
| 2007 Sep- 3 to Sep- 7 | | 5.30 | 5.80 | 6.02 | 5.53 |
| 2007 Sep-10 to Sep-14 | 5.56 | 5.98 | 6.13 | 6.27 | 6.23 |
| 2007 Sep-17 to Sep-21 | 6.38 | 6.42 | 6.25 | 6.02 | 5.96 |
| 2007 Sep-24 to Sep-28 | 6.12 | 6.54 | 6.47 | 6.38 | 6.15 |
| 2007 Oct- 1 to Oct- 5 | 6.07 | 6.55 | 6.96 | 6.91 | 6.77 |
| 2007 Oct- 8 to Oct-12 | 6.69 | 6.63 | 6.79 | 6.85 | 6.46 |
| 2007 Oct-15 to Oct-19 | 7.09 | 7.29 | 7.12 | 7.11 | 6.91 |
| 2007 Oct-22 to Oct-26 | 6.63 | 6.30 | 6.11 | 6.49 | 6.43 |
| 2007 Oct-29 to Nov- 2 | 6.66 | 6.99 | 7.28 | 7.09 | 6.63 |
| 2007 Nov- 5 to Nov- 9 | 6.71 | 7.20 | 7.42 | 6.81 | 6.59 |
| 2007 Nov-12 to Nov-16 | 6.83 | 7.22 | 7.28 | 7.35 | 7.29 |
| 2007 Nov-19 to Nov-23 | 7.38 | 6.81 | 6.67 | | 6.67 |
| 2007 Nov-26 to Nov-30 | 7.53 | 7.42 | 7.51 | 7.45 | 7.29 |
| 2007 Dec- 3 to Dec- 7 | 6.97 | 7.27 | 7.04 | 7.29 | 7.04 |
| 2007 Dec-10 to Dec-14 | 6.98 | 7.12 | 7.22 | 7.46 | 7.09 |
| 2007 Dec-17 to Dec-21 | 7.06 | 7.16 | 7.18 | 7.19 | 7.03 |
| 2007 Dec-24 to Dec-28 | 7.03 | | 6.94 | 6.80 | 7.11 |
| 2007 Dec-31 to Jan- 4 | 7.11 | | 7.83 | 7.84 | 7.51 |
| 2008 Jan- 7 to Jan-11 | 7.61 | 7.59 | 7.89 | 7.96 | 8.13 |
| 2008 Jan-14 to Jan-18 | 8.45 | 8.43 | 8.23 | 8.10 | 8.42 |

| Week | | | | | |
|------|------|------|------|------|------|
| 2008 Jan-21 to Jan-25 | | 7.97 | 7.84 | 7.85 | 7.80 |
| 2008 Jan-28 to Feb- 1 | 7.87 | 8.10 | 8.17 | 8.10 | 7.88 |
| 2008 Feb- 4 to Feb- 8 | 7.56 | 7.80 | 7.94 | 7.99 | 8.06 |
| 2008 Feb-11 to Feb-15 | 8.38 | 8.37 | 8.35 | 8.50 | 8.73 |
| 2008 Feb-18 to Feb-22 | | 8.91 | 9.08 | 8.90 | 8.65 |
| 2008 Feb-25 to Feb-29 | 9.15 | 9.21 | 9.21 | 9.11 | 9.10 |
| 2008 Mar- 3 to Mar- 7 | 9.07 | 9.21 | 9.37 | 9.70 | 9.82 |
| 2008 Mar-10 to Mar-14 | 9.59 | 9.85 | 9.69 | 9.74 | 9.84 |
| 2008 Mar-17 to Mar-21 | 9.59 | 9.10 | 9.11 | 8.54 | |
| 2008 Mar-24 to Mar-28 | 8.99 | 9.28 | 9.25 | 9.30 | 9.36 |
| 2008 Mar-31 to Apr- 4 | 9.86 | 9.92 | 9.60 | 9.68 | 9.36 |
| 2008 Apr- 7 to Apr-11 | 9.48 | 9.78 | 9.88 | 10.18 | 10.07 |
| 2008 Apr-14 to Apr-18 | 10.03 | 10.16 | 10.11 | 10.27 | 10.08 |
| 2008 Apr-21 to Apr-25 | 10.50 | 10.56 | 10.33 | 10.58 | 10.72 |
| 2008 Apr-28 to May- 2 | 10.95 | 10.94 | 10.81 | 10.66 | 10.37 |
| 2008 May- 5 to May- 9 | 10.77 | 11.09 | 11.08 | 11.33 | 11.29 |
| 2008 May-12 to May-16 | 11.38 | 11.18 | 11.52 | 11.41 | 11.31 |
| 2008 May-19 to May-23 | 11.10 | 10.94 | 11.40 | 11.57 | 11.56 |
| 2008 May-26 to May-30 | | 11.85 | 11.60 | 11.81 | 11.43 |
| 2008 Jun- 2 to Jun- 6 | 11.80 | 12.27 | 12.17 | 12.49 | 12.71 |
| 2008 Jun- 9 to Jun-13 | 12.71 | 12.72 | 12.49 | 12.51 | 12.51 |
| 2008 Jun-16 to Jun-20 | 12.73 | 12.87 | 12.93 | 13.09 | 12.76 |
| 2008 Jun-23 to Jun-27 | 12.92 | 12.96 | 12.76 | 12.70 | 13.10 |
| 2008 Jun-30 to Jul- 4 | 13.19 | 13.28 | 13.31 | 13.00 | |
| 2008 Jul- 7 to Jul-11 | 12.96 | 12.47 | 12.10 | 11.83 | 12.15 |
| 2008 Jul-14 to Jul-18 | 11.58 | 11.79 | 11.15 | 11.43 | 10.54 |
| 2008 Jul-21 to Jul-25 | 10.58 | 10.16 | 9.88 | 9.70 | 9.34 |
| 2008 Jul-28 to Aug- 1 | 9.26 | 9.17 | 9.01 | 9.26 | 9.05 |
| 2008 Aug- 4 to Aug- 8 | 9.20 | 8.66 | 8.70 | 8.77 | 8.22 |
| 2008 Aug-11 to Aug-15 | 8.18 | 8.23 | 8.11 | 8.15 | 7.82 |
| 2008 Aug-18 to Aug-22 | 7.74 | 7.73 | 8.02 | 8.04 | 7.98 |
| 2008 Aug-25 to Aug-29 | 7.63 | 8.02 | 8.54 | 8.36 | 8.24 |
| 2008 Sep- 1 to Sep- 5 | | 8.24 | 7.26 | 7.24 | 7.40 |
| 2008 Sep- 8 to Sep-12 | 7.68 | 7.28 | 7.65 | 7.83 | 8.02 |
| 2008 Sep-15 to Sep-19 | 8.02 | 7.76 | 7.72 | 8.26 | 7.79 |
| 2008 Sep-22 to Sep-26 | 7.66 | 7.84 | 8.15 | 7.63 | 7.42 |
| 2008 Sep-29 to Oct- 3 | 7.13 | 7.17 | 7.41 | 7.64 | 7.16 |
| 2008 Oct- 6 to Oct-10 | 6.87 | 6.74 | 6.58 | 6.69 | 6.52 |
| 2008 Oct-13 to Oct-17 | 6.62 | 6.74 | 6.64 | 6.65 | 6.76 |
| 2008 Oct-20 to Oct-24 | 6.98 | 6.76 | 6.94 | 6.77 | 6.29 |
| 2008 Oct-27 to Oct-31 | 6.27 | 6.40 | 6.58 | 6.75 | 6.18 |
| 2008 Nov- 3 to Nov- 7 | 6.45 | 6.79 | 6.94 | 7.04 | 6.60 |
| 2008 Nov-10 to Nov-14 | 7.07 | 7.02 | 6.65 | 6.31 | 6.33 |
| 2008 Nov-17 to Nov-21 | 6.55 | 6.74 | 6.76 | 6.76 | 6.56 |
| 2008 Nov-24 to Nov-28 | 6.85 | 6.71 | 6.43 | | 6.43 |
| 2008 Dec- 1 to Dec- 5 | 6.48 | 6.68 | 6.48 | 6.55 | 5.99 |
| 2008 Dec- 8 to Dec-12 | 5.73 | 5.57 | 5.67 | 5.86 | 5.56 |
| 2008 Dec-15 to Dec-19 | 5.75 | 5.75 | 5.79 | 5.63 | 5.66 |
| 2008 Dec-22 to Dec-26 | 5.39 | 5.37 | 5.44 | | 5.44 |
| 2008 Dec-29 to Jan- 2 | 5.81 | 5.71 | 5.63 | | 5.41 |
| 2009 Jan- 5 to Jan- 9 | 5.83 | 6.10 | 5.89 | 5.96 | 5.60 |
| 2009 Jan-12 to Jan-16 | 5.59 | 5.70 | 5.47 | 5.27 | 5.09 |
| 2009 Jan-19 to Jan-23 | | 4.86 | 4.87 | 4.72 | 4.75 |
| 2009 Jan-26 to Jan-30 | 4.62 | 4.76 | 4.84 | 4.71 | 4.77 |
| 2009 Feb- 2 to Feb- 6 | 4.48 | 5.04 | 5.01 | 4.84 | 4.67 |
| 2009 Feb- 9 to Feb-13 | 4.76 | 4.84 | 4.68 | 4.73 | 4.60 |
| 2009 Feb-16 to Feb-20 | | 4.35 | 4.35 | 4.46 | 4.21 |
| 2009 Feb-23 to Feb-27 | 4.23 | 4.21 | 4.20 | 4.08 | 4.04 |
| 2009 Mar- 2 to Mar- 6 | 4.36 | 4.43 | 4.23 | 4.22 | 3.93 |
| 2009 Mar- 9 to Mar-13 | 3.86 | 3.88 | 3.92 | 3.87 | 3.90 |
| 2009 Mar-16 to Mar-20 | 3.78 | 3.78 | 3.75 | 3.68 | 3.99 |
| 2009 Mar-23 to Mar-27 | 4.17 | 4.13 | 4.13 | 4.16 | 3.73 |
| 2009 Mar-30 to Apr- 3 | 3.63 | 3.58 | 3.56 | 3.69 | 3.66 |
| 2009 Apr- 6 to Apr-10 | 3.74 | 3.60 | 3.50 | 3.59 | |
| 2009 Apr-13 to Apr-17 | 3.46 | 3.59 | 3.60 | 3.54 | 3.47 |
| 2009 Apr-20 to Apr-24 | 3.55 | 3.43 | 3.48 | 3.46 | 3.31 |
| 2009 Apr-27 to May- 1 | 3.19 | 3.29 | 3.43 | 3.25 | 3.30 |
| 2009 May- 4 to May- 8 | 3.47 | 3.62 | 3.67 | 3.96 | 4.16 |
| 2009 May-11 to May-15 | 4.24 | 4.41 | 4.42 | 4.10 | 4.05 |

| | | | | |
|---|---|---|---|---|
| 2009 May-18 to May-22 | 4.02 | 3.99 | 3.75 | 3.77 | 3.41 |
| 2009 May-25 to May-29 | | 3.35 | 3.49 | 3.55 | 3.92 |
| 2009 Jun- 1 to Jun- 5 | 3.86 | 4.05 | 3.81 | 3.58 | 3.51 |
| 2009 Jun- 8 to Jun-12 | 3.53 | 3.53 | 3.56 | 3.51 | 3.54 |
| 2009 Jun-15 to Jun-19 | 3.80 | 4.16 | 3.99 | 4.19 | 4.04 |
| 2009 Jun-22 to Jun-26 | 4.01 | 3.91 | 3.80 | 3.82 | 3.81 |
| 2009 Jun-29 to Jul- 3 | 3.88 | 3.72 | 3.63 | 3.49 | |
| 2009 Jul- 6 to Jul-10 | 3.24 | 3.30 | 3.22 | 3.36 | 3.24 |
| 2009 Jul-13 to Jul-17 | 3.17 | 3.29 | 3.37 | 3.21 | 3.39 |
| 2009 Jul-20 to Jul-24 | 3.49 | 3.48 | 3.49 | 3.66 | 3.37 |
| 2009 Jul-27 to Jul-31 | 3.46 | 3.49 | 3.41 | 3.34 | 3.34 |
| 2009 Aug- 3 to Aug- 7 | 3.43 | 3.53 | 3.61 | 3.78 | 3.57 |
| 2009 Aug-10 to Aug-14 | 3.55 | 3.54 | 3.36 | 3.34 | 3.18 |
| 2009 Aug-17 to Aug-21 | 3.11 | 3.12 | 3.03 | 3.03 | 2.78 |
| 2009 Aug-24 to Aug-28 | 2.69 | 2.85 | 2.76 | 2.76 | 2.52 |
| 2009 Aug-31 to Sep- 4 | 2.42 | 2.36 | 2.25 | 2.06 | 1.83 |
| 2009 Sep- 7 to Sep-11 | | 2.43 | 2.72 | 2.68 | 2.94 |
| 2009 Sep-14 to Sep-18 | 2.84 | 3.21 | 3.28 | 3.50 | 3.21 |
| 2009 Sep-21 to Sep-25 | 3.35 | 3.37 | 3.43 | 3.56 | 3.61 |
| 2009 Sep-28 to Oct- 2 | 3.54 | 3.30 | 3.25 | 2.91 | 2.32 |
| 2009 Oct- 5 to Oct- 9 | 2.89 | 3.23 | 3.70 | 4.24 | 3.92 |
| 2009 Oct-12 to Oct-16 | 3.96 | 4.03 | 3.82 | 3.88 | 3.94 |
| 2009 Oct-19 to Oct-23 | 4.22 | 4.60 | 4.80 | 4.98 | 4.88 |
| 2009 Oct-26 to Oct-30 | 4.52 | 4.52 | 4.59 | 4.11 | 4.11 |
| 2009 Nov- 2 to Nov- 6 | 4.32 | 4.33 | 4.49 | 4.30 | 3.95 |
| 2009 Nov- 9 to Nov-13 | 3.78 | 3.76 | 3.59 | 3.24 | 2.51 |
| 2009 Nov-16 to Nov-20 | 2.65 | 3.47 | 3.74 | 3.57 | 3.09 |
| 2009 Nov-23 to Nov-27 | 3.79 | 3.63 | 3.32 | | 3.32 |
| 2009 Nov-30 to Dec- 4 | 4.41 | 4.30 | 4.67 | 4.57 | 4.53 |
| 2009 Dec- 7 to Dec-11 | 4.78 | 5.10 | 5.27 | 5.02 | 5.21 |
| 2009 Dec-14 to Dec-18 | 5.41 | 5.53 | 5.57 | 5.65 | 5.87 |
| 2009 Dec-21 to Dec-25 | 5.79 | 5.56 | 5.55 | 5.75 | |
| 2009 Dec-28 to Jan- 1 | 5.91 | 6.01 | 5.78 | 5.82 | |
| 2010 Jan- 4 to Jan- 8 | 6.09 | 6.19 | 6.47 | 7.51 | 6.56 |
| 2010 Jan-11 to Jan-15 | 5.77 | 5.57 | 5.61 | 5.77 | 5.66 |
| 2010 Jan-18 to Jan-22 | | 5.51 | 5.54 | 5.52 | 5.67 |
| 2010 Jan-25 to Jan-29 | 5.76 | 5.61 | 5.42 | 5.32 | 5.26 |
| 2010 Feb- 1 to Feb- 5 | 5.30 | 5.47 | 5.51 | 5.47 | 5.61 |
| 2010 Feb- 8 to Feb-12 | 5.73 | 5.54 | 5.48 | 5.53 | 5.48 |
| 2010 Feb-15 to Feb-19 | | 5.65 | 5.47 | 5.40 | 5.10 |
| 2010 Feb-22 to Feb-26 | 4.92 | 4.91 | 4.91 | 4.84 | 4.76 |
| 2010 Mar- 1 to Mar- 5 | 4.83 | 4.78 | 4.76 | 4.78 | 4.56 |
| 2010 Mar- 8 to Mar-12 | 4.47 | 4.51 | 4.44 | 4.47 | 4.35 |
| 2010 Mar-15 to Mar-19 | 4.29 | 4.38 | 4.27 | 4.19 | 4.01 |
| 2010 Mar-22 to Mar-26 | 4.02 | 4.08 | 4.02 | 4.01 | 3.92 |
| 2010 Mar-29 to Apr- 2 | 3.83 | 3.79 | 3.93 | 3.72 | |
| 2010 Apr- 5 to Apr- 9 | 3.93 | 4.16 | 4.08 | 3.92 | 3.90 |
| 2010 Apr-12 to Apr-16 | 4.04 | 3.97 | 4.15 | 4.16 | 3.97 |
| 2010 Apr-19 to Apr-23 | 4.02 | 3.93 | 3.96 | 3.95 | 4.07 |
| 2010 Apr-26 to Apr-30 | 4.23 | 4.18 | 4.19 | 4.24 | 3.94 |
| 2010 May- 3 to May- 7 | 3.86 | 3.96 | 4.00 | 3.97 | 3.91 |
| 2010 May-10 to May-14 | 4.08 | 4.15 | 4.18 | 4.26 | 4.27 |
| 2010 May-17 to May-21 | 4.34 | 4.42 | 4.28 | 4.12 | 4.12 |
| 2010 May-24 to May-28 | 4.08 | 4.08 | 4.19 | 4.22 | 4.31 |
| 2010 May-31 to Jun- 4 | | 4.39 | 4.32 | 4.46 | 4.60 |
| 2010 Jun- 7 to Jun-11 | 4.67 | 4.89 | 4.75 | 4.68 | 4.68 |
| 2010 Jun-14 to Jun-18 | 4.94 | 5.11 | 5.13 | 5.14 | 5.17 |
| 2010 Jun-21 to Jun-25 | 5.15 | 4.87 | 4.90 | 4.88 | 4.84 |
| 2010 Jun-28 to Jul- 2 | 4.85 | 4.68 | 4.53 | 4.54 | 4.72 |
| 2010 Jul- 5 to Jul- 9 | | 4.85 | 4.76 | 4.61 | 4.36 |
| 2010 Jul-12 to Jul-16 | 4.42 | 4.46 | 4.39 | 4.43 | 4.68 |
| 2010 Jul-19 to Jul-23 | 4.56 | 4.59 | 4.70 | 4.67 | 4.69 |
| 2010 Jul-26 to Jul-30 | 4.65 | 4.72 | 4.75 | 4.80 | 4.81 |
| 2010 Aug- 2 to Aug- 6 | 4.94 | 4.78 | 4.77 | 4.84 | 4.67 |
| 2010 Aug- 9 to Aug-13 | 4.52 | 4.43 | 4.38 | 4.42 | 4.35 |
| 2010 Aug-16 to Aug-20 | 4.37 | 4.28 | 4.35 | 4.29 | 4.19 |
| 2010 Aug-23 to Aug-27 | 4.12 | 4.07 | 3.99 | 3.85 | 3.75 |
| 2010 Aug-30 to Sep- 3 | 3.77 | 3.80 | 3.73 | 3.74 | 3.74 |

| | | | | | |
|---|---|---|---|---|---|
| 2010 Sep- 6 to Sep-10 | | 3.82 | 3.81 | 3.79 | 3.79 |
| 2010 Sep-13 to Sep-17 | 3.83 | 3.98 | 4.06 | 4.09 | 4.11 |
| 2010 Sep-20 to Sep-24 | 4.01 | 3.95 | 4.02 | 4.08 | 3.97 |
| 2010 Sep-27 to Oct- 1 | 3.80 | 3.80 | 3.81 | 3.85 | 3.67 |
| 2010 Oct- 4 to Oct- 8 | 3.56 | 3.51 | 3.56 | 3.62 | 3.36 |
| 2010 Oct-11 to Oct-15 | 3.43 | 3.40 | 3.58 | 3.58 | 3.47 |
| 2010 Oct-18 to Oct-22 | 3.36 | 3.36 | 3.46 | 3.46 | 3.19 |
| 2010 Oct-25 to Oct-29 | 3.18 | 3.28 | 3.37 | 3.36 | 3.36 |
| 2010 Nov- 1 to Nov- 5 | 3.42 | 3.20 | 3.35 | 3.53 | 3.47 |
| 2010 Nov- 8 to Nov-12 | 3.49 | 3.76 | 4.00 | 3.73 | 3.50 |
| 2010 Nov-15 to Nov-19 | 3.56 | 3.66 | 3.77 | 3.89 | 3.79 |
| 2010 Nov-22 to Nov-26 | 4.02 | 3.93 | 3.82 | | 3.82 |
| 2010 Nov-29 to Dec- 3 | 4.12 | 4.16 | 4.21 | 4.28 | 4.23 |
| 2010 Dec- 6 to Dec-10 | 4.47 | 4.48 | 4.47 | 4.52 | 4.37 |
| 2010 Dec-13 to Dec-17 | 4.55 | 4.35 | 4.22 | 4.19 | 3.99 |
| 2010 Dec-20 to Dec-24 | 4.10 | 4.17 | 4.01 | 4.08 | |
| 2010 Dec-27 to Dec-31 | 4.05 | 4.10 | 4.19 | 4.22 | 4.22 |
| 2011 Jan- 3 to Jan- 7 | 4.54 | 4.61 | 4.52 | 4.49 | 4.42 |
| 2011 Jan-10 to Jan-14 | 4.49 | 4.42 | 4.55 | 4.48 | 4.38 |
| 2011 Jan-17 to Jan-21 | | 4.52 | 4.48 | 4.57 | 4.72 |
| 2011 Jan-24 to Jan-28 | 4.72 | 4.46 | 4.40 | 4.41 | 4.27 |
| 2011 Jan-31 to Feb- 4 | 4.42 | 4.42 | 4.55 | 4.69 | 4.48 |
| 2011 Feb- 7 to Feb-11 | 4.32 | 4.24 | 4.22 | 4.11 | 3.96 |
| 2011 Feb-14 to Feb-18 | 3.89 | 3.92 | 3.93 | 3.90 | 3.84 |
| 2011 Feb-21 to Feb-25 | | 3.89 | 3.83 | 3.83 | 3.81 |
| 2011 Feb-28 to Mar- 4 | 3.93 | 3.93 | 3.79 | 3.75 | 3.70 |
| 2011 Mar- 7 to Mar-11 | 3.73 | 3.83 | 3.81 | 3.87 | 3.78 |
| 2011 Mar-14 to Mar-18 | 3.90 | 3.81 | 3.86 | 3.85 | 3.98 |
| 2011 Mar-21 to Mar-25 | 3.99 | 4.05 | 4.18 | 4.27 | 4.13 |
| 2011 Mar-28 to Apr- 1 | 4.35 | 4.27 | 4.25 | 4.32 | 4.32 |
| 2011 Apr- 4 to Apr- 8 | 4.21 | 4.22 | 4.17 | 4.12 | 4.05 |
| 2011 Apr-11 to Apr-15 | 4.05 | 4.08 | 4.14 | 4.12 | 4.21 |
| 2011 Apr-18 to Apr-22 | 4.23 | 4.19 | 4.33 | 4.33 | |
| 2011 Apr-25 to Apr-29 | 4.37 | 4.32 | 4.35 | 4.38 | 4.51 |
| 2011 May- 2 to May- 6 | 4.60 | 4.60 | 4.59 | 4.49 | 4.24 |
| 2011 May- 9 to May-13 | 4.28 | 4.19 | 4.23 | 4.10 | 4.09 |
| 2011 May-16 to May-20 | 4.21 | 4.25 | 4.15 | 4.10 | 4.05 |
| 2011 May-23 to May-27 | 4.27 | 4.37 | 4.36 | 4.37 | 4.36 |
| 2011 May-30 to Jun- 3 | | 4.63 | 4.62 | 4.64 | 4.72 |
| 2011 Jun- 6 to Jun-10 | 4.83 | 4.83 | 4.83 | 4.92 | 4.72 |
| 2011 Jun-13 to Jun-17 | 4.75 | 4.59 | 4.53 | 4.54 | 4.39 |
| 2011 Jun-20 to Jun-24 | 4.33 | 4.37 | 4.42 | 4.31 | 4.20 |
| 2011 Jun-27 to Jul- 1 | 4.25 | 4.34 | 4.40 | 4.28 | 4.33 |
| 2011 Jul- 4 to Jul- 8 | | 4.40 | 4.34 | 4.25 | 4.19 |
| 2011 Jul-11 to Jul-15 | 4.35 | 4.38 | 4.43 | 4.42 | 4.49 |
| 2011 Jul-18 to Jul-22 | 4.60 | 4.60 | 4.64 | 4.58 | 4.46 |
| 2011 Jul-25 to Jul-29 | 4.45 | 4.43 | 4.46 | 4.41 | 4.26 |
| 2011 Aug- 1 to Aug- 5 | 4.29 | 4.30 | 4.26 | 4.20 | 4.00 |
| 2011 Aug- 8 to Aug-12 | 4.00 | 4.06 | 4.09 | 4.06 | 4.17 |
| 2011 Aug-15 to Aug-19 | 4.05 | 4.03 | 3.98 | 3.98 | 3.99 |
| 2011 Aug-22 to Aug-26 | 3.97 | 4.01 | 4.10 | 4.01 | 3.96 |
| 2011 Aug-29 to Sep- 2 | 3.93 | 3.85 | 3.97 | 4.18 | 4.12 |
| 2011 Sep- 5 to Sep- 9 | | 3.93 | 3.96 | 3.99 | 3.96 |
| 2011 Sep-12 to Sep-16 | 3.92 | 3.96 | 4.01 | 4.04 | 3.84 |
| 2011 Sep-19 to Sep-23 | 3.78 | 3.84 | 3.78 | 3.72 | 3.74 |
| 2011 Sep-26 to Sep-30 | 3.80 | 3.92 | 3.88 | 3.77 | 3.68 |
| 2011 Oct- 3 to Oct- 7 | 3.57 | 3.56 | 3.63 | 3.49 | 3.40 |
| 2011 Oct-10 to Oct-14 | 3.41 | 3.52 | 3.54 | 3.42 | 3.49 |
| 2011 Oct-17 to Oct-21 | 3.72 | 3.63 | 3.59 | 3.61 | 3.54 |
| 2011 Oct-24 to Oct-28 | 3.61 | 3.62 | 3.65 | 3.59 | 3.63 |
| 2011 Oct-31 to Nov- 4 | 3.66 | 3.49 | 3.39 | 3.39 | 3.44 |
| 2011 Nov- 7 to Nov-11 | 3.35 | 3.42 | 3.55 | 3.48 | 3.29 |
| 2011 Nov-14 to Nov-18 | 3.17 | 3.12 | 3.11 | 3.11 | 3.01 |
| 2011 Nov-21 to Nov-25 | 2.94 | 3.06 | 2.84 | | 2.84 |
| 2011 Nov-28 to Dec- 2 | 3.09 | 3.39 | 3.53 | 3.49 | 3.35 |
| 2011 Dec- 5 to Dec- 9 | 3.38 | 3.43 | 3.45 | 3.42 | 3.29 |
| 2011 Dec-12 to Dec-16 | 3.13 | 3.12 | 3.08 | 3.05 | 3.01 |
| 2011 Dec-19 to Dec-23 | 3.03 | 3.06 | 3.05 | 3.08 | 2.97 |

| Week | | | | | |
|---|---|---|---|---|---|
| 2011 Dec-26 to Dec-30 | | 3.09 | 3.07 | 3.03 | 2.98 |
| 2012 Jan- 2 to Jan- 6 | | 2.97 | 2.96 | 2.91 | 2.85 |
| 2012 Jan- 9 to Jan-13 | 2.89 | 2.97 | 2.81 | 2.70 | 2.67 |
| 2012 Jan-16 to Jan-20 | | 2.51 | 2.49 | 2.36 | 2.23 |
| 2012 Jan-23 to Jan-27 | 2.39 | 2.60 | 2.61 | 2.68 | 2.59 |
| 2012 Jan-30 to Feb- 3 | 2.71 | 2.51 | 2.32 | 2.30 | 2.40 |
| 2012 Feb- 6 to Feb-10 | 2.46 | 2.60 | 2.48 | 2.50 | 2.51 |
| 2012 Feb-13 to Feb-17 | 2.42 | 2.48 | 2.54 | 2.47 | 2.67 |
| 2012 Feb-20 to Feb-24 | | 2.63 | 2.60 | 2.68 | 2.60 |
| 2012 Feb-27 to Mar- 2 | 2.55 | 2.44 | 2.44 | 2.45 | 2.38 |
| 2012 Mar- 5 to Mar- 9 | 2.31 | 2.30 | 2.24 | 2.24 | 2.21 |
| 2012 Mar-12 to Mar-16 | 2.17 | 2.15 | 2.13 | 2.07 | 2.01 |
| 2012 Mar-19 to Mar-23 | 2.14 | 2.19 | 2.21 | 2.19 | 2.07 |
| 2012 Mar-26 to Mar-30 | 2.16 | 2.09 | 2.05 | 2.02 | 2.00 |
| 2012 Apr- 2 to Apr- 6 | 1.88 | 1.94 | 2.06 | 1.98 | |
| 2012 Apr- 9 to Apr-13 | 1.99 | 1.99 | 1.91 | 1.87 | 1.87 |
| 2012 Apr-16 to Apr-20 | 1.88 | 1.89 | 1.87 | 1.85 | 1.82 |
| 2012 Apr-23 to Apr-27 | 1.89 | 1.97 | 1.99 | 2.10 | 2.05 |
| 2012 Apr-30 to May- 4 | 2.10 | 2.29 | 2.31 | 2.29 | 2.30 |
| 2012 May- 7 to May-11 | 2.30 | 2.27 | 2.36 | 2.36 | 2.37 |
| 2012 May-14 to May-18 | 2.41 | 2.38 | 2.50 | 2.60 | 2.56 |
| 2012 May-21 to May-25 | 2.60 | 2.55 | 2.60 | 2.66 | 2.56 |
| 2012 May-28 to Jun- 1 | | 2.50 | 2.39 | 2.34 | 2.24 |
| 2012 Jun- 4 to Jun- 8 | 2.32 | 2.39 | 2.41 | 2.33 | 2.22 |
| 2012 Jun-11 to Jun-15 | 2.22 | 2.17 | 2.18 | 2.20 | 2.44 |
| 2012 Jun-18 to Jun-22 | 2.45 | 2.59 | 2.60 | 2.48 | 2.50 |
| 2012 Jun-25 to Jun-29 | 2.70 | 2.70 | 2.87 | 2.81 | 2.74 |
| 2012 Jul- 2 to Jul- 6 | 2.73 | 2.78 | | 2.90 | 2.94 |
| 2012 Jul- 9 to Jul-13 | 2.79 | 2.87 | 2.72 | 2.83 | 2.88 |
| 2012 Jul-16 to Jul-20 | 2.92 | 2.83 | 2.84 | 2.99 | 3.03 |
| 2012 Jul-23 to Jul-27 | 3.05 | 3.16 | 3.19 | 3.13 | 3.10 |
| 2012 Jul-30 to Aug- 3 | 3.14 | 3.20 | 3.20 | 3.16 | 2.91 |
| 2012 Aug- 6 to Aug-10 | 2.90 | 2.99 | 2.97 | 2.89 | 2.84 |
| 2012 Aug-13 to Aug-17 | 2.77 | 2.79 | 2.82 | 2.78 | 2.70 |
| 2012 Aug-20 to Aug-24 | 2.75 | 2.80 | 2.80 | 2.81 | 2.81 |
| 2012 Aug-27 to Aug-31 | 2.80 | 2.71 | 2.64 | 2.72 | 2.72 |
| 2012 Sep- 3 to Sep- 7 | | 2.81 | 2.87 | 2.85 | 2.73 |
| 2012 Sep-10 to Sep-14 | 2.66 | 2.82 | 2.96 | 3.01 | 2.94 |
| 2012 Sep-17 to Sep-21 | 2.83 | 2.74 | 2.70 | 2.76 | 2.76 |
| 2012 Sep-24 to Sep-28 | 2.82 | 2.84 | 2.92 | 3.01 | 3.08 |
| 2012 Oct- 1 to Oct- 5 | 3.19 | 3.21 | 3.21 | 3.23 | 3.26 |
| 2012 Oct- 8 to Oct-12 | 3.18 | 3.18 | 3.26 | 3.28 | 3.38 |
| 2012 Oct-15 to Oct-19 | 3.35 | 3.27 | 3.24 | 3.28 | 3.43 |
| 2012 Oct-22 to Oct-26 | 3.49 | 3.34 | 3.43 | 3.39 | 3.38 |
| 2012 Oct-29 to Nov- 2 | 3.40 | 3.42 | 3.50 | 3.50 | 3.40 |
| 2012 Nov- 5 to Nov- 9 | 3.34 | 3.41 | 3.47 | 3.45 | 3.33 |
| 2012 Nov-12 to Nov-16 | 3.40 | 3.57 | 3.66 | 3.63 | 3.46 |
| 2012 Nov-19 to Nov-23 | 3.63 | 3.62 | 3.59 | | 3.59 |
| 2012 Nov-26 to Nov-30 | 3.75 | 3.77 | 3.71 | 3.61 | 3.46 |
| 2012 Dec- 3 to Dec- 7 | 3.44 | 3.38 | 3.41 | 3.48 | 3.33 |
| 2012 Dec-10 to Dec-14 | 3.35 | 3.39 | 3.33 | 3.27 | 3.15 |
| 2012 Dec-17 to Dec-21 | 3.20 | 3.29 | 3.25 | 3.35 | 3.42 |
| 2012 Dec-24 to Dec-28 | 3.30 | | 3.35 | 3.31 | 3.40 |
| 2012 Dec-31 to Jan- 4 | 3.43 | | 3.30 | 3.19 | 3.20 |
| 2013 Jan- 7 to Jan-11 | 3.30 | 3.21 | 3.14 | 3.08 | 3.18 |
| 2013 Jan-14 to Jan-18 | 3.39 | 3.40 | 3.43 | 3.44 | 3.54 |
| 2013 Jan-21 to Jan-25 | | 3.63 | 3.53 | 3.56 | 3.42 |
| 2013 Jan-28 to Feb- 1 | 3.25 | 3.14 | 3.24 | 3.33 | 3.34 |
| 2013 Feb- 4 to Feb- 8 | 3.27 | 3.34 | 3.41 | 3.39 | 3.26 |
| 2013 Feb-11 to Feb-15 | 3.20 | 3.30 | 3.29 | 3.30 | 3.19 |
| 2013 Feb-18 to Feb-22 | | 3.23 | 3.34 | 3.29 | 3.27 |
| 2013 Feb-25 to Mar- 1 | 3.42 | 3.46 | 3.49 | 3.48 | 3.54 |
| 2013 Mar- 4 to Mar- 8 | 3.53 | 3.63 | 3.57 | 3.54 | 3.57 |
| 2013 Mar-11 to Mar-15 | 3.64 | 3.71 | 3.72 | 3.74 | 3.89 |
| 2013 Mar-18 to Mar-22 | 3.98 | 3.96 | 3.97 | 4.01 | 4.01 |
| 2013 Mar-25 to Mar-29 | 4.08 | 3.99 | 4.08 | 4.03 | |
| 2013 Apr- 1 to Apr- 5 | 3.97 | 4.07 | 4.00 | 3.94 | 3.98 |
| 2013 Apr- 8 to Apr-12 | 4.18 | 4.08 | 4.07 | 4.11 | 4.21 |
| 2013 Apr-15 to Apr-19 | 4.23 | 4.19 | 4.24 | 4.23 | 4.38 |

| | | | | |
|---|---|---|---|---|
| 2013 Apr-22 to Apr-26 | 4.33 | 4.27 | 4.25 | 4.19 | 4.16 |
| 2013 Apr-29 to May- 3 | 4.28 | 4.30 | 4.31 | 4.28 | 3.98 |
| 2013 May- 6 to May-10 | 3.93 | 3.88 | 3.86 | 3.87 | 3.90 |
| 2013 May-13 to May-17 | 3.87 | 3.93 | 4.03 | 4.01 | 3.89 |
| 2013 May-20 to May-24 | 4.10 | 4.13 | 4.16 | 4.15 | 4.15 |
| 2013 May-27 to May-31 | | 4.19 | 4.15 | 4.12 | 4.02 |
| 2013 Jun- 3 to Jun- 7 | 4.00 | 4.00 | 3.99 | 3.93 | 3.79 |
| 2013 Jun-10 to Jun-14 | 3.85 | 3.77 | 3.74 | 3.73 | 3.76 |
| 2013 Jun-17 to Jun-21 | 3.78 | 3.90 | 3.93 | 3.90 | 3.85 |
| 2013 Jun-24 to Jun-28 | 3.81 | 3.77 | 3.72 | 3.73 | 3.57 |
| 2013 Jul- 1 to Jul- 5 | 3.52 | 3.58 | 3.54 | | 3.52 |
| 2013 Jul- 8 to Jul-12 | 3.65 | 3.69 | 3.69 | 3.64 | 3.61 |
| 2013 Jul-15 to Jul-19 | 3.67 | 3.69 | 3.67 | 3.66 | 3.78 |
| 2013 Jul-22 to Jul-26 | 3.71 | 3.68 | 3.70 | 3.68 | 3.59 |
| 2013 Jul-29 to Aug- 2 | 3.49 | 3.48 | 3.46 | 3.44 | 3.39 |
| 2013 Aug- 5 to Aug- 9 | 3.33 | 3.35 | 3.32 | 3.27 | 3.32 |
| 2013 Aug-12 to Aug-16 | 3.34 | 3.34 | 3.36 | 3.34 | 3.35 |
| 2013 Aug-19 to Aug-23 | 3.46 | 3.48 | 3.51 | 3.52 | 3.50 |
| 2013 Aug-26 to Aug-30 | 3.55 | 3.50 | 3.54 | 3.58 | 3.57 |
| 2013 Sep- 2 to Sep- 6 | | 3.64 | 3.68 | 3.70 | 3.55 |
| 2013 Sep- 9 to Sep-13 | 3.62 | 3.65 | 3.60 | 3.57 | 3.60 |
| 2013 Sep-16 to Sep-20 | 3.64 | 3.77 | 3.72 | 3.73 | 3.68 |
| 2013 Sep-23 to Sep-27 | 3.66 | 3.59 | 3.52 | 3.49 | 3.51 |
| 2013 Sep-30 to Oct- 4 | 3.48 | 3.56 | 3.63 | 3.58 | 3.57 |
| 2013 Oct- 7 to Oct-11 | 3.62 | 3.72 | 3.70 | 3.74 | 3.74 |
| 2013 Oct-14 to Oct-18 | 3.82 | 3.83 | 3.84 | 3.75 | 3.72 |
| 2013 Oct-21 to Oct-25 | 3.77 | 3.70 | 3.66 | 3.65 | 3.69 |
| 2013 Oct-28 to Nov- 1 | 3.61 | 3.57 | 3.55 | 3.57 | 3.45 |
| 2013 Nov- 4 to Nov- 8 | 3.38 | 3.37 | 3.46 | 3.59 | 3.54 |
| 2013 Nov-11 to Nov-15 | 3.62 | 3.69 | 3.69 | 3.52 | 3.56 |
| 2013 Nov-18 to Nov-22 | 3.71 | 3.63 | 3.63 | 3.68 | 3.78 |
| 2013 Nov-25 to Nov-29 | 3.85 | 3.87 | 3.87 | | 3.87 |
| 2013 Dec- 2 to Dec- 6 | 3.85 | 3.84 | 3.89 | 3.97 | 4.15 |
| 2013 Dec- 9 to Dec-13 | 4.24 | 4.24 | 4.24 | 4.40 | 4.44 |
| 2013 Dec-16 to Dec-20 | 4.21 | 4.20 | 4.25 | 4.25 | 4.35 |
| 2013 Dec-23 to Dec-27 | 4.52 | 4.52 | | 4.40 | 4.34 |
| 2013 Dec-30 to Jan- 3 | 4.41 | 4.31 | | 4.32 | 4.39 |
| 2014 Jan- 6 to Jan-10 | 4.50 | 4.58 | 4.36 | 4.15 | 3.95 |
| 2014 Jan-13 to Jan-17 | 4.19 | 4.36 | 4.45 | 4.55 | 4.39 |
| 2014 Jan-20 to Jan-24 | | 4.61 | 4.92 | 5.64 | 5.17 |
| 2014 Jan-27 to Jan-31 | 5.66 | 5.25 | 5.23 | 5.27 | 5.04 |
| 2014 Feb- 3 to Feb- 7 | 5.04 | 5.78 | 8.12 | 6.90 | 5.92 |
| 2014 Feb-10 to Feb-14 | 8.15 | 7.75 | 5.96 | 5.34 | 5.54 |
| 2014 Feb-17 to Feb-21 | | 5.80 | 6.00 | 5.96 | 6.24 |
| 2014 Feb-24 to Feb-28 | 6.08 | 5.21 | 4.81 | 4.61 | 4.80 |
| 2014 Mar- 3 to Mar- 7 | 7.09 | 7.98 | 6.46 | 4.89 | 4.78 |
| 2014 Mar-10 to Mar-14 | 4.67 | 4.67 | 4.72 | 4.41 | 4.40 |
| 2014 Mar-17 to Mar-21 | 4.57 | 4.42 | 4.43 | 4.39 | 4.33 |
| 2014 Mar-24 to Mar-28 | 4.42 | 4.53 | 4.44 | 4.39 | 4.50 |
| 2014 Mar-31 to Apr- 4 | 4.48 | 4.39 | 4.39 | 4.51 | 4.49 |
| 2014 Apr- 7 to Apr-11 | 4.58 | 4.57 | 4.67 | 4.67 | 4.67 |
| 2014 Apr-14 to Apr-18 | 4.64 | 4.69 | 4.64 | 4.64 | |
| 2014 Apr-21 to Apr-25 | 4.76 | | | | |

- = No Data Reported;  -- = Not Applicable;  NA = Not Available;  W = Withheld to avoid disclosure of individual company data.

Release Date: 4/23/2014
Next Release Date: 4/30/2014

Referring Pages:
■   Natural Gas Futures Prices (NYMEX)

**Appendix O**

Wall Street Journal, Nicole Friedman, *Natural Gas Soars as Stockpiles Drop*, February 13, 2014

**To investors who want to retire comfortably.**

If you have a $500,000 portfolio, download the guide by *Forbes* columnist and money manager Ken Fisher's firm.
It's called **"The 15-Minute Retirement Plan."** Even if you have something else in place right now, it *still* makes sense
to request your guide!

Click Here to Download Your Guide!

FISHER INVESTMENTS'

Dow Jones Reprints: This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or
customers, use the Order Reprints tool at the bottom of any article or visit www.djreprints.com

• See a sample reprint in PDF format.  • Order a reprint of this article now

COMMODITIES

# Natural Gas Soars as Stockpiles Drop

*Prices Top $5 as a Frigid Winter Fuels Demand for Heating*

ByNICOLE FRIEDMAN

Updated Feb. 13, 2014 5:28 p.m. ET



The cold has hurt natural-gas output while boosting demand. Above,aColorado gas operation last
March. *Associated Press*

NEW YORK—Natural-gas prices surged Thursday as government data showed that supplies in storage
facilities, already relatively limited, shrank more than expected last week.

High demand for the heating fuel, the result of unusually cold weather, has boosted prices 23% this year
and reduced natural-gas stockpiles, prompting fears that supplies could stay exceptionally low even after
winter ends.

At 1.686 trillion cubic feet, natural-gas supplies are at their lowest for this time of year in a decade, analysts
said. About 237 billion cubic feet of gas was pulled from storage in the week ended Feb. 7, the U.S. Energy
Information Administration said Thursday. That was 8 bcf more than a Wall Street Journal survey indicated
analysts had expected.

Futures prices shot above $5 a million British thermal units after the report's release and settled up 8.3% at $5.223 per mmBtu.

"What a very explosive reaction," said Teri Viswanath, director of commodity strategy for natural gas for BNP Paribas SA. "Seeing a [withdrawal] number that came in at the high end of expectations simply fueled supply concerns."

Another unusually large withdrawal from storage is expected to be announced next week, due to a snowstorm pummeling the eastern U.S. this week and wintry weather elsewhere in the country. Temperatures are forecast to moderate the following week. But colder-than-average weather could return by late February, adding to natural-gas demand.

Futures for March delivery settled 59.1 cents above the April contract, a differential more than twice as big as on Wednesday, indicating concern that supplies could get scarce if heating demand stays robust.

"The focus right now is: Do we have enough gas to deliver to customers in March?" said Ben Smith, president of market-data service First Enercast Financial in Denver. "We really have over a month of winter still."

Demand last week exceeded seasonal norms by 17 billion cubic feet per day on average, according to CIBC World Markets Inc., an investment bank. Freezing temperatures also halted some natural-gas production, prompting utilities to draw more natural gas out of storage. The weather lowered production by nearly 8 bcf last week, according to CIBC.

Prices in this weather-driven market have been especially volatile in recent weeks, and Thursday's settlement was only a one-week high.

"If we see forecasts for sustained warm weather, this rally could come to a very quick end," said Kent Bayazitoglu, an analyst for energy-advisory firm Gelber & Associates in Houston.

But others are hesitant to bet on falling prices before winter has run its course.

"I'm sitting out here at the beginning of the day looking at 18 inches of snow," said Gerry Sullivan, who oversees more than $250 million as a portfolio manager for Dallas-based USA Mutuals.

Mr. Sullivan, who is based in Summit, N.J., made a bet last month that natural-gas prices would rise, expanding one of his funds' holdings of an exchange-traded fund that is designed to track futures from 2% to 8% of the fund's total investments. "It's been a good position," he said.

**Write to** Nicole Friedman at nicole.friedman@wsj.com

Copyright 2013 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com

## **Appendix P**

Financial Post, *Natural gas drillers wary as some see year-long supply squeeze*, February 10, 2014