## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| SORENSON COMMUNICATIONS, INC., *et al.*,[1] | ) Case No. 14-10454 ([____]) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

### MOTION OF SORENSON COMMUNICATIONS, INC., *ET AL.* FOR ENTRY OF AN ORDER AUTHORIZING PAYMENT OF CERTAIN PREPETITION (A) WAGES, SALARIES, AND OTHER COMPENSATION, (B) REIMBURSABLE EMPLOYEE EXPENSES, (C) EMPLOYEE BENEFITS, AND (D) RELATED COSTS

The above-captioned debtors (collectively, the "***Debtors***") file this motion for entry of an order, substantially in the form attached hereto as Exhibit A (the "***Order***"), authorizing the Debtors to pay certain prepetition:  (a) wages, salaries, and other compensation; (b) reimbursable employee expenses; (c) employee benefits; and (d) related costs.  In support of this motion, the Debtors respectfully state as follows:

### Jurisdiction

1.      The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1]    The Debtors, together with the last four digits of each of the Debtors' federal tax identification number, are: Sorenson Communications, Inc. (0555); Allied Communications, Inc. (3611); CaptionCall, LLC (9444); SCI Holdings, Inc. (9815); Sorenson Communications Holdings, LLC (9866); Sorenson Communications of Canada, ULC (9719); and Sorenson Holdings, Inc. (0427).  For the purpose of these chapter 11 cases, the service address for the Debtors is:  4192 South Riverboat Road, Salt Lake City, Utah 84123.

3.     The statutory bases for the relief requested herein are sections 105(a), 363(b), 507, 541(b), and 1129(a)(9)(B) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "***Bankruptcy Code***"), and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***").

### Relief Requested

4.     The Debtors seek entry of the Order authorizing them to pay prepetition claims and honor obligations, and continue programs, as applicable, in the ordinary course of business relating to:  (a) employee wages, salaries, and other compensation; (b) reimbursable employee expenses; (c) employee benefits and related programs; and (d) related costs (collectively, the "***Obligations***"),[2] as more fully described in this motion.

### Introduction

5.     The Debtors filed these chapter 11 cases to implement a consensual, balance-sheet restructuring under a prepackaged chapter 11 plan of reorganization (the "***Plan***").  Under the Plan, there are only two impaired classes — senior secured notes claims and equity interests.  Under a prepetition support agreement, holders of approximately 85% in amount of all senior secured notes claims (whom also hold nearly a majority of first lien debt claims) and holders of approximately 85% in amount of all equity interests support the Plan.  Other than these two classes, all other creditors, including holders of general unsecured claims, are "riding through" these chapter 11 cases.

---

[2]   Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors or a waiver of the Debtors' rights to dispute any claim.  The Debtors expressly reserve their rights to contest any claim related to the relief sought herein.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to an order entered by the Court is not intended and should not be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

**Business Overview[3]**

6.      The Debtors are the leading provider of telecommunications technology and services for individuals with hearing loss in the United States.[4]  The Debtors' video relay service allows people experiencing a hearing loss to communicate with hearing individuals through a company interpreter.  The interpreter and the individual experiencing hearing loss communicate via a videophone, which the Debtors often provide, over the Internet using American Sign Language, and the interpreter communicates verbally with the hearing individual on the other end of the call.  The Debtors' CaptionCall service allows individuals with hearing loss who have difficulty hearing on a phone to use a Debtor-provided telephone to use the phone.  This phone is connected to the Internet and a regular phone line and allows eligible users to read captions of what the other party on the call is saying and to respond using their own voice.  The Debtors hold a leading market share of such video relay and captioned services.

7.      Title IV of the Americans with Disabilities Act, as amended, which is codified as part of the Communications Act of 1934, as amended, governs the Debtors' businesses.  The Federal Communications Commission ("*FCC*") promulgates rules and regulations under these acts.  It requires interstate telecommunications carriers, such as Sprint and Verizon, and interconnected and non-interconnected Voice over Internet Protocol providers, to contribute

---

[3]   For more information regarding the Debtors' history, operations, and financial performance, see the *Declaration of Scott Sorensen in Support of First Day Motions* (the "*First Day Declaration*"), filed concurrently with this motion. On March 3, 2014 (the "*Petition Date*"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors have filed a motion seeking joint administration of their chapter 11 cases under Bankruptcy Rule 1015(b). The Debtors are operating their businesses as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

[4]   The Debtors are headquartered in Salt Lake City, Utah and employ about 6,800 personnel throughout the United States, including Puerto Rico, and Canada.

funds to the Interstate Telecommunication Relay Service Fund (the "*TRS Fund*") from which the Debtors receive more than 99% of their gross revenues — the Debtors' services are free to users, as, in most cases, is use of the necessary end user equipment. The FCC also sets compensation rates and minimum performance standards. The Debtors' failure to comply with the rules and regulations can result in the FCC denying compensation for services rendered.

8.      Video relay service compensation rates have decreased each year since 2010. As a result, despite the Debtors' productivity improvements and expense reductions, the Debtors' adjusted EBITDA decreased from $239 million to $201 million, or by approximately 16%, for fiscal year 2013 over fiscal year 2009. Further, in June 2013, the FCC released a new video relay service ("*VRS*") rate order that further reduces reimbursement rates every six months. At the same time, the FCC increased mandatory performance standards to a level that the Debtors believe may be unsustainable, as failing to meet a daily measurement would result in denial of compensation for the entire day. The Debtors believe that such regulations could put at risk the quality and availability of telecommunication services for the hearing loss community over the long term.

9.      As of January 31, 2014, the book value of the Debtors' assets totaled approximately $645 million and their liabilities totaled approximately $1.4 billion. The Debtors' $550 million first lien credit facility and $735 million of senior secured notes are scheduled to mature in October 2014 and February 2015, respectively. The impact of the changing regulatory environment of the VRS industry negatively affects the Debtors' ability to refinance their funded debt in the market, and the Debtors will not have sufficient cash to pay the principal balances on such debts as they become due. Additionally, the Debtors require time to engage the FCC in

discussions regarding setting compensation rates and performance standards at sustainable levels.  Accordingly, the Debtors must restructure their balance sheet presently.

### The Restructuring

10.     The Debtors began restructuring negotiations with holders of over 77% in amount of their senior secured notes and their primary equity holders almost five months prior to the Petition Date.  These extensive negotiations among highly sophisticated parties resulted in the execution on February 27, 2014 of a support agreement in furtherance the Plan.

11.     The Plan provides, among other things, that the Debtors will: (a) enter into a $550 million exit first lien credit facility backstopped by certain senior secured note holders; (b) exchange existing senior secured notes for a combination of new notes, new equity, and cash; and (c) exchange existing equity for a combination of new notes and new equity.  The Debtors' current senior secured note holders will own 87% of the reorganized company.  Holders of the Debtors' first lien debt are being paid in full in cash and are unimpaired under the Plan, as are general unsecured creditors.  Critically, the Plan will extend the maturities of the Debtors' first and second lien debt until 2020 and otherwise improve the Debtors' ability to service and pay down their indebtedness.  Also, the new notes under the Plan contain paid-in-kind interest features that will provide the Debtors a longer liquidity runway.  This financial restructuring will afford the Debtors the breathing room they need to adjust their businesses to address the regulatory changes that have reshaped their industry and engage in discussions with the FCC regarding stabilizing the industry.

12.     The Debtors, with the support of their primary note holders, did not make an interest payment in February to holders of the senior secured notes because restructuring negotiations were nearing completion.  This non-payment triggered a 30-day grace period under

5

the senior secured notes indenture.  On February 27, 2014, the Debtors began soliciting their senior secured note holders and existing equity holders to accept or reject the Plan in accordance with sections 1125 and 1126 of the Bankruptcy Code.  On March 3, 2014, the Debtors filed their bankruptcy petitions in advance of termination of the grace period and to avoid any cross default under the Debtors' first lien credit facility.  The Debtors will complete their 21-day solicitation on March 20, 2014, or 17 days after the Petition Date.  And, as stated earlier, the Debtors have overwhelming support for their restructuring under the support agreement.

### The Obligations[5]

13.    As of January 1, 2014, the Debtors employed approximately 6,800 hourly and salaried employees (collectively, the "*Employees*") and fewer than 15 temporary or contract workers (the "*Contract Workers*").  Approximately 6,220 of the Employees are hourly, the vast majority of whom are interpreters and communications assistants that are core to the Debtors' services.    The Debtors' approximately 545 salaried employees provide management, engineering, and administrative support in connection with the Debtors' services.  Additionally, the Debtors contract with the Contract Workers for services including but not limited to information technology and engineering services.

14.    The Obligations owed to the Employees include compensating them for services rendered to the Debtors, reimbursing certain of their business expenses, and paying for their health and related benefits.

---

[5]    The summary of the Debtors' various Employee Compensation and Benefits (as defined herein) is qualified entirely by the Debtors' official policies or other practices, programs, or agreements, whether written or unwritten, evidencing an arrangement among the Debtors and their Employees (as defined herein) (each, an "*Official Policy*").  In the event of any inconsistency or ambiguity between the summary contained in this Motion and an Official Policy, the terms of such Official Policy shall govern.

15.    The following table contains descriptions of the Obligations and the Debtors'
estimate of the amounts of the Obligations accrued as of the Petition Date, and, of those
amounts, the amounts that are due in the ordinary course of business within 45 days of the
Petition Date:[6]

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 45 Days |
|---|---|---|---|
| Wages | The Debtors typically pay the Employees on a semi-monthly basis.  On average, the Debtors pay wages of approximately $6,082,150 per pay period in aggregate for all Employees.  Certain wages accrued in the ordinary course of business as of the Petition Date and remain unpaid.  And certain Employees may be entitled to unpaid wages because of:  (a) discrepancies between amounts actually paid versus required to be paid and (b) checks issued before the Petition Date that were not presented for payment or did not clear the Debtors' cash management system before the Petition Date. These wages include a variety of incentives the Debtors offer to the Employees who install the Debtors' equipment at the users' location and train users in the usage of such equipment.  Such incentives include piece rate bonuses for installations, replacements and upgrades, and periodic promotional programs designed to give incentives to the user-facing staff.[7] | $7,298,581 | $7,298,581 |
| Payroll Costs | The Debtors pay approximately 98% of the Employees by direct deposit and the remaining Employees by check.  For U.S. Employees, the | $5,000 | $5,000 |

---

[6]    The Debtors anticipate emerging from bankruptcy on or around 45 days after the Petition Date.

[7]    The Debtors also provide a Management Bonus Option for approximately 400 Employees, including 9 insiders. Bonus payments are payable as a percentage of base salary and are based on the achievement of certain targeted performance metrics of the Debtors for a given quarter, as well as specific personal objectives set for each Employee, with the first quarter bonus payment to be made on or around April 25, 2014.  The Debtors owe $0 on account of these bonus payments as of the Petition Date, and therefore describe such plan herein only in the interest of full disclosure.  For the avoidance of doubt, the Debtors will not seek to make payment of bonuses to insiders during the pendency of the cases without further court order.

DOCS_DE:191926.1 80459/001

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 45 Days |
|----------|-------------|-----------------------------------------------|---------------------------------------|
| | Debtors process the direct deposit transfers to the Employees through JPMorgan Chase. For Canadian Employees, Ceridian Corporation ("*Ceridian*") processes the Debtors' payroll and its payroll taxes for both the U.S. and Canada. The Debtors pay Ceridian approximately $5,000 per month for its services.[8] | | |
| Deductions | The Debtors routinely deduct certain amounts from their Employees' compensation that represent earnings that judicial authorities or the Employees have designated for deduction, including, for example, garnishments, child support and similar deductions, and other pre-tax and after-tax deductions payable pursuant to certain Employee benefit plans. The Debtors have no legal interest in the deductions and forward these deducted amounts to various third-party recipients. The deductions are not property of the Debtors' estates. | $662,015 | $662,015 |

The Debtors also deduct certain amounts in connection with the medical, dental, and vision plans, employee contributions to their 401(k) plans, contributions to flexible spending accounts, supplemental life and accidental death and dismemberment premiums ("*AD&D*"), and section 132 plans where applicable; all of which are offered to the Employees. Generally, the Employees are responsible for 22% of the medical and dental plan premiums, and the Employees are responsible for 100% of the vision plan premiums, supplemental life and AD&D premiums, contributions to their 401(k) plan, and flexible spending plans.

On a semi-monthly basis, the Debtors deduct approximately $680,166 in aggregate from

---

[8]    The Debtors pay approximately $6,000 a month in fees to JPMorgan Chase on account of transaction fees, including fees related to payroll. Contemporaneous with this Motion, the Debtors have filed the *Motion of Sorenson Communications, Inc., et al. for Entry of Interim and Final Orders Authorizing the Debtors to (A) Continue to Operate the Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Continue Current Investment Practices, and (D) Maintain Existing Business Forms*, in which the Debtors have sought authority to pay such fees to JPMorgan Chase.

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 45 Days |
|---|---|---|---|
| | Employees' pay on account of these deductions. | | |
| Withholdings and Payroll Taxes | The Debtors are required by law to withhold from their Employees' pay amounts related to federal, state, and local income taxes, Social Security, state disability insurance, school district taxes, and Medicare taxes. Further, federal and state laws require the Debtors to deduct additional amounts on account of state unemployment insurance. The Debtors calculate the payroll and tax obligations for each Employee and then transfer these amounts to Ceridian following the end of the applicable payroll period. Ceridian remits these amounts to the appropriate federal, state, or local authority. On a semi-monthly basis, these withheld amounts equal approximately $1,771,250 in the aggregate.<br><br>Also, the Debtors incur payroll employment taxes for Social Security, Medicare, and federal and state unemployment assessments. The Debtors are obligated to pay other state and local employer taxes, including various states' disability and workers compensation taxes as applicable. On a semi-monthly basis, these taxes are approximately $865,308 in aggregate. | $3,163,871 | $3,163,871 |
| Contract Worker Pay | The Contract Workers include independent contractors and individuals hired through various staffing vendors. The Debtors remit compensation to the appropriate staffing vendor, which in turn pays the respective Contract Worker, or the Debtors pay the Contract Workers directly. On average, the Debtors pay a total of less than $40,000 per month on account of the Contract Workers. | $60,000 | $60,000 |
| Travel Expenses and Corporate Credit Card Program | The Debtors directly reimburse Employees for certain approved, reasonable expenses incurred in the scope of their employment and for which they have an expectation of being reimbursed. Certain of the Employees use American Express corporate credit cards to pay for their reasonable expenses, the invoices of which are sent to the Employees; however, the Debtors | $942,500 | $942,500 |

9

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 45 Days |
|---|---|---|---|
| | directly pay American Express. Reimbursable expenses include, for example, business-related travel expenses, such as meals, hotels, flights, mileage, car rentals, and other related expenses. On average, the Debtors pay $725,000 per month in reimbursable expenses. The Employees bear personal liability for charges on the American Express corporate credit cards. | | |
| Health Care Coverage and Other Insurance | Full-time Employees are eligible for health care coverage beginning on the thirty-first day after commencing employment (or on their first day of employment with respect to salaried Employees). The Debtors provide these Employees with medical insurance, including prescription drug benefit coverage, dental insurance, vision insurance, and flexible spending accounts. Certain of the dental plans are self-insured, in which case the Debtors pay a third-party administrator to administer the plan, and the Debtors are responsible for the costs of related Employee claims. Other plans are fully-insured, meaning that the Debtors pay the insurance carrier a set premium on a monthly basis, and the insurance carrier pays the Employees' claims based on the applicable policy terms. Enrollment in each of the various health care options is optional. | $203,936 | $203,936 |

The Debtors' sponsored health and welfare benefits continue until the end of the month in which an Employee terminates his or her employment. The Employee and his or her enrolled dependents have the right to continue (as defined by law) medical, dental, vision, and flexible savings accounts coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("*COBRA*") for approximately 18 months.

The Debtors spend approximately $950,000 per month for the Employees' health care coverage, which includes administrative fees. For U.S. Employees not located in Puerto Rico, the Debtors pay UnitedHealthcare Insurance Company approximately $1.2 million a month

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 45 Days |
|---|---|---|---|
| | in connection with the medical plans, and the Debtors pay Delta Dental Insurance Company and Dental Select approximately $75,000 annually in connection with the dental plans. The Debtors believe there are approximately $65,000 in accrued but unpaid self-insured dental claims. Although the Debtors offer vision insurance, the Employees are responsible for 100% of the costs thereof. | | |
| | For Employees in Puerto Rico, the Debtors pay Triple-S, Inc. approximately $6,000 per month in connection with the health, dental, and vision plans. For Employees in Canada, the Debtors pay SunLife Financial of Canada ("*SunLife*") approximately $15,000 per month in connection with the health, dental, and vision plans. | | |
| | The Debtors provide a number of different types of additional insurance benefits to their existing Employees, including voluntary life and AD&D, business travel accident, short-term disability, and long-term disability. Such insurance plans are fully insured, meaning that the Debtors pay the insurance carrier a set premium on a monthly basis, and the insurance carrier pays the Employees' claims based on the applicable policy terms. | | |
| | For U.S. Employees, the Debtors pay Cigna Insurance Company approximately $51,000 per month for such additional benefits. For Employees in Puerto Rico and Canada, the amounts paid to Sunlife and Triple-S, Inc., include payment on account of the additional benefits. | | |
| Workers' Compensation | The Debtors provide workers' compensation insurance for the Employees at the statutorily required level for each state. The Debtors are insured through Travelers Property and Casualty Insurance Company ("*Travelers*") and pay annual insurance premiums. Also, in accordance with applicable state law, the Debtors pay Travelers to provide workers' compensation coverage to the Employees under | $364,014 | $364,014 |

11

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 45 Days |
|---|---|---|---|
| | state-administered workers' compensation programs. | | |
| Vacation Time and Sick Leave Pay | The Debtors provide a time off with pay program for full-time Employees to use for their vacation, personal, and sick leave, generally at their regular daily rate of pay. Such pay accrues daily up to a maximum annual accrual of 9 to 18 days, depending on length of service and job category. Eligible Employees are permitted to carry over hours each calendar year. Also, the Employees are eligible to receive pay on certain holidays. The Debtors estimate that approximately $5.2 million in earned but unused time off with pay has accrued as of the Petition Date. However, this accrued amount is not a current cash payment obligation, as the Employees are only entitled to cash payments for all accrued and unused vacation time upon termination of employment. Moreover, the Debtors anticipate that the Employees will utilize any accrued time off with pay in the ordinary course of business, which will not create any material cash flow requirements beyond the Debtors' normal payroll obligations. | $5,218,979 | $30,000 |
| Retirement Savings Plans | The Debtors maintain retirement savings plans for the benefit of eligible Employees in the U.S. meeting the requirements of section 401(k) of the Internal Revenue Code, on account of which it deducts amounts from the Employees' pay. The Debtors contribute a 100% match on the first 4% for non-Puerto Rican U.S. Employees and 5% for Employees in Puerto Rico and Canada of annual salary invested by each Employee in the savings plans. All Employees are entitled to the matching payments after one full year of employment and 1,000 hours of service in the calendar year, and each subsequent year of employment. The Employee must be employed as of December 31 of the previous year in order to be eligible to receive their matching contribution for the year (Employees in Canada and Puerto Rico are excepted from this requirement). The Debtors' | $34,923 | $34,923 |

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 45 Days |
|---|---|---|---|
| | matching contributions fully vest for the Employees after five full years of service. Thus, an Employee's contributed funds, any fully-vested matching funds, and interest earned belong to the Employee. The Debtors deduct the Employees' contributions from payroll. | | |
| | Approximately 4,000 Employees currently participate in the savings plans. During 2013, the Debtors contributed approximately $5,400,000 to the savings plans. | | |
| | The Debtors pay Merrill Lynch approximately $7,000 each quarter to administer the retirement savings plan for the benefit of the non-Puerto Rican U.S. Employees. And the Debtors pay UBS AG approximately $1,600 each quarter to administer the retirement savings plan for the benefit of Employees in Puerto Rico. For Employees in Canada, the Debtors pay Great West Life Assurance Company approximately $5,500 annually to administer the retirement plan offered to such Employees. | | |
| Relocation Assistance | From time to time, the Debtors in their discretion provide certain relocation assistance to qualifying Employees. The Debtors have paid and may pay *de minimis* amounts in connection with such assistance. | $3,000 | $3,000 |
| Employee Assistance Program | The Debtors provide Employees with counseling and other personal services. For U.S. Employees, the Debtors pay UnitedHealth and OptumRx, Inc. approximately $600 per month for such programs. For Employees in Canada, the Debtors pay Shepell Morneau, Ltd. approximately $1,256 per month for such services. | $5,500 | $5,500 |
| | Additionally, the Debtors are currently within a six-month trial period of an additional employee assistance program for their interpreters. Eligible Employees receive support for coping with vicarious trauma that such Employees may witness while communicating with a user via a video connection. The Debtors pay Resiliency | | |

DOCS_DE:191926.1 80459/001

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 45 Days |
|---|---|---|---|
| | Resources approximately $4,500 per month for such program. | | |
| Insurance Brokers | In connection with certain of the insurance benefits discussed above, the Debtors employ the services of Group Benefit Services, Inc. ("*GBS*") and Marsh LLC ("*Marsh*") as brokers for the Debtors' benefits plans and workers' compensation insurance, respectively. The Debtors pay GBS approximately $24,000 per year and Marsh approximately $182,000, which amount includes premiums paid to Travelers on account of workers' compensation insurance, per year in connection with such brokerage services. | $7,200 | $0 |
| **Total** | | **$17,969,519** | **$12,773,340** |

16.    As of the Petition Date, no Employee of the Debtors was owed unpaid cash and cash equivalent compensation in excess of the cap of $12,475 set forth in section 507(a)(4) of the Bankruptcy Code.

17.    By this motion, the Debtors also are seeking the authority to pay non-salary cash compensation only to non-insiders. Specifically, the Debtors offer certain Employees piece-rate bonuses and other fringe benefits on account of such Employees' performance. To be sure, the Debtors are <u>not</u> seeking the authority to make bonus, severance, or retention payments to any "insiders" (as that term is defined in section 101(31) of the Bankruptcy Code) during the cases. To the extent the Debtors propose to make such payments to any insiders during the cases, the Debtors will seek approval of such payments in a separate motion prior to making any such payments. Finally, the Debtors request authority to re-issue checks to the Employees on account of the Obligations that were issued but not cashed prior to the Petition Date.

DOCS_DE:191926.1 80459/001

## Basis for Relief

**I.    Payment of the Obligations Is Warranted Under Section 363(b)(1) of the Bankruptcy Code**

18.    Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Under section 363(b), courts require only that the debtor "show that a sound business purpose justifies such actions." *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (internal citations omitted) (requiring that the debtor show a "sound business purpose" to justify its actions under section 363(b) of the Bankruptcy Code); *see also In re Phoenix Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987) (requiring that there is a "good business reason" for a sale under section 363 of the Bankruptcy Code); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983) (requiring a "good business reason" for disposition of assets outside of the ordinary course in bankruptcy); *In re Adelphia Commc'ns Corp.*, No. 02-41729 (REG), 2003 WL 22316543, at *31 (Bankr. S.D.N.Y. Mar. 4, 2003) (same).  Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task").

19.    The Debtors have satisfied the business judgment standard.    Absent consummating the restructuring, the Debtors likely will not be able to maintain operations and pursue their business strategy long-term.  If the Debtors do not pay the Obligations, a material portion of Debtors' workforce, including Employees in key user relations and interpreter

15

functions, will face significant financial hardship and other risks, such as the loss of healthcare coverage and insurances. As a result, such Employees may seek alternative employment opportunities or will be demoralized and less productive. Additionally, the deterioration of the Debtors' workforce may require large scale, likely resource- and cost-intensive, employee recruitment efforts — especially for interpreters, who are in short supply — at a time when the Debtors' management needs to focus on restructuring related activities. Paying the Obligations is necessary for the Debtors to avoid unnecessary recruitment, severance, and related costs, to avoid certain operating risks, and to minimize the disruption to its operations in advance of, and during, the implementation of the restructuring.

20.    Also, because the Debtors will pay the Obligations, as applicable, in full under the Plan, the relief sought herein seeks to alter only the timing, not the amount, of payments. Additionally, an ad hoc group consisting of approximately 85% in amount of the Debtors' senior secured note holders and the Debtors' primary equity holders — representing holders of the vast majority of the claims and interests in the only two impaired classes under the plan — support the relief sought in this motion.

21.    Courts have authorized payment of prepetition employee compensation and related obligations under section 363(b) of the Bankruptcy Code. *See, e.g.*, *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (stating that relief regarding payment of prepetition wage claims was appropriate to "preserve and protect [the debtor's] . . . business and ultimately reorganize, retain its currently working employees and maintain positive employee morale"); *see also In re Dex One Corp.*, No. 13-10533 (KG) (Bankr. D. Del. Mar. 19, 2013) (authorizing payment under section 363 of Bankruptcy Code); *In re Edison Mission Energy*, No. 12-49219 (JPC) (Bankr. N.D. Ill. Jan. 17, 2013) (same); *In re MCG Ltd. P'ship (f/k/a*

16

*Monitor Co. Grp. Ltd. P'ship)*, No. 12-13042 (CSS) (Bankr. D. Del. Dec. 4, 2012) (same); *In re*

*DDMG Estate (f/k/a Digital Domain Media Grp., Inc.)*, No. 12-12568 (BLS) (Bankr. D. Del.

Oct. 22, 2012) (same); *In re TMP Directional Mktg., LLC*, No. 11-13835 (MFW) (Bankr. D. Del.

Dec. 27, 2011) (same).[9]

## II.    Payment of the Obligations Is Warranted Under the Doctrine of Necessity

22.    Section 105(a) of the Bankruptcy Code, which codifies the inherent equitable

powers of the bankruptcy court, empowers the bankruptcy court to "issue any order, process, or

judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. §

1059(a).    The Court may use its power under section 105(a) to authorize payment of the

Obligations under the "necessity of payment" rule (also referred to as the "doctrine of

necessity"). *In re NVR L.P.*, 147 B.R. 126, 127-28 (Bankr. E.D. Va. 1992).

23.    The United States Court of Appeals for the Third Circuit recognized the

"necessity of payment" doctrine in *In re Lehigh & New England Railway Co.*, 657 F.2d 570, 581

(3d Cir. 1981).    The Third Circuit held that a court could authorize the payment of prepetition

claims if such payment was essential to the continued operation of the debtor.    *Id.* (stating a court

may authorize payment of prepetition claims when there "is the possibility that the creditor will

employ an immediate economic sanction, failing such payment"); *see also In re Penn Cent.*

*Transp. Co.*, 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding that necessity of payment doctrine

permits "immediate payment of claims of creditors where those creditors will not supply services

or material essential to the conduct of the business until their pre-reorganization claims shall

have been paid"); *In re Motor Coach Indus. Int'l, Inc.*, No. 08-12136, 2009 WL 330993, at *3

---

[9]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

(D. Del. Feb. 10, 2009) (denying stay pending appeal on grounds that there is no serious basis to challenge doctrine of necessity in Third Circuit); *In re Just for Feet, Inc.*, 242 B.R. 821, 824–26 (Bankr. D. Del. 1999) (noting that the Third Circuit permits debtors to pay prepetition claims that are essential to continued operation of business).

24.    The necessity of payment doctrine is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy and goal of Chapter 11." *Ionosphere Clubs, Inc.*, 98 B.R. at 176; *see also Just For Feet*, 242 B.R. at 826 (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); *In re Adams Apple, Inc.*, 829 F.2d 1484, 1490 (9th Cir. 1987) (recognizing that allowance of "unequal treatment of pre-petition debts when necessary for rehabilitation " is appropriate); *In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of tool makers as "necessary to avert a serious threat to the Chapter 11 process"); *In re Chateaugay Corp.*, 80 B.R. 279, 287 (S.D.N.Y. 1987) (authorizing payment of prepetition worker's compensation claims on grounds that fundamental purpose of reorganization and equity powers of bankruptcy courts "is to create a flexible mechanism that will permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately").

18

25.     Payment of the Obligations is warranted under the doctrine of necessity. For instance, the Employees and Contract Workers provide the Debtors essential services necessary to conduct their businesses. Even if the Debtors did not require consummation of the transactions proposed in the Plan, payment of the prepetition claims of the Employees and Contract Workers — especially of the interpreters — would be essential to avoid large-scale attrition, service disruption, and associated costs. Certainly, payment of the Obligations will give the Debtors the greatest likelihood of post-emergence success.

26.     Courts in this district have recognized the importance of satisfying employee obligations in cases requesting relief similar to that requested here. *See, e.g., In re Physiotherapy Holdings, Inc.*, No. 13-12965 (KG) (Bankr. D. Del. Dec. 6, 2013) (stating that relief requested is in the "best interests" of the debtors); *In re Fisker Auto. Holdings, Inc.*, No. 13-13087 (KG) (Bankr. D. Del. Nov. 26, 2013) (same); *In re Longview Power, LLC*, 12-12211 (BLS) (Bankr. D. Del. Sept. 24, 2013) (same); *In re Maxcom Telecomunicaciones, S.A.B. de C.V.*, No. 13-11839 (PJW) (Bankr. D. Del. July 25, 2013) (same); *In re Conexant Sys., Inc.*, 13-10367 (MFW) (Bankr. D. Del. Apr. 11, 2013) (same); *In re Dex One Corp.*, No. 13-10533 (KG) (Bankr. D. Del. Mar. 19, 2013) (same).

### III.    Certain of the Obligations Are Entitled to Priority Treatment

27.     Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle the majority of the Obligations to priority treatment. *See* 11 U.S.C. § 1129(a)(9)(B) (requiring payment of certain allowed unsecured claims given priority under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, for wages, salaries, or commissions, including vacation, severance, and sick leave pay earned by an individual, and contributions to an employee benefit plan, earned in the 180 days before filing of the petition). Because most of the Obligations are priority claims, the

19

Debtors are required to pay these claims in full to confirm the Plan. Accordingly, granting the relief sought here, for the most part, only affects the timing of payment of the Obligations, and the Debtors seek to emerge from chapter 11 within two months from the Petition Date, subject to the Court's schedule. Again, the Debtors believe payment of the Obligations at this time preserves the value of the estates for all interested parties.

## IV.    Payment of Certain of the Obligations Is Required by Law

28.    Certain of the Obligations represent the Employees' earnings that either government entities, the Employees, or judicial authorities have designated for deduction from the Employees' pay. Indeed, the Obligations consisting of contributions to the employee benefit plans and child support and alimony payments are not property of the Debtors' estates. *See* 11 U.S.C. § 541(b). Additionally, federal and state laws require the Debtors and their officers to make certain tax payments withheld from the Employees' pay. 26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes). Because the withheld amounts are not property of the Debtors' estates, the Debtors request that the Court authorize them to transmit the amounts to the proper parties in the ordinary course of business.

29.    Similarly, under state law, the Debtors must maintain a workers' compensation program. If the Debtors fail to do so, state law may prohibit them from operating. Payment of all workers' compensation amounts, therefore, is crucial to the Debtors' continued operation.

## Limited Waiver of the Automatic Stay for Workers' Compensation Claims

30.    Section 362(a)(1) of the Bankruptcy Code operates to stay:

> the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . .

Section 362, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause." *Id.* at § 362(d)(1). Cause exists here to modify the automatic stay to permit the Employees to proceed with workers' compensation claims in the appropriate judicial or administrative forum.[10] Staying the workers' compensation claims could have a detrimental effect on the financial well-being and morale of the Employees. As previously discussed, Employees' departure or demoralization likely will cause severe disruption to the Debtors' businesses and likely will impair the success of their restructuring.

## Processing of Checks and Electronic Fund Transfers Should Be Authorized

31.    The Debtors have sufficient funds to pay or remit the Obligations in the ordinary course of business using expected cash flows from ongoing business operations. Under the Debtors' existing cash management system, the Debtors have made arrangements to readily identify checks or wire transfer requests relating to the Obligations, as applicable. The Debtors believe there is minimal risk that checks or wire transfer requests, which the Court has not authorized, will be made inadvertently. Thus, the Debtors request that the Court authorize all

---

[10] Additionally, by separate motion, the Debtors are requesting that the Court permit claimants generally to pursue claims against the Debtors' estates. Under the Plan, the Debtors propose to pay holders of allowed general unsecured claims in full.

DOCS_DE:191926.1 80459/001

applicable financial institutions to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the Obligations.

## The Requirements of Bankruptcy Rule 6003 Are Satisfied

32.     Under Bankruptcy Rule 6003, the Court may grant relief regarding a motion to pay all or part of a prepetition claim within 21 days after the Petition Date if the relief is necessary to avoid immediate and irreparable harm.  Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern.  *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001).

33.     Bankruptcy Rule 6003 does not condition relief on imminent or threatened harm to the estate alone.  Rather, Bankruptcy Rule 6003 speaks of "immediate and irreparable harm" generally.  *Cf.* Fed. R. Bankr. P. 4001(b)(2), (c)(2) (referring to "irreparable harm to the estate") (emphasis added).  Indeed, the "irreparable harm" standard is analogous to the traditional standards governing the issuance of preliminary injunctions, and courts routinely consider third-party interests when granting such relief.  *See, e.g., Capital Ventures Int'l v. Argentina*, 443 F.3d 214, 223 n.7 (2d Cir. 2006) (stating that potential effect on public interest is factor in considering whether to grant preliminary injunction).

34.     The relief requested in this motion is necessary to avoid immediate and irreparable harm to the Debtors and all parties in interest.  The Employees and Contract Workers are vital to the Debtors' operations.  Failure to satisfy the Obligations in the ordinary course of business during these chapter 11 cases may cause the Employees to terminate their employment and would reduce productivity on account of demoralization.  The Debtors' operations would be

22

severely disrupted at a critical juncture in their restructuring.  Additionally, the Employees and

Contract Workers rely on their compensation, benefits, and reimbursement of expenses to pay

their living expenses and the effect could be financially ruinous if the Debtors cannot pay them

in the ordinary course of business.  Accordingly, the requirements of Bankruptcy Rule 6003 are

satisfied.

### Satisfaction of Bankruptcy Rules 6004(a) and 6004(h)

35.    To implement the foregoing successfully, the Debtors request that the Court enter

an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a)

and that the Debtors have established cause to exclude such relief from the 14-day stay period

under Bankruptcy Rule 6004(h).

### Notice

36.    The Debtors have provided notice of this motion to:  (a) the Office of the United

States Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of

Creditors Holding the 30 Largest Unsecured Claims; (c) counsel to the administrative agent of

the Debtors' prepetition first lien credit facility; (d) counsel to the indenture trustee for the

Debtors' prepetition senior secured notes; (e) counsel to the ad hoc group of prepetition senior

secured note holders; (f) the Internal Revenue Service; (g) the Securities and Exchange

Commission; (h) the FCC; and (i) any party that has requested notice pursuant to Bankruptcy

Rule 2002.  As this motion is seeking "first day" relief, within two business days of the hearing

on this motion, the Debtors will serve copies of this motion and any order entered in respect of

this motion as required by Local Rule 9013-1(m).  The Debtors submit that, in light of the nature

of the relief requested, no other or further notice need be given.

DOCS_DE:191926.1 80459/001

**No Prior Request**

37.    No prior motion for the relief requested herein has been made to this or any other court.

DOCS_DE:191926.1 80459/001

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court enter the Order, attached hereto as Exhibit A, granting the relief requested herein and such other and further relief as the Court deems appropriate.

Dated: March 3, 2014
Wilmington, Delaware

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:        ljones@pszjlaw.com
              tcairns@pszjlaw.com

- and -

James H.M. Sprayregen, P.C. (*pro hac vice* admission pending)
Patrick J. Nash, Jr., P.C. (*pro hac vice* admission pending)
Ross M. Kwasteniet (*pro hac vice* admission pending)
Noah J. Ornstein (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        jsprayregen@kirkland.com
              patrick.nash@kirkland.com
              rkwasteniet@kirkland.com
              nornstein@kirkland.com

Proposed Attorneys for the
Debtors and Debtors in Possession