## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| SORENSON COMMUNICATIONS, INC., *et al.*,[1] | ) Case No. 14-10454 ([___]) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

## MOTION OF SORENSON COMMUNICATIONS, INC., *ET AL.* FOR ENTRY OF AN ORDER AUTHORIZING THE PAYMENT OF CERTAIN PREPETITION TAXES

The above-captioned debtors (collectively, the "***Debtors***") file this motion for entry of an order, substantially in the form attached hereto as <u>Exhibit A</u> (the "***Order***"), authorizing the Debtors to pay certain accrued and outstanding prepetition taxes, fines, and refunds. In support of this motion, the Debtors respectfully state as follows:

### Jurisdiction

1.     The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.

2.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The statutory bases for the relief requested herein are sections 105(a), 363(b), and 507(a)(8) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "***Bankruptcy Code***")

---

[1]     The Debtors, together with the last four digits of each of the Debtors' federal tax identification number, are: Sorenson Communications, Inc. (0555); Allied Communications, Inc. (3611); CaptionCall, LLC (9444); SCI Holdings, Inc. (9815); Sorenson Communications Holdings, LLC (9866); Sorenson Communications of Canada, ULC (9719); and Sorenson Holdings, Inc. (0427). For the purpose of these chapter 11 cases, the service address for the Debtors is: 4192 South Riverboat Road, Salt Lake City, Utah 84123.

and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***").

## Relief Requested

4.      The Debtors seek entry of the Order authorizing them to pay to applicable taxing authorities in the ordinary course of business any taxes, fines, or refunds that accrued prior to the date hereof or will become payable during the pendency of these chapter 11 cases.

## Introduction

5.      The Debtors filed these chapter 11 cases to implement a consensual, balance-sheet restructuring under a prepackaged chapter 11 plan of reorganization (the "***Plan***"). Under the Plan, there are only two impaired classes — senior secured notes claims and equity interests. Under a prepetition support agreement, holders of approximately 85% in amount of all senior secured notes claims (whom also hold nearly a majority of first lien debt claims) and holders of approximately 85% in amount of all equity interests support the Plan. Other than these two classes, all other creditors, including holders of general unsecured claims, are "riding through" these chapter 11 cases.

## Business Overview[2]

6.      The Debtors are the leading provider of telecommunications technology and services for individuals with hearing loss in the United States.[3] The Debtors' video relay service

---

[2] For more information regarding the Debtors' history, operations, and financial performance, see the *Declaration of Scott Sorensen in Support of First Day Motions* (the "***First Day Declaration***"), filed concurrently with this motion. On March 3, 2014 (the "***Petition Date***"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors have filed a motion seeking joint administration of their chapter 11 cases under Bankruptcy Rule 1015(b). The Debtors are operating their businesses as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

[3] The Debtors are headquartered in Salt Lake City, Utah and employ about 6,800 personnel throughout the United States, including Puerto Rico, and Canada.

2

allows people experiencing a hearing loss to communicate with hearing individuals through a company interpreter. The interpreter and the individual experiencing hearing loss communicate via a videophone, which the Debtors often provide, over the Internet using American Sign Language, and the interpreter communicates verbally with the hearing individual on the other end of the call. The Debtors' CaptionCall service allows individuals with hearing loss who have difficulty hearing on a phone to use a Debtor-provided telephone to use the phone. This phone is connected to the Internet and a regular phone line and allows eligible users to read captions of what the other party on the call is saying and to respond using their own voice. The Debtors hold a leading market share of such video relay and captioned services.

7.     Title IV of the Americans with Disabilities Act, as amended, which is codified as part of the Communications Act of 1934, as amended, governs the Debtors' businesses. The Federal Communications Commission ("*FCC*") promulgates rules and regulations under these acts. It requires interstate telecommunications carriers, such as Sprint and Verizon, and interconnected and non-interconnected Voice over Internet Protocol providers, to contribute funds to the Interstate Telecommunication Relay Service Fund (the "*TRS Fund*") from which the Debtors receive more than 99% of their gross revenues — the Debtors' services are free to users, as, in most cases, is use of the necessary end user equipment. The FCC also sets compensation rates and minimum performance standards. The Debtors' failure to comply with the rules and regulations can result in the FCC denying compensation for services rendered.

8.     Video relay service compensation rates have decreased each year since 2010. As a result, despite the Debtors' productivity improvements and expense reductions, the Debtors' adjusted EBITDA decreased from $239 million to $201 million, or by approximately 16%, for fiscal year 2013 over fiscal year 2009. Further, in June 2013, the FCC released a new video

3

relay service ("*VRS*") rate order that further reduces reimbursement rates every six months. At the same time, the FCC increased mandatory performance standards to a level that the Debtors believe may be unsustainable, as failing to meet a daily measurement would result in denial of compensation for the entire day. The Debtors believe that such regulations could put at risk the quality and availability of telecommunication services for the hearing loss community over the long term.

9.     As of January 31, 2014, the book value of the Debtors' assets totaled approximately $645 million and their liabilities totaled approximately $1.4 billion. The Debtors' $550 million first lien credit facility and $735 million of senior secured notes are scheduled to mature in October 2014 and February 2015, respectively. The impact of the changing regulatory environment of the VRS industry negatively affects the Debtors' ability to refinance their funded debt in the market, and the Debtors will not have sufficient cash to pay the principal balances on such debts as they become due. Additionally, the Debtors require time to engage the FCC in discussions regarding setting compensation rates and performance standards at sustainable levels. Accordingly, the Debtors must restructure their balance sheet presently.

## The Restructuring

10.     The Debtors began restructuring negotiations with holders of over 77% in amount of their senior secured notes and their primary equity holders almost five months prior to the Petition Date. These extensive negotiations among highly sophisticated parties resulted in the execution on February 27, 2014 of a support agreement in furtherance the Plan.

11.     The Plan provides, among other things, that the Debtors will: (a) enter into a $550 million exit first lien credit facility backstopped by certain senior secured note holders; (b) exchange existing senior secured notes for a combination of new notes, new equity, and cash; and (c) exchange existing equity for a combination of new notes and new equity. The Debtors'

4

current senior secured note holders will own 87% of the reorganized company. Holders of the Debtors' first lien debt are being paid in full in cash and are unimpaired under the Plan, as are general unsecured creditors. Critically, the Plan will extend the maturities of the Debtors' first and second lien debt until 2020 and otherwise improve the Debtors' ability to service and pay down their indebtedness. Also, the new notes under the Plan contain paid-in-kind interest features that will provide the Debtors a longer liquidity runway. This financial restructuring will afford the Debtors the breathing room they need to adjust their businesses to address the regulatory changes that have reshaped their industry and engage in discussions with the FCC regarding stabilizing the industry.

12.     The Debtors, with the support of their primary note holders, did not make an interest payment in February to holders of the senior secured notes because restructuring negotiations were nearing completion. This non-payment triggered a 30-day grace period under the senior secured notes indenture. On February 27, 2014, the Debtors began soliciting their senior secured note holders and existing equity holders to accept or reject the Plan in accordance with sections 1125 and 1126 of the Bankruptcy Code. On March 3, 2014, the Debtors filed their bankruptcy petitions in advance of termination of the grace period and to avoid any cross default under the Debtors' first lien credit facility. The Debtors will complete their 21-day solicitation on March 20, 2014, or 17 days after the Petition Date. And, as stated earlier, the Debtors have overwhelming support for their restructuring under the support agreement.

**The Taxes**

13.     The Debtors incur and remit use, property, gross receipts, business, and various other taxes, and pay certain regulatory fees, fines, and refunds (each a *"Tax"* and collectively,

5

the "*Taxes*").[4] The Debtors remit the Taxes to applicable taxing authorities (each an "*Authority*"

and collectively, the "*Authorities*"), a list of which is annexed as <u>Exhibit 1</u> to <u>Exhibit A</u> attached

hereto,[5] in the ordinary course of business and in accordance with all applicable laws and

regulations. As of the Petition Date, the Debtors believe that they have timely filed all applicable

returns for the Taxes.

14.    The following table contains descriptions of the Taxes, as well as the Debtors'

estimate of the amounts of the Taxes accrued as of the Petition Date and, of those amounts, the

amounts that are due in the ordinary course within 45 days of the Petition Date:[6]

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 45 Days |
|---|---|---|---|
| Use Tax | The Debtors incur and remit a use tax for business conducted in Utah. | $300,000 | $300,000 |
| Personal Property Tax | The Debtors incur and remit personal property taxes in approximately 50 state, city, and county jurisdictions. | $260,000 | $220,000 |
| Gross Receipts Tax | The Debtors incur and remit gross receipts taxes in Washington, New Mexico, and Ohio. | $80,000 | $80,000 |
| Business Licenses | The Debtors maintain a variety of business licenses in approximately 75 state, city, and county jurisdictions necessary to operate their businesses. | $22,500 | $16,000 |

---

[4]    The Debtors do not seek the authority to collect and remit state and federal employee-related withholding taxes in this motion. Such relief is instead requested in the Debtors' *Motion of Sorenson Communications, Inc., et. al. for Entry of an Order Authorizing Payment of Certain Prepetition (A) Wages, Salaries, and Other Compensation, (B) Reimbursable Employee Expenses, (C) Employee Benefits, and (D) Related Costs*, filed concurrently with this motion.

[5]    <u>Exhibit 1</u> is intended to be all-inclusive. The Debtors, however, may have inadvertently omitted an Authority or Authorities from the exhibit. The Debtors reserve the right to supplement <u>Exhibit 1</u> if any Authority has been omitted. Nonetheless, by this motion, the Debtors request relief applicable to all Authorities, regardless of whether every such Authority is listed in <u>Exhibit 1</u>.

[6]    The Debtors anticipate emerging from bankruptcy on or around 45 days after the Petition Date.

DOCS_DE:191930.1 80459/001

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 45 Days |
|---|---|---|---|
| Income and Franchise Taxes | The Debtors pay estimated annual state and local income and franchise taxes, as well as federal income taxes, in advance on a quarterly basis. On account of underpayment for calendar year 2013 and for calendar year 2014, the Debtors expect to pay in aggregate approximately $11 million for such taxes on or before April 15, 2014. | $11,000, 000 | $11,000,000 |
| FCC Refunds / Offsets and Fines | In the ordinary course, the FCC periodically audits the Debtors and asks the Debtors to investigate possible rule violations and/or FCC billing discrepancies. As part of their internal controls, the Debtors also periodically audit their own billing submissions and monitor their compliance with FCC rules and minimum standards.<br><br>If the Debtors discover a billing discrepancy, the Debtors will submit a corrected billing statement to the FCC and any overpayments will either be refunded to the FCC or offset against future reimbursements.<br><br>Pursuant to a consent decree entered into between the FCC and the Debtors resolving an investigation into their implementation of certain FCC user registration and verification requirements, the Debtors must make a voluntary contribution to the U.S. Treasury in the amount of $5,255,000 on or before May 1, 2014.<br><br>The Debtors do not anticipate that any other liabilities will arise from such audits during the pendency of their cases. For the avoidance of doubt, however, if any such liability does arise, the Debtors seek authority to satisfy the liability in the ordinary course of business. | $5,255,000 | $0 |
| **Total** | | **$16,917,500** | **$11,616,000** |

7

**Basis for Relief**

**I.    Certain of the Taxes May Constitute Priority Claims Entitled to Special Treatment Under the Bankruptcy Code**

15.    Claims for some of the Taxes are or may be priority claims entitled to payment before general unsecured claims. *See* 11 U.S.C. § 507(a)(8) (describing taxes entitled to priority treatment). To the extent that such amounts are entitled to priority treatment under the Bankruptcy Code, the respective Authorities may attempt to assess interest and penalties, which the Debtors seek to avoid. *See* 11 U.S.C. § 507(a)(8)(G) (granting eighth priority status to "a penalty related to a claim of a kind specified in this paragraph and in compensation for actual pecuniary loss"). Payment of the Taxes at this time only affects the timing of the payment for the vast majority of the amounts at issue. Additionally, unsecured creditors are unimpaired under the Plan and the Debtors are seeking relief from the Court to pay non-Tax related prepetition claims in the ordinary course of business. Therefore, payment of the Taxes will not prejudice the rights of other creditors and should be made.

**II.    Payment of the Taxes Is an Exercise of Sound Business Judgment**

16.    Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under section 363(b), courts require only that the debtor "show that a sound business purpose justifies such actions." *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (citations omitted); *see also In re Phoenix Steel Corp.*, 82 B.R. 334, 336 (Bankr. D. Del. 1987) (requiring "good business reason" for sale under section 363 of Bankruptcy Code); *In re Adelphia Commc'ns Corp.*, No. 02-41729, 2003 WL 22316543, at *29, *31 (Bankr. S.D.N.Y. Mar. 4, 2003) (requiring "good business reason" for disposition of assets outside ordinary course in bankruptcy); *In re*

8

*Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983) (same). Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task").

17.     The Debtors have satisfied the business judgment standard. The Debtors' failure to remit the Taxes could adversely affect the Debtors' business operations because, among other things: (a) the Authorities could initiate audits of the Debtors that would unnecessarily divert the Debtors' attention from the reorganization process; (b) the Authorities could attempt to suspend or terminate the Debtors' operations, file liens, seek to lift the automatic stay, or pursue other remedies that will harm the estates; and (c) certain directors and officers might be subject to personal liability — even if a failure to remit such Taxes was not a result of malfeasance on their part — which would undoubtedly distract these key employees from their duties related to the Debtors' restructuring. In fact, the Authorities may take numerous actions regardless of these chapter 11 filings. *See, e.g.*, 11 U.S.C. § 362(b)(9) (permitting tax audits and assessments and allowing creation or perfection of liens for property taxes).

18.     Also, because the Debtors will pay the Taxes, as applicable, in full under the Plan, the relief sought herein seeks to alter only the timing, not the amount, of payments and no creditors will be prejudiced by the relief requested herein. Payment of the Taxes is prudent and in the best interests of the Debtors' estates and stakeholders.

9

19.    Courts in this jurisdiction regularly authorize the payment of prepetition taxes under section 363(b) of the Bankruptcy Code. *See, e.g.*, *In re Physiotherapy Holdings, Inc.*, No. 13-12965 (KG) (Bankr. D. Del. Dec. 6, 2013) (authorizing debtors to pay prepetition taxes in ordinary course of business); *In re Fisker Auto. Holdings, Inc.*, No. 13-13087 (KG) (Bankr. D. Del. Nov. 26, 2013) (same); *In re Longview Power, LLC*, No. 13-12211 (BLS) (Bankr. D. Del. Sept. 4, 2013) (same); *In re Maxcom Telecomunicaciones, S.A.B. de C.V.*, No. 13-11839 (PJW) (Bankr. D. Del. July 25, 2013) (same); *In re Conexant Sys., Inc.*, No. 13-10367 (MFW) (Bankr. D. Del. Apr. 18, 2013) (same).[7]

### III.    Payment of the Taxes Is Warranted Under the Doctrine of Necessity

20.    Section 105(a) of the Bankruptcy Code, which codifies the inherent equitable powers of the bankruptcy court, empowers the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." The Court may use its power under section 105(a) to authorize payment of the Taxes under the "necessity of payment" rule (also referred to as the "doctrine of necessity"). *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992).

21.    The United States Court of Appeals for the Third Circuit recognized the "necessity of payment" doctrine in *In re Lehigh & New England Railway Co.*, 657 F.2d 570, 581 (3d Cir. 1981). The Third Circuit held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor. *Id.* (stating a court may authorize payment of prepetition claims if there is the "possibility that the creditor will employ an immediate economic sanction, failing such payment"); *see also In re Penn Cent. Transp. Co.*, 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding that the necessity of payment

---

[7]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims have been paid"); *In re Motor Coach Indus. Int'l, Inc.*, No. 08-12136, 2009 WL 330993, at *3 (D. Del. Feb. 10, 2009) (denying stay pending appeal on grounds that there is not serious basis to challenge doctrine of necessity in Third Circuit); *In re Just for Feet, Inc.*, 242 B.R. 821, 824–26 (D. Del. 1999) (noting that Third Circuit permits debtors to pay prepetition claims that are essential to continued operation of business).

22.    The necessity of payment doctrine is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy and goal of Chapter 11." *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); *see also Just for Feet*, 242 B.R. at 826 (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); *In re Chateaugay Corp.*, 80 B.R. 279, 285, 287 (S.D.N.Y. 1987) (authorizing payment of prepetition worker's compensation claims on grounds that fundamental purpose of reorganization and equity powers of bankruptcy courts "is to create a flexible mechanism that will permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately"); *In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of tool makers as "necessary to avert a serious threat to the Chapter 11 process"); *In re Adams Apple,*

11

*Inc.*, 829 F.2d 1484, 1490 (9th Cir. 1987) (recognizing that allowance of "unequal treatment of pre-petition debts when necessary for rehabilitation" is appropriate).

23.    Payment of the Taxes is warranted under the doctrine of necessity. As discussed above, the Debtors must continue to remit Taxes to the Authorities to ensure continued operations in certain jurisdictions and to avoid costly distractions during these chapter 11 cases. Indeed, the Authorities may seek to interfere with the Debtors' businesses if the Taxes are not timely paid. Furthermore, the relief requested herein merely expedites the distribution to the Authorities that would otherwise be made at a later date under a plan of reorganization. *See* 11 U.S.C. § 507(a)(7).

24.    Courts in this district recognize the importance to a debtor of paying its prepetition tax obligations. *See, e.g., In re Physiotherapy Holdings, Inc.*, No. 13-12965 (KG) (Bankr. D. Del. Dec. 6, 2013) (authorizing debtors to pay prepetition taxes in ordinary course of business); *In re Fisker Auto. Holdings, Inc.*, No. 13-13087 (KG) (Bankr. D. Del. Nov. 26, 2013) (same); *In re Longview Power, LLC*, No. 13-12211 (BLS) (Bankr. D. Del. Sept. 4, 2013) (same); *In re Maxcom Telecomunicaciones, S.A.B. de C.V.*, No. 13-11839 (PJW) (Bankr. D. Del. July 25, 2013) (same); *In re Conexant Sys., Inc.*, No. 13-10367 (MFW) (Bankr. D. Del. Apr. 18, 2013) (same).

**Processing of Checks and Electronic Fund Transfers Should Be Authorized**

25.    The Debtors have sufficient funds to honor obligations in connection with the Taxes in the ordinary course of business using expected cash flows from ongoing business operations. Under the Debtors' existing cash management system, the Debtors have made arrangements to readily identify checks or wire transfer requests relating to the Taxes, as applicable. The Debtors believe there is minimal risk that checks or wire transfer requests that

12

the Court has not authorized will be inadvertently made. Thus, the Debtors request that the Court authorize all applicable financial institutions to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the Taxes.

### The Requirements of Bankruptcy Rule 6003 Are Satisfied

26.    Under Bankruptcy Rule 6003, the Court may grant relief regarding a motion to pay all or part of a prepetition claim within 21 days after the Petition Date if the relief is necessary to avoid immediate and irreparable harm. Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001). Bankruptcy Rule 6003 does not condition relief on imminent or threatened harm to the estate alone. Rather, Bankruptcy Rule 6003 speaks of "immediate and irreparable harm" generally. *Cf.* Fed. R. Bankr. P. 4001(b)(2), (c)(2) (referring to "irreparable harm to the <u>estate</u>") (emphasis added). Indeed, the "irreparable harm" standard is analogous to the traditional standards governing the issuance of preliminary injunctions. *See* 9 Collier on Bankruptcy ¶ 4001.06[3] (discussing source of "irreparable harm" standard under Rule 4001(c)(2)). Courts routinely consider third-party interests when granting such relief. *See, e.g.,* *Capital Ventures Int'l v. Argentina*, 443 F.3d 214, 223 n.7 (2d Cir. 2006).

27.    As discussed above, payment of the Taxes will not prejudice any creditor of the Debtors' estates.[8] But, if the Debtors fail to meet the obligations imposed upon them to remit the Taxes, among other actions that may be taken, the Authorities may assert that the Debtors' directors and officers are personally liable. Thus, if the relief is not granted, the Debtors'

---

[8]    The Debtors estimate that approximately $7.6 million of the Taxes are due within 21 days of the Petition Date.

13

directors and officers may be subject to personal tax-related lawsuits that would cause the Debtors' estates immediate and irreparable harm by detracting from the Debtors' reorganization efforts. Accordingly, the Debtors meet the "immediate and irreparable harm" standard of Bankruptcy Rule 6003.

### Satisfaction of Bankruptcy Rules 6004(a) and 6004(h)

28.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### Notice

29.     The Debtors have provided notice of this motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims; (c) counsel to the administrative agent of the Debtors' prepetition first lien credit facility; (d) counsel to the indenture trustee for the Debtors' prepetition senior secured notes; (e) counsel to the ad hoc group of prepetition senior secured note holders; (f) the Internal Revenue Service; (g) the Securities and Exchange Commission; (h) the FCC; (i) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (j) the Authorities identified on Exhibit 1 annexed to Exhibit A attached hereto. As this motion is seeking "first day" relief, within two business days of the hearing on this motion, the Debtors will serve copies of this motion and any order entered in respect of this motion as required by Local Rule 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

14

**<u>No Prior Request</u>**

30.    No prior motion for the relief requested herein has been made to this or any other court.

*[The remainder of this page is intentionally left blank]*

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court enter the Order, substantially in the form attached hereto as Exhibit A, granting the relief requested herein and such other and further relief as the Court deems appropriate.

Dated: March 3, 2014
Wilmington, Delaware

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:     (302) 652-4100
Facsimile:     (302) 652-4400
Email:          ljones@pszjlaw.com
                tcairns@pszjlaw.com

- and -

James H.M. Sprayregen, P.C. (*pro hac vice* admission pending)
Patrick J. Nash, Jr., P.C. (*pro hac vice* admission pending)
Ross M. Kwasteniet (*pro hac vice* admission pending)
Noah J. Ornstein (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:          jsprayregen@kirkland.com
                patrick.nash@kirkland.com
                rkwasteniet@kirkland.com
                nornstein@kirkland.com

Proposed Attorneys for the
Debtors and Debtors in Possession