## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-_____ (___) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

### MOTION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*, FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING THE DEBTORS TO PAY PREPETITION CRITICAL VENDOR CLAIMS

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this motion (this "Motion") for entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "Interim Order" and "Final Order"), authorizing the Debtors to pay, in the ordinary course of business, certain prepetition claims held by critical trade vendors that are essential to the Debtors' ongoing business operations (collectively, and as described in this Motion, the "Critical Vendor Claims"). In support of this Motion, the Debtors respectfully state as follows.

### Jurisdiction and Venue

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C.

---

[1]      The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which the debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

§ 157(b)(2), and the Debtors consent pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The bases for the relief requested in this Motion are sections 105(a), 363(b), 503(b), 1107(a), and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Bankruptcy Rule 9013-1(m).

**Relief Requested**

4.      By this Motion, the Debtors seek entry of Interim and Final Orders authorizing, but not directing, the Debtors to pay Critical Vendor Claims during the period between the Petition Date (defined herein) and entry of the Final Order (the "Interim Period")[2] up to $30 million.[3]

5.      The Debtors also request that the Court: (a) schedule a final hearing as soon as practicable after the 21st day following the Petition Date (defined herein) to consider approval of this Motion on a final basis (the "Final Hearing"); (b) after the Final Hearing, permit the Debtors to pay Critical Vendor Claims up to $40 million; and (c) authorize all applicable banks and financial institutions to receive, process, honor, and pay all checks presented for payment and all

---

[2]   Unless stated otherwise, estimated amounts that the Debtors expect will come due during the Interim Period are based on the 30-day period after the Petition Date.

[3]   This Motion does not request any relief with respect to or affect the rights, duties, or obligations of EFIH (defined herein) and EFIH Finance, Inc.

electronic payment requests made by the Debtors related to the Critical Vendor Claims, whether such checks were presented or electronic-payment requests were submitted before or after the date hereof.

## Background

6.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition with the Court under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.   The Debtors have requested joint administration of these chapter 11 cases.  The Court has not appointed a trustee, and the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has not formed any official committees in these chapter 11 cases.[4]

7.      Debtor Energy Future Holdings Corp. ("EFH Corp."), a Texas corporation, is the ultimate parent company for each of the Debtors in these chapter 11 cases and certain of EFH Corp.'s non-Debtor affiliates (collectively, "EFH").   EFH's businesses include the largest generator, distributor, and certified retail provider of electricity in Texas.   EFH conducts substantially all of its business operations in the electricity market overseen by the Electric Reliability Council of Texas ("ERCOT"), which covers the majority of Texas.   The Texas electricity market, in turn, is subject to oversight and regulation by the Public Utility Commission of Texas (the "PUC").  EFH has approximately 9,100 employees, approximately 5,700 of whom are employed by the Debtors,[5] in three distinct business units:

---

[4]  The facts and circumstances supporting this Motion, along with a detailed discussion of EFH's business operations and capital structure, are set forth in the *Declaration of Paul Keglevic, Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of Energy Future Holdings Corp., et al., in Support of First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith.

[5]  The Debtors in these chapter 11 cases consist of:  (a) the vast majority of the entities that compose Luminant and TXU Energy, as well as those entities' intermediate corporate parent entity, Texas Competitive Electric

- EFH's *competitive electricity generation, mining, wholesale electricity sales, and commodity risk management and trading activities*, conducted by TCEH LLC's Debtor subsidiaries composing "Luminant";

- EFH's *competitive retail electricity sales operations and related operations*, mainly conducted by TCEH LLC's Debtor subsidiaries composing "TXU Energy";[6] and

- EFH's *rate-regulated electricity transmission and distribution operations*, conducted by the non-Debtor Oncor.

8.    In the aggregate, the Debtors have approximately $42 billion of funded indebtedness, including (a) approximately $32.1 billion of claims against TCEH LLC and TCEH LLC's direct and indirect Debtor subsidiaries; (b) approximately $71 million of claims against EFCH; (c) approximately $1.9 billion of claims against EFH Corp.; and (d) approximately $7.7 billion of claims against EFIH.[7]

9.    Although the Debtors' balance sheet is overleveraged, the Debtors' operations are strong. Luminant's generation units are high-performing, its mining and electricity generation operations have impressive safety records, and its commodity trading and risk management activities have delivered significant value to the Debtors. TXU Energy is an industry leader in customer care performance and product innovation and has maintained strong performance notwithstanding intense competition. And non-Debtor Oncor produces a strong and consistent

---

Holdings Company LLC ("TCEH LLC"), a Delaware limited liability company, and TCEH LLC's corporate parent, Energy Future Competitive Holdings Company LLC ("EFCH"), a Delaware limited liability company; (b) Energy Future Intermediate Holding Company LLC ("EFIH"), a Delaware limited liability company that indirectly owns approximately 80% of Oncor Electric Delivery Holdings Company LLC ("Oncor"), and EFIH's wholly-owned subsidiary, EFIH Finance Inc.; (c) EFH Corp.; and (d) other direct and indirect subsidiaries of EFH Corp., including EFH Corporate Services Company.

[6]    The Debtors also conduct a relatively small amount of retail electricity operations through their 4Change brand and another entity, Luminant ET Services Company, that provides retail electricity service to some end use customers and to some of Luminant's mining operations, and a small amount of retail gas operations through Luminant Energy Company LLC.

[7]    Amounts include intercompany debt holdings and short-term borrowings, and exclude guarantees, unamortized discounts or premiums, accrued but unpaid interest, and certain other figures typically reported in the Debtors' filings with the Securities and Exchange Commission (the "SEC"), such as capital lease obligations, certain promissory notes, and certain other obligations.

stream of revenue. Thus, these chapter 11 cases will provide the Debtors with the opportunity to restructure their balance sheets and retain their position as leaders in the Texas electricity market.

10.    As of December 31, 2013, EFH Corp. reported total assets of approximately $36.4 billion in book value, approximately $28.8 billion of which is attributable to EFCH, TCEH LLC, and TCEH LLC's direct and indirect subsidiaries (collectively with TCEH LLC and EFCH, "TCEH"),[8] and total liabilities of approximately $49.7 billion in book value, approximately $41.1 billion of which is attributable to TCEH.[9] EFH Corp.'s assets and liabilities that are not attributable to TCEH are mostly attributable to EFIH's indirect ownership of approximately 80% of Oncor. EFH Corp.'s consolidated revenues for the quarter ending December 31, 2013 were approximately $1.3 billion, all of which were attributable to TCEH. EFH Corp.'s consolidated annual revenues for the year ending December 31, 2013 were approximately $5.9 billion.

## I.    Debtors' Process of Identifying Critical Vendors.

11.    The Debtors purchase goods and services from more than 6,700 third-party vendors. These third-party vendors provide a host of goods and services that are important to the continued and uninterrupted operation of the Debtors' businesses. The Debtors estimate that they owe approximately $507 million to their third-party vendors as of the Petition Date.

12.    Recognizing that payment of all prepetition claims of such third-party vendors outside of a plan of reorganization would be extraordinary given the facts and circumstances of these cases, the Debtors spent significant time and effort reviewing their accounts payable and vendor lists to identify those vendors critical to the continued and uninterrupted operation of the

---

[8]    Oncor's revenues are not included in EFH Corp.'s consolidated revenues because EFH Corp. accounts for its ownership of Oncor under the equity method of accounting.

[9]    Figures for TCEH are derived from EFCH's public filings with the SEC, and are almost entirely attributable to TCEH LLC and its Debtor and non-Debtor subsidiaries.

Debtors' businesses (the "Critical Vendors"). In identifying the Critical Vendors, the Debtors examined each of their vendor relationships with the following criteria in mind:

(a) whether a particular vendor is a sole source supplier or service provider;

(b) whether the services provided by the vendor are so vital, or the vendors' operations are so commingled with the Debtors' business, that even the briefest disruption would cause significant harm to the Debtors' operations;

(c) whether the Debtors would be unable to obtain comparable products or services from alternative sources on a cost-effective basis within a reasonable timeframe;

(d) whether the Debtors' inventory levels or service coverage is sufficient to meet customer demands while an alternative vendor is located;

(e) whether a vendor meeting the foregoing criteria is able or likely to refuse providing essential products or services to the Debtors if their prepetition balances are not paid; and

(f) whether the business relationship between the Debtors and the supplier is governed by a contract.

13.     Applying these criteria, the Debtors estimate that they owe approximately $40 million to the Critical Vendors on account of goods and services delivered before the Petition Date. Accordingly, the Debtors seek authority to pay up to $30 million pursuant to the Interim Order and $40 million pursuant to the Final Order. These amounts represent approximately 8.0% of the Debtors' outstanding trade debt and approximately 0.1% of the Debtors' total funded indebtedness as of the Petition Date.

## II.     Summary of the Critical Vendors.

14.     The Critical Vendors generally fall into one of the following five categories: (a) vendors that provide goods and services related to planned maintenance outages; (b) vendors that provide services and related goods that are highly specialized and/or closely integrated with

the Debtors' business operations and customer relationships; (c) sole source or geographically limited providers of critical goods; (d) vendors that provide goods and services related to regulatory compliance obligations; and (e) vendors that provide goods and services related to the Debtors' nuclear power plant at Comanche Peak.[10]

### A.    Outage Vendors.

15.    The Debtors utilize the services of a variety of Critical Vendors in connection with planned maintenance outages of certain of the Debtors' plants (the "Outage Vendors"). In preparation for and during planned outages, the Debtors schedule maintenance, repairs, replacements, upgrades, refueling, refurbishing, and stress-testing on their generation and mining assets, all in an effort to ensure that their assets are in optimal condition before peak electricity season begins and out of service for the least amount of time possible.

16.    Any delay in goods and services from the Outage Vendors would likely extend a planned outage at significant cost to the Debtors' estates and/or unfavorably affect the operational reliability of the Debtors' generation and mining assets and the overall reliability of the ERCOT electricity market. As a result, the Debtors believe that the services provided by the Outage Vendors are so vital that the costs of even the briefest disruption would exceed the prepetition claims owing to the Outage Vendors.

17.    Additionally, certain of the Outage Vendors may not be subject to executory contracts and the Debtors believe that these Outage Vendors may refuse to continue doing business with the Debtors if they are not paid their prepetition claims. Accordingly, the Debtors believe that payment of the Outage Vendors' prepetition claims will benefit their estates.

---

[10]    The Debtors have agreed not to knowingly pay Critical Vendor Claims to any Critical Vendor that is an affiliate or insider, as defined in sections 101(2) and 101(31) of the Bankruptcy Code, respectively, of the Debtors, with the exception of portfolio companies owned by EFH Corp.'s indirect equity holders with which the Debtors conduct arm's-length transactions. The Debtors request that they only be required to conduct a reasonable inquiry under the circumstances with respect to whether a particular Critical Vendor is an affiliate or insider.

**B.    Specialized and Integrated Services Vendors.**

18.    The Debtors rely on specialized labor services and other services that are closely integrated with the Debtors' generation and retail business operations provided by certain Critical Vendors (collectively, the "Integrated Services Vendors").

19.    In certain cases, the Debtors can only obtain services from Integrated Services Vendors who have certifications, permits, or licenses as required by state or federal laws and regulations.  Certain services that could otherwise be performed by a wide range of vendors (*e.g.*, welding, electrical, waste removal, earth moving, security, and cyber security services) can only be performed by certain Integrated Services Vendors due to the risks posed by the nature of the Debtors' facilities, which expose Integrated Services Vendors to, among other things, high speed rotation motors, toxic and radioactive substances, high voltage electricity, and high pressure vessels, as well as the additional dangers inherent in maintaining mining operations. Other customer-facing services are vital to the Debtors' customer relationships and business strategy given the highly competitive Texas electricity market and the Debtors' emphasis on reliability and customer service to differentiate themselves from other market participants.  It is vital that these customer-facing services are not negatively affected by, for example, dissatisfied vendors or the need to obtain new vendors.

20.    Even if alternative service providers who possess the necessary qualifications, experience, and skills could be identified in a timely fashion, the Integrated Services Vendors have specific experiential knowledge about the Debtors' business operations, facilities, and customer demands—developed over the course of the Integrated Services Vendors' long-standing relationship with the Debtors—that cannot be replaced.

21.    The Debtors believe that some of the Integrated Services Vendors will refuse to provide postpetition services to the Debtors if all or a portion of their prepetition claims are not

satisfied.  The Debtors have determined that the harm that would be inflicted on the Debtors' businesses by an interruption in service greatly outweighs the cost of paying the prepetition claims of the Integrated Services Vendors.  Although the Debtors will make every effort to obtain continued performance from the Integrated Services Vendors and, where applicable, would seek to enforce the automatic stay against Integrated Services Vendors who refuse to perform under valid prepetition agreements, due to the integrated nature of all of the services, limited availability of comparable vendors able to provide the Debtors with certain specialized services, and customer-facing nature of other services, it is vitally important that these services continue.  The Debtors, therefore, believe it is critical that they have the discretion to satisfy certain of the prepetition claims of the Integrated Services Vendors.

**C.    Critical Goods Vendors.**

22.    The Debtors rely on a number of Critical Vendors to supply essential raw materials, fuels, specialized replacement parts and supplies, operations consumables, and certain other goods and services required to operate the Debtors' plants and continue their business operations (collectively, and as described in this Motion, the "Critical Goods Vendors" and "Critical Goods").  In some cases, there is no alternative provider for certain Critical Goods.  For example, certain Critical Goods Vendors supply the Debtors with specially fabricated repair and replacement parts for the turbines, transformers, boilers, and other equipment used in the Debtors' electricity generation and lignite mining operations.  This equipment is generally based on patented designs available only from the manufacturer or that is made or provided to the Debtors' exact specifications.

23.    In other cases, alternative suppliers cannot supply the required Critical Goods in sufficient quantity, quality, or reliability, or they are unable to supply the required Critical Goods on a cost-efficient and timely basis in the appropriate geographic areas.  For example, the

Debtors' plants are designed to utilize bulk quantities of certain "laboratory grade" chemicals as part of their energy production and pollution control activities. Due to the chemical specifications and quantities involved, the Debtors are dependent on a few Critical Vendors that can provide such chemicals to their plants to keep the plants running and compliant with environmental regulations. Similarly, certain raw materials and fuels used in the Debtors' business operations, including raw materials that are necessary for the Debtors' compliance with environmental regulatory requirements, are locally sourced because they are expensive and inefficient to transport. In any one of these locales, there may be only one potential counterparty to provide the Debtors with these raw materials and fuels.

24.     Accordingly, the Debtors have determined that they must be able, in their sole discretion, to satisfy certain of the prepetition claims of these Critical Goods Vendors to ensure the continued delivery of the Critical Goods to their plants and operational locations.

**D.    Regulatory Compliance Vendors.**

25.     The Debtors rely on a number of Critical Vendors to assist the Debtors in complying with applicable governmental laws and regulations (the "Regulatory Compliance Vendors"). For example, the Debtors rely on certain vendors to remove regulated waste and chemicals from the Debtors' facilities for proper disposal and vendors who perform emissions testing and other critical compliance activities. Other vendors ensure the Debtors' compliance with requirements under applicable permits and regulations related to the Debtors' generation, mining, wholesale, and retail activities and related services.

26.     The Debtors believe that some of the Regulatory Compliance Vendors may refuse to perform postpetition services if their prepetition claims are not paid, thereby exposing the Debtors to the risk of noncompliance with applicable governmental laws and regulations. Even the slightest delay could cause governmental entities to attempt to levy fines or penalties against

the Debtors or require idling or closing of facilities and may put the Debtors' licenses and permits at risk. Moreover, proper disposal of the regulated waste and chemicals and compliance with environmental requirements on an uninterrupted basis will help to protect the environment and benefit the public health, including that of the Debtors' employees. Additionally, the public relations and regulatory consequences that could result from even temporary noncompliance could have meaningful negative results for the Debtors. For example, the Debtors are required to manage and operate their property in compliance with all applicable state and federal laws and regulations, and the automatic stay does not stay the exercise of police and regulatory powers by regulators. *See* 28 U.S.C. § 959 (requiring compliance with state law and regulation); 11 U.S.C. § 362(b)(4) (providing that the automatic stay is inapplicable to the exercise of police and regulatory powers); 11 U.S.C. § 1166 (providing that chapter 11 debtors are subject to orders of federal, state, and local regulatory bodies to the same extent as non-debtors).

27.     Accordingly, the Debtors believe that their ability, in their sole discretion, to pay the Regulatory Compliance Vendors is essential to their reorganization efforts.

**E.     Nuclear Plant Vendors.**

28.     Certain Critical Vendors provide goods and services related to the Debtors' nuclear generation units at Comanche Peak (the "Nuclear Plant Vendors"). These goods and services may include general operations, maintenance, repairs, inspections, refurbishments, fuel and parts, disposal services, quality control and assurance, physical plant security, and cyber security. It is critical to both the Debtors' business, and as a matter of public safety, that the Debtors be permitted to pay the claims of Nuclear Plant Vendors as necessary to avoid complications, disruptions, or increased safety risks in the operation of their nuclear assets. The Debtors' nuclear operations are subject to extensive oversight from the Nuclear Regulatory Commission and other regulatory bodies. Operational difficulties with respect to the Debtors'

current nuclear assets could have significant regulatory consequences for those assets and the overall reliability of the ERCOT electricity market.

29.    Although the Debtors will make every effort to obtain continued performance from the Nuclear Plant Vendors and, where applicable, would seek to enforce the automatic stay against Nuclear Plant Vendors who refuse to perform under valid prepetition agreements, the Debtors believe that the importance of Comanche Peak's operations to the Debtors and the critical public safety and regulatory issues that could be presented by any disruptions make continued performance vital.  Accordingly, the Debtors have determined that they must be able to satisfy certain of the prepetition claims of these Nuclear Plant Vendors, in the Debtors' discretion.

**III.    Terms and Conditions of Prepetition Payments.**

30.    Subject to the Court's approval, the Debtors intend to pay the Critical Vendor Claims only to the extent necessary to preserve their businesses.  The Debtors have designated a core group of executives, consultants, and employees who have experience in the Debtors' business, as well as the reorganization process, to review, assess, and potentially recommend payment to a Critical Vendor.

31.    Moreover, the Debtors will use their commercially reasonable efforts to condition payment of Critical Vendors Claims upon each Critical Vendor's agreement to continue supplying goods and services on terms that are acceptable to the Debtors in light of customary industry practices (the "Customary Trade Terms").  The Debtors request that the Court approve the form of a Critical Vendor's agreement to extend Customary Trade Terms (the "Vendor Agreement"), substantially in the form annexed as **Exhibit 1** to **Exhibit A** attached hereto.

32.    Notwithstanding the Debtors' commercially reasonable efforts to the contrary, certain Critical Vendors may refuse to enter into a Vendor Agreement.  The Debtors request that they be granted the authority to pay Critical Vendor Claims held by such Critical Vendors if the Debtors conclude, in their sole discretion, that such payment is necessary for the preservation of the Debtors' estates.[11]

33.    Additionally, the Debtors request that if a supplier or vendor accepts payment pursuant to an order granting the relief requested in this Motion and thereafter does not continue to provide goods or services on prepetition trade terms that:  (a) any payment on account of a Critical Vendor Claim may be deemed, in the Debtors' sole discretion in consultation with counsel to the Ad Hoc Committee of TCEH First Lien Creditors, to be an improper postpetition transfer, and, therefore, recoverable by the Debtors in cash upon written request; and (b) upon recovery of the payment by the Debtors, the Critical Vendor Claim shall be reinstated as if the payment had not been made.  If there exists an outstanding postpetition balance due from the Debtors to a vendor or supplier, the Debtors may elect to recharacterize and apply any payment made pursuant to an order granting the relief requested in this Motion to such outstanding postpetition balance and such supplier or vendor will be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.[12]

---

[11]    In the event any payments greater than $5 million are to be paid when (a) a Critical Vendor has not agreed to execute a Vendor Agreement, or (b) the Debtors seek to execute a Vendor Agreement that is modified from the version annexed as **Exhibit 1** to **Exhibit A**, the Debtors have agreed to consult with counsel to certain holders of first lien claims against TCEH (the "Ad Hoc Committee of TCEH First Lien Creditors") before making such payment or modifying the form of Vendor Agreement, as applicable.

[12]    The Debtors have agreed to maintain a matrix summarizing (a) the name of each Critical Vendor that receives a payment (or payments) pursuant to the Interim Order or the Final Order; (b) the total amount paid to each Critical Vendor pursuant to the Interim Order or the Final Order; and (c) the nature of the goods and/or services provided by each Critical Vendor to whom a payment under the Interim Order or the Final Order is made (the "Critical Vendor Summary").  The Debtors will provide the Critical Vendor Summary, along with any executed Vendor Agreement, upon reasonable written request to the U.S. Trustee, the Ad Hoc Committee of

## Basis for Relief

### I.    The Court Should Authorize the Payment of Critical Vendor Claims.

34.    Courts in the Third Circuit and elsewhere generally recognize that debtors may pay prepetition claims that are essential to the continued operation of the debtor's business. *See, e.g., In re Meridian Auto. Sys.-Composite Operations, Inc.*, 372 B.R. 710, 714 (Bankr. D. Del. 2007) (granting the debtor authority to pay prepetition obligations owed to certain critical vendors); *In re Primary Health Sys., Inc.*, 275 B.R. 709, 710 (Bankr. D. Del. 2002) (allowing payment of prepetition wages upon a finding that such relief was "essential to the continued operation of the Debtors' businesses"); *In re Just for Feet, Inc.*, 242 B.R. 821, 824-45 (Bankr. D. Del. 1999) (noting that debtors may pay prepetition claims that are essential to the continued operation of the debtor's business). Courts have relied on several legal bases in approving such relief.

35.    Courts generally recognize that debtors may pay prepetition claims under section 363(b) of the Bankruptcy Code where there is a sound business purpose for the payment of prepetition obligations, and where the debtor is able to "articulate some business justification, other than the mere appeasement of major creditors." *See, e.g., In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (granting debtor authority to pay prepetition wages); *Armstrong World Indus. Inc. v. James A. Phillips, Inc., (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (Bankr. S.D.N.Y. 1983) (granting the debtor the authority to pay prepetition claims of suppliers who were potential lien claimants).

---

TCEH First Lien Creditors, certain holders of unsecured claims against EFIH (the "Ad Hoc Committee of EFIH Unsecured Creditors"), the agent for the TCEH and EFIH debtor in possession financing facilities, and, once appointed, counsel to any official committee of unsecured creditors (the "Creditors' Committee"). The Debtors request that this agreement to disclose payments be conditioned on the execution of a confidentiality agreement by any recipient of a Critical Vendor Summary and/or Vendor Agreements. The Debtors also request that the Debtors not be required to disclose any information that the Debtors deem to be proprietary or competitive in nature to any competitor or any individual member of any committee.

36.    Courts also recognize that payments to prepetition creditors are appropriate pursuant to section 105(a) of the Bankruptcy Code under the "doctrine of necessity" or the "necessity of payment" rule where such payments are necessary to the continued operation of the debtor's business. *See, e.g., In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor); *In re Penn Cent. Transp. Co.*, 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding that the necessity of payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims have been paid"); *In re Friedman's, Inc.*, 2011 WL 5975283, at *3 (Bankr. D. Del. Nov. 30, 2011) ("[M]ost courts will allow payments [of prepetition claims] under the 'doctrine of necessity,' if the debtor establishes that in its business judgment making such payments is critical to the survival of the debtor's business"); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr D. Del. 1994) (noting that debtors may pay prepetition claims that are essential to the continued operation of the debtor's business).  The rationale for the necessity of payment rule—the rehabilitation of a debtor in reorganization cases—is "the paramount policy and goal of Chapter 11." *Ionosphere Clubs*, 98 B.R. at 176; *Just for Feet*, 242 B.R. at 826 (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization.").

37.    Here, maintaining the supplies and services provided by the Critical Vendors is vital to the Debtors' ongoing business operations and the success of these chapter 11 cases.  The Debtors have concluded that the Critical Vendors at issue will cease doing business with the Debtors, or become unable to do business with the Debtors, unless they receive some payment of

their prepetition claims. Moreover, payment of certain of the Critical Vendors is necessary to ensure that the Debtors remain in compliance with all applicable state and federal laws and regulations. *See* 28 U.S.C. § 959; 11 U.S.C. § 1166. Even a slight disruption to the goods and services provided by the Critical Vendors could leave the Debtors unable to meet their regulatory obligations, cost them necessary permits and licenses, and disrupt their important relationships with their customers. The resulting harm to the Debtors' estates far outweighs the cost associated with paying some portion of the Debtors' prepetition obligations to the Critical Vendors. Thus, the Debtors' other creditors will be no worse off, and in fact will fare far better, if the Debtors are empowered to negotiate such payments to achieve a smooth transition into bankruptcy with minimal disruption to their operations. Moreover, as noted above, the Critical Vendor Claims are limited to approximately 8.0% of the Debtors' outstanding trade debt and approximately 0.1% of the Debtors' total funded indebtedness as of the Petition Date. As such, the Debtors believe the relief sought in this Motion will not burden the Debtors and will almost certainly help maximize the value of their estates.

38. Additionally, approximately $6 million, or approximately 14%, of the Critical Vendor Claims relate to goods delivered to the Debtors within 20 days prior to the Petition Date. Such Critical Vendor Claims are entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code. Consequently, payment of such Critical Vendor Claims will alter the timing, not the amount, of payment. Accordingly, payment of such Critical Vendor Claims will benefit the Debtors' estates at no cost to any party in interest. Moreover, the Bankruptcy Code does not prohibit a debtor from paying such claims before confirmation. Indeed, the timing of such

payments lies squarely within the discretion of the Court. *See In re Global Home Prods., LLC*, No. 06-10340, 2006 WL 3791955, at *3 (Bankr. D. Del. Dec. 21, 2006).[13]

39.    Recognizing that payment of prepetition claims of certain essential suppliers and vendors is, in fact, critical to a debtor's ability both to continue as a going-concern and maximize creditor recovery, courts in this district regularly grant relief consistent to that which the Debtors are seeking in this Motion. *In re DSI Holdings, Inc.*, No. 11-11941 (Bankr. D. Del. July 21, 2011) (authorizing payment of up to $6.5 million in prepetition critical vendor claims on a final basis, approximately 85% of total prepetition trade debt); *In re Appleseed's Intermediate Holdings LLC*, No. 11-10160 (Bankr. D. Del. Feb. 23, 2011) (authorizing payment of up to $50 million in prepetition critical vendor claims, approximately 47% of total trade debt); *In re OTC Holdings Corp.*, No. 10-12636 (Bankr. D. Del. Sept. 17, 2010) (authorizing payment of up to $15 million in prepetition critical vendor claims, approximately 50% of total trade debt); *In re Am. Safety Razor Co.*, LLC, No. 10-12351 (Bankr. D. Del. Aug. 23, 2010) (authorizing payment of up to $7.049 million in prepetition critical vendor claims, approximately 45% of total trade debt).

## II.    Cause Exists To Authorize the Debtors' Financial Institutions To Honor Checks and Electronic Fund Transfers.

40.    The Debtors have sufficient funds to pay the amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing business

---

[13] Since the enactment of section 503(b)(9) of the Bankruptcy Code, courts in this district have exercised their discretion and have authorized the payment of prepetition claims under section 503(b)(9) of the Bankruptcy Code during a chapter 11 case. *See, e.g.*, *In re School Specialty, Inc.*, No. 13-10125 (KJC) (Bankr. D. Del. Jan. 30, 2013) (stating that relief requested is in the "best interests of the Debtors"); *In re THQ, Inc.*, No. 12-13398 (MFW) (Bankr. D. Del. Dec. 20, 2012) (same); *In re A123 Sys., Inc.*, No. 12-12859 (KJC) (Bankr D. Del. Nov. 08, 2012) (same); *In re Neb. Book Co.*, No. 11-12005 (Bankr. D. Del. July 21, 2011) (same); *In re Appleseed's Intermediate Holdings LLC*, No. 11-10160 (KG) (Bankr. D. Del. Feb. 23, 2011) (same). Because of the voluminous nature of the orders cited in this Motion, such orders are not attached to this Motion. Copies of these orders are available upon request of the Debtors' counsel.

operations, debtor-in-possession financing, and anticipated access to cash collateral. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the Critical Vendor Claims. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. Therefore, the Debtors respectfully request that the Court authorize and direct all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

### The Requirements of Bankruptcy Rule 6003 are Satisfied

41.     Pursuant to Bankruptcy Rule 6003, the Court may grant relief regarding a motion to pay all or part of a prepetition claim within 21 days after the Petition Date if the relief is necessary to avoid immediate and irreparable harm. Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001).

42.     As described above, if the Debtors fail to honor their prepetition obligations to the Critical Vendors, the Critical Vendors may deprive the Debtors of goods and services that are essential to their businesses at this critical time in their restructuring. As set forth in this Motion, non-payment of Critical Vendor Claims that are currently outstanding or will become due and payable could disrupt the Debtors operations, jeopardize key customer relationships, and undermine the Debtors' efforts to reorganize. Accordingly, the Debtors submit that they have satisfied the requirements of Bankruptcy Rule 6003 to support the relief set forth in the Interim Order on the terms described herein.

## Waiver of Bankruptcy Rules 6004(a) and 6004(h)

43.    To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## Reservation of Rights

44.    Nothing contained in this Motion or any actions taken by the Debtors pursuant to relief granted in the Interim Order and Final Order is intended or should be construed as:  (a) an admission as to the validity of any particular claim against a Debtor entity; (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid, and the Debtors expressly reserved their rights to contest the extent, validity, or perfection or seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## Notice

45.    The Debtors shall provide notice of this Motion on the date hereof via facsimile, overnight delivery, and/or hand delivery to:  (a) the Office of the U.S. Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) Citibank, N.A., in its capacity

as administrative agent under the TCEH first lien credit agreement and collateral agent under the TCEH intercreditor agreements and counsel thereto; (d) Bank of New York Mellon Trust Company, N.A., in its capacity as indenture trustee under: (i) the TCEH unsecured pollution control revenue bonds; and (ii) the EFCH 2037 Notes due 2037, and counsel thereto; (e) American Stock Transfer & Trust Company, LLC, in its capacity as indenture trustee under: (i) the 9.75% EFH senior unsecured notes due 2019; (ii) the 10.0% EFH senior unsecured notes due 2020; (iii) the 10.875% EFH LBO senior unsecured notes due 2017; (iv) the 11.25%/12.0% EFH LBO toggle notes due 2017; (v) the 5.55% EFH legacy notes (series P) due 2014; (vi) the 6.50% EFH legacy notes (series Q) due 2024; and (vii) the 6.55% EFH legacy notes (series R) due 2034, and counsel thereto; (f) Computershare Trust Company, N.A. and Computershare Trust Company of Canada, in their capacities as indenture trustee under: (i) the 11.0% EFIH senior secured second lien notes due 2021; and (ii) the 11.75% EFIH senior secured second lien notes due 2022, and counsel thereto; (g) UMB Bank, N.A. in its capacity as indenture trustee under: (i) the 9.75% EFIH senior unsecured notes due 2019; and (ii) the 11.25%/12.25% EFIH senior toggle notes due 2018, and counsel thereto; (h) BOKF, NA, dba Bank of Arizona, in its capacity as indenture trustee under 11.50% TCEH senior secured notes due 2020, and counsel thereto; (i) CSC Trust Company of Delaware in its capacity as indenture trustee under: (i) the 6.875% EFIH senior secured notes due 2017; and (ii) the 10.0% EFIH senior secured notes due 2020, and counsel thereto; (j) Law Debenture Trust Company of New York in its capacity as indenture trustee under: (i) the 10.25% TCEH senior unsecured notes due 2015; and (ii) the 10.50%/11.25% TCEH senior toggle notes due 2016, and counsel thereto; (k) Wilmington Savings Fund Society, FSB in its capacity as indenture trustee under the 15.0% TCEH senior secured second lien notes due 2021, and counsel thereto; (l) counsel to certain holders of claims

against the Debtors regarding each of the foregoing described in clauses (c) through (k); (m) the agent for the TCEH debtor-in-possession financing facility and counsel thereto; (n) the agent for the EFIH debtor-in-possession financing facility and counsel thereto; (o) counsel to certain holders of equity in Texas Energy Future Holdings Limited Partnership; (p) counsel to Oncor; (q) the SEC; (r) the Internal Revenue Service; (s) the Office of the United States Attorney for the District of Delaware; (t) the Office of the Texas Attorney General on behalf of the PUC; and (u) counsel to ERCOT. As this Motion is seeking "first day" relief, within forty eight hours of the entry of the Interim Order, the Debtors will serve copies of this Motion and the order respecting this Motion as required by Local Bankruptcy Rule 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

46.    No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order and Final Order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Wilmington, Delaware
Dated:  April 29, 2014

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 651-7700
Facsimile:    (302) 651-7701
Email:        collins@rlf.com
              defranceschi@rlf.com
              madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
Richard M. Cieri (*pro hac vice* pending)
Edward O. Sassower, P.C. (*pro hac vice* pending)
Stephen E. Hessler (*pro hac vice* pending)
Brian E. Schartz (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        richard.cieri@kirkland.com
              edward.sassower@kirkland.com
              stephen.hessler@kirkland.com
              brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (*pro hac vice* pending)
Chad J. Husnick (*pro hac vice* pending)
Steven N. Serajeddini (*pro hac vice* pending)
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        james.sprayregen@kirkland.com
              chad.husnick@kirkland.com
              steven.serajeddini@kirkland.com

Proposed Co-Counsel to the Debtors and Debtors in Possession

## EXHIBIT A

**Proposed Interim Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-_____ (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## INTERIM ORDER AUTHORIZING THE DEBTORS
## TO PAY PREPETITION CRITICAL VENDOR CLAIMS

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an interim order (this "Order"), authorizing, but not directing, the Debtors to pay certain Critical Vendor Claims in the ordinary course of business, all as more fully set forth in the Motion; and upon the First Day Declaration; and the Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and the Court having found that the Debtors provided appropriate notice of the Motion and the opportunity for a hearing on the Motion under the circumstances; and the Court having reviewed the Motion and having heard the statements in support of the relief

---

[1]    The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which the debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

requested therein at a hearing, if any, before the Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.    The Motion is granted on an interim basis as set forth herein.

2.    In accordance with this Order, the Debtors are authorized, but not directed, to honor, pay, or otherwise satisfy prepetition amounts on account of Critical Vendor Claims; *provided, however*, that such payments shall not (a) exceed an aggregate amount of $30 million during the Interim Period unless otherwise ordered by the Court, or (b) knowingly be made to any affiliate or insider (as defined in sections 101(2) and 101(31) of the Bankruptcy Code, respectively) of the Debtors other than portfolio companies owned by EFH Corp.'s indirect equity holders with which the Debtors conduct arm's-length transactions, *provided further, however*, that the Debtors shall only be required to conduct a reasonable inquiry under the circumstances with respect to whether a particular Critical Vendor is an affiliate or insider.

3.    The Debtors shall use their commercially reasonable efforts to obtain from any Critical Vendor, as a prerequisite to obtaining payment pursuant to this Order, written acknowledgement of its obligation to continue providing services to the Debtors on Customary Trade Terms, substantially in the form attached hereto as **Exhibit 1** (the "Vendor Agreement"), which shall require, among other things, that the Customary Trade Terms shall be no less favorable than the most favorable trade terms provided by the Critical Vendor to the Debtors in the three months prior to the Petition Date; *provided, however*, that the Debtors may, if necessary under the circumstances, in consultation with counsel to the Ad Hoc Committee of TCEH First Lien Creditors with respect to Critical Vendor Claims greater than $5 million, pay Critical

Vendor Claims without obtaining such agreement; *provided further, however*, that such payment shall not prejudice the Debtor's right to challenge, as a violation of the automatic stay or otherwise, a Critical Vendor's refusal to provide postpetition goods or services on Customary Trade Terms.

4.     The form Vendor Agreement, attached hereto as **Exhibit 1**, is approved on an interim basis; *provided, however*, that the Debtors, in consultation with counsel to the Ad Hoc Committee of TCEH First Lien Creditors with respect to Vendor Agreements addressing Critical Vendor Claims greater than $5 million,  are authorized to modify the Vendor Agreement if a particular situation so requires.

5.     The Debtors will maintain a matrix summarizing (a) the name of each Critical Vendor that receives a payment (or payments) pursuant to this Order; (b) the total amount paid to each Critical Vendor pursuant to this Order; and (c) the nature of the goods and/or services provided by each Critical Vendor to whom a payment under this Order is made (the "Critical Vendor Summary"). The Debtors will provide the Critical Vendor Summary, along with any executed Vendor Agreement, upon reasonable written request to the U.S. Trustee, counsel to any official committee of unsecured creditors appointed in these cases, counsel to the Ad Hoc Committee of TCEH First Lien Creditors, counsel to the Ad Hoc Committee of EFIH Unsecured Creditors, counsel to the agents for the EFIH and TCEH debtor-in-possession financing facilities; *provided, however*, that the Debtors shall only provide the Critical Vendor Summary and executed Vendor Agreements pursuant to this Order subject to the recipient's execution of a confidentiality agreement in form and substance acceptable to the Debtors; *provided further, however*, that nothing in this Order shall require the Debtors to provide the Critical Vendor Summary or any other information that the Debtors deem proprietary or competitive in nature to

any competitor or any individual member of any committee.

6.      If, after receiving a payment pursuant to this Order (and/or the specified terms of a Vendor Agreement), any Critical Vendor does not continue to provide Customary Trade Terms, then (a) any such payment received by such Critical Vendor shall be deemed, in the Debtors' discretion, in consultation with the Ad Hoc Committee of TCEH First Lien Creditors, an improper postpetition transfer and, therefore, recoverable by the Debtors in cash immediately upon written request by the Debtors and (b) upon recovery by the Debtors, any prepetition claim of such Critical Vendor shall be reinstated as if the payment had not been made; *provided, however*, that (x) prior to exercising any remedies set forth in paragraph 6, the Debtors shall provide the applicable party with written notice of their intent to exercise such remedies, and the applicable party shall have fourteen (14) days from service of such written notice to file an objection and serve it on the Debtors and (y) if such party files and serves such written notice, the Debtors shall not exercise any remedies set forth in paragraph 6 pending further order of the Court or agreement of the parties.

7.      If there exists an outstanding postpetition balance due from the Debtors to a Critical Vendor that does not continue to provide Customary Trade Terms, the Debtors may elect to recharacterize and apply any payments made pursuant to this Order to such outstanding postpetition balance, and the Critical Vendor shall repay immediately in cash to the Debtors such paid amounts that exceed the postpetition obligations then outstanding and without any claim, right of setoff, or recoupment against the Debtors resulting thereby.

8.      The Debtors are authorized to issue postpetition checks or to effect postpetition wire transfer requests in replacement of any checks or wire transfer requests in respect of any obligations related to the Critical Vendor Claims that are dishonored or rejected.

9.      The Final Hearing shall be _____, 2014, at __:__ a.m./p.m., prevailing Eastern Time.    Any objections or responses to the Motion must be filed on or before _____, 2014, at 4:00 p.m., prevailing Eastern Time.    If no objections are filed to the Motion, the Court may enter the Final Order without further notice or hearing.

10.      In accordance with this Order and any other order of this Court, each of the financial institutions at which the Debtors maintain their accounts relating to the payment of the obligations described in this Order is authorized to honor checks and electronic payment requests presented for payment of obligations described in this Order and all fund transfer requests made by the Debtors related thereto to the extent that sufficient funds are on deposit in such amounts.

11.      This Order does not grant any relief with respect to or affect the rights, duties, or obligations of EFIH and EFIH Finance, Inc.

12.      Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief, nothing in this Order shall be deemed:    (a) an admission as to the validity of any claim against a Debtor entity; (b) a waiver of the Debtors' rights to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Order are valid, and the Debtors expressly reserved their rights to contest the extent, validity, or perfection or seek avoidance of all such liens.    Payments made pursuant to this Order shall not be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

13.    The requirements set forth in Bankruptcy Rule 6003(b) are satisfied by the contents of the Motion.

14.    Notice of the Motion as provided therein shall be deemed good and sufficient and the requirements of the Local Bankruptcy Rules are satisfied by such notice.

15.    Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7062, 9014 or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

16.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

17.    The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

18.    The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Wilmington, Delaware
Date: _____, 2014

_____
UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT 1** to **EXHIBIT A**

**Vendor Agreement**

_____, 2014

TO:    [Critical Vendor]
       [Name]
       [Address]

Dear [Critical Vendor]:

On April 29, 2014 (the "<u>Petition Date</u>"), Energy Future Holdings Corp. and certain of its affiliates (collectively, and inclusive of any successor entities under a plan of reorganization or otherwise, the "<u>Debtors</u>") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States District Court for the District of Delaware (the "<u>Bankruptcy Court</u>").

On the Petition Date, the Debtors requested that the Bankruptcy Court grant the Debtors the authority to pay certain critical suppliers or service providers in recognition of the importance of our relationship with such suppliers and service providers.  The Bankruptcy Court entered an order authorizing this relief on _____, 2014, a copy of which is enclosed herewith (the "<u>Order</u>").

In accordance with the Order, the Debtors are prepared to enter into this vendor agreement (this "<u>Agreement</u>") in accordance with the following terms:

1.   The estimated accrued balance of the prepetition claim (net of any setoffs, credits, or discounts) that is due and owing is $_____ (the "<u>Claim</u>").

2.   The Debtors hereby agree to pay $_____ on account of the Claim (the "<u>Claim Payment</u>"), subject to the terms and conditions set forth in this Agreement, [it being understood that the remaining amount of your Claim against the Debtors shall be forever released and waived.  If you have already filed a proof of claim with the Bankruptcy Court, you will take all necessary steps to withdraw the proof of claim.]  [it being understood that the estimated remaining amount of your Claim is $_____.  If you have already filed a proof of claim with the Bankruptcy Court, you will take all necessary steps to modify the proof of claim to reflect the remaining amount.  If you have not already filed a proof of claim, you will take all necessary steps to file a proof of claim for the estimated remaining amount.  Nothing in this Agreement should be seen as an admission by the Debtors with respect to the validity or amount of any remaining Claim.]

3.   In consideration of the Claim Payment, you agree to continue providing and/or supplying goods or services to the Debtors based on acceptable and customary ordinary course trade terms (the "<u>Customary Trade Terms</u>"), it being understood that the Customary Trade Terms shall be no less favorable than the most favorable trade terms provided by [Critical Vendor] to the Debtors in the three months prior to the Petition Date.  For purposes of this Agreement, Customary Trade Terms consist of those terms provided for in the following terms and conditions:

_____
_____
_____
(if more space is required, attach continuation pages, as necessary).

4. The Claim Payment may only be made upon execution of this Agreement by a duly authorized representative of your company.  Your execution of this Agreement and the return of same to the Debtors constitute an agreement by you and the Debtors.  You agree to be bound by the terms of this Agreement and you submit to the jurisdiction of the Bankruptcy Court, and expressly consent to the entry by the Bankruptcy Court of final rulings, in connection with any enforcement of this Agreement.  You further agree and/or represent:

   a.   to the Customary Trade Terms and, subject to the reservations contained above, to the amount of the claim set forth above;

   b.   that, from and after the effective date of this Agreement, you will continue to supply the Debtors with goods or services, as applicable, pursuant to the Customary Trade Terms and that the Debtors will pay for such goods in accordance with the Customary Trade Terms;

   c.   that you have reviewed the terms and provisions of the Order and Agreement and that you consent to be bound by such terms and provisions; and

   d.   that you agree to not file or otherwise assert against the Debtors or their assets any lien (regardless of the statute or other legal authority upon which such lien is asserted) or seek payment for reclamation claims or claims pursuant to section 503(b)(9) of the Bankruptcy Code in any way related to prepetition amounts allegedly owed to you by the Debtors arising from agreements, written or otherwise, entered into before the Petition Date. Additionally, if you have taken steps to file or assert such a lien prior to entering into this Agreement, you agree to take all necessary steps to remove such lien as soon as possible.

5. Notwithstanding the foregoing, if you receive the Claim Payment from the Debtors and you do not extend to the Debtors all Customary Trade Terms, or fail to perform in accordance with any of the terms and provisions of this Agreement, you are required to promptly return the Claim Payment to the Debtors immediately upon notice, and the Debtors may take any of the remedial actions described in the Order.

6. Any dispute with respect to this Agreement and/or your participation in this payment program shall be determined by the Bankruptcy Court, and you

expressly waive any right to a trial by jury and withdrawal of the reference for decision by a district court.

7.  All terms of this Agreement (including the existence of this Agreement) are confidential between you and the Debtors; *provided, however*, that the Debtors may disclose this Agreement in accordance with the terms in the Order relating to disclosure of the Critical Vendor Summary (as defined in the Order) and Vendor Agreements (as defined in the Order and including, for the avoidance of doubt, this Agreement), to the Bankruptcy Court *in camera*; or as required by any federal or state securities laws; *provided further, however*, that both you and the Debtors may disclose this Agreement to the extent necessary to comply with the order of any court.

If you have any questions about this Agreement or our restructuring, please do not hesitate to call (_____)_____ or (_____)_____.

Sincerely,

_____
By:
Its:
Agreed and Accepted By:
[Title]
[Name of Vendor]

## EXHIBIT B

**Proposed Final Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) Case No. 14-_____ (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

## FINAL ORDER AUTHORIZING THE DEBTORS
## TO PAY PREPETITION CRITICAL VENDOR CLAIMS

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of a final order (this "Order"), authorizing, but not directing, the Debtors to pay certain Critical Vendor Claims in the ordinary course of business, all as more fully set forth in the Motion; and upon the First Day Declaration; and the Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and the Court having found that the Debtors provided appropriate notice of the Motion and the opportunity for a hearing on the Motion under the circumstances; and the Court having reviewed the Motion and having heard the statements in support of the relief

---

[1]   The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which the debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

requested therein at a hearing, if any, before the Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.     The Motion is granted on a final basis as set forth herein.

2.     In accordance with this Order, the Debtors are authorized, but not directed, to honor, pay, or otherwise satisfy prepetition amounts on account of Critical Vendor Claims; *provided, however,* that such payments shall not (a) exceed an aggregate amount of $40 million unless otherwise ordered by the Court, or (b) knowingly be made to any affiliate or insider (as defined in sections 101(2) and 101(31) of the Bankruptcy Code, respectively) of the Debtors other than portfolio companies owned by EFH Corp.'s indirect equity holders with which the Debtors conduct arm's-length transactions, *provided further, however,* that the Debtors shall only be required to conduct a reasonable inquiry under the circumstances with respect to whether a particular Critical Vendor is an affiliate or insider.

3.     The Debtors shall use their commercially reasonable efforts to obtain from any Critical Vendor, as a prerequisite to obtaining payment pursuant to this Order, written acknowledgement of its obligation to continue providing services to the Debtors on Customary Trade Terms, substantially in the form attached to the Interim Order as **Exhibit 1** (the "Vendor Agreement") which shall require, among other things, that the Customary Trade Terms shall be no less favorable than the most favorable trade terms provided by the Critical Vendor to the Debtors in the three months prior to the Petition Date; *provided, however,* that the Debtors may, if necessary under the circumstances and in consultation with the Ad Hoc Committee of TCEH First Lien Creditors with respect to Critical Vendor Claims greater than $5 million, pay Critical

Vendor Claims without obtaining such agreement; *provided further, however*, that such payment shall not prejudice the Debtor's right to challenge, as a violation of the automatic stay or otherwise, a Critical Vendor's refusal to provide postpetition goods or services on Customary Trade Terms.

4.      The form Vendor Agreement, attached to the Interim Order as **Exhibit 1**, is approved; *provided, however*, that the Debtors, in consultation with counsel to the Ad Hoc Committee of TCEH First Lien Creditors with respect to Vendor Agreements addressing Critical Vendor Claims greater than $5 million, are authorized to modify the Vendor Agreement if a particular situation so requires.

5.      The Debtors will maintain a matrix summarizing (a) the name of each Critical Vendor that receives a payment (or payments) pursuant to this Order; (b) the total amount paid to each Critical Vendor pursuant to this Order; and (c) the nature of the goods and/or services provided by each Critical Vendor to whom a payment under this Order is made (the "Critical Vendor Summary"). The Debtors will provide the Critical Vendor Summary, along with any executed Vendor Agreement, upon reasonable written request to the U.S. Trustee, counsel to any official committee of unsecured creditors appointed in these cases, counsel to the Ad Hoc Committee of TCEH First Lien Creditors, counsel to the Ad Hoc Committee of EFIH Unsecured Creditors, and counsel to the agents for the EFIH and TCEH debtor-in-possession financing facilities; *provided, however*, that the Debtors shall only provide the Critical Vendor Summary and executed Vendor Agreements pursuant to this Order subject to the recipient's execution of a confidentiality agreement in form and substance acceptable to the Debtors; *provided further, however*, that nothing in this Order shall require the Debtors to provide the Critical Vendor Summary or any other information that the Debtors deem proprietary or competitive in nature to

any competitor or any individual member of any committee.

6.    If, after receiving a payment pursuant to this Order (and/or the specified terms of a Vendor Agreement), any Critical Vendor does not continue to provide Customary Trade Terms, then (a) any such payment received by such Critical Vendor shall be deemed, in the Debtors' discretion in consultation with counsel to the Ad Hoc Committee of TCEH First Lien Creditors, an improper postpetition transfer and, therefore, recoverable by the Debtors in cash upon written request by the Debtors and (b) upon recovery by the Debtors, any prepetition claim of such Critical Vendor shall be reinstated as if the payment had not been made; *provided, however*, that (x) prior to exercising any remedies set forth in paragraph 6, the Debtors shall provide the applicable party with written notice of their intent to exercise such remedies, and the applicable party shall have fourteen (14) days from service of such written notice to file an objection and serve it on the Debtors and (y) if such party files and serves such written notice, the Debtors shall not exercise any remedies set forth in paragraph 6 pending further order of the Court or agreement of the parties.

7.    If there exists an outstanding postpetition balance due from the Debtors to a Critical Vendor that does not continue to provide Customary Trade Terms, the Debtors may elect to recharacterize and apply any payments made pursuant to this Order to such outstanding postpetition balance, and the Critical Vendor shall repay immediately in cash to the Debtors such paid amounts that exceed the postpetition obligations then outstanding and without any claim, right of setoff, or recoupment against the Debtors resulting thereby.

8.    The Debtors are authorized to issue postpetition checks or to effect postpetition wire transfer requests in replacement of any checks or wire transfer requests in respect of any obligations related to the Critical Vendor Claims that are dishonored or rejected.

4

9.      In accordance with this Order and any other order of this Court, each of the financial institutions at which the Debtors maintain their accounts relating to the payment of the obligations described in this Order is authorized to honor checks and electronic payment requests presented for payment of obligations described in this Order and all fund transfer requests made by the Debtors related thereto to the extent that sufficient funds are on deposit in such amounts.

10.     This Order does not grant any relief with respect to or affect the rights, duties, or obligations of EFIH and EFIH Finance, Inc.

11.     Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief, nothing in this Order shall be deemed:  (a) an admission as to the validity of any claim against a Debtor entity; (b) a waiver of the Debtors' rights to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Order are valid, and the Debtors expressly reserved their rights to contest the extent, validity, or perfection or seek avoidance of all such liens.  Payments made pursuant to this Order shall not be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

12.     Notice of the Motion as provided therein shall be deemed good and sufficient and the requirements of the Local Bankruptcy Rules are satisfied by such notice.

13.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7062, 9014 or otherwise, the terms and conditions of this Order shall be immediately effective and

enforceable upon its entry.

14.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

15.    The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

16.    The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Wilmington, Delaware
Dated: _____, 2014

_____
UNITED STATES BANKRUPTCY JUDGE