## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | Case No. 14-_____ (___) |
| Debtors. | (Joint Administration Requested) |

## MOTION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*, FOR ENTRY OF AN ORDER (A) AUTHORIZING THE DEBTORS TO (I) CONTINUE USING THEIR EXISTING CASH MANAGEMENT SYSTEM, (II) MAINTAIN EXISTING BANK ACCOUNTS AND BUSINESS FORMS, AND (III) CONTINUE USING CERTAIN INVESTMENT ACCOUNTS; (B) AUTHORIZING CONTINUED INTERCOMPANY TRANSACTIONS AND NETTING OF INTERCOMPANY CLAIMS; AND (C) GRANTING POSTPETITION INTERCOMPANY CLAIMS ADMINISTRATIVE EXPENSE PRIORITY

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this motion (this "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"), (a) authorizing the Debtors to (i) continue using their existing cash management system, (ii) maintain existing bank accounts and business forms, and (iii) continue using certain investment accounts; (b) authorizing continued intercompany transactions and netting of intercompany claims; and (c) granting postpetition intercompany claims administrative expense priority. In support of this Motion, the Debtors respectfully state as follows.

### Jurisdiction and Venue

1.      The United States Bankruptcy Court for the District of Delaware (the "Court")

---

[1]    The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which the debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors consent pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The bases for the relief requested in this Motion are sections 105(a), 345(b), 363(b), 363(c), 364(a), 503(b), 507(a), 1107(a), and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 2015-2, 4001-3, and Local Bankruptcy Rule 9013-1(m).

## Relief Requested

4.      By this Motion, the Debtors seek entry of the Order authorizing, but not directing, the Debtors to continue to operate an integrated cash management system (as discussed herein, the "Cash Management System") in the day-to-day operation of their businesses, and to continue to honor certain prepetition obligations in accordance with the operation of the Cash Management System. The diagram attached hereto as **Exhibit B** and incorporated by reference provides an overview of the Cash Management System. Specifically, the Debtors request authority to: (a) continue to use, with the same account numbers, each of the bank accounts held in the name of a Debtor (the "Bank Accounts") located at the financial institutions (collectively,

the "Banks") listed on **Exhibit C** attached hereto and incorporated herein by reference; (b) treat the Bank Accounts for all purposes as accounts of the Debtors as debtors in possession; and (c) conduct banking transactions by all usual means, and debit the Bank Accounts on account of all usual items and payment instructions.

5.     Additionally, the Debtors seek authority to: (a) use, in their present form, all business forms (including check stock, letterhead, purchase orders, and invoices) and other correspondence and documents related to the Bank Accounts, without reference to the Debtors' status as debtors in possession; (b) continue to use certain investment accounts in accordance with section 345 of the Bankruptcy Code; (c) close existing Bank Accounts and open new debtor-in-possession accounts with Authorized Depositories (as defined herein); and (d) continue certain intercompany and netting arrangements between and among the Debtors and their Debtor and non-Debtor affiliates on an administrative priority basis in the ordinary course of business and in accordance with historical practices (solely as described herein, the "Intercompany Transactions," and claims arising from the Intercompany Transactions, the "Intercompany Claims").

### Background

6.     On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition with the Court under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have requested joint administration of these chapter 11 cases. The Court has not appointed a trustee, and the Office

of the United States Trustee for the District of Delaware (the "U.S. Trustee") has not formed any official committees in these chapter 11 cases.[2]

7.      Debtor Energy Future Holdings Corp. ("EFH Corp."), a Texas corporation, is the ultimate parent company for each of the Debtors in these chapter 11 cases and certain of EFH Corp.'s non-Debtor affiliates (collectively, "EFH"). EFH's businesses include the largest generator, distributor, and certified retail provider of electricity in Texas. EFH conducts substantially all of its business operations in the electricity market overseen by the Electric Reliability Council of Texas ("ERCOT"), which covers the majority of Texas. The Texas electricity market, in turn, is subject to oversight and regulation by the Public Utility Commission of Texas (the "PUC"). EFH has approximately 9,100 employees, approximately 5,700 of whom are employed by the Debtors,[3] in three distinct business units:

- EFH's *competitive electricity generation, mining, wholesale electricity sales, and commodity risk management and trading activities*, conducted by TCEH LLC's Debtor subsidiaries composing "Luminant";

- EFH's *competitive retail electricity sales operations and related operations*, mainly conducted by TCEH LLC's Debtor subsidiaries composing "TXU Energy";[4] and

---

[2]   The facts and circumstances supporting this Motion, along with a detailed discussion of EFH's business operations and capital structure, are set forth in the *Declaration of Paul Keglevic, Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of Energy Future Holdings Corp., et al., in Support of First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith.

[3]   The Debtors in these chapter 11 cases consist of: (a) the vast majority of the entities that compose Luminant and TXU Energy, as well as those entities' intermediate corporate parent entity, Texas Competitive Electric Holdings Company LLC ("TCEH LLC"), a Delaware limited liability company, and TCEH LLC's corporate parent, Energy Future Competitive Holdings Company LLC ("EFCH"), a Delaware limited liability company; (b) Energy Future Intermediate Holding Company LLC ("EFIH"), a Delaware limited liability company that indirectly owns approximately 80% of Oncor Electric Delivery Holdings Company LLC ("Oncor"), and EFIH's wholly-owned subsidiary, EFIH Finance Inc.; (c) EFH Corp.; and (d) other direct and indirect subsidiaries of EFH Corp., including EFH Corporate Services Company.

[4]   The Debtors also conduct a relatively small amount of retail electricity operations through their 4Change brand and another entity, Luminant ET Services Company, that provides retail electricity service to some end use customers and to some of Luminant's mining operations, and a small amount of retail gas operations through Luminant Energy Company LLC.

- EFH's *rate-regulated electricity transmission and distribution operations*, conducted by the non-Debtor Oncor.

8.    In the aggregate, the Debtors have approximately $42 billion of funded indebtedness, including (a) approximately $32.1 billion of claims against TCEH LLC and TCEH LLC's direct and indirect Debtor subsidiaries; (b) approximately $71 million of claims against EFCH; (c) approximately $1.9 billion of claims against EFH Corp.; and (d) approximately $7.7 billion of claims against EFIH.[5]

9.    Although the Debtors' balance sheet is overleveraged, the Debtors' operations are strong. Luminant's generation units are high-performing, its mining and electricity generation operations have impressive safety records, and its commodity trading and risk management activities have delivered significant value to the Debtors. TXU Energy is an industry leader in customer care performance and product innovation and has maintained strong performance notwithstanding intense competition. And non-Debtor Oncor produces a strong and consistent stream of revenue. Thus, these chapter 11 cases will provide the Debtors with the opportunity to restructure their balance sheets and retain their position as leaders in the Texas electricity market.

10.    As of December 31, 2013, EFH Corp. reported total assets of approximately $36.4 billion in book value, approximately $28.8 billion of which is attributable to EFCH, TCEH LLC, and TCEH LLC's direct and indirect subsidiaries (collectively with TCEH LLC and EFCH, "TCEH"),[6] and total liabilities of approximately $49.7 billion in book value,

---

[5]  Amounts include intercompany debt holdings and short-term borrowings, and exclude guarantees, unamortized discounts or premiums, accrued but unpaid interest, and certain other figures typically reported in the Debtors' filings with the Securities and Exchange Commission (the "SEC"), such as capital lease obligations, certain promissory notes, and certain other obligations.

[6]  Oncor's revenues are not included in EFH Corp.'s consolidated revenues because EFH Corp. accounts for its ownership of Oncor under the equity method of accounting.

approximately $41.1 billion of which is attributable to TCEH.[7] EFH Corp.'s assets and liabilities that are not attributable to TCEH are mostly attributable to EFIH's indirect ownership of approximately 80% of Oncor. EFH Corp.'s consolidated revenues for the quarter ending December 31, 2013 were approximately $1.3 billion, all of which were attributable to TCEH. EFH Corp.'s consolidated annual revenues for the year ending December 31, 2013 were approximately $5.9 billion.

## I.    The Bank Accounts.

### A.    Overview.

11.    The Cash Management System consists of 44 Bank Accounts, each of which is held in the name of one the following Debtors:  (a) EFH Corp.; (b) EFIH; (c) EFH Corporate Services Company ("EFH Corporate Services"); (d) Generation Development Company LLC; (e) TXU Receivables Company LLC; (f) EFCH; and (g) TCEH LLC and the following TCEH LLC subsidiaries:    (i) Luminant Energy Company LLC ("Luminant Energy"); (ii) Luminant Generation Company LLC ("Luminant Generation"); (iii) Luminant Mining Company LLC ("Luminant Mining"); (iv) TXU Energy Retail Company LLC ("TXU Energy Retail"); (v) TXU Energy Receivables Company LLC ("TXU Energy Receivables"); and (vi) 4Change Energy Company ("4Change Energy").  The Cash Management System is primarily managed by the Debtors' financial personnel at their corporate headquarters located in Dallas, Texas.

12.    The Debtors' primary Bank is J.P. Morgan Chase Bank ("JPM"), with which the Debtors maintain 34 Bank Accounts.  The Debtors also maintain 10 Bank Accounts with 7

---

[7]    Figures for TCEH are derived from EFCH's public filings with the SEC, and are almost entirely attributable to TCEH LLC and its Debtor and non-Debtor subsidiaries.

Banks other than JPM. The Debtors maintain each of the Bank Accounts at financial institutions insured by the Federal Deposit Insurance Corporation (the "FDIC"). Moreover, 43 of the Bank Accounts are located at institutions that the Debtors believe are designated as authorized depositories (the "Authorized Depositories") by the U.S. Trustee.[8]

13. The bulk of the Debtors' cash on-hand as of the Petition Date is from cash raised from debt issuances, distributions received from Oncor (in the case of EFH Corp. and EFIH), and proceeds generated from ongoing business operations.[9] As of the Petition Date, the Debtors have a total of approximately $795 million in cash held in the Bank Accounts and six investment accounts (as described herein, the "Investment Accounts"), approximately $235 million, $428 million, and $132 million of which is held in the segregated Bank Accounts and Investment Accounts of the EFH Debtors (defined herein), TCEH Debtors (defined herein), and EFIH, respectively.[10]

14. Because the Bank Accounts are central to the Debtors' ongoing business operations, the Debtors seek authority in this Motion to continue utilizing the Cash Management System and Bank Accounts, including the authority to conduct banking transactions, pay the Bank Fees, and open new debtor in possession bank accounts or close any existing Bank

---

[8] The sole Bank Account located at a Bank that is not designated as an Authorized Depository pursuant to the U.S. Trustee Guidelines does not contain significant deposits. Specifically, Bank Account No. 7136, held in the name of Luminant Generation with First National Bank of Granbury, is a miscellaneous receipts account that holds amounts less than the FDIC-insured amount.

[9] Before the Petition Date, TXU Energy Receivables sold all of its accounts receivable under the Debtors' prepetition accounts receivable securitization facility to Debtor TXU Energy Retail. Bank Account No. 0559, held in the name of Debtor TCEH LLC with Union Bank, N.A., holds approximately $149.6 million of unrestricted cash from proceeds of the receivables sale and TXU Energy Receivables' retained earnings.

[10] Cash belonging to the EFH Debtors is segregated from cash belonging to the TCEH Debtors. Similarly, cash belonging to either the TCEH Debtors or EFH Debtors is segregated from cash belonging to EFIH.

Accounts.[11] The Debtors firmly believe that it is critical to the continued operation of their businesses, and to preserving the value of their estates, that the Debtors be allowed to continue to use the Cash Management System and Bank Accounts without disruption.

**B.      EFH Corp. Bank Accounts.**

15.     EFH Corp.'s principal Bank Account is Account No. 3584 (the "<u>EFH Main Account</u>"), which EFH Corp. maintains with JPM.   The EFH Main Account is a general concentration account for excess cash held by EFH Corp. and holds approximately $25 million as of the Petition Date.  As discussed below, the EFH Main Account transfers funds to the main Bank Account for the money pool arrangement used by EFH Corp. and certain of its subsidiaries (as described herein, the "<u>EFH Money Pool</u>").

16.     In addition, EFH Corp. maintains the following Bank Accounts:

(a) ***Bank Account No. 2032***, maintained with JPM, collects miscellaneous receipts and holds approximately $1,000 as of the Petition Date; and

(b) ***Bank Account No. 9707***, maintained with Bank of America, is available for wire transfers in the event of an emergency situation, and is unfunded as of the Petition Date.

(c) ***Bank Account No. 9100***, maintained with JPM, will be used to collect future tax payments from Oncor under the Oncor TSA (defined herein), and is unfunded as of the Petition Date.

17.     As described in detail below, EFH Corp. also uses the EFH Main Account to invest excess cash in two Investment Accounts, which together hold approximately $180.6

---

[11] Specifically, the Debtors request that the Court authorize them to close any existing Bank Accounts, or to open new debtor in possession bank accounts at banks that are Authorized Depositories.  The Debtors will provide notice of any such opening or closing to the U.S. Trustee, counsel to any official committee appointed in these cases, counsel to the agent for the TCEH debtor-in-possession financing facility (the "<u>TCEH DIP Facility</u>" and such agent, the "<u>TCEH DIP Agent</u>"), counsel to the ad hoc committee of TCEH first lien creditors (the "<u>Ad Hoc Committee of TCEH First Lien Creditors</u>"), counsel to the agent for the EFIH first lien debtor-in-possession financing facility (the "<u>EFIH DIP Facility</u>" and such agent, the "<u>EFIH DIP Agent</u>"), counsel to the agent for the EFIH second lien debtor-in-possession notes (the "<u>EFIH DIP Notes</u>" and such agent, the "<u>EFIH DIP Notes Agent</u>"), and counsel to the ad hoc committee of EFIH unsecured creditors (the "<u>Ad Hoc Committee of EFIH Unsecured Creditors</u>").

million as of the Petition Date.[12]

## C. EFH Corporate Services Bank Accounts.

18. EFH Corporate Services, a direct subsidiary of EFH Corp., maintains a principal Bank Account with JPM, Account No. 3790 (the "EFH Money Pool Main Account"). As discussed below, the EFH Money Pool Main Account is the central Bank Account for the EFH Money Pool. The EFH Money Pool Main Account maintains a minimum net balance of approximately $10 million to prefund automated clearinghouse payments ("ACH Payments"), and next-day wires, and has a current balance of approximately $10 million. The Debtors' treasury personnel sweep any excess cash held in the EFH Money Pool Main Account above $10 million into the EFH Main Account on a daily basis. Likewise, and as discussed below, the Debtors' treasury personnel deposit funds into the EFH Money Pool Main Account from the EFH Main Account as necessary to fund the accounts payable, payroll, and other obligations related to the operations of EFH Corp. and certain of its Debtor subsidiaries (collectively, the "EFH Debtors"),[13] as well as obligations related to the operations of EFCH, TCEH LLC, and its direct and indirect Debtor subsidiaries (collectively, the "TCEH Debtors") that are subsequently reimbursed as Intercompany Transactions.

19. In addition to the EFH Money Pool Main Account, EFH Corporate Services maintains the following five Bank Accounts with JPM:

> (a) **Bank Account No. 6572** is a collateral account for deposits related to commercial card obligations, with a current balance of approximately $4.4 million;

---

[12] As discussed below, EFH Corp. invests in the Goldman Sachs Financial Square Treasury Fund (Account No. 4691) and the Morgan Stanley Institutional Treasury Fund (Account No. 0166).

[13] The EFH Debtors include all direct and indirect Debtor subsidiaries of EFH Corp., other than EFIH and its subsidiaries and the TCEH Debtors (defined herein).

(b) **Bank Account No. 8749** is a zero balance account used for payroll disbursements to approximately 5,700 Debtor employees with a current balance of approximately $500,000;

(c) **Bank Account No. 6766** is an accounts payable disbursements account with a current balance of approximately $10 million;

(d) **Bank Account No. 0752** is an accounts payable disbursements account with a current balance of approximately $5 million; and

(e) **Bank Account No. 2019** is a Chase Investments brokerage account with a current balance of approximately $32,000.

**D.     TCEH Bank Accounts.**

20.     TCEH LLC's     principal     Bank     Accounts     are     Account     No. 9810 (the "TCEH Main Account") and Account No. 0481 (the "TCEH Money Pool Main Account"), each of which TCEH maintains with JPM.  As discussed below, the TCEH Main Account and the TCEH Money Pool Main Account together serve as the primary source of funds for the operations of the TCEH Debtors through a separate money pool (as described herein, the "TCEH Money Pool" and, together with the EFH Money Pool, the "Money Pools").  As of the Petition Date, the TCEH Main Account holds approximately $47 million.  The TCEH Money Pool Main Account maintains a minimum net balance of approximately $2 million to prefund next-day wires.  As of the Petition Date, the TCEH Money Pool Main Account holds approximately $2 million.  The Debtors' treasury personnel sweep any excess cash held in the TCEH Money Pool Main Account into the TCEH Main Account on a daily basis.  Likewise, the Debtors' treasury personnel deposit funds from the TCEH Main Account into the TCEH Money Pool Main Account as necessary to fund the operations of the TCEH Debtors.

21.     TCEH LLC also maintains the following four Bank Accounts:

(a) **Bank Account No. 4169**, maintained with JPM, is a receipt and disbursement account relating to financial settlements and over-the-counter transactions, with a current balance of approximately $1,000;

(b) **_Bank Account No. 3657_**, maintained with Citibank, is an account used to fund certain letters of credit, with a current balance of approximately $27,000;

(c) **_Bank Account No. 7837_**, maintained with JPM, is an account used to collect the proceeds of the sale of receivables in connection with the wind-down of the accounts receivable securitization program that was terminated on October 28, 2013, with a current balance of $0; and

(d) **_Bank Account No. 0559_**, maintained with Union Bank, N.A., is an account used to hold unrestricted cash related to the unwinding of the former accounts receivable securitization program, with a current balance of approximately $149.6 million.[14]

22.     Moreover, as described below, TCEH LLC invests excess cash in two Investment Accounts, which together hold approximately $226 million as of the Petition Date.[15]

**E.      Other Debtor Accounts.**

23.     EFIH, the direct parent of Oncor Electric Delivery Holdings Company LLC ("Oncor Holdings"), maintains two Bank Accounts with JPM.  Bank Account No. 4789 holds approximately $3.7 million as of the Petition Date, and is used to pay general corporate expenses (the "EFIH Main Account").  Bank Account No. 4934 holds approximately $1,000 as of the Petition Date, and is used exclusively for the receipt of postpetition dividends from Oncor.  As discussed below, EFIH invests excess cash in the Morgan Stanley Institutional Treasury Fund (Account No. 0127), an Investment Account that holds approximately $128.2 million as of the Petition Date.

24.     Generation Development Company LLC maintains a Bank Account with JPM (Account No. 3633) that holds approximately $1,000 as of the Petition Date.   Generation

---

[14]   The funds in this Bank Account and Bank Account No. 7837 are not part of the prepetition collateral securing the TCEH First Lien Debt or TCEH Second Lien Notes (as defined in the First Day Declaration).

[15]   As discussed below, TCEH LLC invests in the Goldman Sachs Financial Square Treasury Fund (Account No. 4694) and the Western Asset Institutional Treasury Fund (Account No. 4883).

Development Company LLC uses cash from this Bank Account in connection with currently limited activities related to development of generation assets.

25. TXU Receivables Company LLC maintains a Bank Account with JPM (Account No. 8255) that holds $0 as of the Petition Date. The account was used in connection with a former accounts receivable securitization program.

26. EFCH, the direct parent of TCEH LLC, maintains a Bank Account with JPM (Account No. 4511) that holds approximately $4,000 as of the Petition Date. EFCH uses cash from this Bank Account to pay general corporate expenses.

27. In addition, six indirect Debtor subsidiaries of TCEH LLC—TXU Energy Retail, TXU Energy Receivables, Luminant Energy, Luminant Generation, 4Change Energy, and Luminant Mining—collectively maintain 23 collection and disbursement Bank Accounts, identified on **Exhibit C**, which together hold approximately $2.9 million as of the Petition Date.

**F.     The Debtors' Anticipated Postpetition Controls on the Bank Accounts.**

28. The Debtors have taken steps to implement appropriate mechanisms to ensure that no payments will be made on any debts incurred by them before the Petition Date except as provided in the Order or another order of the Court. The procedures the Debtors have implemented (and will implement after the Petition Date) include: (a) notifying the Banks of all prepetition payments that should not be honored; (b) segregating the Debtors' accounts payable into prepetition and postpetition amounts; (c) training the Debtors' accounting and accounts payable staff regarding procedures for identifying and segregating prepetition obligations; and (d) developing specific authorization procedures required for the Debtors' accounting and accounts payable staff to issue a payment for any prepetition liability that is authorized pursuant to an order of the Court.

## II.  Banking Transactions, Bank Fees and Related Expenses.

29.    The Debtors employ two primary methods of making payments from the Bank Accounts to external third parties.  First, substantially all payments by check or ACH Payment are made by EFH Corporate Services from the EFH Money Pool Main Account.[16]  Specifically, the EFH Money Pool Main Account funds Bank Accounts 6766 and 0752, which then fund disbursements by check and ACH Payment, respectively.  As discussed below, to the extent that other Debtor affiliates are obligated to reimburse EFH Corporate Services for payments made on behalf of the Debtors to third parties, the applicable Debtor reimburses EFH Corporate Services by wire transfer within two days of such check or ACH Payment clearing.  Additionally, certain of the Debtors make direct payments by wire transfer to external third parties from an applicable disbursement Bank Account.

30.    In the ordinary course of business, the Banks debit the Bank Accounts on account of all manner of payment items and instructions.  In connection with these payments and the general maintenance of the Bank Accounts, the Banks charge, and the Debtors pay, honor, or allow the deduction from the appropriate account, certain service charges, and other fees, costs, and expenses, including commercial card obligations that enable the Debtors' customers to pay by credit card (collectively, the "Bank Fees"). The Debtors receive credits from JPM in exchange for maintaining a minimum balance in some of their Bank Accounts with JPM, which JPM applies as an offset to certain Bank Fees.

31.    The Cash Management System depends on the ability of the Banks to maintain and administer the Bank Accounts and to honor and process the Debtors' banking transactions.

---

[16]  Importantly, one exception to this payment process relates to refund payments to customers, which TXU Energy Retail makes directly to customers by check from Bank Account No. 6959.

Accordingly, the Debtors request that the Court authorize the Banks to (a) receive, process, honor, and pay any and all payments through, drawn, or directed on such Bank Accounts after the Petition Date by holders, makers, or other parties entitled to issue payments with respect thereto, irrespective of whether such payments are dated before or after the Petition Date, and (b) make payments from and debit the Bank Accounts, in the ordinary course of business, on account of (i) all checks drawn on the Bank Accounts which are presented for payment or exchanged for cashier's checks by the payees thereof before or after the Petition Date, (ii) all checks or other items deposited in one of the Bank Accounts with such Banks that have been dishonored or returned unpaid for any reason, together with any Bank Fees in connection therewith, to the same extent the Debtors were responsible for such items before the Petition Date, (iii) any charge-back on the Bank Accounts, whether the corresponding return or refund was dated before or after the Petition Date, and (iv) undisputed, outstanding Bank Fees owed to the Banks as of the Petition Date on account of the maintenance of the Cash Management System, if any.[17]

32.     Additionally, the Debtors request that any payment from a Bank Account that is authorized by the Debtors and paid by a Bank before the Petition Date (including any ACH Payment such Bank is or becomes obligated to settle), or any instruments issued by such Bank on behalf of any Debtor pursuant to a "midnight deadline"[18] or otherwise, shall be deemed to be paid prepetition, whether or not actually debited from the Bank Account prepetition.

---

[17]   Nothing contained herein is intended to require a Bank to make or issue a payment from a Bank Account that does not have sufficient funds to cover such payment.

[18]   Article 4 of the U.C.C. provides that a "'Midnight Deadline' with respect to a bank is midnight on its next banking day following the banking day on which it receives the relevant item or notice from which the time for taking action commences to run, whichever is later." U.C.C. § 4-104(a)(10) (2002).

33.     The Debtors request that the Banks be authorized to accept, honor, and rely upon all representations from the Debtors as to which payments should be honored, consistent with this Order or another order of the Court, whether such payments are dated before or after the Petition Date.  To the extent a Bank honors a prepetition payment drawn on any Bank Account that is the subject of this Motion either:  (a) at the direction of the Debtors; (b) in a good-faith belief that the Court has authorized such prepetition payment to be honored; or (c) as a result of an innocent mistake made despite the above-described protective measures, the Debtors request that such Bank shall not be liable to any party on account of any such action.

III.    **The Debtors' Existing Business Forms.**

34.     In the ordinary course of business, the Debtors use a variety of correspondence and business forms, such as letterhead, blank check stock, purchase orders, invoices, and other documents related to the Bank Accounts (collectively, the "Business Forms").  To minimize expense to their estates and to avoid confusion on the part of their employees, customers, and suppliers, the Debtors seek authority to continue to use all Business Forms in existence immediately before the Petition Date—without reference to the Debtors' status as debtors in possession—rather than incurring the significant expense, delay, and business disruption that would result if the Debtors were required to immediately cease using their existing Business Forms, and order and use entirely new checks that strictly comply with the U.S. Trustee Guidelines.  The Debtors will order new checks identifying their status as debtors in possession as their existing stock is depleted.

IV.     **Investment Policies.**

35.     Certain of the Debtors invest funds that would otherwise be held in the EFH Main Account, the TCEH Main Account, or other Bank Accounts.  These funds are held in six investment accounts:  (a) Goldman Sachs Financial Square Treasury Fund (Account No. 4694);

(b) Western Asset Institutional Treasury Fund (Account No. 4883); (c) Goldman Sachs Financial Square Treasury Fund (Account No. 4691); (d) Morgan Stanley Institutional Treasury Fund (Account No. 0166); (e) Morgan Stanley Institutional Treasury Fund (Account No. 0127); and (f) Invesco Treasury Portfolio - Institutional Class (Account No. 4457) (collectively, the "Investment Accounts"). As of the Petition Date, the bulk of the Debtors' cash on-hand (approximately $534.8 million) is invested in the Investment Accounts.

36.     Pursuant to the Debtors' internal investment policy (the "Investment Policy"), the Debtors are authorized to invest in (a) short-term securities of the United States government and federal agencies, and (b) money market funds comprised of such securities, provided that such money market funds both: (i) comply with Rule 2a-7 of the Investment Company Act of 1940; and (ii) have a rating of 'AAA' by S&P or 'Aaa' by Moody's.[19]

37.     In addition to complying with the Investment Policy, the Debtors have taken steps to ensure that they will, on a postpetition basis, only use the Investment Accounts or other investment accounts that substantially comply with Local Bankruptcy Rule 4001-3. Specifically, each of the Investment Accounts is held with an open-end management investment company regulated as a money market fund under Rule 2a-7 of the Investment Company Act of 1940 that (a) invests exclusively in United States Treasury securities owned directly or through repurchase agreements, (b) has received the highest money market fund rating of 'AAA' by S&P or 'Aaa' from Moody's, and (c) generally redeems fund shares in cash with payment being made no later than the business day following a redemption by a shareholder, except in the event of an

_____

[19]     The Debtors are also authorized under the Investment Policy, and with the approval of certain corporate officers, to make temporary cash investments in an amount at any one time outstanding not to exceed $50 million in any other short-term investment, security, or instrument. During the pendency of these chapter 11 cases, however, the Debtors will not make any such temporary cash investments, as all funds in excess of operating requirements will be invested in the Investment Accounts.

unscheduled closing of the Federal Reserve Banks or the New York Stock Exchange.[20] Additionally, the Debtors believe that the policies and practices with respect to (a) and (c) above generally will not be substantially altered by the applicable fund managers absent shareholder consent or advance notice. Accordingly, the Debtors request authority to continue using the Investment Accounts, consistent with their prepetition practice.

## V. Intercompany Transactions.

38. In the ordinary course of business, the Debtors engage in the following Intercompany Transactions that give rise to Intercompany Claims: (a) transfers and settlements through the Money Pools (as defined herein); (b) transactions and transfers under the Shared Services (as defined herein); (c) certain ordinary course tax-related transactions under the TSAs (as defined herein); (d) transactions related to Subleases (as defined herein); and (e) transactions related to Letters of Credit (as defined herein).

---

[20] Certain of the money market funds with which the Investment Accounts are held reserve the right to pay redemptions by a distribution in-kind of securities and/or to temporarily suspend redemptions if determined by such fund's manager or board of trustees to be in the interests of the fund and/or shareholders, or in accordance with Section 22(e) of the Investment Company Act or other applicable law.

Specifically, Section 22(e) of the Investment Company Act provides:

No registered investment company shall suspend the right of redemption, or postpone the date of payment or satisfaction upon redemption of any redeemable security in accordance with its terms for more than seven days after the tender of such security to the company or its agent designated for that purpose for redemption, except—

(1) for any period (A) during which the New York Stock Exchange is closed other than customary weekend and holiday closings or (B) during which trading on the New York Stock Exchange is restricted;

(2) for any period during which an emergency exists as a result of which (A) disposal by the company of securities owned by it is not reasonably practicable or (B) it is not reasonably practicable for such company fairly to determine the value of its net assets; or

(3) for such other periods as the Commission may by order permit for the protection of security holders of the company. The Commission shall by rules and regulations determine the conditions under which (i) trading shall be deemed to be restricted and (ii) an emergency shall be deemed to exist within the meaning of this subsection.

Investment Company Act of 1940 § 22(e), 15 U.S.C. §§ 80a (1940).

## A.    The Money Pools.

39.    The Debtors utilize two Money Pools to facilitate transactions among themselves and to minimize the number of accounts needed for the corporate group to operate.  Specifically, EFH Debtors may participate in the EFH Money Pool,[21] and TCEH Debtors may participate in the TCEH Money Pool.  Each Money Pool is a general ledger that tracks, aggregates, nets, and settles intercompany payables and receivables owed to, and by, the entities that participate in that Money Pool.  The list of Debtors that have historically participated in the EFH Money Pool or the TCEH Money Pool, and which will continue to participate in their respective Money Pools on a postpetition basis, is attached hereto as **Exhibit D**.

40.    The primary Bank Accounts associated with the EFH Money Pool are the EFH Main Account and the EFH Money Pool Main Account.  The EFH Money Pool Main Account maintains a minimum net balance of approximately $10 million to prefund outstanding checks, ACH Payments, and next-day wires.  The Debtors' treasury personnel sweep any excess cash above the minimum net balance held in the EFH Money Pool Main Account into the EFH Main Account on a daily basis, and subsequently invest this excess cash in certain of the Investment Accounts.  Moreover, funds are deposited into the EFH Money Pool Main Account from the EFH Main Account as needed to the extent that scheduled disbursements exceed the minimum net cash balance in the EFH Money Pool Main Account.

41.    The primary Bank Accounts associated with the TCEH Money Pool are the TCEH Main Account and the TCEH Money Pool Main Account.  The TCEH Money Pool Main Account maintains a minimum net balance of approximately $2 million to prefund next-day

---

[21]    Historically, EFIH and certain of EFH Corp.'s non-Debtor subsidiaries have participated in the EFH Money Pool.  Pursuant to this Motion, the Debtors do not seek relief to allow, on a postpetition basis, (a) EFIH or its subsidiaries to make or receive loans through the EFH Money Pool, or (b) non-Debtor entities to obtain access to cash through the EFH Money Pool.

wires. The Debtors' treasury personnel sweep any excess cash held in the TCEH Money Pool Main Account (above minimum net balances required to prefund next-day wires) into the TCEH Main Account on a daily basis, and subsequently invest this excess cash in certain of the Investment Accounts. Moreover, funds are deposited into the TCEH Money Pool Main Account from the TCEH Main Account as needed to the extent that scheduled disbursements exceed the minimum net cash balance in the TCEH Money Pool Main Account.

42.    The Money Pools facilitate Intercompany Transactions, including the provision of intercompany services and the payment of third-party obligations, among entities that participate in the same Money Pool. Each entity that participates in a Money Pool is either a net "borrower" of, or a net "lender" to, one of the Money Pools, depending upon whether, in the aggregate, an entity contributes or draws money from the Money Pool. Additionally, if an entity provides intercompany services to another entity that participates in the same Money Pool, or pays an expense on behalf of another entity within the same Money Pool, this is treated as an extension of intercompany credit through the appropriate Money Pool. These arrangements, in turn, give rise to Intercompany Claims, and net lenders accumulate interest on their balances at predetermined rates.[22]

43.    Historically, Intercompany Claims among the entities that participate in the same Money Pool have not been settled in cash; rather, they are recorded as a book entry and appropriate adjustment to the applicable account balances of both the borrower and lender. The Debtors track all such Intercompany Transactions electronically in their accounting system and

---

[22] Net borrowers from the EFH Money Pool must make interest payments to the EFH Money Pool at a rate of 10.875% per annum, a percentage that is based on the EFH Corp. 10.875% LBO Senior Notes due 2017. Net borrowers from the TCEH Money Pool must make interest payments to the TCEH Money Pool at a predetermined rate, equal to the daily weighted average cost of short-term borrowings under TCEH's prepetition revolving credit facility, plus the credit facility commitment fee spread. An entity's accrued interest is paid monthly by a book entry in the ledgers of both the borrower and lender.

can ascertain, trace, and account for them as necessary. Moreover, cash is not moved between the two separate Money Pools except pursuant to documented transactions. The Debtors seek authority to continue to operate the Money Pools in accordance with their past practices.

**B.     The Shared Services.**

44.     In accordance with the Shared Services Agreement between Debtor EFH Corporate Services and the TCEH Debtors, dated October 23, 2013 (as amended, the "TCEH Shared Services Agreement") and the Shared Services Agreement between Debtor EFH Corporate Services and Debtor EFIH, dated April 1, 2014 (the "EFIH Shared Services Agreement" and, together with the TCEH Shared Services Agreement, the "Shared Services Agreements"), the Money Pools, or the Debtors' historical practices, EFH Corporate Services: (a) provides essential centralized administrative and back-office services to its affiliates and employs corporate-level employees to provide services for its affiliates (the "Centralized Services"); (b) makes direct payments for certain expenses attributable to its affiliates, irrespective of whether EFH Corporate Services is the payment obligor for such expenses, including the Debtors' health and welfare benefits for their employees, certain pension related obligations, certain information technology and capital expenditures, and certain real property related expenses (the "Direct Billing Goods and Services"); (c) in connection with its treasury function for the enterprise as a whole, (i) issues checks and ACH Payments on behalf of its affiliates (the "Reimbursable Expenses") and (ii) collects and receives payments owed to its affiliates and remits such amounts to the appropriate affiliate (the "Remittance Services"); and (d) purchases certain assets for the benefit of its affiliates (the "Shared Asset Costs" and together with the Centralized Services, the Direct Billing Goods and Services, the Reimbursable

Expenses, the Remittance Services, and the Shared Asset Costs, the "Shared Services").[23] EFH Corporate Services employs approximately 500 employees, including the majority of the Debtors' executives, and enters into thousands of contractual arrangements with third parties for and on behalf of its affiliates. EFH Corporate Services provides the Shared Services "at cost," and does not charge its affiliates any premium or markup.

45. EFH Corporate Services receives payment from its affiliates for the allocated cost of the Centralized Services through monthly service bills, invoices its affiliates for their allocated cost of the Shared Asset Costs, and seeks reimbursement for the cost of the Direct Billing Goods and Services and the Reimbursable Expenses upon check or ACH clearance.[24] Pursuant to the Remittance Services, EFH Corporate Services collects payments owed to its affiliates and remits such amounts to the appropriate affiliate when due.[25]

46. The EFH Debtors primarily settle Intercompany Claims owed to EFH Corporate Services related to the Shared Services by book entry and adjustment to their respective ledger balances in the EFH Money Pool. The TCEH Debtors, EFIH, and Non-Debtor Affiliates pay Intercompany Claims related to the Shared Services to EFH Corporate Services by making cash payments to the EFH Money Pool Main Account, net of Intercompany Claims owed by EFH

---

[23]  Additionally, EFH Corporate Services seeks to provide similar services to certain direct and indirect non-Debtor subsidiaries of EFH Corp. (collectively, the "Non-Debtor Affiliates"), including Oncor Holdings and its subsidiaries, EFH Properties Company, Basic Resources Inc., and EFH Vermont Insurance Company on a postpetition basis, pursuant to its historical practices.

[24]  On February 18, 2014, TCEH LLC posted a deposit letter of credit in the total amount of $157.2 million to EFH Corporate Services for amounts owing under the TCEH Shared Services Agreement, approximately $100 million of which has been drawn as of the Petition Date.

[25]  For example, EFH Corporate Services receives approximately $15 million to $20 million annually from Oncor on account of "nuclear decommissioning fees" that are payable by the TCEH Debtors on Oncor's behalf, and remits such amounts to the TCEH Debtors for payment of such fees. The nuclear decommissioning fees are further discussed in the *Motion of Energy Future Holdings Corp., et al., for Entry of Interim and Final Orders Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees* (the "Taxes Motion"), filed contemporaneously herewith.

Corporate Services on account of Remittance Services. In 2013, the total net amount reimbursed to EFH Corporate Services by the TCEH Debtors on account of the Shared Services was approximately $2,235.2 million (of which approximately $1,987.5 million was related to Reimbursable Expenses and Direct Billing Goods and Services), and the total net amount reimbursed to EFH Corporate Services by EFIH on account of the Shared Services was approximately $125,000.

47.     The Shared Services result in efficiencies and cost savings to the Debtors, and create value for the Debtors and their estates. Moreover, given the integrated nature of the services and thousands of underlying agreements and employment relationships, requiring the Debtors to discontinue the Intercompany Transactions and the settlement of Intercompany Claims related to the Shared Services at this time would be extremely costly and inefficient, and detrimental to the value of the Debtors and their estates.

48.     As of the Petition Date, the TCEH Debtors owe EFH Corporate Services approximately $69.1 million on account of prepetition Intercompany Claims related to the Shared Services, and EFIH owes EFH Corporate Services approximately $700,000 on account of prepetition Intercompany Claims related to the Shared Services. Pursuant to this Motion, the Debtors seek the authority to pay the prepetition Intercompany Claims owed to EFH Corporate Services related to the Shared Services and to continue entering into Intercompany Transactions and settling Intercompany Claims related to the Shared Services on a postpetition basis; *provided, however*, that the Debtors will not pay or settle Intercompany Claims under that certain Management Agreement dated October 10, 2007 by and among EFH Corp. and each of the managers party thereto (the "Management Agreement"). Similar relief to that requested in this Motion with respect to the Shared Services has been approved by this Court. *See, e.g., In re PMI*

*Grp., Inc.,* No. 11-13730 (Bankr. D. Del. Jan. 6, 2012) (granting administrative expense priority for postpetition services on account of shared services); *In re Edison Mission Energy,* No. 12-49219 (Bankr. N.D. Ill. Dec. 17, 2012) (authorizing, but not directing, the Debtors to continue performance of obligations under the intercompany arrangements in the ordinary course of business); *In re Security Nat'l Props. Funding III, LLC,* No. 11-13277 (Bankr. D. Del. Oct. 18, 2011) (authorizing, but not directing, performance under the servicing agreement); *In re Peregrine I, LLC,* No. 11-11230 (Bankr. D. Del. Apr. 29, 2011); *In re OTC Holdings Corp.,* No. 10-12636 (Bankr. D. Del. Aug. 25, 2010) (according administrative expense priority for postpetition intercompany transactions); *In re Tropicana Entm't, LLC,* No. 08-10856 (Bankr. D. Del. May 6, 2008) (allowing reimbursement for postpetition intercompany claims).[26]

### C.    The Tax Sharing Agreements.

49. EFH Corp. is party to two tax sharing agreements: (a) one with EFCH, TCEH LLC and certain of its subsidiaries, and EFIH (the "Competitive TSA"); and (b) one with Oncor and Oncor Holdings (the "Oncor TSA" and, together with the Competitive TSA, the "TSAs").[27] Historically, the TSAs have been an efficient means of managing the Debtors' tax liabilities and utilizing tax attributes on a consolidated basis, and greatly facilitate the Debtors' accounting and tax reporting and payment obligations. Each of the TSA parties are liable for Texas state margin taxes. Under the TSAs, EFH Corp. files Texas state margin tax returns that include the TSA

---

[26]    Because of the voluminous nature of the orders cited herein, such orders are not attached to this Motion. Copies of these orders are available upon request of the Debtors' counsel.

[27]    EFH Corp. and Oncor have implemented structural and operational "ring-fencing" measures to enhance the credit quality of Oncor. Because Oncor is a partnership for federal income tax purposes, EFH Corp.'s consolidated federal income and Texas state margin tax returns only include EFH Corp's share of Oncor's income. Accordingly, under the Oncor TSA, payments from Oncor to EFH Corp. are limited to EFH Corp.'s share of the federal income and state margin taxes that Oncor would owe if it filed its own tax returns, net of tax refunds and any amounts owed to Oncor for the deemed use by other TSA parties of Oncor's tax attributes.

parties' results, and subsequently settles Intercompany Claims with each of the TSA parties on account of the Texas state margin taxes that are owed by each TSA party.

50. The Competitive TSA allocates the consolidated income tax liability of the Competitive TSA parties (the "Competitive Group") by first requiring the calculation of the tax liability for each corporate member of the Competitive Group that would have resulted if each such corporate member had filed a separate return on a stand-alone basis separate from the Competitive Group, with the liability of a corporate member further allocated to any subsidiaries that are disregarded as separate from such member.[28] The total amount paid in 2013 by the TCEH Debtors to EFH Corp. under the Competitive TSA, net of any reimbursements paid from EFH Corp. to the TCEH Debtors, was approximately $143.1 million.

51. Generally, the Oncor TSA (a) requires Oncor to make payments to EFH Corp. and the minority owners of Oncor in respect of tax liabilities generated by its operations (and in certain circumstances entitles Oncor to payments from EFH Corp. and the minority owners in respect of net operating losses or other tax attributes recognized by it) and (b) requires Oncor Holdings to make payments directly to EFH Corp. in respect of tax liabilities generated by its operations (and in certain circumstances entitles Oncor Holdings to payments from EFH Corp. in respect of tax losses recognized by it). The total amount paid in 2013 to EFH Corp. by Oncor

---

[28] The amount allocated to each member is comprised of two components. *First* is the fraction of the actual consolidated tax liability that corresponds to each such member's relative positive "separate taxable income." *Second* is the relative benefit to members with positive separate taxable incomes from losses generated by other members of the consolidated group and utilized by the group, whether such losses are recognized in the current period or in a prior period. In certain circumstances, a Competitive TSA party that generates a tax loss may be entitled to receive a payment from EFH Corp.

and Oncor Holdings under the Oncor TSA, net of any reimbursements paid from EFH Corp. to Oncor and Oncor Holdings, was approximately $90 million and $34 million, respectively.[29]

52.     Pursuant to the Taxes Motion, the Debtors are seeking authority to continue to pay approximately $70 million on account of certain prepetition state law margin tax claims to ensure that they will be able to continue operating their businesses in the ordinary course. Accordingly, pursuant to this Motion, the Debtors are only seeking to settle Intercompany Claims under the TSAs relating to prepetition state law margin tax claims that the Debtors are authorized to pay under the Taxes Motion, and to continue to settle Intercompany Claims arising under the TSAs with respect to state law margin tax claims on a postpetition basis.  For the avoidance of doubt, the Debtors are not seeking at this time to settle Intercompany Claims relating to federal income taxes among EFH Corp. and the TSA parties.

**D.      Subleases.**

53.     Non-Debtor EFH Properties Company and certain Debtors lease property for the operation of the businesses and, pursuant to sublease agreements, historical practices, and other arrangements (collectively, the "Subleases"), sublet office space and real property to their affiliates.  For example, the Debtors' and their affiliates' Dallas office headquarters, Energy Plaza, is leased pursuant to a lease agreement dated February 14, 2002 (the "EP Lease") between non-Debtor EFH Properties Company, as lessee, and U.S. Bank National Association (as successor-in-interest to State Street Bank and Trust Company of Connecticut, National Association), as Owner Trustee of the ZSF/Dallas Tower Trust, as the lessor.  EFH Properties Company, in turn, subleases Energy Plaza office space to certain of its affiliates, including EFH

---

[29]   In accordance with the Restructuring Support Agreement attached to the First Day Declaration, the Debtors will seek to amend, or otherwise assign the payments under, the Oncor TSA to EFIH during these chapter 11 cases.

Corporate Services and Oncor. Under the Shared Services Agreements, EFH Corporate Services seeks reimbursement from its affiliates for their allocated share of rent, property taxes, operating costs, utilities, depreciation, and other related expenses. Oncor sub-subleases its Energy Plaza space to Debtor Luminant Generation, charging Luminant Generation below Oncor's cost of subleasing such space from EFH Properties Company. In 2013, the TCEH Debtors paid approximately $4.3 million to non-Debtor affiliates under the Subleases.

54. Pursuant to this Motion, the Debtors are seeking authority to settle prepetition Intercompany Claims under the Subleases, and to continue to enter into Intercompany Transactions and settle Intercompany Claims on account of ordinary course Subleases on a postpetition basis. The Debtors will settle all Intercompany Claims under the Subleases owed to Oncor and EFH Properties in cash. As of the Petition Date, the TCEH Debtors owe their non-Debtor affiliates approximately $400,000 in the aggregate on account of prepetition Intercompany Claims under the Subleases.

**E.     Letters of Credit.**

55. TCEH LLC has issued, and is obligated under, the deposit letters of credit for the benefit of its affiliates (the "Letters of Credit"). The following table lists the Letters of Credit that TCEH LLC has issued to third parties for the benefit of certain EFH Debtors and Non-Debtor Affiliates, and the amount outstanding net of draws on such Letters of Credit:

| Applicable Beneficiary(ies) | Number of Letters of Credit | Total Net Amount Outstanding |
|---|---|---|
| EFH Corp. | 6 | $26,169,000 |
| EFH Corp. and LSGT Gas Company LLC | 1 | $12,014,000 |
| EFH Corporate Services | 8 | $5,935,000 |
| EFH Vermont Insurance Company[30] | 2 | $1,704,000 |
| Brighten Energy LLC | 2 | $500,000 |
| LSGT Gas Company LLC | 1 | $250,000 |

56.     The Letters of Credit are backed by restricted cash belonging to the TCEH Debtors.  To the extent that third parties draw on these Letters of Credit as payment for goods and services provided to the Debtors and their affiliates, a payable will result from the applicable beneficiary (if the beneficiary is not TCEH LLC) to TCEH LLC.  The TCEH Debtors' reimbursement obligations to TCEH LLC under the Letters of Credit are settled through the TCEH Money Pool.  Because TCEH LLC is a net payer to EFH Corp. and certain of its subsidiaries, including EFH Corporate Services, on account of Intercompany Claims arising under the other Intercompany Transactions, payables owed to TCEH LLC by these affiliates for drawdowns on the Letters of Credit are generally offset against the TCEH Debtors' obligations, thus reducing the amount of cash payments actually made by the TCEH Debtors.  In 2013, EFH Corp. and certain of the EFH Debtors reimbursed TCEH LLC approximately $1.4 million for amounts drawn under the Letters of Credit.

57.     As of the Petition Date, there are no outstanding Intercompany Claims owing from the EFH Debtors and the Non-Debtor Affiliates to TCEH LLC on account of reimbursement obligations under the Letters of Credit.  Pursuant to this Motion, the Debtors seek authority to settle prepetition Intercompany Claims for reimbursement under the Letters of

---

[30]   Non-Debtor Affiliate EFH Vermont Insurance Company is a direct subsidiary of EFH Corp.

Credit, and to continue their existing reimbursement arrangement with respect to Letters of Credit on a postpetition basis.

**F.     The Intercompany Transactions are Vital to the Debtors' Business Operations.**

58.     The Debtors' operations are highly complex and integrated, and the Intercompany Transactions enable the Debtors to efficiently provide essential goods and services to their Debtor and non-Debtor affiliates and settle internal and external obligations.  If the Intercompany Transactions were to be discontinued, the Cash Management System and related administrative controls would be disrupted to the Debtors' detriment.  Furthermore, preserving the "business as usual" atmosphere and avoiding the unnecessary distractions that inevitably would be associated with any substantial disruption in the Cash Management System will facilitate the Debtors' reorganization efforts.  Accordingly, the Debtors seek authority, but not the direction, to allow: (a) the EFH Debtors to continue to participate in the EFH Money Pool, including with respect to Intercompany Transactions and the netting of postpetition Intercompany Claims; (b) the TCEH Debtors to continue to participate in the TCEH Money Pool, including with respect to Intercompany Transactions and the netting of postpetition Intercompany Claims; and (c) the Debtors and their Debtor and non-Debtor affiliates to continue to engage in Intercompany Transactions and to settle, by netting or cash payment, Intercompany Claims arising from Shared Services, the TSAs (solely with respect to state law margin tax claims), the Subleases, and the Letters of Credit.

59.     Additionally, to ensure that each individual Debtor will not fund, at the expense of its creditors, the operations of another entity, the Debtors request that all Intercompany Claims that arise after the Petition Date as a result of ordinary course Intercompany Transactions be accorded administrative priority expense status.   If Intercompany Claims are accorded

administrative priority expense status, each entity using funds that flow through the Cash Management System should continue to bear ultimate payment responsibility for those ordinary course transactions.

### Basis for Relief

I.    **The Continued Use of the Debtors' Cash Management System, Including the Bank Accounts, is Essential to the Debtors' Operations and Restructuring Efforts and Will Not Harm Parties in Interest.**

60.    The Operating Guidelines for Chapter 11 Cases established by the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee Guidelines") require, among other things, that a debtor:  (a) close all existing bank accounts and open new "debtor in possession" accounts;  (b) establish one "debtor in possession" account for all estate funds required for the payment of taxes (including payroll taxes);  (c) maintain a separate "debtor in possession" account for cash collateral; and (d) include the designation "Debtor in Possession" on all checks, with a notation referencing the bankruptcy case number and type of account. These requirements are designed to provide a clear line of demarcation between prepetition and postpetition claims and payments, and to protect against a debtor's inadvertent payment of prepetition claims.

61.    Section 363(c)(1) of the Bankruptcy Code permits the Debtors to continue the Cash Management System to the extent doing so is in the ordinary course of business. 11 U.S.C. § 363(c)(1) (permitting a debtor to "use property of the estate in the ordinary course of business without notice or a hearing").  Bankruptcy courts routinely treat requests for authority to continue utilizing existing cash management systems as a relatively "simple matter." *In re Baldwin-United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987).  Indeed, courts in the Third Circuit have noted that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the

many different purposes that require cash." *See, e.g., In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1992), *aff'd in part* and *rev'd in part*, 997 F.2d 1039 (3d Cir. 1993), *cert. denied sub nom. Official Comm. of Unsecured Creditors v. Columbia Gas Transmission Corp.*, 510 U.S. 1110 (1994). The United States Court of Appeals for the Third Circuit has agreed, emphasizing that requiring a debtor to maintain separate accounts "would be a huge administrative burden and economically inefficient." *Columbia Gas*, 997 F.2d at 1061; *see also In re Southmark Corp.*, 49 F.3d 1111, 1114 (5th Cir. 1995) (finding a cash management system allows a debtor "to administer more efficiently and effectively its financial operations and assets").

62.    Additionally, the Court may authorize the Debtors to continue to use their existing Cash Management System pursuant to section 105(a) of the Bankruptcy Code. Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). As set forth in this Motion, the Debtors submit that approval of the continued use of the Debtors' routine Cash Management System, including the Bank Accounts, is appropriate and justified.

63.    The Cash Management System constitutes an ordinary course and essential business practice, and provides significant benefits to the Debtors, including the ability to (a) develop timely and accurate account balance information, (b) control and ensure maximum availability of corporate funds when and where necessary, (c) avoid administrative inefficiencies and expenses, (d) reduce interest expenses by funding cash requirements through the system, rather than relying upon short-term borrowing, (e) minimize delays in payments, and (f) differentiate between prepetition and postpetition claims.

64.     Any disruption in the operation of the Cash Management System could have a severe and adverse effect upon the value and ongoing operations of the Debtors, as well as the Debtors' ability to reorganize. As discussed above, the Debtors' businesses and financial affairs are complex. There are 44 different Bank Accounts related to the Debtor's operations, and the current Cash Management System has seamlessly and efficiently operated to collect revenue and disburse funds to the appropriate creditors in a timely fashion. Requiring the Debtors to segment their cash management system, open new accounts, revise cash management procedures, execute new signatory cards and depository agreements, and instruct customers to redirect payments at this critical stage of these chapter 11 cases would be expensive, create unnecessary administrative burdens and distractions, and be extraordinarily disruptive to the operation of the Debtors' businesses.

65.     To comply with the U.S. Trustee Guidelines, the Debtors would also need to create a new system for paying postpetition obligations. If the Debtors' ability to conduct banking transactions by all usual means, and make payments from and debit the Bank Accounts on account of all usual payments (including checks, drafts, wire transfers, ACH Payments, commercial card payments, charge-backs, Bank Fees, and other similar debits, payment methods, and banking transactions) is impaired, they may be unable to perform under certain contracts, their business operations may be unnecessarily disrupted, and their estates will incur additional costs.

66.     The Debtors respectfully submit that parties in interest will not be harmed by their maintenance of the existing Cash Management System, including the Bank Accounts, in the ordinary course of business. With the assistance of their advisors, the Debtors have implemented internal control procedures that prohibit payments on account of prepetition debts, unless such

payments are authorized by the Court and approved by the Debtors' treasury department. To prevent the inadvertent, unauthorized payment of prepetition claims, the Debtors will work closely with the Banks to ensure that appropriate procedures are in place to prevent payments that were issued prepetition from being honored without the Court's approval; *provided, however*, that any payment made or instrument issued by a Bank prior to the Petition Date shall be deemed to be paid prepetition, whether or not actually paid and debited from the Bank Account prepetition. The Debtors will continue to maintain accurate records of all postpetition receipts and disbursements within the Cash Management System in the same manner as such transfers were maintained prior to the Petition Date. In light of such protective measures, the Debtors submit that maintaining the Cash Management System is in the best interests of their estates and creditors.

67.     Additionally, the Cash Management System depends on the ability of the Banks to maintain, service, and administer the Bank Accounts. To the extent authorized by order of the Court, all Banks should have the ability to honor and process the Debtors' banking transactions, including the ability to debit the Bank Accounts in the ordinary course of business on account of all payments, including with respect to charge-backs and Bank Fees, whether made, charged, or incurred before or after the Petition Date.

68.     The Banks are not in a position to independently verify or audit whether a particular payment may be paid pursuant to a Court order or otherwise. Therefore, it is reasonable and appropriate to authorize the Banks to accept and honor all representations from the Debtors as to which payments should be honored or dishonored, consistent with any order of the Court and governing law. The Banks should not be liable to the Debtors or to their estates if a Bank honors a prepetition payment drawn on a Bank Account (a) at the direction of the

Debtors, (b) in a good-faith belief that the Court has authorized such prepetition payment to be honored, or (c) as a result of an innocent mistake made despite the above-described protective measures.

69.     In similar large chapter 11 cases, courts in this district regularly waive the U.S. Trustee Guidelines and allow large corporate debtors to maintain ordinary course banking activities, on the grounds that they are impractical and potentially detrimental to a debtor's postpetition business operations and restructuring efforts. *See, e.g.*, *In re Conexant Sys., Inc.*, No. 13-10367 (Bankr. D. Del. Apr. 11, 2013); *Overseas Shipholding Grp.*, No. 12-20000 (Bankr. D. Del. Jan. 24, 2013); *In re Pipeline Data, Inc.*, No. 12-13123 (Bankr. D. Del. Nov. 21, 2012); *In re Neb. Book Co.*, No. 11-12005 (Bankr. D. Del. June 28, 2011); *In re Appleseed's Intermediate Holdings LLC*, Case No. 11-10160 (Bankr. D. Del. Jan. 20, 2011).[31]

## II.     The Court Should Authorize the Debtors to Continue Using Their Existing Business Forms.

70.     The U.S. Trustee Guidelines require that a debtor obtain pre-numbered checks that bear the designation "Debtor in Possession" and reference the bankruptcy case number and type of account.   Local Bankruptcy Rule 2015-2(a) permits debtors to use their existing, pre-printed checks without the designation "Debtor in Possession," provided that when reordering checks, the debtors require the designation "Debtor in Possession" and the corresponding bankruptcy number to appear on all reordered checks.

71.     The Debtors submit that parties in interest will not be prejudiced if the Debtors are authorized to continue to use their Business Forms substantially in the forms existing immediately prior to the Petition Date.  Parties doing business with the Debtors undoubtedly will

---

[31]   Because of the voluminous nature of the orders cited herein, such orders are not attached to this Motion.  Copies of these orders are available upon request of the Debtors' counsel.

be aware of their status as debtors in possession and, thus, changing business forms is unnecessary and unduly burdensome. After the Petition Date, the Debtors will order new checks identifying their status as debtors in possession as their existing stock is depleted. The Debtors submit that such efforts protect the interests of parties conducting business with the Debtors on a postpetition basis while, at the same time, avoiding unnecessary expenses and administrative delays at this critical time.

72.     In other large cases, courts in this jurisdiction and others have allowed debtors to use their prepetition business forms without the "Debtor-in-Possession" label, at least until the debtors' existing check stock was depleted. *See, e.g., In re Conexant Sys., Inc.*, No. 13-10367 (Bankr. D. Del. Apr. 11, 2013); *Overseas Shipholding Grp.*, No. 12-20000 (Bankr. D. Del. Jan. 24, 2013); *In re Tri-Valley Corp.*, No. 12-12291 (Bankr. D. Del. Aug. 9, 2012); *In re Neb. Book Co.*, No. 11-12005 (Bankr. D. Del. June 28, 2011); *In re Appleseed's Intermediate Holdings LLC*, No. 11-10160 (Bankr. D. Del. Jan. 20, 2011); *In re Atrium Corp.*, No. 10-10150 (Bankr. D. Del. Jan. 21, 2010).

## III.     Cause Exists to Allow the Debtors to Continue Their Investment Practices and for Waiving the Investment and Deposit Guidelines of Section 345 of the Bankruptcy Code.

73.     Section 345 of the Bankruptcy Code governs a debtor's cash deposits during a chapter 11 case and authorizes deposits of money as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." 11 U.S.C. § 345(a). For deposits or investments that are not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) requires the estate to obtain, from the entity with which the money is deposited, a bond in favor of the United States and secured by the undertaking of an adequate corporate surety, or "the deposit of securities of the kind specified

in section 9303 of title 31," unless the Court "for cause" orders otherwise. 11 U.S.C. § 345(a)-(b).[32]

74. Local Bankruptcy Rule 2015-2(b) provides that "[e]xcept as provided in Local Rule 4001-3, no waiver of the investment requirements of 11 U.S.C. § 345 shall be granted by the Court without notice and an opportunity for hearing in accordance with these Local Rules. However, if a motion for such waiver is filed on the first day of a chapter 11 case in which there are more than 200 creditors, the Court may grant an interim waiver until a hearing on the debtor's motion can be held."

75. Pursuant to Local Bankruptcy Rule 4001-3, "cause" exists for relief from section 345(b) of the Bankruptcy Code where: (a) money of the estate is invested in an open-end management investment company that is registered under the Investment Company Act of 1940 and regulated as a "money market fund" pursuant to Rule 2a-7 under the Investment Company Act of 1940; and (b) the debtor has filed with the bankruptcy court (i) a statement identifying the fund and (ii) a certification from the fund, accompanied by its currently effective prospectus as filed with the SEC, that the fund (A) invests exclusively in United States Treasury Bills and United States Treasury Notes owned directly or through repurchase agreements, (B) has received the highest money market fund rating from a nationally recognized statistical rating organization, (C) has agreed to redeem fund shares in cash, with payment being made no later than the business day following a redemption request by a shareholder (except in the event of an unscheduled closing of the Federal Reserve Banks or the New York Stock Exchange), and

---

[32] Strict compliance with the requirements of section 345(b) of the Bankruptcy Code would, in a case such as this, be inconsistent with section 345(a), which permits a debtor in possession to make such investments of money of the estate "as will yield the maximum reasonable net return on such money." Thus, in 1994, to avoid "needlessly handcuff[ing] larger, more sophisticated debtors," Congress amended section 345(b) of the Bankruptcy Code to provide that its strict investment requirements may be waived or modified if the Court so orders "for cause." 140 Cong. Rec. H. 10,767 (Oct. 4, 1994), 1994 WL 54773.

(D) has adopted a policy that it will notify its shareholders 60 days prior to any change in its investment or redemption policies under (A) and (C) above. Local Bankruptcy Rule 4001-3.

76. The Bank Accounts comply with section 345(b) of the Bankruptcy Code. The majority of the Debtors' Bank Accounts are maintained at Banks that have executed Uniform Depository Agreements for the District of Delaware, and/or that have been approved by the U.S. Trustee as Authorized Depositories. Likewise, all of the Bank Accounts are FDIC insured, and other than Bank Accounts maintained with an Authorized Depository, the daily balance held in each Bank Account does not exceed the FDIC insured amount.[33] Thus, the Debtors believe that any funds that are deposited in the Bank Accounts are secure, and, therefore, the Debtors are in compliance with section 345 of the Bankruptcy Code with respect to such Bank Accounts.

77. The Debtors believe that "cause" exists to continue to allow the Debtors to invest in the Investment Accounts. The money market funds with which the Investment Accounts are held invest in securities that are backed by the full faith and credit of the United States; thus, any potential reduction in risk to be achieved by requiring the Debtors to hold such securities directly, rather than through the Investment Accounts, would likely be minimal, and in any case would not justify the transaction and administrative costs. Similarly, it is likely difficult for the Debtors to meet the bond requirements of section 345(b) of the Bankruptcy Code without incurring considerable costs to the detriment of their estates. Additionally, the money market funds with which the Investment Accounts are held substantially comply with Local Bankruptcy Rule 4001-3, and such investments comport with the investment objectives of section 345(a) of

---

[33] As discussed above, the Debtors maintain minimum balances in certain of their Bank Accounts held with Authorized Depositories that are in excess of the FDIC insured amount of $250,000 per depositor, per insured bank, in order to prefund ACH transfers, offset certain fees charged by JPM, as collateral deposits, and to otherwise ensure adequate liquidity for ordinary course operations.

the Bankruptcy Code insofar as they are prudent and have a primary goal of protecting principal and a secondary goal of maximizing yield and liquidity.[34] Specifically, each of money market funds with which the Investment Accounts are held is (a) regulated as a money market fund under Rule 2a-7 of the Investment Company Act of 1940, (b) invests exclusively in United States Treasury securities, (c) has received the highest money market fund rating of "AAA" by S&P or "Aaa" from Moody's, and (d) generally redeems fund shares in cash with payment being made no later than the business day following a redemption request by a shareholder.[35] Furthermore, the Debtors believe that the policies and practices with respect to (b) and (d) above generally will not be substantially altered absent shareholder consent or advance notice. Finally, the Debtors achieve significant risk reduction by diversifying their investments among the Investment Accounts, each of which are managed by large and sophisticated financial institutions, thereby reducing their exposure to any one investment management company. *See In re Serv. Merch. Co.*, 240 B.R. 894 (Bankr. M.D. Tenn. 1999) (noting that some of the factors to consider in determining whether cause exists "for relief from the strictures of § 345(b)" is whether benefits to the debtors outweigh the harm, if any, to the estate).

78. Accordingly, pursuant to section 345 of the Bankruptcy Code and Local Bankruptcy Rule 2015-2(b), the Debtors request an interim waiver of the deposit and investment requirements of section 345 of the Bankruptcy Code; *provided, however*, that if any official

---

[34] Prospectuses for each of the Investment Accounts are available upon request of the Debtors' counsel.

[35] To the extent a redeeming shareholder receives an in-kind distribution of securities rather than cash, such securities are backed by the full faith and credit of the United States, and thus comply with section 345(b) of the Bankruptcy Code. Additionally, to the extent certain of the money market funds may, under certain circumstances, temporarily suspend redemptions other than as permitted by Section 22(e) of the Investment Company Act, the Debtors believe that such suspensions would generally be limited to periods of severe market illiquidity and heavy redemptions, when the divergence between share price and net asset value would likely be of such a magnitude that the temporary suspension of redemptions may be in the best interests of all shareholders.

committee appointed in these chapter 11 cases, or any other party in interest (including the U.S. Trustee), files an objection to the Debtors' investment practices within 60 days after the entry of the order granting the relief requested herein and such objection is not resolved or withdrawn before expiration of the 60-day period following entry of the order, the Debtors shall schedule a prompt hearing before the Court to renew their request for approval of their investment practices.

79. Various courts in this district have granted relief similar to that requested in this Motion. *See, e.g.*, *Overseas Shipholding Grp.*, No. 12-20000 (Bankr. D. Del. Jan. 24, 2013) (authorizing an interim waiver of section 345(b) and providing that a final hearing will be held if an objection is filed before the deadline); *In re Neb. Book Co.*, No. 11-12005 (Bankr. D. Del. June 28, 2011) (granting interim waiver of section 345(b)); *In re Stallion Oilfield Servs. Ltd.*, No. 09-13562 (Bankr. D. Del. Oct. 20, 2009) (granting an interim waiver of section 345(b) and providing that waiver shall become final if no timely objections are filed); *In re Masonite Corp.*, No. 09-10844 (Bankr. D. Del. Mar. 17, 2009) (granting an interim waiver of section 345(b) and providing that waiver shall become final if no timely objections are filed); *In re Nortel Networks Inc.*, No. 09-10138 (Bankr. D. Del. Jan. 1, 2009) (granting interim waiver of section 345(b) and providing that the court may grant a final waiver if no objections are filed by the deadline).

**IV.** **The Debtors Should Be Authorized to Continue to Perform Under the Intercompany Transactions and to Settle Intercompany Claims, and Intercompany Claims Should be Granted Administrative Priority Expense Status.[36]**

80.       As described herein and in the First Day Declaration, the Debtors' operations are highly integrated, requiring them to engage in the Intercompany Transactions with each other and their affiliates on a daily basis, including extensions of intercompany credit through the Money Pools and transactions related to the Shared Services, TSAs (solely with respect to state law margin tax claims), Subleases, and Letters of Credit.

81.       Importantly, EFH Corporate Services provides goods and services to its affiliates "at cost," without charging any premium or markup, and allocates such costs to certain of its affiliates according to the allocation formulas and rates provided for in the Shared Services Agreements.[37]   Likewise, non-Debtor EFH Properties Company leases properties from third-party lessors and, under the Subleases, sublets such properties to Debtor and non-Debtor affiliates.   The Subleases are an efficient arrangement that allows the Debtors to benefit from non-Debtor EFH Properties Company's specialized property management function.   Importantly, the Debtors' payments to their non-Debtor affiliates under the Subleases reflect an allocation of non-Debtor EFH Properties Company's obligations on arm's-length terms.   Similarly, the Letters of Credit are an efficient means of payment offered to certain third parties that do business with

---

[36]   The Debtors are seeking authority pursuant to sections 105(a), 363(b), and 363(c) to continue to engage in Intercompany Transactions and settle pre- and postpetition Intercompany Claims.  Because the Debtors engage in Intercompany Transactions, and settle Intercompany Claims, on a regular basis and such transactions are common among similar enterprises, the Debtors believe that the postpetition transactions and claims are ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code and, therefore, do not require the Court's approval.  Nonetheless, in an abundance of caution, the Debtors are seeking express authority to engage in Intercompany Transactions, and to settle the postpetition Intercompany Claims, on a postpetition basis.  The continued performance of the Intercompany Transactions, and settlement of the Intercompany Claims, in the ordinary course of business is necessary to ensure the Debtor's ability to operate their businesses after the Petition Date.

[37]   For avoidance of doubt, the Debtors are not seeking to pay or settle Intercompany Claims under the Management Agreement.

the Debtors, and the Letters of Credit arrangement allows the Debtors to minimize fees and expenses by reducing the number of outstanding letter of credit facilities that would otherwise be issued by individual entities.

82.     The TSAs enable the Debtors to utilize their tax attributes on an enterprise-wide basis, while generally ensuring that the entities that utilize and benefit from such tax attributes compensate the entities that create and provide such tax attributes.  By this Motion, the Debtors are only seeking authority to honor Intercompany Claims under the TSAs relating to state law margin tax claims.

83.     Accordingly, the Intercompany Transactions, including through the Money Pools and relating to the Shared Services, the TSAs (solely with respect to state law margin tax claims), the Subleases, and the Letters of Credit result in significant synergies and cost-savings for the Debtors, and the continuation of such Intercompany Transactions, and the settlement of related Intercompany Claims, is in the best interests of the Debtors and their estates.

84.     At any given time, there may be balances due and owing between and among the Debtors and their affiliates resulting from ordinary course Intercompany Transactions. Intercompany Claims are settled efficiently through the Money Pool book entry and netting process or by cash payment and reimbursement.  An individual entity's rights with respect to funds are documented by intercompany book entries reflecting Intercompany Transactions and Intercompany Claims.  The Debtors track all fund transfers electronically in their accounting system and can ascertain, trace, and account for all Intercompany Transactions and Intercompany Claims.

85.     If the Intercompany Transactions and Intercompany Claims that permit the use of the consolidated Cash Management System were discontinued, that system and related

administrative controls would be disrupted to the detriment of the Debtors, their estates, and their stakeholders. Furthermore, preserving the "business as usual" atmosphere and avoiding the unnecessary distractions that inevitably would be associated with any substantial disruption in the Debtors' Cash Management System will facilitate the Debtors' reorganization efforts.

86.     To ensure each individual Debtor will not fund, at the expense of its creditors, the operations of another entity, the Debtors respectfully request that, pursuant to sections 503(b)(1) and 364(a) of the Bankruptcy Code, all Intercompany Claims arising after the Petition Date as a result of ordinary course Intercompany Transactions through the Cash Management System be accorded administrative priority expense status. If Intercompany Claims are accorded administrative priority expense status, each entity utilizing funds flowing through the Cash Management System should continue to bear ultimate repayment responsibility for such ordinary course transactions.

87.     Courts in this district have regularly granted similar authority in other complex multi-debtor chapter 11 cases to continue in place ordinary course intercompany transactions (and, in some circumstances, funds flows) and intercompany claims between debtor entities and their non-debtor affiliates, and to grant such intercompany claims administrative priority expense status. *See, e.g., Overseas Shipholding Grp.*, No. 12-20000 (Bankr. D. Del. Jan. 24, 2013); *In re Tri-Valley Corp.*, No. 12-12291 (Bankr. D. Del. Aug. 9, 2012); *Allied Sys. Holdings, Inc.*, No. 12-11564 (Bankr. D. Del. June 12, 2012); *In re Blitz U.S.A., Inc.*, No. 11-13603 (Bankr. D. Del. Dec. 5, 2011); *In re Appleseed's Intermediate Holdings LLC*, Case No. 11-10160 (Bankr. D. Del. Jan. 20, 2011); *In re Atrium Corp.*, No. 10-10150 (Bankr. D. Del. Jan. 21, 2010); *In re Int'l Aluminum Corp.*, No. 10-10003 (Bankr. D. Del. Jan. 6, 2010); *In re Trident Res. Corp.*, No. 09-13150 (Bankr. D. Del. Oct. 5, 2009).

## The Requirements of Bankruptcy Rule 6003 are Satisfied

88. Pursuant to Bankruptcy Rule 6003, the Court may grant relief regarding a motion to pay all or part of a prepetition claim within 21 days after the Petition Date if the relief is necessary to avoid immediate and irreparable harm. Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001).

89. As described above, authorizing the Debtors to maintain the Cash Management System and granting the other relief requested herein is integral to the Debtors' ability to transition their operations into these chapter 11 cases. Failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture. Accordingly, the Debtors submit that they have satisfied the requirements of Bankruptcy Rule 6003 to support the relief set forth in the Order on the terms described herein.

## Waiver of Bankruptcy Rules 6004(a) and 6004(h)

90. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## Reservation of Rights

91. Nothing contained in this Motion or any actions taken by the Debtors pursuant to relief granted in the Order is intended or should be construed as: (a) an admission as to the validity or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors'

rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity or amount of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

**Notice**

92.     The Debtors shall provide notice of this Motion on the date hereof via facsimile, overnight delivery, and/or hand delivery to: (a) the Office of the U.S. Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) Citibank, N.A., in its capacity as administrative agent under the TCEH first lien credit agreement and collateral agent under the TCEH intercreditor agreements and counsel thereto; (d) Bank of New York Mellon Trust Company, N.A., in its capacity as indenture trustee under: (i) the TCEH unsecured pollution control revenue bonds; and (ii) the EFCH 2037 Notes due 2037, and counsel thereto; (e) American Stock Transfer & Trust Company, LLC, in its capacity as indenture trustee under: (i) the 9.75% EFH senior unsecured notes due 2019; (ii) the 10.0% EFH senior unsecured notes due 2020; (iii) the 10.875% EFH LBO senior unsecured notes due 2017; (iv) the 11.25%/12.0% EFH LBO toggle notes due 2017; (v) the 5.55% EFH legacy notes (series P) due 2014; (vi) the 6.50% EFH legacy notes (series Q) due 2024; and (vii) the 6.55% EFH legacy notes (series R) due 2034, and counsel thereto; (f) Computershare Trust Company, N.A. and Computershare

Trust Company of Canada, in their capacities as indenture trustee under: (i) the 11.0% EFIH senior secured second lien notes due 2021; and (ii) the 11.75% EFIH senior secured second lien notes due 2022, and counsel thereto; (g) UMB Bank, N.A. in its capacity as indenture trustee under: (i) the 9.75% EFIH senior unsecured notes due 2019; and (ii) the 11.25%/12.25% EFIH senior toggle notes due 2018, and counsel thereto; (h) BOKF, NA, dba Bank of Arizona, in its capacity as indenture trustee under 11.50% TCEH senior secured notes due 2020, and counsel thereto; (i) CSC Trust Company of Delaware in its capacity as indenture trustee under: (i) the 6.875% EFIH senior secured notes due 2017; and (ii) the 10.0% EFIH senior secured notes due 2020, and counsel thereto; (j) Law Debenture Trust Company of New York in its capacity as indenture trustee under: (i) the 10.25% TCEH senior unsecured notes due 2015; and (ii) the 10.50%/11.25% TCEH senior toggle notes due 2016, and counsel thereto; (k) Wilmington Savings Fund Society, FSB in its capacity as indenture trustee under the 15.0% TCEH senior secured second lien notes due 2021, and counsel thereto; (l) counsel to certain holders of claims against the Debtors regarding each of the foregoing described in clauses (c) through (k); (m) the agent for the TCEH debtor-in-possession financing facility and counsel thereto; (n) the agent for the EFIH debtor-in-possession financing facility and counsel thereto; (o) counsel to certain holders of equity in Texas Energy Future Holdings Limited Partnership; (p) counsel to Oncor; (q) the SEC; (r) the Internal Revenue Service; (s) the Office of the United States Attorney for the District of Delaware; (t) the Office of the Texas Attorney General on behalf of the PUC; (u) counsel to ERCOT; and (v) each of the Banks. As this Motion is seeking "first day" relief, within forty eight hours of the entry of the Order, the Debtors will serve copies of this Motion and the order respecting this Motion as required by Local Bankruptcy Rule 9013-1(m). The

Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **No Prior Request**

93.     No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Debtors respectfully request that the Court enter the Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Wilmington, Delaware
Dated: April 29, 2014

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:     (302) 651-7700
Facsimile:      (302) 651-7701
Email:           collins@rlf.com
                      defranceschi@rlf.com
                      madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
Richard M. Cieri (*pro hac vice* pending)
Edward O. Sassower, P.C. (*pro hac vice* pending)
Stephen E. Hessler (*pro hac vice* pending)
Brian E. Schartz (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:           richard.cieri@kirkland.com
                      edward.sassower@kirkland.com
                      stephen.hessler@kirkland.com
                      brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (*pro hac vice* pending)
Chad J. Husnick (*pro hac vice* pending)
Steven N. Serajeddini (*pro hac vice* pending)
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Email:           james.sprayregen@kirkland.com
                      chad.husnick@kirkland.com
                      steven.serajeddini@kirkland.com

Proposed Co-Counsel to the Debtors and Debtors in Possession

# EXHIBIT A

**Proposed Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) Case No. 14-_____ (____) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

## ORDER (A) AUTHORIZING THE DEBTORS
## TO (I) CONTINUE USING THEIR EXISTING CASH
## MANAGEMENT SYSTEM, (II) MAINTAIN EXISTING BANK
## ACCOUNTS AND BUSINESS FORMS, AND (III) CONTINUE
## USING CERTAIN INVESTMENT ACCOUNTS; (B) AUTHORIZING
## CONTINUED INTERCOMPANY TRANSACTIONS AND NETTING
## OF INTERCOMPANY CLAIMS; AND (C) GRANTING POSTPETITION
## INTERCOMPANY CLAIMS ADMINISTRATIVE EXPENSE PRIORITY

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), for entry of an order (this "Order"), authorizing, but not directing, the Debtors to continue using their existing cash management system, bank accounts, business forms, investment accounts, and granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and the Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which the debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

the Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and the Court having found that the Debtors provided appropriate notice of the Motion and the opportunity for a hearing on the Motion under the circumstances; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing, if any, before the Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted as set forth herein.

2.      The Debtors are authorized to:  (a) continue to use and administer, with the same account numbers, the Bank Accounts in existence on the Petition Date, including those Bank Accounts identified on **Exhibit C** to the Motion; (b) treat the Bank Accounts for all purposes as accounts of the Debtors as debtors in possession; and (c) conduct banking transactions by all usual means, and debit the Bank Accounts on account of all usual items and payment instructions, including checks, drafts, wire transfers, ACH Payments, debits, commercial cards, or other similar methods; *provided*, *however*, that the Debtors shall distinguish between prepetition and postpetition transactions in their books and records, and shall maintain reasonably detailed records in the ordinary course of business reflecting transfers of cash, if any, so as to permit all such transactions to be readily ascertained.

3.      Within fifteen (15) days of entry of this Order, the Debtors shall (a) contact each Bank that is party to a Uniform Depository Agreement (each such agreement, a "UDA") with the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), (b) provide

2

the Debtor's employer identification number, and (c) identify the Bank Accounts held at such Bank as being held by a debtor in possession in a bankruptcy case.

4.      With respect to any Banks that are not party to a UDA with the U.S. Trustee, the Debtors shall use good-faith efforts to cause each such Bank to execute a UDA in the form prescribed by the U.S. Trustee within forty-five (45) days of the date of entry of this Order. The U.S. Trustee's rights to seek further relief from this Court on notice in the event that the aforementioned Banks are unwilling to execute a UDA in a form prescribed by the U.S. Trustee are fully reserved.

5.      The Banks are authorized to continue to: (a) treat, service, and administer the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course; (b) receive, process, honor, and pay any and all checks, drafts, wires, ACH Payments, electronic payment requests and other similar items and instructions issued and drawn on the Bank Accounts before or after the Petition Date by the holders or makers thereof, as the case may be, to the extent that the Debtors have sufficient funds standing to their credit at such Bank; and (c) make payments from and debit the Bank Accounts in the ordinary course of business on account of (i) all checks drawn on the Bank Accounts which are presented for payment or exchanged for cashier's checks by the payees thereof before or after the Petition Date, (ii) all checks or other items deposited in one of the Bank Accounts with such Banks before or after the Petition Date that have been dishonored or returned unpaid for any reason, together with any Bank Fees in connection therewith, to the same extent the Debtors were responsible for such items prior to the Petition Date, (iii) all charge-backs related to credit card purchases by customers, and (iv) all Bank Fees and other amounts, if any, owed to any Bank as service charges for the maintenance of the Cash Management System; *provided, however*, that

nothing contained herein is intended to require a Bank to make or issue a payment from a Bank Account that does not have sufficient funds to cover such payment.

6. Any payment that is authorized by the Debtors and paid from a Bank Account by a Bank before the Petition Date (including any ACH Payment such Bank is or becomes obligated to settle), or any instruments issued by such Bank on behalf of any Debtor pursuant to a "midnight deadline" or otherwise, shall be deemed to be paid prepetition, whether or not actually debited from the Bank Account prepetition.

7. The Banks are authorized to accept and honor and rely upon all representations from the Debtors as to which items or instructions should be honored or dishonored consistent with any order of the Court and governing law, whether such items or instructions are dated before or after the Petition Date. To the extent a Bank honors a prepetition item or instruction drawn on any bank account that is the subject of this Motion either (a) at the direction of the Debtors, (b) in a good-faith belief that the Court has authorized such prepetition item or instruction to be honored, or (c) as a result of an innocent mistake made despite the above-described protective measures, such Bank shall not be liable to any party on account of any such action.

8. The Debtors are authorized to use, in their present form, all Business Forms, without reference to their status as debtors in possession; *provided, however*, the Debtors will order new checks identifying their status as debtors in possession as their existing stock is depleted.

9. The Debtors, having shown sufficient cause under section 345(b) of the Bankruptcy Code, are granted a 60-day interim waiver to continue their deposit and investment practices; *provided, however*, that if any official committee appointed in these chapter 11 cases,

or any other party in interest (including the U.S. Trustee), files an objection to the investment practices within 60 days after the date hereof and such objection is not resolved or withdrawn before expiration of the 60-day period following the date hereof, the Debtors shall schedule a prompt hearing before the Court to renew their request for approval of the investment practices; *provided further*, that if no objection is timely made, this Order shall become final without a further hearing.

10. The Debtors are authorized to close existing Bank Accounts and Investment Accounts, and to open new debtor in possession bank accounts and investment accounts in the ordinary course of business; *provided, however*, that (a) any new debtor-in-possession bank account is established at an Authorized Depository, (b) any new investment account complies with the Debtors' Investment Policy, (c) notice of such opening or closing will be timely provided (i) in the Debtors' monthly operating report, and (ii) prior to 7 days of such opening or closing, to the U.S. Trustee, counsel to any official committee appointed in these cases, counsel to the TCEH DIP Agent, counsel to the Ad Hoc Committee of TCEH First Lien Creditors, counsel to the EFIH DIP Agent, counsel to the EFIH DIP Notes Agent, and counsel to the Ad Hoc Committee of EFIH Unsecured Creditors (collectively, the "Noticing Parties"), and (d) the Debtors will provide a list of all Bank Accounts, Investment Accounts, debtor in possession bank accounts, and investment accounts to the Noticing Parties upon request.

11. The Debtors are authorized, but not directed, to continue performing under and honoring their respective obligations, commitments, and transactions related to the Intercompany Transactions and the Intercompany Claims, as follows: (a) the EFH Debtors with respect to the EFH Money Pool; (b) the TCEH Debtors with respect to the TCEH Money Pool; and (c) the Debtors and Non-Debtor Affiliates, on the terms described in the Motion, with respect to

(i) transfers relating to Shared Services (which, in respect of the TCEH Debtors, shall only be made pursuant to the Shared Services Agreements), (ii) transfers under the TSAs (but only with respect to ordinary course state law margin tax claims attributable to the TCEH Debtors' businesses), (iii) Subleases, and (iv) Letters of Credit; *provided, however*, that the foregoing shall not authorize the Debtors to pay or settle Intercompany Claims in connection with or relating to the Management Agreement. The Debtors shall develop a reasonable allocation of fees, expenses, or other costs associated with the EFH Debtors' and EFIH's boards of directors or similar governing bodies, to be agreed upon by the Debtors, the Ad Hoc Committee of TCEH First Lien Creditors, and the Ad Hoc Committee of EFIH Unsecured Creditors.

12. Except pursuant to the preceding paragraph or any other order of the Court, which order shall be in form and substance satisfactory to the TCEH DIP Agent (but only with respect to relief that affects the TCEH Debtors), (i) the TCEH Debtors shall not distribute or transfer any cash or other value to any Debtor that is not a TCEH Debtor on account of prepetition Intercompany Claims, including transfers from the TCEH Money Pool to the EFH Money Pool, (ii) EFIH and EFIH Finance, Inc. shall not distribute or transfer any cash or other value to any Debtor other than EFIH and EFIH Finance, Inc. on account of prepetition Intercompany Claims, and (iii) the EFH Debtors shall not distribute or transfer any cash or other value to any Debtor that is not an EFH Debtor on account of prepetition Intercompany Claims, including transfers from the EFH Money Pool to the TCEH Money Pool.

13. Notwithstanding anything herein to the contrary, nothing in this Order shall determine the allocation as between the Debtors of any allowed fees or expenses of any professionals retained by the Debtors pursuant to section 327 of the Bankruptcy Code or any professionals retained by any official committee.

14.     Notwithstanding anything herein to the contrary, any amounts owing to a TCEH Debtor by a Debtor that is not a TCEH Debtor on account of or relating to any Intercompany Transactions or Intercompany Claims authorized hereunder, including, without limitation, the Letters of Credit, shall be repaid (whether by cash transfer, setoff or otherwise) in the ordinary course, but no later than (75) seventy-five days after such amounts come due.

15.     Subject to the provisions of the TCEH DIP Facility and the EFIH DIP Facility or any order of this Court approving the TCEH DIP Facility (the "TCEH DIP Order") or any order of this Court approving the EFIH DIP Facility (the "EFIH DIP Order"), all Intercompany Claims authorized pursuant to this Order and arising after the Petition Date shall be accorded administrative expense priority in accordance with sections 503(b) and 507(a)(2) of the Bankruptcy Code.  Additionally, the Debtors shall:  (a) maintain accurate and detailed records of any postpetition Intercompany Transactions and netting or cash settlement of Intercompany Claims that occur during the chapter 11 cases so that all such transactions may be readily ascertained, traced, recorded, and accounted for; (b) implement accounting procedures to identify and distinguish between prepetition and postpetition Intercompany Transactions and netting or cash settlement of Intercompany Claims and to track postpetition Intercompany Transactions and netting or cash settlement of Intercompany Claims; (c) provide reasonable access to such records and procedures to counsel to the Noticing Parties; and (d) provide a quarterly accounting to the TCEH DIP Agent of any Affiliate Value Transfer (as defined in the TCEH DIP Credit Agreement), including the obligor, obligee, and amount.

16.     Nothing in this Order shall authorize or direct the Debtors to take any action that would violate or breach the terms of the TCEH DIP Credit Agreement (as defined in the TCEH

DIP Order) or the EFIH DIP Credit Agreement (as defined in the EFIH DIP Order) or violate the TCEH DIP Order or the EFIH DIP Order.

17.     Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief, nothing in this Order shall be deemed:  (a) an admission as to the validity or amount of any claim against a Debtor entity; (b) a waiver of the Debtors' rights to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law.  Payments made pursuant to this Order shall not be construed as an admission as to the validity or amount of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

18.     The requirements set forth in Bankruptcy Rule 6003(b) are satisfied by the contents of the Motion.

19.     Notice of the Motion as provided therein shall be deemed good and sufficient and the requirements of the Local Bankruptcy Rules are satisfied by such notice.

20.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7062, 9014 or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

21.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

22.    The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

23.    The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Wilmington, Delaware
Dated: _____, 2014

_____
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT B

**Cash Management System Diagram**



# EXHIBIT C

## Bank Account Summary

| Bank Accounts as of April 24, 2014 | | | | |
| --- | --- | --- | --- | --- |
| Debtor | Bank Name | Last 4 Digits of Bank Account # | Account Type | Estimated Amount as of Petition Date |
| *EFH Corp. Bank Accounts* | | | | |
| Energy Future Holdings Corp. | JPMorgan Chase Bank, N.A. (NY) | 3584 | General Fund / Debt Related Activity <br> • Primarily used to pay general expenses and interest. | $25 million |
| Energy Future Holdings Corp. | JPMorgan Chase Bank, N.A. (TX) | 2032 | Receipts <br> • Miscellaneous receipts. | $1,000 |
| Energy Future Holdings Corp. | Bank of America, N.A. | 9707 | Receipts / Disbursements <br> • Available for emergency wire transfers in the event of certain emergency situations. <br> • Historically unfunded. | $0 |
| Energy Future Holdings Corp. | JPMorgan Chase Bank, N.A. (TX) | 9100 | Receipts / Disbursements <br> • To be used to receive future tax payments from Oncor. | $0 |
| *EFH Corporate Services Company Bank Accounts* | | | | |
| EFH Corporate Services Company | JPMorgan Chase Bank, N.A. (TX) | 3790 | Money Pool Concentration <br> • Maintains a minimum net balance of approximately $10 million to prefund outstanding checks, ACH Payments, and next-day wires. <br> • Excess cash is swept into Bank Account 3584 on a daily basis. | $10 million |
| EFH Corporate Services Company | JPMorgan Chase Bank, N.A. (TX) | 6766 | Receipts / Disbursements <br> • Receipts and disbursements related to accounts payable. | $10 million |
| EFH Corporate Services Company | JPMorgan Chase Bank, N.A. (IL) | 0752 | Receipts / Disbursements <br> • Receipts and check disbursements related to accounts payable. | $5 million |

| Bank Accounts as of April 24, 2014 | | | | |
|---|---|---|---|---|
| **Debtor** | **Bank Name** | **Last 4 Digits of Bank Account #** | **Account Type** | **Estimated Amount as of Petition Date** |
| EFH Corporate Services Company | JPMorgan Chase Bank, N.A. (OH) | 8749 | Receipts / Disbursements<br>• Receipts and EDI disbursements related to payroll for approximately 5,700 employees. | zero balance $500,000 |
| EFH Corporate Services Company | JPMorgan Chase Bank, N.A. (IL) | 6572 | Collateral Account<br>• Receipts and disbursements related to commercial card deposits. | $4.4 million |
| EFH Corporate Services Company | Chase Investments | 2019 | Broker / Investment Account<br>• Chase Investments brokerage account. This Bank Account holds cash. | $32,000 |
| *Other EFH Corp. Subsidiary Bank Accounts* | | | | |
| Energy Future Intermediate Holdings Company | JPMorgan Chase Bank, N.A. (NY) | 4789 | General Fund / Debt Related Activity<br>• Primarily used to pay general expenses and interest. | $3.7 million |
| Energy Future Intermediate Holdings Company | JPMorgan Chase Bank, N.A. (NY) | 4934 | General Fund<br>• To be used exclusively for the receipt of postpetition dividends from Oncor. | $1,000 |
| Energy Future Competitive Holdings Company | JPMorgan Chase Bank, N.A. (TX) | 4511 | General Fund<br>• Primarily used to pay general expenses and interest. | $4,000 |
| Generation Development Company LLC | JPMorgan Chase Bank, N.A. (TX) | 3633 | Receipts / Disbursements<br>• Used in connection with development of generation assets. | $1,000 |
| TXU Receivables Company LLC | JPMorgan Chase Bank, N.A. (TX) | 8255 | Receipts / Disbursements<br>• Inactive account related to a former accounts receivable securitization program. | $0 |

**Bank Accounts as of April 24, 2014**

*TCEH LLC Bank Accounts*

| Debtor | Bank Name | Last 4 Digits of Bank Account # | Account Type | Estimated Amount as of Petition Date |
|---|---|---|---|---|
| Texas Competitive Electric Holdings Company LLC | JPMorgan Chase Bank, N.A. (NY) | 9810 | General Fund / Debt Related Activity<br>• Sweeps excess cash from, and deposits funds into Bank Account 0481 on a daily basis as needed to fund operations.<br>• Invests funds into the Investment Accounts. | $47 million |
| Texas Competitive Electric Holdings Company LLC | JPMorgan Chase Bank, N.A. (TX) | 0481 | Money Pool Concentration<br>• Maintains a minimum net balance of approximately $2 million to prefund next-day wires.<br>• Excess cash is swept into Bank Account 9810 daily. | $2 million |
| Texas Competitive Electric Holdings Company LLC | Citibank, N.A. | 3657 | Debt Related Disbursements<br>• Reimburses Citibank, N.A. for draw-downs on a letter of credit used to fund debt payments. | $27,000 |
| Texas Competitive Electric Holdings Company LLC | JPMorgan Chase Bank, N.A. (TX) | 4169 | Receipts / Disbursements<br>• Receipts and disbursements related to financial settlements and over-the-counter transactions. | $1,000 |
| Texas Competitive Electric Holdings Company LLC | JPMorgan Chase Bank, N.A. (NY) | 7837 | General Fund / A/R Closure<br>• Receipts and disbursements related to the unwinding of the former accounts receivable securitization program. | $0 |
| Texas Competitive Electric Holdings Company LLC | Union Bank, N.A. | 0559 | Unencumbered Cash Account.<br>• Holds unencumbered cash related to the unwinding of the former accounts receivable securitization program. | $149.6 million |

*Other TCEH LLC Subsidiary Bank Accounts*

| Debtor | Bank Name | Last 4 Digits of Bank Account # | Account Type | Estimated Amount as of Petition Date |
|---|---|---|---|---|
| Luminant Energy Company LLC | JPMorgan Chase Bank, N.A. (TX) | 7371 | Receipts / Disbursements<br>• Receipts and disbursements for physical gas transactions. | $1,000 |

3

| Bank Accounts as of April 24, 2014 | | | | |
| --- | --- | --- | --- | --- |
| **Debtor** | **Bank Name** | **Last 4 Digits of Bank Account #** | **Account Type** | **Estimated Amount as of Petition Date** |
| Luminant Energy Company LLC | JPMorgan Chase Bank, N.A. (TX) | 8059 | Receipts / Disbursements<br>• Receipts and disbursements for power transactions. | $1,000 |
| Luminant Energy Company LLC | JPMorgan Chase Bank, N.A. (TX) | 3756 | Receipts / Disbursements<br>• Receipts and disbursements for derivatives and financial transactions, including over-the-counter and exchange margins. | $1,000 |
| Luminant Energy Company LLC | Bank of Oklahoma (dba Bank of Texas) | 9732 | Investments / Redemptions<br>• Pursuant to an agreement with Credit Suisse in connection with derivatives and financial transactions relating to Bank Account 3756, funds that are to be wired to or from Credit Suisse are invested in Investment Account 4457.<br>• Investment Account 4457 is a custody account for restricted cash, Invesco Treasury Portfolio - Institutional Class (Account No. 4457), which holds approximately $19,000 as of the Petition Date.<br>• The Debtors have not entered into transactions of this kind since November 2012. | $0 |
| Luminant Generation Company LLC | JPMorgan Chase Bank, N.A. (TX) | 4297 | Receipts / Disbursements<br>• Receipts and disbursements for capacity auctions.<br>• Miscellaneous receipts and disbursements. | $5,000 |
| Luminant Generation Company LLC | First National Bank of Granbury | 7136 | Receipts<br>• Miscellaneous receipts, including for fishing fees collected by the Debtors from individuals permitted to fish at the Comanche Peak Nuclear Power Company LLC plant site.<br>• Receipts are transferred monthly to Account No. 4297. | $9,000 |
| TXU Energy Receivables Company | JPMorgan Chase Bank, N.A. (TX) | 6608 | Receipts / Disbursements<br>• Amounts in this Bank Account are used to pay general expenses, including those relating to the former accounts receivable securitization program. | $10,000 |

4

| Bank Accounts as of April 24, 2014 | | | | |
|---|---|---|---|---|
| **Debtor** | **Bank Name** | **Last 4 Digits of Bank Account #** | **Account Type** | **Estimated Amount as of Petition Date** |
| TXU Energy Receivables Company | JPMorgan Chase Bank, N.A. (TX) | 6970 | Receipts / Disbursements<br>• Collection account used in connection with the former accounts receivable securitization program. | $0 |
| TXU Energy Retail Company LLC | M&T Bank | 6771 | Receipts / Disbursements<br>• Expense reimbursements related to a Residential Finance Program.<br>• This Bank Account is largely inactive. | $4,000 |
| TXU Energy Retail Company LLC | JPMorgan Chase Bank, N.A. (TX) | 6959 | Disbursements<br>• Disbursements for customer refunds.<br>• Zero balance account funded from Bank Account 6934. | zero balance $1.3 million |
| TXU Energy Retail Company LLC | JPMorgan Chase Bank, N.A. (TX) | 6967 | Disbursements<br>• Retail transmission and distribution utility disbursements. | $1,000 |
| TXU Energy Retail Company LLC | JPMorgan Chase Bank, N.A. (TX) | 9334 | Receipts<br>• Miscellaneous receipts. | $3,000 |
| TXU Energy Retail Company LLC | JPMorgan Chase Bank, N.A. (TX) | 4500 | Receipts<br>• Receipts for debit card transactions. | $1,000 |
| TXU Energy Retail Company LLC | The Bank of New York Mellon | 8178 | Receipts<br>• Receipts and disbursements for gas transactions. | $200,000 |
| TXU Energy Retail Company LLC | JPMorgan Chase Bank, N.A. (TX) | 6918 | Receipts<br>• Depository account (checks only). | $227,000 |
| TXU Energy Retail Company LLC | JPMorgan Chase Bank, N.A. (TX) | 6934 | Receipts<br>• General depository account (debit card receipts). | $1,000 |

| Bank Accounts as of April 24, 2014 | | | | |
|---|---|---|---|---|
| **Debtor** | **Bank Name** | **Last 4 Digits of Bank Account #** | **Account Type** | **Estimated Amount as of Petition Date** |
| TXU Energy Retail Company LLC | JPMorgan Chase Bank, N.A. (TX) | 6926 | Receipts<br>• Depository account (electronic data interchange "EDI") and wire receipts). | $0 |
| TXU Energy Retail Company LLC | JPMorgan Chase Bank, N.A. (TX) | 6942 | Receipts<br>• Depository account (EDI receipts from large commercial customers). | $0 |
| TXU Energy Retail Company LLC | JPMorgan Chase Bank, N.A. (NY) | 0158 | Receipts<br>• Depository account (EDI receipts from large commercial customers). | $0 |
| TXU Energy Retail Company LLC | The Bank of New York Mellon | 0329 | Receipts<br>• Depository account (EDI receipts only). | $200,000 |
| Luminant Mining Company LLC | JPMorgan Chase Bank, N.A. (TX) | 9817 | Receipts / Disbursements<br>• General receipts and disbursements. | $1,000 |
| Luminant Mining Company LLC | The Bank of New York Mellon | 1993 | Custody Account<br>• Custody account for restricted cash in connection with the environmental regulations (specifically, the removal of a bald eagle nest at the Turlington Mine). | $25,000 |
| 4Change Energy Company LLC | The Bank of New York Mellon | 5115 | Receipts / Disbursements<br>• General receipts and disbursements. | $928,000 |

6

# EXHIBIT D

## Money Pool Participants

| Money Pool Participants[1] | |
|---|---|
| **TCEH Money Pool Participants** | **EFH Money Pool Participants** |
| Energy Future Competitive Holdings Company LLC | Energy Future Holdings Corp. |
| Texas Competitive Electric Holdings Company LLC | EFH Corporate Services Company |
| 4Change Energy Company | EFH CG Management Company LLC |
| 4Change Energy Holdings LLC | EFH CG Holdings Company LP |
| Big Brown 3 Power Company LLC | LSGT Gas Company LLC |
| Big Brown Lignite Company LLC | LSGT SACROC, Inc. |
| Big Brown Power Company LLC | EEC Holdings, Inc. |
| Collin Power Company LLC | EECI, Inc. |
| DeCordova Power Company LLC | Ebasco Services of Canada Limited |
| Generation MT Company LLC | Brighten Holdings LLC |
| Generation SVC Company | Brighten Energy LLC |
| Lake Creek 3 Power Company LLC | Generation Development Company LLC |
| Luminant Big Brown Mining Company LLC | NCA Development Company LLC |
| Luminant Generation Company LLC | EFH FS Holdings Company |
| Luminant Mineral Development Company LLC | Texas Electric Service Company, Inc. |
| Luminant Mining Company LLC | Texas Energy Industries Company, Inc. |
| Luminant Renewables Company LLC | Texas Utilities Electric Company, Inc. |
| Martin Lake 4 Power Company LLC | TXU Electric Company, Inc. |
| Monticello 4 Power Company LLC | Southwestern Electric Service Company, Inc. |
| Morgan Creek 7 Power Company LLC | Texas Power & Light Company, Inc. |
| NCA Resources Development Company LLC | |
| Oak Grove Management Company LLC | |
| Oak Grove Mining Company LLC | |
| Oak Grove Power Company LLC | |
| Sandow Power Company LLC | |
| Tradinghouse 3 & 4 Power Company LLC | |
| Tradinghouse Power Company LLC | |
| Valley NG Power Company LLC | |
| Valley Power Company LLC | |
| Luminant Energy Company LLC | |

---

[1]   Each of the following Debtors participates in its respective Money Pool as of the Petition Date, and will continue to participate on a postpetition basis.

| Money Pool Participants[1] | |
|---|---|
| **TCEH Money Pool Participants** | **EFH Money Pool Participants** |
| Luminant Energy Trading California Company | |
| Luminant ET Services Company | |
| Luminant Holding Company LLC | |
| TXU Energy Retail Company LLC | |
| TXU Energy Solutions Company LLC | |
| TXU Retail Services Company | |
| TXU SEM Company | |