## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-_____ (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## MOTION OF TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC AND CERTAIN OF ITS DEBTOR AFFILIATES FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING USE OF CASH COLLATERAL, (B) GRANTING ADEQUATE PROTECTION, (C) MODIFYING THE AUTOMATIC STAY, AND (D) SCHEDULING A FINAL HEARING

Texas Competitive Electric Holdings Company LLC ("TCEH"), Energy Future Competitive Holdings Company LLC ("EFCH"), and each of the Subsidiary Guarantors (as defined below) (collectively with TCEH and EFCH, the "TCEH Debtors," and, together with the other debtors in the above-captioned proceeding, the "Debtors") in the above-captioned chapter 11 cases of the TCEH Debtors (collectively, the "Cases") file this motion (this "Motion") for entry of an interim order (the "Interim Order"), substantially in the form attached hereto as **Exhibit A**, and a final order (the "Final Order," and together with the Interim Order, collectively, the "Orders"): (a) authorizing the TCEH Debtors' use of Cash Collateral (as defined in the Interim Order) of the Prepetition Secured Agents and Prepetition Secured Creditors (each as defined in the Interim Order) on an interim basis pending a final hearing on this Motion (the "Final Hearing"); (b) granting adequate protection to the First Lien Collateral Agent and

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which the debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

Prepetition First Lien Creditors for any diminution in value of their respective interests in the Prepetition Collateral (each as defined in the Interim Order), including the Cash Collateral; (c) subject to entry of a Final Order and to the extent set forth herein, waiving the TCEH Debtors' right to surcharge the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code; (d) prescribing the form and manner of notice and setting the time for the Final Hearing; (e) vacating or modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to permit the TCEH Debtors and the First Lien Collateral Agent on behalf of the Prepetition First Lien Creditors to implement and effectuate the terms and provisions of the Interim Order; (f) scheduling the Final Hearing to consider the relief requested in the Motion and the entry of a Final Order, and approving the form of notice with respect to the Final Hearing; and (g) granting related relief. In support of this Motion, the TCEH Debtors respectfully submit the *Declaration of Stephen Goldstein in Support of (I) the Motion of Texas Competitive Electric Holdings Company LLC and Certain of Its Debtor Affiliates for Entry of Interim and Final Orders (A) Approving Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing and (II)* the *Motion of Texas Competitive Electric Holdings Company LLC and Certain of Its Debtor Affiliates for Entry of Interim and Final Orders (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing* (the "Goldstein Declaration"), a copy of which is attached hereto as **Exhibit B**, and the *Declaration of Paul Keglevic, Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of Energy Future Holdings Corp., et al., in Support of First Day Motions* (the "First Day Declaration"), and respectfully submit as follows.

2

## Jurisdiction and Venue

1.      The United States Bankruptcy Court for the District of Delaware (the "Court")
has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended
Standing Order of Reference from the United States District Court for the District of Delaware*,
dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C.
§ 157(b)(2), and the TCEH Debtors confirm their consent pursuant to rule 9013-1(f) of the Local
Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the
District of Delaware (the "Local Bankruptcy Rules") to the entry of a final order by the Court in
connection with this Motion to the extent that it is later determined that the Court, absent consent
of the parties, cannot enter final orders or judgments in connection herewith consistent with
Article III of the United States Constitution.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The bases for the relief requested in this Motion are sections 105(a), 361, 362,
363, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 4001,
6003, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and
Local Bankruptcy Rules 2002-1(b), 4001-2, and 9013-1(m).

## Preliminary Statement

4.      The TCEH Debtors have obtained commitments from several large financial
institutions for a fully underwritten, $4.475 billion debtor-in-possession financing
(the "DIP Financing"), comprised of entirely new money (with no roll up of prepetition
indebtedness).  In addition to the DIP Financing, which will be used primarily to fund the
administration of the chapter 11 cases, the TCEH Debtors require immediate use of their Cash
Collateral (as defined herein) to preserve and maximize value for all stakeholders.  The TCEH

Debtors use Cash Collateral in the ordinary course of business to procure goods and services from vendors, to pay their employees, and to satisfy other working capital needs.

5.     After weeks of negotiations with counsel for a steering committee representing holders of approximately 41% in amount of claims under the First Lien Credit Agreement and the First Lien Notes Indenture (each as defined herein), the TCEH Debtors obtained the consent from this subset of holders to both the priming liens (and other terms provided) under the DIP Financing[2] and the TCEH Debtors' use of Cash Collateral.   In exchange for such holders' consent, the TCEH Debtors have agreed to provide the Prepetition First Lien Creditors (as defined herein) with various forms of adequate protection, including replacement liens, superpriority claims, professional fees and expenses, monthly adequate protection payments, budgets and annual forecasts, a financial covenant, and access to the TCEH Debtors' books and records.  The TCEH Debtors will also provide the Prepetition Second Lien Creditors (as defined herein) with junior replacement liens and superpriority claims.

6.     Absent approval of the Orders, the TCEH Debtors would be effectively unable to generate revenue, operate their businesses, or pay the hundreds of individuals who report to work each day.  Thus, the TCEH Debtors respectfully request authority to use the Cash Collateral subject to the terms and conditions set forth in the Orders.

### Relief Requested

7.     By this Motion, the TCEH Debtors seek entry of the Orders granting the following relief, without limitation:

---

[2]    For additional information on the DIP Financing and the priming liens provided thereunder, see the Debtors' *Motion of Texas Competitive Electric Holdings Company LLC and Certain of its Debtor Affiliates for Entry of Interim and Final Orders (A) Approving Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing*, filed contemporaneously herewith (the "DIP Motion," and the proposed interim order attached as Exhibit A thereto, the "DIP Order").

(a) authorizing the TCEH Debtors' use of Cash Collateral (as defined in the Interim Order) of the Prepetition Secured Agents and Prepetition Secured Creditors (each as defined in the Interim Order) on an interim basis pending the Final Hearing;

(b) granting adequate protection to the First Lien Collateral Agent and Prepetition First Lien Creditors for any diminution in value of their respective interests in the Prepetition Collateral (each as defined herein), including the Cash Collateral;

(c) subject to entry of a Final Order and to the extent set forth herein, waiving the TCEH Debtors' right to surcharge the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code;

(d) prescribing the form and manner of notice and setting the time for the Final Hearing to consider the relief requested in the Motion and the entry of a Final Order;

(e) vacating or modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to permit the TCEH Debtors and the First Lien Collateral Agent on behalf of the Prepetition First Lien Creditors to implement and effectuate the terms and provisions of the Interim Order; and

(f) granting related relief.

**Concise Statement of the Material Terms of the Interim Order**

8. Pursuant to and in accordance with Bankruptcy Rule 4001(b)(1)(B) and Local Bankruptcy Rule 4001-2(a)(ii), the material provisions of the Interim Order, and the location of such provisions therein, are as follows:[3]

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| *Parties with Interest in Cash Collateral* | Citibank, N.A. ("Citibank"), as administrative agent (including any successor thereto, the "First Lien Administrative Agent") and collateral agent (including any successor thereto, the "First Lien Collateral Agent," and together with the First Lien Administrative Agent, the "First Lien Credit Agent")[4] under the | ¶ F(i)-(iii). |

---

[3]   This summary is qualified in its entirety by the provisions of the Interim Order. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Interim Order. To the extent there are any conflicts between this summary and the Interim Order, the terms of the Interim Order shall govern.

[4]   On March 4, 2014, Citibank provided notice of its resignation as Administrative Agent, Collateral Agent, Revolving Letter of Credit Issuer, and Deposit Letter of Credit Issuer under the First Lien Credit Agreement and the other Credit Documents (as defined in the First Lien Credit Agreement) and Financing Documents (as defined in the First Lien Intercreditor Agreement (as defined below)), including, without limitation, its resignation as Collateral Agent under the First Lien Intercreditor Agreement, in accordance with the terms of Sections 3.6 and 12.9 of the First Lien Credit Agreement and Section 7.7 of the First Lien Intercreditor

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| *Fed. R. Bankr. P. 4001(b)(1)(B)(i)* | First Lien Credit Agreement, and the lenders that are parties thereto from time to time (the "First Lien Lenders"); BOKF, N.A., as indenture trustee (the "First Lien Notes Trustee"), and each of the holders of those certain 11.50% senior secured notes (the "First Lien Notes") due October 1, 2020, under the First Lien Notes Indenture; each Hedge Counterparty (as defined herein); each Swap Counterparty (as defined herein); Wilmington Savings Fund Society, FSB, as successor to The Bank of New York Mellon Trust Company, N.A., as indenture trustee (the "Second Lien Trustee"), The Bank of New York Mellon Trust Company, N.A., as collateral agent (including any successor thereto, the "Second Lien Collateral Agent," and together with the Second Lien Trustee, the "Second Lien Agent"), and each of the holders of those certain 15.00% second lien notes (the "Second Lien Debt") under the Second Lien Notes Indenture.<br><br>The "Prepetition First Lien Creditors" shall mean the First Lien Lenders, together with the First Lien Credit Agent, all other "Secured Parties" (as defined in the First Lien Credit Agreement or the First Lien Intercreditor Agreement), the First Lien Notes Trustee, the holders of the First Lien Notes, each Hedge Counterparty and each Swap Counterparty. The "Prepetition Secured Creditors" shall mean the Prepetition First Lien Creditors, together with the Second Lien Agent and holders of Second Lien Debt.<br><br>The "Prepetition First Lien Agents" shall mean the First Lien Credit Agent and the First Lien Notes Trustee. The "Prepetition Secured Agents" shall mean the Prepetition First Lien Agents and the Second Lien Agent. | |
| ***Term***<br>*Fed. R. Bankr. P. 4001(b)(1)(B)(iii)* | Subject to the terms and conditions of the Interim Order, the TCEH Debtors are authorized to use Cash Collateral for the period (the "Specified Period") from the Petition Date through the date which is the earliest to occur of (i) the expiration of the Remedies Notice Period (as defined in the Interim Order), (ii) entry of the Final Order, or (iii) 45 days from the Petition Date. The TCEH First Lien Ad Hoc Committee has consented to 18 months use of Cash Collateral from the Petition Date upon entry and subject to the terms and conditions of the Final Order. | ¶ 3(a). |
| ***Use***<br>*Fed. R. Bankr. P. 4001(b)(1)(B)(ii)* | Subject to the provisions of the Interim Order, Cash Collateral may be used during the Specified Period by the TCEH Debtors to: (i) finance any and all working capital needs solely of the TCEH Debtors and for any other general corporate purposes of the TCEH Debtors (and not for or by any other affiliated entities) including, without limitation, to provide collateral for Letters of Credit (as defined in the DIP Credit Agreement) for general corporate purposes required in the ordinary course of the TCEH Debtors' business, (x) to provide collateral support in respect of financial or physical trading transactions incurred in the ordinary course of the TCEH Debtors' business, including commodities transactions, (y) to honor intercompany obligations incurred in the ordinary course of the TCEH Debtors' business and | ¶ 3(b). |

Agreement. Although such resignation is not yet effective, Citibank intends to appoint Wilmington Trust, N.A. ("WTNA") to act as Administrative Agent under the First Lien Credit Agreement and each other Credit Document and as Collateral Agent under the First Lien Credit Agreement and each other Financing Document. In that connection, the Orders expressly contemplate the resignation of Citibank as the First Lien Credit Agent, the appointment of WTNA as the successor First Lien Credit Agent, and the TCEH Debtors' entry into the Successor Agents and Amendments Agreement with Citibank and WTNA.

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| | to act consistently with the TCEH Debtors' existing cash management practices that have been utilized in the ordinary course of business to date under present collateral agreement(s), but in each case only to the extent permitted under the "first day" order authorizing the TCEH Debtors to, among other things, continue using their existing cash management system (as otherwise amended or modified with the reasonable consent of the TCEH First Lien Ad Hoc Committee, the "Cash Management Order"), and (z) to comply with any legal and/or regulatory requirements of governmental and quasi-governmental entities (including for posting bonds and remediation or reclamation obligations of any nature (such as with the Railroad Commission of Texas, but only after the TCEH Debtors have utilized any amounts available under the DIP Facility for the purpose of satisfying bonding requirements of the Railroad Commission of Texas), complying with any statutory or regulatory requirements and for self-bonding in respect of permits and licenses) of the TCEH Debtors; and (ii) pay related transaction costs, fees, liabilities and expenses (including all professional fees and expenses) and other administration costs incurred in connection with and for the benefit of the TCEH Debtors' chapter 11 cases (including Adequate Protection Payments (defined below)) and the commitment, negotiation, syndication, documentation (including any commitment letters), execution, and closing of the DIP Facility. Notwithstanding anything herein to the contrary, the TCEH Debtors shall not be permitted to transfer any Cash Collateral to, or use any Cash Collateral to make payments or other transfers on behalf of, any of the Debtors other than the TCEH Debtors; provided, however, that the foregoing shall not restrict intercompany payments and other transfers of Cash Collateral pursuant to the Shared Services Agreement, Tax Sharing Agreement, and subleases of property from any Specified Affiliate to the Borrower or any of the Restricted Subsidiaries, to the Specified Affiliates (all as defined in the DIP Credit Agreement), but only to the extent that such payments or other transfers are permitted under the Cash Management Order. | |
| *Consent to Priming Liens*<br><br>*Fed. R. Bankr. P. 4001(b)(1)(B)(iii)* | Subject to the terms of the Interim Order, the Prepetition Secured Creditors are deemed to have consented to the imposition of the priming liens contained in the DIP Credit Agreement approved pursuant to the DIP Order: | ¶ 4. |

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| *Adequate Protection*<br><br>*Fed. R. Bankr. P. 4001(b)(1)(B)(ii)* | The TCEH Debtors will provide the Prepetition First Lien Creditors with various forms of adequate protection, including, primarily: (a) the First Lien Adequate Protection Payments; (b) the First Priority 507(b) Claim; (c) the First Priority Adequate Protection Liens; (d) professional fees and expenses; (e) the Financial Covenant; and (f) access to the TCEH Debtors' books and records, including budgets and financial forecasts (each as defined in the Interim Order). The TCEH Debtors will also provide the Prepetition Second Lien Creditors with: (a) the Second Priority 507(b) Claim and (b) the Adequate Protection Liens (each as defined in the Interim Order), in both cases junior in priority to those received by the Prepetition First Lien Creditors, consistent with the terms of the Second Lien Intercreditor Agreement. The Adequate Protection Obligations (as defined herein) are in each instance subject to (a) the Carve Out (as defined in the DIP Order), (b) the RCT Reclamation Support Carve Out (as defined in the DIP Order), (c) the DIP Liens (as defined in the DIP Order), (d) the Permitted Prior Liens (as defined in the DIP Order), (e) the Permitted Liens (as defined in the DIP Credit Agreement, and (a)-(e), the "Senior Carve Outs and Liens"), and (f) the DIP Superpriority Claims (as defined in the DIP Order). | ¶ G, 5. |
| *Carve Out*<br><br>*Fed. R. Bankr. P. 4001(b)(1)(B)(iii)* | "Carve Out" shall have the meaning provided in the DIP Order. | ¶ 11. |
| *Events of Default*<br><br>*Fed. R. Bankr. P. 4001(b)(1)(B)(iii)* | The occurrence of any of the following events, unless waived in writing by the First Lien Collateral Agent (with the consent or at the direction of the Required Secured Parties), shall constitute an event of default (collectively, the "Events of Default"): | ¶ 9. |
| | • the failure to obtain a Final Order in form and substance reasonably acceptable to the First Lien Collateral Agent and the TCEH First Lien Ad Hoc Committee within 45 days after the Petition Date; | ¶ 9(a). |
| | • the TCEH Debtors shall have filed a motion seeking to create any postpetition liens or security interests, other than those granted or permitted pursuant to the DIP Order, the Secured Commodity Hedging Agreements, Secured Hedging Agreements, Secured Cash Management Agreements, or the Interim Order (pursuant to the terms of such orders as they exist as of the date hereof); | ¶ 9(b). |
| | • the TCEH Debtors shall have breached the Financial Covenant set forth in paragraph 5(f) of the Interim Order; | ¶ 9(c). |
| | • the entry of a final order by the Court, other than the Interim Order, granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (i) to allow any creditor to execute upon or enforce a lien on or security interest in any Collateral, or (ii) with respect to any lien of or the granting of any lien on any Collateral to any state or local environmental or regulatory agency or authority, which in either case would exceed an aggregate value of $150,000,000; | ¶ 9(d). |
| | • the Court shall enter an order approving any claims for recovery of amounts under section 506(c) of the Bankruptcy Code or otherwise arising from the preservation of any Prepetition Collateral; | ¶ 9(e). |

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| | • an Event of Default under the DIP Order or the DIP Credit Agreement that has not been waived or cured in accordance with the DIP Financing; | ¶ 9(f). |
| | • the TCEH Debtors shall commence or join in as an adverse party in any suit or other proceeding against any of the Prepetition First Lien Agents or Prepetition First Lien Creditors relating to the Prepetition First Lien Obligations or Prepetition Collateral, including any proceeding seeking to avoid or require repayment of any Adequate Protection Payments; | ¶ 9(g). |
| | • reversal, amendment, supplement, vacatur, or modification (without the express prior written consent of the First Lien Collateral Agent (with the consent or at the direction of the Required Secured Parties and the TCEH First Lien Ad Hoc Committee) of the Interim Order; | ¶ 9(j). |
| | • the entry of a final order by the Court avoiding or requiring repayment of any portion of the Adequate Protection Payments made by the TCEH Debtors hereunder; | ¶ 9(k). |
| | • dismissal of these Cases or conversion of these Cases to chapter 7 cases, or appointment of a trustee, receiver, interim receiver, or manager, or appointment of a responsible officer or examiner with enlarged powers in any of these Cases (having powers beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4); | ¶ 9(l). |
| | • the TCEH Debtors' exclusive right to file and solicit acceptances of a plan of reorganization is terminated or terminates, unless such exclusivity expires after the TCEH Debtors have filed a plan of reorganization with the Court, in form and substance reasonably satisfactory to the TCEH First Lien Ad Hoc Committee, and are proceeding in good faith toward confirmation and consummation, which shall not be an Event of Default; | ¶ 9(m).<br><br>¶ 9(n). |
| | • the failure to make Adequate Protection Payments or other material payments as set forth herein when due and such failure shall remain unremedied for more than five (5) business days after receipt by the TCEH Debtors of written notice thereof from any of the First Lien Administrative Agent, the First Lien Notes Trustee, any Hedge Counterparty or any Swap Counterparty; and | ¶ 9(o). |
| | • the failure by the TCEH Debtors to perform, in any respect, any of the material terms, provisions, conditions, or obligations under the Interim Order and such failure shall continue unremedied for more than five (5) days after receipt by the TCEH Debtors of written notice thereof from any of the Prepetition First Lien Agents, any Hedge Counterparty or any Swap Counterparty. | ¶ 9(p). |
| *Acknowledgements*<br><br>*Fed. R. Bankr. P. 4001(b)(1)(B)(iii)* | Subject to the provisions of paragraph 13 of the Interim Order, each of the TCEH Debtors acknowledges and agrees that:<br><br>• as of the Petition Date, the Prepetition First Priority Liens are valid, binding, enforceable, non-avoidable, and properly perfected liens on and security interests in the Prepetition Collateral;<br><br>• subject to the Tex-La Collateral, as of the Petition Date, the Prepetition First Priority Liens are senior in priority over any and all | ¶ F(iv). |

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| | other liens on the Prepetition Collateral; | |
| | • the Prepetition First Lien Obligations constitute legal, valid, binding, and non-avoidable obligations of the TCEH Debtors; | |
| | • no offsets, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition First Priority Liens or Prepetition First Lien Obligations exist, and no portion of the Prepetition First Priority Liens or Prepetition First Lien Obligations is subject to any challenge or defense including, without limitation, impairment, set-off, right of recoupment, avoidance, attachment, disallowance, disgorgement, recharacterization, recovery, subordination (whether equitable or otherwise), counterclaims, and cross-claims pursuant to the Bankruptcy Code or applicable nonbankruptcy law; and | |
| | • the TCEH Debtors and their estates have no claims, objections, challenges, causes of actions, and/or choses in action, including, without limitation, "lender liability" causes of action or avoidance claims under chapter 5 of the Bankruptcy Code, whether arising under applicable state law or federal law (including, without limitation, any recharacterization, subordination, avoidance, disgorgement, recovery or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code), against the Prepetition First Lien Creditors or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon, or related to their loans under the First Lien Facilities, the Prepetition First Lien Obligations, or the Prepetition First Priority Liens. | |
| *Waivers* *Fed. R. Bankr. P. 4001(b)(1)(B)(iii)* | The waivers provided include the following: | |
| | ***Chapter 5 Actions.*** The Adequate Protection Liens shall not include a lien on causes of action under chapter 5 of the Bankruptcy Code, but upon entry of the Final Order, shall include any proceeds of such actions. | ¶ 5(a). |
| | ***Automatic Stay.*** As set forth more fully in the Interim Order, the automatic stay imposed under section 362(a) of the Bankruptcy Code is modified as necessary to effectuate all of the terms and provisions of the Interim Order. | ¶ 6. |
| | ***Perfection of Liens.*** The Interim Order shall be sufficient and conclusive evidence of the granting, attachment, validity, perfection, enforceability, and priority of the Adequate Protection Liens without the necessity of obtaining, filing, executing, or recording any financing statement, security agreement, vehicle lien application, patent filing, trademark filing, copyright filing, fixture filing, mortgage, notice, or other instrument or document that may otherwise be required under the law or regulation of any jurisdiction or the taking of possession of, or control over, assets, or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement and any other action required to obtain "control" pursuant to section 9-104, 9-105, 9-106, and/or 9-107 of the Uniform Commercial Code) to grant, attach, validate or perfect (in accordance with applicable nonbankruptcy law) the Adequate Protection Liens, or to entitle the Prepetition Secured Agents and Prepetition Secured Creditors to the priorities | ¶ 7. |

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| | granted in the Interim Order. | |
| | *Credit Bid*: Subject to the terms of the First Lien Intercreditor Agreement, the First Lien Collateral Agent, for the benefit of the Prepetition First Lien Creditors, shall have the right to credit bid under section 363(k) of the Bankruptcy Code all or any portion of their respective claims in connection with a sale of the TCEH Debtors' assets under section 363 of the Bankruptcy Code or under a chapter 11 plan of reorganization for any or all of the TCEH Debtors; provided, however, that if the Court shall enter a final order sustaining any challenge to the validity, enforceability, or allowability of all or any portion of the Prepetition First Lien Obligations (a "Challenge Order"), then upon entry of such Challenge Order and solely with respect to such portion of the Prepetition First Lien Obligations that are subject to such Challenge Order, the rights set forth in paragraph 8 of the Interim Order shall be subject to any limitations on credit bidding set forth in the Challenge Order. | ¶ 8. |
| | *Section 506(c)*.  Upon entry of the Final Order, no costs or expenses of administration which have been or may be incurred in the Cases at any time, or any future proceeding that may result therefrom, shall be charged against the Prepetition First Lien Agents or any Prepetition First Lien Creditor or any of their respective claims or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior express written consent of the First Lien Collateral Agent (with the consent or at the direction of the Required Secured Parties) or applicable Prepetition First Lien Creditor, and no such consent shall be implied, directly or indirectly, from any other action, inaction, or acquiescence by any such representatives, agents, or lenders. | ¶ 16. |
| | *No Marshaling/Applications of Proceeds*. The Prepetition First Lien Agents and Prepetition First Lien Creditors shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Prepetition Collateral, as the case may be, and proceeds or payments shall be received and applied in accordance with the Prepetition First Lien Documents, including, without limitation, the First Lien Intercreditor Agreement, notwithstanding any other agreement or provision to the contrary. | ¶ 19. |
| | *Section 552(b) Claims*.  Upon entry of the Final Order, the Prepetition First Lien Agents and Prepetition First Lien Creditors shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to any of the Prepetition First Lien Agents or Prepetition First Lien Creditors with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral. | ¶ 20. |

## Provisions to be Highlighted Under Local Bankruptcy Rule 4001-2(a)(i)

9.    Local Bankruptcy Rule 4001-2(a)(i) requires a debtor to:  (a) recite whether the proposed form of the cash collateral order contains certain provisions of the type enumerated

therein; (b) identify the location of such provisions in the proposed cash collateral order; and (c) justify the inclusion of such provisions in the proposed cash collateral order (the "Highlighted Provisions"). *See* Del. Bankr. L.R. 4001-2(a)(i). The TCEH Debtors submit that only one provision of the Interim Order actually requires highlighting under Local Bankruptcy Rule 4001-2(a)(i), specifically with respect to Local Bankruptcy Rule 4001-2(a)(i)(H).

10. Upon entry of the Final Order, the Orders provide that the Prepetition First Lien Agents and Prepetition First Lien Creditors will each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and that the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition First Lien Agents or Prepetition First Lien Creditors with respect to proceeds, product, offspring, or profits of any of the Prepetition Collateral. *See* Interim Order, at ¶ 20. The TCEH Debtors submit that this is the only Highlighted Provision that they are required to disclose pursuant to Local Bankruptcy Rule 4001-2(a)(i).

11. Local Bankruptcy Rule 4001-2(a)(i)(H) requires explicit disclosure of provisions that seek to affect the Court's power to consider the equities of the case under section 552(b)(1) of the Bankruptcy Code. *See* Del. Bankr. L.R. 4001-2(a)(i)(H). Section 552(b)(1) of the Bankruptcy Code provides that if a security interest extends to property and the proceeds, products, offspring, or profits of such property before the debtor commences chapter 11, then such security interest extends to such proceeds, products, offspring, or profits acquired by the estate on a postpetition basis, "except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise." 11 U.S.C. § 552(b)(1). Here, solely upon entry of a Final Order, the TCEH Debtors waive the right to object to the enforceability of the

security interests granted in favor of the Prepetition First Lien Creditors under the terms of the Prepetition First Lien Facilities against any proceeds, products, offspring, or profits acquired by the TCEH Debtors subsequent to the Petition Date, and seek that the Court not apply any "equities of the case" exception under section 552(b) of the Bankruptcy Code. This waiver was necessary to obtain the consent of the Prepetition First Lien Creditors and is reasonable and appropriate under the circumstances.

12.    Nevertheless, out of an abundance of caution and for the convenience of the Court and other parties in interest, the TCEH Debtors wish to highlight certain other provisions to demonstrate their compliance, each of which is addressed individually in turn below.

    (a) *Investigation Periods (Del. Bankr. L.R. 4001-2(a)(i)(B))*: the acknowledgment by the TCEH Debtors in respect of the validity, enforceability, and perfection of the Prepetition First Priority Liens, and in respect of the legality, validity, and amount of the Prepetition First Lien Obligations *but without prejudice to the rights of any statutory committee or party in interest to investigate such matters* (*See* Interim Order, ¶ E(iii), ¶ 13);

    (b) *506(c) Waiver (Del. Bankr. L.R. 4001-2(a)(i)(C))*: a waiver by the TCEH Debtors of the provisions of section 506(c) of the Bankruptcy Code *but effective only upon entry of the Final Order* (*See* Interim Order, ¶ 16);

    (c) *Carve Out (Del. Bankr. L.R. 4001-2(a)(i)(F))*: a Carve Out for the benefit of professionals retained by the TCEH Debtors and any statutory committee appointed in these chapter 11 cases, *but providing no disparate treatment with respect to such professionals* (*See* Interim Order, ¶ 12); and

    (d) *Avoidance Actions (Del. Bankr. L.R. Local Rule 4001-2(a)(i)(D))*: the grant to the Prepetition Secured Creditors and Prepetition Secured Agents of a perfected first-priority lien on the proceeds of the TCEH Debtors' claims and causes of action under chapter 5 of the Bankruptcy Code, *but effective only upon entry of the Final Order* (*See* Interim Order ¶ 5(a)).

13.    *Investigation Periods*. The Interim Order provides that nothing therein shall prejudice the rights of any statutory committee appointed in these chapter 11 cases, and any other party in interest granted standing by the Court (other than the TCEH Debtors), to seek to avoid, object to, or otherwise challenge the stipulations made by the TCEH Debtors in the Orders,

regarding the validity, extent, priority, or perfection of the Prepetition First Priority Liens, or the validity, allowability, priority, full secured status, or amount of the Prepetition First Lien Obligations, within (a) 75 calendar days after entry of the Interim Order for any party in interest granted standing by the Court (other than the TCEH Debtors), and (b) 60 calendar days after formation of a statutory committee. *See* Interim Order, at ¶ 13.

14.     Local Bankruptcy Rule 4001-2(a)(i)(B) requires explicit disclosure of provisions that bind the estate or other parties in interest with respect to the validity, perfection, or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest at least 75 days from the entry of the order and the creditors' committee, if formed, at least 60 days from the date of its formation to investigate such matters. *See* Del. Bankr. L.R. 4001-2(a)(i)(B). Here, the Interim Order provides any statutory committee appointed in these chapter 11 cases and other parties in interest with sufficient time within which to investigate and/or challenge the Prepetition First Priority Liens and Prepetition First Lien Obligations. Accordingly, the TCEH Debtors do not believe that this provision of the Interim Order requires disclosure under Local Bankruptcy Rule 4001-2(a)(i)(B); however, such provision is disclosed out of an abundance of caution and for the convenience of the Court and other parties in interest.

15.     *506(c) Waiver.* Upon entry of the Final Order, as a condition to the use of Cash Collateral, the Prepetition First Lien Agents and Prepetition First Lien Creditors are requiring that no expenses of administration of these chapter 11 cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, be charged against or recovered from the Prepetition First Lien Agents, any Prepetition First Lien Creditor, or any of their respective claims in the Collateral pursuant to section 105

or 506(c) of the Bankruptcy Code (the "506(c) Waiver"), without the prior express written consent of the Prepetition First Lien Agents or applicable Prepetition First Lien Creditor. *See* Interim Order, at ¶ 13.

16.     Local Bankruptcy Rule 4001-2(a)(i)(C) requires explicit disclosure of provisions that constitute a waiver, *without notice*, of whatever rights the estate may have under section 506(c) of the Bankruptcy Code. *See* Del. Bankr. L.R. 4001-2(a)(i)(C) (emphasis added). Here, the TCEH Debtors are not seeking the approval of the 506(c) Waiver on an interim basis but, rather, are seeking approval of this provision under the Final Order pursuant to Local Bankruptcy Rule 4001-2(c). To that end, notice of this Motion and the Interim Order entered hereon will be served on all parties in accordance with Local Bankruptcy Rule 9013-1(m). Accordingly, the TCEH Debtors do not believe that this provision of the Interim Order requires disclosure under Local Bankruptcy Rule 4001-2(a)(i)C); however, such provision is disclosed out of an abundance of caution and for the convenience of the Court and other parties in interest.

17.     *Carve Out*. The Carve Out includes the unpaid fees and expenses of professional persons retained by any Debtor or any statutory committee appointed in these chapter 11 cases pursuant to an order of the Court. *See* Interim Order, at ¶ 9. Local Bankruptcy Rule 4001-2(a)(i)(F) requires disclosure of *disparate* treatment between the professionals retained by the TCEH Debtors and the professionals retained by the unsecured creditors' committee with respect to a professional fee carve out. *See* Del. Bankr. L.R. 4001(2)(a)(i)(F) (emphasis added). Here, the Carve Out applies equally to professionals retained by the TCEH Debtors and any statutory committee. Accordingly, the TCEH Debtors do not believe that this provision of the Interim Order requires disclosure under Local Bankruptcy Rule 4001-2(a)(i)(F); however, such

provision is disclosed out of an abundance of caution and for the convenience of the Court and other parties in interest.

18.    Moreover, with the inclusion of the Carve Out, the Orders do not directly or indirectly deprive the TCEH Debtors' estate or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these chapter 11 cases. *See In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). In *Ames*, the court found such "carve-outs" for professional fees to be not only reasonable, but necessary to ensure that official committees and debtors' estates can retain assistance from counsel. *Id.* at 41. The Adequate Protection Obligations are expressly subject and subordinated to the Carve Out, as described above.

19.    Similar carve outs for professional fees have been found to be reasonable and necessary in this district to ensure that a debtor's estate and any statutory committee can retain assistance from counsel. *See, e.g., In re Longview Power, LLC*, No. 13-12211 (BLS) (Bankr. D. Del. Sept. 5, 2013) (allowing carve out for debtor and committee professional fees); *In re Dex One Corp.*, No. 13-10533 (KG) (Bankr. D. Del. Mar. 19, 2013) (same); *In re Amicus Wind Down Corp.*, No. 11-13167 (KG) (Bankr. D. Del. Nov. 2, 2011) (same); *In re Neb. Book Co.*, No. 11-12005 (PJW) (Bankr. D. Del. July 21, 2011) (same); *In re Local Insight Media Holdings, Inc.*, No. 10-13677 (KG) (Bankr. D. Del. Dec. 29, 2010) (same); *In re N. Am. Petroleum Corp. USA*, No. 10-11707 (CSS) (Bankr. D. Del. July 6, 2010) (same); *In re Stallion Oilfield Servs. Ltd.*, No. 09-13562 (BLS) (Bankr. D. Del. Nov. 18, 2009) (same).[5]

---

[5]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to the Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

20.    *Avoidance Actions*.   Upon entry of the Final Order, the Adequate Protection Liens granted to the Prepetition Secured Creditors will include any proceeds or property recovered, unencumbered, or otherwise the subject of successful Avoidance Actions (as defined in the Cash Collateral Order), whether by judgment, settlement, or otherwise.   Local Rule 4001-2(a)(i)(D) requires disclosure of provisions that immediately grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under sections 544, 545, 547, 548, and 549 of the Bankruptcy Code.  Here, such liens are not granted *immediately*, but rather only upon entry of the Final Order.  *See* Interim Order, at ¶ 5(a).  Accordingly, the TCEH Debtors do not believe that this provision of the Interim Order requires disclosure under Local Bankruptcy Rule 4001-2(a)(i)(D); however, such provision is disclosed out of an abundance of caution and for the convenience of the Court and other parties in interest.

### Background

21.    On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition with the Court under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have requested joint administration of these chapter 11 cases.  The Court has not appointed a trustee, and the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has not formed any official committees in these chapter 11 cases.[6]

22.    Debtor Energy Future Holdings Corp. ("EFH Corp."), a Texas corporation, is the ultimate parent company for each of the Debtors in these chapter 11 cases and certain of EFH Corp.'s non-Debtor affiliates (collectively, "EFH").   EFH's businesses include the largest

---

[6]   The facts and circumstances supporting this Motion, along with a detailed discussion of EFH's business operations and capital structure, are set forth in the First Day Declaration, filed contemporaneously herewith.

generator, distributor, and certificated retail provider of electricity in Texas. EFH conducts substantially all of its business operations in the electricity market overseen by the Electric Reliability Council of Texas ("ERCOT"), which covers the majority of Texas. The Texas electricity market, in turn, is subject to oversight and regulation by the Public Utility Commission of Texas (the "PUC"). EFH has approximately 9,100 employees, approximately 5,700 of whom are employed by the Debtors,[7] in three distinct business units:

- EFH's *competitive electricity generation, mining, wholesale electricity sales, and commodity risk management and trading activities*, conducted by TCEH's Debtor subsidiaries composing "Luminant";

- EFH's *competitive retail electricity sales operations and related operations*, mainly conducted by TCEH's Debtor subsidiaries composing "TXU Energy";[8] and

- EFH's *rate-regulated electricity transmission and distribution operations*, conducted by the non-Debtor entities composing "Oncor."

23.    In the aggregate, the Debtors have approximately $42 billion of funded indebtedness, including (a) approximately $32.1 billion of claims against TCEH and TCEH's direct and indirect Debtor subsidiaries; (b) approximately $71 million of claims against EFCH; (c) approximately $1.9 billion of claims against EFH Corp.; and (d) approximately $7.7 billion of claims against EFIH.[9]

---

[7]    The Debtors in these chapter 11 cases consist of: (a) the vast majority of the entities that compose Luminant and TXU Energy, as well as those entities' intermediate corporate parent entity, TCEH, a Delaware limited liability company, and TCEH's corporate parent, EFCH, a Delaware limited liability company; (b) Energy Future Intermediate Holding Company LLC ("EFIH"), a Delaware limited liability company that indirectly owns approximately 80% of Oncor Electric Delivery Holdings Company LLC ("Oncor"), and EFIH's wholly-owned subsidiary, EFIH Finance Inc.; (c) EFH Corp.; and (d) other direct and indirect subsidiaries of EFH Corp., including EFH Corporate Services Company.

[8]    The Debtors also conduct a relatively small amount of retail electricity operations through their 4Change brand and another entity, Luminant ET Services Company, that provides retail electricity service to some end use customers and to some of Luminant's mining operations, and a small amount of retail gas operations through Luminant Energy Company LLC.

[9]    Amounts include intercompany debt holdings and short-term borrowings, and exclude guarantees, unamortized discounts or premiums, accrued but unpaid interest, and certain other figures typically reported in the Debtors'

24.    Although the Debtors' balance sheet is overleveraged, the Debtors' operations are strong. Luminant's generation units are high-performing, its mining and electricity generation operations have impressive safety records, and its commodity trading and risk management activities have delivered significant value to the Debtors. TXU Energy is an industry leader in customer care performance and product innovation and has maintained strong performance notwithstanding intense competition. And non-Debtor Oncor produces a strong and consistent stream of revenue. Thus, these chapter 11 cases will provide the Debtors with the opportunity to restructure their balance sheets and retain their position as leaders in the Texas electricity market.

25.    As of December 31, 2013, EFH Corp. reported total assets of approximately $36.4 billion in book value, approximately $28.8 billion of which is attributable to the TCEH Debtors and TCEH's non-Debtor subsidiaries,[10] and total liabilities of approximately $49.7 billion in book value, approximately $41.1 billion of which is attributable to the TCEH Debtors and TCEH's non-Debtor subsidiaries.[11] EFH Corp.'s assets and liabilities that are not attributable to the TCEH Debtors and TCEH's non-Debtor subsidiaries are mostly attributable to EFIH's indirect ownership of approximately 80% of Oncor. EFH Corp.'s consolidated revenues for the quarter ending December 31, 2013 were approximately $1.3 billion, all of which were attributable to TCEH. EFH Corp.'s consolidated annual revenues for the year ending December 31, 2013 were approximately $5.9 billion.

---

filings with the Securities and Exchange Commission (the "SEC"), such as capital lease obligations, certain promissory notes, and certain other obligations.

[10]    Oncor's revenues are not included in EFH Corp.'s consolidated revenues because EFH Corp. accounts for its ownership of Oncor under the equity method of accounting.

[11]    Figures for TCEH are derived from EFCH's public filings with the SEC, and are almost entirely attributable to TCEH and its Debtor and non-Debtor subsidiaries.

## The TCEH Debtors' Prepetition Indebtedness

### I.    TCEH First Lien Debt.

26.    Pursuant to that certain credit agreement (as amended, modified, or supplemented and in effect immediately prior to the Petition Date, the "First Lien Credit Agreement"), dated October 10, 2007, among TCEH, as the borrower, EFCH, as successor to Energy Future Competitive Holdings Company, as the parent guarantor, the Subsidiary Guarantors,[12] as guarantors, the First Lien Administrative Agent, the First Lien Collateral Agent, and the First Lien Lenders, the TCEH Debtors were truly and justly indebted to the First Lien Lenders pursuant to the First Lien Credit Agreement, without defense, counterclaim, or offset of any kind, in the aggregate principal amount of $22,635,987,924 plus accrued and unpaid interest with respect thereto (which, as of the Petition Date, was $227,267,242) and any additional fees, costs, and expenses (including any attorneys', financial advisors', and other professionals' fees and expenses that are chargeable or reimbursable under the First Lien Credit Agreement) and all other Obligations (as defined in the First Lien Credit Agreement) owing under or in connection with the First Lien Credit Agreement, including, without limitation, any and all obligations owing to the First Lien Credit Agent.

---

[12]    The "Subsidiary Guarantors" include 4Change Energy Company, 4Change Energy Holdings LLC, Big Brown 3 Power Company LLC, Big Brown Lignite Company LLC, Big Brown Power Company LLC, Collin Power Company LLC, Decordova Power Company LLC, Decordova II Power Company LLC, Eagle Mountain Power Company LLC, Generation MT Company LLC, Generation SVC Company, Lake Creek 3 Power Company LLC, Luminant Big Brown Mining Company LLC, Luminant Energy Company LLC, Luminant Energy Trading California Company, Luminant ET Services Company, Luminant Generation Company LLC, Luminant Holding Company LLC, Luminant Mineral Development Company LLC, Luminant Mining Company LLC, Luminant Renewables Company LLC, Martin Lake 4 Power Company LLC, Monticello 4 Power Company LLC, Morgan Creek 7 Power Company, NCA Resources Development Company LLC, Oak Grove Management Company LLC, Oak Grove Mining Company LLC, Oak Grove Power Company LLC, Sandow Power Company LLC, TCEH Finance, Inc., Tradinghouse 3 & 4 Power Company LLC, Tradinghouse Power Company LLC, TXU Energy Retail Company LLC, TXU Energy Solutions Company LLC, TXU Retail Services Company, TXU SEM Company, Valley NG Power Company LLC, and Valley Power Company LLC.

27.     Pursuant to that certain indenture (the "First Lien Notes Indenture," and, together with all other loan documents, security documents (including, without limitation, the "Security Documents" as defined in the First Lien Credit Agreement and the First Lien Notes Indenture), and any other documents or instruments related to, referenced in, or executed in connection with the First Lien Credit Agreement or the First Lien Notes Indenture, the "First Lien Facilities"), dated April 19, 2011, for the First Lien Notes, by and among TCEH and TCEH Finance, Inc., as issuers, the First Lien Notes Trustee, and EFCH and the Subsidiary Guarantors, as guarantors, TCEH and TCEH Finance, Inc. issued $1.75 billion in principal amount of the First Lien Notes. As of the Petition Date, the TCEH Debtors were truly and justly indebted to the holders of the First Lien Notes pursuant to the First Lien Notes Indenture, without defense, counterclaim, or offset of any kind, in the aggregate principal amount of $1,750,000,000 plus accrued and unpaid interest with respect thereto and any additional fees, costs, and expenses (including any attorneys', financial advisors', and other professionals' fees and expenses that are chargeable or reimbursable under the First Lien Notes Indenture) and all other Obligations (as defined in the First Lien Notes Indenture) owing under or in connection with the First Lien Notes Indenture.

28.     The TCEH Debtors are also party to:  (i) Secured Commodity Hedge and Power Sales Agreements (as defined in the First Lien Intercreditor Agreement (as defined below)) with the respective counterparties thereto (each, a "Hedge Counterparty," and such commodity hedges, the "First Lien Commodity Hedges"); and (ii) Secured Hedging Agreements (as defined in the First Lien Intercreditor Agreement) with the respective counterparties thereto (each, a "Swap Counterparty," and such interest rate swaps, the "First Lien Interest Rate Swaps").  The "Prepetition First Lien Documents" shall mean the First Lien Facilities, the First Lien Commodity Hedges, the First Lien Interest Rate Swaps, the First Lien Intercreditor Agreement,

and all other loan documents, security documents, and any other documents or instruments related to, referenced in, or executed in connection with such agreements.

29.    The "Prepetition First Lien Obligations" shall mean all of the obligations under the Prepetition First Lien Documents (collectively, the "First Lien Debt"), together with any amounts paid, incurred, or accrued prior to the Petition Date in accordance with the Prepetition First Lien Documents, principal, accrued and unpaid interest, any fees, expenses, and disbursements (including, without limitation, attorneys' fees, related expenses, and disbursements), indemnities, contingent obligations, reimbursement obligations, "Hedging Obligations" owed to Secured Parties (as defined in the First Lien Intercreditor Agreement), obligations with respect to any "Loan," "Letter of Credit," "Deposit L/C Obligation," or under any "Secured Cash Management Agreement," "Secured Commodity Hedging Agreement," or "Secured Hedging Agreement" (each as defined in the First Lien Credit Agreement), indemnification obligations, and other payments, charges, or liabilities of whatever nature, whether or not contingent, whenever arising, due, or owing in respect thereof to the extent and as provided for in the Prepetition First Lien Documents, including all "Obligations" as defined in each of the First Lien Credit Agreement and First Lien Notes Indenture.

30.    The Prepetition First Lien Obligations are secured by first priority security interests in and liens on (the "Prepetition First Priority Liens") the "Collateral" (the "Prepetition Collateral"), as defined in the First Lien Credit Agreement, including substantially all of the TCEH Debtors' assets, including accounts receivable and cash to the extent that such cash constitutes proceeds of other Prepetition Collateral (the "Cash Collateral").

31.    The first lien intercreditor agreement (as amended, restated, modified, and supplemented from time to time, the "First Lien Intercreditor Agreement") entered into by and

among the TCEH Debtors, the First Lien Credit Agent, certain Prepetition First Lien Creditors, and other parties thereto from time to time, governs, among other things: (a) payment and priority with respect to holders of claims related to the First Lien Debt; (b) rights and remedies of the holders of First Lien Debt with respect to debtor-in-possession financing, use of cash collateral, and adequate protection in a chapter 11 case; and (c) the relative priority of liens granted to holders of "Secured Obligations" under a "Secured Hedging Agreement," "Secured Cash Management Agreement," or "Secured Commodity Hedge and Power Sales Agreement" (each as defined in the First Lien Intercreditor Agreement) pursuant to ISDA master agreements and confirmations thereto or otherwise. In particular, section 6.1 of the First Lien Intercreditor Agreement states that "such Secured Party (a) will be deemed to have consented to, will raise no objection to, nor support any other Person objecting to, the use of such Cash Collateral or such DIP Financing so long as (i) each Secured Party retains the right to object to such use of Cash Collateral or to the granting of any priming liens over any Collateral if the terms thereof, including the terms of adequate protection (if any) granted to the Secured Parties in connection therewith, do not provide for *materially equal* treatment to all Secured Parties...." (emphasis added). The purpose of adequate protection is to protect against a diminution in the value of the secured creditors' interests in the collateral. The TCEH Debtors propose to pay adequate protection to all similarly situated creditors at the same rate, thus satisfying the "materially equal" requirement under the First Lien Intercreditor Agreement.

## II.    TCEH Second Lien Debt.

32.    Pursuant to that certain indenture (the "Second Lien Notes Indenture," and together with the First Lien Facilities, the "Prepetition Secured Facilities") dated October 6, 2010, for the Second Lien Debt, by and among TCEH and TCEH Finance, Inc., as issuers, the Second Lien Agent, and EFCH and the Subsidiary Guarantors, as guarantors, TCEH

23

and TCEH Finance, Inc. issued approximately $1.57 billion in principal amount of the Second Lien Debt.

33.     The "Prepetition Second Lien Obligations" shall mean all obligations under the Second Lien Debt, together with any amounts paid, incurred, or accrued prior to the Petition Date in accordance with the Second Lien Notes Indenture, principal, accrued and unpaid interest, any fees, expenses, and disbursements (including, without limitation, attorneys' fees, related expenses, and disbursements), reimbursement obligations, indemnification obligations, contingent obligations, and other charges of whatever nature, whether or not contingent, whenever arising, due, or owing in respect thereof to the extent and as provided for in the Second Lien Notes Indenture, including all "Obligations" as described in the Second Lien Notes Indenture.   The "Prepetition Secured Obligations" shall mean the Prepetition First Lien Obligations together with the Prepetition Second Lien Obligations.

34.     The Prepetition Second Lien Obligations are secured by second priority liens (the "Prepetition Second Priority Liens") in the Prepetition Collateral, as set forth in that certain second lien security agreement (as amended, restated, modified, and supplemented from time to time, the "Second Lien Security Agreement"), dated as of October 6, 2010, by and among the TCEH Debtors and the Second Lien Agent.

35.     The second lien intercreditor agreement (as amended, restated, modified, and supplemented from time to time, the "Second Lien Intercreditor Agreement") by and among the TCEH Debtors, the Prepetition First Lien Agents, and the Second Lien Agent, governs, among other things, the relative priority of the First Lien Debt and the Second Lien Debt and the relative rights and remedies of the holders of First Lien Debt and Second Lien Debt with respect to, among other things, debtor-in-possession financing, use of cash collateral, and adequate

protection. In particular, pursuant to section 6.04 of the Second Lien Intercreditor Agreement, holders of Second Lien Debt are bound by the actions and consents of the First Lien Collateral Agent, the Prepetition First Lien Agents, or the Prepetition Secured Creditors under the First Lien Intercreditor Agreement with respect to any debtor-in-possession financing or use of cash collateral, and the Second Lien Agent and holders of Second Lien Debt are prohibited from objecting to such debtor-in-possession financing or use of cash collateral to the extent that the First Lien Credit Agent consents.

## III.    The Tex-La Obligations.

36.    In addition to the Prepetition Secured Obligations, EFCH is the principal obligor of, and EFH Corp. guarantees, approximately $62 million of obligations related to a series of transactions by and among the predecessors of EFH Corp. and EFCH, on one hand, and the Tex-La Electric Cooperative of Texas, Inc. ("Tex-La"), on the other hand (such obligations, the "Tex-La Obligations"), as provided in that certain assumption agreement (the "Tex-La Assumption Agreement," and together with all related agreements, the "Tex-La Documents"), dated February 1, 1990, by and among EFCH, Tex-La, and the administrator of the Rural Utilities Service, an agency of the United States Department of Agriculture, whereby EFCH agreed to assume certain outstanding indebtedness of Tex-La. Approximately $29 million and $33 million of the Tex-La Obligations are due in 2019 and 2021, respectively. As of the date of the Interim Order, the Tex-La Obligations are secured by a 2.17% undivided ownership in Comanche Peak's electricity generation and transmission assets and a 6.02% undivided ownership interest in the 51.5 mile 345 kV Comanche Peak-Cleburne-Everman transmission facility (the "Tex-La Collateral," and the liens on the Tex-La Collateral, the "Tex-La Liens"). The Prepetition First Priority Liens and the Prepetition Second Priority Liens were granted subject to the Tex-La Liens.

### The TCEH Debtors' Need for Use of Cash Collateral and DIP Financing

37.    In the normal course of business, the TCEH Debtors use cash on hand and cash flow from operations to fund working capital, capital expenditures, and for other general corporate purposes. An inability to use these funds during these chapter 11 cases could cripple the TCEH Debtors' business operations. Indeed, the TCEH Debtors must use their cash to, among other things, continue the operation of their business in an orderly manner, maintain business relationships with vendors, suppliers, and customers, pay employees, fulfill regulatory obligations, and satisfy other working capital and operational needs—all of which are necessary to preserve and maintain the TCEH Debtors' going-concern value and, ultimately, effectuate a successful reorganization.

38.    In addition to the need for the use of Cash Collateral, the TCEH Debtors have obtained $4.475 billion in DIP Financing, in large part to assist the TCEH Debtors with the costs of administering the chapter 11 cases. As described more fully in the DIP Motion, the DIP Financing consists of:  (a) a revolving credit facility in an aggregate principal amount of up to $1,950,000,000; (b) a term credit facility in an aggregate principal amount of $1,425,000,000, of which up to $800,000,000 may be applied by TCEH to fund the General L/C Collateral Account; (c) a delayed-draw term credit facility in an aggregate principal amount of up to $1,100,000,000, the proceeds of which, if funded, will be applied by TCEH to fund the RCT L/C Collateral Account to support RCT Letters of Credit; (d) obligations owed to the General Letter of Credit Issuer (without duplication of any other obligations described in clauses (a), (b), or (c) above) pursuant to the General Letter of Credit Facility; and (e) obligations owed to the RCT Letter of Credit Issuer (and without duplication of any other obligations described in clauses (a), (b), (c), or (d) above) pursuant to the RCT Letter of Credit Facility (each, as defined in the DIP Credit Agreement). Importantly, the DIP Financing is comprised entirely of new money (with no roll

up of prepetition indebtedness). This financing, together with the use of the Cash Collateral, will enable the TCEH Debtors to fund the administration of their chapter 11 cases and help pave the way to a smooth and expeditious exit from chapter 11.

39.     To obtain consent for the use of Cash Collateral and the priming liens provided for under the DIP Financing, the TCEH Debtors entered into negotiations with Paul, Weiss, Rifkind, Wharton, and Garrison LLP, as counsel to an informal steering committee representing holders of approximately 41% in amount of claims under the First Lien Credit Agreement and the First Lien Notes Indenture (the "TCEH First Lien Ad Hoc Committee"). After weeks of these negotiations, the TCEH First Lien Ad Hoc Committee consented to both the priming liens (and other terms provided) under the DIP Motion and the TCEH Debtors' use of Cash Collateral, in exchange for the TCEH Debtors providing adequate protection against any diminution in value of the Prepetition First Lien Creditors' interests in the Prepetition Collateral.

40.     The TCEH Debtors will provide the Prepetition First Lien Creditors with various forms of adequate protection, including, primarily:   (a) the First Lien Adequate Protection Payments; (b) the First Priority 507(b) Claim; (c) the First Priority Adequate Protection Liens; (d) professional fees and expenses; (e) the Financial Covenant; and (f) access to the TCEH Debtors' books and records, including budgets and financial forecasts (collectively, the "Adequate Protection Obligations").   The TCEH Debtors will also provide the Prepetition Second Lien Creditors with:   (a) the Second Priority 507(b) Claim and (b) the Second Priority Adequate Protection Liens, in both cases junior in priority to those received by the Prepetition First Lien Creditors, consistent with the terms of the Second Lien Intercreditor Agreement.   For the avoidance of doubt, the Prepetition Second Lien Creditors are not entitled to any other forms of adequate protection. *See* Second Lien Intercreditor Agreement, § 6.04.

## Basis for Relief

I.    **The TCEH Debtors' Request To Use Cash Collateral and the Proposed Adequate Protection Is Appropriate.**

41.    The TCEH Debtors use of property of their estates is governed by section 363 of the Bankruptcy Code, which provides in pertinent part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

42.    Section 363(c)(2)(A) of the Bankruptcy Code permits a debtor in possession to use cash collateral with the consent of the secured party. Section 363(e) of the Bankruptcy Code requires that the debtor adequately protect the secured creditors' interest in property to be used by a debtor against any diminution in value of such interest resulting from the debtor's use of the property during these chapter 11 cases.

43.    What constitutes sufficient adequate protection is decided on a case-by-case basis. *See In re Columbia Gas Sys., Inc.*, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Martin*, 761 F.2d 472 (8th Cir. 1985); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); *In re Sw. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992). By adequate protection, the Bankruptcy Code seeks to shield a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. *See In re Hubbard Power & Light*, 202 B.R. 680 (Bankr. E.D.N.Y. 1996); *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986).

Adequate protection can come in various forms, including payment of adequate protection fees, payment of interest, and granting of replacement liens and administrative claims.

44.    Here, in exchange for the TCEH First Lien Ad Hoc Committee's consent to both the priming liens (and other terms provided) under the DIP Motion and the TCEH Debtors' use of Cash Collateral, the TCEH Debtors will provide the Prepetition First Lien Creditors with the Adequate Protection Obligations, as described below.

(a) *First*, the TCEH Debtors will provide the Prepetition Secured Creditors with Adequate Protection Liens on the "DIP Collateral" (as defined in the DIP Order) to the extent of the Diminution in Value of their interests in the Prepetition Collateral, subject and subordinate only to Senior Carve Outs and Liens.

(b) *Second*, the Prepetition Secured Creditors will be granted the 507(b) Claim against each of the TCEH Debtors to the extent of the Diminution in Value of their interests in the Prepetition Collateral, subject and subordinate only to (a) the Carve Out; (b) the RCT Reclamation Support Carve Out; and (c) the DIP Superpriority Claims.

(c) *Third*, the First Lien Collateral Agent (for the benefit of the lenders thereunder) shall receive from the TCEH Debtors monthly First Lien Adequate Protection Payments. Tex-La shall receive from the TCEH Debtors the Tex-La Adequate Protection Payments (as defined in the Interim Order) at the non-default rate provided under the Tex-La Documents, notwithstanding any acceleration provided for as a result of a chapter 11 bankruptcy filing or otherwise. Any Adequate Protection Payment shall be without prejudice, and with a full reservation of rights as to whether such payment should be recharacterized or reallocated pursuant to section 506(b) of the Bankruptcy Code as principal payments under the First Lien Facilities (whether as to principal, interest, or otherwise) or the Tex-La Documents, as applicable.

(d) *Fourth*, the TCEH Debtors will pay all reasonable and documented fees and expenses incurred by (i) the Prepetition First Lien Agents, including, without limitation, the reasonable and documented fees and expenses of Seward & Kissel LLP and Milbank, Tweed, Hadley & McCloy LLP (solely for fees and expenses incurred as counsel to Citibank, in its capacity as current and, upon the effectiveness of its resignation, former First Lien Credit Agent) and (ii) the TCEH First Lien Ad Hoc Committee, including, without limitation, (A) the reasonable and documented fees and expenses of Paul, Weiss, Rifkind, Wharton & Garrison LLP, Winstead PC, and Young Conaway Stargatt & Taylor, LLP, as counsel to the TCEH First Lien Ad Hoc Committee, (B) the reasonable and documented fees and expenses incurred by Millstein & Co.,

L.P. pursuant to that certain engagement letter between TCEH and Millstein & Co., L.P., dated as of February 1, 2013, as financial advisor to the TCEH First Lien Ad Hoc Committee, and (C) a tax advisor and energy consultant for the TCEH First Lien Ad Hoc Committee.

(e) *Fifth*, the TCEH Debtors will provide the Prepetition First Lien Creditors with the Financial Covenant, as set forth herein (and the same as provided to the DIP Agent under the DIP Order).

(f) *Sixth*, the TCEH Debtors will provide the Prepetition First Lien Agents and the TCEH First Lien Ad Hoc Committee with reasonable access to the debtors' books and records.

45.     In light of the foregoing, the TCEH Debtors submit, and the TCEH First Lien Ad Hoc Committee agrees, that the Adequate Protection Obligations proposed for the benefit of the Prepetition First Lien Creditors are necessary and appropriate under the circumstances of these chapter 11 cases to ensure the TCEH Debtors are able to continue using Cash Collateral and grant priming liens under the DIP Order.  Courts in this district have granted similar relief in other recent chapter 11 cases. *See, e.g.*, *Longview Power, LLC*, No. 13-12211 (BLS) (Bankr. D. Del. Sept. 5, 2013) (interim order); *In re Dex One Corp.*, No. 13-10533 (KG) (Bankr. D. Del. Mar. 19, 2013) (same); *In re TMP Directional Mktg., LLC*, No. 11-13835 (MFW) (Bankr. D. Del. Dec. 7, 2011) (same); *In re Stallion Oilfield Servs. Ltd.*, No. 09-13562 (BLS) (Bankr. D. Del. Oct. 20, 2009) (same); *In re Masonite Corp.*, No. 09-10844 (PJW) (Bankr. D. Del. Mar. 17, 2009) (same); *In re Monaco Coach Corp.*, No. 09-10750 (KJC) (Bankr. D. Del. Mar. 10, 2009) (same); *In re Spansion Inc.*, No. 09-10690 (KJC) (Bankr. D. Del. Mar. 4, 2009) (same).[13]  Accordingly, the TCEH Debtors submit that the adequate protection proposed herein and in the Orders is fair and reasonable and sufficient to satisfy the requirements of sections

---

[13]   Because of the voluminous nature of the orders cited herein, such orders are not attached to this Motion.  Copies of these orders are available upon request of the Debtors' counsel.

363(c)(2) and (e) of the Bankruptcy Code.[14]    Therefore, the TCEH Debtors seek authority to provide the Adequate Protection Obligations as set forth herein on an interim basis subject to a Final Hearing.

## II.    The TCEH Debtors' Interim Use of the Cash Collateral Should Be Approved.

46.    Bankruptcy Rule 4001(b) provides that a final hearing on a motion to use Cash Collateral may not be commenced earlier than 14 days after service of such motion.  The Court, however, is authorized to conduct an expedited hearing prior to the expiration of such 14-day period and to authorize the use of cash collateral where, as here, such relief is necessary to avoid immediate and irreparable harm to the debtor's estate.

47.    Without use of the Cash Collateral, the TCEH Debtors will have no ability to operate their businesses.  The TCEH Debtors will not be able to pay their vendors, and their vendors may cease providing goods and services to the TCEH Debtors on credit.  The TCEH Debtors will not be able to fund their payroll.  The TCEH Debtors will not be able to pay the professionals necessary for the successful reorganization of their businesses.  Finally, the TCEH Debtors will not be able to service their customers.  All of these outcomes will cause immediate and irreparable harm to the TCEH Debtors' estates.

48.    The TCEH Debtors' ability to finance their operations and the availability to the TCEH Debtors of sufficient working capital and liquidity through the use of Cash Collateral is vital to the confidence of the TCEH Debtors' employees, suppliers, and customers and to the preservation and maintenance of the going-concern value and other values of the TCEH Debtors' estates.  The TCEH Debtors, therefore, seek immediate authority to use the Cash Collateral as set

---

[14]    For the avoidance of doubt, the Prepetition Second Lien Creditors are not entitled to any other form of adequate protection, and are precluded from objecting to any and all aspects of the Interim Order pursuant to section 6.04 of the Second Lien Intercreditor Agreement, as discussed in paragraph 35 above.

forth in this Motion and in the Interim Order to prevent immediate and irreparable harm to the TCEH Debtors' estates pending the Final Hearing pursuant to Bankruptcy Rule 4001(b).

49.     In light of the foregoing, the TCEH Debtors submit that they have satisfied the requirements of Bankruptcy Rule 4001(b) to support immediate Cash Collateral availability pending the entry of the Final Order, and respectfully request that the Court grant the relief requested herein and authorize the immediate use of the Case Collateral pursuant to the terms and conditions set forth in the Interim Order.

## III.   The Automatic Stay Should Be Modified on a Limited Basis.

50.     The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified as necessary to effectuate the terms and provisions of the Interim Order, *provided, however*, that any stay relief with respect to the exercise of remedies will be subject to the reservation of certain committee and third party rights (specifically an investigation period) provided for in paragraph 13 of the Interim Order or as otherwise ordered by this Court. The Interim Order further provides that the automatic stay is modified and vacated to the extent necessary to permit the Prepetition First Lien Creditors to exercise, upon an Event of Default, certain rights and remedies provided for in the Interim Order. Notably, the Prepetition First Lien Agents and Prepetition First Lien Creditors must provide the the TCEH Debtors five (5) business days' written notice prior to exercising the rights and remedies available under the First Lien Facilities, the Interim Order, or applicable law after such Event of Default.

51.     Stay modifications of this kind are ordinary and standard features of secured parties' consents to use cash collateral and, in the TCEH Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases. Courts in this district have granted similar relief in other recent chapter 11 cases. *See, e.g., Longview Power, LLC,*

No. 13-12211 (BLS) (Bankr. D. Del. Sept. 5, 2013) (terminating automatic stay after termination event and to effect terms of the order); *In re Peak Broad. LLC*, No. 12-10183 (PJW) (Bankr. D. Del. Feb. 2, 2012) (terminating automatic stay after occurrence of termination event); *In re TMP Directional Mktg., LLC*, No. 11-13835 (MFW) (Bankr. D. Del. Jan. 17, 2012) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Broadway 401 LLC*, No. 10-10070 (KJC) (Bankr. D. Del. Feb. 16, 2010) (same); *In re Haights Cross Commc'ns, Inc.*, No. 10-10062 (BLS) (Bankr. D. Del. Feb. 8, 2010) (same); *In re Stallion Oilfield Servs. Ltd.*, No. 09-13562 (BLS) (Bankr. D. Del. Nov. 18, 2009) (same).

### Request for Final Hearing

52.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the TCEH Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, but in no event later than 90 days following the entry of the Interim Order, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

### Notice

53.     The TCEH Debtors shall provide notice of this Motion on the date hereof via facsimile, overnight delivery, and/or hand delivery to:  (a) the Office of the U.S. Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) Citibank, N.A., in its capacity as First Lien Credit Agent under the First Lien Credit Agreement, and Wilmington Trust, N.A., upon the effectiveness of its appointment as successor First Lien Credit Agent; (d) Bank of New York Mellon Trust Company, N.A., in its capacity as indenture trustee under: (i) the TCEH unsecured pollution control revenue bonds; and (ii) the EFCH 2037 Notes due 2037, and counsel thereto; (e) American Stock Transfer & Trust Company, LLC, in its capacity as indenture trustee under:  (i) the 9.75% EFH senior unsecured notes due 2019;  (ii) the 10.0%

EFH senior unsecured notes due 2020; (iii) the 10.875% EFH LBO senior unsecured notes due 2017; (iv) the 11.25%/12.0% EFH LBO toggle notes due 2017; (v) the 5.55% EFH legacy notes (series P) due 2014; (vi) the 6.50% EFH legacy notes (series Q) due 2024; and (vii) the 6.55% EFH legacy notes (series R) due 2034, and counsel thereto; (f) Computershare Trust Company, N.A. and Computershare Trust Company of Canada, in their capacities as indenture trustee under: (i) the 11.0% EFIH senior secured second lien notes due 2021; and (ii) the 11.75% EFIH senior secured second lien notes due 2022; (g) UMB Bank, N.A. in its capacity as indenture trustee under: (i) the 9.75% EFIH senior unsecured notes due 2019; and (ii) the 11.25%/12.25% EFIH senior toggle notes due 2018, and counsel thereto; (h) BOKF, NA, dba Bank of Arizona, in its capacity as indenture trustee under 11.50% TCEH senior secured notes due 2020; (i) CSC Trust Company of Delaware in its capacity as indenture trustee under: (i) the 6.875% EFIH senior secured notes due 2017; and (ii) the 10.0% EFIH senior secured notes due 2020, and counsel thereto; (j) Law Debenture Trust Company of New York in its capacity as indenture trustee under: (i) the 10.25% TCEH senior unsecured notes due 2015; and (ii) the 10.50%/11.25% TCEH senior toggle notes due 2016, and counsel thereto; (k) Wilmington Savings Fund Society, FSB in its capacity as indenture trustee under the 15.0% TCEH senior secured second lien notes due 2021, and counsel thereto; (l) counsel to certain holders of claims against the Debtors regarding each of the foregoing described in clauses (c) through (k); (m) the agent for the TCEH debtor-in-possession financing facility and counsel thereto; (n) the agent for the EFIH debtor-in-possession financing facility and counsel thereto; (o) counsel to certain holders of equity in Texas Energy Future Holdings Limited Partnership; (p) counsel to Oncor; (q) the SEC; (r) the Internal Revenue Service; (s) the Office of the United States Attorney for the District of Delaware; (t) the Office of the Texas Attorney General on behalf of the PUC;

(u) counsel to ERCOT; (v) the Railroad Commission of Texas; (w) the counterparties to the First Lien Commodity Hedges and First Lien Interest Rate Swaps; and (x) counsel to the TCEH First Lien Ad Hoc Committee.  As this Motion is seeking "first day" relief, within forty eight hours of the entry of the Interim Order, the TCEH Debtors will serve copies of this Motion and the order respecting this Motion as required by Local Bankruptcy Rule 9013-1(m).  The TCEH Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

54.    No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the TCEH Debtors respectfully request that the Court enter the Interim

Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested in this

Motion and granting such other and further relief as is appropriate under the circumstances.

Wilmington, Delaware
Dated:  April 29, 2014

RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:      (302) 651-7700
Facsimile:      (302) 651-7701
Email:          collins@rlf.com
                defranceschi@rlf.com
                madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
Richard M. Cieri (*pro hac vice* pending)
Edward O. Sassower, P.C. (*pro hac vice* pending)
Stephen E. Hessler (*pro hac vice* pending)
Brian E. Schartz (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          richard.cieri@kirkland.com
                edward.sassower@kirkland.com
                stephen.hessler@kirkland.com
                brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (*pro hac vice* pending)
Chad J. Husnick (*pro hac vice* pending)
Steven N. Serajeddini (*pro hac vice* pending)
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          james.sprayregen@kirkland.com
                chad.husnick@kirkland.com
                steven.serajeddini@kirkland.com

Proposed Co-Counsel to the Debtors and Debtors in Possession

## EXHIBIT A

**Proposed Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | Case No. 14-_____ (___) |
| Debtors. | (Joint Administration Requested) |

**INTERIM ORDER (A) AUTHORIZING USE
OF CASH COLLATERAL FOR TEXAS COMPETITIVE
ELECTRIC HOLDINGS COMPANY LLC AND CERTAIN OF
ITS DEBTOR AFFILIATES, (B) GRANTING ADEQUATE PROTECTION,
(C) MODIFYING THE AUTOMATIC STAY, AND (D) SCHEDULING A FINAL HEARING**

Upon the motion (the "Motion")[2] of Texas Competitive Electric Holdings Company LLC ("TCEH"), Energy Future Competitive Holdings Company LLC ("EFCH"), and each of the Subsidiary Guarantors (as defined below) (collectively with TCEH and EFCH, the "TCEH Debtors," and, together with the other debtors in the above-captioned proceeding, the "Debtors") in the above-captioned chapter 11 cases of the TCEH Debtors (collectively, the "Cases"), pursuant to sections 105, 361, 362, 363, 364(c)(2), 364(c)(3), 364(d)(1), 503, and 507 of title 11 of the United States Code (as amended, the "Bankruptcy Code"), rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 2002-1(b), 4001-2, and 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules"),

---

[1]    The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which the debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion.

seeking entry of this interim order (this "Interim Order") and a final order (the "Final Order") *inter alia*:

(i)    authorizing the TCEH Debtors' use of Cash Collateral (as defined herein) of the Prepetition Secured Agents and Prepetition Secured Creditors (each as defined herein);

(ii)    granting adequate protection to the First Lien Collateral Agent (as defined below) and Prepetition First Lien Creditors (as defined below) for any diminution in value of their respective interests in the Prepetition Collateral (each as defined herein), including the Cash Collateral;

(iii)    subject to entry of a Final Order and to the extent set forth herein, waiving the TCEH Debtors' right to surcharge the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code;

(iv)    vacating or modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to permit the TCEH Debtors and the First Lien Collateral Agent on behalf of the Prepetition First Lien Creditors to implement and effectuate the terms and provisions of this Interim Order; and

(v)    scheduling a final hearing (the "Final Hearing") to consider the relief requested in the Motion and the entry of a Final Order, and approving the form of notice with respect to the Final Hearing.

The Court (as defined below) having considered the Motion, the *Declaration of Paul Keglevic, Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of Energy Future Holdings Corp., et al., in Support of First Day Motions*, sworn to on April 29, 2014, the exhibits attached thereto, the *Declaration of Stephen Goldstein in Support of (I) the Motion of Texas Competitive Electric Holdings Company LLC and Certain of Its Debtor*

*Affiliates for Entry of Interim and Final Orders (A) Approving Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Granting Adequate Protection, (D) Modifying the Automatic Stay, and (E) Scheduling a Final Hearing and (II) the Motion of Texas Competitive Electric Holdings Company LLC And Certain of Its Debtor Affiliates for Entry of Interim and Final Orders (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing*, sworn to on April 29, 2014, and the evidence submitted or adduced and the arguments of counsel made at the interim hearing held pursuant to Bankruptcy Rule 4001(b)(2) on April 29, 2014 (the "Interim Hearing"); and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

BASED UPON THE RECORD ESTABLISHED BY THE TCEH DEBTORS AT THE INTERIM HEARING, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[3]

    A.    *Petition Date*:  On April 29, 2014 (the "Petition Date"), each of the TCEH Debtors filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (this "Court") commencing these Cases.  On April __, 2014, this Court entered an order approving the joint administration of these Cases.

    B.    *Debtors in Possession*.  The TCEH Debtors continue to manage and operate their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Cases.

---

[3]    Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

C.     *Jurisdiction and Venue*. The Court has jurisdiction over this matter, these proceedings, and the persons and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the TCEH Debtors confirm their consent pursuant to Local Bankruptcy Rule 9013-1(f) to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution. Venue for these Cases is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

D.     *Committee*. As of the date hereof, the United States Trustee (the "U.S. Trustee") has not yet appointed an official committee of unsecured creditors in these Cases pursuant to section 1102 of the Bankruptcy Code (a "Committee").

E.     *Debtor-in-Possession Financing*. On the Petition Date, the TCEH Debtors filed a motion seeking entry of an interim order (the "DIP Order") authorizing the TCEH Debtors to enter into that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement, to be dated on or about the date this Interim Order is entered (the "DIP Credit Agreement") to obtain secured postpetition financing, consisting of (a) a revolving credit facility (the "Revolving Credit Facility") in an aggregate principal amount of up to $1,950,000,000; (b) a term credit facility (the "Term Loan Facility") in an aggregate principal amount of up to $1,425,000,000, of which up to $800,000,000 may be applied by TCEH to fund the General L/C Collateral Account to support General Letters of Credit (each, as defined in the DIP Credit Agreement); (c) a delayed-draw term credit facility (the "Delayed-Draw Term Facility") in an aggregate principal

amount of up to $1,100,000,000, the proceeds of which, if funded, will be applied by TCEH to fund the RCT L/C Collateral Account to support RCT Letters of Credit (each, as defined in the DIP Credit Agreement); (d) obligations owed to the General Letter of Credit Issuer (as defined in the DIP Credit Agreement and without duplication of any other obligations described in clauses (a), (b), or (c) above) pursuant to a cash collateralized letter of credit facility (the "General Letter of Credit Facility") in an aggregate stated amount of up to $800,000,000, as such amount may be increased as agreed in writing between TCEH and the General Letter of Credit Issuers providing such increased amount; and (e) obligations owed to the RCT Letter of Credit Issuer (as defined in the DIP Credit Agreement and without duplication of any other obligations described in clauses (a), (b), (c), or (d) above) pursuant to a cash collateralized letter of credit facility (the "RCT Letter of Credit Facility" and, collectively with the Revolving Credit Facility, the Term Loan Facility, the Delayed-Draw Term Facility, and the General Letter of Credit Facility, the "DIP Facility") in an aggregate stated amount of up to $1,100,000,000.  All references herein to the DIP Order and DIP Credit Agreement shall be to the form of such order and agreement as they exist as of the date hereof and without regard to any future amendment, restatement, or other modification thereof.

F.    *TCEH Debtors' Stipulations*.  After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties in interest as described in paragraph 13 herein, the TCEH Debtors stipulate and agree that (collectively, paragraphs F(i) through (v) below are referred to herein as the "TCEH Debtors' Stipulations," which are not findings of the Court):

(i)    *TCEH First Lien Debt*.

(a)    First Lien Credit Agreement.    Pursuant to that certain credit agreement dated as of October 10, 2007 (as amended, modified, or supplemented and in effect immediately prior to the Petition Date, the "First Lien Credit Agreement"), among TCEH, as borrower, EFCH, as successor to Energy Future Competitive Holdings Company, as parent guarantor, certain of TCEH's subsidiaries, including 4Change Energy Company, 4Change Energy Holdings LLC, Big Brown 3 Power Company LLC, Big Brown Lignite Company LLC, Big Brown Power Company LLC, Collin Power Company LLC, Decordova Power Company LLC, Decordova II Power Company LLC, Eagle Mountain Power Company LLC, Generation MT Company LLC, Generation SVC Company, Lake Creek 3 Power Company LLC, Luminant Big Brown Mining Company LLC, Luminant Energy Company LLC, Luminant Energy Trading California Company, Luminant ET Services Company, Luminant Generation Company LLC, Luminant Holding Company LLC, Luminant Mineral Development Company LLC, Luminant Mining Company LLC, Luminant Renewables Company LLC, Martin Lake 4 Power Company LLC, Monticello 4 Power Company LLC, Morgan Creek 7 Power Company, NCA Resources Development Company LLC, Oak Grove Management Company LLC, Oak Grove Mining Company LLC, Oak Grove Power Company LLC, Sandow Power Company LLC, TCEH Finance, Inc., Tradinghouse 3 & 4 Power Company LLC, Tradinghouse Power Company LLC, TXU Energy Retail Company LLC, TXU Energy Solutions Company LLC, TXU Retail Services Company, TXU SEM Company, Valley NG Power Company LLC, and Valley Power Company LLC, as subsidiary guarantors (collectively, the "Subsidiary Guarantors"), the First Lien Administrative Agent (as defined below), the First Lien Collateral Agent, and the lenders that are parties thereto from time to time (the "First Lien Lenders"), TCEH borrowed approximately $24.5 billion prior to the Petition Date (which amount does not reflect the current outstanding

balance).  As of the Petition Date, the TCEH Debtors were truly and justly indebted to the First

Lien Lenders pursuant to the First Lien Credit Agreement, without defense, counterclaim, or

offset of any kind, in the aggregate principal amount of $22,635,987,924 plus accrued and

unpaid interest with respect thereto (which, as of the Petition Date, was $227,267,242) and any

additional fees, costs, and expenses (including any attorneys', financial advisors', and other

professionals' fees and expenses that are chargeable or reimbursable under the First Lien Credit

Agreement) and all other Obligations (as defined in the First Lien Credit Agreement) owing

under or in connection with the First Lien Credit Agreement, including, without limitation, any

and all obligations owing to the First Lien Credit Agent (as defined below).  The "First Lien

Administrative Agent" shall mean Citibank, N.A., as administrative agent, until a successor shall

replace it, and thereafter shall mean such successor.  The "First Lien Collateral Agent" shall

mean Citibank, N.A., as collateral agent, until a successor shall replace it, and thereafter shall

mean such successor.  The "First Lien Credit Agent" shall mean the First Lien Administrative

Agent and the First Lien Collateral Agent, collectively.

(b)    First Lien Notes.  Pursuant to that certain indenture (the "First Lien

Notes Indenture," and, together with all other loan documents, security documents (including,

without limitation, the "Security Documents" as defined in the First Lien Credit Agreement and

the First Lien Notes Indenture), and any other documents or instruments related to, referenced in,

or executed in connection with the First Lien Credit Agreement or the First Lien Notes

Indenture, the "First Lien Facilities"), dated April 19, 2011, for the 11.50% senior secured notes

(the "First Lien Notes") due October 1, 2020, by and among TCEH and TCEH Finance, Inc., as

issuers, BOKF, N.A., as indenture trustee (the "First Lien Notes Trustee," and together with the

First Lien Credit Agent, the "Prepetition First Lien Agents"), and EFCH and the Subsidiary

Guarantors, as guarantors, TCEH and TCEH Finance, Inc. issued $1.75 billion in principal amount of the First Lien Notes. As of the Petition Date, the TCEH Debtors were truly and justly indebted to the holders of the First Lien Notes pursuant to the First Lien Notes Indenture, without defense, counterclaim, or offset of any kind, in the aggregate principal amount of $1,750,000,000 plus accrued and unpaid interest with respect thereto and any additional fees, costs, and expenses (including any attorneys', financial advisors', and other professionals' fees and expenses that are chargeable or reimbursable under the First Lien Notes Indenture) and all other Obligations (as defined in the First Lien Notes Indenture) owing under or in connection with the First Lien Notes Indenture.

       (c)     First Lien Hedges and Swaps. The TCEH Debtors are also party to: (i) Secured Commodity Hedge and Power Sales Agreements (as defined in the First Lien Intercreditor Agreement (as defined below)) with the respective counterparties thereto (each, a "Hedge Counterparty," and such commodity hedges, the "First Lien Commodity Hedges"); and (ii) Secured Hedging Agreements (as defined in the First Lien Intercreditor Agreement) with the respective counterparties thereto (each, a "Swap Counterparty," and such interest rate swaps, the "First Lien Interest Rate Swaps"). The "Prepetition First Lien Creditors" shall mean the First Lien Lenders, together with the First Lien Credit Agent, all other "Secured Parties" (as defined in the First Lien Credit Agreement or the First Lien Intercreditor Agreement), the First Lien Notes Trustee, the holders of the First Lien Notes, each Hedge Counterparty and each Swap Counterparty. The "Prepetition First Lien Documents" shall mean the First Lien Facilities, the First Lien Commodity Hedges, the First Lien Interest Rate Swaps, the First Lien Intercreditor Agreement, and all other loan documents, security documents, and any other documents or instruments related to, referenced in, or executed in connection with such agreements.

(d)     Prepetition First Lien Obligations.    The "Prepetition First Lien Obligations" shall mean all of the obligations under the Prepetition First Lien Documents (collectively, the "First Lien Debt"), together with any amounts paid, incurred, or accrued prior to the Petition Date in accordance with the Prepetition First Lien Documents, principal, accrued and unpaid interest, any fees, expenses, and disbursements (including, without limitation, attorneys' fees, related expenses, and disbursements), indemnities, contingent obligations, reimbursement obligations, "Hedging Obligations" owed to Secured Parties (as defined in the First Lien Intercreditor Agreement), obligations with respect to any "Loan," "Letter of Credit," "Deposit L/C Obligation," or under any "Secured Cash Management Agreement," "Secured Commodity Hedging Agreement," or "Secured Hedging Agreement" (each as defined in the First Lien Credit Agreement), indemnification obligations, and other payments, charges, or liabilities of whatever nature, whether or not contingent, whenever arising, due, or owing in respect thereof to the extent and as provided for in the Prepetition First Lien Documents, including all "Obligations" as defined in each of the First Lien Credit Agreement and First Lien Notes Indenture.

(e)     First Lien Collateral.    The Prepetition First Lien Obligations are secured by first priority security interests in and liens on (the "Prepetition First Priority Liens") the "Collateral" (the "Prepetition Collateral"), as defined in the First Lien Credit Agreement, including substantially all of the TCEH Debtors' assets, including accounts receivable and cash to the extent that such cash constitutes proceeds of other Prepetition Collateral (the "Cash Collateral").    As of the date hereof, all of the TCEH Debtors' cash, other than cash held in Account #XXXX0559 at Union Bank, N.A. (such cash, the "Segregated Cash"), constitutes Cash Collateral.    The TCEH Debtors shall maintain the Segregated Cash in a segregated account,

9

unless otherwise ordered by the Court. Notwithstanding anything to the contrary contained herein, the Prepetition First Lien Creditors reserve all rights, claims, and defenses with respect to the Segregated Cash, including as to whether such Segregated Cash constitutes Cash Collateral.

(f)    First Lien Intercreditor Agreement. The first lien intercreditor agreement (as amended, restated, modified, and supplemented from time to time, the "First Lien Intercreditor Agreement") entered into by and among the TCEH Debtors, the First Lien Credit Agent, certain Prepetition First Lien Creditors, and other parties thereto from time to time, governs, among other things: (i) payment and priority with respect to holders of claims related to the First Lien Debt; (ii) rights and remedies of the holders of First Lien Debt with respect to debtor-in-possession financing, use of cash collateral, and adequate protection in a chapter 11 case; and (iii) the priority of liens granted to holders of "Secured Obligations" under a "Secured Hedging Agreement," "Secured Cash Management Agreement," or "Secured Commodity Hedge and Power Sales Agreement" (each as defined in the First Lien Intercreditor Agreement) pursuant to ISDA master agreements, schedules, and confirmations related thereto or otherwise.

(ii)    *TCEH Second Lien Debt.*

(a)    Second Lien Notes. Pursuant to that certain indenture (the "Second Lien Notes Indenture," and together with the First Lien Facilities, the "Prepetition Secured Facilities"), dated October 6, 2010, for the 15.0% second lien notes (the "Second Lien Debt"), by and among TCEH and TCEH Finance, Inc., as issuers, Wilmington Savings Fund Society, FSB, as successor to The Bank of New York Mellon Trust Company, N.A., as indenture trustee (the "Second Lien Trustee"), The Bank of New York Mellon Trust Company, N.A., as collateral agent (including any successor thereto, the "Second Lien Collateral Agent," and together with the Second Lien Trustee, the "Second Lien Agent"), EFCH and the

10

Subsidiary Guarantors, as guarantors, TCEH and TCEH Finance, Inc. issued approximately $1.57 billion in principal amount of the Second Lien Debt. The "Prepetition Second Lien Creditors" shall mean the Second Lien Agent and the holders of Second Lien Debt. The "Prepetition Secured Creditors" shall mean the Prepetition Second Lien Creditors together with the Prepetition First Lien Creditors. The "Prepetition Secured Agents" shall mean the Prepetition First Lien Agents and the Second Lien Agent.

(b)    Prepetition Second Lien Obligations.  The "Prepetition Second Lien Obligations" shall mean all obligations under the Second Lien Debt, together with any amounts paid, incurred, or accrued prior to the Petition Date in accordance with the Second Lien Notes Indenture, principal, accrued and unpaid interest, any fees, expenses, and disbursements (including, without limitation, attorneys' fees, related expenses, and disbursements), reimbursement obligations, indemnification obligations, contingent obligations, and other charges of whatever nature, whether or not contingent, whenever arising, due, or owing in respect thereof to the extent and as provided for in the Second Lien Notes Indenture, including all "Obligations" as described in the Second Lien Notes Indenture. The "Prepetition Secured Obligations" shall mean the Prepetition First Lien Obligations together with the Prepetition Second Lien Obligations.

(c)    Second Lien Collateral.  The Prepetition Second Lien Obligations are secured by second priority liens (the "Prepetition Second Priority Liens") in the Prepetition Collateral, as set forth in that certain second lien security agreement (as amended, restated, modified, and supplemented from time to time, the "Second Lien Security Agreement"), dated as of October 6, 2010, by and among the TCEH Debtors and the Second Lien Agent.

(d)    Second Lien Intercreditor Agreement.    The second lien intercreditor agreement (as amended, restated, modified, and supplemented from time to time, the "Second Lien Intercreditor Agreement") by and among the TCEH Debtors, the Prepetition First Lien Agents, and the Second Lien Agent governs, among other things, the relative priority of the First Lien Debt and the Second Lien Debt and the relative rights and remedies of the holders of First Lien Debt and Second Lien Debt with respect to, among other things, debtor-in-possession financing, use of cash collateral, and adequate protection.  In particular, pursuant to section 6.04 of the Second Lien Intercreditor Agreement, holders of Second Lien Debt are bound by the actions and consents of the First Lien Collateral Agent, the Prepetition First Lien Agents or the Prepetition Secured Creditors under the First Lien Intercreditor Agreement with respect to any debtor-in-possession financing or use of cash collateral, and the Second Lien Agent and holders of Second Lien Debt are prohibited from objecting to such debtor-in-possession financing or use of cash collateral to the extent that the First Lien Collateral Agent, the Prepetition First Lien Agents or the Prepetition Secured Creditors consent.

(iii)    *Tex-La Obligations*.  In addition to the Prepetition Secured Obligations, EFCH is the principal obligor of, and Energy Future Holdings Corp. ("EFH Corp.") guarantees, approximately $62 million of obligations related to a series of transactions by and among the predecessors of EFH Corp. and EFCH, on the one hand, and the Tex-La Electric Cooperative of Texas, Inc. ("Tex-La"), on the other hand (such obligations, the "Tex-La Obligations"), as provided in that certain assumption agreement (the "Tex-La Assumption Agreement," and together with all related agreements, the "Tex-La Documents"), dated February 1, 1990, by and among EFCH, Tex-La, and the administrator of the Rural Utilities Service, an agency of the United States Department of Agriculture, whereby EFCH agreed to assume certain outstanding

indebtedness of Tex-La. Approximately $29 million and $33 million of the Tex-La Obligations are due in 2019 and 2021, respectively. As of the date of this Interim Order, the Tex-La Obligations are secured by a 2.17% undivided ownership in Comanche Peak's electricity generation and transmission assets and a 6.02% undivided ownership interest in the 51.5 mile 345 kV Comanche Peak-Cleburne-Everman transmission facility (the "Tex-La Collateral," and the liens on the Tex-La Collateral, the "Tex-La Liens"). The Prepetition First Priority Liens and the Prepetition Second Priority Liens were granted subject to the Tex-La Liens.

(iv)    *Validity, Perfection, and Priority of Prepetition First Priority Liens and Prepetition First Lien Obligations.* Subject to the provisions of paragraph 13 of this Interim Order, each of the TCEH Debtors acknowledges and agrees that: (a) as of the Petition Date, the Prepetition First Priority Liens are valid, binding, enforceable, non-avoidable, and properly perfected liens on and security interests in the Prepetition Collateral; (b) subject to the Tex-La Liens, as of the Petition Date, the Prepetition First Priority Liens are senior in priority over any and all other liens on the Prepetition Collateral; (c) the Prepetition First Lien Obligations constitute legal, valid, binding, and non-avoidable obligations of the TCEH Debtors; (d) no offsets, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition First Priority Liens or Prepetition First Lien Obligations exist, and no portion of the Prepetition First Priority Liens or Prepetition First Lien Obligations is subject to any challenge or defense including, without limitation, impairment, set-off, right of recoupment, avoidance, attachment, disallowance, disgorgement, reduction, recharacterization, recovery, subordination (whether equitable or otherwise), counterclaims, or cross-claims, pursuant to the Bankruptcy Code or applicable nonbankruptcy law; and (e) the TCEH Debtors and their estates have no claims, objections, challenges, causes of actions, and/or choses in action, including,

13

without limitation, "lender liability" causes of action or avoidance claims under chapter 5 of the Bankruptcy Code, whether arising under applicable state law or federal law (including, without limitation, any recharacterization, subordination, avoidance, disgorgement, recovery or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code), against the Prepetition First Lien Creditors or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon, or related to their loans under the First Lien Facilities, the Prepetition First Lien Obligations, or the Prepetition First Priority Liens.

(v)    *Satisfaction of Certain Conditions in the First Lien Intercreditor Agreement.* The terms and provisions of this Interim Order, the DIP Credit Agreement, and DIP Order satisfy the conditions set forth in Section 6.1(a)(i)-(iii) of the First Lien Intercreditor Agreement.

G.    *Adequate Protection.* The First Lien Collateral Agent, for the benefit of itself and the Prepetition First Lien Creditors, to protect such parties' interests in the Prepetition Collateral, and in exchange for consenting to the priming liens contained in the DIP Facility approved pursuant to the DIP Order, is entitled to receive adequate protection for any diminution in value of their respective interests in the Prepetition Collateral from and after the Petition Date resulting from the imposition of such priming liens and the use of Cash Collateral, the use, sale, lease, consumption, or disposition of Prepetition Collateral (which shall be valued as of the Petition Date on a going-concern basis), or the imposition of the automatic stay (collectively the "Diminution in Value") pursuant to sections 361, 362, and 363 of the Bankruptcy Code. Pursuant to sections 361, 363, 364(d)(1), and 507(b) of the Bankruptcy Code, as adequate protection, (i) the First Lien Collateral Agent, for the benefit of itself and the Prepetition First

Lien Creditors, will receive (a) the First Priority Adequate Protection Liens (as defined below) and (b) the First Priority 507(b) Claim (as defined below), and (ii) each of the First Lien Administrative Agent, the First Lien Notes Trustee, each Hedge Counterparty and each Swap Counterparty, for the benefit of themselves and the respective Prepetition First Lien Creditors for which they act as agent, will receive from the TCEH Debtors their ratable share (based on their respective Prepetition First Lien Obligations owing as of the Petition Date) of the aggregate amount of the First Lien Adequate Protection Payments (as defined below).  The Second Lien Agent will receive, for the benefit of itself and the Prepetition Second Lien Creditors, (i) the Second Priority Adequate Protection Liens (as defined below) and (ii) the Second Priority 507(b) Claim (as defined below).  Tex-La will receive Tex-La Adequate Protection Payments (as defined below) as adequate protection for the Diminution in Value of its interests in the Tex-La Collateral.  The adequate protection provided herein and other benefits and privileges contained herein are necessary to (i) protect the Prepetition Secured Creditors and Tex-La from the Diminution in Value of their interests in the Prepetition Collateral and the Tex-La Collateral (if any), respectively, and (ii) obtain the consents and agreements contained herein, including that the Adequate Protection Liens (as defined below) are subject and subordinate only to (a) the Carve Out (as defined below), (b) the RCT Reclamation Support Carve Out (as defined in the DIP Order), (c) the DIP Liens (as defined in the DIP Order), but, in the case of liens granted on account of Secured Commodity Hedging Agreements and Secured Hedging Agreements (each as defined in the DIP Credit Agreement), only to the extent such agreements constitute "Permitted Secured Commodity Hedge Agreements" under the "first day" order authorizing the TCEH Debtors to, among other things, continue performing under their hedging and trading arrangements, (d) the Permitted Prior Liens (as defined in the DIP Order), and (e) the Permitted

Liens (as defined in the DIP Credit Agreement) (such carve outs and liens set forth in clauses (a)

through (e), the "Senior Carve Outs and Liens"), and that the 507(b) Claim (as defined below) is

subject and subordinate only to the Carve Out, the RCT Reclamation Support Carve Out, and the

DIP Superpriority Claims (as defined in the DIP Order).  For the avoidance of doubt, the

Prepetition Second Lien Creditors are not entitled to any other form of adequate protection, and

are precluded from objecting to any and all aspects of this Interim Order pursuant to section 6.04

of the Second Lien Intercreditor Agreement, as discussed in paragraph F(ii)(d) above.

H.     *Sections 506(c) and 552(b)*.  In light of the Prepetition First Lien Agents' and

Prepetition First Lien Creditors' agreement to subordinate the Prepetition First Priority Liens and

the First Priority Adequate Protection Liens to the Senior Carve Outs and Liens, to subordinate

the First Priority 507(b) Claim to the Carve Out, the RCT Reclamation Support Carve Out, and

the DIP Superpriority Claims, and to permit the use of their Cash Collateral as set forth herein,

the Prepetition First Lien Creditors are entitled to the rights and benefits of section 552(b) of the

Bankruptcy Code and (i) upon entry of the Final Order, a waiver of any "equities of the case"

claims under section 552(b) of the Bankruptcy Code and (ii) upon entry of the Final Order, a

waiver of the provisions of section 506(c) of the Bankruptcy Code.

I.     *Consent by First Lien Secured Parties*.  The First Lien Collateral Agent and the

TCEH First Lien Ad Hoc Committee have consented to, conditioned on the entry of this Interim

Order, (i) the priming liens and other terms of the DIP Facility approved pursuant to the DIP

Order, (ii) the TCEH Debtors' proposed use of Cash Collateral, on the terms and conditions set

forth in this Interim Order, and (iii) the terms of the adequate protection provided for in this

Interim Order, including, without limitation, that the Adequate Protection Liens are subject and

subordinate only to the Senior Carve Outs and Liens, and that the 507(b) Claim is subject and

subordinate only to the Carve Out, the RCT Reclamation Support Carve Out, and the DIP Superpriority Claims, and such consent is binding on all Prepetition First Lien Creditors.

J.      *Necessity of Relief Requested*.  The ability of the TCEH Debtors to finance their operations and complete a successful chapter 11 reorganization requires continued use of Cash Collateral.  In the absence of the use of Cash Collateral, the continued operation of the TCEH Debtors' businesses would not be possible and immediate and irreparable harm to the TCEH Debtors, their estates, and their creditors would occur.  The TCEH Debtors do not have sufficient available sources of working capital and financing to operate their businesses in the ordinary course of business or to maintain their property without the use of Cash Collateral.  The relief requested in the Motion is therefore necessary for the continued operation of the TCEH Debtors' businesses and the preservation of their property.  The Prepetition First Lien Creditors and the TCEH Debtors have negotiated at arms' length and in good faith regarding the TCEH Debtors' use of Cash Collateral to fund the continued operation of the TCEH Debtors' businesses during the Specified Period (as defined below).  Entry of this Interim Order is in the best interests of the TCEH Debtors and their estates.

K.      *Good Cause Shown; Best Interest*.  The TCEH Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and Local Bankruptcy Rule 4001-2.  Absent entry of this Interim Order, the TCEH Debtors' businesses, properties, and estates will be immediately and irreparably harmed.  This Court concludes that good cause has been shown and entry of this Interim Order is in the best interests of the TCEH Debtors' respective estates and creditors as its implementation will, among other things, allow for the continued operation of the TCEH Debtors' existing businesses and enhance the TCEH Debtors' prospects for a successful reorganization.

L.    *Final Hearing*.  The TCEH Debtors will seek final approval of the relief requested in the Motion pursuant to a Final Order at the Final Hearing, notice of which will be provided in accordance with paragraph 25 of this Interim Order.

M.    *Notice*.  In accordance with Bankruptcy Rules 2002, 4001(b), (c), and (d), and 9014, and the Local Bankruptcy Rules, notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the TCEH Debtors, whether by facsimile, email, overnight courier or hand delivery, to certain parties in interest, including:  (a) the Office of the U.S. Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) Citibank, N.A., in its capacity as First Lien Credit Agent under the First Lien Credit Agreement, and Wilmington Trust, N.A., upon the effectiveness of its appointment as successor First Lien Credit Agent; (d) Bank of New York Mellon Trust Company, N.A., in its capacity as indenture trustee under:  (i) the TCEH unsecured pollution control revenue bonds; and (ii) the EFCH 2037 Notes due 2037; (e) American Stock Transfer & Trust Company, LLC, in its capacity as indenture trustee under:  (i) the 9.75% EFH senior unsecured notes due 2019;  (ii) the 10.0% EFH senior unsecured notes due 2020; (iii) the 10.875% EFH LBO senior unsecured notes due 2017; (iv) the 11.25%/12.0% EFH LBO toggle notes due 2017; (v) the 5.55% EFH legacy notes (series P) due 2014; (vi) the 6.50% EFH legacy notes (series Q) due 2024; and (vii) the 6.55% EFH legacy notes (series R) due 2034; (f) Computershare Trust Company, N.A. and Computershare Trust Company of Canada, in their capacities as indenture trustee under:  (i) the 11.0% EFIH senior secured second lien notes due 2021; and (ii) the 11.75% EFIH senior secured second lien notes due 2022; (g) UMB Bank, N.A. in its capacity as indenture trustee under:  (i) the 9.75% EFIH senior unsecured notes due 2019; and (ii) the 11.25%/12.25% EFIH senior

toggle notes due 2018; (h) BOKF, NA, dba Bank of Arizona, in its capacity as indenture trustee under 11.50% TCEH senior secured notes due 2020; (i) CSC Trust Company of Delaware in its capacity as indenture trustee under:  (i) the 6.875% EFIH senior secured notes due 2017; and (ii) the 10.0% EFIH senior secured notes due 2020; (j) Law Debenture Trust Company of New York in its capacity as indenture trustee under:  (i) the 10.25% TCEH senior unsecured notes due 2015; and (ii) the 10.50%/11.25% TCEH senior toggle notes due 2016; (k) Wilmington Savings Fund Society, FSB in its capacity as indenture trustee under the 15.0% TCEH senior secured second lien notes due 2021; (l) counsel to certain holders of claims against the Debtors regarding each of the foregoing described in clauses (c) through (k); (m) the agent for the TCEH debtor-in-possession financing facility and counsel thereto; (n) the agent for the EFIH debtor-in-possession financing facility and counsel thereto; (o) counsel to certain holders of equity in Texas Energy Future Holdings Limited Partnership; (p) counsel to Oncor; (q) the SEC; (r) the Internal Revenue Service; (s) the Office of the United States Attorney for the District of Delaware; (t) the Office of the Texas Attorney General on behalf of the PUC; (u) counsel to ERCOT; (v) the RCT; (w) the counterparties to the First Lien Commodity Hedges and First Lien Interest Rate Swaps; and (x) counsel to the unofficial committee of certain TCEH first lien debt holders (the "TCEH First Lien Ad Hoc Committee"), Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019, Attn:  Alan W. Kornberg, Esq. and Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 King Street, Wilmington, Delaware 19801, Attn: Pauline K. Morgan, Esq.  The parties have made reasonable efforts to afford the best notice possible under the circumstances to permit the relief set forth in this Interim Order, and no other or further notice is or shall be required.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.    _Motion Granted._ The Motion is granted on an interim basis as set forth herein, and the use of Cash Collateral on an interim basis is authorized, subject to the terms of this Interim Order.

2.    _Objections Overruled._ All objections to the Motion to the extent not withdrawn or resolved are overruled. This Interim Order shall become effective immediately upon its entry.

3.    _Authorization to Use Cash Collateral._

(a)    _Specified Period._ Subject to the terms and conditions of this Interim Order, the TCEH Debtors are authorized to use Cash Collateral for the period (the "_Specified Period_") from the Petition Date through the date which is the earliest to occur of (i) the expiration of the Remedies Notice Period (as defined herein), (ii) entry of the Final Order, or (iii) 45 days from the Petition Date.

(b)    _Use of Cash Collateral._ Subject to the provisions of this Interim Order, Cash Collateral may be used during the Specified Period by the TCEH Debtors to: (i) finance any and all working capital needs solely of the TCEH Debtors and for any other general corporate purposes of the TCEH Debtors (and not for or by any other affiliated entities) including, without limitation, to provide collateral for Letters of Credit (as defined in the DIP Credit Agreement) for general corporate purposes required in the ordinary course of the TCEH Debtors' business, (x) to provide collateral support in respect of financial or physical trading transactions incurred in the ordinary course of the TCEH Debtors' business, including commodities transactions, (y) to honor intercompany obligations incurred in the ordinary course

20

of the TCEH Debtors' business and to act consistently with the TCEH Debtors' existing cash management practices that have been utilized in the ordinary course of business to date under present collateral agreement(s), but in each case only to the extent permitted under the "first day" order authorizing the TCEH Debtors to, among other things, continue using their existing cash management system (as otherwise amended or modified with the reasonable consent of the TCEH First Lien Ad Hoc Committee, the "Cash Management Order"), and (z) to comply with any legal and/or regulatory requirements of governmental and quasi-governmental entities (including for posting bonds and remediation or reclamation obligations of any nature (such as with the Railroad Commission of Texas, but only after the TCEH Debtors have utilized any amounts available under the DIP Facility for the purpose of satisfying bonding requirements of the Railroad Commission of Texas), complying with any statutory or regulatory requirements and for self-bonding in respect of permits and licenses) of the TCEH Debtors; and (ii) pay related transaction costs, fees, liabilities and expenses (including all professional fees and expenses) and other administration costs incurred in connection with and for the benefit of the TCEH Debtors' chapter 11 cases (including Adequate Protection Payments (defined below)) and the commitment, negotiation, syndication, documentation (including any commitment letters), execution, and closing of the DIP Facility. Notwithstanding anything herein to the contrary, the TCEH Debtors shall not be permitted to transfer any Cash Collateral to, or use any Cash Collateral to make payments or other transfers on behalf of, any of the Debtors other than the TCEH Debtors; provided, however, that the foregoing shall not restrict intercompany payments and other transfers of Cash Collateral pursuant to the Shared Services Agreement, Tax Sharing Agreement, and subleases of property from any Specified Affiliate to the Borrower or any of the Restricted Subsidiaries, to the Specified Affiliates (all as defined in the DIP Credit Agreement),

but only to the extent that such payments or other transfers are permitted under the Cash Management Order.

4.    <u>Consent to Priming Liens</u>.   Subject to the terms of this Interim Order, the Prepetition Secured Creditors are deemed to have consented to the imposition of the priming liens contained in the DIP Credit Agreement approved pursuant to the DIP Order.

5.    <u>Adequate Protection</u>.  The Prepetition Secured Creditors are entitled pursuant to sections 361, 363(c), and 364 of the Bankruptcy Code to adequate protection of their interests in the Prepetition Collateral (including Cash Collateral) to the extent of any Diminution in Value of their interests in the Prepetition Collateral (which shall be valued as of the Petition Date on a going-concern basis).  The First Lien Collateral Agent and the Second Lien Agent, in each case, on behalf of themselves and for the benefit of each of the respective Prepetition Secured Creditors for which they act as agent, are hereby granted, as applicable, to the extent of any Diminution in Value of their interests in the Prepetition Collateral from and after the Petition Date, the following:

(a)    <u>Adequate Protection Liens</u>.  As adequate protection of the interests of the Prepetition Secured Creditors in the Prepetition Collateral against any Diminution in Value of such interests, pursuant to sections 361 and 363(e) of the Bankruptcy Code, the TCEH Debtors are authorized to, and as of entry of this Interim Order are deemed to have granted, to the First Lien Collateral Agent and the Second Lien Agent, for the benefit of themselves and each of the Prepetition Secured Creditors for which they act as agent, additional and replacement continuing valid, binding, enforceable, non-avoidable, and automatically perfected postpetition security interests in and liens on (together, the "<u>Adequate Protection Liens</u>") the "DIP Collateral" (as defined in the DIP Order), whether now owned or hereafter acquired or existing wherever

located, of each TCEH Debtor and TCEH Debtor's "estate" (as created pursuant to section 541(a) of the Bankruptcy Code), including the Segregated Cash; provided, however, that the DIP Collateral shall exclude the TCEH Debtors' claims and causes of action under chapter 5 of the Bankruptcy Code (other than causes of action arising under section 549 of the Bankruptcy Code and any related action under section 550 of the Bankruptcy Code), or any other avoidance actions under the Bankruptcy Code (collectively, "Avoidance Actions"), but subject only to, and effective upon, entry of the Final Order, shall include any proceeds or property recovered, unencumbered, or otherwise the subject of successful Avoidance Actions, whether by judgment, settlement, or otherwise.  The Adequate Protection Liens shall rank in the same relative priority and right as do the respective security interests and liens of the respective Prepetition Secured Facilities as of the Petition Date and shall be subject and subordinate only to the Senior Carve Outs and Liens.  The Adequate Protection Liens granted to the First Lien Collateral Agent, for the benefit of itself and the Prepetition First Lien Creditors (collectively, the "First Priority Adequate Protection Liens") shall be *pari passu* as between the First Lien Administrative Agent, the First Lien Notes Trustee, each Hedge Counterparty and each Swap Counterparty, and the Adequate Protection Liens granted to the Second Lien Agent (the "Second Priority Adequate Protection Liens") shall be junior and subordinate to the First Priority Adequate Protection Liens, as provided in and consistent with the Second Lien Intercreditor Agreement.  The Adequate Protection Liens shall secure the Prepetition Secured Obligations to the extent of any Diminution in Value of the Prepetition Secured Creditors' interests in the Prepetition Collateral from and after the Petition Date.  The Adequate Protection Liens shall be enforceable against the TCEH Debtors, their estates, and any successors thereto, including, without limitation, any trustee or other estate representative appointed in these Cases, or any case under chapter 7 of the

Bankruptcy Code upon the conversion of any of these Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, "Successor Cases"). Except as provided herein, including, without limitation, the Senior Carve Outs and Liens, the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Cases or any Successor Cases, and the Adequate Protection Liens shall be valid and enforceable against any trustee or other estate representative appointed in any of these Cases or any Successor Cases, or upon the dismissal of any of these Cases or Successor Cases. The Adequate Protection Liens shall not be subject to sections 510, 549, or 550 of the Bankruptcy Code and, if approved in the Final Order, the Adequate Protection Liens shall not be subject to section 506(c) of the Bankruptcy Code. The Adequate Protection Liens shall be deemed legal, valid, binding, enforceable, and perfected liens, not subject to subordination, impairment, or avoidance, for all purposes in these Cases and any Successor Cases. For the avoidance of doubt, the Adequate Protection Liens shall be deemed to be effective and perfected automatically as of the Petition Date and without the necessity of the execution by the TCEH Debtors, or the filing of, as applicable, mortgages, security agreements, pledge agreements, financing statements, state or federal notices, recordings (including, without limitation, any recordings with the United States Patent and Trademark or Copyright Office), or other agreements and without the necessity of taking possession or control of any Prepetition Collateral. Except as otherwise expressly provided herein, under no circumstances shall the Adequate Protection Liens be made subordinate to the lien of any other party, no matter when arising.

(b)    Adequate Protection Superpriority Claim.    To the extent of any Diminution in Value of the interests of the Prepetition Secured Creditors in the Prepetition

Collateral (if any), the First Lien Collateral Agent and the Second Lien Agent, on behalf of themselves and the applicable Prepetition Secured Creditors for which they act as agent, shall be granted, subject to the payment of the Carve Out and the RCT Reclamation Support Carve Out, an allowed superpriority administrative expense claim pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, immediately junior to the DIP Superpriority Claims (the "507(b) Claim"), which 507(b) Claim shall be an allowed claim against each of the TCEH Debtors (jointly and severally), with priority (except as otherwise provided herein) over any and all administrative expenses and all other claims against the TCEH Debtors now existing or hereafter arising, of any kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and all other administrative expenses or other claims arising under any other provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 327, 328, 330, 331, 503(b), 507(a), 507(b), or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy, or attachment. The 507(b) Claim shall be payable and have recourse to (i) upon entry of the Final Order, the proceeds of the Avoidance Actions, and (ii) all pre- and post-petition property of the TCEH Debtors, including the Segregated Cash and any unencumbered assets, subject and subordinate only to the Carve Out, the RCT Reclamation Support Carve Out, and the DIP Superpriority Claims. The 507(b) Claim shall rank respectively among the Prepetition Secured Creditors in the same right and priority as do the respective claims thereof as of the Petition Date, provided that the Prepetition Secured Agents and Prepetition Secured Creditors shall not receive or retain any payments, property, or other amounts in respect of the 507(b) Claim granted hereunder or under the Prepetition Secured Facilities unless and until all of the DIP Obligations (as defined in the DIP Order) (excluding the Secured Hedge Obligations (as defined in the DIP Order), the Secured

Cash Management Obligations (as defined in the DIP Order), and Contingent Obligations (as defined in the DIP Credit Agreement)) have been indefeasibly paid in full, in cash, all Commitments (as defined in the DIP Credit Agreement) have been terminated, and all Letters of Credit have been cancelled (or all such Letters of Credit have been fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the applicable DIP L/C Issuers (as defined in the DIP Order)).  The 507(b) Claim granted to the First Lien Collateral Agent, for the benefit of itself and the Prepetition First Lien Creditors (collectively, the "First Priority 507(b) Claim"), shall be *pari passu* as between the First Lien Administrative Agent, the First Lien Notes Trustee, each Hedge Counterparty and each Swap Counterparty, and the 507(b) Claim granted to the Second Lien Agent (the "Second Priority 507(b) Claim") shall be immediately junior to the First Priority 507(b) Claim, as provided in and consistent with the Second Lien Intercreditor Agreement.

(c)    Fees and Expenses.  The TCEH Debtors are authorized and directed to pay, within ten (10) calendar days of delivery of an invoice (which shall include reasonable supporting detail, which may be redacted to protect privileged or confidential information), (i) all reasonable and documented fees and expenses incurred by the Prepetition First Lien Agents, including, without limitation, the reasonable and documented fees and expenses of Seward & Kissel LLP as counsel to the First Lien Credit Agent, one local counsel retained by each Prepetition First Lien Agent, and Milbank, Tweed, Hadley & McCloy LLP, solely for fees and expenses incurred as counsel to Citibank, N.A., in its capacity as current and, upon the effectiveness of its resignation, former First Lien Credit Agent), and (ii) all reasonable and documented fees and expenses incurred by the TCEH First Lien Ad Hoc Committee, including, without limitation, (A) the reasonable and documented fees and expenses of Paul, Weiss,

Rifkind, Wharton & Garrison LLP, Winstead PC, and Young Conaway Stargatt & Taylor, LLP, as counsel to the TCEH First Lien Ad Hoc Committee, (B) the reasonable and documented fees and expenses incurred by Millstein & Co., L.P. pursuant to that certain engagement letter between TCEH and Millstein & Co., L.P., dated as of February 1, 2013, as financial advisor to the TCEH First Lien Ad Hoc Committee, and (C) the reasonable and documented fees and expenses of a tax advisor and energy consultant to the TCEH First Lien Ad Hoc Committee. Payment of all such fees and expenses shall not be subject to allowance by the Court; provided, however, that the TCEH Debtors shall promptly provide copies of invoices received on account of the fees and expenses set forth above to the U.S. Trustee and counsel to any Committee appointed in the TCEH Debtors' Cases, and the Court shall have exclusive jurisdiction over any objections raised to the invoiced amount of the fees and expenses proposed to be paid, which objections may only be raised within ten (10) calendar days after delivery of an invoice(s) therefor.  In the event that within ten (10) calendar days from delivery of such invoices the TCEH Debtors, the U.S. Trustee, or counsel to the Committee raises an objection to a particular invoice, and the parties are unable to resolve such objection, the Court shall hear and determine such dispute; provided, that payment of invoices shall not be delayed based on any such objections and the relevant professional shall only be required to disgorge amounts objected to upon being "so ordered" pursuant to a final order of the Court.

(d)    Adequate Protection Payments.  Each of the First Lien Administrative Agent, the First Lien Notes Trustee, each Hedge Counterparty and each Swap Counterparty shall receive from the TCEH Debtors, for the benefit of themselves and the respective Prepetition First Lien Creditors for which they act as agent, monthly adequate protection payments (the "First Lien Adequate Protection Payments").  The aggregate amount of First Lien Adequate Protection

Payments shall be determined by applying a per annum rate equal to the LIBOR Rate (as defined in the DIP Credit Agreement) + 450 basis points to the aggregate outstanding amount of Prepetition First Lien Obligations as of the Petition Date in respect of such relevant periods ending after the Petition Date (and, for the avoidance of doubt, not at any different contract rate of interest set forth in any Prepetition First Lien Documents). Each month, each of the First Lien Administrative Agent, the First Lien Notes Trustee, each Hedge Counterparty and each Swap Counterparty, for the benefit of themselves and the respective Prepetition First Lien Creditors for which they act as agent, shall receive from the TCEH Debtors their ratable share (calculated based on the proportion that the Prepetition First Lien Obligations outstanding under each of the Prepetition First Lien Documents bears to the aggregate amount of all outstanding Prepetition First Lien Obligations) of the aggregate amount of the First Lien Adequate Protection Payments. Notwithstanding anything contained in this paragraph 5(d) to the contrary, the Prepetition First Lien Creditors reserve the right to assert claims for the payment of additional interest calculated at any other applicable rate of interest (including, without limitation, default rates), or on any other basis, provided for under the Prepetition First Lien Documents, and for the payment of any other amounts provided for in the Prepetition First Lien Documents. The First Lien Adequate Protection Payments will be calculated on a monthly basis, and be due and payable on the first business day of each month beginning in the first full month that is at least twenty-five (25) days following the Petition Date. Tex-La shall receive from the TCEH Debtors current payments of principal and interest (the "Tex-La Adequate Protection Payments," and together with the First Lien Adequate Protection Payments, the "Adequate Protection Payments") at the non-default rate provided under the Tex-La Documents, notwithstanding any acceleration provided for as a result of a chapter 11 bankruptcy filing or otherwise. Any Adequate Protection Payment shall be

28

without prejudice, and with a full reservation of rights, as to whether such payment should be recharacterized or reallocated pursuant to section 506(b) of the Bankruptcy Code as payments under the First Lien Facilities or Tex-La Documents, as applicable (whether as to principal, interest, or otherwise).

(e)     Budget and Annual Forecast Reporting.    TCEH will provide the Prepetition First Lien Agents and the professional advisors to the TCEH First Lien Ad Hoc Committee with all financial reporting to be provided under or in connection with the DIP Order and DIP Credit Agreement, including, without limitation, a statement of cash sources and uses of all free cash flow for the next full three (3)-calendar months of the TCEH Debtors (on a consolidated basis) following entry of the DIP Order, broken down by month (the "Budget"), in the form of the Initial Budget (as defined in the DIP Credit Agreement) attached to the DIP Credit Agreement as Exhibit M, including the anticipated uses of the Cash Collateral for such period, and after such three (3)-calendar month period, at the end of each fiscal quarter (or, at the election of TCEH, at the end of each calendar month or such other earlier period as may be agreed), an updated Budget for the subsequent three (3)-month period.  TCEH will also provide, the Prepetition First Lien Agents and the professional advisors to the TCEH First Lien Ad Hoc Committee, on a monthly basis, with a variance report for each calendar month (delivered no later than the end of the subsequent calendar month), (i) showing a statement of actual cash sources and uses of all free cash flow for the immediately preceding calendar month, noting therein all material variances from values set forth for such historical periods in the most recently delivered Budget, including explanations for all material variances, and (ii) certified as to its reasonableness when made by an Authorized Officer (as defined in the DIP Credit Agreement) of TCEH.  Beginning on the date 60 days after the entry of the DIP Order (and again no later

than December 1, 2014 for the business plan and operating budget covering 2015, and no later than December 1, 2015 for the business plan and operating budget covering 2016), the TCEH Debtors will provide the Prepetition First Lien Agents with the approved annual business plan and projected operating budget through the DIP Facility's stated maturity date (the "Annual Operating Forecast"), (x) which shall be broken down by month, including, without limitation, income statements, balance sheets, cash flow statements, projected capital expenditures, asset sales, a line item for total available liquidity for the period of such Annual Operating Forecast and (y) which shall set forth the anticipated uses of the DIP Facility for such period, certified as to its reasonableness when made by an Authorized Officer of TCEH. Both the Budget and the Annual Operating Forecast shall provide, among other things, for the payment of the fees and expenses relating to the DIP Facility and this Interim Order, ordinary course administrative expenses, the Adequate Protection Payments, bankruptcy-related expenses and working capital, expected issuances and renewals of Letters of Credit, and other general corporate needs; provided, however, that fees and expenses as set forth in paragraph (c) above will be due and payable, and will be paid by the TCEH Debtors whether or not consistent with the items or amounts set forth in the Budget or the Annual Operating Forecast; and provided further, that under no circumstance will the Budget or the Annual Operating Forecast be construed as a cap or limitation on the amount of those fees and expenses due and payable by the TCEH Debtors.

       (f)     Financial Covenant. For any Test Period (as defined in the DIP Credit Agreement) beginning with the Test Period ending on June 30, 2014 (the "Financial Covenant"), the ratio of (i) the Consolidated Superpriority Secured Net Debt to (ii) Consolidated EBITDA (as defined in the DIP Credit Agreement) shall not exceed (x) if the RCT Carve Out Support Rejection Notice (as defined in the DIP Credit Agreement) has not been issued and delivered on

or prior to such Test Period, 3.50 to 1.00 and (y) for all other Test Periods, 4.50 to 1.00. "Consolidated Superpriority Secured Net Debt" shall mean the indebtedness resulting from (i) outstanding principal amount of Term Loans, plus (ii) outstanding principal amount of Delayed-Draw Term Loans, plus (iii) the aggregate amount of undrawn Revolving Credit Commitments, plus (iv) the aggregate principal amount of Revolving Credit Loans then outstanding, less (v) the aggregate amount of all Unrestricted Cash, which Unrestricted Cash shall not include cash in the RCT L/C Collateral Account or General L/C Collateral Account (all as defined in the DIP Credit Agreement).

(g)     Access to Records. Upon reasonable notice, at reasonable times during normal business hours, the TCEH Debtors shall permit representatives, agents, and employees of the Prepetition First Lien Agents and the TCEH First Lien Ad Hoc Committee and its members to have reasonable access to (i) inspect the TCEH Debtors' properties, and (ii) all information (including historical information and the TCEH Debtors' books and records) and personnel, including regularly scheduled meetings as mutually agreed with senior management of the TCEH Debtors and other company advisors (during normal business hours), and the Prepetition First Lien Agents and the TCEH First Lien Ad Hoc Committee shall be provided with access to all information they shall reasonably request, subject to the restrictions of any confidentiality agreement with or other contractual legal or fiduciary obligation of confidentiality to any of the TCEH Debtors with respect to such information.

(h)     Right to Seek Additional Adequate Protection. This Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition First Lien Creditors to request further or alternative forms of adequate protection at any time or the rights of the TCEH Debtors or any other party to contest such request.

6.      _Modification of Automatic Stay_.   The automatic stay imposed under section 362(a) of the Bankruptcy Code is modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to:  (a) permit the TCEH Debtors to grant the Adequate Protection Liens and the 507(b) Claim; (b) permit the TCEH Debtors to perform such acts as the Prepetition Secured Agents or Prepetition Secured Creditors each may request in their reasonable discretion to assure the perfection and priority of the liens granted herein; (c) permit the TCEH Debtors to incur all liabilities and obligations to the Prepetition Secured Agents and Prepetition Secured Creditors under this Interim Order; and (d) authorize the TCEH Debtors to pay, and the Prepetition Secured Agents and Prepetition Secured Creditors to retain and apply, payments made in accordance with the terms of this Interim Order; _provided, however_, any stay relief with respect to the exercise of remedies shall be in accordance with paragraph 13 below or as otherwise ordered by this Court.  Notwithstanding anything to the contrary in this Interim Order, to the extent any Deposit Letters of Credit (as defined in the First Lien Credit Agreement) issued under the First Lien Facilities are drawn upon on or after the Petition Date, section 362(a) of the Bankruptcy Code is deemed modified, without further order of, or notice to, the Bankruptcy Court, to the extent necessary to permit Citibank, N.A. as the issuer of the Citibank Deposit Letters of Credit (as defined in the First Lien Credit Agreement), to withdraw or cause to be withdrawn amounts from the Citibank Deposit L/C Loan Collateral Account (as defined in the First Lien Credit Agreement) and apply such amounts to satisfy any outstanding reimbursement obligations in respect of such Deposit Letter of Credit owing to Citibank, N.A., as Deposit Letter of Credit Issuer (as defined in the First Lien Credit Agreement).  Notwithstanding anything to the contrary in this Interim Order or otherwise, the Deposit Letter of Credit Issuer shall honor any and all draws made from time to time in

accordance with terms of the applicable Deposit Letters of Credit. Notwithstanding anything to the contrary in this Interim Order or any rights granted or action taken pursuant hereto or pursuant to the agreements and transactions approved hereby, any and all rights and priorities of the First Lien Lenders holding Deposit L/C Loans (as defined in the First Lien Credit Agreement) (the "Deposit L/C Lenders") in or to the Deposit L/C Loan Collateral Account (as defined in the First Lien Credit Agreement) or any cash therein or proceeds thereof (including amounts corresponding to undrawn Deposit Letters of Credit, and to drawn Deposit Letters of Credit if and to the extent any such amounts are returned to the TCEH Debtors), whether held by the TCEH Debtors or in which the TCEH Debtors otherwise have an interest as of the Petition Date or thereafter (the "Deposit L/C Loan Collateral"), shall be preserved, including, without limitation, any and all priorities among the First Lien Lenders or as between the Deposit L/C Lenders and the other First Lien Lenders, and any and all rights, claims, and liens granted or provided by or through this Interim Order to the First Lien Lenders, to the extent applicable to any Deposit L/C Loan Collateral, shall have the same priorities, if any, among the First Lien Lenders, and as between the Deposit L/C Lenders and the other First Lien Lenders, as existed in the Deposit L/C Loan Collateral as of the Petition Date. For the avoidance of doubt, the preceding sentence delineates the rights and priorities (if any) among the First Lien Lenders or as between the Deposit L/C Lenders and the other First Lien Lenders only, and in no way affects the DIP Agent, the DIP Lenders, or the DIP L/C Issuers (each, as defined in the DIP Order) or their rights and priorities with respect to the First Lien Lenders, the Deposit L/C Lenders, or the Deposit L/C Loan Collateral.

      7.    <u>Grant and Perfection of Adequate Protection Liens</u>. This Interim Order shall be sufficient and conclusive evidence of the granting, attachment, validity, perfection,

enforceability, and priority of the Adequate Protection Liens without the necessity of obtaining, filing, executing, or recording any financing statement, security agreement, vehicle lien application, patent filing, trademark filing, copyright filing, fixture filing, mortgage, notice, or other instrument or document that may otherwise be required under the law or regulation of any jurisdiction or the taking of possession of, or control over, assets, or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement and any other action required to obtain "control" pursuant to section 9-104, 9-105, 9-106, and/or 9-107 of the Uniform Commercial Code) to grant, attach, validate or perfect (in accordance with applicable nonbankruptcy law) the Adequate Protection Liens, or to entitle the Prepetition Secured Agents and Prepetition Secured Creditors to the priorities granted herein. Notwithstanding the foregoing, the First Lien Collateral Agent and the Second Lien Agent are each authorized, but not required, to file such financing statements, security agreements, vehicle lien applications, patent filings, trademark filings, copyright filings, fixture filing, mortgages, notices of liens, and other instruments or similar documents as may be necessary or desirable to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the Adequate Protection Liens, and all such financing statements, security agreements, vehicle lien applications, patent filings, trademark filings, copyright filings, fixture filings, mortgages, notices of lien, and other documents shall be deemed to have been filed or recorded as of the Petition Date; provided, however, that no such filing or recordation shall be necessary or required in order to create, evidence, or perfect the Adequate Protection Liens.  The TCEH Debtors are authorized and directed to execute and deliver promptly upon demand to the First Lien Collateral Agent and the Second Lien Agent all such financing statements, security agreements, vehicle lien applications, mortgages, notices, instruments, and other documents as

34

the First Lien Collateral Agent or the Second Lien Agent may reasonably request. The First Lien Collateral Agent or the Second Lien Agent may file a copy of this Interim Order as a financing statement or notice with any filing or recording office or with any registry of deeds or similar office, in addition to, or in lieu of, such financing statements, mortgages, notices of lien, instrument, or similar document. In furtherance of the foregoing and without further approval of the Court, each TCEH Debtor is authorized to do and perform all acts to make, execute, and deliver all instruments and documents and to pay all fees that may be reasonably required or necessary for the TCEH Debtors' performance hereunder.

8.  Credit Bid. Subject to the terms of the First Lien Intercreditor Agreement, the First Lien Collateral Agent, for the benefit of the Prepetition First Lien Creditors, shall have the right to credit bid under section 363(k) of the Bankruptcy Code all or any portion of their respective claims in connection with a sale of the TCEH Debtors' assets under section 363 of the Bankruptcy Code or under a chapter 11 plan of reorganization for any or all of the TCEH Debtors; provided, however, that if the Court shall enter a final order sustaining any challenge to the validity, enforceability, or allowability of all or any portion of the Prepetition First Lien Obligations (a "Challenge Order"), then upon entry of such Challenge Order and solely with respect to such portion of the Prepetition First Lien Obligations that are subject to such Challenge Order, the rights set forth in this paragraph 8 shall be subject to any limitations on credit bidding set forth in the Challenge Order.

9.  Events of Default. The occurrence and continuance of any of the following events, unless waived in writing by the First Lien Collateral Agent (with the consent or at the direction of the Required Secured Parties), shall constitute an event of default (collectively, the "Events of Default"):

(a)     the failure to obtain a Final Order in form and substance reasonably acceptable to the First Lien Collateral Agent and the TCEH First Lien Ad Hoc Committee within 45 days after the Petition Date;

(b)     the TCEH Debtors shall have filed a motion seeking to create any postpetition liens or security interests, other than those granted or permitted pursuant to the DIP Order, any order of this Court approving the DIP Facility on a final basis, the Secured Commodity Hedging Agreements, Secured Hedging Agreements, Secured Cash Management Agreements, or this Interim Order;

(c)     the TCEH Debtors shall have breached the Financial Covenant set forth in paragraph 5(f) of this Interim Order;

(d)     the entry of a final order by the Court, other than this Interim Order, granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (i) to allow any creditor to execute upon or enforce a lien on or security interest in any Collateral, or (ii) with respect to any lien of or the granting of any lien on any Collateral to any state or local environmental or regulatory agency or authority, which in either case would exceed an aggregate value of $150,000,000;

(e)     the Court shall enter an order approving any claims for recovery of amounts under section 506(c) of the Bankruptcy Code or otherwise arising from the preservation of any Prepetition Collateral;

(f)     an Event of Default under the DIP Order or the DIP Credit Agreement that has not been waived or cured in accordance with the DIP Order or DIP Credit Agreement, respectively;

(g)     the TCEH Debtors shall commence or join in as an adverse party in any suit or other proceeding against any of the Prepetition First Lien Agents or Prepetition First Lien Creditors relating to the Prepetition First Lien Obligations or Prepetition Collateral, including any proceeding seeking to avoid or require repayment of any Adequate Protection Payments;

(h)     reversal, amendment, supplement, vacatur, or modification (without the express prior written consent of the First Lien Collateral Agent (with the consent or at the direction of the Required Secured Parties and the TCEH First Lien Ad Hoc Committee) of this Interim Order;

(i)     the entry of a final order by the Court avoiding or requiring repayment of any portion of the Adequate Protection Payments made by the TCEH Debtors hereunder;

(j)     dismissal of these Cases or conversion of these Cases to chapter 7 cases, or appointment of a trustee, receiver, interim receiver, or manager, or appointment of a responsible officer or examiner with enlarged powers in any of these Cases (having powers beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4));

(k)     the TCEH Debtors' exclusive right to file and solicit acceptances of a plan of reorganization is terminated or terminates, unless such exclusivity expires after the TCEH Debtors have filed a plan of reorganization with the Court, in form and substance satisfactory to the TCEH First Lien Ad Hoc Committee, and are proceeding in good faith toward confirmation and consummation, which shall not be an Event of Default;

(l)     the failure to make Adequate Protection Payments or other material payments as set forth herein when due and such failure shall remain unremedied for more than five (5) business days after receipt by the TCEH Debtors of written notice thereof from any of

the First Lien Administrative Agent, the First Lien Notes Trustee, any Hedge Counterparty or any Swap Counterparty; and

(m)    the failure by the TCEH Debtors to perform, in any respect, any of the material terms, provisions, conditions, or obligations under this Interim Order and such failure shall continue unremedied for more than five (5) days after receipt by the TCEH Debtors of written notice thereof from any of the Prepetition First Lien Agents, any Hedge Counterparty or any Swap Counterparty.

10.    <u>Rights and Remedies Upon Event of Default</u>.  Upon occurrence of an Event of Default and following the giving of five (5) business days' notice to the TCEH Debtors (the "<u>Remedies Notice Period</u>"), the Prepetition First Lien Agents and the Prepetition First Lien Creditors may exercise the remedies available to them under this Interim Order and applicable non-bankruptcy law, including, but not limited to, terminating the TCEH Debtors' right to use Cash Collateral and collecting and applying any proceeds of the Prepetition Collateral in accordance with the terms of this Interim Order and the Prepetition First Lien Documents; <u>provided</u>, <u>however</u>, that the Prepetition First Lien Agents and the Prepetition First Lien Creditors shall not foreclose on or otherwise exercise remedies against any of the Prepetition Collateral while the DIP Lenders are continuing to pursue enforcement remedies against such Prepetition Collateral after the DIP Agent has given notice to the TCEH Debtors that an Event of Default (as defined in the DIP Order) has occurred upon termination of the TCEH Debtors' use of Cash Collateral; <u>provided</u> <u>further</u>, <u>however</u>, that nothing in this paragraph 10 shall prohibit the Prepetition First Lien Agents or the Prepetition First Lien Creditors from terminating the TCEH Debtors' use of Cash Collateral at the end of the Remedies Notice Period in accordance with the terms of this Interim Order.  During the Remedies Notice Period, the TCEH Debtors may (a)

request that this Court order the continued use of Cash Collateral pursuant to an order in form and substance satisfactory to the Left Lead Arrangers (as defined in the DIP Credit Agreement) and/or challenge whether an Event of Default has occurred and/or is continuing and (b) continue to use Cash Collateral in the ordinary course of business, consistent with past practices and the most recently delivered Budget, but may not enter into any transactions or arrangements (including, without limitation, the incurrence of indebtedness or liens, investments, restricted payments, asset sales, or transactions with non-Debtor affiliates) that are not in the ordinary course of business; provided that nothing in this paragraph 10 or in paragraph 14 shall limit the ability of the TCEH Debtors to use DIP Collateral, including Cash Collateral, during the Remedies Notice Period to seek use of Cash Collateral on a nonconsensual basis and/or to challenge whether an Event of Default has occurred and/or is continuing.  Unless the Court orders otherwise during the Remedies Notice Period, at the end of the Remedies Notice Period, the TCEH Debtors shall no longer have the right to use or seek to use Cash Collateral, the automatic stay pursuant to section 362 of the Bankruptcy Code shall be automatically terminated without further notice to, or order of, the Court, and the Prepetition First Lien Agents and the Prepetition First Lien Creditors shall be permitted to exercise all rights and remedies set forth in this Interim Order and the Prepetition First Lien Documents, and as otherwise available at law without further order or application or motion to the Court, and without restriction or restraint by any stay under section 362 or 105 of the Bankruptcy Code.  Notwithstanding anything herein to the contrary, the automatic stay pursuant to section 362 of the Bankruptcy Code shall be automatically terminated for the purposes of giving any notice contemplated hereunder.  The delay or failure to exercise rights and remedies under this Interim Order or any Prepetition First

Lien Documents shall not constitute a waiver of the Prepetition First Lien Creditors' rights thereunder or otherwise.

11.    Carve Out. As used in this Interim Order, "Carve Out" shall have the meaning provided in the DIP Order. For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order, in the Prepetition Secured Facilities, or in any other prepetition indebtedness agreements, the Carve Out shall be senior to all liens securing the Prepetition Secured Obligations, the Tex-La Obligations, the Adequate Protection Liens, the 507(b) Claim, and any and all other forms of adequate protection, liens, or claims securing the Prepetition First Lien Obligations granted or recognized as valid hereunder, including the liens and security interests granted to the Prepetition First Lien Creditors (including all security agreements, pledge agreements, mortgages, deeds of trust, and other security documents executed by any of the TCEH Debtors in favor of any of the Prepetition First Lien Agents, any Hedge Counterparty or any Swap Counterparty under the Prepetition First Lien Documents, for their benefit or for the benefit of any secured party under or in connection with the Prepetition First Lien Documents).

12.    RCT Reclamation Support Carve Out. Notwithstanding any provision of the DIP Documents (as defined in the DIP Order) or this Interim Order to the contrary, for the sake of clarity, with respect to the RCT Reclamation Support Carve Out in favor of the Railroad Commission of Texas (the "RCT") for financial assurance for Debtor Luminant Mining Company LLC's reclamation obligations, the RCT shall be entitled to up to the first $1,100,000,000 in proceeds of DIP Collateral (as defined in the DIP Order) to satisfy valid claims against the RCT Reclamation Support Carve Out, in the event such DIP Collateral is liquidated, before payment of claims of all other secured or unsecured creditors or other parties

in interest, other than the amounts subject to the professional fee carve out (which amounts are defined as the "Carve Out" in paragraph 25 of the DIP Order).

13.    <u>Reservation of Certain Committee and Third Party Rights and Bar of Challenges and Claims</u>. The stipulations and admissions contained in this Interim Order, including, without limitation, the TCEH Debtors' Stipulations, shall be binding upon the TCEH Debtors, their affiliates, and any of their respective successors (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for a TCEH Debtor) in all circumstances.    The stipulations and admissions contained in this Interim Order, including, without limitation, the TCEH Debtors' Stipulations, shall be binding upon all other parties in interest, including, without limitation, the Committee, if any, and any other person acting on behalf of the TCEH Debtors' estates, unless and to the extent that, upon three (3) days' prior written notice to the TCEH Debtors, the Prepetition First Lien Agents, and counsel to the TCEH First Lien Ad Hoc Committee, a party in interest with proper standing granted by order of the Court (or other court of competent jurisdiction) has filed an adversary proceeding or contested matter (i) within (a) with respect to any party in interest granted standing by the Court other than the Committee, 75 calendar days after entry of this Interim Order, or (b) for the Committee, if appointed and granted standing by the Court, 60 calendar days after formation, in each case subject to further extension by written agreement of the TCEH Debtors, the Prepetition First Lien Agents, the TCEH First Lien Ad Hoc Committee, and any individual Prepetition First Lien Creditor that is the subject of a Challenge (as defined below) solely with respect to the Challenge Period (as defined below) relating to such Challenge, each acting in their sole discretion (in each case, a "<u>Challenge Period</u>" and the date of expiration of each Challenge Period being a "<u>Challenge Period Termination Date</u>"), (ii) seeking to avoid, object to, or otherwise challenge the findings or

41

TCEH Debtors' Stipulations regarding:   (a) the validity, enforceability, extent, priority, or perfection of the mortgages, security interests, and liens of any Prepetition First Lien Agent or Prepetition First Lien Creditor; or (b) the validity, enforceability, allowability, priority, secured status, or amount of the Prepetition First Lien Obligations (any such claim, a "Challenge") and (iii) there is a final order entered in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter.   Upon the expiration of the Challenge Period Termination Date without the filing of a Challenge (or if any such Challenge is filed and overruled):  (a) any and all such Challenges by any party (including, without limitation, the Committee, any chapter 11 trustee, and/or any examiner or other estate representative appointed or elected in these Cases, and any chapter 7 trustee and/or examiner or other estate representative appointed or elected in any Successor Case) shall be deemed to be forever waived, released, and barred; (b) the Prepetition First Lien Obligations shall constitute allowed claims, not subject to counterclaim, setoff, recoupment, reduction, subordination, recharacterization, defense, or avoidance for all purposes in the TCEH Debtors' Cases and any subsequent chapter 7 cases; (c) the Prepetition First Priority Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding and perfected, not subject to recharacterization, subordination, or avoidance; and (d) all of the TCEH Debtors' stipulations and admissions contained in this Interim Order, including, without limitation, the TCEH Debtors' Stipulations, and all other waivers, releases, affirmations, and other stipulations as to the priority, extent, and validity as to the Prepetition First Lien Agents' and Prepetition First Lien Creditors' claims, liens, and interests contained in this Interim Order shall be of full force and effect and forever binding upon the TCEH Debtors, the TCEH Debtors' bankruptcy estates, and all creditors, interest holders, and other parties in interest in these Cases and any Successor Cases.   If any such adversary

42

proceeding or contested matter is timely filed, the stipulations and admissions contained in this Interim Order, including the TCEH Debtors' Stipulations, shall nonetheless remain binding and preclusive on any Committee and any other person or entity except to the extent that such stipulations and admissions were expressly challenged in such adversary proceeding or contested matter prior to the Challenge Period Termination Date. Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including any Committee appointed in these Cases, standing or authority to pursue any cause of action belonging to the TCEH Debtors or their estates, including, without limitation, any Challenges with respect to the First Lien Facilities or the Prepetition First Lien Obligations, and an order of the Court conferring such standing on a Committee or other party-in-interest shall be a prerequisite for the prosecution of a Challenge by the Committee or such other party-in-interest.

14.    <u>Limitations on the Use of Cash Collateral</u>. Notwithstanding anything herein to the contrary, except paragraph 10 with respect to the ability of the TCEH Debtors to use DIP Collateral, including Cash Collateral, solely during the Remedies Notice Period to seek use of Cash Collateral on a nonconsensual basis and/or to challenge whether an Event of Default has occurred and/or is continuing, the TCEH Debtors shall not assert or prosecute, and no portion of the proceeds of the DIP Facility, the DIP Collateral, the Prepetition Collateral, including Cash Collateral, or the Carve Out, and no disbursements set forth in the Budget, may be used for the payment of professional fees, disbursements, costs, or expenses incurred by any person in connection with (a) incurring Indebtedness (as defined in the DIP Credit Agreement) except to the extent permitted under the DIP Credit Agreement; (b) preventing, hindering, or delaying any of the DIP Agent's, the DIP Lenders', the DIP L/C Issuers', the Prepetition First Lien Agents', or the Prepetition First Lien Creditors' (in the case of each of the foregoing, in their respective

capacities as such) enforcement or realization upon, or exercise of rights in respect of, any of the DIP Collateral or the Prepetition Collateral once an Event of Default has occurred and after the Remedies Notice Period; (c) objecting, challenging, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the DIP Liens, the Prepetition First Lien Obligations, the Prepetition First Priority Liens, or the Prepetition Collateral (including Cash Collateral), or any other rights or interest of any of the DIP Agent, the DIP Lenders, the DIP L/C Issuers, the Secured Hedge Banks, the Secured Cash Management Banks, the Prepetition First Lien Agents, or the Prepetition First Lien Creditors (in the case of each of the foregoing, in their respective capacities as such); (d) asserting, commencing, or prosecuting any claims or causes of action, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against any of the DIP Agent, the DIP Lenders, the DIP L/C Issuers, the Secured Hedge Banks, the Secured Cash Management Banks, the Prepetition First Lien Agents, the Prepetition First Lien Creditors, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, or employees (in the case of each of the foregoing, in their respective capacities as such); or (e) asserting, joining, commencing, supporting, investigating, or prosecuting any action for any claim, counter-claim, action, cause of action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the material interests of the Released Parties (as defined in the DIP Order) or the Prepetition First Lien Creditors, arising out of, in connection with, or relating to the DIP Facility, the DIP Documents, the Prepetition First Lien Documents, or the transactions contemplated thereunder, including, without limitation, (i) any action arising under the Bankruptcy Code; (ii) any so-called "lender liability" claims and causes of action; (iii) any action with respect to the validity and

44

extent of the DIP Obligations, the DIP Superpriority Claims, or the Prepetition First Lien Obligations, or the validity, extent, perfection, and priority of the DIP Liens or the Prepetition First Priority Liens; (iv) any action seeking to invalidate, set aside, avoid, reduce, set off, offset, recharacterize, subordinate (whether equitable, contractual, or otherwise), recoup against, disallow, impair, raise any defenses, cross-claims, or counterclaims, or raise any other challenges under the Bankruptcy Code or any other applicable domestic or foreign law or regulation against, or with respect to, the DIP Liens, the DIP Superpriority Claims, or the Prepetition First Priority Liens, in whole or in part; (v) appeal or otherwise challenge the DIP Order, any order of this Court approving the DIP Facility on a final basis, the DIP Documents, or any of the transactions contemplated therein; and/or (vi) any action that has the effect of preventing, hindering, or delaying (whether directly or indirectly) the DIP Agent, the DIP Lenders, and the DIP L/C Issuers in respect of their liens and security interests in the DIP Collateral or any of their rights, powers, or benefits hereunder or in the DIP Documents anywhere in the world; provided, however, that the Carve Out and such collateral proceeds and loans under the DIP Documents may be used for allowed fees and expenses, in an amount not to exceed $175,000 in the aggregate (the "Investigation Fund"), incurred solely by the Committee, if appointed, in investigating the validity, enforceability, perfection, priority, or extent of the Prepetition First Priority Liens or Prepetition Second Priority Liens during the Challenge Period; provided further, however, that the Committee may not use the Investigation Fund to initiate, assert, join, commence, support, or prosecute any actions or discovery with respect thereto. Subject to entry of the Final Order, any and all claims for fees or expenses incurred by the Committee, if appointed, or by any party in interest in violation of any clause of this paragraph 14 (including amounts incurred in excess of the Investigation Fund) shall not be allowed, treated, or payable as an administrative expense

claim for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, and the non-payment of such fees and expenses shall not constitute grounds to deny confirmation of any plan of reorganization for any of the TCEH Debtors.

15.    No Third Party Rights.   Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

16.    Section 506(c) Claims.   Upon entry of the Final Order, no costs or expenses of administration which have been or may be incurred in these Cases at any time, or any future proceeding that may result therefrom, shall be charged against the Prepetition First Lien Agents or any Prepetition First Lien Creditor or any of their respective claims or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior express written consent of the First Lien Collateral Agent (with the consent or at the direction of the Required Secured Parties) or applicable Prepetition First Lien Creditor, and no such consent shall be implied, directly or indirectly, from any other action, inaction, or acquiescence by any such representatives, agents, or lenders.

17.    No Waiver of Prepetition First Lien Creditors' Rights; Reservation of Rights. Notwithstanding any provision in this Interim Order to the contrary, this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, any Prepetition First Lien Creditor's rights with respect to any person or entity other than the TCEH Debtors or with respect to any other collateral owned or held by any person or entity other than the TCEH Debtors.  The rights of the Prepetition First Lien Creditors are expressly reserved and entry of this Interim Order shall be without prejudice to, and does not constitute a waiver, expressly or implicitly, of:

(a)    the Prepetition First Lien Creditors' rights under any of the Prepetition First Lien Documents;

(b)    the Prepetition First Lien Creditors' rights to seek any other or supplemental relief in respect of the TCEH Debtors;

(c)    the Prepetition First Lien Creditors' rights to seek modification of the grant of adequate protection provided under this Interim Order so as to provide different or additional adequate protection at any time; or

(a)    any other rights, claims, or privileges (whether legal, equitable, or otherwise) of the Prepetition First Lien Creditors.  Notwithstanding any other provision of this Interim Order, consistent with and solely to the extent provided in section 5.2 of the First Lien Intercreditor Agreement, no amendment, modification, waiver, supplement, termination or consent shall be made or given with respect to this Interim Order which has the effect of disproportionately disadvantaging, or otherwise discriminating against, the Hedge Counterparties relative to the other Prepetition First Lien Creditors without the prior written consent of the Required Commodity Hedge Counterparties and the Required Alternative Commodity Hedge Counterparties (each as defined in the First Lien Intercreditor Agreement), or, if less than all Hedge Counterparties are so disadvantaged or otherwise discriminated against, the prior written consent of each such Hedge Counterparty that would be materially and adversely affected thereby.

18.    <u>No Liability to Third Parties</u>.  In permitting the TCEH Debtors to use of Cash Collateral under the terms set forth herein or in taking any other actions related to this Interim Order, the Prepetition First Lien Agents and Prepetition First Lien Creditors (a) shall have no liability to any third party and shall not be deemed to be in control of the operations of any

TCEH Debtors or to be acting as a "controlling person," "responsible person," or "owner or operator" with respect to the operation or management of any TCEH Debtors (as such term, or any similar terms, are used in the Internal Revenue Code, the United States Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any similar Federal or state statute), and (b) shall not owe any fiduciary duty to any of the TCEH Debtors, their creditors, or their estates, and shall not be party to or be deemed to be party to a joint venture or partnership with any of the TCEH Debtors.

19.    No Marshaling/Applications of Proceeds. The Prepetition First Lien Agents and Prepetition First Lien Creditors shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Prepetition Collateral, as the case may be, and proceeds or payments shall be received and applied in accordance with the Prepetition First Lien Documents, including, without limitation, the First Lien Intercreditor Agreement, notwithstanding any other agreement or provision to the contrary.

20.    Section 552(b). Upon entry of the Final Order, the Prepetition First Lien Agents and Prepetition First Lien Creditors shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to any of the Prepetition First Lien Agents or Prepetition First Lien Creditors with respect to proceeds, product, offspring, or profits of any of the Prepetition Collateral.

21.    Additional Modification of Stay. To the extent the automatic stay provisions of section 362 of the Bankruptcy Code would otherwise apply, such provisions are vacated for the purposes of permitting the transfer and assignment of any liens, pledges, or security interests upon the Prepetition Collateral from Citibank, N.A. to Wilmington Trust, N.A., as successor

First Lien Administrative Agent and First Lien Collateral Agent under the First Lien Credit Agreement, the First Lien Intercreditor Agreement and the Second Lien Intercreditor Agreement. Citibank, N.A. is authorized to resign as Administrative Agent, Collateral Agent, Revolving Letter of Credit Issuer, and Deposit Letter of Credit Issuer under the First Lien Credit Agreement and the other Credit Documents (as defined in the First Lien Credit Agreement) and Financing Documents (as defined in the First Lien Intercreditor Agreement), including, without limitation, to resign as Collateral Agent under the First Lien Intercreditor Agreement, in accordance with the terms of Sections 3.6 and 12.9 of the First Lien Credit Agreement and Section 7.7 of the First Lien Intercreditor Agreement. Citibank, N.A. is authorized to appoint Wilmington Trust, N.A. to act as successor First Lien Administrative Agent and First Lien Collateral Agent under the First Lien Credit Agreement and the other Credit Documents and Financing Documents, and the TCEH Debtors are authorized and empowered to execute and deliver a successor agency agreement with Citibank, N.A. and Wilmington Trust, N.A., and to execute and deliver all instruments and documents which may be required or necessary to effectuate the resignation contemplated by this paragraph 21 or in any such successor agency agreement. For the avoidance of doubt, Citibank, N.A.'s resignation as Administrative Agent, Collateral Agent, Revolving Letter of Credit Issuer, and Deposit Letter of Credit Issuer under the First Lien Credit Agreement and the other Credit Documents and Financing Documents, including, without limitation, Citibank, N.A.'s resignation as Collateral Agent under the First Lien Intercreditor Agreement, shall in no way cause, create, or result in a lapse in perfection of the Prepetition First Priority Liens. Additionally, to the extent the automatic stay provisions of section 362 of the Bankruptcy Code would otherwise apply, such provisions are vacated for the purposes of permitting the transfer and assignment of any liens, pledges, or security interests upon the

Prepetition Collateral from The Bank of New York Mellon Trust Company, N.A. to Wilmington Savings Fund Society, FSB, as successor Second Lien Collateral Agent under the Second Lien Notes Indenture and the Second Lien Intercreditor Agreement. The Bank of New York Mellon Trust Company, N.A. is authorized to resign as Second Lien Collateral Agent and to appoint Wilmington Savings Fund Society, FSB to act as successor Second Lien Collateral Agent under the Second Lien Notes Indenture and Second Lien Intercreditor Agreement, and the TCEH Debtors are authorized and empowered to execute and deliver a successor agency agreement with The Bank of New York Mellon Trust Company, N.A. and appoint Wilmington Savings Fund Society, FSB, and to execute and deliver all instruments and documents which may be required or necessary to effectuate the resignation contemplated by this paragraph 21 or in any such successor agency agreement; provided, that The Bank of New York Mellon Trust Company, N.A.'s resignation as Second Lien Collateral Agent under the Second Lien Notes Indenture and Second Lien Intercreditor Agreement, shall in no way cause, create, or result in a lapse in perfection of the Prepetition Second Priority Liens; provided, further, that nothing herein shall be construed as allowing any claim, administrative or otherwise, of Wilmington Savings Fund Society, FSB, as successor Second Lien Collateral Agent, or entitling Wilmington Savings Fund Society, FSB to payment of professional fees and expenses.

22.    Proofs of Claim. Notwithstanding any order entered by the Court in relation to the establishment of a bar date in any of these Cases or Successor Cases to the contrary, the Prepetition First Lien Agents and Prepetition First Lien Creditors will not be required to file proofs of claim in any of these Cases or Successor Cases for any claim described herein, and the TCEH Debtors' Stipulations in paragraph F herein shall be deemed to constitute a timely filed proof of claim for the Prepetition First Lien Agents and Prepetition First Lien Creditors.

Notwithstanding the foregoing, the Prepetition First Lien Agents, for the benefit of themselves and the Prepetition First Lien Creditors, and each of the Prepetition First Lien Creditors, for its own benefit, are authorized, but not directed or required, in their sole discretion, to file (and amend and/or supplement, as they see fit) a proof of claim and/or aggregate proofs of claim in each of these Cases or Successor Cases for any claim described herein.

23.    <u>Binding Effect of Interim Order</u>.    Immediately upon entry by this Court (notwithstanding any applicable law or rule to the contrary), the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the TCEH Debtors, the Prepetition First Lien Agents, the Prepetition First Lien Creditors, all other creditors of any of the TCEH Debtors, any Committee or any other Court-appointed committee appointed in any Cases, and all other parties in interest and the respective successors and assigns of each of the foregoing, including any chapter 7 or chapter 11 trustee or other fiduciary hereafter appointed or elected for the estates of the TCEH Debtors or with respect to the property of the estate of any TCEH Debtors in any of these Cases, any Successor Cases, or upon dismissal of any Case or Successor Case.  In the event of any inconsistency between the provisions of this Interim Order and the Prepetition First Lien Documents or any other order (including any "First Day" order, other than the DIP Order), the provisions of this Interim Order shall govern and control.  In the event of any inconsistency between the provisions of this Interim Order and the DIP Order, this Interim Order shall govern with respect to the rights and priorities of the Prepetition First Lien Agents and Prepetition First Lien Creditors in and amongst themselves.  Any payments to be made under any order (including any "First Day" order, other than the DIP Order) shall be made in accordance with this Interim Order.

24.    <u>Survival</u>.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered:  (a) confirming any plan of reorganization in any of these Cases; (b) converting any of these Cases to a case under chapter 7 of the Bankruptcy Code; or (c) dismissing any of these Cases or any Successor Cases.  The terms and provisions of this Interim Order, including, without limitation, the granting of the Adequate Protection Liens and 507(b) Claim, and the other protections granted to the Prepetition First Lien Agents and Prepetition First Lien Creditors pursuant to this Interim Order, shall continue in full force and effect notwithstanding entry of any such order.

25.    <u>Final Hearing</u>.  The Final Hearing shall be _____, 2014, at __:__ a.m./p.m., prevailing Eastern Time.  The TCEH Debtors shall provide notice of the Final Hearing to: (a) the Office of the U.S. Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) Citibank, N.A., in its capacity as First Lien Credit Agent under the First Lien Credit Agreement, and Wilmington Trust, N.A., upon the effectiveness of its appointment as successor First Lien Credit Agent; (d) Bank of New York Mellon Trust Company, N.A., in its capacity as indenture trustee under:  (i) the TCEH unsecured pollution control revenue bonds; and (ii) the EFCH 2037 Notes due 2037; (e) American Stock Transfer & Trust Company, LLC, in its capacity as indenture trustee under:  (i) the 9.75% EFH senior unsecured notes due 2019;  (ii) the 10.0% EFH senior unsecured notes due 2020; (iii) the 10.875% EFH LBO senior unsecured notes due 2017; (iv) the 11.25%/12.0% EFH LBO toggle notes due 2017; (v) the 5.55% EFH legacy notes (series P) due 2014; (vi) the 6.50% EFH legacy notes (series Q) due 2024; and (vii) the 6.55% EFH legacy notes (series R) due 2034; (f) Computershare Trust Company, N.A. and Computershare Trust Company of Canada, in their

capacities as indenture trustee under: (i) the 11.0% EFIH senior secured second lien notes due 2021; and (ii) the 11.75% EFIH senior secured second lien notes due 2022; (g) UMB Bank, N.A. in its capacity as indenture trustee under: (i) the 9.75% EFIH senior unsecured notes due 2019; and (ii) the 11.25%/12.25% EFIH senior toggle notes due 2018; (h) BOKF, NA, dba Bank of Arizona, in its capacity as indenture trustee under 11.50% TCEH senior secured notes due 2020; (i) CSC Trust Company of Delaware in its capacity as indenture trustee under: (i) the 6.875% EFIH senior secured notes due 2017; and (ii) the 10.0% EFIH senior secured notes due 2020; (j) Law Debenture Trust Company of New York in its capacity as indenture trustee under: (i) the 10.25% TCEH senior unsecured notes due 2015; and (ii) the 10.50%/11.25% TCEH senior toggle notes due 2016; (k) Wilmington Savings Fund Society, FSB in its capacity as indenture trustee under the 15.0% TCEH senior secured second lien notes due 2021; (l) counsel to certain holders of claims against the Debtors regarding each of the foregoing described in clauses (c) through (k); (m) the agent for the TCEH debtor-in-possession financing facility and counsel thereto; (n) the agent for the EFIH debtor-in-possession financing facility and counsel thereto; (o) counsel to certain holders of equity in Texas Energy Future Holdings Limited Partnership; (p) counsel to Oncor; (q) the SEC; (r) the Internal Revenue Service; (s) the Office of the United States Attorney for the District of Delaware; (t) the Office of the Texas Attorney General on behalf of the PUC; (u) counsel to ERCOT; (v) the RCT; (w) the counterparties to the First Lien Commodity Hedges and First Lien Interest Rate Swaps; and (x) counsel to the TCEH First Lien Ad Hoc Committee. Any objections or responses to the Motion must be filed on or before _____, 2014, at 4:00 p.m., prevailing Eastern Time. If no objections are filed to the Motion, the Court may enter the Final Order without further notice or hearing.

26.    <u>Effect of this Interim Order</u>.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable immediately upon execution hereof.

27.    <u>Retention of Jurisdiction</u>.  The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Interim Order.

Wilmington, Delaware
Dated: _____, 2014

_____
UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT B

**Goldstein Declaration**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-_____ (___) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

**DECLARATION OF STEPHEN GOLDSTEIN
IN SUPPORT OF (I) THE MOTION OF TEXAS
COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC
AND CERTAIN OF ITS DEBTOR AFFILIATES FOR
ENTRY OF INTERIM AND FINAL ORDERS (A) APPROVING
POSTPETITION FINANCING, (B) GRANTING LIENS AND
PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS,
(C) MODIFYING THE AUTOMATIC STAY, AND (D) SCHEDULING
A FINAL HEARING, AND (II) THE MOTION OF TEXAS COMPETITIVE
ELECTRIC HOLDINGS COMPANY LLC AND CERTAIN OF ITS DEBTOR
AFFILIATES FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING
USE OF CASH COLLATERAL, (B) GRANTING ADEQUATE PROTECTION,
(C) MODIFYING THE AUTOMATIC STAY, AND (D) SCHEDULING A FINAL HEARING**

I, Stephen Goldstein, declare as follows:

1.    I am a Senior Managing Director of Evercore Group LLC ("Evercore"), a financial advisory and investment banking firm with offices around the world and financial advisor and investment banker to the above-captioned debtors and debtors in possession (the "Debtors"). I submit this declaration (this "Declaration") in support of (I) the *Motion of Texas Competitive Electric Holdings Company LLC and Certain of its Debtor Affiliates for Entry of Interim and Final Orders (A) Approving Postpetition Financing, (B) Granting Liens and*

---

[1]    The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which the debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

*Providing Superpriority Administrative Expense Claims, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing* (the "<u>TCEH DIP Motion</u>") *and (II)* the *Motion of Texas Competitive Electric Holdings Company LLC And Certain of its Debtor Affiliates for Entry of Interim and Final Orders (A) Authorizing Use Of Cash Collateral, (B) Granting Adequate Protection, (C) Modifying The Automatic Stay, and (D) Scheduling a Final Hearing* (the "<u>TCEH Cash Collateral Motion</u>").[2]

2.     Except where specifically noted, the statements in this Declaration are based on either my personal knowledge, information supplied or verified by the Evercore financial team that I supervise or the TCEH Debtors' personnel and third-party advisors, my review of relevant documents, or my opinion based upon my experience and knowledge of the TCEH Debtors' operations and financial condition.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.  I am authorized to submit this Declaration on behalf of the TCEH Debtors.

3.     I offer this declaration in support of (a) the TCEH Debtors' motion to obtain approval of the $4.475 billion DIP financing facility offered by the DIP Lenders, and (b) the TCEH Debtors' motion to obtain the use of Cash Collateral of the Prepetition Secured Agents and the Prepetition Secured Creditors.  In particular, I submit this declaration to place before this Court evidence supporting my opinion, to a reasonable degree of expert certainty, that: (a) the DIP Lenders' DIP proposal is (i) the product of an arm's-length negotiation, (ii) is the best available DIP financing for the TCEH Debtors, and (iii) is in the best interests of the TCEH Debtors' estates and creditors; and (b) the use of the Cash Collateral and access to the DIP Financing is necessary to preserve the value of the TCEH Debtors' estates; and (c) the TCEH

---

[2]     Terms used but not otherwise defined herein shall have the meanings ascribed to them in the TCEH DIP Motion or the TCEH Cash Collateral Motion, as applicable.

Debtors' proposed adequate protection, provided to the Prepetition Secured Creditors in exchange for senior secured superpriority priming liens provided to the DIP Lenders and the use of Cash Collateral, is sufficient to protect the Prepetition Secured Creditors' interests in the Collateral, including the Cash Collateral.

### Qualifications

4.      Evercore is one of the world's leading independent investment banking groups, with more than 20 offices in more than eight countries, including an office located at 55 East 52nd Street, New York, NY 10055. Evercore has expertise in domestic and cross-border restructurings, mergers and acquisitions, and other financial advisory services. Evercore has served as an experienced bankruptcy and restructuring advisor to debtors, bondholders, creditors' committees, single creditor classes and secured creditors in a variety of industries. Evercore is a member of the Financial Industry Regulatory Authority and the Securities Investor Protection Corporation.

5.      I specialize in advising both debtors and creditors in financial restructurings and distressed mergers and acquisitions; raising capital for troubled businesses; and representing debtors and creditor constituencies in bankruptcy proceedings. Moreover, I have raised capital in many in-court and out-of-court financings, and have extensive experience in procuring, structuring, and negotiating debtor-in-possession financing.

6.      Before joining Evercore, I was a Managing Director of Lazard Frères & Co. LLC ("Lazard"), where I specialized in corporate reorganizations and bankruptcy. Before joining Lazard in 2002, I served in several investment banking positions at Thomas Weisel Partners and its predecessor firm, Montgomery Securities. I began my career as an attorney at Morgan, Lewis & Bockius, where I specialized in securities law and mergers and acquisitions. I have over 18 years of experience in a broad range of corporate finance activities, including restructurings,

3

mergers and acquisitions, and debt and equity financings. I received my B.A. from Cornell

University in 1992 and my J.D. from New York University School of Law in 1995.

**The TCEH Debtors' Need for DIP Financing and**
**Cash Collateral and the Development of the DIP Budget**

7.      After being retained by the TCEH Debtors in July 2012 and gaining an initial

understanding of the TCEH Debtors' capital structure and business operations, Evercore worked

together with the TCEH Debtors' management team and its other advisors to analyze the TCEH

Debtors' cash needs to determine if additional liquidity was needed to support the TCEH

Debtors' operations during the course of a restructuring. In undertaking this analysis, the TCEH

Debtors and their advisors considered the TCEH Debtors' near-term projected financial

performance, including demand for the TCEH Debtors' services and the cost of supplying such

services. The TCEH Debtors' management also conferred with key operational divisions (*i.e.*,

Luminant and TXU Energy) to understand essential business metrics in both the near- and long-

term.

8.      The TCEH Debtors, Evercore, and other advisors discussed and contemplated the

use of Cash Collateral, with or without any additional financing, to fund operations during these

chapter 11 cases. Based on the TCEH Debtors' financial projections, the TCEH Debtors

determined that Cash Collateral may be sufficient to fund certain aspects of working capital,

capital expenditures, and other general corporate purposes during the anticipated duration of the

chapter 11 cases, but will be insufficient to fund the costs associated with the TCEH Debtors'

restructuring efforts, including providing creditors with adequate protection. Thus, the TCEH

Debtors decided debtor-in-possession financing was necessary to ensure that the TCEH Debtors

have sufficient liquidity to continue operations uninterrupted during the TCEH Debtors'

restructuring.

4

9.      The TCEH Debtors and Evercore developed an initial budget, attached to the TCEH DIP Motion as Exhibit C (the "DIP Budget"), that incorporates a number of factors, including the effect of the chapter 11 filing, material cash disbursements, required vendor/supplier payments, cash flows from the TCEH Debtors' ongoing operations, and the cost of necessary goods and materials, and includes all of the expenditures for which the TCEH Debtors seek authority to pay in various "first day" pleadings. In accordance with the DIP Budget, the TCEH Debtors have determined that postpetition financing is necessary to fund the following restructuring costs, among others:  adequate protection payments; working capital (e.g., collateral for letters of credit); bankruptcy costs (e.g., business disruption and professional fees); and regulatory requirements (e.g., RCT mining reclamation obligations). The funding of these restructuring costs, described in greater detail in the DIP Budget, is necessary to preserve and maintain the TCEH Debtors' going-concern value and, ultimately, effectuate a successful reorganization.

10.      Among the restructuring costs addressed by the DIP Financing are the TCEH Debtors' mining reclamation obligations to the RCT. The TCEH Debtors maintain their mining operations in Texas with the permission of the RCT, a regulatory agency that permits, enforces, and oversees surface mining and reclamation in the State. The RCT's grant of permission to the TCEH Debtors to maintain mining operations is conditioned on the TCEH Debtors' posting security to ensure the reclamation of their permitted mining areas. Prior to the Petition Date, the TCEH Debtors secured their reclamation obligations in the form of a self-bond. The TCEH Debtors arguably lost the right to self-bond upon filing the chapter 11 cases. *See* 16 TAC § 12.309(j)(2)(B).  Pursuant to section 12.309(j)(7) of the TAC, the TCEH Debtors must immediately notify the RCT and post a substitute bond within 90 days of such notification.

5

Given these timing limitations, the TCEH Debtors need to submit the RCT Reclamation Support Carve Out (defined below) to the RCT as soon as practicable to give the RCT sufficient time to consider the substitute bond.

11.    The DIP Financing and the Interim Order contemplate a carve out from the DIP Lenders' liens of up to $1,100,000,000 for the benefit of the RCT (the "RCT Reclamation Support Carve Out"). The RCT Reclamation Carve Out will be senior to any other obligations or liabilities of the Debtors, other than the professional fee Carve Out.

12.    As provided in the DIP Budget, the TCEH Debtors will need approximately $1,600,000,000 in available liquidity from the DIP Financing for operations during the interim period of these chapter 11 cases. The $1,600,000,000 interim DIP Financing is largely comprised of (a) an $800,000,000 Revolving Credit Facility to fund operating costs, bankruptcy expenses, and adequate protection payments, and (b) an $800,000,000 General Letter of Credit Facility to meet collateral posting requirements for trading and other counterparties (which replaces an existing prepetition letter of credit facility).

13.    The proposed DIP Financing will provide the TCEH Debtors with immediate access of up to $2,700,000,000, consisting of: (a) $800,000,000 under the Revolving Credit Facility; (b) $1,100,000,000 under the Delayed-Draw Term Facility, the proceeds of which, if funded, will be applied by TCEH to fund the RCT L/C Collateral Account if required for the purposes of Paragraph 10; and (c) $800,000,000 under the Term Loan Facility, of which up to $800,000,000 may be applied by TCEH to fund the General L/C Collateral Account. Moreover, upon entry of the Final Order, the proposed DIP Financing will provide the TCEH Debtors with up to $4,475,000,000, consisting of (x) $1,950,000,000 under the Revolving Credit Facility, (y) $1,425,000,000 under the Term Loan Facility, of which up to $800,000,000 may be applied

6

by TCEH to fund the General L/C Collateral Account, and (z) $1,100,000,000 under the Delayed-Draw Term Facility, the proceeds of which, if funded, will be applied by TCEH to fund the RCT L/C Collateral Account to support RCT Letters of Credit. The Debtors will not borrow under the Delayed-Draw Term Facility on an interim or final basis unless the Railroad Commission of Texas (the "RCT") rejects the Reclamation Support Carve Out.

14.    In addition to the DIP Financing, in the normal course of business, the TCEH Debtors use cash on hand and cash flow from operations to fund working capital, capital expenditures, and for other general corporate purposes. An inability to use these funds during these chapter 11 cases could cripple the TCEH Debtors' business operations. Indeed, the TCEH Debtors must use their cash to, among other things, continue the operation of their business in an orderly manner, maintain business relationships with vendors, suppliers, and customers, pay employees, fulfill regulatory obligations, and satisfy other working capital and operational needs—all of which are necessary to preserve and maintain the TCEH Debtors' going-concern value and, ultimately, effectuate a successful reorganization. Thus, the TCEH Debtors require the use of Cash Collateral to continue operating their businesses.

15.    Importantly, before entry of the Final Order, the TCEH Debtors will use the DIP Financing and Cash Collateral only to the extent necessary to preserve the value of the Collateral, including to fund necessary operational and adequate protection costs. The TCEH Debtors will not use the DIP Financing and Cash Collateral to pay professional fees and expenses before entry of the Final Order.

16.    Absent an ability to demonstrate that the TCEH Debtors have the means available to operate in the ordinary course and procure goods and services that are vital to ongoing business operations, customers may seek other alternatives and vendors and suppliers may refuse

to do business with the TCEH Debtors.  Moreover, absent access to the Cash Collateral and the funds available under the DIP Facility, the TCEH Debtors may not have sufficient liquidity to continue their business operations in the ordinary course to the material detriment of customers, creditors, employees, and other parties in interests, jeopardizing the success of the TCEH Debtors' restructuring.

17.     The approval of the TCEH Debtors' use of the Cash Collateral and the DIP Financing, with its favorable terms, will substantially enhance the Debtors' ability to make a smooth transition into chapter 11 and instill confidence in their customers, employees, creditors, and other parties in interest.  Therefore, the TCEH Debtors have an immediate need to access the DIP Facility and use the Cash Collateral on an interim basis and throughout the pendency of these chapter 11 cases.

### The TCEH Debtors' Efforts to Obtain Postpetition Financing

18.     The TCEH Debtors were uniquely positioned to negotiate a DIP facility with favorable terms and ultimately secured the DIP Financing, which is, in substance, more akin to conventional, broadly-syndicated facilities than typical post-petition financing facilities.  *First,* the TCEH Debtors are operationally sound and anticipate generating significant positive cash flow before debt service over the course of the chapter 11 cases.  *Second,* relative to the value of the TCEH Debtors' businesses, the DIP Financing is significantly overcollateralized.  *Third,* the opportunity to create a relationship with a strong going concern such as the TCEH Debtors was highly attractive to potential DIP lenders.  The lending market understands that the Debtors are a robust company with a leveraged balance sheet that will be restructured in these chapter 11 cases.

19.     The TCEH Debtors' decision to proceed with the DIP Financing comes after a dedicated and diligent search for the best financing alternatives.  In early September 2013, the

TCEH Debtors and Evercore initiated a request for DIP facility proposals ("RFP"). The TCEH Debtors' and Evercore canvassed the market to find parties interested in providing debtor-in-possession financing. During the initial stage of the RFP process, the TCEH Debtors approached five large financial institutions that are actively involved in the debtor-in-possession and syndicated finance markets. The TCEH Debtors and their advisors provided these financial institutions with a proposed DIP financing structure, draft commitment letter, and a detailed term sheet. The TCEH Debtors offered each of these financial institutions the opportunity to conduct due diligence and submit proposals for up to 100% of the DIP financing commitment.

20.    Five financial institutions submitted proposals in response to the TCEH Debtors' RFP. After thorough analysis of the DIP financing proposals, the TCEH Debtors concluded that no single financial institution would be able to underwrite the entire amount of the DIP financing due to the size of the proposed revolving credit facility. Nevertheless, the size of the revolving credit facility remained a priority for the TCEH Debtors because a revolving credit facility offered several benefits over a comparable term facility, including lower pricing and greater efficiency by deferring funding until needed. As a result of this analysis, the TCEH Debtors decided to aggregate the support of multiple financial institutions to fund the DIP Facility.

21.    In early October 2013, two additional financial institutions signed non-disclosure agreements and joined the DIP financing process. The TCEH Debtors continued negotiating with all seven financing providers during the first three weeks of October to obtain the most favorable terms on the DIP Financing. On October 25, 2013, the TCEH Debtors determined that the DIP Financing proposals from Citigroup Global Markets Inc. and Deutsche Bank Securities Inc. contained the best possible combination of terms and effectively addressed the TCEH Debtors' liquidity needs. The TCEH Debtors thus began negotiating commitment letters with

Citigroup Global Markets Inc. and Deutsche Bank Securities Inc., as well as the five other lenders, understanding that the TCEH Debtors would require a broadly-syndicated facility to achieve a revolving credit facility of this size.

22.     The TCEH Debtors' initial discussions provided a foundation for renewing DIP Financing negotiations in early February 2014. The TCEH Debtors and their advisors continued negotiating with the DIP Lenders through March 2014, including replacing one of the seven lenders.

23.     On April 28, 2014, the TCEH Debtors received signed commitment letters from all seven initial lenders under the DIP Facility. Collectively, these institutions were able to provide the TCEH Debtors with $4,475,000,000 in DIP Financing, including the $1,950,000,000 Revolving Credit Facility.

24.     The DIP Financing is the best source of financing, providing the TCEH Debtors with the liquidity they need to continue operating their businesses in the ordinary course and satisfy restructuring-related costs. The DIP Financing was negotiated at arm's length on terms that are reasonable. The DIP Financing will ensure the TCEH Debtors' access to sufficient liquidity that will provide the foundation for maximizing value for all stakeholders.

### DIP Financing on a Senior Secured and Superpriority Basis

25.     The TCEH Debtors' and Evercore's discussions with various potential sources of DIP financing revealed that DIP financing on a junior or unsecured basis was not available to the TCEH Debtors. The TCEH Debtors' significant secured debt obligations and lack of unencumbered assets precludes them from obtaining postpetition financing in the amount they require on terms other than on a senior secured and superpriority basis.

26.     I believe the TCEH Debtors satisfy the requirements to obtain postpetition financing secured by a first priority priming lien, as I understand them, because the transaction will enhance the value of the TCEH Debtors' assets. *First*, the TCEH Debtors and their advisors canvassed the market and were not able to obtain financing on equal or better terms from the DIP Lenders other than financing secured by first priority priming liens.

27.     *Second*, the TCEH Debtors need the funds to be provided under the DIP Facility to preserve the value of their estates for the benefit of all stakeholders. Specifically, the TCEH Debtors need the funds to be provided under the DIP Facility to maintain operations and signal to their suppliers and other vendors that they are credit-worthy and that their vendors can and should continue to provide goods and services to the TCEH Debtors on substantially the same credit terms as during the prepetition period. Absent access to the DIP Facility and Cash Collateral, the TCEH Debtors will be unable to operate their businesses or prosecute these chapter 11 cases.

28.     *Third*, the TCEH Debtors and their advisors determined that the DIP Lenders offered the best option for obtaining the postpetition financing the TCEH Debtors require, including, upon entry of the Interim Order, access to approximately $2,700,000,000 in incremental liquidity, which the TCEH Debtors and their advisors have independently determined is sufficient and necessary to allow the TCEH Debtors to maintain their operations. The DIP Lenders agreed to favorable terms of the DIP Financing, in part to create and foster relationships with the Debtors.

29.     *Fourth*, the TCEH Debtors conducted arm's-length negotiations with the DIP Lenders regarding the terms of the DIP Facility, and those agreements reflect the most favorable terms on which the DIP Lenders (or any other lender) were willing to offer financing. In my

opinion, the entry into the DIP Financing is an exercise of sound and reasonable business judgment in the best interests of the TCEH Debtors' estate and its creditors.

### The Debtors' Proposed Adequate Protection

30. In exchange for the TCEH Debtors' use of Cash Collateral and the imposition of first priority priming DIP liens, the TCEH Debtors will provide adequate protection to the Prepetition Secured Agents to the extent of any diminution in the value of collateral for the benefit of the Prepetition Secured Creditors. Importantly, the access to the capital provided by the DIP Facility and Cash Collateral will not only preserve the TCEH Debtors' liquidity but, as noted above, will only serve to enhance the value of the TCEH Debtors' estates. I understand that the Prepetition Secured Agents and Prepetition Secured Creditors will be offered superpriority claims, replacement liens, and junior liens. Additionally, the Prepetition First Lien Agents and Prepetition First Lien Creditors will receive adequate protection payments in the amount of their prepetition interest, professional fees and expenses, a financial covenant consistent with what is provided to the DIP Lenders, and reasonable access to books and records, including budgets and annual forecasts.

31. To use cash collateral or impose secured superpriority priming liens, the debtor must adequately protect the secured creditor's interest in the property against any diminution in value of such interest resulting from the debtor's use of the property. I understand that what constitutes adequate protection is decided on a case-by-case basis. In my opinion, the proposed adequate protection summarized in the TCEH Cash Collateral Motion and TCEH DIP Motion is fair and reasonable. Most importantly, the TCEH Debtors otherwise anticipate to be cash-flow positive through the duration of the chapter 11 cases, so the use of Cash Collateral and the imposition of the priming liens to obtain postpetition financing should increase the value of the

Collateral.  The TCEH Debtors have agreed to pay the Prepetition First Lien Creditors full prepetition interest as adequate protection payments.  The proposed adequate protection also includes the superpriority claims, replacement and junior liens, and payment of fees and expenses.  I believe this adequate protection package fully protects the Prepetition Secured Agents and the Prepetition Secured Creditors from diminution in value of the Collateral, including the Cash Collateral.

32.     Finally, I believe that the DIP Financing provides adequate protection for the Prepetition Second Lien Creditors.  The access to the capital provided by the DIP Financing will not only preserve the Debtors' liquidity but, as noted above, will preserve and enhance the value of the Debtors' businesses.  Finally, and just as importantly, I understand that the Second Lien Agent will receive, for the benefit of itself and the Prepetition Second Lien Creditors, (a) the Adequate Protection Liens and (b) a superpriority claim.  By their very nature, all of these events provide adequate protection for these Prepetition Second Lien Creditors.

*[Remainder of page intentionally left blank.]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: April 29, 2014

Stephen Goldstein
Senior Managing Director
Evercore Group LLC