IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-_____ (___) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

**MOTION OF TEXAS COMPETITIVE ELECTRIC
HOLDINGS COMPANY LLC AND CERTAIN OF ITS DEBTOR
AFFILIATES, FOR ENTRY OF INTERIM AND FINAL ORDERS
(A) APPROVING POSTPETITION FINANCING, (B) GRANTING LIENS
AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS,
(C) MODIFYING THE AUTOMATIC STAY, AND (D) SCHEDULING A FINAL HEARING**

Texas Competitive Electric Holdings Company LLC (the "Borrower" or "TCEH"),

Energy Future Competitive Holdings Company LLC (the "Parent Guarantor" or "EFCH"), and

each of the Subsidiary Guarantors (as defined in the DIP Credit Agreement (as defined herein))

(the Subsidiary Guarantors, together with the Parent Guarantor, the "Guarantors"), each as a

debtor and debtor-in-possession (collectively, the "TCEH Debtors," and together with the other

above-captioned debtors and debtors-in-possession, the "Debtors"), file this motion

(the "Motion") for entry of an interim order (the "Interim Order"), substantially in the form

attached hereto as **Exhibit A**, and a final order (the "Final Order," and together with the Interim

Order, collectively, the "Orders"), (a) authorizing the TCEH Debtors to enter into the DIP Credit

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which the debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

Agreement to obtain the DIP Financing (defined below), (b) granting liens and providing superpriority administrative expense claims, (c) modifying the automatic stay, and (d) scheduling a hearing to consider approval of the DIP Facility on a final basis (the "Final Hearing"). In support thereof, the Debtors submit the *Declaration of Stephen Goldstein in Support of (I) the Motion of Texas Competitive Electric Holdings Company LLC and Certain of Its Debtor Affiliates for Entry of Interim and Final Orders (A) Approving Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing and (II)* the *Motion of Texas Competitive Electric Holdings Company LLC and Certain of Its Debtor Affiliates for Entry of Interim and Final Orders (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing* (the "Goldstein Declaration"), a copy of which is attached hereto as **Exhibit B**, and the *Declaration of Paul Keglevic, Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of Energy Future Holdings Corp., et al., in Support of First Day Motions* (the "First Day Declaration"), and respectfully submit as follows.

### Jurisdiction and Venue

1.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors consent pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules") to the entry of a final order by the Court in connection with this

Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The bases for the relief requested in this Motion are sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code, rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Bankruptcy Rules 2002, 4001, and 9014.

### Preliminary Statement

4.      The Debtors commenced these chapter 11 cases to restructure more than $42 billion in funded indebtedness. To ensure a smooth transition into chapter 11 with minimal disruption to their business operations, the Debtors determined that they would need continued access to cash collateral of their prepetition secured lenders as well as postpetition financing. Accordingly, the TCEH Debtors have negotiated for and obtained the consent of a steering committee (the "TCEH First Lien Ad Hoc Committee") representing holders of approximately 41% in amount of claims under the First Lien Credit Agreement and the First Lien Notes Indenture (each as defined herein) to use Cash Collateral (as defined in the Cash Collateral Order).[2] In addition to consenting to the Debtors' continued use of Cash Collateral, the TCEH First Lien Ad Hoc Committee has consented to being primed under the DIP Credit Agreement.

---

[2]     For additional information regarding the Debtors' use of Cash Collateral, see the *Motion of Texas Competitive Electric Holdings Company LLC and Certain of Its Debtor Affiliates for Entry of Interim and Final Orders (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing*, filed contemporaneously herewith (the "Cash Collateral Motion," and the proposed interim order attached as Exhibit A thereto, the "Cash Collateral Order").

5.     The TCEH Debtors were uniquely positioned to negotiate a DIP facility with favorable terms and ultimately secured the DIP Financing on terms more akin to conventional, broadly-syndicated facilities than typical postpetition financing facilities.  *First*, the TCEH Debtors are operationally sound and generate significant positive cash flow before debt service. *Second*, relative to the value of the TCEH Debtors' businesses, the DIP Financing is significantly overcollateralized.  *Third*, the opportunity to create a relationship with a strong going concern such as the Debtors was highly attractive to potential DIP lenders.  The lending market understands that the Debtors are a robust company with an overleveraged balance sheet that will be restructured in these chapter 11 cases.

6.     Accordingly, following a lengthy, competitive process, the TCEH Debtors obtained commitments from several large financial institutions for a fully underwritten, $4,475,000,000 debtor-in-possession financing (the "DIP Financing").  The DIP Financing consists of:  (a) a revolving credit facility (the "Revolving Credit Facility") in an aggregate principal amount of up to $1,950,000,000; (b) a term credit facility (the "Term Loan Facility") in an aggregate principal amount of up to $1,425,000,000, of which up to $800,000,000 may be applied by TCEH to fund the General L/C Collateral Account to support General Letters of Credit (each, as defined in the DIP Credit Agreement); (c) a delayed-draw term credit facility (the "Delayed-Draw Term Facility") in an aggregate principal amount of up to $1,100,000,000, the proceeds of which, if funded, will be applied by TCEH to fund the RCT L/C Collateral Account to support RCT Letters of Credit (each, as defined in the DIP Credit Agreement); (d) obligations owed to the General Letter of Credit Issuer (as defined herein and without duplication of any other obligations described in clauses (a), (b), or (c) above) pursuant to a cash collateralized letter of credit facility (the "General Letter of Credit Facility") in an aggregate

4

stated amount of up to $800,000,000, as such amount may be increased as agreed in writing between TCEH and the General Letter of Credit Issuers providing such increased amount; and (e) obligations owed to the RCT Letter of Credit Issuer (as defined herein and without duplication of any other obligations described in clauses (a), (b), (c), or (d) above) pursuant to a cash collateralized letter of credit facility (the "RCT Letter of Credit Facility" and, collectively with the Revolving Credit Facility, the Term Loan Facility, the Delayed-Draw Term Facility, and the General Letter of Credit Facility, the "DIP Facility") in an aggregate stated amount of up to $1,100,000,000. The Debtors will not borrow under the Delayed-Draw Term Facility on an interim or final basis unless the Railroad Commission of Texas (the "RCT") has refused to accept the Reclamation Support Carve Out (as defined below).

7.        The TCEH Debtors request authority to access $2,700,000,000 of the DIP Facility on an interim basis pursuant to the Interim Order, consisting of: (a) borrowings in an aggregate principal amount of up to $800,000,000 under the Revolving Credit Facility; (b) borrowings in an aggregate principal amount of up to $1,100,000,000 under the Delayed-Draw Term Facility, the proceeds of which, if funded, subject to the condition set forth above, will be applied by TCEH to fund the RCT L/C Collateral Account; and (c) borrowings in an aggregate principal amount of up to $800,000,000 under the Term Loan Facility, of which up to $800,000,000 may be applied by TCEH to fund the General L/C Collateral Account (collectively, the "Interim Financing"). The TCEH Debtors will use the DIP Financing, together with cash flow from operations, for, among other things, adequate protection payments, working capital (e.g., collateral for letters of credit), bankruptcy costs (e.g., business disruption and professional fees), and regulatory requirements.

8.    The DIP Financing also enables the Debtors to satisfy the requirement under section 12.309(j)(7) of the Texas Administrative Code (the "TAC") to provide a collateral bond to the RCT to secure the Debtors' mining reclamation obligations.    In particular, the DIP Financing and the Interim Order contemplate a carve out from the DIP Lenders' liens of up to $1,100,000,000 for the benefit of the RCT (the "RCT Reclamation Support Carve Out").    The RCT Reclamation Support Carve Out will be senior to any other obligations or liabilities of the Debtors, other than the professional fee Carve Out.

9.    The approval of the DIP Financing, with its favorable terms, will substantially enhance the Debtors' ability to make a smooth transition into chapter 11 and instill confidence in their customers, employees, creditors, and other parties in interest.    Therefore, the Debtors respectfully request that the Court enter the Interim and Final Orders approving the DIP Financing and granting related relief.

## Relief Requested

10.    By this Motion, the TCEH Debtors seek entry of the Orders, which, among other things, provide the TCEH Debtors:

> (a) ***DIP Facility***:    authority to obtain secured superpriority postpetition financing (the "DIP Financing") in a principal amount not to exceed $2,700,000,000 on an interim basis and $4,475,000,000 on a final basis, pursuant to the terms and conditions of the proposed debtor in possession financing agreement (the "DIP Credit Agreement") between the Borrower, the Parent Guarantor, the financial institutions from time to time party thereto as lenders (the "DIP Lenders"), the financial institutions from time to time party thereto as letter of credit issuers (the "DIP L/C Issuers"), Citibank, N.A., as administrative agent and collateral agent (in such capacities, the "DIP Agent"),[3] and

---

[3]    As used herein, the term "DIP Agent" refers to Citibank, N.A., as administrative agent under the DIP Credit Agreement, Citibank, N.A., as collateral agent under the DIP Credit Agreement, or both, as the context requires. All references in this Motion to the DIP Agent with respect to the Secured Hedge Banks or the Secured Cash Management Banks (each, as defined in the Interim Order) shall mean Citibank, N.A., in its capacity as
(Continued...)

other agents and entities from time to time party thereto, substantially in the form of the DIP Credit Agreement attached hereto as **Exhibit D**;

(b) *DIP Documents*: authority to execute and deliver the DIP Credit Agreement and all agreements, documents, and instruments contemplated by each (collectively, the "DIP Documents"), and to take all actions necessary, appropriate, or required to comply with the TCEH Debtors' obligations under the DIP Documents and under the Orders;

(c) *DIP Liens*: authority to grant the DIP Agent, for the benefit of itself, the DIP Lenders, the DIP L/C Issuers, the Secured Hedge Banks, and the Secured Cash Management Banks, automatically perfected postpetition security interests and liens (the "DIP Liens") in the DIP Collateral (as defined in the Interim Order), subject only to the Permitted Prior Liens, the Carve Out, and the RCT Reclamation Support Carve Out;

(d) *DIP Superpriority Claims*: authority to grant the DIP Agent, for the benefit of itself, the DIP Lenders, the DIP L/C Issuers, the Secured Hedge Banks, and the Secured Cash Management Banks, allowed superiority administrative expense claims (the "DIP Superpriority Claims"), subject only to the payment of the Carve Out and the RCT Reclamation Support Carve Out;

(e) *Automatic Stay*: vacation and modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Credit Agreement and the Orders;

(f) *Immediate Effectiveness*: waiver of any applicable stay, including under Bankruptcy Rule 6004, to provide for immediate effectiveness of the Interim Order; and

(g) *Final Hearing*: scheduling of a Final Hearing to consider authorizing and approving the DIP Facility described herein on a final basis pursuant to a Final Order.

---

collateral agent. Citibank, N.A., in its capacity as administrative agent, has no duties or obligations to the Secured Hedge Banks or the Secured Cash Management Banks.

## Concise Statement Pursuant to Bankruptcy Rule 4001(c)

11.    In accordance with Bankruptcy Rules 4001(c) and (d), the following summarizes the significant terms of the DIP Credit Agreement and the Interim Order.[4]

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| **DIP Credit Agreement Parties**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | <u>Borrower</u>:    Texas Competitive Electric Holdings Company LLC ("TCEH").<br><br><u>Guarantors</u>:    Energy Future Competitive Holdings Company LLC ("<u>EFCH</u>" or "<u>Parent Guarantor</u>") and each subsidiary of the Borrower that is currently a guarantor under the First Lien Credit Agreement (defined below) (each a "<u>Subsidiary Guarantor</u>").<br><br><u>Left Lead Revolving Arranger</u>:  Deutsche Bank Securities Inc. (the "<u>Left Lead Revolving Arranger</u>").<br><br><u>Left Lead Term Facilities Arranger</u>:  Citigroup Global Markets Inc., (the "<u>Left Lead Term Facilities Arranger</u>" and, together with the Left Lead Revolving Arranger, the "<u>Left Lead Arrangers</u>").<br><br><u>Joint Lead Arrangers</u>:  The Left Lead Term Facilities Arranger, the Left Lead Revolving Arranger, Merrill Lynch, Pierce, Fenner & Smith Incorporated ("<u>MLPFS</u>"), Morgan Stanley Senior Funding, Inc. ("<u>Morgan Stanley</u>"), Barclays Bank PLC ("<u>Barclays</u>"), RBC Capital Markets ("<u>RBCCM</u>"), and Union Bank, N.A. ("<u>Union Bank</u>" and, collectively with the Left Lead Term Facilities Arranger, the Left Lead Revolving Arranger, MLPFS, Morgan Stanley, Barclays, and RBCCM, the "<u>Joint Lead Arrangers</u>").<br><br><u>Lenders</u>:    The lenders under the Revolving Credit Facility ("<u>Revolver Lenders</u>"), the lenders under the Delayed-Draw Term Facility ("<u>Delayed-Draw Term Lenders</u>"), and the lenders under the Term Loan Facility ("<u>Term Lenders</u>") (together with any lenders under the Incremental Facilities, collectively, the "<u>Lenders</u>").<br><br><u>General Letter of Credit Issuers</u>:    Citibank, N.A. and other mutually and reasonably satisfactory banks (the | DIP Credit Agreement at § 1.1. |

---

[4]    Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to such terms in the DIP Documents or the Orders, as applicable.  This statement is qualified in its entirety by the provisions of the DIP Documents or the Orders.  To the extent there exists any inconsistency between this concise statement and the provisions of the DIP Documents or the Orders, the provisions of the DIP Documents or the Orders, as applicable, shall control.

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| | "General Letter of Credit Issuers"). | |
| | RCT Letter of Credit Issuers:  Each of the initial Revolver Lenders, pro rata in proportion to their Revolver Commitments, and other mutually and reasonably satisfactory banks (the "RCT Letter of Credit Issuers" and together with the General Letter of Credit Issuers, the "Letter of Credit Issuers"). | |
| | Administrative Agent:    Citibank, N.A. (together with its permitted successors and assigns, the "Administrative Agent," "DIP Agent," or "Agent"). | |
| *DIP Facility*<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B); LBR 4001-2(a)(ii)* | Total Loan Commitment:    $4,475,000,000 aggregate principal amount.<br><br>Revolving Credit Facility: $1,950,000,000 aggregate principal amount (the "Revolver Commitments"). Up to $800,000,000 of the Revolving Credit Facility will be available in connection with Initial Availability and up to $1,950,000,000 will be available in connection with Full Availability.<br><br>Delayed-Draw Term Facility:  $1,100,000,000 aggregate principal amount (the "Delayed-Draw Term Commitment") made available for up to two drawings (in minimum amounts of $250,000,000 (or the remainder of the Delayed-Draw Term Commitment, if less than $250,000,000)) during the period beginning on the Closing Date and ending 90 days after the Closing Date.<br><br>Term Loan Facility:    $1,425,000,000 aggregate principal amount (the "Term Commitments"). Up to $800,000,000 of the Term Loan Facility in connection with Initial Availability and up to $1,425,000,000 in connection with Full Availability, of which up to $800,000,000 may be used to fund the General L/C Collateral Account.<br><br>General Letter of Credit Facility:    A cash collateralized letter of credit facility in an aggregate stated amount of up to $800,000,000, as such amount may be increased as agreed in writing between TCEH and the General Letter of Credit Issuers providing such increased amount.<br><br>RCT Letter of Credit Facility:  A cash collateralized letter of credit facility in an aggregate stated amount of up to $1,100,000,000. | DIP Credit Agreement at § 2.1, 2.2. |

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| *Interest Rate and Margins*<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The Borrower may elect that the loans comprising each borrowing bear interest at a rate per annum equal to (a) the Alternate Base Rate (such loans the "ABR Loans") plus the Applicable Margin or (b) the Adjusted LIBO Rate (such loans the "Eurodollar Loans") plus the Applicable Margin, subject to a floor of 0.75% per annum.<br><br>"Applicable Margin" means, a margin with respect to:<br><br>(a)    Revolving Credit Loans<br>1.50 %, in the case of ABR Loans<br>2.50 %, in the case of Eurodollar Loans<br><br>(b)    Term Loans and Delayed-Draw Term Loans<br>1.75 %, in the case of ABR Loans<br>2.75 %, in the case of Eurodollar Loans | DIP Credit Agreement at § 2.8. |
| *Fees*<br><br>*Fed R. Bankr. P. 4001(c)(1)(B)* | (a)    Underwriting and Other Fees<br>As set forth in the Fee Letter.<br><br>(b)    Revolving Commitment Fees<br>0.375% if each of the DIP Facilities are rated at least Ba3 by Moody's and BB- by S&P, and 0.500% if otherwise, in each case payable on the undrawn Revolver Commitments.<br><br>(c)    Delayed-Draw Ticking Fees<br>50% of the Applicable Margin payable on the undrawn Delayed-Draw Term Commitments from the date that is 60 days after the Closing Date until the date that is 90 days after the Closing Date.<br><br>(d)    Letter of Credit Fronting Fees<br>0.25% payable on the face amount of each General Letter of Credit and each RCT Letter of Credit. | DIP Credit Agreement at § 4.1, Fee Letter. |
| *Maturity*<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The maturity date of the DIP Facility will be the earliest of:<br><br>• stated maturity, which shall be 24 months from the Closing Date subject to a six-month extension as requested by the Borrower if as of the first day of such extension (1) no Event of Default is outstanding, (2) an Acceptable Reorganization Plan has been filed, (3) a hearing has been scheduled for the confirmation of such Acceptable Reorganization Plan, (4) the Debtors are working in good faith to confirm such Acceptable Reorganization Plan, (5) an updated Budget and Annual Operating Forecast have been delivered by the Borrower at least ten days prior to the first day of such extension, which Budget and Annual Operating Forecast demonstrate minimum liquidity sufficient to provide for Adequate Protection Payments (as defined in the Cash Collateral Order) through such additional six-month period plus an additional $250,000,000, and (6) the Borrower pays an extension fee in the amount 0.25% of the then outstanding Commitments and Loans on the date of such payment to the DIP Agent for distribution to the DIP Lenders on a pro rata basis based on the respective Commitments and Loans held by each Lender; | DIP Credit Agreement at § 1.1. |

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| | • the effective date of any Reorganization Plan;<br><br>• the date that is 45 days after the Interim Order Entry Date if the Final Order Entry Date shall not have occurred by such date;<br><br>• the date of the consummation of a sale of all or substantially all of the Debtors' assets or stock under section 363 of the Bankruptcy Code; and<br><br>• the acceleration of the Loans and termination of the Commitments under any of the DIP Facilities, including, without limitation, as a result of the occurrence and continuance of an Event of Default (any such occurrence, the "Maturity Date"); *provided, however,* that the Maturity Date will occur in any event no later than 30 months from the Closing Date. | |
| ***Purpose/Use of Proceeds***<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B); LBR 4001-2(a)(ii)* | Proceeds of the Term Loans and the Revolving Credit Loans will be used to (a) finance any and all working capital needs and for any other general corporate purposes, including, without limitation, to (i) provide collateral support in respect of financial or physical trading transactions, including commodities transactions (in each case, subject to the terms of all applicable interim and final orders entered by the Court in the chapter 11 cases) and (ii) comply with any legal and/or regulatory requirements of governmental and quasi-governmental entities (including for posting bonds and remediation or reclamation obligations of any nature (such as with the RCT), complying with any statutory or regulatory requirements, and for self-bonding in respect of permits and licenses) applicable to the TCEH Debtors (and, to the limited extent set forth in the DIP Documents, of the Specified Affiliates), (b) provide for Letters of Credit, and (c) pay related transaction costs, fees, liabilities, and expenses, and other administration costs incurred in connection with the chapter 11 cases and the commitment, negotiation, syndication, documentation (including any commitment letters), execution, and closing of the DIP Facility, as provided for in the DIP Credit Agreement and the DIP Documents. If funded, the proceeds of the Delayed-Draw Term Loans will be used to fund the RCT L/C Collateral Account. The General Letters of Credit may be used (x) for general corporate purposes, including, without limitation, providing collateral support in respect of financial or physical trading transactions, including commodities transactions related to the TCEH Debtors' businesses and activities (in each case, subject to the terms of all applicable interim and final orders entered by the Court in the chapter 11 cases) (and, to the limited extent set forth in the DIP Documents, of the Specified Affiliates) and (y) to comply with any legal and/or regulatory requirements of governmental and quasi-governmental entities (including for posting bonds and remediation or reclamation obligations of any nature (such as with the RCT), complying with any statutory or regulatory requirements, and for self-bonding in respect of permits and licenses) applicable to the TCEH Debtors. If issued, the RCT Letters of Credit will be used for the purpose of satisfying bonding requirements of the RCT. | DIP Credit Agreement at § 11.19. |

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| ***Events of Default***<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Usual and customary for financings of this type, including, without limitation, non-payment of principal, interest and fees, breaches of representations and warranties, defaults under negative covenants and certain affirmative covenants, non-entry of Final Order within 45-days after entry of Interim Order, conversion of the chapter 11 cases to chapter 7, entry of an order granting relief from automatic stay to permit foreclosure on any assets of the TCEH Debtors' that have an aggregate value in excess of $150 million, and the termination of the use of cash collateral by the TCEH Debtors if the TCEH Debtors have not obtained use of cash collateral (consensually or non-consensually) pursuant to an order in form and substance acceptable to the Left Lead Arrangers. | DIP Credit Agreement at § 11. |
| ***Priority and Security of DIP Facility Liens***<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | All DIP Obligations under the DIP Facility shall, subject to the Carve Out and the RCT Reclamation Support Carve Out:<br><br>• pursuant to section 364(c)(1) of the Bankruptcy Code, be entitled to superpriority administrative expense claim status in the chapter 11 cases with priority over any and all administrative expense claims, diminution claims, unsecured claims, and all other claims against the TCEH Debtors or their estates in any of the chapter 11 cases and any successor cases, existing on the Petition Date or thereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject only to, and effective upon entry of, the Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which allowed claims shall be payable from, and have recourse to, all prepetition and postpetition property of the TCEH Debtors and all proceeds thereof;<br><br>• pursuant to section 364(c)(2) of the Bankruptcy Code, a perfected first-priority lien on all prepetition and postpetition property of the TCEH Debtors (the "Unencumbered Property"); *provided, however,* that the Unencumbered Property shall exclude the TCEH Debtors' claims and causes of action under chapter 5 of the Bankruptcy Code (other than causes of action arising under section 549 of the Bankruptcy Code and any related action under section 550 of the Bankruptcy Code), or any other avoidance actions under the Bankruptcy Code (collectively, "Avoidance Actions"), but subject only to, and effective upon, entry of the Final Order, shall include any proceeds or property recovered, unencumbered, or otherwise the subject of successful Avoidance Actions, whether by judgment, settlement, or otherwise;<br><br>• pursuant to section 364(d)(1) of the Bankruptcy Code, be secured by a perfected priming first-priority lien on all | Interim Order at ¶ 7. |

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| | prepetition and postpetition property of the TCEH Debtors, whether existing on the Petition Date or thereafter acquired, that is subject to valid, perfected, and non-avoidable liens that secure the obligations of the TCEH Debtors under or in connection with the Prepetition Secured Facilities (as defined herein); excluding the Deposit L/C Loan Collateral Account to the extent of the Deposit L/C Obligations (each, as defined in the First Lien Credit Agreement); provided that such security interests and liens shall be senior in all respects to the interests in such property of any of the Prepetition Secured Creditors (as defined in the Cash Collateral Order) arising from current and future liens of any of the Prepetition Secured Creditors (including, without limitation, Adequate Protection Liens) (as defined in the Cash Collateral Order), but shall not be senior to any valid, perfected, and non-avoidable interests of other parties arising out of liens, if any, on such property existing immediately prior to the Petition Date, including the liens securing the Tex-La Indebtedness (as defined in the DIP Credit Agreement), or to any valid, perfected, and non-avoidable interests in such property arising out of liens to which the liens of any of the Prepetition Secured Creditors become subject subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code. <br><br> • pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior lien on all other prepetition and postpetition property of the TCEH Debtors that is subject to valid, perfected and non-avoidable liens in existence immediately prior to the Petition Date or that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (other than the Adequate Protection Liens). | |
| *Carve Out* <br><br> *Fed. R. Bankr. P. 4001(c)(1)(B)* | The "Carve Out" shall have the meaning set forth in the Order. | Interim Order at ¶ 25. |
| *RCT Reclamation Support Carve Out* <br><br> *Fed. R. Bankr. P. 4001(c)(1)(B)* | All amounts up to $1,100,000,000 required to be paid by the TCEH Debtors to the RCT pursuant to amounts due and owing in respect of reclamation obligations incurred by the RCT and for which any of the TCEH Debtors may be liable under Applicable Law will constitute the "RCT Reclamation Support Carve Out," and such RCT Reclamation Support Carve Out will be senior to the DIP Obligations and to any other obligations or liabilities of the TCEH Debtors (other than, and subject in any event to, the Carve Out), unless the Borrower issues and delivers to the DIP Agent the RCT Carve Out Support Rejection Notice. | Interim Order at ¶ 26. |
| *Covenants* <br><br> *Fed. R. Bankr. P. 4001(c)(1)(B)* | Usual and customary covenants for financings of this type, including but not limited to, the "Financial Covenant," as follows: for any Test Period (as defined in the DIP Credit Agreement) beginning with the Test Period ending on June 30, 2014, the ratio of (i) the | DIP Credit Agreement at § 10. |

13

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| | Consolidated Superpriority Secured Net Debt to (ii) Consolidated EBITDA (each, as defined in the DIP Credit Agreement) shall not exceed (x) if the RCT Carve Out Support Rejection Notice (as defined in the DIP Credit Agreement) has not been issued and delivered during or prior to such Test Period, 3.50 to 1.00 and (y) for all other Test Periods, 4.50 to 1.00. | |
| **Conditions to Borrowing**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Usual and customary conditions precedent to extensions of credit for financings of this type. | DIP Credit Agreement at § 6. |
| **Plan and Disclosure Statement Milestones**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(vi)* | The TCEH Debtors must file with the Court a plan of reorganization and a disclosure statement relating thereto, each in form and substance reasonably satisfactory to the DIP Agent, within 18 months after the Petition Date; *provided, however,* that with respect to provisions of the plan of reorganization and/or any disclosure statement that relate to payment of the DIP Facility, such provisions must be in form and substance satisfactory to the DIP Agent. | DIP Credit Agreement at § 9.15. |
| **Waivers and Consents**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(iv, v), (vii-x)* | **Waiver of Automatic Stay**:  Upon the occurrence and during the continuance of an Event of Default and following the giving of five calendar days' notice to the TCEH Debtors (the "Remedies Notice Period"), the automatic stay pursuant to section 362 of the Bankruptcy Code shall be automatically terminated without further notice to or order of the Court, and the DIP Agent shall be permitted to exercise all rights against the Collateral in accordance with the DIP Documents and the Interim Order or Final Order, as applicable, and shall be permitted to satisfy the DIP Obligations, without further order or application or motion to the Court and without restriction or restraint by any stay under section 362 or 105 of the Bankruptcy Code. | Interim Order at ¶ 20; DIP Credit Agreement at § 12.7. |
| | **Waiver of Nonbankruptcy Law**:  The DIP Liens and other interests granted to the DIP Agent, for the benefit of itself, the DIP Lenders, the DIP L/C Issuers, the Secured Hedge Banks, and the Secured Cash Management Banks, are deemed valid, binding, perfected, enforceable, first-priority liens, non-avoidable and not subject to re-characterization or subordination as of the date of the Interim Order. | Interim Order at ¶ 14. |
| | **Waiver of Section 506(c)**:  Subject to entry of the Final Order, the DIP Agent, the DIP Lenders, and the DIP L/C Issuers shall not be subject to any surcharge under section 506(c) of the Bankruptcy Code. | Interim Order at ¶ 31. |
| | **Indemnification**:  The TCEH Debtors agree to indemnify and hold harmless the DIP Agent, the Joint Lead Arrangers, the DIP Lenders, the DIP L/C Issuers, and their respective Affiliates (as defined in the DIP Credit Agreement), directors, officers, partners, employees, and agents. | DIP Credit Agreement at § 13.5. |
| | **Release of Claims and Causes of Action**:  The TCEH Debtors release the DIP Agent, the DIP Lenders, the DIP L/C Issuers, each of their respective participants, and each of their respective affiliates, | Interim Order at ¶ 29. |

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| | and each of their respective former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest, of and from any and all claims arising out of, in connection with, or relating to the DIP Facility, the DIP Documents, or the transactions contemplated thereunder. | |

## **Provisions to be Highlighted Pursuant to Local Bankruptcy Rule 4001-2(a)(i)**

12.     Local Bankruptcy Rule 4001-2(a)(i) requires a debtor to:  (a) recite whether the proposed form of the financing order contains certain provisions of the type enumerated therein; (b) identify the location of such provisions in the proposed financing order; and (c) justify the inclusion of such provisions in the proposed financing order (the "Highlighted Provisions").[5] *See* Del. Bankr. L.R. 4001-2(a)(i). The TCEH Debtors submit that one provision of the Interim Order requires highlighting under Local Bankruptcy Rule 4001-2(a)(i), specifically with respect to Local Bankruptcy Rule 4001-2(a)(i)(G), the priming of secured liens, and that such provision is justified and necessary in the context and circumstances of these chapter 11 cases.

13.     The DIP Financing grants the DIP Lenders a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all prepetition and postpetition property of the TCEH Debtors pursuant to section 364(d)(1) of the Bankruptcy Code. Such security interest and lien shall be senior in all respects to the interests in such property of any of the Prepetition Secured Creditors arising from current and future liens of any of the Prepetition Secured Creditors (including without limitation, Adequate Protection Liens). *See* Interim Order, at ¶ E(ii), 7.

---

[5]    A further discussion of terms required to be highlighted pursuant to Local Bankruptcy Rule 4001-2 can be found in the Cash Collateral Motion.

14.    Local Rule 4001-2(a)(i)(G) requires explicit disclosure of provisions that prime any secured liens *without that lienholder's consent*.  *See Del. Bankr. L.R.* 4001-2(a)(i)(G) (emphasis added).  Here, the DIP Financing contemplates priming the First Lien Lenders on the Prepetition Collateral (as defined in the Cash Collateral Order) under section 364(d) of the Bankruptcy Code.  As described above, the TCEH Debtors and their advisors determined that the DIP Lenders offered the best option for obtaining the postpetition financing the TCEH Debtors require.  The TCEH Debtors are not able to obtain financing on equal or better terms from the DIP Lenders other than financing secured by first priority priming liens.  Moreover, the TCEH Debtors need the funds to be provided under the DIP Facility to preserve the value of their estates for the benefit of all stakeholders.  Significantly, the TCEH First Lien Ad Hoc Committee, representing holders of approximately 41% in amount of claims under the First Lien Credit Agreement and the First Lien Notes Indenture, has consented to such priming liens (*See* Interim Order, ¶ E(ii), 7), and the Prepetition Second Lien Creditors are deemed to have consented pursuant to the Second Lien Intercreditor Agreement.  In any event, as discussed at length in the Cash Collateral Motion, the TCEH Debtors are providing the Prepetition Secured Creditors with Adequate Protection.

15.    The TCEH Debtors submit that no further provisions of the Interim Order require highlighting under Local Bankruptcy Rule 4001-2(a)(i).  Nevertheless, out of an abundance of caution and for the convenience of the Court and other parties in interest, the TCEH Debtors wish to highlight certain provisions of the Interim Order to demonstrate their compliance, each of which is addressed individually in turn below.

(a) *506(c) Waiver (Del. Bankr. L.R. 4001-2(a)(i)(C))*:  a waiver by the TCEH Debtors of the provisions of section 506(c) of the Bankruptcy Code *but effective only upon entry of the Final Order* (*See* Interim Order, ¶ 31); and

16

(b) ***Carve Out (Del. Bankr. L.R. 4001-2(a)(i)(F))***: a Carve Out for the benefit of professionals retained by the TCEH Debtors and any Creditors' Committee appointed in these chapter 11 cases, *but providing no disparate treatment with respect to such professionals* (*See* Interim Order, ¶ 25).

16.    ***506(c) Waiver.***    Upon entry of the Final Order, no costs or expenses of administration of the chapter 11 cases or any future proceeding that may result therefrom, which have been or may be incurred in the chapter 11 cases at any time, shall be charged against the DIP Agent, the DIP Lenders, or the DIP L/C Issuers, or any of their respective claims or the DIP Collateral, pursuant to section 105 or 506(c) of the Bankruptcy Code (the "506(c) Waiver"), without the prior written consent of the DIP Agent, the DIP Lenders, or the DIP L/C Issuers, as applicable. *See* Interim Order, at ¶ 31.

17.    Local Bankruptcy Rule 4001-2(a)(i)(C) requires explicit disclosure of provisions that constitute a waiver, *without notice*, of whatever rights the estate may have under section 506(c) of the Bankruptcy Code. *See* Del. Bankr. L.R. 4001-2(a)(i)(C) (emphasis added). Here, the TCEH Debtors are not seeking the approval of the 506(c) Waiver on an interim basis but, rather, are seeking approval of this provision under the Final Order pursuant to Local Bankruptcy Rule 4001-2(c). To that end, notice of the Motion and the Interim Order entered thereon will be served on all parties in accordance with Local Bankruptcy Rule 9013-1(m). Accordingly, the TCEH Debtors do not believe that this provision of the Interim Order requires disclosure under Local Bankruptcy Rule 4001-2(a)(i)C); however, such provision is disclosed out of an abundance of caution and for the convenience of the Court and other parties in interest.

18.    ***Carve Out.***    The Carve Out includes the unpaid fees and expenses of professional persons retained by any Debtor or any Creditors' Committee appointed in these chapter 11 cases pursuant to an order of the Court. *See* Interim Order, at ¶ 25. Local Bankruptcy Rule 4001-2(a)(i)(F) requires disclosure of *disparate* treatment between the professionals retained by

the TCEH Debtors and the professionals retained by the unsecured creditors' committee with respect to a professional fee carve out. *See* Del. Bankr. L.R. 4001(2)(a)(i)(F) (emphasis added). Here, the Carve Out applies equally to professionals retained by the TCEH Debtors and any Creditors' Committee.  Accordingly, the TCEH Debtors do not believe that this provision of the Interim Order requires disclosure under Local Bankruptcy Rule 4001-2(a)(i)(F); however, such provision is disclosed out of an abundance of caution and for the convenience of the Court and other parties in interest.

20. Moreover, with the inclusion of the Carve Out, the Orders do not directly or indirectly deprive the TCEH Debtors' estate or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these chapter 11 cases. *See In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). In *Ames*, the court found such "carve-outs" for professional fees to be not only reasonable, but necessary to ensure that official committees and debtors' estates can retain assistance from counsel. *Id.* at 41.

20. Similar carve outs for professional fees have been found to be reasonable and necessary in this district to ensure that a debtor's estate and any statutory committee can retain assistance from counsel. *See, e.g., In re Longview Power, LLC*, No. 13-12211 (BLS) (Bankr. D. Del. Sept. 5, 2013) (allowing carve out for debtor and committee professional fees); *In re Dex One Corp.*, No. 13-10533 (KG) (Bankr. D. Del. Mar. 19, 2013) (same); *In re Amicus Wind Down Corp.*, No. 11-13167 (KG) (Bankr. D. Del. Nov. 2, 2011) (same); *In re Neb. Book Co.*, No. 11-12005 (PJW) (Bankr. D. Del. July 21, 2011) (same); *In re Local Insight Media Holdings,*

*Inc.*, No. 10-13677 (KG) (Bankr. D. Del. Dec. 29, 2010) (same); *In re N. Am. Petroleum Corp. USA*, No. 10-11707 (CSS) (Bankr. D. Del. July 6, 2010) (same); *In re Stallion Oilfield Servs. Ltd.*, No. 09-13562 (BLS) (Bankr. D. Del. Nov. 18, 2009) (same).[6]

## Background

21.     On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition with the Court under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have requested joint administration of these chapter 11 cases. The Court has not appointed a trustee, and the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has not formed any official committees in these chapter 11 cases.[7]

22.     Debtor Energy Future Holdings Corp. ("EFH Corp."), a Texas corporation, is the ultimate parent company for each of the Debtors in these chapter 11 cases and certain of EFH Corp.'s non-Debtor affiliates (collectively, "EFH"). EFH's businesses include the largest generator, distributor, and certificated retail provider of electricity in Texas. EFH conducts substantially all of its business operations in the electricity market overseen by the Electric Reliability Council of Texas ("ERCOT"), which covers the majority of Texas. The Texas electricity market, in turn, is subject to oversight and regulation by the Public Utility

---

[6]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to the Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

[7]     The facts and circumstances supporting this Motion, along with a detailed discussion of EFH's business operations and capital structure, are set forth in the First Day Declaration, filed contemporaneously herewith.

Commission of Texas (the "PUC"). EFH has approximately 9,100 employees, approximately 5,700 of whom are employed by the Debtors,[8] in three distinct business units:

- EFH's *competitive electricity generation, mining, wholesale electricity sales, and commodity risk management and trading activities*, conducted by TCEH's Debtor subsidiaries composing "Luminant";

- EFH's *competitive retail electricity sales operations and related operations*, mainly conducted by TCEH's Debtor subsidiaries composing "TXU Energy";[9] and

- EFH's *rate-regulated electricity transmission and distribution operations*, conducted by the non-Debtor entities composing "Oncor."

23.    In the aggregate, the Debtors have approximately $42 billion of funded indebtedness, including (a) approximately $32.1 billion of claims against TCEH and TCEH's direct and indirect Debtor subsidiaries; (b) approximately $71 million of claims against EFCH; (c) approximately $1.9 billion of claims against EFH Corp.; and (d) approximately $7.7 billion of claims against EFIH.[10]

24.    Although the Debtors' balance sheet is overleveraged, the Debtors' operations are strong. Luminant's generation units are high-performing, its mining and electricity generation

---

[8]    The Debtors in these chapter 11 cases consist of: (a) the vast majority of the entities that compose Luminant and TXU Energy, as well as those entities' intermediate corporate parent entity, TCEH, a Delaware limited liability company, and TCEH's corporate parent, EFCH, a Delaware limited liability company; (b) Energy Future Intermediate Holding Company LLC ("EFIH"), a Delaware limited liability company that indirectly owns approximately 80% of Oncor Electric Delivery Holdings Company LLC ("Oncor"), and EFIH's wholly-owned subsidiary, EFIH Finance Inc.; (c) EFH Corp.; and (d) other direct and indirect subsidiaries of EFH Corp., including EFH Corporate Services Company.

[9]    The Debtors also conduct a relatively small amount of retail electricity operations through their 4Change brand and another entity, Luminant ET Services Company, that provides retail electricity service to some end use customers and to some of Luminant's mining operations, and a small amount of retail gas operations through Luminant Energy Company LLC.

[10]    Amounts include intercompany debt holdings and short-term borrowings, and exclude guarantees, unamortized discounts or premiums, accrued but unpaid interest, and certain other figures typically reported in the Debtors' filings with the Securities and Exchange Commission (the "SEC"), such as capital lease obligations, certain promissory notes, and certain other obligations.

operations have impressive safety records, and its commodity trading and risk management activities have delivered significant value to the Debtors. TXU Energy is an industry leader in customer care performance and product innovation and has maintained strong performance notwithstanding intense competition. And non-Debtor Oncor produces a strong and consistent stream of revenue. Thus, these chapter 11 cases will provide the Debtors with the opportunity to restructure their balance sheets and retain their position as leaders in the Texas electricity market.

25.    As of December 31, 2013, EFH Corp. reported total assets of approximately $36.4 billion in book value, approximately $28.8 billion of which is attributable to the TCEH Debtors and TCEH's non-Debtor subsidiaries,[11] and total liabilities of approximately $49.7 billion in book value, approximately $41.1 billion of which is attributable to the TCEH Debtors and TCEH's non-Debtor subsidiaries.[12] EFH Corp.'s assets and liabilities that are not attributable to the TCEH Debtors and TCEH's non-Debtor subsidiaries are mostly attributable to EFIH's indirect ownership of approximately 80% of Oncor. EFH Corp.'s consolidated revenues for the quarter ending December 31, 2013 were approximately $1.3 billion, all of which were attributable to TCEH Debtors and TCEH's non-Debtor subsidiaries. EFH Corp.'s consolidated annual revenues for the year ending December 31, 2013 were approximately $5.9 billion.

---

[11]    Oncor's revenues are not included in EFH Corp.'s consolidated revenues because EFH Corp. accounts for its ownership of Oncor under the equity method of accounting.

[12]    Figures for TCEH are derived from EFCH's public filings with the SEC, and are almost entirely attributable to TCEH and its Debtor and non-Debtor subsidiaries.

## The TCEH Debtors' Outstanding Prepetition Indebtedness

I.    **TCEH First Lien Debt.**

26.    *First Lien Credit Agreement*.  Pursuant to that certain credit agreement dated as of October 10, 2007 (as amended, modified, or supplemented and in effect immediately prior to the Petition Date, the "First Lien Credit Agreement"), among TCEH, as the borrower, EFCH, as successor to Energy Future Competitive Holdings Company, as the parent guarantor, the Subsidiary Guarantors, Citibank, N.A., as administrative and collateral agent (the "First Lien Credit Agent"), and the lenders that are parties thereto from time to time (the "First Lien Lenders"), the TCEH Debtors may borrow under the term loan and revolving credit facilities, as well as other financial accommodations from the First Lien Lenders.

27.    *First Lien Notes*.  Pursuant to that certain indenture (the "First Lien Notes Indenture," and, together with all other loan and security documents (including, without limitation, the "Security Documents" as defined in the First Lien Credit Agreement and the First Lien Notes Indenture) related to, referenced in, or executed in connection with the First Lien Credit Agreement or the First Lien Notes Indenture, the "First Lien Facilities"), dated April 19, 2011, for the 11.50% senior secured notes (the "First Lien Notes") due October 1, 2020, by and among TCEH and TCEH Finance, Inc., as issuers, BOKF, N.A., as indenture trustee (the "First Lien Notes Trustee," and together with the First Lien Credit Agent, the "Prepetition First Lien Agents"), and EFCH and the Subsidiary Guarantors, as guarantors, TCEH and TCEH Finance, Inc. issued $1.75 billion in principal amount of the First Lien Notes.

28.    *First Lien Hedges and Swaps*.  The TCEH Debtors are also party to:  (a) first lien commodity hedges (the "First Lien Commodity Hedges"); and (b) first lien interest rate swaps used to hedge interest rate exposure on their variable rate debt (the "First Lien Interest Rate

Swaps") as provided for under the First Lien Facilities. The "Prepetition First Lien Creditors" include the First Lien Lenders, together with the First Lien Credit Agent, all other "Secured Parties" (as defined in the First Lien Credit Agreement), the First Lien Notes Trustee, the holders of the First Lien Notes, and the counterparties to the First Lien Interest Rate Swaps and the First Lien Commodity Hedges.

29.    *First Lien Collateral*.    The First Lien Debt is secured by first priority liens (the "Prepetition First Priority Liens") in the "Collateral" (the "Prepetition Collateral"), as defined in that certain amended and restated security agreement (the "First Lien Security Agreement"), dated as of April 7, 2011, by and among the TCEH Debtors and the First Lien Agent, including all of the TCEH Debtors' cash to the extent that such cash constitutes proceeds of other Prepetition Collateral.

30.    *First Lien Intercreditor Agreement*.    The first lien intercreditor agreement (as amended, restated, modified, and supplemented from time to time, the "First Lien Intercreditor Agreement") by and among the TCEH Debtors, the Prepetition First Lien Agents, certain Prepetition First Lien Creditors, and other parties thereto from time to time, governs, among other things:  (i) payment and priority with respect to holders of claims related to the TCEH First Lien Debt; (ii) rights and remedies of the holders of TCEH First Lien Debt with respect to debtor-in-possession financing, use of cash collateral, and adequate protection in a chapter 11 case; and (iii) the relative priority of liens granted to holders of "Secured Obligations" under a "Secured Hedging Agreement," "Secured Cash Management Agreement," or "Secured Commodity Hedge and Power Sale Agreement" (each as defined in the First Lien Intercreditor Agreement) pursuant to ISDA master agreements, schedules, and confirmations related thereto or otherwise.

## II.    TCEH Second Lien Debt.

31.    *Second Lien Notes*.  Pursuant to that certain indenture (the "Second Lien Notes Indenture," and together with the First Lien Facilities, the "Prepetition Secured Facilities"), dated October 6, 2010, for the 15.0% second lien notes (the "Second Lien Debt," and together with the First Lien Debt, the "TCEH Secured Debt"), by and among TCEH and TCEH Finance, Inc., as issuers, as successor to The Bank of New York Mellon Trust Company, N.A., as indenture trustee (the "Second Lien Trustee"), The Bank of New York Mellon Trust Company, N.A., as collateral agent (including any successor thereto, the "Second Lien Collateral Agent," and together with the Second Lien Trustee, the "Second Lien Agent"), and EFCH and the Subsidiary Guarantors, as guarantors, TCEH and TCEH Finance, Inc. issued to holders (the "Prepetition Second Lien Creditors") approximately $1.57 billion in principal amount of the Second Lien Debt.

32.    *Second Lien Collateral*.  The Second Lien Debt is secured by second priority liens (the "Prepetition Second Priority Liens") in the Prepetition Collateral, as set forth in that certain second lien security agreement (as amended, restated, modified, and supplemented from time to time, the "Second Lien Security Agreement"), dated as of October 6, 2010, by and among the TCEH Debtors and the Second Lien Agent.

33.    *Second Lien Intercreditor Agreement*.  The second lien intercreditor agreement (as amended, restated, modified, and supplemented from time to time, the "Second Lien Intercreditor Agreement") entered into by and among the TCEH Debtors, the First Lien Agent, and the Second Lien Agent, governs, among other things, the relative priority of the First Lien Debt and the Second Lien Debt and the rights and remedies of the holders of First Lien Debt and Second Lien Debt with respect to debtor-in-possession financing, use of cash collateral, and

24

adequate protection. In particular, pursuant to section 6.04 of the Second Lien Intercreditor Agreement, holders of Second Lien Debt are bound by the actions and consents of the First Lien Agent under the First Lien Intercreditor Agreement with respect to any debtor-in-possession financing or use of cash collateral, and the Second Lien Agent and holders of Second Lien Debt are prohibited from objecting to such debtor-in-possession financing or use of cash collateral to the extent that the First Lien Credit Agent consents.

### III.   Tex-La Obligations.

34.   ***Tex-La Obligations***.   EFCH is the principal obligor of, and EFH Corp. guarantees, approximately $62 million of obligations related to a series of transactions by and among the predecessors of EFH Corp. and EFCH, on the one hand, and the Tex-La Electric Cooperative of Texas, Inc. ("Tex-La"), on the other hand (such obligations, the "Tex-La Obligations"), as provided in that certain assumption agreement (the "Tex-La Assumption Agreement," and together with all related agreements, the "Tex-La Documents"), dated February 1, 1990, by and among EFCH, Tex-La, and the administrator of the Rural Utilities Service, an agency of the United States Department of Agriculture, whereby EFCH agreed to assume certain outstanding indebtedness of Tex-La. Approximately $29 million and $33 million of the Tex-La Obligations are due in 2019 and 2021, respectively.

35.   ***Tex-La Collateral***.   As of the date of this Motion, the Tex-La Obligations are secured by a 2.17% undivided ownership in Comanche Peak's electricity generation and transmission assets and a 6.02% undivided ownership interest in the 51.5 mile 345 kV Comanche Peak-Cleburne-Everman transmission facility (the "Tex-La Collateral," and the liens on the Tex-La Collateral, the "Tex-La Liens"). The Prepetition First Priority Liens and the Prepetition Second Priority Liens were granted subject to the Tex-La Collateral.

**Development of the DIP Budget and the TCEH Debtors' Need for DIP Financing**

36.    To continue operating in the ordinary course and to effectuate an efficient and expeditious restructuring, the TCEH Debtors need to access liquidity.  As discussed below and in the Goldstein Declaration, the TCEH Debtors, with the assistance of their advisors, analyzed their cash needs to determine what is necessary to maintain their operations in chapter 11 and work toward a successful reorganization.  In undertaking this analysis, the TCEH Debtors and their advisors considered the TCEH Debtors' near-term projected financial performance, including demand for the TCEH Debtors' services and the cost of supplying such services.  The TCEH Debtors' management also conferred with key operational divisions to understand essential business metrics in both the near- and long-term.

37.    As part of the TCEH Debtors' financial review and analysis, the TCEH Debtors developed an initial three-month budget, attached hereto as **Exhibit C** (the "DIP Budget").  The DIP Budget incorporates a number of factors, including the effect of the chapter 11 filing, material cash disbursements, required vendor/supplier payments, cash flows from the TCEH Debtors' ongoing operations, and the cost of necessary goods and materials and includes all of the expenditures for which the Debtors seek authority to pay in various "first day" pleadings.

38.    The Debtors will use Cash Collateral to fund working capital, capital expenditures, and other general corporate purposes.  Cash Collateral, however, will be insufficient to fund the costs associated with a chapter 11 restructuring.  Therefore, the Debtors, with the assistance of their advisors, have determined that postpetition financing is necessary to fund the following restructuring costs, among others:  adequate protection payments; working capital (e.g., collateral for letters of credit), bankruptcy costs (e.g., business disruption and professional fees), and regulatory requirements (e.g., RCT mining reclamation obligations).  The

funding of these restructuring costs, described in greater detail in the DIP Budget, is necessary to preserve and maintain the TCEH Debtors' going-concern value and, ultimately, effectuate a successful reorganization.

39.     Among the restructuring costs addressed by the DIP Financing are the TCEH Debtors' mining reclamation obligations to the RCT. The TCEH Debtors maintain their mining operations in Texas with the permission of the RCT, a regulatory agency that permits, enforces, and oversees surface mining and reclamation in the State. The RCT's grant of permission to the TCEH Debtors to maintain mining operations is conditioned on the TCEH Debtors' posting security to ensure the reclamation of their permitted mining areas. Prior to the Petition Date, the TCEH Debtors secured their reclamation obligations in the form of a self-bond. The TCEH Debtors arguably lost the right to self-bond upon filing the chapter 11 cases. *See* 16 TAC § 12.309(j)(2)(B). Pursuant to section 12.309(j)(7) of the TAC, the TCEH Debtors must immediately notify the RCT and post a substitute bond within 90 days of such notification.

40.     Upon the bankruptcy filing, the DIP Financing and the Interim Order contemplate the RCT Reclamation Support Carve Out, under which the DIP Lenders carve out up to $1,100,000,000 of their collateral for the benefit of the RCT. The RCT Reclamation Carve Out will be senior to any other obligations or liabilities of the Debtors, other than the professional fee Carve Out.

41.     As provided in the DIP Budget, the TCEH Debtors believe that approximately $1,600,000,000 in available liquidity is necessary for operations during the interim period of these chapter 11 cases. The proposed DIP Financing will provide the TCEH Debtors with immediate access of up to $2,700,000,000, consisting of (a) $800,000,000 under the Revolving Credit Facility, (b) $1,100,000,000 under the Delayed-Draw Term Facility, the proceeds of

which, if funded, subject to the condition set forth above, will be applied by TCEH to fund the RCT L/C Collateral Account, and (c) $800,000,000 under the Term Loan Facility, of which up to $800,000,000 may be applied by TCEH to fund the General L/C Collateral Account. Moreover, upon entry of the Final Order, the proposed DIP Financing will provide the TCEH Debtors with up to $4,475,000,000, consisting of (x) $1,950,000,000 under the Revolving Credit Facility, (y) $1,425,000,000 under the Term Loan Facility, of which up to $800,000,000 may be applied by TCEH to fund the General L/C Collateral Account, and (z) $1,100,000,000 under the Delayed-Draw Term Facility, the proceeds of which, if funded, subject to the condition set forth above, will be applied by TCEH to fund the RCT L/C Collateral Account to support RCT Letters of Credit.

42.    Absent an ability to demonstrate that the TCEH Debtors have the means available to operate in the ordinary course and procure goods and services that are vital to ongoing business operations, customers may seek other alternatives and vendors and suppliers may refuse to do business with the TCEH Debtors. Moreover, absent access to the funds available under the DIP Facility, the TCEH Debtors may not have sufficient liquidity to continue their business operations in the ordinary course to the material detriment of customers, creditors, employees, and other parties in interest, jeopardizing the success of the TCEH Debtors' restructuring. Therefore, the TCEH Debtors have an immediate need to access the DIP Facility on an interim basis and throughout the pendency of these chapter 11 cases.

### The TCEH Debtors' Efforts to Obtain Postpetition Financing

43.    As discussed in the Goldstein Declaration, the TCEH Debtors' decision to proceed with the DIP Financing comes after a dedicated and diligent search for the best financing alternatives. In early September 2013, the TCEH Debtors and Evercore initiated a

request for DIP facility proposals ("RFP"). The TCEH Debtors' advisors canvassed the market to find parties interested in providing debtor-in-possession financing. During the initial stage of the RFP process, the TCEH Debtors approached five large financial institutions that are actively involved in the debtor-in-possession and syndicated finance markets. The TCEH Debtors and their advisors provided these financial institutions with a proposed DIP financing structure, draft commitment letter, and a detailed term sheet. The TCEH Debtors offered each of these financial institutions the opportunity to conduct due diligence and submit proposals for up to 100% of the DIP financing commitment.

44.     Five financial institutions submitted proposals in response to the TCEH Debtors' RFP. After substantial analysis of the DIP financing proposals, the TCEH Debtors concluded that no single financial institution would be able to underwrite the entire amount of the DIP financing due to the size of the proposed revolving credit facility. Nevertheless, the size of the revolving credit facility remained a priority for the TCEH Debtors because a revolving credit facility offered several benefits over a comparable term facility, including lower pricing and greater efficiency by deferring funding until needed. As a result of this analysis, the TCEH Debtors decided to aggregate the support of multiple financial institutions to fund the DIP Facility.

45.     In early October 2013, two additional financial institutions signed non-disclosure agreements and joined the DIP financing process. The TCEH Debtors continued negotiating with all seven financing providers during the first three weeks of October to obtain the most favorable terms on the DIP Financing. On October 25, 2013, the TCEH Debtors determined that the DIP Financing proposals from Citigroup Global Markets Inc. and Deutsche Bank Securities Inc. contained the best possible combination of terms and effectively addressed the TCEH

Debtors' liquidity needs. The TCEH Debtors thus began negotiating commitment letters with Citigroup Global Markets Inc. and Deutsche Bank Securities Inc., as well as the five other lenders, understanding that the TCEH Debtors would require a broadly-syndicated facility to achieve a revolving credit facility of this size.

46.    The TCEH Debtors' initial discussions provided a foundation for renewing DIP Financing negotiations in early February 2014. The TCEH Debtors and their advisors continued negotiating with the DIP Lenders through April 2014, including replacing one of the seven lenders.

47.    On April 28, 2014, the TCEH Debtors received signed commitment letters from all seven initial lenders under the DIP Facility. Collectively, these institutions were able to provide the TCEH Debtors with $4,475,000,000 in DIP Financing, including the $1,950,000,000 Revolving Credit Facility.

48.    The DIP Financing is the best source of financing, providing the TCEH Debtors with the liquidity they need to continue operating their businesses in the ordinary course and satisfy restructuring-related costs. The DIP Financing was negotiated at arm's length on terms that are reasonable. Thus, to ensure the TCEH Debtors' access to sufficient liquidity that will provide the foundation for maximizing value for all stakeholders, the DIP Financing should be approved.

## Basis for Relief

I.    **The TCEH Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Facility.**

A.    **Entry into the DIP Credit Agreement is an Exercise of the TCEH Debtors' Sound and Reasonable Business Judgment.**

49.    The Court should authorize the TCEH Debtors, as an exercise of the TCEH Debtors' sound business judgment, to enter into the DIP Credit Agreement and obtain access to the DIP Facility.

50.    Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances as described in greater detail below. Provided that an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance with its sound business judgment in obtaining such credit. *See, e.g., Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment."); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Barbara K. Enters., Inc.*, No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[c]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does

not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, inter alia, an exercise of "sound and reasonable business judgment.").

51.    Specifically, to determine whether the business judgment standard is met, a court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code.") (citation omitted).

52.    The TCEH Debtors' execution of the DIP Credit Agreement is an exercise of their sound business judgment that warrants approval by the Court. Before the Petition Date, the TCEH Debtors and their advisors analyzed the TCEH Debtors' projected financing needs during the pendency of these chapter 11 cases, and determined that the TCEH Debtors would require significant postpetition financing to support their operational and restructuring activities. Accordingly, the TCEH Debtors negotiated the DIP Facility with the DIP Lenders in good faith, at arm's length, and with the assistance of their advisors, to obtain the required postpetition financing on terms most favorable to the TCEH Debtors. Based on the advice of counsel and other professionals, and the TCEH Debtors' own analysis, the TCEH Debtors have determined in their sound business judgment that the DIP Documents provide a greater amount of financing on more favorable terms than any other reasonably available alternative. The TCEH Debtors' advisors canvassed the market to find interested parties to participate in the debtor-in-possession

32

financing and have assisted the TCEH Debtors in negotiations to obtain the best terms available to ensure that the DIP Facility was fully subscribed.

53.    The TCEH Debtors have an urgent need to obtain access to the DIP Facility to, among other things, continue the operation of their businesses in an orderly manner, maintain business relationships with vendors, suppliers, and customers, pay employees, satisfy regulatory obligations, and satisfy other working capital and operational needs – each of which is vital to preserving and maintaining the value of these estates for the benefits of all stakeholders. Moreover, the TCEH Debtors believe that access to the DIP Facility will provide assurance to all parties in interest at this critical juncture.  Thus, entry into the DIP Facility is an exercise of the Debtors' sound business judgment.

**B.    The TCEH Debtors Should Be Authorized to Obtain Postpetition Financing on a Senior Secured and Superpriority Basis.**

54.    Section 364 of the Bankruptcy Code authorizes a debtor to obtain, in certain circumstances, postpetition financing on a secured or superpriority basis, or both.  Specifically, section 364(c) of the Bankruptcy Code provides, in pertinent part, that the Court, after notice and a hearing, may authorize a debtor that is unable to obtain credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code to obtain credit or incur debt:

> (a) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code];
>
> (b) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (c) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

55.    To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an

unsecured or administrative expense basis. *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also, L.A. Dodgers*, 457 B.R. at 313 (citing *Ames Dep't Store*, 115 B.R. at 37 (noting the court "may not approve any credit transaction under subsection (c) [of section 364] unless the debtor demonstrates that it has attempted, but failed, to obtain unsecured credit under section 364(a) or (b)"). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.*; *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense). When few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received); *see also In re Garland Corp.*, 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) authorized, after notice and a hearing, upon showing that unsecured credit unobtainable); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met).

56.     The TCEH Debtors' and Evercore's discussions with various potential sources of DIP financing revealed that DIP financing on a junior or unsecured basis was not available to the TCEH Debtors. The TCEH Debtors' significant secured debt obligations and lack of

unencumbered assets precludes them from obtaining postpetition financing in the amount they require on terms other than on a senior secured and superpriority basis. The Court should therefore authorize the TCEH Debtors to provide the DIP Agent, on behalf of itself, the DIP Lenders, the DIP L/C Issuers, the Secured Hedge Banks, and the Secured Cash Management Banks, (i) senior liens on the TCEH Debtors' unencumbered property as provided in section 364(c)(2) of the Bankruptcy Code, (ii) priming liens on the TCEH Debtors' property that is subject to liens held by any of the Prepetition Secured Creditors, as provided in section 364(d)(1) of the Bankruptcy Code, (iii) junior liens on the TCEH Debtors' encumbered property (other than the property described in clause (i) or (ii) above), as provided in section 364(c)(3) of the Bankruptcy Code, and (iv) superpriority administrative expense status for all DIP Obligations as provided for in section 364(c)(1) of the Bankruptcy Code.

C.   **The TCEH Debtors Should Be Authorized to Obtain Postpetition Financing Secured by First Priority Priming Liens.**

57.   In addition to authorizing financing under section 364(c) of the Bankruptcy Code, courts also may authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on the encumbered property, without the consent of the existing lienholders, if the debtor cannot otherwise obtain such credit and the interests of existing lienholders are adequately protected. *See* 11 U.S.C. § 364(d)(1).

58.   When determining whether to authorize a debtor to obtain credit secured by a "priming" lien as authorized by section 364(d) of the Bankruptcy Code, courts focus on whether the transaction will enhance the value of the TCEH Debtors' assets. Courts consider a number of factors, including, without limitation:

> (a) whether alternative financing is available on any other basis (i.e., whether any better offers, bids, or timely proposals are before the court);

(b) whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtors' business;

(c) whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtors and proposed lender(s); and

(d) whether the proposed financing agreement was negotiated in good faith and at arm's length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors.

See, e.g., *Ames Dep't Stores*, 115 B.R. at 37–39; *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003); *Farmland Indus.*, 294 B.R. at 862–79, *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. Mar. 5, 2009); *Barbara K. Enters.*, 2008 WL 2439649 at *10; *see also* 3 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 364.04[1] (16th ed.). The DIP Documents satisfy each of these factors.

59.     *First*, as described above, the TCEH Debtors and their advisors canvassed the market and were not able to obtain financing on equal or better terms from the DIP Lenders other than financing secured by first priority priming liens.

60.     *Second*, the TCEH Debtors need the funds to be provided under the DIP Facility to preserve the value of their estates for the benefit of all stakeholders. Specifically, the TCEH Debtors need the funds to be provided under the DIP Facility to maintain operations and signal to their suppliers and other vendors that they are credit-worthy and that their vendors can and should continue to provide goods and services to the TCEH Debtors on substantially the same credit terms as during the prepetition period. Absent access to the DIP Facility and Cash Collateral, the TCEH Debtors will be unable to operate their businesses or prosecute these chapter 11 cases. Thus, providing the TCEH Debtors with the liquidity necessary to preserve

their going-concern value through the pendency of these chapter 11 cases is in the best interest of all stakeholders.

61.    ***Third***, the TCEH Debtors and their advisors determined that the DIP Lenders offered the best option for obtaining the postpetition financing the TCEH Debtors require, including, upon entry of the Interim Order, access to approximately $2,700,000,000 in incremental liquidity and access to approximately $1,900,000,000 in Letters of Credit, which the TCEH Debtors and their advisors have independently determined is sufficient and necessary to allow the TCEH Debtors to maintain their operations.  The DIP Lenders agreed to favorable terms of the DIP Financing, in part to create and foster relationships with the Debtors. Accordingly, the terms of the DIP Credit Agreement are reasonable and adequate to support the TCEH Debtors' operations and restructuring activities through the pendency of these chapter 11 cases.

62.    ***Fourth***, the TCEH Debtors conducted arm's-length negotiations with the DIP Lenders regarding the terms of the DIP Facility, and those agreements reflect the most favorable terms on which the DIP Lenders (or any other lender) were willing to offer financing.  Thus, the entry into the DIP Financing is an exercise of sound and reasonable business judgment in the best interests of the TCEH Debtors' estate and its creditors.  Accordingly, the Debtors satisfy the requirements to obtain postpetition financing secured by a first priority priming lien and the Court should authorize the TCEH Debtors to enter into the DIP Credit Agreement and obtain access to the DIP Financing.

**D.    The Interests of the Prepetition First Lien Creditors and Prepetition Second Lien Creditors Are Adequately Protected.**

63.    A debtor may obtain postpetition credit "secured by a senior or equal lien on property of the estate that is subject to a lien only if" the debtor, among other things, provides

37

"adequate protection" to those parties whose liens are primed or such parties consent. *See* 11 U.S.C. § 364(d)(1)(B). Here, the TCEH Debtors have obtained the consent of the TCEH First Lien Ad Hoc Committee, and the Prepetition Second Lien Creditors are deemed to have consented pursuant to the Second Lien Intercreditor Agreement. In any event, as discussed at length in the Cash Collateral Motion, the TCEH Debtors will provide the Prepetition Secured Creditors with Adequate Protection. What constitutes adequate protection is decided on a case-by-case basis, and adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims. *See, e.g., In re Cont'l Airlines Inc.*, 154 B.R. 176, 180–181 (Bankr. D. Del. 1993); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case"); *In re Realty Sw. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted).

64.     Specifically, the TCEH Debtors are providing the First Lien Collateral Agent, for the benefit of itself and the Prepetition First Lien Creditors:  (a) the First Priority Adequate Protection Liens; (b) the First Priority 507(b) Claim; (c) payment of certain fees and expenses; (d) the First Lien Adequate Protection Payments; (e) the Financial Covenant, (f) the Budget and Annual Operating Forecast, and (g) to the extent given to the DIP Lenders, reasonable access to the Debtors' records and information (each as defined in the Cash Collateral Order). The Second Lien Agent will receive, for the benefit of itself and the Prepetition Second Lien Creditors,

(x) the Second Priority Adequate Protection Liens and (y) the Second Priority 507(b) Claim. Although its liens are not being primed, Tex-La will receive Tex-La Adequate Protection Payments as adequate protection for the Diminution in Value of its interests in the Tex-La Collateral.

65.    The Adequate Protection summarized above and set forth in the Cash Collateral Order is fair and reasonable, and is sufficient to satisfy the requirements of section 364(d)(1)(B) of the Bankruptcy Code.  Moreover, the TCEH First Lien Ad Hoc Committee, representing 41% in amount of claims under the First Lien Credit Agreement and the First Lien Notes Indenture, has consented to the Adequate Protection.  Accordingly, the Court should find that the Adequate Protection is fair and reasonable and satisfies the requirements of section 364(d)(1)(B) of the Bankruptcy Code.

## II.    The Payment of Fees is Appropriate.

66.    The TCEH Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Agent, the DIP Lenders, the DIP L/C Issuers, and the Joint Lead Arrangers in exchange for their providing the DIP Financing.  The fees the Debtors have agreed to pay to the DIP Agent, the DIP Lenders, the DIP L/C Issuers, and the Joint Lead Arrangers, together with the other provisions of the DIP Documents, represent the most favorable terms to the TCEH Debtors on which the DIP Agent, the DIP Lenders, the DIP L/C Issuers, and the Joint Lead Arrangers would agree to make the DIP Financing available.  The TCEH Debtors considered such fees when determining in their sound business judgment that the DIP Documents constituted the best terms on which the TCEH Debtors would obtain the postpetition financing necessary to continue their operations and prosecute their chapter 11 cases, and paying these fees in order to obtain the

DIP Financing is in the best interests of the TCEH Debtors' estates, creditors, and other parties in interest.

67.     Courts routinely authorize debtors to pay fees similar to those the TCEH Debtors propose to pay, where the associated financing is, in the debtor's business judgment, beneficial to the debtors' estates—indeed, on a percentage basis the fees here are significantly smaller than fees approved in many other cases. *See, e.g., In re LSP Energy Ltd. P'ship*, No. 12-10460 (Bankr. D. Del Feb. 27, 2012) (approving 1.25-percent commitment fee); *In re Friendly Ice Cream Corp.*, No. 11-13167 (Bankr. D. Del. Nov. 2, 2011) (approving certain letter of credit fees including a 2-percent issuance fee); *In re Sea Launch Co., L.L.C.*, No. 09-12153 (Bankr. D. Del. May 12, 2010) (approving 3.75-percent DIP break-up fee); *In re Cooper-Standard Holdings Inc.*, No. 09-12743 (Bankr. D. Del. Sept. 2, 2009) (approving 2.5-percent upfront fee and 2.5-percent exit fee); *In re Hayes Lemmerz Int'l, Inc.*, No. 09-11655 (Bankr. D. Del. June 15, 2009) (approving 3-percent exit fee); *In re Aleris Int'l. Inc.*, No. 09-10478 (Bankr. D. Del. Mar. 18, 2009) (approving 3.5-percent exit fee and 3.5% front-end net adjustment against each lender's initial commitment); *In re Dura Auto. Sys., Inc.*, No. 06-11202 (Bankr. D. Del. Jan. 30, 2008) (approving a 2.5-percent fee related to refinancing and extending a postpetition financing facility); *see also In re Great Atl. & Pac. Tea Co.*, No. 10-24549 (Bankr. S.D.N.Y. Jan. 11, 2011) (approving 3-percent letter of credit fee); *In re InSight Health Servs. Holdings Corp.*, No. 10-16564 (Bankr. S.D.N.Y. Jan. 4, 2011) (approving 2.5-percent DIP closing fee); *In re Neff Corp.*, No. 10-12610 (Bankr. S.D.N.Y. June 30, 2010) (approving 3.1-percent DIP and exit facility fee); *In re Reader's Digest Ass'n*, No. 09-23529 (Bankr. S.D.N.Y. Oct. 6, 2009) (approving 3-percent exit fee); *In re Lear Corp.*, No. 09-14326 (Bankr. S.D.N.Y. Aug. 4, 2009) (approving 5-percent upfront fee and a 1-percent exit/conversion fee); *In re Gen. Growth Props.,*

*Inc.*, No. 09-11977 (Bankr. S.D.N.Y. May 14, 2009) (approving 3.75-percent exit fee); *In re Tronox Inc.*, No. 09-10156 (Bankr. S.D.N.Y. Feb. 9, 2009) (approving an upfront 3-percent facility fee). Accordingly, the Court should authorize the TCEH Debtors to pay the fees provided under the DIP Documents in connection with entering into those agreements.

68. The terms of the DIP Documents, including the key provisions described above, constitute the most favorable terms on which the TCEH Debtors could obtain needed postpetition financing.

## III. The Scope of the Carve Out and the RCT Reclamation Support Carve Out is Appropriate.

69. The proposed DIP Facility subjects the security interests and administrative expense claims of the DIP Lenders to the Carve Out and the RCT Reclamation Support Carve Out (if any). Carve outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel. *See Ames*, 115 B.R. at 40. The DIP Facility does not directly or indirectly deprive the TCEH Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these cases. *See Ames*, 115 B.R. at 38 (observing that courts insist on carve outs for professionals representing parties-in-interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). Additionally, the Carve Out protects against administrative insolvency during the course of these chapter 11 cases by ensuring that assets remain for the payment of U.S. Trustee fees and professional fees of the TCEH Debtors and a committee of unsecured creditors, notwithstanding the grant of superpriority and administrative liens and claims under the DIP Facility.

70.     Furthermore, as described above, the TCEH Debtors are obligated to secure their reclamation obligations to the RCT.   The TCEH Debtors, after consultation with the DIP Lenders, the Prepetition First Lien Agent, and their respective advisors, believe that securing the RCT reclamation obligations with the RCT Reclamation Support Carve Out is preferable to other alternatives, including a letter of credit, because the Debtors will be able to avoid significant fees associated with such alternatives.   Accordingly, the TCEH Debtors believe the scope of the RCT Reclamation Support Carve Out is appropriate.

## IV.     The DIP Lenders Should Be Deemed Good Faith Lenders under Section 364(e) of the Bankruptcy Code.

71.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Specifically, section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

72.     The DIP Facility was negotiated in good faith and at arm's length among the TCEH Debtors, the DIP Agent, the DIP Lenders, and the DIP L/C Issuers, and all of the DIP Facility obligations will be extended by the DIP Lenders and the DIP L/C Issuers in good faith (as such term is used in section 364(e) of the Bankruptcy Code).   No consideration is being provided to any party in connection with the DIP Financing other than as described in this Motion, the Commitment Letter, and the Fee Letter.   Moreover, the DIP Facility has been

extended in express reliance upon the protections afforded by section 364(e) of the Bankruptcy Code and the DIP Agent, the DIP Lenders, and the DIP L/C Issuers should be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Interim Order or any provision thereof is vacated, reversed, or modified on appeal or otherwise. *See* 11 U.S.C. § 364(e). Accordingly, the Court should find that the DIP Agent, the DIP Lenders, and the DIP L/C Issuers are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by that section.

**V.      Approval of the DIP Facility on an Interim Basis is Necessary to Prevent Immediate and Irreparable Harm.**

73.      Bankruptcy Rule 4001(c)(2) governs the procedures for obtaining authorization to obtain postpetition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 14 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. Proc. 4001(c)(2).

74.      In examining requests for interim relief under this rule, courts in this jurisdiction generally apply the same business judgment standard applicable to other business decisions. *See Ames Dep't Stores*, 115 B.R. at 36.

75.      The Debtors and their estates will suffer immediate and irreparable harm if the relief requested in this Motion, including authorizing the Debtors to borrow up to $2,700,000,000 on an interim basis, is not granted promptly after the Petition Date. The Debtors anticipate that the commencement of the chapter 11 cases will significantly and immediately increase the demands on their free cash as a result of, among other things, the costs of

43

administering the chapter 11 cases and addressing key constituents' concerns regarding the Debtors' financial health and ability to continue operations in light of the chapter 11 cases. Accordingly, the Debtors have an immediate need for access to liquidity to fund, among other things, adequate protection payments, working capital needs, and to maintain ongoing business relationships—all of which are required to preserve and maintain the Debtors' enterprise value for the benefit of all parties in interest.

76.    The importance of a debtor's ability to secure postpetition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized in this district in similar circumstances. *See, e.g.*, *In re Exide Techs.*, No. 13-11482 (Bankr. D. Del June 11, 2013); *In re LSP Energy Ltd. P'ship.*, No. 12-10460 (Bankr. D. Del. Nov. 27, 2012); *In re S. Air Holdings, Inc.*, No. 12-12690 (Bankr. D. Del. Oct. 25, 2012); *In re Neb. Book Co.*, No. 11-12005 (Bankr. D. Del. July 21, 2011); *In re Friendly Ice Cream Corp.*, No. 11-13167 (Bankr. D. Del. Oct. 6, 2011); *In re Appleseed's Intermediate Holdings LLC*, No. 11-10160 (Bankr. D. Del. Feb. 23, 2011); *In re Taylor-Wharton Int'l LLC*, No. 09-14089 (Bankr. D. Del. Nov. 20, 2009); *In re Visteon Corp.*, No. 09-11786 (Bankr. D. Del. Nov. 12, 2009). Accordingly, for the reasons set forth above, prompt entry of the DIP Order is necessary to avert immediate and irreparable harm to the Debtors' estates and is consistent with, and warranted under, Bankruptcy Rules 4001(b)(2) and (c)(2).

## VI. Modification of the Automatic Stay Provided Under Section 362 of the Bankruptcy Code is Appropriate Under the Circumstances.

77.    The DIP Documents and the proposed Interim Order contemplate that the automatic stay imposed under section 362(a) of the Bankruptcy Code shall be vacated or modified to the extent necessary to effectuate all of the terms and provisions contained therein, including, without limitation, to: (a) permit the TCEH Debtors to grant the DIP Liens and the

DIP Superpriority Claims; (b) permit the TCEH Debtors to perform such acts as the DIP Agent, the DIP Lenders, and the DIP L/C Issuers each may request in its sole discretion to assure the perfection and priority of the DIP Liens; (c) permit the TCEH Debtors to incur all liabilities and obligations to the DIP Agent, the DIP Lenders, and the DIP L/C Issuers under the DIP Documents and the Interim Order; (d) authorize the TCEH Debtors to make payments, and the DIP Agent, the DIP Lenders, and the DIP L/C Issuers to retain and apply payments made, in accordance with the terms of the Interim Order; and (e) permit the DIP Agent to exercise and enforce its rights and remedies as provided in the Interim Order.  The Interim Order provides, however, that the DIP Agent must provide the TCEH Debtors, the U.S. Trustee, and lead counsel to any committee appointed in these chapter 11 cases with five calendar days' written notice before exercising any enforcement rights or remedies, which will allow the TCEH Debtors and other interested parties to seek an emergency hearing before the Court solely for the purpose of contesting whether an Event of Default has occurred and/or is continuing.

78.     Stay modification provisions of this sort are ordinary and usual features of debtor-in-possession financing facilities and, in the TCEH Debtors' business judgment, are reasonable under the present circumstances.   Accordingly, the Court should modify the automatic stay to the extent contemplated under the DIP Credit Agreement and the proposed Orders.

### Request For Final Hearing

79.     Pursuant to Bankruptcy Rules 4001(c)(2) and Local Bankruptcy Rule 4001-2(c), the Debtors requests that the Court set a date for the final hearing that is as soon as practicable, but in no event later than 45 days following the Petition Date, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

## Waiver of Bankruptcy Rules 6004(a) and 6004(h)

80.    To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## Notice

81.    The Debtors have provided notice of this Motion to: (a) the Office of the U.S. Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) Citibank, N.A., in its capacity as First Lien Credit Agent under the First Lien Credit Agreement, and Wilmington Trust, N.A., upon the effectiveness of its appointment as successor First Lien Credit Agent; (d) Bank of New York Mellon Trust Company, N.A., in its capacity as indenture trustee under: (i) the TCEH unsecured pollution control revenue bonds; and (ii) the EFCH 2037 Notes due 2037, and counsel thereto; (e) American Stock Transfer & Trust Company, LLC, in its capacity as indenture trustee under: (i) the 9.75% EFH senior unsecured notes due 2019; (ii) the 10.0% EFH senior unsecured notes due 2020; (iii) the 10.875% EFH LBO senior unsecured notes due 2017; (iv) the 11.25%/12.0% EFH LBO toggle notes due 2017; (v) the 5.55% EFH legacy notes (series P) due 2014; (vi) the 6.50% EFH legacy notes (series Q) due 2024; and (vii) the 6.55% EFH legacy notes (series R) due 2034, and counsel thereto; (f) Computershare Trust Company, N.A. and Computershare Trust Company of Canada, in their capacities as indenture trustee under: (i) the 11.0% EFIH senior secured second lien notes due 2021; and (ii) the 11.75% EFIH senior secured second lien notes due 2022; (g) UMB Bank, N.A. in its capacity as indenture trustee under: (i) the 9.75% EFIH senior unsecured notes due 2019; and (ii) the 11.25%/12.25% EFIH senior toggle notes due 2018, and counsel thereto; (h) BOKF,

46

NA, dba Bank of Arizona, in its capacity as indenture trustee under 11.50% TCEH senior secured notes due 2020; (i) CSC Trust Company of Delaware in its capacity as indenture trustee under: (i) the 6.875% EFIH senior secured notes due 2017; and (ii) the 10.0% EFIH senior secured notes due 2020, and counsel thereto; (j) Law Debenture Trust Company of New York in its capacity as indenture trustee under: (i) the 10.25% TCEH senior unsecured notes due 2015; and (ii) the 10.50%/11.25% TCEH senior toggle notes due 2016, and counsel thereto; (k) Wilmington Savings Fund Society, FSB in its capacity as indenture trustee under the 15.0% TCEH senior secured second lien notes due 2021, and counsel thereto; (l) counsel to certain holders of claims against the Debtors regarding each of the foregoing described in clauses (c) through (k); (m) the agent for the TCEH debtor-in-possession financing facility and counsel thereto; (n) the agent for the EFIH debtor-in-possession financing facility and counsel thereto; (o) counsel to certain holders of equity in Texas Energy Future Holdings Limited Partnership; (p) counsel to Oncor; (q) the SEC; (r) the Internal Revenue Service; (s) the Office of the United States Attorney for the District of Delaware; (t) the Office of the Texas Attorney General on behalf of the PUC; (u) counsel to ERCOT; (v) the RCT; (w) the counterparties to the First Lien Commodity Hedges and First Lien Interest Rate Swaps; and (x) counsel to the unofficial committee of certain TCEH first lien debt holders. As this Motion is seeking "first day" relief, within forty eight hours of the entry of an order respecting this Motion, the Debtors will serve copies of this Motion and the order respecting this Motion as required by Local Bankruptcy Rule 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**No Prior Request**

82.     No prior request for the relief sought in this Motion has been made to this or any

other court.

[*Remainder of page intentionally left blank.*]

WHEREFORE, the TCEH Debtors respectfully request that the Court enter the Interim

Order, substantially in the form attached hereto as **Exhibit A**, and set a date for a hearing to

consider entry of the Final Order.

Wilmington, Delaware
Dated:   April 29, 2014

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:      (302) 651-7700
Facsimile:      (302) 651-7701
Email:           collins@rlf.com
                defranceschi@rlf.com
                madron@rlf.com

     -and-

**KIRKLAND & ELLIS LLP**
Richard M. Cieri (*pro hac vice* pending)
Edward O. Sassower, P.C. (*pro hac vice* pending)
Stephen E. Hessler (*pro hac vice* pending)
Brian E. Schartz (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:           richard.cieri@kirkland.com
                edward.sassower@kirkland.com
                stephen.hessler@kirkland.com
                brian.schartz@kirkland.com

     -and-

James H.M. Sprayregen, P.C. (*pro hac vice* pending)
Chad J. Husnick (*pro hac vice* pending)
Steven N. Serajeddini (*pro hac vice* pending)
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:           james.sprayregen@kirkland.com
                chad.husnick@kirkland.com
                steven.serajeddini@kirkland.com

Proposed Co-Counsel to the Debtors and Debtors in Possession

49

**<u>EXHIBIT A</u>**

**Proposed Interim Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | Case No. 14-_____ (___) |
| Debtors. | (Joint Administration Requested) |

## INTERIM ORDER (A) APPROVING
## POSTPETITION FINANCING FOR TEXAS COMPETITIVE
## ELECTRIC HOLDINGS COMPANY LLC AND CERTAIN OF
## ITS DEBTOR AFFILIATES, (B) GRANTING LIENS AND PROVIDING
## SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (C) MODIFYING
## THE AUTOMATIC STAY, AND (D) SCHEDULING A FINAL HEARING

Upon the motion (the "DIP Motion") of Texas Competitive Electric Holdings Company LLC (the "Borrower" or "TCEH"), Energy Future Competitive Holdings Company LLC (the "Parent Guarantor"), and each of the Subsidiary Guarantors (as defined in the DIP Credit Agreement (as defined herein)) (the Subsidiary Guarantors, together with the Parent Guarantor, the "Guarantors"), each as a debtor and debtor-in-possession (collectively, the "TCEH Debtors") in the above-captioned chapter 11 cases of the TCEH Debtors (collectively, the "Cases"), pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d), and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which the debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules"), seeking entry of an interim order (this "Interim Order"), inter alia:

(i)     authorizing the Borrower and the Parent Guarantor to enter into that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement, to be dated on or about the date this Interim Order is entered (as amended, restated, supplemented, or otherwise modified from time to time, the "DIP Credit Agreement"), between the Borrower, the Parent Guarantor, the financial institutions from time to time party thereto as lenders (the "DIP Lenders"), the financial institutions from time to time party thereto as letter of credit issuers (the "DIP L/C Issuers"), Citibank, N.A., as administrative agent and collateral agent (in such capacities, the "DIP Agent"),[2] and the other agents and entities from time to time party thereto, substantially in the form of Exhibit A annexed to the DIP Motion, to obtain secured postpetition financing (the "Financing") on a superpriority basis, consisting of (a) a revolving credit facility (the "Revolving Credit Facility") in an aggregate principal amount of up to $1,950,000,000; (b) a term credit facility (the "Term Loan Facility") in an aggregate principal amount of up to $1,425,000,000, of which up to $800,000,000 may be applied by TCEH to fund the General L/C Collateral Account to support General Letters of Credit (each, as defined in the DIP Credit Agreement); (c) a delayed-draw term credit facility (the "Delayed-Draw Term Facility") in an aggregate principal amount of up to $1,100,000,000, the proceeds of which, if funded, will be applied by TCEH to fund the RCT L/C Collateral Account to support RCT Letters of Credit (each, as defined in the DIP Credit Agreement); (d) obligations owed to the General Letter of Credit Issuer (as defined in

---

[2]     As used herein, the term "DIP Agent" refers to Citibank, N.A., as administrative agent under the DIP Credit Agreement, Citibank, N.A., as collateral agent under the DIP Credit Agreement, or both, as the context requires. All references in this Interim Order to the DIP Agent with respect to the Secured Hedge Banks or the Secured Cash Management Banks (each, as defined herein) shall mean Citibank, N.A., in its capacity as collateral agent. Citibank, N.A., in its capacity as administrative agent, has no duties or obligations to the Secured Hedge Banks or the Secured Cash Management Banks.

the DIP Credit Agreement) (without duplication of any other obligations described in clauses (a), (b), or (c) above) pursuant to a cash collateralized letter of credit facility (the "General Letter of Credit Facility") in an aggregate stated amount of up to $800,000,000, as such amount may be increased as agreed in writing between TCEH and the General Letter of Credit Issuers providing such increased amount; and (e) obligations owed to the RCT Letter of Credit Issuer (as defined in the DIP Credit Agreement) (without duplication of any other obligations described in clauses (a), (b), (c), or (d) above) pursuant to a cash collateralized letter of credit facility (the "RCT Letter of Credit Facility" and, collectively with the Revolving Credit Facility, the Term Loan Facility, the Delayed-Draw Term Facility, and the General Letter of Credit Facility, the "DIP Facility") in an aggregate stated amount of up to $1,100,000,000;

(ii)  authorizing the Parent Guarantor and each of the Subsidiary Guarantors to enter into that certain Guarantee, to be dated on or about the date this Interim Order is entered (as amended, restated, supplemented, or otherwise modified from time to time, the "DIP Guarantee");

(iii)  authorizing each of the TCEH Debtors to execute and deliver the DIP Credit Agreement, the DIP Guarantee, the Fee Letter (as defined in the DIP Credit Agreement), and the other related Credit Documents (as defined in the DIP Credit Agreement) (collectively, the "DIP Documents") and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

(iv)  granting the DIP Facility and all obligations owing thereunder and under the DIP Documents, the Secured Commodity Hedging Agreements, the Secured Hedging Agreements, and the Secured Cash Management Agreements (each, as defined in the DIP Credit Agreement) to the DIP Agent, the DIP Lenders, the DIP L/C Issuers, the Secured Hedge Banks, and the

Secured Cash Management Banks (collectively, and including all "Obligations" as described in the DIP Credit Agreement, including, without limitation, (A) obligations (the "Secured Hedge Obligations") owing under or in connection with the Secured Commodity Hedging Agreements or the Secured Hedging Agreements with the TCEH Debtors and (B) obligations (the "Secured Cash Management Obligations") owing under or in connection with the Secured Cash Management Agreements with the TCEH Debtors, the "DIP Obligations") allowed superpriority administrative expense claims in each of the Cases and any Successor Cases (as defined herein);

(v)    granting to the DIP Agent, for the benefit of itself, its sub-agents, the DIP Lenders, the DIP L/C Issuers, Hedge Banks (as defined in the DIP Credit Agreement) that are parties to Secured Commodity Hedging Agreements or Secured Hedging Agreements (the "Secured Hedge Banks") with the TCEH Debtors,[3] and Cash Management Banks (as defined in the DIP Credit Agreement) that are parties to Secured Cash Management Agreements (the "Secured Cash Management Banks") with the TCEH Debtors, automatically perfected security interests in and liens upon all of the DIP Collateral (as defined herein), including, without limitation, all property constituting "Cash Collateral," as defined in section 363(a) of the Bankruptcy Code, which security interests and liens shall be subject to the priorities set forth herein;

(vi)    authorizing and directing the TCEH Debtors to pay the principal, interest, fees, expenses, and other amounts payable and/or reimbursable under the DIP Documents, including the Fee Letter, as such amounts become due, including, without limitation, letter of credit fees (including issuance and other related charges), commitment fees, closing fees, arrangement fees,

---

[3]    For the avoidance of doubt, the TCEH Debtors are only authorized to pledge collateral for the benefit of Secured Hedge Banks pursuant to the terms of the *Interim Order Authorizing the Debtors To (A) Continue Performing Under the Prepetition Hedging and Trading Arrangements, (B) Pledge Collateral and Honor Obligations Thereunder, and (C) Enter Into and Perform Under Trading Continuation Agreements and New Postpetition Hedging and Trading Arrangements.*

4

incentive fees, and administrative agent's fees, all to the extent provided in, and in accordance with the terms of, the DIP Documents;

(vii)    vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents, as limited pursuant hereto, and this Interim Order; and

(viii)    scheduling a final hearing (the "Final Hearing") to consider the relief requested in the DIP Motion on a final basis and approving the form of notice with respect to the Final Hearing.

The Court having considered the DIP Motion, the *Declaration of Paul Keglevic, Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of Energy Future Holdings Corp., et al., in Support of First Day Motions*, sworn to on April 29, 2014, the exhibits attached thereto, the *Declaration of Stephen Goldstein in Support of (I) the Motion of Texas Competitive Electric Holdings Company LLC and Certain of Its Debtor Affiliates for Entry of Interim and Final Orders (A) Approving Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing and (II) the Motion of Texas Competitive Electric Holdings Company LLC and Certain of Its Debtor Affiliates for Entry of Interim and Final Orders (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing*, sworn to on April 29, 2014, the DIP Documents, and the evidence submitted or adduced and the arguments of counsel made at the interim hearing held on April [__], 2014 (the "Interim Hearing"); and notice of the Interim Hearing having been given in accordance with rules 4001(b), (c), and (d), and 9014 of the Bankruptcy Rules; and the Interim Hearing to consider the interim relief requested in the DIP

Motion having been held and concluded; and all objections, if any, to the interim relief requested in the DIP Motion having been withdrawn, resolved, or overruled by the Court; and it appearing to the Court that granting the interim relief requested is necessary to avoid immediate and irreparable harm to the TCEH Debtors and their estates pending the Final Hearing, is otherwise fair and reasonable and in the best interests of the TCEH Debtors and their estates, creditors, and other parties in interest, and is essential for the continued operation of the TCEH Debtors' businesses; and it further appearing that the TCEH Debtors are unable to obtain unsecured credit for money borrowed allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code; and after due deliberation and consideration and for good and sufficient cause appearing therefor;

BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING BY THE TCEH DEBTORS, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[4]

A.    Petition Date.    On April 29, 2014 (the "Petition Date"), each of the TCEH Debtors filed a separate voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court") commencing these Cases.  On [___], 2014, the Court entered an order approving the joint administration of these Cases.

B.    Debtors-in-Possession.    The TCEH Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Cases.

---

[4]    Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

C.    <u>Jurisdiction and Venue</u>.    The Court has jurisdiction over this matter, these proceedings, and the persons and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.    This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the TCEH Debtors confirm their consent pursuant to rule 9013-1(f) of the Local Bankruptcy Rules to the entry of a final order by the Court in connection with the DIP Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution. Venue for the Cases and proceedings on the DIP Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

D.    <u>Committee Formation</u>.    As of the date hereof, the United States Trustee for the District of Delaware (the "<u>U.S. Trustee</u>") has not appointed an official committee of unsecured creditors in these Cases pursuant to section 1102 of the Bankruptcy Code (the "<u>Creditors'</u> <u>Committee</u>").

E.    <u>Findings Regarding Postpetition Financing</u>.

(i)    <u>Request for Postpetition Financing</u>.    The TCEH Debtors seek authority to obtain the DIP Facility on the terms described herein and in the DIP Documents to administer their Cases and fund their operations.    At the Final Hearing, the TCEH Debtors will seek final approval of the proposed postpetition financing arrangements pursuant to a proposed final order (the "<u>Final Order</u>"), which shall be in form and substance acceptable to the DIP Agent, and notice of which Final Hearing and Final Order will be provided in accordance with this Interim Order.

(ii)      Priming of Liens of Prepetition Secured Creditors.  The priming of the Prepetition First Priority Liens[5] and the Prepetition Second Priority Liens of the Prepetition Secured Creditors in the Prepetition Collateral (each, as defined in the Interim Cash Collateral Order) under section 364(d) of the Bankruptcy Code, as contemplated by the DIP Facility and as further described below, will enable the TCEH Debtors to obtain the DIP Facility and to continue to operate their businesses for the benefit of the estates and their creditors.

(iii)     Need for Postpetition Financing.  The TCEH Debtors' need to obtain credit on an interim basis pursuant to the DIP Facility is immediate and critical to enable the TCEH Debtors to continue operations and to administer and preserve the value of their estates. The ability of the TCEH Debtors to finance their operations, maintain business relationships with their vendors, suppliers, and customers, pay their employees, and otherwise finance their operations requires the availability of working capital from the DIP Facility, the absence of which would immediately and irreparably harm the TCEH Debtors, their estates, and their creditors, and the possibility for a successful reorganization.  The TCEH Debtors do not have sufficient available sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business without the DIP Facility.

(iv)     No Credit Available on More Favorable Terms.  Given their current financial condition, financing arrangements, and capital structure, the TCEH Debtors are unable to obtain financing from sources other than the DIP Lenders and the DIP L/C Issuers on terms more favorable than the DIP Facility.  The TCEH Debtors have been unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.

---

[5]  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the *Interim Order (A) Authorizing Use of Cash Collateral for Texas Competitive Electric Holdings Company LLC, (B) Granting Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing* (the "Interim Cash Collateral Order").

The TCEH Debtors have also been unable to obtain credit (a) having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the TCEH Debtors and their estates that is not otherwise subject to a lien, or (c) secured solely by a junior lien on property of the TCEH Debtors and their estates that is subject to a lien. Financing on a postpetition basis is not otherwise available without granting the DIP Agent, for the benefit of itself, its sub-agents, the DIP Lenders, the DIP L/C Issuers, the Secured Hedge Banks, and the Secured Cash Management Banks, (x) perfected security interests in and liens on (each, as provided herein) all of the TCEH Debtors' existing and after-acquired assets with the priorities set forth in paragraph 8 of this Interim Order, (y) superpriority claims and liens, and (z) the other protections set forth in this Interim Order.

F.    <u>Use of Proceeds of the DIP Facility</u>. As a condition to entry into the DIP Credit Agreement and the extension of credit under the DIP Facility, the DIP Agent, the DIP Lenders, and the DIP L/C Issuers require, and the TCEH Debtors have agreed, that proceeds of the Term Loans and the Revolving Credit Loans (each, as defined in the DIP Credit Agreement) shall be used, in each case in a manner consistent with the terms and conditions of the DIP Documents, to (a) finance any and all working capital needs and for any other general corporate purposes, including, without limitation, to (i) provide collateral support in respect of financial or physical trading transactions, including commodities transactions (in each case, subject to the terms of all applicable interim and final orders entered by the Court in the Cases) and (ii) comply with any legal and/or regulatory requirements of governmental and quasi-governmental entities (including for posting bonds and remediation or reclamation obligations of any nature (such as with the Railroad Commission of Texas (the "<u>RCT</u>")), complying with any statutory or regulatory

requirements, and for self-bonding in respect of permits and licenses) applicable to the TCEH Debtors (and, to the limited extent set forth in the DIP Documents, of the Specified Affiliates (as defined in the DIP Credit Agreement)), (b) provide for Letters of Credit (as defined in the DIP Credit Agreement), and (c) pay related transaction costs, fees, liabilities, and expenses, and other administration costs incurred in connection with the Cases and the commitment, negotiation, syndication, documentation (including any commitment letters), execution, and closing of the DIP Facility, as provided for in the DIP Credit Agreement and the DIP Documents.  If funded, the proceeds of the Delayed-Draw Term Loans (as defined in the DIP Credit Agreement) will be used to fund the RCT L/C Collateral Account.  The General Letters of Credit may be used (x) for general corporate purposes, including, without limitation, providing collateral support in respect of financial or physical trading transactions, including commodities transactions related to the TCEH Debtors' businesses and activities (in each case, subject to the terms of all applicable interim and final orders entered by the Court in the Cases)  (and, to the limited extent set forth in the DIP Documents, of the Specified Affiliates) and (y) to comply with any legal and/or regulatory requirements of governmental and quasi-governmental entities (including for posting bonds and remediation or reclamation obligations of any nature (such as with the RCT), complying with any statutory or regulatory requirements, and for self-bonding in respect of permits and licenses) applicable to the TCEH Debtors.  If issued, the RCT Letters of Credit will be used for the purpose of satisfying bonding requirements of the RCT.

      G.     Section 506(c).  In light of the DIP Agent's, the DIP Lenders', and the DIP L/C Issuers' agreement to subordinate their liens and superpriority claims to the Carve Out and the RCT Reclamation Support Carve Out (each, as defined herein), the DIP Agent, the DIP Lenders,

and the DIP L/C Issuers are each entitled to, subject to entry of a Final Order, a waiver of the provisions of section 506(c) of the Bankruptcy Code.

        H.     <u>Good Faith of the DIP Agent, the DIP Lenders, the DIP L/C Issuers, and the Joint Lead Arrangers</u>.

        (i)     <u>Willingness To Provide Financing</u>.  The DIP Lenders have indicated a willingness to provide financing to the TCEH Debtors subject to (a) the entry of this Interim Order and the Final Order, (b) approval of the terms and conditions of the DIP Facility and the DIP Documents, and (c) entry of findings by the Court that such financing is essential to the TCEH Debtors' estates, that the DIP Agent, the DIP Lenders, and the DIP L/C Issuers are extending credit to the TCEH Debtors pursuant to the DIP Documents in good faith, and that the DIP Agent's, the DIP Lenders', and the DIP L/C Issuers' claims, superpriority claims, security interests and liens, and other protections granted pursuant to this Interim Order and the DIP Documents will have the protections provided in section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument, or reconsideration of this Interim Order or any other order.

        (ii)     <u>Business Judgment and Good Faith Pursuant to Section 364(e)</u>.  The terms and conditions of the DIP Facility and the DIP Documents, and the fees paid and to be paid thereunder, are fair, reasonable, and the best available to the TCEH Debtors under the circumstances, reflect the TCEH Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration.  The DIP Facility was negotiated in good faith and at arm's length among the TCEH Debtors, the DIP Agent, the DIP Lenders, the DIP L/C Issuers, and the Joint Lead Arrangers (as defined in the DIP Credit Agreement).  Credit to be extended under the DIP Facility shall be deemed to have

been so allowed, advanced, made, used, or extended in good faith, and for valid business purposes and uses, within the meaning of section 364(e) of the Bankruptcy Code, and the DIP Agent, the DIP Lenders, the DIP L/C Issuers, and the Joint Lead Arrangers are therefore entitled to the protection and benefits of section 364(e) of the Bankruptcy Code and this Interim Order.

I.    Good Cause; Immediate Entry.   The relief requested in the DIP Motion is necessary, essential, and appropriate, and is in the best interests of, and will benefit, the TCEH Debtors and their estates, creditors, and other parties in interest, as its implementation will, inter alia, provide the TCEH Debtors with the necessary liquidity to (a) minimize the disruption to the TCEH Debtors' business and ongoing operations, (b) preserve and maximize the value of the TCEH Debtors' estates for the benefit of all of the TCEH Debtors' creditors and other parties in interest, and (c) avoid immediate and irreparable harm to the TCEH Debtors and their estates, creditors, other parties in interest, businesses, employees, and assets.   Thus, sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

J.    Notice.   In accordance with rules 2002, 4001(c) and (d), and 9014 of the Bankruptcy Rules, and the Local Bankruptcy Rules, notice of the Interim Hearing and the emergency relief requested in the DIP Motion has been provided by the TCEH Debtors, whether by facsimile, email, overnight courier or hand delivery, to certain parties in interest, including: (a) the Office of the U.S. Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) Citibank, N.A., in its capacity as First Lien Credit Agent under the First Lien Credit Agreement, and Wilmington Trust, N.A., upon the effectiveness of its appointment as successor First Lien Credit Agent; (d) Bank of New York Mellon Trust Company, N.A., in its capacity as indenture trustee under: (i) the TCEH unsecured pollution

control revenue bonds; and (ii) the EFCH 2037 Notes due 2037; (e) American Stock Transfer & Trust Company, LLC, in its capacity as indenture trustee under: (i) the 9.75% EFH senior unsecured notes due 2019; (ii) the 10.0% EFH senior unsecured notes due 2020; (iii) the 10.875% EFH LBO senior unsecured notes due 2017; (iv) the 11.25%/12.0% EFH LBO toggle notes due 2017; (v) the 5.55% EFH legacy notes (series P) due 2014; (vi) the 6.50% EFH legacy notes (series Q) due 2024; and (vii) the 6.55% EFH legacy notes (series R) due 2034; (f) Computershare Trust Company, N.A. and Computershare Trust Company of Canada, in their capacities as indenture trustee under: (i) the 11.0% EFIH senior secured second lien notes due 2021; and (ii) the 11.75% EFIH senior secured second lien notes due 2022; (g) UMB Bank, N.A. in its capacity as indenture trustee under: (i) the 9.75% EFIH senior unsecured notes due 2019; and (ii) the 11.25%/12.25% EFIH senior toggle notes due 2018; (h) BOKF, NA, dba Bank of Arizona, in its capacity as indenture trustee under 11.50% TCEH senior secured notes due 2020; (i) CSC Trust Company of Delaware in its capacity as indenture trustee under: (i) the 6.875% EFIH senior secured notes due 2017; and (ii) the 10.0% EFIH senior secured notes due 2020; (j) Law Debenture Trust Company of New York in its capacity as indenture trustee under: (i) the 10.25% TCEH senior unsecured notes due 2015; and (ii) the 10.50%/11.25% TCEH senior toggle notes due 2016; (k) Wilmington Savings Fund Society, FSB in its capacity as indenture trustee under the 15.0% TCEH senior secured second lien notes due 2021; (l) counsel to certain holders of claims against the Debtors regarding each of the foregoing described in clauses (c) through (k); (m) the agent for the TCEH debtor-in-possession financing facility and counsel thereto; (n) the agent for the EFIH debtor-in-possession financing facility and counsel thereto; (o) counsel to certain holders of equity in Texas Energy Future Holdings Limited Partnership; (p) counsel to Oncor; (q) the SEC; (r) the Internal Revenue Service; (s) the Office of the United

States Attorney for the District of Delaware; (t) the Office of the Texas Attorney General on behalf of the PUC; (u) counsel to ERCOT; (v) the RCT; (w) the counterparties to the First Lien Commodity Hedges and First Lien Interest Rate Swaps; and (x) counsel to the unofficial committee of certain TCEH first lien debt holders.  The parties have made reasonable efforts to afford the best notice possible under the circumstances to permit the relief set forth in this Interim Order, and no other or further notice is or shall be required.

Based upon the foregoing findings and conclusions, the DIP Motion, and the record before the Court with respect to the DIP Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.      <u>Interim Financing Approved</u>.   The DIP Motion is granted and the Interim Financing (as defined herein) is authorized and approved, subject to the terms and conditions set forth in this Interim Order.

2.      <u>Objections Overruled</u>.  All objections to the Interim Financing or entry of the Interim Order, to the extent not withdrawn or resolved, are hereby overruled.  This Interim Order shall be effective immediately upon its entry.

**DIP Facility Authorization**

3.      <u>Authorization of the DIP Financing</u>.   The TCEH Debtors are expressly and immediately authorized and empowered to execute and deliver the DIP Documents and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Documents, and to deliver all instruments and documents which may be required or necessary for the performance by the TCEH Debtors under the DIP Facility and the creation and perfection of the DIP Liens described in, and provided for by, this Interim Order and the DIP Documents.  The TCEH Debtors are hereby authorized and directed to pay, in

14

accordance with this Interim Order, the principal, interest, fees, expenses, reimbursement obligations with respect to Letters of Credit, and other amounts payable or reimbursable by the TCEH Debtors described in the DIP Documents and all other documents comprising the DIP Facility as such become due and without need to obtain further Court approval, including, without limitation, letter of credit fees (including issuance and other related charges), commitment fees, closing fees, arrangement fees, incentive fees, and administrative agent's fees, whether or not the transactions contemplated hereby are consummated, as provided for in the DIP Credit Agreement and the DIP Documents.  All collections and proceeds, whether ordinary course or otherwise, will be deposited and applied as required by this Interim Order and the DIP Documents.  Upon execution and delivery, the DIP Documents shall represent valid and binding obligations of the TCEH Debtors, enforceable against each of the TCEH Debtors and their estates in accordance with their terms.

4.    <u>Authorization to Borrow</u>.  Until the DIP Termination Date (as defined herein), and subject to the terms and conditions set forth in the DIP Documents, the DIP Facility, and this Interim Order, and to prevent immediate and irreparable harm to the TCEH Debtors' estates, the TCEH Debtors are hereby authorized to borrow money and obtain Letters of Credit under the DIP Facility, and the Guarantors are hereby authorized to guarantee such borrowings and the Borrower's obligations with respect to such Letters of Credit, consisting of (a) borrowings in an aggregate principal amount of up to $800,000,000 under the Revolving Credit Facility, (b) borrowings in an aggregate principal amount of up to $1,100,000,000 under the Delayed-Draw Term Facility, the proceeds of which, if funded, will be applied by TCEH to fund the RCT L/C Collateral Account, and (c) borrowings in an aggregate principal amount of up to $800,000,000 under the Term Loan Facility, of which up to $800,000,000 may be applied by

TCEH to fund the General L/C Collateral Account (collectively, the "Interim Financing"). Notwithstanding anything to the contrary in this Interim Order or in the DIP Credit Agreement, if the TCEH Debtors at any time request any Incremental Facilities (as such term is defined in the DIP Credit Agreement) from the DIP Agent and otherwise satisfy the relevant requirements under the DIP Documents, the TCEH Debtors shall be required to seek Court approval of such Incremental Facilities.

5.    Use of DIP Facility Proceeds.  Immediately upon entry of this Interim Order, the TCEH Debtors are authorized to draw upon the DIP Facility and use advances of credit under the DIP Facility only for the purposes specifically set forth in, and subject to the terms and conditions of, this Interim Order and the DIP Documents.

6.    DIP Obligations.  The DIP Obligations shall be enforceable against the TCEH Debtors, their estates, and any successors thereto, including, without limitation, any trustee appointed in the Cases, any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases").  On the DIP Termination Date, (a) the DIP Obligations shall be due and payable, without notice or demand, to the extent provided for in the DIP Credit Agreement, and (b) unless all the DIP Obligations (excluding the Secured Hedge Obligations, the Secured Cash Management Obligations, and Contingent Obligations (as defined in the DIP Credit Agreement)) have been indefeasibly paid in full, in cash, all Commitments (as defined in the DIP Credit Agreement) have been terminated, and all Letters of Credit have been cancelled (or all such Letters of Credit have been fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the applicable DIP L/C Issuers), the use of the DIP Collateral, including Cash Collateral, shall automatically cease.

7.    <u>DIP Liens</u>.  To secure the DIP Obligations, effective immediately upon entry of this Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent, for the benefit of itself, its sub-agents, the DIP Lenders, the DIP L/C Issuers, the Secured Hedge Banks, and the Secured Cash Management Banks, is hereby granted the following continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests and liens (all property identified in clauses (a), (b), and (c) below being collectively referred to as the "<u>DIP Collateral</u>"), subject to the payment of the Carve Out and the RCT Reclamation Support Carve Out (all such liens and security interests granted to the DIP Agent, for the benefit of itself, its sub-agents, the DIP Lenders, the DIP L/C Issuers, the Secured Hedge Banks, and the Secured Cash Management Banks, pursuant to this Interim Order and the DIP Documents, the "<u>DIP Liens</u>"):

(a)    <u>First Lien on Cash Balances and Unencumbered Property</u>.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all prepetition and postpetition property of the TCEH Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date, is not subject to valid, perfected, and non-avoidable liens, including, without limitation, all real and personal property, inventory, plant, fixtures, machinery, equipment, the RCT L/C Collateral Account and the General L/C Collateral Account (each, as defined in the DIP Credit Agreement), cash, any investment of such cash, accounts receivable, other rights to payment whether arising before or after the Petition Date (including, without limitation, postpetition intercompany claims of the TCEH Debtors), deposit accounts, investment property, supporting obligations, minerals, oil, gas, and as-extracted collateral, causes of action (including those arising under section 549 of the Bankruptcy Code and any related

action under section 550 of the Bankruptcy Code), royalty interests, chattel paper, contracts, general intangibles, documents, instruments, interests in leaseholds, letter of credit rights, patents, copyrights, trademarks, trade names, other intellectual property, capital stock and stock equivalents of subsidiaries, books and records pertaining to the foregoing, and to the extent not otherwise included, all proceeds, products, offspring, and profits of any and all of the foregoing (the "Unencumbered Property"). Notwithstanding the prior sentence, Unencumbered Property shall in any event exclude the TCEH Debtors' claims and causes of action under chapter 5 of the Bankruptcy Code (other than causes of action arising under section 549 of the Bankruptcy Code and any related action under section 550 of the Bankruptcy Code), or any other avoidance actions under the Bankruptcy Code (collectively, "Avoidance Actions"), but subject only to, and effective upon, entry of the Final Order, shall include any proceeds or property recovered, unencumbered, or otherwise the subject of successful Avoidance Actions, whether by judgment, settlement, or otherwise.

      (b)    <u>Priming of Liens of Prepetition Secured Creditors</u>. Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all prepetition and postpetition property of the TCEH Debtors, whether existing on the Petition Date or thereafter acquired, that is subject to valid, perfected, and non-avoidable liens presently held by any of the Prepetition Secured Creditors (as defined in the Interim Cash Collateral Order), excluding the Deposit L/C Loan Collateral Account to the extent of the Deposit L/C Obligations (each, as defined in the First Lien Credit Agreement (as defined in the Interim Cash Collateral Order)). Such security interests and liens shall be senior in all respects to the interests in such property of any of the Prepetition Secured Creditors arising from current and future liens of any of the Prepetition

Secured Creditors (including, without limitation, Adequate Protection Liens (as defined in the Interim Cash Collateral Order)), but shall not be senior to any valid, perfected, and non-avoidable interests of other parties arising out of liens, if any, on such property existing immediately prior to the Petition Date, including the liens securing the Tex-La Indebtedness (as defined in the DIP Credit Agreement) (the "Permitted Prior Liens"), or to any valid, perfected, and non-avoidable interests in such property arising out of liens to which the liens of any of the Prepetition Secured Creditors become subject subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code. Notwithstanding anything to the contrary in this Interim Order or any rights granted or action taken pursuant hereto or pursuant to the agreements and transactions approved hereby, any and all rights and priorities of the First Lien Lenders (as defined in the Interim Cash Collateral Order) holding Deposit L/C Loans (as defined in the First Lien Credit Agreement) (the "Deposit L/C Lenders") in or to the Deposit L/C Loan Collateral Account (as defined in the First Lien Credit Agreement) or any cash therein or proceeds thereof (including amounts corresponding to undrawn Deposit Letters of Credit, and to drawn Deposit Letters of Credit if and to the extent any such amounts are returned to the TCEH Debtors), whether held by the TCEH Debtors or in which the TCEH Debtors otherwise have an interest as of the Petition Date or thereafter (the "Deposit L/C Loan Collateral"), shall be preserved, including, without limitation, any and all priorities among the First Lien Lenders or as between the Deposit L/C Lenders and the other First Lien Lenders, and any and all rights, claims, and liens granted or provided by or through this Interim Order to the First Lien Lenders, to the extent applicable to any Deposit L/C Loan Collateral, shall have the same priorities, if any, among the First Lien Lenders, and as between the Deposit L/C Lenders and the other First Lien Lenders, as existed in the Deposit L/C Loan Collateral as of the Petition Date. For the avoidance of doubt,

the preceding sentence delineates the rights and priorities among the First Lien Lenders and as between the Deposit L/C Lenders and the other First Lien Lenders only, and in no way affects the DIP Agent, the DIP Lenders, or the DIP L/C Issuers or their rights and priorities with respect to the First Lien Lenders, the Deposit L/C Lenders, or the Deposit L/C Loan Collateral.

(c)    Liens Junior to Certain Other Liens.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all prepetition and postpetition property of the TCEH Debtors (other than the property described in clause (a) or (b) of this paragraph 7, as to which the liens and security interests in favor of the DIP Agent will be as described in such clauses), whether existing on the Petition Date or thereafter acquired, that is subject to valid, perfected, and non-avoidable liens in existence immediately prior to the Petition Date, or to any valid and non-avoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (in each case, other than the Adequate Protection Liens), which security interests and liens in favor of the DIP Agent are junior to such valid, perfected, and non-avoidable liens.

(d)    Liens Senior to Certain Other Liens.  The DIP Liens shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the TCEH Debtors and their estates under section 551 of the Bankruptcy Code or (ii) any liens arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal, or other domestic or foreign governmental unit (including any regulatory body), commission, board, or court for any liability of the TCEH Debtors.

Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, for the purposes of this Interim Order, in no event shall the Unencumbered Property include, or the DIP Liens granted under this Interim Order attach to, Excluded Stock and Stock Equivalents, Excluded Subsidiaries, and any Excluded Property (each, as defined in the DIP Credit Agreement).

8.    <u>DIP Lien Priority</u>.  The DIP Liens are valid, binding, continuing, automatically perfected, non-avoidable, senior in priority, and superior to any security, mortgage, collateral interest, lien, or claim to any of the DIP Collateral, except that the DIP Liens shall be junior only to Permitted Prior Liens, the Carve Out, and the RCT Reclamation Support Carve Out.  Pursuant to section 364(d) of the Bankruptcy Code, the DIP Liens shall be senior to the Prepetition First Priority Liens and the Prepetition Second Priority Liens of the Prepetition Secured Creditors in the Prepetition Collateral and the Adequate Protection Liens.  For purposes of this Interim Order, it shall be an Event of Default if, other than as set forth herein, the DIP Liens shall be made subject to, or <u>pari passu</u> with, any lien or security interest heretofore or hereinafter granted in the Cases or any Successor Cases, upon the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Cases or Successor Cases.  No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be <u>pari passu</u> with or senior to the DIP Liens.

9.    <u>DIP Superpriority Claims</u>.

(a)    Upon entry of this Interim Order, the DIP Agent, the DIP Lenders, and the DIP L/C Issuers are hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims in each of the Cases and any Successor

Cases (collectively, the "DIP Superpriority Claims") for all DIP Obligations: (i) except as set forth herein, with priority over any and all administrative expense claims, diminution claims, unsecured claims, and all other claims against the TCEH Debtors or their estates in any of the Cases and any Successor Cases, existing on the Petition Date or thereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject only to, and effective upon entry of, the Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which allowed claims shall be payable from, and have recourse to, all prepetition and postpetition property of the TCEH Debtors and all proceeds thereof; and (ii) which shall at all times be senior to the rights of the TCEH Debtors and their estates, and any successor trustee or other estate representative to the extent permitted by law. Notwithstanding the foregoing, the DIP Superpriority Claims shall be subject only to the payment of the Carve Out and the RCT Reclamation Support Carve Out, to the extent specifically provided for herein.

10. No Obligation to Extend Credit. The DIP Agent, the DIP Lenders, and the DIP L/C Issuers shall have no obligation to make any loan or advance, or to issue any Letter of Credit, under the DIP Documents, unless all of the conditions precedent to the making of such extension of credit or the issuance of such Letter of Credit under the DIP Documents and this Interim Order have been satisfied in full or waived in accordance with the terms of the DIP Documents.

**Provisions Common to DIP Financing**

11. Amendments to the DIP Documents. The TCEH Debtors are hereby authorized to implement, in accordance with the terms of the DIP Documents, (a) any nonmaterial

modifications (including, without limitation, any change to the number or composition of the DIP Lenders or the DIP L/C Issuers) of the DIP Documents without further order of the Court, and (b) any other modifications to the DIP Documents, provided, however, that subject to entry of the Final Order, notice of any material modification or amendment to the DIP Documents shall be provided to counsel for the Creditors' Committee and the U.S. Trustee, each of whom shall have five (5) days from the date of such notice within which to object, in writing, to such modification or amendment. If the Creditors' Committee or the U.S. Trustee timely objects to any material modification or amendment to the DIP Documents, such modification or amendment shall only be permitted pursuant to an order of the Court. The foregoing shall be without prejudice to the TCEH Debtors' right to seek approval from the Court of a material modification on an expedited basis.

12.    Budget and Annual Forecast Reporting.    The Borrower will provide the DIP Agent with a statement of cash sources and uses of all free cash flow for the next full three (3)-calendar months of the TCEH Debtors (on a consolidated basis) following the date of entry of this Interim Order, broken down by month (the "Budget"), in the form of the Initial Budget (as defined in the DIP Credit Agreement) attached to the DIP Credit Agreement as Exhibit M, including the anticipated uses of the DIP Facility for such period, and after such three (3)-calendar month period, at the end of each fiscal quarter (or, at the election of the Borrower, at the end of each calendar month or such other earlier period as may be agreed), an updated Budget for the subsequent three (3)-calendar month period. The initial borrowing under the DIP Facility is subject to, among other things, the Borrower's delivery of the Initial Budget to the DIP Agent and the DIP Lenders, which shall be in form and substance reasonably satisfactory to the DIP Agent and the Joint Lead Arrangers. The Borrower will also provide, on a monthly

basis, a variance report for each calendar month (delivered no later than the end of the subsequent calendar month), (a) showing a statement of actual cash sources and uses of all free cash flow for the immediately preceding calendar month, noting therein all material variances from values set forth for such historical periods in the most recently delivered Budget, including explanations for all material variances and (b) certified as to its reasonableness when made by an Authorized Officer (as defined in the DIP Credit Agreement) of the Borrower.  Beginning on the date 60 days after the entry of this Interim Order (and again no later than December 1, 2014 for the business plan and operating budget covering 2015, and no later than December 1, 2015 for the business plan and operating budget covering 2016), the Borrower will provide the DIP Agent with TCEH's approved annual business plan and projected operating budget through the DIP Facility's stated maturity date (the "Annual Operating Forecast"), (x) which shall be broken down by month, including, without limitation, income statements, balance sheets, cash flow statements, projected capital expenditures, asset sales, and a line item for total available liquidity for the period of such Annual Operating Forecast and (y) which shall set forth the anticipated uses of the DIP Facility for such period, certified as to its reasonableness when made by an Authorized Officer of the Borrower.  Both the Budget and the Annual Operating Forecast shall provide, among other things, for the payment of the fees and expenses relating to the DIP Facility, ordinary course administrative expenses, bankruptcy-related expenses and working capital, expected issuances and renewals of Letters of Credit, and other general corporate needs; provided, however, that the Allowed Professional Fees (as defined herein) will be due and payable, and will be paid by the TCEH Debtors, whether or not consistent with the items or amounts set forth in the Initial Budget, the Budget, or the Annual Operating Forecast; and provided, further, that under no circumstance will the Initial Budget, the Budget, or the Annual

Operating Forecast be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the TCEH Debtors.

13.     Modification of the Automatic Stay.    The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to (a) permit the TCEH Debtors to grant the DIP Liens and the DIP Superpriority Claims, (b) permit the TCEH Debtors to perform such acts as the DIP Agent, the DIP Lenders, and the DIP L/C Issuers each may request in its sole discretion to assure the perfection and priority of the liens granted herein, (c) permit the TCEH Debtors to incur all liabilities and obligations to the DIP Agent, the DIP Lenders, and the DIP L/C Issuers under the DIP Documents, the DIP Facility, and this Interim Order, and (d) authorize the TCEH Debtors to make payments, and the DIP Agent, the DIP Lenders, and the DIP L/C Issuers to retain and apply payments made, in accordance with the terms of this Interim Order.

14.     Perfection of DIP Liens.    This Interim Order shall be sufficient and conclusive evidence of the granting, attachment, validity, perfection, and priority of all liens granted herein, including the DIP Liens, without the necessity of filing or recording any financing statement, patent filing, trademark filing, copyright filing, fixture filing, mortgage, notice of lien, or other instrument or document, which may otherwise be required under the law or regulation of any jurisdiction, or the taking possession of, or control over, assets, or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement, securities account control agreement, or other similar agreement) to grant, attach, validate, or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens, or to entitle the DIP Agent, the DIP Lenders, the DIP L/C Issuers, the Secured Hedge Banks, the Secured Cash

Management Banks, and/or secured parties pursuant to the DIP Documents to the priorities granted herein. Notwithstanding the foregoing, the DIP Agent is authorized, but not required, to file, as it in its sole discretion deems necessary, such financing statements, patent filings, trademark filings, copyright filings, mortgages, notices of liens, and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens, and all such financing statements, patent filings, trademark filings, copyright filings, mortgages, notices of lien, and other documents shall be deemed to have been filed or recorded as of the Petition Date; provided, however, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens. The TCEH Debtors are authorized and directed to execute and deliver promptly upon demand to the DIP Agent all such financing statements, mortgages, notices, and other documents and information as the DIP Agent may reasonably request. The DIP Agent, in its discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to, or in lieu of, such financing statements, notices of lien, or similar instrument. In furtherance of the foregoing and without further approval of the Court, each Debtor is (a) authorized to do and perform all acts to make, execute, and deliver all instruments and documents and provide all information and (b) authorized and directed to pay all fees that may be reasonably required or necessary for the TCEH Debtors' performance hereunder.

15.    <u>Proceeds of Subsequent Financing</u>.  If the TCEH Debtors, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed in the Cases or any Successor Cases, shall obtain credit or incur debt pursuant to section 364(b), 364(c), or 364(d) of the Bankruptcy Code or in violation of the DIP Documents at any time prior to such time as the DIP Obligations (excluding the Secured Hedge Obligations, the Secured Cash

Management Obligations, and Contingent Obligations) have been indefeasibly paid in full, in cash, all Commitments have been terminated, and all Letters of Credit have been cancelled (or all such Letters of Credit have been fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the applicable DIP L/C Issuers), including subsequent to the confirmation of any plan with respect to any or all of the TCEH Debtors and the TCEH Debtors' estates, and such facilities are secured by any DIP Collateral, then cash proceeds derived from such credit or debt shall be used to the extent necessary to indefeasibly repay in full, in cash, the DIP Obligations.

16.     Maintenance of DIP Collateral.  Until such time as all DIP Obligations (excluding the Secured Hedge Obligations, the Secured Cash Management Obligations, and Contingent Obligations) have been indefeasibly paid in full, in cash, all Commitments have been terminated, and all Letters of Credit have been cancelled (or all such Letters of Credit shall have been fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the applicable DIP L/C Issuers), the TCEH Debtors shall (a) maintain and insure the DIP Collateral in amounts, for the risks, and by the entities as required under the DIP Documents and (b) maintain the cash management system in effect as of the Petition Date consistent with the Cash Management Order (as defined in the DIP Credit Agreement), as modified by any order that may be entered by the Court, to which the DIP Agent has first agreed, or as otherwise required by the DIP Documents.

17.     Disposition of DIP Collateral; Rights of DIP Agent, DIP Lenders, and DIP L/C Issuers.  The TCEH Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral other than as permitted in the DIP Documents (and no consent shall be implied from any action, inaction, or acquiescence by the DIP Agent, the DIP Lenders, or the

DIP L/C Issuers, or an order of the Court); provided that the TCEH Debtors may release liens on the DIP Collateral solely to the extent permitted by the DIP Documents.

18.    <u>DIP Termination Date</u>. On the DIP Termination Date, (a) the DIP Obligations shall be immediately due and payable, to the extent provided for in the DIP Credit Agreement, and all Commitments shall terminate and (b) unless the DIP Obligations (excluding the Secured Hedge Obligations, the Secured Cash Management Obligations, and Contingent Obligations) have been indefeasibly paid in full, in cash, all Commitments have been terminated, and all Letters of Credit have been cancelled (or all such Letters of Credit have been fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the applicable DIP L/C Issuers), all authority to use the DIP Collateral, including Cash Collateral, shall cease. For purposes of this Interim Order, the "<u>DIP Termination Date</u>" shall mean the Maturity Date as defined in the DIP Credit Agreement.

19.    <u>Events of Default</u>. An "Event of Default" under the DIP Documents shall constitute an Event of Default under this Interim Order, unless waived in writing in accordance with Section 13.1 of the DIP Credit Agreement. Notwithstanding anything to the contrary contained herein or in the DIP Documents, any Event of Default under this Interim Order or the DIP Documents, other than any Event of Default which cannot be waived without the written consent of each DIP Lender directly and adversely affected thereby, shall be deemed not to be "continuing" if the events, act, or condition that gave rise to such Event of Default have been remedied or cured (including by payment, notice, taking of any action, or omitting to take any action) or have ceased to exist and the Borrower is in compliance with the DIP Documents.

20.    <u>Rights and Remedies Upon Event of Default</u>. Upon the occurrence and during the continuance of an Event of Default and following the giving of five calendar days' notice to the

TCEH Debtors (the "Remedies Notice Period"), the DIP Agent, on behalf of the DIP Lenders and the DIP L/C Issuers, may exercise all rights and remedies provided for in the DIP Documents and may declare (a) the termination, reduction, or restriction of any further Commitment to the extent any such Commitment remains, (b) all DIP Obligations under the DIP Documents to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the TCEH Debtors, and (c) the termination of the DIP Documents as to any future liability or obligation of the DIP Agent, the DIP Lenders, and the DIP L/C Issuers, but without affecting any of the DIP Liens or the DIP Obligations.  During the Remedies Notice Period, the TCEH Debtors may continue to use the DIP Collateral, including Cash Collateral, in the ordinary course of business, consistent with past practices and the most recently delivered Budget, but may not enter into any transactions or arrangements (including, without limitation, the incurrence of indebtedness or liens, investments, restricted payments, asset sales, or transactions with non-Debtor affiliates) that are not in the ordinary course of business; provided that nothing in this paragraph 20 or in paragraph 27 shall limit the ability of the TCEH Debtors to use DIP Collateral, including Cash Collateral, to seek use of Cash Collateral on a non-consensual basis and/or to challenge whether an Event of Default has occurred and/or is continuing.  Unless the Court orders otherwise during the Remedies Notice Period, at the end of the Remedies Notice Period, the TCEH Debtors shall no longer have the right to use or seek to use the DIP Collateral, including Cash Collateral, the automatic stay pursuant to section 362 of the Bankruptcy Code, as to all of the DIP Agent, the DIP Lenders, and the DIP L/C Issuers, shall be automatically terminated without further notice to, or order of, the Court, and the DIP Agent, on behalf of itself, the DIP Lenders, and the DIP L/C Issuers, shall be permitted to exercise all rights against the DIP Collateral in accordance with the

DIP Documents and this Interim Order, and shall be permitted to satisfy the DIP Obligations, without further order or application or motion to the Court and without restriction or restraint by any stay under section 362 or 105 of the Bankruptcy Code. Notwithstanding anything herein to the contrary, the automatic stay pursuant to section 362 of the Bankruptcy Code shall be automatically terminated for the purposes of giving any notice contemplated hereunder. During the Remedies Notice Period, any party in interest shall be entitled to seek an emergency hearing with the Court solely for the purpose of contesting whether an Event of Default has occurred and/or is continuing, and the TCEH Debtors waive their right to, and shall not be entitled to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of the DIP Agent, on behalf of the DIP Lenders and the DIP L/C Issuers, set forth in this Interim Order or the DIP Documents.

21.    Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order. Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter modified, amended, or vacated by a subsequent order of the Court or any other court, each of the DIP Agent, the DIP Lenders, the DIP L/C Issuers, and the Joint Lead Arrangers are entitled to the protections provided in section 364(e) of the Bankruptcy Code. Any liens or claims granted to the DIP Agent, the DIP Lenders, the DIP L/C Issuers, and the Joint Lead Arrangers hereunder arising prior to the effective date of any such modification, amendment, or vacatur of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges, and benefits granted herein.

22.    <u>DIP and Other Expenses</u>.  All fees paid and payable, and costs and/or expenses reimbursed or reimbursable, as set forth in the DIP Documents, by the TCEH Debtors to the DIP Agent, the DIP Lenders, the DIP L/C Issuers, and the Joint Lead Arrangers are hereby approved. The TCEH Debtors are hereby authorized and directed to pay all such fees, costs, and expenses in accordance with the terms of the DIP Documents, without the necessity of any further application with the Court for approval or payment of such fees, costs, or expenses.  The TCEH Debtors are authorized and directed to reimburse within ten (10) calendar days of written demand (together with reasonably detailed supporting documentation) the DIP Agent, the DIP Lenders, the DIP L/C Issuers, and the Joint Lead Arrangers for their reasonable and documented out-of-pocket expenses incurred in connection with the negotiation, documentation, syndication, and administration of the DIP Facility, any amendments or waivers with respect thereto, any Event of Default in respect of the DIP Facility, and any exercise of remedies in respect thereof (including reasonable and documented out-of-pocket prepetition and postpetition fees, charges, and disbursements of legal counsel, financial advisors, and third-party appraisers and consultants advising the DIP Agent incurred in connection with the DIP Agent's participation in the Cases, limited in the case of legal counsel to one primary counsel (and (a) local counsel in applicable foreign and local jurisdictions, but limited to one local counsel in each such jurisdiction, (b) regulatory counsel, and (c) solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to the affected indemnified persons similarly situated)).  Payment of all such fees and expenses shall not be subject to allowance by the Court; <u>provided</u>, <u>however</u>, that the TCEH Debtors shall promptly provide copies of invoices received on account of fees and expenses of the professionals retained as provided for in the DIP Credit Agreement and the DIP Documents to counsel to the Creditors' Committee and the U.S. Trustee, and the Court shall

have exclusive jurisdiction over any objections raised to the invoiced amount of the fees and expenses proposed to be paid, which objections may only be raised within ten (10) calendar days after receipt thereof. In the event that within ten (10) calendar days from receipt of such invoices the TCEH Debtors, the U.S. Trustee, or counsel to the Creditors' Committee raises an objection to a particular invoice, and the parties are unable to resolve any dispute regarding the fees and expenses included in such invoice, the Court shall hear and determine such dispute; provided, that payment of invoices shall not be delayed based on any such objections and the relevant professional shall only be required to disgorge amounts objected to upon being "so ordered" pursuant to a final order of the Court. Notwithstanding anything to the contrary herein, the fees, costs, and expenses of the DIP Agent, the DIP Lenders, the DIP L/C Issuers, and the Joint Lead Arrangers under the DIP Documents, whether incurred prior to or after the Petition Date, shall be deemed fully earned, indefeasibly paid, irrevocable, and non-avoidable pursuant to, and in accordance with, the terms of the DIP Documents and, irrespective of any subsequent order approving or denying the Financing or any other financing pursuant to section 364 of the Bankruptcy Code, fully entitled to all protections of section 364(e) of the Bankruptcy Code. All unpaid fees, costs, and expenses payable under the DIP Documents to the DIP Agent, the DIP Lenders, the DIP L/C Issuers, and the Joint Lead Arrangers shall be included and constitute part of the DIP Obligations and be secured by the DIP Liens.

23. <u>Proofs of Claim</u>. Subject to entry of the Final Order, the DIP Agent, the DIP Lenders, and the DIP L/C Issuers will not be required to file proofs of claim in any of the Cases or Successor Cases for any claim allowed herein. Any order entered by the Court in relation to the establishment of a bar date in any of the Cases or Successor Cases shall not apply to the DIP Agent, the DIP Lenders, or the DIP L/C Issuers.

24.    <u>Rights of Access and Information</u>.  Without limiting the rights of access and information afforded the DIP Agent, the DIP Lenders, and the DIP L/C Issuers under the DIP Documents, the TCEH Debtors shall be, and hereby are, required to afford representatives, agents, and/or employees of the DIP Agent, the DIP Lenders, and the DIP L/C Issuers reasonable access to the TCEH Debtors' premises and its books and records in accordance with the DIP Documents and shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested.  In addition, the TCEH Debtors shall authorize their independent certified public accountants, financial advisors, investment bankers, and consultants to cooperate, consult with, and provide to the DIP Agent all such information as may be reasonably requested from the TCEH Debtors with respect to the business, results of operations, and financial condition of the TCEH Debtors.

25.    <u>Carve Out</u>.

(a)    <u>Carve Out</u>.  As used in this Interim Order, the "<u>Carve Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the TCEH Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and any Creditors' Committee appointed in the Cases pursuant to section 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") at any

time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $50,000,000 incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap"). For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the TCEH Debtors, their lead restructuring counsel, the U.S. Trustee, and lead counsel to the Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

      (b)    <u>Carve Out Reserves</u>. On the day on which a Carve Out Trigger Notice is given by the DIP Agent to the TCEH Debtors (the "Termination Declaration Date"), the Carve Out Trigger Notice shall (i) be deemed a draw request and notice of borrowing by the TCEH Debtors for Revolving Credit Loans under the Revolving Credit Commitment (each, as defined in the DIP Credit Agreement) (on a pro rata basis based on the then outstanding Revolving Credit Commitments), in an amount equal to the then unpaid amounts of the Allowed Professional Fees (any such amounts actually advanced shall constitute Revolving Credit Loans) and (ii) also constitute a demand to the TCEH Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees. The TCEH Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such then unpaid

Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims. On the Termination Declaration Date, the Carve Out Trigger Notice shall also be deemed a request by the TCEH Debtors for Revolving Credit Loans under the Revolving Credit Commitment (on a pro rata basis based on the then outstanding Revolving Credit Commitments), in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute Revolving Credit Loans). The TCEH Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims. On the first business day after the DIP Agent gives such notice to such Revolver Credit Lenders (as defined in the DIP Credit Agreement), notwithstanding the existence of a Default (as defined in the DIP Credit Agreement) or Event of Default, the failure of the TCEH Debtors to satisfy any or all of the conditions precedent for Revolving Credit Loans under the Revolving Credit Facility or the occurrence of the Maturity Date, each Revolver Credit Lender with an outstanding Commitment (on a pro rata basis based on the then outstanding Commitments) shall make available to the DIP Agent such Revolver Credit Lender's pro rata share with respect to such borrowing in accordance with the Revolving Credit Facility. All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (ii) through (iii) of the definition of Carve Out set forth above, but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders and the DIP L/C Issuers, unless the DIP Obligations (excluding the Secured Hedge Obligations, the Secured Cash Management

Obligations, and Contingent Obligations) have been indefeasibly paid in full, in cash, all Commitments have been terminated, and all Letters of Credit have been cancelled (or all such Letters of Credit have been fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the applicable DIP L/C Issuers), in which case any such excess shall be paid to the Prepetition First Lien Creditors in accordance with their rights and priorities as of the Petition Date. All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above, and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders and the DIP L/C Issuers, unless the DIP Obligations (excluding the Secured Hedge Obligations, the Secured Cash Management Obligations, and Contingent Obligations) have been indefeasibly paid in full, in cash, all Commitments have been terminated, and all Letters of Credit have been cancelled (or all such Letters of Credit have been fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the applicable DIP L/C Issuers), in which case any such excess shall be paid to the Prepetition First Lien Creditors in accordance with their rights and priorities as of the Petition Date. Notwithstanding anything to the contrary in the DIP Documents, this Interim Order, or the Final Order, following delivery of a Carve Out Trigger Notice, the DIP Agent and the Prepetition First Lien Agents shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the TCEH Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agent for application in accordance with the DIP Documents. Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the TCEH Debtors from the Carve Out Reserves shall not constitute Loans (as defined in the DIP

Credit Agreement) or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Initial Budget, Budget, Annual Operating Forecast, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the TCEH Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary herein or in the Interim Cash Collateral Order, the DIP Facility, or in any Prepetition Secured Facilities (as defined in the Interim Cash Collateral Order), the Carve Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens, and the 507(b) Claim (as defined in the Interim Cash Collateral Order), and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Secured Obligations.

(c)    No Direct Obligation To Pay Allowed Professional Fees.  The DIP Agent, DIP Lenders, and the DIP L/C Issuers shall not be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the DIP L/C Issuers, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the TCEH Debtors have sufficient funds to pay such compensation or reimbursement.

(d)    Payment of Allowed Professional Fees Prior to the Termination Declaration Date.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(e)    <u>Payment of Carve Out On or After the Termination Declaration Date</u>. Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Documents, the Bankruptcy Code, and applicable law.

26.    <u>RCT Reclamation Support Carve Out</u>.  All amounts up to $1,100,000,000 required to be paid by the TCEH Debtors to the RCT pursuant to amounts due and owing in respect of reclamation obligations incurred by the RCT and for which any of the TCEH Debtors may be liable under Applicable Law (as defined in the DIP Credit Agreement) will constitute the "RCT Reclamation Support Carve Out," and such RCT Reclamation Support Carve Out will be senior to the DIP Obligations and to any other obligations or liabilities of the TCEH Debtors (other than, and subject in any event to, the Carve Out), unless the Borrower issues and delivers to the DIP Agent the RCT Carve Out Support Rejection Notice (as defined in the DIP Credit Agreement).  Notwithstanding any provision of the DIP Documents or this Interim Order to the contrary, for the sake of clarity, with respect to the RCT Reclamation Support Carve Out in favor of the RCT for financial assurance for Debtor Luminant Mining Company LLC's reclamation obligations, the RCT shall be entitled to up to the first $1,100,000,000 in proceeds of DIP Collateral to satisfy valid claims against the RCT Reclamation Support Carve Out, in the event such DIP Collateral is liquidated, before payment of claims of all other secured or unsecured creditors or other parties in interest, other than the amounts subject to the professional fee carve out (which amounts are defined as the "Carve Out" in paragraph 25 of this Interim Order).

27.    <u>Limitations on the DIP Facility, the DIP Collateral, and the Carve Out</u>. Notwithstanding anything herein to the contrary, except paragraph 20 with respect to the ability of the TCEH Debtors to use DIP Collateral, including Cash Collateral, and solely during the Remedies Notice Period, to seek use of Cash Collateral on a non-consensual basis and/or to challenge whether an Event of Default has occurred and/or is continuing, the TCEH Debtors shall not assert or prosecute, and no portion of the proceeds of the DIP Facility, the DIP Collateral, including Cash Collateral, or the Carve Out, and no disbursements set forth in the Budget, may be used for the payment of professional fees, disbursements, costs, or expenses incurred by any person in connection with (a) incurring Indebtedness (as defined in the DIP Credit Agreement) except to the extent permitted under the DIP Credit Agreement; (b) preventing, hindering, or delaying any of the DIP Agent's, the DIP Lenders', the DIP L/C Issuers', the Prepetition First Lien Agents', or the Prepetition First Lien Creditors' (in the case of each of the foregoing, in their respective capacities as such) enforcement or realization upon, or exercise of rights in respect of, any of the DIP Collateral once an Event of Default has occurred and after the Remedies Notice Period; (c) objecting, challenging, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the DIP Liens, the Prepetition First Lien Obligations, the Prepetition First Priority Liens, or the Prepetition Collateral (including Cash Collateral), or any other rights or interest of any of the DIP Agent, the DIP Lenders, the DIP L/C Issuers, the Secured Hedge Banks, the Secured Cash Management Banks, the Prepetition First Lien Agents, or the Prepetition First Lien Creditors (in the case of each of the foregoing, in their respective capacities as such); (d) asserting, commencing, or prosecuting any claims or causes of action, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against any of

the DIP Agent, the DIP Lenders, the DIP L/C Issuers, the Secured Hedge Banks, the Secured Cash Management Banks, the Prepetition First Lien Agents, the Prepetition First Lien Creditors, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, or employees (in the case of each of the foregoing, in their respective capacities as such); or (e) asserting, joining, commencing, supporting, investigating, or prosecuting any action for any claim, counter-claim, action, cause of action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the material interests of the Released Parties (as defined herein) or the Prepetition First Lien Creditors, arising out of, in connection with, or relating to the DIP Facility, the DIP Documents, the Prepetition First Lien Documents, or the transactions contemplated hereunder or thereunder, including, without limitation, (i) any action arising under the Bankruptcy Code; (ii) any so-called "lender liability" claims and causes of action; (iii) any action with respect to the validity and extent of the DIP Obligations, the DIP Superpriority Claims, or the Prepetition First Lien Obligations or the validity, extent, perfection, and priority of the DIP Liens or the Prepetition First Priority Liens; (iv) any action seeking to invalidate, set aside, avoid, reduce, set off, offset, recharacterize, subordinate (whether equitable, contractual, or otherwise), recoup against, disallow, impair, raise any defenses, cross-claims, or counterclaims, or raise any other challenges under the Bankruptcy Code or any other applicable domestic or foreign law or regulation against, or with respect to, the DIP Liens, the DIP Superpriority Claims, or the Prepetition First Priority Liens in whole or in part; (v) appeal or otherwise challenge this Interim Order, the Final Order, the DIP Documents, or any of the transactions contemplated herein or therein; and/or (vi) any action that has the effect of preventing, hindering, or delaying (whether directly or indirectly) the DIP Agent, the DIP Lenders, and the DIP L/C Issuers in respect of their liens and security interests in

the DIP Collateral or any of their rights, powers, or benefits hereunder or in the DIP Documents anywhere in the world; provided, however, that the Carve Out and such collateral proceeds and loans under the DIP Documents may be used for allowed fees and expenses, in an amount not to exceed $175,000 in the aggregate (the "Investigation Fund"), incurred solely by the Creditors' Committee, if appointed, in investigating the validity, enforceability, perfection, priority, or extent of the Prepetition First Priority Liens and Prepetition Second Priority Liens during the Challenge Period (as defined in the Interim Cash Collateral Order); provided further, however, that the Creditors' Committee may not use the Investigation Fund to initiate, assert, join, commence, support, or prosecute any actions or discovery with respect thereto.  Subject to entry of the Final Order, any and all claims for fees or expenses incurred by the Creditors' Committee, if appointed, or by any party in interest in violation of any clause of this paragraph 27 (including amounts incurred in excess of the Investigation Fund) shall not be allowed, treated, or payable as an administrative expense claim for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, and the non-payment of such fees and expenses shall not constitute grounds to deny confirmation of any plan of reorganization for any of the TCEH Debtors.  Any party granted standing by the Court other than the Creditors' Committee must commence any claims against the Prepetition First Lien Agents no later than seventy-five (75) calendar days following entry of this Interim Order, and, with respect to the Creditors' Committee, if appointed and granted standing by the Court, no later than sixty (60) calendar days after its formation.

28.    Payment of Compensation.  Nothing herein shall be construed as a consent to the allowance of any professional fees or expenses of any Professional Person or shall affect the right of the DIP Agent, the DIP Lenders, or the DIP L/C Issuers to object to the allowance and payment of such fees and expenses.

29.    Release. The TCEH Debtors, on behalf of themselves and their estates (including any successor trustee or other estate representative in the Cases or Successor Cases) and any party acting by, through, or under the TCEH Debtors or their estates, forever and irrevocably (a) release, discharge, waive, and acquit the current or future DIP Agent, the DIP Lenders, the DIP L/C Issuers, the Joint Lead Arrangers, each of their respective participants and each of their respective affiliates, and each of their respective former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest (collectively, and in each case in their capacities as such, the "Released Parties"), of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened, including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, arising out of, in connection with, or relating to the DIP Facility, the DIP Documents, or the transactions contemplated hereunder or thereunder, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, with respect to or relating to the DIP Obligations, DIP Liens, or DIP Facility, as applicable, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, perfection, or avoidability of the liens or secured claims of the DIP Agent, the DIP Lenders, and the DIP L/C Issuers and (b) waive any and all defenses (including, without limitation, offsets and

counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and nonavoidability of the DIP Obligations and the DIP Liens.

30.    No Third Party Rights.    Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

31.    Section 506(c) Claims.    Subject to entry of the Final Order, no costs or expenses of administration of the Cases or any future proceeding that may result therefrom, which have been or may be incurred in the Cases at any time, shall be charged against the DIP Agent, the DIP Lenders, or the DIP L/C Issuers, or any of their respective claims or the DIP Collateral, pursuant to section 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the DIP Agent, the DIP Lenders, or the DIP L/C Issuers, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent, any DIP Lender, and any DIP L/C Issuer.

32.    No Marshaling/Application of Proceeds.    Subject to entry of the Final Order, the DIP Agent, the DIP Lenders, and the DIP L/C Issuers shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral, and proceeds shall be received and applied pursuant to the terms of the DIP Credit Documents notwithstanding any other agreement or provision to the contrary; provided, however, that nothing herein shall impair the rights of the DIP Agent, DIP Lenders, and the DIP L/C Issuers with respect to the DIP Collateral.

33.    Joint and Several Liability.    Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the TCEH Debtors' estates, it being understood,

however, that the TCEH Debtors shall be jointly and severally liable for the obligations hereunder and in accordance with the terms of the DIP Facility and the DIP Documents.

34.    Discharge Waiver.  The DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the DIP Obligations have been indefeasibly paid in full, in cash, all Commitments have been terminated, and all Letters of Credit have been cancelled (or all such Letters of Credit shall have been fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the applicable DIP L/C Issuers) on or before the effective date of a confirmed plan of reorganization or liquidation.  None of the TCEH Debtors shall propose or support any plan of reorganization or liquidation, sale of all or substantially all of the TCEH Debtors' assets, or entry of any confirmation order or sale order unless any such plan of reorganization or liquidation, sale, or confirmation order provides that the DIP Obligations (excluding the Secured Hedge Obligations, the Secured Cash Management Obligations, and Contingent Obligations) shall be indefeasibly paid in full, in cash, all Commitments shall be terminated, and all Letters of Credit shall be cancelled (or all such Letters of Credit shall be fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the applicable DIP L/C Issuers) on or prior to the earlier to occur of the effective date of any such plan of reorganization or liquidation or sale and the DIP Termination Date.

35.    Rights Preserved.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly:  (a) the DIP Agent's, the DIP Lenders', or the DIP L/C Issuers' right to seek any other or supplemental relief in respect of the TCEH Debtors; (b) any of the rights of the DIP Agent, any of the DIP Lenders, or any of the DIP L/C Issuers under the Bankruptcy Code or under non-

bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Cases or Successor Cases, conversion of any of the Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of any of the DIP Agent, the DIP Lenders, or the DIP L/C Issuers.

36.    <u>No Waiver by Failure To Seek Relief</u>.  The delay or failure of the DIP Agent, the DIP Lenders, or the DIP L/C Issuers to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Agent, the DIP Lenders, the DIP L/C Issuers, the Creditors' Committee, or any party in interest, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the applicable DIP Documents.

37.    <u>Binding Effect; Successors and Assigns</u>.  The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in the Cases, including, without limitation, the DIP Agent, the DIP Lenders, the DIP L/C Issuers, the Secured Hedge Banks, the Secured Cash Management Banks, any statutory or nonstatutory committees appointed or formed in the Cases (including the Creditors' Committee), and the TCEH Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed for the estate of any of the TCEH Debtors) and shall inure to the benefit of the DIP Agent, the DIP Lenders, the DIP L/C Issuers, and the TCEH Debtors and their respective successors and assigns; <u>provided</u>, <u>however</u>, that the DIP Agent, the DIP Lenders, and

the DIP L/C Issuers shall have no obligation to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the TCEH Debtors. In determining to make any loan under the DIP Credit Agreement or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents, the DIP Agent, the DIP Lenders, and the DIP L/C Issuers (a) shall not be deemed to be in control of the operations of any of the TCEH Debtors or to be acting as a "controlling person," "responsible person," or "owner or operator" with respect to the operation or management of any of the TCEH Debtors (as such term, or any similar terms, are used in the Internal Revenue Code, the United States Comprehensive Environmental Response, Compensation and Liability Act (as amended), or any similar Federal or state statute) and (b) shall not owe any fiduciary duty to any of the TCEH Debtors, their creditors, or their estates, and shall not constitute or be deemed to constitute a joint venture or partnership with any of the TCEH Debtors.

38. <u>No Modification of Interim Order</u>. Unless and until the DIP Obligations (excluding the Secured Hedge Obligations, the Secured Cash Management Obligations, and Contingent Obligations) have been indefeasibly paid in full, in cash, all Commitments have been terminated, and all Letters of Credit have been cancelled (or all such Letters of Credit have been fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the applicable DIP L/C Issuers) (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms), an Event of Default shall occur if the TCEH Debtors seek or consent to, directly or indirectly, or if there is entered: (a) without the prior written consent of the DIP Agent, (i) any modification, stay, vacatur, or amendment to this Interim Order, (ii) a priority claim for any administrative expense or unsecured claim against the TCEH Debtors (now existing or hereafter arising of any kind or

nature whatsoever, including, without limitation, any administrative expense of the kind specified in section 503(b), 507(a), or 507(b) of the Bankruptcy Code, or, subject to the entry of the Final Order, section 506(c) of the Bankruptcy Code) in any of the Cases or Successor Cases, equal or superior to the DIP Superpriority Claims other than the Carve Out and the RCT Reclamation Support Carve Out, or (iii) any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens, except as specifically provided herein or in the DIP Documents; (b) without the prior written consent of the DIP Agent, an order allowing use of the DIP Collateral, including Cash Collateral; (c) an order converting or dismissing any of the Cases; (d) an order appointing a chapter 11 trustee in any of the Cases; or (e) an order appointing an examiner with enlarged powers (having powers beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4)) in any of the Cases; provided, however, that notwithstanding anything to the contrary herein, the TCEH Debtors may seek to use Cash Collateral on a non-consensual basis pursuant to an order in form and substance acceptable to the Left Lead Arrangers (as defined in the DIP Credit Agreement). No such consent shall be implied by any other action, inaction, or acquiescence of the DIP Agent.

39.    Survival. The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization or liquidation in any of the Cases; (b) converting any of the Cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of the Cases or any Successor Cases; or (d) pursuant to which the Court abstains from hearing any of the Cases or Successor Cases. The terms and provisions of this Interim Order, including the claims, liens, security interests, and other protections granted to the DIP Agent, the DIP Lenders, the DIP L/C Issuers, the Secured Hedge Banks, and the Secured Cash Management Banks pursuant to this Interim Order and/or

the DIP Documents, notwithstanding the entry of any such order, shall continue in the Cases, in any Successor Cases, or following dismissal of the Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until, in respect of the DIP Facility, all the DIP Obligations (excluding the Secured Hedge Obligations, the Secured Cash Management Obligations, and Contingent Obligations), pursuant to the DIP Documents and this Interim Order, have been indefeasibly paid in full, in cash, all Commitments have been terminated, and all Letters of Credit have been cancelled (or all such Letters of Credit have been fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the applicable DIP L/C Issuers) (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms).

40. <u>Interim Order Governs</u>. In the event of any inconsistency between the provisions of this Interim Order and the DIP Documents, the provisions of this Interim Order shall govern.

41. <u>Final Hearing</u>. The Final Hearing shall be _____, 2014, at __:__ a.m./p.m. (prevailing Eastern time). The TCEH Debtors shall provide notice of the Final Hearing to: (a) the Office of the U.S. Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) Citibank, N.A., in its capacity as First Lien Credit Agent under the First Lien Credit Agreement, and Wilmington Trust, N.A., upon the effectiveness of its appointment as successor First Lien Credit Agent; (d) Bank of New York Mellon Trust Company, N.A., in its capacity as indenture trustee under: (i) the TCEH unsecured pollution control revenue bonds; and (ii) the EFCH 2037 Notes due 2037; (e) American Stock Transfer & Trust Company, LLC, in its capacity as indenture trustee under: (i) the 9.75% EFH senior unsecured notes due 2019; (ii) the 10.0% EFH senior unsecured notes due 2020; (iii) the

10.875% EFH LBO senior unsecured notes due 2017; (iv) the 11.25%/12.0% EFH LBO toggle notes due 2017; (v) the 5.55% EFH legacy notes (series P) due 2014; (vi) the 6.50% EFH legacy notes (series Q) due 2024; and (vii) the 6.55% EFH legacy notes (series R) due 2034; (f) Computershare Trust Company, N.A. and Computershare Trust Company of Canada, in their capacities as indenture trustee under: (i) the 11.0% EFIH senior secured second lien notes due 2021; and (ii) the 11.75% EFIH senior secured second lien notes due 2022; (g) UMB Bank, N.A. in its capacity as indenture trustee under: (i) the 9.75% EFIH senior unsecured notes due 2019; and (ii) the 11.25%/12.25% EFIH senior toggle notes due 2018; (h) BOKF, NA, dba Bank of Arizona, in its capacity as indenture trustee under 11.50% TCEH senior secured notes due 2020; (i) CSC Trust Company of Delaware in its capacity as indenture trustee under: (i) the 6.875% EFIH senior secured notes due 2017; and (ii) the 10.0% EFIH senior secured notes due 2020; (j) Law Debenture Trust Company of New York in its capacity as indenture trustee under: (i) the 10.25% TCEH senior unsecured notes due 2015; and (ii) the 10.50%/11.25% TCEH senior toggle notes due 2016; (k) Wilmington Savings Fund Society, FSB in its capacity as indenture trustee under the 15.0% TCEH senior secured second lien notes due 2021; (l) counsel to certain holders of claims against the Debtors regarding each of the foregoing described in clauses (c) through (k); (m) the agent for the TCEH debtor-in-possession financing facility and counsel thereto; (n) the agent for the EFIH debtor-in-possession financing facility and counsel thereto; (o) counsel to certain holders of equity in Texas Energy Future Holdings Limited Partnership; (p) counsel to Oncor; (q) the SEC; (r) the Internal Revenue Service; (s) the Office of the Texas Attorney General on behalf of the PUC; (t) counsel to ERCOT; (u) the counterparties to the First Lien Commodity Hedges and First Lien Interest Rate Swaps; (v) the RCT; and (w) counsel to the unofficial committee of certain TCEH first lien debt holders. Any objections or responses to the

DIP Motion must be filed on or before _____, 2014, at 4:00 p.m. (prevailing Eastern time).  If no objections are filed to the DIP Motion, the Court may enter the Final Order without further notice or hearing.

42.    *Nunc Pro Tunc* <u>Effect of this Interim Order</u>.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon execution thereof.

43.    <u>Retention of Jurisdiction</u>.  The Court has and will retain jurisdiction to enforce this Interim Order according to its terms.


Wilmington, Delaware
Dated: _____, 2014


_____
UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT B

**Goldstein Declaration**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | Case No. 14-_____ (___) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF STEPHEN GOLDSTEIN
## IN SUPPORT OF (I) THE MOTION OF TEXAS
## COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC
## AND CERTAIN OF ITS DEBTOR AFFILIATES FOR
## ENTRY OF INTERIM AND FINAL ORDERS (A) APPROVING
## POSTPETITION FINANCING, (B) GRANTING LIENS AND
## PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS,
## (C) MODIFYING THE AUTOMATIC STAY, AND (D) SCHEDULING
## A FINAL HEARING, AND (II) THE MOTION OF TEXAS COMPETITIVE
## ELECTRIC HOLDINGS COMPANY LLC AND CERTAIN OF ITS DEBTOR
## AFFILIATES FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING
## USE OF CASH COLLATERAL, (B) GRANTING ADEQUATE PROTECTION,
## (C) MODIFYING THE AUTOMATIC STAY, AND (D) SCHEDULING A FINAL HEARING

I, Stephen Goldstein, declare as follows:

1.      I am a Senior Managing Director of Evercore Group LLC ("Evercore"), a

financial advisory and investment banking firm with offices around the world and financial

advisor and investment banker to the above-captioned debtors and debtors in possession (the

"Debtors"). I submit this declaration (this "Declaration") in support of (I) the *Motion of Texas*

*Competitive Electric Holdings Company LLC and Certain of its Debtor Affiliates for Entry of*

*Interim and Final Orders (A) Approving Postpetition Financing, (B) Granting Liens and*

---

[1]    The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which the debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

*Providing Superpriority Administrative Expense Claims, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing* (the "TCEH DIP Motion") *and (II)* the *Motion of Texas Competitive Electric Holdings Company LLC And Certain of its Debtor Affiliates for Entry of Interim and Final Orders (A) Authorizing Use Of Cash Collateral, (B) Granting Adequate Protection, (C) Modifying The Automatic Stay, and (D) Scheduling a Final Hearing* (the "TCEH Cash Collateral Motion").[2]

2.      Except where specifically noted, the statements in this Declaration are based on either my personal knowledge, information supplied or verified by the Evercore financial team that I supervise or the TCEH Debtors' personnel and third-party advisors, my review of relevant documents, or my opinion based upon my experience and knowledge of the TCEH Debtors' operations and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this Declaration on behalf of the TCEH Debtors.

3.      I offer this declaration in support of (a) the TCEH Debtors' motion to obtain approval of the $4.475 billion DIP financing facility offered by the DIP Lenders, and (b) the TCEH Debtors' motion to obtain the use of Cash Collateral of the Prepetition Secured Agents and the Prepetition Secured Creditors. In particular, I submit this declaration to place before this Court evidence supporting my opinion, to a reasonable degree of expert certainty, that: (a) the DIP Lenders' DIP proposal is (i) the product of an arm's-length negotiation, (ii) is the best available DIP financing for the TCEH Debtors, and (iii) is in the best interests of the TCEH Debtors' estates and creditors; and (b) the use of the Cash Collateral and access to the DIP Financing is necessary to preserve the value of the TCEH Debtors' estates; and (c) the TCEH

---

[2]      Terms used but not otherwise defined herein shall have the meanings ascribed to them in the TCEH DIP Motion or the TCEH Cash Collateral Motion, as applicable.

Debtors' proposed adequate protection, provided to the Prepetition Secured Creditors in exchange for senior secured superpriority priming liens provided to the DIP Lenders and the use of Cash Collateral, is sufficient to protect the Prepetition Secured Creditors' interests in the Collateral, including the Cash Collateral.

### Qualifications

4.     Evercore is one of the world's leading independent investment banking groups, with more than 20 offices in more than eight countries, including an office located at 55 East 52nd Street, New York, NY 10055. Evercore has expertise in domestic and cross-border restructurings, mergers and acquisitions, and other financial advisory services. Evercore has served as an experienced bankruptcy and restructuring advisor to debtors, bondholders, creditors' committees, single creditor classes and secured creditors in a variety of industries. Evercore is a member of the Financial Industry Regulatory Authority and the Securities Investor Protection Corporation.

5.     I specialize in advising both debtors and creditors in financial restructurings and distressed mergers and acquisitions; raising capital for troubled businesses; and representing debtors and creditor constituencies in bankruptcy proceedings. Moreover, I have raised capital in many in-court and out-of-court financings, and have extensive experience in procuring, structuring, and negotiating debtor-in-possession financing.

6.     Before joining Evercore, I was a Managing Director of Lazard Frères & Co. LLC ("Lazard"), where I specialized in corporate reorganizations and bankruptcy. Before joining Lazard in 2002, I served in several investment banking positions at Thomas Weisel Partners and its predecessor firm, Montgomery Securities. I began my career as an attorney at Morgan, Lewis & Bockius, where I specialized in securities law and mergers and acquisitions. I have over 18 years of experience in a broad range of corporate finance activities, including restructurings,

3

mergers and acquisitions, and debt and equity financings. I received my B.A. from Cornell University in 1992 and my J.D. from New York University School of Law in 1995.

### The TCEH Debtors' Need for DIP Financing and Cash Collateral and the Development of the DIP Budget

7.    After being retained by the TCEH Debtors in July 2012 and gaining an initial understanding of the TCEH Debtors' capital structure and business operations, Evercore worked together with the TCEH Debtors' management team and its other advisors to analyze the TCEH Debtors' cash needs to determine if additional liquidity was needed to support the TCEH Debtors' operations during the course of a restructuring. In undertaking this analysis, the TCEH Debtors and their advisors considered the TCEH Debtors' near-term projected financial performance, including demand for the TCEH Debtors' services and the cost of supplying such services. The TCEH Debtors' management also conferred with key operational divisions (*i.e.*, Luminant and TXU Energy) to understand essential business metrics in both the near- and long-term.

8.    The TCEH Debtors, Evercore, and other advisors discussed and contemplated the use of Cash Collateral, with or without any additional financing, to fund operations during these chapter 11 cases. Based on the TCEH Debtors' financial projections, the TCEH Debtors determined that Cash Collateral may be sufficient to fund certain aspects of working capital, capital expenditures, and other general corporate purposes during the anticipated duration of the chapter 11 cases, but will be insufficient to fund the costs associated with the TCEH Debtors' restructuring efforts, including providing creditors with adequate protection. Thus, the TCEH Debtors decided debtor-in-possession financing was necessary to ensure that the TCEH Debtors have sufficient liquidity to continue operations uninterrupted during the TCEH Debtors' restructuring.

4

9.    The TCEH Debtors and Evercore developed an initial budget, attached to the TCEH DIP Motion as Exhibit C (the "DIP Budget"), that incorporates a number of factors, including the effect of the chapter 11 filing, material cash disbursements, required vendor/supplier payments, cash flows from the TCEH Debtors' ongoing operations, and the cost of necessary goods and materials, and includes all of the expenditures for which the TCEH Debtors seek authority to pay in various "first day" pleadings. In accordance with the DIP Budget, the TCEH Debtors have determined that postpetition financing is necessary to fund the following restructuring costs, among others: adequate protection payments; working capital (e.g., collateral for letters of credit); bankruptcy costs (e.g., business disruption and professional fees); and regulatory requirements (e.g., RCT mining reclamation obligations). The funding of these restructuring costs, described in greater detail in the DIP Budget, is necessary to preserve and maintain the TCEH Debtors' going-concern value and, ultimately, effectuate a successful reorganization.

10.    Among the restructuring costs addressed by the DIP Financing are the TCEH Debtors' mining reclamation obligations to the RCT. The TCEH Debtors maintain their mining operations in Texas with the permission of the RCT, a regulatory agency that permits, enforces, and oversees surface mining and reclamation in the State. The RCT's grant of permission to the TCEH Debtors to maintain mining operations is conditioned on the TCEH Debtors' posting security to ensure the reclamation of their permitted mining areas. Prior to the Petition Date, the TCEH Debtors secured their reclamation obligations in the form of a self-bond. The TCEH Debtors arguably lost the right to self-bond upon filing the chapter 11 cases. *See* 16 TAC § 12.309(j)(2)(B). Pursuant to section 12.309(j)(7) of the TAC, the TCEH Debtors must immediately notify the RCT and post a substitute bond within 90 days of such notification.

Given these timing limitations, the TCEH Debtors need to submit the RCT Reclamation Support Carve Out (defined below) to the RCT as soon as practicable to give the RCT sufficient time to consider the substitute bond.

11.     The DIP Financing and the Interim Order contemplate a carve out from the DIP Lenders' liens of up to $1,100,000,000 for the benefit of the RCT (the "RCT Reclamation Support Carve Out"). The RCT Reclamation Carve Out will be senior to any other obligations or liabilities of the Debtors, other than the professional fee Carve Out.

12.     As provided in the DIP Budget, the TCEH Debtors will need approximately $1,600,000,000 in available liquidity from the DIP Financing for operations during the interim period of these chapter 11 cases. The $1,600,000,000 interim DIP Financing is largely comprised of (a) an $800,000,000 Revolving Credit Facility to fund operating costs, bankruptcy expenses, and adequate protection payments, and (b) an $800,000,000 General Letter of Credit Facility to meet collateral posting requirements for trading and other counterparties (which replaces an existing prepetition letter of credit facility).

13.     The proposed DIP Financing will provide the TCEH Debtors with immediate access of up to $2,700,000,000, consisting of:  (a) $800,000,000 under the Revolving Credit Facility; (b) $1,100,000,000 under the Delayed-Draw Term Facility, the proceeds of which, if funded, will be applied by TCEH to fund the RCT L/C Collateral Account if required for the purposes of Paragraph 10; and (c) $800,000,000 under the Term Loan Facility, of which up to $800,000,000 may be applied by TCEH to fund the General L/C Collateral Account. Moreover, upon entry of the Final Order, the proposed DIP Financing will provide the TCEH Debtors with up to $4,475,000,000, consisting of (x) $1,950,000,000 under the Revolving Credit Facility, (y) $1,425,000,000 under the Term Loan Facility, of which up to $800,000,000 may be applied

6

by TCEH to fund the General L/C Collateral Account, and (z) $1,100,000,000 under the

Delayed-Draw Term Facility, the proceeds of which, if funded, will be applied by TCEH to fund

the RCT L/C Collateral Account to support RCT Letters of Credit. The Debtors will not borrow

under the Delayed-Draw Term Facility on an interim or final basis unless the Railroad

Commission of Texas (the "RCT") rejects the Reclamation Support Carve Out.

14.     In addition to the DIP Financing, in the normal course of business, the TCEH

Debtors use cash on hand and cash flow from operations to fund working capital, capital

expenditures, and for other general corporate purposes. An inability to use these funds during

these chapter 11 cases could cripple the TCEH Debtors' business operations. Indeed, the TCEH

Debtors must use their cash to, among other things, continue the operation of their business in an

orderly manner, maintain business relationships with vendors, suppliers, and customers, pay

employees, fulfill regulatory obligations, and satisfy other working capital and operational

needs—all of which are necessary to preserve and maintain the TCEH Debtors' going-concern

value and, ultimately, effectuate a successful reorganization. Thus, the TCEH Debtors require

the use of Cash Collateral to continue operating their businesses.

15.     Importantly, before entry of the Final Order, the TCEH Debtors will use the DIP

Financing and Cash Collateral only to the extent necessary to preserve the value of the

Collateral, including to fund necessary operational and adequate protection costs. The TCEH

Debtors will not use the DIP Financing and Cash Collateral to pay professional fees and

expenses before entry of the Final Order.

16.     Absent an ability to demonstrate that the TCEH Debtors have the means available

to operate in the ordinary course and procure goods and services that are vital to ongoing

business operations, customers may seek other alternatives and vendors and suppliers may refuse

to do business with the TCEH Debtors. Moreover, absent access to the Cash Collateral and the funds available under the DIP Facility, the TCEH Debtors may not have sufficient liquidity to continue their business operations in the ordinary course to the material detriment of customers, creditors, employees, and other parties in interests, jeopardizing the success of the TCEH Debtors' restructuring.

17.    The approval of the TCEH Debtors' use of the Cash Collateral and the DIP Financing, with its favorable terms, will substantially enhance the Debtors' ability to make a smooth transition into chapter 11 and instill confidence in their customers, employees, creditors, and other parties in interest. Therefore, the TCEH Debtors have an immediate need to access the DIP Facility and use the Cash Collateral on an interim basis and throughout the pendency of these chapter 11 cases.

### The TCEH Debtors' Efforts to Obtain Postpetition Financing

18.    The TCEH Debtors were uniquely positioned to negotiate a DIP facility with favorable terms and ultimately secured the DIP Financing, which is, in substance, more akin to conventional, broadly-syndicated facilities than typical post-petition financing facilities. *First*, the TCEH Debtors are operationally sound and anticipate generating significant positive cash flow before debt service over the course of the chapter 11 cases. *Second*, relative to the value of the TCEH Debtors' businesses, the DIP Financing is significantly overcollateralized. *Third*, the opportunity to create a relationship with a strong going concern such as the TCEH Debtors was highly attractive to potential DIP lenders. The lending market understands that the Debtors are a robust company with a leveraged balance sheet that will be restructured in these chapter 11 cases.

19.    The TCEH Debtors' decision to proceed with the DIP Financing comes after a dedicated and diligent search for the best financing alternatives. In early September 2013, the

8

TCEH Debtors and Evercore initiated a request for DIP facility proposals ("RFP"). The TCEH Debtors' and Evercore canvassed the market to find parties interested in providing debtor-in-possession financing. During the initial stage of the RFP process, the TCEH Debtors approached five large financial institutions that are actively involved in the debtor-in-possession and syndicated finance markets. The TCEH Debtors and their advisors provided these financial institutions with a proposed DIP financing structure, draft commitment letter, and a detailed term sheet. The TCEH Debtors offered each of these financial institutions the opportunity to conduct due diligence and submit proposals for up to 100% of the DIP financing commitment.

20.     Five financial institutions submitted proposals in response to the TCEH Debtors' RFP. After thorough analysis of the DIP financing proposals, the TCEH Debtors concluded that no single financial institution would be able to underwrite the entire amount of the DIP financing due to the size of the proposed revolving credit facility. Nevertheless, the size of the revolving credit facility remained a priority for the TCEH Debtors because a revolving credit facility offered several benefits over a comparable term facility, including lower pricing and greater efficiency by deferring funding until needed. As a result of this analysis, the TCEH Debtors decided to aggregate the support of multiple financial institutions to fund the DIP Facility.

21.     In early October 2013, two additional financial institutions signed non-disclosure agreements and joined the DIP financing process. The TCEH Debtors continued negotiating with all seven financing providers during the first three weeks of October to obtain the most favorable terms on the DIP Financing. On October 25, 2013, the TCEH Debtors determined that the DIP Financing proposals from Citigroup Global Markets Inc. and Deutsche Bank Securities Inc. contained the best possible combination of terms and effectively addressed the TCEH Debtors' liquidity needs. The TCEH Debtors thus began negotiating commitment letters with

Citigroup Global Markets Inc. and Deutsche Bank Securities Inc., as well as the five other lenders, understanding that the TCEH Debtors would require a broadly-syndicated facility to achieve a revolving credit facility of this size.

22.     The TCEH Debtors' initial discussions provided a foundation for renewing DIP Financing negotiations in early February 2014. The TCEH Debtors and their advisors continued negotiating with the DIP Lenders through March 2014, including replacing one of the seven lenders.

23.     On April 28, 2014, the TCEH Debtors received signed commitment letters from all seven initial lenders under the DIP Facility. Collectively, these institutions were able to provide the TCEH Debtors with $4,475,000,000 in DIP Financing, including the $1,950,000,000 Revolving Credit Facility.

24.     The DIP Financing is the best source of financing, providing the TCEH Debtors with the liquidity they need to continue operating their businesses in the ordinary course and satisfy restructuring-related costs. The DIP Financing was negotiated at arm's length on terms that are reasonable. The DIP Financing will ensure the TCEH Debtors' access to sufficient liquidity that will provide the foundation for maximizing value for all stakeholders.

### DIP Financing on a Senior Secured and Superpriority Basis

25.     The TCEH Debtors' and Evercore's discussions with various potential sources of DIP financing revealed that DIP financing on a junior or unsecured basis was not available to the TCEH Debtors. The TCEH Debtors' significant secured debt obligations and lack of unencumbered assets precludes them from obtaining postpetition financing in the amount they require on terms other than on a senior secured and superpriority basis.

26.     I believe the TCEH Debtors satisfy the requirements to obtain postpetition financing secured by a first priority priming lien, as I understand them, because the transaction will enhance the value of the TCEH Debtors' assets. *First*, the TCEH Debtors and their advisors canvassed the market and were not able to obtain financing on equal or better terms from the DIP Lenders other than financing secured by first priority priming liens.

27.     *Second*, the TCEH Debtors need the funds to be provided under the DIP Facility to preserve the value of their estates for the benefit of all stakeholders.  Specifically, the TCEH Debtors need the funds to be provided under the DIP Facility to maintain operations and signal to their suppliers and other vendors that they are credit-worthy and that their vendors can and should continue to provide goods and services to the TCEH Debtors on substantially the same credit terms as during the prepetition period.  Absent access to the DIP Facility and Cash Collateral, the TCEH Debtors will be unable to operate their businesses or prosecute these chapter 11 cases.

28.     *Third*, the TCEH Debtors and their advisors determined that the DIP Lenders offered the best option for obtaining the postpetition financing the TCEH Debtors require, including, upon entry of the Interim Order, access to approximately $2,700,000,000 in incremental liquidity, which the TCEH Debtors and their advisors have independently determined is sufficient and necessary to allow the TCEH Debtors to maintain their operations. The DIP Lenders agreed to favorable terms of the DIP Financing, in part to create and foster relationships with the Debtors.

29.     *Fourth*, the TCEH Debtors conducted arm's-length negotiations with the DIP Lenders regarding the terms of the DIP Facility, and those agreements reflect the most favorable terms on which the DIP Lenders (or any other lender) were willing to offer financing.  In my

11

opinion, the entry into the DIP Financing is an exercise of sound and reasonable business judgment in the best interests of the TCEH Debtors' estate and its creditors.

## The Debtors' Proposed Adequate Protection

30.    In exchange for the TCEH Debtors' use of Cash Collateral and the imposition of first priority priming DIP liens, the TCEH Debtors will provide adequate protection to the Prepetition Secured Agents to the extent of any diminution in the value of collateral for the benefit of the Prepetition Secured Creditors.    Importantly, the access to the capital provided by the DIP Facility and Cash Collateral will not only preserve the TCEH Debtors' liquidity but, as noted above, will only serve to enhance the value of the TCEH Debtors' estates.  I understand that the Prepetition Secured Agents and Prepetition Secured Creditors will be offered superpriority claims, replacement liens, and junior liens.  Additionally, the Prepetition First Lien Agents and Prepetition First Lien Creditors will receive adequate protection payments in the amount of their prepetition interest, professional fees and expenses, a financial covenant consistent with what is provided to the DIP Lenders, and reasonable access to books and records, including budgets and annual forecasts.

31.    To use cash collateral or impose secured superpriority priming liens, the debtor must adequately protect the secured creditor's interest in the property against any diminution in value of such interest resulting from the debtor's use of the property.  I understand that what constitutes adequate protection is decided on a case-by-case basis.  In my opinion, the proposed adequate protection summarized in the TCEH Cash Collateral Motion and TCEH DIP Motion is fair and reasonable.  Most importantly, the TCEH Debtors otherwise anticipate to be cash-flow positive through the duration of the chapter 11 cases, so the use of Cash Collateral and the imposition of the priming liens to obtain postpetition financing should increase the value of the

Collateral. The TCEH Debtors have agreed to pay the Prepetition First Lien Creditors full prepetition interest as adequate protection payments. The proposed adequate protection also includes the superpriority claims, replacement and junior liens, and payment of fees and expenses. I believe this adequate protection package fully protects the Prepetition Secured Agents and the Prepetition Secured Creditors from diminution in value of the Collateral, including the Cash Collateral.

32.      Finally, I believe that the DIP Financing provides adequate protection for the Prepetition Second Lien Creditors. The access to the capital provided by the DIP Financing will not only preserve the Debtors' liquidity but, as noted above, will preserve and enhance the value of the Debtors' businesses. Finally, and just as importantly, I understand that the Second Lien Agent will receive, for the benefit of itself and the Prepetition Second Lien Creditors, (a) the Adequate Protection Liens and (b) a superpriority claim. By their very nature, all of these events provide adequate protection for these Prepetition Second Lien Creditors.

*[Remainder of page intentionally left blank.]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: April 29, 2014

Stephen Goldstein
Senior Managing Director
Evercore Group LLC

**EXHIBIT C**

**DIP Budget**

TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC ("TCEH")
DIP Budget
$ in millions

**Unlevered Free Cash Flow**
Open EBITDA
Hedge Value [a]
Cash Impacts of Adjustments to EBITDA
Subtotal
Capital Expenditures
Working Capital
Margin Deposits
Other Cash Flow Items
Cash Impacts Related to EFH Corp.
**Unlevered Free Cash Flow**

**Cash Adjustments**
Margin Deposits Adjustment [b]
Adequate Protection Interest [c]
Payments to Investment-Grade Creditors [d]
DIP Other Information Items
LUME and L/C Collateral / Utility Adequate Assurance [e]
Professional Fees / Financing / Business Impacts / Other [f]
DIP Facility Financing
DIP Facility Interest
Release of Restricted Cash
**Total Ch. 11 Adjustments**

**Total Cash Flow**

Beginning Cash Balance
Total Cash Flow
**Ending Cash Balance**

**Liquidity**
LUME Facility Undrawn Facility Availability
L/C Facility Undrawn Facility Availability
Free Ending Cash Balance
**Total Liquidity**

Notes:
[a] Hedge is unsettled benefit of cap hedges trading $15 on the 1st Jan 2014 – December 2014 base period.
[b] Reflects reversal of all margin deposits money related to gas hedges trading $15 on the 1st May 2014 – December 2014 base period.
[c] Assumes L/C, LUME and LUME commitments per projected balance of all first lien debt, as well as estimated accrued and unpaid first lien interest expense as of April 29, 2014.
[d] Includes other recovery payments related to capital leases and other structurally senior debt.
[e] Combination of collateral for LUME funding parties and L/C, cash collateral, as well as adequate assurance for critical providers.
[f] Purposes of professional fees incurred in Chapter approval.

Draft - Subject to Change and Material Revision
Highly Confidential Subject to Terms of Non-Disclosure Agreement Subject to FRE 408.