## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-_____ (___) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

**MOTION OF ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC AND EFIH FINANCE, INC. FOR ENTRY OF (I) AN INTERIM ORDER (A) APPROVING CERTAIN FEES RELATED TO POSTPETITION FINANCING AND GRANTING SUCH FEES ADMINISTRATIVE EXPENSE PRIORITY AND (B) SCHEDULING A FINAL HEARING; AND (II) A FINAL ORDER (A) APPROVING POSTPETITION FINANCING, (B) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (C) AUTHORIZING THE USE OF CASH COLLATERAL, (D) AUTHORIZING THE EFIH FIRST LIEN REFINANCING, (E) AUTHORIZING ISSUANCE OF ROLL-UP DEBT TO THE EXTENT AUTHORIZED BY THE SETTLEMENT MOTION, (F) DETERMINING THE VALUE OF SECURED CLAIMS, AND (G) MODIFYING THE AUTOMATIC STAY**

Energy Future Intermediate Holding Company LLC ("EFIH") and EFIH Finance Inc.

(together with EFIH, the "Borrower" or the "EFIH Debtors," and together with the other

above-captioned debtors and debtors in possession, the "Debtors"), as debtors and debtors in

possession,[2] file this motion (this "Motion")[3] for entry of (i) an interim order (the "Interim Fee

---

[1]   The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810.  The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201.  Due to the large number of debtors in these chapter 11 cases, for which the debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

[2]   For the avoidance of doubt, only the EFIH Debtors are seeking authority herein.

[3]   Capitalized terms used but not defined herein shall have the meaning ascribed to them in the EFIH First Lien DIP Credit Agreement or the Interim Order, as applicable.  As of the date hereof, the EFIH Debtors, the EFIH First Lien DIP Lenders, and the EFIH First Lien DIP Agent are in the process of finalizing the EFIH First Lien DIP Credit Agreement.  As a result, the agreement has not been filed herewith, but will be filed on or shortly following the Petition Date.

Order"), substantially in the form attached hereto as **Exhibit A**, (a) approving certain fees as and to the extent required under that certain commitment letter (the "EFIH First Lien DIP Commitment Letter")[4] relating to commitments to fund the EFIH First Lien DIP Financing (as defined herein) and that certain fee letter relating to the payment of fees in connection with the EFIH First Lien DIP Financing (the "EFIH First Lien DIP Fee Letter")[5] and (b) scheduling a hearing to consider approval of the relief requested in this Motion on a final basis (the "Final Hearing") and (ii) a final order (the "Final Order," and together with the Interim Fee Order, the "Orders") (a) authorizing the EFIH Debtors to enter into the EFIH First Lien DIP Credit Agreement (as defined herein) to obtain the EFIH First Lien DIP Financing, (b) granting liens and providing superpriority administrative expense claims, (c) authorizing the use of EFIH Cash Collateral (as defined herein), (d) authorizing the EFIH First Lien Refinancing (as defined herein), (e) authorizing the issuance of EFIH First Lien DIP Roll-Up Claims (as defined herein) to the extent provided in the Settlement Motion (as defined herein), (f) determining the value of the secured claims of the Prepetition EFIH First Lien Creditors (as defined herein), including a determination that such amount does not include any EFIH First Lien Makewhole Premium (as defined herein), and (g) modifying the automatic stay.

In support thereof, the EFIH Debtors submit the *Declaration of Stephen Goldstein in Support of the Motion of Energy Future Intermediate Holding Company LLC and EFIH Finance, Inc., for Entry of for Entry of (I) an Interim Order (A) Approving Certain Fees Related to*

---

[4]    The EFIH First Lien Commitment Letter is attached hereto as **Exhibit D** and delineates the fees that must be paid pursuant to the Interim Fee Order to maintain the commitment for the EFIH First Lien DIP Financing. The EFIH First Lien Commitment Letter does not, however, disclose the amount of the applicable fees.

[5]    As is usual and customary with respect to debtor in possession financing facilities, the EFIH Debtors have filed the EFIH First Lien Fee Letter under seal pursuant to the *Motion Authorizing Energy Future Intermediate Holding Company LLC and EFIH Finance, Inc. to File Under Seal Certain Fee Letters Related to Proposed Debtor-in-Possession Financing*, filed contemporaneously herewith.

*Postpetition Financing and Granting Such Fees Administrative Expense Priority and (B) Scheduling a Final Hearing; and (II) a Final Order (A) Approving Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Authorizing the Use of Cash Collateral, (D) Authorizing the EFIH First Lien DIP Refinancing, (E) Authorizing Issuance of Roll-Up Debt to the Extent Authorized by the Settlement Motion, (F) Determining the Value of Secured Claims, and (G) Modifying the Automatic Stay* (the "Goldstein Declaration"),[6] a copy of which is attached hereto as **Exhibit B**.  The EFIH Debtors will also file the *Memorandum of Law in Support of the Motion of Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. for a Final Order Determining That No Makewhole Premium is Due Under the EFIH First Lien Notes* (the "First Lien Makewhole Memorandum") and a motion (the "Settlement Motion") seeking the authorization, among other things, of the EFIH Makewhole Settlements, as soon as reasonably practicable following the Petition Date.

### Jurisdiction and Venue

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.   This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the EFIH Debtors consent pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules") to the entry of a final order by the Court in

---

[6]    The Goldstein Declaration focuses on the relief sought under this Motion and pursuant to the Interim Fee Order. The EFIH Debtors plan to submit supplemental declaration in support of the Final Relief sought herein at an appropriate time before the Final Hearing date.

connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.       Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.       The bases for the relief requested in this Motion are sections 105, 361, 362, 363, 364, 502, 506, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 3012, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Bankruptcy Rules 2002, 4001, and 9014.

### Preliminary Statement

4.       The Debtors commenced these chapter 11 cases to restructure more than $42 billion in funded indebtedness, approximately $7.7 billion of which was issued by the EFIH Debtors.  The relief that the EFIH Debtors seek in this Motion is necessary to allow the EFIH Debtors to maximize the value of their estates.  Specifically, the EFIH Debtors, ***on an interim basis***, seek authority to honor certain obligations under the EFIH First Lien DIP Commitment Letter and EFIH First Lien DIP Fee Letter.  The EFIH Debtors, pursuant to a final order, seek to take advantage of highly favorable debt market conditions to refinance the EFIH First Lien Notes (the "EFIH First Lien Refinancing"), saving an estimated $13 million in interest ***per month***.  At the same time, the EFIH Debtors will obtain access to continued use of cash collateral and additional liquidity to fund their ordinary course restructuring-related expenses.

5.       The EFIH Debtors have obtained commitments from several large financial institutions for up to $5.40 billion of fully underwritten debtor-in-possession financing on a super-priority administrative claim and first priority priming lien basis (the "EFIH First Lien DIP Financing").  The EFIH First Lien DIP Financing consists of a single term credit facility, a

substantial portion of which will be used to execute the EFIH First Lien Refinancing.  The EFIH First Lien DIP Financing will be subject to reduction for amounts attributable to participation in the EFIH First Lien DIP Financing by Settling Prepetition EFIH First Lien Creditors (as defined herein) and by Fidelity in its capacity as both a Settling Prepetition EFIH First Lien Creditor and a Prepetition EFIH Second Lien Creditor (as defined herein).

6.    Certain Prepetition EFIH First Lien Creditors may assert that they should be entitled to the payment of a prepayment penalty, otherwise known as a "make-whole" claim, under the EFIH First Lien Indentures (the "EFIH First Lien Makewhole Claims") in connection with the EFIH First Lien Refinancing.  The EFIH Debtors are pursuing a two-pronged strategy to address the EFIH First Lien Makewhole Claims:  (1) a settlement executed pursuant to a tender offer (the "EFIH First Lien Settlement") and (2) litigation of the non-settling EFIH First Lien Makewhole Claims.

7.    The EFIH First Lien Settlement provides that settling Prepetition EFIH First Lien Creditors (the "Settling Prepetition EFIH First Lien Creditors") will receive approximately $105 of claims (inclusive of applicable fees) under the EFIH First Lien DIP Financing (the "EFIH First Lien DIP Roll-Up Claims") in exchange for every $100 in principal amount of EFIH First Lien Notes tendered into the settlement by the early tender date.[7]

8.    It is possible that certain Prepetition EFIH First Lien Creditors will not participate in the EFIH First Lien Settlement.  With respect to such holdouts, the EFIH Debtors seek a

---

[7]    The Debtors will separately seek approval of the EFIH Makewhole Settlements (as defined herein) pursuant to a separate motion that will be filed on or shortly after the Petition Date (the "Settlement Motion").  Additionally, while certain Prepetition EFIH Secured Creditors have agreed to participate in the EFIH Makewhole Settlements, the EFIH Debtors have determined in their business judgment that allowing all Prepetition EFIH Secured Creditors to participate in the EFIH Makewhole Settlements will maximize the value of the EFIH Debtors' estates.  The EFIH Debtors will solicit participation in the EFIH Makewhole Settlements in accordance with applicable non-bankruptcy securities laws such that solicitation is complete on or around the entry of the Final Order.  Importantly, the EFIH Debtors will seek to consummate the full EFIH First Lien DIP Financing regardless of whether the EFIH Makewhole Settlements are approved.

determination of the amount of the secured claim properly asserted against the EFIH Debtors by the non-settling Prepetition EFIH First Lien Creditors pursuant to Bankruptcy Rule 3012 and sections 502 and 506 of the Bankruptcy Code.  As discussed in greater detail below and in the First Lien Makewhole Memorandum that will be filed with the Court shortly following the Petition Date, the Prepetition EFIH First Lien Creditors' claims should be limited to the principal amount of $3.985 billion, along with any accrued and unpaid interest and other fees properly due under the EFIH First Lien Indentures, *without* the payment of any EFIH First Lien Makewhole Claims.

9.      The EFIH Debtors also intend to refinance the EFIH Second Lien Notes (as defined herein) using the proceeds of a second lien debtor in possession financing facility (such facility, the "EFIH Second Lien DIP Financing," and such refinancing, the "EFIH Second Lien Refinancing").[8] The EFIH Debtors are also seeking to settle makewhole claims asserted by Prepetition EFIH Second Lien Creditors (such claims, the "EFIH Second Lien Makewhole Claims," such settlement, the "EFIH Second Lien Settlement," and the EFIH Second Lien Settlement, together with the EFIH First Lien Settlement, the "EFIH Makewhole Settlements"). Under the terms of the EFIH Second Lien Settlement, Settling Prepetiton EFIH Second Lien Creditors other than Fidelity will receive (a) payment in cash of the principal (and accrued interest) of their EFIH Second Lien Notes and (b) cash in the amount of 50% of their pro rata share of their EFIH Second Lien Makewhole Claim.[9]  Fidelity will also receive principal (and

---

[8]    The EFIH Debtors will seek the approval of the EFIH Second Lien DIP Financing and the EFIH Second Lien Refinancing pursuant to a separate motion that will be filed on or shortly after the Petition Date (the "EFIH Second Lien DIP Motion").  The EFIH Debtors intend to request that the Court approve the EFIH First Lien Refinancing and the EFIH Second Lien Refinancing contemporaneously.

[9]    As discussed in more detail in the Settlement Motion, certain "anchor" settling creditors are receiving different treatment under the EFIH Makewhole Settlements than the terms being offered in the tender offers that will facilitate the EFIH Makewhole Settlements.  Specifically, Fidelity has the option receive up to $500 million

accrued interest) on account of its EFIH Second Lien Notes and a 50% recovery on its EFIH Second Lien Makewhole Claim, but Fidelity will also receive a one-time payment of $11.25 million, and will have the right to receive up to $500 million (plus fees) of its payment under the EFIH Second Lien Settlement in the form of EFIH First Lien DIP Roll-Up Notes.  Finally, certain Prepetition EFIH Second Lien Creditors have agreed to accept claims under the EFIH Second Lien DIP Financing, rather than cash, for their EFIH Second Lien Makewhole Claims.

10.     Importantly, the EFIH Debtors seek access to EFIH Cash Collateral and the imposition of priming liens only pursuant to the Final Order.  The EFIH Debtors, therefore, need not provide adequate protection to the Prepetition EFIH Secured Creditors during the period between the Petition Date and the entry of the Final Order (the "Interim Period").  Moreover, the EFIH Debtors will seek to execute the EFIH Second Lien Refinancing on the same schedule as the EFIH First Lien Refinancing.  Accordingly, the EFIH Debtors do not believe that they should be or are required to provide any adequate protection to the Prepetition EFIH Second Lien Creditors.[10]

11.     The Interim Fee Order seeks to approve certain fees as and to the extent required under the EFIH First Lien DIP Commitment Letter and the EFIH First Lien DIP Fee Letter to compensate the EFIH First Lien DIP Lenders for committing to fund the EFIH First Lien DIP Financing pending entry of the Final Order.  Importantly, under the terms of the EFIH First Lien DIP Fee Letter and the EFIH First Lien DIP Commitment Letter, these fees need not be paid until the EFIH First Lien DIP Financing is funded (including through the EFIH First Lien

---

(plus fees) of its payment under the EFIH Second Lien Refinancing and EFIH Second Lien Settlement in the form of EFIH First Lien DIP Roll-Up Notes.

[10]   The EFIH Debtors will revisit appropriate adequate protection (if any) for the Prepetition EFIH Secured Creditors to the extent necessary if, for example, the EFIH Second Lien Refinancing has not occurred when the Final Order is entered.

Refinancing), or, with respect to the Ticking Fee and the fees and expenses of counsel to the EFIH First Lien DIP Arrangers, on the earlier of the date the Final Order is entered or the date the EFIH Debtors obtain the right to use cash collateral (although such fees will be deemed to be administrative expense claims on the date the Interim Fee Order is entered).  The fees are reasonable under the circumstances, and were subject to hard-fought, arm's-length negotiations between the EFIH Debtors and the EFIH First Lien DIP Lenders.  The only alternative to the Interim Fee Order is a process under which the EFIH Debtors first obtain authority to execute the EFIH First Lien Refinancing and *then* seek financing to consummate that transaction.  That process, however, would cost the EFIH Debtors approximately $13 million ***per month*** in interest expense, require the EFIH Debtors to spend additional resources on a remarketing process, risk causing the EFIH Debtors to fail to satisfy milestones under the Debtors' Restructuring Support Agreement (the "Restructuring Support Agreement"),[11] and there is no guarantee that the EFIH Debtors could obtain financing on the same terms.

12.    In summary, the EFIH Debtors seek to execute the EFIH First Lien DIP Financing to maximize the value of their estates by funding restructuring expenses, taking advantage of favorable market conditions to refinance their prepetition secured indebtedness, and facilitating a global settlement that will allow the EFIH Debtors to expeditiously emerge from chapter 11.  Accordingly, the EFIH First Lien DIP Financing is in the best interests of the EFIH Debtors' estates and should be approved.

---

[11]    The EFIH Debtors will separately seek the authority to assume the Restructuring Support Agreement pursuant to a motion (the "RSA Motion") that will be filed on or shortly following the Petition Date.

**Relief Requested**

13.     By this Motion, the EFIH Debtors seek entry of the Interim Fee Order and Final

Order.  The Interim Fee Order:

> (a) ***Authorization of Fees***:  approves the DIP Facility Fee and the Ticking Fee (each as defined in the EFIH First Lien DIP Fee Letter), as well as the reimbursement of certain costs and expenses, authorizes the EFIH Debtors to satisfy such fees and expenses as and to the extent required under the Commitment Letter, and grants such fees and expenses administrative expense priority pursuant to section 503(b) of the Bankruptcy Code; and
>
> (b) ***Final Hearing***:  schedules a Final Hearing as soon as practicable to consider authorizing and approving the relief requested in the Final Order.

14.     The Final Order:

> (a) ***EFIH First Lien DIP Financing***:  authorizes the EFIH Debtors to obtain secured superpriority postpetition financing (the "EFIH First Lien DIP Financing") in a principal amount of $5.40 billion, pursuant to the terms and conditions of the proposed debtor in possession financing agreement (the "EFIH First Lien DIP Credit Agreement"), between the Borrower, the financial institutions from time to time party thereto as lenders (the "EFIH First Lien DIP Lenders"), Deutsche Bank AG New York Branch, as administrative agent and collateral agent (in such capacity, the "EFIH First Lien DIP Agent"),[12] and other agents and entities from time to time party thereto;
>
> (b) ***EFIH First Lien DIP Documents***:  authorizes the EFIH Debtors to execute and deliver the EFIH First Lien DIP Credit Agreement and all agreements, documents, and instruments contemplated by each (collectively, the "EFIH First Lien DIP Documents"), and to take all actions necessary, appropriate, or required to comply with the EFIH Debtors' obligations under the EFIH First Lien DIP Documents and under the Orders;

---

[12]  As used herein, the term "EFIH First Lien DIP Agent" refers to Deutsche Bank AG New York Branch, as administrative agent under the DIP Credit Agreement, Deutsche Bank AG New York Branch, as collateral agent under the DIP Credit Agreement, or both, as the context requires.  All references in this Motion to the EFIH First Lien DIP Agent with respect to the Secured Hedge Banks or the Secured Cash Management Banks (each, as defined in the Interim Order) shall mean Deutsche Bank AG New York Branch, in its capacity as collateral agent.  Deutsche Bank AG New York Branch, in its capacity as administrative agent, has no duties or obligations to the Secured Hedge Banks or the Secured Cash Management Banks.

(c) *Payment of Fees Under Interim Fee Order*: authorizes and directs the EFIH Debtors to pay fees properly accrued and payable under the Interim Fee Order;

(d) *EFIH First Lien DIP Liens*: authorizes the EFIH Debtors to grant the EFIH First Lien DIP Agent, for the benefit of itself, the EFIH First Lien DIP Lenders, the Secured Hedge Banks, and the Secured Cash Management Banks, automatically perfected postpetition security interests and liens (the "EFIH First Lien DIP Liens") in the DIP Collateral (as defined in the Interim Order), subject only to the Permitted Prior Liens and the Carve Out;

(e) *DIP Superpriority Claims*: authorizes the EFIH Debtors to grant the EFIH First Lien DIP Agent, for the benefit of itself, the EFIH First Lien DIP Lenders, the Secured Hedge Banks, and the Secured Cash Management Banks, allowed superpriority administrative expense claims (the "EFIH DIP Superpriority Claims"), subject only to the payment of the Carve Out;

(f) *EFIH Cash Collateral*: authorizes the EFIH Debtors to use the EFIH Debtors' cash on hand, cash proceeds of the Prepetition EFIH Collateral, and other cash that constituted the Prepetition EFIH Secured Creditors' (as defined herein) "cash collateral," as that term is defined in section 365(a) of the Bankruptcy Code (the "EFIH Cash Collateral");

(g) *EFIH First Lien Refinancing*: authorizes the EFIH Debtors to use the proceeds of the EFIH First Lien DIP Financing to consummate the EFIH First Lien Refinancing;

(h) *Issuance of EFIH First Lien DIP Roll-Up Claims:* authorizes the EFIH Debtors to issue the EFIH First Lien DIP Roll-Up Claims to satisfy EFIH's obligations under the EFIH Makewhole Settlements to the extent authorized pursuant to an order approving the EFIH Makewhole Settlements under the Settlement Motion;

(i) *Determination of Value of Secured Claims*: pursuant to Bankruptcy Rule 3012, determines that the value of the secured claims allowable on account of the EFIH First Lien Notes held by non-settling Prepetition EFIH First Lien Creditors does not include any amount attributable to the EFIH First Lien Makewhole Claims;

(j) *Automatic Stay*: vacates and modifies the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of EFIH First Lien DIP Credit Agreement and the Orders.

## Concise Statement Pursuant to Bankruptcy Rule 4001(c)

15.    Bankruptcy Rule 4001(c) does not require the disclosure of any provision in the Interim Fee Order because the Interim Fee Order does not provide the EFIH Debtors with any authority to obtain credit.  In accordance with Bankruptcy Rules 4001(c) and (d), the following summarizes the significant terms of the EFIH First Lien DIP Credit Agreement and the Final Order.[13]

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| **EFIH First Lien DIP Credit Agreement Parties**<br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | <u>Borrower:</u>        EFIH and EFIH Finance, Inc.<br><br><u>Guarantors:</u>        None<br><br><u>Left Lead DIP Facility Arranger:</u>  Deutsche Bank Securities Inc.<br><br><u>Joint Lead Arrangers:</u>        The Left Lead DIP Facility Arranger, Citi Group Global Markets Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Morgan Stanley Senior Funding, Inc., Barclays Bank PLC, RBC Capital Markets and Union Bank, N.A..<br><br><u>Lenders:</u>        The lenders under the Term Facility.<br><br><u>Administrative Agent:</u>        Deutsche Bank AG New York Branch (together with its permitted successors and assigns | EFIH First Lien DIP Credit Agreement at § 1.1. |
| **EFIH First Lien DIP Financing**<br>*Fed. R. Bankr. P. 4001(c)(1)(B); LBR 4001-2(a)(ii)* | <u>Total Loan Commitment:</u>    $5.40 billion aggregate principal amount at Full Availability.<br><br><u>Junior Incremental Facility:</u> One or more incremental term loan facilities that will rank junior in right of payment with the DIP Facility and will have the same guarantees as the DIP Facility, and be secured by a lien on the same Collateral securing the DIP Facility that is junior to the lien securing the DIP Facility, in a principal amount not to exceed $3,000,000,000 in the aggregate subject to certain provisos, including that the principal amount of the Junior Incremental Term Facility shall be convertible into equity under the Plan of Reorganization. | EFIH First Lien DIP Credit Agreement at § 1.1, 2.1, 2.2, 2.14. |
| **Interest Rate and** | The Borrower may elect that the loans comprising each borrowing bear interest at a rate per annum equal to (a) the Alternate Base Rate plus | EFIH First Lien |

---

[13]   This statement is based on the current versions of the EFIH First Lien DIP Documents and the Final Order, as applicable, which remain subject to ongoing negotiation and will be filed with the Court as soon as possible. This statement is qualified in its entirety by the provisions of the EFIH First Lien DIP Documents and Final Order as eventually filed with the Court, and to the extent there exists any inconsistency between this concise statement and the provisions of the EFIH First Lien DIP Documents or the Final Order, the provisions of the EFIH First Lien DIP Documents or the Final Order, as applicable, shall control.

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| *Margins*<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | the Applicable Margin or (b) the Adjusted LIBO Rate plus 2.25%, in the case of ABR Loans and 3.25 %, in the case of Eurodollar Loans, subject to a floor of 1% per annum. | DIP Credit Agreement at § 2.8. |
| *Fees*<br><br>*Fed R. Bankr. P. 4001(c)(1)(B)* | **Confidential, Filed Under Seal** | EFIH First Lien DIP Credit Agreement at § 3.1. |
| *Maturity*<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The maturity date of the EFIH First Lien DIP Financing will be the earliest of:<br><br>• stated maturity, which shall be _____ (24 months from the Closing Date (defined below)) subject to extensions under certain conditions;<br><br>• the effective date of any Reorganization Plan;<br><br>• the date that is 120 days after the execution of the Commitment Letter if the Final Order Entry Date has not occurred by such date;<br><br>• the consummation of a sale of all or substantially all of the EFIH Debtors' assets or stock under section 363 of the Bankruptcy Code; or<br><br>• the acceleration of any Loans and the termination of any then outstanding Commitments in accordance with the terms of this Agreement.<br><br>The Maturity Date will occur in any event no later than 30 months from the Closing Date. | EFIH First Lien DIP Credit Agreement at § 1.1. |
| *Purpose/Use of Proceeds*<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B); LBR 4001-2(a)(ii)* | The proceeds of the DIP Facility will be used, in a manner consistent with the terms of the Budget: (i) *first*, to pay (x) transaction fees, liabilities and expenses and other administration costs and (y) the refinancing of the EFIH First Lien Secured Notes, and (ii) *second*, to finance any and all working capital needs and for any other general corporate purposes, and to comply with any legal and/or regulatory requirements. | EFIH First Lien DIP Credit Agreement at § 8.16. |
| *Events of Default*<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The occurrence and continuance of any of the following events shall constitute an Event of Default under the DIP Facility (consistent, in each case, with the Documentation Principles):<br><br>• defaults usual and customary for financings of this type, including, without limitation, non-payment of principal, interest and fees, defaults under affirmative and negative covenants, breaches of representations and warranties, judgments or foreclosure actions exceeding certain thresholds, adverse modifications to the Orders, and dismissal or conversion of the bankruptcy cases; and<br><br>• the Final Order Entry Date shall not have occurred or (ii) the Term Facility shall not have been funded in full within certain time frames. | EFIH First Lien DIP Credit Agreement at § 10. |

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| **_Priority and Security of EFIH First Lien DIP Financing Liens_**<br><br>_Fed. R. Bankr. P. 4001(c)(1)(B)_ | All obligations of the Debtors to the Agent and the Lenders (such persons, collectively, the "**<u>DIP Secured Parties</u>**") under the Loan Documents (the "**<u>Obligations</u>**"), including all Loans made under the DIP Facilities, shall, subject to the Carve-Out (defined below), and to the extent provided in the EFIH First Lien DIP Credit Agreement and subject to any limitations therein:<br><br>• pursuant to Bankruptcy Code section 364(c)(1), be entitled to joint and several superpriority administrative expense claim status in the Cases, on a pari passu basis;<br><br>• pursuant to Bankruptcy Code section 364(c)(2), be secured by a perfected first priority lien on substantially all now owned or hereafter acquired assets of the EFIH Debtors that are not otherwise subject to a lien, including, upon the entry of the Final Order, the proceeds of causes of action under chapter 5 of the Bankruptcy Code;<br><br>• pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior lien on all other prepetition and postpetition property of the EFIH Debtors that is subject to valid, perfected and non-avoidable liens in existence immediately prior to the Petition Date or that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (other than the Adequate Protection Liens); and<br><br>• pursuant to Bankruptcy Code section 364(d), be secured by a perfected priming first-priority lien on all prepetition and postpetition property of the EFIH Debtors. | Expected in Final Order |
| **_Carve Out_**<br><br>_Fed. R. Bankr. P. 4001(c)(1)(B)_ | All liens securing the Obligations, liens or claims securing the Obligations and other prepetition obligations, including, among others, those in connection with the Existing Primed Secured Facilities, shall be subject and subordinate to the Carve Out.<br><br>The "<u>Carve Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the EFIH Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and any Creditors' Committee appointed in the Cases pursuant to section 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed | Expected in Final Order |

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| | Professional Fees of Professional Persons in an aggregate amount not to exceed $25,000,000 incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise in this clause (iv) being the "<u>Post-Carve Out Trigger Notice Cap</u>").   For purposes of the foregoing, "<u>Carve Out Trigger Notice</u>" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the EFIH Debtors, their lead restructuring counsel, the U.S. Trustee, and lead counsel to the Creditors' Committee and the Collateral Trustee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.<br><br>The EFIH Debtors shall deposit and hold in a segregated account the Carve Out Reserves, which, following the delivery of certain Trigger Notices, shall be applied by the Borrower to pay obligations arising from the Carve-Out.<br><br>Nothing in the Interim Fee Order,the Final Order or otherwise shall be construed to obligate the DIP Agent or the DIP Lenders, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the EFIH Debtors have sufficient funds to pay such compensation or reimbursement. | |
| *Conditions to Borrowing*<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | 1. Interim Order/Bankruptcy Matters<br><br>&bull; Entry of the Interim Fee Order, as defined in the EFIH First Lien DIP Commitment Letter, within 10 business days of the Petition Date;<br><br>&bull; Entry of the Final Order, which shall provide for, among other things, funding of the EFIH First Lien DIP Facility and consummation of the EFIH First Lien Refinancing, within 110 days after the date of the Commitment Letter;<br><br>&bull; No adverse modifications or stays to the Interim Fee Order or the Final Order without the consent of the Left Lead DIP Facility Arranger;<br><br>&bull; Any order with respect to cash collateral in respect of the EFIH First Lien Notes or EFIH Second Lien Notes shall be in form and substance satisfactory to the Left Lead DIP Facility Arranger; and<br><br>&bull; Certain other customary provisions relating to compliance with the Orders, entry of "first day motions," no appointment of a trustee or examiner with expanded powers.<br><br>2. Financial Statements, Budgets and Reports<br><br>&bull; The EFIH Debtors shall provide certain customary budgeting information<br><br>3. Performance of Obligations | EFIH First Lien DIP Credit Agreement at § 6. |

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| | • The EFIH Debtors shall be in compliance with all obligations under the EFIH First Lien DIP Documents.<br><br>4. Customary Closing Documents and Other Conditions<br><br>• Delivery of customary legal opinions and certain certificates and notices of borrowing; (ii) evidence of authority; and (iii) obtaining of any governmental consents, if any, necessary in connection with the DIP Facilities.<br><br>• The Loan Documents (which shall be consistent with the Documentation Principles) shall have been entered into by the Debtors.<br><br>• The Agent shall have received results of a Uniform Commercial Code search for the jurisdiction of organization of the Debtors and such other lien and/or other searches reasonably requested by the Agent as are customary for transactions of this type.<br><br>• The Agent shall have received proper financing statements (Form UCC-1 or the equivalent) for filing under the UCC in the jurisdiction of organization of each Debtor.<br><br>• As a result of the extension of such credit, usage of the Commitments shall not exceed (i) the applicable Commitments then in effect and (ii) the aggregate amount authorized by the Interim Order.<br><br>1. Final Order<br><br>• If any order authorizes the EFIH First Lien Refinancing with the proceeds of the EFIH First Lien DIP Facility, the EFIH First Lien Notes shall be repaid. | |
| *Acknowledgments*<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(iii)* | EFIH shall make customary representations and warranties regarding the perfection and priority of liens securing EFIH First Lien DIP Financing, and amount and nature of existing indebtedness. | Expected in Final Order |
| *Plan and Disclosure Statement Milestones*<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(vi)* | The Borrower shall file with the Bankruptcy Court a plan of reorganization and a disclosure statement relating thereto, each in form and substance reasonably satisfactory to the Administrative Agent, within 18 months after the Petition Date; *provided*, *however*, that with respect to provisions of the plan of reorganization and/or any disclosure statement that relate to payment of the Credit Facilities, such provisions must be in form and substance satisfactory to the Administrative Agent. | EFIH First Lien DIP Credit Agreement at § 8.14 |
| *Waivers and Consents*<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(iv, v), (vii-x)* | *Waiver of Automatic Stay*:  Upon the occurrence of an Event of Default and following the giving of five calendar days' notice to EFIH (the "Remedies Notice Period"), the automatic stay pursuant to section 362 of the Bankruptcy Code shall be automatically terminated without further notice to or order of the Bankruptcy Court, and the Agent shall be permitted to exercise all rights against the Collateral in accordance with the Loan Documents and the Interim Order or Final Order, as applicable, and shall be permitted to satisfy the Obligations, without | Expected in Final Order |

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| | further order or application or motion to the Bankruptcy Court and without restriction or restraint by any stay under section 362 or 105 of the Bankruptcy Code.  Notwithstanding anything herein to the contrary, the automatic stay pursuant to section 362 of the Bankruptcy Code shall be automatically terminated for the purposes of giving any notice contemplated hereunder.<br><br>***Waiver of Nonbankruptcy Law***:  The EFIH First Lien DIP Liens and other interests granted to the Agent and EFIH First Lien DIP Lenders are deemed valid, binding, perfected, enforceable, first-priority liens, non-avoidable and not subject to re-characterization or subordination as of the date of the Interim EFIH DIP Order.<br><br>***Waiver of Section 506(c)***:  Usual and customary § 506(c) waiver.<br><br>***Indemnification***:  Usual and customary for financings of this type, including that Borrower shall indemnify, pay and hold harmless the Agent, the Joint Lead Arrangers, and the Lenders and their affiliates (and their respective controlling persons, directors, officers, partners, employees, agents, advisors and other representatives (collectively, the "Related Parties")) (each, an "Indemnified Person") against any loss, claim, damage, liability or expense incurred in respect of EFIH First Lien DIP Financing contemplated hereby or the use of proceeds thereof or the Transactions or any claim, litigation, investigation or proceeding (a "Proceeding") relating to any of the foregoing, with customary exceptions for gross negligence, bad faith, willful misconduct or material breach of such Indemnified Person or its Related Parties.<br><br>***Release of Claims and Causes of Action***:  The EFIH Debtors release the EFIH First Lien DIP Agent, the EFIH First Lien DIP Lenders and each of their respective participants, and each of their respective affiliates, and each of their respective former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest, of and from any and all claims arising out of, in connection with, or relating to the EFIH First Lien DIP Financing, the EFIH First Lien DIP Documents, or the transactions contemplated thereunder. | |

## <u>Provisions to be Highlighted Pursuant to Local Bankruptcy Rule 4001-2(a)(i)</u>

16.     Local Bankruptcy Rule 4001-2(a)(i) requires a debtor to:  (a) recite whether the proposed form of the financing order contains certain provisions of the type enumerated therein; (b) identify the location of such provisions in the proposed financing order; and (c) justify the inclusion of such provisions in the proposed financing order (the "Highlighted Provisions").  *See* Del. Bankr. L.R. 4001-2(a)(i).  No provisions in the Interim Fee Order require disclosure under

Local Bankruptcy Rule 4001-2(a)(i).  The EFIH Debtors disclose the following provisions that are expected to be included in the Final Order that require highlighting under Local Bankruptcy Rule 4001-2(a)(i), specifically with respect to Local Bankruptcy Rules 4001-2(a)(i)(E) and (G).

17.     ***Use of Postpetition Loans from Prepetition EFIH Secured Creditors***.  Local Bankruptcy Rule 4001-2(a)(i)(E) requires the disclosure of the use of the proceeds of postpetition financing to repay prepetition indebtedness.  The EFIH Debtors will use a large portion of the proceeds of the EFIH First Lien DIP Financing, including the EFIH First Lien DIP Roll-Up Claims, to execute the EFIH First Lien Refinancing, the EFIH First Lien Settlement, and the EFIH Second Lien Settlement.  Each of the Prepetition EFIH First Lien Creditors and Prepetition EFIH Second Lien Creditors will be given the opportunity to participate in the applicable settlement.  Importantly, having significant commitments from Settling EFIH First Lien Creditors will also improve the overall terms of the "new money" syndication.

18.     The EFIH First Lien DIP Financing does not pose the risks that typically accompany "roll-up" DIP facilities.  There was sufficient market capacity to fund the EFIH First Lien DIP Financing in full without relying on commitments from the Prepetition EFIH First Lien Creditors, and, in fact, the EFIH Debtors do not yet know whether (and to what extent) non-settling Prepetition EFIH First Lien Creditors will participate in the syndication.  As a result, the Prepetition EFIH First Lien Creditors' participation in the syndication of the EFIH First Lien DIP Financing (other than with respect to the EFIH First Lien Settlement) is on the same terms as the other "new money" lenders and does not impose onerous terms on the EFIH Debtors that are typically associated with roll-up DIP facilities.  Accordingly, the EFIH Debtors respectfully submit that the participation of certain Prepetition EFIH First Lien Creditors in the syndication of

the EFIH DIP Financing and the roll-up provisions of the EFIH First Lien Settlement and Fidelity's portion of the EFIH Second Lien Settlement are appropriate.

19.     ***Priming Liens***.  Local Bankruptcy Rule 4001-2(a)(i)(G) requires disclosure of provisions that prime any secured liens *without that lienholder's consent*.  The EFIH First Lien DIP Financing grants the EFIH First Lien DIP Lenders a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all prepetition and postpetition property of the EFIH Debtors pursuant to section 364(d)(1) of the Bankruptcy Code.

20.     As an initial matter, no Prepetition EFIH Secured Creditors are being primed under the Interim Fee Order because the Interim Fee Order merely seeks the approval of certain fees and expenses as administrative expense claims.  Upon entry of the Final Order, the EFIH Debtors will use the funds available under the EFIH First Lien DIP Financing to repay the Prepetition EFIH First Lien Creditors in full.  As a result, the EFIH First Lien DIP Lenders are not priming the Prepetition EFIH First Lien Creditors.  Similarly, the EFIH Debtors plan to execute the EFIH Second Lien Refinancing concurrently with entry of the Final Order and the EFIH First Lien Refinancing, so the Prepetition EFIH Second Lien Creditors are not being primed.  The EFIH Debtors will revisit whether and to what extent any adequate protection is necessary if the EFIH Second Lien Refinancing has not occurred when the Final Order is entered.  The EFIH First Lien DIP Lenders are not priming other secured creditors (if any) of the EFIH Debtors.

21.     The EFIH Debtors and their advisors determined that the EFIH First Lien DIP Lenders offered the best option for obtaining the postpetition financing the EFIH Debtors require, and the EFIH Debtors are not able to obtain financing on equal or better terms from the EFIH First Lien DIP Lenders other than financing secured by first priority priming liens.

Moreover, the priming liens are a key aspect of the EFIH First Lien Settlement and EFIH Second Lien Settlement. Accordingly, the imposition of priming liens under section 364(d), to the extent any Prepetition EFIH Secured Claims remain outstanding at the time the Final Order is entered, is necessary and appropriate under the circumstances.

22. ***506(c) Waiver***. Local Bankruptcy Rule 4001-2(a)(i)(C) requires disclosure of provisions that constitute a waiver, *without notice*, of whatever rights the estate may have under section 506(c) of the Bankruptcy Code. The Final Order will provide that the EFIH First Lien DIP Agent and the EFIH First Lien DIP Lenders are each entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code. Accordingly, while the EFIH Debtors do not believe that the 506(c) waiver requires disclosure under Local Bankruptcy Rule 4001-2(a)(i)(C), they have disclosed it out of an abundance of caution and for the convenience of the Court and other parties in interest.

23. ***Carve Out***. Local Bankruptcy Rule 4001-2(a)(i)(F) requires disclosure of *disparate* treatment between the professionals retained by the EFIH Debtors and the professionals retained by the unsecured creditors' committee with respect to a professional fee carve out. Here, the Carve Out that will be sought under the Final Order will apply equally to professionals retained by the EFIH Debtors and any statutory committee. Accordingly, while the EFIH Debtors do not believe that the terms of the Carve Out require disclosure under Local Bankruptcy Rule 4001-2(a)(i)(F), they have disclosed the provision out of an abundance of caution and for the convenience of the Court and other parties in interest.

## **Background**

24. On the date hereof (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition with the Court under chapter 11 of the Bankruptcy Code. The Debtors are operating

their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have requested joint administration of these chapter 11 cases. The Court has not appointed a trustee, and the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has not formed any official committees in these chapter 11 cases.[14]

25. Debtor Energy Future Holdings Corp. ("EFH Corp."), a Texas corporation, is the ultimate parent company for each of the Debtors in these chapter 11 cases and certain of EFH Corp.'s non-Debtor affiliates (collectively, "EFH"). EFH's businesses include the largest generator, distributor, and certified retail provider of electricity in Texas. EFH conducts substantially all of its business operations in the electricity market overseen by the Electric Reliability Council of Texas ("ERCOT"), which covers the majority of Texas. The Texas electricity market, in turn, is subject to oversight and regulation by the Public Utility Commission of Texas (the "PUC"). EFH has approximately 9,100 employees, approximately 5,700 of whom are employed by the Debtors,[15] in three distinct business units:

- EFH's *competitive electricity generation, mining, wholesale electricity sales, and commodity risk management and trading activities*, conducted by TCEH LLC's Debtor subsidiaries composing "Luminant";

---

[14]    The facts and circumstances supporting this Motion, along with a detailed discussion of EFH's business operations and capital structure, are set forth in the *Declaration of Paul Keglevic, Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of Energy Future Holdings Corp., et al., in Support of First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith.

[15]    The Debtors in these chapter 11 cases consist of: (a) the vast majority of the entities that compose Luminant and TXU Energy, as well as those entities' intermediate corporate parent entity, Texas Competitive Electric Holdings Company LLC ("TCEH LLC"), a Delaware limited liability company, and TCEH LLC's corporate parent, Energy Future Competitive Holdings Company LLC ("EFCH"), a Delaware limited liability company; (b) Energy Future Intermediate Holding Company LLC ("EFIH"), a Delaware limited liability company that indirectly owns approximately 80% of Oncor Electric Delivery Holdings Company LLC ("Oncor"), and EFIH's wholly-owned subsidiary, EFIH Finance Inc.; (c) EFH Corp.; and (d) other direct and indirect subsidiaries of EFH Corp., including EFH Corporate Services Company.

- EFH's ***competitive retail electricity sales operations and related operations***, mainly conducted by TCEH LLC's Debtor subsidiaries composing "<u>TXU Energy</u>";[16] and

- EFH's ***rate-regulated electricity transmission and distribution operations***, conducted by the non-Debtor Oncor.

26.    In the aggregate, the Debtors have approximately $42 billion of funded indebtedness, including (a) approximately $32.1 billion of claims against TCEH LLC and TCEH LLC's direct and indirect Debtor subsidiaries; (b) approximately $70 million of claims against EFCH; (c) approximately $1.9 billion of claims against EFH Corp.; and (d) approximately $7.7 billion of claims against EFIH.[17]

27.    Although the Debtors' balance sheet is overleveraged, the Debtors' operations are strong. Luminant's generation units are high-performing, its mining and electricity generation operations have impressive safety records, and its commodity trading and risk management activities have delivered significant value to the Debtors. TXU Energy is an industry leader in customer care performance and product innovation and has maintained strong performance notwithstanding intense competition. And non-Debtor Oncor produces a strong and consistent stream of revenue. Thus, these chapter 11 cases will provide the Debtors with the opportunity to restructure their balance sheets and retain their position as leaders in the Texas electricity market.

28.    As of December 31, 2013, EFH Corp. reported total assets of approximately $36.4 billion in book value, approximately $28.8 billion of which is attributable to EFCH, TCEH LLC, and TCEH LLC's direct and indirect subsidiaries (collectively with TCEH LLC and

---

[16]    The Debtors also conduct a relatively small amount of retail electricity operations through their 4Change brand and another entity, Luminant ET Services Company, that provides retail electricity service to some end use customers and to some of Luminant's mining operations, and a small amount of retail gas operations through Luminant Energy Company LLC.

[17]    Amounts include intercompany debt holdings and short-term borrowings, and exclude guarantees, unamortized discounts or premiums, accrued but unpaid interest, and certain other figures typically reported in the Debtors' filings with the Securities and Exchange Commission (the "<u>SEC</u>"), such as capital lease obligations, certain promissory notes, and certain other obligations.

EFCH, "TCEH"),[18] and total liabilities of approximately $49.7 billion in book value, approximately $41.1 billion of which is attributable to TCEH.[19] EFH Corp.'s assets and liabilities that are not attributable to TCEH are mostly attributable to EFIH's indirect ownership of approximately 80% of Oncor. EFH Corp.'s consolidated revenues for the quarter ending December 31, 2013 were approximately $1.3 billion, all of which were attributable to TCEH. EFH Corp.'s consolidated annual revenues for the year ending December 31, 2013 were approximately $5.9 billion.

## EFIH's Outstanding Prepetition Secured Indebtedness

### I.    EFIH First Lien Notes.

29.    ***EFIH First Lien 2017 Notes***.  Pursuant to that certain indenture (the "EFIH First Lien 2017 Notes Indenture") dated August 14, 2012, for the 6.875% senior secured notes due August 15, 2017 (the "EFIH First Lien 2017 Notes"), by and among EFIH and EFIH Finance, Inc. ("EFIH Finance"), as issuers, and CSC Trust Company of Delaware ("CSC"), as successor indenture trustee (the "EFIH First Lien Notes Trustee") to The Bank of New York Mellon Trust Company, N.A. ("BNY"), EFIH and EFIH Finance issued approximately $503 million in principal amount of the EFIH First Lien 2017 Notes.

30.    ***EFIH First Lien 2020 Notes***.  Pursuant to that certain indenture (the "EFIH First Lien 2020 Notes Indenture" and, together with the EFIH First Lien 2017 Notes Indenture, the "EFIH First Lien Notes Indentures"), dated August 17, 2010, for the 10.00% senior secured notes (the "EFIH First Lien 2020 Notes," and together with the EFIH First Lien 2017 Notes,

---

[18]  Oncor's revenues are not included in EFH Corp.'s consolidated revenues because EFH Corp. accounts for its ownership of Oncor under the equity method of accounting.

[19]  Figures for TCEH are derived from EFCH's public filings with the SEC, and are almost entirely attributable to TCEH LLC and its Debtor and non-Debtor subsidiaries.

the "EFIH First Lien Notes") due December 1, 2020, by and among EFIH and EFIH Finance, as issuers, and the EFIH First Lien Notes Trustee, EFIH issued approximately $3.482 billion in principal amount of the EFIH First Lien 2020 Notes.  The "Prepetition EFIH First Lien Creditors" shall mean the EFIH First Lien Notes Trustee and the holders of EFIH First Lien Notes.

31.    *First Lien Collateral*.  The EFIH First Lien Notes are secured by first priority security interests in and liens (the "Prepetition EFIH First Priority Liens") in the "Collateral" (the "Prepetition EFIH Collateral"), as defined in the EFIH First Lien Indentures and the EFIH Collateral Trust Agreement (as defined below), including substantially all of EFIH's assets, including cash to the extent that such cash constitutes proceeds of other Prepetition EFIH Collateral ("EFIH Cash Collateral").

**II.    EFIH Second Lien Notes.**

32.    *EFIH Second Lien Notes*.  Pursuant to that certain indenture (the "EFIH Second Lien Notes Indenture," and together with EFIH First Lien Notes Indentures, the "Prepetition EFIH Secured Indentures"), dated April 25, 2011, by and among EFIH, as issuers, Computershare Trust Company, N.A. and Computershare Trust Company of Canada ("Computershare") as successor indenture trustee to BNY (the "EFIH Second Lien Notes Trustee," and together with EFIH First Lien Notes Trustee, the "Prepetition EFIH Secured Trustees"), EFIH issued two series of notes:  (a) approximately $406 million principal amount of 11.00% EFIH Second Lien Notes due October 1, 2021 (the "EFIH Second Lien 2021 Notes"); and (b) approximately $1.750 billion principal amount of 11.75% EFIH Second Lien Notes due March 1, 2022 (the "EFIH Second Lien 2022 Notes," and together with EFIH Second Lien 2021 Notes, the "EFIH Second Lien Notes").  The "Prepetition EFIH Second Lien Creditors" shall

mean the holders of EFIH Second Lien Notes. The "Prepetition EFIH Secured Creditors" shall mean the Prepetition EFIH Second Lien Creditors together with the Prepetition EFIH First Lien Creditors. The "Prepetition EFIH Secured Notes" shall mean the EFIH First Lien Notes together with the EFIH Second Lien Notes.

33.   **Second Lien Collateral**.   The Prepetition EFIH Second Lien Obligations are secured by second priority liens (the "Prepetition EFIH Second Priority Liens" and, together with the Prepetition EFIH First Priority Liens, the "Prepetition EFIH Liens") in the Prepetition EFIH Collateral.

**III.   Other EFIH Secured Debt Documents.**

34.   **Security Documents**.   In connection with the issuance of the EFIH First Lien Notes and EFIH Second Lien Notes, the EFIH Debtors entered into: (a) the Security Documents (as defined in the EFIH First Lien Indentures, and collectively with the EFIH First Lien Indentures, the EFIH First Lien Secured Notes, and the Registration Rights Agreements executed in connection therewith, the "EFIH First Lien Documents"); and (b) the Security Documents (as defined in the EFIH Second Lien Indenture, and collectively with the EFIH Second Lien Indenture, the EFIH Second Lien Secured Notes, and the Registration Rights Agreements executed in connection therewith, the "EFIH Second Lien Documents").

35.   **EFIH Collateral Trust Agreement**.   The EFIH Collateral Trust Agreement (as amended, restated, modified, and supplemented from time to time, the "EFIH Collateral Trust Agreement") entered into by and among EFIH, and CSC, in its capacity as EFIH First Lien Notes Trustee and Collateral Trustee under the EFIH First Lien Documents and EFIH Second Lien Documents, and Computershare, in its capacity as EFIH Second Lien Notes Trustee, governs, among other things, the relative priority of the EFIH First Lien Notes and the EFIH

Second Lien Notes and the relative rights and remedies of the Prepetition EFIH First Lien Creditors and the Prepetition EFIH Second Lien Creditors with respect to, among other things, debtor-in-possession financing, use of EFIH Cash Collateral, and adequate protection.  In particular, pursuant to section 2.8 of the EFIH Collateral Trust Agreement, the Prepetition EFIH Second Lien Creditors are bound by the actions and consents of the Collateral Trustee with respect to any debtor-in-possession financing or use of EFIH Cash Collateral if such actions result from the direction of holders of at least a majority of the outstanding EFIH First Lien Notes.  Moreover, any payments to the Prepetition EFIH Second Lien Creditors before the EFIH First Lien Notes are refinanced will be subject to turnover to the Prepetition EFIH First Lien Creditors pursuant to the terms of the EFIH Collateral Trust Agreement.  *See* EFIH Collateral Trust Agreement § 2.4(c).

### Development of the EFIH DIP Budget and the EFIH Debtors' Need for Use of Cash Collateral and the EFIH First Lien DIP Financing

36.    The EFIH Debtors, with the assistance of their financial advisors and other advisors, developed an initial three-month budget for these chapter 11 cases, attached hereto as **Exhibit C** (the "EFIH DIP Budget").  As of the Petition Date, the EFIH Debtors have approximately $119 million of EFIH Cash Collateral.  In conjunction with the EFIH Debtors' access to EFIH Cash Collateral (which, for the avoidance of doubt, will not occur until the entry of the Final Order), the EFIH First Lien DIP Financing will provide the EFIH Debtors with the liquidity necessary to fund the EFIH Debtors' restructuring-related expenses, satisfy their corporate obligations, and execute the EFIH First Lien Refinancing and the EFIH Secured Settlements.

37.    The EFIH DIP Budget incorporates a number of factors, including the effect of the chapter 11 filing, material cash disbursements, and expected dividends from Oncor.  As

provided in the EFIH DIP Budget, the EFIH Debtors believe that approximately $1 billion in liquidity would be necessary over a 26-month period.  None of those amounts, however, are needed in the first 30 days of the case.  ***As a result, the EFIH Debtors are not seeking interim financing or use of EFIH Cash Collateral pursuant to the Interim Fee Order.***

38.     The relief requested pursuant to the Final Order will maximize the value of the EFIH Debtors' estates.  The EFIH First Lien Refinancing will reduce the EFIH Debtors' interest expense by an estimated $13 million ***per month*** during the course of these chapter 11 cases.  *See* Goldstein Declaration ¶ 8.  The EFIH Secured Settlements allow the EFIH Debtors to minimize litigation risk around the EFIH Makewhole Claims that would total nearly $1.4 billion in the aggregate if payable on the Petition Date (approximately $700 million attributable to the EFIH First Lien Notes and EFIH Second Lien Notes, respectively), build consensus around a restructuring, and, in conjunction with the EFIH Second Lien DIP Financing, effect a substantial deleveraging of the EFIH Debtors.  And the EFIH First Lien DIP Financing provides the EFIH Debtors with highly favorable financing to satisfy their other restructuring-related obligations.  Accordingly, the EFIH Debtors have determined that the EFIH First Lien DIP Financing is in the best interests of their estates.

39.     The benefits of the EFIH First Lien DIP Financing are highly apparent, and any delay diminishes those benefits.  Accordingly, the EFIH Debtors respectfully request that the Court enter the Interim Order to ensure the continuing availability of the EFIH DIP Financing and, following the Final Hearing, the Final Order.

### The EFIH Debtors' Efforts to Obtain Postpetition Financing

40.     As discussed in the Goldstein Declaration, the EFIH Debtors' decision to proceed with the EFIH First Lien DIP Financing comes after a thorough search for the best available

financing alternatives.  In January 2014, the EFIH Debtors and Evercore initiated a request for proposals (the "RFP") with respect to the EFIH First Lien DIP Financing.  During the initial stage of the RFP process, the EFIH Debtors approached seven large financial institutions with active involvement in the debtor-in-possession and syndicated finance markets that had executed non-disclosure agreements.  The EFIH Debtors explained their goals and potential DIP financing structures to the participating banks, and invited those banks to submit term sheets that reflected pricing and structuring possibilities.  From February 3 through February 7, the EFIH Debtors and Evercore hosted calls to discuss the RFP with each of the participating banks.

41.     Of the seven participating banks that received RFPs, six submitted proposals between February 7 and 11.  The proposals varied significantly with respect to, among other things, key economic terms, the size of the DIP facility, whether there would be "last in/first out" participants or other junior components, and whether and on what terms the EFIH Debtors would be permitted to obtain additional junior financing.  *See* Goldstein Declaration ¶ 11-15.  The EFIH Debtors and their advisors evaluated the proposals and, in certain instances, posed follow-up questions to the participating banks in advance of in-person meetings on February 10 and 11.  About a week after those in-person meetings, the EFIH Debtors submitted a revised RFP to the six participating banks that reflected the EFIH Debtors' preferred structure for the EFIH First Lien DIP Financing.  The EFIH Debtors continued their discussions with the participating banks on February 19 and 20 and distributed a term sheet to the participating banks on February 21.

42.     From February 26 through March 2, the EFIH Debtors selected lead bank roles and invited all of the participating banks to participate in the EFIH First Lien DIP Financing (subject to final negotiations).  On March 4, the EFIH Debtors distributed a draft commitment letter and fee letter to lead banks.  Throughout March and April, the EFIH Debtors continued

negotiations with the lead banks, focusing on a variety of issues, including fee structures and structuring the EFIH First Lien DIP Financing to provide for the EFIH First Lien Settlement and EFIH Second Lien Settlement, and drafted definitive documents.  Finally, on April 29, 2014, the EFIH Debtors and arranging banks executed commitment papers.

43.     Ultimately, the EFIH Debtors determined, in consultation with their professional advisors, that the EFIH First Lien DIP Financing is the best source of financing at this time.  The EFIH Debtors and the EFIH First Lien DIP Lenders negotiated the EFIH First Lien DIP Financing at arm's length on terms that are reasonable.  The interest rates, fees, covenants, and events of default, taken as a whole, reflect the most favorable terms available in the market and are consistent with the terms of DIP financing approved in other large chapter 11 cases.  The EFIH Debtors' discussions with various potential sources of EFIH First Lien DIP Financing revealed that such financing on a junior or unsecured basis was not available to the EFIH Debtors on terms that were competitive with the EFIH First Lien DIP Financing.  Specifically, EFIH's significant secured debt obligations and lack of material unencumbered assets precludes the EFIH Debtors from obtaining postpetition financing in the amount they require on terms other than on a secured and superpriority basis.

44.     The EFIH Debtors did receive one proposal for a junior financing that would have satisfied some liquidity needs associated with restructuring expenses, rather than providing financing only for a refinancing (the "Original Second Lien DIP Proposal").  The liens securing the Original Second Lien DIP Proposal would have been junior to the liens securing the EFIH First Lien Notes and *pari passu* with the liens securing the EFIH Second Lien Notes.  The EFIH Debtors did not pursue the Original Second Lien DIP Proposal for a number of reasons:  it contemplated only partial equitization of the EFIH Second Lien Notes, it presumed the EFIH

Second Lien Makewhole Claim would receive a 100% recovery, it provided insufficient incremental liquidity to satisfy the EFIH Debtors' restructuring expenses, and it provided no clear path to execute the EFIH First Lien Refinancing. Moreover, the EFIH Debtors concluded that there was no reasonable likelihood that the Original Second Lien DIP Proposal could be revisited to provide for the same level of deleveraging or for the same level of consensus as the transactions currently contemplated. Thus, the EFIH Debtors concluded that the Original Second Lien DIP Proposal would not maximize the value of the EFIH Debtors' estates.

### The EFIH First Lien Settlement and EFIH Second Lien Settlement

45.    As discussed in more detail in the Settlement Motion, negotiations regarding the EFIH First Lien Settlement and EFIH Second Lien Settlement began to crystalize in mid-March, 2014, after certain holders of first lien claims against TCEH indicated that they would be willing to support a "tax-free spin" transaction. As discussed above, each of the EFIH First Lien Settlement and EFIH Second Lien Settlement contemplate that settling creditors will receive either EFIH First Lien Roll-Up Claims or cash.

46.    The terms of the settlements, including the amount of the roll-ups, the fee structure applicable to the roll-ups, and the amount of cash payments funded by the proceeds of the EFIH First Lien DIP Financing, and the terms under which the EFIH First Lien DIP Lenders would permit settling creditors to participate in the EFIH First Lien DIP Financing (and, therefore, lower the overall "new money" commitment) were subject to significant negotiation among the EFIH Debtors and their stakeholders. The EFIH Debtors believe that the EFIH First Lien Settlement and the EFIH Second Lien Settlement are fair and reasonable, and that the

issuances under the EFIH First Lien DIP Financing to fund the settlements, whether with roll-up notes or cash, are in the best interest of the EFIH Debtors, their estates, and their stakeholders.[20]

## Basis for Relief

### I.    The Fees Payable Under the Interim Fee Order Should Be Approved.

47.    The EFIH Debtors respectfully request that the Court authorize them, as an exercise of their sound business judgment and as an actual and necessary expense, to pay the Interim Fees.  These fees, which are a subset of the overall fees payable under the EFIH First Lien DIP Documents, are composed of the Ticking Fee and the DIP Facilities Fee, each as defined in the EFIH First Lien DIP Fee Letter, which has been filed under seal.  Additionally, the Interim DIP Order provides for the payment of certain out-of-pocket expenses, including professional fees.  None of these amounts will actually be paid until the earlier of the entry of the Final Order or an order authorizing the EFIH Debtors to use EFIH Cash Colleteral.  Approval of the Interim Fees is appropriate under sections 363(b) and 503(b) of the Bankruptcy Code.

48.    In the Third Circuit, certain fees are payable if they satisfy the standards applicable to administrative expense claims under section 503(b) of the Bankruptcy Code.  *See, e.g.*, *In re Reliant Energy Channelview LP*, 594 F.3d 200, 205-06 (3d Cir. 2010) (*citing Calpine Corp. v. O'Brien Env't Energy, Inc. (In re O'Brien Env't Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999) (holding that fees would be payable if appropriate under section 503(b)).  To qualify for such treatment, an expense must be "necessary to preserve the value of the debtors' estate." *Reliant Energy*, 594 F.3d at 206.  Other courts approve fees under the business judgment standard applicable to section 363(b) of the Bankruptcy Code.  *See, e.g.*, *In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011) (comparing the business judgment standard under section 363

---

[20]    For the avoidance of doubt, the to-be-filed Settlement Motion, rather than this Motion, will seek the authority to approve the EFIH First Lien Settlement and the EFIH Second Lien Settlement.

against the administrative expense standard under section 503(b)); *In re Bethlehem Steel Corp.*, No. 02-2854, 2003 WL 21738964, *8-9 (S.D.N.Y. Jul. 28, 2003) (citing instances of courts approving breakup and diligence fees under section 363(b) to justify authorization of payment of union fees).   Generally speaking, debtors are authorized to use estate property outside the ordinary course of business where the use is justified by a sound business purpose. *See*, *e.g.*, *In re Abbotts Dairies, Inc.*, 788 F.2d 143 (3d Cir. 1986) (holding that use should be authorized where supported by a sound business justification); *Computer Sales Int'l Inc. v. Fed. Mogul Global, Inc. (In re Fed. Mogul Global, Inc.)*, 293 B.R. 124, 126 (D. Del. 2003) (same). Importantly, courts in this district commonly authorize the payment of fees before financings close in the context of exit financing. *See*, *e.g.*, *In re Rotech Healthcare, Inc.*, No. 13-10741 (PJW) (Bankr. D. Del. Jul. 29, 2013) (authorizing certain up-front fees, payment of professional expenses, and indemnification obligations prior to the closing of an exit financing); *In re NewPage Corp.*, No. 11-12804 (KG) (Bankr. D. Del. Nov. 6, 2012) (same); *In re Appleseed's Intermediate Holdings LLC*, No. 11-10160 (KG) (Bankr. D. Del. Mar. 29, 2011) (same); *In re Visteon Corp.*, No. 09-11786 (CSS) (Bankr. D. Del. Aug. 31, 2010) (same).[21]

49.      The Interim Fees satisfy both section 363(b) and section 503(b) of the Bankruptcy Code.   Indeed, the same reasoning applies here as applies in the exit financing context:   without the authorization of fees, the commitment is likely to expire.   DIP financings, unlike exit financings, typically have immediate borrowings that facilitate the immediate payment of fees, but the fact that the EFIH First Lien DIP Financing does not have such an interim mechanism to approve fees does not make the financing any less beneficial to the EFIH Debtors' estates.

---

[21]   Because of the voluminous nature of the orders cited herein, such orders are not attached to this Motion.  Copies of these orders are available upon request of the Debtors' counsel.

50.     Approval of the Interim Fees will enable the EFIH Debtors to guarantee the highly favorable terms of the EFIH First Lien DIP Financing pending the Final Hearing on the EFIH First Lien Refinancing and while the EFIH Debtors solicit participation in the EFIH Makewhole Settlements and the Court considers the Settlement Motion.  Importantly, the EFIH First Lien DIP Financing and EFIH First Lien Refinancing will be consummated even if the EFIH Makewhole Settlements are not yet consummated when the Final Order is entered, or even if the EFIH Makewhole Settlements are not approved.  Accordingly, the benefit to the EFIH Debtors is not contingent upon the Court's approval of the Settlement Motion.

51.     As discussed above, the Interim Fees were the subject of hard-fought, arm's-length negotiations between the EFIH Debtors and the EFIH First Lien DIP Lenders, and the EFIH First Lien DIP Lenders are unwilling to hold their commitment open without the payment of the Interim Fees.  Absent the relief requested in the Interim Fee Order, the EFIH First Lien DIP Lenders' funding commitment will expire, which would impose costs and delay as a result of a remarketing process.  Participation in the EFIH Secured Settlements may be depressed by a lack of certainty regarding financing.  The EFIH Debtors will incur significant additional interest expense and may not be able to obtain similar financing on the same terms in a remarketing process.  Perhaps most importantly, delay could cause the EFIH Debtors to fail to satisfy the milestones in the Restructuring Support Agreement, which could cause the agreement to terminate.  Accordingly, the Interim Fees satisfy both section 363(b), because the EFIH Debtors' decision to pay such fees is supported by sound business purposes, and section 503(b), because the Interim Fees are an actual and necessary expense to maximize the value of the EFIH Debtors' estates.

52.    Importantly, prompt entry of the Interim Fee Order is necessary.  The EFIH First Lien DIP Lenders' commitments will expire unless the Interim Fee Order is entered within 10 business days of the Petition Date.  Accordingly, for the reasons set forth above, entry of the Interim Order is critical to avert immediate and irreparable harm to the EFIH Debtors' estate and is consistent with, and warranted under Bankruptcy Rule 6003(b).

## II.    The EFIH Debtors Should Be Authorized to Obtain Postpetition Financing Through the EFIH First Lien DIP Financing.

### A.    Entry into EFIH First Lien DIP Credit Agreement is an Exercise of the EFIH Debtors' Sound and Reasonable Business Judgment.

53.    The Court should authorize the EFIH Debtors, as an exercise of the EFIH Debtors' sound business judgment, to enter into EFIH First Lien DIP Credit Agreement and obtain access to EFIH First Lien DIP Financing.

54.    Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances as described in greater detail below. Provided that an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance with its sound business judgment in obtaining such credit.  *See*, *e.g.*, *Trans World Airlines, Inc. v. Travelers Int'l AG* (*In re Trans World Airlines, Inc.*), 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment."); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Barbara K. Enters., Inc.*, No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and

33

unfairly cede control of the reorganization to one party in interest."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[c]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, inter alia, an exercise of "sound and reasonable business judgment.").

55.    Specifically, to determine whether the business judgment standard is met, a court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code.") (citation omitted).

56.    The EFIH Debtors' execution of the EFIH First Lien DIP Credit Agreement is an exercise of their sound business judgment that warrants approval by the Court.  Before the Petition Date, the EFIH Debtors and their advisors analyzed the EFIH Debtors' projected financing needs during these chapter 11 cases, and determined that the EFIH Debtors would require postpetition financing to support their restructuring activities.  Additionally, the EFIH Debtors and their advisors determined that executing the EFIH First Lien Refinancing would dramatically reduce EFIH's interest obligations going forward.  Finally, as described in more detail in the Settlement Motion, the EFIH First Lien Settlement and EFIH Second Lien

Settlement are each in the best interests of the EFIH Debtors' estates because the settlements will minimize litigation risk and facilitate the speedy resolution of the EFIH Debtors' chapter 11 cases.  Accordingly, the EFIH Debtors negotiated the EFIH First Lien DIP Financing with the EFIH First Lien DIP Lenders in good faith, at arm's length, and with the assistance of their advisors to obtain the required postpetition financing on terms most favorable to the EFIH Debtors.  And, as discussed above, the EFIH Debtors have determined that the EFIH First Lien DIP Financing is the best available financing alternative.  Thus, entry into EFIH First Lien DIP Financing is an exercise of the EFIH Debtors' sound business judgment.

> **B.** **The EFIH Debtors Should Be Authorized to Obtain Postpetition Financing on a Senior Secured and Superpriority Basis.**

57.    Section 364 of the Bankruptcy Code authorizes a debtor to obtain, in certain circumstances, postpetition financing on a secured or superpriority basis, or both.  Specifically, section 364(c) of the Bankruptcy Code provides, in pertinent part, that the Court, after notice and a hearing, may authorize a debtor that is unable to obtain credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code to obtain credit or incur debt:

> (a)  with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code];
>
> (b)  secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (c)  secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

58.    To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. *Bray v. Shenandoah Fed. Sav. & Loan Assoc. (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also, L.A. Dodgers*, 457 B.R. at 313

(citing *Ames Dep't Store*, 115 B.R. at 37 (noting the court "may not approve any credit transaction under subsection (c) [of section 364] unless the debtor demonstrates that it has attempted, but failed, to obtain unsecured credit under section 364(a) or (b)"). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.*; *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense). When few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received); *In re Garland Corp.*, 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) authorized, after notice and a hearing, upon showing that unsecured credit unobtainable); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met).

59.    The EFIH Debtors' discussions with various potential sources of EFIH First Lien DIP Financing revealed that such financing on a junior or unsecured basis was not available to the EFIH Debtors on terms that were competitive with the EFIH First Lien DIP Financing. Specifically, the EFIH Debtors' significant secured debt obligations and lack of material unencumbered assets preclude the EFIH Debtors from obtaining postpetition financing in the

amount they require on terms other than on a secured and superpriority basis.  As discussed above, the EFIH Debtors evaluated—and ultimately rejected—the only junior proposal that would have replaced any portion of the EFIH First Lien DIP Financing because that proposal had inferior economic terms, provided insufficient liquidity, and did not maximize the value of the EFIH Debtors' estates.  The Court should therefore authorize the EFIH Debtors to provide the EFIH First Lien DIP Agent, on behalf of itself, the other EFIH First Lien DIP Lenders, the Secured Hedge Banks, and the Secured Cash Management Banks, (a) senior liens on the EFIH Debtors' unencumbered property as provided in section 364(c)(2) of the Bankruptcy Code, (b) junior liens on the EFIH Debtors' encumbered property, and (c) superpriority administrative expense claims as provided for in section 364(c)(1) of the Bankruptcy Code.

### C.    The EFIH Debtors Should Be Authorized to Obtain Postpetition Financing Secured by First Priority Priming Liens.

60.    In addition to authorizing financing under section 364(c) of the Bankruptcy Code, courts also may authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on the encumbered property, without the consent of the existing lienholders, if the debtor cannot otherwise obtain such credit and the interests of existing lienholders are adequately protected.  *See* 11 U.S.C. § 364(d)(1).

61.    When determining whether to authorize a debtor to obtain credit secured by a "priming" lien as authorized by section 364(d) of the Bankruptcy Code, courts focus on whether the transaction will enhance the value of the EFIH Debtors' assets.  Courts consider a number of factors, including, without limitation:

> (a) whether alternative financing is available on any other basis (i.e., whether any better offers, bids, or timely proposals are before the court);

(b) whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtors' business;

(c) whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtors and proposed lender(s); and

(d) whether the proposed financing agreement was negotiated in good faith and at arm's length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors.

*See*, *e.g.*, *Ames Dep't Stores*, 115 B.R. at 37–39; *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003); *Farmland Indus.*, 294 B.R. at 862–79, *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. Mar. 5, 2009); *Barbara K. Enters.*, 2008 WL 2439649 at \*10; *see also* 3 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 364.04[1] (16th ed.). Even assuming that a priming analysis is relevant here with respect to the EFIH Second Lien Notes (to the extent the EFIH Second Lien Refinancing has not been executed when the Final Order is entered), the EFIH First Lien DIP Financing satisfies each of these factors.

62.    ***First***, as described above, the EFIH Debtors and their advisors canvassed the market and were not able to obtain financing on equal or better terms from the EFIH First Lien DIP Lenders other than financing secured by first priority priming liens.

63.    ***Second***, the EFIH Debtors need the funds to be provided under EFIH First Lien DIP Financing to maximize the value of their estates.  Specifically, the EFIH Debtors need the funds to be provided under EFIH First Lien DIP Financing to pay restructuring-related expenses, terminate their obligations to pay above-market interest rates on the EFIH First Lien Notes, and to facilitate the EFIH First Lien Settlement and the EFIH Second Lien Settlement.  Thus, the EFIH First Lien DIP Financing is necessary to maximize the value of the EFIH Debtors' estates and is in the best interest of all stakeholders.

64.    *Third*, the EFIH Debtors and their advisors determined that the EFIH First Lien DIP Lenders offered the best option for obtaining the postpetition financing the EFIH Debtors require to satisfy their general corporate obligations and restructuring expenses and the means to consummate the EFIH First Lien Refinancing, EFIH First Lien Settlement, and EFIH Second Lien Settlement.  Accordingly, the terms of the EFIH First Lien DIP Credit Agreement are reasonable and adequate to support the EFIH Debtors' general corporate needs and restructuring activities through the pendency of these chapter 11 cases and maximize the value of the EFIH Debtors' estates by effecting a refinancing of the EFIH First Lien Notes.

65.    *Fourth*, the EFIH Debtors negotiated with the EFIH First Lien DIP Lenders at arm's length regarding the terms of the EFIH First Lien DIP Financing.  The interest rates, fees (including the fees payable under the Interim Order), covenants, and events of default, taken as a whole, reflect the most favorable terms available in the market and, as described in more detail below, are consistent with the terms of DIP financing approved in other large chapter 11 cases.

66.    For these reasons, the priming liens under the EFIH First Lien DIP Financing are appropriate under section 364(d) of the Bankruptcy Code and should be approved.

**D.    The Payment of Fees to the EFIH First Lien DIP Lenders Under the Proposed Final Order is Appropriate.**

67.    The EFIH Debtors have agreed, subject to Court approval, to pay certain fees (in addition to the fees the EFIH Debtors seek to approve under the Interim Fee Order) to the EFIH First Lien DIP Agent, the EFIH First Lien DIP Lenders, and the Joint Lead Arrangers in exchange for their providing the EFIH First Lien DIP Financing.  The fees the EFIH Debtors have agreed to pay, together with the other provisions of the EFIH First Lien DIP Documents, represent the most favorable terms to the EFIH Debtors on which the EFIH First Lien DIP Agent, the EFIH First Lien DIP Lenders, and the Joint Lead Arrangers would agree to make the

EFIH First Lien DIP Financing available.  The EFIH Debtors considered such fees when determining in their sound business judgment that the EFIH First Lien DIP Financing provided the best terms on which the EFIH Debtors could obtain the financing necessary to satisfy their restructuring-related obligations and consummate the EFIH First Lien Refinancing, the EFIH First Lien Settlement, and the EFIH Second Lien Settlement.  Accordingly, the EFIH Debtors believe that paying these fees to obtain the EFIH First Lien DIP Financing is in the best interests of the EFIH Debtors' estates, creditors, and other parties in interest.

68.    Courts routinely authorize debtors to pay fees similar to those the EFIH Debtors propose to pay pursuant to the Final Order, as described in the EFIH First Lien DIP Fee Letter and the EFIH First Lien DIP Commitment Letter, where the associated financing is, in the debtor's business judgment, beneficial to the debtors' estates.  Indeed, the fees here are smaller on a percentage basis than the fees approved in many other cases.  *See*, *e.g.*, *In re Exide Techs.*, No. 13-11482 (KJC) (Bankr. D. Del. Jul. 25, 2013) (approving approximately 4.7% of aggregate fees to underwriters, arrangers, and lenders); *In re LSP Energy Ltd. P'ship*, No. 12-10460 (Bankr. D. Del Feb. 27, 2012) (approving 1.25 percent commitment fee); *In re Friendly Ice Cream Corp.*, No. 11-13167 (Bankr. D. Del. Nov. 2, 2011) (approving certain letter of credit fees including a 2 percent issuance fee); *In re Sea Launch Co., L.L.C.*, No. 09-12153 (Bankr. D. Del. May 12, 2010) (approving 3.75-percent DIP break-up fee); *In re Cooper-Standard Holdings Inc.*, No. 09-12743 (Bankr. D. Del. Sept. 2, 2009) (approving 2.5 percent upfront fee and 2.5 percent exit fee); *In re Hayes Lemmerz Int'l, Inc.*, No. 09-11655 (Bankr. D. Del. June 15, 2009) (approving 3 percent exit fee); *In re Aleris Int'l. Inc.*, No. 09-10478 (Bankr. D. Del. Mar. 18, 2009) (approving 3.5-percent exit fee and 3.5% front-end net adjustment against each lender's initial commitment); *In re Dura Auto. Sys., Inc.*, No. 06-11202 (Bankr. D. Del. Jan. 30, 2008)

(approving a 2.5-percent fee related to refinancing and extending a postpetition financing facility); *see also In re Great Atl. & Pac. Tea Co.*, No. 10-24549 (Bankr. S.D.N.Y. Jan. 11, 2011) (approving 3-percent letter of credit fee); *In re InSight Health Servs. Holdings Corp.*, No. 10-16564 (Bankr. S.D.N.Y. Jan. 4, 2011) (approving 2.5-percent DIP closing fee); *In re Neff Corp.*, No. 10-12610 (Bankr. S.D.N.Y. June 30, 2010) (approving 3.1-percent DIP and exit facility fee); *In re Reader's Digest Ass'n*, No. 09-23529 (Bankr. S.D.N.Y. Oct. 6, 2009) (approving 3.0-percent exit fee); *In re Lear Corp.*, No. 09-14326 (Bankr. S.D.N.Y. Aug. 4, 2009) (approving 5.0-percent upfront fee and a 1.0-percent exit/conversion fee); *In re Gen. Growth Props., Inc.*, No. 09-11977 (Bankr. S.D.N.Y. May 14, 2009) (approving 3.75-percent exit fee); *In re Tronox Inc.*, No. 09-10156 (Bankr. S.D.N.Y. Feb. 9, 2009) (approving an up-front 3-percent facility fee). Accordingly, the Court should authorize the EFIH Debtors to pay the fees provided under EFIH First Lien DIP Financing Documents (in addition to the fees the EFIH Debtors seek to pay under the Interim Fee Order) in connection with entering into those agreements.

### E.     The Scope of the Carve Out is Appropriate.

69.     The proposed EFIH First Lien DIP Financing subjects the security interests and administrative expense claims of the EFIH First Lien DIP Lenders to the Carve Out. Carve outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel. *See Ames*, 115 B.R. at 40. The EFIH First Lien DIP Financing does not directly or indirectly deprive the EFIH Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these cases. *See id.* at 38 (observing that courts insist on carve outs for professionals representing parties-in-interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). Additionally,

the Carve Out protects against administrative insolvency during the course of these chapter 11 cases by ensuring that assets remain for the payment of U.S. Trustee fees and professional fees of the EFIH Debtors and an official committee of unsecured creditors, notwithstanding the grant of superpriority and administrative liens and claims under the EFIH First Lien DIP Financing.

70.    Moreover, with the inclusion of the Carve Out, the Orders do not directly or indirectly deprive the EFIH Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in the Chapter 11 Cases. *See In re Ames Dept. Stores*, 115 B.R. at 38 (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). In *Ames*, the court found such "carve-outs" for professional fees to be not only reasonable, but necessary to ensure that official committees and debtors' estates can retain assistance from counsel. *Id.* at 41.

71.    Similar carve outs for professional fees have been found to be reasonable and necessary in this district to ensure that a debtor's estate and any statutory committee can retain assistance from counsel. *See, e.g.*, *In re Longview Power, LLC*, No. 13-12211 (BLS) (Bankr. D. Del. Sept. 5, 2013) (allowing carve out for debtor and committee professional fees); *In re Dex One Corp.*, No. 13-10533 (KG) (Bankr. D. Del. Mar. 19, 2013) (same); *In re Amicus Wind Down Corp.*, No. 11-13167 (KG) (Bankr. D. Del. Nov. 2, 2011) (same); *In re Neb. Book Co., Inc.*, No. 11-12005 (PJW) (Bankr. D. Del. July 21, 2011) (same); *In re Local Insight Media Holdings, Inc.*, No. 10-13677 (KG) (Bankr. D. Del. Dec. 29, 2010) (same); *In re N. Am. Petroleum Corp. USA*, No. 10-11707 (CSS) (Bankr. D. Del. July 6, 2010) (same); *In re Stallion Oilfield Servs. Ltd.*, No. 09-13562 (BLS) (Bankr. D. Del. Nov. 18, 2009) (same).

**F.      The Roll-Ups are Appropriate.**

72.      The EFIH Makewhole Settlements contemplate the issuance of EFIH First Lien DIP Roll-Up Claims.  Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property outside the ordinary course of business with court approval so long as the Debtors demonstrate a sound business purpose.  *See*, *e.g.*, *Abbotts Dairies*, 788 F.2d at 143 (holding that use should be authorized where supported by a sound business justification); *In re Fed. Mogul Global, Inc.*, 293 B.R. at 126 (same).

73.      The EFIH Debtors do not seek approval of the EFIH Makewhole Settlements pursuant to this Motion.  That relief will be sought in the Settlement Motion, which will be filed on or shortly after the Petition Date. In the event the Court approves the EFIH Makewhole Settlements, however, the EFIH Debtors will need funds to satisfy those settlements.  The roll-up aspects of the EFIH First Lien DIP Financing are appropriate for that purpose.  Indeed, the EFIH Makewhole Settlements, along with the other transactions contemplated by the Settlement Motion and the Restructuring Support Agreement, will allow the EFIH Debtors to emerge from these chapter 11 cases in an expeditious and tax-efficient manner.  The EFIH Debtors will still need to litigate the EFIH First Lien Makewhole Claims and EFIH Second Lien Makewhole Claims with non-settling holders, but the ability to settle a significant portion of the EFIH Makewhole Claims and achieve support for the EFIH Debtors' broader restructuring effort is vitally important.

74.      By contrast, if this Court does not approve the roll-ups, creditors may declare a termination event under the Restructuring Support Agreement.  Importantly, this could cause the EFIH Debtors to lose the opportunity to refinance the EFIH Second Lien Notes with the proceeds of an EFIH Second Lien DIP Facility that is mandatorily convertible to equity upon the

consummation of a plan of reorganization, jeopardizing the EFIH Debtors' reorganization efforts.

75.     This Court recently approved a DIP facility that included a roll-up of make-whole claims in *In re School Specialty, Inc.*, Case No. 13-1015 (KJC) (Bankr D. Del. Mar. 14, 2014) (authorizing up to $155 million in DIP financing that included roll-up of between $67 million and $92 million in prepetition debt pursuant to interim and final orders, which amounts included a prepayment claim).  And roll-ups are commonly approved in this district.  *See*, *e.g.*, *In re Mach Gen, LLC*, No. 14-10461 (MFW) (Bankr. D. Del. Mar. 27, 2014) (authorizing up to $200 million in DIP financing that included roll-up of approximately $144 million of prepetition debt pursuant to interim and final orders); *In re Furniture Brands Int'l, Inc.*, No. 13-12329 (CSS) (Bankr. D. Del. Oct. 11, 2013) (authorizing up to $140 million in DIP financing that included roll-up of approximately $91 million prepetition debt pursuant to interim order); *In re WP Steel Venture LLC*, No. 12-11661 (KJC) (Bankr. D. Del. June 1, 2012) (authorizing up to $525 million in DIP financing that included roll-up of approximately $475 million prepetition debt pursuant to interim order); *In re Neb. Book Co.*, No. 11-12005 (PJW) (Bankr. D. Del. July 21, 2011) (authorizing up to $200 million in DIP financing that included roll-up of approximately $30 million prepetition debt pursuant to interim order); *In re Indianapolis Downs, LLC*, No. 11-11046 (BLS) (Bankr. D. Del. Apr. 26, 2011) (authorizing up to $103 million in DIP financing that included roll-up of approximately $98 million prepetition debt pursuant to interim order); *In re NEC Holdings Corp.*, No. 10-11890 (PJW) (Bankr. D. Del. July 16, 2010) (authorizing up to $138 million in DIP financing that included roll-up of approximately $109.7 million prepetition debt pursuant to interim and final orders).

**G.    The EFIH First Lien DIP Financing Was Negotiated in Good Faith and Should Be Afforded the Protection of Section 364(e) of the Bankruptcy Code.**

76.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Specifically, section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

77.    The EFIH First Lien DIP Financing was negotiated in good faith and at arm's length among the EFIH Debtors, the EFIH First Lien DIP Agent, and the EFIH First Lien DIP Lenders, and all of EFIH First Lien DIP Financing obligations will be extended by the EFIH First Lien DIP Lenders in good faith (as such term is used in section 364(e) of the Bankruptcy Code).  No consideration is being provided to any party in connection with the EFIH First Lien DIP Financing other than as described in this Motion, the EFIH First Lien DIP Commitment Letter, and the EFIH First Lien DIP Fee Letter.  Moreover, the EFIH First Lien DIP Financing has been extended in express reliance upon the protections afforded by section 364(e) of the Bankruptcy Code.  The EFIH First Lien DIP Agent and EFIH First Lien DIP Lenders are entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Interim Order or any provision thereof is vacated, reversed, or modified on appeal or otherwise.  *See* 11 U.S.C.

§ 364(e).  Accordingly, the EFIH First Lien DIP Agent and the EFIH First Lien DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code.

> **H.**    **Modification of the Automatic Stay Provided Under Section 362 of the Bankruptcy Code is Appropriate Under the Circumstances.**

78.    The Final Order will contain provisions that provide that the automatic stay imposed under section 362(a) of the Bankruptcy Code be lifted to allow the EFIH First Lien DIP Agent and EFIH First Lien DIP Lenders, in their sole discretion, to file the Final Order or such financing statements, mortgages, deeds of trust, notices of lien, or similar instruments or otherwise confirm perfection of such liens, security interests, and mortgages. The Final Order is also likely to propose that, upon five days written notice to the EFIH Debtors, their counsel, and the Collateral Trustee, the automatic stay imposed under section 362(a) of the Bankruptcy Code be lifted to allow the EFIH First Lien DIP Agent and EFIH First Lien DIP Lenders to exercise remedies following a default under EFIH First Lien DIP Financing.

79.    Stay modification provisions of this sort are ordinary and usual features of debtor in possession financing facilities and, in the EFIH Debtors' business judgment, are reasonable under the present circumstances.  Accordingly, the Court should modify the automatic stay to the extent contemplated under EFIH First Lien DIP Credit Agreement and the proposed Orders.

**III.    The Court Should Authorize the Repayment of the EFIH First Lien Notes Because Doing So Is in the Best Interests of the Debtors and Their Estates.**

80.    Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Whether use of assets pursuant to section 363(b) of the Bankruptcy Code should be approved in a particular case is a matter left to the Court's discretion, giving due consideration to the sound business judgment of the proponent of the

particular transaction.  *See*, *e.g.*, *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F. 2d 1063, 1071 (2d Cir. 1983) (court may approve a transaction involving property of the estate that is outside of the ordinary course of business when the court finds a good business reason for such transaction).  When determining whether a debtor has exercised its business judgment, this Court "is required to examine whether a reasonable business person would make a similar decision under similar circumstances."  *In re AbitibiBowater Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (business judgment rule in the contract assumption process).  Moreover, section 105(a) of the Bankruptcy Code provides this Court with the ability to "issue any order, process, or judgment that is necessary or appropriate" to further the "paramount policy and goal of Chapter 11"—the rehabilitation of a debtor.  11 U.S.C. § 105(a); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176-77 (Bankr. S.D.N.Y. 1989).

81.     There is nothing unprecedented about the EFIH First Lien Refinancing.  In *In re Calpine Corp.*, 356 B.R. 585 (S.D.N.Y. 2007), the district court upheld on appeal the bankruptcy court's decision to allow Calpine to use a combination of asset sale and postpetition financing proceeds to refinance a portion of Calpine's above-market prepetition debt.  *Id.* at 589-90 (noting that the bankruptcy court found that the refinancing was appropriate to allow Calpine to "stop 'hemorrhaging' cash").  Later in the same case, Calpine was permitted to use the proceeds of a new postpetition facility to refinance both postpetition and prepetition financing.  *See In re Calpine Corp.*, 365 B.R. 392, 396 (Bankr. S.D.N.Y. 2007).  More recently, American Airlines was permitted to refinance a significant portion of its prepetition secured equipment leases with the proceeds of postpetition financing.  *In re AMR Corp.*, 485 B.R. 279, 283-84 (Bankr. S.D.N.Y. 2013) (holding that use of postpetition financing to repay prepetition debt is permissible if supported by "sound business reasons"), *aff'd In re AMR Corp.*, 730 F.3d 88 (2nd

Cir. 2013); *see also In re School Specialty, Inc.*, No. 13-10125 (KJC) (Bankr. D. Del. Mar. 14, 2013) (authorizing postpetition financing to repay postpetition and prepetition claims).

82.    There can be no dispute that repaying the EFIH First Lien Notes is in the best interests of the EFIH Debtors' estates.  Interest savings of up to $13 million ***per month*** speaks for itself.  Under these circumstances, the EFIH Debtors plainly should be authorized under sections 363(b) and 105(a) of the Bankruptcy Code to repay the EFIH First Lien Notes.

**IV.    The Court Should Find that the Value of the EFIH First Lien Notes Does Not Include the Amount of any Makewhole Premium.**

83.    Bankruptcy Rule 3012 provides that this Court "may determine the value of a claim secured by a lien on property in which the estate has an interest on motion of any party in interest and after a hearing on notice to the holder of the secured claim."  This Court, like the bankruptcy court in *Calpine*, may determine the value of the Prepetition EFIH First Lien Creditors' claims against the EFIH Debtors in connection with its consideration of the EFIH First Lien Refinancing.  *See also* 11 U.S.C. § 502(b) (providing that a court "shall determine the amount of [claims].").[22]

84.    As discussed in greater detail in the First Lien Makewhole Memorandum that will be filed with the Court shortly following the Petition Date, the Court should enforce the plain terms of the EFIH First Lien Indentures and affirm that the EFIH Debtors' repayment of the EFIH First Lien Notes—accelerated by the commencement of these Chapter 11 cases—does not entitle the Prepetition EFIH First Lien Creditors to any EFIH First Lien Makewhole Premium. The law is well-settled that secured creditors may only recover a makewhole premium if that

---

[22]    The EFIH Debtors do not seek any determination pursuant to this Motion of the value of the Prepetition EFIH Second Lien Creditors' claims.  That said, the EFIH Debtors' position is that no EFIH Second Lien Makewhole Claim will be due in connection with the EFIH Second Lien Refinancing, and will similarly seek a determination that any such premium is not properly includable in the allowed amount of the Prepetition EFIH Second Lien Creditors' claims.

payment is "expressly require[d] by contract." *In re S. Side House, LLC*, 451 B.R. 248, 268 (Bankr. E.D.N.Y. 2011); *see* 11 U.S.C. § 506(b). "Without such a provision," no makewhole or other "damages are recoverable after acceleration." *HSBC Bank USA, Nat. Ass'n v. Calpine Corp.*, 07 CIV 3088 GBD, 2010 WL 3835200, at *4 (S.D.N.Y. Sept. 15, 2010).

85.    The EFIH First Lien Indentures do not "provide for" a premium when the outstanding debt is accelerated by the EFIH Debtors' chapter 11 filing. 11 U.S.C. § 506(b). The parties agreed that an "Applicable Premium," which is defined in exquisite detail, might be due in certain circumstances—and even incorporated that definition elsewhere in the EFIH First Lien Indentures. *See* EFIH First Lien Indentures § 3.07 ("Optional Redemption"). But the acceleration provision, which was triggered when the EFIH Debtors filed for chapter 11, does not reference that term "Applicable Premium." Nor does it mention the Optional Redemption provision that incorporates that term. In fact, the acceleration provision does not even contain the word premium at all. The intent of the parties in these circumstances is plain: the EFIH First Lien Makewhole Premium is not due upon the consummation of the EFIH First Lien Refinancing after the EFIH First Lien Notes' chapter 11-induced acceleration.

86.    The EFIH Debtors' chapter 11 filing accelerated the EFIH First Lien Notes, which became "due and payable immediately without further action or notice." EFIH First Lien Indentures § 6.02. That acceleration "change[d] the date of maturity from some point in the future ... to an earlier date based on the debtor's default under the contract." *In re AMR Corp.*, 730 F.3d 88, 103 (2d Cir. 2013) (citation omitted). Accordingly, as courts across the country have repeatedly held, the proposed repayment is "not a voluntary prepayment because '[p]repayment can only occur *prior* to the maturity date.'" *Id.* (quoting *In re Solutia,* 379 B.R 473, 488 (Bankr. S.D.N.Y. 2007)); *accord HSBC Bank USA, Nat. Ass'n v. Calpine Corp.*, No. 07

Civ. 3088 (GBD), 2010 WL 3835200, at *5 (S.D.N.Y. Sept. 15, 2010); *In re S. Side House, LLC*, 451 B.R. at 268;  *In re LHD Realty Corp.*, 726 F.2d 327, 330–31 (7th Cir. 1984).  Repayment here is mandated by the plain language of the acceleration provision, which itself makes no mention of a makewhole premium.

87.    Accordingly, the EFIH Debtors request that the Court determine the secured claim on account of the EFIH First Lien Notes is allowed in the amount of $3.985 billion, plus accrued and unpaid interest and any other fees or expenses properly allowable under the EFIH First Lien Indentures, but excluding any EFIH First Lien Makewhole Premium.

### Request For Final Hearing

88.    Pursuant to Bankruptcy Rules 4001(c)(2) and Local Bankruptcy Rule 4001-2(c), the Debtors request that the Court set a date for the final hearing that is as soon as practicable, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

### Waiver of Bankruptcy Rules 6004(a) and 6004(h)

89.    To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### Notice

90.    The Debtors shall provide notice of this Motion on the date hereof via facsimile, overnight delivery, and/or hand delivery to:  (a) the Office of the U.S. Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) Citibank, N.A., in its capacity as administrative agent under the TCEH first lien credit agreement and collateral agent under the TCEH intercreditor agreements and counsel thereto; (d) Bank of New York Mellon Trust

Company, N.A., in its capacity as indenture trustee under:  (i) the TCEH unsecured pollution control revenue bonds;  and (ii) the EFCH 2037 Notes due 2037, and counsel thereto; (e) American Stock Transfer & Trust Company, LLC, in its capacity as indenture trustee under: (i) the 9.75% EFH senior unsecured notes due 2019;  (ii) the 10.0% EFH senior unsecured notes due 2020; (iii) the 10.875% EFH LBO senior unsecured notes due 2017; (iv) the 11.25%/12.0% EFH LBO toggle notes due 2017; (v) the 5.55% EFH legacy notes (series P) due 2014; (vi) the 6.50% EFH legacy notes (series Q) due 2024; and (vii) the 6.55% EFH legacy notes (series R) due 2034, and counsel thereto; (f) Computershare Trust Company, N.A. and Computershare Trust Company of Canada, in their capacities as indenture trustee under:  (i) the 11.0% EFIH senior secured second lien notes due 2021; and (ii) the 11.75% EFIH senior secured second lien notes due 2022, and counsel thereto; (g) UMB Bank, N.A. in its capacity as indenture trustee under:  (i) the 9.75% EFIH senior unsecured notes due 2019; and (ii) the 11.25%/12.25% EFIH senior toggle notes due 2018, and counsel thereto; (h) BOKF, NA, dba Bank of Arizona, in its capacity as indenture trustee under 11.50% TCEH senior secured notes due 2020, and counsel thereto; (i) CSC Trust Company of Delaware in its capacity as indenture trustee under:  (i) the 6.875% EFIH senior secured notes due 2017; and (ii) the 10.0% EFIH senior secured notes due 2020, and counsel thereto; (j) Law Debenture Trust Company of New York in its capacity as indenture trustee under:  (i) the 10.25% TCEH senior unsecured notes due 2015; and (ii) the 10.50%/11.25% TCEH senior toggle notes due 2016, and counsel thereto; (k) Wilmington Savings Fund Society, FSB in its capacity as indenture trustee under the 15.0% TCEH senior secured second lien notes due 2021, and counsel thereto; (l) counsel to certain holders of claims against the Debtors regarding each of the foregoing described in clauses (c) through (k); (m) the agent for the TCEH debtor-in-possession financing facility and counsel thereto; (n) the agent for

the EFIH debtor-in-possession financing facility and counsel thereto; (o) counsel to certain holders of equity in Texas Energy Future Holdings Limited Partnership; (p) counsel to Oncor; (q) the SEC; (r) the Internal Revenue Service; (s) the Office of the United States Attorney for the District of Delaware; (t) the Office of the Texas Attorney General on behalf of the PUC; (u) counsel to ERCOT; (v) and Texas Transmission Investment LLC  As this Motion is seeking "first day" relief, within forty eight hours of the entry of an order respecting this Motion, the EFIH Debtors will serve copies of this Motion and the order respecting this Motion as required by Local Bankruptcy Rule 9013-1(m).  The EFIH Debtors submits that, in light of the nature of the relief requested, no other or further notice need be given.

<u>**No Prior Request**</u>

91.    No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the EFIH Debtors respectfully request that the Court enter the Interim Order, substantially in the form attached hereto as **Exhibit A**, and set a date for a hearing to consider entry of the Final Order.

Wilmington, Delaware
Dated:  April 29, 2014

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:      (302) 651-7700
Facsimile:      (302) 651-7701
Email:          collins@rlf.com
                defranceschi@rlf.com
                madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
Richard M. Cieri (*pro hac vice* pending)
Edward O. Sassower, P.C. (*pro hac vice* pending)
Stephen E. Hessler (*pro hac vice* pending)
Brian E. Schartz (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          richard.cieri@kirkland.com
                edward.sassower@kirkland.com
                stephen.hessler@kirkland.com
                brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (*pro hac vice* pending)
Chad J. Husnick (*pro hac vice* pending)
Steven N. Serajeddini (*pro hac vice* pending)
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          james.sprayregen@kirkland.com
                chad.husnick@kirkland.com
                steven.serajeddini@kirkland.com

Proposed Co-Counsel to the Debtors and Debtors in Possession

# EXHIBIT A

**Proposed Interim Order**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) Case No. 14-_____ (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

## ORDER APPROVING CERTAIN FEES RELATED TO AND SCHEDULING A FINAL HEARING ON THE PROPOSED POSTPETITION FINANCING OF ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC AND EFIH FINANCE

Upon the motion (the "Motion")[2] of Energy Future Intermediate Holding Company LLC ("EFIH") and EFIH Finance, Inc. (together with EFIH, the "EFIH Debtors" and, together with the other above-captioned debtors and debtors in possession, the "Debtors"), for entry of, among other things, an order (this "Order"), (a) approving and authorizing and directing the Debtors to promptly satisfy certain fees related to the EFIH Debtors' proposed debtor in possession financing in accordance with the EFIH First Lien DIP Commitment Letter and the EFIH First Lien DIP Fee Letter and (b) scheduling a final hearing to consider the approval of the EFIH First Lien DIP Financing and the other relief requested in the Motion; and the Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having

---

[1]  The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which the debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

[2]  Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion or EFIH DIP Credit Agreement, as applicable.

found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and the Court having found that the Debtors provided appropriate notice of the Motion and the opportunity for a hearing on the Motion under the circumstances; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at the interim hearing, if any, before the Court (the "Interim Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Interim Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted as set forth herein.

2.      The DIP Facility Fee (as defined in the EFIH First Lien DIP Fee Letter), the Ticking Fee (as defined in the EFIH First Lien DIP Fee Letter), and provisions of the EFIH First Lien DIP Commitment Letter providing for the reimbursement of reasonable and documented expenses of the Commitment Parties (as defined in the EFIH First Lien DIP Commitment Letter) (including fees and charges and disbursement of counsel) (collectively, the "Interim Fees") are hereby approved. The EFIH Debtors are authorized and shall promptly satisfy the Interim Fees when due under, to the extent provided in, and in accordance with the EFIH First Lien DIP Commitment Letter and the EFIH First Lien DIP Fee Letter. The Interim Fees shall be entitled to administrative expense priority pursuant to section 503(b) of the Bankruptcy Code and shall be deemed fully earned, indefeasibly paid, irrevocable, and non-avoidable irrespective of whether the EFIH First Lien DIP Financing is approved. For the avoidance of doubt, the EFIH

Debtors will not pay any amounts authorized under this Order in advance of the Final Hearing or unless pursuant to a separate Court order authorizing the EFIH Debtors to use cash collateral.

3.      The Final Hearing shall be _____, 2014, at __:__ a.m./p.m., prevailing Eastern Time.  The EFIH Debtors shall provide notice of the Final Hearing to:  (a) the Office of the U.S. Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) Citibank, N.A., in its capacity as administrative agent under the TCEH first lien credit agreement and collateral agent under the TCEH intercreditor agreements; (d) Bank of New York Mellon Trust Company, N.A., in its capacity as indenture trustee under:  (i) the TCEH unsecured pollution control revenue bonds; and (ii) the EFCH 2037 Notes due 2037; (e) American Stock Transfer & Trust Company, LLC, in its capacity as indenture trustee under:  (i) the 9.75% EFH senior unsecured notes due 2019;  (ii) the 10.0% EFH senior unsecured notes due 2020; (iii) the 10.875% EFH LBO senior unsecured notes due 2017; (iv) the 11.25%/12.0% EFH LBO toggle notes due 2017; (v) the 5.55% EFH legacy notes (series P) due 2014; (vi) the 6.50% EFH legacy notes (series Q) due 2024; and (vii) the 6.55% EFH legacy notes (series R) due 2034; (f) Computershare Trust Company, N.A. and Computershare Trust Company of Canada, in their capacities as indenture trustee under:  (i) the 11.0% EFIH senior secured second lien notes due 2021; and (ii) the 11.75% EFIH senior secured second lien notes due 2022; (g) UMB Bank, N.A. in its capacity as indenture trustee under:  (i) the 9.75% EFIH senior unsecured notes due 2019; and (ii) the 11.25%/12.25% EFIH senior toggle notes due 2018; (h) BOKF, NA, dba Bank of Arizona, in its capacity as indenture trustee under 11.50% TCEH senior secured notes due 2020; (i) CSC Trust Company of Delaware in its capacity as indenture trustee under:  (i) the 6.875% EFIH senior secured notes due 2017; and (ii) the 10.0% EFIH senior secured notes due 2020;

(j) Law Debenture Trust Company of New York in its capacity as indenture trustee under: (i) the 10.25% TCEH senior unsecured notes due 2015; and (ii) the 10.50%/11.25% TCEH senior toggle notes due 2016; (k) Wilmington Savings Fund Society, FSB in its capacity as indenture trustee under the 15.0% TCEH senior secured second lien notes due 2021; (l) counsel to certain holders of claims against the Debtors regarding each of the foregoing described in clauses (c) through (k); (m) the agent for the TCEH debtor-in-possession financing facility and counsel thereto; (n) the agent for the EFIH debtor-in-possession financing facility and counsel thereto; (o) counsel to certain holders of equity in Texas Energy Future Holdings Limited Partnership; (p) counsel to Oncor; (q) the SEC; (r) the Internal Revenue Service; (s) the Office of the Texas Attorney General on behalf of the PUC; and (t) counsel to ERCOT; (u) Texas Transmission Investment LLC; and (v) any official committee of creditors appointed in these cases pursuant to section 1102 of the Bankruptcy Code. Any objections or responses to the Motion must be filed on or before _____, 2014, at 4:00 p.m. (prevailing Eastern time). Any objections or responses to the Motion must be filed on or before _____, 2014, at 4:00 p.m., prevailing Eastern Time. If no objections are filed to the Motion, the Court may enter the Final Order without further notice or hearing.

4.      Notice of the Motion as provided therein shall be deemed good and sufficient and the requirements of the Local Bankruptcy Rules are satisfied by such notice.

5.      Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7062, 9014 or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

6.      All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

7.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

8.     The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Wilmington, Delaware
Dated: _____, 2014

_____
UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT B

**Goldstein Declaration**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | Case No. 14-_____ (___) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF STEPHEN GOLDSTEIN IN SUPPORT
OF THE MOTION OF ENERGY FUTURE INTERMEDIATE
HOLDING COMPANY LLC AND EFIH FINANCE, INC. FOR ENTRY
OF (I) AN INTERIM ORDER (A) APPROVING CERTAIN FEES RELATED TO
POSTPETITION FINANCING AND GRANTING SUCH FEES ADMINISTRATIVE
EXPENSE PRIORITY AND (B) SCHEDULING A FINAL HEARING; AND (II) A FINAL
ORDER (A) APPROVING POSTPETITION FINANCING, (B) GRANTING LIENS AND
PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS,
(C) AUTHORIZING THE USE OF CASH COLLATERAL, (D) AUTHORIZING THE
EFIH FIRST LIEN REFINANCING, (E) AUTHORIZING ISSUANCE OF ROLL-UP
DEBT TO THE EXTENT AUTHORIZED BY THE SETTLEMENT MOTION,
(F) DETERMINING THE VALUE OF SECURED CLAIMS, AND (G) MODIFYING THE
AUTOMATIC STAY**

I, Stephen Goldstein, declare as follows:

1.        I am a Senior Managing Director of Evercore Group LLC ("Evercore"), a financial advisory and investment banking firm with offices around the world and financial advisor and investment banker to the above-captioned debtors and debtors in possession (the "Debtors"). I submit this declaration (this "Declaration") in support of the *Motion of Energy Future Intermediate Holding Company LLC and EFIH Finance, Inc., for Entry of for Entry of (I) an Interim Order (A) Approving Certain Fees Related to Postpetition Financing and Granting*

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which the debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

*Such Fees Administrative Expense Priority and (B) Scheduling a Final Hearing; and (II) a Final Order (A) Approving Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Authorizing the Use of Cash Collateral, (D) Authorizing the EFIH First Lien DIP Refinancing, (E) Authorizing Issuance of Roll-Up Debt to the Extent Authorized by the Settlement Motion, (F) Determining the Value of Secured Claims, and (G) Modifying the Automatic Stay* (the "EFIH First Lien DIP Motion"), and, specifically, in support of the interim relief sought in part (I) of that motion, which seeks an Order (A) approving certain commitment fees related to postpetition financing and granting such fees administrative expense priority and (B) scheduling a final hearing, at which time the other relief sought in the Motion would be considered and ruled upon.[2]

2.      Except where specifically noted, the statements in this Declaration are based on either my personal knowledge, information supplied or verified by the Evercore financial team that I supervise or the EFIH Debtors' personnel and third-party advisors, my review of relevant documents, or my opinion based upon my experience and knowledge of the EFIH Debtors' operations and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this Declaration on behalf of the EFIH Debtors.

3.      With respect to the relief sought by the Debtors today in the form of the Interim Order approving certain fees related to postpetition financing and granting such fees administrative expense priority and scheduling a final hearing, I submit this declaration to place before this Court evidence supporting my opinion, to a reasonable degree of expert certainty, that (1) the DIP Lenders' DIP proposal is in the best interests of the EFIH Debtors' estates and

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the EFIH First Lien DIP Motion.

creditors and was the product of an arm's-length negotiation and is the best available DIP financing for the EFIH Debtors; and (2) approval of the fees related to postpetition financing and authorization of those fees on an interim basis and of granting such fees administrative expense priority is also in the best interests of the EFIH Debtors because: (i) the fees are reasonable under the circumstances; and (ii) the authorization of these fees will allow the Debtors to lock in and hold open this extremely favorable financing while they continue to work to build consensus for and participation in the the EFIH Makewhole Settlements and ultimately refinance the Prepetition EFIH First Lien Creditors at much lower interest rates, thereby saving the EFIH Debtors' estates significant expense.

## Qualifications

4.    Evercore is one of the world's leading independent investment banking groups, with more than 20 offices in more than 8 countries, including an office located at 55 East 52nd Street, New York, NY 10055.    Evercore has expertise in domestic and cross-border restructurings, mergers and acquisitions, and other financial advisory services.    Evercore has served as an experienced bankruptcy and restructuring advisor to debtors, bondholders, creditors' committees, single creditor classes and secured creditors in a variety of industries.    Evercore is a member of the Financial Industry Regulatory Authority and the Securities Investor Protection Corporation.

5.    I am a Senior Managing Director at Evercore, and specialize in advising both debtors and creditors in financial restructurings and distressed mergers and acquisitions; raising capital for troubled businesses; and representing debtors and creditor constituencies in bankruptcy proceedings.    Moreover, I have raised capital in many in-court and out-of-court financings, and have extensive experience in procuring, structuring, and negotiating debtor in possession financing.

3

6.     Before joining Evercore, I was a Managing Director of Lazard Frères & Co. LLC ("Lazard"), where I specialized in corporate reorganizations and bankruptcy.  Prior to joining Lazard in 2002, I served in several investment banking positions at Thomas Weisel Partners and its predecessor firm, Montgomery Securities.  I began my career as an attorney at Morgan, Lewis & Bockius, where I specialized in securities law and mergers and acquisitions.  I have over 18 years of experience in a broad range of corporate finance activities, including restructurings, mergers and acquisitions, and debt and equity financings.  I received my B.A. from Cornell University in 1992 and my J.D. from New York University School of Law in 1995.

### The Interim Relief Sought By the Debtors is In the Debtors' Best Interests

7.     The Debtors have sought Interim Relief, through the EFIH First Lien DIP Motion, of the approval of certain "Interim Fees" associated with the EFIH First Lien DIP facility, including: the DIP Facility Fee (as defined in the EFIH First Lien DIP Fee Letter), the Ticking Fee (as defined in the EFIH First Lien DIP Fee Letter), and the reimbursement of reasonable and documented expenses of the Commitment Parties (as defined in the EFIH First Lien DIP Commitment Letter, including fees and charges and disbursement of counsel).[3]  Although the Debtors are seeking approval for the payment of these amounts on an Interim Basis, as the EFIH First Lien DIP Motion and Proposed Interim Fee Order make clear, the EFIH Debtors **will not pay** any amounts authorized under this Order until the earlier of the entry of the Final Order or the entry of a separate order authorizing the EFIH Debtors to use cash collateral.

8.     As described in more detail in the First Day Declaration of Paul Keglevic, the Debtors currently have $3.985 billion of first lien notes outstanding, (the "EFIH First Lien

---

[3]   As is usual and customary with respect to debtor in possession financing facilities, the EFIH Debtors have filed the EFIH First Lien Fee Letter under seal pursuant to the *Motion Authorizing Energy Future Intermediate Holding Company LLC and EFIH Finance, Inc. to File Under Seal Certain Fee Letters Related to Proposed Debtor-in-Possession Financing*, filed contemporaneously herewith.

Notes"), of which $3.482 billion carries a 10.00% interest rate, and the remaining $503 million principal amount has a 6.875% interest rate.  The EFIH First Lien DIP facility provides $5.4 billion in funding to the Debtors at an indicated interest rate of LIBOR plus 325 with a 1% LIBOR floor (*i.e.*, presently 4.25%), which will allow the Debtors to refinance the high-interest EFIH First Lien Notes at much lower costs, resulting in substantial savings to the Debtors of approximately $13 million *per month* during the course of these chapter 11 cases.

9.    The relief requested pursuant to the Final Order will maximize the value of the EFIH Debtors' estates, and the relief requested in the Interim Order will allow the Debtors to satisfy the conditions specified in the EFIH First Lien DIP Commitment Letter in order to lock in this highly-favorable financing, in order to facilitate the maximization of value for the Debtors that will occur through the relief requested in the Final Order.

10.    Most directly, the EFIH First Lien Refinancing will reduce the EFIH Debtors' interest expense by an estimated $13 million *per month* during the course of these chapter 11 cases.  This result and objective alone would serve as adequate reason to pursue the EFIH First Lien DIP facility, and refinancing that high-interest rate debt described above would be a fundamental objective of any restructuring efforts at EFIH, regardless of the details or structure of any other settlement components.

### The EFIH First Lien DIP Financing Was Negotiated at Arm's Length, and Through A Competitive Process

11.    The EFIH Debtors' decision to proceed with the EFIH First Lien DIP Financing comes after a thorough search for the best available financing alternatives.  I, along with my colleagues at Evercore and the EFIH Debtors' personnel, participated directly in the search for and evaluation of the EFIH First Lien DIP Financing.

12.    In January 2014, the EFIH Debtors and Evercore initiated a request for proposals (the "RFP") with respect to the EFIH First Lien DIP Financing. During the initial stage of the RFP process, the EFIH Debtors approached seven large financial institutions with active involvement in the debtor-in-possession and syndicated finance markets that had executed non-disclosure agreements. The EFIH Debtors explained their goals and potential DIP financing structures to the participating banks, and invited those banks to submit term sheets that reflected pricing and structuring possibilities. From February 3 through February 7, the EFIH Debtors and Evercore hosted calls to discuss the RFP with each of the participating banks.

13.    Between February 7 and 11, six of the seven participating banks that received RFPs submitted proposals. The proposals varied significantly with respect to, among other things, key economic terms, the size of the DIP facility, whether there would be "last in/first out" participants or other junior components, and whether and on what terms the EFIH Debtors would be permitted to obtain additional junior financing. The EFIH Debtors and their advisors evaluated the proposals and, in certain instances, posed follow-up questions to the participating banks in advance of in-person meetings on February 10 and 11. About a week after those in-person meetings, the EFIH Debtors submitted a revised RFP to the six participating banks that reflected the EFIH Debtors' preferred structure for the EFIH First Lien DIP Financing. The EFIH Debtors continued their discussions with the participating banks on February 19 and 20 and distributed a term sheet to the participating banks on February 21.

14.    From February 26 through March 2, the EFIH Debtors selected lead bank roles and invited all of the participating banks to participate in the EFIH First Lien DIP Financing (subject to final negotiations). On March 4, the EFIH Debtors distributed a draft commitment letter and fee letter to lead banks. Throughout March and April, the EFIH Debtors continued

negotiations with the lead banks, focusing on a variety of issues, including fee structures and structuring the EFIH First Lien DIP Financing to provide for the EFIH First Lien Settlement and EFIH Second Lien Settlement, and drafted definitive documents. Finally, on April 28, 2014, the EFIH Debtors and arranging banks executed commitment papers.

15.    The EFIH Debtors did receive one proposal for a junior financing that would have satisfied some liquidity needs associated with restructuring expenses, rather than providing financing for both liquidity and a refinancing. That proposal provided insufficient incremental liquidity to satisfy the EFIH Debtors' restructuring expenses, however, and it provided no clear path to execute the EFIH First Lien Refinancing.

### The EFIH First Lien DIP Financing Is the Best Available Financing Under the Circumstance

16.    The interest rates, fees, covenants, and terms, including the events of default, taken as a whole, reflect the most favorable terms available in the market and are consistent with the terms of DIP financing approved in other large chapter 11 cases. The EFIH First Lien DIP facility is particularly favorable to the Debtors under the circumstances because it is extremely flexible, insofar as it allows the Debtors to scale back the committed banks' portion (and associated fees) of the EFIH First Lien DIP Financing to the extent additional prepetition first lien holders opt into the Settlements.

17.    The EFIH Debtors' discussions with various potential sources of EFIH First Lien DIP Financing revealed that such financing on a junior or unsecured basis was not available to the EFIH Debtors on terms that were competitive with the EFIH First Lien DIP Financing. Specifically, EFIH's significant secured debt obligations and lack of material unencumbered assets precludes the EFIH Debtors from obtaining postpetition financing in the amount they require on terms other than on a secured and superpriority basis.

18.     Ultimately, the EFIH Debtors determined, in consultation with myself and others at Evercore, as well as their other professional advisors, that the EFIH First Lien DIP Financing is the best source of financing at this time. The EFIH Debtors and the EFIH First Lien DIP Lenders negotiated the EFIH First Lien DIP Financing at arm's length, on terms that are reasonable.

### The EFIH DIP Financing Provides All the Liquidity Necessary to Fund the Debtors' Restructuring

19.     In conjunction with the EFIH Debtors' access to EFIH Cash Collateral (which, for the avoidance of doubt, will not occur until the entry of the Final Order), the EFIH First Lien DIP Financing will provide the EFIH Debtors with the liquidity necessary to fund the EFIH Debtors' restructuring-related expenses, satisfy their corporate obligations, and execute the EFIH First Lien Refinancing and the EFIH Secured Settlements. The EFIH Debtors, with the assistance of their financial advisors and other advisors, developed an initial budget for these chapter 11 cases, attached to the EFIH First Lien DIP Motion as **Exhibit C** (the "EFIH DIP Budget"). As of the Petition Date, the EFIH Debtors have approximately $119 million of EFIH Cash Collateral.

20.     The EFIH DIP Budget incorporates a number of factors, including the effect of the chapter 11 filing, material cash disbursements, and expected dividends from Oncor. None of those amounts, however, are needed in the first 30 days of the case. As a result, the EFIH Debtors are not seeking interim financing or use of EFIH Cash Collateral pursuant to the Interim Fee Order.

**The EFIH First Lien DIP Financing Has Served as A Foundational Building Block for the EFIH First Lien and Second Lien Settlements To Date, And Ensuring Its Continued Availability Is Vital to Achieving Increased Participaton In Those Settlements**

21.    As discussed in more detail in the Settlement Motion, which will be filed shortly after the Petition Date, negotiations regarding the EFIH First Lien Settlement and EFIH Second Lien Settlement began to crystalize in mid-March 2014.  The committed banks' flexibility and willingness to reduce their commitment without paying the full commitment fee to allow other parties to opt into the financing, provided an additional means by which the Debtors can provide value to those who might be willing to settle makewhole or other claims.

22.    Given the current status of commitments to the EFIH First and Second Lien Settlements, and the role that the availability and structure of the EFIH First Lien DIP Financing has played in arriving at that level of participation and consensus about those settlements to date, approval of the Interim Fees associated with the EFIH First Lien DIP Financing will be crucial to maintaining this foundational element of the EFIH First and Second Lien Settlements, and to continuing to attract participation from the remaining EFIH First Lien noteholders in those settlements.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my knowledge and belief.

Dated: April 29, 2014

Stephen Goldstein
Senior Managing Director
Evercore Group LLC

## EXHIBIT C

**EFIH DIP Budget**

ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC ("EFIH")

13-Week Budget

$ in millions

Week Ending
Months in Bankruptcy

**Unlevered Free Cash Flow**
EBITDA
Gross/(Decline) (REV)
Other Cash Flow Items
Refund/(Pmt) Tax Payments
Unlevered Free Cash Flow

**Cap Ex Adjustments**
Debt Issuance and Accrual Interest Reimbursement
Adequate Protection Interest
Professional Fees / Other
EFIH Facility Financing
EFIH Facility Interest
Total Cap Ex Adjustments
Levered Free Cash Flow

Beginning Cash Balance
Levered Free Cash Flow
Ending Cash Balance

Notes:

Draft - Subject to Change and Material Revision
Highly Confidential - Subject to Terms of Protective/Disclosure Agreement. Subject to FRE 408

## EXHIBIT D

**EFIH First Lien DIP Commitment Letter**

| DEUTSCHE BANK SECURITIES INC. DEUTSCHE BANK AG NEW YORK BRANCH 60 Wall Street New York, NY 10005 | CITIGROUP GLOBAL MARKETS INC. 388 Greenwich Street New York, NY 10013 | MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED BANK OF AMERICA, N.A. 214 North Tryon Street Charlotte, NC 28255 | MORGAN STANLEY SENIOR FUNDING, INC. 1585 Broadway New York, NY 10036 |
| --- | --- | --- | --- |
| BARCLAYS 745 Seventh Avenue New York, NY 10019 | ROYAL BANK OF CANADA 200 Vesey Street New York, NY 10281 | UNION BANK, N.A. 445 S. Figueroa St., 15th Floor Los Angeles, CA 90071 | |

April 28, 2014

Energy Future Intermediate Holding Company LLC
1601 Bryan St.
Dallas, Texas 75201

Attn:    Anthony R. Horton
         Senior Vice President
         and Treasurer

Commitment Letter

Ladies and Gentlemen:

You have advised each of Deutsche Bank Securities Inc. ("**DBSI**"), Deutsche Bank AG New York Branch ("**DBNY**"), Citi (as defined below), Bank of America, N.A. ("**Bank of America**"), MLPFS (as defined below), Morgan Stanley (as defined below), Barclays Bank PLC ("**Barclays**"), RBC Capital Markets[1] ("**RBCCM**"), Royal Bank of Canada ("**Royal Bank**"), Union Bank, N.A. ("**Union Bank**"), Loop Capital Markets, LLC ("**Loop Capital**") and The Williams Capital Group, L.P. ("**Williams Capital**" and, together with DBSI, DBNY, Citi, Bank of America, MLPFS, Morgan Stanley, Barclays, RBCCM, Royal Bank, Union Bank and Loop Capital, the "**Commitment Parties**", "**us**" or "**we**" and, each a "**Commitment Party**") that Energy Future Intermediate Holding Company LLC, a Delaware limited liability company ("**you**" or the "**Company**"), together with your subsidiaries identified as "**Debtors**" on the Term Sheet attached as **Exhibit A** hereto (together with the annexes thereto, the "**Term Sheet**" and, together with this letter, collectively, the "**Commitment Letter**"), are considering filing voluntary petitions under Chapter 11 of the United States Code (the "**Bankruptcy Code**").

---

[1]    RBC Capital Markets is a brand name for the capital markets businesses of Royal Bank of Canada and its affiliates.

Capitalized terms used but not defined herein are used with the meanings assigned to them in the Term Sheet. As used herein, the term "**Transactions**" means, collectively, the negotiation, entering into and funding of the DIP Facility, and all other related transactions, including the payment of reasonable and documented fees and expenses in connection therewith. The date on which the initial funding under the DIP Facility occurs is referred to as the "**Closing Date**", and the date on which you file a voluntary petition under chapter 11 of the Bankruptcy Code is referred to as the "**Petition Date**".

For purposes of this Commitment Letter, "**Citi**" shall mean Citigroup Global Markets Inc., Citibank, N.A., Citicorp USA, Inc., Citicorp North America, Inc. and/or any of their affiliates as Citi shall determine to be appropriate to provide the services contemplated herein; "**MLPFS**" shall mean Merrill Lynch, Pierce, Fenner & Smith Incorporated and/or any of its affiliates as MLPFS shall determine to be appropriate to provide the services contemplated herein; "**Morgan Stanley**" shall mean Morgan Stanley Senior Funding, Inc. and/or any of its affiliates as Morgan Stanley shall determine to be appropriate to provide the services contemplated herein; and "**Initial Lenders**" shall mean DBNY, Citi, Bank of America, Morgan Stanley, Barclays, Royal Bank, Union Bank, Loop Capital and Williams Capital.

1.  Commitments

In connection with the Transactions, each Initial Lender hereby severally commits to provide to the Company its respective percentages of the DIP Facility as set forth in the Fee Letter referred to below upon the terms and conditions set forth in this Commitment Letter. Subject to the proceeding sentence, the commitments of the Initial Lenders will be reduced (the "**Reduction**") ratably by (x) an amount equal to the product of (1) the aggregate principal amount of the EFIH First Lien Secured Notes held by a holder thereof that is or becomes a party to (A) the exchange agreement or document related to a tender offer for the EFIH First Lien Secured Notes or (B) the restructuring support agreement or similar arrangement in respect of exchanging or rolling such outstanding amounts for Term Loans multiplied by (2) the applicable exchange rate as set forth in such document, in each case solely to the extent such exchange or similar arrangement is a binding enforceable and irrevocable obligation of all parties thereto (each, a "**First Lien Exchange Arrangement**"), (y) the aggregate principal amount (up to $500 million) of the EFIH Second Lien Secured Notes held by a holder thereof that is or becomes a party to the restructuring support agreement or similar arrangement in respect of exchanging or rolling such outstanding amounts for Term Loans multiplied by (2) the applicable exchange rate as set forth in such document, solely to the extent such exchange or similar arrangement is a binding enforceable and irrevocable obligation of all parties thereto (the "**Second Lien Exchange Arrangement**"; together with the First Lien Exchange Arrangements, the "**Exchange Arrangements**") and (z) the aggregate principal amount of the backstop commitment in respect of the DIP Facility provided by holders of the prepetition indebtedness of EFIH, solely to the extent such backstop commitment is a binding and irrevocable commitment, in favor of the Company (the "**Backstop Commitment**") (provided that the Debtors shall determine the aggregate principal amount of the Backstop Commitment at or within two (2) business days of your execution of this Commitment Letter and shall notify (which notification can be through e-mail) the Initial Lenders of such principal amount no later than the close of business on such 2nd business day). For the avoidance of doubt and notwithstanding anything the contrary contained herein, the Fee Letter or Term Sheet, (x) the Reduction shall not be effective unless and until you provide written notice (which notification can be through e-mail) to the Initial Lenders of the amount of the Reduction (it being understood that in no event shall the aggregate principal amount of the DIP Facility exceed $5.4 billion) and (y) the commitments of the Initial Lenders shall be reduced by the amounts specified in clauses (x) through (z) in the immediately preceding sentence prior to any reduction of the Backstop Commitment. Notwithstanding anything to the contrary contained herein, in the Term Sheet, or in the Fee Letter, (i) the exchange rate for exchanging (or otherwise rolling such indebtedness into the Obligations) any such prepetition indebtedness into Term Loans shall be in the sole discretion of the Borrower, (ii) the Borrower shall be entitled to allocate and give fees (including in the form of OID solely to the extent related to the

exchange rate and the Upfront OID (as defined in the Fee Letter)) to any such person in its sole discretion (and the allocation of such fees shall not constitute a breach hereunder), and (iii) neither the Agent, the Joint Lead Arrangers nor the Co-Managers shall have any right to consent to the participants (or their allocations) in any Exchange Arrangement or Backstop Commitment.

2.  Titles and Roles

It is agreed that (i) DBSI, Citi, MLPFS, Morgan Stanley, Barclays, Union Bank, and RBCCM will act as joint lead arrangers and joint bookrunners (collectively in such capacities, the "<u>Joint Lead Arrangers</u>" and, each a "<u>Joint Lead Arranger</u>"), (ii) Loop Capital and Williams Capital will act as co-managers (collectively in such capacities, the "<u>Co-Managers</u>" and each a "<u>Co-Manager</u>") and (iii) DBNY will act as the Administrative Agent and Collateral Agent for the DIP Facility.

It is further agreed that in connection with the Confidential Information Memorandum (as defined below) and any other marketing materials relating to the Term Facility, DBSI will have primary authority for managing the syndication of the Term Facility (the "<u>Left Lead DIP Facility Arranger</u>") and will appear with the other Joint Lead Arrangers appearing in order consistent with the letterhead of this Commitment Letter. You agree that no other agents, co-agents, arrangers, co-arrangers, bookrunners, co-bookrunners, managers or co-managers will be appointed, no other titles will be awarded and no compensation (other than that expressly contemplated by the Term Sheet and Fee Letter referred to below) will be paid to any such other person to obtain the initial Term Commitment of such person, unless you and DBNY, Citi, Bank of America, MLPFS, and Morgan Stanley (collectively, the "<u>Consenting Arrangers</u>") shall so reasonably agree (it being understood and agreed that no such other agent, co-agent, arranger, co-arranger, bookrunner, co-bookrunner, manager or co-manager shall be entitled to greater economics in respect of obtaining the initial Term Commitment of such person for the DIP Facility than (a) in the aggregate, the Commitment Parties or (b) individually, any of the Consenting Arrangers). Notwithstanding anything to the contrary herein or in the Term Sheet, on or prior to the earlier of the date which is ten (10) business days after the date of this Commitment Letter, you may appoint up to three (3) additional agents, co-agents, joint lead arrangers or joint bookrunners or confer other titles in respect of any of the DIP Facility, in a manner and with economics determined by you in consultation with the Joint Lead Arrangers (it being understood that, to the extent you appoint additional agents, co-agents, joint lead arrangers or joint bookrunners or confer other titles in respect of the DIP Facility, no such additional agent, co-agent, joint lead arranger or joint bookrunner shall be entitled to greater economics in respect of the DIP Facility than (a) in the aggregate, the Commitment Parties or (b) individually, any of the Consenting Arrangers, in each case party hereto on the date hereof. Such additional agents shall assume a portion of the commitments under each of the Revolver Facility and the Term Facility that is equal to the proportion of the DIP Facility Fee (as defined in the Fee Letter) allocated to such additional agent and the commitments of each Commitment Party in respect of the Term Facility will be reduced ratably by the amount of the commitments of such appointed entities upon the execution by such financial institutions of customary joinder documentation and, thereafter, each such financial institution shall constitute a "<u>Commitment Party</u>" hereunder) (the "<u>Designation Rights</u>").

3.  Syndication

The Joint Lead Arrangers intend to syndicate the DIP Facility to a group of lenders identified by us in consultation with you (together with the Commitment Parties, the "<u>Lenders</u>") and reasonably acceptable to us and to you (such acceptance not to be unreasonably withheld, conditioned or delayed); <u>provided</u> that it is understood that the Joint Lead Arrangers will not syndicate to (a) any company engaged principally in the business of energy or power generation and/or transmission, as identified in writing to the Joint Lead Arrangers by the Company at or prior to the execution and delivery of this Commitment Letter by us on the date hereof, (b) any company whose principal business is that of an

energy or power merchant, as identified in writing to the Joint Lead Arrangers by the Company on or prior to the date hereof, or (c) any person identified in writing to the Joint Lead Arrangers by the Company on or prior to the date hereof (including any such person's affiliates that are clearly identifiable on the basis of such affiliates' names) ("**Disqualified Institutions**"); provided further that notwithstanding anything to the contrary contained herein or in the Term Sheet, and except as set forth above with respect to Designation Rights or as otherwise agreed to in writing by you and us, (i) each Joint Lead Arranger shall retain exclusive control over all rights and obligations with respect to its commitments under the DIP Facility, including all rights with respect to consents, modifications and amendments of the definitive loan documents, until the earlier to occur of a (x) Successful Syndication (as defined in the Fee Letter) and (y) the day the Final Order is entered (the "**Final Order Entry Date**"), and (ii) any assignment or participation by a Commitment Party of its commitment prior to the applicable Commitment Release Date shall not reduce such Commitment Party's obligation to make available the DIP Facility pursuant to its commitments as set forth in this Commitment Letter in the event an assignee shall fail to do so prior to the applicable Commitment Release Date (and with respect to any participant, at any time if it fails to do so). The Commitment Parties intend to commence syndication efforts promptly after the Petition Date (and only after the Petition Date) and you agree, following the Petition Date (except with respect to clause (C) below), to use your commercially reasonable efforts to assist the Commitment Parties in completing a syndication reasonably satisfactory to the Commitment Parties and to you until the earlier of (x) the Final Order Entry Date and (y) the day on which a Successful Syndication has occurred (such earlier date, the "**Successful Syndication Date**"). Such commercially reasonable efforts to assist shall include (A) your using commercially reasonable efforts to ensure that the syndication efforts benefit from your and your subsidiaries' existing banking relationships, (B) your using commercially reasonable efforts to cause direct contact between your senior management and advisors and the proposed Lenders at mutually agreed times, (C) your preparing and providing (prior to the Petition Date if reasonably requested by the Joint Lead Arrangers) to the Commitment Parties all customary information with respect to you and the other Debtors, including all financial information and Projections (as defined below), as the Commitment Parties may reasonably request in connection with the arrangement and syndication of the DIP Facility and your assistance in the preparation of one or more customary confidential information memoranda (each, a "**Confidential Information Memorandum**") and other marketing materials to be used in connection with the syndication (all such information, memoranda and materials, "**Information Materials**"), (D) the hosting, with the Commitment Parties, of one or more meetings of prospective Lenders at reasonable times and locations to be mutually agreed, and (E) your using commercially reasonable efforts to obtain as soon as reasonably practicable after the Petition Date a rating for the Term Facility from Moody's Investors Services, Inc. and Standard & Poor's Financial Services LLC. For the avoidance of doubt, it is agreed that neither the commencement nor completion of the syndication of any of the DIP Facility, including the occurrence of any Successful Syndication, nor the commencement of any ratings process (nor the achievement of any specific rating), nor the compliance with any of the provisions of this Commitment Letter (other than Section 6), is or will be a condition to our commitments, or to the availability or the funding of the DIP Facility on the Closing Date. For the avoidance of doubt, you will not be required to provide any information to the extent that the provision thereof would violate any attorney-client privilege (as reasonably determined by your counsel), law, rule or regulation, or any obligation of confidentiality binding on you, the other Debtors or your or their respective affiliates (provided that (x) you shall notify us if any such information is being withheld and (y) you shall use your commercially reasonable efforts to obtain a consent to disclosure to us of any such information being withheld as a result of any obligation of confidentiality (other than, for purposes of this clause (y), any such information being withheld as a result of attorney-client privilege)).

Subject to the foregoing (including your Designation Rights), the Commitment Parties will manage, in consultation with you, all aspects of the syndication of the Term Facility, including decisions as to the selection of institutions to be approached and when they will be approached (which shall be reasonably acceptable to you), when commitments will be accepted, which institutions will participate,

4

the allocation of the commitments among the Lenders and the amount (subject to the limitations on fees set forth in this Commitment Letter and the Fee Letter) and distribution of fees among the Lenders. You hereby acknowledge and agree that the Commitment Parties will not be subject to any fiduciary or other implied duties.

At the request of the Commitment Parties, you agree to assist in the preparation of a public version of each Confidential Information Memorandum or other Information Material (a "**Public Version**"); provided, however, that a Public Version may only be used after the Petition Date, consisting exclusively of information with respect to you and your affiliates that is either publicly available or does not contain material non-public information (within the meaning of United States federal securities laws) with respect to you and your subsidiaries, or any of your or their respective securities for purposes of United States federal and state securities laws (such information, "**Non-MNPI**", and any information that is not Non-MNPI is referred to as "**MNPI**"). Such Public Versions, together with any other information prepared by you or your subsidiaries or your representatives and conspicuously marked "**Public**" (collectively, the "**Public Information**"), which at a minimum means that the word "**Public**" will appear prominently on the first page of any such information, may be distributed by us to (only after the Petition Date) prospective Lenders who have advised us that they wish to receive only Non-MNPI ("**Public Side Lenders**"), and you shall be deemed to have authorized the Public Side Lenders to treat such Public Versions and such marked information as containing Non-MNPI. You agree that, unless expressly identified as Public Information, each document to be disseminated by us (or any other agent) to any Lender in connection with the DIP Facility will be deemed to contain MNPI. Notwithstanding the foregoing, you acknowledge and agree that, in addition to Public Information and unless you promptly notify us otherwise after being provided a reasonable amount of time to review such documentation provided by us, (a) the final definitive documentation with respect to the DIP Facility (excluding specified schedules thereto), (b) administrative materials prepared by the Commitment Parties for prospective Lenders (such as a lender meeting invitation, allocations and funding and closing memoranda), (c) the Interim Order and the Final Order, and (d) notifications of changes in the terms of the DIP Facility may be distributed to Public Side Lenders, in each case, only after the Petition Date.

In connection with our distribution to prospective Lenders of any Confidential Information Memorandum, you will execute and deliver to us (only after the Petition Date) a customary authorization letter authorizing such distribution and, in the case of any Public Version thereof, representing that it contains only Non-MNPI. Each Confidential Information Memorandum will be accompanied by a disclaimer exculpating you and us (in each case, including our respective affiliates) with respect to any use thereof and any use of related Information Materials by the recipients thereof.

4.  Information

You hereby represent and warrant that (a) all written information concerning or affecting you or any of your subsidiaries or the Transactions (including all Information Materials), other than the Projections (including estimates included in the Projections), forward looking information and information of a general economic or industry specific nature (the "**Information**"), that has been or will be made available to us by you or any of your representatives in connection with the Transactions contemplated hereby, when taken as a whole, does not or will not, when furnished to us, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (after giving effect to all supplements and updates thereto) and (b) the financial and/or business projections and other forward-looking information (the "**Projections**") that have been or will be made available to us by you or any of your representatives in connection with the Transactions contemplated hereby have been or will be prepared in good faith based upon assumptions believed by you to be reasonable at the time delivered (it being recognized by each Commitment Party that such

Projections are as to future events and are not to be viewed as facts, are subject to significant uncertainties and contingencies, many of which are beyond your control, that no assurances are given that any particular Projections will be realized, that such Projections are not to be viewed as facts and that actual results during the period or periods covered by any such Projections may differ from the projected results, and that such differences may be material). You agree that if, at any time prior to the Petition Date and thereafter until the Successful Syndication Date, you become aware that any of the representations in the preceding sentence is incorrect in any material respect then you will promptly supplement the Information and the Projections so that such representations and warranties, as supplemented, are correct in all material respects under those circumstances. You understand that in arranging and syndicating the DIP Facility we may use and rely on the Information and Projections without independent verification thereof. Notwithstanding anything to the contrary in this Commitment Letter or the Term Sheet, except to the extent requested by the Joint Lead Arrangers in connection with the syndication of the DIP Facility (which, for the avoidance of doubt, shall not be a condition to our commitments, or to the availability or the funding of the DIP Facility on the Closing Date), you will not be obligated to supplement such Information or the Projections to reflect changes in commodity prices, market heat rates, interest rates, regulatory issues of general applicability, general market conditions or similar assumptions relating to, or impacting, the Debtors' businesses.

5.  Fees

    As consideration for the commitments and agreements of the Commitment Parties hereunder, you agree to pay or cause to be paid the nonrefundable fees described in the fee letter dated the date hereof and delivered herewith (as amended, modified or supplemented, the "**Fee Letter**") on the terms and subject to the express conditions set forth therein, it being understood that, to the extent any such payments are to be made after the commencement of the Cases, such payments will also be subject to the entry of the Interim Fee Order and the Final Order authorizing the Debtors to perform their obligations under this Commitment Letter and the Fee Letter and to pay the fees and expenses set forth or referred to herein.

6.  Conditions

    Each Commitment Party's commitments and agreements hereunder are subject only to the conditions expressly set forth in the Term Sheet under the heading "**Conditions to Full Availability**" (with respect to the obligation of the Lenders to make the Loans on the Closing Date under the DIP Facility up to the full amount of the Commitments).

7.  Clear Market

    You agree that until the Clear Market End Date (as defined below), neither you nor the other Debtors set forth in **Annex 1** to the Term Sheet will undertake any competing offering, placement, arrangement or syndication of any debt securities or bank financing (including the DIP Facility by or on behalf of you or the other Debtors, but other than capital leases in the ordinary course of business and other ordinary course of business short-term financings and/or hedges (including any commodity hedges) and other indebtedness or arrangement set forth on **Schedule 1** hereto) without the prior written consent of each Consenting Arranger if such financing would have, in the reasonable judgment of the Consenting Arrangers, a materially detrimental effect upon the primary syndication of the DIP Facility. You further agree to use commercially reasonable efforts to prevent any of the holders of your prepetition indebtedness which are party to a Backstop Commitment to, prior to the Clear Market End Date, syndicate any portion of its commitment under the DIP Facility. For purposes hereof, "**Clear Market End Date**" shall mean the earlier of (x) the Successful Syndication Date and (y) the 25th day following the end of the 'early' election period (such end date being the 10th business day following the

commencement of the exchange offer as such date may be extended in accordance with the terms of the exchange offer) given to the holders of the EFIH First Lien Secured Notes (as defined in the Term Sheet) to exchange, pursuant to an Exchange Arrangement, their EFIH First Lien Secured Notes for loans under the DIP Facility. Without limiting your obligations to assist with syndication efforts as set forth in this Commitment Letter, the Commitment Parties further agree that each Commitment Party shall not be released from its commitment hereunder in connection with such syndication to any lender until such lender shall have entered into the applicable DIP Facility definitive documentation and funded the portion of the applicable DIP Facility required to be funded by it on the applicable Commitment Release Date, and each Commitment Party hereby agrees that upon the terms and subject to the satisfaction or waiver of the conditions set forth in Section 6 of this Commitment Letter, it will execute definitive documentation and close and fund its portion of the DIP Facility, even if prior to the completion of a Successful Syndication of the DIP Facility.

8. Indemnification and Expenses

You agree (a) to indemnify and hold harmless each Commitment Party, its affiliates and controlling persons and its and their respective directors, officers, employees, partners, advisors, agents and other representatives (each, an "**indemnified person**") from and against any and all losses incurred, claims, damages, liabilities and expenses (in each case, other than any anticipated and unrealized profits) to which any such indemnified person may become subject arising out of, resulting from or in connection with this Commitment Letter, the Fee Letter, the DIP Facility, the use of the proceeds thereof or the Transactions or any claim, litigation, investigation or proceeding (a "**Proceeding**") relating to any of the foregoing, regardless of whether any indemnified person is a party thereto, whether or not such Proceedings are brought by you, your equity holders, affiliates, creditors or any other person, and to reimburse each indemnified person promptly following written demand for any reasonable legal or other out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing, provided that the foregoing indemnity will not, as to any indemnified person, apply to losses, claims, damages, liabilities or related expenses (x) to the extent they are found by a final non-appealable judgment of a court of competent jurisdiction to arise from the willful misconduct, bad faith or gross negligence of such indemnified person or its affiliates, directors, officers, employees, advisors, agents or other representatives (collectively, the "**Related Parties**"), (y) to the extent arising from any dispute solely among indemnified persons other than any claims against a Commitment Party in its capacity or in fulfilling its role as Agent or Joint Lead Arranger or any similar role under the DIP Facility and other than any claims arising out of any act or omission on the part of you or the other Debtors, and (z) to the extent they are found by a final non-appealable judgment of a court of competent jurisdiction to arise from any material breach of this Commitment Letter by such indemnified person (or its Related Parties) and (b) to reimburse within 30 days of written demand (together with reasonably detailed supporting documentation) (or, if earlier, on the Closing Date to the extent invoiced prior thereto) each Commitment Party and its affiliates for all reasonable and documented out-of-pocket expenses that have been invoiced prior to such time or following termination or expiration of the commitments hereunder (including reasonable and documented out-of-pocket due diligence expenses, syndication expenses, travel expenses, reasonable fees and reasonable and documented out-of-pocket fees, charges and disbursements of one primary counsel (and (i) appropriate local counsel in applicable foreign and local jurisdictions, but limited to one local counsel in each such jurisdiction, (ii) appropriate regulatory counsel, and (iii) solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to the affected indemnified persons similarly situated)) incurred in connection with the DIP Facility, the Loan Documents, this Commitment Letter, the Term Sheet and the Fee Letter, or the administration, amendment, modification or waiver thereof. It is further agreed that each Commitment Party shall only have liability to you (as opposed to any other person) arising out of the Transactions. No indemnified person or party hereto shall be liable for any damages arising from the use by others of Information or other materials obtained through electronic, telecommunications or other information transmission

systems, except to the extent any such damages are found by a final non-appealable judgment of a court of competent jurisdiction to arise from the gross negligence, bad faith or willful misconduct of such person (or any of its Related Parties). None of the indemnified persons, you, your affiliates and the respective directors, officers, employees, advisors, and agents of the foregoing shall be liable for any indirect, special, punitive or consequential damages in connection with this Commitment Letter, the Fee Letter, the DIP Facility or the Transactions; provided that nothing in this sentence shall limit your indemnification and reimbursement obligations set forth herein to the extent any such indirect, special, punitive or consequential damages are included in any third party claim with respect to which the applicable indemnified person is entitled to indemnification or reimbursement pursuant to this Section.

9.   Sharing of Information, Absence of Fiduciary Relationship, Affiliate Activities

You acknowledge that each Commitment Party (or an affiliate thereof) is a full service securities firm and such person may from time to time effect transactions, for its own or its affiliates' account or the account of customers, and hold positions in loans, securities or options on loans or securities of you, or your affiliates (subject, in each case, to the terms and conditions of any other applicable agreements in effect between you and us (or our affiliates) applicable to the Transactions (including the various Non-Disclosure Agreements executed by you, certain of your affiliates and each of the Joint Lead Arrangers and/or affiliates thereof on or about June 2013, August 2013, September 2013, October 2013, January 2014, and February 2014 (the "**Non-Disclosure Agreements**"))), which other applicable agreements remain in full force and effect in accordance with their terms).

You also acknowledge that the Commitment Parties and their respective affiliates have no obligation to use in connection with the transactions contemplated hereby, or to furnish to you, confidential information obtained from other companies or persons.

You further acknowledge and agree that (a) no fiduciary, advisory or agency relationship between you and the Commitment Parties is intended to be or has been created in respect of any of the transactions contemplated by this Commitment Letter, irrespective of whether any Commitment Party has advised or is advising you on other matters, (b) the Commitment Parties, on the one hand, and you, on the other hand, have an arm's-length business relationship that does not directly or indirectly give rise to, nor do you rely on, any fiduciary duty to you or your affiliates on the part of any Commitment Party, (c) you are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated by this Commitment Letter, (d) you have been advised that each Commitment Party is engaged in a broad range of transactions that may involve interests that differ from your interests and that each Commitment Party has no obligation to disclose such interests and transactions to you (provided, however, that we will be subject to the provisions applicable to us set forth in the preceding paragraph), (e) you have consulted your own legal, accounting, regulatory and tax advisors to the extent you have deemed appropriate, (f) each Commitment Party has been, is and will be acting solely as a principal and, except as otherwise expressly agreed in writing by it and the relevant parties, has not been, is not and will not be acting as an advisor, agent or fiduciary for you, any of your affiliates or any other person or entity, and (g) the Commitment Parties have no obligation to you or your affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein or in any other express writing executed and delivered by a Commitment Party and you or any such affiliate.

In addition, please note that none of the Joint Lead Arrangers, the other Commitment Parties nor the Co-Managers provide accounting, tax or legal advice. Notwithstanding anything herein to the contrary, the Company (and each employee, representative or other agent of the Company) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the DIP Facility and all materials of any kind (including opinions or other tax analyses) that are provided to the

Company relating to such tax treatment and tax structure. However, any information relating to the tax treatment or tax structure will remain subject to the confidentiality provisions hereof (and the foregoing sentence will not apply) to the extent reasonably necessary to enable the parties hereto, their respective affiliates, and their respective affiliates' directors and employees to comply with applicable securities laws. For this purpose, "tax treatment" means U.S. federal or state income tax treatment, and "tax structure" is limited to any facts relevant to the U.S. federal income tax treatment of the transactions contemplated by this Commitment Letter, but does not include information relating to the identity of the parties hereto or any of their respective affiliates.

10. Confidentiality

This Commitment Letter is delivered to you on the understanding that neither this Commitment Letter nor the Fee Letter, nor the Term Sheet nor any of their terms or substance shall be disclosed by you, directly or indirectly, to any other person except (a) at your election, to your officers, directors, employees, affiliates, attorneys and accountants, on a confidential and "need to know" basis, (b) as may be required in (or necessary in connection with) any legal, judicial or administrative proceeding (including, without limitation, as may be required to obtain court approval in connection with any acts or obligations to be taken pursuant to this Commitment Letter or the transactions contemplated hereby (in which case you agree to inform each of us in writing promptly thereof) and further that you may disclose this Commitment Letter, the Term Sheet and the Fee Letter to the official committee of unsecured creditors appointed in any of the Debtors' bankruptcy cases (collectively, the "**Creditors' Committee**") and its advisors and to any other official committee appointed in any of the Debtors' bankruptcy cases (together with the Creditors' Committee, the "**Committees**"), the advisors to the potential arranger for the lenders providing the Junior Incremental Term Facility and the advisors to any holder of prepetition indebtedness consented to by the Left Lead DIP Facility Arranger, so long as the disclosure of the Fee Letter to the Committees, any other official committee and their respective advisors, the advisors to the potential arranger for the lenders providing the Junior Incremental Term Facility and the advisors to any such holder of prepetition indebtedness is on a confidential "professionals only" basis), to the Office of the United States Trustee, and as otherwise required by applicable law or regulation or as requested by a governmental authority (in which case you agree, to the extent permitted by law, to inform each of us in writing promptly in advance thereof and it being understood and agreed that you shall take such reasonable actions as shall be necessary to prevent the Fee Letter from becoming publicly available (it being acknowledged such actions may not be successful)), (c) this Commitment Letter, the Term Sheet and the existence and contents hereof and thereof (but not the Fee Letter or the contents thereof other than the existence thereof and the contents thereof as part of projections, pro forma information and a generic disclosure of aggregate sources and uses to the extent customary in marketing materials and other required filings) may be disclosed in any syndication or other marketing material in connection with the DIP Facility or in connection with any public filing requirement, (d) the Term Sheet may be disclosed to potential Lenders and to any rating agency (provided that, as to rating agencies, we will disclose information acting only through you and with your prior agreement) in connection with the DIP Facility, and (e) in connection with any remedy or enforcement of any right under the Commitment Letter. Notwithstanding anything to the contrary in the foregoing, (i) you shall be permitted to file the Fee Letter with the Bankruptcy Court under seal and provide an unredacted copy of the Fee Letter to the Bankruptcy Court, the Office of the United States Trustee and the advisors to the Committees so long as the disclosure to such advisors to the Committees is on a confidential "professionals only" basis and (ii) you may disclose (and you may file with the Bankruptcy Court) the fees and expenses payable under the Fee Letter on an aggregate basis with the other fees and expenses payable by you in connection with the Transactions (including legal, professional and advisory and other out of pocket fees and expenses).

Each Commitment Party shall use all confidential information received by it in connection with the Transactions and the related transactions solely for the purposes of providing the services that are the

subject of this Commitment Letter and shall treat confidentially all such information; provided, however, that nothing herein shall prevent a Commitment Party from disclosing any such information (a) to rating agencies (provided that as to rating agencies, we will disclose information acting only through you and with your prior agreement), (b) to any Lenders or participants or prospective Lenders or participants that agree in writing, for the benefit of the Company, to keep such information confidential on terms reasonably acceptable to the Company or substantially similar to the terms set forth herein (including pursuant to customary "click through" or similar electronic agreements), (c) in any legal, judicial, administrative proceeding or other compulsory process or as required by applicable law or regulations (in which case such Commitment Party shall promptly notify you, in advance, to the extent permitted by law), (d) upon the request or demand of any regulatory authority having jurisdiction over such Commitment Party or its affiliates, (e) to each Commitment Party's affiliates and each Commitment Party's and its affiliates' respective employees, officers, directors, legal counsel, independent auditors, professionals and other experts or agents (collectively, "**Representatives**") on a "need to know" basis (provided that any such Representative or affiliate, is advised of its obligation to retain such information as confidential, and each Commitment Party shall be responsible for its Representatives' and affiliates' compliance with this paragraph), in each such case solely in connection with the Transactions, (f) to the extent any such information becomes publicly available other than by reason of disclosure by such Commitment Party's affiliates or Representatives in breach of this Commitment Letter, and (g) to the extent such information is independently developed by a Commitment Party, its affiliates or its Representatives so long as not based on information obtained in a manner that would otherwise violate this provision; provided that the disclosure of any such information to any Lender or prospective Lender or participant or prospective participant referred to above shall be made subject to the acknowledgment and acceptance by such Lender or prospective Lender or participant or prospective participant that such information is being disseminated on a confidential basis in accordance with the standard syndication processes of each Commitment Party or customary market standards for dissemination of such type of information. Notwithstanding anything to the contrary in this Commitment Letter or the Term Sheet, under no circumstance will we or our affiliates disclose any confidential information to a Disqualified Institution (except pursuant to clause (c) above (to the extent required pursuant to such legal, judicial, administrative proceeding or other compulsory process or as required by applicable law or regulations) or clause (f) above). The obligations of each Commitment Party under this paragraph shall remain in effect until the earlier of (i) two years from the date hereof and (ii) the date the Loan Documents are entered into, at which point any confidentiality undertaking in the Loan Documents shall supersede the provisions of this paragraph.

11. Miscellaneous

This Commitment Letter shall not be assignable by you without the prior written consent of each Commitment Party (and any purported assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto and the indemnified persons and is not intended to and does not confer any benefits upon, or create any rights in favor of, any person other than the parties hereto and the indemnified persons to the extent expressly set forth herein. Each Commitment Party reserves the right to employ the services of its affiliates (other than certain units of affiliates (such units, "**Trading Affiliates**") providing any commodities, hedge or derivatives trading or brokerage activities conducted, advised, agented or brokered by us or our respective affiliates) in providing services contemplated hereby and to allocate, in whole or in part, to its affiliates (other than Trading Affiliates) certain fees payable to such Commitment Party in such manner as such Commitment Party and its affiliates (other than Trading Affiliates) may agree in its sole discretion. This Commitment Letter may not be amended or waived except by an instrument in writing signed by you and each Commitment Party. This Commitment Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Commitment Letter by facsimile or electronic transmission (e.g., "**pdf**" or "**tif**")

10

shall be effective as delivery of an original executed counterpart hereof. This Commitment Letter and the Fee Letter are the only agreements that have been entered into among us and you with respect to the DIP Facility and set forth the entire understanding of the parties with respect thereto. This Commitment Letter shall be governed by, and construed and interpreted in accordance with, the law of the State of New York. Each of the parties hereto agrees that (i) this Commitment Letter is a binding and enforceable agreement with respect to the subject matter herein, including an agreement to negotiate in good faith the Loan Documents by the parties hereto in a manner consistent with this Commitment Letter (it being understood that the funding of the DIP Facility is subject to the satisfaction (or waiver) of certain conditions, including the execution and delivery of the Loan Documents as provided in this Commitment Letter), (ii) the Fee Letter is a binding and enforceable agreement with respect to the subject matter contained therein and (iii) as of the date hereof, this Commitment Letter (including the Term Sheet), the Fee Letter, and the Non-Disclosure Agreements are the only agreements that have been entered into among you and us with respect to the DIP Facility and set forth the entire understanding of the parties with respect thereto.

You and we hereby irrevocably and unconditionally submit to the exclusive jurisdiction of the Bankruptcy Court or, if such court denies jurisdiction or the Company elects not to file cases under the Bankruptcy Code, then any state or Federal court sitting in the Southern District of New York over any suit, action or proceeding arising out of or relating to the Transactions or the other transactions contemplated hereby, this Commitment Letter or the Fee Letter or the performance of services hereunder or thereunder. You and we agree that service of any process, summons, notice or document by registered mail addressed to you or us shall be effective service of process for any suit, action or proceeding brought in any such court. You and we hereby irrevocably and unconditionally waive (to the extent permitted by applicable law) any objection to the laying of venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in any inconvenient forum. You and we hereby irrevocably agree to waive (to the extent permitted by applicable law) trial by jury in any suit, action, proceeding, claim or counterclaim brought by or on behalf of any party related to or arising out of the Transactions, this Commitment Letter or the Fee Letter or the performance of services hereunder or thereunder.

The Commitment Parties hereby notify you that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "**PATRIOT Act**"), we are required to obtain, verify and record information that identifies each Borrower and each Guarantor, which information includes names, addresses, tax identification numbers and other information that will allow such Lender to identify each Borrower and each Guarantor in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act and is effective for the Commitment Parties and each Lender.

The indemnification, fee, expense, jurisdiction, waiver of jury trial, service of process, venue, governing law, sharing of information, no agency or fiduciary duty and your confidentiality provisions contained herein and in the Fee Letter (including without limitation the "Flex" provisions of the Fee Letter) shall remain in full force and effect regardless of whether definitive financing documentation shall be executed and delivered and notwithstanding the termination of this Commitment Letter or the commitments hereunder; provided that your obligations under this Commitment Letter (other than your obligations with respect to (a) Sections 3, 4, 5 and 7 hereof and (b) confidentiality of the Commitment Letter and Fee Letter and the contents hereof and thereof subject to Section 10 hereof) shall automatically terminate and be superseded by the provisions of the Loan Documents upon the initial funding thereunder, and you shall automatically be released from all liability in connection therewith at such time, in each case to the extent the Loan Documents have comparable provisions with comparable coverage. You may terminate (on a pro rata basis among the Initial Lenders), all or any portion of, the Initial Lenders' commitments hereunder at any time subject to the provisions of the preceding sentence (it being understood that any such termination is permanent and, except in connection with any Reduction in

accordance with the provisions of Section 1 hereof, the DIP Facility shall be permanently reduced by the amount of any such terminated commitments).

If the foregoing correctly sets forth our agreement, please indicate your acceptance of the terms of this Commitment Letter and the Fee Letter by returning to us executed counterparts of this Commitment Letter and the Fee Letter not later than the earlier of (a) 9:00 a.m., New York City time, on April 29, 2014 and (b) the time of the filing by the Debtors of their petition or petitions under Chapter 11 of the Bankruptcy Code. This offer will automatically expire at such time if we have not received such executed counterparts in accordance with the preceding sentence. In addition, this Commitment Letter and the commitments hereunder shall expire (a) at 11:59 p.m. (New York City time) on August 28, 2014, unless the Petition Date has occurred prior to such time and (b) (x) at 11:59 p.m. (New York City time) on the date that is ten (10) business days after the Petition Date, unless, prior to that time, the Court shall have entered an order, in form and substance reasonably acceptable to the Consenting Arrangers, approving the payment of the DIP Facility Fee (as defined in the Fee Letter), the Ticking Fee (as defined in the Fee Letter) and to the extent provided for in this Commitment Letter, the reimbursement of the reasonable and documented expenses of the Commitment Parties (including fees and charges and disbursement of counsel) (such order, the "**Interim Fee Order**") and (y) if the Interim Fee Order has been entered by such time, at 11:59 p.m. (New York City time) on the date that is five (5) business days after the Final Order Entry Date, unless, prior to that time, the Closing Date shall have occurred.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK; SIGNATURE PAGES FOLLOW]

We are pleased to have been given the opportunity to assist you in connection with this important financing.

Very truly yours,

DEUTSCHE BANK SECURITIES INC.

By:
    Name:
    Title:

By:
    Name:
    Title:

DEUTSCHE BANK AG NEW YORK BRANCH

By:
    Name:
    Title:

By:
    Name:
    Title:

We are pleased to have been given the opportunity to assist you in connection with this important financing.

Very truly yours,

DEUTSCHE BANK SECURITIES INC.

By: _____
Name:
Title:

By: _____
Name:
Title:

DEUTSCHE BANK AG NEW YORK BRANCH

By: _____
Name:      KEVIN CHICHESTER
Title:           Director

By: _____
Name:
Title:     David J. Bell
           Managing Director

CITIGROUP GLOBAL MARKETS INC.

By: _____

Name:   Shapleigh B. Smith
Title:    Managing Director

MERRILL LYNCH, PIERCE, FENNER &
SMITH INCORPORATED

By: _____
    Name:  Gavin Wolfe
    Title:  Managing Director


BANK OF AMERICA, N.A.


By: _____
    Name:  John McCusker
    Title:  Managing Director

MORGAN STANLEY SENIOR FUNDING, INC.

By: _____

    Name: William Graham

    Title: Managing Director

BARCLAYS BANK PLC

By: _____
Name:
Title:

        Noam Azachi
        Vice President

ROYAL BANK OF CANADA

By: _____
    Name: Frank Lambrinos
    Title:  Authorized Signatory

UNION BANK, N.A.

By: _____

Name: Jeffrey Fesenmaier
Title: Director

LOOP CAPITAL MARKETS, LLC

By:

Name:  James Reynolds, Jr.
Title:  Chairman & CEO

**THE WILLIAMS CAPITAL GROUP, L.P.**

By: _____
 Name:  Christopher J. Williams
 Title:   Chairman and Chief Executive Officer

*Signature Page to Commitment Letter*
*(Energy Future Intermediate Holding Company LLC)*

Accepted and agreed to as of the date first written above:

**ENERGY FUTURE INTERMEDIATE
HOLDING COMPANY LLC**

By: _____

     Name:   Anthony R. Horton
     Title:    Senior Vice President and Treasurer