# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-_____ (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DECLARATION OF PAUL KEGLEVIC, EXECUTIVE VICE PRESIDENT, CHIEF FINANCIAL OFFICER, AND CO-CHIEF RESTRUCTURING OFFICER OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*, IN SUPPORT OF FIRST DAY MOTIONS

---

[1]    The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810.  The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201.  Due to the large number of debtors in these chapter 11 cases, for which the debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

# TABLE OF CONTENTS

**Page**

**Part I. EFH's Business Operations and Capital Structure** ......................................**10**
    A.  Overview of EFH's Corporate Structure. ...........................................10
    B.  EFH's Business Operations .............................................................12
        1.    TCEH ..................................................................................12
        2.    EFH Corp. and Certain EFH Corp. Subsidiaries .....................22
        3.    EFIH.....................................................................................26
        4.    Oncor....................................................................................26
        5.    EFH's Regulatory Environment ...........................................28
    C.  EFH's Capital Structure.................................................................30
        1.    TCEH Debtors .....................................................................30
        2.    EFH Corp. and EFIH ...........................................................37
        3.    Oncor....................................................................................43

**Part II. The Events Leading to the Chapter 11 Cases** ..................................**44**
    A.  History of EFH Corp.......................................................................44
    B.  The 2007 Acquisition.....................................................................45
    C.  EFH Following the 2007 Acquisition ..............................................46
        1.    Luminant Remains a Market Leader in All Aspects of Electricity
                Generation and Wholesale Operations....................................48
        2.    TXU Energy Remains a Market-Leading REP.........................50
        3.    Other Initiatives ..................................................................52
    D.  The Result of Low Natural Gas Prices on EFH's Financial Performance
       Following the 2007 Acquisition.......................................................52
        1.    The Texas Electricity Market and the Role of ERCOT .............53
        2.    The Precipitous Drop in Natural Gas Prices Resulting From the
                Development of Unconventional Natural Gas ..........................58
        3.    The Effect of Low Natural Gas Prices on EFH ........................61
    E.  Other Market Conditions Affecting TCEH's Performance ...................64
    F.  EFH's Financial Outlook and Business Strategy Going Forward .........66
    G.  EFH's Reorganization Efforts...........................................................67
        1.    EFH Implements Financial Transactions...............................67
        2.    Restructuring Negotiations ..................................................70
        3.    The Restructuring Support Agreement ..................................75
        4.    The Debtors Commence the Chapter 11 Cases.........................80

**Part III. Overview of First Day Relief** ...................................................**81**

i

## **EXHIBITS**

EXHIBIT A          Evidentiary Support for First Day Motions

EXHIBIT B          List of the Debtors

EXHIBIT C          Corporate Structure

EXHIBIT D          Restructuring Support Agreement

Pursuant to 28 U.S.C. § 1746, I, Paul Keglevic, hereby declare as follows under penalty of perjury:

1.      I am the Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of Energy Future Holdings Corp. ("EFH Corp.") a corporation organized under the laws of the state of Texas; its direct subsidiary, Energy Future Competitive Holdings Company LLC ("EFCH"), a limited liability company organized under the laws of the state of Delaware; EFCH's direct subsidiary, Texas Competitive Electric Holdings Company LLC ("TCEH LLC" and, together with EFCH and TCEH LLC's direct and indirect subsidiaries, "TCEH," and the entities composing TCEH that are debtors in these chapter 11 cases, the "TCEH Debtors"), a limited liability company organized under the laws of the state of Delaware; and EFH Corp.'s direct subsidiary, Energy Future Intermediate Holding Company LLC ("EFIH"), a limited liability company organized under the laws of the state of Delaware.  EFH Corp., various other direct and indirect subsidiaries of EFH Corp. that are debtors in these chapter 11 cases, the TCEH Debtors, and EFIH are collectively referred to as the "Debtors" in this declaration (this "First Day Declaration") and are listed on **Exhibit B** hereto.[1]

2.      I have worked for the Debtors since 2008.  I am generally familiar with the Debtors' businesses, day-to-day operations, financial matters, results of operations, cash flows, and underlying books and records.  Except as otherwise indicated in this First Day Declaration, all facts set forth in this declaration are based upon my personal knowledge of the Debtors'

---

[1]    EFH Corp., through EFCH and TCEH LLC, indirectly owns 100% of each of the entities composing Luminant (as defined herein) and TXU Energy (as defined herein), along with EFH's other retail electricity sales operations, with the exception of two joint venture entities with relatively small amounts of assets.  Each of TCEH LLC's direct and indirect subsidiaries, other than Greenway Development Holding Company LLC, Collin G/G&B LLC, Nuclear Energy Future Holdings LLC, Nuclear Energy Future Holdings II LLC, and Comanche Peak Nuclear Power Company LLC, are TCEH Debtors.  EFIH owns 100% of Oncor Electric Delivery Holdings Company LLC ("Oncor Holdings"), which owns approximately 80% of Oncor Electric Delivery Company LLC ("Oncor").

businesses, operations, and related financial information gathered from my review of their books and records, relevant documents, and information supplied to me by members of the Debtors' management team and advisors.  I am over the age of 18 and authorized by the Debtors' Boards of Directors and Managers (as applicable) to submit this declaration on behalf of the Debtors.  If called upon to testify, I could and would testify competently to the facts set forth in this First Day Declaration.

3.    The Debtors have requested a variety of relief in "first day" motions and applications (the "First Day Motions"), filed concurrently herewith, to ensure a smooth transition into chapter 11.  I am generally familiar with the contents of each of the First Day Motions, and I believe that the relief sought therein, including the ability to make certain essential payments and otherwise continue their business operations, is necessary to permit continued efficient operations of the Debtors' businesses and an effective transition into chapter 11.

4.    In my opinion, approval of the relief requested in the First Day Motions will minimize disruption to the Debtors' business operations, thereby preserving and maximizing the value of the Debtors' estates and assisting the Debtors in achieving a successful reorganization. A complete description of the relief requested under the Debtors' First Day Motions, and evidentiary support therefore, is attached to this First Day Declaration as **Exhibit A** and incorporated into this First Day Declaration by reference.

5.    To familiarize the Court with the Debtors and the relief they are seeking on the first day of these chapter 11 cases, this First Day Declaration begins with a Preliminary Statement, which provides an overview of the Debtors and their non-Debtor affiliates (collectively, "EFH"), the facts and circumstances surrounding these chapter 11 cases, and the Debtors' anticipated restructuring.  This First Day Declaration is then organized as follows:

- **Part I** describes EFH's business operations and capital structure;

- **Part II** describes the events that led to the commencement of these chapter 11 cases, including a significant decline in wholesale electricity prices that frustrated the investment thesis of a transaction that took EFH private in 2007, the Debtors' efforts to address the challenging environment of low wholesale electricity prices and the Debtors' resulting balance sheet difficulties, the Debtors' negotiations regarding a consensual restructuring with their key stakeholders, the restructuring support agreement (the "Restructuring Support Agreement"), attached hereto as **Exhibit D**, and the anticipated events in these chapter 11 cases; and

- **Part III** provides an overview of the relief requested in the First Day Motions.

## Preliminary Statement

6.      EFH's businesses include the largest generator, distributor, and certified retail provider of electricity (or "REP") in Texas.[2]  EFH conducts substantially all of its business operations in the electricity market overseen by the Electric Reliability Council of Texas ("ERCOT"), which covers the majority of Texas.   The Texas electricity market, in turn, is subject to oversight and regulation by the Public Utility Commission of Texas (the "PUC"). EFH has approximately 9,100 employees, approximately 5,700 of whom are employed by the Debtors, in three distinct business units:

- EFH's *competitive electricity generation, mining, wholesale electricity sales, and commodity risk management and trading activities,* conducted by the TCEH Debtors composing "Luminant";

- EFH's *competitive retail electricity sales operations and related operations*, mainly conducted by the TCEH Debtors composing "TXU Energy";[3] and

---

[2]    For financial reporting under Generally Accepted Accounting Principles, EFH Corp. reports information for two segments: the Competitive Electric and Regulated Delivery business segments. The Competitive Electric segment includes both Luminant and TXU Energy in consideration of the highly integrated nature of the competitive business, as evidenced by the centralized management of commodity risk across the business and Luminant's sourcing of all TXU Energy's electricity needs.  The Regulated Delivery segment is composed of Oncor.  The Competitive Electric segment is essentially engaged in the production of electricity and the sale of electricity in wholesale and retail channels.

[3]    The Debtors also conduct a relatively small amount of retail electricity operations through their 4Change brand and another entity, Luminant ET Services Company, that provides retail electricity service to one municipality and to some of Luminant's mining operations, and a small amount of retail gas operations through Luminant Energy Company LLC.

3

- EFH's *rate-regulated electricity transmission and distribution operations*, conducted by the non-Debtor Oncor.  EFIH indirectly owns approximately 80% of Oncor.

EFH and its management team have significant experience as leaders in the electricity industry.

7.      Luminant owns and operates fourteen power plants comprising 40 generation units.  Of those units, 33 units are in active year-round operation, three units (at two plants) are subject to seasonal operation, and four units (at two plants) are idled.  Luminant's total nameplate electricity generation capacity[4] of 15,427 megawatts ("MW") accounts for approximately 18% of the generation capacity for the ERCOT market.  Luminant sells approximately 50% of its electricity generation output to TXU Energy, and sells the remainder through bi-lateral sales to third parties or through sales directly to ERCOT.  Luminant also owns and operates 12 surface lignite coal mines in Texas that supply coal to Luminant's lignite/coal-fueled units.[5]  Luminant is the largest coal miner in Texas and the seventh-largest coal miner in the United States.[6]  Luminant's generation units and mines are high-performing and have impressive safety records.  Moreover, Luminant's commodity trading and risk management activities have also delivered significant value to the Debtors.

8.      TXU Energy sells electricity to approximately 1.7 million residential and business customers, and is the single largest REP by customer count in Texas.  TXU Energy serves approximately 26% of the residential customers and approximately 19% of the business customers in the areas of the ERCOT market that are open to competition.  TXU Energy

---

[4]    "Nameplate" capacity is an industry-standard term for the original design capacity of an electricity generation unit.

[5]    Of these mines, eight are active, three are in development, and one is currently idle.

[6]    Based on tons of coal mined in 2012.

purchases all of its electricity requirements from Luminant.  TXU Energy maintains a strong position in the highly competitive ERCOT retail electricity market based on industry-leading customer care performance and technological innovation and has maintained strong performance notwithstanding intense competition.

9.      Oncor is engaged in rate-regulated electricity transmission and distribution activities in Texas.  Oncor provides these services, at rates approved by the PUC, to REPs (including TXU Energy) that sell electricity to residential and business customers, as well as to electricity distribution companies, cooperatives, and municipalities.  Oncor operates the largest transmission and distribution system in Texas, delivering electricity to more than 3.2 million homes and businesses and operating more than 120,000 miles of transmission and distribution lines.  Oncor has the largest geographic service territory of any transmission and distribution utility within the ERCOT market, covering 91 counties and over 400 incorporated municipalities.  Importantly, however, Oncor is "ring-fenced" from the Debtors:  it has an independent board of directors, and it is operated, financed, and managed independently.  As a result, it is not consolidated into EFH Corp.'s financial statements.  A significant portion of Oncor's revenues are attributable to TXU Energy, which is Oncor's largest customer.  Oncor Holdings, Oncor, and their ring-fenced affiliates and subsidiaries are not Debtors in these chapter 11 cases.

10.     EFH largely adopted its current organizational structure, and issued a significant portion of the debt that composes its capital structure, in October 2007 as a result of the largest private acquisition of a public company in history (the "2007 Acquisition").  At the time, EFH's current equity owners, including affiliates of Goldman Sachs, KKR and TPG (the "EFH Equity Owners") (together with certain co-investors) contributed approximately $8.3 billion of equity capital into EFH.  And, like many other private acquisitions, EFH issued significant new debt

and assumed existing debt and liabilities in connection with the 2007 Acquisition. Immediately following the 2007 Acquisition, the Debtors total funded indebtedness[7] was approximately $36.13 billion, comprised of approximately $28.8 billion at TCEH, $128 million at EFCH, and $7.2 billion at EFH Corp. Today, the Debtors' total funded indebtedness is nearly $42 billion, including:

- approximately $24.385 billion of first lien claims (excluding certain first lien hedging obligations), $1.571 billion of second lien claims, and  $6.112 billion of unsecured claims against the TCEH Debtors;

- approximately $9 million of unsecured claims, and $61 million of claims secured by assets owned by other entities, against EFCH;

- approximately $1.929 billion of unsecured claims against EFH Corp.; and

- approximately $3.985 billion of first lien claims, $2.156 billion second lien claims, and $1.568 billion of unsecured claims against EFIH.

11.    Although the Debtors' operations are strong and TCEH and EFIH have historically been and will continue to be cash flow positive before debt service, low wholesale electricity prices in the Texas electricity market since mid-2008 have made it impossible for the TCEH Debtors to support their current debt load.  In October 2007, the main ingredients for EFH's financial success were robust and steady economic growth and high wholesale electricity prices driven by high natural gas prices that were not expected to significantly decline over the long term.  Since 2007, however, overall economic growth was reduced because of the recession in 2008 and 2009 and wholesale electricity prices have significantly declined.  The material reduction in wholesale electricity prices was caused, in large part, by an increase in the supply of natural gas caused by the rise of hydraulic fracturing (known as "fracking").  This increase in the

---

[7]    References to "funded indebtedness" in this First Day Declaration include intercompany debt holdings and short-term borrowings, and exclude guarantees, unamortized discounts or premiums, accrued but unpaid interest, and certain other figures typically reported in the Debtors' filings with the Securities and Exchange Commission (the "SEC"), such as capital lease obligations, certain promissory notes, and certain other obligations.

supply of natural gas caused a significant decline in natural gas prices, and because the wholesale price of electricity in the ERCOT market is closely tied to the price of natural gas, the wholesale price of electricity in the ERCOT market has significantly declined. As a result of those decreases, the profitability of the TCEH Debtors' generation assets has substantially declined.

12.     Separately, EFIH and EFH Corp. have significant funded indebtedness and insufficient cash flows to service those obligations. Before the Petition Date, EFIH—which has no independent business operations—relied on dividend distributions from Oncor and intercompany interest payments (relating to debt issued by EFH Corp. and the TCEH Debtors that EFIH acquired in exchange offers) to satisfy its funded debt obligations. These sources of cash, however, were not sufficient to service EFIH's obligations. Similarly, EFH Corp. also has minimal cash flow. As a result, both EFIH and EFH Corp. faced significant liquidity constraints that prompted a chapter 11 filing.

13.     Accordingly, despite consistent top-tier operational performance in the Debtors' business units, industry-leading customer care, successful hedging operations, efficiencies generated by the Debtors' shared services framework, a consistent stream of dividend distributions to EFIH resulting from its indirect ownership of Oncor, numerous efforts to reduce and extend their funded debt and other obligations, and the fact that EFIH and TCEH are cash flow positive before debt service, the Debtors are significantly overleveraged.

14.     To address these issues, the Debtors retained restructuring professionals and commenced restructuring discussions in July 2012. These discussions accelerated in early 2013, when the Debtors began the process of organizing the various creditor and equity groups and encouraging them to retain professionals. Soon thereafter, the Debtors began substantive negotiations with these constituents and their advisors. These negotiations lasted for over a year

and included countless meetings among professionals and principals.  In April 2013 and October 2014, the Debtors issued comprehensive cleansing disclosures through filings with the SEC, and the Debtors periodically made other disclosures regarding the ongoing negotiations.

15.     Two key issues drove negotiations.   *First*, the tax consequences of certain restructuring outcomes have created a challenging negotiating dynamic.  Certain restructuring scenarios, such as a sale of the Debtors' assets under a plan or under section 363 of the Bankruptcy Code, would trigger in excess of *$6 billion* of aggregate tax liability.[8]  The Debtors and certain of their stakeholders have diverging views on whether the TCEH Debtors, EFIH, and/or EFH Corp. would be liable for those tax liabilities.  Restructuring negotiations have, therefore, focused on attempting to restructure the Debtors in a tax-efficient manner through either a consolidated restructuring or a "tax free" spin of TCEH and/or EFIH.

16.     *Second*, the respective valuation of Oncor, on one hand, and TCEH, on the other hand, has been subject to dispute.  Generally speaking, the recoveries of holders of claims against and interests in the TCEH Debtors will be determined by the value of the TCEH Debtors' assets.  Similarly, the recoveries of holders of claims against and interests in EFIH will be determined by the value of EFIH's 80% ownership of Oncor.  And the recoveries of holders of claims against and interests in EFH Corp. will be determined by the value of EFH Corp.'s assets, including any value allocated on account of EFH Corp.'s ownership of EFIH and TCEH and the value, if any, of EFH Corp.'s direct and indirect subsidiaries other than EFIH and TCEH. Differing views on the valuation of Oncor, on one hand, and TCEH, on the other hand, dominated negotiations of a "consolidated" restructuring scenario that involved various creditor

---

[8]     The actual amount of any tax would depend on, among other things, final sale prices of the assets.  The $6 billion figure reflects the Debtors' view of the potential taxable gain that would arise based on the tax basis and the fair market value of TCEH's assets and EFIH's interests in Oncor.

constituencies receiving equity in EFH Corp.  Additionally, even in the context of a "tax-free" spin, certain of TCEH's stakeholders have insisted that the stakeholders of EFH Corp. and EFIH should "compensate" TCEH's stakeholders for forgoing the value associated with a step-up in tax basis and the subsequent tax benefits of depreciation deductions.

17.    In the final weeks leading to the Debtors' chapter 11 cases, several of the Debtors' stakeholders coalesced around a global restructuring of the Debtors (the "Global Restructuring"), premised on a "tax-free" spin of TCEH (the "TCEH Tax-Free Spin") that will deconsolidate TCEH from EFH, a simultaneous deleveraging of EFIH thorough a $2 billion investment (with that investment to be converted into equity of EFH Corp. upon emergence from chapter 11) (the "Investment Commitment"), and a framework for settling so-called "makewhole" claims against the EFIH Debtors (such claims, the "EFIH Makewhole Claims," and such settlements, the "EFIH Makewhole Settlements").  The material terms of the Global Restructuring are memorialized in the Restructuring Support Agreement that the Debtors and certain of their key stakeholders executed just before filing for chapter 11.[9]

18.    The Restructuring Support Agreement is an important first step toward a consensual and timely chapter 11 reorganization that avoids the spectre of in excess of $6 billion of deconsolidation-related tax liabilities.  To be sure, the Debtors still face a number of hurdles, including the need to obtain a private letter ruling from the IRS blessing the TCEH Tax-Free Spin and resolve the EFIH Makewhole Claims of holdout secured creditors.  The Debtors nevertheless believe that the Global Restructuring represents the best opportunity to conclude their chapter 11 cases in a swift and tax-efficient manner that will maximize the value of their estates.  Accordingly, during the course of these chapter 11 cases, the Debtors expect to finalize

---

[9]    The Debtors will seek authority to assume the Restructuring Support Agreement pursuant to a separate motion (the "RSA Assumption Motion"), which will be filed on or shortly following the Petition Date.

the work that must be done to implement the Global Restructuring, while continuing to focus on "Job 1": operating one of the largest, most complex energy companies in the country in a way that maximizes value for all of their stakeholders, protects jobs, complies with their regulatory obligations, and ensures the smooth and reliable generation, sale, and delivery of electricity to EFH's customers.

## Part I.
## EFH's Business Operations and Capital Structure

### A.    Overview of EFH's Corporate Structure.

19.    EFH Corp. is the parent company of each of the entities that compose EFH, including:  (a) the entities composing TCEH (including TCEH LLC's parent company, EFCH); (b) EFIH; (c) non-Debtor Oncor Holdings, which is 100% owned by EFIH, Oncor, which is approximately 80% owned by Oncor Holdings, and certain subsidiaries and affiliates of Oncor Holdings and Oncor;[10] and (d) certain of EFH Corp.'s other direct and indirect Debtor and non-Debtor subsidiaries that are discussed below.

20.    The following chart is a simplified representation of EFH's corporate structure:[11]

---

[10]    Texas Transmission Investment LLC is an unaffiliated entity that owns approximately 19.75% of Oncor.  It is owned by an investment group led by OMERS Administrative Corporation, acting through its infrastructure investment entity, Borealis Infrastructure Management Inc., and the Government of Singapore Investment Corporation, acting through its private equity and infrastructure arm, GIC Special Investments Pte. Ltd.  The remaining ownership interests in Oncor are indirectly held by members of Oncor's management.

[11]    Exhibit B contains a full list of the TCEH Debtors and other Debtors.  Exhibit C contains a full corporate structure chart of EFH.



21.    As of December 31, 2013, EFH Corp. reported total assets of approximately $36.4 billion in book value, approximately $28.8 billion of which is attributable to TCEH, and total liabilities of approximately $49.7 billion in book value, approximately $41.1 billion of which is attributable to TCEH.[12]  EFH Corp.'s assets and liabilities that are not attributable to TCEH are mostly attributable to EFIH's indirect ownership of approximately 80% of Oncor. EFH Corp.'s consolidated revenues for the quarter ending December 31, 2013 were approximately $1.3 billion, all of which were attributable to TCEH.  EFH Corp.'s consolidated annual revenues for the year ending December 31, 2013 were approximately $5.9 billion.[13]

---

[12]    Figures for TCEH are derived from EFCH's public filings with the SEC, and are almost entirely attributable to TCEH LLC and its Debtor and non-Debtor subsidiaries.

[13]    Oncor's revenues are not included in EFH Corp.'s consolidated revenues because EFH Corp. accounts for its ownership of Oncor under the equity method of accounting.

B.     **EFH's Business Operations.**

1.     **TCEH.**

22.     TCEH is composed of:    (a) the TCEH Debtors, including TCEH LLC; TCEH LLC's direct parent company, EFCH; and most of the entities that compose TCEH, including the entities that compose Luminant's electricity generation, mining, commodity risk management and trading activities, and wholesale operations, TXU Energy and the other entities that compose the Debtors' retail operations, and TCEH Finance, Inc. ("TCEH Finance"); and (b) certain other entities that are not obligated on the TCEH Debtors' funded indebtedness.[14] TCEH's business operations also depend on certain services that are provided by EFH Corporate Services Company ("EFH Corporate Services"), a subsidiary of EFH Corp., which acts as a shared services center for Luminant and TXU Energy.    These operations are discussed in more detail below.

a.     **Luminant.**

i.     **Overview.**

23.     Luminant is the largest electricity generator and lignite coal miner in Texas. Luminant also operates a wholesale electricity sales, commodity risk management and trading activities organization.    Luminant employs approximately 4,200 individuals.

24.     The map below depicts the location of Luminant's power plants and associated lignite mines in Texas.

---

[14]    Specifically, these entities are (a) non-Debtor Greenway Development Holding Company LLC, which is the managing partner of non-Debtor joint venture Collin G/G&B LLC; (b) non-Debtors Nuclear Energy Future Holdings LLC and Nuclear Energy Future Holdings II LLC, which indirectly or indirectly own approximately 88% of non-Debtor Comanche Peak Nuclear Power Company LLC; and (c) Debtor TXU Receivables Company LLC, an entity associated with a terminated accounts receivable program.



### ii.    Generation Activities.

25.    Luminant's total nameplate generation capacity of 15,427 MW, composed of nuclear, lignite/coal, and natural gas-fueled units, accounts for approximately 18% of the ERCOT market's nameplate generation capacity.    Luminant's generation capacity can be categorized as:

- Year-round or full operations:  approximately 11,892 MW (33 units) of lignite/coal, nuclear, and gas-fueled units;

- Seasonal operations:  approximately 1,880 MW (3 units) of lignite/coal-fueled units that Luminant has previously sought, and received, permission to operate only during high-demand periods (*e.g.*, during the peak demand of summer); and

- Idled:  approximately 1,655 MW (4 units) of natural gas-fueled units which could be restarted with approximately 90-days' notice and significant investment.

26.    In 2013, Luminant generated approximately 73,409 gigawatt hours ("GWh"), compared to the ERCOT market's total electricity consumption of approximately 331,000 GWh. As demonstrated by the chart below, Luminant is the 13th largest generator of electricity in the United States:



2013 Net U.S. Generation by Holding Company

**(A)    Nuclear Generation.**

27.    Luminant's nuclear generation operations consist of two units at its Comanche Peak location, with total nameplate capacity of 2,300 MW.  The units generally run at full capacity except during nuclear fuel assembly replacement outages scheduled approximately every 18 months.  Comanche Peak units 1 and 2 began commercial operation in 1990 and 1993, respectively; each unit has a permit allowing for 40 years of operations, and Luminant anticipates that it will obtain a permit to extend operation of the units for an additional 20 years. The Comanche Peak units operated at approximately 101.7%, 98.5%, 95.7%, and 100% of nameplate generation capacity in 2013, 2012, 2011, and 2010, respectively, and are consistently ranked in the top decile of nuclear plants in the U.S. for production reliability and cost

performance.  Additionally, Comanche Peak has consistently demonstrated high performance as evaluated across the industry by the Institute of Nuclear Power Operations.  Nuclear-fueled generation accounted for 15% of Luminant's nameplate capacity and 28% of Luminant's electricity generation in 2013.

**(B)    Lignite/Coal-Fueled Generation.**

28.    Luminant's lignite/coal-fueled generation operations include twelve units at five plant sites, with total nameplate capacity of 8,017 MW.  These include:

- two units at Big Brown with total nameplate capacity of 1,150 MW;

- three units at Monticello with total nameplate capacity of 1,880 MW;

- three units at Martin Lake with total nameplate capacity of 2,250 MW;

- two units at Oak Grove with total nameplate capacity of 1,600 MW; and

- two units at Sandow with total nameplate capacity of 1,137 MW.

29.    Luminant's lignite/coal units are generally available for full operations throughout the year except when they are out of service for either a scheduled or unscheduled maintenance outage.  As discussed in more detail below, however, in recent years Luminant has reduced electricity generation from selected lignite/coal units during times when the demand for electricity and wholesale electricity prices in the ERCOT market are comparatively low.  These reductions are achieved in one of two forms:  either through short-term (*e.g.*, overnight) reductions in response to wholesale electricity prices, or through longer-term seasonal shutdowns in response to sustained periods of relatively low wholesale electricity prices and demand for electricity.  Indeed, two units at Monticello and one unit at Martin Lake have, in the recent past, been subject to seasonal operations.

30.    Luminant's lignite/coal-fueled units operated at 74.1%, 70.0%, 83.5%, and 82.2% of nameplate generation capacity for the years 2013, 2012, 2011, and 2010, respectively.  In

2011 and 2010, the units performed at the top decile for U.S. coal-fueled generation facilities. Reduced generation in 2012 and 2013 was largely due to low wholesale electricity prices in the ERCOT market. Coal/lignite-fueled generation accounted for 52% of Luminant's nameplate capacity and 71% of Luminant's electricity generation in 2013.

(C)     **Natural Gas-Fueled Generation**.

31.    Luminant's natural gas-fueled generation operations consist of 26 units at eight plant sites with 5,110 MW of total nameplate capacity and 3,455 MW of available capacity, including:

- two steam units at Graham with total nameplate capacity of 630 MW;

- two steam units at Lake Hubbard with total nameplate capacity of 921 MW;

- two steam units at Stryker Creek with total nameplate capacity of 685 MW;

- one steam unit at Trinidad with total nameplate capacity of 244 MW;

- four combustion turbines at DeCordova with total nameplate capacity of 260 MW;

- six combustion turbines at Morgan Creek with total nameplate capacity of 390 MW;

- five combustion turbines at Permian Basin with total nameplate capacity of 325 MW;

- three inactive steam units at Valley with total nameplate capacity of 1,115 MW; and

- one inactive steam unit at Permian Basin with total nameplate capacity of 540 MW.

32.    Luminant's natural gas-fueled units are primarily used when electricity demand is highest (*i.e.*, they are considered "peaking" units because they are generally used during peak demand periods) or to support system reliability at times of low "reserve margins" (*i.e.*, times when the system's overall generation capacity needs to be increased to maintain a certain target "cushion" over expected demand for electricity). Inactive units may be restarted in advance of anticipated electricity needs under proper economic conditions, but would likely require several months and incremental capital expenditures to restore them to full operational readiness.

Natural gas-fueled generation accounted for approximately 33% of Luminant's nameplate capacity and 1% of Luminant's electricity generation in 2013.

33.     Luminant also manages approximately 10.5 billion cubic feet of natural gas storage capacity, primarily to assist in fueling its natural gas-fueled units, and engages in various activities related to natural gas including direct purchases, transportation agreements, storage leases, and commercial retail sales.

34.     Luminant has filed permit applications with, and received approval from, the Texas Commission on Environmental Quality (the "TCEQ") to build two new natural gas combustion turbines totaling approximately 420–460 MW at its existing DeCordova plant site and two new natural gas combustion turbines totaling approximately 420–460 MW at its existing Tradinghouse plant site.  Luminant has also filed air permit applications with the TCEQ to build a combined-cycle natural gas turbine generation unit totaling approximately 730–810 MW at its existing Eagle Mountain plant site and two natural gas combustion turbines totaling approximately 420–460 MW at its existing Lake Creek plant site.  Luminant believes current market conditions, primarily driven by low wholesale electricity prices, do not provide adequate economic returns to warrant new construction.  The permits that have been granted, and the permits in the application process, if granted, could allow Luminant to capitalize on opportunities for expansion when they are economically attractive in the future (assuming the TCEH Debtors' balance sheet has been addressed or the TCEH Debtors otherwise have access to sufficient capital to make these investments).

### iii.     Mining Operations.

35.     Luminant currently owns twelve surface lignite coal mines in Texas, eight of which are in active operation.  Luminant is the largest coal miner in Texas and the seventh-largest coal miner in the United States.  Luminant's mining activity supports generation

at its lignite/coal units; Luminant mined approximately 29 million tons of lignite in 2013, and approximately 68% of the fuel used at Luminant's lignite/coal-fueled units in 2013 was supplied from surface-minable lignite reserves located adjacent to Luminant's plants.

36.    As of December 31, 2013, Luminant owns or has under lease an estimated 715 million tons of lignite reserves supporting plant sites, including an undivided interest in approximately 175 million tons of lignite reserves that provide fuel for the Sandow facility, and also owns or has under lease approximately 85 million tons of reserves not currently dedicated to existing plant sites.  Luminant meets its fuel requirements at its Big Brown, Monticello, and Martin Lake plants by blending lignite with coal purchased from third-party suppliers in the Powder River Basin in Wyoming.  The coal is transported from the Powder River Basin to Luminant's plants by railcar pursuant to various contracts.

37.    Luminant Mining Company LLC ("Luminant Mining"), a Debtor entity, holds all of Luminant's mining permits and contracts with several of the TCEH Debtors to conduct Luminant's mining operations.  Luminant Mining is subject to regulatory oversight by the Railroad Commission of Texas (the "RCT"), which regulates, among other things, mining permits and land reclamation requirements related to mining sites.  As part of the land reclamation requirements, Luminant Mining is required to satisfy certain bonding requirements. Before the Petition Date, Luminant Mining "self-bonded" these obligations with the support of a guarantee from another Debtor entity, Luminant Generation Company LLC.  Following the Petition Date, Luminant Mining expects to satisfy the bonding requirement through either (a) the grant of a super-priority "carve-out" from the super-priority liens under the TCEH Debtors' proposed debtor in possession financing facility (the "TCEH DIP Facility") that will enable the RCT to be paid on account of reclamation obligations before the TCEH DIP Facility lenders and

the TCEH Debtors' secured creditors;[15] or (b) if negotiations are not successful with respect to the "carve-out," the delivery of one or more cash collateralized letters of credit. in an amount of up to $1.1 billion, issued under the TCEH DIP Facility.

### iv. Wholesale Electricity Sales, Commodity Risk Management, and Trading Activities.

38.    Luminant's generation units provide electricity for its wholesale electricity sales, commodity risk management, and trading operations, through which Luminant supplies TXU Energy and other third-party wholesale and retail counterparties with electricity and electricity-related services.    Luminant enters into both short-term and long-term electricity contracts, enabling it to manage variations in electricity generation, price risk associated with generation output and changing consumer demand, as well as to meet the needs of large wholesale customers.    Luminant also purchases electricity, including electricity generated from renewable energy resources such as wind, from third-parties.    Additionally, Luminant manages physical fuel purchase agreements and financial hedges with a variety of counterparties to manage key commodity costs and delivery risks that affect Luminant's electricity generation and mining operations.

39.    Wholesale electricity prices in the ERCOT market vary and are based on electricity supply and demand, fuel prices, variable costs for electricity generation assets, and other market factors.    As discussed in greater detail below, wholesale electricity prices in the ERCOT market are closely tied to the price of natural gas.    Additionally, weather can significantly influence short-term wholesale electricity prices, particularly where there are

---

[15]    These options are discussed in greater detail in the *Motion of Energy Future Holdings Corp., et al., for Entry of Interim and Final Orders (A) Approving Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Granting Adequate Protection, (D) Modifying the Automatic Stay, and (e) Scheduling a Final Hearing* (the "TCEH DIP Motion"), filed contemporaneously herewith.

weather extremes in Texas and throughout the country of the kind that occurred in the fall/winter of 2013 and 2014 or the summer of 2011.  Those weather extremes can cause increases in natural gas prices or shortages in electricity generation capacity and increased demand for electricity.  Luminant's wholesale operations manage these risks, and others, through optimizing the dispatch of the electricity generation fleet, physical purchases and sales of electricity and fuel commodities, as well as the use of financial and bilateral contracts and other hedging activities.

40.    Luminant's commodity risk management and trading activities hedge the volume and price risk associated with Luminant's generation fleet and TXU Energy's retail needs.  These activities require significant collateral support and account for a significant portion of funds the TCEH Debtors seek to borrow under the TCEH DIP Motion.[16]

### b.    TXU Energy.

41.    TXU Energy serves approximately 1.7 million residential and commercial retail electricity consumers.[17]    Approximately 69% of TXU Energy's retail revenues in 2013 represented sales to residential customers, with the remaining amount attributable to commercial and industrial business customers.  TXU Energy has a very strong market position in the ERCOT market, serving approximately 26% of the residential customers and 19% of the business customers in the areas of ERCOT open to competition.  Indeed, TXU Energy is the single largest certificated REP by customer count in Texas.  Luminant procures or supplies 100% of TXU

---

[16]    Luminant's trading and hedging activities, and the required collateral support obligations, are discussed in more detail in the *Motion of Energy Future Holdings Corp., et al., for Entry of Interim and Final Orders Authorizing the Debtors to (A) Continue Performing Under Prepetition Hedging and Trading Arrangements, (B) Pledge Collateral and Honor Obligations Thereunder, and (C) Enter Into and Perform Under Trading Continuation Agreements and New Postpetition Hedging and Trading Arrangements* (the "Hedging and Trading Agreements Motion"), filed contemporaneously herewith.

[17]    Customer count measured by number of meters served.

Energy's electricity requirements.  TXU Energy employs approximately 1,000 individuals in its marketing, customer operations, and support organizations.

42.    Texas is one of the fastest growing states in the United States with a diverse economy.  As a result, competition for retail electricity customers is robust.  The number of certified REPs has grown from approximately 40 in 2002, the first year of retail electricity competition in Texas, to over 140 today.  Based on data published by the PUC, as of September 30, 2013, approximately 62% of residential customers and 69% of small commercial customers in competitive areas of the ERCOT market are served by REPs that are not associated with the "incumbent" REP that was the traditional provider in their service area before deregulation. Moreover, approximately 89% of residential customers and 90% of small commercial load customers have chosen an electricity provider at least once since the ERCOT retail market deregulation process began in Texas in 2002,[18] making Texas the only state with retail competition where more than half of residential customers have chosen to be served by electricity providers other than the incumbent electric utilities.  As a result, TXU Energy, like other REPs formerly affiliated with the regulated, monopoly electricity utilities (such as EFH's predecessor, TXU Corp.) that existed before deregulation of Texas's electricity market in 2002, has experienced customer attrition since the Texas electricity market was opened to competition. Indeed, that significant level of competition is one of the reasons that TXU Energy believes it is essential that it receive the authority to promptly assume its retail electricity contracts.[19]

---

[18]    Electric Reliability Council of Texas, Inc., *Supplemental Information Retail Electric Market* (March 21, 2014).

[19]    The Debtors seek this authority pursuant to the *Motion of Energy Future Holdings Corp., et al., for Entry of (A) an Order Authorizing the Debtors to (I) Maintain and Administer Customer Programs, (II) Honor Prepetition Obligations, (III) Pay Certain Expenses on Behalf of Certain Organizations, (IV) Fix Deadlines to File Proofs of Claim for Certain Customer Claims, and (V) Establish Procedures for Notifying Customers of Commencement of the Debtors' Chapter 11 Cases, Assumption of Customer Agreements, and the Bar Dates for Customer Claims and (B) an Order Authorizing Certain of the Debtors to Assume Customer Agreements* (the "Customer Programs Motion"), filed contemporaneously herewith.

Importantly, TXU Energy's key customer metrics including bad debt, days sales outstanding, and PUC complaints have significantly improved since the 2007 Acquisition, performing at or better than industry-leading levels.

### 2.    EFH Corp. and Certain EFH Corp. Subsidiaries.

43.    In addition to EFCH, TCEH LLC and its subsidiaries, EFIH, Oncor Holdings, Oncor, and Oncor's affiliates and subsidiaries, EFH is composed of:  (a) EFH Corp.; (b) EFH Corporate Services; (c) EFH Properties Company; and (d) various other direct and indirect subsidiaries of EFH Corp. that are legacy entities without active business operations.  These entities are discussed below.

### a.    EFH Corp.

44.    EFH Corp. is the ultimate parent holding company of each of the entities composing EFH.  Its principal assets are its indirect approximately 80% ownership of Oncor (through its direct ownership of EFIH) and its indirect ownership of the TCEH LLC and its subsidiaries (through its direct ownership of EFCH).  EFH Corp. also directly or indirectly owns a number of other subsidiaries that are discussed below.

### b.    EFH Corporate Services.

45.    EFH Corporate Services provides a host of vital shared services, primarily to TCEH (*i.e.*, Luminant and TXU Energy) and, to a lesser extent, EFH Corp., EFIH, and Oncor. EFH Corporate Services employs approximately 450 individuals—including the majority of the Debtors' senior executives.  These shared services are integral to EFH Corp. and its subsidiaries' business operations, and also generate significant cost savings.

46.    EFH Corporate Services provides the shared services to TCEH and EFIH under separate shared services agreements (the "Shared Services Agreements"), and to EFH Corp. and certain of EFH Corp.'s other direct and indirect subsidiaries through a series of operating

procedures and the cash management system administered by EFH Corporate Services.[20] Services are provided to Oncor based on historical practice. All shared services are billed at cost. In 2014, shared services are expected to be allocated approximately 54% to Luminant, 30% to TXU Energy, 13% to Oncor, 2% to EFIH, and 2% to EFH Corp.[21]

47.     The shared services include, among other things, certain:

- legal functions;

- human resources functions;

- treasury functions;

- enterprise and market risk management functions;

- controller functions;

- federal, state, and local tax services;

- financial planning functions;

- strategy and business development functions;

- information technology and infrastructure services;

- external affairs, including political and regulatory advocacy;

- investor and media relations;

- corporate secretarial, security, compliance, and ethics issues;

- internal auditing and Sarbanes-Oxley compliance;

- supply chain services;

- business services administration; and

---

[20]  EFH's cash management system, the Shared Services Agreements, and intercompany payments in general are discussed in more detail in the *Motion of Energy Future Holdings Corp., et al., for Entry of an Order (A) Authorizing the Debtors to (I) Continue Using their Existing Cash Management System, (II) Maintain Existing Bank Accounts and Business Forms, and (III) Continue Using Certain Investment Accounts; (B) Authorizing Continued Intercompany Transactions and Netting of Intercompany Claims; and (C) Granting Postpetition Intercompany Claims Administrative Expense Priority* (the "Cash Management Motion"), filed contemporaneously herewith.

[21]  These figures exclude certain quarterly management fees payable to the EFH Equity Owners. The management fees have not been paid since the fourth quarter of 2013.

- facility design and construction and real estate management.

48.    As described in the Cash Management Motion, the treasury function at EFH Corporate Services provides certain cash management services to the Debtors (and certain of their non-Debtor, non-Oncor affiliates).  Specifically, EFH Corporate Services issues checks and automated clearing house payments to third parties for goods and services received by the Debtors (primarily by the TCEH Debtors).  The applicable Debtors then reimburse EFH Corporate Services for amounts paid.

### i.    Federal and State Income Tax Allocation (Tax Sharing) Agreements Administered by EFH Corporate Services.

49.    EFH Corp. files federal and state income tax returns that include the results of EFCH, TCEH LLC and its subsidiaries, EFIH, and Oncor Holdings.  EFH Corp. is a corporate member of the consolidated group, while each of EFIH, Oncor Holdings, EFCH, and TCEH LLC and a majority of its subsidiaries are classified as disregarded entities for federal income tax purposes.  Oncor is a partnership for income tax purposes and is not a corporate member of the EFH Corp. consolidated group.

50.    The tax obligations of the various entities composing EFH are guided by two tax sharing agreements.  Each entity's compliance with applicable tax requirements and the applicable tax sharing agreement is overseen by EFH Corporate Services.  During these chapter 11 cases, the Debtors will continue making certain payments under the tax sharing agreements to the extent the bankruptcy court authorizes such payments.[22]  Oncor will continue to make tax payments in accordance with its tax sharing agreement (the "Oncor TSA"), which effectively

---

[22]    In particular, the Debtors are seeking to pay certain state law tax claims in the ordinary course pursuant to the *Motion of Energy Future Holdings Corp., et al., for Entry of Interim and Final Orders Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees and Granting Related Relief* (the "Taxes Motion"), and are seeking the authority to continue appropriate intercompany transactions related to such state law tax claims pursuant to the Cash Management Motion, each filed contemporaneously herewith.

requires Oncor to make payments approximately equal to payments it would make as a stand-alone taxpayer. As of the Petition Date, Oncor makes those payments to EFH Corp. As discussed in greater detail below, however, in connection with the Restructuring Support Agreement, EFH Corp.'s right to payment under the Oncor TSA will be assigned to EFIH.

### c. EFH Properties Company.

51.    Non-Debtor EFH Properties Company, a direct subsidiary of EFH Corp., is the lessee of record with respect to certain of EFH's real property leases, including the lease of EFH Corp.'s headquarters, which houses approximately 370 EFH Corporate Services and EFH Corp. employees and executives and approximately 435 of Luminant's employees. Additionally, EFH Properties Company administers certain subleases with respect to EFH's real property leases, primarily with respect to the headquarters lease, and operates certain parking facilities.

### d. Other Direct and Indirect Subsidiaries of EFH Corp.

52.    EFH Corp. also is the parent of several entities with *de minimis* assets,[23] including (i) three Debtor entities that once held international assets that have either been liquidated or are currently in administration and/or liquidation cases initiated before the 2007 Acquisition; (ii) Debtor entities associated with a natural gas distribution business that was sold in 2004, a related non-Debtor captive insurance company, a related non-Debtor United Kingdom entity in liquidation, and a related Debtor Canadian entity that is associated with certain *de minimis* pension obligations; and (iii) other entities that hold miscellaneous assets, including a small number of patents, trade names, IT assets, land, and other *de minimis* assets.[24]

---

[23]    Excluding intercompany receivables.

[24]    Each of these entities other than Basic Resources, Inc., which owns certain comparatively minor patents and is a wholly-owned subsidiary of non-Debtor EFH Properties Company, is a Debtor.

### 3.    EFIH.

53.    EFIH is a holding company and a direct, wholly-owned subsidiary of EFH Corp. Its primary asset is its 100% ownership of Oncor Holdings, which, in turn, owns approximately 80% of Oncor.  Oncor has made dividend distributions to EFIH (through Oncor Holdings) totaling approximately $213 million, $147 million, $116 million, and $169 million in 2013, 2012, 2011, and 2010, respectively,[25] and approximately $37 million between January 1, 2014 and the Petition Date.  EFIH has no active business operations, and its capital structure is premised on the value derived from its indirect ownership of Oncor.   EFIH's funded indebtedness was issued in a series of post-2007 Acquisition transactions.

### 4.    Oncor.

#### a.    Overview of Oncor's Business Operations.

54.    Oncor is a transmission and distribution utility that provides transmission and distribution services in Texas.  Unlike Luminant and TXU Energy, whose rates are subject to market competition, Oncor's rates are fully regulated and are subject to detailed rate-setting proceedings before the PUC.  Oncor provides these services to REPs, including TXU Energy, which sell electricity to residential and business customers, and electricity distribution companies, cooperatives, and municipalities.  TXU Energy is Oncor's largest customer and accounts for a large portion of Oncor's annual operating revenues:  approximately 27%, 29%, 33%, and 36% in 2013, 2012, 2011, and 2010, respectively.[26]  Oncor operates the largest transmission and distribution system in Texas:  it covers more than 91 counties and over 400

---

[25]    Does not include amounts in 2012 and 2013 distributed by Oncor to Oncor Holdings that Oncor Holdings used to pay its liability to EFH Corp. under the Oncor TSA.

[26]    These figures also include a relatively small amount attributable to TCEH's other REPs.

incorporated municipalities in Texas, delivers electricity to more than 3.2 million homes and businesses, and operates more than 120,000 miles of transmission and distribution lines.

55.    Pursuant to its organizational documents and applicable PUC orders and rules, Oncor is restricted from making distributions under certain conditions.  Oncor's dividend distributions are limited by its regulatory capital structure, which is required to be at or below the assumed debt-to-equity ratio established periodically by the PUC for ratemaking purposes.  That ratio is currently set at 60% debt to 40% equity.  Additionally, Oncor's independent directors, acting by majority vote, and, during certain periods, any director designated by Oncor's minority investor, may prevent dividend distributions from Oncor if they determine that it is in the best interests of Oncor to retain such amounts to meet expected future cash requirements.

### b.    The Ring-Fencing Measures.

56.    As part of the 2007 Acquisition, Oncor implemented certain structural and operational "ring-fencing" measures, including certain measures required by the PUC, to enhance Oncor's credit quality.  The ring-fence has a number of components.  Most importantly, Oncor's independence is ensured by a requirement that its board be composed of a majority of directors that are independent from EFH Corp. and TCEH, and Oncor also has management and employees separate from EFH's other businesses.  Two of Oncor's directors are appointed by EFIH.

57.    The ring-fence also provides that Oncor is prohibited from securing any indebtedness of EFH Corp. or its other non-Oncor subsidiaries (including the Debtors).[27]  In addition to protecting Oncor's credit rating, the prohibition on cross-collateralization means that

---

[27]    As noted below, certain obligations of EFCH that predate the 2007 Acquisition are secured by certain Oncor assets.

Oncor is not subject to the operational and financial restraints in the various documents governing the Debtors' funded indebtedness.

58.    Finally, among other things, Oncor's books and records are maintained separately from those of EFH Corp. and its non-Oncor subsidiaries, and Oncor's headquarters are physically separated from those of EFH Corp., Luminant, and TXU Energy.

59.    None of the Oncor entities are Debtors in the chapter 11 cases.  The Debtors intend to respect and maintain the ring-fencing measures described above during the pendency of the chapter 11 cases.

### 5.    EFH's Regulatory Environment.

60.    EFH's business operations are subject to significant regulation and oversight. Certain of those regulators were discussed above, and the regulators that are most material to EFH's business operations are identified in the following chart:

| Agency or Entity | Area(s) of Authority |
|---|---|
| Commodity Futures Trading Commission (the "CFTC") | • Futures market derivatives and over-the-counter derivatives (including interest rate swaps and commodity swaps) |
| Electricity Reliability Council of Texas, Inc. (the "ERCOT") | • Ensure reliable operation of transmission and distribution grid in the ERCOT market<br>• Dispatch generation to satisfy electricity requirements in the ERCOT market<br>• Manage real-time and day-ahead markets and financial settlement process in wholesale electricity markets in the ERCOT market |
| Environmental Protection Agency (the "EPA") | • Air and water quality<br>• Solid waste disposal |
| Equal Employment Opportunity Commission (the "EEOC") | • Labor relations |
| Federal Communications Commission (the "FCC") | • Wireless radio licenses for emergency radio communication |
| Federal Energy Regulatory Commission (the "FERC") | • FERC has nationwide electricity reliability authority, including with respect to the ERCOT market.  The ERCOT market, however, is not subject to the plenary jurisdiction of the FERC and electricity sales within the ERCOT market are not within the FERC's jurisdiction. |
| Mine Safety and Health Administration (the "MSHA") | • Mine safety |
| North American Electric Reliability Corporation (the "NERC"), in conjunction with the Texas Reliability | • National electricity grid reliability standards |

| Agency or Entity | Area(s) of Authority |
|---|---|
| Entity (the "<u>TRE</u>") | |
| Nuclear Regulatory Commission (the "<u>NRC</u>") | • Nuclear operating licenses<br>• Nuclear waste disposal |
| Occupational Safety and Health Administration (the "<u>OSHA</u>") | • Workplace safety |
| Office of Surface Mining Reclamation and Enforcement (the "<u>OSM</u>") | • Enforces federal surface mining and environmental standards |
| Public Utility Commission of Texas (the "<u>PUC</u>") | • Wide-ranging oversight over the Texas electricity market including, among other things, ensuring customer protection and regulating the rates and services, as well as certain "change of control" transactions, of transmission and distribution utilities such as Oncor |
| Railroad Commission of Texas (the "<u>RCT</u>") | • Permits, enforces, and oversees Texas surface mining and land reclamation process |
| Texas Commission on Environmental Quality (the "<u>TCEQ</u>") | • Air quality<br>• Water quality<br>• Waste management |

61.    Pursuant to 28 U.S.C. § 959(b), the Debtors intend to comply with all applicable regulatory requirements, including all requirements related to or associated with safety, health, and environmental law compliance, during these chapter 11 cases.  In addition, the Debtors will seek all necessary regulatory approvals, if any, from state and federal regulatory authorities, in connection with the Debtors' business operations and any proposed plan of reorganization. Moreover, to the extent the Debtors maintain insurance of their regulatory compliance obligations, the Debtors intend to continue such insurance in the ordinary course of business.

62.    The Debtors intend to continue funding their obligations related to a nuclear decommissioning trust that will be used to fund the decommissioning of the Comanche Peak plant.  Those funding obligations are satisfied by customer surcharges collected by REPs on behalf of Oncor and indirectly remitted from Oncor to TCEH.[28]  The Debtors also intend to remain in compliance with their mining land reclamation obligations, including their reclamation bonding requirements, as discussed above.

---

[28]    The Debtors are seeking relief to continue making these payments to the nuclear decommissioning trust pursuant to the Taxes Motion.

C.    **EFH's Capital Structure.**

1.    **TCEH Debtors.**

a.    **Overview.**

63.    The TCEH Debtors' funded debt obligations as of the Petition Date totaled approximately $32.068 billion (excluding obligations under certain first lien hedging arrangements and capital leases).  That amount includes approximately $24.385 billion of first lien debt, approximately $1.571 billion of second lien debt, and approximately $6.112 billion of unsecured debt,[29] as summarized in the following table:

| Security | Debt Obligation | Approx. Amount Outstanding as of the Petition Date | Interest or Other Payment Due Dates | Original Maturity/Payoff Date | Debtor Obligors |
|---|---|---|---|---|---|
| TCEH First Lien Secured | TCEH Credit Agreement | $22.635 billion | Varies | Varies | All TCEH Debtors |
| | TCEH First Lien Notes | $1.750 billion | Jan. 1; April 1; July 1; Oct. 1 | October 2020 | All TCEH Debtors |
| | TCEH First Lien Commodity Hedges / TCEH First Lien Interest Rate Swaps | Amount subject to determination. | Varies | Varies | All TCEH Debtors |
| TCEH Second Lien Secured | TCEH Second Lien Notes | $1.571 billion | Jan. 1; April 1; July 1; Oct. 1 | April 2021 | All TCEH Debtors |
| TCEH Unsecured | TCEH 2015 Unsecured Notes | $3.488 billion | May 1; Nov. 1 | November 2015 | All TCEH Debtors |
| | TCEH Senior Toggle Notes | $1.749 billion | May 1, Nov. 1 | November 2016 | |
| | Pollution Control Revenue Bonds | $875 million | Varies | Varies | TCEH LLC |

64.    In addition to the amounts described above, EFCH is an unsecured guarantor of approximately $60 million of unsecured notes issued by EFH Corp. that are discussed in more detail below.  Additionally, certain of the TCEH Debtors also have additional obligations not reflected in the above table, which are discussed below.

---

[29]    Total amounts exclude unamortized premiums, set off rights, accrued but unpaid interest, and fair value discounts, and include amounts held by EFH Corp. or EFIH.  Amounts held by EFH Corp. or EFIH are noted below.  The unsecured debt amount also includes approximately $19 million of outstanding Pollution Control Revenue bonds supported by letters of credit issued under the TCEH Credit Agreement.

### b.    TCEH First Lien Debt.

65.    TCEH's first lien debt is composed of:  (i) approximately $22.635 billion in outstanding obligations under TCEH's first lien credit agreement (the "TCEH Credit Agreement"); (ii) approximately $1.750 billion issued and outstanding TCEH 11.50% senior secured notes (the "TCEH First Lien Notes"); and (iii) obligations related to TCEH's interest rate swaps that are secured on a first lien basis (the "TCEH First Lien Interest Rate Swaps") and natural gas commodity hedges that are secured on a first lien basis (the "TCEH First Lien Commodity Hedges" and, collectively with the TCEH Credit Agreement, the TCEH First Lien Notes, and the TCEH First Lien Interest Rate Swaps, the "TCEH First Lien Debt").

### i.    TCEH Credit Agreement.

66.    Pursuant to the TCEH Credit Agreement, dated as of October 10, 2007 (as amended, modified, or supplemented and in effect immediately prior to the Petition Date), among TCEH LLC, as borrower, EFCH and the other TCEH Debtors, as guarantors, Citibank, N.A., as administrative and collateral agent, and the lenders that are parties thereto from time to time, the TCEH Debtors borrowed money from the lenders under term loan and revolving credit facilities. As of the Petition Date, a total of approximately $22.635 billion was outstanding under the TCEH Credit Agreement, which includes approximately $2.054 billion under a revolving credit facility, approximately $1.062 billion under deposit letter of credit term loan facilities, and approximately $19.519 billion of term loan facilities.[30]

### ii.    TCEH First Lien Notes.

67.    Pursuant to that certain indenture, dated April 19, 2011, for the 11.50% TCEH First Lien Notes originally due October 1, 2020, by and among TCEH LLC and TCEH Finance,

---

[30]    Including approximately $19 million held by EFH Corp.

as issuers, the other TCEH Debtors, as guarantors, and BOKF, NA (d/b/a Bank of Arizona), as successor indenture trustee to Bank of New York Mellon Trust Company, N.A. ("BNY"), TCEH LLC and TCEH Finance issued the TCEH First Lien Notes. Approximately $1.75 billion in principal amount of TCEH First Lien Notes are outstanding as of the Petition Date.

### iii. TCEH First Lien Interest Rate Swaps and TCEH First Lien Commodity Hedges.

68. The TCEH Debtors are party to (A) certain transactions with counterparties under the TCEH First Lien Commodity Hedges and (B) certain transactions under the TCEH First Lien Interest Rate Swaps used to hedge interest rate exposure on their variable rate debt. Certain holders of TCEH First Lien Interest Rate Swaps are also counterparties to TCEH First Lien Commodity Hedges. The amount of the TCEH Debtors' obligations under these transactions, including with respect to any netting of the TCEH First Lien Interest Rate Swaps and TCEH First Lien Commodity Hedges, is subject to determination.

### iv. Collateral Securing the TCEH First Lien Debt.

69. The TCEH First Lien Debt is secured by first priority liens on the collateral as defined in the TCEH Credit Agreement and the TCEH First Lien Intercreditor Agreement (defined below), including substantially all of the assets of TCEH LLC, and is guaranteed on a secured basis by a first priority lien on EFCH's equity interests in TCEH LLC and by a first priority lien on substantially all of the assets of the other TCEH Debtors. The collateral documents governing the TCEH First Lien Debt provide that liens do not attach to certain limited categories of assets as provided in the governing collateral documents.

### c. TCEH Second Lien Notes.

70. Pursuant to that certain indenture, dated as of October 6, 2010 (as amended, modified, or supplemented) for the 15% second lien notes (the "TCEH Second Lien Notes")

originally due April 1, 2021, by and among TCEH LLC and TCEH Finance, as issuers, the other TCEH Debtors, as guarantors, and Wilmington Savings Fund Society, FSB (a/k/a Christiana Trust) ("Wilmington Savings"), as successor indenture trustee to BNY, TCEH LLC and TCEH Finance issued the TCEH Second Lien Notes. Approximately $1.571 billion in principal amount of TCEH Second Lien Notes are outstanding as of the Petition Date.

71.    The TCEH Second Lien Notes are secured by a second priority lien on the collateral as set forth in that certain second lien security agreement, dated as of October 6, 2010, by and among the TCEH Debtors and BNY, as collateral agent, including substantially all of the assets of the TCEH Debtors other than (i) the same categories of assets excluded from the TCEH First Lien Debt and (ii) EFCH's equity interests in TCEH LLC and TCEH LLC's direct and indirect equity interests in the TCEH Debtors if the pledge of such equity interests would require that separate financial statements be filed with the Securities and Exchange Commission (the "SEC") for such subsidiaries. EFCH's guarantee of the TCEH Second Lien Notes is unsecured.

### d.    TCEH Unsecured Funded Debt.

### i.    Senior Unsecured Notes.

72.    Pursuant to that certain indenture, dated as of October 31, 2007 (as amended, modified, or supplemented) for two series of unsecured notes (the "TCEH Unsecured Notes"), by and among TCEH LLC and TCEH Finance, as issuers, the other TCEH Debtors, as guarantors, and Law Debenture Trust Company of New York ("LDTC"), as successor indenture trustee to BNY, TCEH LLC and TCEH Finance issued the TCEH Unsecured Notes. The following TCEH Unsecured Notes are issued and outstanding as of the Petition Date:

- approximately $3.488 billion principal amount of 10.25% notes originally due November 1, 2015;[31] and

---

[31]    Including approximately $284 million held by EFH Corp. and approximately $79 million held by EFIH.

- approximately $1.749 billion principal amount of 10.50% notes originally due November 1, 2016.

### ii.    Pollution Control Revenue Bonds.

73.    TCEH LLC has executed certain assumption agreements with respect to multiple series of Pollution Control Revenue Bonds that are held by unaffiliated third-parties.[32] As of the Petition Date, principal amounts outstanding under the Pollution Control Revenue Bonds totaled approximately $875 million in the aggregate, with interest rates generally ranging from .29%[33] to 8.25%, and original maturities ranging from June 1, 2021 to March 1, 2041.  Of that amount, approximately $19 million of variable interest rate Pollution Control Revenue Bonds are supported by outstanding letters of credit issued under the TCEH Credit Agreement.[34]  The remaining amounts outstanding under the Pollution Control Revenue Bonds are unsecured obligations of TCEH LLC.  TCEH LLC's obligations under these agreements are not secured or guaranteed by any of the other TCEH Debtors.

### e.    Other TCEH Indebtedness.

### i.    EFCH 2037 Notes

74.    Pursuant to that certain indenture, dated as of December 1, 1995, for two series of notes (the "EFCH 2037 Notes") originally due January 30, 2037, by and among EFCH, as issuer, and BNY, as trustee, EFCH issued the EFCH 2037 Notes.  Approximately $9 million in principal amount of the EFCH 2037 Notes are outstanding as of the Petition Date, including approximately $1 million of floating-rate notes and $8 million of 8.175% notes.  The EFCH

---

[32]    Additional series of Pollution Control Revenue Bonds have been repurchased by TCEH LLC and are held in a custody account.

[33]    As of March 31, 2013.

[34]    Before the Petition Date, these amounts were callable on a daily or weekly basis, depending on series.

2037 Notes are not secured or guaranteed, and are subordinate to EFCH's other funded indebtedness.

### ii.    Tex-La Obligations.

75.    EFCH is the principal obligor of, and EFH Corp. guarantees, approximately $61 million of obligations related to a series of transactions by and among the predecessors of EFH Corp. and EFCH, on one hand, and the Tex-La Electric Cooperative of Texas, Inc. ("Tex-La"), on the other hand (the "Tex-La Obligations").  Approximately $29 million and $32 million of the Tex-La Obligations were originally due in 2019 and 2021, respectively.  The Tex-La Obligations are secured by a 2.17% undivided ownership in Comanche Peak's electricity generation and transmission assets and a 6.02% undivided ownership interest in the 51.5 mile 345 kV Comanche Peak-Cleburne-Everman transmission facility.  The Tex-La Obligations relate to a settlement of litigation between the predecessor of EFCH and Tex-La in 1990.

### iii.    Leases.

76.    The TCEH Debtors are parties to leases relating to, among other things: (A) rail cars; (B) office space; (C) equipment used in business operations, including mining equipment; and (D) long-standing leases of tracts of real property.

77.    Certain of the TCEH Debtors' rail car leases are structured as leveraged leases. Under these railcar leases, a trust owns railcars and leases the railcars to the TCEH Debtors.  The trusts, in turn, have issued notes that are secured by, among other things, the railcars subject to the lease and the trust's interest in the lease.

### iv.    Fixed Facility Bonds.

78.    The TCEH Debtors' combustion turbine electricity generation assets are structured as leveraged leases that are similar to the railcar leveraged leases discussed above. Importantly, however, the TCEH Debtors own the beneficial equity interests in the trusts that

35

own these assets.  Accordingly, the TCEH Debtors are the beneficial owners and the lessors of these assets.  Approximately $39 million remains outstanding on the notes secured by the combustion turbines.

### v.    Oak Grove Promissory Note.

79.    In December 2010, Oak Grove Power Company LLC ("Oak Grove"), an indirect subsidiary of TCEH LLC, purchased certain mineral rights located in Robertson County, Texas from North American Coal Royalty Company.  Concurrent with the sale, Oak Grove executed the Oak Grove Promissory Note, which is non-interest bearing and secured by the purchased assets.  Approximately $3 million is outstanding under the Oak Grove Promissory Note as of the Petition Date.

### f.    Intercreditor Agreements.

### i.    TCEH First Lien Intercreditor Agreement.

80.    The TCEH first lien intercreditor agreement (as amended, restated, modified, and supplemented from time to time, the "TCEH First Lien Intercreditor Agreement") entered into by and among the TCEH Debtors, Citibank, N.A., as administrative agent and collateral agent, certain holders of claims under the TCEH First Lien Debt, and other parties thereto from time to time, governs certain rights and remedies as between the various holders of claims under the TCEH First Lien Debt, relative priority of claims, and certain rights and remedies in these chapter 11 cases.  In particular, the TCEH First Lien Intercreditor Agreement provides that the collateral agent, acting at the direction of the majority of holders of claims under the TCEH First Lien Debt, may consent to the use of cash collateral and the acquisition of postpetition debtor-in-possession financing.

### ii.    TCEH Second Lien Intercreditor Agreement.

81.    The TCEH second lien intercreditor agreement (as amended, restated, modified and supplemented from time to time, the "TCEH Second Lien Intercreditor Agreement") entered into by and among the TCEH Debtors, Citibank, N.A., in its capacity as successor first lien agent and collateral agent, and Wilmington Savings, as successor second lien indenture trustee, governs certain rights and remedies as between the holders of claims under the TCEH First Lien Debt, on one hand, and the holders of claims under the TCEH Second Lien Notes, on the other hand, including certain rights and remedies in these chapter 11 proceedings.  In particular, the TCEH Second Lien Intercreditor Agreement provides that if the collateral trustee, acting at a direction of a majority of the holders of TCEH First Lien Debt pursuant to the TCEH First Lien Intercreditor Agreement, consents to the use of cash collateral and the acquisition of postpetition debtor-in-possession financing, the holders of TCEH Second Lien Notes may not contest such relief.

### 2.    EFH Corp. and EFIH.

#### a.    Overview.

82.    As of the Petition Date, EFH Corp. and EFIH had outstanding funded indebtedness of approximately $1.929 billion at EFH Corp. and approximately $7.709 billion at EFIH as summarized in the following table:[35]

---

[35]    In addition to these amounts, EFH Properties Company is obligated on a leveraged lease relating to Energy Plaza, EFH's corporate headquarters.  The lease is currently serviced by the proceeds of a previously-drawn letter of credit issued under the TCEH Credit Agreement.  EFH Corp. has a receivable from EFH Properties Company for this letter of credit, and reimbursed the TCEH Debtors for this letter of credit when it settled its obligations under the TCEH Demand Note (defined herein).

| Security | Debt Obligation | Approx. Amount Outstanding as of the Petition Date | Interest Payment Due Dates | Original Maturity/Payoff Date | Obligors |
|---|---|---|---|---|---|
| **EFH Corp. Debt** | | | | | |
| EFH Corp. Unsecured | EFH Legacy Notes | $1.864 billion[36] | May 15; November 15 | Varies by series, November 2014, November 2024, and November 2034 | EFH Corp. as issuer |
| | EFH LBO Notes | $60 million | May 1; November 1 | November 2017 | EFH Corp. as issuer EFCH as unsecured guarantor EFIH as unsecured guarantor |
| | EFH Unexchanged Notes | $5 million | Varies | Varies | EFH Corp. as issuer |
| **EFIH Debt** | | | | | |
| EFIH First Lien Secured | EFIH First Lien 2017 Notes | $503 million | February 15; August 15 | August 2017 | EFIH and EFIH Finance as issuers |
| | EFIH First Lien 2020 Notes | $3.482 billion | June 1; December 1 | December 2020 | |
| EFIH Second Lien Secured | EFIH Second Lien 2021 Notes | $406 million | May 15; November 15 | October 2021 | EFIH and EFIH Finance as issuers |
| | EFIH Second Lien 2022 Notes | $1.750 billion | March 1; September 1 | March 2022 | |
| EFIH Unsecured | EFIH Senior Toggle Notes | $1.566 billion | June 1; December 1 | December 2018 | EFIH and EFIH Finance as issuers |
| | EFIH Unexchanged Notes | $2 million | April 15; October 15 | October 2019 | |

## b.    EFH Corp. Debt.

83.    Approximately $1.929 billion in outstanding unsecured notes issued by EFH Corp. (the "EFH Unsecured Notes") are outstanding as of the Petition Date (including amounts held by EFIH).   In addition to the EFH Unsecured Notes, EFH Corp. guarantees the Tex-La Obligations described above.

### i.    EFH Legacy Notes.

84.    Pursuant to three separate indentures, each dated as of November 1, 2004 (as amended, modified, or supplemented), and three associated officer's certificates, each dated as of November 26, 2004, for three series of unsecured notes (the "EFH Legacy Notes"), by and among EFH Corp., as issuer, and American Stock Transfer & Trust Company, LLC ("AST"), as successor indenture trustee to BNY, the predecessor to EFH Corp. issued the EFH Legacy Notes. The following EFH Legacy Notes are outstanding as of the Petition Date:

---

[36]    Includes approximately $1.282 billion held by EFIH.

- approximately $371 million principal amount of 5.55% notes originally due November 15, 2014;[37]

- approximately $746 million principal amount of 6.50% notes originally due November 15, 2024;[38] and

- approximately $747 million principal amount of 6.55% notes originally due November 15, 2034.[39]

### ii.    EFH LBO Notes.

85.    Pursuant to that certain indenture, dated as of October 31, 2007 (as amended, modified, or supplemented) for two series of notes (the "EFH LBO Notes") originally due November 1, 2017, by and among EFH Corp, as issuer, EFCH and EFIH, as guarantors, and AST, as successor indenture trustee to BNY, EFH Corp. issued the EFH LBO Notes.  The EFH LBO Notes are guaranteed on an unsecured basis by EFCH and EFIH.  Approximately $60 million principal amount of EFH LBO Notes, including $33 million of 10.875% notes and $27 million of 11.25% notes, are outstanding as of the Petition Date.

### iii.    EFH Unexchanged Notes.

86.    Pursuant to two separate indentures, one dated November 16, 2009, and the other dated January 12, 2010 (each as amended, modified, or supplemented) for two series of unsecured notes (the "EFH Unexchanged Notes"), by and among EFH Corp., as issuer, and AST, as successor indenture trustee to BNY, EFH Corp. issued the EFH Unexchanged Notes.  The EFH Unexchanged Notes are unsecured, unguaranteed obligations of EFH Corp.  Approximately $3 million of 10.00% EFH Unexchanged Notes originally due January 2020 and $2 million of

---

[37]    Approximately $281 million of these notes are held by EFIH.

[38]    Approximately $545 million of these notes are held by EFIH.

[39]    Approximately $456 million of these notes are held by EFIH.

9.75% EFH Unexchanged Notes originally due October 2019 are outstanding as of the Petition Date.[40]

### c.    EFIH Debt.

87.    As of the Petition Date, EFIH has approximately $7.709 billion in outstanding funded indebtedness, including approximately:  (i) $3.985 billion of first lien notes (the "EFIH First Lien Notes"); (ii) approximately $2.156 billion of second lien notes (the "EFIH Second Lien Notes"); and (iii) approximately $1.568 billion of unsecured notes (the "EFIH Unsecured Notes").[41]  Additionally, as described above, EFIH is an unsecured guarantor of approximately $60 million of EFH LBO Notes.

### i.    EFIH First Lien Notes.

88.    Pursuant to that certain indenture, dated August 14, 2012 (as amended, modified, or supplemented), for the 6.875% EFIH First Lien Notes originally due August 15, 2017, by and among EFIH and EFIH Finance, as issuers, and CSC Trust Company of Delaware ("CSC") as successor indenture trustee to BNY, EFIH and EFIH Finance issued a series of EFIH First Lien

---

[40]    The EFH Unexchanged Notes were previously guaranteed by EFCH and EFIH.  EFIH's guarantee was secured by a first priority lien on EFIH's equity interest in Oncor.  The guarantees and lien were eliminated in subsequent transactions.

[41]    These amounts do not include any EFIH Makewhole Claims (as defined herein).  As discussed below, EFIH and EFIH Finance (the "EFIH Debtors") have contemporaneously filed the *Motion of Energy Future Intermediate Holding Company LLC and EFIH Finance, Inc. for Entry of (I) an Interim Order (A) Approving Certain Fees Related to Postpetition Financing and Granting Such Fees Administrative Expense Priority and (B) Scheduling a Final Hearing; and (II) a Final Order (A) Approving Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Authorizing the Use of Cash Collateral, (D) Authorizing the EFIH First Lien Refinancing, (E) Authorizing Issuance of Roll-Up Debt to the Extent Authorized by the Settlement Motion, (F) Determining the Value of Secured Claims, and (G) Modifying the Automatic Stay*   (the "EFIH First Lien DIP Motion"), pursuant to which the EFIH Debtors seek the authority to borrow approximately $5.35 billion to fund their obligations during these chapter 11 cases and refinance the EFIH First Lien Notes in full.  In connection with the EFIH First Lien DIP Motion, the EFIH Debtors seek a determination that no make-whole amounts are due.  The EFIH Debtors will also seek to refinance the EFIH Second Lien Notes pursuant to a separate motion filed on or around the Petition Date. The EFIH Debtors will seek to disallow any EFIH Second Lien Makewhole Claims asserted as a result of the EFIH Second Lien Refinancing.

Notes, of which approximately $503 million principal amount is outstanding as of the Petition Date.[42]

89.    Pursuant to that certain indenture, dated August 17, 2010 (as amended, modified, or supplemented), for the 10.00% EFIH First Lien Notes originally due December 1, 2020, by and among EFIH and EFIH Finance, as issuers, and CSC, as successor indenture trustee to BNY, EFIH and EFIH Finance issued a series of EFIH First Lien Notes, of which approximately $3.482 billion principal amount is outstanding as of the Petition Date.[43]

90.    The EFIH First Lien Notes are secured by first priority liens in the collateral as defined in the EFIH Collateral Trust Agreement (defined below) and certain related documentation, specifically, EFIH's equity interest in Oncor Holdings.  The EFIH First Lien Notes are not guaranteed.

### ii.    EFIH Second Lien Notes.

91.    Pursuant to that certain indenture, dated April 25, 2011 (as amended, modified, or supplemented) for the EFIH Second Lien Notes, by and among EFIH and EFIH Finance, as issuers, and Computershare Trust Company, N.A. and Computershare Trust Company of Canada ("Computershare") as successor indenture trustee to BNY, EFIH issued two series of EFIH

---

[42]    Pursuant to a registration rights agreement, EFIH agreed to use its commercially reasonable efforts to register notes under the Securities Act having substantially the same terms as the EFIH First Lien 2017 Notes as part of an offer to exchange freely tradable notes for the EFIH First Lien 2017 Notes by August 14, 2013.  The exchange offer was not completed by August 14, 2013, resulting in a .25% increase in interest rate.  Under the terms of the registration rights agreement, the interest rate on the EFIH First Lien 2017 Notes increased by another .25% 90 days after August 14, 2013.  The Debtors have reserved all of their rights with respect to the registration rights agreement.

[43]    Pursuant to a registration rights agreement, EFIH agreed to use its commercially reasonable efforts to register notes under the Securities Act having substantially the same terms as the EFIH First Lien 2017 Notes as part of an offer to exchange freely tradable notes for approximately $1.302 billion of the EFIH First Lien 2017 Notes issued in January 2013.  Under the terms of the agreement, the registration was supposed to occur by January 29, 2014.  The exchange offer was not completed by January 29, 2014, resulting in a .25% increase in interest rate.  Under the terms of the registration rights agreement, the interest rate on the applicable EFIH First Lien 2017 Notes will increase by another .25% on April 30, 2014.  The Debtors have reserved all of their rights with respect to the registration rights agreement.

Second Lien Notes.  The following EFIH Second Lien Notes are outstanding as of the Petition

Date:

- approximately $406 million principal amount of 11.00% EFIH Second Lien Notes originally due October 1, 2021; and

- approximately $1.750 billion principal amount of 11.75% EFIH Second Lien Notes originally due March 1, 2022.[44]

92.    The EFIH Second Lien Notes are secured by second priority liens in the collateral

as defined in the EFIH Collateral Trust Agreement (defined below) and certain related

documentation, specifically, EFIH's equity interest in Oncor Holdings.  The EFIH Second Lien

Notes are not guaranteed.

### iii.    EFIH Unsecured Notes.

93.    Pursuant to that certain indenture, dated as of November 16, 2009 (as amended,

modified, or supplemented) for the 9.75% unsecured notes (the "EFIH Unexchanged Notes")

originally due October 15, 2019, by and among EFIH and EFIH Finance, as issuers, and UMB

Bank, N.A. ("UMB"), as successor indenture trustee to BNY, EFIH and EFIH Finance issued the

EFIH Unexchanged Notes.    Approximately $2 million of EFIH Unexchanged Notes are

outstanding as of the Petition Date.[45]

94.    Pursuant to that certain indenture, dated as of December 5, 2012 (as amended,

modified, or supplemented) for 11.25%/12.25% toggle notes (the "EFIH Senior Toggle Notes")

originally due December 1, 2018, by and among EFIH and EFIH Finance, as issuers, and UMB,

---

[44] Pursuant to a registration rights agreement, EFIH agreed to use its commercially reasonable efforts to register notes under the Securities and Exchange Act having substantially the same terms as the EFIH Second Lien 2022 Notes as part of an offer to exchange freely tradable notes for the EFIH Second Lien 2022 Notes by February 5, 2013.  The exchange offer was not completed by February 5, 2013, resulting in a .25% increase in interest for 90 days and an additional .25% increase when the exchange offer was not completed by May 6, 2013.  The Debtors have reserved all of their rights with respect to the registration rights agreement.

[45] The EFIH Unexchanged Notes were previously secured by a first priority lien on EFIH's equity interest in Oncor Holdings.  The lien was eliminated in subsequent transactions.

as successor indenture trustee to BNY, EFIH and EFIH Finance issued the EFIH Senior Toggle Notes.  Approximately $1.566 billion of EFIH Senior Toggle Notes are outstanding as of the Petition Date.[46]

### d.    EFIH Collateral Trust Agreement.

95.    The collateral trust agreement (as amended, restated, modified, and supplemented from time to time, the "EFIH Collateral Trust Agreement") entered into by and among EFIH, CSC, as successor indenture trustee for the EFIH First Lien Notes and as successor "Collateral Trustee" in the indentures governing the EFIH First Lien Notes and the EFIH Second Lien Notes, Computershare, as indenture trustee for the EFIH Second Lien Notes, and other parties thereto from time to time, governs certain rights and remedies as between the holders of claims under the EFIH First Lien Notes, on one hand, and holders of claims under the EFIH Second Lien Notes, on the other hand, including certain rights and remedies in these chapter 11 proceedings.  In particular, the EFIH Collateral Trust Agreement provides that the collateral trustee, acting at the direction of a majority of holders of the EFIH First Lien Notes, may consent to the use of cash collateral and the acquisition of postpetition debtor-in-possession financing, and that  holders of EFIH Second Lien Notes may not contest such relief.

### 3.    Oncor.

96.    As of December 31, 2013, Oncor, together with its subsidiary Oncor Electric Delivery Transition Bond Company LLC ("Oncor BondCo"), had approximately $6.29 billion of outstanding funded indebtedness.  The Debtors expect that none of Oncor's business operations,

---

[46]    Pursuant to a registration rights agreement, EFIH agreed to use its commercially reasonable efforts to register notes under the Securities and Exchange Act having substantially the same terms as the EFIH Senior Toggle Notes as part of an offer to exchange freely tradable notes for the EFIH Senior Toggle Notes by December 5, 2013.  The exchange offer was not completed by December 5, 2013, resulting in a .25% increase in interest for 90 days and an additional .25% increase when the exchange offer was not completed by March 5, 2014.  The Debtors have reserved all of their rights with respect to the registration rights agreement.

assets, or liabilities, including Oncor's and Oncor BondCo's outstanding funded indebtedness, will be materially affected by the chapter 11 cases. Oncor's outstanding funded indebtedness will vary during these chapter 11 cases.

## Part II.
## The Events Leading to the Chapter 11 Cases

### A.    History of EFH Corp.

97.    TXU Corp. (the predecessor of EFH Corp.) was historically a geographically-determined, vertically-integrated, rate-regulated monopoly electricity provider. In other words, TXU Corp. generated its own electricity and transmitted and sold that electricity to customers within its service territory at rates determined by the PUC. That changed with the partial deregulation of the Texas electricity market, which proceeded in two steps. *First*, in 1995, the Texas legislature passed legislation to begin deregulation of the wholesale electricity market. *Second*, in 1999, the Texas legislature passed legislation that mandated deregulation of the retail electricity market and unbundling of integrated utilities in the competitive ERCOT market into separate transmission and distribution utilities, which remained rate-regulated, and competitive electricity generators/wholesalers and retail electricity providers, to be accomplished by 2002. Accordingly, in 2002, TXU Corp. separated its regulated transmission and distribution utility from its deregulated generation, wholesale, and retail electricity units. The transmission and distribution utility remained rate-regulated while the generation, wholesale, and retail businesses became subject to market-driven prices and competitive forces.

98.    As discussed in greater detail below, the wholesale price of electricity is closely related to the price of natural gas in the ERCOT market. The monthly settled price of natural gas almost tripled between 1999 and 2006, resulting in significant increases in the enterprise value of TXU Corp. Moreover, the robust Texas economy led to continuing increases in the demand for

44

electricity.  As a result of increases in natural gas prices, along with other efforts undertaken in the mid-2000s to address certain leverage and over-diversification issues, TXU Corp.'s performance improved and its stock value significantly increased between 2003 and early 2007.

### B.    The 2007 Acquisition.

99.    On February 26, 2007, TXU Corp. announced that it had entered into a merger agreement with the EFH Equity Owners (along with certain co-investors).  The merger agreement contemplated that the EFH Equity Owners and their co-investors, through a merger involving a merger subsidiary of the newly-created Texas Energy Future Holdings Limited Partnership, would acquire all outstanding shares of TXU Corp. for $69.25 per share in cash. This amount represented a premium over the stock price of TXU Corp. before the 2007 Acquisition was announced.

100.    In the 2007 Acquisition transaction, approximately $31.5 billion in new debt was issued, including approximately $27 billion at TCEH and approximately $4.5 billion at EFH Corp.  Additionally, Oncor and TCEH drew approximately $1.3 billion and $250 million on new revolving credit facilities, respectively.  Finally, the EFH Equity Holders and their co-investors contributed approximately $8.3 billion as equity capital.  The 2007 Acquisition resulted in the cash buy-out of the equity held by former TXU Corp. shareholders totaling approximately $31.9 billion and the assumption of approximately $14.7 billion of existing debt, of which approximately $6.5 billion was repaid when the 2007 Acquisition closed.[47]  Following these transactions, EFH had approximately $41.3 billion of outstanding funded indebtedness, including approximately $28.8 billion at TCEH, $128 million at EFCH, $7.2 billion at EFH Corp., and

---

[47]    Amounts exclude capital leases and a promissory note.

$5.2 billion at Oncor.  The 2007 Acquisition was—and remains—the largest private buy-out in history.

### C.    EFH Following the 2007 Acquisition.

101.    After the 2007 Acquisition, the EFH Equity Owners put in place an experienced management team, including the retention of key pre-2007 Acquisition management, and also elected a well-qualified, diverse board of directors to execute their plan to improve EFH's immediate and long-term competitive position.   Today, EFH continues to be led by an experienced team of management and directors, who include, among others:

- Donald L. Evans, who has been the Chairman of EFH Corp. since October 2007.  Mr. Evans previously served as the U.S. Secretary of Commerce.

- John Young, who has been the President and CEO of EFH Corp., TCEH LLC, and EFIH since January 2008.  Mr. Young previously held many leadership roles at Exelon Corporation from March 2003 to January 2008, including Executive Vice President and Chief Financial Officer of Exelon Corporation; President of Exelon Generation; and President of Exelon Power.  Before joining Exelon, Mr. Young was Senior Vice President of Sierra Pacific Resources Corporation, Executive Vice President of Southern Generation, and served as a naval officer in the United States Navy for 5 years.  In sum, Mr. Young has 30 years of experience in the utility industry.

- Paul Keglevic, who has been the CFO of EFH Corp., TCEH, and EFIH since July 2008, the co-CRO of EFH Corp. since October 2013, and the co-CRO of TCEH LLC and EFIH since February 2014.    Mr. Keglevic previously was PricewaterhouseCoopers' Utility Sector Leader from 2002 to 2008 and Clients and Sector Assurance Leader from 2007 to 2008.  Before that, Mr. Keglevic was the head of the utilities practice and Pacific Rim Managing Partner at Arthur Andersen, where he was a partner for 15 years.  In sum, Mr. Keglevic has 38 years of experience in the utility industry.

- Stacey Doré, who has been the General Counsel of EFH Corp., TCEH LLC, and EFIH since April 2012, the co-CRO of EFH Corp. since October 2013, and the co-CRO of TCEH LLC and EFIH since February 2014.  Ms. Doré has been with EFH since December 2008 and previously served as Associate General Counsel of Litigation and General Counsel of Luminant.  Ms. Doré was previously an attorney at Vinson & Elkins.

- Mac McFarland, who has been CEO of Luminant since December 2012.   Mr. McFarland has been with EFH since July 2008 and previously served as Executive Vice President and Chief Commercial Officer of Luminant. Before joining Luminant,

46

Mr. McFarland served as Senior Vice President of Mergers, Acquisitions and Divestitures and as a Vice President in the wholesale marketing and trading division power team at Exelon Corporation.  In sum, Mr. McFarland has 16 years of experience in the utility industry.

- Jim Burke, who has been the CEO of TXU Energy since August 2005.  Mr. Burke has been with EFH since October 2004 and previously served as Senior Vice President of Consumer Markets of TXU Energy.  Before joining TXU Energy, Mr. Burke served as President and Chief Operating Officer of Gexa Energy and as a Senior Vice President of Consumer Operations with Reliant Energy, two other major Texas REPs.  Previously, Mr. Burke worked for the Coca-Cola Company for six years in finance and general management for the domestic and international juice divisions.  In sum, Mr. Burke has more than 20 years of experience in the retail services and consumer products industry, including 14 years in the retail electricity market.

102.    EFH's management team and board of directors have focused their efforts on implementing a host of initiatives that have resulted in numerous operational accomplishments notwithstanding challenging wholesale electricity market conditions.  In addition to the specific initiatives discussed below, management has, among other things:

- identified and invested more than $10 billion in new electric infrastructure in Texas, including three new generation units, two new mining complexes, new transmission and distribution wires, approximately two million advanced meters, and also upgraded critical support and IT systems;

- increased Adjusted EBITDA[48] from approximately $4.578 billion in 2008 to approximately $5.257 billion in 2012 and $4.699 billion in 2013 despite low wholesale electricity prices and other challenging market conditions;

- achieved a reduction of approximately 15% in selling, general, and administrative expenses for the competitive businesses, including "bad debt" expenses, from 2009 to 2013, successfully reducing costs without negatively impacting necessary capital expenditures; and

- hired and/or insourced approximately 1,900 employees to support new assets, improve customer service, and improve operations.

---

[48]    "Adjusted EBITDA" measures earnings (net income) before interest expense, income taxes, depreciation, and amortization, adjusted to exclude noncash items, unusual items, and other adjustments allowed under certain of EFH's debt documents.

### 1. Luminant Remains a Market Leader in All Aspects of Electricity Generation and Wholesale Operations.

103.     Following the 2007 Acquisition, Luminant continued a robust hedging program designed to reduce the risks of a decline in wholesale electricity prices.  The hedging program used financial natural gas instruments to reduce Luminant's exposure to declines in future wholesale electricity prices that result from decreases in the price of natural gas.  This program has operated as designed and contributed approximately $998 million, $1.833 billion, and $1.265 billion, $1.152 billion, and $752 million of TCEH's Adjusted EBITDA in 2013, 2012, 2011, 2010, and 2009, respectively, compared to TCEH's overall Adjusted EBITDA of $2.919 billion, $3.574 billion, $3.584 billion, $3.85 billion, and $3.634 billion in those same years.  As discussed below, however, a significant portion of TCEH's hedge program matured in 2013, and the remaining position has, or will, mature in 2014.

104.     Luminant also completed construction on three new lignite/coal units in 2009 (for new units at Sandow and Oak Grove) and 2010 (for a second new unit at Oak Grove) and offset 100% of key emissions from the new units through a voluntary emissions reduction program. The new units satisfied one of many commitments made in connection with the 2007 Acquisition, helped to ensure sufficient generation capacity in the ERCOT market, and were completed on-time and on-budget.  Luminant also terminated plans for eight additional lignite/coal generation units in compliance with its 2007 Acquisition-related commitments.

105.     Since the 2007 Acquisition, Luminant has achieved significant operational milestones while making significant investments in environmental improvements.  Luminant's nuclear and lignite/coal-fueled generation units are consistently among the most reliable and efficient in the country.  Additionally, the two new units at Oak Grove have the lowest key emissions rates of any Texas lignite units with rates that are at least 63% lower than the national

average for coal units.    Since the 2007 Acquisition, Luminant has increased its lignite/coal-fueled generation output by 21% while satisfying its commitment to decrease the key emissions of its lignite/coal-fueled units by more than 20% from a 2005 benchmark.  Luminant is also a significant purchaser of wind-generated electricity in Texas, with contracts for approximately 700 MW of wind power and related renewable energy credits.  These purchases have allowed Luminant to contribute to environmental improvements and allowed TXU Energy to diversify its retail product offerings.

106.    Luminant's mining activities have also continued to add value to EFH and, specifically, to the TCEH Debtors.  Since the 2007 Acquisition, Luminant has added two mines and is in the process of opening three additional mining operations and expanding operations at other sites.    Additionally, Luminant has been the recipient of numerous awards and acknowledgements related to mining safety and land reclamation, including an unprecedented five Director's Awards for advancing the science of reclamation from the U.S. Department of the Interior's Office of Surface Mining, most recently in 2009; the Texas Coal Mining Reclamation Award from the RCT in 2014; and the 2014 National Mine Reclamation Award in the coal category from the Interstate Mining Compact Commission.

107.    Importantly, Luminant has achieved these operational successes while maintaining a very strong safety record.  For example:

- in 2012, Luminant recorded its best safety year on record as measured by a key industry standard of number of incidents reportable to the Occupational Safety and Health Administration per 200,000 man-hours;

- three of Luminant's mines have recorded between two and four years without any injuries that resulted in "lost time"—in other words, no workers at those mines have been injured in a way that has resulted in any time off the job;

- Luminant's natural gas-fueled plants have had no "lost time" injuries for nine years;

49

- the Monticello lignite/coal-fueled plant has not had a lost-time injury for 21 years; and

- Comanche Peak's employees and contractors have worked more than seven million total hours without a lost-time injury.

### 2. TXU Energy Remains a Market-Leading REP.

108. TXU Energy has maintained its position as a leading REP in Texas by providing top-tier customer services, focusing on target customers, leveraging its high brand recognition, maintaining highly competitive retail prices, and providing innovative products and services. Importantly, TXU Energy has reduced customer complaints by more than 88% since 2009 and is in the top decile of performance in the industry with respect to customer complaints. At the same time, TXU Energy has lowered "bad debt" expense by 71% since 2009 through collection initiatives, customer mix initiatives, and credit policy improvements. TXU Energy has also maintained its position as a leader in technological innovation, leading the way in developing digital capabilities that allow customers to manage and control their electricity costs, such as smart phone applications that allow users to adjust their thermostat remotely. TXU Energy's commitment to innovation makes its products more attractive to customers and improves the environmental footprint of EFH by improving its customers' energy efficiency.

109. Following the 2007 Acquisition, TXU Energy instituted a 15% residential price cut to legacy customers, making it the lowest-cost incumbent provider in Texas, and locked those rates in place through 2008. TXU Energy also provided approximately $125 million in low-income customer assistance through 2012, waived deposit requirements for certain customers, and formed a new Low Income Advisory Committee made up of leaders in the social service delivery sector. TXU Energy Aid[SM] is the company's flagship program for customers in need and is the largest bill payment assistance program in the nation among electricity providers.

Over the past 30 years, TXU Energy Aid[SM] has provided more than $84 million to help more than 455,000 current or former customers in temporary financial need pay their electric bills.

110.    Additionally, TXU Energy has invested more than $100 million to develop innovative, sustainable, and energy savings products and services to help customers better manage their electricity usage.  The suite of sustainability and energy savings solutions, as well as time of use electricity plans, benefit residential and business customers.  A portion of the investment was dedicated to initiatives for low-income customers.  The program has been beneficial to the environment—lower consumption means lower levels of pollutants—and beneficial to EFH's ability to attract and retain customers demanding greater control over their electricity use.

111.    TXU Energy's initiatives have generated positive results.  There are more than 50 REPs offering more than 300 electricity plans to residential customers in areas serviced by Oncor.  Yet, even with that level of competition, TXU Energy's annual residential customer net attrition numbers have declined since 2011.  In fact, TXU Energy had less than 1% net attrition in both the third and fourth quarters of 2013.  Indeed, TXU Energy has the lowest residential net attrition among the "incumbent" REPs (*i.e.*, REPs that are associated with a pre-deregulation electric utility) in the areas traditionally served by those incumbent REPs since 2001.  In other words, since deregulation in 2002, TXU Energy has maintained a larger portion of its residential customers than other incumbent REPs.[49]

---

[49]    Based on information provided by the PUC that evaluates the number of residential customers who purchase electricity from the REP that is historically associated with that customer's regulated transmission and distribution utility.  In other words, a higher percentage of Oncor's customers purchase their electricity from TXU Energy compared to the same statistic for the other regulated transmission and distribution utilities and formerly affiliated REPs in Texas.

### 3.    Other Initiatives.

112.    Following the 2007 Acquisition, EFH put a number of initiatives in place in addition to the operational improvements at TXU Energy and Luminant.  Importantly, EFH has focused on achieving cost savings and service excellence in its provision of shared services to create value for TCEH and the rest of EFH.  The results have been positive:  costs have declined significantly while service has improved significantly.  Part of that improvement has been the reversal of certain outsourcing agreements for human resources, IT, supply chain, and some accounting functions.  Insourcing a significant portion of those functions has resulted in lower cost to EFH while also improving the quality of service to the business and external customers.

113.    Additionally, EFH established a sustainable energy advisory board composed of labor, economic development, reliability/technology, and environmental advocacy representatives of the Texas community as part of a long-term commitment to being a leader on sustainability issues.

### D.    The Result of Low Natural Gas Prices on EFH's Financial Performance Following the 2007 Acquisition.

114.    The 2007 Acquisition was driven, in part, by the expectation that natural gas prices and wholesale electricity prices in the ERCOT market would either stay steady or continue to rise over the long run, or, at a minimum, that there would not be a significant long-term decline in natural gas prices.  These expectations held true in the year following the 2007 Acquisition.  The monthly NYMEX Henry Hub settled price of natural gas futures contracts was $6.42 per MMBtu in October 2007, when the 2007 Acquisition closed.  In 2008, that figure rose as high as $13.11 per MMBtu.  Additionally, the average monthly NYMEX Henry Hub futures contract settled prices for the years ending December 31, 2007 and 2008 were $6.86 per MMBtu and $9.03 per MMBtu, respectively.  Those increases in natural gas prices contributed, in part, to

increases in ERCOT wholesale electricity prices from $52.42 per MWh in 2007 to $63.44 per MWh in 2008. Operating revenues for the competitive electric segment (*i.e.*, TCEH) increased from $8.56 billion to $9.79 billion in the years ending December 31, 2007 and 2008, respectively, due in part to higher wholesale electricity prices reflecting rising natural gas prices. As discussed below, however, technological breakthroughs began to fundamentally alter the energy landscape beginning in 2008, leading, in principal part, to the Debtors' current financial difficulties.

### 1.    The Texas Electricity Market and the Role of ERCOT.

115.    Texas is the largest electricity market in the United States and the eleventh-largest electricity market worldwide—ranking ahead of, among others, the United Kingdom, Italy, and Spain. Several regional reliability coordinating organizations are responsible for ensuring the reliability of the Texas electricity system, and ERCOT is the largest such organization. The ERCOT market covers 75% of Texas's land mass and represents approximately 85% of the electricity consumption in Texas.

116.    The ERCOT mark is a unique "power island" contained within Texas. The following map shows reliability areas, which are generally subject to regulation by the FERC and several regional reliability agencies.



117.    Most of these reliability areas are part of the much larger western and eastern interconnections.  The ERCOT reliability region, by contrast, is also its own standalone interconnection, and it has very limited export and import capability.  Accordingly, approximately 98% of the electricity generated in the ERCOT market is consumed in the ERCOT market.

118.    ERCOT is the regional independent system operator ("ISO") for the ERCOT interconnection—by contrast, no other interconnections or reliability regions are completely served by a single ISO.  ERCOT schedules power on an electric grid that connects 40,500 miles of transmission lines and more than 550 generation units, comprising approximately 84,500 MW of installed generation capacity, including approximately 2,000 MW of idled capacity and more than 11,500 MW of wind and other resources that are not available under certain conditions.  Of the total installed capacity, approximately 59% is natural gas-fueled generation, 28% is lignite/coal and nuclear-fueled generation, and 13% is fueled by wind and other renewable resources.

119.    ERCOT is responsible for procuring energy on behalf of its members while maintaining the reliable operation of the electricity supply system in the market.  ERCOT also performs financial settlements for the competitive wholesale electricity market and enforces certain credit requirements, including collateral posting requirements, to ensure market participants' creditworthiness for transactions facilitated by ERCOT.    Additionally, ERCOT administers retail switching for the 6.7 million customers[50] in the ERCOT market that have the ability to choose their REP.  ERCOT's membership consists of approximately 300 corporate and associate members, including electric cooperatives, municipal power agencies, independent generators, independent power marketers, investor-owned utilities, REPs, and consumers. ERCOT operates under reliability standards set by the NERC and the TRE and is subject to regulatory and legislative oversight by the PUC.

120.    Notwithstanding the ERCOT market's "power island" status, the delivery of electricity in the ERCOT market operates similarly to other electricity markets in the United States.  Market participants buy and sell electricity utilizing both the spot or "real-time" market (*i.e.*, electricity for current transmission/distribution and use by consumers) and the day-ahead market, both of which are facilitated by ERCOT in its role as the ISO, and through bilateral contracts that indirectly facilitate the majority of wholesale electricity sales in the ERCOT market.  These markets allow ERCOT, in conjunction with the qualified scheduling entities that transact directly in the day-ahead and spot markets (facilitated by the bilateral contracts entered into between electricity generators/wholesalers, retailers, and the qualified scheduling entities), to ensure that electricity is reliably delivered to all market participants.

---

[50]    Measured by number of electricity meters.

a.    **The Role of Natural Gas in Wholesale Electricity Pricing in the ERCOT Market.**

121.    Natural gas-fueled generation accounted for approximately 59% of the electricity generation capacity, and 41% of the electricity actually produced and consumed, in the ERCOT market in 2013.  Natural gas units, however, meet the peak, or "marginal," electricity demand approximately 70-90% of the year.  Accordingly, when natural gas-fueled units satisfy demand, prices for wholesale electricity are highly correlated to the price of natural gas.  The chart below illustrates the correlation between natural gas prices and wholesale electricity prices between 2007 and the beginning of 2014:



**ERCOT North HUB Power Price:** Average of Hourly Real-Time Settlement Point Power Prices for the specified delivery month for the ERCOT North HUB (a price point in the current nodal market structure) from December 2011 to March 2014 and the ERCOT North Zone (comparable price point in the previous zonal market structure) from January 2007 to November 2011

**NYMEX Natural Gas Price:** Final NYMEX Henry Hub Physical Futures settled price for the specified delivery month from January 2007 to March 2014

122.    There are essentially six classes of generation assets in the ERCOT market: (i) renewable generation (including wind, hydro-electric, and solar generation); (ii) nuclear;

(iii) lignite/coal; (iv) combined-cycle gas turbines ("CCGTs"), which are more efficient natural gas units;  (v) other natural gas and oil assets; and (vi) internal combustion assets.  As demand for electricity increases or decreases, ERCOT dispatches its assets in ascending order based on cost to generate each marginal MW of electricity.  That cost is generally approximated by a unit's fuel expense.

123.    Generally, in the ERCOT market, when natural gas prices are high, the cost to generate electricity using natural gas-fueled units is high.  These natural gas-fueled units generally set the cost for wholesale electricity in the ERCOT market because they normally satisfy the marginal demand for electricity.  As a result, high natural gas prices generally lead to high wholesale electricity prices.  Lignite/coal and nuclear-fueled units have the ability to benefit from these increases in wholesale electricity prices:  the variable cost to produce electricity using these units are not directly affected by changes in natural gas prices, and the electricity generated by lignite/coal and nuclear-fueled units can be sold for the higher wholesale prices set by natural gas-fueled plants.  Importantly, however, lignite/coal and nuclear units have high start-up costs relative to natural gas units and require longer notice or "lead time" to start.  As a result, lignite/coal units may run at a loss when wholesale electricity prices are low.

124.    Natural gas units, by contrast, typically have lower start-up costs and generation can be substantially increased or decreased in a relatively short period of time.  As a result, natural gas units are more likely to be shut down when wholesale electricity prices are below the natural gas unit's cost to produce electricity.  Importantly, when natural gas prices are relatively low, the cost of producing electricity from CCGTs may drop below the cost of producing electricity from lignite/coal units.  When this occurs, these CCGTs—which Luminant does not own—can displace lignite/coal units, including certain of Luminant's lignite/coal units, at lower

levels of demand, and exacerbate the effect low natural gas prices have on the profitability of those lignite/coal units.  This is a market function known as "coal to gas switching."

125.    These factors reflect a key economic driver for the Debtors:  high natural gas prices contribute to high wholesale electricity prices and higher profitability for Luminant's entire electricity generation fleet, particularly its lignite/coal and nuclear-fueled units.   By contrast, declines in natural gas prices result in lower wholesale electricity prices, increased coal-to-gas switching, lower generation from lignite/coal units, and lower profitability for Luminant's entire electricity generation fleet.   As discussed below, market conditions and technological innovations led to such a decline following the 2007 Acquisition—and that decline has had a substantial negative effect on the results of TCEH's business operations, even after accounting for TCEH's natural gas hedging program.

### 2.    The Precipitous Drop in Natural Gas Prices Resulting From the Development of Unconventional Natural Gas.

126.    When the 2007 Acquisition closed, market conditions, including forward natural gas prices, indicated that EFH would be able to service, repay, and refinance its 2007 Acquisition-related debt and generate positive returns for the EFH Equity Owners and their co-investors.  As discussed below, however, a precipitous and prolonged decline in natural gas prices that resulted from increased exploitation and production of "unconventional" natural gas fundamentally altered market conditions not just for EFH, but for the United States and global energy industry as a whole.

127.    The increased exploitation and development of unconventional natural gas largely results from the development of a process known as hydraulic fracturing (widely known as "fracking").  Unconventional natural gas rests 5,000 to 15,000 feet below the surface, trapped within shale rock and tight sand formations.  Geologists have long known that the United States

has access to the world's largest concentration of natural gas, but until the development of fracking, much of that gas could not be economically extracted.  At its core, the fracking process is simple.  Engineers crack open the shale rock holding the gas by pumping highly-pressurized fluid into the rock, allowing the gas to escape.  When the well is de-pressurized, the gas—which is higher-pressure than the fluids used to break the rock apart—flows to the surface.

128.    Both technological limitations and federal law limited early attempts to capitalize on fracking.  For example, for effective fracking, the cracks in the shale rock must be maintained by a high amount of pressure.  Early processes did not maintain pressure long enough to enable the gas to escape, and picking a spot for new drilling was little better than guesswork because of limitations on underground imaging technology.  Moreover, fracking was essentially banned by the Safe Drinking Water Act, which imposed strict requirements on the injection of industrial chemicals into the ground.  In 2005, however, Congress—citing a 2004 EPA study indicating that the process is safe—lifted the fracking ban.

129.    Between 2005 and 2008, natural gas prices continued to increase.  The prolonged, substantial decreases in natural gas prices that later occurred as a result of fracking were not anticipated at the time of the 2007 Acquisition because of, among other things, technological barriers, environmental concerns, expected increases in natural gas exports, and expected decreases in production to offset decreases in price.  Contrary to expectations at the time of the 2007 Acquisition, however, the technological barriers were overcome.  Lubricating agents were developed that allowed for cheaper injection of fluid at higher pressures and chemical mixtures were developed that maintained the cracks in the shale rock for longer periods of time.  Seismic imaging technology produced greater certainty about the location of wells.  Horizontal drilling advancements allowed for the increase of the "drillable" size of each well.

130.    Together, these advances decreased costs and increased yield, making the process immensely profitable and leading to a dramatic increase in available natural gas reserves, as demonstrated by the following map:



131.    These improvements in the fracking process led to a dramatic increase in natural gas production in the United States since 2008, even as gross withdrawals from traditional sources of natural gas declined:[51]

---

[51]    Source-by-source information for natural gas production is not available from the EIA for 2013.



**Natural Gas Gross Withdrawals and Production**

Source: U.S. Energy Information Administration

132.    These unexpected increases in natural gas production caused natural gas prices to fall to as low as $2.04 per MMBtu in April 2012—the lowest price since February 2002—and natural gas prices have generally stayed in the range of $2.50–$4.80 per MMBtu since then, with the exception of certain weather-driven events.  Although the extremely cold weather throughout most of the country in the fall and winter of 2013/2014 contributed to significant natural gas price increases—causing short-term prices to reach as high as $6.15 per MMBtu on February 19, 2014, for March 2014 delivery—short-term prices have already declined significantly from those highs.  And even those higher, weather-related short-term natural gas prices are below the natural gas prices that prevailed at the time of the 2007 Acquisition.  Longer-term natural gas prices were not significantly influenced by those increases in short-term prices.

### 3.    The Effect of Low Natural Gas Prices on EFH.

133.    The prolonged, significant decline in natural gas prices has significantly decreased the profitability of TCEH's lignite/coal and nuclear-fueled units.  These market conditions have resulted in significant declines in TCEH's revenues that have not been entirely

offset by TCEH's natural gas hedging program, and by the end of 2014, the remaining favorable natural gas hedges will mature.  The consequences to the profitability of TCEH's units have been significant:  declining natural gas prices, increased competition from more economic generation assets (including renewable generation and more efficient natural gas-fueled technology), along with other macroeconomic drivers, resulted in significant declines in revenues and the recognition of impairments to TCEH's goodwill intangible asset balance of $1.0 billion in 2013, $1.2 billion in 2012, and $4.1 billion in 2010.[52]

134.    In response to these economic conditions, Luminant has reduced the amount of time that certain lignite/coal-fueled units, that are comparatively more expensive to operate, generate electricity in order to reduce the amount of electricity generated uneconomically.  These reductions generally take one of two forms.  Luminant may temporarily cease electricity generation at certain lignite/coal units for short periods of time when the demand for electricity and wholesale electricity prices in the ERCOT market are comparatively low.  The units resume operation when demand for electricity, and wholesale electricity prices, are comparatively high. Alternatively, certain units may be operated on a seasonal basis in response to sustained periods of comparatively low wholesale electricity prices and demand for electricity.  Indeed, Luminant has sought and received permission in the past to operate two of its lignite/coal units at Monticello, along with one unit at Martin Lake, on a seasonal basis, and Luminant anticipates that it will continue to operate these units on a seasonal basis going forward.  In 2013 and 2012, the estimated effects of these generation reductions of lignite/coal-fueled units totaled approximately 12,460 GWh and 10,410 GWh of lowered electricity output, respectively.

---

[52]    TCEH also recorded an $8 billion goodwill impairment in 2008.  That impairment, however, was largely unrelated to TCEH's performance or the value of its assets.  Instead, that impairment was due primarily to the financial crisis/economic recession in 2008 that dramatically increased discount rates; Oncor recorded a goodwill impairment of approximately $860 million in the same year.

135.    TCEH's long-term natural gas hedges, which were put in place in 2006, 2007, and 2008, largely matured by 2013, and the remainder either already has, or will mature in 2014. These maturities have already, and will continue to, exacerbate the TCEH Debtors' balance sheet-related challenges.  As of April 30, 2008, TCEH had hedged approximately 85% of its 2009–2013 expected natural gas price exposure associated with its expected nuclear, coal, and lignite generation, with natural gas positions at average prices ranging from $7.25 per MMBtu to $8.26 per MMBtu.  Further, most of the hedging transactions were secured with a first lien interest in TCEH's assets, which eliminated normal collateral posting requirements for those wholesale hedging transactions and associated effects on liquidity.

136.    As of December 31, 2013, approximately 95% of TCEH's exposure to natural gas prices in 2014 was hedged.  Of that amount, however, only approximately 30% is attributable to TCEH's historical natural gas price hedging program, primarily consisting of financial options that effectively "lock in" the price of natural gas at approximately $7.80 - $11.75 per MMBtu. The options represent the final highly favorable positions that TCEH was able to enter into before natural gas prices declined; lower forward natural gas prices and the associated effect on TCEH's financial condition precluded entry into hedges on similar terms for the remainder of 2014 exposure and beyond.  The remainder of TCEH's natural gas exposure for 2014 is hedged with either forward sales of electricity or other natural gas hedges.  These forward sales or other natural gas hedges are at prices that are closer to current market prices of natural gas, versus the favorable prices of the hedges that were executed in 2006, 2007, and 2008.  As a result, TCEH is experiencing significantly greater exposure to lower natural gas prices and correspondingly

lower wholesale electricity prices, and will continue to be exposed to these pressures going forward.[53]

E.    **Other Market Conditions Affecting TCEH's Performance.**

137.    In addition to lower wholesale electricity prices resulting from low natural gas prices, TCEH's financial performance has also been affected by other market and regulatory considerations.

138.    *First*, TCEH's financial difficulties resulting from the effect of low natural gas prices are punctuated by TCEH's significant exposure to the uncertain costs of environmental litigation and regulation, including both air quality and global climate change regulation.  TCEH incurred more than $600 million of environmental capital expenditures from 2010 through 2013, and additional such expenditures are expected to total nearly $450 million from 2014 through 2020.    That amount could be subject to material increases depending upon any new environmental regulations.

139.    Examples of environmental regulation and litigation-related expenses include regulations and litigation related to air quality standards under the Clean Air Act, including the much-litigated Cross-State Air Pollution Rule that was heard by the Supreme Court of the United States in December 2013, litigation and regulation related to the byproducts of electricity generation, and steps to address greenhouse gas emissions.    Each of these categories of regulation and litigation, along with others, impose cost and uncertainty on TCEH's business operations.

140.    *Second*, the cost of delivered coal has increased since the 2007 Acquisition for four reasons:  (a) increases in the price of Powder River Basin Coal, which is used to fuel several

---

[53]    The TCEH Debtors have sought the authority to take steps to preserve these positions and otherwise continue their hedging activities on a postpetition basis pursuant to the Hedging and Trading Agreements Motion.

of the Debtors' coal-fueled units (b) higher rail transportation costs; (c) the addition of rail fuel surcharges to certain agreements; and (d) inflation. These increases in the cost of delivered Powder River Basin coal increase the cost of operating Luminant's lignite/coal-fueled units and, consequently, reduce overall profits.

141. **Third**, electricity demand is driven, in part, by general macroeconomic conditions. The economic recession in 2008/2009 had a negative effect on the demand for electricity, as illustrated by the following chart:[54]



142. **Fourth**, following the deregulation of the Texas electricity market, a significant number of REPs entered the retail electricity market. As is the case in most competitive markets, certain of these REPs have been willing to offer products with prices that are low enough to draw away customers from other REPs, including TXU Energy, that focus on maintaining a higher level of customer service and a broader variety of technological and other offerings. Retail market restructuring in the ERCOT market was designed to encourage customers to shop for alternatives to incumbent REPs such as TXU Energy that are associated with pre-deregulation utilities. As a result of this fierce competition, TXU Energy, along with many other Texas REPs, has experienced customer attrition.

---

[54]    Based on an ERCOT long-term forecast as of May 8, 2007.

143.    *Fifth*, developments, and associated tax incentives for, renewable energy sources like wind power have increased the supply of electricity derived from such sources.  A key driver of increased wind generation has been the competitive renewable energy zone program, which is designed to facilitate the transmission of electricity generated in west Texas and the Texas panhandle to the load centers located in major metropolitan areas.  Indeed, according to ERCOT, wind capacity in the ERCOT market has increased from approximately 3,426 MW in the summer of 2007 to approximately 10,570 MW in the summer of 2013—an increase of 208.5%.  Similarly, actual wind production increased from approximately 8,800 GWh in 2007 to approximately 32,700 GWh in 2013—an increase of approximately 271.6%.  After capital costs are invested, wind power is essentially free to generate:  the fuel source (wind) is free, and, for each MWh of electricity generated, wind generators benefit from governmental incentives like production tax credits and renewable energy credits regardless of the wholesale price of electricity in the ERCOT market.  These increases in wind generation can increase the amount of time Luminant's lignite/coal-fueled units operate unprofitably and at lower output than design.

F.    **EFH's Financial Outlook and Business Strategy Going Forward.**

144.    The Debtors' balance sheet is unsustainable given expected market conditions.  Once the Debtors' balance sheet problems are addressed, however, EFH will be poised to leverage its core operations, sales and customer service expertise, and shared services skills to take advantage of possible growth opportunities.  Demand for electricity in the ERCOT market is forecasted to grow at a compound annual growth rate of 1.3% from 2014 to 2022, resulting in the potential need to build generation resources in the ERCOT market.  Additionally, the Debtors' fundamental business operations are strong notwithstanding the downward pressure placed on wholesale electricity prices by low natural gas prices and high levels of competition.  Once the

Debtors' balance sheet is de-levered, the Debtors expect that they will be able to operate their businesses profitably and aggressively pursue opportunities as they arise.

### G.    EFH's Reorganization Efforts.

145.    Following the 2007 Acquisition and the subsequent decline in market conditions and increase in environmental costs, EFH took a number of steps to maximize the value of the business.  As discussed below, those efforts resulted in significant successes.

### 1.    EFH Implements Financial Transactions.

146.    Since the 2007 Acquisition, EFH has executed several transactions to reduce or extend its debt obligations, reduce cash interest payments, eliminate significant contingent liabilities, and maximize the value of EFH, as discussed below.

### a.    The Liability Management Program.

147.    In October 2009, the Debtors initiated a Liability Management Program focused on improving the Debtors' balance sheets by reducing debt and cash interest payments and extending debt maturities through debt exchanges, repurchases, and issuances.  Since its inception, the Liability Management Program has captured approximately $2.5 billion in debt discount, including approximately $700 million of debt discount at TCEH, by acquiring approximately $12.57 billion in debt in exchange for approximately $10.04 billion of new debt and/or cash (including cash funded by debt issuances).

148.    Additionally, through the liability management program, EFH has amended and extended approximately $25.7 billion of debt maturities to 2017-2021.  The original maturities ranged from 2013 (in the case of certain amounts under the TCEH Credit Agreement, as discussed below) to 2017 (in the case of certain notes issued in connection with the 2007 Acquisition).  Additionally, certain debt exchanges and repurchases involved debt issued in earlier Liability Management Program transactions that had maturity dates in 2019 and 2020.

67

149.    Amendments to the TCEH Credit Agreement completed in April 2011 and January 2013 resulted in the extension of $16.4 billion in loan maturities to 2017 and the extension of $2.05 billion of commitments under the revolving credit facility to 2016.[55]   In connection with the April 2011 amendment, approximately $1.623 billion of claims under the TCEH Credit Agreement were repaid using $1.604 billion of net proceeds from issuing the TCEH First Lien Notes (the remainder was sourced from cash on hand).   The April 2011 amendment also included an amendment to certain of the TCEH Credit Agreement's financial covenants that allowed the TCEH Debtors to avoid triggering an event of default.

150.    EFH also attempted to segregate the credit risk of EFH Corp., EFIH, and EFCH/TCEH.  EFH attempted to accomplish this goal through a combination of the exchanges discussed above—many of which resulted in the elimination of EFH Corp. debt that was guaranteed by both EFCH and EFIH—and issuing EFIH Second Lien Notes to fund the repayment of intercompany demand notes from TCEH to EFH Corp. that were guaranteed by EFIH.  This effort was driven, in part, by an effort to reduce the cost of capital at EFH Corp. and EFIH that would result from isolating EFH Corp. and EFIH from TCEH's credit risk, preserve EFIH's access to the credit markets, and settle the payment obligations of EFH Corp. and EFIH to TCEH in an efficient and orderly manner prior to TCEH needing cash to continue operations and demanding payment in full of all amounts outstanding under the intercompany demand notes.  Additionally, isolating EFH Corp. and EFIH from TCEH's credit risk was part of EFH's strategy to pursue a consolidated restructuring transaction.

---

[55]    Additional amendments were made to the TCEH Credit Agreement in August 2009.

b.        **Tax Transactions.**

151.     In addition to the significant value generated through the Liability Management Program, EFH also eliminated several large contingent tax liabilities.  ***First***, as a result of various transactions over the years, including the 2007 Acquisition, EFH Corp. generated multi-billion dollar deferred intercompany gain ("DIG") and excess loss account ("ELA") contingent tax liabilities with respect to its equity interests in EFCH.   Specifically, the equity interests in EFCH held by EFH Corp. reflected an accumulated excess loss account of approximately $19 billion and deferred intercompany gain of approximately $4 billion as a result of the 2007 Acquisition and prior corporate transactions.  EFH determined that certain restructuring transactions could result in recognition of those amounts, resulting in significant taxable gain and tax liability.

152.     To eliminate the risk of these significant tax liabilities, EFH Corp. sought and obtained a private letter ruling from the IRS that allowed EFH Corp. to eliminate the DIG and ELA without adverse tax consequences.  The transaction was consummated on April 15, 2013.

153.     It is important to note that while this transaction reduced certain potential tax liabilities with respect to the TCEH Debtors, the transaction did not eliminate the multi-billion-dollar tax burden associated with a potential taxable sale of the TCEH Debtors' assets or EFIH's direct and indirect equity interests in Oncor Holdings and Oncor, either through a plan or through a section 363 sale.

154.     ***Second***, in March 2013, EFH and the IRS agreed on terms to resolve disputed tax return adjustments related to the IRS audit for tax years 2003-2006, including most significantly an adjustment relating to an accounting-method issue (as well as other less significant issues). This settlement allowed EFH to eliminate approximately $922 million of potential liability for uncertain tax positions while avoiding material cash liability payable to the IRS.

c.    **Restructuring of the Debtors' Long-Term Employee Pension Obligations.**

155.    EFH also modified its pension plan in 2012 to provide greater certainty regarding future costs.[56]  The modifications resulted in:

- splitting off assets and liabilities under the plan associated with employees of Oncor and all retirees and terminated vested participants of EFH (including discontinued businesses) to a new plan sponsored and administered by Oncor;

- splitting off assets and liabilities under the plan associated with active employees of the Debtors, other than bargaining unit employees, to a terminating plan, freezing benefits, and vesting all accrued plan benefits for such pension participants;

- terminating, distributing benefits under, and settling all of EFH's liabilities under the terminating plan, resulting in a reduction in annual pension expense by approximately $40 million, mostly for the Debtors; and

- maintaining the plan associated with TCEH's bargaining unit employees.

2.    **Restructuring Negotiations.**

156.    Despite EFH's successful operational and restructuring initiatives since the 2007 Acquisition, the prepetition capital structure of EFH Corp., EFIH, and the TCEH Debtors cannot be supported by prevailing market realities, so their capital structure must be delevered. Accordingly, the Debtors commenced restructuring discussions and retained restructuring advisors in July 2012 in an effort to develop a consensual restructuring framework that would maximize the value of the Debtors' estates.  These restructuring negotiations involved highly diverse stakeholders with varying goals and viewpoints and eventually grew to involve nearly every aspect of the Debtors' capital structure.  Membership in the Debtors' various ad hoc stakeholder groups has shifted over time.  Importantly, however, there is a consenting group of creditors at each of EFH Corp., TCEH, and EFIH, which lays the groundwork for a prearranged plan.  Indeed, the majority of the Debtors' stakeholders are either consenting to or being paid in

---

[56]    These modifications did not affect EFH's other post-employment benefit ("OPEB") obligations.

full and in cash under the Global Restructuring.  The following table shows certain members of the various ad hoc groups over time and as of the Petition Date, including those groups with members that have executed the Restructuring Support Agreement (the "Restructuring Support Parties"):[57]

| Constituency | Principals | Advisors |
|---|---|---|
| **Restructuring Support Parties** | | |
| Approximately $9.9 billion, or 41%, of the TCEH First Lien Debt | • Apollo, Oaktree, Centerbridge, Mason Capital, Fortress, Och-Ziff, and Franklin | • Paul Weiss, Millstein |
| Approximately $1.2 billion, or 76%, of the EFIH Unsecured Notes<br><br>Certain members also hold approximately $116 million, or 5% of EFIH Second Lien Notes | • Avenue Capital, GSO, PSAM, Third Avenue, and York Capital. | • Akin Gump, Centerview Partners |
| Approximately $471 million, or 73%, of the EFH Unsecured Notes held by parties other than EFIH<br><br>Approximately $437 million, or 11% of the EFIH First Lien Notes<br><br>Approximately $644 million, or 30% of EFIH Second Lien Notes<br><br>Also holds an undisclosed amount of TCEH First Lien Debt | • Fidelity | • Fried Frank, Perella Weinberg |
| EFIH First Lien Notes<br><br>Holds approximately $769 million, or 19%, of the EFIH First Lien Notes | • PIMCO | • Bingham McCutchen |
| EFH Equity Owners | • KKR, TPG, and Goldman Sachs. | • Wachtell Lipton, Blackstone |
| **Groups Not Supporting the Restructuring Support Agreement** | | |
| TCEH Second Lien Notes | • Arrowgrass Capital, Appaloosa Management, and Marathon Asset Management. | • Brown Rudnick, Peter J. Solomon |

---

[57]    In certain instances, principals reflected here may have subsequently sold their positions, and this chart is not necessarily a comprehensive list of the principals in applicable groups.

| Constituency | Principals | Advisors |
|---|---|---|
| TCEH Unsecured Notes | • BlueCrest, Claren Road, Cyrus Capital, Deutsche Bank AG, DO S1 Limited, Fairway Fund Limited, Fore, J.P. Morgan Securities LLC, LMA SPC, and Pine River. | • White & Case, Houlihan Lokey |
| EFIH First Lien Notes | • Davidson Kempner, WAMCO, Blue Mountain, Cyrus Capital, JP Morgan. | • Ropes & Gray, Capstone Advisors |
| EFIH Second Lien Notes | • Anchorage Capital, Cyrus Capital, Magnetar Financial, Oak Hill Advisors, Taconic, and Morgan Stanley. | • Kramer Levin, Rothschild |

157.     In addition to those key stakeholders, the Debtors also engaged in significant discussions with certain of their regulators and additional stakeholders, including the PUC, ERCOT, the Debtors' unions, the RCT, the NRC, the FERC, the IRS, and Oncor.

158.     Two key issues dominated prepetition negotiations.  *First*, there was significant tension between whether the Debtors will be restructured on a consolidated basis that would maintain EFH's current corporate form, or on a deconsolidated basis that would separate EFIH (and Oncor) from TCEH.  *Second*, any deconsolidated restructuring could either be on a tax-efficient basis, which would avoid triggering in excess of *$6 billion* in deconsolidation-related tax liability, or a taxable basis, which would potentially deliver a step-up in tax basis to certain of the Debtors' new owners.

159.     The Debtors' initial preference was to achieve a consensual, consolidated reorganization.  There were advantages to such an outcome:  EFH's current corporate form offers cost synergies, there would be no risk of triggering deconsolidation-related tax liabilities, and potential disruption to EFH's businesses would be minimized.   Under a consolidated framework, however, a significant portion of EFIH, TCEH, and potentially EFH Corp. debt would have been converted into EFH Corp. equity, necessitating a need for a high degree of consensus among multiple creditor groups with claims to distinct asset classes.

160.    With that goal in mind, the Debtors engaged in nearly a year of negotiations with their stakeholders in an effort to bridge fundamental differences in opinion regarding the relative value of TCEH, on one hand, and EFIH (as reflected by its indirect 80% ownership of Oncor), on the other hand, along with various other issues—such as the amount and kind, if any, of recovery that would be received by EFH Corp.'s stakeholders in a consolidated framework.  Public disclosures of the status of these negotiations were required by the terms of principals' non-disclosure agreements in April 2013 and October 2013.  The Debtors explored various transaction alternatives, including out-of-court exchange offers of EFIH and EFH Corp. debt accompanied by a chapter 11 filing by TCEH.

161.    Following public disclosures of the status of negotiations in October 2013 and a $271 million interest payment that TCEH made to its junior creditors on November 1, 2013, it became clear that a consolidated transaction was not possible because the Debtors and their stakeholders were unable to bridge fundamental differences in opinion on valuation and tax-related issues.  As a result, the Debtors turned their attention to developing a deconsolidation strategy.

162.    The Debtors and their stakeholders focused on two potential deconsolidated transactions.  *First*, TCEH's and EFIH's assets could be sold in a taxable transaction under a plan of reorganization or pursuant to a sale under section 363 of the Bankruptcy Code.  Such a sale would potentially trigger in excess of *$6 billion* in deconsolidation-related tax liabilities, but may deliver a "step-up" in tax basis to the new owners of TCEH and EFIH.  *Second*, a tax-free, or tax-efficient, transaction that triggers no or reduced deconsolidation-related tax liabilities, but does not give the new owners of TCEH and EFIH a "step-up" in tax basis (or, in some cases, gives the new owners of TCEH a "partial" step-up).

73

163.    Evaluation of these transactions is significantly complicated by the tax structure of the Debtors.  The substantial majority of the TCEH Debtors, as well as EFIH, are "disregarded entities" for federal tax purposes.  As a result, certain constituencies—particularly the holders of TCEH First Lien Debt—have insisted that the majority of the entities composing TCEH and EFIH (as disregarded entities) would not be liable for any deconsolidation-related tax liabilities.  Rather, such constituencies have argued that the taxpaying entities in EFH's consolidated tax group (excluding Oncor)—principally EFH Corp. and certain of EFH Corp.'s subsidiaries other than TCEH and EFIH—are the only entities liable for any deconsolidation-related tax.  Certain creditors asserted that these considerations required that any deconsolidated transaction provide for a "step-up" in the basis of TCEH's assets, even though there is a significant risk that little or no tax liability would actually be paid.  The Debtors, by contrast, were firmly of the view that the significant litigation and regulatory risk related to triggering massive deconsolidation-related tax liabilities that may be left impaired at EFH Corp. justified a focus on tax-free and tax-efficient transactions.

164.    Beginning in early 2014, the Debtors' negotiation runway was rapidly coming to an end.  For a number of reasons, including dwindling liquidity and significant debt maturities in October and November 2014, the Debtors expected to receive a "qualified" going concern audit opinion in connection with its 2013 audit.  That opinion, which would be disclosed in the Debtors' 2013 10-K filing with the SEC, would trigger an event of default under the TCEH Credit Agreement following an applicable grace period.  As a result, the TCEH Debtors faced an impending chapter 11 filing.  EFH Corp. and EFIH were expected to follow because of significant liquidity constraints.

165.    Until early March, the Debtors appeared to be on a path to filing for chapter 11 without having obtained any consent regarding the terms of a restructuring or a potential restructuring support agreement.  Beginning in early 2014, Fidelity and certain holders of EFIH Unsecured Notes began to coalesce around the terms of a consensual restructuring, including an infusion of new capital at EFIH and EFH Corp.  Notably, the EFH Equity Owners and their advisors played a vital role in those negotiations and were instrumental in bringing the parties to the table.  Those conversations, however, were premised on a TCEH Tax-Free Spin, and holders of TCEH First Lien Debt were unwilling to consider such a transaction because it did not provide a "step-up" in tax basis.  That all changed, however, in March 2014, when certain holders of TCEH First Lien Debt indicated a willingness to consider a TCEH Tax-Free Spin as long the transaction could be executed quickly and certain other conditions could be satisfied.

166.    These developments completely changed the tone of negotiations and, for the first time, opened a window to a consensual solution.  As a result, the Debtors and their stakeholders—including the EFH Equity Owners, who played a significant role—entered into an intense period of negotiations to negotiate and document a transaction based on the TCEH Tax-Free Spin and Investment Commitment.  To facilitate these negotiations, the TCEH Debtors elected not to make certain interest payments due on April 1, delayed making their public filings, and entered into a month-long grace period.  These negotiations were ultimately successful, and, in the last days before events of default would have forced the Debtors into a "traditional" chapter 11 filing, the Restructuring Support Parties executed the Restructuring Support Agreement.

### 3.    The Restructuring Support Agreement.

167.    The Restructuring Support Agreement represents a landmark settlement that either has the support of each of the Debtors' most important stakeholders or pays them in full in

75

cash.[58]  While the Debtors will be deconsolidated—a result the Debtors sought to avoid—the deconsolidation will avoid triggering deconsolidation-related tax liabilities and will allow the Debtors to emerge from chapter 11 quickly.  Nearly two years of preparation, and over one year of hard-fought negotiations, have gone into inking the Restructuring Support Agreement. Accordingly, the Debtors and the Restructuring Support Parties believe that the Global Restructuring embodied in the Restructuring Support Agreement maximizes the value of all of the Debtors' estates.

168.    The Global Restructuring has two key pieces.  *First*, the TCEH will be "spun off" from EFH Corp. in the TCEH Tax-Free Spin.  *Second*, EFIH and EFH Corp. will be significantly recapitalized.

### a.    TCEH Tax-Free Spin.

169.    Under the TCEH Tax-Free Spin, the TCEH Debtors' current first lien creditors will receive 100% of the equity in reorganized TCEH LLC.  Additionally, an important part of the TCEH Tax-Free Spin is to provide a "partial" step-up in the tax basis in TCEH's assets by using the Debtors' accumulated tax attributes.  This "partial" step-up, which provides significant value to the holders of TCEH First Lien Debt, is a vital aspect of the consideration being received by the TCEH Debtors' first lien creditors—without the "partial" step up, the Debtors may not have been able to reach a deal on the terms of the transaction.  The TCEH Tax-Free Spin will be conditioned on the receipt of a private letter ruling from the IRS that confirms, among other things, the tax-free nature of the TCEH Tax-Free Spin, and the execution by the

---

[58]    The Restructuring Support Agreement and the various settlements it embodies are discussed in more detail in motions that the Debtors will file to authorize the assumption of the Restructuring Support Agreement (the "RSA Assumption Motion") and the approval of certain settlements (the "Settlement Motion"), either of which will be filed on or shortly following the Petition Date.

Debtors of a "tax matters" agreement to protect the status of the transaction post-emergence. Finally, certain subsidiaries of EFH Corp. will transfer operating assets to TCEH.

170.    The TCEH Debtors will issue new debt in an amount to be determined to fund the repayment of the TCEH DIP Facility and fund cash payments to the TCEH Debtors' stakeholders.  Holders of unsecured and second lien claims against the TCEH Debtors will receive their *pro rata* share of the cash value of the TCEH Debtors' unencumbered assets.

### b.    EFIH/EFH Corp. Recapitalization.

171.    The lynchpin of the recapitalization of EFIH and EFH Corp. is the $1.9 billion Investment Commitment that is backstopped by certain holders of EFIH Unsecured Notes (the "Initial Commitment Parties" and, together with certain "Selected Partners," the "Commitment Parties").    Under the Investment Commitment, which is described in more detail in the Settlement Motion, the Commitment Parties and any other parties that elect to exercise their participation rights will inject $1.9 billion of cash into EFIH.  This Investment Commitment will initially take the form of a second lien DIP facility (the "EFIH Second Lien DIP Facility") that will mandatorily convert into approximately 65% of equity in reorganized EFH Corp.[59]  Holders of EFIH Unsecured Notes and EFH Unsecured Notes have participation rights in the Investment Commitment (91% and 9%,[60] respectively, subject, in the case of the participation rights held by holders of EFIH Unsecured Notes, to *pro rata* reduction by certain investing partners selected by the Initial Commitment Parties).    The Investment Commitment will be supported by the amending of the Oncor TSA (the "Oncor TSA Amendment") to provide that Oncor will make

---

[59]    The percent conversion will change based on the amount outstanding under the EFIH Second Lien DIP Financing on the effective date of the plan.

[60]    Only Fidelity has participation rights with respect to funding the EFIH Second Lien DIP Financing.  Other holders of EFH Unsecured Notes who elect to participate in the Investment Commitment will do so pursuant to a rights offering under the plan, the proceeds of which will be used to repay Fidelity's portion of the EFIH Second Lien DIP Financing.

payments directly to EFIH, rather than EFH Corp.  Each of EFIH's DIP facilities will be secured by the new revenue attributable to the Oncor TSA Amendment.

172.    The EFIH Second Lien DIP Facility, together with the EFIH First Lien DIP Facility, will be used to repay the EFIH Second Lien Notes and the EFIH First Lien Notes (the "EFIH Second Lien Refinancing" and the "EFIH First Lien Refinancing," respectively, and together, the "EFIH Secured Refinancings").  The EFIH First Lien Refinancing will save EFIH approximately $13 million per month in interest expense. The EFIH Second Lien Refinancing will save interest expense and, more importantly, simultaneously deleverage EFH Corp. and EFIH while providing significant value to unsecured creditors.

173.    Although the EFIH Secured Refinancings will allow for a significant deleveraging of EFIH, certain holders of EFIH First Lien Notes and EFIH Second Lien Notes believe that they are entitled to so-called makewhole claims (the "EFIH First Lien Makewhole Claims" and "EFIH Second Lien Makewhole Claims," respectively, and together, the "EFIH Makewhole Claims").  The stakes are significant:  the EFIH First Lien Makewhole Claims and the EFIH Second Lien Makewhole Claims each total over $700 million, respectively.  EFIH is taking a dual-pronged approach to the EFIH Makewhole Claims.

174.    *First*, as described in greater detail in the Settlement Motion, EFIH has offered to settle all outstanding obligations under the EFIH First Lien Notes, including EFIH First Lien Makewhole Claims, for approximately $105 (plus accrued but unpaid interest) of roll-up notes under the EFIH First Lien DIP Facility for every $100 of EFIH First Lien Notes tendered into the settlement (the "EFIH First Lien Settlement").  Fidelity and PIMCO have agreed to participate in the EFIH First Lien Settlement.

175.    Additionally, EFIH has offered to settle all outstanding obligations under the EFIH Second Lien Notes, including EFIH Second Lien Makewhole Claims, for a cash payment equal to principal and accrued interest plus a *pro rata* share of a cash payment equal to 50% of the potential EFIH Second Lien Makewhole Claims (the "EFIH Second Lien Settlement" and, together with the EFIH First Lien Settlement, the "EFIH Makewhole Settlements").  Fidelity will have the option to receive up to $500 million of roll-up notes under the EFIH First Lien DIP Financing, in addition to cash, under the EFIH Second Lien Settlement, while certain other holders have agreed to receive claims under the EFIH Second Lien DIP Financing rather than payment in cash in exchange for their claims.  All holders of EFIH First Lien Notes and EFIH Second Lien Notes will be given the opportunity to participate in the EFIH Makewhole Settlements pursuant to two tender offers that will be launched shortly after the Petition Date. Fidelity has agreed to participate.

176.    **Second,** with respect to holdout secured creditors, EFIH will execute the EFIH Secured Refinancings on a non-consensual basis and will litigate the EFIH Makewhole Claims. The EFIH First Lien DIP Motion, filed contemporaneously herewith, seeks to disallow the EFIH First Lien Makewhole Claims.   EFIH will also seek to disallow the EFIH Second Lien Makewhole Claims, to the extent any creditors assert such claims.

177.    In addition to their rights under those transactions, EFIH unsecured creditors will receive approximately 35% of the equity in reorganized EFH Corp. (after accounting for dilution by the Equity Conversion). EFH Corp.'s unsecured creditors will receive any cash remaining at EFH Corp. at the end of the case, a cash payment from EFIH of up to $55 million, and a small distribution of equity in reorganized EFH Corp.

79

c.        **Case Milestones.**

178.    As described in more detail in the Settlement Motion and the RSA Assumption Motion, the Restructuring Support Agreement, the Investment Commitment, and the terms of the EFIH Second Lien DIP Facility each contain certain case milestones.  The goal of the Debtors and their stakeholders are to resolve these chapter 11 cases as expeditiously as possible.  Notably, the Debtors are poised to exit chapter 11 within a year.  To accomplish that goal, the Debtors will file a plan and disclosure within 45 days of the Petition Date and will aim to have a disclosure statement order entered within 105 days of the Petition Date.  From there, the Debtors will seek entry of the confirmation order within 275 days of the Petition Date, and will seek to emerge from chapter 11 within 305 days of the Petition Date.  Additionally, the EFIH Debtors will seek to effectuate the EFIH First Lien Refinancing and the EFIH Second Lien Refinancing within 75 days of the Petition Date.

### 4.        The Debtors Commence the Chapter 11 Cases.

179.    The Debtors commenced these chapter 11 cases to begin the process of implementing the Global Restructuring as memorialized in the Restructuring Support Agreement.  Although there is no question that there are significant issues to resolve even in the consensual framework the Debtors have achieved, the Debtors are confident that these chapter 11 cases will provide the framework to maximize the value of the Debtors' estates for *all* of their stakeholders.  In the meantime, the principal focus of the Debtors will remain on "Job 1": operating their businesses in a way that preserves value, protects jobs, and satisfies their regulatory operations.

**Part III.**
**Overview of First Day Relief**

180.    The Debtors have filed a number of First Day Motions, customary in large chapter 11 cases such as these, designed to minimize the adverse effects of the commencement of the chapter 11 cases on their ongoing business operations.  I believe that court approval of the relief requested in the First Day Motions is essential to providing the Debtors with an opportunity to successfully meet their obligations by maintaining baseline operations, providing for a smooth transition into the chapter 11 cases, and minimizing any loss of value to the Debtors' businesses.

181.    The First Day Motions seek authority to, among other things, continue to pay employee compensation and benefits in order to maintain morale and retention as the Debtors transition into chapter 11, thus avoiding the potential for catastrophic "brain drain"; ensure the continuation of the Debtors' cash management systems and other business operations without interruption, including the Debtors' vital customer programs; provide the Debtors the ability to pay certain critical trade vendors and certain other vendors who could assert liens against the Debtors property and to provide adequate assurance of future performance to their utility providers; provide the ability to maintain existing hedging and trading agreements and/or enter into new agreements that play a vital role in the Debtors' operations and cash flow by managing the Debtors' forward commodities exposure; and assume certain key contracts with ERCOT and the regulated transmission and distribution utilities, including Oncor, that deliver the electricity that is generated and sold by TCEH.

I have reviewed each of the First Day Motions.  The facts stated therein, the description of the relief requested, and the facts supporting each motion and pleading are detailed in <u>Exhibit A</u> to this declaration.  Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the contents of the First Day Motions and the contents of the foregoing are true and correct to the best of my information and belief.

Paul Keglevic
Executive Vice President, Chief Financial
Officer, and Co-Chief Restructuring Officer
of EFH Corp., EFIH, and TCEH LLC

# EXHIBIT A

**Evidentiary Support for First Day Pleadings**

# TABLE OF CONTENTS

**Page**

**Financing Motions** ...................................................................................................................**1**
I.      TCEH DIP Financing Motion. ..........................................................................................1
II.     TCEH Cash Collateral Motion...........................................................................................5
III.    EFIH First Lien DIP Financing Motion..............................................................................7
IV.     Cash Management Motion. ................................................................................................9

**Operational Motions** ...............................................................................................................**31**
V.      Wages Motion. ...............................................................................................................31
VI.     Critical Vendors Motion. ................................................................................................61
VII.    Shippers, Warehousemen, and Materialmen Motion........................................................70
VIII.   Customer Programs Motion..............................................................................................73
IX.     Hedging and Trading Motion...........................................................................................93
X.      Taxes and Fees Motion. ................................................................................................110
XI.     Utilities Motion. ...........................................................................................................116
XII.    TDSPs Assumption Motion. ..........................................................................................119
XIII.   ERCOT Assumption Motion. ........................................................................................128

**Procedural Motions** .............................................................................................................**134**
XIV.    Joint Administration Motion...........................................................................................134
XV.     Claims and Noticing Agent Motion................................................................................135
XVI.    Consolidated Creditors List Motion...............................................................................135
XVII.   Retention Applications...................................................................................................136

## EVIDENTIARY SUPPORT FOR FIRST DAY PLEADINGS[1]

1.      To minimize the adverse effects of the commencement of these chapter 11 cases on their business, the Debtors have requested various types of relief in their First Day Pleadings. The First Day Pleadings seek relief intended to allow the Debtors to effectively transition into chapter 11 and minimize disruption to the Debtors' operations caused by their bankruptcy filings, thereby preserving the value of the Debtors' estates for the benefit of their stakeholders.  I am familiar with the contents of each First Day Pleading (including the exhibits thereto), and I believe that the relief sought in each First Day Pleading:  (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of value; (b) is necessary to provide the Debtors with a reasonable opportunity for a successful reorganization; and (c) best serves the interests of the Debtors' stakeholders.  The following paragraphs describe the factual bases for the relief requested in each of the First Day Pleadings.

## Financing Motions

### I.      TCEH DIP Financing Motion.[2]

2.      The TCEH Debtors request entry of an interim and final order, (a) authorizing the TCEH Debtors to enter into the DIP Credit Agreement to obtain the DIP Financing, (b) granting liens and providing superpriority administrative expense claims, (c) modifying the automatic stay, and (d) scheduling a hearing to consider approval of the DIP Facility on a final basis.

---

[1]     Capitalized terms used in this exhibit and not otherwise defined shall have the meanings set forth in the applicable First Day Pleading or in the First Day Declaration.  Exhibit references are to the exhibits associated with the respective First Day Pleadings.

[2]     See *Motion of Energy Future Holdings Corp.*, et al., *for Entry of Interim and Final Orders (A) Approving Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Granting Adequate Protection, (D) Modifying the Automatic Stay, and (E) Scheduling a Final Order*, filed contemporaneously herewith.

3.      I understand that the TCEH Debtors have negotiated and reached an agreement to enter into, subject to approval of the court, a $4.475 billion secured superpriority postpetition debtor in possession financing agreement.  The DIP Agreement, dated April 28, 2014, is by and among TCEH LLC as borrower, EFCH as Parent Guarantor, and each of TCEH LLC's direct and indirect Debtor subsidiaries, as Guarantors, Citibank, N.A., as administrative agent and DIP agent, Deutsche Bank AG New York Branch as Administrative Agent, and the lenders named therein.

4.      The TCEH Debtors with the assistance of their advisors developed a three-month budget with the assistance of their advisors.  I understand that the DIP Budget incorporates a number of factors, including the effect of the chapter 11 filing, material cash disbursements, required vendor/supplier payments, cash flows from the TCEH Debtors' ongoing operations, and the cost of necessary goods and materials, and includes all of the expenditures for which the TCEH Debtors seek authority to pay in various "first day" pleadings.

5.      I understand that the TCEH Debtors will use Cash Collateral to fund working capital, capital expenditures, and other general corporate purposes; the TCEH Debtors believe Cash Collateral will ultimately be insufficient.  Therefore, the TCEH Debtors have determined that postpetition financing is necessary to fund the following restructuring costs, among others: adequate protection payments, working capital (e.g., collateral for letters of credit), bankruptcy costs (e.g., business disruption and professional fees), and regulatory requirements (e.g., RCT mining reclamation obligations).  I understand that without the DIP Facility, the TCEH Debtors may not have sufficient liquidity to continue their business in the ordinary course.  Additionally, I understand that if the TCEH Debtors are unable to demonstrate that they have the means to operate in the ordinary course of business, customers may seek alternatives and vendors may

refuse to do business with the TCEH Debtors.  Therefore, I believe that the TCEH Debtors have an immediate need to access the DIP Facility; otherwise, the ultimate success of the TCEH Debtors' restructurings may be jeopardized.

6.      As provided in the DIP Budget, the TCEH Debtors believe that approximately $1,600,000,000 in available liquidity is necessary for operations during the interim period of these chapter 11 cases.  I understand that the proposed DIP Financing will provide the TCEH Debtors with immediate access of up to $2,700,000,000, consisting of (a) $800,000,000 under the Revolving Credit Facility, (b)  $1,100,000,000 under the Delayed-Draw Term Facility, the proceeds of which, if funded, subject to the condition set forth above, will be applied by TCEH LLC to fund the RCT L/C Collateral Account, and (c) $800,000,000 under the Term Loan Facility, of which up to $800,000,000 may be applied by TCEH LLC to fund the General L/C Collateral Account.   Moreover, upon entry of the Final Order, the proposed DIP Financing will provide the TCEH Debtors with up to $4,475,000,000, consisting of (x) $1,950,000,000 under the Revolving Credit Facility, (u) $1,425,000,000 under the Term Loan Facility, of which up to $800,000,000 may be applied by TCEH LLC to fund the General L/C Collateral Account, and (z) $1,100,000,000 under the Delayed Draw Term Facility, the proceeds of which, if funded, subject to the condition set forth above, will be applied by TCEH LLC to fund the RCT L/C Collateral Account to support RCT Letters of Credit.

7.      I understand that the TCEH Debtors' decision to proceed with the DIP Financing comes after a dedicated and diligent search for the best financing alternatives as described in greater detail in the Goldstein Declaration.  I understand that in early September 2013, the TCEH Debtors and Evercore initiated a request for DIP RFPs, where the TCEH Debtors approached five large financial institutions that are actively involved in the debtor-in-possession and

syndicated finance markets. I understand that proposals were submitted in response to the TCEH Debtors' RFP and after substantial analysis, the TCEH Debtors concluded that no single financial institution would be able to underwrite the entire amount of the DIP financing due to the size of the proposed revolving credit facility. I understand that negotiations with financial institutions continued through October and on October 25, 2013, the TCEH Debtors determined that Citigroup Global Markets Inc. and Deutsche Bank Securities Inc. proposed the best possible combination of terms and effectively addressed the TCEH Debtors' liquidity needs.  I understand that the TCEH Debtors thus began negotiating commitment letters with Citigroup Global Markets Inc. and Deutsche Bank Securities Inc., as well as five other lenders, understanding that the TCEH Debtors would require a broadly-syndicated facility to achieve a revolving credit facility of this size.

8.      I understand that the DIP Financing negotiations were renewed in early February 2014 using the initial discussions as a foundation.  I also understand that negotiations with the DIP Lenders continued through April 2014, replacing one of the original seven lenders and culminating in the TCEH Debtors receiving signed commitment letters from all seven lenders on April 28, 2014.

9.      I understand that DIP Financing is the best source of financing, providing the TCEH Debtors with the liquidity they need to continue operating their businesses in the ordinary course and satisfy restructuring-related costs. I believe that the relief requested in the TCEH DIP Motion is in the best interest of the TCEH Debtors' estates, their creditors, and all other parties in interest, and is necessary for the TCEH Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the TCEH Debtors, I believe that the relief requested in the TCEH DIP Motion should be granted.

4

II.    **TCEH Cash Collateral Motion.**[3]

10.    In the TCEH Cash Collateral Motion, the TCEH Debtors seek entry of orders: (a) authorizing the TCEH Debtors' use of Cash Collateral (as defined in the Interim Order) of the Prepetition Secured Agents and Prepetition Secured Creditors (each as defined in the Interim Order) on an interim basis pending a final hearing on the TCEH Cash Collateral Motion (the "Final Hearing"); (b) granting adequate protection to the Prepetition First Lien Agents and Prepetition First Lien Creditors for any diminution in value of their respective interests in the Prepetition Collateral (each as defined in the Interim Order), including the Cash Collateral; (c) subject to entry of a Final Order and to the extent set forth herein, waiving the TCEH Debtors' right to surcharge the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code; (d) prescribing the form and manner of notice and setting the time for the Final Hearing; (e) vacating or modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to permit the TCEH Debtors and the Prepetition Secured Agents on behalf of the Prepetition First Lien Creditors to implement and effectuate the terms and provisions of the Interim Order; (f) scheduling the Final Hearing to consider the relief requested in the Motion and the entry of a Final Order, and approving the form of notice with respect to the Final Hearing; and (g) granting related relief.

11.    In the normal course of business, the TCEH Debtors use cash on hand and cash flow from operations to fund working capital, capital expenditures, and for other general corporate purposes.  I understand that an inability to use these funds during these chapter 11 cases could cripple the TCEH Debtors' business operations.  Indeed, the TCEH Debtors must use

---

[3]    See *Motion of Energy Future Holdings Corp., et al., for Entry of Interim and Final Orders (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing*, filed contemporaneously herewith.

their cash to, among other things, continue the operation of their business in an orderly manner, maintain business relationships with vendors, suppliers, and customers, pay employees, fulfill regulatory obligations, and satisfy other working capital and operational needs—all of which are necessary to preserve and maintain the TCEH Debtors' going-concern value and, ultimately, effectuate a successful reorganization.

12.     To obtain consent for the use of Cash Collateral and the priming liens provided for under the DIP Financing, the TCEH Debtors entered into negotiations with Paul, Weiss, Rifkind, Wharton, and Garrison LLP, as counsel to an informal steering committee representing holders of approximately 41% in amount of claims under the TCEH First Lien Credit Agreement and TCEH First Lien Notes Indenture (the "TCEH First Lien Ad Hoc Committee").  After weeks of these negotiations, the TCEH First Lien Ad Hoc Committee consented to both the priming liens (and other terms provided) under the DIP Motion and the TCEH Debtors' use of Cash Collateral, in exchange for the TCEH Debtors providing adequate protection against any diminution in value of the Prepetition First Lien Creditors' interests in the Prepetition Collateral.

13.     I understand that the TCEH Debtors will provide the Prepetition First Lien Creditors with various forms of adequate protection, including, primarily:  (a) the First Lien Adequate Protection Payments;  (b) the First Priority 507(b) Claim;  (c) the First Priority Adequate Protection Liens;  (d) professional fees and expenses;  (e) the Financial Covenant; and (f) access to the TCEH Debtors' books and records, including budgets and financial forecasts (collectively, the "Adequate Protection Obligations").  The TCEH Debtors will also provide the Prepetition Second Lien Creditors with:  (a) the Second Priority 507(b) Claim and (b) the Second Priority Adequate Protection Liens, in both cases junior in priority to those received by the

Prepetition First Lien Creditors, consistent with the terms of the Second Lien Intercreditor Agreement.

14.    Absent approval of the TCEH Cash Collateral Interim Order, the TCEH Debtors would be effectively unable to generate revenue, operate their businesses, or pay the hundreds of individuals who report to work each day.    I believe the TCEH DIP Financing Motion is appropriate and should be approved.

## III.    **EFIH First Lien DIP Financing Motion.**[4]

15.    The EFIH Debtors request entry of  (i) an interim order (the "Interim Fee Order") (a) approving certain fees as and to the extent required under the EFIH First Lien DIP Commitment Letter relating to commitments to fund the EFIH First Lien DIP Financing and that certain fee letter relating to the payment of fees in connection with the EFIH First Lien DIP Financing (the "EFIH First Lien DIP Fee Letter") and (b) scheduling a hearing to consider approval of the relief requested in the Motion on a final basis and (ii) a final order (a) authorizing the EFIH Debtors to enter into the EFIH First Lien DIP Credit Agreement to obtain the EFIH First Lien DIP Financing, (b)  granting liens and providing superpriority administrative expense claims, (c) authorizing the use of EFIH Cash Collateral, (d) authorizing the EFIH First Lien Refinancing, (e) authorizing the issuance of EFIH First Lien DIP Roll-Up Claims to the extent provided in the  Settlement Motion, (f) determining the value of the secured claims of the

---

[4]    See *Motion of Energy Future Intermediate Holding Company LLC and EFIH Finance Inc., for Entry of for Entry of (I) and Interim Order (A) Approving Certain Fees Related to Postpetition Financing and Granting Such Fees Administrative Expense Priority and (B) Scheduling a Final Hearing; and (II) a Final Order (A) Approving Postpetition Financing, (b) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Authorizing the Use of Cash Collateral, (D) Authorizing the EFIH First Lien DIP Refinancing, (E) Authorizing Issuance of Roll-Up Debt to the Extent Authorized by the Settlement Motion, (F) Determining the Value of Secured Claims, and (G) Modifying the Automatic Stay* (the "EFIH First Lien DIP Motion"), filed contemporaneously herewith.

Prepetition EFIH First Lien Creditors, including a determination that such amount does not include any EFIH First Lien Makewhole Premium, and modifying the automatic stay.

16.    I understand that the EFIH Debtors have negotiated and reached an agreement to enter into, subject to approval of the court, a $5.4 billion secured superpriority postpetition debtor in possession financing agreement.  I understand that the EFIH Debtors remain in active negotiations with all parties and will file the EFIH First Lien DIP Credit Agreement on or shortly following the Petition Date.  Further, I understand that the EFIH First Lien DIP Financing consists of a single term loan, along with various "roll-ups" of prepetition secured creditors in settlement of certain makewhole claims.  Given the significant difference in interest rates between the proposed EFIH First Lien DIP Credit Agreement, on one hand, a providing of-courI understand that the EFIH Debtors contest validity of such claims.  I understand that the EFIH Debtors have determined that when comparing the costs and savings of the transaction, it is in their best interest to execute the EFIH First Lien Refinancing as expeditiously as possible.

17.    In light of imminent liquidity needs, I understand that with the assistance of their advisors, the EFIH Debtors developed an initial three-month budget.  According to the EFIH Budget, the EFIH Debtors believe over $1 billion in liquidity is necessary to fund restructuring costs, financing fees, and professional fees.  I understand, however, that the EFIH Debtors need not satisfy these costs during the interim period.  As a result, I understand that the EFIH Debtors *are not* seeking relief with respect to the EFIH First Lien DIP Financing Motion.

IV.    **Cash Management Motion.**[5]

18.    In the Cash Management Motion, the Debtors seek entry of an order authorizing, but not directing, the Debtors to continue to operate an integrated cash management system (as discussed in the Cash Management Motion, the "Cash Management System") in the day-to-day operation of their businesses, and to continue to honor certain prepetition obligations in accordance with the operation of the Cash Management System.  I understand that the diagram attached to the Cash Management Motion as **Exhibit B** and incorporated by reference provides an overview of the Cash Management System.  Specifically, the Debtors request authority to: (a) continue to use, with the same account numbers, each of the bank accounts held in the name of a Debtor (the "Bank Accounts") located at the financial institutions (collectively, the "Banks") listed on **Exhibit C** attached to the Cash Management Motion and incorporated in the Cash Management Motion by reference; (b) treat the Bank Accounts for all purposes as accounts of the Debtors as debtors in possession; and (c) conduct banking transactions by all usual means, and debit the Bank Accounts on account of all usual items and payment instructions.

19.    Additionally, the Debtors seek authority to: (a) use, in their present form, all business forms (including check stock, letterhead, purchase orders, and invoices) and other correspondence and documents related to the Bank Accounts, without reference to the Debtors' status as debtors in possession; (b) continue to use certain investment accounts in accordance with section 345 of the Bankruptcy Code; (c) close existing Bank Accounts and open new debtor-in-possession accounts with Authorized Depositories (as defined in the Cash Management Motion); and (d) continue certain intercompany and netting arrangements between and among

---

[5]    See *Motion of Energy Future Holdings Corp.*, et al.*, for Entry of an Order (A) Authorizing the Debtors to (I) Continue Using Their Existing Cash Management System, (II) Maintain Existing Bank Accounts and Business Forms, and (III) Continue Using Certain Investment Accounts; (B) Authorizing Continued Intercompany Transactions and Netting of Intercompany Claims; and (C) Granting Postpetition Intercompany Claims Administrative Expense Priority*, filed contemporaneously herewith.

the Debtors and their Debtor and non-Debtor affiliates on an administrative priority basis in the ordinary course of business and in accordance with historical practices (solely as described in the Cash Management Motion, the "Intercompany Transactions," and claims arising from the Intercompany Transactions, the "Intercompany Claims").

        **A.**      **The Bank Accounts.**

           **1.**      **Overview.**

      20.      I understand that the Cash Management System is composed of of 44 Bank Accounts, each of which is held in the name of one the following Debtors: (a) EFH Corp.; (b) EFIH; (c) EFH Corporate Services Company ("EFH Corporate Services"); (d) Generation Development Company LLC; and (e) TXU Receivables Company LLC; (f) EFCH; and (g) TCEH LLC and the following TCEH LLC subsidiaries: (i) Luminant Energy Company LLC ("Luminant Energy"); (ii) Luminant Generation Company LLC ("Luminant Generation"); (iii) Luminant Mining Company LLC ("Luminant Mining"); (iv) TXU Energy Retail Company LLC ("TXU Energy Retail"); (v) TXU Energy Receivables Company LLC ("TXU Energy Receivables"); and (vi) 4Change Energy Company ("4Change Energy"). The Cash Management System is primarily managed by the Debtors' financial personnel at their corporate headquarters located in Dallas, Texas.

      21.      The Debtors' primary Bank is J.P. Morgan Chase Bank ("JPM"), with which the Debtors maintain 34 Bank Accounts. The Debtors also maintain 10 Bank Accounts with 7 Banks other than JPM. The Debtors maintain each of the Bank Accounts at financial institutions insured by the Federal Deposit Insurance Corporation (the "FDIC"). Moreover, 43 of the Bank

Accounts are located at institutions that the Debtors believe are designated as authorized depositories (the "Authorized Depositories") by the U.S. Trustee.[6]

22.    I understand that the bulk of the Debtors' cash on-hand as of the Petition Date is from cash raised from debt issuances, distributions received from Oncor (in the case of EFH Corp. and EFIH), and proceeds generated from ongoing business operations.[7] As of the Petition Date, the Debtors have a total of approximately $795 million in cash held in the Bank Accounts and six investment accounts (as described in the Cash Management Motion, the "Investment Accounts"), approximately $235 million, $428 million, and $132 million of which is held in the segregated Bank Accounts and Investment Accounts of the EFH Debtors, TCEH Debtors, and EFIH, respectively.[8]

23.    Because the Bank Accounts are central to the Debtors' ongoing business operations, the Debtors hereby seek authority to continue utilizing the Cash Management System and Bank Accounts, including the authority to conduct banking transactions, pay the Bank Fees, and open new debtor in possession bank accounts or close any existing Bank Accounts.[9]   I

---

[6]    I understand that the sole Bank Account located at a Bank that is not designated as an Authorized Depository pursuant to the U.S. Trustee Guidelines does not contain significant deposits.  Specifically, I understand that Bank Account No. 7136, held in the name of Luminant Generation with First National Bank of Granbury, is a miscellaneous receipts account that holds amounts less than the FDIC insured amount at any given time.

[7]    I understand that before the Petition Date, TXU Energy Receivables sold all of its accounts receivable under the Debtors' prepetition accounts receivable securitization facility to Debtor TXU Energy Retail.  I also understand that Bank Account No. 0559, held in the name of Debtor TCEH LLC, holds approximately $419.6 million of unrestricted cash from proceeds of the receivables sale and TXU Energy Receivables' retained earnings.

[8]    Cash belonging to the EFH Debtors is segregated from cash belonging to the TCEH Debtors.  Similarly, cash belonging to either the TCEH Debtors or EFH Debtors is segregated from cash belonging to EFIH.

[9]    Specifically, I understand that the Debtors request that the Court authorize them to close any existing Bank Accounts, or to open new debtor in possession bank accounts at banks that are Authorized Depositories.  I understand that the Debtors will provide notice of any such opening or closing to the U.S. Trustee, counsel to any official committee appointed in these cases, counsel to the agent for the TCEH debtor-in-possession financing facility (the "TCEH DIP Facility" and such agent, the "TCEH DIP Agent"), counsel to the ad hoc committee of TCEH first lien creditors (the "Ad Hoc Committee of TCEH First Lien Creditors"), counsel to the agent for the EFIH first lien debtor-in-possession financing facility (the "EFIH DIP Facility" and such agent, the "EFIH DIP Agent"), counsel to the agent for the EFIH second lien debtor-in-possession notes (the "EFIH

believe that it is critical to the continued operation of their businesses, and to preserving the value of their estates, that the Debtors be allowed to continue to use the Cash Management System and Bank Accounts without disruption.

### 2.    EFH Bank Accounts.

24.    EFH Corp.'s principal Bank Account is Account No. 3584 (the "EFH Main Account"), which EFH Corp. maintains with JPM.  The EFH Main Account is a general concentration account for excess cash held by EFH Corp. and holds approximately $25 million as of the Petition Date.  As discussed below, the EFH Main Account transfers funds to the main Bank Account for the money pool arrangement used by EFH Corp. and certain of its subsidiaries (as described in the Cash Management Motion, the "EFH Money Pool").

25.    In addition, I understand that EFH Corp. maintains the following Bank Accounts:

- *Bank Account No. 2032,* maintained with JPM, collects miscellaneous receipts and holds approximately $1,000 as of the Petition Date; and

- *Bank Account No. 9707,* maintained with Bank of America, is available for wire transfers in the event of an emergency situation, and is unfunded as of the Petition Date.

- *Bank Account No. 9100,* maintained with JPM, will be used to collect future tax payments from Oncor under the Oncor TSA, and is unfunded as of the Petition Date.

26.    As described in detail below, I understand that EFH Corp. also uses the EFH Main Account to invest excess cash in two Investment Accounts, which together hold approximately $180.6 million as of the Petition Date.[10]

---

DIP Notes" and such agent, the "EFIH DIP Notes Agent"), and counsel to the ad hoc committee of EFIH unsecured creditors (the "Ad Hoc Committee of EFIH Unsecured Creditors").

[10]    As discussed below, I understand that EFH Corp. invests in the Goldman Sachs Financial Square Treasury Fund (Account No. 4691) and the Morgan Stanley Institutional Treasury Fund (Account No. 0166).

### 3.    EFH Corporate Services Bank Accounts.

27.    EFH Corporate Services, a direct subsidiary of EFH Corp., maintains a principal Bank Account with JPM, Account No. 3790 (the "EFH Money Pool Main Account").    As discussed below, the EFH Money Pool Main Account is the central Bank Account for the EFH Money Pool.    I understand that the EFH Money Pool Main Account maintains a minimum net balance of approximately $10 million to prefund automated clearinghouse payments ("ACH Payments"), and next-day wires, and has a current balance of approximately $10 million. The Debtors' treasury personnel sweep any excess cash held in the EFH Money Pool Main Account above $10 million into the EFH Main Account on a daily basis.    Likewise, and as discussed below, the Debtors' treasury personnel deposit funds into the EFH Money Pool Main Account from the EFH Main Account as necessary to fund the accounts payable, payroll, and other obligations related to the operations of the EFH Corp. and certain of its Debtor subsidiaries that have historically participated in the EFH Money Pool (other than EFIH and its subsidiaries) (collectively, the "EFH Debtors"),[11] as well as obligations related to the operations of EFCH, TCEH LLC, and its direct and indirect Debtor subsidiaries (collectively, the "TCEH Debtors") that are subsequently reimbursed as Intercompany Transactions.

28.    In addition to the EFH Money Pool Main Account, I understand that EFH Corporate Services maintains the following five Bank Accounts:

- **Bank Account No. 6572** is a collateral account for deposits related to commercial card obligations, with a current balance of approximately $4.4 million;

- **Bank Account No. 8749** is a zero balance account used for payroll disbursements to approximately 5,700 Debtor employees with a current balance of approximately $500,000;

---

[11]    I understand that the EFH Debtors include all direct and indirect Debtor subsidiaries of EFH Corp., other than EFIH and its subsidiaries and the TCEH Debtors (as defined in the Cash Management Motion).

- ***Bank Account No. 6766*** is an accounts payable disbursements account with a current balance of approximately $10 million;

- ***Bank Account No. 0752*** is an accounts payable disbursements account with a current balance of approximately $5 million; and

- ***Bank Account No. 2019*** is a Chase Investments brokerage account with a current balance of approximately $32,000.

### 4. TCEH Bank Accounts.

29.    I understand that TCEH LLC's principal Bank Accounts are Account No. 9810 (the "TCEH Main Account") and Account No. 0481 (the "TCEH Money Pool Main Account"), each of which TCEH maintains with JPM. As discussed below, the TCEH Main Account and the TCEH Money Pool Main Account together serve as the primary source of funds for the operations of the TCEH Debtors through a separate money pool (as described in the Cash Management Motion, the "TCEH Money Pool" and, together with the EFH Money Pool, the "Money Pools"). As of the Petition Date, the TCEH Main Account holds approximately $47 million. The TCEH Money Pool Main Account maintains a minimum net balance of approximately $2 million to prefund next-day wires. As of the Petition Date, the TCEH Money Pool Main Account holds approximately $2 million. The Debtors' treasury personnel sweep any excess cash held in the TCEH Money Pool Main Account into the TCEH Main Account on a daily basis. Likewise, the Debtors' treasury personnel deposit funds from the TCEH Main Account into the TCEH Money Pool Main Account as necessary to fund the operations of the TCEH Debtors.

30.    I understand that TCEH LLC also maintains the following four Bank Accounts:

- ***Bank Account No. 4169***, maintained with JPM, is a receipt and disbursement account relating to financial settlements and over-the-counter transactions, with a current balance of approximately $1,000;

14

- *Bank Account No. 3657*, maintained with Citibank, is an account used to fund certain letters of credit, with a current balance of approximately $27,000; and

- *Bank Account No. 7837*, maintained with JPM, is an account used to collect the proceeds of the sale of receivables in connection with the wind-down of the accounts receivable securitization program that was terminated on October 28, 2013, with a current balance of $0; and

- *Bank Account No. 0559*, maintained with Union Bank, N.A., is an account used to hold unrestricted cash related to the unwinding of the former accounts receivable securitization program, with a current balance of approximately $149.6 million.[12]

31.     Moreover, as described below, I understand that TCEH LLC invests excess cash in two Investment Funds, which together hold approximately $226 million as of the Petition Date.[13]

### 5.     Other Debtor Accounts.

32.     I understand that EFIH, the direct parent of Oncor Electric Delivery Holdings LLC ("Oncor Holdings"), maintains two Bank Accounts with JPM.  Bank Account No. 4789 holds approximately $3.7 million as of the Petition Date, and is used to pay general corporate expenses (the "EFIH Main Account").  Bank Account No. 4934 holds approximately $1,000 as of the Petition Date, and is used exclusively for the receipt of postpetition dividends from Oncor. As discussed below, EFIH invests excess cash in the Morgan Stanley Institutional Treasury Fund (Account No. 0127), an Investment Account that holds approximately $128.2 million as of the Petition Date.

---

[12]    I understand that the funds in this Bank Account and Bank Account No. 7837 are not part of the prepetition collateral securing the TCEH First Lien Debt or TCEH Second Lien Notes (as defined in the First Day Declaration).

[13]    As discussed below, I understand that TCEH LLC invests in the Goldman Sachs Financial Square Treasury Fund (Account No. 4694) and the Western Asset Institutional Treasury Fund (Account No. 4883).

33.     I understand that Generation Development Company LLC maintains a Bank Account with JPM (Account No. 3633) that holds approximately $1,000 as of the Petition Date. Generation Development Company LLC uses cash from this Bank Account in connection with currently limited activities related to development of generation assets.

34.     TXU Receivables Company LLC maintains a Bank Account with JPM (Account No. 8255) that holds $0 as of the Petition Date.  The account was used in connection with a former accounts receivable securitization program.

35.     I understand that EFCH, the direct parent of TCEH LLC, maintains a Bank Account with JPM (Account No. 4511) that holds approximately $4,000 as of the Petition Date. EFCH uses cash from this Bank Account to pay for general corporate expenses.

36.     In addition, based on my understanding, six indirect Debtor subsidiaries of TCEH LLC—TXU Energy Retail, TXU Energy Receivables, Luminant Energy, Luminant Generation, 4Change Energy, and Luminant Mining—collectively maintain 23 collection and disbursement Bank Accounts, identified on **Exhibit C**, which together hold approximately $2.9 million as of the Petition Date.

### 6.     The Debtors' Anticipated Postpetition Controls on the Bank Accounts.

37.     The Debtors have taken steps to implement appropriate mechanisms to ensure that no payments will be made on any debts incurred by them before the Petition Date except as provided in the Order or another order of the Court.  I understand that the procedures the Debtors have implemented (and will implement after the Petition Date) include:  (a) notifying the Banks of all prepetition payments that should not be honored; (b) segregating the Debtors' accounts payable into prepetition and postpetition amounts; (c) training the Debtors' accounting and accounts payable staff regarding procedures for identifying and segregating prepetition

obligations; and (d) developing specific authorization procedures required for the Debtors' accounting and accounts payable staff to issue a payment for any prepetition liability that is authorized pursuant to an order of the Court.

**B.    Banking Transactions, Bank Fees and Related Expenses.**

38.    I understand that the Debtors employ two primary methods of making payments from the Bank Accounts to external third parties.  First, substantially all payments by check or ACH Payment are made by EFH Corporate Services from the EFH Money Pool Main Account.[14] Specifically, the EFH Money Pool Main Account funds Bank Accounts 6766 and 0752, which then fund disbursements by check and ACH Payment, respectively.  As discussed below, to the extent that other Debtor affiliates are obligated to reimburse EFH Corporate Services for payments made on behalf of the Debtors to third parties, the applicable Debtor reimburses EFH Corporate Services by wire transfer within two days of such check or ACH Payment clearing. Additionally, certain of the Debtors make direct payments by wire transfer to external third parties from an applicable disbursement Bank Account.

39.    In the ordinary course of business, I understand that the Banks debit the Bank Accounts on account of all manner of payment items and instructions.  In connection with these payments and the general maintenance of the Bank Accounts, I understand that the Banks charge, and the Debtors pay, honor, or allow the deduction from the appropriate account, certain service charges, and other fees, costs, and expenses, including commercial card obligations that enable the Debtors' customers to pay by credit card (collectively, the "Bank Fees"). I understand that the Debtors receive credits from JPM in exchange for maintaining a minimum balance in some of their Bank Accounts with JPM, which JPM applies as an offset to certain Bank Fees.

---

[14]    Importantly, I understand that one exception to this payment process relates to refund payments to customers, which TXU Energy Retail makes directly to customers by check from Bank Account No. 6959.

40.    I understand that the Cash Management System depends on the ability of the Banks to maintain and administer the Bank Accounts and to honor and process the Debtors' banking transactions.

### C.    The Debtors' Existing Business Forms.

41.    I understand that, in the ordinary course of business, the Debtors use a variety of correspondence and business forms, such as letterhead, blank check stock, purchase orders, invoices, and other documents related to the Bank Accounts (collectively, the "Business Forms").

### D.    Investment Policies.

42.    I understand that certain of the Debtors invest funds that would otherwise be held in the EFH Main Account, the TCEH Main Account, or other Bank Accounts.  These funds are held in six investment accounts:  (a) Goldman Sachs Financial Square Treasury Fund (Account No. 4694); (b) Western Asset Institutional Treasury Fund (Account No. 4883); (c) Goldman Sachs Financial Square Treasury Fund (Account No. 4691); (d) Morgan Stanley Institutional Treasury Fund (Account No. 0166); (e) Morgan Stanley Institutional Treasury Fund (Account No. 0127); and (f) Invesco Treasury Portfolio - Institutional Class (Account No. 4457) (collectively, the "Investment Accounts").  I understand that as of the Petition Date, the bulk of the Debtors' cash on-hand (approximately $534.8 million) is invested in the Investment Accounts.

43.    I understand that, pursuant to the Debtors' internal investment policy (the "Investment Policy"), the Debtors are authorized to invest in (a) short-term securities of the United States government and federal agencies, and (b) money market funds comprised of such securities, provided that such money market funds both: (i) comply with Rule 2a-7 of the

Investment Company Act of 1940; and (ii) have a rating of 'AAA' by S&P or 'Aaa' by Moody's.[15]

44.    In addition to complying with the Investment Policy, I understand that the Debtors have taken steps to ensure that they will, on a postpetition basis, only use the Investment Accounts or other investment accounts that substantially comply with Local Bankruptcy Rule 4001-3.  Specifically, I understand that each of the Investment Accounts is held with an open-end management investment company regulated as a money market fund under Rule 2a-7 of the Investment Company Act of 1940 that (a) invests exclusively in United States Treasury securities owned directly or through repurchase agreements, (c) has received the highest money market fund rating of 'AAA' by S&P or 'Aaa' from Moody's, and (c) generally redeems fund shares in cash with payment being made no later than the business day following a redemption by a shareholder, except in the event of an unscheduled closing of the Federal Reserve Banks or the New York Stock Exchange.[16]  Additionally, I believe that the policies and practices with

---

[15]    I understand that the Debtors are also authorized under the Investment Policy, and with the approval of certain corporate officers, to make temporary cash investments in an amount at any one time outstanding not to exceed $50 million in any other short-term investment, security, or instrument.  I understand that during the pendency of these chapter 11 cases, however, the Debtors will not make any such temporary cash investments, as all funds in excess of operating requirements will be invested in the Investment Accounts.

[16]    I understand that certain of the money market funds with which the Investment Accounts are held reserve the right to pay redemptions by a distribution in-kind of securities.  Additionally, I understand that certain of the Investment Funds reserve the right to temporarily suspend redemptions if determined by such fund's manager or board of trustees to be in the interests of the fund and/or shareholders, or in accordance with Section 22(e) of the Investment Company Act or other applicable law.

Specifically, Section 22(e) of the Investment Company Act provides:

No registered investment company shall suspend the right of redemption, or postpone the date of payment or satisfaction upon redemption of any redeemable security in accordance with its terms for more than seven days after the tender of such security to the company or its agent designated for that purpose for redemption, except—

(1) for any period (A) during which the New York Stock Exchange is closed other than customary weekend and holiday closings or (B) during which trading on the New York Stock Exchange is restricted;

respect to (b) and (d) above generally will not be substantially altered by the applicable fund managers absent shareholder consent or advance notice.

45.     I understand that in the ordinary course of business, the Debtors engage in the following Intercompany Transactions that give rise to Intercompany Claims: (a) transfers and settlements through the Money Pools (as defined in the Cash Management Motion); (b) transactions and transfers under the Shared Services (as defined in the Cash Management Motion); (c) certain ordinary course transactions under the TSAs (as defined in the Cash Management Motion); (d) transactions related to Subleases (as defined in the Cash Management Motion); and (e) transactions related to Letters of Credit (as defined in the Cash Management Motion).

### 1.     The Money Pools.

46.     I understand that the Debtors utilize two "Money Pools" to facilitate transactions among themselves and to minimize the number of accounts needed for the corporate group to operate.  Specifically, EFH Debtors may participate in the EFH Money Pool,[17] and TCEH Debtors  may participate in the TCEH Money Pool.  I understand that each Money Pool is a general ledger that tracks, aggregates, nets, and settles intercompany payables and receivables

---

(2) for any period during which an emergency exists as a result of which (A) disposal by the company of securities owned by it is not reasonably practicable or (B) it is not reasonably practicable for such company fairly to determine the value of its net assets; or

(3) for such other periods as the Commission may by order permit for the protection of security holders of the company. The Commission shall by rules and regulations determine the conditions under which (i) trading shall be deemed to be restricted and (ii) an emergency shall be deemed to exist within the meaning of this subsection.

Investment Company Act of 1940 § 22(e), 15 U.S.C. §§ 80a (1940).

[17]     I understand that historically, EFIH and certain of EFH Corp.'s non-Debtor subsidiaries have participated in the EFH Money Pool.  Pursuant to the Cash Management Motion, the Debtors do not seek relief to allow, on a postpetition basis, (a) EFIH or its subsidiaries to make or receive loans through the EFH Money Pool, or (b) non-Debtor entities to obtain access to cash through the EFH Money Pool.

owed to, and by, the entities that participate in that Money Pool.  The list of Debtors that have historically participated in the EFH Money Pool or the TCEH Money Pool, and which will continue to participate in their respective Money Pools on a postpetition basis, is attached hereto as **<u>Exhibit D</u>** of the Cash Management Motion .

47.    I understand that the primary Bank Accounts associated with the EFH Money Pool are the EFH Main Account and the EFH Money Pool Main Account.  The EFH Money Pool Main Account maintains a minimum net balance of approximately $10 million to prefund outstanding checks, ACH Payments, and next-day wires.  I understand that the Debtors' treasury personnel sweep any excess cash above the minimum net balance held in the EFH Money Pool Main Account into the EFH Main Account on a daily basis, and subsequently invest this excess cash in certain of the Investment Accounts.  Moreover, I understand that funds are deposited into the EFH Money Pool Main Account from the EFH Main Account as needed to the extent that scheduled disbursements exceed the minimum net cash balance in the EFH Money Pool Main Account.

48.    I understand that the primary Bank Accounts associated with the TCEH Money Pool are the TCEH Main Account and the TCEH Money Pool Main Account.  The TCEH Money Pool Main Account maintains a minimum net balance of approximately $2 million to prefund next-day wires.  I understand that the Debtors' treasury personnel sweep any excess cash held in the TCEH Money Pool Main Account (above minimum net balances required to prefund next-day wires) into the TCEH Main Account on a daily basis, and subsequently invest this excess cash in certain of the Investment Accounts.  Moreover, I understand that funds are deposited into the TCEH Money Pool Main Account from the TCEH Main Account as needed to

the extent that scheduled disbursements exceed the minimum net cash balance in the TCEH Money Pool Main Account.

49.     I understand that the Money Pools facilitate Intercompany Transactions, including the provision of intercompany services and the payment of third-party obligations, among entities that participate in the same Money Pool.  Each entity that participates in a Money Pool is either a net "borrower" of, or a net "lender" to, one of the Money Pools, depending upon whether, in the aggregate, an entity contributes or draws money from the Money Pool. Additionally, I understand that if an entity provides intercompany services to another entity that participates in the same Money Pool, or pays an expense on behalf of another entity within the same Money Pool, this is treated as an extension of intercompany credit through the appropriate Money Pool.  These arrangements, in turn, give rise to Intercompany Claims, and net lenders accumulate interest on their balances at predetermined rates.[18]

50.     I understand that, historically, Intercompany Claims among the entities that participate in the same Money Pool have not been settled in cash; rather, they are recorded as a book entry and appropriate adjustment to the applicable account balances of both the borrower and lender.   The Debtors track all such Intercompany Transactions electronically in their accounting system and can ascertain, trace, and account for them as necessary.  Moreover, cash is not moved between the two separate Money Pools except pursuant to documented transactions.  The Debtors seek authority to continue to operate the Money Pools in accordance with their past practices.

---

[18]    I understand that net borrowers from the EFH Money Pool must make interest payments to the EFH Money Pool at a rate of 10.875% per annum, a percentage that is based on the EFH Corp. 10.875% LBO Senior Notes due 2017.  I also understand that net borrowers from the TCEH Money Pool must make interest payments to the TCEH Money Pool at a predetermined rate, equal to the daily weighted average cost of short-term borrowings under TCEH's prepetition revolving credit facility, plus the credit facility commitment fee spread.  An entity's accrued interest is paid monthly by a book entry in the ledgers of both the borrower and lender.

22

## 2.    The Shared Services.

51.    I understand that, in accordance with the Shared Services Agreement between Debtor EFH Corporate Services and the TCEH Debtors, dated October 23, 2013 (as amended, the "TCEH Shared Services Agreement") and the Shared Services Agreement between Debtor EFH Corporate Services and Debtor EFIH, dated April 1, 2014 (the "EFIH Shared Services Agreement" and, together with the TCEH Shared Services Agreement, the "Shared Services Agreements"), the Money Pools, or the Debtors' historical practices, EFH Corporate Services: (a) provides essential centralized administrative and back-office services to its affiliates and employs corporate-level employees to provide services for its affiliates (the "Centralized Services"); (b) makes direct payments for certain expenses attributable to its affiliates, irrespective of whether EFH Corporate Services is the payment obligor for such expenses, including the Debtors' health and welfare benefits for their employees, certain pension related obligations, certain information technology and capital expenditures, and certain real property related expenses (the "Direct Billing Goods and Services"); (c) in connection with its treasury function for the enterprise as a whole, (i) issues checks and ACH Payments on behalf of its affiliates (the "Reimbursable Expenses"); and (ii) collects and receives payments owed to its affiliates and remits such amounts to the appropriate affiliate (the "Remittance Services"); and (d) purchases certain assets for the benefit of its affiliates (the "Shared Asset Costs," and together with the Centralized Services, the Direct Billing Goods and Services, the Reimbursable Expenses, the Remittance Services, and the Shared Asset Costs, the "Shared Services").[19]    I understand that EFH Corporate Services employs approximately 500 employees, including the

---

[19]    Additionally, I understand that EFH Corporate Services seeks to provide similar services to certain direct and indirect non-Debtor subsidiaries of EFH Corp. (collectively, the "Non-Debtor Affiliates"), including Oncor Holdings and its subsidiaries, EFH Properties Company, Basic Resources Inc., EFH Vermont Insurance Company, and Ebasco Services of Canada Limited on a postpetition basis, pursuant to its historical practices

majority of the Debtors' executives, and enters into thousands of contractual arrangements with third parties for and on behalf of its affiliates.  I understand that EFH Corporate Services provides the Shared Services "at cost," and does not charge its affiliates any premium or markup.

52.    I understand that EFH Corporate Services receives payment from its affiliates for the allocated cost of the Centralized Services through monthly service bills, invoices its affiliates for their allocated cost of the Shared Asset Costs, and seeks reimbursement for the cost of the Direct Billing Goods and Services and the Reimbursable Expenses upon check or ACH clearance.[20]  Pursuant to the Remittance Services, EFH Corporate Services collects payments owed to its affiliates and remits such amounts to the appropriate affiliate when due.[21]

53.    I understand that the EFH Debtors primarily settle Intercompany Claims owed to EFH Corporate Services related to the Shared Services by book entry and adjustment to their respective ledger balances in the EFH Money Pool.  I understand that the TCEH Debtors, EFIH, and Non-Debtor Affiliates pay Intercompany Claims related to the Shared Services to EFH Corporate Services by making cash payments to the EFH Money Pool Main Account, net of Intercompany Claims owed by EFH Corporate Services on account of Remittance Services.  I understand that in 2013, the total net amount reimbursed to EFH Corporate Services by the TCEH Debtors on account of the Shared Services was approximately $2,235.2 million (of which approximately $1,987.5 million was related to Reimbursable Expenses and Direct Billing Goods

---

[20]    On February 18, 2014, TCEH LLC posted a deposit letter of credit in the total amount of $157.2 million to EFH Corporate Services for amounts owing under the TCEH Shared Services Agreement, approximately $100 million of which has been drawn as of the Petition Date.

[21]    For example, EFH Corporate Services receives approximately $15 million to $20 million annually from Oncor on account of "nuclear decommissioning fees" that are payable by the TCEH Debtors on Oncor's behalf, and remits such amounts to the TCEH Debtors for payment of such fees.  The nuclear decommissioning fees are further discussed in the *Motion of Energy Future Holdings Corp., et al., for Entry of Interim and Final Orders Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees and Granting Related Relief* (the "Taxes Motion"), filed contemporaneously herewith.

and Services), and the total net amount reimbursed to EFH Corporate Services by EFIH on account of the Shared Services was approximately $125,000.

54.    I believe that the Shared Services result in efficiencies and cost savings to the Debtors, and create value for the Debtors and their estates.  Moreover, I believe that given the integrated nature of the services and thousands of underlying agreements and employment relationships, requiring the Debtors to discontinue the Intercompany Transactions and the settlement of Intercompany Claims related to the Shared Services at this time would be extremely costly and inefficient, and detrimental to the value of the Debtors and their estates.

55.    As of the Petition Date, I understand that the TCEH Debtors owe EFH Corporate Services approximately $69.1 million on account of prepetition Intercompany Claims related to the Shared Services, and EFIH owes EFH Corporate Services approximately $700,000 on account of prepetition Intercompany Claims related to the Shared Services.

### 3.    The Tax Sharing Agreements.

56.    I understand that EFH Corp. is party to two tax sharing agreements: (a) one with EFCH, TCEH LLC and certain of its subsidiaries, and EFIH (the "Competitive TSA"); and (b) one with Oncor and Oncor Holdings (the "Oncor TSA" and, together with the Competitive TSA, the "TSAs").[22]    I believe that historically, the TSAs have been an efficient means of managing the Debtors' tax liabilities and utilizing tax attributes on a consolidated basis, and greatly facilitate the Debtors' accounting and tax reporting and payment obligations.  Each of the TSA parties are liable for Texas state margin taxes.  Under the TSAs, EFH Corp. files Texas

---

[22]    I understand that EFH Corp. and Oncor have implemented structural and operational "ring-fencing" measures to enhance the credit quality of Oncor.  I understand that because Oncor is a partnership for federal income tax purposes, EFH Corp.'s consolidated federal income and Texas state margin tax returns only include EFH Corp.'s share of Oncor's income.  Accordingly, I understand that under the Oncor TSA, payments from Oncor to EFH Corp. are limited to EFH Corp.'s share of the federal income and state margin taxes that Oncor would owe if it filed its own tax returns, net of tax refunds and any amounts owed to Oncor for the deemed use by other TSA parties of Oncor's tax attributes.

state margin tax returns that include the TSA parties' results, and subsequently settles Intercompany Claims with each of the TSA parties on account of the Texas state margin taxes that are owed by each TSA party.

57.    I understand that the Competitive TSA allocates the consolidated income tax liability of the Competitive TSA parties (the "Competitive Group") by first requiring the calculation of the tax liability for each corporate member of the Competitive Group that would have resulted if each such corporate member had filed a separate return on a stand-alone basis separate from the Competitive Group, with the liability of a corporate member further allocated to any subsidiaries that are disregarded as separate from such member.[23]  I understand that the total amount paid in 2013 by the TCEH Debtors to EFH Corp. under the Competitive TSA, net of any reimbursements paid from EFH Corp. to the TCEH Debtors, was approximately $143.1 million.

58.    Generally, I understand that the Oncor TSA (a) requires Oncor to make payments to EFH Corp. and the minority owners of Oncor in respect of tax liabilities generated by its operations (and in certain circumstances entitles Oncor to payments from EFH Corp. and the minority owners in respect of net operating losses or other tax attributes recognized by it) and (b) requires Oncor Holdings to make payments directly to EFH Corp. in respect of tax liabilities generated by its operations (and in certain circumstances entitles Oncor Holdings to payments from EFH Corp. in respect of tax losses recognized by it).  I understand that the total amount paid in 2013 to EFH Corp. by Oncor and Oncor Holdings under the Oncor TSA, net of any

---

[23]    I understand that the amount allocated to each member is comprised of two components. *First* is the fraction of the actual consolidated tax liability that corresponds to each such member's relative positive "separate taxable income." *Second* is the relative benefit to members with positive separate taxable incomes from losses generated by other members of the consolidated group and utilized by the group, whether such losses are recognized in the current period or in a prior period. I understand that in certain circumstances, a Competitive TSA party that generates a tax loss may be entitled to receive a payment from EFH Corp.

reimbursements owed from EFH Corp. to Oncor and Oncor Holdings, was approximately $90 million and $34 million, respectively.[24]

59.    I understand that pursuant to the *Motion of Energy Future Holdings Corp., et al., for Entry of Interim and Final Orders Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees and Granting Related Relief* (the "Taxes Motion"), the Debtors are seeking authority to continue to pay approximately $70 million on account of certain prepetition state law margin tax claims to ensure that they will be able to continue operating their businesses in the ordinary course.  Accordingly, pursuant to the Cash Management Motion, I understand that the Debtors are only seeking to settle prepetition Intercompany Claims under the TSAs relating to prepetition state law margin tax claims that the Debtors are authorized to pay under the Taxes Motion, and to continue to settle Intercompany Claims arising under the TSAs with respect to state law margin tax claims on a postpetition basis.  I also understand that the Debtors are not seeking at this time to settle Intercompany Claims relating to federal income taxes among EFH Corp. and the TSA parties.

### 4.    Subleases.

60.    I understand that Non-Debtor EFH Properties Company and certain Debtors lease property for the operation of the businesses and, pursuant to sublease agreements, historical practices, and other arrangements (collectively, the "Subleases"), sublet office space and real property to their affiliates.  For example, the Debtors and their affiliates' Dallas office headquarters, Energy Plaza, is leased pursuant to a lease agreement dated February 14, 2002 (the "EP Lease") between non-Debtor EFH Properties Company, as lessee, and U.S. Bank, National Association (as successor-in-interest to State Street Bank and Trust Company of Connecticut,

---

[24]    I understand that in accordance with the Restructuring Support Agreement attached to the First Day Declaration, the Debtors will seek to assign the Oncor TSA to EFIH during these chapter 11 cases.

National Association), as Owner Trustee of the ZSF/Dallas Tower Trust, as the lessor.  EFH

Properties Company, in turn,  subleases Energy Plaza office space to certain of its affiliates,

including EFH Corporate Services and Oncor.  I understand that under the shared services

agreements, EFH Corporate Services seeks reimbursement from their affiliates for its allocated

share of rent, property taxes, operating costs, utilities, depreciation, and other related expenses. I

understand that Oncor sub-subleases its Energy Plaza space to Debtor Luminant Generation,

charging Luminant Generation below Oncor's cost of subleasing such space from EFH

Properties Company.  I understand that in 2013, the TCEH Debtors paid approximately $4.3

million to Non-Debtor Affiliates under the Subleases.  I also understand that as of the Petition

Date, the TCEH Debtors owe their affiliates approximately $400,000 on account of prepetition

Intercompany Claims under the Subleases.

### 5.    Letters of Credit

61.    I understand that TCEH LLC has issued, and is obligated under, the deposit letters

of credit for the benefit of its Debtor affiliates (the "Letters of Credit").  The following table lists

the Letters of Credit that TCEH LLC has issued to third parties for the benefit of certain EFH

Debtors and Non-Debtor Affiliates, and the amount outstanding net of draws on such Letters of

Credit:

| Applicable Beneficiary(ies) | Number of Letters of Credit | Total Net Amount Outstanding |
|---|---|---|
| EFH Corp. | 6 | $26,169,000 |
| EFH Corp. and LSGT Gas Company LLC | 1 | $12,014,000 |
| EFH Corporate Services | 8 | $5,935,000 |
| EFH Vermont Insurance Company[25] | 2 | $704,000 |
| Brighten Energy LLC | 2 | $500,000 |
| LSGT Gas Company LLC | 1 | $250,000 |

62.    The Letters of Credit are backed by restricted cash belonging to the TCEH Debtors.  To the extent that third parties draw on these Letters of Credit as payment for goods and services provided to the Debtors and their affiliates, a payable will result from the applicable beneficiary (if the beneficiary is not TCEH LLC) to TCEH LLC.  I understand that the TCEH Debtors' reimbursement obligations to TCEH LLC under the Letters of Credit are settled through the TCEH Money Pool.  I understand that because TCEH LLC is a net payer to EFH Corp. and certain of its subsidiaries, including EFH Corporate Services, on account of Intercompany Claims arising under the other Intercompany Transactions, payables owed to TCEH LLC by these affiliates for drawdowns on the Letters of Credit are generally offset against the TCEH Debtors' obligations, thus reducing the amount of cash payments actually made by the TCEH Debtors.  I understand that in 2013, EFH Corp. and certain of the EFH Debtors reimbursed TCEH LLC approximately $1.4 million for amounts drawn under the Letters of Credit.  I also understand that as of the Petition Date, there are approximately $57.8 million of TCEH LLC Letters of Credit issued and outstanding for the benefit of EFH Corp. and certain EFH Debtors, of which approximately $56.4 million remains undrawn.

---

[25]    Non-Debtor Affiliate EFH Vermont Insurance Company is a direct subsidiary of EFH Corp.

63.     As of the Petition Date, I understand that there are no outstanding Intercompany Claims owing from the EFH Debtors and the Non-Debtor Affiliates to TCEH LLC on account of reimbursement obligations under the Letters of Credit.

**6.     The Intercompany Transactions are Vital to the Debtors' Business Operations.**

64.     The Debtors' operations are highly complex and integrated, and the Intercompany Transactions enable the Debtors to efficiently provide essential goods and services to their Debtor and Non-Debtor Affiliates and settle internal and external obligations.  I believe that if the Intercompany Transactions were to be discontinued, the Cash Management System and related administrative controls would be disrupted to the Debtors' detriment.  Furthermore, I believe that preserving the "business as usual" atmosphere and avoiding the unnecessary distractions that inevitably would be associated with any substantial disruption in the Cash Management System will facilitate the Debtors' reorganization efforts.

**Operational Motions**

V.    **Wages Motion.**[26]

65.    I understand that in the Wages Motion, the Debtors seek entry of Interim and Final Orders authorizing, but not directing, the Debtors to:  (a) pay certain prepetition wages, salaries, reimbursable employee expenses, and other compensation; (b) pay and honor employee and retiree medical and similar benefits (each as described in sub-clauses (a) and (b) defined in the Wages Motion, and collectively, the "Employee Obligations"); and (c) continue employee compensation and employee and retiree benefit programs (each as defined in the Wages Motion, and collectively, the "Employee Programs") in the ordinary course of business on a postpetition basis and in accordance with prepetition policies.[27]

A.    **Overview of the Debtors' Work Force.**

66.    I understand that EFH Corp., the direct or indirect Debtor parent of each of the Debtors, and its subsidiaries collectively employ approximately 9,100 employees.  I understand that of that number, the Debtors employ approximately 5,700 employees (collectively, the "Employees"), approximately 5,650 of whom are full-time and approximately 50 of whom are part-time.

67.    I understand that approximately 2,000 Employees are represented by unions that are party to 11 collective bargaining agreements (collectively, the "CBAs"). The Debtors pay approximately 2,100 Employees on an hourly basis and approximately 3,600 Employees are

---

[26]    See *Motion of Energy Future Holdings Corp.,* et al.*, for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Pay Certain Prepetition Compensation and Reimbursable Employee Expenses, (II) Pay and Honor Employee and Retiree Medical and Similar Benefits, and (III) Continue Employee and Retiree Benefit Programs, and (B) Modifying the Automatic Stay,* filed contemporaneously herewith.

[27]    I understand that the summary of the Debtors' various Employee Obligations and Employee Programs provided in the Wages Motion is qualified entirely by the Debtors' official policies or other practices, programs, or agreements, whether written or unwritten, evidencing an arrangement among the Debtors and their Employees (each, an "Official Policy"). I understand that in the event of any inconsistency or ambiguity between this summary and an Official Policy, the terms of such Official Policy shall govern.

salaried.  I also understand that Debtors employ approximately 300 Staffing Provider Workers, during various periods throughout the year through an employment agency, and approximately 40 Independent Contractors.

### B.    Payroll.

#### 1.    Employees Compensation.

68.    I understand that the Debtors generally are current on all their payroll obligations to the Employees.   That said, as of the Petition Date, I understand that certain prepetition wage obligations have accrued and remain unpaid.  Additionally, I understand that some Employees may be entitled to compensation because (a) discrepancies may exist as to amounts paid and (b) some payroll checks issued before the Petition Date may not have been presented for payment or may not have cleared the banking system and, accordingly, have not been honored and paid as of the Petition Date.  I understand that the Debtors compensate their Employees (collectively, "Compensation") as discussed below.

69.    I understand that certain of the Debtors' Employees are compensated on an hourly basis and may be entitled to prepetition amounts on account of compensation that has accrued but remains unpaid as of the Petition Date on behalf of such Employees.  Alternatively, I understand that certain of the Debtors' Employees are compensated by way of an annual salary which accrues on a monthly or quarterly basis.  As a result, I understand that there may be prepetition amounts on account of compensation that has accrued but remains unpaid as of the Petition Date on behalf of such Employees.

70.    On average, I understand that the Debtors pay approximately $10.0 million per week on account of Compensation.  As of the Petition Date, I understand that the Debtors estimate that they owe Employees an aggregate amount of approximately $4.1 million on account of Compensation earned before the Petition Date (collectively, "Unpaid

Compensation"), approximately $4.1 million of which will become due and owing within the Interim Period. I understand that the Debtors believe that no amount owed to an Employee exceeds the $12,475 priority cap imposed by section 507(a)(4) of the Bankruptcy Code on account of Unpaid Compensation.

71.    I understand that the Employees perform a variety of critical functions, including sales, customer service, plant and mine operations, accounting, finance, management and other tasks for the Debtors, and in return, depend on the Debtors for their Compensation to pay their daily living expenses.  Thus, I understand that pursuant to the Interim Order, the Debtors seek authority, but not direction, to continue to pay Compensation in the ordinary course of business on a postpetition basis, and to pay Employees any Unpaid Compensation accrued in the ordinary course of business that comes due during the Interim Period, up to $12,475 per eligible Employee (approximately $5.0 million in the aggregate).  Pursuant to the Final Order, I understand that the Debtors seek authority, but not direction, to continue to pay Compensation in the ordinary course of business on a postpetition basis and to pay all Unpaid Compensation owed to Employees, including amounts owed to  Employees above $12,475 (if any).

### 2.    Non-Insider Incentive Compensation.

72.    I understand that certain of the Debtors' non-insider Employees who work in a customer-facing sales capacity receive commission-based compensation from two performance based plans: (a) the TXU Sales Incentive Plan and (b) the Luminant Retail Gas Sales Incentive Plan (each as described in the Wages Motion).  I understand that the Debtors have historically used these plans to drive sales efforts and motivate those Employees who have made significant individual and team contributions to the Debtors' sales efforts.  I also understand that these Employees are highly marketable given the Debtors' fiercely competitive retail market, and the attrition rate associated with these Employees has historically been high.  Failure to compensate

such Employees in accordance with prepetition practices could result in their immediate departure and jeopardize the Debtors' customer relationships.  I understand that the majority of these Employees are eligible to receive such compensation on a biweekly or monthly basis, and, as a result, there may be prepetition amounts that have accrued but remain unpaid as of the Petition Date.  Importantly, I understand that many of these Employees do not participate in other additive incentive programs.[28]

73.    ***TXU Sales Incentive Plan.***    The Debtors have historically offered a sales incentive plan to approximately 200, non-insider, full-time Employees at TXU Energy based on their performance in sales management or sales support positions (the "TXU Sales Incentive Plan").  Specified senior management sets certain performance goals for eligible Employees based on the detailed business plan approved by the TXU Energy executive leadership team. Proposed payments are subject to a rigorous review process, including review by the vice presidents of the relevant business units and approval by a dedicated award committee.  As of the Petition Date, the Debtors estimate that approximately $800,000 is due and outstanding on account of the TXU Sales Incentive Plan, approximately $800,000 of which will become due and payable during the Interim Period (approximately $4,000 per eligible Employee) (the "Unpaid TXU Sales Incentive Payments").

74.    Importantly,  I understand that none of the Employees who are eligible to participate in and receive payments from the TXU Sales Incentive Plan are insiders, as defined under section 101(31) of the Bankruptcy Code.  Instead, I understand that these Employees work on commission earned through their efforts from interfacing with the Debtors' diverse customer

---

[28]    Many of the Debtors' Employees participate in various additive employee compensation programs.  Although the Debtors are not seeking relief with respect to such additive employee compensation programs in the Wages Motion, the Debtors intend to seek authority to continue such programs early in these chapter 11 cases pursuant to a separate motion.

base.  I understand that the Employees eligible to participate in the TXU Sales Incentive Plan are uniquely positioned to know a significant amount about the Debtors and the Debtors' industry, as well as a significant amount of detail about the Debtors' customer base.  As such, I understand that replacing these Employees would be highly disruptive to the business and directly affect the Debtors' relationship with their customers. As a result, I understand that the Debtors are seeking relief pursuant to the Interim Order to honor Unpaid TXU Sales Incentive Payments that become due and payable during the Interim Period and relief pursuant to the Final Order to honor all Unpaid TXU Sales Incentive Payments.

75.     18.     ***Luminant Retail Gas Sales Incentive Plan.***  The Debtors have historically offered a sales incentive plan to approximately four non-Insider, full-time gas sales Employees at Luminant based on financial EBIT targets for each year (the "Luminant Retail Gas Sales Incentive Plan").  Payments under the Luminant Retail Gas Sales Incentive Plan are subject to a rigorous approval process similar to the process described above with respect to the TXU Sales Incentive Plan.  As of the Petition Date, the Debtors estimate that approximately $50,000 is due and outstanding on account of the Luminant Retail Gas Sales Incentive Plan (the "Unpaid Luminant Incentive Retail Plan Payments").

76.     I understand that as with the TXU Sales Incentive Plan, no Employees who are insiders (as defined under the Bankruptcy Code) are entitled to participate in the Luminant Retail Gas Sales Incentive Plan.  I understand that like the TXU Sales Incentive Plan, the Luminant Retail Gas Sales Incentive Plan incentivizes those Employees in a customer-facing position to create sustainable customer relationships that ultimately provide direct and positive returns to the Debtors' operations.

77.     On average, I understand that the Debtors pay approximately $10 million per

35

week on account of Compensation.  As of the Petition Date, I understand that the Debtors estimate that they owe Employees an aggregate amount of approximately $5.2 million on account of Compensation earned before the Petition Date (collectively, "Unpaid Compensation"), approximately $4.2 million of which will become due and owing within the Interim Period.  I believe that no amount owed to an Employee exceeds the $12,475 priority cap imposed by section 507(a)(4) of the Bankruptcy Code on account of Unpaid Compensation.

78.    The Employees perform a variety of critical functions, including sales, customer service, plant and mine operations, accounting, finance, management and other tasks for the Debtors, and in return, depend on the Debtors for their Compensation to pay their daily living expenses.

### 3.    Staffing Provider Workers.

79.    I understand that the Debtors utilize the services of approximately 300 of various types of temporary workers (collectively, the "Staffing Provider Workers") through eight different vendors (collectively, the "Staffing Providers").[29]  I understand that the Debtors typically pay for the Staffing Provider Workers' services directly to the Staffing Providers through their accounts payable system.  The Staffing Providers, in turn, pay the Staffing Provider Workers.

80.    I understand that Staffing Provider Workers are, in many instances, highly skilled workers.  For example, I understand that a significant group of Staffing Provider Workers provide information technology services that would be difficult to replace in a short timeframe.

---

[29]    I understand that one of the Staffing Providers, Pinnacle Technical Resources, Inc. is an affiliate of Kohlberg Kravis Roberts & Co., which has a substantial equity interest in EFH.  Importantly, the Unpaid Staffing Provider Fees (as defined below) owed to Pinnacle are secured by two letters-of-credit in the collective amount of approximately $3 million (the "Letters of Credit"), both of which will expire in June of 2014.

I believe that the institutional knowledge held by such Staffing Provider Workers would also be difficult to replace in a short timeframe. I believe that if they are not permitted to pay the Staffing Providers for the services of the Staffing Provider Workers, the Staffing Providers may withdraw the Staffing Provider Workers or refuse to provide the Debtors with replacement workers.

81.     I understand that on average, the Debtors pay approximately $710,000 per week on account of fees paid to the Staffing Providers on account of compensation owed to Staffing Provider Workers (the "Staffing Provider Fees").  I understand that as of the Petition Date, the Debtors estimate that approximately $500,000 is outstanding on account of the Staffing Provider Fees (the "Unpaid Staffing Provider Fees").

### 4.     Independent Contractors.

82.     I understand that through various contracts, approximately 40 independent and small contractors (collectively, the "Independent Contractors") conduct a range of important services for the Debtors.   I understand that the Independent Contractors provide on-site accounting, information technology, and other services on both a full-time and seasonal basis, and perform a variety of administrative, accounting, legal, finance, management support, and other related tasks.  I believe that their skills, knowledge and understanding with respect to the Debtors' operations, customer relations and infrastructure are essential to the effective reorganization of the Debtors' business.  In addition, I understand that many of the Independent Contractors are small companies that may suffer financial hardship without immediate payment for their services.

83.     On average, I understand that the Debtors pay the vendors approximately $60,000 per week on account of compensation owed to the Independent Contractors (collectively, the "Independent Contractor Fees").  I understand that as of the Petition Date, the Debtors estimate

that they owe an aggregate amount of approximately $160,000 in Independent Contractor Fees earned before the Petition Date (collectively, the "Unpaid Independent Contractor Fees"), approximately $150,000 of which will become due and owing within the Interim Period.

### 5.    Consultant Compensation.

84.    I understand that the EFH Corp. board of directors (the "Board") utilizes the services of two advisors who attend Board meetings and advise the Board as necessary and requested (the "Board Advisors").  I understand that the Debtors also collectively utilize the services of 13 third-party advisors who serve on a third-party advisory board (the "Regulatory Advisors" and, together with the Board Advisors, the "Consultants").  I understand that the Regulatory Advisors routinely advise companies in the Debtors' industry on critical nuclear and environmental regulatory issues.  I understand that none of the Consultants are insiders.  I understand that in the aggregate, the Board Advisors receive $500,000 annually for their services (the "Board Consultant Compensation") and the Regulatory Advisors receive $520,000 annually for their services (the "Regulatory Consultant Compensation" and, together with the Board Consultant Compensation, the "Consultant Compensation").  I believe that the Consultants' collective skills, knowledge, and understanding of the Debtors' operations and infrastructure are critical to the successful reorganization of the Debtors' businesses.

85.    The Debtors estimate that, as of the Petition Date, approximately $25,000 has accrued and remains outstanding on account of Regulatory Consultant Compensation (the "Unpaid Regulatory Consultant Compensation") and no amounts have accrued and remain outstanding on account of the Board Consultant Compensation as of the Petition Date.

### 6.    Payroll Processor.

86.    I understand that the Debtors use the services of Northgate Arinso (the "Payroll Processor") to process direct deposit transfers and administer payroll checks to

Employees.[30]  I understand that the Debtors pay approximately 2% of their Employees by check and the remainder by direct deposit.  I understand that the Payroll Processor calculates the Debtors' payroll, health benefit, and tax obligations for each Employee, and the Debtors then transfer funds sufficient to satisfy such obligations to the Payroll Processor in advance of the end of the applicable pay period.

87.    I understand that, on average, the Debtors pay approximately $300,000 per month to the Payroll Processor for the payroll-related services that it provides to the Debtors and related administrative costs (the "Payroll Processor Fees").  I understand that as of the Petition Date, the Debtors estimate that approximately $300,000 is outstanding on account of amounts owed to the Payroll Processor (the "Unpaid Payroll Processor Fees"), all of which will become due and owing within the Interim Period.

88.    I believe it is critical the Debtors be able to compensate Employees on the historical payroll schedule.  The Debtors will be unable to stay on the historical payroll schedule without the Payroll Processor because the Payroll Processor is responsible for calculating benefits and administering paychecks for the Employees, and replacing the Payroll Processor would take a significant amount of time.

C.    Reimbursable Expenses.

89.    I understand that the Debtors reimburse certain Employees or pay credit card invoices on behalf of certain Employees for approved, legitimate expenses incurred on behalf of the Debtors in the scope of their employment (collectively, "Reimbursable Expenses").  I understand that Reimbursable Expenses include business development and training activities, activities with current or potential customers and partners, business-related travel expenses—

_____

[30]    I understand that Northgate Arinso is an affiliate of Kohlberg Kravis Roberts & Co., which has a substantial equity interest in EFH.

including meals, hotels, flights, car rentals, fuel, cellular service used for business purposes—certain social club memberships, and purchases made for business purposes on the Debtors' corporate credit cards. I understand that Reimbursable Expenses are often incurred by Employees and certain members of the Debtors' boards who must travel as part of their employment responsibilities.

90.     I understand that the Debtors reimburse Employees for Reimbursable Expenses in two ways: through direct reimbursement (the "Direct Reimbursement Process") and the use of corporate credit and purchasing cards issued by JP Morgan Chase (collectively, the "Credit and Purchasing Cards"), each as described in the Wages Motion.

91.     I understand that the Debtors pay approximately $3 million per month on account of Reimbursable Expenses, which are paid in arrears.[31]

92.     I believe that the Employees incurred the Unpaid Reimbursable Expenses as business expenses on the Debtors' behalf and with the understanding that the Debtors would reimburse the Employees. At a minimum, I understand that the Direct Reimbursement Process and the Credit and Purchasing Cards are a historical feature of the Debtors' employment arrangement, and curtailing or halting this program would substantially disrupt the expectations of the Employees and, therefore, the Debtors' operations. In addition, I understand that the Debtors' internal employee reimbursement policy imposes a number of internal controls to ensure reimbursement requests are properly reviewed. I understand that among other things, (a) reimbursement requests can only be approved by managers who are permitted to implement a

---

[31]    I understand that in certain narrow circumstances, the Reimbursable Expenses also include reasonable and documented expenses incurred by members of the Debtors' boards of directors and managers in the scope of their duties as board members. I understand that the approval of such expenses is subject to various internal review processes. As of the Petition Date, the Debtors anticipate that approximately $25,000 of Unpaid Reimbursable Expenses is attributable to reasonable and documented expenses incurred by board members in the scope of their employment.

stricter review process but not a more lenient review process, (b) expenses can only be reimbursed if incurred "for the benefit of the company" and (c) expenses can only be reimbursed if incurred at the lowest available costs (with very particular rules delineated with respect to travel and expenses).

### D. Deductions and Withholdings.

#### 1. Payroll Taxes.

93. I understand that the Debtors are required by law to withhold from Employees' paychecks amounts related to federal, state, and local income taxes, Social Security, and Medicare taxes for remittance to the appropriate federal, state, or local taxing authority (collectively, the "Withheld Amounts"). In addition, I understand that the Debtors are required by applicable statutory authority to pay Social Security and Medicare taxes, and based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (the "Employer Payroll Taxes" and, together with the Withheld Amounts, the "Payroll Taxes").

94. I understand that, on average, the Debtors withhold approximately $12 million per month for Payroll Taxes, including both Employee and Debtor-paid portions. I also understand that as of the Petition Date, the Debtors estimate that approximately $900,000 million in Payroll Taxes have accrued and remain unpaid (the "Unremitted Payroll Taxes"), all of which will become due and owing to various taxing authorities within the Interim Period.

95. I believe that since the Debtors are statutorily obligated to pay Payroll Taxes, their inability to do so may result in adverse legal consequences that disrupt the reorganization process. Moreover, I understand from Debtors' counsel that certain of the Payroll Taxes are generally held in trust by the Debtors and are not property of their estates.

41

E.    **Miscellaneous Deductions.**

96.    In addition to various deductions discussed throughout the Wages Motion, the Debtors routinely deduct certain amounts from Employees' paychecks during each applicable payroll period on account of miscellaneous items, including garnishments, child support, and other similar deductions (collectively, the "Miscellaneous Deductions").

97.    On average, the Debtors remit approximately $400,000 per month on account of the Miscellaneous Deductions.  As of the Petition Date, the Debtors estimate they have collected approximately $400,000 in Miscellaneous Deductions from Employees' paychecks that they have not yet transferred to the appropriate third parties (the "Unremitted Miscellaneous Deductions"), all of which will become due and owing to various third parties within the Interim Period.

98.    The Debtors believe that the Miscellaneous Deductions are generally held in trust by the Debtors and are not property of their estates.  The Debtors seek authorization—but not direction—pursuant to the Interim Order and the Final Order, to remit the Unremitted Miscellaneous Deductions and continue remitting the Miscellaneous Deductions in the ordinary course of business on a postpetition basis.

F.    **Employee Benefit Programs.**

99.    The Debtors offer Employees the opportunity to participate in one or more insurance and benefit programs, including, medical, dental, and vision plans, life insurance, short and long-term disability insurance, and other employee benefit plans as described below.

1.    **Health Benefit Plans.**

100.    As described below, I understand that the Debtors offer Employees that work more than 20 hours per week the opportunity to participate in a number of health benefit plans, including medical, prescription, dental, and vision plans (collectively, the "Health Benefit

42

Plans"), each as described in the Wages Motion.

101.    Overall, I understand that the the Debtors fund approximately 80% of the costs associated with the Health Benefit Plans and Employees fund the remainder.  I understand that the Debtors estimate that they deduct or remit an aggregate amount of approximately $1.0 million each month on account of the Employees under the Health Benefit Plans and pay an aggregate amount of approximately $5.5 million each month on account of administrative fees, premiums, and claims under the Health Benefit Plans (collectively, the "Health Benefit Amounts").  I understand that the Debtors estimate that, as of the Petition Date, they owe approximately $5.5 million on account of the Health Benefit Amounts (the "Unpaid Health Benefit Claims and Fees"), all of which will become due and owing within the Interim Period.

102.    I understand that the Health Benefit Plans are customary for most large companies, and consequently, Employees and their dependents have come to rely on the Health Benefit Plans.  Without the Health Benefit Plans, I believe that employees would be forced to obtain potentially prohibitively expensive out-of-pocket coverage, which would adversely affect Employee morale.   In addition, I understand from counsel to the Debtors believe that deductions taken from Employee paychecks on account of the Health Benefit Plans are generally held in trust by the Debtors and are not property of their estates.

### 2.    Health Savings Account.

103.    I understand that in connection with the Medical Insurance Plans, Employees may opt to participate in the Health Savings Account plan (the "HSA").  I understand that under the HSA, the Debtor entity EFH Corporate Services contributes between $900 and $2,250 each year on behalf of participating Employees.  I understand that EFH Corporate Services has already contributed such amounts for 2014 on behalf of participating Employees in an aggregate amount of approximately $5.4 million.  That being said, I understand that the Debtors are obligated to

contribute amounts on behalf of (i) Employees who were hired after the 2014 funding and who opt to participate in the HSA and (ii) Employees who did not complete the activities required to receive contributions from the Debtors before the 2014 funding but subsequently completed such activities. I understand that as of the Petition Date, the Debtors believe they owe approximately $50,000 in prepetition amounts on account of the HSA (the "Unpaid HSA").

     **3.**  **Flexible Spending Accounts.**

   104.  I understand that the Debtors offer Employees that work more than 20 hours per week the ability to contribute a portion of their pre-tax compensation to flexible spending accounts to pay for certain out-of-pocket health care and dependent care expenses (the "Flexible Spending Program"). I understand that approximately 630 Employees participate in the health care portion of the Flexible Spending Program. I understand that at the beginning of each year, participating Employees contribute anywhere from $200 to $2,500 on behalf of themselves and anywhere from $200 to $5,000 on behalf of their dependents by deducting such amounts from their paychecks. I understand that all FSA amounts were available for distribution in January 2014 and are deducted from employee's paychecks throughout the year.

   105.  I understand that as of the Petition Date, the Debtors do not believe they owe any prepetition amounts on account of the Flexible Spending Program.

     **4.**  **Insurance.**

      **a.**  **Life Insurance.**

   106.  I understand that the Debtors provide approximately 5,650 Employees that work more than 20 hours per week with primary and split-dollar life insurance (the "Life Insurance") through Metropolitan Life Insurance Company. I understand that the Debtors provide eligible Employees with Life Insurance up to each Employee's base salary at no cost to the Employee.

   107.  I understand that the coverage provided by these various policies costs the

44

Debtors approximately $200,000 per month (the "Life Insurance Amounts"). I understand that as of the Petition Date, the Debtors estimate that there are approximately $200,000 in prepetition amounts to be deducted and/or remitted on account of the Life Insurance Amounts. I understand that the Debtors estimate that approximately $200,000 will become due and owing on account of the Life Insurance Amounts within the Interim Period (the "Unpaid Life Insurance Premiums").

108.    I understand that many Employees' long-term planning consists solely of the Life Insurance coverage they receive as a benefit of their employment. I believe that continuing Life Insurance coverage is essential to maintaining Employee morale and protecting Employee expectations and protecting their families from the impact of a catastrophic event.

### b.    Disability Benefits.

109.    I understand that the Debtors provide approximately 5,650 Employees that work more than 20 hours per week with long-term disability benefits, administered through Metropolitan Life Insurance Company (the "Long-Term Disability Benefits"). I understand that the Debtors also provide Employees that work more than 30 hours per week with short-term disability benefits (the "Short-Term Disability Benefits," and, together with the Long-Term Disability Benefits, the "Disability Benefits"), administered through Metropolitan Life Insurance Company. I understand that the Short-Term Disability Benefits are self-insured and are not subject to any limits. I also understand that the Long-Term Disability Benefits are fully insured under a policy that costs the Debtors approximately $200,000 per month. I understand that the Debtors pay 100% of the costs for the Disability Benefits, and the coverage provided by these various policies costs approximately $200,000 per month. I understand the Debtors pay 100% of the costs for the Disability Benefits.

110.    Under the Short-Term Disability Benefits program, I understand that eligible Employees receive three weeks of benefits at 100% of their base pay and ten weeks of benefits at

50% of base pay after six months to a year of service for new Employees. I understand that after one and up to five years of service, eligible Employees receive 13 weeks of benefits at 100% of base pay and 13 weeks of benefits at 50% of base pay.  I also understand that after five years of service, eligible Employees receive up to 26 weeks of benefits at 100% of base pay.  I understand that the Short-Term Disability Benefits program was implemented in 2011, and Employees hired before that time are entitled to 100% of base pay for up to 26 weeks.

111.    On average, I understand that the Debtors pay approximately $200,000 per month on account of the Disability Benefits.  I understand that as of the Petition Date, the Debtors estimate that they are obligated to deduct and/or remit approximately $200,000 on account of the Disability Benefits (the "Unpaid Disability Benefit Premiums"), all of which will become due and owing in the Interim Period.

112.    I understand that the vast majority of Employees rely on Disability Benefits as their sole form of wage-loss relief.  Thus, I believe that Employees will suffer substantial losses if they are not permitted to receive Disability Benefits.

### c.    Supplemental Insurance.

113.    I understand that approximately 5,650 Employees that work more than 20 hours per week may purchase supplemental coverage on their life, critical illness, and accidental death and dismemberment policies (for themselves and their dependents), administered through Metropolitan Life Insurance Company and Boston Mutual (collectively, the "Supplemental Insurance").  I understand that eligible Employees may purchase Supplemental Insurance in an aggregate amount no greater than six times their annual base salary, up to a limit of $2 million.  I understand that the Supplemental Insurance is 100% paid by deductions from participating Employees' monthly paychecks.

114.    I understand that the Debtors deduct or remit approximately $700,000 per month

on account of Supplemental Insurance (the "Supplemental Insurance Amounts").  As of the Petition Date, the Debtors estimate that there are approximately $700,000 in prepetition amounts to be deducted and/or remitted to Metropolitan Life Insurance Company on account of the Supplemental Insurance Amounts.  I understand that the Debtors estimate that they will be obligated to remit approximately $700,000 in deductions (taken on account of the premiums owed by the approximately 3,500 Employees that have elected Supplemental Insurance Coverage), within the Interim Period (the "Unremitted Supplemental Insurance Amounts").

115.    I understand from Debtors' counsel that the Supplemental Insurance Amounts are generally held in trust by the Debtors and are not property of their estates.  The Debtors seek authorization—but not direction—pursuant to the Interim Order and the Final Order, to remit the Unremitted Supplemental Insurance Amounts and continue Supplemental Insurance coverage in the ordinary course of business on a postpetition basis.

### 5.    The 401(k) Plan.

116.    I understand that the Debtors maintain a retirement savings plan for the benefit of their Employees who are at least 18 years old and have completed at least six months of eligible service, in accordance with the requirements of section 401(k) of the Internal Revenue Code (the "401(k) Plan").  I understand that approximately 5,300 Employees currently participate in the 401(k) Plan.

117.    I understand that in addition to making contributions to their 401(k) Plan account, all Employees have the option to take out a loan from their 401(k) Plan account.  I understand that the Debtors then deduct certain amounts from such Employees' paychecks and remit those amounts for repayment of such loans.  I understand that the Debtors deduct approximately $4.0 million in the aggregate each month from Employees' paychecks  (a)  on account of Employees' 401(k) contributions and (b) to repay Employees' 401(k) loans (which are capped at the lesser of

47

50% of the amount in a particular Employee's 401(k) account or $50,000) (collectively, the "401(k) Deductions").  As of the Petition Date, the Debtors estimate that they will be obligated to remit approximately $1.7 million on account of the 401(k) Deductions (the "Unremitted 401(k) Deductions"), all of which will become due and owing within the Interim Period.

118.    I understand that the Debtors also have a limited matching program under the 401(k) Plan (the "401(k) Matching Obligation").  Specifically, I understand that the Debtors match:  (a) 100% of an Employee's contributions, up to 6% of the Employee's salary, if the Employee does not participate in a defined benefit program or if they participate in the cash balance formula of the defined benefit plan; and (b) 75% of an Employee's contributions, up to 6% of the Employee's salary, if the Employee participates in the traditional formula of the defined benefit plan.  I understand that the Debtors paid approximately $23.2 million in 2013 and $6.0 million in the first quarter of 2014 on account of the 401(k) Matching Obligation.  I understand that as of the Petition Date, the Debtors estimate that they owe approximately $1,000,000 on account of the 401(k) Matching Obligation (the "Unpaid 401(k) Matching Obligation"), all of which will become due and owing within the Interim Period.

119.    The 401(k) Plan is administered by Fidelity Workplace Services LLC ("Fidelity Workplace") and by other specialized vendors.  I understand that the Debtors pay these administrators approximately $180,000 in the aggregate each month on account of administrative fees owed to Fidelity Workplace (the "401(k) Administrative Fees").  I also understand that as of the Petition Date, the Debtors estimate that they owe approximately $180,000 in 401(k) Administrative Fees earned before the Petition Date (the "Unpaid 401(k) Administrative Fees"), all of which will become due and owing within the Interim Period.

120.    I believe many Employees' retirement savings solely consist of the 401(k) Plan,

and many Employees choose to participate in the 401(k) Plan because of the 401(k) Matching

Obligation provision.  Thus, I believe that continuing the 401(k) Plan and the 401(k) Matching

Obligation is essential to maintaining Employee morale and protecting Employee expectations.

In addition, I understand from Debtors' counsel that the 401(k) Deductions are generally held in

trust by the Debtors and are not property of their estates.

### G.   Workers' Compensation.

121.   I understand that the Debtors provide workers' compensation insurance for their

Employees at the level required by statute for each state in which the Debtors have Employees

(collectively,  the "Workers' Compensation Program").[32]   The Debtors maintain the Workers'

Compensation  Program  through  Liberty  Mutual  Group,  STARR,  Kemper,  and  Reliance

Insurance (the "Workers' Compensation Insurers").  I understand that the Debtors have a $2

million deductible per occurrence under the Workers' Compensation Program.

122.   I understand that on average, the Debtors pay approximately $1.4 million per year

in  fees  and  premiums  on  account  of  the  Workers'  Compensation  Program  (the  "Workers'

Compensation Coverage Fees").  I understand that the Debtors estimate that they do not owe any

amounts on account of Workers' Compensation Coverage Fees as of the Petition Date.

123.   Additionally, I understand that the Debtors incur an average of approximately

$1.4 million in workers' compensation claims per year, and pay an average of approximately

$1.3 million per year on account of such incurred claims.  I understand that third-party

administrators—Crawford  &  Company,  York  Risk  Services  Group,  Inc.,  and  one  of  the

---

[32]   I understand that the Debtors' workers' compensation policies entitle the Debtors to protection when benefits
are due to Employees under the following states' workers' compensation laws: (a) Arizona; (b) District of
Columbia; (c) Georgia; (d) Maryland; (e) Maine; (f) New York; (g) South Carolina; and (h) Texas.  I
understand from Debtors' counsel that although Texas does not require employers to maintain a Workers'
Compensation Program, the Debtors have not opted out of the Texas Workers' Compensation Act.  Additional
states are also covered in previous years.

49

Workers' Compensation Insurers, Liberty Mutual group—collect and process claims submitted pursuant to the Workers' Compensation Program in exchange for an administrative fee ("Workers' Compensation Administrative Fees").

124.    On average, I understand that the Debtors pay approximately $20,000 per month in Workers' Compensation Administrative Fees.  I understand that as of the Petition Date, the Debtors estimate that they owe approximately $20,000 in Workers' Compensation Administrative Fees ("Unpaid Workers' Compensation Administrative Fees"), all of which will come due and owing within the Interim Period.

125.    I understand that certain benefits under the Workers' Compensation Program may have been incurred prepetition but have yet to be fully paid, and certain other claims may have been filed prepetition but have yet to be resolved (collectively, the "Unpaid Workers' Compensation Claims").  I understand from Debtors' counsel that for the claims administration process to operate in an efficient manner and to ensure that the Debtors comply with their contractual obligations, the Debtors must continue to assess, determine, and adjudicate Unpaid Workers' Compensation Claims during these chapter 11 cases.  In addition, I understand that to the extent any of the Employees assert claims under the Workers' Compensation Program, the Debtors request that the Court modify the automatic stay under section 362 of the Bankruptcy Code to permit the Employees to proceed with their claims under the Workers' Compensation Program.  I understand from Debtors' counsel that the required modification of the automatic stay pertains solely to claims under the Workers' Compensation Program.

126.    I understand from Debtors' counsel that because the Debtors are statutorily and/or contractually obligated to maintain the Workers' Compensation Program, their inability to do so may result in adverse legal consequences that disrupt the reorganization process.

**H.      Vacation, Holiday and Other Leave of Absence Time.**

127.    I understand that the Debtors provide vacation time to all full-time Employees other than union Employees as a paid time-off ("PTO") benefit (the "Vacation Time").[33]  I also understand that the length of employment generally determines the amount of Vacation Time available to each eligible Employee and the rate at which such Vacation Time accrues.   I understand that the amount of available Vacation Time differs between Luminant Employees and all other Employees.   In addition, I understand that Vacation Time for Luminant Employees is earned January 1 of each year (e.g., a Luminant Employee receives 15 days of vacation beginning January 1 of the calendar year that the Employee will have served six years of service), while Vacation time for all other Employees is accrued each pay period.

128.    *Luminant Employees.*  I understand that the amount of Vacation Time that each eligible Luminant Employee can take is based on the number of years of continuous full-time employment, as follows:

- six days of Vacation Time for six months to 10 months of employment;

- 10 days of Vacation Time for 10 months of employment to six years of employment;

- 15 days of Vacation Time for six to 14 years of employment;

- 20 days of Vacation Time for 15 to 23 years of employment; and

- 25 days of Vacation Time for 24 or more years of employment.

129.    I understand that the Luminant Vacation Time amounts differ slightly for Luminant Employees that work in nuclear operations, at lignite plants, or at certain mine sites. Employees who do not use all of their accrued Vacation Time in a year may carry over accrued, unused Vacation Time to the next year, up to a maximum of 48 hours.

---

[33]    All full-time Employees are entitled to the Vacation Time benefits, with the exception of union Employees (as described in the Wages Motion).

130.    ***All Other Employees.*** I understand that the amount of Vacation Time that each eligible non-Luminant Employee can take is based on the number of years of continuous full-time employment, as follows:[34]

- 17 days of Vacation Time for zero to four years of employment;

- 22 days of Vacation Time for five to nine years of employment;

- 27 days of Vacation Time for 10 to 19 years of employment; and

- 32 days of Vacation Time for 20 or more years of employment.

131.    And I understand that Employees who do not use all of their accrued Vacation Time in a year may carry over accrued, unused Vacation Time to the next year, up to a maximum of 40 hours.

132.    I understand that all Employees who are eligible to take Vacation Time and who terminate their employment for any reason are entitled to the cash equivalent of any accrued but unused Vacation Time through their termination date.  I understand that the Debtors have approximately $32.0 million of total cash and non-cash accrued obligations on account of Vacation Time.  I understand that on average, the Debtors pay approximately $200,000 per month on account of cash obligations associated with the accrued but unused Vacation Time of terminated Employees.  I understand that as of the Petition Date, the Debtors estimate they owe an aggregate amount of approximately $200,000 in cash obligations on account of accrued Vacation Time (the "Unpaid Vacation Time"), all of which will come due within the Interim Period.

133.    In addition, I understand that the Debtors recognize eight to ten core holidays as a

---

[34]    The Luminant Vacation Time policies do not include sick-time. Luminant Employees are entitled to take sick leave but do not accrue sick leave benefits. Therefore, the Debtors do not have any cash obligations associated with accrued but unused sick-time on behalf of Luminant Employees.

PTO benefit for certain of their Employees (each, a "<u>Holiday</u>" and, collectively, the "<u>Holidays</u>").[35]  Generally, eligible Employees are not required to work on designated Holidays and are paid for Holiday time at their base rate of pay.  Employees who are required to work on designated Holidays are paid in accordance with the applicable Debtor's Holiday pay rates.

134.    On average, I understand that the Debtors pay approximately $17.0 million per year on account of the Holiday policies.  I understand that as of the Petition Date, the Debtors do not estimate they owe any amounts account of Holiday obligations.

135.    Employees may also take certain other unpaid leaves of absence for personal reasons (collectively, "<u>Leave of Absence Time</u>").  Leave of Absence Time includes family medical leaves, pregnancy, adoption and foster care leaves, military leaves, jury duty, voting leaves, personal leaves, and bereavement leaves.[36]  Employees are not entitled to cash payments for unused Leave of Absence Time.  Thus, I understand that there are no obligations owing as of the Petition Date on account of Leave of Absence Time.

136.    I believe that the continuation of the Vacation Time, Holiday, and Leave of Absence Time policies in accordance with prior practice (subject to the limitations described below), is essential to maintaining Employee morale during these chapter 11 cases.  Further, I understand that the policies are broad-based programs upon which all Employees have come to depend.

137.    I understand that the Debtors anticipate that their Employees will utilize any

---

[35]    I understand that all full-time Employees are entitled to take Holidays.  Full-time Employees of the Luminant entities are further entitled to two floating Holidays.  I understand that floating Holidays must be taken if the Employee is to receive pay for it as a Holiday.  I also understand that holiday premium pay may be earned on a floating Holiday only if the Employee is called to work because of an emergency.

[36]    I understand that Employees taking a military Leave of Absence to serve a regular tour of duty receive pay for all PTO benefits granted and accrued but not used before the effective date of the Leave of Absence.  I understand that such Employees do not receive any other pay during the tour of duty.

accrued Vacation Time, Holiday, and Leave of Absence Time in the ordinary course of business, and, therefore, the Debtors do not expect there to be any material cash requirements beyond the Debtors' normal payroll obligations on account of the relief requested in the Wages Motion.

I.    **Retiree Compensation and Benefits.**

138.    I understand that the Debtors maintain one qualified defined benefit pension plan that provides benefits to the approximately 2,100 union Employees (the "Union Pension Plan"). I understand that the Debtors also provide certain benefits (the "Retiree Medical Benefits") to approximately 4,600 retired Employees and Oncor's retired employees, (collectively, the "Retirees"), and such Retirees' eligible dependents.

1.    **The Union Pension Plan.**

139.    I understand that the Debtors plan to continue to make any and all contributions on account of the Union Pension Plan (the "Union Pension Plan Obligations") as required by applicable law and various contractual obligations.  For 2014, I understand that the Debtors made their annual contribution of approximately $20.0 million on behalf of the Union Pension Plan.

2.    **Retiree Medical Benefits.**

140.    I understand that the Debtors sponsor Retiree Medical Benefits for the Retirees and their eligible dependents.  I understand that in March of 2005, the Debtors and Oncor entered into an allocation agreement, under which Oncor assumed the retiree medical benefit obligations for (a) all of its active and retired employees and (b) Debtor active and retired Employees for the amounts earned by such Employees pursuant to their service prior to the deregulation and disaggregation of the Debtors' and Oncor's combined predecessor electric utility business effective January 1, 2002.   As a result of this agreement, I understand that although the Debtors sponsor the Retiree Medical Benefits, Oncor is obligated to satisfy the vast majority of the Retiree Medical Benefits' obligations.  I understand that as of December 31, 2013,

54

approximately 88% of the Retiree Medical Benefits' liability was attributable to Oncor.

141.    I understand that the Debtors and Oncor are responsible for satisfying their portion of Retiree Medical Benefits' liability.

142.    I understand that generally, the medical coverage offered to the Retirees differs based on the specific plan in which a Retiree chooses to participate, and participant costs differ based on the chosen plan, whether the Retiree's dependents are covered by the chosen plan, and the Retiree's years of service and associated rate band.  On average, I understand that the Debtors pay approximately $700,000 million each month to the VEBA Trusts to sponsor the Retiree Medical Benefits on behalf of the Retirees.  I understand that as of the Petition Date, the Debtors estimate that they owe approximately $700,000 million on account of sponsoring the Retiree Medical Benefits (the "Unpaid Retiree Medical Benefit Claims and Fees"), all of which will become due and owing within the Interim Period.

143.    I understand from Debtors' counsel that the Debtors currently are obligated to provide Retiree Medical Benefits under section 1114 of the Bankruptcy Code.  In addition, I believe that it is important that the Debtors continue to provide Retiree Medical Benefits to reassure all Employees that the Debtors intend to honor their obligations to Employees—both during and after their tenure with the Debtors.

**J.    Severance Program.**

**1.    Severance Payments.**

144.    I understand that the Debtors have historically maintained a severance program under which all Employees are entitled to a certain number of weeks of severance benefits based on their position and length of service with the Debtors, as well as post-employment benefits under the Health Benefit Plans (the "Severance Program").

145.    I understand that the payments under the Severance Program are not due and

payable until termination.  I understand that as a basis for comparison, between the years of 2010 and 2013, the Debtors paid an average of $4 million on behalf of the Severance Program.  I understand that this average reflects an atypical reduction in workforce in 2011, and, in fact, the Debtors paid less than $3 million in each of the last two years on account of the Severance Program.  Importantly, I understand that as of the Petition Date, no cash amounts remain outstanding on account of the Severance Program.

146.    I believe that it is important that the Debtors fulfill their obligations under the Severance Program to reassure all Employees that the Debtors intend to honor their obligations to non-insider Employees—both during and after their tenure with the Debtors—including those obligations incurred postpetition under the Severance Program.

### 2.    COBRA Reimbursements.

147.    I understand that the Debtors reimburse former Employees for deductions taken on account of Consolidated Omnibus Budget Reconciliation Act ("COBRA") expenses for the duration of their severance benefits. Under COBRA, I understand that the Debtors are obligated to offer former Employees and their dependents continued coverage under the Health Benefit Plans for a period of up to eighteen months.  I understand that the Debtors provide these reimbursements through a third-party administrator, Chard Snyder.  I understand that approximately 40 former Employees participate in one or more Health Benefit Plans under COBRA.  I understand that on average, the Debtors remit approximately $20,000 per month on account of COBRA reimbursements to Chard Snyder for former Employees (the "COBRA Reimbursements").

148.    I understand that as of the Petition Date, the Debtors estimate that they owe $20,000 on account of COBRA Reimbursements ("Unpaid COBRA Claims and Fees").

### K.    Other Employee Programs and Benefits.

#### 1.    Relocation Expenses.

149.    I understand that the Debtors provide certain Employees with relocation-related expenses (collectively, the "Relocation Expenses") to incentivize desirable "new-hire" candidates to accept positions with the Debtors or incentivize existing Employees to accept transfers to other locations.  I understand that on average, the Debtors pay approximately $150,000 per month on account of Relocation Expenses.  I understand that as of the Petition Date, the Debtors estimate that they owe $150,000 on account of prepetition Relocation Expenses ("Unpaid Relocation Expenses"), all of which will come due during the Interim Period.

150.    I believe that it is critical that the Debtors be able to pay Relocation Expenses to attract and retain talented employees, as well as to ensure, among other things, that Employees will be reimbursed for the expenses incurred in connection with their moves for the Debtors' benefit.

#### 2.    Tuition Reimbursement Expenses.

151.    I understand that the Debtors provide tuition assistance for eligible Employees who study in fields related to the Debtors' businesses (the "Tuition Reimbursement Expenses"). I understand that Employees are eligible to participate in the program if they work more than 20 hours per week, not including temporary workers or interns.  I understand that on average, the Debtors pay approximately $60,000 per month on account of Tuition Reimbursement Expenses. I understand that as of the Petition Date, the Debtors estimate that they owe approximately $60,000 on account of Tuition Reimbursement Expenses (the "Unpaid Tuition Reimbursement Expenses"), all of which will come due during the Interim Period.

152.    I believe that it is important that the Debtors be permitted to reimburse Employees for their tuition costs to ensure that the Debtors remain a competitive and knowledgeable

presence in the energy industry.

### 3.    Commuter Assistance Program.

153.    The Debtors subsidize eligible Employees for their car pool, bus, and rail costs (the "Commuter Assistance Program").    On average, I understand that the Debtors prepay the costs to administer the Commuter Assistance Program in January of each year (approximately $230,000 for the year).  I understand that as of the Petition Date, the Debtors do not believe there are any prepetition amounts on account of the Commuter Assistance Program, and the Debtors do not believe that any amounts will become due and owing during the Interim Period.

### 4.    Survivors' Benefit Program.

154.    I understand that the Debtors pay a benefit equal to one month of an Employee's base salary to an Employee's beneficiary upon death (the "Survivors' Benefit Program").    I understand that as of the Petition Date, the Debtors estimate that there are no amounts outstanding under the Survivors' Benefit Program.

### 5.    Employee Financing Programs.

155.    I understand that the Debtors have two programs in place in which they offer interest-free financing to Employees for appliances, including one for certain energy saving home appliances (the "Energy Conservation Program"), and another for certain other large household appliances, such as a dishwasher or clothes dryer (the "Appliance Financing Program," and together with the Energy Conservation Program, the "Employee Financing Programs").  I understand that the Energy Conservation Program has a maximum financing limit of $3,500 over a term of up to 60 months, and the Appliance Financing Program has a maximum financing limit of $2,000 over a term of up to 24 months.  I understand that the Debtors' pay approximately $1.2 million per year on account of the Employee Financing Programs.  I understand that as of the Petition Date, the Debtors do not believe they owe any amounts on

account of prepetition obligations related to the Employee Financing Programs.

156.    I understand that the Employee Financing Programs provide significant financing savings to those Employees who participate.

### 6.    United Way Matching Program.

157.    I understand that the Debtors maintain a matching program for Employee contributions to local chapters of United Way, a non-profit organization dedicated to identifying and resolving pressing community issues (the "United Way Matching Contributions").    I understand that for every $1.00 that Employees donate to local United Way chapters, the Debtors contribute $0.50 in United Way Matching Contributions.  I understand that on an annual basis, the Debtors contribute approximately $430,000 in United Way Matching Contributions.

### 7.    Energy Aid Program.

158.    I understand that the Debtors maintain a matching program for customer and employee contributions to local communities (the "Energy Aid Program").  I understand that the Energy Aid Program is the largest bill-payment assistance program among electricity providers in the nation.  I understand that the Debtors' Employees contribute to the Energy Aid Program through paycheck deductions, and the Debtors match Employee contributions (the "Energy Aid Matching Contributions").[37]  I understand that for 2013, the Debtors contributed approximately $1.5 million in Energy Aid Matching Contributions on account of employee deductions.

159.    I understand that as of the Petition Date, the Debtors estimate that they owe $210,000 on account of prepetition obligations related to the Energy Aid Matching Contributions (the "Unpaid Energy Aid Matching Contributions"), all of which will come due during the Interim Period.

---

[37]    I understand that the Debtors also match customer donations to the Energy Aid Program: for every $1.00 that customers donate to the Energy Aid Program, the Debtors contribute $5.00 to local communities to help individuals pay their electricity bills.

**L.    Unions.**

160.    I understand that approximately 2,100 Employees are represented by unions that are party to 11 CBAs with the International Brotherhood of Electrical Workers (the "IBEW").

161.    I understand from Debtors' counsel that the Debtors are required to withhold union member dues, and typically remit such dues on a monthly basis to the IBEW (collectively, the "Union Dues").  I understand that on average, the Debtors remit approximately $100,000 per month on account of the Union Dues.  I understand that as of the Petition Date, the Debtors estimate they have collected approximately $100,000 in Union Dues that they have not yet transferred to the IBEW (the "Unremitted Union Dues"), all of which will become due and owing to the IBEW during the Interim Period.  I understand that the Debtors generally hold the Union Dues in trust and as a result, the Debtors generally do not consider these as assets of their estates.

**M.    Relationship with Oncor.**

162.    I understand that the Debtors also provide and administer benefits to eligible Oncor employees, retirees, and dependents with respect to certain Employee Programs including, among others: (a) the Health Benefit Plans; (b) the Flexible Spending Program; (c) the 401(k) Plan; and (d) the Retiree Medical Benefits.  In the aggregate, I understand that the Debtors historically spend approximately $250,000 per year to provide and administer such benefits on behalf of eligible Oncor employees, retirees, and dependents.   Importantly, however, I understand that Oncor reimburses the Debtors for the vast majority of these costs and many of the Debtors' activities in respect of Oncor employees, retirees, and dependents are administrative in nature.  I understand that after accounting for Oncor's typical reimbursements to the Debtors, the Debtors generally spend approximately $250,000 per year to provide and administer such benefits on behalf of eligible Oncor employees, retirees, and dependents.

VI.    **Critical Vendors Motion.**[38]

163.    In the Critical Vendors Motion, the the Debtors seek entry of orders:  (a) schedule a final hearing as soon as practicable after the 21st day following the Petition Date (defined in the Critical Vendors Motion) to consider approval of the Critical Vendors Motion on a final basis (the "Final Hearing"); (b) after the Final Hearing, permit the Debtors to pay Critical Vendor Claims up to $40 million; and (c) authorize all applicable banks and financial institutions to receive, process, honor, and pay all checks presented for payment and all electronic payment requests made by the Debtors related to the Critical Vendor Claims, whether such checks were presented or electronic-payment requests were submitted before or after the Petition Date.

A.    **Debtors' Process of Identifying Critical Vendors.**

164.    I understand that the Debtors purchase goods and services from more than 6,700 third-party vendors.  I understand that these third-party vendors provide a host of goods and services that are important to the continued and uninterrupted operation of the Debtors' businesses.  I understand that the Debtors estimate they owe approximately $507 million to their third-party vendors as of the Petition Date.

165.    Recognizing that payment of all prepetition claims of such third-party vendors outside of a plan of reorganization would be extraordinary given the facts and circumstances of these cases, I understand that the Debtors spent significant time and effort reviewing their accounts payable and vendor lists to identify those vendors critical to the continued and uninterrupted operation of the Debtors' businesses (the "Critical Vendors").  In identifying the Critical Vendors, the Debtors examined each of their vendor relationships with the following criteria in mind:

---

[38]    See *Motion of Energy Future Holdings Corp.,* et al., *for Entry of Interim and Final Orders Authorizing the Debtors to Pay Prepetition Critical Vendor Claims*, filed contemporaneously herewith.

- whether a particular vendor is a sole source supplier or service provider;

- whether the services provided by the vendor are so vital, or the vendors' operations are so commingled with the Debtors' business, that even the briefest disruption would cause significant harm to the Debtors;

- whether the Debtors would be unable to obtain comparable products or services from alternative sources on a cost-effective basis within a reasonable timeframe;

- whether the Debtors' inventory levels or service coverage is sufficient to meet customer demands while an alternative vendor is located;

- whether a vendor meeting the foregoing criteria is able or likely to refuse providing essential products or services to the Debtors if their prepetition balances are not paid; and

- whether the business relationship between the Debtors and the supplier is governed by a contract.

166.    Applying these criteria, I understand that the Debtors estimate that they owe approximately $40 million to the Critical Vendors on account of goods and services delivered before the Petition Date.  Accordingly, I understand that the Debtors seek authority to pay up to $30 million pursuant to the Interim Order and $40 million pursuant to the Final Order.  I understand that these amounts represent approximately 8.0% of the Debtors' outstanding trade debt and approximately 0.1% of the Debtors' total funded indebtedness as of the Petition Date.

**B.    Summary of the Critical Vendors.**

167.    I understand that the Critical Vendors generally fall into one of the following five categories:  (a) vendors that provide goods and services related to planned maintenance outages: (b) vendors that provide services and related goods that are highly specialized and/or closely integrated with the Debtors' business operations and customer relationships; (c) sole source or geographically limited providers of critical goods; (d) vendors that provide goods and services

related to regulatory compliance obligations; and (e) vendors that provide goods and services related to the Debtors' nuclear power plant at Comanche Peak.[39]

### 1.    Outage Vendors.

168.    I understand that the Debtors utilize the services of a variety of Critical Vendors in connection with planned maintenance outages of certain of the Debtors' plants (the "Outage Vendors").  I further understand that in preparation for and during planned outages, the Debtors schedule maintenance, repairs, replacements, upgrades, refueling, refurbishing, and stress-testing on their generation and mining assets, all in an effort to ensure that their assets are in optimal condition before peak electricity season begins and out of service for the least amount of time possible.

169.    Based on the information available to me, I believe that any delay in goods and services from the Outage Vendors would likely extend a planned outage at significant cost to the Debtors' estates and/or unfavorably affect the operational reliability of the Debtors' generation and mining assets and the overall reliability of the ERCOT electricity market.  As a result, I understand that the Debtors believe that the services provided by the Outage Vendors are so vital that the costs of even the briefest disruption would exceed the prepetition claims owing to the Outage Vendors.

170.    Additionally, I understand from Debtors' counsel that certain of the Outage Vendors may not be subject to executory contracts and the Debtors believe that these Outage Vendors may refuse to continue doing business with the Debtors if they are not paid their

---

[39] The Debtors have agreed not to knowingly pay Critical Vendor Claims to any Critical Vendor that is an affiliate or insider, as defined in sections 101(2) and 101(31) of the Bankruptcy Code, respectively, of the Debtor, with the exception of portfolio companies owed by EFH Corp.'s indirect equity holders with which the Debtors conduct arm's-length transactions.  The Debtors request that they only be required to conduct a reasonable inquiry under the circumstances with respect to whether a particular Critical Vendor is an affiliate or insider.

prepetition claims.    Accordingly, I understand that the Debtors believe that payment of the Outage Vendors' prepetition claims will benefit their estates.

### 2.    Specialized and Integrated Services Vendors.

171.    I understand that the Debtors rely on specialized labor services and other services that are closely integrated with the Debtors' generation and retail business operations provided by certain Critical Vendors (collectively, the "Integrated Services Vendors").

172.    In certain cases, I understand that the Debtors can only obtain services from Integrated Services Vendors who have certifications, permits, or licenses as required by state or federal laws and regulations.    I understand that certain services that could otherwise be performed by a wide range of vendors (*e.g.*, welding, electrical, waste removal, earth moving, security, and cyber security services) can only be performed by certain Integrated Services Vendors due to the risks posed by the nature of the Debtors' facilities, which expose Integrated Services Vendors to, among other things, high speed rotation motors, toxic and radioactive substances, high voltage electricity, and high pressure vessels, as well as the additional dangers inherent in maintaining mining operations.    Other customer-facing services are vital to the Debtors' customer relationships and business strategy given the highly competitive Texas electricity market and the Debtors' emphasis on reliability and customer service to differentiate themselves from other market participants.    I believe it is vital that these customer-facing services are not negatively affected by, for example, dissatisfied vendors or the need to obtain new vendors.

173.    I understand that even if alternative service providers who possess the necessary qualifications, experience, and skills could be identified in a timely fashion, the Integrated Services Vendors have specific experiential knowledge about the Debtors' business operations,

facilities, and customer demands—developed over the course of the Integrated Services Vendors' long-standing relationship with the Debtors—that cannot be replaced.

174.    I believe that some of the Integrated Services Vendors will refuse to provide postpetition services to the Debtors if all or a portion of their prepetition claims are not satisfied. I understand that the Debtors have determined that the harm that would be inflicted on the Debtors' businesses by an interruption in service greatly outweighs the cost of paying the prepetition claims of the Integrated Services Vendors.  Although the Debtors will make every effort to obtain continued performance from the Integrated Services Vendors and, where applicable, would seek to enforce the automatic stay against Integrated Services Vendors who refuse to perform under valid prepetition agreements, due to the integrated nature of all of the services, limited availability of comparable vendors able to provide the Debtors with certain specialized services, and customer-facing nature of other services, it is vitally important that these services continue.  Therefore, I believe it is critical that they have the discretion to satisfy certain of the prepetition claims of the Integrated Services Vendors.

### 3.    Critical Goods Vendors.

175.    I understand that the Debtors rely on a number of Critical Vendors to supply essential raw materials, fuels, specialized replacement parts and supplies, operations consumables, and certain other goods and services required to operate the Debtors' plants and continue their business operations (collectively, and as described in the Critical Vendors Motion, the "Critical Goods Vendors" and "Critical Goods").  In some cases, I understand that there is no alternative provider for certain Critical Goods.  For example, I understand that certain Critical Goods Vendors supply the Debtors with specially fabricated repair and replacement parts for the turbines, transformers, boilers, and other equipment used in the Debtors' electricity generation and lignite mining operations.  I understand that this equipment is generally based on patented

designs available only from the manufacturer or that is made or provided to the Debtors' exact specifications.

176.    In other cases, I understand that alternative suppliers cannot supply the required Critical Goods in sufficient quantity, quality, or reliability, or they are unable to supply the required Critical Goods on a cost-efficient and timely basis in the appropriate geographic areas. For example, the Debtors' plants are designed to utilize bulk quantities of certain "laboratory grade" chemicals as part of their energy production and pollution control activities.  Due to the chemical specifications and quantities involved, I understand that the Debtors are dependent on a few Critical Vendors that can provide such chemicals to their plants to keep the plants running and compliant with environmental regulations.  I understand that similarly, certain raw materials and fuels used in the Debtors' business operations, including raw materials that are necessary for the Debtors' compliance with environmental regulatory requirements, are locally sourced because they are expensive and inefficient to transport.  I also understand that in any one of these locales, there may be only one potential counterparty to provide the Debtors with these raw materials and fuels.

177.    Accordingly, I understand that the Debtors have determined that they must be able, in their sole discretion, to satisfy certain of the prepetition claims of these Critical Goods Vendors to ensure the continued delivery of the Critical Goods to their plants and operational locations.

### 4.    Regulatory Compliance Vendors.

178.    I understand that the Debtors rely on a number of Critical Vendors to assist the Debtors in complying with applicable governmental laws and regulations (the "Regulatory Compliance Vendors").  For example, the Debtors rely on certain vendors to remove regulated waste and chemicals from the Debtors' facilities for proper disposal and vendors who perform

emissions testing and other critical compliance activities.  I understand that other vendors ensure the Debtors' compliance with requirements under applicable permits and regulations related to the Debtors' generation, wholesale, and retail activities and related services.

179.    I understand that some of the Regulatory Compliance Vendors may refuse to perform postpetition services if their prepetition claims are not paid, thereby exposing the Debtors to the risk of noncompliance with applicable governmental laws and regulations.  I also understand that even the slightest delay could cause governmental entities to attempt to levy fines or penalties against the Debtors or require idling or closing of facilities and may put the Debtors' licenses and permits at risk.  Moreover, I understand that proper disposal of the regulated waste and chemicals and compliance with environmental requirements on an uninterrupted basis will help to protect the environment and benefit the public health, including that of the Debtors' employees.  Additionally, I understand that the public relations and regulatory consequences that could result from even temporary noncompliance could have meaningful negative results for the Debtors.  For example, the Debtors are required to manage and operate their property in compliance with all applicable state and federal laws and regulations, and the automatic stay does not stay the exercise of police and regulatory powers by regulators.

180.    Accordingly, I believe that the Debtors' ability, in their sole discretion, to pay the Regulatory Compliance Vendors is essential to their reorganization efforts.

### 5.    Nuclear Plant Vendors.

181.    I understand that certain Critical Vendors provide goods and services related to the Debtors' nuclear generation units at Comanche Peak (the "Nuclear Plant Vendors").  I understand that these goods and services may include general operations, maintenance, repairs, inspections, refurbishments, fuel and parts, disposal services, quality control and assurance,

physical plant security, and cyber security.  I believe it is critical to both the Debtors' business, and as a matter of public safety, that the Debtors be permitted to pay the claims of Nuclear Plant Vendors as necessary to avoid complications, disruptions, or increased safety risks in the operation of their nuclear assets.  I understand that the Debtors' nuclear operations are subject to extensive oversight from the Nuclear Regulatory Commission and other regulatory bodies.  I also understand that operational difficulties with respect to the Debtors' current nuclear assets could have significant regulatory consequences for those assets and the overall reliability of the ERCOT electricity market.

182.    I understand that although the Debtors will make every effort to obtain continued performance from the Nuclear Plant Vendors and, where applicable, would seek to enforce the automatic stay against Nuclear Plant Vendors who refuse to perform under valid prepetition agreements, the Debtors believe that the importance of Comanche Peak's operations to the Debtors and the the critical public safety and regulatory issues that could be presented by any disruptions make continued performance vital.  Accordingly, I understand that the Debtors have determined that they must be able to satisfy certain of the prepetition claims of these Nuclear Plant Vendors, in the Debtors' discretion.

### C.    Terms and Conditions of Prepetition Payments.

183.    I understand that subject to the Court's approval, the Debtors intend to pay the Critical Vendor Claims only to the extent necessary to preserve their businesses.  I also understand that the Debtors have designated a core group of executives, consultants, and employees who have experience in the Debtors' business, as well as the reorganization process, to review, assess, and potentially recommend payment to a Critical Vendor.

184.    Moreover, I understand that the Debtors will use their commercially reasonable efforts to condition payment of Critical Vendors Claims upon each Critical Vendor's agreement

to continue supplying goods and services on terms that are acceptable to the Debtors in light of customary industry practices (the "Customary Trade Terms").

185.     Notwithstanding the Debtors' commercially reasonable efforts to the contrary, I understand that certain Critical Vendors may refuse to enter into a Vendor Agreement. I understand that the Debtors request that they be granted the authority to pay Critical Vendor Claims held by such Critical Vendors if the Debtors conclude, in their sole discretion, that such payment is necessary for the preservation of the Debtors' estates.[40]

186.     Additionally, I understand that the Debtors request that if a supplier or vendor accepts payment pursuant to an order granting the relief requested in the Critical Vendors Motion and thereafter does not continue to provide goods or services on prepetition trade terms that: (a) any payment on account of a Critical Vendor Claim may be deemed, in the Debtors' sole discretion in consultation with counsel to the Ad Hoc Committee of TCEH First Lien Creditors, to be an improper postpetition transfer, and, therefore, recoverable by the Debtors in cash upon written request; and (b) upon recovery of the payment by the Debtors, the Critical Vendor Claim shall be reinstated as if the payment had not been made.  I understand that if there exists an outstanding postpetition balance due from the Debtors to a vendor or supplier, the Debtors may elect to recharacterize and apply any payment made pursuant to an order granting the relief requested in the Critical Vendors Motion to such outstanding postpetition balance and such supplier or vendor will be required to repay to the Debtors such paid amounts that exceed the

---

[40]     In the event any payments greater than $5 million are to be paid when (a) a Critical Vendor has not agreed to execute a Vendor Agreement, or (b) the Debtors seek to execute a Vendor Agreement that is modified from the version annexed as Exhibit 1 to Exhibit A, the Debtors have agreed to consult with counsel to certain holders of first lien claims against TCEH (the "Ad Hoc Committee of TCEH First Lien Creditors") before making such payment or modifying the form of Vendor Agreement, as applicable.

postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.[41]

VII.    **Shippers, Warehousemen, and Materialmen Motion.**[42]

187.    In the Shippers, Warehousemen, and Materialmen Motion, the the Debtors seek entry of orders:   (a) granting administrative expense priority to all undisputed obligations the Outstanding Orders and satisfy such obligations in the ordinary course of business; and (b) pay prepetition claims of the Claimants in the ordinary course of business in an aggregate amount not to exceed $35.3 million during the Interim Period and pursuant to the Final Order, in an aggregate amount not to exceed $39.5 million.

A.    **Outstanding Orders.**

188.    I understand that the Debtors' suppliers may be concerned that they will be rendered general unsecured creditors, rather than administrative claimants, with respect to goods and services ordered before the Petition Date for delivery or provision after the Petition Date.  As a result, I understand that suppliers may refuse to ship or transport such goods (or recall such shipments) or provide services with respect to Outstanding Orders unless the Debtors issue

---

[41]    The Debtors have agreed to maintain a matrix summarizing (a) the name of each Critical Vendor that receives a payment (or payments) pursuant to the Interim Order or the Final Order; (b) the total amount paid to each Critical Vendor pursuant to the Interim Order or the Final Order; and (c) the nature of the goods and/or services provided by each Critical Vendor to whom a payment under the Interim Order or the Final Order is made (the "Critical Vendor Summary").  The Debtors will provide the Critical Vendor Summary, along with any executed Vendor Agreement, upon reasonable written request to the U.S. Trustee, the Ad Hoc Committee of TCEH First Lien Creditors, certain holders of unsecured claims against EFIH (the "Ad Hoc Committee of EFIH Unsecured Creditors", the agent for the TCEH and EFIH debtor in possession financing facilities, and, once appointed counsel to any official committee of unsecured creditors (the "Creditors Committee").  I understand that the Debtors request that this agreement to disclose payments be conditioned on the execution of a confidentiality agreement by any recipient of a Critical Vendor Summary and/or Vendor Agreements.  The Debtors also request that the Debtors not be required to disclose any information that the Debtors deem to be proprietary or competitive in nature to any competitor or any individual member of any committee.

[42]    See *Motion of Energy Future Holdings Corp.,* et al.*, for Entry of Interim and Final Orders Authorizing the Debtors to (A) Grant Administrative Expense Priority to All Undisputed Obligations for Goods and Services Ordered Prepetition and Delivered Postpetition and Satisfy Such Obligations in the Ordinary Course of Business, and (B) Pay Prepetition Claims of Shippers, Warehousemen, and Materialmen*, filed contemporaneously herewith.

substitute purchase orders postpetition or obtain an order of the Court permitting the Debtors to meet their obligations under the Outstanding Orders even though the Outstanding Orders are entitled to administrative expense priority under section 503(b) of the Bankruptcy Code.  Thus, I understand that the Debtors seek to affirm that the Outstanding Orders are entitled to administrative priority and to pay such Outstanding Orders in the ordinary course of business to avoid any unnecessary disruption to business operations and administrative costs associated with reissuing purchase orders or seeking additional relief.

     **B.**     **Claims of Shippers, Warehousemen, and Materialmen.**

          **1.**     **Shippers.**

189.    I understand that the Debtors' ability to produce and deliver energy in a timely manner depends on their timely receipt of raw materials, parts, equipment, supplies, fuel, and components that are important to the Debtors' business operations.  To that end, I understand that the Debtors rely upon certain professional domestic and international common carriers, shippers, truckers, logistics management companies, pipelines, rail carriers, and certain other third-party service providers to ship, transport, and deliver goods (the "Shippers").  I understand from Debtors' counsel that under certain state and federal laws, the Shippers could potentially assert possessory liens over goods currently in their possession for amounts the Debtors owe to the Shippers.  *See* 49 U.S.C. § 80109 (providing for uniform shipper liens with respect to interstate shipments using common carriers); Tx. Bus. & Com. § 7.307 (providing that carriers have a lien on shipped goods).  I understand that the value of the goods being shipped do not necessarily exceed the amounts owed to the Shippers, but an inability to acquire these materials or parts from the Shippers could result in serious disruption to the Debtors' operations.  I also understand that timely delivery of these items is therefore vital to the operation of the Debtors' businesses.

190.   I understand that, as of the Petition Date, the Debtors owe approximately $19.4 million on account of shipping and logistics charges for goods ordered prepetition, all of which will become due and owing during the Interim Period.

### 2. Warehousemen.

191.   I understand that to store certain of the same materials and parts transported by the Shippers, the Debtors use offsite storage space with certain warehouse facilities (collectively, the "Warehousemen").   For example, the Debtors have entered into several contracts to store natural gas utilized to fuel certain power generation assets and in other activities.   From Debtors' counsel, I understand that under certain state laws, the Warehousemen may be able to assert possessory liens against the warehoused property for amounts owed to the Warehousemen. *See* Tx. Bus. & Com. § 7.209 (providing for warehousemen liens even where a storage agreement, rather than a warehouse receipt, governs the transaction). I understand that the availability of these warehoused goods and materials are similarly important to the continued operation of the Debtors' businesses, and the amount due to the Warehousemen is significantly less than the value of the goods being stored.

192.   I understand that, as of the Petition Date, the Debtors owe approximately $3.2 million on account of Warehousemen claims, all of which will become due and owing during the Interim Period.

### 3. Materialmen.

193.   I understand that the Debtors' energy production and mining activities depend upon third-party contractors, mechanics, machinists, and repairmen that repair, fabricate, or perform other services on certain parts, equipment, and other materials used in the Debtors' facilities (the "Materialmen").

194.    I understand from Debtors' counsel that under certain state laws, including the Texas Constitution, the Materialmen could potentially assert possessory liens against the Debtors and their property for amounts that the Debtors owe and may refuse to return the Debtors' property until they are paid for their services.  *See* Tex. Cont. Art. XVI § 37 (self-effectuating constitutional lien in favor of "[m]echanics, artisans and material men, of every class . . . upon the buildings and articles made or repaired by them"); Tx. Prop. § 70.001 (providing for certain possessory materialmen liens).  I understand that the value of the property is greater than the amount of the Materialmens' claim for services rendered.

195.    I understand that, as of the Petition Date, the Debtors owe approximately $16.9 million on account of outstanding prepetition invoices of the Materialmen, of which approximately $12.7 million will become due and owing during the Interim Period.

**C.    Proposed Treatment of Claimants.**

196.    Under the state and federal laws described above, I understand from Debtors' counsel that the Claimants may have perfected liens against certain of the Debtors' goods, equipment, and facilities, or may be able to perfect such liens postpetition. I understand that even in the absence of such liens, the Claimants may possess goods that are vital to the Debtors' ongoing business operations.

**VIII.    Customer Programs Motion.[43]**

350.    In the Customer Programs Motion, the Debtors seek entry of:  (a) the Claims Order authorizing, but not directing, the Debtors to (i) maintain and administer all of the

---

[43]    See *Motion of Energy Future Holdings Corp., et al., for Entry of (A) an Order Authorizing the Debtors to (I) Maintain and Administer Customer Programs and Customer Agreements, (II) Honor Prepetition Obligations Related Thereto, (III) Pay Certain Expenses on Behalf of Certain Organizations, (IV) Fix Deadlines to File Proofs of Claim for Certain Customer Claims, and (V) Establish Procedures for Notifying Customers of Commencement of the Debtors' Chapter 11 Cases, Assumption of Customer Agreements, and the Bar Dates for Customer Claims and (II) an Order Authorizing the Debtors to Assume the Customer Agreements*, filed contemporaneously herewith.

Customer Programs (each defined in the Customer Programs Motion) in the ordinary course of business, (ii) honor prepetition commitments owing on account of all of the Customer Programs, (iii) pay certain expenses on behalf of the PUC and ERCOT (each defined in the Customer Programs Motion) incurred during the chapter 11 cases, (iv) fix the Customer Claims Bar Date for filing Proofs of Claims for Customer Claims (each defined in the Customer Programs Motion), and (v) establish the Customer Noticing Procedures to provide notice to current and former customers of commencement of the chapter 11 cases, assumption of Customer Agreements with current customers, and the Customer Claims Bar Date; and (b) after a final hearing, the Assumption Order authorizing the Debtor entities TXU Energy Retail Company LLC ("TXU Energy Retail"), 4Change Energy Company ("4Change"), Luminant ET Services Company ("Luminant ET Services"), and Luminant Energy Company LLC ("Luminant Energy" and, together with TXU Energy Retail, 4Change,  and Luminant ET Services, the "Retail Debtors") to assume the Customer Agreements with their customers.[44]

351.   I understand that the Debtors estimate that as of the Petition Date, the total amount of obligations to customers on account of the Customer Programs ranges from approximately $120 million to $135 million, including approximately $80 million to $90 million for Customer Credits, Customer Deposits, and the Average Monthly Billing Program.[45]   I also understand that the Debtors estimate that they are obligated to pay approximately $12 million on

---

[44]   The Customer Programs Motion does not request any relief with respect to or affect the rights, duties, or obligations of EFIH and EFIH Finance, Inc., or EFH Corp., other than with respect to EFH Corp.'s obligations under the Charitable Contributions Program (each defined in the Customer Programs Motion).

[45]   I understand that the Debtors' obligations to customers under the following Customer Programs are generally not cash payment obligations: the Average Monthly Billing Program, Customer Credits (excepting amounts refunded to customers, as described in the Customer Programs Motion), Customer Deposits, and Customer Agreements, all as defined and discussed in the Customer Programs Motion.  I also understand that obligations to customers under these Customer Programs fluctuate due to seasonality, business cycles, and various other business and economic factors.

account of prepetition Customer Programs obligations within the first 30 days of the Petition Date.

A.    **Overview of the Debtor's Business Operations and Customer Base.**

352.    I understand that the Debtors operate in all areas of the region overseen by ERCOT, which manages the supply of approximately 85% of the electricity consumption in Texas.    The majority of ERCOT is open to retail electric competition—approximately 6.7 million customers have the ability to choose their retail electric provider.[46]

353.    I understand that the Retail Debtors compose the Debtors' retail operations, through which the Debtors engage in retail sales of electricity to approximately 1.7 million residential and business customers in Texas, as well as the sale and delivery of natural gas to several hundred commercial and industrial customers.    In the first quarter of 2014, I understand that approximately 68% of the Debtors' retail operations revenue resulted from sales of electricity to residential customers.    I also understand that the Debtors compete against more than 100 other certified retail electric providers to supply customers with electricity in all areas of the ERCOT region open to competition, including the Dallas/Fort Worth, Houston, Corpus Christi, and lower Rio Grande Valley areas of Texas.

B.    **The Customer Agreements.**

197.    I understand that the Retail Debtors' agreements with their customers (collectively, the Customer Agreements") generally fall into three categories.    I also understand that the first category of Customer Agreements constitutes the vast majority of the Customer Agreements and consists of various retail electric power sales agreements that one of TXU Energy Retail, 4Change, or Luminant ET Services has entered into with residential and small

---

[46]    References to the number of customers in the Customer Programs Motion refer to the number of electricity meters.

business customers as well as large commercial and industrial end-use customers within the ERCOT region (collectively, the "Retail Agreements").[47]    Although they vary in size, I understand that the Retail Agreements typically include terms relating to the calculation and payment of charges, addition and removal of customer premises, adjustments to the contract price, events giving rise to the right to terminate, remedies upon termination, force majeure, notices, warranties and limitations of liabilities, and indemnifications.[48]    I understand that the customers that are party to the Retail Agreements include residential customers as well as more than 2,200 large organizations that represent a wide range of sectors, including manufacturing, energy, real estate, retail, and healthcare, as well as municipalities, schools, and religious organizations.    As of March 31, 2014, I understand that TXU Energy Retail, 4Change, and Luminant ET Services served approximately 1.7 million retail customers under the Retail Agreements.

198.    I understand that the second category of Customer Agreements is composed of approximately 350 commercial retail natural gas agreements that Luminant Energy has entered into with industrial and commercial customers to supply natural gas across North Texas and the greater Houston area (the "Retail Gas Agreements").    I also understand that the Retail Gas Agreements provide a consistent earnings and cash flow stream to the Debtors.

---

[47]    I understand that for the avoidance of doubt, the Retail Agreements do not include wholesale contracts to which any Debtor is a party with an affiliate of an end-use customer.

[48]    I understand that additionally, certain of the Customer Agreements impose an obligation on the Debtors to purchase power generated by their customers, which the Debtors subsequently sell into the ERCOT region (the "Power Purchase Obligations").    As of the Petition Date, the Debtors estimate that Luminant ET Services owes approximately $315,000 on account of such Power Purchase Obligations.

199.   I understand that the Customer Agreements also include agreements between Luminant Energy and one of the following customers: (a) The City of Goldsmith, Texas;[49] (b) Ameripower, LLC; (c) Infinite Electric, LLC and Veteran Electric, LLC; (d) Clearview Electric, Inc.; and (e) WM Renewable Energy, LLC[50] (collectively, the "Luminant Customer Agreements").   Pursuant to the Luminant Customer Agreements, Luminant Energy sells electricity and provides related services to, and/or schedules the delivery of power for, each customer.   Additional detail regarding the Luminant Customer Agreements, along with the respective Cure Amount, if any, are listed on **Exhibit 1** annexed to **Exhibit B** attached to the Customer Programs Motion.[51]

200.   I believe the Customer Agreements are essential to the Debtors' operations.   In particular, I understand that the Customer Agreements account for approximately 38 terawatt hours of delivered power on an annual basis, and over 74% of the Debtors' overall revenues.   I understand that to provide assurances to current and prospective customers that the Retail Debtors will continue to perform under the Customer Agreements and provide the same level of competitive and innovative service on par with their prepetition performance.

---

[49]   I understand that as discussed in **Exhibit 1** to **Exhibit B** attached to the Customer Programs Motion, Luminant Energy provides payment and invoice processing services to The City of Goldsmith.   Specifically, Luminant Energy pays The City of Goldsmith's transmission, distribution, and other charges to the applicable utility service provider, and then seeks reimbursement from the City of Goldsmith (the "Invoice Processing Services"). As of the Petition Date, the Debtors estimate that they owe approximately $3,000 of "pass-through" amounts on account of Invoice Processing Services.

[50]   I understand that as discussed in **Exhibit 1** to **Exhibit B** attached to the Customer Programs Motion, Luminant Energy purchases power produced by a landfill owned by WM Renewable Energy, LLC, which is subsequently sold to a retail customer of TXU Energy Retail.   As of the Petition Date, I understand that the Debtors estimate that Luminant Energy owes approximately $160,000 to WM Renewable Energy, LLC on account of such Power Purchase Obligations.

[51]   I understand that because the Debtors are seeking to honor prepetition obligations to customers pursuant to the Claims Order, the Debtors estimate that the Cure Amount with respect to each of the Customer Agreements will be $0.

C.      **The Debtors' Customer Programs.**

354.    The wholesale and retail electricity markets in the ERCOT region are highly competitive.  I understand that approximately 73% of the market's electricity demand in the ERCOT region is attributable to customers located in areas where there is a choice among retail electric providers.  I also understand that because Texas is one of the fastest growing states in the U.S. with a comparatively robust economy, competition within the ERCOT region for these customers is particularly fierce.  As of December 2013, I understand that there were more than 100 certified competitive retail electric providers (compared to approximately 40 in 2002, the first year of retail electric competition in Texas).   Based on data published by the PUC, as of September 30, 2013, I understand that approximately 62% of residential customers and 69% of small commercial customers in competitive areas of the ERCOT region are served by retail electric providers not affiliated with the pre-competition electric company in operation before the deregulation of the ERCOT region retail electricity market in 2002.  Moreover, approximately 89% of residential customers and 90% of small commercial load customers have chosen an electricity provider at least once since the ERCOT retail market deregulation process began in Texas in 2002,[52] making Texas the only state with retail competition where more than half of residential customers have chosen to be served by electricity providers other than the incumbent, traditional electric utilities.[53]

355.    In addition, I understand that the Debtors are a significant supplier of natural gas to small business and industrial and commercial customers in North Texas and the greater Houston area. I understand that the Debtors provide a variety of natural gas services, including

---

[52]    Electric Reliability Council of Texas, Inc., *Supplemental Information Retail Electric Market* (March 21, 2014).

[53]    Public Utility Commission of Texas et al., *Texas Energy Assurance Plan* 45 (Nov. 2012).  See the First Day Declaration for more information about deregulation in the ERCOT region.

firm supply, scheduling, nominations, and balancing for those commercial and industrial customers.  The Debtors' natural gas customers participate in various industries, including manufacturing, steel, glass, heat treating, chemical, refining, food service, hospitals, and commercial buildings.

356.    In this highly competitive space, I understand that the Debtors' retail operations employ a number of programs to develop and maintain customer loyalty and attract new customers, including various cash-back, billing arrangements, and other rewards, rebates and incentive programs, and incur certain other obligations and commitments to customers, including credits, deposits, charitable contributions, and warranties (collectively, as discussed in the Customer Programs Motion, the "Customer Programs").

357.    I believe that continuing the Customer Programs in the ordinary course is essential to the Debtors' seamless transition into chapter 11 and will facilitate a successful reorganization.  As discussed in the First Day Declaration, the Debtors filed these cases primarily to effectuate a balance sheet restructuring.  Thus, to preserve the value of their businesses, they must promptly assure their customers that the Customer Programs will continue uninterrupted.  I believe that the continuation of the Customer Programs is critical for maintaining customer confidence and trust in the Debtors' businesses and to ensure that the Debtors preserve market share in a highly competitive industry.  The following describes Customer Programs that the Debtors actively use to cultivate customer support and loyalty.

### 1.    Rewards Programs.

358.    I understand that the Debtors' retail operations offer various rewards programs, including a cash-back loyalty rewards program (the "Cash-Back Rewards"), a welcome bonus program (the "Bonus Program"), the LUV 2Fly Rapid Rewards Program with Southwest Airlines (the "Rapid Rewards Program"), referral programs (the "Refer-a-Friend Programs"),

third-party partner incentives (the "Partner Incentives"), sweepstakes programs (the "Sweepstakes Programs"), and other reward and incentive programs (collectively, the "Rewards Programs").

359.    I understand that the Cash-Back Rewards are a customer loyalty program that makes recurring annual cash payments to participating customers.  I also understand that the Debtors accrue obligations over the course of the year on account of the Cash-Back Rewards and, in the first quarter of each year, make payments to customers in an amount equal to approximately 2% to 6% of the total energy and transmission and distribution utility charges incurred by customers during the preceding calendar year.  I understand that the payments primarily come in the form of Visa debit cards issued in the name of customers, and constitute actual cash obligations.  I also understand that customers with $5.00 or less in Cash-Back Rewards receive a credit on their bill rather than a debit card.  I understand that if customers do not use the full amount of the Cash-Back Rewards on their cards within six months from the date the cards are received, the unused portion is returned to the Debtors.  I understand that hundreds of thousands of residential and business customers participate in the Cash-Back Rewards.

360.    I understand that the Debtors also attract new customers and retain current customers through incentive programs, including the Bonus Program, the Refer-a-Friend Programs, and the Rapid Rewards Programs.  Under the Bonus Program, I understand that new customers and current customers who initiate, transfer, or renew their service receive a prepaid Visa debit card worth various amounts upon redemption.  I understand that under the Refer-a-Friend Programs, current customers who successfully refer a new person who becomes a customer receive up to $50 in the form of billing credits or a prepaid Visa debit card, as does the new customer.  I also understand that there is no limit on the amount of rewards a referring

customer can earn under the Refer-a-Friend Programs.  I understand that the rewards under the

Bonus Program and the Refer-a-Friend Programs constitute actual cash obligations.  I understand

that if customers do not use the full bonus amount on their cards by the expiration date printed on

the cards, the unused portion is returned to the Debtors.  I understand that there are two Rapid

Rewards Programs, each of which lasts for either 12, 24, or 30 months.  I also understand that

customers who signed up for one of the Rapid Rewards Programs earn and receive Southwest

Airlines rewards points over the duration of the program.  I understand that the Debtors purchase

these rewards points from Southwest Airlines, which customers can redeem for Southwest

Airlines flights.

361.    I understand that customers occasionally receive Partner Incentives, including

coupons, discounts, and other incentives, from the Debtors and certain third-party partners.  I

also understand that the Partner Incentives are typically included as inserts with customers'

monthly bills or are offered to customers through direct sales efforts.  Additionally, I understand

that the Debtors and certain of their third-party partners offer Partner Incentives to customers

who enroll in one of the home warranty programs offered to customers by the Debtors and their

third-party partners.  I understand that the Debtors reimburse third-party partners for their

allocated cost of associated Partner Incentives.  I understand that the Sweepstakes Programs are

marketing and promotional tools used to attract new customers and retain current customers.

Under the Sweepstakes Programs, I understand that the Debtors offer customers the opportunity

to win travel and event tickets, gift cards, and certain other prizes.

362.    I understand that the Debtors pay approximately $40 million to $45 million each

year on account of the Rewards Programs.  As of the Petition Date, I understand that the Debtors

estimate that the total amount due under the Rewards Programs will be approximately $15.9 million.

### 2.    Average Monthly Billing Program.

363.    As required by applicable PUC regulations, I understand that the Debtors' retail operations offer residential customers the option to pay their bills based on their average usage on a rolling basis, rather than a bill based on their actual usage in the preceding month (the "Average Monthly Billing Program").  I understand that the Average Monthly Billing Program is an attractive option for certain customers because it reduces the fluctuation in their energy bill due to seasonal requirements.  I also understand that at any point in the year, the Average Monthly Billing Program results in either a net overpayment or underpayment by participating customers, depending on whether the running total of payments by such customers is greater or less than their actual electricity usage.  If customers decide to discontinue the Average Monthly Billing Program, a credit or debit is applied to their next bill.  To the extent that customers' payments under the Average Monthly Billing Program exceed the actual amounts used during those months, I understand that the Debtors are in possession of customer dollars, which constitute obligations to customers.

364.    I understand that a significant number of customers participate in the Average Monthly Billing Program, and the amount owed to customers varies widely during the year, ranging from approximately $2 million to approximately $20 million.  As of the Petition Date, I understand that the Debtors estimate that they owe an aggregate amount of approximately $17 million worth of prepaid services on account of the Average Monthly Billing Program.

### 3.    Customer Deposits and Customer Credits.

365.    I understand that based on customers' utility payment data and history, the Debtors' retail operations request that certain customers pay a deposit (the "Customer

Deposits"). I understand that the Debtors hold Customer Deposits as part of their operating cash. I understand that the PUC, however, requires the Debtors to post letters of credit payable to the PUC in the amount of Customer Deposits held by the Debtors to maintain their status as a certified retail electric provider. In addition, I understand that the Debtors post letters of credit payable to the PUC in the amount of prepayments held by the Debtors under certain of their electricity plans. I understand that the Debtors return Customer Deposits to customers after they have paid their electricity bills in full with no late payments for 12 consecutive months, together with any interest that has accrued during the period. I also understand that the Debtors typically return Customer Deposits in the form of a credit to the customers' electricity bills.

366.    In addition to returned Customer Deposits that are credited to customers' electricity bills, I understand that the Debtors also treat overpayments, corrections, and prepayments (other than through the Average Monthly Billing Program) as credits to the customers' accounts (the "Customer Credits"). As discussed above, I understand that customers who discontinue the Average Monthly Billing Program may receive Customer Credits to the extent their cumulative payments exceed the value of services received. I understand that under certain electricity plans offered by the Debtors, customers are allowed to prefund their account balances. I understand that these prepayments constitute Customer Credits, against which subsequent electricity and other charges are debited. I also understand that based on historical data from the last twelve months, the Debtors estimate that the amount of outstanding Customer Credits fluctuates between $10 million to $20 million throughout the year.

367.    If a customer discontinues service with the Debtors or is an inactive customer and has outstanding Customer Deposits or Customer Credits, I understand that the Debtors will issue a refund check to the customer or otherwise credit a customer's credit card. I also understand

that the Debtors refund approximately $14 million to customers on an annual basis on account of the Customer Deposits and Customer Credits.

368.    As of the Petition Date, I understand that the Debtors estimate that they hold an aggregate amount of approximately $65 million to $75 million on account of the Customer Deposits and Customer Credits.

### 4.    Brighten Programs.

369.    I understand the Debtors' retail operations offer an energy savings program to certain business customers known as Brighten GreenBack (the "Brighten GreenBack Program"). I also understand that the Brighten GreenBack Program provides businesses with an incentive to purchase or install infrastructure or qualifying electric vehicles.  I understand that after installing qualifying energy efficient equipment, customers can submit their expenses to the Debtors and the Debtors then reimburse these customers in the form of rebate checks up to a specified amount.

370.    I understand that the Debtors' retail operations also provide customers with discounts and incentives to purchase energy-saving items through its Brighten Online Energy Store (the "Brighten Online Store" and, together with the Brighten GreenBack Program, the "Brighten Programs").  I understand that a third party manages the Brighten Online Store and handles all product logistics costs in exchange for a percentage of revenues generated through the store with the Debtors.  I understand that the Debtors reimburse this third party for the difference between the retail price and the discounted price of products purchased by the Debtors' customers through the Brighten Online Store.

371.    As of the Petition Date, I understand that the Debtors estimate that they owe an aggregate amount of approximately $1 million on account of the Brighten Programs, net of the Debtors' share of revenues associated with the Brighten Online Store.

### 5.    Customer Partners.

372.    I understand that the Debtors use a variety of third-party contractual arrangements to cultivate, maximize, and develop their customer relationships.  I also understand that the Debtors enter into third-party agreements and professional service agreements (the "Channel Partner Agreements") with third parties that act as brokers and consultants for the Debtors (each, a "Channel Partner").  I understand that the Channel Partner Agreements include collection and remittance agreements, under which the Debtors bill and collect payments from customers, and then remit payments to the Channel Partner.  I understand that if a customer disputes a fee obtained through a Channel Partner Agreement and does not pay, the Debtors do not continue to pay the Channel Partner, and the Channel Partner is responsible for collection from the customer. I understand that the Channel Partner Agreements also include professional service agreements, under which the Channel Partners agree to promote and market the Debtors as retail electric providers to prospective customers, and the Debtors agree to pay Channel Partners certain fees associated with contracts signed by customers.

373.    I understand that the Debtors also utilize third-party partners to conduct door to door sales of the Debtors' retail goods and services (the "Sales Partners").  I understand that the Sales Partners are typically paid commissions for enrolling new customers in the Debtors' electricity plans.  I understand that the rate of commission varies with the type and duration of the plan in which a customer successfully enrolls.  Additionally, I understand that the Sales Partners are paid on commission for the sale of related goods, including iThermostats (defined in the Customer Programs Motion).

374.    I understand that the Debtors also contract with various call centers to provide real-time customer service to the Debtors' retail customers (the "Call Center Partners" and, together with the Channel Partners and the Sales Partners, the "Customer Partners").  I

85

understand that the hourly rates at which the Debtors pay the Call Center Partners vary depending upon the specific type of work performed, including handling customer calls, training personnel, case management, and back-office services.

375.    I understand that the Customer Partners are key intermediaries between the Debtors' retail operations and potential customers, as they inform customers about the Debtors' products and services, assist with the enrollment of new customers, and service the Debtors' existing customers.  As such, I understand that the Customer Partners are important sources of new business and critical to the retention of existing business for the Debtors.  I understand that if the Debtors do not continue to perform under existing Customer Partner agreements and remit fees, the Customer Partners may be reluctant to promote the Debtors' retail operations, generate new customer leads, and provide the exemplary services to the customers that the Debtors are known for.  I believe failure to honor amounts owed to Customer Partners could damage the Debtors' reputation with existing and potential customers, to the detriment of the Debtors' operations.[54]

376.    I understand that the total obligation to Customer Partners is approximately $51 million annually.  As of the Petition Date, I understand that the Debtors estimate that they owe an aggregate amount of approximately $8.6 million to Customer Partners.

### 6.    Renewable Energy Obligations.

377.    I understand that certain regulations require the Debtors to obtain a specified amount of their supply of power from renewable energy sources or otherwise to purchase

---

[54]    I understand that pursuant to the Customer Programs Motion, the Debtors do not seek any relief with respect to employees of the Debtors that perform services similar to those performed by third-party Customer Partners. For additional information on the Debtors' employees, see the *Motion of Energy Future Holdings Corp., et al., for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Pay Certain Prepetition Compensation and Reimbursable Employee Expenses, (II) Pay and Honor Employee and Retiree Medical and Similar Benefits, and (III) Continue Employee and Retiree Benefit Programs, and (B) Modifying the Automatic Stay* (the "Wages Motion"), filed contemporaneously with the Customer Programs Motion.

renewable energy credits in the energy market from renewable energy credit "retailers" or brokers. Additionally, the Debtors' retail operations provide certain customers with an agreed-upon amount of power from renewable energy sources (together with the regulatory obligations, the "Renewable Energy Obligations"). The Debtors' performance of the Renewable Energy Obligations enables the Debtors and their customers to comply with statutory or regulatory requirements, maintain certain environmental sustainability certifications, and make public claims with respect to the use of power from renewable energy sources. ERCOT recognizes the transfer of renewable energy credits from one account holder to another. As a retail electric provider, I understand that the Debtors must "retire" purchased renewable energy credits to demonstrate fulfillment of Renewable Energy Commitments. I understand that renewable energy credits are "retired" by using the credits to comply with a statutory or regulatory requirement or to make a public claim associated with the purchase of the credits, at which point the "retired" renewable energy credits are no longer transferrable. I understand that total Renewable Energy Obligations to customers is approximately $12 million annually.

378.    I understand that as of the Petition Date, the Debtors estimate that they owe an aggregate amount of approximately $11 million on account of the Renewable Energy Obligations.

### 7.    Charitable Contributions Programs.

379.    I understand that the Debtors maintain several charitable contribution programs (the "Charitable Contributions Programs"), including, but not limited to, the Energy Aid Program, the Support and Save Program, the 4Change Pledge, and the 501(c)(3) Donations (each as defined in the Customer Programs Motion). I understand that the Charitable Contributions Programs enhance the Debtors' standing in the industry and within the community and build goodwill that enhances the value of their business.

380.    I understand that the Debtors maintain a matching program for customer contributions to local communities (the "Energy Aid Program").  I understand that the Energy Aid Program is the largest bill-payment assistance program among regulated and competitive electricity providers in the nation.  Under the Energy Aid Program, for every $1.00 that customers donate to the Energy Aid Program, the Debtors contribute $5.00 to local communities to help individuals pay their electricity bills.  As described further in the Wages Motion, I understand that the Debtors' employees also contribute to the Energy Aid Program through paycheck deductions, and the Debtors match their employees' contributions.[55]

381.    I understand that the Debtors' retail operations also maintain a charitable contributions program to support nonprofit organizations (the "Support and Save Program"), under which persons can support a public or private school or other participating nonprofit organization by enrolling as a new customer through the program.  I understand that the designated organization receives $50 for each such enrollment, and amounts are accumulated and awarded on a quarterly basis and are paid by check.  I also understand that there are no annual limits on the amount a participating organization can receive through the program. Rewards under the Support and Save Program constitute actual cash obligations.

382.    I understand that Debtor 4Change Energy Company pledged to give 4% of its profits to one of several non-profit organizations, including Texas Food Bank, the American Cancer Society, the American Red Cross, and Heroes for Children (the "4Change Pledge"). Additionally, I understand that the Debtors plan to donate approximately $2 million during 2014 to various 501(c)(3) nonprofit organizations (the "501(c)(3) Donations").

---

[55]    For additional information on the Energy Aid Program, relief sought with respect to employee donations, and related matching, see the Wages Motion, filed contemporaneously herewith.

383.    I understand that the Debtors plan to contribute over $5 million in 2014 on account of Charitable Contributions Programs.  As of the Petition Date, I understand that the Debtors estimate that their outstanding obligations under the Charitable Contributions Programs total approximately $1.2 million.

### 8.    Customer Warranties.

384.    I understand that the Debtors and certain third-party service providers offer various products, services, and warranty programs to the Debtors' customers (the "Customer Warranties").  For example, the Debtors pay a third-party vendor to provide iThermostat installation services.[56]  In addition to the iThermostats installations, I understand that this third-party vendor also provides a variety of services to the Debtors and their customers, including server hardware and database administration, license and software maintenance, warehousing, and other customer maintenance services such as repairing and replacing gateways and iThermostats (the "Support Services").

385.    As discussed above, I understand that the Debtors' retail operations and certain of their third-party partners also offer home warranty programs to customers (the "Home Warranties").  For example, the Debtors partner with a third-party to provide Home Warranties, including for repair services and replacement coverage for air conditioning units, heating units, electronics, and other appliances.  I also understand that the Debtors collect payments from customers that participate in the Home Warranties and remit a portion of the proceeds to the third party, which provides the warranty goods and services.

386.    I believe the continued performance of customer-facing services under the Customer Warranties is important to satisfying and retaining existing customers, as well as

---

[56]    iThermostats are energy-saving programmable thermostats that allow customers to monitor and manage temperatures via the internet (the "iThermostats").

attracting new customers.  I understand that the third-party partners are important intermediaries between the Debtors and their customers, and it is essential that performance of services under the Customer Warranties continue in the ordinary course of business.  I believe that third-party partners may be reluctant to continue performing under the Customer Warranties absent specific authorization from the Court.  I understand that to provide assurances to the Debtors' customers that the Customer Warranties will be honored, the Debtors seek authority to continue to honor and satisfy any and all obligations related to prepetition and any new postpetition Customer Warranties, including those obligations to third-parties that perform under the Customer Warranties for the benefit of customers.

387.    As of the Petition Date, I understand that the Debtors owe an aggregate amount of approximately $1 million on account of the Customer Warranties.

### 9.    Reduction Rewards.

388.    I understand that the Debtors' retail operations offer a critical peak rebate program (the "Reduction Rewards Program") to commercial and industrial customers with minimum annual electricity usage of approximately 1 megawatt.  I understand that the Reduction Rewards Program helps the Debtors and their customers to address peak electricity demand issues within the ERCOT region, including demand and price volatility, by allowing customers to manage their electricity usage in response to peak events.  I also understand that the Debtors alert participating customers to the occurrence of a peak event, and pay each customer for every kilowatt hour of electricity load reduction below the customer's corresponding baseline demand level.  I understand that the rate per kilowatt hour of electricity reduction during the peak event that is paid to customers varies depending on market conditions.

389.    As of the Petition Date, I understand that the Debtors estimate that they do not owe any amounts on account of the Reduction Rewards Program.

###### D.    Customer Incidents.

201.    I understand that the Customer Agreements and the Customer Programs occasionally give rise to customer complaints and claims (the "Customer Incidents").  To ensure continuing excellent service and customer satisfaction, I understand that the Debtors employ certain measures to address any service-related issues and to resolve and settle the Customer Incidents in the ordinary course of business.  I also understand that as of the Petition Date, the Debtors estimate that they owe an aggregate amount of approximately $2.1 million on account of the Customer Incidents.

###### E.    Payment of Certain Expenses on Behalf of Certain Organizations.

390.    I understand that the Debtors are subject to regulation or oversight by various entities, including the PUC and ERCOT.[57]  I understand that the PUC and ERCOT have wide-ranging oversight over the ERCOT and Texas electricity markets, including with respect to the sale, purchase, transmission, and distribution of electricity to consumers.  I understand that because the Debtors are the preeminent merchant power generator and retail electricity provider within the ERCOT region, the Debtors anticipate that the PUC and ERCOT will play an active role in the Debtors' chapter 11 cases to ensure that the public interest is adequately represented and protected.

391.    I understand to facilitate the participation of the PUC and ERCOT in the Debtors' chapter 11 cases, the Debtors seek to pay certain expenses incurred by the PUC and ERCOT, including all reasonable CourtCall and remote conferencing costs and the cost of providing notice and/or service of filings by the PUC and ERCOT in these chapter 11 cases to relevant

---

[57]    ERCOT, the Electric Reliability Council of Texas, is a regional reliability coordinating organization responsible for ensuring the reliability of the electricity market in Texas.  Additionally, I understand that ERCOT is the independent system operator of the interconnected transmission grid for member electricity systems within Texas.

parties.  Additionally, I understand that the Debtors request authority to allow the PUC and ERCOT to utilize the noticing services of Epiq Bankruptcy Solutions, LLC ("Epiq"), the Debtors' claims and noticing agent, at the Debtors' expense.[58]  I understand that the Debtors submit that the cost to their estates of paying these expenses on behalf of the PUC and ERCOT is greatly outweighed by the benefits to their estates of ensuring that the public interest is well-represented during these chapter 11 cases.

F.    **Assumption of the PPAs and Retail Agreements.**

392.    Pursuant to the Assumption Order, I understand that the Retail Debtors seek to assume the Customer Agreements pursuant to section 365(a) of the Bankruptcy Code to provide their customers and other parties in interest with additional assurance of the Retail Debtors' intent to honor their obligations to customers and to continue providing electricity and natural gas, and performing under the Customer Agreements.  I believe that assumption of the Customer Agreements at the outset of these chapter 11 cases will reduce the likelihood of confusion or uncertainty on the part of customers with respect to the continuing provision of electricity, natural gas, and related services by the Debtors, to the benefit of the Debtors' estates.

393.    I understand that the Retail Debtors' obligations under the Customer Agreements are primarily performance-based, and the Debtors do not believe that any defaults exist under the Customer Agreements that must be cured under section 365(b)(1)(A) (after giving effect to section 365(b)(2)).  Accordingly, I understand that the Debtors have determined that the amount necessary to cure unpaid monetary obligations arising under the Customer Agreements is $0 (the "Cure Amount").  Furthermore, I understand that to the extent any such defaults exist, the

---

[58]    The Debtors seek to retain Epiq as the Debtors' claims and noticing agent pursuant to the *Application of Energy Future Holdings Corp.*, et al*., for Entry of an Order Approving the Retention and Appointment of Epiq Bankruptcy Solutions, LLC as the Claims and Noticing Agent for the Debtors,* filed contemporaneously herewith.

Debtor's long history of providing electricity and natural gas to customers and honoring their contractual obligations with customers provides customers with adequate assurance of the Retail Debtors' ability to continue performing under the Customer Agreements.

## IX.    Hedging and Trading Motion.[59]

202.    As is customary in the Debtors' industry, I understand that certain of the Debtor entities, including Luminant Energy Company LLC, Luminant ET Services Company, and Luminant Generation Company LLC (collectively, the "Hedging and Trading Entities"),[60] enter into hedging and trading contracts with various counterparties primarily to hedge their exposure to commodity risks, including price and delivery risk (collectively, and as described below, the "Hedging and Trading Arrangements" and the activities related thereto, the "Hedging and Trading Activities") within established risk management guidelines (as discussed below, the "Risk Management Guidelines").[61]

---

[59]    See *Motion of Energy Future Holdings Corp.,* et al.*, for Entry of Interim and Final Orders Authorizing the Debtors to (A) Continue Performance Under the Hedging and Trading Arrangements, (B) Pledge Collateral and Honor Obligations Thereunder, and (C) Enter into and Perform Under New Postpetition Hedging and Trading Arrangements,* filed contemporaneously herewith.

[60]    As a general matter, I understand that only the TCEH Debtors (as defined in the Hedging and Trading Motion) have operations like those described in the Hedging and Trading Motion. The Debtors are, therefore, not seeking relief or imposing any obligations in the Interim Order or Final Order as to any Debtors other than the TCEH Debtors. For the avoidance of doubt, the Hedging and Trading Motion does not request any relief with respect to, or affect the rights, duties, or obligations of, EFIH and EFIH Finance, Inc.

[61]    As described in detail in the First Day Declaration, I understand that over 95% of the TCEH Debtors' positions in the natural gas price hedging program and all of the first lien interest rate swaps of TCEH (collectively, the "First Lien Hedges and Swaps") are secured by a first lien on substantially all of the TCEH Debtors' assets that is pari passu with the outstanding obligations under the TCEH Debtors' first-lien credit agreement and first-lien notes.  I understand that the total net first lien exposure on account of the First Lien Hedges and Swaps is approximately $1.255 billion as of April 11, 2014.

In addition, I understand that Energy Future Holdings Corp. transacted a number of unsecured interest rate swap agreements with various banks (collectively the "Legacy Swaps").  I understand that as of April 11, 2014, the exposure to the Hedging and Trading Entities on account of the Legacy Swaps is approximately $14.2 million. I understand that for the avoidance of doubt, the Debtors do not seek relief with respect to the First Lien Hedges and Swaps or the Legacy Swaps in the Trading Motion.

203.    I understand that the Hedging and Trading Activities and the Hedging and Trading Arrangements are vital to the success of the Debtors' various operational businesses and directly affect the ability of the Debtors to successfully operate their generation and retail divisions.  I understand that as of the date hereof (the "Petition Date"), the Debtors estimate that they owe approximately $50.8 million of payables[62] on account of the Prepetition Hedging and Trading Arrangements (as defined below), approximately $43.7 million of which is secured by collateral held by third parties (e.g., letters of credit or cash), and all of which will become due and owing during the period between the Petition Date and entry of the Final Order (the "Interim Period") on account of the Prepetition Hedging and Trading Arrangements.

A.    **Overview of the Prepetition Hedging and Trading Arrangements.**

204.    I believe the Hedging and Trading Activities and the Hedging and Trading Arrangements are vital to the success of the Debtors' various operational businesses and directly affect the ability of the Debtors to successfully operate their generation and retail divisions.  I understand that as of December 31, 2013, the Debtors' annual underlying notional value[63] across all of their wholesale operations, based on energy prices for commodities sold and purchased in their operations, including natural gas, electricity, coal, fuel-oil, uranium, renewable energy credits, and emission allowances, is approximately $3.8 billion.

205.    I understand that the Hedging and Trading Activities and the Hedging and Trading Arrangements mitigate the risks that arise from the Debtors' operations from changes in the overall value of wholesale revenues and costs noted above.  Specifically, I understand that

---

[62]    This number represents the amount of obligations after netting payables and receivables permitted to be netted with the same counterparty under existing contractual terms.

[63]    "Notional value" refers to the fuel purchased by the Debtors and the electricity and ancillary services that the Debtors sell through their wholesale operations, valued at current prevailing market prices for each respective commodity.

the Hedging and Trading Activities and Hedging and Trading Arrangements allow the Debtors to utilize (a) physical commodity transactions to hedge price and delivery risk related to fuel inputs (including natural gas, coal, uranium, and fuel oil) to the Debtors' electricity generation and mining operations, (b) physical transactions for electricity and ancillary services produced in the electricity operations, and (c) financial derivatives that hedge price risk for both fuels and electricity generation.

206.    I understand that through the Hedging and Trading Activities and Hedging and Trading Arrangements, the Debtors are able to hedge against such price fluctuations and thereby protect the economic value of their operations by preventing substantial declines in cash flows. I understand that the Debtors also conduct limited proprietary trading activities in certain commodities that are core to the power generation operations. As an example, during the fiscal years 2009 through 2013, the Hedging and Trading Activities provided a positive incremental return to the Debtors' underlying operations ranging from approximately $240 million to $425 million on annual basis.

207.    I understand that the Hedging and Trading Entities have approximately 72 active prepetition Hedging and Trading Arrangements as of the Petition Date (the "Prepetition Hedging and Trading Arrangements" and, together with the anticipated Postpetition Hedging and Trading Arrangements, the "Hedging and Trading Arrangements"), all of which were entered into in accordance with the Debtors' Risk Management Guidelines.[64]  I understand that the Prepetition Hedging and Trading Arrangements generally fall into the following three categories:  (a) over-

---

[64]    In addition, I understand that the Debtors are party to a significant number of non-active hedging and trading arrangements. Because transactions are not being conducted under these agreements, the Debtors do not have any prepetition obligations arising under such agreements.

the-counter transactions; (b) transactions with the Electric Reliability Council of Texas, Inc. ("ERCOT"); and (c) Broker Arrangements (as defined in the Hedging and Trading Motion).[65]

### 1.    Over-the-Counter Transactions.

208.    I understand that the Hedging and Trading Entities enter into over-the-counter physical and financial  transactions related to natural gas, electricity, coal, fuel oil, uranium, emission allowances, and other energy-related commodities directly with third parties ("OTC Counterparties"), including transactions that are subject to the standard terms and conditions of an ISDA Master Agreement (and related commodity Annexes for natural gas and electricity), an EEI Master Power Purchase and Sale Agreement, or a NAESB Agreement (for natural gas transactions), or other industry agreements, in each case, as modified pursuant to negotiations between the parties (the "OTC Agreements").

209.    Due to the Debtors' limited creditworthiness and in conjunction with industry standards, I understand the Debtors are required on a regular basis to collateralize certain OTC Agreements to provide hedging and trading counterparties with assurance that obligations under the contracts will be met.  As of the Petition Date, I understand that the Hedging and Trading Entities are party to open and active Prepetition Hedging and Trading Arrangements with approximately 68 OTC Counterparties.

---

[65]    As described further in the Debtors' *Motion of Energy Future Holdings Corp., et al., for Entry of (A) An Order Authorizing the Debtors to (I) Maintain and Administer Customer Programs and Customer Agreements, (II) Honor Prepetition Obligations Related Thereto, (III) Pay Certain Expenses on Behalf of Certain Organizations, (IV) Fix Deadlines to File Proofs of Claim for Certain Customer Claims, and (V) Establish Procedures for Notifying Customers of Commencement of the Debtors' Chapter 11 Cases, Assumption of Customer Agreements, and the Bar Dates for Customer Claims and (B) An Order Authorizing Certain of the Debtors to Assume the Customer Agreements* (the "Customer Programs Motion"), filed contemporaneously with the Hedging and Trading Motion, I understand that the Debtors are seeking authority in the Customer Programs Motion to assume certain customer agreements.  I understand that by the Hedging and Trading Motion, the Debtors reserve the right to treat any customer contract to be assumed in the Customer Programs Motion as a Hedging and Trading Arrangement.

210.    As of the Petition Date, I understand that the Debtors estimate that they owe approximately $7.1 million on account of prepetition obligations arising from the OTC Agreements (net of any amounts that may be netted by cash receivables or secured by collateral held by third parties (e.g., letters of credit or cash)), all of which will become due and owing within the Interim Period.

2.    **ERCOT Transactions.**

211.    I understand that ERCOT manages the flow of electricity to 24 million people in Texas and manages the supply of approximately 85% of the electricity consumption in Texas, ERCOT schedules electricity on an electric grid that connects 40,500 miles of transmission lines and more than 550 generation units.    I understand that ERCOT also performs financial settlements for the competitive wholesale electricity market and the majority of ERCOT is open to retail electric competition - approximately 6.7 million customers (*i.e.* electricity meters) have the ability to choose their retail electric provider.    ERCOT is a membership-based 501(c)(4) nonprofit corporation governed by a board of directors and subject to oversight by the Public Utility Commission of Texas and the Texas Legislature.    I understand that ERCOT's members include consumers, cooperatives, electricity generators, electricity marketers, retail electricity providers, investor-owned electric utilities (transmission and distribution providers), and municipal-owned electric utilities.

212.    Through the Debtors' operations in the ERCOT region, I understand that the Hedging and Trading Entities participate in:  (a) the real-time energy market that allows a party to be paid or charged for physical electricity and ancillary services provided to or taken from the wholesale market; (b) financial transactions that are used by market participants to hedge differences in prices in the day-ahead energy market; (c) point-to-point transactions that allow a party to hedge against transmission congestion in ERCOT's real-time energy market between

two specific locations on the transmission system; and (d) auctions for the purchase and sale of congestion revenue rights, which are contracts that allow a party to hedge against transmission congestion costs in ERCOT's day-ahead energy market.

213.    I understand that these markets provide the Hedging and Trading Entities with particular channels to sell and procure electricity, ancillary services, and transmission congestion instruments to mitigate the Debtors' risks associated with the electricity generation assets and retail electricity businesses, and are core to the commercial operations of those businesses.  I understand that the ability to participate in the ERCOT region is critical to the Debtors' daily cash flows.    Moreover, I understand that the Hedging and Trading Entities consummate transactions with ERCOT that they cannot execute with any other party or entity in light of ERCOT's (a) central role in the Texas electricity system, (b) multi-dimensional investment platform, and (c) facilitation of congestion revenue right actions as well as electricity and ancillary services services, sales, and purchases.

214.    I understand that to facilitate the Debtors' Hedging and Trading Activities within the ERCOT region, the Debtors and ERCOT have entered into Standard Form Market Participation Agreements ("SFAs") that include, among other things, an outline of the procedures and processes used by ERCOT and other market participants to maintain the orderly functioning of the ERCOT grid system (the "ERCOT Protocols").  I understand that without the SFAs, the Debtors would be unable to access critical platforms provided by ERCOT.  I also understand that the transactions the Debtors consummate with ERCOT cannot be executed with any other party or entity in light of ERCOT's pivotal role in the Texas electricity market.[66]

---

[66]    I understand that to ensure the Debtors' access to the ERCOT region remains uninterrupted, the Debtors have filed contemporaneously with the Hedging and Trading Motion, the *Motion of Energy Future Holdings Corp., for Entry of an Order Authorizing Certain of the Debtors to Assume Standard Form Participation Agreements with ERCOT* which motion seeks authority to assume the SFAs with ERCOT (the "ERCOT Assumption

### 3.      Broker Arrangements.

215.    I understand that the Hedging and Trading Entities are party to two types of

broker arrangements, as follows: (collectively, the "Broker Arrangements"):

- *Clearing Broker and Exchange Arrangements*. The Hedging and Trading Entities are party to counterparty agreements with clearing brokers (the "Clearing Brokers") and centralized exchanges (the "Exchanges") to clear transactions related to the purchase and sale of electricity, fuel oil, natural gas, uranium, emission allowances, and other energy-related products and physical and financial derivatives thereof, through exchanges, including Intercontinental Exchange, Inc. ("ICE"), the New York Mercantile Exchange ("NYMEX"), and Natural Gas Exchange ("NGX").   As discussed in more detail below, certain of the Hedging and Trading Entities have guarantees from their Debtor parent, TCEH, in favor of each of the Clearing Brokers and are required to provide collateral as requested by each Clearing Broker in a manner that is similar to ICE or NYMEX collateral requirements. Generally, each Clearing Broker or Exchange has broad discretion under its arrangement to: (a) terminate its agreement with the Hedging and Trading Entities; (b) refuse to enter into future transactions for the benefit of the Hedging and Trading Entities; and (c) cancel or liquidate the Hedging and Trading Entities' open positions.  As is common in the Debtors' industry, the Clearing Broker Arrangements are required to be fully-collateralized on a daily basis and the value of such activity and related collateral changes on a day-to-day basis.

- *Introductory Broker Arrangements*. The Hedging and Trading Entities have entered into agreements with certain brokers who facilitate purchase and sale negotiations between the Hedging and Trading Entities and certain of their counterparties. In some instances, the Hedging and Trading Entities compensate the brokers directly for their services. In other instances, the Hedging and Trading Entities collect the fees to which the brokers are entitled for their services from the counterparties (in accordance with the terms set forth in the separately executed agreement between the broker and the customer) and then remit such fees to the brokers.

### B.      Potential Exposure on Account of the Prepetition Hedging and Trading Arrangements.

#### 1.      Potential Settlement Obligation Exposure.

216.    I understand that the cumulative mark-to-market net value of all derivative assets

and liabilities related to the Prepetition Hedging and Trading Arrangements valued using

---

Motion"").  The relief requested in the Hedging and Trading Motion with respect to the SFAs and the ERCOT Protocols is primarily meant to provide limited relief until such time as the Court has an opportunity to hear the ERCOT Assumption Motion.

standard industry valuation processes (and excluding Prepetition Hedging and Trading Arrangements related to the First Lien Hedges and Swaps and the Legacy Swaps) is a net liability of approximately $108 million as of the Petition Date before taking into consideration collateral postings.  I understand that this value is calculated on a daily basis and is subject to fluctuations.  I understand that the Debtors estimate that of the payables that are due and owing on account of the Prepetition Hedging and Trading Arrangements as of the Petition Date (approximately $50.8 million in total).[67]  Approximately $43.7 million is secured by collateral held by third parties (*e.g.*, letters of credit or cash), leaving the Debtors with approximately $7.1 million due and owing as of the Petition Date.

217.    Even though I believe that continued performance under the Prepetition Hedging and Trading Arrangements (other than payment of accrued prepetition obligations)  on a postpetition basis in the ordinary course of business is permitted under section 363(c)(1) without court approval, the Debtors are seeking authority to continue performing postpetition obligations under the Prepetition Hedging and Trading Arrangements out of an abundance of caution, and to give counterparties to Hedging and Trading Arrangements comfort that the Debtors will honor such obligations.   I understand that the Debtors estimate that the Hedging and Trading Entities will owe approximately $19.2 million on account of postpetition payment obligations arising under the Prepetition Hedging and Trading Arrangements during the Interim Period.  I also understand that this estimate is based on the Debtors' best estimates of potential value change from current market prices.

---

[67]  This number represents the amount of obligations after netting payables and receivables permitted to be netted with the same counterparty under existing contractual terms.

2.    **Potential Collateral Exposure.**

218.    I understand that as is typical in the industries that have wholesale trading markets, an entity that participates in those markets must maintain an acceptable level of creditworthiness or provide acceptable credit support, generally in the form of guarantees, letters of credit, cash, prepayments, or other forms of collateral.  In the ordinary course of business, the Debtors post collateral to and receive collateral from counterparties to Hedging and Trading Arrangement.

219.    Specifically, I understand the Debtors provide collateral support relating to the Prepetition Hedging and Trading Arrangements each as described in the Hedging and Trading Motion.

220.    As a general matter, I understand that the amount of credit support required under a Hedging and Trading Arrangement is subject to daily recalculation and posting requirements.[68] On any given day, with respect to any Hedging and Trading Arrangement, additional collateral may be required of the Debtors or posted collateral may be returned to the Debtors.  I understand that in many instances, a counterparty to a Hedging and Trading Arrangement is required to post collateral with the Debtors to secure such counterparty's performance.  I understand that generally, a failure by the Debtors or a counterparty to post or return credit support within the contractually required time period is an event of default under the applicable Hedging and Trading Arrangement.

221.    I understand that the most significant component of collateral requirements under most Hedging and Trading Arrangements is fairly straightforward — each party is required to post collateral equal to the amount of the counterparty's "exposure," minus collateral already

---

[68]    I understand that a limited number of Hedging and Trading Arrangements entered into by the Debtors may have fixed or other collateralization obligations that are calculated on a less frequent basis.

posted and any applicable credit threshold.[69]    I understand that while "exposure" can be calculated in a variety of ways under the Hedging and Trading Arrangements, "exposure" generally means an amount equal to the difference between the contract price and the market price times the volume of commodity remaining under the transaction, plus any amounts due for performance, goods, and service already provided for which payment has not yet been made.  I understand that the key component of exposure is the net amount one party would owe to the other in the event of a default under a Hedging and Trading Arrangement.[70]

222.    To the extent the parties have actually posted collateral under the Hedging and Trading Arrangement, I understand that the party receiving such performance assurance collateral would subtract the value of such collateral from their exposure calculation, while the party delivering the collateral would add the value of the collateral to their exposure calculation. I understand that these amounts, together with the commodity exposure calculation are usually calculated daily, with collateral either being posted or returned, by one party to the other, as applicable, for the outstanding exposures.  I understand that as the parties continue to perform under the Hedging and Trading Arrangements and the volume of the underlying commodity remaining under the transaction decreases, payments for performance are made, resulting in the eventual return of the collateral securing the Hedging and Trading Arrangement, absent a default.

223.    I understand that the amount of credit support required to be posted by or to the Debtors to maintain credit standing and avoid default under Hedging and Trading Arrangements

---

[69]    I understand that because of the limited creditworthiness of the Debtors, they have limited ability to make use of credit thresholds and are generally required to fully secure counterparties to Hedging and Trading Arrangements.

[70]    I understand that the collateral obligation under a Hedging and Trading Arrangement may not be limited to exposure, as some counterparties may require additional security in connection with their trading requirements.

is significantly influenced by the inherent volatility of commodity prices.  I also understand that commodity prices are directly influenced by a number of factors that can vary widely such as overall supply and demand, weather, supply disruptions, production increases, regulatory changes, and other factors.   For example, the extreme winter weather recently experienced across the United States has imposed significant volatility in the natural gas market.  I understand that the price of certain natural gas futures was recently exposed to large movements, and the price volatility was as high as 34% to 37% during 2014 due to the extreme weather conditions.

224.    I understand that a failure by the Debtors to post credit support within the contractually required time period, which could be as little as a few hours after notice from the third party, would be considered a default under the applicable Hedging and Trading Arrangement.  I understand that the third party would have the right to terminate and liquidate the applicable Hedging and Trading Arrangement creating risks to the generation and retail businesses.  Therefore, I believe the ability of the Debtors to continue to meet their collateral obligations during the Interim Period to maintain the protections afforded by the Hedging and Trading Arrangements is critical.

225.    Relatedly, I understand that due to the significant amount of activity that the Debtors' operations have with ERCOT, the Debtors issued a letter of credit in December 2009 for the benefit of ERCOT and in accordance with ERCOT's creditworthiness protocols.   I understand that by the Hedging and Trading Motion, and in an abundance of caution, the Debtors seek authority in the orders to replace ERCOT's letter of credit with a postpetition letter of credit.[71]  In addition, I understand that the Debtors anticipate that ERCOT's prepetition (or new, postpetition) letter of credit will likely be sufficient to satisfy the Debtors' prepetition collateral

---

[71]    For the avoidance of doubt, if the Debtors replace ERCOT's letter of credit with a new postpetition letter of credit, the new postpetition letter of credit would not be subject to the Prepetition Collateral Posting Cap.

posting obligations that may come due during the Interim Period, but, in an abundance of caution are seeking authority in the Interim Order and the Final Order to satisfy prepetition collateral posting obligations to ERCOT, subject to the Prepetition Collateral Posting Cap, as applicable.

226.    Furthermore, in light of these concerns, I understand that the Debtors have negotiated with their postpetition lenders and prepetition secured lenders to obtain authority to grant TCEH Super-Priority Liens to counterparties to Postpetition Hedging and Trading Arrangements and Prepetition Hedging and Trading Arrangements that constitute Secured Commodity Hedge Agreements, in accordance with the TCEH DIP Orders and the TCEH Cash Collateral Orders.

**C.    The Prepetition Hedging and Trading Arrangements are Critical to the Debtors' Financial Success and Business Operations and Limited Relief Is Necessary to Preserve the Value of the Debtors' Estates.**

227.    I understand that the commodity and financial instrument trading sector has been historically and consistently resistant to conducting business with hedging and trading entities in financial distress.  I also understand that counterparties seeking to terminate Prepetition Hedging and Trading Arrangements and discontinue activity prospectively will do so because of fear that a chapter 11 hedging and trading partner is operating outside of the ordinary course of business with respect to sophisticated transactions necessary to conduct the hedging and trading business or because of a perception that the hedging and trading partner presents an unacceptable level of risk exposure without adequate credit support.

228.    At the same time, I understand that the Hedging and Trading Arrangements have historically provided the Debtors with annual returns in the hundreds of millions of dollars that add to and preserve the notional value across all of the Debtors' operations.  I understand that the Debtors will lose this value opportunity if counterparties to Prepetition Hedging and Trading Arrangements who believe they are entitled to certain safe-harbor protections with respect to the

automatic stay provided under the Bankruptcy Code (described in more detail below) terminate the Prepetition Hedging and Trading Arrangements or take other adverse action in response to the Debtors' inability to meet postpetition obligations.

229.    In addition, I understand that the Debtors' market activities — specifically their ability to mitigate price and delivery risks associated with energy commodities — may be adversely affected if the Debtors are not authorized to maintain the Prepetition Hedging and Trading Arrangements in the ordinary course of business.  Ultimately, I understand that these circumstances could have a negative effect on the overall value of the Debtors' business.

230.    I understand that the Debtors intend to pay prepetition claims arising on account of the Prepetition Hedging and Trading Arrangements, to pledge and transfer collateral under Prepetition Hedging and Trading Arrangements, and to grant the TCEH Super-Priority DIP Liens only to the extent necessary to preserve their businesses and under commercially reasonable terms.  To that end, the Debtors will use their commercially reasonable efforts to condition the payment of prepetition claims and the posting of collateral under Prepetition Hedging and Trading Arrangements upon each Prepetition Hedging and Trading Arrangement counterparty's agreement to waive any rights it may have to liquidate, terminate, or accelerate its Hedging and Trading Arrangements with respect to events of default relating to these chapter 11 cases (the "Trading Continuation Agreement").

**D.    The Risk Management Guidelines.**

231.    I understand that as discussed earlier, agreements like the Hedging and Trading Arrangements are common in the Debtors' industry and are routinely used in the ordinary course of business to mitigate exposure to commodity price fluctuations. I understand that as a measure of governance and control, companies in the Debtors' industry, like the Debtors, use risk management guidelines to ensure that hedging and trading arrangements are closely monitored

105

and are in the best interests of all the company's stakeholders. I also understand that to encourage superior risk management control within the energy trading field, the Committee of Chief Risk Officers, a nationally recognized, independent non-profit corporation comprised of risk management leaders in the energy field, establish "best practice" guidelines.

232.    To my knowledge, the Debtors' Risk Management Guidelines are consistent with these "best practice guidelines" and create a complementary framework for governance, operational accountabilities, risk management procedures, and transaction management of the Hedging and Trading Activities in the ordinary course of business.

233.    As a further control, I understand that the Debtors utilize (a) an independent internal audit function, under the direction of the Debtors' audit committee, routinely conduct internal audits of the Debtors' Hedging and Trading Activities and risk management areas and (b) an internal hedging policy, in effect as of the Petition Date, that establishes the parameters within which the Debtors may enter into certain Hedging and Trading Arrangements (the "Internal Hedging Policy"). I understand that the Internal Hedging Policy generally restricts the Debtors' ability to enter into Hedging and Trading Arrangements with respect to commodities other than uranium and Powder River Basin coal that would result in the Debtors being party to Hedging and Trading Arrangements that, on an aggregate basis, hedge more than 100% of the Debtors' projected exposure to such commodity for calendar year 2014. In addition, I understand that the Internal Hedging Policy generally includes a restriction on the Debtors' ability to hedge or manage its exposure with respect to commodities other than uranium or Powder River Basin coal, on an aggregate basis, for calendar year 2015, up to a percentage set forth in the Internal Hedging Policy, which percentage is both consistent with the Debtors' hedging practices over the past two years for the period 13 –24 months after any reference date

106

and is less than 70% (the limits set forth in the Internal Hedging Policy described in the preceding two sentences, the "Hedging Ceiling"). I understand that additionally, the internal audit function often employs the use of third party subject matter experts in the field of energy trading and risk management to assist in the audit work. Collectively, I understand that the Risk Management Guidelines and the Debtors' rigorous auditing process ensure that the Debtors deploy a robust governance and control function at all times related to the potential risks involved with the Hedging and Trading Arrangements. I understand that this activity helps ensure that the Debtors' enter into only those Hedging and Trading Arrangements that are in the best interests of the Debtors, their estates, and other parties in interest. I also understand that the Debtors will continue to abide by the Risk Management Guidelines, including the Internal Hedging Policy and their audit practices throughout these chapter 11 cases.

### 1.    Risk Governance Structure.

234.    I understand that each of the Debtors' business units has a group of senior level employees dedicated to discussing and monitoring the specific risks to which each particular business unit is vulnerable (each such group, a "Risk Management Committee" and, collectively, the "Risk Management Committees"). I understand that for the Hedging and Trading Entities' hedging and trading business, Luminant Energy Company LLC, there is a Risk Management Committee that is responsible for identifying Hedging and Trading Activities risks, including market, liquidity, credit, operational, legal, regulatory, and other risks and managing such risks in accordance with the Risk Management Guidelines ("Hedging and Trading Activities Risks"). I understand that this Risk Management Committee also reviews and approves the types of transactions that the Hedging and Trading Entities can enter into and reviews significant risks for the Hedging and Trading Entities on a regular basis.

235.    In addition to the Risk Management Committees, I understand that the Hedging and Trading Entities also maintain (a) a separate compliance group (the "Compliance Group") that is responsible for creating and enforcing internal policies and procedures to comply with federal and state laws and regulations, and that reports to the vice-president of regulatory law and the chief compliance officer for the Hedging and Trading Entities and (b) a separate risk management team that supervises specialized risk teams in their monitoring, measurement, and reporting of the Hedging and Trading Activities Risks, and that reports directly to the vice president of risk management for EFH and chief financial officer for EFH (the "EFH Risk Management Team").    Collectively, I understand that both groups monitor compliance with internal and external controls and processes, including legal and regulatory compliance, adhering to internal risk policies and limits, supervising and reporting processes, and providing transaction governance processes.

## 2.    Transaction Governance.

236.    I understand that the Hedging and Trading Entities are subject to certain transaction governance processes that ensure the Hedging and Trading Activities are aligned with acceptable risk levels.  I also understand that the Hedging and Trading Entities execute both standard and non-standard transactions, (respectively, the "Standard Transactions" and "Non-Standard Transactions" and, collectively, the "Hedging and Trading Transactions").  I understand that standard Transactions generally require a less rigorous approval process than Non-Standard Transactions.  I understand that this is because Standard Transactions:  (a) use only products pre-approved by the Risk Management Committees; (b) have standard terms and conditions; (c) have specified term limits; (d) are frequently used to mitigate volume and price risk on a regular basis; (e) are frequently used in the Hedging and Trading Activities and well understood by the commercial and support teams for the Hedging and Trading Entities; and

(f) generally operate under industry developed contracts.

237.    By contrast, I understand that Non-Standard Transactions are either:   (a) a combination of Standard Transactions; or (b) Standard Transactions with additional complicating and/or unique provisions, such as atypical settlement dates or complex valuation requirements or higher required levels of operational support.   I understand that non-Standard Transactions require two levels of internal approvals.  First, I understand that Non-Standard Transactions *must* be reviewed by eight specified practice areas to ensure that the transactions' various risks have been assessed and that the practice areas can accommodate the transaction into daily operations.[72]   I understand that second, Non-Standard Transactions must be approved in accordance with the Debtors' corporate risk policy.[73]

238.    I understand that different levels of approval are required depending on the size and tenor of the Hedging and Trading Transaction and whether the transaction is Standard or Non-Standard.  I also understand that the approval hierarchy is based on individual authorities given to personnel based on their role and experience within the Hedging and Trading Entities.

239.    I understand that the Hedging and Trading Entities also govern transactions by utilizing individual limits that provide specific limits to each person that has hedging and trading authority.  I also understand that individual hedging and trading personnel limits are set by the appropriate TCEH Hedging and Trading Entity vice-president and the EFH vice president of risk management on the basis of instrument, commodity, tenor, region, experience of the individual,

---

[72]    As a further control, I understand that the Hedging and Trading Entities' commercial teams are segregated from discussions relating to the management of the EFH Risk Management Team as well as discussion relating to the responsibilities and compensation of the EFH Risk Management Team.

[73]    I understand that the Debtors' corporate risk policy is established by the Debtors' corporate risk management group, which is comprised of:  (a) the audit committee of the EFH Board; (b) the strategy and policy committee, which includes the chief risk officer for EFH; (c) each business unit Risk Management Committees; and (d) the EFH Risk Management Team.

and the individual's role within the business and monitored by the EFH Risk Management Team.

### 3.    Valuation and Risk Parameters.

240.    I understand that in accordance with the Debtors' corporate risk policy, the Debtors use individual trader limits, mark-to-market valuations of all transactions, position and profit and loss reporting, "at risk" measurements, sensitivities/stress testing, and risk/return metrics to measure and control the Hedging and Trading Activities Risks associated with the Hedging and Trading Transactions.  I understand that the specific risk management measures employed by the Hedging and Trading Entities are each as described in the Hedging and Trading Motion.

241.    I believe the continuation of the Hedging and Trading Activities, at all times subject to the Risk Management Guidelines, is key to maximizing the value of the Debtors' estates.  I understand that through the establishment of a defined risk governance structure, the creation of parameters for transaction governance, and the imposition of valuation and risk parameters and reporting processes applicable to all Hedging and Trading Transactions, the Debtors ensure that such transactions are closely scrutinized and in the best interests of the Debtors and all parties in interest.

### X.    Taxes and Fees Motion.[74]

242.    In the Taxes and Fees Motion, the Debtors request that the Court schedule a final hearing as soon as practicable after the 21st day following the Petition Date to consider approval of the Taxes and Fees Motion on a final basis.  Pursuant to the Interim Order, I understand that the Debtors seek authority to satisfy prepetition obligations on account of Taxes and Fees that come due during the Interim Period in an aggregate amount not to exceed $80.47 million, of

---

[74]    See *Motion of Energy Future Holdings Corp.,* et al*., for Entry of an Order Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees*, filed contemporaneously herewith.

which approximately $10 million (12.4%) is in the form of "trust fund" obligations which the Debtors collect from non-Debtors and/or hold in trust for payment to the Taxing and Regulatory Authorities.  Pursuant to the Final Order, I understand that the Debtors seek authority to satisfy all prepetition obligations on account of Taxes and Fees in an aggregate amount not to exceed $146.74 million, of which approximately $10 million (6.8%) is in the form of "trust fund" obligations.

### A.    The Debtors' Tax Obligations.

243.    I understand that in the ordinary course of business, the Debtors:  (a) incur and/or collect taxes, including margin, sales, use, property, and miscellaneous taxes in the operation of their businesses (collectively, the "<u>Taxes</u>"); (b) incur business license, permit fees and other assessments and charges (collectively, the "<u>Fees</u>") necessary to operate their businesses; and (c) remit such Taxes and Fees to various taxing, licensing, administrative, and governmental or similar authorities (collectively, the "<u>Taxing Authorities,</u>" the "<u>Regulatory Authorities</u>," and, collectively the "<u>Taxing and Regulatory Authorities</u>") and make payments to various third parties for Taxes and Fees who, in turn, remit such Taxes and Fees to the Taxing and Regulatory Authorities.  I understand that a list of the current Taxing Authorities is attached to the Taxes Motion as **<u>Exhibit B</u>** and incorporated by reference, and a list of the current Regulatory Authorities is attached to the Taxes Motion as **<u>Exhibit C</u>** and incorporated by reference.  In many instances, I understand that the Debtors negotiate with the Taxing and Regulatory Authorities to determine the amount of Taxes and Fees due and payable by the Debtors.  I understand that generally, the Debtors pay the Taxes and Fees monthly, quarterly, semi-annually, or annually, in each case as required by applicable laws, rules, and/or regulations.  I understand that additional detail with respect to the main categories of Taxes and Fees for which the Debtors are liable is provided below.

### 1.   Income and Margin Taxes.

244.   I understand that the Debtors pay a Texas margin Tax (the "Texas Margin Tax") to operate their businesses in Texas.  I understand that the Texas Margin Tax is calculated as a percentage of estimated combined taxable income for the tax year, minus a deduction to account for costs of goods sold.  I also understand that in May of each year, 90% of the Texas Margin Tax from the previous tax year comes due, and in August of each year, the remaining 10% comes due, subject to a potential true-up payment.  I understand that the Debtors estimate that approximately $70 million in Texas Margin Tax obligations have accrued and remain unpaid as of the Petition Date, approximately $54 million of which will become due and owing during the Interim Period.[75]

245.   I understand that the Debtors are also required to report and pay state income and margin Taxes in other jurisdictions (the "Other State Income and Margin Taxes"), as described in **Exhibit B** of the Taxes and Fees Motion.  I understand that the Debtors estimate that approximately $10,000 in Other State Income and Margin Tax obligations have accrued and remain unpaid as of the Petition Date.

---

[75]   I understand that pursuant to two tax sharing agreements entered into by EFH Corp. with:  (a) EFCH, TCEH LLC and certain of its subsidiaries, and EFIH; and (b) Oncor and Oncor Holdings (together the "TSAs" and the parties to the TSAs described in (a) and (b), the "TSA Parties"), EFH Corp. files Texas state margin tax returns that include the TSA Parties' results, and subsequently settles intercompany claims with each of the TSA Parties on account of the Texas state margin taxes that EFH Corp. has paid on their behalf.  I understand that each of the TSA Parties is individually liable for their share of Texas state law margin taxes.

By the Taxes and Fees Motion, the Debtors seek authority for EFH Corp. to continue to pay the Texas state margin taxes on the TSA Parties' behalf pursuant to the terms of the TSAs.  The authority to settle any intercompany claims that arise due to EFH Corp,'s payment of the Texas state margin tax on behalf of the TSA Parties is addressed in the *Motion of Energy Future Holdings Corp.,* et al., *for Entry of an Order (A) Authorizing the Debtors to (I) Continue Using Their Existing Cash Management System, (II) Maintain Existing Bank Accounts and Business Forms, and (III) Continue Using Certain Overnight Investment Accounts; (B) Authorizing Continued Intercompany Transactions and Netting of Intercompany Claims; and (C) Granting Postpetition Intercompany Claims Administrative Expense Priority*, Docket No. [___].

## 2.      Sales and Use Taxes.

246.     I understand that the Debtors incur and collect an assortment of sales Taxes ("Sales Taxes") and use Taxes ("Use Taxes" and, together with Sales Taxes, the "Sales and Use Taxes") in connection with the operation of their businesses.  I also understand that the Debtors collect Sales Taxes from their customers on behalf of the applicable Taxing Authorities and periodically remit the Sales Taxes to the applicable Taxing Authority on the basis of Sales Taxes actually billed to customers.

247.     I understand that the Debtors also incur Use Taxes in connection with their purchase of certain tangible personal property or taxable services from vendors.  Use Taxes arise when the Debtors purchase items or services from a vendor who is not registered to collect Sales Taxes for Texas or when the Debtors exercise their direct pay permit exemption certificates.  In either circumstance, I understand that such vendors are not obligated to charge or remit Texas Sales Taxes.   I understand that Use Taxes may also arise when a vendor fails to bill the Debtors the appropriate tax or amount of tax.  Nevertheless, I understand that the Debtors are obligated to self-assess and pay the Use Taxes, when applicable, to the relevant Taxing Authorities.

248.     I understand that in an average month, the Debtors incur an obligation of approximately $15 million in Sales and Use Taxes to the Taxing Authorities.  I understand that the Debtors estimate that approximately $10 million in Sales Taxes have accrued and remain unpaid as of the Petition Date all of which will become due and owing within the first 21 days following the Petition Date, and approximately $5.6 million in Use Taxes have accrued and remain unpaid as of the Petition Date, all of which will become due and owing within the first 21 days following the Petition Date.

### 3.    Real and Personal Property Taxes.

249.    I understand that approximately 500 tax jurisdictions in Texas where the Debtors' business operations are located possess the authority to levy property Taxes against the Debtors' real and personal property (collectively, the "Real and Personal Property Taxes").  I understand that the Debtors typically pay Real and Personal Property Taxes in the ordinary course of business as such Taxes are invoiced.  In an average month, I understand that the Debtors accrue approximately $16.25 million in Real and Personal Property Taxes.  The Debtors estimate that approximately $43 million in Real and Personal Property Taxes have accrued and remain unpaid as of the Petition Date.

### 4.    Texas Gross Receipts Tax.

250.    I understand that in addition to the Taxes described above, the Debtors must pay a state gross receipts tax in Texas that is imposed on every utility company located in an incorporated town having a population greater than 1,000 as reflected in the last federal census (the "Texas Gross Receipts Tax").  In an average month, I understand that the Debtors incur an obligation of approximately $5 million on account of the Texas Gross Receipts Tax to certain Taxing Authorities in Texas.

### B.    The Debtors' Fee Obligations.

251.    I understand that the Debtors must obtain various business licenses, permits, and certificates and pay corresponding Fees in certain jurisdictions in which they operate.   In particular, I understand that the Regulatory Authorities described on **Exhibit C** who have oversight over the Debtors' generation and/or retail activities require the Debtors to obtain licenses and periodically remit related fees (collectively, the "Regulatory License Fees").   I understand that the Debtors estimate that approximately $18.13 million in Regulatory License Fees have accrued and remain unpaid as of the Petition Date.  I understand that the Regulatory

License Fees consist of a number of different types of fees, several of which are described in the Taxes and Fees Motion.

252.    Moreover, I understand that the Debtors are also required to pay certain surcharges on their off road heavy-duty diesel equipment.  Specifically, I understand that under the Texas Emissions Reduction Plan, which provides funding for various clean-air initiatives in Texas, a 2% surcharge is applied to the sale, lease, or rental price of heavy-duty, off-road diesel-powered equipment, in addition to regular state and local sales taxes (the "Heavy Duty Diesel Equipment Fees").  I understand that the Debtors remit approximately $21,900 per month to the Texas Comptroller on account of the Heavy Duty Diesel Equipment Fees.  I understand that the Debtors estimate that approximately $20,000 in Heavy Duty Diesel Equipment Fees have accrued and remain unpaid as of the Petition Date.[76]

253.    Finally, I understand that the Debtors are required to pay registration Fees anytime a motor vehicle used as a company car is registered for use on the public highways (collectively, the "Vehicle Registration Fees").  I understand that the amount of Vehicle Registration Fees the Debtors pay varies according to:  (a) the type of each vehicle; and (b) the state in which the motor vehicle is registered.  I understand that the Debtors directly pay approximately $4,000 a month to the Taxing Authorities on account of the Vehicle Registration Fees.  I understand that the Debtors estimate that approximately $5,000 in Vehicle Registration Fees have accrued and remain unpaid as of the Petition Date.

---

[76]    In connection with the Debtors' use of heavy duty diesel equipment, the Debtors are required to file a Texas fuels tax report (stating the amount of tax-free dyed diesel fuel purchased, sold, and used in an exempt manner) as well as a Texas petroleum products delivery fee report (required by all entities who pay Heavy Duty Diesel Equipment Fees).  Neither of these reports imposes cash obligations on the Debtors, and the Debtors are not seeking any additional relief in connection with these reports.

115

XI.    **Utilities Motion.**[77]

394.    In the Utilities Motion, the Debtors seek entry of orders:  (a) determining that the Utility Providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (b) approving the  Proposed Adequate Assurance (defined in the Utilities Motion); (c) prohibiting the Utility Providers from altering, refusing, or discontinuing services on account of prepetition amounts outstanding and on account of any perceived inadequacy of the Proposed Adequate Assurance pending entry of the Final Order; (d) determining the Debtors are not required to provide any additional adequate assurance beyond what is proposed by the Utilities Motion.

395.    As part of the Debtors' business operations, I understand that the Debtors incur utility expenses for electric, gas, water, telephone, internet, waste disposal, and other similar services (the "Utility Services") in the ordinary course of business from approximately 110 utility providers (collectively, the "Utility Providers").[78]  I understand that the Utility Providers that provide Utility Services to the Debtors as of the Petition Date are identified in **Exhibit C** of the Utilities Motion (the "Utility Service List").[79]

---

[77]    See *Motion of Energy Future Holdings Corp., et al., for Entry of Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services*, filed contemporaneously herewith.

[78]    I understand that certain of the Utility Providers may also qualify for treatment under the *Motion of Energy Future Holdings Corp.*, et al.*, for Entry of Interim and Final Orders Authorizing the Debtors to (A) Continue Performance Under Hedging and Trading Arrangements, (B) Pledge Collateral and Honor Obligations Thereunder, and (C) Enter Into and Perform Under New Postpetition Hedging and Trading Arrangements* (the "Hedging and Trading Agreements Motion"), filed contemporaneously herewith.  I understand from Debtors' counsel that the applicability of the Hedging and Trading Arrangements Motion to such Utility Providers should not be treated as an admission by the Debtors that the safe harbor provisions of the Bankruptcy Code do or do not apply to those Utility Providers. From Debtors' counsel I understand that the Debtors reserve the right to argue that section 366 applies to a specific Utility Provider.

[79]    I understand from Debtors' counsel that the Utility Service List is not an admission that any entity is a utility provider within the meaning of section 366 of the Bankruptcy Code, and the Debtors reserve the right to contest any such characterization in the future.

396.    On average, I understand that the Debtors spend approximately $108.8 million each month on Utility Services pursuant to approximately 640 separate accounts, of which approximately $106.8 million is attributable to Utility Providers that provide electricity transmission and distribution services (the "TDSPs").  I understand that as of the Petition Date, the Debtors estimate that approximately $194.5 million in utility costs have accrued and remain outstanding, approximately $185.5 million of which is attributable to TDSPs.  I understand that the Debtors not owe any past due amounts to the Utility Providers.

397.    I believe that uninterrupted Utility Services are essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization.  Indeed, I understand that any interruption of Utility Services, even for a brief period of time, would negatively affect the Debtors' operations, revenues, and cash flows, seriously jeopardizing the Debtors' reorganization efforts and, ultimately, recoveries to creditors.  Accordingly, I believe it is critical, both for the Debtors and for the Debtors' customers, that the Debtors maintain uninterrupted access to Utility Services during these chapter 11 cases.

**A.    The Proposed Adequate Assurance.**

254.    I understand that the Debtors intend to pay postpetition obligations owed to the Utility Providers in the ordinary course of business.  I understand that the Debtors expect that cash from operations and cash on hand will be sufficient to pay postpetition obligations related to their Utility Services.

255.    Nevertheless, I understand that to provide additional assurance of payment for future services to the Utility Providers other than (a) Utility Providers, including ERCOT, that have already been provided a deposit letter of credit that, even accounting for any draws to pay prepetition amounts, will be equal to, or greater than, two weeks of Utility Services, (b) Utility

Providers that have been paid in advance for Utility Services, and (c) the TDSPs,[80] the Debtors propose to deposit $1 million (the "Adequate Assurance Deposit") into a newly-created, segregated, interest-bearing account (the "Adequate Assurance Deposit Account") within 20 days of the Petition Date. I understand that the amount of the Adequate Assurance Deposit equals the estimated aggregate cost for two weeks of Utility Services for Utility Providers (other than the Utility Providers noted above), calculated as a historical average over the past 12 months.

256.    I understand that the Adequate Assurance Deposit will be held for the benefit of Utility Providers during the pendency of these chapter 11 cases, provided that to the extent any Utility Provider receives any value from the Debtors as adequate assurance of payment, the Debtors may reduce the Adequate Assurance Deposit maintained in the Adequate Assurance Account by such amount.

257.    I understand that the Debtors submit that the Adequate Assurance Deposit, in conjunction with the Debtors' demonstrated ability to pay for future Utility Services in the ordinary course of business, any other prepetition or postpetition value provided by the Debtors to the Utility Providers, and other relief granted by the Court in favor of the Utility Providers (together, the "Proposed Adequate Assurance") constitutes sufficient adequate assurance.

---

[80]    Pursuant to section 366(c)(2) of the Bankruptcy Code, I understand from Debtors' counsel that the Debtors need not provide adequate assurance of payment until 30 days after the Petition Date. The Debtors submit that the relief requested pursuant to the *Motion of Energy Future Holdings Corp., et al., for Entry of (A) an Order Authorizing Certain of the Debtors to Pay Certain Prepetition Transition Charges and Delivery Charges and (B) an Order Authorizing Certain of the Debtors to Assume Transmission and Distribution Service Agreement* (the "TDSP Motion"), filed contemporaneously with the Utilities Motion, will satisfy any adequate assurance obligation with respect to the TDSPs within the required 30-day period. From Debtors' counsel I understand that the Debtors' and the TDSP's respective rights under section 366 of the Bankruptcy Code are reserved and, in the event the Court does not grant the relief sought in the TDSP Motion, the amount of the Adequate Assurance Deposit may increase by up to $53 million.

XII.    **TDSPs Assumption Motion.**[81]

258.    In the TDSPs Assumption Motion, Debtor entities TXU Energy Retail Company LLC, 4Change Energy Company LLC, and Luminant ET Services Company (collectively, the "REP Debtors") are each party to one or more of the 23 Delivery Agreements on the list annexed as **Exhibit 1** to **Exhibit B** attached to the TDSPs Assumption Motion.  I understand that each Delivery Agreement is between a REP Debtor and one of seven non-debtor regulated transmission and distribution utility service providers, six of which are non-affiliated entities (the "Unaffiliated TDSPs"),[82] and the other of which is Oncor Electric Delivery Company LLC ("Oncor" and, together with the Unaffiliated TDSPs, the "TDSPs").  I understand that Oncor is an affiliate of the Debtors, but is not a debtor in these chapter 11 cases.[83]  I understand that the Debtors estimate that the REP Debtors owe approximately $185.2 million in the aggregate to the

---

[81]    See *Motion of Energy Future Holdings Corp.*, et al*., for Entry of (A) an Order Authorizing Certain of the Debtors to Pay Certain Prepetition Transition Charges and Delivery Charges and (B) an Order Authorizing Certain of the Debtors to Assume Transmission and Distribution Service Agreements*, filed contemporaneously herewith.

[82]    I understand that the Unaffiliated TDSPs are AEP Texas Central Company, AEP Texas North Company, Centerpoint Energy Houston Electric, LLC, Sharyland Utilities, L.P., Nueces Electric Cooperative, Inc., and Texas-New Mexico Power Company.

[83]    Specifically, I understand that Oncor is an affiliate of the Debtors that is 80% owned by non-Debtor Oncor Electric Delivery Holdings Company LLC ("Oncor Holdings" and, together with its direct and indirect subsidiaries, including Oncor, the "Oncor Ring-Fenced Entities"), which, in turn, is 100% owned by the Debtor entity Energy Future Intermediate Holding Company LLC ("EFIH"), a direct subsidiary of the Debtors' corporate parent Energy Future Holdings Corp. ("EFH Corp.").  I understand that substantially all of the common stock of EFH Corp. is held by Texas Energy Future Holdings Limited Partnership ("Texas Holdings" and, together with EFH Corp. and its direct and indirect subsidiaries other than the Oncor Ring-Fenced Entities, the "Texas Holdings Group").  I understand that EFH Corp. and Oncor have implemented certain structural and operational "ring-fencing" measures based on commitments made by Texas Holdings and Oncor to the PUC (as defined in the TDSP Motion) that are intended to enhance the credit quality of Oncor.  I understand that these measures serve to mitigate Oncor's and Oncor Holdings' credit exposure to the Texas Holdings Group and to reduce the risk that the assets and liabilities of Oncor or Oncor Holdings would be substantively consolidated with the assets and liabilities of the Texas Holdings Group in the event of a bankruptcy of one or more of those entities.  Accordingly, I understand that EFH Corp. and EFIH do not control and do not consolidate Oncor for financial reporting purposes.  The "ring-fencing" measures are described in further detail in the First Day Declaration.

TDSPs under the Delivery Agreements as of the Petition Date, approximately $143.1 million of which the REP Debtors owe to Oncor.

### A.    The TDSPs Are Critical to the Debtors' Business Operations.

259.    The REP Debtors cannot and do not own or operate electric distribution facilities in Texas.  Rather, I understand that the REP Debtors rely on the TDSPs' distribution facilities that connect the interconnected transmission grid and generation resources with customers.

260.    I understand that the TDSPs' distribution facilities receive electricity from the interconnected transmission system and distribute electricity to points of delivery, including customers.  I understand that the TDSPs are regulated because they are, in nearly every instance, the sole provider of delivery service in any particular service area where the REPs are certified to do business.

### B.    Prepetition Amounts Owed to the TDSPs and Outstanding Letters of Credit.

261.    I understand that the amounts that the REP Debtors pay to the TDSPs fall into two categories Delivery Charges and Transition Charges, each of which is discussed below.

#### 1.    Delivery Charges.

262.    The first category of amounts that the REP Debtors pay to the TDSPs is known as "Delivery Charges."  I understand that the Delivery Charges are based on the PUC-approved terms and conditions that govern each TDSP's delivery services (the "Tariffs"), including the rates that TDSPs may charge for such services.[84]  I also understand that the Delivery Charges constitute approximately 90% to 95% of the REP Debtors' payments to TDSPs.

---

[84]    From Debtors' counsel I understand that PUC regulations adopt a standard Tariff for all TDSPs.  *See* Tex. Admin. Code § 25.214.  Chapter 4 of the Tariff, which concerns remedies, is applicable to all TDSPs and cannot be modified.  PUC regulations also adopt a standard Tariff for all electric cooperatives, like Nueces Electric Cooperative, Inc., that have opted to offer retail customer choice. *See* Tex. Admin. Code § 25.215. Like the TDSP standard Tariff, Chapter 4 of this Tariff, relating to remedies, applies to all such electric cooperatives.    Copies    of    the    Tariffs    can    be    found    on    the    PUC    website    at http://www.puc.texas.gov/industry/electric/rates/TDR.aspx.

263.    As provided in the following table, as of the Petition Date, I understand that the REP Debtors owe approximately (a) $32.4 million in the aggregate to the Unaffiliated TDSPs on account of Delivery Charges (the "Unpaid Delivery Charges"), of which approximately $19.9 million has been secured with prepetition letters of credit (the "Delivery Charge LCs"), and (b) $138.1 million in the aggregate to Oncor on account of Unpaid Delivery Charges:[85]

| TDSP | Outstanding Delivery Charges | Delivery Charge LCs |
|---|---|---|
| AEP Texas Central Company | $5,000,000 | $3,400,000 |
| AEP Texas North Company | $2,800,000 | $1,000,000 |
| Centerpoint Energy Houston Electric, LLC | $20,900,000 | $13,800,000 |
| Sharyland Utilities, L.P. | $25,000 | None |
| Nueces Electric Cooperative, Inc. | None | None |
| Texas-New Mexico Power Company | $3,600,000 | $1,700,000 |
| Oncor Electric Delivery Company LLC | $138,100,000 | None |

264.    I estimate that $100 million of the Delivery Charges will come due during the Interim Period.  I understand that the REP Debtors seek authority pursuant to the order to continue to pay approximately $26 million of Unpaid Delivery Charges to the Unaffiliated TDSPs as such amounts come due in the ordinary course during the Interim Period.  I understand that the Debtors seek authority to honor all Unpaid Delivery Charges (including amounts owed to Oncor) pursuant to the Assumption Order.

---

[85]    I understand that PUC regulations do not require the REP Debtors to maintain the Delivery Charge LCs because, as of the Petition Date, the REP Debtors have not defaulted on their obligations.  I understand that the REP Debtors anticipate that the Unaffiliated TDSPs may draw on the Delivery Charge LCs after the Petition Date.  I understand that the REP Debtors do not believe that the Delivery Charge LCs constitute property of their estates such that the TDSPs require Court authority to draw on the Delivery Charge LCs.  Nevertheless, I understand that for purposes of clarity, the Debtors seek authority in both the Interim Order and the Assumption Order allowing (but not directing) the TDSPs to draw on the Delivery Charge LCs as payment for any outstanding amounts that the REP Debtors owe on account of Delivery Charges.

2.     **Transition Charges.**

265.    I understand that the second category of amounts that the REP Debtors pay to the TDSPs is known as Transition Charges.  I understand that the Transition Charges allow TDSPs to recover certain PUC-approved costs that were securitized in conjunction with Texas's transition from a fully-regulated electricity market to an unbundled, competitive retail and generation market.  I understand that the Transition Charges constitute approximately 5% to 10% of the REP Debtors' payments to the TDSPs.

266.    I understand that the PUC has issued financing orders that entitle the TDSPs to recover the Transition Charges, and several of the TDSPs have issued securities known as "transition bonds" that securitize the value of the Transition Charges (the "Transition Bonds").[86] I understand that for the TDSPs that have issued Transition Bonds,[87] each of the applicable Tariffs provides for the collection and payment of Transition Charges to the applicable TDSP, as well as the circumstances under which a REP must provide security for its payment of Transition Charges to the applicable TDSP.[88]

---

[86]    Pursuant to PUC financing orders, certain TDSPs are also entitled to use securitization financing to recover costs of restoring service and infrastructure associated with electric power outages as a result of hurricanes and other weather-related events or natural disasters (the "System Restoration Charges").  Under PUC regulations and applicable Tariffs, Transition Charges include System Restoration Charges, and Transition Bonds include bonds issued to securitize System Restoration Charges.  See Tex. Admin. Code § 36.401-07.  Centerpoint Energy Houston Electric, LLC has issued Transition Bonds to securitize System Restoration Charges.  Accordingly, the Unpaid Transition Charges owed by the REP Debtors to Centerpoint Energy Houston Electric, LLC include prepetition System Restoration Charges, which are secured by Transition Charge Security in the form of letters of credit.

[87]    Sharyland Utilities, L.P., Nueces Electric Cooperative, Inc., AEP Texas North Company, and Texas-New-Mexico Power Company have not issued Transition Bonds.  Accordingly, I understand that these TDSPs do not collect securitized Transition Charges from the REP Debtors.  Texas-New Mexico Power Company collects PUC-approved, non-securitized "competitive transition charges."  Pursuant to section 6.1.1.3 of the Tariff, these "competitive transition charges" are treated as Delivery Charges.  Accordingly, I understand that these amounts are included in the estimated amount of Unpaid Delivery Charges owed to Texas-New Mexico Power Company.

[88]    I understand from Debtors' counsel that pursuant to PUC regulations and the Tariffs, each REP that pays Transition Charges to a TDSP must meet certain long-term unsecured credit ratings, or provide security for the

267.    As provided in the following table, as of the Petition Date, I understand that the REP Debtors owe approximately (a) $9.7 million in the aggregate to the Unaffiliated TDSPs on account of Transition Charges (the "Unpaid Transition Charges"), of which approximately $15.8 million has been secured with prepetition letters of credit, deposits or other collateral posted for the benefit of the Transition Bond indenture trustee   (the "Transition Charge Security"), and (b) $5 million in the aggregate to Oncor on account of Unpaid Transition Charges, of which approximately $10.1 million has been secured with a Transition Charge Security for the benefit of Oncor's Transition Bond indenture trustees:[89]

| TDSP | Outstanding Transition Charges | Transition Charge Security |
|---|---|---|
| AEP Texas Central Company | $3,600,000 | $5,100,000 |
| Centerpoint Energy Houston Electric, LLC | $6,100,000 | $10,700,000 |
| Oncor Electric Delivery Company LLC | $5,000,000 | $10,100,000 |

268.    I understand from Debtors' counsel that Texas law affords special protection in respect of the Transition Charges.  I understand that in particular, the Texas electric industry restructuring and unbundling legislation (which created the competitive retail market) and the PUC's related financing orders provide that Transition Bonds are to be issued by bankruptcy-remote, ring-fenced subsidiaries of the TDSPs.  Moreover, pursuant to state law, I understand from Debtors' counsel that the Transition Bonds are secured by a lien on "transition property,"

---

Transition Charges.  Security may take the form of a deposit, guaranty, surety bond, or letter of credit.  *See* P.U.C. Subst. R. 25.108.

[89]    I understand from Debtors' counsel that under PUC regulations, the REP Debtors would need to replace the Transition Charge Security if drawn and, in any event, the REP Debtors anticipate remaining current with their obligations to the TDSPs with respect to Transition Charges during these chapter 11 cases such that the TDSPs will not need to seek recourse against the Transition Charge Security.  Accordingly, the Debtors anticipate that the TDSPs will not seek recourse against the Transition Charge Security and that, to the extent a letter of credit securing Transition Charges expires during these chapters 11 cases, the REP Debtors will replace such letter of credit under their post-petition financing facility or provide other security.

which includes the right to collect Transition Charges from the REP Debtors and any Transition

Charges collected by the REP Debtors from their customers.  I understand that the Transition

Bond indenture trustees' lien on "transition property" is not affected by the commingling of

funds.[90]  Importantly, I understand that all of the Unpaid Transition Charges have been

securitized with Transition Bonds, and are fully secured by the Transition Charge Security.  I

also understand that because the Transition Charge Security is security for obligations that are

owed to the Transition Bond indenture trustees by entities collecting Transition Charges, the

Transition Charges paid by the REP Debtors to the TDSPs will ultimately be paid to the

Transition Bond indenture trustees.

### C.     Additional Regulatory Implications.

269.   I understand from Debtors' counsel while the Debtors would seek to avoid any

negative issues associated with the REP Debtors' failure to pay the Transition Charges and the

Delivery Charges, the benefits of avoiding any such litigation outweigh the costs of paying the

amounts requested in the TDSP Motion.  Indeed, I understand that the REP Debtors' failure to

pay the Transition Charges and Delivery Charges could negatively affect the Debtors in at least

five ways.

270.   *First*, I understand that the REP Debtors' failure to make timely payments in

respect of Transition Charges or Delivery Charges to a TDSP would permit PUC staff or "any

affected person" to bring a complaint seeking to suspend or revoke the REP Debtors' operating

certificate with the PUC (the "REP Certificate").[91]  I understand that such an action, if

---

[90]   *See* Tex. Util. Code. § 39.309(a) (providing for exclusive lien on "transition property"); Tex. Util. Code §
39.309(e).

[91]   Specifically, the Texas Administrative Code provides as follows:

A certificate granted pursuant to this section is subject to amendment, suspension, or revocation by the
commission for a significant violation of PURA, commission rules, or rules adopted by an independent

successful, would have drastic consequences for the Debtors' business operations: if the PUC suspended the REP Certificates, the REP Debtors would have to cease all activities associated with obtaining new customers in Texas; if the PUC revoked the REP Certificates, the REP Debtors would be required to cease *all* REP activities in Texas. I also understand that revocation of the REP Debtors' REP Certificates would result in a shutdown of their operations, resulting in the REP Debtors no longer being allowed to provide electricity service to retail customers. Such decertification would have a material effect on the REP Debtors' results of operations, liquidity, and financial condition.

271. *Second*, I understand that if the Debtors do not satisfy the Transition Charges and Delivery Charges, the regulatory framework permits the TDSPs that have issued Transition Bonds to, among other things, transition the REP Debtors' customers to a competitor designated as the "provider of last resort," or to arrange for a lockbox account to collect the Delivery Charges directly from the REP Debtors' customers.[92] I understand that if the REP Debtors are required to notify customers of the lockbox arrangement, this could result in a negative market perception of the REP Debtors and lead to additional customer losses.

272. *Third*, I understand that the REP Debtors' failure to satisfy Delivery Charges to an Unaffiliated TDSP permits the Unaffiliated TDSP to pass along the bad debt to all customers in its service area. I understand from Debtors' counsel that under applicable PUC regulations, if

---

organization. . . . The commission staff or any affected person may bring a complaint seeking to amend, suspend, or revoke a REP's certificate. Significant violations include the following: . . . (16) Failure to timely remit payment for invoiced charges to a transmission and distribution utility pursuant to the terms of the statewide standardized tariff adopted by the commission.

Tex. Admin. Code § 25.107(j)(16).

[92] *See* Tex. Admin. Code § 25.214(d)(4), § 25.215; AEP Texas Central Company Tariff § 4.6.2.1(5); AEP Texas North Company Tariff § 4.6.2.1(5); Centerpoint Energy Houston Electric, LLC Tariff § 4.6.2.1(5); Oncor Tariff § 4.6.2.1(5); Sharyland Utilities, L.P. Tariff § 4.6.2.1(5); Nueces Electric Cooperative, Inc. Tariff § 4.6.3.2(5); Texas-New Mexico Power Company Tariff § 4.6.2.1(5).

a REP Debtor defaults on the payment of Delivery Charges to an Unaffiliated TDSP, the Unaffiliated TDSP may treat the resulting bad debt as a regulatory asset.[93]  I understand that the Unaffiliated TDSP may make a case before the PUC to increase the tariff rates that the PUC allows it to charge for Delivery Services to all REPs and other customers with which the TDSP does business.  I understand that this mechanism effectively allows the Unaffiliated TDSPs to pass on and recoup unpaid Delivery Charges from all REPs, irrespective of whether the particular REP is current on Delivery Charge payments.  I understand that these regulations are designed, in part, to ensure that Unaffiliated TDSPs are able to cover their operating costs and capital expenditures.  Ultimately, I understand that the unpaid Delivery Charges owed by any REP could be passed on to customers in the form of higher rates.  I also understand that the mere possibility of increased rates and overcharging of some customers could irreparably damage the REP Debtor's brand and goodwill with customers in the ERCOT region.

273.    *Fourth*, under applicable PUC regulations, I understand from counsel of the Debtors that failure to timely pay the Delivery Charges could result in the assessment of a late penalty equal to 5% of each delinquent balance, which could approximate $160,000 per day.[94]  I

---

[93]    Specifically, the Texas Administrative Code provides as follows:

> A [TDSP] shall create a regulatory asset for bad debt expenses, net of collateral posted pursuant to subparagraph (A) of this paragraph and bad debt already included in its rates, resulting from a REP's default on its obligation to pay delivery charges to the [TDSP]. Upon a review of reasonableness and necessity, a reasonable level of amortization of such regulatory asset shall be included as a recoverable cost in the [TDSP]'s rates in its next rate case or such other rate recovery proceeding as deemed necessary.

16 Tex. Admin. Code § 25.107(f)(3)(B).  I understand from Debtors' counsel that these provisions do <u>not</u> apply to Oncor pursuant to an order of the PUC under section 14.101 of the Public Utility Regulatory Act allowing the merger of Oncor with the Debtors.  Specifically, under that order, Oncor may not, among other things, "seek to recover from its customers any costs incurred as a result of a bankruptcy of [the Debtors]."  Accordingly, I understand from Debtors' counsel that it is unlikely that Oncor would be permitted to make a case before the PUC to increase tariff rates on the basis of the REP Debtors' non-payment of Delivery Charges to Oncor.

[94]    Standard Tariff for Retail Delivery Service § 4.4.6.  See Tex. Admin. Code § 25.214.

understand that upon assumption of the Delivery Agreements, the Debtors would be required to satisfy such late penalties under section 365(b)(1) of the Bankruptcy Code.

274.   **Fifth**, I understand from Debtors' counsel that under applicable PUC regulations and the Tariffs, if a REP has defaulted in respect of Delivery Charges within a 24-month period, such REP is required to provide a deposit as security equal to "one-sixth of the estimated annual amount" billed to the REP under the Tariff, which security could remain outstanding for a minimum of two years.[95]  I understand that with respect to Oncor alone, a two-month security deposit for Delivery Charges could amount to approximately $153 million.   Similarly, I understand that if a REP defaults with respect to Transition Charges, the REP is required to provide a deposit or issue letters of credit equal to two months' maximum expected Transition Charges.[96]  I understand that if the REP Debtors default with respect to all Unpaid Transition Charges, the applicable Transition Bond indenture trustee may seek recourse against the Transition Charge Security and the Debtors may be required to provide replacement security in the form of new letters of credit, deposits, or other collateral. I understand that the Debtors estimate that a replacement two-month security deposit with respect to Transition Charges could amount to approximately $18.2 million.

---

[95]   Importantly, I understand that the REP Debtors are not currently required to provide Delivery Charge LCs to the TDSPs because the REP Debtors have not defaulted on Delivery Charge payments within the past 24 months. I understand that if, however, the REP Debtors were to default on payment of Delivery Charges, they may be required to issue Delivery Charge LCs to secure future Delivery Charges equal to one-sixth of the estimated annual amount of Delivery Charges due to the TDSPs.  *See* Tex. Admin. Code § 25.214(d)(4); AEP Texas Central Company Tariff § 4.5.2.1; AEP Texas North Company Tariff § 4.5.2.1; Centerpoint Energy Houston Electric, LLC Tariff § 4.5.2.1; Oncor Tariff § 4.5.2.1; Sharyland Utilities, L.P. Tariff § 4.5.2.1; Nueces Electric Cooperative, Inc. Tariff § 4.5.2; Texas-New Mexico Power Company Tariff § 4.5.2.1.  *See also* 11 U.S.C. § 366 (requiring a debtor to provide adequate assurance of payment to its utility providers).

[96]   *See* P.U.C. Subst. R. 25.107, 108 (requiring a defaulting REP to provide a deposit or issue replacement letters of credit of two months' maximum expected Transition Charges).

275.     Accordingly, I believe payment of the Transition Charges and Delivery Charges in the ordinary course will help the REP Debtors to avoid potentially serious regulatory consequences, and will save the REP Debtors significant time and expense.

**D.    Adequate Assurance.**

276.     Following the commencement of these chapter 11 cases, I understand that the REP Debtors will continue to sell retail electricity to their customers, collect Transition Charges from customers, and incur Delivery Charges.  I understand that upon assumption of the Delivery Agreements, and consistent with their long history of successful dealings with the TDSPs, the REP Debtors will continue to perform under the Delivery Agreements and pay the Transition Charges and Delivery Charges to the TDSPs.  Indeed, I understand that the REP Debtors' continuing ability to pay the TDSPs is contingent upon the TDSPs continuing to provide electricity distribution service on an uninterrupted basis.

**XIII.   ERCOT Assumption Motion.[97]**

277.     In the ERCOT Assumption Motion, the Debtors entry of an order authorizing, but not directing, the SFA Debtors (as defined in the ERCOT Assumption Motion) to assume the SFAs and provide adequate assurance of future performance in relation thereto.  I understand that the SFAs set out the terms and conditions by which ERCOT and the SFA Debtors will discharge their respective duties and responsibilities under the ERCOT Protocols (as defined in the SFAs).  As such, I understand that executing and being a party to an SFA is a necessary prerequisite for, among other things, operating power generation assets in the ERCOT region; participating in the retail electricity in the ERCOT region; scheduling, buying and selling

---

[97]   See *Motion of Energy Future Holdings Corp.,* et al.*, for Entry of an Order Authorizing Certain of the Debtors to Assume Standard Form Market Participant Agreements with ERCOT,* filed contemporaneously herewith.

electricity and ancillary services through the ERCOT region; transacting certain financial instruments; and transacting in the day-ahead market conducted by ERCOT.

278.    Additionally, I understand that to secure the Debtors' obligations to ERCOT, Citibank, N.A. issued that certain irrevocable and unconditional standby letter of credit No. 63664972 for the benefit of ERCOT, dated December 4, 2009, which is currently in the amount of $120 million (as amended, the "Letter of Credit") in accordance with ERCOT's creditworthiness protocols that ERCOT may draw upon in its discretion.  I understand that the Debtors do not believe that the Letter of Credit constitutes property of the Debtors' estate such that ERCOT requires Court authority to draw upon the Letter of Credit.[98]  Nevertheless, I believe in an abundance of caution, the Debtors are seeking authority in the ERCOT Assumption Motion to allow ERCOT to draw on the Letter of Credit in its discretion.  I believe that the availability of the Letter of Credit (regardless of whether ERCOT chooses to draw on the Letter of Credit) constitutes adequate assurance of the Debtors' future performance under the SFAs.  Furthermore, I understand that it is the Debtors' intentions to honor their respective obligations under the SFAs prior to the entry of the Order.

A.    **ERCOT.**

279.    ERCOT manages the flow of electric power to 24 million Texas customers, representing 85% of the state's electric load.  I understand that ERCOT schedules electricity on an electric grid that connects 40,500 miles of transmission lines and more than 550 generation units.  I understand that ERCOT also performs financial settlements for the competitive

---

[98]  *See, e.g.*, *In re Kaiser Grp. Int'l Inc.*, 399 F.3d 558 (3d. Cir. 2005) (citing the "well-established" rule that a letter of credit and the proceeds therefrom are not property of the debtor's estate); *In re Hechinger Investment Co. of Delaware, Inc.*, 282 B.R. 149, 161 (D. Del. 2002) (finding that debtor could not provide any facts in support of its claim that a letter of credit constituted property of the estate); *S-Tran Holdings, Inc.*, No. 05-11391 (KJC) (Bankr. D. Del. 2009) (recognizing that letters of credit do not constitute property of the debtor's estate); *In re Sabratek Corp.*, 257 B.R. 732, 735 (Bankr. D. Del. 2000) (finding that debtors would be unlikely to succeed in establishing that a letter of credit constituted property of the estate).

wholesale power market, administers retail switching for 6.7 million premises in competitive choice areas, and enforces certain credit requirements, including collateral posting requirements, to ensure that the activity facilitated by ERCOT does not create credit risks in the market.

280.    Additionally, I understand that ERCOT provides a platform for its members to participate in various aspects of the Texas electricity market. These include:

- (a) *Real-Time Energy Market*.  The real-time energy market that allows a party to be paid or charged for physical electricity and ancillary services provided to or taken from the wholesale market;

- (b) *Congestion Revenue Rights Auctions*.  Auctions for the purchase and sale of congestion revenue rights (which allow a party to hedge against transmission congestion costs in the day-ahead market);

  (c) *Day-Ahead Transactions*.  Financial transactions (that allow participants to buy and sell electricity, ancillary services and congestion revenue rights to facilitate hedging price differences between the day-ahead market and the real-time market); and

- (d) *Point-to-point Transactions*.  Point-to-point transactions (which allow a party to hedge against transmission congestion in ERCOT's real-time energy market between two specific locations on the transmission system) (collectively, the "ERCOT Participation Rights").

281.    I understand that ERCOT is a membership-based 501(c)(4) nonprofit corporation. I also understand that ERCOT's membership reflects all facets of the power business, including consumers, electric cooperatives, power generators, power marketers, retail electric providers, investor-owned electric utilities (transmission and distribution providers), and municipal-owned electric utilities.  I understand that only upon execution of an SFA may an entity enjoy the ERCOT Participation Rights.

### B.    The Debtors' Participation in ERCOT.

282.    I believe the Debtors' electricity generating, wholesale trading operations, and retail operations are substantial and rely on ERCOT.  To that end, I understand that certain of the Debtors have executed SFAs with ERCOT.  Specifically, I understand that the following Debtors are party to one or more SFAs:  4Change Energy Company; Big Brown Power Company LLC; Luminant Energy Company LLC; Luminant ET Services Company ("Luminant ET") ; Luminant Generation Company LLC; Oak Grove Management Company LLC; Sandow Power Company

LLC; Tradinghouse Power Company LP; TXU Energy Retail Company LLC d/b/a TXU Energy ("TXU Energy LLC"); and Valley NG Power Company LLC (collectively, the "SFA Debtors").

283.    I understand that Luminant is the largest electricity generator in Texas and accounts for approximately 18% of the installed generation capacity for the ERCOT region.  I understand that to facilitate Luminant's sale of electricity produced by its power generation assets, one of its subsidiaries, Luminant Energy Company LLC ("Luminant Energy") executed an SFA permitting Luminant Energy to participate in the ERCOT region as an entity that may buy and sell energy and ancillary services for wholesale customers.  Additionally, I understand that one of Luminant's subsidiaries, Luminant ET, executed an SFA permitting it to participate in the ERCOT region as an entity that may sell electricity to end-use customers.

284.    From consulting my advisors, I understand the Debtors' retail operations also rely on ERCOT.  TXU Energy LLC conducts the Debtors' primary retail electricity operations, has approximately 1.7 million residential and business customers, and accounts for approximately 26% of the residential and approximately 19% of the business retail electricity market in the ERCOT region.  To sell electricity to these customers, I understand that its executed an SFA permitting it to participate in the ERCOT region as an entity that may sell electricity to end-use customers or wholesale customers therein.  I understand that in order for TXU Energy LLC to continue to sell electricity to TXU Energy LLC's customers and for Luminant Energy to continue to sell electricity generated by Luminant, both of these subsidiaries must continue to be party to an SFA.

285.    I understand that the Debtors also depend on continued participation in the electricity market in which ERCOT facilitates operational activities.  I understand that ERCOT provides the SFA Debtors with particular channels to sell and procure power, ancillary services,

and congestion revenue rights to mitigate the Debtors' risks associated with the power generation assets and retail electricity businesses, and are core to the commercial operations of those businesses.  I understand that ability to participate in the ERCOT region is critical to the daily cash flows of the Debtors.   Moreover, I understand that the SFA Debtors consummate transactions with ERCOT that they cannot execute with any other party or entity in light of ERCOT's (a) central role in the Texas electricity system, (b) multi-dimensional investment platform, and (c) facilitation of real-time and day-ahead market transactions, congestion revenue right auctions, as well as electricity and ancillary services services, sales, and purchases.[99]

286.    I understand that these channels are important to the Debtors as a whole, given that, as of December 31, 2013, the Debtors' annual underlying, notional value across all their operations, based on energy prices for commodities sold and purchased in its operations, including natural gas, power, coal, fuel-oil, uranium, renewable energy credits and emission allowances, is approximately $3.8 billion.

287.    I understand that the Debtors participate in certain hedging and trading activities and arrangements to hedge against price fluctuations and thereby protect the economic value of their operations by preventing substantial declines in cash flows.  As an example, during the fiscal years 2009 through 2013, I understand that the Debtors' hedging and trading activities provided a positive incremental return to the Debtors' underlying operations ranging from

---

[99]    For additional information regarding the Debtors' hedging and trading counterparties, hedging and trading activity in ERCOT, and the financial significance of these activities to the Debtors' businesses, *see Motion of Energy Future Holdings Corp., et al., for Entry of Interim and Final Orders Authorizing the Debtors to (A) Continue Performance Under Prepetition Hedging and Trading Arrangements, (B) Pledge Collateral and Honor Obligations Thereunder, and (C) Enter Into and Perform Under Trading Continuation Agreements and New Postpetition Hedging and Trading Arrangements* (the "Hedging and Trading Motion").  In the Hedging and Trading Motion, the Debtors have requested that, to the extent necessary, the automatic stay provided in section 362 of the Bankruptcy Code is modified to permit ERCOT to continue performing its obligations and exercising its rights under the SFAs and ERCOT protocols.  The relief requested in the ERCOT Assumption Motion is intended to further complement the Debtors' requested relief in the Hedging and Trading Motion to ensure the Debtors' continued access to ERCOT on a postpetition basis

approximately $240 million to $425 million on an annual basis. I understand that without access to ERCOT's operational platforms that play a critical role in optimizing economic value and cash flows, including settling physical energy delivery and certain financial transactions, the Debtors would face a significant hurdle in executing certain of their hedging and trading activities in a timely manner.

### C.    Parties' Financial Obligations

288.    Following the commencement of these chapter 11 cases, I understand that ERCOT may, in its discretion, draw upon the Letter of Credit to pay the approximately $10 million in prepetition obligations owed to ERCOT in connection with the SFAs.

289.    I understand that the TCEH Debtors also have sought authority to use cash collateral and to enter into a $4.475 billion debtor-in-possession financing facility (the "TCEH DIP Facility")[100], both of which will be used in part to fund future payments to ERCOT and provide a replacement or an additional letter(s) of credit for the benefit of ERCOT as may be required by the ERCOT protocols. I understand that these avenues of recourse, coupled with the availability of the Letter of Credit and the ability to provide ERCOT with a replacement or an additional letter(s) of credit for satisfaction of any of the Debtors' postpetition obligations to ERCOT, provide adequate assurance of the SFA Debtors' future performance under the SFAs.

---

[100]    I understand that the Debtors seek authority to use cash collateral pursuant to the *Motion of Texas Competitive Electric Holdings Company LLC, and certain of Its Debtor Affiliates for Entry of Interim and Final Orders (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing* and as defined in such motion.

A more detailed description of the TCEH DIP Facility may be found in the *Motion of Texas Competitive Electric Holdings Company LLC and Certain of its Debtor Affiliates, for Entry of Interim and Final Orders (A) Approving Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing*.

**Procedural Motions**

XIV.    **Joint Administration Motion.**[101]

290.    In the Joint Administration Motion, the Debtors request entry of an order directing joint administration of these chapter 11 cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b).  Specifically, I understand that the Debtors request that the Court maintain one file and one docket for all of these chapter 11 cases under the case of lead Debtor Energy Future Holdings Corp.  Further, the Debtors request that an entry be made on the docket of each of the cases of the Debtors other than Energy Future Holdings Corp. to indicate the joint administration of these chapter 11 cases.

291.    I understand that the 71 Debtors in these chapter 11 cases are "affiliates" as that term is defined in section 101(2) of the Bankruptcy Code.  As discussed in the First Day Declaration, the Debtors have highly integrated operations.  As such, I believe the joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  I understand that many of the motions, hearings, and orders that will arise in these chapter 11 cases will affect each and every Debtor.  In addition, I believe joint administration will reduce fees and costs by avoiding duplicative filings and objections.  I understand that joint administration also will allow the Office of the United States Trustee for the District of Delaware and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

292.    I believe joint administration will not adversely affect the Debtors' respective constituencies because the Joint Administration Motion requests only administrative, not substantive, consolidation of the estates.  I understand that parties in interest will not be harmed

---

[101]    See *Motion of Energy Future Holdings Corp., et al., for Entry of an Order Directing Joint Administration of the Debtors' Chapter 11 Cases*, filed contemporaneously herewith.

by the relief requested, but, instead, will benefit from the cost reductions associated with the joint administration of these chapter 11 cases. Accordingly, I believe that joint administration of these chapter 11 cases is in the best interests of their estates, their creditors, and all other parties in interest.

## XV.    Claims and Noticing Agent Motion.[102]

293.    In the Claims and Noticing Agent Motion, the Debtors seek to retain Epiq Bankruptcy Solutions, LLC ("Epiq") as their claims and noticing agent. I believe that by retaining Epiq in these chapter 11 cases, the Debtors' estates, and particularly their creditors, will benefit from Epiq's service. Since its inception in 1988, I understand that Epiq has provided claims and noticing services in numerous large cases in this district. Consequently, I understand that Epiq has developed efficient and cost-effective methods in its area of expertise. I also understand that Epiq is fully equipped to handle the volume of mailing involved in properly sending the required notices to creditors and other interested parties in the chapter 11 cases and, therefore, I believe that the Claims and Noticing Agent Motion should be approved.

## XVI.    Consolidated Creditors List Motion.[103]

294.    In the Consolidated Creditors List Motion, the Debtors seek entry of an Order authorizing the Debtors to file a consolidated list of creditors in lieu of separate mailing matrix for each Debtor during the Interim Period and the latter of: (a) 90 days thereafter; or (b) until the SoFAs have been filed. I believe that with the assistance of Epiq as claims and noticing agent, the Debtors will be prepared to file a computer-readable consolidated list of creditors and a list of

---

[102] See *Application of Energy Future Holdings Corp.,* et al., *for Entry of an Order Approving the Retention and Appointment of Epiq Bankruptcy Solutions, LLC as the Claims and Noticing Agent for the Debtors,* filed contemporaneously herewith.

[103] See *Motion of Energy Future Holdings Corp.,* et al., *for Entry of an Order Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor,* filed contemporaneously herewith.

equity security holders upon request and will be capable of undertaking all necessary mailings. Indeed, I understand that because the Debtors have thousands of creditors, converting the Debtors' computerized information to a format compatible with the matrix requirements would be an exceptionally burdensome task and would greatly increase the risk and recurrence of error with respect to information already intact on computer systems maintained by the Debtors or their agents.

295.    I believe that consolidation of the Debtors' computer records into a creditor database and mailing notices to all applicable parties in such database will be sufficient to permit Epiq to promptly notice those parties. Accordingly, I believe maintaining electronic-format lists of creditors and equity security holders rather than preparing and filing separate matrices will maximize efficiency and accuracy, and reduce costs.

## XVII.  Retention Applications[104]

296.    In the various retention applications, the Debtors will seek authorization to employ and retain counsel and professionals *nunc pro tunc* in accordance with their engagement letters.    These professionals include, among others, financial advisors, energy consultants, compensation consultants, lead restructuring counsel, restructuring advisors, accounting firms, and various special counsel.    The Debtors' operations are vast and complex, and I believe the retention of professionals is necessary for an efficient and effective transition into chapter 11 and a successful reorganization.    Accordingly, I believe the retention applications should be granted.

---

[104]    Retention Applications pursuant to 11 U.S.C. §§ 327(e) and 1107: Alvarez & Marsal LLC; Deloitte & Touche LLP; Epiq Bankruptcy Solutions, LLC; Ernst & Young LLP; Evercore Partners, Inc.; Filsinger Energy Partners, Inc.; Kirkland & Ellis LLP; PricewaterhouseCoopers LLP; KPMG LLP; Richards, Layton, & Finger, P.A.; Towers Watson & Co.

**Exhibit B**

**List of the Debtors**

**TCEH Debtors**

Texas Competitive Electric Holdings Company LLC
4Change Energy Company
4Change Energy Holdings LLC
Big Brown 3 Power Company LLC
Big Brown Lignite Company LLC
Big Brown Power Company LLC
Collin Power Company LLC
DeCordova Power Company LLC
DeCordova II Power Company LLC
Eagle Mountain Power Company LLC
Energy Future Competitive Holdings Company LLC
Generation MT Company LLC
Generation SVC Company
Lake Creek 3 Power Company LLC
Luminant Big Brown Mining Company LLC
Luminant Energy Company LLC
Luminant Energy Trading California Company
Luminant ET Services Company
Luminant Generation Company LLC
Luminant Holding Company LLC
Luminant Mineral Development Company LLC
Luminant Mining Company LLC
Luminant Renewables Company LLC
Martin Lake 4 Power Company LLC
Monticello 4 Power Company LLC
Morgan Creek 7 Power Company LLC
NCA Resources Development Company LLC
Oak Grove Management Company LLC
Oak Grove Mining Company LLC
Oak Grove Power Company LLC
Sandow Power Company LLC
TCEH Finance, Inc.
Tradinghouse 3 & 4 Power Company LLC
Tradinghouse Power Company LLC
TXU Energy Receivables Company LLC
TXU Energy Retail Company LLC
TXU Energy Solutions Company LLC
TXU Retail Services Company
TXU SEM Company
Valley NG Power Company LLC
Valley Power Company LLC

**Other Debtors**

Energy Future Holdings Corp.
Brighten Energy LLC
Brighten Holdings LLC
Dallas Power & Light Company, Inc.
Ebasco Services of Canada Limited
EEC Holdings, Inc.
EECI, Inc.
EFH Australia (No. 2) Holdings Company
EFH CG Holdings Company LP
EFH CG Management Company LLC
EFH Corporate Services Company
EFH Finance (No. 2) Holdings Company
EFH FS Holdings Company
EFH Renewables Company LLC
EFIH Finance Inc.
Energy Future Intermediate Holding Company LLC
Generation Development Company LLC
Lone Star Energy Company, Inc.
Lone Star Pipeline Company, Inc.
LSGT Gas Company LLC
LSGT SACROC, Inc.
NCA Development Company LLC
Southwestern Electric Service Company, Inc.
Texas Electric Service Company, Inc.
Texas Energy Industries Company, Inc.
Texas Power & Light Company, Inc.
Texas Utilities Company, Inc.
Texas Utilities Electric Company, Inc.
TXU Electric Company, Inc.
TXU Receivables Company

Exhibit 2

- 2 -

**<u>Exhibit C</u>**

**<u>Corporate Structure</u>**

# Energy Future Holdings ("EFH")

Texas Energy Future Holdings Limited Partnership
[TX]

## Energy Future Holdings Corp. ("EFH Corp.")
### [TX]
**Total Indebtedness: $1.929 billion (excluding guarantees)**

| | |
|---|---|
| **Unsecured ($1.929 billion)** | **EFH Unsecured LBO Notes:** • 10.875% EFH LBO Senior Notes due 2017 ($33 million outstanding) • 11.25%/12.0% EFH LBO Toggle Notes due 2017 ($27 million outstanding) |
| | **EFH Unsecured Legacy Notes:** • 5.55% EFH Legacy Notes due 2014 ($371 million outstanding) • 6.50% EFH Legacy Notes due 2024 ($746 million outstanding) • 6.55% EFH Legacy Notes due 2034 ($747 million outstanding) |
| | **EFH Other Unsecured Notes:** • 9.00% EFH Unsecured Notes due 2020 ($3 million outstanding) • 9.75% EFH Unsecured Notes due 2019 ($2 million outstanding) |
| **Total EFH Corp.** | $1.929 billion |
| **Guarantees** | EFCH Tex-La Obligations |

## Energy Future Intermediate Holding Company LLC ("EFIH")
### [DE]
**Total Indebtedness: $7.709 billion (excluding guarantees)**

| | |
|---|---|
| **1st Lien Secured ($3.985 billion)** | **EFIH First Lien Notes** • 6.875% EFIH Senior Secured First Lien Notes due 2017 ($503 million outstanding) • 10.00% EFIH Senior Secured First Lien Notes due 2020 ($3.482 billion outstanding) |
| **2nd Lien Secured ($2.156 billion)** | **EFIH Second Lien Notes:** • 11.00% EFIH Senior Secured Second Lien Notes due 2021 ($406 million outstanding) • 11.75% EFIH Senior Secured Second Lien Notes due 2022 ($1.750 billion outstanding) |
| **Unsecured ($1.568 billion)** | **EFIH Unsecured Toggle Notes** • 11.25%/12.25% Senior Toggle Notes due 2018 ($1.566 billion outstanding) **EFIH Other Unsecured Notes** • 9.75% EFIH Unsecured Notes due 2019 ($2 million outstanding) |
| **Total EFIH Debt** | $7.707 billion |
| **Guarantees** | EFH Unsecured LBO Notes |

## Energy Future Competitive Holdings Company LLC ("EFCH")
### [DE]
**Total Indebtedness: $70 million (excluding guarantees)**

| | |
|---|---|
| **Secured ($61 million)** | EFCH Tex-La Obligations due 2019/2020 ($61 million outstanding) |
| **Unsecured ($9 million)** | EFCH Notes due 2037 ($9 million outstanding) |
| **Total EFCH** | $70 million |
| **Guarantees** | EFH Unsecured LBO Notes |
| | TCEH First Lien Debt |
| | TCEH Second Lien Debt |
| | TCEH Unsecured Notes (other than PCRBs) |

## Texas Competitive Electric Holdings Company LLC ("TCEH LLC")
### [DE]
**Total Indebtedness: $32.068 billion**

| | |
|---|---|
| **1st Lien Secured ($24.385 billion)** | **TCEH First Lien Debt:** • TCEH First Lien Credit Agreement ($22.635 billion outstanding) • 11.50% TCEH First Lien Notes due 2020 ($1.750 billion outstanding) • Obligations under TECH First Lien Interest Rate Swaps and TCEH First Lien Commodity Hedges (to be determined) |
| **2nd Lien Secured ($1.571 billion)** | **TCEH Second Lien Notes:** • 15.0% TCEH Second Lien Notes due 2021 ($1.571 billion outstanding) |
| **Unsecured ($6.113 billion)** | **TCEH Unsecured Notes** • 10.25% TCEH Fixed Senior Notes due 2015 ($3.488 billion outstanding) • 10.50%/11.25% TCEH Senior Toggle Notes due 2016 ($1.749 billion outstanding) **TCEH Pollution Control Revenue Bonds:** • TCEH PCRBs ($875 million outstanding; $19 million supported by outstanding LCs) (PCRBs are owed only by TCEH LLC, not by any subsidiaries. |
| **Total TCEH** | $32.068 billion |

## EFH Corporate Services Company
### [TX]

Texas Transmission Investment LLC [DE] (Outside Investors)

EFH Finance Inc. [DE]

EFIH Finance Inc. [DE]

ONCOR

Luminant

TXU energy

**<u>Exhibit D</u>**

**<u>Restructuring Support Agreement</u>**

*Execution Version*

**THIS RESTRUCTURING SUPPORT AND LOCK-UP AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

## *RESTRUCTURING SUPPORT AND LOCK-UP AGREEMENT*

This RESTRUCTURING SUPPORT AND LOCK-UP AGREEMENT (including all exhibits and schedules attached hereto and in accordance with Section 2, this "**Agreement**") is made and entered into as of April 29, 2014, by and among the following parties:

i.  Energy Future Holdings Corp., a Texas corporation ("**EFH**");[1]

ii.  Energy Future Intermediate Holding Company LLC ("**EFIH**"), a Delaware limited liability company and a direct, wholly-owned subsidiary of EFH;

iii.  EFH Corporate Services Company ("**EFH Corporate Services**"), a Delaware corporation and a direct, wholly-owned subsidiary of EFH;

iv.  EFIH Finance Inc. ("**EFIH Finance**,"), a Delaware corporation and a direct, wholly-owned subsidiary of EFIH;

v.  Energy Future Competitive Holdings Company LLC ("**EFCH**"), a Delaware limited liability company and a direct, wholly-owned subsidiary of EFH;

vi.  Texas Competitive Electric Holdings Company LLC ("**TCEH**"), a Delaware limited liability company and a direct, wholly-owned subsidiary of EFCH;

vii.  each of TCEH's direct and indirect subsidiaries listed on the signature pages hereto (the "**TCEH Subsidiaries**," and together with TCEH and EFCH, the "**TCEH Debtors**," and, together with each of the foregoing entities identified in sub-clauses (i) and (vii) a "**Debtor**" and, collectively, the "**Debtors**");

viii.  Texas Energy Future Holdings Limited Partnership ("**Texas Holdings**"), a Texas limited partnership, which holds approximately 99.26% of the outstanding Interests in EFH (the "**EFH Interests**");

ix.  Texas Energy Future Capital Holdings LLC, a Delaware limited liability company and the general partner of Texas Holdings ("**TEF**" and, together with Texas Holdings, the "**Consenting Interest Holders**");

---

[1]  Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the term sheet attached hereto as **Exhibit A** (the "**Term Sheet**"), subject to Section 2 hereof.

x.  the undersigned lenders or investment advisors or managers of discretionary accounts that hold claims[2] pursuant to the TCEH Credit Agreement against EFCH, TCEH, and the TCEH Subsidiaries under the TCEH Credit Agreement (such claims, the "**TCEH Credit Agreement Claims**" and, collectively, the "**Consenting TCEH First Lien Lenders**");

xi.  the undersigned holders or investment advisors or managers of discretionary accounts that hold claims against EFCH, TCEH, and the TCEH Subsidiaries under the TCEH First Lien Notes issued pursuant to the TCEH First Lien Note Indenture (such claims, the "**TCEH First Lien Note Claims**" and, collectively, the "**Consenting TCEH First Lien Noteholders**" and, together, with the Consenting TCEH First Lien Lenders, the "**Consenting TCEH First Lien Creditors**");

xii.  the undersigned holders or investment advisors or managers of discretionary accounts that hold claims against EFIH and EFIH Finance under the EFIH First Lien Notes issued pursuant to the EFIH First Lien Indentures (collectively, the "**Consenting EFIH First Lien Noteholders**");

xiii.  the undersigned holders or investment advisors or managers of discretionary accounts that hold claims against EFIH and EFIH Finance under the EFIH  Second Lien Notes issued pursuant to the EFIH Second Lien Note Indenture (collectively, the "**Consenting EFIH Second Lien Noteholders**");

xiv.  the undersigned holders or investment advisors or managers of discretionary accounts that hold claims against EFIH and EFIH Finance under the EFIH Unsecured Notes issued pursuant to the EFIH Unsecured Note Indentures (collectively, the "**Consenting EFIH Unsecured Noteholders**");

xv.  the undersigned holders or investment advisors or managers of discretionary accounts that hold claims against EFH, EFIH, and EFCH under the EFH Unsecured Notes issued pursuant to the EFH Unsecured Indentures, but excluding any EFH Unsecured Notes held by EFIH (collectively, the "**Consenting EFH Unsecured Noteholders**," and/or together with the Consenting TCEH First Lien Creditors, the Consenting EFIH First Lien Noteholders, the Consenting EFIH Second Lien Noteholders, and the Consenting EFIH Unsecured Noteholders, (in each case, as to their respective issuance, and to the extent still a party thereto, the "**Consenting Creditors**"); and

xvi.  each transferee who becomes a Permitted Transferee (as defined below) in accordance with Section 4.04 of this Agreement (each of the foregoing described in sub-clauses (i) through (xvi), a "**Party**" and, collectively, the "**Parties**"). Each Consenting Interest Holder, each Consenting Creditor, and each Permitted Transferee (if any) is a "**Restructuring Support Party**" and are collectively referred to herein as the "**Restructuring Support Parties**."

---

[2]  As used herein the term "**claim**" has the meaning ascribed to such term as set forth in section 101(5) of the Bankruptcy Code.

### RECITALS

**WHEREAS**, the Debtors and the Restructuring Support Parties have negotiated certain restructuring and recapitalization transactions with respect to the Debtors' capital structure, including the Debtors' respective obligations under each of the following: (i) the TCEH Credit Agreement; (ii) the TCEH First Lien Notes; (iii) the TCEH First Lien Commodity Hedges (but without respect to any setoff rights that a counterparty to a TCEH First Lien Commodity Hedge may have against TCEH); (iv) the TCEH First Lien Interest Rate Swaps (but without respect to any setoff rights that a counterparty to a TCEH First Interest Rate Swap may have against TCEH); (v) the EFIH First Lien Notes; (vi) the EFIH Second Lien Notes; (vii) the EFIH Unsecured Notes; (viii) the EFH Unsecured Notes; and (ix) the claims arising under the indentures listed on **Exhibit B** hereto (such claims, the "**Notes Claims**");

**WHEREAS**, the Debtors intend to commence voluntary reorganization cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Delaware (such court, or another bankruptcy court of competent jurisdiction with respect to the subject matter, the "**Bankruptcy Court**") to effect the restructuring through a prenegotiated chapter 11 plan of reorganization (as may be amended or supplemented from time to time in accordance with the terms of this Agreement, the "**Plan**"), all of which shall be on the terms and conditions described in this Agreement (such transactions, the "**Restructuring Transactions**");

**WHEREAS**, those Restructuring Support Parties that are party to the commitment letter attached hereto as **Exhibit C** (collectively, the "**Commitment Parties**"[3] and such letter (including the exhibits thereto), the "**Commitment Letter**") have agreed in accordance with the terms and conditions specified in the Commitment Letter to fund the EFIH Second Lien DIP Financing in an amount of up to $2 billion (the "**Investment Commitment**"); and

**WHEREAS**, the Debtors and the Consenting Interest Holders, as the direct or indirect owners of EFH, EFIH, EFIH Finance, EFCH, TCEH, and the TCEH Subsidiaries, have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement, the Commitment Letter, and the Term Sheet.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

### AGREEMENT

**Section 1.**    *Agreement Effective Date*.  This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Time, on the date on which:  (a)(i) the Debtors shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Consenting Interest Holders and counsel to the Consenting Creditors; (ii) holders of at least 40% of the aggregate outstanding principal amount of the TCEH Credit Agreement

---

[3]    For the avoidance of doubt, as used herein, the terms "**Consenting Creditors**" and "**Restructuring Support Parties**" include the Commitment Parties in their capacities as such.

Claims and the TCEH First Lien Note Claims (determined without regard to any claims held by a person or entity that is an "insider" as that term is defined in section 101(31) of the Bankruptcy Code) shall have executed and delivered to the Debtors counterpart signature pages of this Agreement; (iii) holders of at least 70% of the outstanding principal amount of each of the EFIH Unsecured Note Claims and the EFH Unsecured Note Claims (in each case determined without regard to any claims held by a person or entity that is an "insider" as that term is defined in section 101(31) of the Bankruptcy Code) shall have executed and delivered to the Debtors counterpart signature pages of this Agreement; (iv) holders of at least 10% of the outstanding principal amount of the EFIH First Lien Note Claims (determined without regard to any claims held by a person or entity that is an "insider" as that term is defined in section 101(31) of the Bankruptcy Code) held by Fidelity shall have executed and delivered to the Debtors counterpart signature pages of this Agreement (the "**Consenting Fidelity EFIH First Lien Noteholders**"); (v) holders of at least 19% of the outstanding principal amount of the EFIH First Lien Note Claims (determined without regard to any claims held by a person or entity that is an "insider" as that term is defined in section 101(31) of the Bankruptcy Code) held by holders other than Fidelity shall have executed and delivered to the Debtors counterpart signature pages of this Agreement (the "**Consenting Non-Fidelity EFIH First Lien Noteholders**"); (vi) holders of at least 25% of the outstanding principal amount of the EFIH Second Lien Note Claims (determined without regard to any claims held by a person or entity that is an "insider" as that term is defined in section 101(31) of the Bankruptcy Code) held by Fidelity shall have executed and delivered to the Debtors counterpart signature pages of this Agreement; and (vii) each of the Consenting Interest Holders shall have executed and delivered to the Debtors counterpart signatures of this Agreement; (b) each of the Commitment Parties shall have executed and delivered to the Debtors counterpart signatures to the Commitment Letter; (c) EFH and EFIH shall have paid the Execution Fee (as defined in the Commitment Letter); (d) the Debtors shall have paid all reasonable and documented fees and expenses incurred through the Agreement Effective Date (as defined below) for the professionals identified in Section 10 in the amounts set forth in **Schedule 1** attached hereto (including the request to increase or replenish the retainers as set forth on Schedule 1); and (e) the Debtors have given notice to counsel to the Consenting Interest Holders and counsel to the Consenting Creditors in accordance with Section 11.11 hereof that each of the foregoing conditions set forth in this Section 1, in each case, has been satisfied and this Agreement is effective; in each instance, on or before April 29, 2014 (such date, the "**Agreement Effective Date**").[4]

**Section 2.**     *Exhibits Incorporated by Reference*.  Each of the exhibits attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include the exhibits.  In the event of any inconsistency between this Agreement (without reference to the exhibits) and the exhibits, this Agreement (without reference to the exhibits) shall govern.

**Section 3.**     *Definitive Documentation*.  The definitive documents and agreements governing the Restructuring Transactions (collectively, the "**Plan Restructuring Documents**") shall

---

[4]     For the avoidance of doubt, the obligations and rights of the Consenting Creditors described in this Agreement shall apply to any postpetition claims acquired by such Consenting Creditors in accordance with the Restructuring Transactions.

consist of: (a) the motion to assume this Agreement pursuant to sections 105(a) and 365 of the Bankruptcy Code and the performance by the Debtors of their obligations hereunder (the "**RSA Assumption Motion**") and the order approving the RSA Assumption Motion (the "**RSA Assumption Order**"); (b) the Plan (and all exhibits thereto); (c) the Confirmation Order and pleadings in support of entry of the Confirmation Order; (d) the Disclosure Statement, the other solicitation materials in respect of the Plan (such materials, collectively, the "**Solicitation Materials**"), the motion to approve the Disclosure Statement, and the order entered by the Bankruptcy Court approving the Disclosure Statement and Solicitation Materials as containing, among other things, "adequate information" as required by section 1125 of the Bankruptcy Code (the "**Disclosure Statement Order**"); (e) the documentation in respect of the EFIH First Lien DIP Financing (including related motions and orders); (f) the documentation in respect of the EFIH Second Lien DIP Financing (including related motions and orders); (g) the Oncor TSA Amendment; (h) the IRS Submissions and the Private Letter Ruling, (i) the Conversion Agreement (as defined in the Commitment Letter) (including any related order); (j) the motion (the "**Approval Motion**") and related orders to obtain entry of (i) an order (the "**Approval Order**") authorizing, among other things, (A) the EFIH First Lien Settlement, (B) the EFIH Second Lien Settlement; and (C) EFH and EFIH to perform their obligations under the Commitment Letter, including the payment of professionals' fees on the terms set forth in the Commitment Letter and (ii) an order (the "**Oncor TSA Amendment Order**") authorizing the Oncor TSA Amendment, all in a manner consistent with the terms of this Agreement; (k) the documentation in respect of the EFIH First Lien Settlement (including the related order); (l) the documentation in respect of the EFIH Second Lien Settlement (including the related order); (m) any pleadings or orders related to the EFIH First Lien Makewhole Claim and/or EFIH Second Lien Makewhole Claim (collectively, the "**Make-Whole Pleadings**"); (n) all other documents that will comprise the Plan Supplement; and (o) a motion seeking entry of an order and the resulting order restricting transfers of claims against the Debtors to the extent such transfers would adversely affect the Debtors' ability to obtain any required regulatory consents (the "**Trading Motion**"). The Plan Restructuring Documents remain subject to negotiation and completion and shall, upon completion, contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, and shall otherwise be in form and substance reasonably acceptable to each of (i) the Debtors, (ii) the Consenting Interest Holders, and (iii) the Required Consenting Creditors; provided, however, that, only EFH, EFIH, the Consenting Fidelity EFIH First Lien Noteholders, the Consenting EFIH Second Lien Noteholders, the Consenting EFH Unsecured Noteholders, and the Required EFIH Unsecured Consenting Creditors, and no other Restructuring Support Party, shall have the foregoing rights described in this Section 3 over those documents pertaining exclusively to the Restructuring Transactions and Chapter 11 Cases of EFH and EFIH; provided, further, that the Approval Order, the Oncor TSA Amendment Order, and the Make-Whole Pleadings shall be in form and substance reasonably satisfactory to EFH, EFIH, the Consenting Fidelity EFIH First Lien Noteholders, the Consenting EFH Unsecured Noteholders, and the Required EFIH Unsecured Consenting Creditors only (and no other Restructuring Support Party shall have the foregoing rights) provided, further, the new EFH/EFIH debt and equity documents (including the Conversion Agreement) and the EFH and EFIH corporate governance documents (including the selection of the board of directors and officers of such entities) shall be in form and substance satisfactory to the Required EFIH Unsecured Consenting Creditors only, in each case, subject to the terms and conditions specified in the Term Sheet, and the Required EFIH Unsecured

Consenting Creditors shall reasonably consult with the Consenting EFH Creditors in connection with the EFH and EFIH corporate governance documents; provided, further, that only TCEH and the Consenting TCEH First Lien Creditors, and no other Restructuring Support Party, shall have consent rights over those documents pertaining exclusively to the Restructuring Transactions and Chapter 11 cases of the TCEH Debtors.  Additionally, each Consenting Non-Fidelity EFIH First Lien Noteholder shall have reasonable consent rights over all definitive documentation (and orders) in respect of the terms and conditions not otherwise addressed in the Term Sheet regarding each of the EFIH First Lien DIP Financing (and related orders), the Approval Motion, the Approval Order, the RSA Assumption Motion, and the RSA Assumption Order.  As used herein, the term "**Required Consenting Creditors**" means, at any relevant time:  (a) at least three (3) members of the Ad Hoc TCEH Committee who collectively hold at least 50.1% of the TCEH First Lien Claims held by the members of the Ad Hoc TCEH Committee (the "**Consenting Ad Hoc TCEH Committee**"); (b) Consenting Creditors holding at least 50.1% of the EFIH First Lien Note Claims held by all Consenting Creditors; (c) Consenting Creditors holding at least 50.1% of the EFIH Second Lien Note Claims held by all Consenting Creditors; (d) Consenting Creditors holding at least 50.1% of the EFH Unsecured Note Claims held by all Consenting Creditors; and (e) at least three (3) investment advisors that manage and/or advise funds or accounts that beneficially own, collectively, at least 66.67% of the EFIH Unsecured Note Claims held by all Consenting Creditors (the "**Required EFIH Unsecured Consenting Creditors**").

**Section 4.**     *Commitments Regarding the Restructuring Transactions.*

4.01.    Commitment of the Consenting Creditors.

(a)     During the period beginning on the Agreement Effective Date and ending on a Termination Date (as defined in Section 8.11) (such period, the "**Effective Period**"):

(i)     each of the Consenting Creditors that is entitled to accept or reject the Plan pursuant to its terms agrees that it shall, subject to the receipt by such Consenting Creditor of the Disclosure Statement and the Solicitation Materials, in each case, approved by the Bankruptcy Court as containing "adequate information" as such term is defined in section 1125 of the Bankruptcy Code:

(A)     to the extent a class of claims is permitted to vote to accept or reject the Plan, vote each of its claims (including each of its TCEH First Lien Claims, EFIH Unsecured Note Claims, EFH Unsecured Note Claims, EFIH First Lien Note Claims, EFIH Second Lien Note Claims, the Notes Claims, the TCEH DIP Claims, the EFIH First Lien DIP Claims, the EFIH Second Lien DIP Claims, and any other claims against the applicable Debtor) (such Claims, together with the EFH Interests, the Texas Holdings Interests, and the TEF Interests, collectively, the "**Debtor Claims/Interests**") to accept the Plan by delivering its duly executed and completed ballot(s) accepting the Plan on a timely basis following the commencement of the solicitation and its actual receipt of the Solicitation Materials and ballot; and

(B)     not change or withdraw (or cause to be changed or withdrawn) such vote;

(ii)   each Consenting Creditor further agrees that it shall not directly or indirectly (A) object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions, (B) propose, file, support, or vote for any restructuring, workout, plan of arrangement, or plan of reorganization for the Debtors other than the Restructuring Transactions, or (C) direct the Agents[5] (as applicable) to take any action contemplated in (A) and (B) of this Section 4.01(a)(ii); provided, however, that to the extent a Consenting Creditor directs the Agents (as applicable) not to take an action contemplated in (A) and (B) of this Section 4.01(a)(ii), such direction shall not be construed in any way as requiring any Consenting Creditor to provide an indemnity to the applicable Agent, or to incur or potentially incur any other liability, in connection with such direction; and

(iii)   upon the commencement by the Debtors of the Chapter 11 Cases, and subject to Section 8.12, the automatic stay is invoked and each Consenting Creditor agrees that, except to the extent expressly contemplated under the Plan and this Agreement, it will not, and will not direct the Agents (as applicable) to, exercise any right or remedy for the enforcement, collection, or recovery of any of the Debtor Claims/Interests, and any other claims against any direct or indirect subsidiaries of the Debtors that are not Debtors; provided, however, that to the extent a Consenting Creditor directs the Agents (as applicable) to not take any action contemplated in the foregoing provision, such direction shall not be construed in any way as requiring any Consenting Creditor to provide an indemnity to the applicable Agent, or to incur or potentially incur any other liability, in connection with such direction; provided, further, however, that for the avoidance of doubt, upon (A) the termination of this Agreement or (B) termination of the automatic stay as to property or interests in property which secure any such claims upon motion by a person or entity other than a Consenting Creditor, each Consenting

---

[5]   For purposes of the Agreement, the term "**Agent**" means any of the following (and each of their respective successors and assigns):  (a) Citibank, N.A., in its capacity as: (i) administrative agent under the TCEH Credit Agreement; (ii) administrative and collateral agent with respect to certain TCEH First Lien Claims pursuant to the Amended and Restated Collateral Agency and Intercreditor Agreement, dated as of August 7, 2009 (as may be amended, restated, or supplemented); and (iii) senior collateral agent and representative with respect to certain TCEH First and Second Lien Claims pursuant to the Second Lien Intercreditor Agreement, dated as of October 6, 2010 (as may be amended, restated, or supplemented, the "**TCEH Second Lien Intercreditor Agreement**"); (b) The Bank of New York Mellon Trust Company, N.A., in its capacity as: (i) collateral trustee with respect to certain EFIH Second Lien Notes Claims pursuant to the Collateral Trust Agreement (as may be amended, restated or supplemented); (ii) indenture trustee with respect to certain EFIH Senior Toggle Note Claims pursuant to the EFIH Senior Toggle Note Indenture; (iii) indenture trustee with respect to certain EFIH Unexchanged Note Claims pursuant to the EFIH Unexchanged Note Indenture; (iv) indenture trustee with respect to certain TCEH First Lien Note Claims pursuant to the TCEH First Lien Note Indenture; (v) EFH Notes Trustee; (vi) EFH LBO Notes Trustee; (vii) indenture trustee with respect to certain EFIH Second Lien Note Claims; and (viii) initial second priority representative under the TCEH Second Lien Intercreditor Agreement; (c) CSC Trust Company of Delaware in its capacity as:  (i) collateral trustee with respect to certain EFIH First Lien Note Claims pursuant to the Collateral Trust Agreement (as may be amended, restated, or supplemented); (ii) collateral trustee with respect to certain EFIH First Lien Note Claims pursuant to that certain junior lien pledge agreement, dated as of April 25, 2011 (as may be amended, restated or supplemented); and (iii) indenture trustee with respect to certain EFIH First Lien Note Claims; (d) Wilmington Savings Fund Society, FSB, in its capacity as indenture trustee with respect to certain TCEH Second Lien Note Claims; (e) Law Debenture Trust Company of New York, in its capacity as indenture trustee with respect to certain TCEH Unsecured Note Claims; and (f) UMB Bank, N.A., in its capacity as: (i) indenture trustee with respect to certain EFIH Senior Toggle Note Claims pursuant to the EFIH Senior Toggle Note Indenture; and (ii) indenture trustee with respect to certain EFIH Unexchanged Note Claims pursuant to the EFIH Unexchanged Note Indenture.

7

Creditor may, after notifying counsel to the Debtors in accordance with Section 11.11(a), exercise such right or remedy.

(b)     The foregoing sub-clause (a) of this Section 4 will not limit any of the following Consenting Creditor rights, to the extent consistent with this Agreement:

(i)     to appear and participate as a party in interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and do not hinder, delay, or prevent consummation of the Restructuring Transactions;

(ii)     under any applicable credit agreement, indenture, other loan document or applicable law; or

(iii)     to take or direct any action relating to maintenance, protection, or preservation of any collateral.

(c)     (i) It shall not be a violation of this Agreement, and no Restructuring Support Party will assert that it is an "Event of Default" under the TCEH Cash Collateral Order, if the Ad Hoc TCEH Committee or any of its members, within the Challenge Period (as defined in the TCEH Cash Collateral Order), seeks standing to commence, and if granted standing, assert and prosecute any Claims, objections or other Causes of Action relating to the validity, allowability, enforceability, priority, avoidance, or subordination of the TCEH 2012 Incremental Term Loans or the liens and security interests that secure the TCEH 2012 Incremental Term Loans (other than against the holders of EFH Interests, the Debtors' directors, the Debtors' officers, and each of their respective affiliates), and (ii) if any Consenting Creditor(s) (or the Claims beneficially held by such Consenting Creditor) or Consenting Interest Holder(s) becomes the subject of any Cause of Action commenced, or for which court authority is requested to commence, including in respect of any Cause of Action set forth in clause (i) above, by any other person in connection with these Chapter 11 Cases or related to the Debtors, then such Consenting Creditors or Consenting Interest Holder(s) shall be entitled to assert (or seek authority to assert) and prosecute any and all defenses, counterclaims, cross-complaints, cross-claims, and other claims relating in any way to such Cause of Action (other than against the holders of EFH Interests, the Debtors' directors, the Debtors' officers, and each of their respective affiliates) (such Claims, objections, or other Causes of Action described in this Section 4.01(c), a "**Permitted Cause of Action**").

4.02.     Commitment of the Consenting Interest Holders.

(a)     During the Effective Period, each of the Consenting Interest Holders agrees that it shall not, directly or indirectly, (i) object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions or (ii) propose, file, support, or vote for any restructuring, workout, plan of arrangement, or plan of reorganization for the Debtors other than the Restructuring Transactions.

(b)     Each Consenting Interest Holder agrees to (i) support and take all necessary steps to effectuate the Restructuring Transactions, including timely providing all requisite consents and approvals as required in order for the Debtors to file for relief under chapter 11 of the Bankruptcy Code under that certain Amended and Restated Limited Liability Company

Agreement of Texas Energy Future Capital Holdings LLC, dated as of October 10, 2007, by and among the parties thereto and (ii)(A) to the extent it is entitled to accept or reject the Plan pursuant to its terms that it shall, subject to the receipt by such Consenting Interest Holder of the Disclosure Statement and the Solicitation Materials, in each case, approved by the Bankruptcy Court as containing "adequate information" as such term is defined in section 1125 of the Bankruptcy Code, vote to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation and its actual receipt of the Solicitation Materials and ballot, and (B) not change or withdraw (or cause to be changed or withdrawn) such vote.

(c)     The foregoing sub-clause (a) and sub-clause (b) of this Section 4.02 will not limit any Consenting Interest Holder's rights to appear and participate as a party in interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are not inconsistent with the Restructuring Transactions and do not hinder, delay, or prevent consummation of the Restructuring Transactions.

4.03.    Commitment of the Debtors.

(a)     During the Effective Period and thereafter as required pursuant to clause (viii) below, the Debtors shall:  (i) take all steps necessary or desirable to obtain orders of the Bankruptcy Court in respect of the Restructuring Transactions, including obtaining entry of the Confirmation Order; (ii) support and take all steps reasonably necessary or desirable to consummate the Restructuring Transactions in accordance with this Agreement, including the preparation and filing within the time-frame provided herein of the Plan Restructuring Documents; (iii) execute and deliver any other required agreements to effectuate and consummate the Restructuring Transactions; (iv) obtain any and all required regulatory and/or third-party approvals for the Restructuring Transactions; (v) complete the Restructuring Transactions within the time-frame provided herein; (vi) operate their business in the ordinary course, taking into account the Restructuring Transactions; (vii) not object to, delay, impede, or take any other action that is materially inconsistent with, or is intended or is likely to interfere in a material way with acceptance or implementation of the Restructuring Transactions; (viii) report income items to Consenting Creditors in a manner consistent with past practice; and (ix) file the Trading Motion at a time to be mutually agreed upon by the Debtors and the Required Consenting Creditors.

(b)     The Debtors represent and warrant to the Consenting Creditors and the Consenting Interest Holders that there are no pending agreements (oral or written) or understandings, with respect to any plan of reorganization or liquidation, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets or equity interests or restructuring (other than the Restructuring Transactions) involving the Debtors, or any of their assets, properties or businesses (an "**Alternative Proposal**").  If the Debtors make or receive a written proposal or expression of interest regarding an Alternative Proposal, the Debtors shall promptly notify counsel to the Consenting Creditors and the Consenting Interest Holders of the receipt of any such proposal or expression of interest relating to an Alternative Proposal, with such notice to include the material terms thereof, including (unless prohibited by a separate agreement) the identity of the person or group of persons involved.  The Debtors shall promptly furnish counsel

9

to the Consenting Creditors and the Consenting Interest Holders with copies of any written offer or other information that they make or receive relating to an Alternative Proposal and shall keep counsel to the Consenting Creditors and the Consenting Interest Holders fully informed of any material changes to such Alternative Proposal. The Debtors shall not enter into any confidentiality agreement with a party proposing an Alternative Proposal unless such party consents to identifying and providing to counsel to the Consenting Creditors and the Consenting Interest Holders (under a reasonably acceptable confidentiality agreement) the information contemplated under this Section 4.03(b).

(c)    Notwithstanding anything to the contrary herein, nothing in this Agreement shall require the board of directors, board of managers, or such similar governing body of a Debtor to take any action, or to refrain from taking any action, with respect to the Restructuring Transactions to the extent such board of directors, board of managers, or such similar governing body determines, based on the advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law.

4.04.    Transfer of Interests and Securities.

(a)    During the Effective Period, no Consenting Interest Holder or Consenting Creditor shall sell, use, pledge, assign, transfer, permit the participation in, or otherwise dispose of (each, a "**Transfer**") any ownership (including any beneficial ownership)[6] in the Debtor Claims/Interests unless it satisfies all of the following requirements (a transferee that satisfies such requirements, a "**Permitted Transferee**," and such Transfer, a "**Permitted Transfer**"):

(i)    the intended transferee executes and delivers to counsel to the Debtors on the terms set forth below an executed form of the transfer agreement in the form attached hereto as **Exhibit D** (a "**Transfer Agreement**") before such Transfer is effective (it being understood that any Transfer shall not be effective as against the Debtors until notification of such Transfer and a copy of the executed Transfer Agreement is received by counsel to the Debtors, in each case, on the terms set forth herein); and

(ii)    the intended transferee, the intended transferee's affiliates, and/or any unaffiliated third-party in which the intended transferee has a beneficial ownership, or any group of persons acting pursuant to a plan or arrangement as described in Treasury Regulation Section 1.355-6(c)(4) (provided, however, that for purposes of this Section 4.04(a)(ii), none of the Consenting Interest Holders or Consenting Creditors will be treated as acting pursuant to a plan or arrangement as a result of participating in the Plan and Restructuring Transactions), will not, after giving effect to such Transfer, (A) have beneficial ownership of, in the aggregate, fifty percent (50%) or more of TCEH First Lien Claims, EFIH Second Lien DIP Claims, or the Texas Holdings Interests or TEF Interests or (B) have, assuming the Restructuring Transactions were to be consummated immediately upon such Transfer, beneficial ownership of, in the aggregate,

---

[6]    As used herein, the term "**beneficial ownership**" means the direct or indirect economic ownership of, and/or the power, whether by contract or otherwise, to direct the exercise of the voting rights and the disposition of, the Debtor Claims/Interests or the right to acquire such Claims or Interests.

fifty percent (50%) or more of the Reorganized TCEH Common Stock, the Reorganized EFH Common Stock, or the Texas Holdings Interests or TEF Interests.

(b)    [Reserved.]

(c)    Notwithstanding anything to the contrary herein, (i) the foregoing provisions shall not preclude any Consenting Creditor from settling or delivering securities or bank debt to settle any confirmed transaction pending as of the date of such Consenting Creditor's entry into this Agreement (subject to compliance with applicable securities laws and it being understood that such Debtor Claims/Interests so acquired and held (i.e., not as a part of a short transaction) shall be subject to the terms of this Agreement), and (ii) a Qualified Marketmaker[7] (as defined below) that acquires any of the Debtor Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Debtors Claims/Interests, shall not be required to execute and deliver to counsel a Transfer Agreement or otherwise agree to be bound by the terms and conditions set forth in this Agreement if such Qualified Marketmaker transfers such Debtor Claims/Interests (by purchase, sale, assignment, participation, or otherwise) within five (5) business days of its acquisition to a Consenting Interest Holder, Consenting Creditor, or Permitted Transferee (including, for the avoidance of doubt, the requirement that such transferee execute a Transfer Agreement) and the transfer otherwise is a Permitted Transfer.

(d)    This Agreement shall in no way be construed to preclude the Consenting Interest Holders or Consenting Creditors from acquiring additional Debtor Claims/Interests; provided, however, that (i) any Consenting Interest Holder or Consenting Creditor that acquires additional Debtor Claims/Interests, as applicable, after the Agreement Effective Date shall promptly notify the Debtors of such acquisition including the amount of such acquisition and (ii) such acquired Debtor Claims/Interests shall automatically and immediately upon acquisition by a Consenting Creditor or Consenting Interest Holder, as applicable, be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to the Debtors).

(e)    This Section 4.04 shall not impose any obligation on any Debtor to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Interest Holder or Consenting Creditor to Transfer any Debtor Claims/Interests. Notwithstanding anything to the contrary herein, to the extent the Debtors and another Party have entered into a separate agreement with respect to the issuance of a "cleansing letter" or other public disclosure of information in connection with any proposed Restructuring Transactions (each such executed agreement, a "**Confidentiality Agreement**"), the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms.

---

[7]    As used herein, the term "**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers claims of the Debtors (or enter with customers into long and short positions in claims against the Debtors), in its capacity as a dealer or market maker in claims against the Debtors and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

11

(f)     Notwithstanding anything to the contrary herein:  (i) following the funding in full of the EFIH First Lien DIP Financing, the Transfer of EFIH First Lien DIP Claims shall not be subject to this Section 4.04, but shall be subject only to the definitive documentation governing the EFIH First Lien DIP Financing; and (ii) each Consenting Non-Fidelity EFIH First Lien Noteholder and any funds managed by each Consenting Non-Fidelity EFIH First Lien Noteholder shall be bound by the transfer restrictions in this Section 4.04 only in respect of their EFIH First Lien Note Claims.

(g)     Any Transfer made in violation of this Sections 4.04 shall be void *ab initio*.  Any Consenting Interest Holder or Consenting Creditor that effectuates a Permitted Transfer to a Permitted Transferee shall have no liability under this Agreement arising from or related to the failure of the Permitted Transferee to comply with the terms of this Agreement.

4.05.    <u>Representations and Warranties of Consenting Interest Holders and Consenting Creditors</u>.  Each Consenting Creditor and Consenting Interest Holder, severally, and not jointly, represents and warrants that:

(a)     it is the beneficial owner of the face amount of the Debtor Claims/Interests, or is the nominee, investment manager, or advisor for beneficial holders of the Debtor Claims/Interests, as reflected in such Consenting Creditor's and/or Consenting Interest Holder's signature block to this Agreement, which amount each Party understands and acknowledges is proprietary and confidential to such Consenting Creditor and/or Consenting Interest Holder (such Debtor Claims/Interests, the "**Owned Debtor Claims/Interests**");

(b)     other than with respect to a Consenting Non-Fidelity EFIH First Lien Noteholder, it will not beneficially or legally own, either directly or indirectly through its affiliates (but excluding any affiliates that are subject to an internal ethical wall or screen), any unaffiliated third parties in which it may hold a direct or indirect beneficial interest, or as part of any group of persons acting pursuant to a plan or arrangement as described in Treasury Regulation Section 1.355-6(c)(4), provided, however, that for purposes of this Section 4.04(a)(ii), none of the Consenting Interest Holders or Consenting Creditors will be treated as acting pursuant to a plan or arrangement as a result of participating in the Plan and Restructuring Transactions), in the aggregate, fifty percent (50%) or more of (A) TCEH First Lien Claims, EFIH Second Lien DIP Claims, or the Texas Holdings Interests or TEF Interests or (B) the Reorganized TCEH Common Stock, the Reorganized EFH Common Stock, or the Texas Holdings Interests or TEF Interests;

(c)     it has the full power and authority to act on behalf of, vote and consent to matters concerning the Owned Debtor Claims/Interests;

(d)     the Owned Debtor Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Creditor's or Consenting Interest Holder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(e)     (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act or (B) an institutional accredited investor (as defined in Rule 501(a)(1), (2), (3), or

(7) under the Securities Act of 1933, as amended (the "**Securities Act**") (C) a Regulation S non-U.S. person or (D) the foreign equivalent of (A) or (B) above, and (ii) any securities of any Debtor acquired by the applicable Consenting Creditor or Consenting Interest Holder in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act; and

(f)      as of the date hereof, it has no actual knowledge of any event that, due to any fiduciary or similar duty to any other person or entity, would prevent it from taking any action required of it under this Agreement.

**Section 5.**      *Mutual Representations, Warranties, and Covenants*.  Each of the Parties represents, warrants, and covenants to each other Party:

5.01.   Enforceability.  It is validly existing and in good standing under the laws of the state of its organization, and this Agreement (and, to the extent applicable, the Commitment Letter) is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

5.02.   No Consent or Approval.  Except as expressly provided in this Agreement, the Plan, the Term Sheet, the Commitment Letter, or the Bankruptcy Code, no consent or approval is required by any other person or entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform the respective obligations under, this Agreement (and, to the extent applicable, the Commitment Letter).

5.03.   Power and Authority.  Except as expressly provided in this Agreement, it has all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement (and, to the extent applicable, the Commitment Letter) and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement (and, to the extent applicable, the Commitment Letter).

5.04.   Governmental Consents.  Except as expressly set forth herein and with respect to the Debtors' performance of this Agreement (and subject to necessary Bankruptcy Court approval and/or regulatory approvals associated with the Restructuring Transactions), the execution, delivery and performance by it of this Agreement does not, and shall not, require any registration or filing with consent or approval of, or notice to, or other action to, with or by, any federal, state, or other governmental authority or regulatory body.

5.05.   No Conflicts.  The execution, delivery, and performance of this Agreement does not and shall not:  (a) violate any provision of law, rules or regulations applicable to it or any of its subsidiaries in any material respect; (b) violate its certificate of incorporation, bylaws, or other organizational documents or those of any of its subsidiaries; or (c) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any contractual obligation to which it is a party, which conflict, breach, or default, would have a material adverse effect on the Restructuring Transactions.

**Section 6.**      *Acknowledgement*.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes

for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. Any such offer or solicitation will be made only in compliance with all applicable securities laws and provisions of the Bankruptcy Code. The Debtors will not solicit acceptances of any Plan from Consenting Creditors or Consenting Interest Holders in any manner inconsistent with the Bankruptcy Code or applicable bankruptcy law.

**Section 7.**     *Certain Additional Chapter 11 Matters.*

7.01.   The Required Consenting Creditors shall have reviewed, commented on, and consented to the first-day pleadings identified on **Schedule 3** attached hereto (the "**First Day Pleadings**"). Additionally, during the Effective Period, the Debtors will use reasonable efforts to provide:  (i) draft copies of all material motions, pleadings and other documents other than the First Day Pleadings (including the IRS Submissions) that the Debtors intend to file with any court or regulatory body (including, the Bankruptcy Court and the IRS) relating to the Chapter 11 Cases or the Restructuring Transactions to counsel to the Consenting Interest Holders and counsel to the Consenting Creditors at least two (2) business days before the date on which Debtors intend to file any such document; and (ii) copies of all documents actually filed by the Debtors with any court or regulatory body (including the Bankruptcy Court and the IRS) relating to the Chapter 11 Cases or the Restructuring Transactions to counsel to the Consenting Interest Holders and counsel to the Consenting Creditors promptly but not later than two (2) business days after such motions, pleadings, and other documents are filed; provided, however, that the Debtors will provide draft copies of all Plan Restructuring Documents to the Required Consenting Creditors three (3) business days before the date on which the Debtors intend to file such documents. To the extent such documents do not constitute Plan Restructuring Documents (which shall be consistent with Section 3), the Debtors shall consult in good faith with counsel to the Restructuring Support Parties regarding the form and substance of those documents.

7.02.   The Commitment Parties shall coordinate with Oncor Electric Delivery to obtain any necessary regulatory approvals from the Public Utility Commission of Texas related to the change in equity ownership at EFH ("**PUC Regulatory Approval**"). EFH and EFIH shall cooperate as reasonably necessary to obtain the PUC Regulatory Approval; provided, however, that the TCEH Debtors shall not have any obligation to participate in the process to obtain the PUC Regulatory Approval or agree to any conditions affecting the TCEH Debtors; provided, further, that EFH, EFIH, and the Commitment Parties agree to use commercially reasonable efforts to obtain a preliminary order from the PUC limiting the scope of the PUC Regulatory Approval proceeding to issues related to Oncor and the change in equity ownership at EFH and excluding consideration of any issues relating to the TCEH Debtors.

**Section 8.**     *Termination Events.*

8.01.   Shared Consenting Creditor Termination Events.  This Agreement may be terminated as between: (a) the Consenting TCEH First Lien Creditors and the other Parties, (b) the Consenting Fidelity EFIH First Lien Noteholders and the other Parties, (c) the Consenting EFIH Second Lien Noteholders and the other Parties, (d) the Consenting EFH Unsecured Noteholders and the other Parties, or (e) the Consenting EFIH Unsecured Noteholders and the other Parties, in each case, by the delivery to the Debtors, counsel to the Consenting Interest Holders, and counsel to the other Consenting Creditors, other than the Consenting Creditors

14

seeking to terminate this Agreement pursuant to this Section 8.01 (such Consenting Creditors, the "**Terminating Consenting Creditors**") of a written notice in accordance with Section 11.11 hereof by, as applicable:  (i) the Consenting Ad Hoc TCEH Committee; (ii) Consenting Creditors holding at least 50.1% in principal amount of the aggregate amount of the EFIH First Lien Note Claims held by the Consenting Creditors at such time; (iii) Consenting Creditors holding at least 50.1% in principal amount of the aggregate amount of the EFIH Second Lien Note Claims held by the Consenting Creditors at such time; (iv) Consenting Creditors holding at least 50.1% in principal amount of the aggregate amount of the EFH Unsecured Notes Claims held by the Consenting Creditors at such time; or (v) the Required EFIH Unsecured Consenting Creditors, in each case, in the exercise of their discretion, upon the occurrence and continuation of any of the following events:

(a)    the Debtors shall not have commenced the Chapter 11 Cases on or before April 29, 2014;

(b)    the Debtors shall not have filed the RSA Assumption Motion with the Bankruptcy Court on or before the date that is seven (7) days from the Petition Date;

(c)    the Bankruptcy Court shall not have entered the RSA Assumption Order on or before the date that is forty-five (45) days from the Petition Date;

(d)    the Debtors shall not have submitted the Ruling Request in respect of the Private Letter Ruling (which shall, among other things, request the Required Rulings) or filed the Plan and Disclosure Statement with the Bankruptcy Court on or before the date that is forty-five (45) days from the Petition Date;

(e)    the Bankruptcy Court shall not have entered the Disclosure Statement Order on or before the date that is one-hundred and five (105) days from the Petition Date;

(f)    the Bankruptcy Court shall not have entered the Confirmation Order on or before the date that is two-hundred and seventy-five (275) days from the Petition Date;

(g)    the IRS shall not have issued a Private Letter Ruling acceptable to the Required Consenting Creditors on or prior to the Extended Outside Date;

(h)    the Bankruptcy Court otherwise grants relief that would have a material adverse effect on the Restructuring Transactions;

(i)    the effective date of the Plan (the "**Plan Effective Date**") shall not have occurred on or before the date that is thirty (30) days after the date that the Bankruptcy Court enters the Confirmation Order (the "**Initial Outside Date**"), it being understood that if all conditions to the Plan Effective Date other than receipt of any applicable regulatory approvals required to consummate the Plan and/or the Private Letter Ruling have been satisfied on or before the Initial Outside Date, the Initial Outside Date shall be automatically extended by an additional thirty (30) days (such extended date, the "**Extended Outside Date**");

(j)      the IRS shall have denied the Debtors' Ruling Request or shall have informed the Debtors or their counsel, whether orally or in writing, of its decision not to issue one or more of the Required Rulings;

(k)      the breach by any Party other than the Terminating Consenting Creditors of any of the representations, warranties, or covenants of such breaching Party as set forth in this Agreement that would have a material adverse effect on the Restructuring Transactions or the recovery of any Consenting Creditor; provided, however, (i) that such Terminating Consenting Creditors shall transmit a notice to the Debtors, counsel to the Consenting Interest Holders and counsel to the other Consenting Creditors pursuant to Section 11.11 hereof, detailing any such breach and (ii) any other Consenting Creditor may transmit a notice to any Party detailing a breach (while providing copies of such notice pursuant to Section 11.11 hereof) and, in either case,, if such breach is capable of being cured, the breaching Party shall have twenty (20) business days after receiving such notice to cure any breach;

(l)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any injunction, judgment, decree, charge, ruling or order enjoining, the consummation of a material portion of the Restructuring Transactions or materially impacting the recovery of any Consenting Creditor; provided, however, that the Debtors shall have ten (10) business days after issuance of such injunction, judgment, decree, charge, ruling or order to obtain relief that would allow consummation of the Restructuring Transactions that (i) does not prevent or diminish in a material way compliance with the terms of this Agreement or (ii) is otherwise reasonably acceptable to the Required Consenting Creditors;

(m)      an examiner (with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code), or a trustee or receiver shall have been appointed in one or more of the Chapter 11 Cases;

(n)      any Party other than the Terminating Consenting Creditors files any motion or pleading with the Bankruptcy Court that is not consistent in any material respect with this Agreement and such motion or pleading has not been withdrawn or is not otherwise denied by the Bankruptcy Court within twenty (20) business days of receipt of notice by such party that such motion or pleading is inconsistent with this Agreement;

(o)      the termination of this Agreement by (i)(a) the Consenting TCEH First Lien Creditors, (b) the Consenting EFH Unsecured Noteholders, (c) the Consenting EFIH Unsecured Noteholders, or (d) the Consenting Interest Holders or (ii)(a) the Consenting Fidelity EFIH First Lien Noteholders or (b) the Consenting EFIH Second Lien Noteholders, provided, however, solely with respect to subsection (ii) hereof, only to the extent Fidelity does not agree to remain bound to the terms of this Agreement and/or does not subsequently agree to re-execute this Agreement;

(p)      the entry of a ruling or order by the Bankruptcy Court or any other court with appropriate jurisdiction which, in each case, would have the effect of preventing consummation of the Restructuring Transactions or materially impacting the recovery of any Consenting Creditor; provided, however, that the Debtors shall have ten (10) business days after issuance of such ruling or order to obtain relief that would (i) allow consummation of a material portion of

16

the Restructuring Transactions, (ii)remedy the recovery of such Consenting Creditor in a manner that does not prevent or diminish in a material way compliance with the terms of this Agreement, or (iii) is otherwise reasonably acceptable to the Required Consenting Creditors;

(q)     the (i) conversion of one or more of the Chapter 11 Cases of EFH, EFIH, TCEH, EFCH or any Debtor entity obligated under the TCEH First Lien Secured Claims, TCEH Second Lien Note Claims, EFIH First Lien Note Claims, EFIH Second Lien Note Claims, EFIH Unsecured Note Claims, or EFH Unsecured Note Claims to a case under chapter 7 of the Bankruptcy Code or (ii) dismissal of one or more of the Chapter 11 Cases of EFH, EFIH, TCEH, EFCH or any Debtor entity obligated under the TCEH First Lien Secured Claims, TCEH Second Lien Note Claims, EFIH First Lien Note Claims, EFIH Second Lien Note Claims, EFIH Unsecured Note Claims, or EFH Unsecured Note Claims unless such conversion or dismissal, as applicable, is made with the prior written consent of counsel to the Required Consenting Creditors;

(r)     any of the Plan Restructuring Documents shall have been modified in any material respect or withdrawn, without the prior written consent of the Required Consenting Creditors, subject to Section 3; or

(s)     the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any material assets of the Debtors that would have a material adverse effect on the Restructuring Transactions, without the prior written consent of the Required Consenting Creditors.

8.02.     <u>EFIH Unsecured Noteholder, EFIH First Lien Noteholder, EFIH Second Lien Noteholder, and EFH Unsecured Noteholder Termination Events</u>. This Agreement may be terminated as between (a) the Consenting EFIH Unsecured Noteholders and the other Parties, (b) the Consenting Fidelity EFIH First Lien Noteholders and the other Parties, (c) the Consenting EFIH Second Lien Noteholders and the other Parties, and (d) the Consenting EFH Unsecured Creditors and the other Parties by the delivery to the Debtors, counsel to the Consenting Interest Holders, and counsel to the other Consenting Creditors, of a written notice in accordance with Section 11.11 hereof by, as applicable: (i) Consenting Creditors holding at least 50.1% in principal amount of the aggregate amount of the EFIH First Lien Note Claims held by the Consenting Creditors at such time; (ii) Consenting Creditors holding at least 50.1% in principal amount of the aggregate amount of the EFIH Second Lien Note Claims held by the Consenting Creditors at such time; (iii) Consenting Creditors holding at least 50.1% in principal amount of the aggregate amount of the EFH Unsecured Note Claims held by the Consenting Creditors at such time; or (iv) the Required EFIH Unsecured Consenting Creditors, in each case, in the exercise of their discretion, upon the occurrence and continuation of any of the following events:

(a)     the Debtors have not filed each of the EFIH First Lien DIP Motion, the EFIH Second Lien DIP Motion, and the Approval Motion on or before the date that is fourteen (14) days from the Petition Date;

(b)     the Bankruptcy Court shall not have entered each of the Approval Order, the order approving the EFIH First Lien DIP Motion (the "**<u>EFIH First Lien DIP Order</u>**"), and an order approving the EFIH Second Lien DIP Motion (the "**<u>EFIH Second Lien DIP Order</u>**") on or

before the date that is seventy-five (75) days from the Petition Date (it being understood that the Debtors will use commercially reasonable efforts to obtain entry of the EFIH First Lien DIP Order and the EFIH Second Lien DIP Order on or before the date that is forty-five (45) days from the Petition Date);

(c)    the Debtors shall not have consummated each of (i) the EFIH First Lien DIP Financing, (ii) the EFIH Second Lien DIP Financing, and (iii) the transactions and settlements contemplated by the Approval Order on or before the date that is five (5) business days after the date the EFIH First Lien DIP Order, the EFIH Second Lien DIP Order, and the Approval Order, as applicable, is entered; or

(d)    either the Commitment Letter or the Conversion Agreement is terminated according to its terms prior to consummation of the transactions contemplated therein.

8.03.    <u>Consenting TCEH First Lien Holders' Termination Events</u>.  This Agreement may be terminated as between the Consenting TCEH First Lien Creditors and the other Parties by the delivery to the Debtors, counsel to the Consenting Interest Holders, and counsel to the other Consenting Creditors other than the Terminating Consenting Creditors of a written notice in accordance with Section 11.11 hereof by the Consenting Ad Hoc TCEH Committee, in the exercise of their sole discretion, upon the occurrence and continuation of any of an "Event of Default" under the TCEH Cash Collateral Order.

8.04.    <u>Consenting Non-Fidelity EFIH First Lien Noteholders</u>.  This Agreement may be terminated as between a Consenting Non-Fidelity EFIH First Lien Noteholder and the Debtors by the delivery to the Debtors of a written notice in accordance with Section 11.11 hereof by such terminating Consenting Non-Fidelity EFIH First Lien Noteholder, in the exercise of its discretion, upon the occurrence and continuation of any of the following events:

(a)    the Debtors have not filed each of the EFIH First Lien DIP Motion and the Approval Motion on or before the date that is fourteen (14) days from the Petition Date;

(b)    the Bankruptcy Court shall not have entered each of the Approval Order and the EFIH First Lien DIP Order on or before the date that is seventy-five (75) days from the Petition Date;

(c)    the Debtors shall not have consummated each of (i) the EFIH First Lien DIP Financing, (ii) the transactions and settlements contemplated by the Approval Order on or before the date that is five (5) business days after the date the EFIH First Lien DIP Order and the Approval Order, as applicable, is entered;

(d)    the Bankruptcy Court otherwise grants relief on a final basis that would have a material adverse effect on the Restructuring Transactions;

(e)    the Plan Effective Date shall not have occurred on or before the Initial Outside Date, it being understood that if all conditions to the Plan Effective Date other than receipt of any applicable regulatory approvals required to consummate the Plan and/or the Private Letter Ruling have been satisfied or are capable of being satisfied on or before the Initial Outside Date, the Initial Outside Date shall be automatically extended to the Extended Outside Date;

(f)     the breach by any Party other than the Terminating Consenting Creditors of any of the representations, warranties, or covenants of such breaching Party as set forth in this Agreement that would have a material adverse effect on the Restructuring Transactions or the recovery of any Consenting Creditor; provided, however, (i) that such Terminating Consenting Creditors shall transmit a notice to the Debtors, counsel to the Consenting Interest Holders and counsel to the other Consenting Creditors pursuant to Section 11.11 hereof, detailing any such breach and (ii) any other Consenting Creditor may transmit a notice to any Party detailing a breach (while providing copies of such notice pursuant to Section 11.11 hereof) and, in either case,, if such breach is capable of being cured, the breaching Party shall have twenty (20) business days after receiving such notice to cure any breach;

(g)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any injunction, judgment, decree, charge, ruling or order enjoining, the consummation of a material portion of the Restructuring Transactions; provided, however, that the Debtors shall have ten (10) business days after issuance of such injunction, judgment, decree, charge, ruling or order to obtain relief that would allow consummation of the Restructuring Transactions that (i) does not prevent or diminish in a material way compliance with the terms of this Agreement or (ii) is otherwise reasonably acceptable to the applicable Consenting Non-Fidelity EFIH First Lien Noteholder(s);

(h)     an examiner (with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code), or a trustee or receiver shall have been appointed in one or more of the Chapter 11 Cases;

(i)     any Party other than the Terminating Consenting Creditors files any motion or pleading with the Bankruptcy Court that is not consistent in any material respect with this Agreement and such motion or pleading has not been withdrawn or is not otherwise denied by the Bankruptcy Court within twenty (20) business days of receipt of notice by such party that such motion or pleading is inconsistent with this Agreement; or

(j)     the entry of a ruling or order by the Bankruptcy Court or any other court with appropriate jurisdiction which, in each case, would have the effect of preventing consummation of the Restructuring Transactions or materially impacting the recovery of any Consenting Non-Fidelity EFIH First Noteholder ; provided, however, that the Debtors shall have ten (10) business days after issuance of such ruling or order to obtain relief that would (i) allow consummation of a material portion of the Restructuring Transactions, (ii) remedy the recovery of such Consenting Non-Fidelity EFIH First Lien Noteholder in a manner that does not prevent or diminish in a material way compliance with the terms of this Agreement, or (iii) is otherwise reasonably acceptable to the applicable Consenting Non-Fidelity EFIH First Lien Noteholder(s).

8.05.    Consenting Interest Holders Termination Events.    This Agreement may be terminated as between the Consenting Interest Holders and the other Parties by the delivery to the Debtors and counsel to the Consenting Creditors, of a written notice in accordance with Section 11.11 hereof by all of the undersigned holders of the Texas Holdings Interests and the TEF Interests, in the exercise of their discretion, upon the occurrence and continuation of any of the following events:

(a)    the Debtors shall not have commenced the Chapter 11 Cases on or before April 29, 2014;

(b)    the Plan Effective Date shall not have occurred by the Initial Outside Date or the Extended Outside Date, as applicable;

(c)    the breach by the Debtors of any of the representations, warranties, or covenants of the Debtors set forth in this Agreement that would have a material adverse effect on the Restructuring Transactions; provided, however, that (i) the Debtors shall undertake commercially reasonable efforts to provide the Consenting Interest Holders with prompt written notice of the occurrence of such breach and (ii) the Consenting Interest Holders may transmit a notice to the Debtor (detailing a breach (while providing copies of such notice to the Consenting Creditors pursuant to Section 11.11 hereof) and, in either case, if such breach is capable of being cured, the Debtors shall have ten (10) business days after the date of providing or receiving notice, as applicable, to cure any breach; or

(d)    the (i) conversion of one or more of the Chapter 11 Cases of EFH, EFIH, TCEH, EFCH or any Debtor entity obligated under the TCEH First Lien Secured Claims, TCEH Second Lien Note Claims, EFIH First Lien Note Claims, or EFIH Second Lien Note Claims to a case under chapter 7 of the Bankruptcy Code or (ii) dismissal of one or more of the Chapter 11 Cases of EFH, EFIH, TCEH, EFCH or any Debtor entity obligated under the TCEH First Lien Secured Claims, TCEH Second Lien Note Claims, EFIH First Lien Note Claims, or EFIH Second Lien Claims, unless such conversion or dismissal, as applicable, is made with the prior written consent of counsel to the Consenting Interest Holders.

8.06.    Debtors' Termination Events.    Any Debtor may terminate this Agreement as to all Parties upon five (5) business days' prior written notice, delivered in accordance with Section 11.11 hereof, upon the occurrence of any of the following events:  (a) the Plan Effective Date shall not have occurred by the Initial Outside Date or the Extended Outside Date, as applicable; (b) the breach by any of the Restructuring Support Parties of any material provision set forth in this Agreement that remains uncured for a period of fifteen (15) business days after the receipt by the Restructuring Support Parties of notice of such breach; (c) the board of directors, board of managers, or such similar governing body of any Debtor determines based on advice of counsel that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties; or (d) the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order enjoining the consummation of a material portion of the Restructuring Transactions.

8.07. <u>Mutual Termination</u>. This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual agreement among all of the following: (a) each of the Consenting Interest Holders; (b) the Consenting Ad Hoc TCEH Committee; (c) Consenting Fidelity EFIH First Lien Noteholders holding at least 50.1% in principal amount of the aggregate amount of the EFIH First Lien Note Claims held by the Consenting Fidelity EFIH First Lien Noteholders at such time; (d) Consenting Creditors holding at least 50.1% in principal amount of the aggregate amount of the EFIH Second Lien Note Claims held by all Consenting Creditors at such time; (e) Consenting Creditors holding at least 50.1% in principal amount of the aggregate amount of the EFH Unsecured Note Claims held by the Consenting Creditors at such time; (f) the Required EFIH Unsecured Consenting Creditors; and (g) each of the Debtors.

8.08. <u>Termination Upon Completion of the Restructuring Transactions</u>. This Agreement shall terminate automatically without any further required action or notice on the Plan Effective Date.

8.09. <u>Individual Consenting Creditor Termination</u>. Notwithstanding anything to the contrary herein:

(a)     If the Plan Effective Date does not occur by the earlier of (1) the Extended Outside Date and (2) three hundred thirty-five (335) days from the Petition Date, then each Consenting Creditor may terminate its rights and obligations under this Agreement without affecting the other Parties' rights and obligations by providing notice of the same in accordance with Section 11.11 hereof.

(b)     If there are any changes to the terms of the TCEH Cash Collateral Order that have a material, disproportionate (as compared to other Consenting Creditors holding Claims within the same Class as provided for in the Term Sheet) and adverse effect on a Consenting Creditor without such Consenting Creditor's prior written consent, then such Consenting Creditor may terminate its rights and obligations under this Agreement without affecting the other Parties' rights and obligations by providing notice of the same in accordance with Section 11.11 hereof.

(c)     If the Plan (as it may be modified, amended or supplemented) includes terms in respect of the TCEH Incremental 2012 Term Loans that provide for a material, disproportionate (as compared to other Consenting Creditors holding Claims within the same Class as provided for in the Term Sheet) and adverse effect on any Consenting Creditor that beneficially holds the TCEH Incremental 2012 Term Loans (including, without limitation, any disparate treatment with respect to the releases granted under the Plan), then such Consenting Creditor may terminate its rights and obligations under this Agreement without affecting the other Parties hereto by providing notice of the same in accordance with Section 11.11 hereof.

(d)     If any person commences, or obtains standing to commence, a Permitted Cause of Action against a Consenting Creditor (or with respect to Claims beneficially held by such Consenting Creditor), then such Consenting Creditor may terminate its rights and obligations under this Agreement without affecting the other Parties' rights and obligations by providing notice of the same in accordance with Section 11.11 hereof.

8.10.  <u>Fidelity Termination Events</u>.  This Agreement may be terminated as between Fidelity and all Parties by the delivery to the Debtors, counsel to the Consenting Interest Holders, and counsel to the other Consenting Creditors, of a written notice in accordance with Section 11.11 hereof by Fidelity with respect to all Debtor Claims/Interests that Fidelity holds at such time, in the exercise of its discretion, upon the occurrence and continuation of any of the following events; <u>provided</u>, <u>however</u>, Fidelity shall not have the right to terminate this Agreement pursuant to this Section 8.10 if the Commitment Parties exercise their Call Right within ten (10) days of Fidelity's exercise of a termination right under this Section 8.10:

(a)    on the date that is ten (10) business days prior to the first day of the hearing for the Bankruptcy Court to approve entry of the Disclosure Statement Order (the "**<u>Disclosure Statement Hearing</u>**"), if the Debtors have notified Fidelity and all other Parties at least fifteen (15) days prior to the Disclosure Statement Hearing that the Debtors have determined in good faith that the recovery for the EFH Non-Guaranteed Notes is expected to be less than 37.15% (such notification, the "**<u>EFH Minimum Recovery Notification</u>**"); and

(b)    on the date that is ten (10) business days prior to the first day of the hearing for the Bankruptcy Court to approve entry of the Confirmation Order (the "**<u>Confirmation Hearing</u>**"), if (i) the Debtors did not make the EFH Minimum Recovery Notification and (ii) Fidelity notifies all other Parties at least ten (10) business days prior to the first day of the Confirmation Hearing that Fidelity has determined in good faith that the recovery for the EFH Non-Guaranteed Notes is expected to be less than 37.15%.

8.11.  <u>Effect of Termination</u>.  No Party may terminate this Agreement if such Party failed to perform or comply in all material respects with the terms and conditions of this Agreement, with such failure to perform or comply causing, or resulting in, the occurrence of one or more termination events specified herein.  The date on which termination of this Agreement as to a Party is effective in accordance with Sections 8.01, 8.02, 8.03, 8.04, 8.05, 8.06, 8.07, 8.08, 8.09, and 8.10 shall be referred to as a "**<u>Termination Date</u>**".  Except as set forth below, upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement; <u>provided</u>, <u>however</u>, that the occurrence of a Termination Date as to a Party shall not affect the Debtors' obligations under Section 10 with respect to amounts accrued up to and including such Termination Date; <u>provided</u>, <u>further</u>, that Section 4.03(a)(viii) and Section 8.12 shall survive the termination of this Agreement.  Upon the occurrence of a Termination Date, any and all consents or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise.  Notwithstanding anything to the contrary in this Agreement or the Commitment Letter, the foregoing shall not be construed to prohibit the Debtors or any of the Restructuring Support Parties from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement or the Commitment Letter that arose or existed before a Termination Date.  Except as expressly provided in this

Agreement (including as set forth in Section 8.12) , nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Debtor or the ability of any Debtor to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Interest Holder or Consenting Creditor, and (b) any right of any Consenting Interest Holder or Consenting Creditor, or the ability of any Consenting Interest Holder or Consenting Creditor to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Debtor, Consenting Interest Holder, or Consenting Creditor.  Nothing in this Section 8.09 shall restrict any Debtor's right to terminate this Agreement in accordance with Section 8.06(c).

    8.12.   <u>No Violation of Automatic Stay</u>.  The automatic stay applicable under section 362 of the Bankruptcy Code shall not prohibit a Restructuring Support Party from taking any action necessary to effectuate the termination of this Agreement pursuant to the terms hereof.

**Section 9.**   *Amendments*.  This Agreement, including the Term Sheet and the Plan, may not be modified, amended, or supplemented in any manner except in writing signed by all of the following:  (a) the Consenting Interest Holders, (b) the Consenting Ad Hoc TCEH Committee; (c) Consenting Creditors holding at least 50.1% in principal amount of the aggregate amount of the EFH Unsecured Note Claims held at such time by the Consenting Creditors; (d) Consenting Fidelity EFIH First Lien Noteholders holding at least 50.1% in principal amount of the aggregate amount of the EFIH First Lien Note Claims held by all Consenting Fidelity First Lien Noteholders at such time; (e) Consenting Creditors holding at least 50.1% in principal amount of the aggregate of each of the EFIH Second Lien Note Claims at such time; (f) the Required EFIH Unsecured Consenting Creditors; (g) each applicable Consenting Non-Fidelity EFIH First Lien Noteholder(s); and (h) each of the Debtors; <u>provided</u>, <u>however</u>, that if the proposed modification, amendment or supplement has a material, disproportionate (as compared to other Consenting Creditors holding Claims within the same Class as provided for in the Term Sheet) and adverse effect on any of the Restructuring Support Parties or the Claims held by such Restructuring Support Parties (including any disparate treatment with respect to the releases granted under the Plan), then the consent of each such affected Restructuring Support Party shall also be required to effectuate such modification, amendment or supplement; <u>provided</u>, <u>further</u>, <u>however</u>, that Section 8.09 and Section 9 shall not be amended without the consent of each Consenting Creditor.  Any proposed modification, amendment, or supplement that is not approved by the requisite Parties as set forth above shall be ineffective and void *ab initio*.

**Section 10.**   *Fees and Expenses*.  Subject to Section 8.11, the Debtors shall pay or reimburse when due the following reasonable and documented professional fees and expenses:  (a)(i) one (1) primary counsel, one (1) local counsel, one (1) regulatory counsel, one (1) financial advisor, one (1) tax advisor, and one (1) technical and market advisor for, on a collective basis, all Consenting TCEH First Lien Creditors and (ii) the professionals identified on **<u>Schedule 2</u>** attached hereto, in each case, upon the Bankruptcy Court's entry of the RSA Assumption Order; (b) one (1) primary counsel, one (1) local counsel, one (1) regulatory counsel, one (1) tax advisor, and one (1) financial advisor for, on a collective basis, all Consenting EFIH Unsecured Noteholders, upon the Bankruptcy Court's entry of the earlier of the Approval Order and the RSA Assumption Order; (c) one (1) primary counsel, one (1) local counsel, one (1) regulatory counsel, and one (1) financial advisor for, on a collective basis, all Consenting EFH Unsecured Noteholders, Consenting Fidelity EFIH First Lien Noteholders (in connection with EFH

Unsecured Note Claims, EFIH First Lien Note Claims, and EFIH Second Lien Note Claims beneficially owned by Fidelity) upon the Bankruptcy Court's entry of the earlier of the Approval Order and the RSA Assumption Order; (d) one (1) primary counsel and one (1) local counsel for each of the Consenting Non-Fidelity EFIH First Lien Noteholders that are a Party as of the Agreement Effective Date; and (e) one (1) primary counsel, one (1) local counsel, one (1) regulatory counsel, and one (1) financial advisor for, on a collective basis, all Consenting Interest Holders upon the occurrence of the Plan Effective Date.  Additionally, EFIH may, in its reasonable discretion, pay the reasonable and documented fees and expenses of professionals retained by Consenting Non-Fidelity EFIH First Lien Noteholders that become a Party after the Agreement Effective Date.  Fees and expenses described in this Section 10 shall be allocated as described in the Term Sheet.

## Section 11.    *Miscellaneous*.

11.01.  <u>Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

11.02.  <u>Service on an Official Committee</u>.  Notwithstanding anything herein to the contrary, if an official committee is appointed in the Chapter 11 Cases and a Consenting Creditor is appointed to and serves on such official committee, then the terms of this Agreement shall not be construed to limit such Consenting Creditor's exercise of its fiduciary duties in its role as a member of such committee; <u>provided</u>, <u>however</u>, that serving as a member of such committee shall not relieve the Consenting Creditor of any obligations under this Agreement; <u>provided</u>, <u>further</u>, that nothing in the Agreement shall be construed as requiring any Consenting Creditor to serve on any official committee in these Chapter 11 Cases.

11.03.  <u>Complete Agreement</u>.  This Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto.

11.04.  <u>Headings</u>.  The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

11.05.  <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM; WAIVER OF TRIAL BY JURY</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF DELAWARE APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in either the United States District Court for the District of Delaware or any Delaware State court (the "**Chosen Courts**"), and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Chosen Courts; (b) waives any objection to laying venue in any such action or

proceeding in the Chosen Courts; and (c) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any Party hereto; provided, however, that if the Debtors commence the Chapter 11 Cases, then the Bankruptcy Court (or court of proper appellate jurisdiction) shall be the exclusive Chosen Court.

11.06. <u>Confidentiality; Disclosure</u>. The Debtors shall keep strictly confidential and shall not, without the prior written consent of the applicable Consenting Creditor, disclose publicly, or to any person (including any Restructuring Support Party) (a) the holdings of any Consenting Creditor, including the principal amount of TCEH First Lien Claims, EFIH Unsecured Note Claims, EFIH First Lien Note Claims, EFIH Second Lien Note Claims, and EFH Unsecured Note Claims and any other claims held against the applicable Debtor or (b) the identity of any Consenting Creditor or its controlled affiliates, officers, directors, managers, stockholders, members, employees, partners, representatives or agents as a party to this Agreement, in any public manner, including in the Solicitation Materials, the Plan, or any related press release; provided, however, that (x) the Debtors may disclose such names or amounts to the extent that, upon the advice of counsel, it is required to do so by any governmental or regulatory authority (including federal securities laws and regulations), in which case the Debtors, prior to making such disclosure, shall allow the Consenting Creditor to whom such disclosure relates reasonable time at its own cost to seek a protective order with respect to such disclosures, and (y) the Debtors may disclose the aggregate percentage or aggregate principal amount of (i) outstanding TEF Interests; (ii) outstanding Texas Holdings Interests; (iii) TCEH Credit Agreement Claims; (iv) TCEH First Lien Notes; (v) TCEH First Lien Commodity Hedges; (vi) TCEH First Lien Interest Rate Swaps; (vii) EFIH  First Lien Notes; (viii) EFIH Second Lien Notes; (ix) EFIH Unsecured Notes; and (x) EFH Unsecured Note Claims held by the Consenting Creditors (without naming such Consenting Creditors).  No Consenting Creditor or Consenting Interest Holder shall, without the prior written consent of the Debtors, make any public announcement or otherwise communicate (other than to decline to comment) with any person with respect to Restructuring Transactions or any of the transactions contemplated hereby or thereby, other than as may be required by applicable law and regulation or by any governmental or regulatory authority.  This Section 11.06 shall not apply with respect to any information that is or becomes available to the public other than as a result of a disclosure in violation of any Party's obligations under this Agreement.

11.07. <u>Trial by Jury Waiver</u>.  EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

11.08. <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

11.09. <u>Interpretation and Rules of Construction</u>.  This Agreement is the product of negotiations among the Debtors, the Consenting Interest Holders, and the Consenting Creditors,

and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Debtors, the Consenting Interest Holders, and the Consenting Creditors were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.  In addition, this Agreement shall be interpreted in accordance with section 102 of the Bankruptcy Code.

11.10.  <u>Successors and Assigns</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

11.11.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, if sent by electronic mail, courier, or registered or certified mail (return receipt requested) to the following addresses (or at such other addresses as shall be specified by like notice):

(a)    if to a Debtor, to:

Energy Future Holdings Corp.*, et al.*
Energy Plaza
1601 Bryan Street
Dallas, Texas 75201
Attention:  General Counsel
E-mail address:  stacey.dore@energyfutureholdings.com; and andrew.wright@energyfutureholdings.com

with copies (which shall not constitute notice) to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:  Richard M. Cieri, Edward O. Sassower, P.C., Stephen E. Hessler, and Brian E. Schartz
E-mail addresses:  rcieri@kirkland.com, esassower@kirkland.com, shessler@kirkland.com, and bschartz@kirkland.com

and

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Attention: Chad J. Husnick and Steven N. Serajeddini
E-mail address: chusnick@kirkland.com and steven.serajeddini@kirkland.com

(b)    if to a Consenting Interest Holder, to:

26

Wachtell Lipton Rosen & Katz
51 W. 52nd Street
New York, New York 10019
Attention:  Richard G. Mason and Austin T. Witt
E-mail addresses:  rgmason@wlrk.com and awitt@wlrk.com

(c)    if to a Consenting TCEH First Lien Lender, Consenting TCEH First Lien Noteholder, to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Attention:  Alan W. Kornberg, Brian S. Hermann, and Jacob A. Adlerstein
E-mail addresses:  akornberg@paulweiss.com, bhermann@paulweiss.com, and jadlerstein@paulweiss.com

(d)    if to a Consenting EFIH Unsecured Noteholder, to:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
Bank of America Tower
New York, New York 10036
Attention:  Ira S. Dizengoff and Scott L. Alberino
E-mail addresses:  idizengoff@akingump.com and salberino@akingump.com

(e)    if to a Consenting Fidelity EFIH First Lien Noteholder, Consenting EFIH Second Lien Noteholder, Consenting EFH Unsecured Noteholder (each in connection with EFH Unsecured Note Claims, EFIH First Lien Note Claims and EFIH Second Lien Note Claims beneficially owned by Fidelity), to:

Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, New York 10004
Attention: Brad Eric Scheler, Gary L. Kaplan, and Matthew Roose
E-mail addresses: brad.scheler@friedfrank.com, gary.kaplan@friedfrank.com, and matthew.roose@friedfrank.com

(f)    if to a Consenting Non-Fidelity EFIH First Lien Noteholder, to:

Bingham McCutchen LLP
399 Park Avenue
New York, New York 10022-4689
Attention: Jeffrey S. Sabin
E-mail address:  jeffrey.sabin@bingham.com

and

Bingham McCutchen LLP
One Federal Street
Boston, Massachussetts 02110-1726
Attention:  Julia Frost-Davies
E-mail address:  julia.frost-davies@bingham.com

or such other address as may have been furnished by a Party to each of the other Parties by notice given in accordance with the requirements set forth above.

Any notice given by delivery, mail, or courier shall be effective when received.

11.12.  <u>Access</u>.  The Debtors will provide the Restructuring Support Parties and their respective attorneys, consultants, accountants, and other authorized representatives reasonable access, upon reasonable notice during normal business hours, to relevant properties, books, contracts, commitments, records, management personnel, lenders, and advisors of the Debtors; <u>provided</u>, <u>however</u>, that the Debtors' obligation hereunder shall be conditioned upon such Plan Support Party being party to an executed Confidentiality Agreement with the Debtors.

11.13.  <u>Independent Due Diligence and Decision Making</u>.  Each Consenting Party hereby confirms that its decision to execute this agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Debtors.

11.14.  <u>Waiver</u>.  If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms, pursue the consummation of the Restructuring Transactions, or the payment of damages to which a Party may be entitled under this Agreement.

11.15.  <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

11.16.  <u>Several, Not Joint, Claims</u>.  The agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

11.17.  <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

11.18. <u>Remedies Cumulative</u>.   All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

[*Remainder of page intentionally left blank.*]

29

**Debtor Signature Page to the Plan Support and Lock-Up Agreement**

ENERGY FUTURE HOLDINGS CORP.
TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC
4CHANGE ENERGY COMPANY
4CHANGE ENERGY HOLDINGS LLC
BIG BROWN 3 POWER COMPANY LLC
BIG BROWN LIGNITE COMPANY LLC
BIG BROWN POWER COMPANY LLC
BRIGHTEN ENERGY LLC
BRIGHTEN HOLDINGS LLC
COLLIN POWER COMPANY LLC
DALLAS POWER AND LIGHT COMPANY, INC.
DECORDOVA POWER COMPANY LLC
DECORDOVA II POWER COMPANY LLC
EAGLE MOUNTAIN POWER COMPANY LLC
EEC HOLDINGS, INC.
EECI, INC.
EFH AUSTRALIA (NO. 2) HOLDINGS COMPANY
EFH CORPORATE SERVICES COMPANY
EFH FINANCE (NO. 2) HOLDINGS COMPANY
EFH FS HOLDINGS COMPANY
EFH RENEWABLES COMPANY LLC
EFIH FINANCE INC.
ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY LLC
ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC
GENERATION DEVELOPMENT COMPANY LLC
GENERATION MT COMPANY LLC
GENERATION SVC COMPANY
LAKE CREEK 3 POWER COMPANY LLC
LONE STAR ENERGY COMPANY, INC.
LONE STAR PIPELINE COMPANY, INC.
LSGT GAS COMPANY LLC
LSGT SACROC, INC.
LUMINANT BIG BROWN MINING COMPANY LLC
LUMINANT ENERGY COMPANY LLC
LUMINANT ENERGY TRADING CALIFORNIA COMPANY
LUMINANT ET SERVICES COMPANY
LUMINANT GENERATION COMPANY LLC
LUMINANT HOLDING COMPANY LLC
LUMINANT MINERAL DEVELOPMENT COMPANY LLC
LUMINANT MINING COMPANY LLC
LUMINANT RENEWABLES COMPANY LLC
MARTIN LAKE 4 POWER COMPANY LLC
MONTICELLO 4 POWER COMPANY LLC
MORGAN CREEK 7 POWER COMPANY LLC

NCA DEVELOPMENT COMPANY LLC
NCA RESOURCES DEVELOPMENT COMPANY LLC
OAK GROVE MANAGEMENT COMPANY LLC
OAK GROVE MINING COMPANY LLC
OAK GROVE POWER COMPANY LLC
SANDOW POWER COMPANY LLC
SOUTHWESTERN ELECTRIC SERVICE COMPANY, INC.
TCEH FINANCE, INC.
TEXAS ELECTRIC SERVICE COMPANY, INC.
TEXAS ENERGY INDUSTRIES COMPANY, INC.
TEXAS POWER AND LIGHT COMPANY, INC.
TEXAS UTILITIES COMPANY, INC.
TEXAS UTILITIES ELECTRIC COMPANY,  INC.
TRADINGHOUSE 3 & 4 POWER COMPANY LLC
TRADINGHOUSE POWER COMPANY LLC
TXU ELECTRIC COMPANY, INC.
TXU ENERGY RETAIL COMPANY LLC
TXU ENERGY SOLUTIONS COMPANY LLC
TXU RETAIL SERVICES COMPANY
TXU SEM COMPANY
VALLEY NG POWER COMPANY LLC
VALLEY POWER COMPANY LLC

By: _____
Name: Anthony R. Horton
Title: Senior Vice President & Treasurer

**SIGNATURE PAGES**

**[REDACTED]**

**<u>EXHIBIT A</u> to**
**the Restructuring Support and Lock-Up Agreement**

**Term Sheet**

*Execution Version*

**THIS TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN AND IN THE RESTRUCTURING SUPPORT AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

## *RESTRUCTURING TERM SHEET*

### INTRODUCTION

This term sheet (this "**Term Sheet**")[1] describes the terms of a restructuring of: (a) Energy Future Holdings Corp., a Texas corporation ("**EFH**"); (b) EFH's wholly-owned direct subsidiaries Energy Future Intermediate Holding Company LLC, a Delaware limited liability company ("**EFIH**") and Energy Future Competitive Holdings Company LLC, a Delaware limited liability company ("**EFCH**"); (c) EFIH's wholly-owned direct subsidiary, EFIH Finance Inc., a Delaware corporation; (d) EFCH's wholly-owned direct subsidiary, Texas Competitive Electric Holdings Company LLC, a Delaware limited liability company ("**TCEH**"); (e) TCEH's directly and indirectly-owned subsidiaries listed on **Exhibit B**; and (f) EFH's directly and indirectly-owned subsidiaries listed on **Exhibit C** (the entities listed in clauses (a) through (f) collectively, the "**Debtors**," and such restructuring, the "**Restructuring**").

The Debtors will implement the Restructuring through a prearranged plan of reorganization, which shall be consistent with the terms of this Term Sheet and the Restructuring Support Agreement (as it may be amended or supplemented from time to time in accordance with the terms of the Restructuring Support Agreement, the "**Plan**") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware or another bankruptcy court of competent jurisdiction with respect to the subject matter (the "**Bankruptcy Court**"). This Term Sheet incorporates the rules of construction set forth in section 102 of the Bankruptcy Code.

The governing documents with respect to the Restructuring will contain terms and conditions that are dependent on each other, including those described in this Term Sheet.

This Term Sheet does not include a description of all of the terms, conditions, and other provisions that are to be contained in the definitive documentation governing the Restructuring, which remain subject to discussion and negotiation in accordance with the Restructuring Support Agreement. The Restructuring will not contain any material terms or conditions that are inconsistent in any material respect with this Term Sheet or the Restructuring Support Agreement. This Term Sheet is confidential and may not be released to any other party unless permitted under the Restructuring Support Agreement or in accordance with a Confidentiality Agreement (as defined in the Restructuring Support Agreement).

---

[1]     Capitalized terms used but not otherwise defined in this Term Sheet have the meanings ascribed to such terms as set forth on **Exhibit A**.

## OVERVIEW OF THE RESTRUCTURING

In general, the Restructuring contemplates that:

    (a)    The Debtors will implement the Restructuring in the Bankruptcy Court pursuant to the Plan on the terms set forth in this Term Sheet.

    (b)    Holders of the TCEH First Lien Secured Claims will receive their Pro Rata share of (i) 100% of the Reorganized TCEH Common Stock, subject to dilution only by the Reorganized TCEH Management Incentive Plan; and (ii) 100% of the net cash proceeds from the issuance of the New Reorganized TCEH Debt.

    (c)    Holders of General Unsecured Claims Against the TCEH Debtors (which shall include TCEH First Lien Deficiency Claims, TCEH Second Lien Note Claims, and TCEH Unsecured Note Claims) will receive their Pro Rata share of the TCEH Unsecured Claim Fund.

    (d)    Pursuant to the EFIH First Lien Settlement, Settling EFIH First Lien Note Holders will convert their EFIH First Lien Note Claims to EFIH First Lien DIP Claims in an amount equal to the greater of (i) (A) 105% of the principal plus (B) 101% of accrued and unpaid interest at the non-default rate on such principal, through consummation of the EFIH First Lien DIP Financing (which amount shall be deemed to include the original issue discount paid in respect of the EFIH First Lien DIP Financing); and (ii) (A) 104% of the principal plus (B) accrued and unpaid interest at the non-default rate on such principal, through consummation of the EFIH First Lien DIP Financing, plus original issue discount paid in respect of the EFIH First Lien DIP Financing, it being understood that in connection with such loans, Settling EFIH First Lien Note Holders shall be entitled to interest in accordance with the EFIH First Lien DIP Financing, but shall not be entitled to any other fees (including commitment fees) paid in respect of the EFIH First Lien DIP Financing. Any other Allowed EFIH First Lien Note Claims shall receive their Pro Rata share of cash in the amount of such Claims on the Effective Date or such other treatment as permitted under section 1129(b) of the Bankruptcy Code, as mutually agreed by EFIH and the Required EFIH Unsecured Consenting Creditors.

    (e)    Pursuant to the EFIH Second Lien Settlement, Settling EFIH Second Lien Note Holders will receive their Pro Rata share of (a) principal plus accrued and unpaid interest at the non-default rate, through consummation of the EFIH Second Lien DIP Financing; and (b) 50% of the aggregate amount of the EFIH Second Lien Makewhole Claims. Fidelity may use the proceeds it receives on account of the EFIH Second Lien Settlement to participate in the EFIH First Lien DIP Financing in an amount up to $500 million.  The Debtors will initiate litigation to obtain entry of an order disallowing any EFIH Second Lien Makewhole Claim of Non-Settling EFIH Second Lien Note Holders, and Non-Settling EFIH Second Lien Note Holders will receive their Pro Rata share of cash on hand at EFIH or from the proceeds of the EFIH Second Lien DIP Financing and available cash at EFIH in an amount equal to the principal plus accrued and unpaid interest, through consummation of the EFIH Second Lien DIP Financing, at the non-default rate of such Holder's Claim (not including any premiums, fees, or Claims relating to the repayment of the EFIH Second Lien Note Claims).  Any other Allowed EFIH Second Lien Note Claims shall receive their Pro Rata share of cash in the amount of such Claims on the Effective Date or such other treatment as permitted under section 1129(b) of the Bankruptcy Code, as mutually agreed by EFIH and the Required EFIH Unsecured Consenting Creditors.

    (f)    Pursuant to the Commitment Letter, certain Holders of EFIH Unsecured Note Claims will

commit up to $1,900 million in cash, which shall be utilized to backstop the EFIH Second Lien DIP Financing.  On the Effective Date, EFIH Second Lien DIP Claims shall convert on a Pro Rata basis to Reorganized EFH Common Stock issued and outstanding as of the Effective Date pursuant to the Equity Conversion and the terms set forth in this Term Sheet.

(g) Holders of General Unsecured Claims Against the EFIH Debtors will receive their Pro Rata share of (i) 91% of the Participation Rights and (ii) on the Effective Date, 98% of the Reorganized EFH Common Stock, subject to dilution on account of the Equity Conversion.

(h) Holders of General Unsecured Claims Against EFH will receive their Pro Rata share of: (i) the Equity Conversion; (ii) on the Effective Date, 1% of the Reorganized EFH Common Stock, subject to dilution on account of the Equity Conversion; and (iii) on the Effective Date, either:    (A) if the Oncor TSA Amendment has been approved, (1) $55 million in cash from EFIH, *provided, however*, that if the Oncor tax payments received by EFIH under the Oncor TSA Amendment through the Effective Date are less than 80% of the projected amounts set forth in this Term Sheet, the $55 million shall be reduced dollar-for-dollar by such shortfall, and (2) cash on hand at EFH (not including the settlement payment in clause (1) hereof); or (B) if the Oncor TSA Amendment has not been approved, all EFH assets, including cash on hand and any Causes of Action, but excluding Interests in EFIH.

(i) Holders of General Unsecured Claims Against EFH Debtors Other Than EFH shall receive treatment in accordance with the priorities set forth in the Bankruptcy Code.

(j) Holders of EFH Interests will receive, on the Effective Date, their Pro Rata share of 1% of the Reorganized EFH Common Stock, subject to dilution on account of the Equity Conversion.

| **GENERAL PROVISIONS REGARDING THE EFIH RESTRUCTURING** | |
|---|---|
| **EFIH First Lien DIP Financing** | Consistent with the Restructuring Support Agreement, EFIH will file a motion (the "**EFIH First Lien DIP Motion**") or, to the extent necessary, commence an adversary proceeding to:<br><br>(a) seek approval of the EFIH First Lien DIP Financing on the terms set forth in **Exhibit G**;<br><br>(b) repay in full all outstanding principal and accrued and unpaid interest through consummation of the EFIH First Lien DIP Financing, at the non-default rate due and owing under the EFIH First Lien Notes (which shall not include any alleged premiums, fees or claims relating to the repayment of such Claims), held by Non-Settling EFIH First Lien Note Holders in cash from the proceeds of the EFIH First Lien DIP Financing in full satisfaction of such Holders' EFIH First Lien Note Claims;<br><br>(c) exchange the EFIH First Lien Note Claims held by Settling EFIH First Lien Note Holders (and EFIH Second Lien Note Claims electing such treatment under the EFIH Second Lien Settlement, if any) for loans under the EFIH First Lien DIP Financing in accordance with the terms of the EFIH First Lien Settlement (and the EFIH Second Lien Settlement); and |

| | |
|---|---|
| | (d) obtain entry of an order or a judicial finding that no Allowed Claim exists on account of EFIH First Lien Makewhole Claims held by Non-Settling EFIH First Lien Note Holders. |
| **EFIH First Lien Settlement** | Consistent with the Restructuring Support Agreement, EFIH shall file a motion to:<br><br>(a) seek approval of a settlement with the Settling EFIH First Lien Note Holders (the "**EFIH First Lien Settlement**") on the terms set forth below;<br><br>(b) provide EFIH First Lien Note Claims held by Fidelity, PIMCO, and any other holders of EFIH First Lien Note Claims that are signatories to the Restructuring Support Agreement as of the date of the EFIH First Lien DIP Financing is consummated (such Holders, "**Settling EFIH First Lien Note Holders**") with, in connection with the EFIH First Lien DIP Financing, and as payment in full of their EFIH First Lien Note Claims, their Pro Rata share of an amount of loans under the EFIH First Lien DIP Financing equal to the greater of: (i) (A) 105% of the principal plus (B) 101% of accrued and unpaid interest at the non-default rate on such principal, through consummation of the EFIH First Lien DIP Financing (which amount shall be deemed to include the original issue discount paid in respect of the EFIH First Lien DIP Financing); and (ii) (A) 104% of the principal plus (B) accrued and unpaid interest at the non-default rate on such principal, through consummation of the EFIH First Lien DIP Financing, plus original issue discount paid in respect of the EFIH First Lien DIP Financing, it being understood that in connection with such loans, Settling EFIH First Lien Note Holders shall be entitled to interest (in no event less than LIBOR plus 3.25% with a LIBOR floor of 1.00%) in accordance with the EFIH First Lien DIP Financing, but shall not be entitled to any other fees (including commitment fees) paid in respect of the EFIH First Lien DIP Financing; and<br><br>(c) seek approval of a commitment by PIMCO, in the amount of $1.45 billion, and Fidelity or WAMCO if they elect to commit any additional amounts set forth on such parties' signature page to the Restructuring Support Agreement (each, the "**Backstop Amount**," such Backstop Amount, collectively, the "**Backstop Commitment**," and such backstopping parties, the "**Backstop Parties**") to provide backstop EFIH First Lien DIP Financing (the "**Backstop Financing**") on the terms set forth below within five (5) calendar days of the date of the Restructuring Support Agreement, it being understood that in connection with such loans, the Backstop Parties shall be entitled to interest (in no event less than LIBOR plus 3.25% with a LIBOR floor of 1.00%) and original issue discount equal to the greater of (i) 1.00% or such original issue discount as may be paid to other lenders in the EFIH First Lien DIP Financing, and shall be restricted by the Clear Market Provision set forth below, but shall be entitled to commitment fees upon entry of final order consummating the EFIH First Lien DIP Financing, in the following amounts:  (i) 1.75%, if such Settling EFIH First Lien Note Holders enter into a commitment by executing the |

Restructuring Support Agreement before the petition is filed, or (ii) 1.00%, if such Settling EFIH First Lien Note Holders enter into a commitment by executing the Restructuring Support Agreement after the petition is filed, paid in respect of such Backstop Financing, and a ticking fee if and when one becomes payable to EFIH First Lien DIP lenders, and with closing conditions as set forth in **Exhibit I**, and as otherwise set forth in the EFIH First Lien DIP Financing.    The Backstop Financing shall be funded (x) first, by PIMCO in an amount equal to the lesser of:  (a) $768.871 million; or (b) (i) the maximum possible amount of the First Lien Exchange Financing (i.e., assuming all Holders of EFIH First Lien Note Claims participated in the EFIH First Lien Settlement) less the actual amount of the First Lien Exchange Financing at such time (the "**Unallocated First Lien Exchange Capacity**") plus (ii) an amount equal to $4,850 million less the maximum possible amount of the First Lien Exchange Financing (i.e., assuming all Holders of EFIH First Lien Note Claims participated in the EFIH First Lien Settlement); provided, however, in such event, any Backstop Financing funded in excess of the Unallocated First Lien Exchange Capacity shall not be entitled to <u>any</u> commitment fees; (y) second, by all Backstop Parties (on a pro rata basis based on each Backstop Party's individual remaining unused Backstop Amount) in an amount equal to the lesser of:   (A) the remaining amount of the Backstop Commitment, if any; and (B) the remaining amount of the Unallocated First Lien Exchange Capacity, if any;

(d)  seek approval of a commitment by GSO to fund $50 million on the terms set forth in the EFIH First Lien DIP Financing, including original issue discount, but not including commitment fees.

The EFIH First Lien Settlement shall be governed by the following principles:

(a)  **Eligibility**.  The EFIH First Lien Settlement may be offered or made available, at EFIH's election, to other Holders of EFIH First Lien Note Claims that sign the Restructuring Support Agreement; provided, however, that any such offering shall (1) be completed within twenty-five (25) business days after May 5, 2014 and (2) include a "step-down" in the exchange rate applicable to the exchange on the tenth (10) business day after the launch of such exchange (provided such "step down" date can be extended by up to three (3) business days).

(b)  **Reservation of Rights**. The EFIH First Lien Settlement shall in no way affect EFIH's position with respect to Holders of EFIH First Lien Note Claims that do not enter into the EFIH First Lien Settlement (such holders, the "**Non-Settling EFIH First Lien Note Holders**"). Accordingly, as to the Non-Settling EFIH First Lien Note Holders, EFIH shall reserve all rights.

(c)  **Effect; Most Favored Nation**. The EFIH First Lien Settlement shall be binding on Settling EFIH First Lien Note Holders in all respects and irrespective of the outcome of any litigation in respect of any other EFIH First Lien Makewhole Claim; provided, however, that if EFIH reaches one or more voluntary settlements with a Non-Settling EFIH

| | |
|---|---|
| | First Lien Note Holder in the period commencing on the Petition Date and ending on the date on which the EFIH First Lien DIP Financing is fully funded pursuant to a final order entered by the Bankruptcy Court, which provides a higher percentage recovery to a Non-Settling EFIH First Lien Note Holder does the EFIH First Lien Settlement, the EFIH First Lien Settlement shall be automatically amended to provide such higher percentage recovery to Fidelity and PIMCO, provided, further, that if the EFIH First Lien DIP Financing shall have been consummated by such date, such additional consideration may be in the form of cash, at the election of EFIH.<br><br>(d) **Clear Market Provision**. The "**Clear Market Provision**" shall mean the requirement that the Settling EFIH First Lien Note Holders not syndicate or attempt to syndicate any portion of their commitment under the DIP Facility, prior to the earlier of (x) the date that the lenders under the EFIH First Lien DIP Financing no longer hold any of the EFIH First Lien DIP Financing (i.e., successful syndication date) and (y) in the event of an offering with respect to the EFIH First Lien Settlement, the 25th day after the end of any 'early' election period given to the holders of the EFIH First Lien Notes Claims.<br><br>(e) **Definitive Documentation**. The final credit agreement consummating the DIP Financing shall be in form and substance, in all material respects, consistent with the draft credit agreement as modified by the draft DIP Financing term sheet, each as attached to this Term Sheet, and any material modification to such credit agreement (as modified by such DIP Financing term sheet) shall be approved by PIMCO (such approval not to be unreasonably withheld, delayed or conditioned). The final order consummating the DIP Financing shall be in form and substance reasonably acceptable in all material respects to PIMCO. |
| **EFIH Second Lien DIP Financing** | Consistent with the Restructuring Support Agreement, EFIH will file a motion (the "**EFIH Second Lien DIP Motion**") or, to the extent necessary, commence an adversary proceeding to:<br><br>(a) seek approval of the EFIH Second Lien DIP Financing on the terms set forth in **Exhibit H** in an amount up to $1,900 million;<br><br>(b) repay in full all outstanding principal plus accrued and unpaid interest at the non-default rate, through consummation of the EFIH Second Lien DIP Financing, due and owing under the EFIH Second Lien DIP Notes (which shall not include any alleged premiums, fees or claims relating to the repayment of such Claims) to Non-Settling EFIH Second Lien Note Holders in cash from proceeds of the EFIH Second Lien DIP Financing and cash on hand at EFIH in full satisfaction of such Holders' EFIH Second Lien Note Claims; and<br><br>(c) repay the EFIH Second Lien Notes held by Settling EFIH Second Lien Note Holders with cash on hand at EFIH, cash from the proceeds of the EFIH Second Lien DIP Financing or, in the case of Fidelity, an exchange for participation in the EFIH First Lien DIP Financing in accordance with the terms of the EFIH Second Lien Settlement. |

| | |
|---|---|
| | The Debtors will assert that no Allowed Claim exists on account of any alleged premiums, fees or claims relating to the repayment of the EFIH Second Lien Note Claims held by Non-Settling EFIH Second Lien Note Holders, but will litigate such Claims at a later date in the Chapter 11 Cases.<br><br>On the Effective Date, the EFIH Second Lien DIP Claims shall be subject to the Equity Conversion. |
| **EFIH Second Lien Settlement** | Consistent with the Restructuring Support Agreement, EFIH shall file a motion to: |

<div style="margin-left:2em">

(a) seek approval of a settlement with the Settling EFIH Second Lien Note Holders (the "**EFIH Second Lien Settlement**") on the terms set forth below; and

(b) provide settling Holders of EFIH Second Lien Note Claims, which shall include Fidelity, GSO, York, and Avenue and such other holders of the EFIH Second Lien Note Claims that are signatories to the Restructuring Support Agreement as of the date the EFIH Second Lien DIP Financing is consummated (such Holders, the "**Settling EFIH Second Lien Note Holders**"), as payment in full of their EFIH Second Lien Note Claims, their Pro Rata share of (i) an amount in cash equal to principal plus accrued but unpaid interest (including Additional Interest) on such principal at the contract non-default rate through the date of consummation of the EFIH Second Lien Settlement, plus (ii) 50% of the aggregate amount of the EFIH Second Lien Makewhole Claims calculated as of the date of consummation of the EFIH Second Lien Settlement and calculated without inclusion of Additional Interest, plus (iii) in the case of GSO, York, and Avenue, a settlement premium of $1.57 million in cash in the aggregate; *provided*, *however*, (1) Fidelity shall have the right to receive up to $500 million of its payment under the EFIH Second Lien Settlement in the form of EFIH First Lien DIP Financing to be implemented in a manner consistent with this Term Sheet and reasonably acceptable to Fidelity, it being understood that in connection with such loans, Fidelity shall be entitled to interest and original issue discount, if any, in respect of the EFIH First Lien DIP Financing plus a 1.75% commitment fee.

</div>

The EFIH Second Lien Settlement shall be governed by the following principles:

<div style="margin-left:2em">

(a) **Eligibility**. The EFIH Second Lien Settlement may be made available, at EFIH's election, to other Holders of EFIH Second Lien Note Claims that sign the Restructuring Support Agreement.

(b) **Reservation of Rights**. The EFIH Second Lien Settlement shall in no way affect EFIH's position with respect to Holders of EFIH Second Lien Note Claims that do not enter into the EFIH Second Lien Settlement (such holders, the "**Non-Settling EFIH Second Lien Note Holders**"). Accordingly, as to the Non-Settling EFIH Second Lien Note Holders, EFIH shall reserve all rights.

(c) **Effect; Most Favored Nation**. The EFIH Second Lien Settlement shall be binding on Settling EFIH Second Lien Note Holders in all respects and irrespective of the outcome of any litigation in respect of any other

</div>

|  | EFIH Second Lien Makewhole Claim; *provided*, *however*, that if EFIH reaches one or more voluntary settlements with either:  (i) a Commitment Party or affiliate thereof on account of its EFIH Second Lien Note Claims (whenever acquired) at any time prior to a judgment on the merits on such Claims; or (ii) any other Non-Settling EFIH Second Lien Note Holder at any time prior to the earlier of (x) the date seven business days after the commencement of opening statements (or the equivalent) in any trial on the merits of the Second Lien Makewhole Claims and (y) the date upon which the Commitment Parties exercise and consummate the Call Right, and any such settlements, determined as of the final day of such period, provides a higher percentage recovery than does the EFIH Second Lien Settlement, then the EFIH Second Lien Settlement shall be automatically amended with respect to Fidelity to provide such higher percentage recovery to Fidelity, in its capacity as Settling EFIH Second Lien Note Holder; *provided*, *further*, that if the EFIH First Lien DIP Financing shall have been consummated by either such date, such additional consideration may be in the form of cash, at the election of EFIH. |
|  | (d) **Call Right**.  At any time before the Effective Date, any one or more Commitment Parties shall have the right to purchase from Fidelity all of its EFH Non-Guaranteed Notes for a purchase price equal to 37.15% of par plus accrued and unpaid interest through the Petition Date (the "**Call Right**"). |
| **EFIH Second Lien DIP Financing Commitment** | Pursuant to the terms and conditions of the Commitment Letter, certain Holders of General Unsecured Claims Against the EFIH Debtors (the "**Commitment Parties**") have committed up to $1,900 million in available funds (the "**EFIH Second Lien DIP Financing Commitment**") which shall be utilized, in accordance with and subject to the terms and conditions of the Commitment Letter and related documentation, to backstop the EFIH Second Lien DIP Financing, which shall, subject to the terms of the Conversion Agreement, mandatorily convert into Reorganized EFH Common Stock pursuant to the Equity Conversion.<br><br>The Commitment Letter is attached to the Restructuring Support Agreement as **Exhibit C**.<br><br>The Participation Rights with respect to the EFIH Second Lien DIP Financing shall be provided as follows:<br><br>(a) All Holders of EFIH Unsecured Note Claims shall receive their Pro Rata share of 91% of the Participation Rights; and<br><br>(b) Fidelity, as a Holder of General Unsecured Claims of EFH, shall receive 9% of the Participation Rights and General Unsecured Claims Against EFH shall receive a Pro Rata share of 9% of the Equity Conversion on account of the Tranche A-3 Notes.  Moreover, Fidelity shall receive an $11.25 million payment from EFIH in connection with the exercise of any of its Participation Rights.  If at any time (a) the PLR Denial (as defined in the Restructuring Support Agreement) has occurred and (b) the Oncor TSA Amendment has not yet been approved, the Required EFIH Unsecured Consenting Creditors shall have the sole and exclusive right to require the Holders of any Tranche A-3 Notes to assign such |

| | |
|---|---|
| | notes to the Commitment Parties for a purchase price equal to the sum of (i) the par amount of such notes plus accrued and unpaid interest (including the paid-in-kind interest), which amount shall be payable on the purchase date, (ii) in the event such assignment is consummated before the payment of the one-time payment-in-kind fee, 10% of the par amount of such notes plus accrued and unpaid payment-in-kind interest, if any (but not, for the avoidance of doubt, any accrued and unpaid cash interest), which amount shall be payable on the purchase date, and (iii) a Pro Rata share of any Prepayment Fee (as defined in the EFIH Second Lien DIP Financing) subsequently paid on such Tranche A-3 Notes (which amount shall be paid by EFIH to the holders of the Tranche A-3 Notes immediately prior to such assignment and not the holders of the Tranche A-3 Notes as of the date that the Prepayment Fee is due and owing) ("**Tranche A-3 Redemption**").<br><br>The Debtors shall file a motion (the "**Approval Motion**") to obtain entry of<br><br>   (a) an order (the "**Approval Order**") consistent with the Restructuring Support Agreement, authorizing, among other things, (i) the EFIH First Lien Settlement, (ii) the EFIH Second Lien Settlement, and (iii) EFH and EFIH to perform their obligations under the Commitment Letter; and<br><br>   (b) an order (the "**Oncor TSA Amendment Order**") consistent with the Restructuring Support Agreement, authorizing the Oncor TSA Amendment. |
| **Oncor TSA Amendment** | Consistent with the Restructuring Support Agreement, the Approval Motion shall also include a request for authority to amend, or otherwise assign the payments under, the Oncor Tax Sharing Agreement (the "**Oncor TSA Amendment**") to provide that any payment required to be made to EFH under the Oncor Tax Sharing Agreement after March 31, 2014, will instead be made to EFIH.  The Debtors agree to use commercially reasonable efforts to secure entry of the Oncor TSA Amendment Order.  Any tax payments received by EFH before the Bankruptcy Court enters or denies the Oncor TSA Amendment Order shall be deposited by EFH into a segregated account (the "**Segregated Account**") and shall not be disbursed until the earlier of (i) the date the Bankruptcy Court enters the Oncor TSA Amendment Order, in which case, such amounts shall be remitted to EFIH or (ii) the date the Bankruptcy Court denies entry of the Oncor TSA Amendment Order, in which case, such amounts shall be remitted to EFH.  After entry of the Oncor TSA Amendment Order, EFIH will reimburse EFH for cash taxes paid by EFH attributable to Oncor state taxes.<br><br>The Oncor TSA Amendment shall automatically terminate and be of no further force and effect in the event that the Commitment Letter is terminated by the Commitment Parties; *provided*, *however*, that any amounts that were paid to EFIH in accordance with the Oncor TSA Amendment before its termination shall be retained by EFIH if the Commitment Letter or EFIH Second Lien DIP Financing terminates or is not fully funded in accordance with its terms (i.e., except as a result of a breach by the Commitment Parties).  Neither EFH nor EFIH shall have the right to terminate or modify the Oncor TSA Amendment during the Chapter 11 Cases if the EFIH Second Lien DIP Financing is consummated. |

| | |
|---|---|
| | The collateral under the EFIH First Lien DIP Financing and the EFIH Second Lien DIP Financing (if any) will include proceeds of payments under the Oncor TSA Amendment, as long as the Oncor TSA Amendment remains in effect.<br><br>If the Bankruptcy Court has not approved the Oncor TSA Amendment 90 days after the Petition Date, each Holder of EFIH Second Lien DIP Notes shall receive, in accordance with the EFIH Second Lien DIP Financing, 4.0% of additional interest with respect to the EFIH Second Lien DIP Notes, paid in kind and compounded quarterly on account of such Holder's EFIH Second Lien DIP Claim, from the date that is 90 days after the Petition Date.  If the Bankruptcy Court do not approve the Oncor TSA Amendment by May 1, 2015, each Holder of EFIH Second Lien DIP Notes shall receive, in accordance with the EFIH Second Lien DIP Financing, a one-time 10.0% paid in kind fee on account of such Holder's EFIH Second Lien DIP Claim. |
| **Private Letter Ruling** | Consistent with the Restructuring Support Agreement, EFH, on behalf of the Debtors, shall file with the IRS a written request (the "**Ruling Request**," and together with all related materials and supplements thereto to be filed with the IRS, the "**IRS Submissions**") that the IRS issue a private letter ruling (the "**Private Letter Ruling**") to EFH  that:<br><br>(a) will provide that the Contribution and the Distribution qualify as a "reorganization" within the meaning of Sections 368(a)(1)(G), 355 and 356 of the Internal Revenue Code of 1986, as amended (the "**Code**") (collectively, the "**Intended Tax-Free Treatment**"); and<br><br>(b) will include each of the other requested rulings set forth in Part IV of the Energy Future Holdings Corp. Pre-Submission Memorandum for Rulings Under Section 368(a)(1)(G) and 355 in the form attached as **Exhibit E** (the "**Pre-Submission Memo**").<br><br>Collectively, the rulings described in clauses (a) and (b) are the "**Required Rulings**."<br><br>Prior to filing the Ruling Request, EFH shall use its reasonable best efforts to arrange a pre-submission conference with the IRS (a "**Pre-Submission Conference**") by requesting such Pre-Submission Conference as soon as reasonably practicable following the Petition Date.  Such request must be made within 5 business days of the Petition Date.  For the avoidance of doubt, the Pre-Submission Memo shall (a) request that the IRS provide, *inter alia*, the Required Rulings, (b) constitute an IRS Submission and (c) be submitted to the IRS in advance of the Pre-Submission Conference.<br><br>EFH shall be responsible for the preparation and filing of the IRS Submissions.  EFH shall provide tax counsel to the Consenting Creditors and Consenting Interest Holders (the "**PLR Participation Parties**") with a reasonable opportunity to review and comment on drafts of all IRS Submissions filed on or after the date of entry into the Restructuring Support Agreement; *provided, however*, that such rights shall not result in unreasonable delays in submitting the IRS Submissions to the IRS.  No IRS Submission shall be filed without the consent of the Required Consenting Creditors, which consent shall not be unreasonably withheld or delayed.  To the extent that EFH, in its good faith judgment, considers any information included in such IRS drafts to be confidential, EFH may require that any such documents provided to the PLR Participation Parties be redacted to exclude such information, but tax counsel to |

<table>
<tr><td></td><td>the PLR Participation Parties shall receive (and keep confidential) complete and unredacted copies of any IRS Submission. Subject to the foregoing, EFH shall provide the PLR Participation Parties with copies of each IRS Submission promptly following the filing thereof.

EFH shall notify the PLR Participation Parties of any substantive communications with the IRS regarding the IRS Submissions and the Restructuring Transactions. Notwithstanding the foregoing, one representative from each PLR Participation Party (a "**PLR Participation Party Representative**") shall (a) be given the opportunity to participate in all scheduled communications with the IRS concerning the Ruling Request, including all scheduled conference calls and in-person meetings (including the Pre-Submission Conference); and (b) be updated in a timely fashion regarding any unscheduled communications with the IRS. EFH and the PLR Participation Parties agree to cooperate and use their commercially reasonable efforts to assist in obtaining the Private Letter Ruling requested in the Ruling Request, including providing such appropriate information and representations as the IRS shall reasonably require in connection with the Required Rulings; *provided*, *however*, that (i) the representations are consistent with, or not more burdensome to the PLR Participation Parties than, those set forth in the Summary of Key Representations, attached as **Exhibit K**, and (ii) providing such information and representations does not restrict the liquidity of equity in Reorganized TCEH after the Effective Date or the Claims of the PLR Participation Parties against the Debtors prior to the Effective Date. Notwithstanding the foregoing, the Debtors, the Consenting Creditors and the Consenting Interest Holders acknowledge that certain of the Required Rulings set forth in the Pre-Submission Memo address matters for which the IRS does not commonly issue private letter rulings and, as a result, there is substantial uncertainty as to what representations the IRS may require from the Debtors, the Consenting Creditors and the Consenting Interest Holders. The Consenting Creditors and Consenting Interest Holders agree to reasonably consider in good faith any representations described in clause (i) above requested by the IRS in order to issue the Private Letter Ruling.

Other than as set forth in this Term Sheet (including, for this purpose, transactions described in the Pre-Submission Memo), the Debtors shall not take any action to change the entity classification for U.S. federal income tax purposes of any Debtor entity with material assets, by changing their legal form or otherwise, without the consent of the Required EFIH Unsecured Consenting Creditors, the Consenting Interest Holders, and the Ad Hoc TCEH Committee.</td></tr>
</table>

| **TREATMENT OF CLAIMS AND INTERESTS OF THE DEBTORS UNDER THE PLAN** | | | |
|---|---|---|---|
| Class No. | Type of Claim | Treatment | Impairment / Voting |
| **Unclassified Non-Voting Claims Against the Debtors** | | | |
| N/A | **TCEH DIP Claims** | On the Effective Date, in full satisfaction of each Allowed TCEH DIP Claim, each Holder thereof shall receive (a) payment in full in cash or (b) such other less favorable treatment for such Holder as may be agreed to by such Holder and the TCEH Debtors. | N/A |

| N/A | **EFIH First Lien DIP Claims** | On the Effective Date, in full satisfaction of each Allowed EFIH First Lien DIP Claim, each Holder thereof shall receive payment in full in cash from the proceeds of New Reorganized EFIH Debt or cash on hand at EFIH up to the amount of such Holder's Claim. | N/A |
|---|---|---|---|
| N/A | **EFIH Second Lien DIP Claims** | On the Effective Date, in full satisfaction of each Allowed EFIH Second Lien DIP Claim, each Holder thereof shall receive its Pro Rata share of Reorganized EFH Common Stock in accordance with the terms of the Equity Conversion (or cash with respect to the Fidelity Repayment up to the amount of such Holder's Claim). | N/A |
| N/A | **Administrative Claims** | On the Effective Date, except to the extent that a Holder of an Allowed Administrative Claim and the Debtor against which such Allowed Administrative Claim is asserted agree to less favorable treatment for such Holder, each Holder of an Allowed Administrative Claim shall receive, in full satisfaction of its Claim, payment in full in cash. | N/A |
| N/A | **Priority Tax Claims** | Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtor against which such Allowed Priority Tax Claim is asserted agree to less favorable treatment for such Holder, each Holder of an Allowed Priority Tax Claim shall receive, in full satisfaction of its Claim, payments in cash in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code. | N/A |
| **Classified Claims and Interests of the TCEH Debtors** | | | |
| **Class A1** | **Other Secured Claims against TCEH Debtors** | On the Effective Date, in full satisfaction of each Allowed Other Secured Claim, each Holder thereof shall receive, at the option of the applicable TCEH Debtor in consultation with the Ad Hoc TCEH Committee: (a) payment in full in cash; (b) delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (c) Reinstatement of such Other Secured Claim; or (d) other treatment rendering such Claim Unimpaired. | Unimpaired; deemed to accept. |
| **Class A2** | **Other Priority Claims against TCEH Debtors** | On the Effective Date, in full satisfaction of each Allowed Other Priority Claim, each Holder thereof shall receive payment in full in cash or other treatment rendering such Claim Unimpaired. | Unimpaired; deemed to accept. |
| **Class A3** | **TCEH First Lien Secured Claims** | On the Effective Date, in full satisfaction of each Allowed TCEH First Lien Secured Claim, each Holder thereof shall receive its Pro Rata share of: (a) 100% of the Reorganized TCEH Common Stock, subject to dilution only from the Reorganized TCEH Management Incentive Plan; and (b) 100% of the net cash proceeds from the issuance of the New Reorganized TCEH Debt. | Impaired; entitled to vote. |
| **Class A4** | **General Unsecured** | On the Effective Date, in full satisfaction of each | Impaired; |

12

| | Claims Against the TCEH Debtors | Allowed General Unsecured Claim Against the TCEH Debtors, each Holder thereof shall receive its Pro Rata share of the TCEH Unsecured Claim Fund. | entitled to vote. |
|---|---|---|---|
| Class A5 | TCEH Debtor Intercompany Claims | On the Effective Date, unless otherwise provided for under the Plan, each TCEH Debtor Intercompany Claim shall either be Reinstated or canceled and released as mutually agreed by the TCEH Debtors and the Ad Hoc TCEH Committee. | Impaired; deemed to reject or Unimpaired; deemed to accept. |
| Class A6 | Non-TCEH Debtor Intercompany Claims | On the Effective Date, Non-TCEH Debtor Intercompany Claims shall be canceled and released. | Impaired; deemed to reject. |
| Class A7 | Interests in TCEH Debtors other than TCEH and EFCH | On the Effective Date, Interests in the TCEH Debtors other than TCEH and EFCH shall either be Reinstated or canceled and released as mutually agreed by the TCEH Debtors and the Ad Hoc TCEH Committee. | Impaired; deemed to reject or Unimpaired; deemed to accept |
| Class A8 | Interests in TCEH and EFCH | On the Effective Date, Interests in TCEH and EFCH shall be canceled and released in accordance with the Tax-Free Spin-Off. | Impaired; deemed to reject. |
| **Classified Claims and Interests of the EFIH Debtors** | | | |
| Class B1 | Other Secured Claims against EFIH Debtors | On the Effective Date, in full satisfaction of each Allowed Other Secured Claim, each Holder thereof shall receive, at the option of the applicable EFIH Debtor in consultation with the Required EFIH Unsecured Consenting Creditors: (a) payment in full in cash; (b) delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (c) Reinstatement of such Other Secured Claim; or (d) other treatment rendering such Claim Unimpaired. | Unimpaired; deemed to accept. |
| Class B2 | Other Priority Claims against EFIH Debtors | On the Effective Date, in full satisfaction of each Allowed Other Priority Claim, each Holder thereof shall receive payment in full in cash or other treatment rendering such Claim Unimpaired. | Unimpaired; deemed to accept. |
| Class B3 | EFIH First Lien Note Claims | On the Effective Date, in full satisfaction of each Allowed EFIH First Lien Note Claim, and as mutually agreed by EFIH and the Required EFIH Unsecured Consenting Creditors, each Holder thereof shall receive payment in full in cash or such other treatment as permitted under section 1129(b) of the Bankruptcy Code. | Impaired; entitled to vote. |
| Class B4 | EFIH Second Lien Note Claims | On the Effective Date, in full satisfaction of each Allowed EFIH Second Lien Note Claim, and as mutually agreed by EFIH and the Required EFIH Unsecured Consenting Creditors, each Holder thereof shall receive | Impaired; entitled to vote. |

| | | payment in full in cash or such other treatment as permitted under section 1129(b) of the Bankruptcy Code. | |
|---|---|---|---|
| **Class B5** | **General Unsecured Claims Against the EFIH Debtors** | On the Effective Date, in full satisfaction of each Allowed General Unsecured Claim Against the EFIH Debtors, each Holder thereof shall receive its Pro Rata share of 98% of the Reorganized EFH Common Stock, subject to dilution on account of the Equity Conversion. | Impaired; entitled to vote. |
| **Class B6** | **EFIH Debtor Intercompany Claims** | On the Effective Date, unless otherwise provided in the Plan, EFIH Debtor Intercompany Claims shall either be Reinstated or canceled and released as mutually agreed by the EFIH Debtors and the Required EFIH Unsecured Consenting Creditors. | Impaired; deemed to reject or Unimpaired; deemed to accept. |
| **Class B7** | **Non-EFIH Debtor Intercompany Claims** | On the Effective Date, Non-EFIH Debtor Intercompany Claims shall be canceled and released. | Impaired; deemed to reject. |
| **Class B8** | **Interests in EFIH Debtors** | On the Effective Date, Interests in the EFIH Debtors shall be Reinstated. | Unimpaired, deemed to accept. |
|  | **Classified Claims and Interests of the EFH Debtors** | | |
| **Class C1** | **Other Secured Claims against EFH Debtors** | On the Effective Date, in full satisfaction of each Allowed Other Secured Claim, each Holder thereof shall receive, at the option of the applicable EFH Debtor in consultation with the Required EFIH Unsecured Consenting Creditors:   (a) payment in full in cash; (b) delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (c) Reinstatement of such Other Secured Claim;  or (d) other treatment rendering such Claim Unimpaired. | Unimpaired; deemed to accept. |
| **Class C2** | **Other Priority Claims against EFH Debtors** | On the Effective Date, in full satisfaction of each Allowed Other Priority Claim, each Holder thereof shall receive payment in full in cash or other treatment rendering such Claim Unimpaired. | Unimpaired; deemed to accept. |
| **Class C3** | **Legacy General Unsecured Claims Against EFH** | On the Effective Date, in full satisfaction of each Legacy General Unsecured Claim Against EFH, each Holder thereof shall receive:   (a) payment in full in cash; (b) Reinstatement; or (c) such other treatment rendering such Claim Unimpaired. | Unimpaired; deemed to accept. |
| **Class C4** | **General Unsecured Claims Against EFH** | On the Effective Date, in full satisfaction of each Allowed General Unsecured Claim Against EFH, each Holder thereof shall receive its Pro Rata share of: (a) 1% of the Reorganized EFH Common Stock, subject to dilution by the Equity Conversion; and (b) if the Oncor TSA Amendment has been approved, (i) all Cash on hand at EFH, not including the Oncor TSA Amendment | Impaired; entitled to vote. |

| | | | |
|---|---|---|---|
| | | Payment; and (ii) the Oncor TSA Amendment Payment; or (b) if the Oncor TSA Amendment has *not* been approved, the EFH Unsecured Claims Fund. | |
| **Class C5** | **General Unsecured Claims Against the EFH Debtors Other Than EFH** | On the Effective Date, in full satisfaction of each Allowed Unsecured Claim against the EFH Debtors Other Than EFH, each Holder thereof shall receive treatment in accordance with the priorities set forth in the Bankruptcy Code. | Impaired; entitled to vote. |
| **Class C6** | **EFH Debtor Intercompany Claims** | On the Effective Date, unless otherwise provided in the Plan, EFH Debtor Intercompany Claims shall either be Reinstated or canceled and released as mutually agreed by the EFH Debtors, the Required EFIH Unsecured Consenting Creditors, and Fidelity. | Impaired; deemed to reject or Unimpaired; deemed to accept. |
| **Class C7** | **Non-EFH Debtor Intercompany Claims** | On the Effective Date, Non-EFH Debtor Intercompany Claims shall be canceled and released, *provided that* if the Oncor TSA Amendment is not approved by the Bankruptcy Court, each EFH-EFIH Intercompany Claim shall not be canceled or released and shall receive its Pro Rata share of the EFH Unsecured Claims Fund in full satisfaction of such Claim. | Impaired; deemed to reject. |
| **Class C8** | **Interests in EFH Debtors Other Than EFH** | On the Effective Date, Interests in the EFH Debtors other than EFH shall either be Reinstated or canceled and released in the EFH Debtors' or Reorganized EFH Debtors' discretion. | Impaired; deemed to reject or Unimpaired; deemed to accept. |
| **Class C9** | **EFH Interests** | On the Effective Date, EFH Interests shall be Reinstated, subject to dilution by the issuance of Reorganized EFH Common Stock to Holders of General Unsecured Claims Against the EFIH Debtors, Holders of General Unsecured Claims Against the EFH Debtors, and the Equity Conversion. | Impaired; entitled to vote. |

| **GENERAL PROVISIONS REGARDING THE PLAN** | |
|---|---|
| **Subordination** | The classification and treatment of Claims under the Plan shall conform to the respective contractual, legal, and equitable subordination rights of such Claims, and any such rights shall be settled, compromised, and released pursuant to the Plan. |
| **Restructuring Transactions** | The Confirmation Order shall be deemed to authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Tax-Free Spin-Off. |
| **Tax-Free Spin-Off** | To preserve the Intended Tax-Free Treatment of the Restructuring Transactions and conditioned upon the receipt of the Private Letter Ruling with the Required Rulings, the Debtors shall undertake the Tax- |

15

Free Spin-Off as follows:

    (a) before the Effective Date, TCEH shall form a new subsidiary in the form of a limited liability company under the laws of Delaware ("**Reorganized TCEH**");

    (b) on the Effective Date, the Claims against TCEH will be canceled in exchange for each Holder's right to receive its recovery in accordance with the terms of the Plan;

    (c) immediately following such cancellation, TCEH shall transfer all of its assets and its ordinary course operating liabilities, and the Debtors shall transfer assets and liabilities related to the Shared Services, to Reorganized TCEH (the "**Contribution**") in exchange for which TCEH shall receive (i) 100% of the newly issued Reorganized TCEH equity interests and (ii) the cash proceeds of the New Reorganized TCEH Debt, subject to preserving the Intended Tax-Free Treatment of the Restructuring Transactions. For the avoidance of doubt, no funded debt of TCEH, including the TCEH First Lien Claims, TCEH Second Lien Note Claims, and TCEH Unsecured Note Claims will be assumed by Reorganized TCEH pursuant to the Contribution (as all such Claims will have been canceled immediately prior to the transfer of assets to Reorganized TCEH);

    (d) immediately following the Contribution, Reorganized TCEH shall convert into a Delaware corporation; and

    (e) immediately following such conversion, TCEH shall distribute all of the Reorganized TCEH Common Stock it holds and the cash received from Reorganized TCEH to the Holders of TCEH First Lien Claims (the "**Distribution**").

EFH's earnings and profits will be allocated between Reorganized EFH and Reorganized TCEH pursuant to Treasury Regulations Section 1.312-10(a) in proportion to the fair market value of the business or businesses (and interests in any other properties) retained by Reorganized EFH and the business or businesses (and interests in any other properties) of Reorganized TCEH immediately after the Distribution. For purposes of determining their relative fair market values and shares of earnings and profits, the valuation of Reorganized TCEH and Reorganized EFH shall be made, to the extent permitted by law, immediately following the distribution of Reorganized TCEH and prior to (i) Holders of EFIH and EFH General Unsecured Claims receiving Reorganized EFH Common Stock, and (ii) the conversion of EFIH Second Lien DIP into Reorganized EFIH Common Stock, provided that to the extent required under the Private Letter Ruling, an amount of EFIH and EFH General Unsecured Claims, if any, required to cause Reorganized EFH to be solvent at such time shall be deemed exchanged for Reorganized EFH Common Stock.

| | |
|---|---|
| **Tax Basis of Reorganized TCEH** | Immediately following the Distribution, the aggregate tax basis, for U.S. federal income tax purposes, of the assets held by Reorganized TCEH shall be equal to the sum of (x) TCEH's aggregate tax basis, for U.S. federal income tax purposes, in the assets it transfers to Reorganized TCEH pursuant to the Contribution plus (y) 95% of the aggregate amount |

<table>
<tr><td></td><td>
of deductions, net operating losses and capital losses (including carryforwards) available to the EFH consolidated group as of the Effective Date (determined (i) as if the EFH consolidated tax year ended on the Effective Date and (ii) without regard to any gain or income generated as a result of the Contribution), in each case as determined by the Debtors in good faith and in consultation with the Ad Hoc TCEH Committee no later than 60 days prior to the Effective Date (the amount set forth in clause (y), the "**Basis Step-Up**", and the sum of clauses (x) and (y), the "**Minimum Basis**").

After the Petition Date, the Debtors shall continue to operate their business in the ordinary course and shall not take any actions (other than as set forth in this Term Sheet) outside the ordinary course of business that will materially increase the taxable income of the EFH consolidated group (excluding any taxable income generated by TCEH and its subsidiaries) during the period from the Petition Date through the Effective Date.
</td></tr>
<tr><td>**Tax Matters Agreement**</td><td>
Reorganized EFH and Reorganized TCEH shall enter into a Tax Matters Agreement as of the Effective Date that shall govern the rights and obligations of each party with respect to certain tax matters.

Specifically, the Tax Matters Agreement will address:

    (a) the filing of tax returns by Reorganized EFH and Reorganized TCEH;

    (b) tax indemnification obligations of Reorganized EFH and Reorganized TCEH;

    (c) the conduct of tax proceedings by Reorganized EFH and Reorganized TCEH; and

    (d) representations, warranties, and covenants with respect to the Intended Tax-Free Treatment of the Contribution and Distribution.

The Tax Matters Agreement will provide that:

    (i) Reorganized TCEH will indemnify Reorganized EFH for (x) income taxes imposed on Reorganized EFH attributable solely to a failure of the Tax-Free Spin-Off to qualify for the Intended Tax-Free Treatment as a result of a breach of one or more covenants (following the Distribution) by Reorganized TCEH, (y) any alternative minimum tax (A) arising from the resolution of IRS audits for periods (or portions thereof) ending on or before the Effective Date attributable to any business contributed to Reorganized TCEH or its subsidiaries, but in no event to exceed $15 million and (B) arising as a result of the utilization of NOL carryforwards to offset gain related to the portion (if any) of the Basis Step-Up in excess of $1.9 billion and (z) ordinary course non-income taxes for periods (or portions thereof) ending on or before the Effective Date attributable to any business contributed to Reorganized TCEH or its subsidiaries (but only to the extent such taxes are, consistent with past practice, payable by Reorganized TCEH, TCEH or its
</td></tr>
</table>

17

subsidiaries); and

(ii) Reorganized EFH will indemnify Reorganized TCEH for taxes that are not specifically covered by clause (i), including, without duplication, (w) taxes attributable to any business retained by Reorganized EFH or its subsidiaries, (x) EFH and Reorganized EFH's consolidated U.S. federal income taxes (and any affiliated, consolidated, combined, unitary, aggregate or similar state or local taxes), and (y) income taxes attributable to a failure of the Tax-Free Spin-Off to qualify for the Intended Tax-Free Treatment (except as described in clause (i) above); provided, however, that Reorganized EFH will be responsible for income taxes attributable to such failure only if such failure is as a result of the breach of any covenant by EFH or Reorganized EFH hereunder. Nothing herein shall be interpreted to mean that any party other than EFH or Reorganized EFH shall be primarily liable for any taxes imposed on a failure of the Tax-Free Spin-Off to qualify for the Intended Tax-Free Treatment, except to the extent that such failure is as a result of the breach of any covenant by Reorganized TCEH as provided in clause (i) hereunder.

The Tax Matters Agreement will prohibit Reorganized EFH and Reorganized TCEH from taking those actions (or refraining from taking those actions) that are set forth below:

- For two years after the Distribution, Reorganized TCEH, Reorganized EFH, and Reorganized EFIH will not be permitted to:

  - cease, or permit its wholly-owned subsidiaries listed on **Exhibit D** to cease, the active conduct of a business that was conducted immediately prior to the Distribution or from holding certain assets held at the time of the Distribution;
  - dissolve, liquidate, take any action that is a liquidation for federal income tax purposes or permit its wholly-owned subsidiaries listed on **Exhibit D** from doing any of the foregoing;
  - redeem or repurchase any of its equity if such redemption or repurchase could reasonably be expected to adversely impact the continuity of interest requirement set forth in Treas. Reg. Section 1.368-1(e) or 1.355-2(c)(1); and
  - merge with or into another corporation with such other corporation surviving in a transaction that does not qualify as a reorganization under Section 368(a).

For the avoidance of doubt, the Tax Matters Agreement shall contain no express or implied limitation on the transferability or issuance of the stock of Reorganized EFH or Reorganized TCEH following the Effective Date.

Nevertheless, Reorganized TCEH, Reorganized EFH, and Reorganized EFIH will be permitted to take any of the actions described above if Reorganized EFH obtains a supplemental IRS private letter ruling (or an

18

|  | opinion of counsel that is reasonably acceptable to Reorganized EFH and Reorganized TCEH) to the effect that the action will not affect the Intended Tax-Free Treatment of the Restructuring Transactions. Reorganized TCEH and/or Reorganized EFIH can require that Reorganized EFH seek such a supplemental IRS private letter ruling or opinion of counsel if Reorganized EFH does not seek one on its own.<br><br>The Tax Matters Agreement shall otherwise be in form and substance acceptable to the Debtors, the Required EFIH Unsecured Consenting Creditors and the Ad Hoc TCEH Committee. |
|---|---|
| **Shared Services** | Except as otherwise agreed by Reorganized TCEH, Reorganized EFH, and the Ad Hoc TCEH Committee, the TCEH Debtors and the EFH Debtors will transfer to Reorganized TCEH or its designee all operating assets, including executory contracts and liabilities owned by or asserted against the EFH Debtors, that are reasonably necessary to the continued operation of Reorganized TCEH (the "**Shared Services**") and that are not otherwise discharged, in exchange for the rights and benefits provided under the Plan, Restructuring Support Agreement, Term Sheet, and related commitments and settlements (which, for the avoidance of doubt, will not require Reorganized TCEH or the TCEH Debtors to make any cash payments to the EFH Debtors or Reorganized EFH Debtors); *provided*, *however*, Reorganized TCEH will cure and pay any and all amounts due and owing with respect to the Shared Services as of the Effective Date to the extent such payments are authorized pursuant to the Cash Management Order; *provided*, *further*, that employees of EFH and EFH Corporate Services must be transferred to Reorganized TCEH; *provided*, *further*, that Reorganized EFH shall retain liability, if any, for the Legacy General Unsecured Claims.<br><br>The TCEH Debtors, the EFIH Debtors, the EFH Debtors, the Required EFIH Unsecured Consenting Creditors and the Ad Hoc TCEH Committee will negotiate in good faith to reach an agreement on mutually acceptable terms regarding transition services reasonably necessary to the continued operation of Reorganized EFIH and/or Reorganized EFH relating to the foregoing assets, employees, executory contracts, and operating liabilities. |
| **Termination of Competitive Tax Sharing Agreement** | On the Effective Date, the Competitive Tax Sharing Agreement shall automatically terminate and all Claims and Causes of Action arising thereunder or in any way related thereto shall be forever discharged, cancelled and released. |
| **Cancellation of Notes, Instruments, Certificates, and Other Documents** | On the Effective Date, except to the extent otherwise provided in this Term Sheet or the Plan, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be canceled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full and discharged. |
| **Issuance of New Securities; Execution of the Plan Restructuring Documents** | On the Effective Date, the Debtors, as applicable, shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Restructuring, including the Plan Restructuring Documents. |

| | |
|---|---|
| **Executory Contracts and Unexpired Leases** | Except as otherwise provided in this Term Sheet, the Plan will provide for the Debtors, in consultation with the Ad Hoc TCEH Committee and the Required EFIH Unsecured Consenting Creditors, to assume or reject, as the case may be, executory contracts and unexpired leases identified in the Plan Supplement to the extent that any such executory contracts and unexpired leases have not been otherwise assumed or rejected. |
| **Resolution of Contested Claims** | The Plan will provide for the resolution of Contested Claims. |
| **Retention of Jurisdiction** | The Plan will provide for the retention of jurisdiction by the Bankruptcy Court for usual and customary matters. |
| **Discharge of Claims and Termination of Interests** | Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (a) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has accepted the Plan.   The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring. |
| **Releases by the Debtors** | Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in any order resolving a Cause of Action that is entered in a proceeding of the sort described in Section 4.01(c) of the Restructuring Support Agreement, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other |

20

| | |
|---|---|
| | Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Liability Management Program, the Tax Sharing Agreements, the 2007 Acquisition, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, this Term Sheet, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, this Term Sheet, the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined in a final order to have constituted actual fraud or gross negligence.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. |
| **Releases by Holders of Claims and Interests of the Debtors** | As of the Effective Date, and except as otherwise specifically provided in any order resolving a Cause of Action that is entered in a proceeding of the sort described in Section 4.01(c) of the Restructuring Support Agreement, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Liability Management Program, the Tax Sharing Agreements, the 2007 Acquisition, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, this Term Sheet, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, this Term Sheet, the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Debtor, Reorganized Debtor, or Released Party that is determined in a final order to have constituted actual fraud or gross negligence.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any |

| | post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. |
|---|---|
| **Exculpation** | Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. |
| **Injunctions** | Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold claims or interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, Reorganized Debtors, or the Released Parties:  (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such Holder asserts, has, or intends to preserve any right of |

|  | setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan. |
|---|---|

| **OTHER MATERIAL PROVISIONS REGARDING THE RESTRUCTURING** | |
|---|---|
| **TCEH DIP Financing** | The TCEH Debtors' Chapter 11 Cases shall be funded with the proceeds of the TCEH DIP Financing and the Consenting TCEH First Lien Creditors consent to use of cash collateral and priming by the TCEH DIP Financing on the terms set forth in the TCEH Cash Collateral Order. |
| **EFIH DIP Financing** | The EFIH Debtors' Chapter 11 Cases shall be funded with the proceeds of the EFIH First Lien DIP Financing and the EFIH Second Lien DIP Financing.  EFIH will seek authority to use the cash collateral of Holders of EFIH First Lien Note Claims and EFIH Second Lien Note Claims and to prime such Holders with the EFIH First Lien DIP Financing on the terms set forth on **Exhibit G**. |
| **Customer Obligations** | The Debtors shall honor all of their ordinary course customer obligations during the course of the Restructuring. |
| **Use of EFH and EFIH Cash During Chapter 11 Cases** | Unless otherwise agreed by EFH, EFIH, and the Required EFIH Unsecured Consenting Creditors, during the Chapter 11 Cases, EFH and EFIH shall only make payments, including professional fees, in the ordinary course of business consistent with prepetition practices based on benefit to their respective estates, including to each other under the EFIH Shared Services Agreement, as approved pursuant to first day motions in the Chapter 11 Cases, or as otherwise set forth in the Term Sheet; *provided, however,* that EFIH shall be entitled to enter into voluntary settlements from time to time with (i) Non-Settling First Lien Note Holders on economically equal terms to, or terms more favorable to the Estates than, the EFIH First Lien Settlement, so long as, except with respect to the EFIH First Lien Settlement, such terms provide for a settlement at no more than 102.25% of the principal amount of such Holders' EFIH First Lien Notes; and, (ii) with the consent of the Required EFIH Unsecured Consenting Creditors, Non-Settling Second Lien Note Holders on economically equal terms, or terms more favorable to the Estates than the EFIH Second Lien Settlement, except that such consent shall not be required with respect to the EFIH Second Lien Settlement. |
| **Excess EFIH Cash Upon Consummation** | The Required EFIH Unsecured Consenting Creditors shall, in consultation with EFH and EFIH, determine before the Effective Date how the Excess EFIH Cash will be used on and after the Effective Date. |
| **Allocation of Professional Fees** | Any professional fees (the "**Professional Fees**") incurred by professionals retained by the Debtors (the "**Debtors' Professionals**") shall be allocated to, and paid by, the applicable Debtors for whose direct benefit such Professional Fees were incurred (the "**Direct Benefit Fees**").  To the extent a Professional Fee is incurred for the collective benefit of the EFH Debtors, EFIH Debtors, and TCEH Debtors (the "**Collective Benefit Fees**"), such Professional Fees shall be allocated to each Debtor in the same proportion that the amount of Direct Benefit Fees incurred by such Debtor's Professional for such Debtor bears to the total amount of Direct Benefit Fees incurred by such Debtor's Professional for all of the Debtors, on a monthly |

|  | basis in connection with the Debtor's Professional's fee application (the "**Collective Fee Allocation**"). In connection with any quarterly/interim or final applications for payment of Professional Fees, the Debtors shall, as amongst themselves, make any necessary intercompany transfers or other adjustments such that the total Collective Benefit Fees for each of the Debtor's Professionals for the applicable fee period is allocated in a manner consistent with the Collective Fee Allocation for such period. |
|  | Any professional fees incurred by professionals retained by Fidelity for which the Debtors' have agreed to become liable shall be allocated on the following basis: (a) 50% to the EFH Debtors and (b) 50% to the EFIH Debtors. Any professional fees incurred by professionals retained by the Commitment Parties for which the Debtors' have agreed to become liable shall be allocated 100% to the EFIH Debtors. Any professional fees incurred by professionals retained by Holders of EFH Interests (together with the Professional Fees incurred by the Debtors' Professionals and all professional fees discussed in this paragraph, the "**Total Professional Fees**") for which the Debtors' have agreed to become liable shall be allocated 100% to the EFH Debtors. |
|  | On the Effective Date, the first $7.5 million of the Total Professional Fees that would have otherwise been allocated to the EFH Debtors on the terms as set forth above shall instead be allocated to EFIH. |
|  | After the Petition Date, all payment of Professional Fees, including any allocation formula, shall be subject to any applicable orders of the Bankruptcy Court (on an interim or final basis). |
| **Incentive Plans** | The Ad Hoc TCEH Committee and the Required EFIH Unsecured Consenting Creditors shall negotiate in good faith with the TCEH Debtors, the EFH Debtors, and the EFIH Debtors regarding the terms of key employee incentive plans for which the Debtors shall seek approval from the Bankruptcy Court during the Chapter 11 Cases. |
| **Employment Obligations** | Pursuant to the Restructuring Support Agreement and this Term Sheet, the Consenting Creditors consent to each of the Debtors' "first day" or "second day" motions relating to wages, compensation, and benefits, including executive compensation programs. After the Effective Date, the Reorganized Debtors' wages, compensation, and benefit programs shall be acceptable, in the case of Reorganized TCEH, to the TCEH Debtors and the Ad Hoc TCEH Committee and, in the case of Reorganized EFH, to the EFH Debtors and the Required EFIH Unsecured Consenting Creditors. |
|  | Additionally, employees who are party to employment agreements with the Debtors may receive new employment agreements with the applicable Reorganized Debtor, the terms and conditions of which shall be acceptable, in the case of Reorganized TCEH, to the TCEH Debtors and the Ad Hoc TCEH Committee and, in the case of Reorganized EFH, to the EFH Debtors and the Required EFIH Unsecured Consenting Creditors. Until such time as these new employment agreements are fully executed, all employment agreements in place as of the Petition Date between the Debtors and their employees shall remain in place in accordance with the terms of such agreements pending the applicable Debtor's assumption or rejection of such agreements. |

| | |
|---|---|
| **Indemnification of Prepetition Directors, Officers, Managers, et al.** | Under the Restructuring, consistent with applicable law, all indemnification provisions currently in place (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be reinstated and remain intact and irrevocable and shall survive the effectiveness of the Restructuring.  For the avoidance of doubt, the TCEH Debtors and Reorganized TCEH shall not have any liability for, or any obligations in respect of, any indemnification provisions for the benefit of the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the EFH Debtors or the EFIH Debtors, in their capacities as such and the EFH Debtors and Reorganized EFH shall not have any liability for, or any obligations in respect of, any indemnification provisions for the benefit of the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the TCEH Debtors, in their capacities as such. |
| **Director, Officer, Manager, and Employee Tail Coverage** | On or before the Effective Date, the Debtors shall purchase and maintain directors, officers, managers, and employee liability tail coverage for the six-year period following the Effective Date on terms no less favorable than the Debtors' existing director, officer, manager, and employee coverage and with an available aggregate limit of liability upon the Effective Date of no less than the aggregate limit of liability under the existing director, officer, manager, and employee coverage upon placement; *provided*, *however*, that the costs of such policies shall be reasonably allocated among the Debtors in a manner reasonably acceptable to Required Consenting Creditors. |
| **Claims of the Debtors** | The Reorganized Debtors, as applicable, shall retain all rights to commence and pursue any Causes of Action, other than any Causes of Action released by the Debtors pursuant to the release and exculpation provisions outlined in this Term Sheet. |
| **Conditions Precedent to Restructuring** | The following shall be conditions to Consummation of the Restructuring (the "**Conditions Precedent**"):<br><br>(a) the Debtors shall have consummated the EFIH First Lien DIP Financing;<br><br>(b) the Debtors shall have consummated the EFIH Second Lien DIP Financing and the Equity Conversion in accordance with the Commitment Letter;<br><br>(c) the Debtors shall have consummated the EFIH First Lien Settlement and the EFIH Second Lien Settlement in accordance with this Term Sheet;<br><br>(d) the Debtors shall have obtained entry of the Approval Order, which order shall be in full force and effect and not subject to a stay;<br><br>(e) Holders of EFH Non-Guaranteed Notes shall have received not less than 37.15% on account of such Claims under to the Plan, which condition is waivable only by Fidelity as holder of a majority of the EFH Non-Guaranteed Notes on a personal and non-transferable |

basis, and ceases at any time Fidelity holds less than a majority of the EFH Notes;

(f)  immediately following the Distribution, the aggregate tax basis, for federal income tax purposes, of the assets held by Reorganized TCEH shall be equal to the Minimum Basis and the Basis Step-Up shall be no less than $2.1 billion;

(g)  the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan, including from the FERC, the NRC, and the PUC, as applicable; *provided*, *however*, that the PUC Regulatory Approval shall not be required to implement and effectuate the Plan as to the TCEH Debtors;

(h)  the Debtors shall have obtained the Private Letter Ruling from the IRS, which shall be in form and substance acceptable to the Required Consenting Creditors and shall include, *inter alia*, the Required Rulings;

(i)  the Debtors shall have entered into the Tax Matters Agreement, which shall be in form and substance acceptable to the Required Consenting Creditors;

(j)  other than as set forth in this Term Sheet (including, for this purpose, transactions described in the Pre-Submission Memo), the Debtors shall not have taken any action to change the entity classification for U.S. federal income tax purposes of any Debtor entity with material assets, by changing their legal form or otherwise, without the consent of the Required EFIH Unsecured Consenting Creditors and the Ad Hoc TCEH Committee; provided that the consent of the Ad Hoc TCEH Committee shall not be required with respect to the foregoing if such action by EFH, EFIH, or the Required EFIH Unsecured Consenting Creditors does not directly impact the TCEH Contribution and Distribution and does not prevent EFH from obtaining the Required Rulings; *provided*, *further*, that the consent of the Required EFIH Unsecured Consenting Creditors shall not be required with respect to the foregoing if such action by TCEH or the Ad Hoc TCEH Committee does not prevent EFH from obtaining the Required Rulings;

(k)  the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in a manner consistent in all material respects with the Restructuring Support Agreement, this Term Sheet, and the Plan;

(l)  the Restructuring Support Agreement shall remain in full force and effect;

(m)  all professional fees and expenses approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date have been placed in a professional fee escrow pending approval by the Bankruptcy Court;

(n)  the Bankruptcy Court shall have entered the Confirmation Order, which shall:

| | |
|---|---|
| | i.    authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan; |
| | ii.    decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent; |
| | iii.    authorize the Debtors, as applicable/necessary, to: (1) implement the Restructuring Transactions, including the Equity Conversion; (2) distribute the Reorganized EFH Common Stock, New Reorganized TCEH Debt, the Reorganized TCEH Common Stock, and the New Reorganized EFIH Debt, pursuant to the exemption from registration under the Securities Act provided by section 1145 of the Bankruptcy Code or other exemption from such registration or pursuant to one or more registration statements; (3) make all distributions and issuances as required under the Plan, including cash, the Reorganized EFH Common Stock, New Reorganized TCEH Debt, the Reorganized TCEH Common Stock, and the New Reorganized EFIH Debt; and (4) enter into any agreements, transactions, and sales of property as set forth in the Plan Supplement, including the Reorganized TCEH Management Incentive Plan; |
| | iv.    authorize the implementation of the Plan in accordance with its terms; and |
| | v.    provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax (including, any mortgages or security interest filing to be recorded or filed in connection with the New Reorganized TCEH Debt, the New Reorganized EFIH Debt, and the New Reorganized EFIH Junior Debt, as applicable); and |
| | (o)  the Debtors shall have implemented the Restructuring Transactions, including the Tax-Free Spin-Off and all transactions contemplated by the Commitment Letter, in a manner consistent in all material respects with the Restructuring Support Agreement, this Term Sheet, and the Plan. |
| **Waiver of Conditions Precedent to the Restructuring** | The Debtors, with the prior written consent of the Required Consenting Creditors and Required EFIH Unsecured Consenting Creditors (each acting in their sole discretion), may waive any one or more of the Conditions Precedent to the Restructuring. |

| **CORPORATE GOVERNANCE PROVISIONS/SECTION 1145 EXEMPTION** | |
|---|---|
| **Charter; Bylaws; Corporate Governance** | Corporate governance for Reorganized TCEH, including charters, bylaws, operating agreements, or other organization documents, as applicable, shall be consistent with section 1123(a)(6) of the Bankruptcy Code (as applicable) and the Tax Matters Agreement, and the composition of the Reorganized TCEH Board shall be determined by the Ad Hoc TCEH Committee in consultation with (i) TCEH and, (ii) as appropriate, with other Holders of TCEH First Lien Notes. |
| | Corporate governance for Reorganized EFH and Reorganized EFIH, including charters, bylaws, operating agreements, or other organization documents, as applicable, shall be consistent with section 1123(a)(6) of the Bankruptcy Code (as applicable) and the Tax Matters Agreement, and the composition of the Reorganized EFH Board, the Reorganized EFIH Board, and the officers of Reorganized EFH and Reorganized EFIH shall be determined by the Required EFIH Unsecured Consenting Creditors in consultation with (i) EFH, (ii) EFIH, (iii) Fidelity, and (iv) as appropriate, with other Holders of EFIH Second Lien DIP Claims or EFIH Unsecured Note Claims that will receive greater than 15% of the Reorganized EFH Common Stock upon the Effective Date. |
| **Exemption from SEC Registration** | The issuance of all securities under the Plan will be exempt from SEC registration under applicable law. |

[*Exhibits follow.*]

# EXHIBIT A

## DEFINITIONS

| Term | Definition |
| --- | --- |
| **2007 Acquisition** | The 2007 transaction in which TEF and Texas Holdings and their direct and indirect equity holders became the direct and indirect equity holders of the Debtors. |
| **Ad Hoc TCEH Committee** | The ad hoc committee of certain unaffiliated Consenting TCEH First Lien Creditors (as defined in the Restructuring Support Agreement) that is represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP and Millstein & Co., L.P. |
| **Additional Interest** | Additional interest payable on the EFIH First Lien Notes or EFIH Second Lien Notes, as applicable, under the registration rights agreement associated with such notes so long as EFIH has not registered such notes in accordance with the Securities Act, on the terms set forth in such registration rights agreement. |
| **Administrative Claim** | A Claim incurred by the Debtors on or after the Petition Date and before the Effective Date for a cost or expense of administration of the Chapter 11 Cases entitled to priority under sections 503(b), 507(a)(2), or 507(b) of the Bankruptcy Code. |
| **Affiliate** | As defined in section 101(2) of the Bankruptcy Code. |
| **Agreement Effective Date** | The effective date of the Restructuring Support Agreement, as such term is further defined in the Restructuring Support Agreement. |
| **Allowed** | Any Claim that is not a Contested Claim or a Disallowed Claim. |
| **Approval Motion** | As defined in the Term Sheet. |
| **Approval Order** | As defined in the Term Sheet. |
| **Avenue** | Avenue Capital Group and its affiliates. |
| **Bankruptcy Code** | Title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time. |
| **Bankruptcy Court** | As defined in the Term Sheet. |
| **Bankruptcy Rules** | The Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code, and the general, local, and chambers rules of the Bankruptcy Court. |
| **Bar Date** | The date established by the Bankruptcy Court by which Proofs of Claim must be filed with respect to such Claims, as may be ordered by the Bankruptcy Court. |
| **Basis Step-Up** | As defined in the Term Sheet. |
| **BNY** | The Bank of New York Mellon Trust Company, N.A., in its capacity as trustee under certain Indentures, described herein. |
| **Call Right** | As defined in the Term Sheet. |

| Term | Definition |
|------|------------|
| **Cash Management Order** | An order of the Bankruptcy Court, in form and substance acceptable to the Ad Hoc TCEH Committee, authorizing the Debtors to, *inter alia*, continue using their existing cash management system, maintain certain existing bank account and continue certain intercompany transactions. |
| **Cause of Action** | Any claims, Claims, Interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, in tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims on contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code. |
| **Chapter 11 Cases** | When used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and when used with reference to all the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court. |
| **Claim** | As defined in section 101(5) of the Bankruptcy Code against a Debtor. |
| **Claim Objection Deadline** | The deadline for filing objections to Claims as set forth in the Plan or in any Order of the Bankruptcy Court establishing a Bar Date. |
| **Class** | A category of Holders of Claims or Interests pursuant to section 1122(a) of the Bankruptcy Code. |
| **Code** | As defined in the Term Sheet. |
| **Collateral Trust Agreement** | That certain Collateral Trust Agreement, dated as of November 16, 2009, by and among EFIH, BNY, as trustee, and the other secured debt representatives party thereto. |
| **Collective Benefit Fees** | As defined in the Term Sheet. |
| **Commitment Letter** | That certain letter to EFH and EFIH from the Commitment Parties memorializing the EFIH Second Lien DIP Financing Commitment, dated as of April 29, 2014. |
| **Commitment Parties** | Those certain Holders of EFIH Unsecured Notes backstopping the EFIH Second Lien DIP Financing Commitment. |

| Term | Definition |
|---|---|
| **Competitive Tax Sharing Agreement** | That certain Federal and State Income Tax Allocation Agreement (as amended and restated from time to time), dated May 15, 2012, by and among EFH and certain of its direct and indirect subsidiaries. |
| **Conditions Precedent** | As defined in the Term Sheet. |
| **Confirmation** | Entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to the conditions set forth in the Plan and this Term Sheet. |
| **Confirmation Order** | The order entered by the Bankruptcy Court confirming the Plan. |
| **Consenting Creditors** | As defined in the Restructuring Support Agreement. |
| **Consenting Interest Holders** | As defined in the Restructuring Support Agreement. |
| **Consummation** | The occurrence of the Effective Date. |
| **Contested Claim** | A Claim (a) to the extent it is listed in the Schedules as disputed, contingent, or unliquidated, in whole or in part, and as to which no Proof of Claim has been filed; (b) if it is listed in the Schedules as undisputed, liquidated, and not contingent and as to which a Proof of Claim has been filed with the Bankruptcy Court, to the extent (i) the Proof of Claim amount exceeds the amount indicated in the Schedules, or (ii) the Proof of Claim priority differs from the priority set forth in the Schedules; (c) if it is not listed in the Schedules or was listed in the Schedules as disputed, contingent or unliquidated, in whole or in part, but as to which a Proof of Claim has been filed with the Bankruptcy Court; or (d) as to which an objection has been filed on or before the Claim Objection Deadline; provided, that a Claim (x) that is fixed in amount and priority pursuant to the Plan or by final order of the Bankruptcy Court or (y) with respect to which a Proof of Claim has been timely filed and no objection has been filed by the Claim Objection Deadline, shall not be a Contested Claim. |
| **Contribution** | As defined in the Term Sheet. |
| **Conversion Agreement** | That certain agreement governing the terms of the Equity Conversion, which shall be on the terms set forth on Exhibit B to the Commitment Letter. |
| **Conversion Shares** | Shares of Reorganized EFH Common Stock issued and outstanding as of the Effective Date which will be issued pursuant to the Equity Conversion. |
| **Debtors** | As defined in the Introduction. |
| **Disallowed Claim** | A Claim, or a portion thereof, that has been disallowed by a final order of the Bankruptcy Court. |

| Term | Definition |
|------|-----------|
| **Disclosure Statement** | The disclosure statement for the Plan, including all exhibits and schedules thereto and references therein that relate to the Plan that is prepared and distributed in accordance with this Term Sheet, the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law. |
| **Distribution** | As defined in the Term Sheet. |
| **EFCH** | As defined in the Introduction. |
| **EFCH 2037 Note Claims** | Any Claim derived from or based upon the EFCH 2037 Notes. |
| **EFCH 2037 Note Indenture** | That certain Indenture, dated as of December 1, 1995, by and among EFCH, as the issuer, and BNY, as trustee. |
| **EFCH 2037 Notes** | Collectively:  (a) the EFCH Fixed 2037 Notes; and (b) the EFCH Floating 2037 Notes. |
| **EFCH 2037 Note Trustee** | BNY, or any successor thereto, in its capacity as trustee under the EFCH 2037 Notes. |
| **EFCH Fixed 2037 Notes** | The 8.175% Unsecured Fixed Notes due January 30, 2037, issued by EFCH pursuant to the EFCH 2037 Note Indenture. |
| **EFCH Floating 2037 Notes** | The 1.245% Unsecured Floating Rate Notes due January 30, 2037, issued by EFCH pursuant to the EFCH 2037 Note Indenture. |
| **Effective Date** | The date to be selected by the Debtors, in consultation with the Required Consenting Creditors, for the Consummation of the Plan, or as soon thereafter as reasonably practicable. |
| **EFH** | As defined in the Introduction. |
| **EFH 2019 Note Indenture** | That certain Indenture, dated November 16, 2009, by and among EFH, as issuer, and BNY, as trustee. |
| **EFH 2019 Notes** | The 9.75% unsecured notes due October 15, 2019, issued by EFH pursuant to the EFH 2019 Note Indenture |
| **EFH 2020 Note Indenture** | That certain Indenture dated January 12, 2010, by and among EFH, as issuer, and BNY, as trustee. |
| **EFH 2020 Notes** | The 10.0% unsecured notes due January 15, 2020, issued by EFH pursuant to the EFH 2020 Note Indenture. |
| **EFH Cash** | Cash on hand at EFH, including Oncor TSA payments if such is determined by the Bankruptcy Court, less $38 million. |
| **EFH Corporate Services** | EFH Corporate Services Company, a Texas corporation. |
| **EFH Debtor Intercompany Claim** | A Claim by an EFH Debtor against another EFH Debtor. |
| **EFH Debtors** | Collectively:  (a) EFH; and (b) EFH's direct and indirect subsidiaries listed on **Exhibit C**. |

| Term | Definition |
|------|-----------|
| **EFH-EFIH Intercompany Claims** | Allowed Non-EFH Debtor Intercompany Claims held by EFIH against EFH; *provided, however*, that if the Restructuring Support Agreement terminates, such claims shall be reduced on a dollar-for-dollar basis to account for any Oncor TSA payments actually received by EFIH; *provided*, *further*, that, for the avoidance of doubt, all rights, offsets, claims, and defenses of EFH will be preserved (in all cases, subject to any defenses) with respect to such Claims. |
| **EFH Interest** | Any Interest in EFH. |
| **EFH LBO Note Primary Claims** | Any claims against EFH arising on account of the EFH LBO Notes. |
| **EFH LBO Note Claims** | Any claims arising on account of the EFH LBO Notes, including the EFH LBO Note Primary Claims and the EFH LBO Note Guaranty Claims.  If the recovery to Holders of EFH LBO Note Claims under the Plan is greater than 100% of the amount of such Claims, any recovery on account of such claims shall be returned to EFH or EFIH on a Pro Rata basis based on the relative distributions from such Estates; *provided*, *further*, that if Holders of General Unsecured Claims Against the EFIH Debtors receive any postpetition interest on account of their Claims, Holder of EFH LBO Note Claims shall be entitled to postpetition interest before any such amounts are returned. |
| **EFH LBO Note Indenture** | That certain Indenture, dated as of October 31, 2007, by and among EFH, as the issuer, EFCH and EFIH, as guarantors, and BNY, as trustee. |
| **EFH LBO Notes** | Collectively:  (a) the EFH LBO Senior Notes; and (b) the EFH LBO Toggle Notes. |
| **EFH LBO Notes Guaranty Claims** | Any guaranty claims against EFIH arising on account of the EFH LBO Notes. |
| **EFH LBO Notes Trustee** | BNY, or any successor thereto, in its capacity as trustee under the EFH LBO Notes. |
| **EFH LBO Senior Notes** | The 10.875% senior notes due November 1, 2017, issued by EFH pursuant to the EFH LBO Note Indenture. |
| **EFH LBO Toggle Notes** | The 11.25%/12.00% toggle notes due November 1, 2017, issued by EFH pursuant to the EFH LBO Note Indenture. |
| **EFH Legacy 2014 Notes** | The 5.55% series P senior notes due November 15, 2014, issued by EFH pursuant to the EFH Legacy Note Indenture. |
| **EFH Legacy 2024 Notes** | The 6.50% series Q senior notes due November 15, 2024, issued by EFH pursuant to the EFH Legacy Note Indenture. |
| **EFH Legacy 2034 Notes** | The 6.55% series R senior notes due November 15, 2034, issued by EFH pursuant to the EFH Legacy Note Indenture. |
| **EFH Legacy Note Indenture** | That certain Indenture, dated November 1, 2004, by and among EFH, as issuer, and BNY, as trustee. |

| Term | Definition |
|---|---|
| **EFH Legacy Notes** | Collectively:  (a) the EFH Legacy 2014 Notes; (b) the EFH Legacy 2024 Notes; and (c) the EFH Legacy 2034 Notes. |
| **EFH Non-Guaranteed Notes** | Collectively: (a) the EFH Unexchanged Notes; and (b) the EFH Legacy Notes. |
| **EFH Note Claim** | Any Claim derived from or based upon the EFH Notes. |
| **EFH Notes** | Collectively:  (a) the EFH Unexchanged Notes; (b) the EFH Legacy Notes; and (c) the EFH LBO Notes. |
| **EFH Notes Trustee** | BNY, or any successor thereto, in its capacity as trustee under the EFH Notes. |
| **EFH Properties** | EFH Properties Company, a Texas corporation. |
| **EFH Unexchanged Notes** | Collectively:  (a) the EFH 2019 Notes; and (b) the EFH 2020 Notes. |
| **EFH Unsecured Claim Fund** | All EFH assets, including the EFH Cash, and Causes of Action, but excluding Interests in EFIH, subject to all applicable rights and defenses of EFH.  In connection with the creation of the EFH Unsecured Claim Fund, the Debtors shall request a determination from the Bankruptcy Court regarding whether the payments under the Oncor Tax Sharing Agreement are assets of the Estates of the EFH Debtors or the EFH Unsecured Claim Fund (as successor to the rights of EFH in such respect). |
| **EFIH** | As defined in the Introduction. |
| **EFIH Debtor Intercompany Claim** | A Claim by an EFIH Debtor against another EFIH Debtor. |
| **EFIH Debtors** | Collectively:  (a) EFIH; and (b) EFIH Finance. |
| **EFIH Finance** | EFIH Finance Inc., a Delaware corporation. |
| **EFIH First Lien 2017 Note Indenture** | That certain Indenture, dated August 14, 2012, by and among EFIH and EFIH Finance, as issuers, and CSC Trust Company of Delaware, as successor trustee to BNY. |
| **EFIH First Lien 2017 Notes** | The 6.875% senior secured notes due August 15, 2017, issued by EFIH and EFIH Finance pursuant to the EFIH First Lien 2017 Note Indenture. |
| **EFIH First Lien 2020 Note Indenture** | That certain Indenture, dated August 17, 2010, by and among EFIH and EFIH Finance, as issuers, and CSC Trust Company of Delaware, as successor trustee to BNY. |
| **EFIH First Lien 2020 Notes** | The 10.0% senior secured notes due December 1, 2020, issued by EFIH and EFIH Finance pursuant to the EFIH First Lien 2020 Note Indenture. |
| **EFIH First Lien DIP Claims** | Any and all Claims derived from or based upon the EFIH First Lien DIP Financing. |

| Term | Definition |
|---|---|
| **EFIH First Lien DIP Financing** | The postpetition debtor-in-possession financing facility substantially on the terms set forth on **Exhibit G**. |
| **EFIH First Lien Indentures** | The EFIH First Lien 2020 Note Indenture and the EFIH First Lien 2017 Note Indenture. |
| **EFIH First Lien Makewhole Claim** | Any Claim derived from or based upon makewhole or other similar payment provisions under the EFIH First Lien Notes. |
| **EFIH Second Lien DIP Motion** | As defined in the Term Sheet. |
| **EFIH First Lien Note Claim** | Any Claim derived from or based upon the EFIH First Lien Notes. |
| **EFIH First Lien Notes** | Collectively:  (a) the EFIH First Lien 2017 Notes; and (b) the EFIH First Lien 2020 Notes. |
| **EFIH First Lien Settlement** | As defined in the Term Sheet. |
| **EFIH Second Lien 2021 Notes** | The 11.0% senior secured second lien notes due October 1, 2021, issued by EFIH and EFIH Finance pursuant to the EFIH Second Lien Note Indenture. |
| **EFIH Second Lien 2022 Notes** | The 11.75% senior secured second lien notes due March 1, 2022, issued by EFIH and EFIH Finance pursuant to the EFIH Second Lien Note Indenture. |
| **EFIH Second Lien Cash-Out Option** | As defined in the Term Sheet. |
| **EFIH Second Lien DIP Claims** | Any and all Claims derived from or based upon the EFIH Second Lien DIP Financing. |
| **EFIH Second Lien DIP Financing** | The postpetition debtor-in-possession financing facility substantially on the terms set forth on Exhibit A to the Commitment Letter. |
| **EFIH Second Lien DIP Motion** | As defined in the Term Sheet. |
| **EFIH Second Lien DIP Financing Commitment** | As defined in the Term Sheet. |
| **EFIH Second Lien DIP Roll Option** | As defined in the Term Sheet. |
| **EFIH Second Lien Makewhole Claim** | Any Claim derived from or based upon makewhole or other similar payment provisions under the EFIH Second Lien Notes. |
| **EFIH Second Lien Note Claim** | Any Claim derived from or based upon the EFIH Second Lien Notes. |
| **EFIH Second Lien Note Indenture** | That certain Indenture, dated April 25, 2011, by and among EFIH and EFIH Finance, as issuers, and BNY, as trustee. |
| **EFIH Second Lien Notes** | Collectively:  (a) the EFIH Second Lien 2021 Notes; (b) the EFIH Second Lien 2022 Notes. |

| Term | Definition |
| --- | --- |
| **EFIH Second Lien Settlement** | As defined in the Term Sheet. |
| **EFIH Senior Toggle Note Indenture** | That certain Indenture, dated December 5, 2012, by and among EFIH and EFIH Finance, as issuers, and UMB Bank, N.A, as trustee. |
| **EFIH Senior Toggle Notes** | The 11.25%/12.25% unsecured senior toggle notes due December 1, 2018, issued by EFIH and EFIH Finance pursuant to the EFIH Senior Toggle Note Indenture. |
| **EFIH Shared Services Agreement** | That certain Shared Services Agreement, dated March 28, 2014, by and among EFIH, EFIH Finance, and EFH Corporate Services. |
| **EFIH Unexchanged Note Indenture** | That certain Indenture, dated November 16, 2009, by and among EFIH and EFIH Finance, as issuers, and BNY, as trustee. |
| **EFIH Unexchanged Notes** | The 9.75% fixed senior notes due October 15, 2019, issued by EFIH and EFIH Finance pursuant to the EFIH Unexchanged Note Indenture. |
| **EFIH Unsecured Note Claim** | Any Claim against EFIH derived from or based upon the EFIH Unsecured Notes. |
| **EFIH Unsecured Notes** | Collectively: (a) the EFIH Senior Toggle Notes and (b) the EFIH Unexchanged Notes. |
| **Entity** | As defined in section 101(15) of the Bankruptcy Code. |
| **Equity Conversion** | The mandatory conversion of the EFIH Second Lien DIP Financing, inclusive of any Commitment Fee (which for the avoidance of doubt, assumes a $1.9 billion funding amount and the Funding PIK Fee), into 177,658,788 Conversion Shares, plus an additional 89,052 Conversion Shares for each million dollars of EFIH Second Lien DIP Financing in excess of $1,995 million, and less 89,052 shares of Conversion Shares for each million dollars of EFIH Second Lien DIP Financing less than $1,995 million outstanding on the Effective Date; provided, however, that the stated plan value of the Conversion Shares is at least equal to the adjusted issue price of the EFIH Second Lien DIP Financing.[2] For the avoidance of doubt, this is a negotiated plan value solely for purposes of the deal embodied in this Term Sheet and the Restructuring Support Agreement and shall not be binding upon any party to the extent the Plan is not confirmed and consummated. |
| **Estate** | As to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code. |

---

[2]   Calculated contemplated accrued interest as of April 30, 2014.

36

| Term | Definition |
|---|---|
| **Exculpated Parties** | Collectively, and in each case in its capacity as such: (a) the Debtors and Reorganized Debtors; (b) the Consenting Creditors; (c) the Consenting Interest Holders; (d) the DIP Agents; (e) the DIP Lenders; and (f) with respect to each of the foregoing entities in clauses (a) through (e), such Entity's current and former affiliates, equity holders (regardless of whether such interests are held directly or indirectly), subsidiaries, officers, directors, managers, principals, members, employees, agents, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals. |
| **Extended Outside Date** | As defined in the Restructuring Support Agreement. |
| **FERC** | The Federal Energy Regulatory Commission. |
| **Fidelity** | Collectively, Fidelity Investments and its affiliates that execute the Restructuring Support Agreement before the Petition Date. |
| **Fidelity Repayment** | The cash payment by Holders of General Unsecured Claims Against EFH other than Fidelity that elected to participate in their Pro Rata share of up to 9% of the Equity Conversion, which shall be used by EFIH to repay in cash the applicable Second Lien DIP Notes held by Fidelity in respect of such share, simultaneously with the Equity Conversion. |
| **General Unsecured Claim Against EFH** | Any Unsecured Claim against EFH that is not otherwise paid in full pursuant to a separate order of the Bankruptcy Court, including the EFH Note Claims and the EFH LBO Note Primary Claims, but excluding: (a) Administrative Claims against the EFH Debtors; (b) Intercompany Claims against the EFH Debtors; and (c) Other Priority Claims against the EFH Debtors. |
| **General Unsecured Claim Against the EFH Debtors Other Than EFH** | Any Unsecured Claim against one or more of the EFH Debtors other than EFH that is not otherwise paid in full pursuant to a separate order of the Bankruptcy Court, excluding: (a) Administrative Claims against the EFH Debtors; (b) Intercompany Claims against the EFH Debtors; and (c) Other Priority Claims against the EFH Debtors. |
| **General Unsecured Claim Against the EFIH Debtors** | Any Unsecured Claim against one or more of the EFIH Debtors that is not otherwise paid in full pursuant to a separate order of the Bankruptcy Court, including the EFIH Unsecured Note Claims and the EFH LBO Notes Guaranty Claims, but excluding: (a) Administrative Claims against the EFIH Debtors; (b) Intercompany Claims against the EFIH Debtors; and (c) Other Priority Claims against the EFIH Debtors. |

| Term | Definition |
|---|---|
| **General Unsecured Claim Against the TCEH Debtors** | Any Unsecured Claim against one or more of the TCEH Debtors that is not otherwise paid in full pursuant to separate order of the Bankruptcy Court, including the EFCH 2037 Note Claims, TCEH First Lien Deficiency Claims, TCEH Second Lien Note Claims, and TCEH Unsecured Note Claims, but excluding: (a) Administrative Claims against the TCEH Debtors; (b) Intercompany Claims against the TCEH Debtors; and (c) Other Priority Claims against the TCEH Debtors. |
| **GSO** | GSO Capital Partners and its affiliates. |
| **Holder** | An Entity holding a Claim or Interest, as applicable. |
| **Impaired** | With respect to any Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code. |
| **Incremental Amendment Agreement** | That certain Incremental Amendment No. 1, dated as January 4, 2013, by and among the Incremental 2012 Term Lenders (as defined therein), EFCH, TCEH, the Credit Parties (as defined therein) party thereto, and Citibank, N.A., as Administrative Agent and Collateral Agent. |
| **Intended Tax-Free Treatment** | As defined in the Term Sheet. |
| **Intercompany Claim** | A Claim by EFH or any direct or indirect subsidiary of EFH against EFH or any direct or indirect subsidiary of EFH. |
| **Interest** | Any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor. |
| **IRS** | The Internal Revenue Service. |
| **IRS Submission** | As defined in the Term Sheet. |
| **Legacy General Unsecured Claims Against EFH** | Any Claims against EFH arising from liabilities based on asbestos exposure and post-employment benefits relating discontinued operations of the Debtors and their Affiliates. |
| **Liability Management Program** | The various transactions, including debt buybacks, new debt issuances, debt exchanges, and maturity extensions, by EFH and its direct and indirect subsidiaries, and restructuring of such Entities' debt obligations completed before the Petition Date, as described in the Debtors' most recent annual SEC filing. |
| **Minimum Basis** | As defined in the Term Sheet. |
| **New Reorganized EFIH Debt** | The new long-term secured EFIH funded debt issued on the Effective Date on terms and conditions mutually acceptable to the EFIH Debtors and the Required EFIH Unsecured Consenting Creditors. |

| Term | Definition |
|---|---|
| **New Reorganized TCEH Debt** | The new long-term secured TCEH debt, consistent with the terms set forth in this Term Sheet.  The amount of the New Reorganized TCEH Debt issued on the Effective Date shall not be less than the Minimum Basis. |
| **Non-EFH Debtor Intercompany Claim** | A Claim by EFH or any direct or indirect subsidiary of EFH other than an EFH Debtor against an EFH Debtor, including EFH Note Claims held by EFIH. |
| **Non-EFIH Debtor Intercompany Claim** | A Claim by EFH or any direct or indirect subsidiary of EFH other than an EFIH Debtor against an EFIH Debtor. |
| **Non-Settling EFIH First Lien Note Holders** | As defined in the Term Sheet. |
| **Non-Settling EFIH Second Lien Note Holders** | As defined in the Term Sheet. |
| **Non-TCEH Debtor Intercompany Claim** | A Claim by EFH or any direct or indirect subsidiary of EFH other than a TCEH Debtor against a TCEH Debtor, including any Claim against a TCEH Debtor arising under or related to the Competitive Tax Sharing Agreement, but excluding any Claim derived from or based upon TCEH First Lien Notes held by EFH. |
| **NRC** | The Nuclear Regulatory Commission. |
| **Oak Grove Promissory Note** | The promissory note issued by Oak Grove Power Company LLC and secured by certain minerals and real property in Robertson, Texas. |
| **Oak Grove Promissory Note Claim** | Any Claim derived from or based upon the Oak Grove Promissory Note. |
| **Oncor Tax Sharing Agreement** | The amended and restated Tax Sharing Agreement, dated as of November 5, 2008, by and among EFH, Oncor Electric Delivery Holdings Company LLC, Oncor Electric Delivery Company LLC, Texas Transmission Investment LLC, and Oncor Management Investment LLC. |
| **Oncor TSA Amendment** | As defined in the Term Sheet. |
| **Oncor TSA Amendment Order** | As defined in the Term Sheet. |

| Term | Definition |
|---|---|
| **Oncor TSA Amendment Payment** | $55 million cash to be paid by EFIH to EFH on the Effective Date, which shall be paid to Holders of General Unsecured Claims Against EFH on the Effective Date; provided, however, that such payment from EFIH will be reduced dollar-for-dollar (for the avoidance of doubt, beginning with the first dollar of any shortfall) in the event that EFIH receives less than 80% of the amount shown below for the date that is nearest to the Effective Date: |

| | Effective Date: | Projected EFIH Net Tax Receipts: |
|---|---|---|
| | January 31, 2015 | $254 million |
| | February 28, 2015 | $261 million |
| | March 31, 2015 | $261 million |
| | April 30, 2015 | $321 million |
| | May 31, 2015 | $328 million |
| | June 30, 2015 | $387 million |
| | July 31, 2015 | $387 million |
| | August 31, 2015 | $394 million |
| | September 30, 2015 | $453 million |

| Term | Definition |
|---|---|
| **Other Priority Claim** | Any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code. |
| **Other Secured Claim** | Any Secured Claim against any of the Debtors, including the Oak Grove Promissory Note Claims and Tex-La Obligations, but not including a:  (a) TCEH First Lien Secured Claim; (b) TCEH Second Lien Secured Claim; (b) EFIH First Lien Note Claim; or (c) EFIH Second Lien Note Claim. |
| **Participation Rights** | The right to participate in the EFIH Second Lien DIP Financing as set forth in the Commitment Letter. |
| **Petition Date** | The date on which the Debtors commence the Chapter 11 Cases. |
| **PIMCO** | Collectively, funds and accounts under the management of Pacific Investment Management Company LLC and its subsidiaries, in each case solely to the extent that they hold EFIH First Lien Note Claims in the aggregate amounts set forth on PIMCO's signature page to the Restructuring Support Agreement. |
| **Plan** | As defined in the Introduction. |
| **Plan Restructuring Documents** | As defined in the Restructuring Support Agreement. |
| **Plan Supplement** | The compilation of documents and forms of documents, schedules, and exhibits to the Plan filed by the Debtors. |
| **PLR Participation Parties** | As defined in the Term Sheet. |

40

| Term | Definition |
|---|---|
| **PLR Participation Party Representative** | As defined in the Term Sheet. |
| **Pre-Submission Conference** | As defined in the Term Sheet. |
| **Pre-Submission Memo** | As defined in the Term Sheet. |
| **Priority Tax Claims** | Claims of governmental units of the type described in section 507(a)(8) of the Bankruptcy Code. |
| **Private Letter Ruling** | As defined in the Term Sheet. |
| **Professional Fees** | As defined in the Term Sheet. |
| **Proof of Claim** | A proof of Claim filed against any of the Debtors in the Chapter 11 Cases by the applicable Bar Date. |
| **Pro Rata** | The proportion that a Claim or Interest in a particular Class bears to the aggregate amount of the Claims or Interests in that Class, or the proportion of the Claims or Interests in a particular Class and other Classes entitled to share in the same recovery as such Claim or Interest under the Plan. |
| **PUC** | The Public Utility Commission of Texas. |
| **Reinstated** | (a) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the holder of such Claim, or (b) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (ii) reinstating the maturity of such Claim as such maturity existed before such default; (iii) compensating the holder of such Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; (iv) if such Claim arises from any failure to perform a nonmonetary obligation under a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the holder of such Claim for any pecuniary loss incurred by such holder as the result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the holder thereof. |

| Term | Definition |
|---|---|
| **Released Parties** | Collectively, and in each case in its capacity as such: (a) the Consenting Creditors; (b) the Commitment Parties; (c) any Selected Partners (as defined in the Commitment Letter); (d) any Selected Investment Commitment Partners (as defined in the Commitment Letter); (e) the Consenting Interest Holders; (f) the lenders under the TCEH DIP Financing, EFIH First Lien DIP Financing, and the EFIH Second Lien DIP Financing; (g) the agents under the TCEH Credit Agreement, TCEH DIP Financing, EFIH First Lien DIP Financing, and the EFIH Second Lien DIP Financing; and (h) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing entities in clauses (a) through (g), such Entity and its affiliates, and such Entity and its affiliates' current and former equity holders (regardless of whether such interests are held directly or indirectly), subsidiaries, officers, directors, managers, principals, members, employees, agents, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; provided, however, that any Holder of a Claim or Interest that opts out of the releases contained in the Plan shall not be a "Released Party." |
| **Releasing Parties** | Collectively, and in each case in its capacity as such: (a) the Consenting Creditors; (b) the Commitment Parties; (c) any Selected Partners (as defined in the Commitment Letter); (d) any Selected Investment Commitment Partners (as defined in the Commitment Letter); (e) the Consenting Interest Holders; (f) the lenders under the TCEH DIP Financing, EFIH First Lien DIP Financing, and the EFIH Second Lien DIP Financing; (g) the agents under the TCEH Credit Agreement, TCEH DIP Financing, EFIH First Lien DIP Financing, and the EFIH Second Lien DIP Financing; (h) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing entities in clauses (a) through (g), such Entity and its affiliates, and such Entity and its affiliate's current and former equity holders (regardless of whether such interests are held directly or indirectly), subsidiaries, officers, directors, managers, principals, members, employees, agents, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; (i) all holders of Claims that are deemed to accept the Plan; (j) all holders of Claims who vote to accept the Plan; and (k) all holders in voting Classes who abstain from voting on the Plan and who do not opt out of the releases provided by the Plan. |
| **Reorganized Debtors** | Collectively, and each in its capacity as such (and to the extent such Entity is a Debtor in the Chapter 11 Cases): (a) Reorganized EFH; (b) Reorganized EFIH; and (c) the Reorganized TCEH Debtors. |

| Term | Definition |
|---|---|
| **Reorganized EFH** | EFH, or any successor thereto, by merger, consolidation, or otherwise, on and after the Effective Date, it being understood that, as of the Effective Date, Reorganized EFH shall be a corporation organized under the laws of the state of Texas. |
| **Reorganized EFH Board** | The board of directors of Reorganized EFH on and after the Effective Date. |
| **Reorganized EFH Common Stock** | The newly-issued common stock in Reorganized EFH, which shall consist of 100 million shares prior to the Equity Conversion and the issuance of shares under the Reorganized EFH/EFIH Management Incentive Plan (if any), which shall be issued in accordance with this Term Sheet. The number of shares of newly-issued Reorganized EFH Common Stock may be increased or decreased at the direction of the Required EFIH Unsecured Consenting Creditors, which shall result in the proportionate increase or decrease, as applicable, of Reorganized EFH Common Stock issued under the Equity Conversion. |
| **Reorganized EFIH** | EFIH, or any successor thereto, by merger, consolidation, or otherwise, on and after the Effective Date, it being understood that, as of the Effective Date, Reorganized EFIH shall be a limited liability company organized under the laws of the state of Delaware. |
| **Reorganized EFIH Board** | The board of directors of Reorganized EFIH on and after the Effective Date. |
| **Reorganized TCEH** | TCEH, or any successor thereto, by merger, consolidation, or otherwise, on and after the Effective Date, it being understood that, as of the Effective Date, Reorganized TCEH shall be a corporation organized under the laws of the state of Delaware. |
| **Reorganized TCEH Board** | The board of directors of Reorganized TCEH on and after the Effective Date. |
| **Reorganized TCEH Common Stock** | The newly-issued common stock of Reorganized TCEH, which shall be issued in accordance with this Term Sheet. |
| **Reorganized TCEH Debtors** | TCEH and each of its Debtor subsidiaries, or any successor thereto, by merger, consolidation, or otherwise, on and after the Effective Date. |
| **Reorganized TCEH Management Incentive Plan** | The Management Incentive Plan of Reorganized TCEH on terms and conditions to be determined on or after the Effective Date by the compensation committee of the Reorganized TCEH Board. The maximum amount of Reorganized TCEH Common Stock to be allocated to the Management Incentive Plan will be determined by the Ad Hoc TCEH Committee, in consultation with the TCEH Debtors, on or before the hearing date regarding approval of the Disclosure Statement. |
| **Required Consenting Creditors** | As defined in the Restructuring Support Agreement. |

| Term | Definition |
|---|---|
| **Required EFIH Unsecured Consenting Creditors** | At least three (3) investment advisors that manage and/or advise funds or accounts that beneficially own, collectively, at least 66.6% of the EFIH Unsecured Note Claims held by all Consenting Creditors. |
| **Required Rulings** | As defined in the Term Sheet. |
| **Restructuring** | As defined in the Introduction. |
| **Restructuring Support Agreement** | The Restructuring Support and Lock-Up Agreement to which this Term Sheet is attached as <u>Exhibit A</u>, pursuant to which the Debtors, the Consenting Interest Holders, the Consenting Creditors, and the Permitted Transferees (if any) (as defined in the Restructuring Support Agreement) agree to pursue and implement the Restructuring, including the transactions contemplated by the Commitment Letter, consistent in form and substance in all material respects with this Term Sheet and the Plan. |
| **Restructuring Transactions** | Those mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions that the Debtors, the Consenting Interest Holders, and the Consenting Creditors reasonably determine to be necessary to implement the Plan. |
| **Ruling Request** | As defined in the Term Sheet. |
| **Rural Utilities Service** | An agency of the United States Department of Agriculture tasked with providing public utilities to rural areas in the United States through public-private partnerships. |
| **Schedules** | The schedules of assets and liabilities and the statements of financial affairs filed by the Debtors with the Bankruptcy Court, as required by section 521 of the Bankruptcy Code and in conformity with the Bankruptcy Rules, as such schedules and statements have been or may be amended or supplemented from time to time in accordance with Bankruptcy Rule 1009 |
| **SEC** | The Securities and Exchange Commission. |
| **Secured** | When referring to a Claim: (a) secured by a lien on property in which any of Debtors has an interest, which lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Debtors' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan, or separate order of the Bankruptcy Court, as a secured claim. |
| **Securities Act** | The Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder. |

| Term | Definition |
|---|---|
| **Security** | A security as defined in section 2(a)(1) of the Securities Act. |
| **Selected Partners** | As defined in the Commitment Letter. |
| **Settling EFIH First Lien Note Holders** | As defined in the Term Sheet. |
| **Settling EFIH Second Lien Note Holders** | As defined in the Term Sheet. |
| **Shared Services** | As defined in the Term Sheet. |
| **Tax-Free Spin-Off** | The transactions required to preserve the Intended Tax-Free Treatment of the Restructuring Transactions, including the Contribution and the Distribution. |
| **Tax Matters Agreement** | The tax matters agreement entered into by Reorganized EFH and Reorganized TCEH as of the Effective Date which shall govern the rights and obligations of each party with respect to certain tax matters, including covenants to protect the Intended Tax-Free Treatment of the Restructuring Transactions and indemnity provisions if either party takes action that causes the Restructuring Transactions to fail to qualify for the Intended Tax-Free Treatment. |
| **Tax Sharing Agreements** | Collectively: (a) the Competitive Tax Sharing Agreement; and (b) the Oncor Tax Sharing Agreement. |
| **TCEH** | As defined in the Introduction. |
| **TCEH 2012 Incremental Term Loans** | The TCEH First Lien Claims deemed to have been incurred pursuant to Section 1 of the Incremental Amendment Agreement. |
| **TCEH 2015 Notes** | The 10.25% fixed senior notes due November 1, 2015, issued by TCEH and TCEH Finance pursuant to the TCEH 2015 Note Indenture. |
| **TCEH 2015 Note Indenture** | That certain Indenture, dated as of October 31, 2007, by and among TCEH and TCEH Finance, as the issuers; EFCH and certain TCEH subsidiaries, as guarantors, and Law Debenture Trust Company of New York, as successor trustee to BNY. |
| **TCEH Cash Collateral Order** | An order entered by the Bankruptcy Court approving the TCEH Debtors' use of the TCEH First Lien Creditors' cash collateral subject to the terms and conditions described therein, which order shall be in form and substance reasonably satisfactory to the Ad Hoc TCEH Committee. |
| **TCEH Credit Agreement** | The TCEH Credit Agreement, dated as of October 10, 2007, by and among TCEH, as the borrower; EFCH and certain TCEH subsidiaries, as guarantors; Wilmington Trust, N.A., as successor administrative and collateral agent to Citibank, N.A.; and the TCEH First Lien Lenders. |
| **TCEH Debtor Intercompany Claim** | A Claim by a TCEH Debtor against another TCEH Debtor. |

| Term | Definition |
|---|---|
| **TCEH Debtors** | Collectively: (a) EFCH; (b) TCEH; and (c) the TCEH subsidiaries listed on **Exhibit B**. |
| **TCEH DIP Claims** | Any and all Claims arising under or related to the TCEH DIP Financing. |
| **TCEH DIP Financing** | The TCEH Debtors' $4,475 million debtor-in-possession financing facility on the terms set forth on **Exhibit F**. |
| **TCEH Finance** | TCEH Finance, Inc., a Delaware corporation. |
| **TCEH First Lien Claims** | Any Claim derived from or based upon: (a) the TCEH Credit Agreement (including the term loan, revolver, and letter of credit facilities); (b) the TCEH First Lien Notes, including TCEH First Lien Notes held by EFH; (c) the TCEH First Lien Interest Rate Swaps; or (d) the TCEH First Lien Commodity Hedges. |
| **TCEH First Lien Commodity Hedges** | The commodity hedges entered into by TCEH and secured by the same collateral as Claims under the TCEH Credit Agreement and the TCEH First Lien Notes (but without respect to any setoff rights that a counterparty to a TCEH First Lien Commodity Hedge may have against TCEH). |
| **TCEH First Lien Deficiency Claims** | Any TCEH First Lien Claim that is not a TCEH First Lien Secured Claim. |
| **TCEH First Lien Interest Rate Swaps** | The interest rate swaps entered into by TCEH and secured by the same collateral as Claims under the TCEH Credit Agreement and the TCEH First Lien Notes (but without respect to any setoff rights that a counterparty to a TCEH First Lien Interest Rate Swap may have against TCEH). |
| **TCEH First Lien Lenders** | The lending institutions party from time to time to the TCEH Credit Agreement. |
| **TCEH First Lien Note Indenture** | That certain Indenture, dated as of April 19, 2011, by and among TCEH and TCEH Finance, as the issuers, EFCH and certain TCEH subsidiaries, as guarantors, and BNY, as trustee. |
| **TCEH First Lien Notes** | The TCEH first lien notes due October 1, 2020, issued by TCEH and TCEH Finance pursuant to the TCEH First Lien Note Indenture. |
| **TCEH First Lien Secured Claims** | Any TCEH First Lien Claim that is Secured. TCEH First Lien Secured Claims shall be Allowed as Secured Claims in an amount to be determined by the TCEH Debtors with the reasonable consent of the Ad Hoc TCEH Committee. |
| **TCEH Second Lien Note Claims** | Any Claim derived from or based upon the TCEH Second Lien Notes. |
| **TCEH Second Lien Note Indenture** | That certain Indenture, dated as of October 6, 2010, by and among TCEH and TCEH Finance, as the issuers; Citibank, N.A., as administrative agent, EFCH and certain of TCEH's subsidiaries, as guarantors, and Wilmington Savings, as successor trustee to BNY. |

| Term | Definition |
|---|---|
| **TCEH Second Lien Notes** | The TCEH Second Lien Notes due April 21, 2021, issued by TCEH pursuant to the TCEH Second Lien Note Indenture. |
| **TCEH Senior Toggle Note Indenture** | That certain Indenture, dated as of December 6, 2007, by and among TCEH and TCEH Finance, as the issuers; EFCH and certain TCEH subsidiaries, as guarantors; and Law Debenture Trust Company of New York, as successor trustee to BNY. |
| **TCEH Senior Toggle Notes** | The 10.50%/11.25% Senior Toggle Notes due November 1, 2016, issued by TCEH and TCEH Finance pursuant to the TCEH Senior Toggle Note Indenture. |
| **TCEH Unsecured Claim Fund** | Cash in an amount equal to the value of the unencumbered assets of TCEH. |
| **TCEH Unsecured Note Claims** | Any Claim derived from or based upon the TCEH Unsecured Notes. |
| **TCEH Unsecured Notes** | Collectively:  (a) the TCEH 2015 Notes; and (b) the TCEH Senior Toggle Notes. |
| **TEF** | As defined in the Restructuring Support Agreement. |
| **Term Sheet** | As defined in the Introduction. |
| **Tex-La** | Tex-La Electric Cooperative of Texas, Inc. |
| **Tex-La 2019 Obligations** | The payment obligations of EFCH under the terms of the Tex-La Assumption Agreement with respect to the 9.58% fixed notes due 2019 issued by Tex-La in the outstanding principal amount of $35 million. |
| **Tex-La 2021 Obligations** | The payment obligations of EFCH under the terms of the Tex-La Assumption Agreement with respect to the 8.254% Fixed Notes due 2021 issued by Tex-La in the outstanding principal amount of $37 million. |
| **Tex-La Assumption Agreement** | That certain Assumption Agreement, dated February 1, 1990, by and among EFCH, Tex-La, and the United States of America acting through the Administrator of the Rural Utilities Service, whereby EFCH agreed to assume certain payment obligations related to certain outstanding indebtedness of Tex-La that is guaranteed by the Rural Utilities Service. |
| **Tex-La Obligations** | Collectively:  (a) the Tex-La 2019 Obligations; and (b) the Tex-La 2021 Obligations, including any prepayment premiums and other costs and expenses due as full and final satisfaction of each of the foregoing. |
| **Texas Holdings** | As defined in the Restructuring Support Agreement. |
| **Total Professional Fees** | As defined in the Term Sheet. |
| **Tranche A-3 Redemption** | As defined in the Term Sheet |
| **Unimpaired** | With respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Impaired. |

| Term | Definition |
|---|---|
| **Unsecured Claim** | Any Claim that is not a Secured Claim. |
| **Wilmington Savings** | Wilmington Savings Fund Society, FSB, as successor trustee under the TCEH Second Lien Note Indenture. |
| **York** | York Capital Management LLC and its affiliates. |

## EXHIBIT B

## TCEH SUBSIDIARIES PARTY TO RESTRUCTURING

4Change Energy Company
4Change Energy Holdings LLC
Big Brown 3 Power Company LLC
Big Brown Lignite Company LLC
Big Brown Power Company LLC
Collin Power Company LLC
DeCordova Power Company LLC
DeCordova II Power Company LLC
Eagle Mountain Power Company LLC
Energy Future Competitive Holdings Company LLC
Generation MT Company LLC
Generation SVC Company
Lake Creek 3 Power Company LLC
Luminant Big Brown Mining Company LLC
Luminant Energy Company LLC
Luminant Energy Trading California Company
Luminant ET Services Company
Luminant Generation Company LLC
Luminant Holding Company LLC
Luminant Mineral Development Company LLC
Luminant Mining Company LLC
Luminant Renewables Company LLC
Martin Lake 4 Power Company LLC
Monticello 4 Power Company LLC
Morgan Creek 7 Power Company LLC
NCA Resources Development Company LLC
Oak Grove Management Company LLC
Oak Grove Mining Company LLC
Oak Grove Power Company LLC
Sandow Power Company LLC
TCEH Finance
Tradinghouse 3 & 4 Power Company LLC
Tradinghouse Power Company LLC
TXU Energy Receivables Company LLC
TXU Energy Retail Company LLC
TXU Energy Solutions Company LLC
TXU Retail Services Company
TXU SEM Company
Valley NG Power Company LLC
Valley Power Company LLC

**EXHIBIT C**

**EFH SUBSIDIARIES PARTY TO RESTRUCTURING**

Brighten Energy LLC
Brighten Holdings LLC
Dallas Power and Light Company, Inc.
Ebasco Services of Canada Limited
EEC Holdings, Inc.
EECI, Inc.
EFH Australia (No. 2) Holdings Company
EFH CG Holdings Company LP
EFH CG Management Company LLC
EFH Corporate Services Company
EFH Finance (No. 2) Holdings Company
EFH FS Holdings Company
EFH Renewables Company LLC
Generation Development Company LLC
Lone Star Energy Company, Inc.
Lone Star Pipeline Company, Inc.
LSGT Gas Company LLC
LSGT SACROC, Inc.
NCA Development Company LLC
Southwestern Electric Service Company, Inc.
Texas Electric Service Company, Inc.
Texas Energy Industries Company, Inc.
Texas Power and Light Company, Inc.
Texas Utilities Company, Inc.
Texas Utilities Electric Company, Inc.
TXU Electric Company, Inc.
TXU Receivables Company

## **EXHIBIT D**

### **REGARDED TCEH DEBTORS PARTY TO RESTRUCTURING**

4Change Energy Company
Generation SVC Company
Luminant Energy Trading California Company
Luminant ET Services Company
TCEH Finance
TXU Retail Services Company
TXU SEM Company

**<u>EXHIBIT E</u>**

**PRE-SUBMISSION MEMO**

**<u>EXHIBIT F</u>**

**TCEH DIP TERM SHEET**

**<u>EXHIBIT G</u>**

**EFIH FIRST LIEN DIP FINANCING TERM SHEET**

## <u>EXHIBIT H</u>

**EFIH SECOND LIEN DIP FINANCING TERM SHEET**

**<u>EXHIBIT I</u>**

**CLOSING CONDITIONS**

**<u>EXHIBIT J</u>**

**EQUITY CONVERSION TERM SHEET**

## <u>EXHIBIT K</u>

**SUMMARY OF KEY REPRESENTATIONS**

## EXHIBIT B

### TCEH SUBSIDIARIES PARTY TO RESTRUCTURING

4Change Energy Company
4Change Energy Holdings LLC
Big Brown 3 Power Company LLC
Big Brown Lignite Company LLC
Big Brown Power Company LLC
Collin Power Company LLC
DeCordova Power Company LLC
DeCordova II Power Company LLC
Eagle Mountain Power Company LLC
Energy Future Competitive Holdings Company LLC
Generation MT Company LLC
Generation SVC Company
Lake Creek 3 Power Company LLC
Luminant Big Brown Mining Company LLC
Luminant Energy Company LLC
Luminant Energy Trading California Company
Luminant ET Services Company
Luminant Generation Company LLC
Luminant Holding Company LLC
Luminant Mineral Development Company LLC
Luminant Mining Company LLC
Luminant Renewables Company LLC
Martin Lake 4 Power Company LLC
Monticello 4 Power Company LLC
Morgan Creek 7 Power Company LLC
NCA Resources Development Company LLC
Oak Grove Management Company LLC
Oak Grove Mining Company LLC
Oak Grove Power Company LLC
Sandow Power Company LLC
TCEH Finance
Tradinghouse 3 & 4 Power Company LLC
Tradinghouse Power Company LLC
TXU Energy Receivables Company LLC
TXU Energy Retail Company LLC
TXU Energy Solutions Company LLC
TXU Retail Services Company
TXU SEM Company
Valley NG Power Company LLC
Valley Power Company LLC

**EXHIBIT C**

**EFH SUBSIDIARIES PARTY TO RESTRUCTURING**

Brighten Energy LLC
Brighten Holdings LLC
Dallas Power and Light Company, Inc.
Ebasco Services of Canada Limited
EEC Holdings, Inc.
EECI, Inc.
EFH Australia (No. 2) Holdings Company
EFH CG Holdings Company LP
EFH CG Management Company LLC
EFH Corporate Services Company
EFH Finance (No. 2) Holdings Company
EFH FS Holdings Company
EFH Renewables Company LLC
Generation Development Company LLC
Lone Star Energy Company, Inc.
Lone Star Pipeline Company, Inc.
LSGT Gas Company LLC
LSGT SACROC, Inc.
NCA Development Company LLC
Southwestern Electric Service Company, Inc.
Texas Electric Service Company, Inc.
Texas Energy Industries Company, Inc.
Texas Power and Light Company, Inc.
Texas Utilities Company, Inc.
Texas Utilities Electric Company, Inc.
TXU Electric Company, Inc.
TXU Receivables Company

## EXHIBIT D

### REGARDED TCEH DEBTORS PARTY TO RESTRUCTURING

4Change Energy Company
Generation SVC Company
Luminant Energy Trading California Company
Luminant ET Services Company
TCEH Finance
TXU Retail Services Company
TXU SEM Company

**<u>EXHIBIT E</u>**

**PRE-SUBMISSION MEMO**

DRAFT 4.28.14
Privileged & Confidential

ENERGY FUTURE HOLDINGS CORP.
PRE-SUBMISSION MEMORANDUM FOR RULINGS UNDER
SECTIONS 368(A)(1)(G) AND 355

### I.    Overview

This memorandum describes a significant bankruptcy restructuring transaction that requires an Internal Revenue Service ("IRS") ruling in order to be implemented.  The proposed transaction involves the spin-off of the assets of Texas Competitive Electric Holdings LLC ("TCEH") from Energy Future Holdings Corp. ("EFH") pursuant to Section 355 and Section 368(a)(1)(G) (a "G reorganization").[1]  TCEH has an enterprise value of approximately $18 billion and, prior to the restructuring, liabilities in excess of $32 billion.  Without regard to TCEH, EFH indirectly holds (and will continue to hold indirectly following the restructuring) an 80% interest in a partnership with an enterprise value of approximately $17 billion.[2]

A multi-party restructuring support agreement ("RSA") that provides for the transaction described above has been filed with the U.S. Bankruptcy Court for the District of Delaware.  The consummation of those transactions is expressly conditioned on obtaining IRS rulings with respect to the proposed transactions as further set forth herein.  If the IRS rulings set forth herein are not obtained, the parties to the RSA will have the right to terminate the RSA and abandon the transactions described therein.  EFH believes that if the proposed transactions are abandoned, one or more creditor groups will seek the transfer of the assets of EFH (and the assets of its subsidiaries) in satisfaction of their claims, with any such transfers being taxable transactions resulting in an expected tax liability in excess of $6 billion.  EFH does not expect to have sufficient assets to satisfy such tax liability.

All parties to this transaction desire to avoid triggering a multi-billion dollar tax that cannot be paid and that would be subordinated to the claims of the secured creditors.  As a result, the parties have agreed on a structure for a transaction that all sides believe generally should be tax-free.  But given the magnitude of the issue, the unique tax issues that it raises, the cash cost of the potential tax liability, and the public attention that this transaction is apt to attract, the parties are willing to go forward only if it can be done pursuant to an IRS ruling that covers the qualification of the proposed transaction under Sections 368(a)(1)(G) and 355 and the other rulings described herein.

### II.    Facts

#### a.  Bankruptcy Reorganization

EFH is a Dallas, Texas-based holding company with a portfolio of competitive and regulated energy businesses in Texas that it operates through its direct and indirect subsidiaries.

---

[1]  Unless otherwise noted, all section references contained herein are to the Internal Revenue Code of 1986, as amended, and Treasury Regulation references are to the Treasury Regulations promulgated thereunder.

[2]  These valuations of $18 billion and $17 billion for TCEH and EFH's partnership subsidiary are illustrative only, based on the current trading prices of TCEH debt and the terms of the proposed transaction with EFIH creditors. Actual values at closing could be higher or lower.

1

EFH was acquired by a group of private equity funds (the "Sponsors") in 2007 pursuant to a leveraged buyout (the "LBO").    EFH owns 100% of the equity interests of Energy Future Competitive Holdings Company LLC ("EFCH") and Energy Future Intermediate Holding Company LLC ("EFIH"), both of which are disregarded entities for federal income tax purposes. EFCH's principal asset is its membership interest in TCEH, which, through its subsidiaries, is engaged in competitive electricity market activities primarily conducted in Texas.  TCEH, also a disregarded entity, has approximately $24 billion of first lien debt (the "TCEH Debt," the holders of which are referred to herein as the "TCEH Creditors"),[3] as well as $7.7 billion of second lien and unsecured debt.  EFIH's principal asset is its indirect 80% membership interest in Oncor Electric Delivery Co. LLC ("Oncor"), which it owns through Oncor Electric Delivery Holdings LLC, a disregarded entity ("Oncor Holdings").  Oncor is a partnership for federal income tax purposes and operates the largest transmission and distribution system in Texas.  EFIH has approximately $7.7 billion of first lien, second lien and unsecured debt (the holders of which are referred to herein as the "EFIH Creditors").  EFH also has approximately $1.9 billion of debt outstanding.[4]  The chart below summarizes the existing structure of the relevant entities:



To fund the 2007 LBO (which was the largest LBO in history), EFH and certain of its subsidiaries incurred substantial indebtedness, most of which currently resides at TCEH and EFIH.  EFH and its subsidiaries' debt levels have become unsustainable since the LBO, primarily because of rapid changes in the natural gas market that have caused a significant reduction in electricity prices.  As a result, EFH has been in negotiations with certain large creditors for more than one year in an effort to restructure indebtedness of EFH and its subsidiaries.

---

[3] Excludes obligations under certain first lien hedging arrangements.

[4] Includes approximately $1.3 billion of debt held by affiliate EFIH.

In these negotiations, the parties focused on developing a consensual restructuring plan that would achieve a sustainable capital structure and maximize the enterprise value of EFH and its subsidiaries without causing a taxable break-up of the EFH tax group, which would trigger significant tax liabilities at EFH. Unfortunately, no proposal garnered the necessary level of support from the relevant stakeholders. Accordingly, despite more than a year of negotiations and the development and consideration of numerous restructuring proposals, EFH and its subsidiaries' largest creditors were unable to reach an agreement on the terms of a restructuring that would maintain the existing EFH consolidated group (including its disregarded entities). The parties thus seemed destined to enter bankruptcy in April 2014 with no plan whatsoever, with the likely outcome being a break-up of the EFH group with each creditor group foreclosing on, or otherwise taking, its collateral (the assets of TCEH and EFIH) in taxable transactions. In doing so, EFH would recognize taxable gain with respect to virtually all of these assets, perhaps resulting in a tax liability in excess of $6 billion, with no ability to pay that tax. Indeed, EFH began discussions with the IRS regarding the possible implications of such a massive unpaid, uncollectible tax.

Within the last few weeks, a breakthrough occurred in the negotiations. The various creditor groups have agreed to attempt to implement a transaction pursuant to which the EFH group would be separated, but in a tax-free manner. More specifically, the idea is that TCEH would transfer its assets to a new corporation ("Spinco") that would then be distributed to the TCEH Creditors in a tax-free spin-off. We believe that this transaction should be tax-free as a G reorganization with a distribution occurring pursuant to Section 355. However, given the dollar magnitude of the potential tax liability, the relative lack of private letter rulings or other guidance regarding G reorganizations structured as spin-offs, and the unique issues presented by the transaction (as described below), the parties agreed that such a transaction could not be accomplished without an IRS ruling.

### b.  Proposed Transaction

Each of EFH, EFCH, TCEH and EFIH (and certain of their respective subsidiaries, excluding Oncor Holdings and Oncor) filed a voluntary petition for relief under Chapter 11 of the U.S. Bankruptcy Code with the U.S. Bankruptcy Court for the District of Delaware on April __, 2014. As noted above, the filings were made pursuant to the RSA among the debtors, their creditors and certain other parties. The agreement contemplates the tax-free spin-off of Spinco but specifically conditions the transaction on the receipt of a ruling from the IRS concluding that the proposed transactions qualify as a G reorganization and a distribution under Section 355.

The separation transaction contemplated by the RSA is as follows:

1. Before the effective date of the TCEH bankruptcy plan of reorganization (the "TCEH Plan"), TCEH will form Spinco as a limited liability company under the laws of Delaware, which will be a disregarded entity upon formation.

2. On or before such effective date, Spinco will issue new debt (the "Spinco Debt") to third parties (which may include the TCEH Creditors) for cash.

3

DRAFT 4.28.14
Privileged & Confidential

3. On such effective date, the TCEH Debt (and junior debt of TCEH) will be cancelled in exchange for each creditor's right to receive its recovery in accordance with the terms of the TCEH Plan.

4. Immediately following such cancellation, pursuant to the TCEH Plan, TCEH will transfer all of its assets and its ordinary course operating liabilities to Spinco in exchange for which TCEH will receive (i) 100% of the newly-issued equity interests of Spinco and (ii) the cash proceeds of the Spinco Debt.  None of the TCEH Debt will be assumed by Spinco (as all such debt will have been cancelled immediately prior to the transfer of assets to Spinco pursuant to the TCEH Plan).

5. Immediately thereafter, Spinco will convert into a Delaware corporation pursuant to Delaware's conversion statute.  For federal income tax purposes, the incorporation of Spinco will be treated as if EFH contributed the Spinco assets to Spinco (a new corporation), with Spinco assuming the Spinco Debt, in exchange for all of the stock of Spinco (the "Contribution").  The Spinco Debt (together with other liabilities assumed by Spinco) is expected to exceed the tax basis in the assets transferred to Spinco by an amount approximately equal to EFH's net operating loss carryforwards ("NOLs").

6. Immediately following the Contribution, TCEH will distribute all of the Spinco stock and the cash proceeds from the Spinco Debt to the TCEH Creditors (the "Distribution," and together with the Contribution, the "Reorganization").  For federal income tax purposes, because TCEH and EFCH are disregarded entities, EFH will be treated as having made the Distribution to the TCEH Creditors.

The TCEH debt held by junior creditors (with a face amount of approximately $7.7 billion) will be cancelled in exchange for the recovery provided in the TCEH Plan.  It is expected that such creditors will receive a recovery of less than $350 million cash.

Under the EFIH bankruptcy plan, which will occur simultaneously with the TCEH Plan, the first lien and second lien EFIH Creditors will receive a combination of new EFIH debt and cash, as determined by negotiations among the parties.  The unsecured EFIH Creditors will receive EFH stock in a transaction that is expected to be treated as a recapitalization under Section 368(a)(1)(E).  It is currently contemplated that the unsecured EFIH Creditors will own 98% of the EFH stock immediately after the bankruptcy, subject to dilution for management equity and the equity issuance described below.

The EFIH Creditors also may participate in and backstop an equity offering (or convertible DIP loan) to raise approximately $2.1 billion in exchange for approximately 65% of the EFH stock.  The cash proceeds of the equity offering (or convertible DIP loan) will be used to de-lever EFIH.  It is anticipated that such transaction will occur immediately after the exchange of the unsecured EFIH Creditors' claims for EFH stock.

After all transactions described above have occurred, (i) the Spinco stock will be held 100% by the TCEH Creditors; and (ii) the EFH stock will be held 2% by the Sponsors and

unsecured EFH creditors and 98% by the unsecured EFIH Creditors, subject to dilution for management equity and the approximate 65% equity issuance described above.

EFH believes that the Reorganization qualifies as a G reorganization and the Distribution qualifies under Sections 355 and 356, as described in more detail below.[5]

## III.    Analysis

### a.    Qualification as a G Reorganization

#### i.    Generally

A G reorganization is statutorily defined generally as a transfer of assets by a corporation to another corporation in a title 11 or similar case, but only if, in pursuance of the plan, stock or securities of the transferee corporation are distributed in a transaction that qualifies under Section 354 (an acquisitive G reorganization), Section 355 (a divisive G reorganization) or Section 356.[6] The statutory requirements of a G reorganization should be satisfied here, provided that the Distribution qualifies under Sections 355 and Section 356 (as discussed below), because EFH (the sole owner of TCEH, which is a disregarded entity) is treated as transferring assets to Spinco in the Contribution, which will occur in a bankruptcy case.[7]

As with any reorganization under Section 368, a G reorganization also must satisfy the nonstatutory business purpose, continuity of business enterprise ("COBE") and continuity of interest ("COI") requirements.[8]   The ruling request to be submitted will describe in detail the satisfaction of these requirements under applicable authority.  For purposes of this memorandum, the focus is on the COI requirement, as this presents an area of uncertainty.

#### ii.    Continuity of Interest

There is no authority regarding the application of the Section 368 COI requirement to divisive G reorganizations (i.e., G reorganizations qualifying under Section 355).  The Section 368 COI requirement does not apply to divisive D reorganizations in the same manner as to acquisitive reorganizations, in that divisive D Reorganizations must effectively only satisfy the Section 355 COI requirement (discussed below).[9]  Divisive G reorganizations should be treated similarly to divisive D reorganizations.  Nevertheless, in the absence of prior guidance, the

---

[5] The EFIH Creditors are considering an internal restructuring of EFH at or following emergence from bankruptcy to maximize the value of EFH in the marketplace.  Among the transactions being considered are (i) causing Oncor to become a disregarded entity, either by purchasing the 20% minority interest or acquiring such interest for equity in EFH, (ii) restructuring Oncor so as to permit EFH to qualify as a REIT, (iii) transferring certain of Oncor's assets into a separate partnership or (iv) causing EFIH to become a partnership.  Any such transaction will be structured such that the continuity of interest and active trade or business requirements for the Reorganization would be satisfied.

[6] I.R.C. § 368(a)(1)(G).

[7] There appear to be very few private letter rulings in which the IRS has ruled on a G reorganization qualifying under Section 355.  *See, e.g.,* PLR 200345049 (Nov. 7, 2003).

[8] Treas. Reg. § 1.368-1(b), (c).

[9] Treas. Reg. § 1.368-1(b).

following discussion also analyzes the Section 368 COI requirement assuming that a divisive G reorganization must satisfy such requirement in addition to the Section 355 COI requirement. Although the Section 355 COI test may differ from the Section 368 COI test, ultimately the analysis should be substantially the same as it relates to treating the creditors of an insolvent corporation as holding a proprietary interest in the corporation before and, by virtue of exchanging for shares, after the Distribution. In short, the Reorganization should satisfy the Section 368 COI requirement (as well as the Section 355 COI requirement) because the TCEH Creditors (and, for purposes of the Section 355 COI requirement, the unsecured EFIH Creditors) should be treated as holding a proprietary interest in EFH prior to the Reorganization for purposes of both COI tests.

Pursuant to the Treasury Regulations, COI "requires that in substance a substantial part of the value of the proprietary interests in the target corporation be preserved in the reorganization," and that such a proprietary interest is preserved "if it is exchanged for a proprietary interest in the issuing corporation."[10] In the Reorganization, the TCEH Creditors will exchange the TCEH Debt for stock of Spinco and cash. Because TCEH and EFCH are disregarded entities, the TCEH Creditors are treated as creditors of EFH for federal income tax purposes. The Spinco stock received by the TCEH Creditors clearly is a proprietary interest in Spinco (the issuing corporation). Thus, the determination of whether the Section 368 COI requirement can be satisfied in the Reorganization turns on whether the TCEH Creditors are treated as holding a proprietary interest in EFH (the target corporation) before the Reorganization.

The seminal *Alabama Asphaltic* case stands for the proposition that, in certain circumstances involving insolvent corporations, creditors of such corporation can be treated as holding an equity (or proprietary) interest in such corporation.[11] COI Treasury Regulations finalized in 2008 codify the principles of *Alabama Asphaltic*, providing as follows:

> A creditor's claim against a target corporation may be a proprietary interest in the target corporation if the target corporation is in a title 11 or similar case (as defined in section 368(a)(3)) or the amount of the target corporation's liabilities exceeds the fair market value of its assets immediately prior to the potential reorganization. In such cases, if any creditor receives a proprietary interest in the issuing corporation in exchange for its claim, every claim of that class of creditors and every claim of all equal and junior classes of creditors (in addition to the claims of shareholders) is a proprietary interest in the target corporation immediately prior to the potential reorganization to the extent provided in paragraph (e)(6)(ii) of this section.[12]

---

[10] Treas. Reg. § 1.368-1(e)(1)(i).

[11] *Helvering v. Alabama Asphaltic Limestone Co.*, 315 U.S. 179 (1942).

[12] Treas. Reg. § 1.368-1(e)(6). Although separate continuity rules contained in Treas. Reg. §1.355-2(c) apply to Section 355 transactions, this principle that creditors of an insolvent entity should be treated as owners should continue to apply. Treas. Reg. §1.355-2(c) merely refers to "one or more persons who, directly or indirectly, were the owners of the enterprise prior to the distribution or exchange". This regulation is consistent with treating a creditor as an owner for this purpose.

This regulation is consistent with the legislative history to the Bankruptcy Tax Act of 1980, Pub. L. 96-589, which states, "the most senior class of creditors to receive stock, together with all equal and junior classes (including shareholders who receive any consideration for their stock), should generally be considered the proprietors of the insolvent corporation for 'continuity' purposes."  S Rep. 96-1035, 96th Cong., 2d Sess. at 36-37, 1980-2 C.B. 620, 639 (1980).[13]

By virtue of TCEH and EFCH being disregarded entities, the TCEH Creditors' claims are treated as claims against EFH (the target corporation) for tax purposes.  Pursuant to the above Treasury Regulations, the TCEH Creditors (and junior creditors) should be treated as holding a proprietary interest in EFH immediately before the Reorganization because EFH is in a bankruptcy case and the amount of its liabilities exceeds the fair market value of its assets.

Once the TCEH Creditors and junior creditors are treated as proprietary interest holders in EFH, COI is determined by examining the mix of consideration received by the TCEH Creditors and junior creditors.  For this purpose, it is assumed that the Spinco stock received by the TCEH Creditors will have a fair market value of approximately $10 billion.[14]  Comparing such stock to the $350 million cash received by the junior creditors results in over 96% COI, more than sufficient to satisfy the Section 368 COI requirement.[15]

Because COI should be satisfied, the Reorganization should qualify as a G reorganization, provided that the Distribution otherwise qualifies under Sections 355 and Section 356.

### iii.  Tax Consequences to EFH and Spinco

Under Section 361(a), EFH recognizes no gain or loss upon the exchange of property pursuant to the Reorganization solely in exchange for stock in Spinco.  Notwithstanding the nonrecognition rule in Section 361(a), Section 357(c) can cause the transferor corporation to recognize gain to the extent that liabilities assumed by the transferee corporation exceed the tax basis of the assets transferred.[16]

Accordingly, if the amount of liabilities assumed by Spinco from TCEH in the Contribution exceed the basis of the assets transferred (as is expected), EFH generally would be required to recognize gain under Section 357(c)(1).  However, Section 357(c)(2)(B) provides an exception from such rule in the case of G reorganizations in which "no former shareholder of the

---

[13] *See also Atlas Oil v. Comm'r*, 36 T.C. 675 (1961); Rev. Rul. 59-222, 1959-1 C.B. 80.

[14] Under the formula set forth in Treas. Reg. § 1.368-1(e)(6)(ii)(A), only the value of the TCEH Creditors' claims that are exchanged for Spinco stock are taken into account in determining the value of the proprietary interest in EFH held by such creditors.  Thus, the cash received by TCEH Creditors does not count against the COI percentage.

[15] COI = $10B / ($10B + $350M) = 96.6%

[16] Although Section 357(c) generally is turned off in the consolidated group context under Treasury Regulations Section 1.1502-80(d), it is not turned off when either the transferor or transferee becomes a nonmember as a part of the same plan or arrangement.  Here, Spinco is either never a member of the group or will become a nonmember as part of the Reorganization, and thus, Treasury Regulations Section 1.1502-80(d) does not turn off Section 357(c). (See requested ruling #10 below.)

transferor corporation receives any consideration for his stock." In this case, the Sponsors will retain a small amount of stock in the distributing corporation and, therefore, Section 357(c)(2)(B) will not apply.

The Reorganization will be structured to trigger some gain under Section 357(c), achieving a partial step-up in the basis of the assets held by Spinco after the Reorganization.[17] It is contemplated that the amount of gain triggered would not exceed the NOLs available to offset such gain. Upon the Contribution, EFH will be treated as contributing the assets to Spinco and Spinco will be treated as assuming the Spinco Debt, which will exceed the tax basis of the assets transferred. As long as Section 357(c)(2)(B) does not apply, the excess liabilities assumed will trigger gain under Section 357(c). In such a case, EFH will recognize gain to the extent of such excess, providing Spinco with a partially stepped up basis in the assets.[18] Separately, the TCEH Debt will be cancelled prior to the Contribution. Therefore, such debt will not be treated as assumed by Spinco for purposes of Section 357.

### b. Qualification Under Section 355

#### i. Generally

Under Section 355(a) and (c), provided certain requirements are met, a distributing corporation may distribute stock or securities of a controlled subsidiary to its shareholders and security holders without causing either the distributing corporation or its shareholders and security holders to recognize income, gain, or loss. In order to qualify for tax-free treatment under Section 355, certain statutory requirements and nonstatutory requirements must be satisfied. The ruling request to be submitted will elaborate on all of those requirements.[19] For purposes of this memorandum, the focus is on the issues which are not adequately addressed by existing guidance and are critical to obtaining the requested rulings.

#### ii. TCEH Debt As "Securities" For Purposes of Section 355

Key to the satisfaction of Section 355 is that the TCEH Debt constitutes "securities" for purposes of Section 355. The TCEH Debt was originally issued in 2007 with a 2014 maturity date. A large portion of the debt was subject to a significant modification in 2011, which was treated as a deemed exchange for federal income purposes under Treasury Regulations Section 1.1001-3. As part of this modification, the maturity date was extended to 2017. Whether the security determination is made in 2007 or 2011, the TCEH Debt should be treated as securities.

#### iii. The Device Requirement

---

[17] The TCEH Creditors' support for the proposed transaction (rather than seeking a taxable asset transfer) was premised on Spinco's ability to increase the tax basis of the assets it would hold by an amount equal to the gain that EFH would recognize.

[18] I.R.C. §§ 357(c)(1) (flush language), 362(b).

[19] For example, both the distributing (EFH) and controlled (Spinco) corporations (or members of a "separate affiliated group," as defined in Section 355(b)(3)) have been engaged in active businesses for more than five years, and control of such corporations conducting such businesses has not been acquired by EFH (distributing) in taxable transactions within that five-year period.

Treasury Regulation Section 1.355-2(d)(1) provides that "Section 355 does not apply to a transaction used principally as a device for the distribution of the earnings and profits of the distributing corporation, the controlled corporation, or both."[20]  Notwithstanding the absence of authority in the context of a divisive G reorganization, the device requirement should not apply to a distribution to creditors because such a distribution cannot be taxed as a dividend, and thus, has no potential to convert a dividend to capital gain.

### iv.    The COI Requirement

After the Distribution, Spinco stock will be owned 100% by the TCEH Creditors, and EFH stock will be owned 100% by the Sponsors, unsecured EFH creditors and the unsecured EFIH Creditors.  Ownership of 100% of the stock of Spinco clearly is a sufficient percentage of ownership to establish a continuity of interest.  The determination of whether COI is satisfied under Section 355 turns on whether the TCEH Creditors and the unsecured EFIH Creditors are considered "owners of the enterprise" (i.e., owners of EFH) prior to the Distribution.[21]

The same Section 368 principles of treating creditors as proprietary interest holders in the bankruptcy or insolvency context also should apply for Section 355 COI purposes.  Commentators agree that the Section 368 and Section 355 COI principles should be applied similarly:

> "Given the difficulty of understanding why [COI] principles should apply differently in the section 355 context and the safeguards of the device requirement, section 355(d), and section 355(e), the authors believe that Reg. 1.355-2(c) should be modified to adopt similar principles to those contained in Reg. 1.368-1(e)."[22]

Thus, because the TCEH Creditors should be treated as holding a proprietary interest in EFH for Section 368 purposes (as discussed above), such creditors also should be treated as "owners of the enterprise" for Section 355 COI purposes.  The same analysis holds true for the unsecured EFIH Creditors and the unsecured EFH creditors.  Thus, because the TCEH Creditors will own 100% of Spinco, and the Sponsors, unsecured EFH creditors and unsecured EFIH Creditors will own 100% of EFH, after the Distribution, the Section 355 COI requirement should be satisfied.

After the Distribution, EFH expects to issue approximately 65% of its stock for $2.1 billion.  However, such stock offering does not decrease the value of the interest in EFH held by

---

[20] Treas. Reg. § 1.355-2(d)(1).

[21] Treas. Reg. § 1.355-2(c) provides that the COI requirement in the context of a distribution under Section 355 is satisfied if one or more persons who, directly or indirectly, were the "owners of the enterprise" prior to the distribution own, in the aggregate, an amount of stock establishing continuity of interest in each of the distributing and controlled corporation.

[22] Thomas F. Wessel, Joseph M. Pari, and Richard D'Avino, *Corporate Distributions Under Section 355*, Tax Strategies for Corporation Acquisitions, Dispositions, Distributions, Joint Ventures, Financings, Reorganizations and Restructurings (PLI 2014).

the unsecured EFIH Creditors, the Sponsors and the unsecured EFH creditors and therefore should not impact COI.

### v. Section 355(d)

Even if a distribution otherwise qualifies under Section 355, Section 355(d) requires recognition of corporate-level gain by a distributing corporation if a distribution of subsidiary stock or securities is a "disqualified distribution."[23] A disqualified distribution is a distribution to which Section 355 otherwise applies if, immediately after the distribution, "any person" holds a 50%-or-greater interest in either the distributing or controlled corporation consisting of "disqualified stock."[24] Generally, disqualified stock is (i) stock in the distributing or controlled corporation "purchased" within the 5-year period preceding the distribution, (ii) stock in the controlled corporation received in the distribution with respect to disqualified stock in the distributing corporation, or (iii) stock in the controlled corporation received in the distribution with respect to securities in the distributing corporation "purchased" within such 5-year period.[25] Generally, stock is "purchased" if acquired in a transaction other than a carryover basis transaction or a Section 351, 354, 355 or 356 transaction.[26]

Even assuming that the Spinco or EFH stock is "disqualified stock," Section 355(d) requires that a single person hold the requisite percentage of disqualified stock immediately after the distribution. No single TCEH Creditor will hold 50% or more of the stock in Spinco after the Distribution. Nor will any single unsecured EFIH Creditor hold 50% or more of EFH after the Distribution. However, Section 355(d)(7)(B) treats a group of persons acting pursuant to a plan or arrangement as a single person. The Treasury Regulations elaborate on Section 355(d)(7)(B), specifically providing that the receipt of stock by creditors in satisfaction of debt in a bankruptcy case does not cause the group of creditors to be treated as acting pursuant to a plan or arrangement under Section 355(d)(7)(B).[27] Thus, neither the TCEH Creditors nor the unsecured EFIH Creditors should be treated as a single person under Section 355(d)(7)(B). Accordingly, Section 355(d) should not apply to the Distribution.

Also, EFH expects to issue stock representing an approximate 65% interest in EFH after the Distribution. Section 355(d) should not apply to such a post-Distribution equity offering. Further, no single purchaser of stock in the offering will own 50% or more of EFH and such purchasers should not be aggregated under Section 355(d).

### c. Section 355(e)

The exception to Section 355(e) under Section 355(e)(4)(B) should apply because the Distribution will be made in a title 11 case. Accordingly, none of the Distribution, any pre-

---

[23] I.R.C. § 355(d)(1).

[24] I.R.C. § 355(d)(2).

[25] I.R.C. § 355(d)(3).

[26] I.R.C. § 355(d)(5)(A).

[27] Treas. Reg. § 1.355-6(c)(4)(ii).

10

closing trading of EFH debt, or post-closing trading of EFH or Spinco stock should trigger Section 355(e).

### d.   Treatment of Spinco as Nonmember of EFH Consolidated Group

Treasury Regulations Section 1.1502-6(a) provides that the common parent and each subsidiary "which was a member of the group during any part of the consolidated return year shall be severally liable for the tax for such year."  Treasury Regulations Section 1.1502-76(b) provides that when a corporation becomes a member of a group during a consolidated return year, it becomes a member of the group as of the end of the day on which it becomes a member. Here, Spinco becomes a corporation owned by EFH and immediately thereafter becomes wholly-owned by the TCEH Creditors before the end of a single day.  Accordingly, Spinco is not a member of the EFH consolidated group at the end of such day, the time at which it would be treated as a member of the group under Treasury Regulations Section 1.1502-76(b).[28]  Because Spinco is not a member of the group at such time, it should not be treated as ever becoming a member of the group.

### e.   Allocation of EFH Earnings and Profits to Spinco

Section 312(h) provides that in a distribution or exchange to which Section 355 applies, allocation of the earnings and profits ("E&P") of the distributing corporation and the controlled corporation shall be made under regulations prescribed by the Secretary.  Treasury Regulations Section 1.312-10(a) provides that if a corporation transfers part of its assets constituting an active trade or business to a newly-created controlled corporation in a D reorganization and distributes the stock and securities of the controlled corporation in a distribution to which Section 355 applies, the E&P of the distributing corporation immediately before the transaction shall be allocated between the distributing corporation and the controlled corporation in proportion to the fair market value of the business or businesses (and interests in any other properties) retained by the distributing corporation and the business or businesses (and interests in any other properties) of the controlled corporation immediately after the transaction.

Treasury Regulations Section 1.312-10(b) provides for a different E&P allocation in the case of a Section 355 distribution of the stock or securities of an existing corporation (i.e., a Section 355 distribution that is not part of a D reorganization).  Although the application of Treasury Regulations Section 1.312-10(a) is limited on its face to a Section 355 distribution as part of a D reorganization, a G reorganization is closely analogous to a D reorganization and the method under such regulation also should apply in the case of a Section 355 distribution in a G reorganization.  Further, any equity offering by EFH that occurs immediately after the Reorganization (including the conversion of the DIP loan into EFH stock) should not be taken into account for purposes of allocating EFH's E&P to Spinco because the proceeds of such an offering are not part of the "business or businesses (or interests in any other properties) retained by" EFH following the Distribution.

---

[28] We note that Treas. Reg. § 1.1502-76(b)(1)(ii)(C) treats a successor to a member as a member "from the beginning of its existence."  Such regulation should not apply, however, where momentary affiliation prevents a potential successor from becoming a member of the group.

### f.   Impact on 2013 Private Letter Ruling

In April 2013, EFH effected an internal restructuring (the "2013 Reorganization") to eliminate an approximate $20 billion excess loss account ("ELA") and an approximate $5 billion deferred intercompany gain ("DIG") with respect to the stock of EFCH, which was a corporation at the time.  The 2013 Reorganization was the subject of PLR 201326006.  In PLR 201326006, the Service ruled, among other things, that as a result of a downstream merger, the ELA was eliminated without the recognition of gain under Treasury Regulations Section 1.1502-19(b)(2) and the DIG was redetermined to be excluded from income under Treasury Regulations Section 1.1502-13(c)(6)(ii)(C).

At the time of the 2013 Reorganization, the nature of any debt restructuring of the EFH group was unknown.  Specifically, it was not known (i) whether such a restructuring may have occurred in or out of a bankruptcy proceeding, (ii) whether TCEH assets or equity may be transferred to the TCEH Creditors, (iii) whether any EFH equity may be issued to any creditors of EFH and/or TCEH, or (iv) which entities may be included in any such restructuring.  However, it was certain that the existence of the ELA and the DIG prevented any type of debt restructuring and the 2013 Reorganization was key to proceeding with a debt restructuring.  The Reorganization should not adversely impact the conclusion of PLR 201326006.

## IV.    Requested Rulings

EFH intends to request the following rulings in the Ruling Request:

1.  The Reorganization qualifies as a G reorganization and the Distribution qualifies under Sections 355 and 356.[29]

2.  The TCEH Creditors and the unsecured EFIH Creditors are treated as "owners of the enterprise" for purposes of the Section 355 COI requirement.

3.  The TCEH Creditors are treated as holding a proprietary interest in EFH prior to the Reorganization for purposes of Section 368(a)(1)(G) and the COI requirement of a G reorganization is satisfied (or alternatively, that the Reorganization need only satisfy the Section 355 COI requirement).

4.  The device requirement under Section 355(a)(1)(B) does not apply to the Distribution.

5.  The TCEH Debt constitutes "securities" of EFH for purposes of Section 355 and Section 368(a)(1)(G).

---

[29] Notwithstanding the IRS ruling policy set forth in Rev. Proc. 2013-32, the proposed transaction is conditioned on the receipt of a ruling regarding the qualification of the Reorganization under Sections 368 and 355.  The unique nature of the transaction and the lack of guidance on divisive G reorganizations have made the parties unwilling to proceed without such a ruling.  In the words of the revenue procedure, the treatment of the transaction as a G reorganization and a Section 355 distribution is "essentially not free from doubt" even if the sub-issues described above are addressed by the ruling.

DRAFT 4.28.14
**Privileged & Confidential**

6. The EFIH debt held by the unsecured EFIH Creditors constitutes "securities" of EFH for purposes of Section 368(a)(1)(E).

7. Neither the TCEH Creditors nor the unsecured EFIH Creditors will be aggregated for purposes of Section 355(d).

8. The bankruptcy exception to Section 355(e) applies to the Distribution, any pre-Distribution trading of EFH debt, and post-Distribution trading of EFH and Spinco stock.

9. EFH recognizes gain under Section 357(c) to the extent that the Spinco Debt and other liabilities assumed by Spinco exceed the tax basis of assets transferred to Spinco in the Contribution, and Spinco's basis in the former TCEH assets is increased by the amount of such gain under Section 362(b).

10. The TCEH Debt is not treated as assumed by Spinco for purposes of Section 357(c) and (d).

11. Spinco is not treated as ever having been a member of the EFH consolidated group.

12. EFH's earnings and profits will be allocated between EFH and Spinco pursuant to Treasury Regulations Section 1.312-10(a) in proportion to the fair market value of the business or businesses (and interests in any other properties) retained by EFH and the business or businesses (and interests in any other properties) of Spinco immediately after the Distribution.

13. Any equity offering by EFH that occurs immediately after the Reorganization (including the conversion of the EFIH DIP loan into EFH stock) will not be taken into account for purposes of allocating EFH's earnings and profits to Spinco.

14. The Reorganization will not affect the prior ruling received by EFH regarding the 2013 Reorganization.

508551 000027 9611307.15

**<u>EXHIBIT F</u>**

**TCEH DIP TERM SHEET**

**MILBANK DRAFT 4/25/14**

**Exhibit A**

**TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC**

SUMMARY OF TERMS AND CONDITIONS OF THE **$4,475,000,000**
SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION FACILITIES
(**"TERM SHEET"**)

Capitalized terms used but not defined in this Exhibit A will have the meanings set forth in the Commitment Letter to which this Exhibit A is attached.

| | |
|---|---|
| **Borrower and other debtor-in-possession subsidiaries:** | Texas Competitive Electric Holdings Company LLC ("**TCEH**" or the "**Borrower**"), as a debtor-in-possession under Chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") and certain of its subsidiaries as debtors-in-possession under the Bankruptcy Code in jointly administered cases (collectively the **"Cases"**) in the United States Bankruptcy Court for the District of Delaware (such court, together with any other court having exclusive jurisdiction over the Cases from time to time and any Federal appellate court thereof, the **"Bankruptcy Court"**). |
| **Guarantors:** | All obligations under the DIP Facilities (defined below) and the other Loan Documents (defined below) will be unconditionally guaranteed by (a) Energy Future Competitive Holdings Company LLC ("**EFCH**"), as parent guarantor (the "**Parent Guarantor**") and (b) each subsidiary of the Borrower that is currently a guarantor under the Prepetition TCEH Credit Facility (defined below), as subsidiary guarantors (each a "**Subsidiary Guarantor**" and, collectively with the Parent Guarantor, the "**Guarantors**"), subject, in each case of other subsidiaries that may be required to become guarantors under the Loan Documents, to clause (ii) of "Priority/Security" below, covenant restrictions in joint venture agreements, general statutory limitations, corporate benefit and similar principles under applicable law, contractual restrictions and to the extent such guarantee would not result in adverse tax or accounting consequences, as reasonably determined by the Borrower, or as will require that such guarantee be limited by an amount or otherwise (collectively, "**Applicable Limitations**") to the extent of such Applicable Limitations, or as otherwise agreed by the Joint Lead Arrangers (defined below) and the Borrower (collectively, the "**Guarantee**"). |
| | All Guarantors shall also be debtors-in-possession under the Bankruptcy Code (such Guarantors, together with the Borrower, collectively the "**Debtors**"). |
| **Debtors:** | The Debtors are: (i) the Borrower, (ii) the Parent Guarantor and (iii) the subsidiaries of the Borrower identified on **Annex I** hereto. |

**Prepetition Secured Facilities:** The following are collectively referred to as the "**Prepetition Secured Facilities**":  (i) the Credit Agreement, dated as of October 10, 2007, among EFCH, TCEH, Citibank N.A., as administrative and collateral agent (the "**Prepetition First Lien Agent**"), and the other parties thereto (as amended, modified or supplemented and in effect prior to the Petition Date, the "**Prepetition TCEH Credit Facility**");

(ii) the 11.5% senior secured notes due October 1, 2020, issued under the indenture dated April 19, 2011, by and among TCEH and TCEH Finance, Inc., as issuers, The Bank of New York Mellon Trust Company, N.A. ("**BNY**"), as indenture trustee, EFCH and certain subsidiary obligors party thereto, as guarantors (the "**First Lien Secured Notes**");

(iii) (a) certain obligations to the Debtors' counterparties under certain first lien commodity hedges (the "**First Lien Commodity Hedges**"); and (b) certain obligations to the Debtors' counterparties under first lien interest rate swaps (the "**First Lien Interest Rate Swaps**," and together with the Prepetition TCEH Credit Facility, the First Lien Secured Notes and the First Lien Commodity Hedges, the "**Prepetition First Lien Debt**"), as provided in the Prepetition TCEH Credit Facility and the Restated Collateral Agency and Intercreditor Agreement dated as of October 10, 2007, as amended and restated as of August 7, 2009 (as amended, and in effect from time to time, the "**First Lien Intercreditor Agreement**"); and

(iv) the 15% senior secured second lien notes due April 1, 2021 and 15% senior secured second lien notes due April 1, 2021, Series B, issued under the indenture dated October 6, 2010, by and among TCEH and TCEH Finance, Inc., as issuers, BNY, as indenture trustee and collateral agent (the "**Prepetition Second Lien Agent**"), EFCH and certain subsidiary obligors party thereto, as guarantors, and supplemental indentures thereto (the "**Prepetition Second Lien Debt**").

**Eligible Pari Passu Hedges:** The Borrower shall be entitled to grant liens in the Collateral (defined below) to counterparties under certain "right-way" hedging agreements that are *pari passu* to the liens securing the DIP Facilities (the "**Eligible Pari Passu Hedges**").

**DIP Facilities:** (a) Revolver Facility:  A superpriority non-amortizing revolving credit facility (the "**Revolver Facility**") in an aggregate principal amount of $1,950,000,000 (the "**Revolver Commitments**").  Up to $800,000,000 of the Revolver Facility will be available in connection with Initial Availability (defined below) and up to $1,950,000,000 will be available in connection with Full Availability (defined below), in each case subject to the Revolver Commitments, in the form of loans for the account of the Debtors ("**Revolver Loans**").

(b) Delayed-Draw Term Facility:  A superpriority non-amortizing delayed draw term credit facility (the "**Delayed-Draw Term Facility**") in an aggregate principal amount of $1,100,000,000 (the "**Delayed-**

**<u>Draw Term Commitment</u>**") shall be made available for up to two drawings (in minimum amounts of $250,000,000 (or the remainder of the Delayed Draw Term Commitment, if less than $250,000,000)) during the period beginning on the Closing Date (it being understood and agreed that the Initial Availability for the Delayed-Draw Term Facility shall equal the full Delayed-Draw Term Commitment) and ending on the date that is 90 days after the Closing Date (the "**<u>Delayed-Draw Termination Date</u>**"), but only if the Borrower shall have theretofore issued and delivered the RCT Carve Out Support Rejection Notice (as defined below), for (i) the purpose of making loans to the Borrower to provide cash collateral to support obligations of the Debtors (or to refinance any cash collateral previously provided by the Debtors) to the Railroad Commission of Texas and/or (ii) working capital, general corporate and other purposes permitted under "**<u>Purpose: Use of Proceeds</u>**" below (collectively, the "**<u>Delayed-Draw Term Loans</u>**"). Amounts drawn under the Delayed-Draw Term Facility may not be reborrowed once repaid; <u>provided</u> that the Borrower will be under no obligation to elect to reduce the Delayed-Draw Term Commitments or the size of the Delayed-Draw Term Facility. Upon being drawn, Delayed-Draw Term Loans shall be deemed to constitute the same loan tranche as the Term Loans and shall have the same terms as the Term Loans.

The Delayed-Draw Term Facility shall be permanently reduced (dollar-for-dollar) by an amount (the "**<u>Delayed-Draw Term Facility Reduction Amount</u>**") equal to the difference between $1,100,000,000 and the amount of Delayed-Draw Term Loans actually requested by and provided to the Borrower on the earlier of (1) the date of drawing of all of the Delayed-Draw Term Commitments and (2) the Delayed-Draw Termination Date (such earlier date, the "**<u>Delayed-Draw Term Facility Reduction Date</u>**").

(c) Term Loan Facility: A superpriority non-amortizing term credit facility (the "**<u>Term Facility</u>**") in an aggregate principal amount of $1,425,000,000 (the "**<u>Term Commitments</u>**"). Up to $800,000,000 of the Term Facility in connection with Initial Availability and up to $1,425,000,000 in connection with Full Availability, in each case subject to the Term Commitments, will be available in the form of loans for the account of the Debtors ("**<u>Term Loans</u>**" and, together with the Revolver Loans and the Delayed-Draw Term Loans, the "**<u>Loans</u>**"). Up to $800,000,000 of the proceeds of the Term Loans may be applied by the Borrower to fund the General L/C Cash Collateral Account (as defined below). Amounts drawn under the Term Facility may not be re-borrowed once repaid.

| | |
|---|---|
| **General L/C Cash Collateral Account:** | To the extent so requested by the Borrower at its election, proceeds of the Term Facility may be deposited in one or more segregated depositary accounts under the name of the Borrower (collectively, the "**<u>General L/C Cash Collateral Account</u>**") to be subject to a first priority lien in favor of the Lenders and the other secured parties under the DIP Facilities and the General Letter of Credit Issuers (as defined |

below) and shall be invested in cash and cash equivalents as directed by the Borrower (with any such gains or losses being for the account of the Borrower).  For the avoidance of doubt, the commitment of the General Letter of Credit Issuers to issue General Letters of Credit shall not exceed the maximum stated amount set forth below under "General Letter of Credit Issuers".

The Borrower may at any time draw any funds in the General L/C Cash Collateral Account to the extent of the excess of such funds over the then aggregate undrawn amount of all General Letter of Credit plus the amount of unreimbursed drawings on General Letters of Credit; provided that the relevant General Letter of Credit Issuers shall have no obligation to issue General Letters of Credit in excess of the funds in the General L/C Cash Collateral Account. Any General Letter of Credit shall have the expiration dates (and renewal terms) agreed to with the relevant General Letter of Credit Issuer.

**General Letters of Credit:**    Drawings under General Letters of Credit shall be reimbursed by the Borrower (whether with its own funds or, at its election, with the proceeds in the General L/C Cash Collateral Account within one (1) business day of receipt of written notice from the Administrative Agent (as defined below) or the relevant General Letter of Credit Issuer to the effect that a General Letter of Credit has been drawn upon.

To the extent that the Borrower does not so reimburse the General Letter of Credit Issuer in respect of any General Letter of Credit, the General Letter of Credit Issuer may draw in its discretion any balances on deposit in the General L/C Cash Collateral Account in an amount up to such reimbursement obligation.

**RCT L/C Cash Collateral Account:**    To the extent so requested by the Borrower at its election, proceeds of the Delayed-Draw Term Facility shall be funded directly to one or more segregated depositary accounts under the name of the Borrower (collectively, the "**RCT L/C Cash Collateral Account**") to be subject to a first priority lien in favor of the Lenders and the other secured parties under the DIP Facilities and the RCT Letter of Credit Issuers (as defined below) and shall be invested in cash and cash equivalents as directed by the Borrower (with any such gains or losses being for the account of the Borrower).  The Borrower may also draw Delayed-Draw Term Loans and use the proceeds thereof as permitted under "**Purpose/Use of Proceeds**" below.  The RCT L/C Cash Collateral Account shall not be funded with proceeds of the Revolver Facility until the Term Facility and the Delayed-Draw Term Facility have been fully funded (or, in the case of the Delayed-Draw Term Facility, the Delayed-Draw Term Facility Reduction Date has occurred).  For the avoidance of doubt, the commitment of the RCT Letter of Credit Issuers to issue RCT Letters of Credit shall not exceed the maximum stated amount set forth below under "RCT Letter of Credit Issuers".

The Borrower may at any time draw any funds in the RCT L/C Cash Collateral Account to the extent of the excess of such funds over the

4

then aggregate undrawn amount of all RCT Letter of Credit plus the amount of unreimbursed drawings on RCT Letters of Credit; provided that (x) the relevant RCT Letter of Credit Issuers shall have no obligation to issue RCT Letters of Credit in excess of the funds in the RCT L/C Cash Collateral Account and (y) such drawn amounts may not be used for any purpose other than prepaying the Term Loans or the Delayed-Draw Term Loans. Any RCT Letter of Credit shall have the expiration dates (and renewal terms) agreed to with the relevant RCT Letter of Credit Issuer.

**RCT Letters of Credit:**   Drawings under RCT Letters of Credit shall be reimbursed by the Borrower (whether with its own funds or, at its election, with the proceeds in the RCT L/C Cash Collateral Account within one (1) business day of receipt of written notice from the Administrative Agent or the RCT Letter of Credit Issuers to the effect that a RCT Letter of Credit has been drawn upon.

Upon a drawing under an RCT Letter of Credit, the applicable RCT Letter of Credit Issuer will draw any balances on deposit in the RCT L/C Cash Collateral Account in an amount up to the Borrower's reimbursement obligation.

**Purpose/Use of Proceeds:**   The proceeds of the Term Loans and the Revolver Loans will be used, in a manner consistent with the terms of the Budget (defined below): (i) to finance any and all working capital needs and for any other general corporate purposes, including without limitation, to provide collateral support in respect of financial or physical trading transactions, including commodities transactions, and to comply with any legal and/or regulatory requirements of governmental and quasi-governmental entities (including for posting bonds and remediation or reclamation obligations of any nature, complying with any statutory or regulatory requirements and for self-bonding in respect of permits and licenses) of the Debtors, (and, to the limited extent set forth below, of the Specified Affiliates), (ii) to provide for Letters of Credit and (iii) to pay related transaction costs, fees, liabilities and expenses (including all Professional Fees (defined below)) and other administration costs incurred in connection with the Cases (including Adequate Protection Payments (defined below)) and the commitment, negotiation, syndication, documentation (including any commitment letters), execution and closing of the DIP Facilities.  The proceeds of the Delayed-Draw Term Loans will be used to fund the RCT L/C Cash Collateral Account.  Up to $800,000,000 of the proceeds of the Term Facility may be used to fund the General L/C Cash Collateral Account. The General Letters of Credit may be used for general corporate purposes, including without limitation, providing collateral support in respect of financial or physical trading transactions, including commodities transactions related to the Debtors' businesses and activities (and, to the limited extent set forth below, of the Specified Affiliates) and to comply with any legal and/or regulatory requirements of governmental and quasi-governmental entities (including for posting bonds and remediation or reclamation obligations of any nature (such as

with the Railroad Commission of Texas (the "**RCT**")) complying with any statutory or regulatory requirements and for self-bonding in respect of permits and licenses).  The RCT Letters of Credit will be used for the purpose of satisfying bonding requirements of the RCT.

| | |
|---|---|
| **Left Lead Revolving Arranger:** | Deutsche Bank Securities Inc. (the "**Left Lead Revolving Arranger**"). |
| **Left Lead Term Facilities Arranger:** | Citigroup Global Markets Inc. (the "**Left Lead Term Facilities Arranger**" and, together with the Left Lead Revolving Arranger, the "**Left Lead Arrangers**"). |
| **Joint Lead Arrangers:** | The Left Lead Term Facilities Arranger, the Left Lead Revolving Arranger, Merrill Lynch, Pierce, Fenner & Smith Incorporated ("**MLPFS**"), Morgan Stanley Senior Funding, Inc. ("**Morgan Stanley**"), Barclays Bank PLC ("**Barclays**"), RBC Capital Markets ("**RBCCM**"), and Union Bank, N.A. ("**Union Bank**", and together with the Left Lead Term Facilities Arranger, the Left Lead Revolving Arranger, MLPFS, Morgan Stanley, Barclays and RBCCM, collectively, the "**Joint Lead Arrangers**"). |
| **DIP Facilities Commitments and Lenders:** | The Revolver Facility, the Delayed-Draw Term Facility and the Term Facility (together with the Incremental Facilities, if any) are collectively referred to as the "**DIP Facilities**". The lenders under the Revolver Facility are referred to as the "**Revolver Lenders**", the lenders under the Delayed-Draw Term Facility are referred to as the "**Delayed-Draw Term Lenders**" and the lenders under the Term Facility are referred to as the "**Term Lenders**".  The Revolver Lenders, the Delayed-Draw Term Lenders and the Term Lenders (together with any lenders under the Incremental Facilities, if any) are collectively referred to as the "**Lenders**".   The Revolver Commitments, the Delayed-Draw Term Commitments and the Term Commitments are collectively referred to as the "**Commitments**". |
| **General Letter of Credit Issuers:** | Citi and other mutually and reasonably satisfactory banks (the "**General Letter of Credit Issuers**") shall provide for the issuance of General Letters of Credit cash collateralized with the proceeds in the General L/C Cash Collateral Account (the "**General Letters of Credit**") in an aggregate stated amount of up to $800,000,000, which amount may be increased from time to time as may be agreed between the Borrower and the relevant General Letter of Credit Issuers. |
| **RCT Letter of Credit Issuers:** | Each of the initial Revolver Lenders, pro rata in proportion to their Revolver Commitments, and other mutually and reasonably satisfactory banks (the "**RCT Letter of Credit Issuers**" and together with the General Letter of Credit Issuers, the "**Letter of Credit Issuers**") shall provide for the issuance of RCT Letters of Credit cash collateralized with the proceeds in the RCT L/C Cash Collateral Account (the "**RCT Letters of Credit**" and together with the General Letters of Credit, the "**Letters of Credit**") in an aggregate stated amount of up to $1,100,000,000, but only if the Borrower shall have theretofore issued and delivered the RCT Carve Out Support Rejection Notice prior to the |

6

Delayed-Draw Termination Date.

**Administrative Agent:** Citibank, N.A. (together with its permitted successors and assigns, the "**Administrative Agent**" or "**Agent**").

**Initial Availability:** During the period commencing on the date (the "**Interim Order Entry Date**") of the Bankruptcy Court's entry of the Interim Order (defined in Annex II attached hereto) and ending on the date the Bankruptcy Court enters the Final Order (defined in Annex II attached hereto) (such period, the "**Interim Period**"), the Commitments shall be available to the Borrower, subject to (i) delivery by the Debtors of a Budget (defined below) and (ii) compliance with the applicable terms, conditions and covenants described in this Term Sheet in an amount as follows:

1. Revolver Facility, $800,000,000;

2. Delayed-Draw Term Facility, $1,100,000,000; and

3. Term Facility, $800,000,000, or, in each case such other amount as may be approved by order of the Bankruptcy Court, to be made available during the Interim Period in accordance with the Budget (the "**Initial Availability**").

**DIP Facilities Full Availability:** Upon the Bankruptcy Court's entry of the Final Order (the "**Final Order Entry Date**"), the full amount of the Commitments shall be available to the Borrower subject to compliance with the applicable terms, conditions and covenants described in this Term Sheet (the "**Full Availability**"). Subject to the terms hereof, the balance of the DIP Facilities may be borrowed in amounts, and at intervals, to be set forth in the Loan Documents.

**Incremental Facilities:** The Borrower shall be entitled to enter into one or more incremental term loan facilities (the "**Incremental Term Facility**") and/or one or more Incremental Revolver facilities (the "**Incremental Revolver Facility**" and, together with the Incremental Term Facility, the "**Incremental Facilities**") that will rank pari passu in right of payment with the Revolver Facility, the Delayed-Draw Term Facility and the Term Facility and will have the same guarantees as, and be secured on a pari passu basis by the same Collateral securing, the Revolver Facility, the Delayed-Draw Term Facility and the Term Facility, in a principal amount allocated between the Incremental Facilities determined by the Borrower (x) in minimum amounts of at least $100,000,000 and (y) not to exceed the sum of (1) $750,000,000 plus (2) if the RCT Carve Out Support Rejection Notice shall have been issued and delivered prior to the Delayed-Draw Termination Date, the Delayed-Draw Term Facility Reduction Amount; provided that in each case:

(i)      no Event of Default or event that upon the passage of time, the giving of notice, or both, would become an Event of Default ("**Default**") under the Revolver Facility, the Delayed-Draw Term Facility or the Term Facility then exists or would exist immediately after giving effect

7

thereto, and the representations and warranties in the Loan Documents shall be true and correct in all material respects on and as of the date of the incurrence of such Incremental Facility (or, to the extent such representation and warranties relate to an earlier date, they shall be true and correct in all material respects as of such earlier date);

(ii)    such Incremental Facilities may be provided by then existing Lenders or, subject to the reasonable consent of the Administrative Agent, other persons who become Lenders in connection therewith if such consent would be required for an assignment to any such Lender under the Loan Documentation (provided that no existing Lender will be obligated to provide such Incremental Facilities without its consent);

(iii)    solely with respect to an Incremental Revolver Facility, pro forma compliance (assuming a full drawing of such Incremental Revolver Facility) after giving effect to all appropriate pro forma adjustments (but excluding all cash proceeds from such Incremental Revolver Facility) with the Consolidated Superpriority Secured Net Debt Leverage Test for the most recently ended quarterly test period for which financial statements are available;

(iv)    the maturity date of such Incremental Facilities shall be no earlier than the maturity date of the Revolver Facility, the Delayed-Draw Term Facility and the Term Facility, and such Incremental Facilities shall require no scheduled amortization or mandatory commitment reduction (other than pursuant to the same terms applicable to the Revolver Facility or the Term Facility, as applicable) prior to the final maturity of the Revolver Facility, the Delayed-Draw Term Facility and the Term Facility and, with respect to the Incremental Revolver Facility, shall be made pursuant to the same documentation, and (except as otherwise set forth in clause (v) below) shall be on the exact same terms, as are applicable to the Revolver Facility;

(v)    the interest rates, interest margins, any rate floors, fees, original issue and other funding discounts and premiums and (subject to clause (iv) above) amortization schedule applicable to such Incremental Facility shall be determined by the Borrower and the Lenders thereunder; _provided_ that the total yield on the Incremental Term Facility or Incremental Revolver Facility (inclusive of interest rate floors and any original issue discount or upfront fees, but excluding any customary arrangement, administrative, advisory, origination or similar fees in connection therewith that are not paid to all of the Lenders providing the Incremental Facility) does not exceed the total yield on the initial Term Facility or initial Revolver Facility, as applicable, by more than 50 basis points, but the Borrower may increase the total yield on the initial Term Facility or initial Revolver Facility, as applicable, on or prior to the date of the incurrence of such Incremental Term Facility or Incremental Revolver Facility, as applicable, in order to comply with this proviso;

(vi)    except as otherwise set forth above, such Incremental Term

8

Facility shall be on terms and pursuant to documentation to be determined between the Borrower and the Lenders thereunder; provided that to the extent such terms and documentation are not consistent with the Term Facility (except to the extent permitted by clauses (iv) and (v) above), they shall be reasonably satisfactory to the Administrative Agent; and

(vii)    the Final Order Entry Date shall have occurred.

**Documentation Principles:**    "**Documentation Principles**" means that (a) except as otherwise expressly set forth herein in this Term Sheet or the Commitment Letter, the terms and conditions of the mutually agreed definitive documentation for each of the DIP Facilities (the "**Loan Documents**") shall be consistent with the terms and conditions, and in no event more burdensome on the Debtors, than the terms and conditions of the Prepetition TCEH Credit Facility; (b) the Loan Documents will be prepared on the basis of, and using as precedent, the Prepetition TCEH Credit Facility and its related collateral documents; and (c) generally all terms and conditions (including exceptions, thresholds, baskets, grace periods, cure periods and financial definitions) in the Loan Documents will be consistent with those in the Prepetition TCEH Credit Facility and its related collateral documents and in no event more burdensome on the Debtors, in each case modified solely to the extent (i) required to reflect the express terms and conditions set forth in this Term Sheet and the Commitment Letter, (ii) required to reflect the shorter tenor of the DIP Facilities, (iii) to account for the existence and continuance of the Cases, the operational needs and requirements of the Debtors and the Specified Affiliates (defined below) between the Petition Date and the Maturity Date (including as set forth in the last two paragraphs of "**Negative Covenants**" below) and to include provisions applicable to debtor-in-possession facilities generally (including (subject to the last two paragraphs of "**Negative Covenants**" below) customary changes to be mutually agreed with respect to additional restrictions on indebtedness, liens, restricted payments, asset sales and investments), and (iv) as otherwise agreed by the Borrower.

**Budget:**    As used in this Term Sheet and in Annex II hereto, "**Budget**" means the following:

Beginning on the Interim Order Entry Date, in the case of the initial Budget delivered as a condition to the closing and the funding of the Initial Availability (the "**Initial Budget**"), a statement of cash sources and uses of all free cash flow for the next full 3-calendar months of the Debtors (on a consolidated basis) broken down by month, including the anticipated uses of the DIP Facilities for such period, and after such 3-calendar month period, at the end of each fiscal quarter (or, at the election of the Borrower, at the end of each calendar month or such other earlier period as may be agreed).

The Borrower shall also provide on a monthly basis a Budget variance report/reconciliation for each calendar month (delivered no

later than the end of the subsequent calendar month), (i) showing a statement of actual cash sources and uses of all free cash flow for the immediately preceding calendar month, noting therein all material variances from values set forth for such historical periods in the most recently delivered Budget, and shall include explanations for all material variances, and (ii) certified as to its reasonableness when made by the Borrower.

**Annual Operating Forecast:** Beginning on the date 60 days after the Interim Order Entry Date (and again no later than December 1, 2014 for the business plan and operating budget covering 2015 and no later than December 1, 2015 for the business plan and operating budget covering 2016), the approved annual business plan and projected operating budget through the stated maturity date (the "**Annual Operating Forecast**"), broken down by month, including, without limitation, income statements, balance sheets, cash flow statements, projected capital expenditures, asset sales, a line item for total available liquidity for the period of such Budget, and which shall set forth the anticipated uses of the DIP Facilities for such period; the associated underlying assumptions shall be certified by the Borrower as being reasonable when made.

Both the Budget and the Annual Operating Forecast shall provide, among other things, for the payment of the fees and expenses relating to the DIP Facilities, ordinary course administrative expenses, bankruptcy-related expenses and working capital, expected issuances and renewals of letters of credit, and other general corporate needs; provided, however, that notwithstanding anything to the contrary in this Term Sheet or in any of the Loan Documents, the Professional Fees (defined below) will be due and payable, and will be paid by the Debtors whether or not consistent with the items or amounts set forth in the Budget or the Annual Operating Forecast; and provided, further that under no circumstance will the Budget or the Annual Operating Budget be construed as a cap or limitation on the amount of the Professional Fees due and payable by the Debtors.

**Maturity:** The maturity date of the DIP Facilities will be (and all Loans and other payment obligations under the DIP Facilities shall be repaid in full in cash on) the earliest of: (i) stated maturity, which shall be 24 months from the Closing Date (defined below) subject to a six-month extension if as of the first day of such extension (1) no Event of Default is outstanding, (2) a Plan of Reorganization has been filed, (3) a hearing has been scheduled for the confirmation of such Plan of Reorganization, (4) the Debtors are working in good faith to confirm such Plan of Reorganization, (5) an updated Budget and Annual Operating Forecast have been delivered by the Borrower at least ten days prior to the first day of such extension, which Budget and Annual Operating Forecast demonstrate minimum liquidity sufficient to provide for Adequate Protection Payments through such additional six-month period plus an additional $250,000,000, and (6) the Borrower pays an extension fee in the amount of 0.25% of the then outstanding Commitments and Loans on the date of such payment to the Agent for distribution to the Lenders

10

on a pro rata basis based on the respective Commitments and Loans held by each Lender (subclauses (1) through (6), the "**Extension Conditions**"); (ii) the effective date of any Plan of Reorganization; (iii) the date that is 45 days after the Interim Order Entry Date if the Final Order Entry Date shall not have occurred by such date; (iv) the date of the consummation of a sale of all or substantially all of the Debtors' assets or stock under section 363 of the Bankruptcy Code; and (v) the acceleration of the Loans and termination of the Commitments under any of the DIP Facilities, including, without limitation, as a result of the occurrence and continuance of an Event of Default (any such occurrence, the "**Maturity Date**"); provided, however, that the Maturity Date will occur in any event no later than 30 months from the Closing Date.

Any plan of reorganization or liquidation or confirmation order entered in the Cases shall not discharge or otherwise affect in any way any of the joint and several obligations of the Debtors to the Lenders under the DIP Facilities and the Loan Documents, other than after the payment in full and in cash, to the Lenders of all obligations (other than indemnities and other contingent obligations not then due and payable and collateralized letters of credit) under the DIP Facilities and the Loan Documents on or before the effective date of such plan and the termination of the Commitments.

| | |
|---|---|
| **Closing Date:** | The date on which the specified portion of the Commitments is made available for borrowings under the DIP Facilities (the "**Closing Date**"), which shall be no later than five (5) business days after the Interim Order Entry Date, subject to satisfaction (or waiver) of the applicable conditions precedent set forth herein. |
| **Amortization:** | None. For the avoidance of doubt, there will be neither an excess cash flow sweep nor scheduled amortization under the DIP Facilities. |
| **Interest Rate and Fees:** | As set forth on Annex III. |
| **Borrowing Procedure:** | To be consistent with the Documentation Principles, including as follows: |

Borrowings under the Revolver Facility will be in minimum amounts of $5,000,000 or multiples of $1,000,000 in excess thereof (or, if less, the remaining available balance of the applicable Commitments), except for deemed draw requests upon the Agent's delivery of a Carve Out Trigger Notice.

The Term Facility will be available in single draws on or after the date the Interim Order or the Final Order is entered in respect of the portion of the Term Facility available on each such date in accordance with "DIP Facilities Initial Availability" and "DIP Facilities Full Availability" above.

Borrowing requests under each DIP Facility shall be made (i) on three

business days' notice, in the case of Loans bearing interest at a rate based on LIBOR ("**LIBOR Loans**") and (ii) on one business day's notice, in the case of Loans bearing interest based on the Alternate Base Rate ("**ABR Loans**"); <u>provided</u> that Loans funded and Letters of Credit issued on the Interim Order Entry Date will be funded or issued on the basis of a same day notice**.**

**Currency:**        Borrowings will be made in U.S. Dollars. All payments under the DIP Facilities will be made without setoff or counterclaim.

**Voluntary Prepayments and Commitment Reductions:**      To be consistent with the Documentation Principles, including as follows:

The Borrower may repay outstanding Term Loans and Delayed-Draw Term Loans and/or reduce the Term Commitments and/or Delayed-Draw Term Commitments at any time without premium or penalty, including without any make-whole premium (other than breakage costs, if applicable on the amount of the prepayment or reduction) upon (i) at least three (3) business days' notice in the case of LIBOR Loans and (ii) one business day's notice in the case of ABR Loans; <u>provided</u> that in the case of repayment, each partial repayment shall be in an amount of $5,000,000 or multiples of $1,000,000 in excess thereof (or, if less, the outstanding amount of applicable Loans), and, each partial reduction shall be in an amount of $5,000,000 or multiples of $1,000,000 in excess thereof (or, if less, the remaining available balance of the relevant Commitment).

The Borrower may repay the Revolver Loans under the Revolver Facility and/or reduce the Revolver Commitments at any time without premium or penalty (other than breakage costs, if applicable) upon (i) at least three (3) business days' notice in the case of LIBOR Loans and (ii) one business day's notice in the case of ABR Loans; <u>provided</u> that in the case of repayment, each partial repayment shall be in an amount of $1,000,000 or multiples of $500,000 in excess thereof (or, if less, the outstanding amount of applicable Loans), and, in the case of reduction of the Revolver Commitments, each partial reduction shall be in an amount of $1,000,000 or multiples of $500,000 in excess thereof (or, if less, the remaining available balance of the Revolver Commitments).

**Mandatory Prepayments:**      The following mandatory prepayments shall be required, subject, in each case, to reinvestment rights, exceptions and mechanics consistent with the Documentation Principles:

1. <u>Asset Sales</u>: Prepayments of the DIP Facilities in an amount equal to 100% of the net cash proceeds of the sale or other disposition of any property or assets (other than any such proceeds received prior to the date of commencement of the Cases) of the Debtors, other than net cash proceeds of sales or other dispositions of power, capacity, energy, ancillary services and other products, inventory and services or contracts related to any of the foregoing (in each case, whether in physical, financial or other form), any dispositions between the

#4819-5662-6966

Debtors, any dispositions consisting of leases and sub-leases and any other sales or dispositions in the ordinary course of business or consistent with past practice, and subject, in each case, to any Applicable Limitations and additional exceptions to be mutually agreed on in the Loan Documents consistent with the Documentation Principles.

2.  <u>Insurance Proceeds</u>: Prepayments of the DIP Facilities in an amount equal to 100% of the net cash proceeds of insurance paid on account of any loss of any property or assets of the Debtors (other than any such proceeds received prior to the date of commencement of the Cases), subject to any Applicable Limitations and with restrictions to be mutually agreed, and subject to exceptions to be mutually agreed on in the Loan Documents consistent with the Documentation Principles.

3.  <u>RCT Letter of Credit Exposure</u>. On any date that the outstanding RCT Letter of Credit exposures exceed the balance on the RCT L/C Cash Collateral Account (an "**Excess RCT L/C Exposure**"), not later than within two (2) business days from written notice by the applicable RCT Letter of Credit Issuer of the existence of such Excess RCT L/C Exposure, the Borrower will either (i) deposit additional cash in the RCT L/C Cash Collateral Account or otherwise cash collateralize (at 100%) an amount at least equal to such Excess RCT L/C Exposure, or (ii) cause the reduction of any outstanding RCT Letters of Credit exposure in an amount at least equal to such Excess RCT L/C Exposure.

4.  <u>General Letter of Credit Exposure</u>. On any date that the outstanding General Letter of Credit exposures exceed the balance on the General L/C Cash Collateral Account (an "**Excess General L/C Exposure**"), not later than within two (2) business days from written notice by the applicable General Letter of Credit Issuer of the existence of such Excess General L/C Exposure, the Borrower will either (i) deposit additional cash in the General L/C Cash Collateral Account or otherwise cash collateralize (at 100%) an amount at least equal to such Excess General L/C Exposure, or (ii) cause the reduction of any outstanding General Letters of Credit exposure in an amount at least equal to such Excess General L/C Exposure.

Notwithstanding the foregoing, no mandatory prepayments pursuant to clauses 1 and 2 above shall be due in respect of net cash proceeds that (x) do not exceed $25,000,000 in respect of a single mandatory prepayment event and (y) do not exceed $100,000,000 in respect of the aggregate amount of net cash proceeds of all mandatory prepayment events

**Application of Mandatory Prepayments:**

Any mandatory prepayments (other than as set forth in paragraph 3 of "**Mandatory Prepayments**" above) shall be applied first to the Term Facility and the Delayed-Draw Term Facility until paid in full, and then to the Revolver Facility (without any permanent reduction in

#4819-5662-6966

commitments thereof).

**RCT Reclamation Support Carve Out:**

Unless and until the Borrower issues the RCT Carve Out Support Rejection Notice, all amounts up to $1,100,000,000 required to be paid to the RCT pursuant to amounts due and owing in respect of reclamation obligations incurred by the RCT will constitute the RCT Reclamation Support Carve Out, and such RCT Reclamation Support Carve Out will be senior to the Obligations and to any other obligations or liabilities of the Debtors (other than, and subject in any event to, the Carve Out).

If the RCT denies or rejects the TCEH Debtors' application to utilize the RCT Reclamation Support Carve Out to satisfy RCT's bonding requirements, then the Borrower shall be obligated to promptly terminate and permanently reduce to $0 the RCT Reclamation Support Carve Out by issuing and delivering a notice in writing to the Administrative Agent, and the RCT shall thereafter cease to have any rights in respect of the RCT Reclamation Support Carve Out (the "**RCT Carve Out Support Rejection Notice**").

**Priority/Security:**

All obligations of the Debtors to the Administrative Agent, the Lenders, and the Letter of Credit Issuers (such persons, collectively, the "**DIP Secured Parties**") under the Loan Documents (the "**Obligations**") including all Loans made under the DIP Facilities, shall, subject to the Carve Out (defined below) and the RCT Reclamation Support Carve Out, at all times:

(i)  pursuant to Bankruptcy Code section 364(c)(1), be entitled to joint and several superpriority administrative expense claim status in the Cases, on a pari passu basis;

(ii)  pursuant to Bankruptcy Code section 364(c)(2), be secured by the following:

a perfected first-priority lien on substantially all now owned or hereafter acquired assets and property of the Debtors, including real and personal property, plant and equipment, the RCT L/C Cash Collateral Account, the General L/C Cash Collateral Account, cash and the proceeds of each of the foregoing (the "**Collateral**"); provided, however, that notwithstanding anything to the contrary herein or in any other Loan Document, (x) "Excluded Stock and Stock Equivalents", "Excluded Subsidiaries" and any "Excluded Property" (each as defined in the Prepetition TCEH Credit Facility and the "Credit Documents" (as defined therein)) will be excluded from the Collateral, and (y) in any event all "Guarantors" pursuant to the Prepetition TCEH Credit Agreement immediately prior to the Petition Date will be Guarantors and their assets will constitute "Collateral" to the same extent constituting "Collateral" pursuant to the Prepetition TCEH Credit Agreement immediately prior to the Petition Date; provided, further, that the Collateral shall exclude the Debtors' claims and causes of

14

action under Chapter 5 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "**Avoidance Actions**"), but subject only to, and effective upon, entry of the Final Order, shall include any proceeds or property recovered, unencumbered or otherwise the subject of successful Avoidance Actions, whether by judgment, settlement or otherwise; provided, further, that notwithstanding the Documentation Principles, the Collateral shall include (i) stock and stock equivalents of "Immaterial Subsidiaries" (as defined in the Prepetition TCEH Credit Facility) that are Debtors, (ii) deposit accounts and cash, and (iii) any other assets that were excluded from Collateral in the Prepetition Credit Facility due to practicality or the necessity of obtaining third party consents or taking other additional steps, but only to the extent that a lien in such Collateral may be perfected by the entry of the Interim Order and the Final Order.  In addition, "Excluded Subsidiary" will include with respect to any actual or purported Obligation (including pursuant to any guarantee or grant of security) with respect to any "swap" (as defined under the Commodity Exchange Act) (after giving effect to keepwell agreements in the Loan Documents) entered into by the Parent Guarantor, the Borrower or Subsidiary Guarantor thereof that is not an "eligible contract participant" (as such term is defined in the Commodity Exchange Act) at the time such "swap" Obligation is incurred, or in the case of an Obligation resulting from a guarantee (or grant of security) at the later of the time such guarantee (or grant of security) is entered into and the time such "swap" obligation being guaranteed (or secured) is incurred.  For the avoidance of doubt, Collateral will also exclude the following:   (a) those assets over which the granting of security interests in such assets would be prohibited by contract (other than any in respect of any of the Prepetition Secured Facilities), applicable law or regulation or the organizational documents of any non-wholly owned subsidiary (including permitted liens, leases and licenses), or to the extent that such security interests would result in adverse tax or accounting consequences as determined in good faith by the Borrower, (b) those assets as to which the Administrative Agent and the Borrower reasonably determine that the cost of obtaining such a security interest or perfection thereof are excessive in relation to the benefit to the Lenders of the security to be afforded thereby, (c) assets in respect of which the granting or perfection of a lien would violate any applicable law or regulation (including regulations adopted by FERC, the Public Utility Commission of Texas and/or the Nuclear Regulatory Commission), and (d) subject to the requirement that all "Guarantors" pursuant to the Prepetition TCEH Credit Agreement immediately prior to the Petition Date will be Guarantors and their assets will constitute "Collateral" to the same extent constituting "Collateral" pursuant to the Prepetition TCEH Credit Agreement immediately prior to the Petition Date, other exceptions (i) to be mutually agreed upon or (ii) that are

15

usual and customary for facilities of this type for affiliates of the Borrower will not constitute "Collateral"); provided, however, notwithstanding anything to the contrary contained herein, to the extent the security interest in such Collateral may be perfected by the entry of the Interim Order and the Final Order, neither the Borrower nor any Guarantor shall be required to obtain, provide or execute any mortgage or control agreement in favor of the Agent or any other DIP Secured Party with regard to any Collateral nor shall the Borrower or any Guarantor be required to obtain a certificate of title evidencing the security interest of the Agent or any other Secured Party with respect to any Collateral;[1]

in each case, to the extent that such Collateral is not subject to valid, perfected and non-avoidable liens as of the commencement of the Cases;

(iii) pursuant to Bankruptcy Code section 364(c)(3), be secured by the following:

a perfected lien on all Collateral;

to the extent that such Collateral is subject to valid, perfected and non-avoidable liens in favor of third parties in existence at the time of the commencement of the Cases or to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code (other than property that is subject to the existing liens that secure the obligations under any of the Prepetition Secured Facilities referred to above (excluding the "Deposit L/C Loan Collateral Account" to the extent of the "Deposit L/C Obligations" (each as defined in the Prepetition TCEH Credit Facility) (the "**Prepetition Deposit L/C Collateral**")), which liens shall be primed by the liens securing the DIP Facilities, the Carve Out and the liens securing the Eligible Pari Passu Hedges described in such clause); and

(iv) pursuant to Bankruptcy Code section 364(d), be secured by the following:

a perfected priming first-priority lien on all Collateral;

to the extent that such Collateral is subject to valid, perfected and non-avoidable liens in favor of third parties as of the commencement of the Cases, including, all accounts receivable, inventory, real and personal property, plant and equipment of the Debtors that secure the obligations of the Debtors under or in connection with the Prepetition Secured Facilities (including, for the avoidance of doubt, with respect to EFCH

---

[1]    To the extent "Excluded Assets" is to be limited at the request of the Joint Lead Arrangers in the manner set forth above, the Debtors and the Joint Lead Arrangers agree that the exclusions initially proposed by the Debtors on September 15, 2013 will be reinstated in full in the definition of "Excluded Assets" for purposes of any exit facility collateral.

as parent guarantor under the Prepetition TCEH Credit Facility, but excluding the Prepetition Deposit L/C Collateral (which shall be subject to the lien set forth in clause (iii) above);

subject, in each case, to the Carve Out and the RCT Reclamation Support Carve Out.

All liens securing the Obligations, the Adequate Protection Liens (defined below), the 507(b) Claim (as defined below), the Eligible Pari Passu Hedges, and any and all other forms of adequate protection, liens or claims securing the Obligations and all other prepetition obligations of the Debtors, including the liens and security interests granted to the respective lenders, counterparties and holders pursuant to and in connection with the Prepetition Secured Facilities (the "**Existing Primed Creditors**") (including all security agreements, pledge agreements, mortgages, deeds of trust and other security documents executed by any of the Debtors in favor of the agents under the Prepetition Secured Facilities, for its benefit and for the benefit of the any secured party under or in connection with the Prepetition Secured Facilities), shall be subject and subordinate to the Carve Out and the RCT Reclamation Support Carve Out; provided, however, that cash or other amounts of cash equivalents on deposit to cash collateralize Letters of Credit shall not be subject to the Carve Out or the RCT Reclamation Support Carve Out.

The "**Carve Out**" means the sum of (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order or otherwise, all unpaid fees and expenses (the "**Professional Fees**") incurred by persons or firms ("**Debtor Professionals**") retained by the Debtors pursuant to section 327, 328 or 363 of the Bankruptcy Code and any official committee of unsecured creditors (the "**Committee**" and, together with the Debtor Professionals, the "**Professional Persons**") appointed in the Cases pursuant to section 1103 of the Bankruptcy Code at any time before or on the first Business Day following delivery by the Agent of a Carve Out Trigger Notice (defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Professional Fees of Professional Persons in an aggregate amount not to exceed $50,000,000 incurred after the first Business Day following delivery by the Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve Out Trigger Notice Cap**").   For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the Agent to the Debtors, their lead restructuring counsel, the United States Trustee, and lead counsel to the

17

Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the Obligations under the DIP Facilities, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

On the day on which a Carve Out Trigger Notice is given by the Agent to the Debtors, the Carve Out Trigger Notice shall (i) be deemed a request by the Debtors for Loans under the Revolver Commitment (on a pro rata basis based on the then outstanding Revolver Commitments), in an amount equal to the then unpaid amounts of the Professional Fees (any such amounts actually advanced shall constitute Revolver Loans), and (ii) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Professional Fees. The Debtors shall deposit and hold such amounts in a segregated account at Revolver Facility Administrative Agent in trust to pay such then unpaid Professional Fees (the "**Pre-Carve Out Trigger Notice Reserve**") prior to any and all other claims. On the same day on which a Carve Out Trigger Notice is given, the Carve Out Trigger Notice shall also be deemed a draw request and notice of borrowing by the Debtors for Loans under the Revolver Commitment (on a pro rata basis based on the then outstanding Revolver Commitments), in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute Revolver Loans). The Debtors shall deposit and hold such amounts in a segregated account at Administrative Agent in trust to pay such Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "**Post-Carve Out Trigger Notice Reserve**" and, together with the Pre-Carve Out Trigger Notice Reserve, the "**Carve Out Reserves**") prior to any and all other claims. On the first Business Day after the Agent gives such notice to such Revolver Lenders, notwithstanding the existence of a Default or Event of Default, the failure of the Debtors to satisfy any or all of the conditions precedent for Revolver Loans under the Revolver Facility or the occurrence of the Maturity Date, each Revolver Lender with an outstanding Commitment (on a pro rata basis based on the then outstanding Commitments) shall make available to the Agent such Revolver Lender's pro rata share with respect to such Borrowing in accordance with the Revolver Facility. All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (ii) through (iii) of the definition of Carve Out set forth above, but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the Agent for the benefit of the Lenders, unless the Obligations have been paid in full, in which case any such excess shall be paid to the lenders under the Prepetition Secured Facilities in accordance with their rights and priorities as of the Petition Date. All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above, and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the Agent for the benefit of the Lenders,

unless the Obligations have been paid in full, in which case any such excess shall be paid to the lenders under the Prepetition Secured Facilities in accordance with their rights and priorities as of the Petition Date.

Notwithstanding anything to the contrary in the Loan Documents, the Interim Order or the Final Order, following delivery of a Carve Out Trigger Notice, the Lien Agents and the Prepetition First Lien Creditors shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the Agents for application in accordance with the Loan Documents.

Further, notwithstanding anything to the contrary herein, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute Loans or increase or reduce the Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Professional Fees shall not affect the priority of the Carve Out and (iii) in no way shall the Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, any Budget, the Initial Budget, any Annual Operating Forecast or any of the foregoing be construed as a cap or limitation on the amount of the Professional Fees due and payable by the Debtors.  The Debtors shall not assert or prosecute, and no portion of the proceeds of the DIP Facilities, the Collateral, or the Carve Out, and no disbursements set forth in the Budget, shall be used for the payment of professional fees, disbursements, costs or expenses incurred by any person in connection with (a) preventing, hindering or delaying any of the Prepetition First Lien Agent's, the Prepetition First Lien Creditors', the Agent's or the Lenders' enforcement or realization upon any of the Collateral once an Event of Default has occurred and after the Remedies Notice Period, (b) objecting or challenging or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the Obligations, the DIP liens, the obligations and liens under the Prepetition Secured Facilities, or any other rights or interest of any of the Agent, the Lenders, the Prepetition First Lien Agent or any Prepetition First Lien Creditor, or (c) asserting, commencing or prosecuting any claims or causes of action, including, without limitation, any actions under Chapter 5 of the Bankruptcy Code, against the Agent, any Lender, the Prepetition First Lien Agent, any Prepetition First Lien Creditor or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees; provided, however, that the foregoing shall not restrict the Debtors from using proceeds of the DIP Facilities to seek to use cash collateral on a non-consensual basis or prosecuting a plan of reorganization over the objection of the Prepetition First Lien Creditors; provided, further, that the Carve Out and such collateral proceeds and loans under the Loan Documents may be used for allowed fees and expenses, in an amount not to exceed $250,000 in the aggregate, incurred solely by the Committee, if appointed, in investigating (but not commencing or prosecuting) the validity, enforceability, perfection,

19

priority or extent of the liens under the Prepetition Secured Facilities. Any party granted standing by the Bankruptcy Court other than the Committee must commence any claims against the Prepetition First Lien Agents no later than seventy-five (75) calendar days following entry of the Interim Order, and, with respect to the Committee, if appointed and granted standing by the Bankruptcy Court, no later than sixty (60) calendar days after its formation.

The liens on the Collateral securing the Prepetition Secured Facilities shall be junior and subordinate to the Carve Out, the RCT Reclamation Support Carve Out, the liens securing the Obligations, the Adequate Protection Liens, and the liens securing the Eligible Pari Passu Hedges. All of the liens described herein shall be effective and perfected as of the Interim Order Entry Date and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements.

**Adequate Protection:** Pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, the Prepetition First Lien Agent, for the benefit of itself and the holders of claims on account of Prepetition First Lien Debt (the "**Prepetition First Lien Creditors**") and the Prepetition Second Lien Agent, for the benefit of itself and the holder of claims on account of Prepetition Second Lien Debt (the "**Prepetition Second Lien Creditors**"), in each case, shall be granted the following adequate protection (collectively, the "**Adequate Protection**") of the security interests of the Prepetition First Lien Creditors in the Collateral securing the Prepetition First Lien Debt (including, without limitation, cash collateral) (the "**Prepetition First Lien Collateral**") and of the security interests of the Prepetition Second Lien Creditors in the Collateral securing the Prepetition Second Lien Debt (including, without limitation, cash collateral) (the "**Prepetition Second Lien Collateral**"), and equal in amount to, any diminution in the value (collectively, the "**Diminution in Value**") of such prepetition security interests of such Prepetition First Lien Creditors and Prepetition Second Lien Creditors, respectively, calculated in accordance with section 506(a) of the Bankruptcy Code, whether or not the Diminution in Value results from the sale, lease or use by the Debtors of the Prepetition First Lien Collateral or Prepetition Second Lien Collateral, as applicable, the priming of the prepetition security interests of such Prepetition First Lien Creditors or Prepetition Second Lien Creditors, as applicable, or the stay of enforcement of any prepetition security interests arising from section 362 of the Bankruptcy Code, or otherwise:

(a) Adequate Protection Liens. As security for and solely to the extent of any Diminution in Value of their prepetition security interests, the Prepetition First Lien Agent shall be granted for its benefit and the benefit of the applicable Prepetition First Lien Creditors and the Prepetition Second Lien Agent shall be granted for its benefit and the benefit of the applicable Prepetition Second Lien Creditors, respectively, effective and perfected as of the Interim Order Entry Date and without the

#4819-5662-6966

necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements, a replacement security interest in and lien on the Collateral (together, the "**Adequate Protection Liens**"), subject and subordinate only to (i) the Carve Out, (ii) the RCT Reclamation Support Carve Out, (iii) the liens securing the DIP Facilities, (iv) the liens securing the Eligible Pari Passu Hedges, which Adequate Protection Liens shall, *inter se*, rank in the same relative priority and right as do the respective security interests and liens of the respective Prepetition First Lien Creditors and Prepetition Second Lien Creditors, as applicable, as of the Petition Date.

(b) <u>Super-Priority Claim</u>. To the extent of any Diminution in Value of the Prepetition First Lien Creditors or the Prepetition Second Lien Creditors, in their respective prepetition security interests, the Prepetition First Lien Agent, on behalf of itself and the applicable Prepetition First Lien Creditors and the Prepetition Second Lien Agent, on behalf of itself and the applicable Prepetition Second Lien Creditors, respectively, shall be granted, subject to the payment of the Carve Out, a superpriority administrative expense claim pursuant to section 507(b) of the Bankruptcy Code, immediately junior to the claims under section 364(c)(1) of the Bankruptcy Code held by the Agent and the Lenders and other secured parties under the DIP Facilities (the "**507(b) Claim**"), which 507(b) Claim shall, *inter se*, rank in the same relative priority and right as do the respective claims of the Prepetition First Lien Creditors and Prepetition Second Lien Creditors, as applicable, as of the Petition Date; <u>provided</u> that the Prepetition First Lien Agent and Prepetition First Lien Creditors and the Prepetition Second Lien Agent and Prepetition Second Lien Creditors shall not receive or retain any payments, property or other amounts on account of the 507(b) Claim or on account of the Prepetition First Lien Debt or Prepetition Second Lien Debt, as applicable (other than indemnities and/or contingent obligations not then due and payable) and the Eligible Pari Passu Hedges have indefeasibly been paid in cash in full.

(c) <u>Fees and Expenses</u>. The Prepetition First Lien Agent shall receive (for the benefit of the lenders under the Prepetition Secured Facilities) from the Debtors current cash payments of all reasonable and documented out-of-pocket fees and expenses of professionals payable pursuant to the engagement letters dated as of February 1, 2013, with Millstein & Co., L.P., financial advisors to certain of the Prepetition First Lien Creditors, and Paul, Weiss, Rifkind, Wharton & Garrison LLP, as lead counsel to certain of the Prepetition First Lien Creditors, plus the reasonable and documented professional fees and expenses of Young Conaway Stargatt & Taylor, LLP, as local counsel to certain of the Prepetition First Lien Creditors,

#4819-5662-6966

promptly upon receipt of invoices therefor, after providing the U.S. Trustee and counsel to any statutory committee with copies of the invoices and a ten day period to object.

As additional adequate protection, the Prepetition First Lien Agent, on behalf of itself and the other Prepetition First Lien Creditors thereunder, may be granted the following:

Adequate Protection Payments. The Prepetition First Lien Agent on behalf of the Prepetition First Lien Creditors may receive from the Debtors periodic adequate protection payments (the "**Adequate Protection Payments**") in an amount resulting from applying (including, if any, settlement or termination amounts owed under the First Lien Commodity Hedges and any letter of credit fees, in each case in accordance with respective terms of the relevant Prepetition First Lien Debt) a per annum rate equal to LIBOR + 450 basis points to the aggregate outstanding amount of Prepetition First Lien Obligations as of the Petition Date in respect of such relevant periods ending after the Petition Date (and not, for the avoidance of doubt, at any different rate set forth in any of the Prepetition First Lien Debt); provided, however, that any Adequate Protection Payment shall be without prejudice, and with a full reservation of rights, as to whether such payment should be recharacterized or reallocated pursuant to section 506(b) of the Bankruptcy Code as principal payments under the Prepetition First Lien Debt (whether as to principal, interest or otherwise). The Adequate Protection Payments and the expenses paid by the Debtors pursuant to clause (c) of "Adequate Protection" do not themselves result in Diminution in Value. The Adequate Protection Payments will be calculated on a monthly basis, and be due and payable on the first business day of each month occurring after the first full month following the Petition Date.

The Prepetition First Lien Agent on behalf of Prepetition First Lien Creditors shall also receive (i) the Budget, (ii) the Annual Operating Forecast and (iii) to the extent given to the Lenders, reasonable access to the Debtors' records and information.

**Representations and Warranties:**

Each of the Debtors under the DIP Facilities will make only the following representations and warranties, consistent with the Documentation Principles and (for the avoidance of doubt) each as modified as necessary to reflect the commencement of the Cases and events leading up to and following commencement.

Financial statements; no Material Adverse Event since the Petition Date; existence and good standing, authorization and validity; compliance with law; corporate power and authority; due authorization, execution, deliver and enforceability of Loan Documents; no conflict with law, organizational documents, unstayed orders and decrees or post-petition material contractual obligations; no material unstayed litigation; no

default; ownership of property; intellectual property; taxes; insurance; Federal Reserve regulations; ERISA; Investment Company Act; subsidiaries; environmental matters; labor matters; OFAC; FCPA; anti-terrorism laws and anti-money laundering laws; effectiveness of the Interim Order and the Final Order; creation, validity, perfection and priority of lien securing the DIP Facilities; and accuracy of disclosure. Notwithstanding anything in the Commitment Letter, the Fee Letter, this Term Sheet or any Loan Document to the contrary, the Debtors will not provide any representation or warranty concerning solvency.

As used herein and in the Loan Documents, a "**Material Adverse Event**" shall mean any circumstance or conditions affecting the business, assets, operations, properties or financial condition of the Borrower and its subsidiaries taken as a whole, that would individually or in the aggregate, materially adversely affect the ability of the Debtors (taken as a whole) to perform their payment obligations under the Loan Documents to which they are a party, or the rights and remedies of the Agent, the Letter of Credit Issuers and the Lenders under the Loan Documents (other than, in each case, as a result of the events leading up to, and following commencement of a proceeding under Chapter 11 of the Bankruptcy Code and the continuation and prosecution thereof, including circumstances or conditions resulting from, or incidental to, such events, commencement, continuation and prosecution, which shall not, individually or in the aggregate, constitute a Material Adverse Event), and provided, further, that nothing disclosed in any of the following filings by EFH and/or EFCH (1) the Annual Report on Form 10-K for the year ended December 31, 2013 as filed on the date of the Commitment Letter (to the extent substantially the same in form and substance as the version provided to the Joint Lead Arrangers at least 2 days prior to the date of the Commitment Letter), (2) any filings on Form 8-K made through the date of the Commitment Letter and/or (3) any disclosure statement related to any plan of reorganization or liquidation of Debtors provided to the Joint Lead Arrangers on or prior to the date of the Commitment Letter, shall, in any case, in and of itself and based solely on facts as disclosed therein (without giving effect to any developments not disclosed therein) constitute a Material Adverse Event.

**Covenants:**

**- Financial Covenant:**     Each of the Debtors under the DIP Facilities will agree only to the following financial covenant (subject to the Documentation Principles):

Solely with respect to the Revolver Facility, on the last day of any fiscal quarter (but in no event earlier than June 30, 2014) (each, a "**Test Date**"), a Consolidated Superpriority Secured Net Debt leverage test pursuant to which on each such Test Date the ratio of (i) the outstanding principal amount of Term Loans, plus the outstanding principal amount of Delayed-Draw Term Loans, plus the aggregate amount of undrawn Revolver Commitments, the aggregate principal amount of Revolver

Loans then outstanding to (ii) Consolidated EBITDA may not exceed (x) if the RCT Carve Out Support Rejection Notice has not been issued or delivered on or prior to the applicable Test Date, 3.50 to 1.00 and (y) on all other Test Dates, 4.50 to 1.00 (the "**Consolidated Superpriority Secured Net Debt Leverage Test**");

The Consolidated Superpriority Secured Net Debt and the Consolidated EBITDA will be defined in a manner consistent with the Documentation Principles (including as to netting of unrestricted cash but without giving effect to any cap thereon; provided, however, that cash in the RCT L/C Cash Collateral Account and the General L/C Cash Collateral Account will not be netted).

"**Consolidated EBITDA**" will include, in addition to such add-backs as are consistent with the Documentation Principles, add-backs on account of (with each underlying definition to be defined in a manner consistent with the Documentation Principles) (i) restructuring-related or other similar charges, fees, costs, charges, commissions and expenses or other charges incurred during such period in connection with the DIP Facilities, the Cases, any reorganization plan in connection with the Cases, any "exit" credit agreements or financings, and any and all transactions contemplated by the foregoing, including the write-off of any receivables, the termination or settlement of executory contracts, professional and accounting costs fees and expenses, management incentive, employee retention or similar plans (in each case to the extent such plan is approved by the Bankruptcy Court to the extent required), litigation costs and settlements, asset write-downs, income and gains recorded in connection with the corporate reorganization of the Debtors and their subsidiaries; and (ii) the amount of any losses, costs, fees and expenses on disposition of receivables and related assets in connection with any Permitted Receivables Financing, and any losses, costs, fees and expenses in connection with the early repayment, accelerated amortization, repayment, termination or other payoff (including as a result of the exercise of remedies) of any Permitted Receivables Financing.

Notwithstanding the foregoing, the Consolidated EBITDA in respect of the following periods shall be as follows:

| Period | Consolidated EBITDA |
|---|---|
| Fiscal Quarter ending 9/30/13 | $500,000,000 |
| Fiscal Quarter ending 12/31/13 | $300,000,000 |
| Fiscal Quarter ending 3/31/14 | $350,000,000 |

24

Fiscal Month ending 4/30/14      $10,000,000

**- Affirmative Covenants:**

Each of the Debtors under each of the DIP Facilities (solely with respect to itself and each of the other Debtors and restricted subsidiaries) will agree only to the following affirmative covenants (consistent with, in each case, the Documentation Principles):

(a) delivery of (i) periodic updates of the Budget and monthly variance reports and (ii) quarterly and annual financial statements;

(b) delivery of monthly reports with respect to asset sales, cost savings, and other matters reasonably requested by the Agent;

(c) delivery to the Agent and its legal counsel, at least 2 business days in advance of filing with the Bankruptcy Court, of all proposed "first day" pleadings and proposed orders, which must be in form and substance reasonably satisfactory to the Agent (but in the case of the order governing cash management and the order governing adequate protection, shall be satisfactory in form and substance to the Agent);

(d) delivery to the Agent and its legal counsel, as soon as practicable in advance of filing with the Bankruptcy Court, of any plan or reorganization or liquidation and/or any disclosure statement related to such plan, which must be in form and substance reasonably satisfactory to the Agent; provided, however, that with respect to provisions of the plan of reorganization and/or any disclosure statement that relate to payment of the DIP Facilities, such provisions must be in form and substance satisfactory to the Agent;

(e) delivery to the Agent as soon as practicable in advance of filing with the Bankruptcy Court of the Final Order (which must be in form and substance satisfactory to the Agent), all other proposed material orders and pleadings related to the DIP Facilities (which must be in form and substance reasonably satisfactory to the Agent);

(f) file with the Bankruptcy Court a plan of reorganization and a disclosure statement relating thereto, each in form and substance reasonably satisfactory to the Agent, within 18 months after the Petition Date; provided, however, that with respect to provisions of the plan of reorganization and/or any disclosure statement that relate to payment of the DIP Facilities, such provisions must be in form and substance satisfactory to the Agent;

(g) maintenance of cash management system in accordance with the orders entered in the Cases, which orders shall be in form and substance satisfactory to the Agent;

25

(h) contest, if requested by the Agent, any motion seeking entry of an order, and entry of an order, that is materially adverse to the interests of the Agent or the Lenders or their respective material rights and remedies under the DIP Facilities in any of the Cases;

(i) additional reporting reasonably requested by the Agent, including, without limitation, with respect to litigation, contingent liabilities, Defaults, ERISA, environmental liabilities and Material Adverse Events;

(j) reasonable access to information (including historical information) and personnel (during normal business hours), including, regularly scheduled meetings as mutually agreed with senior management of the Borrower and other company advisors (during normal business hours), and a subset of the Agent and Millstein & Co., L.P. ("**Lenders' Financial Advisor**"), and Lenders' Financial Advisor shall be provided with access to all information it shall reasonably request and to other internal meetings regarding strategic planning, cash and liquidity management, operational and restructuring activities;

(k) if not already obtained, commercially reasonable efforts to obtain ratings from each of Moody's and Standard & Poor's as soon as reasonably practicable following the Closing Date; and

(l) only such additional affirmative covenants (as modified to account for the commencement and continuance of the Cases and other express provisions in this Term Sheet and the Commitment Letter) as are consistent with the Documentation Principles.

**- Negative Covenants:** Each of the Debtors under each of the DIP Facilities (solely with respect to itself and each of the other Debtors and restricted subsidiaries) will agree only to the following negative covenants, consistent with, in each case, the Documentation Principles:

(a) prohibition on creating or permitting to exist any liens on any assets, other than liens securing the DIP Facilities and any permitted liens consistent with the Documentation Principles (which liens shall include, among others, scheduled liens in existence on the Closing Date) and other liens described in "**Priority/Security**" above;

(b) prohibition on creating or permitting to exist any other superpriority administrative expense claim or "claim" that is pari passu with or senior to the claims of the Lenders under the DIP Facilities (in each case, other than the Carve-Out, the RCT Reclamation Support Carve-Out or the Obligations);

(c) prohibition on making adequate protection payments to, or otherwise providing adequate protection for, the Prepetition

First Lien Creditors or the Second Lien Creditors other than as provided for in this Term Sheet and contained in the Interim Order, the Final Order and/or any cash collateral order;

(d) prohibition on the use of proceeds of the DIP Facilities or the Letters of Credit for purposes other than those described in this Term Sheet and contained in the Interim Order and Final Order;

(e) limitations on disposing of assets (including, without limitation, any sale and leaseback transaction and any disposition under Bankruptcy Code section 363);

(f) prohibition on modifying or altering in any material manner the nature and type of its business (taken as a whole) except as required by the Bankruptcy Code or orders entered by the Bankruptcy Court;

(g) prohibition on prepaying prepetition Indebtedness (other than for the avoidance of doubt, any payments under any financial or physical trading transaction, including commodities transactions, except as expressly provided for in the Loan Documents or pursuant to "first day" or other orders entered by the Bankruptcy Court upon pleadings in form and substance reasonably satisfactory to the Agent);

(h) prohibition on consenting to the termination or reduction of the Debtors' exclusive plan filing and plan solicitation periods under section 1121 of the Bankruptcy Code (the "**Exclusivity Periods**") or failing to object to any motion by a party in interest (other than a Lender or the Agent) seeking to terminate or reduce the Exclusivity Periods, in each case without the prior written consent of the Agent; and

(i) such additional negative covenants (as modified to account for the commencement of the Cases and other express provisions in this Term Sheet or the Commitment Letter) as are consistent with the Documentation Principles.

It is understood that there shall be no covenants regarding minimum required commodity hedging or trading arrangements. In addition, transactions (including any payments to affiliates) provided for in any shared services or similar agreement ("**Shared Services Agreement**"), any tax sharing agreements ("**Tax Sharing Agreements**"), any sublease of property from any Specified Affiliate to the Borrower or any of its restricted subsidiaries ("**Property Subleases**"), and certain other agreements or arrangements to be agreed to, each as in effect on the date of the Commitment Letter (and as amended, supplemented or modified in a manner that is not materially adverse to the interests of the Lenders in their capacity as such) and/or contemplated in the Initial Budget or any other Budget

27

that has been approved by the Agent and the majority of the Lead Arrangers from time to time (if any) in respect of any applicable period will in any event be permitted by the Loan Documents.

The DIP Facilities will include exceptions from the relevant covenants allowing for the existence of liens, the posting of cash collateral, the issuance of letters of credit, self-bonding and/or the making of other deposits for the benefit of any trading counterparties (including commodity hedging obligations), utilities, governmental and quasi-governmental entities (including the Federal Energy Regulatory Commission, ERCOT, the Nuclear Regulatory Commission, the Public Utility Commission of Texas and the Railroad Commission of Texas), in each case in respect of any contractual, statutory and regulatory requirements (including for purposes of posting bonds and remediation obligations of any nature (including mining reclamation bonds), complying with any contractual, statutory or regulatory requirements, and for self-bonding in respect of the Debtors' and Specified Affiliates' permits and licenses). Further, the DIP Facilities will include exceptions from the relevant covenants allowing for investments and/or restricted payments (in the form of intercompany loans, intercompany funding or otherwise) and transactions with affiliates between the Borrower, any of its subsidiaries, and the Specified Affiliates pursuant to which the Borrower may fund investments in an amount to be agreed at any time outstanding in, and, in addition, perform ordinary course transactions under the intercompany cash management systems (including pursuant to any Shared Services Agreements, any Tax Sharing Agreements, or Property Sublease and certain other agreements or arrangements to be agreed to) to the Specified Affiliates during the pendency of the Cases.

"**Specified Affiliates**" means, collectively, the following affiliates of the Borrower: (i) Comanche Peak Nuclear Power Company LLC; (ii) EFH Corporate Services Company; (iii) EFH Properties Company; (iv) Energy Future Holdings Corp; and (v) solely for the purpose of permitting ordinary course intercompany cash management activities subject to the order governing cash management, Oncor Electric Delivery Holdings Company LLC and its subsidiaries.

**Events of Default:**    The occurrence and continuance of any of the following events shall constitute an Event of Default under the DIP Facilities (consistent, in each case, with the Documentation Principles):

(a) The Final Order Entry Date shall not have occurred within 45 days after the Interim Order Entry Date;

(b) Any of the Cases shall be dismissed or converted to a Chapter 7

28

Case;

(c) A trustee, receiver, interim receiver, receiver or manager shall be appointed in any of the Cases, or a responsible officer or an examiner with enlarged powers shall be appointed in any of the Cases (having powers beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4));

(d) Any other superpriority administrative expense claim or "claim" which is <u>pari</u> <u>passu</u> with or senior to the claims of the Agent or the Lenders under the DIP Facilities (other than in each case the Carve Out, the RCT Reclamation Support Carve Out or the Obligations) or any lien that is pari passu with or senior to the liens of the Agent or the Lenders under DIP Facilities shall be granted in any of the Cases, except with the prior written consent of the Agent or to the extent such lien constitutes a permitted lien under the Loan Documents;

(e) The Bankruptcy Court shall enter an order granting relief from the automatic stay to any creditor or party in interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Debtors that have an aggregate value in excess of $150,000,000;

(f) The Borrower shall default in the payment of (i) principal on the Loans when due or reimbursement obligations in respect of any Letter of Credit; or (ii) interest or fees, and such default shall continue for more than five (5) days;

(g) Any representation or warranty made or deemed made by any Debtor in any Loan Document shall prove untrue in any material respect on the date as of which it is made or deemed made;

(h) The Borrower shall default (i) in the observance of any negative covenant (and certain specified affirmative covenants consistent with the Documentation Principles) in the DIP Agreement, (ii) if applicable on any Test Date, the Financial Covenant; or (iii) in the observance of any other covenant, term or condition not otherwise specified herein which default continues for more than 30 days after receipt of notice to the Borrower from the Agent or the Requisite Lenders (defined below); <u>provided</u>, <u>however</u>, that notwithstanding anything to the contrary herein or in the Loan Documents, an Event of Default under the Revolving Facility with respect to a failure of the Borrower to satisfy the Consolidated Superpriority Secured Net Debt Leverage Test shall not constitute an Event of Default under the Term Facility or the Delayed-Draw Term Facility unless the obligations under the Revolver Facility have been accelerated;

(i) An order shall be entered reversing, supplementing, staying for a period of five (5) business days or more, vacating or otherwise

29

modifying the Interim Order or the Final Order in a manner that is adverse to the interests of the Agent or the Lenders, or any of the Debtors shall apply for authority to do so, without the prior written consent of the Agent or the Requisite Lenders, or the Interim Order or Final Order with respect to the DIP Facilities shall cease to be in full force and effect;

(j) Any single judgment in excess of $150,000,000 as to any post-petition obligation, or any judgments that are in the aggregate in excess of $250,000,000 as to any one or more post-petition obligations, shall be rendered against the Debtors and the enforcement thereof shall not be stayed (by operation of law, the rules or orders of a court with jurisdiction over the matter or by consent of the party litigants, in each case, to the extent not paid or covered by insurance provided by a carrier not disputing coverage) or there shall be rendered against the Debtors a non-monetary judgment with respect to a post-petition event that causes or is reasonably expected to cause a Material Adverse Event; provided that this clause (j) shall not apply to any judgments as to any pre-petition obligation;

(k) Any Debtor makes any material payments relating to prepetition obligations (including any "adequate protection" payments) other than in accordance with a "first day" order, the Interim Order, the Final Order, or as otherwise agreed to by the Agent;

(l) A plan shall be confirmed in any of the Cases that does not provide for termination of the Commitments under the DIP Facilities and the indefeasible payment in full in cash of the Obligations (other than indemnities and other contingent obligations not then due and payable) on the effective date of such plan;

(m) The Interim Order or Final Order shall cease to create a valid and perfected lien on the Collateral;

(n) (i) Any Debtor shall file a motion or pleading or commence a proceeding that could reasonably be expected to result in an impairment of the Agent's or any of the Lenders' material rights or interests in their capacities as such under the DIP Facilities or (ii) a determination by a court with respect to a motion, pleading or proceeding brought by another party that results in such an impairment; provided, however, that this clause (n) will not apply to the termination of use of cash collateral (which shall be exclusively governed by clause (t) below);

(o) Any Loan Document or any material provision thereof shall cease to be effective (other than in accordance with its terms);

(p) Any of the Debtors shall fail to comply with the Interim Order

30

or Final Order in any material respect;[2]

(q) The Bankruptcy Court shall enter an order approving any claims for recovery of amounts under section 506(c) of the Bankruptcy Code or otherwise arising from the preservation of any Collateral;

(r) The Bankruptcy Court shall enter a final non-appealable order that is adverse in any material respect to the interests (when taken as a whole) of the Agent or the Lenders or their respective material rights and remedies in their capacity as such under the DIP Facilities in any of the Cases; provided, however, that this clause (r) will not apply to the termination of use of cash collateral (which shall be governed exclusively by clause (t) below);

(s) The Borrower shall default on payment due or there shall be any event of default the effect of which is to accelerate or permit acceleration with respect to material indebtedness (threshold to be agreed) incurred after the Petition Date;

(t) The use of cash collateral by the Debtors shall be terminated and the Debtors have not obtained use of cash collateral (consensually or non-consensually) pursuant to an order in form and substance acceptable to the Left Lead Revolving Arranger and the Left Lead Term Facilities Arranger;

(u) The Loan Parties or any of their subsidiaries, or any person claiming by or through the Loan Parties or any of their subsidiaries, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against any of the Agent or the Lenders in each case relating to the DIP Facilities;

(v) Any Debtor shall file any pleading seeking, or otherwise consenting to, or shall support or acquiesce in any other person's motion as to any matter set forth in paragraph (b), (c), (d), (e), (i), (j), (k), (l), (m), (n), (q), (r), (t), or (u); and

(w) Such additional events of default (as modified to account for the commencement of the Cases and other express provisions in this Term Sheet or the Commitment Letter) as are consistent with the Documentation Principles (with the change of control definition to be agreed).

---

[2]    For the avoidance of doubt, the parties have agreed to this formulation on the understanding that if provisions in the Interim Order or the Final Order are identified by the Agent as necessitating their own Event of Default and such Events of Default are consented to by the Borrower (such consent not to be unreasonably withheld), such Events of Default shall be included notwithstanding their absence in this Term Sheet.

31

Notwithstanding anything to the contrary contained herein, any Event of Default under the Loan Documents, and any or similarly defined term under any Loan Document, other than any Event of Default which cannot be waived without the written consent of each Lender directly and adversely affected thereby, shall be deemed not to be "continuing" if the events, act or condition that gave rise to such Event of Default have been remedied or cured (including by payment, notice, taking of any action or omitting to take any action) or have ceased to exist.

Upon the enforcement of remedies after acceleration of the Loans as a result of an Event of Default, (i) proceeds in the RCT L/C Cash Collateral Account shall be distributed <u>first</u> to payment of amounts due to the RCT Letter of Credit Issuers and to other obligations with respect to the RCT Letters of Credit and <u>then</u> to the holders of all Obligations, (ii) proceeds in the General L/C Cash Collateral Account shall be distributed <u>first</u> to payment of amounts due to the General Letter of Credit Issuers and to other obligations with respect to the General Letters of Credit and <u>then</u> to the holders of all Obligations and (iii) proceeds of other Collateral will be paid: <u>first</u>, to holders of any then outstanding obligations under the Carve Out (if any), up to the amount thereof; <u>second</u>, to the RCT up to the amount of any then outstanding obligations under the RCT Reclamation Support Carve Out; and <u>then</u>, to the holders of Obligations.

**Rights and Remedies Upon Event of Default:**

Upon the occurrence of an Event of Default and following the giving of five calendar days' notice to the Debtors (the "**Remedies Notice Period**"), the Agent, on behalf of the Lenders, may (and at the direction of the Requisite Lenders, shall) exercise all rights and remedies provided for in the Loan Documents and may declare (i) the termination, reduction or restriction of any further Commitment to the extent any such Commitment remains, (ii) all Obligations to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Debtors, and (iii) the termination of the Loan Documents as to any future liability or obligation of the Agents and the Lenders, but without affecting any of the DIP liens or the Obligations.

During the Remedies Notice Period, the Debtors may continue to use cash collateral in the ordinary course of business, consistent with past practices and the most recently delivered Budget, but may not enter into, or seek approval of, any transactions or arrangements (including, without limitation, the incurrence of indebtedness or liens, investments, restricted payments, asset sales or transactions with non-Debtor affiliates) that are not in the ordinary course of business. Unless the Bankruptcy Court orders otherwise during the Remedies Notice Period, at the end of the Remedies Notice Period, the Debtors shall no longer have the right to use or seek to use cash collateral, the automatic stay pursuant to section 362 of the Bankruptcy Code shall be automatically terminated without further notice to or order of the Bankruptcy Court,

and the Agent shall be permitted to exercise all rights against the Collateral in accordance with the Loan Documents and the Interim Order or Final Order, as applicable, and shall be permitted to satisfy the Obligations, without further order or application or motion to the Bankruptcy Court and without restriction or restraint by any stay under section 362 or 105 of the Bankruptcy Code.  Notwithstanding anything herein to the contrary, the automatic stay pursuant to section 362 of the Bankruptcy Code shall be automatically terminated for the purposes of giving any notice contemplated hereunder.

During the Remedies Notice Period, any party in interest shall be entitled to seek an emergency hearing with the Bankruptcy Court solely for the purpose of contesting whether an Event of Default has occurred and/or is continuing, and the Debtors waive their right to, and shall not be entitled to seek relief, including without limitation, under section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of the Agent, on behalf of the Lenders, set forth in the Interim Order, Final Order, or the Loan Documents.

The delay or failure to exercise rights and remedies under the Interim Order, the Final Order or the Loan Documents by  the Agent, on behalf of the Lenders, shall not constitute a waiver of such Agent's rights thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the applicable Loan Documents.

**Conditions to Initial Availability:**

The obligation of the Lenders to make the initial Loans and/or issue Letters of Credit on the Closing Date under the DIP Facilities will be subject only to the conditions precedent listed on <u>Annex II</u> attached hereto under the captions "**<u>Conditions to Initial Availability</u>**" and, as applicable, "**<u>Additional Conditions to Availability of Delayed-Draw Term Loans and RCT Letters of Credit</u>**".

**Conditions to Full Availability:**

After the Closing Date, the obligation to provide Loans and/or issue Letters of Credit up to the full amount of the Commitments shall be subject to the satisfaction or waiver of the conditions precedent listed on <u>Annex II</u> attached hereto under the captions "**<u>Condition to Full Availability</u>**" and, as applicable, "**<u>Additional Conditions to Availability of Delayed-Draw Term Loans and RCT Letters of Credit</u>**", and in "**<u>Conditions to All Subsequent Borrowings</u>**" below.

#4819-5662-6966

**Conditions to All Subsequent Borrowings:**

Consistent in each case with the Documentation Principles, the conditions to all Loans and/or issuance of Letters of Credit (other than such Loans made and/or Letters of Credit issued on the Closing Date) will include requirements relating to prior written notice of borrowing, the accuracy in all material respects of all representations and warranties, the absence of any Default or Event of Default and the following:

    (a)  The Interim Order or the Final Order, as the case may be, is in full force and effect;

    (b)  As a result of such extension of credit, usage of the Commitments shall not exceed (i) the applicable Commitments then in effect, (ii) the aggregate amount authorized by the Interim Order or the Final Order, as the case may be, (iii) the maximum amount of net borrowings contemplated to be outstanding as reflected in the Budget and other Budget milestones to be mutually agreed to by the Borrower and the Agent (it being agreed that the Budget will contemplate permitted variances); and

    (c)  The Debtors shall have paid the balance of all fees then earned, due and payable in respect of the DIP Facilities as referenced herein.

**Additional Conditions to Availability of Delayed-Draw Term Loans and RCT Letters of Credit:**

The obligation of the Lenders to make Delayed-Draw Term Loans and/or issue RCT Letters of Credit will also be subject to the additional conditions precedent listed on Annex II attached hereto under the caption "**Additional Conditions to Availability of Delayed-Draw Term Loans and RCT Letters of Credit**".

**Assignments and Participations:**

Subject in each case to the Documentation Principles, each Lender may assign all or any part of the Revolver Facility, the Delayed-Draw Term Facility and/or the Term Facility to one or more affiliates, banks, financial institutions or other entities, in each case, with the prior written consent of the Borrower (unless a Term Loan or Delayed-Draw Term Loan is being assigned to a Lender, an affiliate of a Lender, or an approved fund of such Lender or its affiliate) and the Agent (unless a Term Loan or Delayed-Draw Term Loan is being assigned to a Lender, an affiliate of a Lender or an approved fund of such Lender or its affiliate) (in each case, not to be unreasonably withheld, conditioned or delayed); provided, however, that under no circumstances will assignments be made to a Disqualified Institution (defined below), and that the consent of the Borrower will not be required during the continuance of an Event of Default.  Upon such assignment, such affiliate, bank, financial institution or entity will become a Lender for all purposes under the Loan Documents.

The Lenders will also have the right to sell participations (other than to Disqualified Institutions,) subject to customary limitations on voting

rights, in the DIP Facilities.

"**Disqualified Institutions**" means (a) any company engaged principally in the business of energy or power generation and/or transmission as identified in writing to the Agent by the Company from time to time, (b) any company whose principal business is that of an energy or power merchant as identified in writing to the Agent by the Company from time to time, (c) any financial institution identified in writing to the Joint Lead Arrangers by the Borrower on or prior to the date of the Commitment Letter (including any such person's affiliates that are clearly identifiable on the basis of such affiliates' names) and (d) a "defaulting" Lender (as described below).   The list of Disqualified Institutions shall be posted for the benefit of the Lenders.   Upon the identification in writing by the Borrower to the Agent of any additional Disqualified Institutions pursuant to clause (a) or (b) above, the Agent shall promptly post such addition to the list to the Lenders; provided that any additional person so identified shall not be deemed a Disqualified Institution until such time as such addition to the list is posted to the Lenders.

**Requisite Lenders:**

Voting with respect to the DIP Facilities will be done solely by the Lenders (and not, for the avoidance of doubt, by any holders of Eligible Pari Passu Hedges). The vote of the Lenders holding more than 50% of total Commitments under the DIP Facilities (or if no Commitments are outstanding, total exposure) (the "**Requisite Lenders**") shall be required to amend, waive or modify any terms and conditions of the DIP Facilities (with customary exceptions consistent with the Documentation Principles where only the consent of the relevant Agent or Letter of Credit Issuer will be required), except that with respect to matters relating to, among others, the reduction in, or compromise of payment rights with respect to, principal or interest rates, extension of maturity (it being understood and agreed that a waiver or amendment of the Extension Conditions (other than the Extension Conditions set forth under clauses (1) (solely with respect to a payment Event of Default) and (6) of the definition thereof, which will be subject to the consent of each Lender) will be subject to Requisite Lender consent) or scheduled date of payment of any interest or fees due, release of material guarantees and/or liens granted on all or substantially all the Collateral (other than guarantees, liens, or Collateral subject to permitted dispositions, permitted mergers, consolidations, reorganizations, etc.), reduction in voting thresholds and increases in the RCT Reclamation Support Carve Out, the consent of the Lenders holding 100% of total Commitments (or if no Commitments are outstanding, total exposure) in respect of which the consent of all Lenders directly and adversely affected thereby will be required, except that the Commitment of a Lender may not be increased without such Lender's consent; and except, further, that any amendment, waiver or modification of any terms or conditions relevant to the Consolidated Superpriority Secured Net Debt Leverage Ratio Test shall only require more than 50% of total Revolver Commitments (or if no Commitments are outstanding, total exposure

under the Revolver Facility).

**Defaulting Lenders:**   The Loan Documents will contain customary provisions (but consistent in any event with the Documentation Principles) relating to "defaulting" Lenders (including provisions relating to the suspension of voting rights and rights to receive fees, and the termination or assignment of Commitments and Loans held by "defaulting" Lenders at par).

**Taxes:**   Consistent with each case to the Documentation Principles, the Loan Documents shall contain customary provisions (a) protecting the Lenders against increased costs or loss of yield resulting from changes in reserve, tax, capital adequacy and other requirements of law and from the imposition of or changes in withholding or other taxes (including in respect of Dodd-Frank and Basel III) and (b) indemnifying the Lenders for "breakage costs" incurred in connection with any prepayment of a LIBOR Loans on a day other than the last day of an interest period with respect thereto.

In connection with any proposed amendment, waiver or other modification to the DIP Facilities (a "**Proposed Change**") requiring the consent of all Lenders or all directly adversely affected Lenders, if the consent to such Proposed Change of all Lenders whose consent is required is not obtained, but the consent of the Lenders with a majority of the Loans and commitments held by the applicable group of Lenders is obtained (any such Lender whose consent is required but is not obtained, a "**Non-Consenting Lender**"), then the Borrower may, at its sole expense, upon notice to such Non-Consenting Lender and the Agent, require such Non-Consenting Lender to assign and delegate, without recourse (in accordance with and subject to all restrictions otherwise applicable to assignments), all its interests, rights and obligations under the DIP Facilities to an assignee that shall assume such obligations or terminate such Non-Consenting Lender's commitments; <u>provided</u> that such Non-Consenting Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts then due and owing to it under the DIP Facilities from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts).

**Indemnity; Expenses:**   The Loan Documents will provide, in each case to the extent consistent with the Documentation Principles, that the Borrower shall indemnify, pay and hold harmless the Agent, the Joint Lead Arrangers, the Letter of Credit Issuers, and the Lenders and their affiliates (and their respective controlling persons, directors, officers, partners, employees, agents, advisors and other representatives (collectively, the "**Related Parties**")) (each, an "**Indemnified Person**") against any loss, claim, damage, liability or expense incurred in respect of the DIP Facilities contemplated hereby or the use of proceeds thereof or the Transactions or any claim, litigation, investigation or proceeding (a "**Proceeding**") relating to any of the foregoing, regardless of whether any Indemnified Person is a party thereto, whether or not such Proceedings are brought

36

by any Debtor, its equity holders, affiliates, creditors or any other person, and to reimburse each Indemnified Person promptly following written demand for any reasonable legal or other out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing (except, in the case of any Indemnified Person, to the extent resulting (i) from the gross negligence, bad faith or willful misconduct of such Indemnified Person (or its Related Parties), in each case as determined in a final non-appealable judgment of a court of competent jurisdiction, (ii) from a dispute solely among Indemnified Persons other than any claims against any Indemnified Person in its capacity or in fulfilling its role as an Agent or Joint Lead Arranger or any similar role under the DIP Facilities and other than any claims arising out of any act or omission on the part of the Borrower or the other Debtors or (iii) from any material breach of the Loan Documents by such Indemnified Person (or its Related Parties), as determined in a final non-appealable judgment of a court of competent jurisdiction) and (b) the Borrower shall reimburse within 10 days of written demand (together with reasonably detailed supporting documentation) the Agent, the Lenders and the Joint Lead Arrangers for their reasonable and documented out-of-pocket expenses incurred in connection with the negotiation, documentation, syndication and administration of the DIP Facilities, any amendments or waivers with respect thereto, any Event of Default in respect of the DIP Facilities and any exercise of remedies in respect thereof (including reasonable and documented out-of-pocket prepetition and post-petition fees, charges and disbursements of legal counsel, financial advisors and third-party appraisers and consultants advising the Agent incurred in connection with the Agent's participation in the Cases, limited in the case of legal counsel to one primary counsel (and (i) appropriate local counsel in applicable foreign and local jurisdictions, but limited to one local counsel in each such jurisdiction, (ii) appropriate regulatory counsel and (iii) solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to the affected indemnified persons similarly situated)); provided, however, that the Debtors shall promptly provide copies of invoices received on account of fees and expenses of the professionals retained as provided for in the DIP Documents to counsel to the Committee and the United States Trustee, and the Bankruptcy Court shall have exclusive jurisdiction over any objections raised to the invoiced amount of the fees and expenses proposed to be paid, which objections may only be raised within ten days after receipt thereof. In the event that within ten days from receipt of such invoices the Debtors, the United States Trustee or counsel to the Committee raise an objection to a particular invoice, and the parties are unable to resolve any dispute regarding the fees and expenses included in such invoice, the Bankruptcy Court shall hear and determine such dispute; provided, that payment of invoices shall not be delayed based on any such objections and the relevant professional shall only be required to disgorge amounts objected to upon being "so ordered" pursuant to a final order of the Bankruptcy Court.

#4819-5662-6966

| | |
|---|---|
| **Governing Law and Jurisdiction:** | The Loan Documents will provide that the Debtors and the Lenders will submit to the exclusive jurisdiction and venue of the Bankruptcy Court, or in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, then in any state or federal court of competent jurisdiction in the Southern District of New York and shall waive any right to trial by jury. New York law shall govern the Loan Documents. |
| **Miscellaneous:** | The terms and conditions of the interim orders and final orders (e.g. 506(c) waivers, marshaling, and successors and assigns) to be mutually agreed. |
| **Counsel to Joint Lead Arrangers and the Agent:** | Milbank, Tweed, Hadley & McCloy LLP. |

**Annex I**

LIST OF DEBTORS

| Name | Bankruptcy Status | Jurisdiction of Organization |
|---|---|---|
| Energy Future Competitive Holdings Company LLC; | | Texas |
| Texas Competitive Electric Holdings Company LLC; | | Delaware |
| 4Change Energy Company; | | Texas |
| 4Change Energy Holdings LLC; | | Texas |
| Big Brown 3 Power Company LLC; | | Texas |
| Big Brown Lignite Company LLC; | | Texas |
| Big Brown Power Company LLC; | | Texas |
| Collin Power Company LLC; | | Delaware |
| Decordova Power Company LLC; | | Texas |
| Decordova II Power Company LLC; | | Delaware |
| Eagle Mountain Power Company LLC | | Delaware |
| Generation MT Company LLC; | | Delaware |
| Generation SVC Company; | | Texas |
| Lake Creek 3 Power Company LLC; | | Texas |
| Luminant Big Brown Mining Company LLC; | | Texas |
| Luminant Energy Company LLC; | | Texas |
| Luminant Energy Trading California Company; | | Texas |
| Luminant ET Services Company; | | Texas |
| Luminant Generation Company LLC; | | Texas |
| Luminant Holding Company LLC; | | Delaware |
| Luminant Mineral Development Company LLC; | | Texas |
| Luminant Mining Company LLC; | | Texas |
| Luminant Renewables Company LLC; | | Texas |

| **Name** | **Bankruptcy Status** | **Jurisdiction of Organization** |
|---|---|---|
| Martin Lake 4 Power Company LLC; | | Texas |
| Monticello 4 Power Company LLC; | | Texas |
| Morgan Creek 7 Power Company LLC; | | Texas |
| NCA Resources Development Company LLC; | | Texas |
| Oak Grove Management Company LLC; | | Delaware |
| Oak Grove Mining Company LLC; | | Texas |
| Oak Grove Power Company LLC; | | Texas |
| Sandow Power Company LLC; | | Texas |
| TCEH Finance, Inc.; | | Delaware |
| Tradinghouse 3 & 4 Power Company LLC; | | Texas |
| Tradinghouse Power Company LLC; | | Texas |
| TXU Energy Retail Company LLC; | | Texas |
| TXU Energy Solutions Company LLC; | | Texas |
| TXU Retail Services Company; | | Delaware |
| TXU SEM Company; | | Delaware |
| Valley NG Power Company LLC; | | Texas |
| Valley Power Company LLC. | | Texas |

#4819-5662-6966

**Annex II**

**TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC**

SUMMARY OF CONDITIONS PRECEDENT TO THE DIP FACILITIES

A.    CONDITIONS TO INITIAL AVAILABILITY

1.    Interim Order/Bankruptcy Matters.

    (a)    The Bankruptcy Court shall have entered, upon motion in form and substance satisfactory to the Left Lead Arrangers, an interim order in form and substance satisfactory to the Left Lead Arrangers (the "**Interim Order**") as to the Initial Availability no later than ten (10) business days after the date of commencement of the Cases, approving and authorizing, on an interim basis, the DIP Facilities, the provisions thereof and the priorities and liens (including priming liens) granted therein.

    (b)    The Interim Order shall not have been reversed, modified, amended, stayed or vacated, in the case of any modification or amendment, in a manner, that is adverse to the Lenders, without the consent of the Left Lead Arrangers.

    (c)    The Debtors shall be in compliance in all material respects with the Interim Order.

    (d)    The Cases shall have been commenced in the Bankruptcy Court and all of the "first day orders" and all related pleadings to be entered at the time of commencement of the Cases or shortly thereafter shall have been reviewed in advance by the Left Lead Arrangers, and shall be reasonably satisfactory in form and substance to the Left Lead Arrangers, but in the case of orders relating to cash management and adequate protection, shall be satisfactory in form and substance to the Left Lead Arrangers.

    (e)    No trustee or examiner with enlarged powers (having powers beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4)) shall have been appointed with respect to the operations or the business of the Debtors.

2.    Financial Statements, Budgets and Reports.

    (a)    The Debtors shall have delivered the Budget to the Agent and the Lenders, which shall be in form and substance reasonably satisfactory to the Agent and the Joint Lead Arrangers, and the Agent and the Joint Lead Arrangers hereby confirm the receipt of the Budget dated [____], 2014 in form and substance reasonably satisfactory to the Agent and the Joint Lead Arrangers prior to the date hereof;

    (b)    The Debtors shall have delivered to the Agent and the Lenders a base case model, including a statement of cash sources and uses of all free cash flow for the tenor of the DIP Facilities, which shall be in form and substance reasonably satisfactory to the Agent and the Joint Lead Arrangers, and the Agent and the Joint Lead Arrangers hereby confirm the receipt of a base case model dated [____], 2014 in form and substance reasonably satisfactory to the Joint Lead Arrangers and the Lenders prior to the date hereof; and

    (c)    The Agent and the Lenders shall have received reasonably requested financial information.

41

3.      Performance of Obligations.

(a)      All invoiced costs, fees, expenses (including, without limitation, reasonable legal fees) and other compensation contemplated by the Loan Documents and the Fee Letter to be payable to the Commitment Parties, the Agent and the Lenders in respect of the DIP Facilities shall have been paid to the extent earned, due and payable;

(b)      Representations and warranties of the Debtors shall be true and correct in all material respects (or in all respects for representations and warranties qualified by materiality or Material Adverse Effect); and

(c)      No Default or Event of Default shall exist under the DIP Facilities.

4.      Customary Closing Documents and Other Conditions.

(a)      The Debtors shall have complied with the following closing conditions: (i) the delivery of customary legal opinions as to authority, authorization, execution and delivery; corporate records and documents from public officials, including good standing certificates; officer's certificates; and notice of borrowing; (ii) evidence of authority; and (iii) obtaining of any governmental consents, if any, necessary in connection with the DIP Facilities, the financing thereunder and related transactions. The Lenders shall have received at least five (5) days prior to the Closing Date all documentation and other information required by bank regulatory authorities under applicable "**know-your-customer**" and anti-money laundering rules and regulations, including the Patriot Act.

(b)      The Loan Documents (which shall be consistent with the Documentation Principles) shall have been entered into by the Debtors.

(c)      The Agent shall have received results of a Uniform Commercial Code search for the jurisdiction of organization of the Debtors, a federal tax lien search for the jurisdiction of the chief executive office of the Debtors, and such other lien and/or other searches reasonably requested by the Agent as are customary for transactions of this type.

(d)      The Agent shall have received proper financing statements (Form UCC-1 or the equivalent) for filing under the UCC in the jurisdiction of organization of each Debtor.

(e)      As a result of the extension of such credit, usage of the Commitments shall not exceed (i) the applicable Commitments then in effect and (ii) the aggregate amount authorized by the Interim Order.

B.      CONDITIONS TO FULL AVAILABILITY

1.      Final Order.

(a)      Not later than 45-days following the Interim Order Entry Date, a final order shall have been entered by the Bankruptcy Court (the "**Final Order**") in form and substance satisfactory to the Left Lead Arrangers on a motion by the Debtors that is in form and substance satisfactory to the Left Lead Arrangers, approving and authorizing on a final basis the matters and containing the provisions described in A.1. above.

(b)     The Final Order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated, and with respect to any modification or amendment, in a manner that is adverse to the Lenders without the consent of the Left Lead Arrangers.

(c)     The Debtors shall be in compliance with the Final Order.

2.     <u>Other Conditions</u>.

(a)     The Agent and the Lenders shall have received their required periodic updates of the Budget;

(b)     No Default or Event of Default shall exist under any of the DIP Facilities;

(c)     Representations and warranties of the Debtors shall be true and correct in all material respects;

(d)     The Debtors shall have paid the balance of all invoiced fees then earned, due and payable in respect of the DIP Facilities as referenced in the Fee Letter; and

(e)     As a result of the extension of such credit, usage of the Commitments shall not exceed (i) the applicable Commitments then in effect and (ii) the aggregate amount authorized by the Final Order.

C.     <u>ADDITIONAL CONDITIONS TO AVAILABILITY OF DELAYED-DRAW TERM LOANS AND RCT LETTERS OF CREDIT</u>

1.     The RCT Carve Out Support Rejection Notice shall have been exercised (a) prior to the Delayed-Draw Termination Date and (b) prior to the making of such Delayed-Draw Term Loans or the issuance of such RCT Letters of Credit.

#4819-5662-6966

**<u>EXHIBIT G</u>**

**EFIH FIRST LIEN DIP FINANCING TERM SHEET**

**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC AND EFIH FINANCE, INC.**

SUMMARY OF TERMS AND CONDITIONS OF THE $5.4 BILLION
SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION FACILITY
("**TERM SHEET**")

Capitalized terms used but not defined in this Term Sheet will have the meanings set forth in the Commitment Letter to which this Term Sheet is attached (the "**Commitment Letter**").

| | |
|---|---|
| **Borrower:** | Energy Future Intermediate Holding Company LLC ("**EFIH**" and EFIH Finance Inc. ("**EFIH Finance**," and together with EFIH, the "**Borrower**"), each as a debtor-in-possession under Chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") in jointly administered cases (collectively the "**Cases**") in the Bankruptcy Court for District of Delaware (or such other court as may be acceptable to Commitment Parties in their sole discretion, the "**Bankruptcy Court**"). |
| **Guarantors:** | All obligations under the DIP Facility (defined below) and the other Loan Documents (defined below) will be unconditionally guaranteed (collectively, the "**Guarantee**") by each subsidiary of the Borrower (each a "**Guarantor**" and collectively, the "**Guarantors**" and collectively with the Borrower, the "**Debtors**") that may be required to become a guarantor under the definitive documentation of the DIP Facility (the "**Loan Documents**"). |
| **Oncor Entities and EFCH Entities:** | For the avoidance of doubt, Oncor Electric Delivery Holdings Company LLC and its subsidiaries (the "**Oncor Entities**") and Energy Future Holdings Corp. and its subsidiaries other than the Borrower and its subsidiaries including the Oncor Entities (the "**EFH Entities**") (i) will not be Guarantors under the DIP Facility (it being understood that certain of the EFH Entities will be in jointly administered cases expected to be filed on or prior to the Closing Date in the Bankruptcy Court in respect of other debtors-in-possession financings (the "**TCEH DIP Facility**")), and (ii) will not be directly or indirectly restricted in the conduct of their respective businesses by the Loan Documents (whether by application of representations and warranties, affirmative covenants, negative covenants, Events of Default or otherwise) (other than through customary covenants restricting transaction with affiliates, investments and loans). |

**Prepetition Facilities:**

| "**EFIH Secured Notes**" | **Approximate Outstanding Principal Amount** |
|---|---|
| | |
| 10.00% Senior Secured First Lien Notes due 2020 | $3.482 billion |

| | |
|---|---|
| 6.875% Senior Secured First Lien Notes due 2017 (collectively with the 10.00% Senior Secured First Lien Notes due 2020, the "**EFIH First Lien Secured Notes**") | $503 million |
| 11.00% Senior Secured Second Lien Notes due 2021 | $406 million |
| 11.75% Senior Secured Second Lien Notes due 2022 (collectively with the 11.00% Senior Secured Second Lien Notes due 2021, the "**EFIH Second Lien Secured Notes**") | $1.75 billion |

**DIP Facility:**

A superpriority non-amortizing term credit facility (the "**Term Facility**" or the "**DIP Facility**") in an aggregate principal amount of $5,400,000,000 (the "**Term Commitments**" or the "**Commitments**"). Up to $5,400,000,000 of the Term Facility will be available in connection with Full Availability (defined below) in the form of term loans for the account of the Borrower ("**Term Loans**", or the "**Loans**"). Amounts drawn under the Term Facility may not be re-borrowed once repaid.

It is understood that a portion of the DIP Facility may be provided by (i) the exchange or other roll pursuant to an exchange agreement, restructuring support agreement or other similar document or agreement in respect of your prepetition indebtedness into Term Loans or (ii) other Backstop Commitment (as defined in the Commitment Letter), in each case as contemplated by Section 1 of the Commitment Letter, and all such amounts shall constitute Term Loans under the DIP Facility.

Notwithstanding anything to the contrary contained herein, in the Commitment Letter, or in the Fee Letter, (i) the exchange rate for exchanging (or otherwise rolling such indebtedness into the Obligations) any such prepetition indebtedness (as identified in the Commitment Letter) into Term Loans shall be in the sole discretion of the Borrower, (ii) the Borrower shall be entitled to allocate and give fees (including in the form of OID solely to the extent related to the exchange rate under the Exchange Arrangements and the Upfront OID (as defined in the Fee Letter)) to any such person in its sole discretion, and (iii) neither the Agent, any Joint Lead Arranger shall have any right to consent to the participants (or their allocations) in any Exchange Arrangement or any person providing the Backstop Commitment (subject to the terms in the Commitment Letter).

| | |
|---|---|
| **Purpose/Use of Proceeds:** | The proceeds of the DIP Facility will be used, in a manner consistent with the terms of the Budget (defined below) (but not subject to any Budget compliance covenant in respect thereof): (i) *first*, to pay (w) transaction fees, liabilities and expenses (including all Professional Fees) (defined below) and other administration costs incurred in connection with the Cases and the negotiation, syndication, documentation (including any engagement or commitment letters), execution and closing of the DIP Facility, (x) the refinancing of the EFIH First Lien Secured Notes (as contemplated on Annex I) (including through the exchange or other roll of EFIH First Lien Secured Notes into Term Loans), and (y) Settlement Payments (as defined below), and (ii) *second*, to finance any and all working capital needs and for any other general corporate purposes, and to comply with any legal and/or regulatory requirements of governmental and quasi-governmental entities of the Debtors, (and, to the limited extent set forth below, of the Specified Affiliates). "Settlement Payments" shall mean amounts paid in accordance with the terms of any exchange agreement or similar document, agreement or arrangement to settle claims (including in respect of principal, interest and premium (if any)) in respect of the EFIH First Lien Secured Notes. |
| **Left Lead DIP Facility Arranger:** | Deutsche Bank Securities Inc. (the "**Left Lead DIP Facility Arranger**"). |
| **Joint Lead Arrangers:** | The Left Lead DIP Facility Arranger, Citigroup Global Markets Inc. ("**Citi**"), Merrill Lynch, Pierce, Fenner & Smith Incorporated ("**MLPFS**"), Morgan Stanley Senior Funding, Inc. ("**Morgan Stanley**"), Barclays Bank PLC ("**Barclays**"), RBC Capital Markets ("**RBCCM**") and Union Bank, N.A. ("**Union Bank**" and, together with the Left Lead DIP Facility Arranger, MLPFS, Citi, Morgan Stanley, Barclays and RBCCM, collectively, the "**Joint Lead Arrangers**"). |
| **Co-Managers:** | Loop Capital Markets, LLC ("**Loop Capital**") and The Williams Capital Group, L.P. ("**Williams Capital**", together with Loop Capital, the "**Co-Managers**"). |
| **DIP Facility Lenders:** | The Lenders under the Term Facility are referred to as the "**Term Lenders**" or the "**Lenders**". |
| **Administrative Agent:** | Deutsche Bank AG New York Branch (together with its permitted successors and assigns, the "**Administrative Agent**" or the "**Agent**"). |
| **DIP Facility Full Availability:** | Upon the Bankruptcy Court's entry of the Final Order (the "**Final Order Entry Date**"), the full amount of the Commitments shall be available to the Borrower subject to compliance with the applicable terms, conditions and covenants described in this Term Sheet (the "**Full Availability**"). |
| **Incremental Facilities:** | The Borrower shall be entitled to enter into one or more incremental term loan facilities (the "**Junior Incremental Term Facilities**" or the |

"**Junior Incremental Facilities**") that will rank junior in right of payment with the DIP Facility and will have the same guarantees as the DIP Facility, and be secured by a lien on the same Collateral securing the DIP Facility that is junior to the lien securing the DIP Facility, in a principal amount not to exceed $3,000,000,000 in the aggregate; *provided* that:

(i)      no Event of Default or event that upon the passage of time, the giving of notice, or both, would become an Event of Default ("**Default**") under the Term Facility would exist immediately after giving effect thereto, and the representations and warranties in the Loan Documents shall be true and correct in all material respects on and as of the date of the incurrence of each such Junior Incremental Facility (or to the extent such representations and warranties relate to an earlier date, they shall be true and correct in all material respects as of such earlier date);

(ii)      such Junior Incremental Facilities may be provided by then existing Lenders or, other persons, *provided* that no existing Lender will be obligated to provide such Incremental Facilities without its consent;

(iii)      the maturity date of such Junior Incremental Facilities shall be no earlier than the maturity date of the Term Facility, and such Incremental Facilities shall require no scheduled amortization prior to the final maturity of the Junior Term Facility;

(iv)      the interest rates, interest margins, any rate floors, fees, original issue and other funding discounts and premiums and (subject to clause (iii) above) amortization schedule applicable to such Junior Incremental Facility shall be determined by the Borrower and the lenders thereunder;

(v)      no part of the principal amount (including any principal amount arising from PIK interest or fees) of the Junior Incremental Term Facilities shall be required to be repaid in cash; and, subject to the proviso to this clause (v), at the final maturity of each Junior Incremental Term Facility (which shall occur at the exit of the Debtors from the Cases), the principal amount (including any principal amount arising from PIK interest or fees) of the loans under the Junior Incremental Term Facilities shall be converted into equity in accordance with the Plan of Reorganization; <u>provided</u> that nothing in the final documentation for the DIP Facility shall prevent a refinancing and/or repayment of the Junior Incremental Term Facilities at the exit of the Debtors from the Cases if (x) such refinancing and/or repayment occurs after the DIP Facility have been repaid in full in cash and (y) the Plan of Reorganization permits the Borrower to make such repayment and/or incur indebtedness to refinance such Junior Incremental Term Facilities;

(vi)      the proceeds of the Junior Incremental Term Facilities shall be

used solely to repay in full the EFIH Second Lien Secured Notes and all interest, premium and fees in connection with such repayment;

(vii)    the relative priority between the lien securing the Junior Incremental Term Facilities and the lien securing the DIP Facility shall be governed by an intercreditor agreement reasonably satisfactory to the Agent and the Borrower, which intercreditor agreement shall provide that so long as any obligations are outstanding under the DIP Facility, the Agent on behalf of the DIP Facility will control at all times all remedies and other actions related to the Collateral, and that the secured parties under the Junior Incremental Term Facilities will not be entitled to take any action with respect to the Collateral (other than limited actions to preserve and protect the liens securing the Junior Incremental Term Facilities that do not impair the liens securing the DIP Facility);

(viii)    except as otherwise set forth above, each Junior Incremental Term Facility shall be on terms and pursuant to documentation to be determined by the Borrower and the lenders providing such Junior Incremental Term Facility; *provided* that (1) the "baskets" for the covenants and events of default under the Junior Incremental Term Facility will be sized at a cushion reasonably satisfactory to the Agent to the levels of the "baskets" under the corresponding covenants and events of default under the DIP Facility, and (2) to the extent such terms and documentation are not consistent with the Term Facility (except to the extent permitted or required by clauses (iii) through (vii) above or clause (1) above or with respect to fees and immaterial terms), they shall be reasonably satisfactory to the Administrative Agent; and

(ix)    the Final Order Entry Date shall have occurred.

**Documentation Principles:**    "**Documentation Principles**" means that (a) except as otherwise expressly set forth herein in this Term Sheet or the Commitment Letter, the terms and conditions of the Loan Documents shall be consistent with the terms and conditions, and in no event more burdensome on the Debtors, than the terms and conditions of TCEH DIP Facility (the "**Specified Facility**"); (b) the Loan Documents will be prepared on the basis of, and using as precedent, the Specified Facility and its related collateral documents; and (c) generally all terms and conditions (including exceptions, thresholds, baskets, grace periods, cure periods and financial definitions) in the Loan Documents will be consistent with those in the Specified Facility and its related collateral documents and in no event more burdensome on the Debtors, in each case modified solely to the extent (i) required to reflect the express terms and conditions set forth in this Term Sheet and the Commitment Letter, (ii) required to reflect the shorter tenor of the DIP Facility, (iii) required to reflect that the Loan Documents will be for a borrower that is a holding company without any operations, (iv) to account for the existence and continuance of the Cases, the operational needs and requirements of the Borrower, the Guarantors

5

and the Specified Affiliates (defined below) between the Petition Date and the Maturity Date (including as set forth in the last two paragraphs of "**Negative Covenants**" below) and to include provisions applicable to debtor-in-possession facilities generally (including (subject to the last two paragraphs of "**Negative Covenants**" below) customary changes to be mutually agreed with respect to additional restrictions on indebtedness, liens, restricted payments, asset sales and investments in persons that are not subsidiaries of the Borrower), and (v) as otherwise agreed by the Borrower.

**Budget:**

As used in this Term Sheet and in <u>Annex I</u> hereto, "**Budget**" means the following:

Beginning on the Final Entry Order Date, in the case of the initial Budget delivered as a condition precedent to the occurrence of the Closing Date, a statement of cash sources and uses of all free cash flow for the next full 3-calendar months of the Debtors broken down by month, including the anticipated uses of the DIP Facility for such period, and after such 3-calendar month period, at the end of each fiscal quarter (or, at the election of the Borrower, at the end of each calendar month or such other earlier period as may be agreed).

The Borrower shall also provide on a monthly basis a Budget variance report/reconciliation for each calendar month (delivered no later than the end of the subsequent calendar month), (i) showing a statement of actual cash sources and uses of all free cash flow for the immediately preceding calendar month, noting therein all material variances from values set forth for such historical periods in the most recently delivered Budget, and shall include explanations for all material variances, and (ii) certified as to its reasonableness when made by the Borrower.

**Annual Operating Forecast:**

Beginning on the date 60 days after the Final Order Entry Date (and no later than December 1, 2014 for the business plan and operating budget covering 2015 and no later than December 1, 2015 for the business plan and operating budget covering 2016), on an annual basis, the approved annual business plan and projected operating budget through the Stated Maturity Date (the "**Annual Operating Forecast**"), broken down by month, including, without limitation, income statements, balance sheets, cash flow statements, projected capital expenditures, asset sales, a line item for total available liquidity for the period of such Budget, and which shall set forth the anticipated uses of the DIP Facility for such period; the associated underlying assumptions shall be certified by the Borrower as being reasonable when made.

Both the Budget and the Annual Operating Forecast shall provide, among other things, for the payment of the fees and expenses relating to the DIP Facility, ordinary course administrative expenses, bankruptcy-related expenses and working capital, and other general corporate needs; *provided, however*, that notwithstanding anything to

the contrary in this Term Sheet or in any of the Loan Documents, the Professional Fees (defined below) will be due and payable, and will be paid by the Debtors whether or not consistent with the items or amounts set forth in the Budget or the Annual Operating Forecast; and *provided*, *further* that under no circumstance will the Budget or the Annual Operating Budget be construed as a cap or limitation on the amount of the Professional Fees due and payable by the Debtors.

**Maturity:**            The maturity date of the DIP Facility will be (and all Loans and other payment obligations under the DIP Facility shall be repaid in full in cash on) the earliest of (the "**Maturity Date**"): (i) stated maturity, which shall be twenty-four (24) months from the Closing Date (defined below), subject to a six-month extension on the last day of such 24-month period (the "**Stated Maturity Date**") if on such last day (1) no Event of Default is outstanding, (2) a Chapter 11 plan of reorganization for the Debtors (the "**Plan of Reorganization**") has been filed, (3) a hearing has been scheduled for the confirmation of such Plan of Reorganization, (4) the Debtors are working in good faith to confirm such Plan of Reorganization, (5) an updated Budget and Annual Operating Forecast have been delivered by the Borrower at least ten days prior to the first day of such extension, which Budget and Annual Operating Forecast demonstrate minimum liquidity sufficient through such additional six-month period plus $150,000,000, (6) the Borrower has paid an extension fee of 25 basis points on the outstanding principal amount of the Term Loans, and (7) the maturity date of each Junior Incremental Facility has simultaneously extended to a date not earlier than the extended Maturity Date (subclauses (1) through (7), the "**Extension Conditions**"); (ii) the effective date of the Plan of Reorganization; (iii) August 26, 2014 if the Final Order Entry Date shall not have occurred by such date; (iv) the date of the consummation of a sale of all or substantially all of the Debtors' assets or stock under section 363 of the Bankruptcy Code; and (v) the acceleration of the Loans and termination of the Commitments under any of the DIP Facility, including, without limitation, as a result of the occurrence and continuance of an Event of Default (any such occurrence, the "**Maturity Date**"); provided, however, that the Maturity Date will occur in any event no later than 30 months from the Closing Date.

Any plan of reorganization or liquidation or confirmation order entered in the Cases shall not discharge or otherwise affect in any way any of the joint and several obligations of the Debtors to the Lenders under the DIP Facility and the Loan Documents, other than after the payment in full and in cash, to the Lenders of all obligations (other than indemnities and other contingent obligations not then due and payable) under the DIP Facility and the Loan Documents on or before the effective date of a plan of reorganization and the termination of the Commitments.

**Closing Date:**          The date on which the initial portion of the Commitments are made available for borrowings under the DIP Facility (the "**Closing Date**"),

which shall be no later than five (5) business days after the  Final Order Entry Date, subject to satisfaction (or waiver) of the applicable conditions precedent set forth herein.

**Amortization:**  None. For the avoidance of doubt, there will be neither an excess cash flow sweep nor scheduled amortization under the DIP Facility.

**Interest Rate and Fees:**  As set forth on <u>Annex II</u>.

**Borrowing Procedure:**  The Term Facility will be available in a single draw on or after the date the Final Order is entered.  For the avoidance of doubt, the Borrower shall not be required to draw the full amount of the Term Commitments.

Borrowing requests under the DIP Facility shall be made (i) on three business days' notice, in the case of Loans bearing interest at a rate based on LIBOR ("**LIBOR Loans**") and (ii) on one business day's notice, in the case of Loans bearing interest based on the Alternate Base Rate ("**ABR Loans**")**.**

**Currency:**  Borrowings will be made in U.S. Dollars. All payments under the DIP Facility will be made without setoff or counterclaim.

**Voluntary Prepayments and Commitment Reductions:**  To be consistent with the Documentation Principles:

The Borrower may repay outstanding Term Loans and/or reduce the Term Commitments at any time without premium or penalty, including without any make-whole premium, (other than breakage costs, if applicable on the amount of the prepayment or reduction) upon (i) at least three (3) business days' notice in the case of LIBOR Loans and (ii) one business day's notice in the case of ABR Loans; *provided* that in the case of repayment, each partial repayment shall be in an amount of $5,000,000 or multiples of $1,000,000 in excess thereof (or, if less, the outstanding amount of applicable Term Loans), and, each partial reduction shall be in an amount of $5,000,000 or multiples of $1,000,000 in excess thereof (or, if less, the remaining available balance of the relevant Commitment).

**Mandatory Prepayments:**  The following mandatory prepayments shall be required, subject, in each case, to reinvestment rights, exceptions and mechanics consistent with the Documentation Principles:

1. <u>Asset Sales</u>: Prepayments of the DIP Facility in an amount equal to 100% of (i) the net cash proceeds of the sale or other disposition by the Oncor Entities (or successors thereof) of assets outside the ordinary course that have been actually distributed to the Borrower and (ii) the net cash proceeds of the sale or other disposition by the Debtors of any property or assets (other than any such proceeds received prior to the date of commencement of the Cases) of the Debtors, other than net cash proceeds of sales or other dispositions of power, capacity, energy, ancillary services and other products,

8

inventory and services or contracts related to any of the foregoing (in each case, whether in physical, financial or other form), any dispositions between the Debtors, any dispositions consisting of leases and sub-leases and any other sales or dispositions in the ordinary course of business or consistent with past practice, and subject, in each case of clauses (i) and (ii), to any exceptions to be mutually agreed on in the Loan Documents consistent with the Documentation Principles.

2. <u>Insurance Proceeds</u>: Prepayments of the DIP Facility in an amount equal to 100% of the net cash proceeds of insurance paid on account of any loss of any property or assets of the Debtors (other than any such proceeds received prior to the date of commencement of the Cases), with restrictions to be mutually agreed, and subject to exceptions to be mutually agreed on in the Loan Documents consistent with the Documentation Principles.

**Priority/Security:**

All obligations of the Debtors to the Agent and the Lenders (such persons, collectively, the "**DIP Secured Parties**") under the Loan Documents (the "**Obligations**"), including all Loans made under the DIP Facility, shall, subject to the Carve-Out (defined below), at all times:

(i)   pursuant to Bankruptcy Code section 364(c)(1), be entitled to joint and several superpriority administrative expense claim status in the Cases, on a pari passu basis;

(ii)  pursuant to Bankruptcy Code section 364(c)(2), be secured by the following:

a perfected first-priority lien on substantially all now owned or hereafter acquired assets of the Debtors and the proceeds thereof, and a perfected lien on such assets in each case to the extent such assets constitute "Collateral" (including the "Security Collateral" (including the Equity Interests in Oncor Electric Delivery Holdings Company LLC) and the "Account Collateral", as each such term is defined in the Pledge Agreement dated as of November 16, 2009 (as amended, amended and restated, supplemented or otherwise in effect from time to time) between EFIH, the other Pledgors party thereto, and the Bank of New York Mellon Trust Company N.A. as collateral trustee) for purposes of the Collateral Trust Agreement dated as of November 16, 2009 (as amended, amended and restated, supplemented, modified or otherwise in effect from time to time, the "**EFIH Collateral Trust Agreement**") among EFIH, The Bank of New York Mellon Trust Company, N.A. as First Lien Trustee, the other Secured Debt Representatives from time to time party thereto, and The Bank of New York Mellon Trust Company N.A. as Collateral Trustee (to be defined consistent with the Documentation Principles) the ("**Collateral**"); *provided*, *however*, that the

Collateral will not secure any actual or purported Obligation (including pursuant to any guarantee or grant of security) with respect to any "swap" (as defined under the Commodity Exchange Act) (after giving effect to keepwell agreements in the Loan Documents) entered into by the Borrower or any Guarantor thereof that is not an "eligible contract participant" (as such term is defined in the Commodity Exchange Act) at the time such "swap" Obligation is incurred, or in the case of an Obligation resulting from a guarantee (or grant of security) at the later of the time such guarantee (or grant of security) is entered into and the time such "swap" obligation being guaranteed (or secured) is incurred; *provided*, *further* that the Collateral shall exclude the Debtors' claims and causes of action under Chapter 5 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, the "**Avoidance Actions**"), but subject only to, and effective upon, entry of the Final Order, shall include any proceeds or property recovered, unencumbered or otherwise the subject of successful Avoidance Actions, whether by judgment, settlement or otherwise.    For the avoidance of doubt, Collateral will also exclude the following:  (a) those assets over which the granting of security interests in such assets would be prohibited by contract (other than any in respect of any of the Prepetition Facilities), applicable law or regulation or the organizational documents of any non-wholly owned subsidiary (including permitted liens, leases and licenses), or to the extent that such security interests would result in adverse tax or accounting consequences as determined in good faith by the Borrower, (b) those assets as to which the Administrative Agent and the Borrower reasonably determine that the cost of obtaining such a security interest or perfection thereof are excessive in relation to the benefit for the Lenders of the security to be afforded thereby, (c) assets in respect of which the granting or perfection of a lien would violate any applicable law or regulation (including regulations adopted by FERC, the Public Utility Commission of Texas and/or the Nuclear Regulatory Commission), and (d)  other exceptions (i) to be mutually agreed or (ii) that are usual and customary for facilities of this type for affiliates of the Borrower will not constitute "Collateral"; *provided*, *however*, notwithstanding anything to the contrary contained herein, to the extent the security interest in such Collateral may be perfected by the entry of the Final Order, neither the Borrower nor any Guarantor shall be required to obtain, provide or execute any mortgage or control agreement in favor of the Agent or any other DIP Secured Party with regard to any Collateral nor shall the Borrower or any Guarantor be required to obtain a certificate of title evidencing the security interest of the Agent or any other Secured Party with respect to any Collateral;

in each case, to the extent that such Collateral is not subject to valid,

perfected and non-avoidable liens as of the commencement of the Cases;

(iii) pursuant to Bankruptcy Code section 364(c)(3), be secured by the following:

a perfected lien on all Collateral;

to the extent that such Collateral is subject to valid, perfected and non-avoidable liens in favor of third parties in existence at the time of the commencement of the Cases or to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code (other than property that is subject to the existing liens that secure the obligations under any of the Existing Primed Secured Facilities referred to below, which liens shall be primed by the liens securing the DIP Facility described in such clause, subject to such liens in favor of such third parties); and

(iv) pursuant to Bankruptcy Code section 364(d), be secured by the following:

a perfected priming first-priority lien on all Collateral, and

to the extent that such Collateral is subject to valid, perfected and non-avoidable liens in favor of third parties as of the commencement of the Cases that secure the obligations of the Borrower and the Guarantors under or in connection with each of the Prepetition Facilities that are secured (collectively the "**Existing Primed Secured Facilities**");

subject, in each case, to the Carve Out.

All liens securing the Obligations, the 507(b) Claim (as defined below) and any and all forms of adequate protection, liens or claims securing the Obligations and other prepetition obligations, including the liens and security interests granted to the respective noteholders and other secured parties pursuant to and in connection with the Existing Primed Secured Facilities (the "**Existing Primed Creditors**") (including all security agreements, mortgages, pledge agreements, and other security documents executed by any of the Debtors in favor of the agents under the Existing Primed Secured Facilities, for its benefit and for the benefit of any secured party under the Existing Primed Secured Facilities), shall be subject and subordinate to the Carve Out.

The "**Carve Out**" means the sum of (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any

time, whether by interim order, procedural order or otherwise, all unpaid fees and expenses (the "**Professional Fees**") incurred by persons or firms ("**Debtor Professionals**") retained by the Debtors pursuant to section 327, 328 or 363 of the Bankruptcy Code and any official committee of unsecured creditors (the "**Committee**" and, together with the Debtor Professionals, the "**Professional Persons**") appointed in the Cases pursuant to section 1103 of the Bankruptcy Code at any time before or on the first Business Day following delivery by the Agent of a Carve Out Trigger Notice (defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Professional Fees of Professional Persons in an aggregate amount not to exceed $25,000,000 incurred after the first Business Day following delivery by the Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve Out Trigger Notice Cap**"). For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the Agent to the Debtors, their lead restructuring counsel, the United States Trustee, and lead counsel to the Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

On the day on which a Carve Out Trigger Notice is given by the Agent to the Debtors, the Carve Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Professional Fees. The Debtors shall deposit and hold such amounts in a segregated account at the Agent in trust to pay such then unpaid Professional Fees (the "**Pre-Carve Out Trigger Notice Reserve**") prior to any and all other claims. The Debtors shall deposit and hold such amounts in a segregated account at Agent in trust to pay such Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "**Post-Carve Out Trigger Notice Reserve**" and, together with the Pre-Carve Out Trigger Notice Reserve, the "**Carve Out Reserves**") prior to any and all other claims. All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (ii) through (iii) of the definition of Carve Out set forth above, but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the Agent for the benefit of the Lenders, unless the Obligations have been paid in full, in which case any such excess shall be paid to the lenders under the Existing Primed Secured Facilities in accordance with their rights and priorities as of the Petition Date.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above, and then, to the extent the Post-Carve Out Trigger Notice Reserve has not

been reduced to zero, to pay the Agent for the benefit of the Lenders, unless the Obligations have been paid in full, in which case any such excess shall be paid to the lenders under the Existing Primed Secured Facilities in accordance with their rights and priorities as of the Petition Date.

Notwithstanding anything to the contrary in the Loan Documents, the Final Order, following delivery of a Carve Out Trigger Notice, the Agent and the agents under the Existing Primed Secured Facilities shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the Agent for application in accordance with the Loan Documents.

Further, notwithstanding anything to the contrary herein, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute Loans or increase or reduce the Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Professional Fees shall not affect the priority of the Carve Out and (iii) in no way shall the Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Professional Fees due and payable by the Debtors. The Debtors shall not assert or prosecute, and no portion of the proceeds of the DIP Facility, the Collateral, or the Carve Out, and no disbursements set forth in the Budget, shall be used for the payment of professional fees, disbursements, costs or expenses incurred by any person in connection with (a) preventing, hindering or delaying any of the Agent's or the Lenders' enforcement or realization upon any of the Collateral once an Event of Default has occurred and is continuing and after the Remedies Notice Period, (b) objecting or challenging or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the Obligations, the liens securing the DIP Facility, or any other rights or interest of any of the Agent or the Lenders, or (c) asserting, commencing or prosecuting any claims or causes of action, including, without limitation, any actions under Chapter 5 of the Bankruptcy Code, against the Agent, any Lender or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees.

The liens on the Collateral securing the Existing Primed Secured Facilities shall be junior and subordinate to the Carve Out and the liens securing the DIP Facility. All of the liens described herein shall be effective and perfected as of the Final Order Entry Date and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements.

**Representations and**                    Each of the Debtors under the DIP Facility will make only the

13

**Warranties:**

following representations and warranties, consistent with the Documentation Principles and (for the avoidance of doubt) each as modified as necessary to reflect the commencement of the Cases and events leading up to and following commencement:

Financial statements; no Material Adverse Event since the Petition Date; existence and good standing, authorization and validity; compliance with law; corporate power and authority; due authorization, execution, delivery and enforceability of Loan Documents; no conflict with law, organizational documents, unstayed orders and decrees or post-petition material contractual obligations; no material unstayed litigation; no default; ownership of property; intellectual property; taxes; insurance; Federal Reserve regulations; ERISA; Investment Company Act; subsidiaries; environmental matters; labor matters; OFAC; FCPA; Patriot Act; anti-terrorism laws and anti-money laundering laws; effectiveness of the Final Order; creation, validity, perfection and priority of lien securing the DIP Facility; and accuracy of disclosure. Notwithstanding anything in this Term Sheet or any Loan Document to the contrary, the Debtors will not provide any representation or warranty concerning solvency.

As used herein and in the Loan Documents, a "**Material Adverse Event**" shall mean any circumstance or conditions affecting the business, assets, operations, properties or financial condition of the Borrower and its subsidiaries taken as a whole, that would individually or in the aggregate, materially adversely affect the ability of the Debtors (taken as a whole) to perform their payment obligations under the Loan Documents to which they are a party, or the rights and remedies of the Agent and the Lenders under the Loan Documents (other than, in each case, as a result of the events leading up to, and following commencement of a proceeding under Chapter 11 of the Bankruptcy Code and the continuation and prosecution thereof, including circumstances or conditions resulting from, or incidental to, such events, commencement, continuation and prosecution, which shall not individually or in the aggregate constitute a Material Adverse Event), and *provided* that nothing disclosed in any of the following filings by EFIH and/or EFH (1) the Annual Report on Form 10-K for the year ended December 31, 2013, as filed on the date of the Commitment Letter (to the extent substantially the same in form and substance as the version provided to the Left Lead DIP Facility Arranger at least 2 days prior to the date of the Commitment Letter), (2) any filings on Form 8-K made through the date of the Commitment Letter and/or (3) any disclosure statement related to any plan of reorganization or liquidation of Debtors provided to the Joint Lead Arrangers on or prior to the date of the Commitment Letter, shall, in any case, in and of itself and based solely on facts as disclosed therein (without giving effect to any developments not disclosed therein) constitute a Material Adverse Event.

**Covenants:**

14

**- Affirmative
Covenants:**

Each of the Debtors under each of the DIP Facility (solely with respect to itself and each of the other Debtors and restricted subsidiaries) will agree only to the following affirmative covenants (consistent with, in each case, the Documentation Principles):

(a) delivery of (i) periodic updates of the Budget and monthly variance reports (as described above) and (ii) quarterly and annual financial statements;

(b) delivery of monthly reports with respect to asset sales, cost savings, and other matters reasonably requested by the Agent;

(c) delivery to the Agent and its legal counsel, at least 2 business days in advance of filing with the Bankruptcy Court, of all proposed "first day" pleadings and proposed orders, which must be in form and substance reasonably satisfactory to the Agent (but in the case of the order governing cash management and any order governing adequate protection, shall be satisfactory in form and substance to the Agent);

(d) delivery to the Agent and its legal counsel, as soon as practicable in advance of filing with the Bankruptcy Court, of any plan or reorganization or liquidation and/or any disclosure statement related to such plan, which must be in form and substance reasonably satisfactory to the Agent; *provided*, *however*, that with respect to provisions of the plan of reorganization and/or any disclosure statement that relate to payment of the DIP Facility, such provisions must be in form and substance satisfactory to the Agent;

(e) delivery to the Agent as soon as practicable in advance of filing with the Bankruptcy Court of the Final Order (which must be in form and substance satisfactory to the Agent) and all other proposed material orders and pleadings related to the DIP Facility (which must be in form and substance reasonably satisfactory to the Agent), any plan of reorganization or liquidation, and/or any disclosure statement related to such plan;

(f) file with the Bankruptcy Court a plan of reorganization and a disclosure statement relating thereto, each in form and substance reasonably satisfactory to the Agent, within 18 months after the Petition Date; *provided*, *however*, that with respect to provisions of the plan of reorganization and/or any disclosure statement that relate to payment of the DIP Facility, such provisions must be in form and substance satisfactory to the Agent;

(g) maintenance of cash management system in accordance with the orders entered in the Cases, which orders shall be in form and substance satisfactory to the Agent; and the Borrower

shall maintain its own bank accounts and not otherwise commingle cash with Energy Future Holdings Corp. or any of Energy Future Holdings Corp.'s other subsidiaries other than subsidiaries of the Borrower;

(h) contest, if requested by the Agent, any motion seeking entry of an order, and entry of an order, that is materially adverse to the interests of the Agent or the Lenders or their respective material rights and remedies under the DIP Facility in any of the Cases;

(i) additional reporting requirements reasonably requested by the Agent, including, without limitation, with respect to litigation, contingent liabilities, Defaults, ERISA, environmental liabilities and Material Adverse Events;

(j) reasonable access to information (including historical information) and personnel (during normal business hours), including, regularly scheduled meetings as mutually agreed with senior management of the Borrower and other company advisors (during normal business hours), and a subset of the Agent shall be provided with access to all information it shall reasonably request and to other internal meetings regarding strategic planning, cash and liquidity management, operational and restructuring activities;

(k) if not already obtained, commercially reasonable efforts to obtain ratings from each of Moody's and Standard & Poor's as soon as reasonably practicable following the Closing Date; and

(l) only such additional affirmative covenants (as modified to account for the commencement and continuance of the Cases and other express provisions in this Term Sheet) as are consistent with the Documentation Principles.

**- Negative Covenants:** Each of the Debtors under each of the DIP Facility (solely with respect to itself and each of the other Debtors and restricted subsidiaries) will agree only to the following negative covenants, consistent with, in each case, the Documentation Principles:

(a) prohibition on creating or permitting to exist any liens on any assets, other than liens securing the DIP Facility and any permitted liens consistent with the Documentation Principles (which liens shall include, among others, scheduled liens in existence on the Closing Date) and other liens described in "**Priority/Security**" above;

(b) prohibition on creating or permitting to exist any other superpriority claim that is pari passu with or senior to the claims of the Lenders under the DIP Facility, except for the

Carve-Out and liens securing the Obligations;

(c) prohibition on making adequate protection payments to, or otherwise providing adequate protection for, creditors under any of the Prepetition Facilities other than as provided for in this Term Sheet and contained in the Final Order and/or any cash collateral order approved by the Agent;

(d) prohibition on the use of proceeds of the DIP Facility for purposes other than those described in this Term Sheet and contained in the Final Order;

(e) limitations on disposing of assets (including, without limitation, any sale and leaseback transaction and any disposition under Bankruptcy Code section 363);

(f) prohibition on modifying or altering in any material manner the nature and type of its business (taken as a whole) except as required by the Bankruptcy Code or orders entered by the Bankruptcy Court;

(g) prohibition on prepaying prepetition Indebtedness, except as expressly provided for in the Loan Documents or pursuant to "**first day**" or other orders entered by the Bankruptcy Court upon pleadings in form and substance reasonably satisfactory to the Agent;

(h) prohibition on consenting to the termination or reduction of the Debtors' exclusive plan filing and plan solicitation periods under section 1121 of the Bankruptcy Code (the "**Exclusivity Periods**") or failing to object to any motion by a party in interest (other than a Lender or the Agent) seeking to terminate or reduce the Exclusivity Periods, in each case without the prior written consent of the Agent; and

(i) such additional negative covenants (as modified to account for the commencement of the Cases and other express provisions in this Term Sheet or the Commitment Letter) as are consistent with the Documentation Principles.

It is understood that transactions (including any payments to affiliates) under the ordinary course cash management system, including pursuant to any shared services or similar agreement ("**Shared Services Agreement**") and any tax sharing agreements ("**Tax Sharing Agreements**"), any sublease of property from any Specified Affiliate to the Borrower or any of its restricted subsidiaries ("**Property Subleases**") and certain other agreements or arrangements to be agreed, each as in effect on the date of the Commitment Letter (and as amended, supplemented or modified in a manner that is not materially adverse to the interests of the Lenders in their

capacity as such) and/or contemplated in the Initial Budget or any other Budget that has been approved by the Agent from time to time (if any) in respect of any applicable period will in any event be permitted by the Loan Documents (as and when the Borrower and/or Guarantors elect to make such performance in their respective discretion); *provided*, *further* that failure to comply with any such agreements shall not constitute a Default or Event of Default under the Loan Documents.

The DIP Facility will include exceptions from the relevant covenants allowing for investments and/or restricted payments (in the form of intercompany loans, intercompany funding or otherwise) and transactions with affiliates between the Borrower, any of its subsidiaries, and the Specified Affiliates pursuant to which the Borrower may (in its discretion) perform intercompany transactions under the ordinary course cash management system (including pursuant to the Shared Services Agreement, any Tax Sharing Agreements, or Property Sublease and certain other agreements or arrangements to be agreed to) to, the Specified Affiliates, to finance general corporate purposes of the Specified Affiliates during the pendency of the Cases.

"**Specified Affiliates**" means, collectively, the following affiliates of the Borrower: EFH Corporate Services Company and Energy Future Holdings Corp.

**- Financial Covenants:**     Minimum liquidity (to be defined as unrestricted cash) of $150 million at all times.

**Events of Default:**     The occurrence and continuance of any of the following events shall constitute an Event of Default under the DIP Facility (consistent, in each case, with the Documentation Principles):

(a)  (i) the Final Order Entry Date shall not have occurred on or prior to the date that is one hundred and ten (110) days after the date of the Commitment Letter or (ii) the Term Facility shall not have been funded in full within ten (10) days of the Final Order Entry Date;

(b)  Any of the Cases shall be dismissed or converted to a Chapter 7 Case;

(c)  A trustee, receiver, interim receiver, receiver or manager shall be appointed in any of the Cases, or a responsible officer or an examiner with enlarged powers shall be appointed in any of the Cases (having powers beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4));

(d)  Any other superpriority administrative expense claim or lien

18

(other than the Carve-Out) which is pari passu with or senior to the claims or liens of the Agent or the Lenders under the DIP Facility shall be granted in any of the Cases without the prior written consent of the Agent;

(e) The Bankruptcy Court shall enter an order granting relief from the automatic stay to (i) any creditor or party in interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any equity interest in any of the Oncor Entities held by any of the Debtors or (ii) any creditor or party in interest with a value in excess of $25,000,000 to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Debtors (other than assets described in clause (i)) that have an aggregate value in excess of $25,000,000;

(f) The Borrower shall default in the payment of (i) principal on the Loans when due; or (ii) interest or fees and such default shall continue for more than five (5) days;

(g) Any representation or warranty made or deemed made by any Debtor in any Loan Document shall prove untrue in any material respect on the date as of which it is made or deemed made;

(h) The Debtors shall default (i) in the observance of any negative covenant (and certain specified affirmative covenants consistent with the Documentation Principles) in the Loan Documents, (ii) in the observance of the Financial Covenant; or (iii) in the observance of any other covenant, term or condition not otherwise specified herein which default continues for more than 30 days after receipt of notice to the Borrower from the Agent or the Requisite Lenders (defined below);

(i) An order shall be entered reversing, supplementing, or staying for a period of five (5) business days or more, vacating or otherwise modifying the Interim Fee Order or the Final Order in a manner that is adverse to the interests of the Agent or the Lenders, or any of the Debtors shall apply for authority to do so, without the prior written consent of the Agent or the Requisite Lenders, or the Interim Fee Order or the Final Order with respect to the DIP Facility shall cease to be in full force and effect;

(j) An order shall be entered amending in a manner that is adverse in any material respect to the interests of the Lenders the Interim Fee Order or the Final Order without the consent of the Lenders;

(k) Any judgments that are in the aggregate in excess of

19

$25,000,000 as to any post-petition obligation that is allowed as an administrative expense claim against the Debtors shall be rendered against the Debtors and the enforcement thereof shall not be stayed (by operation of law, the rules or orders of a court with jurisdiction over the matter or by consent of the party litigants, in each case, to the extent not paid or covered by insurance provided by a carrier not disputing coverage) or there shall be rendered against the Debtors a non-monetary judgment with respect to a post-petition event that causes or is reasonably expected to cause a Material Adverse Event;

(l)  Any Debtor makes any material payments relating to prepetition obligations (including any "adequate protection" payments) other than in accordance with a "first day" order, the Interim Fee Order, the Final Order, or as otherwise agreed to by the Agent;

(m) A plan shall be confirmed in any of the Cases that does not provide for termination of the Commitments under the DIP Facility and the indefeasible payment in full in cash of the Obligations (other than indemnities and other contingent obligations not then due and payable) on the effective date of such plan;

(n)  The Final Order shall cease to create a valid and perfected lien on the Collateral;

(o)  (i) Any Debtor shall file a motion or pleading or commence a proceeding that would reasonably be expected to result in a material impairment of any of the Lenders' material rights or interests in their capacities as Lenders under the DIP Facility or (ii) a determination by a court with respect to a motion, pleading or proceeding brought by another party that results in such an impairment;

(p)  Any Loan Document or any material provision thereof shall cease to be effective (other than in accordance with its terms);

(q)  Any of the Debtors shall fail to comply with the Interim Fee Order or the Final Order in any material respect;

(r)  The Bankruptcy Court shall enter an order approving any claims for recovery of amounts under section 506(c) of the Bankruptcy Code or otherwise arising from the preservation of any Collateral;

(s)  The Bankruptcy Court shall enter a final non-appealable order that is adverse in any material respect to the interests (when taken as a whole) of the Agent or the Lenders or their respective material rights and remedies in their capacity as such under the DIP Facility in any of the Cases;

(t)  The Borrower shall default on payment due or there shall be any event of default the effect of which is to accelerate or permit acceleration with respect to material indebtedness (threshold to be agreed) incurred after the Petition Date provided, that notwithstanding anything in the foregoing to the contrary, this section shall not apply with respect of make-whole payments or premiums in respect of indebtedness;

(u)  The Loan Parties or any of their subsidiaries, or any person claiming by or through the Loan Parties or any of their subsidiaries, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against any of the Agent or the Lenders in each case relating to the DIP Facility;

(v)  Any Debtor shall file any pleading seeking, or otherwise consenting to, or shall support or acquiesce in any other person's motion as to any matter set forth in clause (a), (b), (c), (d), (e), (i), (j), (k), (l), (m), (n), (o), (r), (s), or (u) above; and

(w)  Such additional events of default (as modified to account for the commencement of the Cases and other express provisions in this Term Sheet or the Commitment Letter]) as are consistent with the Documentation Principles (with the change of control definition to be agreed).

Notwithstanding anything to the contrary contained herein, any Event of Default under the Loan Documents, and any or similarly defined term under any Loan Document, other than any Event of Default which cannot be waived without the written consent of each Lender directly and adversely affected thereby, shall be deemed not to be "continuing" if the events, act or condition that gave rise to such Event of Default have been remedied or cured (including by payment, notice, taking of any action or omitting to take any action) or have ceased to exist.

Upon the enforcement of remedies after acceleration of the Loans as a result of an Event of Default, proceeds of other Collateral will be paid:  first, to holders of any then outstanding obligations under the Carve Out (if any), up the amount thereof; and then, to the holders of the Obligations.

| | |
|---|---|
| **Rights and Remedies Upon Event of Default:** | Upon the occurrence of an Event of Default and following the giving of five calendar days' notice to the Debtors (the "**Remedies Notice Period**"), the Agent, on behalf of the Lenders, may (and at the direction of the Requisite Lenders, shall) exercise all rights and remedies provided for in the Loan Documents and may declare (i) the termination, reduction or restriction of any further Commitment to the |

extent any such Commitment remains, (ii) all Obligations to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Debtors, and (iii) the termination of the Loan Documents as to any future liability or obligation of the Agent and the Lenders, but without affecting any of the liens securing the DIP Facility or the Obligations.

During the Remedies Notice Period, the Debtors may continue to use cash collateral in the ordinary course of business, consistent with past practices and the most recently delivered Budget, but may not enter into, or seek approval of, any transactions or arrangements (including, without limitation, the incurrence of indebtedness or liens, investments, restricted payments, asset sales or transactions with non-Debtor affiliates) that are not in the ordinary course of business. Unless the Bankruptcy Court orders otherwise during the Remedies Notice Period, at the end of the Remedies Notice Period, the Debtors shall no longer have the right to use or seek to use cash collateral, the automatic stay pursuant to section 362 of the Bankruptcy Code shall be automatically terminated without further notice to or order of the Bankruptcy Court, and the Agent shall be permitted to exercise all rights against the Collateral in accordance with the Loan Documents and the Final Order, as applicable, and shall be permitted to satisfy the Obligations, without further order or application or motion to the Bankruptcy Court and without restriction or restraint by any stay under section 362 or 105 of the Bankruptcy Code. Notwithstanding anything herein to the contrary, the automatic stay pursuant to section 362 of the Bankruptcy Code shall be automatically terminated for the purposes of giving any notice contemplated hereunder.

During the Remedies Notice Period, any party in interest shall be entitled to seek an emergency hearing with the Bankruptcy Court solely for the purpose of contesting whether an Event of Default has occurred and/or is continuing, and the Debtors waive their right to, and shall not be entitled to seek relief, including without limitation, under section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of the Agent, on behalf of the Lenders, set forth in the Interim Fee Order, the Final Order, or the Loan Documents.

The delay or failure to exercise rights and remedies under the Interim Fee Order, the Final Order or the Loan Documents by the Agent, on behalf of the Lenders, shall not constitute a waiver of such Agent's rights thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the applicable Loan Documents.

**Conditions to Full Availability:**    The obligation to provide Loans up to the full amount of the Commitments shall be subject to the satisfaction or waiver of the conditions precedent listed on <u>Annex I</u> attached hereto.

**Assignments and**    Subject in each case to the Documentation Principles, each Lender

**Participations:**     may assign all or any part of the Term Facility to one or more affiliates, banks, financial institutions or other entities, in each case, with the prior written consent of the Borrower (unless such an assignment is being made to a Lender, an affiliate of a Lender, or an approved fund of such Lender or its affiliate) and the Agent (unless such an assignment is being made to a Lender, an affiliate of a Lender or an approved fund of such Lender or its affiliate) (in each case, not to be unreasonably withheld, conditioned or delayed); *provided*, *however*, that under no circumstances will assignments be made to a Disqualified Institution (defined below), and that the consent of the Borrower will not be required during the continuance of an Event of Default. Upon such assignment, such affiliate, bank, financial institution or entity will become a Lender for all purposes under the Loan Documents.

The Lenders will also have the right to sell participations (other than to Disqualified Institutions), subject to customary limitations on voting rights, in the DIP Facility.

"**Disqualified Institutions**" means (a) any company engaged principally in the business of energy or power generation and/or transmission as identified in writing to the Agent by the Company from time to time, (b) any company whose principal business is that of an energy or power merchant as identified in writing to the Agent by the Company from time to time, (c) any financial institution identified in writing to the Joint Lead Arrangers by the Borrower on or prior to the date of the Commitment Letter (including any such person's affiliates that are clearly identifiable on the basis of such affiliates' names) and (d) a "defaulting" Lender (as described below). The list of Disqualified Institutions shall be posted for the benefit of the Lenders. Upon the identification in writing by the Borrower to the Agent of any additional Disqualified Institutions pursuant to clause (a) or (b) above, the Agent shall promptly post such addition to the list to the Lenders; provided that any additional person so identified shall not be deemed a Disqualified Institution until such time as such addition to the list is posted to the Lenders.

**Requisite Lenders:**     Voting with respect to the DIP Facility will be done solely by the Lenders. The vote of Lenders holding more than 50% of total Commitments under the DIP Facility (or if no Commitments are outstanding, total exposure) (the "**Requisite Lenders**") shall be required to amend, waive or modify any terms and conditions of the DIP Facility (with customary exceptions consistent with the Documentation Principles where only the consent of the relevant Agent will be required), except that with respect to matters relating to, among others, the reduction in, or compromise of payment rights with respect to, principal or interest rates, extension of maturity (it being understood and agreed that a waiver or amendment of the Extension Conditions (other than the Extension Conditions set forth under clauses (1) (solely with respect to a payment Event of Default) and (6) of the definition thereof, which will be subject to the consent of each

Lender) will be subject to Requisite Lender consent) or scheduled date of payment of any interest or fees due, release of material guarantees and/or liens granted on all or substantially all of the Collateral (other than guarantees, liens, or Collateral subject to permitted dispositions, permitted mergers, consolidations, reorganizations, etc.) and reduction in voting thresholds, the consent of the Lenders holding 100% of total Commitments (or if no Commitments are outstanding, total exposure) directly and adversely affected thereby will be required, except that the Commitment of a Lender may not be increased without such Lender's consent.

**Defaulting Lenders:**    The Loan Documents will contain customary provisions (but consistent in any event with the Documentation Principles) relating to "defaulting" Lenders (including provisions relating to the suspension of voting rights and rights to receive fees, and the termination or assignment of Commitments and Loans held by "defaulting" Lenders at par).

**Taxes:**    Consistent in each case with the Documentation Principles, the Loan Documents shall contain customary provisions (a) protecting the Lenders against increased costs or loss of yield resulting from changes in reserve, tax, capital adequacy and other requirements of law and from the imposition of or changes in withholding or other taxes (including in respect of Dodd-Frank and Basel III) and (b) indemnifying the Lenders for "breakage costs" incurred in connection with any prepayment of a LIBOR Loans on a day other than the last day of an interest period with respect thereto.

In connection with any proposed amendment, waiver or other modification to the DIP Facility (a "**Proposed Change**") requiring the consent of all Lenders or all directly and adversely affected Lenders, if the consent to such Proposed Change of all Lenders whose consent is required is not obtained, but the consent of Lenders with a majority of the Loans held by the applicable group of Lenders is obtained (any such Lender whose consent is required but is not obtained, a "**Non-Consenting Lender**"), then the Borrower may, at its sole expense, upon notice to such Non-Consenting Lender and the Agent, require such Non-Consenting Lender to assign and delegate, without recourse (in accordance with and subject to all restrictions otherwise applicable to assignments), all its interests, rights and obligations under the DIP Facility to an assignee that shall assume such obligations or terminate such Non-Consenting Lender's commitments; *provided* that such Non-Consenting Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts then due and owing to it under the DIP Facility from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts).

**Indemnity; Expenses:**    The Loan Documents will provide, in each case to the extent consistent with the Documentation Principles, that the Borrower shall

indemnify, pay and hold harmless the Agent, the Joint Lead Arrangers, and the Lenders and their affiliates (and their respective controlling persons, directors, officers, partners, employees, agents, advisors and other representatives (collectively the "**Related Parties**")) (each, an "**Indemnified Person**") against any loss, claim, damage, liability, or expense incurred in respect of the DIP Facility contemplated hereby or the use of proceeds thereof or the Transactions or any claim, litigation, investigation or proceeding (a "**Proceeding**") relating to any of the foregoing, regardless of whether any Indemnified Person is a party thereto, whether or not such Proceedings are brought by any Debtor, its equity holders, affiliates, creditors or any other person, and to reimburse each Indemnified Person promptly following written demand for any reasonable legal or other out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing (except, in the case of any Indemnified Person, to the extent resulting (i) from the gross negligence, bad faith or willful misconduct of such Indemnified Person (or its Related Parties), in each case as determined in a final non-appealable judgment of a court of competent jurisdiction, (ii) from a dispute solely among Indemnified Persons other than any claims against any Indemnified Person in its capacity or in fulfilling its role as an Agent or Joint Lead Arranger or any similar role under the DIP Facility and other than any claims arising out of any act or omission on the part of the Borrower or the other Debtors or (iii) from any material breach of the Loan Documents by such Indemnified Person (or its Related Parties), as determined in a final non-appealable judgment of a court of competent jurisdiction) and (b) the Borrower shall reimburse within 10 days of written demand (together with reasonably detailed supporting documentation) the Agent, the Lenders and the Joint Lead Arrangers for their reasonable and documented out-of-pocket expenses incurred in connection with the negotiation, documentation, syndication and administration of the DIP Facility, any amendments or waivers with respect thereto, any Event of Default in respect of the DIP Facility and any exercise of remedies in respect thereof (including reasonable and documented out-of-pocket prepetition and post-petition fees, charges and disbursements of legal counsel, financial advisors and third-party appraisers and consultants advising the Agent incurred in connection with the Agent's participation in the Cases, limited in the case of legal counsel to one primary counsel (and (i) appropriate local counsel in applicable foreign and local jurisdictions, but limited to one local counsel in each such jurisdiction, (ii) appropriate regulatory counsel and (iii) solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to the affected indemnified persons similarly situated)); provided, however, that the Debtors shall promptly provide copies of invoices received on account of fees and expenses of the professionals retained as provided for in the DIP Documents to counsel to the Committee and the United States Trustee, and the Bankruptcy Court shall have exclusive jurisdiction over any objections raised to the invoiced amount of the fees and expenses proposed to be paid, which objections may only be raised within ten days after receipt thereof. In the event that within ten days from receipt

of such invoices the Debtors, the United States Trustee or counsel to the Committee raise an objection to a particular invoice, and the parties are unable to resolve any dispute regarding the fees and expenses included in such invoice, the Bankruptcy Court shall hear and determine such dispute; provided, that payment of invoices shall not be delayed based on any such objections and the relevant professional shall only be required to disgorge amounts objected to upon being "so ordered" pursuant to a final order of the Bankruptcy Court.

**Governing Law and Jurisdiction:**

The Loan Documents will provide that the Debtors and the Lenders will submit to the exclusive jurisdiction and venue of the Bankruptcy Court, or in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, then in any state or federal court of competent jurisdiction in the Southern District of New York and shall waive any right to trial by jury. New York law shall govern the Loan Documents.

**Miscellaneous:**

The terms and conditions of the Interim Fee Order and Final Orders (e.g. 506(c) waivers, marshaling, and successors and assigns) to be mutually agreed.

**Counsel to the Joint Lead Arrangers and the Agent:**

Shearman & Sterling LLP

**Annex I**

**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC AND EFIH FINANCE, INC.**

**SUMMARY OF CONDITIONS PRECEDENT TO THE DIP FACILITY**

1.      <u>Interim Fee Order/Final Order/Bankruptcy Matters</u>.

(a)      The Bankruptcy Court shall have entered, upon motion in form and substance satisfactory to the Left Lead DIP Facility Arranger, an interim order in form and substance satisfactory to the Left Lead DIP Facility Arranger (the "**<u>Interim Fee Order</u>**") as to the DIP Facility Fee, the Ticking Fee and the reimbursement of documented expenses of the Commitment Parties (including fees, charges and disbursements of counsel), no later than ten (10) business days after the date of commencement of the Cases, (a) approving and authorizing the Debtors to satisfy such fees when due under, to the extent provided in, and in accordance with the Commitment Letter and the Fee Letter; and (b) entitling such fees to administrative expense priority pursuant to section 503(b) of the Bankruptcy Code and ordering that such fees shall be deemed fully earned, indefeasibly paid, irrevocable, and non-avoidable irrespective of whether the Term Loans are approved; <u>provided</u>, <u>however</u>, that for the avoidance of doubt, the Borrower will not pay any amounts authorized under the Interim Fee Order in advance of the Final Order Entry Date unless pursuant to a separate Bankruptcy Court order authorizing the Borrower to use cash collateral.

(b)      No later than the date that is one hundred and ten (110) days after the date of the Commitment Letter, a final order shall have been entered by the Bankruptcy Court in form and substance satisfactory to the Left Lead DIP Facility Arranger (which shall in any case approve the entirety of the Term Facility and the repayment and/or settlement (including via an exchange) in full of the principal amount plus any accrued and unpaid interest of the EFIH First Lien Secured Notes with the proceeds of the Term Loans and Incremental Term Loans) (the "**<u>Final Order</u>**") on a motion by the Debtors that is in form and substance satisfactory to the Left Lead DIP Facility Arranger, approving and authorizing on a final basis the matters and containing the other provisions described in this Section 1.

(c)      Neither of the Interim Fee  Order nor the Final Order  shall have been reversed, modified, amended, stayed or vacated, in the case of any modification or amendment, in a manner, that is adverse to the Lenders, without the consent of the Left Lead DIP Facility Arranger.

(d)      The Final Order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated, and with respect to any modification or amendment, in a manner that is adverse to the Lenders without the consent of the Left Lead DIP Facility Arranger.

(e)      The Debtors shall be in compliance in all material respects with the Interim Fee Order and the Final Order.

(f)      The Cases shall have been commenced in the Bankruptcy Court and all of the "first day orders" and all related pleadings to be entered at the time of commencement of the Cases

or shortly thereafter shall have been reviewed in advance by the Left Lead DIP Facility Arranger and shall be reasonably satisfactory in form and substance to the Left Lead DIP Facility Arranger, but in the case of orders relating to cash management and adequate protection, shall be satisfactory in form and substance to the Left Lead DIP Facility Arranger.

(g)     No trustee or examiner with enlarged powers (having powers beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4)) shall have been appointed with respect to the operations or the business of the Debtors.

2.     <u>Financial Statements, Budgets and Reports</u>.

(a)     The Borrower shall have delivered the Budget to the Agent and the Lenders, which shall be in form and substance reasonably satisfactory to the Agent and the Joint Lead Arrangers, and the Agent and the Joint Lead Arrangers hereby confirm the receipt of the Budget dated April 28, 2014 in form and substance reasonably satisfactory to the Agent and the Joint Lead Arrangers prior to the date hereof.

(b)     The Borrower shall have delivered to the Agent and the Lenders a base case model, including a statement of cash sources and uses of all free cash flow for the tenor of the DIP Facility, which shall be in form and substance reasonably satisfactory to the Agent and the Joint Lead Arrangers, and the Agent and the Joint Lead Arrangers hereby confirm the receipt of a base case model dated April 28, 2014 in form and substance reasonably satisfactory to the Joint Lead Arrangers and the Lenders prior to the date hereof.

(c)     The Agent and the Lenders shall have received reasonably requested financial information.

3.     <u>Performance of Obligations</u>.

(a)     All invoiced costs, fees, expenses (including, without limitation, reasonable legal fees) and other compensation contemplated by the Loan Documents and the Fee Letter to be payable to the Commitment Parties, the Agent and the Lenders in respect of the DIP Facility shall have been paid to the extent earned, due and payable.

(b)     Representations and warranties of the Debtors shall be true and correct in all material respects (or in all respects for representations and warranties qualified by materiality or Material Adverse Event).

(c)     No Default or Event of Default shall exist under the DIP Facility.

4.     <u>Customary Closing Documents</u>.

(a)     The Debtors shall have complied with the following closing conditions: (i) the delivery of customary legal opinions as to authority, authorization, execution and delivery; corporate records and documents from public officials, including good standing certificates; officer's certificates; and notice of borrowing; (ii) evidence of authority; and (iii) obtaining of any governmental consents, if any, necessary in connection with the DIP Facility, the financing thereunder and related transactions. The Lenders shall have received at least five (5) days prior to the Closing Date all documentation and other

information required by bank regulatory authorities under applicable "**know-your-customer**" and anti-money laundering rules and regulations, including the Patriot Act.

(b) The Loan Documents (which shall be consistent with the Documentation Principles) shall have been entered into by the Debtors, the Agent and the Lenders.

(c) The Agent shall have received results of a Uniform Commercial Code search for the jurisdiction of organization of the Debtors and a federal tax lien search for the jurisdiction of the chief executive office of the Debtors.

(d) The Agent shall have received proper financing statements (Form UCC-1 or the equivalent) for filing under the UCC in the jurisdiction of organization of each Debtor.

(e) As a result of the extension of such credit, usage of the Commitments shall not exceed (i) the applicable Commitments then in effect and (ii) the aggregate amount authorized by the Final Order.

5. <u>Other Conditions</u>.

(a) If the Final Order (or any order entered concurrently or prior to the entry of the Final Order) approves the repayment in full of the EFIH First Lien Secured Notes with the proceeds of the Term Facility, substantially concurrently with the borrowing under the Term Facility, the principal amount plus any accrued and unpaid interest of the EFIH First Lien Secured Notes (which, for the avoidance of doubt, shall not include make-whole payments or premiums in respect of the EFIH First Lien Secured Notes unless otherwise approved by the Borrower) shall be repaid in full.

**Annex II**

**INTEREST AND CERTAIN FEES**

| | |
|---|---|
| **Interest Rate Options:** | The Borrower may elect that the loans comprising each borrowing bear interest at a rate per annum equal to (a) the Alternate Base Rate (such loans herein referred to as "**ABR Loans**") plus the Applicable Margin or (b) the Adjusted LIBO Rate (such loans herein referred to as "**Eurodollar Loans**") plus the Applicable Margin. |
| | As used herein: |
| | "**Alternate Base Rate**" or "**ABR**" means the greatest of (a) the prime rate of interest announced from time to time by the Agent, changing when and as said prime rate changes (the "**Prime Rate**"), (b) the federal funds effective rate from time to time plus 0.50% and (c) the Adjusted LIBO Rate (after giving effect to LIBO floor in the case of Term Loans) for a one month interest period appearing on the Reuters Page LIBOR01 (or on any successor or substitute page) on such day plus 1.00%. |
| | "**Adjusted LIBO Rate**" means the rate (adjusted for statutory reserve requirements for eurocurrency liabilities) for eurodollar deposits for a period equal to one or two weeks, one, two, three or six months (as selected by the Borrower) appearing on Reuters Page LIBOR01 (or on any other service providing comparable rate quotations) at approximately 11:00 a.m., London time, two business days prior to the first day of the applicable interest period; *provided* that in the case of Term Loans, the Adjusted LIBO Rate shall be subject to a floor (the "**LIBO Floor**") of 1.00% per annum. |
| | "**Applicable Margin**" means, a margin of: |
| | 2.25%, in the case of ABR Loans<br>3.25%, in the case of Eurodollar Loans |
| **Interest Payment Dates:** | In the case of ABR Loans, interest shall be payable in arrears on the first day of each month, upon any prepayment due to acceleration and at the Maturity Date. |
| | In the case of Eurodollar Loans, interest shall be payable in arrears on the last day of each interest period and, in the case of an interest period longer than three months, quarterly, upon any prepayment and at the Maturity Date. |
| **Agent and Joint Lead Arrangers Fees:** | Such additional fees payable to the Agent and the Joint Lead Arrangers as are specified in the fee letter, dated April 28, 2014 (the "**Fee Letter**"), by and among the Agent, the Joint Lead Arrangers and the Borrower. |

**Default Rate:**                    After any payment Event of Default and upon notice by the Agent, the applicable interest rate for all Loans will be increased to, and overdue interest, fees and other amounts (other than overdue principal) shall bear interest at 2% per annum above the applicable rate. Overdue principal shall bear interest at 2% above the rate otherwise applicable.

**Rate and Fee Basis:**              All per annum rates shall be calculated on the basis of a year of 360 days (or 365/366 days, in the case of ABR Loans) for actual days elapsed

### Schedule 1

### "Clear Market" Permitted Indebtedness

1. Indebtedness pursuant to the Junior Incremental Facility.
2. The exchange or other roll of the holders of your prepetition indebtedness pursuant to any Exchange Arrangement.
3. Any Backstop Commitment sought or achieved prior to the date that is sixteen (16) business days after the date you countersign this Commitment Letter.

## **EXHIBIT H**

**EFIH SECOND LIEN DIP FINANCING TERM SHEET**

*Execution Version*

**ENERGY FUTURE HOLDINGS CORP.**
**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC**

SECOND LIEN SUBORDINATED SECURED DEBTOR IN POSSESSION NOTES FACILITY TERM SHEET

*Capitalized terms used but not defined herein shall have the meanings set forth in the letter agreement, dated as of April 29, 2014 (the "Commitment Letter"), to which this Term Sheet is attached, or the Restructuring Support Agreement (as defined in the Commitment Letter).*

| | |
|---|---|
| Issuers | Energy Future Intermediate Holding Company LLC, a Delaware limited liability company ("EFIH"), and EFIH Finance Inc., a Delaware corporation (collectively, the "Issuers"). |
| Guarantors | All of the Issuers' direct and indirect domestic restricted subsidiaries that guarantee the EFIH First Lien DIP Financing (collectively, the "Guarantors") in the Chapter 11 Cases.  The Issuers and the Guarantors are referred to herein as "Note Parties" and each, a "Note Party."  All obligations of the Issuers under the Second Lien DIP Facility (as defined below) will be unconditionally guaranteed by the Guarantors. |
| Backstop Commitment | To be provided by the entities set forth on Schedule I to the Commitment Letter on the date hereof (and defined as Initial Commitment Parties therein) and such other parties that become Commitment Parties from time to time pursuant to the terms of the Commitment Letter.  The Commitment Parties will pursuant to the Commitment Letter, severally and not jointly, backstop the Second Lien DIP Facility in an amount not to exceed $1,900,000,000 (the "Backstop Commitment") based on the respective percentages set forth on Schedule I to the Commitment Letter. |
| Second Lien DIP Facility Rights Holders | The following persons shall have the right to participate in the Second Lien DIP Facility (such persons, the "Second Lien DIP Facility Rights Holder," and such rights, the "Participation Rights"): (i) (a) All Holders of EFIH Unsecured Note Claims shall receive their Pro Rata share of 91% of the Participation Rights; and (b) Fidelity shall receive their Pro Rata share of 9% of the Participation Rights which participation shall be in the form of Tranche A-3 Note; *provided, however,* General Unsecured Claims Against EFH may participate in the Equity Conversion by purchasing such Tranche A-3 Notes held by Fidelity, if the Required Transfer as described below has not occurred.  Moreover, Fidelity shall receive an $11.25 million payment from EFIH in connection with the exercise of any Participation Rights.  If at any time (a) the IRS shall have denied the Debtors' Ruling Request or shall have informed the Debtors or their counsel, whether orally or in writing, of its decision not to issue one or |

more of the Required Rulings (the "PLR Denial") and (b) the Oncor TSA Amendment has not yet been approved, the Required Commitment Parties shall have the sole and exclusive right to require the holders of any Tranche A-3 Notes to transfer such notes to the Commitment Parties (the "Required Transfer") for a purchase price equal to the sum of (i) the par amount of such notes plus accrued and unpaid interest (including the PIK Interest (as defined below)), which amount shall be payable on the purchase date, (ii) in the event such assignment is consummated before the payment of the One-Time PIK Fee (as defined below), 10% of the par amount of such notes plus accrued and unpaid PIK Interest, if any (but not, for the avoidance of doubt, any accrued and unpaid cash interest), which amount shall be payable on the purchase date, and (iii) a Pro Rata share of any Prepayment Fee (as defined below) subsequently paid on such Tranche A-3 Notes (which amount shall be paid by EFIH to the holders of the Tranche A-3 Notes immediately prior to such assignment and not the holders of the Tranche A-3 Notes as of the date that the Prepayment Fee is due and owing).

The Participation Rights of Holders of General Unsecured Claims Against the EFIH Debtors shall be subject to ratable reduction from participation by Selected Partners (if any), in an aggregate amount not to exceed $400,000,000.

| | |
|---|---|
| Administrative Agent | To be determined. |
| Collateral Agent | To be determined. |
| DIP Facility | A second lien subordinated secured debtor-in-possession note facility that consists of (a) the Tranche A Notes, composed of (i) the Tranche A-1 Notes (the "Tranche A-1 Notes") issued to Holders of EFIH Unsecured Note Claims pursuant to the Second Lien DIP Procedures, (ii) the Tranche A-2 Notes (the "Tranche A-2 Notes") issued to each Commitment Party solely as a result of its obligation under the Investment Commitment, the Selected Partners, Post-Funding Partners and Specified Consultants, and (iii) the Tranche A-3 Notes (the "Tranche A-3 Notes" and, together with the Tranche A-1 Notes and Tranche A-2 Notes, the "Tranche A Notes") issued to Fidelity, as a Holder of General Unsecured Claims Against EFH, in each case, which will be available to be drawn in a single drawing on the Closing in an amount up to $1,900,000,000 to consummate the Second Lien Refinancing, and (b) the Tranche B Notes. |
| Second Lien DIP Procedures | The procedures for offering Participation Rights to eligible Second Lien DIP Facility Rights Holders under the Second |

Lien DIP Facility shall be on terms and conditions which are consistent with this Term Sheet and otherwise satisfactory to the Required Commitment Parties, EFH and EFIH (the "<u>Second Lien DIP Procedures</u>") in advance of the consummation of the Second Lien DIP Facility.

The record date that shall determine the parties entitled to Participation Rights shall be the date of the commencement of the offering to eligible Second Lien DIP Facility Rights Holders.

The Second Lien DIP Facility shall be funded by any and all Second Lien DIP Facility Rights Holders that elect to participate in their Pro Rata share of the Second Lien DIP Facility and, with respect to any unfunded portion of the Second Lien DIP Facility, Pro Rata by the Commitment Parties in accordance with the terms of the Commitment Letter (such funding parties, together, with their successors and assigns, the "<u>Note Purchasers</u>"); *provided that* no Commitment Party shall be permitted or required to exercise any participation rights if, after giving effect to such participation, the aggregate principal amount of the Second Lien DIP Facility to be provided by such Commitment Party when aggregated with the aggregate principal amount of the Second Lien DIP Facility provided by affiliates of such Commitment Party would exceed such Commitment Party's Investment Commitment, *provided, however, that* such Commitment Party may exceed such Commitment Party's Investment Commitment to the extent necessary to satisfy any Commitment of a Defaulting Commitment Party; *provided, further, that* any party electing to exercise such participation shall execute a joinder to the Restructuring Support Agreement and Conversion Agreement as a precondition to any such participation becoming effective.

| | |
|---|---|
| <u>Second Lien DIP Facility Termination Date</u> | All Second Lien DIP Notes shall become due and payable on the DIP Facility Termination Date (as defined below), subject to the Equity Conversion. |

The "<u>DIP Facility Termination Date</u>" shall be the earliest of (a) the Scheduled Termination Date (as defined below), (b) the consummation of any Section 363 sale, (c) the effective date of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court or (d) the acceleration of the notes and the termination of the commitment with respect to the Second Lien DIP Facility in accordance with the DIP Documents (as defined below).

"<u>Scheduled Termination Date</u>" means the date that is 24

months from the date the Second Lien DIP Facility is funded.

Equity Conversion

Upon the Effective Date, the Second Lien DIP Notes shall be subject to conversion to Reorganized EFH Common Stock, on the terms set forth in the Restructuring Support Agreement, the Equity Conversion Term Sheet, and the Conversion Agreement (as defined in the Equity Conversion Term Sheet).

If the Equity Conversion does not occur, the Tranche B Notes shall convert to Tranche A-2 Notes.

Use of Proceeds

Proceeds of the Second Lien DIP Facility will be used (together with cash on hand and proceeds of the EFIH First Lien DIP Financing) to (i) repay in full all outstanding principal plus accrued and unpaid interest at the non-default rate due and owing under the EFIH Second Lien Notes (which shall not include any alleged premiums, fees or claims relating to the repayment of such Claims) to Non-Settling EFIH Second Lien Note Holders and (ii) repay the EFIH Second Lien Notes held by Settling EFIH Second Lien Note Holders in accordance with the EFIH Second Lien Settlement (clauses (i) and (ii) collectively, the "Second Lien Refinancing").

DIP Documents

The Second Lien DIP Facility will be documented by a note purchase agreement (the "Note Purchase Agreement") and other guarantee, security, intercreditor, and other relevant documentation (together with the Note Purchase Agreement, collectively, the "DIP Documents") reflecting the terms and provisions set forth in this Term Sheet and otherwise in form and substance reasonably satisfactory to the Required Commitment Parties and the Issuers; *provided*, *however*, that such DIP Documents will be drafted in form and substance consistent with the documents governing the EFIH First Lien DIP Financing (the "First Lien DIP Documents"), with adjustments made to reflect this Term Sheet.  It is agreed that each "basket" or "cushion" set forth in the covenants and events of default contained in the DIP Documents shall be at least 15% more than the corresponding provision in the First Lien DIP Documents.

Transferability of Participation Rights

Subject to compliance with all applicable securities laws, unless otherwise agreed by the Issuers, the Participation Rights will only be transferable to affiliates of Second Lien DIP Facility Rights Holders and Selected Partners;  *provided*, *however,* the Participation Rights may not be transferred, and any such transfer shall be null and void *ab initio* if, assuming the Restructuring Transactions were to be consummated immediately upon such Transfer, the transferee and/or its affiliates of such transfer  were to obtain or have beneficial ownership of, in the aggregate, more than fifty percent (50%)

4

or more of the Reorganized EFH Common Stock.

Notwithstanding anything to the contrary herein, the Holders of EFIH Senior Toggle Notes shall not transfer such EFIH Senior Toggle Notes apart from the Pro Rata share of the Participation Rights attributable to such EFIH Senior Toggle Notes to any party other than affiliates or Selected Partners, and any such transfer shall be retroactively void.

For the avoidance of doubt, any transferee of the Participation Rights described above shall execute a joinder to the Restructuring Support Agreement and Conversion Agreement as a precondition to any transfer described above becoming effective.

| | |
|---|---|
| Transferability of Second Lien DIP Notes | Subject to compliance with all applicable securities laws, unless otherwise agreed by the Issuers, the Second Lien DIP Notes shall only be transferable to (i) affiliates of a Note Purchaser, (ii) other Note Purchasers and their respective affiliates, and (iii) such other Persons that are qualified institutional buyers or accredited investors, *provided, however*, that such transfers of Second Lien DIP Notes are not permitted if, in the reasonable business judgment of the Issuers and their legal and tax advisors, in consultation with the Commitment Parties, such transfers would adversely (a) affect or delay the Debtors' ability to obtain the Private Letter Ruling or violate the terms and conditions of the Private Letter Ruling or (b) affect or delay the Debtors' ability to obtain the regulatory consents or approval necessary to effectuate the Restructuring Transactions, *provided*, *further*, that, any transfer described above shall be null and void *ab initio*, if, assuming the Restructuring Transactions were to be consummated immediately upon such Transfer, the transferee of such transfer (other than affiliates transfers) was to obtain beneficial ownership of, in the aggregate, more than fifty percent (50%) or more of the Reorganized EFH Common Stock. |

Notwithstanding anything to the contrary herein, the Holders of EFIH Senior Toggle Notes that become Note Purchasers shall not transfer such EFIH Senior Toggle Notes apart from the Pro Rata share of the Second Lien DIP Notes attributable to such EFIH Senior Toggle Notes and any such transfer shall be retroactively void; *provided*, *however*, that any Tranche A-2 Notes purchased by a Commitment Party solely as a result of its obligation to do so under the Investment Commitment shall be transferrable separately from such Commitment Party's EFIH Senior Toggle Notes, that the Tranche B Notes shall be transferrable separately from the Commitment Parties' EFIH Senior Toggle Notes and that any Tranche A-1

Notes transferred to Post-Funding Partners or Specified Consultants pursuant to the provision below shall be transferrable separately from such Commitment Party's EFIH Senior Toggle Notes.

Notwithstanding anything herein to the contrary, at any time prior to the earlier of the DIP Facility Termination Date and the Equity Conversion, the Required Commitment Parties (determined based on the amount of their respective Investment Commitments immediately prior to the closing of the Second Lien DIP Facility) may require (i) each Note Purchaser holding Tranche A-1 Notes or Tranche A-2 Notes, except those held by Selected Partners, Post-Funding Partners (as defined below) or Specified Consultants, to sell, at a price of no less than par value of such Second Lien DIP Notes plus accrued but unpaid interest thereon, a Pro Rata portion of its Second Lien DIP Notes to partners selected by the Required Commitment Parties (the "Post-Funding Partners") in an amount such that after giving effect to all such sales, the Post-Funding Partners shall own no more than $400,000,000 of principal amount of Second Lien DIP Notes, after taking into account all Second Lien DIP Notes owned (if any) by the Post-Funding Partners immediately prior to any such sale and any Tranche A-1 Notes received by such Post-Funding Partners pursuant to the above shall automatically become Tranche A-2 Notes (ii) each Note Purchaser holding Tranche A-1 Notes or Tranche A-2 Notes, except those held by Selected Partners, Post-Funding Partners or Specified Consultants, to sell, at a price of no less than par value of such Second Lien DIP Notes outstanding as of the Closing less paid interest thereof, to date, a Pro Rata portion of its Second Lien DIP Notes to consultants to the Administrative Agent or Initial Commitment Parties ("Specified Consultants") in an amount up to $100,000,000 and any Tranche A-1 Notes received by such Specified Consultant pursuant to the above shall automatically become Tranche A-2 Notes.

For the avoidance of doubt, any transferee of Second Lien DIP Notes described above shall execute a joinder to the Restructuring Support Agreement as a precondition to any transfer described above becoming effective.

| | |
|---|---|
| Interest Rates | The Tranche A Notes will bear interest at a fixed rate of 8% per annum, payable in cash on the final business day of each quarter beginning on the first such day after the Closing. |

If the Bankruptcy Court has not entered an order approving the Oncor TSA Amendment as of the date that is 90 days from the Petition Date, the Tranche A Notes shall bear additional interest at a rate of 4% per annum compounded quarterly, paid

6

in kind in additional Tranche A Notes, until such time as the Oncor TSA Amendment is approved (the "PIK Interest").

Default Interest

During the continuance of an event of default (as defined in the DIP Documents), overdue amounts on the Tranche A Notes will bear interest at an additional 2% per annum.

Fees

If the Bankruptcy Court has not entered an order approving the Oncor TSA Amendment by the date that is one year from the Petition Date, the Issuers shall pay a one-time fee in the amount of 10.00% of the Tranche A Notes and Tranche B Notes, as applicable, to the Note Purchasers, paid in kind in additional Tranche A Notes and Tranche B Notes, as applicable (the "One-Time PIK Fee").

If the Second Lien DIP Facility is repaid in cash without the consent of the Required Note Purchasers and other than upon acceleration, the Issuers shall pay an optional prepayment fee of $380 million (which payment may be waived upon the written consent of the Required Note Purchasers (as defined below) in their sole discretion, *provided, however, that* the Required Note Purchasers may not waive the Prepayment Fee with respect to the Tranche A-3 Notes) (the "Prepayment Fee") to the Note Purchasers.

Notwithstanding anything to the contrary herein, the Fidelity Repayment (as defined in the Equity Conversion Term Sheet) shall not constitute a repayment in cash of the Second Lien DIP Facility.

Optional Prepayment

The Issuers may prepay the Second Lien DIP Notes subject to customary notice periods and payment of breakage costs and the Prepayment Fee (which payment may be waived upon the written consent of the Required Note Purchasers in their sole discretion, *provided, however, that* the Required Note Purchasers may not waive the Prepayment Fee with respect to the Tranche A-3 Notes). Notwithstanding anything to the contrary herein, the Fidelity Repayment (as defined in the Equity Conversion Term Sheet) shall not constitute an Optional Prepayment under the Second Lien DIP Facility and shall not result in the Prepayment Fee being due.

Mandatory Prepayments

The DIP Documents will contain mandatory prepayment provisions found in the EFIH First Lien DIP Financing; provided that, (a) notwithstanding anything to the contrary herein, the Second Lien DIP Notes shall not be mandatorily prepaid unless the EFIH First Lien DIP Financing is mandatorily prepaid first and in full and (b) application of mandatory prepayment amounts shall be subject to the

provisions of the Intercreditor Agreement.

Security and Priority

All amounts owing by the Issuers under the Second Lien DIP Facility and the obligations of the Guarantors in respect thereof will be secured, subject to (i) the Carve-Out (as defined in the commitment letter dated as of the date hereof with respect to the EFIH First Lien DIP Facility among EFIH, Deutsche Bank Securities Inc., as Left Lead DIP Facility Arranger (as defined therein), and the other financial institutions party thereto  (the "EFIH First Lien DIP Commitment Letter")), (ii) the liens granted to secure the EFIH First Lien DIP Financing and other liens and encumbrances permitted by the DIP Documents and (iii) all valid, perfected, enforceable and unavoidable liens as of the Closing (the "Permitted Liens"), by a second priority perfected security interest in all assets owned by the Issuers that secures the EFIH First Lien DIP Financing, including, without limitation, distributions pursuant to the Oncor TSA so long as the Oncor TSA Amendment is in effect (the "Collateral").

The liens granted under the Second Lien DIP Facility will be junior only to the (i) the Carve-Out, (ii) the liens granted to secure the EFIH First Lien DIP Financing and other liens and encumbrances permitted by the DIP Documents and (iii) the Permitted Liens.  The Issuers shall use commercially reasonable efforts to obtain the entry of an order providing that the liens under the Second Lien DIP Facility prime, and are in all respects senior to, any Allowed EFIH Second Lien Makewhole Claims of Non-Settling EFIH Second Lien Note Holders.

In the Chapter 11 Cases, the Note Purchasers will be granted in the DIP Order (as defined below) a superpriority administrative claim under section 364(c)(1) of the Bankruptcy Code for the payment of the obligations under the Second Lien DIP Facility with priority above all other administrative claims, subject to the Carve-Out and the liens granted under the EFIH First Lien DIP Financing.

The Second Lien DIP Facility will be subject to an intercreditor agreement, which includes, among other things, customary payment block and standstill provisions (the "Intercreditor Agreement"), in form and substance reasonably acceptable to the lenders under the EFIH First Lien DIP Financing, the Issuers, and the Note Purchasers.

Conditions Precedent to the Closing

The closing date (the "Closing") under the Second Lien DIP Facility shall be subject to satisfaction (or waiver) of the

following conditions:

A.   The DIP Documents shall be in form and substance consistent with this Term Sheet and otherwise reasonably satisfactory to the Required Commitment Parties, the Administrative Agent, the Issuers and each of their counsel.

B.   The Chapter 11 Cases shall have been commenced by the Issuers and the Guarantors and the same shall each be a debtor and a debtor in possession.

C.   The Restructuring Support Agreement shall be in full force and effect and the Issuers shall be in compliance with the Restructuring Support Agreement in all material respects as of the Closing.

D.   Substantially concurrently with the Closing, the DIP Documents shall have been delivered, all applicable fees and expenses shall have been paid, and all applicable liens shall have been perfected.

E.   Substantially concurrently with the Closing, proceeds of the EFIH First Lien DIP Financing, which shall be on the terms set forth in the Restructuring Support Agreement and the aggregate principal amount under the EFIH First Lien DIP Financing shall not exceed $5,400,000,000 (with such changes that are not materially adverse to the Note Purchasers) shall have been used (together with cash on hand) to (i) repay in full all outstanding principal plus accrued and unpaid interest at the non-default rate due and owing under the EFIH First Lien Notes (which shall not include any alleged premiums, fees or claims relating to the repayment of such Claims) to Non-Settling EFIH First Lien Note Holders and (ii) repay the EFIH First Lien Notes held by Settling EFIH First Lien Noteholders in accordance with the EFIH First Lien Settlement.

F.   Substantially concurrently with the Closing, the Second Lien Refinancing shall have been consummated.

G.   The Administrative Agent shall have received a signed copy of an order of the Bankruptcy Court in form and substance satisfactory to the Required Commitment Parties and the Issuers (the "<u>DIP Order</u>"), authorizing and approving the issuance of the Second Lien DIP Notes and the granting of the superpriority claims and liens and other liens referred to above under the heading "Security and Priority", which DIP Order shall not have been vacated, reversed, modified, amended or stayed, in a manner

9

adverse to the Note Purchasers, without the consent of the Required Commitment Parties.

H.   The Issuers shall have complied in all material respects with the terms and conditions of the Second Lien DIP Procedures, and the Participation Rights shall have been allocated in accordance with the Second Lien DIP Procedures.

I.   No default (or any event which with the giving of notice or lapse of time or both would be a default) under the EFIH First Lien DIP Financing is then existing, after giving effect to applicable grace periods or waivers, which would permit the counterparty thereto to exercise remedies thereunder on a post-petition basis.

J.   The Administrative Agent shall have received a customary opinion of counsel to the Issuers.

K.   There shall not have occurred any circumstance or conditions affecting the business, assets, operations, properties or financial condition of the Issuers and their subsidiaries taken as a whole, that would individually or in the aggregate, materially adversely affect the ability of the Issuers (taken as a whole) to perform their payment obligations under the DIP Documents to which they are a party, or the rights and remedies of the Agent and the Note Purchasers under the DIP Documents (other than, in each case, as a result of the events leading up to, and following commencement of a proceeding under Chapter 11 of the Bankruptcy Code and the continuation and prosecution thereof, including circumstances or conditions resulting from, or incidental to, such events, commencement, continuation and prosecution, which shall not individually or in the aggregate constitute a Material Adverse Event), and *provided* that nothing disclosed in any of the following filings by EFIH and/or EFH (1) the Annual Report on Form 10-K for the year ended December 31, 2013, as filed on the date of the Commitment Letter (to the extent substantially the same in form and substance as the version provided to the advisors of the Initial Commitment Parties prior to the date of the Commitment Letter), (2) any filings on Form 8-K made through the date of the Commitment Letter and/or (3) any disclosure statement related to any plan of reorganization or liquidation of the Issuers provided to the Commitment Parties on or prior to the date of the Commitment Letter, shall, in any case, in and of itself and based solely on facts as disclosed therein (without giving effect to any developments not disclosed therein) be a

10

Material Adverse Event (any of the foregoing being a "Material Adverse Event").

L. Any and all governmental consents and approvals necessary in connection with the Second Lien DIP Facility shall have been obtained and shall remain in effect.

M. To the extent requested at least 5 business days prior to Closing, each Note Purchaser who has requested the same shall have received "know your customer" and similar information.

The Note Purchasers shall have a valid and perfected second priority lien on and security interest in the Collateral pursuant to the DIP Order.

N. (i) There shall exist no default under the DIP Documents, (ii) the representations and warranties of the Issuers and each Guarantor therein shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects) immediately prior to, and after giving effect to, such funding and (iii) the issuance of the Second Lien DIP Notes shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently.

| | |
|---|---|
| <u>Representations and Warranties</u> | The DIP Documents will contain representations and warranties consistent with those found in the First Lien DIP Facility and shall include representations and warranties with respect to: valid existence, compliance with law, requisite power, due authorization, approvals, no conflict with material postpetition agreements (to the extent enforceable post-petition) or applicable law, enforceability of the DIP Documents, ownership of subsidiaries and property, material accuracy of financial statements and certain other written information provided, litigation, absence of Material Adverse Event, taxes, margin regulations, no default under the DIP Documents, inapplicability of Investment Company Act, use of proceeds, insurance, labor matters, ERISA, environmental matters, security interests, necessary rights to intellectual property and ownership of properties, DIP Order, sanctioned persons, anti-corruption laws and Patriot Act. |

| | |
|---|---|
| <u>Affirmative Covenants</u> | The DIP Documents will contain affirmative covenants consistent with those found in the EFIH First Lien DIP Financing (subject to the principles set forth in "DIP Documents" above) and shall include affirmative covenants with respect to: |

A.  Preservation of corporate existence.

B.  Compliance with applicable laws (including ERISA and environmental laws).

C.  Conduct of business.

D.  Payment of taxes.

E.  Maintenance of insurance.

F.  Access to books and records and visitation rights.

G.  Maintenance of books and records.

H.  Maintenance of properties.

I.  Use of proceeds.

J.  Provision of additional collateral and mortgages.

K.  Delivery of certain reports and information.

L.  Transactions with affiliates.

M.  Certain bankruptcy matters.

N.  Limitations on changes to fiscal year.

O.  Further assurances.

| | |
|---|---|
| <u>Negative Covenants</u> | The DIP Documents will contain negative covenants consistent with those found in the EFIH First Lien DIP Financing (subject to the principles set forth in "DIP Documents" above), which include negative covenants with respect to: |

A.  Limitations on debt and guarantees.

B.  Limitations on liens.

C.  Limitations on loans and investments.

D.  Limitations on asset dispositions, including, without limitation, the issuance and sale of capital stock of subsidiaries; *provided that*, no sales, dispositions, or other transfers of equity interests in Oncor Electric Delivery Holdings Company LLC shall be permitted.

E.  Limitations on dividends, redemptions and repurchases with respect to capital stock.

F.  Limitations on cancellation of debt and on prepayments, redemptions and repurchases of pre-petition debt, except as expressly provided for in the DIP Documents or pursuant to "first day" or other orders entered by the Bankruptcy Court.

G.  Limitations on fundamental changes.

H.  Limitations on material changes in business.

I.  Limitation on certain affiliate value transfers.

J.  Limitations on sale/leasebacks.

K.  Limitations on amendment of constituent documents except for modifications that could not reasonably be expected to materially and adversely affect the interests of the Note Purchasers.

L.  Limitation on amending, modifying, or terminating the Oncor TSA Amendment, to the extent such agreement is effective without consent of the Required Note Purchasers.

M.  Certain other bankruptcy matters.

<u>Financial Covenants</u>          The DIP Documents will contain financial covenants consistent with those found in the EFIH First Lien DIP Financing, subject to a 15% cushion.

<u>Reporting Requirements</u>          The DIP Documents will contain reporting requirements consistent with those found in the EFIH First Lien DIP Financing.

<u>Events of Default</u>          The DIP Documents will contain events of default consistent with those found in the EFIH First Lien DIP Financing (which will be applicable to the Issuers, the Gurantors, and their respective restricted subsidiaries), which (subject, where appropriate, to grace periods and exceptions consistent with

13

those in the EFIH First Lien DIP Financing and to the principles set forth in "DIP Documents" above) shall include events of default with respect to:

A.  Failure to pay principal, interest or any other amount when due.

B.  Representations and warranties incorrect in any material respect when given.

C.  Failure to comply with covenants (with grace period as appropriate).

D.  Cross-acceleration against post-petition indebtedness in excess of an amount to be mutually agreed upon.

E.  Failure to satisfy or stay execution of final postpetition judgments in excess of an amount to be mutually agreed upon.

F.  The occurrence of certain ERISA events that result in a Material Adverse Event.

G.  Actual or asserted (by any Note Party or any affiliate thereof) invalidity or impairment of any DIP Document (including the failure of any lien to remain perfected).

H.  Change of ownership or control.

I.  (a) The entry of an order dismissing any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code,

(b) the entry of an order appointing a chapter 11 trustee in any of the Chapter 11 Cases;

(c) the entry of an order staying, reversing, vacating or otherwise modifying, in each case in a manner materially adverse to the Administrative Agent or the Note Purchasers, without the prior consent of the Commitment Parties, the Second Lien DIP Facility or the DIP Order;

(d) the entry of an order in any of the Chapter 11 Cases appointing an examiner having expanded powers (beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code);

(e) the entry of an order in any of the Chapter 11 Cases denying  or terminating use of cash collateral by the Issuers and such order has not been stayed or superseded by an order

granting use of cash collateral;

(f) the filing of any pleading by any Note Party seeking, or otherwise consenting to, any of the matters set forth in clauses (a) through (e) above;

(g) the entry of a final non-appealable order in the Chapter 11 Cases charging any of the Collateral under section 506(c) of the Bankruptcy Code against the Note Purchasers or the commencement of other actions that is materially adverse to the Administrative Agent, the Note Purchasers or their respective rights and remedies under the Second Lien DIP Facility in any of the Chapter 11 Cases or inconsistent with the DIP Documents;

(h) the entry of an order granting relief from any stay of proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed against any material assets of the Issuers in excess of an amount to be mutually agreed upon in the aggregate;

(i) existence of any claims or charges, other than in respect of the Carve-Out, the EFIH First Lien DIP Financing or Second Lien DIP Facility or as otherwise permitted under the DIP Documents, entitled to superpriority under Section 364(c)(1) of the Bankruptcy Code *pari passu* or senior to the Second Lien DIP Facility; and

(j) the Note Parties or any of their subsidiaries, or any person claiming by or through the Note Parties any of their subsidiaries, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against the Administrative Agent or any of the Note Purchasers relating to the Second Lien DIP Facility.

(k) a plan shall be filed or confirmed in any of the Chapter 11 Cases that does not provide for either (i) the indefeasible payment in full in cash of the obligations (other than indemnities and other contingent obligations not then due and payable) on the effective date of such plan or (ii) conversion to Conversion Shares on terms pursuant to the Equity Conversion.

Expenses and Indemnification        The Issuers will indemnify the Administrative Agent, the Commitment Parties, the Note Purchasers, their respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons and members of each of the foregoing (each, an "Indemnified Person") and

hold them harmless from and against all costs, expenses (in the case of legal counsel, limited to reasonable and documented fees, disbursements and other charges) and liabilities of such Indemnified Person arising out of or relating to any claim or any litigation or other proceeding (regardless of whether such Indemnified Person is a party thereto and regardless of whether such matter is initiated by a third party or by the Issuers or any of its affiliates) that relates to the Second Lien DIP Facility or the transactions contemplated thereby; provided that no Indemnified Person will be indemnified for any cost, expense or liability to the extent determined in the final, non-appealable judgment of a court of competent jurisdiction to have resulted from its or its related parties' gross negligence, willful misconduct or bad-faith. The Issuer shall reimburse the Administrative Agent for their reasonable and documented out-of-pocket expenses incurred in connection with the negotiation, documentation, syndication and administration of the Second Lien DIP Facility, any amendments or waivers with respect thereto, any Event of Default in respect of the Second Lien DIP Facility and any exercise of remedies in respect thereof (including reasonable and documented out-of-pocket prepetition and post-petition fees, charges and disbursements of legal counsel, financial advisors and third-party appraisers and consultants advising the Administrative Agent incurred in connection with the Agent's participation in the Chapter 11 Cases, limited in the case of legal counsel to one primary counsel (and (i) appropriate local counsel in applicable foreign and local jurisdictions, but limited to one local counsel in each such jurisdiction, (ii) appropriate regulatory counsel and (iii) solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to the affected indemnified persons similarly situated).  The Issuer shall reimburse the reasonable and documented out-of-pocket expenses of (i) Akin Gump Strauss Hauer & Feld LLP, (ii) Cousins, Chipman & Brown LLP, (iii) Ernst & Young LLP, (iv) Leidos, Inc., (v) Centerview Partners LLC, and (vi) such other advisors retained by the Required Commitment Parties, including any regulatory counsel, during these cases (collectively, the "Commitment Party Professionals") incurred in connection with the negotiation, documentation, syndication and administration of the Second Lien DIP Facility, any amendments or waivers with respect thereto, any Event of Default in respect of the Second Lien DIP Facility and any exercise of remedies in respect thereof (including reasonable and documented out-of-pocket prepetition and post-petition fees, charges and disbursements of Commitment Party Professionals incurred in connection with the Note

16

Purchasers' participation in the Chapter 11 Cases).

Required Note Purchasers

Note Purchasers managed and/or advised by three or more investment advisors holding at least 50.1% of the outstanding commitments and/or exposure under the Second Lien DIP Facility (the "Required Note Purchasers").

Amendments

Required Note Purchasers, except for provisions customarily requiring approval by all directly and adversely affected Note Purchasers or all Note Purchasers, including the reduction of any portion of the principal amount of the Second Lien DIP Notes, the reduction of the interest rate (other than as a result of a default, events of default, or default interest) or the extension of the final maturity date, *provided, however*, that the Required Note Purchasers may waive the Prepayment Fee, *provided further*, *however, that* the Required Note Purchasers may not waive the Prepayment Fee with respect to the Tranche A-3 Notes.

Miscellaneous

The DIP Documents will include (i) standard yield protection provisions (including, without limitation, provisions relating to compliance with risk-based capital guidelines, increased costs and payments free and clear of withholding taxes (subject to customary qualifications)), (ii) waivers of consequential damages and jury trial, (iii) customary agency, set-off and sharing language and (iv) customary replacement of lender provisions.

Governing Law and Submission to Non-Exclusive Jurisdiction

State of New York.

Counsel to Commitment Parties and Certain Note Purchasers

Akin Gump Strauss Hauer & Feld LLP.

Counsel to Administrative Agent

To be determined by Administrative Agent

**<u>EXHIBIT I</u>**

**CLOSING CONDITIONS**

## Annex I

**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC AND EFIH FINANCE, INC.**

SUMMARY OF CONDITIONS PRECEDENT TO THE DIP FACILITY

1.    Final Order/Bankruptcy Matters.

   (a)    No later than the date that is one hundred and ten (110) days after the date of the Commitment Letter, a final order shall have been entered by the Bankruptcy Court in form and substance satisfactory to PIMCO (which shall in any case approve (i) the entirety of the Term Facility and the repayment and/or settlement (including via an exchange) in full of the principal amount plus any accrued and unpaid interest of the EFIH First Lien Secured Notes with the proceeds of the Term Loans and Incremental Term Loans and (ii) consistent with this Term Sheet, the payment of fees to PIMCO set forth in the section titled "EFIH First Lien Settlement" and the reimbursement of documented expenses of PIMCO (including fees, charges and disbursements of counsel)) (the "**Final Order**") on a motion by the Debtors that is in form and substance satisfactory to PIMCO, approving and authorizing on a final basis the matters and containing the other provisions described in this Section 1.

   (b)    The Final Order shall not have been reversed, modified, amended, stayed or vacated, in the case of any modification or amendment, in a manner, that is adverse to PIMCO, without the consent of PIMCO.

   (c)    The Final Order shall be in full force and effect.

   (d)    The Debtors shall be in compliance in all material respects with the Final Order.

   (e)    The Cases shall have been commenced in the Bankruptcy Court and all of the "first day orders" and all related pleadings to be entered at the time of commencement of the Cases or shortly thereafter shall have been reviewed in advance by PIMCO.

   (f)    No trustee or examiner with enlarged powers (having powers beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4)) shall have been appointed with respect to the operations or the business of the Debtors.

2.    Performance of Obligations.

   (a)    All invoiced costs, fees, expenses (including, without limitation, reasonable legal fees) and other compensation contemplated by the Loan Documents and this Term Sheet to be payable to PIMCO in respect of the DIP Facility shall have been paid to the extent earned, due and payable.

   (b)    Representations and warranties of the Debtors shall be true and correct in all material respects (or in all respects for representations and warranties qualified by materiality or Material Adverse Event).

   (c)    No Default or Event of Default shall exist under the DIP Facility.

3.     <u>Customary Closing Documents</u>.

    (a)    The Debtors shall have complied with the following closing conditions in a manner satisfactory to the Administrative Agent: (i) the delivery of customary legal opinions as to authority, authorization, execution and delivery; corporate records and documents from public officials, including good standing certificates; officer's certificates; and notice of borrowing; (ii) evidence of authority; and (iii) obtaining of any governmental consents, if any, necessary in connection with the DIP Facility, the financing thereunder and related transactions. PIMCO shall have received at least five (5) days prior to the Closing Date all documentation and other information required by bank regulatory authorities under applicable "**know-your-customer**" and anti-money laundering rules and regulations, including the Patriot Act.

    (b)    The Loan Documents (which shall be consistent with the Documentation Principles and this Term Sheet) shall have been entered into by the Debtors, the Agent and the Lenders.

    (c)    As a result of the extension of such credit, usage of the DIP Financing shall not exceed the aggregate amount authorized by the Final Order.

4.     <u>Other Conditions</u>.

    (a)    If the Final Order (or any order entered concurrently or prior to the entry of the Final Order) approves the repayment in full of the EFIH First Lien Secured Notes with the proceeds of the Term Facility, substantially concurrently with the borrowing under the Term Facility, the principal amount plus any accrued and unpaid interest of the EFIH First Lien Secured Notes (which, for the avoidance of doubt, shall not include make-whole payments or premiums in respect of the EFIH First Lien Secured Notes unless otherwise approved by the Borrower) shall be repaid in full.

    (b)    The Restructuring Support Agreement shall be in full force and effect and the Debtors shall be in compliance with the Restructuring Support Agreement in all material respects as of the Closing Date.

## EXHIBIT J

**EQUITY CONVERSION TERM SHEET**

*Execution Version*

# ENERGY FUTURE HOLDINGS CORP.

EQUITY CONVERSION TERM SHEET

*Capitalized terms used but not defined herein shall have the meanings set forth in the letter agreement, dated as of April 28, 2014 (the "Commitment Letter"), to which this Equity Conversion Term Sheet is attached, or the Restructuring Support Agreement (as defined in the Commitment Letter).*

| | |
|---|---|
| Issuer | Reorganized Energy Future Holdings Corp. ("Reorganized EFH"). |
| Summary of Equity Conversion | The newly issued common stock of Reorganized EFH shall consist of 100 million shares prior to the Equity Conversion and the issuance of shares under the Reorganized EFH/EFIH Management Incentive Plan (if any).  In the Equity Conversion, the Second Lien DIP Notes shall be mandatorily converted to 177,658,788 Conversion Shares plus an additional 89,052 Conversion Shares for each million dollars of EFIH Second Lien DIP Financing in excess of $1,995 million, and less 89,052 shares of Conversion Shares for each million dollars of EFIH Second Lien DIP Financing of less than $1,995 million outstanding on the Effective Date, including on account of the Equity Conversion Fee, on the terms set forth herein (the "Equity Conversion").  Holders of General Unsecured Claims Against EFH other than Fidelity may elect to participate in their Pro Rata share (with all Holders of General Unsecured Claims Against EFH) of up to 9% of the Equity Conversion (such Holders, the "Equity Conversion Participants") provided that such Holders of General Unsecured Claims may only participate in the Equity Conversion by purchasing Tranche A-3 Notes held by Fidelity or any direct or indirect transferee thereof, if the Required Transfer (as defined in the Second Lien DIP Notes Term Sheet) has not occurred.  Such Holders shall fund such share in cash, the proceeds of which shall be used by EFIH to repay in cash Tranche A-3 Notes, Pro Rata, in respect of such share, simultaneously with the Equity Conversion (the "Fidelity Repayment"); *provided*, *further*, that the stated plan value of the Conversion Shares shall be at least equal to the adjusted issue price of the EFIH Second Lien DIP Financing; *provided*, *however*, that, for the avoidance of doubt, this is a negotiated plan value solely for purposes of the deal embodied in this Term Sheet and the Restructuring Support Agreement and shall not be binding upon any party to the extent the Plan is not confirmed and consummated. The number of Conversion Shares issued pursuant to the Equity Conversion shall be adjusted to the extent that Reorganized EFIH Equity Interests, or a combination of Reorganized EFH Common Stock and Reorganized EFIH Equity Interests are issued pursuant to the Equity Conversion. |
| Parties | The parties entitled to participate in the Equity Conversion shall be |

limited to the Note Purchasers under the Second Lien DIP Facility and the Equity Conversion Participants (the "<u>Conversion Parties</u>").

| | |
|---|---|
| <u>Conversion Agreement</u> | The parties acknowledge and agree that this Equity Conversion Term Sheet does not include all of the conditions, covenants, closing conditions, representations, warranties and other terms that would be contained in definitive documents for transactions of this type.  As such, the Commitment Parties and EFH shall no later than 30 days after the date of execution of the Commitment Letter, enter into a conversion agreement (the "<u>Conversion Agreement</u>") containing the terms and conditions set forth in this Equity Conversion Term Sheet, the Commitment Letter and other customary terms and conditions for transactions of this type, and which must be consistent with the Restructuring Support Agreement and reasonably satisfactory to at least three (3) investment advisors that manage and/or advise funds or accounts that beneficially own, collectively, at least 66.6% of the EFIH Unsecured Note Claims held by all Consenting Creditors (the "<u>Required EFIH Unsecured Consenting Creditors</u>") and EFH, which Conversion Agreement shall be incorporated by reference into the Note Purchase Agreement or shall be attached as an exhibit thereto. |
| <u>Organizational Documents</u> | Corporate governance for Reorganized EFH and Reorganized EFIH, including charters, bylaws, operating agreements, or other organization documents, as applicable (the "<u>Organizational Documents</u>"), shall be consistent with section 1123(a)(6) of the Bankruptcy Code (as applicable) and the Tax Matters Agreement, shall be determined by the Required EFIH Unsecured Consenting Creditors in consultation with (i) EFH, (ii) EFIH, and, (iii) as appropriate, with other Holders of EFIH Second Lien DIP Claims or EFIH Unsecured Note Claims that upon the Effective Date will receive greater than 15% of the Reorganized EFH Common Stock. |
| <u>Registration Rights</u> | Reorganized EFH and any Conversion Parties that will constitute affiliates of Reorganized EFH under the Securities Act of 1933 after the Effective Date will enter into a registration rights agreement (the "<u>Registration Rights Agreement</u>"), which shall contain such terms and conditions reasonably satisfactory to the Required EFIH Unsecured Consenting Creditors and as necessary to comply with the terms of the Private Letter Ruling and provide for registration rights, including demand, piggyback and shelf registration rights, with the number of long form demand registration rights to be determined by the Required EFIH Unsecured Consenting Creditors. |
| <u>Transferability of Converted Shares</u> | The Conversion Shares will be transferable, subject to compliance with applicable securities laws (including the Securities Act of 1933, as amended) and the terms of the Private Letter Ruling. |

| | |
|---|---|
| <u>Representations and Warranties:</u> | The Conversion Agreement shall contain customary representations and warranties of EFH and the Commitment Parties for transactions of this type, consistent with the Second Lien DIP Facility. |
| <u>Covenants</u> | The Conversion Agreement will contain covenants of EFH and EFIH, as provided by, consistent with, and subject to the Restructuring Support Agreement. |
| <u>Conditions Precedent to Closing</u> | The Equity Conversion will be conditioned upon satisfaction of terms and conditions in the Conversion Agreement, as provided by, consistent with, and subject to the Restructuring Support Agreement, including, without limitation, the following: |

- The Restructuring Support Agreement shall be in full force and effect as of the closing of the Equity Conversion and shall not have been amended or modified without the prior consent of the Required EFIH Unsecured Consenting Creditors in violation of the terms of the Restructuring Support Agreement;

- The Bankruptcy Court shall have entered the Disclosure Statement Order, and such order shall be in full force and effect and not subject to a stay;

- The Bankruptcy Court shall have entered the Confirmation Order, and such order shall be in full force and effect and not subject to a stay;

- The Registration Rights Agreement shall be in form and substance reasonably satisfactory to the Required EFIH Unsecured Consenting Creditors;

- Any and all governmental and third party consents and approvals necessary in connection with the Equity Conversion and the Plan Restructuring Documents shall have been obtained and shall remain in effect;

- The Private Letter Ruling shall have been obtained from the IRS;

- The Plan shall have become, or simultaneously with the issuance of the New Reorganized EFH Stock will become, effective;

- The covenants to be performed by EFH and EFIH in the Conversion Agreement shall have been performed and complied with in all material respects on the closing date of the Equity Conversion; and

- There shall not have been a continuing default (or any event which

|  | with the giving of notice or lapse of time or both would be a default) under the Second Lien DIP Facility. |
|---|---|
| Termination of Equity Conversion | All of the obligations of the Commitment Parties, Conversion Parties, EFH, and EFIH shall be of no further force or effect, upon the giving of written notice of termination by the Required EFIH Unsecured Consenting Creditors, in the event of: |

- a termination of the Restructuring Support Agreement by any party thereto, or the Commitment Letter; or

- an event of default, cancellation and/or acceleration of the Second Lien DIP Facility.

| Indemnification | EFH and EFIH shall, jointly and severally, indemnify and hold harmless each Conversion Party not indemnified under the Commitment Letter, and their respective affiliates, shareholders, members, partners, and other equity holders, general partners, managers and its and their respective Representatives, agents and controlling persons (each, an "Indemnified Person") from and against any and all losses, claims, damages, liabilities, and costs and expenses that any such Indemnified Person may incur or to which any such Indemnified Person may become subject arising out of or in connection with the Plan, the Plan Restructuring Documents, the Equity Conversion, or any matter relating to the foregoing. |
|---|---|
| Amendments | Amendments to the Conversion Agreement will require the consent of the ; provided that, amendments relating to allocation percentages, fees, or otherwise disproportionately and materially adversely affecting a Conversion Party, shall require the consent such Conversion Party. |

**<u>EXHIBIT K</u>**

**SUMMARY OF KEY REPRESENTATIONS**

**Energy Future Holdings Corp.**
**Summary of Key Representations For Ruling Request Under IRC §§ 368(a)(1)(G) and 355**

The ruling request expected to be filed by EFH with respect to its distribution of Spinco to the TCEH first lien creditors will include the representations set forth herein and any other representations reasonably acceptable to the TCEH Creditors and required for rulings for reorganizations under Section 368(a)(1)(G) and distributions under Section 355. Probably the most significant representation is that EFH and Spinco have actively conducted their respective businesses (regulated and competitive) for the past five years and will continue to actively conduct their respective businesses after the reorganization. Indeed, the Tax Matters Agreement will prohibit EFH and Spinco from ceasing to actively conduct their respective businesses after the reorganization.

The ruling request may include over 50 representations in total. The following is a summary of certain key representations:

1. EFH, EFIH, TCEH and Spinco will be under the jurisdiction of the court in a Title 11 case and the G reorganization and the distribution of Spinco will occur pursuant to the bankruptcy plan in such cases.
2. The Spinco stock and other consideration distributed by EFH will be received by the TCEH creditors in their capacity as holders of interests in EFH.
3. The EFH group has actively conducted both the regulated and competitive businesses for the last five years, and EFH and Spinco will continue to actively conduct their respective businesses after the reorganization.
4. The reorganization will be carried out for the purpose of restructuring the debt of the EFH group and is motivated in whole or substantial part by such purpose.
5. After the reorganization, no person will own (i) 50% or more of EFH stock that was acquired by "purchase" within the last five years, or (ii) 50% or more of Spinco stock that was received in the distribution with respect to EFH stock or securities that was acquired by "purchase" within the last five years.
6. The aggregate fair market value of the assets transferred to Spinco will exceed their aggregate tax basis.
7. The aggregate fair market value of the assets transferred to Spinco will exceed the liabilities of Spinco at the time of the reorganization.
8. Except for the Spinco securities issued in connection with the reorganization, the liabilities assumed by Spinco in the reorganization were incurred in the ordinary course of business.
9. There will be no debt between EFH and Spinco at the time of, or subsequent to, the reorganization (except for debt incurred in the ordinary course of business).
10. Except for an elimination or reduction of intercompany balances in connection with the reorganization, EFH will neither accumulate its receivables nor make any extraordinary payment of its payables in anticipation of the reorganization.
11. Any transactions between EFH and Spinco after the reorganization will be on arm's length terms.
12. Neither EFH nor Spinco are an "investment company" under the Internal Revenue Code.
13. All of the parties will pay their own expenses incurred in connection with the reorganization.

**EXHIBIT B to**
**the Restructuring Support and Lock-Up Agreement**

**Notes Claims**

As used herein, the defined term "**Notes Claims**" collectively refers to any and all obligations of the Debtors arising under any of the following:

    i.    the 15% senior secured second lien notes due April 1, 2021 (the "**TCEH Second Lien Notes**") issued by TCEH and TCEH Finance, Inc. pursuant to an Indenture (as amended, restated, supplemented, or otherwise modified from time to time), dated as of October 6, 2010, by and among TCEH and TCEH Finance, as the issuers; EFCH and certain of the TCEH Subsidiaries, as guarantors; and Wilmington Savings Fund Society, FSB, as successor trustee to BNY (together with all Claims arising in connection with the TCEH Second Lien Notes, the "**TCEH Second Lien Note Claims**");

    ii.    the 10.25% senior notes due November 1, 2015 (the "**TCEH 2015 Notes**") issued by TCEH and TCEH Finance, Inc. pursuant to an Indenture (as amended, restated, supplemented, or otherwise modified from time to time), dated as of October 31, 2007, by and among TCEH and TCEH Finance, as the issuers; EFCH and certain TCEH Subsidiaries, as guarantors; and Law Debenture Trust Company of New York, as successor trustee to BNY (together with all Claims arising in connection with the TCEH 2015 Notes, the "**TCEH 2015 Note Claims**"); and

    iii.    the 10.50%/11.25% unsecured toggle notes due November 1, 2016 (the "**TCEH Senior Toggle Notes**" and, together with the TCEH 2015 Notes, the "**TCEH Unsecured Notes**") issued by TCEH and TCEH Finance pursuant to an Indenture, dated as of December 6, 2007, by and among TCEH and TCEH Finance, as the issuers; EFCH and certain of the TCEH Subsidiaries, as guarantors; and Law Debenture Trust Company of New York, as successor trustee to BNY (together with all Claims arising in connection with the TCEH Senior Toggle Notes, the "**TCEH Senior Toggle Note Claims**").

**<u>EXHIBIT C</u> to**
**the Restructuring Support and Lock-Up Agreement**

**Commitment Letter**

*Execution Version*

PRIVILEGED AND CONFIDENTIAL

April 28, 2014

Energy Future Holdings Corp.
Energy Future Intermediate Holdings Company LLC
Energy Plaza
1601 Bryan Street
Dallas, TX  75201

      Re:     Investment Commitment

Ladies and Gentlemen:

      Reference is made to the Restructuring Support and Lock-Up Agreement, dated as of April 28, 2014 (the "<u>Restructuring Support Agreement</u>"), by and among Energy Future Holdings Corp. ("<u>EFH</u>"), Energy Future Intermediate Holding Company LLC ("<u>EFIH</u>"), and certain of their affiliates (collectively, the "<u>Debtors</u>"), the other parties thereto, and parties listed on the signature pages hereto (the "<u>Initial Commitment Parties</u>"), and the term sheets and other documents attached to the Restructuring Support Agreement, pursuant to which EFH and EFIH intend to engage in a restructuring of their existing liabilities in accordance with the Bankruptcy Code (the "<u>Restructuring</u>").  Capitalized terms used in this letter agreement and not otherwise defined herein shall have the meanings provided in the Restructuring Support Agreement or the Restructuring Term Sheet attached thereto (subject to Section 2 of the Restructuring Support Agreement).

      The Restructuring contemplates, among other things, that the Commitment Parties and the Selected Partners, if any (as defined below), will, severally and not jointly, backstop a second lien subordinated secured debtor-in-possession note facility in accordance with the terms of the Second Lien DIP Notes Term Sheet (as defined below) (the "<u>Second Lien DIP Facility</u>") that consists of (a) non-amortizing notes in an amount up to $1,900,000,000 (the "<u>Tranche A Notes</u>") and (b) non-amortizing, non-interest-bearing notes issued in full satisfaction of the Funding PIK Fee (as defined below) (the "<u>Tranche B Notes</u>" and, together with the Tranche A Notes, the "<u>Second Lien DIP Notes</u>").  The Debtors will offer the right to purchase the Tranche A Notes to (i) Holders of General Unsecured Claims Against the EFIH Debtors (such Tranche A Notes, the "<u>Tranche A-1 Notes</u>"), subject to ratable reduction from participation by Selected Partners (as defined below), if any, in an aggregate amount not to exceed $400,000,000 and (ii) General Unsecured Claims Against EFH held by Fidelity (such Tranche A Notes, the "<u>Tranche A-3 Notes</u>"), subject to the conditions set forth in the Restructuring Support Agreement and the term sheet attached hereto as <u>Exhibit A</u> (the "<u>Second Lien DIP Notes Term Sheet</u>") .

      Upon the Effective Date, the Second Lien DIP Notes shall be subject to conversion to Reorganized EFH Common Stock (the "<u>Equity Conversion</u>"), on the terms set forth in the Restructuring Support Agreement, the term sheet attached hereto as <u>Exhibit B</u> (the "<u>Equity</u>

Conversion Term Sheet"), and the Conversion Agreement (as defined in the Equity Conversion Term Sheet).

To provide assurances that the issuance of the Second Lien DIP Notes will be consummated, the Initial Commitment Parties hereby, severally and not jointly, commit to backstop the Second Lien DIP Notes in the respective percentages set forth on Schedule I hereto, on the terms and conditions described herein (including in the Second Lien DIP Notes Term Sheet and the Equity Conversion Term Sheet) and the Restructuring Support Agreement; *provided*, *however*, that the aggregate amount of such backstop shall not exceed $1.9 billion ($1,900,000,000) (the "Investment Commitment").  The Required Commitment Parties (as defined below) may from time to time (in their sole discretion), up to the date of funding of the Second Lien DIP Facility, select certain partners to transfer the Participation Rights to or to participate in the Investment Commitment in an aggregate amount not to exceed $400,000,000 of the aggregate Investment Commitment, in each case on prior written consent of EFH and EFIH unless such party is included on Schedule III hereto (the "Selected Partners"); and any such inclusion of Selected Partners by the Required Commitment Parties shall ratably reduce each Commitment Party's portion of the Investment Commitment; *provided, however*, that such Selected Partner shall execute a joinder to this letter agreement, the Restructuring Support Agreement (in accordance with Section 4.04 thereof), and any applicable definitive document for the Second Lien DIP Notes; *provided*, *further*, that if a proposed transfer to a Selected Partner were to cause a Commitment Party to transfer more than 50% of its portion of the Investment Commitment (when taken in the aggregate with all other transfers of such Commitment Party's portion of the Investment Commitment in accordance with the below), then the Required Commitment Parties may choose to (x) reduce the amount of the Investment Commitment to be transferred to the Selected Partner to an amount in which such Commitment Party would no longer be transferring 50% (in the aggregate) of its portion of the Investment Commitment or (y) cancel the contemplated transfer of the Investment Commitment.  In addition, an Initial Commitment Party may in its sole discretion select a Selected Partner, or other party otherwise consented to by EFH and EFIH (the "Transferee Commitment Parties") to purchase all or a portion of an Initial Commitment Party's portion of the Investment Commitment; *provided*, *that*, with respect to an affiliate Transferee Commitment Party, the transferring Initial Commitment Party's obligations with respect to the transferred portion of the Investment Commitment shall remain; *provided*, *further*, all Transferee Commitment Parties shall execute a joinder to this letter agreement, the Restructuring Support Agreement (in accordance with Section 4.04 thereof), and any applicable definitive document for the Second Lien DIP Notes; *provided*, *further*, if such transfer were to cause such Initial Commitment Party to transfer more than 50% of its portion of the Investment Commitment (when taken in the aggregate with all other transfers of its portion of the Investment Commitment by such Initial Commitment Party), such proposed transfer shall be deemed null and void *ab initio*.  Subject to the foregoing, following any such sale or transfer by an Initial Commitment Party of all or a portion of its Investment Commitment, such Initial Commitment Party's obligations with respect to such sold or transferred Investment Commitment shall cease.  No Commitment Party other than an Initial Commitment Party shall be permitted to transfer any portion of the Investment Commitment.  For purposes of this letter agreement, (i) the term "Commitment Party" shall mean, collectively, the Initial Commitment Parties, the Selected Partners, and the Transferee Commitment Parties, and Schedule I hereto shall be updated accordingly to account for any additional Commitment Parties and (ii) the term

"Required Commitment Parties" shall mean, at any relevant time, three (3) Initial Commitment Parties (other than a Defaulting Commitment Party) that manage and/or advise funds or accounts that beneficially own, collectively, at least 66.6% of the Investment Commitment. Notwithstanding anything to the contrary contained herein, the identity of each Commitment Party shall be reasonably acceptable to the Borrowers.

In consideration for the Investment Commitment and on the terms set forth in this Commitment Letter and the Restructuring Support Agreement, EFIH shall (A) pay Pro Rata based on the respective percentages set forth on Schedule II hereto an amount in cash equal to 0.46% of $1.9 billion ($1,900,000,000) to the Initial Commitment Parties (the "Execution Fee"), which such Execution Fee shall be paid upon execution of this letter agreement, (B) subject to entry of the Approval Order, pay Pro Rata based on the respective percentages set forth on Schedule II hereto an amount in cash equal to 0.54% of $1.9 billion ($1,900,000,000) to the Initial Commitment Parties (the "Approval Fee"), which Approval Fee shall be paid within 5 days of entry of the Approval Order, (C) subject to entry of the Approval Order and the funding of the Second Lien DIP Facility, pay GSO and Avenue an arranger fee of $1,000,000 each in cash (the "Arranger Fees"), which Arranger Fees shall be paid within 5 days of entry of the Approval Order, (D) subject to entry of the Approval Order and the funding of the Second Lien DIP Facility, pay Pro Rata based on the respective percentages set forth on Schedule I hereto an amount in cash equal to 1.0% of $1.9 billion ($1,900,000,000) to the Commitment Parties (the "Funding Cash Fee"), which Funding Cash Fee shall become due and be paid in full by EFIH simultaneously with the funding of the Second Lien DIP Facility, and (D) issue Pro Rata based on the respective percentages set forth on Schedule I hereto an amount equal to 5.00% of $1.9 billion ($1,900,000,000) to the Commitment Parties in the form of Tranche B Notes (the "Funding PIK Fee" and, collectively with the Execution Fee, the Approval Fee, the Arranger Fees, and the Funding Cash Fee, the "Commitment Fee"), which Funding PIK Fee shall become due and be paid in full by EFIH simultaneously on the funding of the Second Lien DIP Facility. EFH and EFIH agree that the Commitment Fee and the Alternative Transaction Fee shall be nonrefundable once paid on the terms set forth in this letter agreement and that the Commitment Fee, the Alternative Transaction Fee and any other payments hereunder shall be paid without setoff or recoupment and shall not be subject to defense or offset on account of any claim, defense or counterclaim.  For the avoidance of doubt, the Approval Fee, the Arranger Fee, and the Alternative Transaction Fee shall not be paid to any Defaulting Commitment Party.

If and to the extent that any one Commitment Party or multiple Commitment Parties do not satisfy its or their obligations in respect of its or their Pro Rata portion of the Investment Commitment (each such Commitment Party, a "Defaulting Commitment Party"), then each of the remaining non-defaulting Commitment Parties (the "Non-Defaulting Commitment Parties") shall have the right, but not the obligation (the "Default Purchase Right"), to assume all or a portion of the Investment Commitment that was to be funded by such Defaulting Commitment Party (the "Defaulted Investment Commitment").  To the extent that the Non-Defaulting Commitment Parties (in the aggregate) desire to assume more than the total amount of the Defaulted Investment Commitment, then such Defaulted Investment Commitment shall be allocated among the Non-Defaulting Commitment Parties electing to assume the Defaulted Investment Commitment Pro Rata based on the respective percentages set forth on Schedule I hereto; *provided*, *however*, that if a Non-Defaulting Commitment Party is a Selected Partner, then such Non-Defaulting Commitment Party may only assume such portion of the Defaulted

Investment Commitment so as not to exceed $400,000,000 of the Investment Commitment (calculated with all other Selected Partners). Each Defaulting Commitment Party shall immediately pay to each Non-Defaulting Commitment Party that elects to assume all or a portion of the Defaulted Investment Commitment, any portion of the Execution Fee, Approval Fee, and Arranger Fee received by such Defaulting Commitment Party, directly or indirectly, based on such Non-Defaulting Party's Pro Rata share of the Defaulted Investment Commitment so assumed by such Non-Defaulting Commitment Party. For purposes of the Commitment Percentages set forth on Schedule I hereto, the Commitment Percentage for each of the Non-Defaulting Commitment Parties electing to exercise the Default Purchase Right shall be adjusted accordingly to reflect the reallocation of the Defaulting Commitment Party's Commitment Percentage among the Non-Defaulting Committing Parties electing to exercise the Default Purchase Right (such that the total Commitment Percentage for the Non-Defaulting Commitment Parties shall equal 100%). In the event that the entire Defaulted Investment Commitment is not assumed by the Non-Defaulting Commitment Parties, the Required Commitment Parties may assign to a Selected Partner all or the remaining portion of the Defaulted Investment Commitment and following such assignment, Schedule I shall be accordingly adjusted as set forth in the immediately foregoing sentence.

Whether or not the transactions contemplated hereby are consummated, but subject to entry of the Approval Order, the Commitment Parties (other than any Defaulting Commitment Party and their respective affiliates and representatives, the "Indemnified Parties") shall be indemnified and held harmless by EFH and EFIH, on a joint and several basis, from and against any and all losses, claims, damages, liabilities and expenses as a result of a claim by a third party, which any such Indemnified Parties may incur, have asserted against it or be involved in as a result of or arising out of or in any way related to this letter agreement, the matters and transactions referred to herein, the proposed Investment Commitment contemplated hereby, the use of proceeds thereunder or any related transaction or any claim, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any of such Indemnified Parties is a party thereto, and to reimburse each of such indemnified persons for any legal or other expenses incurred in connection with any of the foregoing from the date of the execution of this letter agreement until the termination of this letter agreement (for the avoidance of doubt, any claim for indemnification made after termination of this letter agreement for any event arising prior to the termination of this letter agreement shall not thereafter be barred and all claims for indemnification hereunder shall survive until finally resolved); *provided*, *however*, that the foregoing indemnity will not, as to any indemnified person, apply to losses, claims, damages, liabilities or related expenses to the extent they have resulted from the bad faith or willful misconduct of such indemnified person (as determined by a court of competent jurisdiction in a final and non-appealable judgment). The terms set forth in this paragraph shall survive termination of this letter agreement. This letter agreement is not assignable (a) by either of EFH or EFIH, without the prior written consent of the Required Commitment Parties (and any purported assignment without such consent shall be null and void *ab initio*), or (b) by any of the Commitment Parties, except to (i) its affiliates, subject to the terms and conditions contained herein (provided that such Commitment Party shall remain liable hereunder) or a Transferee Commitment Party as set forth above and (ii) the Commitment Parties may assign all or a portion of the Commitment Parties' obligations hereunder to the Selected Partners as set forth above. This letter agreement is intended to be solely for the benefit of the parties hereto and is

not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto.

The obligations of the Commitment Parties to fund the Investment Commitment are conditioned upon satisfaction of, inter alia, each of the conditions set forth herein, in the Restructuring Support Agreement and in the Second Lien DIP Notes Term Sheet.

This letter agreement shall terminate upon the termination of the Restructuring Support Agreement.  Subject to entry of the Approval Order, if EFIH enters into definitive documentation with respect to a reorganization, restructuring, merger, consolidation, share exchange, rights offering, equity investment, business combination, recapitalization or similar transaction (including the sale of all or substantially all of the assets of EFH, EFIH, or any other Debtor) involving EFIH on equal or better terms and conditions for EFIH than those  contemplated in the Restructuring Support Agreement and the Term Sheet (such transaction, an "Alternative Transaction"), the Debtors shall pay Pro Rata based on the respective percentages set forth on Schedule II hereto, an amount in cash equal to 3.00% of $1.9 billion ($1,900,000,000) to the Initial Commitment Parties (the "Alternative Transaction Fee"), which Alternative Transaction Fee shall become due and be paid in full within 5 days Bankruptcy Court approval of such Alternative Transaction.  For the avoidance of doubt, the Alternative Transaction Fee shall not become due or be payable if the Debtors consummate an Alternative Transaction because of the failure of the Commitment Parties to fulfil their obligations under the Investment Commitment.

All rights and remedies provided in this letter agreement are cumulative and not exclusive of any other rights or remedies that may be available to EFH, EFIH, and the Commitment Parties, including (without limitation) all rights to specific performance, or as otherwise provided by law, equity, statute, or in any other agreement entered into in connection with any of the transactions contemplated hereunder, including as to any Defaulting Commitment Party.

Upon execution of this letter agreement, EFH shall or shall cause EFIH to promptly pay (i) Akin Gump Strauss Hauer & Feld LLP, by wire transfer of immediately available funds, an advance payment of $3,000,000 (the "Akin Gump Advance Payment") and (ii) Centerview Partners LLC, by wire transfer of immediately available funds an advance payment of $675,000 (the "Centerview Advance Payment," and together with the Akin Gump Advance Payment, the "Advance Payment").   In accordance with the terms of that certain amended and restated engagement letter with EFIH dated April 27, 2014 (as may be amended or modified from time to time, the "Centerview Engagement Letter"), EFH shall or shall cause EFIH to promptly pay Centerview an aggregate arrangement payment of $5,000,000, which shall be paid as follows (x) $1,250,000 shall be paid upon the execution of this letter agreement (the "Arrangement Payment I"), (y) $1,250,000 shall be paid simultaneously be paid within 2 days of entry of the EFIH Second Lien DIP Order (the "Arrangement Payment II") and (z) $2,500,000 shall be paid simultaneously with the funding of the Second Lien DIP Notes (the "Arrangement Payment III," and together with the Arrangement Payment I and Arrangement Payment II, the "Arrangement Payment").  Upon entry of the Approval Order, EFH and EFIH agree to pay, within 15 business days of delivery of an invoice (which shall include reasonable supporting detail, which may be redacted to protect privileged or confidential information), the unpaid reasonable and

documented fees and expenses of Akin Gump Strauss Hauer & Feld LLP, pursuant to that certain engagement letter with EFIH dated May 24, 2013 (as may be amended or modified from time to time), Centerview Partners LLC, pursuant to the Centerview Engagement Letter and, without limitation, all other out-pocket fees, costs and expenses of the Commitment Parties, including the fees and expenses of the Commitment Party Professionals incurred previously or in the future relating to the Restructuring or the Chapter 11 Cases, pursuant to applicable engagement letters entered into between such professionals and EFH or EFIH, as applicable (such fees and expenses, the "Professional Fees").    Payment of the Advance Payment, the Arrangement Payment and Professional Fees shall not be subject to allowance by the Bankruptcy Court; *provided*, *however*, that EFH and EFIH shall promptly provide copies of invoices received on account of the Professional Fees to the U.S. Trustee and counsel to any Committee appointed in the Cases, and the Bankruptcy Court shall have exclusive jurisdiction over any objections raised to the invoiced amount of the Professional Fees, which objections may only be raised within 15 business days after delivery of an invoice(s) therefor.    In the event that within 15 business days from delivery of such invoices EFH, EFIH, the U.S. Trustee, or counsel to the Committee raises an objection to a particular invoice, and the parties are unable to resolve such objection, the Court shall hear and determine such dispute; *provided that* payment of invoices shall not be delayed based on any such objections and the relevant professional shall only be required to disgorge amounts objected to upon being "so ordered" pursuant to a final order of the Bankruptcy Court.    EFH and EFIH agree that the Advance Payment, Arrangement Payment and Professional Fees shall be nonrefundable and that the Advance Payment, Arrangement Payment and Professional Fees and any other payments hereunder shall be paid without setoff or recoupment and shall not be subject to defense or offset on account of any claim, defense or counterclaim.    Notwithstanding anything to the contrary herein, the Debtors shall not be obligated for any of the professional fees or other obligations described in this paragraph incurred after this letter agreement terminates.

This letter agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflict of laws that would require the application of the law of any other jurisdiction.    By its execution and delivery of this letter agreement, each of the parties hereto hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this letter agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in either a state or federal court of competent jurisdiction in the State of New York.    By execution and delivery of this letter agreement, each of the parties hereto hereby irrevocably accepts and submits itself to the nonexclusive jurisdiction of each such court, generally and unconditionally, with respect to any such action, suit or proceeding.    Notwithstanding anything to the contrary herein, upon the commencement of the Chapter 11 Cases, each of the parties hereto hereby agrees that, if the petitions have been filed and the Chapter 11 Cases are pending, the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of or in connection with this letter agreement. EACH PARTY HERETO UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING REFERRED TO ABOVE.

This letter agreement may not be amended or waived except in a writing signed by EFH, EFIH, and the Initial Commitment Parties.    Notwithstanding the foregoing, this letter agreement

may be amended by the Initial Commitment Parties to add Selected Partners and Transferee Commitment Parties as Commitment Parties in accordance with the terms of this letter agreement. This letter agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this letter agreement may be delivered by facsimile, electronic mail or otherwise, each of which shall be deemed to be an original for the purposes of this paragraph.

Notwithstanding anything contained herein, each Initial Commitment Party acknowledges that its decision to enter into this letter agreement has been made by such Commitment Party independently of any other Commitment Party.

This letter agreement (including the exhibits and schedules hereto), along with the Restructuring Support Agreement (including the exhibits and schedules thereto), constitutes the entire understanding among the parties hereto with respect to the subject matter hereof and replaces and supersedes all prior agreements and understandings, both written and oral, between the parties hereto with respect to the subject matter hereof, and shall become effective and binding upon (i) the mutual exchange of fully executed counterparts by the EFH and EFIH and all of the Commitment Parties, and (ii) payment by EFH or EFIH of the Execution Fee, the Advance Payment, the Arranger Fee, and the Arrangement Payment I in accordance with the above.

[SIGNATURE PAGES FOLLOW]

If the foregoing is in accordance with your understanding of our agreement, please sign this letter in the space indicated below and return it to us.

Very truly yours,

[INITIAL COMMITMENT PARTIES]

By:_____
Name:
Title:

**Signature page to letter agreement.**

**THE FOREGOING IS HEREBY
AGREED TO AND ACCEPTED:**

ENERGY FUTURE HOLDINGS CORP.

By: _____
Name:
Title: SVP & Treasurer

ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC

By: _____
Name:
Title: SVP & Treasurer

**SCHEDULES I-II**

**[REDACTED]**

## **EXHIBIT A**

**Second Lien DIP Notes Term Sheet**

**[SEE EXHIBIT H OF FULLY COMPILED AND EXECUTED RSA]**

## **EXHIBIT B**

**Equity Conversion Term Sheet**

**[SEE EXHIBIT J OF FULLY COMPILED AND EXECUTED RSA]**

**EXHIBIT D to**
**the Restructuring Support and Lock-Up Agreement**

**Provision for Transfer Agreement**

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support and Lock-Up Agreement, dated as of _____ (the "**Agreement**"),[1] by and among Energy Future Holdings Corp. ("**EFH**") and its affiliates and subsidiaries bound thereto, the Consenting Interest Holders, and the Consenting Creditors, including the transferor to the Transferee of any TCEH Credit Agreement Claims, EFH Interests, Texas Holdings Interests, TEF Interests, TCEH First Lien Note Claims, TCEH First Lien Commodity Hedge Claims, TCEH First Lien Interest Rate Swap Claims, EFIH First Lien Note Claims, EFIH Second Lien Note Claims, EFIH Unsecured Note Claims, EFH Unsecured Note Claims, TCEH DIP Claims, EFIH First Lien DIP Claims, EFIH Second Lien DIP Claims, or any other claims against the Debtors (including the Notes Claims, as described on the following page) (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "**Consenting Creditor**" or "**Consenting Interest Holder**," as applicable, under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____

Name:
Title:

Address:

E-mail address(es):
Telephone:
Facsimile:

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| EFH Interests (if any) | |
| Texas Holdings Interests (if any) | |
| TEF Interests (if any) | |
| TCEH Credit Agreement Claims (if any) | $ |
| TCEH First Lien Note Claims (if any) | $ |
| TCEH First Lien Commodity Hedge Claims (if any) | $ |
| TCEH First Lien Interest Rate Swap Claims (if any) | $ |
| TCEH Second Lien Note Claims (if any) | $ |
| TCEH 2015 Note Claims (if any) | $ |

---

[1]     Capitalized terms not used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

| | |
|---|---|
| TCEH Senior Toggle Note Claims (if any) | $ |
| EFIH First Lien 2017 Note Claims (if any) | $ |
| EFIH First Lien 2020 Note Claims (if any) | $ |
| EFIH 2021 Note Claims (if any) | $ |
| EFIH 2022 Note Claims (if any) | $ |
| EFIH Senior Toggle Note Claims (if any) | $ |
| EFIH Unexchanged Note Claims (if any) | $ |
| EFH 2019 Note Claims (if any) | $ |
| EFH 2020 Note Claims (if any) | $ |
| EFH Series P Note Claims (if any) | $ |
| EFH Series Q Note Claims (if any) | $ |
| EFH Series R Note Claims (if any) | $ |
| EFH LBO Senior Note Claims (if any) | $ |
| EFH LBO Toggle Note Claims (if any) | $ |

**Schedule 1** to
**the Restructuring Support and Lock-Up Agreement**

**Professional Fees and Expenses to Be Paid on the Agreement Effective Date**

| Type of Advisor | Name of Firm | Invoiced Amount |
|---|---|---|
| *TCEH First Lien Noteholders* | | |
| **Primary Counsel** | Paul Weiss Rifkind Wharton & Garrison LLP, pursuant to that certain engagement letter dated February 1, 2013 | $774,286.00 |
| **Local Counsel** | Young Conaway Stargatt & Taylor, LLP | $44,403.12 |
| **Regulatory Counsel** | Winstead, P.C., pursuant to that certain engagement letter dated March 19, 2013 | $379.62 |
| **Financial Advisor** | Millstein & Co, pursuant to that certain engagement letter dated February 1, 2013 | $4,500,000.00 |
| **Tax Advisor** | PricewaterhouseCoopers LLP, pursuant to that certain engagement letter dated March 8, 2013 | $95,790.00 |
| **Technical and Market Advisor** | Navigant Consulting, Inc., pursuant to that certain engagement letter dated February 23, 2013 | $3,000.00 |
| *EFIH Unsecured Noteholders* | | |
| **Primary Counsel** | Akin Gump Strauss Hauer & Feld LLP, pursuant to that certain engagement letter dated May 24, 2013 | $4,508,874.09 |
| **Local Counsel** | Cousins, Chipman & Brown LLP pursuant to that certain engagement letter dated April 25, 2014 | $35,000.00 |

| Technical and Market Advisor | SAIC Energy Environment & Infrastructure, L.L.C. (n/k/a Leidos Engineering LLC), pursuant to that certain engagement letter dated June 17, 2013 | $0.00 |
|---|---|---|
| Tax Advisor | Ernst & Young LLP, pursuant to that certain statement of work dated August 23, 2013 | $0.00 |
| Regulatory Counsel | Duggins Wren Mann & Romero, LLP pursuant to that certain engagement letter dated April 28, 2014 | $73,589.49 |
| Financial Advisor | Centerview Partners, pursuant to that certain engagement letter dated June 13, 2013 | $206,717.43 (advisory) $5,025,000.00 (transaction) |
| *EFH Unsecureds, EFIH First Liens, EFIH Second Liens (beneficially owned by Fidelity)* | | |
| Primary Counsel | Fried, Frank, Harris, Shriver & Jacobson LLP, pursuant to that certain engagement letter dated August 13, 2013 | $956,897.13 |
| Local Counsel | [TBD] | $0.00 |
| Regulatory Counsel | [TBD] | $0.00 |
| Financial Advisor | Perella Weinberg Partners, pursuant to that certain engagement letter dated October 16, 2013 | $0.00 |
| *Consenting Non-Fidelity EFIH First Liens* | | |
| Primary Counsel | Bingham McCutchen LLP pursuant to that certain engagement letter dated as of April 27, 2014 | $200,000.00 |
| Local Counsel | [TBD] | $0.00 |
| *Interest Holders* | | |
| Primary Counsel | Wachtell, Lipton, Rosen, & Katz, pursuant to that certain engagement letter | $9,000,000.00 |

| | dated March 3, 2013 | |
|---|---|---|
| **Local Counsel** | Morris, Nichols, Arsht & Tunnell | $1,200.000.00 |
| **Regulatory Counsel** | [TBD] | $0.00 |
| **Financial Advisor** | Blackstone Advisory Group L.P., pursuant to that certain engagement letter dated March 28, 2013 | $8,398,939.90 |

**Schedule 2** to
**the Restructuring Support and Lock-Up Agreement**

**Individual TCEH First Lien Creditor Advisor**

| TCEH First Lien Creditor | Name of Firm |
|---|---|
| Apollo | O'Melveney & Myers LLP, as primary counsel, pursuant to that certain engagement letter dated January 6, 2014 |
| | Cadwalader, Wickersham & Taft LLP, as counsel with respect to certain regulatory matters, pursuant to that certain engagement letter dated December 26, 2013 |
| | Moelis & Company, as financial advisor, pursuant to that certain engagement letter dated December 20, 2013 |
| Oaktree | Debevoise & Plimpton LLP, as primary counsel |
| Centerbridge | Schulte Roth & Zabel LLP, as primary counsel |

**Schedule 3** to
**the Restructuring Support and Lock-Up Agreement**

1.    Motion of Energy Future Holdings Corp., *et. al.*, for Entry of an Order Directing Joint Administration of the Debtors' Chapter 11 Cases

2.    Motion of Texas Competitive Electric Holdings Company LLC, *et. al.*, for Entry of Interim and Final Orders (A) Approving Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Granting Adequate Protection, (D) Modifying the Automatic Stay, and (E) Scheduling a Final Hearing

3.    Motion of Texas Competitive Electric Holdings Company LLC, *et al.*, for Entry of an Order Authorizing the TCEH Debtors to File Under Seal the Certain Fee Letter Related to Proposed Debtor-In-Possession Financing

4.    Motion of the TCEH Debtors for Entry of Interim and Final Orders (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing

5.    Motion of Energy Future Intermediate Holding Company LLC and EFIH Finance, Inc., for Entry of Interim and Final Orders (A) Approving Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Authorizing the Use of Cash Collateral, (D) Granting Adequate Protection, (E) Authorizing the Repayment of Prepetition Debt, (F) Determining the Value of Secured Claims, (G) Modifying the Automatic Stay, and (H) Scheduling a Final Hearing

6.    Motion of Energy Future Intermediate Holding Company LLC  and EFIH Finance, Inc. for Entry of an Order Authorizing the EFIH Debtors to File Under Seal the Certain Fee Letter Related to Proposed Debtor-In-Possession Financing

7.    Motion of Energy Future Holdings Corp., *et al.*, for Entry of Interim and Final Orders Authorizing the Debtors to (A) Pay Certain Prepetition Wages, Salaries, Reimbursable Employee Expenses, and Other Compensation, (B) Pay and Honor Employee and Retiree Medical and Similar Benefits, and (C) Continue Employee Compensation and Employee and Retiree Benefit Programs

8.    Motion of Energy Future Holdings Corp., *et al.*, for Entry of an Order (A) Authorizing the Debtors to (I) Continue Using Their Existing Cash Management System, (II) Maintain Existing Bank Accounts and Business Forms, and (III) Continue Using Certain Overnight Investment Accounts; (B) Authorizing Continued Intercompany Transactions and Netting of Intercompany Claims; and (C) Granting Postpetition Intercompany Claims Administrative Expense Priority

9.    Motion of Energy Future Holdings Corp., *et al.*, for Entry of (A) an Order Authorizing the Debtors to (I) Maintain and Administer Customer Programs, (II) Honor Prepetition Obligations Related Thereto, (III) Pay Certain Expenses on Behalf of Certain Organizations, (IV) Fix Deadlines to File Proofs of Claim for Certain Customer Claims, and (V) Establish Procedures for Notifying Customers of Commencement of the Debtors' Chapter 11 Cases, Assumption of Customer Agreements, and the Bar Dates for Customer Claims and (B) an Order Authorizing the Debtors to Assume Customer Agreements

10.     Motion of Energy Future Holdings Corp., *et al.*, for Entry of Interim and Final Orders Authorizing the Debtors to Pay Prepetition Critical Vendor Claims

11.     Motion of Energy Future Holdings Corp., *et al.*, for Entry of Interim and Final Orders Authorizing the Debtors to (A) Grant Administrative Expense Priority to All Undisputed Obligations for Goods and Services Ordered Prepetition and Delivered Postpetition and Satisfy Such Obligations in the Ordinary Course of Business, and (B) Pay Prepetition Claims of Shippers, Warehousemen, and Materialmen

12.     Motion of Energy Future Holdings Corp., *et al.*, For Entry of Interim and Final Orders Authorizing the Debtors to (A) Continue Performing Under Prepetition Hedging and Trading Arrangements, (B) Pledge Collateral and Honor Obligations Thereunder, and (C) Enter Into and Perform Under Trading Continuation Agreements and New Postpetition Hedging and Trading Arrangement

13.     Motion of Energy Future Holdings Corp., *et al.*, for Entry of Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services

14.     Motion of Energy Future Holdings Corp., *et al.*, for Entry of an Order Authorizing the Debtors to Assume Certain Transmission and Distribution Service Agreements

15.     Motion of Energy Future Holdings Corp., *et al.*, for Entry of an Order Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees

16.     Application of Energy Future Holdings Corp., *et al.*, for Entry of an Order Approving the Retention and Appointment of Epiq Bankruptcy Solutions, LLC as the Claims and Noticing Agent for the Debtors

17.     Motion of Energy Future Holdings Corp., *et. al.*, for Entry of an Order Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor

18.     Motion of Energy Future Holdings Corp., *et. al.*, for Entry of an Order Authorizing the Debtors to Assume Certain ERCOT Participation Agreements[1]

---

[1]    Will not be heard at first day hearing.