## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979-CSS |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |
| | ) | **Re: D.I. 39, 74** |
| | ) | |

**SUPPLEMENTAL DECLARATION OF STEPHEN GOLDSTEIN IN SUPPORT
OF THE MOTION OF ENERGY FUTURE INTERMEDIATE HOLDING COMPANY
LLC AND EFIH FINANCE, INC. FOR ENTRY OF (I) AN INTERIM ORDER (A)
APPROVING CERTAIN FEES RELATED TO POSTPETITION FINANCING AND
GRANTING SUCH FEES ADMINISTRATIVE EXPENSE PRIORITY AND (B)
SCHEDULING A FINAL HEARING; AND (II) A FINAL ORDER (A) APPROVING
POSTPETITION FINANCING, (B) GRANTING LIENS AND PROVIDING
SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (C) AUTHORIZING THE
USE OF CASH COLLATERAL, (D) AUTHORIZING THE EFIH FIRST LIEN
REFINANCING, (E) AUTHORIZING ISSUANCE OF ROLL-UP DEBT TO THE
EXTENT AUTHORIZED BY THE SETTLEMENT MOTION, (F) DETERMINING THE
VALUE OF SECURED CLAIMS, AND (G) MODIFYING THE AUTOMATIC STAY**

I, Stephen Goldstein, declare as follows:

1.      I submit this supplemental declaration (this "Supplemental Declaration") in

response to a request for additional information from the U.S. Trustee about, and in further

support of, the *Motion of Energy Future Intermediate Holding Company LLC and EFIH*

*Finance, Inc., for Entry of for Entry of (I) an Interim Order (A) Approving Certain Fees Related*

*to Postpetition Financing and Granting Such Fees Administrative Expense Priority and*

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which the debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

*(B) Scheduling a Final Hearing; and (II) a Final Order (A) Approving Postpetition Financing,*
*(B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Authorizing*
*the Use of Cash Collateral, (D) Authorizing the EFIH First Lien DIP Refinancing,*
*(E) Authorizing Issuance of Roll-Up Debt to the Extent Authorized by the Settlement Motion,*
*(F) Determining the Value of Secured Claims, and (G) Modifying the Automatic Stay* [D.I. 74]
(the "EFIH First Lien DIP Motion"). Specifically, this Supplemental Declaration addresses the
Interim Relief sought in the EFIH First Lien DIP Motion, and further explains why the approval
on an interim basis of certain commitment fees related to postpetition financing and granting
such fees administrative expense priority is in the Debtors' best interests, even though the
Debtors will not draw down on the DIP during the Interim Period.[2]  I also address in this
Supplemental Declaration the Debtors' request to file the fee letters for the EFIH First Lien DIP
facility under seal.

2.      I submitted an initial Declaration in support of the EFIH First Lien DIP Motion on
April 29, 2014 [D.I. 74, Exhibit B.]

### The Overall Structure of the EFIH First Lien DIP Financing

3.      The EFIH First Lien DIP Financing is a $5.4 billion total facility.  This is
comprised of three distinct categories as of the petition date: (i) the committed banks (including
Deutsche Bank) (the "Committed Lenders") at $2.1 billion; PIMCO (the "Backstop Party") at
$1.45 billion; and (iii) the settling parties (the "Settling Parties") at $1.85 billion.

4.      As explained in the EFIH First Lien DIP Motion and my April 29, 2014
Declaration, the specific details as to the fees applicable to the EFIH First Lien DIP facility are
set forth in the fee letters relating to that facility, for which a Motion to File Under Seal has been

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the
EFIH First Lien DIP Motion.

filed due to the proprietary and commercially sensitive information contained within those fee letters. (*See* EFIH First Lien DIP Motion [D.I. 74 at 2, n. 5].)

### The Aggregate Fees Associated With the EFIH First Lien DIP Facility

5.      The aggregate fees payable under the EFIH First Lien DIP facility range from approximately 1.75% ($94.5 million) to 1.8% ($97.1 million) of the total EFIH First Lien DIP Financing commitment of $5.4 billion through the 24-month Maturity Date, depending upon the ultimate amount committed by the Committed Lenders, the Backstop Party, and the Settling Parties.[3]

### Participation in the EFIH First Lien DIP Provides a Critical Currency for the EFIH First and Second Lien Settlements

6.      As I explained in my April 29, 2014 Declaration, the EFIH First Lien DIP Facility the Debtors have obtained through the Committed Lenders is the best financing available under the circumstances, and is the product of extremely competitive and arm's length negotiations between the Debtors and potential lenders.

7.      First, based upon my review of the Debtors' financial information and capital structure, the EFIH Debtors need DIP financing regardless of whether a settlement with the EFIH First Lien holders had been reached.    Specifically, a core component of *any* EFIH restructuring is that the Debtors would need to refinance the above-market prepetition debt currently in place at EFIH and pay the fees associated with doing so.    As a result, based on the Debtors' financing needs, under virtually all reasonable scenarios, the Debtors would pay at least $10.5 million in fees in the Interim Period for an EFIH DIP facility.    Of those aggregate fees, the EFIH Debtors seek authority through the Interim Order to commit to pay 0.19% ($10.5 million),

---

[3] These ranges may increase depending on whether original issue discount is utilized in syndication. The aggregate fees exclude any Original Interest Discount ("OID").

3

and up to 0.68% ($36.75 million), depending on whether the full $2.1 billion is provided by the Committed Lenders and which will be paid upon the Final Order.

8.      Second, the DIP facility, and related approval of the requested aggregate commitment fees, is the critical foundation upon which the Debtors will be able to base their efforts to attract participants to the EFIH First Lien Settlements.  Specifically, the Committed Lenders have agreed to allow current EFIH First Lien holders to participate in the EFIH First Lien DIP (and receive associated fees) as part of the proposed EFIH First Lien Makewhole Settlements.  Without the DIP facility as a backstop, there is no "currency" for the settling parties to exchange into the settlement.

9.      Third, in order to achieve the monthly interest savings that will result from this refinancing (*i.e.*, approximately $13 million *per month* (*see* Apr. 29, 2014 Declaration ¶ 10)), the Debtors must pay certain fees to secure that refinancing during the Interim Period.  I, along with my colleagues at Evercore, have reviewed the terms of the EFIH First Lien DIP, including the associated fees, as against other options available to the Debtors when they entertained DIP financing offers, as well as against other DIP financings that I have reviewed in the course of many other engagements over the past several years.   The terms of the EFIH First Lien DIP, including the associated fees, are extremely competitive and highly favorable to the EFIH Debtors.

10.      Fourth, the payment of these DIP commitment fees provides an upfront form of insurance against market movement in DIP interest rates that could greatly impact the EFIH Debtors to their significant detriment.  For example, a potential 100 basis point increase in the DIP's interest rate, on the $5.4 billion lending facility, would cost the Debtors an additional $4.5 million per month, or $108 million over two years.   If even a one-month delay were to result

4

from the loss of the DIP commitment, the $10.5 million fee (which will likely be paid in any reasonable circumstance) would be exceeded by the lost interest savings of $13 million for the month (which would be lost forever). Moreover, any of the interim fees ultimately paid will be entirely or substantially counted within the overall fees payable under the overall EFIH First Lien DIP facility, and hence the payment of these fees on an interim basis is not a discrete and additional cost to the Debtors.

11.     The fees paid on an interim basis in order to secure the availability of the EFIH First Lien DIP Financing are in the best interests of the Debtors under any reasonable scenario, in light of the amount of cost savings that the Debtors are achieving by way of this DIP on these terms. At the most basic level, this DIP financing saves the Debtors $13 million in interest per month. But in addition, the availability of this EFIH First Lien DIP facility allows the Debtors to offer the settlement it has reached with some of the EFIH First Lien noteholders to the remaining holders because the Debtors can point to the certainty of the availability of this facility to refinance the outstanding EFIH First Lien debt.

### If the Interim Relief Is Denied, the Debtors Will Be Irreparably Harmed

12.     If the Interim Relief requested in the EFIH First Lien DIP Motion is denied, and the Debtors cannot secure the extremely advantageous financing terms embodied in the EFIH First Lien DIP Financing facility, the Debtors may not be able to get another DIP facility at all, or they may not be able to get another DIP facility on terms as favorable to the Debtors as this DIP.

13.     The Debtors need this DIP financing, regardless of whether the EFIH First and Second Lien Settlements are approved. The EFIH Debtors will need to refinance their above-market first lien debt, regardless of the availability of such settlements.

5

14.     The EFIH First Lien DIP facility serves as insurance for the Debtors against detrimental changes in market conditions that could make refinancing the EFIH First Lien debt cost prohibitive.  Thus, the authorization of the Interim Fees would enable the EFIH Debtors to **agree to pay** certain reasonable fees in order to ensure that they will not be subject to unfavorable rates and terms at a later date if the market conditions change.

### The Debtors' Request to File the EFIH First Lien DIP Fee Letters Under Seal

15.     I understand that the Debtors have sought to file under seal the fee letters in connection with the EFIH First Lien DIP facility.  (*See Motion to File Under Seal (Motion Authorizing Texas Competitive Electric Holdings Company LLC and Certain of its Debtor Affiliates to File Under Seal the Certain Fee Letter Related to Proposed Debtor-in-Possession Financing) Filed by Energy Future Holdings Corp.* (Apr. 29, 2014) [D.I. 36]; *Motion to File Under Seal (Motion Authorizing Energy Future Intermediate Holding Company LLC and EFIH Finance, Inc. to File Under Seal the Certain Fee Letter Related to Proposed Debtor-in-Possession Financing) Filed by Energy Future Holdings Corp..* (Apr. 29, 2014) [D.I. 39].)

16.     Based on my professional experience and discussions with the DIP lenders and Debtors, filing such fee letters under seal is routinely done, and I believe that the public disclosure of the EFIH First Lien DIP fee letter would be detrimental to the Debtors' estate for at least three reasons:

17.     First, both fee letters include provisions that, if disclosed, could increase the cost of syndicating both the EFIH First Lien DIP Facility.  The disclosure of the terms at issue would make it more likely that the Debtors would be forced to pay the maximum allowable interest rate under the Commitment Letters, which would be harmful to the estate.

18.     Second, the fee letters include proprietary information of the joint lead arrangers concerning their fee structures that could be used by competitors to undercut their business. Based on my experience in negotiating these types of DIP financing facilities, it is typical and understandable for arrangers to seek to protect from disclosure their sophisticated, proprietary methodology for calculating fees.

19.     Finally, and relatedly, the arrangers for both DIP financings have required that the Debtors keep the fee letters confidential, as their disclosure may disadvantage the arrangers in the competitive market place. In addition to potential harm to the arrangers, the public dissemination of this information could jeopardize the Debtors' ability to obtain postpetition financing, as other potential lenders may fear that their own fee structures will be publicly disclosed.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  April 30, 2014

Stephen Goldstein
Senior Managing Director
Evercore Group LLC