**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY LLC, | ) | Case No. 14-11005 (CSS) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC, | ) | Case No. 14-10978 (CSS) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| TCEH FINANCE, INC., | ) | Case No. 14-11028 (CSS) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| 4CHANGE ENERGY COMPANY, | ) | Case No. 14-10980 (CSS) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| 4CHANGE ENERGY HOLDINGS LLC, | ) | Case No. 14-10981 (CSS) |
| | ) | |
| Debtor. | ) | |

MIAMI 1006520

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| BIG BROWN 3 POWER COMPANY LLC, | ) Case No. 14-10983 (CSS) |
| | ) |
| Debtor. | ) |
| | ) |
| In re: | ) Chapter 11 |
| | ) |
| BIG BROWN LIGNITE COMPANY LLC, | ) Case No. 14-10986 (CSS) |
| | ) |
| Debtor. | ) |
| | ) |
| In re: | ) Chapter 11 |
| | ) |
| BIG BROWN POWER COMPANY LLC, | ) Case No. 14-10988 (CSS) |
| | ) |
| Debtor. | ) |
| | ) |
| In re: | ) Chapter 11 |
| | ) |
| COLLIN POWER COMPANY LLC, | ) Case No. 14-10998 (CSS) |
| | ) |
| Debtor. | ) |
| | ) |
| In re: | ) Chapter 11 |
| | ) |
| DECORDOVA II POWER COMPANY LLC, | ) Case No. 14-11003 (CSS) |
| | ) |
| Debtor. | ) |
| | ) |
| In re: | ) Chapter 11 |
| | ) |
| DECORDOVA POWER COMPANY LLC, | ) Case No. 14-10982 (CSS) |
| | ) |
| Debtor. | ) |
| | ) |
| In re: | ) Chapter 11 |
| | ) |

2

| | | |
|---|---|---|
| EAGLE MOUNTAIN POWER COMPANY LLC, | ) | Case No. 14-10984 (CSS) |
| | ) | |
| Debtor. | ) | |
| | ) | |

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GENERATION MT COMPANY LLC, | ) | Case No. 14-11021 (CSS) |
| | ) | |
| Debtor. | ) | |
| | ) | |

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GENERATION SVC COMPANY, | ) | Case No. 14-11025 (CSS) |
| | ) | |
| Debtor. | ) | |
| | ) | |

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LAKE CREEK 3 POWER COMPANY LLC, | ) | Case No. 14-11029 (CSS) |
| | ) | |
| Debtor. | ) | |
| | ) | |

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LUMINANT BIG BROWN MINING COMPANY LLC, | ) | Case No. 14-11018 (CSS) |
| | ) | |
| Debtor. | ) | |
| | ) | |

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LUMINANT ENERGY COMPANY LLC, | ) | Case No. 14-11023 (CSS) |
| | ) | |
| Debtor. | ) | |
| | ) | |

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LUMINANT ENERGY TRADING | ) | Case No. 14-11026 (CSS) |

3

CALIFORNIA COMPANY,    )
    )
    Debtor.    )
————————————————————    )
    )
In re:    )    Chapter 11
    )
LUMINANT ET SERVICES COMPANY,    )    Case No. 14-11030 (CSS)
    )
    Debtor.    )
————————————————————    )
    )
In re:    )    Chapter 11
    )
LUMINANT GENERATION COMPANY LLC,    )    Case No. 14-11032 (CSS)
    )
    Debtor.    )
————————————————————    )
    )
In re:    )    Chapter 11
    )
LUMINANT HOLDING COMPANY LLC,    )    Case No. 14-11037 (CSS)
    )
    Debtor.    )
————————————————————    )
    )
In re:    )    Chapter 11
    )
LUMINANT MINERAL DEVELOPMENT COMPANY LLC,    )    Case No. 14-11040 (CSS)
    )
    Debtor.    )
————————————————————    )
    )
In re:    )    Chapter 11
    )
LUMINANT MINING COMPANY LLC,    )    Case No. 14-11042 (CSS)
    )
    Debtor.    )
————————————————————    )
    )
In re:    )    Chapter 11
    )
LUMINANT RENEWABLES COMPANY LLC,    )    Case No. 14-11044 (CSS)

|  |  |
|---|---|
| Debtor. | ) |
|  | ) |
|  | ) |
| _____ | ) |
|  | ) |
| In re: | ) Chapter 11 |
|  | ) |
| MARTIN LAKE 4 POWER COMPANY LLC, | ) Case No. 14-11010 (CSS) |
|  | ) |
|  | ) |
| Debtor. | ) |
|  | ) |
| _____ | ) |
|  | ) |
| In re: | ) Chapter 11 |
|  | ) |
| MONTICELLO 4 POWER COMPANY LLC, | ) Case No. 14-11011 (CSS) |
|  | ) |
|  | ) |
| Debtor. | ) |
|  | ) |
| _____ | ) |
|  | ) |
| In re: | ) Chapter 11 |
|  | ) |
| MORGAN CREEK 7 POWER COMPANY LLC, | ) Case No. 14-11014 (CSS) |
|  | ) |
|  | ) |
| Debtor. | ) |
|  | ) |
| _____ | ) |
|  | ) |
| In re: | ) Chapter 11 |
|  | ) |
| NCA RESOURCES DEVELOPMENT COMPANY LLC, | ) Case No. 14-11016 (CSS) |
|  | ) |
|  | ) |
| Debtor. | ) |
|  | ) |
| _____ | ) |
|  | ) |
| In re: | ) Chapter 11 |
|  | ) |
| OAK GROVE MANAGEMENT COMPANY LLC, | ) Case No. 14-11022 (CSS) |
|  | ) |
|  | ) |
| Debtor. | ) |
|  | ) |
| _____ | ) |
|  | ) |
| In re: | ) Chapter 11 |

5

|  | ) |  |
| --- | --- | --- |
| OAK GROVE MINING COMPANY LLC, | ) | Case No. 14-11024 (CSS) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

|  | ) |  |
| --- | --- | --- |
| In re: | ) | Chapter 11 |
|  | ) |  |
| OAK GROVE POWER COMPANY LLC, | ) | Case No. 14-11027 (CSS) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

|  | ) |  |
| --- | --- | --- |
| In re: | ) | Chapter 11 |
|  | ) |  |
| SANDOW POWER COMPANY LLC, | ) | Case No. 14-11033 (CSS) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

|  | ) |  |
| --- | --- | --- |
| In re: | ) | Chapter 11 |
|  | ) |  |
| TRADINGHOUSE 3 & 4 POWER COMPANY LLC, | ) | Case No. 14-11046 (CSS) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

|  | ) |  |
| --- | --- | --- |
| In re: | ) | Chapter 11 |
|  | ) |  |
| TRADINGHOUSE POWER COMPANY LLC, | ) | Case No. 14-10985 (CSS) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |
|  | ) |  |

|  | ) |  |
| --- | --- | --- |
| In re: | ) | Chapter 11 |
|  | ) |  |
| TXU ENERGY RECEIVABLES COMPANY LLC, | ) | Case No. 14-10993 (CSS) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

|  | ) |  |
| --- | --- | --- |
| In re: | ) | Chapter 11 |
|  | ) |  |

MIAMI 1006520

| | | |
|---|---|---|
| TXU ENERGY RETAIL COMPANY LLC, | ) | Case No. 14-10997 (CSS) |
| | ) | |
| Debtor. | ) | |
| | ) | |

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TXU ENERGY SOLUTIONS COMPANY LLC, | ) | Case No. 14-11002 (CSS) |
| | ) | |
| Debtor. | ) | |
| | ) | |

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TXU RETAIL SERVICES COMPANY, | ) | Case No. 14-11009 (CSS) |
| | ) | |
| Debtor. | ) | |
| | ) | |

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TXU SEM COMPANY, | ) | Case No. 14-11013 (CSS) |
| | ) | |
| Debtor. | ) | |
| | ) | |

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VALLEY NG POWER COMPANY LLC, | ) | Case No. 14-11015 (CSS) |
| | ) | |
| Debtor. | ) | |
| | ) | |

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VALLEY POWER COMPANY LLC, | ) | Case No. 14-11020 (CSS) |
| | ) | |
| Debtor. | ) | |
| | ) | |

**PRELIMINARY OBJECTION OF THE AD HOC GROUP OF TCEH
UNSECURED NOTEHOLDERS TO THE MOTION OF THE TCEH DEBTORS
FOR ENTRY OF AN ORDER DIRECTING JOINT ADMINISTRATION OF
THEIR CHAPTER 11 CASES WITH THOSE OF THE ONCOR DEBTORS**

7

The ad hoc group of certain holders (the "Ad Hoc Group of TCEH Unsecured Noteholders") of approximately $2.74 billion aggregate principal amount of 10.25% Fixed Senior Notes due 2015 (including Series B) (the "Fixed Unsecured Notes") and 10.50%/11.25% Senior Toggle Notes due 2016 (the "Toggle Unsecured Notes" and, together with the Fixed Unsecured Notes, the "Unsecured Notes") issued by Texas Competitive Electric Holdings Company LLC ("TCEH") and TCEH Finance, Inc. ("TCEH Finance"),[1] by and through its undersigned counsel, hereby files this preliminary objection (the "Objection") to the Motion of Energy Future Holdings Corp., *et al*., for Entry of an Order Directing Joint Administration of The Debtors' Chapter 11 Cases [Docket No. 17] (the "Joint Administration Motion"), to the extent it seeks joint administration of the chapter 11 cases of the TCEH Debtors (as defined herein) with those of the Oncor Debtors (as defined herein).  In support of the Objection, the Ad Hoc Group of TCEH Unsecured Noteholders respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      Although the first-day motions before the Court repeatedly incant the mantra of "the Restructuring," "the Debtors" and "the Cases," in actuality the Court has before it two very distinct groups of Debtors and Cases—what we refer to herein as the "Oncor Cases" and the "TCEH Cases."  These two groups of Cases, in fact, share almost nothing in common and almost everything in conflict.  Not only would their joint administration serve little legitimate purpose at this stage of the process, it would likely create true prejudice to the TCEH Debtors' unsecured creditors.  Joint administration is obviously an administrative remedy; it

---

[1]      The Ad Hoc Group of TCEH Unsecured Noteholders and its counsel recognize the obligation to file a verified statement pursuant to Federal Rule of Bankruptcy Procedure 2019.  Due to the fluidity of the group members' holdings with respect to the various disclosable economic interests held in relation to the Debtors at the outset of these chapter 11 cases, counsel has not yet filed such statement, but intends to do so with reasonable promptness.

8

should not affect substantive rights.  Here, if granted, as requested by the Debtors, it will have

significant and improper substantive impact.  Thus, we respectfully request that the Court limit

the preliminary relief granted under the Joint Administration Motion to ordering the separate

joint administration of the TCEH Cases and the Oncor Cases and scheduling any further relief,

including whether all the Cases should be jointly administered, for an evidentiary hearing.

      2.     The "Oncor Cases" consist of two holding companies, Energy Future

Holdings Corp. ("EFH") and Intermediate Holding Company LLC ("EFIH"), EFIH's financing

subsidiary, EFIH Finance. Inc., EFH Corporate Services Company ("Corporate Services"), EFH

Properties Company, and various other direct and indirect subsidiaries of EFH that are legacy

entities without active business operations (collectively, the "Oncor Debtors").  According to the

Declaration of Paul Keglevic, Executive Vice President, Chief Financial Officer, and Co-Chief

Restructuring Officer of Energy Future Holdings Corp., *et al.*, in Support of First Day Motions

(the "Declaration"), EFH, EFIH and EFIH Finance have no employees, business operations,

vendors, real property or material assets other than their stock ownership interests, either direct

or indirect, in Oncor Electric Delivery Holdings Company LLC ("Oncor Delivery") and Oncor

Electric Delivery Company LLC ("Oncor"), a regulated public utility that transmits and

distributes electricity in the State of Texas.  Oncor, which owns and operates power lines and

towers and delivers electrical power at tariffed rates, is a classic low volatility business with an

almost intuitive capital structure, with equity value flowing up through EFIH to EFH.  Indeed,

the Oncor Debtors enter chapter 11 with restructuring support agreements in hand, and could

have the defined and constrained stay in this Court that one might expect for a holding company

restructuring with near universal creditor and management support.  The velocity of the Oncor

Cases and the issue of whether or not the Oncor Cases will be jointly administered is, however, no the subject of this Objection.

3.    This objection instead concerns the chapter 11 cases of the other Debtors excluding the Oncor Debtors (the "TCEH Debtors"), which consist of Energy Future Competitive Holdings Company LLC ("EFCH") and its thirty-plus direct and indirect subsidiaries.  The Cases of these Debtors, on their own, represent the second largest joint chapter 11 case ever filed in Delaware.  The TCEH Debtors have approximately $26.0 billion in secured funded debt and more than $6.2 billion in unsecured debts, as well as additional contingent and unliquidated unsecured claims.  These Debtors own and operate power generation businesses, a retail electricity provider, an energy hedging company and a series of additional holding companies whose debts are guaranteed by the operating companies.  In total, they have more than 5,000 employees and officers, fourteen plants including two nuclear power plants, 40 operating units and several coals mines.  Their assets include massive merchant power generation plants, extensive executory contracts including hedging contracts and power purchase and sale agreements, real estate, accounts receivable, capital stock and litigation claims, among others.  Their Cases, unlike those of the Oncor Debtors, will be replete with trade creditor issues, executory contract motions, regulatory compliance issues, environmental concerns, and state tax claims and disputes—in short, everything one would expect in a massive chapter 11 case of a merchant power company.  These TCEH businesses need reorganizing in the traditional, expansive sense, and their Cases portend to be both complex and exhausting.

4.    Notwithstanding any of this, by the Joint Administration Motion, "the Debtors" seek to join the Oncor Cases with the TCEH Cases under Federal Rule of Bankruptcy Procedure 1015(b) ("Bankruptcy Rule 1015(b)") with the cursory allegation that "joint

MIAMI 1006520

administration of these chapter 11 cases will provide significant administrative convenience without harming any of the substantive rights of any party in interest." Thus, with that one statement, the TCEH Debtors hope to join their reorganization process for a high-volatility business in a massively complex case in tandem with that of their public utility sister holding company Debtors, whose plan is already fully baked. They do so with the support of less than half of their secured lenders and without a single known unsecured creditor of their thirty-plus Debtor-subsidiaries supporting the purported "Global Restructuring." Even on the preliminary record described herein, the Court can deny outright the Joint Administration Motion to the extent it seeks to join the Cases of the Oncor Debtors with those of the TCEH Debtors, and upon a final hearing, the Court must do so. For, joint administration of the Oncor Cases and the TCEH Cases is neither in the best interests of TCEH Debtors or their creditors, and there is a real and grave concern that the Joint Administration Motion will be used by "the Debtors," as a Trojan horse to draw attention from, and then lay waste to, material inter-Debtor issues that place the two Debtor groups in a present, direct, and irremediable conflict.

5.      To be clear, the Ad Hoc Group of TCEH Unsecured Noteholders does not object to the Cases of the Oncor Debtors and the TCEH Debtors being called jointly for the purposes of first-day proceedings or having the record created in any one Case imported into all other Cases. Nor does the Ad Hoc Group of TCEH Unsecured Noteholders dispute that the TCEH Debtors and the Oncor Debtors (i) are "affiliates" with parallel but similar back-office arrangements, (ii) share certain of the same officers and directors, (iii) share a common shareholder—EFH, or (iv) share the same proposed legal counsel and financial advisors (though whether or not they will continue to do so is not the subject of this Objection). But that alone is not enough to join the Oncor Cases and the TCEH Cases under Bankruptcy Rule 1015(b).

11

6.    <u>First</u>, with one notable exception discussed below, the TCEH Cases and the Oncor Cases will have very little, if any, "administration" in common. The Oncor Debtors and the TCEH Debtors share no rank-and-file employees, trade creditors, or lenders. Their creditor matrixes should be virtually distinct, with the exception of one creditor, Fidelity Investments (whose presence in the capital structure is so tangled that it has its own treatment in the Debtors' restructuring support agreement). Neither of the two group's prepetition or postpetition credit facilities are cross-defaulted. With the exception of Corporate Services, discussed below,[2] the two Debtor groups do no business with one another—any electricity transmission transactions that take place between the TCEH Debtors and the Oncor Debtors take place through the Oncor Debtors' regulated subsidiaries which have not filed for chapter 11 protection. Even as to those transactions, they are all designed to be conducted at arm's length as a condition to the regulated utilities' ongoing operations. Thus, any operational motions practice (and it is unclear whether the Oncor Debtors will have any) will concern almost entirely separate matters and separate parties. These and other matters relating to the lack of any appreciable "administrative overlap" are discussed in more depth, <u>infra</u>, at Part B.

7.    <u>Second</u>, even if there were some minimal overlap on some motions that would be eased by calling the Cases together on the same day, there will be no significant conceivable savings in doing so other than avoiding commuting costs of Delaware counsel and train car-loads of out-of-state attorneys and advisors rushing to fill rooms at the Hotel du Pont. The two Debtor groupings are certainly sufficiently large to support two case infrastructures, including two claims agents (though again, the creditor bodies are almost entirely distinct in any

---

[2]    The relationship of the Corporate Services Case with the TCEH Cases presents a hornet's nest of conflicts affecting first-day relief including Corporate Services' seeking as part of the Debtors; cash management motion the payment of approximately $70 million prepetition claim against TCEH and blanket authorization for Corporate Services (with the input of creditors of the Oncor Debtors) to change certain fees and expenses with no daily input from unsecured creditors. Matters relating to Corporate Services are discussed, <u>infra</u>, at Part C.2.b.

event).  In fact, joint administration of all the Oncor Cases and the TCEH Cases would have the perverse effect of <u>increasing</u> estate costs by having the large, estate-funded secured and restructuring support agreement-supporting creditor groups on both sides of the Cases appearing on matters in which they have no economic interest to protect.  There is no reason, for example, to pay the Oncor Debtors' DIP lenders to appear on and attend the TCEH Debtors' wage motions, or conversely paying the TCEH first lien lenders to appear on the Oncor Debtors' DIP matters merely because the two groups of Cases are called jointly.

8.      <u>Third</u>, and most important, by noting the lack of operational overlap, we do not mean to imply that the two Debtor groups will be strangers to each other as they proceed. On the contrary, where the TCEH Cases and the Oncor Cases will intersect, they will intersect in direct and material adversity.  As set forth below, the TCEH Debtors have a number of significant, value-driving claims, causes of action and defenses against the Oncor Debtors that are deserving of unconflicted evaluation and, if necessary, prosecution.  (Whether or not unconflicted fiduciaries, counsel and advisors will be necessary are similarly matters for other motions and other days.)  These conflicts include disputes over the avoidability of transactions undertaken in connection with the October 10, 2007 leveraged buy-out (the "LBO") that gave rise to "the Debtors," case-altering disputes over the prepetition tax allocation agreements covering the TCEH Debtors and the Oncor Debtors, and the prepetition practices of EFH and its sponsors with respect to their management of relationships between the two businesses.  The Court need to look no further than paragraph 15 of the Declaration in which Mr. Keglevic admits that "the two key" issues driving recoveries at the TCEH Debtors are (1) whether those Debtors or the EFH Debtors are liable on tax claims as to which there is a live dispute between estates, and (2) asset location and valuation disputes between the Debtors' estates.  (The Ad Hoc Group

13

of TCEH Unsecured Noteholders has significant concerns as to how, given those facts, management of the TCEH Debtors locked themselves into a restructuring support agreement that has the support of no unsecured creditors at any TCEH Debtor.)  As to all of these matters, Bankruptcy Rule 1015(b) requires that this Court "shall" take "conflicts of interests" into consideration when determining whether or not to administer a case jointly.  As to that, evaluation of the most material conflicts of interest has had, to date, to be gleaned from the public record, without the aid of any voluntary disclosure by "the Debtors."  Those conflicts of interest are addressed, infra, at Part C.

         9.     In filing this preliminary Objection, we are cognizant that the "normal" result for a first-day joint administration motion would be to have the Court order joint administration under one shareholder debtor and thus defer to the filing mechanics chosen by that shareholder.  We trust that the Court will see that this is not a normal set of cases, however, and that "normal" result is one that inexorably leads down the "normal" path to one business plan, one disclosure statement and one plan of reorganization for all Debtors.  That is a tragically bad path for the TCEH Debtors and their creditors, and one that elevates convenience and closure over careful deliberation and fiduciary rigor.  Given the lack of a meaningful business, fiscal or operational relationship between the TCEH Debtors and the Oncor Debtors other than one of litigant against litigant, a "joint path" in these Cases will, in our view, lead only to a "joint morass" that is ultimately destructive of value to the TCEH Debtors and the recoveries of their unsecured creditors.  In short, these Cases present the rare instance in which the best, and surest, result is for the Court to split what "the Debtors" would like to call "the Cases" into two distinct groupings at the very outset and to proceed accordingly.

## PRELIMINARY OBJECTION

10.     By the Joint Administration Motion, the Debtors seek entry of an order directing joint administration all of the Cases, because the Debtors are "affiliates" within the meaning of 11 U.S.C. § 101(2).  As support for their request, the Debtors make the following six conclusory contentions supported by the Declaration:

- The 71 Debtors in these chapter 11 cases are "affiliates" as that term is defined in section 101(2) of the Bankruptcy Code.

- [T]he Debtors have highly integrated operations.

- [J]oint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.

- Many of the motions, hearing, and order that will arise in these chapter 11 cases will affect each and every Debtors.

- Joint administration will reduce fees and costs by avoiding duplicative filings and objections.

- Joint administration will allow the Office of the United States Trustee for the District of Delaware and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

Joint Administration Motion, at 21-22, Declaration, Ex. A, at 134.  As set forth below, even at first blush, those contentions seem more grounded in a noted restructuring firm's form file than in fact.[3]

11.     Bankruptcy Procedure 1015(b) provides, in relevant part: "[i]f . . . two or more petitions are pending in the same court by or against . . . a debtor and an affiliate, the court may order joint administration of the estates." Fed. R. Bankr. P. 1015(b).  Local Bankruptcy Rule 1015-1 provides for the Court to order joint administration of cases upon the filing of a

---

[3]     Contemporaneous with the filing of this preliminary Objection, the Ad Hoc Group of TCEH Unsecured Noteholders is serving discovery requests on the TCEH Debtors with respect to these allegations and reserve the right to supplement this Objection, at the appropriate time, to bring to the Court's attention any additional facts necessary for disposition of the Joint Administration Motion.

MIAMI 1006520

motion for joint administration supported by a declaration that establishes that joint administration of two or more pending cases is warranted and will ease the administrative burden for the Court and the parties.  Del. Bankr. L.R. 1015-1 (emphasis added).

12.    The Debtors—in asserting that "[j]oint administration will not adversely affect the Debtors' respective constituencies"—appear to have given little, if any, consideration to those inter-Debtor claims and the related conflicts present in the Cases.  Prior to entering a joint administration order, however, the court "shall give consideration to protecting creditors of different estates against potential conflicts of interest."  Fed. R. Bankr. P. 1015(b) (emphasis added).  The advisory committee's note to Bankruptcy Rule 1015(b) states, in relevant part:

> Joint Administration as distinguished from consolidation may include combining the estates by using a single docket for the matters occurring in the administration, including the listing of filed claims, the combining of notices to creditors of the different estates, and the joint handling of other purely administrative matters that may aid in expediting the cases and rendering the process less costly."

Fed. R. Bankr. P. 1015 advisory committee's note (emphasis added).  Given that admonition, we believe it is important that, even on a first day basis, the Court understand the import of the relief requested by the Debtors.

### A.    Overview Of The Separate Capital Structures Of "The Debtors"

13.    As noted above, "the Debtors" are essentially a two-tree enterprise, with the Oncor Debtor holding companies existing as a stand-alone enterprise, and the TCEH Debtors existing as another, with only a common shareholder, EFH and shared back-office operations provided through Corporate Services.  More particularly, EFH is the sole shareholder of EFIH (the lead Oncor Debtor) and Energy Future Competitive Holdings Company LLC ("EFCH") (the lead TCEH Debtor).  See Form 10-K of EFH for the fiscal year ended December 31, 2012 (the

16

"EFH 2012 10-K"), at 1. EFCH is the direct parent of TCEH. Id. The TCEH Debtors are a non-regulated, competitive electricity generation and sales business. Id. EFIH's indirect operating subsidiary, Oncor, is a regulated utility engaged in energy transmission and distribution. Id. Oncor and its immediate parent, Oncor Holdings, are not Debtors.

14.     EFH, EFCH, TCEH, EFIH and Oncor Holdings are all holding companies. The operating entities that actually conduct the Debtors' businesses—Oncor and TCEH's operating subsidiaries—are entirely separate from one another. The only material on-going business relationship between Oncor and TCEH's operating subsidiaries is supposedly conducted at regulated rates. See Form 10-K of Oncor for the fiscal year ended December 31, 2013 (the "Oncor 2013 10-K"), at 134-37. Further, the operating entities are managed on a day-to-day basis by distinct management groups. See Executive Leadership, Oncor, http://www.oncor.com/EN/Pages/Executive-Leadership.aspx (last visited Apr. 16, 2014); Leadership, Luminant, http://www.luminant.com/about/leadership.aspx (last visited Apr. 16, 2014); Leadership, TXU Energy, http://www.txu.com/en/about/leadership.aspx (last visited Apr. 16, 2014).

15.     In addition to engaging in separate lines of business, the regulated and non-regulated segments of the Debtors' businesses have entirely distinct capital structures and, upon information and belief, almost entirely different creditor bodies.

16.     EFH has approximately $650 million of unsecured funded debt (excluding affiliate-owned debt). See Form 10-Q of EFH for the fiscal quarter ended September 30, 2013 (the "EFH Third Quarter 2013 10-Q"), at 14-15. Substantially all of that debt is believed to be owned by one entity, Fidelity Investments. EFH has guaranteed only EFCH's $35 million of 9.580% Fixed Notes due 2019 and $39 million of 8.254% Fixed Notes due 2021. Id. at 14-16.

17.    EFCH has approximately $79 million of funded debt, $74 million of which is purportedly secured on a first-priority basis by, among other things, an undivided interest in a nuclear generation facility owned by an operating subsidiary of TCEH. Id. EFCH has guaranteed (i) $60 million of EFH's funded debt (which is also guaranteed by EFIH) and (ii) the approximately $32.2 billion of funded debt (excluding affiliate-owned debt) of TCEH, described below. Id. at 14, 17, 18, 20.

18.    TCEH has approximately $32.2 billion of funded debt (excluding affiliate owned debt), comprised of first lien loans and first lien, second lien and unsecured notes. Id. at 13-15.  The first lien loans, first lien notes and second lien notes are purportedly secured by the TCEH Debtors' assets. Id. at 17-18.  The TCEH Debtors have not guaranteed EFCH's, EFIH's or EFH's funded debt.

19.    EFIH has approximately $7.9 billion of funded debt, comprised of first lien, second lien and unsecured notes. Id. at 14.  The first lien and second lien notes are purportedly secured by its equity interest in Oncor Holdings. Id. at 18-19.  EFIH has not guaranteed TCEH's or EFCH's funded debt, and EFIH has guaranteed only EFH's $60 million of 10.875% and 11.25%/12.00% Senior Notes due 2017 (which is also guaranteed by EFCH). Id. at 14, 20.

20.    Given the amount of funded debt between EFH and the actual assets of the TCEH Debtors' enterprise, it is no surprise that EFH itself believes that its equity interests in EFCH are valueless.  To that end, both EFH and its largest (and class-controlling) creditor have signed a restructuring support agreement with TCEH's first lien lenders that cancel EFCH equity for no value.

21.     On the other tree, Oncor Holdings, Oncor and its finance subsidiary, Oncor Electric Delivery Transition Company LLC, are "ring-fenced" entities, and thus, have no liability for any debt of the Oncor Debtors or the TCEH Debtors.  EFH 2012 10-K, at 2.  Oncor Holdings has no funded debt, and Oncor has approximately $6.2 billion of funded debt.  EFH 2012 10-K, Ex. 99(e), at 20; Oncor 2013 10-K, at 57.

**B.      The Administrative Overlap Of The Oncor
           Cases And The TCEH Cases Will Be Minimal**

22.     Despite the form-file allegations regarding joint administration in the Joint Administration Motion and the Declaration, the Oncor Cases and the TCEH Cases will have almost no administrative overlap.

23.     The Oncor Debtors have separate creditor bodies from the TCEH Debtors. Thus, it is unclear whether the creditor matrixes of the Cases will overlap in any material respect.

24.     The Oncor Cases and the TCEH Cases have distinct, organized prepetition secured creditor bodies, as well as proposed DIP lenders.  To that end, denial of joint administration will actually save all estates' funds from having to pay the estate-funded secured creditors of, and DIP lenders to, the TCEH Debtors from appearing on matters relevant only to the Oncor Debtors and vice versa.

25.     With the exception of Corporate Services, it is unclear what, if any, administrative motions will concern the Oncor Debtors.  The Declaration in support of the first-day motions draws no distinctions among the Debtors when describing the bases for the operation relief sought.  They appear to have no business operations, employees, trade creditors, third-party vendors, sales or use taxes, utilities, accounts receivable, environmental issues, real estate, or third-party executory contracts—in sum, none of the issues of the TCEH Debtors that

will dominate the early days of the TCEH Cases. This Joint Administration Motion is silent as to

why, then, all of the Oncor Debtors should even be appearing on those types of motions.

26.    In the end, the "efficiencies" here seem to be only that the two trees are

provisionally represented by the same law firms and restructuring professionals. No two cases,

to our knowledge, have ever been tried together under Bankruptcy Rule 1015(b) on that thin,

self-fulfilling coincidence.

## C.    Intercompany Conflicts Exist That Are Alone Sufficient To Justify The Denial Of Joint Administration

27.    While the chapter 11 cases of the TCEH Debtors and the Oncor Debtors

will share almost nothing in common, they will, in fact, share much in conflict. As set forth

below, substantial intercompany claims and disputes exist as between and among the estates of

the TCEH Debtors and the Oncor Debtors, which give rise to not just potential, but actual,

conflicts sufficient to deny joint administration. See In re Avery, 377 B.R. 264, 271 (Bankr. D.

Alaska 1007) (denying joint administration where "a potential conflict exist[ed] between the

estates of [the debtors], e.g., the potential claims for inter-company debt.").

### 1.    The Debtors' Cases Will Be Driven By Irreconcilable Conflicts Between The TCEH Debtors And The Oncor Debtors

28.    Based on publicly available information and diligence conducted to date,

significant intercompany claims of the TCEH Debtors, on the one hand, against the Oncor

Debtors, on the other, have already been identified, and certain inter-Debtor disputes have

already arisen that must be further investigated and resolved as part of the TCEH Debtors'

reorganization. Additional significant inter-Debtor claims will likely be uncovered once

nonpublic information is made available through discovery or otherwise.

MIAMI 1006520

### a.    Claims By EFCH Arising From The Transfer Of Oncor And The LBO Will Put The Debtors' Estates In Irreconcilable Conflict

29.    The most significant source of potential conflict in these bankruptcy proceedings may be the LBO of EFH (and any prior or subsequent transaction related thereto that may be "collapsed" therewith).  Among other things, the TCEH Debtors will need to investigate whether viable claims exist that could be brought on behalf of their estates to avoid any improper transactions that diverted assets or value from the TCEH Debtors in connection with the LBO.

30.    For example, it is possible that, as late as calendar year 2007, Oncor was a direct subsidiary of EFCH.[4]  In connection with the LBO, ownership of Oncor was transferred to Oncor Holdings, a newly-formed special purpose, bankruptcy remote subsidiary put in place in accordance with the ring-fencing measures dictated by the stipulation agreed to with the Public Utility Commission of Texas (the "PUCT") to resolve concerns regarding the LBO.  EFH 2007 10-K, Ex. 10(eee).  Immediately thereafter, EFH transferred ownership of Oncor Holdings to EFIH.  Form 8-K of EFH and TCEH, filed October 17, 2007, Ex. 99.2, at 24.  Based upon publicly-available information, it appears EFCH received nothing of value in exchange for the transfer of its ownership of Oncor.  Further, given the cyclicality inherent in relevant power prices and the attendant impact on the enterprise value of the TCEH Debtors,[5] it is likely the case

---

[4]    Exhibit 21 to the Form 10-K of EFH for the fiscal year ended December 31, 2006 depicts Oncor as a direct subsidiary of TXU US Holdings Company (now EFCH) and an indirect subsidiary of TXU Corp. (now EFH) as of December 31, 2006.  See Form 10-K of EFH for the fiscal year ended December 31, 2007, Ex. 21.  EFH's Forms 10-K for the immediately preceding and following fiscal years contain conflicting statements as to the ownership of Oncor.  See Form 10-K of EFH for the fiscal year ended December 31, 2005, Ex. 21; Form 10-K of EFH for the fiscal year ended December 31, 2007 (the "EFH 2007 10-K"), Ex. 10(eee).

[5]    The price of power in ERCOT, the region in which the Company operates, is highly correlated to the price of natural gas, which rises and falls cyclically.  At the time of the LBO, the price of power was approximately $60/MWh and the price of natural gas was approximately $6/mmBtu.  In evaluating the proposed LBO in the first quarter of 2007, the directors of EFH assumed the price of natural gas would range between $7.87/mmBtu and $8.30/mmBtu during the four calendar years following the LBO (2008 to 2011).  In reality, over the five calendar years preceding the directors' consideration (2002 to 2006), the average price of natural gas was just $6.01/mmBtu,.

that the limited liability company managers of TCEH and the directors of EFCH "intended to

incur, or believed or reasonably should have believed, that [TCEH and EFCH] would incur debts

beyond [their] ability to repay" when they incurred and guaranteed, respectively, approximately

$27.0 billion of debt in connection with the LBO.[6]

31.    The Oncor Debtors will certainly oppose any attempts by the TCEH

Debtors' estates to investigate or pursue such potential claims.  First, the debt incurred by EFH

as part of the LBO was subsequently repaid with the proceeds of debt issued by EFIH.  Second,

EFIH issued no debt in connection with the LBO.  Finally, if a transfer made by the TCEH

Debtors is avoided, EFH likely would receive no recovery on account of its indirect ownership of

---

This historical data places in issue the reasonableness of the directors' assumptions regarding natural gas prices, power prices and the enterprise value of the TCEH Debtors and, in turn, the TCEH Debtors' ability to service and repay substantial levels of debt.

[6]    Although parties may try to argue the LBO is beyond the reach of both applicable state fraudulent transfer law and section 548 of the Bankruptcy Code, that is not necessarily the case.  A trustee or other estate representative may avail itself of the collection period available to the Internal Revenue Service (the "IRS") under 26 U.S.C. § 6502(a) and bring an action under section 544(b) of the Bankruptcy Code and the Uniform Fraudulent Transfer Act, as adopted by Texas.  "In the case of government creditors, the statute of limitations provided by federal law to the specific creditor in question trumps any statute of limitations set forth in the applicable state fraudulent transfer law under the Supreme Court's ruling in [Summerlin]."  Alberts v. HCA Inc. (In re Greater Se. Cmty. Hosp. Corp. I), 365 B.R. 293, 302 (citing United States v. Summerlin, 310 U.S. 414 (1940)).  It is well established that a claim held by the IRS may serve as a predicate unsecured claim under section 544(b) of the Bankruptcy Code.  See Osherow v. Porras (In re Porras), 312 B.R. 81, 97 (Bankr. W.D. Tex. 2004).  Pursuant to 26 U.S.C. § 6502, "[w]here the assessment of any tax imposed by [the Internal Revenue Code] has been made within the period of limitation properly applicable thereto, such tax may be collected . . . by a proceeding in court, but only if . . . the proceeding begun . . . within 10 years after the assessment of the tax . . . ."  26 U.S.C. § 6502(a).

Together, 26 U.S.C. § 6502(a) and Summerlin make clear that the IRS is entitled to bring a state law fraudulent transfer claim within the time period set forth in applicable federal law, notwithstanding the state law statute of limitation.  Summerlin, 310 U.S. at 416 ("[T]he United States is not bound by state statutes of limitation or subject to the defense of laches in enforcing its rights."); Greater Se. Cmty. Hosp. Corp. I, 365 B.R. at 302 ("Numerous courts have held the Summerlin rule applies to fraudulent transfer actions brought by an unsecured governmental creditor.") (collecting cases); In re Porras, 312 B.R. at 97 ("[T]he IRS is entitled to bring the fraudulent transfers in its own name, and so would be entitled to whatever statute of limitations applies to it.  Under [Summerlin], the United States is neither bound by the state statutes of limitations nor is subject to the defense of laches . . . .").  Likewise, a bankruptcy trustee or other estate representative may step into the IRS's shoes and avail itself of the IRS's ten-year statute of limitation.  Finkel v. Polichuk (In re Polichuk), Adv. No. 10-031, 2014 WL 766648, at *5 (Bankr. E.D. Pa. Feb. 27, 2014) ("Because the trustee may step into the shoes of the IRS, she may seek to avoid transfers that occurred as far back as [ten years prior to the filing of the petition]."); Greater Se. Cmty. Hosp. Corp. I, 365 B.R. at 306 ("[T]he court concludes that [the representative of the estate] can utilize the extended statute of limitations available to unsecured governmental creditors assuming that such creditors existed as of the petition date.").  Based on the foregoing, a trustee or other estate representative of the Company can seek to avoid fraudulent transfers that occurred during the past ten years.

MIAMI 1006520

TCEH due to the massive amount of claims (at least $32.2 billion) to be asserted against the TCEH Debtors. All of this gives rise to material conflicts that the Court should not ignore in assessing the Joint Administration Motion.

### b. Claims By TCEH For Lost Interest On Intercompany Notes

32.     Shortly after the LBO by which Kohlberg Kravis Roberts & Co., L.P., TPG Capital, L.P. and GS Capital Partners, an affiliate of Goldman, Sachs & Co. (collectively, the "Sponsors"), acquired the EFH corporate group, TCEH and EFH embarked on an intercompany lending relationship that appears to have diverted significant value away from TCEH to benefit EFH and its Sponsors. Pursuant to two promissory notes entered into in late 2007, TCEH loaned billions of dollars to EFH. See EFH 2012 10-K, at 169. The first note governed the extension of funds to EFH to pay its operating expenses (the "SG&A Note"). Id. at 130. The second note governed the extension of funds to EFH to service its interest payments on debt owing to third parties (the "P&I Note" and, together with the SG&A Note, the "Notes"). Id. These Notes were subsequently amended to provide a guaranty from EFCH and EFIH. Id.

33.     Each Note had identical terms—any loans extended by TCEH were subject to repayment by EFH on demand by TCEH. Id.; P&I Note, at ¶ 5. In the meantime, each loan accrued interest at the rate of LIBOR, plus 5.00% per annum. Form 10-K of EFCH for the fiscal year ended December 31, 2009 (the "EFCH 2009 10-K"), at 151. By the fourth quarter of 2010, the amount outstanding under the Notes exceeded $1.9 billion. Form 10-K of EFH for the fiscal year ended December 31, 2011 (the "EFH 2011 10-K"), at 180 ("The notes, which totaled $1.592 billion and $1.921 billion as of December 31, 2011 and 2010, respectively, and approximately $960 million as of February 15, 2012, are guaranteed by both EFCH and EFIH . . . .").

34.    From the start, the Notes transaction—which was executed by the same individual, Anthony Horton, on behalf of both TCEH and EFH—appears to have been part of a program implemented by the Sponsors and certain conflicted officers and directors to upstream funds away from TCEH for the benefit of EFH and its Sponsors.  EFH, as a holding company, lacked sufficient cash flow to pay dividends and management fees to its Sponsors.  See EFH 2012 10-K, at 143.  TCEH, on the other hand, generated significant cash flow from their generation and retail operations.  Form 10-K of EFCH for the fiscal year ended December 31, 2011 (the "EFCH 2011 10-K"), at 87; Form 10-K of EFCH for the fiscal year ended December 31, 2010 (the "EFCH 2010 10-K"), at 92.  The Notes, however, enabled EFH to divert TCEH's liquidity to other parties.  Using the proceeds of these intercompany loans, EFH paid substantial management fees to the Sponsors totaling nearly $200 million: $38 million, $37 million and $37 million for the years ended December 31, 2012, 2011 and 2010, respectively.  See EFH 2012 10-K, at 168.  At the same time EFH was borrowing from TCEH to pay its operating expenses and service its debt, it purchased (at a discount) at least $303 million in principal amount of TCEH debt securities.  Id. at 169.  EFH thus used the liquidity resulting from its borrowings from TCEH at a discount to purchase TCEH debt, on which TCEH paid EFH a market rate of interest.

35.    The loans made under the Notes therefore bore all the hallmarks of actual and constructive fraudulent transfers.  Indeed, EFH itself admitted that TCEH was insolvent at the time that it extended many of these loans by openly acknowledging that TCEH was insolvent as of December 31, 2010.  See Form 10-K of EFH for the fiscal year ended December 31, 2010 (the "EFH 2010 10-K"), at 23 ("Recent valuation analyses of TCEH's business indicate that the principal amount of its outstanding debt currently exceeds its enterprise value.").  Subsequent disclosure shows that TCEH remained insolvent thereafter.  See, e.g., EFH 2011 10-K, at 30

24

("Third party analyses of TCEH's business . . . have indicated that the principal amount of TCEH's outstanding debt exceeds its enterprise value.").

36.    Doubtlessly recognizing the potential legal challenges that parties would likely assert in connection with the intercompany lending arrangement should EFH and TCEH file for chapter 11 protection, EFH presumably sought to mitigate this liability—and the scrutiny of intercompany issues that such litigation would entail—by unwinding the arrangement.  In early 2013, EFH repaid the principal balance outstanding on the Notes.  EFH 2012 10-K, at 48.

37.    However, EFH failed to address the shortfall in interest payments that TCEH received over the life of the Notes.  In fact, the LIBOR plus 5.00% interest rate payable on each Note was substantially and materially lower than what any unaffiliated entity would have demanded from EFH in an arm's length transaction.  It thus appears that the vast majority of the loans from TCEH to EFH under the Notes were not made for reasonably equivalent value.

38.    Certain creditors of TCEH have already challenged EFH in connection with the unpaid interest on TCEH's demand Notes.  In March 2013, two funds filed a derivative complaint on behalf of TCEH against certain conflicted board members and TCEH's immediate parent, EFCH, in the United States District Court for the North District of Texas.  See Verified Creditor Derivative Complaint for Breach of Fiduciary Duty, Aurelius Capital Master, Ltd. v. Acosta, Case No. 13-01173 (N.D. Tex. Mar. 19, 2013) [Docket No. 1].  The basis of such litigation was that for years, management caused TCEH to make billions of dollars in loans to EFH (even as EFH's ratings eroded and the risk of default grew), but failed to ensure TCEH received an appropriate rate of interest.  Id. at ¶ 33.  These creditors sought to collect from the current and former directors of EFCH the difference between the interest paid and the market interest on the loans that such directors failed to cause TCEH to collect from EFH.  Id. at ¶ 3.

MIAMI 1006520

The complaint alleged that TCEH received approximately $725 million less in interest than it should have received had the corporate separateness between EFH and TCEH been respected. See id. at ¶ 7. The complaint was dismissed without prejudice on January 28, 2014 on standing grounds, without addressing the merits of the case. See Order, Aurelius Capital Master, Ltd. v. Acosta, Case No. 13-01173 (N.D. Tex. Jan. 28, 2014) [Docket No. 17].

39.    The procedural roadblocks that halted the prior litigation—that TCEH has no duty to creditors to collect unpaid interest—no longer remain. TCEH, as debtor in possession, can certainly prosecute avoidance actions, and TCEH's creditors may also prosecute avoidance actions on behalf of the estate in chapter 11. Moreover, any disinterested and independent fiduciary of TCEH would be obligated to conduct diligence and commence fraudulent transfer litigation against EFH in connection with the unpaid interest on the Notes. Such litigation would necessarily place TCEH in a directly adverse position with respect to EFH, as any recovery for the benefit of TCEH's unsecured creditors would come at the expense of EFH's creditors.

### c.    Inter-Debtor Disputes As To The Tax Consequences Of A "Spin-Off" Of The TCEH Debtors From EFH

40.    A central focus of any restructuring of the Debtors is anticipated to be a spin-off of the TCEH Debtors from EFH. As noted in the Form 8-K of EFH, EFCH and EFIH filed April 15, 2013 (the "April 8-K"), a separation of the TCEH business from the EFH consolidated tax group during a debt restructuring would have significant tax implications. See April 8-K, at 10. EFH has estimated, based on certain assumptions relating to the enterprise value of the TCEH Debtors and other matters, that such a separation "could produce a gain on sale of assets with a cash tax liability in excess of $2 billion." Id. That tax liability to the U.S. Treasury rests with EFH and any corporate member of the EFH consolidated tax group on a

26

several basis. See Treas. Reg. § 1-1502-6(A). The TCEH Debtors are not corporate members of the EFH consolidated tax group.[7] Therefore, the TCEH Debtors would not have any liability to EFH for the tax liability resulting from a separation of the TCEH Debtors from EFH.

41.    However, EFH and a number of its subsidiaries, including TCEH, purportedly entered into a Federal and State Income Tax Allocation Agreement Among the Members of the Energy Future Holdings Corp. Consolidated Group (the "TAA") dated May 15, 2012. The TAA purports to apply retroactively with an effective date of January 1, 2010.[8] Under the terms of the TAA, EFH is required to file a single consolidated U.S. federal income tax return on behalf of its subsidiaries, including EFCH, TCEH, EFIH and Oncor Holdings.[9] The TAA provides, among other things, that any corporate member or disregarded entity in the group is required to make payments to EFH in an amount equal to the hypothetical tax liability that such entity would owe to the IRS if it had filed a separate corporate tax return as a stand-alone entity.[10] The TAA further requires that EFH prepare a consolidated corporate tax return that it files with the IRS on behalf of the consolidated tax group and afterwards, each subsidiary pays the amount of its hypothetical tax liability to EFH.[11]

---

[7]    EFH is a corporate member of the "EFH consolidated group," while each of EFCH and TCEH is classified as a disregarded entity for U.S. federal income tax purposes.

[8]    The TAA appears as Exhibit 10(b) to the Form 10-Q of EFH for the quarterly period ended September 30, 2012 (the "EFH Third Quarter 2012 10-Q").

[9]    Like EFCH and TCEH, EFIH and Oncor Holdings are classified as disregarded entities for U.S. federal income tax purposes. Oncor, a direct subsidiary of Oncor Holdings, is a partnership for U.S. federal income tax purposes and is not a corporate member of the EFH consolidated group.

[10]    EFH, Oncor Holdings and Oncor are parties to a separate tax sharing agreement, which governs the computation of federal income tax liability between EFH, on one hand, and Oncor Holdings and Oncor, on the other hand.

[11]    In addition, according to Section 3(b) of the TAA, members of the consolidated group may use the net operating losses ("NOLs") generated by the other members subject to the TAA for their own tax benefit; however, the benefiting members must compensate the contributing subsidiaries for such use. As a result, intercompany liabilities may well exist among the subsidiaries that are signatories to the TAA for any prior use of NOLs for which compensation has not yet been paid.

MIAMI 1006520

42.     As stated above, any tax liability resulting from a separation of the TCEH Debtors from EFH would rest with EFH, the consolidated taxpayer.  Pursuant to the TAA, however, there is an argument that some portion of this statutory liability of EFH is a prepetition contractual liability of various TCEH Debtors.  This contractual liability, if triggered by a separation, could give rise to a significant intercompany claim by EFH against TCEH.

43.     The Debtors have entered into a restructuring support agreement that contemplates, among other things, that "TCEH shall distribute all of the Reorganized TCEH Common Stock it holds and the cash received from Reorganized TCEH to the Holders of TCEH First Lien Claims . . . ."  Declaration, Ex. D, Ex. A, at 16.  This is intended to result in a tax-free "reorganization" within the meaning of sections 368(a)(1)(G), 355 and 356 of the Internal Revenue Code.  See id. at 10, 16.  Typically, in the case of a "tax-free" spin-off transaction, no "step-up" in basis would occur, and instead, the holders of TCEH's first lien debt would receive the assets of the TCEH Debtors subject to a substantial deferred income tax liability.  See EFH considers tax-free spinoff; Apollo, Oaktree forge opposition, DEBTWIRE, Feb. 14, 2014 ("A step-up in basis equal to the purchase price could also create huge tax savings for lenders down the road . . . .  [A] tax-free spin-off is incompatible with a step-up in basis under the [Internal Revenue] [C]ode . . . .").  The Debtors' restructuring support agreement contemplates a transaction by which the TCEH Debtors' first lien lenders will receive just a partial "step-up" in basis equal to the sum of (i) TCEH's existing tax basis and (ii) 95% of the aggregate amount of deductions, net operating losses and capital losses (including carryforwards) available to the EFH consolidated group.  See Declaration, Ex. D, Ex. A, at 16-17.  The resulting tax basis will not equal the "step-up" in basis that would otherwise result from a taxable transaction, and thus, the TCEH Debtors will have a lower tax basis for purposes of depreciation, related deductions

and calculating any gain on sale. This lower tax basis may result in lesser value being ascribed to the TCEH Debtors' estates. EFH, however, will avoid incurring the massive tax liability that would result from a taxable transaction by which the TCEH Debtors are separate from EFH.

44.     How to allocate any tax liability that may result from a separation of the TCEH Debtors from EFH has been and will continue to be a key driver in determining how to restructure the liabilities of EFH and its subsidiaries, including TCEH. "The Debtors" and "their estates," however, have material conflicting interests that cannot be reconciled much less swept away by a restructuring support agreement. The Oncor Debtors and TCEH's first lien lenders will advocate for the "tax-free" spin-off of the TCEH Debtors described above. The TCEH Debtors' other stakeholders will advocate for disaggregation in the manner that maximizes the value of the TCEH Debtors' assets but will resist any allocation of EFH's statutory liability arising from a taxable transaction to their estates. Either way, this conflict is real and, in many respects, case determinative.

### 2.     Additional Intercompany Issues Are Likely To Arise

45.     In addition to the above-described intercompany claims and disputes, based upon publicly-available information only—and without the aid of any discovery or voluntary disclosures by EFH or its affiliates—there already appear to be several potential issues that will need to be investigated thoroughly to determine whether additional inter-Debtor claims exist that will affect joint prosecution of the Cases.

### a.     TCEH's Payments To Oncor For Delivery Of Electricity

46.     The retail operating subsidiaries of TCEH have made significant intercompany payments to Oncor for the delivery of electricity. EFH 2012 10-K, at 169. Those payments totaled approximately $1.0 billion in each of 2012, 2011, 2009 and 2008,

approximately $1.1 billion in 2010 and approximately $209 million for the period from October

11, 2007 through December 31, 2007. Id.; EFCH 2009 10-K, at 151. Although purportedly

purchased at tariffed rates equal to those paid by other retail electricity providers (EFH 2012 10-

K, at 169), diligence will be necessary to determine if in any instances, the rates paid by TCEH's

subsidiaries were in fact above-market, and thus, whether any portion of those significant

amounts paid constituted improper intercompany transfers to Oncor recoverable for the benefit

of the creditors of TCEH.

<b>b.</b>    <u><b>Allocations Of Overhead And Shared Services Agreement</b></u>

47.    Historically, a subsidiary of EFH bills EFH's other subsidiaries, including

TCEH, for information technology, financial, accounting and other administrative services

purportedly at cost. See EFCH 2012 10-K, at 142. Those costs to TCEH totaled $265 million in

2012, $213 million in 2011, $193 million in 2010, $82 million in 2009, $66 million in 2008 and

$16 million for the period from October 10, 2007 through December 31, 2007. Id.; EFCH 2009

10-K, at 151. Diligence will be necessary to determine if in any instances the amounts charged

for these services exceeded the cost thereof or were improperly allocated to TCEH rather than to

one of EFH's other subsidiaries. In either case, any payment for those services may have been

an improper intercompany transfer to EFH that is recoverable by TCEH.

48.    Moreover, the relationship between that EFH subsidiary and TCEH

repeatedly evolved throughout the year before the commencement of these chapter 11 cases. A

Shared Services Agreement was put into place on October 23, 2013, between Corporate Services

and the TCEH Debtors. Declaration, Ex. A, at 23. Pursuant to that agreement, Corporate

Services reportedly provided a range of services to the TCEH Debtors including back-office

services, employment of corporate-level employees, and payments directly to vendors on

30

account of TCEH Debtor expenses.  Id.  In exchange, the TCEH Debtors reportedly made cash payments to the EFH Money Pool Main Account that was managed by Corporate Services— approximately $2.235 billion in 2013 alone.  Id. at 24.

49.    In February 2014, however, this intercompany relationship morphed yet again, in a manner adverse to the interests of the TCEH Debtors.  Instead of continuing to make cash payment to Corporate Services, the Debtors disclose that "on February 18, 2014 TCEH LLC posted a deposit letter of credit in the total amount of $157.2 million to Corporate Services for amounts owing under the TCEH Shared Services Agreement, approximately $100 million of which has been drawn as of the Petition Date."  Id. at 24, n.20.

50.    This sequence of intercompany transactions raises a number of questions that must be fully explored.  Why was the historical intercompany relationship between the TCEH Debtors and Corporate Services modified in late October 2013?  What independent directors, if any, approved the new agreement on behalf of the TCEH Debtors?  What are the terms of the agreement, and was it amended, as the Debtors subtly imply?  Id. at 23 (defining the TCEH Debtors Shared Services Agreement "as amended").  Why did TCEH shift from cash-pay to a letter of credit mere months before the Petition Date, effectively siphoning over $100 million away from the estates of the TCEH Debtors?  In consideration for what services—and on whose authority—did Corporate Services draw $100 million from that letter of credit over the course of only two months (between February 14, 2014 and April 29, 2014)?

51.    The problem posed by joint administration of the Oncor Cases with the TCEH Cases is highlighted by the first day relief sought by "the Debtors" in connection with the Shared Services Agreement.  Corporate Services is a direct subsidiary of EFH, and both entities are signatories to the Debtors' restructuring support agreement which contemplates a plan of

reorganization that would extinguish EFH's equity interests in the TCEH Debtors. As such, Corporate Services is essentially a third-party stranger to the TCEH Cases.

52.    Nonetheless, by their first-day motions, "the Debtors" seek to have the cash management motion for Corporate Services heard jointly with that for the TCEH Debtors. But Corporate Services is in fact in direct conflict with the TCEH Debtors. With minimal disclosure, "the Debtors" seek authority under their cash management motion for the TCEH Debtors to pay approximately $70 million to Corporate Services, admittedly on account of a pre-petition claim. In other words," the Debtors" seek authority to pay $50 million more through their cash management motion than the amount they seek authorization to pay through their critical vendor motion. This amounts to nearly half of the $150 million that the Debtors disclose as available to compensate general unsecured creditors of the TCEH Debtors. See Motion of Energy Future Holdings Corp., et al., for Entry of an Order (A) Authorizing the Debtors to (I) Continue Using Their Existing Cash Management System, (II) Maintain Existing Bank Accounts and Business Forms, and (III) Continue Using Certain Investment Accounts; (B) Authorizing Continued Intercompany Transactions and Netting of Intercompany Claims; and (C) Granting Postpetition Intercompany Claims Administrative Expense Status, at 11, n.14.

53.    Moreover, the Debtors seek authority to continue the ongoing intercompany relationship between the TCEH Debtors and Corporate Services, notwithstanding that the TCEH Debtors paid more than $2 billion under this arrangement pre-petition. And the Debtors seek authority in paragraph 11 of the proposed order granting the Debtors' cash management motion for the TCEH Debtors to pay additional amounts to Corporate Services directors outside of this shared services contract and without input from any general unsecured creditors of the TCEH Debtors.

54.    In sum, viewing the Cases as a "Global Restructuring" to be jointly administered (as suggested by "the Debtors") serves to conceal the existence of value-driving conflicts between the TCEH Debtors and their legacy equity.

c.    **Allocation Of Fees Paid To Sponsors**

55.    EFH pays an annual management fee to the Sponsors pursuant to a management agreement.[12] EFH 2012 10-K, at 217.  Under the terms of that management agreement, affiliates of the Debtors' Sponsors provide management, consulting, financial and other advisory services to EFH.  Id.  In return, those affiliates are entitled to receive an aggregate annual management fee of $35 million, which amount increases 2% annually, and reimbursement of out-of-pocket expenses incurred in connection with the provision of services. Id.  The management agreement provides that it continues in effect from year to year, unless terminated upon a change of control of EFH or in connection with an initial public offering of EFH, or if the parties thereto mutually agree to terminate the agreement.  Id.  Pursuant to the management agreement, EFH paid the Sponsors $38 million in 2012, $37 million in both 2011 and 2010, $36 million in 2009, $35 million in 2008 and $8 million in 2007.[13] EFH 2012 10-K at 168; Form 10-K of EFH for the fiscal year ended December 31, 2009 (the "EFH 2009 10-K"), at 197.  It is not evident from the separate filings of EFCH with the SEC what portion of the management fee paid to the Sponsors is allocated to EFCH and, in turn, TCEH.  In addition, although the management agreement described the services to be provided as being "of the type customarily performed by such Managers[,]" (EFH 2007 10-K, Ex. 10(yyy)), it is difficult to

---

[12]    The management agreement, a letter agreement dated October 10, 2007, appears as Exhibit 10(yyy) to the EFH 2007 10-K.

[13]    Also, under terms of the management agreement, affiliates of the Sponsors and Lehman Brothers Inc. were paid transaction fees of $300 million for certain services provided in connection with the merger and related transactions.  EFH 2009 10-K, at 197.

MIAMI 1006520

discern what services the Sponsors have actually provided to EFH and its subsidiaries in exchange for the substantial management fees paid.  Further diligence is necessary to determine whether any issues exist with respect to the payment or allocation of the management fees, all of which would be released under the plan contemplated by the Debtors' restructuring support agreement.

<b>d.      Settlement Payment To Oncor In Connection With Transition<br>Bonds And Income Tax On Transition Surcharges Paid By Oncor</b>

56.      Disclosure in connection with two additional intercompany settlements between TCEH and Oncor is lacking.  The settlements relate to legislation passed by the Texas legislature in 1999 to restructure the electric utility industry and provide for a transition to competition.  Among other matters, the legislation permitted electric utilities to recover their generation-related regulatory assets and stranded costs by collecting "transition charges" from retail customers and issuing "transition bonds" secured by the transition charges.  Prospectus Supplement of Oncor Electric Delivery Bond Transition Company LLC and Oncor, filed August 18, 2003, at 44-45.

57.      Oncor's bankruptcy remote financing subsidiary, Oncor Electric Delivery Bond Transition Company LLC, issued transition bonds in 2003 and 2004.  EFH 2012 10-K, at 169.  In connection with the bond issuances, Oncor and TCEH entered into two agreements.  First, TCEH agreed to reimburse Oncor's incremental income taxes related to the transition charges it collects under a noninterest bearing note payable to Oncor that was to mature in 2016.  Id.  Second, TCEH agreed to reimburse Oncor's interest expenses on the transition bonds on a monthly basis.  Id.  There is no disclosure as to why TCEH undertook such obligations.

34

58.     In 2012, TCEH and Oncor settled the two agreements.  Id.  Under the settlement, TCEH paid $159 million in cash to Oncor.  Id.  In exchange, TCEH was released from its remaining obligations under the noninterest bearing note, the principal balance of which was $159 million at the time of the settlement, and remaining interest reimbursement obligations, which totaled $53 million at the August 2012 settlement date.  Id.; Form 10-K of Oncor for the fiscal year ended December 31, 2012 (the "Oncor 2012 10-K"), at 16.

59.     There is minimal disclosure regarding the fairness of the intercompany settlement.  Oncor states only that the settlements were "approved both by our board of directors and, from a related party transactions standpoint, by the Audit Committee of the board of directors."  Oncor 2012 10-K at 134.  EFH makes no disclosure regarding approval of the settlements.  Notably lacking is any formal settlement agreement, fairness opinion or minutes from a meeting of the EFH board, an executive committee or an audit committee.

### e.     Allocation Of Services

60.     Oncor pays EFH subsidiaries, including TCEH, for financial and other administrative services and shared facilities at cost.  EFH 2012 10-K, at 169.  Such amounts reduced reported selling, general and administrative expenses by $35 million, $38 million and $40 million for the fiscal years ended December 31, 2012, 2011 and 2010, respectively.  Id. at 65.  Diligence will be necessary to determine whether Oncor paid an appropriate rate for these services and shared facilities and whether payments were properly allocated to TCEH rather than to one of EFH's other subsidiaries.  Such information may reveal that additional expenses may be recovered by TCEH.

**D.    Even If The Court Does Not View The Inter-Debtor Conflicts Identified As Sufficient To Deny Joint Administration, The Court Must Not Order Joint Administration Until The Debtors Have Made The Necessary Disclosures Regarding All Inter-Debtor Conflicts Known To The Debtors**

61.    For the Court to consider—as it must—all potential conflicts, there must be "complete disclosure of all facts relevant to the issue." In re BH & P, Inc., 103 B.R. 556, 569 (Bankr. D. N.J. 1989), aff'd, 119 B.R. 35 (D. N.J. 1990), rev'd in part on other grounds, 949 F.2d 1300 (3d Cir. 1991). The burden of disclosing all facts relating to possible conflicts in the application for joint administration rests upon the applicant. Id. In the absence of complete disclosure by the applicant, an application for joint administration should be denied. Id. (vacating prior orders authorizing joint administration where applications did not disclose all facts relating to possible conflicts).

62.    Here, the Joint Administration Motion contains no disclosures of conflicts much less the requisite one. Likewise, no such disclosures are made in any of the first-day motions or supporting declarations. At the very least, prior to granting the Joint Administration Motion on a final basis, the Debtors must disclose to the Court and all parties how they intend to navigate the foregoing inter-Debtor disputes—as well as any other inter-Debtor issues that give rise to potential conflicts—before this Court undertakes to determine whether joint administration of the Cases is appropriate. See In re Ben Franklin Retail Stores, 214 B.R. 852, 857 (Bankr. N.D. Ill. 1997) ("[T]he court may not even order joint administration until after it has considered 'protecting creditors of different estates against potential conflicts of interest.'") (quoting Fed. R. Bankr. P. 1015(b)).

## RESERVATION OF RIGHTS

63.    The Ad Hoc Group of TCEH Unsecured Noteholders expressly reserves the right to supplement and amend this preliminary Objection, seek discovery with respect to the

36

same, and introduce evidence at any hearing relating to the Joint Administration Motion and this Objection.  Further, the Ad Hoc Group of TCEH Unsecured Noteholders reserves the right to respond, further object, join in, or amend any objection herein with respect to any argument or objection made by any person relating to the Joint Administration Motion.

## **CONCLUSION**

64.    Based on the foregoing, the Ad Hoc Group of TCEH Unsecured Noteholders respectfully requests that the Court deny the Joint Administration Motion to the extent it seeks joint administration of the chapter 11 cases of the TCEH Debtors with those of the Oncor Debtors.

MIAMI 1006520

Dated: April 30, 2014
       Wilmington, Delaware

                         FOX ROTHSCHILD LLP

                         By: _____
                             Jeffrey M. Schlerf (No. 3047)
                             John H. Strock (No. 4965)
                             L. John Bird (No. 5310)
                             919 North Market St., Suite 300
                             Wilmington, DE 19801
                             Telephone:  (302) 654-7444
                             Facsimile:  (302) 463-4971
                             jschlerf@foxrothschild.com
                             jstrock@foxrothschild.com
                             lbird@foxrothschild.com

                             and

                             WHITE & CASE LLP
                             Thomas E Lauria (admission *pro hac vice* pending)
                             Matthew C. Brown (admission *pro hac vice* pending)
                             Southeast Financial Center, Suite 4900
                             200 South Biscayne Blvd.
                             Miami, FL 33131
                             Telephone:  (305) 371-2700
                             Facsimile:  (305) 358-5744
                             tlauria@whitecase.com
                             mbrown@whitecase.com

                             J. Christopher Shore (admission *pro hac vice* pending)
                             Gregory M. Starner (admission *pro hac vice* pending)
                             1155 Avenue of the Americas
                             New York, NY 10036
                             Telephone:  (212) 819-8200
                             Facsimile:  (212) 354-8113
                             cshore@whitecase.com
                             gstarner@whitecase.com

                             *Counsel to the Ad Hoc Group of*
                             *TCEH Unsecured Noteholders*