# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) Case No. 14-10979-CSS |
| Debtors. | ) (Joint Administration Requested) |
| | ) **Re: D.I. 41** |

**DECLARATION OF TERRY L. NUTT IN SUPPORT OF THE MOTION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*, FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING THE DEBTORS TO (A) CONTINUE PERFORMING UNDER PREPETITION HEDGING AND TRADING ARRANGEMENTS, (B) PLEDGE COLLATERAL AND HONOR OBLIGATIONS THEREUNDER, AND (C) ENTER INTO AND PERFORM UNDER TRADING CONTINUATION AGREEMENTS AND NEW POSTPETITION HEDGING AND TRADING ARRANGEMENTS**

I, Terry L. Nutt, declare as follows:

1. I submit this declaration (this "Declaration") in response to a request for additional information from the U.S. Trustee about, and in further support of, the *Motion of Energy Future Holdings Corp., et al., for Entry of Interim and Final Orders Authorizing the Debtors to (A) Continue Performing Under Prepetition Hedging and Trading Arrangements, (B) Pledge Collateral and Honor Obligations Thereunder, and (C) Enter into and Perform Under Trading Continuation Agreements and New Postpetition Hedging and Trading Arrangements*

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which the debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

[D.I. 41] (the "Hedging and Trading Motion").[2] Specifically, this Declaration addresses the Interim Relief sought in the Hedging and Trading Motion, and further explains why the approval on an interim basis of the relief sought in that Motion is vital to the Debtors' business operations as well as certain proposed modifications to the Interim Order to which the Debtors have agreed.

## Background

2. I am the Vice President of Risk Management for EFH Corporate Services Company. My current responsibilities include enterprise-wide risk assessment and management, including managing market, credit, and operational risks for the Debtors' trading and marketing operations. I have been with the Company since 2007, and have served in my current role for the past three years.

3. The facts in this Declaration are based on my personal knowledge and review of information, my experience with the Company's operations (and specifically, with respect to its Hedging and Trading operations), and my experience and knowledge of the industry and general market conditions. If called to testify, I would testify to the facts set forth herein.

## Overview of Hedging and Trading Business

4. Luminant owns and operates fourteen power plants comprising 40 generation units. Luminant's total nameplate electricity generation capacity of 15,427 megawatts accounts for approximately 18% of the generation capacity for the ERCOT market.[3] Luminant sells approximately 50% of its electricity generation output to TXU Energy, and sells the remainder through bi-lateral sales to third parties or through sales directly to ERCOT. Luminant also owns and operates 12 surface lignite coal mines in Texas that supply coal to Luminant's lignite/coal-

---

[2] All capitalized terms used herein have the meaning given to them in the Hedging and Trading Motion.

[3] "Nameplate" capacity is an industry-standard term for the original design capacity of an electricity generation unit.

fueled units.[4] TXU Energy sells electricity to approximately 1.7 million residential and business customers, and is the single largest REP by customer count in Texas. Moreover, the Debtor's commodity hedging and trading activities related to the Hedging and Trading Arrangements associated with these operations noted above have delivered significant value to the Debtors.

5. As explained in the Hedging and Trading Motion, in general, the Hedging and Trading Activities and the Hedging and Trading Arrangements primarily mitigate the inherent risks that arise from the Debtors' assets and operations that result from changes in the price or availability of commodities. Such changes could materially impact the Debtors' overall revenues and costs. Specifically, the Hedging and Trading Activities and Hedging and Trading Arrangements allow the Debtors to utilize (a) physical commodity transactions to hedge price and delivery risk related to fuel inputs (including natural gas, coal, uranium, and fuel oil) to the Debtors' electricity generation and mining operations, (b) physical transactions for electricity and ancillary services produced and procured for the Debtors in their wholesale and retail electricity operations, and (c) financial derivatives that hedge price risk for both fuels and electricity generation.

6. Through the Hedging and Trading Activities and Hedging and Trading Arrangements, the Debtors are able to hedge against price fluctuations in these wholesale inputs, and thereby protect the economic value of their operations by preventing substantial declines in cash flows. The Debtors also conduct limited proprietary trading activities (*i.e.*, trading activities that are conducted solely to generate profits and not intended to hedge or mitigate risk) in certain commodities that are core to their wholesale power operations.

7. During the fiscal years 2009 through 2013, the Hedging and Trading Activities

---

[4] Of these mines, eight are active, three are in development, and one is currently idle.

provided a positive incremental return to the Debtors' underlying operations ranging from approximately $240 million to $425 million on an annual basis.

### The Hedging and Trading Activities and the Hedging and Trading Arrangements are Critical to the Debtors' Business

8. The Hedging and Trading Activities and the Hedging and Trading Arrangements mitigate two major types of risk: delivery risk and price risk.

9. Delivery risk relates to the Debtors' ability to obtain key commodity fuel inputs in a timely and cost-efficient fashion. If the Debtors do not have the required commodity or fuel (*i.e.*, coal, uranium, or natural gas), then they cannot run their operations.

10. Price risk relates to the Debtors' ability to acquire these key fuel inputs at the most optimal cost (*i.e.*, lowest cost) and highest revenue for electricity and ancillary services produced by the Debtors' assets.

11. Both delivery and price risk have routinely had real economic impacts on the Debtors' business due to the availability and pricing of the core commodities in the Debtors' operations. That is why the Hedging and Trading Arrangements are important to the Debtors' business.

12. As integrated business units, the Debtors' power producing, retail and energy trading businesses are highly integrated, and the Hedging and Trading Activities are at the center of those operations.

### The Consequences of Unavailability of Interim Relief

13. If the Debtors cannot obtain the interim relief sought in the Hedging and Trading Motion, the prepetition contracting parties may be able to terminate their Hedging and Trading Arrangements. Certain of the counterparties to the Hedging and Trading Arrangements, as counterparties to future, forward, and financial contracts, may be entitled to protection either as a

result of the "safe harbor" provisions of the Bankruptcy Code, or as a result of their status as secured creditors. As such, they may be entitled to terminate their hedging and trading contracts with the Debtors. Indeed, as of the time of the drafting of this Declaration, at least three counterparties to Hedging and Trading Arrangements have already terminated their contracts, which exposes the Debtors to significant earnings volatility related to the commodities that were hedged under those contracts.

14. The commodity and financial instrument trading sector has been historically and consistently resistant to conducting business with hedging and trading entities in financial distress. Counterparties seeking to terminate Prepetition Hedging and Trading Arrangements and discontinue activity prospectively will do so because of fear that a chapter 11 hedging and trading partner is operating outside of the ordinary course of business with respect to sophisticated transactions necessary to conduct the hedging and trading business. Further, the commodity and financial instrument trading sector maintains a skeptical perception that the hedging and trading partner presents an unacceptable level of risk exposure without adequate credit support.

15. At the same time, the Hedging and Trading Arrangements have historically provided the Debtors with annual returns in the hundreds of millions of dollars that add to and preserve value across all of the Debtors' operations. The Debtors would expect to lose these components of their revenue stream if counterparties to Prepetition Hedging and Trading Arrangements, who believe they are entitled to certain safe-harbor protections with respect to the automatic stay provided under the Bankruptcy Code (described in more detail below), terminate the Prepetition Hedging and Trading Arrangements or take other adverse action in response to the Debtors' inability to meet postpetition obligations.

16. The ability of the Debtors to continue to meet their collateral obligations during the Interim Period to maintain the protections afforded by the Hedging and Trading Arrangements is critical. Specifically, a failure by the Debtors to post credit support within the contractually required time period — which could be as little as a few hours after notice from the counterparty — would be considered a default under the applicable Hedging and Trading Arrangement. The counterparty involved in that arrangement would have the right to terminate and liquidate the applicable Hedging and Trading Arrangement, thereby creating risks to the Debtors' business.

### The Debtors' Risk Management Guidelines Provide Ample Protections Against Unacceptable Levels of Risk in the Hedging and Trading Arrangements

17. The primary method by which the Debtors govern and mitigate the inherent risk associated with entering into Hedging and Trading Arrangements is through the use of internal Risk Management Guidelines (the "Risk Management Guidelines"). (*See* Hedging and Trading Motion at ¶ 43 - 48.) These guidelines establish specific procedural protections to mitigate risk, including: the use of multiple valuation measures, collateralization limits, and trader limits. (*See* Hedging and Trading Motion at ¶ 53.)

18. The Risk Management Guidelines are generated by the Debtors to reflect the "best practice" guidelines established by the Committee of Chief Risk Officers, a nationally recognized, independent non-profit corporation comprised of risk management leaders in the energy field. The Debtors also evaluate the levels of risk associated with their Hedging and Trading Arrangements using an independent internal audit function, under the direction of the Debtors' audit committee, which routinely conducts internal audits of the Debtors' Hedging and Trading Activities and associated risk management activities. This review of the Debtors' Hedging and Trading Arrangements by its internal audit function includes the use of third party

6

subject matter experts in the field of energy trading and risk management to assist in the audit work.

19. As a further control on the levels of risk associated with the Debtors' Hedging and Trading Arrangements, the Debtors employ an internal hedging policy which establishes the parameters within which the Debtors may enter into Hedging Arrangements (the "<u>Internal Hedging Policy</u>"), which is the substantial notional amount of its Hedging and Trading Arrangements.[5] The Internal Hedging Policy generally restricts the Debtors' ability to enter into Hedging and Trading Arrangements with respect to commodities other than uranium and Powder River Basin coal that would result in the Debtors being party to Hedging and Trading Arrangements that, on an aggregate basis, hedge more than 100% of the Debtors' projected exposure to such commodity for calendar year 2014. In addition, the Internal Hedging Policy includes a restriction on the Debtors' ability to hedge or manage its exposure with respect to commodities other than uranium or Powder River Basin coal, on an aggregate basis, for calendar year 2015 (the "<u>Hedging Ceiling</u>").

## Proposed Modifications to the Interim Order

20. In response to concerns raised by the U.S. Trustee relating to the parameters of the Debtors' Hedging and Trading Motion, the Debtors have agreed to the following changes to the relief sought in the Interim Order:

---

[5] As set forth in the Interim Order and Final Order, subject to the Internal Hedging Policy (including any subsequent modification to such policy in a manner consistent with such Internal Hedging Policy, the Interim Order, and the Final Order), the Debtors shall not enter into wholesale Hedging and Trading Arrangements with a tenor beyond December 31, 2015. Furthermore, the Debtors shall not be permitted to amend the tenor and hedge limitations set forth in the Internal Hedging Policy, including, without limitation, the Hedging Ceiling in a manner that, in the Debtors' judgment, varies materially from the Debtors' historical hedging practices over the past two years without further order of the Court.

21. The Debtors have agreed that they will not enter into or perform under any new incremental proprietary trading transactions (*i.e.*, trading activities that are conducted solely to generate profits and not intended to hedge or mitigate risk) during the Interim Period; *provided*, the Debtors may, in the ordinary course of business, enter into and perform under any new proprietary trades entered into solely for the purpose of unwinding, managing risks relating to, or mitigating or limiting losses under proprietary trading transactions existing as of the Petition Date. As a result, during the Interim Period all of the Debtors' new Hedging and Trading Arrangements will relate solely to hedging risks related to the underlying operations of the business.

22. The Debtors have agreed to cut the Prepetition Collateral Cap by 5%.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: April 30, 2014

*[signature]*

Terry L. Nutt
Vice President, Risk Management
EFH Corporate Services Company