Exhibit 10.3

**EXECUTION COPY**

AMENDED AND RESTATED SECURITY AGREEMENT

THIS SECURITY AGREEMENT dated as of October 10, 2007, as amended and restated as of August 7, 2009, among Texas Competitive Electric Holdings Company LLC, a Delaware limited liability company (the "Company"), each of the Subsidiaries of the Company listed on the signature pages hereto or that becomes a party hereto pursuant to Section 8.13 (each such entity being a "Subsidiary Grantor" and, collectively, the "Subsidiary Grantors"; the Subsidiary Grantors and the Company are referred to collectively as the "Grantors") and Citibank, N.A., as Collateral Agent (in such capacity, the "Collateral Agent") under the Credit Agreement (as defined below) for the benefit of the First Lien Secured Parties (as defined below).

W I T N E S S E T H:

WHEREAS, the Company is party to the Credit Agreement, dated as of October 10, 2007 (as amended by Amendment No. 1 thereto, dated as of August 7, 2009 and as the same may be further amended, restated, supplemented or otherwise modified, refinanced or replaced from time to time, the "Credit Agreement") among US Holdings, the Company, the lending institutions from time to time parties thereto (the "Lenders"), Citibank, N.A., as Administrative Agent and as Collateral Agent, and the other agents and entities party thereto;

WHEREAS, (a) pursuant to the Credit Agreement, the Lenders have severally agreed to make Loans and Posting Advances to the Company and the Letter of Credit Issuers have agreed to issue Letters of Credit for the account of the Parent and its Subsidiaries upon the terms and subject to the conditions set forth therein, (b) one or more Cash Management Banks may from time to time enter into Secured Cash Management Agreements, (c) one or more Hedge Banks may from time to time enter into Secured Hedging Agreements and/or Secured Commodity Hedging Agreements and (d) the Loan Parties may incur Additional First Lien Obligations from time to time to the extent permitted by the Credit Agreement and each Additional First Lien Agreement (any extensions of credit to the Grantors as described in clauses (a), (b),(c) or (d), collectively, the "Extensions of Credit");

WHEREAS, pursuant to the Guarantee, dated as of October 10, 2007 (as the same may be amended, restated, supplemented or otherwise modified, refinanced or replaced from time to time, the "Guarantee"), Energy Future Competitive Holdings Company ("US Holdings") and each Subsidiary Grantor party thereto has unconditionally and irrevocably guaranteed, as primary obligor and not merely as surety, to the Collateral Agent for the benefit of the Secured Parties (as defined in the Credit Agreement) the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the Obligations (as such term is defined in the Credit Agreement);

WHEREAS, each Subsidiary Grantor may also unconditionally and irrevocably guaranty, as primary obligor and not merely as surety, for the benefit of the First Lien Secured Parties under any Additional First Lien Agreements, the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the Additional First Lien Obligations;

WHEREAS, each Subsidiary Grantor is a Guarantor and may be a guarantor of the Additional First Lien Obligations;

-1-

WHEREAS, the Grantors are similarly entering into on the date hereof, the Amended and Restated Pledge Agreement (the "Pledge Agreement") for the benefit of the First Lien Secured Parties, which agreement amends and restates the Pledge Agreement;

WHEREAS, the proceeds of the Extensions of Credit have been or will be, as the case may be, used in part to enable the Company to make valuable transfers to the Subsidiary Grantors in connection with the operation of their respective businesses;

WHEREAS, each Grantor acknowledges that it has derived or will derive, as the case may be, substantial direct and indirect benefit from the making of the Extensions of Credit;

WHEREAS, as a condition precedent to the obligation of the Lenders and the Letter of Credit Issuers to make their respective Extensions of Credit to the Company under the Credit Agreement, the Grantors executed and delivered a Security Agreement to the Collateral Agent for the benefit of the Secured Parties, dated as of October 10, 2007 (the "Original Security Agreement"); and

WHEREAS, it is a condition precedent to Amendment No. 1 to the Credit Agreement that the Grantors enter into this Amended and Restated Security Agreement for the benefit of the First Lien Secured Parties;

NOW, THEREFORE, in consideration of the premises and to induce the Administrative Agent, the Collateral Agent, the Lenders and the Letter of Credit Issuers to enter into Amendment No. 1 to the Credit Agreement and to induce the respective Lenders and the Letter of Credit Issuers to make their respective Extensions of Credit to the Company under the Credit Agreement, to induce each Cash Management Bank to enter into Secured Cash Management Agreements and to induce each Hedge Bank to enter into Secured Hedging Agreements and/or Secured Commodity Hedging Agreements with US Holdings, the Company and/or its Subsidiaries and to induce the holders of any Additional First Lien Obligations to make their respective Extensions of Credit thereunder, the Grantors hereby agree with the Collateral Agent, for the benefit of the First Lien Secured Parties, to amend and restate the Original Security Agreement as follows:

1. Defined Terms.

(a) Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

(b) Unless otherwise defined herein or in the Credit Agreement, terms defined in the Intercreditor Agreement shall have the meanings given to them in the Intercreditor Agreement

(c) Terms used herein without definition that are defined in the UCC have the meanings given to them in the UCC, including the following terms (which are capitalized herein): Account, As-Extracted Collateral, Certificated Securities, Chattel Paper, Commercial Tort Claim, Commodity Account, Commodity Contract, Documents, Fixtures, Instruments, Inventory, Letter-of-Credit Right, Securities, Securities Account, Security Entitlement, Supporting Obligation, and Tangible Chattel Paper.

(d) The following terms shall have the following meanings:

"Accession Agreement" shall have meaning provided to it in the Intercreditor Agreement.

"<u>Additional First Lien Agreement</u>" shall mean any indenture, credit agreement or other document, instrument or agreement, if any, pursuant to which any Grantor has or will incur Additional First Lien Obligations; provided that, in each case, the Indebtedness thereunder has been designated as Additional First Lien Obligations pursuant to and in accordance with Section 8.18.

"<u>Additional First Lien Obligations</u>" shall mean all advances to, and debts, liabilities, obligations, covenants and duties of, any Grantor arising under any Additional First Lien Agreement including, without limitation, Permitted Other Debt, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Grantor or any Affiliate thereof of any proceeding under any bankruptcy or insolvency law naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding, in each case, that have been designated as Additional First Lien Obligations pursuant to and in accordance with Section 8.18.

"<u>Additional First Lien Secured Party Consent</u>" shall mean a consent in the form of Annex C to this Security Agreement executed by the Authorized Representative of any holders of Additional First Lien Obligations pursuant to Section 8.18.

"<u>Applicable First Lien Representative</u>" shall mean, prior to the Non-Controlling Enforcement Date, the Administrative Agent, and on and after the Non-Controlling Enforcement Date, the Secured Debt Representative with respect to the Major Non-Controlling Series at such time.

"<u>Authorized Representative</u>" shall mean (i) the Administrative Agent with respect to the Credit Agreement and (ii) any duly authorized agent, trustee or representative of any other First Lien Secured Party under Additional First Lien Agreements designated as "Authorized Representative" for any First Lien Secured Party in an Additional First Lien Secured Party Consent delivered to the Collateral Agent.

"<u>Bundled Payment</u>" shall mean an amount paid or payable by an obligor to a Grantor pursuant to a bundled bill, which amount includes both (a) Excluded Property under clauses (a) or (c) (or both such clauses) of the definition of such term, and (b) other amounts.

"<u>Bundled Payment Amount</u>" shall mean amounts paid or payable to any Grantor and described in clause (b) of the definition of Bundled Payment.

"<u>Collateral</u>" shall have the meaning provided in Section 2.

"<u>Collateral Account</u>" shall mean any collateral account established by the Collateral Agent as provided in Section 5.1 or Section 5.3.

"<u>Collateral Agent</u>" shall have the meaning provided in the preamble to this Security Agreement.

"<u>Conduit Purchase Agreement</u>" means the Fourth Amended and Restated Trade Receivables Purchase and Sale Agreement, dated as of August 4, 2003, as amended, among TXU Receivables Company, as Seller, TXU Business Services Company, as Collection Agent, the purchasers party thereto, the Managing Agents party thereto, and the Administrative Agent named therein.

-3-

"<u>Copyright License</u>" shall mean any written agreement, now or hereafter in effect, granting any right to any third party under any copyright now or hereafter owned by any Grantor (including all Copyrights) or that any Grantor otherwise has the right to license, or granting any right to any Grantor under any copyright now or hereafter owned by any third party, and all rights of any Grantor under any such agreement.

"<u>copyrights</u>" shall mean, with respect to any Person, all of the following now owned or hereafter acquired by such Person: (i) all copyright rights in any work subject to the copyright laws of the United States or any other country, whether as author, assignee, transferee or otherwise, and (ii) all registrations and applications for registration of any such copyright in the United States or any other country, including registrations, recordings, supplemental registrations and pending applications for registration in the United States Copyright Office.

"<u>Copyrights</u>" shall mean all copyrights now owned or hereafter acquired by any Grantor, including those referred to on Schedule 1.

"<u>Credit Party</u>" shall mean the Company, US Holdings, the Subsidiary Grantors and each other Subsidiary of the Company that is a party to the Credit Agreement, any other Credit Document or any Additional First Lien Agreement.

"<u>Deposit Agreement</u>" shall mean the deposit agreement substantially in the form of Exhibit A hereto.

"<u>Deposit L/C Loan Collateral Account</u>" shall have the meaning set forth in the Deposit Agreement.

"<u>Energy Plaza Lessee</u>" shall have the meaning provided in Section 8.16.

"<u>equipment</u>" shall mean all "equipment," as such term is defined in Article 9 of the UCC, now or hereafter owned by any Grantor or to which any Grantor has rights and, in any event, shall include all machinery, equipment, furnishings, movable trade fixtures and vehicles now or hereafter owned by any Grantor or to which any Grantor has rights and any and all Proceeds, additions, substitutions and replacements of any of the foregoing, wherever located, together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto; but excluding equipment to the extent it is subject to a Lien, in each case permitted by the Credit Agreement and any equivalent provision of each Additional First Lien Agreement and the terms of the Indebtedness secured by such Lien prohibit assignment of, or granting of a security interest in, such Grantor's rights and interests therein (other than to the extent that any such prohibition would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the UCC (or any successor provision or provisions) of any relevant jurisdiction or any other applicable law), <u>provided</u>, that immediately upon the repayment of all Indebtedness secured by such Lien, such Grantor shall be deemed to have granted a Security Interest in all the rights and interests with respect to such equipment.

"<u>Event of Default</u>" shall mean an "Event of Default" under and as defined in the Credit Agreement or any Additional First Lien Agreement.

"<u>Excluded Lease Rights</u>" shall mean any Operating Lease Rights to the extent that, pursuant to the terms of an Operating Lease, the granting of a Security Interest or Lien in such Operating Lease Rights (i) would be prohibited without the consent by any other party thereto (other than a Credit

Party), unless all such consents have been obtained, or (ii) would represent a breach or default thereunder or give any other party thereto (other than a Credit Party) the right to terminate its obligations or the Grantor's rights thereunder with or without the lapse of time, the giving of notice, or both (other than to the extent that any such prohibition, restriction or obligation referred to in clauses (i) and (ii) would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the UCC (or any successor provision or provisions) of any relevant jurisdiction or any other applicable law) (it being understood that the foregoing shall not be deemed to obligate such Grantor to obtain such consent or comply with such obligations).

"Excluded Property" shall mean (a) Receivables Facility Assets purported to be sold, contributed or pledged by any Participating Receivables Grantor pursuant to a Permitted Receivables Financing (which shall be deemed to include "Receivable Assets" as defined in the Existing Securitization Documentation), (b) collections or proceeds of Receivables Facility Assets repurchased by a Participating Receivables Grantor pursuant to the provisions of a Permitted Receivables Financing, while such collections or proceeds are in a lockbox, collateral account or similar account established pursuant to such Permitted Receivables Financing to receive collections of Receivables Facility Assets or are in an account subject to an intercreditor agreement related to Transition Charges or Transition Property, (c) amounts payable to any Grantor that such Grantor is collecting on behalf of Persons that are not Grantors, including Transition Property and Transition Charges, and any customer deposits related to the foregoing, and (d) any Bundled Payment Amounts, while such Bundled Payment Amounts are in a lockbox, collateral account or similar account established pursuant to a Permitted Receivables Financing to receive collections of Receivables Facility Assets or are in an account subject to an intercreditor agreement related to Transition Charges or Transition Property.

"Existing Securitization Documentation" means the Conduit Purchase Agreement, the Parallel Purchase Commitment (as defined in the Conduit Purchase Agreement), the Receivables Contribution and Sale Agreement (as defined in the Conduit Purchase Agreement), and the other Transaction Documents (as defined in the Conduit Purchase Agreement), in each case as amended, and as may hereafter be amended, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms.

"Extensions of Credit" shall have the meaning assigned to such term in the recitals hereto.

"Financing Documents" shall have meaning provided to it in the Intercreditor Agreement.

"First Lien Obligations" shall mean collectively, the Obligations (as such term is defined in the Credit Agreement) and the Additional First Lien Obligations.

"First Lien Secured Parties" shall man collectively, the "Secured Parties" (as such term is defined in the Credit Agreement) and, if any, the holders of Additional First Lien Obligations and any Authorized Representative with respect thereto.

"General Intangibles" shall mean all "general intangibles" as such term is defined in Article 9 of the UCC and, in any event, including with respect to any Grantor, all contracts, agreements, instruments and indentures in any form, and portions thereof, to which such Grantor is a party or under which such Grantor has any right, title or interest or to which such Grantor or any property of such Grantor is subject, as the same may from time to time be amended, supplemented or otherwise modified,

including (a) all rights of such Grantor to receive moneys due and to become due to it thereunder or in connection therewith, (b) all rights of such Grantor to receive proceeds of any insurance, indemnity, warranty or guarantee with respect thereto, (c) all claims of such Grantor for damages arising out of any breach of or default thereunder and (d) all rights of such Grantor to terminate, amend, supplement, modify or exercise rights or options thereunder, to perform thereunder and to compel performance and otherwise exercise all remedies thereunder, in each case to the extent the grant by such Grantor of a Security Interest pursuant to this Security Agreement in its right, title and interest in any such contract, agreement, instrument or indenture (i) is not prohibited by such contract, agreement, instrument or indenture without the consent of any other party thereto (other than a Credit Party), (ii) would not give any other party (other than a Credit Party) to any such contract, agreement, instrument or indenture the right to terminate its obligations thereunder or (iii) is permitted with consent if all necessary consents to such grant of a Security Interest have been obtained from the other parties thereto (other than to the extent that any such prohibition referred to in clauses (i), (ii) and (iii) would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the UCC (or any successor provision or provisions) of any relevant jurisdiction or any other applicable law) (it being understood that the foregoing shall not be deemed to obligate such Grantor to obtain such consents), provided that the foregoing limitation shall not affect, limit, restrict or impair the grant by such Grantor of a Security Interest pursuant to this Security Agreement in any Subject Account or any money or other amounts due or to become due under any such contract, agreement, instrument or indenture.

"Grantor" shall have the meaning assigned to such term in the recitals hereto.

"Intellectual Property" shall mean all of the following now owned or hereafter acquired by any Grantor: (A) all Copyrights, Trademarks and Patents, and (B) all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise now owned or hereafter acquired, including (a) all information used or useful arising from the business including all goodwill, trade secrets, trade secret rights, know-how, customer lists, processes of production, ideas, confidential business information, techniques, processes, formulas and all other proprietary information, and (b) rights, priorities and privileges relating to the Copyrights, the Patents, the Trademarks and the Licenses and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom, in each case to the extent the grant by such Grantor of a Security Interest pursuant to this Security Agreement in any such rights, priorities and privileges relating to intellectual property (i) is not prohibited by any contract, agreement or other instrument governing such rights, priorities and privileges without the consent of any other party thereto (other than a Credit Party), (ii) would not give any other party (other than a Credit Party) to any such contract, agreement or other instrument the right to terminate its obligations thereunder or (iii) is permitted with consent if all necessary consents to such grant of a Security Interest have been obtained from the relevant parties (other than to the extent that any such prohibition referred to in clauses (i), (ii) and (iii) would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the UCC (or any successor provision or provisions) of any relevant jurisdiction or any other applicable law) (it being understood that the foregoing shall not be deemed to obligate such Grantor to obtain such consents).

"Investment Property" shall mean all Securities (whether certificated or uncertificated), Security Entitlements, Securities Accounts, Commodity Contracts and Commodity Accounts of any Grantor (other than (i) as pledged pursuant to the Pledge Agreement and (ii) any Excluded Stock or Stock Equivalents), whether now or hereafter acquired by any Grantor, except, in each case to the extent the grant by a Grantor of a Security Interest therein pursuant to this Security Agreement in its right, title and interest in any such Investment Property (i) is prohibited by any contract, agreement, instrument or

-6-

indenture governing such Investment Property without the consent of any other party thereto (other than a Credit Party or a wholly owned subsidiary of a Credit Party) unless such consent has been expressly obtained, or (ii) would give any other party (other than a Credit Party or a wholly owned subsidiary of a Credit Party) to any such contract, agreement, instrument or indenture the right to terminate its obligations thereunder (other than to the extent that any such prohibition referred to in clauses (i) and (ii) would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the UCC (or any successor provision or provisions) of any relevant jurisdiction or any other applicable law) (it being understood that the foregoing shall not be deemed to obligate any Grantor to seek or obtain any such consents referred to in clauses (i) or (ii) above).

"Lessor" shall have the meaning provided in Section 8.16.

"License" shall mean any Patent License, Trademark License, Copyright License or other license or sublicense to which any Grantor is a party.

"Operating Lease" shall mean any lease of any property (whether real, personal or mixed) by any Grantor as lessee that does not constitute a Capital Lease with respect to such Grantor.

"Operating Lease Rights" shall mean any property, rights or interests of an Grantor as lessee pursuant to an Operating Lease.

"Original Security Agreement" shall have the meaning assigned to such term in the recitals hereto.

"Participating Receivables Grantor" means any Grantor that is or becomes a participant in a Permitted Receivables Financing.

"Patent License" shall mean any written agreement, now or hereafter in effect, granting to any third party any right to make, use or sell any invention on which a patent, now or hereafter owned by any Grantor (including all Patents) or that any Grantor otherwise has the right to license, is in existence, or granting to any Grantor any right to make, use or sell any invention on which a patent, now or hereafter owned by any third party, is in existence, and all rights of any Grantor under any such agreement.

"patents" shall mean, with respect to any Person, all of the following now owned or hereafter acquired by such Person: (a) all letters patent of the United States or the equivalent thereof in any other country, all registrations and recordings thereof, and all applications for letters patent of the United States or the equivalent thereof in any other country, including registrations, recordings and pending applications in the United States Patent and Trademark Office or any similar offices in any other country, and (b) all reissues, continuations, divisions, continuations-in-part, renewals or extensions thereof, and the inventions disclosed or claimed therein, including the right to make, use and/or sell the inventions disclosed or claimed therein.

"Patents" shall mean all patents now owned or hereafter acquired by any Grantor, including those referred to on Schedule 2.

"Pledge Agreement" shall have the meaning assigned to such term in the recitals hereto.

-7-

"Proceeds" shall mean all "proceeds" as such term is defined in Article 9 of the UCC and, in any event, shall include with respect to any Grantor, any consideration received from the sale, exchange, license, lease or other disposition of any asset or property that constitutes Collateral, any value received as a consequence of the possession of any Collateral and any payment received from any insurer or other Person or entity as a result of the destruction, loss, theft, damage or other involuntary conversion of whatever nature of any asset or property that constitutes Collateral, and shall include (a) all cash and negotiable instruments received by or held on behalf of the Collateral Agent, (b) any claim of any Grantor against any third party for (and the right to sue and recover for and the rights to damages or profits due or accrued arising out of or in connection with) (i) past, present or future infringement of any Patent now or hereafter owned by any Grantor, or licensed under a Patent License, (ii) past, present or future infringement or dilution of any Trademark now or hereafter owned by any Grantor or licensed under a Trademark License or injury to the goodwill associated with or symbolized by any Trademark now or hereafter owned by any Grantor, (iii) past, present or future breach of any License and (iv) past, present or future infringement of any Copyright now or hereafter owned by any Grantor or licensed under a Copyright License and (c) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

"Properties" shall have the meaning provided in Section 8.16.

"Required Secured Parties" shall have meaning provided to it in the Intercreditor Agreement.

"Secured Obligations" shall have meaning provided to it in the Intercreditor Agreement.

"Security Agreement" shall mean this Security Agreement, as the same may be amended, supplemented or otherwise modified from time to time.

"Security Interest" shall have the meaning provided in Section 2.

"Subject Accounts" shall have the meaning provided in Section 5.1.

"Trademark License" shall mean any written agreement, now or hereafter in effect, granting to any third party any right to use any trademark now or hereafter owned by any Grantor (including any Trademark) or that any Grantor otherwise has the right to license, or granting to any Grantor any right to use any trademark now or hereafter owned by any third party, and all rights of any Grantor under any such agreement.

"trademarks" shall mean, with respect to any Person, all of the following now owned or hereafter acquired by such Person: (i) all trademarks, service marks, trade names, corporate names, company names, business names, fictitious business names, trade styles, trade dress, logos, other source or business identifiers, designs and general intangibles of like nature, now existing or hereafter adopted or acquired, all registrations and recordings thereof (if any), and all registration and recording applications filed in connection therewith, including registrations and registration applications in the United States Patent and Trademark Office or any similar offices in any State of the United States or any other country or any political subdivision thereof, and all extensions or renewals thereof, (ii) all goodwill associated therewith or symbolized thereby and (iii) all other assets, rights and interests that uniquely reflect or embody such goodwill.

-8-

"Trademarks" shall mean all trademarks now owned or hereafter acquired by any Grantor, including those referred to on Schedule 3; provided that any United States "intent to use" trademark applications for which a "statement of use" or "amendment to allege use" has not been filed and accepted in the United States Patent and Trademark Office (but only until such statement is filed and accepted), or to the extent that, and solely during the period in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark applications under applicable United States federal law, are excluded from this definition.

"Transition Charges" has the meaning ascribed to such term in Section 39.302(7) of the Texas Utilities Code.

"Transition Property" has the meaning ascribed to such term in Section 39.302(8) of the Texas Utilities Code.

"UCC" shall mean the Uniform Commercial Code as from time to time in effect in the State of New York; provided, however, that, in the event that, by reason of mandatory provisions of law, any of the attachment, perfection or priority of the Collateral Agent's and the First Lien Secured Parties' security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, the term "UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such attachment, perfection or priority and for purposes of definitions related to such provisions.

(e) The words "hereof", "herein", "hereto" and "hereunder" and words of similar import when used in this Security Agreement shall refer to this Security Agreement as a whole and not to any particular provision of this Security Agreement, and Section, subsection, clause and Schedule references are to this Security Agreement unless otherwise specified. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".

(f) The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(g) Where the context requires, terms relating to the Collateral or any part thereof, when used in relation to a Grantor, shall refer to such Grantor's Collateral or the relevant part thereof.

(h) References to "Lenders" in this Security Agreement shall be deemed to include Cash Management Banks and Hedge Banks.

(i) This Amended and Restated Security Agreement amends and restates the Original Security Agreement. The Obligations of the Grantors under the Original Security Agreement and the grant of security interest in the Collateral by the Grantors under the Original Security Agreement shall continue under this Amended and Restated Security Agreement, and shall not in any event be terminated, extinguished or annulled, but shall hereafter be governed by this Amended and Restated Security Agreement. All references to the Original Security Agreement in any Credit Document (other than this Amended and Restated Security Agreement) or other document or instrument delivered in connection therewith shall be deemed to refer to this Amended and Restated Security Agreement and the provisions hereof. It is understood and agreed that the Original Security Agreement is being amended and restated by entry into this Amended and Restated Security Agreement on the date hereof.

-9-

2. <u>Grant of Security Interest</u>.

(a) Each Grantor hereby bargains, sells, conveys, assigns, sets over, mortgages, pledges, hypothecates and transfers to the Collateral Agent, for the benefit of the First Lien Secured Parties, and grants to the Collateral Agent, for the benefit of the First Lien Secured Parties and confirms its prior grant to the Collateral Agent for the benefit of the Secured Parties of, a lien on and security interest in (the "<u>Security Interest</u>"), all of its right, title and interest in, to and under all of the following property now owned or at any time hereafter acquired by such Grantor or in which such Grantor now has or at any time in the future may acquire any right, title or interest (collectively, the "<u>Collateral</u>"), as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the First Lien Obligations:

(i) all Accounts;

(ii) all Chattel Paper;

(iii) all Documents;

(iv) all equipment and fixtures;

(v) all General Intangibles;

(vi) all Instruments;

(vii) all Intellectual Property;

(viii) all Inventory;

(ix) all Investment Property;

(x) all Supporting Obligations;

(xi) all Collateral Accounts;

(xii) the Deposit L/C Loan Collateral Account;

(xiii) all minerals, oil, gas and As-Extracted Collateral;

(xiv) all books and records pertaining to the Collateral; and

(xv) the extent not otherwise included, all Proceeds and products of any and all of the foregoing;

<u>provided</u>, that notwithstanding anything to the contrary in this Agreement (x) the Collateral shall exclude (A) Excluded Stock and Stock Equivalents or any other Stock or Stock Equivalents of any Person pledged (or specifically excluded from the pledge) pursuant to the Pledge Agreement, (B) Excluded Property, (C) motor vehicles and other assets subject to certificates of title, (D) Letter-of Credit Rights, (E) Commercial Tort Claims, (F) Excluded Lease Rights, (G) assets specifically requiring perfection through control agreements (other than the Deposit L/C Loan Collateral Account), (H) property or assets subject to capital

leases and purchase money obligations to the extent subject to a Lien, in each case permitted by the Credit Agreement and by each Additional First Lien Agreement, and the terms of the Indebtedness secured by such Lien prohibit assignment of, or granting of a security interest in, such Grantor's rights and interests therein (other than to the extent that any such prohibition would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the UCC (or any successor provision or provisions) of any relevant jurisdiction or any other applicable law), underlined provided, that immediately upon the repayment of all Indebtedness secured by such Lien, such Grantor shall be deemed to have granted a Security Interest in all the rights and interests with respect to such property or assets, and (I) any assets as to which the Collateral Agent and the Company have determined that the costs or other consequences (including adverse tax consequences) of providing a security interest in is excessive in view of the benefits to be gained thereby by the Lenders and (y) none of the items included in clauses (i) through (xiv) above shall constitute Collateral to the extent (and only to the extent) that the grant of the Security Interest therein would violate any Requirement of Law applicable to such Collateral.

(b) Each Grantor hereby irrevocably authorizes the Collateral Agent and its Affiliates, counsel and other representatives, at any time and from time to time, to file or record financing statements, amendments to financing statements and, with notice to the Company, other filing or recording documents or instruments with respect to the Collateral in such form and in such offices as the Collateral Agent reasonably determines appropriate to perfect the security interests of the Collateral Agent under this Security Agreement, and such financing statements and amendments may describe the Collateral covered thereby as "all assets", "all personal property" or words of similar effect; *provided* that, with respect to As-Extracted Collateral, the Collateral Agent shall only file or record financing statements in the Secretary of State or other central filing office of the jurisdiction of organization of a Grantor except in connection with a Mortgage. Each Grantor hereby also authorizes the Collateral Agent and its Affiliates, counsel and other representatives, at any time and from time to time, to file continuation statements with respect to previously filed financing statements.

Each Grantor hereby agrees to provide to the Collateral Agent, promptly upon request, any information reasonably necessary to effectuate the filings or recordings authorized by this Section 2(b).

The Collateral Agent is further authorized to file with the United States Patent and Trademark Office or United States Copyright Office (or any successor office) such documents as may be necessary or advisable for the purpose of perfecting, confirming, continuing, enforcing or protecting the Security Interest granted hereunder by each Grantor, without the signature of any Grantor, and naming any Grantor or the Grantors as debtors and the Collateral Agent (for the benefit of the First Lien Secured Parties), as the case may be, as secured party.

The Security Interests are granted as security only and shall not subject the Collateral Agent or any other First Lien Secured Party to, or in any way alter or modify, any obligation or liability of any Grantor with respect to or arising out of the Collateral.

(c) Notwithstanding anything to the contrary in this Section 2, at the Company's option, the term Collateral, as it refers to the Collateral securing Additional First Lien Obligations, shall not include any Stock and other securities of a Subsidiary to the extent that the pledge of such Stock and other securities would result in the Company being required to file separate financial statements of such Subsidiary with the SEC, but only to the extent necessary to not be subject to such requirement and only for so long as such requirement is in existence and only with respect to the relevant Additional First Lien

Obligations affected; <u>provided</u> that neither US Holdings, the Company nor any Subsidiary shall take any action in the form of a reorganization, merger or other restructuring a principal purpose of which is to provide for the release of the Lien on any Stock pursuant to this clause (ii). In addition, in the event that Rule 3-16 of Regulation S-X under the Securities Act of 1933, as amended ("Rule 3-16") is amended, modified or interpreted by the SEC to require (or is replaced with another rule or regulation, or any other law, rule or regulation is adopted, which would require) the filing with the SEC (or any other Governmental Authority) of separate financial statements of any Subsidiary of the Company due to the fact that such Subsidiary's Stock secures the Additional First Lien Obligations affected thereby, then the Stock of such Subsidiary will automatically be deemed not to be part of the Collateral securing the relevant Additional First Lien Obligations affected thereby but only to the extent necessary to not be subject to such requirement and only for so long as required to not be subject to such requirement. In such event, this Security Agreement may be amended or modified, without the consent of any First Lien Secured Party, to the extent necessary to release the Security Interests in favor of the Collateral Agent on the shares of Stock that are so deemed to no longer constitute part of the Collateral for the relevant Additional First Lien Obligations only. In the event that Rule 3-16 is amended, modified or interpreted by the SEC to permit (or is replaced with another rule or regulation, or any other law, rule or regulation is adopted, which would permit) such Subsidiary's Stock to secure the Additional First Lien Obligations in excess of the amount then pledged without the filing with the SEC (or any other Governmental Authority) of separate financial statements of such Subsidiary, then the Stock of such Subsidiary will automatically be deemed to be a part of the Collateral for the relevant Additional First Lien Obligations. For the avoidance of doubt and notwithstanding anything to the contrary in this Agreement, nothing in this clause (d) shall limit the pledge of such Stock and other securities from securing the Obligations (as defined in the Credit Agreement) at all times or from securing any Additional First Lien Obligations that are not in respect of securities subject to regulation by the SEC.

3. <u>Representations and Warranties</u>.

Each Grantor hereby represents and warrants to the Collateral Agent and each First Lien Secured Party that:

3.1. <u>Title; No Other Liens</u>. Except for (a) the Security Interest granted to the Collateral Agent for the benefit of the First Lien Secured Parties pursuant to this Security Agreement, (b) the Liens permitted under each of the Credit Agreement and each Additional First Lien Agreement and (c) any Liens securing Indebtedness which is no longer outstanding or any Liens with respect to commitments to lend which have been terminated, such Grantor owns each item of the Collateral free and clear of any and all Liens or claims of others. No security agreement, financing statement or other public notice with respect to all or any part of the Collateral that evidences a Lien securing any material Indebtedness is on file or of record in any public office, except such as (i) have been filed in favor of the Collateral Agent for the benefit of the First Lien Secured Parties pursuant to this Security Agreement or (ii) are permitted by each of the Credit Agreement and each Additional First Lien Agreement. For the avoidance of doubt, any reference herein to Liens permitted to be outstanding shall mean only Liens permitted to be outstanding under both the Credit Agreement (so long as it is in effect) and each Additional First Lien Agreement. The information set forth in the Perfection Certificate is complete and accurate in all respects as of the date hereof.

-12-

3.2. <u>Perfected First Priority Liens</u>.

(a) This Security Agreement is effective to create in favor of the Collateral Agent, for its benefit and for the benefit of the First Lien Secured Parties, legal, valid and enforceable Security Interests in the Collateral, subject to the effects of bankruptcy, insolvency or similar laws affecting creditors' rights generally and general equitable principles.

(b) Subject to the limitations set forth in clause (c) of this Section 3.2, the Security Interests granted pursuant to this Security Agreement (i) constitute and will continue to constitute valid and perfected Security Interests in the Collateral (as to which perfection may be obtained by the filings or other actions described in clause (A), (B), (C) or (D) of this paragraph, which actions have been taken prior to the date hereof to the extent required by the Original Security Agreement and shall continue to apply to the First Lien Obligations under this Security Agreement and other than with respect to any As-Extracted Collateral that requires the filing or recording of financing statements other than in the office of the Secretary of State or other central filing office in the jurisdiction of organization of the applicable Grantor in order to perfect) in favor of the Collateral Agent, for the benefit of the First Lien Secured Parties, as collateral security for the First Lien Obligations, as a result of (A) the completion of the filing in the applicable filing offices of all financing statements, in each case, naming each Grantor as "debtor" and the Collateral Agent as "secured party" and describing the Collateral, (B) delivery to the Collateral Agent (or its bailee) of all Instruments, Chattel Paper, Certificated Securities and negotiable Documents in each case, properly endorsed for transfer to the Collateral Agent or in blank, (C) delivery to the Collateral Agent of the fully executed Deposit Agreement and (D) completion of the filing, registration and recording of a fully executed agreement in the form hereof (or a supplement hereto) and containing a description of all Collateral constituting registered Patents and Trademarks in the United States Patent and Trademark Office (or any successor office) within a three month period (commencing as of the date of the Original Security Agreement) or, with respect to Collateral constituting United States Patents and United States registered Trademarks acquired after the date of the Original Security Agreement, within three months thereafter, and all Collateral constituting registered Copyrights in the United States Copyright Office (or any successor office) within a one month period (commencing as of the date of the Original Security Agreement) or, with respect to Collateral constituting registered United States Copyrights acquired after the date of the Original Security Agreement, within one month thereafter pursuant to 35 USC § 261, 15 USC § 1060 or 17 USC § 205 and the regulations thereunder, and otherwise as may be required pursuant to the laws of any other necessary jurisdiction to the extent that a security interest may be perfected by such filings, registrations and recordings, and (ii) are prior to all other Liens on the Collateral other than Liens permitted pursuant to Section 10.2 of the Credit Agreement and by the equivalent provisions of each Additional First Lien Agreement.

(c) Notwithstanding anything to the contrary herein, no Grantor shall be required to perfect the Security Interests granted by this Security Agreement by any means other than by (i) filings pursuant to the Uniform Commercial Code of the relevant State(s), (ii) filings approved by United States government offices with respect to Intellectual Property or (iii) delivery to the Collateral Agent (or its bailee) to be held in its possession of all Collateral consisting of Tangible Chattel Paper, Instruments, Certificated Securities or Negotiable Documents; *provided* that the Grantors shall not be required to deliver to the Collateral Agent any Tangible Chattel Paper, Instruments, Certificated Securities or Negotiable Documents with an individual fair market value of less than $10,000,000. Notwithstanding anything to the contrary herein, no Grantor shall be required to complete any filings or other actions with respect to the perfection of the security interests created hereby in any jurisdiction outside of the United States.

-13-

(d) It is understood and agreed that the Security Interests in Investment Property created hereunder shall not prevent the Grantors from using such assets in the ordinary course of their respective businesses.

3.3. Bundled Payments. As of the date hereof, it is not billing for, and has no, Bundled Payments.

4. Covenants.

Each Grantor hereby covenants and agrees with the Collateral Agent and the First Lien Secured Parties that, from and after the date of this Security Agreement until all Secured Obligations (other than contingent indemnification and reimbursement obligations) are paid in full, the Commitments are terminated and no Letters of Credit thereunder remains outstanding (or all such Letters of Credit shall have been cash collateralized):

4.1. Maintenance of Perfected Security Interest; Further Documentation.

(a) Such Grantor shall maintain the Security Interest created by this Security Agreement as a perfected Security Interest having at least the priority described in Section 3.1 and shall defend such Security Interest against the claims and demands of all Persons whomsoever, in each case subject to Section 3.2(c).

(b) Such Grantor will furnish to the Collateral Agent, the Lenders and any other First Lien Secured Parties from time to time statements and schedules further identifying and describing the assets and property of such Grantor and such other reports in connection therewith as the Collateral Agent may reasonably request. In addition, within 30 days after the end of each calendar quarter, such Grantor will deliver to the Collateral Agent a written supplement substantially in the form of Annex A hereto with respect to any additional Copyrights, Patents and Trademarks registered or applied for with the United States Patent and Trademark Office or the United States Copyright Office and acquired by such Grantor after the date hereof, all in reasonable detail.

(c) Subject to clause (d) below and Section 3.2(c), each Grantor agrees that at any time and from time to time, at the expense of such Grantor, it will execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements and other documents, including all applicable documents required under Section 3.2(b) (i)(C)), which may be required under any applicable law, or which the Collateral Agent or the Required Secured Parties may reasonably request, in order (i) to grant, preserve, protect and perfect the validity and priority of the Security Interests created or intended to be created hereby or (ii) to enable the Collateral Agent to exercise and enforce its rights and remedies hereunder with respect to any Collateral, including the filing of any financing or continuation statements under the Uniform Commercial Code in effect in any jurisdiction with respect to the Security Interests created hereby and all applicable documents required under Section 3.2(b)(i)(C), all at the expense of such Grantor.

(d) Notwithstanding anything in this Section 4.1 to the contrary, (i) with respect to any assets acquired by such Grantor after the date hereof that are required by the Credit Agreement or any Additional First Lien Agreement to be subject to the Lien created hereby or (ii) with respect to any Person that, subsequent to the date hereof, becomes a Domestic Subsidiary that is required by the Credit Agreement or any Additional First Lien Agreement to become a party hereto, the relevant Grantor after the

-14-

acquisition or creation thereof shall promptly take all actions required by the Credit Agreement, any Additional First Lien Agreement or this Section 4.1.

(e) The Collateral Agent has a first priority security interest in the Deposit L/C Loan Collateral Account which security interest is perfected by Control (as defined in Section 9-104 of the UCC). No Pledgor shall grant Control of the Deposit L/C Loan Collateral Account to any person other than the Collateral Agent and no Pledgor shall grant Control of any other Deposit Account to any other Person, except in connection with a Permitted Lien.

4.2. <u>Changes in Locations, Name, etc</u>. Each Grantor will furnish to the Collateral Agent promptly (and in any event within 30 days of such change) a written notice of any change (i) in its legal name, (ii) in its jurisdiction of organization or location for purposes of the UCC, (iii) in its identity or type of organization or corporate structure or (iv) in its Federal Taxpayer Identification Number or organizational identification number. Each Grantor agrees promptly to provide the Collateral Agent with certified organizational documents reflecting any of the changes described in the first sentence of this paragraph. Each Grantor also agrees promptly to notify the Collateral Agent if any material portion of the Collateral is damaged or destroyed.

4.3. <u>Notices</u>. Each Grantor will advise the Collateral Agent, the Lenders and each of the other First Lien Secured Parties promptly, in reasonable detail, of any Lien of which it has knowledge (other than the Security Interests created hereby or Liens permitted under each of the Credit Agreement and each Additional First Lien Agreement) on any of the Collateral which would adversely affect, in any material respect, the ability of the Collateral Agent to exercise any of its remedies hereunder.

4.4. <u>Bundled Payments</u>. From and after the date hereof, no Grantor shall voluntary include Bundled Payment Amounts in a bundled bill.

5. <u>Remedial Provisions</u>.

5.1. <u>Certain Matters Relating to Accounts</u>.

(a) At any time after the occurrence and during the continuance of an Event of Default and after giving reasonable written notice to the Company and any other relevant Grantor, the Applicable First Lien Representative shall have the right, but not the obligation, to instruct the Collateral Agent to (and upon such instruction, the Collateral Agent shall) make test verifications of the Accounts that are Collateral (the "<u>Subject Accounts</u>") in any manner and through any medium that such Applicable First Lien Representative reasonably considers advisable, and each Grantor shall furnish all such assistance and information as such Applicable First Lien Representative may require in connection with such test verifications. The Collateral Agent shall have the absolute right to share any information it gains from such inspection or verification with any First Lien Secured Party.

(b) The Collateral Agent hereby authorizes each Grantor to collect such Grantor's Subject Accounts and the Collateral Agent may curtail or terminate said authority at any time after the occurrence and during the continuance of an Event of Default. If required in writing by the Collateral Agent at any time after the occurrence and during the continuance of an Event of Default, any payments of Subject Accounts, when collected by any Grantor, (i) shall be forthwith (and, in any event, within two Business Days) deposited by such Grantor in the exact form received, duly endorsed by such Grantor to the Collateral Agent if required, in a Collateral Account maintained under the sole dominion and control

-15-

of and on terms and conditions reasonably satisfactory to the Collateral Agent, subject to withdrawal by the Collateral Agent for the account of the First Lien Secured Parties only as provided in Section 5.5, and (ii) until so turned over, shall be held by such Grantor in trust for the Collateral Agent and the First Lien Secured Parties, segregated from other funds of such Grantor. Each such deposit of Proceeds of Subject Accounts shall be accompanied by a report identifying in reasonable detail the nature and source of the payments included in the deposit.

(c) At the Collateral Agent's written request at any time after the occurrence and during the continuance of an Event of Default, each Grantor shall deliver to the Collateral Agent all original and other documents evidencing, and relating to, the agreements and transactions which gave rise to the Subject Accounts, including all original orders, invoices and shipping receipts.

(d) Upon the occurrence and during the continuance of an Event of Default, a Grantor shall not grant any extension of the time of payment of any of the Subject Accounts, compromise, compound or settle the same for less than the full amount thereof, release, wholly or partly, any Person liable for the payment thereof, or allow any credit or discount whatsoever thereon if the Collateral Agent shall have instructed the such Grantor in writing not to grant or make any such extension, credit, discount, compromise or settlement under any circumstances during the continuance of such Event of Default.

(e) At the direction of the Collateral Agent, upon the occurrence and during the continuance of an Event of Default, each Grantor shall grant to the Collateral Agent to the extent assignable, an irrevocable, non-exclusive, fully paid-up, royalty-free, worldwide license to use, assign, license or sublicense any of the Intellectual Property now owned or hereafter acquired by such Grantor. Such license shall include access to all media in which any of the licensed items may be recorded or stored and to all computer programs used for the compilation of printout thereof.

5.2. Communications with Credit Parties; Grantors Remain Liable.

(a) The Collateral Agent in its own name or in the name of others may at any time after the occurrence and during the continuance of an Event of Default, after giving reasonable written notice to the relevant Grantor of its intent to do so, communicate with obligors under the Subject Accounts to verify with them to the Collateral Agent's satisfaction the existence, amount and terms of any Subject Accounts. The Collateral Agent shall have the absolute right to share any information it gains from such inspection or verification with any First Lien Secured Party.

(b) Upon the written request of the Collateral Agent at any time after the occurrence and during the continuance of an Event of Default, each Grantor shall notify obligors on the Subject Accounts that the Subject Accounts have been assigned to the Collateral Agent for the benefit of the First Lien Secured Parties and that payments in respect thereof shall be made directly to the Collateral Agent.

(c) Anything herein to the contrary notwithstanding, each Grantor shall remain liable under each of the Subject Accounts to observe and perform all the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise thereto. Neither the Collateral Agent nor any First Lien Secured Party shall have any obligation or liability under any Subject Account (or any agreement giving rise thereto) by reason of or arising out of this Security Agreement or the receipt by the Collateral Agent or any First Lien Secured Party of any payment relating thereto, nor shall the Collateral Agent or any First Lien Secured Party be obligated in any manner to perform any of the obligations of any Grantor under or pursuant to any Subject Account (or any

-16-

agreement giving rise thereto), to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party thereunder, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

5.3. <u>Proceeds to be Turned Over to Collateral Agent</u>. In addition to the rights of the Collateral Agent and the First Lien Secured Parties specified in Section 5.1 with respect to payments of Subject Accounts, if an Event of Default shall occur and be continuing and the Collateral Agent so requires by notice in writing to the relevant Grantor (it being understood that the exercise of remedies by the First Lien Secured Parties pursuant to the Intercreditor Agreement in connection with an Event of Default under Section 11.5 of the Credit Agreement or the equivalent provisions of any Additional First Lien Agreement shall be deemed to constitute a request by the Collateral Agent for the purposes of this sentence and in such circumstances, no such written notice shall be required), all Proceeds received by any Grantor consisting of cash, checks and other near-cash items shall be held by such Grantor in trust for the Collateral Agent and the First Lien Secured Parties, segregated from other funds of such Grantor, and shall, forthwith upon receipt by such Grantor, be turned over to the Collateral Agent in the exact form received by such Grantor (duly endorsed by such Grantor to the Collateral Agent, if required). All Proceeds received by the Collateral Agent hereunder shall be held by the Collateral Agent in a Collateral Account maintained under its dominion and control and on terms and conditions reasonably satisfactory to the Collateral Agent. All Proceeds while held by the Collateral Agent in a Collateral Account (or by such Grantor in trust for the Collateral Agent and the First Lien Secured Parties) shall continue to be held as collateral security for all the First Lien Obligations and shall not constitute payment thereof until applied as provided in Section 5.4.

5.4. <u>Application of Proceeds</u>. The Collateral Agent shall apply the proceeds of any collection or sale of the Collateral as well as any Collateral consisting of cash, at any time after receipt in the order specified in Section 4.1 of the Intercreditor Agreement. Upon any sale of the Collateral by the Collateral Agent (including pursuant to a power of sale granted by statute or under a judicial proceeding), the receipt of the Collateral Agent or of the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to the Collateral Agent or such officer or be answerable in any way for the misapplication thereof.

5.5. <u>Code and Other Remedies</u>. If an Event of Default shall occur and be continuing, the Collateral Agent may exercise in respect of the Collateral, in addition to all other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party upon default under the UCC or any other applicable law and also may, with notice to the relevant Grantor, sell the Collateral or any part thereof in one or more parcels at one or more public or private sales, at any exchange, broker's board or office of the Collateral Agent or any Lender or elsewhere for cash or on credit or for future delivery at such price or prices and upon such other terms as are commercially reasonable irrespective of the impact of any such sales on the market price of the Collateral. The Collateral Agent shall be authorized at any such sale (if it deems it advisable to do so) to restrict the prospective bidders or purchasers of Collateral to Persons who will represent and agree that they are purchasing the Collateral for their own account for investment and not with a view to the distribution or sale thereof, and, upon consummation of any such sale, the Collateral Agent shall have the right to assign, transfer and deliver to the purchaser or purchasers thereof the Collateral so sold. Each purchaser at any such sale shall hold the property sold absolutely free from any claim or right on the part of any Grantor, and each Grantor hereby waives (to the extent permitted by law) all rights of redemption, stay and/or appraisal that it now has or

-17-

may at any time in the future have under any rule of law or statute now existing or hereafter enacted. The Collateral Agent and any First Lien Secured Party shall have the right upon any such public sale, and, to the extent permitted by law, upon any such private sale, to purchase the whole or any part of the Collateral so sold, and, subject to the terms of the Intercreditor Agreement, the Collateral Agent or such First Lien Secured Party may pay the purchase price by crediting the amount thereof against the First Lien Obligations. Each Grantor agrees that, to the extent notice of sale shall be required by law, at least ten days' notice to such Grantor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. The Collateral Agent shall not be obligated to make any sale of Collateral regardless of notice of sale having been given. The Collateral Agent may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned. To the extent permitted by law, each Grantor hereby waives any claim against the Collateral Agent arising by reason of the fact that the price at which any Collateral may have been sold at such a private sale was less than the price that might have been obtained at a public sale, even if the Collateral Agent accepts the first offer received and does not offer such Collateral to more than one offeree. Each Grantor further agrees, at the Collateral Agent's request to assemble the Collateral and make it available to the Collateral Agent, at places which the Collateral Agent shall reasonably select, whether at such Grantor's premises or elsewhere. The Collateral Agent shall apply the net proceeds of any action taken by it pursuant to this Section 5.5 in accordance with the provisions of Section 5.4.

5.6. Deficiency. Each Grantor shall remain liable for any deficiency if the proceeds of any sale or other disposition of the Collateral are insufficient to pay its First Lien Obligations and the reasonable and documented fees, disbursements and other charges of one firm of counsel and, if necessary, one firm of regulatory counsel and/or one firm of local counsel in each appropriate jurisdiction, to the Administrative Agent and Collateral Agent (and, in the case of an actual or perceived conflict of interest where the Person affected by such conflict informs the Company of such conflict and thereafter, after receipt of the consent of the Company (which consent shall not be unreasonably withheld or delayed), retains its own counsel, of another firm of counsel for such affected Person) to collect such deficiency.

5.7. Amendments, etc. with Respect to the First Lien Obligations; Waiver of Rights. Each Grantor shall remain obligated hereunder notwithstanding that, without any reservation of rights against any Grantor and without notice to or further assent by any Grantor, (a) any demand for payment of any of the First Lien Obligations made by the Collateral Agent or any other First Lien Secured Party may be rescinded by such party and any of the First Lien Obligations continued, (b) the First Lien Obligations, or the liability of any other party upon or for any part thereof, or any collateral security or guarantee therefor or right of offset with respect thereto, may, from time to time, in whole or in part, be renewed, extended, amended, modified, accelerated, compromised, waived, surrendered or released by the Collateral Agent or any other First Lien Secured Party, (c) the Credit Agreement, the other Credit Documents, the Letters of Credit, any Additional First Lien Agreement and any other documents executed and delivered in connection therewith and any Secured Cash Management Agreements, Secured Hedging Agreements, and Secured Commodity Hedging Agreement and any other documents executed and delivered in connection therewith may be amended, modified, supplemented or terminated, in whole or in part, as the Administrative Agent (or the Required Lenders, as the case may be, or, in the case of any Secured Cash Management Agreement, Secured Hedging Agreement or Secured Commodity Hedging Agreement, the applicable Cash Management Bank or Hedge Bank, or, in the case of any Additional First Lien Agreement, the trustee, agent or representative thereunder or the required lenders or holders thereunder) may deem advisable from time to time, and (d) any collateral security, guarantee or right of offset at any time held by the Collateral Agent or any other First Lien Secured Party for the payment of the First Lien Obligations may be sold, exchanged, waived, surrendered or released. Neither the Collateral Agent nor any

-18-

other First Lien Secured Party shall have any obligation to protect, secure, perfect or insure any Lien at any time held by it as security for the First Lien Obligations or for this Security Agreement or any property subject thereto. When making any demand hereunder against any Grantor, the Collateral Agent or any other First Lien Secured Party may, but shall be under no obligation to, make a similar demand on the Company or any Grantor or any other Person, and any failure by the Collateral Agent or any other First Lien Secured Party to make any such demand or to collect any payments from the Company or any Grantor or any other Person or any release of the Company or any Grantor or any other Person shall not relieve any Grantor in respect of which a demand or collection is not made or any Grantor not so released of its several obligations or liabilities hereunder, and shall not impair or affect the rights and remedies, express or implied, or as a matter of law, of the Collateral Agent or any other First Lien Secured Party against any Grantor. For the purposes hereof "demand" shall include the commencement and continuance of any legal proceedings.

6. The Collateral Agent.

6.1. Collateral Agent's Appointment as Attorney-in-Fact, etc.

(a) Each Grantor hereby appoints, which appointment is irrevocable and coupled with an interest, effective upon the occurrence and during the continuance of an Event of Default, the Collateral Agent and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Grantor and in the name of such Grantor or otherwise, for the purpose of carrying out the terms of this Security Agreement, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary or desirable to accomplish the purposes of this Security Agreement, and, without limiting the generality of the foregoing, each Grantor hereby gives the Collateral Agent the power and right, on behalf of such Grantor, either in the Collateral Agent's name or in the name of such Grantor or otherwise, without assent by such Grantor, to do any or all of the following, in each case after the occurrence and during the continuance of an Event of Default and after written notice by the Collateral Agent of its intent to do so:

(i) take possession of and endorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due under any Subject Account or with respect to any other Collateral and file any claim or take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Collateral Agent for the purpose of collecting any and all such moneys due under any Subject Account or with respect to any other Collateral whenever payable;

(ii) in the case of any Intellectual Property, execute and deliver, and have recorded, any and all agreements, instruments, documents and papers as the Collateral Agent may reasonably request to evidence the Collateral Agent's and the First Lien Secured Parties' Security Interest in such Intellectual Property and the goodwill and general intangibles of such Grantor relating thereto or represented thereby;

(iii) pay or discharge taxes and Liens levied or placed on or threatened against the Collateral;

(iv) execute, in connection with any sale provided for in Section 5.5, any endorsements, assignments or other instruments of conveyance or transfer with respect to the Collateral;

-19-

(v) obtain and adjust insurance required to be maintained by such Grantor pursuant to Section 9.3 of the Credit Agreement or any equivalent provision of any Additional First Lien Agreement;

(vi) direct any party liable for any payment under any of the Collateral to make payment of any and all moneys due or to become due thereunder directly to the Collateral Agent or as the Collateral Agent shall direct;

(vii) ask or demand for, collect and receive payment of and receipt for, any and all moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Collateral;

(viii) sign and endorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications, notices and other documents in connection with any of the Collateral;

(ix) commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Collateral or any portion thereof and to enforce any other right in respect of any Collateral;

(x) defend any suit, action or proceeding brought against such Grantor with respect to any Collateral (with such Grantor's consent to the extent such action or its resolution could materially affect such Grantor or any of its Affiliates in any manner other than with respect to its continuing rights in such Collateral);

(xi) settle, compromise or adjust any such suit, action or proceeding and, in connection therewith, give such discharges or releases as the Collateral Agent may deem appropriate (with such Grantor's consent to the extent such action or its resolution could materially affect such Grantor or any of its affiliates in any manner other than with respect to its continuing rights in such Collateral);

(xii) assign any Intellectual Property (along with the goodwill of the business to which any such Intellectual Property pertains), throughout the world for such term or terms, on such conditions, and in such manner, as the Collateral Agent shall in its reasonable business discretion determine; and

(xiii) generally, sell, transfer, pledge and make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Collateral Agent were the absolute owner thereof for all purposes, and do, at the Collateral Agent's option and such Grantor's expense, at any time, or from time to time, all acts and things that the Collateral Agent deems necessary to protect, preserve or realize upon the Collateral and the Collateral Agent's and the First Lien Secured Parties' Security Interests therein and to effect the intent of this Security Agreement, all as fully and effectively as such Grantor might do.

Anything in this Section 6.1(a) to the contrary notwithstanding, the Collateral Agent agrees that it will not exercise any rights under the power of attorney provided for in this Section 6.1(a) unless an Event of Default shall have occurred and be continuing.

(b) If any Grantor fails to perform or comply with any of its agreements contained herein, the Collateral Agent, at its option, but without any obligation so to do, may perform or comply, or otherwise cause performance or compliance, with such agreement.

(c) The expenses of the Collateral Agent incurred in connection with actions undertaken as provided in this Section 6.1 (to the extent required to be reimbursed by the Grantors pursuant to the Credit Documents), together with interest thereon at a rate per annum equal to the highest rate per annum at which interest would then be payable on any category of past due ABR Loans under the Credit Agreement (whether or not the Credit Agreement is then in effect), from the date of payment by the Collateral Agent to the date reimbursed by the relevant Grantor, shall be payable by such Grantor to the Collateral Agent on demand.

(d) Each Grantor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof. All powers, authorizations and agencies contained in this Security Agreement are coupled with an interest and are irrevocable until this Security Agreement is terminated and the Security Interests created hereby are released.

6.2. <u>Duty of Collateral Agent</u>. The Collateral Agent's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under Section 9-207 of the UCC or otherwise, shall be to deal with it in the same manner as the Collateral Agent deals with similar property for its own account. The Collateral Agent shall be deemed to have exercised reasonable care in the custody and preservation of any Collateral in its possession if such Collateral is accorded treatment substantially equal to that which the Collateral Agent accords its own property. Neither the Collateral Agent, any First Lien Secured Party nor any of their respective officers, directors, employees or agents shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of any Grantor or any other Person or to take any other action whatsoever with regard to the Collateral or any part thereof. The powers conferred on the Collateral Agent and the First Lien Secured Parties hereunder are solely to protect the Collateral Agent's and the First Lien Secured Parties' interests in the Collateral and shall not impose any duty upon the Collateral Agent or any First Lien Secured Party to exercise any such powers. The Collateral Agent and the First Lien Secured Parties shall be accountable only for amounts that they actually receive as a result of the exercise of such powers, and neither they nor any of their officers, directors, employees or agents shall be responsible to any Grantor for any act or failure to act hereunder, except for their own gross negligence or willful misconduct.

6.3. <u>Authority of Collateral Agent</u>. Each Grantor acknowledges that the rights and responsibilities of the Collateral Agent under this Security Agreement with respect to any action taken by the Collateral Agent or the exercise or non-exercise by the Collateral Agent of any option, voting right, request, judgment or other right or remedy provided for herein or resulting or arising out of this Security Agreement shall, as between the Collateral Agent and the First Lien Secured Parties, be governed by the Intercreditor Agreement, and by such other agreements with respect thereto as may exist from time to time among them, but, as between the Collateral Agent and the Grantors, the Collateral Agent shall be conclusively presumed to be acting as agent for the applicable First Lien Secured Parties with full and valid authority so to act or refrain from acting, and no Grantor shall be under any obligation, or entitlement, to make any inquiry respecting such authority.

6.4. <u>Security Interest Absolute</u>. All rights of the Collateral Agent hereunder, the Security Interest and all obligations of the Grantors hereunder shall be absolute and unconditional.

-21-

6.5. <u>Continuing Security Interest; Assignments Under the Credit Agreement; Release</u>.

(a) This Security Agreement shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon each Grantor and the successors and assigns thereof and shall inure to the benefit of the Collateral Agent and the other First Lien Secured Parties and their respective successors, indorsees, transferees and assigns until all Secured Obligations (other than any contingent indemnity obligations not then due) and the obligations of each Grantor under this Security Agreement shall have been satisfied by payment in full, the Commitments shall be terminated and no Letters of Credit shall be outstanding (or all such Letters of Credit shall have been fully Cash Collateralized or otherwise back-stopped to the reasonable satisfaction of the applicable Letter of Credit Issuers), notwithstanding that from time to time during the term of the Credit Agreement, any Additional First Lien Agreements and any Secured Cash Management Agreement, Secured Hedging Agreement or Secured Commodity Hedging Agreement the Credit Parties may be free from any First Lien Obligations.

(b) Subject to the terms of the Intercreditor Agreement, a Subsidiary Grantor shall automatically be released from its obligations hereunder and the Security Interest in the Collateral of such Subsidiary Grantor shall be automatically released (x) as it relates to the "Obligations" (as defined in the Credit Agreement), upon the consummation of any transaction permitted under the Credit Agreement as a result of which such Subsidiary Grantor ceases to be a Subsidiary Guarantor and (y) as it relates to the First Lien Obligations under any Additional First Lien Agreement, upon the consummation of any transaction permitted under such Additional First Lien Agreement, as a result of which such Subsidiary Guarantor ceases to be a guarantor under such Additional First Lien Agreement pursuant to the applicable provision(s) of such Additional First Lien Agreement.

(c) Subject to the terms of the Intercreditor Agreement, the Security Interest granted hereby in any Collateral shall automatically be released (i) if (and to the extent) provided in (A) Section 13.1 of the Credit Agreement and (B) any applicable provision of any Additional First Lien Agreement, (ii) upon the effectiveness of any written consent to the release of the security interest granted hereby in such Collateral pursuant to Section 13.1 of the Credit Agreement and any applicable provision of any Additional First Lien Agreement and (iii) as otherwise may be provided in the Intercreditor Agreement. Any such release in connection with any sale, transfer or other disposition of such Collateral shall result in such Collateral being sold, transferred or disposed of, as applicable, free and clear of the Lien and Security Interest created hereby.

(d) In connection with any termination or release pursuant to paragraph (a), (b) or (c), the Collateral Agent shall execute and deliver to any Grantor, at such Grantor's expense, all documents that such Grantor shall reasonably request to evidence such termination or release. Any execution and delivery of documents pursuant to this Section 6.5 shall be without recourse to or warranty by the Collateral Agent.

6.6. <u>Reinstatement</u>. Each Grantor further agrees that, if any payment made by any Credit Party or other Person and applied to the First Lien Obligations is at any time annulled, avoided, set aside, rescinded, invalidated, declared to be fraudulent or preferential or otherwise required to be refunded or repaid, or the Proceeds of Collateral are required to be returned by any First Lien Secured Party to such Credit Party, its estate, trustee, receiver or any other party, including any Grantor, under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or repayment, any Lien or other Collateral securing such liability shall be and remain in full force and effect, as fully as if such payment had never been made or, if prior thereto the Lien granted hereby or other

-22-

Collateral securing such liability hereunder shall have been released or terminated by virtue of such cancellation or surrender), such Lien or other Collateral shall be reinstated in full force and effect, and such prior cancellation or surrender shall not diminish, release, discharge, impair or otherwise affect any Lien or other Collateral securing the obligations of any Grantor in respect of the amount of such payment.

      7. <u>Collateral Agent as Agent</u>.

      (a) Citibank, N.A. has been appointed to act as the Collateral Agent under the Credit Agreement, by the Lenders under the Credit Agreement and, by their acceptance of the benefits hereof, the other First Lien Secured Parties. The Collateral Agent shall be obligated, and shall have the right hereunder, to make demands, to give notices, to exercise or refrain from exercising any rights, and to take or refrain from taking any action (including the release or substitution of Collateral), solely in accordance with this Security Agreement, the Credit Agreement and the Intercreditor Agreement, <u>provided</u> that the Collateral Agent shall exercise, or refrain from exercising, any remedies provided for in Section 5 in accordance with the instructions of the Required Secured Parties. In furtherance of the foregoing provisions of this Section 7(a), each First Lien Secured Party, by its acceptance of the benefits hereof, agrees that it shall have no right individually to realize upon any of the Collateral hereunder, it being understood and agreed by such First Lien Secured Party that all rights and remedies hereunder may be exercised solely by the Collateral Agent for the benefit of the applicable First Lien Secured Parties in accordance with the terms of this Section 7(a).

      (b) The Collateral Agent shall at all times be the same Person that is the Collateral Agent under the Credit Agreement. Written notice of resignation by the Collateral Agent pursuant to Section 12.9 of the Credit Agreement shall also constitute notice of resignation as Collateral Agent under this Security Agreement; removal of the Collateral Agent shall also constitute removal under this Security Agreement; and appointment of a Collateral Agent pursuant to Section 12.9 of the Credit Agreement shall also constitute appointment of a successor Collateral Agent under this Security Agreement. Upon the acceptance of any appointment as Collateral Agent under Section 12.9 of the Credit Agreement by a successor Collateral Agent, that successor Collateral Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring or removed Collateral Agent under this Security Agreement, and the retiring or removed Collateral Agent under this Security Agreement shall promptly (i) transfer to such successor Collateral Agent all sums, securities and other items of Collateral held hereunder, together with all records and other documents necessary or appropriate in connection with the performance of the duties of the successor Collateral Agent under this Security Agreement, and (ii) execute and deliver to such successor Collateral Agent or otherwise authorize the filing of such amendments to financing statements and take such other actions, as may be necessary or appropriate in connection with the assignment to such successor Collateral Agent of the Security Interests created hereunder, whereupon such retiring or removed Collateral Agent shall be discharged from its duties and obligations under this Security Agreement. After any retiring or removed Collateral Agent's resignation or removal hereunder as Collateral Agent, the provisions of this Security Agreement shall inure to its benefit as to any actions taken or omitted to be taken by it under this Security Agreement while it was Collateral Agent hereunder.

      (c) The Collateral Agent shall not be deemed to have any duty whatsoever with respect to any First Lien Secured Party that is a counterparty to a Secured Cash Management Agreement, Secured Commodity Hedging Agreement or Secured Hedging Agreement the obligations under which constitute First Lien Obligations, unless it shall have received written notice in form and substance satisfactory to the Collateral Agent from a Grantor or any such First Lien Secured Party as to the existence and terms of the applicable Secured Cash Management Agreement, Secured Commodity Hedging

Agreement or Secured Hedging Agreement, it being agreed by the Collateral Agent that delivery of a duly executed Accession Agreement pursuant to the terms of the Intercreditor Agreement shall comply with the requirements of this clause (c).

8. <u>Miscellaneous</u>.

8.1. <u>Amendments in Writing</u>. None of the terms or provisions of this Security Agreement may be waived, amended, supplemented or otherwise modified except by a written instrument executed by the affected Grantor and the Collateral Agent in accordance with Section 13.1 of the Credit Agreement and by each other party to the extent required by (and in accordance with) the Intercreditor Agreement.

8.2. <u>Notices</u>. All notices, requests and demands pursuant hereto shall be made in accordance with Section 13.2 of the Credit Agreement (whether or not then in effect). All communications and notices hereunder to any Subsidiary Grantor shall be given to it in care of the Company at the Company's address set forth in Section 13.2 of the Credit Agreement (whether or not then in effect) and all notices to any holder of obligations under any Additional First Lien Agreements, at its address set forth in the Additional First Lien Secured Party Consent, as such address may be changed by written notice to the Collateral Agent and the Company.

8.3. <u>No Waiver by Course of Conduct; Cumulative Remedies</u>. Neither the Collateral Agent nor any First Lien Secured Party shall by any act (except by a written instrument pursuant to Section 8.1), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Default or Event of Default or in any breach of any of the terms and conditions hereof. No failure to exercise, nor any delay in exercising, on the part of the Collateral Agent or any other First Lien Secured Party, any right, power or privilege hereunder shall operate as a waiver thereof. No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege. A waiver by the Collateral Agent or any other First Lien Secured Party of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy that the Collateral Agent or such other First Lien Secured Party would otherwise have on any future occasion. The rights, remedies, powers and privileges herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any other rights or remedies provided by law.

8.4. <u>Enforcement Expenses; Indemnification</u>.

(a) Each Grantor agrees to pay any and all reasonable and documented out-of-pocket costs and expenses (including all reasonable and documented fees, disbursements and other charges of one firm of counsel, and, if necessary, one firm of regulatory counsel and/or one firm of local counsel in each appropriate jurisdiction, in each case to the Administrative Agent and Collateral Agent (and, in the case of an actual or perceived conflict of interest where the Person affected by such conflict informs the Company of such conflict and thereafter, after receipt of the consent of the Company (which consent shall not be unreasonably withheld or delayed), retains its own counsel, of another firm of counsel for such affected Person)) that may be paid or incurred by any First Lien Secured Party in enforcing, or obtaining advice of counsel in respect of, any rights with respect to, or collecting, any or all of the First Lien Obligations and/or enforcing any rights with respect to, or collecting against, such Grantor under this Security Agreement.

-24-

(b) Each Grantor agrees to pay, and to save the Collateral Agent and the First Lien Secured Parties harmless from, any and all liabilities with respect to, or resulting from any delay in paying, any and all stamp, excise, sales or other taxes which may be payable or determined to be payable with respect to any of the Collateral or in connection with any of the transactions contemplated by this Security Agreement, other than Excluded Taxes and any interest, penalties or expenses caused by the Collateral Agent's or a First Lien Secured Party's gross negligence or willful misconduct.

(c) Each Grantor agrees to pay, and to save the Collateral Agent and the First Lien Secured Parties harmless from, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Security Agreement to the extent the Company would be required to do so pursuant to Section 13.5 of the Credit Agreement (whether or not then in effect).

(d) The agreements in this Section 8.4 shall survive repayment of the First Lien Obligations and all other amounts payable under the Credit Agreement, the other Financing Documents any additional First Lien Agreement.

8.5. <u>Successors and Assigns</u>. The provisions of this Security Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Grantor may assign, transfer or delegate any of its rights or obligations under this Security Agreement without the prior written consent of the Collateral Agent except pursuant to a transaction permitted by both the Credit Agreement and each Additional First Lien Agreement.

8.6. <u>Counterparts</u>. This Security Agreement may be executed by one or more of the parties to this Security Agreement on any number of separate counterparts (including by facsimile or other electronic transmission (e.g., a "pdf" or "tif" file)), and all of said counterparts taken together shall be deemed to constitute one and the same instrument. A set of the copies of this Security Agreement signed by all the parties shall be lodged with the Collateral Agent and the Company.

8.7. <u>Severability</u>. Any provision of this Security Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. The parties hereto shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

8.8. <u>Section Headings</u>. The Section headings used in this Security Agreement are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation hereof.

8.9. <u>Integration</u>. This Security Agreement together with the other Credit Documents and each Additional First Lien Agreement represents the agreement of each of the Grantors with respect to the subject matter hereof and there are no promises, undertakings, representations or warranties by the Collateral Agent or any other First Lien Secured Party relative to the subject matter hereof not expressly set forth or referred to herein or in the other Credit Documents and each Additional First Lien Agreement.

-25-

8.10. **GOVERNING LAW. THIS SECURITY AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.**

8.11. <u>Submission to Jurisdiction Waivers</u>. Each party hereto hereby irrevocably and unconditionally:

(a) submits for itself and its property in any legal action or proceeding relating to this Security Agreement, the other Credit Documents to which it is a party and any Additional First Lien Agreement to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of the courts of the State of New York, the courts of the United States of America for the Southern District of New York, and appellate courts from any thereof;

(b) consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c) agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Person at its address referred to in Section 8.2 or at such other address of which the Collateral Agent shall have been notified pursuant thereto;

(d) agrees that nothing herein shall affect the right of any other party hereto (or any First Lien Secured Party) to effect service of process in any other manner permitted by law or shall limit the right of any party hereto (or any First Lien Secured Party) to sue in any other jurisdiction;

(e) waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section 8.11 any special, exemplary, punitive or consequential damages; and

(f) agrees that a final judgment in any action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Applicable Law.

8.12. <u>Acknowledgments</u>. Each party hereto hereby acknowledges that:

(a) it has been advised by counsel in the negotiation, execution and delivery of this Security Agreement and the other Credit Documents to which it is a party;

(b) neither the Collateral Agent nor any other First Lien Secured Party has any fiduciary relationship with or duty to any Grantor arising out of or in connection with this Security Agreement or any of the other Credit Documents, and the relationship between the Grantors, on the one hand, and the Collateral Agent and the other First Lien Secured Parties, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

-26-

(c) no joint venture is created hereby or by the other Credit Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders and any other First Lien Secured Party or among the Grantors and the Lenders and any other First Lien Secured Party.

8.13. <u>Additional Grantors</u>. Each Subsidiary of the Company that is required to become a party to this Security Agreement pursuant to Section 9.11 of the Credit Agreement and/or the equivalent provision of any Additional First Lien Agreement shall become a Grantor, with the same force and effect as if originally named as a Grantor herein, for all purposes of this Security Agreement upon execution and delivery by such Subsidiary of a written supplement substantially in the form of Annex B hereto or in such other form reasonably satisfactory to the Collateral Agent. The execution and delivery of any instrument adding an additional Grantor as a party to this Security Agreement shall not require the consent of any other Grantor hereunder. The rights and obligations of each Grantor hereunder shall remain in full force and effect notwithstanding the addition of any new Grantor as a party to this Security Agreement.

8.14. **WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS SECURITY AGREEMENT, ANY OTHER CREDIT DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.**

8.15. <u>Oncor Separateness</u>.

(a) The Collateral Agent, on behalf of itself and the First Lien Secured Parties, acknowledges (i) the legal separateness of the Company and the Grantors from Oncor Holdings and its Subsidiaries, (ii) that the lenders under the Oncor Credit Facility and the noteholders under Oncor and its Subsidiaries' indentures have likely advanced funds thereunder in reliance upon the separateness of Oncor and its Subsidiaries (and in the case of the Oncor Credit Facility, Oncor Holdings and its respective Subsidiaries) from the Company and the Grantors, (iii) that Oncor Holdings and its Subsidiaries have assets and liabilities that are separate from those of Energy Future Holdings Corp. and its other Subsidiaries, (iv) that the First Lien Obligations owing under the Credit Documents and any Additional First Lien Agreement are obligations and liabilities of the Company and the Guarantors only, and are not the obligations or liabilities of Oncor Holdings or any of its Subsidiaries, (v) that the First Lien Secured Parties shall look solely to the Company, the Guarantors and their assets, and not to any assets, or to the pledge of any assets, owned by Oncor Holdings or any of its Subsidiaries, for the repayment of any amounts payable pursuant to the Credit Documents or any Secured Cash Management Agreement, Secured Hedging Agreement or Secured Commodity Hedging Agreement and for satisfaction of any other First Lien Obligations owing to the Secured Parties under the Credit Documents or any Secured Cash Management Agreement, Secured Hedging Agreement or Secured Commodity Hedging Agreement, and (vi) that none of Oncor Holdings or its Subsidiaries shall be personally liable to the First Lien Secured Parties for any amounts payable, or any other liability, under the Credit Documents, any Additional First Lien Agreement or any Secured Cash Management Agreement, Secured Hedging Agreement or Secured Commodity Hedging Agreement.

(b) The Collateral Agent, on behalf of itself and the First Lien Secured Parties, shall not (i) initiate any legal proceeding to procure the appointment of an administrative receiver, or (ii) institute any bankruptcy, reorganization, insolvency, winding up, liquidation, or any like proceeding under applicable law, against Oncor Holdings, Oncor, or any of their Subsidiaries, or against any of Oncor Holdings's, Oncor's, or any of their Subsidiaries' assets. The Collateral Agent, on behalf of itself and the

-27-

First Lien Secured Parties, acknowledges and agrees that each of Oncor Holdings, Oncor, and their Subsidiaries is a third party beneficiary of the forgoing covenant and shall have the right to specifically enforce such covenant in any proceeding at law or in equity.

8.16. <u>Energy Plaza Lease</u>. To the extent not prohibited by the Credit Agreement or any Additional First Lien Agreement, each Grantor (including each additional Grantor pursuant to Section 8.13 hereof) hereby irrevocably waives and releases, for the benefit of the Energy Plaza Lessee (as hereinafter defined), any direct or indirect right of reimbursement, subrogation or other claims which such Grantor may now or in the future have against the Energy Plaza Lessee with respect to any Qualified Letter of Credit (as defined in the First Amendment to Lease Agreement) dated as of June 1, 2007 between U.S. Bank, N.A. (as successor-in-interest to State Street Bank and Trust Company of Connecticut, National Association), as owner trustee of the ZSF/Dallas Tower Trust, a Delaware grantor trust (as trustee only, and not individually) ("<u>Lessor</u>"), and TXU Properties Company, a Texas corporation ("<u>Properties</u>"), including any amounts drawn under the Qualified Letter of Credit. "<u>Energy Plaza Lessee</u>" means Properties or a successor or assignee in its capacity as "Lessee" pursuant to the Lease dated as of February 14, 2002 between Lessor and Properties, as from time to time amended, modified, amended and restated or replaced, relating to the property currently or previously known as Energy Plaza in Dallas, Texas. This Section 8.16 shall be enforceable by the Energy Plaza Lessee, notwithstanding the fact that it is not a party to this Agreement. Nothing in this Section 8.16 shall be construed to modify the relative rights and obligations of the Collateral Agent, the First Lien Secured Parties and Grantors described elsewhere in this Security Agreement, any other Credit Document or any Additional First Lien Agreement.

8.17. <u>Intercreditor Agreement</u>. Notwithstanding any provision to the contrary in this Security Agreement, this Security Agreement is subject to the provisions of the Intercreditor Agreement, which provisions shall supercede and control any conflicting provisions in this Security Agreement.

8.18. <u>Additional First Lien Obligations</u>. On or after the date hereof and so long as expressly permitted by the Credit Agreement and any Additional First Lien Agreement then outstanding, the Company may from time to time designate Indebtedness at the time of incurrence to be secured on a pari passu basis with the First Lien Obligations as Additional First Lien Obligations hereunder by delivering to the Collateral Agent and each Authorized Representative (a) a certificate signed by an Authorized Officer of the Company (i) identifying the obligations so designated and the initial aggregate principal amount or face amount thereof, (ii) stating that such obligations are designated as Additional First Lien Obligations for purposes hereof, (iii) representing that such designation of such obligations as Additional First Lien Obligations complies with the terms of the Credit Agreement and any Additional First Lien Agreement then outstanding and (iv) specifying the name and address of the Authorized Representative for such obligations and (b) a fully executed Additional First Lien Secured Party Consent (in the form attached as Annex C). Each Authorized Representative agrees that upon the satisfaction of all conditions set forth in the preceding sentence and those set forth in Section 5.6 of the Intercreditor Agreement, the Collateral Agent shall act as agent under and subject to the terms of the Security Documents for the benefit of all First Lien Secured Parties, including without limitation, any First Lien Secured Parties that hold any such Additional First Lien Obligations, and each Authorized Representative agrees to the appointment, and acceptance of the appointment, of the Collateral Agent as agent for the holders of such Additional First Lien Obligations as set forth in each Additional First Lien Secured Party Consent and agrees, on behalf of itself and each First Lien Secured Party it represents, to be bound by this Agreement and the Intercreditor Agreement.

[Signature Pages Follow]

-28-

IN WITNESS WHEREOF, each of the undersigned has caused this Security Agreement to be duly executed and delivered as of the date first above written.

TEXAS COMPETITIVE ELECTRIC HOLDINGS
COMPANY LLC

By: _____ /s/   Anthony R. Horton
Name:                          Anthony R. Horton
Title:                              Treasurer

BIG BROWN 3 POWER COMPANY LLC
BIG BROWN LIGNITE COMPANY LLC
BIG BROWN POWER COMPANY LLC
COLLIN POWER COMPANY LLC
DECORDOVA POWER COMPANY LLC
DFW MIDSTREAM SERVICES LLC
GENERATION MT COMPANY LLC
GENERATION SVC COMPANY
LAKE CREEK 3 POWER COMPANY LLC
LUMINANT BIG BROWN MINING COMPANY LLC
LUMINANT ENERGY COMPANY LLC
LUMINANT ENERGY SERVICES COMPANY
LUMINANT GENERATION COMPANY LLC
LUMINANT HOLDING COMPANY LLC
LUMINANT MINERAL DEVELOPMENT COMPANY LLC
LUMINANT MINING COMPANY LLC
LUMINANT MINING SERVICES COMPANY
LUMINANT POWER SERVICES COMPANY
LUMINANT RENEWABLES COMPANY LLC
MARTIN LAKE 4 POWER COMPANY LLC
MONTICELLO 4 POWER COMPANY LLC
MORGAN CREEK 7 POWER COMPANY LLC
NCA RESOURCES DEVELOPMENT
COMPANY LLC
OAK GROVE MANAGEMENT COMPANY LLC
OAK GROVE MINING COMPANY LLC
OAK GROVE POWER COMPANY LLC
SANDOW POWER COMPANY LLC
TCEH FINANCE, INC.
TRADINGHOUSE 3 & 4 POWER COMPANY LLC
TRADINGHOUSE POWER COMPANY LLC
TXU CHILLED WATER SOLUTIONS COMPANY

[SIGNATURE PAGE TO AMENDED AND RESTATED SECURITY AGREEMENT]

TXU ENERGY RETAIL COMPANY LLC
TXU ENERGY RETAIL MANAGEMENT
COMPANY LLC
TXU ENERGY SOLUTIONS COMPANY LLC
TXU ENERGY TRADING (CALIFORNIA)
COMPANY
TXU ET SERVICES COMPANY
TXU RETAIL SERVICES COMPANY
TXU SEM COMPANY
TXU SESCO COMPANY LLC
TXU SESCO ENERGY SERVICES COMPANY
VALLEY NG POWER COMPANY LLC
VALLEY POWER COMPANY LLC
WICHITA/VICTORY AVE., LLC


By: _____ /s/ Anthony R. Horton
Name:                        Anthony R. Horton
Title:                              Treasurer

[SIGNATURE PAGE TO AMENDED AND RESTATED SECURITY AGREEMENT]

**CITIBANK, N.A.**, as Collateral Agent

By: _____ /s/   NIETZSCHE RODRICKS

Name:                                   NIETZSCHE RODRICKS

Title:                                              Vice President

[Signature Page A&R Security Agreement]

<u>Schedule 1</u>

<u>Copyrights</u>

[The copyright registrations and applications listed on Schedule 7(b) of the Perfection Certificate are incorporated by reference herein.]

Patents

[The patent registrations and applications listed on Schedule 7(a) of the Perfection Certificate are incorporated by reference herein.]

Schedule 3

<u>Trademarks</u>

[The trademark registrations and applications listed on Schedule 7(a) of the Perfection Certificate are incorporated by reference herein.]

SUPPLEMENT NO. [    ], dated as of [                    ], to the AMENDED AND RESTATED SECURITY AGREEMENT dated as of August 7, 2009, among each of the Grantors listed on the signature pages thereto (each such subsidiary individually, a "<u>Grantor</u>" and, collectively, the "<u>Grantors</u>"), and Citibank, N.A., as Collateral Agent for the First Lien Secured Parties (as defined therein).

A. Reference is made to the Credit Agreement, dated as of October 10, 2007 (as amended by Amendment No. 1 thereto, dated as of August 7, 2009 and as the same may be further amended, restated, supplemented or otherwise modified, refinanced or replaced from time to time, the "<u>Credit Agreement</u>") among Energy Future Competitive Holdings Company, Texas Competitive Electric Holdings Company (the "<u>Company</u>"), the lending institutions from time to time parties thereto (the "<u>Lenders</u>"), Citibank, N.A., as Administrative Agent and as Collateral Agent, and the other agents and entities party thereto.

B. Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Security Agreement.

C. The Grantors have entered into the Security Agreement in order to induce the Administrative Agent, the Collateral Agent, the Lenders and the Letter of Credit Issuers to enter into the Amendment No. 1 to the Credit Agreement and to induce the respective Lenders and the Letter of Credit Issuers to make their respective Extensions of Credit to the Company under the Credit Agreement and to induce the Cash Management Banks and Hedge Banks to enter into Secured Cash Management Agreements, Secured Hedging Agreements and Secured Commodity Hedging Agreements and to induce the holders of any Additional First Lien Obligations to make their respective Extensions of Credit thereunder.

D. Pursuant to Section 4.1(b) of the Security Agreement, within 30 days after the end of each calendar quarter, each Grantor has agreed to deliver to the Collateral Agent a written supplement substantially in the form of this Supplement with respect to any additional Copyrights, Patents and Trademarks acquired by such Grantor after the date of the Credit Agreement. The Grantors have identified on Schedule I, II and III hereto the additional Copyrights, Patents and Trademarks registered or applied for with the United States Patent and Trademark Office or the United States Copyright Office acquired by such Grantors after the date of the Credit Agreement. The undersigned Grantors are executing this Supplement in order to facilitate supplemental filings to be made by the Collateral Agent with the United States Copyright Office and the United States Patent and Trademark Office.

Accordingly, the Collateral Agent and the Grantors agree as follows:

SECTION 1. (a) Schedule 1 of the Security Agreement is hereby supplemented, as applicable, by the information (if any) set forth in the Schedule I hereto, (b) Schedule 2 of the Security Agreement is hereby supplemented, as applicable, by the information (if any) set forth in the Schedule II hereto and (c) Schedule 3 of the Security Agreement is hereby supplemented, as applicable, by the information (if any) set forth in the Schedule III hereto.

SECTION 2. Each Grantor hereby grants to the Collateral Agent for the benefit of the First Lien Secured Parties a security interest in the Intellectual Property set forth in Schedules I, II and III hereto. Each Grantor hereby represents and warrants that the information set forth on Schedules I, II and III hereto is true and correct in all material respects as of the date hereof.

A-1

SECTION 3. This Supplement may be executed by one or more of the parties to this Supplement on any number of separate counterparts (including by facsimile or other electronic transmission (e.g., a "pdf" or "tif" file)), and all of said counterparts taken together shall be deemed to constitute one and the same instrument. A set of the copies of this Supplement signed by all the parties shall be lodged with the Collateral Agent and the Company. This Supplement shall become effective as to each Grantor when the Collateral Agent shall have received counterparts of this Supplement that, when taken together, bear the signatures of such Grantor and the Collateral Agent.

SECTION 4. Except as expressly supplemented hereby, the Security Agreement shall remain in full force and effect.

SECTION 5. **THIS SUPPLEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.**

SECTION 6. Any provision of this Supplement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof and in the Security Agreement, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. The parties hereto shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 7. All notices, requests and demands pursuant hereto shall be made in accordance with Section 8.2 of the Security Agreement.

SECTION 8. Each Grantor agrees to reimburse the Collateral Agent for its respective reasonable and documented out-of-pocket costs and expenses in connection with this Supplement, including the reasonable and documented fees, other charges and disbursements of one firm of counsel, and, if necessary, one firm of regulatory counsel and/or one firm of local counsel in each appropriate jurisdiction, in each case to the Administrative Agent and Collateral Agent (and, in the case of an actual or perceived conflict of interest where the Person affected by such conflict informs the Company of such conflict and thereafter, after receipt of the consent of the Company (which consent shall not be unreasonably withheld or delayed), retains its own counsel, of another firm of counsel for such affected Person).

[Signature Pages Follow]

A-2

IN WITNESS WHEREOF, each Grantor and the Collateral Agent have duly executed this Supplement to the Security Agreement as of the day and year first above written.

_____, as Grantor

By: _____
Name:
Title:

_____, as Collateral Agent

By: _____
Name:
Title:

[SIGNATURE PAGE TO SUPPLEMENT NO. [    ] TO SECURITY AGREEMENT]

Copyrights

UNITED STATES COPYRIGHTS:

Registrations:

| OWNER | TITLE | REGISTRATION NUMBER |
|---|---|---|
| | | |

Applications:

| OWNER | DESCRIPTION | APPLICATION NUMBER |
|---|---|---|
| | | |

<u>Schedule II</u>

<u>Patents</u>

UNITED STATES PATENTS:

Registrations:

| OWNER | TITLE | REGISTRATION NUMBER |
|---|---|---|
| | | |

Applications:

| OWNER | DESCRIPTION | APPLICATION NUMBER |
|---|---|---|
| | | |

Trademarks

UNITED STATES TRADEMARKS:

Registrations:

| OWNER | TRADEMARK | REGISTRATION NUMBER |
|---|---|---|
| | | |

Applications:

| OWNER | TRADEMARK | APPLICATION NUMBER |
|---|---|---|
| | | |

SUPPLEMENT NO. [    ], dated as of [                ], to the AMENDED AND RESTATED SECURITY AGREEMENT dated as of August 7, 2009, among each of the Grantors listed on the signature pages thereto (each such subsidiary individually, a "Grantor" and, collectively, the "Grantors"), and Citibank, N.A., as Collateral Agent for the First Lien Secured Parties (as defined therein).

A. Reference is made to the Credit Agreement, dated as of October 10, 2007 (as amended by Amendment No. 1 thereto, dated as of August 7, 2009 and as the same may be further amended, restated, supplemented or otherwise modified, refinanced or replaced from time to time, the "Credit Agreement") among Energy Future Competitive Holdings Company, Texas Competitive Electric Holdings Company (the "Company"), the lending institutions from time to time parties thereto (the "Lenders"), Citibank, N.A., as Administrative Agent and as Collateral Agent, and the other agents and entities party thereto.

B. Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Security Agreement.

C. The Grantors have entered into the Security Agreement in order to induce the Administrative Agent, the Collateral Agent, the Lenders and the Letter of Credit Issuers to enter into Amendment No. 1 to the Credit Agreement and to induce the respective Lenders and the Letter of Credit Issuers to make their respective Extensions of Credit to the Company under the Credit Agreement and to induce the Cash Management Banks or Hedge Banks to enter into Secured Cash Management Agreements, Secured Hedging Agreements and Secured Commodity Hedging Agreements and to induce the holders of any Additional First Lien Obligations to make their respective Extensions of Credit thereunder.

D. Section 9.11 of the Credit Agreement and/or the equivalent provision of any other Additional First Lien Agreement and Section 8.13 of the Security Agreement provide that additional Subsidiaries may become Grantors under the Security Agreement by execution and delivery of this Supplement. Each undersigned Domestic Subsidiary (each a "New Grantor") is executing this Supplement in accordance with the requirements of the Security Agreement to become a Subsidiary Grantor under the Security Agreement in order to induce the Lenders and the Letter of Credit Issuer to make additional Extensions of Credit and as consideration for Extensions of Credit previously made and to induce the holders of any Additional First Lien Obligations to extend credit thereunder as consideration for Extensions of Credit previously made and to induce one or more Cash Management Banks and/or Hedge Banks to enter into Secured Cash Management Agreements, Secured Hedging Agreements and Secured Commodity Hedging Agreements.

Accordingly, the Collateral Agent and the New Grantors agree as follows:

SECTION 1. In accordance with subsection 8.13 of the Security Agreement, each New Grantor by its signature below becomes a Grantor under the Security Agreement with the same force and effect as if originally named therein as a Grantor and each New Grantor hereby (a) agrees to all the terms and provisions of the Security Agreement applicable to it as a Grantor thereunder and (b) represents and warrants that the representations and warranties made by it as a Grantor thereunder are true and correct on and as of the date hereof (except where such representations and warranties expressly related to an earlier date, in which case such representations and warranties shall have been true and correct as of such earlier date). In furtherance of the foregoing, each New Grantor, as security for the payment and performance in full of the First Lien Obligations, does hereby bargain, sell, convey, assign, set over, mortgage, pledge,

B-1

hypothecate and transfer to the Collateral Agent, for the benefit of the First Lien Secured Parties, and hereby grants to the Collateral Agent, for the benefit of the First Lien Secured Parties, a Security Interest in all of the Collateral of such New Grantor, in each case whether now or hereafter existing or in which it now has or hereafter acquires an interest. Each reference to a "Grantor" in the Security Agreement shall be deemed to include each New Grantor. The Security Agreement is hereby incorporated herein by reference.

SECTION 2. Each New Grantor represents and warrants to the Collateral Agent and the other First Lien Secured Parties that this Supplement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization or similar laws affecting creditors' rights generally and general equitable principles (whether considered in a proceeding in equity or law).

SECTION 3. This Supplement may be executed by one or more of the parties to this Supplement on any number of separate counterparts (including by facsimile or other electronic transmission (e.g. a "pdf" or "tif" file)), and all of said counterparts taken together shall be deemed to constitute one and the same instrument. A set of the copies of this Supplement signed by all the parties shall be lodged with the Collateral Agent and the Company. This Supplement shall become effective as to each New Grantor when the Collateral Agent shall have received counterparts of this Supplement that, when taken together, bear the signatures of such New Grantor and the Collateral Agent.

SECTION 4. Each New Grantor hereby represents and warrants that (a) set forth on Schedule I hereto is (i) the legal name of such New Grantor, (ii) the jurisdiction of incorporation or organization of such New Grantor, (iii) the type of organization or corporate structure of such New Grantor (iv) the Federal Taxpayer Identification Number and organizational number of such New Grantor and (v) the true and correct location of the chief executive office and principal place of business and any office in which it maintains books of records relating to Collateral owned by it and (b) as of the date hereof (i) Schedule II hereto sets forth, in proper form for filing with the United States Copyright Office, all of each New Grantor's Copyrights registered or applied for with the United States Copyright Office, (ii) Schedule III hereto sets forth, in proper form for filing with the United States Patent and Trademark Office, all of each New Grantor's Patents registered or applied for with the United States Patent and Trademark Office, (iii) Schedule IV hereto sets forth, in proper form for filing with the United States Patent and Trademark Office, all of each New Grantor's Trademarks (and all applications therefor).

SECTION 5. Except as expressly supplemented hereby, the Security Agreement shall remain in full force and effect.

SECTION 6. **THIS SUPPLEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

SECTION 7. Any provision of this Supplement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof and in the Security Agreement, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. The parties hereto shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

B-2

SECTION 8. All notices, requests and demands pursuant hereto shall be made in accordance with Section 8.2 of the Security Agreement. All communications and notices hereunder to each New Grantor shall be given to it in care of the Company at the Company's address set forth in Section 13.2 of the Credit Agreement (whether or not then in effect) and all notices to any holder of obligations under any Additional First Lien Agreements, at its address set forth in the Additional First Lien Secured Party Consent, as such address may be changed by written notice to the Collateral Agent and the Company.

SECTION 9. Each New Grantor agrees to reimburse the Collateral Agent for its respective reasonable and documented out-of-pocket costs and expenses in connection with this Supplement, including the reasonable and documented fees, other charges and disbursements of one firm of counsel, and, if necessary, one firm of regulatory counsel and/or one firm of local counsel in each appropriate jurisdiction, in each case to the Administrative Agent and Collateral Agent (and, in the case of an actual or perceived conflict of interest where the Person affected by such conflict informs the Company of such conflict and thereafter, after receipt of the consent of the Company (which consent shall not be unreasonably withheld or delayed), retains its own counsel, of another firm of counsel for such affected Person).

[Signature Pages Follow]

B-3

IN WITNESS WHEREOF, each New Grantor and the Collateral Agent have duly executed this Supplement to the Security Agreement as of the day and year first above written.

_____, as New Grantor

By: _____
Name:
Title:

_____, as Collateral Agent

By: _____
Name:
Title:

[SIGNATURE PAGE TO SUPPLEMENT NO.[    ] TO SECURITY AGREEMENT]

Schedule I

COLLATERAL

| Legal Name | Jurisdiction of Incorporation or Organization | Type of Organization or Corporate Structure | Federal Taxpayer Identification Number and Organizational Identification Number | Chief Executive Office and Principal Place of Business |
|---|---|---|---|---|

<u>Schedule II</u>

<u>Copyrights</u>

UNITED STATES COPYRIGHTS:

Registrations:

| OWNER | TITLE | REGISTRATION NUMBER |
|-------|-------|---------------------|
|       |       |                     |

Applications:

| OWNER | DESCRIPTION | APPLICATION NUMBER |
|-------|-------------|--------------------|
|       |             |                    |

Patents

UNITED STATES PATENTS:

Registrations:

| OWNER | TITLE | REGISTRATION NUMBER |
|---|---|---|
|  |  |  |

Applications:

| OWNER | DESCRIPTION | APPLICATION NUMBER |
|---|---|---|
|  |  |  |

Trademarks

UNITED STATES TRADEMARKS:

Registrations:

| OWNER | TRADEMARK | REGISTRATION NUMBER |
|---|---|---|
| | | |

Applications:

| OWNER | TRADEMARK | APPLICATION NUMBER |
|---|---|---|
| | | |

ANNEX C TO THE
SECURITY AGREEMENT

[Form of]

ADDITIONAL FIRST LIEN SECURED PARTY CONSENT

[Name of Additional First Lien Secured Party]
[Address of Additional First Lien Secured Party]

[Date]

_____

_____

_____

_____

The undersigned is the Authorized Representative for Persons wishing to become First Lien Secured Parties (the "New Secured Parties") under (i) the Amended and Restated Security Agreement dated as of August 7, 2009 (as heretofore amended and/or supplemented, the "Security Agreement" (terms used without definition herein have the meanings assigned to such term by the Security Agreement)), (ii) the Amended and Restated Pledge Agreement dated as of August 7, 2009 (as heretofore amended and/or supplemented, the "Pledge Agreement") among each of the Grantors listed on the signature pages thereto (each such subsidiary individually, a "Grantor" and, collectively, the "Grantors"), and Citibank, N.A., as Collateral Agent for the First Lien Secured Parties (as defined therein) and (iii) each other Security Document, including the Mortgage.

In consideration of the foregoing, the undersigned hereby:

(i) represents that the Authorized Representative has been duly authorized by the New Secured Parties to become a party to the Security Agreement, the Pledge Agreement and the other Security Documents on behalf of the New Secured Parties under that [DESCRIBE OPERATIVE AGREEMENT] (the "New Secured Obligation") and to act as the Authorized Representative for the New Secured Parties;

(ii) acknowledges that the New Secured Parties has received a copy of the Security Agreement, the Pledge Agreement, the other Security Documents and the Intercreditor Agreement;

(iii) appoints and authorizes the Collateral Agent to take such action as agent on its behalf and on behalf of all other First Lien Secured Parties and to exercise such powers under the Security Agreement, the Pledge Agreement, each other Security Document and Intercreditor Agreement as are delegated to the Collateral Agent by the terms thereof, together with all such powers as are reasonably incidental thereto;

(iv) accepts and acknowledges the terms of the Intercreditor Agreement applicable to it and the New Secured Parties and agrees to serve as Authorized Representative and Secured Debt Representative (as defined in the Intercreditor Agreement) for the New Secured Parties with

C-1

respect to the New Secured Obligations and agrees on its own behalf and on behalf of the New Secured Parties to be bound by the terms thereof applicable to holders of Additional First Lien Obligations, with all the rights and obligations of a First Lien Secured Party thereunder and bound by all the provisions thereof as fully as if it had been an First Lien Secured Party on the effective date of the Intercreditor Agreement and agrees that its address for receiving notices pursuant to the Security Agreement and the Pledge Agreement shall be as follows:

[Address]

The Collateral Agent, by acknowledging and agreeing to this Additional First Lien Secured Party Consent, accepts the appointment set forth in clause (iii) above.

THIS ADDITIONAL FIRST LIEN SECURED PARTY CONSENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

C-2

IN WITNESS WHEREOF, the undersigned has caused this Additional First Lien Secured Party Consent to be duly executed by its authorized officer as of the      day of 20    .

[NAME OF AUTHORIZED REPRESENTATIVE]

By: _____

Name:

Title:

Acknowledged and Agreed
CITIBANK, N.A.,
as Collateral Agent

By: _____

Name:

Title:

Texas Competitive Electric Holdings Company LLC
The Grantors party to the Security Agreement,
each as Grantor

By: _____

Name:

Title: