# Exhibit A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-_____ (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**MOTION OF ENERGY FUTURE HOLDINGS
CORP., *ET AL.*, FOR ENTRY OF (A) AN ORDER
AUTHORIZING THE DEBTORS TO (I) MAINTAIN AND
ADMINISTER CUSTOMER PROGRAMS AND CUSTOMER
AGREEMENTS, (II) HONOR PREPETITION OBLIGATIONS
RELATED THERETO, (III) PAY CERTAIN EXPENSES ON BEHALF OF
CERTAIN ORGANIZATIONS, (IV) FIX THE DEADLINE TO FILE PROOFS
OF CLAIM FOR CERTAIN CUSTOMER CLAIMS, AND (V) ESTABLISH
PROCEDURES FOR NOTIFYING CUSTOMERS OF COMMENCEMENT
OF THE DEBTORS' CHAPTER 11 CASES, ASSUMPTION OF CUSTOMER
AGREEMENTS, AND THE BAR DATE FOR CUSTOMER CLAIMS AND (B) AN ORDER
AUTHORIZING CERTAIN OF THE DEBTORS TO ASSUME THE CUSTOMER AGREEMENTS**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file

this motion (this "Motion") for entry of (a) an order, substantially in the form attached hereto as

**Exhibit A** (the "Claims Order"), authorizing the Debtors to (i) maintain and administer all of

their customer programs and certain customer agreements; (ii) honor prepetition obligations

related thereto; (iii) pay certain expenses on behalf of certain organizations; (iv) fix the deadline

to file proofs of claim for certain customer claims; and (v) establish procedures to notify current

and former customers of the commencement of the chapter 11 cases, assumption of customer

---

[1]    The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810.  The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201.  Due to the large number of debtors in these chapter 11 cases, for which the debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

agreements, and the bar date for customer claims; and (b) after a final hearing, an order, substantially in the form attached hereto as **Exhibit B** (the "Assumption Order"), authorizing certain of the Debtors to assume certain customer agreements. In support of this Motion, the Debtors respectfully state as follows.

### Jurisdiction and Venue

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors consent pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The bases for the relief requested in this Motion are sections 105(a), 363, 365, 1107(a), and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 3003, 6003, 6004, 6006, 6008, and 9008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 2000-1(e) and Local Bankruptcy Rule 9013-1(m).

### Relief Requested

4.      By this Motion, the Debtors seek entry of: (a) the Claims Order authorizing, but not directing, the Debtors to (i) maintain and administer all of the Customer Programs and

2

Customer Agreements (each defined herein) in the ordinary course of business, (ii) honor all prepetition commitments owing on account of all of the Customer Programs and Customer Agreements, (iii) pay certain expenses on behalf of the PUC and ERCOT (each defined herein) incurred during the chapter 11 cases, (iv) fix the Customer Claims Bar Date for filing Proofs of Claims for Customer Claims (each defined herein), and (v) establish the Customer Noticing Procedures (defined herein) to provide notice to current and former customers of commencement of the chapter 11 cases, assumption of Customer Agreements with current customers, and the Customer Claims Bar Date; and (b) after a final hearing, the Assumption Order authorizing the Debtor entities TXU Energy Retail Company LLC ("TXU Energy Retail"), 4Change Energy Company ("4Change"), Luminant ET Services Company ("Luminant ET Services"), and Luminant Energy Company LLC[2] ("Luminant Energy" and, together with TXU Energy Retail, 4Change, and Luminant ET Services, the "Retail Debtors") to assume the Customer Agreements with their customers.[3]

5.     The Debtors also request that the Court schedule a final hearing as soon as practicable after the 21st day following the Petition Date (defined herein) to consider entry of the Assumption Order.

6.     The Debtors estimate that as of the Petition Date, the total amount of obligations to customers on account of the Customer Programs ranges from approximately $120 million to $135 million, including approximately $80 million to $90 million for Customer Credits,

---

[2]   As discussed below, Luminant Energy's retail operations are limited to the Retail Natural Gas Agreements and the Luminant Customer Agreements (each defined herein).

[3]   This Motion does not request any relief with respect to or affect the rights, duties, or obligations of EFIH, EFIH Finance, Inc., or EFH Corp., other than with respect to EFH Corp.'s obligations under the Charitable Contributions Programs (each defined herein)

3

Customer Deposits, and the Average Monthly Billing Program.[4]  The Debtors estimate that within the first 21 days of the Petition Date (the "Interim Period"), they are obligated to pay approximately $7.1 million on account prepetition obligations related to the following Customer Programs:

| Customer Program | Estimated Amount Due During Interim Period |
|---|---|
| Rewards Programs | $570,000 |
| Customer Deposits and Customer Credits | $740,000 |
| Brighten Programs | $100,000 |
| Customer Partners | $5,120,000 |
| Charitable Contribution Programs | $150,000 |
| Customer Warranties | $420,000 |
| **Total** | **$7,100,000** |

7.      Additionally, in connection with the Claims Order, the Debtors seek approval of (a) the Current Customer Notice and the Former Customer Notice (each defined herein), annexed to **Exhibit A** as **Exhibit 1** and **Exhibit 2**, respectively, and (b) related noticing procedures to provide customers with notice of the commencement of the chapter 11 cases, of the proposed assumption of current customers' executory Customer Agreements, and of the Customer Claims Bar Date, October 27, 2014, to file claims against the Debtors, including with respect to Cure Amounts (defined herein).

8.      To enable the Debtors to carry out the relief requested, the Debtors request that the Court authorize all applicable banks and financial institutions to receive, process, honor, and pay all checks presented for payment and all electronic payment requests made by the Debtors

---

[4]    The Debtors' obligations to customers under the following Customer Programs are generally not cash payment obligations: the Average Monthly Billing Program, Customer Credits (excepting amounts refunded to customers, as described herein), Customer Deposits, and Customer Agreements, all as defined and discussed herein.  Obligations to customers under these Customer Programs fluctuate due to seasonality, business cycles, and various other business and economic factors.

related to the Customer Programs, whether such checks were presented or electronic-payment requests were submitted before or after the date hereof.

## Background

9.     On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition with the Court under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have requested joint administration of these chapter 11 cases. The Court has not appointed a trustee, and the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has not formed any official committees in these chapter 11 cases.[5]

10.     Debtor Energy Future Holdings Corp. ("EFH Corp."), a Texas corporation, is the ultimate parent company for each of the Debtors in these chapter 11 cases and certain of EFH Corp.'s non-Debtor affiliates (collectively, "EFH"). EFH's businesses include the largest generator, distributor, and certified retail provider of electricity in Texas. EFH conducts substantially all of its business operations in the electricity market overseen by the Electric Reliability Council of Texas ("ERCOT"), which covers the majority of Texas. The Texas electricity market, in turn, is subject to oversight and regulation by the Public Utility Commission of Texas (the "PUC"). EFH has approximately 9,100 employees, approximately 5,700 of whom are employed by the Debtors,[6] in three distinct business units:

---

[5]   The facts and circumstances supporting this Motion, along with a detailed discussion of EFH's business operations and capital structure, are set forth in the *Declaration of Paul Keglevic, Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of Energy Future Holdings Corp., et al., in Support of First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith.

[6]   The Debtors in these chapter 11 cases consist of: (a) the vast majority of the entities that compose Luminant and TXU Energy, as well as those entities' intermediate corporate parent entity, Texas Competitive Electric Holdings Company LLC ("TCEH LLC"), a Delaware limited liability company, and TCEH LLC's corporate (Continued...)

- EFH's *competitive electricity generation, mining, wholesale electricity sales, and commodity risk management and trading activities*, conducted by TCEH LLC's Debtor subsidiaries composing "Luminant";

- EFH's *competitive retail electricity sales operations and related operations*, mainly conducted by TCEH LLC's Debtor subsidiaries composing "TXU Energy";[7] and

- EFH's *rate-regulated electricity transmission and distribution operations*, conducted by the non-Debtor Oncor.

11.    In the aggregate, the Debtors have approximately $42 billion of funded indebtedness, including (a) approximately $32.1 billion of claims against TCEH LLC and TCEH LLC's direct and indirect Debtor subsidiaries; (b) approximately $71 million of claims against EFCH; (c) approximately $1.9 billion of claims against EFH Corp.; and (d) approximately $7.7 billion of claims against EFIH.[8]

12.    Although the Debtors' balance sheet is overleveraged, the Debtors' operations are strong. Luminant's generation units are high-performing, its mining and electricity generation operations have impressive safety records, and its commodity trading and risk management activities have delivered significant value to the Debtors. TXU Energy is an industry leader in customer care performance and product innovation and has maintained strong performance notwithstanding intense competition. And non-Debtor Oncor produces a strong and consistent

---

parent, Energy Future Competitive Holdings Company LLC ("EFCH"), a Delaware limited liability company; (b) Energy Future Intermediate Holding Company LLC ("EFIH"), a Delaware limited liability company that indirectly owns approximately 80% of Oncor Electric Delivery Holdings Company LLC ("Oncor"), and EFIH's wholly-owned subsidiary, EFIH Finance Inc.; (c) EFH Corp.; and (d) other direct and indirect subsidiaries of EFH Corp., including EFH Corporate Services Company.

[7]    The Debtors also conduct a relatively small amount of retail electricity operations through their 4Change brand and another entity, Luminant ET Services Company, that provides retail electricity service to some end use customers and to some of Luminant's mining operations, and a small amount of retail gas operations through Luminant Energy Company LLC.

[8]    Amounts include intercompany debt holdings and short-term borrowings, and exclude guarantees, unamortized discounts or premiums, accrued but unpaid interest, and certain other figures typically reported in the Debtors' filings with the Securities and Exchange Commission (the "SEC"), such as capital lease obligations, certain promissory notes, and certain other obligations.

stream of revenue. Thus, these chapter 11 cases will provide the Debtors with the opportunity to restructure their balance sheets and retain their position as leaders in the Texas electricity market.

13.    As of December 31, 2013, EFH Corp. reported total assets of approximately $36.4 billion in book value, approximately $28.8 billion of which is attributable to EFCH, TCEH LLC, and TCEH LLC's direct and indirect subsidiaries (collectively with TCEH LLC and EFCH, "TCEH"),[9] and total liabilities of approximately $49.7 billion in book value, approximately $41.1 billion of which is attributable to TCEH.[10] EFH Corp.'s assets and liabilities that are not attributable to TCEH are mostly attributable to EFIH's indirect ownership of approximately 80% of Oncor. EFH Corp.'s consolidated revenues for the quarter ending December 31, 2013 were approximately $1.3 billion, all of which were attributable to TCEH. EFH Corp.'s consolidated annual revenues for the year ending December 31, 2013 were approximately $5.9 billion.

**I.    Overview of the Debtors' Business Operations and Customer Base.**

14.    As described in detail in the First Day Declaration, the Debtors operate in all areas of the region overseen by ERCOT, which manages the supply of approximately 85% of the electricity consumption in Texas. The majority of ERCOT is open to retail electric competition– approximately 6.7 million customers have the ability to choose their retail electric provider.[11]

15.    The Retail Debtors comprise the Debtors' retail operations, through which the Debtors engage in retail sales of electricity to approximately 1.7 million residential and business customers in Texas, as well as the sale and delivery of natural gas to several hundred commercial

---

[9]    Oncor's revenues are not included in EFH Corp.'s consolidated revenues because EFH Corp. accounts for its ownership of Oncor under the equity method of accounting.

[10]    Figures for TCEH are derived from EFCH's public filings with the SEC, and are almost entirely attributable to TCEH LLC and its Debtor and non-Debtor subsidiaries.

[11]    References to the number of customers in this Motion refer to the number of electricity meters.

and industrial customers.  In the first quarter of 2014, approximately 68% of the Debtors' retail operations revenue resulted from sales of electricity to residential customers.  The Debtors compete against more than 100 other certified retail electric providers to supply customers with electricity in all areas of the ERCOT region open to competition, including the Dallas/Fort Worth, Houston, Corpus Christi, and lower Rio Grande Valley areas of Texas.

## II.    The Customer Agreements.

16.    The Retail Debtors' agreements with their customers (collectively, the "Customer Agreements") generally fall into three categories.  The first category of Customer Agreements constitutes the vast majority of the Customer Agreements and consists of various retail electric power sales agreements that one of TXU Energy Retail, 4Change, or Luminant ET Services has entered into with residential and small business customers as well as large commercial and industrial end-use customers within the ERCOT region (collectively, the "Retail Agreements").[12]  Although they vary in size, the Retail Agreements typically include terms relating to the calculation and payment of charges, addition and removal of customer premises, adjustments to the contract price, events giving rise to the right to terminate, remedies upon termination, force majeure, notices, warranties and limitations of liabilities, and indemnifications.[13]  The customers that are party to the Retail Agreements include residential customers as well as more than 2,200 large organizations that represent a wide range of sectors, including manufacturing, energy, real estate, retail, and healthcare, as well as municipalities,

---

[12]   For the avoidance of doubt, the Retail Agreements do not include wholesale contracts to which any Debtor is a party with a third party that sells retail electricity to an end-use customer.

[13]   Additionally, certain of the Customer Agreements impose an obligation on the Debtors to purchase power generated by their customers, which the Debtors subsequently sell into the ERCOT region (the "Power Purchase Obligations").  As of the Petition Date, the Debtors estimate that Luminant ET Services owes approximately $315,000 on account of such Power Purchase Obligations.

schools, and religious organizations. As of March 31, 2014, TXU Energy Retail, 4Change, and Luminant ET Services served approximately 1.7 million retail customers under the Retail Agreements.

17.    The second category of Customer Agreements is composed of approximately 350 commercial retail natural gas agreements that Luminant Energy has entered into with industrial and commercial customers to supply natural gas across North Texas and the greater Houston area (the "Retail Gas Agreements"). The Retail Gas Agreements provide a consistent earnings and cash flow stream to the Debtors.

18.    The Customer Agreements also include agreements between Luminant Energy and one of the following customers:  (a) The City of Goldsmith, Texas;[14] (b) Ameripower, LLC; (c) Infinite Electric, LLC and Veteran Electric, LLC; (d) Clearview Electric, Inc.; and (e) WM Renewable Energy, LLC[15] (collectively, the "Luminant Customer Agreements"). Pursuant to the Luminant Customer Agreements, Luminant Energy sells electricity and provides related services to, and/or schedules the delivery of power for, each customer. Additional detail regarding the Luminant Customer Agreements, along with the respective Cure Amount, if any, are listed on **Exhibit 1** annexed to **Exhibit B** attached hereto.[16]

---

[14]    As discussed in **Exhibit 1** to **Exhibit B** attached hereto, Luminant Energy provides payment and invoice processing services to The City of Goldsmith. Specifically, Luminant Energy pays The City of Goldsmith's transmission, distribution, and other charges to the applicable utility service provider, and then seeks reimbursement from the City of Goldsmith (the "Invoice Processing Services"). As of the Petition Date, the Debtors estimate that they owe approximately $3,000 of "pass-through" amounts on account of Invoice Processing Services.

[15]    As discussed in **Exhibit 1** to **Exhibit B** attached hereto, Luminant Energy purchases power produced by a landfill owned by WM Renewable Energy, LLC, which is subsequently sold to a retail customer of TXU Energy Retail. As of the Petition Date, the Debtors estimate that Luminant Energy owes approximately $160,000 to WM Renewable Energy, LLC on account of such Power Purchase Obligations.

[16]    Because the Debtors are seeking to honor prepetition obligations to customers pursuant to the Claims Order, the Debtors estimate that the Cure Amount with respect to each of the Customer Agreements will be $0.

19.    The Customer Agreements are essential to the Debtors' operations. In particular, the Customer Agreements account for approximately 38 terawatt hours of delivered power on an annual basis, and over 74% of the Debtors' overall revenues. To provide assurances to current and prospective customers that the Retail Debtors will continue to perform under the Customer Agreements and provide the same level of competitive and innovative service on par with their prepetition performance, the Retail Debtors seek authority pursuant to the Claims Order to continue to (a) honor any and all obligations under the prepetition Customer Agreements, (b) honor the Customer Agreements on a postpetition basis, and (c) negotiate with customers, including the authority to (i) modify, amend, and extend existing Customer Agreements and (ii) settle any customer claims arising from or related to the Customer Agreements and other Customer Programs, all in the ordinary course of business, consistent with their past practice. Additionally, in an abundance of caution, the Retail Debtors seek authority pursuant to the Claims Order to continue to enter into new contracts and enroll new customers after the Petition Date, in the ordinary course of business, consistent with their past practice.[17]

### III.    The Debtors' Customer Programs.

20.    The wholesale and retail electricity markets in the ERCOT region are highly competitive. Approximately 73% of the market's electricity demand in the ERCOT region is attributable to customers located in areas where there is a choice among retail electric providers.

---

[17] To the extent a Customer Agreement constitutes a hedging and trading arrangement of the type described in the *Motion of Energy Future Holdings Corp., et al., for Entry of Interim and Final Orders Authorizing the Debtors to (A) Continue Performing Under Prepetition Hedging and Trading Arrangements, (B) Pledge Collateral and Honor Obligations Thereunder, and (C) Enter into and Perform under Trading Continuation Agreements and New Postpetition Hedging and Trading Arrangements* (the "Trading Motion"), filed contemporaneously herewith, the Debtors reserve the right to exclude such Customer Agreement from the relief sought pursuant to this Motion and to otherwise address such Customer Agreement in accordance with the relief sought in the Trading Motion. For the avoidance of doubt, pursuant to this Motion the Debtors are not seeking to assume any Luminant Energy wholesale power marketing agreements.

Because Texas is one of the fastest growing states in the U.S. with a comparatively robust economy, competition within the ERCOT region for these customers is particularly fierce. As of December 2013, there were more than 100 certified competitive retail electric providers (compared to approximately 40 in 2002, the first year of retail electric competition in Texas). Based on data published by the PUC, as of September 30, 2013, approximately 62% of residential customers and 69% of small commercial customers in competitive areas of the ERCOT region are served by retail electric providers not affiliated with the pre-competition electric company in operation before the deregulation of the ERCOT region retail electricity market in 2002. Moreover, approximately 89% of residential customers and 90% of small commercial load customers have chosen an electricity provider at least once since the ERCOT retail market deregulation process began in Texas in 2002,[18] making Texas the only state with retail competition where more than half of residential customers have chosen to be served by electricity providers other than the incumbent, traditional electric utilities.[19]

21.     In addition, the Debtors are a significant supplier of natural gas to small business and industrial and commercial customers in North Texas and the greater Houston area. The Debtors provide a variety of natural gas services, including firm supply, scheduling, nominations, and balancing for those commercial and industrial customers. The Debtors' natural gas customers participate in various industries, including manufacturing, steel, glass, heat treating, chemical, refining, food service, hospitals, and commercial buildings.

22.     In this highly competitive space, the Debtors' retail operations employ a number of programs to develop and maintain customer loyalty and attract new customers, including

---

[18]   Electric Reliability Council of Texas, Inc., *Supplemental Information Retail Electric Market* (March 21, 2014).

[19]   Public Utility Commission of Texas et al., *Texas Energy Assurance Plan* 45 (Nov. 2012). See the First Day Declaration for more information about deregulation in the ERCOT region.

various cash-back, billing arrangements, and other rewards, rebates and incentive programs, and incur certain other obligations and commitments to customers, including credits, deposits, charitable contributions, and warranties (collectively, as discussed herein, the "Customer Programs").

23.    Continuing the Customer Programs in the ordinary course is essential to the Debtors' seamless transition into chapter 11 and will facilitate a successful reorganization. As discussed in the First Day Declaration, the Debtors filed these cases primarily to effectuate a balance sheet restructuring. Thus, to preserve the value of their businesses, they must promptly assure their customers that the Customer Programs will continue uninterrupted. The continuation of the Customer Programs is critical for maintaining customer confidence and trust in the Debtors' businesses and to ensure that the Debtors preserve market share in a highly competitive industry. The following describes Customer Programs that the Debtors actively use to cultivate customer support and loyalty.

**A.    Rewards Programs.**

24.    The Debtors' retail operations offer various rewards programs, including a cash-back loyalty rewards program (the "Cash-Back Rewards"), a welcome bonus program (the "Bonus Program"), the LUV 2Fly Rapid Rewards Program with Southwest Airlines (the "Rapid Rewards Program"), referral programs (the "Refer-a-Friend Programs"), third-party partner incentives (the "Partner Incentives"), sweepstakes programs (the "Sweepstakes Programs"), and other reward and incentive programs (collectively, the "Rewards Programs").

25.    The Cash-Back Rewards are a customer loyalty program that makes recurring annual cash payments to participating customers. The Debtors accrue obligations over the course of the year on account of the Cash-Back Rewards and, in the first quarter of each year, make payments to customers in an amount equal to approximately 2% to 6% of the total energy

12

and transmission and distribution utility charges incurred by customers during the preceding calendar year. The payments primarily come in the form of Visa debit cards issued in the name of customers, and constitute actual cash obligations. Customers with $5.00 or less in Cash-Back Rewards receive a credit on their bill rather than a debit card. If customers do not use the full amount of the Cash-Back Rewards on their cards within six months from the date the cards are received, the unused portion is returned to the Debtors. Hundreds of thousands of residential and business customers participate in the Cash-Back Rewards.

26.    The Debtors also attract new customers and retain current customers through incentive programs, including the Bonus Program, the Refer-a-Friend Programs, and the Rapid Rewards Programs. Under the Bonus Program, new customers and current customers who initiate, transfer, or renew their service receive a prepaid Visa debit card worth various amounts upon redemption. Under the Refer-a-Friend Programs, current customers who successfully refer a new person who becomes a customer receive up to $50 in the form of billing credits or a prepaid Visa debit card, as does the new customer. There is no limit on the amount of rewards a referring customer can earn under the Refer-a-Friend Programs. The rewards under the Bonus Program and the Refer-a-Friend Programs constitute actual cash obligations. If customers do not use the full bonus amount on their cards by the expiration date printed on the cards, the unused portion is returned to the Debtors. There are two Rapid Rewards Programs, each of which lasts for either 24 or 30 months. Customers who signed up for one of the Rapid Rewards Programs earn and receive Southwest Airlines rewards points over the duration of the program. The Debtors purchase these rewards points from Southwest Airlines, which customers can redeem for Southwest Airlines flights.

13

27.     Customers occasionally receive Partner Incentives, including coupons, discounts, and other incentives, from the Debtors and certain third-party partners. The Partner Incentives are typically included as inserts with customers' monthly bills or are offered to customers through direct sales efforts. Additionally, the Debtors and certain of their third-party partners offer Partner Incentives to customers who enroll in one of the home warranty programs offered to customers by the Debtors and their third-party partners. The Debtors reimburse third-party partners for their allocated cost of associated Partner Incentives. The Sweepstakes Programs are marketing and promotional tools used to attract new customers and retain current customers. Under the Sweepstakes Programs, the Debtors offer customers the opportunity to win travel and event tickets, gift cards, and certain other prizes.

28.     The Debtors estimate that they pay approximately $40 million to $45 million each year on account of the Rewards Programs. As of the Petition Date, the Debtors estimate that the total amount due under the Rewards Programs will be approximately $15.9 million. The Debtors seek authority pursuant to the Claims Order to honor all prepetition obligations with respect to the Rewards Programs in the ordinary course of business and to continue the Rewards Programs and to offer new Rewards Programs on a postpetition basis, consistent with their past practice.

**B.      Average Monthly Billing Program.**

29.     As required by applicable PUC regulations, the Debtors' retail operations offer residential customers the option to pay their bills based on their average usage on a rolling basis, rather than a bill based on their actual usage in the preceding month (the "Average Monthly Billing Program"). The Average Monthly Billing Program is an attractive option for certain customers because it reduces the fluctuation in their energy bill due to seasonal requirements. At any point in the year, the Average Monthly Billing Program results in either a net overpayment or underpayment by participating customers, depending on whether the running total of

14

payments by such customers is greater or less than their actual electricity usage. If customers decide to discontinue the Average Monthly Billing Program, a credit or debit is applied to their next bill. To the extent that customers' payments under the Average Monthly Billing Program exceed the actual amounts used during those months, the Debtors are in possession of customer dollars, which constitute obligations to customers.

30.    A significant number of customers participate in the Average Monthly Billing Program, and the amount owed to customers varies widely during the year, ranging from approximately $2 million to approximately $20 million. As of the Petition Date, the Debtors estimate that they owe an aggregate amount of approximately $17 million worth of prepaid services on account of the Average Monthly Billing Program. The Debtors seek authority pursuant to the Claims Order to honor all prepetition obligations with respect to the Average Monthly Billing Program in the ordinary course of business and to continue the Average Monthly Billing Program on a postpetition basis, consistent with their past practice.

C.    **Customer Deposits and Customer Credits.**

31.    Based on customers' utility payment data and history, the Debtors' retail operations request that certain customers pay a deposit (the "Customer Deposits"). The Debtors hold Customer Deposits as part of their operating cash. The PUC, however, requires the Debtors to post letters of credit payable to the PUC in the amount of Customer Deposits held by the Debtors to maintain their status as a certified retail electric provider. In addition, the Debtors post letters of credit payable to the PUC in the amount of prepayments held by the Debtors under certain of their electricity plans. The Debtors return Customer Deposits to customers after they have paid their electricity bills in full with no late payments for 12 consecutive months, together with any interest that has accrued during the period. The Debtors typically return Customer Deposits in the form of a credit to the customers' electricity bills.

15

32.    In addition to returned Customer Deposits that are credited to customers' electricity bills, the Debtors also treat overpayments, billing adjustments, and prepayments (other than through the Average Monthly Billing Program) as credits to the customers' accounts (the "Customer Credits"). As discussed above, customers who discontinue the Average Monthly Billing Program may receive Customer Credits to the extent their cumulative payments exceed the value of services received. Under certain electricity plans offered by the Debtors, customers are allowed to prefund their account balances. These prepayments constitute Customer Credits, against which subsequent electricity and other charges are debited. Based on historical data from the last twelve months, the Debtors estimate that the amount of outstanding Customer Credits fluctuates between $10 million to $20 million throughout the year.

33.    If a customer discontinues service with the Debtors or is an inactive customer and has outstanding Customer Deposits or Customer Credits, the Debtors will issue a refund check to the customer or otherwise credit a customer's credit card. The Debtors estimate that they refund approximately $14 million to customers on an annual basis on account of the Customer Deposits and Customer Credits.

34.    As of the Petition Date, the Debtors estimate that they hold an aggregate amount of approximately $65 million to $75 million on account of the Customer Deposits and Customer Credits. The Debtors seek authority pursuant to the Claims Order to honor all prepetition obligations with respect to the Customer Deposits and Customer Credits in the ordinary course of business and to continue to honor the Customer Deposits and Customer Credits on a postpetition basis, consistent with their past practice.

**D.    Brighten Programs.**

35.    The Debtors' retail operations offer an energy savings program to certain business customers known as Brighten GreenBack (the "Brighten GreenBack Program"). The Brighten

GreenBack Program provides businesses with an incentive to purchase or install infrastructure or qualifying electric vehicles. After installing qualifying energy efficient equipment, customers can submit their expenses to the Debtors and the Debtors then reimburse these customers in the form of rebate checks up to a specified amount.

36.    The Debtors' retail operations also provide customers with discounts and incentives to purchase energy-saving items through its Brighten Online Energy Store (the "Brighten Online Store" and, together with the Brighten GreenBack Program, the "Brighten Programs"). A third party manages the Brighten Online Store and handles all product logistics costs in exchange for a percentage of revenues generated through the store with the Debtors. The Debtors reimburse this third party for the difference between the retail price and the discounted price of products purchased by the Debtors' customers through the Brighten Online Store.

37.    As of the Petition Date, the Debtors estimate that they owe an aggregate amount of approximately $1 million on account of the Brighten Programs, net of the Debtors' share of revenues associated with the Brighten Online Store. The Debtors seek authority pursuant to the Claims Order to honor all prepetition obligations with respect to the Brighten Programs in the ordinary course of business and to continue the Brighten Programs on a postpetition basis, consistent with their past practice.

E.    **Customer Partners.**

38.    The Debtors use a variety of third-party contractual arrangements to cultivate, maximize, and develop their customer relationships. The Debtors enter into third-party agreements and professional service agreements (the "Channel Partner Agreements") with third parties that act as brokers and consultants for the Debtors (each, a "Channel Partner"). The Channel Partner Agreements include collection and remittance agreements, under which the

17

Debtors bill and collect payments from customers, and then remit payments to the Channel Partner. If a customer disputes a fee obtained through a Channel Partner Agreement and does not pay, the Debtors do not continue to pay the Channel Partner, and the Channel Partner is responsible for collection from the customer. The Channel Partner Agreements also include professional service agreements, under which the Channel Partners agree to promote and market the Debtors as retail electric providers to prospective customers, and the Debtors agree to pay Channel Partners certain fees associated with contracts signed by customers. As of the Petition Date, the Debtors estimate that they owe an aggregate amount of approximately $1.6 million to the Channel Partners, of which approximately $390,000 will come due during the Interim Period.

39.     The Debtors also utilize third-party partners to conduct door-to-door sales of the Debtors' retail goods and services (the "Sales Partners"). The Sales Partners are typically paid commissions for enrolling new customers in the Debtors' electricity plans. The rate of commission varies with the type and duration of the plan in which a customer successfully enrolls. Additionally, the Sales Partners are paid on commission for the sale of related goods, including iThermostats (defined herein). As of the Petition Date, the Debtors estimate that they owe an aggregate amount of approximately $230,000 to the Sales Partners, all of which will come due during the Interim Period.

40.     The Debtors also contract with various call centers to provide real-time customer service to the Debtors' retail customers (the "Call Center Partners" and, together with the Channel Partners and the Sales Partners, the "Customer Partners"). The hourly rates at which the Debtors pay the Call Center Partners vary depending upon the specific type of work performed, including handling customer calls, training personnel, case management, and back-office services. As of the Petition Date, the Debtors estimate that they owe an aggregate amount of

18

approximately $6.8 million to the Call Center Partners, of which approximately $4.5 million will come due during the Interim Period.

41.    The Customer Partners are key intermediaries between the Debtors' retail operations and potential customers, as they inform customers about the Debtors' products and services, assist with the enrollment of new customers, and service the Debtors' existing customers. As such, the Customer Partners are important sources of new business and critical to the retention of existing business for the Debtors. If the Debtors do not continue to perform under existing Customer Partner agreements and remit fees, the Customer Partners may be reluctant to promote the Debtors' retail operations, generate new customer leads, and provide the exemplary services to the customers that the Debtors are known for. Failure to honor amounts owed to Customer Partners could damage the Debtors' reputation with existing and potential customers, to the detriment of the Debtors' operations.[20]

42.    The Debtors estimate that the total obligation to Customer Partners is approximately $51 million annually. As of the Petition Date, the Debtors estimate that they owe an aggregate amount of approximately $8.6 million to Customer Partners. The Debtors seek authority pursuant to the Claims Order to honor all prepetition obligations with respect to the Customer Partners in the ordinary course of business, and to continue to honor existing agreements with Customer Partners and to enter into new agreements with Customer Partners on a postpetition basis, consistent with their past practice.

---

[20]    Pursuant to this Motion, the Debtors do not seek any relief with respect to employees of the Debtors that perform services similar to those performed by third-party Customer Partners. For additional information on the Debtors' employees, see the *Motion of Energy Future Holdings Corp., et al., for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Pay Certain Prepetition Compensation and Reimbursable Employee Expenses, (II) Pay and Honor Employee and Retiree Medical and Similar Benefits, and (III) Continue Employee and Retiree Benefit Programs, and (B) Modifying the Automatic Stay* (the "Wages Motion"), filed contemporaneously herewith.

**F.      Renewable Energy Obligations.**

43.      Certain regulations require the Debtors to obtain a specified amount of their supply of power from renewable energy sources or otherwise to purchase renewable energy credits in the energy market from renewable energy credit "retailers" or brokers.  Additionally, the Debtors' retail operations provide certain customers with an agreed-upon amount of power from renewable energy sources (together with the regulatory obligations, the "Renewable Energy Obligations").  The Debtors' performance of the Renewable Energy Obligations enables the Debtors and their customers to comply with statutory or regulatory requirements, maintain certain environmental sustainability certifications, and make public claims with respect to the use of power from renewable energy sources.  ERCOT recognizes the transfer of renewable energy credits from one account holder to another.  As a retail electric provider, the Debtors must "retire" purchased renewable energy credits to demonstrate fulfillment of Renewable Energy Obligations.  Renewable energy credits are "retired" by using the credits to comply with a statutory or regulatory requirement or to make a public claim associated with the purchase of the credits, at which point the "retired" renewable energy credits are no longer transferrable.

44.      The Debtors estimate that total Renewable Energy Obligations to customers is approximately $12 million annually.  As of the Petition Date, the Debtors estimate that they owe an aggregate amount of approximately $11 million on account of the Renewable Energy Obligations.  The Debtors seek authority pursuant to the Claims Order to honor all prepetition obligations with respect to the Renewable Energy Obligations in the ordinary course of business and to continue to honor the Renewable Energy Obligations on a postpetition basis, consistent with their past practice.

## G.    Charitable Contributions Programs.

45.    The Debtors maintain several charitable contribution programs (the "Charitable Contributions Programs"), including, but not limited to, the Energy Aid Program, the Support and Save Program, the 4Change Pledge, and the 501(c)(3) Donations (each defined herein).  The Charitable Contributions Programs enhance the Debtors' standing in the industry and within the community and build goodwill that enhances the value of their business.

46.    The Debtors maintain a matching program for customer contributions to local communities (the "Energy Aid Program").  The Energy Aid Program is the largest bill-payment assistance program among regulated and competitive electricity providers in the nation.  Under the Energy Aid Program, for every $1.00 that customers donate to the Energy Aid Program, the Debtors contribute $5.00 to local communities to help individuals pay their electricity bills.  As described further in the Wages Motion, the Debtors' employees also contribute to the Energy Aid Program through paycheck deductions, and the Debtors match their employees' contributions.[21]

47.    The Debtors' retail operations also maintain a charitable contributions program to support nonprofit organizations (the "Support and Save Program"), under which persons can support a public or private school or other participating nonprofit organization by enrolling as a new customer through the program.  The designated organization receives $50 for each such enrollment, and amounts are accumulated and awarded on a quarterly basis and are paid by check.  There are no annual limits on the amount a participating organization can receive through the program.  Rewards under the Support and Save Program constitute actual cash obligations.

---

[21]    For additional information on the Energy Aid Program, relief sought with respect to employee donations, and related matching, see the Wages Motion, filed contemporaneously herewith.

48.    Debtor 4Change Energy Company pledged to give 4% of its profits to one of several non-profit organizations, including Texas Food Bank, the American Cancer Society, the American Red Cross, and Heroes for Children (the "4Change Pledge").    Additionally, the Debtors plan to donate approximately $2 million during 2014 to various 501(c)(3) nonprofit organizations (the "501(c)(3) Donations").

49.    The Debtors plan to contribute over $5 million in 2014 on account of Charitable Contributions Programs.  As of the Petition Date, the Debtors estimate that their outstanding obligations under the Charitable Contributions Programs total approximately $1.2 million.  The Debtors seek authority pursuant to the Claims Order to honor prepetition obligations with respect to the Energy Aid Program in the ordinary course of business and to continue the Charitable Contribution Programs on a postpetition basis, consistent with their past practice. Pursuant to the Assumption Order, the Debtors seek authority to honor all prepetition obligations with respect to the Charitable Contributions Programs in the ordinary course of business.    Similar relief authorizing debtors to continue programs like the Charitable Contributions Programs have been approved by this Court.  *See, e.g., In re Magic Brands, LLC,* No. 10-11310 (Bankr. D. Del. Apr. 23, 2010) (authorizing debtors to continue sponsoring and participating in charitable events and programs and to make certain prepetition charitable contributions); *In re Anchor Blue Retail Grp., Inc.,* No. 09-11770 (Bankr. D. Del. May 28, 2009) (same); *In re Mervyn's Holdings, LLC,* No. 08-11586 (Bankr. D. Del. July 30, 2008) (authorizing debtors to continue charity-based product promotions wherein 100% of the proceeds from such product sales were donated to charity).[22]

---

[22]    Because of the voluminous nature of the orders cited herein, such orders are not attached to this Motion.  Copies of these orders are available upon request of the Debtors' counsel.

22

### H.    Customer Warranties.

50.    The Debtors and certain third-party service providers offer various products, services, and warranty programs to the Debtors' customers (the "Customer Warranties"). For example, the Debtors pay a third-party vendor to provide iThermostat installation services.[23] In addition to the iThermostats installations, this third-party vendor also provides a variety of services to the Debtors and their customers, including server hardware and database administration, license and software maintenance, warehousing, and other customer maintenance services such as repairing and replacing gateways and iThermostats (the "Support Services").

51.    As discussed above, the Debtors' retail operations and certain of their third-party partners also offer home warranty programs to customers (the "Home Warranties"). For example, the Debtors partner with a third party to provide Home Warranties, including for repair services and replacement coverage for air conditioning units, heating units, electronics, and other appliances. The Debtors collect payments from customers that participate in the Home Warranties and remit a portion of the proceeds to the third-party, which provides the warranty goods and services.

52.    The continued performance of customer-facing services under the Customer Warranties is important to satisfying and retaining existing customers, as well as attracting new customers. The third-party partners are important intermediaries between the Debtors and their customers, and it is essential that performance of services under the Customer Warranties continue in the ordinary course of business. The Debtors believe that third-party partners may be reluctant to continue performing under the Customer Warranties absent specific authorization

---

[23]    iThermostats are energy-saving programmable thermostats that allow customers to monitor and manage temperatures via the internet (the "iThermostats").

from the Court.  To provide assurances to the Debtors' customers that the Customer Warranties will be honored, the Debtors seek authority to continue to honor and satisfy any and all obligations related to prepetition and any new postpetition Customer Warranties, including those obligations to third parties that perform under the Customer Warranties for the benefit of customers.

53.     As of the Petition Date, the Debtors estimate that they owe an aggregate amount of approximately $1.1 million on account of the Customer Warranties.  The Debtors seek authority pursuant to the Claims Order to honor all prepetition obligations with respect to the Customer Warranties in the ordinary course of business and to continue to honor the Customer Warranties on a postpetition basis, consistent with their past practice.

I.     **Reduction Rewards.**

54.     The Debtors' retail operations offer a critical peak rebate program (the "Reduction Rewards Program") to commercial and industrial customers with minimum annual electricity usage of approximately 1 megawatt.  The Reduction Rewards Program helps the Debtors and their customers to address peak electricity demand issues within the ERCOT region, including demand and price volatility, by allowing customers to manage their electricity usage in response to peak events.  The Debtors alert participating customers to the occurrence of a peak event, and pay each customer for every kilowatt hour of electricity load reduction below the customer's corresponding baseline demand level.  The rate per kilowatt hour of electricity reduction during the peak event that is paid to customers varies depending on market conditions.

55.     As of the Petition Date, the Debtors estimate that they do not owe any amounts on account of the Reduction Rewards Program.  In an abundance of caution, the Debtors seek authority pursuant to the Claims Order to honor all prepetition obligations with respect to the

Reduction Rewards Program in the ordinary course of business, and to continue to honor the Reduction Rewards Program on a postpetition basis, consistent with their past practice.

### J.    Customer Incidents.

56.    The Customer Agreements and the Customer Programs occasionally give rise to customer complaints and claims (the "Customer Incidents"). To ensure continuing excellent service and customer satisfaction, the Debtors employ certain measures to address any service-related issues and to resolve and settle the Customer Incidents in the ordinary course of business. As of the Petition Date, the Debtors estimate that they owe an aggregate amount of approximately $2.1 million on account of the Customer Incidents. Pursuant to the Claims Order, the Debtors seek authority, but not direction, to honor all prepetition obligations with respect to the Customer Incidents in the ordinary course of business and to continue to settle, resolve, and honor the Customer Incidents on a postpetition basis, consistent with their past practice.

### IV.    Payment of Certain Expenses on Behalf of Certain Organizations.

57.    As discussed in the First Day Declaration, the Debtors are subject to regulation or oversight by various entities, including the PUC and ERCOT.[24] The PUC and ERCOT have wide-ranging oversight over the ERCOT and Texas electricity markets, including with respect to the sale, purchase, transmission, and distribution of electricity to consumers. Because the Debtors are the preeminent merchant power generator and retail electricity provider within the ERCOT region, the Debtors anticipate that the PUC and ERCOT will play an active role in the Debtors' chapter 11 cases to ensure that the public interest is adequately represented and protected.

---

[24]    ERCOT, the Electric Reliability Council of Texas, is a regional reliability coordinating organization responsible for ensuring the reliability of the electricity market in Texas. Additionally, ERCOT is the independent system operator of the interconnected transmission grid for member electricity systems within Texas.

58.    To facilitate the participation of the PUC and ERCOT in the Debtors' chapter 11 cases, the Debtors seek to pay certain expenses incurred by the PUC and ERCOT, including all reasonable CourtCall and remote conferencing costs and the cost of providing notice and/or service of filings by the PUC and ERCOT in these chapter 11 cases to relevant parties. Additionally, the Debtors request authority to allow the PUC and ERCOT to utilize the noticing services of Epiq Bankruptcy Solutions, LLC ("Epiq"), the Debtors' claims and noticing agent, at the Debtors' expense.[25]    The Debtors submit that the cost to their estates of paying these expenses on behalf of the PUC and ERCOT is greatly outweighed by the benefits to their estates of ensuring that the public interest is well-represented during these chapter 11 cases.

**V.    Assumption of the Customer Agreements.**

59.    Pursuant to the Assumption Order, the Retail Debtors seek to assume the Customer Agreements pursuant to section 365(a) of the Bankruptcy Code to provide their customers and other parties in interest with additional assurance of the Retail Debtors' intent to honor their obligations to customers and to continue providing electricity and natural gas, and performing under the Customer Agreements.  Assumption of the Customer Agreements at the outset of these chapter 11 cases will reduce the likelihood of confusion or uncertainty on the part of customers with respect to the continuing provision of electricity, natural gas, and related services by the Debtors, to the benefit of the Debtors' estates.

60.    The Retail Debtors' obligations under the Customer Agreements are primarily performance-based, and the Debtors do not believe that any defaults exist under the Customer

---

[25]    The Debtors seek to retain Epiq Bankruptcy Solutions, LLC as the Debtors' claims and noticing agent pursuant to the *Application of Energy Future Holdings Corp.,* et al., *for Entry of an Order Approving the Retention and Appointment of Epiq Bankruptcy Solutions, LLC as the Claims and Noticing Agent for the Debtors,* filed contemporaneously herewith.

Agreements that must be cured under section 365(b)(1)(A) (after giving effect to section 365(b)(2)). Accordingly, the Debtors have determined that the amount necessary to cure unpaid monetary obligations arising under the Customer Agreements is $0 (the "Cure Amount"). Furthermore, to the extent any such defaults exist, the Debtor's long history of providing electricity and natural gas to customers and honoring their contractual obligations with customers provides customers with adequate assurance of the Retail Debtors' ability to continue performing under the Customer Agreements.

61.     Pursuant to the Claims Order, the Debtors seek to establish **May 20, 2014 at 5:00 p.m. (prevailing Eastern Time)** (the "Assumption Objection Deadline") as the deadline for customers to object to the assumption of a Customer Agreement.

**VI.     The Customer Claims Bar Date.**

62.     Upon entry of the Claims Order, the Debtors will be authorized to honor prepetition obligations to all customers on account of the Customer Programs and, upon effectiveness of the Assumption Order, the Retail Debtors will assume and continue to perform under the Customer Agreements.  To the extent, however, customers seek to assert any claims against any Debtor, including *any* Cure Amounts (such claims, the "Customer Claims"), the Debtors seek authority to fix **October 27, 2014, at 5:00 p.m. (prevailing Eastern Time)** (the "Customer Claims Bar Date") as the deadline by which each customer (including governmental units asserting Customer Claims solely in their capacities as customers of the Debtors) must file its proof of claim (each, a "Proof of Claim") against any of the Debtors under the Claims Order.  The Debtors will file their schedules of assets and liabilities and statements of financial affairs within 90 days of the Petition Date.

A.    **Proofs of Claim That Must Be Filed.**

63.    Subject to the exceptions set forth herein, the Customer Claims Bar Date would apply to all types of Customer Claims against the Debtors that arose or are deemed to have arisen prior to the Petition Date, including secured claims, unsecured priority claims, and unsecured non-priority claims.

B.    **Proofs of Claim That are Not Required to be Filed.**

64.    Customers that hold the following types of claims are **not** required to file Proofs of Claim for such claims:

> (a) any claim that is paid under the Claims Order;
>
> (b) claims relating to a Customer Agreement that is being assumed by the Retail Debtors under the Assumption Order, only if the customer agrees that the Cure Amount is $0;
>
> (c) any claim for which a signed Proof of Claim has already been filed against the applicable Debtor(s) with the Clerk of the Court in a form substantially similar to Official Bankruptcy Form B10;
>
> (d) any claim that is specifically allowed by order of the Court or that is allowed pursuant to a plan of reorganization proposed in connection with these chapter 11 cases;
>
> (e) any claim that has already been paid in full by any of the Debtors pursuant to the Bankruptcy Code or in accordance with an order of the Court; and
>
> (f) any claim for which a specific deadline, other than the Customer Claims Bar Date, is fixed by the Court.

C.    **Requirements for Preparing and Filing Proofs of Claim.**

65.    Each customer that submits a Proof of Claim is required to identify the Debtor against which the customer is asserting a Customer Claim and the amount and type of such Customer Claim. A copy of Official Form 10 is annexed as **Exhibit 3** to **Exhibit A** attached hereto (the "Proof of Claim Form").

66.    With respect to preparing and filing Proofs of Claim, the Debtors propose that Proofs of Claim be required to be consistent with the following:

(a) ***Contents.*** Each Proof of Claim must (i) be written in English; (ii) include a claim amount denominated in United States dollars; (iii) conform substantially with the Proof of Claim Form; and (iv) be signed by the claimant or by an authorized agent or legal representative of the claimant.

(b) ***Original Signatures Required.*** Only an <u>original</u> Proof of Claim may be deemed acceptable for purposes of claims administration. Copies of Proofs of Claim or Proofs of Claim sent by facsimile or electronic mail will not be accepted.

(c) ***Identification of the Debtor.*** Each Proof of Claim must clearly identify the Debtor against which a claim is asserted, including the individual Debtor's case number. A Proof of Claim that is filed (i) under the joint administration case number (No. 14-_____), (ii) against multiple Debtor entities, or (iii) without identifying a Debtor, will be deemed as filed only against the Debtor entity of which the claimant is or was a customer at the time such claim arose, as determined by the Debtors after an inspection of the Debtors' books and records and the supporting documentation submitted by such customer.

(d) ***Supporting Documentation.*** Each Proof of Claim must include supporting documentation in accordance with Bankruptcy Rules 3001(c) and 3001(d). If, however, such documentation is voluminous, such Proof of Claim may include a summary of such documentation or an explanation as to why such documentation is not available.

(e) ***Timely Service.*** Each Proof of Claim must be filed, including supporting documentation, by U.S. Mail or other hand delivery system, so as to be **actually received** by Epiq on or before the Customer Claims Bar Date (or, where applicable, on or before any other bar date as set forth herein, by order of the Court, or as provided by the Bankruptcy Code) at the following address:

*If by First-Class Mail:*
Energy Future Holdings Corp. Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 4613
New York, NY 10150-4613

*If by Hand Delivery or Overnight Mail:*
Energy Future Holdings Corp. Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, NY 10017

(f) *Receipt of Service.* Claimants wishing to receive acknowledgment that their Proofs of Claim were received by Epiq must submit (i) a copy of the Proof of Claim and (ii) a self-addressed, stamped envelope (in addition to the original Proof of Claim sent to Epiq).

**D.    Consequences of Failure to File a Proof of Claim.**

67.    In accordance with Bankruptcy Rule 3003(c)(2), any customer who is required, but fails, to file a Proof of Claim with respect to a Customer Claim in accordance with the terms set forth in the Claims Order on or before the Customer Claims Bar Date, or on or before such other date fixed by order of the Court, shall not be treated as a creditor with respect to such claim for purposes of voting and distribution and it shall be deemed that no Cure Amount is due and owing such customer; *provided,* that the Debtors shall be authorized, but not directed, to honor any Customer Claims that are authorized to be paid under the Claims Order, before or after the Customer Claims Bar Date, irrespective of whether a Proof of Claim has been filed with respect to such Customer Claim.

**VII.    Procedures for Providing Customers with Notice of Commencement, the Proposed Assumption of Executory Contracts, and the Proposed Customer Claims Bar Date.**

68.    The Debtors seek approval of noticing procedures for current and former customers as described in this Motion to streamline the delivery of notices and simplify the chapter 11 process for customers (the "Customer Noticing Procedures"). The Debtors maintain contact information for each of their customers, including former customers during the last five years, and are accustomed to sending customers a monthly bill and other communications by each customer's preferred method of correspondence, including by mail. As soon as reasonably practicable after the Court enters the Claims Order, the Debtors propose to send (a) the notice, annexed as **Exhibit 1** to **Exhibit A** attached hereto (the "Current Customer Notice"), providing current customers with notice of commencement of the chapter 11 cases, notice of the proposed assumption of the Customer Agreements, and notice of the proposed Customer Claims Bar Date

and (b) the notice, annexed as **Exhibit 2** to **Exhibit A** attached hereto (the "Former Customer Notice," and, together with the Current Customer Notice, the "Customer Notices") providing former customers with notice of commencement of the chapter 11 cases and notice of the proposed Customer Claims Bar Date.

69.    In addition to mailing the Customer Notices to the Debtors' customers, the Debtors propose to publish a notice to provide all of the Debtors' potential creditors and parties in interest with notice of commencement of the chapter 11 cases, as well as the Debtors' customers with notice of the Customer Claims Bar Date and assumption of the Customer Agreements (the "Publication Notice"). As soon as is practicable, the Debtors will publish the Publication Notice in:  (i) *The Wall Street Journal*, *USA Today*, *The Dallas Morning News*, *Houston Chronicle*, *Corpus Christi Caller Times*, *Fort Worth Star-Telegram*, and *Waco Tribune-Herald*; and (ii) on the restructuring website established by Epiq, the Debtors' proposed noticing and claims agent, available at http://www.efhcaseinfo.com. The Debtors are confident that these publications will be most likely to reach those customers (including former customers) who may not receive the Customer Notices by mail.

## Basis for Relief

**I.    Continuation of the Customer Programs and Payment of Certain Expenses on Behalf of the PUC and ERCOT is in the Best Interests of the Debtors' Estates.**

73.    Courts in the Third Circuit and elsewhere generally recognize that debtors may pay prepetition claims that are essential to the continued operation of the debtor's business. *See, e.g.*, *In re Meridian Auto. Sys.-Composite Operations, Inc.*, 372 B.R. 710, 714 (Bankr. D. Del. 2007) (granting the debtor authority to pay prepetition obligations owed to certain critical vendors); *In re Primary Health Sys., Inc.*, 275 B.R. 709, 710 (Bankr. D. Del. 2002) (allowing payment of prepetition wages upon a finding that such relief was "essential to

the continued operation of the Debtors' businesses"); *In re Just for Feet, Inc.*, 242 B.R. 821, 824-45 (Bankr. D. Del. 1999) (noting that debtors may pay prepetition claims that are essential to the continued operation of the debtor's business). Courts have relied on several legal bases in approving such relief.

74.    Courts generally recognize that debtors may pay prepetition claims under section 363(b) of the Bankruptcy Code where there is a sound business purpose for the payment of prepetition obligations, and where the debtor is able to "articulate some business justification, other than the mere appeasement of major creditors." *See, e.g., In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (granting debtor authority to pay prepetition wages); *Armstrong World Indus. Inc. v. James A. Phillips, Inc., (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (Bankr. S.D.N.Y. 1983) (granting the debtor the authority to pay prepetition claims of suppliers who were potential lien claimants).

75.    Courts also recognize that payments to prepetition creditors are appropriate pursuant to section 105(a) of the Bankruptcy Code under the "doctrine of necessity" or the "necessity of payment" rule where such payments are necessary to the continued operation of the debtor's business. *See, e.g., In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor); *In re Penn Cent. Transp. Co.*, 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding that the necessity of payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims have been paid"); *In re Friedman's, Inc.*, 2011 WL 5975283, at *3 (Bankr. D. Del. Nov. 30, 2011) ("[M]ost courts will allow payments [of prepetition claims] under the 'doctrine of necessity,' if the debtor

32

establishes that in its business judgment making such payments is critical to the survival of the debtor's business"); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr D. Del. 1994) (noting that debtors may pay prepetition claims that are essential to the continued operation of the debtor's business). The rationale for the necessity of payment rule—the rehabilitation of a debtor in reorganization cases—is "the paramount policy and goal of Chapter 11." *Ionosphere Clubs*, 98 B.R. at 176; *Just for Feet*, 242 B.R. at 826 (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization.").

76.     As described above, continuing to administer their Customer Programs in the ordinary course of business during the pendency of these chapter 11 cases will help preserve the Debtors' valuable customer relationships and goodwill, which will inure to the benefit of the Debtors' estates and their creditors. If the Debtors are unable to honor amounts due and owing to their customers, as well as amounts due to certain customer-facing third parties who provide goods and services to customers on behalf of the Debtors, the Debtors risk damaging their reputation and alienating certain customer constituencies, who may feel that the Debtors are no longer offering a competitive level of service. Corresponding losses in customer loyalty and goodwill may lead to customer attrition, harming the Debtors' prospects for reorganization and maximizing value.

70.     The Customer Programs are essential marketing strategies for attracting new customers in the highly competitive Texas energy market, where over 100 other retail electric providers are certified to compete. The Debtors' ability to attract new customers depends not only on satisfying direct obligations to customers, but also on honoring obligations owed to "gate-keepers" such as the Channel Partners and the Sales Partners, which provide information

about the services offered by the Debtors and their competitors and make recommendations to potential customers, and other customer-facing partners such as the Call Center Partners and partners that offer Partner Incentives and Customer Warranties to the Debtors' customers. Failure to honor the Customer Programs could place the Debtors at a competitive disadvantage in the ERCOT region. Moreover, termination of the Customer Programs or a failure to honor outstanding customer obligations may constitute noncompliance with statutory or regulatory requirements, including with respect to PUC regulations concerning the safeguarding of Customer Deposits. Accordingly, the Debtors submit that continuing to honor the Customer Programs in the ordinary course of business is in the best interest of their estates.

71.    Moreover, a significant amount of the Customer Programs obligations may be entitled to priority over general unsecured claims. A portion of the claims arising from a consumer's prepetition deposit "of money for the purchase of property or services for personal, family or household use" to the extent that such property or services were not delivered has priority over other general unsecured claims pursuant to section 507(a)(7) of the Bankruptcy Code. Here, certain of the obligations related to the Average Monthly Billing Program, Customer Credits, Customer Deposits, the Brighten Programs, the Customer Warranties, and the Customer Incidents may be entitled to priority over general unsecured claims under section 507(a)(7). Satisfaction of such priority claims on a postpetition basis in the ordinary course of business only affects the timing of payment for such claims, and does not prejudice the rights of general unsecured creditors or other parties in interest.

72.    Courts in this district have regularly granted relief similar to the relief requested in this Motion. *See, e.g., In re Fresh & Easy Neighborhood Mkts. Inc.*, No. 13-12569 (Bankr. D. Del. Oct. 10, 2013); *In re Orchard Supply Hardware Stores Corp.*, No. 13-11565 (Bankr. D. Del.

June 18, 2013); *In re Vertis Holdings, Inc.*, No. 12-12821 (Bankr. D. Del. Oct. 12 & 31, 2013); *In re Neb. Book Co.*, No. 11-12005 (Bankr. D. Del. June 28, 2011); *In re Appleseed's Intermediate Holdings LLC*, No. 11-10160 (Bankr. D. Del. Jan 20, 2011); *In re Constar Int'l Inc.*, No. 11-10109 (Bankr. D. Del. Jan 13, 2011); *In re Local Insight Media Holdings, Inc.*, No. 10-13677 (Bankr. D. Del. Nov. 19, 2010); *In re U.S. Concrete, Inc.*, No. 10-11407 (Bankr. D. Del. Apr. 30, 2010); *In re SemCrude, L.P.*, No. 08-11525 (Bankr. D. Del. Sept. 29, 2008).

73.    Additionally, the Debtors have determined that it is in the best interests of their estates to facilitate the PUC and ERCOT's involvement in the Debtors' chapter 11 cases by paying certain expenses on behalf of the PUC and ERCOT, including all reasonable CourtCall and remote conferencing costs and the cost of providing notice of filings in these chapter 11 cases to relevant parties.  Assisting the PUC and ERCOT in this manner will enable them to participate in Court hearings and provide input with respect to regulatory matters, especially those concerning the public interest, and, as a result, the Debtors will be in a better position to maintain their compliance with regulations and to minimize any disruptions to customers. Accordingly, the Court should authorize the Debtors to pay certain of the PUC and ERCOT's reasonable expenses incurred during these chapter 11 cases.

## II.    Assumption of the Customer Agreements is in the Best Interests of the Debtors' Estates.

74.    Section 365(a) of the Bankruptcy Code provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  The decision to assume or reject an executory contract is a matter within the sound business judgment of the debtor.  *See, e.g., In re Taylor*, 913 F.2d 102 (3d Cir. 1990). Upon finding that the debtor has exercised its sound business judgment in determining that the assumption or rejection of an executory contract or unexpired lease is in the best interests of the

debtor, the court should approve such assumption or rejection under section 365(a) of the Bankruptcy Code. *See In re Fed. Mogul Global, Inc.*, 293 B.R. 124, 126 (D. Del. 2003) ("The business judgment test dictates that a court should approve a debtor's decision to reject a contract unless that decision is the product of bad faith or gross abuse of discretion.").

75.    The Debtors have determined that it is in the best interests of their estates to assume the Customer Agreements. Assumption of the Customer Agreements will make a strong statement to customers and regulatory authorities that the Debtors will continue to honor their obligations to customers throughout the restructuring and beyond. Additionally, assumption of the Customer Agreements will preserve customer goodwill and loyalty toward the Debtors and thereby preserve the value of the Debtors' estates.

76.    The Debtors' obligations under the Customer Agreements relate primarily to the provision of electricity and natural gas and do not constitute cash obligations, except with respect to charges owed by customers to other parties that the Debtors "pass-through" under the Invoice Processing Services, certain electricity purchase obligations of the Debtors under the Power Purchase Obligations, and certain limited collateral posting obligations. Therefore, the Debtors are confident that they will be able to meet the obligations under the Customer Agreements. The Debtors do not believe that any defaults exist under the Customer Agreements that must be cured under section 365(b)(1)(A) (after giving effect to section 365(b)(2)). Therefore, assumption of the Customer Agreements will come at little to no cost to the Debtors' estates. Accordingly, the Court should authorize the Debtors to assume the Customer Agreements.[26]

---

[26]    The Debtors reserve the right to treat all customer information as confidential.

III.    **The Customer Claims Bar Date and the Proposed Procedures for Filing Proofs of Claim for Customer Claims in these Chapter 11 Cases Are Appropriate.**

77.    Bankruptcy Rule 3003(c)(3) generally governs the filing of proofs of claim in a chapter 11 case and provides in relevant part: "[t]he court shall fix and for cause shown may extend the time within which proofs of claim or interest may be filed." Fed. R. Bankr. P. 3003(c)(3). Bankruptcy Rule 2002(a)(7) generally provides that all parties in interest must receive, at a minimum, 21 days' notice of the time fixed for filing proofs of claim pursuant to Bankruptcy Rule 3003(c). Section 502(b)(9) of the Bankruptcy Code provides, in relevant part, that "[a] claim of a governmental unit shall be timely filed if it is filed before 180 days after the date of the order for relief or such later time as the [Bankruptcy Rules or a court order] may provide . . . ." 11 U.S.C. § 502(b)(9).

78.    It is well recognized that the claims bar date plays an essential role in the twin goals of bankruptcy—preserving a debtor's going-concern value and maximizing property available to satisfy creditors. *See Bank of Am. Nat'l Trust and Sav. Assoc. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999). The claims bar date allows the debtor and parties in interest to expeditiously determine and evaluate the liabilities of the estate. The absence of such a deadline, in contrast, would prolong creditor uncertainty, increase the costs and expenses incurred by debtors in connection with the claims reconciliation process, and delay or even derail the claims process, thus undercutting one of the principal purposes of bankruptcy law—"secur[ing] within a limited period the prompt and effectual administration and settlement of the debtor's estate." *See Chemetron Corp. v. Jones*, 72 F.3d 341, 346 (3d Cir. 1995).

79.    The procedures described in this Motion provide customers with ample notice and opportunity and a clear process for filing Proofs of Claim, and achieve administrative and judicial efficiency. Indeed, the proposed procedures are calibrated to achieve the twin goals of

37

providing comprehensive notice and clear instructions to customers, on the one hand, and allowing these chapter 11 cases to move forward quickly with a minimum of administrative expense and delay, on the other hand.

80.    Among other things, the proposed procedures provide clear instructions that are calculated to avoid confusion or uncertainty among customers that might lead them to file unnecessary protective Proofs of Claim, or multiple Proofs of Claim, that would cause expense and delay in the claims process for all parties.  The proposed procedures are also designed to comply with the Bankruptcy Code.  For example, the Customer Claims Bar Date is set at the 180-day period mandated by statute.  Moreover, the Debtors will file their schedules of assets and liabilities and statements of financial affairs within 90 days of the Petition Date, which will provide customers with additional information regarding whether they must file Proofs of Claim for any Customer Claims.  Accordingly, the Customer Claims Bar Date and the proposed procedures for filing Proofs of Claim for Customer Claims are appropriate and should be approved.

### IV.    The Proposed Customer Noticing Procedures Comply with the Bankruptcy Code and are in the Best Interests of the Debtors and Their Estates.

81.    Bankruptcy Rule 2002(a) provides, in relevant part, that "the clerk, or some other person as the court may direct, shall give the debtor, the trustee, all creditors and indenture trustees at least 21 days' notice by mail of . . . (1) the meeting of creditors under section 341 or section 1104(b) of the Code . . . [and]  (7) the time fixed for filing proofs of claims pursuant to [Bankruptcy Rule] 3003(c)."  Fed. R. Bankr. P. 2002(a)(1) and (7).  Furthermore, Bankruptcy Rule 2002(f) provides that notice of the order for relief shall be sent by mail to all creditors. Local Bankruptcy Rule 2002-1(e) provides that "[i]n all cases under chapter 11, the debtor may

request a bar date for the filing of proofs of claim or interest . . . ." Del. Bankr. L.R. 2002-1(e).[27]

Upon entry of a bar date order, a debtor must serve actual written notice of the bar date on (i) all

known creditors and their counsel (if known), (ii) all parties on the service list described in Local

Rule 2002-1(c), (iii) all equity security holders, (iv) indenture trustees, (v) the U.S. Trustee, and

(vi) all taxing authorities for the jurisdictions in which the debtor does business. Del. Bankr.

L.R. 2002-1(e).

82.     Bankruptcy Rule 6006(c) provides that notice of a motion to assume an executory

contract "shall be given to the other party to the contract or lease, to other parties in interest as

the court may direct, and . . . to the United States trustee." Fed. R. Bankr. P. 6006(c).

Additionally, Bankruptcy Rule 2002(l) provides that the Court may order notice by publication if

it finds that notice by mail is impractical or it is desirable to supplement other notice.

Bankruptcy Rule 9008 also provides that the Court shall determine the form and manner of

publication notice, the newspapers used, and the frequency of publication.

83.     By this Motion, the Debtors seek authority to honor prepetition obligations to

customers on account of the Customer Programs and Customer Agreements. Accordingly, at

this time the Debtors anticipate that the vast majority of customers will not have Customer

Claims for which the customers must file Proofs of Claim, and will not play an active role in

these chapter 11 cases. In an abundance of caution, however, and to the extent that any

customers seek to assert a Cure Amount or any other claim against the Debtors, the Debtors

submit that the proposed Customer Noticing Procedures, including the Customer Notices and

---

[27] "The request may be granted without notice and hearing if (i) the request gives fourteen (14) days' notice to the United States Trustee and the creditors' committee . . . , (ii) the request is filed after the Schedules and Statement of Financial Affairs have been filed and the 11 U.S.C. § 341(a) meeting of creditors has been held and (iii) the request provides that the bar date shall be not less than sixty (60) days from the date that notice of the bar date is served (and not less than 180 days from the order for relief for governmental units." *See* Del. Bankr. L.R. 2002-1(e).

Publication Notice, satisfy the requirements of Bankruptcy Rules 2002, 6006, and 9008. Rather than send customers separate notices of commencement of the chapter 11 cases, assumption of Customer Agreements, and Customer Claims Bar Date, the Customer Notices will provide customers with consolidated notice of important dates and other relevant information early in the cases, which will ultimately enable customers to make more informed decisions regarding the treatment and assumption of their Customer Agreements and whether to file Proofs of Claim for Customer Claims.

84.     Accordingly, the proposed Customer Noticing Procedures are beneficial to the Debtors' estates, because they provide actual and constructive notice of the commencement of the chapter 11 cases, assumption of the Customer Agreements, and the Customer Claims Bar Date to the Debtors' customers in an efficient and cost-effective manner.

V.     **Cause Exists To Authorize the Debtors' Financial Institutions To Honor Checks and Electronic Fund Transfers.**

85.     The Debtors have sufficient funds to pay the amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations, debtor in possession financing, and anticipated access to cash collateral. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the Customer Programs and Customer Agreements. Thus, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. Accordingly, the Debtors respectfully request that the Court authorize and direct all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

## The Requirements of Bankruptcy Rule 6003 are Satisfied

86.     Pursuant to Bankruptcy Rule 6003, the Court may grant relief regarding a motion to pay all or part of a prepetition claim within 21 days after the Petition Date if the relief is necessary to avoid immediate and irreparable harm. Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001).

87.     As described above, the Customer Programs and Customer Agreements are integral to the Debtors' continued operations because they are necessary to maintain the confidence and goodwill of the Debtors' customers. The Debtors are at a critical juncture at which they must make every effort to retain customer support, drive revenues, and maximize cash flow. The Debtors' inability to honor the Customer Programs and Customer Agreements could materially—and perhaps fatally—impair these efforts and thwart the Debtors' chapter 11 cases before they have had a chance to begin. Moreover, the Debtors are not seeking authority to assume any executory contract or unexpired lease under section 365 of the Bankruptcy Code during the first 21 days after the Petition Date. Accordingly, the Debtors submit that they have satisfied Bankruptcy Rule 6003 to support immediate payment of any obligations arising from Customer Programs and Customer Agreements.

## Waiver of Bankruptcy Rules 6004(a) and 6004(h)

88.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

**Reservation of Rights**

89.     Nothing contained in this Motion or any actions taken by the Debtors pursuant to relief granted in the Claims Order and Assumption Order is intended or should be construed as: (a) an admission as to the validity or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code other than the Customer Agreements; or (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity or amount of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

**Notice**

90.     The Debtors shall provide notice of this Motion on the date hereof via facsimile, overnight delivery, and/or hand delivery to:  (a) the Office of the U.S. Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) Citibank, N.A., in its capacity as administrative agent under the TCEH first lien credit agreement and collateral agent under the TCEH intercreditor agreements and counsel thereto; (d) Bank of New York Mellon Trust Company, N.A., in its capacity as indenture trustee under:  (i) the TCEH unsecured pollution control revenue bonds; and (ii) the EFCH 2037 Notes due 2037, and counsel thereto; (e) American Stock Transfer & Trust Company, LLC, in its capacity as indenture trustee under:

(i) the 9.75% EFH senior unsecured notes due 2019; (ii) the 10.0% EFH senior unsecured notes due 2020; (iii) the 10.875% EFH LBO senior unsecured notes due 2017; (iv) the 11.25%/12.0% EFH LBO toggle notes due 2017; (v) the 5.55% EFH legacy notes (series P) due 2014; (vi) the 6.50% EFH legacy notes (series Q) due 2024; and (vii) the 6.55% EFH legacy notes (series R) due 2034, and counsel thereto; (f) Computershare Trust Company, N.A. and Computershare Trust Company of Canada, in their capacities as indenture trustee under: (i) the 11.0% EFIH senior secured second lien notes due 2021; and (ii) the 11.75% EFIH senior secured second lien notes due 2022, and counsel thereto; (g) UMB Bank, N.A. in its capacity as indenture trustee under: (i) the 9.75% EFIH senior unsecured notes due 2019; and (ii) the 11.25%/12.25% EFIH senior toggle notes due 2018, and counsel thereto; (h) BOKF, NA, dba Bank of Arizona, in its capacity as indenture trustee under 11.50% TCEH senior secured notes due 2020, and counsel thereto; (i) CSC Trust Company of Delaware in its capacity as indenture trustee under: (i) the 6.875% EFIH senior secured notes due 2017; and (ii) the 10.0% EFIH senior secured notes due 2020, and counsel thereto; (j) Law Debenture Trust Company of New York in its capacity as indenture trustee under: (i) the 10.25% TCEH senior unsecured notes due 2015; and (ii) the 10.50%/11.25% TCEH senior toggle notes due 2016, and counsel thereto; (k) Wilmington Savings Fund Society, FSB in its capacity as indenture trustee under the 15.0% TCEH senior secured second lien notes due 2021, and counsel thereto; (l) counsel to certain holders of claims against the Debtors regarding each of the foregoing described in clauses (c) through (k); (m) the agent for the TCEH debtor-in-possession financing facility and counsel thereto; (n) the agent for the EFIH debtor-in-possession financing facility and counsel thereto; (o) counsel to certain holders of equity in Texas Energy Future Holdings Limited Partnership; (p) counsel to Oncor; (q) the SEC; (r) the Internal Revenue Service; (s) the Office of the United States Attorney for the

43

District of Delaware; (t) the Office of the Texas Attorney General on behalf of the PUC; and (u) counsel to ERCOT.  As this Motion is seeking "first day" relief, within forty eight hours of the entry of an order respecting this Motion, the Debtors will serve copies of this Motion and the order respecting this Motion as required by Local Bankruptcy Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**No Prior Request**

91.    No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Debtors respectfully request that the Court enter the Claims Order and the Assumption Order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Wilmington, Delaware
Dated:  April 29, 2014

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:      (302) 651-7700
Facsimile:      (302) 651-7701
Email:          collins@rlf.com
                defranceschi@rlf.com
                madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
Richard M. Cieri (*pro hac vice* pending)
Edward O. Sassower, P.C. (*pro hac vice* pending)
Stephen E. Hessler (*pro hac vice* pending)
Brian E. Schartz (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          richard.cieri@kirkland.com
                edward.sassower@kirkland.com
                stephen.hessler@kirkland.com
                brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (*pro hac vice* pending)
Chad J. Husnick (*pro hac vice* pending)
Steven N. Serajeddini (*pro hac vice* pending)
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          james.sprayregen@kirkland.com
                chad.husnick@kirkland.com
                steven.serajeddini@kirkland.com

Proposed Co-Counsel to the Debtors and Debtors in Possession

45

**EXHIBIT A**

**Proposed Claims Order**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-_____ (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

ORDER AUTHORIZING THE DEBTORS TO (A) MAINTAIN AND ADMINISTER
CUSTOMER PROGRAMS AND CUSTOMER AGREEMENTS, (B) HONOR
PREPETITION OBLIGATIONS RELATED THERETO, (C) PAY CERTAIN
EXPENSES ON BEHALF OF CERTAIN ORGANIZATIONS, (D) FIX THE
DEADLINE TO FILE PROOFS OF CLAIM FOR CERTAIN CUSTOMER
CLAIMS, AND (E) ESTABLISH PROCEDURES FOR NOTIFYING CUSTOMERS OF
COMMENCEMENT OF THE DEBTORS' CHAPTER 11 CASES, ASSUMPTION OF
THE CUSTOMER AGREEMENTS, AND THE BAR DATE FOR CUSTOMER CLAIMS

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in
possession (collectively, the "Debtors"), for entry of an order (this "Order"), authorizing, but not
directing, the Debtors to honor certain prepetition obligations to customers, continue the
Customer Programs and perform under the Customer Agreements in the ordinary course of
business, pay certain expenses on behalf of certain organizations, fix the deadline to file proofs
of claim for certain customer claims, and establish procedures to notify customers of the
commencement of the chapter 11 cases, the Retail Debtors' assumption of Customer
Agreements, and the Customer Claims Bar Date for Customer Claims, all as more fully set forth

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which the debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

in the Motion; and upon the First Day Declaration; and the Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and the Court having found that the Debtors provided appropriate notice of the Motion and the opportunity for a hearing on the Motion under the circumstances; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing, if any, before the Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted as set forth herein.

2.      The Debtors are authorized to continue to (a) honor any and all obligations under the prepetition Customer Agreements, (b) continue to honor the Customer Agreements on a postpetition basis, (c) negotiate with customers, including the authority to (i) modify, amend, and extend existing Customer Agreements and (ii) settle any customer claims arising from or related to the Customer Agreements and Customer Programs; and (d) enter into new contracts and enroll new customers after the Petition Date.

3.      The Debtors are authorized, but not directed, to continue the Customer Programs in the ordinary course of business and consistent with the Debtors' historical practices, and to honor any obligations related to the Customer Programs incurred in the ordinary course of

business and consistent with the Debtors' historical practices; *provided, however*, that with respect to the Charitable Contributions Programs, the Debtors shall only honor those prepetition obligations related to the Energy Aid Program.

4.    The Debtors are authorized to pay certain expenses on behalf of the PUC and ERCOT, including all reasonable CourtCall and remote conferencing costs and the cost of providing notice and/or service of filings by the PUC and ERCOT in these chapter 11 cases to relevant parties. Notice of the PUC and ERCOT's filings will be provided to relevant parties by Epiq Bankruptcy Solutions, LLC, at the expense of the Debtors.

5.    The Customer Claims Bar Date for filing Proofs of Claims for Customer Claims (including those held by governmental units solely in their capacities as customers of the Debtors) is set for **October 27, 2014, at 5:00 p.m. (prevailing Eastern Time)**.

6.    The Customer Claims Bar Date applies to all types of claims against the Debtors that arose or are deemed to have arisen prior to the Petition Date, including secured claims, unsecured priority claims, and unsecured non-priority claims.

7.    Each customer that asserts a Customer Claim against the Debtors that arose or is deemed to have arisen before the Petition Date shall be required to file an original, written Proof of Claim substantially in the form of Official Form No. 10 attached hereto as **Exhibit 3**.

8.    All Proofs of Claim must be filed so as to be **actually received** on or before the the Customer Claims Bar Date by Epiq, the proposed notice and claims agent in these chapter 11 cases, in accordance with the requirements and instructions set forth in the Motion and the Customer Notices.

9.    Customers that hold the following types of claims are **not** required to file Proofs of Claim for such claims:

(a) any claim that is paid under this Order;

(b) claims relating to a Customer Agreement that is being assumed by the Retail Debtors under the Assumption Order, <u>only if</u> the customer agrees that the Cure Amount is $0;

(c) any claim for which a signed Proof of Claim has already been filed against the applicable Debtor(s) with the Clerk of the Court in a form substantially similar to Official Form No. 10;

(d) any claim that is specifically allowed by order of the Court or that is allowed pursuant to a plan of reorganization proposed in connection with these chapter 11 cases;

(e) any claim that has already been paid in full by any of the Debtors pursuant to the Bankruptcy Code or in accordance with an order of the Court; and

(f) any claim for which a specific deadline, other than the Customer Claims Bar Date, is fixed by the Court.

10.    The following requirements shall apply with respect to filing and preparing each Proof of Claim:

(a) ***Contents.*** Each Proof of Claim must (i) be written in English; (ii) include a claim amount denominated in United States dollars; (iii) conform substantially with the Proof of Claim Form; and (iv) be signed by the claimant or by an authorized agent or legal representative of the claimant.

(b) ***Original Signatures Required.*** Only an <u>original</u> Proof of Claim may be deemed acceptable for purposes of claims administration. Copies of Proofs of Claim or Proofs of Claim sent by facsimile or electronic mail will not be accepted.

(c) ***Identification of the Debtor.*** Each Proof of Claim must clearly identify the Debtor against which a claim is asserted, including the individual Debtor's case number. A Proof of Claim that is filed (i) under the joint administration case number (No. 14-_____), (ii) against multiple Debtor entities, or (iii) without identifying a Debtor, will be deemed as filed only against the Debtor entity of which the claimant is or was a customer at the time such claim arose, as determined by the Debtors after an inspection of the Debtors' books and records and the supporting documentation submitted by such customer.

(d) ***Supporting Documentation.*** Each Proof of Claim must include supporting documentation in accordance with Bankruptcy Rules 3001(c) and 3001(d). If, however, such documentation is voluminous, such Proof of Claim may include a summary of such documentation or an explanation as to why such documentation is not available.

4

(e) *Timely Service.*  Each Proof of Claim must be filed, including supporting documentation, by U.S. Mail or other hand delivery system, so as to be **actually received** by Epiq on or before the Customer Claims Bar Date (or, where applicable, on or before any other bar date as set forth herein, by order of the Court, or as provided by the Bankruptcy Code) at the following address:

*If by First-Class Mail:*
Energy Future Holdings Corp. Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 4613
New York, NY 10150-4613

*If by Hand Delivery or Overnight Mail:*
Energy Future Holdings Corp. Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, NY 10017

(f) *Receipt of Service.*  Claimants wishing to receive acknowledgment that their Proofs of Claim were received by Epiq must submit (i) a copy of the Proof of Claim and (ii) a self-addressed, stamped envelope (in addition to the original Proof of Claim sent to Epiq).

11.    In accordance with Bankruptcy Rule 3003(c)(2), any customer who is required, but fails, to file a Proof of Claim with respect to a Customer Claim in accordance with the terms set forth in the Claims Order on or before the Customer Claims Bar Date, or on or before such other date fixed by order of the Court, shall not be treated as a creditor with respect to such claim for purposes of voting and distribution, and will be deemed to have consented to the assumption of its Customer Agreement and it shall be deemed that no Cure Amount is due and owing such customer; *provided,* that the Debtors shall be authorized, but not directed, to honor any Customer Claims that are authorized to be paid under the Claims Order, before or after the Customer Claims Bar Date, irrespective of whether a Proof of Claim has been filed with respect to such Customer Claim.

12.    The Noticing Procedures are hereby approved.

13.    The form of Current Customer Notice attached hereto as **Exhibit 1** is hereby approved, and the Debtors are authorized to send the Current Customer Notice to customers by mail.

14.    The form of Former Customer Notice attached hereto as **Exhibit 2** is hereby approved, and the Debtors are authorized to send the Former Customer Notice to customers by mail.

15.    The Debtors are authorized to publish the Publication Notice in: (i) *The Wall Street Journal*, *USA Today*, *The Dallas Morning News*, *Houston Chronicle*, *Corpus Christi Caller Times*, *Fort Worth Star-Telegram*, and *Waco Tribune-Herald*; and (ii) on the restructuring website established by Epiq, the Debtors' proposed noticing and claims agent, available at http://www.efhcaseinfo.com.

16.    The hearing to approve the Assumption Order shall be _____, 2014, at __:__ a.m./p.m. (prevailing Eastern Time).  Any objections or responses to the Motion or the proposed assumption must be filed on or before the Assumption Objection Deadline,_____, 2014, at __:__ a.m./p.m. (prevailing Eastern Time).

17.    This Order does not grant any relief with respect to or affect the rights, duties, or obligations of EFIH, EFIH Finance Inc., or EFH Corp., other than with respect to EFH Corp.'s obligations under the Charitable Contributions Programs.

18.    In accordance with this Order and any other order of this Court, each of the financial institutions at which the Debtors maintain their accounts relating to the payment of the obligations described in this Order is authorized to honor checks and electronic payment requests presented for payment of obligations described in this Order and all fund transfer requests made by the Debtors related thereto to the extent that sufficient funds are on deposit in such amounts.

6

19.     The Debtors are authorized to issue postpetition checks or to effect postpetition wire transfer requests in replacement of any checks or wire transfer requests in respect of any obligations related to the Customer Programs that are dishonored or rejected.

20.     Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief, nothing in this Order shall be deemed:  (a) an admission as to the validity or amount of any claim against a Debtor entity; (b) a waiver of the Debtors' rights to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law.  Payments made pursuant to this Order shall not be construed as an admission as to the validity or amount of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

21.     The requirements set forth in Bankruptcy Rule 6003(b) are satisfied by the contents of the Motion.

22.     Notice of the Motion as provided therein shall be deemed good and sufficient and the requirements of the Local Bankruptcy Rules are satisfied by such notice.

23.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7062, 9014 or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

24.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

25.    The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

26.    The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Wilmington, Delaware
Dated: _____, 2014

_____
UNITED STATES BANKRUPTCY JUDGE

8

**EXHIBIT 1** to **EXHIBIT A**

**Proposed Current Customer Notice**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-_____ (___) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

NOTICE TO CURRENT CUSTOMERS OF
(A) COMMENCEMENT OF CHAPTER 11 CASES, MEETING OF
CREDITORS, AND FIXING OF CERTAIN DATES, (B) AUTHORITY
TO HONOR AND ASSUME THE CUSTOMER AGREEMENTS, AND
(C) DEADLINE FOR FILING PROOFS OF CLAIM FOR CUSTOMER CLAIMS

---

THE DEADLINE FOR FILING PROOFS OF CLAIM
FOR CUSTOMER CLAIMS IS OCTOBER 27, 2014,
AT 5:00 P.M. (PREVAILING EASTERN TIME).

---

You are receiving this notice (this "Notice") because, according to the records of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), you are: (a) a large commercial or industrial customer of the Debtors that is party to a custom power purchase agreement or a residential or small business customer of the Debtors that is subject to an agreement for the sale of electricity and related services, including the standard terms of service (each such agreement, a "Retail Agreement"); (b) party to a commercial retail natural gas agreement (each such agreement, a "Retail Gas Agreement"); or (c) party to an agreement listed on **Exhibit 1** annexed to **Exhibit B** of the Customer Programs Motion (defined herein) (each such agreement, a "Luminant Customer Agreement" and together with the Retail Agreements and Retail Gas Agreements, the "Customer Agreements").

A.    COMMENCEMENT   OF   CHAPTER   11   CASES   AND   MEETING   OF
CREDITORS.

COMMENCEMENT OF CASES: On April 29, 2014 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the

---

[1]    The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which the debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

"Bankruptcy Code") in the United States Bankruptcy Court of the District of Delaware (the "Court"). The Court has entered orders for relief under the Bankruptcy Code with respect to each of the Debtors listed above.

**DATE, TIME, AND LOCATION OF MEETING OF CREDITORS**: In accordance with section 341 of the Bankruptcy Code, the meeting of the Debtors' creditors will be conducted on [_____], 2014, at _:00 a.m./p.m. (prevailing Eastern Time), at the J. Caleb Boggs Federal Building, 844 King Street, 2nd Floor, Room [___], Wilmington, Delaware 19801. The Debtors' representative, as specified in Rule 9001(5) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), is required to appear at the meeting of creditors on the date and at the place set forth above for the purpose of being examined under oath. Attendance by creditors at the meeting is welcomed, but not required. At the meeting, the creditors may examine the Debtors and transact such other business as may properly come before the meeting. The meeting may be continued or adjourned from time to time by notice at the meeting, without further written notice to the creditors.

**PURPOSE OF CHAPTER 11 FILING**: Chapter 11 of the Bankruptcy Code enables a debtor to reorganize and/or liquidate pursuant to a chapter 11 plan. A plan is not effective unless approved by the Court at a confirmation hearing. Creditors and other parties in interest will be given notice concerning any plan, or in the event the case is dismissed or converted to another chapter of the Bankruptcy Code. The Debtors will remain in possession of their property and will continue to operate any business unless a trustee is appointed.[2]

**CREDITORS MAY NOT TAKE CERTAIN ACTIONS**: A creditor is anyone to whom a debtor owes money or property. Under the Bankruptcy Code, a debtor is granted certain protection against creditors. Common examples of prohibited actions by creditors are contacting a debtor to demand repayment, taking action against a debtor to collect money owed to creditors or to take property of a debtor, and starting or continuing foreclosure actions or repossessions. If unauthorized actions are taken by a creditor against a debtor, the Court may penalize that creditor. A creditor who is considering taking action against a debtor or the property of a debtor should review section 362 of the Bankruptcy Code and may wish to seek legal advice. **The staff of the Clerk of the Court are not permitted to give legal advice.**

**DISCHARGE OF DEBTS**. Confirmation of a chapter 11 plan may result in a discharge of debts, which may include all or part of your debt. See 11 U.S.C. § 1141(d). A discharge means that you may never try to collect the debt from the debtor, except as provided in the plan.

**B.    AUTHORITY TO HONOR AND ASSUME CUSTOMER AGREEMENTS.**

On April 29, 2014, the Debtors filed the *Motion of Energy Future Holdings Corp., et al., for Entry of (I) an Order Authorizing the Debtors to (A) Maintain and Administer Customer*

---

[2]    For a detailed description of the Debtors, their businesses, and the facts and circumstances leading to the filing of these chapter 11 cases, see the *Declaration of Paul Keglevic, Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of Energy Future Holdings Corp.,* et al., *In Support of First Day Motions,* filed contemporaneously with the Debtors' voluntary petitions for relief.

*Programs and Customer Agreements, (B) Honor Prepetition Obligations Related Thereto, (C) Pay Certain Expenses on Behalf of Certain Organizations, (D) Fix a Deadline to File Proofs of Claim for Customer Claims, and (E) Establish Procedures for Notifying Customers of Commencement of the Debtors' Chapter 11 Cases, Assumption of Customer Agreements, and the Bar Date for Customer Claims and (II) an Order Authorizing the Debtors to Assume Customer Agreements* (the "Customer Programs Motion").[3]  On [_____], 2014, the Court entered an order [Docket No. [_]] (the "Claims Order") approving the Customer Programs Motion, including authorizing the Debtors to satisfy obligations to customers (including under the Customer Agreements), fixing **October 27, 2014** as the deadline for customers (including governmental units acting solely in their capacities as customers of the Debtors) to file Proofs of Claim for Customer Claims in these chapter 11 cases (the "Customer Claims Bar Date"), approving the form of this Notice and related noticing procedures, and setting [_____], 2014 as the date for a hearing on the Customer Programs Motion at which, among other things, the Debtors are seeking final authority to assume all of the Customer Agreements under section 365(a) of the Bankruptcy Code.

**The Debtors intend to assume the Customer Agreement to which you are a party.  By assuming your Customer Agreement, the Debtors are agreeing to continue to provide electricity, natural gas, and/or related services under the terms of your Customer Agreement.**

If you wish to object to the Debtors' assumption of your Customer Agreement then you **must** file an objection to the Debtors' assumption of your Customer Agreement.  Any objection to the proposed assumption must:  (a) be in writing; (b) conform to the Bankruptcy Rules and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware; (c) state the name and address of the objecting party; (d) state with particularity the basis and nature of the objection; (e) be filed with the Bankruptcy Court on or before **May 20, 2014, at 5:00 p.m. (prevailing Eastern Time)** (the "Assumption Objection Deadline"); and (f) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **actually received** no later than the Assumption Objection Deadline by the following notice parties (the "Notice Parties"):

---

[3]    All capitalized terms used but otherwise not defined in this section shall have the meanings set forth in the Customer Programs Motion.

| **KIRKLAND & ELLIS LLP**<br>Attn: Richard M. Cieri<br>Attn: Edward O. Sassower, P.C.<br>Attn: Stephen E. Hessler<br>Attn: Brian E. Schartz<br>601 Lexington Avenue<br>New York, New York  10022<br><br>and<br><br>Attn: James H.M. Sprayregen, P.C.<br>Attn: Chad J. Husnick<br>Attn: Steven N. Serajeddini<br>300 North LaSalle<br>Chicago, Illinois 60654 | **RICHARDS, LAYTON & FINGER, P.A.**<br>Attn: Mark D. Collins<br>Attn: Daniel J. DeFranceschi<br>Attn: Jason M. Madron<br>920 North King Street<br>Wilmington, Delaware 19801 |
|---|---|
| *Counsel to the Debtors* | |
| **THE OFFICE OF THE U.S. TRUSTEE FOR THE DISTRICT OF DELAWARE**<br>Attn.:  Richard L. Schepacarter<br>844 King Street, Suite 2207<br>Wilmington, Delaware  19801 | |

Any objection to the assumption that is timely filed (and is not consensually resolved before the Assumption Objection Deadline) will be addressed at the hearing on [_____], 2014, before the Honorable [    ], United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, located at 824 Market Street, 6th Floor, Courtroom [  ], Wilmington, Delaware 19801.

In addition, the Debtors do not believe that they are in default with respect to the terms of your Customer Agreement as of the date of entry of the Assumption Order.  Accordingly, the Debtors have determined that there are no unpaid monetary obligations owed to you by the Debtors under your Customer Agreement, and no measures are necessary to comply with the terms of your Customer Agreement or otherwise remedy existing defaults, and therefore there is **no Cure Amount owed**.  Please note, however, that pursuant to the Claims Order the Debtors are authorized to satisfy the Customer Programs obligations in the ordinary course of business.

If you agree that there is no default under your Customer Agreement and that the Cure Amount owed to you is $0, you are not required to take any further action.

4

## C.   DEADLINE FOR FILING PROOFS OF CLAIM.[4]

TO THE EXTENT YOU DISAGREE WITH THE CURE AMOUNT SET FORTH
ABOVE OR OTHERWISE BELIEVE YOU HAVE A CUSTOMER CLAIM AGAINST
THE DEBTORS, THE DEADLINE FOR FILING PROOFS OF CLAIM IS OCTOBER
27, 2014.

### 1.   PROOFS OF CLAIM REQUIRED TO BE FILED.

The Customer Claims Bar Date applies to all types of Customer Claims against the Debtors that
arose or are deemed to have arisen prior to the Petition Date, including secured claims,
unsecured priority claims, and unsecured non-priority claims.

Customers that hold the following types of claims are **not** required to file Proofs of Claim for
such claims:

> (a) any claim that is paid under the Claims Order;
>
> (b) claims relating to a Customer Agreement that is being assumed by the Retail
> Debtors under the Assumption Order, only if the customer agrees that the
> Cure Amount is $0;
>
> (c) any claim for which a signed Proof of Claim has already been filed against the
> applicable Debtor(s) with the Clerk of the Court in a form substantially similar
> to Official Bankruptcy Form B10;
>
> (d) any claim that is specifically allowed by order of the Court or that is allowed
> pursuant to a plan of reorganization proposed in connection with these chapter
> 11 cases;
>
> (e) any claim that has already been paid in full by any of the Debtors pursuant to
> the Bankruptcy Code or in accordance with an order of the Court; and
>
> (f) any claim for which a specific deadline, other than the Customer Claims Bar
> Date, is fixed by the Court.

### 2.   INSTRUCTIONS FOR FILING PROOFS OF CLAIM.

For your convenience, enclosed with this Notice is a Proof of Claim Form. Proof of Claim Forms
are also available in the clerk's office of any bankruptcy court or from the Court's web site at

---

[4]   As used in this Notice, the term "claim" means, as to or against the Debtors and in accordance with section
101(5) of the Bankruptcy Code:  (a) any right to payment, whether or not such right is reduced to judgment,
liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured,
or unsecured; or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a
right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent,
matured, unmatured, disputed, undisputed, secured, or unsecured.

www.deb.uscourts.gov.  If you require additional information regarding the filing of a Proof of Claim, you may contact the Debtors' claims agent, Epiq, directly by writing to: Energy Future Holdings Corp. Claims Processing Center, c/o Epiq Bankruptcy Solutions, LLC, FDR Station, P.O. Box 4613, New York, New York 10150-4613, or contact the EFH Corp. Claims Hotline at: (877) 276-7311.

The following requirements apply with respect to preparing and filing each Proof of Claim:

> (a) **Contents.**  Each Proof of Claim must (1) be written in English; (2) include a claim amount denominated in United States dollars; (3) conform substantially with the Proof of Claim Form; and (4) be signed by the claimant or by an authorized agent or legal representative of the claimant.

> (b) **Original Signatures Required.**  Only an original Proof of Claim may be deemed acceptable for purposes of claims administration.  Copies of Proofs of Claim or Proofs of Claim sent by facsimile or electronic mail will not be accepted.

> (c) **Identification of the Debtor.**  Each Proof of Claim must clearly identify the Debtor against which a claim is asserted, including the individual Debtor's case number.  A Proof of Claim that is filed (1) under the joint administration case number (No. 14-____), (2) against multiple Debtor entities, or (3) without identifying a Debtor, will be deemed as filed only against the Debtor entity of which the claimant is or was a customer at the time such claim arose, as determined by the Debtors after an inspection of the Debtors' books and records and the supporting documentation submitted by such customer.

> (d) **Supporting Documentation.**  Each Proof of Claim must include supporting documentation in accordance with Bankruptcy Rules 3001(c) and 3001(d).  If, however, such documentation is voluminous, such Proof of Claim may include a summary of such documentation or an explanation as to why such documentation is not available.

> (e) **Timely Service.**  Each Proof of Claim must be filed, including supporting documentation, by U.S. Mail or other hand delivery system, so as to be **actually received** by Epiq on or before the Customer Claims Bar Date (or, where applicable, on or before any other bar date as set forth herein, by order of the Court, or as provided by the Bankruptcy Code) at the following address:

> > *If by First-Class Mail*:
> > Energy Future Holdings Corp. Claims Processing Center
> > c/o Epiq Bankruptcy Solutions, LLC
> > FDR Station, P.O. Box 4613
> > New York, NY 10150-4613

6

*If by Hand Delivery or Overnight Mail*:
Energy Future Holdings Corp. Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, NY 10017

(f) *Receipt of Service.* Claimants wishing to receive acknowledgment that their Proofs of Claim were received by Epiq must submit (1) a copy of the Proof of Claim and (2) a self-addressed, stamped envelope (in addition to the original Proof of Claim sent to Epiq).

3.    **CONSEQUENCES OF FAILING TO TIMELY FILE YOUR PROOF OF CLAIM.**

Pursuant to the Claims Order and in accordance with Bankruptcy Rule 3003(c)(2), if you or any party or entity who is required, but fails, to file a Proof of Claim with respect to a Customer Claim in accordance with the Claims Order on or before the Customer Claims Bar Date, please be advised that:

(A) YOU WILL NOT RECEIVE ANY DISTRIBUTION IN THESE CHAPTER 11 CASES ON ACCOUNT OF THAT CLAIM;

(B) YOU WILL NOT BE PERMITTED TO VOTE ON ANY PLAN OR PLANS OF REORGANIZATION FOR THE DEBTORS ON ACCOUNT OF THAT CLAIM; AND

(C) YOU WILL BE DEEMED TO HAVE AGREED THAT THE CURE AMOUNT DETERMINED BY THE DEBTORS IS CORRECT.

4.    **RESERVATION OF RIGHTS.**

Nothing contained in this Notice is intended to or should be construed as a waiver of the Debtors' right to:    (a) dispute, or assert offsets or defenses against, any filed claim; (b) subsequently schedule and designate a claim as disputed, contingent, or unliquidated; (c) honor any Customer Claims that are authorized to be paid under the Claims Order, before or after the Customer Claims Bar Date, irrespective of whether a Proof of Claim has been filed with respect to such Customer Claim; and (d) otherwise amend or supplement the Debtors' schedules of creditors and assets and liabilities.

5.    **ADDITIONAL INFORMATION.**

Copies of the Customer Programs Motion, Claims Order, and other information regarding the Debtors' chapter 11 cases are available for inspection free of charge on Epiq's website at http://www.efhcaseinfo.com. Filings in the Debtors' chapter 11 cases also are available for a fee at the Court's website at http://www.deb.uscourts.gov. A login identification and password to the Court's Public Access to Court Electronic Records ("PACER") are required to access this information and can be obtained through the PACER Service Center at http://www.pacer.psc.uscourts.gov. Copies of documents filed in these cases also may be

examined between the hours of 9:00 a.m. and 4:30 p.m. (prevailing Eastern Time), Monday through Friday, at the office of the Clerk of the Bankruptcy Court, United States Bankruptcy Court for the District of Delaware, 8234 Market Street, 3rd Floor, Wilmington, Delaware 19801.

If you require additional information regarding the filing of a proof of claim, you may contact the Debtors' claims agent, Epiq, directly by writing to: Energy Future Holdings Corp. Claims Processing Center, c/o Epiq Bankruptcy Solutions, LLC, FDR Station, P.O. Box 4613, New York, New York 10150-4613, or contact the EFH Corp. Claims Hotline at: (877) 276-7311.

A HOLDER OF A CLAIM AGAINST THE DEBTORS SHOULD CONSULT AN ATTORNEY REGARDING ANY MATTERS NOT COVERED BY THIS NOTICE, SUCH AS WHETHER THE HOLDER SHOULD FILE A PROOF OF CLAIM.

**BY ORDER OF THE COURT**

Wilmington, Delaware
Dated:  April 29, 2014

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:      (302) 651-7700
Facsimile:      (302) 651-7701
Email:           collins@rlf.com
                 defranceschi@rlf.com
                 madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
Richard M. Cieri (*pro hac vice* pending)
Edward O. Sassower, P.C. (*pro hac vice* pending)
Stephen E. Hessler (*pro hac vice* pending)
Brian E. Schartz (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:           richard.cieri@kirkland.com
                 edward.sassower@kirkland.com
                 stephen.hessler@kirkland.com
                 brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (*pro hac vice* pending)
Chad J. Husnick (*pro hac vice* pending)
Steven N. Serajeddini (*pro hac vice* pending)
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:           james.sprayregen@kirkland.com
                 chad.husnick@kirkland.com
                 steven.serajeddini@kirkland.com

Proposed Co-Counsel to the Debtors and Debtors in Possession

**EXHIBIT 2** to **EXHIBIT A**

**Proposed Former Customer Notice**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-_____  (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**NOTICE TO FORMER CUSTOMERS OF (A) COMMENCEMENT OF CHAPTER 11
CASES, MEETING OF CREDITORS, AND FIXING OF CERTAIN DATES AND
(B) THE DEADLINE FOR FILING PROOFS OF CLAIM FOR CUSTOMER CLAIMS**

---

> **THE DEADLINE FOR FILING PROOFS OF CLAIM
> FOR CUSTOMER CLAIMS IS OCTOBER 27, 2014,
> AT 5:00 P.M. (PREVAILING EASTERN TIME).**

You are receiving this notice (this "Notice") because, according to the records of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), you are a former customer of the Debtors.

**A.    COMMENCEMENT OF CHAPTER 11 CASES AND MEETING OF
       CREDITORS.**

**COMMENCEMENT OF CASES**: On April 29, 2014 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court of the District of Delaware (the "Court"). The Court has entered orders for relief under the Bankruptcy Code with respect to each of the Debtors listed above.

**DATE, TIME, AND LOCATION OF MEETING OF CREDITORS**: In accordance with section 341 of the Bankruptcy Code, the meeting of the Debtors' creditors will be conducted on [_____], 2014, at [_]:00 a.m./p.m. (prevailing Eastern Time), at the J. Caleb Boggs Federal Building, 844 King Street, 2nd Floor, Room [___], Wilmington, Delaware 19801. The Debtors' representative, as specified in Rule 9001(5) of the Federal Rules of Bankruptcy

---

[1]    The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which the debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

Procedure (the "Bankruptcy Rules"), is required to appear at the meeting of creditors on the date and at the place set forth above for the purpose of being examined under oath. Attendance by creditors at the meeting is welcomed, but not required. At the meeting, the creditors may examine the Debtors and transact such other business as may properly come before the meeting. The meeting may be continued or adjourned from time to time by notice at the meeting, without further written notice to the creditors.

**PURPOSE OF CHAPTER 11 FILING:** Chapter 11 of the Bankruptcy Code enables a debtor to reorganize and/or liquidate pursuant to a chapter 11 plan. A plan is not effective unless approved by the Court at a confirmation hearing. Creditors and other parties in interest will be given notice concerning any plan, or in the event the case is dismissed or converted to another chapter of the Bankruptcy Code. The Debtors will remain in possession of their property and will continue to operate any business unless a trustee is appointed.[2]

**CREDITORS MAY NOT TAKE CERTAIN ACTIONS:** A creditor is anyone to whom a debtor owes money or property. Under the Bankruptcy Code, a debtor is granted certain protection against creditors. Common examples of prohibited actions by creditors are contacting a debtor to demand repayment, taking action against a debtor to collect money owed to creditors or to take property of a debtor, and starting or continuing foreclosure actions or repossessions. If unauthorized actions are taken by a creditor against a debtor, the Court may penalize that creditor. A creditor who is considering taking action against a debtor or the property of a debtor should review section 362 of the Bankruptcy Code and may wish to seek legal advice. **The staff of the Clerk of the Court are not permitted to give legal advice.**

**DISCHARGE OF DEBTS.** Confirmation of a chapter 11 plan may result in a discharge of debts, which may include all or part of your debt. See 11 U.S.C. § 1141(d). A discharge means that you may never try to collect the debt from the debtor, except as provided in the plan.

**B.      DEADLINE FOR FILING PROOFS OF CLAIM.**[3]

On April 29, 2014, the Debtors filed the *Motion of Energy Future Holdings Corp., et al., for Entry of (I) an Order Authorizing the Debtors to (A) Maintain and Administer Customer Programs and Customer Agreements, (B) Honor Prepetition Obligations Related Thereto, (C) Pay Certain Expenses on Behalf of Certain Organizations, (D) Fix a Deadline to File Proofs of Claim for Customer Claims, and (E) Establish Procedures for Notifying Customers of*

---

[2]   For a detailed description of the Debtors, their businesses, and the facts and circumstances leading to the filing of these chapter 11 cases, see the *Declaration of Paul Keglevic, Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of Energy Future Holdings Corp., et al., In Support of First Day Motions*, filed contemporaneously with the Debtors' voluntary petitions for relief.

[3]   As used in this Notice, the term "claim" means, as to or against the Debtors and in accordance with section 101(5) of the Bankruptcy Code: (a) any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

*Commencement of the Debtors' Chapter 11 Cases, Assumption of Customer Agreements, and the Bar Date for Customer Claims and (II) an Order Authorizing the Debtors to Assume Customer Agreements* (the "Customer Programs Motion").[4]  On [_____], 2014, the Court entered an order [Docket No. [ ]] (the "Claims Order") approving the Customer Programs Motion, including, among other things, fixing **October 27, 2014** as the deadline for customers (including governmental units acting solely in their capacities as customers of the Debtors) to file Proofs of Claim for Customer Claims in these chapter 11 cases (the "Customer Claims Bar Date"), and approving the form of this Notice and related noticing procedures.

---

**TO THE EXTENT YOU HAVE A CUSTOMER CLAIM AGAINST THE DEBTORS, THE DEADLINE FOR FILING PROOFS OF CLAIM IS OCTOBER 27, 2014.**

---

1.    **PROOFS OF CLAIM REQUIRED TO BE FILED.**

The Customer Claims Bar Date applies to all types of Customer Claims against the Debtors that arose or are deemed to have arisen prior to the Petition Date, including secured claims, unsecured priority claims, and unsecured non-priority claims.

Customers that hold the following types of claims are **not** required to file Proofs of Claim for such claims:

> (a) any claim that is paid under the Claims Order;
>
> (b) any claim for which a signed Proof of Claim has already been filed against the applicable Debtor(s) with the Clerk of the Court in a form substantially similar to Official Bankruptcy Form B10;
>
> (c) any claim that is specifically allowed by order of the Court or that is allowed pursuant to a plan of reorganization proposed in connection with these chapter 11 cases;
>
> (d) any claim that has already been paid in full by any of the Debtors pursuant to the Bankruptcy Code or in accordance with an order of the Court; and
>
> (e) any claim for which a specific deadline, other than the Customer Claims Bar Date, is fixed by the Court.

2.    **INSTRUCTIONS FOR FILING PROOFS OF CLAIM.**

For your convenience, enclosed with this Notice is a Proof of Claim Form. Proof of Claim Forms are also available in the clerk's office of any bankruptcy court or from the Court's web site at

---

[4]    All capitalized terms used but otherwise not defined in this section shall have the meanings set forth in the Customer Programs Motion.

3

www.deb.uscourts.gov. If you require additional information regarding the filing of a Proof of Claim, you may contact the Debtors' claims agent, Epiq, directly by writing to: Energy Future Holdings Corp. Claims Processing Center, c/o Epiq Bankruptcy Solutions, LLC, FDR Station, P.O. Box 4613, New York, New York 10150-4613, or contact the EFH Corp. Claims Hotline at: (877) 276-7311.

The following requirements apply with respect to preparing and filing each Proof of Claim:

(a) *Contents.* Each Proof of Claim must (1) be written in English; (2) include a claim amount denominated in United States dollars; (3) conform substantially with the Proof of Claim Form; and (4) be signed by the claimant or by an authorized agent or legal representative of the claimant.

(b) *Original Signatures Required.* Only an original Proof of Claim may be deemed acceptable for purposes of claims administration. Copies of Proofs of Claim or Proofs of Claim sent by facsimile or electronic mail will not be accepted.

(c) *Identification of the Debtor.* Each Proof of Claim must clearly identify the Debtor against which a claim is asserted, including the individual Debtor's case number. A Proof of Claim that is filed (1) under the joint administration case number (No. 14-[_____]), (2) against multiple Debtor entities, or (3) without identifying a Debtor, will be deemed as filed only against the Debtor entity of which the claimant is or was a customer at the time such claim arose, as determined by the Debtors after an inspection of the Debtors' books and records and the supporting documentation submitted by such customer.

(d) *Supporting Documentation.* Each Proof of Claim must include supporting documentation in accordance with Bankruptcy Rules 3001(c) and 3001(d). If, however, such documentation is voluminous, such Proof of Claim may include a summary of such documentation or an explanation as to why such documentation is not available.

(e) *Timely Service.* Each Proof of Claim must be filed, including supporting documentation, by U.S. Mail or other hand delivery system, so as to be **actually received** by Epiq on or before the Customer Claims Bar Date (or, where applicable, on or before any other bar date as set forth herein, by order of the Court, or as provided by the Bankruptcy Code) at the following address:

*If by First-Class Mail*:
Energy Future Holdings Corp. Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 4613
New York, NY 10150-4613

4

*If by Hand Delivery or Overnight Mail*:
Energy Future Holdings Corp. Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, NY 10017

(f) ***Receipt of Service.*** Claimants wishing to receive acknowledgment that their Proofs of Claim were received by Epiq must submit (1) a copy of the Proof of Claim and (2) a self-addressed, stamped envelope (in addition to the original Proof of Claim sent to Epiq).

3. **CONSEQUENCES OF FAILING TO TIMELY FILE YOUR PROOF OF CLAIM.**

Pursuant to the Claims Order and in accordance with Bankruptcy Rule 3003(c)(2), if you or any party or entity who is required, but fails, to file a Proof of Claim with respect to a Customer Claim in accordance with the Claims Order on or before the Customer Claims Bar Date, please be advised that:

(A) YOU WILL NOT RECEIVE ANY DISTRIBUTION IN THESE CHAPTER 11 CASES ON ACCOUNT OF THAT CLAIM; AND

(B) YOU WILL NOT BE PERMITTED TO VOTE ON ANY PLAN OR PLANS OF REORGANIZATION FOR THE DEBTORS ON ACCOUNT OF THAT CLAIM.

4. **RESERVATION OF RIGHTS.**

Nothing contained in this Notice is intended to or should be construed as a waiver of the Debtors' right to: (a) dispute, or assert offsets or defenses against, any filed claim; (b) subsequently schedule and designate a claim as disputed, contingent, or unliquidated; (c) honor any Customer Claims that are authorized to be paid under the Claims Order, before or after the Customer Claims Bar Date, irrespective of whether a Proof of Claim has been filed with respect to such Customer Claim; and (d) otherwise amend or supplement the Debtors' schedules of creditors and assets and liabilities.

5. **ADDITIONAL INFORMATION.**

Copies of the Customer Programs Motion, Claims Order, and other information regarding the Debtors' chapter 11 cases are available for inspection free of charge on Epiq's website at http://www.efhcaseinfo.com. Filings in the Debtors' chapter 11 cases also are available for a fee at the Court's website at http://www.deb.uscourts.gov. A login identification and password to the Court's Public Access to Court Electronic Records ("PACER") are required to access this information and can be obtained through the PACER Service Center at http://www.pacer.psc.uscourts.gov. Copies of documents filed in these cases also may be examined between the hours of 9:00 a.m. and 4:30 p.m. (prevailing Eastern Time), Monday through Friday, at the office of the Clerk of the Bankruptcy Court, United States Bankruptcy Court for the District of Delaware, 8234 Market Street, 3rd Floor, Wilmington, Delaware 19801.

If you require additional information regarding the filing of a proof of claim, you may contact the Debtors' claims agent, Epiq, directly by writing to: Energy Future Holdings Corp. Claims Processing Center, c/o Epiq Bankruptcy Solutions, LLC, FDR Station, P.O. Box 4613, New York, New York 10150-4613, or contact the EFH Corp. Claims Hotline at: (877) 276-7311.

A HOLDER OF A CLAIM AGAINST THE DEBTORS SHOULD CONSULT AN ATTORNEY REGARDING ANY MATTERS NOT COVERED BY THIS NOTICE, SUCH AS WHETHER THE HOLDER SHOULD FILE A PROOF OF CLAIM.

**BY ORDER OF THE COURT**

Wilmington, Delaware
Dated:  April 29, 2014

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:     (302) 651-7700
Facsimile:      (302) 651-7701
Email:           collins@rlf.com
                    defranceschi@rlf.com
                    madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
Richard M. Cieri (*pro hac vice* pending)
Edward O. Sassower, P.C. (*pro hac vice* pending)
Stephen E. Hessler (*pro hac vice* pending)
Brian E. Schartz (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:           richard.cieri@kirkland.com
                    edward.sassower@kirkland.com
                    stephen.hessler@kirkland.com
                    brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (*pro hac vice* pending)
Chad J. Husnick (*pro hac vice* pending)
Steven N. Serajeddini (*pro hac vice* pending)
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Email:           james.sprayregen@kirkland.com
                    chad.husnick@kirkland.com
                    steven.serajeddini@kirkland.com

Proposed Co-Counsel to the Debtors and Debtors in Possession

**EXHIBIT 3 to EXHIBIT A**

**Proof of Claim Form**

| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**<br>Energy Future Holdings Corp. Claims Processing Center<br>c/o Epiq Bankruptcy Solutions, LLC<br>FDR Station, P.O. Box 4613<br>New York, NY 10150-4613 | **PROOF OF CLAIM**<br>COURT USE ONLY |

| Name of Debtor: | Case Number: |
|---|---|
| | |

**NOTE:** Do not use this form to make a claim for an administrative expense that arises *after* the bankruptcy filing. You may file a request for payment of an administrative expense according to 11 U.S.C. § 503.

Name and address where notices should be sent:





Telephone number:          Email:

☐ Check this box if this claim amends a previously filed claim.

**Court Claim Number:**

*(If known)*
_____

**Filed on:**
_____

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

Name and address where payment should be sent (if different from above) :




Telephone number:          Email:

COURT USE ONLY

**5.    Amount of Claim Entitled to Priority under 11 U.S.C. § 507 (a).  If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.**

☐  Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐  Wages, salaries or commissions (up to $12,475), earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. § 507(a)(4).

☐  Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(5).

☐  Up to $2,775 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507(a)(7).

☐  Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐  Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(____).

**Amount entitled to priority:**

$_____

**1.    Amount of Claim as of Date Case Filed:**          $_____
If all or part of the claim is secured, complete item 4.
If all or part of the claim is entitled to priority, complete item 5.
If all or part of the claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete item 6.
☐    Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest charges.

**2.    Basis for Claim:** _____
(See instruction #2)

**3.    Last four digits of any number by which creditor identifies debtor:** ____ ____ ____ ____
3a. Debtor may have scheduled account as: _____
(See instruction #3a)

**4.    Secured Claim** (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

**Nature of property or right of setoff:**
☐ Real Estate    ☐ Motor Vehicle    ☐ Other

**Describe:** _____
**Value of Property:** $_____
**Annual Interest Rate** _____% ☐ Fixed or ☐ Variable
(when case was filed)

Amount of arrearage and other charges, as of time case was filed, included in secured claim, if any:

$_____

**Basis for perfection:** _____

**Amount of Secured Claim:**  $_____

**Amount Unsecured:**      $_____

**6.    Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9): $**          (See instruction #6)
**7.    Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)
**8.    Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. If the claim is secured, box 4 has been completed, and redacted copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #8 and definition of "redacted".)*
DO NOT SEND ORIGINAL DOCUMENTS.  ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

**9.    Signature:** (See instruction #9)    Check the appropriate box:
☐ I am the creditor.    ☐ I am the creditor's authorized agent.    ☐ I am the trustee, or the debtor, or their    ☐ I am a guarantor, surety, indorser, or other codebtor.
        (Attached a copy of power of attorney, if any.)    authorized agent. (See Bankruptcy Rule 3004.)    (See Bankruptcy Rule 3005.)
I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Address, telephone number, and email
(if different from notice address above):

Print Name: _____
Title: _____     (Signature)
Company: _____
                      (Date)

Telephone number: _____
Email: _____

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both.  18 U.S.C. §§ 152 and 3571.

# INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, exceptions to these general rules may apply.*

**Items to be completed in Proof of Claim form**

**Name of Debtor, and Case Number:**
Fill in the debtor's full name, and the case number. The full list of debtors is provided under the general information section on the Claims Agent's website:

http://dm.epiq11.com/EFH

If the creditor received a notice of the case from the bankruptcy court, all of this information is at the top of the notice. If your Claim is against multiple Debtors, complete a separate form for each Debtor.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the bankruptcy filing. Follow the instructions concerning whether to complete items 4, 5, and 6. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card. If the claim is based on delivering health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information. You may be required to provide additional disclosure if an interested party objects to the claim.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4. Secured Claim:**
Check whether the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See Definitions.)

If the claim is secured, check the box for the nature and value of property that secures the claim, attach copies of lien documentation, and state, as of the date of the bankruptcy filing, the annual interest rate (and whether it is fixed or variable), and the amount past due on the claim.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of the claim falls into any category shown, check the appropriate box(es) and state the amount entitled to priority. (See Definitions.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9):**
State the value of any goods received by the debtor within 20 days before the date of commencement in which the goods have been sold to the debtor in the ordinary course of the debtor's business.

**7. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**8. Documents:**
Attach redacted copies of any documents that show the debt exists and a lien secures the debt. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary in addition to the documents themselves. FRBP 3001(c) and (d). If the claim is based on delivering health care goods or services, limit disclosing confidential health care information. Do not send original documents, as attachments may be destroyed after scanning.

**9. Date and Signature:**
The individual completing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what constitutes a signature. If you sign this form, you declare under penalty of perjury that the information provided is true and correct to the best of your knowledge, information, and reasonable belief. Your signature is also a certification that the claim meets the requirements of FRBP 9011(b). Whether the claim is filed electronically or in person, if your name is on the signature line, you are responsible for the declaration. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. If the claim is filed by an authorized agent, attach a complete copy of any power of attorney, and provide both the name of the individual filing the claim and the name of the agent. If the authorized agent is a servicer, identify the corporate servicer as the company. Criminal penalties apply for making a false statement on a proof of claim.

## DEFINITIONS

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is the person, corporation, or other entity owed a debt by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (10).

**Claim**
A claim is the creditor's right to receive payment on a debt that was owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the Claims Agent at the following address:

**If by First Class Mail:**

Energy Future Holdings Corp. Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 4613
New York, NY 10150-4613

**If by Hand Delivery or Overnight Mail:**

Energy Future Holdings Corp. Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, NY 10017

**Secured Claim Under 11 U.S.C. §506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. §507(a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security, individual's tax identification, or financial-account number, all but the initials of a minor's name and only the year of any person's date of birth.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

## INFORMATION

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim or you may access the Claims Agent's website (http://dm.epiq11.com/EFH) to view your filed proof of claim under "Claims."

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court.

## EXHIBIT B

### Proposed Assumption Order

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-_____ (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

ORDER AUTHORIZING THE RETAIL
DEBTORS TO ASSUME THE CUSTOMER AGREEMENTS

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), for entry of an order (this "Order"), authorizing the Retail Debtors to assume Customer Agreements, as more fully set forth in the Motion; and upon the First Day Declaration; and the Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and the Court having found that the Debtors provided appropriate notice of the Motion and the opportunity for a hearing on the Motion under the circumstances; and the Court having reviewed the Motion and having heard the statements in

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which the debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

support of the relief requested therein at a hearing, if any, before the Court (the "Hearing"); and

the Court having determined that the legal and factual bases set forth in the Motion and at the

Hearing establish just cause for the relief granted herein; and upon all of the proceedings had

before the Court; and after due deliberation and sufficient cause appearing therefor, it is

HEREBY ORDERED THAT:

1.    The Motion is granted as set forth herein.

2.    The Debtors are authorized to honor all prepetition obligations relating to the

Charitable Contributions Programs.

3.    The Retail Debtors are authorized to assume the Customer Agreements (including

the Customer Agreements identified on **Exhibit 1** to this Order), and the Customer Agreements

are hereby assumed pursuant to section 365 of the Bankruptcy Code.    By way of further

explanation for customers who are reading this Order, the Retail Debtors have agreed to continue

providing electricity, natural gas, and/or related services to customers, and will continue to

perform subject to the terms of the Customer Agreements.

4.    To the extent the Court finds that any customer is owed a Cure Amount, assumption

of the respective Customer Agreement shall be effective and contingent upon payment of such

Cure Amount by the Retail Debtors, payment of such Cure Amounts shall constitute the cure of

all defaults arising under the Customer Agreement that are required to be cured by section

365(b)(1)(A) of the Bankruptcy Code (after giving effect to section 365(b)(2) of the Bankruptcy

Code), and the Retail Debtors shall have demonstrated adequate assurance of future performance

of the Customer Agreement and shall have satisfied the requirements of section 365(b)(1)(C) of

the Bankruptcy Code related thereto.

5.    In accordance with this Order and any other order of this Court, each of the financial institutions at which the Debtors maintain their accounts relating to the payment of the obligations described in this Order is authorized to honor checks and electronic payment requests presented for payment of obligations described in this Order and all fund transfer requests made by the Debtors related thereto to the extent that sufficient funds are on deposit in such amounts.

6.    The Debtors are authorized to issue postpetition checks or to effect postpetition wire transfer requests in replacement of any checks or wire transfer requests in respect of any obligations related to the Customer Programs that are dishonored or rejected.

7.    Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief, nothing in this Order shall be deemed:  (a) an admission as to the validity or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' rights to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any claim is of a type specified or defined in this Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code other than the Customer Agreements; or (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law.  Payments made pursuant to this Order shall not be construed as an admission as to the validity or amount of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

8.    Notice of the Motion as provided therein shall be deemed good and sufficient and the requirements of Bankruptcy Rule 6004(a) and the Local Bankruptcy Rules are satisfied by such notice.

9.    This Order does not grant any relief with respect to or affect the rights, duties, or obligations of EFIH, EFIH Finance Inc., or EFH Corp., other than with respect to EFH Corp.'s obligations under the Charitable Contributions Programs.

10.    Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7062, 9014 or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

11.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

12.    The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

13.    The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Wilmington, Delaware
Dated: _____, 2014

_____
UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT 1** to **Exhibit B**

**Luminant Customer Agreements**

## Luminant Customer Agreements

| Counterparty | Effective Date | Cure Amount | Luminant Customer Agreement[1] |
|---|---|---|---|
| The City of Goldsmith, Texas | June 15, 1981 | $0 | **Agreement for Electric Service** dated May 27, 1981, as amended<br><br>Luminant Energy sells electricity to The City of Goldsmith. Additionally, Luminant Energy pays The City of Goldsmith's transmission, distribution, and other charges to the applicable utility service provider, and then seeks reimbursement from The City of Goldsmith. |
| Ameripower, LLC | July 1, 2011 | $0 | **Energy Marketing Support Agreement** dated June 23, 2011, as amended<br><br>Luminant Energy sells electricity to, and acts as the Qualified Scheduling Entity for, Ameripower LLC, a competitive REP, to enable Ameripower to supply its customer load in ERCOT. |
| Infinite Electric, LLC and Veteran Energy, LLC | August 1, 2011 | $0 | **Energy Marketing Support Agreement** dated July 15, 2011, as amended<br><br>Luminant Energy sells electricity to, and acts as the Qualified Scheduling Entity for, Infinite Electric and Veteran Energy, each of which is a competitive REP, to enable Infinite and Veteran to supply their customer loads in ERCOT. |
| Clearview Electric, Inc. | October 1, 2012 | $0 | **Energy Marketing Support Agreement** dated November 1, 2012, as amended<br><br>Luminant Energy sells electricity to, and acts as the Qualified Scheduling Entity for, Clearview Electric, Inc., a competitive REP, to enable Clearview to supply its customer load in ERCOT. |

---

[1]  Luminant Energy seeks to assume each of the following Luminant Customer Agreements, and, in their sole discretion, any other agreements related thereto or referenced therein, as is necessary to give effect to the assumption of the agreements described herein.

| Counterparty | Effective Date | Cure Amount | Luminant Customer Agreement[1] |
|---|---|---|---|
| WM Renewable Energy, LLC | October 30, 2007 | $0 | **Power Purchase and Sale Agreement dated October 30, 2007**<br><br>Luminant Energy purchases power from a landfill gas facility owned by WM Renewable Energy, LLC, and serves as the "Qualified Scheduling Entity" for the power produced by such landfill. Additionally, pursuant to a separate Customer Agreement, Luminant Energy resells the power produced by the landfill to TXU Energy Retail for a specific TXU Energy Retail retail customer. The Customer Agreement between TXU Energy Retail and its retail customer and the Customer Agreement between Luminant Energy and WM Renewable Energy, LLC are interrelated, including with respect to pricing, indemnification, and the transfer of "renewable energy credits." |

2

## File a First Day Motion:

14-10979-CSS Energy Future Holdings Corp.

| | | |
|---|---|---|
| Type: bk | Chapter: 11 v | Office: 1 (Delaware) |
| Assets: y | Judge: CSS | Case Flag: VerifDue, PlnDue, DsclsDue |

### U.S. Bankruptcy Court

### District of Delaware

Notice of Electronic Filing

The following transaction was received from Jason M. Madron entered on 4/29/2014 at 9:40 AM EDT
and filed on 4/29/2014

**Case Name:**       Energy Future Holdings Corp.
**Case Number:**     14-10979-CSS
**Document Number:** 31

**Docket Text:**
Motion to Continue Customer Programs *Motion of Energy Future Holdings Corp., et al., for Entry of
(A) An Order Authorizing the Debtors to (I) Maintain and Administer Customer Programs and
Customer Agreements, (II) Honor Prepetition Obligations Related Thereto, (III) Pay Certain Expenses
on Behalf of Certain Organizations, (IV) Fix the Deadline to File Proofs of Claim for Certian Customer
Claims, and (V) Establish Procedures for Notifying Customers of Commencement of the Debtors'
Chapter 11 Cases, Assumption of Customer Agreement, and the Bar Date for Customer Claims and (B)
An Order Authorizing Certain of the Debtors to Assume the Customer Agreements* Filed By Energy
Future Holdings Corp. (Madron, Jason)

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** W:\BJW\EFH - First Day Motions\EFH - Customer Programs Motion.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=4/29/2014] [FileNumber=12418450-0
] [3a86d5e6f61b029e340d2084976f97b2457010c7596777eafeb9788a01fdd403a3f
b2e03d1102237ed2f7f18b7438dbae5496a7b4599a368ece0a44aad5ec5b6]]

**14-10979-CSS Notice will be electronically mailed to:**

Ashley F. Bartram on behalf of Interested Party Public Utility Commission of Texas
ashley.bartram@texasattorneygeneral.gov

Ashley F. Bartram on behalf of Interested Party Railroad Commission of Texas
ashley.bartram@texasattorneygeneral.gov

Ashley F. Bartram on behalf of Interested Party Texas Commission on Environmental Quality
ashley.bartram@texasattorneygeneral.gov