# Exhibit A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | Case No. 14-_____ (___) |
| Debtors. | (Joint Administration Requested) |

## MOTION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*, FOR ENTRY OF (A) AN ORDER AUTHORIZING CERTAIN OF THE DEBTORS TO PAY CERTAIN PREPETITION TRANSITION CHARGES AND DELIVERY CHARGES AND (B) AN ORDER AUTHORIZING CERTAIN OF THE DEBTORS TO ASSUME TRANSMISSION AND DISTRIBUTION SERVICE AGREEMENTS

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file

this motion (this "Motion") for entry of (a) an order, substantially in the form attached hereto as

**Exhibit A** (the "Interim Order"), authorizing, but not directing, certain of the Debtors to pay

certain prepetition amounts related to transition charges and delivery charges owed to certain

transmission and distribution service providers that come due during the period between the

Petition Date (defined herein) and the date of entry of the Assumption Order (as defined below)

(such period, the "Interim Period"),[2] and (b) after a final hearing, an order, substantially in the

form attached hereto as **Exhibit B** (the "Assumption Order"), authorizing certain of the Debtors

to assume the 23 electricity transmission and distribution service provider agreements identified

---

[1]   The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which the debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

[2]   Unless stated otherwise, the Debtors based their estimate of amounts that will come due during the Interim Period on the 30-day period after the Petition Date.

on the list annexed as **Exhibit 1** to **Exhibit B** attached hereto (collectively, the "Delivery Agreements"). In support of this Motion, the Debtors respectfully state as follows.

### Jurisdiction and Venue

1.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors consent pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The bases for the relief requested in this Motion are sections 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 6003, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Bankruptcy Rule 9013-1(m).

### Relief Requested

4.     As discussed below, the Debtor entities TXU Energy Retail Company LLC, 4Change Energy Company LLC, and Luminant ET Services Company (collectively, the "REP Debtors") are each party to one or more of the 23 Delivery Agreements on the list annexed as **Exhibit 1** to **Exhibit B** attached hereto. Each Delivery Agreement is between a REP Debtor and one of seven non-debtor regulated transmission and distribution utility service

providers, six of which are non-affiliated entities (the "Unaffiliated TDSPs"),[3] and the other of which is Oncor Electric Delivery Company LLC ("Oncor" and, together with the Unaffiliated TDSPs, the "TDSPs"). Oncor is an affiliate of the Debtors, but is not a debtor in these chapter 11 cases.[4] The Debtors estimate that the REP Debtors owe approximately $185.2 million in the aggregate to the TDSPs under the Delivery Agreements as of the Petition Date, approximately $143.1 million of which the REP Debtors owe to Oncor.

5.      By this Motion, the REP Debtors seek the authority, but not direction, pursuant to the Interim Order to pay up to approximately $9.7 million in prepetition securitized "transition" charges (the "Transition Charges") and up to approximately $32.4 million in prepetition electricity transmission and distribution charges (the "Delivery Charges") owed to the Unaffiliated TDSPs, and up to approximately $5 million in prepetition Transition Charges owed to Oncor that come due during the Interim Period. Additionally, the Debtors request that the Court schedule a final hearing as soon as practicable after the 21st day following the Petition Date (as defined herein) to consider entry of the Assumption Order, and establish a deadline (the "Assumption Objection Deadline") for parties to object to entry of the Assumption Order.

---

[3]    The Unaffiliated TDSPs are AEP Texas Central Company, AEP Texas North Company, Centerpoint Energy Houston Electric, LLC, Sharyland Utilities, L.P., Nueces Electric Cooperative, Inc., and Texas-New Mexico Power Company.

[4]    Specifically, Oncor is an affiliate of the Debtors that is approximately 80% owned by non-Debtor Oncor Electric Delivery Holdings Company LLC ("Oncor Holdings"), which, in turn, is 100% owned by the Debtor entity Energy Future Intermediate Holding Company LLC ("EFIH"), a direct subsidiary of the Debtors' corporate parent Energy Future Holdings Corp. ("EFH Corp."). Substantially all of the common stock of EFH Corp. is held by Texas Energy Future Holdings Limited Partnership ("Texas Holdings" and, together with EFH Corp. and its direct and indirect subsidiaries other than Oncor Holdings and its subsidiaries, the "Texas Holdings Group"). EFH Corp. and Oncor have implemented certain structural and operational "ring-fencing" measures based on commitments made by Texas Holdings and Oncor to the PUC (defined below) that are intended to enhance the credit quality of Oncor. These measures serve to mitigate Oncor's and Oncor Holdings' credit exposure to the Texas Holdings Group and to reduce the risk that the assets and liabilities of Oncor or Oncor Holdings would be substantively consolidated with the assets and liabilities of the Texas Holdings Group in the event of a bankruptcy of one or more of those entities. Accordingly, EFH Corp. and EFIH do not control and do not consolidate Oncor for financial reporting purposes. The "ring-fencing" measures are described in further detail in the First Day Declaration (defined herein), filed contemporaneously herewith.

6.     Pursuant to the Assumption Order and after a final hearing, the REP Debtors request authority to assume each of the Delivery Agreements and pay any related cure amounts in accordance with section 365 of the Bankruptcy Code.

7.     To enable the Debtors to carry out the relief requested by this Motion, the Debtors request that the Court authorize all applicable banks and financial institutions to receive, process, honor, and pay all checks presented for payment and all electronic payment requests made by the Debtors related to the Delivery Agreements in accordance with the Interim Order and the Assumption Order, whether such checks were presented or electronic-payment requests were submitted before or after the Petition Date.

### Background

8.     On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition with the Court under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.   The Debtors have requested joint administration of these chapter 11 cases.  The Court has not appointed a trustee, and the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has not formed any official committees in these chapter 11 cases.[5]

9.     EFH Corp., a Texas corporation, is the ultimate parent company for each of the Debtors in these chapter 11 cases and certain of EFH Corp.'s non-Debtor affiliates (collectively, "EFH").  EFH's businesses include the largest generator, distributor, and certified retail provider of electricity in Texas.  EFH conducts substantially all of its business operations in the electricity

---

[5]     The facts and circumstances supporting this Motion, along with a detailed discussion of EFH's business operations and capital structure, are set forth in the *Declaration of Paul Keglevic, Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of Energy Future Holdings Corp., et al., in Support of First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith.

4

market overseen by the Electric Reliability Council of Texas ("ERCOT"), which covers the majority of Texas. The Texas electricity market, in turn, is subject to oversight and regulation by the Public Utility Commission of Texas (the "PUC"). EFH has approximately 9,100 employees, approximately 5,700 of whom are employed by the Debtors,[6] in three distinct business units:

- EFH's *competitive electricity generation, mining, wholesale electricity sales, and commodity risk management and trading activities*, conducted by TCEH LLC's Debtor subsidiaries composing "Luminant";

- EFH's *competitive retail electricity sales operations and related operations*, mainly conducted by TCEH LLC's Debtor subsidiaries composing "TXU Energy";[7] and

- EFH's *rate-regulated electricity transmission and distribution operations*, conducted by non-Debtor Oncor Holdings and its non-Debtor subsidiaries, including Oncor.

10.    In the aggregate, the Debtors have approximately $42 billion of funded indebtedness, including (a) approximately $32.1 billion of claims against TCEH LLC and TCEH LLC's direct and indirect Debtor subsidiaries; (b) approximately $71 million of claims against EFCH; (c) approximately $1.9 billion of claims against EFH Corp.; and (d) approximately $7.7 billion of claims against EFIH.[8]

11.    Although the Debtors' balance sheet is overleveraged, the Debtors' operations are strong. Luminant's generation units are high-performing, its mining and electricity generation

---

[6]   The Debtors in these chapter 11 cases consist of: (a) the vast majority of the entities that compose Luminant and TXU Energy, as well as those entities' intermediate corporate parent entity, Texas Competitive Electric Holdings Company LLC ("TCEH LLC"), a Delaware limited liability company, and TCEH's corporate parent, Energy Future Competitive Holdings Company LLC ("EFCH"), a Delaware limited liability company; (b) EFIH, a Delaware limited liability company, and its subsidiary, EFIH Finance Inc.; (c) EFH Corp.; and (d) other direct and indirect subsidiaries of EFH Corp., including EFH Corporate Services Company.

[7]   The Debtors also conduct a relatively small amount of retail electricity operations through their 4Change brand and another entity, Luminant ET Services Company, that provides retail electricity service to some end use customers and to some of Luminant's mining operations, and a small amount of retail gas operations through Luminant Energy Company LLC.

[8]   Amounts include intercompany debt holdings and short-term borrowings, and exclude guarantees, unamortized discounts or premiums, accrued but unpaid interest, and certain other figures typically reported in the Debtors' filings with the Securities and Exchange Commission (the "SEC"), such as capital lease obligations, certain promissory notes, and certain other obligations.

operations have impressive safety records, and its commodity trading and risk management activities have delivered significant value to the Debtors. TXU Energy is an industry leader in customer care performance and product innovation and has maintained strong performance notwithstanding intense competition. And non-Debtor Oncor produces a strong and consistent stream of revenue. Thus, these chapter 11 cases will provide the Debtors with the opportunity to restructure their balance sheets and retain their position as leaders in the Texas electricity market.

12.    As of December 31, 2013, EFH Corp. reported total assets of approximately $36.4 billion in book value, approximately $28.8 billion of which is attributable to EFCH, TCEH LLC, and TCEH LLC's direct and indirect subsidiaries (collectively with TCEH LLC and EFCH, "TCEH"),[9] and total liabilities of approximately $49.7 billion in book value, approximately $41.1 billion of which is attributable to TCEH.[10] EFH Corp.'s assets and liabilities that are not attributable to TCEH are mostly attributable to EFIH's indirect ownership of approximately 80% of Oncor. EFH Corp.'s consolidated revenues for the quarter ending December 31, 2013 were approximately $1.3 billion, all of which were attributable to TCEH. EFH Corp.'s consolidated annual revenues for the year ending December 31, 2013 were approximately $5.9 billion.

I.    The TDSPs Are Critical to the Debtors' Business Operations.

13.    Pursuant to Texas law, the REP Debtors cannot and do not own or operate electric distribution facilities in Texas. Rather, the REP Debtors rely on the TDSPs' distribution facilities that connect the interconnected transmission grid and generation resources with customers.

---

[9]    Oncor's revenues are not included in EFH Corp.'s consolidated revenues because EFH Corp. accounts for its ownership of Oncor under the equity method of accounting.

[10]    Figures for TCEH are derived from EFCH's public filings with the SEC, and are almost entirely attributable to TCEH LLC and its Debtor and non-Debtor subsidiaries.

14.     The TDSPs' distribution facilities receive electricity from the interconnected transmission system and distribute electricity to points of delivery, including customers. The TDSPs are regulated because they are, in nearly every instance, the sole provider of delivery service in any particular service area where the REPs are certified to do business. In short, without access to the TDSPs' distribution systems, the REP Debtors would be unable to deliver electricity to their customers.

## II.     Prepetition Amounts Owed to the TDSPs and Outstanding Letters of Credit.

15.     The amounts that the REP Debtors pay to the TDSPs fall into two categories—Delivery Charges and Transition Charges—each of which is discussed below.

### A.     Delivery Charges.

16.     The first category of amounts that the REP Debtors pay to the TDSPs is known as Delivery Charges. The Delivery Charges are based on the PUC-approved terms and conditions that govern each TDSP's delivery services (the "Tariffs"), including the rates that TDSPs may charge for such services.[11] The Delivery Charges constitute approximately 90% to 95% of the REP Debtors' payments to TDSPs.

17.     As provided in the following table, as of the Petition Date, the REP Debtors owe approximately (a) $32.4 million in the aggregate to the Unaffiliated TDSPs on account of Delivery Charges (the "Unpaid Delivery Charges"), of which approximately $19.9 million has

---

[11]     PUC regulations adopt a standard Tariff for all TDSPs. *See* Tex. Admin. Code § 25.214. Chapter 4 of the Tariff, which concerns remedies, is applicable to all TDSPs and cannot be modified. PUC regulations also adopt a standard Tariff for all electric cooperatives, like Nueces Electric Cooperative, Inc., that have opted to offer retail customer choice. *See* Tex. Admin. Code § 25.215. Like the TDSP standard Tariff, Chapter 4 of this Tariff, relating to remedies, applies to all such electric cooperatives. Copies of the Tariffs can be found on the PUC website at http://www.puc.texas.gov/industry/electric/rates/TDR.aspx.

been secured with prepetition letters of credit (the "Delivery Charge LCs"), and (b) $138.1 million in the aggregate to Oncor on account of Unpaid Delivery Charges:[12]

| TDSP | Estimated Outstanding Delivery Charges | Delivery Charge LCs |
|------|----------------------------------------|---------------------|
| AEP Texas Central Company | $5,000,000 | $3,400,000 |
| AEP Texas North Company | $2,800,000 | $1,000,000 |
| Centerpoint Energy Houston Electric, LLC | $20,900,000 | $13,800,000 |
| Sharyland Utilities, L.P. | $25,000 | None |
| Nueces Electric Cooperative, Inc. | None | None |
| Texas-New Mexico Power Company | $3,600,000 | $1,700,000 |
| Oncor Electric Delivery Company LLC | $138,100,000 | None |

18.     The Debtors estimate that $100 million of the Delivery Charges will come due during the Interim Period. The REP Debtors seek authority pursuant to the Interim Order to continue to pay approximately $26 million of Unpaid Delivery Charges to the Unaffiliated TDSPs as such amounts come due in the ordinary course during the Interim Period. The Debtors seek authority to honor all Unpaid Delivery Charges (including amounts owed to Oncor) pursuant to the Assumption Order.

**B.     Transition Charges.**

19.     The second category of amounts that the REP Debtors pay to the TDSPs is known as Transition Charges. The Transition Charges allow TDSPs to recover certain PUC-approved costs, some of which were securitized in conjunction with Texas's transition from a fully-regulated electricity market to an unbundled, competitive retail and generation market. The

---

[12]   PUC regulations do not require the REP Debtors to maintain the Delivery Charge LCs because, as of the Petition Date, the REP Debtors have not defaulted on their obligations. The REP Debtors anticipate that the Unaffiliated TDSPs may draw on the Delivery Charge LCs after the Petition Date. The REP Debtors do not believe that the Delivery Charge LCs constitute property of their estates such that the TDSPs require Court authority to draw on the Delivery Charge LCs. Nevertheless, for purposes of clarity, the Debtors seek authority in both the Interim Order and the Assumption Order allowing (but not directing) the TDSPs to draw on the Delivery Charge LCs as payment for any outstanding amounts that the REP Debtors owe on account of Delivery Charges.

Transition Charges constitute approximately 5% to 10% of the REP Debtors' payments to the TDSPs.

20.    The PUC has issued financing orders that entitle the TDSPs to recover the Transition Charges, and several of the TDSPs have issued securities known as "transition bonds" that securitize the value of the Transition Charges (the "Transition Bonds").[13]  For the TDSPs that have issued Transition Bonds,[14] each of the applicable Tariffs provides for the collection and payment of Transition Charges to the applicable TDSP, as well as the circumstances under which a REP must provide security for its payment of Transition Charges to the applicable TDSP.[15]

21.    As provided in the following table, as of the Petition Date, the REP Debtors owe approximately (a) $9.7 million in the aggregate to the Unaffiliated TDSPs on account of Transition Charges (the "Unpaid Transition Charges"), of which approximately $15.8 million has been secured with prepetition letters of credit, deposits, or other collateral posted for the benefit of the Transition Bond indenture trustees   (the "Transition Charge Security"), and (b) $5 million in the aggregate to Oncor on account of Unpaid Transition Charges, of which

---

[13]    Pursuant to PUC financing orders, certain TDSPs are also entitled to use securitization financing to recover costs of restoring service and infrastructure associated with electric power outages as a result of hurricanes and other weather-related events or natural disasters (the "System Restoration Charges").  Under PUC regulations and applicable Tariffs, Transition Charges include System Restoration Charges, and Transition Bonds include bonds issued to securitize System Restoration Charges.  See Tex. Admin. Code § 36.401-07.  Centerpoint Energy Houston Electric, LLC has issued Transition Bonds to securitize System Restoration Charges. Accordingly, the Unpaid Transition Charges owed by the REP Debtors to Centerpoint Energy Houston Electric, LLC include prepetition System Restoration Charges, which are secured by Transition Charge Security in the form of letters of credit.

[14]    Sharyland Utilities, L.P., Nueces Electric Cooperative, Inc., AEP Texas North Company, and Texas-New-Mexico Power Company have not issued Transition Bonds.  Accordingly, these TDSPs do not collect securitized Transition Charges from the REP Debtors.  Texas-New Mexico Power Company collects PUC-approved, non-securitized "competitive transition charges."  Pursuant to section 6.1.1.3 of the Tariff, these "competitive transition charges" are treated as Delivery Charges.  Accordingly, these amounts are included in the estimated amount of Unpaid Delivery Charges owed to Texas-New Mexico Power Company.

[15]    Pursuant to PUC regulations and the Tariffs, each REP that pays Transition Charges to a TDSP must meet certain long-term unsecured credit ratings, or provide security for the Transition Charges.  Security may take the form of a deposit, guaranty, surety bond, or letter of credit.  See P.U.C. Subst. R. 25.108.

approximately $10.1 million has been secured with a Transition Charge Security for the benefit of Oncor's Transition Bond indenture trustees:[16]

| TDSP | Estimated Outstanding Transition Charges | Transition Charge Security |
|---|---|---|
| AEP Texas Central Company | $3,600,000 | $5,100,000 |
| Centerpoint Energy Houston Electric, LLC | $6,100,000 | $10,700,000 |
| Oncor Electric Delivery Company LLC | $5,000,000 | $10,100,000 |

22.     Texas law affords special protection in respect of the securitized Transition Charges.  In particular, the Texas electric industry restructuring and unbundling legislation (which created the competitive retail market) and the PUC's related financing orders provide that Transition Bonds are to be issued by bankruptcy-remote, ring-fenced subsidiaries of the TDSPs. Moreover, pursuant to state law, the Transition Bonds are secured by a lien on "transition property," which includes the right to collect Transition Charges from the REP Debtors and any Transition Charges collected by the REP Debtors from their customers.  The Transition Bond indenture trustees' lien on "transition property" is not affected by the commingling of funds.[17] Importantly, all of the Unpaid Transition Charges have been securitized with Transition Bonds, and are fully secured by the Transition Charge Security.  Because the Transition Charge Security is security for obligations that are owed to the Transition Bond indenture trustees by entities collecting Transition Charges, the Transition Charges paid by the REP Debtors to the TDSPs will ultimately be paid to the Transition Bond indenture trustees.

---

[16]    Under PUC regulations, the REP Debtors would need to replace the Transition Charge Security if drawn and, in any event, the REP Debtors anticipate remaining current with their obligations to the TDSPs with respect to Transition Charges during these chapter 11 cases such that the TDSPs will not need to seek recourse against the Transition Charge Security.  Accordingly, the Debtors anticipate that the TDSPs will not seek recourse against the Transition Charge Security and that, to the extent a letter of credit securing Transition Charges expires during these chapters 11 cases, the REP Debtors will replace such letter of credit under their post-petition financing facility or provide other security.

[17]    See Tex. Util. Code. § 39.309(a) (providing for exclusive lien on "transition property"); Tex. Util. Code § 39.309(e).

23.     The Debtors estimate that $10 million of the Unpaid Transition Charges will come due during the Interim Period. Because of the special protections afforded Transition Charges under Texas law, the Debtors seek authority pursuant to the Interim Order to continue to permit the REP Debtors to pay the Unpaid Transition Charges to both the Unaffiliated TDSPs and Oncor, as such amounts come due in the ordinary course during the Interim Period. The Debtors seek authority to honor all Unpaid Transition Charges pursuant to the Assumption Order.[18]

**III.    Additional Regulatory Implications.**

24.     While the Debtors would seek to avoid any negative issues associated with the REP Debtors' failure to pay the Transition Charges and the Delivery Charges, they believe that the benefits of avoiding any such litigation outweigh the costs of paying the amounts requested in this Motion. Indeed, the REP Debtors' failure to pay the Transition Charges and Delivery Charges could negatively affect the Debtors in at least five ways.

25.     *First*, the REP Debtors' failure to make timely payments in respect of Transition Charges or Delivery Charges to a TDSP would permit PUC staff or "any affected person" to bring a complaint seeking to suspend or revoke the REP Debtors' operating certificate with the

---

[18]  Additionally, the Tariff for each TDSP that has issued Transition Bonds allows for a quarterly review of deposit requirements to ensure that associated Transition Charge Security accurately reflects two months' maximum collections in respect of securitized Transition Charges. Although the Debtors believe that periodically adjusting the Transition Charge Security is ordinary course such that it would not require additional Court authority, in an abundance of caution, the Debtors seek authority to increase or decrease the amount available under the Transition Charge Security, including letters of credit to the extent available under the TCEH debtor-in-possession financing facility (the "TCEH DIP Facility"), as is necessary to remain in compliance with applicable Tariffs and PUC regulations on a postpetition basis. The Debtors are seeking authority to obtain postpetition financing under the TCEH DIP Facility pursuant to the *Motion of Texas Competitive Electric Holdings Company LLC and Certain of its Debtor Affiliates for Entry of Interim and Final Orders (A) Approving Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing,* filed contemporaneously herewith.

PUC (the "REP Certificate").[19]  Such an action, if successful, would have drastic consequences

for the Debtors' business operations:  if the PUC suspended the REP Certificates, the REP

Debtors would have to cease all activities associated with obtaining new customers in Texas; if

the PUC revoked the REP Certificates, the REP Debtors would be required to cease *all* REP

activities in Texas.  Revocation of the REP Debtors' REP Certificates would result in a shutdown

of their operations, resulting in the REP Debtors no longer being allowed to provide electricity

service to retail customers.  Such decertification would have a material effect on the REP

Debtors' results of operations, liquidity, and financial condition.

26.    *Second*, if the Debtors do not satisfy the Transition Charges and Delivery

Charges, the regulatory framework permits the TDSPs that have issued Transition Bonds to,

among other things, transition the REP Debtors' customers to a competitor designated as the

"provider of last resort," or to arrange for a lockbox account to collect the Delivery Charges

directly from the REP Debtors' customers.[20]  If the REP Debtors are required to notify customers

of the lockbox arrangement, this could result in a negative market perception of the REP Debtors

and lead to additional customer losses.

27.    *Third*, the REP Debtors' failure to satisfy Delivery Charges to an Unaffiliated

TDSP permits the Unaffiliated TDSP to pass along the bad debt to all customers in its service

---

[19]    Specifically, the Texas Administrative Code provides as follows:

> A certificate granted pursuant to this section is subject to amendment, suspension, or revocation by the commission for a significant violation of PURA, commission rules, or rules adopted by an independent organization. . . . The commission staff or any affected person may bring a complaint seeking to amend, suspend, or revoke a REP's certificate.  Significant violations include the following:  . . . (16) Failure to timely remit payment for invoiced charges to a transmission and distribution utility pursuant to the terms of the statewide standardized tariff adopted by the commission.

Tex. Admin. Code § 25.107(j)(16).

[20]    *See* Tex. Admin. Code § 25.214(d)(4), § 25.215; AEP Texas Central Company Tariff § 4.6.2.1(5); AEP Texas North Company Tariff § 4.6.2.1(5); Centerpoint Energy Houston Electric, LLC Tariff § 4.6.2.1(5); Oncor Tariff § 4.6.2.1(5); Sharyland Utilities, L.P. Tariff § 4.6.2.1(5); Nueces Electric Cooperative, Inc. Tariff § 4.6.3.2(5); Texas-New Mexico Power Company Tariff § 4.6.2.1(5).

area. Under applicable PUC regulations, if a REP Debtor defaults on the payment of Delivery

Charges to an Unaffiliated TDSP, the Unaffiliated TDSP may treat the resulting bad debt as a

regulatory asset.[21] Subsequently, the Unaffiliated TDSP may make a case before the PUC to

increase the tariff rates that the PUC allows it to charge for Delivery Services to all REPs and

other customers with which the TDSP does business. This mechanism effectively allows the

Unaffiliated TDSPs to pass on and recoup unpaid Delivery Charges from all REPs, irrespective

of whether the particular REP is current on Delivery Charge payments. These regulations are

designed, in part, to ensure that Unaffiliated TDSPs are able to cover their operating costs and

capital expenditures. Ultimately, the unpaid Delivery Charges owed by any REP could be

passed on to customers in the form of higher rates. The mere possibility of increased rates and

overcharging of some customers could irreparably damage the REP Debtor's brand and goodwill

with customers in the ERCOT region.

28. *Fourth*, under applicable PUC regulations, failure to timely pay the Delivery

Charges could result in the assessment of a late penalty equal to 5% of each delinquent balance,

which could approximate $160,000 per day.[22] Upon assumption of the Delivery Agreements, the

---

[21]    Specifically, the Texas Administrative Code provides as follows:

> A [TDSP] shall create a regulatory asset for bad debt expenses, net of collateral posted pursuant to subparagraph (A) of this paragraph and bad debt already included in its rates, resulting from a REP's default on its obligation to pay delivery charges to the [TDSP]. Upon a review of reasonableness and necessity, a reasonable level of amortization of such regulatory asset shall be included as a recoverable cost in the [TDSP]'s rates in its next rate case or such other rate recovery proceeding as deemed necessary.

16 Tex. Admin. Code § 25.107(f)(3)(B). These provisions do not apply to Oncor pursuant to an order of the PUC under section 14.101 of the Public Utility Regulatory Act allowing the merger of Oncor with the Debtors. Specifically, under that order, Oncor may not, among other things, "seek to recover from its customers any costs incurred as a result of a bankruptcy of [the Debtors]." Accordingly, it is unlikely that Oncor would be permitted to make a case before the PUC to increase tariff rates on the basis of the REP Debtors' non-payment of Delivery Charges to Oncor.

[22]    Standard Tariff for Retail Delivery Service § 4.4.6. *See* Tex. Admin. Code § 25.214.

Debtors would be required to satisfy such late penalties under section 365(b)(1) of the Bankruptcy Code.

29.     *Fifth*, under applicable PUC regulations and the Tariffs, if a REP has defaulted in respect of Delivery Charges within a 24-month period, such REP is required to provide a deposit as security equal to "one-sixth of the estimated annual amount" billed to the REP under the Tariff, which security could remain outstanding for a minimum of two years.[23]   With respect to Oncor alone, a two-month security deposit for Delivery Charges could amount to approximately $153 million.   Similarly, if a REP defaults with respect to Transition Charges, the REP is required to provide a deposit or issue letters of credit equal to two months' maximum expected Transition Charges.[24]   If the REP Debtors default with respect to all Unpaid Transition Charges, the applicable Transition Bond indenture trustee may seek recourse against the Transition Charge Security and the Debtors may be required to provide replacement security in the form of new letters of credit, deposits, or other collateral.   The Debtors estimate that a replacement two-month security deposit with respect to Transition Charges could amount to approximately $18.2 million.

30.     Accordingly, payment of the Transition Charges and Delivery Charges in the ordinary course will help the REP Debtors to avoid potentially serious regulatory consequences, and will save the REP Debtors significant time and expense.

---

[23]   Importantly, the REP Debtors are not currently required to provide Delivery Charge LCs to the TDSPs because the REP Debtors have not defaulted on Delivery Charge payments within the past 24 months. If, however, the REP Debtors were to default on payment of Delivery Charges, they may be required to issue Delivery Charge LCs to secure future Delivery Charges equal to one-sixth of the estimated annual amount of Delivery Charges due to the TDSPs. *See* Tex. Admin. Code § 25.214(d)(4); AEP Texas Central Company Tariff § 4.5.2.1; AEP Texas North Company Tariff § 4.5.2.1; Centerpoint Energy Houston Electric, LLC Tariff § 4.5.2.1; Oncor Tariff § 4.5.2.1; Sharyland Utilities, L.P. Tariff § 4.5.2.1; Nueces Electric Cooperative, Inc. Tariff § 4.5.2; Texas-New Mexico Power Company Tariff § 4.5.2.1. *See also* 11 U.S.C. § 366 (requiring a debtor to provide adequate assurance of payment to its utility providers).

[24]   *See* P.U.C. Subst. R. 25.107, 108 (requiring a defaulting REP to provide a deposit or issue replacement letters of credit of two months' maximum expected Transition Charges).

IV.    **Adequate Assurance.**

31.    Following the commencement of these chapter 11 cases, the REP Debtors will continue to sell retail electricity to their customers, collect Transition Charges from customers, and incur Delivery Charges.  Upon assumption of the Delivery Agreements, and consistent with their long history of successful dealings with the TDSPs, the REP Debtors will continue to perform under the Delivery Agreements and pay the Transition Charges and Delivery Charges to the TDSPs.  Indeed, the REP Debtors' continuing ability to pay the TDSPs is contingent upon the TDSPs continuing to provide electricity distribution service on an uninterrupted basis.

32.    Additionally, the Debtors are seeking authority to use approximately $272 million of cash collateral and to enter into a $4.475 billion debtor-in-possession financing facility (the "TCEH DIP Facility").  The cash collateral and the proceeds of the TCEH DIP Facility ensure that the REP Debtors will have sufficient funds to make future payments to the TDSPs in respect of the Transition Charges and Delivery Charges.[25]  Accordingly, the Debtors believe that they have provided the TDSPs with adequate assurance of the REP Debtors' future performance under the Delivery Agreements.

**Basis for Relief**

I.    **Payment of Unpaid Transition Charges and Unpaid Delivery Charges is in the Best Interests of the Debtors' Estates.**

33.    Courts in the Third Circuit and elsewhere generally recognize that debtors may pay prepetition claims pursuant to section 363(b) of the Bankruptcy Code when making such payment is essential to the continued operation of the debtor's business.  *See, e.g., In re Meridian*

---

[25]    A more detailed description of the TCEH DIP Facility may be found in the *Motion of Texas Competitive Electric Holdings Company LLC and Certain of Its Debtor Affiliates, for Entry of Interim and Final Orders (A) Approving Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing,* filed contemporaneously herewith.

15

*Automotive Sys.-Composite Operations, Inc.*, 372 B.R. 710, 714 (Bankr. D. Del. 2007) (granting

the debtor authority to pay prepetition obligations owed to certain critical vendors); *In re Just for*

*Feet, Inc.*, 242 B.R. 821, 824-45 (Bankr. D. Del. 1999) (noting that debtors may pay prepetition

claims that are essential to the continued operation of the debtor's business); *Armstrong World*

*Indus., Inc. v. James A. Phillips, Inc., (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (Bankr.

S.D.N.Y. 1983) (granting the debtor the authority to pay prepetition claims of suppliers who

were potential lien claimants).

34.     Where there is a sound business purpose for the payment of prepetition

obligations, and where the debtor is able to "articulate some business justification, other than the

mere appeasement of major creditors," courts have authorized debtors to make such payments

under section 363(b) of the Bankruptcy Code. *See, e.g.*, *In re Ionosphere Clubs, Inc.*, 98 B.R. at

175 (finding that a sound business justification existed to pay prepetition wages); *In re James A.*

*Phillips, Inc.*, 29 B.R. at 397 (relying upon section 363 as a basis to allow a contractor to pay the

prepetition claims of suppliers who were potential lien claimants).

35.     Courts have also relied on section 105(a) of the Bankruptcy Code, which codifies

the inherent equitable powers of the bankruptcy court, and the "doctrine of necessity" or the

"necessity of payment" rule as a basis to permit payment of prepetition claims where the

payment of such claims is necessary to the continuing operations of the debtor's business. *See,*

*e.g.*, *In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court

could authorize the payment of prepetition claims if such payment was essential to the continued

operation of the debtor); *In re Penn Cent. Transp. Co.*, 467 F.2d 100, 102 n.1 (3d Cir. 1972)

(holding that the necessity of payment doctrine permits "immediate payment of claims of

creditors where those creditors will not supply services or material essential to the conduct of the

business until their pre-reorganization claims have been paid"); *In re Friedman's, Inc.*, 2011 WL 5975283, at *3 (Bankr. D. Del. Nov. 30, 2011) ("[M]ost courts will allow payments [of prepetition claims] under the 'doctrine of necessity,' if the debtor establishes that in its business judgment making such payments is critical to the survival of the debtor's business"); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr D. Del. 1994) (noting that debtors may pay prepetition claims that are essential to the continued operation of the debtor's business).

36.    Today, the rationale for the necessity of payment rule—the rehabilitation of a debtor in reorganization cases—is "the paramount policy and goal of Chapter 11." *In re Ionosphere Clubs, Inc.*, 98 B.R. at 176; *Just for Feet*, 242 B.R. at 826 (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization.").

37.    The REP Debtors have determined, in the sound exercise of their reasonable business judgment, that it is in the best interest of their estates to satisfy unpaid prepetition amounts due under the Delivery Agreements in the ordinary course of business. As discussed above, satisfying the Unpaid Transition Charges owed to both Oncor and the Unaffiliated TDSPs and Unpaid Delivery Charges owed to the Unaffiliated TDSPs during the Interim Period will reduce the risk that the PUC or an affected party will seek to revoke or suspend the REP Debtors' certifications, or seek to replace the REP Debtors and transition their customers to a "provider of last resort." In the extremely competitive ERCOT retail electricity market, customers frequently switch between competing REPs. Thus, the suspension of the REP Debtors' certifications and a freeze on all new customer recruitment activities would almost assuredly result in a decline in the REP Debtors' customer base, as would the forced transition of

17

the REP Debtors' customers to a competing REP. Revocation of the REP Debtors' certificates could effectively put the REP Debtors out of business.

38.     Additionally, paying the Unpaid Transition Charges and Unpaid Delivery Charges obviates the need for the Unaffiliated TDSPs to seek to recoup the missed payments through increased rates, thereby preserving the value of the Debtors' brand and customer goodwill. Indeed, the Debtors believe that the mere public perception that their failure to pay Delivery Charges could be the cause of potential rate increases could irreparably damage the REP Debtors' reputation in the extremely competitive Texas electricity market and make it significantly more difficult to retain current customers and attract new customers.

39.     Moreover, the securitized Transition Charges are secured by a statutory lien in "transition property," including amounts collected by the REP Debtors from their customers on account of Transition Charges, in favor of the applicable indenture trustees for each Transition Bond. *See* Tex. Util. Code. § 39.309(a). This statutory lien is not affected by commingling of funds, and thus the Transition Bonds are effectively secured by a floating lien on any cash that could be potentially traced back to Transition Charges, even if such tracing is not possible. Because the Transition Bond indenture trustees are likely oversecured by the "transition property," they will be entitled to payment in full on account of their claims. Satisfaction of the Transition Charges in the ordinary course of business, therefore, affects only the timing of payment of such claims, and does not prejudice the rights of general unsecured creditors or other parties in interest. Indeed, to the extent the Transition Bond indenture trustees are oversecured and entitled to adequate protection under section 363(e) of the Bankruptcy Code, payment of the Transition Charges in the ordinary course will benefit all parties in interest by avoiding the need to provide such adequate protection.

40. Accordingly, the Debtors believe that payment of all outstanding Unpaid Transition Charges to the TDSPs and outstanding Unpaid Delivery Charges to the Unaffiliated TDSPs during the Interim Period is in the best interests of the Debtors' estates and creditors and should be approved.

**II.    Assumption of the Delivery Agreements is Supported by Sound Business Judgment.**

41. Section 365(a) of the Bankruptcy Code provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). The decision to assume or reject is governed by the business judgment rule. *See In re Grp. of Institutional Investors, Inc. v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co.,* 318 U.S. 523, 550 (1943) ("[T]he question [of assumption] is one of business judgment."); *In re Sharon Steel Corp.,* 872 F.2d 36, 40 (3rd Cir. 1989) (same); *In re Armstrong World Indus.,* 348 B.R. 136, 162 (Bankr. D. Del. 2006) ("Courts have uniformly deferred to the business judgment of the debtor to determine whether the rejection of an executory contract or lease is appropriate under section 365(a).").

42. Upon finding that the debtor has exercised its sound business judgment in determining that the assumption or rejection of an executory contract or unexpired lease is in the best interests of the debtor, its creditors, and all parties in interest, the court should approve such assumption or rejection under section 365(a) of the Bankruptcy Code. *See In re Fed. Mogul Global, Inc.,* 293 B.R. 124, 126 (D. Del. 2003) ("The business judgment test dictates that a court should approve a debtor's decision to reject a contract unless that decision is the product of bad faith or gross abuse of discretion."); *Armstrong,* 348 B.R. at 162 (same); *In re HQ Global Holdings, Inc.,* 290 B.R. 507, 511 (Bankr. D. Del. 2003) (same).

43. As discussed above, the TDSPs are essential to the Debtors' business operations and the REP Debtors would seek to assume the Delivery Agreements in any conceivable

19

restructuring scenario. By assuming the Delivery Agreements and satisfying outstanding prepetition amounts early in these chapter 11 cases, however, the REP Debtors will derive substantial benefits from preserving their critical relationships with the TDSPs and remaining in compliance with applicable regulations and in good standing with the PUC. Accordingly, assumption of the Delivery Agreements and payment of the cure amounts, including Unpaid Delivery Charges owed to Oncor, are critical to the Debtors' reorganization efforts, are in the best interests of the Debtors' estates and creditors and should be approved.

**III.    The REP Debtors Have Satisfied the Adequate Assurance Requirements of Section 365 of the Bankruptcy Code.**

44.    Pursuant to section 365(b)(1)(A) of the Bankruptcy Code, a debtor may not assume an executory contract unless, at the time of assumption, the debtor cures or provides adequate assurance that the debtor will promptly cure any existing default. *See* 11 U.S.C. § 365(b)(1)(A); *see also L.R.S.C. Co. v. Rickel Home Ctrs. (In re Rickel Home Ctrs.), Inc.*, 209 F.3d 291, 298 (3d Cir. 2000) (finding that that the debtor must cure defaults or provide adequate assurance of prompt cure); *In re DBSI, Inc.*, 405 B.R. 698, 704 (Bankr. D. Del. 2009) (same); *In re Rowland*, 292 B.R. 815, 818 (Bankr. E.D. Pa. 2003) ("There is no dispute that in order for a debtor to assume an executory contract, it must cure existing defaults."). Further, pursuant to section 365(b)(1)(C) of the Bankruptcy Code, a debtor seeking to assume an executory contract must provide adequate assurance of future performance under such contract.

45.    The REP Debtors have determined that, absent the relief requested herein, they will be in default with respect to the payment of approximately $185.2 million on account of Unpaid Transition Charges and Unpaid Delivery Charges. Because the TDSPs are critical to the Debtors' operations and the Debtors would seek to assume the Delivery Agreements pursuant to any conceivable plan of reorganization, assumption of the Delivery Agreements merely alters the

timing of payment of the cure amounts, while avoiding the potential negative consequences that would arise should the REP Debtors fail to pay the Transition Charges and Delivery Charges when due.

46. The TDSPs are adequately assured of the REP Debtors' future performance under the Delivery Agreements, as required by section 365(b)(1)(C). The Debtors submit that their access to cash collateral and funding under the TCEH DIP Facility, the Transition Charge Security, and Delivery Charge LCs, the Debtors' ongoing collection and remittance of Delivery Charges and Transition Charges and diligence in remaining current on postpetition obligations together constitute adequate assurance of future performance. *See Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989) (suggesting the meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction"); *In re Casual Male Corp.*, 120 B.R. 256, 264-65 (Bankr. D. Mass 1990) (finding an irrevocable letter of credit to be adequate assurance for future performance under section 365(b)(1)(C)); *In re Alipat, Inc.*, 36 B.R. 274, 277-78 (Bankr. E.D. Mo. 1984) (same).

## IV.  Cause Exists to Authorize the Debtors' Financial Institutions to Honor Checks and Electronic Fund Transfers.

47. The Debtors have sufficient funds to pay the amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations, debtor in possession financing, and anticipated access to cash collateral. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the Transition Charges and Delivery Charges. Thus, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. Accordingly, the

Debtors respectfully request that the Court authorize and direct all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

### The Requirements of Bankruptcy Rule 6003 are Satisfied

48.     Pursuant to Bankruptcy Rule 6003, the Court may grant relief regarding a motion to pay all or part of a prepetition claim within 21 days after the Petition Date if the relief is necessary to avoid immediate and irreparable harm.   Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern.  *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001).

49.     As described above, the distribution service provided by the TDSPs is integral to the Debtors' retail operations.  The Debtors are at a critical juncture at which they must make every effort to retain customers, drive revenues, and maximize cash flow.  The REP Debtors' failure to pay prepetition Unpaid Transition Charges and Unpaid Delivery Charges could materially—and perhaps fatally—impair these efforts and thwart the Debtors' chapter 11 cases before they have had a chance to begin.  Moreover, the REP Debtors are not seeking authority to assume any executory contract or unexpired lease under section 365 of the Bankruptcy Code during the first 21 days after the Petition Date.  Accordingly, the Debtors submit that they have satisfied Bankruptcy Rule 6003 to support immediate payment of any obligations arising under the Delivery Agreements.

### Waiver of Bankruptcy Rules 6004(a) and (h)

50.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### Reservation of Rights

51.     Nothing contained in this Motion or any actions taken by the Debtors pursuant to relief granted in the Interim Order and Assumption Order is intended or should be construed as: (a) an admission as to the validity or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code other than the Delivery Agreements; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) described in this Motion are valid, and the Debtors expressly reserved their rights to contest the extent, validity, or perfection or seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity or amount of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

### Notice

52.     The Debtors shall provide notice of this Motion on the date hereof via facsimile, overnight delivery, and/or hand delivery to:  (a) the Office of the U.S. Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 50 Largest

Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) Citibank, N.A., in its capacity as administrative agent under the TCEH first lien credit agreement and collateral agent under the TCEH intercreditor agreements and counsel thereto; (d) Bank of New York Mellon Trust Company, N.A., in its capacity as indenture trustee under: (i) the TCEH unsecured pollution control revenue bonds; and (ii) the EFCH 2037 Notes due 2037, and counsel thereto; (e) American Stock Transfer & Trust Company, LLC, in its capacity as indenture trustee under: (i) the 9.75% EFH senior unsecured notes due 2019; (ii) the 10.0% EFH senior unsecured notes due 2020; (iii) the 10.875% EFH LBO senior unsecured notes due 2017; (iv) the 11.25%/12.0% EFH LBO toggle notes due 2017; (v) the 5.55% EFH legacy notes (series P) due 2014; (vi) the 6.50% EFH legacy notes (series Q) due 2024; and (vii) the 6.55% EFH legacy notes (series R) due 2034, and counsel thereto; (f) Computershare Trust Company, N.A. and Computershare Trust Company of Canada, in their capacities as indenture trustee under: (i) the 11.0% EFIH senior secured second lien notes due 2021; and (ii) the 11.75% EFIH senior secured second lien notes due 2022, and counsel thereto; (g) UMB Bank, N.A. in its capacity as indenture trustee under: (i) the 9.75% EFIH senior unsecured notes due 2019; and (ii) the 11.25%/12.25% EFIH senior toggle notes due 2018, and counsel thereto; (h) BOKF, NA, dba Bank of Arizona, in its capacity as indenture trustee under 11.50% TCEH senior secured notes due 2020, and counsel thereto; (i) CSC Trust Company of Delaware in its capacity as indenture trustee under: (i) the 6.875% EFIH senior secured notes due 2017; and (ii) the 10.0% EFIH senior secured notes due 2020, and counsel thereto; (j) Law Debenture Trust Company of New York in its capacity as indenture trustee under: (i) the 10.25% TCEH senior unsecured notes due 2015; and (ii) the 10.50%/11.25% TCEH senior toggle notes due 2016, and counsel thereto; (k) Wilmington Savings Fund Society, FSB in its capacity as indenture trustee under the 15.0% TCEH senior

24

secured second lien notes due 2021, and counsel thereto; (l) counsel to certain holders of claims against the Debtors regarding each of the foregoing described in clauses (c) through (k); (m) the agent for the TCEH debtor-in-possession financing facility and counsel thereto; (n) the agent for the EFIH debtor-in-possession financing facility and counsel thereto; (o) counsel to certain holders of equity in Texas Energy Future Holdings Limited Partnership; (p) counsel to Oncor; (q) the SEC; (r) the Internal Revenue Service; (s) the Office of the United States Attorney for the District of Delaware; (t) the Office of the Texas Attorney General on behalf of the PUC; (u) counsel to ERCOT; (v) each of the TDSPs; and (w) each of the Transition Bond indenture trustees.  As this Motion is seeking "first day" relief, within forty eight hours of the entry of an order respecting this Motion, the Debtors will serve copies of this Motion and the order respecting this Motion as required by Local Bankruptcy Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

53.     No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order and the Assumption Order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Wilmington, Delaware
Dated:  April 29, 2014

/s/ Jason D. Collins

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:      (302) 651-7700
Facsimile:      (302) 651-7701
Email:          collins@rlf.com
                defranceschi@rlf.com
                madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
Richard M. Cieri (*pro hac vice* pending)
Edward O. Sassower, P.C. (*pro hac vice* pending)
Stephen E. Hessler (*pro hac vice* pending)
Brian E. Schartz (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          richard.cieri@kirkland.com
                edward.sassower@kirkland.com
                stephen.hessler@kirkland.com
                brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (*pro hac vice* pending)
Chad J. Husnick (*pro hac vice* pending)
Steven N. Serajeddini (*pro hac vice* pending)
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          james.sprayregen@kirkland.com
                chad.husnick@kirkland.com
                steven.serajeddini@kirkland.com

Proposed Co-Counsel to the Debtors and Debtors in Possession

26

## EXHIBIT A

**Proposed Interim Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-_____ (___) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

## ORDER AUTHORIZING CERTAIN OF THE DEBTORS TO PAY
## CERTAIN PREPETITION TRANSITION CHARGES AND DELIVERY CHARGES

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), for entry of an order (this "Order") authorizing certain of the Debtors to pay prepetition Transition Charges and Delivery Charges during the Interim Period, all as more fully set forth in the Motion; and the Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and the Court having found that the Debtors provided appropriate notice of the Motion and the opportunity for a hearing on the Motion under the circumstances; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing, if any, before

---

[1]   The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which the debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

the Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.    The Motion is granted as set forth herein.

2.    The REP Debtors, as applicable, are authorized, but not directed, to pay Unpaid Transition Charges owed to the TDSPs that come due during the Interim Period.

3.    The REP Debtors, as applicable, are authorized, but not directed, to pay Unpaid Delivery Charges owed to the Unaffiliated TDSPs that come due during the Interim Period.

4.    The TDSPs are authorized, but not directed, to draw on the applicable Delivery Charge LCs in their discretion.

5.    The REP Debtors are authorized, but not directed, to increase or decrease the amount available under the Transition Charge Security as is necessary to remain in compliance with the applicable Tariffs and PUC regulations.

6.    The hearing to approve the Assumption Order shall be _____, 2014 at __:__ a.m./p.m. (prevailing Eastern Time). Any objections or responses to the Motion or the proposed assumption must be filed on or before the Assumption Objection Deadline, _____, 2014 at __:__ a.m./p.m. (prevailing Eastern Time).

7.    Notwithstanding anything to the contrary in this Order, nothing in this Order shall impose an obligation on any Debtor other than the REP Debtors.

8.    In accordance with this Order and any other order of this Court, each of the financial institutions at which the Debtors maintain their accounts relating to the payment of the Transition Charges and Delivery Charges is authorized and directed to receive, process, honor,

and pay all such checks presented for payment and wire transfer requests made by the Debtors related to the Transition Charges and Delivery Charges, to the extent sufficient funds are on deposit in such accounts.

9.      In accordance with this Order and any other order of this Court, the Debtors are authorized to issue postpetition checks or to effect postpetition wire transfer requests in replacement of any checks or wire transfer requests in respect of any obligations related to the Transition Charges and Delivery Agreements that are dishonored or rejected.

10.     Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief, nothing in this Order shall be deemed:  (a) an admission as to the validity or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code other than the Delivery Agreements; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) described in this Motion are valid, and the Debtors expressly reserved their rights to contest the extent, validity, or perfection or seek avoidance of all such liens.  Payments made pursuant to this Order shall not be construed as an admission as to the validity or amount of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

11.     The requirements set forth in Bankruptcy Rule 6003(b) are satisfied by the contents of the Motion.

3

12.    The notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h) are waived.

13.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

14.    The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

15.    The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Wilmington, Delaware
Dated: _____, 2014

_____
UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT B

### Proposed Assumption Order

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-_____ (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

ORDER AUTHORIZING CERTAIN OF THE DEBTORS TO
ASSUME TRANSMISSION AND DISTRIBUTION SERVICE AGREEMENTS

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), for entry of an order (this "Order") authorizing certain of the Debtors to pay prepetition Transition Charges and Delivery Charges and assume the Delivery Agreements, pay outstanding cure amounts, and provide adequate assurance of future performance in relation thereto, all as more fully set forth in the Motion; and the Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and the Court having found that the Debtors provided appropriate notice of the Motion

---

[1]   The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which the debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

and the opportunity for a hearing on the Motion under the circumstances; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing, if any, before the Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted as set forth herein.

2.      The relief granted in the Interim Order is approved on a final basis.

3.      The REP Debtors are authorized to assume the Delivery Agreements listed on **Exhibit 1** attached hereto, and the Delivery Agreements are hereby assumed pursuant to section 365 of the Bankruptcy Code.

4.      The REP Debtors are authorized to pay the Unpaid Delivery Charges and the Unpaid Transition Charges.

5.      The TDSPs are authorized, but not directed, to draw on the applicable Delivery Charge LCs in their discretion.

6.      The REP Debtors are authorized, but not directed, to increase or decrease the amount available under the Transition Charge Security as is necessary to remain in compliance with the applicable Tariffs and PUC regulations.

7.      The Debtors have provided adequate assurance of future performance under the Delivery Agreements.

8.      Upon receipt and payment of the Unpaid Transition Charges and the Unpaid Delivery Charges, the TDSPs shall be forever barred and enjoined from asserting against the

2

Debtors any defaults, claims, interest, or other default penalties under the Delivery Agreements arising before the date of this Order.

9.      Notwithstanding anything to the contrary in this Order, nothing in this Order shall impose an obligation on any Debtor other than the REP Debtors.

10.      In accordance with this Order and any other order of this Court, each of the financial institutions at which the Debtors maintain their accounts relating to the payment of the Transition Charges and Delivery Charges is authorized and directed to receive, process, honor, and pay all such checks presented for payment and wire transfer requests made by the Debtors related to the Transition Charges and Delivery Charges, to the extent sufficient funds are on deposit in such accounts.

11.      In accordance with this Order and any other order of this Court, the Debtors are authorized to issue postpetition checks or to effect postpetition wire transfer requests in replacement of any checks or wire transfer requests in respect of any obligations related to the Transition Charges and Delivery Agreements that are dishonored or rejected.

12.      Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief, nothing in this Order shall be deemed: (a) an admission as to the validity or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code other than the Delivery Agreements; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise)

3

described in this Motion are valid, and the Debtors expressly reserved their rights to contest the extent, validity, or perfection or seek avoidance of all such liens. Payments made pursuant to this Order shall not be construed as an admission as to the validity or amount of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

13.    The notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h) are waived.

14.    The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

15.    The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Wilmington, Delaware
Dated: _____, 2014

_____
UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT 1** to **EXHIBIT B**

**List of Delivery Agreements**

## List of Delivery Agreements

| Debtor | Counterparty | Cure Amount | Effective Date |
|---|---|---|---|
| 4Change Energy Company | AEP Texas Central Company | $20,000 | 5/4/12 |
| 4Change Energy Company | AEP Texas North Company | $20,000 | 5/4/12 |
| 4Change Energy Company | Centerpoint Energy Houston Electric, LLC | $200,000 | 8/9/13 |
| 4Change Energy Company | Nueces Electric Cooperative, Inc. | $0 | 2/19/13 |
| 4Change Energy Company | Oncor Electric Delivery Company | $700,000 | 5/31/12 |
| 4Change Energy Company | Sharyland Utilities, L.P. | $0 | 9/20/12 |
| 4Change Energy Company | Sharyland Utilities, L.P. (New Service Territory) | $0 | 3/19/14 |
| 4Change Energy Company | Texas-New Mexico Power Company | $20,000 | 4/24/12 |
| Luminant ET Services Company | AEP Texas Central Company | $20,000 | 1/7/10 |
| Luminant ET Services Company | Oncor Electric Delivery Company | $600,000 | 4/11/11 |
| TXU Energy Retail Company LLC (d/b/a Assurance Energy) | AEP Texas Central Company | $0 | 8/11/08 |
| TXU Energy Retail Company LLC (d/b/a Assurance Energy) | AEP Texas North Company | $0 | 8/11/08 |
| TXU Energy Retail Company LLC (d/b/a Assurance Energy) | Centerpoint Energy Houston Electric, LLC | $0 | 6/23/08 |
| TXU Energy Retail Company LLC (d/b/a Assurance Energy) | Oncor Electric Delivery Company | $0 | 6/23/08 |
| TXU Energy Retail Company LLC (d/b/a Assurance Energy) | Sharyland Utilities, L.P. | $0 | 7/13/08 |
| TXU Energy Retail Company LLC (d/b/a Assurance Energy) | Texas-New Mexico Power Company | $0 | 7/3/08 |
| TXU Energy Retail Company LLC | AEP Texas Central Company | $1,400,000 | 8/6/09 |
| TXU Energy Retail Company LLC | AEP Texas North Company | $800,000 | 8/6/09 |
| TXU Energy Retail Company LLC | Centerpoint Energy Houston Electric, LLC | $5,700,000 | 9/3/09 |
| TXU Energy Retail Company LLC | Oncor Electric Delivery Company | $124,400,000 | 9/25/09 |
| TXU Energy Retail Company LLC | Sharyland Utilities, L.P. | $20,000 | 7/23/08 |

| Debtor | Counterparty | Cure Amount | Effective Date |
|---|---|---|---|
| TXU Energy Retail Company LLC | Sharyland Utilities, L.P. (New Service Territory) | $0 | 10/22/13 |
| TXU Energy Retail Company LLC | Texas-New Mexico Power Company | $1,000,000 | 6/22/09 |

## File a First Day Motion:

14-10979-CSS Energy Future Holdings Corp.

| | | |
|---|---|---|
| Type: bk | Chapter: 11 v | Office: 1 (Delaware) |
| Assets: y | Judge: CSS | Case Flag: VerifDue, PlnDue, DsclsDue |

### U.S. Bankruptcy Court

### District of Delaware

Notice of Electronic Filing

The following transaction was received from Mark D. Collins entered on 4/29/2014 at 10:52 AM EDT and filed on 4/29/2014

**Case Name:**      Energy Future Holdings Corp.
**Case Number:**     14-10979-CSS
**Document Number:** 38

**Docket Text:**
Chapter 11 - First Day Motion *(Motion of Energy Future Holdings Corp., et al., for Entry of (A) an Order Authorizing Certain of the Debtors to Pay Certain Prepetition Transition Charges and Delivery Charges and (B) an Order Authorizing Certain of the Debtors to Assume Transmission and Distribution Service Agreements)* Filed By Energy Future Holdings Corp. (Collins, Mark)

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** \\netapp2\home\lae\WindowsProfile\Desktop\EFH - Transition & Delivery Charges Motion.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=4/29/2014] [FileNumber=12418805-0
] [42f26dc0c8ef7ab8ab3c0c49618d328c735f0516debbef291d095d1fc31a3294f8b
c19bfe689821bd7d0af79865e33f28df8373e730ed35e0d4931fa51d8231d]]

**14-10979-CSS Notice will be electronically mailed to:**

Elizabeth Banda Calvo on behalf of Creditor Somervell County et al
rgleason@pbfcm.com, ebcalvo@pbfcm.com;ebcalvo@ecf.inforuptcy.com

Ashley F. Bartram on behalf of Interested Party Public Utility Commission of Texas
ashley.bartram@texasattorneygeneral.gov

Ashley F. Bartram on behalf of Interested Party Railroad Commission of Texas
ashley.bartram@texasattorneygeneral.gov

Ashley F. Bartram on behalf of Interested Party Texas Commission on Environmental Quality
ashley.bartram@texasattorneygeneral.gov