# Exhibit A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-_____ (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

### MOTION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*, FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING THE DEBTORS TO (A) CONTINUE PERFORMING UNDER PREPETITION HEDGING AND TRADING ARRANGEMENTS, (B) PLEDGE COLLATERAL AND HONOR OBLIGATIONS THEREUNDER, AND (C) ENTER INTO AND PERFORM UNDER TRADING CONTINUATION AGREEMENTS AND NEW POSTPETITION HEDGING AND TRADING ARRANGEMENTS

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this motion (this "Motion") for entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "Interim Order" and "Final Order"), authorizing the Debtors to: (a) continue performing under the Debtors' hedging and trading arrangements and to honor, pay, and/or otherwise satisfy any and all obligations thereunder, including prepetition obligations, in a manner consistent with prepetition practices; (b) enter into trading continuation agreements and new postpetition hedging and trading arrangements in the ordinary course of business; and (c) pledge collateral in the form of cash, letters of credit, and, in certain limited circumstances, super-priority liens, on account of the Debtors' prepetition and postpetition hedging and trading arrangements, and as permitted

---

[1]   The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which the debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

Docket No. 41
Filed: 4/29/14

under the terms of the Debtors' proposed postpetition financing facility and cash collateral order. In support of this Motion, the Debtors respectfully state as follows.

## Jurisdiction and Venue

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware,* dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors consent pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The bases for the relief requested in this Motion are sections 105(a), 362, 363, and 364 of title 11 of the United States Code (the "Bankruptcy Code"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Bankruptcy Rule 9013-1(m).

## Relief Requested

4.      As is customary in the Debtors' industry, certain of the Debtor entities, including Luminant Energy Company LLC, Luminant ET Services Company, and Luminant Generation Company LLC (collectively, the "Hedging and Trading Entities")[2] enter into hedging and trading

---

[2]   As a general matter, only the TCEH Debtors (as defined herein) have operations like those described in this Motion. The Debtors are, therefore, not seeking relief or imposing any obligations in the Interim Order or Final

contracts with various counterparties primarily to hedge their exposure to commodity risks, including price and delivery risk (collectively, and as described below, the "Hedging and Trading Arrangements" and the activities related thereto, the "Hedging and Trading Activities") within established risk management guidelines (as discussed below, the "Risk Management Guidelines").[3]

5.      As of the date hereof (the "Petition Date"), the Debtors estimate that they owe approximately $50.8 million of payables[4] on account of the Prepetition Hedging and Trading Arrangements (as defined below), approximately $43.7 million of which is secured by collateral held by third parties (e.g., letters of credit or cash), and all of which will become due and owing during the period between the Petition Date and entry of the Final Order (the "Interim Period") on account of the Prepetition Hedging and Trading Arrangements.

6.      By this Motion, the Debtors seek limited authority pursuant to the Interim Order that the Debtors believe is necessary to prevent immediate and irreparable harm to their business operations, including:

---

Order as to any Debtors other than the TCEH Debtors. For the avoidance of doubt, this Motion does not request any relief with respect to, or affect the rights, duties, or obligations of, EFIH (as defined herein) and EFIH Finance, Inc.

[3]      As described in detail in the First Day Declaration, over 95% of the TCEH Debtors' positions in the natural gas price hedging program and all of the first lien interest rate swaps of TCEH (collectively, the "First Lien Hedges and Swaps") are secured by a first lien on substantially all of the TCEH Debtors' assets that is pari passu with the outstanding obligations under the TCEH Debtors' first-lien credit agreement and first-lien notes. The total net first lien exposure on account of the First Lien Hedges and Swaps is approximately $1.255 billion as of April 11, 2014.

In addition, Energy Future Holdings Corp. transacted a number of unsecured interest rate swap agreements with various banks (collectively the "Legacy Swaps"). As of April 11, 2014, the exposure to the Hedging and Trading Entities on account of the Legacy Swaps is approximately $14.2 million. For the avoidance of doubt, the Debtors do not seek relief with respect to the First Lien Hedges and Swaps or the Legacy Swaps in this Motion.

[4]      This number represents the amount of obligations after netting payables and receivables permitted to be netted with the same counterparty under existing contractual terms.

(a) authority to honor, pay, or otherwise satisfy prepetition obligations arising under the Prepetition Hedging and Trading Arrangements as they come due during the Interim Period and in an aggregate amount not to exceed $50.8 million, with the understanding that such cap will reflect the aggregate of net amounts the Debtors may owe with respect to each Prepetition Hedging and Trading Arrangement that gives rise to prepetition obligations during the Interim Period (the "Prepetition Payment Cap");

(b) authority to pledge and transfer collateral under the Prepetition Hedging and Trading Arrangements as such obligations come due during the Interim Period in the form of cash, letters of credit, or, with respect to those Prepetition Hedging and Trading Arrangements that constitute Secured Commodity Hedging Agreements,[5] super-priority liens on the collateral securing the TCEH Debtors' (as defined herein) postpetition secured financing facility (the "TCEH DIP Facility") in accordance with the interim and final orders order authorizing such postpetition financing, if and when entered (the "TCEH DIP Orders") and the interim and final orders authorizing the TCEH Debtors to use cash collateral, if and when entered (the "TCEH Cash Collateral Orders")[6] (the "TCEH Super-Priority DIP Liens"), in an aggregate amount not to exceed $173 million (on a net basis) (the "Prepetition Collateral Posting Cap");[7]

---

[5] As used herein, the term "Secured Commodity Hedging Agreements" (and any other capitalized term contained within such definition) shall have the meaning ascribed to it (and any other such capitalized terms) in the TCEH DIP Agreement.

As used herein, the TCEH DIP Agreement shall mean the debtor-in-possession financing agreement executed between TCEH LLC, as borrower, Energy Future Competitive Holdings Company LLC, as guarantor, the financial institutions from time to time party thereto as lenders and letter of credit issuers, and Citibank, N.A., as administrative agent and collateral agent as of the Petition Date without giving effect to any subsequent substantive amendments that may be made to any such term under the TCEH DIP Agreement. Notwithstanding the foregoing, the TCEH Debtors, counsel to those parties authorizing the use of the TCEH Debtors' cash collateral (as described in the TCEH Cash Collateral Orders (defined herein)), and the DIP Agent (as defined in the TCEH DIP Orders) may agree in writing to amend the definition of the term "Secured Commodity Hedging Agreements" as it applies to this Motion, the Interim Order, and the Final Order, and such amended definition will be given immediate effect.

[6] The TCEH Debtors seek entry of the TCEH DIP Orders pursuant to the *Motion of Texas Competitive Electric Holdings Company LLC and Certain of its Debtor Affiliates, for Entry of Interim and Final Orders (A) Approving Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing* and entry of the TCEH Cash Collateral Orders pursuant to the *Motion of Texas Competitive Electric Holdings Company LLC and Certain of its Debtor Affiliates for Entry of Interim and Final Orders (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing,* filed contemporaneously herewith.

[7] Approximately $23 million is attributable to potential prepetition collateral obligations to ERCOT that may become due and owing during the Interim Period. As described herein, the Debtors anticipate that ERCOT's Letter of Credit will likely be sufficient to satisfy the Debtors' prepetition collateral posting obligations that come due during the Interim Period, but, in an abundance of caution, are seeking the relief described herein.

(c) approval of the form Trading Continuation Agreement (as defined herein and as annexed as **Exhibit 1** to **Exhibit A**) and authority to perform in accordance with the terms of any executed Trading Continuation Agreements;

(d) in an abundance of caution, authority to replace the prepetition letter of credit the Debtors issued in favor of ERCOT (as defined herein) with a new, postpetition letter of credit;

(e) authority to modify the automatic stay under section 362 of the Bankruptcy Code to the extent necessary to allow ERCOT to perform its obligations and exercise its rights under the SFAs and ERCOT Protocols (each as defined herein); *provided, however*, that any amounts paid by the Debtors to ERCOT on account of ERCOT's prepetition claims during the Interim Period shall be subject to the Prepetition Payment Cap;

(f) authority to continue honoring postpetition obligations arising under the Prepetition Hedging and Trading Arrangements in the ordinary course of business, including, with respect to those Prepetition Hedging and Trading Arrangements that constitute Secured Commodity Hedging Agreements, providing collateral in the form of TCEH Super-Priority DIP Liens in accordance with the TCEH DIP Orders and the TCEH Cash Collateral Orders; and

(g) in an abundance of caution, enter into, and perform under, new, postpetition Hedging and Trading Arrangements in the ordinary course of business and in accordance with the Risk Management Guidelines (collectively, the "Postpetition Hedging and Trading Arrangements"), including, with respect to those Hedging and Trading Arrangements that constitute Secured Commodity Hedging Agreements, providing TCEH Super-Priority DIP Liens in accordance with the TCEH DIP Orders and the TCEH Cash Collateral Orders.

7.     The Debtors seek this relief only to the extent such Prepetition Hedging and Trading Arrangement has not been previously assumed, rejected, or terminated pursuant to sections 365, 546, 555, 556, 559, 560, and 561 of the Bankruptcy Code. And, as discussed herein, the Debtors will undertake commercially reasonable efforts to ensure that, in exchange for such payments and/or collateral postings, counter-parties to Prepetition Hedging and Trading Arrangements agree not to terminate their Hedging and Trading Arrangements.

8.     Pursuant to the Final Order, the Debtors seek substantially the same relief as well as authority to honor any accrued prepetition obligations (including periodic and fixed settlement

payments) with respect to the Hedging and Trading Arrangements, including obligations related to pledging collateral, in the ordinary course of business and consistent with the Risk Management Guidelines.[8]

9.      Finally, to enable the Debtors to carry out the relief requested, the Debtors request that the Court: (a) schedule a final hearing as soon as practicable after the 21st day following the Petition Date to consider approval of this Motion on a final basis (the "Final Hearing"); and (b) authorize all applicable banks and financial institutions to receive, process, honor, and pay all checks presented for payment and all electronic payment requests made by the Debtors related to the Debtors' continued performance under the Hedging and Trading Arrangements, whether such checks were presented or electronic-payment requests were submitted before or after the date hereof.

## Background

10.      On the Petition Date, each of the Debtors filed a voluntary petition with the Court under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have requested joint administration of these chapter 11 cases. The Court has not appointed a trustee, and the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has not formed any official committees in these chapter 11 cases.[9]

---

[8]   For the avoidance of doubt, the Debtors are not seeking at this time to assume or reject any of the Hedging and Trading Arrangements.

[9]   The facts and circumstances supporting this Motion, along with a detailed discussion of EFH's business operations and capital structure, are set forth in the *Declaration of Paul Keglevic, Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of Energy Future Holdings Corp., et al., in Support of First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith.

11.    Debtor Energy Future Holdings Corp. ("EFH Corp."), a Texas corporation, is the ultimate parent company for each of the Debtors in these chapter 11 cases and certain of EFH Corp.'s non-Debtor affiliates (collectively, "EFH"). EFH's businesses include the largest generator, distributor, and certified retail provider of electricity in Texas. EFH conducts substantially all of its business operations in the electricity market overseen by the Electric Reliability Council of Texas ("ERCOT"), which covers the majority of Texas. The Texas electricity market, in turn, is subject to oversight and regulation by the Public Utility Commission of Texas (the "PUC"). EFH has approximately 9,100 employees, approximately 5,700 of whom are employed by the Debtors,[10] in three distinct business units:

- EFH's *competitive electricity generation, mining, wholesale electricity sales, and commodity risk management and trading activities*, conducted by TCEH LLC's Debtor subsidiaries composing "Luminant";

- EFH's *competitive retail electricity sales operations and related operations*, mainly conducted by TCEH LLC's Debtor subsidiaries composing "TXU Energy" (together, with Luminant, the "TCEH Debtors");[11] and

- EFH's *rate-regulated electricity transmission and distribution operations*, conducted by the non-Debtor Oncor.

12.    In the aggregate, the Debtors have approximately $42 billion of funded indebtedness, including (a) approximately $32.1 billion of claims against TCEH LLC and TCEH LLC's direct and indirect Debtor subsidiaries; (b) approximately $71 million of claims against

---

[10]    The Debtors in these chapter 11 cases consist of: (a) the vast majority of the entities that compose Luminant and TXU Energy, as well as those entities' intermediate corporate parent entity, Texas Competitive Electric Holdings Company LLC ("TCEH LLC"), a Delaware limited liability company, and TCEH LLC's corporate parent, Energy Future Competitive Holdings Company LLC ("EFCH"), a Delaware limited liability company; (b) Energy Future Intermediate Holding Company LLC ("EFIH"), a Delaware limited liability company that indirectly owns approximately 80% of Oncor Electric Delivery Holdings Company LLC ("Oncor"), and EFIH's wholly-owned subsidiary, EFIH Finance Inc.; (c) EFH Corp.; and (d) other direct and indirect subsidiaries of EFH Corp., including EFH Corporate Services Company.

[11]    The Debtors also conduct a relatively small amount of retail electricity operations through their 4Change brand and another entity, Luminant ET Services Company, that provides retail electricity service to some end use customers and to some of Luminant's mining operations, and a small amount of retail gas operations through Luminant Energy Company LLC.

EFCH; (c) approximately $1.9 billion of claims against EFH Corp.; and (d) approximately $7.7 billion of claims against EFIH.[12]

13.    Although the Debtors' balance sheet is overleveraged, the Debtors' operations are strong.  Luminant's generation units are high-performing, its mining and electricity generation operations have impressive safety records, and its commodity trading and risk management activities have delivered significant value to the Debtors.  TXU Energy is an industry leader in customer care performance and product innovation and has maintained strong performance notwithstanding intense competition.  And non-Debtor Oncor produces a strong and consistent stream of revenue.  Thus, these chapter 11 cases will provide the Debtors with the opportunity to restructure their balance sheets and retain their position as leaders in the Texas electricity market.

14.    As of December 31, 2013, EFH Corp. reported total assets of approximately $36.4 billion in book value, approximately $28.8 billion of which is attributable to EFCH, TCEH LLC, and TCEH LLC's direct and indirect subsidiaries (collectively with TCEH LLC and EFCH, "TCEH"),[13] and total liabilities of approximately $49.7 billion in book value, approximately $41.1 billion of which is attributable to TCEH.[14] EFH Corp.'s assets and liabilities that are not attributable to TCEH are mostly attributable to EFIH's indirect ownership of approximately 80% of Oncor.  EFH Corp.'s consolidated revenues for the quarter ending December 31, 2013 were approximately $1.3 billion, all of which were attributable to TCEH. EFH Corp.'s consolidated annual revenues for the year ending December 31, 2013 were

---

[12]    Amounts include intercompany debt holdings and short-term borrowings, and exclude guarantees, unamortized discounts or premiums, accrued but unpaid interest, and certain other figures typically reported in the Debtors' filings with the Securities and Exchange Commission (the "SEC"), such as capital lease obligations, certain promissory notes, and certain other obligations.

[13]    Oncor's revenues are not included in EFH Corp.'s consolidated revenues because EFH Corp. accounts for its ownership of Oncor under the equity method of accounting.

[14]    Figures for TCEH are derived from EFCH's public filings with the SEC, and are almost entirely attributable to TCEH LLC and its Debtor and non-Debtor subsidiaries.

approximately $5.9 billion.

I.       **Overview of the Prepetition Hedging and Trading Arrangements.**

15.      The Hedging and Trading Activities and the Hedging and Trading Arrangements are vital to the success of the Debtors' various operational businesses and directly affect the ability of the Debtors to successfully operate their generation and retail divisions. As of December 31, 2013, the Debtors' annual underlying notional value[15] across all of their wholesale operations, based on energy prices for commodities sold and purchased in their operations, including natural gas, electricity, coal, fuel-oil, uranium, renewable energy credits, and emission allowances, is approximately $3.8 billion.

16.      The Hedging and Trading Activities and the Hedging and Trading Arrangements mitigate the risks that arise from the Debtors' operations from changes in the overall value of wholesale revenues and costs noted above. Specifically, the Hedging and Trading Activities and Hedging and Trading Arrangements allow the Debtors to utilize (a) physical commodity transactions to hedge price and delivery risk related to fuel inputs (including natural gas, coal, uranium, and fuel oil) to the Debtors' electricity generation and mining operations, (b) physical transactions for electricity and ancillary services produced in the electricity operations, and (c) financial derivatives that hedge price risk for both fuels and electricity generation.

17.      Through the Hedging and Trading Activities and Hedging and Trading Arrangements, the Debtors are able to hedge against such price fluctuations and thereby protect the economic value of their operations by preventing substantial declines in cash flows. We also conduct limited proprietary trading activities in certain commodities that are core to our power

---

[15]    "Notional value" refers to the fuel purchased by the Debtors and the electricity and ancillary services that the Debtors sell through their wholesale operations, valued at current prevailing market prices for each respective commodity.

generation operations. As an example, during the fiscal years 2009 through 2013, the Hedging and Trading Activities provided a positive incremental return to the Debtors' underlying operations ranging from approximately $240 million to $425 million on an annual basis.

18.     The Hedging and Trading Entities have approximately 72 active prepetition Hedging and Trading Arrangements as of the Petition Date (the "Prepetition Hedging and Trading Arrangements" and, together with the anticipated Postpetition Hedging and Trading Arrangements, the "Hedging and Trading Arrangements"), all of which were entered into in accordance with the Debtors' Risk Management Guidelines.[16]  The Prepetition Hedging and Trading Arrangements generally fall into the following three categories:  (a) over-the-counter transactions; (b) transactions with ERCOT; and (c) Broker Arrangements (as defined herein).[17]

### A.     Over-the-Counter Transactions.

19.     The Hedging and Trading Entities enter into over-the-counter physical and financial  transactions related to natural gas, electricity, coal, fuel oil, uranium, emission allowances, and other energy-related commodities directly with third parties ("OTC Counterparties"), including transactions that are subject to the standard terms and conditions of an ISDA Master Agreement (and related commodity Annexes for natural gas and electricity), an EEI Master Power Purchase and Sale Agreement, or a NAESB Agreement (for natural gas

---

[16]   In addition, the Debtors are party to a significant number of non-active hedging and trading arrangements. Because transactions are not being conducted under these agreements, the Debtors do not have any prepetition obligations arising under such agreements.

[17]   As described further in the Debtors' *Motion of Energy Future Holdings Corp.,* et al., *for Entry of (A) An Order Authorizing the Debtors to (I) Maintain and Administer Customer Programs and Customer Agreements, (II) Honor Prepetition Obligations Related Thereto, (III) Pay Certain Expenses on Behalf of Certain Organizations, (IV) Fix The Deadline to File Proofs of Claim for Certain Customer Claims, and (V) Establish Procedures for Notifying Customers of Commencement of the Debtors' Chapter 11 Cases, Assumption of Customer Agreements, and the Bar Dates for Customer Claims and (B) An Order Authorizing Certain of the Debtors to Assume the Customer Agreements* (the "Customer Programs Motion"), filed contemporaneously with this Motion, the Debtors are seeking authority in the Customer Programs Motion to assume certain customer agreements.  By this Motion, the Debtors reserve the right to treat any customer contract to be assumed in the Customer Programs Motion as a Hedging and Trading Arrangement.

transactions), or other industry agreements, in each case, as modified pursuant to negotiations between the parties (the "OTC Agreements").

20.    Due to the Debtors' limited creditworthiness and in conjunction with industry standards, the Debtors are required on a regular basis to collateralize certain OTC Agreements to provide hedging and trading counterparties with assurance that obligations under the contracts will be met. As of the Petition Date, the Hedging and Trading Entities are party to open and active Prepetition Hedging and Trading Arrangements with approximately 68 OTC Counterparties.

21.    As of the Petition Date, the Debtors estimate that they owe approximately $7.1 million on account of prepetition obligations arising from the OTC Agreements (net of any amounts that may be netted by cash receivables or secured by collateral held by third parties (e.g., letters of credit or cash)), all of which will become due and owing within the Interim Period.

**B.     ERCOT Transactions.**

22.    ERCOT manages the flow of electricity to 24 million people in Texas, and manages the supply of approximately 85% of the electricity consumption in Texas. ERCOT schedules electricity on an electric grid that connects 40,500 miles of transmission lines and more than 550 generation units. ERCOT also performs financial settlements for the competitive wholesale electricity market and the majority of ERCOT is open to retail electric competition - approximately 6.7 million customers (*i.e.*, electricity meters) have the ability to choose their retail electric provider.      ERCOT is a membership-based 501(c)(4) nonprofit corporation governed by a board of directors and subject to oversight by the Public Utility Commission of Texas and the Texas Legislature.    ERCOT's members include consumers, cooperatives,

electricity generators, electricity marketers, retail electricity providers, investor-owned electric utilities (transmission and distribution providers), and municipal-owned electric utilities.

23.    Through the Debtors' operations in the ERCOT region, the Hedging and Trading Entities participate in: (a) the real-time energy market that allows a party to be paid or charged for physical electricity and ancillary services provided to or taken from the wholesale market; (b) financial transactions that are used by market participants to hedge differences in prices in the day-ahead energy market; (c) point-to-point transactions that allow a party to hedge against transmission congestion in ERCOT's real-time energy market between two specific locations on the transmission system; and (d) auctions for the purchase and sale of congestion revenue rights, which are contracts that allow a party to hedge against transmission congestion costs in ERCOT's day-ahead energy market.

24.    These markets provide the Hedging and Trading Entities with particular channels to sell and procure electricity, ancillary services, and transmission congestion instruments to mitigate the Debtors' risks associated with the electricity generation assets and retail electricity businesses, and are core to the commercial operations of those businesses. Ability to participate in the ERCOT region is critical to the Debtors' daily cash flows. Moreover, the Hedging and Trading Entities consummate transactions with ERCOT that they cannot execute with any other party or entity in light of ERCOT's (a) central role in the Texas electricity system, (b) multi-dimensional investment platform, and (c) facilitation of congestion revenue right actions as well as electricity and ancillary services services, sales, and purchases.

25.    Thus, to facilitate the Debtors' Hedging and Trading Activities within the ERCOT region, the Debtors and ERCOT have entered into Standard Form Market Participation Agreements ("SFAs") that include, among other things, an outline of the procedures and

processes used by ERCOT and other market participants to maintain the orderly functioning of the ERCOT grid system (the "ERCOT Protocols"). Without the SFAs, the Debtors would be unable to access critical platforms provided by ERCOT. The transactions the Debtors consummate with ERCOT cannot be executed with any other party or entity in light of ERCOT's pivotal role in the Texas electricity market.[18]

### C.   Broker Arrangements.

26.   The Hedging and Trading Entities are party to two types of broker arrangements, as follows (collectively, the "Broker Arrangements"):

(a) *Clearing Broker and Exchange Arrangements.* The Hedging and Trading Entities are party to counterparty agreements with clearing brokers (the "Clearing Brokers") and centralized exchanges (the "Exchanges") to clear transactions related to the purchase and sale of electricity, fuel oil, natural gas, uranium, emission allowances, and other energy-related products and physical and financial derivatives thereof, through exchanges, including Intercontinental Exchange, Inc. ("ICE"), the New York Mercantile Exchange ("NYMEX"), and Natural Gas Exchange ("NGX"). As discussed in more detail below, certain of the Hedging and Trading Entities have guarantees from their Debtor parent, TCEH, in favor of each of the Clearing Brokers and are required to provide collateral as requested by each Clearing Broker in a manner that is similar to ICE or NYMEX collateral requirements. Generally, each Clearing Broker or Exchange has broad discretion under its arrangement to: (a) terminate its agreement with the Hedging and Trading Entities; (b) refuse to enter into future transactions for the benefit of the Hedging and Trading Entities; and (c) cancel or liquidate the Hedging and Trading Entities' open positions. As is common in the Debtors' industry, the Clearing Broker Arrangements are required to be fully-collateralized on a daily basis and the value of such activity and related collateral changes on a day-to-day basis.

(b) *Introductory Broker Arrangements.* The Hedging and Trading Entities have entered into agreements with certain brokers who facilitate purchase and sale negotiations between the Hedging and Trading Entities and certain of their counterparties. In some instances, the Hedging and Trading Entities

---

[18]   To ensure the Debtors' access to the ERCOT region remains uninterrupted, the Debtors have filed contemporaneously with this Motion, the *Motion of Energy Future Holdings Corp.,et al., for Entry of an Order Authorizing Certain of the Debtors to Assume Standard Form Market Participant Agreements with ERCOT* which motion seeks authority to assume the SFAs with ERCOT (the "ERCOT Assumption Motion"). The relief requested herein with respect to the SFAs and the ERCOT Protocols is primarily meant to provide limited relief until such time as the Court has an opportunity to hear the ERCOT Assumption Motion.

compensate the brokers directly for their services.   In other instances, the Hedging and Trading Entities collect the fees to which the brokers are entitled for their services from the counterparties (in accordance with the terms set forth in the separately executed agreement between the broker and the customer) and then remit such fees to the brokers.

## II.    Potential Exposure on Account of the Prepetition Hedging and Trading Arrangements.

### A.    Potential Settlement Obligation Exposure.

27.    The cumulative mark-to-market net value of all derivative assets and liabilities related to the Prepetition Hedging and Trading Arrangements valued using standard industry valuation processes (and excluding Prepetition Hedging and Trading Arrangements related to the First Lien Hedges and Swaps and the Legacy Swaps) is a net liability of approximately $108 million as of the Petition Date, before taking into consideration collateral postings.  This value is calculated on a daily basis and is subject to fluctuations.  The Debtors estimate that of the payables that are due and owing on account of the Prepetition Hedging and Trading Arrangements as of the Petition Date (approximately $50.8 million in total), [19] approximately $43.7 million is secured by collateral held by third parties (*e.g.*, letters of credit or cash), leaving the Debtors with approximately $7.1 million due and owing as of the Petition Date.

28.    Even though the Debtors believe that continued performance under the Prepetition Hedging and Trading Arrangements (other than payment of accrued prepetition obligations)  on a postpetition basis in the ordinary course of business is permitted under section 363(c)(1) without court approval, the Debtors are seeking authority to continue performing postpetition obligations under the Prepetition Hedging and Trading Arrangements out of an abundance of caution, and to give counterparties to Hedging and Trading Arrangements comfort that the

---

[19]    This number represents the amount of obligations after netting payables and receivables permitted to be netted with the same counterparty under existing contractual terms.

Debtors will honor such obligations.    The Debtors estimate that the Hedging and Trading Entities will owe approximately $19.2 million on account of postpetition payment obligations arising under the Prepetition Hedging and Trading Arrangements during the Interim Period. This estimate is based on the Debtors' best estimates of potential value change from current market prices.

**B.    Potential Collateral Exposure.**

29.    As is typical in the industries that have wholesale trading markets, an entity that participates in those markets must maintain an acceptable level of creditworthiness or provide acceptable credit support, generally in the form of guarantees, letters of credit, cash, prepayments, or other forms of collateral. In the ordinary course of business, the Debtors post collateral to and receive collateral from counterparties to Hedging and Trading Arrangements.

30.    Specifically, the Debtors provide credit support relating to the following Prepetition Hedging and Trading Arrangements:

> (a) *Over-the-Counter Transactions.*  TCEH issued guarantees on behalf of the Hedging and Trading Entities in favor of most of the OTC Counterparties. Many of the OTC Agreements have defined triggers, such as credit ratings or financial performance ratios, which permit an OTC Counterparty to request additional collateral from the Hedging and Trading Entities upon changes to those triggers.  Further, some OTC Agreements give the OTC Counterparty the right to request additional collateral in the event that it has reasonable grounds to believe that the Hedging and Trading Entities' creditworthiness or performance under the applicable OTC Agreement has become unsatisfactory. Under these requirements, the Debtors have posted collateral with respect to the OTC Agreements in the amount of $80 million as of the Petition Date, consisting of $1 million of cash and $79 million of letters of credit.

> (b) *Clearing Broker and Exchange Arrangements.*  TCEH issued guarantees on behalf of certain of the Hedging and Trading Entities in favor of each of the Clearing Brokers and Exchanges, and, additionally, the Hedging and Trading Entities are required to provide collateral, including initial margin and variation margin, in such amounts, at such times and in such form as requested by each Clearing Broker or Exchange in its discretion. The Debtors have posted collateral with respect to the Clearing Broker and Exchange

Arrangements in the amount of $203.6 million as of the Petition Date, consisting of $117.6 million of cash and $86 million of letters of credit.

(c) **ERCOT Transactions.**    ERCOT has credit requirements for market participants to reduce the risk of default and associated effects on the entire market. Thus, certain of the Hedging and Trading Entities post collateral to cover the Hedging and Trading Entities' potential exposure for non-payment associated with their ERCOT transactions. Additionally, the Hedging and Trading Entities are required to comply with certain credit evaluations, including financial statement reporting requirements and notification requirements in the event of a material change in or affecting their financial condition. As discussed below, the Debtors have posted a letter of credit in the amount of $120 million for the benefit of ERCOT.

31.    As a general matter, the amount of credit support required under a Hedging and Trading Arrangement is subject to daily recalculation and posting requirements.[20]  On any given day, with respect to any Hedging and Trading Arrangement, additional collateral may be required of the Debtors or posted collateral may be returned to the Debtors. In many instances, a counterparty to a Hedging and Trading Arrangement is required to post collateral with the Debtors to secure such counterparty's performance. Generally, a failure by the Debtors or a counterparty to post or return credit support within the contractually required time period is an event of default under the applicable Hedging and Trading Arrangement.

32.    The most significant component of collateral requirements under most Hedging and Trading Arrangements is fairly straightforward — each party is required to post collateral equal to the amount of the counterparty's "exposure," minus collateral already posted and any applicable credit threshold.[21]  While "exposure" can be calculated in a variety of ways under the Hedging and Trading Arrangements, "exposure" generally means an amount equal to the difference between the contract price and the market price times the volume of commodity

---

[20]    A limited number of Hedging and Trading Arrangements entered into by the Debtors may have fixed or other collateralization obligations that are calculated on a less frequent basis.

[21]    Because of the limited creditworthiness of the Debtors, they have limited ability to make use of credit thresholds and are generally required to fully secure counterparties to Hedging and Trading Arrangements.

remaining under the transaction, plus any amounts due for performance, goods, and service already provided for which payment has not yet been made. Stated differently, the key component of exposure is the net amount one party would owe to the other in the event of a default under a Hedging and Trading Arrangement.[22]

33.    To the extent the parties have actually posted collateral under the Hedging and Trading Arrangement, the party receiving such performance assurance collateral would subtract the value of such collateral from their exposure calculation, while the party delivering the collateral would add the value of the collateral to their exposure calculation. These amounts, together with the commodity exposure calculation are usually calculated daily, with collateral either being posted or returned, by one party to the other, as applicable, for the outstanding exposures. As the parties continue to perform under the Hedging and Trading Arrangements and the volume of the underlying commodity remaining under the transaction decreases, payments for performance are made, resulting in the eventual return of the collateral securing the Hedging and Trading Arrangement, absent a default.

34.    The amount of credit support required to be posted by or to the Debtors to maintain credit standing and avoid default under Hedging and Trading Arrangements is significantly influenced by the inherent volatility of commodity prices. Commodity prices are directly influenced by a number of factors that can vary widely such as overall supply and demand, weather, supply disruptions, production increases, regulatory changes, and other factors. For example, the extreme winter weather recently experienced across the United States has imposed significant volatility in the natural gas market. The price of certain natural gas futures

---

[22]    The collateral obligation under a Hedging and Trading Arrangement may not be limited to exposure, as some counterparties may require additional security in connection with their trading requirements.

was recently exposed to large movements, and the price volatility was as high as 34% to 37% during 2014 due to the extreme weather conditions.

35.    A failure by the Debtors to post credit support within the contractually required time period, which could be as little as a few hours after notice from the third party, would be considered a default under the applicable Hedging and Trading Arrangement. The third party would have the right to terminate and liquidate the applicable Hedging and Trading Arrangement creating risks to the generation and retail businesses. Therefore, the ability of the Debtors to continue to meet their collateral obligations during the Interim Period to maintain the protections afforded by the Hedging and Trading Arrangements is critical.

36.    Relatedly, due to the significant amount of activity that the Debtors' operations have with ERCOT, the Debtors issued a letter of credit in December 2009 for the benefit of ERCOT and in accordance with ERCOT's creditworthiness protocols. By this Motion, and in an abundance of caution, the Debtors seek authority in the Interim Order and the Final Order to replace ERCOT's letter of credit with a postpetition letter of credit.[23]  In addition, the Debtors anticipate that ERCOT's prepetition (or new, postpetition) letter of credit will likely be sufficient to satisfy the Debtors' prepetition collateral posting obligations that may come due during the Interim Period, but, in an abundance of caution, are seeking authority in the Interim Order and the Final Order to satisfy prepetition collateral posting obligations to ERCOT, subject to the Prepetition Collateral Posting Cap, as applicable.

37.    Furthermore, in light of these concerns, the Debtors have negotiated with their postpetition lenders and prepetition secured lenders to obtain authority to grant TCEH Super-Priority DIP Liens to counterparties to certain Postpetition Hedging and Trading Arrangements

---

[23]    For the avoidance of doubt, if the Debtors replace ERCOT's letter of credit with a new postpetition letter of credit, the new postpetition letter of credit would not be subject to the Prepetition Collateral Posting Cap.

and Prepetition Hedging and Trading Arrangements that (1)(a) constitute Secured Commodity Hedge Agreements (as defined in the TCEH DIP Agreement), (b) are intended, at inception or execution, to hedge or manage any of the risks related to existing and/or forecasted power generation or load of the Debtors (whether owned or contracted), including but not limited to, against price movements or delivery risk in any commodity which, in the Debtors' judgment, could reasonably likely result in (i) an increase in the cost of the Debtors' operation or production and/or (ii) a decrease in the Debtors' revenue, in each case with respect to the Debtors' ordinary course of business and (c) are entered into in the ordinary course of the Debtors' business (the "Permitted Secured Commodity Hedge Agreements") and/or (2) is entered into to unwind or offset any existing Permitted Secured Commodity Hedge Agreement of the type described in clause (1) above.

III.    **The Prepetition Hedging and Trading Arrangements are Critical to the Debtors' Financial Success and Business Operations and Limited Relief Is Necessary to Preserve the Value of the Debtors' Estates.**

38.    The commodity and financial instrument trading sector has been historically and consistently resistant to conducting business with hedging and trading entities in financial distress.  Counterparties seeking to terminate Prepetition Hedging and Trading Arrangements and discontinue activity prospectively will do so because of fear that a chapter 11 hedging and trading partner is operating outside of the ordinary course of business with respect to sophisticated transactions necessary to conduct the hedging and trading business or because of a perception that the hedging and trading partner presents an unacceptable level of risk exposure without adequate credit support.

39.    At the same time, the Hedging and Trading Arrangements have historically provided the Debtors with annual returns in the hundreds of millions of dollars that add to and preserve the notional value across all of the Debtors' operations.  The Debtors will lose this

value opportunity if counterparties to Prepetition Hedging and Trading Arrangements, who believe they are entitled to certain safe-harbor protections with respect to the automatic stay provided under the Bankruptcy Code (described in more detail below), terminate the Prepetition Hedging and Trading Arrangements or take other adverse action in response to the Debtors' inability to meet postpetition obligations.

40.    In addition, the Debtors' market activities — specifically their ability to mitigate price and delivery risks associated with energy commodities — may be adversely affected if the Debtors are not authorized to maintain the Prepetition Hedging and Trading Arrangements in the ordinary course of business. Ultimately, these circumstances could have a negative effect on the overall value of the Debtors' business.

41.    The Debtors intend to pay prepetition claims arising on account of the Prepetition Hedging and Trading Arrangements, to pledge and transfer collateral under Prepetition Hedging and Trading Arrangements, and to grant the TCEH Super-Priority DIP Liens only to the extent necessary to preserve their businesses and under commercially reasonable terms. To that end, the Debtors will use their commercially reasonable efforts to condition the payment of prepetition claims and the posting of collateral under Prepetition Hedging and Trading Arrangements upon each Prepetition Hedging and Trading Arrangement counterparty's agreement to waive any rights it may have to liquidate, terminate, or accelerate its Hedging and Trading Arrangements with respect to events of default relating to these chapter 11 cases (the "Trading Continuation Agreement").

42.    Pursuant to the Interim Order and the Final Order, the Debtors request that the Court: (a) approve the form of the Trading Continuation Agreement, substantially in the form annexed as **Exhibit 1** to **Exhibit A** attached hereto, and (b) deem any payments made (or

collateral posted) by the Debtors to a counterparty who has executed a Trading Continuation Agreement but subsequently fails to perform in accordance with the terms thereof an improper postpetition transfer recoverable by the Debtors immediately upon written request.    Upon recovery of such payments or collateral, as applicable, claims by such Prepetition Hedging and Trading Arrangement counterparties shall be reinstated as if the payment had not been made or the collateral had not been posted.[24]

### IV.    The Risk Management Guidelines.

43.    As discussed earlier, agreements like the Hedging and Trading Arrangements are common in the Debtors' industry and are routinely used in the ordinary course of business to mitigate exposure to commodity price fluctuations. As a measure of governance and control, companies in the Debtors' industry, like the Debtors, use risk management guidelines to ensure that hedging and trading arrangements are closely monitored and are in the best interests of all the company's stakeholders.  To encourage superior risk management control within the energy trading field, the Committee of Chief Risk Officers, a nationally recognized, independent non-profit corporation comprised of risk management leaders in the energy field, establish "best practice" guidelines.

44.    The Debtors' Risk Management Guidelines are consistent with these "best practice guidelines" and create a complementary framework for governance, operational accountabilities, risk management procedures, and transaction management of the Hedging and Trading Activities in the ordinary course of business.

---

[24]    If there exists an outstanding postpetition balance due from the Debtors to a Prepetition Hedging and Trading Arrangement counterparty, the Debtors may elect to recharacterize and apply any payment made (and, as applicable, any collateral posted) pursuant to an order granting the relief requested in this Motion to such outstanding postpetition balance and such Prepetition Hedging and Trading Arrangement counterparty will be required to repay the Debtors (and, as applicable, return any collateral posted by the Debtors) such amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

45.     As a further control, the Debtors use an internal hedging policy, in effect as of the Petition Date, that establishes the parameters within which the Debtors may enter into certain Hedging and Trading Arrangements (the "Internal Hedging Policy").[25]   The Internal Hedging Policy generally restricts the Debtors' ability to enter into Hedging and Trading Arrangements with respect to commodities other than uranium and Powder River Basin coal that would result in the Debtors being party to Hedging and Trading Arrangements that, on an aggregate basis, hedge more than 100% of the Debtors' projected exposure to such commodity for calendar year 2014.  In addition, the Internal Hedging Policy generally includes a restriction on the Debtors' ability to hedge or manage its exposure with respect to commodities other than uranium or Powder River Basin coal, on an aggregate basis, for calendar year 2015, up to a percentage set forth in the Internal Hedging Policy, which percentage is both consistent with the Debtors' hedging practices over the past two years for the period 13 –24 months after any reference date and is less than 70% (the limits set forth in the Internal Hedging Policy described in the preceding two sentences, the "Hedging Ceiling").

46.     Additionally, the Debtors use an independent internal audit function, under the direction of the Debtors' audit committee which routinely conducts internal audits of the Debtors' Hedging and Trading Arrangements from a risk management perspective.  Specifically, the internal audit function often employs the use of third party subject matter experts in the field of energy trading and risk management to assist in the audit work.  Collectively, the Risk Management Guidelines and the Debtors' rigorous auditing process ensure that the Debtors

---

[25]   As set forth in the Interim Order and Final Order, subject to the Internal Hedging Policy (including any subsequent modification to such policy in a manner consistent with such Internal Hedging Policy, the Interim Order, and the Final Order), the Debtors shall not enter into wholesale Hedging and Trading Arrangements with a tenor beyond December 31, 2015.  Furthermore, the Debtors shall not be permitted to amend the tenor and hedge limitations set forth in the Internal Hedging Policy, including, without limitation, the Hedging Ceiling in a manner that, in the Debtors' judgment, varies materially from the Debtors' historical hedging practices over the past two years without further order of the Court.

deploy a robust governance and control function at all times related to the potential risks involved with the Hedging and Trading Arrangements. This activity helps ensure that the Debtors' enter into only those Hedging and Trading Arrangements that are in the best interests of the Debtors, their estates, and other parties in interest. The Debtors will continue to abide by the Risk Management Guidelines, including the Internal Hedging Policy, and their audit practices throughout these chapter 11 cases.

### A.    Risk Governance Structure.

47.    Each of the Debtors' business units has a group of senior level employees dedicated to discussing and monitoring the specific risks to which each particular business unit is vulnerable (each such group, a "Risk Management Committee" and, collectively, the "Risk Management Committees"). For the Hedging and Trading Entities' hedging and trading business, Luminant Energy Company LLC, there is a Risk Management Committee that is responsible for identifying Hedging and Trading Activities risks, including market, liquidity, credit, operational, legal, regulatory, and other risks and managing such risks in accordance with the Risk Management Guidelines ("Hedging and Trading Activities Risks"). This Risk Management Committee also reviews and approves the types of transactions that the Hedging and Trading Entities can enter into and reviews significant risks for the Hedging and Trading Entities on a regular basis.

48.    In addition to the Risk Management Committees, the Hedging and Trading Entities also maintain (a) a separate compliance group (the "Compliance Group") that is responsible for creating and enforcing internal policies and procedures to comply with federal and state laws and regulations, and that reports to the vice-president of regulatory law and the chief compliance officer for the Hedging and Trading Entities and (b) a separate risk management team that supervises specialized risk teams in their monitoring, measurement, and

reporting of the Hedging and Trading Activities Risks, and that reports directly to the vice president of risk management for EFH and chief financial officer for EFH (the "EFH Risk Management Team"). Collectively, both groups monitor compliance with internal and external controls and processes, including legal and regulatory compliance, adhering to internal risk policies and limits, supervising and reporting processes, and providing transaction governance processes.

### B.        Transaction Governance.

49.        The Hedging and Trading Entities are subject to certain transaction governance processes that ensure the Hedging and Trading Activities are aligned with acceptable risk levels. The Hedging and Trading Entities execute both standard and non-standard transactions, (respectively, the "Standard Transactions" and "Non-Standard Transactions" and, collectively, the "Hedging and Trading Transactions"). Standard Transactions generally require a less rigorous approval process than Non-Standard Transactions. This is because Standard Transactions: (a) use only products pre-approved by the Risk Management Committees; (b) have standard terms and conditions; (c) have specified term limits; (d) are frequently used to mitigate volume and price risk on a regular basis; (e) are frequently used in the Hedging and Trading Activities and well understood by the commercial and support teams for the Hedging and Trading Entities; and (f) generally operate under industry developed contracts.

50.        By contrast, Non-Standard Transactions are either: (a) a combination of Standard Transactions; or (b) Standard Transactions with additional complicating and/or unique provisions, such as atypical settlement dates or complex valuation requirements or higher required levels of operational support. Non-Standard Transactions require two levels of internal approvals. First, Non-Standard Transactions *must* be reviewed by eight specified practice areas to ensure that the transactions' various risks have been assessed and that the practice areas can

accommodate the transaction into daily operations.[26]  Second, Non-Standard Transactions must be approved in accordance with the Debtors' corporate risk policy.[27]

51.    Different levels of approval are required depending on the size and tenor of the Hedging and Trading Transaction and whether the transaction is Standard or Non-Standard.  The approval hierarchy is based on individual authorities given to personnel based on their role and experience within the Hedging and Trading Entities.

52.    The Hedging and Trading Entities also govern transactions by utilizing individual limits that provide specific limits to each person that has hedging and trading authority. Individual hedging and trading personnel limits are set by the appropriate TCEH Hedging and Trading Entity vice-president and the EFH vice president of risk management on the basis of instrument, commodity, tenor, region, experience of the individual, and the individual's role within the business and monitored by the EFH Risk Management Team.

### C.    Valuation and Risk Parameters.

53.    In accordance with the Debtors' corporate risk policy, the Debtors use individual trader limits, mark-to-market valuations of all transactions, position and profit and loss reporting, "at risk" measurements, sensitivities/stress testing, and risk/return metrics to measure and control the Hedging and Trading Activities Risks associated with the Hedging and Trading Transactions. The specific risk management measures employed by the Hedging and Trading Entities are described below:

---

[26]    As a further control, the Hedging and Trading Entities' commercial teams are segregated from discussions relating to the management of the EFH Risk Management Team as well as discussion relating to the responsibilities and compensation of the EFH Risk Management Team.

[27]    The Debtors' corporate risk policy is established by the Debtors' corporate risk management group, which is comprised of: (a) the audit committee of the EFH Board; (b) the strategy and policy committee, which includes the chief risk officer for EFH; (c) each business unit Risk Management Committees; and (d) the EFH Risk Management Team.

(a) *Use of Multiple Valuation Measures.* To value their portfolio of transactions, the Hedging and Trading Entities create individual forward price curves ("FPCs") for each of their target markets using the mid-point of the bid and ask prices. Specialized members of the EFH Risk Management Team independently validate both the market-observable and non-observable FPCs on a daily basis, using valuation models as needed. Those prices are then utilized to value all portfolios of transactions on a daily basis to provide detailed profit and loss reporting related to Hedging and Trading Entities. The daily profit and loss reports provide a timely measure of the risks associated with the Hedging and Trading Entities' activities. In addition, the EFH Risk Management Team employs various "at risk" measurement methodologies to quantify the market and liquidity risks associated with the Hedging and Trading Activities conducted by the Hedging and Trading Entities. These "at risk" measures provide metrics that are utilized to limit the amount of risk that the Hedging and Trading Entities maintain in the business related to Hedging and Trading Activities.

(b) *Commodity Position and Profit and Loss Reporting.* All portfolios of transactions are monitored and valued on a daily basis by the EFH Risk Management Team. All existing positions in Hedging and Trading Activities are reported by commodity and by tenor for utilization by Hedging and Trading personnel and EFH Risk Management Team. Additionally, the EFH Risk Management Team produces daily profit and loss reports that present the performance of each portfolio of transactions. The profit and loss of each portfolio of transactions is also reported on a monthly basis as part of the Debtors' monthly internal management reporting processes.

(c) *Collateralization Monitoring.* The Hedging and Trading Entities manage the liquidity use associated with collateral posting requirements from performance assurance and/or margin calls related to the Hedging and Trading Activities. The total collateral that may be posted on behalf of TCEH or the Hedging and Trading Entities is monitored by a credit risk team within the EFH Risk Management Team working in conjunction with personnel from the Hedging and Trading Entities' team for the purposes of liquidity risk management, and is routinely communicated to the Debtors' centralized treasury team.

54.    The continuation of the Hedging and Trading Activities, at all times subject to the Risk Management Guidelines, is key to maximizing the value of the Debtors' estates. Through the establishment of a defined risk governance structure, the creation of parameters for transaction governance, and the imposition of valuation and risk parameters and reporting processes applicable to all Hedging and Trading Transactions, the Debtors ensure that such

transactions are closely scrutinized and in the best interests of the Debtors and all parties in interest.

**Basis for Relief**

I.    **Payment of Prepetition Obligations Arising on Account of the Hedging and Trading Arrangements is Authorized Under the Bankruptcy Code.**

55.    The Debtors believe there is substantial authority under the Bankruptcy Code to support payment of their prepetition obligations under the Hedging and Trading Arrangements. As discussed below, certain of the counterparties to the Hedging and Trading Arrangements may be entitled to protection either as a result of the "safe harbor" provisions of the Bankruptcy Code, or as a result of their status as secured creditors. In addition, the Hedging and Trading Arrangements are a critical complement to the Debtors' generation and retail businesses, and as a result, payment of prepetition obligations arising under the Hedging and Trading Arrangements is in the best interests of the Debtors' estates.

A.    **Some of the Hedging and Trading Arrangements May Be Entitled to Special Treatment Under the Bankruptcy Code.**

56.    Certain hedging and trading arrangements are governed primarily by sections 546, 555, 556, 559, 560, and 561 of the Bankruptcy Code. Specifically, sections 546(e)–(g) (providing relief from certain avoidance actions), section 555 (providing for the liquidation of certain security accounts), section 556 (providing for the liquidation of forward and commodity contracts), section 559 (providing for the liquidation of certain repurchase agreements) of the Bankruptcy Code, in combination with sections 362(b)(6), (7), and (17) of the Bankruptcy Code, section 560 (providing for the liquidation, termination, and acceleration of swap agreements), and section 561 (providing for the termination, liquidation, and acceleration of master netting agreements)—often referred to as the "safe harbors"—contain special protections for counterparties to future, forward, and financial contracts that enable such counterparties to:

(a) terminate, liquidate, and apply collateral held under a commodity and forward contract upon the bankruptcy filing of the other party, notwithstanding the anti-*ipso-facto* protections of section 365(e)(1) of the Bankruptcy Code;

(b) protect prepetition payments made under a commodity and forward contract by the debtor to the non-debtor party from the avoidance powers of a trustee or debtor in possession, except in particular cases of actual intent to defraud other creditors; and

(c) setoff mutual debts and claims against the debtor under and across contracts entitled to "safe harbor" protection without the need to obtain relief from the automatic stay, provided the underlying agreement allows for such setoff.

57.     The Debtors believe that some counterparties to the Hedging and Trading Arrangements, may be reluctant to continue to trade with the Debtors without specific authorization from the Court.  Because of the unique rights under the "safe harbor" provisions available to certain Hedging and Trading Arrangement counterparties, the Debtors believe that such counterparties may prematurely seek to terminate the Hedging and Trading Arrangements or related contracts or take other adverse actions against the Debtors, whether or not any special rights actually apply to any Hedging and Trading Arrangements.  Therefore, the Debtors believe that they must have authority to continue to perform under the Hedging and Trading Arrangements, pursuant to the established Risk Management Guidelines, to preserve the value of the Hedging and Trading Arrangements and the Debtors' overall business.  Accordingly, the Debtors request authority, but not direction, to continue to perform under the Hedging and Trading Arrangements in the ordinary course of business on a postpetition basis.

**B.      Payment of Prepetition Obligations Under the Hedging and Trading Arrangements is a Sound Exercise of the Debtors' Business Judgment.**

**1.      Payment of Certain Prepetition Obligations is Entitled to Administrative Priority Under Section 503(b)(9).**

58.     As a preliminary matter, the Debtors estimate that they owe approximately $57.8 million (gross) on account of goods delivered in the 20 days prior to the Petition Date.

Claims for such amounts are entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code. Consequently, payment of such claims will alter the timing, not the amount, of payment. Accordingly, payment of such amounts will benefit the Debtors' estates at no cost to any party in interest. Moreover, the Bankruptcy Code does not prohibit a debtor from paying such claims before confirmation. Indeed, the timing of such payments lies squarely within the discretion of the Court. *See In re Global Home Prods., LLC*, No. 06-10340, 2006 WL 3791955, at *3 (Bankr. D. Del. Dec. 21, 2006).[28] In addition, substantially all of the Debtors' obligations under the Hedging and Trading Arrangements are secured by prepetition collateral. Counterparties to such Hedging and Trading Arrangements are secured creditors whose claims will ultimately be paid during the course of these chapter 11 cases. Consequently, payment of these claims through this Motion will alter the timing, not the payment owed to such secured creditors.

### 2. Payment of the Prepetition Obligations is Warranted Under the Doctrine of Necessity.

59.     Courts in the Third Circuit and elsewhere generally recognize that debtors may pay prepetition claims that are essential to the continued operation of the debtor's business. *See, e.g., In re Meridian Auto. Sys.-Composite Operations, Inc.*, 372 B.R. 710, 714 (Bankr. D. Del. 2007) (granting the debtor authority to pay prepetition obligations owed to certain critical vendors); *In re Primary Health Sys., Inc.*, 275 B.R. 709, 710 (Bankr. D. Del.

---

[28]  Since the enactment of section 503(b)(9) of the Bankruptcy Code, courts in this district have exercised their discretion and have authorized the payment of prepetition claims under section 503(b)(9) of the Bankruptcy Code during a chapter 11 case. *See, e.g., In re School Specialty, Inc.*, No. 13-10125 (KJC) (Bankr D. Del. Jan. 30, 2013) (stating that relief requested is in the "best interests of the Debtors"); *In re THQ, Inc.*, No. 12-13398 (MFW) (Bankr. D. Del. Dec. 20, 2012) (same); *In re A123 Sys., Inc.*, No. 12-12859 (KJC) (Bankr. D. Del. Nov. 08, 2012) (same); *In re Neb. Book Co.*, No. 11-12005 (Bankr. D. Del. July 21, 2011) (same); *In re Appleseed's Intermediate Holdings LLC*, No. 11-10160 (KG) (Bankr. D. Del. Feb. 23, 2011) (same). Because of the voluminous nature of the orders cited herein, such orders are not attached to this Motion. Copies of these orders are available upon request of the Debtors' counsel.

2002) (allowing payment of prepetition wages upon a finding that such relief was "essential to the continued operation of the Debtors' businesses"); *In re Just for Feet, Inc.*, 242 B.R. 821, 824-45 (Bankr. D. Del. 1999) (noting that debtors may pay prepetition claims that are essential to the continued operation of the debtor's business). Courts have relied on several legal bases in approving such relief.

60.    Courts generally recognize that debtors may pay prepetition claims under section 363(b) of the Bankruptcy Code where there is a sound business purpose for the payment of prepetition obligations, and where the debtor is able to "articulate some business justification, other than the mere appeasement of major creditors." *See, e.g., In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (granting debtor authority to pay prepetition wages); *Armstrong World Indus. Inc. v. James A. Phillips, Inc., (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (Bankr. S.D.N.Y. 1983) (granting the debtor the authority to pay prepetition claims of suppliers who were potential lien claimants).

61.    Courts also recognize that payments to prepetition creditors are appropriate pursuant to section 105(a) of the Bankruptcy Code under the "doctrine of necessity" or the "necessity of payment" rule where such payments are necessary to the continued operation of the debtor's business. *See, e.g., In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor); *In re Penn Cent. Transp. Co.*, 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding that the necessity of payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims have been paid"); *In re Friedman's, Inc.*, 2011 WL 5975283, at *3 (Bankr. D. Del. Nov. 30, 2011) ("[M]ost

courts will allow payments [of prepetition claims] under the 'doctrine of necessity,' if the debtor establishes that in its business judgment making such payments is critical to the survival of the debtor's business"); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr D. Del. 1994) (noting that debtors may pay prepetition claims that are essential to the continued operation of the debtor's business). The rationale for the necessity of payment rule—the rehabilitation of a debtor in reorganization cases—is "the paramount policy and goal of Chapter 11." *Ionosphere Clubs*, 98 B.R. at 176; *Just for Feet*, 242 B.R. at 826 (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization.").

62.    Here, the decision to pay prepetition obligations under the Hedging and Trading Arrangements is in the sound business judgment of the Debtors because the Hedging and Trading Arrangements are essential to the continued operation of the Debtors' generation and retail businesses, and generate revenue for the Debtors' estates. The Debtors believe that by authorizing the Debtors to pay prepetition obligations as the Debtors see fit in their business judgment, the Court will underscore the Debtors' intent and ability to continue performing under the Hedging and Trading Arrangements and minimize disruption by premature, unilateral termination by counterparties. Accordingly, the Debtors believe the relief requested in this Motion will yield benefits that are in the best interests of the Debtors, their estates, and all parties in interest.

II.    **Section 363(c) of the Bankruptcy Code Authorizes the Debtors to Perform Postpetition Obligations Under Prepetition Hedging and Trading Arrangements and Enter Into New Postpetition Hedging and Trading Arrangements.**

63.    Section 363(c) of the Bankruptcy Code provides, in relevant part, that a debtor in possession "may enter into transactions . . . in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or

a hearing." 11 U.S.C. § 363(c)(l).  To maximize the value of the Debtors' estates, the Debtors should be permitted to continue performing postpetition obligations under existing Hedging and Trading Arrangements and to enter into new Postpetition Hedging and Trading Arrangements in the ordinary course of business.

64.     Section 363(c)(1)'s ordinary course of business standard was intended to allow a debtor in possession the flexibility to run its business.  *Moore v. Brewer (In re HMH Motor Servs., Inc.)*, 259 B.R. 440, 448–49 (Bankr. S.D. Ga. 2000).  A debtor in possession may therefore use, sell, or lease property of the estate without the need for prior court approval if the transaction is in the ordinary course of business.  *See Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (holding that ordinary course of business use of estate property does not require a prior hearing); *James A. Phillips*, 29 B.R. at 394 (holding that where a debtor in possession is merely exercising the privileges of its status, there is no general right to notice and a hearing concerning particular transactions conducted in the ordinary course of business).

65.     The Bankruptcy Code does not define the "ordinary course of business." *In re Commercial Mortg. & Fin. Co.*, 414 B.R. 389, 393 (Bankr. N.D. Ill. 2009).  The two tests ordinarily applied by the courts to determine the ordinary course of business are the "horizontal" test and the "vertical" test. *Denton Cnty. Elec. Co-Op., Inc. v. Eldorado Ranch (In re Denton Cnty. Elec. Coop., Inc.)*, 281 B.R. 876, 882 and n.12 (Bankr. N.D. Tex. 2002). "The 'horizontal test' focuses on the way businesses operate within a given industry. The 'vertical test' focuses on the expectations of creditors." *Denton Cnty. Elec. Co-Op.*, 281 B.R. at 882 n.12.

66.     Under both the horizontal test and the vertical test, the Hedging and Trading Activities conducted through the use of Hedging and Trading Arrangements (as described herein

and at all times consistent with the Debtors' Risk Management Guidelines) are in the ordinary course of the Debtors' businesses. *See Med. Malpractice Ins. Assoc. v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2d Cir. 1997) (finding that "ordinary course of business" is meant "to embrace the reasonable expectations of interested parties of the nature of transactions that the debtor would likely enter in the course of its normal, daily business") (quoting *In re Watford*, 159 B.R. 597, 599 (M.D. Ga. 1993)); *In re Roth American, Inc.*, 975 F.2d 949, 952 (3rd Cir. 1992) (stating that section 363 of the Bankruptcy Code is designed to allow a debtor in possession "flexibility to engage in ordinary transactions without unnecessary...oversight"); *In re Coordinated Apparel, Inc.*, 179 B.R. 40, 43 (Bankr. S.D.N.Y. 1995).

67.    Under the horizontal test, the Hedging and Trading Arrangements are typical arrangements and ubiquitous among companies in the Debtors' industry to preserve value of their estates.    Companies in the Debtors' industry routinely enter into hedging and trading transactions similar to those contemplated by the Hedging and Trading Arrangements. *See, e.g., In re Patriot Coal Corp.*, No. 12-12900 (Bankr. S.D.N.Y. July 10, 2012) (granting authority to enter into and perform under coal sales contracts); *In re Dynegy Holdings, LLC*, No. 11-38111 (Bankr. S.D.N.Y. Nov. 9, 2011) (granting authority to enter into and perform under derivative contracts); *In re Boston Generating, LLC*, No. 10-14419 (Bankr. S.D.N.Y. Sept. 23, 2010) (granting authority to enter into and perform under its hedging and purchase and sale contracts); *In re Calpine Corp.*, No. 05-60200 (Bankr. S.D.N.Y. Dec. 21, 2005) (granting authority to enter into and perform under its derivative contracts, including forward, futures, and options contracts); *In re Mirant Corp.*, No. 03-46590 (Bankr. N.D. Tex. Aug. 28, 2003) (same); *In re NRG Energy, Inc.*, No. 03-13024 (Bankr. S.D.N.Y. June 30, 2003) (same). [29]    Accordingly, the

---

[29]    Because of the voluminous nature of the orders cited herein, such orders are not attached to this Motion.  Copies of these orders are available upon request of the Debtors' counsel.

Debtors believe that performing postpetition obligations under Prepetition Hedging and Trading Arrangements and entering into new, Postpetition Hedging and Trading Arrangements is within the ordinary course of business and should be permitted.

68.    Under the vertical test, creditors' reasonable expectations of a debtor's "ordinary course of business" are based on the debtor's specific prepetition business practices and norms, and the expectation that the debtor will conform to those practices and norms while operating as a debtor in possession. *In re Garofalo's Finer Foods, Inc.,* 185 B.R. 414, 425 (N.D. Ill. 1995). Thus, a fundamental characteristic of an "ordinary" postpetition business transaction is its similarity to a prepetition business practice. *Marshack v. Orange Commercial Credit (In re Nat'l Lumber & Supply, Inc),* 184 B.R. 74, 79 (9th Cir. B.A.P. 1995); *James A. Phillips,* 29 B.R. at 394. The size, nature and type of business, and the size and nature of the transactions in question, are all relevant to determining whether the transactions at issue are ordinary. *U.S. ex rel. Harrison v. Estate of Deutscher,* 115 B.R. 592, 598 (M.D. Tenn. 1990); *Johns-Manville Corp.,* 60 B.R. at 617. "Accordingly, a postpetition transaction undertaken by the debtor that is similar in size and nature to prepetition transactions undertaken by the debtor would be within the ordinary course of business." *Garofalo's,* 186 B.R. at 426.

69.    Here, the Debtors seek to continue performing postpetition obligations under existing Hedging and Trading Arrangements and to enter into new Postpetition Hedging and Trading Arrangements (which the Debtors anticipate being virtually identical to the Prepetition Hedging and Trading Arrangements) in the ordinary course of business to the extent such Hedging and Trading Arrangements represent beneficial contracts to the Debtors, consistent with past practice and the Risk Management Guidelines. Accordingly, and under the authority provided by section 363(c)(1) of the Bankruptcy Code, the Debtors submit that performance of

postpetition obligations under the Hedging and Trading Arrangements and authority to enter into new Postpetition Hedging and Trading Arrangements is appropriate and in the best interests of their estates and all parties in interest in these chapter 11 cases.

**III.     The Debtors Should Be Authorized to Pledge Collateral Under the Hedging and Trading Arrangements.**

70.     Because the transactions under the Hedging and Trading Arrangements are subject to value fluctuation, under most of the Hedging and Trading Arrangements, the Debtors are expected to continue to be required to maintain a good credit standing with counterparties by: (a) posting cash collateral or letters of credit; (b) pledging certain of the Debtors' assets; or (c) making a prepayment to the counterparty in circumstances where the Debtors' obligations to the counterparty exceed a predetermined threshold.  These security obligations are not unduly burdensome on the Debtors and, more importantly, are necessary for the Debtors to continue with their business and Hedging and Trading Activities.  Therefore, to preserve the value of the Debtors' estates, the Debtors request the express authority to pledge collateral under the Hedging and Trading Arrangements in the form of cash, letters of credit, and, in the case of those Hedging and Trading Arrangements that constitute Secured Commodity Hedging Agreements, TCEH Super-Priority DIP Liens, as permitted under the TCEH Cash Collateral Orders and the TCEH DIP Orders.

71.     As discussed herein, a prohibition on the Debtors' ability to pledge collateral on account of Hedging and Trading Arrangements in the form of cash, letters of credit, and, in the case of Hedging and Trading Arrangements that constitute Secured Commodity Hedging Agreements, TCEH Super-Priority DIP Liens (as permitted under the TCEH Cash Collateral Orders and TCEH DIP Orders) would:    (a) cause disruption to the Debtors' operations; (b) require the immediate attention of the Debtors' management at a time when their resources

are limited and better spent on the restructuring; (c) effectively prevent the Debtors from entering into Hedging and Trading Arrangements because counterparties will require credit support in the form of collateral and security; (d) compromise the Debtors' ability to successfully reorganize because of their new exposure to previously-hedged fluctuations in energy and related commodities prices and interest rates; and (e) potentially cause the Debtors to default under Hedging and Trading Arrangements if reasonable collateral requests from counterparties to the Hedging and Trading Arrangements in the ordinary course of business are not met.

72.    Courts in various jurisdictions have approved relief similar to the relief requested in this Motion. *See, e.g., In re Optim Energy, LLC*, No. 14-10262 (Bankr. D. Del. Mar. 6, 2014) (authorizing Debtors to honor and continue performing under trading contracts in a manner consistent with prepetition practices); *In re Patriot Coal Corp.*, No. 12-12900 (Bankr. S.D.N.Y. July 10, 2012) (allowing the Debtors to perform under and pledge collateral under prepetition and postpetition derivative contracts); *In re Dynegy Holdings, LLC*, No. 11-38111 (Bankr. S.D.N.Y. Nov. 9, 2011) (authorizing the Debtors to continue trading operations in the ordinary course of business); *In re Calpine Corp.*, No. 05-60200 (Bankr. S.D.N.Y. Dec. 21, 2005) (permitting the Debtors to continue prepetition trading activities in the postpetition period, honor related prepetition obligations, and enter into postpetition trading contracts); *In re Mirant Corp.*, No. 03-46590 (N.D. Tex. 2003) (authorizing the Debtors to honor prepetition trading obligations, enter into, and perform under, postpetition trading arrangements, and provide related credit support).

73.    In light of the foregoing, the Debtors believe that the relief requested in this Motion is appropriate and is in the best interests of the Debtors, their estates, and all parties in interest.

IV. **ERCOT Should Be Authorized to Perform Its Obligations and Exercise Its Rights Under the SFAs and ERCOT Protocols.**

74. ERCOT plays an important role via the SFAs and ERCOT Protocols to facilitate a substantial number of the Debtors' Hedging and Trading Arrangements. Among other things, ERCOT manages the centralized clearing and financial settlements for the Debtors electricity generation operations and certain obligations related to the retail electricity business. Such activities by ERCOT may, and likely will, give rise to claims against the Debtors. It is the Debtors' intent by this Motion to allow the Debtors to continue their Hedging and Trading Arrangements, and in connection therewith, allow ERCOT to continue performing its obligations without regard to whether a claim arises against the Debtors from its Hedging and Trading Activities prepetition or postpetition. Such relief will ensure that there is minimal disruption to the Debtors' operations. Accordingly, it is in the best interest of the Debtors' estates and all parties in interest in these chapter 11 cases that pursuant to sections 105(a) and 362(d) of the Bankruptcy Code, the automatic stay be modified to the extent necessary to permit ERCOT to continue performing its obligations and exercising its rights under the SFAs and ERCOT Protocols, pursuant to sections 105(a) and 362(d) of the Bankruptcy Code. Moreover, given the Debtors' key role in providing electricity and reliable generation to the ERCOT electricity region, and the associated end-user customers of that market, it is in the public interest to ensure that ERCOT and the Debtors continue to meet their obligations under the SFAs and ERCOT Protocols.

V. **Cause Exists To Authorize the Debtors' Financial Institutions To Honor Checks and Electronic Fund Transfers Associated with Hedging and Trading Operations.**

75. The Debtors have sufficient funds to pay the amounts described in this Motion in the ordinary course of their business by virtue of expected cash flows from ongoing business operations, debtor-in-possession financing, and anticipated access to cash collateral. In addition,

37

under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the Hedging and Trading Arrangements. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. Therefore, the Debtors respectfully request that the Court authorize and direct all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

### The Requirements of Bankruptcy Rule 6003 are Satisfied

76.    Pursuant to Bankruptcy Rule 6003, the Court may grant relief regarding a motion to pay all or part of a prepetition claim within 21 days after the Petition Date if the relief is necessary to avoid immediate and irreparable harm. Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001).

77.    As described above, if the Debtors are not authorized to honor their prepetition obligations under the Hedging and Trading Arrangements, many, if not all, counterparties will terminate the Hedging and Trading Arrangements, leaving the Debtors vulnerable to fluctuations in the price of multiple commodities. The Debtors also rely on certain of the Hedging and Trading Arrangements for the physical delivery of certain commodities vital to the operation of the Debtors' electricity-generation business. Moreover, pending entry of the Final Order, the Debtors only intend to honor prepetition obligations arising from the Prepetition Hedging and Trading Arrangements and to continue performing under the Hedging and Trading Arrangements

to the extent they determine that failure to perform will cause immediate and irreparable harm to the Debtors. Specifically, the Debtors have proposed caps on prepetition obligations (including collateral posting obligations) that come due during the Interim Period. Accordingly, the Debtors submit that they have satisfied the requirements of Bankruptcy Rule 6003 to support honoring obligations under the Hedging and Trading Arrangements and continuing to honor obligations under the Hedging and Trading Arrangements in the postpetition period, to the extent the Debtors determine that failure to honor such obligations will cause immediate and irreparable harm to the Debtors' estates.

### Waiver of Bankruptcy Rules 6004(a) and 6004(h)

78.    To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### Reservation of Rights

79.    Nothing contained in this Motion or any actions taken by the Debtors pursuant to relief granted in the Interim Order and Final Order is intended or should be construed as: (a) an admission as to the validity or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) an admission that any agreement to which one or more of the Debtors may be party constitutes a Hedging and Trading Arrangement. If the Court grants the relief sought herein, any

payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

### Notice

80.    The Debtors shall provide notice of this Motion on the date hereof via facsimile, overnight delivery, and/or hand delivery to:  (a) the Office of the U.S. Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) Citibank, N.A., in its capacity as administrative agent under the TCEH first lien credit agreement and collateral agent under the TCEH intercreditor agreements and counsel thereto; (d) Bank of New York Mellon Trust Company, N.A., in its capacity as indenture trustee under:  (i) the TCEH unsecured pollution control revenue bonds; and (ii) the EFCH 2037 Notes due 2037, and counsel thereto; (e) American Stock Transfer & Trust Company, LLC, in its capacity as indenture trustee under: (i) the 9.75% EFH senior unsecured notes due 2019;  (ii) the 10.0% EFH senior unsecured notes due 2020; (iii) the 10.875% EFH LBO senior unsecured notes due 2017; (iv) the 11.25%/12.0% EFH LBO toggle notes due 2017; (v) the 5.55% EFH legacy notes (series P) due 2014; (vi) the 6.50% EFH legacy notes (series Q) due 2024; and (vii) the 6.55% EFH legacy notes (series R) due 2034, and counsel thereto; (f) Computershare Trust Company, N.A. and Computershare Trust Company of Canada, in their capacities as indenture trustee under:  (i) the 11.0% EFIH senior secured second lien notes due 2021; and (ii) the 11.75% EFIH senior secured second lien notes due 2022, and counsel thereto; (g) UMB Bank, N.A. in its capacity as indenture trustee under:  (i) the 9.75% EFIH senior unsecured notes due 2019; and (ii) the 11.25%/12.25% EFIH senior toggle notes due 2018, and counsel thereto; (h) BOKF, NA, dba Bank of Arizona, in its capacity as indenture trustee under 11.50% TCEH senior secured notes due 2020, and counsel

thereto; (i) CSC Trust Company of Delaware in its capacity as indenture trustee under: (i) the 6.875% EFIH senior secured notes due 2017; and (ii) the 10.0% EFIH senior secured notes due 2020, and counsel thereto; (j) Law Debenture Trust Company of New York in its capacity as indenture trustee under: (i) the 10.25% TCEH senior unsecured notes due 2015; and (ii) the 10.50%/11.25% TCEH senior toggle notes due 2016, and counsel thereto; (k) Wilmington Savings Fund Society, FSB in its capacity as indenture trustee under the 15.0% TCEH senior secured second lien notes due 2021, and counsel thereto; (l) counsel to certain holders of claims against the Debtors regarding each of the foregoing described in clauses (c) through (k); (m) the agent for the TCEH debtor-in-possession financing facility and counsel thereto; (n) the agent for the EFIH debtor-in-possession financing facility and counsel thereto; (o) counsel to certain holders of equity in Texas Energy Future Holdings Limited Partnership; (p) counsel to Oncor; (q) the SEC; (r) the Internal Revenue Service; (s) the Office of the United States Attorney for the District of Delaware; (t) the Office of the Texas Attorney General on behalf of the PUC; (u) counsel to ERCOT; and (v) all parties the Debtors reasonably believe are counterparties to the Hedging and Trading Arrangements. As this Motion is seeking "first day" relief, within forty eight hours of the entry of the Interim Order, the Debtors will serve copies of this Motion and the order respecting this Motion as required by Local Bankruptcy Rule 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

81.     No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

41

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order and Final Order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Wilmington, Delaware
Dated: April 29, 2014

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:       (302) 651-7700
Facsimile:        (302) 651-7701
Email:             collins@rlf.com
                       defranceschi@rlf.com
                       madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
Richard M. Cieri (*pro hac vice* pending)
Edward O. Sassower, P.C. (*pro hac vice* pending)
Stephen E. Hessler (*pro hac vice* pending)
Brian E. Schartz (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:       (212) 446-4800
Facsimile:        (212) 446-4900
Email:             richard.cieri@kirkland.com
                       edward.sassower@kirkland.com
                       stephen.hessler@kirkland.com
                       brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (*pro hac vice* pending)
Chad J. Husnick (*pro hac vice* pending)
Steven N. Serajeddini (*pro hac vice* pending)
300 North LaSalle
Chicago, Illinois 60654
Telephone:       (312) 862-2000
Facsimile:        (312) 862-2200
Email:             james.sprayregen@kirkland.com
                       chad.husnick@kirkland.com
                       steven.serajeddini@kirkland.com

Proposed Co-Counsel to the Debtors and Debtors in Possession

## EXHIBIT A

**Proposed Interim Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-_____ (___) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

## INTERIM ORDER AUTHORIZING THE DEBTORS TO (A) CONTINUE PERFORMING UNDER PREPETITION HEDGING AND TRADING ARRANGEMENTS, (B) PLEDGE COLLATERAL AND HONOR OBLIGATIONS THEREUNDER, AND (C) ENTER INTO AND PERFORM UNDER TRADING CONTINUATION AGREEMENTS AND NEW POSTPETITION HEDGING AND TRADING ARRANGEMENTS

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), for entry of an interim order (this "Order") authorizing, but not directing, the Debtors to:  (a) honor, pay, or otherwise satisfy prepetition obligations arising under the Prepetition Hedging and Trading Arrangements as they come due during the Interim Period; (b) pledge and transfer collateral under the Hedging and Trading Arrangements as such obligations arise during the Interim Period, in the form of cash, letters of credit and, in certain instances, TCEH Super-Priority DIP Liens, as permitted under the terms of the TCEH DIP Orders and the TCEH Cash Collateral Orders; (c) continue to honor, pay, or otherwise satisfy postpetition obligations arising under the Prepetition Hedging and Trading Arrangements

---

[1]    The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810.  The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201.  Due to the large number of debtors in these chapter 11 cases, for which the debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

in the ordinary course of business; and (d) enter into and perform under Trading Continuation Agreements (herein defined) and new, Postpetition Hedging and Trading Arrangements in the ordinary course of business and consistent with the Risk Management Guidelines, all as more fully set forth in the Motion; and upon the First Day Declaration; and the Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and the Court having found that the Debtors provided appropriate notice of the Motion and the opportunity for a hearing on the Motion under the circumstances; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing, if any, before the Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.    The Motion is granted on an interim basis as set forth herein.

2.    The Debtors are authorized, but not directed, to:  (a) honor, pay, or otherwise satisfy prepetition obligations arising under the Prepetition Hedging and Trading Arrangements as they come due during the Interim Period, in an aggregate amount not to exceed the Prepetition Payment Cap; (b) pledge and transfer collateral as such obligations come due during the Interim Period on account of the Hedging and Trading Arrangements in the form of cash or letters of credit, and, in the case of Hedging and Trading Arrangements that constitute Permitted Secured

2

Commodity Hedge Agreements, TCEH Super-Priority DIP Liens, as permitted under the terms of the TCEH DIP Orders and the TCEH Cash Collateral Orders, *provided, however*, that with respect to the Prepetition Hedging and Trading Arrangements such collateral shall be pledged and transferred in an aggregate amount not to exceed the Prepetition Collateral Posting Cap (on a net basis); (c) continue to honor, pay, or otherwise satisfy postpetition obligations arising under the Prepetition Hedging and Trading Arrangements in the ordinary course of business and consistent with the Risk Management Guidelines and, to the extent applicable, subject to the Internal Hedging Policy; and (d) enter into and perform under Trading Continuation Agreements and new, Postpetition Hedging and Trading Arrangements in the ordinary course of business and, to the extent applicable, subject to the Internal Hedging Policy and consistent with the Risk Management Guidelines.

3.      The Debtors are authorized, but not directed, to replace ERCOT's existing letter of credit with a new, postpetition letter of credit to the extent permitted under any DIP financing facility.  For the avoidance of doubt, such new postpetition letter of credit would not be subject to Prepetition Collateral Posting Cap.

4.      The Debtors shall use their commercially reasonable efforts to obtain from any Prepetition Hedging and Trading Arrangement counterparty, as a prerequisite to obtaining relief with respect to prepetition obligations pursuant to this Order, written acknowledgement of its obligations to perform under the Prepetition Hedging and Trading Arrangements on a postpetition basis, substantially in the form attached hereto as **Exhibit 1** (the "Trading Continuation Agreement"); *provided, however*, that the Debtors may, if necessary under the circumstances, in the Debtors' judgment, satisfy prepetition obligations in accordance with the Prepetition Payment Cap and Prepetition Collateral Posting Cap set forth in the Motion and this

Order without obtaining such agreement; *provided further*, *however*, that such payment shall not prejudice any Debtor's right to challenge, as a violation of the automatic stay or otherwise, a Hedging and Trading Arrangement counterparty's refusal to perform under the Hedging and Trading Arrangements on a postpetition basis.

5.       The form Trading Continuation Agreement, attached hereto as **Exhibit 1**, is approved on an interim basis; *provided*, *however*, that the Debtors are authorized to modify the Trading Continuation Agreement if, in the Debtors' judgment, a particular situation so requires.

6.       As security and assurance of the Debtors' obligations arising under Hedging and Trading Arrangements, and in exchange for providing benefits to non-terminating counterparties in accordance with this Order:

> (a) counterparties are each hereby granted, for their own benefit, effective as of the Petition Date and without the necessity of the execution by the Debtors, or filing, of security agreements, pledge agreements, mortgages, financing statements or otherwise, pursuant to Bankruptcy Code section 364(c)(2) enforceable first-priority liens and security interests on any cash collateral, and/or letters of credit with respect to initial, maintenance or variation margin or payments in advance provided to such counterparty whether prior hereto, on or after the date of this Order;

> (b) the obligations, liabilities and indebtedness of the Debtors arising from postpetition market movements, performance and performance obligations in respect of Postpetition Hedging and Trading Arrangements, and postpetition performance under Prepetition Hedging and Trading Arrangements shall have the status of an administrative expense, and shall be paid at the prices set forth in the Prepetition Hedging and Trading Arrangements or Postpetition Hedging and Trading Arrangements, as applicable;

> (c) counterparties may net exposures, amounts, and obligations under Prepetition Hedging and Trading Arrangements against exposures, amounts and obligations under other Prepetition Hedging and Trading Arrangements and Postpetition Hedging and Trading Arrangements with a Debtor and vice versa. In this regard, there shall be no distinction between transactions entered into prepetition and postpetition; and

> (d) the Debtors and the non-terminating counterparties shall be authorized and permitted to apply any and all cash collateral and/or letters of credit that may have been posted prepetition to any obligations arising postpetition, regardless

of whether such obligations arise under existing Prepetition Hedging and Trading Arrangements or Postpetition Hedging and Trading Arrangements, as applicable.

7.     Notwithstanding the foregoing, if, after receiving payment or collateral pursuant to this Order (and/or the specified terms of a Trading Continuation Agreement), any Prepetition Hedging and Trading Arrangement counterparty does not perform under the Prepetition Hedging and Trading Arrangements on a postpetition basis or otherwise exercises valid and enforceable termination rights under sections 555, 556, 559, 560, and 561 of the Bankruptcy Code with respect to the Prepetition Hedging and Trading Arrangements then (a) any postpetition payment or collateral received by such Prepetition Hedging and Trading Arrangement counterparty for prepetition obligations shall be deemed, in the Debtors' sole discretion, an improper postpetition transfer, and, therefore, recoverable by the Debtors immediately upon written request by the Debtors; and (b) upon recovery by the Debtors, any prepetition claim of such Prepetition Hedging and Trading Arrangement counterparty shall be reinstated as if the payment had not been made and/or the collateral had not been posted.

8.     If any or all of the provisions of this Order are stayed, modified in a manner adverse to a Hedging and Trading Arrangement counterparty or vacated, or this Order otherwise terminates, such stay, modification, vacation or termination will not affect (a) the validity of any indebtedness, obligation or liability incurred by the Debtors to each of the counterparties before the receipt of written notice by the counterparties of the effective date of such stay, modification or vacation, (b) the validity or enforceability of the security interests, administrative claims and netting and termination rights authorized or created hereby or pursuant to the Hedging and Trading Arrangements, or any related documents, and (c) the rights of the counterparties to exercise remedies as set forth in the Prepetition Hedging and Trading Arrangement or the

Postpetition Hedging and Trading Arrangements, as the case may be, and each counterparty shall be entitled to the benefits of the provisions of section 364(e) of the Bankruptcy Code.

9.    If there exists an outstanding postpetition balance due from the Debtors to a Prepetition Hedging and Trading Arrangement counterparty that does not perform under the Hedging and Trading Arrangements on a postpetition basis or otherwise exercises valid and enforceable termination rights under sections 555, 556, 559, 560, and 561 of the Bankruptcy Code with respect to the Prepetition Hedging and Trading Arrangements, the Debtors may elect, in the Debtors' sole discretion, to recharacterize and apply any payments made pursuant to this Order, and, as applicable, any collateral posted pursuant to this Order to such postpetition balance, and the Prepetition Hedging and Trading Arrangement counterparty shall repay immediately in cash to the Debtors (and, as applicable, return collateral posted by the Debtors) any amounts that exceed the postpetition obligations then outstanding, and without any claim, right of setoff, or recoupment against the Debtors resulting thereby.

10.    This Order does not grant any relief with respect to or affect the rights, duties, or obligations of EFIH or EFIH Finance Inc.

11.    The Final Hearing shall be _____, 2014, at __:__ a.m./p.m., prevailing Eastern Time.    Any objections or responses to the Motion must be filed on or before _____, 2014, at 4:00 p.m., prevailing Eastern Time.  If no objections are filed to the Motion, the Court may enter the Final Order without further notice or hearing.

12.    In accordance with this Order and any other order of this Court, each of the financial institutions at which the Debtors maintain their accounts relating to the payment of the obligations described in this Order is authorized to honor checks and electronic payment requests

presented for payment of obligations described in this Order and all fund transfer requests made by the Debtors related thereto to the extent that sufficient funds are on deposit in such amounts.

13.    Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief, nothing in this Order shall be deemed: (a) an admission as to the validity of any claim against a Debtor entity; (b) a waiver of the Debtors' rights to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) an admission that any agreement to which one or more of the Debtors may be party constitutes a Hedging and Trading Arrangement. Payments made pursuant to this Order shall not be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

14.    The relief granted in this Order applies only to Hedging and Trading Arrangements not previously assumed, rejected, or terminated pursuant to sections 365, 546, 555, 556, 559, 560, and 561 of the Bankruptcy Code.

15.    To the extent necessary, the automatic stay provided in section 362 of the Bankruptcy Code is modified to permit ERCOT to continue performing its obligations and exercising its rights under the SFAs and the ERCOT Protocols.

16.    Nothing in this Order shall authorize or direct the Debtors to take any action that would violate or breach the terms of the TCEH DIP Credit Agreement (as defined in the TCEH DIP Orders) or violate any order of this Court approving the TCEH DIP Facility.

17.    The Debtors shall provide to the DIP Agent (as defined in the TCEH DIP Orders)

and counsel to the TCEH First Lien Ad Hoc Committee (as defined in the TCEH Cash Collateral Orders) monthly written reports, exclusive of counterparty names or identifiers, of all Hedging and Trading Arrangements and all Hedging and Trading Activities summarizing the aggregate amount of collateral pledged, and the aggregate amount of Hedging and Trading Arrangements for which TCEH Super-Priority DIP Liens have been granted pursuant to this Order and/or the DIP Orders, as applicable; *provided, however,* that, with the exception of the aggregate amount of collateral pledged, and the aggregate amount of Hedging and Trading Arrangements for which TCEH Super-Priority DIP Liens have been granted, the Debtors shall not be required to provide any other information in such monthly reports that the Debtors reasonably believe is subject to another confidentiality agreement (or other contractual or legal obligation of confidentiality) between the Debtors and their Hedging and Trading Arrangements counterparties.

18.     Subject to the Internal Hedging Policy (including any subsequent modification to such policy in a manner consistent with such Internal Hedging Policy and this Order), the Debtors shall not enter into wholesale Hedging and Trading Arrangements with a tenor beyond December 31, 2015. The Debtors shall not be permitted to amend the tenor and hedge limitations set forth in the Internal Hedging Policy, including, without limitation, the Hedging Ceiling, in a manner that, in the Debtors' judgment, varies materially from the Debtors' historical hedging practices over the past two years without further order of the Court.

19.     Notwithstanding anything herein to the contrary, the provisions of this Order shall not apply to the First Lien Hedges and Swaps or the Legacy Swaps, and the Debtors are not authorized hereunder to make any payments or other transfers (except for the return of cash collateral held by Debtors pursuant to the First Lien Hedges and Swaps) on account of or in relation to the First Lien Hedges and Swaps or the Legacy Swaps.

20.    The requirements set forth in Bankruptcy Rule 6003(b) are satisfied by the contents of the Motion.

21.    Notice of the Motion as provided therein shall be deemed good and sufficient and the requirements of the Local Bankruptcy Rules are satisfied by such notice.

22.    Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7062, 9014 or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

23.    Notwithstanding the relief granted in this Order, any payment made by the Debtors pursuant to the authority granted herein shall be subject to the TCEH DIP Orders and TCEH Cash Collateral Orders.

24.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

25.    The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

26.    The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Wilmington, Delaware
Dated: _____, 2014

_____
UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT 1 to EXHIBIT A**

**Trading Continuation Agreement**

_____, 2014

TO:    [Hedging and Trading Arrangement counterparty]
       [Name]
       [Address]

Dear [Hedging and Trading Arrangement counterparty]:

      [Hedging and Trading Arrangement counterparty] ("<u>you</u>") and the following entities [_____] (such entity or entities and any successor entities under a plan of reorganization or otherwise collectively referred to as the "<u>Debtors</u>" and, together with you, the "<u>Parties</u>") are engaged in substantial business transactions and hedging and trading relationships described in <u>Schedule 1</u> attached hereto (collectively, the "<u>Prepetition Hedging and Trading Arrangements</u>").[1]

      On _____, 2014 (the "<u>Petition Date</u>"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States District Court for the District of Delaware (the "<u>Bankruptcy Court</u>").

      In recognition of the importance of our relationship with certain critical counterparties to the Prepetition Hedging and Trading Arrangements, on the Petition Date, the Debtors requested that the Bankruptcy Court grant the Debtors the authority to satisfy certain prepetition obligations (including, without limitation, collateral posting obligations and payments due for prepetition deliveries and monthly settlement payments after accounting for any offset, netting, or cross-netting provisions included in the Prepetition Hedging and Trading Arrangements) owed to such counterparties under the Prepetition Hedging and Trading Arrangements, subject to certain caps. The Bankruptcy Court entered an order authorizing this relief on _____, 2014, a copy of which is enclosed herewith (the "<u>Order</u>").

      [Following the Petition Date, the parties entered into post-petition business transactions and trading relationships documented in a form substantially similar to the Prepetition Hedging and Trading Arrangements (together with the Prepetition Hedging and Trading Arrangements, the "<u>Hedging and Trading Arrangements</u>").]

      In accordance with the Order, the Debtors are prepared to enter into this trading counterparty agreement (this "<u>Agreement</u>") in accordance with the following terms:

1.    The estimated accrued balance of the prepetition claims arising on account of Prepetition Hedging and Trading Arrangements (net of any setoffs, credits, or discounts as applicable under the respective Prepetition Hedging and Trading Agreement) that is due and owing to you is $_____ (the "<u>Prepetition Payment Claim</u>") as of the date of this Agreement.

2.    The estimated value of the collateral required to be posted to you, but not yet delivered, on account of Prepetition Hedging and Trading Arrangements is

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Motion.

$_____ (the "Prepetition Collateral Claim") as of the date of this Agreement.

3.  Subject to the terms and conditions set forth in this Agreement, and subject to the authority granted in the Order, the Debtors hereby agree to:

(a)  pay $_____ on account of the Prepetition Payment Claim (the "Claim Payment");

(b)  pledge, on account of the Prepetition Collateral Claim, $_____ in collateral (in the form of cash or letters of credit) and, to the extent the Prepetition Hedging and Trading Arrangements constitute Permitted Secured Commodity Hedge Agreements, grant a TCEH Super-Priority DIP Lien as permitted under the TCEH DIP Orders and TCEH Cash Collateral Orders (the "Collateral");

(c)  grant you, for your own benefit, effective as of the Petition Date and without the necessity of the execution by the Debtors or filing of security agreements, pledge agreements, mortgages, financing statements or otherwise, pursuant to Bankruptcy Code section 364(c)(2) enforceable first-priority liens and security interests on any cash collateral and/or letters of credit you hold with respect to initial, maintenance, or variation margin or payments in advance, regardless of whether provided to you prior hereto, on or after the date of the Order;

(d)  grant you administrative expense status with respect to any obligations that may arise in connection with the Debtors' postpetition performance under the Hedging and Trading Arrangements and satisfy such obligations at the prices set forth in the respective Hedging and Trading Arrangement; and

(e)  waive any objection to your ability to net exposures, amounts, and obligations across different Hedging and Trading Arrangements entered into between you and a Debtor and acknowledge that there shall be no distinction between prepetition transactions between you and a Debtor and postpetition transactions between you and a Debtor.

4.  The Debtors may satisfy postpetition collateral posting obligations as required by the Hedging and Trading Agreements in the ordinary course of business following execution of this Agreement, subject to the terms and conditions set forth in this Agreement, and subject to the authority granted in the Order, and without prejudice to the Debtors' rights regarding assumption or rejection of Prepetition Hedging and Trading Agreements.

5.  You and the Debtors may apply any and all collateral that may have previously been posted prepetition to any and all postpetition obligations arising under the Hedging and Trading Arrangements.

6.  [You understand that the remaining amount of your Prepetition Payment Claim and your Prepetition Collateral Claim against the Debtors shall be forever released and waived in consideration of the Claim Payment and Collateral. If you have already filed a proof of claim with the Bankruptcy Court, you will take all necessary steps to withdraw the proof of claim.]   [You understood that the

2

estimated remaining amount of your Prepetition Payment Claim is $_____, and the estimated remaining amount of your Prepetition Collateral Claim is $_____. If you have already filed a proof of claim with the Bankruptcy Court, you will take all necessary steps to modify the proof of claim to reflect the remaining amounts. If you have not already filed a proof of claim, you will take all necessary steps to file a proof of claim for the estimated remaining amounts. Nothing in this Agreement should be seen as an admission by the Debtors with respect to the validity or amount of any remaining Prepetition Payment Claim or Prepetition Collateral Claim.]

7.  In consideration of the Claim Payment and Collateral, you agree to waive the utilization or enforcement of any contractual rights to which you may be entitled to liquidate, terminate, or accelerate the Hedging and Trading Arrangements (as such rights may arise under sections 555, 556, 559, 560, and 561 of the Bankruptcy Code). To the extent any of the Hedging and Trading Agreements contain a right of termination tied to bankruptcy, a bankruptcy proceeding, a potential bankruptcy, insolvency, or the like, then the definition of that event of default or potential event of default, as applicable, shall be deleted in its entirety, *provided, however,* that in the event that: (a) the Debtors file a petition under Chapter 7 of the Bankruptcy Code, or have an involuntary Chapter 7 petition filed against them and such petition is not dismissed or converted to a case under chapter 11 of the Bankruptcy Code within 190 days of the initial filing date, or (b) during the course of these chapter 11 cases, one of the following events occurs: (x) a chapter 11 trustee with expanded powers is appointed; or (y) any of the Debtors has a receiver, custodian, trustee, or liquidator appointed over all of its assets; the occurrence of such event shall constitute an event of default under the Hedging and Trading Agreements. Nothing in this Agreement should be construed as an admission by the Debtors regarding whether you are entitled to any liquidation, termination, or acceleration rights with respect to the Hedging and Trading Arrangements.

8.  To the extent the Debtors enter into this Agreement before the Bankruptcy Court has entered a final version of the Order, the Debtors further agree to seek and obtain the entry of a final version of the Order containing, in substance, the same relief provided for in the Order, but without regard to the caps proposed under the Order (the "Final Order"). If the Final Order is entered, you agree to permanently waive, relinquish, and discharge the utilization and enforcement of any further rights to which you may be entitled to liquidate, accelerate, or terminate the Hedging and Trading Arrangements, on account of the Debtors' commencement of the chapter 11 cases.

9.  If any or all of the provisions of the Order (or Final Order, if entered) are stayed, modified in a manner adverse to you, or vacated, or the Order (or the Final Order, if entered) otherwise terminates, such stay, modification, vacation or termination will not affect (a) the validity of any indebtedness, obligation or liability incurred by the Debtors to you before your receipt of written notice of the effective date of

3

such stay, modification or vacation, (b) the validity or enforceability of the security interests, administrative claims and netting and termination rights authorized or created by this Agreement, and (c) your right to exercise remedies as set forth in the Hedging and Trading Arrangements, as the case may be, and you shall be entitled to the benefits of the provisions of section 364(e) of the Bankruptcy Code.

10. The Claim Payment and the Collateral may only be provided upon execution of this Agreement by a duly authorized representative of your company. Your execution of this Agreement and the return of same to the Debtors constitute an agreement by you and the Debtors. You agree to be bound by the terms of this Agreement and you submit to the jurisdiction of the Bankruptcy Court, and expressly consent to the entry by the Bankruptcy Court of final rulings, in connection with any enforcement of this Agreement. You further agree and/or represent:

   (a) to the amount of the Claim Payment and Collateral set forth above;

   (b) that you have reviewed the terms and provisions of the Order and Agreement and that you consent to be bound by such terms and provisions; and

   (c) that you agree to not file or otherwise assert against the Debtors or their assets any lien (regardless of the statute or other legal authority upon which such lien is asserted) or seek payment for reclamation claims or claims pursuant to section 503(b)(9) of the Bankruptcy Code in any way related to prepetition amounts allegedly owed to you by the Debtors arising from agreements, written or otherwise, entered into before the Petition Date. Additionally, if you have taken steps to file or assert such a lien prior to entering into this Agreement, you agree to take all necessary steps to remove such lien as soon as possible.

11. Notwithstanding the foregoing, if you receive the Claim Payment or the Collateral from the Debtors and you do not continue to perform under the Hedging and Trading Arrangements on a postpetition basis, or fail to perform in accordance with any of the terms and provisions of this Agreement, you are required to return the Claim Payment and the Collateral to the Debtors, and the Debtors may take any of the remedial actions described in the Order.

12. Any dispute with respect to this Agreement and/or your participation in this payment program shall be determined by the Bankruptcy Court, and you expressly waive any right to a trial by jury and withdrawal of the reference for decision by a district court.

13. All terms of this Agreement (including the existence of this Agreement) are confidential between you and the Debtors; *provided, however,* that the Debtors may disclose this Agreement to the United States Trustee assigned to the chapter 11 cases, any official committee appointed in the chapter 11 cases, and to the

4

Bankruptcy Court *in camera*; *provided further, however*, that both you and the Debtors may disclose this Agreement to the extent necessary to comply with the order of any court.

If you have any questions about this Agreement or our restructuring, please do not hesitate to call (____)_____ or (____)_____.

Sincerely,

_____

By:

Its:

Agreed and Accepted By:

[Title]

[Name of Hedging and Trading Arrangement counterparty]

5

## EXHIBIT B

**Proposed Final Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) Case No. 14-____ (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

### FINAL ORDER AUTHORIZING THE DEBTORS TO
### (A) CONTINUE PERFORMING UNDER PREPETITION HEDGING
### AND TRADING ARRANGEMENTS, (B) PLEDGE COLLATERAL
### AND HONOR OBLIGATIONS THEREUNDER, AND (C) ENTER INTO
### AND PERFORM UNDER TRADING CONTINUATION AGREEMENTS
### AND NEW POSTPETITION HEDGING AND TRADING ARRANGEMENTS

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), for entry of a final order (this "Order") authorizing, but not directing, the Debtors to: (a) honor, pay, or otherwise satisfy all obligations arising under the Hedging and Trading Arrangements, in the ordinary course of business, without regard to whether such amounts accrued or arose before the Petition Date; (b) pledge and transfer collateral under the Hedging and Trading Arrangements in the form of cash, letters of credit, and, in certain instances, TCEH Super-Priority DIP Liens, as permitted under the terms of the TCEH DIP Orders and the TCEH Cash Collateral Orders, all in the ordinary course of business without regard to whether such obligations accrued or arose before the Petition Date; (c) continue to honor, pay, or otherwise satisfy postpetition obligations arising under the Hedging and Trading

---

[1]    The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which the debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

Arrangements in the ordinary course of business consistent with the Risk Management Guidelines and, to the extent applicable, subject to the Internal Hedging Policy; and (d) enter into, and perform under Trading Continuation Agreements and new Postpetition Hedging and Trading Arrangements in the ordinary course of business, consistent with the Risk Management Guidelines, and, to the extent applicable, subject to the Internal Hedging Policy all as more fully set forth in the Motion; and upon the First Day Declaration; and the Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and the Court having found that the Debtors provided appropriate notice of the Motion and the opportunity for a hearing on the Motion under the circumstances; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing, if any, before the Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.    The Motion is granted on a final basis as set forth herein.

2.    The Debtors are authorized, but not directed, to (a) honor, pay, or otherwise satisfy all obligations under the Hedging and Trading Arrangements in the ordinary course of business, without regard to whether such amounts accrued or arose before or after the Petition Date, consistent with the Risk Management Guidelines, and, to the extent applicable, subject to

the Internal Hedging Policy; (b) pay any amounts accrued in the ordinary course of business as a result of credit support obligations and to pledge and transfer collateral in the form of cash, letters of credit on account of the Hedging and Trading Arrangements, and, in the case of Hedging and Trading Arrangements that constitute Permitted Secured Commodity Hedge Agreements, TCEH Super-Priority DIP Liens, as permitted under the terms of the TCEH DIP Orders and the TCEH Cash Collateral Orders, in the ordinary course of business, without regard to whether such obligations accrued or arose before or after the Petition Date; and (c) enter into and perform under Trading Continuation Agreements and new, Postpetition Hedging and Trading Arrangements in the ordinary course of business on a postpetition basis consistent with the Risk Management Guidelines and, to the extent applicable, subject to the Internal Hedging Policy.

3.      The Debtors are authorized, but not directed, to replace ERCOT's existing letter of credit with a new, postpetition letter of credit to the extent permitted under any DIP financing facility.  For the avoidance of doubt, such new postpetition letter of credit would not be subject to Prepetition Collateral Posting Cap.

4.      The Debtors shall use their commercially reasonable efforts to obtain from any Prepetition Hedging and Trading Arrangement counterparty, as a prerequisite to obtaining payment or collateral pursuant to this Order, written acknowledgement of its obligations to perform under the Prepetition Hedging and Trading Arrangements on a postpetition basis, substantially in the form attached hereto as **Exhibit 1** (the "Trading Continuation Agreement"); *provided, however*, that the Debtors may, if necessary under the circumstances, in the Debtors' judgment, satisfy prepetition obligations in accordance with the Prepetition Payment Cap and Prepetition Collateral Posting Cap set forth in the Motion and this Order without obtaining such

3

agreement; *provided further, however*, that such payment shall not prejudice any Debtor's right to challenge, as a violation of the automatic stay or otherwise, a Hedging and Trading Arrangement counterparty's refusal to perform under the Hedging and Trading Arrangements on a postpetition basis.

5.    The form Trading Continuation Agreement, attached hereto as **Exhibit 1**, is approved on a final basis; *provided, however*, that the Debtors are authorized to modify the Trading Continuation Agreement if a particular situation, in the Debtors' judgment, so requires.

6.    As security and assurance of the Debtors' obligations arising under Hedging and Trading Arrangements, and in exchange for providing benefits to non-terminating counterparties in accordance with this Order:

> (a) counterparties are each hereby granted, for their own benefit, effective as of the Petition Date and without the necessity of the execution by the Debtors, or filing, of security agreements, pledge agreements, mortgages, financing statements or otherwise, pursuant to Bankruptcy Code section 364(c)(2) enforceable first-priority liens and security interests on any cash collateral, and/or letters of credit with respect to initial, maintenance or variation margin or payments in advance provided to such counterparty whether prior hereto, on or after the date of this Order;

> (b) the obligations, liabilities and indebtedness of the Debtors arising from postpetition market movements, performance and performance obligations in respect of Postpetition Hedging and Trading Arrangements, and postpetition performance under Prepetition Hedging and Trading Arrangements shall have the status of an administrative expense, and shall be paid at the prices set forth in the Prepetition Hedging and Trading Arrangements or Postpetition Hedging and Trading Arrangements, as applicable;

> (c) counterparties may net exposures, amounts, and obligations under Prepetition Hedging and Trading Arrangements against exposures, amounts and obligations under other Prepetition Hedging and Trading Arrangements and Postpetition Hedging and Trading Arrangements with a Debtor and vice versa. In this regard, there shall be no distinction between transactions entered into prepetition and postpetition; and

> (d) the Debtors and the non-terminating counterparties shall be authorized and permitted to apply any and all cash collateral and/or letters of credit that may have been posted prepetition to any obligations arising postpetition, regardless

of whether such obligations arise under existing Prepetition Hedging and Trading Arrangements or Postpetition Hedging and Trading Arrangements, as applicable.

7.    Notwithstanding the foregoing, if, after receiving payment or collateral pursuant to this Order (and/or the specified terms of a Trading Continuation Agreement), any Prepetition Hedging and Trading Arrangement counterparty does not perform under the Prepetition Hedging and Trading Arrangements on a postpetition basis or otherwise exercises valid and enforceable termination rights under sections 555, 556, 559, 560, and 561 of the Bankruptcy Code with respect to the Prepetition Hedging and Trading Arrangements, then (a) any postpetition payment or collateral received by such Prepetition Hedging and Trading Arrangement counterparty for prepetition obligations shall be deemed, in the Debtors' sole discretion, an improper postpetition transfer, and, therefore, recoverable by the Debtors upon written request by the Debtors, and (b) upon recovery by the Debtors, any prepetition claim of such Prepetition Hedging and Trading Arrangement counterparty shall be reinstated as if the payment had not been made and/or the collateral had not been posted.

8.    If any or all of the provisions of this Order are stayed, modified in a manner adverse to a Hedging and Trading Arrangement counterparty or vacated, or this Order otherwise terminates, such stay, modification, vacation or termination will not affect (a) the validity of any indebtedness, obligation or liability incurred by the Debtors to each of the counterparties before the receipt of written notice by the counterparties of the effective date of such stay, modification or vacation, (b) the validity or enforceability of the security interests, administrative claims and netting and termination rights authorized or created hereby or pursuant to the Hedging and Trading Arrangements, or any related documents, and (c) the rights of the counterparties to exercise remedies as set forth in the Prepetition Hedging and Trading Arrangement or the

Postpetition Hedging and Trading Arrangements, as the case may be, and each counterparty shall be entitled to the benefits of the provisions of section 364(e) of the Bankruptcy Code.

9.     If there exists an outstanding postpetition balance due from the Debtors to a Prepetition Hedging and Trading Arrangement counterparty that does not perform under the Hedging and Trading Arrangements on a postpetition basis or otherwise exercises valid and enforceable termination rights under sections 555, 556, 559, 560, and 561 of the Bankruptcy Code with respect to the Prepetition Hedging and Trading Arrangements, the Debtors may elect, in the Debtors' sole discretion, to recharacterize and apply any payments made pursuant to this Order, and, as applicable, any collateral posted pursuant to this Order to such postpetition balance, and the Prepetition Hedging and Trading Arrangement counterparty shall repay immediately in cash to the Debtors (and, as applicable, return collateral posted by the Debtors) any amounts that exceed the postpetition obligations then outstanding, and without any claim, right of setoff, or recoupment against the Debtors resulting thereby.

10.     This Order does not grant any relief with respect to or affect the rights, duties, or obligations of EFIH or EFIH Finance Inc.

11.     In accordance with this Order and any other order of this Court, each of the financial institutions at which the Debtors maintain their accounts relating to the payment of the obligations described in this Order is authorized to honor checks and electronic payment requests presented for payment of obligations described in this Order and all fund transfer requests made by the Debtors related thereto to the extent that sufficient funds are on deposit in such amounts.

12.     Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief, nothing in this Order shall be deemed (a) an admission as to the validity of any claim against a Debtor entity; (b) a waiver of the Debtors' rights to dispute any claim on any grounds;

(c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) an admission that any agreement to which one or more of the Debtors may be party constitutes a Hedging and Trading Arrangement. Payments made pursuant to this Order shall not be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

13.    Notice of the Motion as provided therein shall be deemed good and sufficient and the requirements of the Local Bankruptcy Rules are satisfied by such notice.

14.    The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

15.    Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7062, 9014 or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

16.    To the extent necessary, the automatic stay provided in section 362 of the Bankruptcy Code is modified to permit ERCOT to continue performing its obligations and exercising its rights under the SFAs and ERCOT protocols.

17.    Nothing in this Order shall authorize or direct the Debtors to take any action that would violate or breach the terms of the TCEH DIP Credit Agreement (as defined in the TCEH DIP Orders) or violate any order of this Court approving the TCEH DIP Facility.

18.    The Debtors shall provide to the DIP Agent (as defined in the TCEH DIP Orders) and counsel to the TCEH First Lien Ad Hoc Committee (as defined in the TCEH Cash Collateral

Orders) monthly written reports, exclusive of counterparty names or identifiers, of all Hedging and Trading Arrangements and all Hedging and Trading Activities summarizing the aggregate amount of collateral pledged, and the aggregate amount of Hedging and Trading Arrangements for which TCEH Super-Priority DIP Liens have been granted pursuant to this Order and/or the DIP Orders, as applicable; *provided, however*, that, with the exception of the aggregate amount of collateral pledged, and the aggregate amount of Hedging and Trading Arrangements for which TCEH Super-Priority DIP Liens have been granted, the Debtors shall not be required to provide any other information in such monthly reports that the Debtors reasonably believe is subject to another confidentiality agreement (or other contractual or legal obligation of confidentiality) between the Debtors and their Hedging and Trading Arrangements counterparties.

19.    Subject to the Internal Hedging Policy (including any subsequent modification to such policy in a manner consistent with such Internal Hedging Policy and this Order), the Debtors shall not enter into wholesale Hedging and Trading Arrangements with a tenor beyond December 31, 2015.    The Debtors shall not be permitted to amend the tenor and hedge limitations set forth in the Internal Hedging Policy, including, without limitation, the Hedging Ceiling, in a manner that, in the Debtors' judgment, varies materially from the Debtors' historical hedging practices over the past two years without further order of the Court.

20.    Notwithstanding anything herein to the contrary, the provisions of this Order shall not apply to the First Lien Hedges and Swaps or the Legacy Swaps, and the Debtors are not authorized hereunder to make any payments or other transfers (except for the return of cash collateral held by Debtors pursuant to the First Lien Hedges and Swaps) on account of or in relation to the First Lien Hedges and Swaps or the Legacy Swaps.

21.    The relief granted in this Order applies only to Hedging and Trading

Arrangements not previously assumed, rejected, or terminated pursuant to sections 365, 546, 555, 556, and 559 of the Bankruptcy Code.

22.    Notwithstanding the relief granted in this Order, any payment made by the Debtors pursuant to the authority granted herein shall be subject to the TCEH DIP Orders and the TCEH Cash Collateral Orders.

23.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

24.    The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

25.    The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Wilmington, Delaware
Dated: _____, 2014

_____
UNITED STATES BANKRUPTCY JUDGE