# **Exhibit A**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-_____ (___) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

MOTION OF TEXAS COMPETITIVE ELECTRIC
HOLDINGS COMPANY LLC AND CERTAIN OF ITS DEBTOR
AFFILIATES, FOR ENTRY OF INTERIM AND FINAL ORDERS
(A) APPROVING POSTPETITION FINANCING, (B) GRANTING LIENS
AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS,
(C) MODIFYING THE AUTOMATIC STAY, AND (D) SCHEDULING A FINAL HEARING

Texas Competitive Electric Holdings Company LLC (the "Borrower" or "TCEH"),

Energy Future Competitive Holdings Company LLC (the "Parent Guarantor" or "EFCH"), and

each of the Subsidiary Guarantors (as defined in the DIP Credit Agreement (as defined herein))

(the Subsidiary Guarantors, together with the Parent Guarantor, the "Guarantors"), each as a

debtor and debtor-in-possession (collectively, the "TCEH Debtors," and together with the other

above-captioned debtors and debtors-in-possession, the "Debtors"), file this motion

(the "Motion") for entry of an interim order (the "Interim Order"), substantially in the form

attached hereto as **Exhibit A**, and a final order (the "Final Order," and together with the Interim

Order, collectively, the "Orders"), (a) authorizing the TCEH Debtors to enter into the DIP Credit

---

[1]    The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the
debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these
chapter 11 cases, for which the debtors have requested joint administration, a complete list of the debtors and
the last four digits of their federal tax identification numbers is not provided herein. A complete list of such
information may be obtained on the website of the debtors' proposed claims and noticing agent at
http://www.efhcaseinfo.com.

Agreement to obtain the DIP Financing (defined below), (b) granting liens and providing superpriority administrative expense claims, (c) modifying the automatic stay, and (d) scheduling a hearing to consider approval of the DIP Facility on a final basis (the "Final Hearing"). In support thereof, the Debtors submit the *Declaration of Stephen Goldstein in Support of (I) the Motion of Texas Competitive Electric Holdings Company LLC and Certain of Its Debtor Affiliates for Entry of Interim and Final Orders (A) Approving Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing and (II) the Motion of Texas Competitive Electric Holdings Company LLC and Certain of Its Debtor Affiliates for Entry of Interim and Final Orders (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing* (the "Goldstein Declaration"), a copy of which is attached hereto as **Exhibit B**, and the *Declaration of Paul Keglevic, Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of Energy Future Holdings Corp., et al., in Support of First Day Motions* (the "First Day Declaration"), and respectfully submit as follows.

### Jurisdiction and Venue

1.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors consent pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules") to the entry of a final order by the Court in connection with this

Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    The bases for the relief requested in this Motion are sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code, rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Bankruptcy Rules 2002, 4001, and 9014.

## Preliminary Statement

4.    The Debtors commenced these chapter 11 cases to restructure more than $42 billion in funded indebtedness. To ensure a smooth transition into chapter 11 with minimal disruption to their business operations, the Debtors determined that they would need continued access to cash collateral of their prepetition secured lenders as well as postpetition financing. Accordingly, the TCEH Debtors have negotiated for and obtained the consent of a steering committee (the "TCEH First Lien Ad Hoc Committee") representing holders of approximately 41% in amount of claims under the First Lien Credit Agreement and the First Lien Notes Indenture (each as defined herein) to use Cash Collateral (as defined in the Cash Collateral Order).[2] In addition to consenting to the Debtors' continued use of Cash Collateral, the TCEH First Lien Ad Hoc Committee has consented to being primed under the DIP Credit Agreement.

---

[2]    For additional information regarding the Debtors' use of Cash Collateral, see the *Motion of Texas Competitive Electric Holdings Company LLC and Certain of Its Debtor Affiliates for Entry of Interim and Final Orders (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing*, filed contemporaneously herewith (the "Cash Collateral Motion," and the proposed interim order attached as Exhibit A thereto, the "Cash Collateral Order").

5.      The TCEH Debtors were uniquely positioned to negotiate a DIP facility with favorable terms and ultimately secured the DIP Financing on terms more akin to conventional, broadly-syndicated facilities than typical postpetition financing facilities. *First*, the TCEH Debtors are operationally sound and generate significant positive cash flow before debt service. *Second*, relative to the value of the TCEH Debtors' businesses, the DIP Financing is significantly overcollateralized. *Third*, the opportunity to create a relationship with a strong going concern such as the Debtors was highly attractive to potential DIP lenders. The lending market understands that the Debtors are a robust company with an overleveraged balance sheet that will be restructured in these chapter 11 cases.

6.      Accordingly, following a lengthy, competitive process, the TCEH Debtors obtained commitments from several large financial institutions for a fully underwritten, $4,475,000,000 debtor-in-possession financing (the "DIP Financing"). The DIP Financing consists of: (a) a revolving credit facility (the "Revolving Credit Facility") in an aggregate principal amount of up to $1,950,000,000; (b) a term credit facility (the "Term Loan Facility") in an aggregate principal amount of up to $1,425,000,000, of which up to $800,000,000 may be applied by TCEH to fund the General L/C Collateral Account to support General Letters of Credit (each, as defined in the DIP Credit Agreement); (c) a delayed-draw term credit facility (the "Delayed-Draw Term Facility") in an aggregate principal amount of up to $1,100,000,000, the proceeds of which, if funded, will be applied by TCEH to fund the RCT L/C Collateral Account to support RCT Letters of Credit (each, as defined in the DIP Credit Agreement); (d) obligations owed to the General Letter of Credit Issuer (as defined herein and without duplication of any other obligations described in clauses (a), (b), or (c) above) pursuant to a cash collateralized letter of credit facility (the "General Letter of Credit Facility") in an aggregate

4

stated amount of up to $800,000,000, as such amount may be increased as agreed in writing between TCEH and the General Letter of Credit Issuers providing such increased amount; and (e) obligations owed to the RCT Letter of Credit Issuer (as defined herein and without duplication of any other obligations described in clauses (a), (b), (c), or (d) above) pursuant to a cash collateralized letter of credit facility (the "RCT Letter of Credit Facility" and, collectively with the Revolving Credit Facility, the Term Loan Facility, the Delayed-Draw Term Facility, and the General Letter of Credit Facility, the "DIP Facility") in an aggregate stated amount of up to $1,100,000,000. The Debtors will not borrow under the Delayed-Draw Term Facility on an interim or final basis unless the Railroad Commission of Texas (the "RCT") has refused to accept the Reclamation Support Carve Out (as defined below).

7.      The TCEH Debtors request authority to access $2,700,000,000 of the DIP Facility on an interim basis pursuant to the Interim Order, consisting of: (a) borrowings in an aggregate principal amount of up to $800,000,000 under the Revolving Credit Facility; (b) borrowings in an aggregate principal amount of up to $1,100,000,000 under the Delayed-Draw Term Facility, the proceeds of which, if funded, subject to the condition set forth above, will be applied by TCEH to fund the RCT L/C Collateral Account; and (c) borrowings in an aggregate principal amount of up to $800,000,000 under the Term Loan Facility, of which up to $800,000,000 may be applied by TCEH to fund the General L/C Collateral Account (collectively, the "Interim Financing"). The TCEH Debtors will use the DIP Financing, together with cash flow from operations, for, among other things, adequate protection payments, working capital (e.g., collateral for letters of credit), bankruptcy costs (e.g., business disruption and professional fees), and regulatory requirements.

8.     The DIP Financing also enables the Debtors to satisfy the requirement under section 12.309(j)(7) of the Texas Administrative Code (the "TAC") to provide a collateral bond to the RCT to secure the Debtors' mining reclamation obligations.  In particular, the DIP Financing and the Interim Order contemplate a carve out from the DIP Lenders' liens of up to $1,100,000,000 for the benefit of the RCT (the "RCT Reclamation Support Carve Out").  The RCT Reclamation Support Carve Out will be senior to any other obligations or liabilities of the Debtors, other than the professional fee Carve Out.

9.     The approval of the DIP Financing, with its favorable terms, will substantially enhance the Debtors' ability to make a smooth transition into chapter 11 and instill confidence in their customers, employees, creditors, and other parties in interest.  Therefore, the Debtors respectfully request that the Court enter the Interim and Final Orders approving the DIP Financing and granting related relief.

## Relief Requested

10.     By this Motion, the TCEH Debtors seek entry of the Orders, which, among other things, provide the TCEH Debtors:

> (a) ***DIP Facility***:  authority to obtain secured superpriority postpetition financing (the "DIP Financing") in a principal amount not to exceed $2,700,000,000 on an interim basis and $4,475,000,000 on a final basis, pursuant to the terms and conditions of the proposed debtor in possession financing agreement (the "DIP Credit Agreement") between the Borrower, the Parent Guarantor, the financial institutions from time to time party thereto as lenders (the "DIP Lenders"), the financial institutions from time to time party thereto as letter of credit issuers (the "DIP L/C Issuers"), Citibank, N.A., as administrative agent and collateral agent (in such capacities, the "DIP Agent"),[3] and

---

[3]     As used herein, the term "DIP Agent" refers to Citibank, N.A., as administrative agent under the DIP Credit Agreement, Citibank, N.A., as collateral agent under the DIP Credit Agreement, or both, as the context requires. All references in this Motion to the DIP Agent with respect to the Secured Hedge Banks or the Secured Cash Management Banks (each, as defined in the Interim Order) shall mean Citibank, N.A., in its capacity as
(Continued...)

other agents and entities from time to time party thereto, substantially in the form of the DIP Credit Agreement attached hereto as **Exhibit D**;

(b) *DIP Documents*: authority to execute and deliver the DIP Credit Agreement and all agreements, documents, and instruments contemplated by each (collectively, the "DIP Documents"), and to take all actions necessary, appropriate, or required to comply with the TCEH Debtors' obligations under the DIP Documents and under the Orders;

(c) *DIP Liens*: authority to grant the DIP Agent, for the benefit of itself, the DIP Lenders, the DIP L/C Issuers, the Secured Hedge Banks, and the Secured Cash Management Banks, automatically perfected postpetition security interests and liens (the "DIP Liens") in the DIP Collateral (as defined in the Interim Order), subject only to the Permitted Prior Liens, the Carve Out, and the RCT Reclamation Support Carve Out;

(d) *DIP Superpriority Claims*: authority to grant the DIP Agent, for the benefit of itself, the DIP Lenders, the DIP L/C Issuers, the Secured Hedge Banks, and the Secured Cash Management Banks, allowed superiority administrative expense claims (the "DIP Superpriority Claims"), subject only to the payment of the Carve Out and the RCT Reclamation Support Carve Out;

(e) *Automatic Stay*: vacation and modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Credit Agreement and the Orders;

(f) *Immediate Effectiveness*: waiver of any applicable stay, including under Bankruptcy Rule 6004, to provide for immediate effectiveness of the Interim Order; and

(g) *Final Hearing*: scheduling of a Final Hearing to consider authorizing and approving the DIP Facility described herein on a final basis pursuant to a Final Order.

---

collateral agent. Citibank, N.A., in its capacity as administrative agent, has no duties or obligations to the Secured Hedge Banks or the Secured Cash Management Banks.

**Concise Statement Pursuant to Bankruptcy Rule 4001(c)**

11.     In accordance with Bankruptcy Rules 4001(c) and (d), the following summarizes the significant terms of the DIP Credit Agreement and the Interim Order.[4]

| Material Terms | Summary of Material Terms | | Provision |
|---|---|---|---|
| ***DIP Credit Agreement Parties***<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Borrower: | Texas Competitive Electric Holdings Company LLC ("TCEH"). | DIP Credit Agreement at § 1.1. |
| | Guarantors: | Energy Future Competitive Holdings Company LLC ("EFCH" or "Parent Guarantor") and each subsidiary of the Borrower that is currently a guarantor under the First Lien Credit Agreement (defined below) (each a "Subsidiary Guarantor"). | |
| | Left Lead Revolving Arranger: | Deutsche Bank Securities Inc. (the "Left Lead Revolving Arranger"). | |
| | Left Lead Term Facilities Arranger: | Citigroup Global Markets Inc., (the "Left Lead Term Facilities Arranger" and, together with the Left Lead Revolving Arranger, the "Left Lead Arrangers"). | |
| | Joint Lead Arrangers: | The Left Lead Term Facilities Arranger, the Left Lead Revolving Arranger, Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPFS"), Morgan Stanley Senior Funding, Inc. ("Morgan Stanley"), Barclays Bank PLC ("Barclays"), RBC Capital Markets ("RBCCM"), and Union Bank, N.A. ("Union Bank" and, collectively with the Left Lead Term Facilities Arranger, the Left Lead Revolving Arranger, MLPFS, Morgan Stanley, Barclays, and RBCCM, the "Joint Lead Arrangers"). | |
| | Lenders: | The lenders under the Revolving Credit Facility ("Revolver Lenders"), the lenders under the Delayed-Draw Term Facility ("Delayed-Draw Term Lenders"), and the lenders under the Term Loan Facility ("Term Lenders") (together with any lenders under the Incremental Facilities, collectively, the "Lenders"). | |
| | General Letter of Credit Issuers: | Citibank, N.A. and other mutually and reasonably satisfactory banks (the | |

---

[4]     Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to such terms in the DIP Documents or the Orders, as applicable. This statement is qualified in its entirety by the provisions of the DIP Documents or the Orders. To the extent there exists any inconsistency between this concise statement and the provisions of the DIP Documents or the Orders, the provisions of the DIP Documents or the Orders, as applicable, shall control.

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| | "General Letter of Credit Issuers"). | |
| | RCT Letter of Credit Issuers: Each of the initial Revolver Lenders, pro rata in proportion to their Revolver Commitments, and other mutually and reasonably satisfactory banks (the "RCT Letter of Credit Issuers" and together with the General Letter of Credit Issuers, the "Letter of Credit Issuers"). | |
| | Administrative Agent: Citibank, N.A. (together with its permitted successors and assigns, the "Administrative Agent," "DIP Agent," or "Agent"). | |
| *DIP Facility*<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B); LBR 4001-2(a)(ii)* | Total Loan Commitment: $4,475,000,000 aggregate principal amount.<br><br>Revolving Credit Facility: $1,950,000,000 aggregate principal amount (the "Revolver Commitments"). Up to $800,000,000 of the Revolving Credit Facility will be available in connection with Initial Availability and up to $1,950,000,000 will be available in connection with Full Availability.<br><br>Delayed-Draw Term Facility: $1,100,000,000 aggregate principal amount (the "Delayed-Draw Term Commitment") made available for up to two drawings (in minimum amounts of $250,000,000 (or the remainder of the Delayed-Draw Term Commitment, if less than $250,000,000)) during the period beginning on the Closing Date and ending 90 days after the Closing Date.<br><br>Term Loan Facility: $1,425,000,000 aggregate principal amount (the "Term Commitments"). Up to $800,000,000 of the Term Loan Facility in connection with Initial Availability and up to $1,425,000,000 in connection with Full Availability, of which up to $800,000,000 may be used to fund the General L/C Collateral Account.<br><br>General Letter of Credit Facility: A cash collateralized letter of credit facility in an aggregate stated amount of up to $800,000,000, as such amount may be increased as agreed in writing between TCEH and the General Letter of Credit Issuers providing such increased amount.<br><br>RCT Letter of Credit Facility: A cash collateralized letter of credit facility in an aggregate stated amount of up to $1,100,000,000. | DIP Credit Agreement at § 2.1, 2.2. |

9

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| *Interest Rate and Margins*<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The Borrower may elect that the loans comprising each borrowing bear interest at a rate per annum equal to (a) the Alternate Base Rate (such loans the "ABR Loans") plus the Applicable Margin or (b) the Adjusted LIBO Rate (such loans the "Eurodollar Loans") plus the Applicable Margin, subject to a floor of 0.75% per annum.<br><br>"Applicable Margin" means, a margin with respect to:<br><br>(a)  Revolving Credit Loans<br>1.50 %, in the case of ABR Loans<br>2.50 %, in the case of Eurodollar Loans<br><br>(b)  Term Loans and Delayed-Draw Term Loans<br>1.75 %, in the case of ABR Loans<br>2.75 %, in the case of Eurodollar Loans | DIP Credit Agreement at § 2.8. |
| *Fees*<br><br>*Fed R. Bankr. P. 4001(c)(1)(B)* | (a)  Underwriting and Other Fees<br>As set forth in the Fee Letter.<br><br>(b)  Revolving Commitment Fees<br>0.375% if each of the DIP Facilities are rated at least Ba3 by Moody's and BB- by S&P, and 0.500% if otherwise, in each case payable on the undrawn Revolver Commitments.<br><br>(c)  Delayed-Draw Ticking Fees<br>50% of the Applicable Margin payable on the undrawn Delayed-Draw Term Commitments from the date that is 60 days after the Closing Date until the date that is 90 days after the Closing Date.<br><br>(d)  Letter of Credit Fronting Fees<br>0.25% payable on the face amount of each General Letter of Credit and each RCT Letter of Credit. | DIP Credit Agreement at § 4.1, Fee Letter. |
| *Maturity*<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The maturity date of the DIP Facility will be the earliest of:<br><br>• stated maturity, which shall be 24 months from the Closing Date subject to a six-month extension as requested by the Borrower if as of the first day of such extension (1) no Event of Default is outstanding, (2) an Acceptable Reorganization Plan has been filed, (3) a hearing has been scheduled for the confirmation of such Acceptable Reorganization Plan, (4) the Debtors are working in good faith to confirm such Acceptable Reorganization Plan, (5) an updated Budget and Annual Operating Forecast have been delivered by the Borrower at least ten days prior to the first day of such extension, which Budget and Annual Operating Forecast demonstrate minimum liquidity sufficient to provide for Adequate Protection Payments (as defined in the Cash Collateral Order) through such additional six-month period plus an additional $250,000,000, and (6) the Borrower pays an extension fee in the amount 0.25% of the then outstanding Commitments and Loans on the date of such payment to the DIP Agent for distribution to the DIP Lenders on a pro rata basis based on the respective Commitments and Loans held by each Lender; | DIP Credit Agreement at § 1.1. |

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| | • the effective date of any Reorganization Plan; | |
| | • the date that is 45 days after the Interim Order Entry Date if the Final Order Entry Date shall not have occurred by such date; | |
| | • the date of the consummation of a sale of all or substantially all of the Debtors' assets or stock under section 363 of the Bankruptcy Code; and | |
| | • the acceleration of the Loans and termination of the Commitments under any of the DIP Facilities, including, without limitation, as a result of the occurrence and continuance of an Event of Default (any such occurrence, the "Maturity Date"); *provided, however*, that the Maturity Date will occur in any event no later than 30 months from the Closing Date. | |
| *Purpose/Use of Proceeds*<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B); LBR 4001-2(a)(ii)* | Proceeds of the Term Loans and the Revolving Credit Loans will be used to (a) finance any and all working capital needs and for any other general corporate purposes, including, without limitation, to (i) provide collateral support in respect of financial or physical trading transactions, including commodities transactions (in each case, subject to the terms of all applicable interim and final orders entered by the Court in the chapter 11 cases) and (ii) comply with any legal and/or regulatory requirements of governmental and quasi-governmental entities (including for posting bonds and remediation or reclamation obligations of any nature (such as with the RCT), complying with any statutory or regulatory requirements, and for self-bonding in respect of permits and licenses) applicable to the TCEH Debtors (and, to the limited extent set forth in the DIP Documents, of the Specified Affiliates), (b) provide for Letters of Credit, and (c) pay related transaction costs, fees, liabilities, and expenses, and other administration costs incurred in connection with the chapter 11 cases and the commitment, negotiation, syndication, documentation (including any commitment letters), execution, and closing of the DIP Facility, as provided for in the DIP Credit Agreement and the DIP Documents. If funded, the proceeds of the Delayed-Draw Term Loans will be used to fund the RCT L/C Collateral Account. The General Letters of Credit may be used (x) for general corporate purposes, including, without limitation, providing collateral support in respect of financial or physical trading transactions, including commodities transactions related to the TCEH Debtors' businesses and activities (in each case, subject to the terms of all applicable interim and final orders entered by the Court in the chapter 11 cases) (and, to the limited extent set forth in the DIP Documents, of the Specified Affiliates) and (y) to comply with any legal and/or regulatory requirements of governmental and quasi-governmental entities (including for posting bonds and remediation or reclamation obligations of any nature (such as with the RCT), complying with any statutory or regulatory requirements, and for self-bonding in respect of permits and licenses) applicable to the TCEH Debtors. If issued, the RCT Letters of Credit will be used for the purpose of satisfying bonding requirements of the RCT. | DIP Credit Agreement at § 11.19. |

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| *Events of Default*<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Usual and customary for financings of this type, including, without limitation, non-payment of principal, interest and fees, breaches of representations and warranties, defaults under negative covenants and certain affirmative covenants, non-entry of Final Order within 45-days after entry of Interim Order, conversion of the chapter 11 cases to chapter 7, entry of an order granting relief from automatic stay to permit foreclosure on any assets of the TCEH Debtors' that have an aggregate value in excess of \$150 million, and the termination of the use of cash collateral by the TCEH Debtors if the TCEH Debtors have not obtained use of cash collateral (consensually or non-consensually) pursuant to an order in form and substance acceptable to the Left Lead Arrangers. | DIP Credit Agreement at § 11. |
| *Priority and Security of DIP Facility Liens*<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | All DIP Obligations under the DIP Facility shall, subject to the Carve Out and the RCT Reclamation Support Carve Out:<br><br>• pursuant to section 364(c)(1) of the Bankruptcy Code, be entitled to superpriority administrative expense claim status in the chapter 11 cases with priority over any and all administrative expense claims, diminution claims, unsecured claims, and all other claims against the TCEH Debtors or their estates in any of the chapter 11 cases and any successor cases, existing on the Petition Date or thereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject only to, and effective upon entry of, the Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which allowed claims shall be payable from, and have recourse to, all prepetition and postpetition property of the TCEH Debtors and all proceeds thereof;<br><br>• pursuant to section 364(c)(2) of the Bankruptcy Code, a perfected first-priority lien on all prepetition and postpetition property of the TCEH Debtors (the "Unencumbered Property"); *provided, however,* that the Unencumbered Property shall exclude the TCEH Debtors' claims and causes of action under chapter 5 of the Bankruptcy Code (other than causes of action arising under section 549 of the Bankruptcy Code and any related action under section 550 of the Bankruptcy Code), or any other avoidance actions under the Bankruptcy Code (collectively, "Avoidance Actions"), but subject only to, and effective upon, entry of the Final Order, shall include any proceeds or property recovered, unencumbered, or otherwise the subject of successful Avoidance Actions, whether by judgment, settlement, or otherwise;<br><br>• pursuant to section 364(d)(1) of the Bankruptcy Code, be secured by a perfected priming first-priority lien on all | Interim Order at ¶ 7. |

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| | prepetition and postpetition property of the TCEH Debtors, whether existing on the Petition Date or thereafter acquired, that is subject to valid, perfected, and non-avoidable liens that secure the obligations of the TCEH Debtors under or in connection with the Prepetition Secured Facilities (as defined herein); excluding the Deposit L/C Loan Collateral Account to the extent of the Deposit L/C Obligations (each, as defined in the First Lien Credit Agreement); provided that such security interests and liens shall be senior in all respects to the interests in such property of any of the Prepetition Secured Creditors (as defined in the Cash Collateral Order) arising from current and future liens of any of the Prepetition Secured Creditors (including, without limitation, Adequate Protection Liens) (as defined in the Cash Collateral Order), but shall not be senior to any valid, perfected, and non-avoidable interests of other parties arising out of liens, if any, on such property existing immediately prior to the Petition Date, including the liens securing the Tex-La Indebtedness (as defined in the DIP Credit Agreement), or to any valid, perfected, and non-avoidable interests in such property arising out of liens to which the liens of any of the Prepetition Secured Creditors become subject subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code.<br><br>• pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior lien on all other prepetition and postpetition property of the TCEH Debtors that is subject to valid, perfected and non-avoidable liens in existence immediately prior to the Petition Date or that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (other than the Adequate Protection Liens). | |
| *Carve Out*<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The "Carve Out" shall have the meaning set forth in the Order. | Interim Order at ¶ 25. |
| *RCT Reclamation Support Carve Out*<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | All amounts up to $1,100,000,000 required to be paid by the TCEH Debtors to the RCT pursuant to amounts due and owing in respect of reclamation obligations incurred by the RCT and for which any of the TCEH Debtors may be liable under Applicable Law will constitute the "RCT Reclamation Support Carve Out," and such RCT Reclamation Support Carve Out will be senior to the DIP Obligations and to any other obligations or liabilities of the TCEH Debtors (other than, and subject in any event to, the Carve Out), unless the Borrower issues and delivers to the DIP Agent the RCT Carve Out Support Rejection Notice. | Interim Order at ¶ 26. |
| *Covenants*<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Usual and customary covenants for financings of this type, including but not limited to, the "Financial Covenant," as follows: for any Test Period (as defined in the DIP Credit Agreement) beginning with the Test Period ending on June 30, 2014, the ratio of (i) the | DIP Credit Agreement at § 10. |

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| | Consolidated Superpriority Secured Net Debt to (ii) Consolidated EBITDA (each, as defined in the DIP Credit Agreement) shall not exceed (x) if the RCT Carve Out Support Rejection Notice (as defined in the DIP Credit Agreement) has not been issued and delivered during or prior to such Test Period, 3.50 to 1.00 and (y) for all other Test Periods, 4.50 to 1.00. | |
| **Conditions to Borrowing**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Usual and customary conditions precedent to extensions of credit for financings of this type. | DIP Credit Agreement at § 6. |
| **Plan and Disclosure Statement Milestones**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(vi)* | The TCEH Debtors must file with the Court a plan of reorganization and a disclosure statement relating thereto, each in form and substance reasonably satisfactory to the DIP Agent, within 18 months after the Petition Date; *provided, however,* that with respect to provisions of the plan of reorganization and/or any disclosure statement that relate to payment of the DIP Facility, such provisions must be in form and substance satisfactory to the DIP Agent. | DIP Credit Agreement at § 9.15. |
| **Waivers and Consents**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(iv, v), (vii-x)* | *Waiver of Automatic Stay:* Upon the occurrence and during the continuance of an Event of Default and following the giving of five calendar days' notice to the TCEH Debtors (the "Remedies Notice Period"), the automatic stay pursuant to section 362 of the Bankruptcy Code shall be automatically terminated without further notice to or order of the Court, and the DIP Agent shall be permitted to exercise all rights against the Collateral in accordance with the DIP Documents and the Interim Order or Final Order, as applicable, and shall be permitted to satisfy the DIP Obligations, without further order or application or motion to the Court and without restriction or restraint by any stay under section 362 or 105 of the Bankruptcy Code. | Interim Order at ¶ 20; DIP Credit Agreement at § 12.7. |
| | *Waiver of Nonbankruptcy Law:* The DIP Liens and other interests granted to the DIP Agent, for the benefit of itself, the DIP Lenders, the DIP L/C Issuers, the Secured Hedge Banks, and the Secured Cash Management Banks, are deemed valid, binding, perfected, enforceable, first-priority liens, non-avoidable and not subject to re-characterization or subordination as of the date of the Interim Order. | Interim Order at ¶ 14. |
| | *Waiver of Section 506(c):* Subject to entry of the Final Order, the DIP Agent, the DIP Lenders, and the DIP L/C Issuers shall not be subject to any surcharge under section 506(c) of the Bankruptcy Code. | Interim Order at ¶ 31. |
| | *Indemnification:* The TCEH Debtors agree to indemnify and hold harmless the DIP Agent, the Joint Lead Arrangers, the DIP Lenders, the DIP L/C Issuers, and their respective Affiliates (as defined in the DIP Credit Agreement), directors, officers, partners, employees, and agents. | DIP Credit Agreement at § 13.5. |
| | *Release of Claims and Causes of Action:* The TCEH Debtors release the DIP Agent, the DIP Lenders, the DIP L/C Issuers, each of their respective participants, and each of their respective affiliates, | Interim Order at ¶ 29. |

14

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
|  | and each of their respective former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest, of and from any and all claims arising out of, in connection with, or relating to the DIP Facility, the DIP Documents, or the transactions contemplated thereunder. |  |

## Provisions to be Highlighted Pursuant to Local Bankruptcy Rule 4001-2(a)(i)

12.    Local Bankruptcy Rule 4001-2(a)(i) requires a debtor to:  (a) recite whether the proposed form of the financing order contains certain provisions of the type enumerated therein; (b) identify the location of such provisions in the proposed financing order; and (c) justify the inclusion of such provisions in the proposed financing order (the "Highlighted Provisions").[5] *See* Del. Bankr. L.R. 4001-2(a)(i).  The TCEH Debtors submit that one provision of the Interim Order requires highlighting under Local Bankruptcy Rule 4001-2(a)(i), specifically with respect to Local Bankruptcy Rule 4001-2(a)(i)(G), the priming of secured liens, and that such provision is justified and necessary in the context and circumstances of these chapter 11 cases.

13.    The DIP Financing grants the DIP Lenders a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all prepetition and postpetition property of the TCEH Debtors pursuant to section 364(d)(1) of the Bankruptcy Code.  Such security interest and lien shall be senior in all respects to the interests in such property of any of the Prepetition Secured Creditors arising from current and future liens of any of the Prepetition Secured Creditors (including without limitation, Adequate Protection Liens). *See* Interim Order, at ¶ E(ii), 7.

---

[5]    A further discussion of terms required to be highlighted pursuant to Local Bankruptcy Rule 4001-2 can be found in the Cash Collateral Motion.

14.     Local Rule 4001-2(a)(i)(G) requires explicit disclosure of provisions that prime any secured liens *without that lienholder's consent*.  *See Del. Bankr. L.R.* 4001-2(a)(i)(G) (emphasis added).  Here, the DIP Financing contemplates priming the First Lien Lenders on the Prepetition Collateral (as defined in the Cash Collateral Order) under section 364(d) of the Bankruptcy Code.  As described above, the TCEH Debtors and their advisors determined that the DIP Lenders offered the best option for obtaining the postpetition financing the TCEH Debtors require.  The TCEH Debtors are not able to obtain financing on equal or better terms from the DIP Lenders other than financing secured by first priority priming liens.  Moreover, the TCEH Debtors need the funds to be provided under the DIP Facility to preserve the value of their estates for the benefit of all stakeholders.  Significantly, the TCEH First Lien Ad Hoc Committee, representing holders of approximately 41% in amount of claims under the First Lien Credit Agreement and the First Lien Notes Indenture, has consented to such priming liens (*See* Interim Order, ¶ E(ii), 7), and the Prepetition Second Lien Creditors are deemed to have consented pursuant to the Second Lien Intercreditor Agreement.  In any event, as discussed at length in the Cash Collateral Motion, the TCEH Debtors are providing the Prepetition Secured Creditors with Adequate Protection.

15.     The TCEH Debtors submit that no further provisions of the Interim Order require highlighting under Local Bankruptcy Rule 4001-2(a)(i).  Nevertheless, out of an abundance of caution and for the convenience of the Court and other parties in interest, the TCEH Debtors wish to highlight certain provisions of the Interim Order to demonstrate their compliance, each of which is addressed individually in turn below.

(a) ***506(c) Waiver (Del. Bankr. L.R. 4001-2(a)(i)(C))***:  a waiver by the TCEH Debtors of the provisions of section 506(c) of the Bankruptcy Code *but effective only upon entry of the Final Order* (*See* Interim Order, ¶ 31); and

16

(b) ***Carve Out (Del. Bankr. L.R. 4001-2(a)(i)(F))***: a Carve Out for the benefit of professionals retained by the TCEH Debtors and any Creditors' Committee appointed in these chapter 11 cases, *but providing no disparate treatment with respect to such professionals* (*See* Interim Order, ¶ 25).

16.    ***506(c) Waiver***.    Upon entry of the Final Order, no costs or expenses of administration of the chapter 11 cases or any future proceeding that may result therefrom, which have been or may be incurred in the chapter 11 cases at any time, shall be charged against the DIP Agent, the DIP Lenders, or the DIP L/C Issuers, or any of their respective claims or the DIP Collateral, pursuant to section 105 or 506(c) of the Bankruptcy Code (the "506(c) Waiver"), without the prior written consent of the DIP Agent, the DIP Lenders, or the DIP L/C Issuers, as applicable. *See* Interim Order, at ¶ 31.

17.    Local Bankruptcy Rule 4001-2(a)(i)(C) requires explicit disclosure of provisions that constitute a waiver, *without notice*, of whatever rights the estate may have under section 506(c) of the Bankruptcy Code. *See* Del. Bankr. L.R. 4001-2(a)(i)(C) (emphasis added). Here, the TCEH Debtors are not seeking the approval of the 506(c) Waiver on an interim basis but, rather, are seeking approval of this provision under the Final Order pursuant to Local Bankruptcy Rule 4001-2(c). To that end, notice of the Motion and the Interim Order entered thereon will be served on all parties in accordance with Local Bankruptcy Rule 9013-1(m). Accordingly, the TCEH Debtors do not believe that this provision of the Interim Order requires disclosure under Local Bankruptcy Rule 4001-2(a)(i)C); however, such provision is disclosed out of an abundance of caution and for the convenience of the Court and other parties in interest.

18.    ***Carve Out***.    The Carve Out includes the unpaid fees and expenses of professional persons retained by any Debtor or any Creditors' Committee appointed in these chapter 11 cases pursuant to an order of the Court. *See* Interim Order, at ¶ 25. Local Bankruptcy Rule 4001-2(a)(i)(F) requires disclosure of *disparate* treatment between the professionals retained by

the TCEH Debtors and the professionals retained by the unsecured creditors' committee with respect to a professional fee carve out. *See* Del. Bankr. L.R. 4001(2)(a)(i)(F) (emphasis added). Here, the Carve Out applies equally to professionals retained by the TCEH Debtors and any Creditors' Committee. Accordingly, the TCEH Debtors do not believe that this provision of the Interim Order requires disclosure under Local Bankruptcy Rule 4001-2(a)(i)(F); however, such provision is disclosed out of an abundance of caution and for the convenience of the Court and other parties in interest.

19.    Moreover, with the inclusion of the Carve Out, the Orders do not directly or indirectly deprive the TCEH Debtors' estate or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these chapter 11 cases. *See In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). In *Ames*, the court found such "carve-outs" for professional fees to be not only reasonable, but necessary to ensure that official committees and debtors' estates can retain assistance from counsel. *Id.* at 41.

20.    Similar carve outs for professional fees have been found to be reasonable and necessary in this district to ensure that a debtor's estate and any statutory committee can retain assistance from counsel. *See, e.g., In re Longview Power, LLC*, No. 13-12211 (BLS) (Bankr. D. Del. Sept. 5, 2013) (allowing carve out for debtor and committee professional fees); *In re Dex One Corp.*, No. 13-10533 (KG) (Bankr. D. Del. Mar. 19, 2013) (same); *In re Amicus Wind Down Corp.*, No. 11-13167 (KG) (Bankr. D. Del. Nov. 2, 2011) (same); *In re Neb. Book Co.*, No. 11-12005 (PJW) (Bankr. D. Del. July 21, 2011) (same); *In re Local Insight Media Holdings,*

*Inc.*, No. 10-13677 (KG) (Bankr. D. Del. Dec. 29, 2010) (same); *In re N. Am. Petroleum Corp. USA*, No. 10-11707 (CSS) (Bankr. D. Del. July 6, 2010) (same); *In re Stallion Oilfield Servs. Ltd.*, No. 09-13562 (BLS) (Bankr. D. Del. Nov. 18, 2009) (same).[6]

## Background

21.    On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition with the Court under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have requested joint administration of these chapter 11 cases. The Court has not appointed a trustee, and the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has not formed any official committees in these chapter 11 cases.[7]

22.    Debtor Energy Future Holdings Corp. ("EFH Corp."), a Texas corporation, is the ultimate parent company for each of the Debtors in these chapter 11 cases and certain of EFH Corp.'s non-Debtor affiliates (collectively, "EFH"). EFH's businesses include the largest generator, distributor, and certificated retail provider of electricity in Texas. EFH conducts substantially all of its business operations in the electricity market overseen by the Electric Reliability Council of Texas ("ERCOT"), which covers the majority of Texas. The Texas electricity market, in turn, is subject to oversight and regulation by the Public Utility

---

[6]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to the Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

[7]    The facts and circumstances supporting this Motion, along with a detailed discussion of EFH's business operations and capital structure, are set forth in the First Day Declaration, filed contemporaneously herewith.

Commission of Texas (the "PUC"). EFH has approximately 9,100 employees, approximately 5,700 of whom are employed by the Debtors,[8] in three distinct business units:

- EFH's *competitive electricity generation, mining, wholesale electricity sales, and commodity risk management and trading activities*, conducted by TCEH's Debtor subsidiaries composing "Luminant";

- EFH's *competitive retail electricity sales operations and related operations*, mainly conducted by TCEH's Debtor subsidiaries composing "TXU Energy";[9] and

- EFH's *rate-regulated electricity transmission and distribution operations*, conducted by the non-Debtor entities composing "Oncor."

23.     In the aggregate, the Debtors have approximately $42 billion of funded indebtedness, including (a) approximately $32.1 billion of claims against TCEH and TCEH's direct and indirect Debtor subsidiaries; (b) approximately $71 million of claims against EFCH; (c) approximately $1.9 billion of claims against EFH Corp.; and (d) approximately $7.7 billion of claims against EFIH.[10]

24.     Although the Debtors' balance sheet is overleveraged, the Debtors' operations are strong. Luminant's generation units are high-performing, its mining and electricity generation

---

[8]   The Debtors in these chapter 11 cases consist of: (a) the vast majority of the entities that compose Luminant and TXU Energy, as well as those entities' intermediate corporate parent entity, TCEH, a Delaware limited liability company, and TCEH's corporate parent, EFCH, a Delaware limited liability company; (b) Energy Future Intermediate Holding Company LLC ("EFIH"), a Delaware limited liability company that indirectly owns approximately 80% of Oncor Electric Delivery Holdings Company LLC ("Oncor"), and EFIH's wholly-owned subsidiary, EFIH Finance Inc.; (c) EFH Corp.; and (d) other direct and indirect subsidiaries of EFH Corp., including EFH Corporate Services Company.

[9]   The Debtors also conduct a relatively small amount of retail electricity operations through their 4Change brand and another entity, Luminant ET Services Company, that provides retail electricity service to some end use customers and to some of Luminant's mining operations, and a small amount of retail gas operations through Luminant Energy Company LLC.

[10]  Amounts include intercompany debt holdings and short-term borrowings, and exclude guarantees, unamortized discounts or premiums, accrued but unpaid interest, and certain other figures typically reported in the Debtors' filings with the Securities and Exchange Commission (the "SEC"), such as capital lease obligations, certain promissory notes, and certain other obligations.

operations have impressive safety records, and its commodity trading and risk management activities have delivered significant value to the Debtors. TXU Energy is an industry leader in customer care performance and product innovation and has maintained strong performance notwithstanding intense competition. And non-Debtor Oncor produces a strong and consistent stream of revenue. Thus, these chapter 11 cases will provide the Debtors with the opportunity to restructure their balance sheets and retain their position as leaders in the Texas electricity market.

25.    As of December 31, 2013, EFH Corp. reported total assets of approximately $36.4 billion in book value, approximately $28.8 billion of which is attributable to the TCEH Debtors and TCEH's non-Debtor subsidiaries,[11] and total liabilities of approximately $49.7 billion in book value, approximately $41.1 billion of which is attributable to the TCEH Debtors and TCEH's non-Debtor subsidiaries.[12] EFH Corp.'s assets and liabilities that are not attributable to the TCEH Debtors and TCEH's non-Debtor subsidiaries are mostly attributable to EFIH's indirect ownership of approximately 80% of Oncor. EFH Corp.'s consolidated revenues for the quarter ending December 31, 2013 were approximately $1.3 billion, all of which were attributable to TCEH Debtors and TCEH's non-Debtor subsidiaries. EFH Corp.'s consolidated annual revenues for the year ending December 31, 2013 were approximately $5.9 billion.

---

[11]  Oncor's revenues are not included in EFH Corp.'s consolidated revenues because EFH Corp. accounts for its ownership of Oncor under the equity method of accounting.

[12]  Figures for TCEH are derived from EFCH's public filings with the SEC, and are almost entirely attributable to TCEH and its Debtor and non-Debtor subsidiaries.

## The TCEH Debtors' Outstanding Prepetition Indebtedness

**I.      TCEH First Lien Debt.**

26.      *First Lien Credit Agreement.*  Pursuant to that certain credit agreement dated as of October 10, 2007 (as amended, modified, or supplemented and in effect immediately prior to the Petition Date, the "First Lien Credit Agreement"), among TCEH, as the borrower, EFCH, as successor to Energy Future Competitive Holdings Company, as the parent guarantor, the Subsidiary Guarantors, Citibank, N.A., as administrative and collateral agent (the "First Lien Credit Agent"), and the lenders that are parties thereto from time to time (the "First Lien Lenders"), the TCEH Debtors may borrow under the term loan and revolving credit facilities, as well as other financial accommodations from the First Lien Lenders.

27.      *First Lien Notes.*  Pursuant to that certain indenture (the "First Lien Notes Indenture," and, together with all other loan and security documents (including, without limitation, the "Security Documents" as defined in the First Lien Credit Agreement and the First Lien Notes Indenture) related to, referenced in, or executed in connection with the First Lien Credit Agreement or the First Lien Notes Indenture, the "First Lien Facilities"), dated April 19, 2011, for the 11.50% senior secured notes (the "First Lien Notes") due October 1, 2020, by and among TCEH and TCEH Finance, Inc., as issuers, BOKF, N.A., as indenture trustee (the "First Lien Notes Trustee," and together with the First Lien Credit Agent, the "Prepetition First Lien Agents"), and EFCH and the Subsidiary Guarantors, as guarantors, TCEH and TCEH Finance, Inc. issued $1.75 billion in principal amount of the First Lien Notes.

28.      *First Lien Hedges and Swaps.*  The TCEH Debtors are also party to:  (a) first lien commodity hedges (the "First Lien Commodity Hedges"); and (b) first lien interest rate swaps used to hedge interest rate exposure on their variable rate debt (the "First Lien Interest Rate

22

Swaps") as provided for under the First Lien Facilities. The "Prepetition First Lien Creditors" include the First Lien Lenders, together with the First Lien Credit Agent, all other "Secured Parties" (as defined in the First Lien Credit Agreement), the First Lien Notes Trustee, the holders of the First Lien Notes, and the counterparties to the First Lien Interest Rate Swaps and the First Lien Commodity Hedges.

29.    *First Lien Collateral.*    The First Lien Debt is secured by first priority liens (the "Prepetition First Priority Liens") in the "Collateral" (the "Prepetition Collateral"), as defined in that certain amended and restated security agreement (the "First Lien Security Agreement"), dated as of April 7, 2011, by and among the TCEH Debtors and the First Lien Agent, including all of the TCEH Debtors' cash to the extent that such cash constitutes proceeds of other Prepetition Collateral.

30.    *First Lien Intercreditor Agreement.*    The first lien intercreditor agreement (as amended, restated, modified, and supplemented from time to time, the "First Lien Intercreditor Agreement") by and among the TCEH Debtors, the Prepetition First Lien Agents, certain Prepetition First Lien Creditors, and other parties thereto from time to time, governs, among other things: (i) payment and priority with respect to holders of claims related to the TCEH First Lien Debt; (ii) rights and remedies of the holders of TCEH First Lien Debt with respect to debtor-in-possession financing, use of cash collateral, and adequate protection in a chapter 11 case; and (iii) the relative priority of liens granted to holders of "Secured Obligations" under a "Secured Hedging Agreement," "Secured Cash Management Agreement," or "Secured Commodity Hedge and Power Sale Agreement" (each as defined in the First Lien Intercreditor Agreement) pursuant to ISDA master agreements, schedules, and confirmations related thereto or otherwise.

## II.    TCEH Second Lien Debt.

31.    *Second Lien Notes.*  Pursuant to that certain indenture (the "Second Lien Notes Indenture," and together with the First Lien Facilities, the "Prepetition Secured Facilities"), dated October 6, 2010, for the 15.0% second lien notes (the "Second Lien Debt," and together with the First Lien Debt, the "TCEH Secured Debt"), by and among TCEH and TCEH Finance, Inc., as issuers, as successor to The Bank of New York Mellon Trust Company, N.A., as indenture trustee (the "Second Lien Trustee"), The Bank of New York Mellon Trust Company, N.A., as collateral agent (including any successor thereto, the "Second Lien Collateral Agent," and together with the Second Lien Trustee, the "Second Lien Agent"), and EFCH and the Subsidiary Guarantors, as guarantors, TCEH and TCEH Finance, Inc. issued to holders (the "Prepetition Second Lien Creditors") approximately $1.57 billion in principal amount of the Second Lien Debt.

32.    *Second Lien Collateral.*  The Second Lien Debt is secured by second priority liens (the "Prepetition Second Priority Liens") in the Prepetition Collateral, as set forth in that certain second lien security agreement (as amended, restated, modified, and supplemented from time to time, the "Second Lien Security Agreement"), dated as of October 6, 2010, by and among the TCEH Debtors and the Second Lien Agent.

33.    *Second Lien Intercreditor Agreement.*  The second lien intercreditor agreement (as amended, restated, modified, and supplemented from time to time, the "Second Lien Intercreditor Agreement") entered into by and among the TCEH Debtors, the First Lien Agent, and the Second Lien Agent, governs, among other things, the relative priority of the First Lien Debt and the Second Lien Debt and the rights and remedies of the holders of First Lien Debt and Second Lien Debt with respect to debtor-in-possession financing, use of cash collateral, and

24

adequate protection. In particular, pursuant to section 6.04 of the Second Lien Intercreditor Agreement, holders of Second Lien Debt are bound by the actions and consents of the First Lien Agent under the First Lien Intercreditor Agreement with respect to any debtor-in-possession financing or use of cash collateral, and the Second Lien Agent and holders of Second Lien Debt are prohibited from objecting to such debtor-in-possession financing or use of cash collateral to the extent that the First Lien Credit Agent consents.

### III.    Tex-La Obligations.

34.    *Tex-La Obligations*. EFCH is the principal obligor of, and EFH Corp. guarantees, approximately $62 million of obligations related to a series of transactions by and among the predecessors of EFH Corp. and EFCH, on the one hand, and the Tex-La Electric Cooperative of Texas, Inc. ("Tex-La"), on the other hand (such obligations, the "Tex-La Obligations"), as provided in that certain assumption agreement (the "Tex-La Assumption Agreement," and together with all related agreements, the "Tex-La Documents"), dated February 1, 1990, by and among EFCH, Tex-La, and the administrator of the Rural Utilities Service, an agency of the United States Department of Agriculture, whereby EFCH agreed to assume certain outstanding indebtedness of Tex-La. Approximately $29 million and $33 million of the Tex-La Obligations are due in 2019 and 2021, respectively.

35.    *Tex-La Collateral*. As of the date of this Motion, the Tex-La Obligations are secured by a 2.17% undivided ownership in Comanche Peak's electricity generation and transmission assets and a 6.02% undivided ownership interest in the 51.5 mile 345 kV Comanche Peak-Cleburne-Everman transmission facility (the "Tex-La Collateral," and the liens on the Tex-La Collateral, the "Tex-La Liens"). The Prepetition First Priority Liens and the Prepetition Second Priority Liens were granted subject to the Tex-La Collateral.

**Development of the DIP Budget and the TCEH Debtors' Need for DIP Financing**

36.    To continue operating in the ordinary course and to effectuate an efficient and expeditious restructuring, the TCEH Debtors need to access liquidity. As discussed below and in the Goldstein Declaration, the TCEH Debtors, with the assistance of their advisors, analyzed their cash needs to determine what is necessary to maintain their operations in chapter 11 and work toward a successful reorganization. In undertaking this analysis, the TCEH Debtors and their advisors considered the TCEH Debtors' near-term projected financial performance, including demand for the TCEH Debtors' services and the cost of supplying such services. The TCEH Debtors' management also conferred with key operational divisions to understand essential business metrics in both the near- and long-term.

37.    As part of the TCEH Debtors' financial review and analysis, the TCEH Debtors developed an initial three-month budget, attached hereto as **Exhibit C** (the "DIP Budget"). The DIP Budget incorporates a number of factors, including the effect of the chapter 11 filing, material cash disbursements, required vendor/supplier payments, cash flows from the TCEH Debtors' ongoing operations, and the cost of necessary goods and materials and includes all of the expenditures for which the Debtors seek authority to pay in various "first day" pleadings.

38.    The Debtors will use Cash Collateral to fund working capital, capital expenditures, and other general corporate purposes. Cash Collateral, however, will be insufficient to fund the costs associated with a chapter 11 restructuring. Therefore, the Debtors, with the assistance of their advisors, have determined that postpetition financing is necessary to fund the following restructuring costs, among others: adequate protection payments; working capital (e.g., collateral for letters of credit), bankruptcy costs (e.g., business disruption and professional fees), and regulatory requirements (e.g., RCT mining reclamation obligations). The

funding of these restructuring costs, described in greater detail in the DIP Budget, is necessary to preserve and maintain the TCEH Debtors' going-concern value and, ultimately, effectuate a successful reorganization.

39.    Among the restructuring costs addressed by the DIP Financing are the TCEH Debtors' mining reclamation obligations to the RCT. The TCEH Debtors maintain their mining operations in Texas with the permission of the RCT, a regulatory agency that permits, enforces, and oversees surface mining and reclamation in the State. The RCT's grant of permission to the TCEH Debtors to maintain mining operations is conditioned on the TCEH Debtors' posting security to ensure the reclamation of their permitted mining areas. Prior to the Petition Date, the TCEH Debtors secured their reclamation obligations in the form of a self-bond. The TCEH Debtors arguably lost the right to self-bond upon filing the chapter 11 cases. *See* 16 TAC § 12.309(j)(2)(B). Pursuant to section 12.309(j)(7) of the TAC, the TCEH Debtors must immediately notify the RCT and post a substitute bond within 90 days of such notification.

40.    Upon the bankruptcy filing, the DIP Financing and the Interim Order contemplate the RCT Reclamation Support Carve Out, under which the DIP Lenders carve out up to $1,100,000,000 of their collateral for the benefit of the RCT. The RCT Reclamation Carve Out will be senior to any other obligations or liabilities of the Debtors, other than the professional fee Carve Out.

41.    As provided in the DIP Budget, the TCEH Debtors believe that approximately $1,600,000,000 in available liquidity is necessary for operations during the interim period of these chapter 11 cases. The proposed DIP Financing will provide the TCEH Debtors with immediate access of up to $2,700,000,000, consisting of (a) $800,000,000 under the Revolving Credit Facility, (b) $1,100,000,000 under the Delayed-Draw Term Facility, the proceeds of

which, if funded, subject to the condition set forth above, will be applied by TCEH to fund the RCT L/C Collateral Account, and (c) $800,000,000 under the Term Loan Facility, of which up to $800,000,000 may be applied by TCEH to fund the General L/C Collateral Account. Moreover, upon entry of the Final Order, the proposed DIP Financing will provide the TCEH Debtors with up to $4,475,000,000, consisting of (x) $1,950,000,000 under the Revolving Credit Facility, (y) $1,425,000,000 under the Term Loan Facility, of which up to $800,000,000 may be applied by TCEH to fund the General L/C Collateral Account, and (z) $1,100,000,000 under the Delayed-Draw Term Facility, the proceeds of which, if funded, subject to the condition set forth above, will be applied by TCEH to fund the RCT L/C Collateral Account to support RCT Letters of Credit.

42.    Absent an ability to demonstrate that the TCEH Debtors have the means available to operate in the ordinary course and procure goods and services that are vital to ongoing business operations, customers may seek other alternatives and vendors and suppliers may refuse to do business with the TCEH Debtors. Moreover, absent access to the funds available under the DIP Facility, the TCEH Debtors may not have sufficient liquidity to continue their business operations in the ordinary course to the material detriment of customers, creditors, employees, and other parties in interest, jeopardizing the success of the TCEH Debtors' restructuring. Therefore, the TCEH Debtors have an immediate need to access the DIP Facility on an interim basis and throughout the pendency of these chapter 11 cases.

## The TCEH Debtors' Efforts to Obtain Postpetition Financing

43.    As discussed in the Goldstein Declaration, the TCEH Debtors' decision to proceed with the DIP Financing comes after a dedicated and diligent search for the best financing alternatives. In early September 2013, the TCEH Debtors and Evercore initiated a

request for DIP facility proposals ("RFP"). The TCEH Debtors' advisors canvassed the market to find parties interested in providing debtor-in-possession financing. During the initial stage of the RFP process, the TCEH Debtors approached five large financial institutions that are actively involved in the debtor-in-possession and syndicated finance markets. The TCEH Debtors and their advisors provided these financial institutions with a proposed DIP financing structure, draft commitment letter, and a detailed term sheet. The TCEH Debtors offered each of these financial institutions the opportunity to conduct due diligence and submit proposals for up to 100% of the DIP financing commitment.

44.    Five financial institutions submitted proposals in response to the TCEH Debtors' RFP. After substantial analysis of the DIP financing proposals, the TCEH Debtors concluded that no single financial institution would be able to underwrite the entire amount of the DIP financing due to the size of the proposed revolving credit facility. Nevertheless, the size of the revolving credit facility remained a priority for the TCEH Debtors because a revolving credit facility offered several benefits over a comparable term facility, including lower pricing and greater efficiency by deferring funding until needed. As a result of this analysis, the TCEH Debtors decided to aggregate the support of multiple financial institutions to fund the DIP Facility.

45.    In early October 2013, two additional financial institutions signed non-disclosure agreements and joined the DIP financing process. The TCEH Debtors continued negotiating with all seven financing providers during the first three weeks of October to obtain the most favorable terms on the DIP Financing. On October 25, 2013, the TCEH Debtors determined that the DIP Financing proposals from Citigroup Global Markets Inc. and Deutsche Bank Securities Inc. contained the best possible combination of terms and effectively addressed the TCEH

Debtors' liquidity needs. The TCEH Debtors thus began negotiating commitment letters with Citigroup Global Markets Inc. and Deutsche Bank Securities Inc., as well as the five other lenders, understanding that the TCEH Debtors would require a broadly-syndicated facility to achieve a revolving credit facility of this size.

46.    The TCEH Debtors' initial discussions provided a foundation for renewing DIP Financing negotiations in early February 2014. The TCEH Debtors and their advisors continued negotiating with the DIP Lenders through April 2014, including replacing one of the seven lenders.

47.    On April 28, 2014, the TCEH Debtors received signed commitment letters from all seven initial lenders under the DIP Facility. Collectively, these institutions were able to provide the TCEH Debtors with $4,475,000,000 in DIP Financing, including the $1,950,000,000 Revolving Credit Facility.

48.    The DIP Financing is the best source of financing, providing the TCEH Debtors with the liquidity they need to continue operating their businesses in the ordinary course and satisfy restructuring-related costs. The DIP Financing was negotiated at arm's length on terms that are reasonable. Thus, to ensure the TCEH Debtors' access to sufficient liquidity that will provide the foundation for maximizing value for all stakeholders, the DIP Financing should be approved.

## Basis for Relief

I.    **The TCEH Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Facility.**

    A.    **Entry into the DIP Credit Agreement is an Exercise of the TCEH Debtors' Sound and Reasonable Business Judgment.**

49.    The Court should authorize the TCEH Debtors, as an exercise of the TCEH Debtors' sound business judgment, to enter into the DIP Credit Agreement and obtain access to the DIP Facility.

50.    Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances as described in greater detail below. Provided that an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance with its sound business judgment in obtaining such credit. *See, e.g., Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment."); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Barbara K. Enters., Inc.*, No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[c]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does

not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, inter alia, an exercise of "sound and reasonable business judgment.").

51.    Specifically, to determine whether the business judgment standard is met, a court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code.") (citation omitted).

52.    The TCEH Debtors' execution of the DIP Credit Agreement is an exercise of their sound business judgment that warrants approval by the Court.  Before the Petition Date, the TCEH Debtors and their advisors analyzed the TCEH Debtors' projected financing needs during the pendency of these chapter 11 cases, and determined that the TCEH Debtors would require significant postpetition financing to support their operational and restructuring activities. Accordingly, the TCEH Debtors negotiated the DIP Facility with the DIP Lenders in good faith, at arm's length, and with the assistance of their advisors, to obtain the required postpetition financing on terms most favorable to the TCEH Debtors.  Based on the advice of counsel and other professionals, and the TCEH Debtors' own analysis, the TCEH Debtors have determined in their sound business judgment that the DIP Documents provide a greater amount of financing on more favorable terms than any other reasonably available alternative.  The TCEH Debtors' advisors canvassed the market to find interested parties to participate in the debtor-in-possession

32

financing and have assisted the TCEH Debtors in negotiations to obtain the best terms available

to ensure that the DIP Facility was fully subscribed.

      53.     The TCEH Debtors have an urgent need to obtain access to the DIP Facility to,

among other things, continue the operation of their businesses in an orderly manner, maintain

business relationships with vendors, suppliers, and customers, pay employees, satisfy regulatory

obligations, and satisfy other working capital and operational needs – each of which is vital to

preserving and maintaining the value of these estates for the benefits of all stakeholders.

Moreover, the TCEH Debtors believe that access to the DIP Facility will provide assurance to all

parties in interest at this critical juncture.  Thus, entry into the DIP Facility is an exercise of the

Debtors' sound business judgment.

**B.**     **The TCEH Debtors Should Be Authorized to Obtain Postpetition Financing on a Senior Secured and Superpriority Basis.**

      54.     Section 364 of the Bankruptcy Code authorizes a debtor to obtain, in certain

circumstances, postpetition financing on a secured or superpriority basis, or both.  Specifically,

section 364(c) of the Bankruptcy Code provides, in pertinent part, that the Court, after notice and

a hearing, may authorize a debtor that is unable to obtain credit allowable as an administrative

expense under section 503(b)(1) of the Bankruptcy Code to obtain credit or incur debt:

> (a) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code];
>
> (b) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (c) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

      55.     To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor

need only demonstrate "by a good faith effort that credit was not available" to the debtor on an

33

unsecured or administrative expense basis. *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also, L.A. Dodgers*, 457 B.R. at 313 (citing *Ames Dep't Store*, 115 B.R. at 37 (noting the court "may not approve any credit transaction under subsection (c) [of section 364] unless the debtor demonstrates that it has attempted, but failed, to obtain unsecured credit under section 364(a) or (b)"). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.*; *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense). When few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received); *see also In re Garland Corp.*, 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) authorized, after notice and a hearing, upon showing that unsecured credit unobtainable); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met).

56.    The TCEH Debtors' and Evercore's discussions with various potential sources of DIP financing revealed that DIP financing on a junior or unsecured basis was not available to the TCEH Debtors.    The TCEH Debtors' significant secured debt obligations and lack of

unencumbered assets precludes them from obtaining postpetition financing in the amount they require on terms other than on a senior secured and superpriority basis. The Court should therefore authorize the TCEH Debtors to provide the DIP Agent, on behalf of itself, the DIP Lenders, the DIP L/C Issuers, the Secured Hedge Banks, and the Secured Cash Management Banks, (i) senior liens on the TCEH Debtors' unencumbered property as provided in section 364(c)(2) of the Bankruptcy Code, (ii) priming liens on the TCEH Debtors' property that is subject to liens held by any of the Prepetition Secured Creditors, as provided in section 364(d)(1) of the Bankruptcy Code, (iii) junior liens on the TCEH Debtors' encumbered property (other than the property described in clause (i) or (ii) above), as provided in section 364(c)(3) of the Bankruptcy Code, and (iv) superpriority administrative expense status for all DIP Obligations as provided for in section 364(c)(1) of the Bankruptcy Code.

### C.    The TCEH Debtors Should Be Authorized to Obtain Postpetition Financing Secured by First Priority Priming Liens.

57.    In addition to authorizing financing under section 364(c) of the Bankruptcy Code, courts also may authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on the encumbered property, without the consent of the existing lienholders, if the debtor cannot otherwise obtain such credit and the interests of existing lienholders are adequately protected. *See* 11 U.S.C. § 364(d)(1).

58.    When determining whether to authorize a debtor to obtain credit secured by a "priming" lien as authorized by section 364(d) of the Bankruptcy Code, courts focus on whether the transaction will enhance the value of the TCEH Debtors' assets. Courts consider a number of factors, including, without limitation:

> (a) whether alternative financing is available on any other basis (i.e., whether any better offers, bids, or timely proposals are before the court);

35

>   (b) whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtors' business;
>
>   (c) whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtors and proposed lender(s); and
>
>   (d) whether the proposed financing agreement was negotiated in good faith and at arm's length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors.

*See, e.g., Ames Dep't Stores*, 115 B.R. at 37–39; *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003); *Farmland Indus.*, 294 B.R. at 862–79, *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. Mar. 5, 2009); *Barbara K. Enters.*, 2008 WL 2439649 at *10; *see also* 3 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 364.04[1] (16th ed.). The DIP Documents satisfy each of these factors.

59.    *First*, as described above, the TCEH Debtors and their advisors canvassed the market and were not able to obtain financing on equal or better terms from the DIP Lenders other than financing secured by first priority priming liens.

60.    *Second*, the TCEH Debtors need the funds to be provided under the DIP Facility to preserve the value of their estates for the benefit of all stakeholders. Specifically, the TCEH Debtors need the funds to be provided under the DIP Facility to maintain operations and signal to their suppliers and other vendors that they are credit-worthy and that their vendors can and should continue to provide goods and services to the TCEH Debtors on substantially the same credit terms as during the prepetition period. Absent access to the DIP Facility and Cash Collateral, the TCEH Debtors will be unable to operate their businesses or prosecute these chapter 11 cases. Thus, providing the TCEH Debtors with the liquidity necessary to preserve

their going-concern value through the pendency of these chapter 11 cases is in the best interest of all stakeholders.

61.    *Third*, the TCEH Debtors and their advisors determined that the DIP Lenders offered the best option for obtaining the postpetition financing the TCEH Debtors require, including, upon entry of the Interim Order, access to approximately $2,700,000,000 in incremental liquidity and access to approximately $1,900,000,000 in Letters of Credit, which the TCEH Debtors and their advisors have independently determined is sufficient and necessary to allow the TCEH Debtors to maintain their operations. The DIP Lenders agreed to favorable terms of the DIP Financing, in part to create and foster relationships with the Debtors. Accordingly, the terms of the DIP Credit Agreement are reasonable and adequate to support the TCEH Debtors' operations and restructuring activities through the pendency of these chapter 11 cases.

62.    *Fourth*, the TCEH Debtors conducted arm's-length negotiations with the DIP Lenders regarding the terms of the DIP Facility, and those agreements reflect the most favorable terms on which the DIP Lenders (or any other lender) were willing to offer financing. Thus, the entry into the DIP Financing is an exercise of sound and reasonable business judgment in the best interests of the TCEH Debtors' estate and its creditors. Accordingly, the Debtors satisfy the requirements to obtain postpetition financing secured by a first priority priming lien and the Court should authorize the TCEH Debtors to enter into the DIP Credit Agreement and obtain access to the DIP Financing.

**D.    The Interests of the Prepetition First Lien Creditors and Prepetition Second Lien Creditors Are Adequately Protected.**

63.    A debtor may obtain postpetition credit "secured by a senior or equal lien on property of the estate that is subject to a lien only if" the debtor, among other things, provides

37

"adequate protection" to those parties whose liens are primed or such parties consent. *See* 11 U.S.C. § 364(d)(1)(B). Here, the TCEH Debtors have obtained the consent of the TCEH First Lien Ad Hoc Committee, and the Prepetition Second Lien Creditors are deemed to have consented pursuant to the Second Lien Intercreditor Agreement. In any event, as discussed at length in the Cash Collateral Motion, the TCEH Debtors will provide the Prepetition Secured Creditors with Adequate Protection. What constitutes adequate protection is decided on a case-by-case basis, and adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims. *See, e.g., In re Cont'l Airlines Inc.*, 154 B.R. 176, 180–181 (Bankr. D. Del. 1993); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case"); *In re Realty Sw. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted).

64.     Specifically, the TCEH Debtors are providing the First Lien Collateral Agent, for the benefit of itself and the Prepetition First Lien Creditors:  (a) the First Priority Adequate Protection Liens; (b) the First Priority 507(b) Claim; (c) payment of certain fees and expenses; (d) the First Lien Adequate Protection Payments; (e) the Financial Covenant, (f) the Budget and Annual Operating Forecast, and (g) to the extent given to the DIP Lenders, reasonable access to the Debtors' records and information (each as defined in the Cash Collateral Order). The Second Lien Agent will receive, for the benefit of itself and the Prepetition Second Lien Creditors,

(x) the Second Priority Adequate Protection Liens and (y) the Second Priority 507(b) Claim. Although its liens are not being primed, Tex-La will receive Tex-La Adequate Protection Payments as adequate protection for the Diminution in Value of its interests in the Tex-La Collateral.

65.    The Adequate Protection summarized above and set forth in the Cash Collateral Order is fair and reasonable, and is sufficient to satisfy the requirements of section 364(d)(1)(B) of the Bankruptcy Code.  Moreover, the TCEH First Lien Ad Hoc Committee, representing 41% in amount of claims under the First Lien Credit Agreement and the First Lien Notes Indenture, has consented to the Adequate Protection.  Accordingly, the Court should find that the Adequate Protection is fair and reasonable and satisfies the requirements of section 364(d)(1)(B) of the Bankruptcy Code.

## II.    The Payment of Fees is Appropriate.

66.    The TCEH Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Agent, the DIP Lenders, the DIP L/C Issuers, and the Joint Lead Arrangers in exchange for their providing the DIP Financing.  The fees the Debtors have agreed to pay to the DIP Agent, the DIP Lenders, the DIP L/C Issuers, and the Joint Lead Arrangers, together with the other provisions of the DIP Documents, represent the most favorable terms to the TCEH Debtors on which the DIP Agent, the DIP Lenders, the DIP L/C Issuers, and the Joint Lead Arrangers would agree to make the DIP Financing available.  The TCEH Debtors considered such fees when determining in their sound business judgment that the DIP Documents constituted the best terms on which the TCEH Debtors would obtain the postpetition financing necessary to continue their operations and prosecute their chapter 11 cases, and paying these fees in order to obtain the

DIP Financing is in the best interests of the TCEH Debtors' estates, creditors, and other parties in interest.

67.     Courts routinely authorize debtors to pay fees similar to those the TCEH Debtors propose to pay, where the associated financing is, in the debtor's business judgment, beneficial to the debtors' estates—indeed, on a percentage basis the fees here are significantly smaller than fees approved in many other cases. *See, e.g., In re LSP Energy Ltd. P'ship*, No. 12-10460 (Bankr. D. Del Feb. 27, 2012) (approving 1.25-percent commitment fee); *In re Friendly Ice Cream Corp.*, No. 11-13167 (Bankr. D. Del. Nov. 2, 2011) (approving certain letter of credit fees including a 2-percent issuance fee); *In re Sea Launch Co., L.L.C.*, No. 09-12153 (Bankr. D. Del. May 12, 2010) (approving 3.75-percent DIP break-up fee); *In re Cooper-Standard Holdings Inc.*, No. 09-12743 (Bankr. D. Del. Sept. 2, 2009) (approving 2.5-percent upfront fee and 2.5-percent exit fee); *In re Hayes Lemmerz Int'l, Inc.*, No. 09-11655 (Bankr. D. Del. June 15, 2009) (approving 3-percent exit fee); *In re Aleris Int'l. Inc.*, No. 09-10478 (Bankr. D. Del. Mar. 18, 2009) (approving 3.5-percent exit fee and 3.5% front-end net adjustment against each lender's initial commitment); *In re Dura Auto. Sys., Inc.*, No. 06-11202 (Bankr. D. Del. Jan. 30, 2008) (approving a 2.5-percent fee related to refinancing and extending a postpetition financing facility); *see also In re Great Atl. & Pac. Tea Co.*, No. 10-24549 (Bankr. S.D.N.Y. Jan. 11, 2011) (approving 3-percent letter of credit fee); *In re InSight Health Servs. Holdings Corp.*, No. 10-16564 (Bankr. S.D.N.Y. Jan. 4, 2011) (approving 2.5-percent DIP closing fee); *In re Neff Corp.*, No. 10-12610 (Bankr. S.D.N.Y. June 30, 2010) (approving 3.1-percent DIP and exit facility fee); *In re Reader's Digest Ass'n*, No. 09-23529 (Bankr. S.D.N.Y. Oct. 6, 2009) (approving 3-percent exit fee); *In re Lear Corp.*, No. 09-14326 (Bankr. S.D.N.Y. Aug. 4, 2009) (approving 5-percent upfront fee and a 1-percent exit/conversion fee); *In re Gen. Growth Props.,*

*Inc.*, No. 09-11977 (Bankr. S.D.N.Y. May 14, 2009) (approving 3.75-percent exit fee); *In re Tronox Inc.*, No. 09-10156 (Bankr. S.D.N.Y. Feb. 9, 2009) (approving an upfront 3-percent facility fee). Accordingly, the Court should authorize the TCEH Debtors to pay the fees provided under the DIP Documents in connection with entering into those agreements.

68.    The terms of the DIP Documents, including the key provisions described above, constitute the most favorable terms on which the TCEH Debtors could obtain needed postpetition financing.

**III.    The Scope of the Carve Out and the RCT Reclamation Support Carve Out is Appropriate.**

69.    The proposed DIP Facility subjects the security interests and administrative expense claims of the DIP Lenders to the Carve Out and the RCT Reclamation Support Carve Out (if any). Carve outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel. *See Ames*, 115 B.R. at 40. The DIP Facility does not directly or indirectly deprive the TCEH Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these cases. *See Ames*, 115 B.R. at 38 (observing that courts insist on carve outs for professionals representing parties-in-interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). Additionally, the Carve Out protects against administrative insolvency during the course of these chapter 11 cases by ensuring that assets remain for the payment of U.S. Trustee fees and professional fees of the TCEH Debtors and a committee of unsecured creditors, notwithstanding the grant of superpriority and administrative liens and claims under the DIP Facility.

70.     Furthermore, as described above, the TCEH Debtors are obligated to secure their reclamation obligations to the RCT.  The TCEH Debtors, after consultation with the DIP Lenders, the Prepetition First Lien Agent, and their respective advisors, believe that securing the RCT reclamation obligations with the RCT Reclamation Support Carve Out is preferable to other alternatives, including a letter of credit, because the Debtors will be able to avoid significant fees associated with such alternatives.  Accordingly, the TCEH Debtors believe the scope of the RCT Reclamation Support Carve Out is appropriate.

**IV.     The DIP Lenders Should Be Deemed Good Faith Lenders under Section 364(e) of the Bankruptcy Code.**

71.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Specifically, section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

72.     The DIP Facility was negotiated in good faith and at arm's length among the TCEH Debtors, the DIP Agent, the DIP Lenders, and the DIP L/C Issuers, and all of the DIP Facility obligations will be extended by the DIP Lenders and the DIP L/C Issuers in good faith (as such term is used in section 364(e) of the Bankruptcy Code).  No consideration is being provided to any party in connection with the DIP Financing other than as described in this Motion, the Commitment Letter, and the Fee Letter.  Moreover, the DIP Facility has been

extended in express reliance upon the protections afforded by section 364(e) of the Bankruptcy Code and the DIP Agent, the DIP Lenders, and the DIP L/C Issuers should be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Interim Order or any provision thereof is vacated, reversed, or modified on appeal or otherwise. *See* 11 U.S.C. § 364(e). Accordingly, the Court should find that the DIP Agent, the DIP Lenders, and the DIP L/C Issuers are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by that section.

## V.    Approval of the DIP Facility on an Interim Basis is Necessary to Prevent Immediate and Irreparable Harm.

73.    Bankruptcy Rule 4001(c)(2) governs the procedures for obtaining authorization to obtain postpetition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 14 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. Proc. 4001(c)(2).

74.    In examining requests for interim relief under this rule, courts in this jurisdiction generally apply the same business judgment standard applicable to other business decisions. *See Ames Dep't Stores*, 115 B.R. at 36.

75.    The Debtors and their estates will suffer immediate and irreparable harm if the relief requested in this Motion, including authorizing the Debtors to borrow up to $2,700,000,000 on an interim basis, is not granted promptly after the Petition Date. The Debtors anticipate that the commencement of the chapter 11 cases will significantly and immediately increase the demands on their free cash as a result of, among other things, the costs of

administering the chapter 11 cases and addressing key constituents' concerns regarding the Debtors' financial health and ability to continue operations in light of the chapter 11 cases. Accordingly, the Debtors have an immediate need for access to liquidity to fund, among other things, adequate protection payments, working capital needs, and to maintain ongoing business relationships—all of which are required to preserve and maintain the Debtors' enterprise value for the benefit of all parties in interest.

76.    The importance of a debtor's ability to secure postpetition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized in this district in similar circumstances. *See, e.g., In re Exide Techs.*, No. 13-11482 (Bankr. D. Del June 11, 2013); *In re LSP Energy Ltd. P'ship.*, No. 12-10460 (Bankr. D. Del. Nov. 27, 2012); *In re S. Air Holdings, Inc.*, No. 12-12690 (Bankr. D. Del. Oct. 25, 2012); *In re Neb. Book Co.*, No. 11-12005 (Bankr. D. Del. July 21, 2011); *In re Friendly Ice Cream Corp.*, No. 11-13167 (Bankr. D. Del. Oct. 6, 2011); *In re Appleseed's Intermediate Holdings LLC*, No. 11-10160 (Bankr. D. Del. Feb. 23, 2011); *In re Taylor-Wharton Int'l LLC*, No. 09-14089 (Bankr. D. Del. Nov. 20, 2009); *In re Visteon Corp.*, No. 09-11786 (Bankr. D. Del. Nov. 12, 2009). Accordingly, for the reasons set forth above, prompt entry of the DIP Order is necessary to avert immediate and irreparable harm to the Debtors' estates and is consistent with, and warranted under, Bankruptcy Rules 4001(b)(2) and (c)(2).

**VI.    Modification of the Automatic Stay Provided Under Section 362 of the Bankruptcy Code is Appropriate Under the Circumstances.**

77.    The DIP Documents and the proposed Interim Order contemplate that the automatic stay imposed under section 362(a) of the Bankruptcy Code shall be vacated or modified to the extent necessary to effectuate all of the terms and provisions contained therein, including, without limitation, to:  (a) permit the TCEH Debtors to grant the DIP Liens and the

44

DIP Superpriority Claims; (b) permit the TCEH Debtors to perform such acts as the DIP Agent, the DIP Lenders, and the DIP L/C Issuers each may request in its sole discretion to assure the perfection and priority of the DIP Liens; (c) permit the TCEH Debtors to incur all liabilities and obligations to the DIP Agent, the DIP Lenders, and the DIP L/C Issuers under the DIP Documents and the Interim Order; (d) authorize the TCEH Debtors to make payments, and the DIP Agent, the DIP Lenders, and the DIP L/C Issuers to retain and apply payments made, in accordance with the terms of the Interim Order; and (e) permit the DIP Agent to exercise and enforce its rights and remedies as provided in the Interim Order. The Interim Order provides, however, that the DIP Agent must provide the TCEH Debtors, the U.S. Trustee, and lead counsel to any committee appointed in these chapter 11 cases with five calendar days' written notice before exercising any enforcement rights or remedies, which will allow the TCEH Debtors and other interested parties to seek an emergency hearing before the Court solely for the purpose of contesting whether an Event of Default has occurred and/or is continuing.

78.     Stay modification provisions of this sort are ordinary and usual features of debtor-in-possession financing facilities and, in the TCEH Debtors' business judgment, are reasonable under the present circumstances.  Accordingly, the Court should modify the automatic stay to the extent contemplated under the DIP Credit Agreement and the proposed Orders.

## Request For Final Hearing

79.     Pursuant to Bankruptcy Rules 4001(c)(2) and Local Bankruptcy Rule 4001-2(c), the Debtors requests that the Court set a date for the final hearing that is as soon as practicable, but in no event later than 45 days following the Petition Date, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

45

**Waiver of Bankruptcy Rules 6004(a) and 6004(h)**

80.    To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

**Notice**

81.    The Debtors have provided notice of this Motion to:  (a) the Office of the U.S. Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) Citibank, N.A., in its capacity as First Lien Credit Agent under the First Lien Credit Agreement, and Wilmington Trust, N.A., upon the effectiveness of its appointment as successor First Lien Credit Agent; (d) Bank of New York Mellon Trust Company, N.A., in its capacity as indenture trustee under:  (i) the TCEH unsecured pollution control revenue bonds; and (ii) the EFCH 2037 Notes due 2037, and counsel thereto; (e) American Stock Transfer & Trust Company, LLC, in its capacity as indenture trustee under:  (i) the 9.75% EFH senior unsecured notes due 2019;  (ii) the 10.0% EFH senior unsecured notes due 2020; (iii) the 10.875% EFH LBO senior unsecured notes due 2017; (iv) the 11.25%/12.0% EFH LBO toggle notes due 2017; (v) the 5.55% EFH legacy notes (series P) due 2014; (vi) the 6.50% EFH legacy notes (series Q) due 2024; and (vii) the 6.55% EFH legacy notes (series R) due 2034, and counsel thereto; (f) Computershare Trust Company, N.A. and Computershare Trust Company of Canada, in their capacities as indenture trustee under:  (i) the 11.0% EFIH senior secured second lien notes due 2021; and (ii) the 11.75% EFIH senior secured second lien notes due 2022; (g) UMB Bank, N.A. in its capacity as indenture trustee under:  (i) the 9.75% EFIH senior unsecured notes due 2019; and (ii) the 11.25%/12.25% EFIH senior toggle notes due 2018, and counsel thereto; (h) BOKF,

NA, dba Bank of Arizona, in its capacity as indenture trustee under 11.50% TCEH senior secured notes due 2020; (i) CSC Trust Company of Delaware in its capacity as indenture trustee under: (i) the 6.875% EFIH senior secured notes due 2017; and (ii) the 10.0% EFIH senior secured notes due 2020, and counsel thereto; (j) Law Debenture Trust Company of New York in its capacity as indenture trustee under: (i) the 10.25% TCEH senior unsecured notes due 2015; and (ii) the 10.50%/11.25% TCEH senior toggle notes due 2016, and counsel thereto; (k) Wilmington Savings Fund Society, FSB in its capacity as indenture trustee under the 15.0% TCEH senior secured second lien notes due 2021, and counsel thereto; (l) counsel to certain holders of claims against the Debtors regarding each of the foregoing described in clauses (c) through (k); (m) the agent for the TCEH debtor-in-possession financing facility and counsel thereto; (n) the agent for the EFIH debtor-in-possession financing facility and counsel thereto; (o) counsel to certain holders of equity in Texas Energy Future Holdings Limited Partnership; (p) counsel to Oncor; (q) the SEC; (r) the Internal Revenue Service; (s) the Office of the United States Attorney for the District of Delaware; (t) the Office of the Texas Attorney General on behalf of the PUC; (u) counsel to ERCOT; (v) the RCT; (w) the counterparties to the First Lien Commodity Hedges and First Lien Interest Rate Swaps; and (x) counsel to the unofficial committee of certain TCEH first lien debt holders. As this Motion is seeking "first day" relief, within forty eight hours of the entry of an order respecting this Motion, the Debtors will serve copies of this Motion and the order respecting this Motion as required by Local Bankruptcy Rule 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

82.    No prior request for the relief sought in this Motion has been made to this or any

other court.

[*Remainder of page intentionally left blank.*]

WHEREFORE, the TCEH Debtors respectfully request that the Court enter the Interim Order, substantially in the form attached hereto as **Exhibit A**, and set a date for a hearing to consider entry of the Final Order.

Wilmington, Delaware
Dated:  April 29, 2014

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 651-7700
Facsimile:     (302) 651-7701
Email:           collins@rlf.com
                     defranceschi@rlf.com
                     madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
Richard M. Cieri (*pro hac vice* pending)
Edward O. Sassower, P.C. (*pro hac vice* pending)
Stephen E. Hessler (*pro hac vice* pending)
Brian E. Schartz (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:     (212) 446-4900
Email:           richard.cieri@kirkland.com
                     edward.sassower@kirkland.com
                     stephen.hessler@kirkland.com
                     brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (*pro hac vice* pending)
Chad J. Husnick (*pro hac vice* pending)
Steven N. Serajeddini (*pro hac vice* pending)
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:     (312) 862-2200
Email:           james.sprayregen@kirkland.com
                     chad.husnick@kirkland.com
                     steven.serajeddini@kirkland.com

Proposed Co-Counsel to the Debtors and Debtors in Possession

## EXHIBIT A

**Proposed Interim Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-_____ (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## INTERIM ORDER (A) APPROVING
## POSTPETITION FINANCING FOR TEXAS COMPETITIVE
## ELECTRIC HOLDINGS COMPANY LLC AND CERTAIN OF
## ITS DEBTOR AFFILIATES, (B) GRANTING LIENS AND PROVIDING
## SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (C) MODIFYING
## THE AUTOMATIC STAY, AND (D) SCHEDULING A FINAL HEARING

Upon the motion (the "DIP Motion") of Texas Competitive Electric Holdings Company LLC (the "Borrower" or "TCEH"), Energy Future Competitive Holdings Company LLC (the "Parent Guarantor"), and each of the Subsidiary Guarantors (as defined in the DIP Credit Agreement (as defined herein)) (the Subsidiary Guarantors, together with the Parent Guarantor, the "Guarantors"), each as a debtor and debtor-in-possession (collectively, the "TCEH Debtors") in the above-captioned chapter 11 cases of the TCEH Debtors (collectively, the "Cases"), pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d), and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which the debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules"), seeking entry of an interim order (this "Interim Order"), inter alia:

       (i)       authorizing the Borrower and the Parent Guarantor to enter into that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement, to be dated on or about the date this Interim Order is entered (as amended, restated, supplemented, or otherwise modified from time to time, the "DIP Credit Agreement"), between the Borrower, the Parent Guarantor, the financial institutions from time to time party thereto as lenders (the "DIP Lenders"), the financial institutions from time to time party thereto as letter of credit issuers (the "DIP L/C Issuers"), Citibank, N.A., as administrative agent and collateral agent (in such capacities, the "DIP Agent"),[2] and the other agents and entities from time to time party thereto, substantially in the form of Exhibit A annexed to the DIP Motion, to obtain secured postpetition financing (the "Financing") on a superpriority basis, consisting of (a) a revolving credit facility (the "Revolving Credit Facility") in an aggregate principal amount of up to $1,950,000,000; (b) a term credit facility (the "Term Loan Facility") in an aggregate principal amount of up to $1,425,000,000, of which up to $800,000,000 may be applied by TCEH to fund the General L/C Collateral Account to support General Letters of Credit (each, as defined in the DIP Credit Agreement); (c) a delayed-draw term credit facility (the "Delayed-Draw Term Facility") in an aggregate principal amount of up to $1,100,000,000, the proceeds of which, if funded, will be applied by TCEH to fund the RCT L/C Collateral Account to support RCT Letters of Credit (each, as defined in the DIP Credit Agreement); (d) obligations owed to the General Letter of Credit Issuer (as defined in

---

[2]    As used herein, the term "DIP Agent" refers to Citibank, N.A., as administrative agent under the DIP Credit Agreement, Citibank, N.A., as collateral agent under the DIP Credit Agreement, or both, as the context requires. All references in this Interim Order to the DIP Agent with respect to the Secured Hedge Banks or the Secured Cash Management Banks (each, as defined herein) shall mean Citibank, N.A., in its capacity as collateral agent. Citibank, N.A., in its capacity as administrative agent, has no duties or obligations to the Secured Hedge Banks or the Secured Cash Management Banks.

the DIP Credit Agreement) (without duplication of any other obligations described in clauses (a), (b), or (c) above) pursuant to a cash collateralized letter of credit facility (the "General Letter of Credit Facility") in an aggregate stated amount of up to $800,000,000, as such amount may be increased as agreed in writing between TCEH and the General Letter of Credit Issuers providing such increased amount; and (e) obligations owed to the RCT Letter of Credit Issuer (as defined in the DIP Credit Agreement) (without duplication of any other obligations described in clauses (a), (b), (c), or (d) above) pursuant to a cash collateralized letter of credit facility (the "RCT Letter of Credit Facility" and, collectively with the Revolving Credit Facility, the Term Loan Facility, the Delayed-Draw Term Facility, and the General Letter of Credit Facility, the "DIP Facility") in an aggregate stated amount of up to $1,100,000,000;

(ii)     authorizing the Parent Guarantor and each of the Subsidiary Guarantors to enter into that certain Guarantee, to be dated on or about the date this Interim Order is entered (as amended, restated, supplemented, or otherwise modified from time to time, the "DIP Guarantee");

(iii)     authorizing each of the TCEH Debtors to execute and deliver the DIP Credit Agreement, the DIP Guarantee, the Fee Letter (as defined in the DIP Credit Agreement), and the other related Credit Documents (as defined in the DIP Credit Agreement) (collectively, the "DIP Documents") and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

(iv)     granting the DIP Facility and all obligations owing thereunder and under the DIP Documents, the Secured Commodity Hedging Agreements, the Secured Hedging Agreements, and the Secured Cash Management Agreements (each, as defined in the DIP Credit Agreement) to the DIP Agent, the DIP Lenders, the DIP L/C Issuers, the Secured Hedge Banks, and the

Secured Cash Management Banks (collectively, and including all "Obligations" as described in the DIP Credit Agreement, including, without limitation, (A) obligations (the "Secured Hedge Obligations") owing under or in connection with the Secured Commodity Hedging Agreements or the Secured Hedging Agreements with the TCEH Debtors and (B) obligations (the "Secured Cash Management Obligations") owing under or in connection with the Secured Cash Management Agreements with the TCEH Debtors, the "DIP Obligations") allowed superpriority administrative expense claims in each of the Cases and any Successor Cases (as defined herein);

(v)    granting to the DIP Agent, for the benefit of itself, its sub-agents, the DIP Lenders, the DIP L/C Issuers, Hedge Banks (as defined in the DIP Credit Agreement) that are parties to Secured Commodity Hedging Agreements or Secured Hedging Agreements (the "Secured Hedge Banks") with the TCEH Debtors,[3] and Cash Management Banks (as defined in the DIP Credit Agreement) that are parties to Secured Cash Management Agreements (the "Secured Cash Management Banks") with the TCEH Debtors, automatically perfected security interests in and liens upon all of the DIP Collateral (as defined herein), including, without limitation, all property constituting "Cash Collateral," as defined in section 363(a) of the Bankruptcy Code, which security interests and liens shall be subject to the priorities set forth herein;

(vi)    authorizing and directing the TCEH Debtors to pay the principal, interest, fees, expenses, and other amounts payable and/or reimbursable under the DIP Documents, including the Fee Letter, as such amounts become due, including, without limitation, letter of credit fees (including issuance and other related charges), commitment fees, closing fees, arrangement fees,

---

[3]    For the avoidance of doubt, the TCEH Debtors are only authorized to pledge collateral for the benefit of Secured Hedge Banks pursuant to the terms of the *Interim Order Authorizing the Debtors To (A) Continue Performing Under the Prepetition Hedging and Trading Arrangements, (B) Pledge Collateral and Honor Obligations Thereunder, and (C) Enter Into and Perform Under Trading Continuation Agreements and New Postpetition Hedging and Trading Arrangements.*

incentive fees, and administrative agent's fees, all to the extent provided in, and in accordance with the terms of, the DIP Documents;

(vii)    vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents, as limited pursuant hereto, and this Interim Order; and

(viii)    scheduling a final hearing (the "Final Hearing") to consider the relief requested in the DIP Motion on a final basis and approving the form of notice with respect to the Final Hearing.

The Court having considered the DIP Motion, the *Declaration of Paul Keglevic, Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of Energy Future Holdings Corp., et al., in Support of First Day Motions*, sworn to on April 29, 2014, the exhibits attached thereto, the *Declaration of Stephen Goldstein in Support of (I) the Motion of Texas Competitive Electric Holdings Company LLC and Certain of Its Debtor Affiliates for Entry of Interim and Final Orders (A) Approving Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing and (II) the Motion of Texas Competitive Electric Holdings Company LLC and Certain of Its Debtor Affiliates for Entry of Interim and Final Orders (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing*, sworn to on April 29, 2014, the DIP Documents, and the evidence submitted or adduced and the arguments of counsel made at the interim hearing held on April [__], 2014 (the "Interim Hearing"); and notice of the Interim Hearing having been given in accordance with rules 4001(b), (c), and (d), and 9014 of the Bankruptcy Rules; and the Interim Hearing to consider the interim relief requested in the DIP

Motion having been held and concluded; and all objections, if any, to the interim relief requested in the DIP Motion having been withdrawn, resolved, or overruled by the Court; and it appearing to the Court that granting the interim relief requested is necessary to avoid immediate and irreparable harm to the TCEH Debtors and their estates pending the Final Hearing, is otherwise fair and reasonable and in the best interests of the TCEH Debtors and their estates, creditors, and other parties in interest, and is essential for the continued operation of the TCEH Debtors' businesses; and it further appearing that the TCEH Debtors are unable to obtain unsecured credit for money borrowed allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code; and after due deliberation and consideration and for good and sufficient cause appearing therefor;

BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING BY THE TCEH DEBTORS, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[4]

      A.     Petition Date.  On April 29, 2014 (the "Petition Date"), each of the TCEH Debtors filed a separate voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court") commencing these Cases. On [ ___ ], 2014, the Court entered an order approving the joint administration of these Cases.

      B.     Debtors-in-Possession.  The TCEH Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these Cases.

---

[4]    Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

C.    <u>Jurisdiction and Venue</u>.    The Court has jurisdiction over this matter, these proceedings, and the persons and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the TCEH Debtors confirm their consent pursuant to rule 9013-1(f) of the Local Bankruptcy Rules to the entry of a final order by the Court in connection with the DIP Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution. Venue for the Cases and proceedings on the DIP Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

D.    <u>Committee Formation</u>.  As of the date hereof, the United States Trustee for the District of Delaware (the "<u>U.S. Trustee</u>") has not appointed an official committee of unsecured creditors in these Cases pursuant to section 1102 of the Bankruptcy Code (the "<u>Creditors' Committee</u>").

E.    <u>Findings Regarding Postpetition Financing</u>.

(i)    <u>Request for Postpetition Financing</u>.  The TCEH Debtors seek authority to obtain the DIP Facility on the terms described herein and in the DIP Documents to administer their Cases and fund their operations.  At the Final Hearing, the TCEH Debtors will seek final approval of the proposed postpetition financing arrangements pursuant to a proposed final order (the "<u>Final Order</u>"), which shall be in form and substance acceptable to the DIP Agent, and notice of which Final Hearing and Final Order will be provided in accordance with this Interim Order.

(ii)    Priming of Liens of Prepetition Secured Creditors.  The priming of the Prepetition First Priority Liens[5] and the Prepetition Second Priority Liens of the Prepetition Secured Creditors in the Prepetition Collateral (each, as defined in the Interim Cash Collateral Order) under section 364(d) of the Bankruptcy Code, as contemplated by the DIP Facility and as further described below, will enable the TCEH Debtors to obtain the DIP Facility and to continue to operate their businesses for the benefit of the estates and their creditors.

(iii)    Need for Postpetition Financing.  The TCEH Debtors' need to obtain credit on an interim basis pursuant to the DIP Facility is immediate and critical to enable the TCEH Debtors to continue operations and to administer and preserve the value of their estates. The ability of the TCEH Debtors to finance their operations, maintain business relationships with their vendors, suppliers, and customers, pay their employees, and otherwise finance their operations requires the availability of working capital from the DIP Facility, the absence of which would immediately and irreparably harm the TCEH Debtors, their estates, and their creditors, and the possibility for a successful reorganization.  The TCEH Debtors do not have sufficient available sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business without the DIP Facility.

(iv)    No Credit Available on More Favorable Terms.  Given their current financial condition, financing arrangements, and capital structure, the TCEH Debtors are unable to obtain financing from sources other than the DIP Lenders and the DIP L/C Issuers on terms more favorable than the DIP Facility.  The TCEH Debtors have been unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.

---

[5]    Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the *Interim Order (A) Authorizing Use of Cash Collateral for Texas Competitive Electric Holdings Company LLC, (B) Granting Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing* (the "Interim Cash Collateral Order").

The TCEH Debtors have also been unable to obtain credit (a) having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the TCEH Debtors and their estates that is not otherwise subject to a lien, or (c) secured solely by a junior lien on property of the TCEH Debtors and their estates that is subject to a lien. Financing on a postpetition basis is not otherwise available without granting the DIP Agent, for the benefit of itself, its sub-agents, the DIP Lenders, the DIP L/C Issuers, the Secured Hedge Banks, and the Secured Cash Management Banks, (x) perfected security interests in and liens on (each, as provided herein) all of the TCEH Debtors' existing and after-acquired assets with the priorities set forth in paragraph 8 of this Interim Order, (y) superpriority claims and liens, and (z) the other protections set forth in this Interim Order.

F.      Use of Proceeds of the DIP Facility. As a condition to entry into the DIP Credit Agreement and the extension of credit under the DIP Facility, the DIP Agent, the DIP Lenders, and the DIP L/C Issuers require, and the TCEH Debtors have agreed, that proceeds of the Term Loans and the Revolving Credit Loans (each, as defined in the DIP Credit Agreement) shall be used, in each case in a manner consistent with the terms and conditions of the DIP Documents, to (a) finance any and all working capital needs and for any other general corporate purposes, including, without limitation, to (i) provide collateral support in respect of financial or physical trading transactions, including commodities transactions (in each case, subject to the terms of all applicable interim and final orders entered by the Court in the Cases) and (ii) comply with any legal and/or regulatory requirements of governmental and quasi-governmental entities (including for posting bonds and remediation or reclamation obligations of any nature (such as with the Railroad Commission of Texas (the "RCT")), complying with any statutory or regulatory

requirements, and for self-bonding in respect of permits and licenses) applicable to the TCEH

Debtors (and, to the limited extent set forth in the DIP Documents, of the Specified Affiliates (as

defined in the DIP Credit Agreement)), (b) provide for Letters of Credit (as defined in the DIP

Credit Agreement), and (c) pay related transaction costs, fees, liabilities, and expenses, and other

administration costs incurred in connection with the Cases and the commitment, negotiation,

syndication, documentation (including any commitment letters), execution, and closing of the

DIP Facility, as provided for in the DIP Credit Agreement and the DIP Documents. If funded,

the proceeds of the Delayed-Draw Term Loans (as defined in the DIP Credit Agreement) will be

used to fund the RCT L/C Collateral Account. The General Letters of Credit may be used (x) for

general corporate purposes, including, without limitation, providing collateral support in respect

of financial or physical trading transactions, including commodities transactions related to the

TCEH Debtors' businesses and activities (in each case, subject to the terms of all applicable

interim and final orders entered by the Court in the Cases) (and, to the limited extent set forth in

the DIP Documents, of the Specified Affiliates) and (y) to comply with any legal and/or

regulatory requirements of governmental and quasi-governmental entities (including for posting

bonds and remediation or reclamation obligations of any nature (such as with the RCT),

complying with any statutory or regulatory requirements, and for self-bonding in respect of

permits and licenses) applicable to the TCEH Debtors. If issued, the RCT Letters of Credit will

be used for the purpose of satisfying bonding requirements of the RCT.

      G.    Section 506(c). In light of the DIP Agent's, the DIP Lenders', and the DIP L/C

Issuers' agreement to subordinate their liens and superpriority claims to the Carve Out and the

RCT Reclamation Support Carve Out (each, as defined herein), the DIP Agent, the DIP Lenders,

and the DIP L/C Issuers are each entitled to, subject to entry of a Final Order, a waiver of the provisions of section 506(c) of the Bankruptcy Code.

      H.      <u>Good Faith of the DIP Agent, the DIP Lenders, the DIP L/C Issuers, and the Joint Lead Arrangers</u>.

      (i)      <u>Willingness To Provide Financing</u>. The DIP Lenders have indicated a willingness to provide financing to the TCEH Debtors subject to (a) the entry of this Interim Order and the Final Order, (b) approval of the terms and conditions of the DIP Facility and the DIP Documents, and (c) entry of findings by the Court that such financing is essential to the TCEH Debtors' estates, that the DIP Agent, the DIP Lenders, and the DIP L/C Issuers are extending credit to the TCEH Debtors pursuant to the DIP Documents in good faith, and that the DIP Agent's, the DIP Lenders', and the DIP L/C Issuers' claims, superpriority claims, security interests and liens, and other protections granted pursuant to this Interim Order and the DIP Documents will have the protections provided in section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument, or reconsideration of this Interim Order or any other order.

      (ii)      <u>Business Judgment and Good Faith Pursuant to Section 364(e)</u>. The terms and conditions of the DIP Facility and the DIP Documents, and the fees paid and to be paid thereunder, are fair, reasonable, and the best available to the TCEH Debtors under the circumstances, reflect the TCEH Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration. The DIP Facility was negotiated in good faith and at arm's length among the TCEH Debtors, the DIP Agent, the DIP Lenders, the DIP L/C Issuers, and the Joint Lead Arrangers (as defined in the DIP Credit Agreement). Credit to be extended under the DIP Facility shall be deemed to have

been so allowed, advanced, made, used, or extended in good faith, and for valid business purposes and uses, within the meaning of section 364(e) of the Bankruptcy Code, and the DIP Agent, the DIP Lenders, the DIP L/C Issuers, and the Joint Lead Arrangers are therefore entitled to the protection and benefits of section 364(e) of the Bankruptcy Code and this Interim Order.

       I.    <u>Good Cause; Immediate Entry</u>.  The relief requested in the DIP Motion is necessary, essential, and appropriate, and is in the best interests of, and will benefit, the TCEH Debtors and their estates, creditors, and other parties in interest, as its implementation will, <u>inter alia</u>, provide the TCEH Debtors with the necessary liquidity to (a) minimize the disruption to the TCEH Debtors' business and ongoing operations, (b) preserve and maximize the value of the TCEH Debtors' estates for the benefit of all of the TCEH Debtors' creditors and other parties in interest, and (c) avoid immediate and irreparable harm to the TCEH Debtors and their estates, creditors, other parties in interest, businesses, employees, and assets.  Thus, sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

       J.    <u>Notice</u>.  In accordance with rules 2002, 4001(c) and (d), and 9014 of the Bankruptcy Rules, and the Local Bankruptcy Rules, notice of the Interim Hearing and the emergency relief requested in the DIP Motion has been provided by the TCEH Debtors, whether by facsimile, email, overnight courier or hand delivery, to certain parties in interest, including: (a) the Office of the U.S. Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) Citibank, N.A., in its capacity as First Lien Credit Agent under the First Lien Credit Agreement, and Wilmington Trust, N.A., upon the effectiveness of its appointment as successor First Lien Credit Agent; (d) Bank of New York Mellon Trust Company, N.A., in its capacity as indenture trustee under:  (i) the TCEH unsecured pollution

control revenue bonds; and (ii) the EFCH 2037 Notes due 2037; (e) American Stock Transfer & Trust Company, LLC, in its capacity as indenture trustee under: (i) the 9.75% EFH senior unsecured notes due 2019; (ii) the 10.0% EFH senior unsecured notes due 2020; (iii) the 10.875% EFH LBO senior unsecured notes due 2017; (iv) the 11.25%/12.0% EFH LBO toggle notes due 2017; (v) the 5.55% EFH legacy notes (series P) due 2014; (vi) the 6.50% EFH legacy notes (series Q) due 2024; and (vii) the 6.55% EFH legacy notes (series R) due 2034; (f) Computershare Trust Company, N.A. and Computershare Trust Company of Canada, in their capacities as indenture trustee under: (i) the 11.0% EFIH senior secured second lien notes due 2021; and (ii) the 11.75% EFIH senior secured second lien notes due 2022; (g) UMB Bank, N.A. in its capacity as indenture trustee under: (i) the 9.75% EFIH senior unsecured notes due 2019; and (ii) the 11.25%/12.25% EFIH senior toggle notes due 2018; (h) BOKF, NA, dba Bank of Arizona, in its capacity as indenture trustee under 11.50% TCEH senior secured notes due 2020; (i) CSC Trust Company of Delaware in its capacity as indenture trustee under: (i) the 6.875% EFIH senior secured notes due 2017; and (ii) the 10.0% EFIH senior secured notes due 2020; (j) Law Debenture Trust Company of New York in its capacity as indenture trustee under: (i) the 10.25% TCEH senior unsecured notes due 2015; and (ii) the 10.50%/11.25% TCEH senior toggle notes due 2016; (k) Wilmington Savings Fund Society, FSB in its capacity as indenture trustee under the 15.0% TCEH senior secured second lien notes due 2021; (l) counsel to certain holders of claims against the Debtors regarding each of the foregoing described in clauses (c) through (k); (m) the agent for the TCEH debtor-in-possession financing facility and counsel thereto; (n) the agent for the EFIH debtor-in-possession financing facility and counsel thereto; (o) counsel to certain holders of equity in Texas Energy Future Holdings Limited Partnership; (p) counsel to Oncor; (q) the SEC; (r) the Internal Revenue Service; (s) the Office of the United

States Attorney for the District of Delaware; (t) the Office of the Texas Attorney General on behalf of the PUC; (u) counsel to ERCOT; (v) the RCT; (w) the counterparties to the First Lien Commodity Hedges and First Lien Interest Rate Swaps; and (x) counsel to the unofficial committee of certain TCEH first lien debt holders. The parties have made reasonable efforts to afford the best notice possible under the circumstances to permit the relief set forth in this Interim Order, and no other or further notice is or shall be required.

Based upon the foregoing findings and conclusions, the DIP Motion, and the record before the Court with respect to the DIP Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.      <u>Interim Financing Approved</u>.    The DIP Motion is granted and the Interim Financing (as defined herein) is authorized and approved, subject to the terms and conditions set forth in this Interim Order.

2.      <u>Objections Overruled</u>.    All objections to the Interim Financing or entry of the Interim Order, to the extent not withdrawn or resolved, are hereby overruled.  This Interim Order shall be effective immediately upon its entry.

**<u>DIP Facility Authorization</u>**

3.      <u>Authorization of the DIP Financing</u>.    The TCEH Debtors are expressly and immediately authorized and empowered to execute and deliver the DIP Documents and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Documents, and to deliver all instruments and documents which may be required or necessary for the performance by the TCEH Debtors under the DIP Facility and the creation and perfection of the DIP Liens described in, and provided for by, this Interim Order and the DIP Documents.  The TCEH Debtors are hereby authorized and directed to pay, in

accordance with this Interim Order, the principal, interest, fees, expenses, reimbursement obligations with respect to Letters of Credit, and other amounts payable or reimbursable by the TCEH Debtors described in the DIP Documents and all other documents comprising the DIP Facility as such become due and without need to obtain further Court approval, including, without limitation, letter of credit fees (including issuance and other related charges), commitment fees, closing fees, arrangement fees, incentive fees, and administrative agent's fees, whether or not the transactions contemplated hereby are consummated, as provided for in the DIP Credit Agreement and the DIP Documents. All collections and proceeds, whether ordinary course or otherwise, will be deposited and applied as required by this Interim Order and the DIP Documents. Upon execution and delivery, the DIP Documents shall represent valid and binding obligations of the TCEH Debtors, enforceable against each of the TCEH Debtors and their estates in accordance with their terms.

4.      Authorization to Borrow.  Until the DIP Termination Date (as defined herein), and subject to the terms and conditions set forth in the DIP Documents, the DIP Facility, and this Interim Order, and to prevent immediate and irreparable harm to the TCEH Debtors' estates, the TCEH Debtors are hereby authorized to borrow money and obtain Letters of Credit under the DIP Facility, and the Guarantors are hereby authorized to guarantee such borrowings and the Borrower's obligations with respect to such Letters of Credit, consisting of (a) borrowings in an aggregate principal amount of up to $800,000,000 under the Revolving Credit Facility, (b) borrowings in an aggregate principal amount of up to $1,100,000,000 under the Delayed-Draw Term Facility, the proceeds of which, if funded, will be applied by TCEH to fund the RCT L/C Collateral Account, and (c) borrowings in an aggregate principal amount of up to $800,000,000 under the Term Loan Facility, of which up to $800,000,000 may be applied by

TCEH to fund the General L/C Collateral Account (collectively, the "Interim Financing"). Notwithstanding anything to the contrary in this Interim Order or in the DIP Credit Agreement, if the TCEH Debtors at any time request any Incremental Facilities (as such term is defined in the DIP Credit Agreement) from the DIP Agent and otherwise satisfy the relevant requirements under the DIP Documents, the TCEH Debtors shall be required to seek Court approval of such Incremental Facilities.

5.     Use of DIP Facility Proceeds.  Immediately upon entry of this Interim Order, the TCEH Debtors are authorized to draw upon the DIP Facility and use advances of credit under the DIP Facility only for the purposes specifically set forth in, and subject to the terms and conditions of, this Interim Order and the DIP Documents.

6.     DIP Obligations.  The DIP Obligations shall be enforceable against the TCEH Debtors, their estates, and any successors thereto, including, without limitation, any trustee appointed in the Cases, any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases").  On the DIP Termination Date, (a) the DIP Obligations shall be due and payable, without notice or demand, to the extent provided for in the DIP Credit Agreement, and (b) unless all the DIP Obligations (excluding the Secured Hedge Obligations, the Secured Cash Management Obligations, and Contingent Obligations (as defined in the DIP Credit Agreement)) have been indefeasibly paid in full, in cash, all Commitments (as defined in the DIP Credit Agreement) have been terminated, and all Letters of Credit have been cancelled (or all such Letters of Credit have been fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the applicable DIP L/C Issuers), the use of the DIP Collateral, including Cash Collateral, shall automatically cease.

7.     DIP Liens.  To secure the DIP Obligations, effective immediately upon entry of this Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent, for the benefit of itself, its sub-agents, the DIP Lenders, the DIP L/C Issuers, the Secured Hedge Banks, and the Secured Cash Management Banks, is hereby granted the following continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests and liens (all property identified in clauses (a), (b), and (c) below being collectively referred to as the "DIP Collateral"), subject to the payment of the Carve Out and the RCT Reclamation Support Carve Out (all such liens and security interests granted to the DIP Agent, for the benefit of itself, its sub-agents, the DIP Lenders, the DIP L/C Issuers, the Secured Hedge Banks, and the Secured Cash Management Banks, pursuant to this Interim Order and the DIP Documents, the "DIP Liens"):

(a)     First Lien on Cash Balances and Unencumbered Property.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all prepetition and postpetition property of the TCEH Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date, is not subject to valid, perfected, and non-avoidable liens, including, without limitation, all real and personal property, inventory, plant, fixtures, machinery, equipment, the RCT L/C Collateral Account and the General L/C Collateral Account (each, as defined in the DIP Credit Agreement), cash, any investment of such cash, accounts receivable, other rights to payment whether arising before or after the Petition Date (including, without limitation, postpetition intercompany claims of the TCEH Debtors), deposit accounts, investment property, supporting obligations, minerals, oil, gas, and as-extracted collateral, causes of action (including those arising under section 549 of the Bankruptcy Code and any related

17

action under section 550 of the Bankruptcy Code), royalty interests, chattel paper, contracts, general intangibles, documents, instruments, interests in leaseholds, letter of credit rights, patents, copyrights, trademarks, trade names, other intellectual property, capital stock and stock equivalents of subsidiaries, books and records pertaining to the foregoing, and to the extent not otherwise included, all proceeds, products, offspring, and profits of any and all of the foregoing (the "Unencumbered Property"). Notwithstanding the prior sentence, Unencumbered Property shall in any event exclude the TCEH Debtors' claims and causes of action under chapter 5 of the Bankruptcy Code (other than causes of action arising under section 549 of the Bankruptcy Code and any related action under section 550 of the Bankruptcy Code), or any other avoidance actions under the Bankruptcy Code (collectively, "Avoidance Actions"), but subject only to, and effective upon, entry of the Final Order, shall include any proceeds or property recovered, unencumbered, or otherwise the subject of successful Avoidance Actions, whether by judgment, settlement, or otherwise.

(b)    Priming of Liens of Prepetition Secured Creditors.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all prepetition and postpetition property of the TCEH Debtors, whether existing on the Petition Date or thereafter acquired, that is subject to valid, perfected, and non-avoidable liens presently held by any of the Prepetition Secured Creditors (as defined in the Interim Cash Collateral Order), excluding the Deposit L/C Loan Collateral Account to the extent of the Deposit L/C Obligations (each, as defined in the First Lien Credit Agreement (as defined in the Interim Cash Collateral Order)).  Such security interests and liens shall be senior in all respects to the interests in such property of any of the Prepetition Secured Creditors arising from current and future liens of any of the Prepetition

Secured Creditors (including, without limitation, Adequate Protection Liens (as defined in the Interim Cash Collateral Order)), but shall not be senior to any valid, perfected, and non-avoidable interests of other parties arising out of liens, if any, on such property existing immediately prior to the Petition Date, including the liens securing the Tex-La Indebtedness (as defined in the DIP Credit Agreement) (the "Permitted Prior Liens"), or to any valid, perfected, and non-avoidable interests in such property arising out of liens to which the liens of any of the Prepetition Secured Creditors become subject subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code.  Notwithstanding anything to the contrary in this Interim Order or any rights granted or action taken pursuant hereto or pursuant to the agreements and transactions approved hereby, any and all rights and priorities of the First Lien Lenders (as defined in the Interim Cash Collateral Order) holding Deposit L/C Loans (as defined in the First Lien Credit Agreement) (the "Deposit L/C Lenders") in or to the Deposit L/C Loan Collateral Account (as defined in the First Lien Credit Agreement) or any cash therein or proceeds thereof (including amounts corresponding to undrawn Deposit Letters of Credit, and to drawn Deposit Letters of Credit if and to the extent any such amounts are returned to the TCEH Debtors), whether held by the TCEH Debtors or in which the TCEH Debtors otherwise have an interest as of the Petition Date or thereafter (the "Deposit L/C Loan Collateral"), shall be preserved, including, without limitation, any and all priorities among the First Lien Lenders or as between the Deposit L/C Lenders and the other First Lien Lenders, and any and all rights, claims, and liens granted or provided by or through this Interim Order to the First Lien Lenders, to the extent applicable to any Deposit L/C Loan Collateral, shall have the same priorities, if any, among the First Lien Lenders, and as between the Deposit L/C Lenders and the other First Lien Lenders, as existed in the Deposit L/C Loan Collateral as of the Petition Date.  For the avoidance of doubt,

the preceding sentence delineates the rights and priorities among the First Lien Lenders and as between the Deposit L/C Lenders and the other First Lien Lenders only, and in no way affects the DIP Agent, the DIP Lenders, or the DIP L/C Issuers or their rights and priorities with respect to the First Lien Lenders, the Deposit L/C Lenders, or the Deposit L/C Loan Collateral.

(c)      Liens Junior to Certain Other Liens.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all prepetition and postpetition property of the TCEH Debtors (other than the property described in clause (a) or (b) of this paragraph 7, as to which the liens and security interests in favor of the DIP Agent will be as described in such clauses), whether existing on the Petition Date or thereafter acquired, that is subject to valid, perfected, and non-avoidable liens in existence immediately prior to the Petition Date, or to any valid and non-avoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (in each case, other than the Adequate Protection Liens), which security interests and liens in favor of the DIP Agent are junior to such valid, perfected, and non-avoidable liens.

(d)      Liens Senior to Certain Other Liens.  The DIP Liens shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the TCEH Debtors and their estates under section 551 of the Bankruptcy Code or (ii) any liens arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal, or other domestic or foreign governmental unit (including any regulatory body), commission, board, or court for any liability of the TCEH Debtors.

Notwithstanding anything to the contrary in the DIP Documents or this Interim

Order, for the purposes of this Interim Order, in no event shall the Unencumbered Property

include, or the DIP Liens granted under this Interim Order attach to, Excluded Stock and Stock

Equivalents, Excluded Subsidiaries, and any Excluded Property (each, as defined in the DIP

Credit Agreement).

8.      DIP Lien Priority.  The DIP Liens are valid, binding, continuing, automatically

perfected, non-avoidable, senior in priority, and superior to any security, mortgage, collateral

interest, lien, or claim to any of the DIP Collateral, except that the DIP Liens shall be junior only

to Permitted Prior Liens, the Carve Out, and the RCT Reclamation Support Carve Out.  Pursuant

to section 364(d) of the Bankruptcy Code, the DIP Liens shall be senior to the Prepetition First

Priority Liens and the Prepetition Second Priority Liens of the Prepetition Secured Creditors in

the Prepetition Collateral and the Adequate Protection Liens.  For purposes of this Interim Order,

it shall be an Event of Default if, other than as set forth herein, the DIP Liens shall be made

subject to, or pari passu with, any lien or security interest heretofore or hereinafter granted in the

Cases or any Successor Cases, upon the conversion of any of the Cases to a case under chapter 7

of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the

Cases or Successor Cases.  No lien or interest avoided and preserved for the benefit of the estate

pursuant to section 551 of the Bankruptcy Code shall be pari passu with or senior to the DIP

Liens.

9.      DIP Superpriority Claims.

(a)     Upon entry of this Interim Order, the DIP Agent, the DIP Lenders, and the

DIP L/C Issuers are hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code,

allowed superpriority administrative expense claims in each of the Cases and any Successor

Cases (collectively, the "DIP Superpriority Claims") for all DIP Obligations: (i) except as set forth herein, with priority over any and all administrative expense claims, diminution claims, unsecured claims, and all other claims against the TCEH Debtors or their estates in any of the Cases and any Successor Cases, existing on the Petition Date or thereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject only to, and effective upon entry of, the Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which allowed claims shall be payable from, and have recourse to, all prepetition and postpetition property of the TCEH Debtors and all proceeds thereof; and (ii) which shall at all times be senior to the rights of the TCEH Debtors and their estates, and any successor trustee or other estate representative to the extent permitted by law.  Notwithstanding the foregoing, the DIP Superpriority Claims shall be subject only to the payment of the Carve Out and the RCT Reclamation Support Carve Out, to the extent specifically provided for herein.

      10.     No Obligation to Extend Credit.  The DIP Agent, the DIP Lenders, and the DIP L/C Issuers shall have no obligation to make any loan or advance, or to issue any Letter of Credit, under the DIP Documents, unless all of the conditions precedent to the making of such extension of credit or the issuance of such Letter of Credit under the DIP Documents and this Interim Order have been satisfied in full or waived in accordance with the terms of the DIP Documents.

**Provisions Common to DIP Financing**

      11.     Amendments to the DIP Documents.  The TCEH Debtors are hereby authorized to implement, in accordance with the terms of the DIP Documents, (a) any nonmaterial

modifications (including, without limitation, any change to the number or composition of the DIP Lenders or the DIP L/C Issuers) of the DIP Documents without further order of the Court, and (b) any other modifications to the DIP Documents, provided, however, that subject to entry of the Final Order, notice of any material modification or amendment to the DIP Documents shall be provided to counsel for the Creditors' Committee and the U.S. Trustee, each of whom shall have five (5) days from the date of such notice within which to object, in writing, to such modification or amendment. If the Creditors' Committee or the U.S. Trustee timely objects to any material modification or amendment to the DIP Documents, such modification or amendment shall only be permitted pursuant to an order of the Court. The foregoing shall be without prejudice to the TCEH Debtors' right to seek approval from the Court of a material modification on an expedited basis.

12.     Budget and Annual Forecast Reporting. The Borrower will provide the DIP Agent with a statement of cash sources and uses of all free cash flow for the next full three (3)-calendar months of the TCEH Debtors (on a consolidated basis) following the date of entry of this Interim Order, broken down by month (the "Budget"), in the form of the Initial Budget (as defined in the DIP Credit Agreement) attached to the DIP Credit Agreement as Exhibit M, including the anticipated uses of the DIP Facility for such period, and after such three (3)-calendar month period, at the end of each fiscal quarter (or, at the election of the Borrower, at the end of each calendar month or such other earlier period as may be agreed), an updated Budget for the subsequent three (3)-calendar month period. The initial borrowing under the DIP Facility is subject to, among other things, the Borrower's delivery of the Initial Budget to the DIP Agent and the DIP Lenders, which shall be in form and substance reasonably satisfactory to the DIP Agent and the Joint Lead Arrangers. The Borrower will also provide, on a monthly

basis, a variance report for each calendar month (delivered no later than the end of the subsequent calendar month), (a) showing a statement of actual cash sources and uses of all free cash flow for the immediately preceding calendar month, noting therein all material variances from values set forth for such historical periods in the most recently delivered Budget, including explanations for all material variances and (b) certified as to its reasonableness when made by an Authorized Officer (as defined in the DIP Credit Agreement) of the Borrower. Beginning on the date 60 days after the entry of this Interim Order (and again no later than December 1, 2014 for the business plan and operating budget covering 2015, and no later than December 1, 2015 for the business plan and operating budget covering 2016), the Borrower will provide the DIP Agent with TCEH's approved annual business plan and projected operating budget through the DIP Facility's stated maturity date (the "Annual Operating Forecast"), (x) which shall be broken down by month, including, without limitation, income statements, balance sheets, cash flow statements, projected capital expenditures, asset sales, and a line item for total available liquidity for the period of such Annual Operating Forecast and (y) which shall set forth the anticipated uses of the DIP Facility for such period, certified as to its reasonableness when made by an Authorized Officer of the Borrower. Both the Budget and the Annual Operating Forecast shall provide, among other things, for the payment of the fees and expenses relating to the DIP Facility, ordinary course administrative expenses, bankruptcy-related expenses and working capital, expected issuances and renewals of Letters of Credit, and other general corporate needs; provided, however, that the Allowed Professional Fees (as defined herein) will be due and payable, and will be paid by the TCEH Debtors, whether or not consistent with the items or amounts set forth in the Initial Budget, the Budget, or the Annual Operating Forecast; and provided, further, that under no circumstance will the Initial Budget, the Budget, or the Annual

Operating Forecast be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the TCEH Debtors.

13.    <u>Modification of the Automatic Stay</u>.    The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to (a) permit the TCEH Debtors to grant the DIP Liens and the DIP Superpriority Claims, (b) permit the TCEH Debtors to perform such acts as the DIP Agent, the DIP Lenders, and the DIP L/C Issuers each may request in its sole discretion to assure the perfection and priority of the liens granted herein, (c) permit the TCEH Debtors to incur all liabilities and obligations to the DIP Agent, the DIP Lenders, and the DIP L/C Issuers under the DIP Documents, the DIP Facility, and this Interim Order, and (d) authorize the TCEH Debtors to make payments, and the DIP Agent, the DIP Lenders, and the DIP L/C Issuers to retain and apply payments made, in accordance with the terms of this Interim Order.

14.    <u>Perfection of DIP Liens</u>.    This Interim Order shall be sufficient and conclusive evidence of the granting, attachment, validity, perfection, and priority of all liens granted herein, including the DIP Liens, without the necessity of filing or recording any financing statement, patent filing, trademark filing, copyright filing, fixture filing, mortgage, notice of lien, or other instrument or document, which may otherwise be required under the law or regulation of any jurisdiction, or the taking possession of, or control over, assets, or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement, securities account control agreement, or other similar agreement) to grant, attach, validate, or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens, or to entitle the DIP Agent, the DIP Lenders, the DIP L/C Issuers, the Secured Hedge Banks, the Secured Cash

Management Banks, and/or secured parties pursuant to the DIP Documents to the priorities granted herein. Notwithstanding the foregoing, the DIP Agent is authorized, but not required, to file, as it in its sole discretion deems necessary, such financing statements, patent filings, trademark filings, copyright filings, mortgages, notices of liens, and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens, and all such financing statements, patent filings, trademark filings, copyright filings, mortgages, notices of lien, and other documents shall be deemed to have been filed or recorded as of the Petition Date; provided, however, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens. The TCEH Debtors are authorized and directed to execute and deliver promptly upon demand to the DIP Agent all such financing statements, mortgages, notices, and other documents and information as the DIP Agent may reasonably request. The DIP Agent, in its discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to, or in lieu of, such financing statements, notices of lien, or similar instrument. In furtherance of the foregoing and without further approval of the Court, each Debtor is (a) authorized to do and perform all acts to make, execute, and deliver all instruments and documents and provide all information and (b) authorized and directed to pay all fees that may be reasonably required or necessary for the TCEH Debtors' performance hereunder.

15.    Proceeds of Subsequent Financing. If the TCEH Debtors, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed in the Cases or any Successor Cases, shall obtain credit or incur debt pursuant to section 364(b), 364(c), or 364(d) of the Bankruptcy Code or in violation of the DIP Documents at any time prior to such time as the DIP Obligations (excluding the Secured Hedge Obligations, the Secured Cash

Management Obligations, and Contingent Obligations) have been indefeasibly paid in full, in cash, all Commitments have been terminated, and all Letters of Credit have been cancelled (or all such Letters of Credit have been fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the applicable DIP L/C Issuers), including subsequent to the confirmation of any plan with respect to any or all of the TCEH Debtors and the TCEH Debtors' estates, and such facilities are secured by any DIP Collateral, then cash proceeds derived from such credit or debt shall be used to the extent necessary to indefeasibly repay in full, in cash, the DIP Obligations.

16.    <u>Maintenance of DIP Collateral</u>.  Until such time as all DIP Obligations (excluding the Secured Hedge Obligations, the Secured Cash Management Obligations, and Contingent Obligations) have been indefeasibly paid in full, in cash, all Commitments have been terminated, and all Letters of Credit have been cancelled (or all such Letters of Credit shall have been fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the applicable DIP L/C Issuers), the TCEH Debtors shall (a) maintain and insure the DIP Collateral in amounts, for the risks, and by the entities as required under the DIP Documents and (b) maintain the cash management system in effect as of the Petition Date consistent with the Cash Management Order (as defined in the DIP Credit Agreement), as modified by any order that may be entered by the Court, to which the DIP Agent has first agreed, or as otherwise required by the DIP Documents.

17.    <u>Disposition of DIP Collateral; Rights of DIP Agent, DIP Lenders, and DIP L/C Issuers</u>.  The TCEH Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral other than as permitted in the DIP Documents (and no consent shall be implied from any action, inaction, or acquiescence by the DIP Agent, the DIP Lenders, or the

DIP L/C Issuers, or an order of the Court); provided that the TCEH Debtors may release liens on the DIP Collateral solely to the extent permitted by the DIP Documents.

18.    DIP Termination Date.  On the DIP Termination Date, (a) the DIP Obligations shall be immediately due and payable, to the extent provided for in the DIP Credit Agreement, and all Commitments shall terminate and (b) unless the DIP Obligations (excluding the Secured Hedge Obligations, the Secured Cash Management Obligations, and Contingent Obligations) have been indefeasibly paid in full, in cash, all Commitments have been terminated, and all Letters of Credit have been cancelled (or all such Letters of Credit have been fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the applicable DIP L/C Issuers), all authority to use the DIP Collateral, including Cash Collateral, shall cease.  For purposes of this Interim Order, the "DIP Termination Date" shall mean the Maturity Date as defined in the DIP Credit Agreement.

19.    Events of Default.  An "Event of Default" under the DIP Documents shall constitute an Event of Default under this Interim Order, unless waived in writing in accordance with Section 13.1 of the DIP Credit Agreement.  Notwithstanding anything to the contrary contained herein or in the DIP Documents, any Event of Default under this Interim Order or the DIP Documents, other than any Event of Default which cannot be waived without the written consent of each DIP Lender directly and adversely affected thereby, shall be deemed not to be "continuing" if the events, act, or condition that gave rise to such Event of Default have been remedied or cured (including by payment, notice, taking of any action, or omitting to take any action) or have ceased to exist and the Borrower is in compliance with the DIP Documents.

20.    Rights and Remedies Upon Event of Default.  Upon the occurrence and during the continuance of an Event of Default and following the giving of five calendar days' notice to the

TCEH Debtors (the "Remedies Notice Period"), the DIP Agent, on behalf of the DIP Lenders and the DIP L/C Issuers, may exercise all rights and remedies provided for in the DIP Documents and may declare (a) the termination, reduction, or restriction of any further Commitment to the extent any such Commitment remains, (b) all DIP Obligations under the DIP Documents to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the TCEH Debtors, and (c) the termination of the DIP Documents as to any future liability or obligation of the DIP Agent, the DIP Lenders, and the DIP L/C Issuers, but without affecting any of the DIP Liens or the DIP Obligations.  During the Remedies Notice Period, the TCEH Debtors may continue to use the DIP Collateral, including Cash Collateral, in the ordinary course of business, consistent with past practices and the most recently delivered Budget, but may not enter into any transactions or arrangements (including, without limitation, the incurrence of indebtedness or liens, investments, restricted payments, asset sales, or transactions with non-Debtor affiliates) that are not in the ordinary course of business; provided that nothing in this paragraph 20 or in paragraph 27 shall limit the ability of the TCEH Debtors to use DIP Collateral, including Cash Collateral, to seek use of Cash Collateral on a non-consensual basis and/or to challenge whether an Event of Default has occurred and/or is continuing.  Unless the Court orders otherwise during the Remedies Notice Period, at the end of the Remedies Notice Period, the TCEH Debtors shall no longer have the right to use or seek to use the DIP Collateral, including Cash Collateral, the automatic stay pursuant to section 362 of the Bankruptcy Code, as to all of the DIP Agent, the DIP Lenders, and the DIP L/C Issuers, shall be automatically terminated without further notice to, or order of, the Court, and the DIP Agent, on behalf of itself, the DIP Lenders, and the DIP L/C Issuers, shall be permitted to exercise all rights against the DIP Collateral in accordance with the

DIP Documents and this Interim Order, and shall be permitted to satisfy the DIP Obligations, without further order or application or motion to the Court and without restriction or restraint by any stay under section 362 or 105 of the Bankruptcy Code. Notwithstanding anything herein to the contrary, the automatic stay pursuant to section 362 of the Bankruptcy Code shall be automatically terminated for the purposes of giving any notice contemplated hereunder. During the Remedies Notice Period, any party in interest shall be entitled to seek an emergency hearing with the Court solely for the purpose of contesting whether an Event of Default has occurred and/or is continuing, and the TCEH Debtors waive their right to, and shall not be entitled to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of the DIP Agent, on behalf of the DIP Lenders and the DIP L/C Issuers, set forth in this Interim Order or the DIP Documents.

21.    Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order. Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter modified, amended, or vacated by a subsequent order of the Court or any other court, each of the DIP Agent, the DIP Lenders, the DIP L/C Issuers, and the Joint Lead Arrangers are entitled to the protections provided in section 364(e) of the Bankruptcy Code. Any liens or claims granted to the DIP Agent, the DIP Lenders, the DIP L/C Issuers, and the Joint Lead Arrangers hereunder arising prior to the effective date of any such modification, amendment, or vacatur of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges, and benefits granted herein.

22.    <u>DIP and Other Expenses</u>.  All fees paid and payable, and costs and/or expenses reimbursed or reimbursable, as set forth in the DIP Documents, by the TCEH Debtors to the DIP Agent, the DIP Lenders, the DIP L/C Issuers, and the Joint Lead Arrangers are hereby approved. The TCEH Debtors are hereby authorized and directed to pay all such fees, costs, and expenses in accordance with the terms of the DIP Documents, without the necessity of any further application with the Court for approval or payment of such fees, costs, or expenses.  The TCEH Debtors are authorized and directed to reimburse within ten (10) calendar days of written demand (together with reasonably detailed supporting documentation) the DIP Agent, the DIP Lenders, the DIP L/C Issuers, and the Joint Lead Arrangers for their reasonable and documented out-of-pocket expenses incurred in connection with the negotiation, documentation, syndication, and administration of the DIP Facility, any amendments or waivers with respect thereto, any Event of Default in respect of the DIP Facility, and any exercise of remedies in respect thereof (including reasonable and documented out-of-pocket prepetition and postpetition fees, charges, and disbursements of legal counsel, financial advisors, and third-party appraisers and consultants advising the DIP Agent incurred in connection with the DIP Agent's participation in the Cases, limited in the case of legal counsel to one primary counsel (and (a) local counsel in applicable foreign and local jurisdictions, but limited to one local counsel in each such jurisdiction, (b) regulatory counsel, and (c) solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to the affected indemnified persons similarly situated)).  Payment of all such fees and expenses shall not be subject to allowance by the Court; <u>provided</u>, <u>however</u>, that the TCEH Debtors shall promptly provide copies of invoices received on account of fees and expenses of the professionals retained as provided for in the DIP Credit Agreement and the DIP Documents to counsel to the Creditors' Committee and the U.S. Trustee, and the Court shall

31

have exclusive jurisdiction over any objections raised to the invoiced amount of the fees and expenses proposed to be paid, which objections may only be raised within ten (10) calendar days after receipt thereof. In the event that within ten (10) calendar days from receipt of such invoices the TCEH Debtors, the U.S. Trustee, or counsel to the Creditors' Committee raises an objection to a particular invoice, and the parties are unable to resolve any dispute regarding the fees and expenses included in such invoice, the Court shall hear and determine such dispute; provided, that payment of invoices shall not be delayed based on any such objections and the relevant professional shall only be required to disgorge amounts objected to upon being "so ordered" pursuant to a final order of the Court. Notwithstanding anything to the contrary herein, the fees, costs, and expenses of the DIP Agent, the DIP Lenders, the DIP L/C Issuers, and the Joint Lead Arrangers under the DIP Documents, whether incurred prior to or after the Petition Date, shall be deemed fully earned, indefeasibly paid, irrevocable, and non-avoidable pursuant to, and in accordance with, the terms of the DIP Documents and, irrespective of any subsequent order approving or denying the Financing or any other financing pursuant to section 364 of the Bankruptcy Code, fully entitled to all protections of section 364(e) of the Bankruptcy Code. All unpaid fees, costs, and expenses payable under the DIP Documents to the DIP Agent, the DIP Lenders, the DIP L/C Issuers, and the Joint Lead Arrangers shall be included and constitute part of the DIP Obligations and be secured by the DIP Liens.

23.   Proofs of Claim. Subject to entry of the Final Order, the DIP Agent, the DIP Lenders, and the DIP L/C Issuers will not be required to file proofs of claim in any of the Cases or Successor Cases for any claim allowed herein. Any order entered by the Court in relation to the establishment of a bar date in any of the Cases or Successor Cases shall not apply to the DIP Agent, the DIP Lenders, or the DIP L/C Issuers.

24.    <u>Rights of Access and Information</u>.    Without limiting the rights of access and information afforded the DIP Agent, the DIP Lenders, and the DIP L/C Issuers under the DIP Documents, the TCEH Debtors shall be, and hereby are, required to afford representatives, agents, and/or employees of the DIP Agent, the DIP Lenders, and the DIP L/C Issuers reasonable access to the TCEH Debtors' premises and its books and records in accordance with the DIP Documents and shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested.    In addition, the TCEH Debtors shall authorize their independent certified public accountants, financial advisors, investment bankers, and consultants to cooperate, consult with, and provide to the DIP Agent all such information as may be reasonably requested from the TCEH Debtors with respect to the business, results of operations, and financial condition of the TCEH Debtors.

25.    <u>Carve Out</u>.

(a)    <u>Carve Out</u>.    As used in this Interim Order, the "<u>Carve Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the TCEH Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and any Creditors' Committee appointed in the Cases pursuant to section 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") at any

33

time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $50,000,000 incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap"). For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the TCEH Debtors, their lead restructuring counsel, the U.S. Trustee, and lead counsel to the Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)    Carve Out Reserves. On the day on which a Carve Out Trigger Notice is given by the DIP Agent to the TCEH Debtors (the "Termination Declaration Date"), the Carve Out Trigger Notice shall (i) be deemed a draw request and notice of borrowing by the TCEH Debtors for Revolving Credit Loans under the Revolving Credit Commitment (each, as defined in the DIP Credit Agreement) (on a pro rata basis based on the then outstanding Revolving Credit Commitments), in an amount equal to the then unpaid amounts of the Allowed Professional Fees (any such amounts actually advanced shall constitute Revolving Credit Loans) and (ii) also constitute a demand to the TCEH Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees. The TCEH Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such then unpaid

Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims. On the Termination Declaration Date, the Carve Out Trigger Notice shall also be deemed a request by the TCEH Debtors for Revolving Credit Loans under the Revolving Credit Commitment (on a pro rata basis based on the then outstanding Revolving Credit Commitments), in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute Revolving Credit Loans). The TCEH Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims. On the first business day after the DIP Agent gives such notice to such Revolver Credit Lenders (as defined in the DIP Credit Agreement), notwithstanding the existence of a Default (as defined in the DIP Credit Agreement) or Event of Default, the failure of the TCEH Debtors to satisfy any or all of the conditions precedent for Revolving Credit Loans under the Revolving Credit Facility or the occurrence of the Maturity Date, each Revolver Credit Lender with an outstanding Commitment (on a pro rata basis based on the then outstanding Commitments) shall make available to the DIP Agent such Revolver Credit Lender's pro rata share with respect to such borrowing in accordance with the Revolving Credit Facility. All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (ii) through (iii) of the definition of Carve Out set forth above, but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders and the DIP L/C Issuers, unless the DIP Obligations (excluding the Secured Hedge Obligations, the Secured Cash Management

Obligations, and Contingent Obligations) have been indefeasibly paid in full, in cash, all

Commitments have been terminated, and all Letters of Credit have been cancelled (or all such

Letters of Credit have been fully cash collateralized or otherwise back-stopped, in each case to

the satisfaction of the applicable DIP L/C Issuers), in which case any such excess shall be paid to

the Prepetition First Lien Creditors in accordance with their rights and priorities as of the Petition

Date.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the

obligations set forth in clause (iv) of the definition of Carve Out set forth above, and then, to the

extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP

Agent for the benefit of the DIP Lenders and the DIP L/C Issuers, unless the DIP Obligations

(excluding the Secured Hedge Obligations, the Secured Cash Management Obligations, and

Contingent Obligations)  have been indefeasibly paid in full, in cash, all Commitments have been

terminated, and all Letters of Credit have been cancelled (or all such Letters of Credit have been

fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the

applicable DIP L/C Issuers), in which case any such excess shall be paid to the Prepetition First

Lien Creditors in accordance with their rights and priorities as of the Petition Date.

Notwithstanding anything to the contrary in the DIP Documents, this Interim Order, or the Final

Order, following delivery of a Carve Out Trigger Notice, the DIP Agent and the Prepetition First

Lien Agents shall not sweep or foreclose on cash (including cash received as a result of the sale

or other disposition of any assets) of the TCEH Debtors until the Carve Out Reserves have been

fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves,

with any excess paid to the DIP Agent for application in accordance with the DIP Documents.

Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the

TCEH Debtors from the Carve Out Reserves shall not constitute Loans (as defined in the DIP

Credit Agreement) or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Initial Budget, Budget, Annual Operating Forecast, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the TCEH Debtors. For the avoidance of doubt and notwithstanding anything to the contrary herein or in the Interim Cash Collateral Order, the DIP Facility, or in any Prepetition Secured Facilities (as defined in the Interim Cash Collateral Order), the Carve Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens, and the 507(b) Claim (as defined in the Interim Cash Collateral Order), and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Secured Obligations.

(c)      No Direct Obligation To Pay Allowed Professional Fees. The DIP Agent, DIP Lenders, and the DIP L/C Issuers shall not be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Cases or any Successor Cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the DIP L/C Issuers, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the TCEH Debtors have sufficient funds to pay such compensation or reimbursement.

(d)      Payment of Allowed Professional Fees Prior to the Termination Declaration Date. Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(e)    Payment of Carve Out On or After the Termination Declaration Date. Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis. Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Documents, the Bankruptcy Code, and applicable law.

26.    RCT Reclamation Support Carve Out. All amounts up to $1,100,000,000 required to be paid by the TCEH Debtors to the RCT pursuant to amounts due and owing in respect of reclamation obligations incurred by the RCT and for which any of the TCEH Debtors may be liable under Applicable Law (as defined in the DIP Credit Agreement) will constitute the "RCT Reclamation Support Carve Out," and such RCT Reclamation Support Carve Out will be senior to the DIP Obligations and to any other obligations or liabilities of the TCEH Debtors (other than, and subject in any event to, the Carve Out), unless the Borrower issues and delivers to the DIP Agent the RCT Carve Out Support Rejection Notice (as defined in the DIP Credit Agreement). Notwithstanding any provision of the DIP Documents or this Interim Order to the contrary, for the sake of clarity, with respect to the RCT Reclamation Support Carve Out in favor of the RCT for financial assurance for Debtor Luminant Mining Company LLC's reclamation obligations, the RCT shall be entitled to up to the first $1,100,000,000 in proceeds of DIP Collateral to satisfy valid claims against the RCT Reclamation Support Carve Out, in the event such DIP Collateral is liquidated, before payment of claims of all other secured or unsecured creditors or other parties in interest, other than the amounts subject to the professional fee carve out (which amounts are defined as the "Carve Out" in paragraph 25 of this Interim Order).

27. <u>Limitations on the DIP Facility, the DIP Collateral, and the Carve Out</u>. Notwithstanding anything herein to the contrary, except paragraph 20 with respect to the ability of the TCEH Debtors to use DIP Collateral, including Cash Collateral, and solely during the Remedies Notice Period, to seek use of Cash Collateral on a non-consensual basis and/or to challenge whether an Event of Default has occurred and/or is continuing, the TCEH Debtors shall not assert or prosecute, and no portion of the proceeds of the DIP Facility, the DIP Collateral, including Cash Collateral, or the Carve Out, and no disbursements set forth in the Budget, may be used for the payment of professional fees, disbursements, costs, or expenses incurred by any person in connection with (a) incurring Indebtedness (as defined in the DIP Credit Agreement) except to the extent permitted under the DIP Credit Agreement; (b) preventing, hindering, or delaying any of the DIP Agent's, the DIP Lenders', the DIP L/C Issuers', the Prepetition First Lien Agents', or the Prepetition First Lien Creditors' (in the case of each of the foregoing, in their respective capacities as such) enforcement or realization upon, or exercise of rights in respect of, any of the DIP Collateral once an Event of Default has occurred and after the Remedies Notice Period; (c) objecting, challenging, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the DIP Liens, the Prepetition First Lien Obligations, the Prepetition First Priority Liens, or the Prepetition Collateral (including Cash Collateral), or any other rights or interest of any of the DIP Agent, the DIP Lenders, the DIP L/C Issuers, the Secured Hedge Banks, the Secured Cash Management Banks, the Prepetition First Lien Agents, or the Prepetition First Lien Creditors (in the case of each of the foregoing, in their respective capacities as such); (d) asserting, commencing, or prosecuting any claims or causes of action, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against any of

the DIP Agent, the DIP Lenders, the DIP L/C Issuers, the Secured Hedge Banks, the Secured Cash Management Banks, the Prepetition First Lien Agents, the Prepetition First Lien Creditors, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, or employees (in the case of each of the foregoing, in their respective capacities as such); or (e) asserting, joining, commencing, supporting, investigating, or prosecuting any action for any claim, counter-claim, action, cause of action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the material interests of the Released Parties (as defined herein) or the Prepetition First Lien Creditors, arising out of, in connection with, or relating to the DIP Facility, the DIP Documents, the Prepetition First Lien Documents, or the transactions contemplated hereunder or thereunder, including, without limitation, (i) any action arising under the Bankruptcy Code; (ii) any so-called "lender liability" claims and causes of action; (iii) any action with respect to the validity and extent of the DIP Obligations, the DIP Superpriority Claims, or the Prepetition First Lien Obligations or the validity, extent, perfection, and priority of the DIP Liens or the Prepetition First Priority Liens; (iv) any action seeking to invalidate, set aside, avoid, reduce, set off, offset, recharacterize, subordinate (whether equitable, contractual, or otherwise), recoup against, disallow, impair, raise any defenses, cross-claims, or counterclaims, or raise any other challenges under the Bankruptcy Code or any other applicable domestic or foreign law or regulation against, or with respect to, the DIP Liens, the DIP Superpriority Claims, or the Prepetition First Priority Liens in whole or in part; (v) appeal or otherwise challenge this Interim Order, the Final Order, the DIP Documents, or any of the transactions contemplated herein or therein; and/or (vi) any action that has the effect of preventing, hindering, or delaying (whether directly or indirectly) the DIP Agent, the DIP Lenders, and the DIP L/C Issuers in respect of their liens and security interests in

the DIP Collateral or any of their rights, powers, or benefits hereunder or in the DIP Documents anywhere in the world; provided, however, that the Carve Out and such collateral proceeds and loans under the DIP Documents may be used for allowed fees and expenses, in an amount not to exceed $175,000 in the aggregate (the "Investigation Fund"), incurred solely by the Creditors' Committee, if appointed, in investigating the validity, enforceability, perfection, priority, or extent of the Prepetition First Priority Liens and Prepetition Second Priority Liens during the Challenge Period (as defined in the Interim Cash Collateral Order); provided further, however, that the Creditors' Committee may not use the Investigation Fund to initiate, assert, join, commence, support, or prosecute any actions or discovery with respect thereto. Subject to entry of the Final Order, any and all claims for fees or expenses incurred by the Creditors' Committee, if appointed, or by any party in interest in violation of any clause of this paragraph 27 (including amounts incurred in excess of the Investigation Fund) shall not be allowed, treated, or payable as an administrative expense claim for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, and the non-payment of such fees and expenses shall not constitute grounds to deny confirmation of any plan of reorganization for any of the TCEH Debtors. Any party granted standing by the Court other than the Creditors' Committee must commence any claims against the Prepetition First Lien Agents no later than seventy-five (75) calendar days following entry of this Interim Order, and, with respect to the Creditors' Committee, if appointed and granted standing by the Court, no later than sixty (60) calendar days after its formation.

28.    Payment of Compensation. Nothing herein shall be construed as a consent to the allowance of any professional fees or expenses of any Professional Person or shall affect the right of the DIP Agent, the DIP Lenders, or the DIP L/C Issuers to object to the allowance and payment of such fees and expenses.

29.    <u>Release</u>. The TCEH Debtors, on behalf of themselves and their estates (including any successor trustee or other estate representative in the Cases or Successor Cases) and any party acting by, through, or under the TCEH Debtors or their estates, forever and irrevocably (a) release, discharge, waive, and acquit the current or future DIP Agent, the DIP Lenders, the DIP L/C Issuers, the Joint Lead Arrangers, each of their respective participants and each of their respective affiliates, and each of their respective former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest (collectively, and in each case in their capacities as such, the "Released Parties"), of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened, including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, arising out of, in connection with, or relating to the DIP Facility, the DIP Documents, or the transactions contemplated hereunder or thereunder, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, with respect to or relating to the DIP Obligations, DIP Liens, or DIP Facility, as applicable, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, perfection, or avoidability of the liens or secured claims of the DIP Agent, the DIP Lenders, and the DIP L/C Issuers and (b) waive any and all defenses (including, without limitation, offsets and

counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and nonavoidability of the DIP Obligations and the DIP Liens.

30.    No Third Party Rights.    Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

31.    Section 506(c) Claims.    Subject to entry of the Final Order, no costs or expenses of administration of the Cases or any future proceeding that may result therefrom, which have been or may be incurred in the Cases at any time, shall be charged against the DIP Agent, the DIP Lenders, or the DIP L/C Issuers, or any of their respective claims or the DIP Collateral, pursuant to section 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the DIP Agent, the DIP Lenders, or the DIP L/C Issuers, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent, any DIP Lender, and any DIP L/C Issuer.

32.    No Marshaling/Application of Proceeds.    Subject to entry of the Final Order, the DIP Agent, the DIP Lenders, and the DIP L/C Issuers shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral, and proceeds shall be received and applied pursuant to the terms of the DIP Credit Documents notwithstanding any other agreement or provision to the contrary; provided, however, that nothing herein shall impair the rights of the DIP Agent, DIP Lenders, and the DIP L/C Issuers with respect to the DIP Collateral.

33.    Joint and Several Liability.    Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the TCEH Debtors' estates, it being understood,

however, that the TCEH Debtors shall be jointly and severally liable for the obligations hereunder and in accordance with the terms of the DIP Facility and the DIP Documents.

34.    <u>Discharge Waiver</u>. The DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the DIP Obligations have been indefeasibly paid in full, in cash, all Commitments have been terminated, and all Letters of Credit have been cancelled (or all such Letters of Credit shall have been fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the applicable DIP L/C Issuers) on or before the effective date of a confirmed plan of reorganization or liquidation. None of the TCEH Debtors shall propose or support any plan of reorganization or liquidation, sale of all or substantially all of the TCEH Debtors' assets, or entry of any confirmation order or sale order unless any such plan of reorganization or liquidation, sale, or confirmation order provides that the DIP Obligations (excluding the Secured Hedge Obligations, the Secured Cash Management Obligations, and Contingent Obligations) shall be indefeasibly paid in full, in cash, all Commitments shall be terminated, and all Letters of Credit shall be cancelled (or all such Letters of Credit shall be fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the applicable DIP L/C Issuers) on or prior to the earlier to occur of the effective date of any such plan of reorganization or liquidation or sale and the DIP Termination Date.

35.    <u>Rights Preserved</u>. Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the DIP Agent's, the DIP Lenders', or the DIP L/C Issuers' right to seek any other or supplemental relief in respect of the TCEH Debtors; (b) any of the rights of the DIP Agent, any of the DIP Lenders, or any of the DIP L/C Issuers under the Bankruptcy Code or under non-

bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Cases or Successor Cases, conversion of any of the Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of any of the DIP Agent, the DIP Lenders, or the DIP L/C Issuers.

36.     No Waiver by Failure To Seek Relief.  The delay or failure of the DIP Agent, the DIP Lenders, or the DIP L/C Issuers to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Agent, the DIP Lenders, the DIP L/C Issuers, the Creditors' Committee, or any party in interest, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the applicable DIP Documents.

37.     Binding Effect; Successors and Assigns.  The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in the Cases, including, without limitation, the DIP Agent, the DIP Lenders, the DIP L/C Issuers, the Secured Hedge Banks, the Secured Cash Management Banks, any statutory or nonstatutory committees appointed or formed in the Cases (including the Creditors' Committee), and the TCEH Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed for the estate of any of the TCEH Debtors) and shall inure to the benefit of the DIP Agent, the DIP Lenders, the DIP L/C Issuers, and the TCEH Debtors and their respective successors and assigns; provided, however, that the DIP Agent, the DIP Lenders, and

the DIP L/C Issuers shall have no obligation to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the TCEH Debtors.  In determining to make any loan under the DIP Credit Agreement or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents, the DIP Agent, the DIP Lenders, and the DIP L/C Issuers (a) shall not be deemed to be in control of the operations of any of the TCEH Debtors or to be acting as a "controlling person," "responsible person," or "owner or operator" with respect to the operation or management of any of the TCEH Debtors (as such term, or any similar terms, are used in the Internal Revenue Code, the United States Comprehensive Environmental Response, Compensation and Liability Act (as amended), or any similar Federal or state statute) and (b) shall not owe any fiduciary duty to any of the TCEH Debtors, their creditors, or their estates, and shall not constitute or be deemed to constitute a joint venture or partnership with any of the TCEH Debtors.

38.    No Modification of Interim Order.    Unless and until the DIP Obligations (excluding the Secured Hedge Obligations, the Secured Cash Management Obligations, and Contingent Obligations) have been indefeasibly paid in full, in cash, all Commitments have been terminated, and all Letters of Credit have been cancelled (or all such Letters of Credit have been fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the applicable DIP L/C Issuers) (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms), an Event of Default shall occur if the TCEH Debtors seek or consent to, directly or indirectly, or if there is entered: (a) without the prior written consent of the DIP Agent, (i) any modification, stay, vacatur, or amendment to this Interim Order, (ii) a priority claim for any administrative expense or unsecured claim against the TCEH Debtors (now existing or hereafter arising of any kind or

46

nature whatsoever, including, without limitation, any administrative expense of the kind specified in section 503(b), 507(a), or 507(b) of the Bankruptcy Code, or, subject to the entry of the Final Order, section 506(c) of the Bankruptcy Code) in any of the Cases or Successor Cases, equal or superior to the DIP Superpriority Claims other than the Carve Out and the RCT Reclamation Support Carve Out, or (iii) any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens, except as specifically provided herein or in the DIP Documents; (b) without the prior written consent of the DIP Agent, an order allowing use of the DIP Collateral, including Cash Collateral; (c) an order converting or dismissing any of the Cases; (d) an order appointing a chapter 11 trustee in any of the Cases; or (e) an order appointing an examiner with enlarged powers (having powers beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4)) in any of the Cases; provided, however, that notwithstanding anything to the contrary herein, the TCEH Debtors may seek to use Cash Collateral on a non-consensual basis pursuant to an order in form and substance acceptable to the Left Lead Arrangers (as defined in the DIP Credit Agreement). No such consent shall be implied by any other action, inaction, or acquiescence of the DIP Agent.

39.    Survival. The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization or liquidation in any of the Cases; (b) converting any of the Cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of the Cases or any Successor Cases; or (d) pursuant to which the Court abstains from hearing any of the Cases or Successor Cases. The terms and provisions of this Interim Order, including the claims, liens, security interests, and other protections granted to the DIP Agent, the DIP Lenders, the DIP L/C Issuers, the Secured Hedge Banks, and the Secured Cash Management Banks pursuant to this Interim Order and/or

the DIP Documents, notwithstanding the entry of any such order, shall continue in the Cases, in any Successor Cases, or following dismissal of the Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until, in respect of the DIP Facility, all the DIP Obligations (excluding the Secured Hedge Obligations, the Secured Cash Management Obligations, and Contingent Obligations), pursuant to the DIP Documents and this Interim Order, have been indefeasibly paid in full, in cash, all Commitments have been terminated, and all Letters of Credit have been cancelled (or all such Letters of Credit have been fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the applicable DIP L/C Issuers) (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms).

40.    Interim Order Governs.  In the event of any inconsistency between the provisions of this Interim Order and the DIP Documents, the provisions of this Interim Order shall govern.

41.    Final Hearing.  The Final Hearing shall be _____, 2014, at __:__ a.m./p.m. (prevailing Eastern time). The TCEH Debtors shall provide notice of the Final Hearing to: (a) the Office of the U.S. Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) Citibank, N.A., in its capacity as First Lien Credit Agent under the First Lien Credit Agreement, and Wilmington Trust, N.A., upon the effectiveness of its appointment as successor First Lien Credit Agent; (d) Bank of New York Mellon Trust Company, N.A., in its capacity as indenture trustee under: (i) the TCEH unsecured pollution control revenue bonds; and (ii) the EFCH 2037 Notes due 2037; (e) American Stock Transfer & Trust Company, LLC, in its capacity as indenture trustee under: (i) the 9.75% EFH senior unsecured notes due 2019;  (ii) the 10.0% EFH senior unsecured notes due 2020; (iii) the

10.875% EFH LBO senior unsecured notes due 2017; (iv) the 11.25%/12.0% EFH LBO toggle notes due 2017; (v) the 5.55% EFH legacy notes (series P) due 2014; (vi) the 6.50% EFH legacy notes (series Q) due 2024; and (vii) the 6.55% EFH legacy notes (series R) due 2034; (f) Computershare Trust Company, N.A. and Computershare Trust Company of Canada, in their capacities as indenture trustee under: (i) the 11.0% EFIH senior secured second lien notes due 2021; and (ii) the 11.75% EFIH senior secured second lien notes due 2022; (g) UMB Bank, N.A. in its capacity as indenture trustee under: (i) the 9.75% EFIH senior unsecured notes due 2019; and (ii) the 11.25%/12.25% EFIH senior toggle notes due 2018; (h) BOKF, NA, dba Bank of Arizona, in its capacity as indenture trustee under 11.50% TCEH senior secured notes due 2020; (i) CSC Trust Company of Delaware in its capacity as indenture trustee under: (i) the 6.875% EFIH senior secured notes due 2017; and (ii) the 10.0% EFIH senior secured notes due 2020; (j) Law Debenture Trust Company of New York in its capacity as indenture trustee under: (i) the 10.25% TCEH senior unsecured notes due 2015; and (ii) the 10.50%/11.25% TCEH senior toggle notes due 2016; (k) Wilmington Savings Fund Society, FSB in its capacity as indenture trustee under the 15.0% TCEH senior secured second lien notes due 2021; (l) counsel to certain holders of claims against the Debtors regarding each of the foregoing described in clauses (c) through (k); (m) the agent for the TCEH debtor-in-possession financing facility and counsel thereto; (n) the agent for the EFIH debtor-in-possession financing facility and counsel thereto; (o) counsel to certain holders of equity in Texas Energy Future Holdings Limited Partnership; (p) counsel to Oncor; (q) the SEC; (r) the Internal Revenue Service; (s) the Office of the Texas Attorney General on behalf of the PUC; (t) counsel to ERCOT; (u) the counterparties to the First Lien Commodity Hedges and First Lien Interest Rate Swaps; (v) the RCT; and (w) counsel to the unofficial committee of certain TCEH first lien debt holders. Any objections or responses to the

DIP Motion must be filed on or before _____, 2014, at 4:00 p.m. (prevailing Eastern time).  If no objections are filed to the DIP Motion, the Court may enter the Final Order without further notice or hearing.

42.    *Nunc Pro Tunc* Effect of this Interim Order.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon execution thereof.

43.    Retention of Jurisdiction.  The Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

Wilmington, Delaware
Dated: _____, 2014


_____
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT B

**Goldstein Declaration**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | Case No. 14-_____ (___) |
| Debtors. | (Joint Administration Requested) |

DECLARATION OF STEPHEN GOLDSTEIN
IN SUPPORT OF (I) THE MOTION OF TEXAS
COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC
AND CERTAIN OF ITS DEBTOR AFFILIATES FOR
ENTRY OF INTERIM AND FINAL ORDERS (A) APPROVING
POSTPETITION FINANCING, (B) GRANTING LIENS AND
PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS,
(C) MODIFYING THE AUTOMATIC STAY, AND (D) SCHEDULING
A FINAL HEARING, AND (II) THE MOTION OF TEXAS COMPETITIVE
ELECTRIC HOLDINGS COMPANY LLC AND CERTAIN OF ITS DEBTOR
AFFILIATES FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING
USE OF CASH COLLATERAL, (B) GRANTING ADEQUATE PROTECTION,
(C) MODIFYING THE AUTOMATIC STAY, AND (D) SCHEDULING A FINAL HEARING

I, Stephen Goldstein, declare as follows:

1. I am a Senior Managing Director of Evercore Group LLC ("Evercore"), a financial advisory and investment banking firm with offices around the world and financial advisor and investment banker to the above-captioned debtors and debtors in possession (the "Debtors"). I submit this declaration (this "Declaration") in support of (I) the *Motion of Texas Competitive Electric Holdings Company LLC and Certain of its Debtor Affiliates for Entry of Interim and Final Orders (A) Approving Postpetition Financing, (B) Granting Liens and*

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which the debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

*Providing Superpriority Administrative Expense Claims, (C) Modifying the Automatic Stay, and*
*(D) Scheduling a Final Hearing* (the "TCEH DIP Motion") *and (II)* the *Motion of Texas*
*Competitive Electric Holdings Company LLC And Certain of its Debtor Affiliates for Entry of*
*Interim and Final Orders (A) Authorizing Use Of Cash Collateral, (B) Granting Adequate*
*Protection, (C) Modifying The Automatic Stay, and (D) Scheduling a Final Hearing* (the "TCEH
Cash Collateral Motion").[2]

2.      Except where specifically noted, the statements in this Declaration are based on
either my personal knowledge, information supplied or verified by the Evercore financial team
that I supervise or the TCEH Debtors' personnel and third-party advisors, my review of relevant
documents, or my opinion based upon my experience and knowledge of the TCEH Debtors'
operations and financial condition.  If I were called upon to testify, I could and would testify
competently to the facts set forth herein.  I am authorized to submit this Declaration on behalf of
the TCEH Debtors.

3.      I offer this declaration in support of (a) the TCEH Debtors' motion to obtain
approval of the $4.475 billion DIP financing facility offered by the DIP Lenders, and (b) the
TCEH Debtors' motion to obtain the use of Cash Collateral of the Prepetition Secured Agents
and the Prepetition Secured Creditors.  In particular, I submit this declaration to place before this
Court evidence supporting my opinion, to a reasonable degree of expert certainty, that:  (a) the
DIP Lenders' DIP proposal is (i) the product of an arm's-length negotiation, (ii) is the best
available DIP financing for the TCEH Debtors, and (iii) is in the best interests of the TCEH
Debtors' estates and creditors; and (b) the use of the Cash Collateral and access to the DIP
Financing is necessary to preserve the value of the TCEH Debtors' estates; and (c) the TCEH

---

[2]     Terms used but not otherwise defined herein shall have the meanings ascribed to them in the TCEH DIP Motion
or the TCEH Cash Collateral Motion, as applicable.

Debtors' proposed adequate protection, provided to the Prepetition Secured Creditors in exchange for senior secured superpriority priming liens provided to the DIP Lenders and the use of Cash Collateral, is sufficient to protect the Prepetition Secured Creditors' interests in the Collateral, including the Cash Collateral.

**<u>Qualifications</u>**

4.    Evercore is one of the world's leading independent investment banking groups, with more than 20 offices in more than eight countries, including an office located at 55 East 52nd Street, New York, NY 10055.  Evercore has expertise in domestic and cross-border restructurings, mergers and acquisitions, and other financial advisory services.  Evercore has served as an experienced bankruptcy and restructuring advisor to debtors, bondholders, creditors' committees, single creditor classes and secured creditors in a variety of industries.  Evercore is a member of the Financial Industry Regulatory Authority and the Securities Investor Protection Corporation.

5.    I specialize in advising both debtors and creditors in financial restructurings and distressed mergers and acquisitions; raising capital for troubled businesses; and representing debtors and creditor constituencies in bankruptcy proceedings.  Moreover, I have raised capital in many in-court and out-of-court financings, and have extensive experience in procuring, structuring, and negotiating debtor-in-possession financing.

6.    Before joining Evercore, I was a Managing Director of Lazard Frères & Co. LLC ("Lazard"), where I specialized in corporate reorganizations and bankruptcy.  Before joining Lazard in 2002, I served in several investment banking positions at Thomas Weisel Partners and its predecessor firm, Montgomery Securities.  I began my career as an attorney at Morgan, Lewis & Bockius, where I specialized in securities law and mergers and acquisitions.  I have over 18 years of experience in a broad range of corporate finance activities, including restructurings,

3

mergers and acquisitions, and debt and equity financings. I received my B.A. from Cornell University in 1992 and my J.D. from New York University School of Law in 1995.

### The TCEH Debtors' Need for DIP Financing and Cash Collateral and the Development of the DIP Budget

7.    After being retained by the TCEH Debtors in July 2012 and gaining an initial understanding of the TCEH Debtors' capital structure and business operations, Evercore worked together with the TCEH Debtors' management team and its other advisors to analyze the TCEH Debtors' cash needs to determine if additional liquidity was needed to support the TCEH Debtors' operations during the course of a restructuring. In undertaking this analysis, the TCEH Debtors and their advisors considered the TCEH Debtors' near-term projected financial performance, including demand for the TCEH Debtors' services and the cost of supplying such services. The TCEH Debtors' management also conferred with key operational divisions (*i.e.*, Luminant and TXU Energy) to understand essential business metrics in both the near- and long-term.

8.    The TCEH Debtors, Evercore, and other advisors discussed and contemplated the use of Cash Collateral, with or without any additional financing, to fund operations during these chapter 11 cases. Based on the TCEH Debtors' financial projections, the TCEH Debtors determined that Cash Collateral may be sufficient to fund certain aspects of working capital, capital expenditures, and other general corporate purposes during the anticipated duration of the chapter 11 cases, but will be insufficient to fund the costs associated with the TCEH Debtors' restructuring efforts, including providing creditors with adequate protection. Thus, the TCEH Debtors decided debtor-in-possession financing was necessary to ensure that the TCEH Debtors have sufficient liquidity to continue operations uninterrupted during the TCEH Debtors' restructuring.

4

9.      The TCEH Debtors and Evercore developed an initial budget, attached to the

TCEH DIP Motion as Exhibit C (the "DIP Budget"), that incorporates a number of factors,

including the effect of the chapter 11 filing, material cash disbursements, required

vendor/supplier payments, cash flows from the TCEH Debtors' ongoing operations, and the cost

of necessary goods and materials, and includes all of the expenditures for which the TCEH

Debtors seek authority to pay in various "first day" pleadings.  In accordance with the DIP

Budget, the TCEH Debtors have determined that postpetition financing is necessary to fund the

following restructuring costs, among others:   adequate protection payments; working capital

(e.g., collateral for letters of credit); bankruptcy costs (e.g., business disruption and professional

fees); and regulatory requirements (e.g., RCT mining reclamation obligations).  The funding of

these restructuring costs, described in greater detail in the DIP Budget, is necessary to preserve

and maintain the TCEH Debtors' going-concern value and, ultimately, effectuate a successful

reorganization.

10.      Among the restructuring costs addressed by the DIP Financing are the TCEH

Debtors' mining reclamation obligations to the RCT.  The TCEH Debtors maintain their mining

operations in Texas with the permission of the RCT, a regulatory agency that permits, enforces,

and oversees surface mining and reclamation in the State.  The RCT's grant of permission to the

TCEH Debtors to maintain mining operations is conditioned on the TCEH Debtors' posting

security to ensure the reclamation of their permitted mining areas.  Prior to the Petition Date, the

TCEH Debtors secured their reclamation obligations in the form of a self-bond.  The TCEH

Debtors arguably lost the right to self-bond upon filing the chapter 11 cases.  *See* 16 TAC

§ 12.309(j)(2)(B).   Pursuant to section 12.309(j)(7) of the TAC, the TCEH Debtors must

immediately notify the RCT and post a substitute bond within 90 days of such notification.

5

Given these timing limitations, the TCEH Debtors need to submit the RCT Reclamation Support Carve Out (defined below) to the RCT as soon as practicable to give the RCT sufficient time to consider the substitute bond.

11.    The DIP Financing and the Interim Order contemplate a carve out from the DIP Lenders' liens of up to $1,100,000,000 for the benefit of the RCT (the "RCT Reclamation Support Carve Out"). The RCT Reclamation Carve Out will be senior to any other obligations or liabilities of the Debtors, other than the professional fee Carve Out.

12.    As provided in the DIP Budget, the TCEH Debtors will need approximately $1,600,000,000 in available liquidity from the DIP Financing for operations during the interim period of these chapter 11 cases. The $1,600,000,000 interim DIP Financing is largely comprised of (a) an $800,000,000 Revolving Credit Facility to fund operating costs, bankruptcy expenses, and adequate protection payments, and (b) an $800,000,000 General Letter of Credit Facility to meet collateral posting requirements for trading and other counterparties (which replaces an existing prepetition letter of credit facility).

13.    The proposed DIP Financing will provide the TCEH Debtors with immediate access of up to $2,700,000,000, consisting of: (a) $800,000,000 under the Revolving Credit Facility; (b) $1,100,000,000 under the Delayed-Draw Term Facility, the proceeds of which, if funded, will be applied by TCEH to fund the RCT L/C Collateral Account if required for the purposes of Paragraph 10; and (c) $800,000,000 under the Term Loan Facility, of which up to $800,000,000 may be applied by TCEH to fund the General L/C Collateral Account. Moreover, upon entry of the Final Order, the proposed DIP Financing will provide the TCEH Debtors with up to $4,475,000,000, consisting of (x) $1,950,000,000 under the Revolving Credit Facility, (y) $1,425,000,000 under the Term Loan Facility, of which up to $800,000,000 may be applied

6

by TCEH to fund the General L/C Collateral Account, and (z) $1,100,000,000 under the Delayed-Draw Term Facility, the proceeds of which, if funded, will be applied by TCEH to fund the RCT L/C Collateral Account to support RCT Letters of Credit. The Debtors will not borrow under the Delayed-Draw Term Facility on an interim or final basis unless the Railroad Commission of Texas (the "RCT") rejects the Reclamation Support Carve Out.

14.    In addition to the DIP Financing, in the normal course of business, the TCEH Debtors use cash on hand and cash flow from operations to fund working capital, capital expenditures, and for other general corporate purposes. An inability to use these funds during these chapter 11 cases could cripple the TCEH Debtors' business operations. Indeed, the TCEH Debtors must use their cash to, among other things, continue the operation of their business in an orderly manner, maintain business relationships with vendors, suppliers, and customers, pay employees, fulfill regulatory obligations, and satisfy other working capital and operational needs—all of which are necessary to preserve and maintain the TCEH Debtors' going-concern value and, ultimately, effectuate a successful reorganization. Thus, the TCEH Debtors require the use of Cash Collateral to continue operating their businesses.

15.    Importantly, before entry of the Final Order, the TCEH Debtors will use the DIP Financing and Cash Collateral only to the extent necessary to preserve the value of the Collateral, including to fund necessary operational and adequate protection costs. The TCEH Debtors will not use the DIP Financing and Cash Collateral to pay professional fees and expenses before entry of the Final Order.

16.    Absent an ability to demonstrate that the TCEH Debtors have the means available to operate in the ordinary course and procure goods and services that are vital to ongoing business operations, customers may seek other alternatives and vendors and suppliers may refuse

7

to do business with the TCEH Debtors. Moreover, absent access to the Cash Collateral and the funds available under the DIP Facility, the TCEH Debtors may not have sufficient liquidity to continue their business operations in the ordinary course to the material detriment of customers, creditors, employees, and other parties in interests, jeopardizing the success of the TCEH Debtors' restructuring.

17.    The approval of the TCEH Debtors' use of the Cash Collateral and the DIP Financing, with its favorable terms, will substantially enhance the Debtors' ability to make a smooth transition into chapter 11 and instill confidence in their customers, employees, creditors, and other parties in interest. Therefore, the TCEH Debtors have an immediate need to access the DIP Facility and use the Cash Collateral on an interim basis and throughout the pendency of these chapter 11 cases.

<b><u>The TCEH Debtors' Efforts to Obtain Postpetition Financing</u></b>

18.    The TCEH Debtors were uniquely positioned to negotiate a DIP facility with favorable terms and ultimately secured the DIP Financing, which is, in substance, more akin to conventional, broadly-syndicated facilities than typical post-petition financing facilities. *First*, the TCEH Debtors are operationally sound and anticipate generating significant positive cash flow before debt service over the course of the chapter 11 cases. *Second*, relative to the value of the TCEH Debtors' businesses, the DIP Financing is significantly overcollateralized. *Third*, the opportunity to create a relationship with a strong going concern such as the TCEH Debtors was highly attractive to potential DIP lenders. The lending market understands that the Debtors are a robust company with a leveraged balance sheet that will be restructured in these chapter 11 cases.

19.    The TCEH Debtors' decision to proceed with the DIP Financing comes after a dedicated and diligent search for the best financing alternatives. In early September 2013, the

8

TCEH Debtors and Evercore initiated a request for DIP facility proposals ("RFP"). The TCEH Debtors' and Evercore canvassed the market to find parties interested in providing debtor-in-possession financing. During the initial stage of the RFP process, the TCEH Debtors approached five large financial institutions that are actively involved in the debtor-in-possession and syndicated finance markets. The TCEH Debtors and their advisors provided these financial institutions with a proposed DIP financing structure, draft commitment letter, and a detailed term sheet. The TCEH Debtors offered each of these financial institutions the opportunity to conduct due diligence and submit proposals for up to 100% of the DIP financing commitment.

20.    Five financial institutions submitted proposals in response to the TCEH Debtors' RFP. After thorough analysis of the DIP financing proposals, the TCEH Debtors concluded that no single financial institution would be able to underwrite the entire amount of the DIP financing due to the size of the proposed revolving credit facility. Nevertheless, the size of the revolving credit facility remained a priority for the TCEH Debtors because a revolving credit facility offered several benefits over a comparable term facility, including lower pricing and greater efficiency by deferring funding until needed. As a result of this analysis, the TCEH Debtors decided to aggregate the support of multiple financial institutions to fund the DIP Facility.

21.    In early October 2013, two additional financial institutions signed non-disclosure agreements and joined the DIP financing process. The TCEH Debtors continued negotiating with all seven financing providers during the first three weeks of October to obtain the most favorable terms on the DIP Financing. On October 25, 2013, the TCEH Debtors determined that the DIP Financing proposals from Citigroup Global Markets Inc. and Deutsche Bank Securities Inc. contained the best possible combination of terms and effectively addressed the TCEH Debtors' liquidity needs. The TCEH Debtors thus began negotiating commitment letters with

Citigroup Global Markets Inc. and Deutsche Bank Securities Inc., as well as the five other lenders, understanding that the TCEH Debtors would require a broadly-syndicated facility to achieve a revolving credit facility of this size.

22.     The TCEH Debtors' initial discussions provided a foundation for renewing DIP Financing negotiations in early February 2014. The TCEH Debtors and their advisors continued negotiating with the DIP Lenders through March 2014, including replacing one of the seven lenders.

23.     On April 28, 2014, the TCEH Debtors received signed commitment letters from all seven initial lenders under the DIP Facility. Collectively, these institutions were able to provide the TCEH Debtors with $4,475,000,000 in DIP Financing, including the $1,950,000,000 Revolving Credit Facility.

24.     The DIP Financing is the best source of financing, providing the TCEH Debtors with the liquidity they need to continue operating their businesses in the ordinary course and satisfy restructuring-related costs. The DIP Financing was negotiated at arm's length on terms that are reasonable. The DIP Financing will ensure the TCEH Debtors' access to sufficient liquidity that will provide the foundation for maximizing value for all stakeholders.

### DIP Financing on a Senior Secured and Superpriority Basis

25.     The TCEH Debtors' and Evercore's discussions with various potential sources of DIP financing revealed that DIP financing on a junior or unsecured basis was not available to the TCEH Debtors.   The TCEH Debtors' significant secured debt obligations and lack of unencumbered assets precludes them from obtaining postpetition financing in the amount they require on terms other than on a senior secured and superpriority basis.

10

26.     I believe the TCEH Debtors satisfy the requirements to obtain postpetition financing secured by a first priority priming lien, as I understand them, because the transaction will enhance the value of the TCEH Debtors' assets. *First*, the TCEH Debtors and their advisors canvassed the market and were not able to obtain financing on equal or better terms from the DIP Lenders other than financing secured by first priority priming liens.

27.     *Second*, the TCEH Debtors need the funds to be provided under the DIP Facility to preserve the value of their estates for the benefit of all stakeholders. Specifically, the TCEH Debtors need the funds to be provided under the DIP Facility to maintain operations and signal to their suppliers and other vendors that they are credit-worthy and that their vendors can and should continue to provide goods and services to the TCEH Debtors on substantially the same credit terms as during the prepetition period. Absent access to the DIP Facility and Cash Collateral, the TCEH Debtors will be unable to operate their businesses or prosecute these chapter 11 cases.

28.     *Third*, the TCEH Debtors and their advisors determined that the DIP Lenders offered the best option for obtaining the postpetition financing the TCEH Debtors require, including, upon entry of the Interim Order, access to approximately \$2,700,000,000 in incremental liquidity, which the TCEH Debtors and their advisors have independently determined is sufficient and necessary to allow the TCEH Debtors to maintain their operations. The DIP Lenders agreed to favorable terms of the DIP Financing, in part to create and foster relationships with the Debtors.

29.     *Fourth*, the TCEH Debtors conducted arm's-length negotiations with the DIP Lenders regarding the terms of the DIP Facility, and those agreements reflect the most favorable terms on which the DIP Lenders (or any other lender) were willing to offer financing. In my

opinion, the entry into the DIP Financing is an exercise of sound and reasonable business judgment in the best interests of the TCEH Debtors' estate and its creditors.

## The Debtors' Proposed Adequate Protection

30.    In exchange for the TCEH Debtors' use of Cash Collateral and the imposition of first priority priming DIP liens, the TCEH Debtors will provide adequate protection to the Prepetition Secured Agents to the extent of any diminution in the value of collateral for the benefit of the Prepetition Secured Creditors.    Importantly, the access to the capital provided by the DIP Facility and Cash Collateral will not only preserve the TCEH Debtors' liquidity but, as noted above, will only serve to enhance the value of the TCEH Debtors' estates. I understand that the Prepetition Secured Agents and Prepetition Secured Creditors will be offered superpriority claims, replacement liens, and junior liens. Additionally, the Prepetition First Lien Agents and Prepetition First Lien Creditors will receive adequate protection payments in the amount of their prepetition interest, professional fees and expenses, a financial covenant consistent with what is provided to the DIP Lenders, and reasonable access to books and records, including budgets and annual forecasts.

31.    To use cash collateral or impose secured superpriority priming liens, the debtor must adequately protect the secured creditor's interest in the property against any diminution in value of such interest resulting from the debtor's use of the property.  I understand that what constitutes adequate protection is decided on a case-by-case basis.  In my opinion, the proposed adequate protection summarized in the TCEH Cash Collateral Motion and TCEH DIP Motion is fair and reasonable.  Most importantly, the TCEH Debtors otherwise anticipate to be cash-flow positive through the duration of the chapter 11 cases, so the use of Cash Collateral and the imposition of the priming liens to obtain postpetition financing should increase the value of the

Collateral. The TCEH Debtors have agreed to pay the Prepetition First Lien Creditors full prepetition interest as adequate protection payments. The proposed adequate protection also includes the superpriority claims, replacement and junior liens, and payment of fees and expenses. I believe this adequate protection package fully protects the Prepetition Secured Agents and the Prepetition Secured Creditors from diminution in value of the Collateral, including the Cash Collateral.

32.    Finally, I believe that the DIP Financing provides adequate protection for the Prepetition Second Lien Creditors. The access to the capital provided by the DIP Financing will not only preserve the Debtors' liquidity but, as noted above, will preserve and enhance the value of the Debtors' businesses. Finally, and just as importantly, I understand that the Second Lien Agent will receive, for the benefit of itself and the Prepetition Second Lien Creditors, (a) the Adequate Protection Liens and (b) a superpriority claim. By their very nature, all of these events provide adequate protection for these Prepetition Second Lien Creditors.

*[Remainder of page intentionally left blank.]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: April 29, 2014

Stephen Goldstein
Senior Managing Director
Evercore Group LLC

## EXHIBIT C

**DIP Budget**

TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC ("TCEH")

EIP Budget

Bank Lenders' Clean and Untitled Business

Highly Confidential Subject to Thirteenth Non-Disclosure Agreement; Subject to FRE 408

# EXHIBIT D

**DIP Credit Agreement**

SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

Dated as of [\_\_\_\_\_], 2014

among

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY LLC,**
as Parent Guarantor,

**TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC,**
as the Borrower,

**The Several Lenders
from Time to Time Parties Hereto,**

**CITIBANK, N.A.,**
as Administrative Agent and Collateral Agent,

**DEUTSCHE BANK AG NEW YORK BRANCH,
BANK OF AMERICA, N.A. AND
MORGAN STANLEY SENIOR FUNDING, INC.,**
as Co-Syndication Agents,

**BARCLAYS BANK PLC,
ROYAL BANK OF CANADA AND
UNION BANK, N.A.,**
as Co-Documentation Agents,

and

**CITIGROUP GLOBAL MARKETS INC.,
DEUTSCHE BANK SECURITIES INC.,
MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED,
MORGAN STANLEY SENIOR FUNDING, INC.,
BARCLAYS BANK PLC,
RBC CAPITAL MARKETS[1] AND
UNION BANK, N.A.**

as Joint Lead Arrangers and Joint Bookrunners

---

[1] RBC Capital Markets is a brand name for the capital markets businesses of Royal Bank of Canada and its affiliates.

#4821-7663-6950

# TABLE OF CONTENTS

Page

SECTION 1.    Definitions...................................................................................................2

1.1.    Defined Terms..................................................................................2
1.2.    Other Interpretive Provisions ........................................................60
1.3.    Accounting Terms ..........................................................................61
1.4.    Rounding ........................................................................................61
1.5.    References to Agreements, Laws, Etc.............................................61
1.6.    Times of Day ..................................................................................61
1.7.    Timing of Payment of Performance ...............................................61
1.8.    Currency Equivalents Generally ....................................................61
1.9.    Classification of Loans and Borrowings ........................................62
1.10.   Hedging Agreements ......................................................................62

SECTION 2.    Amount and Terms of Credit...................................................................62

2.1.    Commitments ..................................................................................62
2.2.    Minimum Amount of Each Borrowing; Maximum Number of
        Borrowings......................................................................................64
2.3.    Notice of Borrowing; Determination of Class of Loans..................64
2.4.    Disbursement of Funds....................................................................65
2.5.    Repayment of Loans; Evidence of Debt..........................................66
2.6.    Conversions and Continuations ......................................................66
2.7.    Pro Rata Borrowings .......................................................................67
2.8.    Interest ............................................................................................67
2.9.    Interest Periods ...............................................................................68
2.10.   Increased Costs, Illegality, Etc. ......................................................69
2.11.   Compensation..................................................................................70
2.12.   Change of Lending Office...............................................................71
2.13.   Notice of Certain Costs...................................................................71
2.14.   Incremental Facilities .....................................................................71
2.15.   [Reserved] .......................................................................................73
2.16.   Defaulting Lenders ..........................................................................73

SECTION 3.    Letters of Credit ..............................................................................74

3.1.    Issuance of Letters of Credit ...........................................................74
3.2.    Letter of Credit Requests.................................................................75
3.3.    [Reserved].........................................................................................76
3.4.    Agreement to Repay Letter of Credit Drawings...............................76
3.5.    Increased Costs ................................................................................77
3.6.    New or Successor Letter of Credit Issuer.........................................77
3.7.    Role of Letter of Credit Issuer.........................................................78
3.8.    General L/C Collateral Account.......................................................79
3.9.    RCT L/C Collateral Account............................................................80

-i-

**Page**

3.10.    Drawings from General L/C Collateral Accounts and RCT L/C
         Collateral Account.................................................................................81
3.11.    Applicability of ISP and UCP ...............................................................81
3.12.    Conflict with Issuer Documents .............................................................81
3.13.    Letters of Credit Issued for Others ........................................................82

SECTION 4.    Fees; Commitments ...................................................................82

4.1.    Fees............................................................................................................82
4.2.    Voluntary Reduction of Revolving Credit Commitments and
        Delayed-Draw Term Loan Commitments ...............................................83
4.3.    Mandatory Termination of Commitments ...............................................84
4.4.    RCT Carve Out Support Rejection Notice. ............................................84

SECTION 5.    Payments ...................................................................................84

5.1.    Voluntary Prepayments .............................................................................84
5.2.    Mandatory Prepayments ...........................................................................85
5.3.    Method and Place of Payment ..................................................................86
5.4.    Net Payments.............................................................................................87
5.5.    Computations of Interest and Fees ..........................................................90
5.6.    Limit on Rate of Interest ..........................................................................90

SECTION 6.    Conditions Precedent to Initial Borrowing...........................91

6.1.     Credit Documents.....................................................................................91
6.2.     Collateral ..................................................................................................91
6.3.     Legal Opinions .........................................................................................91
6.4.     Initial Budget............................................................................................92
6.5.     [Reserved]. ...............................................................................................92
6.6.     Closing Certificates ..................................................................................92
6.7.     Authorization of Proceedings of Each Credit Party .............................92
6.8.     Fees............................................................................................................92
6.9.     Representations and Warranties ...............................................................92
6.10.    Interim Order ............................................................................................92
6.11.    First Day Orders .......................................................................................92
6.12.    Trustees and Examiners............................................................................93
6.13.    Projections ................................................................................................93
6.14.    Patriot Act ................................................................................................93
6.15.    Petition Date .............................................................................................93
6.16.    Restructuring Support Agreement............................................................93
6.17.    Restructuring Documents .........................................................................93

SECTION 7.    Conditions Precedent to All Credit Events...........................93

7.1.    No Default; Representations and Warranties ...........................................94
7.2.    Notice of Borrowing..................................................................................94
7.3.    Full Availability ........................................................................................94

-ii-

**Page**

|  | 7.4. | Availability of Delayed-Draw Term Loans and RCT Letters of Credit .................................................................................95 |

| SECTION 8. | | Representations, Warranties and Agreements ............................95 |

|  | 8.1. | Corporate Status; Compliance with Laws ...................................95 |
|  | 8.2. | Corporate Power and Authority ..................................................96 |
|  | 8.3. | No Violation .................................................................................96 |
|  | 8.4. | Litigation .....................................................................................96 |
|  | 8.5. | Margin Regulations .....................................................................96 |
|  | 8.6. | Governmental Approvals ............................................................96 |
|  | 8.7. | Investment Company Act ............................................................97 |
|  | 8.8. | True and Complete Disclosure ....................................................97 |
|  | 8.9. | Financial Condition; Projections; Material Adverse Effect ................97 |
|  | 8.10. | Tax Matters .................................................................................97 |
|  | 8.11. | Compliance with ERISA .............................................................98 |
|  | 8.12. | Subsidiaries .................................................................................98 |
|  | 8.13. | Intellectual Property ...................................................................98 |
|  | 8.14. | Environmental Laws....................................................................99 |
|  | 8.15. | Properties.....................................................................................99 |
|  | 8.16. | Orders ..........................................................................................99 |
|  | 8.17. | Status of Obligations; Perfection and Priority of Security Interests ...............................................................................99 |
|  | 8.18. | Insurance ...................................................................................100 |
|  | 8.19. | Labor Matters ............................................................................100 |
|  | 8.20. | Sanctioned Persons; Anti-Corruption Laws; Patriot Act....................100 |

| SECTION 9. | | Affirmative Covenants ..............................................................100 |

|  | 9.1. | Information Covenants ...............................................................101 |
|  | 9.2. | Books, Records and Inspections................................................104 |
|  | 9.3. | Maintenance of Insurance .........................................................105 |
|  | 9.4. | Payment of Taxes .....................................................................105 |
|  | 9.5. | Consolidated Corporate Franchises...........................................106 |
|  | 9.6. | Compliance with Statutes, Regulations, Etc..............................106 |
|  | 9.7. | ERISA ........................................................................................106 |
|  | 9.8. | Maintenance of Properties ........................................................107 |
|  | 9.9. | Transactions with Affiliates .......................................................107 |
|  | 9.10. | End of Fiscal Years; Fiscal Quarters ........................................108 |
|  | 9.11. | Additional Guarantors and Grantors .........................................108 |
|  | 9.12. | Pledge of Additional Stock and Evidence of Indebtedness...............109 |
|  | 9.13. | [Reserved] .................................................................................109 |
|  | 9.14. | Further Assurances ...................................................................109 |
|  | 9.15. | Bankruptcy Matters ...................................................................110 |
|  | 9.16. | Ratings.......................................................................................110 |
|  | 9.17. | Use of Proceeds ........................................................................110 |

| SECTION 10. | | Negative Covenants....................................................................111 |

-iii-

**Page**

| | | |
|---|---|---|
| 10.1. | Limitation on Indebtedness | 111 |
| 10.2. | Limitation on Liens | 115 |
| 10.3. | Limitation on Fundamental Changes | 119 |
| 10.4. | Limitation on Sale of Assets | 120 |
| 10.5. | Limitation on Investments | 123 |
| 10.6. | Limitation on Dividends | 127 |
| 10.7. | Limitation on Prepaying Indebtedness | 131 |
| 10.8. | Limitations on Sale Leasebacks | 131 |
| 10.9. | Consolidated Superpriority Secured Net Debt to Consolidated EBITDA Ratio | 131 |
| 10.10. | Changes in Business | 131 |
| 10.11. | Bankruptcy Provisions. | 131 |
| 10.12. | Affiliate Value Transfers | 132 |
| SECTION 11. | Events of Default | 132 |
| 11.1. | Payments | 132 |
| 11.2. | Representations, Etc. | 132 |
| 11.3. | Covenants | 132 |
| 11.4. | Default Under Other Agreements | 132 |
| 11.5. | [Reserved] | 133 |
| 11.6. | ERISA | 133 |
| 11.7. | Credit Documents | 133 |
| 11.8. | [Reserved] | 133 |
| 11.9. | [Reserved] | 133 |
| 11.10. | [Reserved] | 133 |
| 11.11. | Judgments | 133 |
| 11.12. | Hedging Agreements | 133 |
| 11.13. | Change of Control | 134 |
| 11.14. | Final Order | 134 |
| 11.15. | Matters Related to the Cases | 134 |
| 11.16. | Automatic Stay | 135 |
| 11.17. | Status of Orders | 135 |
| 11.18. | Confirmation of Plan | 135 |
| 11.19. | Application of Proceeds | 135 |
| SECTION 12. | The Agents | 138 |
| 12.1. | Appointment | 138 |
| 12.2. | Delegation of Duties | 138 |
| 12.3. | Exculpatory Provisions | 138 |
| 12.4. | Reliance by Agents | 140 |
| 12.5. | Notice of Default | 140 |
| 12.6. | Non-Reliance on Administrative Agent, Collateral Agent and Other Lenders | 140 |
| 12.7. | Indemnification | 141 |
| 12.8. | Agents in its Individual Capacities | 142 |
| 12.9. | Successor Agents | 142 |
| 12.10. | Withholding Tax | 143 |

#4821-7663-6950

**Page**

12.11.    Trust Indenture Act ...................................................................143
12.12.    [Reserved]. ...............................................................................143
12.13.    Security Documents and Guarantee ..........................................143

SECTION 13.    Miscellaneous...............................................................................144

13.1.    Amendments, Waivers and Releases..........................................144
13.2.    Notices.......................................................................................148
13.3.    No Waiver; Cumulative Remedies.............................................148
13.4.    Survival of Representations and Warranties ..............................148
13.5.    Payment of Expenses; Indemnification......................................148
13.6.    Successors and Assigns; Participations and Assignments..........150
13.7.    Replacements of Lenders under Certain Circumstances ............154
13.8.    Adjustments; Set-off .................................................................155
13.9.    Counterparts ..............................................................................155
13.10.    Severability................................................................................155
13.11.    INTEGRATION..........................................................................155
13.12.    GOVERNING LAW ...................................................................156
13.13.    Submission to Jurisdiction; Waivers .........................................156
13.14.    Acknowledgments......................................................................156
13.15.    WAIVERS OF JURY TRIAL ......................................................157
13.16.    Confidentiality...........................................................................157
13.17.    Direct Website Communications................................................158
13.18.    USA PATRIOT Act ....................................................................160
13.19.    Payments Set Aside ...................................................................160
13.20.    Separateness ..............................................................................160
13.21.    Keepwell....................................................................................160

SECTION 14.    Security; Secured Commodity Hedging Agreements.........................161

14.1.    Security......................................................................................161
14.2.    Secured Commodity Hedging Agreements .................................163
14.3.    Permitted Property Interests ......................................................164

#4821-7663-6950

SCHEDULES

| | |
|---|---|
| Schedule 1.1(a) | Commitments |
| Schedule 1.1(b) | Excluded Subsidiaries |
| Schedule 1.1(c) | Unrestricted Subsidiaries |
| Schedule 1.1(d) | First Day Motions |
| Schedule 8.4 | Litigation |
| Schedule 8.12 | Subsidiaries |
| Schedule 8.15 | Property |
| Schedule 9.9 | Closing Date Affiliate Transactions |
| Schedule 10.1 | Closing Date Indebtedness |
| Schedule 10.2 | Closing Date Liens |
| Schedule 10.4 | Scheduled Dispositions |
| Schedule 10.5 | Closing Date Investments |
| Schedule 13.2 | Notice Addresses |

EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Notice of Borrowing |
| Exhibit B | Form of Guarantee |
| Exhibit C | Form of Budget Notice |
| Exhibit D | [Reserved] |
| Exhibit E | [Reserved] |
| Exhibit F | Form of Security Agreement |
| Exhibit G | Form of Letter of Credit Request |
| Exhibit H | Form of Credit Party Closing Certificate |
| Exhibit I | Form of Assignment and Acceptance |
| Exhibit J-1 | Form of Promissory Note (Revolving Credit Loans) |
| Exhibit J-2 | Form of Promissory Note (Term Loans) |
| Exhibit J-3 | Form of Promissory Note (Delayed-Draw Term Loans) |
| Exhibit K | Form of Incremental Amendment |
| Exhibit L | Form of Non-U.S. Lender Certification |
| Exhibit M | Initial Budget |
| Exhibit N | Form of Interim Order |

#4821-7663-6950

SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of [    ], 2014, among ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY LLC, a Delaware limited liability company and a debtor and debtor-in-possession ("**Parent Guarantor**"), TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC, a Delaware limited liability company and a debtor and debtor-in-possession ("**TCEH**" or the "**Borrower**") in a case pending under chapter 11 of the Bankruptcy Code ("**Chapter 11**"), the lending institutions from time to time parties hereto (each, a "**Lender**" and, collectively, the "**Lenders**"), CITIBANK, N.A., as Administrative Agent and Collateral Agent and CITIGROUP GLOBAL MARKETS INC., DEUTSCHE BANK SECURITIES INC., MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, MORGAN STANLEY SENIOR FUNDING, INC., BARCLAYS BANK PLC, RBC CAPITAL MARKETS and UNION BANK, N.A., as Joint Lead Arrangers and Joint Bookrunners.

## RECITALS:

WHEREAS, capitalized terms used and not defined in the preamble and these recitals shall have the respective meanings set forth for such terms in Section 1.1 hereof;

WHEREAS, on [    ], 2014 (the "**Petition Date**"), the Borrower, Parent Guarantor and each of the other Guarantors (collectively, the "**TCEH Debtors**") filed voluntary petitions for relief under Chapter 11 in the United States Bankruptcy Court for the District of Delaware (such court, together with any other court having exclusive jurisdiction over any Case from time to time and any Federal appellate court thereof, the "**Bankruptcy Court**") and commenced cases numbered [    ] respectively (each, a "**Case**" and, collectively, the "**Cases**"), and have continued in the possession and operation of their assets and in the management of their businesses pursuant to sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, in connection with the foregoing, the Borrower has requested that the Lenders and Letter of Credit Issuers extend credit to the Borrower in the form of (a) $1,425,000,000 in aggregate principal amount of Term Loans, (b) $1,950,000,000 in aggregate principal amount of Revolving Credit Commitments to be made available to the Borrower at any time and from time to time prior to the Revolving Credit Termination Date, (c) up to $1,100,000,000 in aggregate principal amount of Delayed-Draw Term Loan Commitments to be made available to the Borrower at any time and from time to time prior to the Delayed-Draw Termination Date, (d) $1,100,000,000 in RCT Letter of Credit Commitments for the issuance of RCT Letters of Credit to be made available to the Borrower from time to time prior to the RCT L/C Termination Date and (e) $800,000,000 in General Letter of Credit Commitments for the issuance of General Letters of Credit to be made available to the Borrower from time to time prior to the General L/C Termination Date, in each case subject to the terms and conditions set forth herein; and

WHEREAS, the Lenders and Letter of Credit Issuers are willing to make available to the Borrower such loans and facilities upon the terms and subject to the conditions set forth herein;

## AGREEMENT:

NOW, THEREFORE, in consideration of the premises and the covenants and agreements contained herein, the parties hereto hereby agree as follows:

#4821-7663-6950

SECTION 1.  Definitions.

1.1.  Defined Terms.

(a)    As used herein, the following terms shall have the meanings specified in this Section 1.1 unless the context otherwise requires:

"**ABR**" shall mean for any day a fluctuating rate per annum equal to the greatest of (a) the Federal Funds Effective Rate plus 1/2 of 1%, (b) the rate of interest in effect for such day as publicly announced from time to time by the Administrative Agent as its "prime rate" and (c) the LIBOR Rate for a one month Interest Period on such day (or if such day is not a Business Day, the immediately preceding Business Day) plus 1.00%; provided that, for the avoidance of doubt, for purposes of calculating the LIBOR Rate pursuant to clause (c), the LIBOR Rate for any day shall be based on the rate per annum determined by the Administrative Agent at approximately 11:00 a.m. (London time) on such day by reference to the ICE Benchmark Administration (or any successor organization) LIBOR Rate (the "**Relevant LIBOR Rate**") for deposits in Dollars (as published by Reuters or any other commonly available source providing quotations of the Relevant LIBOR Rate as designated by the Administrative Agent) for a period equal to one month.  The "prime rate" is a rate set by the Administrative Agent based upon various factors including the Administrative Agent's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate.  If the Administrative Agent is unable to ascertain the Federal Funds Effective Rate due to its inability to obtain sufficient quotations in accordance with the definition thereof, after notice is provided to the Borrower, the ABR shall be determined without regard to clause (a) above until the circumstances giving rise to such inability no longer exist.  Any change in the ABR due to a change in such rate announced by the Administrative Agent or in the Federal Funds Effective Rate shall take effect at the opening of business on the day specified in the public announcement of such change or on the effective date of such change in the Federal Funds Effective Rate or the Relevant LIBOR Rate, as applicable.

"**ABR Loan**" shall mean each Loan bearing interest based on the ABR.

"**Acceptable Reinvestment Commitment**" shall mean a binding commitment of the Borrower or any Restricted Subsidiary entered into at any time prior to the end of the Reinvestment Period to reinvest the proceeds of a Prepayment Event.

"**Acceptable Reorganization Plan**" shall mean a Reorganization Plan that is in form and substance consistent in all material respects with, and as it may be amended in accordance with the terms of, the Restructuring Support Agreement and the Restructuring Term Sheet, and is in form and substance reasonably satisfactory to the Administrative Agent (provided, however, that with respect to provisions of the plan that relate to the payment of the Credit Facilities, such provisions must be in form and substance satisfactory to the Administrative Agent) and provides for, among other things, the termination of the Revolving Credit Commitments and the payment in full in cash of the Obligations outstanding under the Credit Documents (other than Contingent Obligations) and, with respect to any Letter of Credit that does not become a letter of credit under the Exit Facilities, cash collateralization of such Letter of Credit, in each case, on or prior to the earlier of the Plan Effective Date or substantial consummation of such Reorganization Plan.

"**Accession Agreement**" shall mean an accession agreement substantially in the form attached to the Security Agreement as Exhibit B thereto.

"**Acquired EBITDA**" shall mean, with respect to any Acquired Entity or Business or any Converted Restricted Subsidiary (any of the foregoing, a "**Pro Forma Entity**") for any period, the amount for such period of Consolidated EBITDA of such Pro Forma Entity (determined using such definitions as if references to the Borrower and the Restricted Subsidiaries therein were to such Pro Forma Entity and its Restricted Subsidiaries), all as determined on a consolidated basis for such Pro Forma Entity in a manner not inconsistent with GAAP.

"**Acquired Entity or Business**" shall have the meaning provided in the definition of the term "Consolidated EBITDA".

"**Additional Lender**" shall mean, at any time, any Person (other than any such Person that is a Lender at such time) that agrees to provide any portion of an Incremental Term Loan, or Incremental Revolving Commitment Increase pursuant to an Incremental Amendment in accordance with Section 2.14(h).

"**Adequate Protection Payments**" shall have the meaning ascribed thereto in the Interim Cash Collateral Order.

"**Adjusted Available Delayed-Draw Term Loan Commitment**" shall mean at any time the Available Delayed-Draw Term Loan Commitment less the Available Delayed-Draw Term Loan Commitments of all Defaulting Lenders.

"**Adjusted Total Revolving Credit Commitment**" shall mean at any time the Total Revolving Credit Commitment less the aggregate Revolving Credit Commitments of all Defaulting Lenders.

"**Administrative Agent**" shall mean Citibank, N.A., as the administrative agent for the Lenders under this Agreement and the other Credit Documents, or any successor administrative agent pursuant to Section 12.

"**Administrative Agent's Office**" shall mean the Administrative Agent's address and, as appropriate, account as set forth on Schedule 13.2, or such other address or account as the Administrative Agent may from time to time notify to the Borrower and the Lenders.

"**Administrative Questionnaire**" shall have the meaning provided in Section 13.6(b)(ii)(D).

"**Advisors**" shall mean legal counsel, financial advisors and third-party appraisers and consultants advising the Agents, the Letter of Credit Issuers, the Lenders and their Related Parties in connection with their participation in the Cases, limited in the case of legal counsel to one primary counsel for the Agents (as of the Closing Date, Milbank, Tweed, Hadley & McCloy LLP) and, if necessary, one firm of regulatory counsel and/or one firm of local counsel in each appropriate jurisdiction (and, in the case of an actual or perceived conflict of interest where the Person affected by such conflict informs the Borrower of such conflict and thereafter, after receipt of the consent of the Borrower (which consent shall not be unreasonably withheld or delayed), retains its own counsel, of another firm of counsel for such affected Person).

"**Affiliate**" shall mean, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with such Person. A Person shall be deemed to control another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership

-3-

of voting securities, by contract or otherwise. The terms "controlling" and "controlled" shall have meanings correlative thereto.

"**Affiliate Value Transfer**" shall mean any Investment made in reliance on Section 10.5(c), (g), (h), (i), (k), (l), (m), (p), (q), (t), (u), (v), (aa), (cc), (dd), (ee) or (ff) (including the issuance of Letters of Credit for the direct or indirect benefit of the Ultimate Parent and its Subsidiaries (other than the Borrower and the Restricted Subsidiaries)), any Disposition made in reliance on Section 10.4(b), (g) or (m) or any distribution made in reliance on Section 10.6(u), in each case made by the Borrower or any Restricted Subsidiary to an Affiliate thereof (other than the Borrower and the Restricted Subsidiaries), excluding payments, transfers or Dispositions to such Affiliates (including the issuance of Letters of Credit for the benefit of Ultimate Parent and its Subsidiaries) pursuant to the Shared Services Agreement or the Tax Sharing Agreement.

"**Agent Parties**" shall have the meaning provided in Section 13.17(d).

"**Agents**" shall mean the Administrative Agent, the Collateral Agent, the Co-Syndication Agents, each Joint Lead Arranger and the Co-Documentation Agents.

"**Aggregate Revolving Credit Outstandings**" shall have the meaning provided in Section 5.2(b).

"**Agreement**" shall mean this Senior Secured Superpriority Debtor-in-Possession Credit Agreement.

"**Annual Operating Forecast**" shall have the meaning provided in Section 9.1(d). For the avoidance of doubt, no Annual Operating Forecast shall constitute a cap or limitation on the amount of "Allowed Professional Fees" (as defined in the Orders) payable by the TCEH Debtors.

"**Anti-Corruption Laws**" shall have the meaning provided in Section 8.20.

"**Applicable ABR Margin**" shall mean at any date:

(a)    with respect to each ABR Loan that is a Term Loan, 1.75% *per annum*, (b) with respect to each ABR Loan that is a Delayed-Draw Term Loan, 1.75% *per annum* and (c) with respect to each ABR Loan that is a Revolving Credit Loan, 1.50% *per annum*.

"**Applicable Amount**" shall mean, at any time (the "**Applicable Amount Reference Time**"), an amount (which amount may not in any event be less than zero (0)) equal to the sum, without duplication, of:

(i)    50% of Cumulative Consolidated Net Income of the Borrower and the Restricted Subsidiaries for the period from the first day of the first fiscal quarter commencing after the Closing Date until the last day of the then most recent fiscal quarter or fiscal year, as applicable, for which Section 9.1 Financials have been delivered;

(ii)    to the extent not (A) already included in the calculation of Consolidated Net Income of the Borrower and the Restricted Subsidiaries or (B) already reflected as a return of capital or deemed reduction in the amount of such Investment, the aggregate JV Distribution Amount received by the Borrower or any Restricted Subsidiary during the period from and including the Business Day immediately following the Closing Date through and including the Applicable Amount Reference Time;

-4-

(iii)    to the extent not (A) already included in the calculation of Consolidated Net Income or (B) already reflected as a return of capital or deemed reduction in the amount of any such Investment, the aggregate amount of all cash repayments of principal received by the Borrower or any Restricted Subsidiary from any Minority Investments or Unrestricted Subsidiaries during the period from and including the Business Day immediately following the Closing Date through and including the Applicable Amount Reference Time in respect of loans made by the Borrower or any Restricted Subsidiary to such Minority Investments or Unrestricted Subsidiaries; and

(iv)    to the extent not (A) already included in the calculation of Consolidated Net Income of the Borrower and the Restricted Subsidiaries, (B) already reflected as a return of capital or deemed reduction in the amount of such Investment or (C) applied to prepay the Term Loans and Delayed-Draw Term Loans in accordance with Section 5.2(a), the aggregate amount of all Net Cash Proceeds received by the Borrower or any Restricted Subsidiary in connection with the sale, transfer or other disposition of its ownership interest in any Minority Investments or in any Unrestricted Subsidiary during the period from and including the Business Day immediately following the Closing Date through and including the Applicable Amount Reference Time;

minus (b) the sum, without duplication of:

(i)    the aggregate amount of Investments made pursuant to Section 10.5(g)(ii)(y), 10.5(h)(iii), 10.5(i)(y) or 10.5(v)(y) following the Closing Date and prior to the Applicable Amount Reference Time; and

(ii)    the aggregate amount of prepayments pursuant to Section 10.7(ii) following the Closing Date and prior to the Applicable Amount Reference Time.

Notwithstanding the foregoing, in making any calculation or other determination under this Agreement involving the Applicable Amount, if the Applicable Amount at such time is less than zero, then the Applicable Amount shall be deemed to be zero for purposes of such calculation or determination.

"**Applicable Equity Amount**" shall mean, at any time (the "**Applicable Equity Amount Reference Time**"), an amount equal to, without duplication, (a) the amount of any capital contributions made in cash to, or any proceeds of an equity issuance received by the Borrower during the period from and including the Business Day immediately following the Closing Date through and including the Applicable Equity Amount Reference Time, including proceeds from the issuance of Stock or Stock Equivalents of Parent Guarantor or any direct or indirect parent of Parent Guarantor (to the extent the proceeds of any such issuance are contributed to the Borrower), but excluding all proceeds from the issuance of Disqualified Stock

minus (b) the sum, without duplication, of:

(i)    the aggregate amount of Investments made pursuant to Section 10.5(g)(ii)(x), 10.5(h)(ii), 10.5(i)(x) or 10.5(v)(x) following the Closing Date and prior to the Applicable Equity Amount Reference Time; and

(ii)    the aggregate amount of dividends pursuant to Section 10.6(c)(y) following the Closing Date and prior to the Applicable Equity Amount Reference Time.

"**Applicable Laws**" shall mean, as to any Person, any law (including common law), statute, regulation, ordinance, rule, order, decree, judgment, consent decree, writ, injunction, settlement agreement or governmental requirement enacted, promulgated or entered into or agreed by any Governmental Authority (including the PUCT and ERCOT), in each case applicable to or binding on such Person or any of its property or assets or to which such Person or any of its property or assets is subject.

"**Applicable LIBOR Margin**" shall mean at any date:

(a)    with respect to each LIBOR Loan that is a Term Loan, 2.75% *per annum*, (b) with respect to each LIBOR Loan that is a Delayed-Draw Term Loan, 2.75% *per annum* and (c) with respect to each LIBOR Loan that is a Revolving Credit Loan, 2.50% *per annum*.

"**Approved Fund**" shall mean any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Asset Sale Prepayment Event**" shall mean any Disposition of any business units, assets or other property of the Borrower and the Restricted Subsidiaries not in the ordinary course of business (including any Disposition of any Stock or Stock Equivalents of any Subsidiary of the Borrower owned by the Borrower or any Restricted Subsidiary). Notwithstanding the foregoing, the term "Asset Sale Prepayment Event" shall not include any transaction permitted by Section 10.4 (other than transactions permitted by Section 10.4(b), Section 10.4(g), the first proviso to Section 10.4(i), Section 10.4(j), Section 10.4(m), Section 10.4(q), Section 10.4(r), Section 10.4(s) and Section 10.4(t), which shall constitute Asset Sale Prepayment Events).

"**Assignment and Acceptance**" shall mean an assignment and acceptance substantially in the form of Exhibit I, or such other form as may be approved by the Administrative Agent.

"**Authorized Officer**" shall mean the President, the Chief Executive Officer, the Chief Financial Officer, the Chief Operating Officer, the Treasurer, the Assistant Treasurer, the Controller, any Senior Vice President, with respect to certain limited liability companies or partnerships that do not have officers, any manager, managing member or general partner thereof, any other senior officer of Parent Guarantor, the Borrower or any other Credit Party designated as such in writing to the Administrative Agent by Parent Guarantor, the Borrower or any other Credit Party, as applicable, and, with respect to any document (other than the solvency certificate) delivered on the Closing Date, the Secretary or the Assistant Secretary of any Credit Party. Any document delivered hereunder that is signed by an Authorized Officer shall be conclusively presumed to have been authorized by all necessary corporate, limited liability company, partnership and/or other action on the part of Parent Guarantor, the Borrower or any other Credit Party and such Authorized Officer shall be conclusively presumed to have acted on behalf of such Person.

"**Auto-Extension Letter of Credit**" shall have the meaning provided in Section 3.2(b).

"**Available Delayed-Draw Term Loan Commitment**" shall mean, as of any date, an amount equal to the excess, if any, of (a) the amount of the Total Delayed Draw Term Loan Commitment over (b) the sum of the aggregate principal amount of all Delayed Draw Term Loans made hereunder prior to such date.

#4821-7663-6950

"**Available Revolving Commitment**" shall mean, as of any date, an amount equal to the excess, if any, of (a) the amount of the Total Revolving Credit Commitment over (b) the aggregate principal amount of all Revolving Credit Loans then-outstanding at such time.

"**Available Term Loan Commitment**" shall mean, (a) as of the Closing Date, the Interim Availability Amount and (b) as of the Full Availability Date, an amount equal to the excess, if any, of (i) the amount of the Total Term Loan Commitment over (ii) the sum of the aggregate principal amount of all Term Loans made hereunder prior to such date.

"**Avoidance Actions**" shall mean the Credit Parties' claims and causes of action under chapter 5 of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code (but excluding causes of action arising under section 549 of the Bankruptcy Code and any related action under section 550 of the Bankruptcy Code).

"**Bankruptcy Code**" shall mean The Bankruptcy Reform Act of 1978, as heretofore and hereafter amended, and codified as 11 U.S.C. §§ 101-1532.

"**Bankruptcy Court**" shall have the meaning assigned in the Recitals hereto.

"**Baseload Assets**" shall mean (a) any Baseload Generation Assets and (b) any other assets comprising an electric generating facility or unit acquired, constructed or redesignated as such, in each such case after the Closing Date that is certified by an Authorized Officer of the Borrower to be a baseload asset.

"**Baseload Generation Assets**" shall mean the assets comprising the following generation facilities, each owned by the Borrower and its Restricted Subsidiaries on the Closing Date:

- Comanche Peak Unit 1 shall mean the approximately 1,150 megawatt (net load) nuclear fueled power generation facility known as "Comanche Peak Unit 1" being operated and owned by Luminant Generation Company LLC in Somervell County and Hood County, Texas;
- Comanche Peak Unit 2 shall mean the approximately 1,150 megawatt (net load) nuclear fueled power generation facility known as "Comanche Peak Unit 2" being operated and owned by Luminant Generation Company LLC in Somervell County and Hood County, Texas;
- Big Brown Unit 1 shall mean the approximately 575 megawatt (net load) lignite/coal fired power generation facility, excluding mining properties, known as "Big Brown Unit 1" being operated and owned by Big Brown Power Company LLC in Freestone County, Texas;
- Big Brown Unit 2 shall mean the approximately 575 megawatt (net load) lignite/coal fired power generation facility, excluding mining properties, known as "Big Brown Unit 2" being operated and owned by Big Brown Power Company LLC in Freestone County, Texas;
- Monticello Unit 1 shall mean the approximately 565 megawatt (net load) lignite/coal fired power generation facility, excluding mining properties, known as "Monticello Unit 1" being operated and owned by Luminant Generation Company LLC in Titus County, Franklin County and Hopkins County, Texas;
- Monticello Unit 2 shall mean the approximately 565 megawatt (net load) lignite/coal fired power generation facility, excluding mining properties, known as "Monticello Unit 2" being operated and owned by Luminant Generation Company LLC in Titus County, Franklin County and Hopkins County, Texas;

#4821-7663-6950

- Monticello Unit 3 shall mean the approximately 750 megawatt (net load) lignite/coal fired power generation facility, excluding mining properties, known as "Monticello Unit 3" being operated and owned by Luminant Generation Company LLC in Titus County, Franklin County and Hopkins County, Texas;
- Martin Lake Unit 1 shall mean the approximately 750 megawatt (net load) lignite/coal fired power generation facility, excluding mining properties, known as "Martin Lake Unit 1" being operated and owned by Luminant Generation Company LLC in Panola County and Rusk County, Texas;
- Martin Lake Unit 2 shall mean the approximately 750 megawatt (net load) lignite/coal fired power generation facility, excluding mining properties, known as "Martin Lake Unit 2" being operated and owned by Luminant Generation Company LLC in Panola County and Rusk County, Texas;
- Martin Lake Unit 3 shall mean the approximately 750 megawatt (net load) lignite/coal fired power generation facility, excluding mining properties, known as "Martin Lake Unit 3" being operated and owned by Luminant Generation Company LLC in Panola County and Rusk County, Texas;
- Oak Grove Unit 1 shall mean the approximately 800 megawatt (net load), lignite coal-fired, power generation facility, excluding mining properties, known as "Oak Grove Unit 1", being operated and owned by Oak Grove Management Company LLC in Robertson County, Texas;
- Oak Grove Unit 2 shall mean the approximately 800 megawatt (net load), lignite coal-fired, power generation facility, excluding mining properties, known as "Oak Grove Unit 2", being operated and owned by Oak Grove Management Company LLC in Robertson County, Texas;
- Sandow Unit 4; and
- Sandow Unit 5 shall mean the approximately 580 megawatt (net load), lignite coal fired, circulating fluidized bed power generation facility, excluding mining properties, known as "Sandow Unit 5" being operated and owned by Sandow Power Company LLC in Milam County, Texas.

"**Benefited Lender**" shall have the meaning provided in <u>Section 13.8(a)</u>.

"**Board**" shall mean the Board of Governors of the Federal Reserve System of the United States (or any successor).

"**Borrower**" shall have the meaning provided in the preamble to this Agreement.

"**Borrowing**" shall mean and include (a) the incurrence of one Class and Type of Loan on a given date having a single Maturity Date and in the case of LIBOR Loans, the same Interest Period (<u>provided</u> that ABR Loans incurred pursuant to <u>Section 2.10(b)</u> shall be considered part of any related Borrowing of LIBOR Loans).

"**Budget**" shall mean the Borrower and the Guarantors' consolidated budget attached hereto as <u>Exhibit M</u> (the "**Initial Budget**") setting forth a statement of cash sources and uses of all free cash flow for the next full 3 calendar months of the TCEH Debtors following the Interim Order Entry Date, broken down month by month, including the anticipated uses of the Credit Facilities in such detail as provided therein, and after such initial 3 calendar month period, at the end of each fiscal quarter (or, at the election of the Borrower, at the end of each calendar month or such other earlier period as may be agreed), an updated 3 month statement of the matters set forth above for the subsequent 3 month period in

-8-

similar detail, in each case certified as to its reasonableness when made by an Authorized Officer of the Borrower in the form of Exhibit C.

For the avoidance of doubt, no Budget shall constitute a cap or limitation on the amount of "Allowed Professional Fees" (as defined in the Orders) payable by the TCEH Debtors.

"**Bundled Payment**" shall mean an amount paid or payable by an obligor to a Credit Party pursuant to a bundled bill, which amount includes both (a) Excluded Property under clauses (a) or (c) (or both such clauses) of the definition of such term, and (b) other amounts.

"**Bundled Payment Amount**" shall mean amounts paid or payable to any Credit Party and described in clause (b) of the definition of "Bundled Payment".

"**Business Day**" shall mean any day excluding Saturday, Sunday and any other day on which banking institutions in New York City are authorized by law or other governmental actions to close, and, if such day relates to (a) any interest rate settings as to a LIBOR Loan, (b) any fundings, disbursements, settlements and payments in respect of any such LIBOR Loan, or (c) any other dealings pursuant to this Agreement in respect of any such LIBOR Loan, such day shall be a day on which dealings in deposits in Dollars are conducted by and between banks in the London interbank eurodollar market.

"**Capital Expenditures**" shall mean, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities and including in all events all amounts expended or capitalized under Capital Leases) by the Borrower and the Restricted Subsidiaries during such period that, in conformity with GAAP, are or are required to be included as capital expenditures on a consolidated statement of cash flows of the Borrower.

"**Capital Lease**" shall mean, as applied to the Borrower and the Restricted Subsidiaries, any lease of any property (whether real, personal or mixed) by the Borrower or any Restricted Subsidiary as lessee that, in conformity with GAAP, is, or is required to be, accounted for as a capital lease on the balance sheet of the Borrower; provided, however, that, notwithstanding anything to the contrary in this Agreement or in any other Credit Document, any leases that were not capital leases when entered into but are recharacterized as capital leases due to a change in accounting rules after the Closing Date shall for all purposes of this agreement not be treated as Capital Leases.

"**Capitalized Lease Obligations**" shall mean, as applied to the Borrower and the Restricted Subsidiaries at the time any determination is to be made, the amount of the liability in respect of a Capital Lease that would at such time be required to be capitalized and reflected as a liability on the balance sheet (excluding the footnotes thereto) of the Borrower in accordance with GAAP, and the Stated Maturity thereof shall be the date of the last payment of rent or any other amount due under such Capital Lease prior to the first date upon which such Capital Lease may be prepaid by the lessee without payment of a penalty; provided, however, that, notwithstanding anything to the contrary in this Agreement or in any other Credit Document, any obligations that were not required to be included on the balance sheet of the Borrower as capital lease obligations when incurred but are recharacterized as capital lease obligations due to a change in accounting rules after the Closing Date shall for all purposes of this Agreement not be treated as Capitalized Lease Obligations.

"**Capitalized Software Expenditures**" shall mean, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities) by the Borrower and the Restricted Subsidiaries during such period in respect of purchased software or internally developed software and

software enhancements that, in conformity with GAAP are or are required to be reflected as capitalized costs on the consolidated balance sheet of the Borrower.

"**Carve Out**" shall have the meaning assigned to such term in the Orders (and shall exclude, for the avoidance of doubt, cash or other amounts of cash equivalents on deposit to cash collateralize Letters of Credit (including cash in the RCT L/C Collateral Accounts or General L/C Collateral Accounts)).

"**Case**" and "**Cases**" shall each have the meaning assigned in the Recitals hereto.

"**Cash Collateral Account**" shall mean a blocked deposit account under the sole dominion and control of the Collateral Agent, and otherwise established in a manner reasonably satisfactory to the Collateral Agent.

"**Cash Management Agreement**" shall mean any agreement or arrangement to provide Cash Management Services.

"**Cash Management Bank**" shall mean any Person that either (x) at the time it enters into a Cash Management Agreement or provides Cash Management Services or (y) on the Closing Date, is a Lender or an Affiliate of a Lender, in its capacity as a party to such Cash Management Agreement or a provider of such Cash Management Services.

"**Cash Management Obligations**" shall mean obligations owed by the Borrower or any Restricted Subsidiary to any Cash Management Bank in connection with, or in respect of, any Cash Management Services or under any Cash Management Agreement.

"**Cash Management Order**" shall mean that certain Order (A) Authorizing the Debtors To (I) Continue Using Their Existing Cash Management System, (II) Maintain Existing Bank Accounts and Business Forms, and (III) Continue Using Certain Overnight Investment Accounts, (B) Authorizing Continued Intercompany Transactions and Netting of Intercompany Claims, and (C) Granting Postpetition Intercompany Claims Administrative Expense Priority [Docket No. ___].

"**Cash Management Services**" shall mean treasury, depository, overdraft, credit or debit card, purchase card, electronic funds transfer (including automated clearing house fund transfer services) and other cash management services.

"**Change in Law**" shall mean (a) the adoption of any Applicable Law after the Closing Date, (b) any change in any Applicable Law or in the interpretation or application thereof by any Governmental Authority after the Closing Date or (c) compliance by any party with any guideline, request, directive or order issued or made after the Closing Date by any central bank or other governmental or quasi-governmental authority (whether or not having the force of law); provided, that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"**Change of Control**" shall mean and be deemed to have occurred if, at any time, Parent Guarantor shall cease to own directly 100% of the Stock and Stock Equivalents of the Borrower.

#4821-7663-6950

"**Chapter 11**" shall have the meaning provided in the preamble to this Agreement.

"**Citi**" shall mean Citigroup Global Markets Inc.

"**Class**", when used in reference to any Loan or Borrowing, shall refer to whether such Loan, or the Loans comprising such Borrowing, is a Revolving Credit Loan, a Term Loan, a Delayed-Draw Term Loan or an Incremental Term Loan and, when used in reference to any Commitment, refers to whether such Commitment is a Term Loan Commitment, a Delayed-Draw Term Loan Commitment, a Revolving Credit Commitment or an Incremental Term Loan Commitment.

"**Closing Date**" shall mean the first date following the Interim Order Entry Date on which the conditions precedent set forth in Section 6 and in Sections 7.1 and 7.2 shall have been satisfied or waived in accordance with Section 13.1 hereof (which in no event shall be more than five (5) Business Days following the Interim Order Entry Date (or such later date as the Administrative Agent and the Required Lenders may agree in their sole discretion)).

"**Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time. Section references to the Code are to the Code, as in effect on the Closing Date, and any subsequent provisions of the Code, amendatory thereof, supplemental thereto or substituted therefor.

"**Co-Documentation Agents**" shall mean Barclays Bank PLC, Royal Bank of Canada and Union Bank, N.A., as documentation agents for the Lenders under this Agreement and the other Credit Documents.

"**Collateral**" shall mean all property pledged, mortgaged or purported to be pledged or mortgaged pursuant to the Security Documents.

"**Collateral Agent**" shall mean, Citibank, N.A., in its capacity as collateral agent for the Secured Parties under this Agreement and the Security Documents, or any successor collateral agent appointed pursuant hereto.

"**Commitment Letter**" shall mean the commitment letter, dated April 28, 2014, among the Borrower and the Joint Lead Arrangers.

"**Commitments**" shall mean, with respect to each Lender (to the extent applicable), such Lender's Revolving Credit Commitment, New Revolving Credit Commitment, Incremental Term Loan Commitment, Term Loan Commitment or Delayed-Draw Term Loan Commitment, and with respect to each Letter of Credit Issuer, such Letter of Credit Issuer's General Letter of Credit Commitment or RCT Letter of Credit Commitment.

"**Commodity Exchange Act**" shall mean the Commodity Exchange Act (7 U.S.C. 1 et seq.), as amended from time to time, and any successor statute.

"**Commodity Hedging Agreement**" shall mean any agreement (including each confirmation pursuant to any Master Agreement) or transaction providing for one or more swaps, caps, collars, floors, futures, options, spots, forwards, derivative, any physical or financial commodity contracts or agreements, power purchase or sale agreements, fuel purchase or sale agreements, environmental credit purchase or sale agreements, power transmission agreements, ancillary service agreements, commodity transportation agreements, fuel storage agreements, weather derivatives, netting agreements (including Netting Agreements), capacity agreements or commercial or trading agreements, each with respect to the purchase, sale or exchange of (or the option to purchase, sell or exchange), transmission, transportation,

storage, distribution, processing, lease or hedge of, any Covered Commodity, price or price indices for any such Covered Commodity or services or any other similar derivative agreements, and any other similar agreements.

"**Communications**" shall have the meaning provided in <u>Section 13.17(a)</u>.

"**Confidential Information**" shall have the meaning provided in <u>Section 13.16</u>.

"**Consolidated Depreciation and Amortization Expense**" shall mean, with respect to the Borrower and the Restricted Subsidiaries for any period, the total amount of depreciation and amortization expense, including the amortization of deferred financing fees, nuclear fuel costs, depletion of coal or lignite reserves, debt issuance costs, commissions, fees and expenses and Capitalized Software Expenditures, of the Borrower and the Restricted Subsidiaries for such period on a consolidated basis and otherwise determined in accordance with GAAP.

"**Consolidated EBITDA**" shall mean, for any period, Consolidated Net Income for such period, <u>plus</u>:

     (a)     without duplication and to the extent deducted (and not added back) in arriving at such Consolidated Net Income, the sum of the following amounts for the Borrower and the Restricted Subsidiaries for such period:

          (i)     Consolidated Interest Expense (including (x) net losses on Hedging Obligations or other derivative instruments entered into for the purpose of hedging interest rate risk and (y) costs of surety bonds in connection with financing activities in each case to the extent included in Consolidated Interest Expense), together with items excluded from Consolidated Interest Expense pursuant to clause (1)(u), (v), (w), (x), (y) and (z) of the definition thereof,

          (ii)     provision for taxes based on income or profits or capital gains, including federal, foreign, state, franchise, excise, value-added and similar taxes and foreign withholding taxes (including penalties and interest related to such taxes or arising from tax examinations) paid or accrued during such period,

          (iii)     Consolidated Depreciation and Amortization Expense for such period,

          (iv)     any fees, expenses or charges (other than depreciation or amortization expense) related to any offering of Stock or Stock Equivalents (including any Equity Offering), Investment, acquisition (including any Permitted Acquisition), Disposition, recapitalization or the issuance or incurrence of Indebtedness permitted to be incurred by the Borrower and the Restricted Subsidiaries pursuant hereto (including any refinancing transaction or amendment or other modification of any debt instrument), including (A) such fees, expenses or charges related to the negotiation, execution and delivery and other transactions contemplated by this Agreement, the other Credit Documents and any Permitted Receivables Financing, (B) any amendment or other modification of this Agreement and the other Credit Documents, (C) any such transaction consummated prior to the Closing Date and any such transaction undertaken but not completed and (D) any charges or non-recurring merger costs as a result of any such transaction;

-12-

(v)       the amount of any restructuring charge or reserve (including any costs incurred in connection with acquisitions after the Closing Date and costs related to the closure and/or consolidation of facilities),

(vi)      any other non-cash charges, including any write-offs or write-downs for such period (provided that if any such non-cash charges represent an accrual or reserve for potential cash items in any future period, the cash payment in respect thereof in such future period shall be subtracted from Consolidated EBITDA to such extent, and excluding amortization of a prepaid cash item that was paid in a prior period),

(vii)     the amount of any minority interest expense consisting of Subsidiary income attributable to minority equity interests of third parties in any non-Wholly Owned Subsidiary,

(viii)    the amount of management, monitoring, consulting and advisory fees and related indemnities and expenses paid in such period to (or on behalf of) the Management Investors to the extent otherwise permitted pursuant to Section 9.9,

(ix)      the amount of net cost savings projected by the Borrower in good faith to be realized as a result of specified actions taken or to be taken prior to or during such period (which cost savings shall be added to Consolidated EBITDA until fully realized, shall be subject to certification by management of the Borrower and shall be calculated on a Pro Forma Basis as though such cost savings had been realized on the first day of such period), net of the amount of actual benefits realized during such period from such actions; provided that (A) such cost savings are reasonably identifiable and factually supportable, (B) such actions have been taken or are to be taken within 12 months after the date of determination to take such action and some portion of the benefit is expected to be realized within 12 months of taking such action, (C) no cost savings shall be added pursuant to this clause (ix) to the extent duplicative of any expenses or charges relating to such cost savings that are included in clause (v) above with respect to such period and (D) the aggregate amount of cost savings added pursuant to this clause (ix) shall not exceed $150,000,000 for any Test Period (which adjustments may be incremental to any Pro Forma Adjustments),

(x)       the amount of losses on Dispositions of receivables and related assets in connection with any Permitted Receivables Financing and any losses, costs, fees and expenses in connection with the early repayment, accelerated amortization, repayment, termination or other payoff (including as a result of the exercise of remedies) of any Permitted Receivables Financing,

(xi)      any costs or expenses incurred pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement or any stock subscription or shareholder agreement, to the extent that such costs or expenses are funded with cash proceeds contributed to the capital of the Borrower or net cash proceeds of an issuance of Stock or Stock Equivalents (other than Disqualified Stock) of the Borrower (or any direct or indirect parent thereof) solely to the extent that such net cash proceeds are excluded from the calculation of the Applicable Equity Amount,

(xii)     Expenses Relating to a Unit Outage (if positive); provided that the only Expenses Relating to a Unit Outage that may be included as Consolidated EBITDA shall be, without duplication, (A) up to $250,000,000 per fiscal year of Expenses Relating to a

-13-

Unit Outage incurred within the first 12 months of any planned or unplanned outage of any Unit by reason of any action by any regulatory body or other Governmental Authority or to comply with any Applicable Law, (B) up to $100,000,000 per fiscal year of Expenses Relating to a Unit Outage incurred within the first 12 months of any planned outage of any Unit for purposes of expanding or upgrading such Unit and (C) solely for the purposes of calculating "Consolidated EBITDA" for purposes of <u>Section 10.9</u>, all Expenses Relating to a Unit Outage incurred within the first 12 months of any unplanned outage of any Unit,

(xiii)      solely for the purposes of calculating "Consolidated EBITDA" for purposes of <u>Section 10.9</u>, the proceeds of any business interruption insurance and, without duplication of such amounts, all EBITDA Lost as a Result of a Unit Outage and all EBITDA Lost as a Result of a Grid Outage less, in all such cases, the absolute value of Expenses Relating to a Unit Outage (if negative); <u>provided</u> that the amount calculated pursuant to this clause (xiii) shall not be less than zero,

(xiv)      restructuring-related or other similar charges, fees, costs, commissions and expenses or other charges incurred during such period in connection with this Agreement, the other Credit Documents, the Credit Facilities, the Cases, any reorganization plan in connection with the Cases, any Exit Credit Agreements and Exit Facilities, and any and all transactions contemplated by the foregoing, including the write-off of any receivables, the termination or settlement of executory contracts, professional and accounting costs fees and expenses, management incentive, employee retention or similar plans (in each case to the extent such plan is approved by the Bankruptcy Court to the extent required), litigation costs and settlements, asset write-downs, income and gains recorded in connection with the corporate reorganization of the TCEH Debtors,

(xv)      unusual or non-recurring charges (including unusual or non-recurring expenses), severance, relocation costs, consolidation and closing costs, business optimization costs, transition costs, restructuring costs, signing, retention or completion bonuses, and curtailments or modifications to pension and post-retirement employee benefit plans for such period,

(xvi)      any impairment charge or asset write-off or write-down including impairment charges or asset write-offs or write-downs related to intangible assets, long-lived assets and Investments in debt and equity securities, in each case pursuant to GAAP, and the amortization of intangibles arising pursuant to GAAP,

(xvii)      cash receipts (or any netting arrangements resulting in increased cash receipts) not added in arriving at Consolidated EBITDA or Consolidated Net Income in any period to the extent the non-cash gains relating to such receipts were deducted in the calculation of Consolidated EBITDA pursuant to paragraph (b) below for any previous period and not added, and

(xviii)      to the extent covered by insurance and actually reimbursed, or, so long as the Borrower has made a determination that there exists reasonable evidence that such amount will in fact be reimbursed by the insurer and only to the extent that such amount is (i) not denied by the applicable carrier in writing within 180 days and (ii) in fact reimbursed within 365 days of the date of such evidence (with a deduction for any

-14-

amount so added back to the extent not so reimbursed within 365 days), expenses with respect to liability or casualty events or business interruption, <u>less</u>

(b)    without duplication and to the extent included in arriving at such Consolidated Net Income for the Borrower and the Restricted Subsidiaries, the sum of the following amounts for such period:

(i)    non-cash gains increasing Consolidated Net Income for such period (excluding any non-cash gain to the extent it represents the reversal of an accrual or reserve for a potential cash item that reduced Consolidated Net Income or Consolidated EBITDA in any prior period),

(ii)    unusual or non-recurring gains,

(iii)    cash expenditures (or any netting arrangements resulting in increased cash expenditures) not deducted in arriving at Consolidated EBITDA or Consolidated Net Income in any period to the extent non-cash losses relating to such expenditures were added in the calculation of Consolidated EBITDA pursuant to paragraph (a) above for any previous period and not deducted, and

(iv)    the amount of any minority interest income consisting of Subsidiary losses attributable to minority equity interests of third parties in any non-Wholly Owned Subsidiary,

in each case, as determined on a consolidated basis for the Borrower and the Restricted Subsidiaries in accordance with GAAP; <u>provided</u> that

(i)    to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA any gain or loss resulting in such period from currency translation gains and losses related to currency remeasurements of Indebtedness or intercompany balances (including the net loss or gain resulting from Hedging Obligations for currency exchange risk),

(ii)    there shall be included in determining Consolidated EBITDA for any period, without duplication, (A) the Acquired EBITDA of any Person or business, or attributable to any property or asset, acquired by the Borrower or any Restricted Subsidiary during such period (but not the Acquired EBITDA of any related Person or business or any Acquired EBITDA attributable to any assets or property, in each case to the extent not so acquired) to the extent not subsequently sold, transferred, abandoned or otherwise disposed by the Borrower or such Restricted Subsidiary (each such Person, business, property or asset acquired (including pursuant to the Transactions) and not subsequently so disposed of, an "**Acquired Entity or Business**") and the Acquired EBITDA of any Unrestricted Subsidiary that is converted into a Restricted Subsidiary during such period (each, a "**Converted Restricted Subsidiary**"), in each case based on the actual Acquired EBITDA of such Pro Forma Entity for such period (including the portion thereof occurring prior to such acquisition or conversion) and (B) an adjustment in respect of each Pro Forma Entity equal to the amount of the Pro Forma Adjustment with respect to such Pro Forma Entity for such period (including the portion thereof occurring prior to such acquisition) as specified in a Pro Forma Adjustment Certificate and delivered to the Administrative Agent (for further delivery to the Lenders),

(iii)    [Reserved],

-15-

(iv)    to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA for any period the Disposed EBITDA of any Person, property, business or asset (other than an Unrestricted Subsidiary) sold, transferred, abandoned or otherwise disposed of, closed or classified as discontinued operations by the Borrower or any Restricted Subsidiary during such period (each such Person, property, business or asset so sold, transferred, abandoned or otherwise disposed of, or closed or so classified, a "**Sold Entity or Business**"), and the Disposed EBITDA of any Restricted Subsidiary that is converted into an Unrestricted Subsidiary during such period (each, a "**Converted Unrestricted Subsidiary**"), in each case based on the actual Disposed EBITDA of such Sold Entity or Business or Converted Unrestricted Subsidiary for such period (including the portion thereof occurring prior to such sale, transfer or disposition, closure, classification or conversion).

Notwithstanding anything to the contrary contained herein, for purposes of determining Consolidated EBITDA under this Agreement (i) for any period that includes any of the fiscal quarters ended September 30, 2013, December 31, 2013, or March 31, 2014, Consolidated EBITDA for such quarter, shall be $500,000,000, $300,000,000 and $350,000,000, respectively and (ii) for any period that includes any fiscal month ended April 30, 2014, Consolidated EBITDA for such month shall be $10,000,000.

"**Consolidated Interest Expense**" shall mean, with respect to any period, without duplication, the sum of:

(1)    consolidated interest expense of the Borrower and the Restricted Subsidiaries for such period, to the extent such expense was deducted (and not added back) in computing Consolidated Net Income (including (a) amortization of original issue discount resulting from the issuance of Indebtedness at less than par, (b) all commissions, discounts and other fees and charges owed with respect to letters of credit, bankers' acceptances or collateral posting facilities, (c) non-cash interest payments (but excluding any non-cash interest expense attributable to the movement in the mark to market valuation of Hedging Obligations or other derivative instruments pursuant to GAAP), (d) the interest component of Capitalized Lease Obligations and (e) net payments, if any, pursuant to interest rate Hedging Obligations with respect to Indebtedness, and excluding (u) accretion of asset retirement obligations and accretion or accrual of discounted liabilities not constituting Indebtedness, (v) any expense resulting from the discounting of any Indebtedness in connection with the application of purchase accounting, (w) [reserved], (x) amortization of reacquired Indebtedness, deferred financing fees, debt issuance costs, commissions, fees and expenses, (y) any expensing of bridge, commitment and other financing fees and (z) commissions, discounts, yield and other fees and charges (including any interest expense) related to any Permitted Receivables Financing); plus

(2)    consolidated capitalized interest of (A) the Borrower and the Restricted Subsidiaries, in each case for such period, whether paid or accrued; less

(3)    interest income for such period; plus

(4)    all cash dividends or other distributions paid (excluding items eliminated in consolidation) on any series of Preferred Stock during such period; plus

(5)    all cash dividends or other distributions paid (excluding items eliminated in consolidation) on any series of Disqualified Stock during such period.

-16-

For purposes of this definition, interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by such Person to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP.

"**Consolidated Net Income**" shall mean, for any period, the net income (loss) of the Borrower and the Restricted Subsidiaries for such period determined on a consolidated basis in accordance with GAAP, excluding, without duplication,

(a)     any after-tax effect of extraordinary losses and gains for such period,

(b)     Transaction Expenses,

(c)     the cumulative effect of a change in accounting principles during such period,

(d)     any after-tax effect of income (or loss) from disposed, abandoned or discontinued operations and any net after-tax gains or losses on disposal of disposed, abandoned, transferred, closed or discontinued operations,

(e)     any after-tax effect of gains or losses (less all fees and expenses relating thereto) attributable to asset dispositions or abandonments other than in the ordinary course of business, as determined in good faith by the Borrower,

(f)     any income (or loss) during such period of any Person that is an Unrestricted Subsidiary, and any income (or loss) during such period of any Person that is not a Subsidiary or that is accounted for by the equity method of accounting; provided that the Consolidated Net Income of the Borrower and the Restricted Subsidiaries shall be increased by the amount of dividends or distributions or other payments that are actually paid in cash (or to the extent converted into cash) to the Borrower or any Restricted Subsidiary during such period,

(g)     solely for the purpose of determining the Applicable Amount, any income (or loss) during such period of any Restricted Subsidiary (other than any Credit Party) to the extent that the declaration or payment of dividends or similar distributions by that Restricted Subsidiary of its net income is not at the date of determination wholly permitted without any prior governmental approval or an order of the Bankruptcy Court (which has not been obtained) or, directly or indirectly, by the operation of the terms of its Organizational Documents or any agreement, instrument or Applicable Law applicable to that Restricted Subsidiary or its stockholders, unless such restriction with respect to the payment of dividends or similar distributions has been legally waived (in each case, other than restrictions pursuant to this Agreement); provided that Consolidated Net Income of the Borrower and the Restricted Subsidiaries will be increased by the amount of dividends or other distributions or other payments actually paid in cash (or to the extent converted into cash) to the Borrower or any Restricted Subsidiary during such period, to the extent not already included therein,

(h)     effects of all adjustments (including the effects of such adjustments pushed down to the Borrower and the Restricted Subsidiaries) in the Borrower's consolidated financial statements pursuant to GAAP resulting from the application of purchase accounting in relation to the Transactions or any consummated acquisition whether consummated before or after the Closing Date or the amortization or write-off of any amounts thereof, net of taxes,

-17-

(i)      any net after-tax effect of income (or loss) for such period attributable to the early extinguishment of Indebtedness (other than Hedging Obligations, but including, for the avoidance of doubt, debt exchange transactions),

(j)      any net after-tax effect of any unrealized income (or loss) for such period attributable to Hedging Obligations or other derivative instruments,

(k)      any impairment charge or asset write-off or write-down including impairment charges or asset write-offs or write-downs related to intangible assets, long-lived assets and investments in debt and equity securities to the extent relating to changes in commodity prices, in each case pursuant to GAAP to the extent offset by gains from Hedging Obligations,

(l)      any non-cash compensation expense recorded from grants of stock appreciation or similar rights, stock options, restricted stock or other rights, and any cash charges associated with the rollover, acceleration or payout of Stock or Stock Equivalents by management of the Borrower or any of its direct or indirect parent companies in connection with the Transactions, and

(m)      accruals and reserves established or adjusted within twelve months after the Closing Date that are so required to be established as a result of the Transactions in accordance with GAAP or changes as a result of adoption of or modification of accounting policies during such period.

"**Consolidated Superpriority Secured Net Debt**" shall mean, as of any date of determination as determined in respect of the Borrower and its Restricted Subsidiaries for such period on a consolidated basis in a balance sheet in accordance with GAAP, (a) all Indebtedness of the types described in clause (a), clause (b), clause (d) (but, in the case of clause (d), only to the extent of any unreimbursed drawings under any RCT Letter of Credit or General Letter of Credit) and clause (f) of the definition thereof, in each case, solely to the extent consisting of the outstanding Term Loans, Delayed-Draw Term Loans and the Revolving Credit Exposure (determined for this purpose as if the Revolving Credit Commitment of each Lender outstanding from time to time has been fully drawn), minus (b) the aggregate amount of all Unrestricted Cash.

"**Consolidated Superpriority Secured Net Debt to Consolidated EBITDA Ratio**" shall mean, as of any date of determination, the ratio of (a) Consolidated Superpriority Secured Net Debt as of such date of determination to (b) Consolidated EBITDA for such Test Period.

"**Consolidated Total Assets**" shall mean, as of any date of determination, the amount that would, in conformity with GAAP, be set forth opposite the caption "total assets" (or any like caption), after intercompany eliminations, on a consolidated balance sheet of the Borrower and the Restricted Subsidiaries at such date.

"**Contingent Obligation**" shall mean indemnification Obligations and other similar contingent Obligations for which no claim has been made in writing (but excluding, for the avoidance of doubt, amounts available to be drawn under Letters of Credit).

"**Continuing Director**" shall mean, at any date, an individual (a) who is a member of the board of directors of the Borrower on the Closing Date, (b) who, as of the date of determination, has been a member of such board of directors for at least the twelve preceding months, (c) who has been nominated to be a member of such board of directors, directly or indirectly, by a Permitted Holder or Persons

-18-

nominated by a Permitted Holder or (d) who has been nominated to be a member of such board of directors by a majority of the other Continuing Directors then in office.

"**Contractual Requirement**" shall have the meaning provided in <u>Section 8.3</u>.

"**Converted Restricted Subsidiary**" shall have the meaning provided in the definition of the term "Consolidated EBITDA".

"**Converted Unrestricted Subsidiary**" shall have the meaning provided in the definition of the term "Consolidated EBITDA".

"**Co-Syndication Agents**" shall mean Deutsche Bank AG New York Branch, Bank of America, N.A. and Morgan Stanley Senior Funding, Inc., as syndication agents for the Lenders under this Agreement and the other Credit Documents.

"**Covered Commodity**" shall mean any energy, electricity, generation capacity, power, heat rate, congestion, natural gas, nuclear fuel (including enrichment and conversion), diesel fuel, fuel oil, other petroleum-based liquids, coal, lignite, weather, emissions and other environmental credits, waste by-products, renewable energy credit, or any other energy related commodity or service (including ancillary services and related risks (such as location basis)).

"**Credit Documents**" shall mean this Agreement, the Guarantee, the Security Documents, each Letter of Credit and any promissory notes issued by the Borrower hereunder.

"**Credit Event**" shall mean and include the making (but not the conversion or continuation) of a Loan and the issuance of a Letter of Credit.

"**Credit Facility**" shall mean any of the Term Loan Facility, the Delayed-Draw Term Facility, any Incremental Term Loan Facility and the Revolving Credit Facility.

"**Credit Party**" shall mean each of Parent Guarantor, the Borrower, each of the Subsidiary Guarantors and each other Subsidiary of the Borrower that is a party to a Credit Document.

"**CT Lease Indebtedness**" shall mean obligations owing by Parent Guarantor (or certain trusts directly or indirectly beneficially owned by Parent Guarantor) under Indebtedness issued by such trusts and secured by the combustion turbines owned by such trusts that are subject to the CT Leases.

"**CT Leases**" shall mean (a) the leveraged lease with respect to combustion turbines at the Permian Basin and DeCordova facilities (with approximately $35,000,000 of 7.48% trust issued debt outstanding as of March 31, 2014) and (b) the leveraged lease with respect to combustion turbines at the Morgan Creek and Permian Basin facilities (with approximately $4,000,000 of 7.46% trust issued debt outstanding as of March 31, 2014).

"**Cumulative Consolidated Net Income**" shall mean, for any period, Consolidated Net Income for such period, taken as a single accounting period. Cumulative Consolidated Net Income may be a positive or negative amount.

"**DBSI**" shall mean Deutsche Bank Securities Inc.

"**Debtor Relief Laws**" shall mean the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement,

receivership, insolvency, reorganization, or similar debtor relief Applicable Laws of the United States or other applicable jurisdictions from time to time in effect.

"**Deemed Cash**" shall have the meaning provided in Section 10.4(b).

"**Default**" shall mean any event, act or condition that with notice or lapse of time, or both, would constitute an Event of Default.

"**Default Rate**" shall have the meaning provided in Section 2.8(d).

"**Defaulting Lender**" shall mean any Lender with respect to which a Lender Default is in effect.

"**Deferred Net Cash Proceeds**" shall have the meaning provided such term in the definition of "Net Cash Proceeds".

"**Deferred Net Cash Proceeds Payment Date**" shall have the meaning provided such term in the definition of "Net Cash Proceeds".

"**Delayed-Draw Term Facility**" shall mean the facility providing for the Delayed-Draw Term Loans.

"**Delayed-Draw Term Facility Reduction Amount**" shall mean the sum of (1) the aggregate amount of voluntary reductions to the Delayed-Draw Term Loan Commitment made pursuant to Sections 4.2 or 4.3 and (2) the amount of Available Delayed-Draw Term Loan Commitments permanently terminated on the Delayed-Draw Termination Date.

"**Delayed-Draw Term Loan Commitment**" shall mean, (a) in the case of each Lender that is a Lender on the date hereof, the amount set forth opposite such Lender's name on Schedule 1.1(a) as such Lender's "Delayed-Draw Term Loan Commitment" and (b) in the case of any Lender that becomes a Lender after the date hereof, the amount specified as such Lender's "Delayed Draw Term Loan Commitment" in the Assignment and Acceptance pursuant to which such Lender assumed a portion of the Total Delayed-Draw Term Loan Commitment, in each case as the same may be changed from time to time pursuant to the terms hereof. The aggregate amount of Delayed-Draw Term Loan Commitments outstanding as of the Closing Date is $1,100,000,000.

"**Delayed-Draw Term Loan Lender**" shall mean each Lender holding a Delayed-Draw Term Loan.

"**Delayed-Draw Term Loans**" shall have the meaning provided in Section 2.1(b).  As set forth in Section 2.1(b)(ii), immediately after any Delayed-Draw Term Loans are funded pursuant to Section 2.1(b), such Loans will automatically be deemed to constitute Term Loans, and to not constitute Delayed-Draw Term Loans, for all purposes of this Credit Agreement and the other Credit Documents (except for purposes of the definitions of "Available Delayed-Draw Term Loan Commitment" and "Available Term Loan Commitment").

"**Delayed-Draw Termination Date**" shall mean the date that is 90 days after the Closing Date.

"**Delayed-Draw Ticking Fee**" shall have the meaning provided in Section 4.1(e).

-20-

"**Designated Non-Cash Consideration**" shall mean the fair market value of non-cash consideration received by the Borrower or any Restricted Subsidiary in connection with a Disposition pursuant to Section 10.4(b) or Section 10.4(m) that is designated as Designated Non-Cash Consideration pursuant to a certificate of an Authorized Officer of the Borrower, setting forth the basis of such valuation (which amount will be reduced by the fair market value of the portion of the non-cash consideration converted to cash within 180 days following the consummation of the applicable Disposition).

"**Disclosure Statement**" shall mean a Disclosure Statement that is [in form and substance consistent in all material respects with, and as it may be amended in accordance with the terms of, the Restructuring Support Agreement and the Restructuring Term Sheet, and is] in form and substance reasonably satisfactory to the Administrative Agent (provided, however, that with respect to provisions of the Disclosure Statement that relate to the payment of the Credit Facilities, such provisions must be in form and substance satisfactory to the Administrative Agent).

"**Disposed EBITDA**" shall mean, with respect to any Sold Entity or Business or any Converted Unrestricted Subsidiary for any period, the amount for such period of Consolidated EBITDA of such Sold Entity or Business or Converted Unrestricted Subsidiary (determined as if references to the Borrower and the Restricted Subsidiaries in the definition of Consolidated EBITDA were references to such Sold Entity or Business or Converted Unrestricted Subsidiary and its respective Subsidiaries), all as determined on a consolidated basis for such Sold Entity or Business or Converted Unrestricted Subsidiary, as the case may be.

"**Disposition**" shall have the meaning provided in Section 10.4.

"**Disqualified Institutions**" shall mean (a) any company engaged principally in the business of energy or power generation and/or transmission and identified in writing to the Administrative Agent by the Borrower from time to time, (b) any company whose principal business is that of an energy or power merchant and identified in writing to the Administrative Agent by the Borrower from time to time, (c) any Person identified in writing to the Administrative Agent by the Borrower on or prior to April 28, 2014 (including any such Person's affiliates that are clearly identifiable on the basis of such affiliates' names) and (d) any Defaulting Lender. The list of all Disqualified Institutions shall be made available to all Lenders by posting such list to the Platform. Upon the identification in writing by the Borrower to the Administrative Agent of any additional Disqualified Institutions pursuant to clause (a) or (b) above, the Administrative Agent shall promptly post such addition to the list to the Platform; provided that any additional Person so identified shall not be deemed a Disqualified Institution until such time as such addition to the list is posted to the Platform.

"**Disqualified Stock**" shall mean, with respect to any Person, any Stock or Stock Equivalents of such Person which, by its terms, or by the terms of any security into which it is convertible or for which it is putable or exchangeable, or upon the happening of any event, matures or is mandatorily redeemable (other than solely for Stock or Stock Equivalents that is not Disqualified Stock), other than as a result of a change of control, asset sale or similar event so long as any rights of the holders thereof upon the occurrence of such change of control, asset sale or similar event shall be subject to the prior repayment in full of the Loans and all other Obligations (other than Hedging Obligations under Secured Hedging Agreements and/or Secured Commodity Hedging Agreements, Cash Management Obligations under Secured Cash Management Agreements or Contingent Obligations and the termination of the Commitments), pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof (other than as a result of a change of control, asset sale or similar event so long as any rights of the holders thereof upon the occurrence of such change of control, asset sale or similar event shall be subject to the prior repayment in full of the Loans and all other Obligations (other than Hedging Obligations under Secured Hedging Agreements and/or Secured Commodity Hedging Agreements, Cash

Management Obligations under Secured Cash Management Agreements or Contingent Obligations and the termination of the Commitments), in whole or in part, in each case prior to the date that is ninety-one (91) days after the Latest Maturity Date; provided that if such Stock or Stock Equivalents are issued to any plan for the benefit of employees of the Borrower or any of its Subsidiaries or by any such plan to such employees, such Stock or Stock Equivalents shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Borrower (or any direct or indirect parent company thereof) or any of its Subsidiaries in order to satisfy applicable statutory or regulatory obligations; provided, further, that any Stock or Stock Equivalents held by any present or former employee, officer, director, manager or consultant, of the Borrower, any of its Subsidiaries or any of its direct or indirect parent companies or any other entity in which the Borrower or any Restricted Subsidiary has an Investment and is designated in good faith as an "affiliate" by the Board of Directors of the Borrower, in each case pursuant to any stockholders' agreement, management equity plan or stock incentive plan or any other management or employee benefit plan or agreement shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Borrower or any of its Subsidiaries.

"dividends" shall have the meaning provided in Section 10.6.

"Dollars" and "$" shall mean dollars in lawful currency of the United States of America.

"Domestic Subsidiary" shall mean each Subsidiary of the Borrower that is organized under the laws of the United States or any state thereof, or the District of Columbia.

"Drawing" shall have the meaning provided in Section 3.4(b).

"EBITDA Lost as a Result of a Grid Outage" shall mean, to the extent that any transmission or distribution lines go out of service, the revenue not actually earned by the Borrower and its Restricted Subsidiaries that would otherwise have been earned with respect to any Unit within the first 12 month period that such transmission or distribution lines were out of service had such transmission or distribution lines not been out of service during such period.

"EBITDA Lost as a Result of a Unit Outage" shall mean, to the extent that any Unit is out of service as a result of any unplanned outage or shut down, the revenue not actually earned by the Borrower and its Restricted Subsidiaries that would otherwise have been earned with respect to any such Unit during the first 12 month period of any such outage or shut down had such Unit not been out of service during such period.

"EFIH" shall mean Energy Future Intermediate Holding Company LLC, a Delaware limited liability company.

"Employee Benefit Plan" shall mean an employee benefit plan (as defined in Section 3(3) of ERISA), other than a Foreign Plan, that is maintained or contributed to by the Ultimate Parent, Parent Guarantor, Borrower or any Subsidiary (or, with respect to an employee benefit plan subject to Title IV of ERISA, any ERISA Affiliate).

"Environmental CapEx" shall mean Capital Expenditures deemed reasonably necessary by the Borrower or any Restricted Subsidiary or otherwise undertaken voluntarily by the Borrower or any Restricted Subsidiary, to comply with, or in anticipation of having to comply with, applicable Environmental Laws or Capital Expenditures otherwise undertaken voluntarily by the Borrower or any Restricted Subsidiary in connection with environmental matters.

-22-

"**Environmental Claims**" shall mean any and all actions, suits, proceedings, orders, decrees, demands, demand letters, claims, liens, notices of noncompliance, violation or potential responsibility or investigation (other than reports prepared by or on behalf of the Ultimate Parent, Parent Guarantor, the Borrower or any other Subsidiary of the Ultimate Parent (a) in the ordinary course of such Person's business or (b) as required in connection with a financing transaction or an acquisition or disposition of Real Estate) or proceedings relating in any way to any Environmental Law or any permit issued, or any approval given, under any such Environmental Law (hereinafter, "**Claims**"), including (i) any and all Claims by Governmental Authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law and (ii) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief relating to the presence, release or threatened release into the environment of Hazardous Materials or arising from alleged injury or threat of injury to human health or safety (to the extent relating to human exposure to Hazardous Materials), or to the environment, including ambient air, indoor air, surface water, groundwater, land surface and subsurface strata and natural resources such as wetlands.

"**Environmental Law**" shall mean any applicable Federal, state, foreign or local statute, law, rule, regulation, ordinance, code and rule of common law now or, with respect to any post-Closing Date requirements of the Credit Documents, hereafter in effect and in each case as amended, and any binding judicial or administrative interpretation thereof, including any binding judicial or administrative order, consent decree or judgment, relating to the protection of the environment, including ambient air, indoor air, surface water, groundwater, land surface and subsurface strata and natural resources such as wetlands, or to human health or safety (to the extent relating to human exposure to Hazardous Materials), or Hazardous Materials.

"**Equity Offering**" shall mean any public or private sale of common stock or Preferred Stock of the Borrower or any of its direct or indirect parent companies (excluding Disqualified Stock), other than: (a) public offerings with respect to the Borrower's or any direct or indirect parent company's common stock registered on Form S-8, and (b) issuances to any Subsidiary of the Borrower or any such parent.

"**ERCOT**" shall mean the Electric Reliability Council of Texas or any other entity succeeding thereto.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time.  Section references to ERISA are to ERISA as in effect on the Closing Date and any subsequent provisions of ERISA amendatory thereof, supplemental thereto or substituted therefor.

"**ERISA Affiliate**" shall mean each person (as defined in Section 3(9) of ERISA) that together with the Borrower or any Subsidiary of the Borrower would be deemed to be a "single employer" within the meaning of Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"**Event of Default**" shall have the meaning provided in Section 11.

"**Exchange Act**" shall mean the Securities Exchange Act of 1934, as amended, and rules and regulations promulgated thereunder.

"**Exchange Rate**" shall mean on any day, with respect to any currency, the rate at which such currency may be exchanged into another currency, which shall be the Historical Exchange Rate on the immediately prior day as determined by OANDA Corporation and made available on its website at

#4821-7663-6950

http://www.oanda.com/convert/fxhistory; provided, that the Administrative Agent may obtain such spot rate from another financial institution designated by the Administrative Agent if at the time of any such determination, for any reason, no such rate is being quoted.

"**Excluded Collateral**" shall mean (a) Excluded Stock and Stock Equivalents, (b) Excluded Subsidiaries, (c) Excluded Property and (d) (i) property or assets subject to capital leases, purchase money obligations and other arrangements described in Section 10.1(f) to the extent subject to a Lien, in each case permitted by this Agreement, and the terms of the Indebtedness secured by such Lien prohibit assignment of, or granting of a security interest in, the applicable Credit Party's rights and interests therein (other than to the extent that any such prohibition would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the UCC (or any successor provision or provisions) of any relevant jurisdiction or any other Applicable Law), provided, that immediately upon the repayment of all Indebtedness secured by such Lien, such property shall no longer constitute "Excluded Collateral" and such Credit Party shall be deemed to have granted a security interest in all the rights and interests with respect to such property or assets pursuant to the applicable Credit Documents, (ii) any assets so as to which the Collateral Agent and the Borrower have reasonably determined (after giving effect to the effectiveness of the Orders) that the costs or other consequences (including adverse tax consequences) of providing a security interest in such assets is excessive in view of the benefits to be gained thereby by the Lenders, (iii) any property that would otherwise constitute Collateral to the extent (and only to the extent) that the grant of a security interest therein or perfection of a Lien thereon pursuant to the applicable Credit Documents would violate any Applicable Law or regulation (including regulations adopted by Federal Energy Regulatory Commission and/or the Nuclear Regulatory Commission) applicable to such property and (iv) the Borrower's Avoidance Actions (other than, upon entry of the Final Order, proceeds or property recovered, unencumbered, or otherwise the subject of successful Avoidance Actions, whether by judgment, settlement or otherwise).

"**Excluded Property**" shall mean (a) Receivables Facility Assets purported to be sold, contributed or pledged by any Credit Party that is or becomes a participant in a Permitted Receivables Financing pursuant to a Permitted Receivables Financing, (b) collections or proceeds of Receivables Facility Assets repurchased by any Credit Party that is or becomes a participant in a Permitted Receivables Financing pursuant to the provisions of a Permitted Receivables Financing, while such collections or proceeds are in a lockbox, collateral account or similar account established pursuant to such Permitted Receivables Financing to receive collections of Receivables Facility Assets or are in an account subject to an intercreditor agreement related to Transition Charges or Transition Property, (c) amounts payable to any Credit Party that such Credit Party is collecting on behalf of Persons that are not Credit Parties, including Transition Property and Transition Charges, and any customer deposits related to the foregoing, and (d) any Bundled Payment Amounts, while such Bundled Payment Amounts are in a lockbox, collateral account or similar account established pursuant to a Permitted Receivables Financing to receive collections of Receivables Facility Assets or are in an account subject to an intercreditor agreement related to Transition Charges or Transition Property.

"**Excluded Stock and Stock Equivalents**" shall mean (i) any Stock or Stock Equivalents with respect to which, in the reasonable judgment of the Collateral Agent (confirmed in writing by notice to the Borrower and the Administrative Agent), the cost or other consequences (including any adverse tax or accounting consequences) of pledging such Stock or Stock Equivalents in favor of the Secured Parties under the Security Documents shall be excessive in view of the benefits to be obtained by the Secured Parties therefrom, (ii) solely in the case of any pledge of Voting Stock of any Foreign Subsidiary or Foreign Subsidiary Holding Company to secure the Obligations, any Stock or Stock Equivalents of any class of such Foreign Subsidiary or Foreign Subsidiary Holding Company in excess of 65% of the outstanding Voting Stock of such class (such percentage to be adjusted upon any Change in Law as may be required to avoid adverse U.S. federal income tax consequences to Parent Guarantor, the Borrower or

-24-

any Subsidiary of the Borrower), (iii) any Stock or Stock Equivalents to the extent the pledge thereof would violate any Applicable Law, (iv) in the case of any Stock or Stock Equivalents of any Subsidiary of the Borrower that is not Wholly Owned by the Borrower or any Subsidiary Guarantor at the time such Subsidiary becomes a Subsidiary, any Stock or Stock Equivalents of each such Subsidiary to the extent (A) that a pledge thereof to secure the Obligations is prohibited by any applicable Contractual Requirement (other than customary non-assignment provisions which are ineffective under the Uniform Commercial Code or other Applicable Law or any Organizational Document), (B) any Contractual Requirement prohibits such a pledge without the consent of any other party; provided that this clause (B) shall not apply if (x) such other party is a Credit Party or Wholly Owned Subsidiary or (y) consent has been obtained to consummate such pledge (it being understood that the foregoing shall not be deemed to obligate the Borrower or any Subsidiary of the Borrower to obtain any such consent)) and for so long as such Contractual Requirement or replacement or renewal thereof is in effect, or (C) a pledge thereof to secure the Obligations would give any other party (other than a Credit Party or Wholly Owned Subsidiary) to any contract, agreement, instrument or indenture governing such Stock or Stock Equivalents the right to terminate its obligations thereunder (other than customary non-assignment provisions which are ineffective under the Uniform Commercial Code or other applicable law), (v) the Stock or Stock Equivalents of any Subsidiary of a Foreign Subsidiary, (vi) any Stock or Stock Equivalents of any Subsidiary to the extent that (A) the pledge of such Stock or Stock Equivalents would result in adverse tax or accounting consequences to the Borrower or any Subsidiary as reasonably determined by the Borrower and (B) such Stock or Stock Equivalents have been identified in writing to the Collateral Agent by an Authorized Officer of the Borrower, (vii) the Stock or Stock Equivalents of any Unrestricted Subsidiary or Immaterial Subsidiary and (viii) the Stock or Stock Equivalents of any Receivables Entity if, after using commercially reasonable efforts, the Borrower is unable to obtain the consent of the funding sources under the applicable Permitted Receivables Financing to the pledge of such Stock or Stock Equivalents. Notwithstanding the foregoing, the term "Excluded Stock and Stock Equivalents" shall not in any event include the Stock or Stock Equivalents of any Subsidiary that is a debtor and debtor-in-possession in the Cases.

"**Excluded Subsidiary**" shall mean (a) each Domestic Subsidiary listed on Schedule 1.1(b) hereto and each future Domestic Subsidiary, in each case, for so long as any such Subsidiary does not constitute a Material Subsidiary, (b) each Domestic Subsidiary that is not a Wholly Owned Subsidiary on any date such Subsidiary would otherwise be required to become a Subsidiary Guarantor pursuant to the requirements of Section 9.11 (for so long as such Subsidiary remains a non-Wholly Owned Restricted Subsidiary), (c) any Foreign Subsidiary Holding Company, (d) each Domestic Subsidiary that is prohibited by any applicable Contractual Requirement, Applicable Law or Organizational Document from guaranteeing or granting Liens to secure the Obligations at the time such Subsidiary becomes a Restricted Subsidiary (and for so long as such restriction or any replacement or renewal thereof is in effect), (e) each Domestic Subsidiary that is a Subsidiary of a Foreign Subsidiary, (f) any other Domestic Subsidiary with respect to which, in the reasonable judgment of the Administrative Agent (confirmed in writing by notice to the Borrower), the cost or other consequences (including any adverse tax or accounting consequences) of guaranteeing the Obligations shall be excessive in view of the benefits to be obtained by the Secured Parties therefrom, (g) each Unrestricted Subsidiary, (h) any Foreign Subsidiary, (i) any Receivables Entity and (j) any Subsidiary to the extent that (A) the guarantee of the Obligations by would result in adverse tax or accounting consequences and (B) such Subsidiaries have been identified in writing to the Collateral Agent by an Authorized Officer of the Borrower. Notwithstanding the foregoing, the term "Excluded Subsidiary" shall not in any event include any Subsidiary that is a debtor and debtor-in-possession in the Cases.

"**Excluded Swap Obligation**" shall mean, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any Guarantee thereof) is or

-25-

becomes illegal or unlawful under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the Guarantee of such Guarantor or the grant of such security interest would otherwise have become effective with respect to such Swap Obligation but for such Guarantor's failure to constitute an "eligible contract participant" at such time.

"**Excluded Taxes**" shall mean, with respect to any Agent or any Lender, (a) net income taxes and franchise and excise taxes (imposed in lieu of net income taxes) imposed on such Agent or Lender, (b) any Taxes imposed on any Agent or any Lender as a result of any current or former connection between such Agent or Lender and the jurisdiction of the Governmental Authority imposing such tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising from such Agent or Lender having executed, delivered or performed its obligations or received a payment under, or having been a party to or having enforced, this Agreement or any other Credit Document), (c) any U.S. federal withholding tax that is imposed on amounts payable to any Lender under the law in effect at the time such Lender becomes a party to this Agreement (or designates a new lending office other than a new lending office designated at request of the Borrower); provided that this subclause (c) shall not apply to the extent that (x) the indemnity payments or additional amounts any Lender would be entitled to receive (without regard to this subclause (c)) do not exceed the indemnity payment or additional amounts that the person making the assignment, participation or transfer to such Lender (or designation of a new lending office by such Lender) would have been entitled to receive in the absence of such assignment or (y) any Tax is imposed on a Lender in connection with an interest in any Loan or other obligation that such Lender was required to acquire pursuant to Section 13.8(a) or that such Lender acquired pursuant to Section 13.7 (it being understood and agreed, for the avoidance of doubt, that any withholding tax imposed on a Lender as a result of a Change in Law occurring after the time such Lender became a party to this Agreement (or designates a new lending office) shall not be an Excluded Tax),(d) any Tax to the extent attributable to such Lender's failure to comply with Sections 5.4(d) and (e) (in the case of any Non-U.S. Lender) or Section 5.4(h) (in the case of a U.S. Lender), and (e) any Taxes imposed by FATCA.

"**Exit Credit Agreements**" shall mean each of the credit agreements for the Exit Facilities of the reorganized Borrower and consistent in form and substance in all material respects with the Exit Facility Term Sheet, with such amendments, modifications, supplements and changes permitted or agreed to pursuant to the terms of the Restructuring Support Agreement or otherwise.

"**Exit Facilities**" shall mean, collectively, the credit facilities under the Exit Credit Agreements.

"**Exit Facility Term Sheet**" shall mean the term sheet in respect of the Exit Credit Agreements attached as Exhibit C to the Restructuring Term Sheet.

"**Expenses Relating to a Unit Outage**" shall mean an amount (which may be negative) equal to (x) any expenses or other charges as a result of any outage or shut-down of any Unit, including any expenses or charges relating to (a) restarting any such Unit so that it may be placed back in service after such outage or shut-down, (b) purchases of power, natural gas or heat rate to meet commitments to sell, or offset a short position in, power, natural gas or heat rate that would otherwise have been met or offset from production generated by such Unit during the period of such outage or shut-down and (c) starting up, operating, maintaining and shutting down any other Unit that would not otherwise have been operating absent such outage or shut-down, including the fuel and other operating expenses, incurred to start-up, operate, maintain and shut-down such Unit and that are required during the period of time that

-26-

the shut-down or outaged Unit is out of service in order to meet the commitments of such shut-down or outaged Unit to sell, or offset a short position in, power, natural gas or heat rate less (y) any expenses or charges not in fact incurred (including fuel and other operating expenses) that would have been incurred absent such outage or shut-down.

"**Extension Conditions**" shall have the meaning provided in the definition of "Maturity Date".

"**FATCA**" shall mean Sections 1471 through 1474 of the Code as of the Closing Date (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future Treasury regulations or official administrative interpretations thereof.

"**Federal Funds Effective Rate**" shall mean, for any day, the weighted average of the *per annum* rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers on such day, as published on the next succeeding Business Day by the Federal Reserve Bank of New York; provided that (a) if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Effective Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to the Administrative Agent on such day on such transactions as determined by the Administrative Agent.

"**Fee Letter**" shall mean the fee letter, dated April 28, 2014, among the Borrower and the Joint Lead Arrangers.

"**Fees**" shall mean all amounts payable pursuant to, or referred to in, Section 4.1.

"**Final Cash Collateral Order**" shall mean a final order of the Bankruptcy Court entered in the Cases in form and substance satisfactory to the Administrative Agent on a motion by the TCEH Debtors that is in form and substance satisfactory to the TCEH Debtors, authorizing and approving on a final basis, among other things, the matters and provisions in the Interim Cash Collateral Order.

"**Final Order**" shall mean a final order of the Bankruptcy Court entered in the Cases in form and substance satisfactory to the Left Lead Arrangers on a motion by the TCEH Debtors that is in form and substance satisfactory to the Left Lead Arrangers, authorizing and approving on a final basis, among other things, the matters and provisions in the Interim Order and the borrowing by the Borrower of the full amount of the Credit Facilities, as such order or orders may be extended, amended, supplemented or modified in a manner satisfactory to the Left Lead Arrangers.

"**Final Order Entry Date**" shall mean the date that the Final Order is entered by the Bankruptcy Court in the Cases.

"**Financial Advisor**" shall mean Millstein & Co., L.P.

"**First Day Orders**" shall mean all orders entered or to be entered by the Bankruptcy Court based on the motions identified on Schedule 1.1(d) hereto, which shall each be in form and substance reasonably satisfactory to the Left Lead Arrangers (other than the Cash Management Order, the Interim Order, and the Interim Cash Collateral Order, which shall each be in form and substance satisfactory to the Left Lead Arrangers).

"**Fiscal Year**" shall have the meaning provided in Section 9.10.

"**Foreign Asset Sale**" shall have the meaning provided in Section 5.2(i).

"**Foreign Plan**" shall mean any employee benefit plan, program, policy, arrangement or agreement maintained or contributed to by the Borrower or any of its Subsidiaries with respect to employees employed outside the United States.

"**Foreign Recovery Event**" shall have the meaning provided in Section 5.2(i).

"**Foreign Subsidiary**" shall mean each Subsidiary of the Borrower that is not a Domestic Subsidiary.

"**Foreign Subsidiary Holding Company**" shall mean any Subsidiary that owns no material assets other than equity interest (including, for this purpose, any debt or other instrument treated as equity for U.S. federal income tax purposes) in one or more (a) Foreign Subsidiaries and/or (b) other Subsidiaries that own no material assets other than equity interests (including, for this purpose, any debt or other instrument treated as equity for U.S. federal income tax purposes) in one or more Foreign Subsidiaries.

"**Fronting Fee**" shall have the meaning provided in Section 4.1(c).

"**Full Availability Date**" shall mean the first date following the Final Order Entry Date on which the conditions precedent set forth in Section 6 and Section 7 shall have been satisfied or waived in accordance with Section 13.1.

"**Fund**" shall mean any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course.

"**GAAP**" shall mean generally accepted accounting principles in the United States of America, as in effect from time to time; provided, however, that if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

"**General L/C Cash Coverage Requirement**" shall have the meaning provided in Section 3.8.

"**General L/C Collateral Account**" shall mean one or more Cash Collateral Accounts or securities accounts established pursuant to, and subject to the terms of, Section 3.8 for the purpose of collateralizing the General L/C Obligations in respect of General Letters of Credit.

"**General L/C Collateral Account Balance**" shall mean, at any time, with respect to any General L/C Collateral Account, the aggregate amount on deposit in such General L/C Collateral Account. References herein and in the other Credit Documents to the General L/C Collateral Account

Balance shall be deemed to refer to the General L/C Collateral Account Balance in respect of the applicable General L/C Collateral Account or to the General L/C Collateral Account Balance in respect of all General L/C Collateral Accounts, as the context requires.

"**General L/C Collateral Account Depositary Bank**" shall have the meaning provided in Section 3.8.

"**General L/C Obligations**" shall mean, as at any date of determination and without duplication, the aggregate Stated Amount of all outstanding General Letters of Credit plus the aggregate principal amount of all Unpaid Drawings under all General Letters of Credit. For all purposes of this Agreement, if on any date of determination a General Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, such General Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

"**General L/C Permitted Investments**" shall mean:

(a)    any Permitted Investments described in clauses (a) through (g) of the definition thereof; and

(b)    such other securities as agreed to by the TCEH Debtors with the applicable General Letter of Credit Issuer from time to time.

"**General L/C Termination Date**" shall mean the Maturity Date.

"**General Letter of Credit**" shall have the meaning provided in Section 3.1(a)(i).

"**General Letter of Credit Commitment**" shall mean $800,000,000 (as such amount may be increased as agreed in writing between the Borrower and the General Letter of Credit Issuers providing such increased General Letter of Credit Commitment, and as such amount may be reduced pursuant to Section 4.2(d)).

"**General Letter of Credit Issuers**" shall mean (a) on the date hereof, Citibank, N.A. and (b) at any time such Person who shall become a General Letter of Credit Issuer pursuant to Section 3.6 (it being understood that if any such Person ceases to be a Lender hereunder, such Person will remain a General Letter of Credit Issuer with respect to any General Letters of Credit issued by such Person that remained outstanding as of the date such Person ceased to be a Lender). Any General Letter of Credit Issuer may, in its discretion, arrange for one or more General Letters of Credit to be issued by Affiliates of such General Letter of Credit Issuer, and in each such case the term "General Letter of Credit Issuer" shall include any such Affiliate with respect to General Letters of Credit issued by such Affiliate. References herein and in the other Credit Documents to the General Letter of Credit Issuer shall be deemed to refer to the General Letter of Credit Issuer in respect of the applicable General Letter of Credit or to all General Letter of Credit Issuers, as the context requires.

"**General Letters of Credit Outstanding**" shall mean, at any time, with respect to any General Letter of Credit Issuer, the sum of, without duplication, (a) the aggregate Stated Amount of all outstanding General Letters of Credit issued by such General Letter of Credit Issuer and (b) the aggregate principal amount of all Unpaid Drawings in respect of all such General Letters of Credit. References herein and in the other Credit Documents to the General Letters of Credit Outstanding shall be deemed to refer to the General Letters of Credit Outstanding in respect of all General Letters of Credit issued by the applicable General Letter of Credit Issuer or to the General Letters of Credit Outstanding in respect of all General Letters of Credit, as the context requires.

#4821-7663-6950

"**General Letter of Credit Reimbursement Obligations**" shall mean the obligations of the TCEH Debtors to reimburse and repay Unpaid Drawings on any General Letter of Credit pursuant to the terms and conditions set forth in Section 3.4 of this Agreement.

"**General L/C Collateral Account Depositary Bank**" shall have the meaning provided in Section 3.8.

"**Governmental Authority**" shall mean any nation, sovereign or government, any state, province, territory or other political subdivision thereof, and any entity or authority exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including a central bank, stock exchange, PUCT or ERCOT.

"**Granting Lender**" shall have the meaning provided in Section 13.6(g).

"**Guarantee**" shall mean the Guarantee made by each Guarantor in favor of the Collateral Agent for the benefit of the Secured Parties, substantially in the form of Exhibit B.

"**Guarantee Obligations**" shall mean, as to any Person, any obligation of such Person guaranteeing or intended to guarantee any Indebtedness of any other Person (the "**primary obligor**") in any manner, whether directly or indirectly, including any obligation of such Person, whether or not contingent, (a) to purchase any such Indebtedness or any property constituting direct or indirect security therefor, (b) to advance or supply funds (i) for the purchase or payment of any such Indebtedness or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such Indebtedness of the ability of the primary obligor to make payment of such Indebtedness or (d) otherwise to assure or hold harmless the owner of such Indebtedness against loss in respect thereof; provided, however, that the term "**Guarantee Obligations**" shall not include endorsements of instruments for deposit or collection in the ordinary course of business or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee Obligation shall be deemed to be an amount equal to the stated or determinable amount of the Indebtedness in respect of which such Guarantee Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.

"**Guarantors**" shall mean (a) Parent Guarantor, (b) each Domestic Subsidiary that is a party to the Guarantee on the Closing Date, which will in any event include all Subsidiaries that are debtors and debtors-in-possession in the Cases, and (c) each Domestic Subsidiary that becomes a party to the Guarantee on or after the Closing Date pursuant to Section 9.11 or otherwise.

"**Hazardous Materials**" shall mean (a) any petroleum or petroleum products spilled or released into the environment, radioactive materials, friable asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, and radon gas; (b) any chemicals, materials or substances defined as or included in the definition of "hazardous substances", "hazardous waste", "hazardous materials", "extremely hazardous waste", "restricted hazardous waste", "toxic substances", "toxic pollutants", "contaminants", or "pollutants", or words of similar import, under any applicable Environmental Law; and (c) any other chemical, material or substance, for which a release into the environment is prohibited, limited or regulated by any Environmental Law.

"**Hedge Bank**" shall mean any Person (other than Parent Guarantor, the Borrower or any other Subsidiary of the Borrower) that either (i) is a party to a Secured Commodity Hedging Agreement and has executed and delivered to the Collateral Agent an Accession Agreement, and become a party to the Security Agreement, pursuant to Section 14.2 or (ii) with respect to any other Hedging Agreement (other than a Commodity Hedging Agreement) either (x) at the time it enters into a Secured Hedging Agreement or (y) on the Closing Date, is a Lender or an Affiliate of a Lender, in its capacity as a party to a Secured Hedging Agreement.

"**Hedging Agreements**" shall mean (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement or any other master agreement (any such master agreement, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement and (c) physical or financial commodity contracts or agreements, power purchase or sale agreements, fuel purchase or sale agreements, environmental credit purchase or sale agreements, power transmission agreements, ancillary service agreements, commodity transportation agreements, fuel storage agreements, weather derivatives, netting agreements (including Netting Agreements), capacity agreements and commercial or trading agreements, each with respect to the purchase, sale or exchange of (or the option to purchase, sell or exchange), transmission, transportation, storage, distribution, processing, sale, lease or hedge of, any Covered Commodity, price or price indices for any such Covered Commodity or services or any other similar derivative agreements, and any other similar agreements.

"**Hedging and Trading Order**" shall mean that certain Final Order Authorizing the Debtors To (A) Continue Performance Under the Hedging and Trading Arrangements, (B) Pledge Collateral and Honor Obligations Thereunder, and (C) Enter Into and Perform Under New Postpetition Hedging and Trading Arrangements [Docket No. __].

"**Hedging Obligations**" shall mean, with respect to any Person, the obligations of such Person under Hedging Agreements.

"**Holdings**" shall mean Texas Energy Future Holdings Limited Partnership, a Delaware limited partnership, and its successors.

"**Immaterial Subsidiary**" shall mean each Subsidiary of the Borrower that is not a Material Subsidiary.

"**Incremental Amendment**" shall have the meaning set forth in Section 2.14(h).

"**Incremental Facility**" shall have the meaning provided in Section 2.14(a).

"**Incremental Revolving Commitment Increase**" shall have the meaning provided in Section 2.14(a).

"**Incremental Term Loan Commitment**" shall mean the commitment of any lender to make Incremental Term Loans of a particular tranche pursuant to Section 2.14(a).

"**Incremental Term Loan Facility**" shall mean each tranche of Incremental Term Loans made pursuant to Section 2.14.

"**Incremental Term Loans**" shall have the meaning provided in Section 2.14(a).

"**Indebtedness**" of any Person shall mean (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments, (c) the deferred purchase price of assets or services that in accordance with GAAP would be included as a liability on the balance sheet of such Person, (d) the face amount of all letters of credit issued for the account of such Person and, without duplication, all drafts drawn thereunder, (e) all Indebtedness of any other Person secured by any Lien on any property owned by such Person, whether or not such Indebtedness has been assumed by such Person, (f) the principal component of all Capitalized Lease Obligations of such Person, (g) net Hedging Obligations of such Person, (h) without duplication, all Guarantee Obligations of such Person and (i) Disqualified Stock of such Person; provided that Indebtedness shall not include (i) trade and other ordinary course payables and accrued expenses arising in the ordinary course of business, (ii) deferred or prepaid revenue, (iii) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the respective seller, (iv) amounts payable by and between Parent Guarantor, the Borrower and any other Subsidiary of the Ultimate Parent in connection with retail clawback or other regulatory transition issues and (v) any Indebtedness defeased by such Person or by any Subsidiary of such Person. The amount of any net Hedging Obligations on any date shall be deemed to be the Swap Termination Value. The amount of Indebtedness of any Person for purposes of clause (e) shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value of the property encumbered thereby as determined by such Person in good faith.

"**indemnified liabilities**" shall have the meaning provided in Section 13.5.

"**Indemnified Taxes**" shall mean all Taxes (including Other Taxes) other than (i) Excluded Taxes and (ii) any interest, penalties or expenses caused by an Agent's or Lender's gross negligence or willful misconduct.

"**Initial Budget**" shall have the meaning provided in the definition of the term "Budget".

"**Intercompany Subordinated Note**" shall mean the Intercompany Note, dated as of April 7, 2011, executed by Parent Guarantor, the Borrower and each Restricted Subsidiary of the Borrower.

"**Interest Period**" shall mean, with respect to any Term Loan, Delayed-Draw Term Loan or Revolving Credit Loan, the interest period applicable thereto, as determined pursuant to Section 2.9.

"**Interim Availability Amount**" shall mean, as of any date of determination (x) with respect to the Revolving Credit Facility, the lesser of (a) $800,000,000 and (b) such amount as the Bankruptcy Court may order or as may be agreed by the Required Lenders and the Borrower, (y) with respect to the Term Loan Facility, the lesser of (a) $800,000,000 and (b) such amount as the Bankruptcy Court may order or as may be agreed by the Required Lenders and the Borrower, and (z) with respect to the Delayed-Draw Term Facility, the lesser of (a) $1,100,000,000 and (b) such amount as the Bankruptcy Court may order or as may be agreed by the Required Lenders and the Borrower.

"**Interim Cash Collateral Order**" shall mean that certain Interim Order (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing [Docket No. __].

"**Interim Order**" shall mean that certain Interim Order (A) Approving Postpetition Financing for Texas Competitive Electric Holdings Company LLC and Certain of Its Debtor Affiliates, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing [Docket No. __] attached as Exhibit N hereto, in form and substance satisfactory to the Left Lead Arrangers on a motion by the TCEH Debtors that is in form and substance satisfactory to the Left Lead Arrangers, as such order or orders may be extended, amended, supplemented or modified in a manner satisfactory to the Left Lead Arrangers.

"**Interim Order Entry Date**" shall mean the date on which the Interim Order is entered by the Bankruptcy Court.

"**Interim Period**" shall mean the period of time between the Interim Order Entry Date and the Final Order Entry Date.

"**Investment**" shall mean, for any Person:  (a) the acquisition (whether for cash, property, services or securities or otherwise) of Stock, Stock Equivalents, bonds, notes, debentures, partnership, limited liability company membership or other ownership interests or other securities of any other Person (including any "short sale" or any sale of any securities at a time when such securities are not owned by the Person entering into such sale), (b) the making of any deposit with, or advance, loan or other extension of credit to, any other Person (including the purchase of property from another Person subject to an understanding or agreement, contingent or otherwise, to resell such property to such Person) (including any partnership or joint venture), (c) the entering into of any guarantee of, or other contingent obligation with respect to, Indebtedness; or (d) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person; provided that, in the event that any Investment is made by the Borrower or any Restricted Subsidiary in any Person through substantially concurrent interim transfers of any amount through one or more other Restricted Subsidiaries, then such other substantially concurrent interim transfers shall be disregarded for purposes of Section 10.5.

"**ISP**" shall mean, with respect to any Letter of Credit, the "International Standby Practices 1998" published by the Institute of International Banking Law & Practice (or such later version thereof as may be in effect at the time of issuance).

"**Issuer Documents**" shall mean with respect to any Letter of Credit, the Letter of Credit Request, and any other document, agreement and instrument entered into by a Letter of Credit Issuer and the Ultimate Parent, Parent Guarantor, the Borrower or any Subsidiary of the Ultimate Parent (other than the Oncor Subsidiaries) or in favor of a Letter of Credit Issuer and relating to such Letter of Credit.

"**Joint Lead Arrangers**" shall mean Citi, DBSI, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Morgan Stanley Senior Funding, Inc., Barclays Bank PLC, RBC Capital Markets and Union Bank, N.A., as joint lead arrangers and joint bookrunners for the Lenders under this Agreement and the other Credit Documents.

"**JV Distribution Amount**" shall mean, at any time, the aggregate amount of cash dividends and other cash distributions received by the Borrower or any Restricted Subsidiary from any Minority Investments or any Unrestricted Subsidiary since the Closing Date and prior to such time and

-33-

only to the extent that neither the Borrower nor any Restricted Subsidiary is under any obligation to repay such amount to such Minority Investments or such Unrestricted Subsidiary.

"**Latest Maturity Date**" shall mean, at any date of determination, the latest maturity date applicable to any Credit Facility hereunder as of such date of determination, including the latest maturity date of any Incremental Facility, in each case as extended in accordance with this Agreement from time to time.

"**Left Lead Arrangers**" shall mean Citi and DBSI.

"**Lender**" shall have the meaning provided in the preamble to this Agreement.

"**Lender Default**" shall mean (a) the failure (which has not been cured) of a Lender to make available its portion of any Borrowing or (b) a Lender having notified the Administrative Agent and/or the Borrower that it does not intend to comply with the obligations under Section 2.1(a), 2.1(b) or 2.1(c), as the case may be, or (c) a Lender having (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity.

"**Letter of Credit**" shall mean each RCT Letter of Credit and each General Letter of Credit.

"**Letter of Credit Issuer**" shall mean, with respect to any RCT Letter of Credit, each RCT Letter of Credit Issuer, and with respect to any General Letter of Credit, any General Letter of Credit Issuer.

"**Letter of Credit Request**" shall have the meaning provided in Section 3.2(a).

"**LIBOR Loan**" shall mean any Term Loan, Delayed-Draw Term Loan or Revolving Credit Loan bearing interest at a rate determined by reference to the LIBOR Rate.

"**LIBOR Rate**" shall mean, for any Interest Period with respect to a LIBOR Loan the rate per annum equal to the ICE Benchmark Administration (or any successor organization) LIBOR Rate ("**ICE LIBOR**"), as published by Reuters (or other commercially available source providing quotations of ICE LIBOR as designated by the Administrative Agent from time to time) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, for deposits in dollars (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period. If such rate is not available at such time for any reason, then the "LIBOR Rate" for such Interest Period, as applicable, shall be a rate per annum as may be agreed upon by the Borrower and the Administrative Agent to be a rate at which deposits in dollars for delivery on the first day of such Interest Period in same day funds in the approximate amount of the LIBOR Loan being made, continued or converted by the Administrative Agent and with a term equivalent to such Interest Period, would be offered by the Administrative Agent's London Branch to major banks in the applicable London interbank eurodollar market at their request at approximately 11:00 a.m. (London time) two Business Days prior to the commencement of such Interest Period. Notwithstanding anything to the contrary contained herein, with respect to Term Loans and Delayed-Draw Term Loans, in no event shall the LIBOR Rate be less than 0.75% per annum.

-34-

"**Lien**" shall mean any mortgage, pledge, security interest, hypothecation, collateral assignment, lien (statutory or other) or similar encumbrance (including any conditional sale or other title retention agreement or any lease or license in the nature thereof); provided that in no event shall an operating lease be deemed to be a Lien.

"**Liquidity**" shall mean the sum, as of any date of determination, of (i) Unrestricted Cash plus (ii) the excess of (A) the Adjusted Total Revolving Credit Commitment over (B) the Revolving Credit Exposure of all Lenders.

"**Loan**" shall mean any Revolving Credit Loan, Term Loan or Delayed-Draw Term Loan made by any Lender hereunder.

"**Management Investors**" shall mean the directors, management, officers and employees of the Ultimate Parent and its Subsidiaries who are or become investors (directly or indirectly) in Holdings, any of its direct or indirect parent entities or in the Ultimate Parent at any time prior to the first anniversary of Closing Date.

"**Master Agreement**" shall have the meaning provided in the definition of the term "Hedging Agreements".

"**Material Adverse Effect**" shall mean any circumstance or conditions affecting the business, assets, operations, properties or financial condition of the Borrower and its Subsidiaries taken as a whole, that would individually or in the aggregate, materially adversely affect the ability of the TCEH Debtors (taken as a whole) to perform their payment obligations under the Credit Documents to which they are a party, or the rights and remedies of the Administrative Agent, the Letter of Credit Issuers and the Lenders under the Credit Documents other than, in each case, as a result of the events leading up to, and following the commencement of a proceeding under Chapter 11 and the continuation and prosecution thereof, including circumstances or conditions resulting from, or incidental to, such events, commencement, continuation and prosecution, which shall not, individually or in the aggregate, constitute a Material Adverse Effect, and provided that nothing disclosed in any of the following filings by the Ultimate Parent and/or Parent Guarantor: (1) the annual report on Form 10-K for the year ended December 31, 2013 (to the extent substantially the same in form and substance as the version provided to the Left Lead Arrangers at least two days prior to the date of the Commitment Letter), (2) any filings on Form 8-K made through the date of the Commitment Letter and/or (3) any disclosure statement related to any plan of reorganization or liquidation of TCEH Debtors provided to the Joint Lead Arrangers on or prior to the date of the Commitment Letter, shall, in any case, in and of itself and based solely on facts as disclosed therein (without giving effect to any developments not disclosed therein) constitute a Material Adverse Effect.

"**Material Subsidiary**" shall mean, at any date of determination, each Restricted Subsidiary of the Borrower (a) whose total assets (when combined with the assets of such Restricted Subsidiary's Subsidiaries, after eliminating intercompany obligations) at the last day of the most recent Test Period for which Section 9.1 Financials have been delivered were equal to or greater than 2.5% of the Consolidated Total Assets of the Borrower and the Restricted Subsidiaries at such date or (b) whose total revenues (when combined with the revenues of such Restricted Subsidiary's Subsidiaries, after eliminating intercompany obligations) during such Test Period were equal to or greater than 2.5% of the consolidated revenues of the Borrower and the Restricted Subsidiaries for such period, in each case determined in accordance with GAAP; provided that if, at any time and from time to time after the Closing Date, Restricted Subsidiaries that are not Material Subsidiaries have, in the aggregate, (x) total assets (when combined with the assets of such Restricted Subsidiary's Subsidiaries, after eliminating intercompany obligations) at the last day of such Test Period equal to or greater than 10.0% of the

-35-

Consolidated Total Assets of the Borrower and the Restricted Subsidiaries at such date or (y) total revenues (when combined with the revenues of such Restricted Subsidiary's Subsidiaries, after eliminating intercompany obligations) during such Test Period equal to or greater than 10.0% of the consolidated revenues of the Borrower and the Restricted Subsidiaries for such period, in each case determined in accordance with GAAP, then the Borrower shall, on the date on which financial statements for such quarter are delivered pursuant to this Agreement, designate in writing to the Administrative Agent one or more of such Restricted Subsidiaries as "Material Subsidiaries" so that such condition no longer exists. It is agreed and understood that no Receivables Entity shall be a Material Subsidiary.

"**Maturity Date**" shall mean the earliest to occur of (a) _____, 2016;[2] provided, however, that the Maturity Date shall be subject to a six-month extension as requested by the Borrower if (1) as of the first day of such extension no Event of Default is continuing, (2) an Acceptable Reorganization Plan has been filed, (3) a hearing has been scheduled for the confirmation of such Acceptable Reorganization Plan, (4) the TCEH Debtors are working in good faith to confirm such Acceptable Reorganization Plan, (5) an updated Budget and Annual Operating Forecast have been delivered by the Borrower at least ten (10) days prior to the first day of such extension, which Budget and Annual Operating Forecast demonstrate Liquidity sufficient to provide for Adequate Protection Payments required by the Interim Cash Collateral Order, the Final Cash Collateral Order and the Orders through such additional six-month period plus an additional $250,000,000, and (6) the Borrower pays an extension fee in the amount of 0.25% of the then outstanding Commitments and Loans on the date of such payment to the Administrative Agent for distribution to the Lenders on a pro rata basis based on the respective Commitments and Loans held by each Lender (subclauses (1) through (6), the "**Extension Conditions**"); (b) the effective date of any Reorganization Plan; (c) the date that is 45 days after the Interim Order Entry Date if the Final Order Entry Date has not occurred by such date; (d) the consummation of a sale of all or substantially all of the TCEH Debtors' assets or stock under section 363 of the Bankruptcy Code; or (e) the acceleration of any Loans and the termination of any then outstanding Commitments in accordance with the terms of this Agreement; provided, however, that the Maturity Date will occur in any event no later than [_____].[3]

"**Minimum Borrowing Amount**" shall mean (a) with respect to any Borrowing of Loans (other than Delayed-Draw Term Loans), $5,000,000, (b) with respect to a borrowing of Delayed-Draw Term Loans, $250,000,000 (or, in each case, if less, the entire remaining Commitments of any applicable Credit Facility at the time of such Borrowing).

"**Minority Investment**" shall mean any Person (other than a Subsidiary) in which the Borrower or any Restricted Subsidiary owns Stock or Stock Equivalents, including any joint venture (regardless of form of legal entity).

"**Moody's**" shall mean Moody's Investors Service, Inc. or any successor by merger or consolidation to its business.

"**Mortgage**" shall mean a mortgage or a deed of trust, deed to secure debt, trust deed or other security document entered into by the owner of a Mortgaged Property and the Collateral Agent for the benefit of the Secured Parties in respect of that Mortgaged Property.

---

[2] 24 months from Closing Date.

[3] 30 months from Closing Date.

#4821-7663-6950

"**Mortgaged Property**" shall mean all Real Estate, if any, with respect to which a Lien for the benefit of the Collateral Agent and the other Secured Parties is granted and perfected pursuant to the terms and conditions of any Order.

"**Multiemployer Plan**" shall mean a plan that is a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA (i) to which any of the Borrower, any Subsidiary of the Borrower or any ERISA Affiliate is then making or has an obligation to make contributions or (ii) with respect to which the Borrower, any Subsidiary of the Borrower or any ERISA Affiliate could incur liability pursuant to Title IV of ERISA.

"**Narrative Report**" shall mean, with respect to the financial statements for which such narrative report is required, a management's discussion and analysis of the financial condition and results of operations of the Borrower and its consolidated Subsidiaries for the applicable period to which such financial statements relate.

"**Necessary CapEx**" shall mean Capital Expenditures that are required by Applicable Law (other than Environmental Law) or otherwise undertaken voluntarily for health and safety reasons (other than as required by Environmental Law). The term "Necessary CapEx" does not include any Capital Expenditure undertaken primarily to increase the efficiency of, expand or re-power any power generation facility.

"**Net Cash Proceeds**" shall mean, with respect to any Prepayment Event, (a) the gross cash proceeds (including payments from time to time in respect of installment obligations, if applicable) received by or on behalf of the Borrower or any Restricted Subsidiary in respect of such Prepayment Event, as the case may be, less (b) the sum of:

(i)    the amount, if any, of all taxes paid or estimated by the Borrower in good faith to be payable by the Borrower or any Restricted Subsidiary in connection with such Prepayment Event,

(ii)    the amount of any reasonable reserve established in accordance with GAAP against any liabilities (other than any taxes deducted pursuant to clause (i) above) (x) associated with the assets that are the subject of such Prepayment Event and (y) retained by the Borrower or any Restricted Subsidiary (including any pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction); provided that the amount of any subsequent reduction of such reserve (other than in connection with a payment in respect of any such liability) shall be deemed to be Net Cash Proceeds of such Prepayment Event occurring on the date of such reduction,

(iii)    the amount of any Indebtedness (other than Indebtedness hereunder) secured by a Lien on the assets that are the subject of such Prepayment Event to the extent that the instrument creating or evidencing such Indebtedness requires that such Indebtedness be repaid upon consummation of such Prepayment Event,

(iv)    in the case of any Asset Sale Prepayment Event (other than any Asset Sale Prepayment Event pursuant to Section 10.4(m)) or Recovery Prepayment Event, the amount of any proceeds of such Prepayment Event that the Borrower or any Restricted Subsidiary has reinvested (or intends to reinvest within the Reinvestment Period, has entered into an Acceptable Reinvestment Commitment prior to the last day of the Reinvestment Period to reinvest or, with respect to any Recovery Prepayment Event, provided an Acceptable Reinvestment Commitment or a Restoration Certification prior to the last day of the Reinvestment Period) in the business of

-37-

the Borrower or any Restricted Subsidiary (subject to Section 9.15), including for the repair, restoration or replacement of an asset or assets subject to a Recovery Prepayment Event; provided that any portion of such proceeds that has not been so reinvested within such Reinvestment Period (with respect to such Prepayment Event, the "**Deferred Net Cash Proceeds**") shall, unless the Borrower or any Restricted Subsidiary has entered into an Acceptable Reinvestment Commitment or provided a Restoration Certification prior to the last day of such Reinvestment Period to reinvest such proceeds, (x) be deemed to be Net Cash Proceeds of an Asset Sale Prepayment Event or Recovery Prepayment Event occurring on the last day of such Reinvestment Period or, if later, 180 days after the date the Borrower or such Restricted Subsidiary has entered into such Acceptable Reinvestment Commitment or provided such Restoration Certification, as applicable (such last day or 180th day, as applicable, the "**Deferred Net Cash Proceeds Payment Date**"), and (y) be applied to the repayment of Term Loans and Delayed-Draw Term Loans in accordance with Section 5.2(a).

(v)     in the case of any Asset Sale Prepayment Event with respect to Baseload Assets pursuant to Section 10.4(m), the amount of any proceeds of such Asset Sale Prepayment Event that the Borrower or any Restricted Subsidiary has reinvested (or intends to reinvest within the Reinvestment Period or has entered into an Acceptable Reinvestment Commitment prior to the last day of the Reinvestment Period to reinvest) in other Baseload Assets; provided that any Deferred Net Cash Proceeds with respect to such Asset Sale Prepayment Event shall, unless the Borrower or any Restricted Subsidiary has entered into an Acceptable Reinvestment Commitment prior to the last day of such Reinvestment Period to reinvest such proceeds, (x) be deemed to be Net Cash Proceeds of an Asset Sale Prepayment Event occurring on the Deferred Net Cash Proceeds Payment Date and (y) be applied to the repayment of Term Loans and Delayed-Draw Term Loans in accordance with Section 5.2(a).

(vi)     in the case of any Asset Sale Prepayment Event or Recovery Prepayment Event by a non-Wholly Owned Restricted Subsidiary, the *pro rata* portion of the Net Cash Proceeds thereof (calculated without regard to this clause (vi)) attributable to minority interests and not available for distribution to or for the account of the Borrower or a Wholly Owned Restricted Subsidiary as a result thereof, and

(vii)     reasonable and customary fees, commissions, expenses (including attorney's fees, investment banking fees, survey costs, title insurance premiums and recording charges, transfer taxes, deed or mortgage recording taxes and other customary expenses and brokerage, consultant and other customary fees), issuance costs, discounts and other costs paid by the Borrower or any Restricted Subsidiary, as applicable, in connection with such Prepayment Event, in each case only to the extent not already deducted in arriving at the amount referred to in clause (a) above.

"**Netting Agreement**" shall mean, in respect of Hedging Obligations, a netting agreement, master netting agreement or other similar document having the same effect as a netting agreement or master netting agreement and, as applicable, any collateral annex, security agreement or other similar document related to any master netting agreement or Permitted Contract.

"**New Revolving Credit Commitments**" shall have the meaning provided in Section 2.14(i)(ii).

"**New Revolving Credit Loan**" shall have the meaning provided in Section 2.14(i)(ii).

"**New Revolving Credit Series**" shall have the meaning provided in Section 2.14(i)(ii).

"**Non-Consenting Lender**" shall have the meaning provided in Section 13.7(b).

"**Non-Defaulting Lender**" shall mean and include each Lender other than a Defaulting Lender.

"**Non-Extension Notice Date**" shall have the meaning provided in Section 3.2(b).

"**Non-U.S. Lender**" shall mean any Agent or Lender that is not, for United States federal income tax purposes, (a) an individual who is a citizen or resident of the United States, (b) a corporation, partnership or entity treated as a corporation or partnership created or organized in or under the laws of the United States, or any political subdivision thereof, (c) an estate whose income is subject to U.S. federal income taxation regardless of its source or (d) a trust if a court within the United States is able to exercise primary supervision over the administration of such trust and one or more United States persons have the authority to control all substantial decisions of such trust or a trust that has a valid election in effect under applicable U.S. Treasury regulations to be treated as a United States person.

"**Notice of Borrowing**" shall mean a request of the Borrower in accordance with the terms of Section 2.3 and substantially in the form of Exhibit A or such other form as shall be approved by the Administrative Agent (acting reasonably).

"**Notice of Conversion or Continuation**" shall have the meaning provided in Section 2.6(a).

"**Obligations**" shall mean all advances to, and debts, liabilities, obligations, covenants and duties of, any Credit Party arising under any Credit Document or otherwise with respect to any Loan or Letter of Credit or under any Secured Cash Management Agreement, Secured Commodity Hedging Agreement or Secured Hedging Agreement, in each case, entered into with Parent Guarantor, the Borrower or any Restricted Subsidiary, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Credit Party of any proceeding under the Cases or any bankruptcy or insolvency law naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding, in each case other than Excluded Swap Obligations. Without limiting the generality of the foregoing, the Obligations of the Credit Parties under the Credit Documents (and any of their Restricted Subsidiaries to the extent they have obligations under the Credit Documents) (i) include the obligation (including guarantee obligations) to pay principal, interest, charges, expenses, fees, attorney costs, indemnities and other amounts payable by any Credit Party under any Credit Document and (ii) exclude, notwithstanding any term or condition in this Agreement or any other Credit Documents, any Excluded Swap Obligations.

"**Oncor**" shall mean Oncor Electric Delivery Company LLC, a Delaware limited liability company.

"**Oncor Credit Facility**" shall mean the revolving credit agreement, dated as of October 10, 2007, among Oncor, the lenders from time to time party thereto, JPMorgan Chase Bank, N.A., as administrative agent, Citibank, N.A., as syndication agent, and J.P. Morgan Securities Inc., Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Goldman Sachs Credit Partners L.P., Lehman Brothers Inc. and Morgan Stanley Senior Funding, Inc., as joint lead arrangers and bookrunners, as amended, supplemented or otherwise modified from time to time.

"**Oncor Notes**" shall mean:

-39-

- Oncor's 6.375% Senior Notes due 2015;

- Oncor's 5.000% Senior Secured Notes due 2017;

- Oncor's 6.800% Senior Secured Notes due 2018;

- Oncor's 5.750% Senior Secured Notes due 2020;

- Oncor's 4.100% Senior Secured Notes due 2022;

- Oncor's 7.000% Fixed Debentures due 2022;

- Oncor's 7.000% Senior Notes due 2032;

- Oncor's 7.250% Senior Notes due 2033;

- Oncor's 7.500% Senior Secured Notes due 2038;

- Oncor's 5.250% Senior Secured Notes due 2040;

- Oncor's 4.550% Senior Secured Notes due 2041; and

- Oncor's 5.300% Senior Secured Notes due 2042.

"**Oncor Subsidiaries**" shall mean Oncor Electric Delivery Holdings Company LLC and its Subsidiaries.

"**Orders**" shall mean the Interim Order or the Final Order or both, as the context may require.

"**Organizational Documents**" shall mean, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction), (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and, if applicable, any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Other Taxes**" shall mean any and all present or future stamp, registration, documentary or any other excise, property or similar taxes (including interest, fines, penalties, additions to tax and related expenses with regard thereto) arising from any payment made or required to be made under this Agreement or any other Credit Document or from the execution or delivery of, registration or enforcement of, consummation or administration of, or otherwise with respect to, this Agreement or any other Credit Document.

"**Overnight Rate**" shall mean, for any day, the greater of (a) the Federal Funds Effective Rate and (b) an overnight rate determined by the Administrative Agent, the General Letter of Credit

-40-

Issuer or the RCT Letter of Credit Issuer, as the case may be, in accordance with banking industry rules on interbank compensation.

"**Parent Guarantor**" shall have the meaning provided in the preamble to this Agreement.

"**Participant**" shall have the meaning provided in Section 13.6(c)(i).

"**Participant Register**" shall have the meaning provided in Section 13.6(c)(iii).

"**Participating Receivables Grantor**" shall mean the Borrower or any Restricted Subsidiary that is or that becomes a participant or originator in a Permitted Receivables Financing.

"**Patriot Act**" shall have the meaning provided in Section 13.18.

"**Payment Default**" shall mean any event, act or condition that with notice or lapse of time, or both, would constitute an Event of Default under Section 11.1.

"**PBGC**" shall mean the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA, or any successor thereto.

"**Pension Act**" shall mean the Pension Protection Act of 2006, as it presently exists or as it may be amended from time to time.

"**Perfection Certificate**" shall mean a certificate of the Borrower in a form approved by the Administrative Agent.

"**Permitted Acquisition**" shall mean the acquisition, by merger or otherwise, by the Borrower or any Restricted Subsidiary of assets (including assets constituting a business unit, line of business or division) or Stock or Stock Equivalents, so long as (a) such acquisition and all transactions related thereto shall be consummated in accordance with Applicable Law, (b) if such acquisition involves any Stock or Stock Equivalents, such acquisition shall result in the issuer of such Stock or Stock Equivalents and its Subsidiaries becoming a Restricted Subsidiary and a Subsidiary Guarantor, to the extent required by Section 9.11, (c) such acquisition shall result in the Collateral Agent, for the benefit of the applicable Secured Parties, being granted a security interest in any Stock, Stock Equivalent or any assets so acquired, to the extent required by Sections 9.11, 9.12 and/or 9.14, (d) after giving effect to such acquisition, the Borrower and the Restricted Subsidiaries shall be in compliance with Section 9.15, (e) both before and after giving effect to such acquisition, no Default or Event of Default shall have occurred and be continuing and (f) the Borrower shall be in compliance, on a Pro Forma Basis, after giving effect to such acquisition (including any Indebtedness assumed or permitted to exist or incurred pursuant to Section 10.1, and any related Pro Forma Adjustment), with the covenant set forth in Section 10.9.

"**Permitted Contract**" shall have the meaning provided in Section 10.2(bb).

"**Permitted Holders**" shall mean (a) the Sponsors and (b) the Management Investors.

-41-

#4821-7663-6950

"**Permitted Investments**" shall mean:

(a)     securities issued or unconditionally guaranteed by the United States government or any agency or instrumentality thereof, in each case having maturities and/or reset dates of not more than 24 months from the date of acquisition thereof;

(b)     securities issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof or any political subdivision of any such state or any public instrumentality thereof having maturities of not more than 24 months from the date of acquisition thereof and, at the time of acquisition, having an investment grade rating generally obtainable from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, then from another nationally recognized rating service);

(c)     commercial paper or variable or fixed rate notes maturing no more than 12 months after the date of creation thereof and, at the time of acquisition, having a rating of at least A-3 or P-3 from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, an equivalent rating from another nationally recognized rating service);

(d)     time deposits with, or domestic and LIBOR certificates of deposit or bankers' acceptances maturing no more than two years after the date of acquisition thereof issued by, any Lender or any other bank having combined capital and surplus of not less than $500,000,000 in the case of domestic banks and $100,000,000 (or the dollar equivalent thereof) in the case of foreign banks;

(e)     repurchase agreements with a term of not more than 90 days for underlying securities of the type described in clauses (a), (b) and (d) above entered into with any bank meeting the qualifications specified in clause (d) above or securities dealers of recognized national standing;

(f)     marketable short-term money market and similar funds (x) either having assets in excess of $500,000,000 or (y) having a rating of at least A-3 or P-3 from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, an equivalent rating from another nationally recognized rating service);

(g)     shares of investment companies that are registered under the Investment Company Act of 1940 and substantially all the investments of which are one or more of the types of securities described in clauses (a) through (f) above; and

(h)     in the case of Investments by any Restricted Foreign Subsidiary or Investments made in a country outside the United States of America, other customarily utilized high-quality Investments in the country where such Restricted Foreign Subsidiary is located or in which such Investment is made.

"**Permitted Liens**" shall mean:

(a)     Liens for taxes, assessments or governmental charges or claims not yet delinquent or that are being contested in good faith and by appropriate proceedings for which appropriate reserves have been established to the extent required by and in accordance with GAAP;

-42-

(b)    Liens in respect of property or assets of the Borrower or any Subsidiary of the Borrower imposed by Applicable Law, such as carriers', warehousemen's and mechanics' Liens and other similar Liens, arising in the ordinary course of business or in connection with the construction or restoration of facilities for the generation, transmission or distribution of electricity, in each case so long as such Liens arise in the ordinary course of business and do not individually or in the aggregate have a Material Adverse Effect;

(c)    Liens arising from judgments or decrees in circumstances not constituting an Event of Default under Section 11.11;

(d)    Liens incurred or deposits made in connection with workers' compensation, unemployment insurance and other types of social security or similar legislation, or to secure the performance of tenders, statutory obligations, trade contracts (other than for payment of money), leases, statutory obligations, surety, stay, customs and appeal bonds, bids, leases, government contracts, performance and return-of-money bonds and other similar obligations, in each case incurred in the ordinary course of business (including in connection with the construction or restoration of facilities for the generation, transmission or distribution of electricity) or otherwise constituting Investments permitted by Section 10.5;

(e)    ground leases or subleases, licenses or sublicenses in respect of real property on which facilities owned or leased by the Borrower or any of the Subsidiaries of the Borrower are located;

(f)    easements, rights-of-way, licenses, reservations, servitudes, permits, conditions, covenants, rights of others, restrictions (including zoning restrictions), oil, gas and other mineral interests, royalty interests and leases, minor defects, exceptions or irregularities in title or survey, encroachments, protrusions and other similar charges or encumbrances (including those to secure health, safety and environmental obligations), which do not interfere in any material respect with the business of the Borrower and the Subsidiaries of the Borrower, taken as a whole;

(g)    any exception on the title policies issued in connection with any Mortgaged Property;

(h)    any interest or title of a lessor, sublessor, licensor, sublicensor or grantor of an easement or secured by a lessor's, sublessor's, licensor's, sublicensor's interest or grantor of an easement under any lease, sublease, license, sublicense or easement to be entered into by the Borrower or any Restricted Subsidiary of the Borrower as lessee, sublessee, licensee, grantee or sublicensee to the extent permitted by this Agreement;

(i)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(j)    Liens on goods or inventory the purchase, shipment or storage price of which is financed by a documentary letter of credit or banker's acceptance issued or created for the account of the Borrower or any Subsidiary of the Borrower; provided that such Lien secures only the obligations of the Borrower or such Subsidiary in respect of such letter of credit or banker's acceptance to the extent permitted under Section 10.1;

(k)    leases, licenses, subleases or sublicenses granted to others not interfering in any material respect with the business of the Borrower and the Subsidiaries of the Borrower, taken as a whole;

-43-

(l)       Liens arising from precautionary Uniform Commercial Code financing statement or similar filings made in respect of operating leases entered into by the Borrower or any Subsidiary of the Borrower;

(m)      Liens created in the ordinary course of business in favor of banks and other financial institutions over credit balances of any bank accounts of the Borrower and the Subsidiaries held at such banks or financial institutions, as the case may be, to facilitate the operation of cash pooling and/or interest set-off arrangements in respect of such bank accounts in the ordinary course of business;

(n)       Liens arising under Section 9.343 of the Texas Uniform Commercial Code or similar statutes of states other than Texas;

(o)       Liens on accounts receivable, other Receivables Facility Assets, or accounts into which collections or proceeds of Receivables Facility Assets are deposited, in each case arising in connection with a Permitted Receivables Financing;

(p)       any zoning, land use, environmental or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of the Borrower and the Subsidiaries of the Borrower, taken as a whole;

(q)       any Lien arising by reason of deposits with or giving of any form of security to any Governmental Authority for any purpose at any time as required by Applicable Law as a condition to the transaction of any business or the exercise of any privilege or license, or to enable the Borrower or any Subsidiary to maintain self-insurance or to participate in any fund for liability on any insurance risks;

(r)       Liens, restrictions, regulations, easements, exceptions or reservations of any Governmental Authority applying to nuclear fuel;

(s)       rights reserved to or vested in any Governmental Authority by the terms of any right, power, franchise, grant, license or permit, or by any provision of Applicable Law, to terminate or modify such right, power, franchise, grant, license or permit or to purchase or recapture or to designate a purchaser of any of the property of such person;

(t)       Liens arising under any obligations or duties affecting any of the property, the Borrower or any Restricted Subsidiary to any Governmental Authority with respect to any franchise, grant, license or permit which do not materially impair the use of such property for the purposes for which it is held;

(u)       rights reserved to or vested in any Governmental Authority to use, control or regulate any property of such person, which do not materially impair the use of such property for the purposes for which it is held;

(v)       any obligations or duties, affecting the property of Parent Guarantor, the Borrower or any Restricted Subsidiary, to any Governmental Authority with respect to any franchise, grant, license or permit; and

-44-

(w)    a set-off or netting rights granted by Parent Guarantor, the Borrower or any Subsidiary of the Borrower pursuant to any Hedging Agreements, Netting Agreements or Permitted Contracts solely in respect of amounts owing under such agreements.

Notwithstanding anything to the contrary, Permitted Liens shall not include Liens securing any of the Prepetition Debt.

"**Permitted Property Interest**" shall have the meaning provided in Section 14.3.

"**Permitted Receivables Financing**" shall mean any of one or more receivables financing programs as amended, supplemented, modified, extended, renewed, restated or refunded from time to time, the obligations of which are non-recourse (except for customary representations, warranties, covenants and indemnities and other customary forms of support, in each case made in connection with such facilities) to the Borrower and the Restricted Subsidiaries (other than a Receivables Entity) providing for the sale, conveyance, or contribution to capital of Receivables Facility Assets by Participating Receivables Grantors in transactions purporting to be sales of Receivables Facility Assets to either (a) a Person that is not a Restricted Subsidiary or (b) a Receivables Entity that in turn funds such purchase by the direct or indirect sale, transfer, conveyance, pledge, or grant of participation or other interest in such Receivables Facility Assets to a Person that is not a Restricted Subsidiary.

"**Permitted Sale Leaseback**" shall mean any Sale Leaseback existing on the Closing Date or consummated by the Borrower or any Restricted Subsidiary after the Closing Date; provided that any such Sale Leaseback consummated after the Closing Date not between (a) a Credit Party and another Credit Party or (b) a Restricted Subsidiary that is not a Credit Party and another Restricted Subsidiary that is not a Credit Party is consummated for fair value as determined at the time of consummation in good faith by (i) the Borrower or such Restricted Subsidiary and (ii) in the case of any Sale Leaseback (or series of related Sale Leasebacks) the aggregate proceeds of which exceed $100,000,000, the board of directors of the Borrower or such Restricted Subsidiary (which such determination may take into account any retained interest or other Investment of the Borrower or such Restricted Subsidiary in connection with, and any other material economic terms of, such Sale Leaseback). Notwithstanding anything to the contrary contained in this Agreement, the term "Permitted Sale Leaseback" shall not in any event include any direct or indirect Sale Leaseback of all or any portion of one or more Baseload Generation Assets.

"**Person**" shall mean any individual, partnership, joint venture, firm, corporation, limited liability company, association, trust or other enterprise or any Governmental Authority.

"**Petition Date**" shall have the meaning set forth in the Recitals hereto.

"**Plan**" shall mean an employee pension benefit plan (other than a Multiemployer Plan) - which is covered by Title IV of ERISA or subject to the minimum funding standards under Section 412 of the Code or Section 302 of ERISA and is maintained or contributed to by the Borrower, any Subsidiary or ERISA Affiliate or with respect to which the Borrower or any Subsidiary could incur liability pursuant to Title IV of ERISA.

"**Plan Effective Date**" shall mean the date of the effectiveness of an Acceptable Reorganization Plan that has been confirmed pursuant to a final order of the Bankruptcy Court.

"**Platform**" shall have the meaning provided in Section 13.17(c).

"**Pledge Agreement**" shall mean any pledge agreement with respect to any or all of the Obligations delivered pursuant to Section 9.12.

-45-

"**Post-Acquisition Period**" shall mean, with respect to any Specified Transaction, the period beginning on the date such Specified Transaction is consummated and ending on the last day of the sixth full consecutive fiscal quarter immediately following the date on which such Specified Transaction is consummated.

"**Preferred Stock**" shall mean any Stock or Stock Equivalents with preferential rights of payment of dividends or upon liquidation, dissolution or winding up.

"**Prepayment Event**" shall mean any Asset Sale Prepayment Event or Recovery Prepayment Event.

"**Prepetition**" shall mean, when used with respect to any agreement or instrument or any claim or proceeding or any other matter with respect of any Credit Party, an agreement or instrument that was entered into or became effective, a claim or proceeding that first arose or was first instituted, or another matter that first occurred or, by operation of law, is deemed to have occurred, prior to the Petition Date.

"**Prepetition Credit Agreement**" shall mean that certain Credit Agreement, dated as of October 10, 2007, by and among Texas Competitive Electric Holdings Company LLC, as borrower, Energy Future Competitive Holdings Company, LLC, the guarantors party thereto, the lenders party thereto and Citibank, N.A., as administrative agent, collateral agent, swingline lender and an issuing bank, as amended, supplemented or otherwise modified from time to time.

"**Prepetition Credit Agreement Lender**" shall mean each "Lender" (under and as defined in the Prepetition Credit Agreement) from time to time party to the Prepetition Credit Agreement.

"**Prepetition Debt**" shall mean collectively all Prepetition First Lien Obligations and Prepetition Second Lien Obligations.

"**Prepetition First Lien Intercreditor Agreement**" shall mean that certain Amended and Restated Collateral Agency and Intercreditor Agreement, dated as of October 10, 2007 and amended and restated as of August 7, 2009, among Energy Future Competitive Holdings Company LLC, Texas Competitive Electric Holdings Company LLC, the subsidiary guarantors party thereto, Citibank, N.A., as Administrative Agent and Collateral Agent, Credit Suisse Energy LLC, J. Aron & Company, Morgan Stanley Capital Group Inc., Citigroup Energy Inc., and the other parties from time to time party thereto, as amended, restated, supplemented or modified from time to time to the extent permitted by this Agreement

"**Prepetition First Lien Obligations**" shall mean the "Secured Obligations" (as defined in the Prepetition First Lien Intercreditor Agreement).

"**Prepetition First Lien Secured Parties**" shall mean the "Secured Parties" (as defined in the Prepetition First Lien Intercreditor Agreement).

"**Prepetition Second Lien Documents**" shall mean the Prepetition Second Lien Indenture, the other Collateral Documents (as defined in the Prepetition Second Lien Indenture), including each collateral trust agreement, mortgage and other security documents and any guarantee entered into in connection therewith and any related notes, the Prepetition Second Lien Notes, and the other Collateral Documents (as defined in the Prepetition Second Lien Indenture), including the Prepetition Second Lien Intercreditor Agreement and each mortgage and other security documents and any guarantee entered into in connection therewith and any related notes.

-46-

"**Prepetition Second Lien Indenture**" shall mean that certain indenture, dated as of October 6, 2010, among the Borrower, TCEH Finance, Inc., the guarantors party thereto and The Bank of New York Mellon Trust Company, as trustee, The Bank of New York Mellon Trust Company, as collateral agent for the Prepetition Second Lien Secured Parties, as amended, restated, supplemented or modified from time to time to the extent permitted by this Agreement.

"**Prepetition Second Lien Intercreditor Agreement**" shall mean that certain Second Lien Intercreditor Agreement, dated as of October 6, 2010, among Energy Future Competitive Holdings Company, Texas Competitive Electric Holdings Company LLC, the subsidiary guarantors party thereto, Citibank, N.A., as senior collateral agent for the senior secured parties and as representative for the credit agreement secured parties, The Bank of New York Mellon Trust Company, as the initial second priority representative, and the other parties from time to time party thereto, as amended, restated, supplemented or modified from time to time to the extent permitted by this Agreement.

"**Prepetition Second Lien Notes**" shall mean (i) the 15% senior secured second lien notes due April 1, 2021 and (ii) the 15% senior secured second lien notes due April 1, 2021, Series B issued by Borrower and TCEH Finance, Inc. under the Prepetition Second Lien Indenture and any notes issued in connection therewith (or increases thereto) resulting from payment of interest in kind and any notes issued in exchange therefor having the same economic terms, including guarantees thereof by the guarantors thereof.

"**Prepetition Second Lien Obligations**" shall mean the "Second Priority Debt Obligations" as defined in the Prepetition Second Lien Intercreditor Agreement.

"**Prepetition Second Lien Secured Parties**" shall mean The Bank of New York Mellon Trust Company, in its capacities as Trustee under the Prepetition Second Lien Indenture and as collateral agent under the Prepetition Second Lien Documents, its successors and assigns in such capacities and each person that is a holder of Prepetition Second Lien Notes.

"**Pro Forma Adjustment**" shall mean, for any Test Period that includes all or any part of a fiscal quarter included in any Post-Acquisition Period, with respect to the Acquired EBITDA of the applicable Pro Forma Entity or the Consolidated EBITDA of the Borrower, the pro forma increase or decrease in such Acquired EBITDA or such Consolidated EBITDA, as the case may be, projected by the Borrower in good faith as a result of (a) actions taken or to be taken, prior to or during such Post-Acquisition Period for the purposes of realizing reasonably identifiable and factually supportable cost savings or (b) any additional costs incurred prior to or during such Post-Acquisition Period, in each case in connection with the combination of the operations of such Pro Forma Entity with the operations of the Borrower and the Restricted Subsidiaries; provided that (A) at the election of the Borrower, such Pro Forma Adjustment shall not be required to be determined for any Pro Forma Entity to the extent the aggregate consideration paid in connection with such acquisition was less than $50,000,000 and (ii) so long as such actions are taken, or to be taken, prior to or during such Post-Acquisition Period or such costs are incurred prior to or during such Post-Acquisition Period, as applicable, it may be assumed, for purposes of projecting such pro forma increase or decrease to such Acquired EBITDA or such Consolidated EBITDA, as the case may be, that the applicable amount of such cost savings will be realizable during the entirety of such Test Period, or the applicable amount of such additional costs, as applicable, will be incurred during the entirety of such Test Period; provided, further that any such pro forma increase or decrease to such Acquired EBITDA or such Consolidated EBITDA, as the case may be, shall be without duplication for cost savings or additional costs already included in such Acquired EBITDA or such Consolidated EBITDA, as the case may be, for such Test Period.

"**Pro Forma Adjustment Certificate**" shall mean any certificate of an Authorized Officer of the Borrower delivered pursuant to <u>Section 9.1(h)</u> or setting forth the information described in clause (iii) to <u>Section 9.1(c)</u>.

"**Pro Forma Basis**", "**Pro Forma Compliance**" and "**Pro Forma Effect**" shall mean, with respect to compliance with any test or covenant hereunder, that (A) to the extent applicable, the Pro Forma Adjustment shall have been made and (B) all Specified Transactions and the following transactions in connection therewith shall be deemed to have occurred as of the first day of the applicable period of measurement in such test or covenant: (a) income statement items (whether positive or negative) attributable to the property or Person subject to such Specified Transaction, (i) in the case of a Disposition of all or substantially all Stock in any Subsidiary of the Borrower or any division, product line, or facility used for operations of the Borrower or any Subsidiary of the Borrower, shall be excluded, and (ii) in the case of a Permitted Acquisition or Investment described in the definition of "Specified Transaction", shall be included, (b) any retirement or repayment of Indebtedness, and (c) any incurrence or assumption of Indebtedness by the Borrower or any Restricted Subsidiary in connection therewith (it being agreed that if such Indebtedness has a floating or formula rate, such Indebtedness shall have an implied rate of interest for the applicable period for purposes of this definition determined by utilizing the rate that is or would be in effect with respect to such Indebtedness as at the relevant date of determination); <u>provided</u> that, without limiting the application of the Pro Forma Adjustment pursuant to (A) above (but without duplication thereof), the foregoing pro forma adjustments may be applied to any such test or covenant solely to the extent that such adjustments are consistent with the definition of Consolidated EBITDA and give effect to events (including operating expense reductions) that are (i) (x) directly attributable to such transaction, (y) expected to have a continuing impact on the Borrower and the Restricted Subsidiaries and (z) factually supportable or (ii) otherwise consistent with the definition of Pro Forma Adjustment.

"**Pro Forma Entity**" shall have the meaning provided in the definition of the term "Acquired EBITDA".

"**PUCT**" shall mean the Public Utility Commission of Texas or any successor.

"**Qualified ECP Guarantor**" shall mean, in respect of any Swap Obligation, each Guarantor that has total assets exceeding $10,000,000 at the time the relevant Guarantee or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"**Qualifying IPO**" shall mean the issuance by the Ultimate Parent, Parent Guarantor or any other direct or indirect parent of Parent Guarantor of its common Stock in an underwritten primary public offering (other than a public offering pursuant to a registration statement on Form S-8) pursuant to an effective registration statement filed with the SEC in accordance with the Securities Act (whether alone or in connection with a secondary public offering).

"**RCT**" shall mean the Railroad Commission of Texas.

"**RCT Carve Out Support Rejection Notice**" shall have the meaning provided in <u>Section 4.4</u>.

"**RCT L/C Cash Coverage Requirement**" shall have the meaning provided in <u>Section 3.9</u>.

"**RCT L/C Collateral Account**" shall mean one or more Cash Collateral Accounts or securities accounts established pursuant to, and subject to the terms of, Section 3.9 for the purpose of cash collateralizing the RCT L/C Obligations in respect of RCT Letters of Credit.

"**RCT L/C Collateral Account Balance**" shall mean, at any time, with respect to any RCT L/C Collateral Account, the aggregate amount on deposit in such RCT L/C Collateral Account. References herein and in the other Credit Documents to the RCT L/C Collateral Account Balance shall be deemed to refer to the RCT L/C Collateral Account Balance in respect of the applicable RCT L/C Collateral Account or to the RCT L/C Collateral Account Balance in respect of all RCT L/C Collateral Accounts, as the context requires.

"**RCT L/C Collateral Account Depository Bank**" shall have the meaning provided in Section 3.9.

"**RCT L/C Obligations**" shall mean, as at any date of determination and, without duplication, the aggregate Stated Amount of all outstanding RCT Letters of Credit plus the aggregate principal amount of all Unpaid Drawings under all RCT Letters of Credit. For all purposes of this Agreement, if on any date of determination a RCT Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, such RCT Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

"**RCT L/C Permitted Investments**" shall mean:

(a)    any Permitted Investments described in clauses (a) through (g) of the definition thereof; and

(b)    such other securities as agreed to by the TCEH Debtors with the applicable RCT Letter of Credit Issuer from time to time.

"**RCT L/C Termination Date**" shall mean the Maturity Date.

"**RCT Letter of Credit**" shall have the meaning provided in Section 3.1(b)(i).

"**RCT Letter of Credit Commitment**" shall mean $1,100,000,000 (as such amount may be reduced pursuant to Section 4.2(c) or Section 4.4).

"**RCT Letter of Credit Issuers**" shall mean (a) on the date hereof, (i) Citibank, N.A., (ii) Deutsche Bank AG New York Branch, (iii) Bank of America, N.A., (iv) Morgan Stanley Senior Funding, Inc., (v) Barclays Bank PLC, (vi) Royal Bank of Canada and (vii) Union Bank, N.A. and (b) at any time such Person who shall become an RCT Letter of Credit Issuer pursuant to Section 3.6 (it being understood that if any such Person ceases to be a Lender hereunder, such Person will remain an RCT Letter of Credit Issuer with respect to any RCT Letters of Credit issued by such Person that remained outstanding as of the date such Person ceased to be a Lender). Any RCT Letter of Credit Issuer may, in its discretion, arrange for one or more RCT Letters of Credit to be issued by Affiliates of such RCT Letter of Credit Issuer, and in each such case the term "RCT Letter of Credit Issuer" shall include any such Affiliate with respect to RCT Letters of Credit issued by such Affiliate. References herein and in the other Credit Documents to the RCT Letter of Credit Issuer shall be deemed to refer to the RCT Letter of Credit Issuer in respect of the applicable RCT Letter of Credit or to all RCT Letter of Credit Issuers, as the context requires.

-49-

"**RCT Letter of Credit Reimbursement Obligations**" shall mean the obligations of the TCEH Debtors to reimburse and repay Unpaid Drawings on any RCT Letter of Credit pursuant to the terms and conditions set forth in Section 3.4 of this Agreement.

"**RCT Letters of Credit Outstanding**" shall mean, at any time, with respect to any RCT Letter of Credit Issuer, the sum of, without duplication, (a) the aggregate Stated Amount of all outstanding RCT Letters of Credit issued by such RCT Letter of Credit Issuer and (b) the aggregate principal amount of all Unpaid Drawings in respect of all such RCT Letters of Credit. References herein and in the other Credit Documents to the RCT Letters of Credit Outstanding shall be deemed to refer to the RCT Letters of Credit Outstanding in respect of all RCT Letters of Credit issued by the applicable RCT Letter of Credit Issuer or to the RCT Letters of Credit Outstanding in respect of all RCT Letters of Credit, as the context requires.

"**RCT Reclamation Support Carve Out**" shall mean (unless and until the Borrower issues and delivers the RCT Carve Out Support Rejection Notice pursuant to Section 4.4 hereof) all amounts up to $1,100,000,000 required to be paid by the TCEH Debtors to the RCT pursuant to amounts due and owing in respect of reclamation obligations incurred by the RCT and for which any of the TCEH Debtors may be liable under Applicable Law.

"**Real Estate**" shall have the meaning provided in Section 9.1(f).

"**Receivables Entity**" shall mean any Person formed solely for the purpose of (i) facilitating or entering into one or more Permitted Receivables Financings, and (ii) in each case, engaging in activities reasonably related or incidental thereto. TXU Receivables Company, a Delaware corporation and TXU Energy Receivables Company LLC, a Delaware corporation, shall each be deemed to be a Receivables Entity.

"**Receivables Facility Assets**" shall mean currently existing and hereafter arising or originated Accounts, Payment Intangibles and Chattel Paper (as each such term is defined in the UCC) owed or payable to any Participating Receivables Grantor, and to the extent related to or supporting any Accounts, Chattel Paper or Payment Intangibles, or constituting a receivable, all General Intangibles (as each such term is defined in the UCC) and other forms of obligations and receivables owed or payable to any Participating Receivables Grantor, including the right to payment of any interest, finance charges, late payment fees or other charges with respect thereto (the foregoing, collectively, being "**receivables**"), all of such Participating Receivables Grantor's rights as an unpaid vendor (including rights in any goods the sale of which gave rise to any receivables), all security interests or liens and property subject to such security interests or liens from time to time purporting to secure payment of any receivables or other items described in this definition, all guarantees, letters of credit, security agreements, insurance and other agreements or arrangements from time to time supporting or securing payment of any receivables or other items described in this definition, all customer deposits with respect thereto, all rights under any contracts giving rise to or evidencing any receivables or other items described in this definition, and all documents, books, records and information (including computer programs, tapes, disks, data processing software and related property and rights) relating to any receivables or other items described in this definition or to any obligor with respect thereto, and all proceeds of the foregoing.

"**Receivables Fees**" shall mean distributions or payments made directly or by means of discounts with respect to any accounts receivable or participation interest therein issued or sold in connection with, and other fees paid to a Person that is not a Restricted Subsidiary in connection with any Permitted Receivables Financing.

-50-

"**Recovery Event**" shall mean (a) any damage to, destruction of or other casualty or loss involving any property or asset or (b) any seizure, condemnation, confiscation or taking (or transfer under threat of condemnation) under the power of eminent domain of, or any requisition of title or use of or relating to, or any similar event in respect of, any property or asset.

"**Recovery Prepayment Event**" shall mean the receipt of cash proceeds with respect to any settlement or payment in connection with any Recovery Event in respect of any property or asset of the Borrower or any Restricted Subsidiary; provided that the term "Recovery Prepayment Event" shall not include any Asset Sale Prepayment Event.

"**Register**" shall have the meaning provided in Section 13.6(b)(iv).

"**Regulation T**" shall mean Regulation T of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"**Regulation U**" shall mean Regulation U of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"**Regulation X**" shall mean Regulation X of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"**Reimbursement Date**" shall have the meaning provided in Section 3.4(a).

"**Reinvestment Period**" shall mean 15 months following the date of receipt of Net Cash Proceeds of an Asset Sale Prepayment Event or Recovery Prepayment Event.

"**Related Parties**" shall mean, with respect to any specified Person, such Person's Affiliates and the directors, officers, employees, agents, trustees and advisors of such Person and any Person that possesses, directly or indirectly, the power to direct or cause the direction of the management or policies of such Person, whether through the ability to exercise voting power, by contract or otherwise.

"**Reorganization Plan**" shall mean a plan of reorganization of the TCEH Debtors in the Cases.

"**Reportable Event**" shall mean an event described in Section 4043 of ERISA and the regulations thereunder, other than any event as to which the thirty day notice period has been waived.

"**Required Delayed-Draw Term Loan Lenders**" shall mean, at any date, Non-Defaulting Lenders having or holding a majority of the sum of (a) the aggregate outstanding principal amount of the Delayed-Draw Term Loans (excluding Delayed Draw Term Loans held by Defaulting Lenders) at such date and (b) the Adjusted Available Delayed Draw Term Loan Commitment at such date.

"**Required Lenders**" shall mean, at any date, Non-Defaulting Lenders having or holding a majority of the sum of (a) the outstanding amount of the Term Loans in the aggregate at such date, (b) the sum of (i) the aggregate outstanding principal amount of the Delayed-Draw Term Loans (excluding Delayed-Draw Term Loans held by Defaulting Lenders) at such date and (ii) the Adjusted Available Delayed-Draw Term Loan Commitment at such date and (c) (i) the Adjusted Total Revolving Credit Commitment at such date or (ii) if the Total Revolving Credit Commitment has been terminated or for the purposes of acceleration pursuant to Section 11, the outstanding principal amount of the Revolving Credit Loans (excluding the Revolving Credit Loans of Defaulting Lenders) in the aggregate at such date.

"**Required Revolving Credit Lenders**" shall mean, at any date, (i) Non-Defaulting Lenders holding a majority of the Adjusted Total Revolving Credit Commitment at such date or (ii) if the Total Revolving Credit Commitment has been terminated or for the purposes of acceleration pursuant to Section 11, the outstanding principal amount of the Revolving Credit Loans (excluding Revolving Credit Loans of Defaulting Lenders) in the aggregate at such date.

"**Required Term Loan Lenders**" shall mean, at any date, Lenders having or holding a majority of the aggregate outstanding principal amount of the Term Loans at such date.

"**Restoration Certification**" shall mean, with respect to any Recovery Prepayment Event, a certification made by an Authorized Officer of the Borrower or any Restricted Subsidiary, as applicable, to the Administrative Agent prior to the end of the Reinvestment Period certifying (a) that the Borrower or such Restricted Subsidiary intends to use the proceeds received in connection with such Recovery Prepayment Event to repair, restore or replace the property or assets in respect of which such Recovery Prepayment Event occurred, (b) the approximate costs of completion of such repair, restoration or replacement and (c) that such repair, restoration or replacement will be completed within the later of (x) fifteen months after the date on which cash proceeds with respect to such Recovery Prepayment Event were received and (y) 180 days after delivery of such Restoration Certification.

"**Restricted Foreign Subsidiary**" shall mean a Foreign Subsidiary that is a Restricted Subsidiary.

"**Restricted Subsidiary**" shall mean any Subsidiary of the Borrower other than an Unrestricted Subsidiary.

"**Restructuring Support Agreement**" shall mean that certain Restructuring Support Agreement dated [    ], 2014 by and among the Credit Parties, [    ], the Prepetition Credit Agreement Lenders party thereto the [Prepetition Noteholders] party thereto and the holders of Prepetition Second Lien Notes party thereto, as amended and restated, supplemented or otherwise modified in accordance with the terms thereof.

"**Restructuring Term Sheet**" shall mean the Restructuring Term Sheet attached as Exhibit [ ] to the Restructuring Support Agreement, as amended, amended and restated, supplemented or otherwise modified in accordance with the terms thereof.

"**Revolving Credit Commitment**" shall mean, (a) in the case of each Lender that is a Lender on the date hereof, the amount set forth opposite such Lender's name on Schedule 1.1(a) as such Lender's "Revolving Credit Commitment" and (b) in the case of any Lender that becomes a Lender after the date hereof, the amount specified as such Lender's "Revolving Credit Commitment" in the Assignment and Acceptance pursuant to which such Lender assumed a portion of the Total Revolving Credit Commitment, in each case as the same may be changed from time to time pursuant to the terms hereof. Subject to Section 2.1(c), the aggregate amount of Revolving Credit Commitments outstanding as of the Closing Date is $1,950,000,000. Unless the context shall otherwise require, the term "Revolving Credit Commitment" shall include any New Revolving Credit Commitment.

"**Revolving Credit Commitment Fee**" shall have the meaning provided in Section 4.1(a).

"**Revolving Credit Commitment Fee Rate**" shall mean, (x) at any time the Revolving Credit Facilities are rated at least Ba3 by Moody's and BB- by S&P, 0.375% per annum or (y) at any other time, 0.50% per annum.

"**Revolving Credit Commitment Percentage**" shall mean at any time, for each Lender, the percentage obtained by dividing (a) such Lender's Revolving Credit Commitment at such time by (b) the amount of the Total Revolving Credit Commitment at such time; provided that at any time when the Total Revolving Credit Commitment shall have been terminated, each Lender's Revolving Credit Commitment Percentage shall be the percentage obtained by dividing (a) such Lender's Revolving Credit Exposure at such time by (b) the Revolving Credit Exposure of all Lenders at such time.

"**Revolving Credit Exposure**" shall mean, with respect to any Lender at any time, the aggregate principal amount of the Revolving Credit Loans of such Lender then-outstanding at such time.

"**Revolving Credit Facility**" shall mean the revolving credit facility represented by the Revolving Credit Commitments.

"**Revolving Credit Lender**" shall mean, at any time, any Lender that has a Revolving Credit Commitment at such time.

"**Revolving Credit Loans**" shall have the meaning provided in Section 2.1(c). Unless the context shall otherwise require, the term "Revolving Credit Loans" shall include any New Revolving Credit Loans.

"**Revolving Credit Termination Date**" shall mean the Maturity Date.

"**S&P**" shall mean Standard & Poor's Ratings Services or any successor by merger or consolidation to its business.

"**Sale Leaseback**" shall mean any transaction or series of related transactions pursuant to which the Borrower or any Restricted Subsidiary (a) sells, transfers or otherwise disposes of any property, real or personal, whether now owned or hereafter acquired, and (b) as part of such transaction, thereafter rents or leases such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold, transferred or disposed.

"**Sandow Unit 4**" shall mean the approximately 557 megawatt (net load) lignite fired power generation facility, excluding mining properties, known as "Sandow Unit 4" being operated and owned by Luminant Generation Company LLC in Milam County, Texas.

"**Sanctions**" shall have the meaning provided in Section 8.20.

"**Sanctions Laws**" shall have the meaning provided in Section 8.20.

"**SEC**" shall mean the Securities and Exchange Commission or any successor thereto.

"**Section 9.1 Financials**" shall mean the financial statements delivered, or required to be delivered, pursuant to Section 9.1(a) or (b) together with the accompanying officer's certificate delivered, or required to be delivered, pursuant to Section 9.1(c).

"**Secured Cash Management Agreement**" shall mean any agreement relating to Cash Management Services that is entered into by and between the Borrower or any Restricted Subsidiary and any Cash Management Bank.

"**Secured Commodity Hedging Agreement**" shall mean (a) any Commodity Hedging Agreement that (i) is entered into by and between the Borrower or any Restricted Subsidiary and any

-53-

Hedge Bank and (ii) individually or together with other Commodity Hedging Agreements (other than Commodity Hedging Agreements that are unsecured) entered into or being entered into with such Hedge Bank or its affiliates, is structured such that, at the time it is first entered into, the net mark-to-market credit exposure calculated as of the date of entry into such Commodity Hedging Agreement of (x) the counterparties to such Commodity Hedging Agreements (taken as a whole) to (y) the Borrower or any other TCEH Debtor, is positively correlated with the price of the relevant commodity or positively correlated with changes in the relevant spark spread and (b) any other Commodity Hedging Agreement that (i) is entered into by and between the Borrower or any Restricted Subsidiary and any Hedge Bank and (ii) is entered into to unwind or offset any existing Secured Commodity Hedging Agreement of the type described in clause (a) above; provided that any Commodity Hedging Agreement entered into prior to the Petition Date shall not constitute a "Secured Commodity Hedging Agreement" unless (x) as of the Petition Date, the Swap Termination Value in respect of such Commodity Hedging Agreement would be payable to the Borrower or the Restricted Subsidiary party to such Commodity Hedging Agreement if such Commodity Hedging Agreement were terminated as of the Petition Date and (y) such Commodity Hedging Agreement has not been terminated as of the Petition Date and the counterparty thereto has waived its right to terminate such Commodity Hedging Agreement.

"**Secured Hedging Agreement**" shall mean any Hedging Agreement that is entered into by and between the Borrower or any Restricted Subsidiary and any Hedge Bank.

"**Secured Parties**" shall mean the Administrative Agent, the Collateral Agent, the Letter of Credit Issuers, each Lender, each Hedge Bank that is party to any Secured Hedging Agreement or a Secured Commodity Hedging Agreement, as applicable, each Cash Management Bank that is a party to a Secured Cash Management Agreement and each sub-agent pursuant to Section 12 appointed by the Administrative Agent with respect to matters relating to the Credit Facilities or by the Collateral Agent with respect to matters relating to any Security Document.

"**Securities Act**" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"**Securitization**" shall mean a public or private offering by a Lender or any of its Affiliates or their respective successors and assigns of securities or notes which represent an interest in, or which are collateralized, in whole or in part, by the Loans and the Lender's rights under the Credit Documents.

"**Security Agreement**" shall mean the Security Agreement entered into by the Borrower, the other grantors party thereto and the Collateral Agent for the benefit of the Secured Parties, substantially in the form of Exhibit F.

"**Security Documents**" shall mean, collectively, (a) the Security Agreement, (b) any Pledge Agreement, (c) the Orders, (d) Section 14 of this Agreement and (e) each other security agreement or other instrument or document executed and delivered pursuant to Section 9.11, 9.12 or 9.14 or pursuant to any other such Security Documents to secure or perfect the security interest in any or all of the Obligations. The Security Documents (other than the Orders) shall supplement, and shall not limit, the grant of a Lien on and security interest in the Collateral pursuant to the Orders.

"**Shared Services Agreement**" shall mean the Shared Services Agreement, dated on or about October 23, 2013 between EFH Corporate Services Company and the Borrower, as amended, supplemented or otherwise modified from time to time in a manner that is not, in the Borrower's reasonable judgment, adverse, taken as a whole, to the Lenders in any material respect.

#4821-7663-6950

"**Sold Entity or Business**" shall have the meaning provided in the definition of the term "Consolidated EBITDA".

"**Specified Affiliates**" shall mean, collectively, the following affiliates of the Borrower: (i) Comanche Peak Nuclear Power Company LLC; (ii) EFH Corporate Services Company; (iii) EFH Properties Company; (iv) the Ultimate Parent; and (v) the Oncor Subsidiaries.

"**Specified Default**" shall mean any Event of Default under Section 11.1.

"**Specified RCT Letter of Credit Commitment**" shall mean, with respect to any RCT Letter of Credit Issuer, (a) in the case of each RCT Letter of Credit Issuer that is a RCT Letter of Credit Issuer on the date hereof, the percentage of the RCT Letter of Credit Commitment set forth opposite such RCT Letter of Credit Issuer's name on Schedule 1.1(a) as such RCT Letter of Credit Issuer's "Specified RCT Letter of Credit Commitment" or such other percentage as the Borrower and such RCT Letter of Credit Issuer may agree in writing from time to time and (b) in the case of any other RCT Letter of Credit Issuer, 100% of the RCT Letter of Credit Commitment or such lower percentage as is specified in the agreement pursuant to which such Person becomes a RCT Letter of Credit Issuer entered into pursuant to Section 3.6(a) hereof.

"**Specified General Letter of Credit Commitment**" . shall mean, with respect to any General Letter of Credit Issuer, (a) in the case of each General Letter of Credit Issuer that is a General Letter of Credit Issuer on the date hereof, the percentage of the General Letter of Credit Commitment set forth opposite such General Letter of Credit Issuer's name on Schedule 1.1(a) as such General Letter of Credit Issuer's "Specified General Letter of Credit Commitment" or such other percentage as the Borrower and such General Letter of Credit Issuer may agree in writing from time to time and (b) in the case of any other General Letter of Credit Issuer, 100% of the General Letter of Credit Commitment or such lower percentage as is specified in the agreement pursuant to which such Person becomes a General Letter of Credit Issuer entered into pursuant to Section 3.6(a) hereof.

"**Specified Transaction**" shall mean, with respect to any period, any Investment, any Disposition of assets, Permitted Sale Leaseback, incurrence or repayment of Indebtedness, dividend, Subsidiary designation, Incremental Term Loan, Incremental Revolving Commitment Increase or other event that by the terms of this Agreement requires "Pro Forma Compliance" with a test or covenant hereunder or requires such test or covenant to be calculated on a "Pro Forma Basis".

"**Sponsors**" shall mean any of Kohlberg Kravis Roberts & Co., L.P., KKR Associates, L.P., TPG Capital, L.P. and Goldman, Sachs & Co., and each of their respective Affiliates, but excluding portfolio companies of any of the foregoing.

"**SPV**" shall have the meaning provided in Section 13.6(g).

"**Stated Amount**" of any Letter of Credit shall mean the maximum amount from time to time available to be drawn thereunder, determined without regard to whether any conditions to drawing could then be met.

"**Stated Maturity**" shall mean, with respect to any installment of interest or principal on any series of Indebtedness, the date on which such payment of interest or principal was scheduled to be paid in the original documentation governing such Indebtedness, and shall not include any contingent obligations to repay, redeem or repurchase any such interest or principal prior to the date originally scheduled for payment thereof; provided that, with respect to any pollution control revenue bonds or

-55-

similar instruments, the Stated Maturity of any series thereof shall be deemed to be the date set forth in any instrument governing such Indebtedness for the remarketing of such Indebtedness.

["**Steering Committee**" shall have the meaning given therefor in the Restructuring Term Sheet.]

"**Stock**" shall mean shares of capital stock or shares in the capital, as the case may be (whether denominated as common stock or preferred stock or ordinary shares or preferred shares, as the case may be), beneficial, partnership or membership interests, participations or other equivalents (regardless of how designated) of or in a corporation, partnership, limited liability company or equivalent entity, whether voting or non-voting.

"**Stock Equivalents**" shall mean all securities convertible into or exchangeable for Stock and all warrants, options or other rights to purchase or subscribe for any Stock, whether or not presently convertible, exchangeable or exercisable.

"**Subsidiary**" of any Person shall mean and include (a) any corporation more than 50% of whose Stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time Stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person directly or indirectly through Subsidiaries and (b) any limited liability company, partnership, association, joint venture or other entity of which such Person directly or indirectly through Subsidiaries has more than a 50% equity interest at the time or is a controlling general partner. Unless otherwise expressly provided, all references herein to a "Subsidiary" shall mean a Subsidiary of the Borrower.

"**Subsidiary Guarantor**" shall mean each Guarantor that is a Subsidiary of the Borrower.

"**Superpriority Claim**" shall mean superpriority administrative expense claim with priority over any and all other obligations, liabilities and indebtedness, now existing or hereafter arising, of any kind whatsoever, including any and all administrative expenses or other claims of the kind specified in or arising under sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject only to and effective upon entry of the Final Order), 507(a), 507(b), 546(c), 726, 1113 and 1114 of the Bankruptcy Code.

"**Swap Obligation**" shall mean, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"**Swap Termination Value**" shall mean, in respect of any one or more Hedging Agreements, after taking into account the effect of any legally enforceable netting agreement relating to such Hedging Agreements, (a) for any date on or after the date such Hedging Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Hedging Agreements, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedging Agreements (which may include a Lender or any Affiliate of a Lender).

"**Tax Order**" shall mean that certain Order Authorizing the Debtors To Pay Certain Prepetition Taxes and Fees [Docket No. ___].

#4821-7663-6950

"**Tax Sharing Agreements**" shall mean (i) the Federal and State Income Tax Allocation Agreement among the Members of the Energy Future Holdings Corp. Consolidated Group, dated May 15, 2012 by and among Energy Future Holdings Corp. and the other parties thereto, (ii) the Amended and Restated Tax Sharing Agreement, dated November 5, 2008, among Energy Future Holdings Corp., Oncor Electric Delivery Holdings Company LLC, Oncor Electric Delivery Company LLC, Texas Transmission Investment LLC and Oncor Management Investment LLC and (iii) any other tax sharing agreement, each as amended, supplemented or otherwise modified from time to time in a manner that is not, in the Borrower's reasonable judgment, adverse, taken as a whole, to the Lenders in any material respect.

"**Taxes**" shall mean any and all present or future taxes, duties, levies, imposts, assessments, deductions, withholdings or other similar charges imposed by any Governmental Authority whether computed on a separate, consolidated, unitary, combined or other basis and any interest, fines, penalties or additions to tax with respect to the foregoing.

"**TCEH**" shall have the meaning provided in the preamble to this Agreement.

"**TCEH Debtors**" shall have the meaning set forth in the Recitals hereto.

"**Term Loan Commitment**" shall mean, on the date hereof, the amount set forth opposite such Lender's name on Schedule 1.1(a) as such Lender's "Term Loan Commitment" and (b) in the case of any Lender that becomes a Lender after the date hereof, the amount specified as such Lender's "Term Loan Commitment" in the Assignment and Acceptance pursuant to which such Lender assumed a portion of the Total Term Loan Commitment, in each case as the same may be changed from time to time pursuant to the terms hereof. The aggregate amount of Term Loan Commitments outstanding as of the Closing Date is $800,000,000.

"**Term Loan Facility**" shall mean the facility providing for the Term Loans.

"**Term Loan Lender**" shall mean each Lender holding a Term Loan.

"**Term Loans**" shall have the meaning provided in Section 2.1(a). Unless the context shall otherwise require, the term "Term Loans" shall include any Incremental Term Loans. As set forth in Section 2.1(b)(ii), immediately after any Delayed-Draw Term Loans are funded pursuant to Section 2.1(b), such Loans will automatically be deemed to constitute Term Loans, and to not constitute Delayed-Draw Term Loans, for all purposes of this Credit Agreement and the other Credit Documents (except for purposes of the definitions of "Available Delayed-Draw Term Loan Commitment" and "Available Term Loan Commitment").

"**Test Period**" shall mean, for any determination under this Agreement, the four consecutive fiscal quarters of the Borrower then last ended and for which Section 9.1 Financials have been or were required to have been delivered.

"**Tex-La Indebtedness**" shall mean the obligations owing by Parent Guarantor in respect of obligations between Parent Guarantor (or its legal predecessors in interest) and the Tex-La Electric Cooperative of Texas, Inc., in aggregate principal amount of approximately $62,000,000 as of the Closing Date, which obligations are secured by a Lien on a 2.17% undivided interest in "Comanche Peak Unit 1" and "Comanche Peak Unit 2" (each as defined in the definition of "Baseload Generation Assets").

"**Total Credit Exposure**" shall mean, at any date, the sum, without duplication, of (a) the Total Revolving Credit Commitment (if any) at such date or, if the Total Revolving Credit Commitment shall have terminated on or prior to such date, the aggregate outstanding principal amount of all

Revolving Credit Loans (if any) at such date (which shall be equal to the aggregate Revolving Credit Exposure of all Revolving Credit Lenders), (b) the Available Delayed-Draw Term Loan Commitment (if any) at such date, (c) the aggregate outstanding principal amount of all Delayed-Draw Term Loans (if any) at such date, (d) the Available Total Term Loan Commitment (if any) at such date and (e) the aggregate outstanding principal amount of all Term Loans (if any) at such date.

"**Total Delayed-Draw Term Loan Commitment**" shall mean the sum of the Delayed-Draw Term Loan Commitments of all the Lenders.

"**Total Revolving Credit Commitment**" shall mean the sum of the Revolving Credit Commitments of all the Lenders.

"**Total Term Loan Commitment**" shall mean the sum of the Term Loan Commitments of all the Lenders.

"**Transaction Expenses**" shall mean any fees, costs, liabilities or expenses incurred or paid by the Ultimate Parent, Parent Guarantor or any of their respective Subsidiaries in connection with the Transactions, this Agreement and the other Credit Documents and the transactions contemplated hereby and thereby including in respect of the commitments, negotiation, syndication, documentation and closing (and post-closing actions in connection with the Collateral) of the Credit Facilities.

"**Transactions**" shall mean, collectively, the transactions contemplated by this Agreement to occur on or around the Closing Date (including the entering into and funding hereunder, the preparation and filing of the Cases, the preparation and documentation of the other transactions set forth in the Restructuring Support Agreement), the payment of fees, costs, liabilities and expenses in connection with each of the foregoing, and the consummation of any other transaction connected with the foregoing.

"**Transferee**" shall have the meaning provided in Section 13.6(e).

"**Transition Charges**" shall have the meaning provided in in Section 39.302(7) of the Texas Utilities Code.

"**Transition Property**" shall have the meaning provided in Section 39.302(8) of the Texas Utilities Code.

"**Trust Indenture Act**" shall have the meaning provided in Section 12.11.

"**Type**" shall mean, (a) as to any Term Loan, its nature as an ABR Loan or a LIBOR Loan, (b) as to any Delayed-Draw Term Loan, its nature as an ABR Loan or a LIBOR Loan and (c) as to any Revolving Credit Loan, its nature as an ABR Loan or a LIBOR Loan.

"**UCC**" shall mean the Uniform Commercial Code of the State of New York or the State of Texas, as applicable, or of any other state the laws of which are required to be applied in connection with the perfection of security interests in any Collateral.

"**Ultimate Parent**" shall mean Energy Future Holdings Corp., a Texas corporation.

"**Unfunded Current Liability**" of any Plan shall mean the amount, if any, by which the Accumulated Benefit Obligation (as defined under Statement of Financial Accounting Standards No. 87

-58-

("**SFAS 87**")) under the Plan as of the close of its most recent plan year, determined in accordance with SFAS 87 as in effect on the Closing Date, exceeds the fair market value of the assets allocable thereto.

"**Unit**" shall mean an individual power plant generation system comprised of all necessary physically connected generators, reactors, boilers, combustion turbines and other prime movers operated together to independently generate electricity.

"**Unpaid Drawing**" shall have the meaning provided in Section 3.4(a).

"**Unrestricted Cash**" shall mean, without duplication, (a) all cash and cash equivalents (in each case, free and clear of all Liens, other than nonconsensual Liens permitted by Section 10.2(l) and Liens permitted by Sections 10.2(a), (j) and (bb) and clauses (i) and (ii) of Section 10.2(o)) included in the cash and cash equivalents accounts listed on the consolidated balance sheet of the Borrower and the Restricted Subsidiaries as at such date and (b) all margin deposits related to commodity positions listed as assets on the consolidated balance sheet of the Borrower and the Restricted Subsidiaries; provided that Unrestricted Cash shall not include any amounts on deposit in or credited to any RCT L/C Collateral Account or General L/C Collateral Account.

"**Unrestricted Subsidiary**" shall mean (a) the Subsidiaries set forth on Schedule 1.1(c) hereto; (b) any Subsidiary of the Borrower that is formed or acquired after the Closing Date; provided that at such time (or promptly thereafter) the Borrower designates such Subsidiary an Unrestricted Subsidiary in a written notice to the Administrative Agent, (c) any Restricted Subsidiary subsequently designated as an Unrestricted Subsidiary by the Borrower in a written notice to the Administrative Agent; provided that in the case of (b) and (c), (x) such designation shall be deemed to be an Investment (or reduction in an outstanding Investment, in the case of a designation of an Unrestricted Subsidiary as a Restricted Subsidiary) on the date of such designation in an amount equal to the net book value of the investment therein and such designation shall be permitted only to the extent permitted under Section 10.5 on the date of such designation and (y) no Default or Event of Default would result from such designation after giving Pro Forma Effect thereto and (d) each Subsidiary of an Unrestricted Subsidiary. The Borrower may, by written notice to the Administrative Agent, re-designate any Unrestricted Subsidiary as a Restricted Subsidiary, and thereafter, such Subsidiary shall no longer constitute an Unrestricted Subsidiary, but only if (x) to the extent such Subsidiary has outstanding Indebtedness on the date of such designation, immediately after giving effect to such designation, the Borrower shall be in compliance, on a Pro Forma Basis, after giving effect to the incurrence of such Indebtedness, with the covenant set forth in Section 10.9 and (y) no Default or Event of Default would result from such re-designation. On or promptly after the date of its formation, acquisition, designation or re-designation, as applicable, each Unrestricted Subsidiary (other than an Unrestricted Subsidiary that is a Foreign Subsidiary) shall have entered into a tax sharing agreement containing terms that, in the reasonable judgment of the Administrative Agent, provide for an appropriate allocation of tax liabilities and benefits; provided that the tax sharing agreements described in clauses (i) and (ii) of the definition of "Tax Sharing Agreements" as in effect on the date hereof shall be deemed to satisfy such standard.

"**U.S. Lender**" shall have the meaning provided in Section 5.4(h).

"**Voting Stock**" shall mean, with respect to any Person, such Person's Stock or Stock Equivalents having the right to vote for the election of directors or other governing body of such Person under ordinary circumstances.

"**Wages Order**" shall mean the "Final Order Authorizing Energy Future Holdings Corp., et al., To (a) Pay Certain Prepetition Wages, Salaries, Reimbursable Employee Expenses, and Other

#4821-7663-6950

Compensation, (b) Pay and Honor Employee and Retiree Medical and Similar Benefits, and (c) Continue Employee Compensation and Employee and Retiree Benefit Programs" as in effect from time to time.

"**Wholly Owned**" shall mean, with respect to the ownership by a Person of a Subsidiary, that all of the Stock of such Subsidiary (other than directors' qualifying shares or nominee or other similar shares required pursuant to Applicable Law) are owned by such Person or another Wholly Owned Subsidiary of such Person.

"**Yield**" shall mean, with respect to any Commitments and/or Loans, on any date of determination, the yield to maturity, in each case, based on the interest rate applicable to such Commitments and/or Loans on such date and giving effect to interest rate floors and any original issue discount or upfront fees, but excluding any customary arrangement, administrative, advisory, origination or similar fees in connection therewith that are not paid to all of the Lenders providing such Commitments and/or Loans).

      1.2.   Other Interpretive Provisions. With reference to this Agreement and each other Credit Document, unless otherwise specified herein or in such other Credit Document:

      (a)   The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

      (b)   The words "herein", "hereto", "hereof" and "hereunder" and words of similar import when used in any Credit Document shall refer to such Credit Document as a whole and not to any particular provision thereof.

      (c)   Article, Section, Exhibit and Schedule references are to the Credit Document in which such reference appears.

      (d)   The term "including" is by way of example and not limitation.

      (e)   The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

      (f)   The words "asset" and "property" shall be construed to have the same meaning and effect and refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

      (g)   All references to "knowledge" or "awareness" of any Credit Party or a Restricted Subsidiary thereof means the actual knowledge of an Authorized Officer of a Credit Party or such Restricted Subsidiary.

      (h)   In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including".

      (i)   Section headings herein and in the other Credit Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Credit Document.

(j)     For purposes of determining compliance with any one of Sections 10.1, 10.2, 10.3, 10.4, 10.5, 10.6, 10.7 and 1.1(a), in the event that any Lien, Investment, Indebtedness, merger, consolidation, amalgamation or similar fundamental change, Disposition, dividend, affiliate transaction, contractual obligation or prepayment of Indebtedness meets the criteria of more than one of the categories of transactions permitted pursuant to any clause of such Section, such transaction (or portion thereof) at any time shall be permitted under one or more of such clauses as determined by the Borrower (and the Borrower shall be entitled to redesignate use of any such clauses from time to time) in its sole discretion at such time.

1.3.    <u>Accounting Terms</u>.

(a)     All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP.

(b)     Notwithstanding anything to the contrary herein, for purposes of determining compliance with any test or covenant contained in this Agreement with respect to any period during which any Specified Transaction occurs, the Consolidated Superpriority Secured Net Debt to Consolidated EBITDA Ratio shall each be calculated with respect to such period and such Specified Transaction on a Pro Forma Basis.

1.4.    <u>Rounding</u>. Any financial ratios required to be maintained by the Borrower pursuant to this Agreement (or required to be satisfied in order for a specific action to be permitted under this Agreement) shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

1.5.    <u>References to Agreements, Laws, Etc</u>. Unless otherwise expressly provided herein, (a) references to organizational documents, agreements (including the Credit Documents) and other Contractual Requirements shall be deemed to include all subsequent amendments, restatements, amendment and restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, amendment and restatements, extensions, supplements and other modifications are permitted by any Credit Document; and (b) references to any Applicable Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Applicable Law.

1.6.    <u>Times of Day</u>. Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

1.7.    <u>Timing of Payment of Performance</u>. When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in the definition of Interest Period) or performance shall extend to the immediately succeeding Business Day.

1.8.    <u>Currency Equivalents Generally</u>. For purposes of determining compliance under <u>Sections 10.4</u>, <u>10.5</u> and <u>10.6</u> with respect to any amount denominated in any currency other than Dollars (other than with respect to (a) any amount derived from the financial statements of the Borrower and the Subsidiaries of the Borrower or (b) any Indebtedness denominated in a currency other than Dollars), such amount shall be deemed to equal the Dollar equivalent thereof based on the average Exchange Rate for

-61-

such other currency for the most recent twelve-month period immediately prior to the date of determination determined in a manner consistent with that used in calculating Consolidated EBITDA for the related period. For purposes of determining compliance with Sections 10.1, 10.2 and 10.5, with respect to any amount of Indebtedness in a currency other than Dollars, compliance will be determined at the time of incurrence or advancing thereof using the Dollar equivalent thereof at the Exchange Rate in effect at the time of such incurrence or advancement.

1.9.    Classification of Loans and Borrowings. For purposes of this Agreement, Loans may be classified and referred to by Class (e.g., a "**Revolving Credit Loan**") or by Type (e.g., a "**LIBOR Loan**") or by Class and Type (e.g., a "**LIBOR Revolving Credit Loan**"). Borrowings also may be classified and referred to by Class (e.g., a "**Revolving Credit Borrowing**") or by Type (e.g., a "**LIBOR Borrowing**") or by Class and Type (e.g., a "**LIBOR Revolving Credit Borrowing**").

1.10.    Hedging Agreements. For the avoidance of doubt, it is understood that the following Hedging Agreements and/or Commodity Hedging Agreements shall not be deemed to be speculative or entered into for speculative purposes for any purpose of this Agreement and all other Credit Documents: (a) any Commodity Hedging Agreement intended, at inception or execution, to hedge or manage any of the risks related to existing and/or forecasted power generation or load of the Borrower or the Restricted Subsidiaries (whether owned or contracted), (b) any Hedging Agreement intended, at inception or execution, (i) to hedge or manage the interest rate exposure associated with any debt securities, debt facilities or leases (existing or forecasted) of the Borrower or the Restricted Subsidiaries, (ii) for foreign exchange or currency exchange management, (iii) to manage commodity portfolio exposure associated with changes in interest rates or (iv) to hedge any exposure that the Borrower or the Restricted Subsidiaries may have to counterparties under other Hedging Agreements such that the combination of such Hedging Agreements is not speculative taken as a whole and (c) any Hedging Agreement and/or Commodity Hedging Agreement, as applicable, entered into by the Borrower or any Restricted Subsidiary (in each case, entered into in the ordinary course of business or consistent with past practice) that was intended, at inception or execution, to unwind or offset any Hedging Agreement and/or Commodity Hedging Agreement, as applicable, described in clauses (a) and (b) of this Section 1.10.

SECTION 2.    Amount and Terms of Credit.

2.1.    Commitments.

(a)    Subject to and upon the terms and conditions set forth in this Agreement, each Lender having a Term Loan Commitment, severally, but not jointly, agrees to make a loan (each a "**Term Loan**" and, collectively, the "**Term Loans**") in Dollars to the Borrower (x) on the Closing Date, which Term Loans shall equal the amount requested by the Borrower, not to exceed (i) for any such Lender, the Available Term Loan Commitment of such Lender, and (ii) in the aggregate, the Available Term Loan Commitment, and (y) on the Full Availability Date, which Term Loans shall equal the amount requested by the Borrower, not to exceed (i) for any such Lender, the Available Term Loan Commitment of such Lender, and (ii) in the aggregate, the Available Term Loan Commitment.

(i)    The Term Loans may, at the option of the Borrower, be incurred, maintained as, and/or converted into, ABR Loans or LIBOR Loans in accordance with Section 2.6; provided that all such Term Loans made by each of the Lenders pursuant to the same Borrowing shall, unless otherwise specifically provided herein, consist entirely of Term Loans of the same Type. The Term Loans may be repaid or prepaid in accordance with the provisions hereof, but once repaid or prepaid may not be reborrowed.

-62-

(ii)    All Term Loans funded on the Full Availability Date will be of the same Type and, in the case of LIBOR Loans, have the same Interest Periods and LIBOR Rate as all other LIBOR Loans then outstanding (on a ratable basis if there is more than one Borrowing of Term Loans then outstanding); provided that the initial Interest Period of any such LIBOR Term Loans funded on the Full Availability Date shall commence on the Full Availability Date and shall end on the last day of the then-current Interest Period for all other LIBOR Term Loans then outstanding (on a ratable basis if there is more than one Borrowing of other LIBOR Term Loans then outstanding).

(b)    Subject to and upon the terms and conditions herein set forth, each Lender having a Delayed-Draw Term Loan Commitment severally, but not jointly, agrees to make a loan or loans (each a "**Delayed-Draw Term Loan**" and, collectively, the "**Delayed-Draw Term Loans**") in Dollars to the Borrower.

(i)    Such Delayed-Draw Term Loans (A) shall be made at any time and from time to time on and after the Closing Date and prior to Delayed-Draw Termination Date, but only if the Borrower shall have theretofore issued and delivered the RCT Carve Out Support Rejection Notice pursuant to Section 4.4, (B) shall equal the amount requested by the Borrower, not to exceed, for any such Lender, the Available Delayed-Draw Term Loan Commitment of such Lender, (C) shall equal the amount requested by the Borrower, not to exceed, in the aggregate, the Total-Delayed Draw Term Loan Commitment and (D) may, at the option of the Borrower, be maintained as, and/or converted into, ABR Loans or LIBOR Loans in accordance with Section 2.6; provided that all such Delayed Draw Term Loans made by each of the Lenders pursuant to the same Borrowing shall, unless otherwise specifically provided herein, consist entirely of Delayed Draw Term Loans of the same Type. The Delayed-Draw Term Loans may be repaid or prepaid in accordance with the provisions hereof, but once repaid or prepaid may not be reborrowed.

(ii)    Notwithstanding anything to the contrary herein, immediately after any Delayed-Draw Term Loans are funded pursuant to this Section 2.1(b), such Loans will automatically be deemed to constitute Term Loans, and to not constitute Delayed-Draw Term Loans, for all purposes of this Credit Agreement and the other Credit Documents (except for purposes of the definitions of "Available Delayed-Draw Term Loan Commitment" and "Available Term Loan Commitment"). Without limitation of the foregoing, all such Loans (x) will have the same terms, be part of the same Class and be assigned the same CUSIP as all other Term Loans and (y) be of the same Type and, in the case of LIBOR Loans, have the same Interest Periods and LIBOR Rate as all other LIBOR Term Loans then outstanding (on a ratable basis if there is more than one Borrowing of Term Loans then outstanding); provided that the initial Interest Period of any such LIBOR Loans shall commence on the date such Loans are made and shall end on the last day of the then-current Interest Period for all other LIBOR Term Loans then outstanding (on a ratable basis if there is more than one Borrowing of other LIBOR Term Loans then outstanding).

(c)    Subject to and upon the terms and conditions herein set forth, each Lender having a Revolving Credit Commitment severally, but not jointly, agrees to make a loan or loans (each a "**Revolving Credit Loan**" and, collectively, the "**Revolving Credit Loans**") in Dollars to the Borrower; provided that prior to the Full Availability Date, the aggregate principal amount of the Lenders' Revolving Credit Exposures shall not exceed the Interim Availability Amount. Such Revolving Credit Loans (A) shall be made at any time and from time to time on and after the Closing Date and prior to Revolving Credit Termination Date, (B) may, at the option of the Borrower, be incurred and maintained as, and/or converted into, ABR Loans or LIBOR Loans; provided that all Revolving Credit Loans made by each of the Lenders pursuant to the same Borrowing shall, unless otherwise specifically provided

-63-

herein, consist entirely of Revolving Credit Loans of the same Type, (C) may be repaid and reborrowed in accordance with the provisions hereof, (D) shall not, for any Lender at any time with respect to any Class of Revolving Credit Loan, after giving effect thereto and to the application of the proceeds thereof, result in such Lender's Revolving Credit Exposure with respect to such Class at such time exceeding such Lender's Revolving Credit Commitment with respect to such Class at such time and (E) shall not, after giving effect thereto and to the application of the proceeds thereof, result at any time in the aggregate amount of the Lenders' Revolving Credit Exposures at such time exceeding the Total Revolving Credit Commitment then in effect.

(d)    Each Lender may at its option make any LIBOR Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided that (A) any exercise of such option shall not affect the obligation of the Borrower to repay such Loan and (B) in exercising such option, such Lender shall use its reasonable efforts to minimize any increased costs to the Borrower resulting therefrom (which obligation of the Lender shall not require it to take, or refrain from taking, actions that it determines would result in increased costs for which it will not be compensated hereunder or that it determines would be otherwise disadvantageous to it and in the event of such request for costs for which compensation is provided under this Agreement, the provisions of Section 2.10 shall apply).

2.2.    Minimum Amount of Each Borrowing; Maximum Number of Borrowings. The aggregate principal amount of each Borrowing of Loans shall be in a minimum amount of at least the Minimum Borrowing Amount for such Type of Loan and in a multiple of $1,000,000 in excess thereof; provided that there shall be no more than two drawings of Delayed-Draw Term Loans. More than one Borrowing may be incurred on any date; provided that at no time shall there be outstanding more than (i) twenty (20), in the case of Revolving Credit Loans (ii) ten (10), in the case of Term Loan Borrowings of LIBOR Loans and (iii) ten (10), in the case of Delayed-Draw Term Loan Borrowings under this Agreement. For the avoidance of doubt, unless otherwise determined by the Borrower, all Loans of the same Class subject to the same Interest Period and drawn on the same date will constitute one Borrowing.

2.3.    Notice of Borrowing; Determination of Class of Loans.

(a)    When the Borrower desires to incur Term Loans, the Borrower shall deliver to the Administrative Agent at the Administrative Agent's Office a Notice of Borrowing (or telephonic notice promptly confirmed by delivery of a Notice of Borrowing) (i) prior to 1:00 p.m. (New York City time) at least three Business Days' prior to the date of the proposed Borrowing of Term Loans or Delayed-Draw Term Loans if all or any of such Loans are to be initially LIBOR Loans, and (ii) prior to 10:00 a.m. (New York City time) on the date of the proposed Borrowing of Term Loans or Delayed-Draw Term Loans if all or any of such Loans are to be ABR Loans. Each Notice of Borrowing shall specify (i) the aggregate principal amount of Loans to be made, (ii) the date of the Borrowing and (iii) whether such Loans shall consist of ABR Loans and/or LIBOR Loans and, if the Loans are to include LIBOR Loans, the Interest Period to be initially applicable thereto. The Administrative Agent shall promptly give each applicable Lender written notice (or telephonic notice promptly confirmed in writing) of the proposed Borrowing of Loans, of such Lender's proportionate share thereof and of the other matters covered by the related Notice of Borrowing.

(b)    [Reserved].

(c)    [Reserved].

(d)    Whenever the Borrower desires to incur Revolving Credit Loans, the Borrower shall give the Administrative Agent at the Administrative Agent's Office, (i) prior to 1:00 p.m. (New York City time) at least three Business Days' prior written notice (or telephonic notice promptly

-64-

confirmed in writing) of each Borrowing of Revolving Credit Loans if all or any of such Revolving Credit Loans are to be initially LIBOR Loans and (ii) prior to 1:00 p.m. (New York City time) at least one Business Day's prior written notice (or telephonic notice promptly confirmed in writing) of each Borrowing of Revolving Credit Loans if all or any of such Revolving Credit Loans are to be ABR Loans. Each such Notice of Borrowing shall specify (i) the aggregate principal amount of the Revolving Credit Loans to be made pursuant to such Borrowing, (ii) the date of the Borrowing (which shall be a Business Day) and (iii) whether the Borrowing shall consist of ABR Loans and/or LIBOR Loans and, if LIBOR Loans, the Interest Period to be initially applicable thereto. The Administrative Agent shall promptly give each Revolving Credit Lender written notice (or telephonic notice promptly confirmed in writing) of each proposed Borrowing of Revolving Credit Loans, of such Lender's Revolving Credit Commitment Percentage thereof and of the other matters covered by the related Notice of Borrowing.

        (e)     [Reserved].

        (f)     [Reserved].

        (g)     [Reserved].

        (h)     Without in any way limiting the obligation of the Borrower to confirm in writing any notice it may give hereunder by telephone, the Administrative Agent may act prior to receipt of written confirmation without liability upon the basis of such telephonic notice believed by the Administrative Agent in good faith to be from an Authorized Officer of the Borrower.

        2.4.   <u>Disbursement of Funds</u>.

        (a)     No later than 2:00 p.m. (New York City time) on the date specified in each Notice of Borrowing, each Lender will make available its *pro rata* portion, if any, of each Borrowing requested to be made on such date in the manner provided below.

        (b)     Each Lender shall make available all amounts required under any Borrowing for its applicable Commitments in immediately available funds to the Administrative Agent at the Administrative Agent's Office in Dollars, and the Administrative Agent will make available to the Borrower, by depositing to an account designated by the Borrower to the Administrative Agent the aggregate of the amounts so made available in Dollars. Unless the Administrative Agent shall have been notified by any Lender prior to the date of any such Borrowing that such Lender does not intend to make available to the Administrative Agent its portion of the Borrowing or Borrowings to be made on such date, the Administrative Agent may assume that such Lender has made such amount available to the Administrative Agent on such date of Borrowing, and the Administrative Agent, in reliance upon such assumption, may (in its sole discretion and without any obligation to do so) make available to the Borrower a corresponding amount. If such corresponding amount is not in fact made available to the Administrative Agent by such Lender and the Administrative Agent has made available such amount to the Borrower, the Administrative Agent shall be entitled to recover such corresponding amount from such Lender. If such Lender does not pay such corresponding amount forthwith upon the Administrative Agent's demand therefor the Administrative Agent shall promptly notify the Borrower and the Borrower shall immediately pay such corresponding amount to the Administrative Agent in Dollars. The Administrative Agent shall also be entitled to recover from such Lender or the Borrower interest on such corresponding amount in respect of each day from the date such corresponding amount was made available by the Administrative Agent to the Borrower to the date such corresponding amount is recovered by the Administrative Agent, at a rate *per annum* equal to (i) if paid by such Lender, the Overnight Rate or (ii) if paid by the Borrower, the then-applicable rate of interest or fees, calculated in accordance with <u>Section 2.8</u>, for the Loans of the applicable Class.

(c)      Nothing in this Section 2.4 shall be deemed to relieve any Lender from its obligation to fulfill its commitments hereunder or to prejudice any rights that the Borrower may have against any Lender as a result of any default by such Lender hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other Lender to fulfill its commitments hereunder).

2.5.      Repayment of Loans; Evidence of Debt.

(a)      The Borrower shall repay to the Administrative Agent, for the benefit of the applicable Lenders, on the Maturity Date, (i) the then outstanding Term Loans, (ii) the then outstanding Delayed-Draw Term Loans and (iii) the then outstanding Revolving Credit Loans.

(b)      [Reserved].

(c)      In the event any Incremental Term Loans are made, such Incremental Term Loans, as applicable, shall be repaid in amounts and on dates as agreed between the Borrower and the relevant Lenders of such Incremental Term Loans, subject to the requirements set forth in Section 2.14.

(d)      Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to the appropriate lending office of such Lender resulting from each Loan made by such lending office of such Lender from time to time, including the amounts of principal and interest payable and paid to such lending office of such Lender from time to time under this Agreement.

(e)      The Administrative Agent shall maintain the Register pursuant to Section 13.6(b), and a subaccount for each Lender, in which Register and subaccounts (taken together) shall be recorded (i) the amount of each Loan made hereunder, whether such Loan is a Term Loan, an Incremental Term Loan, a Delayed-Draw Term Loan, a Revolving Credit Loan or a New Revolving Credit Loan, as applicable, the Type of each Loan made and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder, and (iii) the amount of any sum received by the Administrative Agent hereunder from the Borrower and each Lender's share thereof.

(f)      The entries made in the Register and accounts and subaccounts maintained pursuant to clauses (d) and (e) of this Section 2.5 shall, to the extent permitted by Applicable Law, be prima facie evidence of the existence and amounts of the obligations of the Borrower therein recorded; provided, however, that the failure of any Lender or the Administrative Agent to maintain such account, such Register or such subaccount, as applicable, or any error therein, shall not in any manner affect the obligation of the Borrower to repay (with applicable interest) the Loans made to the Borrower by such Lender in accordance with the terms of this Agreement.

2.6.      Conversions and Continuations.

(a)      Subject to the penultimate sentence of this clause (a), (x) the Borrower shall have the option on any Business Day to convert all or a portion equal to no less than the Minimum Borrowing Amount of the outstanding principal amount of Term Loans, Delayed-Draw Term Loans or Revolving Credit Loans of one Type into a Borrowing or Borrowings of another Type and (y) the Borrower shall have the option on any Business Day to continue the outstanding principal amount of any LIBOR Loans as LIBOR Loans for an additional Interest Period; provided that (i) no partial conversion of LIBOR Loans shall reduce the outstanding principal amount of LIBOR Loans made pursuant to a single Borrowing to less than the Minimum Borrowing Amount, (ii) ABR Loans may not be converted into LIBOR Loans if a

-66-

Payment Default or Event of Default is in existence on the date of the conversion and the Administrative Agent has or the Required Lenders have determined in its or their sole discretion not to permit such conversion, (iii) LIBOR Loans may not be continued as LIBOR Loans for an additional Interest Period if a Default or Event of Default is in existence on the date of the proposed continuation and the Administrative Agent has or the Required Lenders have determined in its or their sole discretion not to permit such continuation and (iv) Borrowings resulting from conversions pursuant to this Section 2.6 shall be limited in number as provided in Section 2.2. Each such conversion or continuation shall be effected by the Borrower by giving the Administrative Agent at the Administrative Agent's Office prior to 1:00 p.m. (New York City time) at least (i) three Business Days', in the case of a continuation of, or conversion to, LIBOR Loans or (ii) one Business Day's in the case of a conversion into ABR Loans, prior written notice (or telephonic notice promptly confirmed in writing) (each, a "**Notice of Conversion or Continuation**") specifying the Loans to be so converted or continued, the Type of Loans to be converted into or continued and, if such Loans are to be converted into, or continued as, LIBOR Loans, the Interest Period to be initially applicable thereto (if no Interest Period is selected, the Borrower shall be deemed to have selected an Interest Period of one month's duration). The Administrative Agent shall give each applicable Lender notice as promptly as practicable of any such proposed conversion or continuation affecting any of its Loans.

(b)     If any Payment Default or Event of Default is in existence at the time of any proposed continuation of any LIBOR Loans and the Administrative Agent has or the Required Lenders have determined in its or their sole discretion not to permit such continuation, such LIBOR Loans shall be automatically converted on the last day of the current Interest Period into ABR Loans. If upon the expiration of any Interest Period in respect of LIBOR Loans, the Borrower has failed to elect a new Interest Period to be applicable thereto as provided in clause (a) above, the Borrower shall be deemed to have elected to convert such Borrowing of LIBOR Loans into a Borrowing of ABR Loans, effective as of the expiration date of such current Interest Period.

(c)     Notwithstanding anything to the contrary herein, the Borrower may deliver a Notice of Conversion or Continuation pursuant to which the Borrower elects to irrevocably continue the outstanding principal amount of any Term Loans or Delayed-Draw Term Loans subject to an interest rate Hedging Agreement as LIBOR Loans for each Interest Period until the expiration of the term of such applicable Hedging Agreement.

2.7.    Pro Rata Borrowings. Subject to Section 2.1(c), each Borrowing of Revolving Credit Loans under this Agreement shall be made by the Lenders *pro rata* on the basis of their then applicable Revolving Credit Commitments without regard to the Class of Revolving Credit Commitments held by such Lender. It is understood that (a) no Lender shall be responsible for any default by any other Lender in its obligation to make Loans hereunder and that each Lender severally but not jointly shall be obligated to make the Loans provided to be made by it hereunder, regardless of the failure of any other Lender to fulfill its commitments hereunder and (b) failure by a Lender to perform any of its obligations under any of the Credit Documents shall not release any Person from performance of its obligation under any Credit Document.

2.8.    Interest.

(a)     The unpaid principal amount of each ABR Loan shall bear interest from the date of the Borrowing thereof until maturity (whether by acceleration or otherwise) at a rate *per annum* that shall at all times be the Applicable ABR Margin plus the ABR, in each case, in effect from time to time.

(b)     The unpaid principal amount of each LIBOR Loan shall bear interest from the date of the Borrowing thereof until maturity thereof (whether by acceleration or otherwise) at a rate *per*

-67-

*annum* that shall at all times be the Applicable LIBOR Margin plus the relevant LIBOR Rate, in each case in effect from time to time.

        (c)     [Reserved].

        (d)     If all or a portion of (i) the principal amount of any Loan or (ii) any interest payable thereon or any other amount hereunder shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), and an Event of Default shall exist as a result of such failure to pay, then upon the giving of written notice by the Administrative Agent to the Borrower, such overdue amount shall bear interest at a rate *per annum* (the "**Default Rate**") that is (x) in the case of overdue principal, the rate that would otherwise be applicable thereto plus 2% or (y) in the case of any overdue interest or other amounts due hereunder, to the extent permitted by Applicable Law, the rate described in Section 2.8(a) plus 2% from the date of such non-payment to the date on which such amount is paid in full (after as well as before judgment).

        (e)     Interest on each Loan shall accrue from and including the date of any Borrowing to but excluding the date of any repayment thereof and shall be payable in Dollars; provided that any Loan that is repaid on the same date on which it is made shall bear interest for one day. Except as provided below, interest shall be payable (i) in respect of each ABR Loan, monthly in arrears on the third Business Day of each calendar month, (ii) in respect of each LIBOR Loan, on the last day of each Interest Period applicable thereto and, in the case of an Interest Period in excess of three months, on each date occurring at three-month intervals after the first day of such Interest Period and (iii) in respect of each Loan, (A) on any prepayment; provided that interest on ABR Loans shall only become due pursuant to this subclause (A) if the aggregate principal amount of the ABR Loans then-outstanding is repaid in full, (B) at maturity (whether by acceleration or otherwise) and (C) after such maturity, on demand.

        (f)     All computations of interest hereunder shall be made in accordance with Section 5.5.

        (g)     The Administrative Agent, upon determining the interest rate for any Borrowing of LIBOR Loans, shall promptly notify the Borrower and the relevant Lenders thereof. Each such determination shall, absent clearly demonstrable error, be final and conclusive and binding on all parties hereto.

        2.9.     Interest Periods. At the time the Borrower gives a Notice of Borrowing or Notice of Conversion or Continuation in respect of the making of, or conversion into or continuation as, a Borrowing of LIBOR Loans in accordance with Section 2.6(a), the Borrower shall give the Administrative Agent written notice (or telephonic notice promptly confirmed in writing) of the Interest Period applicable to such Borrowing, which Interest Period shall, at the option of the Borrower, be a one week (solely with respect to LIBOR Revolving Credit Loans) or a one, two, three or six or (if available to all relevant Lenders participating in the relevant Credit Facility) a twelve month period or a period of less than one month; provided that, notwithstanding the foregoing, the initial Interest Period beginning on the Closing Date may be for a period of less than one month if agreed upon by the Borrower and the Administrative Agent.

        Notwithstanding anything to the contrary contained above:

        (a)     the initial Interest Period for any Borrowing of LIBOR Loans shall commence on the date of such Borrowing (including the date of any conversion from a Borrowing of ABR Loans) and each Interest Period occurring thereafter in respect of such Borrowing shall commence on the day on which the next preceding Interest Period expires;

(b)    if any Interest Period relating to a Borrowing of LIBOR Loans begins on the last Business Day of a calendar month or begins on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period, such Interest Period shall end on the last Business Day of the calendar month at the end of such Interest Period;

(c)    if any Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day; provided that if any Interest Period in respect of a LIBOR Loan would otherwise expire on a day that is not a Business Day but is a day of the month after which no further Business Day occurs in such month, such Interest Period shall expire on the next preceding Business Day; and

(d)    the Borrower shall not be entitled to elect any Interest Period in respect of any LIBOR Loan if such Interest Period would extend beyond the applicable Maturity Date of such Loan.

2.10.    Increased Costs, Illegality, Etc.

(a)    In the event that (x) in the case of clause (i) below, the Administrative Agent or (y) in the case of clauses (ii) and (iii) below, any Lender shall have reasonably determined (which determination shall, absent clearly demonstrable error, be final and conclusive and binding upon all parties hereto):

(i)    on any date for determining the LIBOR Rate for any Interest Period that (x) deposits in the principal amounts and currencies of the Loans comprising such LIBOR Borrowing, are not generally available in the relevant market or (y) by reason of any changes arising on or after the Closing Date affecting the interbank LIBOR market, adequate and fair means do not exist for ascertaining the applicable interest rate on the basis provided for in the definition of LIBOR Rate; or

(ii)    at any time, that such Lender shall incur increased costs or reductions in the amounts received or receivable hereunder with respect to any LIBOR Loans (other than any increase or reduction attributable to (i) Taxes indemnifiable under Section 5.4, (ii) net income taxes and franchise and excise taxes (imposed in lieu of net income taxes) imposed on any Agent or Lender or (iii) Taxes included under clauses (c) and (d) of the definition of "Excluded Taxes") because of (x) any change since the Closing Date in any Applicable Law (or in the interpretation or administration thereof and including the introduction of any new Applicable Law), such as, for example, without limitation, a change in official reserve requirements, and/or (y) other circumstances affecting the interbank LIBOR market or the position of such Lender in such market; or

(iii)    at any time, that the making or continuance of any LIBOR Loan has become unlawful as a result of compliance by such Lender in good faith with any Applicable Law (or would conflict with any such Applicable Law not having the force of law even though the failure to comply therewith would not be unlawful), or has become impracticable as a result of a contingency occurring after the Closing Date that materially and adversely affects the interbank LIBOR market;

then, and in any such event, such Lender (or the Administrative Agent, in the case of clause (i) above) shall within a reasonable time thereafter give notice (if by telephone, confirmed in writing) to the Borrower and to the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each of the other Lenders).  Thereafter (x) in the case of clause (i) above, LIBOR Loans shall no longer be available until such time as the Administrative Agent notifies the

-69-

Borrower and the Lenders that the circumstances giving rise to such notice by the Administrative Agent no longer exist (which notice the Administrative Agent agrees to give at such time when such circumstances no longer exist), and any Notice of Borrowing or Notice of Conversion or Continuation given by the Borrower with respect to LIBOR Loans, that have not yet been incurred shall be deemed rescinded by the Borrower, as applicable, (y) in the case of clause (ii) above, the Borrower shall pay to such Lender, promptly after receipt of written demand therefor such additional amounts (in the form of an increased rate of or a different method of calculating, interest or otherwise, as such Lender in its reasonable discretion shall determine) as shall be required to compensate such Lender for such increased costs or reductions in amounts receivable hereunder (it being agreed that a written notice as to the additional amounts owed to such Lender, showing in reasonable detail the basis for the calculation thereof, submitted to the Borrower by such Lender shall, absent clearly demonstrable error, be final and conclusive and binding upon all parties hereto) and (z) in the case of subclause (iii) above, the Borrower shall take one of the actions specified in Section 2.10(b) as promptly as possible and, in any event, within the time period required by Applicable Law.

(b)    At any time that any LIBOR Loan is affected by the circumstances described in Section 2.10(a)(ii) or (iii), the Borrower may (and in the case of a LIBOR Loan affected pursuant to Section 2.10(a)(iii) shall) either (x) if the affected LIBOR Loan is then being made pursuant to a Borrowing, cancel such Borrowing by giving the Administrative Agent telephonic notice (confirmed promptly in writing) thereof on the same date that the Borrower was notified by a Lender pursuant to Section 2.10(a)(ii) or (iii) or (y) if the affected LIBOR Loan is then-outstanding, upon at least three Business Days' notice to the Administrative Agent require the affected Lender to convert each such LIBOR Loan into an ABR Loan; provided that if more than one Lender is affected at any time, then all affected Lenders must be treated in the same manner pursuant to this Section 2.10(b).

(c)    If, after the Closing Date, any Change in Law relating to capital adequacy or liquidity of any Lender or compliance by any Lender or its parent with any Change in Law relating to capital adequacy or liquidity occurring after the Closing Date, has or would have the effect of reducing the rate of return on such Lender's or its parent's or its Affiliate's capital or assets as a consequence of such Lender's commitments or obligations hereunder to a level below that which such Lender or its parent or its Affiliate could have achieved but for such Change in Law (taking into consideration such Lender's or its parent's policies with respect to capital adequacy), then from time to time, promptly after demand by such Lender (with a copy to the Administrative Agent, the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or its parent for such reduction, it being understood and agreed, however, that a Lender shall not be entitled to such compensation as a result of such Lender's compliance with, or pursuant to any request or directive to comply with, any Applicable Law as in effect on the Closing Date. Each Lender, upon determining in good faith that any additional amounts will be payable pursuant to this Section 2.10(c), will give prompt written notice thereof to the Borrower, which notice shall set forth in reasonable detail the basis of the calculation of such additional amounts, although the failure to give any such notice shall not, subject to Section 2.13, release or diminish the Borrower's obligations to pay additional amounts pursuant to this Section 2.10(c) upon receipt of such notice.

2.11.    Compensation.  If (i) any payment of principal of any LIBOR Loan is made by the Borrower to or for the account of a Lender other than on the last day of the Interest Period for such LIBOR Loan as a result of a payment or conversion pursuant to Section 2.5, 2.6, 2.10, 5.1, 5.2 or 13.7, as a result of acceleration of the maturity of the Loans pursuant to Section 11 or for any other reason, (ii) any Borrowing of LIBOR Loans is not made as a result of a withdrawn Notice of Borrowing, (iii) any ABR Loan is not converted into a LIBOR Loan as a result of a withdrawn Notice of Conversion or Continuation, (iv) any LIBOR Loan is not continued as a LIBOR Loan, as the case may be, as a result of a withdrawn Notice of Conversion or Continuation or (v) any prepayment of principal of any LIBOR

-70-

Loan is not made as a result of a withdrawn notice of prepayment pursuant to Section 5.1 or 5.2, the Borrower shall, after receipt of a written request by such Lender (which request shall set forth in reasonable detail the basis for requesting such amount), pay to the Administrative Agent for the account of such Lender any amounts required to compensate such Lender for any additional losses, costs or expenses that such Lender may reasonably incur as a result of such payment, failure to convert, failure to continue or failure to prepay, including any loss, cost or expense (excluding loss of anticipated profits) actually incurred by reason of the liquidation or reemployment of deposits or other funds acquired by any Lender to fund or maintain such LIBOR Loan.

2.12.    Change of Lending Office.  Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 2.10(a)(ii), 2.10(a)(iii), 2.10(b), 3.5 or 5.4 with respect to such Lender, it will, if requested by the Borrower use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event; provided that such designation is made on such terms that such Lender and its lending office suffer no economic, legal or regulatory disadvantage, with the object of avoiding the consequence of the event giving rise to the operation of any such Section.  Nothing in this Section 2.12 shall affect or postpone any of the obligations of the Borrower or the right of any Lender provided in Section 2.10, 3.5 or 5.4.

2.13.    Notice of Certain Costs.  Notwithstanding anything in this Agreement to the contrary, to the extent any notice required by Section 2.10, 2.11, 3.5 or 5.4 is given by any Lender more than 180 days after such Lender has knowledge (or should have had knowledge) of the occurrence of the event giving rise to the additional cost, reduction in amounts, loss, tax or other additional amounts described in such Sections, such Lender shall not be entitled to compensation under Section 2.10, 2.11, 3.5 or 5.4, as the case may be, for any such amounts incurred or accruing prior to the 181st day prior to the giving of such notice to the Borrower.

2.14.    Incremental Facilities.

(a)    The Borrower may, at any time or from time to time after the Closing Date, by notice to the Administrative Agent (whereupon the Administrative Agent shall promptly deliver a copy to each of the Lenders), request (i) one or more additional tranches of term loans (the "**Incremental Term Loans**") or (ii) one or more increases in the amount of the Revolving Credit Commitments; (each such increase, an "**Incremental Revolving Commitment Increase**"); together with the Incremental Term Loans, the "**Incremental Facilities**"), provided that (A) both at the time of any such request and after giving effect to the effectiveness of any Incremental Amendment referred to below, no Default or Event of Default shall exist and at the time that any such Incremental Term Loan or Incremental Revolving Commitment Increase is made or effected (and after giving effect thereto), the conditions in Section 7.1 shall be satisfied and (B) the Full Availability Date shall have occurred and (C) solely with respect to an Incremental Revolving Commitment Increase, the Borrower shall be in compliance with the covenant set forth in Section 10.9 for the most recently ended fiscal quarter determined on a Pro Forma Basis as of the date of the making of such Incremental Revolving Commitment Increase.

(b)    Each tranche of Incremental Term Loans and each Incremental Revolving Commitment Increase shall be in an aggregate principal amount that is not less than $100,000,000 (provided that such amount may be less than $100,000,000 if such amount represents all remaining availability under the limit set forth in the next sentence).

(c)    The aggregate principal amount of all Incremental Facilities shall not exceed the sum of (1) $750,000,000 plus (2) if the RCT Carve Out Support Rejection Notice shall have been issued and delivered prior to the Delayed-Draw Termination Date, the Delayed-Draw Term Facility Reduction Amount determined on a Pro Forma Basis after the incurrence of such Incremental Facility.

-71-

(d)    The Incremental Term Loans (i) shall rank pari passu in right of payment and of security with the Revolving Credit Loans, Delayed-Draw Term Loans and all other Term Loans (ii) shall not mature earlier than the Latest Maturity Date, (iii) shall have interest rates, interest margins, rate floors, fees, funding discounts, premiums and amortization schedules determined by the Borrower and the lenders thereof and (iv) may have terms and conditions different from those of the other Term Loans; provided that, except with respect to the differences set forth in clauses (ii) and (iii) above, any differences must be reasonably acceptable to the Administrative Agent; provided, further that the Yield on any tranche of Incremental Term Loans does not exceed the Yield on the initial Term Loans or the Delayed Draw Term Loans by more than 50 basis points per annum, unless the interest rate on the initial Term Loans and the Delayed Draw Term Loans, as applicable, is increased on or prior to the date of the incurrence of such Incremental Term Loans in order to comply with this proviso.

(e)    [Reserved].

(f)    [Reserved].

(g)    Each notice from the Borrower pursuant to this Section 2.14 shall set forth the requested amount and proposed terms of the relevant Incremental Facility. Incremental Term Loans may be made, and Incremental Revolving Commitment Increases may be provided, by any existing Lender (it being understood that (i) no existing Lender will have an obligation to make a portion of any Incremental Facility and (ii) the Borrower shall have no obligation to offer any existing Lender the opportunity to provide any such Credit Facility); provided that the Administrative Agent shall have consented (not to be unreasonably withheld) to such Lender's or Additional Lender's making such Incremental Term Loans or providing such Incremental Revolving Commitment Increases if such consent would be required under Section 13.6(b) for an assignment of Loans or Commitments, as applicable, to such Lender or Additional Lender.

(h)    Commitments in respect of Incremental Term Loans and Incremental Revolving Commitment Increases shall become Commitments (or in the case of an Incremental Revolving Commitment Increase to be provided by an existing Lender with a Revolving Credit Commitment, an increase in such Lender's applicable Revolving Credit Commitment) under this Agreement pursuant to an amendment (an "**Incremental Amendment**") to this Agreement (which shall be substantially in the form of Exhibit K to this Agreement) and, as appropriate, the other Credit Documents, executed by the Borrower, each Lender agreeing to provide such Commitment, if any, each Additional Lender, if any, and the Administrative Agent (notwithstanding any provision to the contrary in Section 13.1 of this Agreement). The Incremental Amendment may, subject to Section 2.14(c) and (f)) as the case may be, without the consent of any other Lenders, effect such amendments to this Agreement and the other Credit Documents as may be necessary, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the provisions of this Section (notwithstanding any provision to the contrary in Section 13.1 of this Agreement). The effectiveness of any Incremental Amendment shall be subject to the satisfaction on the date thereof of the conditions in Section 7.1 and such other conditions as the parties thereto shall agree. The Borrower may use the proceeds of the Incremental Term Loans and Incremental Revolving Commitment Increases for any purpose not prohibited by this Agreement.

(i)    (i) unless it so agrees, the Borrower shall not be obligated to offer any existing Lender the opportunity to provide any Incremental Facility. If, on the date of any increase in the Revolving Credit Commitments pursuant to an Incremental Revolving Commitment Increase, there are any Revolving Credit Loans outstanding, such Revolving Credit Loans shall on or prior to the effectiveness of such Incremental Revolving Commitment Increase be prepaid from the proceeds of additional Revolving Credit Loans made hereunder (reflecting such increase in Revolving Credit Commitments), which prepayment shall be accompanied by accrued interest on the Revolving Credit

Loans being prepaid and any costs incurred by any Lender in accordance with Section 2.11. The Administrative Agent and the Lenders hereby agree that the minimum borrowing, *pro rata* borrowing and *pro rata* payment requirements contained elsewhere in this Agreement shall not apply to the transactions effected pursuant to the immediately preceding sentence.

(ii) At the option of the Borrower and the Lenders providing such Incremental Revolving Commitment Increases, any Incremental Revolving Commitment Increases may be in the form of one or more separate classes of revolving credit commitments (the "**New Revolving Credit Commitments**") which shall constitute a separate Class of Commitments from the Revolving Credit Commitments and/or any other New Revolving Credit Commitments (each such separate Class of New Revolving Credit Commitments, a "**New Revolving Credit Series**" and each Loan thereunder, a "**New Revolving Credit Loan**") and the related Loans shall constitute a separate Class of Loans from the Revolving Credit Loans, and/or any other New Revolving Credit Loans (it being understood that New Revolving Credit Commitments of a single New Revolving Credit Series may be established on more than one date); provided that:

(A)    Each tranche of New Revolving Credit Commitments shall be in an aggregate principal amount of not less than $100,000,000 (provided that such amount may be less than $100,000,000 if such amount represents all remaining availability under the limit set forth in Section 2.14(b) above).

(B)    the terms of such New Revolving Credit Commitments, except for (w) the tenor of the New Revolving Credit Commitments (which shall have a scheduled expiration date no earlier than the Maturity Date), (x) the size of any letter of credit subfacilities under such New Revolving Credit Commitments, (y) the applicable interest rates, interest margins, rate floors, premiums, funding discounts and fees payable with respect to such New Revolving Credit Commitments and (z) the borrowing, repayment and termination of Commitment procedures (in each case which shall be as specified in the applicable Incremental Amendment), shall be similar to the terms of the Revolving Credit Commitments (unless otherwise consented to by the Administrative Agent); provided that the Yield on the New Revolving Credit Commitments does not exceed the Yield on the initial Revolving Credit Commitments by more than 50 basis points, unless the interest rate on the initial Revolving Credit Commitments is increased on or prior to the date of the incurrence of such New Revolving Credit Commitments in order to comply with this proviso.

(C)    in connection with the establishment of any New Revolving Credit Commitments that will include letter of credit subfacilities, any amendment to this Agreement pursuant to this Section 2.14(i)(ii) may include provisions relating to letters of credit issued thereunder, which issuances shall be on terms similar (except for the overall size of such subfacilities and the identity of the letter of credit issuer, and borrowing, repayment and termination of commitment procedures, in each case which shall be specified in the applicable Incremental Amendment) to the terms relating to Letters of Credit with respect to the Revolving Credit Commitments or otherwise reasonably acceptable to the Administrative Agent and any applicable letter of credit issuer thereunder.

2.15.    [Reserved].

2.16.    Defaulting Lenders. Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then for so long as such Lender is a Defaulting

Lender, fees shall cease to accrue on the unfunded portion of the Commitment of such Defaulting Lender pursuant to Section 4.1(a). If the Borrower and the Administrative Agent agree in writing in their discretion that a Lender that is a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon, as of the effective date specified in such notice and subject to any conditions set forth therein, such Lender will cease to be a Defaulting Lender and will be a Non-Defaulting Lender; provided that, except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Non-Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from such Lender's having been a Defaulting Lender.

SECTION 3.  Letters of Credit.

3.1.  Issuance of Letters of Credit.

(a)  General Letters of Credit. (i) Subject to and upon the terms and conditions herein set forth (including Section 3.8), at any time and from time to time on and after the Closing Date and prior to the General L/C Termination Date, each General Letter of Credit Issuer agrees to issue upon the request of the Borrower (x) for the direct or indirect benefit of the Borrower and the Restricted Subsidiaries and (y) for the direct or indirect benefit of the Ultimate Parent and its other Subsidiaries (excluding the Oncor Subsidiaries) (in the case of this sub-clause (y), so long as the aggregate Stated Amount of all Letters of Credit issued by the General Letter of Credit Issuers from the Closing Date for the Ultimate Parent and its other Subsidiaries' benefit does not exceed $50,000,000), a letter of credit or letters of credit (the "**General Letters of Credit**" and each, a "**General Letter of Credit**") in such form and with such Issuer Documents as may be approved by such General Letter of Credit Issuer in its reasonable discretion; provided that the Borrower shall be a co-applicant, and jointly and severally liable with respect to each General Letter of Credit issued for the account of the Ultimate Parent and its Subsidiaries other than the Borrower; provided further that General Letters of Credit issued for the direct or indirect benefit of the Ultimate Parent and its other Subsidiaries (excluding the Oncor Subsidiaries) other than the Borrower and the Restricted Subsidiaries shall be subject to Sections 10.5(b), (g), (i) and/or (v) and Section 10.12 hereof.

(ii)  Notwithstanding the foregoing, (A) no General Letter of Credit shall be issued, the Stated Amount of which, when added to the General Letters of Credit Outstanding at such time, would exceed the lesser of (x) the General Letter of Credit Commitment then in effect and (y) the General L/C Collateral Account Balance, (B) no General Letter of Credit shall be issued by any General Letter of Credit Issuer the Stated Amount of which, when added to the General Letters of Credit Outstanding with respect to such General Letter of Credit Issuer, would exceed the lesser of (x) the Specified General Letter of Credit Commitment of such General Letter of Credit Issuer then in effect and (y) the General L/C Collateral Account Balance of the relevant General L/C Collateral Account, (C) each General Letter of Credit shall have an expiration date occurring no later than the earlier of (x) one year after the date of issuance thereof, unless otherwise agreed upon by the Administrative Agent and the relevant General Letter of Credit Issuer or as provided under Section 3.2(b) and (y) the General L/C Termination Date, (D) each General Letter of Credit shall be denominated in Dollars, (E) no General Letter of Credit shall be issued if it would be illegal under any Applicable Law for the beneficiary of the General Letter of Credit to have a General Letter of Credit issued in its favor and (F) no General Letter of Credit shall be issued after the relevant General Letter of Credit Issuer has received a written notice from the Borrower or the Administrative Agent or the Required Lenders stating that a Default or an Event of Default has occurred and is continuing until such time as such General Letter of Credit Issuer shall have received a written notice (x) of rescission of such notice from the party or parties originally delivering such notice, (y) of the waiver of such Default or Event of Default in

-74-

accordance with the provisions of <u>Section 13.1</u> or (z) that such Default or Event of Default is no longer continuing.

(b)    <u>RCT Letters of Credit</u>. (i) Subject to and upon the terms and conditions herein set forth (including <u>Section 3.9</u>), at any time and from time to time on and after the Closing Date and prior to the RCT L/C Termination Date, but only if the Borrower shall have theretofore issued and delivered the RCT Carve Out Support Rejection Notice pursuant to <u>Section 4.4</u> prior to the Delayed-Draw Termination Date, each RCT Letter of Credit Issuer agrees to issue upon the request of the Borrower and for the benefit of the RCT a letter of credit or letters of credit (the "**RCT Letters of Credit**" and each, a "**RCT Letter of Credit**") in such form and with such Issuer Documents as may be approved by such RCT Letter of Credit Issuer in its reasonable discretion. RCT Letters of Credit shall be used for the purpose of satisfying bonding requirements of the RCT.

(ii)    Notwithstanding the foregoing, (A) no RCT Letter of Credit shall be issued, the Stated Amount of which, when added to the RCT Letters of Credit Outstanding at such time, would exceed the lesser of (x) the RCT Letter of Credit Commitment then in effect and (y) the RCT L/C Collateral Account Balance, (B) no RCT Letter of Credit shall be issued by any RCT Letter of Credit Issuer the Stated Amount of which, when added to the RCT Letters of Credit Outstanding with respect to such RCT Letter of Credit Issuer, would exceed the lesser of (x) the Specified RCT Letter of Credit Commitment of such RCT Letter of Credit Issuer then in effect and (y) the RCT L/C Collateral Account Balance of the relevant RCT L/C Collateral Account, (C) each RCT Letter of Credit shall have an expiration date occurring no later than the earlier of (x) one year after the date of issuance thereof, unless otherwise agreed upon by the Administrative Agent and the relevant RCT Letter of Credit Issuer or as provided under <u>Section 3.2(b)</u> and (y) the RCT L/C Termination Date, (D) each RCT Letter of Credit shall be denominated in Dollars, (E) no RCT Letter of Credit shall be issued if it would be illegal under any Applicable Law for the beneficiary of the RCT Letter of Credit to have a RCT Letter of Credit issued in its favor and (F) no RCT Letter of Credit shall be issued after the relevant RCT Letter of Credit Issuer has received a written notice from the Borrower or the Administrative Agent or the Required Lenders stating that a Default or an Event of Default has occurred and is continuing until such time as such RCT Letter of Credit Issuer shall have received a written notice (x) of rescission of such notice from the party or parties originally delivering such notice, (y) of the waiver of such Default or Event of Default in accordance with the provisions of <u>Section 13.1</u> or (z) that such Default or Event of Default is no longer continuing.

3.2.    <u>Letter of Credit Requests</u>.

(a)    Whenever the Borrower desires that a Letter of Credit be issued, the Borrower shall give the Administrative Agent and the applicable Letter of Credit Issuer a Letter of Credit Request by no later than 1:00 p.m. (New York City time) at least two (or such lesser number as may be agreed upon by the Administrative Agent and such Letter of Credit Issuer) Business Days prior to the proposed date of issuance. Each notice shall be executed by the Borrower, shall specify whether such Letter of Credit is to be a General Letter of Credit or RCT Letter of Credit and shall be in the form of <u>Exhibit G</u>, or such other form (including by electronic or fax transmission) as agreed between the Borrower, the Administrative Agent and the applicable Letter of Credit Issuer (each a "**Letter of Credit Request**").

(b)    If the Borrower so requests in any applicable Letter of Credit Request, any Letter of Credit Issuer may, in its sole and absolute discretion, agree to issue a Letter of Credit that has automatic extension provisions (each, an "**Auto-Extension Letter of Credit**"); <u>provided</u> that any such Auto-Extension Letter of Credit must permit the Letter of Credit Issuer to prevent any such extension at least once in each twelve-month period (commencing with the date of issuance of such Letter of Credit)

#4821-7663-6950

by giving prior notice to the beneficiary thereof not later than a day (the "**Non-Extension Notice Date**") in each such twelve-month period to be agreed upon at the time such Letter of Credit is issued. Unless otherwise directed by a Letter of Credit Issuer, the Borrower shall not be required to make a specific request to such Letter of Credit Issuer for any such extension. Once an Auto-Extension Letter of Credit has been issued, the Borrower shall be deemed to have authorized (but may not require) such Letter of Credit Issuer to permit the extension of such Letter of Credit at any time to an expiry date not later than, in the case of any General Letter of Credit, the General L/C Termination Date, and in the case of any RCT Letter of Credit, the RCT L/C Termination Date; provided, however, that such Letter of Credit Issuer shall not permit any such extension if (A) such Letter of Credit Issuer has determined that it would not be permitted, or would have no obligation, at such time to issue such Letter of Credit in its revised form (as extended) under the terms hereof (by reason of the provisions of clause(ii) of either Sections 3.1(a) or (b), as applicable or otherwise), or (B) it has received notice (which may be by telephone or in writing) on or before the day that is five Business Days before the Non-Extension Notice Date from the Administrative Agent or the Borrower that one or more of the applicable conditions specified in Section 7 are not then satisfied, and in each such case directing such Letter of Credit Issuer not to permit such extension.

(c)     Each Letter of Credit Issuer shall, at least once each month, provide the Administrative Agent a list of all Letters of Credit issued by it that are outstanding at such time and specifying whether such Letters of Credit are General Letters of Credit or RCT Letters of Credit; provided that upon written request from the Administrative Agent, such Letter of Credit Issuer shall thereafter notify the Administrative Agent in writing on each Business Day of all Letters of Credit issued on the prior Business Day by such Letter of Credit Issuer and specifying whether such Letters of Credit are General Letters of Credit or RCT Letters of Credit.

(d)     The making of each Letter of Credit Request shall be deemed to be a representation and warranty by the Borrower that the Letter of Credit may be issued in accordance with, and will not violate the requirements of, Section 3.1(a)(ii) or Section 3.1(b)(ii), as applicable.

3.3.     [Reserved].

3.4.     Agreement to Repay Letter of Credit Drawings.

(a)     The Borrower hereby agrees to reimburse the applicable Letter of Credit Issuer, by making payment in Dollars to such Letter of Credit Issuer in immediately available funds, for any payment or disbursement made by such Letter of Credit Issuer under any Letter of Credit (each such amount so paid until reimbursed, an "**Unpaid Drawing**") (i) within one Business Day of the date of such payment or disbursement, if such Letter of Credit Issuer provides notice to the Borrower of such payment or disbursement prior to 10:00 a.m. (New York City time) on such next succeeding Business Day from the date of such payment or disbursement or (ii) if such notice is received after such time, on the first Business Day following the date of receipt of such notice (such required date for reimbursement under clause (i) or (ii), as applicable, the "**Reimbursement Date**"), with interest on the amount so paid or disbursed by such Letter of Credit Issuer, from and including the date of such payment or disbursement to but excluding the Reimbursement Date, at the per annum rate for each day equal to the Overnight Rate; provided that, notwithstanding anything contained in this Agreement to the contrary, (i) in the case of any Unpaid Drawing under any General Letter of Credit, if the Borrower shall have notified the Administrative Agent and the relevant General Letter of Credit Issuer that it does not intend to reimburse the relevant General Letter of Credit Issuer for the amount of such drawing with its own funds, or if the Borrower has not notified the Administrative Agent and the relevant General Letter of Credit Issuer prior to 10:00 a.m. (New York City time) on the Reimbursement Date that it intends to reimburse the relevant General Letter of Credit Issuer for the amount of such drawing with its own funds, in either case the Collateral Agent shall promptly cause the amounts on deposit in the relevant General L/C Collateral

-76-

Account to be applied to repay in full the amount of such Unpaid Drawing and (ii) in the case of any payment or disbursement made by any RCT Letter of Credit Issuer under any RCT Letter of Credit, upon notification by such RCT Letter of Credit Issuer to the Collateral Agent of such payment or disbursement, the Collateral Agent shall promptly cause the amounts on deposit in the relevant RCT L/C Collateral Account to be applied to repay in full the amount of such payment or disbursement.

(b)    The obligations of the Borrower under this Section 3.4 to reimburse the Letter of Credit Issuers with respect to Unpaid Drawings (including, in each case, interest thereon) shall be absolute and unconditional under any and all circumstances and irrespective of any set-off, counterclaim or defense to payment that the Borrower or any other Person may have or have had against any Letter of Credit Issuer, the Administrative Agent or any Lender including any defense based upon the failure of any drawing under a Letter of Credit (each a "**Drawing**") to conform to the terms of the Letter of Credit or any non-application or misapplication by the beneficiary of the proceeds of such Drawing; provided that the Borrower shall not be obligated to reimburse any Letter of Credit Issuer for any wrongful payment made by such Letter of Credit Issuer under the Letter of Credit issued by it as a result of acts or omissions constituting willful misconduct or gross negligence on the part of such Letter of Credit Issuer.

3.5.    Increased Costs.  If after the Closing Date, the adoption of any Applicable Law, or any change therein, or any change in the interpretation or administration thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or actual compliance by a Letter of Credit Issuer with any request or directive made or adopted after the Closing Date (whether or not having the force of law), by any such authority, central bank or comparable agency shall either (a) impose, modify or make applicable any reserve, deposit, capital adequacy, liquidity or similar requirement against letters of credit issued by any Letter of Credit Issuer, or (b) impose on any Letter of Credit Issuer any other conditions or liabilities affecting its obligations under this Agreement in respect of Letters of Credit or any Letter of Credit, and the result of any of the foregoing is to increase the cost to such Letter of Credit Issuer of issuing or maintaining any Letter of Credit, or to reduce the amount of any sum received or receivable by such Letter of Credit Issuer hereunder (other than any such increase or reduction attributable to (i) taxes indemnifiable under Section 5.4, or (ii) Excluded Taxes) in respect of Letters of Credit, then, promptly after receipt of written demand to the Borrower by such Letter of Credit Issuer (a copy of which notice shall be sent by such Letter of Credit Issuer to the Administrative Agent), the Borrower shall pay to such Letter of Credit Issuer such additional amount or amounts as will compensate such Letter of Credit Issuer for such increased cost or reduction, it being understood and agreed, however, that any Letter of Credit Issuer shall not be entitled to such compensation as a result of such Person's compliance with, or pursuant to any request or directive to comply with, any such Applicable Law as in effect on the Closing Date.  A certificate submitted to the Borrower by the relevant Letter of Credit Issuer (a copy of which certificate shall be sent by such Letter of Credit Issuer to the Administrative Agent), setting forth in reasonable detail the basis for the determination of such additional amount or amounts necessary to compensate such Letter of Credit Issuer as aforesaid shall be conclusive and binding on the Borrower absent clearly demonstrable error.

3.6.    New or Successor Letter of Credit Issuer.

(a)    Any Letter of Credit Issuer may resign as a Letter of Credit Issuer upon 30 days' prior written notice to the Administrative Agent, the Lenders and the Borrower.  The Borrower may add General Letter of Credit Issuers or RCT Letter of Credit Issuers at any time upon notice to the Administrative Agent.  If a Letter of Credit Issuer shall resign or be replaced, or if the Borrower shall decide to add a new Letter of Credit Issuer under this Agreement, then the Borrower may appoint from among the Lenders a successor or new issuer of Letters of Credit or, with the consent of the Administrative Agent (such consent not to be unreasonably withheld), another successor or new issuer of Letters of Credit, whereupon such successor issuer of Letters of Credit shall succeed to the rights, powers

#4821-7663-6950

and duties of the replaced or resigning Letter of Credit Issuer under this Agreement and the other Credit Documents, or such new issuer of Letters of Credit shall be granted the rights, powers and duties of a General Letter of Credit Issuer or RCT Letter of Credit Issuer, as applicable, hereunder, and the term "General Letter of Credit Issuer" or "RCT Letter of Credit Issuer", as applicable, shall mean such successor or include such new issuer of Letters of Credit effective upon such appointment.  At the time such resignation or replacement shall become effective, the Borrower shall pay to the resigning or replaced Letter of Credit Issuer all accrued and unpaid fees owing to such Letter of Credit Issuer pursuant to Section 4.1(c).  The acceptance of any appointment as a Letter of Credit Issuer hereunder whether as a successor or new issuer of Letters of Credit in accordance with this Agreement, shall be evidenced by an agreement entered into by such new or successor issuer of Letters of Credit, in a form satisfactory to the Borrower and the Administrative Agent and, from and after the effective date of such agreement, such new or successor issuer of Letters of Credit shall become a "General Letter of Credit Issuer" or "RCT Letter of Credit Issuer", as applicable, hereunder.  After the resignation or replacement of a Letter of Credit Issuer hereunder, the resigning or replaced Letter of Credit Issuer shall remain a party hereto and shall continue to have all the rights and obligations of a Letter of Credit Issuer under this Agreement and the other Credit Documents with respect to Letters of Credit issued by it prior to such resignation or replacement, but shall not be required to issue additional Letters of Credit.  In connection with any resignation or replacement pursuant to this clause (a) (but, in case of any such resignation, only to the extent that a successor issuer of Letters of Credit shall have been appointed), either (i) the Borrower, the resigning or replaced Letter of Credit Issuer and the successor issuer of Letters of Credit shall arrange to have any outstanding Letters of Credit issued by the resigning or replaced Letter of Credit Issuer replaced with Letters of Credit issued by the successor issuer of Letters of Credit or (ii) the Borrower shall cause the successor issuer of Letters of Credit, if such successor issuer is satisfactory to the replaced or resigning Letter of Credit Issuer, to issue "back-stop" Letters of Credit naming the resigning or replaced Letter of Credit Issuer as beneficiary for each outstanding Letter of Credit issued by the resigning or replaced Letter of Credit Issuer, which new Letters of Credit shall have a face amount equal to the Letters of Credit being back-stopped and the sole requirement for drawing on such new Letters of Credit shall be a drawing on the corresponding back-stopped Letters of Credit.  After any resigning or replaced Letter of Credit Issuer's resignation or replacement as Letter of Credit Issuer, the provisions of this Agreement relating to a Letter of Credit Issuer shall inure to its benefit as to any actions taken or omitted to be taken by it (A) while it was a Letter of Credit Issuer under this Agreement or (B) at any time with respect to Letters of Credit issued by such Letter of Credit Issuer.

(b)     To the extent that there are, at the time of any resignation or replacement as set forth in clause (a) above, any outstanding Letters of Credit, nothing herein shall be deemed to impact or impair any rights and obligations of any of the parties hereto with respect to such outstanding Letters of Credit (including, without limitation, any obligations related to the payment of Fees or the reimbursement or funding of amounts drawn), except that the Borrower, the resigning or replaced Letter of Credit Issuer and the successor issuer of Letters of Credit shall have the obligations regarding outstanding Letters of Credit described in clause (a) above.

3.7.     Role of Letter of Credit Issuer.  Each Lender and the Borrower agree that, in paying any Drawing under a Letter of Credit, the relevant Letter of Credit Issuer shall not have any responsibility to obtain any document (other than any sight draft, certificates and documents expressly required by the Letter of Credit) or to ascertain or inquire as to the validity or accuracy of any such document or the authority of the Person executing or delivering any such document.  None of the Letter of Credit Issuers, the Administrative Agent, any of their respective affiliates nor any correspondent, participant or assignee of any Letter of Credit Issuer shall be liable to any Lender for (i) any action taken or omitted in connection herewith at the request or with the approval of the Required Lenders; (ii) any action taken or omitted in the absence of gross negligence or willful misconduct; or (iii) the due execution, effectiveness, validity or enforceability of any document or instrument related to any Letter of

#4821-7663-6950

Credit or Issuer Document. The Borrower hereby assumes all risks of the acts or omissions of any beneficiary or transferee with respect to its use of any Letter of Credit; provided that this assumption is not intended to, and shall not, preclude the Borrower's pursuing such rights and remedies as it may have against the beneficiary or transferee at law or under any other agreement. None of the Letter of Credit Issuers, the Administrative Agent, any of their respective affiliates nor any correspondent, participant or assignee of any Letter of Credit Issuer shall be liable or responsible for (i) any lack of validity or enforceability of this Agreement or any of the other Credit Documents, (ii) the existence of any claim, set-off, defense or other right that the Borrower may have at any time against a beneficiary named in a Letter of Credit, any transferee of any Letter of Credit (or any Person for whom any such transferee may be acting), the Administrative Agent, any Letter of Credit Issuer, any Lender or other Person, whether in connection with this Agreement, any Letter of Credit, the transactions contemplated herein or any unrelated transactions (including any underlying transaction between the Borrower and the beneficiary named in any such Letter of Credit), (iii) any draft, certificate or any other document presented under any Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect, (iv) the surrender or impairment of any security for the performance or observance of any of the terms of any of the Credit Documents or (v) the occurrence of any Default or Event of Default; provided that anything in this Section to the contrary notwithstanding, the Borrower may have a claim against a Letter of Credit Issuer, and such Letter of Credit Issuer may be liable to the Borrower, to the extent, but only to the extent, of any direct, as opposed to consequential or exemplary, damages suffered by the Borrower which the Borrower proves were caused by such Letter of Credit Issuer's willful misconduct or gross negligence or such Letter of Credit Issuer's willful failure to pay under any Letter of Credit after the presentation to it by the beneficiary of a sight draft and certificate(s) strictly complying with the terms and conditions of a Letter of Credit. In furtherance and not in limitation of the foregoing, each Letter of Credit Issuer may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary, and no Letter of Credit Issuer shall be responsible for the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign a Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason.

       3.8.    General L/C Collateral Account. On or prior to the date of initial issuance of any General Letters of Credit, the Borrower shall establish under its name one or more General L/C Collateral Accounts for the purpose of cash collateralizing the Borrower's obligations to any General Letter of Credit Issuer (including the General Letter of Credit Reimbursement Obligation) and may transfer all or any portion of the funds in any General L/C Collateral Account to any other General L/C Collateral Account, subject to the satisfaction of the conditions set forth in this Section 3.8; provided that each General Letter of Credit Issuer may require that the General L/C Collateral Account Depositary Bank for the General L/C Collateral Account corresponding to its General L/C Obligations is such General Letter of Credit Issuer or an Affiliate thereof. The Borrower agrees that at all times, and shall immediately cause additional funds to be deposited and held in each General L/C Collateral Account from time to time in order that the General L/C Collateral Account Balance of each General L/C Collateral Account shall at least equal the General Letters of Credit Outstanding (the "**General L/C Cash Coverage Requirement**") of the relevant General Letter of Credit Issuer. The Borrower hereby grants to the Collateral Agent, for the benefit of all General Letter of Credit Issuers, a security interest in the General L/C Collateral Accounts and all cash and balances therein and all proceeds of the foregoing, as security for the General L/C Obligations (including the General Letter of Credit Reimbursement Obligation) (and, in addition, grants a security interest therein, for the benefit of the Secured Parties as collateral security for the other Obligations; provided that amounts on deposit in any General L/C Collateral Account shall be applied, first, to repay the corresponding General L/C Obligations (including the General Letter of Credit Reimbursement Obligation) and, then, to repay all other Obligations, in each case in such order as set forth in Section 11.19 hereof). Except as expressly provided herein or in any other Credit Document, no

-79-

Person shall have the right to make any withdrawal from any General L/C Collateral Account or to exercise any right or power with respect thereto; _provided_ that at any time the Borrower shall fail to reimburse any General Letter of Credit Issuer for any Unpaid Drawing in accordance with Section 3.4(a), the Borrower hereby absolutely, unconditionally and irrevocably agrees that such General Letter of Credit Issuer shall be entitled to instruct the Collateral Agent, and the Collateral Agent shall instruct the applicable depositary bank (each, a "**General L/C Collateral Account Depositary Bank**") of the applicable General L/C Collateral Account, to withdraw therefrom and pay to the Administrative Agent for account of such General Letter of Credit Issuer amounts equal to such Unpaid Drawings. Amounts in any General L/C Collateral Account shall be invested by the applicable General L/C Collateral Account Depositary Bank in the manner instructed by the Borrower in General L/C Permitted Investments to which such General L/C Collateral Account Depositary Bank has ready access; _provided_, _however_, that the General L/C Collateral Account Depositary Bank shall determine such investments in General L/C Permitted Investments during the existence of any Event of Default as long as made in General L/C Permitted Investments, it being understood and agreed that neither the Borrower nor the General L/C Collateral Account Depositary Bank nor any other Person may direct the investment of funds in the General L/C Collateral Account in any assets other than General L/C Permitted Investments. The Borrower shall bear the risk of loss of principal with respect to any investments in any General L/C Collateral Account. In addition, the Collateral Agent hereby agrees to instruct each General L/C Collateral Account Depositary Bank to release and pay to the Borrower amounts (if any) (x) remaining on deposit in each relevant General L/C Collateral Account after the termination of all General Letter of Credit Commitments, the termination or cancellation of all General Letters of Credit and the repayment in full of all outstanding General L/C Obligations and/or (y) as set forth in Section 3.10(a) below. Each General L/C Collateral Account Depositary Bank shall inform the applicable General L/C Issuer of the balance in the applicable General L/C Collateral Account upon the request of such General L/C Issuer.

3.9.    RCT L/C Collateral Account. On or prior to the date of initial drawing of Delayed-Draw Term Loans, the Borrower shall establish under its name one or more RCT L/C Collateral Accounts for the purpose of cash collateralizing the Borrower's obligations to any RCT Letter of Credit Issuer (including the RCT Letter of Credit Reimbursement Obligation) and may transfer all or any portion of the funds in any RCT L/C Collateral Account to any other RCT L/C Collateral Account, subject to the satisfaction of the conditions set forth in this Section 3.9; _provided_ that each RCT Letter of Credit Issuer may require that the RCT L/C Collateral Account Depositary Bank for the RCT L/C Collateral Account corresponding to its RCT L/C Obligations is such RCT Letter of Credit Issuer or an Affiliate thereof. The Borrower agrees that at all times, and shall immediately cause additional funds to be deposited and held in each RCT L/C Collateral Account from time to time in order that, the RCT L/C Collateral Account Balance of each RCT L/C Collateral Account shall at least equal the RCT Letters of Credit Outstanding (the "**RCT L/C Cash Coverage Requirement**") of the relevant RCT Letter of Credit Issuer. The Borrower hereby grants to the Collateral Agent, for the benefit of all RCT Letter of Credit Issuers, a security interest in the RCT L/C Collateral Accounts and all cash and balances therein and all proceeds of the foregoing, as security for the RCT L/C Obligations (including the RCT Letter of Credit Reimbursement Obligation) (and, in addition, grants a security interest therein, for the benefit of the Secured Parties as collateral security for the other Obligations; _provided_ that amounts on deposit in any RCT L/C Collateral Account shall be applied, first, to repay the corresponding RCT L/C Obligations (including the RCT Letter of Credit Reimbursement Obligation) and, then, to repay all other Obligations, in each case in such order as set forth in Section 11.19 hereof). Except as expressly provided herein or in any other Credit Document, no Person shall have the right to make any withdrawal from any RCT L/C Collateral Account or to exercise any right or power with respect thereto; _provided_ that at any time the Borrower shall fail to reimburse any RCT Letter of Credit Issuer for any Unpaid Drawing in accordance with Section 3.4(a), the Borrower hereby absolutely, unconditionally and irrevocably agrees that such RCT Letter of Credit Issuer shall be entitled to instruct the Collateral Agent, and the Collateral Agent shall instruct the applicable depositary bank (each, a "**RCT L/C Collateral Account Depositary Bank**")

-80-

of the applicable RCT L/C Collateral Account, to withdraw therefrom and pay to the Administrative Agent for account of such RCT Letter of Credit Issuer amounts equal to such Unpaid Drawings. Amounts in any RCT L/C Collateral Account shall be invested by the applicable RCT L/C Collateral Account Depositary Bank in the manner instructed by the Borrower in RCT L/C Permitted Investments to which such RCT L/C Collateral Account Depositary Bank has ready access; provided, however, that the RCT L/C Collateral Account Depositary Bank shall determine such investments in RCT L/C Permitted Investments during the existence of any Event of Default as long as made in RCT L/C Permitted Investments, it being understood and agreed that neither the Borrower nor the RCT L/C Collateral Account Depositary Bank nor any other Person may direct the investment of funds in the RCT L/C Collateral Account in any assets other than RCT L/C Permitted Investments. The Borrower shall bear the risk of loss of principal with respect to any investments in any RCT L/C Collateral Account. In addition, the Collateral Agent hereby agrees to instruct each RCT L/C Collateral Account Depositary Bank to release and pay to the Borrower amounts (if any) (x) remaining on deposit in each relevant RCT L/C Collateral Account after the termination of all RCT Letter of Credit Commitments, the termination or cancellation of all RCT Letters of Credit and the repayment in full of all outstanding RCT L/C Obligations and/or (y) as set forth in Section 3.10(b) below. Each RCT L/C Collateral Account Depositary Bank shall inform the applicable RCT L/C Issuer of the balance in the applicable RCT L/C Collateral Account upon the request of such RCT L/C Issuer.

3.10.    Drawings from General L/C Collateral Accounts and RCT L/C Collateral Accounts.

(a)    At any time and from time to time (other than during the existence of an Event of Default), upon at least two (2) Business Days' prior written notice to the Collateral Agent, the Administrative Agent, the relevant General Letter of Credit Issuer and the relevant General L/C Collateral Account Depositary Bank, the Borrower may draw amounts in any General L/C Collateral Account, provided, however, that after giving effect to any such drawing, the General L/C Cash Coverage Requirement shall be satisfied. For the avoidance of doubt, the conditions set forth in Sections 6 and 7 of this Agreement will not be applicable to any withdrawals made pursuant to this Section 3.10(a) or the last sentence of Section 3.8.

(b)    At any time and from time to time (other than during the existence of an Event of Default), upon at least two (2) Business Days' prior written notice to the Collateral Agent, the Administrative Agent, the relevant RCT Letter of Credit Issuer and the relevant RCT L/C Collateral Account Depositary Bank, the Borrower may draw amounts in any RCT L/C Collateral Account, provided, however, that (x) after giving effect to any such drawing, the RCT L/C Cash Coverage Requirement shall be satisfied (y) such drawn amounts may not be used for any purpose other than prepaying the Term Loans or the Delayed-Draw Term Loans in accordance with Section 5.1. For the avoidance of doubt, the conditions set forth in Sections 6 and 7 of this Agreement will not be applicable to any withdrawals made pursuant to this Section 3.10(b) or the last sentence of Section 3.9.

3.11.    Applicability of ISP and UCP. Unless otherwise expressly agreed by the relevant Letter of Credit Issuer and the Borrower when a Letter of Credit is issued, (i) the rules of the ISP shall apply to each Standby Letter of Credit, and (ii) the rules of the Uniform Customs and Practice for Documentary Credits, as most recently published by the International Chamber of Commerce at the time of issuance, shall apply to each Commercial Letter of Credit, and in each case to the extent not inconsistent with the above referred rules, the laws of the State of New York shall apply to each Letter of Credit.

3.12.    Conflict with Issuer Documents. In the event of any conflict between the terms hereof and the terms of any Issuer Document, the terms hereof shall control.

-81-

3.13. <u>Letters of Credit Issued for Others</u>. Notwithstanding that a Letter of Credit issued or outstanding hereunder is in support of any obligations of, or is for the account of, the Ultimate Parent or its Subsidiaries other than the Borrower, the Borrower shall be obligated to reimburse the relevant Letter of Credit Issuer hereunder for any and all drawings under such Letter of Credit. The Borrower hereby acknowledges that the issuance of Letters of Credit for the account of the Ultimate Parent or its Subsidiaries other than the Borrower inures to the benefit of the Borrower, and that the Borrower's business derives substantial benefits from the businesses of the Ultimate Parent and its Subsidiaries other than the Borrower.

SECTION 4.    Fees; Commitments.

4.1.    <u>Fees</u>.

(a)    The Borrower agrees to pay to the Administrative Agent in Dollars, for the account of each Revolving Credit Lender (in each case *pro rata* according to the respective Revolving Credit Commitments of all such Lenders), a commitment fee (the "**Revolving Credit Commitment Fee**") for each day from the Closing Date to, but excluding, the Maturity Date. The Revolving Credit Commitment Fee shall be payable by the Borrower (x) quarterly in arrears on the tenth Business Day following the end of each March, June, September and December (for the three-month period (or portion thereof) ended on such day for which no payment has been received) and (y) on the Revolving Credit Termination Date, (for the period ended on such date for which no payment has been received pursuant to <u>clause (x)</u> above) and shall be computed for each day during such period at a rate *per annum* equal to the Revolving Credit Commitment Fee Rate on the applicable portion of the Available Revolving Commitment in effect on such day.

(b)    [Reserved].

(c)    The Borrower agrees to pay to each Letter of Credit Issuer a fee in respect of each Letter of Credit issued by it (the "**Fronting Fee**"), for the period from the date of issuance of such Letter of Credit to the termination date of such Letter of Credit, computed at the rate for each day equal to 0.25% *per annum* on the average daily Stated Amount of such Letter of Credit (or at such other rate per annum as agreed in writing between the Borrower and such Letter of Credit Issuer). Such Fronting Fees shall be due and payable by the Borrower (x) quarterly in arrears on the tenth Business Day following the end of each March, June, September and December and (y) on the later of (A) the Maturity Date and (B) the day on which the General Letters of Credit Outstanding or RCT Letters of Credit Outstanding, as applicable, shall have been reduced to zero (0).

(d)    The Borrower agrees to pay directly to the Letter of Credit Issuer upon each issuance of, drawing under, and/or amendment of, a Letter of Credit issued by it such amount as the Letter of Credit Issuer and the Borrower shall have agreed upon for issuances of, drawings under or amendments of, letters of credit issued by it.

(e)    The Borrower agrees to pay to the Administrative Agent in Dollars, for the account of each Lender holding a Delayed-Draw Term Loan Commitment, a fee equal to 50% of the Applicable LIBOR Margin calculated on the Available Delayed-Draw Term Loan Commitment of such Lenders (the "**Delayed-Draw Ticking Fee**") for each day from (and including) the date that is sixty (60) days following the Closing Date until (but excluding) the Delayed-Draw Termination Date. The Delayed-Draw Ticking Fee shall be payable by the Borrower quarterly in arrears on the tenth Business Day following the end of each March, June, September and December (for the three-month period (or portion thereof) ended on such day for which no payment has been received) and (y) on the Delayed Draw Termination Date (for the period ended on such date for which no payment has been received pursuant to

-82-

clause (x) above), and shall be computed for each day during such period on the applicable portion of the Delayed-Draw Term Loan Commitment in effect on such day.

(f)    The Borrower agrees to pay directly to the Administrative Agent for its own account the administrative agent fees as set forth in the Fee Letter.

(g)    Notwithstanding the foregoing, the Borrower shall not be obligated to pay any amounts to any Defaulting Lender pursuant to this Section 4.1.

4.2.    Voluntary Reduction of Revolving Credit Commitments and Delayed-Draw Term Loan Commitments.

(a)    Upon at least one Business Day's prior written notice (or telephonic notice promptly confirmed in writing) to the Administrative Agent at the Administrative Agent's Office (which notice the Administrative Agent shall promptly transmit to each of the Revolving Credit Lenders), the Borrower shall have the right, without premium or penalty, on any day, permanently to terminate or reduce the Revolving Credit Commitments in whole or in part; provided that (a) any such termination or reduction of Revolving Credit Commitments shall apply proportionately and permanently to reduce the Total Revolving Credit Commitment on a *pro rata* basis as between each of the Revolving Credit Lenders, (b) any partial reduction pursuant to this Section 4.2 shall be in the amount of at least the Minimum Borrowing Amount and (c) after giving effect to such termination or reduction and to any prepayments of the Revolving Credit Loans made on the date thereof in accordance with this Agreement (including pursuant to Section 5.2(b)), the aggregate amount of the Revolving Credit Lenders' Revolving Credit Exposures shall not exceed the Total Revolving Credit Commitment.

(b)    Upon at least one Business Day's prior written notice (or telephonic notice promptly confirmed in writing) to the Administrative Agent at the Administrative Agent's Office (which notice the Administrative Agent shall promptly transmit to each of the Delayed-Draw Term Loan Lenders), the Borrower shall have the right, without premium or penalty, on any day, permanently to terminate or reduce the Delayed-Draw Term Loan Commitments in whole or in part; provided that (a) any such termination or reduction of Delayed-Draw Term Loan Commitments shall apply proportionately and permanently to reduce the Total Delayed-Draw Term Loan Commitment on a *pro rata* basis as between each of the Delayed-Draw Term Loan Lenders and (b) any partial reduction pursuant to this Section 4.2 shall be in the amount of at least $50,000,000.

(c)    Upon at least one Business Day's prior written notice (or telephonic notice promptly confirmed in writing) to the Administrative Agent and the RCT Letter of Credit Issuers, the Borrower shall have the right, without premium or penalty, on any day, permanently to terminate or reduce the RCT Letter of Credit Commitment in whole or in part; provided that, after giving effect to such termination or reduction, (i) the RCT Letters of Credit Outstanding shall not exceed the RCT Letter of Credit Commitment, (ii) the RCT Letters of Credit Outstanding with respect to each RCT Letter of Credit Issuer shall not exceed the Specified RCT Letter of Credit Commitment of such RCT Letter of Credit Issuer and (iii) the RCT L/C Cash Coverage Requirement shall be satisfied.

(d)    Upon at least one Business Day's prior written notice (or telephonic notice promptly confirmed in writing) to the Administrative Agent and the General Letter of Credit Issuers, the Borrower shall have the right, without premium or penalty, on any day, permanently to terminate or reduce the General Letter of Credit Commitment in whole or in part; provided that, after giving effect to such termination or reduction, (i) the General Letters of Credit Outstanding shall not exceed the General Letter of Credit Commitment, (ii) the General Letters of Credit Outstanding with respect to each General

#4821-7663-6950

Letter of Credit Issuer shall not exceed the Specified General Letter of Credit Commitment of such General Letter of Credit Issuer and (iii) the General L/C Cash Coverage Requirement shall be satisfied.

        4.3.    <u>Mandatory Termination of Commitments</u>.

        (a)    The Delayed-Draw Term Loan Commitment shall terminate at 5:00 p.m. (New York City time) on the Delayed-Draw Termination Date.

        (b)    The Total Revolving Credit Commitment shall terminate at 5:00 p.m. (New York City time) on the Maturity Date.

        4.4.    <u>RCT Carve Out Support Rejection Notice</u>.

        If the RCT denies or rejects the TCEH Debtors' application to utilize the RCT Reclamation Support Carve Out to satisfy the RCT's bonding requirements, then the Borrower shall be obligated to promptly terminate the RCT Reclamation Support Carve Out by issuing and delivering a notice in writing to the Administrative Agent (the "**RCT Carve Out Support Rejection Notice**"). Upon issuance and delivery by the Borrower of the RCT Carve Out Support Rejection Notice to the Administrative Agent, immediately, automatically and without further action, the RCT Reclamation Support Carve Out will terminate and be permanently reduced to $0 for all purposes hereunder and under the Orders, and the RCT shall thereafter cease to have any rights in respect of the RCT Reclamation Support Carve Out. Except as set forth in this <u>Section 4.4</u>, the Borrower may not terminate the RCT Reclamation Support Carve Out.

        SECTION 5.    <u>Payments</u>.

        5.1.    <u>Voluntary Prepayments</u>. The Borrower shall have the right to prepay Term Loans, Delayed-Draw Term Loans and Revolving Credit Loans, without premium or penalty, in whole or in part, from time to time on the following terms and conditions: (a) the Borrower shall give the Administrative Agent at the Administrative Agent's Office written notice (or telephonic notice promptly confirmed in writing) of its intent to make such prepayment, the amount of such prepayment and, in the case of LIBOR Loans, the specific Borrowing(s) pursuant to which made, which notice shall be given by the Borrower no later than 1:00 p.m. (New York City time) (x) one Business Day prior to (in the case of ABR Loans) or (y) three Business Days prior to (in the case of LIBOR Loans), the date of such prepayment and shall promptly be transmitted by the Administrative Agent to each of the relevant Lenders, (b) each partial prepayment of any Borrowing of Term Loans, Delayed-Draw Term Loans or Revolving Credit Loans shall be in a multiple of $1,000,000 and in an aggregate principal amount of at least $5,000,000; <u>provided</u> that no partial prepayment of LIBOR Loans made pursuant to a single Borrowing shall reduce the outstanding LIBOR Loans made pursuant to such Borrowing to an amount less than the Minimum Borrowing Amount for LIBOR Loans and (c) any prepayment of LIBOR Loans pursuant to this <u>Section 5.1</u> on any day other than the last day of an Interest Period applicable thereto shall be subject to compliance by the Borrower with the applicable provisions of <u>Section 2.11</u>. Each prepayment in respect of any tranche of Term Loans or Delayed-Draw Term Loans pursuant to this <u>Section 5.1</u> shall be applied to the Class or Classes of Term Loans or Delayed Draw Term Loans in such manner as the Borrower may determine. All prepayments under this <u>Section 5.1</u> shall also be subject to the provisions of <u>Section 5.2(d)</u> or <u>(e)</u>, as applicable. At the Borrower's election in connection with any prepayment pursuant to this <u>Section 5.1</u>, such prepayment shall not be applied to any Loan of a Defaulting Lender.

5.2.    Mandatory Prepayments.

(a)    Loan Prepayments.  On each occasion that a Prepayment Event occurs, the Borrower shall, within three Business Days after the occurrence of such Prepayment Event (or, in the case of Deferred Net Cash Proceeds, within three Business Days after the Deferred Net Cash Proceeds Payment Date), prepay (subject to Section 11.19 when applicable), in accordance with clauses (c) and (d) below, Loans in a principal amount equal to 100% of the Net Cash Proceeds from such Prepayment Event.

(b)    Repayment of Revolving Credit Loans.  Subject to Section 11.19 when applicable, if on any date the aggregate amount of the Lenders' Revolving Credit Exposures (collectively, the "**Aggregate Revolving Credit Outstandings**") for any reason exceeds 100% of the Total Revolving Credit Commitment then in effect (or, prior to the Full Availability Date, the Interim Availability Amount), the Borrower shall, forthwith repay within two (2) Business Days of such date the principal amount of any Revolving Credit Loans in an amount necessary to eliminate such deficiency.

(c)    Application to Repayments.  Subject to Section 11.19 when applicable, each prepayment of Loans required by Section 5.2(a) shall be allocated (i) first, to the Term Loans and any Incremental Term Loans in direct order of maturity until paid in full, (ii) to any Delayed-Draw Term Loans then outstanding in direct order of maturity until paid in full, and (iii) thereafter, to the Revolving Credit Facility (without any permanent reduction in commitments thereof).

(d)    Application to Term Loans and Delayed-Draw Term Loans.  With respect to each prepayment of Term Loans and Delayed-Draw Term Loans elected to be made by the Borrower pursuant to Section 5.1 or required by Section 5.2(a), subject to Section 11.19 when applicable, the Borrower may designate the Types of Loans that are to be prepaid and the specific Borrowing(s) pursuant to which made; provided that the Borrower pays any amounts, if any, required to be paid pursuant to Section 2.11 with respect to prepayments of LIBOR Loans made on any date other than the last day of the applicable Interest Period.  In the absence of a designation by the Borrower as described in the preceding sentence, the Administrative Agent shall, subject to the above, make such designation in its reasonable discretion with a view, but no obligation, to minimize breakage costs owing under Section 2.11.

(e)    Application to Revolving Credit Loans.  With respect to each prepayment of Revolving Credit Loans elected to be made by the Borrower pursuant to Section 5.1 or required by Section 5.2(a) or (b), the Borrower may designate (i) the Types of Loans that are to be prepaid and the specific Borrowing(s) pursuant to which made and (ii) the Revolving Credit Loans to be prepaid; provided that (x) each prepayment of any Loans made pursuant to a Borrowing shall be applied *pro rata* among such Loans; and (y) notwithstanding the provisions of the preceding clause (x), no prepayment made pursuant to Section 5.1 or 5.2 of Revolving Credit Loans shall be applied to the Revolving Credit Loans of any Defaulting Lender.  In the absence of a designation by the Borrower as described in the preceding sentence, the Administrative Agent shall, subject to the above, make such designation in its reasonable discretion with a view, but no obligation, to minimize breakage costs owing under Section 2.11.

(f)    LIBOR Interest Periods.  In lieu of making any payment pursuant to this Section 5.2 in respect of any LIBOR Loan other than on the last day of the Interest Period therefor so long as no Event of Default shall have occurred and be continuing, the Borrower at its option may deposit with the Administrative Agent an amount equal to the amount of the LIBOR Loan to be prepaid and such LIBOR Loan shall be repaid on the last day of the Interest Period therefor in the required amount.  Such deposit shall be held by the Administrative Agent in a corporate time deposit account established on terms reasonably satisfactory to the Administrative Agent, earning interest at the then customary rate for

-85-

accounts of such type.  Such deposit shall constitute cash collateral for the LIBOR Loans to be so prepaid; provided that the Borrower may at any time direct that such deposit be applied to make the applicable payment required pursuant to this Section 5.2.

(g)     Minimum Amount.  No prepayment shall be required pursuant to Section 5.2(a) (i) in the case of any Prepayment Event yielding Net Cash Proceeds of less than $5,000,000 in the aggregate and (ii) unless and until the amount at any time of Net Cash Proceeds from Prepayment Events required to be applied at or prior to such time pursuant to such Section and not yet applied at or prior to such time to prepay Term Loans or Delayed-Draw Term Loans pursuant to such Section exceeds (x) $25,000,000 for a single Prepayment Event or (y) $100,000,000 in the aggregate for all Prepayment Events (other than those that are either under the threshold specified in subclause (i) or over the threshold specified in subclause (ii)(x)) in any one fiscal year, at which time all such Net Cash Proceeds referred to in this subclause (ii) with respect to such fiscal year shall be applied as a prepayment in accordance with this Section 5.2.

(h)     [Reserved].

(i)     Foreign Net Cash Proceeds.  Notwithstanding any other provisions of this Section 5.2, (i) to the extent that any or all of the Net Cash Proceeds from a Recovery Prepayment Event (a "**Foreign Recovery Event**") of, or any Disposition by, a Restricted Foreign Subsidiary giving rise to an Asset Sale Prepayment Event (a "**Foreign Asset Sale**") are prohibited or delayed by applicable local law from being repatriated to the United States, such portion of the Net Cash Proceeds so affected will not be required to be applied to repay Term Loans or Delayed-Draw Term Loans at the times provided in this Section 5.2 but may be retained by the applicable Restricted Foreign Subsidiary so long, but only so long, as the applicable local law will not permit repatriation to the United States (the Borrower hereby agreeing to cause the applicable Restricted Foreign Subsidiary to promptly take all actions required by the applicable local law to permit such repatriation), and once such repatriation of any of such affected Net Cash Proceeds is permitted under the applicable local law, such repatriation will be immediately effected and such repatriated Net Cash Proceeds will be promptly (and in any event not later than two Business Days after such repatriation) applied (net of additional taxes payable or reserved against as a result thereof) to the repayment of the Term Loans or Delayed-Draw Term Loans as required pursuant to this Section 5.2 and (ii) to the extent that the Borrower has determined in good faith that repatriation of any of or all the Net Cash Proceeds of any Foreign Recovery Event on any Foreign Asset Sale would have a material adverse tax consequence with respect to such Net Cash Proceeds, the Net Cash Proceeds so affected may be retained by the applicable Restricted Foreign Subsidiary; provided that, in the case of this clause (ii), on or before the date on which any Net Cash Proceeds so retained would otherwise have been required to be applied to reinvestments or prepayments pursuant to Section 5.2(a), (x) the Borrower applies an amount equal to such Net Cash Proceeds to such reinvestments or prepayments as if such Net Cash Proceeds had been received by the Borrower rather than such Restricted Foreign Subsidiary, less the amount of additional taxes that would have been payable or reserved against if such Net Cash Proceeds had been repatriated (or, if less, the Net Cash Proceeds that would be calculated if received by such Foreign Subsidiary) or (y) such Net Cash Proceeds are applied to the repayment of Indebtedness of a Restricted Foreign Subsidiary.

5.3.     Method and Place of Payment.

(a)     Except as otherwise specifically provided herein, all payments under this Agreement shall be made by the Borrower without set-off, counterclaim or deduction of any kind, to the Administrative Agent for the ratable account of the Lenders entitled thereto or the Letter of Credit Issuer entitled thereto, as the case may be, not later than 2:00 p.m. (New York City time), in each case, on the date when due and shall be made in immediately available funds at the Administrative Agent's Office or

at such other office as the Administrative Agent shall specify for such purpose by notice to the Borrower, it being understood that written or facsimile notice by the Borrower to the Administrative Agent to make a payment from the funds in the Borrower's account at the Administrative Agent's Office shall constitute the making of such payment to the extent of such funds held in such account. All repayments or prepayments of any Loans (whether of principal, interest or otherwise) hereunder and all other payments under each Credit Document shall be made in Dollars. The Administrative Agent will thereafter cause to be distributed on the same day (if payment was actually received by the Administrative Agent prior to 2:00 p.m. (New York City time) or, otherwise, on the next Business Day) like funds relating to the payment of principal or interest or fees ratably to the Lenders entitled thereto.

(b)    Any payments under this Agreement that are made later than 2:00 p.m. (New York City time) shall be deemed to have been made on the next succeeding Business Day. Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest shall be payable during such extension at the applicable rate in effect immediately prior to such extension.

5.4.    Net Payments.

(a)    Any and all payments made by or on behalf of the Borrower or any Guarantor under this Agreement or any other Credit Document shall be made free and clear of, and without deduction or withholding for or on account of, any Indemnified Taxes; provided that if the Borrower or any Guarantor or the Administrative Agent shall be required by Applicable Law to deduct or withhold any Indemnified Taxes from such payments, then (i) the sum payable by the Borrower or any Guarantor shall be increased as necessary so that after making all required deductions and withholdings (including deductions or withholdings applicable to additional sums payable under this Section 5.4) the Administrative Agent, the Collateral Agent or any Lender (which term shall include each Letter of Credit Issuer for purposes of Section 5.4 and for the purposes of the definition of Excluded Taxes), as the case may be, receives an amount equal to the sum it would have received had no such deductions or withholdings been made, (ii) the Borrower or such Guarantor or the Administrative Agent shall make such deductions or withholdings and (iii) the Borrower or such Guarantor or the Administrative Agent shall timely pay the full amount deducted or withheld to the relevant Governmental Authority within the time allowed and in accordance with Applicable Law. Whenever any Indemnified Taxes are payable by the Borrower or such Guarantor, as promptly as possible thereafter, the Borrower or Guarantor shall send to the Administrative Agent for its own account or for the account of such Lender, as the case may be, a certified copy of an original official receipt (or other evidence acceptable to such Lender, acting reasonably) received by the Borrower or such Guarantor showing payment thereof.

(b)    The Borrower shall timely pay and shall indemnify and hold harmless the Administrative Agent, the Collateral Agent and each Lender with regard to any Other Taxes (whether or not such Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority).

(c)    The Borrower shall indemnify and hold harmless the Administrative Agent, the Collateral Agent and each Lender within fifteen Business Days after written demand therefor, for the full amount of any Indemnified Taxes imposed on the Administrative Agent, the Collateral Agent or such Lender as the case may be, on or with respect to any payment by or on account of any obligation of the Borrower or any Guarantor hereunder or under any other Credit Document (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 5.4) and any reasonable out-of-pocket expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate setting

forth reasonable detail as to the amount of such payment or liability delivered to the Borrower by a Lender, the Administrative Agent or the Collateral Agent (as applicable) on its own behalf or on behalf of a Lender shall be conclusive absent manifest error.

(d)    Any Non-U.S. Lender that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which the Borrower is resident for tax purposes, or under any treaty to which such jurisdiction is a party, with respect to payments hereunder or under any other Credit Document shall, to the extent it is legally able to do so, deliver to the Borrower (with a copy to the Administrative Agent), at the time or times prescribed by Applicable Law or reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by Applicable Law as will permit such payments to be made without withholding or at a reduced rate of withholding.  A Lender's obligation under the prior sentence shall apply only if the Borrower or the Administrative Agent has made a request for such documentation.  In addition, any Lender, if requested by the Borrower or the Administrative Agent shall deliver such other documentation prescribed by Applicable Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

(e)    Each Non-U.S. Lender with respect to any Loan made to the Borrower shall, to the extent it is legally entitled to do so:

(i)    deliver to the Borrower and the Administrative Agent, prior to the date on which the first payment to the Non-U.S. Lender is due hereunder, two copies of (x) in the case of a Non-U.S. Lender claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest", United States Internal Revenue Service Form W-8BEN (together with a certificate substantially in the form of Exhibit L representing that such Non-U.S. Lender is not a bank for purposes of Section 881(c) of the Code, is not a 10-percent shareholder (within the meaning of Section 871(h)(3)(B) of the Code) of the Borrower, any interest payment received by such Non-U.S. Lender under this Agreement or any other Credit Document is not effectively connected with the conduct of a trade or business in the United States and is not a controlled foreign corporation related to the Borrower (within the meaning of Section 864(d)(4) of the Code)), (y) Internal Revenue Service Form W-8BEN or Form W-8ECI, in each case properly completed and duly executed by such Non-U.S. Lender claiming complete exemption from, or reduced rate of, U.S. Federal withholding tax on payments by the Borrower under this Agreement or (z) if a Non-U.S. Lender does not act or ceases to act for its own account with respect to any portion of any sums paid or payable to such Lender under any of the Credit Documents (for example, in the case of a typical participation or where Non-U.S. Lender is a pass through entity) Internal Revenue Service Form W-8IMY and all necessary attachments (including the forms described in clauses (x) and (y) above, as required); and

(ii)    deliver to the Borrower and the Administrative Agent two further copies of any such form or certification (or any applicable successor form) on or before the date that any such form or certification expires or becomes obsolete and after the occurrence of any event requiring a change in the most recent form previously delivered by it to the Borrower.

If in any such case any Change in Law has occurred prior to the date on which any such delivery would otherwise be required that renders any such form inapplicable or would prevent such Non-U.S. Lender from duly completing and delivering any such form with respect to it, such Non-U.S. Lender shall promptly so advise the Borrower and the Administrative Agent.

-88-

(f)    If any Lender, the Administrative Agent or the Collateral Agent, as applicable, determines, in its sole discretion exercised in good faith, that it had received and retained a refund of an Indemnified Tax (including an Other Tax) for which a payment has been made by the Borrower pursuant to this Agreement, which refund in the good faith judgment of such Lender, the Administrative Agent or the Collateral Agent, as the case may be, is attributable to such payment made by the Borrower, then the Lender, the Administrative Agent or the Collateral Agent, as the case may be, shall reimburse the Borrower for such amount (net of all out-of-pocket expenses of such Lender, the Administrative Agent or the Collateral Agent, as the case may be, and without interest other than any interest received thereon from the relevant Governmental Authority with respect to such refund) as the Lender, Administrative Agent or the Collateral Agent, as the case may be, determines in its sole discretion exercised in good faith to be the proportion of the refund as will leave it, after such reimbursement, in no better or worse position (taking into account expenses or any taxes imposed on the refund) than it would have been in if the payment had not been required; provided that the Borrower, upon the request of the Lender, the Administrative Agent or the Collateral Agent, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Lender, the Administrative Agent or the Collateral Agent in the event the Lender, the Administrative Agent or the Collateral Agent is required to repay such refund to such Governmental Authority. A Lender, the Administrative Agent or the Collateral Agent shall claim any refund that it determines is available to it, unless it concludes in its sole discretion that it would be adversely affected by making such a claim. Neither the Lender, the Administrative Agent nor the Collateral Agent shall be obliged to disclose any information regarding its tax affairs or computations to any Credit Party in connection with this clause (f) or any other provision of this Section 5.4.

(g)    If the Borrower determines that a reasonable basis exists for contesting a Tax, each Lender or Agent, as the case may be, shall use reasonable efforts to cooperate with the Borrower as the Borrower may reasonably request in challenging such Tax. Subject to the provisions of Section 2.12, each Lender and Agent agrees to use reasonable efforts to cooperate with the Borrower as the Borrower may reasonably request to minimize any amount payable by the Borrower or any Guarantor pursuant to this Section 5.4. The Borrower shall indemnify and hold each Lender and Agent harmless against any out-of-pocket expenses incurred by such Person in connection with any request made by the Borrower pursuant to this Section 5.4(g). Nothing in this Section 5.4(g) shall obligate any Lender or Agent to take any action that such Person, in its sole judgment, determines may result in a material detriment to such Person.

(h)    Each Lender with respect to any Loan made to the Borrower that is a United States person under Section 7701(a)(30) of the Code and each Agent (each, a "**U.S. Lender**") shall deliver to the Borrower and the Administrative Agent two United States Internal Revenue Service Forms W-9 (or substitute or successor form), properly completed and duly executed, certifying that such Lender or Agent is exempt from United States backup withholding (i) on or prior to the Closing Date (or on or prior to the date it becomes a party to this Agreement), (ii) on or before the date that such form expires or becomes obsolete, (iii) after the occurrence of a change in such Agent's or Lender's circumstances requiring a change in the most recent form previously delivered by it to the Borrower and the Administrative Agent and (iv) from time to time thereafter if reasonably requested by the Borrower or the Administrative Agent.

(i)    If a payment made to any Lender would be subject to U.S. federal withholding Tax imposed under FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Sections 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent, at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Agent, such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the

-89-

Code) and such other documentation reasonably requested by the Administrative Agent and the Borrower as may be necessary for the Administrative Agent and the Borrower to comply with their obligations under FATCA, to determine whether such Lender has or has not complied with such Lender's FATCA obligations and to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this subsection (i), "FATCA" shall include any amendments after the date of this Agreement.

(j)     The agreements in this Section 5.4 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

5.5.    Computations of Interest and Fees.

(a)     Except as provided in the next succeeding sentence, interest on LIBOR Loans, and ABR Loans shall be calculated on the basis of a 360-day year for the actual days elapsed. Interest on ABR Loans in respect of which the rate of interest is calculated on the basis of the Administrative Agent's prime rate and interest on overdue interest shall be calculated on the basis of a 365- (or 366-, as the case may be) day year for the actual days elapsed.

(b)     Fees and the average daily Stated Amount of Letters of Credit shall be calculated on the basis of a 360-day year for the actual days elapsed.

5.6.    Limit on Rate of Interest.

(a)     No Payment Shall Exceed Lawful Rate. Notwithstanding any other term of this Agreement, the Borrower shall not be obligated to pay any interest or other amounts under or in connection with this Agreement or otherwise in respect of the Obligations in excess of the amount or rate permitted under or consistent with any applicable law, rule or regulation.

(b)     Payment at Highest Lawful Rate. If the Borrower is not obliged to make a payment that it would otherwise be required to make, as a result of Section 5.6(a), the Borrower shall make such payment to the maximum extent permitted by or consistent with applicable laws, rules and regulations.

(c)     Adjustment if Any Payment Exceeds Lawful Rate. If any provision of this Agreement or any of the other Credit Documents would obligate the Borrower to make any payment of interest or other amount payable to any Lender in an amount or calculated at a rate that would be prohibited by any Applicable Law, then notwithstanding such provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by Applicable Law, such adjustment to be effected, to the extent necessary, by reducing the amount or rate of interest required to be paid by the Borrower to the affected Lender under Section 2.8.

(d)     Spreading. In determining whether the interest hereunder is in excess of the amount or rate permitted under or consistent with any Applicable Law, the total amount of interest shall be spread throughout the entire term of this Agreement until its payment in full.

(e)     Notwithstanding the foregoing, and after giving effect to all adjustments contemplated thereby, if any Lender shall have received from the Borrower an amount in excess of the maximum permitted by any Applicable Law, then the Borrower shall be entitled, by notice in writing to the Administrative Agent to obtain reimbursement from that Lender in an amount equal to such excess, and pending such reimbursement, such amount shall be deemed to be an amount payable by that Lender to the Borrower.

#4821-7663-6950

SECTION 6.   <u>Conditions Precedent to Initial Borrowing</u>.

The initial Borrowing under this Agreement is subject to the satisfaction of the following conditions precedent, except as otherwise agreed between the Borrower and the Administrative Agent.

6.1.   <u>Credit Documents</u>.  The Administrative Agent shall have received:

(a)    this Agreement, executed and delivered by a duly authorized officer of Parent Guarantor, the Borrower, each Agent, each Lender and each Letter of Credit Issuer;

(b)    the Guarantee, executed and delivered by a duly authorized officer of each Guarantor as of the Closing Date; and

(c)    the Security Agreement, executed and delivered by a duly authorized officer of each party thereto as of the Closing Date.

6.2.   <u>Collateral</u>.

(a)    All outstanding Stock of the Borrower directly owned by Parent Guarantor and all Stock of each Subsidiary of the Borrower directly owned by the Borrower or any Subsidiary Guarantor, in each case, as of the Closing Date, shall have been pledged pursuant to the Interim Order (except that such Credit Parties shall not be required to pledge any Excluded Stock and Stock Equivalents).

(b)    All Indebtedness of the Borrower and each Subsidiary of the Borrower that is owing to the Borrower or a Subsidiary Guarantor (other than indebtedness of a Foreign Subsidiary that is owing to the Borrower or a Subsidiary Guarantor), to the extent exceeding $10,000,000 in aggregate principal amount, shall have been pledged pursuant to the Interim Order.

(c)    All documents and instruments, including Uniform Commercial Code or other applicable personal property and financing statements, reasonably requested by the Collateral Agent to be filed, registered or recorded to create the Liens intended to be created by any Security Document to be executed on the Closing Date and perfect such Liens to the extent required by, and with the priority required by, such Security Document shall have been delivered to the Collateral Agent in proper form for filing, registration or recording and none of the Collateral shall be subject to any other pledges, security interests or mortgages, except for Liens permitted hereunder; <u>provided</u>, <u>however</u>, that notwithstanding anything to the contrary contained in this Agreement or in any other Credit Document, but without limiting the grant of a Lien on and security interest in the Collateral pursuant to the Orders and the Security Documents, the TCEH Debtors will not be obligated to enter into any mortgages (including a Mortgage), authorize any fixture filing, enter into any agreement requiring "control" as defined in Section 9-104, 9-105, 9-106 and 9-107 of the UCC as in effect in any relevant jurisdiction) or to undertake any registration in respect of assets subject to a certificate of title.

(d)    [Reserved].

(e)    The Guarantee shall be in full force and effect.

(f)    [Reserved].

6.3.   <u>Legal Opinions</u>.  The Administrative Agent shall have received the executed legal opinions (which legal opinion will address customary matters for a debtor-in-possession financing) of

(a) Kirkland & Ellis LLP, special New York counsel to Parent Guarantor and the Borrower, and (b) Gibson, Dunn & Crutcher LLP, special Texas counsel to Parent Guarantor and the Borrower, in each case, in form and substance reasonably acceptable to the Administrative Agent. Parent Guarantor, the Borrower, the other Credit Parties and the Administrative Agent hereby instruct such counsel to deliver such legal opinions.

6.4.    Initial Budget. The Borrower shall have delivered the Initial Budget to the Administrative Agent and the Lenders, which shall be in form and substance reasonably satisfactory to the Administrative Agent and the Joint Lead Arrangers, and the Administrative Agent and the Joint Lead Arrangers hereby confirm the receipt of the Initial Budget dated April 24, 2014 in form and substance reasonably satisfactory to the Administrative Agent and the Joint Lead Arrangers prior to the date hereof.

6.5.    [Reserved].

6.6.    Closing Certificates. The Administrative Agent shall have received a certificate of the Credit Parties, dated the Closing Date, substantially in the form of Exhibit H, with appropriate insertions, executed by an Authorized Officer of each Credit Party, and attaching the documents referred to in Section 6.7.

6.7.    Authorization of Proceedings of Each Credit Party. The Administrative Agent shall have received (a) a copy of the resolutions of the board of directors, other managers or general partner of each Credit Party (or a duly authorized committee thereof) authorizing (i) the execution, delivery and performance of the Credit Documents (and any agreements relating thereto) to which it is a party and (ii) in the case of the Borrower, the extensions of credit contemplated hereunder and (b) true and complete copies of the Organizational Documents of each Credit Party as of the Closing Date.

6.8.    Fees. The Agents shall have received the fees in the amounts previously agreed in writing by the Agents to be received on the Closing Date and all expenses (including the reasonable fees, disbursements and other charges of any Advisors) payable by the Credit Parties for which invoices have been presented prior to the Closing Date shall have been paid.

6.9.    Representations and Warranties. On the Closing Date, the representations and warranties made by the Credit Parties in Section 8, shall be true and correct in all material respects (or in all respects for representations and warranties qualified by materiality or Material Adverse Effect).

6.10.    Interim Order. The Interim Order, in form and substance satisfactory to the Left Lead Arrangers, shall have been entered by the Bankruptcy Court in the Cases, upon motion in form and substance satisfactory to the Left Lead Arrangers, by the Bankruptcy Court in the Cases no later than ten (10) Business Days after the date of commencement of the Cases and shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated, in the case of any modification or amendment, in a manner that is adverse to the Lenders, without the consent of the Left Lead Arrangers. The TCEH Debtors shall be in compliance in all material respects with the Interim Order.

6.11.    First Day Orders. The Left Lead Arrangers shall have received evidence of the entry of all First Day Orders, which shall be reasonably satisfactory in form and substance to the Left Lead Arrangers (but in the case of the Interim Cash Collateral Order, the Cash Management Order and the Interim Order, in form and substance satisfactory to the Left Lead Arrangers), and which First Day Orders shall have been received by the Left Lead Arrangers.

#4821-7663-6950

6.12.    _Trustees and Examiners_.  No trustee or examiner with enlarged powers (having powers beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4)) shall have been appointed with respect to the operations or the business of the TCEH Debtors.

6.13.    _Projections_.  The Administrative Agent and the Lenders shall have received a base case model, including a statement of cash sources and uses of all free cash flow of the TCEH Debtors for the tenor of the Credit Facilities, which shall be in form and substance reasonably satisfactory to the Administrative Agent and the Joint Lead Arrangers, and the Administrative Agent and the Joint Lead Arrangers hereby confirm the receipt of a base case model dated April 24, 2014 in form and substance reasonably satisfactory to the Administrative Agent and the Joint Lead Arrangers prior to the date hereof.

6.14.    _Patriot Act_.  The Joint Lead Arrangers shall have received at least 5 days prior to the Closing Date such documentation and information as is reasonably requested in writing at least 10 days prior to the Closing Date by the Administrative Agent about Parent Guarantor, the Borrower and the Subsidiary Guarantors mutually agreed to be required by U.S. regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the Patriot Act.

6.15.    _Petition Date_.  The Petition Date shall have occurred.

6.16.    _Restructuring Support Agreement_.  [The Restructuring Support Agreement shall have been duly executed by the Credit Parties and each other party thereto, all conditions to the effectiveness of the Restructuring Support Agreement shall have been satisfied or waived and the Restructuring Support Agreement shall be in full force and effect, subject to any necessary Bankruptcy Court approvals.]

6.17.    _Restructuring Documents_.  [The Disclosure Statement, Acceptable Reorganization Plan, [the Plan Related Documents (as defined in the Restructuring Support Agreement)] and other material definitive documents with respect to the Cases, in each case, as applicable and in form and [substance reasonably satisfactory to the Administrative Agent (provided, however, that with respect to provisions of the Disclosure Statement or Acceptable Reorganization Plan that relate to the payment of the Credit Facilities, such provisions must be in form and substance satisfactory to the Administrative Agent)] shall have been filed in the Cases and the solicitation for the Acceptable Reorganization Plan shall have been commenced.]

For purposes of determining compliance with the conditions specified in this Section 6 on the Closing Date, each Agent and each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to such Agent or Lender unless the Borrower shall have received notice from such Agent or Lender (or from the Administrative Agent on behalf of such Lender) prior to the proposed Closing Date specifying its objection thereto, but excluding for the avoidance of doubt any subsequent changes or modifications to such documents or matters made after release of such party's signature page.

SECTION 7.    Conditions Precedent to All Credit Events.

(a) The agreement of each Lender to make any Loan requested to be made by it on any date, and the obligation of any Letter of Credit Issuer to issue Letters of Credit on any date, is subject to the satisfaction of the conditions precedent set forth in the following Sections 7.1 and 7.2; (b) the obligation of each Lender to make Loans hereunder and of each Letter of Credit Issuer to issue Letters of Credit hereunder in an aggregate amount in excess of the Interim Availability Amount shall not become

-93-

effective until the date on which each of the conditions in <u>Section 7.3</u> is satisfied; and (c) the obligation of each Lender to make Delayed-Draw Term Loans hereunder and of each RCT Letter of Credit Issuer to issue RCT Letters of Credit hereunder shall not become effective until the date on which each of the conditions in <u>Section 7.4</u> is satisfied.

     7.1.   <u>No Default; Representations and Warranties</u>.  At the time of each Credit Event and also after giving effect thereto (a) no Default or Event of Default shall have occurred and be continuing and (b) all representations and warranties made by any Credit Party contained herein or in the other Credit Documents shall be true and correct in all material respects with the same effect as though such representations and warranties had been made on and as of the date of such Credit Event (except where such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects as of such earlier date).

     7.2.   <u>Notice of Borrowing</u>.

     (a)   Prior to the making of each Term Loan, the Administrative Agent shall have received a Notice of Borrowing (whether in writing or by telephone) meeting the requirements of <u>Section 2.3</u>.

     (b)   Prior to the making of each Delayed-Draw Term Loan, the Administrative Agent shall have received a Notice of Borrowing (whether in writing or by telephone) meeting the requirements of <u>Section 2.3</u>.

     (c)   Prior to the making of each Revolving Credit Loan, the Administrative Agent shall have received a Notice of Borrowing (whether in writing or by telephone) meeting the requirements of <u>Section 2.3</u>.

     (d)   Prior to the issuance of each General Letter of Credit, the Administrative Agent and the General Letter of Credit Issuer shall have received a Letter of Credit Request meeting the requirements of <u>Section 3.2(a)</u>.

     (e)   Prior to the issuance of each RCT Letter of Credit, the Administrative Agent and the RCT Letter of Credit Issuer shall have received a Letter of Credit Request meeting the requirements of <u>Section 3.2(a)</u>.

     (f)   The Interim Order or the Final Order, as the case may be, shall be in full force and effect.

     7.3.   <u>Full Availability</u>.

     (a)   [Reserved].

     (b)   <u>Orders</u>. (i) The Interim Order shall be in full force and effect and shall not have been stayed, reversed, vacated, modified or amended, in the case of any modification or amendment, in a manner adverse to the interests (taken as a whole) of the Lenders without the consent of the Left Lead Arrangers; (ii) the Left Lead Arrangers shall have received a certified copy of the Final Order, in form and substance satisfactory to the Left Lead Arrangers, which, in any event, shall have been entered by the Bankruptcy Court, upon motion in form and substance satisfactory to the Left Lead Arrangers, no later than forty-five (45) days after the Interim Order Entry Date (or such later date agreed to by the Required Lenders in their sole discretion) and at the time of any such extension of credit the Final Order shall be in

full force and effect, and shall not have been stayed, reversed, vacated, modified or amended, in the case of any modification or amendment, in a manner that is adverse to the interests (taken as a whole) of the Lenders without the prior written consent of the Left Lead Arrangers; and (iii) if either the Interim Order or the Final Order is the subject of a pending appeal in any respect, none of the making of such extensions of credit, the grant of Liens and Superpriority Claims as set forth in <u>Section 8.17</u> and the performance by the Borrower or any Guarantor of any of their respective obligations under any of the Credit Documents shall be the subject of a then effective stay. The TCEH Debtors shall be in compliance with the Final Order.

(c)    (i) No Default or Event of Default shall have occurred and be continuing and (ii) all representations and warranties made by any Credit Party contained herein or in the other Credit Documents shall be true and correct in all material respects with the same effect as though such representations and warranties had been made on and as of such date (except where such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects as of such earlier date).

(d)    The Agents shall have received the fees in the amounts previously agreed in writing by the Agents to be received on or prior to such date and all expenses (including the reasonable fees, disbursements and other charges of any Advisors) payable by the Credit Parties for which invoices have been presented prior to such date shall have been paid

(e)    The Administrative Agent shall have received a copy of, or a certificate as to coverage under, the insurance policies required by <u>Section 9.3</u> and the applicable provisions of the Security Documents, each of which shall be endorsed or otherwise amended to name the Collateral Agent, on behalf of the Secured Parties, as "loss payee" and, solely if available from the relevant insurance company in respect of the Collateral perfected pursuant to the Orders, as "mortgagee" under any casualty insurance policies, and the Secured Parties, as "additional insureds", under any liability insurance policies.

7.4.    <u>Availability of Delayed-Draw Term Loans and RCT Letters of Credit</u>. The RCT Carve Out Support Rejection Notice shall have been issued and delivered (a) prior to the Delayed-Draw Termination Date and (b) prior to the making of such Delayed-Draw Term Loans or the issuance of such RCT Letters of Credit.

The acceptance of the benefits of each Credit Event shall constitute a representation and warranty by each Credit Party to each of the Lenders that all the applicable conditions specified in <u>Section 7</u> above have been satisfied or waived as of that time.

SECTION 8.    <u>Representations, Warranties and Agreements</u>.

In order to induce the Lenders and the Letter of Credit Issuers to enter into this Agreement, to make the Loans and issue or participate in Letters of Credit as provided for herein, each of Parent Guarantor and the Borrower makes (on the Closing Date and on each other date as required or otherwise set forth in this Agreement) the following representations and warranties to, and agreements with, the Lenders and the Letter of Credit Issuers, all of which shall survive the execution and delivery of this Agreement, the making of the Loans and the issuance of the Letters of Credit:

8.1.    <u>Corporate Status; Compliance with Laws</u>. Each of Parent Guarantor, the Borrower and each Material Subsidiary of the Borrower that is a Restricted Subsidiary (a) is a duly organized and validly existing corporation or other entity in good standing (as applicable) under the laws of the jurisdiction of its organization and has the corporate or other organizational power and authority to

-95-

own its property and assets and to transact the business in which it is engaged, (b) has duly qualified and is authorized to do business and is in good standing (if applicable) in all jurisdictions where it is required to be so qualified, except where the failure to be so qualified could not reasonably be expected to result in a Material Adverse Effect and (c) is in compliance with all Applicable Laws, except to the extent that the failure to be in compliance could not reasonably be expected to result in a Material Adverse Effect.

8.2.    <u>Corporate Power and Authority</u>.  Subject to the entry of the Orders and the terms thereof, each Credit Party has the corporate or other organizational power and authority to execute, deliver and carry out the terms and provisions of the Credit Documents to which it is a party and has taken all necessary corporate or other organizational action to authorize the execution, delivery and performance of the Credit Documents to which it is a party.  Each Credit Party has duly executed and delivered each Credit Document to which it is a party and, subject to the entry of the Orders and the terms thereof, each such Credit Document constitutes the legal, valid and binding obligation of such Credit Party enforceable in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization and other similar laws relating to or affecting creditors' rights generally and general principles of equity (whether considered in a proceeding in equity or law).

8.3.    <u>No Violation</u>.  Subject to the entry of the Orders and the terms thereof, neither the execution, delivery or performance by any Credit Party of the Credit Documents to which it is a party nor the compliance with the terms and provisions thereof will (a) contravene any applicable provision of any material Applicable Law (including material Environmental Laws), (b) result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien upon any of the property or assets of Parent Guarantor, the Borrower or any Restricted Subsidiary (other than Liens created under the Credit Documents, Permitted Liens or Liens securing any of the Prepetition Debt) pursuant to the terms of any material indenture, loan agreement, lease agreement, mortgage, deed of trust or other material agreement or instrument to which Parent Guarantor, the Borrower or any Restricted Subsidiary is a party or by which it or any of its property or assets is bound, in each case to the extent any such agreement was entered into after the Petition Date (any such term, covenant, condition or provision, a "**Contractual Requirement**") other than any such breach, default or Lien that could not reasonably be expected to result in a Material Adverse Effect, or (c) violate any provision of the Organizational Documents of Parent Guarantor, the Borrower or any Restricted Subsidiary.

8.4.    <u>Litigation</u>.  Other than the Cases, except as set forth on <u>Schedule 8.4</u>, there are no actions, suits or proceedings (including Environmental Claims) pending or, to the knowledge of the Borrower, threatened with respect to Parent Guarantor, the Borrower or any of the Restricted Subsidiaries that could reasonably be expected to result in a Material Adverse Effect.

8.5.    <u>Margin Regulations</u>.  Neither the making of any Loan hereunder nor the use of the proceeds thereof will violate the provisions of Regulation T, U or X of the Board.

8.6.    <u>Governmental Approvals</u>.  Subject to the entry of the Orders and the terms thereof, the execution, delivery and performance of the Credit Documents does not require any consent or approval of, registration or filing with, or other action by, any Governmental Authority, except for (i) such as have been obtained or made and are in full force and effect, (ii) filings and recordings in respect of the Liens created pursuant to the Security Documents and (iii) such consents, approvals, registrations, filings or actions the failure of which to obtain or make could not reasonably be expected to have a Material Adverse Effect.

8.7.    Investment Company Act.  None of the Credit Parties is an "investment company" within the meaning of, and subject to registration under, the Investment Company Act of 1940, as amended.

8.8.    True and Complete Disclosure.  None of the written factual information and written data (taken as a whole) heretofore or contemporaneously furnished by or on behalf of Parent Guarantor, the Borrower, any of the Subsidiaries of the Borrower or any of their respective authorized representatives to the Administrative Agent, any Joint Lead Arranger and/or any Lender on or before the Closing Date (including all such information and data contained in the Credit Documents) for purposes of or in connection with this Agreement or any transaction contemplated herein contained any untrue statement of any material fact or omitted to state any material fact necessary to make such information and data (taken as a whole) not materially misleading at such time in light of the circumstances under which such information or data was furnished, it being understood and agreed that for purposes of this Section 8.8, such factual information and data shall not include projections or estimates (including financial estimates, forecasts and other forward-looking information) and information of a general economic or general industry nature.

8.9.    Financial Condition; Projections; Material Adverse Effect.

(a)    The Borrower has heretofore furnished to the Lenders the consolidated balance sheet and statements of earnings, shareholders' equity and cash flows of the Borrower as of and for the fiscal year ended December 31, 2013, reported on by Deloitte & Touche LLP, an independent registered public accounting firm; provided that if such consolidated balance sheet and statement of earnings, shareholders' equity and cash flows have not been filed with the SEC on or prior to the Closing Date, then the Borrower has heretofore furnished to the Lenders the consolidated balance sheet and statements of earnings, shareholders' equity and cash flows of the Borrower as of and for the fiscal year ended December 31, 2012, reported on by Deloitte & Touche LLP, and the unaudited consolidated balance sheet and statement of earnings, shareholders' equity and cash flows of the Borrower as of and for the fiscal quarters and the portions of the fiscal year ended March 31, 2013, June 30, 2013 and September 30, 2013. Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of the Borrower and its consolidated subsidiaries as of such date and for such period in accordance with GAAP consistently applied (except to the extent provided in the notes thereto).

(b)    The projections, forward-looking statements, estimates and pro forma financial information contained in this Agreement, any other Credit Document or any other document, certificate or statement furnished to any Agent, any Joint Lead Arranger or any Lenders (including, without limitation, each Budget and Annual Operating Forecast) are based upon good faith estimates and assumptions believed by the Borrower to be reasonable at the time made, it being recognized by the Agents, Joint Lead Arrangers and the Lenders that such projections, forward-looking statements, estimates and pro forma financial information are not to be viewed as facts and are subject to material contingencies and assumptions, many of which are beyond the control of the Credit Parties, and that actual results during the period or periods covered by any such projections, forward-looking statements, estimates and pro forma financial information may differ materially from the projected results.

(c)    There has been no Material Adverse Effect since the Petition Date.

8.10.    Tax Matters.  Except where the failure of which could not be reasonably expected to have a Material Adverse Effect, (a) each of Parent Guarantor, the Borrower and each of the Restricted Subsidiaries has filed all federal income Tax returns and all other Tax returns, domestic and foreign, required to be filed by it and has paid all material Taxes payable by it that have become due (whether or not shown on such Tax return), other than those (i) not yet delinquent or (ii) contested in good faith as to

-97-

which adequate reserves have been provided to the extent required by law and in accordance with GAAP, (b) each of Parent Guarantor, the Borrower and each of the Restricted Subsidiaries has provided adequate reserves in accordance with GAAP for the payment of, all federal, state, provincial and foreign Taxes not yet due and payable and (c) each of Parent Guarantor, the Borrower and each of the Restricted Subsidiaries has satisfied all of its Tax withholding obligations.

8.11.    Compliance with ERISA.

(a)    Each Employee Benefit Plan is in compliance with ERISA, the Code and any Applicable Law; no Reportable Event has occurred (or is reasonably likely to occur) with respect to any Plan; no Multiemployer Plan is insolvent or in reorganization (or is reasonably likely to be insolvent or in reorganization), and no written notice of any such insolvency or reorganization has been given to the Borrower or any ERISA Affiliate; no Plan has an accumulated or waived funding deficiency (or is reasonably likely to have such a deficiency); on and after the effectiveness of the Pension Act, each Plan has satisfied the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Plan, and there has been no determination that any such Plan is, or is expected to be, in "at risk" status (within the meaning of Section 4010(d)(2) of ERISA); none of the Borrower or any ERISA Affiliate has incurred (or is reasonably likely to incur) any liability to or on account of a Plan pursuant to Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201 or 4204 of ERISA or Section 4971 or 4975 of the Code; no proceedings have been instituted (or are reasonably likely to be instituted) to terminate or to reorganize any Plan or to appoint a trustee to administer any Plan, and no written notice of any such proceedings has been given to the Borrower or any ERISA Affiliate; and no Lien imposed under the Code or ERISA on the assets of the Borrower or any ERISA Affiliate exists (or is reasonably likely to exist) nor has the Borrower or any ERISA Affiliate been notified in writing that such a Lien will be imposed on the assets of the Ultimate Parent, Parent Guarantor, the Borrower or any ERISA Affiliate on account of any Plan, except to the extent that a breach of any of the representations, warranties or agreements in this Section 8.11(a) would not result, individually or in the aggregate, in an amount of liability that would be reasonably likely to have a Material Adverse Effect. No Plan has an Unfunded Current Liability that would, individually or when taken together with any other liabilities referenced in this Section 8.11(a), be reasonably likely to have a Material Adverse Effect. With respect to Plans that are Multiemployer Plans, the representations and warranties in this Section 8.11(a), other than any made with respect to (i) liability under Section 4201 or 4204 of ERISA or (ii) liability for termination or reorganization of such Multiemployer Plans under ERISA, are made to the best knowledge of the Borrower.

(b)    All Foreign Plans are in compliance with, and have been established, administered and operated in accordance with, the terms of such Foreign Plans and Applicable Law, except for any failure to so comply, establish, administer or operate the Foreign Plans as would not reasonably be expected to have a Material Adverse Effect. All contributions or other payments which are due with respect to each Foreign Plan have been made in full and there are no funding deficiencies thereunder, except to the extent any such events would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

8.12.    Subsidiaries.  Schedule 8.12 lists each Subsidiary of Parent Guarantor (and the direct and indirect ownership interest of Parent Guarantor therein), in each case existing on the Closing Date.  Each Material Subsidiary as of the Closing Date has been so designated on Schedule 8.12.

8.13.    Intellectual Property.  Each of Parent Guarantor, the Borrower and the Restricted Subsidiaries has good and marketable title to, or a valid license or right to use, all patents, trademarks, servicemarks, trade names, copyrights and all applications therefor and licenses thereof, and all other intellectual property rights, free and clear of all Liens (other than Liens permitted by Section 10.2), that

-98-

are necessary for the operation of their respective businesses as currently conducted, except where the failure to have any such title, license or rights could not reasonably be expected to have a Material Adverse Effect.

8.14.   Environmental Laws.  Except as could not reasonably be expected to have a Material Adverse Effect:  (a) Parent Guarantor, the Borrower and the Restricted Subsidiaries and all Real Estate are in compliance with all Environmental Laws; (b) Parent Guarantor, the Borrower and the Restricted Subsidiaries have, and have timely applied for renewal of, all permits under Environmental Law to construct and operate their facilities as currently constructed; (c) except as set forth on Schedule 8.4, neither Parent Guarantor, the Borrower nor any Restricted Subsidiary is subject to any pending or, to the knowledge of the Borrower, threatened Environmental Claim or any other liability under any Environmental Law including any such Environmental Claim or, to the knowledge of the Borrower, any other liability under Environmental Law related to, or resulting from the business or operations of any predecessor in interest of any of them; (d); neither Parent Guarantor, the Borrower nor any Restricted Subsidiary is conducting or financing or is required to conduct or finance, any investigation, removal, remedial or other corrective action pursuant to any Environmental Law at any location; (e) to the knowledge of the Borrower, no Hazardous Materials have been released into the environment at, on or under any Real Estate currently owned or leased by Parent Guarantor, the Borrower or any Restricted Subsidiary and (f) neither Parent Guarantor, the Borrower nor any Restricted Subsidiary has treated, stored, transported, released or disposed or arranged for disposal or transport for disposal of Hazardous Materials at, on, under or from any currently or, to the knowledge of the Borrower, formerly owned or leased Real Estate or facility.

8.15.   Properties.  Except as set forth on Schedule 8.15, Parent Guarantor, the Borrower and the Restricted Subsidiaries have good and indefeasible title to or valid leasehold or easement interests or other license or use rights in all properties that are necessary for the operation of their respective businesses as currently conducted, free and clear of all Liens (other than any Liens permitted by this Agreement) and except where the failure to have such good title, leasehold or easement interests or other license or use rights could not reasonably be expected to have a Material Adverse Effect.

8.16.   Orders.  The Interim Order is (and the Final Order when entered will be) effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid, binding and enforceable perfected security interest in the Collateral and the proceeds and products thereof without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements or documents.

8.17.   Status of Obligations; Perfection and Priority of Security Interests.  The Obligations are, subject to the Carve Out, the RCT Reclamation Support Carve Out and the Orders:

(a)      upon entry of the Interim Order, and pursuant to the Interim Order and the Final Order, allowed administrative expense claims in the Cases, having priority over any and all administrative expense claims, diminution claims, unsecured claims, and all other claims against each of the Borrower, Parent Guarantor and each other Guarantor or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject only to, and effective upon entry of, the Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code or otherwise, as provided under section 364(c)(1) of the Bankruptcy Code;

(b)      after the entry of the Interim Order and pursuant to the Interim Order and the Final Order, as applicable, secured by a valid and perfected Lien with the priority provided in

-99-

Section 14.1(a) on all of the Collateral, subject to the Carve Out and the RCT Reclamation Support Carve Out; and

        (c)    notwithstanding the provisions of section 362 of the Bankruptcy Code and subject to the applicable provisions of the Interim Order or the Final Order, as applicable, upon the Maturity Date (whether by acceleration or otherwise) of any of the Obligations, the Administrative Agent and Lenders shall be entitled to immediate payment of such Obligations in cash and to enforce the remedies provided for hereunder or under applicable law, without further application to or order by the Bankruptcy Court, subject to the terms of the Credit Documents and the Interim Order and the Final Order.

        8.18.   Insurance. The properties of Parent Guarantor, the Borrower and the Restricted Subsidiaries are insured pursuant to self-insurance arrangements or with insurance companies that the Borrower believes (in the good faith judgment of the management of the Borrower, as applicable) are financially sound and responsible, in at least such amounts (after giving effect to any self-insurance which the Borrower believes (in the good faith judgment of management of the Borrower, as applicable) is reasonable and prudent in light of the size and nature of its business) and against at least such risks (and with such risk retentions) as the Borrower believes (in the good faith judgment of management of the Borrower, as applicable) is reasonable and prudent in light of the size and nature of its business.

        8.19.   Labor Matters. Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect: (a) there are no strikes or other labor disputes against any Parent Guarantor, the Borrower or any Restricted Subsidiary pending or, to the knowledge of the Borrower, threatened in writing; and (b) hours worked by and payment made to employees of Parent Guarantor, the Borrower and each Restricted Subsidiary have not been in violation of the Fair Labor Standards Act or any other applicable Requirement of Law dealing with such matters.

        8.20.   Sanctioned Persons; Anti-Corruption Laws; Patriot Act. None of Parent Guarantor, the Borrower or any of its Subsidiaries or any of their respective directors or officers is subject to any economic embargoes or similar sanctions administered or enforced by the U.S. Department of State or the U.S. Department of Treasury (including the Office of Foreign Assets Control) or any other applicable sanctions authority (collectively, "**Sanctions**", and the associated laws, rules, regulations and orders, collectively, "**Sanctions Laws**"). Each of Parent Guarantor, the Borrower and its Subsidiaries and their respective directors and officers is in compliance, in all material respects, with (i) all Sanctions Laws, (ii) the United States Foreign Corrupt Practices Act of 1977, as amended, and any other applicable anti-bribery or anti-corruption laws, rules, regulations and orders (collectively, "**Anti-Corruption Laws**") and (iii) the Patriot Act and any other applicable terrorism and money laundering laws, rules, regulations and orders. No part of the proceeds of the Loans or Letters of Credit will be used, directly or indirectly, (A) for the purpose of financing any activities or business of or with any Person or in any country or territory that at such time is the subject of any Sanctions or (B) for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of any Anti-Corruption Law.

SECTION 9.   Affirmative Covenants.

        The Borrower hereby covenants and agrees that on the Closing Date and thereafter, until all Commitments and all Letters of Credit have terminated (unless such Letters of Credit have been collateralized on terms and conditions reasonably satisfactory to the applicable Letter of Credit Issuer following the termination of the Revolving Credit Commitments) and the Loans and Unpaid Drawings, together with interest, fees and all other Obligations (other than Hedging Obligations under Secured

-100-

Hedging Agreements and/or Secured Commodity Hedging Agreements, Cash Management Obligations under Secured Cash Management Agreements or Contingent Obligations), are paid in full:

9.1.    Information Covenants. The Borrower will furnish to the Administrative Agent (which shall promptly make such information available to the Lenders in accordance with its customary practice):

(a)    Annual Financial Statements. As soon as available and in any event on or before the date on which such financial statements are required to be filed with the SEC (after giving effect to any permitted extensions) (or, if such financial statements are not required to be filed with the SEC, on or before the date that is 90 days after the end of each such fiscal year), the consolidated balance sheet of (x) the Borrower and its consolidated Subsidiaries and (y) if different, the Borrower and the Restricted Subsidiaries (provided, however, that the Borrower shall be under no obligation to deliver the consolidated financial statements described in sub-clause (y) if the Consolidated Total Assets and the Consolidated EBITDA of the Borrower and its consolidated Subsidiaries (which Consolidated Total Assets and Consolidated EBITDA shall be calculated in accordance with the definitions of such terms, but determined based on the financial information of the Borrower and its consolidated Subsidiaries, and not the financial information of the Borrower and its Restricted Subsidiaries) do not differ from the Consolidated Total Assets and the Consolidated EBITDA, respectively, of the Borrower and its Restricted Subsidiaries by more than 2.5%), in each case as at the end of such fiscal year, and the related consolidated statements of operations and cash flows for such fiscal year, setting forth comparative consolidated figures for the preceding fiscal years (or, unless the consolidated financial statements described in sub-clause (y) are not required to be delivered pursuant to the immediately preceding proviso, in lieu of such audited financial statements of the Borrower and the Restricted Subsidiaries, a detailed reconciliation, reflecting such financial information for the Borrower and the Restricted Subsidiaries, on the one hand, and the Borrower and its consolidated Subsidiaries, on the other hand), all in reasonable detail and prepared in accordance with GAAP, and, in each case, (i) except with respect to any such reconciliation, certified by independent certified public accountants of recognized national standing whose opinion shall not be qualified as to the scope of audit, (ii) certified by an Authorized Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations, stockholders' equity and cash flows of the Borrower and its consolidated Subsidiaries (or the Borrower and the Restricted Subsidiaries, as the case may be) in accordance with GAAP and (iii) accompanied by a Narrative Report with regard thereto.

(b)    Quarterly Financial Statements. As soon as available and in any event on or before the date on which such financial statements are required to be filed with the SEC (after giving effect to any permitted extensions) with respect to each of the first three quarterly accounting periods in each fiscal year of the Borrower (or, if such financial statements are not required to be filed with the SEC, on or before the date that is 45 days after the end of each such quarterly accounting period), the consolidated balance sheets of (x) the Borrower and its consolidated Subsidiaries and (y) if different, the Borrower and the Restricted Subsidiaries (provided, however, that the Borrower shall be under no obligation to deliver the consolidated financial statements described in sub-clause (y) if the Consolidated Total Assets and the Consolidated EBITDA of the Borrower and its consolidated Subsidiaries (which Consolidated Total Assets and Consolidated EBITDA shall be calculated in accordance with the definitions of such terms, but determined based on the financial information of the Borrower and its consolidated Subsidiaries, and not the financial information of the Borrower and its Restricted Subsidiaries) do not differ from the Consolidated Total Assets and the Consolidated EBITDA, respectively, of the Borrower and its Restricted Subsidiaries by more than 2.5%), in each case as at the end of such quarterly period and the related consolidated statements of operations for such quarterly accounting period and for the elapsed portion of the fiscal year ended with the last day of such quarterly period, and the related consolidated statement of cash flows for such quarterly accounting period and for

the elapsed portion of the fiscal year ended with the last day of such quarterly period, and setting forth comparative consolidated figures for the related periods in the prior fiscal year or, in the case of such consolidated balance sheet, for the last day of the prior fiscal year (or, unless the consolidated financial statements described in sub-clause (y) are not required to be delivered pursuant to the immediately preceding proviso, in lieu of such unaudited financial statements of the Borrower and the Restricted Subsidiaries, a detailed reconciliation reflecting such financial information for the Borrower and the Restricted Subsidiaries, on the one hand, and the Borrower and its consolidated Subsidiaries, on the other hand), all of which shall be (i) certified by an Authorized Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations, stockholders' equity and cash flows of the Borrower and its consolidated Subsidiaries (or the Borrower and the Restricted Subsidiaries, as the case may be) in accordance with GAAP, subject to changes resulting from audit, normal year-end audit adjustments and absence of footnotes and (ii) accompanied by a Narrative Report with respect thereto.

(c)    <u>Officer's Certificate</u>. At the time of the delivery of the financial statements provided for in <u>Section 9.1(a)</u> and <u>(b)</u>, a certificate of an Authorized Officer of the Borrower to the effect that no Default or Event of Default exists or, if any Default or Event of Default does exist, specifying the nature and extent thereof, which certificate shall set forth (i) the calculations required to establish whether the Borrower and its Restricted Subsidiaries were in compliance with the provisions of <u>Section 10.9</u> as at the end of such fiscal year or period, as the case may be (including calculations in reasonable detail of any amount added back to Consolidated EBITDA pursuant to clause (a)(xii), clause (a)(xiii) and any amount excluded from Consolidated Net Income pursuant to clause k of the definition thereof), (ii) a specification of any change in the identity of the Restricted Subsidiaries and Unrestricted Subsidiaries as at the end of such fiscal year or period, as the case may be, from the Restricted Subsidiaries and Unrestricted Subsidiaries, respectively, provided to the Lenders on the Closing Date of the most recent fiscal year or period, as the case may be and (iii) the amount of any Pro Forma Adjustment not previously set forth in a Pro Forma Adjustment Certificate or any change in the amount of a Pro Forma Adjustment set forth in any Pro Forma Adjustment Certificate previously provided and, in either case, in reasonable detail, the calculations and basis therefor. At the time of the delivery of the financial statements provided for in <u>Section 9.1(a)</u>, a certificate of an Authorized Officer of the Borrower setting forth (A) in reasonable detail the Applicable Amount and the Applicable Equity Amount as at the end of the fiscal year to which such financial statements relate and (B) the information required pursuant to Section 1 of the Perfection Certificate or confirming that there has been no change in such information since the Closing Date or the date of the most recent certificate delivered pursuant to this clause (c)(B), as the case may be.

(d)    <u>Annual Operating Forecast</u>. Beginning on the date 60 days after the Interim Order Entry Date (and again no later than December 1, 2014 for the business plan and operating budget covering 2015, and no later than December 1, 2015 for the business plan and operating budget covering 2016), the approved annual business plan and projected operating budget (the "**Annual Operating Forecast**"), on an annual basis, through the Maturity Date (as set forth in clause (a) of the definition thereof), broken down by month, including, without limitation, income statements, balance sheets, cash flow statements, projected capital expenditures, asset sales, a line item for total available liquidity for the period of such Annual Operating Forecast, and which shall set forth the anticipated uses of the Credit Facilities for such period, certified as to its reasonableness when made by an Authorized Officer of the Borrower in the form of <u>Exhibit C</u>.

(e)    <u>Notice of Default; Litigation</u>. Promptly after an Authorized Officer of the Borrower or any Restricted Subsidiary obtains knowledge thereof, notice of (i) the occurrence of any event that constitutes a Default or Event of Default, which notice shall specify the nature thereof, the period of existence thereof and what action the Borrower proposes to take with respect thereto and (ii) any litigation, regulatory or governmental proceeding pending against the Borrower or any Restricted

Subsidiary that could reasonably be expected to be determined adversely and, if so determined, to result in a Material Adverse Effect.

(f)    Environmental Matters.  Promptly after obtaining knowledge of any one or more of the following environmental matters, unless such environmental matters known to the Borrower and the Restricted Subsidiaries would not, individually, or when aggregated with all other such matters, be reasonably expected to result in a Material Adverse Effect, notice of:

(i)    any pending or threatened Environmental Claim against any Credit Party or any Real Estate or any Credit Party or any predecessor in interest of the Borrower or any Restricted Subsidiary or any other Person for which any Credit Party is alleged to be liable by contract or operation of law;

(ii)    any condition or occurrence on any Real Estate that (x) could reasonably be expected to result in noncompliance by any Credit Party with any applicable Environmental Law or (y) could reasonably be anticipated to form the basis of any Environmental Claim against any Credit Party or any Real Estate;

(iii)    any condition or occurrence on any Real Estate or any circumstance that could reasonably be anticipated to cause such Real Estate to be subject to any restrictions on the ownership, occupancy, use or transferability of such Real Estate under any Environmental Law that would be inconsistent with the present use or operation of such Real Estate; and

(iv)    the conduct of any investigation, or any removal, remedial or other corrective action in response to the actual or alleged presence, release or threatened release into the environment of any Hazardous Material on, at, under or from any Real Estate.

All such notices shall describe in reasonable detail the nature of the claim, investigation, condition, occurrence, removal or remedial or other corrective action and the response thereto.  The term "**Real Estate**" shall mean any interest in land, buildings and improvements owned, leased or otherwise held by any Credit Party, but excluding all operating fixtures and equipment.

(g)    Other Information.  Promptly upon filing thereof, copies of any filings (including on Form 10-K, 10-Q or 8-K) or registration statements with, and reports to, the SEC or any analogous Governmental Authority in any relevant jurisdiction by Parent Guarantor, the Borrower or any Restricted Subsidiary (other than amendments to any registration statement (to the extent such registration statement, in the form it becomes effective, is delivered to the Administrative Agent), exhibits to any registration statement and, if applicable, any registration statements on Form S-8) and copies of all financial statements, proxy statements, notices and reports that Parent Guarantor, the Borrower or any Restricted Subsidiary shall send to the holders of any publicly issued debt of Parent Guarantor, the Borrower and/or any Restricted Subsidiary in their capacity as such holders (in each case to the extent not theretofore delivered to the Administrative Agent pursuant to this Agreement) and, with reasonable promptness, such other information (financial or otherwise) as the Administrative Agent on its own behalf or on behalf of any Lender (acting through the Administrative Agent) may reasonably request in writing from time to time.

(h)    Pro Forma Adjustment Certificate.  Not later than any date on which financial statements are delivered with respect to any Test Period in which a Pro Forma Adjustment is made, a certificate of an Authorized Officer of the Borrower setting forth the amount of such Pro Forma Adjustment and, in reasonable detail, the calculations and basis therefor.

-103-

(i)     Budget and Variance Report. (i) Commencing with the end of the first full fiscal quarter ended after the entry of the Interim Order (or, at the election of the Borrower, at the end of each calendar month or such earlier period as may be agreed), the Borrower shall promptly provide an updated Budget for the subsequent 3-month period to the Administrative Agent.

(ii)     With respect to each calendar month, no later than the end of the subsequent calendar month in each case with respect to Parent Guarantor and its Restricted Subsidiaries, a variance report showing a statement of actual cash sources and uses of all free cash flow for the immediately such preceding calendar month, noting therein all material variances from values set forth for such historical periods in the most recently delivered Budget, including narrative explanations as to any material variances and certified as to its reasonableness when made by an Authorized Officer of the Borrower.

(j)     Monthly Reporting. As soon as available, but in any event not later than twenty five days after the end of each calendar month, a report detailing (i) any material Dispositions consummated by any Credit Party (or the entry into any binding contracts for a material Disposition by any Credit Party), (ii) material developments in connection with any cost savings programs by any Credit Party and (iii) such other matters as the Administrative Agent may reasonably request; provided that, notwithstanding anything to the contrary in this clause (iii) (but without limitation of any other requirement set forth in this Section 9.1), none of the Parent Guarantor, the Borrower or any of its Restricted Subsidiaries will be required under this clause (iii) to provide any information to the extent that the provision thereof would violate any attorney-client privilege (as reasonably determined by counsel to the Credit Parties), law, rule or regulation, or any contractual obligation of confidentiality binding on the Credit Parties or their respective affiliates (provided that (x) the Administrative Agent shall be notified if any such information is being withheld and (y) the Credit Parties shall use commercially reasonable efforts to obtain a consent to disclosure to the Administrative Agent of any such information being withheld as a result of any contractual obligation of confidentiality (other than, for purposes of this clause (y), any such information being withheld as a result of attorney-client privilege).

Notwithstanding the foregoing, the obligations in clauses (f), (h) and (i) of this Section 9.1 may be satisfied with respect to financial information of the Borrower and the Restricted Subsidiaries by furnishing (A) the applicable financial statements of Parent Guarantor, the Ultimate Parent or any direct or indirect parent of the Ultimate Parent or (B) the Borrower's (or Parent Guarantor's, the Ultimate Parent's or any direct or indirect parent thereof), as applicable, Form 10-K or 10-Q, as applicable, filed with the SEC; provided that, with respect to each of subclauses (A) and (B) of this paragraph, to the extent such information relates to Parent Guarantor, the Ultimate Parent or a parent of the Ultimate Parent, such information is accompanied by consolidating or other information that explains in reasonable detail the differences between the information relating to Parent Guarantor, the Ultimate Parent or such parent, on the one hand, and the information relating to the Borrower and the Restricted Subsidiaries on a standalone basis, on the other hand.

9.2.     Books, Records and Inspections. The Borrower will, and will cause each Restricted Subsidiary to, permit officers and designated representatives of the Administrative Agent (including Financial Advisor) or the Required Lenders (as accompanied by the Administrative Agent) to visit and inspect any of the properties or assets of the Borrower or such Restricted Subsidiary in whomsoever's possession to the extent that it is within such party's control to permit such inspection (and shall use commercially reasonable efforts to cause such inspection to be permitted to the extent that it is not within such party's control to permit such inspection), and to examine the books and records of the Borrower and any such Restricted Subsidiary and discuss the affairs, finances and accounts (including, without limitation, strategic planning, cash and liquidity management and operational and restructuring activities) of the Borrower and of any such Restricted Subsidiary with, and be advised as to the same by,

-104-

its and their officers and independent accountants, all at such reasonable times and intervals and to such reasonable extent as the Administrative Agent or Required Lenders may desire (and subject, in the case of any such meetings or advice from such independent accountants, to such accountants' customary policies and procedures); provided that, excluding any such visits and inspections during the continuation of an Event of Default (a) only the Administrative Agent, whether on its own or in conjunction with the Required Lenders, may exercise rights of the Administrative Agent and the Lenders under this Section 9.2, (b) the Administrative Agent shall not exercise such rights more than two times in any calendar year and (c) only one such visit shall be at the Borrower's expense; provided further that when an Event of Default exists, the Administrative Agent (or any of its representatives or independent contractors) or any representative of any Lender may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice. The Administrative Agent and the Required Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants. Notwithstanding anything to the contrary in this Section 9.2, neither the Borrower nor any Restricted Subsidiary will be required under this Section 9.2 to disclose or permit the inspection or discussion of any document, information or other matter to the extent that such action would violate any attorney-client privilege (as reasonably determined by counsel to the Credit Parties), law, rule or regulation, or any contractual obligation of confidentiality binding on the Credit Parties or their respective affiliates (provided that (x) the Administrative Agent shall be notified if any such information is being withheld and (y) the Credit Parties shall use commercially reasonable efforts to obtain a consent to such disclosure or action being withheld as a result of any contractual obligation of confidentiality (other than, for purposes of this clause (y), any such information being withheld as a result of attorney-client privilege).

      9.3.    Maintenance of Insurance. The Borrower will, and will cause each Material Subsidiary that is a Restricted Subsidiary to, at all times maintain in full force and effect, pursuant to self-insurance arrangements or with insurance companies that the Borrower believes (in the good faith judgment of the management of the Borrower, as applicable) are financially sound and responsible at the time the relevant coverage is placed or renewed, insurance in at least such amounts (after giving effect to any self-insurance which the Borrower believes (in the good faith judgment of management of the Borrower, as applicable) is reasonable and prudent in light of the size and nature of its business) and against at least such risks (and with such risk retentions) as the Borrower believes (in the good faith judgment of management of the Borrower, as applicable) is reasonable and prudent in light of the size and nature of its business; and will furnish to the Administrative Agent, upon written reasonable request from the Administrative Agent, information presented in reasonable detail as to the insurance so carried. With respect to each Mortgaged Property, obtain flood insurance in such total amount as the Administrative Agent may from time to time require, if at any time the area in which any improvements located on any Mortgaged Property is designated a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), and otherwise comply with the National Flood Insurance Program as set forth in the Flood Disaster Protection Act of 1973, as amended from time to time.

      9.4.    Payment of Taxes. The Borrower will pay and discharge, and will cause each of the Restricted Subsidiaries to pay and discharge, all Taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits, or upon any properties belonging to it, prior to the date on which penalties attach thereto, and all lawful claims in respect of any Taxes imposed, assessed or levied that, if unpaid, could reasonably be expected to become a material Lien upon any properties of the Borrower or any Restricted Subsidiary of the Borrower; provided that neither the Borrower nor any such Restricted Subsidiary shall be required to pay any such tax, assessment, charge, levy or claim that is being contested in good faith and by proper proceedings if it has maintained adequate reserves (in the good faith judgment of management of the Borrower) with respect thereto in accordance with GAAP or the failure to pay could not reasonably be expected to result in a Material Adverse Effect.

-105-

9.5.    Consolidated Corporate Franchises.  The Borrower will do, and will cause each Material Subsidiary that is a Restricted Subsidiary to do, or cause to be done, all things necessary to preserve and keep in full force and effect its existence, corporate rights and authority, except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect; provided, however, that the Borrower and the Restricted Subsidiaries may consummate any transaction permitted under Section 10.3, 10.4 or 10.5.

9.6.    Compliance with Statutes, Regulations, Etc.  The Borrower will, and will cause each Restricted Subsidiary to, comply with all Applicable Laws applicable to it or its property, including all governmental approvals or authorizations required to conduct its business, and to maintain all such governmental approvals or authorizations in full force and effect, in each case except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

9.7.    ERISA.

(a)    Promptly after the Borrower or any ERISA Affiliate knows or has reason to know of the occurrence of any of the following events that, individually or in the aggregate (including in the aggregate such events previously disclosed or exempt from disclosure hereunder, to the extent the liability therefor remains outstanding), would be reasonably likely to have a Material Adverse Effect, the Borrower will deliver to the Administrative Agent a certificate of an Authorized Officer or any other senior officer of the Borrower setting forth details as to such occurrence and the action, if any, that the Borrower or such ERISA Affiliate is required or proposes to take, together with any notices (required, proposed or otherwise) given to or filed with or by the Borrower, such ERISA Affiliate, the PBGC, a Plan participant (other than notices relating to an individual participant's benefits) or the Plan administrator with respect thereto:  that a Reportable Event has occurred; that an accumulated funding deficiency has been incurred or an application is to be made to the Secretary of the Treasury for a waiver or modification of the minimum funding standard (including any required installment payments) or an extension of any amortization period under Section 412 of the Code with respect to a Plan; that a Plan having an Unfunded Current Liability has been or is to be terminated, reorganized, partitioned or declared insolvent under Title IV of ERISA (including the giving of written notice thereof); that a Plan has an Unfunded Current Liability that has or will result in a lien under ERISA or the Code; that proceedings will be or have been instituted to terminate a Plan having an Unfunded Current Liability (including the giving of written notice thereof); that a proceeding has been instituted against the Borrower or an ERISA Affiliate pursuant to Section 515 of ERISA to collect a delinquent contribution to a Plan; that the PBGC has notified the Borrower or any ERISA Affiliate of its intention to appoint a trustee to administer any Plan; that the Borrower or any ERISA Affiliate has failed to make a required installment or other payment pursuant to Section 412 of the Code with respect to a Plan; or that the Borrower or any ERISA Affiliate has incurred or will incur (or has been notified in writing that it will incur) any liability (including any contingent or secondary liability) to or on account of a Plan pursuant to Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201 or 4204 of ERISA or Section 4971 or 4975 of the Code.

(b)    Promptly following any request therefor, on and after the effectiveness of the Pension Act, the Borrower will deliver to the Administrative Agent copies of (i) any documents described in Section 101(k) of ERISA that the Borrower and any of the Restricted Subsidiaries or any ERISA Affiliate may request with respect to any Multiemployer Plan and (ii) any notices described in Section 101(l) of ERISA that the Borrower and any of the Restricted Subsidiaries or any ERISA Affiliate may request with respect to any Multiemployer Plan; provided that if the Borrower, any of such Restricted Subsidiaries or any ERISA Affiliate has not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plan, the Borrower, the applicable Restricted Subsidiary(ies) or the ERISA Affiliate(s) shall promptly make a request for such documents or notices from such

administrator or sponsor and shall provide copies of such documents and notices promptly after receipt thereof.

(c)    Upon the reasonable request of the Administrative Agent, the Borrower shall deliver to the Administrative Agent copies of:  (i) each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) filed by the Borrower or any ERISA Affiliate with the Internal Revenue Service with respect to each Plan, (ii) the most recent actuarial valuation report for each Plan, (iii) all notices received by the Borrower or any ERISA Affiliate from a Multiemployer Plan sponsor or any governmental agency and (iv) such other documents or governmental reports or filings relating to any Employee Benefit Plan as the Administrative Agent shall reasonably request.

9.8.    Maintenance of Properties.  The Borrower will, and will cause the Restricted Subsidiaries to, keep and maintain all property material to the conduct of its business in good working order and condition (ordinary wear and tear excepted), except to the extent that the failure to do so could reasonably be expected to have a Material Adverse Effect.

9.9.    Transactions with Affiliates.  The Borrower will conduct, and cause the Restricted Subsidiaries to conduct, all transactions with any of its Affiliates (other than transactions between or among the Borrower and the Restricted Subsidiaries and, between or among the Borrower, the Restricted Subsidiaries and to the extent by the ordinary course or consistent with past practice the Ultimate Parent and any of its other Subsidiaries, including the Oncor Subsidiaries) on terms that are, taken as a whole, substantially as favorable to the Borrower or such Restricted Subsidiary as it would obtain in a comparable arm's-length transaction with a Person that is not an Affiliate; provided that, subject to the Cash Management Order, the Tax Order, the Wages Order and any other orders of the Bankruptcy Court, the foregoing restrictions shall not apply to:

(a)    [reserved],

(b)    transactions permitted by Sections 10.5(c) (other than clause (iii) thereof), (k), (l), (m), (p), (z), and (bb) and Section 10.6,

(c)    the Transactions and the payment of the Transaction Expenses,

(d)    the issuance of Stock or Stock Equivalents of the Borrower (or any direct or indirect parent thereof) to the management of the Borrower (or any direct or indirect parent thereof) or any Subsidiary of the Borrower in connection with the Transactions or pursuant to arrangements described in clause (f) of this Section 9.9,

(e)    loans, advances and other transactions between or among the Borrower, any Subsidiary of the Borrower or any joint venture (regardless of the form of legal entity) in which the Borrower or any Subsidiary of the Borrower has invested (and which Subsidiary or joint venture would not be an Affiliate of the Borrower but for the Borrower's or such Subsidiary's Subsidiary ownership of Stock or Stock Equivalents in such joint venture or Subsidiary) to the extent permitted under Section 10,

(f)    payments, advances or loans (or cancellation of loans), employment and severance arrangements and health and benefit plans or agreements between the Ultimate Parent, Parent Guarantor, the Borrower and the other Subsidiaries of the Ultimate Parent and their respective officers, employees or consultants (including management and employee benefit plans or agreements, stock option plans and other compensatory arrangements) in the ordinary course of business,

-107-

(g)    payments by the Borrower (and any direct or indirect parent thereof), and the Subsidiaries of the Ultimate Parent pursuant to the Tax Sharing Agreements among the Borrower (and any such parent) and the Subsidiaries of the Borrower to the extent attributable to the ownership or operation of the Borrower and the Subsidiaries of the Ultimate Parent,

(h)    the payment of customary fees and reasonable out of pocket costs to, and indemnities provided on behalf of, directors, managers, consultants, officers and employees of the Borrower (or, to the extent attributable to the ownership of the Borrower by such parent, any direct or indirect parent thereof) and the Subsidiaries of the Borrower in the ordinary course of business,

(i)    the payment of indemnities and reasonable out-of-pocket expenses incurred by the Sponsors and their Affiliates in connection with services provided to the Borrower (or any direct or indirect parent thereof), or any of the Subsidiaries of the Borrower,

(j)    the issuance of Stock or Stock Equivalents (other than Disqualified Stock) of the Borrower (or any direct or indirect parent thereof) to Ultimate Parent, any Permitted Holder or to any director, officer, employee or consultant,

(k)    sales of Receivables Facility Assets in connection with any Permitted Receivables Financing,

(l)    the performance of any and all obligations (including payment obligations) pursuant to the Shared Services Agreement and other ordinary course transactions under the intercompany cash management systems with Specified Affiliates and subleases of property from any Specified Affiliate to the Borrower or any of the Restricted Subsidiaries, or as disclosed in any Budget approved by the Administrative Agent and the Joint Lead Arrangers, and

(m)    transactions pursuant to permitted agreements in existence on the Closing Date and set forth on Schedule 9.9 or any amendment thereto to the extent such an amendment (together with any other amendment or supplemental agreements) is not adverse, taken as a whole, to the Lenders in any material respect.

9.10.    End of Fiscal Years; Fiscal Quarters.  The Borrower will, for financial reporting purposes, cause (a) each of its, and the Restricted Subsidiaries' fiscal years to end on December 31 of each year (each a "**Fiscal Year**") and (b) each of its, and the Restricted Subsidiaries', fiscal quarters to end on dates consistent with such fiscal year-end; provided, however, that the Borrower may, upon written notice to the Administrative Agent change the financial reporting convention specified above to any other financial reporting convention reasonably acceptable to the Administrative Agent, in which case the Borrower and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary in order to reflect such change in financial reporting.

9.11.    Additional Guarantors and Grantors.  Subject to any applicable limitations set forth in the Guarantee and the Security Documents, the Borrower will cause each direct or indirect Domestic Subsidiary of the Borrower (excluding any Excluded Subsidiary) formed or otherwise purchased or acquired after the Closing Date and each other Domestic Subsidiary of the Borrower that ceases to constitute an Excluded Subsidiary to, within 30 days from the date of such formation, acquisition or cessation, as applicable (or such longer period as the Administrative Agent may agree in its reasonable discretion), (i) become a Guarantor under the Guarantee and a grantor under the Security Agreement pursuant to (A) the Interim Order or (when applicable) the Final Order or (B) if reasonably requested by the Administrative Agent, a supplement to each of the Guarantee and the Security

#4821-7663-6950

Agreement and (ii) if reasonably requested by the Administrative Agent, execute a joinder to the Intercompany Subordinated Note.

9.12.   Pledge of Additional Stock and Evidence of Indebtedness.

(a)      Subject to any applicable limitations set forth in the Security Documents, the Borrower will promptly notify the Administrative Agent in writing of any Stock or Stock Equivalents issued or otherwise purchased or acquired after the Closing Date and of any Indebtedness in excess of $10,000,000 that is owing to the Borrower or any Subsidiary Guarantor (or Person required to become a Subsidiary Guarantor pursuant to Section 9.11) incurred (individually or in a series of related transactions) after the Closing Date and, in each case, if reasonably requested by the Administrative Agent, will pledge, and, if applicable, will cause each other Subsidiary Guarantor (or Person required to become a Subsidiary Guarantor pursuant to Section 9.11), to pledge to the Collateral Agent for the benefit of the Secured Parties, (i) all such Stock and Stock Equivalents (other than any Excluded Stock and Stock Equivalents), pursuant to a Pledge Agreement or supplement thereto, and (ii) all evidences of such Indebtedness, pursuant to a Pledge Agreement or supplement thereto.

(a)      The Borrower agrees that, at the reasonable request of the Administrative Agent, all Indebtedness of the Borrower and the Restricted Subsidiaries of the Borrower and that is owing to the Borrower or to any Subsidiary Guarantor (or Person required to become a Subsidiary Guarantor pursuant to Section 9.11) shall be evidenced by the Intercompany Subordinated Note.

9.13.   [Reserved].

9.14.   Further Assurances.

(a)      Subject to the applicable limitations set forth in this Agreement and in the Security Documents, the Borrower will, and will cause each other Credit Party to, execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, and other documents) that may be required under any Applicable Law, or that the Collateral Agent or the Required Lenders may reasonably request, in order to grant, preserve, protect and perfect the validity and priority of the security interests created or intended to be created by the applicable Security Documents, all at the expense of Parent Guarantor, the Borrower and the other Guarantors; provided, however, that notwithstanding anything to the contrary contained in this Agreement or in any other Credit Document, but without limiting the grant of a Lien on and security interest in the Collateral pursuant to the Orders and the Security Documents, the TCEH Debtors will not be obligated to enter into any Mortgage, authorize any fixture filing, enter into any agreement providing "control" as defined in Section 9-104, 9-105, 9-106 and 9-107 of the UCC as in effect in any relevant jurisdiction) or to undertake any registration in respect of assets subject to a certificate of title.

(b)      [Reserved].

(c)      [Reserved].

(d)      [Reserved].

(e)      Notwithstanding anything herein to the contrary, if the Collateral Agent determines (taking into account the existence and effect of the Orders) in its reasonable judgment (confirmed in writing to the Borrower and the Administrative Agent) that the cost or other consequences (including adverse tax and accounting consequences) of creating or perfecting any Lien on any property is

-109-

excessive in relation to the benefits afforded to the Secured Party thereby, then such property may be excluded from the Collateral for all purposes of the Credit Documents.

9.15.    Bankruptcy Matters.

(a)    The Borrower will deliver to the Administrative Agent and its legal counsel, at least two Business Days in advance of filing with the Bankruptcy Court, copies of all proposed First Day Orders and motions seeking approval of the First Day Orders, which shall be in form and substance reasonably satisfactory to the Administrative Agent (but in the case of the Cash Management Order, the Interim Cash Collateral Order, and the Interim Order, shall be satisfactory in form and substance to the Administrative Agent).

(b)    The Borrower will deliver to the Administrative Agent, and in the case of (iii) below to its legal counsel, as soon as practicable in advance of filing with the Bankruptcy Court (i) the Final Order (which must be in form and substance satisfactory to the Administrative Agent), (ii) all other proposed material orders and pleadings related to the Credit Facilities (which must be in form and substance reasonably satisfactory to the Administrative Agent) and (iii) any plan of reorganization or liquidation and/or any disclosure statement related to such plan (which shall be in form and substance reasonably satisfactory to the Administrative Agent; provided that with respect to provisions of the plan of reorganization and/or disclosure statements that relate to the payment of the Credit Facilities, such provisions must be in form and substance satisfactory to the Administrative Agent).

(c)    The Borrower shall maintain a cash management system in accordance with the Cash Management Order and the Orders each of which shall be in form and substance satisfactory to the Administrative Agent.

(d)    The Borrower shall file with the Bankruptcy Court a plan of reorganization and a disclosure statement relating thereto, each in form and substance reasonably satisfactory to the Administrative Agent, within 18 months after the Petition Date; provided, however, that with respect to provisions of the plan of reorganization and/or any disclosure statement that relate to payment of the Credit Facilities, such provisions must be in form and substance satisfactory to the Administrative Agent.

(e)    The Borrower shall contest, if requested by the Administrative Agent, any motion seeking entry of an order, and entry of an order, that is materially adverse to the interests of the Administrative Agent or the Lenders or their respective material rights and remedies under the Credit Documents in any of the Cases;

9.16.    Ratings.  The Borrower shall use commercially reasonable efforts to obtain ratings from each of Moody's and S&P as soon as reasonably practicable after the Closing Date.

9.17.    Use of Proceeds.  Parent Guarantor and the Borrower shall not, and shall not permit any other Credit Party or any other Restricted Subsidiary to:

(a)    use the proceeds of the Credit Facilities or any Letters of Credit issued hereunder for purposes other than those permitted under this Agreement and contained in the Interim Order or the Final Order, as applicable;

(b)    use the proceeds of the Credit Facilities or any Letters of Credit issued hereunder for purposes that would violate the provisions of Regulation T, U or X of the Board;

-110-

(c)     use the proceeds of any Revolving Credit Loan to fund any RCT L/C Collateral Account until (i) the earlier to occur of (x) the funding of the Delayed-Draw Term Loans in an amount equal to the aggregate amount of Delayed-Draw Term Loan Commitments as of the Closing Date and (y) the termination in full of the Delayed-Draw Term Loan Commitments and (ii) the funding of the Term Loans as of the Full Availability Date;

(d)     use the proceeds of the Delayed-Draw Term Loans for purposes other than funding the RCT L/C Collateral Accounts; and

(e)     use the proceeds of the Term Loans to fund the General L/C Collateral Accounts in an amount exceeding $800,000,000 in the aggregate.

SECTION 10. Negative Covenants.

The Borrower hereby covenants and agrees that on the Closing Date and thereafter, until all Commitments and all Letters of Credit have terminated (unless such Letters of Credit have been collateralized on terms and conditions reasonably satisfactory to the applicable Letter of Credit Issuer following the termination of the Revolving Credit Commitments) and the Loans and Unpaid Drawings, together with interest, fees and all other Obligations (other than Hedging Obligations under Secured Hedging Agreements and/or Secured Commodity Hedging Agreements, Cash Management Obligations under Secured Cash Management Agreement or Contingent Obligations) are paid in full:

10.1.     Limitation on Indebtedness. The Borrower will not, and will not permit the Restricted Subsidiaries to, create, incur, assume or suffer to exist any Indebtedness.

Notwithstanding the foregoing, the limitations set forth in the immediately preceding paragraph shall not apply to any of the following items:

(a)     Indebtedness arising under the Credit Documents (including any Indebtedness incurred pursuant to Section 2.14);

(b)     subject to compliance with Section 10.5, Indebtedness of the Borrower or any Restricted Subsidiary owed to the Borrower or any Restricted Subsidiary; provided that all such Indebtedness of any Credit Party owed to any Person that is not a Credit Party shall be (x) evidenced by the Intercompany Subordinated Note or (y) otherwise be subject to subordination terms substantially identical to the subordination terms set forth in the Intercompany Subordinated Note or otherwise reasonably acceptable to the Administrative Agent;

(c)     Indebtedness in respect of any bankers' acceptance, bank guarantees, letter of credit, warehouse receipt or similar facilities entered into in the ordinary course of business (including in respect of construction and restoration activities and in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims);

(d)     subject to compliance with Section 10.5, Guarantee Obligations incurred by (i) Restricted Subsidiaries in respect of Indebtedness of the Borrower or any other Restricted Subsidiary that is permitted to be incurred under this Agreement (except that a Restricted Subsidiary that is not a Credit Party may not, by virtue of this Section 10.1(d) guarantee Indebtedness that such Restricted Subsidiary could not otherwise incur under this Section 10.1) and (ii) the Borrower in respect of Indebtedness of Restricted Subsidiaries that is permitted to be incurred under this Agreement; provided that (A) if the Indebtedness being guaranteed under this Section 10.1(d) is subordinated to the

-111-

Obligations, such Guarantee Obligations shall be subordinated to the Guarantee of the Obligations on terms at least as favorable to the Lenders as those contained in the subordination of such Indebtedness, (B) [Reserved] and (C) the aggregate amount of Guarantee Obligations incurred by Restricted Subsidiaries that are not Subsidiary Guarantors under this clause (d), when combined with the total amount of Indebtedness incurred by Restricted Subsidiaries that are not Subsidiary Guarantors pursuant to Section 10.1(j) and Section 10.1(n), shall not exceed $200,000,000 at any time outstanding;

     (e)    Guarantee Obligations (i) incurred in the ordinary course of business (including in respect of construction or restoration activities) in respect of obligations of (or to) suppliers, customers, franchisees, lessors and licensees or (ii) otherwise constituting Investments permitted by Sections 10.5(d), 10.5(g), 10.5(i), 10.5(q), 10.5(t) and 10.5(v);

     (f)    (i) Indebtedness (including Indebtedness arising under Capital Leases) incurred to finance the purchase price, cost of design, acquisition, construction, repair, restoration, replacement, expansion, installation or improvement of fixed or capital assets or otherwise in respect of Capital Expenditures, so long as such Indebtedness, except in the case of Environmental CapEx or Necessary CapEx, is incurred within 270 days of the acquisition, construction, repair, restoration, replacement, expansion, installation or improvement of such fixed or capital assets or incurrence of such Capital Expenditure, (ii) Indebtedness arising under Capital Leases entered into in connection with Permitted Sale Leasebacks and (iii) Indebtedness arising under Capital Leases, other than Capital Leases in effect on the Closing Date and Capital Leases entered into pursuant to subclauses (i) and (ii) above; provided, that the aggregate amount of Indebtedness incurred pursuant to this clause (iii) at any time outstanding shall not exceed $400,000,000 and (iv) any modification, replacement, refinancing, refunding, renewal or extension of any Indebtedness specified in subclause (i), (ii) or (iii) above; provided that, except to the extent otherwise expressly permitted hereunder, the principal amount thereof does not exceed the principal amount thereof outstanding immediately prior to such modification, replacement, refinancing, refunding, renewal or extension except by an amount equal to the unpaid accrued interest and premium thereon plus the reasonable amounts paid in respect of fees and expenses incurred in connection with such modification, replacement, refinancing, refunding, renewal or extension;

     (g)    Indebtedness outstanding on the Closing Date listed on Schedule 10.1 and the Prepetition Debt and any modification, replacement, refinancing, refunding, renewal or extension thereof; provided that except to the extent otherwise expressly permitted hereunder, in the case of any such modification, replacement, refinancing, refunding, renewal or extension, (i) the principal amount thereof (including any unused commitments) does not exceed the principal amount thereof outstanding immediately prior to such modification, replacement, refinancing, refunding, renewal or extension except by an amount equal to the unpaid accrued interest and premium thereon plus the reasonable amounts paid in respect of fees and expenses incurred in connection with such modification, replacement, refinancing, refunding, renewal or extension, (ii) the direct and contingent obligors with respect to such Indebtedness are not changed (iii) no portion of such Indebtedness matures prior to the Stated Maturity of such Indebtedness as in effect as of the Closing Date and (iv) if the Indebtedness being refinanced, or any guarantee thereof, constituted subordinated Indebtedness, then such replacement or refinancing Indebtedness, or such guarantee, respectively, shall be subordinated to the Obligations to substantially the same extent (it being understood that an Incremental Amendment may provide, without the consent of any other Lender required, for restrictions similar and in addition to those set forth in this Section 10.1(g)(iv) on modification, replacement, refinancing, refunding, renewal or extension of Indebtedness which matures on or after the Maturity Date but on or before the final maturity date for the Incremental Term Loans in such Incremental Amendment);

     (h)    Indebtedness in respect of Hedging Agreements; provided that (i) other than in the case of Commodity Hedging Agreements, such Hedging Agreements are not entered into for

#4821-7663-6950

speculative purposes (as determined by the Borrower in its reasonable discretion acting in good faith) and (ii) any speculative Commodity Hedging Agreements must be entered into in the ordinary course of business and shall be consistent with past practice;

    (i)    [reserved];

    (j)    (i)    Indebtedness of a Person or Indebtedness attaching to assets of a Person that, in either case, becomes a Restricted Subsidiary (or is a Restricted Subsidiary that survives a merger with such Person or any of its Subsidiaries) or Indebtedness attaching to assets that are acquired by the Borrower or any Restricted Subsidiary, in each case after the Closing Date as the result of a Permitted Acquisition; provided that

    (x)    such Indebtedness existed at the time such Person became a Restricted Subsidiary or at the time such assets were acquired and, in each case, was not created in anticipation thereof,

    (y)    such Indebtedness is not guaranteed in any respect by the Borrower or any Restricted Subsidiary (other than by any such Person that so becomes a Restricted Subsidiary or is the survivor of a merger with such Person or any of its Subsidiaries), and

    (z) (A) the Stock and Stock Equivalents of such Person are pledged to the Collateral Agent to the extent required under Section 9.12 and (B) such Person executes a supplement to each of the Guarantee and the Security Documents (or alternative guarantee and security arrangements in relation to the Obligations reasonably acceptable to the Collateral Agent); provided, further, that the requirements of this subclause (z) shall not apply to any Indebtedness of the type that could have been incurred under Section 10.1(f);

    (ii)    any modification, replacement, refinancing, refunding, renewal or extension of any Indebtedness specified in subclause (j)(i) above; provided that, except to the extent otherwise expressly permitted hereunder, (x) the principal amount of any such Indebtedness does not exceed the principal amount thereof outstanding immediately prior to such modification, replacement, refinancing, refunding, renewal or extension except by an amount equal to the unpaid accrued interest and premium thereon plus the reasonable amounts paid in respect of fees and expenses incurred in connection with such modification, replacement, refinancing, refunding, renewal or extension, (y) the direct and contingent obligors with respect to such Indebtedness are not changed and (z) if the Indebtedness being refinanced, or any guarantee thereof, constituted subordinated Indebtedness, then such replacement or refinancing Indebtedness, or such guarantee, respectively, shall be subordinated to the Obligations to substantially the same extent; and

    provided further that the aggregate amount of Indebtedness incurred under this Section 10.1(j) (A) shall not exceed $200,000,000 at any time outstanding and (B) by Restricted Subsidiaries that are not Subsidiary Guarantors, when combined with the total amount of Indebtedness incurred by Restricted Subsidiaries that are not Subsidiary Guarantors pursuant to Sections 10.1(d) and 10.1(n), shall not exceed $200,000,000 at any time outstanding;

    (k)    [reserved].

    (l)    Indebtedness in respect of performance bonds, bid bonds, appeal bonds, surety bonds and completion guarantees and similar obligations not in connection with money borrowed, in each case provided in the ordinary course of business (including in respect of construction or restoration

-113-

activities) or consistent with past practice or in respect of coal mine reclamation, including those incurred to secure health, safety and environmental obligations in the ordinary course of business (including in respect of construction or restoration activities) or consistent with past practice;

(m)    (i) Indebtedness incurred in connection with any Permitted Sale Leaseback and (ii) any modification, replacement, refinancing, refunding, renewal or extension of any Indebtedness specified in subclause (m)(i) above; provided that, except to the extent otherwise permitted hereunder, (x) the principal amount of any such Indebtedness is not increased above the principal amount thereof outstanding immediately prior to such modification, replacement, refinancing, refunding, renewal or extension except by an amount equal to the unpaid accrued interest and premium thereon plus the reasonable amounts paid in respect of fees and expenses incurred in connection with such modification, refinancing, refunding, renewal or extension and (y) the direct and contingent obligors with respect to such Indebtedness are not changed;

(n)    additional Indebtedness; provided that the aggregate amount of Indebtedness incurred and remaining outstanding pursuant to this Section 10.1(n) shall not at any time exceed $250,000,000; provided, that the aggregate amount of Indebtedness incurred by Restricted Subsidiaries that are not Subsidiary Guarantors under this Section 10.1(n), when combined with the total amount of Indebtedness incurred by Restricted Subsidiaries that are not Subsidiary Guarantors pursuant to Section 10.1(d) and 10.1(j), shall not exceed $200,000,000 at any time outstanding;

(o)    [reserved];

(p)    Cash Management Obligations and other Indebtedness in respect of overdraft facilities, employee credit card programs, netting services, automatic clearinghouse arrangements and other cash management and similar arrangements in the ordinary course of business;

(q)    (i) Indebtedness incurred in the ordinary course of business iu respect of obligations of the Borrower or any Restricted Subsidiary to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services, including turbines, transformers and similar equipment and (ii) Indebtedness in respect of intercompany obligations of the Borrower or any Restricted Subsidiary with the Borrower or any Restricted Subsidiary of the Borrower in respect of accounts payable incurred in connection with goods sold or services rendered in the ordinary course of business and not in connection with the borrowing of money;

(r)    Indebtedness arising from agreements of the Borrower or any Restricted Subsidiary providing for indemnification, adjustment of purchase price or similar obligations (including earn-outs), in each case entered into in connection with Permitted Acquisitions, other Investments and the Disposition of any business, assets or Stock or Stock Equivalents permitted hereunder;

(s)    Indebtedness of the Borrower or any Restricted Subsidiary consisting of (i) obligations to pay insurance premiums or (ii) take or pay obligations contained in supply agreements, in each case arising in the ordinary course of business (including in respect of construction or restoration activities);

(t)    Indebtedness representing deferred compensation to employees, consultants or independent contractors of the Borrower (or, to the extent such work is done for the Borrower or its Subsidiaries, any direct or indirect parent thereof) and the Restricted Subsidiaries incurred in the ordinary course of business;

-114-

(u)    Indebtedness consisting of promissory notes issued by any Credit Party to current or former officers, managers, consultants, directors and employees (or their respective spouses, former spouses, successors, executors, administrators, heirs, legatees or distributees) to finance the purchase or redemption of Stock or Stock Equivalents of the Borrower (or any direct or indirect parent thereof) permitted by Section 10.6(b);

(v)    Indebtedness consisting of obligations of the Borrower and the Restricted Subsidiaries under deferred compensation or other similar arrangements incurred by such Person in connection with the Transactions and Permitted Acquisitions or any other Investment permitted hereunder;

(w)    Indebtedness in respect of Permitted Receivables Financings;

(x)    Indebtedness of the Borrower or any Restricted Subsidiary to the Ultimate Parent or any of its other Subsidiaries in the aggregate amount at any time outstanding not in excess of $25,000,000;

(y)    [reserved];

(z)    [reserved]; and

(aa)    all premiums (if any), interest (including post-petition interest), fees, expenses, charges, and additional or contingent interest on obligations described in clauses (a) through (x) above.

For purposes of determining compliance with this Section 10.1, in the event that an item of Indebtedness meets the criteria of more than one of the categories of Indebtedness described clauses (a) through (aa) above, the Borrower shall, in its sole discretion, classify and reclassify or later divide, classify or reclassify such item of Indebtedness (or any portion thereof) and will only be required to include the amount and type of such Indebtedness in one or more of the above paragraph or clauses; provided that all Indebtedness outstanding under the Credit Documents will be deemed at all times to have been incurred in reliance only on the exception in clause (a) of Section 10.1.

10.2.    Limitation on Liens.  The Borrower will not, and will not permit the Restricted Subsidiaries to, create, incur, assume or suffer to exist any Lien upon any property or assets of any kind (real or personal, tangible or intangible) of the Borrower or such Restricted Subsidiary, whether now owned or hereafter acquired, except:

(a)    Liens arising under (i) the Credit Documents and/or created pursuant to the Interim Order and the Final Order, in each case securing the Obligations;

(b)    Liens on the Collateral securing obligations under Secured Cash Management Agreements, Secured Hedging Agreements and Secured Commodity Hedging Agreements; provided that (i) such obligations shall be secured by the Liens granted in favor of the Collateral Agent in the manner set forth in, and be otherwise subject to (and in compliance with), this Agreement and governed by the applicable Security Documents and (ii) such agreements were not entered into for speculative purposes (as determined by the Borrower at the time such agreement was entered into in its reasonable discretion acting in good faith) and, in the case of any Secured Commodity Hedging Agreement or any Secured Hedging Agreement of the type described in clause (c) of the definition of "Hedging Agreement", entered into in order to hedge against or manage fluctuations in the price or availability of any Covered Commodity);

-115-

(c)     Permitted Liens;

(d)     Liens securing Indebtedness permitted pursuant to Section 10.1(f); provided that (x) except with respect to any Indebtedness incurred in connection with Environmental CapEx or Necessary CapEx, such Liens attach concurrently with or within two hundred and seventy (270) days after completion of the acquisition, construction, repair, restoration, replacement, expansion, installation or improvement (as applicable) of the property subject to such Liens and (y) such Liens attach at all times only to the assets so financed except (1) for accessions to the property financed with the proceeds of such Indebtedness and the proceeds and the products thereof and (2) that individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by such lender;

(e)     Liens existing on the Closing Date; provided that any Lien securing Indebtedness or other obligations in excess of (x) $20,000,000 individually or (y) $100,000,000 in the aggregate (when taken together with all other Liens securing obligations outstanding in reliance on this clause (e) that are not set forth on Schedule 10.2) shall only be permitted to the extent such Lien is listed on Schedule 10.2;

(f)     the modification, replacement, extension or renewal of any Lien permitted by clauses (a) through (e) and clause (g) of this Section 10.2 upon or in the same assets theretofore subject to such Lien (or upon or in after-acquired property that is affixed or incorporated into the property covered by such Lien or any proceeds or products thereof) or the modification, refunding, refinancing, replacement, extension or renewal (without increase in the amount or change in any direct or contingent obligor except to the extent otherwise permitted hereunder) of the Indebtedness or other obligations secured thereby (including any unused commitments), to the extent such modification, refunding, refinancing, replacement, extension or renewal is permitted by Section 10.1;

(g)     Liens existing on the assets of any Person that becomes a Restricted Subsidiary (or is a Restricted Subsidiary that survives a merger with such Person or any of its Subsidiaries) pursuant to a Permitted Acquisition or other permitted Investment, or existing on assets acquired after the Closing Date, to the extent the Liens on such assets secure Indebtedness permitted by Section 10.1(j); provided that such Liens (i) are not created or incurred in connection with, or in contemplation of, such Person becoming such a Restricted Subsidiary or such assets being acquired and (ii) attach at all times only to the same assets to which such Liens attached (and after-acquired property that is affixed or incorporated into the property covered by such Lien), and secure only the same Indebtedness or obligations that such Liens secured, immediately prior to such Permitted Acquisition and any modification, replacement, refinancing, refunding, renewal or extension thereof permitted by Section 10.1(j);

(h)     [reserved];

(i)     Liens securing Indebtedness or other obligations (i) of the Borrower or any Restricted Subsidiary in favor of a Credit Party and (ii) of any other Restricted Subsidiary that is not a Credit Party in favor of any other Restricted Subsidiary that is not a Credit Party;

(j)     Liens (i) of a collecting bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection and (ii) in favor of a banking institution arising as a matter of law encumbering deposits (including the right of set-off);

(k)     Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment permitted pursuant to Section 10.5 to be applied against the purchase price for such Investment and (ii) consisting of an agreement to sell, transfer, lease or otherwise dispose of any property in a transaction permitted under Section 10.4, in each case, solely to the extent such Investment or sale,

-116-

disposition, transfer or lease, as the case may be, would have been permitted on the date of the creation of such Lien;

      (l)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale or purchase of goods entered into by the Borrower or any Restricted Subsidiary in the ordinary course of business (including in respect of construction or restoration activities) permitted by this Agreement;

      (m)    Liens deemed to exist in connection with Investments in repurchase agreements permitted under Section 10.5;

      (n)    any amounts held by a trustee in the funds and accounts under an indenture securing any revenue bonds issued for the benefit of the Borrower or any Restricted Subsidiary;

      (o)    Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Borrower or any Restricted Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower and the Restricted Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any Restricted Subsidiary in the ordinary course of business;

      (p)    Liens solely on any cash earnest money deposits made by the Borrower or any Restricted Subsidiary in connection with any letter of intent or purchase agreement permitted hereunder;

      (q)    Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

      (r)    Liens on specific items of inventory or other goods and the proceeds thereof securing such Person's obligations in respect of documentary letters of credit or banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods in the ordinary course of business or consistent with past practice;

      (s)    [reserved];

      (t)    [reserved];

      (u)    Liens in respect of Permitted Sale Leasebacks;

      (v)    Liens on Receivables Facility Assets in respect of any Permitted Receivables Financing;

      (w)    rights reserved to or vested in others to take or receive any part of, or royalties related to, the power, gas, oil, coal, lignite or other minerals or timber generated, developed, manufactured or produced by, or grown on, or acquired with, any property of the Borrower and the Restricted Subsidiaries and Liens upon the production from property of power, gas, oil, coal, lignite or other minerals or timber, and the by-products and proceeds thereof, to secure the obligations to pay all or a part of the expenses of exploration, drilling, mining or development of such property only out of such production or proceeds;

      (x)    Liens arising out of all presently existing and future division and transfer orders, advance payment agreements, processing contracts, gas processing plant agreements, operating

agreements, gas balancing or deferred production agreements, pooling, unitization or communitization agreements, pipeline, gathering or transportation agreements, platform agreements, drilling contracts, injection or repressuring agreements, cycling agreements, construction agreements, shared facilities agreements, salt water or other disposal agreements, leases or rental agreements, farm-out and farm-in agreements, exploration and development agreements, and any and all other contracts or agreements covering, arising out of, used or useful in connection with or pertaining to the exploration, development, operation, production, sale, use, purchase, exchange, storage, separation, dehydration, treatment, compression, gathering, transportation, processing, improvement, marketing, disposal or handling of any property of the Borrower and the Restricted Subsidiaries; provided that such agreements are entered into in the ordinary course of business (including in respect of construction or restoration activities);

(y)    any restrictions on any Stock or Stock Equivalents or other joint venture interests of the Borrower or any Restricted Subsidiary providing for a breach, termination or default under any owners, participation, shared facility, joint venture, stockholder, membership, limited liability company or partnership agreement between such Person and one or more other holders of such Stock or Stock Equivalents or interest of such Person, if a security interest or other Lien is created on such Stock or Stock Equivalents or interest as a result thereof and other similar Liens;

(z)    Rights of first refusal and purchase options in favor of Aluminum Company of America ("Alcoa") to purchase Sandow Unit 4 and/or the real property related thereto, as described in (i) Sandow Unit 4 Agreement dated August 13, 1976, as amended, between Alcoa and Texas Power & Light Company ("TPL") and in (ii) Deeds dated March 14, 1978 and July 21, 1980, as amended, executed by Alcoa conveying to TPL the Sandow Unit 4 real property;

(aa)    Lien and other exceptions to title, in either case on or in respect of any facilities of the Borrower or any Restricted Subsidiary, arising as a result of any shared facility agreement entered into with respect to such facility, except to the extent that any such Liens or exceptions, individually or in the aggregate, materially adversely affect the value of the relevant property or materially impair the use of the relevant property in the operation of business the Borrower and the Restricted Subsidiaries, taken as a whole;

(bb)    Liens on cash and Permitted Investments (i) deposited by the Borrower or any Restricted Subsidiary in margin accounts with or on behalf of brokers, credit clearing organizations, independent system operators, regional transmission organizations, pipelines, state agencies, federal agencies, futures contract brokers, customers, trading counterparties, or any other parties or issuers of surety bonds or (ii) pledged or deposited as collateral by the Borrower or any Restricted Subsidiary with any of the entities described in clause (i) above to secure their respective obligations, in the case of each of clauses (i) and (ii) above, with respect to:  (A) any contracts and transactions for the purchase, sale, exchange of, or the option (whether physical or financial) to purchase, sell or exchange (1) natural gas, (2) electricity, (3) coal, (4) petroleum-based liquids, (5) oil, (6) nuclear fuel (including enrichment and conversion), (7) emissions or other environmental credits, (8) waste byproducts, (9) weather, (10) power and other generation capacity, (11) heat rate, (12) congestion, (13) renewal energy credit or (14) any other energy-related commodity or services or derivative (including ancillary services and related risk (such as location basis) or weather related risk); (B) any contracts or transactions for the purchase, processing, transmission, transportation, distribution, sale, lease, hedge or storage of, or any other services related to any commodity or service identified in subparts (1) - (14) above, including any capacity agreement; (C) any financial derivative agreement (including but not limited to swaps, options or swaptions) related to any commodity identified in subparts (1) - (14) above, or to any interest rate or currency rate management activities; (D) any agreement for membership or participation in an organization that facilitates or permits the entering into or clearing of any Netting Agreement, any insurance or self-insurance arrangements or any agreement described in this Section 10.2(bb); (E) any agreement combining part or all of a Netting

-118-

Agreement or part or all of any of the agreements described in this Section 10.2(bb); (F) any document relating to any agreement described in this Section 10.2(bb) that is filed with a Governmental Authority and any related service agreements; or (G) any commercial or trading agreements, each with respect to, or involving the purchase, transmission, distribution, sale, lease or hedge of, any energy, generation capacity or fuel, or any other energy related commodity or service, price or price indices for any such commodities or services or any other similar derivative agreements, and any other similar agreements (such agreements described in clauses (A) through (G) of this Section 10.2(bb) being collectively, "**Permitted Contracts**"), Netting Agreements, Hedging Agreements and letters of credit supporting Permitted Contracts, Netting Agreements and Hedging Agreements; and

(cc)    additional Liens so long as the aggregate amount of obligations secured thereby at any time outstanding does not exceed $20,000,000.

10.3.    Limitation on Fundamental Changes.  Except as permitted by Section 10.4 or 10.5, the Borrower will not, and will not permit the Restricted Subsidiaries to, consummate any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or convey, sell, lease, assign, transfer or otherwise consummate the disposition of, all or substantially all its business units, assets or other properties, except that:

(a)    so long as (i) both before and after giving effect to such transaction, no Payment Default or Event of Default has occurred and is continuing or would result therefrom and (ii) after giving effect to such transaction the Borrower shall be in compliance, on a Pro Forma Basis, with the covenant set forth in Section 10.9, any Subsidiary of the Borrower or any other Person may be merged, amalgamated or consolidated with or into the Borrower; provided that the Borrower shall be the continuing or surviving company;

(b)    so long as no Payment Default or Event of Default has occurred or is continuing, or would result therefrom, any Subsidiary of the Borrower or any other Person (in each case, other than the Borrower) may be merged, amalgamated or consolidated with or into any one or more Subsidiaries of the Borrower; provided that (i) in the case of any merger, amalgamation or consolidation involving one or more Restricted Subsidiaries, (A) a Restricted Subsidiary shall be the continuing or surviving Person or (B) the Borrower shall cause the Person formed by or surviving any such merger, amalgamation or consolidation (if other than a Restricted Subsidiary) to become a Restricted Subsidiary, (ii) in the case of any merger, amalgamation or consolidation involving one or more Guarantors, a Guarantor shall be the continuing or surviving Person or the Person formed by or surviving any such merger, amalgamation or consolidation (if other than a Guarantor) shall execute a supplement to the Guarantee and the relevant Security Documents and a joinder to the Intercompany Subordinated Note, each in form and substance reasonably satisfactory to the Administrative Agent in order to become a Guarantor and pledgor, mortgagor and grantor, as applicable, thereunder for the benefit of the Secured Parties and to acknowledge and agree to the terms of the Intercompany Subordinated Note and (iii) the Borrower shall have delivered to the Administrative Agent an officers' certificate stating that such merger, amalgamation or consolidation and any such supplements to the Guarantee and any Security Document preserve the enforceability of the Guarantee and the perfection and priority of the Liens under the applicable Security Documents;

(c)    [reserved];

(d)    any Restricted Subsidiary that is not a Credit Party may sell, lease, transfer or otherwise dispose of any or all of its assets (upon voluntary liquidation or otherwise) to the Borrower or any other Restricted Subsidiary;

-119-

(e)      the Borrower or any Subsidiary of the Borrower may sell, lease, transfer or otherwise dispose of any or all of its assets (upon voluntary liquidation or otherwise) to any Credit Party; provided that the consideration for any such disposition by any Person other than a Guarantor shall not exceed the fair value of such assets;

(f)      any Restricted Subsidiary may liquidate or dissolve if (i) the Borrower determines in good faith that such liquidation or dissolution is in the best interests of the Borrower and is not materially disadvantageous to the Lenders and (ii) to the extent such Restricted Subsidiary is a Credit Party, any assets or business of such Restricted Subsidiary not otherwise disposed of or transferred in accordance with Section 10.4 or 10.5, or in the case of any such business, discontinued, shall be transferred to, or otherwise owned or conducted by, a Credit Party after giving effect to such liquidation or dissolution; and

(g)      to the extent that no Payment Default or Event of Default has occurred and is continuing or would result from the consummation of such Disposition, the Borrower and the Restricted Subsidiaries may consummate a merger, dissolution, liquidation, consolidation or disposition, the purpose of which is to effect a Disposition permitted pursuant to Section 10.4.

10.4.    Limitation on Sale of Assets.  The Borrower will not, and will not permit the Restricted Subsidiaries to, (i) convey, sell, lease, assign, transfer or otherwise consummate the disposition of any of its property, business or assets (including receivables and leasehold interests), whether now owned or hereafter acquired or (ii) consummate the sale to any Person (other than to the Borrower or a Subsidiary Guarantor) any shares owned by it of the Borrower's or any Restricted Subsidiary's Stock and Stock Equivalents (each of the foregoing a "**Disposition**"), except that:

(a)      the Borrower and the Restricted Subsidiaries may sell, transfer or otherwise dispose of (i) obsolete, worn-out, scrap, used, or surplus or mothballed equipment (including any such equipment that has been refurbished in contemplation of such disposition), vehicles and other assets to the extent such assets are not necessary for the operation of the Borrower's and the Restricted Subsidiaries' business, (ii) inventory or goods (or other assets) held for sale in the ordinary course of business, (iii) cash and Permitted Investments and (iv) assets for the purposes of charitable contributions or similar gifts to the extent such assets are not material to the ability of the Borrower and the Restricted Subsidiaries, taken as a whole, to conduct its business in the ordinary course;

(b)      the Borrower and the Restricted Subsidiaries may make Dispositions of assets, excluding any Disposition of accounts receivable except in connection with the Disposition of any business to which such accounts receivable relate, for fair value; provided that (i) to the extent required, the Net Cash Proceeds thereof to the Borrower and the Restricted Subsidiaries are promptly applied to the prepayment of Term Loans or Delayed-Draw Term Loans as provided for in Section 5.2(a), (ii) after giving effect to any such Disposition, no Default or Event of Default shall have occurred and be continuing, (iii) the aggregate consideration for all Dispositions made in reliance on this Section 10.4(b), when aggregated with the amount of Permitted Sale Leaseback transactions consummated pursuant to Section 10.4(g), shall not exceed at any time 5% of Consolidated Total Assets (determined at the time of each Disposition) for all such transactions consummated after the Closing Date, (iv) with respect to any Disposition pursuant to this clause (b) for a purchase price in excess of $50,000,000, the Person making such Disposition shall receive not less than 75% of such consideration in the form of cash or Permitted Investments; provided that for the purposes of this subclause (iv) and Section 10.4(g) the following shall be deemed to be cash ("**Deemed Cash**"):  (A) any liabilities (as shown on the Borrower's or such Restricted Subsidiary's most recent balance sheet provided hereunder or in the footnotes thereto) of the Borrower or such Restricted Subsidiary, other than liabilities that are by their terms (1) subordinated to the payment in cash of the Obligations or (2) not secured by the assets that are the subject of such

-120-

Disposition, that are assumed by the transferee with respect to the applicable Disposition and for which the Borrower and all of the Restricted Subsidiaries shall have been validly released by all applicable creditors in writing, (B) any securities received by the Person making such Disposition from the purchaser that are converted by such Person into cash (to the extent of the cash received) within 180 days following the closing of the applicable Disposition, (C) any Designated Non-Cash Consideration received by the Person making such Disposition having an aggregate fair market value, taken together with all other Designated Non-Cash Consideration received pursuant to this Section 10.4(b) that is at that time outstanding, not in excess of 1.5% of Consolidated Total Assets at the time of the receipt of such Designated Non-Cash Consideration, with the fair market value of each item of Designated Non-Cash Consideration being measured at the time received and without giving effect to subsequent changes in value and (v) any non-cash proceeds received in the form of Real Estate, Indebtedness or Stock and Stock Equivalents are pledged to the Collateral Agent to the extent required under Section 9.12 or 9.14;

(c)    (i) the Borrower and the Restricted Subsidiaries may make Dispositions to the Borrower or any other Credit Party and (ii) any Restricted Subsidiary that is not a Credit Party may make Dispositions to the Borrower or any other Subsidiary of the Borrower; provided that with respect to any such Dispositions, such sale, transfer or disposition shall be for fair value;

(d)    the Borrower and any Restricted Subsidiary may effect any transaction permitted by Section 10.3, 10.5 or 10.6;

(e)    the Borrower and any Restricted Subsidiary may lease, sublease, license (only on a non-exclusive basis with respect to any intellectual property) or sublicense (only on a non-exclusive basis with respect to any intellectual property) real, personal or intellectual property in the ordinary course of business;

(f)    Dispositions of property (including like-kind exchanges) to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Disposition are applied to the purchase price of such replacement property, in each case under Section 1031 of the Code or otherwise;

(g)    Dispositions pursuant to Permitted Sale Leaseback transactions in an aggregate amount pursuant to this Section 10.4(g), when aggregated with the amount of Dispositions made pursuant to Section 10.4(b), not to exceed the limitations set forth in Section 10.4(b).

(h)    Dispositions of (i) Investments in joint ventures (regardless of the form of legal entity) to the extent required by, or made pursuant to, customary buy/sell arrangements or put/call arrangements between the joint venture parties set forth in joint venture arrangements and similar binding arrangements or (ii) to joint ventures in connection with the dissolution or termination of a joint venture to the extent required pursuant to joint venture and similar arrangements;

(i)    Dispositions of Receivables Facility Assets in connection with any Permitted Receivables Financing; provided to the extent that any new Participating Receivables Grantor is added to any Permitted Receivables Financing after the Closing Date, the Net Cash Proceeds of any Dispositions of Receivables Facility Assets by such new Participating Receivables Grantor must be promptly applied to the prepayment of Loans as provided for in Section 5.2(a) without giving effect to any reinvestment rights under the definition of "Net Cash Proceeds"; provided, further, that no Net Cash Proceeds shall be required to be used to prepay the Loans pursuant to Section 5.2(a) to the extent that any new Participating Receivables Grantor replaces (by merger or otherwise) any existing Participating Receivables Grantor and at the time of such replacement, the volume of Receivables Facility Assets sold into any Permitted Receivables Financing does not increase as a result of such replacement;

-121-

(j)    Dispositions listed on Schedule 10.4;

(k)    transfers of property subject to a Recovery Event or in connection with any condemnation proceeding upon receipt of the Net Cash Proceeds of such Recovery Event or condemnation proceeding;

(l)    Dispositions of accounts receivable in connection with the collection or compromise thereof;

(m)    the Borrower and the Restricted Subsidiaries may make Dispositions (excluding any Disposition of accounts receivable except in connection with the Disposition of any business to which such accounts receivable relate), for fair value to the extent that (i) the aggregate consideration for all such Dispositions consummated after the Closing Date, when combined with all Dispositions made pursuant to Section 10.4(b), does not exceed 7.5% of Consolidated Total Assets (determined at the time of each Disposition), (ii) the Net Cash Proceeds of any such Disposition are promptly applied to the prepayment of Loans as provided in Section 5.2(a) without giving effect to any reinvestment rights under the definition of "Net Cash Proceeds"; provided that, in the case of a Disposition of a Baseload Asset pursuant to this Section 10.4(m), the Borrower shall be permitted to reinvest the Net Cash Proceeds received in such Disposition in other Baseload Assets within the reinvestment periods set forth in the definition of "Net Cash Proceeds", (iii) after giving effect to any such Disposition, no Default or Event of Default shall have occurred and be continuing, (iv) with respect to any Disposition pursuant to this Section 10.4(m) for a purchase price in excess of $50,000,000, the Person making such Disposition shall, subject to the parenthetical below, receive not less than 75% of such consideration in the form of cash or Permitted Investments (or, to the extent that less than 75% of such consideration is in the form of cash or Permitted Investments, the Borrower shall apply the amount of such difference to the prepayment of Loans as provided in clause (ii) above); provided that for the purposes of this subclause (iv), Deemed Cash shall be deemed to be cash and (v) any non-cash proceeds received in the form of Real Estate, Indebtedness or Stock and Stock Equivalents are pledged to the Collateral Agent to the extent required under Section 9.12 or 9.14;

(n)    [reserved];

(o)    Dispositions of power, capacity, heat rate, renewable energy credits, waste by-products, energy, electricity, coal and lignite, oil and other petroleum-based liquids, emissions and other environmental credits, ancillary services, fuel (including all forms of nuclear fuel and natural gas) and other related assets or products of services, including assets related to trading activities or the sale of inventory or contracts related to any of the foregoing, in each case in the ordinary course of business;

(p)    the execution of (or amendment to), settlement of or unwinding of any Hedging Agreement;

(q)    any Disposition of mineral rights, other than mineral rights in respect of coal or lignite;

(r)    any Disposition of any real property that is (i) primarily used or intended to be used for mining which has either been reclaimed, or has not been used for mining in a manner which requires reclamation, and in either case has been determined by the Borrower not to be necessary for use for mining, (ii) used as buffer land, but no longer serves such purpose, or its use is restricted such that it will continue to be buffer land, or (iii) was acquired in connection with power generation facilities, but has been determined by the Borrower to no longer be commercially suitable for such purpose;

-122-

(s)     any Disposition of any assets required by any Governmental Authority;

(t)     any Disposition of assets in connection with salvage activities;

(u)     any Disposition of assets pursuant to any First Day Orders or the order governing de minimis asset dispositions, in each case to the extent approved by the Joint Lead Arrangers; and

(v)     Dispositions of any asset between or among the Borrower and/or any Restricted Subsidiary as a substantially concurrent interim Disposition in connection with a Disposition otherwise permitted pursuant to clauses (a) through (t) above; provided that after giving effect to any such Disposition, to the extent the assets subject to such Dispositions constituted Collateral, such assets shall remain subject to, or be rejoined to, the Lien of the Security Documents.

10.5.    Limitation on Investments. The Borrower will not, and will not permit the Restricted Subsidiaries, to make any Investment except, subject to the Cash Management Order, the Tax Order, the Wages Order and any other orders of the Bankruptcy Court:

(a)     extensions of trade credit, asset purchases (including purchases of inventory, fuel (including all forms of nuclear fuel), supplies, materials and equipment) and the licensing or contribution of intellectual property pursuant to joint marketing arrangements or development agreements with other Persons, in each case in the ordinary course of business (including in respect of construction or restoration activities);

(b)     Investments that were Permitted Investments when such Investments were made;

(c)     loans and advances to officers, directors, employees and consultants of the Borrower (or any direct or indirect parent thereof) or any Subsidiary of the Borrower (i) for reasonable and customary business-related travel, entertainment, relocation and analogous ordinary business purposes (including employee payroll advances), (ii) in connection with such Person's purchase of Stock or Stock Equivalents of the Ultimate Parent (or any direct or indirect parent thereof; provided that, to the extent such loans and advances are made in cash, the amount of such loans and advances used to acquire such Stock or Stock Equivalents shall be contributed to the Borrower in cash) and (iii) for purposes not described in the foregoing subclauses (i) and (ii); provided that the aggregate principal amount outstanding pursuant to subclause (iii) shall not exceed $25,000,000 at any one time outstanding;

(d)     Investments (i) existing on, or made pursuant to legally binding written commitments in existence on, the Closing Date as set forth on Schedule 10.5 and any modifications, extensions, renewals or reinvestments thereof and (ii) existing on the Closing Date of the Borrower or any Restricted Subsidiary in the Borrower or any Subsidiary of the Borrower and any modification, extension, renewal or reinvestment thereof, only to the extent that the amount of any Investment made pursuant to this clause (d) does not at any time exceed the amount of such Investment set forth on Schedule 10.5;

(e)     Investments received in connection with the bankruptcy or reorganization of suppliers or customers and in settlement of delinquent obligations of, and other disputes with, customers arising in the ordinary course of business or upon foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(f)     Investments to the extent that payment for such Investments is made with Stock or Stock Equivalents (other than Disqualified Stock) of the Borrower (or any direct or indirect parent thereof);

(g)    Investments (i) (A) by the Borrower or any Restricted Subsidiary in any Credit Party, (B) between or among Restricted Subsidiaries that are not Credit Parties, and (C) consisting of intercompany Investments incurred in the ordinary course of business in connection with the cash management operations (including with respect to intercompany self-insurance arrangements) among the Borrower and the Restricted Subsidiaries (provided that any such intercompany Investment in connection with cash management arrangements by a Credit Party in a Subsidiary of the Borrower that is not a Credit Party is in the form of an intercompany loan or advance and the Borrower or such Restricted Subsidiary complies with Section 9.12 to the extent applicable, and subject in each case to the Cash Management Orders); (ii) by Credit Parties in any Restricted Subsidiary that is not a Credit Party, to the extent that the aggregate amount of all Investments made on or after the Closing Date pursuant to this subclause (ii), when valued at the fair market value (determined by the Borrower acting in good faith) of each such Investment at the time each such Investment was made, is not in excess of, when combined with, and without duplication, the aggregate amount of Investments made pursuant to the proviso to Section 10.5(h) an amount equal to the sum of (w) $200,000,000 plus (x) the Applicable Equity Amount at such time plus (y) if no Event of Default has occurred and is continuing at the time the Investment is first made, the Applicable Amount at such time plus (z) to the extent not otherwise included in the determination of the Applicable Equity Amount or the Applicable Amount, an amount equal to any repayments, interest, returns, profits, distributions, income and similar amounts actually received in cash in respect of any such Investment (which amount referred to in this subclause (z) shall not exceed the amount of such Investment valued at the fair market value of such Investment at the time such Investment was made) (subject in each case to the Cash Management Order); and (iii) by Credit Parties in any Restricted Subsidiary that is not a Credit Party so long as such Investment is part of a series of simultaneous Investments by Restricted Subsidiaries in other Restricted Subsidiaries that result in the proceeds of the initial Investment being invested in one or more Credit Parties;

(h)    Investments constituting Permitted Acquisitions; provided that the aggregate amount of any such Investment, as valued at the fair market value (determined by the Borrower acting in good faith) of such Investment at the time each such Investment is made, made by the Borrower or any Subsidiary Guarantor in any Restricted Subsidiary that, after giving effect to such Investment, shall not be a Guarantor, shall not cause the aggregate amount of all such Investments made pursuant to this clause (h) (as so valued at the time each such investment is made) to exceed, when combined with, and without duplication of, the aggregate amount of Investments made pursuant to clause (ii) of Section 10.5(g), an amount equal to the sum of (i) $200,000,000 plus (ii) the Applicable Equity Amount at such time plus (iii) if no Event of Default has occurred and is continuing at the time such Investment is first made, the Applicable Amount at such time plus (iv) to the extent not otherwise included in the determination of the Applicable Equity Amount or the Applicable Amount, an amount equal to any repayments, interest, returns, profits, distributions, income and similar amounts actually received in cash in respect of any such Investment (which amount referred to in this clause (iv) shall not exceed the amount of such Investment valued at the fair market value of such Investment at the time such Investment was made);

(i)    Investments (including but not limited to (i) Minority Investments and Investments in Unrestricted Subsidiaries, (ii) Investments in joint ventures (regardless of the form of legal entity) or similar Persons that do not constitute Restricted Subsidiaries and (iii) Investments in Subsidiaries that are not Credit Parties), in each case valued at the fair market value (determined the Borrower acting in good faith) of such Investment at the time each such Investment is made, in an aggregate amount pursuant to this clause (i) that, at the time each such Investment is made, would not exceed the sum of (w) $500,000,000 plus (x) the Applicable Equity Amount at such time plus (y) if no Event of Default has occurred and is continuing at the time such Investment is first made, the Applicable Amount at such time plus (z) to the extent not otherwise included in the determination of the Applicable Equity Amount or the Applicable Amount, an amount equal to any repayments, interest, returns, profits, distributions, income and similar amounts actually received in cash in respect of any such Investment

-124-

(which amount referred to in this subclause (z) shall not exceed the amount of such Investment valued at the fair market value of such Investment at the time such Investment was made);

(j)    Investments constituting non-cash proceeds of Dispositions of assets to the extent permitted by Section 10.4;

(k)    Investments made to repurchase or retire Stock or Stock Equivalents of the Borrower or any direct or indirect parent thereof owned by any employee or any stock ownership plan or key employee stock ownership plan of the Borrower (or any direct or indirect parent thereof) in an aggregate amount, when combined with distributions made pursuant to Section 10.6(b), not to exceed the limitations set forth in such Section;

(l)    Investments consisting of dividends permitted under Section 10.6;

(m)    loans and advances to any direct or indirect parent of the Borrower in lieu of, and not in excess of the amount of, dividends to the extent permitted to be made to such parent in accordance with Section 10.6; provided that the aggregate amount of such loans and advances shall reduce the ability of the Borrower and the Restricted Subsidiaries to make dividends under the applicable clauses of Section 10.6 by such amount;

(n)    Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and other credits to suppliers in the ordinary course of business;

(o)    Investments in the ordinary course of business consisting of endorsements for collection or deposit and customary trade arrangements with customers consistent with past practices;

(p)    advances of payroll payments to employees, consultants or independent contractors or other advances of salaries or compensation to employees, consultants or independent contractors, in each case in the ordinary course of business;

(q)    Guarantee Obligations of the Borrower or any Restricted Subsidiary of leases (other than Capital Leases) or of other obligations that do not constitute Indebtedness, in each case entered into in the ordinary course of business;

(r)    Investments held by a Person acquired (including by way of merger, amalgamation or consolidation) after the Closing Date otherwise in accordance with this Section 10.5 to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger, amalgamation or consolidation and were in existence on the date of such acquisition, merger, amalgamation or consolidation;

(s)    Investments in Hedging Agreements permitted by Section 10.1;

(t)    Investments arising out of, or in connection with, any Permitted Receivables Financing;

(u)    Investments consisting of deposits of cash and Permitted Investments as collateral support permitted under Section 10.2;

-125-

(v)  other Investments, which, when aggregated with (i) all aggregate principal amounts paid pursuant to Section 10.7(ii) from the Closing Date and (ii) all loans and advances made to any direct or indirect parent of the Borrower pursuant to Section 10.5(m) in lieu of dividends permitted by Section 10.6(c) and (iii) all dividends paid pursuant to Section 10.6(c), shall not exceed an amount equal to (w) $250,000,000 plus (x) the Applicable Equity Amount at the time such Investments are made plus (y) if no Event of Default has occurred and is continuing at the time such Investment is first made, the Applicable Amount at such time plus (z) to the extent not otherwise included in the determination of the Applicable Equity Amount or the Applicable Amount, an amount equal to any repayments, interest, returns, profits, distributions, income and similar amounts actually received in cash in respect of any such Investment (which amount referred to in this subclause (z) shall not exceed the amount of such Investment valued at the fair market value of such Investment at the time such Investment was made);

(w)  to the extent constituting Investments, transactions pursuant to the Shared Services Agreement, transactions pursuant to the Tax Sharing Agreements permitted under Section 10.6(d)(i) or transactions disclosed in any Budget approved by Administrative Agent and the Joint Lead Arrangers;

(x)  Investments consisting of purchases and acquisitions of assets and services in the ordinary course of business (including in respect of construction or restoration activities);

(y)  Investments in the ordinary course of business consisting of Article 3 endorsements for collection or deposit and Article 4 customary trade arrangements with customers consistent with past practice;

(z)  to the extent constituting Investments, any payments made or obligations acquired pursuant to the Wages Order;

(aa)  Investments consisting of Indebtedness permitted by Section 10.1 (but only to the extent such Indebtedness was permitted without reference to Section 10.5) or fundamental changes permitted by Section 10.3;

(bb)  Investments relating to pension trusts;

(cc)  Investments by Credit Parties in any Restricted Subsidiary that is not a Credit Party so long as such Investment is part of a series of simultaneous Investments by the Borrower and the Restricted Subsidiaries in other Restricted Subsidiaries that result in the proceeds of the intercompany Investment being invested in one or more Credit Parties;

(dd)  Investments relating to nuclear decommission trusts and nuclear insurance and self-insurance organizations or arrangements;

(ee)  Investments in the form of, or pursuant to, operating agreements, working interests, royalty interests, mineral leases, processing agreements, farm-out agreements, contracts for the sale, transportation or exchange of oil and natural gas or other fuel or commodities, unitization agreements, pooling agreements, area of mutual interest agreements, production sharing agreements or other similar or customary agreements, transactions, properties, interests or arrangements, and Investments and expenditures in connection therewith or pursuant thereto, in each case, made or entered into in the ordinary course of business; and

(ff)  Investments in wind or other renewable energy projects or in any nuclear power or energy joint venture in an aggregate amount not to exceed $200,000,000 at any time outstanding;

-126-

provided that, notwithstanding the definition of Excluded Stock and Stock Equivalents, all Stock and Stock Equivalents representing any such Investment shall be pledged to the Collateral Agent for the benefit of the Secured Parties.

Notwithstanding anything to the contrary contained in this Agreement, the Borrower and the Restricted Subsidiaries may not rely on clause (g), (h), (i) or (j) of this Section 10.5 to directly or indirectly make an Investment of all or any portion of one or more Baseload Generation Assets.

      10.6.  Limitation on Dividends.  The Borrower will not declare or pay any dividends (other than dividends payable solely in its Stock or Stock Equivalents (other than Disqualified Stock)) or return any capital to its stockholders or make any other distribution, payment or delivery of property or cash to its stockholders as such, or redeem, retire, purchase or otherwise acquire, directly or indirectly, for consideration, any shares of any class of its Stock or Stock Equivalents or the Stock or Stock Equivalents of any direct or indirect parent now or hereafter outstanding, or set aside any funds for any of the foregoing purposes, or permit any Restricted Subsidiary to purchase or otherwise acquire for consideration (other than in connection with an Investment permitted by Section 10.5) any Stock or Stock Equivalents of the Borrower now or hereafter outstanding (all of the foregoing, "**dividends**"), provided, subject to the Cash Management Order, the Tax Order and the Wages Order:

      (a)      the Borrower may (or may pay dividends to permit any direct or indirect parent thereof to) redeem in whole or in part any of its Stock or Stock Equivalents for another class of its (or such parent's) Stock or Stock Equivalents or with proceeds from substantially concurrent equity contributions or issuances of new Stock or Stock Equivalents; provided that (i) such new Stock or Stock Equivalents contain terms and provisions at least as advantageous to the Lenders, taken as a whole, in all respects material to their interests as those contained in the Stock or Stock Equivalents redeemed thereby and (ii) the cash proceeds from any such contribution or issuance have not otherwise been applied pursuant to the Applicable Equity Amount;

      (b)      so long as no Payment Default or Event of Default shall have occurred and is continuing or would result therefrom, the Borrower may (or may pay dividends to permit any direct or indirect parent thereof to) redeem, acquire, retire or repurchase shares of its (or such parent's) Stock or Stock Equivalents held by any present or former officer, manager, consultant, director or employee (or their respective Affiliates, spouses, former spouses, successors, executors, administrators, heirs, legatees, distributees, estates or immediate family members) of the Borrower (or any direct or indirect parent thereof) and any Subsidiaries, so long as such repurchase is pursuant to, and in accordance with the terms of, any stock option or stock appreciation rights plan, any management, director and/or employee benefit, stock ownership or option plan, stock subscription plan or agreement, employment termination agreement or any employment agreements or stockholders' or shareholders' agreement; provided, however, that the aggregate amount of payments made under this Section 10.6(b) do not exceed in any calendar year $25,000,000 (with unused amounts in any calendar year being carried over to succeeding calendar years subject to a maximum (without giving effect to the following proviso) of $50,000,000 in any calendar year); provided, further, that such amount in any calendar year may be increased by an amount not to exceed:

      (i)      the cash proceeds from the sale of Stock (other than Disqualified Stock) of the Borrower and, to the extent contributed to the Borrower, Stock of any of the Borrower's direct or indirect parent companies, in each case to present or former officers, managers, consultants, directors or employees (or their respective Affiliates, spouses, former spouses, successors, executors, administrators, heirs, legatees, distributees, estates or immediate family members) of the Borrower (or any of its direct or indirect parent companies) or any Subsidiary of the Borrower

-127-

that occurs after the Closing Date, to the extent the cash proceeds from the sale of such Stock have not otherwise been applied pursuant to the Applicable Equity Amount; plus

(ii)    the cash proceeds of key man life insurance policies received the Borrower or any Restricted Subsidiary after the Closing Date; less

(iii)    the amount of any dividends or distributions previously made with the cash proceeds described in clauses (i) and (ii) above;

and provided, further, that cancellation of Indebtedness owing to the Borrower or any Restricted Subsidiary from present or former officers, managers, consultants, directors or employees (or their respective Affiliates, spouses, former spouses, successors, executors, administrators, heirs, legatees, distributees, estates or immediate family members) of the Borrower (or any of its direct or indirect parent companies), or any Subsidiary of the Borrower in connection with a repurchase of Stock or Stock Equivalents of the Borrower or any of its direct or indirect parent companies will not be deemed to constitute a dividend for purposes of this covenant or any other provision of this Agreement;

(c)    so long as no Payment Default or Event of Default shall have occurred and is continuing or would result therefrom, the Borrower may pay dividends on its Stock or Stock Equivalents; provided that the amount of all such dividends paid from the Closing Date pursuant to this clause (c), when aggregated with (i) all aggregate principal amounts paid pursuant to Section 10.7 from the Closing Date and (ii) (A) all loans and advances made to any direct or indirect parent of the Borrower pursuant to Section 10.5(m) in lieu of dividends permitted by this clause (c) and (B) all Investments made pursuant to Section 10.5(v), shall not exceed an amount equal to (x) $0 plus (y) the Applicable Equity Amount at the time such dividends are paid;

(d)    the Borrower may make dividends, distributions or loans to any direct or indirect parent company of the Borrower in amount required for any such direct or indirect parent to pay, in each case without duplication:

(i)    foreign, federal, state and local income taxes, to the extent such income taxes are attributable to the income of the Borrower and its Subsidiaries; provided that the amount of such payments in any fiscal year does not exceed the amount that the Ultimate Parent and its Subsidiaries are required to pay in respect of foreign, federal, state and local income taxes attributable to the income of the Borrower and its Subsidiaries for such fiscal year;

(ii)    (A) such parents' and their respective Subsidiaries' (other than the Oncor Subsidiaries) general operating expenses incurred in the ordinary course of business and other corporate overhead costs and expenses (including administrative, legal, accounting and similar expenses provided by third parties), which are reasonable and customary and incurred in the ordinary course of business and to the extent such costs and expenses are attributable to the ownership or operation of the Borrower and its Subsidiaries, (B) any reasonable and customary indemnification claims made by directors or officers of the Borrower (or any parent thereof and such parent's Subsidiaries (other than the Oncor Subsidiaries) to the extent such claims are attributable to the ownership or operation of the Borrower and its Subsidiaries) or any Restricted Subsidiary or (C) fees and expenses otherwise due and payable by the Borrower (or any parent thereof and such parent's Subsidiaries (other than the Oncor Subsidiaries) to the extent such fees and expenses are attributable to the ownership or operation of the Borrower and its Subsidiaries) or any Restricted Subsidiary and not prohibited to be paid by the Borrower and its Restricted Subsidiaries hereunder;

-128-

(iii)    franchise and excise taxes and other fees, taxes and expenses required to maintain the corporate existence of any direct or indirect parent of the Borrower;

(iv)    to any direct or indirect parent of the Borrower to finance any Investment permitted to be made by the Borrower or any Restricted Subsidiary pursuant to Section 10.5; provided that (A) such dividend shall be made substantially concurrently with the closing of such Investment, (B) such parent shall, immediately following the closing thereof, cause (1) all property acquired (whether assets, Stock or Stock Equivalents) to be contributed to the Borrower or such Restricted Subsidiary or (2) the merger (to the extent permitted in Section 10.5) of the Person formed or acquired into the Borrower or any Restricted Subsidiary, (C) the Borrower shall comply with Section 9.11 and Section 9.12 to the extent applicable and (D) the aggregate amount of such dividends shall reduce the ability of the Borrower and the Restricted Subsidiary to make Investments under the applicable clauses of Section 10.5 by such amount;

(v)    customary costs, fees and expenses (other than to Affiliates) related to any unsuccessful equity or debt offering or acquisition or disposition transaction payable by the Borrower or the Restricted Subsidiaries; and

(vi)    customary salary, bonus and other benefits payable to officers, employees or consultants of any direct or indirect parent company (and such parent's Subsidiaries (other than the Oncor Subsidiaries)) of the Borrower to the extent such salaries, bonuses and other benefits are attributable to the ownership or operation of the Borrower and its Subsidiaries;

(e)    to the extent (if any) constituting dividends, transactions pursuant to the Shared Services Agreement or described in any Budget approved by the Administrative Agent and the Joint Lead Arrangers;

(f)    to the extent constituting dividends, the Borrower may enter into and consummate transactions expressly permitted by any provision of Section 10.3;

(g)    the Borrower may repurchase Stock or Stock Equivalents of the Borrower (or any direct or indirect parent thereof) deemed to occur upon exercise of stock options or warrants if such Stock or Stock Equivalents represents a portion of the exercise price of such options or warrants, and the Borrower may pay dividends to any direct or indirect parent thereof as and when necessary to enable such parent to effect such repurchases;

(h)    the Borrower may (i) pay cash in lieu of fractional shares in connection with any dividend, split or combination thereof or any Permitted Acquisition and (ii) honor any conversion request by a holder of convertible Indebtedness and make cash payments in lieu of fractional shares in connection with any such conversion and may make payments on convertible Indebtedness in accordance with its terms;

(i)    the Borrower may pay any dividend or distribution within 60 days after the date of declaration thereof, if at the date of declaration such payment would have complied with the provisions of this Agreement;

(j)    [reserved];

(k)    the Borrower may pay dividends in an amount equal to withholding or similar Taxes payable or expected to be payable by any present or former employee, director, manager or consultant (or their respective Affiliates, estates or immediate family members) and any repurchases of

-129-

Stock or Stock Equivalents in consideration of such payments including deemed repurchases in connection with the exercise of stock options;

(l)    [reserved];

(m)    the Borrower may make payments described in Sections 9.9(a), 9.9(c), 9.9(f), 9.9(g), 9.9(h), 9.9(i), 9.9(k), 9.9(l) and 10.5(z);

(n)    the Borrower may pay dividends or make distributions in connection with the Transactions, including payments in respect of the Ultimate Parent's and its Subsidiaries' long term incentive plan or in respect of tax gross-ups and other deferred compensation;

(o)    [reserved];

(p)    the Borrower may make distributions or payments of Receivables Fees;

(q)    [reserved];

(r)    [reserved];

(s)    the Borrower may make distributions of, or Investments in, Receivables Facility Assets for purposes of inclusion in any Permitted Receivables Financing, in each case made in the ordinary course of business or consistent with past practices;

(t)    the Borrower may make distributions, loans or other advances to Parent Guarantor, in an amount not to exceed $125,000,000 in the aggregate for all such distributions, loans or other advances made from the Closing Date solely to the extent that the proceeds of such distributions, loans or other advances are used by Parent Guarantor to satisfy payment obligations (including, without limitation, payment of principal, interest and any make-whole, prepayment or similar fees) owed by Parent Guarantor under (i) the Tex-La Indebtedness and (ii) the CT Lease Indebtedness; provided that no such distribution, loan or other advance shall be permitted pursuant to this clause (ii) unless (x) the Borrower or the Restricted Subsidiary, as applicable, that is the lessee under the applicable CT Lease retains its leasehold interest in respect of such CT Lease or (y) the assets subject to such CT Lease are contributed to the Borrower or a Restricted Subsidiary; and

(u)    the Borrower may make loans to, or permit letters of credit (including Letters of Credit) to be issued on behalf of, any of its direct or indirect parent companies or such parents' Subsidiaries for working capital purposes or the cost of maintaining the headquarters building at Energy Plaza, in each case so long as made in the ordinary course of business and consistent with past practices and in an amount not to exceed $50,000,000.

Notwithstanding anything to the contrary contained in Section 10 (including Section 10.5 and this Section 10.6), the Borrower will not, and will not permit any of its Restricted Subsidiaries to, pay any cash dividend or make any cash distribution on or in respect of the Borrower's Stock or Stock Equivalents or purchase or otherwise acquire for cash any Stock or Stock Equivalents of the Borrower or any direct or indirect parent of the Borrower, for the purpose of paying any cash dividend or making any cash distribution to, or acquiring any Stock or Stock Equivalents of the Borrower or any direct or indirect parent of the Borrower for cash from the Permitted Holders, or guarantee any Indebtedness of any Affiliate of the Borrower for the purpose of paying such dividend, making such distribution or so acquiring such Stock or Stock Equivalents to or from the Permitted Holders, in each case by means of utilization of the cumulative dividend and investment credit provided by the use of the Applicable

-130-

Amount or the exceptions provided by Sections 10.5(i), (m) and (v), and Section 10.7(ii), unless at the time and after giving effect to such payment, no Event of Default has occurred and is continuing.

10.7.    Limitation on Prepaying Indebtedness. Except as permitted by the terms and conditions set forth in the Acceptable Reorganization Plan, the First Day Orders, the Orders or as specifically permitted hereunder, Borrower shall not, and shall not permit the Restricted Subsidiaries to, without the express prior written consent of the Required Lenders, make any payment or transfer with respect to any Indebtedness incurred or arising prior to the filing of the Cases, whether by way of "adequate protection" under the Bankruptcy Code or otherwise (in each case, other than any (i) to the extent permitted under the Hedging and Trading Order, payments under any financial or physical trading transaction, including commodities transactions and any payments under any Hedging Agreements, and (ii) payments in an aggregate amount not to exceed the sum of (A) $200,000,000 and (B) the Applicable Amount).

10.8.    Limitations on Sale Leasebacks. The Borrower will not, and will not permit the Restricted Subsidiaries to, enter into or effect any Sale Leasebacks after the Closing Date, other than Permitted Sale Leasebacks.

10.9.    Consolidated Superpriority Secured Net Debt to Consolidated EBITDA Ratio. The Borrower will not permit the Consolidated Superpriority Secured Net Debt to Consolidated EBITDA Ratio for any Test Period beginning with the Test Period ending on June 30, 2014 to be greater than (x) if the RCT Carve Out Support Rejection Notice has not been issued and delivered during or prior to such Test Period, 3.50 to 1.00 and (y) for all other Test Periods, 4.50 to 1.00.

Any provision of this Agreement that contains a requirement for the Borrower to be in compliance with the covenant contained in this Section 10.9 prior to the time that this covenant is otherwise applicable shall be deemed to require that the Consolidated Superpriority Secured Net Debt to Consolidated EBITDA Ratio for the applicable Test Period not be greater than (x) if the RCT Carve Out Support Rejection Notice has not been issued and delivered during or prior to such Test Period, 3.50 to 1.00 and (y) for all other Test Periods, 4.50 to 1.00.

10.10.    Changes in Business. The Borrower and the Restricted Subsidiaries, taken as a whole, will not fundamentally and substantively alter the character of their business, taken as a whole, from the business conducted by the Borrower and the Restricted Subsidiaries, taken as a whole, on the Closing Date and other business activities incidental or reasonably related to any of the foregoing except as required by the Bankruptcy Code or pursuant to the Interim Order or the Final Order.

10.11. Bankruptcy Provisions.

(a)    Parent Guarantor and the Borrower shall not, and shall not permit any other Credit Party or any other Restricted Subsidiary to, consent to the termination or reduction of the TCEH Debtors' exclusive plan filing and plan solicitation periods under section 1121 of the Bankruptcy Code (the "**Exclusivity Periods**") or fail to object to any motion by a party in interest (other than a Lender or the Administrative Agent) seeking to terminate or reduce the Exclusivity Periods, in each case without the prior written consent of the Administrative Agent.

(b)    Parent Guarantor and the Borrower shall not, and shall not permit any other Credit Party or any other Restricted Subsidiary to create or permit to exist any other Superpriority Claim (other than the Carve Out, the RCT Reclamation Support Carve Out or the Obligations) or any "claim" (as such word is defined in the Bankruptcy Code) that is pari passu with or senior to the claims of the Secured Parties or any lien that is pari passu with or senior to the liens of the Secured Parties in any of the

-131-

Cases except (A) with the prior written consent of the Administrative Agent or (B) to the extent such lien constitutes a Permitted Lien securing Indebtedness or obligations not prohibited by this Agreement.

10.12. <u>Affiliate Value Transfers</u>. The Borrower will not, and will not permit the Restricted Subsidiaries to, make any Affiliate Value Transfers in an aggregate amount in excess of $50,000,000 for all such Affiliate Value Transfers made from the Closing Date.

SECTION 11. <u>Events of Default</u>.

Upon the occurrence of any of the following specified events (each an "**Event of Default**"):

11.1. <u>Payments</u>. The Borrower shall (a) default in the payment when due of any principal of the Loans or any Unpaid Drawings or (b) default, and such default shall continue for five or more days, in the payment when due of any interest on the Loans or any Fees or any other amounts owing hereunder or under any other Credit Document; or

11.2. <u>Representations, Etc</u>. Any representation, warranty or statement made or deemed made by any Credit Party herein or in any other Credit Document or any certificate delivered or required to be delivered pursuant hereto or thereto shall prove to be untrue in any material respect on the date as of which made or deemed made; or

11.3. <u>Covenants</u>. Any Credit Party shall:

(a)    default in the due performance or observance by it of any term, covenant or agreement contained in <u>Section 9.1(e)</u>, <u>Section 9.5</u> (solely with respect to the Borrower), <u>Section 9.15</u> or <u>Section 10</u>; <u>provided</u> that an Event of Default under <u>Section 10.9</u> shall not constitute an Event of Default for purposes of any Term Loan or Delayed-Draw Term Loan, or result in the availability of any remedies for the Term Loan Lenders or Delayed-Draw Term Loan Lenders, unless and until the Required Revolving Credit Lenders have actually declared all Revolving Credit Loans and all related Obligations to be immediately due and payable in accordance with this Agreement and such declaration has not been rescinded on or before the date the Required Term Loan Lenders or Required Delayed-Draw Term Loan Lenders declare an Event of Default with respect to <u>Section 10.9</u>; or

(b)    default in the due performance or observance by it of any term, covenant or agreement (other than those referred to in <u>Section 11.1</u> or <u>11.2</u> or clause (a) of this <u>Section 11.3</u>) contained in this Agreement or any other Credit Document and such default shall continue unremedied for a period of at least 30 days after receipt of written notice by the Borrower from the Administrative Agent or the Required Lenders; or

11.4. <u>Default Under Other Agreements</u>. (a) The Borrower or any Restricted Subsidiary shall (i) default in any payment with respect to any Indebtedness incurred after the Petition Date (other than any Indebtedness described in <u>Section 11.1</u>, Hedging Obligations or Indebtedness under any Permitted Receivables Financing) in excess of $150,000,000 in the aggregate for the Borrower and such Restricted Subsidiaries, beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness was created or (ii) default in the observance or performance of any agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist (other than any agreement or condition relating to, or provided in any instrument or agreement, under which such Hedging Obligations or such Permitted Receivables Financing was created), in each case, after giving effect to any applicable period of grace, the effect of which default or other event or condition is to cause, or to permit the holder

-132-

or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause, any such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; or (b) without limiting the provisions of clause (a) above, any such Indebtedness shall be declared to be due and payable, or required to be prepaid other than by a regularly scheduled required prepayment (other than any Hedging Obligations or Indebtedness under any Permitted Receivables Financing) or as a mandatory prepayment, prior to the stated maturity thereof; provided that this clause (b) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness; or

      11.5.   [Reserved].

      11.6.   ERISA.  (a) Any Plan shall fail to satisfy the minimum funding standard required for any plan year or part thereof or a waiver of such standard or extension of any amortization period is sought or granted under Section 412 of the Code; any Plan is or shall have been terminated or is the subject of termination proceedings under ERISA (including the giving of written notice thereof); an event shall have occurred or a condition shall exist in either case entitling the PBGC to terminate any Plan or to appoint a trustee to administer any Plan (including the giving of written notice thereof); any Plan shall have an accumulated funding deficiency (whether or not waived); the Borrower or any ERISA Affiliate has incurred or is likely to incur a liability to or on account of a Plan under Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201 or 4204 of ERISA or Section 4971 or 4975 of the Code (including the giving of written notice thereof); (b) there could result from any event or events set forth in clause (a) of this Section 11.6 the imposition of a Lien, the granting of a security interest, or a liability, or the reasonable likelihood of incurring a Lien, security interest or liability; and (c) such Lien, security interest or liability will or would be reasonably likely to have a Material Adverse Effect; or

      11.7.   Credit Documents. Any Credit Document or any material provision thereof shall cease to be in full force and effect (other than pursuant to the terms hereof or thereof); or

      11.8.   [Reserved].

      11.9.   [Reserved].

      11.10.   [Reserved].

      11.11.   Judgments.  Any single judgment in excess of $150,000,000 as to any post-petition obligation, or any judgments that are in the aggregate in excess of $250,000,000 as to any one or more post-petition obligations, shall be rendered against the TCEH Debtors and the enforcement thereof shall not be stayed (by operation of law, the rules or orders of a court with jurisdiction over the matter or by consent of the party litigants, in each case, to the extent not paid or covered by insurance provided by a carrier not disputing coverage) or there shall be rendered against the TCEH Debtors a non-monetary judgment with respect to a post-petition event that causes or is reasonably expected to cause a Material Adverse Effect; provided, however, that this Section 11.11 shall not apply to any judgments as to any pre-petition obligation; or

      11.12.   Hedging Agreements. The Borrower or any of the Restricted Subsidiaries shall default (and have knowledge of such default) in any required payment obligation that is not being contested in good faith and by appropriate proceedings by the Borrower or any Restricted Subsidiary under any one or more Hedging Agreements entered into after the Petition Date and involving liabilities in the aggregate in excess of $150,000,000 and payable by the Borrower and the Restricted Subsidiaries,

after giving effect to any grace periods, dispute resolution provisions or similar provisions contained in such Hedging Agreements; and such default shall not have been cured within 60 days after the date on which the date on which the counterparty under such Hedging Agreement is permitted to cause the obligation to become due and payable; or

11.13. <u>Change of Control</u>.  A Change of Control shall occur; or

11.14. <u>Final Order</u>.  The Final Order Entry Date shall not have occurred within 45 days of the Interim Order Entry Date; or

11.15. <u>Matters Related to the Cases</u>.

(i)    any of the Cases shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code; or

(ii)    a trustee, receiver, interim receiver, or manager shall be appointed in any of the Cases, or a responsible officer or an examiner with enlarged powers shall be appointed in any of the Cases (having powers beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code); or

(iii)    Any other Superpriority Claim (other than the Carve Out, the RCT Reclamation Support Carve Out or the Obligations) or any "claim" (as such word is defined in the Bankruptcy Code) that is pari passu with or senior to the claims of the Secured Parties or any lien that is pari passu with or senior to the liens of the Secured Parties shall be granted in any of the Cases except (A) with the prior written consent of the Administrative Agent or (B) to the extent such lien constitutes a Permitted Lien securing Indebtedness or obligations not prohibited by this Agreement.

(iv)    the Bankruptcy Court shall enter an order approving any claims for recovery of amounts under section 506(c) of the Bankruptcy Code or otherwise arising from the preservation of any Collateral; or

(v)    any TCEH Debtor makes any material payments relating to prepetition obligations (including any "adequate protection" payments) other than in accordance with the First Day Orders, the Interim Order, the Final Order, <u>Section 10.7</u> or as otherwise agreed to by the Administrative Agent; or

(vi)    the use of cash collateral by the TCEH Debtors shall be terminated and the TCEH Debtors shall not have obtained use of cash collateral (consensually or non-consensually) pursuant to an order in form and substance acceptable to the Left Lead Arrangers; or

(vii)    the Credit Parties or any of their Subsidiaries, or any person claiming by or through the Credit Parties or any of their Subsidiaries, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against any of the Administrative Agent or Lenders, in each case, relating to the Credit Facilities; or

(viii)    (i) Any TCEH Debtor shall file a motion or pleading or commence a proceeding that could reasonably be expected to result in an impairment of the Administrative Agent's or any of the Lenders' material rights or interests in their capacities as such under the Credit Facilities or (ii) a determination by a court with respect to a motion, pleading or proceeding brought by

-134-

another party that results in such an impairment; provided, however, that this subclause (viii) will not apply to the termination of use of cash collateral (which shall be exclusively governed by subclause (vi) above); or

(ix)    the Bankruptcy Court shall enter a final non-appealable order that is adverse in any material respect to the interests (taken as a whole) of the Administrative Agent or the Lenders or their respective material rights and remedies in their capacity as such under the Credit Facilities in any of the Cases; provided, however, that this subclause (viii) will not apply to the termination of use of cash collateral (which shall be governed exclusively by subclause (vi) above); or

(x)    any TCEH Debtor shall file any pleading seeking, or otherwise consenting to, or shall support or acquiesce in any other person's motion as to any matter set forth in Section 11.11, this Section 11.15 (other than this subclause (x)), Section 11.16, Section 11.17(i) and (ii), or Section 11.18.

11.16.  Automatic Stay. The Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to any creditor or party in interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the TCEH Debtors that have an aggregate value in excess of $150,000,000; or

11.17.  Status of Orders. (i) An order shall be entered reversing, supplementing, staying for a period of five (5) Business Days or more, vacating or otherwise amending, supplementing or modifying the Interim Order or the Final Order in a manner that is adverse to the interests of the Administrative Agent or the Lenders, or the Borrower or any Guarantor shall apply for authority to do so, without the prior written consent of the Administrative Agent or the Required Lenders, (ii) the Interim Order or Final Order shall cease to create a valid and perfected lien on the Collateral or to be in full force and effect; or (iii) the Borrower or any Guarantor shall fail to comply with the Orders in any material respect; or

11.18.  Confirmation of Plan. A plan shall be confirmed in any of the Cases that does not provide for termination of the Commitments hereunder and the indefeasible payment in full in cash of the Obligations (other than Contingent Obligations) on the effective date of such plan;

then, and in any such event, and at any time thereafter, if any Event of Default shall then be continuing, subject in each case to the terms and conditions of the Interim Order and (once entered) the Final Order, the Administrative Agent may and, upon the written request of the Required Lenders, shall, by five calendar days' written notice to the Borrower, take any or all of the following actions, without prejudice to the rights of the Administrative Agent or any Lender to enforce its claims against the Borrower, except as otherwise specifically provided for in this Agreement: (i) declare the Commitments terminated, whereupon the Commitments, if any, of each Lender and each Letter of Credit Issuer shall forthwith terminate immediately and any Fees theretofore accrued shall forthwith become due and payable without any other notice of any kind; (ii) declare the principal of and any accrued interest and Fees in respect of any or all Loans and any or all Obligations owing hereunder and under any other Credit Document to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; and/or (iii) terminate any Letter of Credit that may be terminated in accordance with its terms.

11.19.  Application of Proceeds. Subject to the Carve Out and the RCT Reclamation Support Carve Out, during the existence of an Event of Default any Net Cash Proceeds received by the Collateral Agent, any distribution made in respect of any Collateral in any bankruptcy or insolvency

-135-

proceeding of any Credit Party, all proceeds of any sale, collection or other liquidation of any Collateral, including all insurance proceeds received in respect thereof, and all proceeds of any such distribution, and any proceeds received by the Collateral Agent in respect of any sale of, collection from or other realization upon all or any part of the Collateral pursuant to the exercise by the Collateral Agent of its remedies shall be applied, in full or in part, together with any other sums then held by the Collateral Agent pursuant to this Agreement and/or any other Credit Document, promptly as follows:

(a)    with respect to any Collateral other than the RCT L/C Collateral Accounts and the General L/C Collateral Accounts:

(i)    First, to the payment of all reasonable costs and expenses, fees, commissions and taxes of such sale, collection or other realization including compensation to the Administrative Agent, Collateral Agent and their agents and counsel, and all expenses, liabilities and advances made or incurred by the Administrative Agent and Collateral Agent in connection therewith and all amounts for which the Administrative Agent and Collateral Agent is entitled to indemnification pursuant to the provisions of any Credit Document, together with interest on each such amount at the highest rate then in effect under this Agreement from and after the date such amount is due, owing or unpaid until paid in full;

(ii)    Second, to the payment of all other reasonable costs and expenses of such sale, collection or other realization including all costs, liabilities and advances made or incurred by the other Secured Parties in connection therewith, together with interest on each such amount at the highest rate then in effect under this Agreement from and after the date such amount is due, owing or unpaid until paid in full;

(iii)    Third, without duplication of amounts applied pursuant to clauses (i) and (ii) above, to the indefeasible payment in full in cash, pro rata, of interest and other amounts constituting Obligations (other than principal, reimbursement obligations in respect of Letters of Credit and obligations to cash collateralize Letters of Credit) and any fees, premiums and scheduled periodic payments due under Secured Hedging Agreement, Secured Commodity Hedging Agreements and Secured Cash Management Agreements to the extent constituting Obligations and any interest accrued thereon (excluding any breakage, termination or other payments thereunder), in each case equally and ratably in accordance with the respective amounts thereof then due and owing;

(iv)    Fourth, to the payment in full in cash, pro rata, of principal amount of the Obligations (including reimbursement obligations in respect of Letters of Credit and obligations to cash collateralize Letters of Credit) and any premium thereon and any breakage, termination or other payments under Secured Hedging Agreement, Secured Commodity Hedging Agreements or Secured Cash Management Agreements to the extent constituting Obligations and any interest accrued thereon; and

(v)    Fifth, the balance, if any, to the person lawfully entitled thereto (including the applicable Credit Party or its successors or assigns) or as a court of competent jurisdiction may direct.

(b)    with respect to any RCT L/C Collateral Account:

(i)    First, on a pro rata basis, to the payment of all amounts due to the relevant RCT Letter of Credit Issuer under any of the Credit Documents, excluding amounts payable in connection with any RCT Letter of Credit Reimbursement Obligation;

#4821-7663-6950

(ii)     Second, on a pro rata basis, to the payment of all amounts due to the relevant RCT Letter of Credit Issuer in an amount equal to 100% of all relevant RCT Letter of Credit Reimbursement Obligations;

(iii)     Third, on a pro rata basis, to any Secured Party which has theretofore advanced or paid any fees to the relevant RCT Letter of Credit Issuer, other than any amounts covered by priority Second, an amount equal to the amount thereof so advanced or paid by such Secured Party and for which such Secured Party has not been previously reimbursed;

(iv)     Fourth, on a pro rata basis, to the payment of all other relevant RCT L/C Obligations; and

(v)     Last, the balance, if any, after all of the relevant RCT L/C Obligations have been indefeasibly paid in full in cash, as set forth above in Section 11.19(a).

(c)     with respect to any General L/C Collateral Account:

(i)     First, on a pro rata basis, to the payment of all amounts due to the relevant General Letter of Credit Issuer under any of the Credit Documents, excluding amounts payable in connection with any General Letter of Credit Reimbursement Obligation;

(ii)     Second, on a pro rata basis, to the payment of all amounts due to the relevant General Letter of Credit Issuer in an amount equal to 100% of all General Letter of Credit Reimbursement Obligations;

(iii)     Third, on a pro rata basis, to any Secured Party which has theretofore advanced or paid any fees to the relevant General Letter of Credit Issuer, other than any amounts covered by priority Second, an amount equal to the amount thereof so advanced or paid by such Secured Party and for which such Secured Party has not been previously reimbursed;

(iv)     Fourth, on a pro rata basis, to the payment of all other relevant General L/C Obligations; and

(v)     Last, the balance, if any, after all of the relevant General L/C Obligations have been indefeasibly paid in full in cash, as set forth above in Section 11.19(a).

In the event that any such proceeds are insufficient to pay in full the items described in clauses (a), (b) and (c) of this Section 11.19, the Credit Parties shall remain liable, jointly and severally, for any deficiency.

Notwithstanding anything to the contrary contained herein, any Event of Default under this Agreement or similarly defined term under any other Credit Document, other than any Event of Default which cannot be waived without the written consent of each Lender directly and adversely affected thereby, shall be deemed not to be "continuing" if the events, act or condition that gave rise to such Event of Default have been remedied or cured (including by payment, notice, taking of any action or omitting to take any action) or have ceased to exist and the Borrower is in compliance with this Agreement and/or such other Credit Document.

SECTION 12. The Agents.

12.1.  Appointment.

(a)      Each Lender hereby irrevocably designates and appoints the Administrative Agent as the agent of such Lender under this Agreement and the other Credit Documents and irrevocably authorizes the Administrative Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Credit Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of this Agreement and the other Credit Documents, together with such other powers as are reasonably incidental thereto.  The provisions of this Section 12 (other than Sections 12.9 and 12.13 with respect to the Borrower) are solely for the benefit of the Agents and the Lenders, and the Borrower shall not have any rights as a third party beneficiary of such provision.  Notwithstanding any provision to the contrary elsewhere in this Agreement, no Agent shall have any duties or responsibilities, except those expressly set forth herein or in any other Credit Document, any fiduciary relationship with any Lender or any agency or trust obligations with respect to any Credit Party, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Credit Document or otherwise exist against such Agent.

(b)      The Administrative Agent, each Lender, each Hedge Bank with respect to any Secured Commodity Hedging Agreement and the Letter of Credit Issuers hereby irrevocably designate and appoint the Collateral Agent as the agent with respect to the Collateral, and each of the Administrative Agent, each Lender and each Letter of Credit Issuer irrevocably authorizes the Collateral Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Credit Documents and to exercise such powers and perform such duties as are expressly delegated to the Collateral Agent by the terms of this Agreement and the other Credit Documents, together with such other powers as are reasonably incidental thereto.  Notwithstanding any provision to the contrary elsewhere in this Agreement, the Collateral Agent shall not have any duties or responsibilities except those expressly set forth herein or in any other Credit Document, any fiduciary relationship with any of the Administrative Agent, the Lenders, or the Letter of Credit Issuers or any agency or trust obligations with respect to any Credit Party, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Credit Document or otherwise exist against the Collateral Agent.

(c)      Each of the Co-Syndication Agents, the Joint Lead Arrangers and the Co-Documentation Agents, each in its capacity as such, shall not have any obligations, duties or responsibilities under this Agreement but shall be entitled to all benefits of this Section 12.

12.2.  Delegation of Duties.  The Administrative Agent and the Collateral Agent may each execute any of its duties under this Agreement and the other Credit Documents by or through agents, sub-agents, employees or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  Neither the Administrative Agent nor the Collateral Agent shall be responsible for the negligence or misconduct of any agents, sub-agents or attorneys-in-fact selected by it in the absence of gross negligence or willful misconduct (as determined in the final judgment of a court of competent jurisdiction).

12.3.  Exculpatory Provisions.

(a)      No Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates shall be (i) liable for any action lawfully taken or omitted to be taken by any of them under or in connection with this Agreement or any other Credit Document (except for its or such Person's own

-138-

gross negligence or willful misconduct, as determined in the final judgment of a court of competent jurisdiction, in connection with its duties expressly set forth herein) or (ii) responsible in any manner to any of the Lenders or any participant for any recitals, statements, representations or warranties made by any of Parent Guarantor, the Borrower, any other Guarantor, any other Credit Party or any officer thereof contained in this Agreement or any other Credit Document or in any certificate, report, statement or other document referred to or provided for in, or received by such Agent under or in connection with, this Agreement or any other Credit Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Credit Document, or the perfection or priority of any Lien or security interest created or purported to be created under the Security Documents, or for any failure of Parent Guarantor, the Borrower, any other Guarantor or any other Credit Party to perform its obligations hereunder or thereunder. No Agent shall be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Credit Document, or to inspect the properties, books or records of any Credit Party or any Affiliate thereof. The Collateral Agent shall not be under any obligation to the Administrative Agent, any Lender or any Letter of Credit Issuer to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Credit Document, or to inspect the properties, books or records of any Credit Party.

(b)     Each Lender confirms to the Administrative Agent, each other Lender and each of their respective Related Parties that it (i) possesses (individually or through its Related Parties) such knowledge and experience in financial and business matters that it is capable, without reliance on the Administrative Agent, any other Lender or any of their respective Related Parties, of evaluating the merits and risks (including tax, legal, regulatory, credit, accounting and other financial matters) of (x) entering into this Agreement, (y) making Loans and other extensions of credit hereunder and under the other Credit Documents and (z) in taking or not taking actions hereunder and thereunder, (ii) is financially able to bear such risks and (iii) has determined that entering into this Agreement and making Loans and other extensions of credit hereunder and under the other Credit Documents is suitable and appropriate for it.

(c)     Each Lender acknowledges that (i) it is solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with this Agreement and the other Credit Documents, (ii) that it has, independently and without reliance upon the Administrative Agent, any other Lender or any of their respective Related Parties, made its own appraisal and investigation of all risks associated with, and its own credit analysis and decision to enter into, this Agreement based on such documents and information, as it has deemed appropriate and (iii) it will, independently and without reliance upon the Administrative Agent, any other Lender or any of their respective Related Parties, continue to be solely responsible for making its own appraisal and investigation of all risks arising under or in connection with, and its own credit analysis and decision to take or not take action under, this Agreement and the other Credit Documents based on such documents and information as it shall from time to time deem appropriate, which may include, in each case:

(i)     the financial condition, status and capitalization of the Borrower and each other Credit Party;

(ii)     the legality, validity, effectiveness, adequacy or enforceability of this Agreement and each other Credit Document and any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Credit Document;

(iii)     determining compliance or non-compliance with any condition hereunder to the making of a Loan or the issuance of a Letter of Credit and the form and substance of all evidence delivered in connection with establishing the satisfaction of each such condition; and

(iv)    the adequacy, accuracy and/or completeness of any information delivered by the Administrative Agent, any other Lender or by any of their respective Related Parties under or in connection with this Agreement or any other Credit Document, the transactions contemplated hereby and thereby or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Credit Document.

12.4.    Reliance by Agents.    The Administrative Agent and the Collateral Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telecopy, telex, electronic mail, or teletype message, statement, order or other document or instruction believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to Parent Guarantor and/or the Borrower), independent accountants and other experts selected by the Administrative Agent or the Collateral Agent.    The Administrative Agent may deem and treat the Lender specified in the Register with respect to any amount owing hereunder as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Administrative Agent.    The Administrative Agent and the Collateral Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Credit Document unless it shall first receive such advice or concurrence of the Required Lenders as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.    The Administrative Agent and the Collateral Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Credit Documents in accordance with a request of the Required Lenders, and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans; provided that the Administrative Agent and Collateral Agent shall not be required to take any action that, in its opinion or in the opinion of its counsel, may expose it to liability or that is contrary to any Credit Document or Applicable Law.    For purposes of determining compliance with the conditions specified in Sections 6 and 7 on the Closing Date, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

12.5.    Notice of Default.    Neither the Administrative Agent nor the Collateral Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder unless the Administrative Agent or Collateral Agent, as applicable, has received notice from a Lender, Parent Guarantor or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default".    In the event that the Administrative Agent receives such a notice, it shall give notice thereof to the Lenders, the Administrative Agent and the Collateral Agent.    The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders; provided that unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as is within its authority to take under this Agreement and otherwise as it shall deem advisable in the best interests of the Lenders except to the extent that this Agreement requires that such action be taken only with the approval of the Required Lenders or each of the Lenders, as applicable.

12.6.    Non-Reliance on Administrative Agent, Collateral Agent and Other Lenders. Each Lender expressly acknowledges that neither the Administrative Agent nor the Collateral Agent nor any of their respective officers, directors, employees, agents, attorneys-in-fact or Affiliates has made any representations or warranties to it and that no act by the Administrative Agent or Collateral Agent hereinafter taken, including any review of the affairs of Parent Guarantor, the Borrower, any other

-140-

Guarantor or any other Credit Party, shall be deemed to constitute any representation or warranty by the Administrative Agent or Collateral Agent to any Lender or the Letter of Credit Issuer. Each Lender and the Letter of Credit Issuer represents to the Administrative Agent and the Collateral Agent that it has, independently and without reliance upon the Administrative Agent, Collateral Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of Parent Guarantor, the Borrower, each other Guarantor and each other Credit Party and made its own decision to make its Loans hereunder and enter into this Agreement. Each Lender also represents that it will, independently and without reliance upon the Administrative Agent, Collateral Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Credit Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of Parent Guarantor, the Borrower, each other Guarantor and each other Credit Party. Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder, neither the Administrative Agent nor the Collateral Agent shall have any duty or responsibility to provide any Lender with any credit or other information concerning the business, assets, operations, properties, financial condition, prospects or creditworthiness of Parent Guarantor, the Borrower, any other Guarantor or any other Credit Party that may come into the possession of the Administrative Agent or Collateral Agent any of their respective officers, directors, employees, agents, attorneys-in-fact or Affiliates.

12.7.   Indemnification. The Lenders agree to indemnify each Agent, each in its capacity as such (to the extent not reimbursed by the Credit Parties and without limiting the obligation of the Credit Parties to do so), ratably according to their respective portions of the Total Credit Exposure in effect on the date on which indemnification is sought (or, if indemnification is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with their respective portions of the Total Credit Exposure in effect immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time occur (including at any time following the payment of the Loans) be imposed on, incurred by or asserted against such Agent, including all fees, disbursements and other charges of counsel to the extent required to be reimbursed by the Credit Parties pursuant to Section 13.5, in any way relating to or arising out of the Commitments, this Agreement, any of the other Credit Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent under or in connection with any of the foregoing **(SUBJECT TO THE PROVISO BELOW, WHETHER OR NOT CAUSED BY OR ARISING IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE ORDINARY NEGLIGENCE OF THE INDEMNIFIED PERSON);** provided that no Lender shall be liable to any Agent for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction; provided, further, that no action taken in accordance with the directions of the Required Lenders (or such other number or percentage of the Lenders as shall be required by the Credit Documents) shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section 12.7. In the case of any investigation, litigation or proceeding giving rise to any liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time occur, be imposed upon, incurred by or asserted against the Administrative Agent or the Collateral Agent in any way relating to or arising out of the Commitments, this Agreement, any of the other Credit Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent under or in connection with any of the foregoing (including at any

-141-

time following the payment of the Loans), this Section 12.7 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person. Without limitation of the foregoing, each Lender shall reimburse such Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including attorneys' fees) incurred by such Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice rendered in respect of rights or responsibilities under, this Agreement, any other Credit Document, or any document contemplated by or referred to herein, to the extent that such Agent is not reimbursed for such expenses by or on behalf of the Borrower; provided that such reimbursement by the Lenders shall not affect the Borrower's continuing reimbursement obligations with respect thereto. If any indemnity furnished to any Agent for any purpose shall, in the opinion of such Agent, be insufficient or become impaired, such Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; provided in no event shall this sentence require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's *pro rata* portion thereof; and provided further, this sentence shall not be deemed to require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement resulting from such Agent's gross negligence or willful misconduct (as determined by a final judgment of court of competent jurisdiction). The agreements in this Section 12.7 shall survive the payment of the Loans and all other amounts payable hereunder.

      12.8.   Agents in its Individual Capacities. Each Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with Parent Guarantor, the Borrower, any other Guarantor, and any other Credit Party as though such Agent were not an Agent hereunder and under the other Credit Documents. With respect to the Loans made by it, each Agent shall have the same rights and powers under this Agreement and the other Credit Documents as any Lender and may exercise the same as though it were not an Agent, and the terms "Lender" and "Lenders" shall include each Agent in its individual capacity.

      12.9.   Successor Agents. Each of the Administrative Agent and Collateral Agent may resign at any time by notifying the other Agent, the Lenders, the Letter of Credit Issuers and the Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, subject to the consent of the Borrower (not to be unreasonably withheld or delayed), to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may on behalf of the Lenders and the Letter of Credit Issuers, appoint a successor Agent meeting the qualifications set forth above; provided that if such Agent shall notify the Borrower and the Lenders that no qualifying person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (x) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Credit Documents (except that in the case of any collateral security held by the Collateral Agent on behalf of the Secured Parties under any of the Credit Documents, the retiring Collateral Agent shall continue to hold such collateral security until such time as a successor Collateral Agent is appointed) and (y) all payments, communications and determinations provided to be made by, to or through such Agent shall instead be made by or to each Lender and the Letter of Credit Issuer directly, until such time as the Required Lenders with (except after the occurrence and during the continuation of a Default or Event of Default) the consent of the Borrower (not to be unreasonably withheld) appoint successor Agents as provided for above in this paragraph. Upon the acceptance of a successor's appointment as the Administrative Agent or Collateral Agent, as the case may be, hereunder, and upon the execution and filing or recording of such financing statements, or amendments thereto, and such amendments or supplements to the Mortgages, and such other instruments

-142-

or notices, as may be necessary or desirable, or as the Required Lenders may request, in order to continue the perfection of the Liens granted or purported to be granted by the Security Documents, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Credit Documents (if not already discharged therefrom as provided above in this Section). The fees payable by the Borrower (following the effectiveness of such appointment) to such Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring Agent's resignation hereunder and under the other Credit Documents, the provisions of this Section 12 (including 12.7) and Section 13.5 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as an Agent.

12.10.  Withholding Tax.  To the extent required by any Applicable Law, the Administrative Agent may withhold from any interest payment to any Lender an amount equivalent to any applicable withholding tax. If the Internal Revenue Service or any authority of the United States or other jurisdiction asserts a claim that the Administrative Agent did not properly withhold tax from amounts paid to or for the account of any Lender (because the appropriate form was not delivered, was not properly executed, or because such Lender failed to notify the Administrative Agent or of a change in circumstances that rendered the exemption from, or reduction of, withholding tax ineffective, or for any other reason), such Lender shall indemnify the Administrative Agent (to the extent that the Administrative Agent has not already been reimbursed by the Borrower (solely to the extent required by this Agreement) and without limiting the obligation of the Borrower to do so) fully for all amounts paid, directly or indirectly, by the Administrative Agent as tax or otherwise, including penalties and interest, together with all expenses incurred, including legal expenses, allocated staff costs and any out of pocket expenses.

12.11.  Trust Indenture Act.  In the event that Citibank, N.A. or any of its Affiliates shall be or become an indenture trustee under the Trust Indenture Act of 1939 (as amended, the "**Trust Indenture Act**") in respect of any securities issued or guaranteed by any Credit Party, and agree that any payment or property received in satisfaction of or in respect of any Obligation of such Credit Party hereunder or under any other Credit Document by or on behalf of Citibank, N.A., in its capacity as the Administrative Agent or the Collateral Agent for the benefit of any Lender or Secured Party under any Credit Document (other than Citibank, N.A. or an Affiliate of Citibank, N.A.) and which is applied in accordance with the Credit Documents shall be deemed to be exempt from the requirements of Section 311 of the Trust Indenture Act pursuant to Section 311(b)(3) of the Trust Indenture Act.

12.12.  [Reserved].

12.13.  Security Documents and Guarantee.  (a) Agents under Security Documents and Guarantee. Each Secured Party hereby further authorizes the Administrative Agent or Collateral Agent, as applicable, on behalf of and for the benefit of the Secured Parties, to be the agent for and representative of the Secured Parties with respect to the Collateral and the Security Documents. Subject to Section 13.1, without further written consent or authorization from any Secured Party, the Administrative Agent or Collateral Agent, as applicable, may execute any documents or instruments necessary to in connection with a sale or disposition of assets permitted by this Agreement, (i) release any Lien encumbering any item of Collateral that is the subject of such sale or other disposition of assets, or with respect to which Required Lenders (or such other Lenders as may be required to give such consent under Section 13.1) have otherwise consented or (ii) release any Guarantor from the Guarantee, or with respect to which Required Lenders (or such other Lenders as may be required to give such consent under Section 13.1) have otherwise consented.

(b)    Right to Realize on Collateral and Enforce Guarantee.  Anything contained in any of the Credit Documents to the contrary notwithstanding, Parent Guarantor, the Borrower, the Agents and each Secured Party hereby agree that (i) no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Guarantee, it being understood and agreed that all powers, rights and remedies hereunder may be exercised solely by the Administrative Agent, on behalf of the Lenders in accordance with the terms hereof and all powers, rights and remedies under the Security Documents and Guarantee may be exercised solely by the Collateral Agent, on behalf of the Secured Parties, and (ii) in the event of a foreclosure by the Collateral Agent on any of the Collateral pursuant to a public or private sale or other disposition, the Collateral Agent or any Secured Party may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition and the Collateral Agent, as agent for and representative of the Secured Parties (but not any Lender or Lenders in its or their respective individual capacities unless Required Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by the Collateral Agent at such sale or other disposition.

SECTION 13.  Miscellaneous.

13.1.    Amendments, Waivers and Releases.  Neither this Agreement nor any other Credit Document, nor any terms hereof or thereof, may be amended, supplemented or modified except in accordance with the provisions of this Section 13.1.  The Required Lenders may, or, with the written consent of the Required Lenders, the Administrative Agent and/or the Collateral Agent may, from time to time, (a) enter into with the relevant Credit Party or Credit Parties written amendments, supplements or modifications hereto and to the other Credit Documents for the purpose of adding any provisions to this Agreement or the other Credit Documents or changing in any manner the rights of the Lenders or of the Credit Parties hereunder or thereunder or (b) waive in writing, on such terms and conditions as the Required Lenders or the Administrative Agent and/or Collateral Agent, as the case may be, may specify in such instrument, any of the requirements of this Agreement or the other Credit Documents or any Default or Event of Default and its consequences; provided, however, that each such waiver and each such amendment, supplement or modification shall be effective only in the specific instance and for the specific purpose for which given; and provided, further, that no such waiver and no such amendment, supplement or modification shall:

(i)    forgive or reduce any portion of any Loan or extend the final scheduled maturity date of any Loan or reduce the stated rate (it being understood that only the consent of the Required Lenders shall be necessary to waive any obligation of the Borrower to pay interest or principal at the Default Rate or amend Section 2.8(d)), or forgive any portion, or extend the date for the payment, of any interest or Fee payable hereunder (other than as a result of waiving the applicability of any post-default increase in interest rates, or the applicability of the "most favorable nation" clause in respect of any Incremental Facility), or extend the final expiration date of any Lender's Commitment or extend the final expiration date of any Letter of Credit beyond the General L/C Termination Date or the RCT L/C Termination Date, as applicable, or increase the aggregate amount of the Commitments of any Lender, or amend or modify any provisions of Section 5.3(a) (with respect to the ratable allocation of any payments only) and 13.8(a) and 13.19 or make any Loan, interest, Fee or other amount payable in any currency other than expressly provided herein, in each case without the written consent of each Lender directly and adversely affected thereby; provided that the Extension Conditions (other than the Extension Conditions set forth under clauses (1) (solely with respect to an Event of Default under Section 11.1) and (6) of the definition thereof) may be amended, supplemented or modified or waived with the written consent of the Required Lenders, or

-144-

(ii)     amend, modify or waive any provision of this <u>Section 13.1</u> or reduce the percentages specified in the definition of the term "Required Lenders", "Required Revolving Credit Lenders", "Required Delayed-Draw Term Loan Lenders" or "Required Term Loan Lenders", consent to the assignment or transfer by Parent Guarantor or the Borrower of their respective rights and obligations under any Credit Document to which it is a party (except as permitted pursuant to <u>Section 10.3</u>) or alter the order of application set forth in <u>Section 5.2(c)(i)</u>, in each case without the written consent of each Lender directly and adversely affected thereby, or

(iii)     amend, modify or waive any provision of <u>Section 12</u> without the written consent of the then-current Administrative Agent and Collateral Agent or any other former or current Agent to whom <u>Section 12</u> then applies in a manner that directly and adversely affects such Person, or

(iv)     amend, modify or waive any provision of <u>Section 3</u> (or amend, modify or waive any defined term in such <u>Section 3</u>, or any underlying definition thereto, in each case in a manner directly adverse to any Letter of Credit Issuer in its capacity as such) without the written consent of the applicable Letter of Credit Issuer in its capacity as such, or

(v)     amend, waive or otherwise modify any term or provision of <u>Section 10.9</u> or <u>11.3</u> (solely as it relates to <u>Section 10.9</u>), or the definition of "Consolidated Superpriority Secured Net Debt to Consolidated EBITDA Ratio" (or any of its component definitions (as used in such Section but not as used in other Sections of this Agreement)), without the written consent of the Required Revolving Credit Lenders (it being understood and agreed that the consent of no other Lender shall be required to amend, waive or modify any such terms or provision), or

(vi)     change any Revolving Credit Commitment to an Incremental Term Loan Commitment, or change any Incremental Term Loan Commitment to a Revolving Credit Commitment, in each case without the prior written consent of each Lender directly and adversely affected thereby, or

(vii)     release all or substantially all of the Guarantors under the Guarantee (except as expressly permitted by the Guarantee or this Agreement) or release all or substantially all of the Collateral under the Security Documents (except as expressly permitted by the Security Documents or this Agreement), in either case without the prior written consent of each Lender, or

(viii)     amend <u>Section 2.9</u> (or any related definitions) so as to permit Interest Period intervals greater than six months without regard to availability to Lenders, without the written consent of each Lender directly and adversely affected thereby, or

(ix)     affect the rights or duties of, or any Fees or other amounts payable to, any Agent under this Agreement or any other Credit Document without the prior written consent of such Agent, or

(x)     decrease the amount or allocation of any mandatory prepayment to be received by any Term Loan Lender (other than Term Loan Lenders holding Incremental Term Loans) without the written consent of the Required Term Loan Lenders (but not including in such calculation any Incremental Term Loans), or

-145-

(xi)    decrease the amount or allocation of any mandatory prepayment to be received by any Delayed-Draw Term Loan Lender without the written consent of the Required Delayed-Draw Term Loan Lenders, or

(xii)    waive the provisions of the proviso of <u>Section 2.14(d)</u> without the written consent of the Non-Defaulting Lenders having or holding a majority of the sum of (a) the aggregate outstanding principal amount of the Term Loans (excluding Term Loans held by Defaulting Lenders) at such date plus (b) the aggregate outstanding principal amount of the Delayed-Draw Term Loans (excluding Delayed Draw Term Loans held by Defaulting Lenders) at such date plus (c) the Adjusted Available Delayed Draw Term Loan Commitment at such date (but not including in such calculation any Incremental Term Loans, and it being understood and agreed that the consent of no other Lender shall be required to waive such provisions), or

(xiii)    waive the provisions of the proviso of Section 2.14(i)(ii) without the written consent of the Required Revolving Credit Lenders (but not including in such calculation any New Revolving Credit Commitments), or

(xiv)    increase the maximum amount of the RCT Reclamation Support Carve Out.

Any such waiver and any such amendment, supplement or modification shall apply equally to each of the affected Lenders and shall be binding upon Parent Guarantor, the Borrower, the applicable Credit Parties, such Lenders, the Administrative Agent and all future holders of the affected Loans.

In the case of any waiver, Parent Guarantor, the Borrower, the applicable Credit Parties, the Lenders, the Administrative Agent shall be restored to their former positions and rights hereunder and under the other Credit Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing, it being understood that no such waiver shall extend to any subsequent or other Default or Event of Default or impair any right consequent thereon. In connection with the foregoing provisions, the Administrative Agent may, but shall have no obligations to, with the concurrence of any Lender, execute amendments, modifications, waivers or consents on behalf of such Lender.

Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, modification, supplement, waiver or consent hereunder, except that the Commitment of such Lender may not be increased or extended without the consent of such Lender (it being understood that any Commitments, Loans held or deemed held by any Defaulting Lender shall be excluded for a vote of the Lenders hereunder requiring any consent of the Lenders, except as expressly provided for by this Agreement).

Notwithstanding the foregoing, in addition to any credit extensions and related Incremental Amendment(s) effectuated without the consent of Lenders in accordance with <u>Section 2.14</u>, this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent, Parent Guarantor and the Borrower (a) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Credit Documents with the Loans and Commitments and the accrued interest and Fees in respect thereof and (b) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders and other definitions related to such new Loans and Commitments.

In addition, notwithstanding the foregoing, (i) the Administrative Agent, the Collateral Agent and the relevant Credit Parties may amend, supplement or modify the Security Documents to make such ministerial changes as may be required to effect the provisions of Section 10.2(a) without the consent of any Lender so long as such amendments do not adversely affect the Lenders and (ii) the Administrative Agent, the Collateral Agent and the relevant Credit Parties may amend, supplement or modify this Agreement or any of the Security Documents and any other document delivered in connection therewith at the request of the Borrower without the need to obtain the consent of any other Lender if such amendment, supplement or waiver is delivered in order (i) to comply with local law or advice of local counsel, (ii) to cure ambiguities, omissions, mistakes or defects, (iii) to cause any such Security Document or other document to be consistent with this Agreement and the other Credit Documents or (iv) add syndication or documentation agents and make customary changes and references related thereto.

In addition, notwithstanding the foregoing, the Administrative Agent may amend, supplement or modify the last sentence of the definition of "Delayed-Draw Term Loans", the last sentence of the definition of "Term Loans", Section 2.1(a)(ii), Section 2.1(b)(ii) and related provisions to make such ministerial changes as may be required to make the Delayed-Draw Term Loans and the Term Loans fungible for loan trading purposes, or to remove such provisions if the Administrative Agent reasonably determines that the Delayed-Draw Term Loans and the Term Loans will not be fungible for loan trading purposes.

The Lenders hereby irrevocably agree that the Liens granted to the Collateral Agent by the Credit Parties on any Collateral shall be automatically released (i) in full, upon the Obligations (except for Hedging Obligations in respect of any Secured Hedging Agreement and/or any Secured Commodity Hedging Agreement, Cash Management Obligations in respect of Secured Cash Management Agreements and Contingent Obligations) having been indefeasibly paid in full, in cash, all Commitments having been terminated, and all Letters of Credit having been cancelled (or all such Letters of Credit having been fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the applicable Letter of Credit Issuers), (ii) upon the sale or other disposition of such Collateral (including as part of or in connection with any other sale or other disposition permitted hereunder) to any Person other than another Credit Party, to the extent such sale or other disposition is made in compliance with the terms of this Agreement (and the Collateral Agent may rely conclusively on a certificate to that effect provided to it by any Credit Party upon its reasonable request without further inquiry), (iii) to the extent such Collateral is comprised of property leased to a Credit Party, upon termination (in accordance with the terms of this Agreement) or expiration of such lease, (iv) if the release of such Lien is approved, authorized or ratified in writing by the Required Lenders (or such other percentage of Lenders whose consent may be required in accordance with this Section 13.1), (v) to the extent the property constituting such Collateral is owned by any Subsidiary Guarantor, upon the release of such Subsidiary Guarantor from its obligations under the Guarantee (in accordance with the following sentence) and (vi) as required to effect any sale or other disposition of Collateral in connection with any exercise of remedies of the Collateral Agent pursuant to the Credit Documents. Any such release shall not in any manner discharge, affect or impair the Obligations or any Liens (other than those being released) upon (or obligations (other than those being released) of the Credit Parties in respect of) all interests retained by the Credit Parties, including the proceeds of any sale, all of which shall continue to constitute part of the Collateral except to the extent otherwise released in accordance with the provisions of the Credit Documents. Additionally, the Lenders hereby irrevocably agree that the Subsidiary Guarantors shall be released from the Guarantee upon consummation of any transaction resulting in such Subsidiary ceasing to constitute a Restricted Subsidiary. The Lenders hereby authorize the Administrative Agent and the Collateral Agent, as applicable, to execute and deliver any instruments, documents, and agreements necessary or desirable to evidence and confirm the release of any Subsidiary Guarantor or Collateral pursuant to the foregoing provisions of this paragraph, all without the further consent or joinder of any Lender.

13.2.  <u>Notices</u>.  Unless otherwise expressly provided herein, all notices and other communications provided for hereunder or under any other Credit Document shall be in writing (including by facsimile or other electronic transmission).  All such written notices shall be mailed, faxed or delivered to the applicable address, facsimile number or electronic mail address, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(a)    if to Parent Guarantor, the Borrower, the Administrative Agent, the Collateral Agent or any Letter of Credit Issuer, to the address, facsimile number, electronic mail address or telephone number specified for such Person on <u>Schedule 13.2</u> or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the other parties; and

(b)    if to any other Lender, to the address, facsimile number, electronic mail address or telephone number specified in its Administrative Questionnaire or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to Parent Guarantor, the Borrower, the Administrative Agent and the Collateral Agent.

All such notices and other communications shall be deemed to be given or made upon the earlier to occur of (i) actual receipt by the relevant party hereto and (ii) (A) if delivered by hand or by courier, when signed for by or on behalf of the relevant party hereto; (B) if delivered by mail, three Business Days after deposit in the mails, postage prepaid; (C) if delivered by facsimile, when sent and receipt has been confirmed by telephone; and (D) if delivered by electronic mail, when delivered; <u>provided</u> that notices and other communications to the Administrative Agent or the Lenders pursuant to <u>Sections 2.3</u>, <u>2.6</u>, <u>2.9</u>, <u>4.2</u> and <u>5.1</u> shall not be effective until received.

13.3.  <u>No Waiver; Cumulative Remedies</u>.  No failure to exercise and no delay in exercising, on the part of the Administrative Agent, the Collateral Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Credit Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

13.4.  <u>Survival of Representations and Warranties</u>.  All representations and warranties made hereunder, in the other Credit Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans hereunder.

13.5.  <u>Payment of Expenses; Indemnification</u>.  The Borrower agrees (a) to pay or reimburse the Agents, the Joint Lead Arrangers, the Letter of Credit Issuers and the Lenders for all their reasonable and documented out-of-pocket costs and expenses incurred in connection with the development, negotiation, preparation and execution and delivery of, and any amendment, supplement or modification to, this Agreement and the other Credit Documents and any other documents prepared in connection herewith or therewith, the syndication of the Credit Facilities, the consummation and administration of the transactions contemplated hereby and thereby, any Event of Default or the enforcement or preservation of any rights under this Agreement, the other Credit Documents and any such other documents, including the reasonable and documented out-of-pocket Prepetition and post-Petition Date fees, disbursements and other charges of Advisors; (b) to pay, indemnify, and hold harmless each Agent, each Joint Lead Arranger, each Letter of Credit Issuer and each Lender from, any and all recording and filing fees and (c) to pay, indemnify, and hold harmless each Agent, each Joint Lead Arranger, each

-148-

Letter of Credit Issuer and their respective Affiliates, directors, officers, partners, employees and agents from and against any and all other liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever, including reasonable and documented out-of-pocket fees, disbursements and other charges of Advisors, related to the Transactions (including the Cases) or, with respect to the execution, delivery, enforcement, performance and administration of this Agreement, the other Credit Documents and any such other documents, including, any of the foregoing relating to the violation of, noncompliance with or liability under, any Environmental Law (other than by such indemnified Person or any of its Related Parties (other than trustees and advisors)) or to any actual or alleged presence, release or threatened release into the environment of Hazardous Materials attributable to the operations of Parent Guarantor, the Borrower, any of the Borrower's Subsidiaries or any of the Real Estate (all the foregoing in this clause (c), collectively, the "**indemnified liabilities**") (**SUBJECT TO THE PROVISO BELOW, WHETHER OR NOT CAUSED BY OR ARISING IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE ORDINARY NEGLIGENCE OF THE INDEMNIFIED PERSON**); provided that neither the Borrower nor any other Credit Party shall have any obligation hereunder to any Agent, any Letter of Credit Issuer or any Lender or any of their respective Related Parties with respect to indemnified liabilities to the extent they result from (A) the gross negligence, bad faith or willful misconduct of such indemnified Person or any of its Related Parties, as determined by a final non-appealable judgment of a court of competent jurisdiction, (B) a material breach of the obligations of such indemnified Person or any of its Related Parties under the Credit Documents, as determined by a final non-appealable judgment of a court of competent jurisdiction or (C) disputes not involving an act or omission of Parent Guarantor, the Borrower or any other Credit Party and that is brought by an indemnified Person against any other indemnified Person, other than any claims against any indemnified Person in its capacity or in fulfilling its role as an Agent or Joint Lead Arranger or any similar role under the Credit Facilities. The agreements in this Section 13.5 shall survive repayment of the Loans and all other amounts payable hereunder.

All amounts payable under this Section 13.5 shall be paid within ten days of receipt by the Borrower of an invoice relating thereto setting forth such expense in reasonable detail; provided, that the TCEH Debtors shall promptly provide copies of invoices received on account of fees and expenses of the professionals retained as provided for in the Credit Documents to counsel to the Steering Committee and the United States Trustee, and the Bankruptcy Court shall have exclusive jurisdiction over any objections raised to the invoiced amount of the fees and expenses proposed to be paid, which objections may only be raised within ten days after receipt thereof. In the event that within ten days from receipt of such invoices, the Credit Parties, the United States Trustee or counsel to the Steering Committee raise an objection to a particular invoice, and the parties are unable to resolve any dispute regarding the fees and expenses included in such invoice, the Bankruptcy Court shall hear and determine such dispute; provided, that payment of invoices shall not be delayed based on any such objections and the relevant professional shall only be required to disgorge amounts objected to upon being "so ordered" pursuant to a final order of the Bankruptcy Court.

No Credit Party nor any indemnified Person shall have any liability for any special, punitive, indirect or consequential damages resulting from this Agreement or any other Credit Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date) (except, in the case of the Borrower's obligation hereunder to indemnify and hold harmless the indemnified Persons, to the extent any indemnified Persons is found liable for special, punitive, indirect or consequential damages to a third party). No indemnified Persons shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby, except to the extent that such damages have resulted from the willful misconduct, bad faith or gross negligence of

#4821-7663-6950

any indemnified Person or any of its Related Parties (as determined by a final non-appealable judgment of a court of competent jurisdiction). This Section 13.5 shall not apply to Taxes.

        13.6.   Successors and Assigns; Participations and Assignments.

        (a)     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate of a Letter of Credit Issuer that issues any Letter of Credit), except that (i) except as expressly permitted by Section 10.3, neither Parent Guarantor nor the Borrower may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender (and any attempted assignment or transfer by Parent Guarantor or the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 13.6. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby (including any Affiliate of a Letter of Credit Issuer that issues any Letter of Credit), Participants (to the extent provided in clause (c) of this Section 13.6), to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the Collateral Agent, the Letter of Credit Issuers and the Lenders and each other Person entitled to indemnification under Section 13.5 and, to the extent expressly contemplated by Section 13.20, the Oncor Subsidiaries) any legal or equitable right, remedy or claim under or by reason of this Agreement.

        (b)    (i) Subject to the conditions set forth in clause (b)(ii) below, any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans at the time owing to it) with the prior written consent (such consent not be unreasonably withheld or delayed; it being understood that, without limitation, the Borrower shall have the right to withhold or delay its consent to any assignment if in order for such assignment to comply with Applicable Law, the Borrower would be required to obtain the consent of, or make any filing or registration with, any Governmental Authority) of:

        (A)    the Borrower (which consent shall not be unreasonably withheld or delayed); provided that no consent of the Borrower shall be required for an assignment (1) to a Lender (other than in respect of an assignment of a Revolving Credit Commitment and Revolving Credit Loans), an Affiliate of a Lender (other than in respect of an assignment of a Revolving Credit Commitment and Revolving Credit Loans (except to an Affiliate of such Revolving Credit Lender having a combined capital and surplus of not less than the greater of (x) $100,000,000 and (y) an amount equal to twice the amount of Revolving Credit Commitments to be held by such assignee after giving effect to such assignment, in which case no such Borrower consent shall be required) or an Approved Fund (other than in respect of an assignment of a Revolving Credit Commitment and Revolving Credit Loans) or (2) if Specified Default has occurred and is continuing with respect to the Borrower, to any other assignee; and

        (B)    the Administrative Agent (which consent shall not be unreasonably withheld or delayed); provided that no consent of the Administrative Agent shall be required for any assignment of any Term Loan to a Lender, an Affiliate of a Lender or an Approved Fund.

        Notwithstanding the foregoing or any other term or condition herein to the contrary, no such assignment shall be made to (x) a natural person or (y) a Disqualified Institution.

        (ii)    Assignments shall be subject to the following additional conditions:

-150-

(A)      except (i) in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans of any Class, (ii) an assignment to a Federal Reserve Bank or (iii) in connection with the initial syndication of the Commitments or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent), shall not be less than, in the case of Loans and Commitments, $5,000,000 and increments of $1,000,000 in excess thereof unless each of the Borrower and the Administrative Agent otherwise consents (which consents shall not be unreasonably withheld or delayed); provided that no such consent of the Borrower shall be required if a Specified Default has occurred and is continuing with respect to Parent Guarantor or the Borrower; provided, further, that contemporaneous assignments to a single assignee made by Affiliates of Lenders and related Approved Funds shall be aggregated for purposes of meeting the minimum assignment amount requirements stated above;

(B)      each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement; provided that this clause shall not be construed to prohibit the assignment of a proportionate part of all the assigning Lender's rights and obligations in respect of one Class of Commitments or Loans;

(C)      The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Acceptance, together with a processing and recordation fee in the amount of $3,500; provided that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment; and

(D)      the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an administrative questionnaire in a form approved by the Administrative Agent (the "**Administrative Questionnaire**").

(iii)      Subject to acceptance and recording thereof pursuant to clause (b)(iv) of this Section 13.6, from and after the effective date specified in each Assignment and Acceptance, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.10, 2.11, 3.5, 5.4 and 13.5). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 13.6 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with clause (c) of this Section 13.6.

(iv)      The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amount of the Loans and any payment made by any Letter of Credit Issuer under any Letter of Credit owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**"). Further, each Register shall contain the name and address of the Administrative Agent and the lending office through which each such Person acts under this Agreement. The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent, the Collateral Agent, the Letter of Credit Issuers and the Lenders shall treat each Person

whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by Parent Guarantor, the Borrower, the Collateral Agent, the Letter of Credit Issuers and any Lender, at any reasonable time and from time to time upon reasonable prior notice. This Section shall be construed so that the Loans and Letters of Credit are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code.

(v)     Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in clause (b) of this Section 13.6 (unless waived) and any written consent to such assignment required by clause (b) of this Section 13.6, the Administrative Agent shall accept such Assignment and Acceptance and record the information contained therein in the Register.

(c)     (i) Any Lender may, without the consent of Parent Guarantor, the Borrower, the Administrative Agent or any Letter of Credit Issuer, sell participations to one or more banks or other entities that are not Disqualified Institutions (each, a "**Participant**") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) Parent Guarantor, the Borrower, the Administrative Agent, the Letter of Credit Issuers and the other Lenders shall continue to deal solely with and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement or any other Credit Document; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any consent, amendment, modification, supplement or waiver described in clause (i) and (vii) of the second proviso of the first paragraph of Section 13.1 that affects such Participant. Subject to clause (c)(ii) of this Section 13.6, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.10, 2.11 and 5.4 to the same extent as if it were a Lender, and provided that such Participant agrees to be subject to the requirements of those Sections as though it were a Lender and had acquired its interest by assignment pursuant to clause (b) of this Section 13.6 To the extent permitted by Applicable Law, each Participant also shall be entitled to the benefits of Section 13.8(b) as though it were a Lender; provided such Participant agrees to be subject to Section 13.8(a) as though it were a Lender.

(ii)     A Participant shall not be entitled to receive any greater payment under Section 2.10, 2.11, or 5.4 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent (which consent shall not be unreasonably withheld or delayed).

(iii)     Each Lender that sells a participation shall, acting for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts of each participant's interest in the Loans (or other rights or obligations) held by it (the "**Participant Register**"). The entries in the Participant Register shall be conclusive, and such lender shall treat each Person whose name is recorded in the Participant Register as the owner of such Loan or other obligation hereunder as the owner thereof for all purposes of this Agreement notwithstanding any notice to the contrary. No Lender shall have any obligation to disclose all or any portion of the Participant Register (including the

-152-

identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Credit Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. This Section shall be construed so that the Loans are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code.

(d)    Any Lender may, without the consent of Parent Guarantor, the Borrower, the Administrative Agent, at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section 13.6 shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto. In order to facilitate such pledge or assignment or for any other reason, the Borrower hereby agrees that, upon request of any Lender at any time and from time to time after any Borrower has made its initial borrowing hereunder, the Borrower shall provide to such Lender, at the Borrower's own expense, a promissory note, substantially in the form of Exhibit J-1, J-2 or J-3, evidencing the Revolving Credit Loans, Term Loans and Delayed-Draw Term Loans, respectively, owing to such Lender.

(e)    Subject to this Section 13.16, the Borrower authorizes each Lender to disclose to any Participant, secured creditor of such Lender or assignee (each, a "**Transferee**"), any prospective Transferee and any prospective direct or indirect contractual counterparties to any swap or derivative transactions to be entered into in connection with or relating to Loans made hereunder any and all financial information in such Lender's possession concerning the Borrower and its Affiliates that has been delivered to such Lender by or on behalf of the Borrower and its Affiliates pursuant to this Agreement or that has been delivered to such Lender by or on behalf of the Borrower and its Affiliates in connection with such Lender's credit evaluation of the Borrower and its Affiliates prior to becoming a party to this Agreement.

(f)    The words "execution," "signed," "signature," and words of like import in any Assignment and Acceptance shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

(g)    SPV Lender. Notwithstanding anything to the contrary contained herein, any Lender (a "**Granting Lender**") may grant to a special purpose funding vehicle (a "**SPV**"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower, the option to provide to the Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make the Borrower pursuant to this Agreement; provided that (i) nothing herein shall constitute a commitment by any SPV to make any Loan and (ii) if an SPV elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof. The making of a Loan by an SPV hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Each party hereto hereby agrees that no SPV shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender). In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive

-153-

the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPV, it shall not institute against, or join any other person in instituting against, such SPV any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any State thereof. In addition, notwithstanding anything to the contrary contained in this Section 13.6, any SPV may (i) with notice to, but without the prior written consent of, the Borrower and the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting Lender or to any financial institutions (consented to by the Borrower and Administrative Agent) providing liquidity and/or credit support to or for the account of such SPV to support the funding or maintenance of Loans and (ii) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPV. This Section 13.6(g) may not be amended without the written consent of the SPV. Notwithstanding anything to the contrary in this Agreement, (x) no SPV shall be entitled to any greater rights under Sections 2.10, 2.11, and 5.4 than its Granting Lender would have been entitled to absent the use of such SPV and (y) each SPV agrees to be subject to the requirements of Sections 2.10, 2.11, and 5.4 as though it were a Lender and has acquired its interest by assignment pursuant to clause (b) of this Section 13.6.

13.7.    Replacements of Lenders under Certain Circumstances.

(a)    The Borrower shall be permitted to replace any Lender that (a) requests reimbursement for amounts owing pursuant to Section 2.10, 3.5 or 5.4, (b) is affected in the manner described in Section 2.10(a)(iii) and as a result thereof any of the actions described in such Section is required to be taken or (c) becomes a Defaulting Lender, with a replacement bank or other financial institution; provided that (i) such replacement does not conflict with any Applicable Law, (ii) no Specified Default shall have occurred and be continuing at the time of such replacement, (iii) the Borrower shall repay (or the replacement bank or institution shall purchase, at par) all Loans and other amounts (other than any disputed amounts), pursuant to Section 2.10, 2.11, 3.5 or 5.4, as the case may be) owing to such replaced Lender prior to the date of replacement, (iv) the replacement bank or institution, if not already a Lender, and the terms and conditions of such replacement, shall be reasonably satisfactory to the Administrative Agent, (v) the replaced Lender shall be obligated to make such replacement in accordance with the provisions of Section 13.6 (provided that the Borrower shall be obligated to pay the registration and processing fee referred to therein) and (vi) any such replacement shall not be deemed to be a waiver of any rights that the Borrower, the Administrative Agent or any other Lender shall have against the replaced Lender.

(b)    If any Lender (such Lender, a "**Non-Consenting Lender**") has failed to consent to a proposed amendment, modification, supplement, waiver, discharge or termination that pursuant to the terms of Section 13.1 requires the consent of all of the Lenders or all Lenders affected and with respect to which the Required Lenders shall have granted their consent, then provided no Event of Default then exists, the Borrower shall have the right (unless such Non-Consenting Lender grants such consent) to replace such Non-Consenting Lender by requiring such Non-Consenting Lender to assign its Loans and its Commitments hereunder to one or more assignees reasonably acceptable to the Administrative Agent; provided that: (a) all Obligations of the Borrower owing to such Non-Consenting Lender being replaced shall be paid in full to such Non-Consenting Lender concurrently with such assignment, and (b) the replacement Lender shall purchase the foregoing by paying to such Non-Consenting Lender a price equal to the principal amount thereof plus accrued and unpaid interest thereon. In connection with any such assignment, the Borrower, Administrative Agent, such Non-Consenting Lender and the replacement Lender shall otherwise comply with Section 13.6.

-154-

13.8.  Adjustments; Set-off .  Subject in each case to the Orders:

(a)     If any Lender (a "**Benefited Lender**") shall at any time receive any payment of all or part of its Loans, or interest thereon, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set-off, or otherwise), in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of such other Lender's Loans, or interest thereon, such Benefited Lender shall purchase for cash from the other Lenders a participating interest in such portion of each such other Lender's Loan, or shall provide such other Lenders with the benefits of any such collateral, or the proceeds thereof, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such collateral or proceeds ratably with each of the Lenders; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest.

(b)     After the occurrence and during the continuance of an Event of Default, in addition to any rights and remedies of the Lenders provided by Applicable Law, each Lender shall have the right, without prior notice to Parent Guarantor, the Borrower, any such notice being expressly waived by Parent Guarantor, the Borrower to the extent permitted by Applicable Law, upon any amount becoming due and payable by the Borrower hereunder (whether at the stated maturity, by acceleration or otherwise) to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any branch or agency thereof to or for the credit or the account of the Borrower.  Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such set-off and application made by such Lender; provided that the failure to give such notice shall not affect the validity of such set-off and application.

13.9.  Counterparts.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts (including by facsimile or other electronic transmission), and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Administrative Agent.

13.10.  Severability.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

13.11.  INTEGRATION.  THIS WRITTEN AGREEMENT AND THE OTHER CREDIT DOCUMENTS REPRESENT THE FINAL AGREEMENT OF PARENT GUARANTOR, THE BORROWER, THE COLLATERAL AGENT, THE ADMINISTRATIVE AGENT, THE LETTER OF CREDIT ISSUERS AND THE LENDERS WITH RESPECT TO THE SUBJECT MATTER HEREOF, AND (1) THERE ARE NO PROMISES, UNDERTAKINGS, REPRESENTATIONS OR WARRANTIES BY PARENT GUARANTOR, THE BORROWER, THE ADMINISTRATIVE AGENT, THE COLLATERAL AGENT, THE LETTER OF CREDIT ISSUERS OR ANY LENDER RELATIVE TO SUBJECT MATTER HEREOF NOT EXPRESSLY SET FORTH OR REFERRED TO HEREIN OR IN THE OTHER CREDIT DOCUMENTS, (2) THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES AND (3) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES; PROVIDED

THAT THE SYNDICATION PROVISIONS AND THE BORROWER'S AND PARENT GUARANTOR'S CONFIDENTIALITY OBLIGATIONS IN THE COMMITMENT LETTER SHALL REMAIN IN FULL FORCE AND EFFECT. IT IS SPECIFICALLY AGREED THAT THE PROVISION OF THE CREDIT FACILITIES HEREUNDER BY THE LENDERS SUPERSEDES AND IS IN SATISFACTION OF THE OBLIGATIONS OF THE AGENTS (AS DEFINED IN THE COMMITMENT LETTER) TO PROVIDE THE COMMITMENTS SET FORTH IN THE COMMITMENT LETTER.

13.12. GOVERNING LAW. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK AND TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

13.13. Submission to Jurisdiction; Waivers. Each party hereto irrevocably and unconditionally:

(a)    submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Credit Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the exclusive jurisdiction of the Bankruptcy Court, and to the extent the Bankruptcy Court does not have (or abstains from exercising) jurisdiction, the courts of the State of New York, the courts of the United States of America for the Southern District of New York and appellate courts from any thereof;

(b)    consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)    agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Person at its address set forth on Schedule 13.2 at such other address of which the Administrative Agent shall have been notified pursuant to Section 13.2;

(d)    agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction;

(e)    subject to the last paragraph of Section 13.5, waives, to the maximum extent not prohibited by Applicable Law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section 13.13 any special, exemplary, punitive or consequential damages; and

(f)    agrees that a final judgment in any action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Applicable Law.

13.14. Acknowledgments. Each of Parent Guarantor and the Borrower hereby acknowledges that:

(a)    it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Credit Documents;

-156-

(b)      (i) the credit facilities provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Credit Document) are an arm's-length commercial transaction between Parent Guarantor and the Borrower, on the one hand, and the Administrative Agent, the Letter of Credit Issuer, the Lenders and the other Agents on the other hand, and Parent Guarantor, the Borrower and the other Credit Parties are capable of evaluating and understanding and understand and accept the terms, risks and conditions of the transactions contemplated hereby and by the other Credit Documents (including any amendment, waiver or other modification hereof or thereof); (ii) in connection with the process leading to such transaction, each of the Administrative Agent and the other Agents, is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary for any of Parent Guarantor, the Borrower, any other Credit Parties or any of their respective Affiliates, stockholders, creditors or employees or any other Person; (iii) neither the Administrative Agent nor any other Agent has assumed or will assume an advisory, agency or fiduciary responsibility in favor of Parent Guarantor, the Borrower or any other Credit Party with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Credit Document (irrespective of whether the Administrative Agent or any other Agent has advised or is currently advising Parent Guarantor, the Borrower, the other Credit Parties or their respective Affiliates on other matters) and neither the Administrative Agent or other Agent has any obligation to Parent Guarantor, the Borrower, the other Credit Parties or their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Credit Documents; (iv) the Administrative Agent, each other Agent and each Affiliate of the foregoing may be engaged in a broad range of transactions that involve interests that differ from those of Parent Guarantor, the Borrower and their respective Affiliates, and neither the Administrative Agent nor any other Agent has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (v) neither the Administrative Agent nor any other Agent has provided and none will provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Credit Document) and Parent Guarantor and the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate. Parent Guarantor and the Borrower agree not to claim that the Administrative Agent or any other Agent has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to Parent Guarantor, the Borrower or any other Affiliates, in connection with the transactions contemplated hereby or the process leading hereto.

(c)      no joint venture is created hereby or by the other Credit Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among Parent Guarantor and the Borrower, on the one hand, and any Lender, on the other hand.

13.15.  WAIVERS OF JURY TRIAL.  PARENT GUARANTOR, THE BORROWER, EACH AGENT AND EACH LENDER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

13.16.  Confidentiality.  The Administrative Agent, each Letter of Credit Issuer, each other Agent and each Lender shall hold all non-public information furnished by or on behalf of Parent Guarantor, the Borrower or any Subsidiary of the Borrower in connection with such Lender's evaluation of whether to become a Lender hereunder or obtained by such Lender, the Administrative Agent, Letter of Credit Issuer or such other Agent pursuant to the requirements of this Agreement or in connection with any amendment, supplement, modification or waiver or proposed amendment, supplement, modification or waiver hereto or the other Credit Documents ("**Confidential Information**"), confidential in accordance with its customary procedure for handling confidential information of this nature and (in the

-157-

case of a Lender that is a bank) in accordance with safe and sound banking practices and in any event may make disclosure as required or requested by any governmental, regulatory or self-regulatory agency or representative thereof or pursuant to legal process or Applicable Law or (a) to such Lender's or the Administrative Agent's or such Letter of Credit Issuer's or such other Agent's attorneys, professional advisors, independent auditors, trustees or Affiliates, (b) to an investor or prospective investor in a Securitization that agrees its access to information regarding the Credit Parties, the Loans and the Credit Documents is solely for purposes of evaluating an investment in a Securitization and who agrees to treat such information as confidential, (c) to a trustee, collateral manager, servicer, backup servicer, noteholder or secured party in connection with the administration, servicing and reporting on the assets serving as collateral for a Securitization and who agrees to treat such information as confidential and (d) to a nationally recognized ratings agency that requires access to information regarding the Credit Parties, the Loans and Credit Documents in connection with ratings issued with respect to a Securitization; provided that unless specifically prohibited by Applicable Law or court order, each Lender, the Administrative Agent, each Letter of Credit Issuer and each other Agent shall use commercially reasonable efforts to notify the Borrower of any request made to such Lender, the Administrative Agent, such Letter of Credit Issuer or such other Agent, as applicable, by any governmental, regulatory or self-regulatory agency or representative thereof (other than any such request in connection with a routine examination of such Lender by such governmental regulatory or self-regulatory agency) for disclosure of any such non-public information prior to disclosure of such information; and provided further that in no event shall any Lender, the Administrative Agent, any Letter of Credit Issuer or any other Agent be obligated or required to return any materials furnished by Parent Guarantor, the Borrower or any Subsidiary of the Borrower. Each Lender, the Administrative Agent, each other Letter of Credit Issuer and each other Agent agrees that it will not provide to prospective Transferees or to any pledgee referred to in Section 13.6 or to prospective direct or indirect contractual counterparties to any swap or derivative transactions to be entered into in connection with or relating to Loans made hereunder any of the Confidential Information unless such Person is advised of and agrees to be bound by the provisions of this Section 13.16 or confidentiality provisions at least as restrictive as those set forth in this Section 13.16.

13.17.  Direct Website Communications.

(a)  Parent Guarantor and the Borrower may, at their option, provide to the Administrative Agent any information, documents and other materials that they are obligated to furnish to the Administrative Agent pursuant to the Credit Documents, including, all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (A) relates to a request for a new, or a conversion of an existing, Borrowing or other extension of credit (including any election of an interest rate or Interest Period relating thereto), (B) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (C) provides notice of any Default or Event of Default under this Agreement or (D) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any Borrowing or other extension of credit thereunder (all such non-excluded communications being referred to herein collectively as "**Communications**"), by transmitting the Communications in an electronic/soft medium in a format reasonably acceptable to the Administrative Agent at glagentofficeops@citi.com; provided that: (i) upon written request by the Administrative Agent, Parent Guarantor or the Borrower shall deliver paper copies of such documents to the Administrative Agent for further distribution to each Lender until a written request to cease delivering paper copies is given by the Administrative Agent and (ii) Parent Guarantor or the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents. Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents. Nothing in this Section 13.17 shall prejudice the right of Parent Guarantor, the Borrower, the

-158-

Administrative Agent, any other Agent or any Lender to give any notice or other communication pursuant to any Credit Document in any other manner specified in such Credit Document.

(b)    The Administrative Agent agrees that the receipt of the Communications by the Administrative Agent at its e-mail address set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Credit Documents.  Each Lender agrees that notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Credit Documents.  Each Lender agrees (A) to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and (B) that the foregoing notice may be sent to such e-mail address.

(c)    Parent Guarantor and the Borrower further agree that the Agents may make the Communications available to the Lenders by posting the Communications on Intralinks or a substantially similar electronic transmission system (the "**Platform**"), so long as the access to such Platform is limited (i) to the Agents, the Letter of Credit Issuers, the Lenders or any bona fide potential Transferee and (ii) remains subject the confidentiality requirements set forth in Section 13.16.

(d)    THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE".  THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE COMMUNICATIONS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM.  In no event shall any Agent or their Related Parties (collectively, the "**Agent Parties**" and each an "**Agent Party**") have any liability to Parent Guarantor, the Borrower, any Lender, any Letter of Credit Issuer or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of Parent Guarantor', the Borrower's or any Agent's transmission of Communications through the internet, except to the extent the liability of any Agent Party resulted from such Agent Party's (or any of its Related Parties' (other than trustees or advisors)) gross negligence, bad faith or willful misconduct or material breach of the Credit Documents (as determined in a final non-appealable judgment of a court of competent jurisdiction).

(e)    The Borrower and each Lender acknowledge that certain of the Lenders may be "public-side" Lenders (Lenders that do not wish to receive material non-public information with respect to Parent Guarantor, the Borrower, the Subsidiaries of the Borrower or their securities) and, if documents or notices required to be delivered pursuant to the Credit Documents or otherwise are being distributed through the Platform, any document or notice that Parent Guarantor or the Borrower has indicated contains only publicly available information with respect to Parent Guarantor, the Borrower and the Subsidiaries of the Borrower and their securities may be posted on that portion of the Platform designated for such public-side Lenders.  If Parent Guarantor or the Borrower has not indicated whether a document or notice delivered contains only publicly available information, the Administrative Agent shall post such document or notice solely on that portion of the Platform designated for Lenders who wish to receive material nonpublic information with respect to Parent Guarantor, the Borrower, the Subsidiaries of the Borrower and their securities.  Notwithstanding the foregoing, Parent Guarantor and the Borrower shall use commercially reasonable efforts to indicate whether any document or notice contains only publicly available information.

13.18. <u>USA PATRIOT Act</u>. Each Lender hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Patriot Act**"), it is required to obtain, verify and record information that identifies each Credit Party, which information includes the name and address of each Credit Party and other information that will allow such Lender to identify each Credit Party in accordance with the Patriot Act.

13.19. <u>Payments Set Aside</u>. To the extent that any payment by or on behalf of the Borrower is made to any Agent or any Lender, or any Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by any Agent, <u>plus</u> interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Overnight Rate from time to time in effect.

13.20. <u>Separateness</u>.

(a)     The Secured Parties hereby acknowledge (i) the legal separateness of Parent Guarantor, the Borrower and the Subsidiaries of the Borrower from the Oncor Subsidiaries, (ii) that the lenders under the Oncor Credit Facility and the noteholders under the Oncor Notes and under the transition bonds have likely advanced funds thereunder in reliance upon the separateness of the Oncor Subsidiaries from Parent Guarantor, the Borrower and the Subsidiaries of the Borrower, (iii) that the Oncor Subsidiaries have assets and liabilities that are separate from those of Parent Guarantor, the Borrower and the Subsidiaries of the Borrower, (iv) that the Obligations are obligations and liabilities of the Borrower and the other Credit Parties only, and are not the obligations or liabilities of any of the Oncor Subsidiaries, (v) that the Secured Parties shall look solely to the Borrower and the Guarantors and such Persons' assets, and not to any assets, or to the pledge of any assets, owned by any of the Oncor Subsidiaries, for the repayment of any amounts payable pursuant to this Agreement and for satisfaction of any other Obligations and (vi) that none of the Oncor Subsidiaries shall be personally liable to the Secured Parties for any amounts payable, or any other Obligation, under the Credit Documents.

(b)     The Secured Parties hereby acknowledge and agree that the Secured Parties shall not (i) initiate any legal proceeding to procure the appointment of an administrative receiver, or (ii) institute any bankruptcy, reorganization, insolvency, winding up, liquidation, or any like proceeding under applicable law, against any of the Oncor Subsidiaries, or against any of the Oncor Subsidiaries' assets. The Secured Parties further acknowledge and agree that each of the Oncor Subsidiaries is a third party beneficiary of the foregoing covenant and shall have the right to specifically enforce such covenant in any proceeding at law or in equity.

13.21. <u>Keepwell</u>. Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Guarantor to honor all of its obligations under this Guarantee in respect of Swap Obligations (provided, however, that each Qualified ECP Guarantor shall only be liable for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this <u>Section 13.21</u>, or otherwise under this Agreement, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). Each Qualified ECP Guarantor intends that this <u>Section 13.21</u> constitute, and this <u>Section 13.21</u> shall be deemed to constitute, a

"keepwell, support, or other agreement" for the benefit of each other Guarantor for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

SECTION 14. Security; Secured Commodity Hedging Agreements.

14.1.  Security.

(a)    Collateral; Grant of Lien and Security Interest.

(i)    Pursuant to the Interim Order and (when applicable) the Final Order and in accordance with the terms thereof (and subject to the terms and conditions set forth therein), as security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration, or otherwise) of the Obligations, the Borrower hereby assigns, pledges, and grants to the Collateral Agent, for the benefit of the Secured Parties (subject, in each case, to the Carve Out and the RCT Reclamation Support Carve Out):

(A) a fully-perfected first priority senior security interest in and Lien upon, pursuant to section 364(c)(2) of the Bankruptcy Code, all prepetition and postpetition property of the Borrower, whether existing on the Petition Date or thereafter acquired that, on or as of the Petition Date, is not subject to valid, perfected, and non-avoidable Liens, including, without limitation, all real and personal property, inventory, plant, fixtures, machinery, equipment, the RCT L/C Collateral Accounts, the General L/C Collateral Accounts, cash, any investment of such cash, accounts receivable, other rights to payment whether arising before or after the Petition Date (including, without limitation, post-petition intercompany claims of the Borrower), deposit accounts, investment property, supporting obligations, minerals, oil, gas, and as-extracted collateral, causes of action (including those arising under section 549 of the Bankruptcy Code and any related action under section 550 of the Bankruptcy Code), royalty interests, chattel paper, contracts, general intangibles, documents, instruments, interests in leaseholds, letter of credit rights, patents, copyrights, trademarks, trade names, other intellectual property, Stock and Stock Equivalents of Subsidiaries, books and records pertaining to the foregoing, and to the extent not otherwise included, all proceeds, products, offspring, and profits of any and all of the foregoing (the "**Unencumbered Property**"); provided that the Unencumbered Property shall exclude the Borrower's Avoidance Actions, but subject only to, and effective upon, entry of the Final Order, shall include any proceeds or property recovered, unencumbered, or otherwise the subject of successful Avoidance Actions, whether by judgment, settlement, or otherwise;

(B) a fully-perfected first priority senior priming security interest in and Lien upon, pursuant to section 364(d)(1) of the Bankruptcy Code, all prepetition and postpetition property of the Borrower, whether existing on the Petition Date or thereafter acquired, that is subject to valid, perfected, and non-avoidable Liens currently held by any of the Prepetition Secured Creditors (as defined in the Interim Cash Collateral Order and (when applicable) the Final Cash Collateral Order), excluding the "Deposit L/C Loan Collateral Account" to the extent of the "Deposit L/C Obligations" (each as defined in the Prepetition Credit Agreement); provided that such security interests and Liens shall be senior in all respects to the interests in such property of any of the Prepetition Secured Creditors arising from current and future Liens of any of the Prepetition Secured Creditors (including, without limitation, Adequate Protection Liens) (as defined in the Interim Cash Collateral Order and (when applicable) the Final Cash Collateral Order), but shall not be senior to any valid, perfected, and non-avoidable interests of other parties

-161-

arising out of Liens, if any, on such property existing immediately prior to the Petition Date, including the Liens securing the Tex-La Indebtedness, or to any valid, perfected, and non-avoidable interests in such property arising out of Liens to which the Liens of any of the Prepetition Secured Creditors become subject subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code; and

(C) a fully-perfected junior security interest in and Lien upon, pursuant to section 364(c)(3) of the Bankruptcy Code, all prepetition and postpetition property of the Borrower (other than the property described in clauses (A) and (B) of this Section 14.1(a)(i), as to which the Liens and security interests in favor of the Collateral Agent, for the benefit of the Secured Parties, will be as described in such clauses), whether existing on the Petition Date or thereafter acquired, that is subject to valid, perfected, and non-avoidable Liens in existence immediately prior to the Petition Date, or to any valid and non-avoidable Liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (in each case, other than the Adequate Protection Liens (as defined in the Interim Cash Collateral Order and (when applicable) the Final Cash Collateral Order));

provided, that notwithstanding anything to the contrary in this Section 14.1(a)(i), the Collateral shall exclude Excluded Collateral.

(ii)    The security interests and Liens in favor of the Collateral Agent in the Collateral shall be effective immediately upon the entry of the Interim Order and subject, only in the event of the occurrence and during the continuance of an Event of Default, to the Carve Out, the RCT Reclamation Support Carve Out and the terms and conditions set forth in the Interim Order and (when applicable) the Final Order. Such Liens and security interests and their priority shall remain in effect until the Obligations (except for Hedging Obligations in respect of any Secured Hedging Agreement and/or any Secured Commodity Hedging Agreement, Cash Management Obligations in respect of Secured Cash Management Agreements and Contingent Obligations) have been indefeasibly paid in full, in cash, all Commitments have been terminated, and all Letters of Credit have been cancelled (or all such Letters of Credit have been fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the applicable Letter of Credit Issuers).

(iii)    Subject only to the prior payment of the Carve Out and the RCT Reclamation Support Carve Out, no costs or expenses of administration which have been or may be incurred in the Cases or any Successor Cases (as defined in the Orders) or in any other proceedings related thereto, and no priority claims, are or will be senior to, or pari passu with, any claim of any Secured Party or the Collateral Agent against any Credit Party.

(b)    Administrative Priority. The Borrower agrees that its Obligations shall, pursuant to section 364(c)(1) of the Bankruptcy Code, constitute allowed superpriority administrative expense claims in the Cases or any Successor Cases, ranking on a parity with each other and having priority over all administrative expense claims, diminution claims, unsecured claims, and all other claims against the TCEH Debtors or their estates in any of the Cases and any Successor Cases, existing on the Petition Date or thereafter, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject only to, and upon entry of, the Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, subject only to the Carve Out and the RCT Reclamation Support Carve Out, to the extent specifically provided for in the Interim Order and (when applicable) the Final Order.

#4821-7663-6950

(c)    Grants, Rights and Remedies. The Liens and security interests granted pursuant to Section 14.1(a)(i) hereof and the administrative priority granted pursuant to Section 14.1(b) hereof may be independently granted by the Credit Documents and by other Credit Documents hereafter entered into. This Agreement, the Interim Order and (when applicable) the Final Order, and such other Credit Documents supplement each other, and the grants, priorities, rights, and remedies of the Agents and the Secured Parties hereunder and thereunder are cumulative.

(d)    No Filings Required. The Liens and security interests referred to in this Section 14 shall be deemed valid and perfected by entry of the Interim Order and (when applicable) the Final Order, and entry of the Interim Order shall have occurred on or before any Loan is made during the Interim Period and entry of the Final Order shall have occurred on or before any Loan is made after the Interim Period. The Collateral Agent shall not be required to file or record any financing statements, patent filings, trademark filings, mortgages, notices of Lien, or other instrument or document in any jurisdiction or filing office, take possession or control of any Collateral, or take any other action in order to validate or perfect the Liens and security interests granted by or pursuant to this Agreement, the Interim Order or (when applicable) the Final Order or any other Credit Document.

(e)    Survival. The Liens, lien priority, administrative priorities and other rights and remedies granted to the Collateral Agent and the Secured Parties pursuant to this Agreement, the Interim Order and (when applicable) the Final Order, and the other Credit Documents (specifically including, but not limited to, the existence, perfection and priority of the Liens and security interests provided herein and therein, and the administrative priority provided herein and therein) shall not be modified, altered, or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by the TCEH Debtors (pursuant to section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of any of the Cases, or by any other act or omission whatsoever. Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(i)    except to the extent of the Carve Out or the RCT Reclamation Support Carve Out, no fees, charges, disbursements, costs or expenses of administration which have been or may be incurred in the Cases or any Successor Cases, or in any other proceedings related thereto, and no priority claims, are or will be superior to or pari passu with any claim of the Collateral Agent and the Secured Parties against the TCEH Debtors;

(ii)    subject to the Carve Out and the RCT Reclamation Support Carve Out and subject to the terms of the Interim Order and (when applicable) the Final Order, the Liens in favor of the Collateral Agent and the Secured Parties set forth in Section 14.1(a)(i) hereof shall constitute valid and perfected first priority Liens and security interests, and shall be superior to all other Liens and security interests, existing as of the Petition Date or thereafter arising, in favor of any other creditor or any other Person whatsoever (subject to Permitted Liens); and

(iii)    the Liens in favor of the Collateral Agent and the Secured Parties set forth herein and in the other Credit Documents shall continue to be valid and perfected without the necessity that the Collateral Agent files financing statements or mortgages, takes possession or control of any Collateral, or otherwise perfects its Lien under applicable non-bankruptcy law.

14.2.    Secured Commodity Hedging Agreements.

(a)    Subject to the limitations set forth in this Agreement, the Borrower and each Secured Party acknowledges and agrees that the Collateral may secure additional obligations of the Borrower and the other Credit Parties in respect of Secured Commodity Hedging Agreements, subject to

-163-

compliance with this Section 14.2. Upon (x) execution and delivery to the Collateral Agent of an Accession Agreement and (y) compliance with the procedures set forth in Section 8.16 of the Security Agreement, such Person shall become a "Hedge Bank" under clause (i) of the definition thereof and a "Secured Party" hereunder and under the other Credit Documents, and the Credit Parties' obligations to such Person shall become "Obligations" hereunder and under the Credit Documents and "Secured Obligations" under the Security Agreement; provided that, for the avoidance of doubt, no such Person in such capacity shall have any consent or voting rights under this Agreement or any of the Credit Documents. Each Credit Party and each Secured Party agrees that this Agreement and the applicable Security Documents may be amended by the Credit Parties and the Collateral Agent without the consent of any Secured Party to the extent necessary or desirable to cause the Liens granted thereby to be in favor of such Persons (to the extent Liens in favor of such Persons are permitted by the terms of this Agreement).

(b)    Notwithstanding the foregoing, nothing in this Agreement will be construed to allow any Credit Party to incur additional Indebtedness or grant additional Liens unless in each case permitted by the terms of this Agreement.

14.3.    Permitted Property Interests.  Upon the written request of any Credit Party following such Credit Party's execution of an easement, right-of-way or other real or personal property interest that (i) constitutes in whole or in part a Permitted Lien pursuant to clause (f) of the definition of Permitted Liens in the Agreement (a Permitted Lien pursuant to such clause (f), a "**Permitted Property Interest**"), and (ii) in the commercially reasonable determination of such Credit Party is required in the ordinary course of business, the Collateral Agent will promptly subordinate any Liens and any Superpriority Claim held by it for the benefit of any Secured Party, to the rights of third parties with respect to such Permitted Property Interest.

-164-

IN WITNESS WHEREOF, each of the parties hereto has caused a counterpart of this Agreement to be duly executed and delivered as of the date first written above.

ENERGY FUTURE COMPETITIVE HOLDINGS
COMPANY LLC,
as Parent Guarantor


By: _____
    Name:
    Title:


TEXAS COMPETITIVE ELECTRIC HOLDINGS
COMPANY LLC,
as the Borrower


By: _____
    Name:
    Title:

#4821-7663-6950

[Lender Signature Pages]

#4821-7663-6950

Internal CM/ECF Live Database

## File a First Day Motion:

14-10979-CSS Energy Future Holdings Corp.

| | | |
|---|---|---|
| Type: bk | Chapter: 11 v | Office: 1 (Delaware) |
| Assets: y | Judge: CSS | Case Flag: PlnDue, DsclsDue |

### U.S. Bankruptcy Court

### District of Delaware

Notice of Electronic Filing

The following transaction was received from Mark D. Collins entered on 4/29/2014 at 3:09 PM EDT and filed on 4/29/2014

**Case Name:**          Energy Future Holdings Corp.
**Case Number:**        14-10979-CSS
**Document Number:** 73

**Docket Text:**
Motion to Approve Debtor In Possession Financing *(Motion of Texas Competitive Electric Holdings Company LLC and Certain of its Debtor Affiliates, for Entry of Interim and Final Orders (A) Approving Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing)* Filed By Energy Future Holdings Corp. (Attachments: # (1) Exhibit D)(Collins, Mark)

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** W:\AJ\TCEH DIP Motion (3) - part 1.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=4/29/2014] [FileNumber=12420616-0
] [312fb0f40d7283cbef77f930e54b0b7c827e8bb410e3bab1ac8b6c7b35b9e70d8a0
b392743f6b52e30af0e72f9c7f26c2b12a079c5199b2a6fb1d0fae22c9671]]
**Document description:** Exhibit D
**Original filename:** W:\AJ\TCEH DIP Motion (3) - part 2.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=4/29/2014] [FileNumber=12420616-1
] [50d8496af402d31b47ad75c9ccfc754c06a3578ab41c70ff48f0bfb2a26cca6cd5e
373b36d190870ad15f33c263b8466cf4650808046f89fb17f12128d1e6e0e]]

**14-10979-CSS Notice will be electronically mailed to:**

Desiree M. Amador on behalf of Creditor Pension Benefit Guaranty Corporation
amador.desiree@pbgc.gov, efile@pbgc.gov

Elizabeth Banda Calvo on behalf of Creditor Somervell County et al
rgleason@pbfcm.com, ebcalvo@pbfcm.com;ebcalvo@ecf.inforuptcy.com