# **Exhibit A**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-_____ (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**MOTION OF ENERGY FUTURE HOLDINGS
CORP., *ET AL.*, FOR ENTRY OF INTERIM AND
FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO (I) PAY
CERTAIN PREPETITION COMPENSATION AND REIMBURSABLE
EMPLOYEE EXPENSES, (II) PAY AND HONOR EMPLOYEE AND RETIREE
MEDICAL AND SIMILAR BENEFITS, AND (III) CONTINUE EMPLOYEE AND
RETIREE BENEFIT PROGRAMS, AND (B) MODIFYING THE AUTOMATIC STAY**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this motion (this "Motion") for entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "Interim Order" and "Final Order"), (a) authorizing the Debtors to: (i) pay certain prepetition wages, salaries, reimbursable employee expenses, and other compensation described below; (ii) pay and honor employee and retiree medical and similar benefits; and (iii) continue employee compensation and employee and retiree benefit programs in the ordinary course of business on a postpetition basis and in a manner consistent with prepetition practices; and (b) modifying the automatic stay with respect to the Debtors' workers' compensation program. In support of this Motion, the Debtors submit the *Supplemental Declaration of Paul Keglevic, Executive Vice President, Chief*

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which the debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

*Financial Officer, and Co-Chief Restructuring Officer of Energy Future Holdings Corp., et al., in Support of Wages and Benefits Motion* (the "Supplemental Keglevic Declaration"). In further support of this Motion, the Debtors respectfully state as follows.

## Jurisdiction and Venue

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors consent pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The bases for the relief requested in this Motion are sections 105(a), 362, 363, and 507(a)(4)-(5) of title 11 of the United States Code (the "Bankruptcy Code"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Bankruptcy Rule 9013-1(m).

## Relief Requested

4.      By this Motion, the Debtors seek entry of Interim and Final Orders authorizing, but not directing, the Debtors to:  (a) pay certain prepetition wages, salaries, reimbursable employee expenses, and other compensation; (b) pay and honor employee and retiree medical

and similar benefits (each as described in sub-clauses (a) and (b) defined herein, and collectively, the "Employee Obligations"); and (c) continue employee compensation and employee and retiree benefit programs (each as defined herein, and collectively, the "Employee Programs") in the ordinary course of business on a postpetition basis and in a manner consistent with prepetition policies.[2]

5.     The Debtors also request that the Court schedule a final hearing as soon as practicable after the 21st day following the date hereof (the "Petition Date") to consider approval of this Motion on a final basis (the "Final Hearing").

**I.     Interim Order.**

6.     To minimize disruption to the Debtors' businesses, the Debtors request the authority to make the following payments related to the Employee Obligations that come due during the period between the Petition Date and entry of the Final Order (the "Interim Period") in an aggregate amount not to exceed $19,010,000 and to continue to honor the Employee Programs associated with such Employee Obligations in the ordinary course of business on a postpetition basis and in a manner consistent with the Debtors' prepetition policies and procedures, *provided, however*, that no individual holder of a priority claim under section 507(a)(4) of the Bankruptcy Code will receive in the aggregate a payment in excess of $12,475 on account of such claim:

---

[2]   The summary of the Debtors' various Employee Obligations and Employee Programs provided herein is qualified entirely by the Debtors' official policies or other practices, programs, or agreements, whether written or unwritten, evidencing an arrangement among the Debtors and their Employees (each, an "Official Policy"). In the event of any inconsistency or ambiguity between this summary and an Official Policy, the terms of such Official Policy shall govern.

For the avoidance of doubt, the Debtors are not seeking relief pursuant to this Motion, the Interim Order or the Final Order with respect to the Debtors' Supplemental Retirement Plan, any other benefit plan that pays proceeds through a rabbi trust, or any incentive bonus program in a manner that is inconsistent with section 503(c) of the Bankruptcy Code.

| Employee Obligation | Amount |
|---|---|
| Unpaid Compensation | $4,100,000 |
| Unpaid TXU Sales Incentive Payments | $800,000 |
| Unpaid Payroll Processor Fees | $300,000 |
| Unpaid Reimbursable Expenses | $1,000,000 |
| Unremitted Payroll Taxes | $900,000 |
| Unremitted Miscellaneous Deductions | $400,000 |
| Unpaid Health Benefit Claims and Fees | $5,500,000 |
| Unpaid HSA | $50,000 |
| Unpaid Life Insurance Premiums | $200,000 |
| Unpaid Disability Benefit Premiums | $200,000 |
| Unremitted Supplemental Insurance Amounts | $700,000 |
| Unremitted 401(k) Deductions | $2,100,000 |
| Unpaid 401(k) Administrative Fees | $180,000 |
| Unpaid 401(k) Matching Obligation | $1,000,000 |
| Unpaid Workers' Compensation Administrative Fees | $20,000 |
| Unpaid Workers' Compensation Claims | $120,000 |
| Unpaid Vacation Time | $200,000 |
| Unpaid Retiree Medical Benefit Claims and Fees | $700,000 |
| Unpaid COBRA Claims and Fees | $20,000 |
| Unpaid Relocation Expenses | $150,000 |
| Unpaid Tuition Reimbursement Expenses | $60,000 |
| Unpaid Energy Aid Matching Contributions | $210,000 |
| Unremitted Union Dues | $100,000 |
| **Total** | **$19,010,000** |
| (Estimated Amount Held in Trust) | $5,200,000 |

7.      During the Interim Period, the Debtors also request authority, in the ordinary course of business on a postpetition basis and in a manner consistent with the Debtors' prepetition policies and procedures, to continue the Union Pension Plan and pay any prepetition amounts owing on account thereof and to continue the Flexible Spending Program, the Commuter Assistance Program, the Survivors' Benefit Program, the Employee Financing Program, the United Way Matching Contributions, the Workers' Compensation Coverage Fees, and Holiday and Leave of Absence Time (each as defined herein).

8.      To enable the Debtors to carry out the relief requested, the Debtors request that the Court (a) authorize all applicable bank, financial institutions, and the Payroll Processor (as defined herein) to receive, process, honor, and pay all checks presented for payment and all electronic payment requests made by the Debtors related to the Employee Obligations, whether

4

such checks were presented or electronic-payment requests were submitted before or after the date hereof and (b) modify the automatic stay to the extent necessary to permit the relief requested in this Motion with respect to the Debtors' workers' compensation program.

## II.    The Final Order.

9.    In addition, at the Final Hearing, the Debtors will seek entry of the Final Order, authorizing the Debtors to continue to honor the Employee Programs associated with the following Employee Obligations in the ordinary course of business on a postpetition basis and in a manner consistent with the Debtors' prepetition policies and procedures and to honor, pay, satisfy, or remit in the ordinary course of business and in accordance with the Debtors' prepetition policies and programs, all prepetition amounts outstanding on account of the following Employee Obligations in an aggregate amount not to exceed $23,435,000 (which amount includes all amounts requested in the Interim Order), including amounts owed to individual holders of claims with respect to such Employee Obligations in excess of $12,475:

| Employee Obligation | Interim Amount | Final Amount |
|---|---|---|
| Unpaid Compensation | $4,100,000 | $4,100,000 |
| Unpaid TXU Sales Incentive Payments | $800,000 | $800,000 |
| Unpaid Luminant Retail Incentive Plan Payments | $0 | $50,000 |
| Unpaid Staffing Provider Fees | $0 | $500,000 |
| Unpaid Independent Contractors | $0 | $50,000 |
| Unpaid Regulatory Consultant Compensation | $0 | $25,000 |
| Unpaid Payroll Processor Fees | $300,000 | $300,000 |
| Unpaid Reimbursable Expenses | $1,000,000 | $3,000,000 |
| Unremitted Payroll Taxes | $900,000 | $900,000 |
| Unremitted Miscellaneous Deductions | $400,000 | $400,000 |
| Unpaid Health Benefit Claims and Fees | $5,500,000 | $5,500,000 |
| Unpaid HSA | $50,000 | $50,000 |
| Unpaid Life Insurance Premiums | $200,000 | $200,000 |
| Unpaid Disability Benefit Premiums | $200,000 | $200,000 |
| Unremitted Supplemental Insurance Amounts | $700,000 | $700,000 |
| Unremitted 401(k) Deductions | $2,100,000 | $2,100,000 |
| Unpaid 401(k) Administrative Fees | $180,000 | $180,000 |
| Unpaid 401(k) Matching Obligation | $1,000,000 | $1,000,000 |

| Employee Obligation | Interim Amount | Final Amount |
|---|---|---|
| Unpaid Workers' Compensation Administrative Fees | $20,000 | $20,000 |
| Unpaid Workers' Compensation Claims | $120,000 | $120,000 |
| Unpaid Vacation Time | $200,000 | $2,000,000[3] |
| Unpaid Retiree Medical Benefit Claims and Fees | $700,000 | $700,000 |
| Unpaid COBRA Claims and Fees | $20,000 | $20,000 |
| Unpaid Relocation Expenses | $150,000 | $150,000 |
| Unpaid Tuition Reimbursement Expenses | $60,000 | $60,000 |
| Unpaid Energy Aid Matching Contributions | $210,000 | $210,000 |
| Unremitted Union Dues | $100,000 | $100,000 |
| **Total** | $19,010,000 | $23,435,000 |
| (Estimated Amount Held in Trust) | $5,200,000 | $5,200,000 |

10.     In addition, the Debtors seek authority, in the ordinary course of business on a postpetition basis and in a manner consistent with the Debtors' prepetition policies and procedures, to continue the same Employee Programs permitted in the Interim Order as well as the Consultant Compensation and the Severance Program (each as defined herein).

## Background

11.     On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition with the Court under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have requested joint administration of these chapter 11 cases. The Court has not appointed a trustee, and the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has not formed any official committees in these chapter 11 cases.[4]

12.     Debtor Energy Future Holdings Corp. ("EFH Corp."), a Texas corporation, is the

---

[3]     As discussed in the Motion, the total estimated cost of all cash and non-cash Unpaid Vacation Time is approximately $32,000,000. The Debtors estimate approximately $2 million in cash payments related to Unpaid Vacation Time obligations will accrue in these chapter 11 cases, assuming a ten-month case.

[4]     The facts and circumstances supporting this Motion, along with a detailed discussion of EFH's business operations and capital structure, are set forth in the *Declaration of Paul Keglevic, Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of Energy Future Holdings Corp., et al., in Support of First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith.

6

ultimate parent company for each of the Debtors in these chapter 11 cases and certain of EFH

Corp.'s non-Debtor affiliates (collectively, "EFH"). EFH's businesses include the largest

generator, distributor, and certified retail provider of electricity in Texas. EFH conducts

substantially all of its business operations in the electricity market overseen by the Electric

Reliability Council of Texas ("ERCOT"), which covers the majority of Texas. The Texas

electricity market, in turn, is subject to oversight and regulation by the Public Utility

Commission of Texas (the "PUC"). EFH has approximately 9,100 employees, approximately

5,700 of whom are employed by the Debtors,[5] in three distinct business units:

- EFH's *competitive electricity generation, mining, wholesale electricity sales, and commodity risk management and trading activities*, conducted by TCEH LLC's Debtor subsidiaries composing "Luminant";

- EFH's *competitive retail electricity sales operations and related operations*, mainly conducted by TCEH LLC's Debtor subsidiaries composing "TXU Energy";[6] and

- EFH's *rate-regulated electricity transmission and distribution operations*, conducted by the non-Debtor Oncor.

13. In the aggregate, the Debtors have approximately $42 billion of funded

indebtedness, including (a) approximately $32.1 billion of claims against TCEH LLC and TCEH

LLC's direct and indirect Debtor subsidiaries; (b) approximately $71 million of claims against

EFCH; (c) approximately $1.9 billion of claims against EFH Corp.; and (d) approximately $7.7

---

[5] The Debtors in these chapter 11 cases consist of: (a) the vast majority of the entities that compose Luminant and TXU Energy, as well as those entities' intermediate corporate parent entity, Texas Competitive Electric Holdings Company LLC ("TCEH LLC"), a Delaware limited liability company, and TCEH LLC's corporate parent, Energy Future Competitive Holdings Company LLC ("EFCH"), a Delaware limited liability company; (b) Energy Future Intermediate Holding Company LLC ("EFIH"), a Delaware limited liability company that indirectly owns approximately 80% of Oncor Electric Delivery Holdings Company LLC ("Oncor"), and EFIH's wholly-owned subsidiary, EFIH Finance Inc.; (c) EFH Corp.; and (d) other direct and indirect subsidiaries of EFH Corp., including EFH Corporate Services Company.

[6] The Debtors also conduct a relatively small amount of retail electricity operations through their 4Change brand and another entity, Luminant ET Services Company, that provides retail electricity service to some end use customers and to some of Luminant's mining operations, and a small amount of retail gas operations through Luminant Energy Company LLC.

billion of claims against EFIH.[7]

14.    Although the Debtors' balance sheet is overleveraged, the Debtors' operations are strong.  Luminant's generation units are high-performing, its mining and electricity generation operations have impressive safety records, and its commodity trading and risk management activities have delivered significant value to the Debtors.  TXU Energy is an industry leader in customer care performance and product innovation and has maintained strong performance notwithstanding intense competition.  And non-Debtor Oncor produces a strong and consistent stream of revenue.  Thus, these chapter 11 cases will provide the Debtors with the opportunity to restructure their balance sheets and retain their position as leaders in the Texas electricity market.

15.    As of December 31, 2013, EFH Corp. reported total assets of approximately $36.4 billion in book value, approximately $28.8 billion of which is attributable to EFCH, TCEH LLC, and TCEH LLC's direct and indirect subsidiaries (collectively with TCEH LLC and EFCH, "TCEH"),[8] and total liabilities of approximately $49.7 billion in book value, approximately $41.1 billion of which is attributable to TCEH.[9] EFH Corp.'s assets and liabilities that are not attributable to TCEH are mostly attributable to EFIH's indirect ownership of approximately 80% of Oncor.  EFH Corp.'s consolidated revenues for the quarter ending December 31, 2013 were approximately $1.3 billion, all of which were attributable to TCEH. EFH Corp.'s consolidated annual revenues for the year ending December 31, 2013 were

---

[7]    Amounts include intercompany debt holdings and short-term borrowings, and exclude guarantees, unamortized discounts or premiums, accrued but unpaid interest, and certain other figures typically reported in the Debtors' filings with the Securities and Exchange Commission (the "SEC"), such as capital lease obligations, certain promissory notes, and certain other obligations.

[8]    Oncor's revenues are not included in EFH Corp.'s consolidated revenues because EFH Corp. accounts for its ownership of Oncor under the equity method of accounting.

[9]    Figures for TCEH are derived from EFCH's public filings with the SEC, and are almost entirely attributable to TCEH LLC and its Debtor and non-Debtor subsidiaries.

approximately $5.9 billion.

## I.    Overview of the Debtors' Work Force.

16.    EFH Corp., the direct or indirect Debtor parent of each of the Debtors, and its subsidiaries collectively employ approximately 9,100 employees.  Of that number, the Debtors employ approximately 5,700 employees (collectively, the "Employees"), approximately 5,650 of whom are full-time and approximately 50 of whom are part-time.

17.    Approximately 2,000 Employees are represented by unions that are party to 11 collective bargaining agreements (collectively, the "CBAs"). The Debtors pay approximately 2,100 Employees on an hourly basis and approximately 3,600 Employees are salaried.  The Debtors also employ approximately 300 Staffing Provider Workers (as defined herein), during various periods throughout the year through an employment agency, and approximately 40 Independent Contractors (as defined herein).

## II.    Payroll.

### A.    Employee Compensation.

18.    The Debtors generally are current on all their payroll obligations to the Employees.  That said, as of the Petition Date, certain prepetition wage obligations have accrued and remain unpaid.  Additionally, some Employees may be entitled to compensation because (a) discrepancies may exist as to amounts paid and (b) some payroll checks issued before the Petition Date may not have been presented for payment or may not have cleared the banking system and, accordingly, have not been honored and paid as of the Petition Date.  The Debtors compensate their Employees (collectively, the "Compensation") as discussed below.

19.    Certain of the Debtors' Employees are compensated on an *hourly* basis and may be entitled to prepetition amounts on account of compensation that has accrued but remains unpaid as of the Petition Date on behalf of such Employees.  Alternatively, certain of the

9

Debtors' Employees are compensated by way of an annual salary which accrues on an hourly basis. As a result, there may be prepetition amounts on account of compensation that has accrued but remains unpaid as of the Petition Date on behalf of such Employees.

20.     On average, the Debtors pay approximately $10.0 million per week on account of Compensation. As of the Petition Date, the Debtors estimate that they owe Employees an aggregate amount of approximately $4.1 million on account of Compensation earned before the Petition Date (collectively, "Unpaid Compensation"), approximately $4.1 million of which will become due and owing within the Interim Period. The Debtors believe that no amount owed to an Employee exceeds the $12,475 priority cap imposed by section 507(a)(4) of the Bankruptcy Code on account of Unpaid Compensation.

21.     The Employees perform a variety of critical functions, including sales, customer service, plant and mine operations, accounting, finance, management and other tasks for the Debtors, and in return, depend on the Debtors for their Compensation to pay their daily living expenses. Thus, pursuant to the Interim Order, the Debtors seek authority, but not direction, to continue to pay Compensation in the ordinary course of business on a postpetition basis, and to pay Employees any Unpaid Compensation accrued in the ordinary course of business that comes due during the Interim Period, up to $12,475 per eligible Employee (approximately $5.0 million in the aggregate). Pursuant to the Final Order, the Debtors seek authority, but not direction, to continue to pay Compensation in the ordinary course of business on a postpetition basis and to pay all Unpaid Compensation owed to Employees, including amounts owed to Employees above $12,475 (if any).

**B.    Non-Insider Incentive Compensation.**

22.     As further described and detailed in the Supplemental Keglevic Declaration, certain of the Debtors' non-insider Employees who work in a customer-facing sales capacity

10

receive commission-based compensation from two performance based plans: (a) the TXU Sales Incentive Plan and (b) the Luminant Retail Gas Sales Incentive Plan (each as described herein). The Debtors have historically used these plans to drive sales efforts and motivate those Employees who have made significant individual and team contributions to the Debtors' sales efforts. These Employees are highly marketable given the Debtors' fiercely competitive retail market, and the attrition rate associated with these Employees has historically been high. Failure to compensate such Employees in accordance with prepetition practices could result in their immediate departure and jeopardize the Debtors' customer relationships. The majority of these Employees are eligible to receive such compensation on a biweekly or monthly basis, and, as a result, there may be prepetition amounts that have accrued but remain unpaid as of the Petition Date. Importantly, many of these Employees do not participate in other additive incentive programs. [10]

23.    *TXU Sales Incentive Plan.* The Debtors have historically offered a sales incentive plan to approximately 200, non-insider, full-time Employees at TXU Energy based on their performance in sales management or sales support positions (the "TXU Sales Incentive Plan"). Specified senior management sets certain performance goals for eligible Employees based on the detailed business plan approved by the TXU Energy executive leadership team. Proposed payments are subject to a rigorous review process, including review by the vice presidents of the relevant business units and approval by a dedicated award committee. As of the Petition Date, the Debtors estimate that approximately $800,000 is due and outstanding on

---

[10]    Many of the Debtors' Employees participate in various *additive* employee compensation programs. Although the Debtors are not seeking relief with respect to such additive employee compensation programs in this Motion, the Debtors intend to seek authority to continue such programs early in these chapter 11 cases pursuant to a separate motion.

account of the TXU Sales Incentive Plan, approximately $800,000 of which will become due and payable during the Interim Period (approximately $4,000 per eligible Employee) (the "Unpaid TXU Sales Incentive Payments").

24.    Importantly, none of the Employees who are eligible to participate in and receive payments from the TXU Sales Incentive Plan are insiders, as defined under section 101(31) of the Bankruptcy Code. Instead, these Employees work on commission earned through their efforts from interfacing with the Debtors' diverse customer base. The Employees eligible to participate in the TXU Sales Incentive Plan are uniquely positioned to know a significant amount about the Debtors and the Debtors' industry, as well as a significant amount of detail about the Debtors' customer base. As such, replacing these Employees would be highly disruptive to the business and directly affect the Debtors' relationship with their customers. As a result, the Debtors are seeking relief pursuant to the Interim Order to honor Unpaid TXU Sales Incentive Payments that become due and payable during the Interim Period and relief pursuant to the Final Order to honor all Unpaid TXU Sales Incentive Payments.

25.    ***Luminant Retail Gas Sales Incentive Plan.*** The Debtors have historically offered a sales incentive plan to approximately four non-Insider, full-time gas sales Employees at Luminant based on financial EBIT targets for each year (the "Luminant Retail Gas Sales Incentive Plan"). Payments under the Luminant Retail Gas Sales Incentive Plan are subject to a rigorous approval process similar to the process described above with respect to the TXU Sales Incentive Plan. As of the Petition Date, the Debtors estimate that approximately $50,000 is due and outstanding on account of the Luminant Retail Gas Sales Incentive Plan (the "Unpaid Luminant Incentive Retail Plan Payments").

26.    As with the TXU Sales Incentive Plan, no Employees who are insiders (as defined under the Bankruptcy Code) are entitled to participate in the Luminant Retail Gas Sales Incentive Plan.    Like the TXU Sales Incentive Plan, the Luminant Retail Gas Sales Incentive Plan incentivizes those Employees in a customer-facing position to create sustainable customer relationships that ultimately provide direct and positive returns to the Debtors' operations.    For the avoidance of doubt, the Debtors are seeking relief with respect to the Unpaid Luminant Incentive Retail Plan Payments on a final basis only.

**C.    Staffing Provider Workers.**

27.    The Debtors utilize the services of approximately 300 of various types of temporary workers (collectively, the "Staffing Provider Workers") through a number of different vendors (collectively, the "Staffing Providers").[11]    The Debtors typically pay for the Staffing Provider Workers' services directly to the Staffing Providers through their accounts payable system.  The Staffing Providers, in turn, pay the Staffing Provider Workers.

28.    The Staffing Provider Workers are, in many instances, highly skilled workers. For example, a significant group of Staffing Provider Workers provide information technology services that would be difficult to replace in a short timeframe.  The institutional knowledge held by such Staffing Provider Workers would also be difficult to replace in a short timeframe. The Debtors believe that if they are not permitted to pay the Staffing Providers for the services of the Staffing Provider Workers, the Staffing Providers may withdraw the Staffing Provider Workers or refuse to provide the Debtors with replacement workers.

---

[11]    One of the Staffing Providers, Pinnacle Technical Resources, Inc. is an affiliate of Kohlberg Kravis Roberts & Co., which has a substantial equity interest in EFH.  Importantly, the Unpaid Staffing Provider Fees (as defined below) owed to Pinnacle are secured by two letters-of-credit in the collective amount of approximately $3 million (the "Letters of Credit"), both of which will expire in June of 2014.

29.    On average, the Debtors pay approximately $710,000 per week on account of fees paid to the Staffing Providers on account of compensation owed to Staffing Provider Workers (the "Staffing Provider Fees").  As of the Petition Date, the Debtors estimate that approximately $500,000 is outstanding on account of the Staffing Provider Fees (the "Unpaid Staffing Provider Fees").

30.    Pursuant to the Final Order only, the Debtors seek authority, but not direction, to continue paying Staffing Provider Fees in the ordinary course of business on a postpetition basis, and to pay all Unpaid Staffing Provider Fees accrued in the ordinary course of business (approximately $500,000 in the aggregate).

**D.    Independent Contractors.**

31.    Through various contracts, approximately 40 independent and small contractors (collectively, the "Independent Contractors") conduct a range of important services for the Debtors.  The Independent Contractors provide on-site accounting, information technology, and other services on both a full-time and seasonal basis, and perform a variety of administrative, accounting, legal, finance, management support, and other related tasks.  Their skills, knowledge and understanding with respect to the Debtors' operations, customer relations and infrastructure are essential to the effective reorganization of the Debtors' business.  In addition, many of the Independent Contractors are small companies that may suffer financial hardship without immediate payment for their services.

32.    On average, the Debtors pay the vendors approximately $60,000 per week on account of compensation owed to the Independent Contractors (collectively, the "Independent Contractor Fees").  As of the Petition Date, the Debtors estimate that they owe an aggregate amount of approximately $50,000 in Independent Contractor Fees earned before the Petition Date (collectively, the "Unpaid Independent Contractor Fees").

14

33.    Pursuant to the Final Order only, the Debtors seek authority, but not direction, to continue paying Independent Contractors Fees in the ordinary course of business on a postpetition basis, and to pay all Unpaid Independent Contractors Fees accrued in the ordinary course of business, including amounts owed above $12,475 per each eligible Independent Contractor (approximately $50,000 in the aggregate).

### E.    Consultant Compensation.

34.    The EFH Corp. board of directors (the "Board") utilizes the services of two advisors who attend Board meetings and advise the Board as necessary and requested (the "Board Advisors"). The Debtors also collectively utilize the services of 13 third-party advisors who serve on a third-party advisory board (the "Regulatory Advisors" and, together with the Board Advisors, the "Consultants").    The Regulatory Advisors routinely advise companies in the Debtors' industry on critical nuclear and environmental regulatory issues. None of the Consultants are insiders.  In the aggregate, the Board Advisors receive $500,000 annually for their services (the "Board Consultant Compensation") and the Regulatory Advisors receive $520,000 annually for their services (the "Regulatory Consultant Compensation" and, together with the Board Consultant Compensation, the "Consultant Compensation").    The Debtors believe that the Consultants' collective skills, knowledge, and understanding of the Debtors' operations and infrastructure are critical to the successful reorganization of the Debtors' businesses.

35.    The Debtors estimate that, as of the Petition Date, approximately $25,000 has accrued and remains outstanding on account of Regulatory Consultant Compensation (the "Unpaid Regulatory Consultant Compensation") and no amounts have accrued and remain outstanding on account of Board Consultant Compensation. Pursuant to the Final Order only, the Debtors seek authority, but not direction, to pay the Unpaid Regulatory Consultant

15

Compensation and continue to honor the Consultant Compensation in the ordinary course of business on a postpetition basis.

**F.      Payroll Processor.**

36.      The Debtors use the services of Northgate Arinso (the "Payroll Processor") to process direct deposit transfers and administer payroll checks to Employees.[12]  The Debtors pay approximately 2% of their Employees by check and the remainder by direct deposit.  The Payroll Processor calculates the Debtors' payroll, health benefit, and tax obligations for each Employee, and the Debtors then transfer funds sufficient to satisfy such obligations to the Payroll Processor in advance of the end of the applicable pay period.

37.      On average, the Debtors pay approximately $300,000 per month to the Payroll Processor for the payroll-related services that it provides to the Debtors and related administrative costs (the "Payroll Processor Fees").  As of the Petition Date, the Debtors estimate that approximately $300,000 is outstanding on account of amounts owed to the Payroll Processor (the "Unpaid Payroll Processor Fees"), all of which will become due and owing within the Interim Period.

38.      It is critical the Debtors be able to compensate Employees on the historical payroll schedule.  The Debtors will be unable to stay on the historical payroll schedule without the Payroll Processor because the Payroll Processor is responsible for calculating benefits and administering paychecks for the Employees, and replacing the Payroll Processor would take a significant amount of time.  Thus, the Debtors seek authorization—but not direction—pursuant

---

[12]   Northgate Arinso is an affiliate of Kohlberg Kravis Roberts & Co., which has a substantial equity interest in EFH.

to the Interim Order and the Final Order, to pay the Unpaid Payroll Processor Fees and continue paying the Payroll Processor Fees in the ordinary course of business on a postpetition basis.

**III.     Reimbursable Expenses.**

39.     The Debtors reimburse certain Employees or pay credit card invoices on behalf of certain Employees for approved, legitimate expenses incurred on behalf of the Debtors in the scope of their employment (collectively, "Reimbursable Expenses"). Reimbursable Expenses include business development and training activities, activities with current or potential customers and partners, business-related travel expenses—including meals, hotels, flights, car rentals, fuel, cellular service used for business purposes—certain social club memberships, and purchases made for business purposes on the Debtors' corporate credit cards. Reimbursable Expenses are often incurred by Employees and certain members of the Debtors' boards who must travel as part of their employment responsibilities.

40.     The Debtors reimburse Employees for Reimbursable Expenses in two ways: through direct reimbursement (the "Direct Reimbursement Process") and the use of corporate credit and purchasing cards issued by JP Morgan Chase (collectively, the "Credit and Purchasing Cards").

(a) ***Direct Reimbursement Process.*** All Employees that make purchases with their own credit cards or with cash for Reimbursable Expenses incurred in the ordinary course of business are entitled to reimbursement. After certain approvals are received, in accordance with internal policies and procedures, the Debtors directly reimburse Employees for the Reimbursable Expenses incurred (including any late fees if the Employee can show that the delay was attributable to another party other than the Employee). The Employees are personally liable to their banks for such costs in the first instance and in some instances, the business expenses may be significant. If the Debtors did not provide Direct Reimbursement for the Employees, the Employees would be unwilling to incur such costs in the first instance for the benefit of the Debtors' businesses.

(b) ***Credit and Purchasing Cards.*** Approximately 2,210 Employees hold Credit and Purchasing Cards, which they typically use to cover Reimbursable

17

Expenses incurred in the ordinary course of business.[13]  The Debtors repay the amounts outstanding on the Credit and Purchasing Cards directly to JP Morgan Chase.  Although only the Debtors are liable on the Credit and Purchasing Cards, such that the Employees would not incur personal liability if balances went unpaid, the continued functionality of the Credit and Purchasing Cards is critical to avoid a costly disruption of the Debtors' ordinary business operations.  Importantly, JP Morgan Chase holds approximately $4.4 million of the Debtors' cash in a separate account created in September 2013 as security for the Debtors' ongoing obligations on account of the Credit and Purchasing Cards.  This amount accounts for more than the Debtors' average monthly spend on account of Reimbursable Expenses.

41.    The Debtors pay approximately $3 million per month on account of Reimbursable Expenses, which are paid in arrears.[14]  By this Motion, the Debtors seek authority to satisfy such Reimbursable Expenses that have accrued and become due and payable as of the Petition Date (the "Unpaid Reimbursable Expenses").  Pursuant to the Final Order, the Debtors seek to satisfy all Unpaid Reimbursable Expenses.

42.    The Employees incurred the Unpaid Reimbursable Expenses as business expenses on the Debtors' behalf and with the understanding that the Debtors would reimburse the Employees.  At a minimum, the Direct Reimbursement Process and the Credit and Purchasing Cards are a historical feature of the Debtors' employment arrangement, and curtailing or halting this program would substantially disrupt the expectations of the Employees and, therefore, the Debtors' operations.  In addition, the Debtors' internal employee reimbursement policy imposes a number of internal controls to ensure reimbursement requests are properly reviewed.  Among

---

[13]  The Debtors will instruct Employees not to pay for goods and services received before the Petition Date with their Credit and Purchasing Cards except to the extent permitted by order of the Court.

[14]  In certain narrow circumstances, the Reimbursable Expenses also include reasonable and documented expenses incurred by members of the Debtors' boards of directors and managers in the scope of their duties as board members.  The approval of such expenses is subject to various internal review processes.  As of the Petition Date, the Debtors anticipate that approximately $25,000 of Unpaid Reimbursable Expenses is attributable to reasonable and documented expenses incurred by board members in the scope of their employment.

other things, (a) reimbursement requests can only be approved by managers who are permitted to implement a stricter review process but not a more lenient review process, (b) expenses can only be reimbursed if incurred "for the benefit of the company" and (c) expenses can only be reimbursed if incurred at the lowest available costs (with very particular rules delineated with respect to travel and expenses).

43.     Pursuant to the Interim Order, the Debtors seek authorization, but not direction, to pay Unpaid Reimbursable Expenses in an amount not to exceed $2,500 per eligible Employee and, in any event, no more than $1 million in the aggregate, and continue to pay Reimbursable Expenses in the ordinary course of business on a postpetition basis.  Pursuant to the Final Order, the Debtors seek authorization, but not direction, to pay the Unpaid Reimbursable Expenses and continue paying the Reimbursable Expenses in the ordinary course of business on a postpetition basis.

## IV.    Deductions and Withholdings.

### A.    Payroll Taxes.

44.     The Debtors are required by law to withhold from Employees' paychecks amounts related to federal, state, and local income taxes, Social Security, and Medicare taxes for remittance to the appropriate federal, state, or local taxing authority (collectively, the "Withheld Amounts").  In addition, the Debtors are required by applicable statutory authority to pay Social Security and Medicare taxes, and based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (the "Employer Payroll Taxes" and, together with the Withheld Amounts, the "Payroll Taxes").

45.     On average, the Debtors withhold approximately $12 million per month for Payroll Taxes, including both Employee and Debtor-paid portions.   As of the Petition Date, the Debtors estimate that approximately $900,000 in Payroll Taxes have accrued and remain unpaid

(the "Unremitted Payroll Taxes"), all of which will become due and owing to various taxing authorities within the Interim Period.

46.     Since the Debtors are statutorily obligated to pay Payroll Taxes, their inability to do so may result in adverse legal consequences that disrupt the reorganization process. Moreover, the Debtors believe that certain of the Payroll Taxes are generally held in trust by the Debtors and are not property of their estates.   The Debtors seek authorization—but not direction—pursuant to the Interim Order and the Final Order, to remit the Unremitted Payroll Taxes and continue remitting Payroll Taxes in the ordinary course of business on a postpetition basis.

**B.     Miscellaneous Deductions.**

47.     In addition to various deductions discussed throughout this Motion, the Debtors routinely deduct certain amounts from Employees' paychecks during each applicable payroll period on account of miscellaneous items, including garnishments, child support, and other similar deductions (collectively, the "Miscellaneous Deductions").

48.     On average, the Debtors remit approximately $400,000 per month on account of the Miscellaneous Deductions.  As of the Petition Date, the Debtors estimate they have collected approximately $400,000 in Miscellaneous Deductions from Employees' paychecks that they have not yet transferred to the appropriate third parties (the "Unremitted Miscellaneous Deductions"), all of which will become due and owing to various third parties within the Interim Period.

49.     The Debtors believe that the Miscellaneous Deductions are generally held in trust by the Debtors and are not property of their estates.  The Debtors seek authorization—but not direction—pursuant to the Interim Order and the Final Order, to remit the Unremitted

20

Miscellaneous Deductions and continue remitting the Miscellaneous Deductions in the ordinary course of business on a postpetition basis.

## V.    Employee Benefit Programs.

50.    The Debtors offer Employees the opportunity to participate in one or more insurance and benefit programs, including, medical, dental, and vision plans, life insurance, short and long-term disability insurance, and other employee benefit plans as described below.

### A.    Health Benefit Plans.

51.    As described below, the Debtors offer Employees that work more than 20 hours per week the opportunity to participate in a number of health benefit plans, including medical, prescription, dental, and vision plans (collectively, the "Health Benefit Plans").

(a) *Medical Insurance Plans.*[15]    The Debtors' primary medical plans (collectively, the "Medical Insurance Plans") for their eligible Employees and eligible dependents are administered by Blue Cross Blue Shield of Texas. The Debtors' primary prescription drug plans for eligible Employees are administered by CVS/Caremark.  Approximately 5,000 eligible Employees and 7,000 dependents of eligible Employees are covered under the Medical Insurance Plans.    The Debtors' monthly cost to provide the Medical Insurance Plans on behalf of their Employees is approximately $5.1 million, of which approximately $900,000 is funded by deductions from participating eligible Employees. The Employees generally may choose between a variety of health reimbursement or savings account plans with deductibles typically in the range of $1,000 to $3,600 per year and, in the case of the HSA (as defined herein), to which the Debtors contribute on an annual basis.

(b) *Vision Plan.* The Debtors offer eligible Employees the option of participating in a vision plan (the "Vision Plan") administered by United Healthcare Vision. Approximately 3,700 eligible Employees and 5,500 dependents of eligible Employees are enrolled in the Vision Plan.  Eligible Employees contribute approximately $6 a month to participate in the Vision Plan as individuals, or approximately $20 a month for families.  The Debtors' monthly cost to

---

[15]    As part of the Medical Insurance Plans, the Debtors also maintain an employee assistance program (the "EAP") for all eligible Employees through Magellan Health Services.  The program provides up to eight in-person sessions for counseling on a range of life management issues such as alcohol and drug abuse, anxiety and depression, career and employment, family and marriage, financial, legal, and stress issues.  Costs expended on account of the EAP are included in the costs of Medical Insurance Plans.

provide the Vision Plan on behalf of their Employees (approximately $50,000) is fully funded by deductions from participating eligible Employees. The Debtors' Vision Plan is fully-insured and not subject to any limits.

(c) ***Dental Plan.*** The Debtors also offer eligible Employees the option to participate in a dental plan (the "Dental Plan") administered by Aetna. Approximately 5,400 eligible Employees and 5,000 dependents of eligible Employees are enrolled in the Dental Plan. There are two Dental Plan options. Under the comprehensive coverage Dental Plan, Employees do not pay any amounts on a monthly basis, but have a higher deductible and less post-deductible coverage. Under the "enhanced coverage" Dental Plan, Employees pay approximately $10 per month, as individuals, and have a lower deductible and more post-deductible coverage. The Debtors' monthly cost to provide the Dental Plan to their Employees is approximately $400,000, of which approximately $90,000 is funded by deductions from participating eligible Employees. The Dental Plan is self-insured and is not subject to any limits.

52.     Overall, the Debtors fund approximately 80% of the costs associated with the Health Benefit Plans and Employees fund the remainder. The Debtors estimate that they deduct or remit an aggregate amount of approximately $1.0 million each month on account of the Employees under the Health Benefit Plans and pay an aggregate amount of approximately $5.5 million each month on account of administrative fees, premiums, and claims under the Health Benefit Plans (collectively, the "Health Benefit Amounts"). The Debtors estimate that, as of the Petition Date, they owe approximately $5.5 million on account of the Health Benefit Amounts (the "Unpaid Health Benefit Claims and Fees"), all of which will become due and owing within the Interim Period.

53.     The Health Benefit Plans are customary for most large companies, and consequently, Employees and their dependents have come to rely on the Health Benefit Plans. Without the Health Benefit Plans, Employees would be forced to obtain potentially prohibitively expensive out-of-pocket coverage, which would adversely affect Employee morale. In addition, the Debtors believe that deductions taken from Employee paychecks on account of the Health Benefit Plans are generally held in trust by the Debtors and are not property of their estates. The

Debtors seek authorization—but not direction—pursuant to the Interim Order and the Final Order, to remit the Unpaid Health Benefit Claims and Fees and continue the Health Benefit Plans in the ordinary course of business on a postpetition basis.

**B.    Health Savings Account.**

54.    In connection with the Medical Insurance Plans, Employees may opt to participate in the Health Savings Account plan (the "HSA"). Under the HSA, the Debtor entity EFH Corporate Services contributes between $900 and $2,250 each year on behalf of participating Employees. EFH Corporate Services has already contributed such amounts for 2014 on behalf of participating Employees in an aggregate amount of approximately $5.4 million. That being said, the Debtors are obligated to contribute amounts on behalf of (i) Employees who were hired after the 2014 funding and who opt to participate in the HSA and (ii) Employees who did not complete the activities required to receive contributions from the Debtors before the 2014 funding but subsequently completed such activities. As of the Petition Date, the Debtors believe they owe approximately $50,000 in prepetition amounts on account of the HSA (the "Unpaid HSA"). Pursuant to the Interim Order and the Final Order, the Debtors seek authority, but not direction, to pay the Unpaid HSA and to continue the HSA in the ordinary course of business on a postpetition basis.

**C.    Flexible Spending Accounts.**

55.    The Debtors offer Employees that work more than 20 hours per week the ability to contribute a portion of their pre-tax compensation to flexible spending accounts to pay for certain    out-of-pocket    health    care    and    dependent    care    expenses (the "Flexible Spending Program"). Approximately 630 Employees participate in the health care portion of the Flexible Spending Program. At the beginning of each year, participating Employees contribute anywhere from $200 to $2,500 on behalf of themselves and anywhere

23

from \$200 to \$5,000 on behalf of their dependents by deducting such amounts from their paychecks. All FSA amounts were available for distribution in January 2014 and are deducted from employee's paychecks throughout the year.

56.    As of the Petition Date, the Debtors do not believe they owe any prepetition amounts on account of the Flexible Spending Program. Pursuant to the Interim Order and the Final Order, the Debtors seek authority, but not direction, to continue the Flexible Spending Program in the ordinary course of business on a postpetition basis.

**D.    Insurance.**

**1.    Life Insurance.**

57.    The Debtors provide approximately 5,650 Employees that work more than 20 hours per week with primary and split-dollar life insurance (the "Life Insurance") through Metropolitan Life Insurance Company. The Debtors provide eligible Employees with Life Insurance up to each Employee's base salary at no cost to the Employee.

58.    The coverage and related administration costs provided by these various policies costs the Debtors approximately \$200,000 per month (the "Life Insurance Amounts"). As of the Petition Date, the Debtors estimate that there are approximately \$200,000 in prepetition amounts to be deducted and/or remitted on account of the Life Insurance Amounts, all of which will become due and owing on account of the Life Insurance Amounts within the Interim Period (the "Unpaid Life Insurance Premiums").

59.    Many Employees' long-term planning consists solely of the Life Insurance coverage they receive as a benefit of their employment. The Debtors believe that continuing Life Insurance coverage is essential to maintaining Employee morale and protecting Employee expectations and protecting their families from the impact of a catastrophic event. Thus, the Debtors seek authorization—but not direction—pursuant to the Interim Order and the Final

24

Order, to pay the Unpaid Life Insurance Premiums and continue the Life Insurance in the ordinary course of business on a postpetition basis.

### 2. Disability Benefits.

60.    The Debtors provide approximately 5,650 Employees that work more than 20 hours per week with long-term disability benefits, administered through Metropolitan Life Insurance Company (the "Long-Term Disability Benefits").    The Debtors also provide Employees that work more than 30 hours per week with short-term disability benefits (the "Short-Term Disability Benefits," and, together with the Long-Term Disability Benefits, the "Disability Benefits"), administered through Metropolitan Life Insurance Company.  The Short-Term Disability Benefits are self-insured and are not subject to any limits.  The Long-Term Disability Benefits are fully insured under a policy that costs the Debtors approximately $200,000 per month.  The Debtors pay 100% of the costs for the Disability Benefits.

61.    Under the Short-Term Disability Benefits program, eligible Employees receive three weeks of benefits at 100% of their base pay and ten weeks of benefits at 50% of base pay after six months to a year of service for new Employees. After one and up to five years of service, eligible Employees receive 13 weeks of benefits at 100% of base pay and 13 weeks of benefits at 50% of base pay.  After five years of service, eligible Employees receive up to 26 weeks of benefits at 100% of base pay.  The Short-Term Disability Benefits program was implemented in 2011, and Employees hired before that time are entitled to 100% of base pay for up to 26 weeks.

62.    On average, the Debtors pay approximately $200,000 per month on account of the Disability Benefits.  As of the Petition Date, the Debtors estimate that they are obligated to

deduct and/or remit approximately $200,000 on account of the Disability Benefits (the "Unpaid Disability Benefit Premiums"), all of which will become due and owing in the Interim Period.

63.    The vast majority of Employees rely on Disability Benefits as their sole form of wage-loss relief. Thus, Employees will suffer substantial losses if they are not permitted to receive Disability Benefits. Accordingly, the Debtors seek authorization—but not direction—pursuant to the Interim Order and the Final Order, to pay the Unpaid Disability Benefit Premiums and continue the Disability Benefits in the ordinary course of business on a postpetition basis.

### 3.    Supplemental Insurance.

64.    Approximately 5,650 Employees that work more than 20 hours per week may purchase supplemental coverage on their life, critical illness, and accidental death and dismemberment policies (for themselves and their dependents), administered through Metropolitan Life Insurance Company and Boston Mutual (collectively, the "Supplemental Insurance"). Eligible Employees may purchase Supplemental Insurance in an aggregate amount no greater than six times their annual base salary, up to a limit of $2 million. The Supplemental Insurance is 100% paid by deductions from participating Employees' monthly paychecks.

65.    The Debtors deduct or remit approximately $700,000 per month on account of Supplemental Insurance (the "Supplemental Insurance Amounts"). As of the Petition Date, the Debtors estimate that there are approximately $700,000 in prepetition amounts to be deducted and/or remitted to Metropolitan Life Insurance Company on account of the Supplemental Insurance Amounts. The Debtors estimate that they will be obligated to remit approximately $700,000 in deductions (taken on account of the premiums owed by the approximately 3,500

26

Employees that have elected Supplemental Insurance Coverage), within the Interim Period (the "Unremitted Supplemental Insurance Amounts").

66.    The Debtors believe that the Supplemental Insurance Amounts are generally held in trust by the Debtors and are not property of their estates.  The Debtors seek authorization—but not direction—pursuant to the Interim Order and the Final Order, to remit the Unremitted Supplemental Insurance Amounts and continue Supplemental Insurance coverage in the ordinary course of business on a postpetition basis.

**E.    The 401(k) Plan.**

67.    The Debtors maintain a retirement savings plan for the benefit of their Employees who are at least 18 years old and have completed at least six months of eligible service, in accordance with the requirements of section 401(k) of the Internal Revenue Code (the "401(k) Plan").  Approximately 5,300 Employees currently participate in the 401(k) Plan.

68.    In addition to making contributions to their 401(k) Plan account, all Employees have the option to take out a loan from their 401(k) Plan account.  The Debtors then deduct certain amounts from such Employees' paychecks and remit those amounts for repayment of such loans.  The Debtors deduct approximately $4.0 million in the aggregate each month from Employees' paychecks  (a)  on account of Employees' 401(k) contributions and (b) to repay Employees' 401(k) loans (which are capped at the lesser of 50% of the amount in a particular Employee's 401(k) account or $50,000) (collectively, the "401(k) Deductions").  As of the Petition Date, the Debtors estimate that they will be obligated to remit approximately $2.1 million on account of the 401(k) Deductions (the "Unremitted 401(k) Deductions"), all of which will become due and owing within the Interim Period.

69.    The Debtors also have a limited matching program under the 401(k) Plan (the "401(k) Matching Obligation").  Specifically, the Debtors match:  (a) 100% of an Employee's

27

contributions, up to 6% of the Employee's salary, if the Employee does not participate in a defined benefit program or if they participate in the cash balance formula of the defined benefit plan; and (b) 75% of an Employee's contributions, up to 6% of the Employee's salary, if the Employee participates in the traditional formula of the defined benefit plan. The Debtors paid approximately $23.2 million in 2013 and $6.0 in the first quarter of 2014 on account of the 401(k) Matching Obligation. As of the Petition Date, the Debtors estimate that they owe approximately $1,000,000 on account of the 401(k) Matching Obligation (the "Unpaid 401(k) Matching Obligation"), all of which will become due and owing within the Interim Period.

70.    The 401(k) Plan is administered by Fidelity Workplace Services LLC ("Fidelity Workplace") and by other specialized vendors. The Debtors pay these administrators approximately $180,000 in the aggregate each month on account of administrative fees owed to Fidelity Workplace (the "401(k) Administrative Fees"). As of the Petition Date, the Debtors estimate that they owe approximately $180,000 in 401(k) Administrative Fees earned before the Petition Date (the "Unpaid 401(k) Administrative Fees"), all of which will become due and owing within the Interim Period.

71.    Many Employees' retirement savings solely consist of the 401(k) Plan, and many Employees choose to participate in the 401(k) Plan because of the 401(k) Matching Obligation provision. Thus, the Debtors believe that continuing the 401(k) Plan and the 401(k) Matching Obligation is essential to maintaining Employee morale and protecting Employee expectations. In addition, the Debtors believe that the 401(k) Deductions are generally held in trust by the Debtors and are not property of their estates.

72.    Accordingly, pursuant to the Interim Order and the Final Order, the Debtors seek the authority, but not direction, to (a) continue the 401(k) Plan in the ordinary course of business

28

on a postpetition basis, (b) remit all Unremitted 401(k) Deductions collected in the ordinary course of business that come due during the Interim Period (approximately $2.1 million in the aggregate), and (c) pay the Unpaid 401(k) Administrative Fees (approximately $180,000 in the aggregate), and (d) pay the Unpaid 401(k) Matching Obligation in the ordinary course of business (approximately $1,000,000 in the aggregate).

## VI.    Workers' Compensation.

73.    The Debtors provide workers' compensation insurance for their Employees at the level required by statute for each state in which the Debtors have Employees (collectively, the "Workers' Compensation Program").[16]  The Debtors maintain the Workers' Compensation Program through Liberty Mutual Group, STARR, Kemper, and Reliance Insurance (the "Workers' Compensation Insurers").   The Debtors have a $2 million deductible per occurrence under the Workers' Compensation Program.

74.    On average, the Debtors pay approximately $1.4 million per year in fees and premiums on account of the Workers' Compensation Program (the "Workers' Compensation Coverage Fees").   The Debtors estimate that they do not owe any amounts on account of Workers' Compensation Coverage Fees as of the Petition Date.

75.    Additionally, the Debtors incur an average of approximately $1.4 million in workers' compensation claims per year, and pay an average of approximately $1.3 million per year on account of such incurred claims.  Third-party administrators—Crawford & Company, York Risk Services Group, Inc., and one of the Workers' Compensation Insurers, Liberty Mutual

---

[16]  The Debtors' workers' compensation policies entitle the Debtors to protection when benefits are due to Employees under the following states' workers' compensation laws:  (a) Arizona; (b) District of Columbia; (c) Georgia; (d) Maryland; (e) Maine; (f) New York; (g) South Carolina; and (h) Texas.  Although Texas does not require employers to maintain a Workers' Compensation Program, the Debtors have not opted out of the Texas Workers' Compensation Act.  Additional states are also covered in previous years.

group—collect and process claims submitted pursuant to the Workers' Compensation Program in exchange for an administrative fee ("Workers' Compensation Administrative Fees").

76.     On average, the Debtors pay approximately $20,000 per month in Workers' Compensation Administrative Fees. As of the Petition Date, the Debtors estimate that they owe approximately $20,000 in Workers' Compensation Administrative Fees ("Unpaid Workers' Compensation Administrative Fees"), all of which will come due and owing within the Interim Period.

77.     Certain benefits under the Workers' Compensation Program may have been incurred prepetition but have yet to be fully paid, and certain other claims may have been filed prepetition but have yet to be resolved (collectively, the "Unpaid Workers' Compensation Claims"). For the claims administration process to operate in an efficient manner and to ensure that the Debtors comply with their contractual obligations, the Debtors must continue to assess, determine, and adjudicate Unpaid Workers' Compensation Claims during these chapter 11 cases. In addition, to the extent any of the Employees assert claims under the Workers' Compensation Program, the Debtors request that the Court modify the automatic stay under section 362 of the Bankruptcy Code to permit the Employees to proceed with their claims under the Workers' Compensation Program. This required modification of the automatic stay pertains solely to claims under the Workers' Compensation Program.

78.     Because the Debtors are statutorily and/or contractually obligated to maintain the Workers' Compensation Program, their inability to do so may result in adverse legal consequences that disrupt the reorganization process. Thus, pursuant to the Interim Order, the Debtors seek authority, but not direction, to: (a) continue the Workers' Compensation Program in the ordinary course of business on a postpetition basis, including by paying all Workers'

Compensation Coverage Fees; (b) modify the automatic stay solely to allow Employees to assert claims under the Workers' Compensation Program; (c) pay any Unpaid Workers' Compensation Administrative Fees accrued in the ordinary course of business that come due during the Interim Period (approximately $20,000 in the aggregate); and (d) pay all Unpaid Workers' Compensation Claims incurred in the ordinary course of business that come due during the Interim Period (approximately $120,000 in the aggregate).

79.     Pursuant to the Final Order, the Debtors seek (a) substantially the same relief as requested in the Interim Order and (b) to pay all Workers' Compensation Coverage Fees, Workers Compensation Administrative Fees, and Workers' Compensation Claims accrued in the ordinary course of business on a postpetition basis.

## VII.    Vacation, Holiday and Other Leave of Absence Time.

80.     The Debtors provide vacation time to all full-time Employees other than union Employees as a paid time-off ("PTO") benefit (the "Vacation Time").[17] Length of employment generally determines the amount of Vacation Time available to each eligible Employee and the rate at which such Vacation Time accrues. The amount of available Vacation Time differs between Luminant Employees and all other Employees. In addition, Vacation Time for Luminant Employees is earned January 1 of each year (e.g., a Luminant Employee receives 15 days of vacation beginning January 1 of the calendar year that the Employee will have served six years of service), while Vacation time for all other Employees is accrued each pay period.

---

[17]    All full-time Employees are entitled to the Vacation Time benefits, with the exception of union Employees (as described herein).

31

81.    *Luminant Employees.*  The amount of Vacation Time that each eligible Luminant Employee can take is based on the number of years of continuous full-time employment, as follows:

      (a)  six days of Vacation Time for six months to 10 months of employment;
      (b)  10 days of Vacation Time for 10 months of employment to six years of employment;
      (c)  15 days of Vacation Time for six to 14 years of employment;
      (d)  20 days of Vacation Time for 15 to 23 years of employment; and
      (e)  25 days of Vacation Time for 24 or more years of employment.

82.    The Luminant Vacation Time amounts differ slightly for Luminant Employees that work in nuclear operations, at lignite plants, or at certain mine sites.  Employees who do not use all of their accrued Vacation Time in a year may carry over accrued, unused Vacation Time to the next year, up to a maximum of 48 hours.

83.    *All Other Employees.*    The amount of Vacation Time that each eligible non-Luminant Employee can take is based on the number of years of continuous full-time employment, as follows:[18]

      (a)  17 days of Vacation Time for zero to four years of employment;
      (b)  22 days of Vacation Time for five to nine years of employment;
      (c)  27 days of Vacation Time for 10 to 19 years of employment; and
      (d)  32 days of Vacation Time for 20 or more years of employment.

84.    Employees who do not use all of their accrued Vacation Time in a year may carry over accrued, unused Vacation Time to the next year, up to a maximum of 40 hours.

85.    All Employees who are eligible to take Vacation Time and who terminate their employment for any reason are entitled to the cash equivalent of any accrued but unused Vacation Time through their termination date.  The Debtors have approximately $32.0 million of

---

[18]    The Luminant Vacation Time policies do not include sick-time.  Luminant Employees are entitled to take sick leave but do not accrue sick leave benefits.  Therefore, the Debtors do not have any cash obligations associated with accrued but unused sick-time on behalf of Luminant Employees.

total cash and non-cash accrued obligations on account of Vacation Time. On average, the

Debtors pay approximately $200,000 per month on account of cash obligations associated with

the accrued but unused Vacation Time of terminated Employees. As of the Petition Date, the

Debtors estimate they owe an aggregate amount of approximately $200,000 in cash obligations

on account of accrued Vacation Time (the "Unpaid Vacation Time"), all of which will come due

within the Interim Period.

86.    In addition, the Debtors recognize eight to ten core holidays as a PTO benefit for

certain of their Employees (each, a "Holiday" and, collectively, the "Holidays").[19]  Generally,

eligible Employees are not required to work on designated Holidays and are paid for Holiday

time at their base rate of pay. Employees who are required to work on designated Holidays are

paid in accordance with the applicable Debtor's Holiday pay rates.

87.    On average, the Debtors pay approximately $17.0 million per year on account of

the Holiday policies. As of the Petition Date, the Debtors do not estimate they owe any amounts

account of Holiday obligations.

88.    Employees may also take certain other unpaid leaves of absence for personal

reasons (collectively, "Leave of Absence Time"). Leave of Absence Time includes family

medical leaves, pregnancy, adoption and foster care leaves, military leaves, jury duty, voting

leaves, personal leaves, and bereavement leaves.[20] Employees are not entitled to cash payments

---

[19]  All full-time Employees are entitled to take Holidays. Full-time Luminant Employees are further entitled to
two floating Holidays. Floating Holidays must be taken if the Employee is to receive pay for it as a Holiday.
Holiday premium pay may be earned on a floating Holiday only if the Employee is called to work because of an
emergency.

[20]  Employees taking a military Leave of Absence to serve a regular tour of duty receive pay for all PTO benefits
granted and accrued but not used before the effective date of the Leave of Absence. Such Employees do not
receive any other pay during the tour of duty.

for unused Leave of Absence Time. Thus, the Debtors do not believe that there are any obligations owing as of the Petition Date on account of Leave of Absence Time.

89.    The Debtors believe that the continuation of the Vacation Time, Holiday, and Leave of Absence Time policies in accordance with prior practice (subject to the limitations described below), is essential to maintaining Employee morale during these chapter 11 cases. Further, the policies are broad-based programs upon which all Employees have come to depend.

90.    As a result, pursuant to the Interim Order, the Debtors seek authority, but not direction, to allow eligible Employees to use their Vacation Time, Holiday, and Leave of Absence Time in the ordinary course of business on a postpetition basis, and to pay any Unpaid Vacation Time accrued in the ordinary course of business that comes due during the Interim Period, up to $12,475 per eligible Employee (approximately $200,000 in the aggregate). The Debtors seek the same relief in the Final Order, but without with respect to the priority cap of $12,475.

91.    To be clear, the Debtors anticipate that their Employees will utilize any accrued Vacation Time, Holiday, and Leave of Absence Time in the ordinary course of business, and, therefore, the Debtors do not expect there to be any material cash requirements beyond the Debtors' normal payroll obligations on account of the relief requested herein.

**VIII.  Retiree Compensation and Benefits.**

92.    The Debtors maintain one qualified defined benefit pension plan that provides benefits to the approximately 2,100 union Employees (the "Union Pension Plan"). The Debtors also provide certain benefits (the "Retiree Medical Benefits") to approximately 4,600 retired Employees and Oncor's retired employees, (collectively, the "Retirees"), and such Retirees' eligible dependents.

### A.    The Union Pension Plan.

93.    The Debtors plan to continue to make any and all contributions on account of the Union Pension Plan (the "<u>Union Pension Plan Obligations</u>") as required by applicable law and various contractual obligations.  For 2014, the Debtors made their annual contribution of approximately $20.0 million on behalf of the Union Pension Plan.  Pursuant to the Interim Order and the Final Order, the Debtors seek authority, but not direction, to pay all Union Pension Plan Obligations accrued in the ordinary course of business (whether incurred prepetition or postpetition) and to continue the Union Pension Plan in the ordinary course of business on a postpetition basis.

### B.    Retiree Medical Benefits.

94.    The Debtors sponsor Retiree Medical Benefits for the Retirees and their eligible dependents.  In March of 2005, the Debtors and Oncor entered into an allocation agreement, under which Oncor assumed the retiree medical benefit obligations for (a) all of its active and retired employees and (b) Debtor active and retired Employees for the amounts earned by such Employees pursuant to their service prior to the deregulation and disaggregation of the Debtors' and Oncor's combined predecessor electric utility business effective January 1, 2002.  As a result of this agreement, although the Debtors sponsor the Retiree Medical Benefits, Oncor is obligated to satisfy the vast majority of the Retiree Medical Benefits' obligations.  As of December 31, 2013, approximately 88% of the Retiree Medical Benefits' liability was attributable to Oncor. The Debtors and Oncor are each responsible for satisfying their portion of Retiree Medical Benefits' liability.

95.    Generally, the medical coverage offered to the Retirees differs based on the specific plan in which a Retiree chooses to participate, and participant costs differ based on the chosen plan, whether the Retiree's dependents are covered by the chosen plan, and the Retiree's

years of service and associated rate band. On average, the Debtors pay approximately $700,000 each month to sponsor the Retiree Medical Benefits on behalf of the Retirees. As of the Petition Date, the Debtors estimate that they owe approximately $700,000 on account of sponsoring the Retiree Medical Benefits (the "Unpaid Retiree Medical Benefit Claims and Fees"), all of which will become due and owing within the Interim Period.

96.    The Debtors currently are obligated to provide Retiree Medical Benefits under section 1114 of the Bankruptcy Code. In addition, the Debtors believe that it is important that they continue to provide Retiree Medical Benefits to reassure all Employees that the Debtors intend to honor their obligations to Employees—both during and after their tenure with the Debtors.

97.    The Debtors seek authorization—but not direction—pursuant to the Interim Order and the Final Order, to pay the Unpaid Retiree Medical Benefit Claims and Fees and continue providing the Retiree Medical Benefits in the ordinary course of business on a postpetition basis.

IX.    **Severance Program.**

A.    **Severance Payments.**

98.    The Debtors have historically maintained a severance program under which all Employees are entitled to a certain number of weeks of severance benefits based on their position and length of service with the Debtors, as well as post-employment benefits under the Health Benefit Plans (the "Severance Program").

99.    Payments under the Severance Program are not due and payable until termination. As a basis for comparison, between the years of 2010 and 2013, the Debtors paid an average of $4 million per year on behalf of the Severance Program. This average reflects an atypical reduction in workforce in 2011, and, in fact, the Debtors paid less than $3 million in each of the

36

last two years on account of the Severance Program. Importantly, as of the Petition Date, no cash amounts remain outstanding on account of the Severance Program.

100.    The Debtors believe that it is important that they fulfill their obligations under the Severance Program to reassure all Employees that the Debtors intend to honor their obligations to Employees—both during and after their tenure with the Debtors—including those obligations incurred postpetition under the Severance Program. Accordingly, the Debtors seek to continue the Severance Program on a postpetition basis solely upon entry of the Final Order, whether or not such Employees were eligible for the Severance Program before the Petition Date.

101.    Importantly, the Debtors do not seek the authority in this Motion to pay any obligations under the Severance Program to any "insider" (as the term is defined in section 101(31) of the Bankruptcy Code), so the Debtors submit that section 503(c)(2) of the Bankruptcy Code with respect to severance payments to insiders does not apply to the relief requested herein.

**B.    COBRA Reimbursements.**

102.    The Debtors also reimburse former Employees for deductions taken on account of Consolidated Omnibus Budget Reconciliation Act ("COBRA") expenses for the duration of their severance benefits. Under COBRA, the Debtors are obligated to offer former Employees and their dependents continued coverage under the Health Benefit Plans for a period of up to eighteen months. The Debtors provide these reimbursements through a third-party administrator, Chard Snyder. Approximately 40 former Employees participate in one or more Health Benefit Plans under COBRA. On average, the Debtors remit approximately $20,000 per month on account of COBRA reimbursements to Chard Snyder for former Employees (the "COBRA Reimbursements").

103.    As of the Petition Date, the Debtors estimate that they owe $20,000 on account of COBRA Reimbursements ("Unpaid COBRA Claims and Fees"). The Debtors seek

authorization—but not direction—pursuant to the Interim Order and the Final Order, to remit the Unpaid COBRA Claims and Fees and continue remitting COBRA Reimbursements in the ordinary course of business on a postpetition basis.

## X.    Other Employee Programs and Benefits.

### A.    Relocation Expenses.

104.    The Debtors provide certain Employees with relocation-related expenses (collectively, the "Relocation Expenses") to incentivize desirable "new-hire" candidates to accept positions with the Debtors or incentivize existing Employees to accept transfers to other locations.  On average, the Debtors pay approximately $150,000 per month on account of Relocation Expenses.  As of the Petition Date, the Debtors estimate that they owe $150,000 on account of prepetition Relocation Expenses ("Unpaid Relocation Expenses"), all of which will come due during the Interim Period.

105.    It is critical that the Debtors be able to pay Relocation Expenses to attract and retain talented employees, as well as to ensure, among other things, that Employees will be reimbursed for the expenses incurred in connection with their moves for the Debtors' benefit. Accordingly, pursuant to the Interim Order and the Final Order, the Debtors seek authority, but not direction, to pay any Unpaid Relocation Expenses that come due in the ordinary course of business and to continue paying Relocation Expenses in the ordinary course of business on a postpetition basis.

### B.    Tuition Reimbursement Expenses.

106.    The Debtors provide tuition assistance for eligible Employees who study in fields related to the Debtors' businesses (the "Tuition Reimbursement Expenses").  Employees are eligible to participate in the program if they work more than 20 hours per week, not including temporary workers or interns.  On average, the Debtors pay approximately $60,000 per month on

account of Tuition Reimbursement Expenses. As of the Petition Date, the Debtors estimate that they owe approximately $60,000 on account of Tuition Reimbursement Expenses (the "Unpaid Tuition Reimbursement Expenses"), all of which will come due during the Interim Period.

107.    It is important that the Debtors be permitted to reimburse Employees for their tuition costs to ensure that the Debtors remain a competitive and knowledgeable presence in the energy industry. Thus, the Debtors seek authorization—but not direction—pursuant to the Interim Order and the Final Order, to pay the Unpaid Tuition Reimbursement Expenses and continue paying the Tuition Reimbursement Expenses in the ordinary course of business on a postpetition basis.

**C.    Commuter Assistance Program.**

108.    The Debtors subsidize eligible Employees for their car pool, bus, and rail costs (the "Commuter Assistance Program"). The Debtors prepay the costs to administer the Commuter Assistance Program in January of each year (approximately $230,000 for the year). As of the Petition Date, the Debtors do not believe there are any prepetition amounts on account of the Commuter Assistance Program, and the Debtors do not believe that any amounts will become due and owing during the Interim Period.

109.    Pursuant to the Interim Order and the Final Order, the Debtors seek authority to continue the Commuter Assistance Program in the ordinary course of business on a postpetition basis.

**D.    Survivors' Benefit Program.**

110.    The Debtors pay a benefit equal to one month of an Employee's base salary to an Employee's beneficiary upon death (the "Survivors' Benefit Program"). As of the Petition Date, the Debtors estimate that there are no amounts outstanding under the Survivors' Benefit Program.

39

111.     Pursuant to the Interim Order and the Final Order, the Debtors seek authority, but not direction, to continue the Survivors' Benefit Program and pay amounts on account thereof in the ordinary course of business on a postpetition basis.

**E.       Employee Financing Programs.**

112.     The Debtors have two programs in place in which they offer interest-free financing to Employees for appliances, including one for certain energy saving home appliances (the "Energy Conservation Program"), and another for certain other large household appliances, such as a dishwasher or clothes dryer (the "Appliance Financing Program," and together with the Energy Conservation Program, the "Employee Financing Programs"). The Energy Conservation Program has a maximum financing limit of $3,500 over a term of up to 60 months, and the Appliance Financing Program has a maximum financing limit of $2,000 over a term of up to 24 months. The Debtors' pay approximately $1.2 million per year on account of the Employee Financing Programs. As of the Petition Date, the Debtors do not believe they owe any amounts on account of prepetition obligations related to the Employee Financing Programs.

113.     The Employee Financing Programs provide significant financing savings to those Employees who participate. Pursuant to the Interim Order and the Final Order, the Debtors seek authority, but not direction, to continue the Employee Financing Programs in the ordinary course of business on a postpetition basis.

**F.       United Way Matching Program.**

114.     The Debtors maintain a matching program for Employee contributions to local chapters of United Way, a non-profit organization dedicated to identifying and resolving pressing community issues (the "United Way Matching Contributions"). For every $1.00 that Employees donate to local United Way chapters, the Debtors contribute $0.50 in United Way

Matching Contributions. On an annual basis, the Debtors contribute approximately $430,000 in United Way Matching Contributions.

115. As of the Petition Date, the Debtors do not believe there are any prepetition amounts owed on account of United Way Matching Contributions. Pursuant to the Interim and the Final Order, the Debtors seek authority, but not direction, to continue making United Way Matching Contributions in the ordinary course of business on a postpetition basis.

### G.    Energy Aid Program.

116. The Debtors maintain a matching program for customer and employee contributions to local communities (the "Energy Aid Program"). The Energy Aid Program is the largest bill-payment assistance program among electricity providers in the nation. The Debtors' Employees contribute to the Energy Aid Program through paycheck deductions, and the Debtors match Employee contributions (the "Energy Aid Matching Contributions").[21] For 2013, the Debtors contributed approximately $1.5 million in Energy Aid Matching Contributions on account of employee deductions.

117. As of the Petition Date, the Debtors estimate that they owe $210,000 on account of prepetition obligations related to the Energy Aid Matching Contributions (the "Unpaid Energy Aid Matching Contributions"), all of which will come due during the Interim Period. Pursuant to the Interim Order and the Final Order, the Debtors seek authority, but not direction, to pay the

---

[21]   The Debtors also match customer donations to the Energy Aid Program: for every $1.00 that customers donate to the Energy Aid Program, the Debtors contribute $5.00 to local communities to help individuals pay their electricity bills. For additional information on the Energy Aid Program and relief sought with respect to matching customer contributions, see the *Motion of Energy Future Holdings Corp., et al., for Entry of (A) an Order Authorizing the Debtors to (I) Maintain and Administer Customer Programs and Customer Agreements, (II) Honor Prepetition Obligations Related Thereto, (III) Pay Certain Expenses on Behalf of Certain Organizations, (IV) Fix Deadlines to File Proofs of Claim for Certain Customer Claims, and (V) Establish Procedures for Notifying Customers of Commencement of the Debtors' Chapter 11 Cases, Assumption of Customer Agreements, and the Bar Dates for Customer Claims and (B) an Order Authorizing Certain of the Debtors to Assume the Customer Agreements* (the "Customer Programs Motion"), filed contemporaneously herewith.

Unpaid Energy Aid Matching Contributions and to continue making Energy Aid Matching Contributions in the ordinary course of business on a postpetition basis.

## XI.    Unions.

118.    Approximately 2,100 Employees are represented by unions that are party to 11 CBAs with the International Brotherhood of Electrical Workers (the "IBEW").

119.    The Debtors are required to withhold union member dues, and typically remit such dues on a monthly basis to the IBEW (collectively, the "Union Dues"). On average, the Debtors remit approximately $100,000 per month on account of the Union Dues. As of the Petition Date, the Debtors estimate they have collected approximately $100,000 in Union Dues that they have not yet transferred to the IBEW (the "Unremitted Union Dues"), all of which will become due and owing to the IBEW during the Interim Period. The Debtors generally hold the Union Dues in trust and as a result, the Debtors generally do not consider these as assets of their estates.

120.    Accordingly, pursuant to the Interim Order and the Final Order, the Debtors seek authority, but not direction, to: (a) continue deducting and remitting the Union Dues in the ordinary course of business on a postpetition basis; (b) continue honoring the CBAs in the ordinary course of business on a postpetition basis; and (c) remit the Unremitted Union Dues collected in the ordinary course of business.

## XII.    Relationship with Oncor.

121.    The Debtors also provide and administer benefits to eligible Oncor employees, retirees, and dependents with respect to certain Employee Programs including, among others: (a) the Health Benefit Plans; (b) the Flexible Spending Program; (c) the 401(k) Plan; and (d) the Retiree Medical Benefits. In the aggregate, the Debtors historically spend approximately $250,000 per year to provide and administer such benefits on behalf of eligible Oncor

employees, retirees, and dependents. Importantly, however, Oncor reimburses the Debtors for the vast majority of these costs and many of the Debtors' activities in respect of Oncor employees, retirees, and dependents are administrative in nature.[22] After accounting for Oncor's typical reimbursements to the Debtors, the Debtors generally spend approximately $250,000 per year to provide and administer such benefits on behalf of eligible Oncor employees, retirees, and dependents.

122.    By this Motion, the Debtors seek the authority to (a) honor prepetition obligations related to administration of benefits on behalf of eligible Oncor employees, retirees, and dependents in accordance with prepetition practices; (b) continue to provide and administer benefits to eligible Oncor employees, retirees and dependents, in accordance with prepetition practices and contractual arrangements; and (c) continue to pay the costs of providing retiree welfare benefits to certain eligible retirees in accordance with prepetition practices, in the ordinary course of business, and in accordance with prepetition contractual arrangements.

---

[22] With respect to the Debtors' administration of benefits on behalf of Oncor, the Debtors and Oncor have entered into two agreements that address how benefits obligations will be shared between the Debtors and Oncor but which do not substantively affect the benefits received by eligible Employees and their dependents or eligible Oncor employees and their dependents. Specifically, as of the Petition Date, the Debtors and Oncor have entered into an agreement to provide that, effective July 1, 2014 through December 31, 2014, the Debtors will continue to administer welfare benefits for Oncor employees, retirees, and dependents ("Welfare Benefit Administration Agreement"). Under the Welfare Benefit Administration Agreement, Oncor will continue to pay the Debtors for such administrative services on substantially the same terms and conditions as current practice. Additionally, the Debtors and Oncor have entered into an agreement as of the Petition Date that provides that, effective January 1, 2015, Oncor will administer welfare benefits for certain "split-service" retirees to whom the Debtors and Oncor have obligations ("Split Participant Agreement"). Under the Split Participant Agreement, Debtor and Oncor will essentially continue the same economic relationship that currently exists under which Oncor and the Debtors each pay their respective portion of the costs of providing retiree welfare benefits to the split participants.

<u>Basis for Relief</u>

I.   **Sufficient Cause Exists to Authorize the Debtors to Honor Employee Wage and Benefit Obligations.**

   A.   **Certain of the Employee Obligations are Entitled to Administrative or Priority Treatment.**

   123.   A significant majority of Unpaid Compensation and other Employee-related obligations are entitled to priority treatment under the Bankruptcy Code.  For example, sections 507(a)(4) and (a)(5) of the Bankruptcy Code afford priority status to wage claims up to $12,475 per individual—including claims for vacation, severance and sick-leave—and to claims for contributions to employee benefit plans.

   124.   In addition, section 1114(e) of the Bankruptcy Code provides that debtors shall timely pay (without modification) any retiree benefits and that such payments will have the status of allowed administrative expenses under the Bankruptcy Code.  *See* 11 U.S.C. § 1114(e)(2); *In re Visteon Corp.*, 612 F.3d 210, 218 (3d Cir. 2010) (finding that "[s]ection 1114(e) provides additional protection for retiree benefits by giving them priority they would not otherwise have.  That provision states: '[a]ny payment for retiree benefits required to be made' during a Chapter 11 proceeding 'has the status of an allowed administrative expense' under 11 U.S.C. § 503, rather than the general unsecured status that would otherwise apply."); *In re Roth Am., Inc.*, 975 F.2d 949, 956 (3d Cir. 1992) (finding that "section 1114, which was enacted to protect retiree benefits, explicitly gives such claims administrative priority.").  To confirm a chapter 11 plan, the Debtors must pay priority claims in full and continue to honor the Retiree Medical Benefit obligations.   *See* 11 U.S.C. § 1129(a)(9)(b) (requiring payment of certain allowed unsecured claims for (a) wages, salaries, or commissions, including vacation and severance earned by an individual and (b) contributions to an employee benefit plan); 11 U.S.C. § 1129(a)(13) (requiring confirmation of all retiree benefits).

125.    Thus, granting much of the relief sought in this Motion affects only the timing of payments to Employees, and does not negatively affect recoveries for general unsecured creditors.  Indeed, the Debtors firmly believe that paying Employee claims at this time enhances value for the benefit of all interested parties.

**B.    Payment of Certain of the Employee Obligations is Required by Law.**

126.    The Debtors also seek authority to remit deductions (including Miscellaneous Deductions) and Payroll Taxes to the appropriate entities.  These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from Employees' paychecks.  Indeed, certain deductions are not property of the Debtors' estates because the Debtors have withheld such amounts from Employees' paychecks on another party's behalf.  *See* 11 U.S.C. § 541(b).

127.    In addition, federal and state laws require the Debtors to withhold certain tax payments from Employees' paychecks and to pay such amounts to the appropriate taxing authority.  *See* 26 U.S.C. §§ 6672 and 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95-97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes).  Failure to remit such amounts to the proper taxing authorities could give rise to personal liability for the Debtors' directors and officers.

128.    Accordingly, the Debtors request that the Court authorize them to remit all deductions (including Miscellaneous Deductions) and Payroll Taxes to the proper third-parties in the ordinary course of business.

**C.    Payment of the Employee Obligations is Warranted Under the Doctrine of Necessity.**

129.    Courts in the Third Circuit and elsewhere generally recognize that debtors may pay prepetition claims that are essential to the continued operation of the debtor's business. *See, e.g., In re Meridian Auto. Sys.-Composite Operations, Inc.*, 372 B.R. 710, 714 (Bankr. D. Del. 2007) (granting the debtor authority to pay prepetition obligations owed to certain critical vendors); *In re Primary Health Sys., Inc.*, 275 B.R. 709, 710 (Bankr. D. Del. 2002) (allowing payment of prepetition wages upon a finding that such relief was "essential to the continued operation of the Debtors' businesses"); *In re Just for Feet, Inc.*, 242 B.R. 821, 824-45 (Bankr. D. Del. 1999) (noting that debtors may pay prepetition claims that are essential to the continued operation of the debtor's business). Courts have relied on several legal bases in approving such relief.

130.    Courts generally recognize that debtors may pay prepetition claims under section 363(b) of the Bankruptcy Code where there is a sound business purpose for the payment of prepetition obligations, and where the debtor is able to "articulate some business justification, other than the mere appeasement of major creditors." *See, e.g., In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (granting debtor authority to pay prepetition wages); *Armstrong World Indus. Inc. v. James A. Phillips, Inc., (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (Bankr. S.D.N.Y. 1983) (granting the debtor the authority to pay prepetition claims of suppliers who were potential lien claimants).

131.    Courts also recognize that payments to prepetition creditors are appropriate pursuant to section 105(a) of the Bankruptcy Code under the "doctrine of necessity" or the "necessity of payment" rule where such payments are necessary to the continued operation of the debtor's business. *See, e.g., In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir.

1981) (holding that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor); *In re Penn Cent. Transp. Co.*, 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding that the necessity of payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims have been paid"); *In re Friedman's, Inc.*, 2011 WL 5975283, at *3 (Bankr. D. Del. Nov. 30, 2011) ("[M]ost courts will allow payments [of prepetition claims] under the 'doctrine of necessity,' if the debtor establishes that in its business judgment making such payments is critical to the survival of the debtor's business"); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr D. Del. 1994) (noting that debtors may pay prepetition claims that are essential to the continued operation of the debtor's business). The rationale for the necessity of payment rule—the rehabilitation of a debtor in reorganization cases—is "the paramount policy and goal of Chapter 11." *Ionosphere Clubs*, 98 B.R. at 176; *Just for Feet*, 242 B.R. at 826 (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization.").

132.    Here, the relief requested in this Motion will benefit the Debtors' estates and creditors by allowing the Debtors' business operations to continue without interruption. In the absence of such payments, the Debtors believe that their Employees may seek alternative employment opportunities, perhaps with the Debtors' competitors. Such a development would deplete the Debtors' workforce, hinder the Debtors' ability to meet its customer obligations, and likely diminish creditors' confidence in the Debtors. The loss of valuable individuals and the recruiting efforts that would be required to replace them would be a massive and costly distraction at a time when the Debtors should be focusing on stabilizing their operations.

Moreover, the majority of Employees rely exclusively on their compensation, benefits, and reimbursement of expenses to satisfy their daily living expenses. Consequently, these Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor the Employee Obligations.

133.    The importance of a debtor's employees to its operations has been recognized by courts in this district in granting relief similar to the relief requested in this Motion. *See, e.g., In re School Specialty, Inc.*, No. 13-10125 (KJC) (Bankr D. Del. Feb. 25, 2013) (stating that relief requested is in the "best interests of the Debtors"); *In re THQ, Inc.*, No. 12-13398 (MFW) (Bankr. D. Del. Jan. 1, 2013) (same); *In re A123 Sys., Inc.*, No. 12-12859 (KJC) (Bankr. D. Del. Nov. 8, 2012) (same); *In re Vertis Holdings, Inc.*, No. 12-12821 (CSS) (Bankr. D. Del. Nov. 1, 2012) (same); *In re Neb. Book Co.*, No. 11-12005 (PJW) (Bankr. D. Del. July 21, 2011) (same).[23]

## II.    The Debtors Seek a Waiver of the Automatic Stay as it Applies to Workers' Compensation Program.

134.  Section 362(a) of the Bankruptcy Code operates to stay:

> the commencement or continuation, including the issuance or employment of process of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to receive a claim against the debtor that arose before the commencement of the case under this title . . . .

11 U.S.C. § 362(a)(1).  Section 362, however, permits a debtor or other parties in interest to request a modification or termination of the Automatic Stay for "cause." *Id.* at § 362(d)(1).

---

[23]  Because of the voluminous nature of the orders cited herein, such orders are not attached to this Motion. Copies of these orders are available upon request of the Debtors' counsel.

135.    The Debtors seek authorization, under section 362(d) of the Bankruptcy Code, to permit their Employees to proceed with their Workers' Compensation Program in the appropriate judicial or administrative forum. Under various state laws, the Debtors must maintain the Workers' Compensation Program to ensure prompt and efficient payment of applicable claims. If the Debtors fail to maintain the Workers' Compensation Program, they may be prohibited by state law from operating in those states without making significant adjustments. Payment of all amounts due under the Workers' Compensation Program, therefore, is crucial to the continued operation of the Debtors' business.

### III.    Cause Exists To Authorize the Debtors' Financial Institutions To Honor Checks and Electronic Fund Transfers.

136.    The Debtors have sufficient funds to pay the amounts described herein in the ordinary course of business by virtue of expected cash flows from ongoing business operations, debtor-in-possession financing, and anticipated access to cash collateral. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the Employee Obligations and Employee Programs. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. Therefore, the Debtors respectfully request that the Court authorize and direct all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

### The Requirements of Bankruptcy Rule 6003 are Satisfied

137.    Pursuant to Bankruptcy Rule 6003, the Court may grant relief regarding a motion to pay all or part of a prepetition claim within 21 days after the Petition Date if the relief is necessary to avoid immediate and irreparable harm. Immediate and irreparable harm exists

where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001).

138.    As described above, the Employees are integral to the Debtors' operations. Failure by the Debtors to satisfy their obligations with respect to their Employees in the ordinary course of business during these chapter 11 cases will jeopardize Employee loyalty and trust, possibly causing Employees to leave the Debtors' employ and severely disrupting the Debtors' operations at a critical juncture. Moreover, the Employees rely on their compensation, benefits, and reimbursement of expenses to pay their living expenses and the effect could be financially ruinous if the Debtors cannot pay them in the ordinary course of business. Accordingly, the Debtors submit that they have satisfied the requirements of Bankruptcy Rule 6003 to support immediate payment of the Employee Obligations pursuant to the Interim Order on the terms described herein.

### Waiver of Bankruptcy Rules 6004(a) and 6004(h)

139.    To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### Reservation of Rights

140.    Nothing contained in this Motion or any actions taken by the Debtors pursuant to relief granted in the Interim Order and Final Order is intended or should be construed as:  (a) an admission as to the validity or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds; (c) a promise or

requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) to create an administrative priority claim on account of the Employee Obligations.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity or amount of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

### Notice

141.    The Debtors shall provide notice of this Motion on the date hereof via facsimile, overnight delivery, and/or hand delivery to:  (a) the Office of the U.S. Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) Citibank, N.A., in its capacity as administrative agent under the TCEH first lien credit agreement and collateral agent under the TCEH intercreditor agreements and counsel thereto; (d) Bank of New York Mellon Trust Company, N.A., in its capacity as indenture trustee under:  (i) the TCEH unsecured pollution control revenue bonds; and (ii) the EFCH 2037 Notes due 2037, and counsel thereto; (e) American Stock Transfer & Trust Company, LLC, in its capacity as indenture trustee under: (i) the 9.75% EFH senior unsecured notes due 2019;  (ii) the 10.0% EFH senior unsecured notes due 2020; (iii) the 10.875% EFH LBO senior unsecured notes due 2017; (iv) the 11.25%/12.0% EFH LBO toggle notes due 2017; (v) the 5.55% EFH legacy notes (series P) due 2014; (vi) the 6.50% EFH legacy notes (series Q) due 2024; and (vii) the 6.55% EFH legacy notes (series R) due 2034, and counsel thereto; (f) Computershare Trust Company, N.A. and Computershare

51

Trust Company of Canada, in their capacities as indenture trustee under: (i) the 11.0% EFIH senior secured second lien notes due 2021; and (ii) the 11.75% EFIH senior secured second lien notes due 2022, and counsel thereto; (g) UMB Bank, N.A. in its capacity as indenture trustee under: (i) the 9.75% EFIH senior unsecured notes due 2019; and (ii) the 11.25%/12.25% EFIH senior toggle notes due 2018, and counsel thereto; (h) BOKF, NA, dba Bank of Arizona, in its capacity as indenture trustee under 11.50% TCEH senior secured notes due 2020, and counsel thereto; (i) CSC Trust Company of Delaware in its capacity as indenture trustee under: (i) the 6.875% EFIH senior secured notes due 2017; and (ii) the 10.0% EFIH senior secured notes due 2020, and counsel thereto; (j) Law Debenture Trust Company of New York in its capacity as indenture trustee under: (i) the 10.25% TCEH senior unsecured notes due 2015; and (ii) the 10.50%/11.25% TCEH senior toggle notes due 2016, and counsel thereto; (k) Wilmington Savings Fund Society, FSB in its capacity as indenture trustee under the 15.0% TCEH senior secured second lien notes due 2021, and counsel thereto; (l) counsel to certain holders of claims against the Debtors regarding each of the foregoing described in clauses (c) through (k); (m) the agent for the TCEH debtor-in-possession financing facility and counsel thereto; (n) the agent for the EFIH debtor-in-possession financing facility and counsel thereto; (o) counsel to certain holders of equity in Texas Energy Future Holdings Limited Partnership; (p) counsel to Oncor; (q) the SEC; (r) the Internal Revenue Service; (s) the Office of the United States Attorney for the District of Delaware; (t) the Office of the Texas Attorney General on behalf of the PUC; and (u) counsel to ERCOT. As this Motion is seeking "first day" relief, within forty eight hours of the entry of the Interim Order, the Debtors will serve copies of this Motion and the order respecting this Motion as required by Local Bankruptcy Rule 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

142.    No prior request for the relief sought in this Motion has been made to this or any

other court.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order and Final Order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Wilmington, Delaware
Dated: April 29, 2014

/s/
RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 651-7700
Facsimile:    (302) 651-7701
Email:        collins@rlf.com
              defranceschi@rlf.com
              madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
Richard M. Cieri (*pro hac vice* pending)
Edward O. Sassower, P.C. (*pro hac vice* pending)
Stephen E. Hessler (*pro hac vice* pending)
Brian E. Schartz (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        richard.cieri@kirkland.com
              edward.sassower@kirkland.com
              stephen.hessler@kirkland.com
              brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (*pro hac vice* pending)
Chad J. Husnick (*pro hac vice* pending)
Steven N. Serajeddini (*pro hac vice* pending)
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        james.sprayregen@kirkland.com
              chad.husnick@kirkland.com
              steven.serajeddini@kirkland.com

Proposed Co-Counsel to the Debtors and Debtors in Possession

## EXHIBIT A

**Proposed Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | Case No. 14-_____ (____) |
| Debtors. | (Joint Administration Requested) |

**INTERIM ORDER (A) AUTHORIZING THE DEBTORS TO (I) PAY
CERTAIN PREPETITION COMPENSATION AND REIMBURSABLE
EMPLOYEE EXPENSES, (II) PAY AND HONOR EMPLOYEE AND RETIREE
MEDICAL AND SIMILAR BENEFITS, AND (III) CONTINUE EMPLOYEE AND
RETIREE BENEFIT PROGRAMS, AND (B) MODIFYING THE AUTOMATIC STAY**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), for entry of an interim order (this "Order") (a) authorizing the Debtors to: (i) pay certain prepetition wages, salaries, reimbursable employee expenses, and other compensation described below; (ii) pay and honor employee and retiree medical and similar benefits; (iii) continue employee compensation and employee and retiree benefit programs in the ordinary course of business on a postpetition basis and in a manner consistent with prepetition practices; and (iv) schedule a Final Hearing to the extent necessary; and (b) modifying the automatic stay with respect to the Workers' Compensation Program, all as more fully set forth in the Motion; and upon the First Day Declaration; and the Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the

---

[1]     The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which the debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and the Court having found that the Debtors provided appropriate notice of the Motion and the opportunity for a hearing on the Motion under the circumstances; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing, if any, before the Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1. The Motion is granted on an interim basis as set forth herein.

2. The Debtors are authorized to pay all outstanding prepetition amounts accrued in the ordinary course of business that come due during the Interim Period on account of the following Employee Obligations in an aggregate amount not to exceed $19,010,000; *provided, however,* that no individual Employee that is a holder of a priority claim under section 507(a)(4) of the Bankruptcy Code shall receive a payment in the aggregate in excess of $12,475 on account of such claim, including: (a) Unpaid Compensation; (b) Unpaid TXU Sales Incentive Payments; (c) Unpaid Payroll Processor Fees; (d) Unpaid Reimbursable Expenses (in an amount not to exceed $2,500 per Employee and, in any event, no more than $1 million in the aggregate); (e) Unremitted Payroll Taxes; (f) Unremitted Miscellaneous Deductions; (g) Unpaid Health Benefit Claims and Fees; (h) Unpaid HSA; (i) Unpaid Life Insurance Premiums; (j) Unpaid Disability Benefit Premiums; (k) Unremitted Supplemental Insurance Amounts; (l) Unremitted

2

401(k) Deductions; (m) Unpaid 401(k) Administrative Fees; (n) Unpaid 401(k) Matching Obligation; (o) Unpaid Workers' Compensation Administrative Fees; (p) Unpaid Workers' Compensation Claims; (q) Unpaid Vacation Time; (r) Unpaid Retiree Medical Benefit Claims and Fees; (s) Unpaid COBRA Claims and Fees; (t) Unpaid Relocation Expenses; (u) Unpaid Tuition Reimbursement Expenses; (v) Unpaid Energy Aid Matching Contributions; and (w) Unremitted Union Dues.

3.      The Debtors are also authorized, in the ordinary course of business on a postpetition basis and in a manner consistent with the Debtors' prepetition policies and procedures, to continue to honor:  (a) the Employee Obligations discussed in sub-clauses (a) through (x) of paragraph 2 and each of the Employee Programs related thereto; and (b) each of (i) the Flexible Spending Program; (ii) the Commuter Assistance Program; (iii) the Survivors' Benefit Program; (iv) the Employee Financing Program; (v) the United Way Matching Contributions; (vi) the Workers' Compensation Coverage Fees; and (vii) Holiday and Leave of Absence Time.  The Debtors may not provide any relief pursuant to this Order with respect to the Debtors' Severance Program, Supplemental Retirement Plan, any other benefit plan that pays proceeds through a rabbi trust, any incentive bonus program that violates section 503(c) of the Bankruptcy Code.

4.      The Debtors are also authorized, in the ordinary course of business on a postpetition basis and in a manner consistent with the Debtors' prepetition policies and procedures, to continue the Union Pension Plan, including paying any prepetition amounts owing on account thereof as they come due.

5.      The automatic stay is modified, pursuant to section 362(d) of the Bankruptcy Code, solely to the extent necessary to permit Employees to proceed with their claims under the

Workers' Compensation Program in the appropriate judicial or administrative forum and the Debtors are authorized, but not directed, to continue the Workers' Compensation Program and pay all prepetition amounts relating thereto in the ordinary course of business.

6.    The Debtors are authorized, but not directed, to pay all postpetition costs and expenses incidental to payment of the Employee Obligations described in paragraphs 2 through 4 herein, including all administrative and processing costs and payments to outside professionals in the ordinary course of business.

7.    The Final Hearing shall be _____, 2014, at __:__ a.m./p.m., prevailing Eastern Time.  Any objections or responses to the Motion must be filed on or before _____, 2014, at 4:00 p.m., prevailing Eastern Time.  If no objections are filed to the Motion, the Court may enter the Final Order without further notice or hearing.

8.    The Debtors are authorized, but not directed, to issue postpetition checks, or to affect postpetition fund transfer requests in replacement of any checks or fund transfer requests that are dishonored as a consequence of the chapter 11 cases with respect to prepetition amounts that the Debtors are permitted to honor pursuant to this Order.

9.    In accordance with this Order and any other order of this Court, each of the financial institutions at which the Debtors maintain their accounts relating to the payment of the obligations described in this Order is authorized to honor checks and electronic payment requests presented for payment of obligations described in this Order and all fund transfer requests made by the Debtors related thereto to the extent that sufficient funds are on deposit in such amounts.

10.    Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief, nothing in this Order shall be deemed:  (a) an admission as to the validity or amount of any claim against a Debtor entity; (b) a waiver of the Debtors' rights to dispute any claim on

4

any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) to create an administrative priority claim on account of the Employee Obligations. Payments made pursuant to this Order shall not be construed as an admission as to the validity or amount of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

11.    The requirements set forth in Bankruptcy Rule 6003(b) are satisfied by the contents of the Motion.

12.    Notice of the Motion as provided therein shall be deemed good and sufficient and the requirements of the Local Bankruptcy Rules are satisfied by such notice.

13.    Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7062, 9014 or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

14.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

15.    The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

16.    The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Wilmington, Delaware
Dated: _____, 2014

_____
UNITED STATES BANKRUPTCY JUDGE

5

## EXHIBIT B

**Proposed Final Order**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | Case No. 14-_____( ) |
| Debtors. | Jointly Administered |

**FINAL ORDER (A) AUTHORIZING THE DEBTORS TO (I) PAY
CERTAIN PREPETITION COMPENSATION AND REIMBURSABLE
EMPLOYEE EXPENSES, (II) PAY AND HONOR EMPLOYEE AND RETIREE
MEDICAL AND SIMILAR BENEFITS, AND (III) CONTINUE EMPLOYEE AND
RETIREE BENEFIT PROGRAMS, AND (B) MODIFYING THE AUTOMATIC STAY**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), for entry of a final order (this "Order") (a) authorizing, but not directing, the Debtors to: (i) pay certain prepetition wages, salaries, reimbursable employee expenses, and other compensation described below; (ii) pay and honor employee and retiree medical and similar benefits; and (iii) continue employee compensation and employee and retiree benefit programs in the ordinary course of business on a postpetition basis and in a manner consistent with prepetition practices; and (b) modifying the automatic stay with respect to the Workers' Compensation Program, all as more fully set forth in the Motion; and upon the First Day Declaration; and the Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which the debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and the Court having found that the Debtors provided appropriate notice of the Motion and the opportunity for a hearing on the Motion under the circumstances; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing, if any, before the Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.    The Motion is granted as set forth herein.

2.    The relief provided in the Interim Order is approved on a final basis.

3.    In addition to the relief provided in the Interim Order, the Debtors are authorized, but not directed, to honor, pay, satisfy or remit in the ordinary course of business and in accordance with the Debtors' prepetition policies and programs, all prepetition amounts outstanding on account of the following Employee Obligations, in an aggregate amount not to exceed $23,435,000: (a) Unpaid Compensation; (b) Unpaid Staffing Provider Fees; (c) Unpaid Independent Contractor Fees; (d) Unpaid Regulatory Consultant Compensation; (e) Unpaid Payroll Processor Fees; (f) Unpaid Reimbursable Expenses; (g) Unremitted Payroll Taxes; (h) Unremitted Miscellaneous Deductions; (i) Unpaid Health Benefit Claims and Fees; (j) Unpaid HSA; (k) Unpaid Life Insurance Premiums; (l) Unpaid Disability Benefit Premiums; (m) Unremitted Supplemental Insurance Amounts; (n) Unremitted 401(k) Deductions;

(o) Unpaid 401(k) Administrative Fees; (p) Unpaid 401(k) Matching Obligation; (q) Unpaid Workers' Compensation Administrative Fees; (r) Unpaid Workers' Compensation Claims; (s) Unpaid Vacation Time; (t) Unpaid Retiree Medical Benefit Claims and Fees; (u) Unpaid COBRA Claims and Fees; (v) Unpaid Relocation Expenses; (w) Unpaid Tuition Reimbursement Expenses; (x) Unpaid Energy Aid Matching Contributions; and (y) Unremitted Union Dues.

4.      The Debtors are also authorized, in the ordinary course of business on a postpetition basis and in a manner consistent with the Debtors' prepetition policies and procedures, to continue to honor: (a) all the Employee Obligations discussed in sub-clauses (a) through (y) of paragraph 3 and each of the Employee Obligations related thereto; and (b) each of (i) the Board Consultant Compensation; (ii) the Flexible Spending Program; (iii) the Severance Program; (iv) the Commuter Assistance Program; (v) the Survivors' Benefit Program; (vi) the Employee Financing Program; (vii) the United Way Matching Contributions; (viii) the Workers' Compensation Coverage Fees; and (ix) Holiday and Leave of Absence Time.  For the avoidance of doubt, the foregoing shall not authorize the Debtors to make any payments under the Severance Program with respect to any "insiders" as the term is defined in section 101(31) of the Bankruptcy Code.  The Debtors may not provide any relief pursuant to this Order with respect to the Debtors' Supplemental Retirement Plan, any other benefit plan that pays proceeds through a rabbi trust, or any incentive bonus program that violates section 503(c) of the Bankruptcy Code.

5.      The Debtors are also authorized, in the ordinary course of business on a postpetition basis and in a manner consistent with the Debtors' prepetition policies and procedures, to continue the Union Pension Plan, including paying any prepetition amounts owing on account thereof as they come due.

3

6.      The automatic stay is modified, pursuant to section 362(d) of the Bankruptcy Code, solely to the extent necessary to permit Employees to proceed with their claims under the Workers' Compensation Program in the appropriate judicial or administrative forum and the Debtors are authorized, but not directed, to continue the Workers' Compensation Program and pay all prepetition amounts relating thereto in the ordinary course of business.

7.      The Debtors are authorized, but not directed, to pay costs and expenses incidental to payment of the Employee Obligations described in paragraphs 3 through 5, including all administrative and processing costs and payments to outside professionals.

8.      Nothing contained herein is intended or should be construed to create an administrative priority claim on account of the Employee Obligations.

9.      The Debtors are authorized, but not directed, to issue postpetition checks or to affect postpetition fund transfer requests in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition that the Debtors are permitted to honor pursuant to this Order.

10.     In accordance with this Order and any other order of this Court, each of the financial institutions at which the Debtors maintain their accounts relating to the payment of the obligations described in this Order is authorized to honor checks and electronic payment requests presented for payment of obligations described in this Order and all fund transfer requests made by the Debtors related thereto to the extent that sufficient funds are on deposit in such amounts.

11.     Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief, nothing in this Order shall be deemed (a) an admission as to the validity or amount of any claim against a Debtor entity; (b) a waiver of the Debtors' rights to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any

4

particular claim is of a type specified or defined in this Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) to create an administrative priority claim on account of the Employee Obligations. Payments made pursuant to this Order shall not be construed as an admission as to the validity or amount of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

12.    Notice of the Motion as provided therein shall be deemed good and sufficient and the requirements of the Local Bankruptcy Rules are satisfied by such notice.

13.    Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7062, and 9014 or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

14.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

15.    The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

16.    The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Wilmington, Delaware
Dated: _____, 2014

_____
UNITED STATES BANKRUPTCY JUDGE

5

## File a First Day Motion:

14-10979-CSS Energy Future Holdings Corp.

| | | |
|---|---|---|
| Type: bk | Chapter: 11 v | Office: 1 (Delaware) |
| Assets: y | Judge: CSS | Case Flag: VerifDue, PlnDue, DsclsDue |

### U.S. Bankruptcy Court

### District of Delaware

Notice of Electronic Filing

The following transaction was received from Jason M. Madron entered on 4/29/2014 at 9:20 AM EDT and filed on 4/29/2014

**Case Name:**       Energy Future Holdings Corp.
**Case Number:**     14-10979-CSS
**Document Number:** 25

**Docket Text:**
Motion to Pay Employee Wages *(Motion of Energy Future Holdings Corp., et al. for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Pay Certain Prepetition Compensation and Reimbursable Employee Expenses, (II) Pay and Honor Employee and Retiree Medical and Similar Benefits, and (III) Continue Employee and Retiree Benefit Programs, and (B) Modifying the Automatic Stay)* Filed By Energy Future Holdings Corp. (Madron, Jason)

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** W:\AJ\EFH - Employee Wage.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=4/29/2014] [FileNumber=12418390-0
] [8f23a975a8bd9edd78cfff5f5ce8dcd63d2ef5289142180436880a7ae97453c08b4
bf0b75b653e7de172e4ad9da0562a2998350800f47b0f34d51aae0d7b64c9]]

**14-10979-CSS Notice will be electronically mailed to:**

Ashley F. Bartram on behalf of Interested Party Public Utility Commission of Texas
ashley.bartram@texasattorneygeneral.gov

Ashley F. Bartram on behalf of Interested Party Railroad Commission of Texas
ashley.bartram@texasattorneygeneral.gov

Ashley F. Bartram on behalf of Interested Party Texas Commission on Environmental Quality
ashley.bartram@texasattorneygeneral.gov

William Pierce Bowden on behalf of Interested Party Wilmington Savings Fund Society, FSB, in its capacity as successor Indenture Trustee