Page 1

1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF DELAWARE

3

4

5   In re:                    :    Chapter 11

                              :

6   ENERGY FUTURE HOLDINGS    :    Case No. 14-10979(CSS)

    CORP.,  et al.,           :

7                             :    (Jointly Administration

            Debtors.          :

8   _____:    Requested)

9

10                                 United States Bankruptcy Court

11                                 824 North Market Street

12                                 Wilmington, Delaware

13                                 May 1, 2014

14                                 9:53 AM

15

16

17   B E F O R E :

18   HON CHRISTOPHER S. SONTCHI

19   U.S. BANKRUPTCY JUDGE

20

21

22

23

24

25   ECR OPERATOR:  LESLIE MURIN

1   HEARING re Motion of Energy Future Holdings Corp., et al.,

2   for Entry of an Order Directing Joint Administration of the

3   Debtors' Chapter 11 Cases [Docket No. 17; filed April 29,

4   2014]

5

6   HEARING re Motion of Energy Future Intermediate Holding

7   Company LLC and EFIH Finance, Inc. for Entry of (I) An

8   Interim Order (A) Approving Certain Fees Related to

9   Postpetition Financing and Granting Such Fees Administrative

10  Expenses Priority and (B) Scheduling a Final Hearing; and

11  (II) A Final Order (A) Approving Postpetition Financing, (B)

12  Granting Liens and Providing Superpriority Administrative

13  Expense Claims, (C) Authorizing the Use of Cash Collateral,

14  (D) Authorizing the EFIH First Lien Refinancing, (E)

15  Authorizing Issuance of Roll-Up Debt to the Extent

16  Authorized by the Settlement Motion, (F) Determining the

17  Value of Secured Claims, and (G) Modifying the Automatic

18  Stay [Docket No. 74; filed April 29, 2014]

19

20  HEARING re Motion of Texas Competitive Electric Holdings

21  Company LLC and Certain of its Debtor Affiliates, for Entry

22  of Interim and Final Orders (A) Approving Postpetition

23  Financing, (B) Granting Liens and Providing Superpriority

24  Administrative Expense Claims, (C) Modifying the Automatic

25  Stay, and (D) Scheduling a Final Hearing [Docket No. 73;

1   filed April 29, 2014]

2

3   HEARING re Motion of Texas Competitive Electric Holdings

4   Company LLC and Certain of its Debtor Affiliates for Entry

5   of Interim and Final Orders (A) Authorizing Use of Cash

6   Collateral, (B) Granting Adequate Protection (C) Modifying

7   the Automatic Stay, and (D) Scheduling a Final Hearing

8   [Docket No. 71; filed April 29, 2014]

9

10  HEARING re Motion of Energy Future Holdings Corp., et al.,

11  for Entry of Interim and Final Orders (A) Authorizing the

12  Debtors to (I) Pay Certain Prepetition Compensation and

13  Reimbursable Employee Expenses, (II) Pay and Honor Employee

14  and Retiree Medical and Similar Benefits, and (III) Continue

15  Employee and Retiree Benefit Programs, and (B) Modifying the

16  Automatic Stay [Docket No. 25; filed April 29, 2014]

17

18  HEARING re Motion of Energy Future Holding Corp., et al, for

19  Entry of an Order (A) Authorizing the Debtors to (I)

20  Continue Using Their Existing Cash Management System, (II)

21  Maintain Existing Bank Accounts and Business Forms, and

22  (III) Continue Using Certain Investment Accounts; (B)

23  Authorizing Continued Intercompany Transactions and Netting

24  of Intercompany Claims; and (C) Granting Postpetition

25  Intercompany Claims Administrative Expense Priority [Docket

1    No. 37; filed April 29, 2014]

2

3    HEARING re Motion of Energy Future Holdings Corp., et al.,

4    for Entry of (A) An Order Authorizing the Debtors to (I)

5    Maintain and Administer Customer Programs and Customer

6    Agreements, (II) Honor Prepetition Obligations Related

7    Thereto, (III) Pay Certain Expenses on Behalf of Certain

8    Organizations, (IV) Fix the Deadline to File Proofs of Claim

9    for Certain Customer Claims, and (V) Establish Procedures

10   for Notifying Customers of Commencement of the Debtors'

11   Chapter 11 Cases, Assumption of Customer Agreements, and the

12   Bar Dates for Customer Claims and (B) An Order Authorizing

13   Certain of the Debtors to Assume the Customer Agreements

14   [Docket No. 31; filed April 29, 2014]

15

16   HEARING re Motion of Energy Future Holdings Corp., et al.,

17   for Entry of Interim and Final Orders Authorizing the

18   Debtors to Pay Prepetition Critical Vendor Claims [Docket

19   No. 29; filed April 29, 2014]

20

21   HEARING re Motion of Energy Future Holdings Corp., et al.,

22   for Entry of Interim and Final orders Authorizing the

23   Debtors to (A) Grant Administrative Expenses Priority to all

24   Undisputed Obligations for Goods and Services Ordered

25   Prepetition and Delivered Postpetition and Satisfy Such

1    Obligations in the Ordinary Course of Business, and (B) Pay

2    Prepetition Claims of Shippers, warehousemen, and

3    Materialmen [Docket No. 27; filed April 29, 2014]

4

5    HEARING re Motion of Energy Future Holdings Corp., et al.,

6    for Entry of Interim and Final Orders Authorizing the

7    Debtors to (A) Continue Performing Under Prepetition Hedging

8    and Trading Arrangements, (B) Pledge Collateral and Honor

9    Obligations Thereunder, and (C) Enter into and Perform Under

10   Trading Continuation Agreements and New Postpetition Hedging

11   and Trading Arrangements [Docket No. 41; filed April 29,

12   2014]

13

14   HEARING re Motion of Energy Future Holdings Corp., et al.,

15   for Entry of (A) An Order Authorizing Certain of the Debtors

16   to Pay Certain Prepetition Transition Charges and Delivery

17   Charges and (B) An Order Authorizing Certain of the Debtors

18   to Assume Transmission and Distribution Service Agreements

19   [Docket No. 38; filed April 29, 2014]

20

21   HEARING re Motion of Energy Future Holdings Corp., et al.,

22   for Entry of Interim and Final Orders Determining Adequate

23   Assurance of Payment for Future Utility Services [Docket No.

24   26; filed April 29, 2014]

25

1   HEARING re Motion of Energy Future Holdings Corp., et a.,

2   for Entry of Interim and Final Orders Authorizing the

3   Debtors to Pay Certain Prepetition Taxes and Fees [Docket

4   No. 23; filed April 29, 2014]

5

6   HEARING re Application of Energy Future Holdings Corp., et

7   al., for Entry of an Order Approving the Retention and

8   Appointment of Epiq Bankruptcy Solutions, LLC as the Claims

9   and Noticing Agent for the Debtors [Docket No. 24; filed

10   April 20, 2014]

11

12   HEARING re Motion of Energy Future Holdings Corp., et al.,

13   for Entry of an Order Authorizing the Debtors to File a

14   Consolidated List of Creditors in Lieu of Submitting a

15   Separate Mailing Matrix for Each Debtor [Docket No. 28;

16   filed April 29, 2014]

17

18

19

20

21

22

23

24   Transcribed by:  Dawn South, Sheila Orms, Jamie Gallagher,

25   Sherri Breach and Leigh David

1  A P P E A R A N C E S :

2  RICHARDS, LAYTON & FINGER, P.A.

3       Attorney for the Debtors

4

5  BY:  DANIEL J. DEFRANCESCHI, ESQ.

6       MARK D. COLLINS, ESQ.

7       JASON M. MADRON, ESQ.

8

9  KIRKLAND & ELLIS

10      Attorneys for the Debtors

11

12  BY:  RICHARD M. CIERI, ESQ.

13      EDWARD O. SASSOWER, ESQ.

14      STEPHEN E. HESSLER, ESQ.

15      BRIAN E. SCHARTZ, ESQ.

16      CHAD HUSNICK, ESQ.

17      WILLIAM PRUITT, ESQ.

18      MARK MCKANE, ESQ.

19      ANDREW MCGAAN, ESQ.

20

21

22

23

24

25

1    PAUL, WEISS, RIFKIND, WHARTON & GARRISON

2         Attorneys for Ad Hoc Committee of TCEH First Lien

3         Creditors

4

5    BY:  ALAN W. KORNBERG, ESQ.

6         KELLEY A. CORNISH, ESQ.

7         ADAM M. DENHOFF, ESQ.

8         BRIAN S. HERMANN, ESQ.

9         JACOB ADLESTEIN, ESQ.

10

11    YOUNG CONAWAY STARGATT & TAYLOR, LLP

12         Attorneys for Ad Hoc Committee of TCEH First Lien

13         Creditors

14

15    BY:  PAULINE K. MORGAN, ESQ.

16         JOEL A. WAITE, ESQ.

17         RYAN M. BARTLEY, ESQ

18

19    BROWN RUDNICK

20         Attorneys for TCEH, Second Lien Trustee

21

22    BY:  EDWARD S. WEISFELNER, ESQ.

23         JEFFREY L. JONAS, ESQ.

24         JEFFREY B. COFFEY, ESQ.

25

1    UNITED STATES DEPARTMENT OF JUSTICE

2         Attorney for the U.S. Trustee

3

4    BY:  RICHARD L. SCHEPACARTER, ESQ.

5         ANDREA B. SCHWARTZ, ESQ.

6

7    LANDIS RATH & COBB LLP

8         Attorney for Marathon Asset Management, LP

9

10   BY:  ADAM G. LANDIS, ESQ.

11

12   WILMER CUTLER PICKERING HALE, ET AL.

13        Attorneys for Marathon Asset Management, LP

14

15   BY:  GEORGE W. SHUSTER, JR., ESQ.

16

17   CLEARY GOTTLIEB STEEN & HAMILTON LLP

18        Attorney for J. Aron & Company

19

20   BY:  SEAN A. O'NEAL, ESQ.

21

22   COZEN O'CONNOR

23        Attorney for J. Aron & Company

24

25   BY:  MARK FELGER, ESQ.

```
1    GOODWIN PROCTOR
2         Attorneys for Aurelius Capital Management, LP
3
4    BY:  BILL WEINTRAUB, ESQ.
5         KIZZY L. JARASHOW, ESQ.
6
7    GELLERT SCALI BUSENKELL & BROWN, LLC
8         Attorney for Aurelius Capital Management, LP
9
10   BY:  MICHAEL G. BUSENKELL, ESQ.
11
12   AKIN GUMP STRAUSS HAUER & FELT LLP
13        Attorneys for Ad Hoc Committee of EFIH Unsecured
14        Noteholders
15
16   BY:  IRA DIZENGOFF, ESQ.
17        SCOTT ALBERINO, ESQ.
18
19   SHEARMAN & STERLING
20        Attorneys for Duetsche Bank AG New York Branch
21
22   BY:  FREDRIC SOSNICK, ESQ.
23        NED S. SCHODEK, ESQ.
24
25
```

```
1   POTTER ANDERSON & CORROON LLP

2        Attorneys for Deutsche Bank AG New York Branch

3

4   BY:  LAURIE SELBER SILVERSTEIN, ESQ.

5        JEREMY WILLIAM RYAN, ESQ.

6        R. STEPHEN MCNALL, ESQ.

7

8   COUSINS CHIPMAN & BROWN, LLP

9        Attorneys for Ad Hoc Committee of EFIH Unsecured

10       Noteholders

11

12  BY:  SCOTT D. COUSINS, ESQ.

13       ANN M. KASHISHIAN, ESQ.

14

15  ROPES & GRAY LLP

16       Attorneys for CSC Trust Company of Delaware

17

18  BY:  D. ROSS MARTIN, ESQ.

19       KEITH HOWARD WOFFORD, ESQ.

20

21  COLE SCHOTZ MEISEL FORMAN & LEONARD, PA

22       Attorney for CSC Trust Company of Delaware

23

24  BY:  NORMAN L. PERNICK, ESQ.

25
```

Page 12

1  MORRIS, NICHOLS, ARSHT & TUNNELL, LLP

2        Attorney for Sponsors

3

4  BY:  DEREK ABBOTT, ESQ.

5

6  WACHTELL LIPTON ROSEN & KATZ

7        Attorneys for Sponsors

8

9  BY:  RICHARD G. MASON, ESQ.

10       EMIL A. KLEINHAUS, ESQ.

11

12  DRINKER BIDDLE & REATH LLP

13       Attorneys for Citibank, N.A.

14

15  BY:  HOWARD A. COHEN, ESQ.

16       ROBERT K. MALONE, ESQ.

17

18  MILBANK, TWEE, HADLEY & MCCLOY LLP

19       Attorneys for Citibank, N.A.

20

21  BY:  DENNIS F. DUNNE, ESQ.

22       EVAN R. FLECK, ESQ.

23       WILLIAM BICIE, ESQ.

24

25

1  BROWN RUDNICK LLP

2       Attorneys for Wilmington Savings Fund Society

3

4  BY:  EDWARD S. WEISFELNER, ESQ.

5       JEFFREY L. JONAS, ESQ.

6

7  ASHBY & GEDDES

8       Attorneys for Wilmington Savings Fund Society

9

10  BY:  WILLIAM PIERCE BOWDEN, ESQ.

11       GREGORY A. TAYLOR, ESQ.

12

13  FOLEY & LARDNER LLP

14       Attorneys for UMB Bank, N.A.

15

16  BY:  HAROLD L. KAPLAN, ESQ.

17       MARK F. HEBBELN, ESQ.

18

19  MORRIS JAMES LLP

20       Attorney for Law Debenture Trust Company of New York

21

22  BY:  STEPHEN M. MILLER, ESQ.

23

24

25

1   PATTERSON BELKNAP WEBB & TYLER LLP

2        Attorney for Law Debenture Trust Company of New York

3

4   BY:  DANIEL A. LOWENTHAL, III, ESQ.

5

6   PACHULSKI STANG ZIEHL & JONES LLP

7        Attorney for Computershare Trust Company, N.A., et

8        al. and Ad Hoc Second Lien Holder

9

10  BY:  LAURA DAVIS JONES, ESQ.

11       ROBERT J. FEINSTEIN, ESQ.

12

13  KRAMER LEVIN NAFTALIS & FRANKEL LLP

14       Attorneys for Computershare Trust Company, N.A., et

15       al. and Ad Hoc Second Lien Holder

16

17  BY:  THOMAS MAYER, ESQ.

18       JOSHUA BRODY, ESQ.

19

20  BINGHAM MCCUTCHEN LLP

21       Attorney for Pacific Investment Management Co. LLC

22

23  BY:  JEFFREY SABIN, ESQ.

24

25

1    CONNOLLY GALLAGHER LLP

2         Attorney for Pacific Investment Management Co. LLP

3

4    BY:  KAREN C. BIFFERATO, ESQ.

5

6    QUINN EMANUEL

7         Attorney for Centerbridge Partners

8

9    BY:  SUSHEEL KIRPALANI, ESQ.

10

11   SAUL EWING LLP

12        Attorney for ERCOT

13

14   BY:  MARK MINUTI, ESQ.

15

16   MUNSCH HARDT KOPF & HARR, P.C.

17        Attorney for Electric Reliability Counsel of Texas,

18        Inc.

19

20   BY:  KEVIN M. LIPPMAN, ESQ.

21

22   FOX ROTHSCHILD LLP

23        Attorney for Ad Hoc Group of Unsecured TCEH Noteholders

24

25   BY:  JEFFREY M. SCHLERF, ESQ.

1    WHITE & CASE LLP

2         Attorney for Ad Hoc Group of TCEH Unsecured Noteholders

3

4    BY:  J. CHRISTOPHER SHORE, ESQ.

5         GREGORY M. STARNER, ESQ.

6         THOMAS E. LAURIA, ESQ.

7

8    FRIED FRANK HARRIS SHRIVER & JACOBSON

9         Attorney for Fidelity Management & Research Company

10

11   BY:  GARY L. KAPLAN, ESQ.

12        MATTHEW M. ROSSE, ESQ.

13

14   CROSS & SIMON, LLC

15        Attorney for Fidelity Management & Research Company

16

17   BY:  MICHAEL JOSEPH JOYCE, ESQ.

18

19   REED SMITH LLP

20        Attorney for Bank of New York Mellon Trust

21

22   BY:  KIMBERLY LAWSON, ESQ.

23

24

25

1    BLANK ROME

2         Attorney for Wilmington Trust

3

4    BY:  MICHAEL DEBAECKE, ESQ.

5

6    SEWARD KISSEL

7         Attorneys for Wilmington Trust

8

9    BY:  JOHN ASHMEAD, ESQ.

10        ARLENE ALVES, ESQ.

11

12   DYKEMA GOSSETT PLLC

13        Attorney for PIMCO Pacific

14

15   BY:  JEFFREY R. FINE, ESQ.

16

17   BINGHAM MCCUTCHEN LLP

18        Attorney for Pacific Investment Management Co. LLC

19

20   BY:  JULIA FROST-DAVIES, ESQ.

21

22   CIARDI, CIARDI & ASTIN, P.C.

23        Attorney for Atmos Energy Corporation

24

25   BY:  DANIEL K. ASTIN, ESQ.

1   WOMBLE CARLYLE SANDRIDGE & RICE, LLP

2        Attorney for CenterPoint Energy Houston Electric, LLC

3

4   BY:  STEVEN K. KORTANEK, ESQ.

5

6   FINLEY & ASSOCIATES

7        Attorney for GLM, et al.

8

9   BY:  G. LEE FINLEY, ESQ.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              (The following transcript contains multiple

3     indiscernibles due to the poor recording quality:)

4              THE CLERK:  All rise.

5              THE COURT:  Please be seated.  Give me a moment.

6         (Pause)

7              THE COURT:  All right, Mr. DeFranceschi, good

8     morning.

9              MR. DEFRANCESCHI:  Good morning, Your Honor.  Dan

10    DeFranceschi, Richards, Layton & Finger on behalf of the

11    debtors.

12             First and foremost, Your Honor, on behalf of the

13    debtors and all the many parties and professionals here and

14    in the overflow courtrooms wanted to thank you and your

15    staff for this hearing this morning and for all the time and

16    effort put into it.  We appreciate it.

17             THE COURT:  You're welcome.

18             MR. DEFRANCESCHI:  What we would propose this

19    morning, Your Honor, and I'm happy to report we have what I

20    think is the first agreement of hopefully many in this case

21    and that is in a way to proceed.

22             There was a motion filed to adjourn this first day

23    hearings by the TCEH ad hoc group of unsecured noteholders,

24    it was filed after the agendas.  We have -- by Mr. Lauria.

25    We've agreed with them, if it please the Court, that after I

1    make some introductions we would do opening statements to

2    get Your Honor familiar with the case and then before

3    getting into the agenda move towards ,that motion and

4    present that to Your Honor so that Your Honor can rule on

5    that, if that would please the Court.

6              THE COURT:  That's fine.

7              MR. DEFRANCESCHI:  All right.

8              With that I'd like to introduce my friend and

9    colleague from Kirkland & Ellis, Mr. Edward Sassower, he

10   will take the podium and make additional introductions and

11   remarks.

12             THE COURT:  All right.  Thank you.

13             Mr. Sassower, correct?

14             MR. SASSOWER:  Yes.

15             THE COURT:  Good morning.

16             MR. SASSOWER:  Thank you, Your Honor.  Edward

17   Sassower, Kirkland & Ellis LLP, proposed counsel to the

18   debtors.

19             Your Honor, I'd like to echo my colleague's

20   remarks and thank Your Honor for making yourself and your

21   courtroom available today.  We say that in every case, but

22   we especially mean it here.

23             We're cognizant of the fact that we dumped a lot

24   of paper on your desk on Tuesday and I'll try to use my

25   opening remarks to unpack some of that.

1          I'd also like to thank the Office of the United

2     States Trustee.  We've been in constant contact with them

3     over the last week and I'm pleased to announce that we have

4     resolved all of their objections.

5          Your Honor, before I begin my presentation I'd

6     like to introduce some people in the courtroom here today.

7          THE COURT:  Okay.

8          MR. SASSOWER:  Paul Keglevic --

9          THE COURT:  Okay.

10          MR. SASSOWER:  -- the company's CFO and co-chief

11     restructuring officer and first day declarant.

12          THE COURT:  Okay.

13          MR. SASSOWER:  Stacey Dore, the company's general

14     counsel and co-chief restructuring officer.

15          My restructuring partners, Steve Hessler --

16          THE COURT:  Mr. Hessler.

17          MR. SASSOWER:  -- Chad Husnick.

18          MR. HUSNICK:  Good morning, Your Honor.

19          MR. SASSOWER:  And Brian Schartz.

20          THE COURT:  Welcome.

21          MR. SASSOWER:  My litigation partners, Mark

22     McKane.

23          MR. MCGAAN:  Good morning, Your Honor.

24          THE COURT:  Good morning.

25          MR. SASSOWER:  And Andy McGaan.

1          MR. MCGAAN:  Good morning, Your Honor.

2          MR. SASSOWER:  David Ying (ph) and Steve Goldstein

3   of Evercore, proposed financial advisors to the debtors.

4   Jeff Steganga (ph) of Alavarez & Marsal, proposed

5   restructuring advisor to the debtor.

6          Before we get into the first day motions, Your

7   Honor, I prepared a presentation to give you some background

8   on who we are and how we got here and where we're going.

9   Accordingly, every fact in this presentation is tied back to

10  the first day declaration of Mr. Keglevic, and I will move

11  that declaration into evidence after this presentation as

12  the evidentiary basis for the first day pleadings.

13         THE COURT:  I'm sorry.

14         MR. SASSOWER:  Okay.

15         THE COURT:  Will you just hold for just a second?

16         MR. SASSOWER:  Yes.

17      (Pause)

18         THE COURT:  I responded to your -- oh, it's not

19  you, I apologize.

20      (Pause)

21         THE COURT:  I apologize.

22         MR. SASSOWER:  Your Honor, we have handouts of

23  this presentation if you'd like we can hand it out to people

24  in the courtroom or they can refer to the screen.  Whatever

25  Your Honor wants.

1            THE COURT:  Can I get a handout?

2        (Laughter)

3            MR. SASSOWER:  Yes, if I may.

4            THE COURT:  Thank you.  I don't have any glasses.

5            MR. WEISFELNER:  Mr. Sassower, if you could

6    provide some to this table as well.  We can't see the

7    screen.

8            MR. SASSOWER:  I would be happy to do so,

9    Mr. Weisfelner.

10           May I approach, Your Honor?

11           THE COURT:  Yes.

12        (Court confers with clerk)

13           THE COURT:  Okay.

14           MR. SASSOWER:  Okay, thank you, Your Honor.

15           The debtors commenced these Chapter 11 cases

16   because of liquidity concerns and a going concern opinion.

17           These cases involve 71 debtors, $42 billion in

18   debt, and over 5,700 employees.

19           It's one of the top ten companies to ever file for

20   Chapter 11 and the second largest company to ever file for

21   Chapter 11 in Delaware.

22           The debtors and many of their stakeholders have

23   executed a restructuring support agreement that involves a

24   tremendous amount of consensus across their capital

25   structure, and I'll walk Your Honor through that RSA later

1    in the presentation.

2              The RSA paves the way for a prearranged plan,

3    allow for the debtors to substantially deleverage their

4    capital structure, and maximize the value of their assets.

5              I'd like to emphasize that this is purely a

6    balance sheet prestructuring, we're planning to minimize the

7    impact of Chapter 11 on the debtors' strong operations.

8              Given the size and complexity of this case a

9    traditional Chapter 11 case could have been a long, costly,

10   litigious, and value destructive affair.  As a result the

11   debtors chief goal was to enter Chapter 11 with a consensual

12   deal in place.

13             EFH and its subsidiaries compose one of the

14   largest power companies in the United States.  They own

15   power plants that produce electricity, they own lines that

16   transmit and distribute electricity, and they own the

17   retailer that sells electricity to both residential and

18   business customers.

19             In the early 2000's the company was vertically

20   integrated and was a monopoly.  It was called TXU Corp.,

21   which is a name you sometimes still see in the press.

22             As a result of deregulation in the early 2000's

23   and a buyout in 2007 this is what the company looks like

24   today.

25             Your Honor, there's two charts in front of you.

1    The one that's furthest to the right is actually what the

2    company looks like and you'll see there's a lot more squares

3    and boxes there.  We prepared this more simplified chart to

4    aid in today's discussion.  The one on the -- and we go

5    through various versions of this simplified chart through

6    this presentation.  The one that you're looking at on the

7    screen right now has red boxes around the entities that are

8    debtors.

9            In purple you'll see Energy Future Holdings Corp.

10   or EFH, the ultimate parent which is a holding company.

11   That company has $1.9 billion of unsecured debt.

12           Turning to the green portion of the chart EFH owns

13   EFCH or Energy Future Competitive Holdings Company, which in

14   turn owns TCEH or Texas Competitive Electric Holdings

15   Company.  TCEH in turn owns two of the company's three

16   businesses.  Luminant, which owns power plants and actually

17   generates electricity, this entity has 4200 employees, and

18   TXU Energy, which is the arm that sells electricity to the

19   consumers, and this entity has approximately 1,000

20   employees.  TCEH has approximately $32 billion in debt,

21   including 24.4 billion of first lien debt, $1.6 billion of

22   second lien debt, and $6.1 billion of unsecured debt.

23           Turning to the blue portion of the chart EFH also

24   owns EFIH or Energy Future Intermediate Holding Company.

25   EFIH indirectly owns 80 percent of Encore, which is the

1    entity that owns the power lines.

2          EFIH has approximately $7.7 billion of debt,

3    including 4 bill of first lien debt, 2.2 billion of second

4    lien debt, and 1.6 billion of unsecured debt.

5          Encore also has $6 billion of its own debt, but

6    that's not reflected here because Encore is not a debtor.

7          The other 20 percent of Encore is owned by an

8    unaffiliated entity called Texas Transmission Investment,

9    which is owned by an investment group lead by Borealis and

10   the Government of Singapore Investment Corporation.

11         Last you'll see EFH Corporate Services Company

12   which is shaded in orange.  Corporate Services provides

13   shared services like IT, tax, legal, and accounting to TCEH

14   and to a lesser extent EFH, EFIH, and Encore.  It does not

15   have any substantial debt obligations and has approximately

16   450 employees.

17         Your Honor, now I'm going to quickly describe each

18   of the three business units starting with Luminant.

19         Luminant is the thirteenth largest electricity

20   generator in the United States.  Here you can see a break

21   down of its generation fleet and here you can see a break

22   down of Luminant's electricity generation in 2013.

23         Luminant is also the seventh largest coal miner in

24   the U.S., it mined 29 million tons of lignite in 2013.

25   Lignite is a type of coal that's found in the south and

1    southeast.  Importantly Luminant's lignite mines are located

2    right next to Luminant's coal plants and which gives it a

3    strategic advantage.

4            Moving on to TXU Energy.  TXU Energy sells

5    electricity to approximately 1.7 million residential and

6    business consumers.  Before deregulation TXU Corp. was the

7    only utility in its geographic region.  Since deregulation

8    the market has become extremely competitive.

9            In 2002, the first year of full retail

10   competition, 39 competitors joined the field.  Today there

11   are over 140.  In this market customers can change their

12   providers in the few clicks of a mouse, and many do every

13   single year.

14           Even with this intense competition TXU Energy is

15   still the largest retail electricity provider in its region.

16   It serves 26 percent of the residential customers and 19

17   percent of the business customers.  But as I mentioned, this

18   can all change with the click of a mouse.

19           Customers effectively must use Luminant's plants

20   and Encore's transmission lines, but customers do not need

21   to use TXU Energy to purchase electricity, and for that

22   reason insuring its smooth landing into Chapter 11 it's

23   particularly important to TXU Energy and that's one of our

24   chief aims here today.

25           Lastly Encore.  Encore owns the power lines and

1    the transmission systems in north Texas.  It's a -- it is

2    bankruptcy remote and it is link fenced and the debtors do

3    not intend to take any steps during these cases to seek any

4    modification of that link fence.

5            Encore is managed by a separate management team

6    and it has its own board, and most importantly Encore is not

7    a debtor in these proceedings.

8            Now, Your Honor, I'll turn to the buyout of 2007.

9    Your Honor, in 2007 three large private equity funds

10   purchased TXU Corp. and renamed it Energy Future Holdings.

11   This transaction was and still is the largest private buyout

12   in history.  The purchase price approached $50 billion, and

13   there's a break down.

14           In connection with the buyout the company and the

15   new equity --

16       (CourtCall interruption)

17           THE COURT:  That was CourtCall?  Okay.

18           MR. SASSOWER:  In connection with the buyout the

19   company and the new equity owners assembled an experienced

20   director and officer team that remains largely in place

21   today.

22           Donald Evans is the chairman of EFH's board.

23   Prior to that he was the United States Secretary of

24   Commerce.  John young is the company's CEO.  Prior to that

25   he was the CFO of Exelon.  Paul Keglevic, who I introduced

1   earlier, is the company's CFO and co-CRO.  Stacey Dore is

2   the company's general counsel and co-CRO, I also introduced

3   her earlier.  Mac McFarland is the CEO of Luminant.  And Jim

4   Burke is the CEO of TXU Energy.

5           Your Honor, over the course of my career I've had

6   the privilege of working with many talented boards and

7   management teams, but I'm not sure that I've had the

8   privilege of working with a board and management team as

9   talented as this one.  As you'll hear in a moment over the

10  past five years they've had to work under the most difficult

11  of circumstances and they've managed it incredibly well.

12          The company operates --

13          THE COURT:  I'm sorry to interrupt.  You can't

14  block the doors, gentlemen.  Thank you.

15          MR. SASSOWER:  The company operates in a region

16  known as ERCOT.  As you can see from this chart in the ERCOT

17  market the price of wholesale electricity is highly

18  correlated to the price of natural gas.  As the price of

19  natural gas goes up so does the price of wholesale

20  electricity.  And as the price of natural gas goes down so

21  does the price of wholesale electricity.

22          Since TCH is in the business of generating and

23  selling electricity natural gas prices are the biggest

24  driver of its incremental revenue.  In other words when the

25  price of electricity goes up TCH makes more money and when

1        the price of electricity goes down TCH makes less money.

2                The equity owners' thesis was premised on the fact

3        that wholesale electricity prices correlated to natural gas

4        prices would remain relatively stable or rise.  In the first

5        year following the buyout this thesis held true.

6                At the time of the transaction natural gas was

7        trading at $6.42 and electricity prices were $52.42.  Within

8        a year of the transaction natural gas prices rose to

9        approximately $13.11 and electricity prices rose to $63.44.

10       As a result operating revenues rose from $8.56 billion in

11       2007 for the company's competitive segment to $9.78 billion

12       in 2008.

13               Your Honor, as a result of this one year after the

14       buyout this transaction was being hailed as one of the

15       greatest buyouts in history and then the energy revolution

16       happened.

17               A year after the buyout energy markets experienced

18       a technological breakthrough that transformed the industry

19       and the world for that matter.  Geologists have long known

20       about the vast deposits of natural gas to be found in shell

21       rock but they couldn't extract it cost efficiently.

22               In 2008 a confluence of technological developments

23       made it possible for the first time ever to access this oil

24       and gas in shell rock on a cost efficient basis.

25               This is what the United States thought their oil

1    and gas deposits were in 2006 and this is what we thought

2    they were in 2011, and increases -- and the amount of

3    deposits have increased since that time.

4             Your Honor, I love this chart -- this map, because

5    it really drives home what is happening in this country on

6    the energy field near the price of -- the amount of oil and

7    gas has more than doubled.

8             The (indiscernible) in supply has led to a drop in

9    natural gas prices from $13.11 where we last left it in 2008

10   to -- it dropped to $2.04 in April of 2012.  And since that

11   time it's bounced around between the range of $$2.50 to

12   $4.80.  And as we talked about earlier there's a huge

13   correlation between natural gas prices and electricity

14   prices, and so the decrease in natural gas prices

15   simultaneously decreased the electricity prices and that's

16   had a significant impact on the company.

17            That said the companies' assets remain extremely

18   valuable and once the company right sizes its balance sheet

19   the companies' prospects will once again flourish.

20            There are a couple of mitigating factors for me to

21   take you through, Your Honor.  While the decline was a major

22   blow to the value of EFH the company was able to remain

23   relatively stable for two reasons.  Natural gas hedges and

24   the liability management program.  I'll start with the

25   hedges.

1          Beginning in 2006 the company used long-term

2     hedging programs to stabilize cash flows and minimize

3     downside risk in natural gases.  This chart shows the cash

4     flows generated by the natural gas hedging program in the

5     years following the buyout.

6          When the company entered into the hedges it

7     effectively locked in the price of natural gas at the time

8     it entered into the contract.  If natural gas prices rise

9     above the price set by the hedges then the hedges are out of

10    the money and the company has to pay money to the

11    counterparty.

12          Now as you can see here in 2008 the hedges cost

13    the money (sic) approximately $200 million when natural gas

14    prices spiked.  And if natural gas prices fall below the

15    price of the hedge then the hedges are out of the money and

16    the counterparty pays money to the company.  And then as you

17    can see as the natural gas prices plummeted one year after

18    the buyout the hedges contributed billions of dollars of

19    cash flow to the company.

20          Because of the hedges since the buyout the company

21    has essentially been operating in a bubble.  It's been

22    protected from the worst affects of the drop in natural gas

23    prices because the cash received from the hedges offset the

24    low wholesale prices in electricity.

25          Unfortunately these long-term hedges largely began

1    to expire in 2013 and the (indiscernible) hedges have all

2    but expired or will expire this year.  As a result the

3    company will for the first time be fully exposed to the

4    affect of low natural gas prices.

5            The company also embarked on a liability

6    management program.  We have three particular -- the company

7    had three goals in mind.  Capturing market discounts,

8    reducing interest expense, and extending maturities, and

9    through this program the company was able to capture

10   approximately $2.5 billion in debt discounts and

11   (indiscernible) of 25.7 billion of debt.

12           Your Honor, the company is heavily regulated and

13   the regulators will play an important role in these cases.

14   As a result the debtors were actively engaged with many of

15   their regulators in the year leading up to these cases.  To

16   that end I want to quickly introduce some of the key

17   regulators.  These regulators are listed alphabetically.

18           The NFC regulates the debtors' nuclear operating

19   licenses and M&A involving nuclear owners and operators.

20   The NFC -- NFC approval will be necessary for any

21   transaction involving a nuclear plant.

22           THE COURT:  Including a restructuring transaction?

23           MR. SASSOWER:  Especially the restructuring

24   transactions.  And I'll get into that in a little bit, Your

25   Honor, but that process takes about six to nine months to

1    really to layer that approval process onto the Bankruptcy

2    Court timeline.

3              The PUC has oversight over a broad range of issues

4    in Texas and the Texas (indiscernible) market.  The PUC will

5    also be involved in these cases because of the majority

6    ownership change of (indiscernible).

7              THE COURT:  Right.

8              MR. SASSOWER:  Specifically the debtors have

9    worked closely with the Attorney General's Office for Texas

10   in preparation for these cases and yesterday the Attorney

11   General's Office filed a statement on behalf of the PUC in

12   support of some of the debtors' first day relief, and

13   Mr. Morris is available by phone today to answer any

14   questions that Your Honor has of the PUC or its filing.

15             Lastly the Railroad Commission of Texas which

16   ironically has nothing to do with railroads, this entity

17   actually regulates surface mining and reclamation

18   activities, and as we'll discuss later today these mining

19   and reclamation activities are a key component of the TCH

20   DIP facility, but we'll get into the -- it has to do with

21   the TCH DIP carve out.  We'll get into that a little bit

22   later today.

23             Now, Your Honor, we'd like to take you through the

24   RSA.  It's widely complex and so I think hopefully this

25   presentation will help, But I do want to note that the RSA

1    is not up for approval today, this is purely to put it in

2    context.

3            The restructuring support agreement provides for a

4    tax-free spin off of TCH from EFH and EFIH.  So the green

5    boxes will be spun off, form its own company, and what will

6    be left is EFH and EFIH.  And the restructuring support

7    agreement also provides for the substantial deleveraging of

8    each of the debtors.  So you've got a deleveraging

9    transaction of the spun off entities as well as the entities

10   that are not being spun off.

11           Under the RSA the TCH first lien creditors will

12   receive 100 percent of the equity of the (indiscernible)

13   spun off TCH.  This transaction as we just noted is

14   conditioned on the regulatory approval of the NRC and it's

15   also conditioned on obtaining a private letter ruling from

16   the IRS.  The IRS process will also take approximately six

17   to nine months.

18           And so we've given a lot of thought to the

19   timelines here and how to start to coordinate all these

20   different processes so we don't run them sequentially,

21   because otherwise that deal would take many, many years.

22           The TCH first lien holders will also receive a

23   cash payment from the issuance of new debt and the TCH

24   second lien holders of unsecured holders will receive their

25   pro rata share of TCH's unencumbered assets.

1          The restructuring of EFH and EFIH is made possible

2     by two takeout DIP facilities.  The EFIH first lien holders

3     will be paid in full using the proceeds of a $5.4 billion

4     first lien DIP.  All that will be left after we pay out

5     those holders with the DIP is their alleged make whole

6     claims.  The debtors strongly believe that there are no make

7     whole premiums due.

8          In connection with the RSA holders of

9     approximately 30 percent of the first lien notes have agreed

10    to settle their make whole claims for 20 cents on the

11    dollar.  The debtors will launch a tender offer that will

12    allow the remaining 70 percent of the first lien holders to

13    opt into that same settlement.  For anyone who does not opt

14    into that settlement then we will litigate their make whole

15    before Your Honor.

16          Similarly the EFIH second lien holders will be

17    paid in full using the proceeds of a $1.9 billion second

18    lien DIP.  Again, the debtors strongly believe that this

19    transaction does not (indiscernible) a make whole.

20          In connection with the RSA holders of

21    approximately 35 percent of the second lien notes have

22    agreed to settle their make whole claims for approximately

23    50 cents on the dollar.  Again, the debtors will launch a

24    tender offer to allow the remaining 65 percent of the EFIH

25    second lien holders to opt into that same settlement.  And

1   for those people that do not opt into that settlement we

2   will litigate their alleged make whole claims before Your

3   Honor.

4           THE COURT:  Do the balances that you put on your

5   earlier chart which indicate 4 billion of first lien, 2.2

6   billion in second lien, 1.6 billion in unsecured, does that

7   -- are make whole claims included in those principal

8   amounts?

9           MR. SASSOWER:  No, they're not.

10          THE COURT:  I mean this is a stupid question, but

11   how do you pay off 2.2 billion if their second lien debt

12   with 1.8 billion of the debt?

13          MR. SASSOWER:  Because we're also using the first

14   lien debt.

15          THE COURT:  Okay.

16          MR. SASSOWER:  To pay off -- it's a combination.

17          THE COURT:  Combination.  Okay.

18          MR. SASSOWER:  Yeah.

19          Your Honor, I can't actually see the screen.  What

20   does that first line say up there on the screen?  I just

21   want to know where I am --

22          THE COURT:  The second lien (indiscernible) --

23          MR. SASSOWER:  Okay, got it.  Thanks.

24      (Laughter)

25          THE COURT:  Sorry are the flags in the way?

1          MR. SASSOWER:  No, it's not that, it's just I've

2     been following along because I -- but I can actually see it.

3          THE COURT:  All right.

4          MR. SASSOWER:  So the second lien DIP will

5     monetarily convert to approximately 64 percent of the equity

6     of reorganized EFH.  The EFH unsecured holders will receive

7     approximately 45 percent of the equity, the remaining -- 45

8     percent of the equity of reorganized EFIH.

9          EFH unsecured creditors will receive less than one

10    percent of the equity of reorganized EFH but they will also

11    receive any cash remaining at EFH and a cash payment from

12    EFIH under certain circumstances.

13         The current EFH equity owners will receive less

14    than one percent of the reorganized equity of EFH.

15         So I mentioned earlier the PUC will be involved in

16    this transaction because the ownership change of EFH, which

17    is the indirect parent company of Encore.

18         THE COURT:  Any idea a time frame (indiscernible)

19    same six to nine months?

20         MR. SASSOWER:  The same kind of six to nine month

21    time frame because we have three large kind of regulatory

22    processes in addition to the Bankruptcy Court.  The NRC, the

23    PUC, and the IRS.

24         THE COURT:  All right.

25         MR. SASSOWER:  The second lien DIP -- let's see --

```
 1    EFIH unsecured noteholders receive the right to fund up to

 2    91 percent of the second lien DIP.  The (indiscernible) will

 3    receive the right to fund up to nine percent of the second

 4    lien DIP.  But the full $2 billion second lien DIP is

 5    backstopped by certain EFIH unsecured noteholders.

 6              So who has opted into -- or who has signed the

 7    RSA?  Thirty-one percent of the holders of TCH first lien

 8    debt have signed up to the RSA and we expect that number to

 9    grow significantly over the coming weeks and months.

10              The members that have currently signed are Angelo

11    Gordon (ph), Apollo, Summerbridge (ph), Franklin, Bortris

12    (ph), Oaktree, Oxsif (ph).

13              I do want to note one thing for Your Honor.  There

14    was -- Angelo Gordon was unintentionally omitted from the

15    first day declaration.  Not only are they a party to the RSA

16    but they were instrumental in helping to negotiate the RSA.

17    Also Mason Capital was incorrectly included in the first day

18    declaration in place of Angelo Gordon as a signatory.  And

19    so we with file an amended first day declaration after the

20    hearing correcting that one error.

21              This group is represented by Paul, Weiss and

22    Milbank & Company, and Alan Kornberg of Paul, Weiss is here

23    today in the courtroom.

24              THE COURT:  All right.

25              MR. SASSOWER:  Seventy-six percent of the holders
```

1    of the EFIH unsecured notes have signed the restructuring

2    support agreement.  These (Indiscernible) include Avenue,

3    GSA, Peaceland, Third Avenue, New York, and this group the

4    represented by Akin Gump and Centerview Partners.  And Ira

5    Dizengoff and Scott Alberino from Akin Gump are in the

6    courtroom here today, Your Honor.

7              THE COURT:  Gentlemen.

8              MR. SASSOWER:  Fidelity has also signed the

9    restructuring support agreement.  Fidelity owns 30 -- 73

10   percent of the EFH unsecured notes other than the EFH notes

11   that are held by EFIH.  Eleven percent of the EFIH first

12   lien notes and 40 percent of the EFIH second lien notes.

13             Fidelity is represented by Fried, Frank and

14   Perella Weinberg, and Gary Kaplan of Fried, Frank is here in

15   the courtroom today.

16             PIMCO, which holds approximately 19 percent of the

17   EFIH first lien notes, have also signed the restructuring

18   support agreement.

19             Last the current EFH equity holders are also

20   parties to the RSA.  The equity owns are represented by

21   Wachtell, Lipton & Blackstone, and Rickey Mason from

22   Wachtell is in the courtroom today.

23             Your Honor, just a word about the equity owners.

24   The equity owners and their advisors worked tirelessly long

25   after it was clear that the equity owners would receive

1    little or no recovery in these cases to help facilitate the

2    RSA, and I think that their efforts in that regard speak

3    volumes about their commitment to this company.

4         In negotiating the RSA the debtors were mindful to

5    have an impaired accepting class at each of the estates, and

6    the boxes, this time are in red, represent those people that

7    we believe will serve as our impaired accepting class under

8    or plan.

9         The group in the green box you have the TCH first

10   lien holders, in the blue box you have the EFIH unsecured

11   noteholders, and in the purple box it is Fidelity who holds

12   the majority of claims at EFH other than the EFH claims that

13   are held by EFIH.

14        Your Honor, this doesn't represent everybody who

15   has signed onto the RSA, as I explained many of the EFIH

16   first lien holders and second lien holders have signed onto

17   the RSA, this is just looking at it from a different

18   perspective from the impaired accepting class perspective.

19        THE COURT:  Do you have sign off on -- in each of

20   those classes sufficient to categorize at this point?

21        MR. SASSOWER:  Not yet.  Not in the -- not in all

22   of the classes, Your Honor, and also it's, you know, based

23   on numerosity which we can't know quite yet.

24        So who has not signed the RSA?  Certain holders

25   that the EFIH first lien notes other than Fidelity and

```
1    PIMCO, holders of the EFIH second lien notes other than

2    Fidelity, and certain EFIH unsecured holders of Cross

3    Holdings and hold some EFIH second lien notes.  Holders of

4    the TCH second lien debts and holders of the TCH unsecured

5    debt.

6              As Your Honor knows well when a debtor starts

7    negotiating the plan it oftentimes starts with what it

8    believes to be their full (indiscernible) securities and

9    then later turns to the over secured or out of the money

10   creditors.

11             When you look at this page what you basically have

12   left is what the debtors believe are the over secured and

13   out of the money creditors.

14             Specifically with the first and second lien

15   noteholders these parties are being paid in full.  What is

16   left is their alleged make whole claims and either they will

17   opt into the tenders that we launch, if Your Honor so

18   authorizes, or we will litigate their alleged make whole

19   claims in front of Your Honor.

20             As for the TCH second lien debt and the TCH

21   unsecured debt I don't plan to say too much here.  From the

22   debtors' perspective at this current time these parties are

23   woefully out of the money by billions of dollars.  I'm sure

24   they feel differently, and unless we settle some time

25   between now and the confirmation hearing they will have a
```

1      full and fair opportunity to argue that point.

2              We -- now that we have a deal in place for the TCH

3      first lien holders we can talk to the TCH second lien

4      holders and unsecured holders about possibly bringing them

5      into that deal.  Until we had a deal in place that wasn't

6      possible, I did not have a currency with which to negotiate

7      with them.  We couldn't negotiate a way what we believed was

8      the TCH first lien holders' value without the consent of the

9      TCH first lien holders.

10             Beyond that we will respond to their various

11     motions and objections as they arise today or over the

12     course of these cases.

13             Last slide.  The restructuring support agreement

14     sets forth a path forward for a timely and value maximizing

15     resolution of these Chapter 11 cases.  I do want to mention

16     a few of the milestones that are contemplated by the RSA,

17     and then my colleague, Mr. Hessler, will mention some of the

18     other milestones.

19             (Indiscernible) contemplates an exit from Chapter

20     11 in under a year.  We're obligated to file a plan

21     disclosure statement by June 13th, to file -- to obtain the

22     entry of disclosure statement order by August 12th, to

23     obtain entry of the confirmation order by January 29th,

24     2015, and then to emerge by February 28th, 2015, although we

25     have a 30-day extension if we need additional time to

1    regulatory approvals.

2          Your Honor we're cognizant of the fact that we've

3    negotiated these dates without your input and you are the

4    final arbitrator of your schedule.  One of the things, and

5    you'll hear this later on today that the parties to the RSA

6    were negotiating for, was to limit the time and expense of

7    the Chapter 11 process and so they committed the debtors to

8    moving as fast as possible.

9          With that, Your Honor, I'd like to take any

10   questions or comments you may have.

11         THE COURT:  (Indiscernible).

12         MR. SASSOWER:  Okay, at this point I will cede the

13   podium to my partner, Mr. Hessler.

14         THE COURT:  Okay.

15      (Pause)

16         THE COURT:  That didn't do it.  Go ahead.

17         MR. HESSLER:  Good morning, Your Honor, for the

18   records Steve Hessler of Kirkland & Ellis, proposed counsel

19   for the debtors.

20         Your Honor, Mr. Sassower described generally

21   particularly at the end of his presentation the term sheet

22   and the RSA.  What I'd like to do with this next stage of

23   the opening presentation is provide some further detail on

24   both of those documents which were filed as attachments to

25   the first day declaration, but perhaps more importantly also

1    walk through for the Court how we propose to get this done

2    via motion practice, like what are the going to the

3    mechanisms to seek authority for each of these transactions

4    before the Court.

5                THE COURT:  Okay.

6                MR. HESSLER:  Your Honor, with your permission I'd

7    proceed to go through three stages in this presentation and

8    hopefully get to the last one as quickly as possible because

9    I think that's what salient.  But we would like to walk

10   through the mechanics of the term sheet and the RSA --

11               THE COURT:  Okay.

12               MR. HESSLER:  -- as well as highlight the

13   contemplated contributions and economic recoveries on a

14   constituency by constituency basis and then actually

15   highlight what the motions are and what we would propose to

16   be the timeline to seek authority for those motions.

17               Your Honor, I do want to reiterate what Mr.

18   Sassower said, which we think is a critical point for

19   today's hearing, which is that we are requesting approval

20   today (indiscernible) of anything in the RSA or the term

21   sheet.  There is with regard to the EFIH debt we are seeking

22   interim approval on the EFIH DIP to pay certain fees to the

23   DIP lender, that's -- that is quite critical for

24   facilitating the settlement process, but the vast majority

25   -- overwhelming majority of the transactions that we're

1     talking about through the term sheet and the RAS are not

2     before the Court this morning, Your Honor.

3              Your Honor, this is just a quick -- or a quick

4     overview of the before and after of the deal, if authorized.

5     On the left you will see what the company looks like as of

6     the petition date.  This is a simplified view of the capital

7     and organizational structure that Mr. Sassower highlighted,

8     but the key take away is presently the EFH interest holders

9     effectively own 100 percent of the enterprise.

10             After the restructuring and the transactions that

11    are proposed to be effected you -- you move over EFH to

12    continue to be the owner of EFIH and you're going to spin

13    off the attached refin TCEH, and the result of that will be

14    the E side of the structure, as it sometimes gets referred

15    to, will be approximately 98 percent owned by the EFIH

16    unsecured creditors -- excuse me -- yeah, the EFIH unsecured

17    creditors, 1 percent by the EFH unsecured creditors, and

18    approximately 1 percent -- probably less than 1 percent of

19    the EFH interest holders.

20             The reason for the CIRCA before each of those

21    equity percentages is there is going to be a dilution of

22    these percentages via a conversion that I'm going to discuss

23    in a moment, Your Honor.

24             THE COURT:  Okay.  In the EFH -- excuse me -- the

25    EFIH creditors for the first and second lien debt under your

1    proposal get paid in full but the issue is the issue of

2    (indiscernible) make whole claims.

3               MR. HESSLER:  That is correct, Your Honor, and I'm

4    going get to that further in a moment, but that is correct.

5               And then, Your Honor, on the right side of the

6    organizational capital structure, which sometimes gets

7    referred to as the T side, the first lien creditors are

8    proposed to be the 100 percent equity owners of TCH as well

9    as its businesses below it.

10              THE COURT:  Say again?  What happens to this

11   second lien of unsecured debt on the TCIH side?

12              MR. HESSLER:  It's going to be extinguished, Your

13   Honor.

14              THE COURT:  Extinguished.

15              MR. HESSLER:  Yeah.

16              Your Honor, the next -- turning to the first third

17   of the presentation, this to walk through the mechanics of

18   the RSA and the term sheet.  I want to begin by highlighting

19   the two DIP facilities at TCH.  There's a quick side by side

20   comparison here in total, it's going to be -- well, let me

21   start first with the EFIH first lien DIP facility, it's a

22   $5.4 billion facility, we've highlighted here the interest

23   rate.

24              A key function of this facility is about halfway

25   down the page and this is that -- the make whole settlement.

1    Your Honor, this facility, which we'll talk about when the

2    EFIH DIP comes up on the agenda, is critical for

3    facilitating the settlement because it offers the

4    opportunity for EFIH first lien debt holders to opt into a

5    settlement that has been negotiated prepetition and then

6    participate in the settlement as EFIH first lien DIP

7    holders.

8              I want to note for the Court as you see in the

9    middle of the page we said as of the petition date there was

10   at least $1.85 billion of the approximately $4 billion of

11   EFIH first lien debt holders were party to the settlement.

12   Fortuitously yesterday another $50 million in claims opted

13   in the settlement.  So as of the time we didn't have time to

14   update this before it had to be printed but that is actually

15   now greater than $1.85 billion.  And I'll explain in a

16   moment, Your Honor, how we intend to walk through the

17   process or effect the process of bringing more settling

18   parties into that settlement.

19             The rest of the page notes the use of proceeds.

20             In further answer to a question you asked before,

21   Your Honor, it's a $5.4 billion facility, the first

22   $4 billion will be used to refinance and repay the existing

23   first lien debt.  Some of the remaining $1.4 billion will be

24   used also to facilitate the settlement and refinancing of

25   the second lien debt.

1          On the right side of the page, Your Honor, is the

2     proposed EFIH second lien DIP facility.  And again, this

3     just walks through the funded amount, the interest rate, the

4     use of proceeds, as well as about two-thirds of the way down

5     the page the mandatory conversion function.  I'm going to

6     talk about that a little bit more in a moment, but that's a

7     -- that's a fundamental element of this facility and also

8     what facilitates the overall restructuring.

9          Your Honor, turning to the next slide.  This is

10    the EFIH make whole settlements that have been referenced.

11    There are two.  A first lien settlement and a second lien

12    settlement.

13          Under the first lien settlement what is proposed

14    is settling first lien lenders who opt in would get 100

15    percent of their principal amount plus 101 percent of their

16    accrued interest.  The currency they receive for that amount

17    is the opportunity to participate in the EFIH first lien

18    DIP, but they will not receive the DIP lender fees that

19    would otherwise go to the third-party lenders to the extent

20    the third-party lenders are needed.  And again, there's

21    going to be more on that when we go through the actual EFIH

22    DIP up for approval.

23          The eligibility it's basically a credit to the

24    investors into both facilities.

25          And then as I said -- as I noted a moment ago the

1    participation as of the petition date was approximately 30

2    percent of the EFIH first lien notes with the opt in party

3    that we -- that we received signature pages from yesterday,

4    that number is now up to 31.5 percent, Your Honor.

5            On the right side of the page as to the second

6    lien make whole settlement here participating parties that

7    opt into this they get 100 percent of their principal and

8    interest and they receive that in cash.  So that's distinct

9    from the first lien settlement they receive participation in

10   the DIP.  Here they receive cash on their principal and

11   interest and if they opt to settle 50 percent of their

12   alleged make whole claim which also will be paid in cash.

13           As Mr. Sassower noted, Your Honor, at present 35

14   percent of the EFIH second lien noteholders have opted into

15   this settlement and we're going to run a process to

16   hopefully significantly increase the number of settlement

17   parties.

18           Turn the page, Your Honor, I do want to highlight

19   what we're referring to as the anchor tenant, which was

20   Fidelity and PIMCO, also referenced by Mr. Sassower.

21           Within the EFIH first lien settlement both PIMCO

22   and Fidelity have agreed to participate.  Critically PIMCO,

23   in addition to settling its first lien claims, has also

24   agreed to backstop an additional $1.45 billion of the EFIH

25   first lien DIP facility.

1          Under the second lien settlement, Your Honor,

2     Fidelity is a key participant in this settlement as well.

3     It's a (indiscernible) holder of the second lien notes and

4     it's going to participate $500 million of Fidelity's second

5     lien settlement is going to roll into first lien DIP

6     participation.  So Fidelity will be participating -- is

7     proposed to participate in the first lien DIP on behalf of

8     both its first lien debt claims as well as its second lien

9     debt claims.

10          Turning to the next slide, Your Honor, a word

11     about the opt in process that we have referred to.  We think

12     this is a critical, critical and very salient feature of the

13     settlement.

14          The first lien and second lien settlement is open

15     to all accredited investors, which is effectively all EFIH

16     first and second lien noteholders, so we already have

17     significant percentages and we have anchor participants, but

18     we are as we announced in our pleadings and we are

19     reiterating today the door is open, we want everybody to

20     come into that settlement.  Ideally we'd have 100 percent of

21     both classes at which point we would not have to have a make

22     whole fight at all, Your Honor.

23          The three sub bullets in the middle of the page

24     indicate how we propose to effectuate that opt in process.

25     There's going to be a first lien make whole exchange offer.

1    Underneath that, Your Honor, the first lien claimants will

2    exchange their first lien debt claims for participation in

3    the first lien DIP.

4              Under the second lien make whole tender offer what

5    happens is second lien claimants would tender their second

6    lien claims in exchange for cash.

7              And then, Your Honor, there's also an offering for

8    the second lien DIP.  As Mr. Sassower indicated it is

9    backstopped by an ad hoc group of EFIH unsecured holders,

10   but otherwise that is going to be open to additional

11   participation into the EFIH second lien DIP.

12             Your Honor, we intend to launch these processes

13   early next week and pursuant to federal securities laws

14   these will be held open for at least 20 business days.

15             Turning to the next slide, Your Honor, I want to

16   describe the EFIH investment commitment that is being

17   facilitated by the EFIH unsecured creditors.

18             There's an ad hoc group that is sponsoring this

19   lynchpin transaction.  Underneath this, Your Honor, the --

20   the key vehicle is the EFIH second lien DIP which will be

21   funded in an amount of $1.9 billion, and this provides the

22   majority of the funding, Your Honor, to effectuate the

23   refinancing of the present EFIH second lien claims.

24             Your Honor, in the middle we show a chart that

25   indicates of that DIP 91 percent is offered to all EFIH

1    general unsecured creditors and 9 percent is reserved for

2    Fidelity, Your Honor.

3            Turning the page, Your Honor, important to talk

4    about the Encore tax sharing agreement.

5            Your Honor, there is a tax sharing agreement

6    between Encore, which as Mr. Sassower indicated is a non-

7    debtor, is not a party in these proceedings.  There's an

8    agreement that presently provides between certain entities

9    under which Encore remits tax-related payments from Encore

10   to EFH.  So it streams upwards.  This is approximately 250-

11   to $300 million annually that flows upward from Encore to

12   EFH and this represents EFH's allocable share of the taxes

13   due to Encore's taxable income.

14           A critical element of the settlement is to amend,

15   pursuant to the Court's approval, is to amend that tax

16   sharing agreement to provide for the direct payment of those

17   tax sharing payments directly from Encore up to EFIH.  So

18   not going up to EFH, instead it will go directly to EFH,

19   which is presently below EFIH -- excuse me -- EFIH is

20   presently below EFH.

21           Your Honor, there's a lot of words on this page --

22           THE COURT:  I'm sorry, it currently goes to EFH

23   and you're switching that to EFIH or --

24           MR. HESSLER:  Apologies, let me state that again.

25   It presently -- the payments presently go from Encore to

1    EFH.

2              THE COURT:  All right.

3              MR. HESSLER:  The proposed amendment would change

4    the agreement so the payments would go directly from Encore

5    to EFIH.

6              THE COURT:  Okay.

7              MR. HESSLER:  Your Honor, what the rest of the

8    page describes is there are certain milestones for seeking

9    approval and obtaining approval of this amendment, and if

10   the amendment is not approved within these specified time

11   periods there are certain incremental amounts that would be

12   paid via the EFIH second lien DIP, the proposed new EFIH

13   second lien DIP.

14             Turning the page, Your Honor, this is to the next

15   section.  This is what we're calling the contemplated

16   contributions and economic recoveries.

17             Your Honor, the next three slides represent on a

18   constituency by constituency basis the present status

19   treatment during the case and treatment at exit of -- on a

20   -- of all of the constituents at EFH, EFIH, and TCEH.

21             There's a lot of detail here, Your Honor.  In the

22   interest of time I would not propose to go through on a

23   bullet point by bullet point basis all that is in here.

24   This is intended to be however a concise summary of the

25   hundreds of pages of deal documents that we filed, this is

1    intended to be a concise summary for constituents to see at

2    least at a glance.  Now this is necessarily over simplified,

3    but to see at a glance effectively what their proposed

4    treatment under the global settlement would be, Your Honor.

5    And given that we have handed out copies to the participants

6    in the courtroom and we can otherwise make them available

7    for individuals I would propose not to go through it line by

8    line unless there are specific questions that Your Honor

9    would like me to address.

10              THE COURT:  No, I don't.

11              MR. HESSLER:  Your Honor, I'm going flip forward

12   then to what I think is for present purposes probably of

13   greatest interest to the Court and all of the parties'

14   interest today, which is the last section on the motions and

15   timing.

16              Your Honor, there's essentially four motions that

17   -- they overlap a little bit, but in the aggregate these are

18   the vehicles under which we propose to obtain approval of

19   what we're calling the global settlement.

20              As I indicated there's two DIPs.  There was a

21   third DIP in the case, Your Honor, it's the -- it's the TCH

22   DIP which you're going to hear about this morning on an

23   interim basis, but not directly part of the RSA and the term

24   sheet, but I just want to note there was a third DIP.

25              But there are otherwise on the E side there are

1     two DIPs.  A first lien DIP, a second lien DIP, there's a

2     global settlement motion, which I'll describe in a moment,

3     and then the restructuring support agreement itself will be

4     the subject of a stand-alone restructuring support agreement

5     assumption motion.

6               Turning Your Honor first onto the next slide to

7     the EFIH first lien DIP motion.  This motion was filed on

8     the petition date.  This is -- as I said at the outset this

9     is the only element related to the global restructuring of

10    which there is Court approval that we're seeking today and

11    there are certain fees under which we're seeking approval.

12    We can I think deal with that when we get to the EFI first

13    lien's DIP on the docket.

14              What I did want to go ahead and preview for the

15    Court on a final basis, Your Honor, what we will be seeking

16    is authority to borrow $5.4 billion, and here as well on the

17    page it says including a roll up of at least $1.85 billion.

18    As of today that now stands at $2.35 billion and we are --

19    we are optimistic that before we come back for you for final

20    approval of that DIP that that amount is going to be

21    significantly higher, that represents (indiscernible) EFIH

22    first lien holders who are opting to participate in the

23    deal.

24              Your Honor, what we are seeking authority to use

25    those funds for is to promptly repay the existing first lien

1    note, the approximately $4 billion of first lien notes.

2            Your Honor, we are also going to be seeking a

3    finding that no make whole premium is due to non-settling

4    holders of EFIH first lien claims, and Your Honor, we'll be

5    seeking customary use of cash collateral under that DIP.

6            As to timing, Your Honor, we would -- what we will

7    propose is a hearing on this DIP approximately 35 days into

8    the case.  We did note that it looks like chambers entered

9    on the docket soon before the hearing this morning a hearing

10   in June and a hearing in July.  We will need to discuss it

11   this morning talking about a hearing schedule.  We can

12   probably do that in the context of the actual motions.

13           I did want to note that we had an RSA milestone

14   that's going to come up throughout, but as to the first lien

15   DIP it's for the debtors to use commercially reasonable

16   efforts to attempt to obtain approval of this DIP.  It's

17   like day 45.  I think I saw that -- or it was relayed to me

18   that the first hearing that you'd indicated on the docket

19   was June 17th.

20           So when we get to discussing scheduling we may

21   need to seek a hearing in advance of that date -- or request

22   a hearing in advance of that date, Your Honor.

23           THE COURT:  Hang on.  Hearing dates were requested

24   by you.

25           MR. HESSLER:  Your Honor, my colleague from

Page 58

1    Richards, Layton & Finger is saying it was entered in error.

2    The dates were not requested -- were not requested by the

3    debtors, Your Honor.

4         (Pause)

5              MR. DEFRANCESCHI:  Your Honor, Dan DeFranceschi.

6              We understand that those hearing dates were

7    intended for another case but inadvertently entered in this

8    case by the Court and so they're not applicable, there are

9    no hearing dates for this case.

10             THE COURT:  Okay.  (Indiscernible).

11             MR. DEFRANCESCHI:  Thank you, Your Honor.

12             MR. HESSLER:  Your Honor, while you're -- while

13   you're pulling up your computer.  Yeah, so but it is a take

14   away from the debtors' perspective is we --

15             THE COURT:  Wait a minute, you can't talk to me

16   because I'm not hearing a word you're saying, okay?  I'm

17   trying to -- I'm trying to address the hearings.

18             MR. HESSLER:  Yes, Your Honor.

19        (Pause)

20             THE COURT:  Mr. DeFranceschi, has the order

21   been --

22             MR. DEFRANCESCHI:  It's my understanding it's been

23   withdrawn by the Court.

24             THE COURT:  It's been withdrawn by the Court.

25             MR. DEFRANCESCHI:  Yes.

1              THE COURT:  Okay, that was a downstairs issue, I

2       apologize.

3              MR. DEFRANCESCHI:  Yes.

4              THE COURT:  It was -- it did not come from

5       chambers.  All right.

6              MR. HESSLER:  The upshot, Your Honor --

7              THE COURT:  My apologies.

8              MR. HESSLER:  Oh, no, of course, Your Honor.

9              The upshot from the debtors' perspective is -- and

10      again, we can handle this in the context of the motions or

11      at present, whichever is your preference, is we would like

12      to seek a second day hearing in the first week of June.  So

13      for instance, you know, Tuesday the 3rd, Wednesday the 4th,

14      or Thursday the 5th.

15             THE COURT:  Okay, we'll talk about this in the

16      future.

17             MR. HESSLER:  Okay.  Your Honor, turning to the

18      next slide, the EFI second lien DIP motion.

19             Importantly this motion has not been filed yet, so

20      none of the relief related to the EFI second lien DIP motion

21      is up for interim approval today.

22             As a preview what we will be seeking is final

23      relief, this is to borrow $1.9 billion.  Similar to the

24      first lien DIP we'd like to use those proceeds to promptly

25      repay the existing second -- the EFI second lien notes of

1    non-second lien holders.

2              Your Honor, similarly to the first lien DIP we

3    also will be seeking a ruling that no make whole premium is

4    due to the non-settling holders.

5              I should mention, Your Honor, because nothing

6    related to the second lien DIP is going to be on the docket

7    today, with regard to both the first lien DIP and the second

8    lien DIP the holder -- excuse me -- the holders of the first

9    lien claims and the second lien claims they are all

10   organized and they are represented.  You know, a large group

11   of holders with the -- with the trustee as well.  The first

12   lien holders are represented by Ropes & Gray and the second

13   -- there's an ad hoc -- the second lien holders along with

14   the trustee that's represented by Kramer Levin.  I'm not

15   sure if Ropes & Gray is in the courtroom today, I assume

16   they are.  In fact I see Mr. Wofford, Your Honor and Ross

17   Martin as well on behalf of Ropes & Gray, and I believe Tom

18   Mayer from Kramer Levin is in the courtroom as well.

19             I do want to note for the Court -- and this is

20   going to come up again in the context of the actual DIP --

21   but the debtors have begun conversations with both groups

22   about hopefully coming to a consensual agreement as to

23   scheduling for the DIP, for the refi, and for the make

24   whole.  We are not there yet which may be an understatement,

25   but we look forward to continuing that conversation.  We

1    hope to work this out amongst ourselves.  If we can't do so

2    in the very near term though, Your Honor, we may need to

3    come back to the Court for some assistance in obtaining

4    clarity on scheduling.

5              I -- just last point I would note, Your Honor.  As

6    to the second lien DIP also we would -- the debtors propose

7    there would be a hearing on the DIP on approximately day 35

8    at that second lien hearing, same as the first lien DIP.

9              Your Honor, turning the slide the EFIH global

10   settlement motion.  As well this motion has not yet been

11   filed, therefore necessarily no interim relief is being

12   requested under this motion today.

13             As a preview what we will be seeking approval for

14   on a final basis, this is approval of the EFIH investment

15   commitment that was discussed earlier.

16             Your Honor, we will be seeking approval of the

17   compromises that are embodied in the EFH make whole

18   settlements, this will be a 9019 -- a real 9019 motion, Your

19   Honor, as to both the first lien settlement and the second

20   lien settlement.

21             And then thirdly, Your Honor, the Encore TSA

22   amendment that I discussed we will be seeking authority of

23   that amendment through this motion as well.

24             Here as well, Your Honor, what we would propose is

25   a hearing on approximately day 35 so that this would be

1    brought up at the second day hearing as well, Your Honor.

2            Lastly is the RSA assumption motion.  You're

3    sensing a theme here.  This has not been filed yet so

4    therefore no interim relief is being requested today under

5    the RSA assumption motion.

6            But what we will be seeking on a final basis is to

7    formally assume the obligations under the restructuring

8    support agreement and we will propose for this to be heard

9    on the second day hearing to be scheduled as well, Your

10   Honor.

11           Your Honor, turning the page this is the last

12   slide in this presentation.  This is a proposed illustrative

13   timeline from the debtors' perspective as well as the

14   perspective of the other settling parties under the RSA of

15   as I said at the outset how we get this done and in what

16   pieces.  I won't walk through all of this, I'm sure some of

17   this is going necessarily change based on the Court's

18   calendar as well as what we are able to work out on a

19   consensual and in some cases non-consensual basis with the

20   parties, but we did at least want to provide for the

21   edification of the Court and other parties in interest kind

22   of the key work streams and a proposed timeline under which

23   we see these proceeding.

24           Again, because we handed this up to the Court and

25   to all of the folks present in the courtroom we can provide

1    additional copies.  I won't try and walk through each point.

2            If Your Honor has any additional questions I'm

3    happy to take those, otherwise I believe this concludes the

4    introduction of the case, Your Honor.

5            THE COURT:  Okay.  Thank you.

6            MR. HESSLER:  Thank you, Your Honor.

7            THE COURT:  Let's take a very short recess, just a

8    few minutes.  Try not to, you know, mill around and create a

9    lot of sort of back and forth.  I know everybody needs to

10   talk to each other, which is fine, but I don't want to take

11   ten minutes to try to get everybody back in their seats

12   after the three-minute recess.  So just literally we'll

13   reconvene at 11 o'clock sharp.

14           MR. HESSLER:  Thank you, Your Honor.

15       (Recess at 10:55 a.m.)

16           THE CLERK:  Okay, everybody the judge is coming

17   back in if you could sit.

18           THE CLERK:  All rise.

19           THE COURT:  I tell you what that's the voice of a

20   mother.  All right.

21           MR. DEFRANCESCHI:  Your Honor, as I understand

22   Mr. Lauria has ceded his time to Mr. Weisfelner to make some

23   -- an opening statement before we get into the actual motion

24   to continue the -- or adjourn the hearing.

25           THE COURT:  Okay.

1            MR. DEFRANCESCHI:  And there may be other parties

2     as well that will want to make brief statements, but I think

3     Mr. Weisfelner -- he'll be one second, Your Honor.  Should I

4     go take a look and see if he's out in the hallway?

5            THE COURT:  He'll come.  He's coming, okay.

6        (Pause)

7            MR. WEISFELNER:  Your Honor, I apologize.

8            THE COURT:  That's all right.

9            MR. WEISFELNER:  The men's room line was longer

10    than it was (indiscernible).

11           THE COURT:  (Indiscernible).

12        (Laughter)

13           MR. WEISFELNER:  Your Honor, for the record my

14    name is Edward Weisfelner, I'm with Brown Rudnick LLP, I'm

15    with my co-counsel, Mr. Bowden from Ashby & Geddes, and we

16    represent Wilmington Savings Fund Society.  I think I'm

17    supposed to pronounce it WSFS.

18           Your Honor, to a very, very large extent our

19    commentary will be similar to the commentary that I'm sure

20    you'll be treated to from counsel to the ad hoc group of

21    unsecured noteholders, but we are the trustee for the second

22    lien notes, $1.6 billion in the capital structure.  I can't

23    see the chart that you're looking at but it's below the

24    first lien debt and in between -- sandwiched in between the

25    first lien debt and the general unsecured, some $6 billion

1    worth of general unsecured debt.

2            Now, Your Honor, we know that there are a number

3    of focuses and purposes of Chapter 11, one of which is the

4    search to determine what the value of the enterprise is and

5    the other is to allocate that value.

6            Sitting here today I think that we've gone about

7    this the other way around, that the debtor has purported to

8    allocate values without determining what the value is, so

9    that 100 percent of something, the equity on the TCEH side,

10   the T side of the equation has already been given away to

11   the first lien creditors without any consideration for what

12   that 100 percent of the equity is worth.

13           You're being presented with a soft landing and a

14   consensus among any number of interested parties and told

15   that a substantial portion of the debt has agreed on how

16   that whack up ought to be accomplished, but I want to insure

17   for you or emphasize for you that on the TCEH side of the

18   equation the vast majority of the debt resides on the TCEH

19   side of the equation, the vast majority of the value resides

20   on the TCEH side of the equation as compared to EFIH or the

21   E side of the equation, and at least on the TCEH side of the

22   equation the agreements as far as we can tell only are with

23   some 41 percent of the first lien debt.

24           There is no agreement with any constituency other

25   than 41 percent of the first lien debt, and in particular

1    the second lien debt, which from the debtors' perspective is

2    totally undersecured, it's just one big whopping deficiency

3    claim, and the entirety of the general unsecured bonds and

4    other general unsecured creditors there is no agreement and

5    the debtor tells us that those creditors -- they don't use

6    the term wipe out because it's -- it's not a nice term of

7    art for the first day of the hearing -- but wipe out is what

8    they intend to those constituents.

9            Yes they say that well all of us share the

10   unencumbered value.  Now who's the all of us that's going

11   the share?  Well it's the first lien creditors' deficiency

12   claim.  And if I've done my calculations right based on

13   their public disclosures and what they've said in all the

14   pleadings that were filed they're going to tell you the

15   first lien deficiency is some 5 or $6 billion, and that's

16   the amount by which I'm out of the money.  So you've got

17   their 5 or 6 billion, the 1.6 billion that my trustee looks

18   out for, the 6 billion that the folks at White & Case look

19   out for, so that's 13 and a half billion dollar they're

20   going to share unencumbered value which the debtor estimates

21   in its various papers is less than $350 million.  So they're

22   promising us some two and a half cents worth of

23   distribution.

24           And again, Your Honor, that's predicated on their

25   assumption that the first liens are the folcrum (ph)

1    security and in fact that they are undersecured to the tune

2    of about 5 or $6 billion.

3            Your Honor, I must tell you that the second liens

4    organized way over a year ago, not at the debtors'

5    suggestion or request, and I'll get to that in a minute, but

6    organized on their own and hired on their own dime a number

7    of professionals, my firm, the firm of Peter J. Solomon, and

8    in particular Anders (ph) Maxwell and the firm of Concentric

9    (ph).  These are entities who have considerable experience

10   in the merchant power area and in the ERCOT market in

11   particular.

12           And I guess with reference to our venue motion the

13   entire time that counsel was going through its introduction

14   and talking about the number of power plants and where they

15   operate kept talking about their region.  They're region is

16   Texas so they shouldn't be afraid to embrace the word Texas.

17   It's an easy state's name to pronounce.  This is a Texas

18   company, and while I appreciate that they want to avoid the

19   use of the word as often as possible, if you go through all

20   of their presentation every time they talk about their

21   region, their market, substitute the right word, it's Texas.

22           In any event we've done an awful lot of work over

23   the past year with regard to the issue of value, and Your

24   Honor we will obviously need to get into this issue in much

25   more detail at some future date, but I can do this for you

1   very quickly.

2          The debtors' projections contained in their most

3   recent 8-K imply a value, and you can get to the implied

4   value as I know Your Honor knows by using an appropriate

5   whack, an appropriate (indiscernible) growth rate, and an

6   appropriate multiple, and we're not using any numbers that I

7   think the debtor would disagree with, we're trying to be

8   conservative, but if you took a look at the debtors'

9   projections you'd get to a high end value of $20 billion,

10   and therein lies the debtors' ability to say that the first

11   liens are impaired.  They showed you a chart of how they

12   guaranteed an impaired accepting class, they're impaired,

13   and they're under water to the tune of 5 bill to $6 billion.

14   You don't even get to my class, the second liens, let along

15   the unsecured creditors.

16          The problem is that when they did that valuation

17   they made a couple of shall we call it mistakes.  There are

18   a couple of things that are missing.  Some courts have

19   called it machinations or manipulation by management that

20   have a goal in mind.

21          What'd they leave out?  Well they left out

22   unrestricted cash.  What else did they leave out?  They left

23   out an energy price adder which again requires you to

24   understand a little bit about the ERCOT market.

25          The energy producers in ERCOT have long argued

1    before the regulatory bodies down there, and in particular

2    the Public Energy Commission of Texas, that the ISO, the

3    independent power provider, the ERCOT region, ought to move

4    to capacity pricing regime much like many of the other ISOs

5    in the country.  That argument has been proffered and

6    championed by none other than our debtors.  the TCEH debtors

7    have appeared before, talked and argued that pricing regimes

8    have got to change.

9            Up until this point in time there has been some

10   movant towards capacity pricing, the timing has been

11   delayed, but what's been put in place are a number of price

12   adders what we commonly refer to as alternative pricing

13   regimes or interim solution B, you'll hear a lot about, and

14   that has added both a spot adder and a capacity adder to the

15   pricing that the debtors' projections don't reflect and add

16   quite a bit of value, and I don't think that these are

17   subjective analyses.  I think these are objective adders to

18   the debtors' valuation recognized by market participants and

19   other experts, back casted and front casted by many analysts

20   in the industry to demonstrate what additional value it

21   would add to the enterprise value in this case.

22           The other important thing that's missing from the

23   debtors' projections is the impact of natural gas prices.

24   And you heard a lot about gas prices in connection with the

25   opening remark.  Part of the problem we perceive in this

1    case is that the debtors' entire analysis and all of the

2    work its done to date is based on their valuation which

3    assumes gas prices that date back to August of last year, if

4    not earlier.  Those gas prices are outdated and nevertheless

5    they formed a predicate for the debtors' assessment that

6    we're out of the money and we and the unsecured creditors

7    ought to get zeroed out in this case.

8              Now it's the debtors' own public filings that tell

9    you that a $1 shift in natural gas prices they will tell you

10   is worth $475 million of EBITA, and that's no next year.

11   And we all know --

12             THE COURT:  How much more EBITA?

13             MR. WEISFELNER:  They say another $475 million, a

14   $1 change in natural gas price.

15             As Your Honor knows for purposes of valuation on

16   the back of an envelope if you multiply 475 by an

17   appropriate market multiple, which I think most of the

18   experts that you've been introduced to today, Evercore, the

19   guys from Blackstone, you haven't been introduced to them

20   yet, but Houlihan, certainly my expert will tell you that on

21   a conservative basis the right multiple to use to nine to

22   nine and a half.

23             But what you'll also find out is that the debtors'

24   assumptions about the sensitivity of value associated with

25   gas prices is just understated.  In their public

1   (indiscernible) they say a dollar change is worth 475- next

2   year, but -- and we think we can demonstrate this pretty

3   easily -- that's based on certain -- pardon me -- heat rate

4   assumptions that the debtor uses that the rest of the

5   industry thinks are wrong.

6           They're also predicated, and I know this gets a

7   little bit in the weeds, but it's predicated on the amount

8   of time that natural gas is on the margin.  It's a term of

9   art used in power production.  And you really need to

10  understand the heat rate, the percentage of time that

11  natural gas is on the margin to determine the company's

12  sensitivity from a total enterprise value perspective to a

13  change in gas prices.

14          Now we have our own view about sensitivity but

15  there is no organization that most of us have been reading

16  lately called Credit Insights, they've done a lot of work in

17  merchant power generally and in this case specifically.

18  They've published their view that with the right heat rate

19  and percentage time on margin calculations that a $1 shift

20  in natural gas prices for next calendar year isn't the 475-

21  that the debtor talks about but closer to $700 million.

22  Again, 700 million times an appropriate multiple doesn't

23  take a calculator to do the math.

24          If Credit Insights was right and we're entitled to

25  a $700 million EBITA adder at a 9 and a half times multiple

1    the differential that the debtor argues is there in terms of

2    us being under water is made up.  It's made up before you

3    consider the fact that they haven't added cash to their

4    valuation, we don't believe, and they've done nothing to

5    reflect the price adder that we think is applicable in terms

6    of things that have already taken place in the ERCOT market.

7              Now there are a lot of other factors, Your Honor,

8    that we may or may not have to get into, but we think that

9    the overhead is bloated relative to the comps in the

10   industry.  It could be that the overheads remain bloated on

11   purpose, that has a massive impact on earnings.  And by the

12   way a lot of that overhead has gone historically to the

13   payment of fees to the equity owners.  KKR, TPG, and Goldman

14   Sachs.  Many tens of millions of dollars of management fees

15   blown out to those entities.

16             There's other value adders that again I won't bore

17   the Court with, but my point is this, we are desperate to

18   have our day in court to demonstrate to Your Honor through

19   competent standard methodologies, and I know Your Honor is

20   familiar with them, discounted cash flows predominantly, but

21   comparable transactions and other analysis that have become

22   standard if needed to show you that far from being out of

23   the money, as the debtor contends, at least the second liens

24   are firmly within the money and the fulcrum security in this

25   case.

1           And what we're desperately concerned about is

2     timing and whether timing will work against us such that we

3     won't get our day in court, that the debtor will tell you

4     valuation hearing, we don't need a valuation hearing, let's

5     show you where the bonds are trading.  And the first lien

6     bonds are trading below par so therefore the market is

7     telling you that Weisfelner is smoking some fancy tobacco

8     and he's under water.

9           Now of course I could tell you that this market

10    doesn't properly reflect values because my under water out

11    of the money zero entitlement bonds trade at close to 30

12    cents on the dollar.

13          So they can't rely on a market to tell you that

14    the first lien bonds trading value probably reflects I'm out

15    of the money and ignore the enact my bonds traded at value

16    that suggest that we're very much in the money, to say

17    nothing of the fact that the unsecured bonds trade in the

18    marketplace as well.

19          I'm desperately concerned about being shut out and

20    not having time to make our case.  And I know they've shown

21    you a time line and I know they've talked about many months

22    to get regulatory approvals, but they're not waiving.

23          If you look at various provisions of the DIP

24    financing and the cash collateral they want a disclosure

25    statement approved in this case in 105 days.  And I've heard

1    the argument before and I'm afraid I'm going hear it again,

2    you can't get ready to try a valuation case within the time

3    frames that we have under our financing and our cash

4    collateral orders.  And I filed my motion for discovery the

5    first day of the case, they objected, and what I'm concerned

6    about is not that we couldn't work out an appropriate

7    schedule to resolve our discovery disputes, but that I'll be

8    held at bay for as long a period of time as they can and

9    then they'll throw up their hands to Your Honor and say,

10   well we'll like to have a valuation trial, we're not sure we

11   really need one, but we ran out of time.

12            And here I think there's an important thing for

13   Your Honor to consider.  There are tons of professionals

14   involved and tons of professionals have been involved in

15   this case some of them for way over a year.  All of the

16   parties with whom the debtor has reached consensus or

17   organized at the debtors' insistence or with their

18   cooperation their professionals were paid by the estates

19   prepetition, and most critically their professionals were

20   afforded access to walk away of non-public information.

21            There isn't a single constituency that's in front

22   of you today who hasn't been paid except us.  We were

23   organized over a year ago and the debtor refused to work

24   with us towards paying professional fees, paying for our

25   experts, but most importantly opening up the door to allow

1    us to begin a due diligence process.

2              So, Your Honor, I think that there's one

3    fundamental theme here and that is we're entitled to a

4    valuation and we shouldn't have the timing of the process

5    deprive us of the ability to put on a valuation because we

6    think we're going to be in a position to show Your Honor

7    that any plan that delivers 100 percent of the equity to the

8    first lien creditors gives them way in excess of 100 percent

9    recovery and doesn't comply with the applicable provisions

10   of 1129.

11             Now beyond that there are other major themes in

12   this case that Your Honor may or may not have gotten a

13   flavor for today, and that is that we've got, as you have in

14   a lot of big cases, a multiplicity of debtor entities.

15             Our concern here is that the way the debtor is

16   structured and the nature of the interdebtor claims and

17   conflicts can pose a humongous problem for the Court and for

18   the parties.  And let me sort of give you one highlight of

19   that.  There are many other examples.

20             The other issue that drives this case as you can

21   read from first day declarations and lead ins to various

22   pleadings is tax issues.  And not just any tax issues but

23   the critical tax issue in this case as we understand it from

24   reading the papers.  And that is that the debtor tried for a

25   period of time to do a reorganization that would keep the

1    regulated utility company and the unregulated merchant power

2    company together.  The E side and the T side kept together

3    under EFH, the parent holder company.

4              Disagreements with respect to valuation of the

5    Encore or E side of the business among their creditor groups

6    and disagreements on the T side of the equation as to the

7    value of TCEH among its creditor constituents made that

8    impossible.  And it was clear that the creditors on the EFIH

9    side wanted to take their asset and go home and likewise the

10   first lien creditors on the TCEH side wanted to take their

11   equity and go home, and the problem was that that could give

12   rise to a very, very substantial stranded tax liability at

13   the ultimate parent holding company level.  And I use the

14   term stranded tax to make reference to the fact that there

15   would be a big tax liability but no value at the ultimate

16   parent company level to pay that tax.

17             Why is that a bad thing?  Well it's a bad thing if

18   you're the equity sponsors who put together this $40 billion

19   largest ever in the world LBO.  If the LBO falls apart,

20   crumbles because you made bad bets on gas prices and it

21   results in the U.S. government being stuck for billions of

22   dollars of taxes that's not good reputationally for folks

23   like KKR, Goldman Sachs, and I forgot the other mass through

24   the universe that did this, TBG.  And EFH has dictated to

25   the other debtor entities on the TCEH side, we will not

1    facilitate or support a plan that leaves this stranded tax.

2          Now from the perspective of secured creditors,

3    first lien creditors, and first second lien creditors that

4    believe and we'll eventually be able to show you that they

5    are likewise in the money, there's a big difference between

6    the tax program that we understand the first lien creditors

7    pursued and what the debtor ultimately agreed to.

8          What the first lien creditors were looking for was

9    the ability to take back their asset -- we don't think it's

10   theirs exclusively, but for purposes of this example -- they

11   wanted to take back their asset on what's known as a stepped

12   up basis basis so that if they eventually sold their equity

13   they'd get the benefit of a step up in basis and in

14   (indiscernible) terms would pay less tax on a gain.

15         The debtor again didn't want to see a step up in

16   basis taxed resolution in part we think if not exclusively

17   because they didn't want to stick EFH and its shareholders

18   with that kind of liability.

19         And ultimately it appears that 41 percent of the

20   first liens have now agreed to give up a step up in basis in

21   favor of a tax free spin.

22         The differential in value that would be available

23   in a stepped up basis transaction versus a tax-free spin

24   transaction is -- this is a technical term -- humongous, but

25   we haven't had the discovery yet to determine how humongous

1     humongous is, but it's probably in the billions.

2               While one could argue that if someone at the EFH

3     level was forcing the TCEH level to forego that value then

4     how can I be looking at my debtor as a fiduciary to protect

5     my interest during the course of the case?  They've already

6     suggested that I'm under water when I think I can prove that

7     I'm not, they've already agreed to compensate every lawyer

8     -- virtually ever lawyer in this room except for the people

9     representing second liens and unsecured creditors, and

10    they're moving forward on a program that I fear will deprive

11    us and the unsecured creditors to show a value is truly

12    here.

13              Now, Your Honor, I don't want to take up more of

14    your time than necessary, but our other major concern, and

15    we can get to it whenever is an appropriate time, is venue.

16    And, Your Honor, we're not asking for a change in venue out

17    of any concern about Your Honor's ability to go through a

18    valuation trial, which we think is the most critical issue

19    to our constituent, in fact we know Your Honor's work in any

20    number of cases that we've been involved in including Six

21    Flags, we've read -- I never remember how to pronounce

22    Nelson Nutrical (ph) decision that Your Honor wrote.  We've

23    read some of the stuff you've published in the ABI on

24    valuation.  We know you get it.

25              The problem for us is not who determines this, but

1    to a very large extent cost.  And let me tell you why it

2    concerns us.  I've got a DIP financing on the TCEH side of

3    the equation where my debtors -- and they always talk about

4    debtors collectively -- my debtors come into court and say

5    we need to borrow all of this money and if you put aside the

6    need to borrow money for the railroad authorities so that

7    they have a bonding requirement on their reclamation claims,

8    what's the money being used for?  It's being used to pay

9    professional fees to the first lien lenders, and it's being

10   used to pay interest to the first lien lenders, and it's not

11   enough that they were going to get paid under their first

12   lien debt on a quarterly basis, but now they convert it into

13   a monthly payment.

14           So in effect they're borrowing money from a

15   priming DIP so as to use the proceeds to pay the first liens

16   when they're undersecured and otherwise would think are more

17   than adequately protected because all this money is being

18   used to continue to operate a business that the debtor says

19   is stable, growing, and very strong.

20           So again my concern is that we see the writing on

21   the wall, that the first lien creditors and the debtor will

22   join forces, will promulgate a plan that sticks to their

23   value so that they can print very cheap equity.  When you

24   print cheap equity it benefits the first liens and it

25   benefits management.  Because again, buried in all the

1   papers we see that whatever equity they're going to get, the

2   100 percent of the equity, well it's subject to dilution

3   from management programs to come.

4           Like a lot of the other stuff that they told you

5   they're going to file later, well the management

6   compensation package is to come also and my guess is that

7   management will get a nice slug of the equity again printed

8   at a very cheap price, and if people that suffer are the

9   second lien holders and the unsecured creditors.

10          Your Honor, you've got a full agenda, we will be

11  here again to talk about venue at an appropriate time, we'll

12  be here again to talk about discovery at an appropriate

13  time, and we do have concerns and objections with regard to

14  some of the motions that are before you, but I didn't want

15  you to start these hearings under the impression that the

16  deal, at least on the TCEH side, involves more than 41

17  percent of the first lien creditors, wipes out all of the

18  second liens and the unsecureds without there ever being a

19  valuation put before you where we think the value clearly

20  demonstrates that we're in the money.

21          Thanks, Judge.

22          THE COURT:  You're welcome.

23          MR. KORNBERG:  Good morning, Your Honor, Alan

24  Kornberg from Paul, Weiss, Rifkind, Wharton & Garrison.  I'm

25  here today with my colleagues, Kelley Cornish, Jacob

1    Adlestein, and Adam Denhoff, and Pauline Morgan of Young

2    Conaway.

3              Your Honor, we represent the ad hoc committee of

4    TCEH first lien creditors.  That is comprised of ten of the

5    largest holders of TCEH's first lien secured debt.  Seven of

6    the holders, as Mr. Sassower told you this morning, have

7    signed the RSA, and based on the reception it has received

8    after being published with Mr. Keglevic's declaration we

9    expect that many more will sign that document.

10             Based on the most current information we have the

11   members of the ad hoc committee currently hold in the

12   aggregate approximately 47 percent of the first lien debt,

13   so that's approximately $11.5 billion of more than

14   $24 billion of debt.

15             As such, Your Honor, we represent the largest

16   traunch of debt in this very, very large capital structure

17   and we're one of the largest creditor constituencies in this

18   Chapter 11 case.

19             I'm not here today to debate the future of ERCOT,

20   I am not going address Mr. Weisfelner's valuation thesis.  I

21   think it's fair to say that no one is going deprive

22   Mr. Weisfelner or Mr. Lauria of their day in court and their

23   opportunity to prove their valuation theories.  And that of

24   course assumes, Your Honor, that we won't be able to reach

25   agreement with them and we certainly will try to do so.

1           Let me just say that no one is going railroad this

2    case through, I'll come back to timing in a moment, but as I

3    think you've already gotten an indication Mr. Weisfelner and

4    Mr. Maxwell have been thinking about these issues for a very

5    long time.  They've been at it for over a year, they have

6    well-developed theories, we don't accept those theories.  A

7    lot of very, very talented financial advisors have been on

8    the scene for a long time.  We think they got it right.  But

9    even if they didn't they certainly didn't get it wrong in a

10   way that would be sufficient to move the needle by billions

11   and billions and billions of dollars of debt which would be

12   required for Mr. Weisfelner and Mr. Lauria for prevail.

13          What I would like to just spend a few minutes on

14   is this case a bit of its history from our perspective.  The

15   ad hoc committee was formed in March 2013, we were presented

16   very shortly thereafter with a combined company

17   restructuring proposal that was aptly named Project Olympus.

18   Olympus proved too tall to climb.  It was not our preferred

19   outcome from the first lien debt holders' perspective but we

20   worked very hard and in good faith to try and reach an

21   agreement with the company, but also because it was a

22   combined company restructuring proposal we had to reach

23   agreement with not only the company and the sponsors but the

24   creditors on the E side of things, and that required

25   agreements on valuation that were just too complex to

1    achieve.

2              We negotiated through October of 2013 on that

3    structure and we ultimately could not reach agreement and

4    that was publicly disclosed by the company.

5              Beginning in November of 2013 we began discussions

6    over a deconsolidation transaction, the tax-free spin that

7    was described this morning, and that those negotiations

8    ultimately led to the RSA.

9              As Mr. Weisfelner has eluded to, as Mr. Keglevic

10   describes in his first day declaration the tax-free spin is

11   not our first choice.  It will not result in a full step up

12   in basis, that was a very important tax attribute that our

13   clients were pushing for.  Nevertheless we ultimately

14   concluded that this was the appropriate resolution of what

15   is a very large and very complex case and the disruption and

16   potential degradation to the company's business resulting

17   from a multiyear stay in Chapter 11 was not in the best

18   interest of our clients, not in the best interest of the

19   company, and not in the best interest of any of the

20   stakeholders.

21             So to be clear, Your Honor, speed is fundamental

22   to the way we look at this case.  There are case milestones,

23   they were very, very heavily negotiated, and they're

24   critically important to our committee members.

25             Having said that, again we recognize that if

1    people don't agree with the valuation proposition that is

2    embedded in the RSA they will have every chance to challenge

3    that, indeed a lot of thought was given by the debtor and

4    others as to how information can be made readily on a

5    virtually immediate basis to those that need it in order to

6    challenge these transactions.

7              There is of course another critical important

8    player and that's the Internal Revenue Service.  There are

9    complex multiple rulings that are absolutely critical to the

10   ability to get the RSA transactions accomplished and we will

11   work very hard with the other parties to do what we can do

12   make sure those rulings are received.

13             So, Your Honor, just to sum up we have made very

14   substantial concessions.  The notion that we are stealing

15   the company by getting cheaply priced equity is -- could not

16   be further from the truth.  We are agreeing to a transaction

17   which from our perspective is a major concession.  We will

18   work very hard to try and build consensus with other

19   parties, including Mr. Weisfelner, and we will work

20   cooperatively to do what we can to make sure that these

21   transactions, which we truly believe are in the best

22   interest of all stakeholders, are consummate expeditiously.

23             THE COURT:  Is there a -- is there another RSA in

24   the treatment of the first lien debt, is there a deficiency

25   claim that remains that will be paid pro rata with the

1    second lien and unsecured creditors?

2          MR. KORNBERG:  Yes, Your Honor, there is a very

3    substantial deficiency claim that would share pro rata

4    subject to other intercreditor arrangements and

5    (indiscernible) provisions and the like, but there is -- as

6    drafted there is a substantial deficiency claim which is

7    maintained.

8          THE COURT:  All right.

9          MR. KORNBERG:  And again, Your Honor --

10         THE COURT:  I just wanted to make sure.  Is it the

11   six billion that was suggested?

12         MR. KORNBERG:  I think it's in the 5 to $6 billion

13   arena, Your Honor.

14         THE COURT:  Okay.

15         MR. KORNBERG:  But again, I want to say this is

16   not the end of the story.  As Mr. Sassower said this morning

17   you have to start somewhere in a huge capital structure like

18   this, and we had to understand what the transaction was,

19   what the structure was, what the tax ramifications were

20   before we could then really embark on discussions with

21   others in our silo, but I can assure the Court that we will

22   do that.

23         THE COURT:  Okay, thank you.

24         MR. KORNBERG:  Thank you, Your Honor.

25         THE COURT:  Good morning.

1          MR. DIZENGOFF:  Good morning, Your Honor.

2          THE COURT:  Good morning.

3          MR. DIZENGOFF:  Ira Dizengoff, Akin Gump Strauss

4    Hauer & Feld, we represent, Your Honor, the ad hoc committee

5    of the EFIH unsecureds, and the $2 billion second lien DIP

6    commitment parties, the proposed EFIH second lien DIP

7    financing.

8          Your Honor, I listened to the introductions and

9    they were very good Edward.  Your Honor, I think back to

10   Voltaire, and Voltaire loosely said that the perfect is the

11   enemy of the good.

12         And what we have here today, Your Honor is a deal

13   that's before you, nothing to be approved today, it has a

14   long way to go.  That deal is not perfect, Your Honor, no

15   one would say it is, and the company would be the first to

16   admit that it's not perfect.  But is it good?  Yes, it's

17   good.  Should it be vetted by all the parties?  Yes, it

18   should be.  And should people have the opportunity to

19   express their concerns about it?  Absolutely.

20         Your Honor, this case has been ongoing for a

21   better part of 12 months.  There have been long arduous,

22   vigorous negotiations and we're finally here to start the

23   hard part of the Chapter 11 restructuring, but there's a

24   balancing act in all of this and I know that the Court is

25   very good at that.

1            The issues in this case, Your Honor, are not new

2     to anybody, on my side, on the E side and on the T side.

3     They've been thoroughly vetted, and as Mr. Weisfelner told

4     you, he's got a parade of professionals who have dug in very

5     deep on all these issues, but delay Your Honor costs money.

6     So delay costs millions of dollars every day.

7            In particular on my side of the house under the

8     EFIH side every day of delay where the first lien financing

9     is not done or the second lien financing is not taken out

10    costs our constituents class about $1 million.  So every

11    single day of delay, Your Honor, will come back to haunt our

12    constituent class where it comes out of our hide.

13            Your Honor, there are real --

14            THE COURT:  Where's the loss in value come from?

15            MR. DIZENGOFF:  The loss in value comes

16    effectively out of the picks, which is my constituent class.

17            THE COURT:  Right.  But where's -- but where's the

18    -- where's the daily -- where's the daily made?

19            MR. DIZENGOFF:  It's the difference -- it's the

20    delta between the interest that they currently have to pay

21    on the first and second liens --

22            THE COURT:  Okay.

23            MR. DIZENGOFF:  -- versus what the refinancing is.

24            THE COURT:  Okay.

25            MR. DIZENGOFF:  Your Honor, that's why there was a

1    heavy negotiation about real and meaningful milestones here,

2    and that's why the timeline was a heavily negotiated point.

3    You see milestones in every restructuring support agreement,

4    some are looser than others.  Here it was the subject of

5    arduous negotiations for meaningful reason, because it is a

6    value shifter, Your Honor.

7              So we ask that this Court, Your Honor, proceed

8    with dispatch and do it expeditiously and keep that

9    balancing act in mind, that's at the heart of every

10   Chapter 11.  Everyone should get their day in court but not

11   at the expense of different constituent classes.

12             Your Honor, we have a deal that's good.  Our class

13   is putting up $2 billion, we are doing the proverbial

14   putting our money where our mouth is.  It's a deal that

15   works, and again for this backdrop we think that the hard

16   part of Chapter 11 should begin in earnest and

17   expeditiously.

18             Thank you.

19             THE COURT:  Thank you.  Anything else?

20             All right, should we -- Mr. Sassower, should we

21   turn to --

22             UNIDENTIFIED SPEAKER:  Your Honor, I think I'm not

23   quite up yet.

24             MR. SASSOWER:  Well, I was just going to continue

25   on the motion to adjourn, Your Honor.

1              THE COURT:  Yeah, that's what I thought.  Yeah.

2              MR. SASSOWER:  If I can just make a couple quick

3      remarks, Your Honor --

4              THE COURT:  Yeah.

5              MR. SASSOWER:  -- in response.

6              First the RSA does not set forth the amount of the

7      deficiency claim.  The amount of the deficiency claim will

8      be determined by Your Honor in connection with the valuation

9      hearing, that is unless the parties settle before then.

10     So --

11             THE COURT:  And when do you contemplate that

12     valuation hearing?

13             MR. SASSOWER:  Yeah, and as I -- actually this is

14     exactly what I was going next to, which is the milestones in

15     the RSA provide for a confirmation order to be entered no

16     later than January 29th, 2015.  And as I said in our opening

17     remarks, that I'm sure the TCH second lien holders and

18     unsecureds feel differently about value, and that unless the

19     parties settle before the confirmation order they're going

20     to have -- before the confirmation hearing they're going to

21     have a full and fair opportunity to argue that issue.

22             So Mr. Weisfelner need not be overly concerned

23     about our trying to deprive them of his day in court.

24             MR. WEISFELNER:  With all due respect, and I hate

25     to interrupt, but how do vote on a plan if I don't know what

1    the deficiency claims are?  So to tell me that I've gotten

2    till plan confirmation to get my value set when they want to

3    do a disclosure statement four months before that is

4    sophistry.  I apologize for interrupting.

5              MR. SASSOWER:  No problem, but if the -- you know,

6    if you disagree, Mr. Weisfelner or Mr. (indiscernible)

7    disagree with the debtors' valuation they're going to have

8    an opportunity to come back to this court and they're going

9    to have plenty of opportunity to perform discovery and get

10   ready for that valuation hearing.

11             We're not seeking to shorten or deprive anybody of

12   any of their rights.  We think there's ample time between

13   now and January 29th to have that valuation hearing if in

14   fact it's needed.

15             The only other thing I was going say and I'm sure

16   we'll come back to this in the context of other motions over

17   the course of this case, Mr. Weisfelner made a comment about

18   a conflict among the boards, and I'll just say that we ran a

19   very careful process here.  There are independent directors

20   on every board, the company has a multitude of law firms, it

21   was careful to use different law firms for different pieces

22   of the transactions.  Kirkland, for example, did not do any

23   of the LMP work, that was done by Gibson & Dunn.  Kirkland

24   did not do any of the work to investigate the sponsors.

25   That was done by Sibley & Austin.

1           So, you know, I just didn't want to leave that

2    comment untouched, but I'm sure we'll have an opportunity to

3    kind of delve into the careful board process and

4    consideration process and negotiation process over the

5    course of these cases.

6           THE COURT:  Right.  Thank you. (Indiscernible)

7    before we -- yes, Mr. Schepacarter.

8           MR. SCHEPACARTER:  Good morning, Your Honor.

9           THE COURT:  Good morning.

10           MR. SCHEPACARTER:  Richard Schepacarter for if

11    United States Trustee.

12           I just wanted to take this opportunity to inform

13    the Court that we have a formation meeting that's been

14    scheduled for April the 12th at 10 a.m. and that's going to

15    be held at the Double Tree Hotel -- oh, May.  I keep doing

16    that.  I actually sent the notice out or prepared it and

17    actually made that mistake.  I like April, it was a good

18    month.

19           THE COURT:  May 12th at 10 a.m.?

20           MR. SCHEPACARTER:  May 12th at 10 a.m.

21           I also want to take the opportunity to introduce

22    the Court to Andrea Schwartz.  Andrea is a trial attorney

23    with our office in the sub district of New York and

24    Manhattan and she's been -- she will be assisting us on this

25    case.

1                THE COURT:  Oh, very good.  Welcome.

2                MS. SCHWARTZ:  Thank you, Your Honor.

3                THE COURT:  Anything further with regard to the

4      motion to delay or adjourn?

5                MR. SASSOWER:  The only thing further is if Your

6      Honor would like me to move at this point the first day

7      declaration of Mr. Keglevic into evidence I can do so or we

8      can do it after the motion to adjourn.

9                THE COURT:  Why don't you do it in the context of

10     the motion practice.

11               MR. SASSOWER:  Very well.

12               THE COURT:  All right, Mr. Shore.

13               MR. SHORE:  Good morning, Your Honor, Chris Shore

14     from White & Case on behalf of the ad hoc group of TCEH

15     unsecured noteholders.  With me here today is Mr. Lauria and

16     Jeff Schlerf from Fox Rothschild.

17               I don't think of Voltaire coming in here, I think

18     of Bill Murray, this is like groundhog day for me.  I've

19     listened to another speech by debtors' counsel saying we

20     have a deal, it's a global deal, we're marching towards

21     bankruptcy -- or we're marching toward exit, you have nine

22     months, you're not going to get estate funded, and sorry

23     you're out of the money.

24               We're here because we think we are in the money

25     globally.  I'm not going to argue valuation today.  We're

1    here on first day motions.  Who we are.  We represent more

2    than 50 percent of the $5 billion of unsecured TCEH notes.

3    And if you look at the chart it's a little misleading.  It

4    looks -- misleading may be wrong.  I think maybe you have

5    the big chart on the right which has all the boxes in it.

6    You really have two cases in front of you.  You have on the

7    one side are EFIH and EFH, which are two holding companies.

8    They have no operations, no trade debtors, they are seeking

9    to reorganize in a true balance sheet reorganization.  They

10   are fighting over one asset which is that line that runs

11   down into Encore Holdings, which is the equity value of the

12   towers and wires operation.

13           And on the other side they have some boxes which

14   are legacy companies and one pass through entity which would

15   be the subject of some of our objections on the first day

16   motion.  That is one case.

17           And importantly what you didn't really hear today

18   is there aren't any creditors in that case that are

19   creditors in our cases.  It is a completely distinct set of

20   creditor bodies on the left, not cross-defaulted at all over

21   to the right, and in fact everything in that box was

22   intended to be rain fenced such that any business that

23   occurs between the TCEH debtors and the Encore side is

24   intended to be done at arms length.

25           The other set of debtors, what we call the TCEH

1    debtors is everything from EFCH down.  Two (indiscernible)

2    companies and then 40 boxes.  The unsecured notes have

3    guarantees in all of those boxes and in the box up at EFCH.

4              So unlike the Encore restructuring that's going on

5    you have a 40-plus debtor case which represents the

6    electrical generation operations of this company along with

7    all the power plants in the ground and the retail energy

8    operations that you heard about this morning.  That is a

9    distinct case with creditors who don't cross over to the

10   Encore side, have no rights in the Encore side.

11             We have no claims, direct claims against EFH on

12   the bonds, we don't have direct claims against EFIH, we

13   don't have direct claims against the Encore debtors.  What

14   we do have is claims against every single one of those TCEH

15   debtors.

16             And so when you hear about the global

17   restructuring, and maybe you heard a little frustration from

18   Mr. Weisfelner as well, that there was a great and grand

19   restructuring at EFH along with its sponsors and everybody

20   got on board with that.

21             At the TCEH debtors, which in and of themselves

22   are the largest operating company ever to file in Delaware,

23   WAMU is the biggest case, of that group they have 41 percent

24   of the secured lenders -- I'm surprised it's not more and we

25   probably should see it go up with the deal that's on the

1    table -- and not one single unsecured or second lien

2    creditor who supports the deal.  Not one trade creditor, not

3    one creditor within that box has had formal negotiations

4    with the debtors other than to have the debtors say we're

5    happy to be as expansive and effusive as possible talking

6    about your rights once we get into the case.

7              But this global restructuring that is on the table

8    contemplates a cram down at 40 estates over the no votes of

9    all of the creditors there who are to share some hundred

10   millions of dollars assuming that we don't as part of the

11   first day have all that money pledged to either the DIP

12   lenders or provided -- provide adequate protection liens on

13   it.  That's the global restructuring they want to walk

14   towards.  It is not a global restructuring, it is a

15   judicially supervised foreclosure proceeding that is

16   proceeding in this court and not down in Texas with respect

17   to all that real property, plant, and equipment that's

18   sitting down there.

19             They have come to this court because they have

20   that tax issue, which is going to be a huge conflict issue

21   in this case that they need to resolve on the other side.

22   They brought that debtor in here and have asked to have what

23   this Court do a judicially supervised foreclosure, which

24   you'll see when we get to cash flows, we have some cash

25   flows, we need more, it's going to just burn a billion

1    dollars of professional fees and at the end of the day hand

2    all of these companies over to the secured lenders.

3            We're not obviously happy with that deal.  We're

4    not here to fight the deal today.  I will fight the deal,

5    we'll all fight the deal, but we just have to make sure that

6    the playing field is level.  We're here to preserve the

7    grass on the field.

8            What's going on today we fear is that people are

9    drawing lines on the field and the 50 yard line is going to

10   marked down where the 20 yard line should be and they're

11   going to say go.  You'll have your day in court, you just

12   have to go 80 yards to get to the touchdown and you have

13   minutes to get there.  We don't want that.  What we want

14   today is to just preserve the grass.

15           We'll come back and have these fights about second

16   and third day hearings and all that other stuff, but what we

17   can't do is have first day hearings result in substantive

18   relief that's going on.

19           I tallied up all they're asking for just on the

20   TCEH side, and let me make clear the motion to adjourn is

21   not about the Encore debtors, they can do what they want.

22   These are the debtors against whom we have claims.  And I'm

23   not asking to move the first day hearings, we're all here.

24   What I'm asking for is just a simple protocol.

25           What do we need to do today on 36 hours of notice

1    with 1700 pages filed?  What do we need to do today to get

2    us to a quick next hearing?  If there are things that they

3    can present today they have to do to get us to next week

4    fine, we can agree with it, but they -- what they're doing

5    today is seeking (indiscernible) authority to pay out

6    $682 million to prepetition unsecured creditors.  That is

7    unsecured creditors who would otherwise be getting blanked

8    under this plan will be getting paid in cash on the first

9    day.

10              We agree there are always people who need to be

11   paid on the first day.  There are going to be critical

12   vendors, particularly in this business, there are

13   environmental issues, you can't shut it down, we're not

14   trying to shut it down.  We're just asking for some rigor

15   with respect to how they approach what they really need in

16   this.

17              Included in that amount going to unsecured

18   creditors is a requested $70 million of payment to the out

19   of the money equity on account of a prepetition claim on an

20   executory service contract.  If you put a multiple on any of

21   that, to the extent any of it is tied to EBITA numbers

22   you're talking about a giant amount of enterprise value that

23   they want to send out on the first day.

24              You know, Your Honor, that we will sit down and go

25   through first day pleadings with people and agree on relief.

1    We're not here to shut the business down.  We have asked, we

2    like everybody else formed early, we have asked for first

3    day motions for a long time.  We asked for them as late as

4    last week, got nothing.  The first time we saw any of what

5    they wanted to do with respect to the DIP and a cash

6    collateral motion and the cash management motion was the

7    same time Your Honor got those pleadings on the docket.  So

8    we then reached out.  Guys, can we sit down and talk about

9    what you really need to get us to a hearing so that we can

10   make sure that what's not happening here is we find out that

11   money went out the door, a $70 million payment to the parent

12   went out the door that we can't get back because it's been

13   authorized by the Court?  Could we just have a little time

14   to diligence?  Nope, first day hearing is Thursday morning

15   we're going ahead with the first day and you're here now,

16   second day hearings we'll have some time in June.

17            That's what they want, but we can't be anymore

18   than Your Honor can -- well we have many more people to do

19   it, so I don't mean to minimize the burden on Your Honor --

20   but get through the amount of material they want to do on

21   the first day particularly when we're not getting

22   comfortable with what we're finding in the documents that

23   are there.  Liens -- well we're not taking liens or

24   avoidance actions we're taking liens on proceeds of

25   avoidance actions.  There are no marshalling provisions in

1    the DIP or the cash collateral order which allowed them to

2    foreclose on our -- on the unencumbered assets any way.

3            So what we're asking today is just a two-step

4    protocol with respect to each of these first day motions.

5    What do we need to do to get through to a setting next week

6    and then what can we push to some hearing to the final

7    hearing, or some further interim hearing.

8            But what they've done is they've dumped everything

9    on the Court and the parties and said, sift through it, sift

10   through it and you better come forward with your objections

11   today, otherwise, it's gone.  I'm not sure what's going out

12   to unsecured creditors, $682 million.

13           They are seeking authority today to pay for -- to

14   borrow under the DIP, make an interim draw on the DIP and

15   then pay $400 million to the first lien to the lenders, $300

16   million on account of their prepetition claim and current

17   post petition interest.  This is the lenders who said

18   they're willfully undersecured, they want current pay of

19   their post-petition interest, as long as -- as well as a

20   topping up of their prepetition claims.

21           They're going to be enterprise value, even if it's

22   just cash, that's going to be used in the valuation, and not

23   up to the other side, there's a DIP that needs to be taken

24   out.  They didn't even (indiscernible) that money.  And

25   they're going to tell you that they're going to refuse to

1    consent to cash collateral unless Your Honor allows them to

2    get paid current on their prepetition interest and get post-

3    petition interest paid current?

4           They're taking $1.2 billion of a draw on the DIPs

5    at TCEH on the first day to cash collateralize LOCs, extent

6    LOCs, some of them, and some unknown amount of a new LOC

7    capacity that's needed.

8           They're asking to pay $280 million on their DIP

9    budget of additional professional fees.  In other words,

10   they want to take a draw on the DIP to fund the accrual of

11   professional fees.

12          So what I'm asking, and we don't need to do

13   anything now, I can carry it and deal with it in the context

14   of the motions we are most concerned about, ask that we

15   really take a two-step process.  What do we have to get

16   today, find the time next week when we can come back to the

17   Court and address these issues.

18          And it's not just -- this is -- there is a great

19   deal of process problem that's going on here.  You may have

20   seen they filed a motion to quash last night.  As soon as I

21   got the first day declaration, Mr. Lauria sent an e-mail to

22   Kirkland, we'd like the first day declarant to answer some

23   questions.  Silence through the first full (indiscernible).

24          Notice of deposition got sent yesterday morning.

25   Silence.  I asked, are we going to have a deposition, I've

1    got a reporter ready, we're -- Fox Rothschild last night.

2    At 4 o'clock, I got a response, oh, I'm sorry we didn't get

3    back to you, the notice or the motion to quash is being

4    filed now.  The one that says that they talked to me, they

5    didn't talk to me.  There's been nothing.

6           So we're coming in on a first day hearing, they

7    want to put a declarant on, who they refuse to provide a

8    deposition on, arguing that there wasn't enough time to do

9    it, but they needed seven days' notice to respond to a

10   subpoena or notice of deposition, but instead what we have

11   to do today is deal with everything we need over the next 30

12   days, let more than $2 billion out the door before we get to

13   June, and then come back and respond.  That's not a fair

14   process.

15          So we're just asking again to -- if we can take

16   this somewhat measured today and going through the first day

17   hearings, and figure out what do we have to do today to stop

18   the bleeding to make sure that the grass is safe, and then

19   have a quick setting, with some time to have discussions

20   with them about the rest of the time up to the final

21   hearings, to take discovery to the extent we can't get the

22   answers we need, but they can't just come in here and seek

23   to trade away our recoveries on the first day, and then say

24   it's unfair for them to have to follow the rules.

25          THE COURT:  Thank you.  Anyone else?

1            MR. WEISFELNER:  Your Honor, just for the record,

2    we would join in counsel's motion to adjourn, and again

3    emphasize that it doesn't relate to anything having to do

4    with EFIH, it's only Matis' (ph) side.

5            THE COURT:  I understand, thank you.

6            MR. MAYER:  Good morning, Your Honor.  For the

7    record, Tom Mayer from Kramer Levin.  My understanding is

8    the motion to set the DIP date is not up before you at this

9    instant.  We're just going to hold our remarks until then if

10   that's okay.

11           THE COURT:  I don't understand that, what you just

12   said.

13           MR. MAYER:  Well, the question is procedural, Your

14   Honor, and I have watched -- I understand sometimes you want

15   people not to wait till the last minute and lose their

16   chance to speak.

17           What is up before the Court at this instant is a

18   motion to adjourn the entire first day hearings, we filed an

19   objection to the motion to set a date for the DIP.  I'm

20   happy to wait until we get past the motion to adjourn, and

21   deal with it at that time.

22           THE COURT:  (indiscernible) objection and motion

23   to set the DIP, you're talking about which DIP and which

24   (indiscernible)?

25           MR. MAYER:  Your Honor, one of the motions that's

1    been filed that's actually asking for relief, the motion

2    before you is to set a date to hear the approval on the

3    first lien DIP.  And although it hasn't been filed --

4              THE COURT:  All right.  (indiscernible)

5              MR. MAYER:  Correct, I beg your pardon, Your

6    Honor, yes.

7              THE COURT:  Okay.

8              MR. MAYER:  And I would -- I'm happy to wait until

9    that motion is formally presented unless you want remarks.

10             THE COURT:  No.  All right.  We'll wait on that

11   one I think, okay.

12             MR. SASSOWER:  Your Honor, what they -- the TCH

13   unsecured ad hoc committee filed was a motion to adjourn the

14   hearing a week.  It sounds like since the time they've filed

15   it, it's morphed into a motion for a two-step process, which

16   is what I thought -- this is what I thought the way

17   bankruptcy actually worked, which was an interim hearing and

18   a final hearing.

19             All the leave that we're asking for, except in one

20   limited instance which will explain to Your Honor in the

21   context of that motion, is asking the Court for interim

22   relief.  And the standard is clear, irreparable harm.  It's

23   pretty common to have the first day hearing on the first day

24   or the second day of the case.

25             So I don't think we're doing anything that's

1   unusual here, and seems like I'm not even sure if there's

2   anything to argue against anymore, given what Mr. Shore just

3   presented to Your Honor.

4           THE COURT:  Okay.  Thank you.  All right.  Well,

5   in the context of Mr. Shore's comments and in connection

6   with the motion to adjourn, (indiscernible) counsel that

7   what I heard was sort of the preview or (indiscernible) some

8   context to comments that will come as we go along in each

9   motion, which is for the Court to (indiscernible) the Court

10  take a very careful look at what truly is (indiscernible)

11  and appropriate (indiscernible).  And what I heard was that

12  not that there was some sort of problem with an interim and

13  a final basis, but given the press of time, the amount of

14  paper, lack of preview, et cetera, it's really not fair to

15  even have an interim hearing on a certain of the things that

16  the debtor wants to have an interim hearing on.

17          So while I understand that argument, and it has

18  some allure, I would think that I do have to look at each of

19  the motions, while in the global context of the RSA, et

20  cetera, also in the global context of due process, which I

21  take very, very seriously.

22          So as we go through, I expect I'll hear the

23  objections in connection with what I can or not can, what I

24  should or shouldn't do in connection with how far the

25  interim relief will go.  But I'd like to hear a response

1    from the debtor before we move forward, as to the issue of

2    how presenting their witness for deposition.  If you could

3    respond to Mr. Shore's comments.

4              MR. MCKANE:  I'm happy to do so, Your Honor, for

5    the record, Mark McKane, Kirkland & Ellis, proposed counsel

6    for the debtors.

7              We received a request to depose Mr. Keglevic I

8    believe in the last -- it's now been 28 hours, and at that

9    time, we were already in the midst of finalizing the

10   preparation for today and being enroute down here.  When we

11   received the request of it, we reached back to them, and I

12   believe we explained through e-mail, and this was all

13   through e-mail correspondence to my knowledge, that Mr.

14   Keglevic was here, that he be available for cross-

15   examination on the first day on all issues, and that -- and

16   actually at that time, my understanding was Mr. Shore was --

17   that was acceptable, that he accepted that response.  I

18   think we got back to him when we were enroute down here

19   approximately 4 o'clock yesterday.

20             THE COURT:  Okay.  Mr. Shore.

21             MR. SHORE:  For the record, it is not accepted.

22             MR. MCKANE:  And there's no question, Mr. Keglevic

23   is here, we'd like to move the first day declaration into

24   evidence as the principal of evidentiary foundation.  There

25   are other supplemental declarations that have been presented

1    and filed on the docket for -- to address specific issues

2    that have been raised, and I believe resolved by the United

3    States Trustee.  But they're available for all creditors.

4           All of the -- all the declarants are available for

5    cross-examination if any of the creditors have any questions

6    regarding the first day relief.

7           THE COURT:  All right.  Well, in connection with

8    the evidence and making the affiants available for cross

9    which is what we do generally speaking of course in first

10   day hearings, I -- it's less than ideal, of course, because

11   for nothing else, it makes a less efficient process, and

12   less efficient use of court time.  But I don't think in the

13   context of getting a first day relief in front of the Court,

14   that it's inherently unfair to allow the process to go

15   forward where there is not an actual deposition of a witness

16   before the hearing.  It would be nice if there were an

17   opportunity to do that, but it's rarely, if at all,

18   practical.

19           So I will, again subject to cross-examination,

20   accept the declaration of Mr. Keglevic.  Is that right,

21   Keglevic?  In evidence, which was Docket item 98.  Docket

22   item 98.  And obviously that will be subject to cross on

23   each motion, as it comes up.

24           So I'll turn it at this point over to the debtor

25   to proceed.  And -- just a moment.  I understand we'll be

1    going in the order of the notice of hearing that was filed

2    at Docket 108 yesterday.

3          MR. HESSLER:  Yes, Your Honor, again just for the

4    record, Steve Hessler of Kirkland & Ellis, proposed counsel

5    for the debtors.

6          I do believe we're now at the point of turning to

7    the filed agenda.  Sure.

8          MS. SCHWARTZ:  Just one second.

9          MR. HESSLER:  Yeah, sure.

10         MS. SCHWARTZ:  Good morning, Your Honor, Andrea

11   Schwartz for the U.S. Trustee.

12         Your Honor, thank you for allowing me here today.

13   Your Honor, I have been down here in Delaware for the past

14   four or five days assisting Mr. Schepacarter and working

15   cooperatively with the debtors who have, for the record,

16   Your Honor, been very, very cooperative with the U.S.

17   Trustee's office and made themselves available.

18         I just, unfortunately, Your Honor, will have to

19   take a train back to New York around 12:30, and I just

20   wanted to request permission to be able to leave if the

21   proceedings were continued past that time.  Thank you, Your

22   Honor.

23         MR. HESSLER:  Your Honor, on that note, I do on

24   behalf of the debtors also want to extend our appreciation

25   to Mr. Schepacarter and Ms. Schwartz.  They -- as she just

1    indicated, we have had extensive conversations in advance of

2    today and the feedback and guidance that they have given us

3    on our motions has been very, very helpful, in our

4    preparations for the papers, and other information that we

5    put before the Court, so thank you again for your time and

6    courtesy on that front.

7            Your Honor, so turning to the agenda, the first,

8    first day motion before the Court is the -- actually before

9    I turn to the agenda, just one very quick thing, additional

10   recordkeeping point.

11           In addition to moving the first day affidavit into

12   evidence, we just wanted to for the purposes of indicating

13   for the record with regard to notice, we did have an

14   affidavit of service filed by Epiq, the debtors' claim

15   administrator.  It's at Docket No. 212.  It's over 60 pages

16   long, and I think it evidences at great length the efforts

17   that we went to identify and provide notice to all relevant

18   stakeholders.  So I just did want to note that for the

19   record, Your Honor, before we turn to the agenda.

20           THE COURT:  Okay.

21           MR. HESSLER:  Your Honor, the first item on the

22   agenda it appears is item C.1.  It's the debtors' motion for

23   joint administration of their Chapter 11 cases.  This motion

24   seeks to allow for the joint administration of the 71 cases

25   filed by the debtors.  Your Honor, we are aware that this

1    motion is routinely granted in essentially every multi-

2    debtor case without the need for much argument, but there

3    was a quite extraordinary objection filed by the TCEH

4    unsecureds ad hoc group late last night.

5            And for that reason, I will spend a longer moment

6    than normal, justifying the relief that we are seeking, Your

7    Honor.

8            THE COURT:  Okay.  Give me a few seconds to find

9    something.

10            MR. HESSLER:  Of course.

11            THE COURT:  Oh, there it is, thank you.  Go ahead.

12            MR. HESSLER:  Thank you, Your Honor.  Under

13    Bankruptcy Rule 1015(b) provides in relevant part that if

14    two or more petitions are pending in the same court by a

15    debtor and an affiliate, the Court may order a joint

16    administration of the estates.  But I don't believe there's

17    any argument as to that the 71 debtors in these Chapter 11

18    cases are affiliates, as defined in Section 1012 of the

19    Code.

20            So we believe the standard is pretty straight-

21    forwardly satisfied before you.

22            Your Honor, our motion states very clearly at the

23    outset, as it must, that the joint administration of these

24    cases is for procedural purposes only, not for any

25    substantive purposes.  And that maintaining a single docket

1    will provide convenience and cost savings by avoiding

2    duplicative filings and monitoring burdens in hypothetically

3    71 cases.

4             One of the objections that was filed, spends

5    approximately 39 pages setting forth the litany of

6    allegations about purported conflicts between the estates

7    that should preclude joint administration.

8             As an initial matter, Your Honor, the debtors

9    believe that those allegations are inaccurate, inappropriate

10   and entirely inapposite for the purposes of this motion.

11            Your Honor, one other discovery that the ad hoc

12   group ultimately may be entitled to take, or whatever claims

13   they ultimately may be entitled to pursue, that actually

14   would be facilitated, not hindered, by the maintenance of a

15   single docket in a single proceeding before the same judge.

16            Your Honor, even if the ad hoc group somehow is

17   able to establish that the cases should not be jointly

18   administered down the road after they've had their

19   discovery, you know, Your Honor, and again, jointly

20   administered for procedural purposes only, it's certainly

21   within your Court's authority to separate the proceedings at

22   that point in time.

23            But as we are before you today, Your Honor, with

24   the record before you, we believe there is no justifiable

25   basis for denying the debtor's motion.

1            THE COURT:  Okay.  Thank you.  Mr. Shore.

2            MR. SHORE:  Can I call a witness?

3            THE COURT:  Yes, you may.  We -- somebody get rid

4    of the carts if you don't mind.  Yes.  I'm sorry, you're

5    calling -- do you want to cross Mr. Keglevic, or are you

6    calling a witness?

7            MR. SHORE:  Yeah, I'd like to cross him.

8            THE COURT:  All right.  Mr. Keglevic, please, just

9    take the stand here, sir.  Yeah, step up there, yep, remain

10   standing and --

11           THE CLERK:  Would you raise your right hand?

12               PAUL KEGLEVIC, WITNESS, SWORN

13           THE CLERK:  Thank you.  State and spell your name.

14           THE WITNESS:  It's Paul Keglevic, K-e-g-l-e-v-i-c.

15           THE CLERK:  Thank you.

16                  CROSS-EXAMINATION

17   BY MR. SHORE:

18   Q    Good afternoon, Mr. Keglevic.  I'm Chris Shore from

19   White & Case on behalf of the TCEH noteholders.  You're an

20   officer of TCEH, right?

21   A    That's correct, Mr. Shore.

22   Q    All right.

23   A    So good afternoon.

24   Q    I represent $2.5 billion of your unsecured creditors

25   here today, or actually .7 billion dollars.

1       Have you ever filed or been involved in a joint

2    administration before?

3    A    I have not.

4    Q    Okay.  Can you explain to the Court what the immediate

5    and irreparable harm will be if this motion is not heard on

6    June 1?

7    A    My biggest concern with respect to this case being

8    segregated, I mean, this is a balance sheet restructuring,

9    and we have creditors all over the United States, but most

10   of them are concentrated in the U.S., and we believe it's

11   appropriate to have the venue here.  And we also believe

12   that for convenience and to reduce costs and be as efficient

13   as possible that, in fact, the cases should be kept

14   together.

15   Q    Can you tell the Court what your understanding is of a

16   what a joint administration motion is?

17   A    I'm not a lawyer, so I would not perhaps be the right

18   expert to answer that question.

19   Q    Okay.  Can you quantify for the Court in any way any

20   administrative savings that will occur if we don't hold the

21   joint administration motion until June 1?

22   A    I haven't done that calculation.

23   Q    Has anybody done that calculation on your behalf?

24   A    I've not asked for anybody to do that calculation.

25   Q    Okay.  And can you explain -- you say in your

1    declaration that it's going to save costs.  What's it mean

2    by that?

3    A    Well, I think I described the efficiencies associated

4    with having the course -- the cases together.  I think also

5    we have all the professionals ready here, ready to go, and I

6    think a delay in time is just going to, you know, incur

7    additional costs.  Time is not a friend of cost with request

8    to this type of proceeding.

9    Q    Uh-huh.  And that's the extent of your answer on what's

10   going to -- what savings will occur between now and June 1

11   if we don't adjourn the motion until then?

12   A    Yes.

13   Q    Okay.  And just so we're clear on the savings part,

14   assume the cases stay together and there's discovery that

15   goes on this week, or next week and the following week,

16   okay, understand that, you understand that will create some

17   costs, right?

18   A    Yes.

19   Q    And if the cases are called together, would you be

20   expecting the -- your first lien lenders on the Encore side

21   to be participating in the discovery that's occurring in the

22   TCEH side?

23   A    No, not necessarily, but I would think the management

24   team, who represents both sides, such as myself, who split

25   our time, have cases in one location at one time would be

1    more efficient for all of the people that we have that work

2    on both, as well as our lawyers and representatives.

3    Q    Yeah, and that's why I asked you whether you understood

4    what a joint administration motion was.  I just want to make

5    clear, we're not trying to split the cases apart, we're just

6    trying to have two separate filing numbers for them.

7         Can you explain how having two separate filing motions

8    in two places for the creditor bodies to file their motions

9    will increase drain on management?

10   A    I cannot, I defer to my attorneys.

11            MR. SHORE:  Okay.  I have no further questions,

12   Your Honor.

13            THE COURT:  All right.  Redirect?

14                     REDIRECT EXAMINATION

15   BY MR. MCKANE:

16   Q    Mr. Keglevic, in identifying the need to facilitate or

17   a request for a joint administration, is it your

18   understanding that part of that need is to facilitate a

19   burden on the Courts and on the clerk's office, and on the

20   administration of the cases in general?

21   A    Yes.

22   Q    And is it your understanding after working with your

23   professionals in preparing for these cases, that a joint

24   administration of this case from the beginning would

25   facilitate and reduce the overall cost burden on the

1   estates?

2            MR. SHORE:  Objection, leading, Your Honor.

3            THE COURT:  Sustained.

4            THE WITNESS:  Well, I hope I covered that in my --

5            THE COURT:  I sustained the objection.

6            THE WITNESS:  Sorry.  Sorry, Your Honor.

7   BY MR. MCKANE:

8   Q    What is your understanding, based on your preparations

9   for today as to why joint administration would reduce costs,

10   just as a general matter for these proceedings?

11   A    Just simply my advisors and the people at EFH that work

12   for both sides, you know, both the E side and the T side as

13   we've described them to date, it is more efficient to work

14   together on the administration of these cases, than to be

15   brought in to separate cases at different times.

16            MR. SHORE:  Motion to strike, hearsay, Your Honor.

17   The witness --

18            THE COURT:  Sustained.

19            MR. MCKANE:  No further questions at this time for

20   this witness.

21            THE COURT:  Okay.  Specific to what was asked of

22   him, Mr. Shore.

23            MR. SHORE:  No, I'm just rising on my objection

24   again then, Your Honor.

25            THE COURT:  Oh, we don't -- the witness then?

1           MR. MCKANE:  We can excuse the witness then?

2           MR. SHORE:  We can excuse the witness.

3           THE COURT:  Okay.  Thank you, sir.  You may step

4    down.

5           THE WITNESS:  Thank you.

6           THE COURT:  If we call you later, which I expect

7    we will, your affirmation will apply at that time, so I

8    don't need to keep reswearing the witness.

9           MR. SHORE:  At this time, I'd just like to strike

10   those portions of Mr. Keglevic's declaration that pertain to

11   joint administration.  I found at the very back of his

12   supplemental declaration, which is the exhibit to his thing,

13   which are found at paragraphs 290, 291, 292 --

14           THE COURT:  Hang on, hang on, what --

15           MR. SHORE:  I have a copy for Your Honor if you

16   want it.

17           THE COURT:  Well, I have his declaration.  What --

18   I'm not sure I understand the --

19           MR. SHORE:  Okay.  The --

20           THE COURT:  The (indiscernible) declaration isn't

21   in evidence yet.

22           MR. SHORE:  The declaration is a declaration with

23   an exhibit.

24           THE COURT:  Yeah, oh, okay.

25           MR. SHORE:  If you look at the exhibit at the very

1    back, paragraphs 290, 291 and 292, I move to strike on the

2    basis that the witness lacked personal knowledge of many of

3    the matters, lacked the competency to testify with respect

4    to the matters he testified to there, and to the extent it

5    was based on what other people told him, Your Honor has

6    sustained the hearsay objection.

7              MR. MCKANE:  Your Honor, may I be heard on the

8    motion to strike?

9              THE COURT:  Yeah.

10             MR. MCKANE:  Your Honor, I don't believe any of

11   the testimony solicited by Mr. Shore on cross-examination

12   undercuts the foundation for his testimony, Mr. Keglevic's

13   testimony in paragraph -- in those paragraphs.

14             For example, in the joint administration paragraph

15   290, he -- Mr. Keglevic states his understanding the

16   maintaining of one file and one docket, and a request to be

17   made in these cases, and that's one of the purposes to have

18   an early request in these cases.

19             And 291, the estate is understanding that the 71

20   dockets are affiliates and therefore satisfy that portion of

21   the Code.  And that they had a highly integrated set of

22   operations.  There's been no testimony here to suggest

23   otherwise.

24             That he also goes on to say, "I believe that joint

25   administration in these cases will provide significant

1    administrative convenience, without harming the substance

2    and rights of any party in interest."  I haven't heard any

3    testimony from Mr. Keglevic today to suggest otherwise.

4            And he also stated he understands that "many of

5    these motions will affect each and every one of the

6    debtors."  And in other words, to the extent that Mr. Shore

7    has elicited some testimony that he wants to use to advance

8    his argument, it doesn't mean it undercuts the affirmative

9    evidence that's already been put in from Mr. Keglevic on

10   those issues.  And therefore, the motion to strike would

11   have to be denied.

12           THE COURT:  Thank you.  Mr. Shore.

13           MR. SHORE:  Well, I was just about to say well,

14   that's what I said.  The -- on the allegations, he hasn't

15   been involved in a joint administration motion before, he

16   doesn't have any study or analysis on the cost savings in

17   the next 30 days of pushing this motion off till then.  He

18   couldn't articulate a single fact to support his testimony

19   that there's going to be administrative convenience during

20   this time period.  It's the wrong witness.  They can put the

21   right witness on if they still want to jointly administer

22   when we get to a final hearing.

23           THE COURT:  All right.  Thank you.

24           All right.  Well, in connection with the motion to

25   strike (indiscernible) simply states what the motion states,

1   which is that it is what the debtors are requesting, since

2   his (indiscernible) the debtors, I think he can describe,

3   and I think he can elicit what he understands what it is

4   they're asking for.  So that's allowed.

5          The (indiscernible) paragraph 1891, I think the

6   witness has really -- did testify but in a broader context

7   of how the case will run in the future.  The witness is

8   certainly specific to why an interim order as opposed to a

9   general final order may have been needed, but I think --

10  well, I don't think, I will allow it in the context of the

11  broader issue.  What joint administration generally means in

12  connection with (indiscernible) you operate in a state,

13  there's no question in my mind that there are administrative

14  (indiscernible) that exist both from the court side and from

15  just managing the day-to-day flow of paper from the debtors'

16  side.  So I'll admit that or continue to admit that.

17          (Indiscernible) 1092 it's fairly basically I

18  believe oral argument if nothing else.  Anything further,

19  Mr. Shore?

20          MR. SHORE:  No.  If I may proceed with my

21  objection now?

22          THE COURT:  Yes.

23          MR. SHORE:  All right.  Let me be clear about what

24  we want.  I'm not asking for 71 cases and separate

25  administration till the end of the month.  We have no

1    objection to however they want to consolidate beyond core

2    debtors, which are every debtor before Your Honor other than

3    EFCH and its direct and indirect subsidiary.

4            We have no objection to a consolidation of EFCH

5    and all of its direct and indirect subsidiaries, but what we

6    and the debtors have been called the TCH debtors.  What we

7    do object to on an interim basis, is the joining of the

8    Encore cases with the cases of the TCEH debtors until we've

9    had a further opportunity to address issues related to cost

10   savings and the like, and more importantly, issues of

11   conflicts.

12           We filed a pleading last night, sorry, we tried to

13   get everything in as quickly as possible, that says just

14   that.

15           THE COURT:  I read it.

16           MR. SHORE:  Okay.  1015(b) allows you, we're not

17   disputing, they're all affiliates, all 71 are affiliates,

18   the question is, in the interim period, is this -- what are

19   we doing about administrative overlap, administrative

20   efficiencies and dealing with conflicts?

21           The witness testified he couldn't articulate any

22   immediate irreparable harm for keeping the non-consolidation

23   of those two cases going on.  So I'm not sure with the

24   record in front of it, why we need to address this issue

25   today, other than in the interim period in the next 30 days,

1    people are either going to have to file in a TCEH case, an

2    Encore case, or both.  Which will lead to maybe no

3    duplication, at most, two more sets of filings, to be dealt

4    with in that period.

5         From our perspective keeping it separate is going

6    to cut down on what's actually going to be happening in the

7    next 30 days, which is a flurry of interactions between the

8    Encore debtors and their creditors on one side, and the TCEH

9    debtors and their creditors on one side.  And keeping it all

10   with the debtor is going to create the problem where

11   everybody's going to be appearing on everything, because the

12   case gets called.

13        Just asking for an interim period to call a TCEH

14   debtor case, call an Encore case, and quite frankly, call

15   them together.  What we are most concerned about here is the

16   issue of conflicts.  1101.5(b) requires that the Court take

17   into consideration the conflicts that exist between the TCEH

18   debtors on the one hand, and the Encore debtors on the

19   other.  And we think those conflicts are manifest.

20        We filed last night a declaration with attachments

21   that deals with many of these issues, we'd like to move that

22   into evidence.  It's just news articles and other support

23   for the conflicts that exist, not to prove that case today,

24   but to sensitize to everybody to the issues that exist

25   between the TCEH debtors on the one hand, and the Encore

1   debtors on the other.

2           Again, no creditor overlap between the two.  They

3   are two islands, and they only intersect in one place,

4   shared services, which was a box on one of these charts

5   before, which is a pass-through entity, direct subsidiary of

6   EFH.  So the TCEH debtors have no equity interest in that

7   entity.

8           And that entity for us, and I'll come back to it

9   on cash management, explains the problem we're going to have

10  in jointly administering these cases, both in the interim

11  and the long term.

12          EFH has a shared services agreement with TCEH.

13  TCEH has under that agreement, which has not been assumed or

14  rejected, paid $2 billion to EFH, which has been distributed

15  out to, among -- from the declaration, distributed out to

16  either third party vendors or through the corporate

17  enterprise on reimbursements.

18          It is a $70 million prepetition claim.  Shared

19  services, $70 million in TCEH.  As part of the cash

20  collateral or cash management motion which has been brought

21  by both the TCEH debtors and the shared service debtor in

22  their cases today, a request for reimbursement of the $70

23  million cash pay, not an admin claim for the payment of

24  intercompanies the way you see in a cash management motion,

25  or a freezing of intercompany claims as of the petition

1    date, but an actual cash funding $69 million out the door

2    today to pay EFH or sorry, EFH shared services that

3    prepetition claim.

4            If these are not jointly administered cases, in

5    other words, each debtor have to file that motion, EFH has

6    to file a motion -- EFH Services had to file a motion to

7    allow it to continue to take cash and disburse cash, and the

8    TCEH debtors had to pay, had to file a motion and say, I

9    want to pay one of my affiliates $70 million, that's where

10   the conflict shows up.  And it's a real conflict, and it's

11   one that's going to need to be dealt with.

12           I don't need to argue that motion next, but it's

13   the problem of joint administration between these cases.

14   That's a small conflict.

15           We laid out for Your Honor material ongoing

16   unresolved conflicts between those two estates, that date

17   back to the LBO, that deal with intercompany lending

18   arrangements that occurred, that deal with the tax sharing

19   conflict which they came in and tell you they had today.

20   Which is, they've got some estates which have benefited by a

21   certain tax treatment, and some of estates are hurt by a

22   certain tax treatment, but we're going to jointly administer

23   these two cases on the biggest -- on the first thing that

24   was affecting negotiations between the parties, we're going

25   to jointly administer these cases in order to resolve in a

1    comprehensive plan that inter-debtor estate conflict.

2            They're going to come up with reasons why there

3    isn't a conflict.  They're going to point out reasons before

4    we get to the final hearing why what they said is what I

5    said is untrue, and it's overstated and what not.

6            But what we don't want today, and there's no

7    evidence that we need to deal with today is one order which

8    will jointly administer TCEH debtors with the Encore

9    debtors, and start us down the path of why it's commonly a

10   joint administration.  It's also commonly had one plan, you

11   have one disclosure statement, and you have one timeline.

12           When what you heard today is why don't we have two

13   timelines?  We have an operating business and we have a hold

14   co restructuring.  The only reason they're tied to together,

15   was the deal that was cut between the EFIH unsecureds and

16   the secured creditors, our secured creditors at TCEH, both

17   agreed not surprisingly that velocity was their friend.

18           And so we're starting this process without any

19   consideration of the conflicts that the Court shall take

20   into consideration.  And what we're going to do to manage

21   that.  We don't need a reading on the conflicts today, we

22   just need what -- for the Court to do is just hold off the

23   joint administration of those two cases, allow for the next

24   30 days, things to be filed, and full reservation on the

25   rights of the debtor to come in and argue that the cases --

1   those two cases should be put together.  And hopefully we'll

2   have a witness at that time to come in and really say, here

3   are the savings, here are the benefits of doing this that

4   outweigh the prejudice that occurs when you don't have two

5   estates in conflict in with each other at arm's length

6   coming in and dealing with each other jointly on the same

7   motion filed in the same case.

8           THE COURT:  Thank you.

9           MR. MCKANE:  Your Honor, I feel it's necessary to

10  level set what we're seeking to do here.  This is the joint

11  admin motion.  Nothing with this motion involves a shared

12  services agreement or any payments thereunder.  That's going

13  to be the subject later on today.  A lot of what Mr. Shore

14  was mentioning with regard to a $77 million payment, that's

15  not even occurred today, but no matter what, it's not going

16  to get heard in the context of a joint admin motion.

17          Nothing in the joint admin motion affects the tax

18  sharing agreement or the parties under the tax sharing

19  agreement, the rights and obligations under the tax sharing

20  agreement.  Nothing under the joint admin notice, if and

21  when the Court enters it, if there's a ruling on any alleged

22  conflicts, we're not asking for any of those things.

23          We're asking for a single caption, a single docket

24  for administrative convenience, no substantive impact for

25  the administrative convenience of these proceedings.  And I

1      think that's the important -- that's the prism for which

2      we're presenting this motion, Your Honor.  That's the very,

3      very limited relief we're seeking.

4              I also want to point out, Mr. Shore spent some

5      time with the witness in part of his argument, that we

6      cannot establish that there will be irreparable injury to

7      the debtor if the joint admin motion is not approved.

8              Your Honor, Rule 6003 sets forth when irreparable

9      injury is needed for first day motions.  The joint admin

10     motion for quite plain reasons is not one of the motions for

11     which you need to establish immediate and irreparable

12     injury.

13             6003(a), (b) and (c) involve retaining

14     professionals, the use of estate property, or motion to

15     assume an executory contract.  That is not what the joint

16     admin motion, and that -- we return to, that is why this

17     motion is typically routinely granted in essentially every

18     case.

19             Based on the record we've put before the Court for

20     the limited reasons that we want a joint admin motion, for

21     the reasons that, if in fact, any of these parade of

22     horribles ever come to pass, this Court could undo a joint

23     admin motion if needed.  We would ask that this Court enter

24     the very customary relief of approving our motion on joint

25     administrative grounds purpose, Your Honor.

1          THE COURT:  Thank you.  I'm going to overrule the

2     objection and grant the motion.  And we are up to Docket

3     item 269 already in this case.  And not administering this

4     at least for present purposes jointly is going to double the

5     docket size in each case, I can't imagine any attorney in

6     this room with (indiscernible) filing in the wrong case, so

7     every filing is going to be duly captioned.  So we're not

8     saving any or drawing any distinctions by separating out the

9     cases.

10          It's -- a large part of why this is an appropriate

11     motion has to do with the administrative convenience and

12     organization of the Court.  I don't need evidence on that.

13     I am more than capable of being sensitive to the issues

14     about how we run cases and how cases get organized, and the

15     efficiencies that occur internally in the court system

16     (indiscernible) from a joint administration.

17          Certainly nothing in this joint administration has

18     anything to do with substantive consolidation, nor am I

19     making a ruling that TCEH and the T side and the E side

20     should or shouldn't be consolidated in substantive places.

21     And I am sensitive to the point Mr. Shore made although I

22     don't think I'm doing anything today that would in any way

23     undermine his point and his position.

24          That said, although it's unusual, I'm prepared to

25     enter the joint administration motion as an interim order,

1    and then we can revisit to the extent appropriate the same

2    motion at a final hearing, when people have had more of an

3    opportunity to work through the issues, and when I'll have

4    -- and this is going to be a theme, when I'll have the input

5    of whatever the official committee of unsecured creditor

6    committee or committees, I don't know, are formed, what

7    their position will be on even the mundane of motions.

8              So I'll overrule the motion, and I grant the --

9    overrule the objection, excuse me, and grant the motion on

10   an interim basis.  And that said, we're going to have to

11   mark up the order that was put before the Court.

12             I have no issues with the order as drafted, so all

13   we need to do is bake in the fact that it's an interim order

14   and set it up for a final hearing, which would be, you know,

15   the second day hearing in the case.  And maybe we can do

16   that right now, setting up at least for things like the

17   joint admin motion appearing for the second day of the case.

18             And what I was hearing was the first week in June.

19             MR. MCKANE:  That's correct, Your Honor.

20             THE COURT:  Let me check.

21        (Pause)

22             THE COURT:  All right.  We're going to set aside

23   June 5th, which is a Thursday, starting at 9:30 for the

24   balance of the day till 5 o'clock.  We will also at this

25   time pencil in the next day as well, all day (indiscernible)

1    prior.

2              MR. MCKANE:  Thank you, Your Honor.

3              THE COURT:  And schedule motions for the 5th and

4    (indiscernible) that we need time to go over, we'll simply

5    carry them over to the 6th.

6              MR. WEISFELNER:  Your Honor, I -- pardon me.  I

7    submit without prejudice to the setting of the time for our

8    venue motion.

9              THE COURT:  Absolutely.  All I'm scheduling is an

10   actual hearing date that we can use to the extent

11   appropriate for motions as we go forward, and we're setting

12   them for some sort of final hearing date.

13             MR. WEISFELNER:  Thank you, Judge.

14             MR. MCKANE:  Thank you, Your Honor.  One

15   housekeeping matter.  For -- we will amend the order for the

16   limited purpose of reflecting the interim nature.  As a

17   general matter you had orders handed up (indiscernible) do

18   you want us to just communicate with your clerks afterwards

19   or?

20             THE COURT:  If you're submitting something like

21   that, just send it over cert.  If you're marking it up in

22   court, that's fine, to the extent the mark-ups are not

23   extensive, that won't be a problem.  I don't want -- don't

24   give me a big pile of orders right now because that won't

25   work.  I think we better take it just motion by motion.

1            MR. MCKANE:  Okay.  We will do so, Your Honor.

2            Your Honor, the next item on the agenda is the

3    EFIH DIP motion.  That's actually in item C(2).  I would

4    note that we do have a -- sort of a subsidiary motion to

5    that, which was the motion to file under seal, the letter

6    related to the fees for the proposed DIP financing.

7            As noted in our pleadings -- I'm sorry, with Your

8    Honor's permission, we'd ask to proceed with the seal motion

9    first.

10            THE COURT:  You want to go with the seal and then

11    with the --

12            MR. MCKANE:  And then with the DIP itself.

13            THE COURT:  All you're seeking under this DIP is

14    the fee commitment, correct?

15            MR. MCKANE:  That is correct, Your Honor.

16            THE COURT:  TCEH probably doesn't have an

17    objection, right?  Not your problem.

18            MR. SHORE:  It seems to be a common theme.

19            THE COURT:  Yeah, we can proceed, and then we'll

20    probably break for lunch after the EFIH motions.

21            MR. MCKANE:  Okay, Your Honor.  Thank you.

22            First as to the seal motion, pretty straight

23    forward, Your Honor, Section 107(d) of the Code does

24    authorize the Court to file certain materials under seal.

25    As noted in our pleadings at length, courts in this and

1   other jurisdictions routinely grant motions of this nature

2   to file DIP fee letters under seal for the proprietary

3   reasons that we've indicated in our pleadings.

4          I want to -- I should note for the record, Your

5   Honor, we did discuss this motion with the United States

6   Trustee's Office.  They asked us to file a supplemental

7   declaration that disclosed the aggregate amount of fees to

8   be paid under the proposed interim order.

9          Complying with that request, Your Honor, we did

10  file last night a supplemental declaration of Steven

11  Goldstein of Evercore, the debtors' proposed financial

12  advisors that made the requested disclosure.

13         THE COURT:  Which -- because there were a couple.

14  Which supplemental declaration was --

15         MR. MCKANE:  Your Honor, it's Docket No. 221.

16         THE COURT:  Okay.

17         MR. HESSLER:  And, Your Honor, to the extent it

18  aids you, we have a binder with the supplemental

19  declarations that were filed yesterday.

20         THE COURT:  Oh, that'd be great.

21         MR. HESSLER:  May I approach?

22         THE COURT:  Yes.  Very good.

23         So this is item 3 in the binder you just gave me?

24  Where -- again at what, paragraph 5 then?

25         MR. MCKANE:  Yes, Your Honor, they -- the relevant

1    statements are in paragraph 5, as well as at the bottom of

2    paragraph 7.  It's the last sentence that carries over from

3    page 3 to page 4.  That is, Your Honor, the reason that

4    there's two different statements.  One is in the aggregate,

5    as we're going to get to in the substantive motion in a

6    moment as to this DIP, it's kind of a unique instrument

7    because we're not drawing any funding today, and we're going

8    to move settling parties into the DIP.

9             So one is aggregate fees, the second reference

10   that appears in paragraph 7, again carrying over from page 3

11   to page 4, that is the range, the potential range under the

12   limited relief being sought in the interim order only.

13             THE COURT:  Okay.  So the total is between 94 and

14   a half and 97.09; is that right?

15             MR. MCKANE:  That's assuming -- that's on the

16   total facility.

17             THE COURT:  The total funded facility.

18             MR. MCKANE:  Including final relief, Your Honor.

19             THE COURT:  (indiscernible) in a range is 10 and a

20   half million to 36 and a -- .75?

21             MR. MCKANE:  That is correct, Your Honor.

22             THE COURT:  And that range, that range is a result

23   of what?

24             MR. MCKANE:  I'm happy to put that up now.  I get

25   into it in more detail with regard to the substantive motion

1    itself.

2            THE COURT: Okay.

3            MR. MCKANE:  But I will definitely address that

4    it.  It's because --

5            THE COURT:  All right.

6            MR. MCKANE:  -- it's the contingent nature of the

7    debt.

8            THE COURT:  All right.  So, is there any objection

9    to admission of the supplemental declaration, Docket No. 61.

10   Does anyone have an objection?  Are there any pending

11   objections to the motion to file under seal?  No?  All

12   right.  You resolved with Mr. Schepacarter any issues, yes?

13           MR. SCHEPACARTER:  Thank you.  Again, Richard

14   Schepacarter for the United States Trustee, these

15   declarations you'll see one in with respect to the TSA DIP

16   as well.  We spent a lot of time on this and we were happy

17   that they were able to disclose the amounts in writing prior

18   to today's hearing and put those declarations in evidence

19   and on the docket.  So that resolves our objection.  Thank

20   you, Your Honor.

21           THE COURT:  Okay.  All right.  Do you have any

22   order?

23           MR. MCKANE:  We do, Your Honor.  I have the DIP

24   order in there as well would you like me to proceed with the

25   DIP for --

1            THE COURT:  That's fine.

2            MR. MCKANE:  -- send them both up now.

3            THE COURT:  You can give me both of them.

4            UNIDENTIFIED:  (Indiscernible).

5            THE COURT:  Yes.

6            MR. MCKANE:  Thank you.

7            THE COURT:  Did you mean to give me two copies.

8            MR. MCKANE:  Yes, Your Honor.

9            THE COURT:  I have signed the seal order.

10            MR. MCKANE:  Thank you, Your Honor.

11        With your permission I will proceed to the DIP

12   motion itself.

13            THE COURT: Yes.

14            MR. MCKANE:  Which on the agenda appears as Item

15   C2.

16            THE COURT:  Yes.

17            MR. MCKANE:  So this seeking permission to proceed

18   on an interim basis with the EFIH DIP, and I will endeavor

19   to explain at the outset the very limited relief that we are

20   seeking from the court today.

21        As part of that presentation, it is very important

22   to note at the outset, Your Honor, the debtors at EFIH do

23   not need access to cash collateral on an interim basis, and

24   therefore, they do not need any DIP funding on an interim

25   basis either.

1              So all that we are seeking through this order the

2    authority to treat certain fees as administrative expenses.

3    The purpose of that is it will allow us to secure the

4    commitment of the EFIH DIP lenders until approval can be

5    sought on a final basis, and we also want to be very clear,

6    which is also specified in the order, Your Honor, none of

7    these fees actually will be paid by the debtors during the

8    interim period.  It's merely granting administrative expense

9    claim status and no cash will actually be paid on those

10   until we receive final approval or otherwise come before the

11   court and obtain authority on a cash collateral order.  So

12   just admin expense basis.

13             Your Honor, in order to understand the EFHI DIP I

14   need to explain the central role that it plays in the

15   proposed multi-party settlement that we previewed in the

16   presentations at the outset.

17             This overall is a 5.4 billion dollar facility.

18   Deutsche Bank is the lead arranger of the committed banks

19   under this facility, Your Honor.  At present Deutsche Bank's

20   commitment is 2.1 billion of the 5.4 billion total.  That

21   differential of 3.3 billion that actually represents what to

22   date we have committed by settling EFIH, first lien parties

23   and then in one instance a second lien party.  And I'll

24   break that down.

25             On the 3.3 billion, Fidelity is committed for $1

1    billion of the first lien DIP, and that's $500 million that

2    it will roll up on its first lien claim, and 500 million

3    that it will roll up on its second lien claim.

4            In addition, Your Honor, Pinco (ph) is the other

5    2.3 billion of the 3.3 billion and that represents 850

6    million of Pinco's EFIH first lien claim, as well as Pinco's

7    commitment to back stop an additional $1.45 billion of the

8    EFIH debt.

9            So that's where we stand as of the petition date,

10   and actually as I indicated earlier, late last night we got

11   an additional commitment from another party for $50 million

12   of its first lien claim.  As well as a commitment to take up

13   $250 of the back stop.

14           I highlight this not because it impacts the inner

15   motor but it shows the fluid nature of this DIP in the role

16   that this DIP plays as a vehicle for facilitating the

17   proposed settlement.  We're going to move as many parties

18   into the DIP as we can.  That's part of the benefit they

19   receive as participants as a DIP lender.  And to the extent

20   we continue to move that up it will reduce the amount of

21   commitment that we need to draw upon from Deutsche Bank and

22   the other committing banks.

23           However, as would be expected of a financial

24   institution they can't -- we're practically renting their

25   balance sheet for the next month.  And they will not

1    continue to make that commitment without the payment of at

2    least some of the fees.  So that's the commitment fees that

3    I indicated at the outset and that's the reason for the

4    range.

5              The range will ultimately be paid.  The terms on

6    the commitment fee turns on how much we actually do need to

7    draw from third party banks. We won't know that until this

8    opt-in process that we described plays out over the next

9    month.

10             THE COURT: Okay.

11             MR. MCKANE:  I should note, Your Honor, there was

12   an objection filed by Mr. Mayer of Kramer Levin on behalf of

13   the second lien notice indenture trustee that's what he was

14   referencing earlier about what was the right time for his

15   objection.

16             As I read the objection what it requested was the

17   court schedule a final hearing on any EFIH priming DIP no

18   earlier than 120 days post-petition.  As previewed in

19   addition to this EFIH first lien DIP we will be forthcoming

20   with an EFI second lien DIP, nothing's been filed on that

21   yet.

22             However, when those two -- you'll see those two

23   DIPS are forthcoming.  As to this objection, and I know Mr.

24   Mayer of course will be heard in a moment, you know, we

25   respectfully submit that this objection is out of place in

1    this context today.

2           As an initial matter as I said we intend to file

3    our motions for final orders on both of these DIPS entirely

4    in compliance with applicable notice periods.  We'll get

5    them on file with requisite notice to both and the second

6    lien trustee and any other party-in-interest at that time

7    can object to or otherwise seek to oppose the relief that

8    we're seeking.  It's seems highly unusual to ask the court

9    not to let us schedule a hearing on a DIP for some period of

10   time in the future.

11          THE COURT: Is there any issue with how long the

12   commitment is held open that will force the hand or whether

13   or whether or not to pull the trigger on the motion?  Or

14   financing?

15          MR. MCKANE:  On which motion?  On the --

16          THE COURT:  (Indiscernible) wanted to hear today

17   is approved, the fee letter, the commitment letter.

18          MR. MCKANE:  Correct.

19          THE COURT: And you want to push down the road

20   don't worry about when I'm going to ask you for a hearing,

21   Judge, I'll -- we'll deal that later.  My question is is

22   there something, as I -- I mean I read it but I don't

23   recall, is there something in the fee letter that, the whole

24   point of which is you locked in your lender for a period of

25   time.

1           MR. MCKANE:  Correct.

2           THE COURT:  Is that period of time sufficiently

3    short that it might prejudice anyone?

4           MR. MCKANE:  No, it's sufficiently long.  We'll be

5    fine.  With entry of the interim relief we're seeking today

6    we'll be fine.  What the --

7           THE COURT:  Or is that something we can, can't

8    disclose?

9           MR. MCKANE:  Actually we can because it's up to 90

10   days, Your Honor.  Let me explain the interplay of the

11   timing though.

12          We have other deadlines that are milestones that

13   will otherwise need to be complied with, and that is 75 plus

14   five day milestone within the RSA that provides for the time

15   in which we need to obtain a final order on this DIP.

16          I want to correct something though that was said

17   before, Your Honor.  I may have given Your Honor the wrong

18   impression.  We intend to seek a final hearing on this DIP

19   as soon as possible.  We want to go forward with it on now

20   what's going to be the first week of June.  So it's not that

21   we're seeking to push this off in a way that would implicate

22   the bank's commitments.

23          We want to close this DIP with Deutsche Bank and

24   the other banks to the extent needed as quickly as possible

25   or entirely with EFI settling parties.  So there's not --

there's no, with the limited relief that we requested in the interim order today that will give us sufficient runway within what we believe to be a reasonable schedule to consummate this DIP financing.

Your Honor, the other part I wanted to mention and then I'll cede the podium to Mr. Mayer. I mentioned at the outset I do think it's important for the record also because it actually wasn't mentioned in their papers, but even before the second lien trustee files objection, even before the petition date, well before the petition date, the debtors -- we did reach out to both the EFI's first lien trustee and the EFI second lien trustee as I said to begin a dialogue with them about a consensual scheduling order for everything that's related to the debts, because again it's to draw on the debt, its authority also to refinance the outstanding first and second lien debt as well as the make-whole claims.

All three of those items of relief may not be able to be achieved on the exact same timeline for each. First and most important we definitely need to get authority to drawn on the DIPs though and we do want to then repay the existing debt. It is possible that the make-whole claims will not be litigated contemporaneously with the final draw authority in their refinancing authority.

We, unsurprisingly, would like to accomplish all

1  of those work streams as quickly as possible because it is

2  significantly beneficial to the debtors' estates.  There is

3  a negative interest rate arbitrage right now between the

4  existing first and second lien debt and the first and second

5  lien debt that we are seeking to draw upon.

6          And I know that the first and second lien trustees

7  and the holders are going to take issue with those

8  statements.  I just note none of this needs to get decided

9  today.  We're going to continue to talk to them.  We have

10 some hope, we're actually not that far apart on one front.

11 We have some hope of coming up with a consensual schedule

12 for all of that various relief that we're seeking and to

13 some extent they presumably will oppose.  I'm reasonably

14 optimistic we can work this out amongst ourselves.

15         If we can't, we'll come back before the court and,

16 you know, we and they will have full opportunity to seek

17 your assistance in coming up with a schedule that works for

18 the parties and the court, Your Honor.

19         THE COURT: Okay.  Thank you.

20         MR. WOFFARD:  Your Honor, good afternoon.  Keith

21 Wofford from Ropes & Gray on behalf of CSC Trust Company of

22 Delaware.

23         CSC is the indenture trustee for the roughly $4

24 billion of EFIH first lien notes and also collateral trustee

25 with respect to the collateral securing both the first and

1    the second liens of EFIH.

2         The trustee has many objections to the relief

3    sought in the DIP motion, not surprisingly.  But those

4    objections are for another day.

5         Issues for today that we do want to remark upon

6    given the prior commentary is the procedure and schedule

7    that the debtors have requested to abdicate the matters that

8    are addressed in that DIP motion including the make-whole.

9         As the debtor's motion states there is roughly a

10   $7 million secured make-whole claim for the first lien, and

11   another $7 million for the make-whole claim for the second

12   lien.  We understand that those are contested.

13        The big point though is that those claims which

14   total $1.4 billion and are by the debtor's admission fully

15   secured, dwarf this $13 million a month in incremental

16   interest expense to which they refer.

17        The debtor's motion also speaks to the settlement.

18   Particularly the first lien settlement.  The trustee has

19   been in contact with the majority of the first lien holders

20   and has been for months.  The vast majority of first lien

21   creditors have not agreed to this advertised settlement as

22   Mr. Sassower's power point revealed earlier.  In fact many

23   of the first lien holders actively oppose the settlement.

24   Other holders know nothing of this proposed settlement

25   because until Tuesday frankly it was a well-kept secret.

1          The debtor's proposals here which is to adjudicate

2    not just the DIP financing and frankly not just the first

3    lien DIP but both DIP facilities which total $8.4 billion

4    depending upon which portion of the papers you read, as well

5    as adjudicate of the make-whole of $1.4 billion -- pardon

6    me, $1.4 billion within the next 35 days we think is,

7    frankly unrealistically aggressive.

8          The trustee on the first lien front objects to

9    this 35 day deadline whether it's aspirational or otherwise.

10   Because such short deadline just is not possible or

11   procedurally appropriate.  As currently designed, Your

12   Honor, to be perfectly frank this overall transaction is

13   clearly intended to deny the first liens and the second

14   liens the ability to fairly adjudicate the make-whole in the

15   bankruptcy court and to effectively deny us the ability of

16   an appeal who invoke the mootness doctrine.

17          The other problem is that denying the proper time

18   to decide this dispute may actually convince holders to

19   accept this tender offer, for which they've not appeared to

20   be seeking court approval without adequate information being

21   given out to those holders of their legal rights.  And I

22   could go onto examples of that, but I just note that this

23   tender offer has been mentioned without any thought as to

24   what information is being sent or any thought of to what

25   extent that is a proxy for a reorganization plan.

1           Another point, Your Honor, harken back to your

2    earlier question, the 35 deadline -- day deadline that they

3    are talking about is unnecessary.  The deadlines under their

4    financing commitment letter with Deutsche Bank have 110 days

5    to obtain a final order, but they have asked for this

6    adjudication or appear to be asking for adjudication in 35

7    days.

8           I will not remark upon the other plan support

9    deadlines that are mentioned other than to say that those

10   have been unilaterally selected by junior people in the

11   capital structure.  Normally the PICs were financing the

12   second lien DIP.  So from our perspective to the extent that

13   it is, there is a real deadline it's that commitment

14   deadline of 110 days, and that is going to be potentially a

15   hard stop in terms of the ability to probably adjudicate

16   this.

17          Now for a moment the substance of why this is

18   going to take a little bit of time to adjudicate given what

19   they've put on the table, we're going to have to do some

20   discovery.  At a minimum, Your Honor, with respect to the

21   make-whole there is an issue of whether this is an

22   intentional default by the debtor which under the applicable

23   case law in our view makes the make-whole payable even under

24   the debtor's interpretation of the contracts.  By the way we

25   don't happen to agree with that contractual interpretation,

1    but even if they're right there's this issue of intentional

2    default.

3              And then there are other discovery issues as well,

4    we won't belabor them here given the crowding in the

5    courtroom and the lateness of the hour.

6              The other things that the parties would like more

7    clarity about is what is being decided and when.  We'd like

8    to have some clarity about whether the litigation on the two

9    DIP financing approvals and the make-whole is going to be

10   together or be bifurcated because there are implications if

11   this bifurcated through the DIP financing dispute and then a

12   make-whole determination afterward.  Particularly on the

13   issue of adequate protection.

14             So for example, Your Honor, if they're going to

15   finance this take out of the first lien and second lien

16   claims but then adjudicate the make-whole later, well the

17   debtors have already said the first and second claims are in

18   fact secured.  So then the question is if you're layering in

19   either 5.4 or 8.4 billion of debt into that financing

20   closing, what is the added protection for the as yet

21   unadjudicated make-whole claim.

22             Their credit papers don't say very much about

23   that, Your Honor.  That's something that in terms of

24   posturing the fast track litigation is a problem for us.

25             The other thought, Your Honor, is that in order

1    for us to probably frame objections there should be some

2    disclosure of what the route of priorities that they're

3    asking for if the DIP orders are entered.  That is among the

4    first lien DIP, the second lien DIP and the respective first

5    and second line make-whole claims; again, adequate

6    protection, short falls and relative water fall among them.

7            Although the debtors say well we filed the DIP

8    motion and we're ready to go, one thing they have not filed

9    is a proposed final DIP order that would normally disclose

10   this, and it would allow us to frame objection to these

11   things properly.

12           So I guess at this point, Your Honor, I think

13   we've outlined what some of our issues are.  Certainly the

14   proposed 35 or 45 days is inadequate.  What I think without

15   speaking further, noting the conversations with Mr. Hessler

16   I'd like to turn it over to Mr. Mayer.

17           THE COURT:  Okay.

18           MR. MAYER:  Thank you, Your Honor, for the record

19   Tom Mayer of Kramer Levin for Computer Share as indenture

20   trustee for the second lien EFIH notes and assorted bond

21   holders who are also joining in this objection to the

22   schedule.  It's a very narrow objection.

23           They want a hearing in 35 days.  I wasn't sure

24   what Mr. Hessler said about we've had conversations we can

25   step out and work this out, either he's asking for a hearing

1    in 35 days or he isn't.

2              In terms of prior scheduling discussions, we did

3    have good discussions with his colleagues about his schedule

4    for the adjudication of our make-whole which is supposed to

5    happen months down the road, and we'll work that out.

6              Right now, excuse me, we have 35 day proposal, and

7    it's a very simple proposition, Your Honor.  They want to

8    prime us, we don't think 35 days is enough time to have a

9    hearing on whether or not we should be primed.  Because what

10   they're looking at is a transaction that layers on

11   potentially a billion four in additional make-whole claims,

12   700 million which is ours, plus additional loans under the

13   first lien DIP, and you add it up and you add it up and

14   suddenly there's a lot more secured debt in the structure.

15             If you're going to prime people you need to show

16   that they're adequately protected. It's not a difficult

17   legal proposition but it does involve some testimony, will

18   involve some hearing time and we don't think 35 days is

19   appropriate.

20             We suggested 120, did not know there was a 90 day

21   drop dead period on the commitment and I'm not trying to

22   create obstacles for the case.  But I just don't think 35

23   days is enough to have what could be a very contested

24   hearing.

25             The other issue at hand which bears mentioning and

1    then I will stop, is that there will be a requirement that

2    Your Honor find that the DIP orders entered -- that the DIP

3    lenders are lending in good faith.  And we raised this very

4    briefly in our papers and it's really not for today, but it

5    does bear on whether 35 days is enough.

6              The only member of the second lien, the EFIH

7    second lien group, that is signing on for this 50 percent

8    settlement, well in number and size is Fidelity.

9              Fidelity is getting side payments here, Your

10   Honor.  They're in very many different places in the capital

11   structure, and we have not been able to do the final math

12   because we just got these papers at 7 p.m. on Tuesday.  But

13   it is possible that when you do the math Fidelity isn't

14   really settling at 50 percent, it's settling at 100 percent

15   of its make-whole, but people don't know that.  We're not

16   sure.  We still have to do the math.

17             But it's very clear that because Fidelity is

18   receiving payments here and here and here and here many of

19   these payments being otherwise in excess of what it would

20   normally be entitled to here and here and here it's really

21   getting in respect of its second lien make-whole isn't 50

22   cents, it's much more than that.

23             If there's going to do a tender offer, one, I

24   think they need to disclose all this and two, if they're

25   going to put together a second lien DIP to fund this then

1    they're going to ask for a good faith finding that's going

2    to be an issue that we'll need to look at, and I just don't

3    think 35 days is sufficient. If they want to withdraw their

4    request for 35 days and we can meet and confer on a number

5    of days that will allow them to close on their financing,

6    I'm happy to do that.

7              THE COURT: Thank you.

8              MR. SOSNICK:  Good afternoon, Your Honor.  Fred

9    Sosnick from Sherman Sterling on behalf of Deutsche Bank and

10   the other lead arrangers and there's actually seven of them.

11             But I just wanted to quickly rise to make sure

12   again we're focused on what the motion is that's before the

13   Court.  Mr. Mayer's comments while interesting on perhaps a

14   lot of different things, aren't really relevant to the seven

15   arrangers who have signed onto this commitment letter which

16   is really what we're asking Your Honor to approve is the

17   commitment letter relative to those seven, and it's the $2.1

18   billion that we're talking about is the backstop under that

19   commitment.

20             That's all that's on the agenda for today.  There

21   is no question I think that our group is lending in good

22   faith, in the sense even relevant at this point, because all

23   we're asking for is approval of the commitment letter.  But

24   just wanted to refocus the discussion today on what's

25   actually before the court which is just approval of this

1    letter at this point.

2              THE COURT:  Thank you.

3              MR. KAPLAN:  Good afternoon, Your Honor.  Gary

4    Kaplan from Fried Frank on behalf of Fidelity.  I just

5    wanted to make for the record it's crystal clear because Mr.

6    Mayer made allegations and his objection suggested there was

7    some sort of side payments.  There are no payments gone

8    through Fidelity that are not fully disclosed and fully

9    discussed in all, in the RSA and in the term sheet.  There

10   are no side deals.

11             The only thing, and they allude to it, and call it

12   side deals and then they say well because it's getting a

13   recovery at EFH, well yes there's a recovery at EFH just

14   like there's a recovery at EFIH.  Like there's consideration

15   and when they go through all of these transactions as we

16   move along in the case, you know there's been some

17   discussion this morning about the amendment to the TSA.

18             The amendment to the TSA is redirecting payments

19   that would otherwise go to EFH.  So as part and parcel of

20   these transactions, yes there are recoveries in different

21   areas.  But Fidelity is getting on its make-whole claim the

22   same amounts that other people are going to get, but has

23   made additional concessions for example instead of just

24   taking cash and going home that to lower the burden for the

25   debtors that it will roll some of that into the first lien

1    DIP so as to reduce the cash needs in the case.

2            But otherwise there are no side deals, there are

3    no payments that are going out that are not fully disclosed

4    in all of the documents.

5            THE COURT:  All right. Thank you.  Quickly.

6            All of that has been very interesting and I

7    understand what you're trying to do in the context of

8    setting a table for having an argument about when we're

9    going to have the DIP hearing on a motion that hasn't even

10   been completely filed, let's actually talk about the

11   commitment fee.

12           MR. MCKANE:  Correct, Your Honor.

13           Final two points.  With both first and second lien

14   lenders, with Fidelity, with anybody else involved in the

15   make-whole claim we're going to proceed with all appropriate

16   notice.  If people think we're moving too fast we have no

17   doubt they're going to come to you and seek relief on that

18   and I'm confident we can work it out, but if not no one's

19   rights are going to be compromised with regard to

20   scheduling.

21           I echo Mr. Sosnick as to what's before the court

22   right now, Your Honor.

23           THE COURT: All right.

24           MR. MCKANE:  We're looking to pay certain fees and

25   to have a final hearing on the EFI at the hearing that Your

Page 152

1    Honor set for the first week in June.  And with that limited

2    relief imbued in the order Your Honor we would respectfully

3    request that the court enter it on an interim basis.

4            THE COURT:  All right.  When do you anticipate

5    you'll actually have everything filed?

6            MR. MCKANE:  For the EFIH first lien DIP?

7            THE COURT: Yeah.

8            MR. MCKANE:  Certainly within 21 days -- I mean,

9    what has been 21 days, Your Honor, what you entered June 5th

10   I think.  I have to count backwards but certainly within 21

11   days.

12            Your Honor, as I count the calendar 21 days would

13   be May 15th and we'll make every effort to do it on file as

14   quickly as possible if not before then.

15            MR. WOFFARD:  Your Honor.

16            THE COURT: Yes.

17            MR. WOFFARD:  With all due respect, shouldn't we

18   actually see what the papers are before we get locked into

19   the leverage of a date on the calendar of June?  I mean we

20   don't have a final order -- we've already remarked, we won't

21   belabor it.  What we haven't seen and Mr. Hessler has

22   rightfully referred to his desire to have colloquy over the

23   substance of a schedule.  I don't know why we would set a

24   date in stone given everything that's on the agenda and

25   given all that we haven't seen.

1           MR. MCKANE:  My quick response to that Your Honor

2   is I don't think we're attempting to proceed here with

3   anything dissimilar to standard bankruptcy practice.  We

4   schedule hearings, we put items on the agenda, to the extent

5   parties oppose that relief they can oppose the relief, if

6   they oppose the timing they can oppose the timing.  But I

7   don't know how we would have to file all of the paperwork

8   before we could actually schedule it for a hearing.

9           THE COURT:  Okay.  What I'm going to do is, I am
                                                       th
10  going to set the final hearing with this for June 5  at

11  9:30, context between now and then when I hear, and this

12  will probably be in the context of both venue being where

13  the issue is any status conference soon after the committee

14  is formed, and we can refer onto it and I know it can't

15  actually seem like it's openly filed, as part of that status

16  conference, we'll update further -- we'll take up whether

17  moving this long the path is an appropriate thing to do.
                                                       th
18          So instead of the final hearing for June 5 , and

19  in the context of a settlement -- not settlement, excuse me,

20  a status conference at least that we're going to have after

21  the committee is formed, I'll at that time consider whether

22  pushing it further back is more appropriate.  At that time

23  we'll have the committee in place and we'll actually have

24  all the final documents filed.

25          But as we sit here today I'm going to set June 5

1    as the hearing date.

2          MR. MCKANE:  On behalf of the debtors thank you,

3    Your Honor.

4          THE COURT: Okay.  And I'm looking at the order and

5    its -- I'm a little confused.  If you look at -- the pages

6    aren't number actually.  Look at the fourth page, it looks

7    like you've got two objection deadlines filled in there.

8    I'm a little confused.  I think it's just a typo, but.

9          MR. MCKANE:  I'm sorry in which paragraph, Your

10   Honor.

11         THE COURT: Paragraph 3 at the bottom of Page 4.

12         MR. MCKANE:  It's just a repeat, Your Honor.  It

13   is.  We'll -- if you want us to tender another order with

14   the second reference stricken of if you want to cross it

15   out, whichever is easier for the court.

16         THE COURT: I'll cross it out.

17         MR. MCKANE:  Thank you.

                                            th
18         THE COURT:  We'll set that as May 29 .

19         UNIDENTIFIED:  May 21.

20         MR. MCKANE:  Your Honor, just for others in the

21   court I believe you said May 21st is the going to be the

22   objection deadline.

23         THE COURT:  No, I said May 29th.

24         MR. MCKANE:  29th, sorry about that.

25         THE COURT:  Sorry.  So I've signed the order with

1   those few changes.  I need to backtrack though I'm sorry to

2   the motion, to the order under seal.

3            MR. MCKANE:  Yes, Your Honor.

4            THE COURT:  I did have a comment to that that I

5   forgot to give you.  So if you go to paragraph 3 which says,

6   who gets it, whose entitled to actually look at the document

7   under seal, and it's limited to some people and basically

8   says everybody has to agree.  I want to build myself into

9   that process.

10           MR. MCKANE:  Certainly.

11           THE COURT: So what I'd like to do is to start that

12   paragraph with, "except as otherwise ordered by the court

13   upon notice to the EFIH debtors and the EFIH first lien

14   arrangers, the debtor's confident the letter is

15   confidential," et cetera, et cetera.

16           And what I'm trying to do there is there may be,

17   it may be appropriate to expand the universe of who gets to

18   see that letter.

19           MR. MCKANE:  Sure.

20           THE COURT: So I want to have the power to do that

21   if appropriate, but obviously I would only do it upon notice

22   to the arrangers who have obviously the most critical

23   concern with spreading the commitment letter around.

24           MR. MCKANE:  We will make that change, Your Honor.

25           THE COURT:  I'll do it right here.

```
 1              MR. MCKANE:  Okay.

 2              THE COURT:  Doing it right here.

 3         (Pause)

 4              THE COURT:  Okay.  I made that change.

 5              MR. MCKANE:  Thank you, Your Honor.

 6              THE COURT:  All right.  At this time we're going

 7    to break for lunch.   When we come back we'll deal with the

 8    first TC - --

 9              MR. MCKANE:  TCEH.

10              THE COURT: You got it.

11              MR. MCKANE:  What time would you like to

12    reconvene, Your Honor?

13              THE COURT:  Okay.  We're going to reconvene

14    promptly at 2:30.  Okay.  Now some instructions.  Don't take

15    any packages with you because if so you'll have to go

16    through the process again of going through the x-ray

17    machines to the extent possible I encourage to be able to

18    simply walk through the metal detector without having to

19    check any packages through the x-ray machine.  If you show

20    up at 2:12 you're not going to get, you're not going to be

21    here when the hearing starts.  So build in a little bit of

22    extra time.

23              Second, just like law school you've all stacked

24    out your space.  Okay.  Nobody's switching seats without

25    permission.  Okay.  So the sitting arrangements will stay
```

1    the same.  I think that way, well hopefully we'll be able to

2    move things through very quickly without, with a minimum of

3    disruption.

4              So we will convene at 2:30.

5         (Recessed at 1:17 p.m.; reconvened at 2:29 p.m.)

6              THE CLERK:  All rise.

7              THE COURT:  Please be seated.  Yes, sir.

8              MR. DEFRANCESCHI:  Dan DeFranceschi for the

9    debtors.  Your Honor, before we start this afternoon, I

10   wanted to make a few preliminary comments and let the Judge

11   -- let Your Honor know how we intend to proceed this

12   afternoon.

13             There are a number of items on the agenda that are

14   critically important that we get through today.  So we

15   wanted to make sure we pace the remaining time to do that.

16   It may mean that we may need to go out of order slightly.

17             I can tell Your Honor what those motions are

18   quickly.  It's the next DIP motion, it's the cash collateral

19   motion which is at number 4 on the agenda.  It's the

20   employee motion which is number 5; the cash management

21   motion, the customers' motion, and the hedging and trading

22   motion.

23             And in that regard, it will be helpful if we had

24   an idea, is Your Honor intending to stay today until 5 or

25   5:30, or is that flexible from your standpoint, within

1    reason, of course.

2              THE COURT:  I'm sorry, you said the TCEH DIP and

3    cash collateral, the cash management, the customer programs

4    --

5              MR. DEFRANCESCHI:  Employee wages.

6              THE COURT:  Wait and trading arrangements?

7              MR. DEFRANCESCHI:  And hedging and trading, which

8    I believe is number 10.

9              THE COURT:  Well, my plan was to go till between 5

10   and 5:30.  I'm certainly not going past 5:30, because we

11   have all day tomorrow available.

12             MR. DEFRANCESCHI:  Very good, Your Honor, well,

13   we'll keep that in mind with pacing through it.  A couple of

14   other points, Your Honor.  There have been several times

15   today when there have been statements made by various

16   attorneys that, as Your Honor could imagine, the debtors

17   disagree with.

18             And rather than us getting up every time there's a

19   lawyer essentially testifying to something, we're

20   essentially going to make a standing objection, if and when

21   the time comes, if there's evidence that's actually

22   presented on something, or if there's a true legal argument

23   that needs to be responded to.

24             I just didn't want our silence to be viewed as

25   acquiescence, and I'm sure Your Honor understands that, it's

1   more for the record.

2          THE COURT:  Uh-huh.

3          MR. DEFRANCESCHI:  The other thing is, we've heard

4   a number of times that there's two sides, the TCEH and the

5   EFIH side, and by the way, it is TCEH and EFIH, not TCEH, I

6   don't -- I recognize that acronym TCEH that we've heard a

7   few times, and certainly it's not the Encore side, because

8   Encore is not a debtor.  So I -- in terms of the usage, I

9   think it would be best for the record if all parties get

10  used to using the phrase TCEH and EFIH, rather than TCEH and

11  Encore, because it's just not appropriate and it's going to

12  confuse the record I think.

13         But we keep hearing that there's two sides, and at

14  a minimum, there's at least a third side, which is the

15  parent, which has its own debt.  And so there's been some

16  confusion about that on the record, and I didn't want the

17  Court to be left with any impression that we believe to be

18  wrong.

19         And with that, I think my colleague, Mr. Husnick

20  is up on the next motion.

21         THE COURT:  All right.

22         MR. DEFRANCESCHI:  Thank you.

23         MR. HUSNICK:  Good morning, Your Honor, Chad

24  Husnick from Kirkland & Ellis on behalf of the debtors.

25         Your Honor, the next item on the agenda, which is

1    at Docket No. 73 is the TCEH debtor's motion for post-

2    petition financing.

3              Your Honor, the debtors filed in support of the

4    TCEH DIP motion the declaration of Mr. Stephen Goldstein of

5    Evercore, that is the debtors' proposed financial advisor.

6    That can be found at Exhibit B of Docket No. 73.

7              In addition to the declaration of Mr. Goldstein,

8    we do plan to rely on the declaration of the debtors' first

9    day declarant, Mr. Paul Keglevic in further support of the

10   motion that I'm presenting.

11             And finally, Your Honor, at Docket No. 221, the

12   debtors' presented supplemental declaration of Mr. Stephen

13   Goldstein, which is in support of not only the DIP but also

14   in support of the TCEH seal motion.

15             Your Honor, at this time, I'd like to introduce

16   the two declarations of Mr. Goldstein into evidence.  I

17   believe the Keglevic declaration has already been admitted.

18             THE COURT:  You said Docket 211 and 221.

19             MR. HUSNICK:  It'd be 73, Exhibit B and Docket No.

20   221.  And Mr. Goldstein is in the courtroom and available

21   for cross.

22             Your Honor, we do have extra copies if you'd like

23   us to bring one up.

24        (Pause)

25             MR. HUSNICK:  May I approach?

1           THE COURT:  Yes, please.  I can't -- you handed me

2    the declaration of Mr. Goldstein without a docket reference

3    or no -- you need to show me where it is.

4           MR. HUSNICK:  Pardon me.

5           THE COURT:  Because it's not on your agenda.

6           MR. HUSNICK:  On the lower right-hand corner, Your

7    Honor, I think it's Docket No. 211.  I may have misspoke.

8           MR. SHORE:  73 is the first one, Your Honor,

9    Docket 73.

10           THE COURT:  Oh, you attached it to the motion as

11    an exhibit?

12           MR. HUSNICK:  Yeah, Exhibit B to packet 73.

13           MR. SHORE:  And, Your Honor, for the record, Chris

14    Shore, I have no objection subject to cross.

15           THE COURT:  All right.  Thank you.  Mr.

16    Goldstein's declaration which is Exhibit B to Docket item 73

17    --

18           MR. HUSNICK:  Correct.

19           THE COURT:  -- and his supplemental declaration,

20    which is Docket 211 (indiscernible) admitted without

21    objection subject to cross-examination.

22      (Goldstein's declarations received)

23           MR. HUSNICK:  Your Honor, before we dive into the

24    DIP motion, I will address the seal motion that's at Docket

25    36.  The debtors had requested that the fee letter in

1    connection with the TCEH DIP be sealed, subject to the

2    disclosure to the parties that are identified including any

3    official committee, and the United States Trustee and the

4    Court.

5              Similar to your comment on the EFIH seal motion,

6    we conformed that and unless Your Honor has any questions on

7    the seal motion, I believe we've resolved the United States

8    Trustee's objection by filing the supplemental Goldstein

9    declaration.

10             THE COURT:  Can I see the order?

11             MR. HUSNICK:  It turns out, Your Honor, that it's

12   not finished yet, so we'll hand it up later if that's okay

13   with you.

14             THE COURT:  Oh, I can make the -- you can

15   handwrite the clause.

16        (Pause)

17             THE COURT:  Is there any objection to the motion

18   to seal?  No?

19             MR. SHORE:  No objection.

20             THE COURT:  Okay.  And this does not set a further

21   hearing date, so I don't have to worry about that issue, so

22   I have signed the order.

23             MR. HUSNICK:  Thank you, Your Honor.

24             THE COURT:  Okay.

25             MR. HUSNICK:  So if I may, I will continue on the

1    to the TCEH DIP motion.

2            Your Honor, I'll begin with just a quick overview

3    of the DIP facility and the terms of the DIP facility, and

4    then I'll respond to some of the issues that were raised in

5    the objection that I believe were filed very early this

6    morning by the ad hoc committee of unsecured creditors at

7    TCEH.

8            Your Honor, as we said in the papers regarding the

9    DIP facility, the TCEH debtors were in a unique position

10   insofar as they were able to negotiate incredibly favorable

11   terms on this $4.475 billion DIP facility.

12           Not only are the TCEH debtors operationally sound,

13   but they generate significant positive cash flow before

14   payment of adequate protection and debt service.  Your

15   Honor, the DIP financing is also over-collateralized, and

16   the opportunity to create a relationship with these banks --

17   these banks to create a relationship with the debtors going

18   forward, which post-reorganization will continue as a strong

19   growing concern, was incredibly attractive to potential DIP

20   lenders.  And therefore, the interest in the TCEH DIP was

21   robust.

22           The DIP financing terms are more similar to

23   convention broadly syndicated facilities insofar as the

24   company was able to do what I'll call more of a club

25   facility, in terms of bringing various large financial

1   institutions together in order to fund the full amount of

2   the commitment of $4.475 billion.

3           Your Honor, beginning in 2013, April 14, the

4   debtors reached out with the assistance of Evercore and

5   Kirkland & Ellis and led a lengthy and competitive marketing

6   process for this DIP.  Five financial institutions submitted

7   proposals in response to the initial RFP, and those

8   institutions continued to negotiate throughout 2003.

9           Your Honor, in early 2014, the debtors accelerated

10  their process for preparing for a Chapter 11 filing, and

11  recommenced negotiations with these DIP lenders, and moved

12  quickly to selecting two joint lead arrangers for the TCEH

13  DIP and that is Citibank and Deutsche Bank.

14          Collectively, the institutions including the joint

15  lead arrangers and the other five banks participating, have

16  provided the company with fully backed commitments for the

17  $4.475 billion DIP financing facility, which includes

18  notably a 1.950 revolving credit facility.

19          This DIP facility has a 24-month maturity, and

20  we'll talk about more at the final hearing date.  I only

21  want to mention that now because there was some discussion

22  on the record in connection with the joint administration

23  motion about there being RSA related milestones in this DIP.

24  This DIP and the cash collateral order do not contain RSA

25  milestones.  There may be milestones in the RSA related to

1    termination of cash collateral, but it doesn't go the other

2    way around.  And we'll talk about that in connection with

3    cash collateral as well, because there the lenders consented

4    to the prepetition TCEH first lien lenders, have consented

5    to a full 18 months of cash collateral usage without the

6    onerous milestones.

7            I believe the only plan related milestone in

8    there, Your Honor, is actually that the debtor has got to

9    file -- has to file a plan by 18 months, and there's a

10   higher power that has determined that deadline beyond just

11   the parties in this room.

12           Your Honor, focusing in on the DIP facility, and

13   in particular, the interim relief that we're seeking today,

14   Your Honor, the debtors are asking for authority to borrow

15   up to $2.7 billion on an interim basis.

16           Of that amount, approximately $800 million will be

17   under the revolving credit facility, which accrues interest

18   at L plus 250.  $1.1 billion of the 2.7 billion will be

19   available under the delay draw term facility, and that is

20   only to the extent that it is necessary to satisfy the

21   Railroad Commission of Texas, Mining and Reclamation Bond

22   requirement, and I'll come back to that in a minute, if

23   you'll allow me to put a pen in that for a second.

24           And finally, the third component of the interim

25   borrowing is up to $800 million under the term loan

1   facility, of which 800 million can be used to fund the

2   general LC collateral account.

3            The debtors believe that the approximately $1.6

4   billion of available liquidity is necessary to avoid

5   immediate and irreparable harm during the interim period of

6   these Chapter 11 cases to fund among other things

7   approximately $300 million of trading collateral, related to

8   replacement of terminating hedging agreements, as a result

9   of the bankruptcy filing, posting additional collateral to

10  secure prepetition contracts.

11           Another 400 million of that, as I believe the

12  unsecureds have already identified, is for payment of

13  adequate protection, and we can talk about that in a moment

14  as to the appropriateness of that amount, which the debtors

15  submit is entirely appropriate.

16           $190 million will be used for available working

17  capital and there's an adjustment in the debtors' free and

18  clear on levered numbers to show effects of the Chapter 11

19  cases again relating to the termination of gas hedges.  And

20  I'll just highlight that already as of today, two of the

21  debtors larger counterparties in the trading sphere have

22  already terminated the hedges, putting pressure on the

23  debtor to replace that gas, the gas that they purchased as

24  quickly as possible.

25           Your Honor, the -- let me just revert now.  This

1   facility will be on a super priority priming lien basis.  We

2   do have the consent of the prepetition first lien agent.

3   It's important to mention that the consent of the first lien

4   agent also (indiscernible) by virtue of the intercreditor

5   agreement, the second lien agent, and the second lien agent

6   is going to have consented to the imposition of the priming

7   liens, and the adequate protection package that is proposed,

8   and we'll discuss that in detail.

9        Your Honor, if you'd like, I'm happy to hand up

10   the intercreditor agreement just so you have it for the

11   record.

12        THE COURT:  I don't need it.

13        MR. HUSNICK:  Okay.  Thank you.  So let me focus

14   in on the -- what I'll call the one fairly unique term of

15   this DIP facility, and that is the reclamation carve-out,

16   which is a concept that we created in order to save the

17   company some cash.

18        As I said, the Railroad Commission of Texas is the

19   regulatory authority that oversees mining operations in

20   Texas.  In connection with operating the debtors' 12 lignite

21   fire-coaled power plants, the debtors have right next door

22   to those coal power plants significant mines.  As a result

23   of that, the debtors are, I believe, the seventh largest

24   miner in the United States, and perhaps the largest miner in

25   the State of Texas.

1          The mining operations are dependent in large part

2     upon having a license from the Railroad Commission of Texas,

3     that allows the debtors to continue their mining

4     obligations.  Pursuant to the statutes in Texas, a mining

5     operator is required to post a bond that secures the

6     debtor's reclamation obligations.  That is, as they strip

7     the land to do the mine, they have an obligation when the

8     mining is complete to reclaim the land.

9          These debtors do happen to reclaim the land on a

10    rolling basis, so it would be unlikely that the full amount

11    of a particular claim under the statute would ever get

12    triggered, but the statute and the number or the size of the

13    reclamation bond obligation is not calculated by how much

14    land hasn't been reclaimed.  It's actually calculated by how

15    many mines you're operating at a given time.

16         Your Honor, rather than take on the Railroad

17    Commission of Texas consistent with the debtors' overall

18    intent to continue to comply with the regulatory obligations

19    in the ordinary course, the debtors engaged various parties

20    including the Railroad Commission of Texas, in an effort to

21    come up with ways to replace the bond.

22         Prior to the petition date, Your Honor, the

23    debtors were self-bonded.  And that effectively means that

24    the entity that has the license had given a self-bond, and

25    the parent company had guaranteed that bond.

1         But once the company filed the Chapter 11 case, it

2   was no longer to self-bond under the regulation and is

3   required therefore to post or going forward obligations, a

4   cash bond or a collateral bond.

5         We negotiated, the debtors negotiated with the

6   prepetition secured lenders for this carve-out, which is

7   similar to a professional fee, or a U.S. Trustee carve-out,

8   insofar as it slots in right above the DIP lenders, right

9   below the professional fee carve-out, but the first $1.1

10  billion in any liquidation, would go to fund the Railroad

11  Commission carve-out to ensure that the debtors have the

12  ability to fulfill their mining reclamation obligations.

13        And that claim only arises in the event that there

14  is a liquidation, which we think is an incredibly rare

15  circumstance and unlikely to happen.

16        Your Honor, the debtors are obligated to post the

17  form of replacement bond in advance of 90 days post file.

18  That period is not a deadline, but instead, it's a deadline

19  by which the license can be yanked from the debtor, and the

20  debtor will no longer be able to continue mining.

21        As such, the debtor needs to commence the process

22  of replacing the bond as quickly as possible, so as to

23  ensure that there's an appropriate amount of time to meet

24  with the Railroad Commission of Texas, have them run the

25  process of reviewing the proposed form of bond, and be able

1    to make adjustments on the go.

2             It's as a result of that, Your Honor, that we're

3    asking for approval of not only the -- $1.1 billion carve-

4    out, it is that we would have available as -- to the extent

5    necessary, availability under the $1.1 billion delay drop

6    term loan.

7             Your Honor, unless you have any specific questions

8    about the terms of the DIP, I'd just like to drill in on a

9    few of the issues that were raised in the pleadings filed

10   this morning.

11            THE COURT:  Okay.

12            MR. HUSNICK:  Your Honor, one of the first things

13   that was asserted in the unsecured creditor's papers is that

14   this facility is not the best available financing.

15            Your Honor, as I started to say as we ran -- as I

16   entered into this discussion, is that we ran and the

17   professionals ran a full process to market the DIP as it

18   stands today.

19            And the evidence that we introduced into the

20   record, and I'm sure will be adduced through testimony is

21   that the debtors did run a full marketing process and did

22   engage banks and many different potential structures.

23            The unsecured argue, though, that the company

24   fails to satisfy Section 364(c) and (b) of the bankruptcy

25   Code because they did not consider what folks colloquially

1    refer to as a drop down DIP.  The drop down DIP, Your Honor,

2    and just for a quick explanation is based on, and this a lay

3    person's explanation of how it works, but effectively, the

4    first lien -- prepetition first lien indenture and the first

5    lien credit agreement had a basket for unencumbered

6    subsidiaries effectively they could check the box, and

7    unencumber a subsidiary and drop assets into that box.

8              What the unsecureds are suggesting is that the

9    debtors could have and should have dropped assets into an

10   unrestricted subsidiary and then pledged those assets to new

11   financiers to raise money, but they don't stop there, Your

12   Honor.

13             The -- it wasn't enough to do one drop down DIP,

14   instead the next step in the argument is what we call a

15   recharge.  And effectively what the debtor -- what the

16   borrower would have done is once it closed on its project

17   level financing, it would have upstreamed the proceeds from

18   that financing to the parent, which had originally owned the

19   asset, and then dropped down some more assets, recharging

20   the basket.  And then do additional project level financing

21   on the newly dropped down asset.

22             Your Honor, it's not that the debtors did not

23   consider this alternative, the debtors definitely considered

24   this alternative, but they determined in their reasonable

25   business judgment, in consultation with Evercore, their

1    investment banker, in consultation with Kirkland & Ellis,

2    and in consultation with the market, that such financing was

3    not the best available alternative for the TCEH debtors.

4              Why is that?  Number one, it's sizing.

5              THE COURT:  I'm sorry, is this argument or

6    evidence?

7              MR. HUSNICK:  This is argument.

8              THE COURT:  Well, it sounds like evidence.

9              MR. HUSNICK:  Well, I'm happy to put somebody -- I

10   can proffer some evidence on this issue, but --

11             THE COURT:  Well, if you're going to talk to me

12   about what you did and what you considered, I think you need

13   to have an evidentiary basis.

14             MR. HUSNICK:  That's fine.  Yeah, I'm happy to

15   proffer or -- what's that?  Yeah, I can finish my argument

16   in terms of responding to their other points, and then I can

17   circle back if that's all right with Your Honor, to --

18             THE COURT:  All right.  I'm not considering

19   anything that's being said that isn't -- that is basically

20   new evidence.  I'm not considering it until it's actually

21   put before the Court that's in your argument.

22             MR. HUSNICK:  Understood.  Your Honor, the only

23   other thing that I guess I would say is -- I'll say a few

24   other things.  One, they question the need on the $400

25   million of adequate protection.

1            Your Honor, the $400 million is -- equals -- it's

2    calculated by multiplying L plus 450, which happens to be

3    the interest rate and one of the first lien tranches.  It's

4    not the highest, and it's not the lowest, by the total

5    amount of the first lien claim.

6            The unsecureds argue, Your Honor, that that's

7    inappropriate under the law because we're paying interest.

8    I think they went so far as to say that we're paying

9    prepetition interest.

10            I would submit, Your Honor, that the payment of

11    adequate protection, while interest is a proxy for

12    appropriate calculation of diminution in value, that's not

13    the standard.  The standard is what is the diminution in

14    value.

15            The negotiators negotiated hard with the

16    prepetition first lien lenders to reach an agreement on

17    consensual use of collateral or cash collateral,

18    understanding that to the extent we did not have consensual

19    use of cash collateral that we would've been in a long

20    drawn-out cash collateral fight.

21            As such, one of the concessions that the debtors

22    made was to pay adequate protection at the rate that's set

23    forth in the papers.

24            Your Honor, we also negotiated, while we gave that

25    concession, we negotiated to have the right, as is standard,

1    to recharacterize or disgorge the amounts of adequate

2    protection paid to the extent that it is not -- that there

3    is no or is less than the full amount of the adequate

4    protection in terms of diminution in value.

5                Your Honor, we think that's important in something

6    that was glazed over in the papers, because the 400 million

7    in no way is going to prejudice the unsecured creditors.

8    It's somewhat ironic that we're standing here arguing about

9    the amount of adequate protection to pay to a secured

10   creditor, who the lenders say is over-secured, and whose

11   interest, if in fact, they are over-secured and the second

12   liens are entitled to one cent beyond the unencumbered

13   assets and the secured -- the unsecureds are entitled to

14   anything.

15               In order for that to happen, not only would non-

16   default rate of interest need to be paid, but under Section

17   506, it is arguable, and I suspect that the first lien

18   lenders would say, that default interest needs to be paid.

19               So it's a bit ironic that we're standing here

20   fighting about this.  The other thing I will say is the

21   controversial terms, so to speak, of the DIP order that were

22   highlighted in the brief are generally delayed until the

23   final order, in particular, liens on avoidance actions,

24   those are not taking effect until a final order.

25               The 549 and 550, while that is a lien on those

1    types of actions, I'd submit again that 549 to the extent it

2    relates to a post-petition transfer of the debtor's

3    collateral that was inappropriate, if that transfer is

4    avoided, that should be again part of the debtors'

5    collateral or of the DIP lender's collateral.  So that's an

6    entirely appropriate provision.

7              On the challenge period, Your Honor, the

8    unsecureds asserted that the -- effectively believe that the

9    time specified in the local rules in insufficient.  The

10   debtors do not believe that to be the case and take issue

11   and believe that there's ample time here for the parties to

12   review the liens.

13             And finally, the limitation they raise on the

14   budget for the lien challenges is 175,000.  Your Honor, the

15   debtors did negotiate this amount with the secured

16   creditors, and I'm certain to the extent that the unsecured

17   creditors are going to engage the DIP lenders, that can be

18   resolved between the interim and the final hearing.

19             So I will stop now.

20             THE COURT:  Okay.  Do you want to proffer the

21   evidence?

22             MR. HUSNICK:  Yeah.

23             MR. HESSLER:  Your Honor, it's my understanding

24   that Mr. Shore has expressed an interest in cross-examining

25   Mr. Keglevic.  I can do this, but it'd probably better for

1    you to hear from him, so we can call Mr. Keglevic to the

2    stand.

3                THE COURT:  Okay.  Have a seat.

4                THE WITNESS:  Thank you.

5                    PAUL KEGLEVIC, WITNESS, PREV. SWORN

6                        DIRECT EXAMINATION

7    BY MR. HESSLER:

8    Q    Mr. Keglevic, are you familiar with the DIP financing

9    strategy that involves dropping assets down from the TCEH

10   first lien's collateral package?

11   A    I am.

12   Q    And are you familiar with the term the drop down DIP?

13   A    I am.

14   Q    And is that the term that was used within TCEH to

15   evaluate that strategy?

16   A    Yes, it was.

17   Q    Can you describe the process under which TCEH could

18   employ that type of strategy, dropping down assets, then go

19   out in the marketplace and secure a DIP financing?

20   A    Sure.  So basically in our credit agreement, we had the

21   ability under one of our baskets to drop down a billion 5 of

22   assets effectively take it away from the collateral package

23   of the first liens, and then to, you know, do whatever we

24   wanted to do with those assets, finance them, or potentially

25   even sell those assets.

1          When we started looking at this as a potential

2     opportunity for the DIP, we had used already $100 million of

3     that capacity, so we had 1.4 billion available.  As we

4     looked at dropping that down, and then doing project

5     financing associated with that asset, the market rate that

6     we heard from our consultation with banks, and it's

7     generally the banks that are in the DIP facility that you

8     heard about earlier, Your Honor, would say that it's 50

9     percent is the traditional project financing percentage that

10    you could get.

11         So effectively dropping down assets, and in our case,

12    it would likely have to be generation plants that we would

13    drop those down into a structure, finance 50 percent, and

14    then have $700 million of available cash.

15         I think we also looked at that and said the 700 million

16    was woefully short of the amount of money we would need to

17    cover our operational needs as you'll hear about in a few

18    minutes under the DIP, and you can see that we're ultimately

19    asking for authority to borrow up to $4.75 billion, so the

20    700 million was very short.

21         We did consider a concept called recharge --

22    Q    Let me --

23    A    Would you like me to stop here so far?

24    Q    If you wouldn't mind, I just need to insert a question

25    every couple of minutes.

1    Could you -- you referenced that you were dropping down

2    $1.4 billion in assets, and based on the loan to value ratio

3    that you could get for project financing, you'd only be able

4    to get 700 million in additional financing.

5    A    Right.

6    Q    Does that include this recharging concept or is that

7    prior to the recharging concept?

8    A    That's prior to the recharging concept.

9    Q    So explain to the Court, if you can, how the recharging

10   concept works.

11   A    The recharging concept assumed that we would then take

12   the proceeds from the project financing and send those up to

13   TCEH, but put them in accounts that would not be subject to

14   lien package.  And by doing that, we would effectively have

15   recharged the amount of money that went up to TCEH and

16   effectively would've created another $700 million of

17   capacity that we then could drop down 700 million more of

18   assets and project finance those.

19       And you could --

20   Q    Go ahead.

21   A    -- assumingly continue that until ultimately you have

22   the law of diminishing returns and you have nothing left to

23   drop down.

24   Q    Was there concern within TCEH on the ability, under the

25   indentures and the financing documents to actually executive

1    a recharging strategy?

2    A    Yes.  You know, I would state that there was not only

3    concern about the recharge, but we had received letters from

4    the first lien lenders and certainly in comments that any

5    attempt to do a drop down structure to use the initial

6    basket this close to a bankruptcy proceeding would be

7    problematic, but certainly the recharge was also something

8    that at best is unclear, as to whether you have the ability

9    to do that, and would be the subject of litigation.

10   Q    In evaluating this drop down DIP strategy, what

11   challenges is this, just from a basic -- sufficient -- I'll

12   say it this way.  Was one of the challenges that you

13   identified in evaluating this, sufficient financing?

14   A    Yes.  So there really a couple; one, you know, was

15   capacity.  Because as I described this, we thought -- you

16   know, our calculations indicated we needed more money than

17   would be available through this process, even if the

18   recharge, in fact, turned out to be something that was

19   executable.

20        So capacity was an issue, execution was an issue, not

21   only because of the legal issues, but just the amount of

22   time it would take to do a transaction of this type, because

23   of course, these plants are tied to our system, we don't do

24   individual pricing and sales from individual plants.  We

25   have to allocate the associated fuel and fuel handling

1    facilities.  It's a very complex transaction.

2         And the third point was ultimately the cost at which we

3    could borrow that money if we were to enter into this

4    structure, which we would believe, and in fact, which the

5    market quoted us to be substantially higher than we were

6    able to accomplish at the 2.50 and live or plus 250 or 275

7    that you have in the documents.  In fact, it was closer to

8    almost double digit rates, high single digits or close to 10

9    percent.

10   Q    And ultimately who within TCEH and the advisory team

11   evaluated the drop down DIP and made a conclusion as to

12   whether to proceed forward with (indiscernible)?

13   A    My -- we had looked at this before we had any

14   consultation or meetings with the unsecured creditors.

15   Ultimately, my treasurer did meet with his team, some of the

16   unsecured creditors to make sure they didn't have any

17   additional wrinkles into the structure that we had looked

18   at.  We had routinely presented that to the TCEH board, and

19   to the EFH board, and based on the issues that I've

20   outlined, it was my recommendation to those boards that this

21   was not the appropriate way to proceed.

22             MR. HESSLER:  Thank you, Mr. Keglevic, we have no

23   further questions at this time.

24             THE COURT:  Okay.  Any further argument before I

25   turn it over?  Let's turn it over then.  Wait.

1          MR. HUSNICK:  No, Your Honor, I think we're fine.

2          THE COURT:  Okay.  All right.  Very good.  Mr.

3    Weisfelner.

4          MR. WEISFELNER:  I just need some clarifying --

5          THE COURT:  Can you go to the mic, just so I have

6    you on the --

7                      CROSS-EXAMINATION

8    BY MR. WEISFELNER:

9    Q    Now, you're the Executive Vice-President and CFO and

10   whole restructuring or co-chief restructuring officer of

11   which debtor?

12   A    I am -- I show those titles at all of -- at the EFH,

13   TCEH and EFIH levels.

14   Q    Weren't you sued for breach of duty in connection with

15   your services at EFH by creditors of TCEH?

16          MR. HESSLER:  Objection, Your Honor, it's beyond

17   the scope of the issues presented and part of the interim

18   relief under this motion.

19          THE COURT:  Relevance.

20          MR. WEISFELNER:  Sure.  I'm working with the first

21   day declarant, who among other things is here to tell us

22   that the DIP financing, and from my perspective more

23   importantly, the adequate protection package that's been

24   negotiated is fair and reasonable, and I keep getting from

25   the prospective of the debtors, or they break it down and

1    say the TCEH, since I can't say TCEH anymore, even though

2    we've been doing it for a year, the TCEH debtors.

3              So given that this is being presented as fair from

4    all of those debtors' perspective, I want to understand how

5    the specific implications for my debtor versus EFH have been

6    considered and ultimately dealt with.  So I think it's

7    completely relevant.  It's a background question, and I

8    think Your Honor is entitled to know what position this

9    gentleman, who's the co-chief restructuring officer faces,

10   and what problems he's faced in terms of litigation he's

11   been a part of.

12             THE COURT:  Okay.

13             MR. HESSLER:  I just didn't hear your ruling, Your

14   Honor.

15             THE COURT:  Just -- you looked like you wanted to

16   say something.

17             MR. HESSLER:  Well, I didn't -- if you had already

18   ruled, I wasn't --

19             THE COURT:  No, no, I was waiting for you to say

20   something.

21             MR. HESSLER:  Your Honor, I understand the

22   interest in probing to see whether there's relations

23   (indiscernible) but the relationship of TCEH DIP and the

24   evidence of (indiscernible) on the DIP, there's nothing

25   related to a separate financing or transaction that happened

1    years ago and litigation that arose and then later dismissed

2    out of this.  I don't think this is (indiscernible) of the

3    line of questioning, specifically as it relates to that

4    litigation.

5          MR. WEISFELNER:  Your Honor, I think we spend more

6    arguing it than we would have on this topic.

7          THE COURT:  I'll allow the questions

8    (indiscernible) asked in this (indiscernible).

9    BY MR. WEISFELNER:

10   Q    You were sued, were you not, in connection with

11   hundreds of millions of dollars, I think it was in excess of

12   a billion dollars' worth of loans that TCEH was forced to

13   make to EFH; isn't that accurate?

14   A    We were sued, but we -- I don't believe we were forced

15   to make those loans.

16   Q    Okay.

17   A    We had our independent board make a decision as to

18   whether those loans would be made.

19   Q    How much did those loans total at their high end, do

20   you recall?

21   A    I think $1.9 billion is my recollection.

22   Q    And when in the far past did those loans get repaid?

23   A    They got repaid over a period of time.  I think the

24   last payment was January 2013, if I'm not mistaken.

25   Q    And at what interest rate did -- what interest did TCEH

1    earn on the loans it made to its parent EFH?

2    A    Live or plus 550.

3    Q    And how does that compare to the interest rates on the

4    DIP financing that's being proposed?

5    A    It is above the rate of the DIP financing that we're

6    suggesting be approved at 250 and 275.

7    Q    Do you think that there an opportunity for EFH to

8    borrow the money that it had borrowed from its subsidiary at

9    or anywhere near the interest rates that were being charged?

10   A    TCH --

11   Q    (indiscernible) you know, do you think --

12             THE COURT:   (indiscernible) he can answer the

13   question that isn't (indiscernible).

14             THE WITNESS:   I think it's important to note that

15   the money TCH lent to EFH was borrowed under a revolving

16   credit agreement at live or plus 450, they charged 550, that

17   was a demand note, so it's very difficult to compare

18   interest rates on a demand note that is due and payable at a

19   moment's notice to other types of notes that are in our

20   capital structure.

21             So as I thought about it from my seat with my TCEH

22   duties is that effectively if TCH did not make those loans,

23   they would never have borrowed that money.  When they did

24   make the loans, they earned a profit, effectively, you know,

25   a positive arbitrage of a hundred dips on that money, and it

1    was repaid in full.

2    BY MR. WEISFELNER:

3    Q    But did EFH have an opportunity to borrow that money

4    from any other source at the same economic rate?

5    A    We never attempted to borrow the money because it was

6    provided for in the TCH credit agreement that these loans

7    would be made for principal and interest and SJA, which

8    spelled out at the beginning of the deal.  There was always

9    debt up there that couldn't be serviced any other way, and

10   that was the -- you know, the transaction that was always

11   contemplated when this deal was signed.

12   Q    Assuming the Court approves the DIP financing that

13   you're requesting, do you anticipate that the TCEH debtors'

14   business value is going to decrease between now and

15   confirmation of a plan?

16   A    I'm sorry, can you repeat?  I just didn't hear the

17   first part.

18   Q    Do you anticipate -- assume, if you will, that the

19   Court approves the DIP financing that you've asked for.

20   Under those circumstances, do you anticipate that the value

21   of the TCEH debtor's business is likely to decline between

22   now and confirmation?

23   A    Look, I believe it's very important that the DIP get

24   approved, so we have the ability to operate business as

25   usual, so there isn't a decline or deterioration of the TCEH

1    estate for the benefit of all creditors.  But whether or not

2    at the date we get the confirmation, you know, today the

3    power curves would indicate that the power in the future is

4    higher than the power today.  We hope we're able to retain

5    the customers, and we hope going through restructuring won't

6    have a negative other consequences to the estate, but it's a

7    difficult projection to make today until we see how that --

8    you know, how the interim year plays out in terms of power

9    markets and all the head winds we have associated with

10   protecting business value as we sit here today because of

11   the restructuring.

12   Q    From your perspective, and in your capacity as the co-

13   chief restructuring officer, do you have a view as to what

14   the purpose of adequate protection to the first lien holders

15   is?

16   A    Yes.

17   Q    What is the purpose?

18   A    It's basically to recognize that, you know, we are

19   going to pay them the value, you know, any diminution in

20   value associated with the bankruptcy, and they have the

21   right to liens and in some cases, payments of interest to

22   protect them from that diminution during that period of

23   time.  But once again, I'm not a lawyer, but that's my

24   understanding.

25   Q    Okay.  But from the financial point of view, do you

1   believe there will be any diminution in value to their

2   collateral?

3   A    As I indicated, it all depends on a lot of different

4   elements that are going to take place over the next 12

5   months.  I'm very hopeful that we're going to work very hard

6   that there is not, but there's no assurance that the head

7   winds associated with restructuring and the vagaries of the

8   power markets aren't going to have a negative impact in that

9   period of time.

10  Q    Have you attempted to quantify the potential diminution

11  in value of their collateral, with all of those factors

12  taken into account?

13  A    I have not, but I can, you know, off the top of my

14  head, I can generally translate power prices as you did

15  earlier into changes, but there's a lot of other variables,

16  Mr. Weisfelner, that you have to consider, including how our

17  retail business can operate; whether, in fact, if we don't

18  get the kind of customer motions we're asking for, or even

19  if we do that, you know, we have UBS out there saying that

20  the competitors are going to come and take a bunch of our

21  customers.  That would have a significant value diminution

22  to us during the case, which could offset the positives of

23  power markets.

24       We don't know if we're going to get a cash collateral

25  offer or this DIP, which we might not be able to trade and

1    lock in risk positions.  So it's a complex business, and

2    there's a lot of variables, as I sit here today, you know,

3    it's difficult to make that forecast with any degree of

4    certainty.

5    Q    Were you active in the negotiations of the terms of the

6    cash collateral protection being afforded to

7    (indiscernible)?

8    A    Yes.

9    Q    Are you familiar with the provision that has the Court

10   make certain finding with respect to the intercreditor

11   agreement that exists between the first and the second?

12   A    Yes, I'm aware generally of the intercreditor agreement

13   and what it says.

14   Q    Can you explain for us how it is that having the Court

15   make certain findings with regard to the intercreditor

16   agreement affords adequate protection to the first liens

17   with respect to the potential diminution in value of their

18   collateral?

19   A    While my understanding is the first liens will get

20   replacement liens, and they'll get payments of interest and

21   that should provide them adequate protection.  The second

22   liens will get also replacement liens, and they will not get

23   interest payments because the intercreditor agreement

24   provides that any amounts paid to the second liens could

25   ultimately be funneled to the first liens to assure that

1    they have adequate protection first.

2    Q    Are you aware of the extent to which the Court is being

3    asked to make decisions with regard to the enforceability of

4    the intercreditor agreement as part of the application

5    currently before it?

6    A    Just as I've testified to in my last comment, that's

7    primarily my understanding.

8    Q    Beyond what you testified to, are there any elements of

9    the intercreditor agreement that in your view need to be

10   approved as part of adequate protection?

11            MR. HESSLER:  I'm going to object, Your Honor.  At

12   this level, he's asking for a legal interpretation, and the

13   man's admitted he's the CFO and the chief restructuring

14   officer, he's not a lawyer.

15            MR. WEISFELNER:  Oh, quite to the contrary.  I'm

16   asking him in his capacity as the co-chief restructuring

17   officer who testified that he was involved in the

18   negotiations, I want to know what he negotiated over.

19            MR. HESSLER:  He's now being asked to interpret

20   the agreement (indiscernible).  He's identified the

21   (indiscernible), in fact, he's identified how he viewed it

22   as (indiscernible), and how (indiscernible) to go one step

23   too far, a bridge too far into interpreting the contract

24   itself in the order, and (indiscernible) interpretation.

25            MR. WEISFELNER:  I'll move on to my next question.

1          THE COURT:  Please do.

2    BY MR. WEISFELNER:

3    Q    The first lien lenders acquiescenced to the use of cash

4    collateral terminates, does it not, in the event that this

5    Court or some other court of competent jurisdiction would've

6    determined that a trustee or examiner should be appointed;

7    isn't that right?

8    A    I don't believe that -- that's not my understanding.

9    Q    Okay.  The cash collateral order that the Court is

10   being asked to sign would suffer a discontinuance of the

11   debtors' use of cash collateral, in the event that the

12   debtors' exclusivity period were terminated; is that right?

13   A    I know that the debtors' exclusivity period generally

14   is expected to go 18 months, but there are various steps and

15   milestones which we must achieve, or there are effectively

16   walkaway rights, but those walkaway rights do not reduce the

17   period of exclusivity for the debtor.

18   Q    Do you know what happens to the debtors' ability to use

19   cash collateral on the consensual basis if tomorrow the

20   Judge were to terminate exclusivity?  Do you know one way or

21   the other?

22   A    I'm not aware that there's any linkage between the cash

23   collateral order and exclusivity.

24   Q    Do you think such a leakage would be appropriate in

25   terms of providing adequate protection, as to understand --

1             THE COURT:  These are legal arguments, these are

2      legal arguments.

3             MR. WEISFELNER:  I have nothing else.  Oh, I'm

4      sorry, one other line of questions, because I'm confused.

5      BY MR. WEISFELNER:

6      Q    Who is the agent for the first lien creditors in a

7      position to consent to cash collateral use?  Who is that

8      entity?

9      A    I'd have to double-check, I don't recall off the top of

10     my head.

11     Q    Well, if I told you it was Citibank, would that refresh

12     your recollection?

13     A    Citibank was the first lien agent for a long period of

14     time, I wasn't aware if they had changed or not recently,

15     but.

16     Q    But I'm asking you --

17            MR. DUNNE:  Your Honor, (indiscernible) it

18     shouldn't be a memory test or trick question.  Citibank was

19     not the agent when we constructed the agent (indiscernible)

20     while we've been in this hearing.  And for the record --

21            THE COURT:  Whoa, whoa, okay, wait a minute, back

22     off.  You want to -- you went a bridge too far, Mr. Dunne.

23     Okay.  Start over.

24            MR. WEISFELNER:  Maybe I could --

25            MR. DUNNE:  For the record --

1      MR. WEISFELNER:  -- finish my examination and then

2  Mr. Dunne can clarify --

3      THE COURT:  Well, I don't want to put this witness

4  through a memory test on whether or not Citibank is

5  currently the agent.  If there's been a change, let me hear

6  about it.

7      MR. DUNNE:  And for the record, Dennis Dunne from

8  Milbank, Tweed, Hadley & McCloy on behalf of Citibank, N.A.,

9  who was formerly the agent, the administrative agent, and

10  the collateral agents on the first lien secured debt

11  facility at TCEH.  They are no longer.  That transition took

12  place today and Wilmington Trust Company represented by

13  Stuart and Kissell is, and I suspect they have some words

14  about what may be an ongoing breach of the intercreditor

15  agreement through this contesting and objecting to the

16  adequate protection.

17      THE COURT:  I haven't heard an objection, I've

18  heard cross-examination.  Thank you.

19  BY MR. WEISFELNER:

20  Q    All right.  So as I understand it now, and if you don't

21  know, you don't know, but as I understand it, Citibank was

22  the agent for the first liens that --

23  A    I knew that was the case, but I didn't --

24  Q    Okay.  And up until some time ago, was the agent, and

25  now Wilmington is the agent; is that right?

1    A    I knew they had to change.  I knew they couldn't be

2    part of our DIP structure unless there was a change in the

3    agent.

4    Q    Okay.  Here's what I'm trying to figure out.

5    A    Yes, sir.

6    Q    If Citibank ceased being the agent sometime today, who

7    consented to the cash collateral usage on behalf of the

8    first lien creditors?  Who consented?

9    A    I'm not aware of who consented, Your Honor.

10            THE COURT:  Okay.  That's fine.

11            MR. WEISFELNER:  I have no further questions.

12            THE COURT:  All right.  Mr. Debaecke, do you wish

13   to be heard?  And remember, we're in the context of cross-

14   examination in connection with the TCEH DIP.

15            MR. DEBAECKE:  Yes, Your Honor.  Your Honor, may

16   it please the Court, good afternoon, Michael Debaecke of

17   Blank Rome on behalf of Wilmington Trust Company as the

18   successor first lien administrative agent and first lien

19   collateral agent.  I'd like to introduce Mr. John Ashmead of

20   Stuart Kissell who I would move his admission orally, and we

21   will follow up with a motion for pro hoc vitae, thank you.

22            THE COURT:  All right.

23            MR. ASHMEAD:  Your Honor, John Ashmead of Stuart

24   and Kissell again for Wilmington Trust Company, which is

25   just while this hearing is going on, come in and finalized

1    its successorship as first lien administrative agent and

2    first lien collateral agent.  We've been working through

3    those issues just as this hearing has been going on today

4    and Citibank has been heretofore in that capacity and we're

5    still finalizing that.

6            I don't want to intervene into the examination or

7    the direct examination or any redirect, except for to note,

8    there are some issues which we will be raising with respect

9    to the existing intercreditor and the drag rights on the

10   second lien, and whether or not they have a right to object

11   to the adequate protection package, and there will be

12   questions about whether or not this testimony should be

13   stricken, given the obligations of the second lien parties

14   under that intercreditor agreement.

15           I apologize if this is somewhat disjointed, but

16   this is happening in live time as we speak.

17           THE COURT:  Your client consents to the adequate

18   protection package?

19           MR. ASHMEAD:  Our client understands that

20   Citibank, who was heretofore in that role until just about

21   this moment had consented, and we followed behind them, and

22   we agreed to and consent to the cash collateral package and

23   the DIP as set forth in the documents.

24           THE COURT:  All right.  Mr. Dunne?

25           MR. DUNNE:  Okay.  Let me just expand on that a

1   little bit so we have it clear.  I know I'm disappointing

2   Chris who is chomping at the bit here to cross-examine.  But

3   --

4           UNIDENTIFIED:  (indiscernible)

5           THE COURT:  I doubt that.

6           MR. DUNNE:  Citibank in its prior capacity as

7   administrative agent on the first lien facility has

8   consented.  That was based in part on hearing

9   representations from counsel, both from the Paul Weiss group

10  and others who represent more than 50 percent of the debt in

11  that facility, who have said that they support both the

12  priming that it's in the DIP and the cash collateral.

13          And, Your Honor, the transition, it's unfortunate

14  it occurred right now, it's been in the works for weeks,

15  maybe a couple of months now, it's unfortunate to His Honor,

16  so I apologize as to that.

17          THE COURT:  All right.

18          MR. WEISFELNER:  Your Honor, if I might just be

19  heard briefly because --

20          THE COURT:  Yes.

21          MR. WEISFELNER:  -- Your Honor must be wondering

22  why you're being treated with all of this detail in

23  connection with cash collateral and this witness, and I'll

24  be very, very brief about this.

25          First of all, there is a major disconnect between

1    what's being proffered in the papers from an evidentiary

2    perspective.  What we're told is that the Paul Weiss group

3    represents some 41 percent of the first lien noteholders.

4    I'm not hearing that in connection with Citibank's consent

5    to the DIP financing being proposed by Citibank -- let me

6    make sure you got that, Citibank goes to Citibank and says,

7    I'll tell you what, Citibank, we'd like you to agree to have

8    Citibank prime you, is that okay with you.

9           Now, I would have thought that Citibank under

10   their indenture and under my intercreditor agreement would

11   be obligated to have the requisite consent of the first lien

12   lenders.  I don't know if they had, I haven't seen any

13   evidence of it, other than what Mr. Dunne just said.

14          From that pose a number of consequences, because

15   what you're going to hear is someone say that I can't object

16   to DIP financing or cash collateral.  As far as I know, I

17   haven't.  I'm asking questions of a witness.  But I'll tell

18   you the mere fact that I'm talking him on cross-examination

19   is a violation of the intercreditor agreement.

20          That would also tell you by the way that I can't

21   vote under a plan under the intercreditor agreement, they

22   get to fill out my ballot for me.

23          If the time ever comes for us to deal with the

24   legality of intercreditor agreement we can, but the

25   enforceability of the intercreditor agreement depends on

1   them reaching certain steps, and having Citibank go to

2   Citibank with 41 percent of the creditors supporting it

3   isn't what was contemplated.  And I'm hearing two different

4   things.

5           41 percent was in the papers that I read, 50

6   percent or over 50 percent is what's being represented

7   today.  I have no further questions of the witness.

8           THE COURT:  Okay.  I've heard enough on that.

9   We're fine.  (indiscernible) Mr. Shore who is not a party to

10  an intercreditor agreement.

11                  CROSS-EXAMINATION

12  BY MR. SHORE:

13  Q   Well, let me fix that right now.  If I stood here and

14  asked you every question that Mr. Weisfelner asked you on

15  cross-examination, I take it you would give the same

16  truthful answers back?

17  A   Yes.

18  Q   Now --

19          THE COURT:  I told you you wouldn't forget what

20  you were thinking.

21          MR. SHORE:  No, I've got another one, I've got

22  (indiscernible).

23  Q   Which is the demand note, who at TCH had the right to

24  call the demand note that you testified to?

25  A   I'm sure the board did at a minimum, if not you know,

1    it might have been within my authority, but it would've been

2    something we would've made a board decision on.

3    Q    So you think as CFO, you might have authority as TCEH

4    CFO to make a call of the -- no, no, no.

5         TCEH was loaning money to --

6    A    (indiscernible) yes.

7    Q    Right.  So TCH would've called the obligation, right?

8    A    Right.

9    Q    So you weren't concerned that as -- that there was

10   going to be some time in which you would determine you had

11   to call the note, right?

12   A    Or my board.

13   Q    Yeah.  And you were the CFO of EFH at the time too,

14   right?

15   A    That's correct.

16   Q    Right.  And you had the overlapping board with EFH and

17   TCEH, right?

18   A    We do have an independent director at TCH.

19   Q    Right.  But are you aware of whether the independent

20   director at TCEH at that time had the ability to call the

21   note without the rest of the board?

22   A    It would've taken the board I believe.

23   Q    Right.  So your concern when you said that there's some

24   pricing problems that you couldn't testify about was the

25   concern that you as CFO and/or your board at TCEH would one

1    morning wake up and decide to make a demand on you as CFO as

2    EFH and the board of EFH, which is also the board of TCEH

3    stands that one director?

4    A    That was their right under the agreement.

5    Q    Okay.  When you say their right, that was your right to

6    call it from you.

7    A    That was TCH's board right to call it from EFH.

8    Q    Okay.  I'm -- I don't need to take -- I may need to

9    take you on your declaration.  Throughout your declaration

10   you used this phrase I understand that, and I'm looking at

11   paragraph 3 of your declaration, "I understand that TCEH

12   debtors have negotiated and reached an agreement."

13        When you use that phrase "I understand" is that meant

14   to mean I negotiated or someone told you that it was

15   negotiated?

16   A    I'd have to go through I guess all of the understands,

17   but I -- in that case, that one I knew, I was there.

18            MR. SHORE:  May I approach the witness, Your

19   Honor?  You'll find at the tab right here.  I'm going to

20   take (indiscernible - 3:29:17) who's got the --

21            UNIDENTIFIED SPEAKER:  Do you have a copy?

22            MR. SHORE:  Yeah, it's the declaration and I'll

23   tell you right now, it's page 89 of 464 on docket number 98.

24   It's the one you proffered into evidence.

25            THE WITNESS:  I'm sorry, which tab is this under?

1         MR. SHORE:  It's -- no, it's just -- see the

2    yellow -- little yellow tab that I (indiscernible - 3:29:34)

3    box, yes.

4         THE WITNESS:  Okay.  Is this in the exhibit?

5         MR. SHORE:  It's in the exhibit, yes.

6         THE WITNESS:  Which paragraph number?

7         MR. SHORE:  Paragraph 3 we're going to go to,

8    which is page 89 of 464 on docket 98.  Okay?  All right.

9    BY MR. SHORE:

10   Q    So, in that first one you say, "I understand that the

11   TCH debtors have negotiated and reached an agreement to

12   enter into subject of the approval of Court the $4.45

13   billion."  Let me parse that out then.  You do know that

14   you've entered into a DIP agreement, right?

15   A    Yes.

16   Q    Okay.  Did you -- what was your role in the

17   negotiations of that particular DIP agreement before the

18   Court?

19   A    I wasn't necessarily in every negotiation session.  I

20   was in some negotiation sessions.  I certainly understood at

21   different phases if I wasn't there what had transpired

22   during the session and ultimately understood this is where

23   we ended up after a lot of negotiation with the TCH first

24   lien lenders.

25   Q    Have you read the DIP agreement?

1    A    Yes.

2    Q    And have you commented on the DIP agreement?

3    A    Yes, at a point.

4    Q    And have you read the DIP order?

5    A    Yes.

6    Q    Okay.  And then the next one you say, in paragraph 4,

7    the TCH debtors, with the assistance of their advisors,

8    developed the three month budget with the assistance of

9    their advisors.  What role did you personally play in the

10   development of the budget?

11   A    The budget is primarily developed by people who work

12   directly for me and I reviewed that budget, it's consistent

13   with the budget that we created as part of our long-range

14   plan.  It was approved by our Board prior to that time.

15   Q    Okay, and did you play any role in either developing or

16   reviewing the budget, which was appended to the DIP motion?

17   A    Yes.

18   Q    Okay, and everyone who's my age or older, who can't

19   see, is going to hate this, but it's the size I have.

20            MR. SHORE:  May I approach, Your Honor?

21            THE COURT:  Are you going to show me the budget?

22   All right, thank you.

23            MR. SHORE:  Show this debtor out there.  Gloria

24   points out this is enlarged from the one we got.  All right.

25   BY MR. SHORE:

1    Q    Could you identify what I'll mark as TCH noteholders --

2    first day, Exhibit 1?

3            THE COURT:  What you say -- call that again?  TCH

4    noteholders 1?

5            MR. SHORE:  Actually, why don't we do Unsecured 1.

6            THE COURT:  Okay.

7    BY MR. SHORE:

8    Q    Can you identify what that is?

9    A    Yes.

10   Q    All right, now I just want to focus the Court on really

11   what's happening in the first month.  Do you have 13 week

12   cash flows?

13   A    We do not.

14   Q    You do not.  Do you have any cash flows which show what

15   happens over -- on a weekly basis between now and the end of

16   the month that pull up into this document?

17   A    I don't believe so.  It's typically monthly, quarterly,

18   and annual.

19   Q    Okay.  So, this is the only way we can look at what's

20   going to happen over the next month is to see what it is at

21   month end?

22   A    That's certainly what this represents that I have in

23   front of me.

24   Q    Okay, so I just want to start -- let's start down at

25   the line beginning cash balance.  See that down -- two-

1    thirds of the way down, 401?

2    A    Yes.

3    Q    So, that's to tell the Court that there's -- you

4    believe there's $401 million in cash at TCH right now,

5    right?

6    A    Correct.

7    Q    And is this TCH Consolidated or Consolidating?

8    A    This is TCH Consolidated.

9    Q    Okay, so now that 401 number, is that before or after

10   the payment of all the cash that you're seeking to have go

11   out the door on the first day motions?

12   A    I actually wish I could see if the -- this is May -- at

13   the end of May 31st, so this is the 1st of May --

14   Q    Yeah.

15   A    -- so it would be before.

16   Q    Okay, it's before.  So, you start with 401 million in

17   cash and -- and now let's go up to the top, the EBITDA

18   coming in and that will take you to the subtotal number,

19   after the cash impact on EBITDA, you're going to add 121

20   million in the month?

21   A    Yes, sorry, these are small numbers.

22   Q    Okay.  They really are.  I'm sorry.  So, you start at

23   400 and you add 121, and then you're going to have some

24   deducts here, right?

25   A    Yes.

```
 1   Q    All right, so you're going to take out 57 for capex,
 2   that's just for TCH subsidiaries.
 3   A    That's correct.
 4   Q    By the way, what's the -- is there any capex or
 5   expenditures that occur on the EFIH side, those debtors?
 6   A    There is not an EFIH box.
 7   Q    Yeah.  The -- and then next you have working capital,
 8   96.  See that?  Now, the EFIH debtors, they don't have any
 9   working capital expenditure either, do they?
10   A    They do not.
11   Q    Yeah.  And then margin deposits, you're taking 40 out
12   there, right?
13   A    Yeah.  It looked like 30, but --
14   Q    All right.  Yeah, 30, because then you go down -- go
15   down to the Chapter 11 adjustments down at the bottom.  Do
16   you see you're adding in 30?
17   A    Okay.  I see that, yes.
18   Q    Yeah.  So, the actual cash impact, depending on --
19   A    Is zero.
20   Q    -- would be zero, okay.  So, it's a zero cash impact.
21   And then you have other cash flow items, 6 million.
22   A    Okay, all right.
23   Q    And then you have estimated tax payments to EFH Corp.,
24   20 -- is that 27 million?
25   A    It looks like it, yes.
```

1    Q    Okay, so in the interim period, you are going to be up-

2    streaming $27 million to EFH Corp.?

3    A    Yes, I believe that's covered in our tax motion and

4    that's -- I believe it's Texas margin tax.  There might be

5    some sales tax in there too.

6    Q    And what obligation does TCH have to pay that money to

7    EFH?

8    A    EFH is just a passer entity.  Those are taxes created

9    by TCH and related to TCH only operations.

10   Q    Let me make sure I got this right, though.  You said

11   EFH was the pass through entity.  TCEH is the pass through

12   entity, right?

13   A    TCH pays the amounts to EFH who distributes them to the

14   ultimate taxing authority.

15   Q    Right, but who's liable to the taxing authority on the

16   27 million?  Who's the taxpayer there?

17   A    EFH Corp.

18   Q    EFH Corp.  So, is there any reason why EFH Corp.

19   couldn't pay the taxes, since it's the taxpayer and then

20   take an administrative claim, or some other claim against

21   the TCH (indiscernible - 3:36:17) tax?

22   A    I can't -- I haven't thought about that.  These are

23   taxes created by the TCH operations that are passed up to

24   EFH for distribution.

25   Q    You haven't thought about that?  You're -- do you know

1    you're asking the Court for authority as a TCEH officer on a

2    TCEH motion to pay $27 million to your parent for a tax

3    liability of your parent, pre-petition tax liability of your

4    parent?

5    A    Yes, because to the extent that the parent was not to

6    make those payments, there would be business harm associated

7    to TCH.

8    Q    But isn't that the -- but the original tax obligation

9    is of EFH, the taxpayer, right?

10   A    Well, the tax obligation is created by the TCH

11   business.  The obligation, technically, resides at EFH.

12   Q    Do you have a concern that the Texas --

13             THE COURT:  I'm sorry.  Why is that?  Does it come

14   from your tax sharing agreement or is that State law?

15             THE WITNESS:  No, it's just I believe that

16   effectively EFH is the taxpayer of record with these

17   agencies.  So, in fact, but you know, I want to double check

18   that with my team to make absolutely sure, but I believe

19   that to be the case.

20             THE COURT:  Okay.

21   BY MR. SHORE:

22   Q    Any reason EFH just couldn't pay the taxes and defer

23   that issue for 30 days until we can have a final hearing on

24   this?

25   A    I don't know what EFH's position would be with respect

1    to paying taxes associated with TCH, but I would assume non-

2    payment of tax would have negative business impacts of TCH

3    and I wouldn't like to take the risk of having -- wondering

4    whether the EFH would make payments even though, in fact, as

5    you point out, there would be no impact to their estate.

6    Q    Let me just understand when you say I don't -- I

7    wouldn't -- I don't know whether EFH is going to pay.

8    You're the CFO of EFH, right?

9    A    Right.

10   Q    And it would be largely your responsibility to make a

11   determination as to what things to pay and what not the

12   things to pay in a particular month?

13   A    Right, and I would do it in consultation with my

14   advisors, my lawyers, and our board.

15   Q    All right.

16   A    I just haven't had that consultation.

17   Q    So, then we get down to -- we take it -- we had that 27

18   and then you get down to a negative cash flow of 96 million?

19              THE COURT:  I think it's 95.

20              THE WITNESS:  It looks like 95 -- could be the

21   closest --

22   BY MR. SHORE:

23   Q    95, okay, 95.  And then let's go down below the line.

24   You get the Chapter 11 adjustments.  The margin deposit we

25   see added in, okay?  And then there's 401 there.  That's the

1    payment that's going out to the secured creditors, right?

2    A    That's correct, to the TCH first lien creditors.

3    Q    And what does that represent?  What's that --

4    A    I believe that's 300 million of accrued interest and

5    101 million of current interest.

6    Q    Right, so when your counsel said that it's, you know, a

7    way of equating them, in your mind, what's happening here is

8    you're paying $300 million in pre-petition interest as an

9    adequate protection payment?

10   A    That's correct.  That was what was negotiated with the

11   TCH first lien lenders.

12   Q    Okay, and then the next one, one two -- well, actually

13   I'm going to ask you to switch -- look over those next

14   columns -- or two columns down over to the right.  There's a

15   1 point -- is that a $1.1 billion charge?

16            THE COURT:  Right, for the mine reclamation bond?

17   BY MR. SHORE:

18   Q    Yeah, that's mine reclamations happening in the net per

19   month, right, in your cash flow?

20   A    Yes, we have it coming out in the month of -- I guess

21   that's June.

22   Q    Right, so that's -- that would be after the final

23   hearing or after a final hearing on DIP and cash collateral,

24   right?

25   A    That's correct.  That's the assumption here.

1   Q    Okay.  All right, and -- well, Mr. Weisfelner, I'll

2   give you credit, though I can't give him credit for the

3   question.  Shoot.  I'm going to come up with a question on

4   my own here, which is that money may not have to go out the

5   door at all if the Texas authority agrees to the carve out?

6   A    That's correct.  Our concern -- what we want the first

7   day motion approval of is to make sure we give assurance to

8   the railroad commission of the State of Texas that there is

9   provision to have it paid, and they don't have to hand out

10  for another 30 days waiting for the determination of whether

11  they'll get a super-priority lien.  We don't want to take

12  the business disruption risk associated with decisions they

13  might make in the interim if, in fact, this relief is not

14  granted.

15  Q    Okay, and then down next, 1.2 billion.  Now, you have

16  -- do understand how much LOC exposure you have right now?

17  A    Yes, generally.

18  Q    How much?

19  A    We have, today, about -- I mean, it changes daily, but

20  we have about $600 million of existing LC's that we're

21  asking to replace with new LC's, and the reason we're doing

22  that is because if we -- if, in fact, they terminate those

23  agreements because we haven't replaced the LC, that opens up

24  our commodity position, you know, to greater risk and we'd

25  have to, effectively, re-hedge that at a cost and take the

1    market risk of a decline in the interim period.

2    Q    Have you gone to the counterparties on those and asked

3    them whether or not they're willing to live with the

4    existing LOC's that are in place?

5    A    We have -- negotiations are continuing.  Obviously, we

6    did not go and announce that we were going to file

7    bankruptcy on a date certain.  It was material, non-public

8    information, so --

9              THE COURT:  I'm sorry.  Is there anybody in the

10   room that didn't know they were going to file bankruptcy

11   this week?  Anyway.

12             MR. SHORE:  So, of that -- so, of the 1.2 here --

13             THE WITNESS:  I'll just say date certain, Judge, I

14   didn't --

15             THE COURT:  I understand.

16             THE WITNESS:  -- want to argue the week.

17             THE COURT:  I understand.  I understand.  I

18   understand.

19   BY MR. SHORE:

20   Q    Of that 1.2, you're saying that 600 might not even need

21   to ever be drawn because you could get people to roll on

22   their existing LOC's?

23   A    Our assumption is they would not roll and they'd want a

24   new LOC based on discussions we've had with them prior to

25   filing.

1    Q    I thought you said you didn't have discussions with

2    them?

3    A    General discussions about what happens when you file,

4    not specific discussions when we filed about what each

5    counterparty would do.  And in fact, we know, I think it's

6    already been put into evidence that two of our largest

7    counterparties have, in fact, drawn on the LOC's.

8    Q    That actually was spoken about by your lawyer.

9    A    Well, let me make it testimony, if you don't mind.

10   Q    It's their client, go ahead.

11   A    So, it was -- a couple of the banks did that.

12   Q    All right, but who would I need to speak to in your

13   shop to find out about conversations that were had with

14   hedging counterparties as to whether or not they'd roll into

15   existing LOC's?

16   A    It's our risk management team.

17   Q    Did you personally have any of those communications?

18   A    No, they were all communicated to me with the

19   counterparties what those discussions resulted in.

20   Q    Okay, so you got 600 LOC's out right now, and the

21   assumption, I guess, is in the next month, you're going to

22   need another $600 million of LOC's?

23   A    Yes, that's to cover, you know, all the positions that

24   we, you know, may have to take associated with, you know,

25   these counterparties going away, providing new

1    counterparties.  It also provides for any changes in market

2    commodities.  It's just -- it's an estimate of what we think

3    the potential exposure should be and the best way to treat

4    the estate in terms of, you know, reducing risk and

5    maximizing air price value.

6    Q    Okay, well, let's go down --

7              THE COURT:  I'm sorry.  I'm a little unclear,

8    (indiscernible - 3:45:56) are the counterparties that could

9    draw on the LC's?  Were these stock, or hedge parties, or --

10             THE WITNESS:  Yeah, these are typically hedge

11   parties associated with natural gas are the largest portion,

12   so they are basically a NYMEX traded swap that they are in

13   the money.

14             THE COURT:  Okay.

15             MR. PE:  You know, or -- I'm sorry, that are out

16   of the money that had a post-collateral to.

17             THE COURT:  Okay, so instead of posting in

18   collateral -- well, the way you post the collateral with a

19   letter of credit or the letters?

20             THE WITNESS:  Yes.

21             THE COURT:  And two counterparties have withdrawn?

22             THE WITNESS:  Two counterparties have already

23   announced that they're closing out their position and we --

24   you know, like I said, it's going on constantly as we're

25   sitting here today as to what the counterparties' points of

1    view is going to ultimately be.

2              THE COURT:  All right.

3    BY MR. SHORE:

4    Q    Just since we're on that and (indiscernible - 3:44:45),

5    it gets even smaller, if you look at footnote 1, just so

6    we're talking about your hedging position, these numbers

7    we've gone through do not include projected hedging revenue

8    you're going to make.  In other words, your hedges are in

9    the money by how much money between now and December are you

10   projecting?

11   A    We're assuming most of the amount of that money that's

12   in the hedges is going to -- they're going to take the

13   position that they're going to offset what they owe us

14   against what we'd owe them in interest rate hedges.  So, the

15   net amount of money between -- in December, this is probably

16   the people that we're in the money to that don't have a

17   right of offset, and I would assume that's the 391 we're

18   talking about.

19   Q    All right, so there could be another 390 -- or some

20   portion of the 391 million in cash come in during the month

21   to supplement that 121 number, had its positions close out?

22   A    No, we would expect since they owe us, they will not

23   close out the position to pay us early, so it'll occur over

24   the entire period of time.

25   Q    All right, but some portion would come in now.  I

1    agree, it does not say here that all the money is supposed

2    to come in in December.

3    A     There will be a -- probably -- well, I don't know the

4    specific amount, but there may be some, yes, that would come

5    in in that one month.

6    Q     Okay.  And keep going down the line now, the 218,

7    professional fees, financing --

8    A     Business impact.

9    Q     -- business impact, and other.

10   A     I have my glasses.  I can help now.

11   Q     Good.  So, it's 200 and --

12   A     16 or --

13   Q     -- 15 million going out --

14   A     Maybe it's --

15   Q     -- between now and the final order on that?

16   A     Yeah, and a lot of that is the, you know, approximately

17   90 million or so as associated with the proposed DIP fee.

18   Q     Okay.

19   A     That's why that number is so large.

20   Q     Yeah, and the rest of it is accrual of professional

21   expenses?

22   A     Well, there's a cash forecast, so this should be the

23   cash payment of professional expenses.  That would be one of

24   the pieces, yes.

25   Q     Right, but -- so, right.  That's what I didn't

1     understand though, because the motion says you're not going

2     to be cash paying professional expenses, right?  You're

3     going to make an application for them and have that

4     application granted before there can be a payment?

5     A     I'd have to get more information specifically on how

6     much professional fees are in that number.  I know the

7     biggest piece is the DIP fee.  And the business impact is an

8     assumption of reduction in cash flow associated with

9     customer loss, you know, associated with the issue that I

10    talked about before, the competitors pushing to take our

11    customers, given we're in distress and not operating

12    business as usual.

13    Q     Okay.  Now, so if you took out the expenses associated

14    with the Chapter 11 adjustments down, and it's just new ways

15    of financing things, or the restructuring expenses, you are

16    cash flow negative in month 1, somewhere at 95, assuming

17    that you're allowed to pay your parent, right?  Cash flow

18    negative 95 with 400 in the bank plus another 121 coming in.

19    A     Yes, excluding all these other items we just discussed.

20    Q     And so when we deal with cash collateral, you were

21    concerned and gave the cash collateral package to the first

22    lien lenders in the interim period, not waiting for a final

23    order, that because the company started with 400 million in

24    cash, added another 121 to the kiddie, and then spent 95,

25    that the first lien lenders were going to precipitate a

1    contested cash collateral fight and shut off the spigot that

2    would allow you to pay any of those expenses up at the top?

3    A    Could you rephrase that?

4    Q    Sure.  $400 million in cash in the starting position

5    with another 121 plus in potential hedging money coming in,

6    right?  That's where we've been.  Am I --

7    A    I don't know where you get the 121.

8    Q    Well, if you -- you got another 121 in revenues that

9    are coming in over the month.

10   A    Okay, that's EBITDA, that wasn't hedging.  That's --

11   you referred to as hedging money.

12   Q    No, sorry.  400 --

13   A    Plus the 121, yeah.

14   Q    -- plus 121, plus some unknown amount of potential

15   hedging revenue during the period which was excluded as per

16   footnote 1.  And then you have the expenditures, which

17   includes $27 million of tax payments to the parent, puts you

18   at negative 95 -- no, sorry, which are negative 210, right?

19   A    Well, if all those items up above, which includes the

20   EBITDA and the item you're talking about on an unlevered

21   basis, even if you take the 27 out, you're negative 68.

22   Q    Right, so you're negative 68.  So, the cash position of

23   this company would diminish under your view -- cash, $68

24   million until the final hearing.  And your concern was that

25   the first lien DIP lenders were going to shut off your

1    access to cash and precipitate a contested cash collateral

2    hearing in the first phase of the case, which would destroy

3    the business that you are handing over to them if the

4    restructuring support agreement transactions go forward?

5    A    Yes, because you've ignored all the other adjustments

6    associated with letter to credits and all the other

7    financing needs that I could have running a complicated

8    business with billions of dollars of commodity positions

9    that can vary greatly overnight.  So, not to have the

10   ability to use the unlevered cash flow, not to have the

11   ability to be able to provide a super-priority lien, and to

12   have the cushion to allow me to operate both with the

13   railroad commission and with my counterparties and protect

14   the positions on power, gas, uranium, coal, and all the

15   other commodities is a huge risk for this company to take,

16   and as the CFO, I did not believe that was the appropriate

17   risk.

18   Q    I'm not -- I was going to ask you to focus -- to stop

19   with the DIP.  We're going to come to whether or not you can

20   get the DIP and how big a DIP you need, I'm just talking

21   about cash collateral fights that's going on.  You weren't

22   -- you're not taking a DIP from your existing lenders,

23   right?

24   A    That's correct.

25   Q    Okay.  You went out into the market and got a DIP and

1    that DIP on market terms need to define the first lien

2    lenders, right?

3    A    Yes, sir, but of course, I couldn't get that DIP unless

4    my first lien lenders consented to the ability to give them

5    the super-priority liens.

6    Q    Or it would start a fight with the first lien lenders

7    that you would have to overcome in order to have the

8    Judge --

9    A    In any event, in substantially increasing the risk of

10   business disruption that, you know, is not what I believe

11   would maximize enterprise value for the estate.

12   Q    And your assumption was that if that happened, if you

13   came in and got a DIP that the first lien lenders were going

14   to precipitate this value destructive fight which was going

15   to destroy the business which they are taking at the end of

16   the chart, Exhibit 1.

17   A    I -- my job is to mitigate risk and not to take on

18   unknown risk and I was not willing to bet that the first

19   lien lenders would not take that position.

20   Q    Okay, and with respect to the cash collateral, then,

21   just focus on that, your view was that even if -- that then

22   in order to get the DIP, and to have them stand down on the

23   super-priority fight, you had to give them what they wanted

24   under the cash collateral order?

25   A    That's correct.

1   Q    Okay, and part of that was $300 million in post-

2   petition interest?

3   A    That was part of the negotiation to get to a consensual

4   deal to assure the business disruption that I was worried

5   about did not occur.

6   Q    Okay, do you know what a 506(c) waiver is?

7   A    I'm not aware of it as I sit here today.

8   Q    Okay.

9   A    I know I've read it in some of the documents.

10  Q    All right, well, let me tell you that under certain

11  circumstances if what the debtors are doing are preserving

12  collateral just for the benefit of the secured lenders, you

13  can charge the secured lenders for doing that.  Do you

14  understand that you waived the right to do that in the cash

15  collateral order?

16  A    That is my recollection.

17  Q    All right, do you understand what there are in

18  unencumbered funds in the TCH debtor's estates now?

19  A    Yes, I believe the number's about 150 million, and I

20  believe in the cash collateral office -- or order, we

21  propose segregating that amount for the benefit of -- or

22  just segregating that amount, I should say.

23  Q    Okay, now part of my questions, which picked up

24  Mr. Weisfelner's questions were the -- what happens if the

25  cash collateral order is terminated.  Let's move forward in

1    the chart a little bit.  If you could follow the

2    restructuring items here, other than the DIP fees, and that

3    whole line of professional fees, how much professional fees

4    are you expected are going to be incurred getting the TCH

5    assets from the petition date to the time in which you turn

6    over the company to the secured lenders?

7    A    I think those numbers probably are a pretty good

8    estimate of that number.  So, you know, they're running

9    about 20 something to 30 a month, and I think that -- my

10   recollection is that pretty much, times 12 months, would --

11   you know, if that's the timeframe we're looking at is the

12   kind of cost we were expecting.

13   Q    That's the debtors' professionals, right?  What about

14   the secured creditors' professionals?

15   A    That should be everybody's professionals.

16   Q    And let's assume you get -- we get out to November and

17   exclusivity is terminated, cash collateral ends, or some

18   other event happens that cash collateral ends, where is the

19   company going to come up with the money to pay employees?

20   A    I assume we're going to come back to the Court and

21   figure that out.

22   Q    Well, get it from where?  They say, no, spigot's off,

23   cash collateral has ended, there's been a termination event,

24   where are you going to get the money to pay employees?

25   A    I'm not sure in that situation where we'd get that

1    money.

2    Q    Where are you going to get the money to protect the

3    plants?

4    A    Same answer.  I can't assume where we're going to get

5    that money.  I'm assuming it's going to come from one of the

6    debtors.

7    Q    One of which debtors?  These debtors have just agreed

8    to a cash collateral order, which is going to prevent you

9    from surcharging their collateral.  So, where are you going

10   to get the money at that point to pay all your operating

11   expenses in the event the cash collateral order terminates?

12   A    I think I've answered that.  I have to assume the only

13   source of funds here is from -- ultimately from the debtors

14   and the secured debtors.

15   Q    Well, when you say the debtors, the TCEH debtors?

16   A    Yes, sir.

17   Q    Okay.  So, the TCEH debtors are going to have to find

18   some unencumbered funds, right?

19   A    I don't know what their source will be.

20   Q    Okay, and what about the 150 that's sitting there?

21   A    The 150 is segregated.  That's all we've agreed to at

22   this point.  It's a hypothetical what happens down the road

23   and where the sources come from.

24   Q    Well, I take it that in agreeing to the 506(c) waiver,

25   you weren't thinking about the issue of what happens if the

1    cash collateral order terminates before the assets are

2    turned over to the secured lenders?

3    A    We ultimately believed that that wasn't going to be a

4    substantial risk to the estate, that we would get it done.

5    Q    So, the assumption is that you're just not going to hit

6    a termination event, so you don't need to worry about it.

7    A    Or that if we had a termination event, we'll have a

8    negotiation that will result in, effectively, cash being

9    provided to secure the value of their estate.

10   Q    Now, just so I understand this chart, everything spent

11   on here, is there anything that's being spent in this entire

12   case at TCEH which you can point to provides benefit to the

13   unsecured creditors of TCEH?  Any of the TCEH debtors?

14   A    I would assume that all of the money spent for the

15   benefit of the estate could ultimately benefit all the

16   creditors.

17   Q    Under your RSA -- the RSA -- first of all, did you sign

18   the RSA on behalf of -- or of TCEH?

19   A    I believe I did.

20   Q    Okay.  And did you sign the RSA on behalf of EFH?

21   A    I believe I did.

22   Q    And under that RSA, EFH has agreed to cancel its equity

23   in TCE -- no, to --

24   A    EFCH?

25   Q    -- EFCH.

1          MR. HESSLER:  Objection, Your Honor, I don't see a

2    connection at all.  It's an RSA, which isn't even up for

3    approval on today's cash collateral hearing.  We've allowed

4    a lot of leeway on this, but there's no nexus between that

5    question and the issues at this interim level here.

6          THE COURT:  Overruled.

7          THE WITNESS:  I'm sorry, could you repeat the

8    question?

9    BY MR. SHORE:

10   Q    Sure.  EFH has agreed to cancel its equity in --

11   A    EFCH.

12   Q    -- EFCH?

13   A    I believe I answered that, yes.

14   Q    Yes, okay.  And TCH -- you, as the CFO of TCH, signed a

15   restructuring support agreement which ultimately will turn

16   the company over to the secured lenders, right?

17   A    Correct.

18   Q    Now, you're not spending any money under any line item

19   in this budget to cover the expense of putting $150 million

20   in an account?

21   A    No, because we have that cash today, so segregating it

22   doesn't cost us anything.

23   Q    Right, so every -- is it true that every, single dollar

24   of expenditure under this chart is ultimately being spent on

25   assets and processes which will be turned over to the

1    secured lenders at the end of the forecast period?

2    A    Every dollar being spent is for the value of the estate

3    that under that agreement would be turned over to the

4    secured lenders, that's correct.

5    Q    So, if your view is that there's no money left over for

6    unsecured creditors other than the 150, what's the benefit

7    to the unsecured creditors of any of this?

8    A    My understanding is the Court will decide ultimately

9    how to allocate the value of the estate among the creditors.

10   My job is just to keep the estate -- to maximize enterprise

11   value of that estate for the benefit of all creditors and

12   whether the RSA is executed as contemplated or whether the

13   estate is allocated differently is the Court's decision, and

14   something that, you know, I won't opine on.

15   Q    But it's your view, though, that what you're doing is

16   you're preserving the collateral of the secured lender to

17   turn over to them at the end of the case?

18   A    Well, I think I've answered that, but my view is that

19   I'm maximizing the value of the estate for whoever the Court

20   decides receives that value.

21   Q    This -- and maybe we're talking past each other -- in

22   the RSA, you are seeking, and going to seek approval for the

23   -- to commit the TCH estate to pursue a plan, which will

24   turn the assets over to the unsecured -- to secured

25   creditors.

1    A    I understand the distinction you just made, counsel, so

2    yes, in the event that the RSA is executed as it is written,

3    the money spent would maximize the value of the estate,

4    which would then be turned over to them and would

5    potentially reduce the amount of recovery to the TCH

6    unsecured and the second liens to the $150 million in that

7    segregated account subject to any other Court decisions to

8    the contrary.

9    Q    All right, and let's talk about unencumbered assets,

10   then, with a dropdown.  I want to understand your testimony.

11   Did you -- was it your testimony that you believed you could

12   have dropped down $1.5 billion into a sub, consistent with

13   the first lien indenture?

14   A    I testified to 1.4.

15   Q    1.4.

16   A    1.5 was the original amount.  We had used 100 of it

17   before for other reasons a while back.

18   Q    All right, so you could have, in the company's view,

19   pursued a transaction which would have gotten you $1.4

20   billion of assets which were available to (indiscernible -

21   4:01:37) to a potential DIP lender?

22   A    That's correct.

23   Q    But you -- ultimately, you gave up on the 1.4 billion,

24   you just decided to go for a larger DIP with other people?

25   A    For the reasons suggested: because of the complexity,

1   the executability, and the cost.

2   Q    And how long -- for how long has TCH had the

3   contemplation that it might have to file for Chapter 11

4   protection?

5   A    I don't remember the exact date, but it's probably been

6   awhile.  You know -- sorry.

7   Q    That's really an NPI.

8   A    I don't remember the date.

9   Q    Okay, when was the first time you discussed the

10  dropdown feature with unsecured creditors?

11  A    You know, I don't remember exactly, but it was probably

12  8, 9 months ago.

13  Q    So, you had at least 8 or 9 months to pursue a

14  structure in which you could have created, in the company's

15  view, $1.4 billion of assets (indiscernible - 4:02:41) the

16  pledge to the DIP lenders?

17  A    Subject to financing, we could have used the 1.4, but

18  at a higher cost, and once again, I didn't think the

19  ultimate value to the estate was up -- the comparison to the

20  alternative.

21  Q    But at least as to that $1.4 billion, it was the

22  company's view that the first lien lenders wouldn't be able

23  to engage in that super-priority fight?

24  A    That's correct.  I would also say that, though, to be

25  clear, I think the initial discussions with the unsecured

1    lenders of 9 months ago, we're talking about using those

2    proceeds to do an amend and extend, not to be -- for DIP

3    purposes, but the transaction was similar.

4    Q    So, there was nothing that prevented you at that time

5    if you were contemplating through Chapter 11 protection that

6    pursuing the structure in which you created $1.4 billion of

7    assets that you could pledge free and clear?

8    A    That's correct.  We could have undertaken that had we

9    determined that was the best outcome, which we did not.

10   Q    Okay.  The -- I'm going to read you -- have you read

11   Mr. Goldstein's declaration?

12   A    I don't know that I have.

13   Q    Let me read you a sentence then --

14   A    Okay.

15   Q    -- and see whether you agree with it.  "Based on the

16   TCEH debtor's financial projections" --

17             THE COURT:  Where are you?

18             MR. SHORE:  Sorry.  I'm in the Goldstein

19   declaration if you want to follow along, Your Honor.  It's

20   document number 73, the first one.

21             THE COURT:  What page?

22             THE WITNESS:  Can I get a copy?

23             MR. SHORE:  Yeah, you guys just had one.

24             THE WITNESS:  The first one?

25             MR. HESSLER:  Your Honor, may I approach the

1   witness?

2            THE COURT:  Yes.

3            MR. HESSLER:  Thank you.

4   BY MR. SHORE:

5   Q    I'm going to draw your attention to paragraph 8, which

6   is on page 105 of 117 in docket 73, the page 4 in, I think,

7   your copy.  And I ask whether you agree with this sentence,

8   the second sentence in paragraph 8.  "Based on the TCEH

9   debtors financial projections, the TCEH debtors determined

10  that cash collateral may be sufficient to fund certain

11  aspects of working capital, capital expenditures, and other

12  general corporate purposes during the anticipated duration

13  of the Chapter 11 cases, but will be insufficient to fund

14  the cost associated with the TCEH debtors restructuring

15  efforts, including provided creditors with adequate

16  protection."  See that?

17  A    Yes.

18  Q    All right, you agree with that sentence?

19  A    I'd love to see the numbers because when we did that

20  determination, we did not believe that even if we paid zero

21  adequate protection and didn't have to pay the railroad

22  commission that the amount that we could finance through a

23  dropdown structure were not sufficient.

24  Q    So you're disagreeing with Mr. Goldstein's testimony?

25  A    Yes, the last projection I saw of that analysis that I

1    presented to board showed that it was insufficient to cover,

2    even if we did not pay the railroad commission and did not

3    pay adequate protection.

4    Q    And that was because of the LOC structure you wanted to

5    put in place where you wanted full availability in the first

6    30 days of the case to replace every outstanding LOC and

7    leave yourself $600 million of additional LOC capacity?

8    A    No, sir.  It was over the period of time.  It was over

9    the period of bankruptcy that we thought was most likely

10   that there would not be enough funds to do it.  That was the

11   last one that I did and presented to our board that with

12   those two, it was still short.

13   Q    All right, well, let's focus.

14   A    Yes.

15   Q    Okay, I'll be more precise then, focus over the next 30

16   days.  Do you believe that the debtor's cash collateral is

17   sufficient to fund aspects of working capital, capital

18   expenditures, and other general corporate purposes during

19   the duration of the interim period?

20   A    Well, no, because of the items associated with risk

21   management that we talked about before, the replacement of,

22   you know, if you were just talking about the meat and

23   potatoes stuff, and we didn't have to manage our commodity

24   positions, or didn't have to worry about that risk, maybe we

25   could have gotten there, but those other items have a

1    tremendous impact, potentially, on cash.

2    Q    Right, one is the payment of the adequate protection

3    payment.  So, if you don't make an adequate protection

4    payment to the lenders by using their cash collateral, then

5    you'd have to use their cash collateral?

6    A    No, even ignoring the adequate protection --

7    Q    Okay.

8    A    -- there still are --

9    Q    Yeah, in the first 30 days, you've got the issue on the

10   LOC's?

11   A    Yes.

12   Q    Right?  The LOC's are you've got 600 out on the LOC's,

13   which you are assuming you're going to need to replace every

14   single one in the first 30 days.

15   A    That's what the assumption is here.

16   Q    But that's based on communications that people in your

17   shop would have with the counterparties, which you don't

18   know have happened yet.

19   A    I know they're ongoing as I suggested that they had

20   begun, and that was the indication we were getting.  Plus,

21   it also covers, it's just not the replacement LOC's, it

22   gives us the ability to mitigate risk associated with future

23   operations of the estate and trading positions, et cetera.

24   So --

25   Q    600, you -- and is it your view you need $600 million

```
 1    of additional LOC capacity in the first 30 days of the case

 2    because your trading positions are going to change so much

 3    in the first 30 days, you're going to have additional $600

 4    million in outlay on that?

 5    A    I think we very well could.  It's not only the outlays

 6    because of the trading positions, but it also could be a

 7    market movement and existing positions that are there.  And

 8    in fact, in our cash collateral order, we asked for $160

 9    million of cash to cover existing positions with just two

10    counterparties if we go to 95th percent confidence level and

11    we get commodity moves.  So it just -- unfortunately, you

12    know, this company has a huge commodity position and that's

13    why the bet on gas, or the bet on power prices is so big and

14    why those small variances, and the cost of gas, or the cost

15    of power, or heat rates, which is the element of gas times

16    heat rate equal power price, can drive tremendous, you know,

17    changes.  And there is a lot of volatility as indicated in

18    Mr. Sassower's report.  We had a weather event in January,

19    you know, that everybody's painfully aware of and, you know,

20    it's a big risk for this estate to take not to be covered on

21    those items.  And that was our determination and it remains

22    our determination.

23    Q    Right, and all of that then, the structure of the cash

24    collateral order, with the first lien lenders, though, was

25    premised on the notion that they were not going to consent
```

1    to any DIP which would take care of that situation.  They

2    would let the company go naked on its hedging positions in

3    the first 30 days of the case, unless they got paid $400

4    million, got a Section 552 waiver, got a Section 506(c)

5    waiver, got everything -- got an allowance, or recognition

6    of the credit bid right in the agreement, that all of that

7    was a precondition to them not agreeing to what we've

8    isolated, I think, at least in the first 30 days is the need

9    to not blow up your hedging positions.

10   A    Not blow up our hedging positions, and manage our risk

11   positions of existing commodity, but yes, that was the

12   concern.

13   Q    Okay, and is there any reason that you know that a

14   representative of the first lien lenders couldn't have come

15   to testify at the first day hearings to explain that they

16   would be blowing up the company's hedging positions, and

17   refusing to consent to any DIP unless they got all that cash

18   collateral protection?

19   A    I'm not aware of what that position is.  Mr. Kornberg

20   can probably answer that better than I can.

21          MR. SHORE:  Okay, thank you.  No further

22      questions.

23          MR. WEISFELNER:  Your Honor?

24          THE COURT:  Redirect?

25          MR. WEISFELNER:  May I be permitted, I just have

Page 233

1    one line of questions that -- because the papers got

2    delivered yesterday, I just don't understand these numbers

3    and I thought this was the best witness.  It's part of his

4    declaration.

5              THE COURT:  Okay.

6                       RECROSS EXAMINATION

7    BY MR. WEISFELNER:

8    Q    Sir, if you could (indiscernible - 4:11:07), we're

9    still at document 98.  That's the tail end of your

10   deposition.  I'm all the way at page 459 of 464.  It's a

11   schedule to the restructuring support and lockup agreement.

12   And my question to you is --

13   A    I'm sorry, I don't have that.  I'm just using this

14   binder which doesn't have that same page reference.

15   Q    Does anybody else have another copy of it?

16   A    Do you have a paragraph reference, perhaps, or --

17   Q    It's at the very, very end of your declaration and

18   document number 98.  The very, very end.  The last piece of

19   paper.  It's Schedule 3.  I'm looking at Schedule 1, like

20   three pages in.

21   A    Can somebody give me that?  Sorry, Your Honor, I --

22              THE COURT:  It's okay.  Are you talking about

23   Schedule 1, professional fees and expenses to be paid?

24              MR. WEISFELNER:  Exactly, I'm just going to talk

25   (indiscernible - 4:12:11).  And here's my question --

1        MR. HESSLER:  Your Honor, can I approach with a

2    complete copy?

3        THE COURT:  He has what he needs.

4    BY MR. WEISFELNER:

5    Q    This is, as I understand it, professional fees and

6    expenses that are to be paid on what's defined as the

7    agreement effective date, do you see that?

8    A    Yes.

9    Q    When does the agreement effective date occur, or has it

10   occurred, or do you know?

11   A    I'm trying to recall, but maybe the amount of these

12   numbers -- I don't recall as I sit here.

13   Q    Okay, well, maybe you can -- we can figure it out this

14   way.  The very first line item for primary counsel shows a

15   dollar amount of $774,000.  Sitting here today, do you

16   recall what that dollar amount reflects?  Is that amounts

17   incurred by the firm or accrued by the firm up to a date

18   certain?

19   A    I believe that to be the case.

20   Q    Do you remember up to what date?

21   A    I would assume it was very close to the filing date.

22   Q    In point of fact, do you know whether or not any of the

23   TCEH debtors had periodically paid the law firm involved?

24   You've been paying Paul Weiss all along, haven't you?

25   A    For a while, yes.

1    Q    And on a monthly basis, correct?

2    A    Yeah, I believe so.

3    Q    Okay, so then this is the -- I think you and I have

4    then just established this is likely a one month accrual for

5    that firm, correct?

6    A    It might be one or two months, but yes, I think it's --

7    Q    Go down to the financial advisor line item, do you see

8    that?

9    A    Yes.

10   Q    Is that likewise a one month accrual?

11   A    No, that, I believe, is a percentage of the success fee

12   I negotiated and I think -- I do believe the agreement date

13   was the date we signed the -- the parties signed the RSA.

14   We had a procedure in place that if they signed the RSA,

15   that triggered a payment, and a percentage of the success

16   fee of their advisor was due.

17   Q    Okay, so now, are you telling me that you recall if

18   these payments were actually made already?

19   A    You know, I can double check and get you that answer,

20   but I believe they were.

21   Q    And if they were paid, they were paid within the last

22   four or five days, is that right?

23   A    Yes, sir, as per the agreement.

24   Q    And that's before the Bankruptcy Court was asked to, or

25   in fact did approve a restructuring support agreement?

1    A    Yes.

2    Q    And part of what you've already paid is 4 and a half

3    million to a financial advisor, which you're now telling us

4    includes some sort of success fees, correct?

5    A    I believe that's a portion of the success fee, yes.

6    Q    When do these various professionals intend, if you

7    know, to file applications with the Court seeking approval

8    of the fees that you've already paid?

9    A    I don't know.

10   Q    Do you know if they do intend to file applications with

11   the Court to get paid?

12   A    I assume the Court ultimately will make the

13   determination of fees paid for all the parties, yes.

14   Q    Sir, isn't it, in fact, the case that these parties

15   bargained to get paid without fee applications or any other

16   applications to the Court, isn't that true?  Didn't they

17   bargain for that?

18   A    I don't recall that part of the bargain if that was it.

19   Q    Okay, I also want you to turn to -- by the way, do you

20   know whether or not the debtors under the RSA have agreed to

21   waive any claims or causes of actions against these

22   professional firms to recoup the payments that were made

23   within the last four or five days?  Are the debtors giving

24   up the right to pursue those claims?

25   A    I don't recall that element.

1    Q    Okay.  By the way, TCEH, at least I call it TCEH time

2    again, that entity has been insolvent by admission since

3    some time in 2010, correct?

4    A    We've had disclosure in our financial statements that

5    the fair market value of the assets did not equal the par

6    value of the debt.

7    Q    I'm sorry, it's a quarter after 4:00, so the answer to

8    my question is yes, correct?

9    A    Well, I know there's different definitions of

10   insolvency, including paying your bills on time and things

11   like that, which we continued to do since 2010, but that --

12   those words are those words.

13   Q    Okay, so let's make sure we're clear now so that we

14   don't have the record messed up.  On a balance sheet basis,

15   TCEH has been insolvent since at least 2010, correct?

16   A    Correct.

17   Q    Can you turn to 460 of 464?  Towards the very bottom of

18   the page, there is a line item or a series of line items

19   under the heading interest holders, do you see that?

20   A    I'm sorry, I have the same problem that I don't have --

21   Q    Just turn the page from where you were looking before.

22   It's on the very --

23   A    There's no page numbers on this.

24   Q    Sure there is, on the very top.

25   A    I'm sorry.  I see them now.  460 of 464, I'm there.

1    Q    On the very, very bottom, do you see the line item that

2    says interest holders?

3    A    Yes.

4    Q    And there was a payment -- am I then therefore to

5    assume that the TCEH debtors -- I'm sorry, the TCEH debtors

6    made a payment of some $9 million to the equity's counsel

7    within the last three or four days?

8    A    Yes, the payments are made by -- I think EFH actually

9    makes payments on behalf of the entire entity, but they were

10   effectively made using TCEH cash.

11   Q    Okay, and who at TCEH authorized the payment of $9

12   million to the law firm representing the out of the money

13   equity?  Who?

14   A    I don't specifically recall who made that approval.

15   Q    Okay.  And there was a million two made to the equity's

16   local counsel within a couple of days, correct?

17   A    Yes.

18   Q    And it was almost $8.4 million paid to the financial

19   advisors for the out of the money equity within the last

20   three days, right?

21   A    Yes.

22   Q    And how much of that round number is 8.4 million

23   represented a success fee?

24   A    If I remember correctly, it was around 6 million.

25   Q    Do you have any recollection, sitting here today, how

1    it is that the equity's investment banker who are getting

2    nothing from the TCEH estate, and as I understand a 1

3    percent of the equity of EFH from the -- I'm not supposed to

4    call it Oncor, am I?  The EFIH estate, how did they define

5    success if they're getting 1 percent of the equity and wiped

6    out?

7    A    The job arrangement letters are -- define success.  I

8    don't recall the exact terms.

9    Q    But you paid the fee, knowing it was a success fee

10   without caring what the definition of success was.

11             THE COURT:  That's enough.  That's enough of that.

12   BY MR. WEISFELNER:

13   Q    Okay, so let me ask you this, last thing I want you to

14   take a look at is the very next page -- I'm sorry, it's two

15   pages over, it's 462 of 464.

16             THE COURT:  This is Schedule 3?

17             MR. WEISFELNER:  This is still Schedule 2.

18             THE COURT:  All right.

19   BY MR. WEISFELNER:

20   Q    And I need some help understanding what this schedule

21   teaches me.  It says it's Schedule 2, the restructuring

22   support and lockup agreement.  Then the next line down, it

23   says individual TCEH first lien creditor advisor.  And then

24   it goes down to say, TCEH first lien creditor and there are

25   three funds that are listed there.  Do you see that?

1    A    Yes.

2    Q    And then next to the funds, there are firms that are

3    listed.  Do you see that?

4    A    Yes.

5    Q    What was the purpose of listing the firms?  Is that to

6    suggest that at some point now or in the future, or in the

7    past, there was an obligation to pay those professionals?

8    A    I believe there were payments to those professionals.

9    Q    When were those payments made?

10   A    Over the course of the last period of time, probably --

11   I don't know, maybe March, April, May of 2013.

12   Q    So, you're telling me that in addition to paying the

13   fees of the law firm representing the ad hoc committee, as

14   well as the financial advisor that they retained, the debtor

15   has historically paid the legal fees and financial advisory

16   fees of at least one of the individual members of the first

17   lien ad hoc group, is that correct?

18   A    That's correct.

19   Q    Do you know the order of magnitude of the dollars that

20   have been paid on behalf of, for example, Apollo's

21   professionals?

22   A    I'm sorry, I don't.

23   Q    Do you know whether or not Moelis, Apollo's financial

24   advisor, got a success fee or is otherwise entitled to a

25   success that the estate's going to pay?

1    A    I don't recall.  I think there was a success fee in the

2    Moelis arrangement.

3    Q    Have you had any opportunity to negotiate with either

4    Apollo, Oaktree, or Centerbridge with regard to the amount

5    of equity that management is going to get as part of an

6    ultimate restructuring?

7    A    We have not.  We don't know the amount of equity we're

8    going to get.  I don't know if I have a job, and I don't

9    know if they're going to assume my contract.

10   Q    Do you have separate counsel representing you in

11   connection with those issues?

12   A    I do not.

13   Q    Did you have separate counsel representing you when you

14   were sued for breach of fiduciary duty back in Texas?

15   A    I believe we did.  My general counsel would know the

16   answer to that.

17   Q    When, if at all, do you intend to enter into

18   negotiations with regard to the size and terms of management

19   incentives?

20   A    We have not come to any agreement with the first lien

21   lenders as to whether, when, and that will occur.  I don't

22   have any idea when that's going to take place.

23   Q    Had they indicated to you a range of total amounts of

24   equity that they intend to reserve for management?

25   A    We had some initial discussions.  They referred us to

1    other transactions that they've done and suggested that they

2    might be in those ranges, but there's been no commitment and

3    I don't know what the answers would be.

4    Q    Who referred you to other transactions they've been

5    involved in?

6    A    Some of the creditors.

7    Q    Which creditors?

8    A    Apollo, for example, specifically referred me to --

9    Q    Who at Apollo?

10   A    Jordan Zaken.

11   Q    Okay, and what transactions did Jordan Zaken tell you

12   to go look at for (indiscernible - 4:23:59)?

13          MR. HESSLER:  Objection, Your Honor.  He already

14   said he didn't know.  He didn't remember.

15          THE COURT:  He just said that.  (Indiscernible -

16      4:24:05).

17          MR. WEISFELNER:  No, but now he's remembering that

18   he spoke to Apollo, that it was Jordan Zaken, that Jordan

19   Zaken told him to go look at other transactions to see what

20   range of value and other deals Apollo was run.

21          THE COURT:  Right, and none of this was in -- he

22   didn't say he didn't remember any of that.  We're fighting

23   over something that doesn't matter.  Do you remember what

24   transaction?

25          THE WITNESS:  As I sit here today, I cannot

1   remember the specific transactions.

2            MR. HESSLER:  Your Honor, I object to the line of

3   questions.

4            THE COURT:  Yeah, we're way --

5            MR. WEISFELNER:  I'm done.  Okay, thank you.

6            THE COURT:  Redirect?

7            MR. HESSLER:  Just a little bit, Your Honor.

8                        REDIRECT EXAMINATION

9   BY MR. HESSLER:

10  Q    Mr. Keglevic, I just want to clarify a couple things.

11  Let's start with that schedule.  That Schedule 1 that you

12  were looking at, I know there's some ambiguity about who

13  paid whom, to the best of your recollection, sir, did EFH

14  pay for the advisors listed under the EFH section on page 2

15  -- 460?

16  A    Yes, I believe they did.

17  Q    And, sir, did the TCEH debtor pay for the professionals

18  listed under the TCEH first lien noteholders group?

19  A    I believe they did.

20  Q    And did EFIH pay for the professionals listed under the

21  EFIH unsecured noteholders group?

22  A    I believe they did.

23  Q    And to the best of your knowledge, did each of the

24  primary debtors, EFIH, TCEH, and EFH pay for the

25  professionals and their advisors in this transaction?

1    A    Yes.

2    Q    You've been asked a lot of questions about the cash

3    collateral order, there was -- and I want to have you focus

4    for a minute on the negotiations we have attached to the

5    collateral order.  Can you explain to the Court the notion

6    of milestones and whether they were milestones in the cash

7    collateral -- proposed cash collateral order during the

8    course of the negotiations with the TCEH first lien lender?

9    A    During the negotiations, there were discussion of

10   milestones.  Ultimately, one of the benefits we received out

11   of the consensual deal was the elimination of those

12   milestones.

13   Q    And was that viewed as an important concession for the

14   TCEH debtors to extract?

15   A    Absolutely.

16   Q    Why?

17   A    Because it effectively provided us a long runway of

18   operation of that cash collateral to make sure we did not

19   have the business diminution or take on the risk that I

20   won't elaborate again that I mentioned before.

21   Q    And in exchange for the removal of that issue in the

22   bundle of rights, did you grant the TCEH first liens other

23   concessions to obtain the elimination of potential

24   milestones?

25   A    Well, ultimately, the absolute deal was the absolute

1    deal and what we gave them in terms of adequate protection,

2    and liens, et cetera was part and parcel to that

3    negotiation.

4    Q    All right, thanks.  I hate to move you around, but I

5    want to go back to some of the discussion about the drop

6    down DIP.  There was a discussion that you had with

7    Mr. Shore regarding the amount of assets that could be

8    obtained in our dropdown DIP, and you referred to the amount

9    of 1.4 billion.  Do you recall that?

10   A    Yes, sir.

11   Q    Based on that $1.4 billion of assets that could be

12   dropped down, how much borrowing capacity could you obtain

13   for those $1.4 billion?

14   A    The market data we had at that point was 50 percent or

15   700 million, and the example of full billion four dropdown.

16   Q    So, when you were testifying earlier about whether $700

17   million is going to be sufficient to meet your needs, was

18   that based on the total amount of borrowing capacity you

19   thought you could obtain under the dropdown DIP?

20   A    It was the total amount of the borrowing capacity I

21   could get, unless I was able to do the recharge mechanics

22   that we were uncertain as to whether, in fact, they would be

23   executable, and we were fairly certain that they would be

24   subject to lengthy litigation.

25   Q    And how much adequate protection did you forecast would

1   you be paying even if you were short with that $700 million?

2   A    We did an analysis assuming zero adequate protection

3   and zero payment to the railroad commission, and the amount

4   still was not sufficient, which ultimately was the primary

5   driver as to why we didn't pursue the dropdown structure.

6   Q    So, sir, when you were --

7   A    That, and cost.  Cost was an element too.

8   Q    And so, sir, when you were talking in response to the

9   section in Mr. Goldstein's declaration that you thought you

10  were still short with regard -- when there was no adequate

11  protection being paid, were you referring to still being

12  short under a dropdown DIP structure?

13  A    Yes, I was only referring to -- sorry, I thought he was

14  referring me to that section in connection with our

15  discussion of the dropdown DIP structure and whether the

16  dropdown DIP structure would, in fact, represent the

17  liquidity to cover those items, which it did not.

18          MR. HESSLER:  Your Honor, I don't have any further

19  questions for Mr. Keglevic as it relates to this motion.

20          THE COURT:  Thank you.  You may step down.

21          THE WITNESS:  All right.

22          MR. HESSLER:  Your Honor, just to clarify a point

23  that -- that's been raised, a new issue as it relates to the

24  taxes, I'm prepared to make a proffer of the testimony of

25  the vice-president and general counsel for taxes of EFIH and

1    CCG (sic).

2              THE COURT:  And who's that?

3              MR. HESSLER:  That is Ms. Carla Howard.  She's

4    here today in the courtroom.

5              THE COURT:  All right.

6              MR. HESSLER:  And I'll be brief.

7              THE COURT:  Any objection to a proffer?

8              MR. SHORE:  Well, why don't we just put her on the

9    stand, Your Honor?  I mean, I'm going to have a cross.

10   Let's just --

11             THE COURT:  How long is the proffer?

12             MR. HESSLER:  Five lines, sir.

13             THE COURT:  All right.  Why don't you put her on

14   the stand?  It's easier that way.

15        (Pause)

16             THE CLERK:  Raise your right hand.

17                   CARLA HOWARD, WITNESS, SWORN

18             THE CLERK:  Please state and spell your name for

19   the record.

20             THE WITNESS:  Carla Howard, H-O-W-A-R-D.

21             THE CLERK:  Thank you.

22                        DIRECT EXAMINATION

23   BY MR. HESSLER:

24   Q    Good afternoon, Ms. Howard.  Could you please describe

25   your general duties at EFH?

1    A    I'm responsible for all --

2           THE COURT:  I'm sorry, Ms. Howard.  Could you move

3    closer to the mic?  Thank you.

4           THE WITNESS:  I'm responsible for all tax

5    administration for all entities in the EFH family.

6    BY MR. HESSLER:

7    Q    Okay.  And, sir, were -- I'm sorry.  Ma'am --

8         (Laughter)

9    Q    -- were you in the courtroom today when Mr. Shore -- I

10   apologize.  That's -- let me just do that again.

11          Ms. Howard, were you in the courtroom today when

12   you heard Mr. Shore ask a series of questions regarding the

13   tax liabilities that are identified in the schedule that was

14   attached to the DIP -- the DCH DIP agreement?

15   A    Yes.

16   Q    And that had been -- just for the record, that schedule

17   has been marked as TCEH Unsecured's 1.

18   A    Correct.

19   Q    All right.  And you -- do you recall Mr. Shore asking

20   Mr. Keglevic a series of questions about the $27 million in

21   estimated tax payments to EFH that were going to be made

22   from TCEH?

23   A    Correct.

24   Q    Okay.

25   A    I do.

1    Q    All right.  Is TCEH directly liable for those taxes?

2    A    Yes.

3    Q    Can you explain why?

4    A    There's a number of taxes that are included in that

5    number.  Some of those are transaction taxes that are

6    specifically imposed on legal entities in the TCEH group.

7    Texas is a legal entity respecting state for tax purposes.

8    It also includes Texas gross margin tax liability, which is

9    a state law combined group liability and TCEH is a combined

10   group member with joint and several liability for that tax.

11   Q    So if TCEH and EFH are jointly several for those taxes,

12   why does TCEH send a payment up to EFH as reflected in this

13   budget?

14   A    Under Texas law the taxpayer that submits the return

15   and submits the payments is EFH.

16   Q    And when will EFH make those payments to the taxing

17   authorities in Texas?

18   A    Specifically the gross margin tax is due 90 percent May

19   15th, 10 percent in August with the true up return in

20   October.

21        MR. HESSLER:  I have no further questions.

22        THE COURT:  Thank you

23        Mr. Shore.

24                    CROSS-EXAMINATION

25   BY MR. SHORE:

1   Q    Just so we're clear, the $27 million, how much of that

2   that is getting sent up in the next month, how much of that

3   are the TCEH debtors liable for?

4   A    I don't know the exact number, but it's the majority.

5   Q    But there's some of it, then, that EFH is liable for

6   and TCEH is just reimbursing them?

7   A    There's a -- there might -- I think that there's a

8   small sliver that is EFH transaction taxes.  The TCEH piece

9   that's going up to EFH is all TCEH, either transaction tax,

10  Department of Energy fees or Texas gross margin tax.

11  Q    Okay.  And just -- sorry.

12  A    Sorry.  I --

13  Q    No.  No.  And I'm sorry you got thrown up here and I'm

14  sorry that you're getting asked questions about what the law

15  is.

16          Is there any reason why over the last couple of

17  days you couldn't have sat down and other members of your

18  team couldn't have sat down and gone through the budget with

19  creditors and explained these things rather than you being

20  drawn up into the stand to have to answer questions?

21          MR. HESSLER:  Objection, Your Honor.

22          MR. SHORE:  Withdrawn.

23      (Laughter)

24          MR. SHORE:  No further questions.

25          THE COURT:  You may step down.

1          MR. HESSLER:  I have no further questions.

2          THE COURT:  Any other witnesses?

3          MR. HESSLER:  No, Your Honor.

4          THE COURT:  Any witnesses, Mr. Shore?

5          MR. SHORE:  I would have called Mr. Goldstein to

6   follow up on some of the questions about his declaration.

7          THE COURT:  Mr. Goldstein?

8          MR. SHORE:  Mr. Goldstein, correct.

9          THE COURT:  Yeah.  Mr. Goldstein, is he present?

10          UNIDENTIFIED SPEAKER:  He is.

11          THE COURT:  Oh, okay.

12          Tell you what, we're going to take, say, five

13   minutes recess before we move to the next witness.

14      (Recess at 4:34 p.m.; reconvened at 4:43 p.m.)

15          THE CLERK:  All rise.

16          THE COURT:   Please be seated.

17          I got this thing somebody gave me eight years ago.

18      (Laughter)

19          THE COURT:  I've never been allowed to use it.

20          Mr. Collins, I understand we can't agree whether

21   venue is proper in the State of Delaware when the Delaware

22   corporation files and affiliates also file.

23          MR. COLLINS:  Yes.  We --

24          THE COURT:  That is obviously a correct statement.

25          MR. COLLINS:  We agree, Your Honor, and we do have

1   a joint administration order that has been reviewed by

2   counsel.  If I may hand it up along with the redline?

3                THE COURT:  Yes.

4                Thank you.

5                All right.  Yes, sir.

6          (Pause)

7                THE COURT:  Oh, yeah.  I'm sorry.  I drew a blank.

8   I apologize.

9                Please stand up, sir.  Sorry.  Raise your right

10  hand.

11                   STEPHEN GOLDSTEIN, WITNESS, SWORN

12                THE CLERK:  Please state and spell your name for

13  the record.

14                THE WITNESS:  Stephen, S-T-E-P-H-E-N, Goldstein,

15  G-O-L-D-S-T-E-I-N.

16                THE CLERK:  Thank you.

17                THE COURT:  Does he have the declarations?

18                MR. SHORE:  May I approach with the --

19                THE COURT:  Yes.  The budget?

20                THE WITNESS:  Thank you.

21                       DIRECT EXAMINATION

22  BY MR. SHORE:

23  Q    Good afternoon, Mr. Goldstein.  I'm Chris Shore from

24  White & Case on behalf of the TCEH unsecured committee -- ad

25  hoc committee.

1           Let me just follow up on some questions that I was

2    asking the CFO.  In your declaration you say that the budget

3    assumes the granting of all the first day relief, right?

4    A    I would have to look at it.  I'm not sure what

5    paragraph you're talking about.

6    Q    Well, let me just read it to you in the interest of

7    moving along because I know we want to get things done.

8           MR. HESSLER:  Objection, Your Honor.  Since I have

9    -- we have copies available of the declaration --

10          THE COURT:  Okay.

11      (Pause)

12          THE COURT:  Are we in the first or the

13   supplemental?

14          MR. SHORE:  It's the first.

15          THE COURT:  Okay.

16          MR. SHORE:  Document 73, page 106 of 117,

17   paragraph 9.

18      (Pause)

19          THE WITNESS:  Okay.

20   BY MR. SHORE:

21   Q    So if you would look at the first sentence.  It was

22   written pretty long.  And it ends, "And includes all of the

23   expenditures for which the TCEH debtors seek authority to

24   pay in the various first day pleadings.  Do you see that?

25   A    Yes.

1    Q    I'm just trying to figure this out.  Starting cash is

2    at 400 in the budget, right?

3    A    Yes.

4    Q    Okay.  You do understand -- have you tallied up all the

5    payments that the TCEH debtors are seeking to make in the

6    first day motions?

7    A    What -- sorry.  What's the question?

8    Q    Have you tallied up all the payments the TCEH debtors

9    are seeking to make in the first day motions?

10   A    Well, I think that's generally what the DIP budget

11   does, no?

12   Q    Well, I'm -- when I added it up I came up with $682

13   million worth of funds going out the door if the first day

14   motions are granted to unsecured creditors.  Is that

15   consistent with your understanding?

16   A    You mentioned that number this morning. I couldn't

17   replicate that number.  No.

18   Q    Okay.  So do you understand that that would be if final

19   is granted.  Do you know what the interim number is that

20   would go out the door?

21   A    I have not looked at it in that way.

22   Q    Would $339 million be consistent with your

23   understanding of cash going out the door if the first day

24   orders are granted?

25   A    I would need to see a breakdown.

1   Q    Well, can you, within $10 million, tell me how much the

2   debtors are seeking to pay out for transition and delivery

3   charges?

4   A    I maybe -- if we can -- if you don't mind we could come

5   at it a different way the way I did look at it.  Three

6   different buckets, 1.1. for the mining reclamation bond,

7   $800 million of which 600 million replaces cash LCs or LCs

8   with a couple of hundred million dollars of cushion as you

9   heard by Mr. Keglevic, and then $800 million of which all

10  these other things have to come out of with enough cushion

11  to operate the business.  I can't --

12  Q    Well --

13  A    I can't tick and tie (sic) to any specific amount that

14  you're talking about.

15  Q    Well, can you show me where in the line items you

16  reflect any of the first day items coming out?

17  A    I assume that's all by the way in EBITDA which is the

18  starting point.  Wages and all those things would be above

19  the line, and, you know, I haven't gone through every single

20  motion, but all the natural expenses of the business would

21  be not necessarily even on this sheet because all those

22  things need to be paid.

23  Q    Right.  So --

24  A    The company does $500 million a month in revenue.

25  Q    Right.  So I just want to say if you didn't pay all the

1    prepetition claims you're seeking to pay, do you know how

2    much more cash you would have in the bank?

3    A    I'm looking at the budget here.  I'm just trying to

4    figure out which things are prepetition.  There's the 30

5    million of critical vendors.  There's the adequate

6    protection payments we've been talking about.

7    Q    Uh-huh.

8    A    The rest of this -- it's a big company.  There's a lot

9    going on in May that is what's reflected in the DIP budget.

10   Q    So can you tell me within the nearest $50 million how

11   much more cash the debtors have in the bank account today

12   that they won't have if the first day motions are granted?

13   A    I'm not sure I understand that question.

14   Q    Okay.  You've got cash in the bank, right?

15   A    Correct.

16   Q    And you're seeking to supplement that with DIP

17   borrowings?

18   A    Yes.

19   Q    Okay.  But right now you also have above the line

20   items, above EBITDA items of normal operating expenses which

21   are accrued, but unpaid right now because they're

22   prepetition.

23   A    Okay.

24   Q    Right?

25   A    Yes.

1    Q    Okay.  And let me just tell you, I total it up to $339

2    million going out the door to pay unsecured creditors in the

3    first day motions, right?

4    A    Again --

5    Q    Okay.  Can you take my word at that?

6    A    I will not.  I don't know what that number is.  I'm

7    sorry.

8    Q    And if the first day motions aren't granted and the

9    prepetition creditors aren't paid, there will be more -- can

10   you at least agree there will be more cash in the bank?

11   A    I just don't understand what you mean by prepetition

12   creditors.  I -- employees who are owed wages or what --

13   what are you --

14   Q    Do you understand that as part of the first day motions

15   the debtors are seeking authority to pay certain prepetition

16   claims?

17   A    Yes.

18   Q    Okay.  And do you understand that if the Court doesn't

19   grant those motions there will be more cash on your starting

20   $400 million number?

21   A    I don't know if those are out of the 400 or subsequent

22   to the 400.

23   Q    Okay.  So that's why I started with your declaration

24   and what I was trying to do is hook it up with the CFO.  You

25   say, "and includes all of the expenditures for which the

1    TCEH debtors seek authority to pay in the various first day

2    pleadings."

3    A    Right.  What I -- I just don't know what -- it's a very

4    narrow timing window, so I don't know if that's in the 401

5    or subsequent to the 401.

6    Q    Okay.  So you don't know one way or the other as to

7    whether or not anything that's granted in the first day is

8    going to change your DIP budget?  I don't understand.  Can

9    you explain?

10   A    The DIP budget reflects the payment of all those

11   expenses.

12   Q    Okay.  So those will be before the start of this

13   process.  In other words, the cash number is cash prior to

14   --

15   A    Right.

16   Q    -- or, sorry, post payment of whatever prepetition

17   expenses are authorized to be paid?

18   A    I think the beginning cash balance is immediately pre-

19   filing.

20   Q    But if it's immediately pre-filing and you're

21   authorized to pay prepetition claims, how do you show the

22   diminution in the cash number, then?

23   A    That's what I'm saying.  I think it all flows through

24   the entire budget for May.

25   Q    The EBITDA number is consistent with the rest of the

1    months, right, so it's not -- this is not a situation in

2    what you're doing is you've got a larger or a smaller amount

3    of EBITDA because you're paying or not paying expenses in

4    May, right?

5    A    Again, I would have to look at the categories.  I don't

6    know where -- you know, where they would fall between

7    working capital, capital expenditure, margin deposits.

8    Q    Okay.  So as you sit here today you can't tell me where

9    at all in the DIP budget the monies that are seek -- for

10   which the debtors are seeking authority to pay prepetition

11   creditors as part of the first day motions are coming out

12   of?

13   A    I -- again, I would have to look at which motions

14   you're talking about.

15   Q    But you understand they're trying to pay -- the debtors

16   are seeking authority to pay $80.7 million in prepetition

17   taxes?  That number ring a bell with you?

18   A    I don't know that specifically, but I'm sure that's in

19   the first day motions.  I'll take your word for that.

20   Q    Uh-huh.  And are you aware the debtors are seeking to

21   pay $69.1 million to TCEH for -- sorry -- to EFH for --

22   sorry -- EFH Shared Services for prepetition liabilities?

23   A    I'm not sure that's still the case.

24   Q    You're not sure that's still the case.  What's your --

25   what do you mean?

1    A    I thought that was going to pay for the final.

2    Q    Okay.  But you can't tell me where that would be

3    reflected, then, in the next month, right?

4    A    I don't see it called out here.  No.

5    Q    Would you like to do a little more studying to figure

6    out where the numbers come if the first day motions are

7    granted, whether they are in this budget or whether this

8    budget assumes the Court has granted all the first day

9    motions?

10   A    I think this assumes the Court has granted all the

11   first day motions.

12   Q    Okay.  So if the Court doesn't grant all the first day

13   motions, you're starting cash position is going to be

14   better?

15   A    Again, I -- the cash position will be better.

16   Q    Right, because you're going to be using that cash to

17   pay prepetition claims?

18   A    Yes.

19   Q    And so whatever the tally is for the amount of cash

20   you're seeking to spend to pay prepetition creditors, that

21   will be additive to this starting cash balance number?

22   A    Yes.

23   Q    All right.  Now that sentence that -- in paragraph 8 of

24   your declaration on page 105 of 117 in Document 73, is that

25   a true statement in the second sentence beginning, "Based on

1    the TCEH debtors' financial projections"?

2    A    Yes.

3    Q    Okay.  And you don't need to amend your testimony in

4    light of any other testimony you've heard today?

5    A    No.  I mean, just to be clear the cash final may be

6    sufficient to fund certain aspects of working capital, et

7    cetera, but was insufficient to fund everything.

8    Q    I see.

9    A    It could have been drafted better, I probably admit,

10   but it -- that's the essence of the sentence, which is a

11   true statement.

12   Q    Do you know -- you're also working for EFH, right?

13   A    Yes.

14   Q    Does EFH have cash?

15   A    Yes.

16   Q    How much cash does EFH have?

17   A    I don't know the exact balance.

18   Q    Can you tell me within $10 million?

19            UNIDENTIFIED SPEAKER:  You've got to speak up a

20   little bit.

21   Q    Do you -- can you tell me within $10 million how much

22   cash they have?

23   A    I cannot.

24   Q    Okay.

25            MR. SHORE:  I have no further questions.

1          THE COURT:  All right.  Any redirect?

2          MR. HESSLER:  No.

3          THE COURT:  Or cross?

4          MR. HESSLER:  Not at this time.

5          THE COURT:  All right.  Thank you, sir.  You may

6    step down.  You can leave the papers.

7          Is that it for witnesses, testimony, et cetera?

8          Mr. Shore, are we done?

9          MR. SHORE:  We're done.  Yes, Your Honor.

10          THE COURT:  All right.  That --

11          MR. SHORE:  With the evidentiary piece.

12          THE COURT:  I understand.  Yeah.  All right.  That

13    will close the record.

14          Does the debtor wish to be heard?  I'll take

15    argument at this point.

16          UNIDENTIFIED SPEAKER:  Go ahead.  Go ahead.

17          MS. CORNISH:  Good afternoon, Your Honor.  Kelley

18    Cornish from Paul, Weiss, Rifkind, Wharton & Garrison on

19    behalf of the ad hoc committee of TCEH first lien lenders.

20          THE COURT:  Okay.

21          MS. CORNISH:  Your Honor, I just want to make --

22    really clarify or focus on a couple of key points,

23    particularly with respect to the objectors apparently taking

24    issue with the payments that are contemplated to be made

25    under the cash collateral order.

1              First, Your Honor, and I think Mr. Husnick made

2      reference to this, that position taking issue with those

3      payments is fundamentally inconsistent with the position

4      they're taking that the first lien creditors are over-

5      secured in these cases.  Obviously, if we are over-secured

6      we would be entitled to interest payments, post-petition

7      interest,  and we would argue at a default rate so that the

8      payments that would be made through the case, including the

9      payment that they're focusing on during the interim period

10     would be an interest payment.

11             These payments are not, however, Your Honor,

12     interest payments.  They are adequate protection payments

13     and those payments, Your Honor, were essential in the

14     negotiations that we had with the debtors as an element to

15     agreement to both the use of our cash collateral and, also,

16     to be primed --

17             THE COURT:  But I --

18             MS. CORNISH:  -- and --

19             THE COURT:  -- I'm a little confused.  So just

20     help me out.

21             MS. CORNISH:  Sure.

22             THE COURT:  I understand you're saying they're not

23     interest payments.  They're adequate protection payments,

24     but aren't they in the same amount as --

25             MS. CORNISH:  Yeah.

```
 1              THE COURT:  -- the interest payment would be?

 2              MS. CORNISH:  Yes.  And that's not unusual.  I

 3    mean, they are in the sense that they are --

 4              THE COURT:  So your adequate assurance is that

 5    you're getting interest?

 6              MS. CORNISH:  They're geared off of the documents.

 7    The interest rate is L plus 450.  The actual interest rates

 8    under the documents are actually different for different

 9    facilities that are part of this group, so they are not

10    precisely --

11              THE COURT:  Okay.

12              MS. CORNISH:  -- interest under the documents.

13    But it is not at all unusual when adequate protection

14    payments are made during a bankruptcy case in this context

15    for the payments to be geared off interest.  And here, here

16    they are at least tied in a sense to interest.

17              As I was mentioning, receiving these payments

18    under the cash collateral order was absolutely essential to

19    the first lien creditors.  We are agreeing, Your Honor, in

20    the first instance to be primed here by up to $4.5 billion

21    of new money through the DIP financing.  And, in addition,

22    the first lien creditors have liens in substantially all of

23    the TCEH debtors' assets.  Those assets will be consumed on

24    a daily basis by this very, very large operating company.

25              And so while the -- you know, the absolute amounts
```

1    of these payments are large as a relative or absolute

2    amount, they are entirely in keeping with the size of this

3    company and the billions of dollars of collateral that this

4    company is going to be using which is our collateral on an

5    ongoing basis here.

6              So we would suggest that there's nothing unusual

7    about the payments.  They're entirely appropriate and they

8    were an absolute essential element of reaching agreement

9    with the debtors on the use of our cash collateral.

10             Thank you.

11             THE COURT:  You're welcome.

12             MR. WEISFELNER:  Your Honor, just to respond to

13   Ms. Cornish.  You know, on the one hand she says, you know,

14   if we were fully secured, then we would be entitled to these

15   payments.  But under the restructuring agreement they

16   signed, they're saying they're not fully secured.  They're

17   $5 billion underwater.  The debtors' position is they're

18   under water.

19             So the debtor who believes they're under water

20   agrees with the first lien holders who concede to you that

21   they think they're under water, and then when we argue, but

22   these aren't permissible payments to an under-secured

23   creditor they say, yeah, but you think that we're fully

24   secured.  It's like whiplash.  You can't have it both ways.

25             And just so that the facts are correct, even

1    though there's no evidence, the evidence that you did hear

2    was that the payments you heard from debtors' witness

3    approximated the interest.  It's not exactly the interest

4    because you also heard that some of the payments have more

5    than L plus 450, some of them have less than L plus 450.

6    They just averaged it out to L plus 450 in ways that the

7    record isn't clear on.  And they used to be payable

8    quarterly.  Now they're payable monthly.  So to that extent,

9    they don't match.

10           But my only point to raise is you can't say we're

11   entitled to these payments because the unsecured and second

12   liens say we're fully secured.

13           THE COURT:  Wouldn't you agree with me that even

14   an under-secured creditor is entitled to adequate protection

15   if that under-secured creditor is primed?

16           MR. WEISFELNER:  Absolutely.  But in the form of

17   pulled boat interest, pulled boat payment of all your

18   professional fees --

19           THE COURT:  Uh-huh.

20           MR. WEISFELNER:  -- and not just one set of

21   professionals, but we'll pay the ad hoc professionals and

22   they're investment banker, and we'll pay Apollo, and we'll

23   pay Center Bridge and we'll pay Oak Tree.

24           THE COURT:  Uh-huh.

25           MR. WEISFELNER:  And, understand, with a 506(c)

1    waiver and the debtors' contention that they own 100 percent

2    of the asset, well, if we're right that they're fully

3    secured and that somebody else is (indiscernible) from

4    security, guess who's paying for all of this?  We are.

5              And the point that I think Mr. Shore was making is

6    a critical one.  You mean to tell me that you wouldn't let

7    the debtor use your cash collateral, which is, in the

8    debtors' view, necessary to keep your asset alive.  You are

9    going to go home.  It's like I remember in a case that we

10   had a hundred years ago -- it happened to have been in

11   Dallas -- and it was Zale Jewelers.  Someone came in and

12   said, stop me before I shoot the dog.  It's like the first

13   lien lenders want you to believe they have a gun to their

14   head.  You have to stop them before they kill their own

15   company by refusing cash collateral.  It's a joke.

16             THE COURT:  I have heard that argument in every

17   case I've ever had.

18             MR. WEISFELNER:  Right, for good reason.

19             THE COURT:  And yet to happen.

20        (Laughter)

21             THE COURT:  That's not necessary.

22             MS. CORNISH:  Your Honor, just -- just one for the

23   record.  I recognize that Mr. Weisfelner did not actually

24   formally file an objection to the DIP or the cash

25   collateral, but that sounded like an objection to me.  And I

1      just want to make it very clear for the record that the

2      intercreditor agreement, Section 6.04 of the intercreditor

3      agreement precludes him from doing that.  The Wilmington

4      Trust, the successor agent's counsel --

5              THE COURT:  I don't have a copy of the

6      intercreditor agreement.  Do you have --

7              MS. CORNISH:  Your Honor, may I approach?

8              THE COURT:  Yes.

9              Thank you.

10             MS. CORNISH:  The today successor of counsel to

11     Wilmington Trust, our successor agent, confirmed in the

12     court or to the Court that they have consented to the

13     priming liens and the order --

14             UNIDENTIFIED SPEAKER:  That's not what he's

15     saying.

16             MR. WEISFELNER:  That's not what he said.

17             THE COURT:  Mr. Weisfelner, you will have an

18     opportunity to speak when it's your turn.

19             MS. CORNISH:  And it's here so you can --

20             THE COURT:  This is not going to -- I'm not going

21     to have this deteriorate into chaos.

22             MS. CORNISH:  And I would just point the Court to

23     Section 6.04 which essentially precludes Mr. Weisfelner from

24     objecting to either the DIP -- I realize I'm not involved in

25     the DIP, but in particular the cash collateral order.

1          So we would, to the extent that any of this

2    questioning or addressing of the Court is -- we think it is

3    implicated by 6.04 and should be stricken.

4          THE COURT:  Thanks.

5          All right.  I'll hear from the debtor.

6          MR. HUSNICK:  Your Honor, Chad Husnick again from

7    Kirkland & Ellis appearing on behalf of the debtors.

8          Again, just responding quickly to some of the

9    arguments that have been made and now that the evidence is

10   in the record I'll actually argue and not testify.

11      (Laughter)

12          MR. HUSNICK:  Your Honor, just a few points.

13          One, they argue that the best available financing

14   here was the drop down DIP and that the company should have

15   pursued the drop down DIP.

16          Well, Your Honor, the company decided in its

17   business judgment not to pursue the drop down DIP.  That was

18   prepetition.  Now we're in bankruptcy.  The drop down DIP is

19   no longer an option.  So the company has pursued and has put

20   forth the best available financing that is available today.

21   And no one has put on any evidence to the contrary that this

22   DIP is not on the best terms available to this debtor.

23          I won't go into the detail about why the drop down

24   DIP was insufficient, just suffice to say that it's no

25   longer available.

1           On the interim need, Your Honor, this case is

2      huge.  We all know it.  The numbers are also significant as

3      a result.  But it doesn't mean that the number and the

4      payment of the adequate protection is any less than

5      reasonable and necessary to get the consent of the first

6      lien lenders.

7           I do want to clarify the record because I think

8      there is an error in the budget and we've been kind of

9      dancing around when we're talking about it today.  And that

10     is the cash collateral order does not contemplate payment of

11     the prepetition stub that was accrued and unpaid as of the

12     petition date.

13          There's a -- and I think Ms. Cornish can confirm

14     for the record that that's correct.

15          MS. CORNISH:  So confirmed, Your Honor.

16          MR. HUSNICK:  The budget did not get caught up to

17     make that change, but that would reduce the number, the $400

18     million number I believe that everybody's been talking about

19     down to the 100 going forward.

20          And we apologize for having not --

21          THE COURT:  I am confused.

22          MR. HUSNICK:  -- highlighted that earlier.

23          THE COURT:  What just happened?

24          MR. HUSNICK:  There was a --

25          THE COURT:  First of all, you need to speak up,

1    but --

2              MR. HUSNICK:  Sure.

3              In the budget there's a line item for payment of

4    adequate protection and that line item, it's about 401

5    million.

6              THE COURT:  Yes.

7              MR. HUSNICK:  It was contemplated when the budget

8    -- when the DIP was sized that adequate protection would be

9    paid not only going forward on the interest, but also

10   anything that had accrued and had not been paid as of the

11   petition date, because as Mr. Weisfelner said, first lien

12   interest payments were due quarterly.  So a chunk had

13   accrued and not been paid.

14             THE COURT:  Uh-huh.

15             MR. HUSNICK:  In negotiating the cash collateral

16   order we negotiated not to have to pay.  That amount will

17   get capitalized and added to the first lien claim.  It's not

18   going to be paid under the interim cash collateral order.

19             THE COURT:  So you -- okay.  So whatever was owed

20   prepetition for interest that had not been paid has been

21   capitalized into the principal?

22             MR. HUSNICK:  Correct.

23             THE COURT:  And that means -- what does that do to

24   your 401 number?

25             MR. HUSNICK:  It reduces that $401 million number,

1    I believe, to 100 million.

2              THE COURT:  So 300 million in unpaid prepetition

3    interest was capitalized?

4              MR. HUSNICK:  Correct.

5              THE COURT:  Correct?

6              MR. HUSNICK:  Correct.

7              THE COURT:  Okay.

8              MR. HUSNICK:  But, Your Honor --

9              MR. SHORE:  Can I just ask --

10             MR. HUSNICK:  Go ahead.

11             MR. SHORE:  And this is -- of course, this is how

12   we get negotiations.  Are you downsizing the DIP 300, too?

13             MR. HUSNICK:  I need to speak with the client, but

14   I -- can I give one moment?

15             THE COURT:  You don't need to answer that on the

16   fly.

17             MR. HUSNICK:  Okay.

18             THE COURT:  Just continue.

19             MR. HUSNICK:  Your Honor, so after that

20   clarification I would say that we're still talking about L

21   plus 450 on the full amount of the claim that the first lien

22   lenders are asserting.  And, Your Honor, that is fairly

23   typical and is reasonable and necessary to get the consent

24   in order to alleviate the milestones.  You heard from Mr.

25   Keglevic that we engaged in significant negotiations with

1    the first lien secured lenders in an order to eliminate

2    certain plan-related milestones, sale-related milestones.

3    We were agreeable to pay interest at the full interest or at

4    the -- pay adequate protection at the full amount of the

5    interest rate.

6            But one additional concession that we insisted

7    upon throughout if we were going to pay adequate protection

8    at the full amount was the reservation to recharacterize or

9    disgorge to the extent it's ever determined that the first

10   lien lenders received too much adequate protection, more

11   adequate protection than what they were entitled.

12           Your Honor, so basically what I'm saying is that

13   this payment of adequate protection and the amount of the

14   adequate protection, again, and coming back is reasonable

15   and necessary to secure the consent of the first lien

16   lenders, which as I believe Mr. Goldstein testified and Mr.

17   Keglevic testified was critical to securing the $4.475

18   billion DIP, including the railroad commission carve-out

19   which is critical to our continuing our mining operations in

20   Texas.

21           Your Honor, the lien on the 150 million, I just

22   want to circle back, this is the unencumbered cash that is

23   segregated under the cash collateral order.

24           Your Honor, the unsecureds are raising an issue

25   regarding the marshalling provisions which say that the

1    marshalling provision in the DIP order is subject to a final

2    order.  So that will not be -- is not an issue for today.

3              THE COURT:  The marshalling?

4              MR. HUSNICK:  The marshalling provision.

5              THE COURT:  You added that, then.

6              MR. HUSNICK:  It's -- I think it's today.  As of

7    per the request of the U.S. Trustee, I believe, right?

8              THE COURT:  In the original it was -- in the

9    original order it was not subject to a final order.

10             UNIDENTIFIED SPEAKER:  Yeah.

11             MR. HUSNICK:  Do you know what provision that is?

12             THE COURT:  That's okay.  We'll find it when we go

13   through the order, if we do.

14             MR. HUSNICK:  Okay.

15             So let me just make sure I've covered the points.

16             Termination of cash collateral, we heard a

17   significant amount of questioning and a little argument

18   around what happened if cash collateral usage is terminated

19   during the case.

20             And for starters the cash collateral order does

21   not -- does -- it does terminate upon termination of

22   exclusivity and it does terminate upon appointment of an

23   examiner or trustee.  But that's the -- that is fairly

24   typical relief when you have a consensual agreement with

25   your first lien lenders and you have a new DIP lender

1    putting in $4.475 billion of debt.

2              THE COURT:  My memory is that the order

3    specifically reserves the debtors' right to seek cash

4    collateral on a contested basis.

5              MR. HUSNICK:  That's correct.  That's where I was

6    going next, which is you had -- the line of questioning from

7    counsel was, well, what is your right, where do you get the

8    cash from to operate the business if exclusivity is

9    terminated.  The answer is, is under the cash collateral

10   order we negotiated to have the right to come back to Your

11   Honor and ask for non-consensual use of cash collateral

12   going forward; that is, notwithstanding the Section 5.06(c)

13   waiver which, I submit, is common place in a consensual cash

14   collateral order.

15             THE COURT:  Uh-huh.

16             MR. HUSNICK:  The last thing I'll say is on

17   professional fees I heard some talk about that the

18   professional fees for Apollo and Center Bridge and others

19   are getting picked up in the cash collateral order.  That is

20   not true.  Those fees are contemplated under the RSA if the

21   restructuring support agreement is ultimately assumed, but

22   --

23             THE COURT:  All right.  So --

24             MR. HUSNICK:  -- it's not --

25             THE COURT:  -- all of the -- all of those dollars,

1    the back of the RSA Mr. Weisfelner was going through haven't

2    been paid.

3                MR. HUSNICK:  No.  They've -- they were paid --

4    some of -- most of them were paid prepetition.  What I'm

5    saying is during the case.  During the case we're not

6    contemplating payment of fees to advisors for Center Bridge

7    and Apollo under this cash collateral order.

8                THE COURT:  Oh, all right.

9                MR. HUSNICK:  Thank you, Your Honor.

10               THE COURT:  Okay.  Anyone else before I turn it

11   over to --

12        (Pause)

13               THE COURT:  All right.  Whoever's going to make

14   the argument for the noteholders.  Mr. Lauria.

15               MR. LAURIA:  Yes.

16               MR. HUSNICK:  Your Honor, I can represent that we

17   will reduce the interim ask for that 300.

18               THE COURT:  Okay.

19               MR. LAURIA:  Good afternoon, Your Honor.  Tom

20   Lauria with White & Case for the ad hoc group of TCEH

21   unsecured noteholders.

22               I had actually hoped to keep my pallet dry today,

23   but it became apparent with everything that was going on

24   that Mr. Shore and I were going to have to divide this up in

25   some fashion.  So I drew the short straw of arguing the DIP

1    motion.

2              I think at the top, Your Honor, we have to go back

3    to focusing on what we talked about this morning, which is

4    making sure that we understand and find out exactly what is

5    needed to bridge the debtors, and by this I mean the TCEH

6    debtors to a final hearing, which I guess is now going to

7    start on June 5th.

8              And in that regard I'm not really sure that we

9    have an adequate record to figure out what that number is.

10   There seems to be quite a bit of confusion and uncertainty.

11   The numbers seem to be moving around rather fluidly.

12             But let's start with the adequate protection

13   component.  I understand that the payment that was

14   represented to be a $401 million payment on day one is now

15   only $100 million, round number, and that that is reducing

16   the amount of the interim request by a like amount.  It

17   seems to me it ought to reduce the amount of the DIP period,

18   but I guess we can take that up on June 5th.

19             But what I'm troubled about is I think everybody

20   agrees that adequate protection is to address the potential

21   diminution in value of the collateral.  And, in fact, the

22   only testimony regarding diminution in value was provided by

23   Mr. Keglevic, who I think said that he had no idea if the

24   collateral value was going to go up or down.  He said that

25   if you believe the forward curves, then over the time the

1    value of the collateral was going to go up.

2            Certainly, the effect of continuing to operate the

3    collateral is preserving, if not at least enhancing its

4    value.  And so it's hard to understand while -- why we're

5    talking about any particular cash number if we don't have

6    any evidence of diminution in value.

7            In addition to the adequate protection payment,

8    which has now been reduced from 400 to 100, the uses are

9    still kind of confounding.  There are amounts that are going

10   to be paid to affiliates.  One of the motions that we

11   haven't yet gotten to, the cash management motion,

12   contemplates a payment of approximately $70 million to EFCH

13   Shared Services.

14           THE COURT:  I think I heard, and no one's actually

15   verified it, that I believe Mr. Goldstein said that that

16   payment is not being paid until the final order.

17           MR. SASSOWER:  Correct, Your Honor.

18           THE COURT:  Okay.

19           MR. LAURIA:  Very good.  So there's another 70

20   million that we don't need in an initial approval.

21           There's conflicting evidence in the record about

22   the amount of prepetition claims that are going to be paid.

23   My colleague has totaled the number up at 339.  Mr.

24   Goldstein was unable to -- did I get it wrong -- was unable

25   to provide any testimony as to what the number was.

1           And at this point it's unclear why any money is

2    going out in respect of prepetition claims to affiliates or

3    otherwise.  And so until there is some case made for

4    payments going out in respect of prepetition amounts, I

5    don't think any should go out in respect of prepetition

6    amounts.

7           We've got this billion-one for the Texas Railroad

8    Commission.  The testimony on that was quite confusing to me

9    as well.  The idea is to give the Texas Railroad Commission

10   a carve-out and I -- it seems to me that there's -- from the

11   testimony that there's optimism that they're going to accept

12   that.

13          If they don't, they want to have the capacity to

14   bond that amount.  In their own projections they show that

15   as a payout in June.  So I don't think there's any evidence

16   that supports approval of that amount on an interim basis.

17          There's $1.2 billion, according to Mr. Keglevic,

18   in respect of letters of credit, 600 for existing letters of

19   credit that he wants to replace and another 600 that he

20   wants to have in his back pocket without any testimony as to

21   the likelihood that they will have used either of those

22   amounts in full.  It's not clear to me that it's an

23   appropriate use or the best use of DIP financing to deal

24   with those amounts at this time.

25          And, in fact, I can point the Court to the relief

1    that was granted in the Mirant (ph) case where we had

2    exactly the same problem.  We had forward contracts and

3    commodity contracts with counterparties, safe harbor

4    contracts.  The stay didn't apply.  They had the right to

5    terminate.  We got first day relief where we gave those

6    people administrative claims on day one and they agreed to

7    continue their contracts with no super priority, with no

8    priming liens, with none of the cost, with none of the

9    interest and none of the rest that is being proposed in this

10   case.

11          So to suggest that the solution here of incurring

12   super priority priming liens with interest, even if it's a

13   low interest rate, is the best solution for that particular

14   issue.  Just categorically I can tell you this is not

15   correct.

16          What's problematic about the proposal on the whole

17   is that it is, in effect, a value transfer.  Today, on day

18   one, we're told that there's $150 million of unencumbered

19   cash.  I'm not sure why the number is 150.  I understand

20   that that cash is in an account because of the -- as a

21   consequence of the liquidation of an old TXU AP program.

22   And there are parts of the declaration that suggest that

23   that number should be something more in line with about $400

24   million.  I have no idea what the difference is.  I'm sure

25   over the coming days, weeks and months we'll figure out

1    what's going on there.

2            But what's clear, I think, is that the 150 million

3    is going to become encumbered by the DIP.  Now I've heard

4    people say today that that money is going to be segregated.

5    I haven't heard a representation that that money is not

6    going to be encumbered by the DIP, and I know that the

7    papers that they filed did not provide any marshaling

8    obligations.

9            So that 150, once it's encumbered, there's nothing

10   to stop using that money as the first money to repay the DIP

11   and leaving the unsecured creditors, who today have some pot

12   of cash available being left without it.

13           The other source of recovery that unsecured

14   creditors have in this case is Chapter 5 causes of action.

15   And we have tried to outline in our papers what those

16   entail.  They are complicated issues.  They no doubt will

17   involve a lot of investigation and analysis.  Certainly,

18   it's going to cost more than $175,000 to do so.  The DIP

19   doesn't permit the use of estate resources beyond that

20   $175,000.  But the interesting thing is the DIP also

21   encumbers those as well.  It doesn't encumber the causes of

22   action.  It causes the proceeds of the causes of action.

23           Now I'm not really sure substantively what the

24   difference is between those two.  I think at the bottom line

25   if there's recovery, it goes to the DIP lenders and not to

1    the unsecured creditors.

2            So it raises a basic question.  I've always

3    understood that when value flows through the bankruptcy

4    estate, the money that goes in respect of secured claims, in

5    respect of the collateral, the value that goes in respect of

6    the collateral really is outside the estate.  The estate is

7    the rest.  It's what's left over, what goes to the unsecured

8    and priority claims.

9            And these debtors have already decided that that's

10   -- that's that nothing; that they have entered into an

11   agreement that they will advocate.  I thought it was

12   interesting that Mr. Keglevic said it's up to the Court to

13   decide.  It may be up to the Court to decide at the end of

14   the day whether that agreement gets approved and whether or

15   not the plan that it envisions gets confirmed, but the

16   debtors are obligated to advocate it.  And by debtors I mean

17   all the debtors.

18           And there's a real question here about conflict

19   that's -- that I'm going to touch on in a moment.  But

20   what's concerning is that according to the debtors' view of

21   the world, according to the first lien lenders' view of the

22   world, all of the value of this estate is going to flow

23   through to the first lien lenders in respect of their liens.

24   I suspect the DIP is just going to roll into an exit claim,

25   an exit financing, and the unsecured creditors, perhaps the

1    second lien lenders, are going to get nothing, which means

2    that all of this, whether they're going to spend one billion

3    or two billion or three billion or 4.475 billion, all of

4    that -- all of this DIP, all of the use of cash collateral

5    is for the benefit of the secured lenders, not the estate.

6    The estate is the rest, the surplus.

7           And so, again, going back to comments that were

8    made this morning, this is, from the perspective of TCEH, a

9    judicial foreclosure with bells and whistles, with releases,

10   with various other forms of relief that guild everybody's

11   (indiscernible) except for the beneficiaries of the estate,

12   the unsecured creditors.

13          Equity has already walked away.  They've already

14   said, we give up.  We're not taking anything.  And so it

15   falls to us.

16          So the -- the question that the Court has to

17   grapple with here is should we approve DIP financing and the

18   use of cash collateral when the sole beneficiary is the

19   first lien lenders, or should we put them to the test;

20   should we say, do you want to get relief from the stay; do

21   you want us to turn the lights out, literally and

22   figuratively, and you come in and get relief from the stay,

23   or can the debtors provide adequate protection by continuing

24   to operate the business a la snowshoe.

25          Now what's interesting, we've heard some testimony

1    about why the drop down doesn't work.  But there are a

2    couple of things about the drop down that I think we need to

3    look at.

4            First of all, the testimony was that there's a

5    billion-four that can be dropped down.  The advance rate

6    would be 50 percent.

7            Now for me that 50 percent was hearsay testimony.

8    I don't know if 50 percent is right or 60 or 70.  It's a lot

9    less than the financial players we were talking to when we

10   were actively exploring the drop down strategy.

11           But let's use Mr. Keglevic's 50 percent.  So you

12   drop down a billion-four of assets.  You borrow 700.  You

13   put the 700 back up to TCEH in an unrestricted account, and

14   you drop down another 700 and you borrow 50 percent against

15   that.  Now we've got a billion-fifty of borrowings and we've

16   got a billion-fifty of equity value in that unrestricted

17   subsidiary that's unencumbered; that doesn't belong to

18   anybody.

19           Now that billion-fifty of equity value could be

20   used for a lot of things.  To the extent there is

21   diminution, that could be used as adequate protection.  It

22   could be a reservoir for adequate protections to first lien

23   lenders, to the extent there is diminution in value.

24           It could also become a reservoir for a recovery

25   for unsecured creditors.  And that's the real rub as to why

1    the drop down wasn't implemented here.  We started talking

2    about this nine months ago, Your Honor.  Nine months ago we

3    talked with counsel about the drop down.  That is the

4    testimony, eight or nine months ago.  And there was

5    agreement that it could be done and there was agreement that

6    it could be recharged.

7            So we could be here today getting approval of

8    financing done on a drop down basis and there was argument

9    and testimony that there were legal challenges to a drop

10   down.  That could be before the Court.  The Court could be

11   looking at the agreements and determining if the drop down

12   is legal and permitted under the contracts.  And if it was,

13   we could have a billion-fifty of availability, financing and

14   a billion-fifty of free value that could be used however it

15   should best be used in these cases, whether it's for

16   adequate protection or to provide a recovery to unsecured

17   creditors and those with deficiency claims.

18           But that was passed.  And I think the explanation

19   as to why it was passed falls short, which means that the

20   debtors have not met the standard under 364(c) or (d) for

21   approval of their proposed financing.

22       (Pause)

23           MR. LAURIA:  Now Your Honor heard the testimony

24   regarding the cash that the company has, the very limited

25   diminution in the company's cash if interest is not paid on

1    a going forward basis and other debt service obligations

2    going forward in Chapter 11 on debt that everybody seems to

3    think is under-secured.

4              And I want to be clear about one things.  We have

5    not taken a position regarding the value of the collateral.

6    We don't know.  We haven't had access to the information to

7    be able to form an opinion or a view.  I presume, either

8    voluntarily or by court order we will get access to that

9    information and at some point in time we will be able to

10   form a view if we're unable to reach -- achieve some other

11   resolution in the case.

12             But what we do know is that there is unencumbered

13   cash and other unencumbered miscellaneous assets and Chapter

14   5 causes of action that may have great value.  The liens

15   granted to the first lien lenders may be subject to

16   avoidance which would give them replacement unsecured claims

17   pari passu with everybody else.

18             Now let me talk about the conflict issue.  Think

19   about what I -- what I just said.  Who is looking at that?

20   Mr. Keglevic testified that he was concerned that he or

21   somebody similar to him as an officer of a subsidiary of a

22   company that he's an officer of would, without his

23   permission or authority, decide to call a loan on himself.

24   There are serious, serious conflicts of interest here.

25             There's another cause of action that the Court

1  needs to be aware of.  We addressed it in our papers.  The

2  spinoff of Encore.  The debtor makes inconsistent statements

3  in its historical disclosures regarding when Encore was spun

4  off.  But one thing is clear.  When Encore was spun off it

5  was done for no value to the parent of TCEH, EFCH.  EFCH is

6  a guarantor of our debt.  If that's a fraudulent transfer,

7  the value of Encore comes back to EFCH.

8          Now the debtors, EFH, EFIH are running for the

9  barn to get done with their settlement that uses that value

10 as currency to settle with the EFIH and EFH creditors.  Who,

11 who -- Your Honor, you heard a presentation from counsel

12 this morning and saw the pictures of all the people who are

13 making decisions.  You know the guy that you didn't see and

14 the guy that you haven't heard from today and the guy who's

15 not here is the supposed independent director of TCEH.  And

16 when his -- when Mr. Keglevic was asked what that

17 independent director's authority was, he didn't know.

18         Now this guy came on the scene recently.  Nobody

19 has presented any evidence regarding what his authority was

20 with respect to the RHA transaction or who his advisors

21 were, if they were different than the company's other

22 advisors in connection with the RSA transaction.  And nobody

23 certainly has given you any evidence that he even thought

24 about or whoever approved the agreement -- I guess Mr.

25 Keglevic signed it for TCEH -- dividability (sic) and value

1    of claims that TCEH has against its affiliates.

2            Why?  Because he's at all those places.  He's the

3    CRO and CFO of all three of those companies.  How can he

4    possibly decide if he should sue himself; how can Kirkland &

5    Ellis as his counsel in all three capacities possibly advise

6    him if he should sue himself; how can they possibly decide

7    in the way our system works, which is an adversary system

8    with advocates on both sides decide what should be done with

9    those claims and causes of action.  But the RSA contemplates

10   that they are all gone and wiped clean.

11           Now I think these conflicts infect the case.  We

12   tried at the beginning to say, look, let's keep things apart

13   for a while -- and I think we'll be back on June 5th to talk

14   about that more.  But we got two cases that where they touch

15   each other it's in conflict.  They are adversaries,

16   including with respect to this -- this tax issue.

17           If you believe the presentation that was made this

18   morning, one of the driving considerations in the structure

19   of the deal contemplated by the RSA is that it avoids having

20   a trap tax of billions of dollars at the EFH level.

21           As a creditor of TCEH I don't care.  TCEH is a

22   pass through entity.  WE are not liable for that tax.

23   That's of no benefit or value to the estate of TCEH, and

24   we've been told that the step up basis is worth billions of

25   dollars and that was given up in this settlement.

1          Now I just want to know who is going to be the

2    advocate for TCEH on these issues.  And if it's the same

3    person and advisors who advocate for TCEH in connection with

4    this DIP and cash collateral, I'm worried.  And I think the

5    Court should be concerned because we -- you know, it's easy

6    to say this relief is interim, but let's face it, with a DIP

7    it's -- it is kind of interim only in the sense that you

8    can't borrow more if it's ultimately determined that it's

9    inappropriate.

10         But the -- what's out the door is out the door and

11   the protections that are granted are granted.  They're cast

12   in stone.  They're done.  So it's not so easy to just say,

13   oh, it's just interim.  Let's not worry about it.  We've got

14   problems here.

15         What we have offered for purposes of tonight at

16   least to get to tomorrow is if the debtors would tell us how

17   much money they've got -- how many dollars and checks

18   they've got to write tonight or tomorrow and what it's for,

19   we'll agree.  Sign it.  Put an order up and make sure that

20   those amounts can be paid because we want the company to

21   continue to live.

22         But we've got a -- we've got to solve these

23   problems and it's a hard one.  Your Honor, I don't envy the

24   position that you're in in having to grapple with this.

25   It's -- this is a toughy (sic).  This is a very tough case

1    because what you're being told is we're going to have a

2    liquidation of the operating business and a balance sheet

3    restructuring of a couple of holding companies that own a

4    bankruptcy remote company that may rightfully belong to

5    EFCH.

6         (Pause)

7              MR. LAURIA:  Oh, one of the reasons that the drop

8    down wasn't used was because Mr. Keglevic understood that

9    the interest rate on that debt would be higher.

10             Just to put it in perspective, let's assume the

11   drop down financing was a billion.  You would do the first

12   700, you upstream it, you do another 300.  And let's assume

13   that interest rate was double digits like he said or his

14   counsel said, ten percent.  And let's just round up the

15   interest rate on the proposed DIP, three percent on a

16   billion dollars.  You know what that is?  It's 70 million

17   bucks.

18             And we're talking about a $4.475 billion DIP that

19   they wanted approval at 2.7 today.  I guess they want 2.4

20   now.  The math -- the consideration that people are doing is

21   way out of balance.  The drivers of these decisions don't

22   add up unless you take account of the conflicts.  And the

23   conflicts shouldn't be a basis for a decision here.  And the

24   presence of the conflicts raises a very serious question for

25   this Court as to whether or not this is a business judgment

1   case, or does the debtor have to establish the overall

2   fairness of the transaction?

3            And we all know from experience under Delaware law

4   if that standard applies generally, the decision of company

5   is not upheld.  I've been involved in a lot of cases.  One

6   case that I can think of in Delaware where the Court

7   determined that the overall fairness standard applied was

8   the Los Angeles Dodgers case.  Judge Gross there determined

9   that there were conflicts on the part of the decision-maker,

10  the overall fairness standard applied and the consequence

11  was the DIP was not approved.

12           I have a solution for tonight and that's let's

13  figure out how much they need to get to tomorrow, and we can

14  rejoin the debate.  But this is a toughy (sic).

15           Thank you.

16           THE COURT:  Thank you.

17           MR. LOWENTHAL:  Good afternoon, Your Honor.  Dan

18  Lowenthal, Patterson, Belknap, Webb & Tyler.  We represent

19  Law Debenture Trust Company of New York.  And I'm here today

20  with Steve Miller for the Morris James firm,  our Delaware

21  counsel.  Law Debenture, Your Honor, is the Indenture

22  Trustee on the more than $5 billion worth of unsecured notes

23  at the TCEH level.  We're the successor trustee to Bank of

24  New York Mellon, so we're a recent newcomer to the case.

25  We've been plowing through the papers and drilling down into

1    the details.

2              So for today, I'll say with respect to the DIP

3    motion and the cash collateral motion, we wholly support the

4    arguments that have been made by our ad hoc bond holders and

5    their papers they put in in the last 24 hours and in all the

6    comments that Mr. Lauria just made and reserve our rights to

7    be heard further on the motion.

8              THE COURT:  All right.

9              MR. LOWENTHAL:  Thank you.

10             THE COURT:  Thank you.  Mr. Dunne, do you want to

11   be heard?

12             MR. DUNNE:  Yes, Your Honor.  I'll be brief given

13   the hour.  But I wanted to address some of the points.  For

14   the record, Dennis Dunne from Milbank, Tweed, Hadley, McCloy

15   on behalf of --

16             THE COURT:  I'm sorry.  Mr. Lauria.

17             MR. LAURIA:  I'm just a little confused, did -- I

18   thought Mr. Dunne earlier said he was counsel for the

19   outgoing agent and so I'm not sure why he's talking to this

20   point.

21             THE COURT:  Well, Mr. Dunne.

22             MR. DUNNE:  I think he knows.  We are counsel -- I

23   was about to get there for the record, Your Honor.  We

24   represent Citibank on the DIP facility.  We are agents on

25   the DIP facility and I wanted to address the motion to

1    approve the debtor-in-possession financing.

2         We are the predecessor agent on the prepetition

3    secured first lien TCEH financing facility which is -- I'm

4    going to come back for a second and clarify that one last

5    time for the record because apparently there is still some

6    misunderstanding here.  But on the DIP I wanted to take a

7    step back, Your Honor, because I think what's getting lost

8    in a lot of the specifics is -- is the forest.

9         The DIP financing before the Court today is one of

10   the largest DIP loan facilities, I believe, in the history

11   of the Code and it may be the largest in terms of the amount

12   of incremental dollars, and that's the part that I want to

13   emphasize, made available to the estates.

14        Citibank and the other lead arrangers have

15   negotiated and committed to 4.475 billion of financing.  And

16   I want to talk about what this is not.  First, there's no

17   roll up of any prepetition claims here.  There's no

18   prepetition -- there's no prepayment of any prepetition

19   principal amounts.  The entire facility is comprised of new

20   dollars for the sole purpose of allowing these debtors to

21   finance their operations through Chapter 11.  There is a

22   two-year term on this facility.  There are no case control

23   milestones in the DIP financing.  The terms of the debtor-

24   in-possession financing do not require a certain plan to be

25   filed and confirmed by a date certain.

1            With these facts in mind, Your Honor, the parties

2     should not be challenging the DIP when Citibank and the

3     other lead arrangers have provided the TCEH debtors with the

4     requisite liquidity, minimal covenants, over a  two-year

5     term on favorable pricing.

6            I have two other -- two other points, Your Honor.

7     One is a clarification and it has to do what     Mr.

8     Weisfelner said earlier.  He kept coming back to the

9     approval of point, I believe, which is that the polarized

10    group according to the RSA only represents 41 percent of the

11    first needs secure class in the TCEH side.  And therefore,

12    those holders could not have directed Citibank in its prior

13    capacity as agents to consent.  And thus, Citibank must have

14    done it on its own.

15           This fails for reasons I will get into.  It's in

16    the category of never let the facts get in the way of a

17    colorful argument.  And let me break it down.  The 41

18    percent in the RSA is the percentage across the entire first

19    lien class.  What's relevant for our purposes right now is

20    the percentage that group has in the bank facility, NTCH.

21    There's also first lien notes which would count for purposes

22    of doing the RSA percentage, but would not count for

23    purposes of doing the percentage holdings within the bank's

24    syndicate name; that 41 percent would be larger, because my

25    understanding is they hold very little of the notes.

1          The other part is that we received a letter from

2    Paul Weiss, who can explain it themselves, saying that they

3    had authority to represent to Citibank that more than 50

4    percent of the debt in that facility consented and were

5    directing Citibank as the prior agent and now, Wilmington as

6    a successor, to support the priming and the cash collateral.

7          My understanding is that, that included authority

8    from lenders who were not RSA signatories, they may be in

9    the future, but who would nevertheless were part of the Paul

10   Weiss group or had otherwise authorized them to make that

11   direction.  At the end of the day, the admin agent isn't

12   going around making these decisions as some type of

13   freewheeling and medieval chancellor.  They're relying on

14   the views of the economic stakeholders in syndicate and

15   that's how it happened here.

16          And the last point on that is the time for the

17   consent, Your Honor, is today.  There was no period two

18   weeks ago, two months ago where KD (phonetic) asked nor did

19   Citi ever respond to would you consent.  This deal only came

20   together, my understanding, very recently.  We were only

21   asked yesterday about the consent and it only occurred

22   today.

23          Last point, Your Honor, with -- and we'll get to

24   this one and go through the order.  On the number of the

25   specific objections, on the avoidance actions, Your Honor,

1    that's subject to entry to final hearing.  I do believe the

2    final order at the final hearing that it is appropriate on a

3    pure new money debtor-in-possession financing facility for

4    the DIP lenders to be repaid from any available funds in the

5    estate.

6          To answer Mr. Lauria's question, the difference

7    between proceeds and getting a lien of the avoidance actions

8    is who controls the actual litigation.  And by having a lien

9    only on the proceeds, we would never be in a position, nor

10   would we want to be, to actually control the prosecution and

11   settlements of those claims.  But if the debtors or the

12   creditors committee or some estate beneficiary actually

13   monetizes those claims through prosecution or settlement,

14   they should be made available.

15         The drop down argument, Your Honor, one quick

16   point there; I believe at best, this argument is of

17   historical interest only for two reasons, one of which is

18   that the debtors in the exercise of their business judgment

19   chose not to pursue that.  It was insufficient or they

20   thought it too much execution risk, but for whatever reason,

21   they chose not to.  The second, and perhaps this is more

22   important to today's purposes is that those options were

23   foreclosed today due to the various defaults, payment and

24   otherwise that exist under the prepetition credit facility

25   that would prevent the drop down of those assets.

1          Lastly, the unencumbered assets, Your Honor;   The

2     objectors make much of the fact that there may be

3     unencumbered assets out there and that somehow the DIP

4     lenders should not have a lien on that or should be forced

5     to look to it last.  I think this attempts to turn Section

6     364 in the Code a bit on its ear.  The class of assets that

7     is the easiest and the best to use as collateral for a

8     debtor-in-possession financing facility are the unencumbered

9     assets.  The most difficult class of assets to use are those

10    that are encumbered by an existing lien, because you need to

11    go and prime the prepetition lenders and provide adequate

12    protection.

13          A new money DIP lender is entitled to look to the

14    unencumbered assets for retainment.  On motioning, again, we

15    can defer this to the final hearing, Your Honor.  I'll point

16    out one note which is that mostly there's a doctrine that

17    exists among various secured creditors so that if there were

18    multiple prepetition secured creditors, they could argue

19    about marshalling among their collateral.

20          Mr. Lauria's client is unsecured and the Doctrine

21    of Marshalling does not apply to him.  But in any event, we

22    are not looking for that to be set in stone today.  That

23    will be subject to the final hearing.  Hopefully we'll reach

24    a deal with whomever the creditors committee is in this case

25    and we'll be back in front of you on the fifth with more

1    consensus on those points than we have today.

2              THE COURT:  Thank you.  Any?  Very briefly.

3              MR. HAYES:  Thank you, Your Honor, very briefly.

4    Your Honor, I just wanted to sum up to say in stepping back

5    and about Section 364 and the debtor's ability to carry

6    their burden.  Your Honor, we put on testimony in the form

7    of the affirmative declarations, live testimony from Mr.

8    Keglevic and live testimony from Mr. Goldstein about the

9    marketing process and the availability of this DIP for the

10   benefit of these estates.  We also testified as to the needs

11   of this DIP facility in particular for the operation of the

12   business as well as satisfaction of the regulatory

13   requirements, so that should not go unnoticed.

14             It is also important to emphasize that as Mr.

15   Dunne just noted, the administrative agent, both former and

16   current, are consenting and more than 50 percent of the

17   secured lenders are consenting to both the DIP and the cash

18   collateral.

19             There is no question, Your Honor, that this is the

20   best available facility today.  We can talk about the drop

21   down DIP all we want.  It's interesting.  It's

22   intellectually interesting.  But it's irrelevant for today.

23   Today we are faced with what is the best available financing

24   on the market for this debtor and that is the facility that

25   the debtors have put forward.

1          As to the various arguments that the unsecureds

2    have raised about the order, again, the avoidance action

3    subject to a final order, Your Honor, on the marshalling,

4    paragraph 32, subject to a final order in the DIP.

5          And on last thing I wanted to say is Mr. Lauria

6    said that the debtors have agreed that the unsecureds get no

7    recovery.  That's just simply incorrect.  The RSA does say

8    that they will get the prorata share of any unencumbered

9    assets which is exactly what they're entitled to get under

10   1129B.

11          THE COURT:  Okay.  Thank you.

12          MR. HAYES:  Thank you.

13          THE COURT:  Last words?  Very briefly, please.

14          MR. LAURIA:  Your Honor, I just wanted -- I mean

15   the juxtaposition of the two comments are amazing.  I think

16   Mr. Dunne was right on the law.  That marshalling doesn't

17   apply unless there's an agreement to it.  And Mr. Dunne was

18   right that they get a lien on the unencumbered assets with

19   no legal duty to go to the other assets first, which means,

20   the unencumbered assets that are available today won't be

21   available at the end.

22          THE COURT:  All right.  Thank you very much.  I am

23   very cognizant of the fact that this DIP is focused on not

24   all the debtors, but there's the TCEH debtors and that this

25   concept of, you know, maybe they're different pieces here

1   that conflict with each other; they're in line for that as

2   well.

3            However, in the context of if I had a verdict

4   today, I think inferring that the testimony both at direct

5   and in cross of Mr. Keglevic as well as the other witnesses

6   establish that the DIP should be approved as modified.  And

7   by that I mean for example, the $300 million drop down on

8   what would go out as adequate protections.  So that lowers

9   the amount as well as not making the $67 million shared

10  services payment.  And also, I have when we get to it

11  comments, not many, to the order.

12           But I think that the objections really sort of

13  fade away.  As to adequate protection, I think, and as I

14  sort of previewed this in a lot of colloquy from

15  Mr. Weisfelner, that the issue here is adequate protection

16  to the first-line lenders in connection with the priming DIP

17  facility.  They are entitled to adequate protection in -- if

18  they're being primed.  I think they are arguably entitled to

19  adequate protection that would take them from a current

20  undersecured basis all the way topped up to a secured basis

21  because until they get there, nobody is otherwise entitled

22  to get in front of them.

23           Don't need to get to that because the Plan which

24  is also current by right of code of adequate protection, I

25  think those petition interests will approve a petition that

1    although it's a guess -- not guesstimate -- but a rough

2    estimate and it doesn't necessarily go to the actual dollar

3    amount but is roughly equivalent to what they were being

4    entitled to on a non (indiscernible) basis on post-petition

5    interests.  I think that adequate protection is appropriate

6    and I will approve that.

7              With regard to the ad protection and also

8    specifically this issue about the drop down DIP financing

9    which is fascinating, I think Mr. Keglevic's testimony on

10   that was comprehensive and made a lot of sense to me.  And

11   the bottom line was they calculated it and they considered

12   it, but it didn't provide them the liquidity they needed at

13   a price that was affordable.

14             And he made this point several times and I don't

15   think we need to, we can't lose sight of it is, there is a

16   giant business risk associated with and there always is

17   going forward but on a contested basis on cash collateral or

18   a contested basis on the debt that doesn't bear the bank in

19   mind.  And this business is volatile in that the customers

20   as was said, the customers are the click of a mouse away

21   from changing.  The price protectors up or down are hard to

22   predict.  I mean nobody except maybe the Farmer's Almanac

23   predicted, you know, the polar vortex of this winter and the

24   effect that had, you know, I don't know what the summer is

25   going to be like.  But, you know, the truth being there's a

1    lot of risk in this company.  And as a result, something

2    like the drop down DIP, I think will combine the limit of

3    what you could have actually gotten for it, the pricing on

4    it which is not insignificant, although it's certainly not

5    the most important point, as well as the business risk

6    associated with it.  I think that Mr. Keglevic's testimony

7    was, you know, more than adequate, that it was a reasonable

8    exercise of the debtor's business judgment not to pursue

9    that course of action.

10            In connection with what they're going to use the

11   money for, I think that the $1.1 million sort of set aside

12   for the Railroad Commission in connection with reclamation

13   of land.  It may or may not get paid in the next 30 days.

14   But the reality is that it has to be there in order to

15   protect the debtor from some sort of instantaneous or short

16   order action by the regulatory authority.  It could be

17   disastrous to the debtor's business if they can't mine the

18   coal, if they can't run the plant, and if they can't run the

19   plant, they can't make the electricity and it brings -- it

20   all follows from there.

21            In connection with the letters of credit, I don't

22   think that's unreasonable at all.  There are different ways

23   you can approach protecting the debtor from the downside of

24   walkaways under these types of hedging instruments.  One is

25   the (indiscernible) claim, that is the first act for money,

1    I suppose.  And one is to have a letter of credit.

2            I didn't really hear anything today that made me

3    doubt the debtor's business judgment that posting a letter

4    of credit is the way to go.  And given my experience, and

5    certainly not as much as a many of the professionals in the

6    room, but given my experience, the risk in connection with

7    these types of hedging instruments is very high and very

8    serious and could quickly eradicate any kind of cash that

9    the debtor would have.

10           So I don't think it's inappropriate to roll that

11   all up into a larger amount because circumstances have

12   changed and we have evidence that at least two contracts

13   were called today.

14           So for all those reasons, you know, the delayed

15   draw, the 1.1 billion, correct?  Right.  The term of the

16   (indiscernible) of Maryland, for that the revolver of 800

17   million, reduced by 300 million.  I don't know if it comes

18   out of the revolver or the term.  I don't really care.  And

19   another 67 million for the inner company transaction which

20   also gets reduced.

21           I am going to -- I will approve the debtor-in-

22   possession of (indiscernible) on an interim basis subject to

23   comments I have about the order which are relatively limited

24   and I could tell you, I guess, quickly what they are at

25   least from a global perspective.  I should go through -- it

1    would be better to go through the order, but some of them

2    have already been addressed, the motion and the waiver if

3    you will is being put off until final order.

4              The avoidance action liens -- are they being put

5    off until final order?

6              MR. HAYES:  They are, Your Honor.

7              THE COURT:  Actions and proceeds?

8              MR. HAYES:  Actions and proceeds.

9              THE COURT:  Okay.  And I don't want to -- I don't

10   want to look at these notes as opposed to my actual markups

11   because I don't want to miss something or say something.  So

12   that's my ruling.

13             And I'm also prepared based on the record I have

14   in front of me, I believe enough of a record to approve the

15   cash collateral order as well.  And I'm prepared to do that.

16   Again, I have comments on the forms of order.

17             That's all we're going to get done today.  I'm not

18   going to be able to turn to any of the other motions that

19   Mr. DeFranceschi mentioned.  I simply don't have the time.

20   But I am willing to spend hopefully not more than 15 or 20

21   minutes going through the order so that we can get those

22   docketed.  Other than that, you're going to have to come

23   back tomorrow at 9:30.

24             MR. DUNNE:  Your Honor, if I may indulge on one

25   point.  We do have interim one-day bridge orders that I

1    think would address the concerns that Mr. Lauria expressed

2    with much significantly reduced amounts on cash management,

3    employee wages, customer programs, and the trading motion.

4    And while you're going through those orders, if I could have

5    a minute to show them to my friends at that other side of

6    the courtroom, perhaps, Your Honor would have time to enter

7    them as well on a one-day basis.

8              MR. LAURIA:  Your Honor, I would propose instead

9    of trying to go through all the issues and all of the orders

10   that if the debtors have an amount of money that they need

11   to pay tomorrow, that they just say so on the record and let

12   the Court authorize that and those items can be paid and

13   then we can take up the other motions tomorrow.

14             MR. DUNNE:  Your Honor, I can do that right now.

15             THE COURT:  All right.  That would be preferable

16   because I do have comments.  I've already held the security

17   people much longer than I'm supposed to.  Let me see what

18   you have.

19             MR. DUNNE:  Okay.  I have one copy.  Do you want

20   me to read through them or give them to you?

21             THE COURT:  Give me.

22             MR. DUNNE:  Okay.

23             THE COURT:  If I sign any of these, let me make

24   something very, very clear, because I have comments to all

25   of these orders that were just handed to me.  And I'm not --

1          MR. LAURIA:  I don't know if we're speaking

2    different languages or what?  I thought they were just going

3    say they've got to pay some items.  They've got the cash on

4    hand to pay it and we were going to agree that the Court

5    could order them -- authorize to pay and we'll come deal

6    with the motions tomorrow.

7          MR. DUNNE:  What we did is we put -- it's a one-

8    day bridge order.  It expires tomorrow and it --

9          MR. LAURIA:  We don't agree to that, Your Honor.

10   We do not agree to that.  We just agree -- they've got money

11   they want to pay.  There's --

12         THE COURT:  Well, there's two questions.  You

13   know, right?  There's always the question, they're source

14   and use, right?  You're willing to give them enough cash

15   collateral on an agreed one-day basis to whatever checks

16   they have to write today.  That's source.  Their problem is

17   what do they use it for?  And they want to hand me a bunch

18   of orders that say they're going to use it for X, Y, Z

19   purposes.

20         MR. LAURIA:  What we were -- what I thought we

21   were agreeing is that whatever they say they've got to pay,

22   we'd like them to say it on the record so we know what

23   they're going to pay and what it adds up to and they can go

24   pay it, and it's source and use.

25         MR. DUNNE:  Yeah, and the customer programs motion

```
1    actually really had a very minimal amount.  It's really more

2    so we just continue to honor and, you know, work with those

3    agreements with our customers.

4              THE COURT:  I'm not -- I've got to tell you,

5    there's no way I'm signing the trading agreement order right

6    now.  I can't give you that today.

7              MR. DUNNE:  Okay.

8              THE COURT:  I got too many comments today.  And it

9    looks like $70,000 --

10             MR. DUNNE:  That was on the customer programs.

11             THE COURT:  And what are we talking about

12   generally speaking?  What is that -- what is that actually?

13             MR. DUNNE:  Just refund checks --

14             THE COURT:  All right.

15             MR. DUNNE:  -- to customers.

16             MR. LAURIA:  I just don't understand why they

17   can't take whatever the numbers are that they've written

18   into each of those orders and say we want to pay those

19   amounts in respect of those obligations and we say okay and

20   the Court says okay and --

21             THE COURT:  Just give them a blank check to spend

22   whatever on whatever they want?

23             MR. LAURIA:  Right.

24             MR. DUNNE:   Well, I mean, I can take those

25   orders --
```

1            THE COURT:  I don't have time for this.

2            MR. DUNNE:  I can take those orders back and tell

3    you the number and it's less than 20 -- I think it's less

4    than 20 million if I remember.  It was less than $20 million

5    and it would go towards employ, you know, I guess you don't

6    care what it goes towards, but it --

7            MR. LAURIA:  I said just say it on the record what

8    it's for.

9            MR. DUNNE:  Employee, employee programs, customer

10   programs, is 70,000 was for that.  And there was the trading

11   and hedging and what was the last one?  Well cash management

12   is not a cash matter, there's no money there.

13   (Indiscernible).  It's roughly 20 million.

14           MR. LAURIA:  All right.  Your Honor, for those

15   uses it's fine.  We consent.

16           MR. DUNNE:    And then the motions will be

17   considered tomorrow but we for today we could use that money

18   subject to Your Honor.

19           THE COURT:  Everybody slow down.  All right.

20   Here's what I'll do.

21           SO ORDER THE RECORD based on the consent of the

22   objectors that the debtor may use cash collateral of up to

23   $20 million to pay what must be paid in the next 24 hours in

24   connection with the employee expenses, the trading motion,

25   and the customers' motion and they may use the cash

1    management system to do it since otherwise it can't write

2    the checks and so order to the record to that limited

3    extent.

4              MR. DUNNE:  We appreciate it, Your Honor.

5              THE COURT:  Tomorrow morning we can take up the

6    actual orders themselves and then move on to the other

7    motions.  Okay.  We'll reconvene at 9:30.  No will be

8    allowed in the building until 8:30 and I can't -- my

9    security won't come on until 8:15 so don't show up early.

10             As I said, as far as I'm concerned, these seats

11   are yours for the duration of the hearing.  So that should

12   eliminate the need for people to get here overly early.  You

13   are welcome and encouraged to leave as much material here as

14   you like.  Everything you take out has to go back through

15   the x-ray machines and we know that takes time and effort

16   and resources.

17             So we're going to adjourn until 9:30 tomorrow.

18   I've so ordered the record.  I'm going to hand that back to

19   you.  And we'll uptake everything tomorrow morning at 9:30.

20             SEVERAL:  Thank you, Your Honor.

21   (Recessed at 6:03 PM; to reconvene on May 2, 2014)

22                       * * * * *

23

24

25

1                          I N D E X

2

3                      W I T N E S S E S

4    WITNESS                 BY                      PAGE

5    PAUL KEGLEVIC          MR. SHORE               111

6                          MR. MCKANE               114

7    PAUL KEGLEVIC          MR. HESSLER             176

8                          MR. WEISFELNER           181

9                          MR. SHORE                197

10                         MR. WEISFELNER           233

11                         MR. HESSLER              243

12   CARLA HOWARD           MR. HESSLER             247

13                         MR. SHORE                250

14   STEPHEN GOLDSTEIN      MR. SHORE                252

15

16

17

18

19

20

21

22

23

24

25

1                    I N D E X

2

3                  E X H I B I T S

4   NO.                IDENTIFICATION                    PAGE

5   --      Goldstein's declarations              161

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                               I N D E X

2

3                             R U L I N G S

4      DESCRIPTION                                        PAGE

5      Motion to Strike                                    118

6      Motion for Joint Admin                              127

7      Motion to Approve DIP Financing                     303

8      Motion for Cash Collateral                     304 & 308

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 313

```
 1                    C E R T I F I C A T I O N

 2

 3    I, Dawn South, certify that the foregoing transcript is a

 4    true and accurate record of the proceedings.

 5
```

**Dawn South**

Digitally signed by Dawn South
DN: cn=Dawn South, o=Veritext, ou,
email=digital@veritext.com, c=US
Date: 2014.05.02 14:32:57 -04'00'

```
 9    AAERT Certified Electronic Transcriber CET**D-408

10

11

            I, Sheila G. Orms, certify that the foregoing is a

12    correct transcript from the official electronic sound

13    recording of the proceedings in the above-entitled matter.

14

15    Dated:  May 2, 2014

16
```

**Shelia G. Orms**

Digitally signed by Shelia G. Orms
DN: cn=Shelia G. Orms, o=Veritext,
ou, email=digital@veritext.com, c=US
Date: 2014.05.02 14:33:39 -04'00'

```
19     Signature of Approved Transcriber

20

21

      I, Jamie Gallagher, certify that the foregoing transcript

22

      is a true and accurate record of the proceedings.

23
```

**Jamie Gallagher**

Digitally signed by Jamie Gallagher
DN: cn=Jamie Gallagher, o=Veritext, ou,
email=digital@veritext.com, c=US
Date: 2014.05.02 14:34:27 -04'00'

1                    C E R T I F I C A T I O N

2

3    I, Sherri L. Breach, CERT*D-397, certified that the

4    foregoing transcript is a true and accurate record of the

5    proceedings.

6

7    Dated: May 2, 2014

8    Sherri Breach
     Digitally signed by Sherri Breach
     DN: cn=Sherri Breach, o=Veritext, ou,
     email=digital@veritext.com, c=US
9    Date: 2014.05.02 14:35:30 -04'00'

10   SHERRI L. BREACH

11   AAERT Certified Electronic Reporter & Transcriber

12   CERT*D-397

13

14

15   Also transcribed by:

16   Leigh David, CET 694

17   _____

18

19   Leigh David
     Digitally signed by Leigh David
     DN: cn=Leigh David, o=Veritext,
20   ou, email=digital@veritext.com,
     c=US
21   Date: 2014.05.02 14:39:57 -04'00'

22

23

24

25