1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3

4

5    In re:                    :

                               :      Chapter 11

6    ENERGY FUTURE HOLDINGS    :

     CORP.,  et al.,           :    Case No. 14-10979(CSS)

7                              :

              Debtors.         :    (Jointly Administration

8    _____:    Requested)

9

10                                 United States Bankruptcy Court

11                                 824 North Market Street

12                                 Wilmington, Delaware

13                                 May 2, 2014

14                                 9:39 AM

15

16

17   B E F O R E :

18   HON CHRISTOPHER S. SONTCHI

19   U.S. BANKRUPTCY JUDGE

20

21

22

23

24   ECR OPERATOR:  LESLIE MURIN

25

1    HEARING re Motion of Energy Future Holdings Corp., et al.,

2    for Entry of an Order Directing Joint Administration of the

3    Debtors' Chapter 11 Cases [Docket No. 17; filed April 29,

4    2014]

5

6    HEARING re Motion of Energy Future Intermediate Holding

7    Company LLC and EFIH Finance, Inc. for Entry of (I) An

8    Interim Order (A) Approving Certain Fees Related to

9    Postpetition Financing and Granting Such Fees Administrative

10   Expenses Priority and (B) Scheduling a Final Hearing; and

11   (II) A Final Order (A) Approving Postpetition Financing, (B)

12   Granting Liens and Providing Superpriority Administrative

13   Expense Claims, (C) Authorizing the Use of Cash Collateral,

14   (D) Authorizing the EFIH First Lien Refinancing, (E)

15   Authorizing Issuance of Roll-Up Debt to the Extent

16   Authorized by the Settlement Motion, (F) Determining the

17   Value of Secured Claims, and (G) Modifying the Automatic

18   Stay [Docket No. 74; filed April 29, 2014]

19

20   HEARING re Motion of Texas Competitive Electric Holdings

21   Company LLC and Certain of its Debtor Affiliates, for Entry

22   of Interim and Final Orders (A) Approving Postpetition

23   Financing, (B) Granting Liens and Providing Superpriority

24   Administrative Expense Claims, (C) Modifying the Automatic

25   Stay, and (D) Scheduling a Final Hearing [Docket No. 73;

1    filed April 29, 2014]

2

3    HEARING re Motion of Texas Competitive Electric Holdings

4    Company LLC and Certain of its Debtor Affiliates for Entry

5    of Interim and Final Orders (A) Authorizing Use of Cash

6    Collateral, (B) Granting Adequate Protection (C) Modifying

7    the Automatic Stay, and (D) Scheduling a Final Hearing

8    [Docket No. 71; filed April 29, 2014]

9

10   HEARING re Motion of Energy Future Holdings Corp., et al.,

11   for Entry of Interim and Final Orders (A) Authorizing the

12   Debtors to (I) Pay Certain Prepetition Compensation and

13   Reimbursable Employee Expenses, (II) Pay and Honor Employee

14   and Retiree Medical and Similar Benefits, and (III) Continue

15   Employee and Retiree Benefit Programs, and (B) Modifying the

16   Automatic Stay [Docket No. 25; filed April 29, 2014]

17

18   HEARING re Motion of Energy Future Holding Corp., et al, for

19   Entry of an Order (A) Authorizing the Debtors to (I)

20   Continue Using Their Existing Cash Management System, (II)

21   Maintain Existing Bank Accounts and Business Forms, and

22   (III) Continue Using Certain Investment Accounts; (B)

23   Authorizing Continued Intercompany Transactions and Netting

24   of Intercompany Claims; and (C) Granting Postpetition

25   Intercompany Claims Administrative Expense Priority [Docket

1    No. 37; filed April 29, 2014]

2

3    HEARING re Motion of Energy Future Holdings Corp., et al.,

4    for Entry of (A) An Order Authorizing the Debtors to (I)

5    Maintain and Administer Customer Programs and Customer

6    Agreements, (II) Honor Prepetition Obligations Related

7    Thereto, (III) Pay Certain Expenses on Behalf of Certain

8    Organizations, (IV) Fix the Deadline to File Proofs of Claim

9    for Certain Customer Claims, and (V) Establish Procedures

10    for Notifying Customers of Commencement of the Debtors'

11    Chapter 11 Cases, Assumption of Customer Agreements, and the

12    Bar Dates for Customer Claims and (B) An Order Authorizing

13    Certain of the Debtors to Assume the Customer Agreements

14    [Docket No. 31; filed April 29, 2014]

15

16    HEARING re Motion of Energy Future Holdings Corp., et al.,

17    for Entry of Interim and Final Orders Authorizing the

18    Debtors to Pay Prepetition Critical Vendor Claims [Docket

19    No. 29; filed April 29, 2014]

20

21    HEARING re Motion of Energy Future Holdings Corp., et al.,

22    for Entry of Interim and Final orders Authorizing the

23    Debtors to (A) Grant Administrative Expenses Priority to all

24    Undisputed Obligations for Goods and Services Ordered

25    Prepetition and Delivered Postpetition and Satisfy Such

1   Obligations in the Ordinary Course of Business, and (B) Pay

2   Prepetition Claims of Shippers, warehousemen, and

3   Materialmen [Docket No. 27; filed April 29, 2014]

4

5   HEARING re Motion of Energy Future Holdings Corp., et al.,

6   for Entry of Interim and Final Orders Authorizing the

7   Debtors to (A) Continue Performing Under Prepetition Hedging

8   and Trading Arrangements, (B) Pledge Collateral and Honor

9   Obligations Thereunder, and (C) Enter into and Perform Under

10  Trading Continuation Agreements and New Postpetition Hedging

11  and Trading Arrangements [Docket No. 41; filed April 29,

12  2014]

13

14  HEARING re Motion of Energy Future Holdings Corp., et al.,

15  for Entry of (A) An Order Authorizing Certain of the Debtors

16  to Pay Certain Prepetition Transition Charges and Delivery

17  Charges and (B) An Order Authorizing Certain of the Debtors

18  to Assume Transmission and Distribution Service Agreements

19  [Docket No. 38; filed April 29, 2014]

20

21  HEARING re Motion of Energy Future Holdings Corp., et al.,

22  for Entry of Interim and Final Orders Determining Adequate

23  Assurance of Payment for Future Utility Services [Docket No.

24  26; filed April 29, 2014]

25

Page 6

1   HEARING re Motion of Energy Future Holdings Corp., et a.,

2   for Entry of Interim and Final Orders Authorizing the

3   Debtors to Pay Certain Prepetition Taxes and Fees [Docket

4   No. 23; filed April 29, 2014]

5

6   HEARING re Application of Energy Future Holdings Corp., et

7   al., for Entry of an Order Approving the Retention and

8   Appointment of Epiq Bankruptcy Solutions, LLC as the Claims

9   and Noticing Agent for the Debtors [Docket No. 24; filed

10  April 20, 2014]

11

12  HEARING re Motion of Energy Future Holdings Corp., et al.,

13  for Entry of an Order Authorizing the Debtors to File a

14  Consolidated List of Creditors in Lieu of Submitting a

15  Separate Mailing Matrix for Each Debtor [Docket No. 28;

16  filed April 29, 2014]

17

18

19

20

21

22

23

24  Transcribed by:  Dawn South, Melissa Looney, Jamie

25  Gallagher, and William J. Garling

```
 1   A P P E A R A N C E S :

 2   RICHARDS, LAYTON & FINGER, P.A.

 3        Attorney for the Debtors

 4

 5   BY:  DANIEL J. DEFRANCESCHI, ESQ.

 6        MARK D. COLLINS, ESQ.

 7        JASON M. MADRON, ESQ.

 8

 9   KIRKLAND & ELLIS

10        Attorneys for the Debtors

11

12   BY:  RICHARD M. CIERI, ESQ.

13        EDWARD O. SASSOWER, ESQ.

14        STEPHEN E. HESSLER, ESQ.

15        BRIAN E. SCHARTZ, ESQ.

16        CHAD HUSNICK, ESQ.

17        WILLIAM PRUITT, ESQ.

18        MARK MCKANE, ESQ.

19        ANDREW MCGAAN, ESQ.

20

21

22

23

24

25
```

```
 1   PAUL, WEISS, RIFKIND, WHARTON & GARRISON
 2        Attorneys for Ad Hoc Committee of TCEH First Lien
 3        Creditors
 4
 5   BY:  ALAN W. KORNBERG, ESQ.
 6        KELLEY A. CORNISH, ESQ.
 7        ADAM M. DENHOFF, ESQ.
 8        BRIAN S. HERMANN, ESQ.
 9        JACOB ADLESTEIN, ESQ.
10
11   YOUNG CONAWAY STARGATT & TAYLOR, LLP
12        Attorneys for Ad Hoc Committee of TCEH First Lien
13        Creditors
14
15   BY:  PAULINE K. MORGAN, ESQ.
16        JOEL A. WAITE, ESQ.
17        RYAN M. BARTLEY, ESQ
18
19   BROWN RUDNICK
20        Attorneys for TCEH, Second Lien Trustee
21
22   BY:  EDWARD S. WEISFELNER, ESQ.
23        JEFFREY L. JONAS, ESQ.
24        JEFFREY B. COFFEY, ESQ.
25
```

1   UNITED STATES DEPARTMENT OF JUSTICE

2         Attorney for the U.S. Trustee

3

4   BY:  RICHARD L. SCHEPACARTER, ESQ.

5         ANDREA B. SCHWARTZ, ESQ.

6

7   LANDIS RATH & COBB LLP

8         Attorney for Marathon Asset Management, LP

9

10   BY:  ADAM G. LANDIS, ESQ.

11

12   WILMER CUTLER PICKERING HALE, ET AL.

13         Attorneys for Marathon Asset Management, LP

14

15   BY:  GEORGE W. SHUSTER, JR., ESQ.

16

17   CLEARY GOTTLIEB STEEN & HAMILTON LLP

18         Attorney for J. Aron & Company

19

20   BY:  SEAN A. O'NEAL, ESQ.

21

22   COZEN O'CONNOR

23         Attorney for J. Aron & Company

24

25   BY:  MARK FELGER, ESQ.

1   GOODWIN PROCTOR

2        Attorneys for Aurelius Capital Management, LP

3

4   BY:  BILL WEINTRAUB, ESQ.

5        KIZZY L. JARASHOW, ESQ.

6

7   GELLERT SCALI BUSENKELL & BROWN, LLC

8        Attorney for Aurelius Capital Management, LP

9

10  BY:  MICHAEL G. BUSENKELL, ESQ.

11

12  AKIN GUMP STRAUSS HAUER & FELT LLP

13       Attorneys for Ad Hoc Committee of EFIH Unsecured

14       Noteholders

15

16  BY:  IRA DIZENGOFF, ESQ.

17       SCOTT ALBERINO, ESQ.

18

19  SHEARMAN & STERLING

20       Attorneys for Duetsche Bank AG New York Branch

21

22  BY:  FREDRIC SOSNICK, ESQ.

23       NED S. SCHODEK, ESQ.

24

25

1   POTTER ANDERSON & CORROON LLP

2        Attorneys for Deutsche Bank AG New York Branch

3

4   BY:  LAURIE SELBER SILVERSTEIN, ESQ.

5        JEREMY WILLIAM RYAN, ESQ.

6        R. STEPHEN MCNALL, ESQ.

7

8   COUSINS CHIPMAN & BROWN, LLP

9        Attorneys for Ad Hoc Committee of EFIH Unsecured

10       Noteholders

11

12  BY:  SCOTT D. COUSINS, ESQ.

13       ANN M. KASHISHIAN, ESQ.

14

15  ROPES & GRAY LLP

16       Attorneys for CSC Trust Company of Delaware

17

18  BY:  D. ROSS MARTIN, ESQ.

19       KEITH HOWARD WOFFORD, ESQ.

20

21  COLE SCHOTZ MEISEL FORMAN & LEONARD, PA

22       Attorney for CSC Trust Company of Delaware

23

24  BY:  NORMAN L. PERNICK, ESQ.

25

1  MORRIS, NICHOLS, ARSHT & TUNNELL, LLP

2       Attorney for Sponsors

3

4  BY:  DEREK ABBOTT, ESQ.

5

6  WACHTELL LIPTON ROSEN & KATZ

7       Attorneys for Sponsors

8

9  BY:  RICHARD G. MASON, ESQ.

10       EMIL A. KLEINHAUS, ESQ.

11

12  DRINKER BIDDLE & REATH LLP

13       Attorneys for Citibank, N.A.

14

15  BY:  HOWARD A. COHEN, ESQ.

16       ROBERT K. MALONE, ESQ.

17

18  MILBANK, TWEE, HADLEY & MCCLOY LLP

19       Attorneys for Citibank, N.A.

20

21  BY:  DENNIS F. DUNNE, ESQ.

22       EVAN R. FLECK, ESQ.

23       WILLIAM BICIE, ESQ.

24

25

1    BROWN RUDNICK LLP

2          Attorneys for Wilmington Savings Fund Society

3

4    BY:  EDWARD S. WEISFELNER, ESQ.

5          JEFFREY L. JONAS, ESQ.

6

7    ASHBY & GEDDES

8          Attorneys for Wilmington Savings Fund Society

9

10   BY:  WILLIAM PIERCE BOWDEN, ESQ.

11         GREGORY A. TAYLOR, ESQ.

12

13   FOLEY & LARDNER LLP

14         Attorneys for UMB Bank, N.A.

15

16   BY:  HAROLD L. KAPLAN, ESQ.

17         MARK F. HEBBELN, ESQ.

18

19   MORRIS JAMES LLP

20         Attorney for Law Debenture Trust Company of New York

21

22   BY:  STEPHEN M. MILLER, ESQ.

23

24

25

1   PATTERSON BELKNAP WEBB & TYLER LLP

2        Attorney for Law Debenture Trust Company of New York

3

4   BY:  DANIEL A. LOWENTHAL, III, ESQ.

5

6   PACHULSKI STANG ZIEHL & JONES LLP

7        Attorney for Computershare Trust Company, N.A., et

8        al. and Ad Hoc Second Lien Holder

9

10   BY:  LAURA DAVIS JONES, ESQ.

11        ROBERT J. FEINSTEIN, ESQ.

12

13   KRAMER LEVIN NAFTALIS & FRANKEL LLP

14        Attorneys for Computershare Trust Company, N.A., et

15        al. and Ad Hoc Second Lien Holder

16

17   BY:  THOMAS MAYER, ESQ.

18        JOSHUA BRODY, ESQ.

19

20   BINGHAM MCCUTCHEN LLP

21        Attorney for Pacific Investment Management Co. LLC

22

23   BY:  JEFFREY SABIN, ESQ.

24

25

1    CONNOLLY GALLAGHER LLP

2         Attorney for Pacific Investment Management Co. LLP

3

4    BY:  KAREN C. BIFFERATO, ESQ.

5

6    QUINN EMANUEL

7         Attorney for Centerbridge Partners

8

9    BY:  SUSHEEL KIRPALANI, ESQ.

10

11   SAUL EWING LLP

12        Attorney for ERCOT

13

14   BY:  MARK MINUTI, ESQ.

15

16   MUNSCH HARDT KOPF & HARR, P.C.

17        Attorney for Electric Reliability Counsel of Texas,

18        Inc.

19

20   BY:  KEVIN M. LIPPMAN, ESQ.

21

22   FOX ROTHSCHILD LLP

23        Attorney for Ad Hoc Group of Unsecured TCEH Noteholders

24

25   BY:  JEFFREY M. SCHLERF, ESQ.

1   WHITE & CASE LLP

2        Attorney for Ad Hoc Group of TCEH Unsecured Noteholders

3

4   BY:  J. CHRISTOPHER SHORE, ESQ.

5        GREGORY M. STARNER, ESQ.

6        THOMAS E. LAURIA, ESQ.

7

8   FRIED FRANK HARRIS SHRIVER & JACOBSON

9        Attorney for Fidelity Management & Research Company

10

11  BY:  GARY L. KAPLAN, ESQ.

12       MATTHEW M. ROSSE, ESQ.

13

14  CROSS & SIMON, LLC

15       Attorney for Fidelity Management & Research Company

16

17  BY:  MICHAEL JOSEPH JOYCE, ESQ.

18

19  REED SMITH LLP

20       Attorney for Bank of New York Mellon Trust

21

22  BY:  KIMBERLY LAWSON, ESQ.

23

24

25

1    BLANK ROME

2         Attorney for Wilmington Trust

3

4    BY:  MICHAEL DEBAECKE, ESQ.

5

6    SEWARD KISSEL

7         Attorneys for Wilmington Trust

8

9    BY:  JOHN ASHMEAD, ESQ.

10        ARLENE ALVES, ESQ.

11

12   DYKEMA GOSSETT PLLC

13        Attorney for PIMCO Pacific

14

15   BY:  JEFFREY R. FINE, ESQ.

16

17   BINGHAM MCCUTCHEN LLP

18        Attorney for Pacific Investment Management Co. LLC

19

20   BY:  JULIA FROST-DAVIES, ESQ.

21

22   CIARDI, CIARDI & ASTIN, P.C.

23        Attorney for Atmos Energy Corporation

24

25   BY:  DANIEL K. ASTIN, ESQ.

1   WOMBLE CARLYLE SANDRIDGE & RICE, LLP

2        Attorney for CenterPoint Energy Houston Electric, LLC

3

4   BY:  STEVEN K. KORTANEK, ESQ.

5

6   FINLEY & ASSOCIATES

7        Attorney for GLM, et al.

8

9   BY:  G. LEE FINLEY, ESQ.

10

11  APPEARED TELEPHONICALLY:

12  HAL F. MORRIS, ESQ.

13  ASHLEY F. BARTRAM, ESQ.

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              (The following transcript contains multiple

3     indiscernibles due to the poor recording quality:)

4              THE CLERK:  All rise.

5              THE COURT:  Please be seated.  Give me just a

6     moment.

7          (Pause)

8              THE COURT:  Sorry about that, ready to go.

9              MR. SASSOWER:  Good morning, Your Honor.

10             THE COURT:  Good morning.

11             MR. SASSOWER:  Again for the record, Edward

12    Sassower, Kirkland & Ellis LLP on behalf of the debtors.

13             Your Honor, after yesterday's hearing the debtors

14    got together with the ad hoc committee of the TCH unsecureds

15    and worked late into the night and again picked it up this

16    morning to resolve all of their issues to the remaining

17    motions.

18             I believe that their -- the second lien trustee

19    still has one or two outstanding issues.  I believe

20    Mr. Jonas wants to make a reservation of rights and also

21    have some live testimony on the wages motion.

22             So what I propose we do today is we pick it up

23    where we left off yesterday on the TCH DIP and cash

24    collateral and then proceed through the agenda.  As the

25    items are listed on the agenda I'd simply take wages, which

1    is the one issue we may have live testimony on and put that

2    towards the end.

3                    THE COURT:  Okay.  So all the -- other than --

4    just for the clarification, all the issues on the orders are

5    resolved?

6                    MR. SASSOWER:  We believe so, and we'll take up

7    each of those clarifications in the context of each motion.

8                    THE COURT:  Sure.  Of course.  That's fine.

9                    MR. SASSOWER:  So with that I yield the podium to

10   my partner, Chad Husnick, who is handling the TCH DIP and

11   cash collateral.

12        (Pause)

13                    THE COURT:  Go ahead.

14                    MR. HUSNICK:  Good morning, Your Honor, Chad

15   Husnick with Kirkland & Ellis appearing on behalf of the

16   debtors.

17                    Your Honor, turning first to the DIP motion, which

18   was argued and ruled upon yesterday, Your Honor, there's a

19   couple of issues in connection with that that I'm going to

20   read into the record if that's all right with Your Honor,

21   that are part of the resolution that Mr. Sassower mentioned

22   just a few minutes ago.

23                    THE COURT:  All right.

24                    MR. HUSNICK:  Your Honor, the debtors have agreed

25   to use commercially reasonable efforts during the interim

1    period to convince holders of prepetition letters of credit

2    not to role or request new LCs.

3            In addition the debtors have agreed to use

4    commercially reasonable efforts to convince the Railroad

5    Commission of Texas to accept the carve out as a substitute

6    bond.

7            The TCH debtors also agree that with respect to

8    the interim relief granted by the various first day orders

9    on an interim basis and for the duration of the interim

10   period; (a) except as and only to the extent otherwise

11   provided in the interim DIP and cash collateral orders

12   entered by the Court, the TCH debtors will not encumber or

13   otherwise dispose of any assets that were unencumbered as of

14   the petition date, including, but not limited to, the

15   approximately $150 million of segregated cash, and (b) the

16   TCH debtors will not make any payment or distribution to or

17   for the benefit or any debtor other than a TCEH debtor

18   pursuant to the various interim first day order on account

19   of prepetition obligations other than the approximately

20   $27 million Texas margin tax to be paid to EFH Corp. for

21   remittance to the State of Texas.

22           Based on that representation, Your Honor, there's

23   several other changes that'll flow through the orders, but

24   we can take those up as we go through and make the record if

25   that's all right with Your Honor.

1           THE COURT:  Sure.

2           MR. HUSNICK:  Okay.  On the DIP order, Your Honor,

3    we reached agreement with the United State's Trustee on some

4    changes to the order that we had actually filed with the

5    motion.  If it's okay with Your Honor I'll approach and give

6    you a copy of that redline.  I know Your Honor had said you

7    might have some additional changes as well.

8           THE COURT:  Yes.  Thank you.

9           I'm sorry, do you have a copy for Ms. Werkieser

10   (ph), please.

11          MR. HUSNICK:  (Indiscernible) extra copy.

12          THE COURT:  Thanks.

13          MR. HUSNICK:  Your Honor, the first change that we

14   have to the order -- and I don't know if you want to give us

15   yours as we walk through --

16          THE COURT:  Yeah, let's just page turn it as we

17   go.

18          MR. HUSNICK:  Okay.  My first change is on

19   page 30.

20          THE COURT:  Oh, okay.  Back up.  Let's go to

21   page 7.

22          MR. HUSNICK:  Okay.

23          THE COURT:  These are not major changes any of

24   them I don't believe.

25          This has to do with the findings, and for the most

1    part I'm -- actually I am okay with the findings; however,

2    sometimes they read more like briefs than findings, so one

3    in particular is paragraph (e)(i) where you're making a

4    finding -- I'm making a finding as to what you're going to

5    do at the final hearing and for whatever, so my only change

6    there would be -- would be to strike the first -- third line

7    down, strike "at a final hearing," strike that clause and

8    then just start with, "The TCEH debtors ..." and then just

9    insert "state that, at the final hearing, they ..." and then

10   it continues "will seek final approval ..." et cetera, et

11   cetera, "the final order."  And then go down to the very

12   last line of the black line where it says, "which shall

13   be ..."  Just say, "which they state shall be ..."  And like

14   I said that's a very minor change.  That was my only change

15   there.

16             MR. HUSNICK:  Thank you.

17             THE COURT:  I don't know if you want to -- people

18   want to digest them as we go or go back, but does anybody

19   have a problem with that change?  No?  Okay, great.

20       (Pause)

21             THE COURT:  Oh, yeah, page 27, paragraph 16.  This

22   is the very last line -- actually it's on page 28 that your

23   -- oh, no, it's on the bottom of page 27.  And this

24   basically talks about how the (indiscernible) was going be

25   maintained.  At the very end it says, "As modified by any

1    order that may be entered by the Court to which the DIP

2    agent first agrees."  No.  If I enter an order I'll enter an

3    order and of course parties will have an opportunity to be

4    heard on it.

5              So I need to just strike "to which the DIP agent

6    has agreed."

7              MR. HUSNICK:  That's fine with the debtors.

8              THE COURT:  Okay.

9         (Laughter)

10             MR. HUSNICK:  I'm searching and (indiscernible)

11   for the lender's counsel.

12             THE COURT:  If nobody says anything I'm going to

13   assume it's okay.

14             MR. HUSNICK:  It's fine.

15             THE COURT:  Okay, I'm sorry, I've been expecting

16   an important phone call that I have to take, so if you'll

17   give me five minutes.  We're going to be in recess.

18        (Recess at 9:49 a.m.)

19             THE COURT:  Please be seated.  Thank you, I

20   apologize.

21             So that last change was fine, correct?

22             MR. HUSNICK:  Yes, Your Honor, I believe lender's

23   counsel have confirmed.

24             THE COURT:  Okay, I think we're up to where you

25   are then.

1          MR. HUSNICK:  Your Honor, on page 30 at the bottom

2     or paragraph 21 and it carries over onto page 31, the

3     debtors inserted the words "to the fullest extent permitted

4     under Section 364(e) of the Bankruptcy Code."  And then the

5     language continues.  Effectively placing a limiter on that

6     language to the extent the Bankruptcy Code permits.

7          THE COURT:  Okay.

8          MR. HUSNICK:  The next change at -- well, sorry.

9     The next change I have then is at the bottom of page 31,

10    it's just deleting the word "and" between reasonable and

11    documented.

12         THE COURT:  Okay.

13         MR. HUSNICK:  The next change is on page 46.  In

14    the middle of the page we have inserted "upon entry of a

15    final order."  And this relates to the findings related to

16    the DIP lenders not being persons in control or owners and

17    operators under the CIRCLA law and other environmental laws.

18         THE COURT:  Okay, thank you.  I was -- I was going

19    to actually strike it, but "final order" is fine.

20         Will you back up to the previous page?

21         MR. HUSNICK:  Yes, sir.

22         THE COURT:  This goes -- actually two pages.

23    Paragraph 34, discharge waiver about five lines down.  The

24    sentence begins -- seven lines down I guess.  The sentence

25    is, "None of the TCEH debtors shall propose ..."  Change

1    that to say --

2              MR. HUSNICK:  One second, I'm not finding it.

3              THE COURT:  See where I am?  One, two, three,

4    four, five, six, seven lines down.

5              MR. HUSNICK:  On page 44?

6              THE COURT:  Yes, sir.

7              MR. HUSNICK:  No, no, I got it.

8              THE COURT:  It begins, "None of the TCEH ..."  I'd

9    like to change that to striking "none" and "shall" and just

10   shall, "It shall be an event of default if any of the TCEH

11   debtors propose ..."  Event of default is a defined term I

12   believe.

13             MR. HUSNICK:  Okay, Your Honor, that's fine with

14   the debtors.

15             THE COURT:  Okay.  All right.  That's good to

16   hear.

17             All right, next change, if any?

18             MR. HUSNICK:  The next change, Your Honor, is on

19   page 48.

20             Your Honor, the reservation here is one draft

21   behind unfortunately, so if I may I'll read into the record,

22   and I think we'll have to submit a modified order because

23   this is a little bit more lengthy than what we have here.

24             THE COURT:  Okay.

25             MR. HUSNICK:  "Nothing herein primes or otherwise

1    affects the rights and interests of TXU 2007-1 Railcar

2    Leasing LLC (as the assignee of its affiliate Highridge

3    Leasing LLC) under that certain lease dated as of

4    September 7, 2007 by and among TXU 2007-1 Railcar Leasing

5    LLC (as assignee of its affiliate Highridge Leasing LLC) and

6    debtor, Texas Competitive Electric Holdings Company LLC

7    relating to 996 aluminum rapid discharge for coal cars (the

8    railcar lease).

9            All rights of parties in interest with respect to

10   the railcar lease are preserved."

11           THE COURT:  Okay, I have no problem with that.

12           MR. HUSNICK:  And then the last two changes, Your

13   Honor, on pages 49 and 50 simply inserting the time for the

14   final hearing and the objection deadline for the final

15   order.

16           THE COURT:  All right.  I have no further comments

17   to the order.  Does anyone wish to be heard on the order?

18           MR. FLECK:  Your Honor, good morning, Evan Fleck

19   of Milbank, Tweed on behalf of Citibank and the other

20   rangers.

21           Just for purposes of clarity on the record we have

22   no objection with respect to the changes that were reached

23   in agreement with the Office of the United States Trustee,

24   the reservation or rights, and the Court's changes.

25           Thank you.

1              THE COURT:  You're welcome.  Thank you very much.

2              MR. HUSNICK:  Your Honor, the United States

3       Trustee has asked that we add the United States District --

4       I'm sorry -- the United States Attorney's Office to the

5       noticing block I believe on page 50, so we'll go ahead and

6       do that.

7              THE COURT:  Of course.  That's fine.

8              Okay, I have no issues with the order at this

9       point, I think it's fine, and based on the record and my

10      findings and rulings yesterday I'm prepared to approve the

11      financing under the terms of the interim order, and when I

12      receive it I will sign it.

13             MR. HUSNICK:  Thank you, Your Honor.

14             Next I have the debtors' motion for consensual --

15      or use of cash collateral.

16             Your Honor, if we can go through the same exercise

17      I'll be happy to hand up a redline of the changes.

18             THE COURT:  That's fine.  Give me just a moment.

19         (Pause)

20             THE COURT:  Okay.

21             MR. HUSNICK:  Your Honor, the first change that we

22      have to the cash collateral order is on page 35.

23             THE COURT:  Oh, you have it -- oh, sorry.

24             MR. HUSNICK:  Sorry.

25             THE COURT:  Didn't see it.  I didn't see that it

1    appeared.  Page 35?

2              MR. HUSNICK:  Yes, sir.

3              THE COURT:  All right.  Let me see if I had

4    anything before that.

5         (Pause)

6              THE COURT:  Page 35?

7              MR. HUSNICK:  Correct.

8              THE COURT:  Okay, that's fine, that's where I

9    start.

10             MR. HUSNICK:  Paragraph 8 and the lead in to the

11   credit bid paragraph we have inserted the words "upon entry

12   of a final order and subject to the terms of the first lien

13   intercreditor agreement ..." and then it carries forward.

14   So that just making the credit bid paragraph subject to a

15   final order.

16             THE COURT:  Okay, thank you.  Because I had an

17   issue with that as well.

18             MR. HUSNICK:  My next change, Your Honor, is on

19   page 43.  I'm sorry, 41.

20             THE COURT:  Okay.

21             MR. HUSNICK:  This provision, Your Honor, relates

22   to the reservation of rights or challenged rights for other

23   parties in interest and the creditors' committee.

24             Your Honor, in consultation with the United States

25   Trustee's Office we've agreed to eliminate the requirement

1    that there be three days prior written notice, and we've

2    also deleted the words "by entry of the Court" a couple of

3    times; however, we've made clear that it continues to be

4    subject to entry of an order of the Court -- this Court or

5    another court of competent jurisdiction that grant standing

6    to a creditor or other party in interest to bring a cause of

7    action.

8              THE COURT:  Okay.

9              MR. HUSNICK:  On page 42, Your Honor, we just

10   deleted the two words "timely filed adversary proceeding."

11             THE COURT:  Okay.

12             MR. HUSNICK:  Page 43, Your Honor, we -- this is

13   the change I just discussed mentioning or any other court of

14   competent jurisdiction.

15             Page 47 is my next change.

16             THE COURT:  Mine too.

17             MR. HUSNICK:  Paragraph 18, no liabilities to

18   third parties.  Your Honor, we've inserted the words "upon

19   entry of a final order."

20             THE COURT:  Okay, I had the same -- well, I had

21   basically the same change.  That's fine.

22             MR. HUSNICK:  Your Honor, on page 52 --

23             THE COURT:  Wait a minute, what happened with

24   marshalling?  I thought we -- I thought that was a final

25   order.

1          MR. HUSNICK:  This is that -- this is cash

2    collateral, it is subject to a final order in the DIP, but

3    on the cash collateral it was not.

4          MR. LAURIE:  I thought -- Your Honor, Tom Laurie

5    of White & Case.

6          THE COURT:  Yeah.

7          MR. LAURIE:  I thought it was an across board --

8          THE COURT:  Yeah, that's -- that needs to be

9    subject to a final order.

10          MR. HUSNICK:  That's acceptable to the lenders.

11          THE COURT:  All right.

12          MR. HUSNICK:  The next change is on page 52,

13    paragraph 25.

14          Your Honor, this is the same language that we

15    inserted into the DIP order.  If it may please the Court

16    rather than read it again into the record I'll just

17    represent that we will cut and paste that same language into

18    this paragraph.

19          THE COURT:  Sure.

20          MR. HUSNICK:  So that takes us to the bottom of

21    page 52 and 54 where again we inserted the --

22          THE COURT:  Well --

23          MR. HUSNICK:  -- date of the second date hearing

24    as well as the objection deadline for the final order.

25          THE COURT:  You're going to add the U.S.

1    Attorney's Office to the notice list?

2              MR. HUSNICK:  That's actually listed in paragraph

3    S as in Sam.

4              THE COURT:  It's already there.  Okay.  Great.

5              Anyone else on the order?

6              MR. SHORE:  Chris Shore of White & Case.

7              It would just also be subject to the adequate

8    protection payment, that 300 million which is in the DIP

9    budget is not going out and it's being capitalized.  We need

10   to see that as part of this order.

11             MR. HUSNICK:  We can so represent it's not

12   actually in the language here that that payment would be

13   paid post-petition, it's just go forward interest.

14             THE COURT:  Okay.  I will accept that

15   representation.

16             Yes, ma'am?

17             MS. CORNISH:  Good morning, Your Honor, Kelley

18   Cornish from Paul, Weiss, Rifkind, Wharton & Garrison on

19   behalf of the ad hoc committee of TCEH first lien creditors.

20             We are in agreement with the changes that have

21   been negotiated with the U.S. Trustee's Office and other

22   parties and we are -- as well as those suggested by the

23   Court and we are in favor of entry of the order.

24             THE COURT:  All right.  And you'll -- and you'll

25   also agree the 300 million isn't being paid.

1              MS. CORNISH:  Yes, and for the record that was --

2     that was a -- I think there's been some confusion about

3     that, that was an error, that was never intended to be paid.

4              THE COURT:  Okay.

5              MS. CORNISH:  So -- and I think that was said

6     yesterday, but I think there's been some confusion about

7     that.  So that was literally an error and it's not something

8     that was ever reflected in the order in any event.

9              THE COURT:  Okay, thank you.

10             MS. CORNISH:  Thank you, Your Honor.

11             THE COURT:  Mr. Lauria?

12             MR. LAURIA:  Your Honor, just one point of

13    clarification if I may.

14             I'm not sure if the DIP order actually says that

15    the maximum utilization on the interim is now reduced by

16    that 300-, but I think everybody agrees that it is, and I

17    just wanted to get clarification of that.

18             MR. HUSNICK:  Yeah, we will reflect in the markup

19    that the new amount of the revolver will be 533 million and

20    the new amount of the term loan will be 700 million, which

21    is a total reduction of 367 million.

22             MR. LAURIA:  Great, thank you.

23             THE COURT:  Very good.  Thank you.

24             All right again, those are all my changes, I

25    haven't heard any other objections, and again, I am -- based

1    on the record from yesterday, the rulings, and the

2    discussions today I will sign the order approving the cash

3    collateral as presented -- or as changed.

4            MR. HUSNICK:  Thank you, Your Honor.

5            So the next motion I would take up is the TCEH

6    cash management motion.  That can be found at item number 6

7    on Your Honor's agenda.

8            THE COURT:  Go ahead.

9            MR. HUSNICK:  Thank you.

10           Your Honor, the debtors have approximately

11   $795 million in cash on hand.  They use a fairly complex

12   cash management system to deal with the intercompany

13   transactions and transactions with third parties, payments

14   to third parties, and other issues that they deal with with

15   their cash on a day-to-day basis.

16           Your Honor, the cash management system can be

17   boiled down in its simplest form to two separate money

18   pools.  One money pool is associated with the TCEH debtors,

19   so it's effectively EFCH, TCEH, and all of TCEH's

20   subsidiaries participate in that money pool.  That money

21   pool has approximately $428 million in it as of the petition

22   date.

23           The other money pool is a money pool with EFH and

24   its subsidiaries other than TCEH and EFCH and EFIH, which no

25   longer participates in the EFH money pool.

1          Cash does not move freely between the two money

2     pools.  It only moves between the money pools, Your Honor,

3     pursuant to transactions that are documented and tracked.

4          What I would -- I should stop here, Your Honor,

5     and just mention that yesterday we introduced the

6     declaration of Mr. Paul Keglevic, the CFO of the company.  I

7     believe that's been introduced into evidence.  Your Honor

8     all of which I'm drawing upon to describe this motion is

9     contained in the declaration.

10          Your Honor, there are types of transactions, so

11     let me start with within the money pool transactions.

12     Generally those are treated as ledger entries by the

13     different debtor entity such that not every entity needs to

14     have its own bank account.  Effectively TCEH has one or more

15     bank accounts and then distributes cash on behalf of the

16     other TCEH debtors and nets the transactions off during the

17     -- during the relevant periods, and at any given time each

18     TCH debtor is either a net borrower or a net lender to the

19     TCEH money pool.  There is interest accruing on these

20     intercompany loans and we did preview the interest agreement

21     and the money pool policy with the Office of the United

22     States Trustee in advance of the hearing.

23          The same goes on both sets of money pools.

24          Just focus in on the way that cash would move

25     between the money pools.  I mentioned that those are only

1    separate -- only subject to documented transactions, and

2    there's four categories or transactions, and I think it's

3    important to walk through each of them only because we've

4    tailored the relief in consultation with the ad hoc

5    unsecured committee as to the different buckets, what we're

6    getting during the interim period.

7              The first bucket of intercompany transactions

8    between the money pools is pursuant to shared services

9    agreements.  Your Honor, there are two shared services

10   agreements.  The first is between TCEH and its affiliates

11   and EFH Corporate Services.  And if you remember back to

12   Mr. Sassower's opening presentation he explained that

13   there's an entity on the corporate chart called EFH

14   Corporation Services.  That entity employs approximately 500

15   employees and provides back office and management support

16   for the entire EFH enterprise.

17             Pursuant to the shared services agreement the

18   services provided by EFH Corporate Services are allocated

19   across the various debtor entities as appropriate and

20   they're memorialized in the shared services agreement

21   itself.  That's the TCEH shared service agreement.

22             There is a separate shared services agreement

23   between EFIH, that is the EFIH debtor, and EFH Corporate

24   Services, again to provide that same sort of back office

25   check support that is required to continue to operate the

1    company in an ordinary course business.

2              Corporate Services has significant contractual

3    relationships with third parties and much of the cash that

4    flows out of the company on a day-to-day basis actually

5    flows out through Corporate Services and has been reimbursed

6    by the various debtor entities through the shared services

7    agreement.

8              What the debtors requested in the motion is not

9    only authority to pay the prepetition amounts outstanding

10   under the shared service agreement, that is the $69 million

11   number you heard yesterday, but also the request authority

12   to continue in the ordinary course post-petition

13   transactions as appropriate and as documented in the shared

14   services agreement.

15             We did agree, Your Honor, during the interim

16   period not to pay any of the $69 million that is currently

17   outstanding under the shared services agreement between EFH

18   Corporate Services and the TCEH debtors.

19             As to go forward the ad hoc committee is

20   comfortable with the debtors continuing in the ordinary

21   course their relationships, vis-à-vis, the shared services

22   agreement so long as those are documented and able to be

23   tracked, and we've also asked that those types of

24   transactions be afforded administrative priority in order

25   that at the end of the day the debtors are able to restore

1   the state of the accounts to the way they were as of the

2   petition date to the extent necessary.

3           Unless Your Honor has any questions about the

4   shared services agreement I'll move on to the tax sharing

5   agreement.

6           Under the tax sharing agreement, Your Honor, again

7   there are two separate agreements.  There's a tax sharing

8   agreement between EF -- I'm sorry -- between EFH and Oncor

9   Holdings.  I'm not specifically going to deal with that tax

10  sharing agreement, but you heard a little bit about it

11  yesterday.

12          The tax sharing agreement I'm -- actually it's

13  both tax sharing agreements, I apologize.  So that's one,

14  and that relates to taxes that accrue as a result of Oncor

15  operations.  Because EFH is the taxpayer as Ms. Howard

16  discussed yesterday, those tax obligations are actually paid

17  by EFH and reimbursed by Oncor Holdings, which is a non-

18  debtor.

19          On the other side of the house, Your Honor, we

20  have a tax sharing agreement between EFIH, EFH, and the TCEH

21  debtors.  That tax sharing agreement functions much in the

22  same way for purposes of what we're discussing today insofar

23  as to the extent that the Texas state margin taxes are

24  actually accrued on account of operations at TCEH those

25  obligations are then paid by EFH and they're reimbursed

1    through the tax sharing agreement.

2              Your Honor, we identified yesterday that the

3    amount of prepetition obligations outstanding under the tax

4    sharing agreement is approximately $27 million related to

5    taxes that will come due during the interim period.

6              In consultation with the ad hoc committee we have

7    agreed in the form of order for cash management to cap the

8    amount of cash leaving the TCH debtors at 27 million, and I

9    believe I referenced that earlier in my introduction.

10             The third category, Your Honor, of -- go ahead.

11   I'm sorry.  The third category of intercompany transactions

12   is subleases.  Your Honor, EFH -- non-debtor EFH Properties

13   is an entity that has a lease with a third-party lessor for

14   the use of the building where the company's corporate

15   headquarters are located in Dallas, Texas.  EFH Properties

16   then subleases the property to various entities, including

17   the Federal Deposit Insurance Corporation, Oncor, and Oncor

18   then subsequently subleases that property back to Luminant

19   Generation.

20             Your Honor, non-debtor EFH Properties is going to

21   continue to service its objections but it does get

22   reimbursed by the debtors to the extent that the debtors are

23   using the property.

24             We have agreed in the form of interim order not to

25   ask for any reimbursement of intercompany claims on account

1    of prepetition lease obligations, that's approximately

2    $400,000.  Instead, Your Honor, we will though continue to

3    perform under those obligations post-petition.

4            Finally, Your Honor, there's a bucket for letters

5    of credit issues by TCEH for the benefit of EFH.  This is

6    actually a flow of cash that comes back to TCH to the extent

7    that a counterparty at EFH draws on a letter of credit.

8    That intercompany payment then is from EFH to TCEH.

9            Your Honor, we again are agreeing that during the

10   interim period there will be no prepayments of prepetition

11   claims on account of the letter of credit reimbursements;

12   however, Your Honor, we don't believe there are any

13   outstanding prepetition claims.  Going forward, to the

14   extent these claims arise, we will treat them just like any

15   other post-petition obligation.

16           With that, Your Honor, I will probably stop and

17   let you ask questions if you have any other questions about

18   the company's cash management system.  Beyond that it

19   functions like any other cash management system.  We are

20   working with the Office of the United States Trustee to

21   insure that the cash management system is fully within the

22   authorized depository limits that have been approved by the

23   trustee's office.  I am optimistic we will resolve any

24   issues there, but we have only asked for a 60-day interim

25   waiver.

1          MR. SHORE:  Good morning, Chris Shore from White &

2     Case on behalf of the ad hoc group of TCEH unsecured notes.

3          I'd like to start just by thanking Mr. Sassower

4     and his team, they did spend a great deal of time last night

5     and tonight bringing us up to speed on a lot of these

6     issues, and I think there's a general recognition that the

7     best way to figure out what's going on is not to put people

8     in the box to do it.

9          We've gone through a lot, we still have a lot to

10    do, there are going to be issues that we need the diligence

11    with respect to both the tax sharing agreement and the

12    shared services agreement, but for now the terms that were

13    laid out on the record are agreeable to us on an interim

14    basis.

15         THE COURT:  Thank you.  Anyone else?  Okay.

16         MR. HUSNICK:  Your Honor, at this time I would

17    recommend that I hand up an order and walk through just a

18    few changes we made for the U.S. Trustee's Office.

19         THE COURT:  That's fine.  Thank you.

20         Go ahead.

21         MR. HUSNICK:  Your Honor, the first change we have

22    is in paragraph 10, this was as a result of the discussions

23    that we had with the unsecured ad hoc group last night

24    basically giving them -- making them a noticed party as it

25    relates to the closing of bank accounts and modifications to

1      the cash management system.

2              THE COURT:  Okay.

3              MR. HUSNICK:  Your Honor, on page 6 we have

4      clarified by adding the word "post-petition" for post-

5      petition shared services, and we've added language here in

6      letter (y) and letter (z) that memorializes the deal that I

7      just articulated on the record as to which categories are

8      being approved and how much amount of cash is able to flow

9      on account of prepetition only claims.

10             THE COURT:  Okay.

11             MR. HUSNICK:  Your Honor, then we added a

12     paragraph scheduling a final hearing in paragraph 12 and we

13     clarified that the order needs to be in form and substance

14     acceptable to the EFIH DIP agent to the extent that

15     provisions or modifications to the cash management system

16     relate to the EFIH DIP agent.

17             The same in paragraph 7 we're just clarifying that

18     amounts owing to EFIH or EFIH financed by any other debtor

19     on account of it relating to the intercompany transactions

20     will be repaid within 70 days, effectively insuring that no

21     administrative claim builds up during the case.

22             THE COURT:  Okay.

23             MR. HUSNICK:  Page 8, Your Honor, at the request

24     of the United States Trustee -- actually, I'm sorry, this is

25     at the request of the ad hoc committee, we just clarified

1    that all parties in interest their rights are reserved as to

2    particular claims and the validity and amount of such

3    claims.

4              THE COURT:  Okie doke.

5              MR. HUSNICK:  Unless Your Honor has any further

6    questions about the form of order we'd respectfully ask that

7    the order be entered.

8              THE COURT:  (Indiscernible) order anyone

9    (indiscernible) thoughts?  Okay.

10             I'm happy to go with the motion and approve the

11   form of order as modified on the record.

12             MR. HUSNICK:  Thank you, Your Honor.  Would you

13   like me to hand up a clean or do you want --

14             THE COURT:  If you have a clean -- yeah, if you

15   have a clean that's fine.

16        (Court confers with clerk)

17             THE COURT:  Okay.

18             MR. HUSNICK:  The next item on your agenda, Your

19   Honor, agenda item number 7 can be found at docket number 31

20   is the debtors' motion to authorize the debtors continued

21   performance under customer programs.

22             Your Honor, there are other pieces of relief in

23   here that I'll discuss, but let me just start very quickly

24   with an overview of the importance of this motion.

25             Customer programs motions are almost always one of

1    the most important first day motions for a retail company.

2    I submit that this retail company is even more important as

3    to the customer programs.

4            The debtors have more than 1.7 million customers

5    in a highly competitive retail electricity market in Texas.

6    That market has more than 100 competing retail providers,

7    and I've routinely heard the CEO of TXU Energy, that is the

8    retail wing, tell me that it just takes two people and a

9    laptop to set up a retail energy provider in Texas.

10           For that reason, Your Honor, the barriers to entry

11   in this market are extraordinarily low and the turnover of

12   customers in the absence of customer programs such as those

13   we're going to discuss today can be high.

14           As the debtors do their best to try and combat any

15   risk to the turnover -- any increases in turnover it will be

16   to their benefit to have access to the prepetition customer

17   programs that we will discuss.

18           The customer programs can be broken down into

19   three general categories.  Basic services such as credits

20   and over payments for customers, incentives and perks

21   provided to customers in order to encourage them to become

22   and stay customers of TXU Energy, including matching

23   charitable contributions, prepaid debit cards for renewal

24   and referrals.  I'll mention just on the charitable

25   contribution front briefly the Energy Aid programs which is

1     one of the charitable programs that allows low income energy

2     -- or energy for low income individuals in the State of

3     Texas.

4              Finally there are buckets of programs such as the

5     Brighton program that allow a reimbursement for energy

6     efficient equipment installations.

7              Your Honor, these programs are not all a drain on

8     the debtors' cash, and while the debtors have ample cash on

9     hand will have substantial DIP financing the programs do not

10    all require cash outlays insofar as a lot of them are

11    crediting back against future bills and the like.

12             Your Honor, during the interim period the debtors

13    have -- are requesting $14 million.  This is an increase

14    from the amount that was mentioned in the motion insofar as

15    we had teed the size of the basket in the motion off from a

16    21-day period.  In consultation with the ad hoc creditors

17    this morning I believe we indicated that we would need a

18    slightly larger basket given that we're going to go I

19    believe roughly 35 days during the interim period.  That

20    basket will be $14 million of cash outlay for the PCH

21    debtors on the customer programs.

22             Your Honor, I just want to briefly talk and

23    preview what we're going to be doing -- requesting as it

24    comes to a final order, and I think once of the pieces of

25    relief we had actually requested on an interim basis and

1       have agreed in consultation with the U.S. Trustee to do that

2       request on a final basis.  That is the payment of CourtCall

3       costs and other noticing costs for the -- excuse -- for the

4       PUC, which is the Public Utility Commission of Texas, that

5       is the debtors' primary regulatory authority, as well as

6       ERCOT, which is the agency that we -- that effectively runs

7       the grid in Texas.

8               Your Honor, while I'll get into at the final

9       hearing additional justification and why we believe those

10      payments are both appropriate and necessary, I just want to

11      mention that the debtors worked incredibly closely with the

12      PUC and ECOT to insure that as the debtors entered into

13      Chapter 11 that they would have the softest landing humanly

14      possible for this large retail energy provider in Texas, and

15      that customers in Texas would experience absolutely no

16      disruption to their service during these Chapter 11 cases.

17              As part of that process we engaged in extensive

18      discussions with the Attorney General's Office, and at this

19      time I'd just like to mention Mr. Hal Morris and Ms. Ashley

20      Bartram who I believe are both on the phone, they are

21      counsel for the PUC and they did file a statement in support

22      of the customer programs motion in advance of the hearing.

23      I don't know if they have -- they'll have an opportunity to

24      make a statement after I am completed.

25              The other form of relief here that I will call,

1    Your Honor, that will be done on a final basis is assumption

2    of the customer agreements.

3            Assumption of the customer agreements, Your Honor,

4    was a critical request from the PUC to insure the customers

5    in the State of Texas will not experience any disruption in

6    their service.  The debtors are not trying to lock customers

7    into these agreements, instead the debtors are simply trying

8    to insure that customers are aware in the simplest form

9    possible that the debtors will be there and will provide the

10   service going forward.

11           We've agreed with the PUC to notice the debtors

12   approximately 1.7 million customers with notice that the

13   debtors are seeking to assume the contract and that we'll

14   come back at a final order on June 5th to ask Your Honor to

15   enter an order permitting and indeed directing the debtors

16   to assume those contracts.

17           Your Honor, the -- the last thing I'd like to

18   discuss is the setting of the bar date.  It's an abnormal

19   request in a first day motion, and we believe, and I'll

20   discuss on the record, why we think it's appropriate and

21   establish -- while I don't think the appropriate standard is

22   immediate and irreparable I would submit that it's immediate

23   at least.  Perhaps not irreparable given that it's a dollar

24   amount.

25           But, Your Honor, as part of assuming contracts for

1    the debtors 1.7 million customers the debtors are going to

2    be providing notice to those customers.  In addition the

3    debtors will need to provide yet another notice later in the

4    case of the setting of a bar date.  Rather than mail

5    1.7 million customers an additional 3.5 million former

6    customers notices not only of the commencement of the

7    Chapter 11 cases but of the intent to assume the contract

8    and to set a bar date we've asked the Court and we've asked

9    the United States Trustee to consent to doing that all in

10   one notice.

11           We understand that it's incredibly rare to set a

12   bar date this early in the case, but as to customers and in

13   light of the significant burden on the estate of having to

14   send multiple notices to the customers we believe it's

15   appropriate.

16           In order to accommodate the concerns about due

17   process what we've agreed with the United States Trustee is

18   that we will endeavor to get the schedules on file by no

19   later than 65 days -- or 75 days following the petition

20   date, and indeed we'll try to get them on file even earlier.

21   That is more of a drop dead deadline and we will have to get

22   -- I've discussed with the United States Trustee that to the

23   extent we actually want to go out that far we of course have

24   got to come back to Your Honor and get an extension of the

25   schedule filing deadline.

1         Assuming we do that we've also agreed to extend

2    the bar date not -- it will not be 90 days but out to

3    October 27th, 2014, a full 180 days.  As a result assuming

4    the debtors file the schedules and statements within in that

5    75-day period parties will have ample notice that the bar

6    date has been set once the schedules have been on file.

7         Your Honor, unless you have any other questions

8    about this motion or any of the relief requested in this

9    motion I'd respectfully request that the Court enter the

10   order.

11         MR. MORRIS:  Your Honor, may the Texas Attorney

12   General be heard on this matter at a convenient time?

13         THE COURT:  (Indiscernible) sir.

14         MR. MORRIS:  Thank you.  Good morning, Your Honor.

15   By way of introduction my name is Hal Morris, H-A-L,

16   M-O-R-R-I-S, I'm an assistant attorney general for the State

17   of Texas, and in my capacity as the managing attorney for

18   our bankruptcy regulatory section I have the privilege of

19   I'll be serving as lead bankruptcy counsel for not only the

20   Public Utility Commission but also the Railroad Commission

21   as well as the Texas Commission on environmental quality who

22   also has some regulatory oversight over many of the debtors

23   operations.

24         I'm very pleased, Your Honor, to be here this

25   morning and appreciate the Court's courtesy in allowing me

1    to appear by phone.

2          I'd also like to take this opportunity, Your

3    Honor, to thank Kirkland and the debtor, who we have worked

4    very closely with over the past months as Mr. Husnick

5    pointed out to allow the debtor the softest landing

6    possible.

7          In that regard, Your Honor, as a bankruptcy lawyer

8    there will be many matters that will come up of a highly

9    technical nature that candidly I'll probably not be in a

10   position to answer, but I'll represent to the Court that if

11   the Court has any questions of the Public Utility Commission

12   or any of the other regulatory agencies I will endeavor to

13   get those answers to the Court as quickly as possible.

14         And towards that end, Your Honor, as you'll see in

15   our papers we filed I believe at 7:30 Wednesday morning a

16   responsive pleading to many of the debtors' first day

17   motions, specifically the one that's currently before the

18   Court on the customer contracts.

19         We believe, Your Honor, the DIP motion is very

20   important and would also urge that the Court grant it.  We

21   believe it is very important to allow the debtor to continue

22   to aggressively and competitively complete in the Texas

23   energy markets.  We think that this is in the best interest

24   of the public to have these consumer protections in place,

25   and we would certainly support the relief that the debtors

1    are requesting.

2            Your Honor, one additional point I'd like to make

3    while I have the Court's time this morning.  In regards to

4    the regulatory processes that will take place before the

5    Public Utility Commission on the change of control in

6    consultation with my client as recently as 7 o'clock this

7    morning we believe that those approvals or rather the

8    approval process for the regulatory approvals at the Public

9    Utility Commission consistent with applicable law and

10   obviously consistent with due process and appropriate

11   procedural standards we believe, Your Honor, those can take

12   place within six months.

13           And I'm pleased to represent to the Court that the

14   Public Utility Commission as well as the Railroad

15   Commission, again consistent with due process and applicable

16   procedural rules that we have to live by, will be everything

17   it can to expedite any of these approval processes.

18           Again, as a bankruptcy lawyer I'm obviously very

19   sympathetic to the time constraints of bankruptcy and the

20   expense that every day the debtor remains in bankruptcy.  We

21   are pleased to work with the debtor and with this Court to

22   keep the Court advised of those processes as they go

23   forward.  And again, I'm pleased at any point in time in

24   these proceedings to answer any questions the Court would

25   have.

1           We appreciate the debtors courtesies and the U.S.

2      Trustee's courtesies in allowing the debtor to pay for

3      CourtCall which that is of course a de minimis expense to

4      anyone in the private sector for a government entity, Your

5      Honor, such as ourselves I was on the phone for eight hours

6      yesterday.  It is our intention and we will endeavor to

7      appear if not at every hearing I or a member of my team hope

8      to be at every hearing because of the importance we place on

9      this matter, and so that cost savings to us is in fact

10     significant and we appreciate the Court's courtesies in

11     considering the granting of that motion.

12           So with that, Your Honor, I appreciate the

13     opportunity to make this introduction.  I'd be pleased at

14     any time to respond to any questions, and as to the specific

15     motion before the Court today would urge that these motions

16     be granted.

17           Thank you very much, Your Honor.

18           THE COURT:  You're welcome.  (Indiscernible)

19     Mr. Schepacarter.

20           MR. SCHEPACARTER:  Good morning, Your Honor,

21     Richard Schepacarter for the United States Trustee.

22           I wasn't sure we were going to actually have

23     argument on this issue since it was kicked over to a final

24     order on the CourtCall costs and the like, so I'm just going

25     to reserve our rights on that to address that at a final

1    hearing.

2              THE COURT:  Okay.

3              MR. SCHEPACARTER:  On the proof of claim issue my

4    goal is, or at least for the debtors, I'm hoping that they

5    can get the schedules, the statement of financial affairs,

6    and the like filed within 60 days.  I'm hoping that that'll

7    take place.  What it does is it should allow the parties

8    with the 180-day process the opportunity to have a fulsome

9    review of the statement of financial affairs and schedules.

10   But 60 days does create a little bit of a problem for us in

11   that we have to have a 341 meeting with 40 days.  So I'm

12   going to have a meeting, probably have to adjourn it until

13   the schedules are filed, and then -- and then have another

14   meeting to finish that.  But hopefully that'll be resolved.

15             Just for the record we haven't actually consented

16   to that process, but we're just not objecting to it as it's

17   been proposed by the debtors.

18             THE COURT:  Okay.

19             MR. SCHEPACARTER:  Thank you.

20             THE COURT:  Thank you.

21             Anyone else?

22             All right, well, I have to say -- let me just say

23   this, I was very reluctant to approve a bar date as part of

24   a first day motion.  To say it's unusual relief I think is

25   an understatement; however, merely relying on the public

1    government entities whose task, which I know they take

2    extremely seriously, is the protection of creditors,

3    unsecured creditors as well as the customers and other

4    individuals and business in Texas that do business and get

5    their power from the debtor or debtors, I am prepared to

6    approve the bar date based primarily if not almost

7    exclusively on the support of the Attorney General and the

8    Office of the United States Trustee, and of course I take

9    into account the consent of all the parties in interest,

10   especially those that have been more active in attempting to

11   marshal -- no, not marshal, I can't say that, right -- keep

12   the debtor on the straight and narrow path.

13            So I will approve the motion.  Do you have changes

14   to the order?

15            MR. HUSKIN:  I do have a few, Your Honor.  May I

16   approach?

17            THE COURT:  Yes, and if you have a clean too you

18   can bring that up.  Okie doke.

19            MR. HUSKIN:  Your Honor, the first change is on

20   page 2 or the order, paragraph 2, and that is as I discussed

21   earlier to insert the cap in an aggregate amount not to

22   exceed $14 million during the interim period.

23            The second change, Your Honor, on page 3,

24   paragraph 3 is to confirm that during the interim period --

25   excuse me -- the debtors will not pay prepetition claims

1    related to charitable contribution programs other than

2    Energy Aid, and in addition the debtors in this paragraph

3    have agreed to defer the issue as to payment of CourtCall

4    and noticing costs to a final hearing, and that is why

5    paragraph 4 is deleted in its entirety.

6            THE COURT:  Well who's going to -- is the

7    (indiscernible) simply not going to pay waiting for the

8    final order or are they going to have to come out of pocket?

9            MR. HUSNICK:  I would --

10           MR. MORRIS:  Your Honor, this is Hal Morris with

11   the Attorney General's Office.

12           We happy to -- and I apologize to the U.S.

13   Trustee's Office if I misunderstood.  If they would like to

14   just take this up at a final hearing we'll be happy to pay

15   those costs between now and any hearings for a final hearing

16   that may be set.

17           THE COURT:  Okay, thank you.

18           To the extent that's ultimately granted I would

19   not have a problem with reimbursing, but we'll take that up

20   at the appropriate time.

21           MR. MORRIS:  Thank you much, Your Honor.

22           MR. HUSNICK:  Paragraph 4, Your Honor is an

23   agreement we reached with the United State's Trustee

24   relating to one category of the customer programs that we

25   were seeking, and that is the customer partners.  Here we

1    are agreeing that nothing in the order with authorize the

2    debtors to pay prepetion obligations to the customer

3    partners other than the channel partners that come due

4    between the petition date and the date of the entry of the

5    assumption order, which is the final order.

6            We use the term assumption order here because

7    that's the order that authorized the assumption of the

8    customer programs -- or customer agreements.

9            THE COURT:  Okay.  Any further comment?

10           MR. HUSNICK:  That is it, Your Honor.

11           THE COURT:  All right.  I -- based on the record

12   and as I said statements of counsel, which are extremely

13   important in me making the decision, I'm prepared to and

14   will approve the order as presented.  And I've signed it and

15   we'll get it on the docket.

16           MR. HUSNICK:  Thank you, Your Honor.  The next

17   item on the agenda is the agenda item number 8.  That is the

18   Debtors' motion to pay certain pre-petition claims of

19   critical vendors.

20           Your Honor, this began -- the debtors began the

21   process more than a year ago of analyzing their more than

22   6,700 vendors.  They analyzed those vendors with a critical

23   eye towards narrowing those vendors down to a small list of

24   vendors that are "critical" to the operation of the business

25   during the post-petition period.

1          Your Honor, we used various factors in trying to

2     develop the critical vendor list including the nature of the

3     goods provided by the vendors goods and services, whether or

4     not those vendors have what we'll call solid contractual

5     relationships that the debtors could seek to enforce in a

6     Chapter 11 proceeding, whether those vendors are sole source

7     suppliers or highly integrated into the company's business

8     such that they could not be replaced, whether those vendors

9     are authorized by governmental authorities and agencies to

10    provide services and goods to the debtor that could not be

11    replaced immediately because those other providers do not

12    have such governmental approvals.

13          Applying those factors and a host of others, the

14    debtors had narrowed their critical vendors down to five

15    buckets and we discussed them at length in the motion and

16    I'll just mention them briefly here.  They are vendors that

17    service the debtors' power plants during outages, providing

18    goods and services relating to the preparation for and

19    execution of an outage.  That is when the debtor takes the

20    power plant offline to provide service, maintenance and

21    other -- resolve issues on their power plant, it is

22    absolutely essential that the debtors have access to those

23    power plants as quickly as possible and that they stay on

24    schedule.  So we believe that this bucket was appropriate.

25          The next bucket are specialized integrated

1    services vendors, again with highly specialized or closely

2    integrated services that could not be replicated on a short

3    term without incurring significant costs to the debtors'

4    estate.

5           Critical goods vendors -- these are vendors that

6    supply raw materials necessary for the operation of the

7    business, whether it's fuel to power them or equipment to

8    run the power plants, generators, turbines and others that

9    are necessary for the debtors to continue to operate in the

10   ordinary course.

11          Regulatory compliance vendors.  I touched upon

12   these briefly, but these are vendors who are authorized

13    by -- under the applicable regulations and laws to provide

14   waste removal and emissions testing services.  The debtors

15   are not able to use other vendors under this context in

16   light of the governmental regulations and I believe again

17   that this makes those vendors critical in nature.

18          Your Honor, the last bucket I'll discuss is the

19   nuclear plant vendors and I'll spend just a bit more time on

20   this one.  The debtors' nuclear plant at Comanche Peak is

21   perhaps one of its finest assets and most important assets

22   to the overall operations and revenues of the business.

23          Comanche Peak is heavily regulated as Your Honor

24   can imagine, by the Nuclear Regulatory Commission and it

25   cannot be more important that the debtors have the services

1    of the vendors that provide services to the nuclear facility

2    in the central Texas.

3              Your Honor, in the absence of those services, the

4    debtors could -- and I emphasize could -- may not be able to

5    replace those vendors quick enough to ensure the safety of

6    everyone around.  We don't actually think that would be an

7    issue and we'll do everything in our power if that were to

8    become an issue that we would solve it.  But we believe,

9    Your Honor, in light of public health and safety concerns

10   that any vendor providing services in connection with the

11   nuclear power plant at Comanche Peak is critical in nature.

12             Your Honor, we submitted the declaration of Mr.

13   Paul Keglevic in support of this motion and we identified

14   everything that I had just said on the record and my

15   argument and evidence to support the process that the

16   debtors went through as well as the end result of that

17   process, which is narrowing down to a bucket of critical

18   vendors that while we have not disclosed publicly to avoid

19   the self fulfilling prophesy of having to pay every critical

20   vendor that's listed in this list.  We have previewed t list

21   with the Office of the United State's Trustee and agreed to

22   provide certain creditors and the United States Trustee with

23   a report as the payments that are made in connection with

24   the critical vendors' order.

25             During the interim period, Your Honor, the debtors

1    are asking for a bucket of $30 million.  That $30 million

2    represents, Your Honor, less than -- or approximately 5

3    percent of the debtors' overall trade debt, which is

4    approximately $507 million.  It is actually just .1 percent

5    of the total pre-petition funded indebtedness that the

6    debtors have.

7            Approximately $6 million of the $30 million is

8    503(b)(9) claims.  We believe that would otherwise be

9    entitled to priority, so we're not asking to bump the

10   503(b)(9) and the critical vendors.  It's actually within

11   the critical vendor bucket of $30 million.

12           Unless Your Honor has any other questions about

13   the debtors' critical vendor motion, the debtors would

14   respectfully ask that the Court enter the order.

15           THE COURT:  All right.  Does anyone wish to be

16   heard?  Mr. Shore?

17           MR. SHORE:  Thank you, Your Honor.  This is one of

18   the motions that we wanted to really understand and provide

19   comment on, particularly since what's happening here is a

20   large number of -- or a large amount of money could be going

21   out to other general unsecured creditors of the debtors,

22   then there's so little at this point that is clearly

23   earmarked as unencumbered funds.

24           In particular, the reservation that by paying a

25   critical vendor claim, the debtors aren't waiving any claims

1    they have, that a critical vendor's refusal to provide

2    services to the debtors in the absence of the payment of the

3    pre petition claims, that they aren't waiving any of those

4    rights.  So, there is case law out there that would provide

5    remedies to the debtors if someone refused to provide an

6    important, critical service if those pre petition payments

7    weren't made.  But with the understanding that the debtors

8    have reserved those rights, we're okay with the order, Your

9    Honor.

10             THE COURT:  Thank you.

11             MR. JONAS:  Good morning, Your Honor.  Jeff Jonas

12   from Brown Rudnick on behalf of the second liens.   Your

13   Honor, I rise now and this was really the reservation I

14   wanted to make generally with respect to a number of the

15   motions that are on today and I think it would be most

16   efficient if it's okay with the Court if I just do it once

17   rather than at each turn.

18             Your Honor, we have a general limited objection

19   and reservation of rights to the critical vendor motion and

20   any of the other motions which you'll hear, for example, the

21   motion to continue to perform under pre petition hedging and

22   trading arrangements, also the motion to pay certain pre

23   petition taxes and fees.  To the extent, Your Honor, that

24   the payments there under are based on the so-called doctrine

25   of necessity and -- or otherwise not based on a specific

1    authorizing bankruptcy code section.

2            Your Honor, I do this to preserve appropriate plan

3    and confirmation objection including based on the fact that

4    such payments arguably might be preplanned distributions,

5    which could among other things, violate 1129(b) and I

6    appreciate, Your Honor, that this Court and generally the

7    Third Circuit have permitted such payments, but I think the

8    Supreme Court's recent decision a few weeks ago in Law v.

9    Siegel, which is 134 S.CT. 1188, that's a March 4th of this

10   year decision, Your Honor, which although a very different

11   context, admittedly, found that the bankruptcy court could

12   not authorize a payment -- in that case it was a

13   surcharge -- if that it contravened a specific code

14   provision.

15           I think, Your Honor, that at least arguably, that

16   would support Judge Easterbrook's decision -- Seventh

17   Circuit decision in Kmart finding that bankruptcy courts

18   lack authority with respect to alleged doctrine of necessity

19   payments.

20           I think I know, Your Honor, how this is going to

21   go and how the other motions will be dealt with and again,

22   Your Honor, we simply are seeking to preserve rights with

23   respect to plan confirmation and objections we might have at

24   that time.

25           THE COURT:  Well, let me be clear (indiscernible)

1    understand what you're saying.  You don't want me to approve

2    the payments, correct?

3         MR. JONAS:  We have an objection, Your Honor, to

4    the extent that those payments are made and when we get to

5    plan confirmation, to the extent that we have objections

6    based on those payments having been made, we want to

7    preserve those objections.  And if --

8         THE COURT:  So you want to be able to seek claw

9    back?

10        MR. JONAS:  Debtors may not be able to seek claw

11   back, that's the point, Your Honor.  And if they're not,

12   that's what would be the basis of whether it's an unfair

13   discrimination, unequal treatment, some basis for an

14   objection --

15        THE COURT:  Well, Easterbrook says that doctrine

16   of necessity isn't necessary because 363(b) provides all the

17   authority needed.  So if I approve a payment under 363(b),

18   that's not going to preserve any rights for you at

19   confirmation.

20        MR. JONAS:  I think there would be some question,

21   Your Honor, as to whether or not -- at least under the

22   Supreme Court's view of this and I'll admit, Your Honor, on

23   the read of Law v. Siegel it's a very -- might be somewhat

24   tenuous, what I'm trying to link these together.  But in any

25   event, Your Honor, I think that there would be an argument

1    that there is not a specific code provision that permits the

2    Court to approve a payment, which would prefer a pre

3    petition vendor or otherwise would prefer a pre petition

4    creditor depending on where our (indiscernible).

5              THE COURT:  You want to go a step further then

6    Judge Easterbrook.

7              MR. JONAS:  Well, I can see how you see it that

8    way and that may be true.

9              THE COURT:  Well, I see it that way because I've

10   already said in the opinion.

11             MR. JONAS:  Understood, Your Honor.  Understood,

12   Your Honor.

13             THE COURT:  Okay.  Thank you.  Any response to

14   that issue?

15             MR. HUSNICK:  I do have a response, Your Honor and

16   it's a -- I think reflects a fundamental misunderstanding of

17   the holding in Kmart.  I was actually there at the oral

18   argument, I read that opinion many times, studied it at then

19   University of Chicago under Professor Baird (ph), know it

20   well.  That's not what it says.  It says what you said it

21   says and therefore, Your Honor, in all of the Kirkland and

22   Ellis first day pleadings, you'll notice that we don't

23   usually begin with the discussion of the doctrine of

24   necessity.  We usually begin with a discussion of Section

25   363(b) and its applicability to payment of pre petition

1    claims.  And then we also mention the doctrine of necessity,

2    especially in this circuit where there's a binding Third

3    Circuit opinion that has upheld the doctrine of necessity

4    and its applicability to the situation.

5              THE COURT:  Yeah.  I'm going to overrule that

6    objection.  First of all, I do not find that Judge

7    Easterbrook's decision in the Seventh Circuit is binding

8    upon this Court.  I have numerous issues with that opinion,

9    but I think at the very least that Judge Easterbrook seems

10   to indicate that 363(b) is an option.  And what that case I

11   think is really about is the lack of making any sufficient

12   record to approve really dollar one, let alone dollar

13   billion of the -- or however much it was of the critical

14   trade vendors in that case.

15             I believe that the doctrine of necessity is a

16   valid doctrine and is available to approve critical trade

17   vendor motions.  I also believe that the Court has authority

18   under Section 363(b) to make these payments.  I think

19   frankly the doctrine of necessity is a stronger pillar to

20   allow the payments.

21             But in any event, I would note the factual record

22   for backing these payments is incredibly thorough and

23   appropriately so.  In addition the amount of money sought in

24   the greater context of this case is almost enormous and is

25   clearly focused on what are truly critical trade vendors.

1    And I would particularly approve and note that I think it's

2    appropriate to ensure that a debtor that's involved in a

3    dangerous business, if it's not done right, if the debtor

4    doesn't get the proper services from its vendors -- if it

5    doesn't have the ability to run the company correctly,

6    people could die.  This is important.  This isn't Kmart.

7    People won't die if they can't get the blue light special.

8    Okay.

9        (Laughter

10            THE COURT:  This is serious stuff, at least in my

11    understanding, part of it is serious stuff.  So I'm

12    overruling the objection.  As far as I'm concerned, you can

13    make the arguments you want to make at confirmation, we'll

14    deal with it then, but I am going to approve the motion and

15    overrule the objection on the merits.

16            MR. HUSNICK:  Thank you, Your Honor.

17            THE COURT:  That said, I don't want to jump ahead

18    of anyone else that has comments about the motion or the

19    order.  And I hear none.  Okay.

20            Do you have changes?

21            MR. HUSNICK:  We do, Your Honor.  May I approach?

22            THE COURT:  Yes.

23        (Pause)

24            MR. HUSNICK:  Your Honor, the first change in this

25    motion is in -- or in this order is in paragraph 2.  Your

1    Honor, in consultation with the Office of the United States

2    Trustee, we have amended the language related to payments to

3    affiliates or insiders.  Your Honor, we removed the

4    knowingly requirement and we also added -- we removed the

5    shall only be required so it says shall be required to

6    conduct a reasonable inquiry.  The concern here, Your Honor,

7    is that the debtors given its position being held by or

8    owned by private equity sponsors are that there's many, many

9    portfolio companies of which the debtors may not be aware

10   are insiders are affiliates.  So we will conduct a

11   reasonable investigation as to whether any particular vendor

12   is an affiliate under the definition of the code through

13   those portfolio companies.  But it will not be a violation

14   of the Court's order to the extent that we were not aware.

15             THE COURT:  Okay.

16             MR. HUSNICK:  Your Honor, paragraph number 3 and

17   carrying over onto page 3, is the -- reflects the debtors'

18   agreement that they will not only seek a letter agreeing to

19   future trade terms from critical vendors, but well in fact

20   obtain such a letter in advance of making a critical vendor

21   payment and this is an agreement that we negotiated with the

22   Office of the United States Trustee.

23             THE COURT:  All right.

24             MR. HUSNICK:  In connection with that agreement,

25   Your Honor, in the end of paragraph 4, we added some

1    additional language to make clear that to the extent the

2    debtors agree to modify the form vendor agreement because

3    folks can't help themselves in over lawyering such

4    agreements, and I suspect we will be in a position to modify

5    it, that in no circumstances will we not provide for the

6    customary trade terms that are set forth in paragraph 3.

7              THE COURT:  Okay.

8              THE COURT:  Your Honor, in paragraph 5, page 3, we

9    deleted the upon reasonable consent request and have agreed

10   to give those reports to the United States Trustee and

11   counsel for any official committee. x

12             THE COURT:  Okay.

13             MR. HUSNICK:  Your Honor, in paragraph -- bottom

14   of paragraph 5 we have agreed to exclude the United States

15   Trustee from any confidentiality agreement requirement.  And

16   we have also agreed that if any party were to come to Your

17   Honor and obtain an order of the Court ordering the debtor

18   to disclose the confidential information that we would in

19   fact comply with that order.

20             THE COURT:  Good.

21             MR. HUSNICK:  Your Honor, in paragraph 6, we just

22   added a consultation right for any official committee

23   appointed by the office of the United States Trustee.

24             THE COURT:  All right.

25             MR. HUSNICK:  Paragraph 9 we added the final order

1    and an objection deadline for that final order and that is

2    the sum total of the changes.

3            THE COURT:  Anyone wish to be heard?

4       (Pause)

5            THE COURT:  I've signed the order as modified.

6            MR. HUSNICK:  Thank you, Your Honor.  The next

7    item on the agenda is item number 9.  That is the shipper's

8    warehouse and material men motion.  That can be found at

9    docket 27.

10           Your Honor, similar to the efforts of the debtors

11   in connection with the critical vendor motion, they

12   undertook a painstaking process over the last year to

13   examine all of their shipper warehousemen and material men

14   contracts, liens and relationships as they relate to the

15   generation, mining and consumer facing operations that the

16   debtors have with respect to the operation of their

17   business.

18           We believe that the shippers, warehousemen and

19   material men supply, hold and repair equipment and materials

20   that are critical to the operation of the business and in

21   that vein, we submitted Your Honor the declaration of Mr.

22   Paul Keglevic to provide evidentiary support for the

23   findings of the debtors and the beliefs of the debtors in

24   connection with this motion.

25           Just a couple of examples, Your Honor, about this

1    motion and the importance of these goods and these shippers

2    and warehousemen and material men to the debtors, I give you

3    the example of shipping coal.  Your Honor, the debtors ship

4    coal from, I believe the Wyoming state to Texas to burn in

5    their coal plants.  While an individual load of coal may not

6    be worth the full value of the shipping claim relating to

7    that coal, the delay of even days of a load of coal to one

8    of the coal fired power plants could cause disruption in the

9    power generation system and delay the debtors delivering

10   that power to the (indiscernible) grid.

11           Similarly, Your Honor, warehousemen store gas for

12   the debtors, natural gas.  That is that is burned in the

13   natural gas fire power plants operated by the debtors.

14   Along -- just like with the rail cars, if the warehousemen

15   decide to hold back the supply of gas to the power plant,

16   the power plant can't run, so it is critical that the debtor

17   be able to pay the warehousemen for the storage costs

18   related to the natural gas.

19           Likewise, material men that take our equipment

20   offsite such as turbines and other parts necessary to

21   running the power plant and perform services on those power

22   plant get possessory liens under applicable non-bankruptcy

23   law that would prime the debtors ability to get the property

24   back in order to put it into the power plant and continue to

25   operate the business, which is the overall goal of these

1   Chapter 11 cases.  Avoiding the disruption of the debtors'

2   supply chain and operations is therefore critical and the

3   relief requested in this motion is essential to the

4   continued operation of the business during the interim

5   period.

6            Your Honor, the basket that we're requesting for

7   this particular motion is $35.3 million on an interim basis.

8   We'll also be asking that the Court enter a finding that the

9   goods and services ordered pre petition, but delivered post

10  petition are entitled to administrative priority.  This is

11  more in the nature of a comfort order.  It's referred to as

12  the outstanding orders in the pleadings and in the order.

13           What we have here, Your Honor, is a situation

14  where the debtor has ordered goods in order to run the

15  plants and operate the business.  To the extent those goods

16  come in and services come in post petition, the debtor

17  should have to pay for those administrative expenses, we

18  believe under the law, but to give comfort to those vendors

19  providing those goods, we ask that the Court enter an order

20  making that finding.  And we believe that's fairly standard

21  relief across all jurisdictions.

22           Your Honor, unless you have any further questions

23  about the content of the shipper's motions, we'd

24  respectfully ask that the Court enter the order.

25           THE COURT:  All right.  Does anyone wish to be

1    heard?  I had no -- sorry, I had no comments.

2              MR. HUSNICK:  Okay.  May I approach?

3              THE COURT:  Yes.

4         (Pause)

5              THE COURT:  And again, the objection which was

6    preserved by the second liens is overruled for the previous

7    reason articulated.  (Indiscernible) is entered

8    (indiscernible).

9              MR. HUSNICK:  Your Honor, there's just one change

10   to this order that's reflected in the redline I handed up.

11   And that is the debtors' agreement as with the critical

12   vendor's motion to agree to obtain trade terms no less

13   favorable than the trade terms provided in the three months

14   prior to the petition date in connection with making any

15   shipper warehousemen or mechanic's lien claimants.

16             THE COURT:  All right.  I've signed the order as

17   presented.  Would this be an okay time to take a recess?

18             MR. HUSNICK:  Yes.

19             THE COURT:  Okay.  We'll reconvene at 11:15.

20        (Recess at 11:05 a.m.)

21             THE CLERK:  All rise.

22             THE COURT:  Please be seated.

23             MR. HUSNICK:  Thank you, Your Honor, I'll try and

24   pick up the pace a bit here.  I've been warned that if I

25   don't finish by quarter to 12:00, I may be under penalty of

1    further cross examinations.

2            Your Honor, the next item on the agenda here is

3    item number 10, the debtors' motion for authority to

4    continue their trading and hedging operations in the

5    ordinary course of business and to satisfy prepetition

6    claims in the ordinary course of business.

7            Your Honor, this is, perhaps, the debtors' most

8    complicated motion and we spent significant amount of time

9    with the Office of the United States Trustee discussing both

10   the parameters of the relief granted in the motion -- or

11   requested in the motion as well as the effect on the

12   business related to termination of this business during the

13   Chapter 11 cases.

14           In response to those discussions, the debtors

15   submitted a supplemental declaration to supplement the

16   testimony of Mr. Paul Keglevic, the CFO of the company.

17   That declaration came from Mr. Terry Nut.  Mr. Nut -- excuse

18   me -- is the vice-president of risk management for EFH

19   Corporate Services Company.  His responsibilities in that

20   role include enterprise-wide risk assessment and management,

21   including managing market, credit, and operational risk for

22   the debtors trading and marketing the operations.  He is the

23   resident expert.

24           Your Honor, I'd ask rather than do oral testimony

25   on this motion that we introduce the declaration in as

1    docket number 229 into evidence.

2              THE COURT:  Any objection?

3              MR. SHORE:  No objection, Your Honor.

4              THE COURT:  Declarations admitted without

5    objection.

6         (Mr. Nut's declaration admitted)

7              MR. HUSNICK:  Thank you, Your Honor.

8              Mr. Nut testified in his written declaration as to

9    the importance of the hedging and trading activities to the

10   overall operation of the debtors' businesses.  As you know,

11   Your Honor, the debtor is in the business of generating and

12   selling electricity in the State of Texas.  Your Honor, the

13   hedging and trading contracts allowed the debtors to

14   mitigate two significant risks in the operation of their

15   business.  The first risk is delivery risk and the second

16   risk is pricing risk.

17             Your Honor, delivery risk is the need for the

18   debtors to secure the necessary raw materials and inputs for

19   the production of energy in their generation plants.

20   Whether it's coal, natural gas, diesel fuel, or any other

21   input, the debtors need to have those inputs to run the

22   business.  What the debtors do as part of their hedging and

23   trading business is purchase coal, natural gas, and other

24   commodities into the future and ensure delivery to the

25   company today that they will have that fuel available to

1    operate the business.

2            That delivery risk increases significantly to the

3    extent that the debtors don't have access to these

4    contracts.  And as Your Honor, I know, is intimately

5    familiar in light of your recent testimony in front of

6    Congress related to safe harbor contracts, many of these

7    commodity purchase and forward agreements are subject to the

8    safe harbor set forth in the United States Bankruptcy Code.

9            Those safe harbors enable those trading

10   counterparties to terminate on a whim, following the

11   commencement of a Chapter 11 case, the trading relationship

12   with the debtors, thus depriving the debtors of that key

13   protection on delivery risk, and forcing the debtors to go

14   back into the market to secure the fuel needed for the

15   deliveries even on the very next day.

16           The other risk, Your Honor, is pricing risk.  As I

17   said, as you're forced to go back into the market, Your

18   Honor, you are exposed to the volatility and the commodity

19   markets.  And as you can see from Mr. Sassower's natural gas

20   chart on the first day in his opening presentation, natural

21   gas prices are volatile.  What the debtors do in their

22   hedging and trading business is level out that volatility by

23   hedging back certain of their relationships related to the

24   key commodities that they use in the operation of their

25   business.  The debtors' overall operations and wholesale

1    revenues and costs for 2013 were approximately 3.8 billion.

2    The debtors' hedging and trading activities along netted a

3    positive return of approximately 245 to 450 million dollars

4    on an annual basis from 2009 to 2013.

5            Your Honor, we'd submit that the damages to be

6    suffered by the debtors should they not get this relief

7    would be immediate and irreparable.  I'm unable to stand

8    here today and tell you exactly how much damage the debtor

9    would face, or experience, if this relief is not granted

10   today.  What I can tell you is what has happened since the

11   debtors commenced the Chapter 11 cases.

12           You heard yesterday that Mr. Keglevic testified

13   that two of the largest trading counterparties have already

14   terminated their hedges.  I've learned and I -- while it's

15   not in evidence, let me just represent to you that at least,

16   I believe, five or six more have terminated since yesterday.

17           The debtors need to act now to stop the

18   termination of their in the money hedging agreements and to

19   preserve the hedging agreements for the long-term.  As a

20   result, Your Honor, the debtors are asking for three forms

21   of relief on an interim basis.

22           First, the debtors are asking for authority to pay

23   up to $50.8 million on account of prepetition payables under

24   the hedging and trading agreements.  The hedging and trading

25   agreements that we're talking about here fall into three

1    buckets.  The first are over the counter arrangements, that

2    is counterparty to counterparty, gas supplier to the

3    company, those types of relationships for provision of

4    physical commodities and financial transactions of energy-

5    related commodities.

6         The second bucket is ERCOT.  ERCOT operates the

7    grid.  It is a critical component of the Luminant business

8    and TXU, that Luminant be able to put its energy up on the

9    ERCOT grid and sell it to the various counterparties engaged

10   in the ERCOT grid.  The debtors do that pursuant to standard

11   form market participation agreements and they sell power on

12   the grid under those agreements.  There is some amounts

13   outstanding under those agreements prepetition, and the

14   debtors ask for authority to pay those amounts in the

15   ordinary course as they come due.

16        Briefly on that, Your Honor, I will mention that

17   the debtors do plan to come back to Your Honor at the second

18   day hearing pursuant to a motion that we filed at the first

19   day hearing to actually assume the ERCOT SFA's.  Without the

20   ERCOT SFA's, the debtors can't participate in the ERCOT

21   market, and therefore, it is critical that the debtors have

22   the ability to not only perform under those obligations, but

23   to continue to perform post-petition and assume those

24   obligations.  Under no circumstances, Your Honor, would the

25   debtors ever reject those obligations.

1              The third bucket broker arrangements, Your Honor,

2     there are various exchanges on which the debtors participate

3     when they're not dealing directly with a counterparty in a

4     commodity or a forward purchase agreement.  They're dealing

5     over exchanges, including ICE, NYMEX, and NGX.  These

6     clearing brokers require the posting of collateral in order

7     for the debtor to continue to participate in the exchange

8     and in order to continue to mitigate the pricing delivery

9     risks that I discussed at the beginning.

10             Your Honor, the second bucket of relief in

11    connection with these three categories beyond the -- the

12    first bucket, again, was the prepetition payment cap, is the

13    prepetition collateral posting cap.  That is, 164.15

14    million.  Your Honor, we requested in the original motion

15    approximately 170 million.  In consultation with the Office

16    of the United States Trustee, we've agreed to reduce that

17    basket by 5 percent and that brings us to the 160 -- I

18    believe it's 164.15.

19             Your Honor, what this basket allows the debtors to

20    do is to continue to post collateral to the trading partners

21    as there are margin calls at the end of each day.  Not only

22    is the Chapter 11 filing an event of default, but the

23    failure to post collateral or pay a prepetition claim would

24    also be an event of default that would entitle the

25    counterparty to terminate the hedging contract.

1            Should the debtor not have the relief granted here

2    today, it will be nearly impossible for the debtor to

3    convince the counterparty to continue to honor its

4    obligations under these trading agreements post-petition if

5    the debtor is, itself, not honoring its obligations post-

6    petition on account of the prepetition collateral posting

7    obligations.

8            Your Honor, just a couple notes on the collateral

9    posting requirements.  They are subject to the limits

10   imposed by the debtor in possession financing facility.  In

11   the entire trading business, Your Honor, that I've discussed

12   here today is subject to the overall risk management

13   procedures that the company has imbedded.  The company's

14   risk management guidelines are state of the art, based on a

15   nationally recognized form or model, set of guidelines.

16           In addition, the company has its own internal

17   hedging policy that the creditors have reviewed, or at least

18   their advisors have reviewed, and we have made certain

19   tweaks to cabin in some of the relief that's being granted

20   here today as it relates to the tenor of hedges and the

21   volume of commodities being hedged.

22           Subject to those limitations, Your Honor, and the

23   limitations in the debtor in possession financing facility

24   related to the types of collateral that can be posted, we

25   believe that the prepetition relief is necessary and

1    appropriate for a case of this type in the energy market

2    where the hedging contracts are so vital to the operation of

3    the business.

4          The third form of relief we're here to ask for

5    today is the ability, Your Honor, to continue to enter into

6    hedging and trading agreements post-petition.  Your Honor,

7    those -- this is comfort relief to provide to counterparties

8    as they engage with us in the trading market.

9          I submit, Your Honor, that prior to the petition

10   date, as you can imagine, the market for counterparties

11   virtually dried up.  Nobody wants to do business with

12   someone that's on the verge of bankruptcy, and as I think

13   you said yesterday, that was far from materially non-public

14   information.

15         But as we stand here today, and we try to get

16   these parties to re-engage with us, the language in the

17   comfort order and the ability to deliver the protections

18   necessary to ensure that the trading counterparties get paid

19   on account of the hedging agreements is critical to securing

20   their ongoing participation in the market.

21         Unless Your Honor has any further questions, I --

22   the only thing I would highlight for you from the United

23   States Trustee's comments, and as we go through the order,

24   if Your Honor grants the motion, is that the debtors have

25   agreed, at least during the interim period, to defer any

1    proprietary trading, as opposed to hedging, to the final

2    order.  So, as a result, during the interim case -- or

3    during the interim period, the debtors will not be engaged

4    in proprietary trading.  That is a small -- much smaller

5    portion of their overall trading business.

6              The only exception to that is to the extent that

7    the debtors need to unwind a previous hedge, or mitigate, or

8    cabin in the exposure on an existing prepetition hedge, they

9    can enter into another hedge to bring it back.  That type of

10   hedging of hedgings can in certain -- in the (indiscernible)

11   circles, be deemed to be proprietary.  We've walked the

12   United States Trustee through that.  Mr. Nut, actually had a

13   nice telephone call with Mr. Schepacarter and Ms. Schwartz

14   the other day, wherein he educated both them and me on how

15   these things work.  And I find it extraordinarily

16   fascinating, but also I understand the need for the

17   business.

18             Unless Your Honor has any questions, I'd

19   respectfully ask that the Court enter the order.

20             THE COURT:  Okay.  I don't have any questions on

21   the motion.  Does anyone wish to be heard on the motion

22   before we look to the order?  Okay.  Do you have a mark-up?

23             MR. HUSNICK:  I do.  Your Honor, the first piece

24   of language you'll see on page 2 is just clarifying that the

25   amount of the cap, which is a defined term in the motion

1    itself, is 50.8 million.  So, we just covered that off in a

2    parenthetical.  Page 3, we again covered off the point on

3    the amount of the prepetition collateral posting cap at

4    164.35 million.  That's actually -- that number is a bit

5    different than what I said on the record, so I apologize for

6    that, but that's the appropriate number, 364 -- 164.35.

7            Your Honor, at the end of paragraph 2, there's a

8    lengthy paragraph here that I won't read into the record,

9    but it is inserted to address the concerns of the unsecured

10   ad hoc committee, effectively clarifying that the relief

11   being granted in this motion is limited to the types of

12   contracts that are deemed securities contracts, commodities

13   contracts, forward contracts, repurchase agreements, swap

14   agreements, or master netting agreements under the

15   Bankruptcy Code.

16           THE COURT:  I -- this -- I think you may have a

17   drafting issue here, but it says, "for the avoidance of

18   doubt, the prepetition hedging and trading agreements

19   include and are limited to only those contracts."  So, if

20   there's a limitation --

21           MR. HUSNICK:  I think what it --

22           THE COURT:  If you have --

23           MR. HUSNICK:  Go ahead.

24           THE COURT:  Okay, include and are limited to,

25   okay, I was reading it wrong.  I apologize.

1           MR. HUSNICK:  Yeah, what the -- yeah.  Okay.

2           THE COURT:  I thought there was a -- that it was

3    -- I thought it was saying include, but are not limited to

4    only, which didn't make any sense.  So, I missed the "but"

5    so I apologize.  I was looking out for you, but that --

6           MR. HUSNICK:  I appreciate that, Your Honor.

7           THE COURT:  All right.  That's fine.  I apologize.

8           MR. HUSNICK:  Paragraph 3, Your Honor, this is --

9    embodies the agreement with the Office of the United States

10   Trustee related to proprietary trading and effectively says

11   that the debtors will not, during the interim period, enter

12   into any new, incremental proprietary trading transactions,

13   but it does allow new proprietary trades entered into for

14   the purpose of one -- unwinding or managing risk related to

15   existing proprietary trades.

16           Paragraph number 5, again, we're just clarifying

17   and inserting by reference the actual cap amounts.  And then

18   on page 7, we've inserted the final hearing date and reserve

19   the right of any party in interest rather than just the

20   debtors as to particular claims and (indiscernible) amount

21   of those claims.

22           THE COURT:  Any other changes?

23           MR. HUSNICK:  No.

24           THE COURT:  Does anyone wish to be heard on the

25   order?  All right.

1          Well, clearly this motion is truly critical to the

2     ongoing business to the debtors.  It illustrates very nicely

3     the complexities and really difficulties in preserving a

4     company that has to engage in these kind of transactions as

5     a result of the safe harbors.  They are what they are and

6     presumably the debtors got better pricing upfront because of

7     the safe harbors, or at least that's the theory.  But in any

8     event, that doesn't really matter for present purposes

9     because the law is what it is and I'm prepared and am

10    signing the order as presented.

11          MR. HUSNICK:  Thank you, Your Honor.  Your Honor,

12    that includes -- concludes my presentation.  If I may, I'll

13    turn the podium over to my partner, Brian Schartz, who has

14    the last few motions.

15          MR. SCHARTZ:  Good morning, Your Honor, Brian

16    Schartz from Kirkland & Ellis, proposed counsel on behalf of

17    the debtors.

18          I'm told I, too, have to move pretty quickly here,

19    so I will try to do exactly that.  The next two motions on

20    the agenda are similar to each other, so I'll take them one

21    at a time, but I just want to preview that.

22          The next motion is the debtors' motion to pay

23    certain amounts owed to a very specific and very important

24    type of service provider known as the debtors' transmission

25    distribution service providers.  That motion's at our number

1    38 on the docket.  And at the risk of introducing even more

2    jargon into this case, we colloquially refer to these

3    service providers as the TDSP's, sometimes folks call them

4    the TDNU's, but I'm going to call them TDSP's.

5             These are, Your Honor, the providers who allow the

6    debtors to -- who own the power lines that the debtors use

7    to deliver electricity to their customers.  As you noted,

8    and probably heard -- you did hear from Mr. Sassower

9    yesterday, the debtors do not own power lines.  Service

10   providers, TDSP's like Oncor, own those power lines and in

11   fact, the debtors are prohibited under Texas law from owning

12   those assets.

13            So, there are three debtor subsidiaries, all of

14   which sit under TCH that sell electricity to customers.

15   Those three entities have entered into a total of 23

16   delivery agreements with 7 different TDSP's.  Six of those

17   TDSP's are unaffiliated with the debtors.  The seventh and

18   by far the largest is Oncor, which as Your Honor heard

19   yesterday, is a (indiscernible) affiliate, sits under the E

20   side of the house, EFIH, and is not a debtor in this case.

21   Oncor has its own bankruptcy counsel represented by Jones

22   Day, Corinne Ball, who is in the courtroom today, and I'll

23   speak about that in a second.

24            Today, the debtors estimate that they owe the

25   TDSP's a total of about $185 million in the aggregate, of

1    which the majority, about 143 million, the debtors owe to

2    Oncor.  Because the TDSP's are critical to the debtors'

3    ability to deliver power to the customers, and because there

4    are very unique regulatory implications associated with not

5    honoring the debtors' obligation to the TDSP's, and I'll

6    cover that in a moment, the debtors seek authority to honor

7    the amounts that they owe the TDSP's pursuant to this

8    motion.

9         Importantly, however, we take very seriously the

10   restrictions in 6003.  So, we -- in Bankruptcy Rule 6003 --

11   so, we split that relief across two orders.  The first order

12   that's up for consideration today is intended to address

13   only those amounts that come due between now and the second

14   day hearing with one caveat that I'll get to in a second.

15   And at the second day hearing, June 5th, we will seek to

16   have those three debtors assume all of the delivery

17   agreements with the TDSP's and pay any associated cure

18   amounts.

19        So, with that preview, here's the relief that

20   we're seeking today.  On an interim basis, the debtors are

21   asking for authority, but not direction, to pay a total of

22   $36 million owed to the TDSP's.  Of that amount, it's

23   estimated that about 3 million would go to amounts not owed

24   necessarily to Oncor, but associated with Oncor, and I'll

25   further explain that in a second.

1            In order to understand what we're seeking, you

2    have to understand that the TDSP's are owed basically two

3    types of charges.  The first charges are called delivery

4    charges and those are exactly what they sound like.  They

5    are the costs associated with the debtors' payment to the

6    TDSP's for the use of the power lines.  So, in other words,

7    you know, the costs of delivering electricity to the

8    debtors' customers.  The delivery charges constitute about

9    90 to 95 percent of all amounts that they owe to the TDSP's.

10           The debtors owe, just as a preview, about $138

11   million to Oncor on account of delivery charges.  We are not

12   seeking authority to pay that today.  But the debtors do owe

13   a total of $32.4 million to TSP's other than Oncor.  And

14   we're not seeking to pay that full amount today.  We're only

15   seeking to pay the amount that we believe will come due

16   during the interim period and that total amount is $26

17   million.  So, to be very clear, that's $26 million that if

18   the Judge -- Judge, if you were to enter the order, would go

19   to TDSP's other than Oncor.

20           The second component of the two, which is much

21   smaller, is something known as transition charges.  The

22   transition charges are very different from the delivery

23   charges.  They are PUC costs that allow the TDSP's to

24   recover stranded investment costs that were incurred before

25   the Texas market transitioned to the current state in which

1    it sits.  So, that was the transition to a regulated and

2    unregulated utilities market in the early 2000's.

3            Texas law and the PUC regulations essentially

4    allow various TDSP's to securitize transition bonds and in

5    the effort to make those bonds as safe as possible for

6    investors, Texas law and the PUC regulation give the

7    transition bonds certain important protections, including

8    status, as statutory liens.  So, if we don't pay the

9    amounts, they could be secured.  They also require

10   electricity sellers, like the debtors, to provide security,

11   like letters of credit to cover the perceived risk.  So,

12   even here, and you'll see in our motion on page 10, all of

13   the transition charges that are outstanding today are

14   actually over-secured by outstanding letters of credit, and

15   I'll touch on that in just a second.

16            So, there are several sort of unique reasons why

17   the debtors seek to pay amounts to the TDSP's, and real

18   fast, I skipped over something.  Let me get this.

19            The debtors are seeking, with respect to

20   transition charges, only to pay the amounts that come due in

21   the interim period.  The total there is $10 million.  It's a

22   $3 million piece that would go to Oncor.  So, let me explain

23   why we think this is very important.

24            First, in relation to the transition costs, we

25   don't think that they are necessarily property of the

1    debtors' estates.  Second, if we did not pay those amounts,

2    the indentured trustees for the transition bonds that had

3    been issued could seek to force the debtors to pass all of

4    their customer payments to a lockbox that they would

5    control.  Now, we think that, you know, there would be

6    substantive counterarguments to any action that the

7    indentured trustees could take, but we did not want to take

8    any risk whatsoever, and I think Mr. Husnick explained very

9    well the risks that, you know, we could have in the

10   respective 1.7 million customers in the State of Texas.  We

11   didn't want to take any risk.

12            So, you know, faced with a significant risk to

13   customers and continuing to pay what we think is a

14   relatively small amount that's probably not even our cash in

15   the first place, we figure we might as well just pay the

16   cash in the first place.

17            Second, if the debtors do not pay both transition

18   charges and delivery charges, there is significant risk that

19   the debtors could be subject to scrutiny within the PUC.

20   The regulations that govern this relationship provide that

21   PUC staffers, or even third parties could force the PUC to

22   take a look at the debtors' certificates that allow them to

23   operate in Texas to either revoke or suspend those

24   certificates.  Again, we think that there would be very

25   plausible counterarguments against that, but as you heard

1    today and I think Mr. Morris' comments to the Court

2    indicate, we worked hard to find peace and work

3    cooperatively with the PUC.  So, even the specter of, you

4    know, potential litigation or dispute with the PUC is not

5    something that we will undertake at this time.  And based on

6    the decision of paying those costs, we'd rather do it.

7             Minor point on the amounts that we're seeking to

8    pay on the delivery charges to the non-Oncor TDSP's, I said

9    the number was about $26 million that we're seeking.  The

10   vast majority of that, about 20 million, is actually backed

11   by letters of credit.  So, likely, we think they may draw on

12   those letters of credit.  We don't know.  But the order does

13   say that if they so choose, you know, obviously they don't

14   need to go back to the Bankruptcy Court to get that

15   protection.  So, whether they do that or not do that, we'll

16   have the ability to make them whole, at least until we get

17   to the June 5th hearing on the final assumption order.

18             I will say one last point about Oncor, although

19   the debtors are not seeking to pay delivery charges to

20   unaffiliated TSP's, so to Oncor, all of the risk that I

21   talked about earlier, they apply with equal force.  And

22   that's why, and you'll hear more about this on -- in

23   June 5th, why the debtors believe it's in their business

24   judgment to assume those delivery contracts.  At the same

25   time, it's a significant amount of money, about 130 some

1    million dollars, $140 million that would go to Oncor, and we

2    have -- well, Oncor  -- (indiscernible) has a good

3    relationship with Oncor.  We've worked very closely with

4    them in crafting this motion and they've given us some

5    assurances that during this period, between now and

6    assumption, they are not going to go to the PUC and seek to

7    take adverse action.  They're not, for example, going to

8    seek to charge, you know, and impose late penalties that

9    could otherwise be charged under regulations.  It's sort of

10   a standstill period.

11           But, you know, when you get to the June 5th

12   hearing, you'll hear from us that it is actually very

13   important to the debtors that they assume the delivery

14   agreements with Oncor and continue the status quo in the

15   ordinary course.  That's not up today, but I did want to

16   preview it to you for the Judge.

17           So, with all that said, let me get this very

18   clear.  The debtors respectfully request, unless the Court

19   has any questions, that we be granted interim relief

20   authorizing the amount directing the debtors to pay up to

21   14.7 million to all of the TDSP's -- I'm sorry, 10 million

22   -- on account of all the TDSP's that are owed transition

23   charges, and $26 million to the TDSP's other than Oncor on

24   account of the prepetition delivery charges.

25           And I do have just a few small changes to the

1    order based on conversations with (indiscernible).

2              THE COURT:  Please approach.  Does anybody wish to

3    be heard in connection with the motion itself?

4              All right.  Thank you.

5              MR. SCHARTZ:  So, just a couple changes, very

6    quickly here.  The most important of which, Your Honor, is

7    on page 2, paragraph 2.

8              MR. SCHARTZ:  So, just a couple of quick changes,

9    here, the most important, Your Honor, which is upon page 2,

10   paragraph two.  We've made it clear in the record what the

11   caps are with respect to both unpaid transition charges and

12   unpaid delivery charges.  So paragraph two said that the cap

13   is up to ten million dollars on account of unpaid transition

14   charges.  That would go to all the TSPs.

15             And then in paragraph three, we have made it clear

16   that the cap is up to twenty-six million dollars on account

17   of unpaid delivery charges and that would go to TSPs, other

18   than Oncor.

19             THE COURT:  Anyone wish to be heard on the record?

20             I have no comments or questions.

21             Based on the record, on the motion, I will permit.

22             Next on the order?

23             MR. SCHARTZ:  Thank you, Your Honor.

24             The next motion, trying to move quickly, is the

25   debtors' utility studies motion.  That's item, I believe

1      item number 12 on the agenda and docket number 26.  I think

2      this is a very straightforward motion that Your Honor has

3      seen before and I think there are just a couple of points

4      that I would like to make.

5              We have, each of the operating entities, an

6      aggregate amount of about 640 accounts with identified

7      utility providers who make seek adequate assurance or

8      entitled adequate insurance under Section 366 of the

9      Bankruptcy Code, so we did want to file this motion as soon

10     as possible so that we could begin the adequate insurance

11     saga that's necessary -- that's definitely going to ensue in

12     this case.

13             And, in fact, since we've filed, we have already

14     received incoming calls from probably ten or so utility

15     providers seeking further adequate assurance.  So, to that

16     end, we seek to establish an adequate assurance deposit

17     account in the amount of one million dollars and that's

18     subject to further requests for adequate assurance that

19     utility providers can make pursuant to procedures that we

20     set out in the order.

21             I think there are sort of three things here that

22     make this motion unique.  First, Your Honor, is the

23     relationship to the TSPs.  As I just discussed in the prior

24     motion, we are seeking to pay those in full, so, for the

25     time being, the estimate does not include a deposit on

1    account of amounts that the Debtors could owe to the TSPs.

2    Our view is if we're going to assume your contract, pay your

3    care costs, we shouldn't also have to post the deposit.  I

4    think that most of the TSPs, if not all, are on board with

5    that strategy, but to be very clear, if our strategy does

6    not play out at the June 5th hearing with respect to the alt

7    TSPs, then their rights would be reserved under Section 366.

8              The second is that ERCOT, itself, which could

9    argue that it is a utility provider, is not included as a

10   utility provider current in the motion.  It's a similar

11   motion there.  We are seeking to take care of ERCOT right

12   now, pursuant to the trading order, as Mr. Husnick

13   described, and we have also filed on the docket, a motion,

14   which is -- it's at docket number 40, to assume all ERCOT

15   agreements.  Again, that will be heard at the June 5th

16   hearing.  So, for the time being, ERCOT is not included in

17   the estimated deposit amount that's described in this

18   motion, but we'll see how that plays out, if and when the

19   Court has an opportunity to hear that second motion on

20   ERCOT.

21             And then last, Your Honor, we did talk to our

22   local counsel, RLF, who told us that one of your preferences

23   is not to have a sort of bar date for requested adequate

24   assurance.  I believe that we've complied with that and that

25   the order is otherwise in a form that you've entered in

1    other cases, and with that said, I would, respectfully

2    request that Your Honor enter the order as drafted, and

3    there are only a couple of changes actually.

4              THE COURT:  All right.  Does anyone wish to be

5    heard in connection with the motion?

6              All right.  I'll have a look at the order.  Thank

7    you.

8              MR. SCHARTZ:  So, just a couple of changes -- in

9    fact, it may be only be one -- is that we did agree with

10   counsel to the ad hoc group of TCEH unsecured no holders

11   that we would give them the same consultation rights that we

12   are giving to certain other parties in the case, including

13   an ad hoc committee of first lien creditors and you find

14   that change, Your Honor, on page 3, paragraph 6-D of the

15   order.

16             THE COURT:  Uh-huh.

17             MR. SCHARTZ:  And on page 10 -- I'm sorry, page 5,

18   paragraph 10 of the order, we've also expanded the waiver

19   regarding end-party interest rights, so other folks who were

20   not Debtors in the case want to have the opportunity to

21   dispute or challenge anything that we are doing here at a

22   later date, they would have the opportunity to do so.  We

23   think we had that covered already, but we've expanded the

24   language in that paragraph as well.

25             THE COURT:  Okay.  Anyone wish to be heard on the

1    order?

2          All right.  I don't hear anybody.

3          I have one word that I think is a legacy from

4    probably your original draft which included a deadline for

5    you, if you look at page 3, paragraph -- subparagraph C,

6    since the Debtors timely receipt -- we're just going to

7    correct timely.

8          With that change, I'm signing the order.

9          MR. SCHARTZ:  Thank you.

10         THE COURT:  Taxes?

11         MR. SCHARTZ:  Yes, the taxes motion, Your Honor is

12   at docket number 23.  As I'm sure you can appreciate, the

13   Debtors have a significant number of taxing and regular

14   authorities with which they do business with and that the

15   Debtors are responsible to pay various costs, fees, and

16   expenses to in the ordinary course of business.

17         Been there's been a lot of talk about tax over the

18   last day and a half, so this motion works in tandem with the

19   cash management motion where the cash management motion

20   authorizes the Debtors to move cash around in the manner

21   that the judge already ordered.  It also allows the Debtors

22   to actually pay cash to third parties.  So let me talk very

23   briefly about what those categories are.

24         The first, and you've heard quite a bit about

25   this, is the State, Texas State margin claims, which is

1   essentially the income tax that is due on state basis.  That

2   payment, just because of the timing of our filing, that

3   typically is due in May -- a portion of it is due in May and

4   then part of it is due later in August.  We anticipate that

5   about 80.7 --

6            THE COURT:  Let me interrupt, because I see

7   someone leaving.  There's something going on in the nature

8   of a medical emergency.  So we don't have lawyers going out

9   and getting into the middle of something, I would ask you --

10  everyone to stay in the courtroom for the time being and not

11  leave.  Thank you.

12           Proceed.

13           MR. SCHARTZ:  Okay.  The State tax margin claims,

14  Your Honor, is, we estimate there's about $80.7 million

15  dollars due in the interim period and we, you know, think

16  that about 10 percent of that is arguably, you know, a trust

17  fund tax based on how the laws work in Texas.

18           There are also a number of fees and expenses that

19  are due.  I won't go through the list that's in the motion,

20  but they do relate to a number of very important aspects of

21  the Debtors' business, not the least of which are fees that

22  the Debtors pay to the U.S. regulatory agency on account of

23  their operation of the nuclear power plant facilities at

24  Comanche Peak.  There are also, for example, nuclear waste

25  fees that the Debtors pay the Department of Energy, also

1    associated with the operations of the Comanche Peak

2    facility.  We think it's very important that the Debtors

3    continue to honor all of their obligations on account of the

4    taxes and the regulatory fees that are part of this motion,

5    because doing so will allow them to continue their

6    operations with minimal disruption and preserve the

7    enterprise for the benefit of all of their estates.

8              Among other things, making the payments is

9    necessary to avoid penalties, which they, themselves, may be

10   entitled to priority under the Bankruptcy Code and otherwise

11   ensure that the Debtors do not run afoul of their licensing

12   obligations in the ordinary course.  We have discussed this

13   with our chief creditors, and I think this is one of the

14   motions that does not have any changes to the order.

15             Understand the Court has any questions, I would

16   ask that you grant it, the proposed order that we filed with

17   the Court.

18             THE COURT:  All right.  Anyone wish to be heard?

19             My version of the order is double-sided; do you

20   have a version I can have?

21             MR. SCHARTZ:  May I approach?

22             THE COURT:  Yes.

23             MR. SCHARTZ:  The next two items, Your Honor, are

24   the -- well, the next item is the epic -- is the application

25   to retain Epiq Bankruptcy Solutions, LLC, as the Debtors'

1    claims and noting agent in this case.  That is on docket

2    number 24, and includes, attached as Exhibit B, a

3    declaration from Mr. James Katchadurian, who's the vice

4    president of Epiq, that sets forth the various evidentiary

5    support for Epiq's qualifications, including importantly,

6    Epiq's compliance with the protocol that's been established

7    in this court.

8              THE COURT:  This is routine -- are there any

9    changes or issues?

10             I'll sign the order.

11             MR. SCHARTZ:  Would you like me to hand you a pen?

12             THE COURT:  Thank you.

13             MR. SCHARTZ:  One second, Your Honor.  I want to

14   show you something that's interesting.

15             The second to last, Your Honor, is the Debtors'

16   creditor, Matrix's motion.  Again, I think this is a fairly

17   straightforward motion and it's at docket number 28 and the

18   Debtors seek to file one consolidated creditor, Matrix.

19             There is one twist on this motion that's probably

20   different from what you've seen in the past.  We have agreed

21   with the Office of the United States Trustee that although

22   we are seeking to file a consolidated Matrix today, when we

23   file our separate SOFAs and schedules for each debtor

24   entity, we will also file on the docket for each debtor, an

25   individual creditor Matrix.  They want that just so they

1   have the information handy and we will do that in tandem

2   when we file our schedules and statements and the order, so

3   provides.

4           THE COURT:  Okay.

5           MR. SCHARTZ:  May I approach?

6           THE COURT:  Yes.  Thank you.

7           Anyone wish to be heard?

8           Okay.  I have signed the order.

9           MR. SCHARTZ:  Thank you, Your Honor.

10          THE COURT:  I believe that leaves wages, and then

11  at some point, actual different cash collateral order.

12          MR. SCHARTZ:  All right.  So I will take up the

13  wages motion and then we'll hash it out.

14          THE COURT:  Okay.

15          MR. SCHARTZ:  So the wages motion, Your Honor, is

16  at docket number 25, and we also filed, Your Honor,

17  supplemental declaration from Mr. Paul Keglevic, who is the

18  Debtors Chief Financial Officer and court restructuring

19  officer.  That declaration is in support of certain sale

20  incentive relief that the Debtors request in this motion,

21  related to one commission sales incentive plan.

22          THE COURT:  Wait a minute.  I need to switch

23  notebooks.  Give me a minute to get organized.

24          MR. SCHARTZ:  I have copies of the declaration, if

25  you need one.

1           THE COURT:  Okay.  Sorry for the delay.

2           MR. SCHARTZ:  No problem.

3           The wages motion, as I was saying, is found in

4    docket number 25.  We did file a supplemental declaration

5    for Mr. Keglevic.  It's in support of just item that we seek

6    related to a sales incentive plan.  I'll come back to that

7    in just a second and that is going to be the item of the

8    live testimony that Mr. Sassower referenced at the beginning

9    of the hearing today.

10           Your Honor, although we're discussing this motion

11   last in the first-day hearing, it is one of the most

12   important items I have on the agenda, probably second, if

13   not on the same level as the trading motion that Mr. Husnick

14   presented earlier today.  This is because the Debtors have

15   approximately 5700 employees, the vast majority of whom are

16   full-time employees and rely on the debtors for their

17   livelihood.  Approximately 2,000 of those employees are

18   Union members represented under one or more collective

19   bargaining agreements, and as Mr. Sassower and Mr. Hessler

20   noted yesterday in their presentations, the Debtors are

21   primarily focused on a balance sheet restructuring.  This is

22   not an operational restructuring, so from that end, as I'm

23   sure you're used to hearing, Your Honor, it is absolutely

24   critical to the company that they continue to provide basic

25   compensation and benefits to their 5700 employees, various

1     retirees and each of their dependents.

2             At the same time, Your Honor, we do take the

3     requirements in Bankruptcy Rule 6003 very carefully, and we

4     are only seeking today that we believe the Debtors need to

5     prevent immediate and irreparable harm to the Debtors'

6     businesses.  That relief, Your Honor, is summarized,

7     although the motions, they want summarized in a table that

8     begins at the top of page 4 of the motion which sets out a

9     number of things I think will be helpful to guide you

10    through this motion.

11            As indicated in that table, the Debtors seek to

12    pay an aggregate -- would you like a copy?

13            THE COURT:  A summary as well, hang on a minute.

14            Yeah -- sorry, you know, I was -- I got it.

15            MR. SCHARTZ:  So that table sets forth 23

16    categories of employee-rated obligations that the Debtors

17    seek to pay -- pre-petition obligations -- that the Debtors

18    seek to pay in the order course of business totaling

19    approximately $19,010,000.  There's one caveat here that I

20    want to point out at the outset before I jump into the

21    table.

22            Item number 5, row number 5 on the table,

23    unremitted payroll taxes, there was a wire for payroll taxes

24    that the Debtors collected from their employees, but did not

25    get remitted to the taxing authorities before we filed.  We

1   thought that it would, but it didn't happen for whatever

2   reason.  That number requested in the motion is $900,000 and

3   it should be increased.  We would ask to increase the number

4   from $900,000 to $7.9 million dollars.  We do think that all

5   of those monies in that obligation is essentially trust fund

6   tax.  We collected it from employees' wages and remit to the

7   taxing authorities in the order course of business.

8            So with that change, Your Honor, the total amount

9   that we would ask under this motion is $26,010,000 and then

10  also that last line on the table, which says the estimated

11  amount held in trust, it would bump that up by at $7 million

12  dollars, which means the total request is about -- means

13  that about 47 percent of what we're seeking is likely held

14  in trust as of petition date.

15           These categories, Your Honor, sort of taken

16  together, unpaid compensation -- the (indiscernible -

17  12:08:31) incentive plan I'll talk about in a second,

18  payroll processor fees, unpaid HSA, all of this stuff taken

19  together is what we see after working very closely with the

20  company over the course of a year to prepare the company for

21  Chapter 11, we see as the bare essential obligations that

22  the Debtors incur in the ordinary course of business in the

23  amounts that we would like to seek to pay pre-petition

24  obligations in the ordinary course.

25           Your Honor, I just have a couple other things that

1    I would like to note, and if you would, I would like to hand

2    up a couple of changes to the order.

3              May I approach?

4              THE COURT:  Uh-huh.

5              Do you have the final, too?  I'll save you the

6    trip.

7              MR. SCHARTZ:  So, in addition to the change on

8    page 2, paragraph 2, which addresses the dollar amount issue

9    about which I just spoke earlier on page 3, paragraph 3, we

10   did strike a reference to United Way, matching contributions

11   that we thought are actually not due, as of the petition

12   date and we don't seek to pay in the interim period and that

13   comment comes at the request of the U.S. Trustee's Office

14   and we also struck the language at the end of that same

15   paragraph 3 that said that we will not make any payment on

16   account of severed -- Debtors' severance program or

17   supplemental retirement program or any other benefit that

18   pays proceeds to Rabbi Trust or any other incentive program.

19   We struck the language that violates Section 503(c) and we

20   did that with a view, and we want to make sure clear that

21   what we are seeking here is not relief with respect to those

22   claims.

23              The last point that I'll make and then we'll turn

24   to the Texas sales incentive plan, is that we've also made

25   clear -- and this is not a change, we had this in the

1    original order -- but we made they very clear that we are

2    not seeking relief with respect to any amounts above the

3    statutory priority cap and we're not seeking to make any

4    payments to insiders on account of bonuses.

5              So with that sort of basic stuff cleared away, let

6    me talk for a minute agree TXU supplemental incentive plan.

7    That is the subject of Mr. Keglevic's supplemental

8    declaration.  That item is identified on row 2 of that

9    summary table and it's described in paragraphs 23 and 24 of

10   the wages motion.  Your Honor, there is a total of about

11   800,000 in accrued and outstanding --

12             THE COURT:  I'm sorry, are we doing a proffer for

13   this?

14             MR. SCHARTZ:  I'm just going to describe it

15   generally for a second just to give you a little bit of

16   context, and then what I would like to do is we will

17   offer --

18             THE COURT:  We will put the witness -- I read it.

19             MR. SCHARTZ:  That's fine.

20             THE COURT:  I read the contract.

21             MR. SCHARTZ:  And rather than offer it into

22   evidence, we would like to put Mr. Keglevic on the stand.

23             THE COURT:  Okay.  That's fine.

24             Mr. Keglevic, your previous affirmation is still

25   in place.

1          MR. KEGLEVIC:  Thank you, Your Honor.

2          PAUL KEGLEVIC, WITNESS, PREVIOUSLY SWORN

3    DIRECT EXAMINATION

4    BY MR. MCKANE:

5    Q   Good afternoon, Mr. Keglevic.

6    A    Good afternoon.

7    Q   Sir, are you familiar with the TXU Energy sales

8    incentive program?

9    A    I am.

10   Q   And can you briefly describe that sales program to the

11   Court?

12   A    Yes.  It basically covers 200 people.  These are

13   customer-basing people at small commercial industrial and

14   large commercial industrial customers and basically what

15   they're trying to do is get customers to buy our product.

16   And while they have a small -- generally a small base pay,

17   this incentive effectively provides, to the extent that they

18   sell contracts at sufficient margins, the right

19   profitability, they get additional pay and that's basically

20   what the incentive is all about.

21   Q   And approximately how much of their pay is this

22   incentive compensation?

23   A    The lower-level people, which are, I think the highest

24   number of people in the plan, it's up to 75 percent, and

25   then if you take all of the people, it's in my testimony, is

1    somewhere around 35, 38 percent of the total, for all of the

2    people covered by this plan.

3              THE COURT:  I'm sorry, let me interrupt for a

4    moment, if you will.  The coast is clear outside, so if

5    anyone needs to leave the courtroom, you may do so at your

6    convenience.

7              Go ahead.

8    BY MR. MCKANE:

9    Q    And how does the plan incentivize them to maximize

10   value for TXU Energy?

11   A    Well, basically, it is to increase the volume we sell

12   at target or above profitability, so we make additional

13   margin to the extent that they're out there knocking on

14   doors or telemarketing or visiting big or small customers

15   who are just increasing the amount needed and that obviously

16   increases the value of our estate.

17   Q    And how much of the amounts due, pre-petition, would be

18   paid out in the interim period?

19   A    I believe it's $800,000.

20   Q    And do you know approximately how much that would be

21   per person?

22   A    Yes, it's in my testimony, but I think it's about

23   $4,000 per person.

24   Q    And are these -- is there a risk of losing this sales

25   force or some of the sales force if you do not make these

1    payments?

2    A    Yeah, this is a very competitive group of people.

3    There's two reasons why we would not like to lose them.

4    One, is they're very valuable because they sell additional

5    product at target margins.  Secondly, they have a great

6    understanding of pricing and marketplace and which customers

7    we're targeting, so they would be in high demand to our

8    competitors and they are the type of people that not only

9    would we lose them and they would hurt us, but they would go

10   to our competitor and our competitor would gain some

11   competitive insight into our billing practices.

12   Q   And can you explain to the Court how the sales

13   personnel fit in the overall hierarchy of corporate

14   governance at TXU Energy?

15   A    Sure.  There are probably -- we have a president and

16   CEO of the company and then we have a chief operating

17   officer, and under the chief operating officer, we

18   effectively have market-facing units like, you know, large

19   commercial and industrial, they would be under that person's

20   jurisdiction.  So they're, generally speaking, I think

21   there's two people in this program -- none of them are vice

22   presidents -- the two highest paid directors in this program

23   would be four levels beneath Jim Burke, our president and

24   CEO.

25   Q   And Jim Burke is the president of TXU Energy?

1    A    Of TXU Energy, excuse me, yes.

2    Q   And that term "director" that you used, that's a term -

3    - can you explain how that term is used at TXU Energy?

4    A    Yes, it's above the manager.  It does not mean a board

5    of director responsibility.  It is the level below the vice

6    president.  So it's a managerial capacity with slightly

7    greater capacity than what we term managers.

8    Q   And do any of these managers or directors have any

9    ability to direct or control the business units underneath

10   TXU Energy?

11   A    No, they have zero responsibility for anything other

12   than the program which I just described.

13   Q   And that's just sales of energy or contracts to the

14   retail public?

15   A    Sales of energy contracts to large commercial and small

16   commercial industrial customers, correct.

17             MR. MCKANE:  All right.  We have no further

18   questions at this time.

19             THE COURT:  Does anyone wish to cross-examine the

20   witness?

21             Yes, sir?

22             MR. JONAS:  Judge, Jeff Jonas.

23             I had indicated to Mr. Sassower earlier that we

24   had some questions, but discretion being the better part of

25   (indiscernible - 12:16:29) I think we'll pass and we have no

1    objection on the motion.

2              THE COURT:  All right.

3              You may step down, sir.  Thank you.

4              THE WITNESS:  Thank you, Your Honor.

5              MR. SCHARTZ:  With that, Your Honor, we would ask

6    that you enter the interim order approving the wages motion,

7    as I presented to you earlier.

8              THE COURT:  Just a note, and it doesn't really

9    matter because you're carving it out of the motion, we

10   couldn't find supplemental retirement plan actually

11   described or defined in the motion.

12             MR. SCHARTZ:  It's a good point, Your Honor.  It's

13   not described in the motion.  We included that language for

14   the avoidance of doubt.  The Debtors may likely seek relief

15   with respect to some of their on-going plans, but that will

16   be done in a separate motion at a later date.

17             THE COURT:  Okay.  All right.  I signed the order.

18             MR. SCHARTZ:  Thank you, Your Honor.

19             I think we wanted to close out just a couple of

20   things on DIP and cash collateral; is that correct, guys?

21             THE COURT:  Do we need a recess?

22             MR. COLLINS:  No, Your Honor.  I'm ready.

23             Good afternoon, Your Honor.  For the record, Mark

24   Collins of Richards, Layton & Finger on behalf of the

25   Debtors.

1          Your Honor, I do have interlineated the ordered,

2    both the DIP order and the cash collateral order for TCEH.

3    I know that Mr. McGaan has reviewed the order.  I think

4    Mr. Shore has, as well, and they reflect the changes that

5    were put on the record.

6          One moment, Your Honor?

7          THE COURT:  Let's take a recess.

8          MR. COLLINS:  Okay.

9      (Recess at 12:19 p.m.)

10          THE CLERK:  All rise.

11          THE COURT:  Thank you, be seated.

12          MR. COLLINS:  Thank you, Your Honor, for that

13    brief recess.  The parties have reviewed the revised forms

14    of the interim DIP order and the cash collateral order.  We

15    have interlineated the changes that were put on the record

16    before.

17          May I approach?

18          THE COURT:  Yes.

19          Are they handwritten?

20      (Pause)

21          THE COURT:  Okay.  Does anyone wish to be heard?

22          All right.  I have reviewed the revised order.

23    It's consistent with my comments and the other comments made

24    on the record.  As I stated earlier, I will sign that order,

25    which I've done.

1            Let me look at the cash collateral real fast.  The

2     cash collateral order is also acceptable, and I have signed

3     that.

4            Backing up to the DIP for the cash collateral,

5     there were no exhibits, correct?  The budget isn't attached?

6            MR. COLLINS:  Correct.

7            THE COURT:  Okay.  I've signed both of those

8     orders the let's get those on the docket.

9            MR. COLLINS:  Thank you.

10           THE COURT:  All right.  I think that's it for the

11    affirmative relief requests today, so I'd like, at this

12    time, to talk about the (indiscernible - 12:31:07) motion

13    and scheduling that for a hearing.

14           Yes, sir.  Go ahead.

15           MR. MCGAAN:  Hi.  Good afternoon, Your Honor.

16    Andrew McGaan, for the Debtors.

17           We had submitted an opposition to the motion to

18    expedite the hearing on the 2004 request and in connection

19    with that with regard to the motion to transfer, we

20    propose -- we agreed, in effect, that it ought to be heard

21    sooner and proposed to file our brief in opposition to

22    transfer on Thursday, May 8, and then to be heard, at Your

23    Honor's earliest convenience thereafter.

24           THE COURT:  Yes?

25           MR. JONAS:  That's fine, Your Honor.

```
 1            In terms of scheduling, we would ask as soon after
 2    May 8th that the Court can hear us, we would like to be
 3    heard.
 4            THE COURT:  A committee won't be formed until the
 5    12th, correct?
 6            MR. MCGAAN:  That's correct, Your Honor.
 7            THE COURT:  All right.  Well, what I propose to
 8    do, obviously, it is important -- it's important that it
 9    needs to be heard.  I absolutely want the input of the
10    unsecured creditors committee or any other committee -- I
11    can't imagine than there being any other than the unsecured
12    creditors, but it doesn't matter -- prior to hearing the
13    motion and I want that committee to have an opportunity to
14    get up to speed.
15            So what I have decided to do on scheduling -- I'm
16    sorry, excuse me -- is to schedule -- schedule it for -- I'm
17    scheduling a hearing -- I don't know if you're going to need
18    two days, but I'm setting aside two days -- May 22nd or
19    May 23rd, those are Thursdays and Fridays, a Thursday and a
20    Friday.  It's approximately -- well, it's three weeks from
21    yesterday, so a motion to shorten isn't necessary.
22            In connection with discovery, whether it be 2004
23    discovery, a motion for discovery, it's a contested matter
24    and (indiscernible - 12:33:41) are entitled to early
25    discovery under -- as it is a contested matter, but related
```

1    to the issue of them, you know.  It's not a wide-open

2    opportunity to take discovery.

3              Now, John, I'm not inclined to sign a walking 2004

4    motion on short notice, but at the same time, anyone who's

5    participating has a right to discovery.

6              MR. MCGAAN:  Understood.

7              THE COURT:  And in connection with whatever you've

8    agreed to on your brief, I was going to set a matter of

9    continuance, but objection deadline at noon, but if you've

10   agreed otherwise, obviously, that should control.

11             Given that he's not here, although there might be

12   counsel that wind up -- I'm not recommending it to anybody,

13   but they're not here because they're not (indiscernible -

14   12:34:28).  So I want to (indiscernible - 12:34:32) and give

15   them an opportunity to be prepared and gives them a whole

16   week before they have to file some sort of response and I

17   leave it to the parties to talk about whether there's going

18   to be a reply followed by anyone who's in support of the

19   motion or not.

20             MR. MCGAAN:  Okay.

21             THE COURT:  Okay.  This is -- we touched on, was

22   it yesterday or the day before -- yesterday, on having a --

23   a hearing on the motion, having sort of an interim status

24   conference between now and June 5th.

25             MR. MCGAAN:  Right.  You raised that and we

1    welcome that.  Our response on this request to expedite

2    hearing on the 2004 motion, you're right, it's a whopping

3    request to ask for everything, and our only reaction was of

4    course there'll be discovery, but let's do it in a

5    coordinated way, now that we know when the committee is

6    going to be formed.

7              If Your Honor would like to have a status

8    conference, that would give us an opportunity to try and

9    engage in that discussion, stage it, do what needs to be

10   done now.  We're prepared to begin pretty quickly on stuff

11   that's up front before Your Honor, sooner rather than later,

12   so we think that's the way we ought to proceed.

13             THE COURT:  Yeah, let's set that date, May

14   22nd, as a status date on the 2004 motion; however, if there

15   are any issues that arise in connection with not getting the

16   discovery related to the venue motion that people think they

17   are entitled to or should be getting, please don't hesitate

18   to pick up the telephone and call and we'll figure it out,

19   but I don't -- I don't --

20             MR. JONAS:  Your Honor, I'm happy to --

21             THE COURT: -- anticipate -- I don't anticipate

22   hundreds of thousands of pages and dozens of depositions

23   between now and the 22nd.

24             MR. JONAS:  Your Honor, frankly, I've been

25   thinking about that, and I think -- I'm happy to represent

1    on the venue, it will be focused and fairly limited

2    discovery.  Similar on depositions, it's probably one, maybe

3    two 30(b)(6) depositions, that's it.  So I don't think that

4    will be a problem and we'll be back on the 22nd to discuss

5    the 2004, that's fine.  Thank you.

6              THE COURT:  Thank you.

7              There was another motion, though.  Yesterday I

8    signed an order and for the life of me -- I apologize -- I

9    can't remember.

10             MR. HESSLER:  Your Honor, Stephen Hessler,

11   Kirkland & Ellis, on behalf of the Debtors.

12             In the context of the EFIH first and second lien

13   DIPs, they were talking about -- counsel for both, the

14   trustee for the first and second lien trustee, had indicated

15   that they have issues with the timing that we're proposed to

16   go forward on those DIPs.  I think you may be referring to,

17   in the context of putting both of those DIPs up for hearing

18   at the June 5th and 6th hearings, that we would potential be

19   coming back to you to talk about whether or not we have been

20   able to come to an agreement amongst ourselves, as to the

21   timing.

22             And, again, it's not just the -- we think the DIP

23   motions, it's the ability to draw on the DIP, as well as

24   refinance the principals and drifts, as well as the make

25   holes, so there's three components of that, and I think you

1    may be referring for us coming back to you for some help on

2    scheduling those.

3              MR. SHORE:  Actually, what you did yesterday was

4    you talked about the venue motion and then the 2004 and you

5    said that you wanted to set a telephonic status conference

6    after the formation of the committee to talk about

7    scheduling of those motions.

8              THE COURT:  All right.  Well, we'll hear it on the

9    22nd, all right?

10             Anything -- anything else?

11             MR. MCGAAN:  Is that 9:30, Your Honor, on the

12   22nd?

13             THE COURT:  Yeah, we'll start at 9:30.

14             And, again, you'll have all day Thursday and all

15   day Friday, and I'm hoping we don't have to, but we'll take

16   the time we need to, to do it right.

17             That's it.  Anything else?

18             MR. SASSOWER:  We have nothing further, Your

19   Honor.  I just want to, again, thank the Court for making

20   itself available over the last two days.

21             THE COURT:  Well, that's what we're here for.

22             We're adjourned.

23        (Recessed at 12:37 PM; to reconvene on May 22, 2014)

24

25                         * * * * *

```
 1                        I N D E X

 2                    E X H I B I T S

 3    PARTY    NO    DESCRIPTION            ID.      EVID.

 4    Debtors        Mr. Nut's Declaration   --       74

 5

 6                    W I T N E S S E S

 7    WITNESS                 BY                       PAGE

 8    PAUL KEGLEVIC           MR. MCKANE               106

 9

10                    R U L I N G S

11    DESCRIPTION                                      PAGE

12    Finance Motion                                    28

13

14    Cash Collateral Motion                            33

15

16    TCEH Cash Management Motion                        43

17

18    Motion of Energy Future Holdings Corp., et al., for

19    Entry of (A) An Order Authorizing the Debtors to (I)

20    Maintain and Administer Customer Programs and

21    Customer Agreements, (II) Honor Prepetition

22    Obligations Related Thereto, (III) Pay Certain

23    Expenses on Behalf of Certain Organizations, (IV)

24    Fix the Deadline to File Proofs of Claim for

25    Certain Customer Claims, and (V) Establish Procedures
```

1    for Notifying Customers of Commencement of the

2    Debtors' Chapter 11 Cases, Assumption of Customer

3    Agreements, and the Bar Dates for Customer Claims

4    and (B) An Order Authorizing Certain of the Debtors

5    to Assume the Customer Agreements [Docket No. 31;        53

6    filed April 29, 2014]                                    56

7

8    Debtors' Critical Vendor Motion                          65

9

10   Motion for Authority to Continue Trading in the

11   Ordinary Course                                          74

12

13   Interim Relief                                           92

14

15   Debtors' Utility Studies Motion                          96

16

17   Retention of Epiq                                        99

18

19   Matrix Motion                                            100

20

21   Wages Interim Motion                                     110

22

23

24

25

1          C E R T I F I C A T I O N

2

3    We, Dawn South, Melissa Looney, Jamie Gallagher, and William

4    J. Garling, certify that the foregoing transcript is a true

5    and accurate record of the proceedings.

6    
     **Dawn South**          Digitally signed by Dawn South
7                            DN: cn=Dawn South, o=Veritext, ou,
                             email=digital@veritext.com, c=US
                             Date: 2014.05.05 11:21:16 -04'00'
8

9    AAERT Certified Electronic Transcriber CET**D-408

10
     **Melissa Looney**      Digitally signed by Melissa Looney
11                           DN: cn=Melissa Looney, o=Veritext, ou,
                             email=digital@veritext.com, c=US
                             Date: 2014.05.05 11:21:42 -04'00'
12   _____

13   Melissa Looney

14   AAERT Certified Electronic Transcriber CET**D-607

15
     **Jamie Gallagher**     Digitally signed by Jamie Gallagher
16                           DN: cn=Jamie Gallagher, o=Veritext,
                             ou, email=digital@veritext.com, c=US
17                           Date: 2014.05.05 11:22:09 -04'00'

18
     **William J. Garling**  Digitally signed by William J. Garling
19                           DN: cn=William J. Garling, o=Veritext,
                             ou, email=digital@veritext.com, c=US
                             Date: 2014.05.05 11:22:33 -04'00'
20

21   Veritext

22   330 Old Country Road

23   Suite 300

24   Mineola, NY 11501

25   Date:  May 2, 2014