## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | ) ) ) Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) ) Case No. 14-10979 (CSS) ) (Jointly Administered) |
| *Debtors.* | ) ) Related Doc. No. 74 ) |

**PRELIMINARY OBJECTION OF CSC TRUST COMPANY OF DELAWARE, AS INDENTURE TRUSTEE, TO DEBTORS' MOTION TO APPROVE FIRST-LIEN POST-PETITION FINANCING, REDEEM FIRST LIEN AND SECOND LIEN NOTES, AND DETERMINE SECURED CLAIM**

CSC Trust Company of Delaware ("CSC Trust"), as Indenture Trustee (the "10% Indenture Trustee") for the 10% Senior Secured Notes Due 2020 (the "10% First Lien Notes" or the "10% Notes") issued by certain of the Debtors under the Indenture dated as of August 17, 2010 (together with all supplements, amendments, and exhibits, the "10% Indenture") between Energy Future Intermediate Holdings LLC ("EFIH"), EFIH Finance Inc. ("EFIH Finance," and together with EFIH, the "EFIH Debtors") and CSC Trust (as successor to The Bank of New York Mellon Trust Company, N.A.), hereby makes a preliminary objection to the EFIH Debtors' Motion for Entry of (I) Interim Order (A) Approving Certain Fees Related to Post-Petition Financing and Granting Such Fees Administrative Expense Priority and (B) Scheduling a Final Hearing; and (II) a Final

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, which are being jointly administered on an interim basis, a complete list of the debtors (the "Debtors") and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

Order (A) Approving Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Authorizing the Use of Cash Collateral, (D) Authorizing the EFIH First Lien Refinancing, (E) Authorizing Issuance of Roll-Up Debt to the Extent Authorized by the Settlement Motion, (F) Determining the Value of Secured Claims, and (G) Modifying the Automatic Stay [Dkt. No. 74] (the "EFIH First Lien Financing Motion").

## PRELIMINARY STATEMENT

1.      The 10% Indenture Trustee makes this preliminary objection at the written direction of holders with a majority in principal amount of the $3.482 billion of 10% First Lien Notes.  This preliminary objection is intended (i) to join the issues for discovery, such as they are known at this time; (ii) to highlight for the Court and parties in interest (including noteholders) the many flaws already apparent in the EFIH Debtors' proposed transactions; (iii) to (briefly) explain why the redemption premium is due; and (iv) to make clear that there is no way to conduct the required litigation, including numerous fact-dependent issues, on the requested timeframe for this unprecedented "tender/two-tiered-financing-including-multiple-conversion-rights/global-settlement/assumption-of-contracts/claims-objection."

2.      The 10% Indenture Trustee is aware of no other instance in which "non-bankruptcy tender offers" were used post-petition at the outset of a case.  The offers were "launched" only on Wednesday, May 7, 2014 for the EFIH First Lien Notes (as defined, *infra*) and late at night just this past Friday, May 9, 2014 to holders of EFIH Second Lien Notes (as defined, *infra*).  This objection is necessarily preliminary because the EFIH

2

Debtors have not even filed all the requisite papers relating to their proposed transactions, still omitting at least six major documents: (i) the proposed DIP financing order (which in this circumstance is useful to understanding the relief actually being sought), (ii) a still forthcoming Memorandum of Law, (iii) any motion papers regarding an intertwined second lien DIP financing, (iv) the two proposed DIP credit agreements, (v) a so-called "Global Settlement Motion" that will apparently contain many components and (vi) a motion to assume a restructuring support agreement.

3.     Even a cursory examination of the economics of the proposed tender offers for first and second lien notes, payment of which is the primary purpose of the EFIH First Lien DIP Financing, demonstrates that the tenders are entirely incoherent in terms of the merits of the parties' contractual rights and bankruptcy entitlements. Certain of these securities, despite having the same language concerning the redemption premiums—as explained in more detail in paragraphs 15–27, are offered less tender consideration than others. *See* Dkt. No. 363-1; 400-1.

| Securities | Redemption Premium (as % of principal) | Tender Consideration (as % of premium) |
|---|---|---|
| First Lien 6⅞% | 8.1% | 62% |
| First Lien 10% AA5 CUSIP | 18.8% | 27% |
| First Lien 10% AK3 CUSIP | 19.6% | 26% |
| Second Lien 11% | 24.8% | 50% |
| Second Lien 11¾% | 33.4% | 50% |

3

This lower payment for the 10% First Lien Notes (26.5% vs. 50% vs. 62%) has no rational explanation, other than perhaps to entice two specific holders (one who has 6⅞% Notes and one who has significant cross-over holdings between first lien and second lien notes) to accept and then stampede other holders, with insufficient time and inadequate information. It is also designed to entirely avoid a plan process.

4.    This tactic is brought into even sharper focus by considering the other massive consideration (described below) flowing to the first lien noteholders induced to sign the restructuring support agreement. Nowhere in the tender documents, or the first-day presentation to this Court, did the EFIH Debtors disclose these differential payments among similar notes or make disclosure of the side-payments in any detail. Indeed, the tender offer Information Memorandum [Dkt. No. 363-1] (the "IM") makes a completely misleading statement that certain holders have accepted the deal on the same terms as offered to all other holders. The IM states on its "cover page" (actually page 3 of the IM) that "each RSA First Lien Note Party has agreed to accept as payment in full . . . 105% of principal . . . and 101% of the accrued and unpaid interest . . . ." No disclosure is made as to the differential consideration for 6⅞% Notes, or the extent and precise recipients of the side payments, all of which are in fact disguised consideration resulting in a substantially lower payout on the redemption premium for the 10% First Lien Notes payable to holders who accept the Exchange Offer.

5.    The EFIH Debtors have begun this case in an unprecedented fashion. They have launched a tender and solicitation process to reset their entire multi-billion dollar capital structure and lock in creditors. And they have done so before court papers

4

for their transactions are even filed.  They ask for court approval within a mere 35 days for $7.3 billion of priming DIP financing.  The EFIH Debtors seek not only the extraordinary relief of paying claims outside a plan, but also authority to pay equivalent claims on a differential and unequal basis.  They seek to elevate contractually junior second lien claims to first lien status and thus violate an intercreditor agreement.  All of this is being done in order to deny the contractual and bankruptcy entitlements of the oversecured first lien notes.[2]

## BACKGROUND

6.      The chapter 11 case of EFIH is a holding-company case.  There is no threat to EFIH's utility-company operating subsidiary, Oncor, that is ring-fenced and not

---

[2] It is worth observing that the tender is being conducted in a materially different way than was represented at the first-day hearings and the Debtors are simply proceeding without any court approval.

For example, the EFIH Debtors stated at the first-day hearing that the tender would be open for at least 20 business days.  *See* Hrg. Tr. May 1, 2014, at p. 52:12.  However, the EFIH Debtors are actually giving holders only an "early tender period" of 10 business days in which the offer described at the first-day hearings is available.  Dkt. No. 363-1 at 2.  This "early tender period" for what the EFIH Debtors say they are offering expires on May 19, 2014, remarkably <u>only two business days</u> after May 15, 2014, which is the day the EFIH Debtors are expected to file the remaining papers for the hearing at which they are seeking global approval of these unprecedented transactions.  After that, only a highly reduced offer will apparently be available.

Creditors must make an irrevocable tender, so that even if the EFIH Debtors' chapter 11 cases were to last for years, the creditors are locked in.  Indeed, it appears that holders who tender remain locked into the terms of the tender even if this Court rejects approval of the proposed settlement.  Under the terms of the form of Letter of Transmittal, any tendering holder is essentially precluded from asserting its rights even after the Court denies approval of the proposed DIP financing and/or settlement.  Dkt. No. 363-1 at 81 ¶ 6(b).

This supposed tender also is not available to all holders, directly contrary to the Debtors' statements at the first day hearing.  *See* Hrg. Tr. May 1, 2014, at pp. 36, 42.  Notwithstanding the fact that nearly $2.2 billion of the EFIH First Lien Notes are registered securities that can trade in the hands of retail and small-fund investors, the tender offer is only available to "Qualified Institutional Buyers," "institutional accredited investors," and offshore investors.  Dkt. No. 363-1 at 26.

To be clear, the 10% Indenture Trustee believes that the proposed financing and settlement should be rejected by the Court, and so changes to the process are, perhaps, harmless in that sense.  But the rapid changes to what was promised at the first-day hearings nonetheless demonstrate that the EFIH Debtors understand that their proposed transaction has serious problems.

a debtor in chapter 11. The disputes in this case are entirely intercreditor disputes. They are principally between, on the one hand, the two secured creditor constituencies (first lien and second lien notes) that the EFIH Debtors contend are currently oversecured, and on the other hand, the unsecured noteholders that only recently came to be creditors of EFIH in a series of exchange offers from December 2012 through early 2013. These exchange offers moved them from a structurally subordinate position of being holders of bonds of the parent company, Energy Futures Holding Corp. ("EFH"). Other intercreditor disputes exist because there are separate and structurally subordinated bonds, mostly held by Fidelity, at the parent-company EFH level. Those EFH bonds made a choice not to exchange, and remain structurally junior.

7.    The EFIH Debtors' chapter 11 cases are about these two junior creditor groups attempting to upset the contractual entitlements of the first lien and second lien notes to $1.4 billion. There is no justification for doing so. These intercreditor disputes must be resolved as a matter fact and law in a reasonably expeditious but not emergency process.

8.    Some brief factual background is necessary to elaborate on what the EFIH Debtors have presented in their EFIH First Lien Financing Motion. There are $3.985 billion of EFIH First Lien Notes: (i) $3.482 billion of 10% First Lien Notes and (ii) $503 million of 6⅞% notes due 2017 (the "6⅞% First Lien Notes" or "6⅞% Notes"). The 10% Notes and 6⅞% Notes are issued under two separate indentures that are, for purposes of these disputes, identical in their language. In addition, the 10% First Lien Notes themselves are of two different types, issued under a single indenture. CUSIP

29269QAA5 consists of $2.18 billion of 10% Notes issued in 2010.  CUSIP 29269QAK3 consists of $1.302 billion of 10% Notes issued in 2013.[3]

9.     The 6⅞% Notes and the AK3 10% Notes each had an associated registration rights agreement that provides that if such notes are not registered by a date certain, thereafter the notes pay "Additional Interest," first at 0.25% per annum for a period and thereafter at 0.5% per annum.  EFIH did not register either of those issuances, and therefore Additional Interest is payable and accruing.  These amounts also increase the redemption premium payable.  The AA5 10% Notes have been registered securities at all times since their issuance in 2010.

10.    The EFIH First Lien Notes have a combined redemption premium of approximately $700 million.[4]  The first call date for the 6⅞% Notes is February 2015, as compared to December 2015 for the 10% Notes.  The difference in call date, together with the difference in the interest rates, means that the redemption premium for the 6⅞% Notes is $40.7 million, while the premium for the 10% Notes is $665.2 million.

11.    The EFIH Debtors have also issued $2.156 billion of second lien notes (the "EFIH Second Lien Notes").  There are two types: (i) $406 million of 11% second lien notes due 2021 (the "11% Second Lien Notes") and (ii) $1.75 billion of 11¾% second lien notes due 2022 (the "11¾% Second Lien Notes").  These have a combined redemption premium of approximately $685 million.[5]The EFIH First Lien Notes and

_____

[3] In the case of both the 6⅞% Notes and the 10% Notes there is an additional small CUSIP of bonds issued into the Canadian market.  They are included in the overall numbers presented for 6⅞% Notes and 10% Notes.

[4] Assuming a redemption date of June 6, 2014.

[5] Also assuming a redemption date as of June 6, 2014.

EFIH Second Lien Notes are subject to the Collateral Trust Agreement dated as of November 16, 2009 (together with all supplements, amendments, joinders and exhibits thereto, the "Collateral Trust Agreement") between EFIH and CSC Trust, as Collateral Trustee (as successor to The Bank of New York Mellon Trust Company, N.A.), the 10% Indenture Trustee, and other indenture trustees joined thereto.

12.     The EFIH Debtors are proposing a first lien DIP financing (the "EFIH First Lien DIP Financing"). They propose to use the proceeds to, *inter alia*, (i) conduct a tender offer "under ordinary nonbankruptcy law" for EFIH First Lien Notes; (ii) pay principal and accrued interest to any non-tendering holders of EFIH First Lien Notes; (iii) conduct a tender offer to holders of EFIH Second Lien Notes and (iv) pay, in part, principal and accrued interest to any non-tendering holder of EFIH Second Lien Notes.

13.     The EFIH Debtors are also proposing a second lien DIP financing (the "EFIH Second Lien DIP Financing"). This is unusual not only as a second lien DIP financing, but also because it is to be convertible (and intended to be converted) into the bulk of the equity of the reorganized debtors. The EFIH Debtors have not yet filed papers regarding this financing nor have they sought approval of such financing, although they have asked that it be heard at the June 5, 2014 hearing.

## ARGUMENT

14.     The entire proposed transaction, which includes the EFIH First Lien DIP Financing, the Second Lien DIP Financing, two tender offers, the so-called global settlement, and assumption and assignment of a major tax sharing agreement and restructuring support agreement, runs afoul of numerous Bankruptcy Code provisions and

8

the Bankruptcy Rules.  The EFIH Debtors' arguments that the EFIH First Lien Notes' redemption premiums are not due rely on a misreading of the documents' most fundamental provisions and erroneous applications of relevant law, ignoring the documents' intent.  The proposed transactions also violate the intercreditor provisions of the Collateral Trust Agreement between the first lien indenture trustee and the second lien indenture trustee.  This Preliminary Objection sets forth these arguments in summary form.  In connection with the full litigation of these various motions, the Court is considering a schedule for this litigation at the status conference set for May 22, 2014.  The 10% Indenture Trustee will conduct discovery, and has already begun to do so with written requests to various parties.  The 10% Indenture Trustee will file comprehensive objections on the schedule to be set by the Court.

A.    **The Redemption Premium Language of the 10% Notes**

15.    The EFIH Debtors appear to argue (in the bare 3 pages so far devoted to this $1.4 billion redemption premium issue) that the redemption premium is not due because they theorize that the redemption premium is only payable "prior to maturity."  Rather, the 10% Indenture states that a redemption premium is payable "[a]t any time prior to December 1, 2015" – a fixed date.  10% Indenture § 3.07(a).  The EFIH First Lien Notes and the EFIH Second Lien Notes both provide that the notes may only be redeemed prior to a date certain (which varies by indenture) if accompanied by payment of a redemption premium.  *Id.* at § 3.07(c).  The EFIH Debtors attempt to obfuscate this by ignoring the contractual language most specific to the transaction at hand, namely, a redemption.  Instead, the Debtors prefer to focus only on the acceleration provisions,

ignoring the actual language that in all cases refers to "premium" being payable under the terms of the relevant notes.

16.     The provisions at issue here are identical in substance to the contractual provisions that Judge Gerber analyzed in the *Chemtura* case. *In re Chemtura*, 439 B.R. 561 (Bankr. S.D.N.Y. 2010). The *Chemtura* opinion examined the competing legal authority and concluded that "bondholders would have substantially the better of the argument" for the redemption premium based on the contractual language with a premium payable prior to a specified date. *Id.* at 601.[6]

17.     Lest there be any confusion, a redemption is what the EFIH Debtors are trying to accomplish. The economic goal of their proposed transaction is to replace the current higher-coupon first and second lien notes with lower interest rate debt. This is exactly the situation for which the noteholders obtained the right to redemption premiums. These protections are part of their bundle of rights, all of which—monetary and nonmonetary—are secured by their collateral. The EFIH Debtors have even launched a tender offer—a redemption—to accomplish their stated goals.

18.     The EFIH Debtors appear to premise their entire transaction, settlement proposals, and treatment of creditors on the notion that other indenture provisions relating to acceleration have the effect of overriding the redemption provision; but at the same time, the Debtors' offers contain the implicit premise that the relevant indenture provisions are different for first lien noteholders and second lien noteholders. This is obvious from the settlement percentages shown in the following chart:

---

[6] The absence of mention of that case in the EFIH Debtors' papers is striking, since the debtors' counsel in *Chemtura* is also Debtors' counsel in these cases.

| Securities | Redemption Premium (as % of principal) | Tender Consideration (as % of premium) |
|---|---|---|
| First Lien 6⅞% | 8.1% | 62% |
| First Lien 10% AA5 CUSIP | 18.8% | 27% |
| First Lien 10% AK3 CUSIP | 19.6% | 26% |
| Second Lien 11% | 24.8% | 50% |
| Second Lien 11¾% | 33.4% | 50% |

This assertion that the notes differ is demonstrably incorrect.[7]

19.    The actual first lien notes provide that for events of default, the indenture trustee or 30% of holders may declare the "principal, premium, if any, interest and any other monetary obligations on all the then outstanding Notes to be due and payable immediately." *See* Form of Note, 10% Indenture, Exh. A, p. A-2-6 (para (12)) (emphasis added).    The very next sentence of the Notes then states that upon a bankruptcy default, these amounts on all outstanding Notes accelerate and become payable without such notice.    *Id.*    The 10% Indenture itself confirms this, containing the same formulation in Section 6.02, stating that in the case of a bankruptcy default, "all outstanding Notes shall be due and payable without further action or notice."    The payment covenant of the 10%

---

[7] In addition, various of these notes have "additional interest" accruing and payable, on account of the lack of registration of such notes.    This is the case for the 6⅞% Notes, the AK3 CUSIP 10% first lien notes and the 11¾% second lien notes.    There is also wildly disparate treatment of these additional interest amounts.    The 6⅞% Notes are not proposed to be paid additional interest, but then again they are getting substantially more than all other notes even though they have the smallest premium.    Dkt. No. 363-1 at 26. The 10% notes with additional interest are to get none, whether they take the tender or not.    *Id.*    The 11¾% notes get the additional interest if they take the tender but do not get it if they decline.    Dkt. No. 400-1 at 29, 38.    This creates a strong inference that the noteholders who signed the Restructuring Support Agreement and therefore are tendering have disproportionately large holdings in the higher recovery notes getting the additional interest in the tender.

52881/0001-10605006v2

Indenture provides that the EFIH Debtors "shall pay or cause to be paid <u>the principal, premium, if any, and interest</u> on the Notes, on the dates and in the manner provided in the Notes." 10% Indenture § 4.01 (emphasis added). As such, the 10% Indenture states that when "the Notes" are payable, that payment includes "premium, if any."

20.     The most telling and central piece of evidence on this issue is the prospectus for the original issuance of 10% Notes, which expressly states that:

> <u>In the event that EFIH becomes the subject of a bankruptcy proceeding</u>, you will only have a claim against EFIH's assets . . . to satisfy any outstanding <u>principal, premium and interest</u> on the [10% Notes] . . . . (emphasis added)

The only difference between the EFIH First Lien Notes and EFIH Second Lien Notes is that the drafter of the second lien documents listed out the component payments on "the Notes," including "premium, if any", from the payment covenant, instead of the simple use of the composite term "all outstanding Notes are due and payable," with the payment covenant referring to "premium, if any" and other items. Substantively this makes no difference because no provision of a contract can be construed in isolation.

21.     To counter this, the EFIH Debtors allege a special "rule of explicitness." The cases that the EFIH Debtors cite for the proposition that some "explicitness" is required to make a premium due upon acceleration are inapplicable and inapposite. First, as demonstrated above, the acceleration provisions (which, as stated above, are not the governing provisions) call for payment of the notes, and the payment provisions in turn reference "premium." Thus, the explicit language the EFIH Debtors contend is necessary is present here. Second, the EFIH Debtors' cases, traced to their roots, only stand for the proposition that if a lender takes voluntary and affirmative remedial steps to accelerate

and collect the debt through foreclosure or other remedies, it has waived any premium because it is affirmatively seeking to collect the debt early, rendering payment by the borrower involuntary. Under such circumstances, state law requires an explicit statement that the premium remains due even after the lender commences collection actions. Here, the first lien noteholders and trustee have taken no affirmative steps to accelerate and collect the debt early. Rather, it is the EFIH Debtors who seek to voluntarily redeem the notes, having filed a voluntary bankruptcy petition for the purpose of implementing a redemption without paying the contractually-required redemption premium. They have even structured this along with a tender offer. As such, the 10% Indenture Trustee has taken no voluntary collection action that would trigger any waiver of the redemption premium.

22.    Any ambiguity as to whether "explicitness" exists as to the payment of the redemption premium should be construed against the drafter where, as here, the noteholders did not participate in the drafting. *See, e.g., Columbia Gas Sys., Inc. v. United States*, 473 F.2d 1244, 1248-49 (2d Cir. 1973) (holding that the "preferable solution is to charge [] ambiguity against" the "one responsible for the wording of the clause and the indenture") (internal quotation marks omitted). Indeed, there have been very few cases in which courts have needed to determine the "explicitness" of a contract's language requiring payment of premiums upon bankruptcy. In one case a contract was "explicit" for a premium to be payable on a bankruptcy filing, *In re Sch. Specialty, Inc.*, No. 13-10125 (KJC), 2013 WL 1838513, at *2 (Bankr. D. Del. Apr. 22, 2013), but it was negotiated one-on-one in the context of a rescue loan. In another case,

13

the contract was explicitly against the premium being payable on a bankruptcy filing; but the involved creditors attempted to obtain the premium nonetheless. *U.S. Bank Trust Nat'l Assoc. v. Am. Airlines, Inc. (In re AMR Corp.)*, 730 F.3d 88 (2d Cir. 2013) *cert. denied* 2014 WL 583570 (Apr. 21, 2014). At worst, the 10% Indenture is neither of those as a matter of contract language or the Court might discern a conflict between the discrete provisions governing redemption and acceleration, and the Court must determine the intent of the parties. In the paradigm cases on which the EFIH Debtors rely, *AMR* and *HSBC Bank U.S.A. v. Calpine Corp.*, No. 07 Civ 3088 (GBD), 2010 WL 3835200 (S.D.N.Y. Sept. 15, 2010), the refinancings did not even start until well into the bankruptcy case. They certainly were not the product of a prebankruptcy arrangement implemented by a debtor filing a voluntary chapter 11 petition.

**B.      Under the Well-Settled Intentional Default Doctrine, the EFIH Debtors are Liable to Pay Based Upon Their Affirmative Acts Intended to Evade the Premium.**

23.      Even if the EFIH Debtors were to prevail in their reading of the 10% Indenture, the premium is payable. The law is clear that if a default triggering acceleration includes the intent to avoid or evade the premium, the premium is payable regardless of technical arguments that the debtor raises regarding the acceleration clause. *See, e.g., Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039 (2d Cir. 1982); *Eyde v. Empire of Am. Fed. Sav. Bank*, 701 F. Supp. 126 (E.D. Mich. 1988); *Nw. Mut. Life Ins. Co. v. Uniondale Realty Assocs.*, 816 N.Y.S.2d 831 (N.Y. Sup. Ct. 2006); *Nat'l Bank of Miami v. Bankatlantic*, 589 So.2d 255 (Fla. 1991). And so it is here. Just by way of a few examples, the denial of the premium was prominently featured in the

EFIH Debtors' own description of the situation in the first day hearings and in the justification set forth in the EFIH First Lien DIP Financing Motion.  It is further notable that until well into 2013 there were apparently significant efforts to avoid placing the EFIH Debtors into chapter 11.  In the same time period, beginning in late 2012, a series of exchange offers resulted in substantial new debt incurrence at EFIH (by which the current unsecured PIK notes first became creditors at the EFIH level), and just a year later those same most junior creditors seek to eliminate the contractual redemption premiums.

24.     It is also noteworthy that the various debtors have been able to come to an arrangement prepetition to move a major cash flow – the Oncor Tax Sharing Agreement – from EFH to EFIH.  With that cash flow to EFIH, the EFIH First Lien Notes may be serviceable.  Of course, the EFIH Debtors have apparently tried to make that inevitable movement of that cash flow part of their "global settlement."  This too is an important area for discovery, and is a factual matter that cannot be resolved merely on the papers. The global settlement, including the request to move the tax sharing agreement cash flow, has not even been filed or noticed.  This is another reason why, both substantively and procedurally, these transactions cannot go forward.

C.     **The 10% Indenture Expressly Grants to Holders the Right of Rescission in This Circumstance**

25.     Even if the EFIH Debtors were to prevail on their supposed reading of the acceleration clause of the 10% Indenture and 10% Notes, they entirely ignore another feature of the indenture.  This indenture specifically permits holders to rescind the automatic bankruptcy acceleration, and not merely declared accelerations.  Thus, the 10%

15

Indenture specifically permits the noteholders to preserve the right to require the redemption premium even after an acceleration.[8]

26.     No doubt the EFIH Debtors will contend that the automatic stay prevents rescission of acceleration, relying on two cases from another Circuit. *See In re AMR Corp.*, 730 F.3d at 102; *In re Solutia Inc.*, 379 B.R. 473, 485 n.7, 488-89 (Bankr. S.D.N.Y. 2007). The analysis contained in *Solutia* is not only dictum but also did not have the benefit of any briefing on the issue; we respectfully submit that its conclusions on applicability of the stay are erroneous. *AMR* relied on nothing but *Solutia*. This Court should exercise utmost caution in examining those cases.

27.     In *Solutia*, the court based its analysis on a cursory reading of the word "assess" in the automatic stay provisions. The *Solutia* court purportedly relied on a dictionary definition of "assess," but did not consider the prior definitions of "assess" in the same dictionary, each of which specifically reference taxation. The *Solutia* court also did not look to other uses of "assess" in the Bankruptcy Code, which relate to taxes, other government revenue payments or similar types of charges. Still further, the *Solutia* court ignored the drafting history of the Bankruptcy Code, which added the word "assess" to the automatic stay only late in the drafting process as part of an extensive and integrated package of tax-claim specific changes. *Compare* Bankruptcy Reform Act, H.R. 8200, 95th Cong. § 101, at 52 (1st Sess. 1977), *with* 95 Cong. Rec. H11,053 (daily ed. Sept 28, 1978) (amendment to H.R. 8200). As such, the first lien noteholders may rescind the

---

[8] This makes eminent sense. Bankruptcy acceleration is most frequently caused (as it was here) by a voluntary petition, which of course is initiated by the debtor. The rescission provision in this indenture preserves the economics for holders in this situation.

acceleration of the debt without violating the automatic stay.[9]   Both *Solutia* and *AMR*

took note of the delayed attempts to rescind or lift the stay, whereas this dispute is joined

at the outset of the case.   Even if the automatic stay applies, the right to rescind is part of

the entire package of the first lien holders' rights – which is exactly what constitutes their

oversecured claim with entitlements under Section 506(b).

### D.   The Financing Motion Is Procedurally Improper for Determining the Redemption Premium

28.   The EFIH Debtors' motion seeks three elements of relief: authority to

borrow, authority to use loan proceeds and a determination that no redemption premium

is payable.   The EFIH Debtors cite only one authority—Bankruptcy Rule 3012—for the

notion that they can obtain the third prong of this relief, a mere 35 days into the case,

before a bar date order and without an adversary proceeding in the nature of a declaratory

judgment.   This is incorrect, and the Court simply cannot address the redemption

premium matter in this proceeding.

29.   Issues regarding secured claims are litigated in three distinct ways.   First,

validity, priority and extent of a lien must be determined by adversary proceeding.

Bankruptcy Rule 7001(2); *see* Adv. Cmte. Note to Rule 3012.   Second, Bankruptcy Rule

3012 specifically permits determinations as to the value of collateral by motion and

contested matter.   This addresses the bifurcation of undersecured claims under Section

506(a), or the determination of oversecured status.   Lastly, the actual overall amount of

---

[9] *AMR* does also cite to *In re Manville Forest Prods. Corp.*, 43 B.R. 293 (Bankr. S.D.N.Y. 1984). Showing the lack of depth of the analysis, *AMR* cited *Manville* only for the proposition that sections 362(a)(3), (4) and (5) preclude rescission.   730 F.3d at 103.   However, even the most cursory reading of *Manville* makes clear that it addressed acceleration and not deceleration, and did not invoke at all any of those three Bankruptcy Code sections on which *AMR* purported to rely.   43 B.R. at 296.

an allowed secured claim is determined, like other claims, in a contested matter started by a claims objection.

30.    As noted above, the EFIH Debtors only invoke Rule 3012 for their 35-day "determination of secured claim." They omit the very title of the Rule: "Valuation of Security." The Rule itself states that the Court may determine on motion "the <u>value</u> of a claim secured by a lien." The EFIH Debtors, however, concede that the 10% Indenture Trustee is oversecured, and therefore no bifurcation and valuation is necessary.

31.    An attempt to disallow the claim must occur in accordance with Bankruptcy Code Section 501 and Bankruptcy Rules 3002-3004. Bankruptcy Code Section 501(c) specifically provides that the debtor can only institute the claims filing and allowance process after the expiration of the bar date. Bankruptcy Rule 3012 was specifically amended in 2005 to make this clear. *See* Adv. Comm. Note to 2005 Amendments to Rule 3012. No bar date has been set in this case. The EFIH Debtors have not even filed schedules. The EFIH Debtors cannot unilaterally decide to seek the extraordinary relief of paying claims outside of a plan (entirely truncating the reorganization process) and also eliminate the entire claims allowance process, especially for a secured claim.[10]

32.    Furthermore, Rule 3012 only addresses secured claims, and even if the premium were otherwise denied, in the context of a solvent chapter 11 case, the premium

---

[10] The 10% Indenture Trustee is not seeking a long litigation, merely a rational one that preserves the protections set forth in the Bankruptcy Code and respects the noteholders' contractual rights. It intends to file a complaint in the near term for a declaratory judgment regarding the redemption premium and proposes that such adversary proceeding be conducted on an appropriate basis of less than 6 months in this Court, assuming discovery and other deadlines, including for third-party discovery, can be adjusted accordingly.

is payable in accordance with Bankruptcy Code § 502.  *See UPS Capital Bus. Credit v. Gencarelli (In re Gencarelli)*, 501 F.3d 1 (1st Cir. 2007).  Notably, the unsecured notes of EFIH currently trade at 105% of par.  There also may be other theories on which those unsecured claims are reduced such that EFIH is solvent.  Setting all else aside, the 10% Indenture Trustee could have an unsecured claim for the premium, and Rule 3012 does not address that at all.

33.     Relatedly, the EFIH Debtors have not proposed any adequate protection or described how, during the litigation, the proposed second lien DIP financing will interrelate to the disputed redemption premium.  Although they ask for a hearing on all their proposed transactions by June 5, 2014, the EFIH Debtors state in the tender offer materials that they "currently do not expect that [redemption-premium] litigation will be resolved by the Early Participation Date, the Expiration Date [of the tender] or prior to consummation of [the tender offer.]"  *See* Dkt. No. 363-1 at 32.  Thus they appear to understand that this $665 million premium for the 10% Notes will still be unresolved even if they can obtain approval to fund their priming first lien DIP financing and their second lien DIP financing.  If they intend to try to prime the redemption premium claim, then there in fact would be a valuation proceeding under Rule 3012, separate from a determination of the total allowable claim.  Thus there must be a determination of adequate protection.  As of now, the lien priorities sought by the Debtors are unclear, because the papers have not even been filed.

34.     Indeed, because the 10% Indenture Trustee does not yet have the forthcoming Memorandum of Law, "Global Settlement Motion" and other papers, it

cannot discern the precise theory under which the EFIH Debtors assert the redemption premium is not payable. The 10% Indenture Trustee does not at this time consent to the entry of final judgment or the adjudication of such issues in the bankruptcy court because, *inter alia*, the legal basis for the relief is uncertain.

E.    **There Are Substantial Issues Relating to Findings Under Section 364(e)**

35.    The EFIH Debtors have requested findings of good faith for lenders under the first lien DIP financing. They presumably will seek the same for the lenders in the second lien DIP financing. However, many of the lenders in these facilities have existing creditor positions in the case, are taking fees under the DIP facilities in settlement of other claims, and are using the facilities to obtain controlling equity stakes in the reorganized debtor outside of a plan process. All of these require a full litigation regarding Section 364(e) findings. For example, existing creditors prepared to invest $1.9 billion in new equity (the conversion of the second lien DIP facility) almost certainly have a view toward retention and compensation of the very management that is proposing these lending arrangements, and very likely will have discussed those arrangements. One of those converting second lien lenders is Fidelity, who is also intertwined in the first lien DIP facility, both in purporting to settle its own EFIH First Lien Notes holdings but also obtaining for itself a special "roll-up" treatment for its EFIH Second Lien Notes, for which it is obtaining DIP loans that are to be protected by the Section 364(e) finding. This too is an area that requires discovery.[11]

---

[11] As noted above, the Oncor Tax Sharing Agreement payments are to be part of the support for the DIP financings, from the start of the case. That is new information, contrary even to the public securities filings of EFIH prepetition. This raises significant factual questions about whether other DIP financing was sought based on potential cash flows that would include those tax sharing payments, and thus

**F.**     **The EFIH First Lien DIP Financing Violates the Collateral Trust Agreement**

36.     The EFIH First Lien DIP Financing cannot be approved, under Bankruptcy Code Section 510(a), because the borrowing and proposed use of borrowed funds violate the Collateral Trust Agreement, which contains subordination provisions in favor of the EFIH First Lien Notes.  It is axiomatic that Bankruptcy Code Section 510(a) makes subordination agreements enforceable in bankruptcy cases to the same extent that they are enforceable under nonbankruptcy law.  The only arguable exception to this maxim is when a chapter 11 debtor confirms a full plan of reorganization, which of course is the opposite of what the EFIH Debtors claim to be doing here.  11 U.S.C. § 1129(b)(1); *In re Tribune Co.*, 477 B.R. 465 (Bankr. D. Del. 2012); *In re Tribune Co.*, 472 B.R. 223 (Bankr. D. Del. 2012); *In re TCI 2 Holdings, LLC*, 428 B.R. 117 (Bankr. D.N.J. 2010).[12]

37.     The EFIH First Lien DIP Facility and proposed use of proceeds violates Section 2.4(c) of the Collateral Trust Agreement, which provides that after the commencement of a bankruptcy proceeding "no payment of money . . . shall be made from the proceeds of Collateral by EFIH to the Collateral Trustee . . . any Junior Lien Representative or any holder of Junior Lien Obligations with respect to Junior Lien

---

whether the EFIH Debtors can meet the standard that no alternative was available.  The sudden availability of this important cash flow for financing may have occurred at the behest of one or more DIP Lenders, which are now (as lenders) claiming both that no other financing was available and that they are entitled to a good-faith finding.

[12] The Indenture Trustee reserves the right to argue that intercreditor agreements remain enforceable even in the confirmation context, in appropriate circumstances, under the "fair and equitable" and "unfair discrimination" requirements if a class votes against a plan.  *See In re Consul Rest. Corp.*, 146 B.R. 979 (Bankr. D. Minn. 1992); Kenneth N. Klee, *All You Ever Wanted to Know About Cramdown Under the New Bankruptcy Code*, 53 AM. BANKR. L.J. 133, 142 n.70 (1979).

Obligations."[13]  Correspondingly, the actual second lien noteholders have agreed that any such money "will be held [by such second lien noteholder] in trust for the account of [the first lien noteholders and first lien indenture trustees]." *See* Collateral Trust Agreement § 2.4(d). The EFIH Debtors are proposing that proceeds of the collateral for the EFIH First Lien Notes are to be used to pay second lien noteholders.  Specifically, EFIH is raising cash by granting a senior lien.  A senior lien is a disposition of collateral since it unquestionably reduces the EFIH Debtors' and the 10% Indenture Trustee's rights in the collateral. *See* U.C.C. § 9-102(64)(A).

38.     Therefore, the EFIH Debtors may not use the cash from the financing in order to conduct a tender for or otherwise pay the EFIH Second Lien Notes.  At the very least, any approval for EFIH First Lien DIP Facility cash borrowings to pay any second lien notes, whether under the proposed tender offer or otherwise, must provide that sufficient funds are to be held in escrow pending the final outcome (including appeals, if any) of litigation of the first lien redemption premium claim and related litigation among first lien and second lien representatives (which involves additional questions of fact and law outside of the scope of the relief currently sought from the Bankruptcy Court). *See* Collateral Trust Agreement § 3.4(a).

---

[13] The Junior Lien Representatives are the indenture trustees for the various EFIH Second Lien Notes.  The holders of Junior Lien Obligations are the Second Lien Noteholders.

G.    **There are Serious Flaws in the EFIH First Lien Tender Offer**

39.    The "tender offer" that the EFIH Debtors announced at the first-day hearings was launched early on Thursday, May 7, 2014.  It has numerous substantive flaws, as well as serious omissions and misstatements in the solicitation materials:

(1)    The Information Memorandum states that the three first lien noteholders who have already agreed to tender are receiving the same amount as is being offered to all noteholders.  That is not the case.  At least two of those three, PIMCO and Fidelity, are receiving large allocations of the EFIH First Lien DIP Facility and are supposedly backstopping such facility in exchange for very significant fees.  However, the IM states that before reaching agreement with those creditors, the EFIH Debtors already had committed lending for these amounts; the obvious conclusion is that these fees were part of the settlement, not the commitment to lend.  IM at p.2 (noting a commitment of initial lenders for the full facility).  Furthermore, the details regarding the fees are anything but clearly disclosed.

(2)    In addition, Fidelity is receiving other large amounts, ranging from (A) outsized recoveries on other securities, (B) preferential step-up of their EFIH Second Lien Notes being rolled up into EFIH First Lien DIP Loans, to (C) outright cash fees of $20 million.  These are all likely attributable to Fidelity receiving a much more favorable settlement than is being disclosed.

(3)    On information and belief (Bloomberg online reporting of holdings information), at least one of those holders has a very sizeable position in the 6⅞% First Lien Notes, and the IM does not disclose those holdings of the accepting holders.  This matters because the 6⅞% Notes have a redemption premium that is less than half of the amount of the premium (as a percent of principal) on the 10% First Lien Notes.  However, the tender offer gives the same nominal offer to the 6⅞% Notes as the 10% Notes.  Nowhere does the IM reflect that the proposal to the 10% Notes is less than half of the offer to the 6⅞% Notes; *i.e.,* an offer to settle at 25% compared to offer to settle at 60%.  *See* page 3 *supra.*  Indeed, the settlement for the 6⅞% Notes is at a level even higher than the 50% tender proposal being made to the EFIH Second Lien Notes.

23

(4)     Remarkably, the tender offer includes a waiver of claims (and perhaps third party claims), requiring each tendering holder to agree "that it will be bound by the terms and conditions of <u>the EFIH First Lien Settlement as set forth in the Information Memorandum</u> (including, but not limited to, surrendering and waiving any and all claims it may have with respect to its EFIH First Lien Notes)." *See* form of Letter of Transmittal [Dkt. No. 363-1 at 81 ¶ 6] (emphasis added).  Yet nowhere in the entire IM is the term "EFIH First Lien Settlement" defined.  There is no section of the IM that describes such settlement; in contrast there is a section describing a proposed settlement with the second lien noteholders.  This is an omission regarding the most central component of the proposed transaction.

(5)     The IM makes an offer to settle at a mere 25% of the redemption premium amount for the 10% Notes, but does not disclose that in the original 2010 offering documents for the 10% Notes, EFIH stated that in the event of a bankruptcy filing there would be recourse for the premium.

(6)     Neither the IM nor the EFIH First Lien Financing Motion contain a sufficiently detailed budget or a description of sources and uses of existing cash and DIP financing proceeds, to permit first lien noteholders to properly evaluate their choices.

(7)     The IM does not disclose that the 6⅞% Notes and the AK3 CUSIP of the 10% Notes bear Additional Interest, pursuant to Registration Rights Agreements, of an additional 0.5% per annum.  The tender offer appears to propose complete waiver of these amounts, without clearly disclosing that fact.

(8)     These inadequate disclosures are not a mere procedural point; they place significant risk on the estate.  The tender is occurring entirely post-petition, and therefore any misstatements and omissions could create claims with administrative status.  This of course is exactly why the Bankruptcy Code plan process provides for <u>prior</u> court approval of disclosure to security holders, after notice (including to the SEC) and hearing, coupled with an express statutory exculpation; thus no one can make subsequent complaints about court-approved disclosure and the adequacy of disclosure and administrative-claim risk is avoided.  *See* 11 U.S.C. § 1125(e).

Most fundamentally, the Financing Motion seeks not only authority to pay claims outside a reorganization plan, but also authority to pay creditors different amounts even though they would be classified together.  The proposed disparate treatment is among three groups of financial creditors (the 6⅞% Notes, the 10% AK3 Notes and the 10% AA5 Notes), all of which have the same collateral and contractual provisions, but merely with different allowable claim sizes.  The EFIH Debtors offer no precedent or Bankruptcy Code authority to do such a thing.

40.    In addition, this is not truly a 20-business-day tender, which is the minimum required under even non-bankruptcy rules.  The early tender period is only 10 business days, expiring on May 19, 2014.  After the early tender date, the offer is reduced by more than a third.  As noted above, the early tender period expires only two business days after the EFIH Debtors' stated day for filing the very pleading that would seek approval of the settlement offered in the tender.  In addition, numerous other pleadings that directly relate to the tender and the alternative for first lien noteholders are also expected to be filed only two business days before the early tender deadline.  Those missing documents include the actual form of order for the EFIH First Lien DIP Financing, papers regarding the second lien DIP financing, papers regarding the so-called "global settlement," the pleadings to amend the Tax Sharing Agreement between Oncor and EFH, and supposedly a motion for the Debtors to assume a restructuring support agreement.

41.    The tender to the first lien noteholders is at a below-market price.  The EFIH Debtors could only expect to garner support by being entirely coercive, on a short

time frame, and using inadequate disclosure. The reality is that any meaningful offer should occur pursuant to the usual plan process. Such an offer would affect the recovery amounts of some other creditor constituencies, but would not affect the operations of Oncor or the other debtors at all. The EFIH Debtors' actions are an attempt to ram through one particular resolution of this holding company case, which involves only intercreditor disputes.

WHEREFORE, this Court should deny the Motion, and grant such other relief as is appropriate under the circumstances.

52881/0001-10605006v2

Dated:  May 13, 2014

COLE, SCHOTZ, MEISEL, FORMAN
& LEONARD, P.A.


*/s/ Norman L. Pernick*
Norman L. Pernick (DE No. 2290)
J. Kate Stickles (DE No. 2917)          Warren A. Usatine
500 Delaware Avenue, Suite 1410         25 Main Street
Wilmington, DE  19801                   P.O. Box 800
Telephone: 302-652-3131                 Hackensack, NJ 07602
Facsimile:  302-652-3117                Telephone: 201-489-3000
npernick@coleschotz.com                 Facsimile:  201-489-1536
kstickles@coleschotz.com                wusatine@coleschotz.com

     --and--

ROPES & GRAY LLP
Keith H. Wofford                        D. Ross Martin
Mark R. Somerstein                      Andrew G. Devore
1211 Avenue of the Americas             Prudential Tower
New York, NY 10036-8704                 800 Boylston Street
Telephone: 212-596-9000                 Boston, MA  02199-3600
Facsimile:  212-596-9090                Telephone: 617-951-7000
Keith.Wofford@ropesgray.com             Facsimile:  617-951-7050
Mark.Somerstein@ropesgray.com           Ross.Martin@ropesgray.com
                                        Andrew.Devore@ropesgray.com


     --and--

DRINKER BIDDLE & REATH LLP
James H. Millar
1177 Avenue of the Americas
41st Floor
New York, NY 10036-2714
Telephone: 212-248-3264
Facsimile:  212-248-3141
James.Millar@dbr.com


*Counsel for CSC Trust Company of Delaware,*
*as successor indenture trustee*

52881/0001-10605006v2