**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Energy Future Holdings, Inc., *et al.*, | : | Case No. 14-10978 (CSS) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

---------------------------------------------------------- x

**EMERGENCY MOTION OF EFIH 2ND LIEN NOTES INDENTURE**
**TRUSTEE TO COMPEL DEBTORS TO OBTAIN PRIOR APPROVAL**
**OF PROCEDURES GOVERNING THEIR EFIH 2ND LIEN TENDER OFFER**

## <u>TABLE OF CONTENTS</u>

Jurisdiction and Venue.......................................................................................................... 5

Relief Requested .................................................................................................................. 6

Background .......................................................................................................................... 6

   I.    The Proposed Restructuring............................................................................. 7

   II.   Fidelity's Role in the Proposed Restructuring .................................................. 9

   III.    The EFIH 2nd Lien Tender Offer .............................................................. 10

ARGUMENT ..................................................................................................................... 12

   I.    The Tender Offer Violates the Securities Laws.............................................. 13

     A.    The Tender Offer Materials Are Materially Misleading ........................... 13

     B.    The Structure of the Tender Offer Is Illusory.......................................... 19

   II.   The Tender Offer Gives Creditors Insufficient Time to Evaluate the Proposed Settlement
      23

     A.    Holders Should Be Given at Least 20 Business Days From the Resolicitation Date to
    Accept the Total Tender Offer Consideration ...................................................... 24

     B.    Delays in Transmitting Tender Materials and Tender Instructions Are Unavoidable 25

   III.    The Debtors Are Attempting an End Run Around the Creditor Protections of the
   Bankruptcy Code................................................................................................................... 26

     A.    The EFIH 2nd Lien Settlement Violates Section 1123(a)(4) of the Bankruptcy Code
      26

     B.    The EFIH 2nd Lien Settlement Impermissibly Strips Creditors of Rights in Other
    Classes ................................................................................................................. 29

Reservation of Rights......................................................................................................... 29

Notice ................................................................................................................................ 30

No Prior Request................................................................................................................ 30

Computershare Trust Company, N.A. and Computershare Trust Company of Canada, as indenture trustee (the "**Indenture Trustee**") for $2,156,000,000 aggregate principal amount of second lien notes (the "**EFIH 2nd Lien Notes**") issued by Energy Future Intermediate Holding Company LLC ("**EFIH**") and EFIH Finance Inc., pursuant to Bankruptcy Code §§ 363(b) and 105(a), in response to EFIH's tender offer for such notes (the "**EFIH 2nd Lien Tender Offer**"), file this emergency motion (the "**Emergency Motion**") for an order:

- Setting June 6, 2014 as a hearing on the procedures and adequacy of the disclosures.

- Directing the Debtors to extend the "50%"[1] settlement offer deadline for tendering EFIH 2nd Lien Notes to ***the later of*** (a) June 12, 2014 or (b) if the Court orders the Debtors to change their tender offer procedures or to make additional disclosures, a date 20 business days after the Debtors make such changes or additional disclosures.

## PRELIMINARY STATEMENT

Rather than use the claim treatment procedures expressly provided for in the Bankruptcy Code (i.e., a plan of reorganization), EFIH has launched a $2.5 billion tender offer for the EFIH 2nd Lien Notes.  *See* Notice of Initiation of Opt-In Period for Proposed EFIH Second Lien Settlement [Dkt. No. 400] at Exhibit A (hereinafter the "**Offer Memorandum**").

The EFIH 2nd Lien Tender Offer strips creditors of basic protections provided by the Bankruptcy Code, and violates the securities laws, in an effort to implement a settlement (the "**EFIH 2nd Lien Settlement**") that itself violates the Bankruptcy Code.

The EFIH 2nd Lien Tender Offer purportedly offers to settle a dispute central to EFIH's reorganization:  whether the holders of EFIH 2nd Lien Notes are entitled to a make-whole premium (the **"Make-Whole Claim"**) totaling more than $700 million.  To receive the full settlement consideration – 100% of principal and accrued interest, plus somewhat less than

---

[1] The Debtors described their projected EFIH 2nd Lien Settlement as a payment of 50% of the makewhole premium. However, the Indenture Trustee believes the amount actually offered in the EFIH 2nd Lien Tender Offer is less than 50% of the actual makewhole.

KL2 2846150.12

50% of its Make-Whole Claim – a holder must tender its notes within 10 business days after the offer's commencement.   Holders who tender between 10 and 20 business days after the commencement receive significantly reduced consideration.

As an initial matter, by providing various side-payments to certain creditors – i.e., Fidelity (as defined below) and certain holders of the Debtors' PIK Notes (as defined below) – the EFIH 2nd Lien Settlement violates the "no-discrimination-within-a-class" rule of Bankruptcy Code § 1123(a)(4) and cannot be approved.[2]

Moreover, the Debtors are attempting to force a "settlement" down the throats of EFIH 2nd Lien Noteholders by using an unfair process that does not comply with either the Bankruptcy Code or the securities laws and that is based on inadequate, and misleading, information.

- *Misleading and Inadequate Disclosure*.   The Offer Memorandum states prominently that "holders of at least 35% of the outstanding aggregate principal amount of EFIH Second Lien Notes" have agreed to accept the EFIH 2nd Lien Settlement.  *See* Offer Memorandum at cover page & p. 18.   The tender materials fail to disclose that Fidelity Investments (together with its affiliates, "**Fidelity**"), which holds approximately 30% of the EFIH 2nd Lien Notes and negotiated the tender offer, has been promised additional consideration that cannot be determined without discovery but could exceed *$135 million*.

- *Insufficient Time.*   Notwithstanding the Debtors' declaration on May 1 that they would give Noteholders 20 business days to agree to a "50%" settlement of their make-whole, the EFIH 2nd Lien Tender Offer actually gives EFIH 2nd Lien Noteholders only ten business days to decide whether or not to compromise their make-whole claims at something less than 50%.  The time is actually shorter.  Many noteholders will have only a few days to decide, given common delays in their receipt of documents from intermediaries and the need of many to notify brokers two or three business days in advance of the tender deadline.

- *The Tender Offer Violates the Securities Laws*.  EFIH can terminate its offer at any time.   This renders the Tender Offer illusory, in violation of Section 14(e) of the

---

[2] To be sure, much of this premium treatment is being delivered through *pre-plan* agreements, rather than through a plan of reorganization, but, as explained below, this does not eliminate the application of the Code's no-discrimination principles, as several courts of appeal have emphasized.

Securities Exchange Act.  EFIH compounds the unfairness of its right to terminate by denying Noteholders a correlative right to withdraw tendered notes – potentially freezing those notes indefinitely, since EFIH also has the right to extend the tender offer as often as it wants, without full and fair disclosure of the consequences of the untenable choices thrust upon the noteholders.

- *The Court Should Pre-Approve the Tender Offer.*  While the Indenture Trustee believes that the EFIH 2nd Lien Settlement simply cannot be approved for the reasons described herein, if the Debtor insists on moving forward with its flawed approach, the Bankruptcy Court should, at a minimum, require the Debtors to obtain pre-approval of the EFIH 2nd Lien Tender Offer and the procedures related thereto, including the adequacy of the disclosure.

The Indenture Trustee seeks emergency relief because, as referred to above and explained in more detail below, the real world (as opposed to theoretical) deadline for tendering EFIH 2nd Lien Notes is actually ***Tuesday May 20, 2014***.

## **Jurisdiction and Venue**

1.      The United States Bankruptcy Court for the District of Delaware (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Bankruptcy Rules**"), the Indenture Trustee consents to the entry of a final order and judgment by the Court in connection with this Emergency Motion to the extent it is later determined that the Court cannot enter such final orders or judgments consistent with Article III of the United States Constitution absent consent of the parties.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The basis for the relief requested in this Emergency Motion is sections 363(b) and 105(a) of title 11 of the United States Code (the "**Bankruptcy Code**").

## **Relief Requested**

4.      By this Emergency Motion, the Indenture Trustee seeks entry of an order (1) setting June 6, 2014 as a hearing on the procedures and adequacy of the disclosures; and (2) directing the Debtors to extend the "50%" settlement offer deadline for tendering EFIH 2nd Lien Notes to ***the later of*** (a) June 12, 2014 or (b) if the Court orders the Debtors to change their tender offer procedures or to make additional disclosures, a date 20 business days after the Debtors make such changes or additional disclosures.

## **Background**

5.      On April 29, 2014 (the "**Petition Date**"), each of the Debtors filed a voluntary petition with the Court under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee has been appointed.  On May 12, 2014, the U.S. Trustee appointed the official committee of unsecured creditors to represent the interests of unsecured creditors of the TCEH Debtors (defined below).

6.      The cases are currently being jointly administered under the Energy Future Holdings Corp. ("**EFH**") bankruptcy case.  EFH is a limited liability company with two main direct subsidiaries:  (i) Energy Future Intermediate Holding Company LLC ("**EFIH**"), and (ii) Energy Future Competitive Holdings Company LLC ("**EFCH**") and its direct subsidiary Texas Competitive Electric Holdings Company LLC (together with EFCH and their direct and indirect subsidiaries, the "**TCEH Debtors**").

7.      EFIH itself is a holding company, as well as a wholly-owned subsidiary of EFH.  EFIH has three outstanding tranches of debt:  (i) approximately $4 billion of senior

secured first lien notes (the "**EFIH 1st Lien Notes**"), (ii) approximately $2.156 billion of EFIH

2nd Lien Notes, and (iii) approximately $1.4 billion of unsecured notes (the "**PIK Notes**").

## I.    THE PROPOSED RESTRUCTURING

8.    In the Declaration of Paul Keglevic (the "**Keglevic Decl.**") [Dkt. No. 98],

the Debtors describe a global restructuring under which they will refinance the EFIH 1st Lien

Notes and EFIH 2nd Lien Notes, spin off TCEH from EFH, and provide specified treatment to

holders of claims and equity interests against each Debtor.   The Debtors have entered into a

restructuring support agreement (the "**RSA**") with different parties throughout the capital

structure.   The parties that have signed the RSA hold minorities of the EFIH 1st and EFIH 2nd

Lien Notes – which, as noted, comprise about 80% of the debt of EFIH.

9.    As part of the RSA, the Debtors propose to settle all outstanding

obligations under the EFIH 1st Lien Notes (the "**1st Lien Settlement**") by entering into a DIP

Facility (the "**EFIH 1st Lien DIP**") and commencing a tender offer (the "**1st Lien Tender**

**Offer**") to refinance those notes.   The 1st Lien Tender Offer, which the Debtors commenced on

May 7, 2014, incorporates a purported settlement of make-whole claims of the 1st Lien Notes; it

offers $105 for every $100 of principal and $101 for every $100 of accrued and unpaid interest

on the EFIH 1st Lien Notes tendered into the settlement, all in the form of EFIH 1st Lien DIP roll-

up notes.

10.    With regard to the EFIH 2nd Lien Notes, the Debtors have outlined the

following restructuring process:

- First, to commence the EFIH 2nd Lien Tender Offer, which will include the EFIH 2nd Lien Settlement;

- Second, to obtain Court approval of the EFIH 2nd Lien Settlement, as well as the $1.9 billion EFIH 2nd Lien debtor-in-possession financing (the "**EFIH 2nd Lien DIP**");[3]

- Third, to use the proceeds of the EFIH 2nd Lien DIP (a) to consummate the EFIH 2nd Lien Tender Offer (i.e., to pay down the principal, interest and make-whole settlement of the participants) and (b) to pay down the principal and interest of the notes held by holders of EFIH 2nd Lien Notes who do not opt into the EFIH 2nd Lien Tender Offer (the "**Non-Participants**"); and

- Fourth, to litigate the Non-Participants' entitlement to the Make-Whole Claim.

11.    The term sheet attached to the RSA (the "**Term Sheet**", attached as Exhibit A to Exhibit D of the Keglevic Decl.) provides that the Non-Participants who hold residual claims of EFIH 2nd Lien Notes, including any allowed Make-Whole Claims, will be impaired and will receive either payment in full in cash or such other treatment as permitted under section 1129(b) of the Bankruptcy Code.  Term Sheet at pp. 13-14.

12.    Aside from EFIH's debt, EFH itself has approximately $1.929 billion of unsecured notes (the "**EFH Legacy Notes**").  Approximately two-thirds of the Legacy Notes are held by EFIH.  Fidelity holds approximately 73% of the other third (i.e., approximately $471 million).  The Term Sheet provides that the Legacy Notes held by EFIH will not participate in the cash distributed on account of EFH unsecured claims (the "**Legacy Notes Waiver**"), provided certain conditions, including approval of the proposed amendment of the Oncor Tax Sharing Agreement, are satisfied.  The result of the cancellation of EFIH's Legacy Notes will be to approximately triple the cash and equity distributed on the Legacy Notes received by Fidelity and the other remaining holders.  While the resulting incremental cash benefit to Fidelity cannot

---

[3] The Debtors have stated that they intend for the EFIH 2nd Lien DIP to prime the Make-Whole Claim (*see* Offer Memorandum at 36 (describing the ranking of the EFIH 2nd Lien DIP)), which will place the Make-Whole Claim behind $7.3 billion of debt.  The Debtors have the burden of showing that the secured Make-Whole Claim is adequately protected, and the Indenture Trustee intends to object to the EFIH 2nd Lien DIP to extent the holders of the Make-Whole Claim are not provided satisfactory adequate protection.

be determined without discovery, the Indenture Trustee believes it is likely to be at least $116 million.

## II.    FIDELITY'S ROLE IN THE PROPOSED RESTRUCTURING

13.    Fidelity holds positions throughout the Debtors' capital structure, including approximately 30% of the EFIH 2nd Lien Notes, 11% of the EFIH 1st Lien Notes, 73% of the third-party-held EFH Legacy Notes, and an undisclosed amount of TCEH 1st Lien Debt. Keglevic Decl. at ¶ 156.

14.    Fidelity has used these cross-holdings to insert itself as a key party to the overall restructuring.  At the end of October 2013, the Debtors met with several of their principal creditor constituencies, including Fidelity, and made an oral restructuring proposal.  *See* Exhibit 3 to Form 8-K filed on Nov. 1, 2013.  The Debtors continued to engage with Fidelity, and by early 2014, Fidelity and certain holders of PIK Notes "began to coalesce around the terms of a consensual restructuring."  Keglevic Decl. at ¶ 165.  Ultimately, Fidelity executed the RSA and agreed to participate in both the 1st and EFIH 2nd Lien Make-Whole Settlements.  Keglevic Decl. at ¶ 174-75.  At the first-day hearing and in their motion papers, the Debtors have described Fidelity as an "anchor tenant" of its reorganization and a "key participant" of the 1st and EFIH 2nd Lien Settlements.[4]  Hr'g Tr. at 50:18-51:9 (May 1, 2014) (excerpts of which are attached hereto as **Exhibit C**); Motion to Approve EFIH 1st Lien DIP [Dkt. No. 74] at ¶ 9 n.9.

15.    Under the proposed restructuring transaction documents (including the Term Sheet, the 1st Lien Settlement, the EFIH 2nd Lien Settlement and the Commitment Letter for the EFIH 2nd Lien DIP), Fidelity has been promised multiple additional forms of

---

[4] In contrast, the Debtors have largely shut out the Indenture Trustee, as well as the EFIH 2nd Lien Noteholders jointly represented by the undersigned counsel, from restructuring negotiations.  Both before and after the commencement of these chapter 11 cases, the Indenture Trustee's counsel and financial advisor made several attempts to engage the Debtors on restructuring proposals to no avail.  *See* Snyder Decl. (as defined below) at ¶ 9.

KL2 2846150.12

consideration, on top of the benefits that will be made available to the holders that opt in to the

1st and EFIH 2nd Lien Tender Offers:

- A greatly enhanced distribution on its Legacy Notes – which could be worth $116 million or more – obtained by virtue of EFIH's agreement to cancel the EFH Legacy Notes it holds;

- The right to terminate its support of the RSA if it receives less than 37.15% on its EFH Legacy Notes, unless certain of the EFIH 2nd Lien DIP Commitment Parties exercise a "call option" to buy out Fidelity's Legacy Notes at 37.15% of par plus accrued interest.  In other words, Fidelity can bring down the house of cards unless it gets 37.15% *either* from EFH *or* from other parties to the RSA.  The 37.15% payment from EFH is made possible only by EFIH's waiver of its own Legacy Notes. Tellingly, the 37.15% "call option" on Fidelity's EFH Notes appears in the section of the Term Sheet that addresses Fidelity's agreement to settle its Make-Whole Claim at a purported 50%.  An exercise of the "call option' would terminate the "most favored nation" clause with respect to the EFIH 2nd Lien Settlement (described below);

- An option to convert up to $500 million of its aggregate recovery on the EFIH 2nd Lien Settlement into the $5.4 billion first lien debtor-in-possession financing for EFIH (the "**EFIH 1st Lien DIP**") and to receive a purported "commitment fee" equal to 1.75% of the amount it so converts – i.e., up to $8.75 million – even though it has not committed to fund any portion of this DIP facility;

- An option to participate in up to 9% of the EFIH 2nd Lien DIP and to receive a fixed payment of $11.25 million upon the exercise of any of its participation rights under that DIP – i.e., regardless of how much of the EFIH 2nd Lien DIP it actually funds; and

- A "most favored nation" clause, which entitles Fidelity to a higher percentage recovery on its Make-Whole Claim if the Debtors settle with any other EFIH 2nd Lien Noteholder for a higher percentage recovery than that offered in the EFIH 2nd Lien Tender Offer.

### III.    THE EFIH 2ND LIEN TENDER OFFER

16.    On the evening of May 9, 2014, the Debtors commenced solicitation of the

EFIH 2nd Lien Tender Offer.  Under the terms of the EFIH 2nd Lien Tender Offer, holders of

EFIH 2nd Lien Notes have 10 business days (i.e., until May 23 at 5:00 p.m.) to opt into the

tender in order to receive principal, interest and a fixed amount with respect to their Make-Whole

Claim that the Debtors assert is equal to 50% thereof (the "**Total Consideratio**n").  Holders of

EFIH 2nd Lien Notes who opt into the tender between day 10 and day 20 (i.e., between May 23 and June 6) will receive principal, interest and, depending on the composition of their holdings, an amount equal to what the Debtors assert is between 29.7% and 35.0% of the value of their Make-Whole Claim (the "**Step-Down**").   Consummation of the EFIH 2nd Lien Tender Offer is conditioned on Court approval of, among other things, the EFIH 2nd Lien DIP and the EFIH 2nd Lien Settlement.[5]

17.    Holders of EFIH 2nd Lien Notes who do not opt into the EFIH 2nd Lien Tender Offer (i.e., the Non-Participants) will be forced to accept payment of their notes at par plus accrued interest (albeit at a lower interest rate than that being paid to holders that opt into the settlement) from the proceeds of the EFIH 2nd Lien DIP, and the Debtors will litigate with the Non-Participants over whether they are entitled to a make-whole premium or any other amounts due under the Indenture (e.g., the Additional Interest being paid to those holders that opt into the settlement).

18.    Prior to commencement of the EFIH 2nd Lien Tender Offer, counsel for the Indenture Trustee spoke on several occasions with counsel for the Debtors to convey concerns about the EFIH 2nd Lien Settlement and EFIH 2nd Lien Tender Offer – including the disclosure and timing issues – as well as the EFIH 2nd Lien DIP.  Counsel to the Indenture Trustee asked to review the EFIH 2nd Lien Tender Offer materials before the Debtors distributed them to holders, but the Debtors declined to provide copies.  The Debtors did hold a call with counsel to the Indenture Trustee on May 8, 2014, but offered only a very general description of the EFIH 2nd Lien Tender Offer materials, with no specific information on the Step-Down.

---

[5] Despite conditioning consummation of the EFIH 2nd Lien Tender Offer on approval of these orders, as of the filing of this Emergency Motion, the Debtors have not yet filed their motion to approve the EFIH 2nd Lien DIP or their motion to approve the EFIH 2nd Lien Settlement.

Counsel for the Indenture Trustee outlined its proposed corrective disclosure on the May 8 call and provided the Debtors with a one-page corrective disclosure shortly after the May 8 call, but the Debtors declined to add this supplemental disclosure to the EFIH 2nd Lien Tender Offer materials they filed on May 9.

19.    Instead, they responded by adding partial and inadequate disclosure.  Most notably, the tender materials fail to adequately disclose that the principal creditor that has accepted the settlement – Fidelity, which holds approximately 30% of the EFIH 2nd Lien Notes – has been promised premium consideration, not offered to other EFIH 2nd Lien Noteholders, with an aggregate value that cannot be determined without discovery but may exceed $135 million.  The Offer Memorandum conceals Fidelity's enhanced consideration, by (i) making no mention of the most valuable item of value it has been promised (the Legacy Notes Waiver, which may be worth as much as $116 million), and (ii) referring to each of the other premium items separately, without disclosing that they have all been promised to the same party, *i.e.*, Fidelity.[6]

## ARGUMENT

20.    Bankruptcy Code § 363(b) requires a debtor to seek bankruptcy court approval, after notice and a hearing, for its use of estate property outside the ordinary course of business.  A tender offer by a debtor-in-possession for its own debt is anything but an ordinary course transaction; to the contrary, it is a novel technique rarely used in chapter 11.[7]  Moreover,

---

[6] The Debtors take the same "hide the ball" approach with respect to the $1.57 million EFIH 2nd Lien Settlement premium being paid to certain holders of PIK Notes that are sponsors of the Debtors plan, referring to such parties only as "other RSA EFIH Second Lien Note Parties."  *See* Offer Memorandum at second cover page.

[7] The only recent example of which the undersigned counsel are aware occurred in the American Airlines bankruptcy.  There, before commencing their tender offer to purchase certain of certain of their own prepetition secured notes and certificates, the debtors sought and obtained bankruptcy court approval, pursuant to Code § 363(b), to undertake the transaction.  *See* Motion of Debtors for Order Pursuant to 11 U.S.C. §§ 105(a) and 363 and

KL2 2846150.12

when as here this device is used to seek to obtain the consent of creditor classes to key restructuring terms, the need for bankruptcy court supervision is particularly evident.

21.     For these reasons, the Debtors should have sought this Court's approval before commencing the EFIH 2nd Lien Tender Offer.  Their failure to do so should not enable them to avoid judicial review of this transaction, including the adequacy of the Debtors' disclosures, solicitation procedures and timing.  To the contrary, this transaction cries out for judicial review.

## I.     THE TENDER OFFER VIOLATES THE SECURITIES LAWS

### A.  The Tender Offer Materials Are Materially Misleading

22.     Section 14(e) of the Securities Exchange Act of 1934, added as part of the Williams Act, is the federal anti-fraud statute for tender offers and prohibits dissemination of material untrue statements and omission of material facts that make the information contained in the tender offer misleading.  15 U.S.C. § 78n(e).  Remedies for violations of Section 14(e) include curative disclosure, as well as preliminary and permanent injunctions in cases of intentional violations or manipulative acts that cannot be cured through disclosure.  *Koppers Co., Inc. v. Am. Exp. Co.,* 689 F. Supp. 1371, 1382 (W.D. Pa. 1988).

23.     The standard for a material omission under the federal securities laws has been defined as whether "there is a substantial likelihood that a reasonable shareholder would consider it important."  TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976) (addressing proxy solicitation disclosure); *see also Staffin v. Greenberg*, 672 F.2d 1196, 1205 n.10 (3d Cir. 1982) (adopting *TSC Industries* materiality test for Section 14(e) claims).  The Supreme Court

---

Fed. R. Bankr. P. 6004 (i) Authorizing Debtors to Purchase Prepetition Secured Notes and Enhanced Equipment Trust Certificates and (ii) Granting Related Relief, *In re AMR Corp.*, No. 11-15463 (May 23, 2013) [Dkt. No. 8268].

said in *TSC Industries* that an objecting party need not show that reasonable investor would have changed its decision but merely that "disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." 426 U.S. at 449. Moreover, mere disclosure of material facts is not sufficient if done in an obscure manner. *See, e.g.*, *National Home Products, Inc. v. Gray*, 416 F. Supp. 1293, 1315-16 (D. Del. 1976) (finding material defect in proxy statement where information concerning a lawsuit against former president for inventory loss was scattered in different places in 80-page statement so that reasonable shareholder might fail to correlate suit with fact and amount of loss); *see also I. Meyer Pincus & Assoc. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir. 1991) ("Parties will be found to have violated Section 11 [of the Securites Act of 1933] whenever material facts have been omitted or presented in such a way as to obscure or distort their significance.").[8]

### i. The Tender Offer Materials Fail to Adequately Disclose the Enhanced Recovery Promised to Fidelity

24.     The Offer Memorandum states prominently that "holders of approximately 35% of the outstanding aggregate principal amount of EFIH Second Lien Notes" have agreed to accept the EFIH 2nd Lien Settlement. Offer Memorandum at cover page, 18. But the tender materials fail to disclose that the principal such holder – Fidelity, which holds approximately 30% of the EFIH 2nd Lien Notes – has been promised additional consideration with an apparent

---

[8] In the present case, where the Debtors are employing a tender offer to obtain a creditor class's consent to restructuring terms, consideration of the disclosure principles set forth in Bankruptcy Code § 1125 is also appropriate. The disclosure standards under § 1125 are similar to those under the Williams Act. A disclosure statement must contain "adequate information," 11 U.S.C. § 1125(b), which is defined as "information of a kind, and in sufficient detail, as far as is reasonably practicable . . . that would enable . . . a hypothetical investor of the relevant class to make an informed judgment about the plan . . . ," 11 U.S.C. § 1125(a)(1); *see also Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court. Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of 'adequate information.'").

aggregate value in excess of $135 million.  Most glaringly, the tender materials do not mention

that, as a result of EFIH's waiver of its right to a distribution from EFH on account of the EFH

Legacy Notes it holds, Fidelity (which holds two-thirds of the Legacy Notes not held by EFIH)

will receive a greatly increased recovery from EFH – at least $116 million in additional value,

assuming Fidelity receives the 37.15% recovery on the Legacy Notes for which it bargained, *see*

Term Sheet at 25 (a condition to Debtors' restructuring is that "holders of EFH Non-Guaranteed

Notes [including EFH Legacy Notes] shall have received not less than 37.15% on account of

such Claim under the Plan").[9]

25.     The EFIH 2nd Lien Tender Offer materials also fail to note that Fidelity

will be receiving several additional sorts of premium consideration as well – namely:

- A purported "commitment fee" of up to $8.75 million under the EFIH 1st Lien DIP – i.e., 1.75% on up to $500 million of its EFIH 2nd Lien Notes that it rolls into the EFIH 1st Lien DIP (even though it has not committed to fund any portion of that facility);

- A fixed $11.25 million payment upon exercise of any of its participation rights under the EFIH 2nd Lien DIP (even if it exercises the participation rights for only a de minimis amount of the facility); and

- A "most favored nations" clause, which entitles Fidelity to a higher percentage recovery on its Make-Whole Claim if the Debtors settle with any other EFIH 2nd

---

[9] For Legacy Note holders to receive a 37.15% distribution after the Legacy Notes Waiver, the total distribution on account of EFH Legacy Notes must total at least $240 million (i.e., 37.15% of the $647 million of outstanding EFH Legacy Notes held by parties other than EFIH).  Fidelity, which holds 72.8% of the non-EFIH held notes, would receive $175 million of this $240 million.  If EFIH had not waived recovery under its EFH Legacy Notes, Fidelity would only receive 24.4% of the total $240 million distribution, or $59 million.  Thus, Fidelity is receiving an additional $116 million as a result of the Legacy Notes Waiver.  (This calculation gives no consideration to the additional value that Fidelity may receive from the equity conversion as a result of the Legacy Notes Waiver.)

We understand the Debtors may argue that EFIH received valuable consideration in exchange for its waiver of any recovery on its EFH Legacy Notes – namely, the EFH's assignment to EFIH of its right to receive payments under the Oncor Tax Sharing Agreement.  This argument is unfounded:  Under a separate tax sharing agreement (the so-called 2012 TSA), EFH is obligated to pay EFIH for the use of EFIH's interest deductions – and EFH needs to use those deductions, during this case, to implement its settlement with the TCEH banks.  Thus, EFIH will receive the benefit of most, if not substantially all, of the Oncor tax payments during the chapter 11 case whether or not it receives the Oncor Tax Sharing agreement.  EFIH's net benefit from receiving the Oncor Tax Sharing Agreement therefore appears to be de minimis – and certainly much less than the value EFIH is giving up through the waiver of its EFH Legacy Notes.

Lien Noteholder for a higher percentage recovery than that offered in the EFIH 2nd Lien Tender Offer.

For these three items (unlike for the Legacy Notes Waiver), the EFIH 2nd Lien Tender Offer materials do note that each item will be received by "an RSA EFIH Second Lien Note Party," whose identity is not disclosed.  In fact, the party that will be receiving each of these additional sorts of consideration is Fidelity.  These additional items boost Fidelity's aggregate premium to more than $135 million – a material fact for creditors considering whether to accept a make-whole settlement that does not include this additional value.

26.    Moreover, the Term Sheet itself directly links the most valuable premium consideration that Fidelity will be receiving – the Legacy Notes Waiver – to Fidelity's agreement to settle its Make-Whole Claims.  The 37.15% "call option" on Fidelity's EFH Notes appears in the section of the Term Sheet that addresses Fidelity's agreement to settle its Make-Whole Claim at a purported 50%.  Term Sheet at 8.  Moreover, the Term Sheet expressly provides that Fidelity's "most favored nation" provision, entitling it to the benefit of any more favorable make-whole settlement, will terminate if and when one of the parties to the RSA exercises its "call right" to buy Fidelity's EFH Unsecured Notes.  Put another way, Fidelity has agreed to forego a valuable portion of its EFIH 2nd Lien Settlement premium once it receives a payment on account of its EFH Legacy Notes.

27.    The enhanced consideration that Fidelity will be receiving would be material even if the Debtors were not touting Fidelity's purported acceptance of a "50%" settlement.  Payment of premiums in tender offers is information that should generally be disclosed.  *Valente v. PepsiCo, Inc.,* 454 F. Supp. 1228, 1244-45 (D. Del. 1978).  In *Valente,* the Delaware District Court held that there was an issue of fact whether the premium paid to certain shareholders was material and whether disclosures on the amount and purpose of the

premium were inadequate. *Id.* at n.26. The court noted that "a reasonable shareholder might have considered the payments to the option holders to be unfair preferential treatment, which should have been matched by an increase in the tender offer price, and that such a consideration might have assumed importance in his decision." *Id.* at 1244-45.

28.     While the Indenture Trustee believes the additional value that Fidelity will be receiving on account of its agreement to the Make-Whole Settlement is clear, the Debtors dispute that any of this additional value is being paid on account of that settlement. Discovery therefore will be needed to confirm that these items were agreed to as a *quid pro quo* for Fidelity's agreement.   To that end, counsel to the Indenture Trustee on May 5, 2014 served narrowly-targeted informal discovery requests on advisors to the Debtors, certain of the holders of PIK Notes, Fidelity, and the equity owners of EFH seeking information about the negotiation of the RSA and the other plan restructuring documents, as well as all drafts of the RSA and any plan restructuring document. Counsel asked that the parties substantially complete discovery no less than three weeks before the hearing on the EFIH 2nd Lien DIP motion (currently May 15). As of the date of the filing of this Emergency Motion, no production has occurred. The completion of this discovery should significantly aid in determining the facts that will need to be disclosed by the Debtors.

      **ii.**     **Additional Disclosure Defects**

29.     The Tender Offer materials make other material omissions that would impact a noteholder's decision whether to participate in the settlement.

30.     *First,* while the Debtors publicly announced that tendering EFIH 2nd Lien Noteholders would receive 50% of their Make-Whole Claims and the RSA provides for a 50% settlement, the Offer Memorandum only provides dollar amounts: that those non-RSA signatories who participate will receive $1,123.22 per $1,000 for the 11% EFIH 2nd Lien Notes

and $1,166.22 per $1,000 for the 11.75% EFIH 2nd Lien Notes.  The Debtors should be required to clearly set forth their calculations.  Without additional information as to these calculations, the EFIH 2nd Lien Noteholders cannot evaluate the adequacy of the settlement.  Furthermore, the Indenture Trustee submits that the proposed settlement is less than 50% because the Debtors' appear to have improperly excluded the Additional Interest payable under the registration rights agreement in calculating the Make-Whole Claims and the related settlements.

31.     *Second,* the EFIH 2nd Tender Offer materials do not adequately disclose the extent of the risk that the June 11, 2014 Settlement Date for the EFIH 2nd Lien Tender Offer may be delayed – perhaps substantially – after holders have tendered their notes.  Consummation of the EFIH 2nd Lien Tender Offer requires Court approval of multiple motions: the 1st Lien Settlement, the EFIH 1st Lien DIP, the EFIH 2nd Lien Settlement, and the EFIH 2nd Lien DIP.  The Indenture Trustee has serious concerns with these motions, including the appropriateness of the enhanced distributions being offered to Fidelity under the EFIH 2nd Lien Settlement, the extent to which the EFIH 2nd Lien DIP will prime EFIH 2nd Lien noteholders' Make-Whole Claims and whether the EFIH 2nd Lien noteholders are adequately protected, and the existence of an alternative EFIH 2nd Lien DIP proposal that was offered to the Debtors at better rates than the current EFIH 2nd Lien DIP.  *See* Declaration of Todd R. Snyder (hereinafter "**Snyder Decl.**") (attached hereto as **Exhibit B**) at ¶ 10.  These issues require evidentiary hearings; understanding the true nature of Fidelity's recovery requires discovery, *see id.* at ¶ 15, and the presentation of facts gleaned through discovery, while determining adequate protection frequently requires expert testimony and protracted valuation fights.

32.     In addition to these risks of delay, there is a new risk that surfaced only yesterday.  The indenture trustee for the EFIH 1st Lien Notes (the "**1st Lien Indenture Trustee**")

has filed a preliminary objection [Dkt. No. 421] to the EFIH 1st Lien DIP Motion arguing that, pursuant to the Collateral Trust Agreement, the Debtors are currently prohibited from using the proceeds of the Debtors' financings to redeem the EFIH 2nd Lien Notes until the 1st Lien Notes are paid in full (including until there has been a determination of the 1st Lien make-whole claim).  While the Indenture Trustee reserves all rights with respect to this issue, the Debtors' tender offer now contains an additional – and completely undisclosed – risk: that even if the Court were to approve the EFIH 2nd Lien Settlement, EFIH 2nd Lien Noteholders that accept the tender offer may be forced to wait for an indefinite period of time to actually receive their consideration under the EFIH 2nd Lien Settlement.

33.    *Third*, the Tender Offer materials do not adequately disclose how little time holders will have to consider the full ramifications of the Tender Offer itself.  The Tender Offer incorporates by reference filings made with the Bankruptcy Court, and these pleadings are "an important part of this Offer to Purchase."  Offer Memorandum at xi.  Yet the Tender Offer was launched before many of these important documents – including the EFIH 2nd Lien DIP motion, the motion for approval of the EFIH 1st Lien and EFIH 2nd Lien Settlements, and the motion to assume the RSA – were filed.  On May 13, 2014, the Debtors filed an 8-K notifying parties about amendments to the RSA.  One of these amendments extends the deadline for the Debtors to file the aforementioned motions until May 15 – only 6 business days before the early tender deadline.  As discussed below, most holders will likely have to make a decision on whether to tender a few days in advance of the deadline, giving holders only a few days to review these "important" documents.  Any revision of the Tender Offer materials should notify holders as to how little time they will have to make an informed decision.

**B.  The Structure of the Tender Offer Is Illusory**

34.    The Offer Memorandum states that "notwithstanding any other provisions of the Offer, the Company has the right, in its sole discretion, to terminate the Offer at any time and for any reason to the extent it is legally permitted to do so."  *See* Offer Memorandum at 31; *see also id.* at cover page, iii, 2, 12, 25.  It also says that the Debtors have "the right to extend the Offer from time to time and intend to extend the Offer if necessary in order to enable the EFIH Second Lien Settlement to be heard and approved by the Bankruptcy Court. As a result of the foregoing, [holders] will not be able to transfer any EFIH Second Lien Notes that have been tendered into the Offer if [they] choose to participate in the Offer."  *Id.* at 21.  The right to terminate the Tender Offer in the Debtors' sole discretion renders the tender offer illusory and in likely violation of Section 14(e).

35.    Section 14(e) provides that "[i]t shall be unlawful for any person to . . . engage in any fraudulent, deceptive or manipulative acts or practices, in connection with any tender offer."   The Securities and Exchange Commission and its staff have consistently challenged tender offers that may be terminated for any reason as being inconsistent with Section 14(e). As the Commission said in Securities Exchange Act Release No. 34-43069, "If the conditions [of a tender offer] are not objective and are within the bidder's control (e.g., the offer may be terminated for any reason or may be extended indefinitely), we believe the offer would be illusory and may constitute a 'fraudulent, deceptive or manipulative' practice within the meaning of Section 14(e)"[10]

---

[10]    The staff of the Commission has likewise articulated this position in numerous comment letters. *See, e.g., The Strategic Hotels & Resorts, Inc.*, SEC Comment Letter (May 19, 2010) ("[T]he ability of the offeror to terminate the offer it its sole discretion . . . creates the implication that the offeror may conduct an illusory offer in potential contravention of Section 14(e)."); *Google Inc.,* SEC Comment Letter (February 13, 2009) ("[L]anguage suggesting that your board in its 'sole discretion' may terminate the offer for any reason at any time makes your offer an illusory offer and therefore, in contravention of Section 14(e) of the Exchange Act."); *PSB Holdings, Inc.*, SEC Comment Letter (May 23, 2006) ("The right to indiscriminately terminate the offer appears to be so broad as to render the offer illusory."); *Scientific Games Corporation,* SEC Comment Letter (August 1, 2011) ("Reserving the right to ['withdraw' an existing offer at will] renders this an impermissible illusory offer.")

36.     The Debtors' reservation of the right to terminate the tender offer in their sole discretion is precisely the type of unfettered discretion to which the federal securities regulators have consistently and rightfully objected.  While giving the impression of a firm offer subject to stated conditions, in fact the Debtors' offer is illusory and may be pulled back at any time and for any reason.  Additionally, holders cannot withdraw their notes after they have tendered them.  *See* Offer Memorandum at cover page ("Tenders of EFIH Second Lien Notes may not be withdrawn, except in certain limited circumstances where withdrawal rights are required by law.").  Thus, after a holder of EIFH EFIH 2nd Lien Notes has tendered and potentially locked up his investment for an extended period – as the Debtors acknowledge (*see* Offer Memorandum at 21) – the Debtors can simply walk away from the Tender Offer.  Insertion of a qualification of legality ("to the extent it is legally permitted to do so") in these circumstances does not cure the offending retention of absolute discretion. [11]  To the contrary, it implies that this retention of discretion to terminate is generally in compliance with law, when in fact the contrary is true.

37.     Even more troublingly, the Debtors have the "right to extend the Offer from time to time and intend to extend the Offer if necessary in order to enable the EFIH Second Lien Settlement to be heard and approved by the Bankruptcy Court. As a result of the foregoing, [holders] will not be able to transfer any EFIH Second Lien Notes that have been tendered into the Offer if [they] choose to participate in the Offer."  *Id.* at 21.  The risk of delay to consummation of the Tender Offer is greater than in a usual tender offer case because the

---

[11]   *See, e.g., Blair Corporation,* SEC Comment Letter (July 20, 2005) ("You disclose throughout your document that you 'can terminate the offer in your sole discretion, subject to applicable law.' . . . [T]his language seems to inappropriately imply that you may terminate the offer at will, in your sole discretion, and for any reason. This implies an impermissible illusory offer.")

KL2 2846150.12

Debtors are subject to the bankruptcy process, potentially creating a tender offer that "may be extended indefinitely" in potential violation of the Securities Rules.

38.    In normal circumstances, a tender offer without withdrawal rights may be acceptable because such offers are usually open for a limited period of time.  Outside of the bankruptcy process, a company seeking to make a tender offer has the incentive to close the offer quickly and few impediments blocking its ability to do so.  The company can proceed at its own speed.  In bankruptcy, consummation of the tender offer is subject to court approval.  In this case, the Debtors must obtain approval for both the EFIH 2nd Lien Settlement and the EFIH 2nd Lien DIP – but the Debtors have not yet even filed motions seeking approval of either this settlement or this DIP.

39.    Even if these motions are filed shortly, it is not yet clear when they will be heard.  The Court has already indicated that, at the May 22 status conference, it will consider whether it is appropriate for these motions to be heard at the scheduled June 5 hearing or instead at a later date.  Hr'g Tr. at 117:8-9 (May 2, 2014) (excerpts of which are attached hereto as **Exhibit D**).  This would be appropriate, given the significant discovery and testimony that may be needed in connection with these motions.  In the event the Debtors seek to prime the EFIH 2nd Lien Make-Whole Claim behind $7.3 billion of debt, a contested valuation hearing may be needed to determine whether that claim is adequately protected.  Indeed, the Indenture Trustee and a group of EFIH 2nd Lien Noteholders have already registered their objection to the DIP on these grounds.  *See* Preliminary Objection of EFIH 2nd Lien Notes Indenture Trustee and Certain Noteholders to Motion for Interim Order Scheduling Final Hearing on Post-Petition Financings [Dkt. No. 188] at ¶ 5.  Additionally, the Indenture Trustee understands that certain holders of EFIH 2nd Lien Notes are in discussions with the Debtors regarding an alternative DIP

they are willing to provide with terms that they believe are significantly more competitive than the current EFIH 2nd Lien DIP's terms. If the Debtors decline to accept this alternative DIP, the holders are likely to argue that the existing EFIH 2nd Lien DIP is not in the best interests of the estate, which could further delay consummation of the Tender Offer.[12]

40.     Other than certain boilerplate disclosures regarding the ability of the Debtors to extend the offer and the inability to withdraw, the Debtors do not provide full and fair disclosure of the reasons that such extension is likely, the potentially lengthy period of the extension and the prospect that after a lengthy extension and lockup of the tendered notes, the offer may be terminated.[13]  This is the precisely type of "fraudulent, deceptive or manipulative practice" against which Section 14(e) was intended to protect.

## II.    THE TENDER OFFER GIVES CREDITORS INSUFFICIENT TIME TO EVALUATE THE PROPOSED SETTLEMENT

41.     The EFIH 2nd Lien Tender Offer requires holders to make a critical business decision – whether or not to accept a settlement of the more than $700 million of Make-Whole Claims for only "50%" of their asserted value – on an extremely and unnecessarily compressed timeframe, namely, within 10 business days after the offer's commencement.  In fact, creditors will have substantially less than 10 business days to make their decision.  Due to logistical delays in the transmission of tender documents to beneficial holders (at the front end of the process), as well as the time demanded by many institutions to transmit holders' tender

---

[12] In addition to the Tender Offer materials' other failures of disclosure, the Tender Offer materials do not adequately disclose the extent of the risk that the June 11, 2014 Settlement Date for the EFIH 2nd Lien Tender Offer may be delayed, perhaps substantially, for the reasons discussed above.

[13] Ordinarily, because there are no withdrawal rights, holders who desire to retain control over and the ability to transfer their notes would wait until the end of the offer period to tender their notes.  In this case, however, failure to tender during the first 10 business days of the offer will result in the forfeiture of the early participation payment.  It is therefore especially important that full and fair disclosure be made to noteholders so that they can carefully weigh the consequences of their decision to tender. *See Rondeau v. Mosinee PaperCorp.*, 422 U.S. 49, 58 (1975) ("The purpose of the Williams Act . . . is to insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information."), *cited in Schreiber v. Burlington N.*, 472 U.S. 1, 8 (1985).

instructions (at the back end of the process), many creditors will have only a few days to review the tender materials and decide whether or not to tender.

### A. Holders Should Be Given at Least 20 Business Days From the Resolicitation Date to Accept the Total Tender Offer Consideration

42.     Although the EFIH 2nd Lien Tender Offer does not expire until 20 business days after the offer's commencement, holders that do not tender within 10 business days receive significantly reduced tender offer consideration – specifically, a recovery of between 29.7% and 35%, rather than "50%", of their Make-Whole Claim.[14]  Consequently, any holder that wishes to receive the full tender offer consideration is effectively forced to make its decision within 10, rather than 20, business days.  To ensure that holders have an adequate time to consider the offer, the Court should require the Debtors to give holders at least 20 business days to tender and receive the full tender offer consideration.

43.     While not directly applicable, bankruptcy rules and practice are instructive.  Bankruptcy Rule 3017(c) provides that, prior to approving a disclosure statement, the court must fix a time "within which the holders of claims and interests may accept or reject the plan." Although Rule 3017(c) does not specify the time required for consideration of a plan, courts in this District typically provide creditors and interest holders at least as much time to vote on a plan as Rule 2002(b) requires for consideration of whether to object to a plan – i.e., 28 days. *See, e.g.*, *In re FAH Liquidating Corp. f/k/a Fisker Automotive Holdings, Inc.*, No. 13-13087 (KG) (Bankr. D. Del. Dec. 10, 2013) (providing 35 days from service of solicitation package to deadline to vote on plan); *In re Pipeline Data Inc.*, No. 12-13123 (KJC) (Bankr. D. Del. Aug. 8, 2013) (providing at least 28 days to vote on plan); *In re Conexant Sys., Inc.*, No. 13-10367

---

[14] At the first day hearing, when the Debtors described to the Court that the "50%" settlement was going to be made available to all EFIH 2nd Lien Noteholders for 20 business days, they made no mention of the fact that holders would only have (at most) 10 business days to make a decision that would give them the actual "50%".

(MFW) (Bankr. D. Del. Apr. 19, 2013) (providing 29 days to vote on plan); *In re Neb. Book Co.*, No. 11-12005 (PJW) (Bankr. D. Del. Apr. 12, 2012) (providing 34 days to vote on plan); *In re Appleseed's Intermediate Holdings, LLC*, No. 11-10160 (KG) (Bankr. D. Del. Mar. 1, 2011) (providing 32 days to vote on plan); *In re OTC Holdings Corp.*, No. 10-12636 (BLS) (Bankr. D. Del. Nov. 1, 2010) (providing 28 days to vote on plan).

44.    Although the Debtors here are not soliciting a plan, they are asking holders to make a major economic decision that directly impacts recoveries – similar to voting on a plan of reorganization.  There is no valid reason to deprive holders of a reasonable amount of time to make this important decision.  Notably, a 20 business day resolicitation period will not interfere with the Debtors' overall restructuring timeline.  The RSA does not contain a milestone for completion of the tender offer; it provides only that an order be entered approving the EFIH 2nd Lien Settlement within 75 days of the Petition Date (i.e., by July 13), and that the Debtors consummate the transactions contemplated by the EFIH 2nd Lien DIP within 5 business days of entry of such order (i.e., by July 18).  Resolicitation as proposed herein would enable the EFIH 2nd Lien Tender Offer to be consummated before those dates.

**B. Delays in Transmitting Tender Materials and Tender Instructions Are Unavoidable**

45.    The Debtors do not describe how the Tender Offer materials are being transmitted to beneficial holders.  Based on market practice, however, it is likely that days will elapse before materials to reach beneficial holders, and the timing for this is uncertain and subject to variation.  For example, from the time materials are delivered to Broadridge or a similar investor communication service, a significant number of days typically elapses before the materials are actually received by the beneficial holders.  As a result, beneficial holders may not

receive the tender offer materials until just a few days before the expiration of the 10-business-days early tender period.[15]

46.    In addition, many – if not most – of the creditors that decide to tender will need to make that decision significantly in advance of the early tender deadline.  The institutions holding creditors' bonds generally require beneficial holders to notify them two to three business days in advance of the deadline to ensure that tenders are received in timely fashion.  *See* Snyder Decl. at ¶ 11.  In particular, holders often hold their securities at brokers who may lend the securities out.  When holders wish to tender their securities, the brokers may have to "buy them back", which usually takes three business days.  This underscores the need to provide at least 20 business days between the resolicitation date and the early tender deadline.

## III.    THE DEBTORS ARE ATTEMPTING AN END RUN AROUND THE CREDITOR PROTECTIONS OF THE BANKRUPTCY CODE

47.    The Debtors are employing a novel device to restructure their debt:  the use of a tender offer to attempt to obtain the consent of creditor classes to key restructuring terms.  While the provisions of the Bankruptcy Code applicable to plans of reorganization do not apply directly to the Debtors' actions, close scrutiny is nevertheless warranted to ensure that the Debtors do not violate important bankruptcy principles.

### A.    The EFIH 2nd Lien Settlement Violates Section 1123(a)(4) of the Bankruptcy Code

---

[15] The Tender Offer materials themselves consist of some 55 pages.  The materials incorporate by reference EFIH's Annual Report on Form 10-K for the year ended December 31, 2014, which runs almost 100 pages, and the EFIH Annual Report on Form 10-Q, which runs some 40 additional pages.  Moreover, the materials make repeated reference to the RSA, which together with its exhibits and term sheets runs to over 234 pages.  The Tender Offer materials also purport to incorporate the voluminous materials filed with the Bankruptcy Court, and the offering materials admonish, "The information incorporated by reference is an important part of this Offer to Purchase."  *Offering Memorandum* at xi.  No investor should be required to read and digest these materials in the very limited time the Debtors have provided.  Under the federal proxy rules – which do not apply to the EFIH 2nd Lien Tender Offer but are nonetheless instructive by analogy in this context of an exceedingly complex financial restructuring – where documents are incorporated by reference, at least 20 business days must generally elapse from the time materials are sent out until action may be taken.  *See* Instruction D.3 to Schedule 14A.

48.     The Second and Fifth Circuit Courts of Appeal have held that, in a Chapter 11 case, settlement payments made prior to confirmation of a plan must be evaluated to determine if they comply with the requirements for plan confirmation.  *See In re Iridium*, 478 F. 3d 452, 455 (2d Cir. 2007) (holding that "in the Chapter 11 context, whether a pre-plan settlement's distribution plan complies with the Bankruptcy Code's priority scheme will be the most important factor for a bankruptcy court to consider in approving a settlement under Bankruptcy Rule 9019.  In most cases, it will be dispositive."); *see also United States v. AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293, 298 (5th Cir. 1984) (holding that a bankruptcy court abuses its discretion when it approves a settlement which violates the absolute priority rule).

49.     The EFIH 2nd Lien Settlement violates the Bankruptcy Code's prohibition of discrimination among members of a class.  The premium recoveries provided to Fidelity and certain holders of PIK Notes, as compared to other EFIH 2nd Lien Noteholders, violate Section 1123(a)(4) of the Bankruptcy Code, which requires that all members of a given class receive the same treatment.  As described above, Fidelity is receiving side payments that may exceed $135 million in addition to "50%" of their Make-Whole Claim, whereas other EFIH 2nd Lien Noteholders are only being offered "50%".  *See, e.g.*, *In re Finova Group., Inc.*, 304 B.R. 630, 637 (D. Del. 2004) (holding that to provide utilization fees as a component of interest to some appellee lenders but not to others "would be to ignore the economic realities of their Credit Agreements, elevate form over substance and violate the equal treatment mandate of Section 1123(a)(4)").

50.     While it is of course permissible to offer creditors a settlement to avoid litigation, it is a violation of Section 1123(a)(4) if all creditors within the class do not have the

"same opportunity to receive equal treatment."  *See In re Wash. Mut.,* 442 BR 314, 355-56 (Bankr. D. Del. 2011) (plan provision that gave different distributions to creditors that gave releases did not violate Section 1123(a)(4) because all creditors within the class were offered the same settlement opportunity).  Given that Fidelity will be receiving significant additional consideration not available to any other EFIH 2nd Lien Noteholder – including the "most favored nation" provision that ensures Fidelity gets the benefit of any higher settlements – it is clear that other EFIH 2nd Lien Noteholders have not been given the same opportunity as Fidelity.[16]

51.    Section 1123(a)(4) "guarantees that each class member will be treated equally, regardless of how it votes on a proposed plan." *ACC Bondholder Group v. Adelphia Commc'n Corp. (In re Adelphia Commc'n Corp.)*, 361 B.R. 337, 363 (S.D.N.Y. 2007).  As noted by the *Adelphia* court, "Where the receipt of valuable benefits is conditioned on a vote to accept *that plan*, there is a very real possibility of dissuading or silencing opposition to the plan" which is "the spirit of section 1123(a)(4) and what it seeks to protect."  *Id* at 363-364. The Debtors' tender offer (in which the determination whether or not to tender is the equivalent of deciding whether or not to vote on a plan), whereby (i) holders are compelled to make a decision on a shortened timeframe (as discussed above), (ii) holders that are unable to tender in such timeframe (i.e., the Early Participation Date) will receive a smaller distribution even if they do tender before the expiration deadline, is clearly structured to compel holders to vote in favor of the settlement (i.e., tender their bonds) by providing those that tender with benefits that will not

---

[16] Moreover, even if it could be said that holders that opt in to the EFIH 2nd Lien Tender Offer might have thereby waived their right to equal treatment by agreeing to take less than Fidelity, at minimum any such waiver would have to rest on full and fair disclosure of the additional value that Fidelity is receiving.  The holders cannot be said to have "agreed to take less" than Fidelity without knowing how much "less" they are receiving.

KL2 2846150.12

be available to those that do not.  As noted below, the EFIH 2nd Lien Tender Offer is similar to "vote buying" since the Debtors are buying not only notes but each tendering holder's agreement not to oppose several proposed settlements.

### B.  The EFIH 2nd Lien Settlement Impermissibly Strips Creditors of Rights in Other Classes

52.    The tender offer materials purport to require participants in the EFIH 2nd Lien Tender Offer to give up rights with regard to any EFIH 1st Lien Notes they hold.  *See* Offer Memorandum at 28 ("[T]he Holder, by tendering its EFIH Second Lien Notes in the Offer agrees . . . that it will not, directly or indirectly, object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the EFIH First Lien Settlement, the EFIH Second Lien Settlement, the EFIH First Lien DIP Facility or the EFIH Second Lien DIP Notes Financing in the Bankruptcy Court or otherwise . . . .").[17]  While the Debtors have a legitimate interest in requiring participants in the EFIH 2nd Lien Tender Offer to consent to the EFIH 2nd Lien Settlement and the EFIH 2nd Lien DIP, both of which are conditions to consummation of the EFIH 2nd Lien Tender Offer, it is not proper to condition participation in this tender offer on a holder's relinquishment of its rights with respect to any EFIH *1st Lien* Notes it may hold.  The 1st Lien Settlement and the EFIH 2nd Lien Settlement are separate and distinct, and a creditor should not be required to agree to both in order to accept one.

### Reservation of Rights

53.    The Indenture Trustee reserves all of its rights with regard to the ultimate approval of the RSA, the 1st Lien Settlement, EFIH 2nd Lien Settlement, the EFIH 1st Lien DIP and the EFIH 2nd Lien DIP and any other restructuring documents.

---

[17] Similar language appears in the Offer Memorandum for the 1st Lien Tender Offer.  *See* Exhibit A to Notice of Initiation of EFIH 1st Lien Opt-In Period [Dkt. No. 363] at 39.

**Notice**

54.      Notice of this Emergency Motion shall be provided to (a) the Debtors, (b) Fidelity, (c) the Office of the U.S. Trustee for the District of Delaware and (c) all other parties who have filed a notice of appearance pursuant to Rule 2002.

**No Prior Request**

55.      No prior request for the relief sought in this Emergency Motion has been made to this or any other court.

56.      WHEREFORE, the Indenture Trustee respectfully requests that that Court enter an order, substantially in the form attached hereto as **Exhibit A**, (1) setting June 6, 2014 as a hearing on the procedures and adequacy of the disclosures; (2) directing the Debtors to extend the "50%" settlement offer deadline for tendering EFIH 2nd Lien Notes to ***the later of*** (a) June 12, 2014 or (b) if the Court orders the Debtors to change their tender offer procedures or to make additional disclosures, a date 20 business days after the Debtors make such changes or additional disclosures; and (3) granting such other and further relief as is appropriate under the circumstances.

Dated: May 14, 2014                     PACHULSKI STANG ZIEHL & JONES LLP

                                       */s/ Laura Davis Jones*
                                       Laura Davis Jones
                                       (Bar No. 2436)
                                       Robert J. Feinstein
                                       (NY Bar No. RF-2836)
                                       919 N. Market Street, 17th Floor
                                       P.O. Box 8705
                                       Wilmington, DE  19899-8705 (Courier 19801)
                                       Telephone:  (302) 652-4100
                                       Facsimile:  (302) 652-4400
                                       Email: ljones@ pszjlaw.com
                                               rfeinstein@ pszjlaw.com

*- and -*


KRAMER   LEVIN   NAFTALIS   &   FRANKEL   LLP
Thomas Moers Mayer
Philip Bentley
Joshua K. Brody
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 715-9100
Facsimile:   (212) 715-8000
Email: tmayer@kramerlevin.com
         pbentley@kramerlevin.com
         jbrody@kramerlevin.com

*- and -*

BRYAN CAVE LLP

Stephanie Wickouski
1290 Avenue of the Americas
New York, New York 10104-3300
Tel: 212-541-1114
Fax: 212-904-0514
Email: stephanie.wickouski@bryancave.com

*Counsel to the Indenture Trustee*