## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | Case No. 14-10979 (CSS) |
| Debtors. | (Jointly Administered) |
|  | **Objection Deadline: May 29, 2014 at 4:00 p.m** |
|  | **Hearing Date: June 5, 2014 at 9:30 a.m.** |

## MOTION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*, FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO (A) PAY CERTAIN PREPETITION AMOUNTS ON ACCOUNT OF NON-INSIDER COMPENSATION PROGRAMS AND (B) CONTINUE THE NON-INSIDER COMPENSATION PROGRAMS IN THE ORDINARY COURSE OF BUSINESS ON A POSTPETITION BASIS

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file

this motion (this "Motion") for entry of an order, substantially in the form attached hereto as

**Exhibit A** (the "Order"), authorizing the Debtors to: (a) pay certain prepetition amounts owed

on account of the Debtors' Non-Insider Compensation Programs (as defined herein), and

(b) continue the Non-Insider Compensation Programs in the ordinary course of business on a

postpetition basis.[2]  In support of this Motion, the Debtors respectfully submit the declarations of

Doug Friske, Managing Director of Executive Compensation at Towers Watson (the "Friske

Declaration) and Paul Keglevic, Executive Vice President, Chief Financial Officer, and Co-Chief

---

[1]   The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted on an interim basis, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

[2]   Any incentive payments to "insiders" under the Debtors' incentive compensation programs will be the subject of a separate motion.

Restructuring Officer of Energy Future Holdings Corp. (the "<u>Keglevic Declaration</u>").  In further

support of this Motion, the Debtors respectfully state as follows.

<u>**Preliminary Statement**</u>

1.      The Debtors' approximately 5,700 employees are at the heart of the Debtors'

business and vital to their operations.  At this critical juncture in the chapter 11 restructuring

process, maintaining employee support and focus is necessary to stabilize and continue safe,

reliable operations while implementing a successful reorganization that maximizes value for all

of the Debtors' stakeholders.  This Motion seeks the approval of both discretionary incentive

compensation programs that will encourage and reward exceptional performance and retention

bonus programs for non-insiders—rank-and-file employees as well as management, all of whom

are non-insiders—in order to help ensure that the Debtors motivate key employees during this

challenging time (collectively, the "<u>Non-Insider Compensation Programs</u>").[3]    There is

approximately $8.9 million under the Non-Insider Compensation Programs that has been earned

and is payable between now and September 2014.  If all of the various incentive thresholds are

met under the Non-Insider Compensation Programs, the Debtors estimate that up to

approximately $100 million[4] would potentially be payable to non-insiders through March 2015,

which payments would be spread across over 5,500 different participants under the various Non-

Insider Compensation Programs.  Of that amount, up to approximately $80 million relates to the

Debtors' annual incentive program, which has an average payment of approximately $15,000 per

participant (and will be paid in 2015 only if the incentive thresholds for 2014 are met).

---

[3]     A general summary of each of the Non-Insider Compensation Programs is attached as **<u>Exhibit B</u>**.

[4]     Estimates for certain of the Non-Insider Compensation Programs are based on 2013 costs.  See **<u>Exhibit B</u>**.

2.     The Debtors originally intended to file a single motion that sought court approval for all of the Debtors' incentive and variable compensation programs, including those involving insiders (as that term is defined in section 101(31) of the Bankruptcy Code).  Given the fact that the first payments under the Non-Insider Compensation Programs need to be authorized by late June, however, the Debtors have bifurcated the comprehensive motion and are seeking relief in this Motion only for rank-and-file and other non-insider employees.  The Debtors will file a separate motion in the future that applies only to insiders.[5]  This approach enables the Debtors to pursue the critical and timely relief related to the compensation programs that apply to the Debtors' rank-and-file and other non-insider employees, while enabling the Court and other constituencies to consider at a later date the Debtors' incentive compensation programs that apply to insiders.

3.     For the reasons discussed herein, the Debtors firmly believe that maintaining the Non-Insider Compensation Programs is necessary and in the best interests of the Debtors and their estates.  As an initial matter, continuing these programs is an ordinary course transaction, as each of these programs has been in place for years; the Debtors merely seek to continue their existence in order to continue to incentivize and motivate non-insider employees.  Regardless, these programs are a proper exercise of the Debtors' business judgment:  the Debtors' ability to continue these ordinary-course programs is critical to demonstrating the Debtors' ongoing commitment to their critical workforce in the face of challenges associated with the Debtors' restructuring and continued market dynamics.  Approval of this Motion will send a clear and positive message to employees that these chapter 11 cases are not a reason to seek alternative

---

[5]     Because this Motion does not seek relief with respect to the Debtors' incentive compensation programs that include insiders, certain payments that may be earned by non-executive management employees who are potential insiders will be delayed.

employment or otherwise doubt the Debtors' commitments to their employees. Instead, these programs will provide motivation and drive value for the benefit of *all* parties in interest.

## Relief Requested

4.       By this Motion, the Debtors seek entry of the Order authorizing, but not directing, the Debtors to (a) pay certain prepetition amounts owed on account of the Debtors' Non-Insider Compensation Programs and (b) continue the Non-Insider Compensation Programs in the ordinary course of business on a postpetition basis except to the extent discussed herein. For the avoidance of doubt, this Motion does not seek any authority to make payments to insiders (as that term is defined in section 101(31) of the Bankruptcy Code) under any of the compensation programs discussed herein.

## Jurisdiction and Venue

5.       The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

6.       Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4

7.     The bases for the relief requested in this Motion are sections 105(a), 363, and 503(c) of title 11 of the United States Code (the "Bankruptcy Code") and rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## Background

8.     On April 29, 2014 (the "Petition Date"), each of the Debtors filed a voluntary petition with the Court under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Court has entered an interim order for joint administration of these chapter 11 cases.  The Court has not appointed a trustee.  The Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") formed an official committee of unsecured creditors in these chapter 11 cases on May 13, 2014 [D.I. 420].  Further information regarding the Debtors' business operations and capital structure is set forth in the First Day Declaration.

**I.       Overview of the Non-Insider Compensation Programs.**

9.     EFH Corp., the direct or indirect Debtor parent of each of the Debtors and their non-Debtor affiliates, and its subsidiaries collectively employ approximately 9,100 employees— 5,700 of whom are employed by Debtor entities.  As is typical for any organization of similar size, scope, and complexity, the Debtors developed the programs that are the subject of this Motion to encourage and reward exceptional employee performance and to ensure that their high-performing work force stays with the company.

10.     The Non-Insider Compensation Programs have always been a critical component of employee compensation, providing substantial benefits and value to the Debtors by aligning employee incentives with the Debtors' business goals.  Although there are a number of Non-

Insider Compensation Programs, each is designed to apply to specific segments of the employee population such that the degree of overlap in employee participation is relatively low.  In fact, going forward, other than the approximately 55 eligible employees who participate in the unique Luminant Commercial Incentive Plan and certain employees who are party to an Individual Retention Agreement, no employees will participate in more than two of the Non-Insider Compensation Programs at any one time.  At a high level, under four of the Non-Insider Compensation Programs (the Annual Incentive Plan, the Executive Annual Incentive Plan, the Luminant Developer Incentive Plan, and the Luminant Commercial Incentive Plan), payments are earned only if the Debtors meet certain ongoing performance thresholds.  The remaining Non-Insider Compensation Programs generally are either classic retention programs (the Key Leader Program and the vast majority of the Individual Bonus Payments) or were vested (in part) when the Debtors met previous performance thresholds (the Owner/Operator Plan).  (*See* **Exhibit B.**)

11.     Importantly, the Non-Insider Compensation Programs include only appropriate management and other rank-and-file employees, none of whom are "insiders" as that term is defined in section 101(31) of the Bankruptcy Code.  None of the participants in these programs are directors or officers of any of the Debtors (as those terms are construed under section 101(31) of the Bankruptcy Code) or are persons in control of the Debtors.  None are members of the Debtors' seven-member Strategy and Policy Committee (the "SPC"), which includes the Debtors' executive management and officers.  None are Executive Vice Presidents.  In fact, very few of the participants in the Non-Insider Compensation Programs even report directly to members of the SPC or Executive Vice Presidents.  Keglevic Declaration ¶¶29-35.

6

II.     **The Non-Insider Compensation Programs.**

A.     **Annual Incentive Plan.**

12.     The Debtors have historically maintained their Annual Incentive Plan for non-insider employees below the level of Vice President.  Approximately 5,500 employees (none of whom are insiders) are eligible to receive an annual payment under the Annual Incentive Plan (the "AIP") if the eligible employee and the Debtors achieve certain performance goals and the eligible employee is employed at the time of the AIP payment.  The Debtors make AIP payments no later than March 15th of the following year.  Amounts are payable under the AIP only if the Debtors hit difficult-to-meet performance metrics (that are discussed in more detail below).

13.     The AIP establishes a target payment (expressed as a percentage of base salary) for eligible employees, which varies according to each participant's level of responsibility (the "AIP Target Payment").  The actual amount of the AIP payment pool is determined by comparing the Debtors' business results against challenging financial and operational metrics, including by way of example, EBITDA, customer retention, cost management, plant and mine operational metrics, and other measures.  Those metrics, in the form of business unit and consolidated scorecards, are presented to and approved by a subset of the EFH board of directors, the Organization & Compensation Committee of the Board (the "O&C Committee").  The metrics for the 2014 AIP were approved by the committee in October of 2013.

14.     Actual payments under the AIP will be calculated at the end of 2014 by taking each employee's AIP Target Payment and modifying it based on two factors:  (a) the Debtors' actual performance relative to the operational and financial performance criteria; and (b) an individual performance modifier for each eligible employee.  The individual performance modifier, which may range from 0% to 150%, is recommended by the applicable business unit's

7

leaders after an extensive performance review and calibration processes across the business units and is ultimately approved by the SPC.  Although in no event can payments under the AIP exceed the pool of available and accrued payment funds determined by the results of the Debtors' actual performance, the individual performance modifier allows for recognition of exceptional performers who may receive greater than 100% of their AIP Target Payments. (Less exceptional performers may receive less than 100% of their AIP Target Payment.)  Payments under the AIP accrue monthly and accruals are adjusted based on business results against the metrics calculated at periodic intervals during the calendar year and again after the close of the calendar year.  Scorecard results and overall payment rates across the business are certified and approved by the O&C Committee.  For the fiscal year ending December 31, 2013, the Debtors paid approximately $70.7 million under the AIP across 5,500 employees.

15.    As of the Petition Date, no amounts are owed on account of the AIP.  The Debtors seek authority to continue the 2014 AIP in the ordinary course of business on a postpetition basis with AIP payments earned in 2014 to be made in 2015 in the ordinary course.

**B.    Executive Annual Incentive Plan as Applicable to Non-Insiders.**

16.    The Debtors have historically maintained their Executive Annual Incentive Plan for approximately 74 employees at or above the level of Vice President (the "EAIP").  The Debtors are excluding from this Motion 21 members of senior management, for whom they will seek approval of the EAIP at a later date, which leaves only non-insider management—Vice Presidents and two Senior Vice Presidents.[6]  Each employee in the program is eligible to receive a bonus equal to a target portion of his or her base salary if—and only if—the Debtors meet

---

[6]    The Debtors are not seeking any relief with respect to the EAIP as it applies to insiders.  No payments will be made under the EAIP to insiders without further order of the Court.

8

difficult-to-satisfy incentive metrics, which vary by business unit based on the employee's role. The metrics, approvals, and administration is identical to the AIP, detailed above.

17.     As of the Petition Date, no amounts are owed on account of the EAIP with respect to non-insiders.   The Debtors seek authority to continue the 2014 EAIP with respect to non-insiders in the ordinary course of business on a postpetition basis with EAIP payments earned in 2014 to be made in 2015 in the ordinary course.

### C.     Owner/Operator Plan.

18.     The Debtors historically have offered an incentive plan to approximately 128 employees that the Debtors believed were critically important to the Debtors' business operations (the "Owner/Operator Plan").[7] Entitlement to the full cash award[8] under the Owner/Operator Plan requires the Debtors to achieve the management EBITDA target for the relevant multi-year performance periods as defined in the scorecard metrics approved by the O&C Committee, which are the same scorecards used in other Non-Insider Compensation Programs.   In addition, eligible employees will not receive a payment of any obligations remaining under the Owner/Operator Plan unless they are employed by the Debtors on the date the Debtors make these payments.

19.     As of January 1, 2014, the Debtors have transitioned eligible non-insider employees under the Owner/Operator Plan to the Key Leader Program, which is discussed below, and therefore will not be continuing the Owner/Operator Plan on a go-forward basis.

---

[7]     On January 1, 2014, eligible non-insider employees transitioned to the Key Leader Program, as discussed more fully below.

[8]     In addition to the cash component described above, each participant in the Owner/Operator Plan also was granted restricted stock units.   The restricted stock units that were granted vest in September 2014.   The restricted stock units were based on the Employee's level in the organization and other key criteria.

9

20.    That said, the Debtors have remaining obligations—to non-insiders alone—under the Owner/Operator Plan that total up to approximately $8.9 million as of the Petition Date, which amount would be reduced by any payments owed to participants who leave the Debtors prior to September 2014.  In particular, the final performance period for the Owner/Operator Plan that spanned 2012 and 2013 ended on December 31, 2013, and the payments under that plan were earned based on the Debtors achieving EBITDA targets for the years in question.  The Debtors are scheduled to make the final payments under the 2012-13 Owner/Operator Plan to non-insiders in September 2014.

21.    Pursuant to this Motion, the Debtors request authority to honor the potential $8.9 million of obligations under the Owner/Operator Plan in the ordinary course of business on a postpetition basis.

**D.    Key Leader Program.**

22.    On January 1, 2014, the Debtors implemented the Key Leader Program (the "Key Leader Program"), which is a modified version of the previously-existing Owner/Operator Plan. The program applies to 155 non-insider employees, most of whom historically participated in the Owner/Operator Plan.  Under the Key Leader Program, each eligible employee's annual award under the Key Leader Program is similar to the annual target previously used in the Owner/Operator Plan (or, for the eligible employees who did not participate in the Owner/Operator Plan, the annual target is based on peer employees and/or role in the organization).  The Debtors will make payments under the Key Leader Program on a quarterly basis so long as the eligible employee is employed by the Debtors at the end of the applicable quarter.   The Debtors expect the annual cost of the Key Leader Program to be up to approximately $5.4 million.

23.     As of the Petition Date, no amounts are owed on account of the Key Leader Program.  The Debtors seek authority to continue the 2014 Key Leader Program in the ordinary course of business on a postpetition basis, including payments due on June 30, 2014.

**E.     Luminant Developer Incentive Plan.**

24.     The Debtors have historically offered an incentive plan to approximately 25 non-insider, full-time employees at Luminant who are eligible based on their contributions to certain commercial transactions that have been designated by specified senior management as business development projects (the "Luminant DIP").

25.     The payments are typically divided based on meeting two types of goals for projects, for example:  (a) the Debtors' execution of an agreement and funding commitment letters for a qualifying business development project and; or (b) when the project is commercially operational and generating revenue.  The specific goals are defined in writing and approved at the outset of each applicable project.

26.     Target awards under the Luminant DIP are based on the amount of additional economic value that the transactions create for the Debtors—*i.e.*, the net present value of the project.  Generally, eligible employees under the Luminant DIP may receive:  (a) 0-75% of their base salary, if the net present value of the associated project is between $0-$49 million; (b) 25-150% of their base salary, if the net present value of the associated project is worth $50-$149 million; or (c) 100-250% of their base salary, if the net present value of the associated project is over $150 million.  No eligible employee may receive more than $300,000 under the Luminant DIP during a calendar year.  For the fiscal year ending December 31, 2013, the Debtors paid approximately $17,000 under the Luminant DIP.

27.    As of the Petition Date, no amounts are owed on account of the Luminant DIP. The Debtors seek authority to continue the 2014 Luminant DIP in the ordinary course of business on a postpetition basis.[9]

**F.    Luminant Commercial Incentive Plan as Applicable to Non-Insiders.**

28.    The Debtors historically have offered a commercial incentive plan to approximately 55 full-time employees at Luminant who are instrumental to the Debtors' trading activities in order to provide for market-based performance incentives commensurate with commodity hedging and trading organizations (the "Luminant CIP").    One participant is a potential insider, but all other participants are non-insiders.[10]    None of the participants in the Luminant CIP are SPC members or Executive Vice Presidents.    The Debtors' trading personnel are frequently recruited by competing organizations, and the industry is sensitive to market compensation changes.    Each year the Debtors' risk management team establishes a pool of available funds based on the aggregate incremental value that Luminant achieves on all commercial trading transactions for that year.[11]    An aggregate funding pool accrues throughout the year based on actual incremental value, and shortly after December 31 of each year, Luminant's financial planning and analysis team determines the pool of available funds. Luminant's Chief Commercial Officer then recommends individual payments for those eligible participants who have contributed to the creation of added value for that year under the Luminant

---

[9]    To the extent any of the transactions are outside of the ordinary course of business, the Debtors will seek approval of the transactions from the Court pursuant to section 363(b) of the Bankruptcy Code.

[10]    The Debtors are not seeking any relief with respect to the Luminant CIP as it applies to this potential insider. No payments will be made under the Luminant CIP to this individual without further order of the Court.

[11]    The discretionary incentive pool is generally tied to the incremental value that Luminant provides on its trading activities, as follows:    (a) approximately 2.0% of all incremental value between $100-$250 million; (b) approximately 4.0% of all incremental value between $250-$325 million; and (c) approximately 7.0% of all incremental value higher than $325 million.

RLF1 10317564v.1

CIP to an award committee (comprising Luminant's CFO, Luminant's CEO, and EFH's EVP of Human Resources), which evaluates the recommendations and approves or modifies payments as appropriate.  The Luminant CEO then determines if a payment to the Chief Commercial Officer is warranted based on the year's performance and makes a recommendation to the other members of the award committee for consideration.  By rewarding participating employees if—and only if—they generate actual, additional incremental value for the Debtors, the Luminant CIP incentivizes the exact type of performance that contributes to the Debtors' bottom-line success.  Any individual payments in excess of $300,000 under the Luminant CIP must be submitted for approval to the O&C Committee.  Employees receive payments under the Luminant CIP no later than March 15th of each year.

29.    For the fiscal year ending December 31, 2013, the Debtors paid approximately $3.35 million under the Luminant CIP.

30.    As of the Petition Date, no amounts are owed on account of the Luminant CIP. The Debtors seek authority to continue the Luminant CIP in the ordinary course of business on a postpetition basis with Luminant CIP payments earned in 2014 to be made in 2015 in the ordinary course.

G.    **Individual Bonus Payments.**

31.    In the ordinary course of business and consistent with both historic and industry-standard practice, the Debtors have historically provided for (a) retention payments under individual agreements to non-insider employees so long as they remain with the Debtors for a specified period of time and continue to perform in a highly effective manner that contributes to the overall success of the Debtors and (b) bonus payments to non-insider employees for

13

obtaining or maintaining critical certifications and licenses that are required to operate the Debtors' nuclear facility (collectively, the "Individual Bonus Payments").

32.     As of the Petition Date, the majority of the potential Individual Bonus Payments relate to 95 individual retention agreements, over 95% of which call for awards to be paid in September 2014 to the extent the participating employees fulfill the requirements set forth in each respective agreement.  Awards under these agreements are calculated according to relevant market data and historical practice.  These types of individual retention agreements are common and consistent with competitive industry practice.  The participating employees are critical to the Debtors' business, and most are not senior enough to participate in the Owner/Operator Plan or the Key Leader Plan.  The Debtors have determined that, in their business judgment, honoring payments under the individual retention agreements is essential to incentivizing these critical non-insider employees to remain with the Debtors during the restructuring.  These employees are highly talented—and frequently sought after by the Debtors' competitors—and it would be difficult, if not impossible, to replace them given the Debtors' present circumstances if they were to seek employment elsewhere.  The payments under the individual retention agreements accrue on a monthly basis, although amounts are not paid until the date set forth in each individual retention agreement.  The average payment under the individual retention agreements is approximately $16,000.

33.     In addition to the potential retention payments, there also are potential certification and licensing bonuses that may come due in the future.  The certification bonuses ($3,000 each) and licensing bonuses ($6,000 each) are paid shortly after the certification or license is obtained/renewed by the nuclear plant personnel.  Historically, certification and

14

licensing bonus payments have been *de minimis*—for example, in 2013, the Debtors paid three certification bonuses (totaling $9,000) and zero licensing bonuses.

34.     As of the Petition Date, no amounts are owed on account of the Individual Bonus Payments.  Pursuant to this Motion, the Debtors request authority to honor the estimated potential $1.6 million of aggregate obligations of Individual Bonus Payments in the ordinary course of business on a postpetition basis.

**III.    Post-2014 Non-Insider Compensation Programs.**

35.     The Debtors have specifically limited the relief requested herein to amounts under the Non-Insider Compensation Programs that pertain to the 2014 performance period or that otherwise will come due in 2014.  The Debtors, however, intend to implement similar Non-Insider Compensation Programs for 2015 and beyond, as the Debtors firmly believe that aligning employee incentives with the financial and operational success of the Debtors' businesses is critical to maximizing the value of the Debtors' estates.  The Debtors will file a supplemental motion seeking approval of post-2014 non-insider compensation programs at a future date when they are able to provide the Court with full disclosure regarding the potential levels of compensation and applicable incentive metrics.

<u>**Basis for Relief**</u>

**I.    The Continuation of the Non-Insider Compensation Programs Constitutes An Ordinary Course Transaction That Is Appropriate Under Section 363 of the Bankruptcy Code.**

36.     As an initial matter, the Non-Insider Compensation Programs should be approved under section 363 of the Bankruptcy Code.  Under that provision, a debtor in possession "may enter into transactions…in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing."  11 U.S.C. § 363(c)(1).  The Non-Insider Compensation Programs here are ordinary course

15

transactions:  the Debtors merely seek to carry forward the same compensation structure and philosophy from their prepetition employee incentive plans.  *See In re Blitz U.S.A. Inc.*, 475 B.R. 209, 215 (Bankr. D. Del. 2012) (approving the continuation of incentive bonus plans under section 363(c)(1) of the Bankruptcy Code where the debtor had maintained the plans for many years prepetition and that an incentive-based bonus plan was common to the industry).  Over the years, those programs have helped ensure that the Debtors' employees strived for top-tier performance and aligned employee incentives with the company's key stakeholders to ensure their focus on, among other things, achieving important financial and operational goals.  The Debtors merely seek to carry forward these or similar programs, each of which have been in place for many years.[12]  Further, the structure and cost of the Non-Insider Compensation Programs are consistent with market practice, including within the Debtors' industry.  Friske Declaration at ¶ 8.  Accordingly, the Court should approve the continuation of the Non-Insider Compensation Programs as an ordinary course transaction.

## II.    The Continuation of the Non-Insider Compensation Programs Also Is Appropriate Under Section 363(b) of the Bankruptcy Code.

37.    Moreover, the Non-Insider Compensation Programs can be approved under the more stringent standard of section 363(b)(1) of the Bankruptcy Code, which provides that a debtor "may use, sell or lease, other than in the ordinary course of business, property of the estate" if the debtor demonstrates a "sound business purpose" for such uses. *See, e.g.*, *In re Martin*, 91 F.3d 389, 395 (3d. Cir. 1996) ("[U]nder normal circumstances the [bankruptcy] court would defer to the trustee's [or debtor-in-possession's] judgment so long as there is a legitimate

---

[12]    While the Debtors no longer have an Owner/Operator program, they have replaced that plan for non-insider employees with the Key Leader Program, which continues the incentive-based compensation structure set forth in the Owner/Operator Plan.

business justification."); *Computer Sales Int'l, Inc. v. Fed. Mogul Global (In re Fed. Mogul Global, Inc.)*, 293 B.R. 124, 126 (D. Del. 2003) ("[I]n the Third Circuit, a court should approve a debtor's use of assets outside the ordinary course of business if the debtor can demonstrate a sound business justification for the proposed transaction."). Accordingly, once a debtor articulates a valid business justification for the Non-Insider Compensation Programs, the Court should review that request under the business judgment rule. *See In re Commercial Mortg. & Fin., Co.*, 414 B.R. 389, 394 (Bankr. N.D. Ill. 2009) (noting that a debtor in possession "has the discretionary authority to exercise his business judgment in operating the debtor's business similar to the discretionary authority to exercise business judgment given to an officer or director of a corporation").

38.    The business judgment rule shields certain debtor decisions, like the Non-Insider Compensation Programs here, from judicial second guessing. *See Official Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) (finding that "a presumption of reasonableness attaches to a debtor's management decisions" and noting that courts will generally not entertain objections to the debtor's conduct after the debtor sets forth a reasonable basis for it). Thus, if a debtor's decision satisfies the business judgment rule, the transaction should be approved under section 363(b)(1) of the Bankruptcy Code.

39.    In this case, continuing the Non-Insider Compensation Programs is a proper exercise of the Debtors' business judgment and is in the best interests of the Debtors and their stakeholders. The Debtors' employees—along with their skills, knowledge, and hard work—are critical to ensuring that the Debtors continue to generate value for their creditors in a difficult, and complicated, energy market. It is thus imperative that the Debtors provide appropriate,

market-based compensation and incentives to ensure the success of the Debtors' restructuring efforts and to maximize the Debtors' value.  If that were not enough, employees can earn payments if—and only if—the Debtors and their employees meet difficult-to-attain, performance-based metrics under many of the Non-Insider Compensation Programs.[13]  Although the Debtors do not have the burden of showing that non-insider incentive programs are primarily incentivizing, the existence of performance-based metrics in these programs further bolsters their reasonableness.  Achieving the targets necessary for the incentive program participants to earn awards will require a great deal of work, which will result in both strengthened business performance and significant cost savings.  These programs thus assure that the Debtors' employees are incentivized to maximize the Debtors' financial and operational performance.

40.    Both the incentive structure and award levels of the Debtors' incentive-based Non-Insider Compensation Programs are reasonable in light of competitive market practice for companies, like the Debtors, that operate in the utilities industry.  Friske Declaration ¶¶ 8, 13-19.

41.    Further, the Debtors' two primarily retention-based programs (the Key Leader Program and the Individual Retention Agreements) are a sound exercise of the Debtors' business judgment.  These programs are meant to retain key, non-insider employees during a time of significant and ongoing distractions.  These employees are intimately familiar with the Debtors' business and have the experience and knowledge necessary to ensure the Debtors' continued operations through the completion of these chapter 11 cases.  The Debtors cannot easily replace these employees without it adversely affecting their operating efficiency and distracting management from the Debtors' restructuring efforts.  The total costs of the two retention-based

---

[13]    To be clear, the Non-Insider Compensation Programs include two non-insider compensation plans—the Key Leader Program and the individual retention agreements (part of the Individual Bonus Payments)—that are primarily retention-based and not premised on the achievement by the Debtors of certain financial metrics.

18

programs (the Key Leader Program and the Individual Retention Agreements) utilized by the Debtors are reasonable in light of competitive market practice. Friske Declaration ¶¶ 8, 20-22. Those programs involve compensation structures often used in other restructuring situations to reduce employee attrition and avoid recruiting and training costs.

42.    Courts in this jurisdiction and elsewhere have approved plans similar to the Debtors' Non-Insider Compensation Programs because they are an effective way to maximize the value of a debtor's estate. *See*, *e.g.*, *In re Global Home Prods.*, 369 B.R. 778, 784 (Bankr. D. Del. 2007) ("The reasonable use of incentives and performance bonuses are considered the proper exercise of a debtor's business judgment." (internal citation omitted); *see also In re IPC Int'l Corp.*, No. 13-12050 (MFW) (Bankr. D. Del. Sept. 3, 2013) (approving debtors' key employee incentive plan).[14]

43.    Accordingly, the Debtors submit that the relief requested with respect to the Non-Insider Compensation Programs is a valid exercise of the Debtors' business judgment and the approval of the Non-Insider Compensation Programs is appropriate under section 363 of the Bankruptcy Code and in the best interests of the Debtors, their estates, and all parties in interest in these chapter 11 cases.

## III.    The Non-Insider Compensation Programs Do Not Implicate Section 503 of the Bankruptcy Code.

44.    The Non-Insider Compensation Programs also are permissible under section 503(c) of the Bankruptcy Code. Specifically, section 503(c)(1) of the Bankruptcy Code restricts payments made to "insiders of the debtor for the purpose of inducing such person to remain with the debtor's business"—i.e. those insider plans that are essentially "pay to stay" plans—and

---

[14]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to the Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

section 503(c)(2) of the Bankruptcy Code restricts severance payments to insiders.  *In re Velo Holdings, Inc.*, No. 12-11384 (MG) slip op. at 12-13 (Bankr. S.D.N.Y. June 6, 2012); *In re Borders Grp., Inc.*, 453 B.R. 459, 471 (Bankr. S.D.N.Y. 2011) (quoting *In re Dana Corp.*, 358 B.R. 567, 571 (Bankr. S.D.N.Y. 2006).   Simply put, because the Non-Insider Compensation Programs do not contemplate any payments to insiders, the restrictions of section 503(c)(1)-(2) of the Bankruptcy Code are not applicable to the relief requested by this Motion.   Even to the extent section 503(c)(3) did apply,[15] which the Debtors submit it does not because the Non-Insider Compensation Programs are ordinary course transactions for the reasons stated in paragraph 36, the relief requested in this Motion is appropriate because it is justified by the facts and circumstances of the case.   Courts have held the requirement that transfers or obligations be "justified by the facts and circumstances of the case" is a reiteration of the business judgment test incorporated into Bankruptcy Code section 363(b), which the Debtors have already demonstrated they satisfy for the reasons set forth in Section II above. *See Global Homes*, 369 B.R. at 784. The Non-Insider Compensation Programs represent a continuation of long-standing compensation plans that the Debtors have had in place to ensure that they incentivize their key non-insider personnel, and thus these programs should be approved.  *Blitz U.S.A. Inc.*, 475 B.R. at 215.   The Debtors quite reasonably are concerned that without these programs many of their talented employees would seek alternative employment.   The Debtors cannot afford to lose these essential employees, whose skills and knowledge of this complex business are critical to safe and successful operations.   Moreover, significant employee attrition would undoubtedly cause the

---

[15]  Bankruptcy Code section 503(c)(3) provides: "[There shall neither be allowed, nor paid…] (3) other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition."

Debtors to incur increased recruiting costs to find and attract similarly qualified replacements. These direct costs would only be compounded while the Debtors continue to undertake critical operational projects at the same time as undergoing a complex restructuring.

45.     Presumably recognizing these serious concerns, courts in this jurisdiction and elsewhere have regularly approved compensation programs for non-insiders, even programs that are primarily retention-based.  *See*, *e.g.*, *In re Mervyn's Holdings, LLC*, No. 08-11586 (Bankr. D. Del. Oct 30, 2009) (approving a retention plan for non-insiders); *In re KB Toys, Inc.*, No. 08-13269 (Bankr. D. Del. Jan. 6, 2009) (same).  Accordingly, the facts and circumstances of these chapter 11 cases warrant approval of the Non-Insider Programs and the relief requested in this Motion is appropriate under section 503(c) of the Bankruptcy Code.

## IV.    Authorizing the Debtors to Pay Prepetition Amounts Owed on Account of the Non-Insider Compensation Programs is Appropriate.

46.     Courts in the Third Circuit and elsewhere generally recognize that debtors may pay prepetition claims that are essential to the continued operation of the debtor's business.  *See*, *e.g.*, *In re Meridian Auto. Sys.-Composite Operations, Inc.*, 372 B.R. 710, 714 (Bankr. D. Del. 2007) (granting the debtor authority to pay prepetition obligations owed to certain critical vendors); *In re Primary Health Sys., Inc.*, 275 B.R. 709, 710 (Bankr. D. Del. 2002) (allowing payment of prepetition wages upon a finding that such relief was "essential to the continued operation of the Debtors' businesses"); *In re Just for Feet, Inc.*, 242 B.R. 821, 824-45 (Bankr. D. Del. 1999) (noting that debtors may pay prepetition claims that are essential to the continued operation of the debtor's business); *In re Sharon Steel Corp.*, 159 B.R. 730, 737 (Bankr. W.D. Pa. 1993) (granting the debtor the authority to pay prepetition wages); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (granting debtor authority to pay prepetition wages); *Armstrong World Indus. Inc. v. James A. Phillips, Inc. (In re James A.*

21

*Phillips, Inc.*), 29 B.R. 391, 398 (Bankr. S.D.N.Y. 1983) (granting the debtor the authority to pay prepetition claims of suppliers who were potential lien claimants).

47.    Specifically, where the debtor is able to "articulate some business justification, other than the mere appeasement of major creditors," courts have authorized debtors to make such prepetition payments under section 363(b) of the Bankruptcy Code.[16]  *See, e.g., Ionosphere Clubs*, 98 B.R. at 175 (finding that a sound business justification existed to pay prepetition wages); *Phillips*, 29 B.R. at 397 (relying upon section 363 as a basis to allow a contractor to pay the prepetition claims of suppliers who were potential lien claimants).

48.    The Court should approve the payment of the limited, prepetition compensation that has already accrued under the Non-Insider Compensation Programs because honoring these obligations is critical to demonstrating the Debtors' ongoing commitment to the workforce in the face of challenges associated with the Debtors' restructuring.   Paying the limited obligations under the Non-Insider Compensation Programs will help continue to motivate employees and drive value for the benefit of ***all*** parties in interest.   In the absence of such payments, the Debtors believe that their employees may seek alternative employment opportunities, perhaps with the Debtors' competitors.   Such a development would deplete the Debtors' workforce, likely hinder the Debtors' financial performance, and likely diminish creditors' confidence in the Debtors.

---

[16]   Moreover, pursuant to section 105(a) of the Bankruptcy Code, courts have developed the "necessity of payment" rule that justifies payment of prepetition claims like those here.  *See, e.g., In re Lehigh & New Eng. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor); *In re Penn Cent. Transp. Co.*, 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding that the necessity of payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims have been paid"); *In re Friedman's, Inc.*, No. 09-10161, 2011 WL 5975283, at *3 (Bankr. D. Del. Nov. 30, 2011) ("[M]ost courts will allow payments [of prepetition claims] under the 'doctrine of necessity' if the debtor establishes that in its business judgment making such payments is critical to the survival of the debtor's business"); *In re Columbia Gas Sys. Inc.*, 171 B.R. 189, 191-92 (Bankr D. Del. 1994) (noting that debtors may pay prepetition claims that are essential to the continued operation of the debtor's business).

The loss of valuable individuals, combined with the recruiting efforts that would be required to replace them, would be a significant and costly distraction at a time when the Debtors should be focusing on stabilizing their operations.

## Waiver of Bankruptcy Rules 6004(a) and 6004(h)

49.    To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## Notice

50.    The Debtors shall provide notice of this Motion on the date hereof via first class mail to:  (a) the Office of the U.S. Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d) and proposed counsel thereto; (c) Wilmington Trust, N.A., in its capacity as administrative agent under the TCEH first lien credit agreement and collateral agent under the TCEH intercreditor agreements and counsel thereto; (d) Bank of New York Mellon Trust Company, N.A., in its capacity as indenture trustee under:  (i) the TCEH unsecured pollution control revenue bonds; and (ii) the EFCH 2037 Notes due 2037, and counsel thereto; (e) American Stock Transfer & Trust Company, LLC, in its capacity as indenture trustee under: (i) the 9.75% EFH senior unsecured notes due 2019; (ii) the 10.0% EFH senior unsecured notes due 2020; (iii) the 10.875% EFH LBO senior unsecured notes due 2017; (iv) the 11.25%/12.0% EFH LBO toggle notes due 2017; (v) the 5.55% EFH legacy notes (series P) due 2014; (vi) the 6.50% EFH legacy notes (series Q) due 2024; and (vii) the 6.55% EFH legacy notes (series R) due 2034, and counsel thereto; (f) Computershare Trust Company, N.A. and Computershare Trust Company of Canada, in their capacities as indenture trustee under:  (i) the 11.0% EFIH

senior secured second lien notes due 2021; and (ii) the 11.75% EFIH senior secured second lien notes due 2022, and counsel thereto; (g) UMB Bank, N.A. in its capacity as indenture trustee under: (i) the 9.75% EFIH senior unsecured notes due 2019; and (ii) the 11.25%/12.25% EFIH senior toggle notes due 2018, and counsel thereto; (h) BOKF, NA, dba Bank of Arizona, in its capacity as indenture trustee under 11.50% TCEH senior secured notes due 2020, and counsel thereto; (i) CSC Trust Company of Delaware in its capacity as indenture trustee under: (i) the 6.875% EFIH senior secured notes due 2017; and (ii) the 10.0% EFIH senior secured notes due 2020, and counsel thereto; (j) Law Debenture Trust Company of New York in its capacity as indenture trustee under: (i) the 10.25% TCEH senior unsecured notes due 2015; and (ii) the 10.50%/11.25% TCEH senior toggle notes due 2016, and counsel thereto; (k) Wilmington Savings Fund Society, FSB in its capacity as indenture trustee under the 15.0% TCEH senior secured second lien notes due 2021, and counsel thereto; (l) counsel to certain holders of claims against the Debtors regarding each of the foregoing described in clauses (c) through (k); (m) the agent for the TCEH debtor-in-possession financing facility and counsel thereto; (n) the agent for the EFIH debtor-in-possession financing facility and counsel thereto; (o) counsel to certain holders of equity in Texas Energy Future Holdings Limited Partnership; (p) counsel to the Ad Hoc Committee of TCEH Unsecured Noteholders; (q) counsel to the Ad Hoc Committee of TCEH Second Lien Noteholders; (r) counsel to Oncor Electric Delivery Holdings Company LLC; (s) the Securities and Exchange Commission; (t) the Internal Revenue Service; (u) the Office of the United States Attorney for the District of Delaware; (v) the Office of the Texas Attorney General on behalf of the Public Utility Commission of Texas; and (w) counsel to the Electric Reliability Council of Texas. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **No Prior Request**

51.     No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

RLF1 10317564v.1

WHEREFORE, the Debtors respectfully request that the Court enter the order, substantially in the form attached hereto as **Exhibit A** granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Dated: May 15, 2014
Wilmington, Delaware

*/s/ Tyler D. Semmelman*

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
Tyler D. Semmelman (No. 5386)
920 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 651-7700
Facsimile:    (302) 651-7701
Email:    collins@rlf.com
    defranceschi@rlf.com
    madron@rlf.com
    semmelman@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
Richard M. Cieri (admitted *pro hac vice*)
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    richard.cieri@kirkland.com
    edward.sassower@kirkland.com
    stephen.hessler@kirkland.com
    brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    james.sprayregen@kirkland.com
    chad.husnick@kirkland.com
    steven.serajeddini@kirkland.com

Proposed Co-Counsel to the Debtors and Debtors in Possession

26