**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | Re: Docket No. 468 |

**DECLARATION OF DOUGLAS FRISKE IN SUPPORT OF
DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING
THE DEBTORS TO (A) PAY CERTAIN PREPETITION AMOUNTS
ON ACCOUNT OF NON-INSIDER COMPENSATION PROGRAMS
AND (B) CONTINUE THE NON-INSIDER COMPENSATION PROGRAMS
IN THE ORDINARY COURSE OF BUSINESS ON A POSTPETITION BASIS**

I, Douglas J. Friske, hereby declare under penalty of perjury:

1. I am a managing director of Executive Compensation at Towers Watson Delaware Inc. ("Towers Watson").[2] Towers Watson was engaged pre-petition in October 2012 to provide compensation consulting services to Energy Future Holdings Corporation and certain of its affiliates both before and after the commencement of these chapter 11 cases. I am familiar with the pre-petition structure of the Debtors' compensation plans as well as the structure of the Debtors' Non-Insider Compensation Programs as they are set forth in the *Debtors' Motion for Entry of an Order Authorizing the Debtors To (A) Pay Certain Prepetition Amounts on Account of the Non-Insider Compensation Programs and (B) Continue the Non-Insider Compensation*

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted on an interim basis, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

[2] All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Motion (as defined herein).

1

*Programs in the Ordinary Course of Business on a Postpetition Basis* (the "Motion"). I am duly authorized to submit this declaration (this "Declaration") on behalf of Towers Watson in support of the Motion.

2. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and finances, my research into market practices for companies in the energy industry and those that have recently filed for chapter 11 protection, and information supplied to me by members of the Debtors' management and the Debtors' other advisors. If called upon to testify, I could and would testify competently to the facts set forth herein.

## Background and Qualifications

3. I received my Bachelor's degree in Finance from the University of Illinois in 1986. After working at Allstate and Chubb Insurance Companies, I returned to school at Northwestern University. I received a Master's degree in Management from Northwestern's J.L. Kellogg Graduate School of Management in 1990. Since that time, I have been employed by Towers Watson.

4. Towers Watson is an international professional services firm that offers a wide variety of services to public and private clients, including expert analysis of executive and management compensation. Services offered by Towers Watson include actuarial, compensation, performance management, employee benefits design communication and administration, organizational communication, human resources effectiveness, and reinsurance and risk management.

5. I have worked with numerous *Fortune* 1000 companies, and have participated in the development and design of hundreds of management and employee incentive plans for companies inside and outside of bankruptcy. I am frequently retained by large companies to

advise them on their employee compensation strategies, programs, and pay levels. I am also sometimes retained by companies performing specific searches for management personnel, for which I provide guidelines on general market practice and the level and form of current market compensation for those positions.

6. I am highly experienced in executive, management, and employee compensation matters with more than 23 years of experience in the field. During this time, I have been the lead or supporting employee compensation expert in more than 30 bankruptcy cases, and have frequently testified as to the reasonableness of a variety of post-petition compensation arrangements. Specifically, I have been involved in the review and design of key employee incentive plans, key employee retention plans, and other similar-type plans in the chapter 11 cases of, among others, American Airlines, AMF, ATA Airlines, Calpine, Chemtura, Collins & Aikman, Conexant, Delta Airlines, Dura Automotive, Frontier Airlines, The Great Atlantic & Pacific Tea Company, Hayes Lemmerz, Keystone Automotive, Kimball Hill Homes, Lear, Leiner Health Products, Longview Power, Mark IV, Muzak, Neff, Northwest Airlines, Orchard Brands, Reader's Digest Association, Round Table Pizza, Sbarro, School Specialty, TOUSA, United Airlines, Visteon, and Xerium.

**Summary**

7. Based on my experience in the industry and review of the Debtors' compensation programs, I believe that it is appropriate to continue the Non-Insider Compensation Programs in their current form for the 2014 calendar year for at least four reasons:

(a) The Motion asks the Court to allow the Debtors to continue administering their existing Non-Insider Compensation Programs. Those programs are similar to others in the industry, and will help the Debtors continue to retain and incentivize their non-Insider employees.

3

(b) The overall design and structure of the Non-Insider Compensation Programs is consistent with market practice. Several of the programs, for example, emphasize the achievement of certain targets for Earnings before Interest, Taxes, Depreciation, and Amortization ("EBITDA") and cost management—both of which are objective performance measures commonly used in recent bankruptcy court-approved employee incentive plans as well as by other companies in the energy industry.

(c) A benchmark analysis of total direct compensation data (defined as base salary plus incentive-based compensation) for a representative sample of participants in the Non-Insider Compensation Programs reveals that the target award levels under the Non-Insider Compensation Programs are within the reasonable range of competitive practice in the energy industry and the Debtors' peer group; and

(d) The total costs of the two retention-based programs (the Key Leader Program and the Individual Retention Agreements) utilized by the Debtors are reasonable in light of competitive market practice and involve compensation structures often used in other restructuring situations to reduce employee attrition and avoid recruiting and training costs.

### Towers Watson's Engagement With the Debtors

8. Since Towers Watson was retained by the Debtors in October 2012, I have familiarized myself with the Debtors' operations and unique business and restructuring challenges. At the start of our engagement, Towers Watson discussed with both the Debtors and the Debtors' advisors the Debtors' operational history, financial performance, restructuring process, and various issues regarding the Debtors' workforce and employee programs. Towers Watson reviewed the structure of the Debtors' existing base salary and primary incentive programs, paying specific attention to the various incentive plans' performance metrics,

participating employees, payout frequency, and target payout levels.  As a result of this thorough review of the Debtors' operational and compensation history, Towers Watson was able to evaluate and benchmark the Debtors' primary compensation plans with appropriate consideration for the Debtors' particular business objectives.

9. Towers Watson collaborated with the Debtors' key managers and directors in assessing the Debtors' primary compensation plans and helping to refine those programs in advance of a potential chapter 11 restructuring.  My primary goal in the course of these interactions was to provide independent compensation plan analyses that drew directly upon relevant market data as well as my experience in designing such programs for similarly-situated companies.

### Analysis of the Structure of the Debtors' Non-Insider Compensation Programs

10. Based on my review of the existing compensation structure, I believe that the Debtors' Non-Insider Compensation Programs are a continuation of prepetition programs that the Debtors designed in the ordinary course of their business, with certain modifications made as part of the ordinary course review and design process to account for a potential in-court restructuring.  Moreover, the overall design and structure of the Debtors' Non-Insider Compensation Programs are generally consistent with market practice and properly align employee incentives with the Debtors' operating success.  Several of the programs, for example, include incentivizing metrics that comport with practice in the energy industry more broadly.  Based on a recent Towers Watson study, we found that a majority of companies in the energy industry use an earnings-based goal (earnings per share, EBITDA, net income, etc.) in their annual and/or long-term incentive plans.

**Analysis of Total Compensation for**
**Participants in the Non-Insider Compensation Programs**

11. In assessing the reasonableness of the Incentive Programs, I analyzed competitive total compensation data for a representative sample of participants in the Non-Insider Compensation Programs.

12. I compared the Debtors' combined target compensation data (reflecting base salary and any opportunities under the Non-Insider Compensation Programs) to equivalent figures from the competitive market. I reviewed these data for a group of approximately 70 non-insider employees at the Vice President level and above—working across all of the Debtors' business units and a wide variety of functional areas (operational, sales, legal, human resources, information technology, etc.). The size and variation of that group make it a particularly relevant sample for benchmarking the entirety of the Debtors' Non-Insider Compensation Programs. Target pay levels for the group of employees at the Vice President level and above were compared to pay levels among a broad group of energy companies that I believed were in the relevant labor market for this level of non-insider positions. Our analysis was conducted shortly after we were engaged by the Debtors in October 2012 using comparative market data as taken from the 2012 Towers Watson CDB Energy Services Executive Compensation Survey Report. All data have been aged to January 1, 2014 using an annualized update factor of 3.0%.

13. In conducting this comparison, I did not consider previously-earned compensation, including prepetition pay-outs, as compensation benchmarking analyses are generally intended to assess current target compensation opportunities. The rationale for this methodology is two-fold: (a) target pay elements are reflective of "going forward" pay opportunities, which need to be calibrated to market to help ensure proper engagement and

motivation; and (b) historical pay-outs from prior years' incentive plans are not relevant to ongoing engagement as they reflect past compensation for past performance.

14. This analytical framework, as described above, is consistent with the methodologies I have used in the review of employee incentive compensation plans in other chapter 11 cases.

15. As shown in the table below, overall compensation levels, assuming the maintenance of all existing compensation programs (including the Non-Insider Compensation Programs), for the entire group of employees included in our analysis (*i.e.*, the group of approximately 70 non-insider employees at the Vice President level and above) were within competitive norms:

| Employee Group | Percentage Difference Between Debtors' Target Total Direct Compensation and 75th Percentile of Competitive Market |
|---|---|
| Other VPs and Above | -21% |

16. Based on the results of this benchmarking analysis, I believe the award levels of the Non-Insider Compensation Programs and the potential total compensation levels of representative samples of the participants are reasonable in light of (a) competitive market practice for companies, like the Debtors, that operate in the energy industry and (b) the Debtors' compensation philosophy of targeting compensation opportunities in line with a belief that only top talent should be and are employed at the Debtors and that such top talent should be compensated accordingly. Critically, the absence of an incentive opportunity for the participants in the Non-Insider Compensation Programs would significantly undermine the current competitiveness of the Debtors' compensation structure, which in turn could impact the Debtors' ability to motivate current employees to achieve desired business objectives.

**Analysis of Costs of Debtors' Retention-Based Compensation Programs**

17. The Key Leader Program (for non-insiders) and the individual retention agreements (which are part of the Individual Bonus Payments) are traditional, retention-based compensation programs. Retention-based compensation programs are often used by companies in similar restructuring situations to reduce employee attrition and thus expenses associated with turnover, recruiting, and training.

18. Accordingly, Towers Watson compared the total cost of the above-mentioned programs to equivalent data collected from the retention plans approved for 20 companies that filed for chapter 11 bankruptcy protection since 2008. The total costs for the Debtors' retention-oriented 2014 plans for non-insiders are as follows:

| Program | 2014 Estimated Cost |
|---|---|
| Key Leader Program | $5.4 million |
| Individual Retention Agreements | $1.6 million |
| **Total** | **$7.0 million** |
| **Total as a Percentage of EFH Projected 2014 Revenues** | **0.06%** |
| **Total as a Percentage of TCEH Projected 2014 Revenues** | **0.09%** |

19. The median cost of the retention programs among the 20 other plans reviewed by Towers Watson was approximately 0.04% of company revenues while the 75th percentile was 0.13% of company revenues. As shown above, the estimated total costs of the Debtors' two retention-based programs are only slightly above median market practice and significantly lower than the 75th percentile of the observed market data, reflecting the Debtors' focus on employing top talent and rewarding them accordingly. As such, the total cost of these retention-based programs is reasonable in light of competitive market practice.

**Conclusion**

20.     Based on my education, experience, and the work I have done in this case and in similar cases, I believe that the total cost and individual award opportunities available under the Debtors' Non-Insider Compensation Programs are appropriately designed, consistent with market practice, and reasonable given the facts and circumstances of these chapter 11 cases. Further, the Debtors' retention-based compensation programs are reasonable in light of competitive market practice.

[*Remainder of page intentionally left blank.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: May 15, 2014                              /s/ Douglas J. Friske
                                                 Douglas J. Friske
                                                 Towers Watson Delaware Inc.