**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) Case No. 14-10979 (CSS) |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) Re: Docket No. 468 |

**DECLARATION OF PAUL KEGLEVIC, EXECUTIVE VICE
PRESIDENT, CHIEF FINANCIAL OFFICER, AND CO-CHIEF
RESTRUCTURING OFFICER OF ENERGY FUTURE HOLDINGS CORP.,
ET AL., IN SUPPORT OF MOTION OF ENERGY FUTURE HOLDINGS
CORP., *ET AL.*, FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO
(A) PAY CERTAIN PREPETITION AMOUNTS ON ACCOUNT OF NON-INSIDER
COMPENSATION PROGRAMS AND (B) CONTINUE THE NON-INSIDER COMPENSATION
PROGRAMS IN THE ORDINARY COURSE OF BUSINESS ON A POSTPETITION BASIS**

Pursuant to 28 U.S.C. § 1746, I, Paul Keglevic, hereby declare as follows under penalty of perjury:

1. I am the Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of Energy Future Holdings Corp. ("EFH Corp.") a corporation organized under the laws of the state of Texas; its direct subsidiary, Energy Future Competitive Holdings Company LLC ("EFCH"), a limited liability company organized under the laws of the state of Delaware; EFCH's direct subsidiary, Texas Competitive Electric Holdings Company LLC ("TCEH LLC" and, together with EFCH and TCEH LLC's direct and indirect subsidiaries, "TCEH," and the entities composing TCEH that are debtors in these chapter 11 cases, the "TCEH Debtors"), a limited liability company organized under the laws of the state of Delaware; and EFH Corp.'s direct subsidiary, Energy Future Intermediate Holding Company LLC

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted on an interim basis, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

("EFIH"), a limited liability company organized under the laws of the state of Delaware. EFH Corp., various other direct and indirect subsidiaries of EFH Corp. that are debtors in these chapter 11 cases, the TCEH Debtors, and EFIH are collectively referred to as the "Debtors" in this declaration (this "Declaration").

2. I have worked for the Debtors since 2008. I am generally familiar with the Debtors' businesses, day-to-day operations, financial matters, results of operations, cash flows, and underlying books and records. All facts set forth in this Declaration are based upon my personal knowledge of the Debtors' businesses, operations, and related financial information gathered from my review of their books and records, relevant documents, and information supplied to me by members of the Debtors' management team and advisors. I am over the age of 18 and duly authorized to execute this Declaration on behalf of the Debtors in support of the *Motion of Energy Future Holdings Corp., et al., for Entry of an Order Authorizing the Debtors to (A) Pay Certain Prepetition Amounts On Account of Non-Insider Compensation Programs and (B) Continue the Non-Insider Compensation Programs in the Ordinary Course of Business on a Postpetition Basis* (the "Motion").[2]

3. This Declaration addresses (a) the factual background of the various Non-Insider Compensation Programs and (b) the non-insider status of the Debtors' employees who are eligible to receive payments under the Non-Insider Compensation Programs described in the Motion ("Eligible Employees").

**Background Regarding the Non-Insider Compensation Programs**

4. There is approximately $8.9 million under the Non-Insider Compensation Programs that has been earned and is payable between now and September 2014. If all of the various incentive thresholds are met under the Non-Insider Compensation Programs, the Debtors

---

[2] Capitalized terms used, but not defined, herein shall have the meaning ascribed to them in the Motion.

estimate that up to approximately $100 million[3] would potentially be payable to non-insiders through March 2015 which payments would be spread across over 5,500 different participants under the various Non-Insider Compensation Programs. Of that amount, up to approximately $80 million relates to the Debtors' annual incentive program, which has an average payment of approximately $15,000 per participant (and will be paid in 2015 only if the incentive thresholds for 2014 are met).

5. EFH Corp., the direct or indirect Debtor parent of each of the Debtors and their non-Debtor affiliates, and its subsidiaries collectively employ approximately 9,100 employees—5,700 of whom are employed by Debtor entities. As is typical for any organization of similar size, scope, and complexity, the Debtors developed the programs that are the subject of this Motion to encourage and reward exceptional employee performance and to ensure that their high-performing work force stays with the company.

6. The Non-Insider Compensation Programs have always been a critical component of employee compensation, providing substantial benefits and value to the Debtors by aligning employee incentives with the Debtors' business goals. Although there are a number of Non-Insider Compensation Programs, each is designed to apply to specific segments of the employee population such that the degree of overlap in employee participation is relatively low. In fact, going forward, other than the approximately 55 eligible employees who participate in the unique Luminant Commercial Incentive Plan and certain employees who are party to an Individual Retention Agreement, no employees will participate in more than two of the Non-Insider Compensation Programs at any one time. At a high level, under four of the Non-Insider Compensation Programs (the Annual Incentive Plan, the Executive Annual Incentive Plan, the

---

[3] Estimates for certain of the Non-Insider Compensation Programs are based on 2013 costs. See **Exhibit B** to the Motion.

Luminant Developer Incentive Plan, and the Luminant Commercial Incentive Plan), payments are earned only if the Debtors meet certain ongoing performance thresholds. The remaining Non-Insider Compensation Programs generally are either classic retention programs (the Key Leader Program and the vast majority of the Individual Bonus Payments) or were vested (in part) when the Debtors met previous performance thresholds (the Owner/Operator Plan).

      **A.**     **Annual Incentive Plan.**

     7. The Debtors have historically maintained their Annual Incentive Plan for non-insider employees below the level of Vice President. Approximately 5,500 employees (none of whom are insiders) are eligible to receive an annual payment under the AIP if the eligible employee and the Debtors achieve certain performance goals and the eligible employee is employed at the time of the AIP payment. The Debtors make AIP payments no later than March 15th of the following year. Amounts are payable under the AIP only if the Debtors hit difficult-to-meet performance metrics (that are discussed in more detail below).

     8. The AIP establishes a target payment (expressed as a percentage of base salary) for eligible employees, which varies according to each participant's level of responsibility (the "<u>AIP Target Payment</u>"). The actual amount of the AIP payment pool is determined by comparing the Debtors' business results against challenging financial and operational metrics, including by way of example, EBITDA, customer retention, cost management, plant and mine operational metrics, and other measures. Those metrics, in the form of business unit and consolidated scorecards, are presented to and approved by a subset of the EFH board of directors, the Organization & Compensation Committee of the Board (the "<u>O&C Committee</u>"). The metrics for the 2014 AIP were approved by the committee in October of 2013.

     9. Actual payments under the AIP will be calculated at the end of 2014 by taking each employee's AIP Target Payment and modifying it based on two factors: (a) the Debtors'

actual performance relative to the operational and financial performance criteria; and (b) an individual performance modifier for each eligible employee. The individual performance modifier, which may range from 0% to 150%, is recommended by the applicable business unit's leaders after an extensive performance review and calibration processes across the business units and is ultimately approved by the Debtors' seven-member Strategy and Policy Committee (the "SPC"). Although in no event can payments under the AIP exceed the pool of available and accrued payment funds determined by the results of the Debtors' actual performance, the individual performance modifier allows for recognition of exceptional performers who may receive greater than 100% of their AIP Target Payments. (Less exceptional performers may receive less than 100% of their AIP Target Payment.) Payments under the AIP accrue monthly and accruals are adjusted based on business results against the metrics calculated at periodic intervals during the calendar year and again after the close of the calendar year. Scorecard results and overall payment rates across the business are certified and approved by the O&C Committee. For the fiscal year ending December 31, 2013, the Debtors paid approximately $70.7 million under the AIP across 5,500 employees.

10. As of the Petition Date, no amounts are owed on account of the AIP.

**B.    Executive Annual Incentive Plan as Applicable to Non-Insiders.**

11. The Debtors have historically maintained their Executive Annual Incentive Plan for approximately 74 employees at or above the level of Vice President (the "EAIP"). The Debtors are excluding from this Motion 21 members of senior management, for whom they will seek approval of the EAIP at a later date, which leaves only non-insider management—Vice Presidents and two Senior Vice Presidents.[4] Each employee in the program is eligible to receive

---

[4] The Debtors are not seeking any relief with respect to the EAIP as it applies to insiders. No payments will be made under the EAIP to insiders without further order of the Court.

a bonus equal to a target portion of his or her base salary if—and only if—the Debtors meet difficult-to-satisfy incentive metrics, which vary by business unit based on the employee's role. The metrics, approvals, and administration are identical to the AIP, detailed above.

12.     As of the Petition Date, no amounts are owed on account of the EAIP with respect to non-insiders.

       **C.     Owner/Operator Plan.**

13.     The Debtors historically have offered an incentive plan to approximately 128 employees that the Debtors believed were critically important to the Debtors' business operations (the "Owner/Operator Plan").[5] Entitlement to the full cash award[6] under the Owner/Operator Plan requires the Debtors to achieve the management EBITDA target for the relevant multi-year performance periods as defined in the scorecard metrics approved by the O&C Committee, which are the same scorecards used in other Non-Insider Compensation Programs. In addition, eligible employees will not receive a payment of any obligations remaining under the Owner/Operator Plan unless they are employed by the Debtors on the date the Debtors make these payments.

14.     As of January 1, 2014, the Debtors have transitioned eligible non-insider employees under the Owner/Operator Plan to the Key Leader Program, which is discussed below, and therefore will not be continuing the Owner/Operator Plan on a go-forward basis.

15.     That said, the Debtors have remaining obligations—to non-insiders alone—under the Owner/Operator Plan that total up to approximately $8.9 million as of the Petition Date, which amount would be reduced by any payments owed to participants who leave the Debtors

---

[5]  On January 1, 2014, eligible non-insider Employees transitioned to the Key Leader Program, as discussed more fully below.

[6]  In addition to the cash component described above, each participant in the Owner/Operator Plan also was granted restricted stock units. The restricted stock units that were granted vest in September 2014. The restricted stock units were based on the Employee's level in the organization and other key criteria.

prior to September 2014. In particular, the final performance period for the Owner/Operator Plan that spanned 2012 and 2013 ended on December 31, 2013, and the payments under that plan were earned based on the Debtors achieving EBITDA targets for the years in question. The Debtors are scheduled to make the final payments under the 2012-13 Owner/Operator Plan to non-insiders in September 2014.

      **D.**      **Key Leader Program.**

      16.      On January 1, 2014, the Debtors implemented the Key Leader Program (the "Key Leader Program"), which is a modified version of the previously-existing Owner/Operator Plan. The program applies to 155 non-insider employees, most of whom historically participated in the Owner/Operator Plan. Under the Key Leader Program, each eligible employee's annual award under the Key Leader Program is similar to the annual target previously used in the Owner/Operator Plan (or, for the eligible employees who did not participate in the Owner/Operator Plan, the annual target is based on peer employees and/or role in the organization). The Debtors will make payments under the Key Leader Program on a quarterly basis so long as the eligible employee is employed by the Debtors at the end of the applicable quarter. The Debtors expect the annual cost of the Key Leader Program to be up to approximately $5.4 million.

      17.      As of the Petition Date, no amounts are owed on account of the Key Leader Program.

      **E.**      **Luminant Developer Incentive Plan.**

      18.      The Debtors have historically offered an incentive plan to approximately 25 non-insider, full-time employees at Luminant who are eligible based on their contributions to certain commercial transactions that have been designated by specified senior management as business development projects (the "Luminant DIP").

19. The payments are typically divided based on meeting two types of goals for projects; for example: (a) the Debtors' execution of an agreement and funding commitment letters for a qualifying business development project and; or (b) when the project is commercially operational and generating revenue. The specific goals are defined in writing and approved at the outset of each applicable project.

20. Target awards under the Luminant DIP are based on the amount of additional economic value that the transactions create for the Debtors—*i.e.*, the net present value of the project. Generally, eligible employees under the Luminant DIP may receive: (a) 0-75% of their base salary, if the net present value of the associated project is between $0-$49 million; (b) 25-150% of their base salary, if the net present value of the associated project is worth $50-$149 million; or (c) 100-250% of their base salary, if the net present value of the associated project is over $150 million. No eligible employee may receive more than $300,000 under the Luminant DIP during a calendar year. For the fiscal year ending December 31, 2013, the Debtors paid approximately $17,000 under the Luminant DIP.

21. As of the Petition Date, no amounts are owed on account of the Luminant DIP.

**F.  Luminant Commercial Incentive Plan as Applicable to Non-Insiders.**

22. The Debtors historically have offered a commercial incentive plan to approximately 55 full-time employees at Luminant who are instrumental to the Debtors' trading activities in order to provide for market-based performance incentives commensurate with commodity hedging and trading organizations (the "<u>Luminant CIP</u>"). One participant is a potential insider, but all other participants are non-insiders.[7] None of the participants in the Luminant CIP are SPC members or Executive Vice Presidents. The Debtors' trading personnel

---

[7] The Debtors are not seeking any relief with respect to the Luminant CIP as it applies to this potential insider. No payments will be made under the Luminant CIP to this individual without further order of the Court.

are frequently recruited by competing organizations, and the industry is sensitive to market compensation changes. Each year the Debtors' risk management team establishes a pool of available funds based on the aggregate incremental value that Luminant achieves on all commercial trading transactions for that year.[8] An aggregate funding pool accrues throughout the year based on actual incremental value, and shortly after December 31 of each year, Luminant's financial planning and analysis team determines the pool of available funds. Luminant's Chief Commercial Officer then recommends individual payments for those eligible participants who have contributed to the creation of added value for that year under the Luminant CIP to an award committee (comprising Luminant's CFO, Luminant's CEO, and EFH's EVP of Human Resources), which evaluates the recommendations and approves or modifies payments as appropriate. The Luminant CEO then determines if a payment to the Chief Commercial Officer is warranted based on the year's performance and makes a recommendation to the other members of the award committee for consideration. Any individual payments in excess of $300,000 under the Luminant CIP must be submitted for approval to the O&C Committee. Employees receive payments under the Luminant CIP no later than March 15th of each year.

23. For the fiscal year ending December 31, 2013, the Debtors paid approximately $3.35 million under the Luminant CIP.

24. As of the Petition Date, no amounts are owed on account of the Luminant CIP.

**G.    Individual Bonus Payments.**

25. In the ordinary course of business and consistent with both historic and industry-standard practice, the Debtors have historically provided for (a) retention payments under individual agreements to non-insider employees so long as they remain with the Debtors for a

---

[8] The discretionary incentive pool is generally tied to the incremental value that Luminant provides on its trading activities, as follows: (a) approximately 2.0% of all incremental value between $100-$250 million; (b) approximately 4.0% of all incremental value between $250-$325 million; and (c) approximately 7.0% of all incremental value higher than $325 million.

specified period of time and continue to perform in a highly effective manner that contributes to the overall success of the Debtors and (b) bonus payments to non-insider employees for obtaining or maintaining critical certifications and licenses that are required to operate the Debtors' nuclear facility (collectively, the "Individual Bonus Payments").

26. As of the Petition Date, the majority of the potential Individual Bonus Payments relate to 95 individual retention agreements, over 95% of which call for awards to be paid in September 2014 to the extent the participating employees fulfill the requirements set forth in each respective agreement. Awards under these agreements are calculated according to relevant market data and historical practice. These types of individual retention agreements are common and consistent with competitive industry practice. The participating employees are critical to the Debtors' business, and most are not senior enough to participate in the Owner/Operator Plan or the Key Leader Plan. The Debtors have determined that, in their business judgment, honoring payments under the individual retention agreements is essential to incentivizing these critical non-insider employees to remain with the Debtors during the restructuring. These employees are highly talented—and frequently sought after by the Debtors' competitors—and it would be difficult, if not impossible, to replace them given the Debtors' present circumstances if they were to seek employment elsewhere. The payments under the individual retention agreements accrue on a monthly basis, although amounts are not paid until the date set forth in each individual retention agreement. The average payment under the individual retention agreements is approximately $16,000.

27. In addition to the potential retention payments, there also are potential certification and licensing bonuses that may come due in the future. The certification bonuses ($3,000 each) and licensing bonuses ($6,000 each) are paid shortly after the certification or license is obtained/renewed by the nuclear plant personnel. Historically, certification and

licensing bonus payments have been *de minimis*—for example, in 2013, the Debtors paid three certification bonuses (totaling $9,000) and zero licensing bonuses.

28. As of the Petition Date, no amounts are owed on account of the Individual Bonus Payments.

### The Eligible Employees Are Not Insiders

29. I understand that the Bankruptcy Code places certain limitations on retention payments to "insiders," as that term is defined in section 101(31) of the Bankruptcy Code. Specifically, I have been advised that section 101(31) of the Bankruptcy Code defines "insiders" to include "directors," "officers," and any person "in control of the debtor."

30. The Debtors' businesses ultimately are managed by a seven-member Strategy and Policy Committee (the "SPC"), whose members include the Chief Executive Officer of EFH Corp. and the Debtors' four Executive Vice Presidents and two Executive Vice Presidents/business unit Chief Executive Officers,[9] all of whom report directly to the Chief Executive Officer of EFH Corp. Generally, the Debtors' approximately 5,700 employees are organized into multiple layers of direct reports, beginning with the Chief Executive Officer of EFH Corp. and then proceeding through (a) the Debtors' four Executive Vice Presidents and two Executive Vice Presidents/business unit Chief Executive Officers to (b) Senior Vice Presidents to (c) Vice Presidents to (d) thousands of "rank-and-file" employees. Of the Debtors' approximately 5,700 employees, only 31 employees directly report to members of the SPC.

31. Based on this organizational structure, the Debtors and their advisors reviewed the participants in the Non-Insider Compensation Programs to evaluate whether any of the participants were "insiders," as that term is defined in section 101(31) of the Bankruptcy Code.

---

[9] These six individuals are (a) the Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer, (b) the Chief Executive Officer of Luminant, (c) the Chief Executive Officer of TXU, (d) the Executive Vice President, General Counsel, and Co-Chief Restructuring Officer, (e) the Executive Vice President of Public Policy and External Affairs, and (f) the Executive Vice President of Human Resources.

Ultimately—out of an abundance of caution—the Debtors excluded 21 individuals from participating in any of the Non-Insider Compensation Programs. This list includes all seven members of the SPC—the "insiders" at the company—along with 14 employees who are either Senior Vice Presidents or serve as directors on boards of affiliates of EFH Corp. While ten of these 21 individuals are more easily identified as insiders, the Debtors, with my consultation and the input of the SPC, opted to expand the group and exclude all 21 individuals from the Non-Insider Compensation Programs. Accordingly, the employees who are eligible for the Non-Insider Compensation Programs include middle- or junior-management employees and other rank-and-file employees. All members of the Debtors' executive team, and all members of management who are "persons in control" of the Debtors, have been excluded from receiving payments under the Non-Insider Compensation Programs.

32. ***The Eligible Employees Are Not Directors.*** I understand that the term "director" generally means an individual who sits on the board of directors of a corporation. None of the Eligible Employees sit on any of the Debtors' boards of directors, partake in board meetings as a director, implement corporate policy, or engage in corporate governance.[10]

33. ***The Eligible Employees Are Not Officers.*** I understand that, because the Bankruptcy Code does not specify what it means to be an officer, the facts and circumstances of an individual's role within a debtor's business generally inform the determination regarding whether a particular individual is an officer, and that an individual's title, by itself, is insufficient to establish that an individual is an officer.

34. None of the Eligible Employees manage the daily operations of any of the Debtors' business lines. None of the Eligible Employees report directly to the board of directors

---

[10] Although there are employees with the titles of senior director or director, these are positions that report directly or indirectly to a vice president and these employees do not sit on any of the Debtors' boards.

of the EFH Corp, and none report directly to EFH Corp.'s Chief Executive Officer. While the employees participating in the Non-Insider Compensation Programs are critically important to the Debtors' business operations, none of the Eligible Employees (including the Vice Presidents and two Senior Vice Presidents) dictate overall company policy or strategy, have discretionary control over substantial budgetary amounts, or manage important aspects of the company's overall businesses. Although 51 Eligible Employees may have the title of Vice President (and two have the title of Senior Vice President), the individuals with these titles do not have the decision-making authority akin to an executive—indeed, they have *no* company-wide decision-making authority at all. Instead, the individuals with these titles are generally responsible for the oversight of a limited group of employees with respect to a specific aspect of one of the Debtors' businesses.

35.     ***The Eligible Employees Are Not Persons In Control of the Debtors.*** Finally, the Eligible Employees are not "persons in control" of the Debtors. Specifically, none of the Eligible Employees have sufficient authority to dictate corporate policy or dispose of corporate assets. None oversee the Debtors' strategic plan or determine the disposition of corporate funds with respect to strategic investing or financing activities. Additionally, none of the Eligible Employees report directly to the Debtors' boards, none report directly to the Chief Executive Officer of EFH Corp., only 18 directly report to the Debtors' executive management team, and none are granted decision-making authority akin to an executive. Instead, as discussed above, the Eligible Employees are non-insider management employees and rank-and-file employees in charge of specific financial, administrative, or operational aspects of the Debtors' businesses.

*[Remainder of the page left intentionally blank.]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information and belief.

Wilmington, Delaware
Dated: May 15, 2014

                                              */s/* Paul Keglevic
                                              Paul Keglevic
                                              Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of EFH Corp., EFIH, and TCEH LLC