**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | **Objection Deadline:  May 29, 2014 at 4:00 p.m.** |
| | ) | **Hearing Date:  June 5, 2014 at 9:30 a.m.** |

**MOTION OF ENERGY FUTURE HOLDINGS
CORP., *ET AL.*, FOR ENTRY OF ORDERS APPROVING
CERTAIN EFIH SETTLEMENTS AND THE ONCOR TSA AMENDMENT**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file

this motion (this "Motion")[2] for the entry of orders, substantially in the forms attached hereto as

**Exhibit A** and **Exhibit B** (the "Orders"), (a) approving the EFIH Settlements (as defined below)

on the terms set forth in that certain Restructuring Support and Lock-Up Agreement, dated as of

April 29, 2014 (including all exhibits and schedules attached thereto and as may be amended

from time to time according to its terms, the "Restructuring Support Agreement"), including the

Backstop Commitment, and authorizing the payment of certain fees in connection therewith;

(b) approving certain of the Debtors' entry into the Oncor TSA Amendment (as defined herein

and, together with the EFIH Settlements, the "Settlement") on the terms set forth in the

Restructuring Support Agreement; and (c) authorizing the Debtors to take any and all actions

---

[1]    The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810.  The location of the
debtors' service address is 1601 Bryan Street, Dallas, Texas 75201.  Due to the large number of debtors in these
chapter 11 cases, which are being jointly administered on an interim basis, a complete list of the debtors and the
last four digits of their federal tax identification numbers is not provided herein.  A complete list of such
information may be obtained on the website of the debtors' claims and noticing agent at
http://www.efhcaseinfo.com.

[2]    Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to such terms
in the Restructuring Support Agreement.

reasonably necessary to consummate, and to perform any and all obligations contemplated by, the Settlement.

In support of this Motion, the Debtors submit the *Declaration of David Ying in Support of the Motion of Energy Future Holdings Corp., et al., for Entry of Orders Approving Certain EFIH Settlements and the Oncor TSA Amendment* (the "Ying Declaration"), filed contemporaneously herewith, and the *Declaration of Paul Keglevic, Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of Energy Future Holdings Corp., et al., in Support of First Day Motions* (the "First Day Declaration").  In further support of this Motion, the Debtors respectfully submit as follows.

## Preliminary Statement

1.      With seven principal tranches of funded debt totaling approximately $42 billion, distributed across EFIH, TCEH, and EFH Corp., the Debtors are undertaking one of the most complex restructuring efforts in history.  After more than a year of good-faith, arm's-length negotiations, the Debtors and many of their key stakeholders have reached an agreement on the terms of a restructuring that, if consummated, will deleverage the Debtors' balance sheets and facilitate an expeditious emergence from chapter 11.  This comprehensive restructuring is memorialized in the Restructuring Support Agreement.

2.      The restructuring transactions contemplated under the Restructuring Support Agreement will, among other things, separate TCEH from EFH on a tax-free basis (the "TCEH Tax-Free Spin-Off") and simultaneously deleverage EFIH through a significant capital infusion from certain of its unsecured creditors.  Among other things, this proposed transaction structure would avoid an over $6 billion tax liability that could otherwise be triggered by the

2

deconsolidation of EFIH and TCEH from EFH Corp.  The Settlement, as set forth in this Motion, is a critical early step in the process.

3.      The Settlement has two major components.  *First*, the EFIH Settlements will resolve the claims (including any Alleged Makewhole Claims (as defined herein)) of several major stakeholders—specifically, Fidelity, PIMCO, WAMCO, GSO, York, and Avenue (all as defined in the Restructuring Support Agreement), representing approximately 32% of the EFIH First Lien Notes and 35% of the EFIH Second Lien Notes as of the Petition Date—related to the repayment of the EFIH First and Second Lien Notes.[3]  Moreover, the Debtors are providing all other qualified holders of such notes a full opportunity to settle and compromise their claims through an opt-in process.  The EFIH Settlements are a prerequisite to the consummation of both the EFIH First Lien DIP Facility and the EFIH Second Lien DIP Facility.  *Second*, in connection with obtaining the commitment of certain holders of EFIH Unsecured Notes to backstop the EFIH Second Lien DIP Facility (the "Investment Commitment," and such backstop parties, the "Commitment Parties")[4] and the settlement of $1.3 billion of intercompany claims, the EFIH Debtors agreed to seek approval of the Oncor TSA Amendment.  The Oncor TSA Amendment

---

[3]     The Debtors have separately sought entry of an order disallowing and extinguishing any non-settled Makewhole Claims related to the EFIH First Lien Notes, pursuant to the *Motion of Energy Future Intermediate Holding Company LLC and EFIH Finance, Inc. for Entry of (I) an Interim Order (A) Approving Certain Fees Related to Postpetition Financing and Granting Such Fees Administrative Expense Priority and (B) Scheduling a Final Hearing; and (II) a Final Order (A) Approving Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Authorizing the Use of Cash Collateral, (D) Authorizing the EFIH First Lien Repayment, (E) Authorizing Issuance of Roll-Up Debt to the Extent Authorized by the Settlement Motion, (F) Determining the Value of Secured Claims, and (G) Modifying the Automatic Stay* [Docket No. 74] (the "EFIH First Lien DIP Motion").  The Debtors also deny the validity of any non-settled Makewhole Claims related to the EFIH Second Lien Notes pursuant to the *Motion of Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. for Entry of an Order (A) Approving Postpetition Second Lien Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Authorizing the Use of Cash Collateral, (D) Authorizing the EFIH Second Lien Repayment, (E) Authorizing Entry Into and Payment of Fees Under the Commitment Letter, and (F) Modifying the Automatic Stay*, filed contemporaneously herewith (the "EFIH Second Lien DIP Motion"), but will litigate such claims at a later date.

[4]     The Debtors seek approval of the Investment Commitment and the payment of certain fees and expenses in connection therewith pursuant to the EFIH Second Lien DIP Motion.

provides for the direct payment to EFIH of certain periodic tax payments that would have otherwise been initially paid to EFH Corp.  The Oncor TSA Amendment is intended to ensure that the cash flow support for the various consensual transactions contemplated by the Restructuring Support Agreement will remain in place for the duration of the chapter 11 cases.

4.      The EFIH Settlements and the Oncor TSA Amendment are critical components to the overall agreement struck among the Debtors, the Consenting Creditors, and the Consenting Interest Holders under the Restructuring Support Agreement to separate TCEH from EFIH and to deleverage the Debtors' balance sheets.  The Restructuring Support Agreement requires the Debtors to receive Court approval of the EFIH Settlements within 75 days of the Petition Date and consummate the EFIH Settlements and related repayments through the EFIH First Lien DIP Facility and the EFIH Second Lien DIP Facility within five days of such approval.

5.      As discussed in this Motion, the First Day Declaration, and the Ying Declaration, the Settlement represents a reasonable exercise of the Debtors' sound business judgment and is in the best interest of the Debtors' estates.  The Settlement is the result of hard-fought, often contentious arm's-length negotiations, in which all parties were forced to make significant concessions.  The Settlement will not only limit an otherwise complex web of litigation, but is expected to provide EFIH with the necessary cash flows to fund restructuring costs and to consummate the transactions under the Restructuring Support Agreement, setting the stage for a substantial deleveraging of EFIH's balance sheet pursuant to a chapter 11 plan (the "Plan").  Thus, the Debtors respectfully request that the Court approve the Settlement as a reasonable compromise under Bankruptcy Rule 9019 and as a valid exercise of the Debtors' reasonable business judgment under section 363(b) of the Bankruptcy Code.

**Jurisdiction and Venue**

6.      The United States Bankruptcy Court for the District of Delaware (the "Court")
has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended
Standing Order of Reference from the United States District Court for the District of Delaware*,
dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C.
§ 157(b)(2), and the Debtors confirm their consent pursuant to rule 9013-1(f) of the Local Rules
of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of
Delaware (the "Local Bankruptcy Rules") to the entry of a final order by the Court in connection
with this Motion to the extent that it is later determined that the Court, absent consent of the
parties, cannot enter final orders or judgments in connection herewith consistent with Article III
of the United States Constitution.

7.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      The bases for the relief requested in this Motion are sections 105 and 363(b) of
title 11 of the United States Code (the "Bankruptcy Code") and Local Bankruptcy Rules 6004
and 9019.

**Relief Requested**

9.      By this Motion, the Debtors seek entry of the Orders, in no event later than 75
days after the Petition Date:  (a) approving the EFIH Settlements and related relief, including the
First Lien Opt-In, First Lien DMA, Backstop Commitment, Second Lien Opt-In, and Second
Lien DMA (all as defined below), and the fees and expenses in connection therewith;
(b) authorizing the Debtors' entry into the Oncor TSA Amendment (as defined below); and
(c) authorizing the Debtors to take any and all actions reasonably necessary to consummate, and
to perform any and all obligations contemplated by, the Settlement.

5

## Background

10.     On April 29, 2014 (the "Petition Date"), each of the Debtors filed a voluntary petition with the Court under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Court has entered an interim order for joint administration of these chapter 11 cases.  The Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") formed an official committee of unsecured creditors in these chapter 11 cases on May 13, 2014 [D.I. 420].  Further information regarding the Debtors' business operations and capital structure is set forth in the First Day Declaration.

## I.     The Restructuring Support Agreement

11.     The Debtors began their restructuring negotiations in early 2013, focusing in the first instance on a transaction structure that would keep EFIH, TCEH, and EFH Corp. together as a single consolidated group.  Initial negotiations lasted for several months and included countless meetings among professionals and principals.

12.     It became clear in November 2013, however, that a transaction to keep the EFH group together was not possible because the parties were unable to agree on the relative values of the various entities.  As a result, the Debtors turned their focus to developing a consensual deconsolidation strategy.  The parties considered two forms of deconsolidation strategies:  (a) a taxable transaction that would trigger an over $6 billion deconsolidation tax but would give the new owners of TCEH a full "step-up" in tax basis; and (b) a tax-free transaction that would not trigger a deconsolidation tax but would only give the new owners of TCEH and EFIH a partial "step-up" in tax basis.

13.     In early 2014, the Debtors made several important breakthroughs in negotiations with creditors.  First, certain EFIH and EFH stakeholders gained momentum around the terms of

a restructuring transaction at EFH and EFIH that was conditioned on a tax-free spin-off of TCEH. Second, in mid-March 2014, an ad hoc group of TCEH first lien creditors, for the first time, informed the Debtors that they were willing to consider a tax-free transaction to separate TCEH from EFH. Soon after, the principals and professionals of such constituencies entered into extensive arm's-length negotiations to come to an agreement on the material terms and conditions of a restructuring and to document a transaction based on these concepts.

14. As a result of these efforts, the Debtors and (a) certain holders of TCEH First Lien Debt; (b) certain holders of EFIH Unsecured Notes; (c) Fidelity (in its capacity as a holder of EFIH First Lien Notes, EFIH Second Lien Notes, and EFH Unsecured Notes), (d) PIMCO and WAMCO (in their capacities as holders of EFIH First Lien Notes); (e) GSO, York, and Avenue (in their capacities as holders of EFIH Second Lien Notes); and (f) certain holders of equity interests in EFH Corp. (collectively, the "Restructuring Support Parties") reached an agreement on the key terms of a restructuring, memorialized in the Restructuring Support Agreement. Through a series of interconnected compromises and transactions, the Restructuring Support Agreement provides the framework for a consensual reorganization of the Debtors and an expeditious emergence from chapter 11.

## II.    The Settlement[5]

### A.    The First Lien Settlement

15. Pursuant to the EFIH First Lien DIP Motion, the Debtors seek to repay the $3.985 billion in principal outstanding under the EFIH First Lien Notes, together with all accrued but unpaid interest thereon, with the proceeds from a $5.4 billion first lien superpriority debtor in

---

[5]    The summaries of the First Lien Settlement, Second Lien Settlement, and Oncor TSA Amendment set forth in this section are qualified in their entirety by the provisions of the Restructuring Support Agreement. To the extent there exists any inconsistency between this summary and the Restructuring Support Agreement, the Restructuring Support Agreement shall govern.

possession financing facility (the "EFIH First Lien DIP Facility," and the lenders thereunder, the "EFIH First Lien DIP Lenders").  Repayment of the EFIH First Lien Notes prior to confirmation of a chapter 11 plan will save the Debtors an estimated $15 million in interest per month. Certain holders of the EFIH First Lien Notes, however, have asserted that under provisions of the applicable debt documents, this repayment would trigger so-called "makewhole" or prepayment penalties of approximately $700 million in the aggregate (the "Alleged First Lien Makewhole Claims"), if no such claims were settled.  As a result, the Debtors are seeking in the EFIH First Lien DIP Motion a determination from this Court that the Alleged First Lien Makewhole Claims are without merit and should not be included in the allowed claims of the holders of EFIH First Lien Notes.

16.     In connection with the Restructuring Support Agreement, the Debtors negotiated and agreed to the terms of a settlement with Fidelity, PIMCO, and WAMCO (collectively, the "First Lien RSA Parties"), holders of approximately 32% of the outstanding principal amount of the EFIH First Lien Notes as of the Petition Date (the "First Lien Settlement").  Pursuant to the First Lien Settlement, in full satisfaction of their EFIH First Lien Note Claims, the First Lien RSA Parties will exchange their EFIH First Lien Note Claims (as defined in the Restructuring Support Agreement), including any Alleged First Lien Makewhole Claims, into EFIH First Lien DIP Claims in an amount equal to the greater of:

> (a) (i) 105% of the principal plus (ii) 101% of accrued and unpaid interest at the non-default rate on such principal, through consummation of the EFIH First Lien DIP Facility (deemed to include the original issue discount paid in respect of the EFIH First Lien DIP Facility); and

> (b) (i) 104% of the principal plus (ii) accrued and unpaid interest at the non-default rate on such principal, through consummation of the EFIH First Lien DIP Facility, plus (iii) original issue discount paid in respect of the EFIH First Lien DIP Facility, in connection with the initial syndication of the EFIH First Lien DIP Facility.

The First Lien RSA Parties will also be entitled to interest (in no event less than LIBOR plus 3.25% with a LIBOR floor of 1.00%) on the EFIH First Lien DIP Facility, but will not be entitled to any other fees (including commitment fees) paid under the EFIH First Lien DIP Facility.[6]

17.     In addition, as part of the First Lien Settlement, PIMCO committed, in the amount of up to $1.45 billion, and WAMCO, in the amount of up to $250 million (each, the "Backstop Amount," and together, the "Backstop Commitment," and such backstopping parties, the "Backstop Parties"), to backstop the EFIH First Lien DIP Facility (the "Backstop Financing") on the terms set forth in the Restructuring Support Agreement.  In connection with any loans made under the Backstop Commitment, the Backstop Parties will be entitled to:  (a) interest (in no event less than LIBOR plus 3.25% with a LIBOR floor of 1.00%); and (b) original issue discount (equal to the greater of (i) 1.0% or (ii) such original issue discount as may be paid to the EFIH First Lien DIP Lenders), subject to a Clear Market Provision (as defined in Exhibit A to the Restructuring Support Agreement).

18.     The Backstop Financing will be funded first by PIMCO in an amount up to $768.871 million and thereafter on a pro rata basis by PIMCO (for its remaining commitment) and WAMCO in an amount equal to any shortfall in participation under the First Lien Settlement, provided that to the extent such amount is not greater than $768.871 million, PIMCO may fund the portion of the EFIH First Lien DIP Facility not otherwise funded under the First Lien Settlement or by Fidelity or GSO (the "PIMCO Oversubscription Right").

---

[6]     As set forth in the EFIH First Lien DIP Motion, the Debtors have made arrangements with the EFIH First Lien DIP Lenders to accommodate participation by Settling EFIH First Lien Note Holders.

19.    The Backstop Parties will also be entitled to the following backstop fees (the "Backstop Fees"), upon entry of the final order approving the EFIH First Lien DIP Facility and the funding of any loans pursuant to the Backstop Commitment:  (a) a commitment fee of 1.75% for PIMCO and 1.0% for WAMCO, paid in respect of such funded loans, except with respect to any funding pursuant to the PIMCO Oversubscription Right; and (b) a "ticking" fee if and when any such fee becomes payable to the EFIH First Lien DIP Lenders.  PIMCO will also receive payment of its fees and expenses on the terms set forth in the Restructuring Support Agreement.

20.    Last, in connection with the First Lien Settlement, GSO committed to provide $50 million of the EFIH First Lien DIP Facility to the Debtors for which it will be entitled to receive the interest (in no event less than LIBOR plus 3.25% with a LIBOR floor of 1%) and original issue discount as may be paid to other EFIH First Lien DIP Lenders, but shall not be entitled to any other fees (including commitment fees) paid in respect of the EFIH First Lien DIP Facility.

21.    The First Lien Settlement was vital to the execution of the Restructuring Support Agreement, and the Debtors could have limited participation in the First Lien Settlement to only the parties that executed the Restructuring Support Agreement prepetition.  Importantly, however, on May 6, 2014, the Debtors made the First Lien Settlement available to all qualified holders of EFIH First Lien Notes in accordance with applicable securities laws by distributing relevant materials to such holders (the "First Lien Opt-In," and such materials, the "First Lien Opt-In Materials").[7]    The First Lien Opt-In provides for the settlement terms set forth in

---

[7]    On May 7, 2014, the Debtors filed the *Notice of Initiation of Opt-In Period for Proposed EFIH First Lien Settlement* [D.I. 363].  As soon as practicable following the expiration of the First Lien Opt-In, the Debtors, through Epiq, will file with the Court a report of such holders' participation in the First Lien Settlement.

paragraph 16(a) above, subject to the "step-down" contained in the First Lien Opt-In Materials (the "First Lien Opt-In Procedures").

22.     The First Lien Opt-In reflects an effort to increase consensus and avoid any argument that the First Lien Settlement favored parties to the Restructuring Support Agreement by allowing these parties, and only these parties, to avoid litigation regarding the Alleged First Lien Makewhole Claims.  Any holder of EFIH First Lien Notes that participates in the First Lien Settlement pursuant to the First Lien Opt-In (such participants, the "First Lien Opt-In Participants," and together with First Lien RSA Parties, the "Settling EFIH First Lien Note Holders") must validly tender and deliver the full amount of their EFIH First Lien Notes by the deadlines set forth in the First Lien Opt-In Materials.  The First Lien Opt-In (with the exception of the early participation term) will not expire until the Court has approved the relief requested in this Motion with respect to the EFIH Settlements.

23.     In connection with the First Lien Opt-In, the Debtors seek approval of that certain Dealer Management Agreement, dated as of May 6, 2014, by and between EFIH, EFIH Finance, and the dealer managers for the First Lien Opt-In (such dealer managers, the "First Lien Dealer Managers," and such agreement, the "First Lien DMA"), attached hereto as **Exhibit C**.  In the Debtors' reasonable business judgment, the First Lien DMA is a necessary and reasonable component for the successful consummation of the First Lien Opt-In.  The services performed by, and the indemnities provided to, the First Lien Dealer Managers under the First Lien DMA are on customary, if not highly favorable, terms for the Debtors.  Indeed, the First Lien Dealer Managers receive no compensation other than the reimbursement of legal expenses.  Approval of the First Lien DMA is an express condition to consummation of the First Lien Opt-In.

24.     By this Motion, the Debtors respectfully request authority to enter into (a) the First Lien Settlement with (i) the First Lien RSA Parties and (ii) all other holders of EFIH First Lien Notes that elect to participate in the First Lien Settlement and become Settling EFIH First Lien Note Holders; (b) related transactions and fees, including authority to enter into the Backstop Commitment and pay related Backstop Fees; and (c) the First Lien DMA, including the indemnities provided to the First Lien Dealer Managers thereunder.

**B.      The Second Lien Settlement.**

25.     Under the EFIH Second Lien DIP Motion, the Debtors seek to repay the entire $2.156 billion in principal outstanding under the EFIH Second Lien Notes, together with all accrued but unpaid interest thereon, using the proceeds of the $1.9 billion EFIH second-lien postpetition note-purchase financing facility (the "EFIH Second Lien DIP Facility"), plus proceeds of the EFIH First Lien DIP Facility and EFIH cash on hand.  Repayment of the EFIH Second Lien Notes prior to confirmation of a chapter 11 plan will save the Debtors an estimated $8 million per month.  And, like the holders of the EFIH First Lien Notes, certain holders of the EFIH Second Lien Notes have asserted that, in the event of such repayment, provisions of the applicable debt documents entitle them to makewhole premiums or prepayment penalties of approximately $700 million in the aggregate (the "Alleged Second Lien Makewhole Claims" and, together with the Alleged First Lien Makewhole Claims, the "Alleged Makewhole Claims"), if no such claims were settled.  The Debtors believe that the Alleged Second Lien Makewhole Claims are without merit and will seek a determination from this Court on a later date that they should not be included in the allowed claims of the holders of EFIH Second Lien Notes.

26.    In connection with the Restructuring Support Agreement, the Debtors negotiated and agreed to a settlement with Fidelity,[8] GSO, York, and Avenue (collectively, the "Second Lien RSA Parties"), as holders of approximately 35% of the outstanding principal amount of the EFIH Second Lien Notes, regarding any and all claims related to the EFIH Second Lien Notes (the "Second Lien Settlement," and, together with the First Lien Settlement, the "EFIH Settlements").  Under the terms of the Second Lien Settlement, in full satisfaction of its EFIH Second Lien Note Claims, the Second Lien RSA Parties will receive their pro rata share of:

    (a) an amount in cash equal to principal plus accrued but unpaid interest (including Additional Interest) on such principal at the contract non-default rate through the date of consummation of the Second Lien Settlement; plus

    (b) 50% of the aggregate amount of the Alleged Second Lien Makewhole Claims calculated as of the date of consummation of the Second Lien Settlement and calculated without inclusion of Additional Interest; plus

    (c) in the case of GSO, York, and Avenue, settlement consideration of $1.57 million in cash in the aggregate.

In addition, as part of the Second Lien Settlement, Fidelity has the right to invest $500 million in loans under the EFIH First Lien DIP Facility (the "Fidelity Investment") for which it will be entitled to receive:  (a) interest (in no event less than LIBOR plus 3.25% with a LIBOR floor of 1.00%); (b) original issue discount as may be paid to the EFIH First Lien DIP Lenders; and (c) a 1.75% commitment fee paid in respect of the EFIH First Lien DIP Facility.

27.    As with the First Lien Settlement, the Second Lien Settlement was vital to the execution of the Restructuring Support Agreement, and the Debtors could have limited

---

[8]    The Second Lien Settlement provides that at any time before the Effective Date, any one or more of the Commitment Parties shall have the right to purchase from Fidelity all of its EFH Non-Guaranteed Notes for a purchase price equal to 37.15% of par plus accrued and unpaid interest through the Petition Date (the "Call Right").  The Call Right represents an intercreditor arrangement that does not require the use of the Debtors' estate assets.

participation in the Second Lien Settlement to only the parties that executed the Restructuring Support Agreement prepetition.  Importantly, however, on May 9, 2014, the Debtors made the Second Lien Settlement available to all holders of EFIH Second Lien Notes in accordance with applicable securities laws by distributing relevant materials to such holders (the "Second Lien Opt-In," and such materials, the "Second Lien Opt-In Materials").[9]    The Second Lien Opt-In Participants (as defined below) were offered settlement terms consistent with the terms set forth in paragraph 26(a) and (b), except that the Alleged Second Lien Makewhole Claims were calculated based on treasury rates existing at the time of the commencement of the Second Lien Opt-In, subject to a "step-down" in consideration after 10 business days (consistent with offers of this type) (the "Second Lien Opt-In Procedures," and together with the First Lien Opt-In Procedures, the "Opt-In Procedures").

28.    The Second Lien Opt-In reflects an effort to increase consensus and avoid ny argument that the Second Lien Settlement favored parties to the Restructuring Support Agreement by allowing these parties, and only these parties, to avoid litigation regarding the Alleged Second Lien Makewhole Claims.  Any holder of EFIH Second Lien Notes that participates in the Second Lien Settlement pursuant to the Second Lien Opt-In (such participants, the "Second Lien Opt-In Participants," and together with Second Lien RSA Parties, the "Settling EFIH Second Lien Note Holders") must validly tender and deliver the full amount of their EFIH Second Lien Notes by the deadlines set forth in the Second Lien Opt-In Materials.  The Second

---

[9]    On May 9, 2014, the Debtors filed the *Notice of Initiation of Opt-In Period for Proposed EFIH Second Lien Settlement* [Docket No. 400].  As soon as practicable following the expiration of Second Lien Opt-In, the Debtors, through Epiq, will file with the Court a report of such holders' participation in the Second Lien Settlement.

Lien Opt-In (with the exception of the early participation term) will not expire until the Court has approved the relief requested in this Motion with respect to the EFIH Settlements.

29.     In connection with the Second Lien Opt-In, the Debtors seek approval of that certain Dealer Management Agreement, dated as of May 9, 2014, by and between EFIH, EFIH Finance, and the dealer managers for the Second Lien Opt-In (such dealer managers, the "Second Lien Dealer Managers," such agreement, the "Second Lien DMA," and together with the First Lien DMA, the "Dealer Manager Agreements"), attached hereto as **Exhibit D**.  In the Debtors' reasonable business judgment, the Second Lien DMA is a necessary and reasonable component for the successful consummation of the Second Lien Opt-In.  The services performed by, and the indemnities provided to, the Second Lien Dealer Managers under the Second Lien DMA are on customary, if not highly favorable, terms for the Debtors.  Indeed, the Second Lien Dealer Managers receive no compensation other than the reimbursement of legal expenses.  Approval of the Second Lien DMA is an express condition to consummation of the Second Lien Opt-In.

30.     By this Motion, the Debtors respectfully request authority to enter into (a) the Second Lien Settlement with (i) the Second Lien RSA Parties and (ii) all other holders of EFIH Second Lien Notes that elect to participate in the Second Lien Settlement and become Settling EFIH Second Lien Noteholders; (b) related transactions and fees, including the Fidelity Investment; and (c) the Second Lien DMA, including the indemnities provided to the Second Lien Dealer Managers thereunder.

**C.     The Oncor TSA Amendment.**

31.     As is common practice among affiliated corporations filing consolidated tax returns, certain of the Debtors are party to tax sharing agreements, including the Amended and Restated Tax Sharing Agreement, dated as of November 5, 2008 (the "Oncor TSA"), by and among EFH Corp., Oncor Electric Delivery Holdings Company LLC ("Oncor Holdings"), Oncor

Electric Delivery Company LLC ("Oncor"), Texas Transmission Investment LLC, and Oncor Management Investment LLC (collectively, the "Oncor TSA Parties").[10]

32.    The Oncor TSA allocates liability for taxes with respect to the operations of Oncor and Oncor Holdings among the Oncor TSA Parties to enable the Debtors to efficiently and fairly share the burden of their tax liabilities as well as the benefit of their tax attributes. Because Oncor is a partnership for federal income tax purposes, Oncor itself pays no federal taxes on its earnings.  Instead, Oncor's earnings flow through to its partners, who ultimately bear the tax burden associated with Oncor's earnings.   To accomplish this goal, the Oncor TSA provides that Oncor and Oncor Holdings shall make payments to EFH Corp. in an amount sufficient for EFH Corp. to pay the taxes on the income generated by Oncor (which taxes Oncor's regulated, rate-paying customers would bear indirectly if Oncor were a taxable corporate entity).  The Oncor TSA requires Oncor Holdings to make 100% of its payments and Oncor to make approximately 80% of its payments (together, the "Tax Payments") directly to EFH Corp. (the taxable parent in the ownership structure), with the other approximately 20% of Oncor's tax payments paid to its minority equity holders, Texas Transmission Investment LLC and Oncor Management Investment LLC, in respect of tax liabilities generated by Oncor's operations.

33.    As part of the compromise struck in the Restructuring Support Agreement and in exchange for the Investment Commitment, the Debtors seek, by this Motion, to amend the Oncor TSA to provide that any payment required to be made to EFH Corp. under the Oncor TSA after March 31, 2014, be made directly to EFIH (the "Oncor TSA Amendment").   If the Court approves the Oncor TSA Amendment, the collateral under the EFIH First Lien DIP Facility and

---

[10]    EFIH is party to a separate tax sharing agreement with EFH Corp. that is not relevant to this Motion.

the EFIH Second Lien DIP Facility will include proceeds of the Oncor TSA Amendment payments.  EFIH, however, will reimburse EFH Corp. for Texas gross margin tax paid by EFH Corp. attributable to Oncor.  In the event that the Investment Commitment terminates or the EFIH Second Lien DIP Facility is not fully funded, the Oncor TSA Amendment will have no further force and effect, except that any payments previously paid or to be paid to EFIH pursuant to the Oncor TSA Amendment will be retained by, or paid to, EFIH.  In exchange for the Oncor TSA Amendment, the Restructuring Support Agreement contemplates that EFH will receive the following under the Plan:  (a) a $55 million cash payment from EFIH (the "Oncor TSA Amendment Payment") to EFH; and (b) a release of EFH by EFIH under the Plan, including on account of the over $1.3 billion in EFH unsecured notes held as assets by EFIH.[11]  This release of claims eliminates what would have likely been protracted litigation between EFH and EFIH.

34.     The purpose of the Oncor TSA Amendment is to ensure that EFIH continues to have access to working capital during the chapter 11 cases to service EFIH's restructuring-related costs, including debt service on the value-maximizing EFIH Second Lien DIP Facility that will allow the Debtors to deliver value to junior stakeholders of EFIH and EFH.

35.     Without the incremental cash provided by the Oncor TSA Amendment, EFIH may not have sufficient cash to meet its minimum cash covenant requirement under the EFIH First Lien DIP Facility and EFIH Second Lien DIP Facility if the bankruptcy process runs longer than anticipated by the Restructuring Support Agreement.  Failure to obtain approval of the Oncor TSA Amendment during the chapter 11 cases would also cause EFIH to incur payment-in-

---

[11]   The Oncor TSA Amendment Payment is subject to reduction if the tax payments received by EFIH under the Oncor TSA Amendment do not reach certain thresholds specified in the Restructuring Support Agreement.

kind interest and fees on the EFIH Second Lien DIP Facility, further increasing the debt burden on EFIH.

36.     The Oncor TSA Amendment is in the best interests of EFH.  Without approval of the Oncor TSA Amendment, EFH and its creditors will be subject to a far greater claims pool, reduced recoveries, and the risk of value-destructive intercreditor litigation.  As a result, approval of the Oncor TSA Amendment will materially increase the recovery by EFH unsecured creditors as compared to their recovery without the approval of the Oncor TSA Amendment.  By this Motion, the Debtors respectfully submit that the Oncor TSA Amendment is in the best interests of the Debtors' estates and should be approved.

### Basis for Relief

37.     The Debtors respectfully submit that the Court should approve the Settlement, including the EFIH Settlements and the Oncor TSA Amendment, under Bankruptcy Rule 9019 and section 363(b) of the Bankruptcy Code.  The Settlement is eminently reasonable because it resolves a web of complex potential litigation and objections among certain key stakeholders that absent the Restructuring Support Agreement would likely result in delay and severely burden these chapter 11 cases.  Likewise, there are legitimate business reasons supporting the use of property of the estate outside the ordinary course of business to effect the Settlement, including the building of consensus around the TCEH Tax-Free Spin-Off and the substantial deleveraging of the Debtors' balance sheets.

**I.      Approval of the Settlement Is Warranted Under Bankruptcy Rule 9019 Because It Is Well Above the Lowest Point in the Range of Reasonableness.**

38.     The Debtors respectfully submit that the Settlement, including the Dealer Management Agreements and Opt-In Procedures implemented to effectuate the Settlement, is well above the lowest point the range of reasonableness, which is the standard for approval of

settlements under Bankruptcy Rule 9019. By securing the support of certain of the Debtors' key stakeholders, the Settlement would resolve what otherwise threaten to be myriad, costly, and time-consuming objections and litigations.

39. Under Bankruptcy Rule 9019, bankruptcy courts have the authority to approve a compromise or settlement. *See* Fed. R. Bankr. P. 9019. The decision to accept or reject a compromise or settlement is within the sound discretion of the bankruptcy court. *See In re ID Liquidation One, LLC*, No. 13-3386, 2014 WL 630126, at *2 (3d Cir. Feb. 19, 2014); *Will v. Next Proteins, Inc. (In re Nutraquest, Inc.)*, 434 F.3d 639, 645 (3d Cir. 2006); *In re W.R. Grace & Co.*, 475 B.R. 34, 78 (D. Del. 2012), *aff'd sub nom.*, 729 F.3d 332 (3d Cir. 2013).

40. The Third Circuit has enumerated the following four-factor test to determine whether a settlement is fair and reasonable and should be approved: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *Liquidation One*, 2014 WL 630126, at *2 (quoting *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996)).

41. No one factor is dispositive. Instead, the court should "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." *Martin*, 91 F.3d at 393. In addition, in exercising its discretion, the court need only find that the settlement is "above the lowest point in the range of reasonableness." *In re Tribune Co.*, 464 B.R. 126, 158, *on reconsideration*, 464 B.R. 208 (Bankr. D. Del. 2011) (internal quotation marks omitted). In the final analysis, the court "does not have to be convinced that the settlement is the best possible compromise. Rather, the court

must conclude that the settlement is within the reasonable range of litigation possibilities." *In re Spansion, Inc.*, No. 09-10690 (KJC), 2009 WL 1531788 (Bankr. D. Del. June 2, 2009).

42.     Additionally, the court should consider the proposition that "[t]o minimize litigation and expedite the administration of a bankruptcy estate, '[c]ompromises are favored in bankruptcy.'" *In re Key3Media Grp., Inc.*, 336 B.R. 87, 93 (Bankr. D. Del. 2005), *aff'd*, No. 03-10323 (MFW), 2006 WL 2842462 (D. Del. Oct. 2, 2006).

43.     The Settlement is in the best interests of the Debtors and their estates and well above the lowest point in the range of reasonableness. ***First***, the Settlement paves the way to a restructuring that has the support of the Debtors' most significant stakeholders, including significant interest savings and deleveraging of EFIH and EFH, and, through the TCEH Tax-Free Spin-Off, avoids an over $6 billion deconsolidation tax liability. Although the benefits of the TCEH Tax-Free Spin-Off are significant and self-evident, agreement around that transaction structure was by no means a foregone conclusion in the negotiations leading up to the commencement of the case, given substantial disagreement regarding deconsolidation and the taxable nature of such a transaction. Moreover, the Settlement is supported by the most junior economic stakeholders of EFIH and EFH, those that bear the economic risk, and provides a means by which all senior EFIH stakeholders may receive payment in full on account of their allowed claims. For that reason, the Settlement will be a necessary first step to a successful restructuring.

44.     ***Second***, absent the Settlement, the Debtors' chapter 11 cases would be subject to a complex web of litigation that could threaten confirmation of chapter 11 plans of reorganization by the Debtors. Although the Debtors believe that all such litigations and objections would ultimately be resolved in their favor, the analyses conducted by the Debtors

20

and their advisors conclude that, in the aggregate, these actions would require significant resources to dispute and risk delaying the Debtors from a value-maximizing emergence from chapter 11.

45.    For these reasons, the Debtors respectfully submit that the Court should approve the Settlement, as the compromises that it embodies are well above the lowest point in the range of reasonableness.

## II.    Approval of the Settlement Is Warranted Under Section 363(b) of the Bankruptcy Code Because It is Supported by Sound Business Reasons.

46.    The Debtors respectfully request that the Court approve the disposition of property of the estate outside the ordinary course of business under section 363(b) of the Bankruptcy Code to the extent necessary to effectuate the Settlement because the Debtors can demonstrate ample business justifications for doing so.    The Settlement and the Restructuring Support Agreement that it facilitates promise to bring billions of dollars into the Debtors' estates, to substantially deleverage EFH and EFIH's balance sheets, and to generate consensus around the terms of a plan, including the TCEH Tax-Free Spin-Off, which itself avoids billions of dollars of potential deconsolidation liabilities.

47.    The Bankruptcy Code authorizes the use of property outside the ordinary course of business with court approval and given a valid business reason.    Specifically, the Bankruptcy Code authorizes a debtor in possession to "use, sell, or lease, other than in the ordinary course of business, property of the estate," after notice and a hearing.    11 U.S.C. § 363(b).    It is well established in this jurisdiction that a debtor may use property of the estate outside the ordinary course of business under this provision if there is a good business reason for doing so.    *See, e.g.*, *Martin*, 91 F.3d at 395; *In re Elpida Memory, Inc.*, No. 12-10947 (CSS), 2012 WL 6090194, at

*5 (Bankr. D. Del. Nov. 20, 2012); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153

(Bankr. D. Del. 1999); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175 (Bankr. D. Del. 1991).

48.    This standard for approval of the use of property outside the ordinary course of

business is a deferential one.  Once "the debtor articulates a reasonable basis for its business

decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not

entertain objections to the debtor's conduct."  *Comm. of Asbestos-Related Litigants and/or*

*Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr.

S.D.N.Y. 1986).  Rather, there is "a presumption that in making a business decision the directors

of a corporation acted on an informed basis, in good faith and in the honest belief that the action

taken was in the best interests of the company."  *Gantler v. Stephens*, 965 A.2d 695, 705-06

(Del. 2009).  Indeed, the business judgment standard "embodies the deference that is accorded to

managerial decisions of a board of directors."  *Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d

914, 928 (Del. 2003).

49.    The Settlement, at all times negotiated at arm's-length and a critical and necessary

component of the Restructuring Support Agreement, is supported by numerous and compelling

business justifications.  **First**, the Settlement paves the way to a plan of reorganization providing

for the TCEH Tax-Free Spin-Off, which avoids an over $6 billion deconsolidation tax liability

and resolves the high-level debate among certain of the Debtors' key stakeholders as to the best

transaction structure for these chapter 11 cases.  **Second**, the EFIH Settlements serve as the basis

for key stakeholders' support for the process—specifically, each of the First Lien RSA Parties

and Second Lien RSA Parties made entry into the EFIH Settlements a condition to their

participation in the Restructuring Support Agreement.  Yet, to make the EFIH Settlements as

equitable as possible, the parties agreed to give other holders of the EFIH First Lien Notes and

the EFIH Second Lien Notes an opportunity to settle their Alleged Makewhole Claims, and as a result further reduce any potential litigation exposure to the EFIH Debtors on account of their repayment transactions.  To the extent any First Lien RSA Parties and Second Lien RSA Parties are receiving superior settlement terms than provided in the First Lien Opt-In or the Second Lien Opt-In, such settlement terms were negotiated in the context of the unique value such parties provided to the Restructuring Support Agreement and are justified in light of the immense value the Restructuring Support Agreement provides to the Debtors.  *Finally*, the Oncor TSA Amendment is necessary to provide sufficient working capital to service EFIH's restructuring-related costs, including debt service on the value-maximizing EFIH Second Lien DIP Facility, which creates significant value for both EFH's and EFIH's estates through its deleveraging conversion feature.  Therefore, the Debtors submit that entry into the Settlement, including the EFIH Settlements and the Oncor TSA Amendment and related relief, is a sound exercise of their reasonable business judgment.

### III.    The Backstop Fees Are Necessary and Appropriate.

50.    As discussed above, the First Lien Settlement contemplates the payment of certain fees and expenses to the Backstop Parties.  The Backstop Fees associated with the funding of the Backstop Commitment and the payment of PIMCO's fees and expenses are necessary and appropriate.  The Backstop Parties required payment of the Backstop Fees, which range from zero to $29.75 million, upon funding, as a condition of the Backstop Commitment.  Here, the Debtors, in a sound exercise of their reasonable business judgment, have likewise determined that payment of these fees and expenses are an effective, commonplace, and necessary means to secure the Backstop Parties' Backstop Commitment and that the amounts contemplated thereby are reasonable by market standards.  Courts in this and other districts have approved similar fees in other recent chapter 11 cases.  *See*, *e.g.*, *In re Exide Techs.*, No. 13-11482 (KJC) (Bankr. D.

Del. July 25, 2013) (approving approximately 4.7% of aggregate fees to underwriters, arrangers, and lenders); *In re Neb. Book Co.*, No. 11-12005 (Bankr. D. Del. Apr. 12, 2012) (approving a commitment fee of 1% of backstop commitment for each month outstanding, a 1% funding fee, expense reimbursement, and similar indemnification language); *In re LSP Energy Ltd. P'ship*, No. 12-10460 (Bankr. D. Del. Feb. 27, 2012) (approving 1.25% DIP commitment fee); *In re Friendly Ice Cream Corp.*, No. 11-13167 (Bankr. D. Del. Nov. 2, 2011) (approving certain letter of credit fees including a 2% issuance fee); *In re Cooper-Standard Holdings Inc.*, No. 09-12743 (Bankr. D. Del. Sept. 2, 2009) (approving 2.5% upfront fee and 2.5% exit fee); *In re Hayes Lemmerz Int'l, Inc.*, No. 09-11655 (Bankr. D. Del. June 15, 2009) (approving 3% exit fee); *In re Aleris Int'l. Inc.*, No. 09-10478 (Bankr. D. Del. Mar. 18, 2009) (approving 3.5% exit fee and 3.5% front-end net adjustment against each lender's initial commitment); *In re Dura Auto. Sys., Inc.*, No. 06-11202 (Bankr. D. Del. Jan. 30, 2008) (approving a 2.5% fee related to refinancing and extending a postpetition financing facility); *see also In re Eastman Kodak Co.*, No. 12-10202 (Bankr. S.D.N.Y. Dec. 14, 2012) (approving a DIP commitment fee of 2% in cash or 3% paid in kind, among other fees, plus expense reimbursement and indemnification provisions); *In re Great Atl. & Pac. Tea Co.*, No. 10-24549 (Bankr. S.D.N.Y. Jan. 11, 2011) (approving 3% letter of credit fee); *In re InSight Health Servs. Holdings Corp.*, No. 10-16564 (Bankr. S.D.N.Y. Jan. 4, 2011) (approving 2.5% DIP closing fee); *In re Neff Corp.*, No. 10-12610 (Bankr. S.D.N.Y. June 30, 2010) (approving 3.1% DIP and exit facility fee); *In re Reader's Digest Ass'n*, No. 09-23529 (Bankr. S.D.N.Y. Oct. 6, 2009) (approving 3% exit fee); *In re Lear Corp.*, No. 09-14326 (Bankr. S.D.N.Y. Aug. 4, 2009) (approving 5% upfront fee and a 1% exit/conversion fee); *In re Hayes Lemmerz Int'l, Inc.*, No. 09-11655 (Bankr. D. Del. May 22, 2009) (approving a 4% DIP commitment fee); *In re Gen. Growth Props., Inc.*, No. 09-11977 (Bankr. S.D.N.Y. May 14,

2009) (approving 3.75% exit fee); *In re Tronox Inc.*, No. 09-10156 (Bankr. S.D.N.Y. Feb. 9, 2009) (approving an up-front 3% facility fee).[12]  Also, as applied in the cases cited in this paragraph, courts regularly grant debtors authority pursuant to section 363(b) of the Bankruptcy Code to enter into agreements similar to the Backstop Commitment.

## Notice

51.    The Debtors shall provide notice of this Motion on the date hereof via first class mail to:  (a) the Office of the U.S. Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d) and proposed counsel thereto; (c) Wilmington Trust, N.A., in its capacity as administrative agent under the TCEH first lien credit agreement and collateral agent under the TCEH intercreditor agreements and counsel thereto; (d) Bank of New York Mellon Trust Company, N.A., in its capacity as indenture trustee under:  (i) the TCEH unsecured pollution control revenue bonds; and (ii) the EFCH 2037 Notes due 2037, and counsel thereto; (e) American Stock Transfer & Trust Company, LLC, in its capacity as indenture trustee under: (i) the 9.75% EFH senior unsecured notes due 2019;  (ii) the 10.0% EFH senior unsecured notes due 2020; (iii) the 10.875% EFH LBO senior unsecured notes due 2017; (iv) the 11.25%/12.0% EFH LBO toggle notes due 2017; (v) the 5.55% EFH legacy notes (series P) due 2014; (vi) the 6.50% EFH legacy notes (series Q) due 2024; and (vii) the 6.55% EFH legacy notes (series R) due 2034, and counsel thereto; (f) Computershare Trust Company, N.A. and Computershare Trust Company of Canada, in their capacities as indenture trustee under:  (i) the 11.0% EFIH senior secured second lien notes due 2021; and (ii) the 11.75% EFIH senior secured second lien

---

[12]    Because of the voluminous nature of the orders cited herein, such orders are not attached to the motion.  Copies of these orders are available upon request of the Debtors' counsel.

notes due 2022, and counsel thereto; (g) UMB Bank, N.A. in its capacity as indenture trustee under: (i) the 9.75% EFIH senior unsecured notes due 2019; and (ii) the 11.25%/12.25% EFIH senior toggle notes due 2018, and counsel thereto; (h) BOKF, NA, dba Bank of Arizona, in its capacity as indenture trustee under 11.50% TCEH senior secured notes due 2020, and counsel thereto; (i) CSC Trust Company of Delaware in its capacity as indenture trustee under: (i) the 6.875% EFIH senior secured notes due 2017; and (ii) the 10.0% EFIH senior secured notes due 2020, and counsel thereto; (j) Law Debenture Trust Company of New York in its capacity as indenture trustee under: (i) the 10.25% TCEH senior unsecured notes due 2015; and (ii) the 10.50%/11.25% TCEH senior toggle notes due 2016, and counsel thereto; (k) Wilmington Savings Fund Society, FSB in its capacity as indenture trustee under the 15.0% TCEH senior secured second lien notes due 2021, and counsel thereto; (l) counsel to certain holders of claims against the Debtors regarding each of the foregoing described in clauses (c) through (k); (m) the agent for the TCEH debtor-in-possession financing facility and counsel thereto; (n) the agent for the EFIH debtor-in-possession financing facility and counsel thereto; (o) counsel to certain holders of equity in Texas Energy Future Holdings Limited Partnership; (p) counsel to the Ad Hoc Committee of TCEH Unsecured Noteholders, (q) counsel to the Ad Hoc Committee of Second Lien Noteholders, (r) counsel to Oncor Holdings; (s) the Securities and Exchange Commission; (t) the Internal Revenue Service; (u) the Office of the United States Attorney for the District of Delaware; (v) the Office of the Texas Attorney General on behalf of the Public Utility Commission of Texas; (w) counsel to the Electric Reliability Council of Texas; (x) the parties to the Restructuring Support Agreement; and (y) Texas Transmission Investment LLC. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **No Prior Request**

52.    No prior request for the relief sought in this Motion has been made to this or any other court.

[*Remainder of page intentionally left blank.*]

WHEREFORE, the Debtors respectfully request that the Court enter the Orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Wilmington, Delaware
Dated:  May 15, 2014

/s/ Tyler D. Semmelman

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:      (302) 651-7700
Facsimile:      (302) 651-7701
Email:          collins@rlf.com
                defranceschi@rlf.com
                madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
Richard M. Cieri (admitted *pro hac vice*)
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          richard.cieri@kirkland.com
                edward.sassower@kirkland.com
                stephen.hessler@kirkland.com
                brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          james.sprayregen@kirkland.com
                chad.husnick@kirkland.com
                steven.serajeddini@kirkland.com

Proposed Co-Counsel to the Debtors and Debtors in Possession