**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) ) ) | Case No. 14-10979 (CSS) |
| Debtors. | ) ) ) | (Joint Administration Requested) |

**DECLARATION OF DAVID YING, SENIOR MANAGING DIRECTOR OF EVERCORE GROUP L.L.C. IN SUPPORT OF THE MOTION OF ENERGY FUTURE HOLDINGS CORP., ET AL., FOR ENTRY OF ORDERS APPROVING CERTAIN EFIH SETTLEMENTS AND THE ONCOR TSA AMENDMENT**

I, David Ying, declare as follows:

1. I am a Senior Managing Director and the Head of Restructuring and Debt Advisory Group at Evercore Group L.L.C. ("Evercore"), a financial advisory and investment banking firm with offices around the world and financial advisor and investment banker to the above-captioned debtors and debtors in possession (the "Debtors"). I submit this declaration (this "Declaration") in support of the *Motion of Energy Future Holdings Corp., Et Al., For Entry Of Orders Approving Certain EFIH Settlements And The Oncor TSA Amendment* (the "EFIH Settlement Motion" or the "Settlement").[2]

2. Except where specifically noted, the statements in this Declaration are based on my personal knowledge; information supplied or verified by the Evercore financial team that I

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which the debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the EFIH Settlement Motion.

supervise or the EFIH Debtors' personnel and third-party advisors; my review of relevant documents; or my experience and knowledge of the EFIH Debtors' operations and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this Declaration on behalf of the EFIH Debtors.

**A.      Qualifications**

3.      Evercore is one of the world's leading independent investment banking groups, with more than 20 offices in 8 countries, including an office located at 55 East 52nd Street, New York, NY 10055. Evercore has expertise in domestic and cross border restructurings, mergers and acquisitions, debt and equity capital markets transactions, and other financial advisory services. Evercore has served as an experienced bankruptcy and restructuring advisor to debtors, bondholders, creditors' committees, single creditor classes and secured creditors, shareholders, and boards of directors in a variety of industries. Evercore is a member of the Financial Industry Regulatory Authority and the Securities Investor Protection Corporation.

4.      I joined Evercore in 2005 and am a co-founder and head of the firm's Restructuring and Debt Advisory Group. I have over 30 years of experience in restructuring advisory, debt and equity financings, and private equity investing. Prior to joining Evercore, I held partner-level positions at Miller Buckfire Ying & Co, JLL Partners, Donaldson, Lufkin & Jenrette, Smith Barney, and Drexel Burnham Lambert. I have a B.S. from the Sloan School of Management at the Massachusetts Institute of Technology (1976) and an M.B.A. in Finance from the Wharton School at the University of Pennsylvania (1978).

5.      As a Senior Managing Director at Evercore, I specialize in advising both debtors and creditors in financial restructurings and distressed mergers and acquisitions and raising debt and equity capital in both out-of-court and in bankruptcy proceedings. Moreover, I have advised numerous public and private corporations in complex restructurings, and have advised distressed

corporations in connection with obtaining postpetition financing (including DIP financing and confirmation financing), helped them to find sources of financing, and negotiated, on their behalf, the terms of such financing.

**B.     Summary**

6.     I believe that the Settlement—a comprehensive agreement comprised of the makewhole settlements and the Oncor TSA Amendment—is in the best interests of the Debtors and their estates for the following reasons:

7.     *First*, the Settlement provides for the settlement of alleged makewhole claims by certain holders of the EFIH First and Second Lien Notes.  The settlements are at a meaningful premium to their pre-petition claims, voluntary on the part of the EFIH First and Second Lien Noteholders, and present an opportunity to avoid the uncertainty of litigation.

8.     *Second*, I believe that the fees related to the Settlement are reasonable under the circumstances, and integral to securing the support of critical parties to the restructuring and thus maximizing the value of the Debtors' estates.

9.     *Finally,* approval of the Settlement will result in an infusion of additional cash flow to EFIH following the Court's approval of the Oncor TSA Amendment.  This incremental cash flow will help stabilize EFIH's cash balance during the bankruptcy.  Provided that the Oncor TSA amendment is approved, under the to-be-proposed Plan of Reorganization, EFH will receive a cash payment from EFIH, and EFIH will forgive $1.3 billion in debt claims it has against EFH.  The net effect of these transactions would be to increase materially the recovery by EFH unsecured creditors as compared to their recovery without the approval of the Oncor TSA Amendment.  In fact, the amendment has the support of a supermajority of the EFH unsecured creditors (i.e., Fidelity).

**C.      The Makewhole Settlements Are In The Debtors' Best Interests.**

10.     As an initial matter, the Settlement Motion seeks the approval of the EFIH First and Second Lien Makewhole Settlements.  I believe that both are in the best interests of the Debtors' estates and well within the range of reasonableness.

The EFIH First and Second Lien creditors both allege that the repayment of their debt constitutes an optional redemption and thus entitles them to a so-called makewhole premium under the terms and conditions of the applicable debt agreements.  Although the Debtors do not believe that such premiums are owed, the EFIH First and Second Lien creditors are likely to argue that they are entitled to the makewhole premiums set forth in the relevant indentures (despite that such language is not in either indenture).  If the EFIH Debtors litigated this issue and lost, the EFIH First and Second Lien creditors would have significant makewhole claims, which could be calculated as follows:

| Debt Issuance | Applicable Premium[3] (as of June 11, 2014) $M |
|---|---|
| **First Lien Notes** | |
| **2017 Notes** (6.875% Senior Secured Notes due 2017) | $39 |
| **2020 Notes** (10% Senior Secured Notes due 2020) | $652 |
| **Second Lien Notes** | |
| **2021 Notes** (11% Senior Secured Second Lien Notes due 2021) | $100 |
| **2022 Notes** (11.75% Senior Secured Second Lien Notes due 2022) | $582 |

11.     The First and Second Lien Makewhole Settlements resolve those claims for a fraction of those amounts:  52 cents on the dollar for the EFIH First Lien 2017 Notes; 21 cents

---

[3]     The Applicable Premium is calculated based on Treasury rates as of May 7, 2014.  These aggregate amounts are all in millions of $.

4

for the EFIH First Lien 2020 Notes[4]; and 50 cents for the EFIH Second Lien Notes. These settlements, moreover, helped the EFIH Debtors and EFH Corp. secure Fidelity's support for the Settlement and the Restructuring Support Agreement. Fidelity's support is critical to confirming a plan at EFH Corp. and resolving significant inter-debtor disputes between EFH and EFIH, given its holdings of approximately 73% of the unsecured debt at EFH Corp as of the Petition Date. During the negotiations, Fidelity made clear that it would not settle certain of its claims against the Debtors while its remaining claims were the subject of costly and protracted litigation. Accordingly, Fidelity endeavored to resolve each of its claims across the capital structure, including their makewhole claims at EFIH. And the Debtors negotiated the makewhole settlements—along with the EFIH unsecured creditors[5]—at arm's length with Fidelity.

12. In the wake of negotiations with Fidelity, other major holders of EFIH First and Second Lien Notes have agreed to settle their makewhole claims. Specifically, PIMCO and WAMCO, who collectively held approximately 21% of the outstanding principal amount of the EFIH First Lien Notes, have agreed to settle their makewhole claims.[6] The Debtors also reached terms with GSO, York, and Avenue, who collectively held approximately 5% of the outstanding principal amount of the EFIH Second Lien Notes as of the Petition Date. As of this filing, the Debtors have come to terms with holders of approximately 33% of EFIH First Lien Notes and 35% of the EFIH Second Lien Notes.

---

[4] Assuming a makewhole settlement of 104% of principal for the 2017 and 2020 Notes.

[5] Given their position in the capital structure, the EFIH unsecured creditors had direct financial interest in minimizing the amount of any makewhole settlement.

[6] PIMCO's holdings were as of the Petition Date; and WAMCO's holdings were as of the date of its execution of the RSA.

13. These Makewhole Settlements, taken as a whole, will significantly reduce the Debtors' litigation exposure with respect to these alleged makewhole claims. The settlements provide certainty with regard to the recovery of a significant portion of claims, which helps to ensure the success of the EFIH Debtors' restructuring. Resolving the makewhole claims now, at the outset of the chapter 11 cases, permits Debtors to make informed assessments about their potential liabilities going forward. These settlements may also allow the Debtors to reduce or avoid costly, protracted litigation that may drain the Debtors' estates and potentially prolong the chapter 11 process.

14. I believe that the terms and fees associated with the Makewhole Settlements are both necessary and appropriate, and reflect attractive terms under the circumstances. They are the product of extensive, virtually non-stop, good faith negotiations that spanned the course of months in early 2014.

**D.     The Backstop Fees Were Negotiated At Arm's Length And Are Reasonable Under The Circumstances.**

15. In addition to agreeing to settle their alleged First Lien Makewhole Claims, PIMCO has committed, in the amount of $1.45 billion, and WAMCO, in the amount of $250 million (each, the "Backstop Amount," and together, the "Backstop Commitment," and such backstopping parties, the "Backstop Parties"), to backstop the EFIH First Lien DIP Facility (the "Backstop Financing") on the terms set forth in the current Restructuring Support Agreement ("RSA").

16. Also in connection with any loans made under the Backstop Commitment, the Backstop Parties will be entitled to certain backstop fees (the "Backstop Fees"), upon entry of the final order approving the EFIH First Lien DIP Facility, in the following amounts:

(a)     a commitment fee of up to 1.75% for PIMCO and 1.0% for WAMCO, paid in respect of such Backstop Financing; and

(b)     a "ticking" fee if and when one becomes payable to the EFIH First Lien DIP Lenders.

17.     The EFIH Debtors' benefit from the Backstop Financing arrangement with PIMCO and WAMCO because the fees are only payable if PIMCO and WAMCO *actually* fund the First Lien DIP.  Essentially, PIMCO and WAMCO are permitting the EFIH Debtors to use their balance sheets without a fee, which would likely have been required by the other financial institutions providing the commitment for the EFIH First Lien DIP Facility.  Agreeing to this type of contingent DIP financing fee removes financing risk at no cost and is a good business decision for the EFIH Debtors.

18.     Moreover, the Debtors benefit from the participation of PIMCO and WAMCO in the First Lien Makewhole Settlement:  their doing so decreases the Debtors' litigation exposure.

E.      **The Oncor TSA Amendment Is A Reasonable Business Decision And Necessary To The Economics Supporting The Investment Commitment.**

19.     As part of the Settlement, the Debtors seek to amend the Oncor TSA to provide that any payment required to be made to EFH Corp. under the Oncor TSA after March 31, 2014, be made directly to EFIH.  If the Court approves the Oncor TSA Amendment, the collateral under the EFIH First Lien DIP Facility and the EFIH Second Lien DIP Facility will include proceeds of the Oncor TSA Amendment payments.  EFIH, however, will reimburse EFH Corp. for cash taxes paid by EFH Corp. attributable to Texas gross margin taxes attributable to Oncor. In the event the Investment Commitment terminates or is not fully funded, the Oncor TSA Amendment will have no further force and effect, except that any payments previously made to EFIH pursuant to the Oncor TSA Amendment will be retained by EFIH.

20. The Oncor TSA Amendment, which would provide significant incremental cash flow to EFIH, is a key piece of this larger restructuring agreement.  Prior to filing, EFIH was forecasted to run out of liquidity in the second quarter of 2014, assuming that it continued to pay the above-market interest rates on its existing, prepetition debt.  Without the incremental cash flow provided by the Oncor TSA Amendment, EFIH may not have sufficient cash to meet its minimum cash covenant requirement under the EFIH First and Second Lien DIP Facilities if the bankruptcy process runs longer than anticipated by the RSA.  With the Oncor TSA Amendment, however, EFIH will maintain a stable cash balance during the bankruptcy.

21. Approval of the Oncor TSA Amendment also benefits EFH's creditors.  If the Oncor TSA Amendment is approved, and the to-be-proposed Plan of Reorganization is confirmed, EFH would receive a cash payment from EFIH, and EFIH would forgive $1.3 billion in debt claims it has against EFH.  The net effect of these transactions would be to materially increase the recovery by EFH unsecured creditors as compared to their recovery without the approval of the Oncor TSA Amendment.

22. Finally, the Oncor TSA Amendment is an integral component of the RSA.  The Oncor TSA Amendment will restore the status quo, allowing EFIH ongoing access to tax payments.  That amendment provides the necessary additional cash flows for EFIH—and, ultimately, EFH—to have a self-sustaining capital structure at emergence.  It is also interrelated with the EFIH Second Lien DIP Facility, Investment Commitment, and the Restructuring Support Agreement.

*[Remainder of page intentionally left blank.]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: May 15, 2014

/s/ David Ying
David Ying
Senior Managing Director
Evercore Group L.L.C.