**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | **Objection Deadline:  May 29, 2014 at 4:00 p.m.** |
| | ) | **Hearing Date:  June 5, 2014 at 9:30 a.m.** |

**MOTION OF ENERGY FUTURE INTERMEDIATE HOLDING
COMPANY LLC AND EFIH FINANCE INC. FOR ENTRY OF AN ORDER
(A) APPROVING POSTPETITION SECOND LIEN FINANCING,
(B) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE
EXPENSE CLAIMS, (C) AUTHORIZING THE USE OF CASH COLLATERAL,
(D) AUTHORIZING THE EFIH SECOND LIEN REPAYMENT,
(E) AUTHORIZING ENTRY INTO AND PAYMENT OF FEES UNDER THE
COMMITMENT LETTER, AND (F) MODIFYING THE AUTOMATIC STAY**

Energy Future Intermediate Holding Company LLC ("EFIH") and EFIH Finance, Inc.

(together with EFIH, the "Issuer" or the "EFIH Debtors," and together with the other

above-captioned debtors and debtors in possession, the "Debtors"), as debtors and debtors in

possession,[2] file this motion (this "Motion")[3] for entry of an order, substantially in the form

attached hereto as Exhibit A (the "Order"),[4] (a) authorizing the EFIH Debtors to enter into the

---

[1]    The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810.  The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201.  Due to the large number of debtors in these chapter 11 cases, for which the debtors have been granted joint administration on an interim basis, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

[2]    For the avoidance of doubt, only the EFIH Debtors are seeking authority herein.

[3]    Capitalized terms used but not defined herein shall have the meaning ascribed to them in the EFIH Second Lien DIP NPA or the Order, as applicable.

[4]    To be filed no later than 14 days before the June 5, 2014, hearing in accordance with Bankruptcy Rule 4001.

EFIH Second Lien DIP NPA (as defined herein) to obtain the EFIH Second Lien DIP Facility (as defined herein), (b)  granting liens and providing superpriority administrative expense claims, (c) authorizing the use of EFIH Cash Collateral (as defined herein), (d) authorizing the EFIH Second Lien Repayment (as defined herein), (e) authorizing the EFIH Debtors to execute and perform obligations under the Commitment Letter (as defined herein), and (f) modifying the automatic stay.

In support thereof, the EFIH Debtors submit the *Declaration of David Y. Ying, Senior Managing Director of Evercore, in Support of the Motion of Energy Future Intermediate Holding Company LLC and EFIH Finance, Inc., for Entry of an Order (A) Approving Postpetition Second Lien Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Authorizing the Use of Cash Collateral, (D) Authorizing the EFIH Second Lien Repayment, (E) Authorizing Entry Into and Payment of Fees Under the Commitment Letter, and (F) Modifying the Automatic Stay* (the "Ying Declaration"), filed contemporaneously herewith.  In further support of this Motion, the EFIH Debtors respectfully submit as follows.

## Jurisdiction and Venue

1.    The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.   This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the EFIH Debtors consent pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules") to the entry of a final order by the Court in

connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The bases for the relief requested in this Motion are sections 105, 361, 362, 363, 364, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Bankruptcy Rules 2002, 4001, and 9014.

## Preliminary Statement

4.      The Debtors commenced these chapter 11 cases to restructure more than $42 billion in funded indebtedness, approximately $7.7 billion of which was issued by the EFIH Debtors.  As discussed in more detail in the declaration of Paul Keglevic in support of the Debtors' first day motions (the "First Day Declaration"), after over a year of arm's-length negotiations, the Debtors agreed to the terms of a restructuring support agreement (as amended, the "Restructuring Support Agreement")[5] that provides a framework for significantly deleveraging each of the Debtors and consummating a "tax-free" spin of Texas Competitive Electric Holdings Company LLC and its direct and indirect subsidiaries ("TCEH"), thereby avoiding potential deconsolidation tax-related liabilities in excess of $6 billion.  The relief requested in this Motion is a key component of the Restructuring Support Agreement.

5.      The EFIH Debtors seek authority in this Motion to borrow $1.9 billion in cash under a debtor in possession term note financing (the "EFIH Second Lien DIP Facility") (and to

---

[5]      The Restructuring Support Agreement is discussed in more detail in the *Motion of Energy Future Holdings Corp., et al., for Entry of Orders Approving Certain EFIH Settlements and the Oncor TSA Amendment* (the "Settlement Motion"), filed contemporaneously herewith, and the First Day Declaration.

borrow an additional $95 million in the form of a Closing Fee (defined herein)) and use the proceeds of such financing, the EFIH First Lien DIP Financing (as defined herein), and other cash on hand to repay the EFIH Second Lien Notes (as defined below) (the "EFIH Second Lien Repayment") following the acceleration of those notes on the Petition Date.  As discussed in the Ying Declaration, the EFIH Second Lien Repayment will replace the high interest-rate EFIH Second Lien Notes (as defined herein) with lower interest rate debt, saving the EFIH Debtors approximately $8 million *per month* of interest expense.  More importantly, though, the EFIH Second Lien DIP Facility is mandatorily convertible to approximately 64% of the equity (the "Equity Conversion") in reorganized Energy Future Holdings Corp. ("EFH Corp.") upon the effective date of a plan that provides for the treatment of the "Obligations" under and as defined in the EFIH Second Lien DIP NPA (the "EFIH Second Lien DIP Obligations") in accordance with the Restructuring Support Agreement.  Consequently, the EFIH Second Lien DIP Facility and the EFIH Second Lien Repayment provide a mechanism to meaningfully deleverage the EFIH Debtors at emergence while saving significant interest expense during the chapter 11 cases.

6.    The EFIH Second Lien DIP Facility will be secured by liens that are junior to the $5.4 billion of first lien superpriority debtor in possession financing (the "EFIH First Lien DIP Financing"), the EFIH First Lien Notes (as defined herein), including any asserted EFIH First Lien Makewhole Claims (as defined herein) in connection with the repayment of the EFIH First Lien Notes (the "EFIH First Lien Repayment"), the EFIH Second Lien Notes (as defined herein), including any asserted EFIH Second Lien Makewhole Claims (as defined herein) in connection with the EFIH Second Lien Repayment, Permitted Liens (as defined in the EFIH Second Lien DIP NPA), and the Carve Out (as defined in the order approving the EFIH First Lien DIP

4

Financing (the "EFIH First Lien DIP Order")).[6]  As a result, the EFIH Second Lien DIP Facility is not priming any prepetition secured creditors.

7.     The opportunity to fund the EFIH Second Lien DIP Facility is being granted to substantially all of the EFIH Debtors' unsecured creditors (including holders of the EFIH Senior Toggle Notes (as defined herein) and certain EFH Corp. notes that are guaranteed by EFIH (the "EFH LBO Notes")) and Fidelity Investments and certain affiliates (collectively, "Fidelity"), in Fidelity's capacity as a holder of EFH Corp. unsecured notes through an unregistered offering (the "EFIH Second Lien DIP Offering").  Holders of the EFIH Senior Toggle Notes and the EFH LBO Notes collectively have the right to fund up to 91% of the EFIH Second Lien DIP Facility in the form of "Tranche A-1 Notes," and Fidelity[7] has the right to fund up to 9% of the EFIH Second Lien DIP Facility in the form of "Tranche A-3 Notes" (collectively, such funding rights are the "Participation Rights" and such holders are the "Participation Rights Holders").[8]  The EFIH Debtors, through Epiq Bankruptcy Solutions, LLC ("Epiq"), intend to commence the EFIH Second Lien DIP Offering in accordance with applicable securities laws (the "EFIH Second Lien

---

[6]   In accordance with Bankruptcy Rule 4001, the EFIH First Lien DIP Order will be filed within 14 days of the June 5 hearing date that has been set with respect to the final hearing on the *Motion of Energy Future Intermediate Holding Company LLC and EFIH Finance, Inc. for Entry of (I) an Interim Order (A) Approving Certain Fees Related to Postpetition Financing and (B) Scheduling a Final Hearing; and (II) a Final Order (A) Approving Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Authorizing the Use of Cash Collateral, (D) Authorizing the EFIH First Lien Repayment, (E) Authorizing Issuance of Roll-Up Debt to the Extent Authorized by the Settlement Motion, (D) Determining the Value of Secured Claims, and (G) Modifying the Automatic Stay* (the "EFIH First Lien DIP Motion") [D.I. 74] (April 29, 2014).

[7]   On April 29, 2014, the Debtors filed a form 10-K with the Securities and Exchange Commission.  The 10-K provided that a "significant EFIH Second Lien Note Party" would be given the right to purchase up to $170 million of Tranche A-3 Notes under the EFIH Second Lien DIP Facility and that such "significant EFIH Second Lien Note Party" would receive $11.3 million if it elected to participate.  For the purposes of clarification, these references in the 10-K were to Fidelity in its capacity as an EFIH unsecured creditor.

[8]   Fidelity, in its capacity as holder of EFH Corp. unsecured notes has the right to participate in the EFIH Second Lien DIP Facility, but all other EFH Corp. general unsecured creditors may purchase the right to participate in the Equity Conversion under the Plan.

DIP Participation Procedures").[9]  Fidelity will receive an $11.25 million fee (the "Participation Fee") in connection with the exercise of any of its Participation Rights.  The Participation Fee approximately equals the Total Second Lien DIP Commitment Fees (as defined herein) payable to the Commitment Parties (as defined herein).

       8.      Additionally, certain holders of EFIH Senior Toggle Notes the  (the "Initial Commitment Parties") and certain selected partners and transferees, if any (such parties, together with the Initial Commitment Parties, the "Commitment Parties"),[10] have agreed to backstop the full $1.9 billion EFIH Second Lien DIP Facility (the "Investment Commitment") in the form of "Tranche A-2 Notes" in the event Participation Rights are not exercised in sufficient amount to fund the EFIH Second Lien DIP Facility.[11]  The Commitment Parties have thus committed to funding the EFIH Second Lien DIP Facility in full and have essentially backstopped an equity rights offering under the Equity Conversion.  The Investment Commitment is integral to the Restructuring Support Agreement because it both facilitates the settlement of the asserted EFIH Second Lien Makewhole Claims and sets the stage for deleveraging EFIH's balance sheet through conversion of the EFIH Second Lien DIP Notes to equity in reorganized EFH Corp. under an Acceptable Reorganization Plan.  Thus, the Investment Commitment is integral to

---

[9]    The EFIH Second Lien DIP Offering and the EFIH Second Lien DIP Participation Procedures will be discussed in more detail in a notice of commencement filed with the Court when the EFIH Second Lien DIP Offering is commenced.  The EFIH Debtors expect to commence the EFIH Second Lien DIP Offering during the week of May 19, 2014.  The EFIH Second Lien DIP Facility will not close, and funding will not occur, until after the Court approves the Settlement Motion and this Motion.

[10]    The Initial Commitment Parties have the right to select certain parties, including non-creditor third parties, to participate in the Investment Commitment for an amount up to $400 million on the same terms as the Initial Commitment Parties (the "Selected Partners").  Each Initial Commitment Party also has the right to transfer its pro rata share of the Investment Commitment to a Selected Partner, affiliate, or other party otherwise consented to by EFH Corp. and EFIH (a "Transferee Commitment Party"), subject to certain terms and conditions set forth in more detail in the Commitment Letter, including a condition that Selected Partners and Transferee Commitment Parties execute a joinder to the Restructuring Support Agreement.

[11]    The Tranche A-1 Notes, Tranche A-2 Notes, and Tranche A-3 Notes are collectively the "Tranche A Notes," and the Tranche A Notes, together with the Tranche B Notes, are the "EFIH Second Lien DIP Notes."

executing a swift, value-maximizing restructuring that avoids the risk of massive deconsolidation-related tax liabilities.

9.    As consideration for the Investment Commitment, including backstopping the EFIH Second Lien DIP Facility and effectively backstopping an equity rights offering under the Equity Conversion, the Commitment Parties required, and the EFIH Debtors have agreed to pay, certain fees and other obligations pursuant to a commitment letter (the "Commitment Letter") and the EFIH Second Lien DIP NPA.  The EFIH Debtors believe all of the fees under the EFIH Second Lien DIP Documents (as defined herein) and the Commitment Letter are reasonable in light of the unprecedented nature of the EFIH Second Lien DIP Facility, the essential nature of the Investment Commitment to the EFIH Debtors' overall restructuring efforts, and the size and scope of the financing and the effective rights offering commitment:

(a) an execution fee equal to approximately 0.46% of $1.9 billion ($8,750,000) to the Initial Commitment Parties on a pro rata basis, which was paid when the Commitment Letter was executed prepetition (the "Execution Fee");

(b) an approval fee equal to approximately 0.54% of $1.9 billion ($10,250,000) to the Initial Commitment Parties on a pro rata basis, to be paid within five days following entry of the Order (the "Approval Fee");

(c) arranger fees payable in the cash amount of $1 million each of two parties (together equal to approximately 0.11% of $1.9 billion), to be paid within five days following entry of the Order and upon funding of the EFIH Second Lien DIP Facility (the "Arranger Fees");

(d) a funding fee equal to 1.0% of $1.9 billion ($19,000,000) to the Commitment Parties on a pro rata basis, to be paid following entry of the Order and upon funding of the EFIH Second Lien DIP Facility (the "Funding Cash Fee" and, collectively with the Approval Fee and the Arranger Fees, the "Postpetition DIP Commitment Fees," and the Postpetition DIP Commitment Fees, together with the Execution Fee, the "Total Second Lien DIP Commitment Fees");

(e) a participation fee equal to approximately 0.59% of $1.9 billion ($11,250,000) to Fidelity in connection with Fidelity's exercise of any of its Participation Rights (the "Participation Fee");

(f) a fee equal to 5.0% of $1.9 billion ($95,000,000 face value) to the Commitment Parties in the form of non-amortizing, non-interest bearing, mandatorily convertible Tranche B Notes, which fee shall become due and be paid in full by EFIH simultaneously with the funding of the EFIH Second Lien DIP Facility (the "Closing Fee");

(g) an alternative transaction fee equal to 3.0% of $1.9 billion ($57,000,000), to be paid solely in the event that, up to the funding of the EFIH Second Lien DIP Facility, EFIH enters into definitive documentation for an alternative transaction (*i.e.*, a transaction in lieu of the Global Settlement) on equal or better terms than the Restructuring Support Agreement, within five days of Court approval of such alternative transaction (the "Alternative Transaction Fee");[12] and

(h) payment of certain fees, reasonable out of pocket expenses, indemnifications and limitations on remedies that are integral to the agreement of the Commitment Parties, on one hand, and the Debtors on the other hand, including an "Arrangement Payment" payable to Centerview Partners LLC[13] and payment of the documented fees and expenses of professionals, to support and eventually consummate the EFIH Second Lien DIP Facility and the transactions contemplated under the Restructuring Support Agreement.

10.     Certain Prepetition EFIH Second Lien Creditors (as defined herein) may assert that they will be entitled to payment of an "Applicable Premium" under the EFIH Second Lien Indenture (as defined herein) (the "EFIH Second Lien Makewhole Claims") in connection with the EFIH Second Lien Repayment.  As discussed in more detail in the Settlement Motion, the EFIH Debtors have negotiated a settlement with certain Prepetition EFIH Second Lien Creditors

---

[12]  Fidelity is not entitled to the Alternative Transaction Fee.

[13]  The Arrangement Payment is $5 million in the aggregate, composed of:  (a) $1,250,000 payable upon the execution of the Commitment Letter (the "Arrangement Payment I"), which amount has already been paid; (b) $1,250,000 payable within 2 days of the entry of the Order (the "Arrangement Payment II"), and (c) $2,500,000, payable upon the funding of the EFIH Second Lien DIP Notes (the "Arrangement Payment III").

holding approximately 35% of the EFIH Second Lien Notes on account of their claims, including any asserted EFIH Second Lien Makewhole Claims (the "EFIH Second Lien Settlement").

11.     The EFIH Second Lien Settlement was vital to the execution of the Restructuring Support Agreement, and the EFIH Debtors could have limited the settlement offer only to the parties that executed the Restructuring Support Agreement prepetition.  Importantly, however, the EFIH Debtors have made the EFIH Second Lien Settlement available to all Prepetition EFIH Second Lien Creditors (the "EFIH Second Lien Opt-In") on substantially the same terms.  The EFIH Second Lien Opt-In reflects an effort to increase consensus, minimize costly and time-consuming litigation, and avoid accusations that the EFIH Second Lien Settlement favored parties to the Restructuring Support Agreement by allowing these parties, and only these parties, to avoid litigation regarding the asserted EFIH Second Lien Makewhole Claims.  Specifically, the EFIH Debtors, through Epiq, commenced a cash tender offer to facilitate the EFIH Second Lien Opt-In (the "Second Lien Notes Tender Solicitation Procedures") that complies with applicable securities laws.[14]  The EFIH Debtors will seek to disallow the asserted EFIH Second Lien Makewhole Claims of non-settling Prepetition EFIH Second Lien Creditors in due course.

12.     No adequate protection is necessary in connection with the EFIH Second Lien DIP Facility or with the use of cash collateral.  The EFIH Second Lien DIP Facility does not prime the EFIH First Lien Notes or any asserted contingent makewhole claims resulting from the EFIH First Lien Repayment (the "EFIH First Lien Makewhole Claims" and, together with the

---

[14]    The EFIH Second Lien Opt-In and the Second Lien Notes Tender Solicitation Procedures are discussed in more detail in the *Notice of Initiation of Opt-In Period for Proposed EFIH Second Lien Settlement* [D.I. 400] (May 9, 2014).  While the tender offer is scheduled to expire on June 6, 2014, the EFIH Debtors do not intend to permit the offering to expire, and the EFIH Second Lien Settlement will not close, until after the Court approves the Settlement Motion and this Motion.  There is, however, a "step down" mechanic with respect to late participants in the EFIH Second Lien Opt-In.  The EFIH Debtors will respond to objections that have been raised with respect to those procedures, and the EFIH Second Lien Settlement more broadly, in due course.

EFIH Second Lien Makewhole Claims, the "EFIH Makewhole Claims") or the EFIH Second Lien Notes (or any asserted contingent EFIH Second Lien Makewhole Claims).

13.    In any event, the Prepetition EFIH Secured Creditors are not entitled to adequate protection on account of their asserted EFIH Makewhole Claims because such claims are baseless.  The EFIH Second Lien Settlement was a necessary component to the execution of the Restructuring Support Agreement, and because of that, the Initial Commitment Parties, who constitute a majority of EFIH's junior creditors, supported the settlement.  The EFIH Debtors' willingness to consummate the EFIH Second Lien Settlement should not, however, be treated as an indication that the asserted EFIH Second Lien Makewhole Claims are meritorious.  The EFIH Debtors elected to settle the EFIH First Lien Makewhole Claims for similar reasons.  But those settlements do not mean the EFIH Makewhole Claims are entitled to adequate protection.

14.    Three days before the filing of this Motion, on Monday, May 13, the EFIH Debtors received a summary of potential terms for an alternative second lien financing facility from certain Prepetition EFIH Second Lien Creditors.  That summary, however, was incomplete, did not represent a binding commitment, and remains incomplete as of the time of this filing. The EFIH Debtors will continue to evaluate the alternative proposal between now and the June 5 hearing date.  As of the time of this filing, however, the EFIH Second Lien DIP Facility represents the only complete and committed proposal available to the EFIH Debtors. Accordingly, the EFIH Debtors are proceeding with the EFIH Second Lien DIP Facility, and they believe that consummating the facility in a timely way is in the best interests of the EFIH Debtors' estates.

15.    In summary, the EFIH Debtors seek to consummate the EFIH Second Lien DIP Facility and use cash collateral to maximize the value of their estates and increase unsecured

creditor recoveries by reducing interest expense and enabling a significant deleveraging of the EFIH Debtors.

### Relief Requested

16.     By this Motion, the EFIH Debtors seek entry of the Order, substantially in the form attached as Exhibit A:

(a) ***EFIH Second Lien DIP Facility***:  authorizing the EFIH Debtors to enter into the $1.995 billion EFIH Second Lien DIP Facility pursuant to the terms and conditions of the proposed second lien subordinated secured debtor in possession note purchase agreement (the "EFIH Second Lien DIP NPA"), between the Issuer, the purchasers of notes (the "EFIH Second Lien DIP Note Purchasers"), Cortland Capital Market Services LLC, as administrative agent and collateral agent (in such capacities, the "EFIH Second Lien DIP Agent"), and other agents and entities from time to time party thereto, substantially in the form attached hereto as Exhibit C;[15]

(b) ***EFIH Second Lien DIP Documents***:  authorizing the EFIH Debtors to execute and deliver the EFIH Second Lien DIP NPA and all agreements, documents, and instruments contemplated by each, including an intercreditor agreement (the "EFIH DIP Intercreditor Agreement"), attached hereto as Exhibit D,[16] addressing the relative rights and remedies of the EFIH First Lien DIP Lenders (as defined in the EFIH First Lien DIP Motion) and the EFIH Second Lien DIP Note Purchasers, and the documents related to the EFIH Second Lien DIP Offering (collectively, the "EFIH Second Lien DIP Documents"), and to take all actions necessary, appropriate, or required to comply with the EFIH Debtors' obligations under the EFIH Second Lien DIP Documents and under the Order;

(c) ***EFIH Second Lien DIP Liens***:  authorizing the EFIH Debtors to grant the EFIH Second Lien DIP Agent, for the benefit of itself and the EFIH Second Lien DIP Note Purchasers, automatically perfected postpetition security interests and liens (the "EFIH Second Lien DIP Liens") in the EFIH DIP Collateral (as defined in the Order), subject to the Prepetition EFIH First Priority Liens (as defined herein), the Permitted Liens, the Carve Out, the liens granted pursuant to the EFIH

---

[15]   To be filed no later than 14 days before the June 5, 2014, hearing in accordance with Bankruptcy Rule 4001.

[16]   To be filed no later than 14 days before the June 5, 2014, hearing in accordance with Bankruptcy Rule 4001.

First Lien DIP Financing (the "<u>EFIH First Lien DIP Liens</u>"), and the Prepetition EFIH Second Priority Liens (as defined herein);

(d) ***EFIH DIP Junior Superpriority Claims***:  authorizing the EFIH Debtors to grant the EFIH Second Lien DIP Agent, for the benefit of itself and the EFIH Second Lien DIP Note Purchasers, allowed superpriority administrative expense claims (the "<u>EFIH DIP Junior Superpriority Claims</u>"), subject only to the payment of the Carve Out, the Prepetition EFIH First Lien Obligations (defined herein), and Obligations (as defined in the EFIH First Lien DIP Credit Agreement) under the EFIH First Lien DIP Financing;

(e) ***EFIH Cash Collateral***:  authorizing the EFIH Debtors to use EFIH Cash Collateral;

(f) ***EFIH Second Lien Repayment***:  authorizing the EFIH Debtors to use the proceeds of the EFIH Second Lien DIP Facility to consummate the EFIH Second Lien Repayment (including with respect to the EFIH Second Lien Settlement to the extent approved in the Settlement Motion);

(g) ***Commitment Letter***:  approving the Commitment Letter, attached hereto (together with certain applicable term sheets) as <u>Exhibit E</u>, including the Investment Commitment and the payment of the fees and expenses thereunder or otherwise described in the EFIH Second Lien DIP Documents, each as discussed herein; and

(h) ***Automatic Stay***:  vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of EFIH Second Lien DIP NPA and the Order.

### <u>Concise Statement Pursuant to Bankruptcy Rule 4001(c)</u>

17.    In accordance with Bankruptcy Rules 4001(c) and (d), the following summarizes the significant terms of the EFIH Second Lien DIP NPA and the Order.[17]

---

[17]  This concise statement is qualified in its entirety by the provisions of the EFIH Second Lien DIP Documents and the Order.  To the extent that the terms of the EFIH Second Lien DIP Documents or the Order conflict with this concise statement, the provisions of the EFIH Second Lien DIP Documents or the Order, as applicable, shall control.

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| ***EFIH Second Lien DIP Facility Parties***<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | <u>Issuer:</u>         Energy Future Intermediate Holding Company LLC ("EFIH") and EFIH Finance, Inc.<br><br><u>Purchasers:</u>    Purchasers to be determined in accordance with the EFIH Second Lien DIP Offering and the Commitment Letter.<br><br><u>Guarantors:</u>    None<br><br><u>Administrative Agent:</u>    Cortland Capital Market Services LLC (together with its permitted successors and assigns) | EFIH Second Lien DIP NPA |
| ***EFIH Second Lien DIP Facility***<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B); LBR 4001-2(a)(ii)* | <u>Total Loan Commitment:</u>  $1.9 billion of new money composed of the Tranche A Notes, and $95 million of payment-in-kind Tranche B Notes issued in satisfaction of the Closing Fee.<br><br><u>Tranche A Notes:</u>    $1.9 billion in the aggregate, composed of: (i) the Tranche A-1 Notes issued to holders of EFIH Senior Toggle Notes and EFH LBO Notes that exercise Participation Rights; (ii) the Tranche A-2 Notes issued to each Commitment Party as a result of its obligations under the Investment Commitment, the Selected Partners, Post-Funding Partners, and Specified Consultants; and (iii) the Tranche A-3 Notes issued to Fidelity in its capacity as a holder of EFH Corp. unsecured notes.<br><br><u>Tranche B Notes:</u>    $95 million, issued to the Commitment Parties upon the funding of the EFIH Second Lien DIP Facility in satisfaction of the Closing Fee. | EFIH Second Lien DIP NPA |
| ***Interest Rate***<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | <u>Base Interest:</u>    Tranche A Notes: 8% per annum payable in cash; Tranche B Notes, interest-free.<br><br><u>PIK Interest:</u>    Interest rate on Tranche A Notes increases by 4%, payable in kind and compounded quarterly, if the Oncor TSA Amendment (as defined herein) is not approved by July 27, 2014. | EFIH Second Lien DIP NPA |
| ***Fees***<br><br>*Fed R. Bankr. P. 4001(c)(1)(B)* | Fees payable to the EFIH Second Lien DIP Purchasers under the EFIH Second Lien DIP NPA include:<br><br><u>PIK Fee:</u>    A one-time PIK Fee equal to 10% of the outstanding Tranche A and Tranche B Notes, payable in kind if the Oncor TSA Amendment is not approved by April 29, 2015.<br><br><u>Prepayment Fee:</u> A Prepayment Fee of $380 million if the EFIH Second Lien DIP Facility is repaid in cash without consent other than upon acceleration. | EFIH Second Lien DIP NPA; Commitment Letter |

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| | Fees payable to the Commitment Parties under the Commitment Letter or the EFIH Second Lien DIP NPA include: | |
| | Execution Fee:   Approximately $8.75 million paid to the Initial Commitment Parties upon execution of the Commitment Letter (paid prior to the Petition Date). | |
| | Approval Fee:   Approximately $10.25 million payable to the Initial Commitment Parties within 5 days of the entry of the Order; | |
| | Arranger Fees:   $2 million payable to certain parties upon entry of the Order and funding of the EFIH Second Lien DIP Facility; | |
| | Funding Cash Fee: $19 million payable to the Commitment Parties upon entry of the Order and funding of the EFIH Second Lien DIP Facility; | |
| | Alternative Transaction Fee: $57 million payable, up to the funding of the EFIH Second Lien DIP Facility, to the Initial Commitment Parties within 5 days of Bankruptcy Court approval of an "Alternative Transaction" (as defined in the Commitment Letter); and | |
| | Closing Fee:   $95 million of Tranche B Notes payable to the Commitment Parties issued upon entry of the Order funding of the EFIH Second Lien DIP Facility. | |
| | Other Fees, Expenses, and Indemnifications: The Commitment Letter provides for the payment of certain fees to professionals, including the Arrangement Payment, and for indemnification obligations. | |
| | Other fees include: | |
| | Participation Fee: A one-time participation fee of $11.25 million payable to Fidelity upon the exercise of any of its Participation Rights. | |
| *Maturity*<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The maturity date of the EFIH Second Lien DIP Facility will be the earliest of:<br><br>• The stated maturity, which shall be 24 months from the Closing Date;<br><br>• the effective date of any Reorganization Plan;<br><br>• the consummation of a sale of all or substantially all of the EFIH Debtors' assets or stock under section 363 of the Bankruptcy Code;<br><br>• the acceleration of the EFIH Second Lien DIP Facility and the termination of any then outstanding Commitments in accordance with the terms of the EFIH Second Lien DIP NPA and the EFIH DIP Intercreditor Agreement; or | EFIH Second Lien DIP NPA |

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| | • the Equity Conversion. | |
| ***Purpose/Use of Proceeds***<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B); LBR 4001-2(a)(ii)* | The proceeds of the EFIH Second Lien DIP Facility will be used for the purpose of funding the EFIH Second Lien Repayment and in accordance with the EFIH Second Lien DIP NPA.. | EFIH Second Lien DIP NPA |
| ***Events of Default***<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Consistent with the events of default found in the EFIH First Lien DIP Financing, including defaults usual and customary for debtor in possession financing, including, without limitation, non-payment of principal, interest and fees, defaults under affirmative and negative covenants, breaches of representations and warranties, judgments or foreclosure actions exceeding certain thresholds, adverse modifications to the Order, and dismissal or conversion of the bankruptcy cases.<br><br>Additionally, it shall be an Event of Default if a plan of reorganization is filed or confirmed that does not provide for either (i) payment in full of the EFIH Second Lien DIP Facility or (ii) consummation of the Equity Conversion. | EFIH Second Lien DIP NPA |
| ***Priority and Security of EFIH Second Lien DIP Facility Liens***<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The EFIH Second Lien DIP Liens shall attach to all of the EFIH DIP Collateral, as follows:<br><br>• pursuant to Bankruptcy Code section 364(c)(1), be entitled to joint and several superpriority administrative expense claim status in the Cases;<br><br>• pursuant to Bankruptcy Code section 364(c)(2), be secured by a perfected subordinated lien on substantially all now owned or hereafter acquired assets of the EFIH Debtors that are not otherwise subject to a lien, including, upon the entry of the Order, the proceeds of causes of action under chapter 5 of the Bankruptcy Code; and<br><br>• pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by a perfected subordinated junior lien on all other prepetition and postpetition property of the EFIH Debtors that is subject to valid, perfected and non-avoidable liens in existence immediately prior to the Petition Date or that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code.<br><br>All obligations and liens of the EFIH Debtors to the EFIH Second Lien DIP Agent and the EFIH Second Lien DIP Note Purchasers shall be subject to the Carve Out, the Prepetition Obligations, the Prepetition EFIH First Priority Liens, the Prepetition EFIH Second Priority Liens, all obligations under the EFIH First Lien DIP Financing, and the EFIH First Lien DIP Liens. | EFIH Second Lien DIP NPA |
| ***Carve Out***<br><br>*Fed. R. Bankr. P.* | All liens securing the EFIH Second Lien DIP Obligations and the EFIH DIP Junior Superpriority Claim shall be subject and | EFIH Second Lien DIP NPA |

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| *4001(c)(1)(B)* | subordinate to the Carve Out (as defined in the order approving the EFIH First Lien DIP Motion). | |
| ***Conditions to Closing***<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | • The EFIH Second Lien DIP Documents shall be reasonably satisfactory to the Required Commitment Parties, the EFIH Second Lien DIP Agent, and their counsel;<br><br>• The Restructuring Support Agreement shall be in full force and effect and the EFIH Debtors shall be in material compliance therewith;<br><br>• The EFIH Second Lien DIP Documents shall have been delivered, all applicable fees and expenses shall have been paid, and all applicable liens shall have been perfected;<br><br>• The EFIH First Lien Repayment and EFIH Second Lien Repayment occur substantially contemporaneously;<br><br>• The EFIH Second Lien DIP Agent shall receive a signed copy of the Order that has not been vacated, reversed, modified, amended, or stayed in a manner adverse to the Required Commitment Parties, and such Order is in form and substance satisfactory to the Required Commitment Parties;<br><br>• The EFIH Debtors have complied in all material respects with the requirements of the EFIH Second Lien DIP Offering;<br><br>• No existing event of default under the EFIH First Lien DIP Financing that would allow for acceleration thereof (after accounting for applicable grace periods and waivers);<br><br>• The EFIH First Lien DIP Financing shall be on the terms set forth in the Restructuring Support Agreement and the aggregate principal amount of the EFIH First Lien DIP Financing shall not exceed $5.4 billion;<br><br>• The EFIH Second Lien DIP Agent shall have received a customary opinion of EFIH Debtors' counsel;<br><br>• No Material Adverse Event shall have occurred;<br><br>• Receipt of any and all necessary governmental consents and approvals;<br><br>• The EFIH Second Lien DIP Agent and EFIH Second Lien DIP Note Purchasers shall have received at least five (5) days prior to the Closing Date all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the Patriot Act; and<br><br>• Representations and warranties of the Issuers and other Note Parties shall be true and correct in all material respects (or in all respects for representations and warranties | EFIH Second Lien DIP NPA |

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| | qualified by materiality or Material Adverse Event). | |
| *Equity Conversion* | The EFIH Second Lien DIP Facility shall be mandatorily convertible to approximately 64% of the equity in reorganized EFH Corp. upon the terms and conditions specified in the EFIH Second Lien DIP NPA. | EFIH Second Lien DIP NPA |
| *Intercreditor Agreement* | The rights and remedies of the EFIH Second Lien DIP Agent and the EFIH Second Lien DIP Note Purchasers shall, at all times and in all circumstances, be subject to the terms and conditions of the EFIH DIP Intercreditor Agreement. | Order |
| *Acknowledgments*<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(iii)* | The EFIH Debtors shall make customary representations and warranties regarding the perfection and priority of liens securing EFIH Second Lien DIP Facility, and the amount and nature of existing indebtedness. | Order |
| *Plan and Disclosure Statement Milestones*<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(vi)* | The Issuer shall file with the Bankruptcy Court a plan of reorganization and a disclosure statement relating thereto, each in form and substance reasonably satisfactory to the EFIH Second Lien DIP Agent, within 18 months after the Petition Date; *provided, however*, that with respect to provisions of the plan of reorganization and/or any disclosure statement that relate to payment of the obligations arising under the EFIH Second Lien DIP Facility, such provisions must be in form and substance satisfactory to the Required Purchasers. | EFIH Second Lien DIP NPA |
| *Waivers and Consents*<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(iv, v), (vii-x)* | ***Waiver of Automatic Stay***:  Upon the occurrence of an Event of Default and following the giving of five calendar days' notice to the EFIH Debtors (the "<u>Remedies Notice Period</u>"), the automatic stay pursuant to section 362 of the Bankruptcy Code shall be automatically terminated without further notice to or order of the Bankruptcy Court, and the EFIH Second Lien DIP Agent shall, subject to the terms of the EFIH DIP Intercreditor Agreement, be permitted to exercise all rights against the EFIH DIP Collateral in accordance with the EFIH Second Lien DIP Documents and the Order, as applicable, and shall be permitted to satisfy the EFIH Second Lien DIP Obligations, without further order or application or motion to the Bankruptcy Court and without restriction or restraint by any stay under section 362 or 105 of the Bankruptcy Code. Notwithstanding anything herein to the contrary, the automatic stay pursuant to section 362 of the Bankruptcy Code shall be automatically terminated for the purposes of giving any notice contemplated hereunder.<br><br>***Waiver of Nonbankruptcy Law***:  The EFIH Second Lien DIP Liens and other interests granted to the EFIH Second Lien DIP Agent and EFIH Second Lien DIP Note Purchasers are deemed valid, binding, perfected, enforceable, first-priority liens, non-avoidable and not subject to re-characterization or subordination.<br><br>***Waiver of Section 506(c)***:  Usual and customary § 506(c) waiver.<br><br>***Indemnification***:  Usual and customary for financings of this type, | Order; EFIH Second Lien DIP NPA |

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
|  | including that Issuer shall pay, indemnify, and hold harmless the Agents and the Purchasers and their respective Affiliates, directors, officers, partners, employees, agents or other Related Parties from and against any and all other liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever, including reasonable and documented out-of-pocket fees, disbursements and other charges of legal counsel, financial advisors, other advisors and professionals, related to the Transactions (including the Cases) or, with respect to the execution, delivery, enforcement, performance and administration of the EFIH Second Lien DIP Documents, with customary exceptions for gross negligence, bad faith, willful misconduct, or material breach of the obligations of indemnified persons or Related Parties under the EFIH Second Lien DIP Documents.<br><br>***Release of Claims and Causes of Action***: The EFIH Debtors release the EFIH Second Lien DIP Agent, the EFIH Second Lien DIP Note Purchasers and each of their respective participants, and each of their respective affiliates, and each of their respective former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest, of and from any and all claims arising out of, in connection with, or relating to the EFIH Second Lien DIP Facility or the transactions contemplated thereunder. |  |

## **Provisions to be Highlighted Pursuant to Local Bankruptcy Rule 4001-2(a)(i)**

18.     Local Bankruptcy Rule 4001-2(a)(i) requires a debtor to: (a) recite whether the proposed form of the financing order contains certain provisions of the type enumerated therein; (b) identify the location of such provisions in the proposed financing order; and (c) justify the inclusion of such provisions in the proposed financing order (the "Highlighted Provisions"). *See* Del. Bankr. L.R. 4001-2(a)(i). The EFIH Debtors submit that only one provision of the Order requires highlighting under Local Bankruptcy Rule 4001-2(a)(i), specifically with respect to Local Bankruptcy Rule 4001-2(a)(i)(E).

19.     ***Use of Postpetition Loans to Repay Prepetition EFIH Second Lien Creditors***. Local Bankruptcy Rule 4001-2(a)(i)(E) requires the disclosure of the use of the proceeds of postpetition financing to repay prepetition indebtedness. The proceeds of the EFIH Second Lien

DIP Facility will be used to consummate the EFIH Second Lien Repayment.  Certain of the EFIH Second Lien DIP Note Purchasers may hold EFIH Second Lien Notes that will be repaid using funds from the EFIH Second Lien DIP Facility.  The EFIH Debtors will benefit from the significant savings of interest expense associated with the EFIH Second Lien DIP Facility and ensuring that the EFIH Debtors will be able to deleverage their balance sheet pursuant to a chapter 11 plan.  Additionally, only the EFIH Debtors' prepetition creditors are able to provide equitizing debtor in possession financing in a way that facilitates the tax-free restructuring contemplated under the Restructuring Support Agreement and avoids over $6 billion of deconsolidation-related tax liabilities.  As a result, the use of proceeds from the EFIH Second Lien DIP Facility that has been provided by prepetition creditors to repay prepetition indebtedness is nearly unavoidable here.  Under these circumstances, the EFIH Debtors respectfully submit that the repayment is permissible and in the best interests of the EFIH Debtors' estates.

20.    The EFIH Debtors submit that no further provisions of the Order require highlighting under Local Bankruptcy Rule 4001-2(a)(i).  Nevertheless, out of an abundance of caution and for the convenience of the Court and other parties in interest, the EFIH Debtors wish to highlight the following provisions of the Order to demonstrate their compliance with the Local Bankruptcy Rules.

21.    *506(c) Waiver*.  Local Bankruptcy Rule 4001-2(a)(i)(C) requires disclosure of provisions that constitute a waiver, *without notice*, of whatever rights the estate may have under section 506(c) of the Bankruptcy Code.  The Order will provide that the EFIH Second Lien DIP Agent and the EFIH Second Lien DIP Note Purchasers are each entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code.  Nevertheless, the EFIH Debtors are

providing notice of the 506(c) waiver provisions and an opportunity for parties in interest to object to the waiver. Accordingly, while the EFIH Debtors do not believe that this provision of the Order requires disclosure under Local Bankruptcy Rule 4001-2(a)(i)(C), they have disclosed the provision out of an abundance of caution and for the convenience of the Court and other parties in interest.

22. ***Carve Out***. Local Bankruptcy Rule 4001-2(a)(i)(F) requires disclosure of *disparate* treatment between the professionals retained by the EFIH Debtors and the professionals retained by the unsecured creditors' committee (the "Creditors' Committee") with respect to a professional fee carve out. Here, the Carve Out applies equally to professionals retained by the EFIH Debtors and the Creditors' Committee. Accordingly, while the EFIH Debtors do not believe that this provision of the Order requires disclosure under Local Bankruptcy Rule 4001-2(a)(i)(F), they have disclosed the provision out of an abundance of caution and for the convenience of the Court and other parties in interest.

## Background

23. On April 29, 2014 (the "Petition Date"), each of the Debtors filed a voluntary petition with the Court under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Court has entered an interim order for joint administration of these chapter 11 cases. The Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") formed an official committee of unsecured creditors in these chapter 11 cases on May 13, 2014 [D.I. 420]. Further information regarding the Debtors' business operations and capital structure is set forth in the First Day Declaration.

## **EFIH's Outstanding Prepetition Secured Indebtedness**

### I.    **EFIH First Lien Notes.**

24.    ***EFIH First Lien 2017 Notes***.  Pursuant to that certain indenture (as amended, modified, or supplemented, the "EFIH First Lien 2017 Notes Indenture"), dated August 14, 2012, for the 6.875% senior secured notes due August 15, 2017 (the "EFIH First Lien 2017 Notes"), by and among EFIH and EFIH Finance, Inc. ("EFIH Finance"), as issuers, and CSC Trust Company of Delaware ("CSC"), as successor indenture trustee (the "EFIH First Lien Notes Trustee") to The Bank of New York Mellon Trust Company, N.A. ("BNY"), EFIH and EFIH Finance issued approximately $503 million in principal amount of the EFIH First Lien 2017 Notes.

25.    ***EFIH First Lien 2020 Notes***.  Pursuant to that certain indenture (as amended, modified, or supplemented, the "EFIH First Lien 2020 Notes Indenture" and, together with the EFIH First Lien 2017 Notes Indenture, the "EFIH First Lien Notes Indentures"), dated August 17, 2010, for the 10.00% senior secured notes (the "EFIH First Lien 2020 Notes," and, together with the EFIH First Lien 2017 Notes, the "EFIH First Lien Notes") due December 1, 2020, by and among EFIH and EFIH Finance, as issuers, and the EFIH First Lien Notes Trustee, EFIH and EFIH Finance issued approximately $3.482 billion in principal amount of the EFIH First Lien 2020 Notes.  The "Prepetition EFIH First Lien Creditors" shall mean the EFIH First Lien Notes Trustee and the holders of EFIH First Lien Notes.

26.    ***First Lien Collateral***.  The EFIH First Lien Notes are secured by first priority security interests in and liens (the "Prepetition EFIH First Priority Liens") in the "Collateral" as defined in the EFIH First Lien Indentures and the EFIH Collateral Trust Agreement (as defined

herein) (such collateral, the "<u>Prepetition EFIH Collateral</u>"), including cash to the extent that such cash constitutes proceeds of other Prepetition EFIH Collateral ("<u>EFIH Cash Collateral</u>").

## II.    EFIH Second Lien Notes.

27.    ***EFIH Second Lien Notes***.    Pursuant to that certain indenture (as amended, modified, or supplemented, the "<u>EFIH Second Lien Notes Indenture</u>," and, together with the EFIH First Lien Notes Indentures, the "<u>Prepetition EFIH Secured Indentures</u>"), dated April 25, 2011, by and among EFIH and EFIH Finance, as issuers, Computershare Trust Company, N.A. and Computershare Trust Company of Canada ("<u>Computershare</u>") as successor indenture trustee to BNY (the "<u>EFIH Second Lien Notes Trustee</u>," and, together with the EFIH First Lien Notes Trustee, the "<u>Prepetition EFIH Secured Trustees</u>"), EFIH and EFIH Finance issued two series of notes:  (a) approximately $406 million principal amount of 11.00% EFIH Second Lien Notes due October 1, 2021 (the "<u>EFIH Second Lien 2021 Notes</u>"); and (b) approximately $1.750 billion principal amount of 11.75% EFIH Second Lien Notes due March 1, 2022 (the "<u>EFIH Second Lien 2022 Notes</u>," and, together with the EFIH Second Lien 2021 Notes, the "<u>EFIH Second Lien Notes</u>").  The "<u>Prepetition EFIH Second Lien Creditors</u>" shall mean the holders of EFIH Second Lien Notes.  The "<u>Prepetition EFIH Secured Creditors</u>" shall mean the Prepetition EFIH Second Lien Creditors together with the Prepetition EFIH First Lien Creditors.  The "<u>Prepetition EFIH Secured Notes</u>" shall mean the EFIH First Lien Notes together with the EFIH Second Lien Notes.

28.    ***Second Lien Collateral***.    The Prepetition EFIH Second Lien Obligations are secured by second priority liens (the "<u>Prepetition EFIH Second Priority Liens</u>") in the Prepetition EFIH Collateral.

## III.    Other EFIH Secured Debt Documents.

29.    ***Security Documents***.  In connection with the issuance of the EFIH First Lien Notes and EFIH Second Lien Notes, the EFIH Debtors entered into:  (a) the Security Documents (as defined in the EFIH First Lien Indentures, and collectively with the EFIH First Lien Indentures, the EFIH First Lien Notes, and the Registration Rights Agreements executed in connection therewith, the "<u>EFIH First Lien Documents</u>"); and (b) the Security Documents (as defined in the EFIH Second Lien Indenture, and collectively with the EFIH Second Lien Indenture, the EFIH Second Lien Notes, and the Registration Rights Agreements executed in connection therewith, the "<u>EFIH Second Lien Documents</u>").[18]

30.    ***EFIH Collateral Trust Agreement***.  The EFIH Collateral Trust Agreement (as amended, modified, or supplemented, the "<u>EFIH Collateral Trust Agreement</u>") entered into by and among EFIH, and CSC, in its capacity as EFIH First Lien Notes Trustee and Collateral Trustee as defined in and under the EFIH First Lien Documents and EFIH Second Lien Documents, and Computershare, in its capacity as EFIH Second Lien Notes Trustee, governs, among other things, the relative priority of the EFIH First Lien Notes and the EFIH Second Lien Notes and the relative rights and remedies of the Prepetition EFIH First Lien Creditors and the Prepetition EFIH Second Lien Creditors with respect to, among other things, debtor-in-possession financing, use of EFIH Cash Collateral, and adequate protection.

## IV.    EFIH Senior Toggle Notes.

31.    Pursuant to that certain indenture (as amended, modified, or supplemented, the "<u>EFIH Senior Toggle Notes Indenture</u>"), dated December 5, 2012, for the 11.25%/12.25% toggle

---

[18]    As discussed in the First Day Declaration, the interest rates on certain of the EFIH First Lien Notes and the EFIH Second Lien Notes have increased by .50% as a result of the Registration Rights Agreements and related "Additional Interest" under the Prepetition EFIH Secured Indentures.  The EFIH Debtors reserve their rights with respect to the Additional Interest and the Registration Rights Agreements.

notes due December 1, 2018 (the "EFIH Senior Toggle Notes"), by and among EFIH and EFIH Finance, as issuers, and UMB Bank, N.A., as successor indenture trustee (the "EFIH Senior Toggle Notes Trustee"), EFIH and EFIH Finance issued the EFIH Senior Toggle Notes. Approximately $1.566 billion of EFIH Senior Toggle Notes were outstanding as of the Petition Date. The "EFIH Senior Toggle Note Lenders" shall mean the holders of EFIH Senior Toggle Notes.[19]

**The EFIH Debtors'
Need for the EFIH Second Lien DIP Facility**

32.    As noted above, the EFIH Second Lien DIP Facility will be used to consummate the EFIH Second Lien Repayment. The EFIH Debtors believe it is in the best interests of their estates to enter into the EFIH Second Lien DIP Facility for a number of reasons. The EFIH Second Lien Repayment will save the EFIH Debtors approximately $8 million per month in interest expense during the chapter 11 cases and set the stage for a significant deleveraging of the EFIH Debtors pursuant to the terms of the Restructuring Support Agreement. Additionally, the EFIH Second Lien DIP Facility, in conjunction with other sources of cash, will provide a framework for the EFIH Debtors to fund the settlement of potential EFIH Second Lien Makewhole Claims at terms acceptable to the EFIH Debtors and already agreed to by holders of approximately 35% of the EFIH Second Lien Notes. Finally, as discussed in more detail in the First Day Declaration and the Settlement Motion, the EFIH Second Lien DIP Facility is a key component of the Restructuring Support Agreement, which reflects the best possibility for all of the Debtors to avoid more than $6 billion of deconsolidation-related tax liabilities. The EFIH

---

[19]    As discussed in the First Day Declaration, the interest rates on certain of the EFIH Senior Toggle Notes have increased by .50% as a result of the Registration Rights Agreements and related "Additional Interest" under the EFIH Senior Toggle Notes Indenture. The EFIH Debtors reserve their rights with respect to the Additional Interest and the Registration Rights Agreements.

Debtors have obtained these benefits in connection with a fully non-priming debtor in possession financing. Any delay will diminish these benefits and risk termination of the Restructuring Support Agreement. Accordingly, the EFIH Debtors respectfully request that the Court enter the Order.

## The EFIH Debtors' Efforts to Obtain Postpetition Financing

33. The EFIH Debtors' decision to proceed with the EFIH Second Lien DIP Facility comes after extensive negotiations with certain of their key stakeholders regarding a consensual restructuring. As discussed in greater detail in the First Day Declaration, beginning in early 2014, the EFIH Debtors, the Commitment Parties, and Fidelity made significant progress on the terms of a consensual restructuring. These discussions were premised on a transaction that would deconsolidate EFH Corp. and the EFIH Debtors from TCEH through a "tax-free" spin-off transaction. The EFIH Debtors concluded that a key aspect of any transaction would be an immediate reduction in the EFIH Debtors' interest expense with respect to their secured debt with above-market interest rates and a substantial deleveraging of the EFIH Debtors.

34. The EFIH Debtors, the Commitment Parties, and Fidelity made progress toward a framework that accomplished both goals beginning in early 2014. First, certain EFIH and EFH Corp. stakeholders gained momentum around the terms of a restructuring transaction at EFH Corp. and EFIH that was conditioned on a tax-free spin-off of TCEH. Second, in mid-March 2014, an ad hoc group of TCEH first lien creditors, for the first time, informed the Debtors that they were willing to consider a tax-free transaction to separate TCEH from EFH Corp. Soon after, the principals and professionals of such constituencies entered into extensive arm's-length negotiations to reach an agreement on the material terms and conditions of a restructuring and to document a transaction based on these concepts. After a flurry of hard-fought, arm's-length

negotiations among the Debtors and their stakeholders, the EFIH Second Lien DIP Facility emerged as the only viable alternative.  Importantly, the EFIH Debtors were informed by potential lenders under the EFIH First Lien DIP Financing that any junior DIP financing requiring repayment of principal in cash, and not converting to equity, would be problematic. Such financing would adversely impact the Debtors' ability to obtain EFIH First Lien DIP Financing on favorable terms due to concerns about leverage and cash-flow coverage at emergence.

35.    The Investment Commitment, memorialized in the Commitment Letter and effectuated through the EFIH Second Lien DIP Facility, was the only alternative that (a) provided the consensus needed to move forward with a speedy restructuring, (b) facilitated a repayment of the accelerated EFIH Second Lien Notes at an early point in these chapter 11 cases, which, in conjunction with the EFIH First Lien DIP Financing and the EFIH First Lien Repayment, would allow the EFIH Debtors to save a substantial amount of interest every month, and (c) provide a consensual framework to equitize the EFIH Debtors' and EFH Corp.'s unsecured debt, along with the EFIH Second Lien DIP Facility, pursuant to an Acceptable Reorganization Plan.

36.    Importantly, tax limitations constrain the ability to broadly market the EFIH Second Lien DIP Facility.  If any person or persons other than current creditors of the EFIH Debtors were to obtain, as a group, a majority interest in EFIH or EFH Corp. in connection with a debt-restructuring deal, the tax-free nature of the restructuring contemplated by the restructuring support agreement would no longer be achievable.  The EFIH Debtors strongly believe avoiding a taxable deconsolidation is necessary to avoid litigation risk, a protracted chapter 11 process, and unnecessary destruction of value.  Thus, the EFIH Debtors are

effectively constrained to market among their current stakeholders to achieve a meaningful deleveraging.

37.     The EFIH Debtors received two alternative proposals to the EFIH Second Lien DIP Facility.  Before the Petition Date, certain Prepetition EFIH Second Lien Creditors submitted a preliminary proposal for second lien DIP financing *pari passu* with the EFIH Second Lien Notes (the "Original Second Lien DIP Proposal").  As discussed in more detail in the Ying Declaration, however, the Original Second Lien DIP Proposal had significant drawbacks.  It reflected a lower indicative valuation of EFH Corp. and EFIH, payment of interest on the EFIH Second Lien Notes throughout the chapter 11 cases rather than an early repayment, payment of the full amount of alleged makewhole claims, lower recoveries to EFIH's and EFH Corp.'s unsecured creditors, and less deleveraging.  The EFIH Debtors chose not to engage in further negotiations with respect to the Original Second Lien DIP Proposal because they did not believe it was reasonably likely that the proponents would be willing or able to provide an acceptable level of deleveraging, a timely repayment of the EFIH Second Lien Notes, an appropriate settlement of the asserted EFIH Second Lien Makewhole Claims, an appropriate valuation of EFH Corp. and EFIH to maximize recoveries for creditors, or the level of consensus necessary to ensure a timely and successful reorganization.

38.     Three days before the filing of this Motion, certain Prepetition EFIH Second Lien Creditors put forward a four-page summary of potential terms for an alternative second lien financing facility (the "Competing Second Lien DIP Summary").  This summary contained many of the same terms as the EFIH Second Lien DIP Facility with lower fees (particularly with respect to the termination fee), a slightly lower interest rate, and no payment in kind fees related to the amendment of the tax sharing agreement among EFH Corp., Oncor Electric Delivery

Holdings Company LLC ("Oncor Holdings"), and Oncor Electric Delivery Company LLC (together with Oncor Holdings, "Oncor") to provide for direct payments under that agreement to EFIH (the "Oncor TSA Amendment").[20]  Although the nominal terms of the Competing Second Lien DIP Summary appear, in some ways, economically favorable compared to the EFIH Second Lien DIP Facility, the proposal is still incomplete.  There was no commitment of any kind, and none of the parties providing commitment financing were identified.  The proposal may increase the difficulty of establishing the prerequisites to obtaining a private letter ruling from the Internal Revenue Service confirming the tax-free nature of the transaction under the Restructuring Support Agreement.  And, most critically, the proposal did not address how the proposal could replace the current Investment Commitment while preserving the significant value created by having a Restructuring Support Agreement in place that provides a framework for the Debtors' goal of an expedient, value-maximizing chapter 11 proceeding that leads to a confirmable plan that avoids deconsolidation-related tax liabilities.  The EFIH Debtors will continue to evaluate the Competing Second Lien DIP Summary and negotiate with its Prepetition EFIH Second Lien Creditor proponents.  As of the date hereof, however, the EFIH Second Lien DIP Financing remains the only viable transaction—indeed, the only transaction at all, given the preliminary nature of the Competing Second Lien DIP Summary.

39.     Ultimately, the EFIH Debtors determined, in consultation with their professional advisors, that, at this time, the EFIH Second Lien DIP Facility is the best source of financing to effect the EFIH Second Lien Repayment and deleverage the EFIH Debtors on the effective date of an Acceptable Reorganization Plan.  The EFIH Debtors and the Commitment Parties

---

[20]   The Debtors are separately seeking the authority to consummate the Oncor TSA Amendment pursuant to the Settlement Motion.

negotiated the terms of the Investment Commitment, including all of the fees disclosed herein, as well as the EFIH Second Lien DIP Facility at arm's length.  The interest rates, fees, covenants, and events of default, taken as a whole, are reasonable, especially given the unprecedented nature of this debtor in possession financing that sits behind the $5.4 billion EFIH First Lien DIP Financing, any contingent asserted EFIH Makewhole Claims, and mandatorily converts into EFH Corp. equity under a chapter 11 plan.  The EFIH Debtors have not discovered any sources of financing on the same or similar terms junior to the EFIH Second Lien DIP Facility.  Indeed, the EFIH Debtors are not aware of any sources of financing on terms comparable to those under the EFIH Second Lien DIP Facility.  Thus, the EFIH Debtors believe the EFIH Second Lien DIP Facility is the best financing available, maximizes the value of their estates, and increases recoveries for the EFIH Debtors' unsecured creditors.

**Fees Under the EFIH Second Lien DIP Documents and the Commitment Letter**

40.    As discussed above and in the Ying Declaration, the EFIH Second Lien DIP Documents and the Commitment Letter provide for the payment of certain fees to the EFIH Second Lien DIP Note Purchasers and the Commitment Parties on account of the EFIH Second Lien DIP Financing and the Investment Commitment.  As discussed below, each of these fees are reasonable in light of the unprecedented nature of the EFIH Second Lien DIP Facility and the vital nature of the Investment Commitment to the EFIH Debtors' overall restructuring.

41.    *First*, the EFIH Second Lien DIP Documents provide for (a) the PIK Interest and the PIK Fee that are applicable only if approval of the Oncor TSA Amendment is delayed or does not occur and (b) the Prepayment Fee in the event the EFIH Second Lien DIP Financing is repaid in cash for a reason other than acceleration under an event of default.

42.    The PIK Interest and PIK Fee each apply only if the Court denies the Oncor TSA Amendment.  As discussed in more detail in the Settlement Motion, the Oncor TSA Amendment is designed to enhance the creditworthiness of EFIH by redirecting certain tax payments that Oncor currently makes to EFH Corp., and instead provides that those payments will be made to EFIH.  The PIK Interest and PIK Fee are designed to account for the reduced creditworthiness of EFIH in the event the Oncor TSA Amendment is not approved.  Specifically, if the Oncor TSA Amendment is not approved by July 27, 2014, the 4% PIK Interest shall apply to the Tranche A Notes (*e.g.*, notes other than notes issued to the Commitment Parties pursuant to the Closing Fee).  Additionally, if the Oncor TSA Amendment is not approved by April 29, 2015, the one-time PIK Fee of 10% will be applied to both the Tranche A Notes and Tranche B Notes. Importantly, the PIK Fee and PIK Interest reflect a key compromise.  In the absence of these fees, the Initial Commitment Parties likely would have insisted that a failure to consummate the Oncor TSA Amendment result in an event of default under the EFIH Second Lien DIP Facility or a termination of the Investment Commitment.   Moreover, the EFIH Debtors are contemporaneously seeking the approval of the Oncor TSA Amendment.  As a result, the EFIH Debtors do not believe the PIK Interest or the PIK Fee should ever be applicable.  The EFIH Debtors believe that these fees are reasonable given the structure of the EFIH Second Lien DIP Financing—particularly the its non-priming nature—and the increased risk that will be borne by the EFIH Second Lien DIP Note Purchasers if the Oncor TSA Amendment is not approved.

43.    After extensive negotiations, the EFIH Debtors also agreed to the Prepayment Fee of $380 million in the event the EFIH Second Lien DIP Financing is repaid in cash other than as a result of acceleration, without the consent of certain noteholders.  The Commitment Parties required the Prepayment Fee to preserve their expectation of owning the equity in reorganized

EFH Corp., a key component of the EFIH Second Lien DIP Facility.  Regardless, the EFIH Debtors believe that it is unlikely that the Prepayment Fee will ever become payable except in a liquidation scenario given that the universe of potential alternative investors is limited largely for tax reasons to the EFIH Debtors' current stakeholders.  As a result, the EFIH Debtors believe the Prepayment Fee is reasonable given the unprecedented nature of the EFIH Second Lien DIP Facility and the key role the EFIH Second Lien DIP Facility plays in the transactions contemplated by the Restructuring Support Agreement.

44.     *Second*, the Commitment Letter (in conjunction with the EFIH Second Lien DIP Documents) provides for the Total Second Lien DIP Commitment Fees, the Alternative Transaction Fee, and the Closing Fee.  The Total Second Lien DIP Commitment Fees (including the Execution Fee that was paid prepetition) total approximately $51.25 million, or 2.70% of the $1.9 billion Investment Commitment, and are payable in connection with certain milestones relating to approval of the Commitment Letter and funding of the EFIH Second Lien DIP Financing.  The Total Second Lien DIP Commitment Fees are well within the range of fees payable in connection with debtor in possession financings in large chapter 11 cases.  Similarly, the Participation Fee payable to Fidelity, which Fidelity required as a condition to exercising its Participation Rights, effectively mirrors the Total Second Lien DIP Commitment Fees payable to the Commitment Parties and is reasonable.  The Commitment Letter also provides for customary payment of certain professional fees, including the Arrangement Fee, and indemnification obligations.

45.     The Closing Fee and the Alternative Transaction Fee are also reasonable and necessary.  The Closing Fee, which is 5% of the Investment Commitment ($95 million) and

payable in kind in the form of Tranche B Notes that do *not* bear interest,[21] is reasonable given that the Equity Conversion is closely analogous to a rights offering, and the Closing Fee is well within the range of fees payable in connection with rights offerings in large chapter 11 cases. Similarly, the Alternative Transaction Fee is payable only in the event the EFIH Debtors, up to the funding of the EFIH Second Lien DIP Facility, enter into definitive documentation regarding a restructuring transaction that is more favorable than that contemplated under the Restructuring Support Agreement.   The Alternative Transaction Fee, which is approximately 3% of the Investment Commitment ($57 million), was insisted upon by the Commitment Parties and was necessary to the execution of the Commitment Letter and the Restructuring Support Agreement. Moreover, the Alternative Transaction Fee is within the range of fees payable in connection of rights offerings in large chapter 11 cases.

46.     Ultimately, each of the fees under the EFIH Second Lien DIP Documents and the Commitment Letter was essential to the framework for the Debtors' speedy, cost-efficient restructuring that minimizes the risk of massive deconsolidation-related tax liabilities.  Certain of the fees are squarely in line with precedent for debtor in possession financing facilities and rights offerings in chapter 11 cases of this size, certain fees are unlikely to be applicable, and the remaining fees are appropriate in light of the unprecedented nature of the transaction.  Each of the fees was subject to extensive arm's-length negotiations in which the EFIH Debtors made every effort to obtain the best deal that would also facilitate a swift, tax-efficient exit from chapter 11.  Accordingly, the EFIH Debtors believe that entry into the EFIH Second Lien DIP

---

[21]   The Tranche B Notes are convertible to Tranche A Notes in the event the Equity Conversion does not occur. Additionally, the PIK Fee, if applicable, does apply to the Tranche B Notes.

Facility and the Commitment Letters is in the best interest of their estates and all of their stakeholders.

## No Adequate Protection is Necessary

47.    The Prepetition EFIH Secured Creditors are not entitled to adequate protection in connection with the EFIH Second Lien DIP Facility or the EFIH Debtors' use of cash collateral. Importantly, the EFIH Second Lien DIP Facility is junior to any asserted EFIH Makewhole Claims.  In any event, the EFIH Makewhole Claims are not entitled to adequate protection in connection with the use of cash collateral because such claims are baseless.  Accordingly, the EFIH Debtors believe that no adequate protection is necessary in connection with their use of cash collateral or the EFIH Second Lien DIP Facility.

## The EFIH Second Lien DIP Offering

48.    As noted above, the EFIH Debtors will solicit participation in the EFIH Second Lien DIP Facility pursuant to the EFIH Second Lien DIP Offering under applicable securities laws.  As with the EFIH Second Lien Opt-In, the EFIH Debtors will provide notice to the Court and all parties in interest when the EFIH Second Lien DIP Offering is launched.

## Basis for Relief

I.    **The EFIH Debtors Should Be Authorized to Obtain Postpetition Financing Through the EFIH Second Lien DIP Facility.**

A.    **Entry into the EFIH Second Lien DIP NPA is an Exercise of the EFIH Debtors' Sound and Reasonable Business Judgment.**

49.    The Court should authorize the EFIH Debtors, as an exercise of the EFIH Debtors' sound business judgment, to enter into the EFIH Second Lien DIP NPA and obtain access to the EFIH Second Lien DIP Facility.

50.    Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances as described in greater detail below.

Provided that an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference to the debtor's exercise of its sound business judgment in obtaining such credit. *See*, *e.g.*, *Trans World Airlines, Inc. v. Travelers Int'l AG* (*In re Trans World Airlines, Inc.*), 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment."); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Barbara K. Enters., Inc.*, No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[c]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, inter alia, an exercise of "sound and reasonable business judgment.").

51.    Specifically, to determine whether the business judgment standard is met, a court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business

judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code.") (citation omitted).

52.     The EFIH Debtors' execution of the EFIH Second Lien DIP NPA is well within the Debtors' sound business judgment and warrants approval by the Court.  Before the Petition Date, the EFIH Debtors and their advisors analyzed the cost of the EFIH Second Lien Notes and potential restructuring and deleveraging options.  In this process, the EFIH Debtors and their advisors concluded that (a) executing the EFIH Second Lien Repayment would dramatically reduce EFIH's interest obligations going forward and (b) set the stage for a substantial deleveraging of the EFIH Debtors' balance sheet under a chapter 11 plan.  The EFIH Debtors negotiated the terms of the EFIH Second Lien DIP Facility with the Commitment Parties in good faith and at arm's length to obtain the most favorable terms possible for the EFIH Debtors.

53.     As discussed above, the EFIH Debtors have determined that the EFIH Second Lien DIP Facility is the best available financing alternative.  There are no alternative sources of financing that will permit the EFIH Debtors to execute the EFIH Second Lien Repayment and set the stage for a deleveraging of the EFIH Debtors' balance sheet upon emergence from chapter 11.  And the EFIH Second Lien DIP Facility is fully subordinated to the EFIH Debtors' prepetition secured debt.  Thus, entry into EFIH Second Lien DIP Facility is an exercise of the EFIH Debtors' sound business judgment.

**B.      The EFIH Debtors Should Be Authorized to Obtain Postpetition Financing on a Junior Secured Basis.**

54.     Section 364 of the Bankruptcy Code authorizes a debtor to obtain, in certain circumstances, postpetition financing on a secured or superpriority basis, or both.  Specifically, section 364(c) of the Bankruptcy Code provides, in pertinent part, that the court, after notice and

a hearing, may authorize a debtor that is unable to obtain credit allowable as an administrative

expense under section 503(b)(1) of the Bankruptcy Code to obtain credit or incur debt:

> (a) with priority over any or all administrative expenses of the kind specified in
> section 503(b) or 507(b) of [the Bankruptcy Code];
>
> (b) secured by a lien on property of the estate that is not otherwise subject to a
> lien; or
>
> (c) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

　　　55.　　To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor

need only demonstrate "by a good faith effort that credit was not available" to the debtor on an

unsecured or administrative expense basis. *Bray v. Shenandoah Fed. Sav. & Loan Assoc. (In re

Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also L.A. Dodgers*, 457 B.R. at 313

(citing *Ames Dep't Store*, 115 B.R. at 37 (noting the court "may not approve any credit

transaction under subsection (c) [of section 364] unless the debtor demonstrates that it has

attempted, but failed, to obtain unsecured credit under section 364(a) or (b)").  "The statute

imposes no duty to seek credit from every possible lender before concluding that such credit is

unavailable." *Id.*; *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584

(S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain

credit as an administrative expense).  When few lenders are likely to be able and willing to

extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the

debtor] to conduct such an exhaustive search for financing." *In re Sky Valley*, *Inc.*, 100 B.R.

107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99

B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also Ames Dep't Stores*, 115 B.R. at 40 (approving

financing facility and holding that the debtor made reasonable efforts to satisfy the standards of

section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received); *In re Garland Corp.*, 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) authorized, after notice and a hearing, upon showing that unsecured credit unobtainable); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met).

56.     The EFIH Debtors' discussions with various potential sources of second lien debtor in possession financing revealed that such financing on a basis junior to the EFIH Second Lien DIP Facility was not available to the EFIH Debtors on terms that were competitive with those in the EFIH Second Lien DIP Facility.  The Court should therefore authorize the EFIH Debtors to provide (a) liens on the EFIH Debtors' unencumbered property as provided in section 364(c)(2) of the Bankruptcy Code that are junior to the EFIH First Lien DIP Liens, Permitted Liens, and the Carve Out, (b) junior liens on the EFIH Debtors' encumbered property, and (c) superpriority administrative expense claims as provided for in section 364(c)(1) of the Bankruptcy Code that are subordinated to (i) the Carve Out, (ii) the superiority claim granted pursuant to the EFIH First Lien DIP Financing, and (iii) the Prepetition Obligations.

### C.     The Prepetition EFIH Secured Creditors Are Not Entitled to Adequate Protection and EFIH Debtors' Request to Use EFIH Cash Collateral is Appropriate.

57.     A debtor may obtain postpetition credit "secured by a senior or equal lien on property of the estate that is subject to a lien only if" the debtor, among other things, provides "adequate protection" to those parties or such parties consent.  *See* 11 U.S.C. § 364(d)(1)(B). Similarly, section 363(c)(2) of the Bankruptcy Code provides that a debtor may only use cash

collateral if parties with an interest in the cash collateral consent or such parties are adequately protected.

58.    Here, the Prepetition EFIH Secured Creditors are not entitled to adequate protection. *First*, the EFIH Second Lien DIP Facility is not priming or *pari passu* with any prepetition secured claims.    *Second*, the Prepetition EFIH Secured Notes will be repaid following consummation of the EFIH First Lien DIP Financing and the EFIH Second Lien DIP Facility.    Importantly, the Prepetition EFIH Secured Creditors are not entitled to adequate protection with respect to their baseless EFIH Makewhole Claims.    The EFIH Second Lien Settlement and EFIH First Lien Settlement were key aspects of brokering consensus, executing the Restructuring Support Agreement, and facilitating a speedy chapter 11 process that avoided a massive deconsolidation tax liability—but none of those points justify the provision of adequate protection for a contingent, disputed claim that the EFIH Debtors will seek to disallow in full in due course.    The EFIH Debtors have, therefore, satisfied sections 363(c)(2) of the Bankruptcy Code and should be authorized to use the EFIH Cash Collateral.

**D.    The Scope of the Carve Out is Appropriate.**

59.    The proposed EFIH Second Lien DIP Facility subjects the security interests and administrative expense claims of the EFIH Second Lien DIP Note Purchasers to the Carve Out. Carve outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel. *See Ames*, 115 B.R. at 40.  The EFIH Second Lien DIP Facility does not directly or indirectly deprive the EFIH Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these cases.  *See id.* at 38 (observing that courts insist on carve outs for professionals representing parties-in-interest because "[a]bsent such

protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). Additionally, the Carve Out protects against administrative insolvency during the course of these chapter 11 cases by ensuring that assets remain for the payment of U.S. Trustee fees and professional fees of the EFIH Debtors and the Creditors' Committee, notwithstanding the grant of superpriority and administrative liens and claims under the EFIH Second Lien DIP Facility.

60.    Moreover, with the inclusion of the Carve Out, the Order does not directly or indirectly deprive the EFIH Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in the Chapter 11 Cases. *See In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). In *Ames*, the court found such "carve-outs" for professional fees to be not only reasonable, but necessary to ensure that official committees and debtors' estates can retain assistance from counsel. *Id.* at 41.

61.    Similar carve outs for professional fees have been found to be reasonable and necessary in this district to ensure that a debtor's estate and any statutory committee can retain assistance from counsel. *See, e.g., In re Longview Power, LLC*, No. 13-12211 (BLS) (Bankr. D. Del. Sept. 5, 2013) (allowing carve out for debtor and committee professional fees); *In re Dex One Corp.*, No. 13-10533 (KG) (Bankr. D. Del. Mar. 19, 2013) (same); *In re Amicus Wind Down Corp.*, No. 11-13167 (KG) (Bankr. D. Del. Nov. 2, 2011) (same); *In re Neb. Book Co., Inc.*, No. 11-12005 (PJW) (Bankr. D. Del. July 21, 2011) (same); *In re Local Insight Media Holdings, Inc.*, No. 10-13677 (KG) (Bankr. D. Del. Dec. 29, 2010) (same); *In re N. Am. Petroleum Corp.*

*USA*, No. 10-11707 (CSS) (Bankr. D. Del. July 6, 2010) (same); *In re Stallion Oilfield Servs.*

*Ltd.*, No. 09-13562 (BLS) (Bankr. D. Del. Nov. 18, 2009) (same).

>    **E.**    **The EFIH Second Lien DIP Facility Was Negotiated in Good Faith and Should Be Afforded the Protection of Section 364(e) of the Bankruptcy Code.**

62.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to

collect on loans extended to a debtor, and its right in any lien securing those loans, even if the

authority of the debtor to obtain such loans or grant such liens is later reversed or modified on

appeal.  Specifically, section 364(e) provides that:

>    The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

63.    The EFIH Second Lien DIP Facility was negotiated in good faith and at arm's

length among the EFIH Debtors and the Commitment Parties, and all of the EFIH Second Lien

DIP Facility obligations will be extended by the EFIH Second Lien DIP Note Purchasers in good

faith (as such term is used in section 364(e) of the Bankruptcy Code).  No consideration is being

provided to any party in connection with the EFIH Second Lien DIP Facility other than as

described in this Motion, in the Settlement Motion, in the Restructuring Support Agreement, and

in the EFIH Second Lien DIP Documents.  Moreover, the EFIH Second Lien DIP Facility has

been extended in express reliance upon the protections afforded by section 364(e) of the

Bankruptcy Code and the EFIH Second Lien DIP Agent, the Commitment Parties, and the EFIH

Second Lien DIP Note Purchasers should be entitled to the full protection of section 364(e) of

the Bankruptcy Code in the event that the Order or any provision thereof is vacated, reversed, or modified on appeal or otherwise.  *See* 11 U.S.C. § 364(e).  Accordingly, the Court should find that the Commitment Parties, the EFIH Second Lien DIP Agent, and the EFIH Second Lien DIP Note Purchasers are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by that section.

**F.    Modification of the Automatic Stay Provided Under Section 362 of the Bankruptcy Code is Appropriate Under the Circumstances.**

64.    The Order proposes that the automatic stay imposed under section 362(a) of the Bankruptcy Code be lifted to allow the EFIH Second Lien DIP Agent and the EFIH Second Lien DIP Note Purchasers, in their sole discretion, to file the Order or such financing statements, mortgages, deeds of trust, notices of lien, or similar instruments or otherwise confirm perfection of such liens, security interests, and mortgages.  The Order also proposes that, upon five days written notice to the EFIH Debtors, their counsel, and the Collateral Trustee, the automatic stay imposed under section 362(a) of the Bankruptcy Code be lifted to allow the EFIH Second Lien DIP Agent to exercise remedies following a default under EFIH Second Lien DIP Facility.

65.    Stay modification provisions of this sort are ordinary and usual features of debtor in possession financing facilities and, in the EFIH Debtors' business judgment, are reasonable under the present circumstances.  Accordingly, the Court should modify the automatic stay to the extent contemplated under EFIH Second Lien DIP NPA and the proposed Orders.

**G.    The EFIH Second Lien DIP Offering Should Be Approved.**

66.    Authorizing the EFIH Second Lien DIP Offering is within this Court's authority under sections 105(a), 363(b), and 364 of the Bankruptcy Code.  Section 105(a), in conjunction with section 364, generally allow the Court to "issue any order [or] process . . . that is necessary or appropriate to carry out the provisions of this title."  Here, the applicable "provision" is

section 364, obtaining debtor in possession financing. Similarly, as discussed above, section 363(b) generally provides that a debtor may use property of the estate outside of the ordinary course of business so long as such use is in the debtor's sound business judgment.

67. The EFIH Second Lien DIP Offering will be conducted in accordance with applicable securities laws, and full notice will provided to the Court and all parties in interest when the EFIH Second Lien DIP Offering is launched. Given the large number of parties that have Participation Rights in the EFIH Second Lien DIP Offering, the EFIH Debtors reasonably concluded that the EFIH Second Lien DIP Offering was the best way to allow all such parties to participate while minimizing any potential delay in consummating the EFIH Second Lien DIP Facility. Indeed, at least one court has authorized a postpetition solicitation with respect to participation in a debtor in possession financing facility. *See In re Eastman Kodak Co.*, No, 12-10202 (ALG) (Bankr. S.D.N.Y. Dec. 19, 2012) (approving solicitation of certain prepetition junior creditors to participate in a debtor in possession financing). Accordingly, the EFIH Debtors respectfully submit that the EFIH Second Lien DIP Offering is reasonably necessary to obtaining the EFIH Second Lien DIP Facility, is a sound exercise of the EFIH Debtors' business judgment, and should be approved.

## II.    The Fees Payable Under the EFIH Second Lien DIP NPA and the Commitment Letter are Appropriate.

68. The EFIH Second Lien DIP Documents and the Commitment Letter provide for various fees, some of which are payable upon funding the EFIH Second Lien DIP Facility, some of which have already been paid, and some of which are payable only under certain circumstances. Each of these fees is reasonable given the unprecedented nature of this debtor in possession financing that sits behind the $5.4 billion EFIH First Lien DIP Financing and the contingent EFIH Makewhole Claims and that converts into equity under a chapter 11 plan.

42

**A.**     **The Fees Payable Only if the Oncor TSA Amendment is Not Approved Are Reasonable and Appropriate.**

69.     There are two payment in kind provisions related to the Oncor TSA Amendment. *First*, if the Oncor TSA Amendment is not approved by July 27, 2014, PIK Interest of 4% per year will apply.  *Second*, if the Oncor TSA Amendment is not approved by April 29, 2015, a one-time PIK Fee of 10%, payable in kind with respect to outstanding Tranche A and Tranche B Notes, applies.

70.     The PIK Interest and PIK Fee reflect a key compromise between the EFIH Debtors and the Commitment Parties and were a necessary element to ensuring the EFIH Second Lien DIP Facility could be consummated.  In the absence of such fees, the EFIH Second Lien DIP Facility likely would include an event of default in the event the Oncor TSA Amendment is not approved.  The PIK Interest and PIK Fee are each designed to compensate the EFIH Second Lien DIP Note Purchasers for the increased risk of the EFIH Second Lien DIP Facility in the event the Oncor TSA Amendment is not approved.   Importantly, the EFIH Debtors are contemporaneously seeking the approval of the Oncor TSA Amendment and do not believe the PIK Interest or PIK Fee should ever be applicable.  And the fees were subject to extensive negotiations among the EFIH Debtors and their stakeholders.  Given the vital nature of the EFIH Second Lien DIP Facility to the overall restructuring, the EFIH Debtors are well within their reasonable business judgment in agreement to payment of the PIK Interest and PIK Fee in the event that the Oncor TSA Amendment is delayed or not approved.

**B.**     **The Prepayment Fee is Reasonable and Appropriate.**

71.     The $380 million Prepayment Fee is payable to the EFIH Second Lien DIP Note Purchasers upon repayment of the EFIH Second Lien DIP Facility in cash without the consent of the Required Purchasers, subject to certain exceptions specified in the EFIH Second Lien DIP

NPA, other than upon acceleration.  Accordingly, the prepayment fee will only be triggered if the EFIH Debtors enter into a transaction with terms that are superior to the EFIH Second Lien DIP Facility and the EFIH Debtors make the affirmative decision to repay the EFIH Second Lien Financing in cash.  Such a decision would only be made in conjunction the EFIH Debtors' interest in avoiding a transaction that results in over $6 billion of aggregate deconsolidation-related tax liabilities and maximizing the value of the EFIH Debtors' estates.

72.     The EFIH Second Lien DIP Facility is an unprecedented transaction that entails a significant amount of risk and an expectation that the risk will be rewarded in the form of equity, not debt or cash.  The Prepayment Fee was bargained for to protect the EFIH Second Lien DIP Note Purchasers from losing the opportunity to obtain approximately 64% of the equity of reorganized EFH Corp., which is a key component of the EFIH Second Lien DIP Facility, it was subject to extensive negotiations among the EFIH Debtors and their stakeholders, and it was essential to the execution of the Commitment Letter and the Restructuring Support Agreement. Under these circumstances, the Prepayment Fee is appropriate compensation for the risk the EFIH Second Lien DIP Note Purchasers have agreed to accept and the key role the EFIH Second Lien DIP Facility plays in the EFIH Debtors' restructuring efforts.

### C.     The Postpetition DIP Commitment Fees, Participation Fee, and Expense and Indemnification Provisions Are Necessary and Appropriate.

73.     The EFIH Debtors request approval of the Execution Fee ($8,750,000) and authority to pay the Postpetition DIP Commitment Fees and Participation Fee.  The Postpetition DIP Commitment Fees and Participation Fee amount to 2.24% of $1.9 billion ($42,500,000) to be paid in cash.  The Total Second Lien DIP Commitment Fees, including the Execution Fee already paid in cash, and the Participation Fee, are 2.70% of $1.9 billion ($51,250,000).  The Commitment Parties required the Second Lien DIP Commitment Fees as a condition to

backstopping the EFIH Second Lien DIP Facility, and the fees are comparable to debtor in possession commitment fees commonly paid in connection with postpetition financing commitments.  Similarly, Fidelity required the Participation Fee as a condition to exercising its Participation Rights.

74.    Indeed, courts in this and other districts have approved fees similar to the Postpetition DIP Commitment Fees in other recent chapter 11 cases.  *See*, *e.g.*, *In re Exide Techs.*, No. 13-11482 (KJC) (Bankr. D. Del. Jul. 25, 2013) (approving approximately 4.7% of aggregate fees to underwriters, arrangers, and lenders); *In re Neb. Book Co.*, No. 11-12005 (Bankr. D. Del. Apr. 12, 2012) (approving a commitment fee of 1% of backstop commitment for each month outstanding, a 1% funding fee, expense reimbursement, and similar indemnification language); *In re LSP Energy Ltd. P'ship*, No. 12-10460 (Bankr. D. Del Feb. 27, 2012) (approving 1.25% DIP commitment fee); *In re Friendly Ice Cream Corp.*, No. 11-13167 (Bankr. D. Del. Nov. 2, 2011) (approving certain letter of credit fees including a 2% issuance fee); *In re Cooper-Standard Holdings Inc.*, No. 09-12743 (Bankr. D. Del. Sept. 2, 2009) (approving 2.5% upfront fee and 2.5% exit fee); *In re Hayes Lemmerz Int'l, Inc.*, No. 09-11655 (Bankr. D. Del. June 15, 2009) (approving 3% exit fee); *In re Aleris Int'l. Inc.*, No. 09-10478 (Bankr. D. Del. Mar. 18, 2009) (approving 3.5% exit fee and 3.5% front-end net adjustment against each lender's initial commitment); *In re Dura Auto. Sys., Inc.*, No. 06-11202 (Bankr. D. Del. Jan. 30, 2008) (approving a 2.5% fee related to refinancing and extending a postpetition financing facility); *see also In re Eastman Kodak Co.*, No. 12-10202 (Bankr. S.D.N.Y. Dec. 14, 2012) (approving a DIP commitment fee of 2% in cash or 3% paid in kind, among other fees, plus expense reimbursement and indemnification provisions); *In re Great Atl. & Pac. Tea Co.*, No. 10-24549 (Bankr. S.D.N.Y. Jan. 11, 2011) (approving 3% letter of credit fee); *In re InSight Health Servs.*

*Holdings Corp.*, No. 10-16564 (Bankr. S.D.N.Y. Jan. 4, 2011) (approving 2.5% DIP closing fee); *In re Neff Corp.*, No. 10-12610 (Bankr. S.D.N.Y. June 30, 2010) (approving 3.1% DIP and exit facility fee); *In re Reader's Digest Ass'n*, No. 09-23529 (Bankr. S.D.N.Y. Oct. 6, 2009) (approving 3% exit fee); *In re Lear Corp.*, No. 09-14326 (Bankr. S.D.N.Y. Aug. 4, 2009) (approving 5% upfront fee and a 1% exit/conversion fee); *In re Hayes Lemmerz Int'l, Inc.*, No. 09-11655 (Bankr. D. Del. May 22, 2009) (approving a 4% DIP commitment fee); *In re Gen. Growth Props., Inc.*, No. 09-11977 (Bankr. S.D.N.Y. May 14, 2009) (approving 3.75% exit fee); *In re Tronox Inc.*, No. 09-10156 (Bankr. S.D.N.Y. Feb. 9, 2009) (approving an up-front 3% facility fee).

75.     The EFIH Debtors, in a sound exercise of their reasonable business judgment, have determined that payment of the Total Second Lien DIP Commitment Fees and agreeing to the expense and indemnification provisions in the Commitment Letter are an effective, commonplace, and necessary means to secure the Commitment Parties' agreement to fund the EFIH Second Lien DIP Facility and that the amounts contemplated thereby are reasonable by market standards.

76.     In addition, for the reasons set forth above, the EFIH Debtors have determined in a sound exercise of their reasonable business judgment that the Participation Fee is an effective, commonplace, and necessary means to secure Fidelity's participation in the EFIH Second Lien DIP Facility given the unprecedented nature of the financing, the risks undertaken by Fidelity, and the key role the EFIH Second Lien DIP Facility plays in the transactions contemplated by the Restructuring Support Agreement.  The amount contemplated thereby is reasonable by market standards and approximates the fees payable to the Commitment Parties under the Commitment Letter.

**D.      The Closing Fee and Alternative Transaction Fee Are Necessary and Appropriate.**

77.      The EFIH Debtors also request authority to pay the Closing Fee and the Alternative Transaction Fee as a condition of the Equity Conversion. The Closing Fee is equal to 5.00% of $1.9 billion ($95 million) and is payable in Tranche B Notes. The Closing Fee is comparable to a commitment fee paid in connection with an equity rights offering because it compensates the Commitment Parties for backstopping the Equity Conversion. The Commitment Parties also required the Alternative Transaction Fee, which is equal to 3.00% of $1.9 billion ($57 million) and is payable only up to the funding of the EFIH Second Lien DIP Facility and only in the event the Debtors enter into a restructuring transaction on more favorable terms than the transaction in the Restructuring Support Agreement. The Alternative Transaction Fee is comparably to similar "deal away" fees commonly paid in connection with equity rights offerings.

78.      Courts in this and other districts have approved commitment fees similar to the Closing Fee in connection with equity rights offerings in other recent chapter 11 cases. *See, e.g.*, *In re K-V Discovery Solutions Inc.*, No. 12-13346 (Bankr. S.D.N.Y. June 7, 2013) (approving a 5% equity rights offering fee); *In Vertis Holdings, Inc.*, No. 10-16170 (Bankr. S.D.N.Y. Dec. 1, 2010) (approving a 10% equity rights offering fee); *In re Tronox, Inc.*, No. 09-10156 (Bankr. S.D.N.Y. Sept. 17, 2010) (approving a 6% equity rights offering fee); *In re AbitibiBowater Inc.*, No. 09-11296 (Bankr. D. Del. June 25, 2010) (approving a 6% commitment fee for a rights offering of convertible unsecured notes); *In re Visteon Corp.*, No. 09-11786 (Bankr. D. Del. June 17, 2010) (approving a 4.8% equity rights offering fee); *In re Spansion Inc.*, No. 09-10690 (Bankr. D. Del. Jan. 7, 2010) (approving a 4.1% equity rights offering fee); *In re RathGibson, Inc.*, No. 09-12452 (Bankr. D. Del. Sept. 2, 2009) (approving a 5% to 7.5% equity rights offering

fee); *In re Magnachip Semiconductor Fin. Co.*, No. 09-12008 (Bankr. D. Del. Aug. 31, 2009) (approving a 10% equity rights offering fee); *In re Landsource Cmtys. Dev. LLC*, No. 08-11111 (Bankr. D. Del. June 2, 2009) (approving a 5% equity rights offering fee); *In re Motor Coach Indus. Int'l, Inc.*, No. 08-12136 (Bankr. D. Del. Oct. 29, 2008) (approving a 5% commitment fee for a rights offering of preferred stock); *In re Dura Auto. Sys., Inc.*, No. 06-11202 (Bankr. D. Del. Aug. 17, 2007) (approving a 4% equity rights offering fee); *In re Bally Total Fitness of Greater NY Inc.*, No. 07-12395 (Bankr. S.D.N.Y. Aug. 1, 2007) (approving a 4% equity rights offering fee).

79.    Moreover, courts in this and other districts have approved fees similar to the Alternative Transaction Fee in other recent chapter 11 cases.  *See, e.g.*, *In re K-V Discovery Solutions Inc.*, No. 12-13346 (Bankr. S.D.N.Y. June 7, 2013) (approving a 3% alternative transaction fee for an equity rights offering); *In re Tronox, Inc.*, No. 09-10156 (Bankr. S.D.N.Y. Sept. 17, 2010) (approving a 6% breakup fee for an equity rights offering); *In re AbitibiBowater Inc.*, No. 09-11296 (Bankr. D. Del. June 25, 2010) (approving a 3% termination fee for a rights offering of convertible unsecured notes); *In re Visteon Corp.*, No. 09-11786 (Bankr. D. Del. June 17, 2010) (approving a 4.8% termination fee, including the nonrefundable portion of the commitment fee); *In re Accuride Corp.*, No. 09-13449 (Bankr. D. Del. Nov. 2, 2009) (approving a 7.1% breakup fee for a convertible notes rights offering); *see also In re Sea Launch Co., L.L.C.*, No. 09-12153 (Bankr. D. Del. May 12, 2010) (approving 3.75% DIP break-up fee).

80.    The EFIH Debtors, in a sound exercise of their reasonable business judgment, have determined that payment of the Closing Fee and the Alternative Transaction Fee is an effective, commonplace, and necessary means to secure the Commitment Parties' agreement to

undertake the Equity Conversion and that the amounts contemplated thereby are reasonable by market standards.

### III. The Court Should Authorize the Repayment of the EFIH Second Lien Notes Because Doing So Is in the Best Interests of the Debtors and Their Estates.

81.     Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Whether use of assets pursuant to section 363(b) of the Bankruptcy Code should be approved in a particular case is a matter left to the court's discretion, giving due consideration to the sound business judgment of the proponent of the particular transaction.  *See*, *e.g.*, *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F. 2d 1063, 1071 (2d Cir. 1983) (court may approve a transaction involving property of the estate that is outside of the ordinary course of business when the court finds a good business reason for such transaction).  When determining whether a debtor has exercised its business judgment, this Court "is required to examine whether a reasonable business person would make a similar decision under similar circumstances."  *In re AbitibiBowater Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (business judgment rule in the contract assumption process).  Moreover, section 105(a) of the Bankruptcy Code provides this Court with the ability to "issue any order, process, or judgment that is necessary or appropriate" to further the "paramount policy and goal of Chapter 11"—the rehabilitation of a debtor.  11 U.S.C. § 105(a); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176-77 (Bankr. S.D.N.Y. 1989).

82.     The EFIH Second Lien Repayment, like the EFIH First Lien Repayment, is firmly supported by strong precedent and within the EFIH Debtors' business judgment.  In *In re Calpine Corp.*, 356 B.R. 585 (S.D.N.Y. 2007), the district court upheld on appeal the bankruptcy court's decision to allow Calpine to use a combination of asset sale and postpetition financing

proceeds to repay a portion of Calpine's above-market prepetition debt.  *Id.* at 589-90 (noting that the bankruptcy court found that the repayment was appropriate to allow Calpine to "stop 'hemorrhaging' cash").  Later in the same case, Calpine was permitted to use the proceeds of a new postpetition facility to repay both postpetition and prepetition financing.  *See In re Calpine Corp.*, 365 B.R. 392, 396 (Bankr. S.D.N.Y. 2007).  More recently, American Airlines was permitted to repay a significant portion of its prepetition secured equipment leases with the proceeds of postpetition financing.  *In re AMR Corp.*, 485 B.R. 279, 283-84 (Bankr. S.D.N.Y. 2013) (holding that use of postpetition financing to repay prepetition debt is permissible if supported by "sound business reasons"), *aff'd In re AMR Corp.*, 730 F.3d 88 (2nd Cir. 2013); *see also In re School Specialty, Inc.*, No. 13-10125 (KJC) (Bankr. D. Del. Mar. 14, 2013) (authorizing postpetition financing to repay postpetition and prepetition claims).

83.    There can be no dispute that repaying the EFIH Second Lien Notes is in the best interests of the EFIH Debtors' estates.  Interest savings of up to $8 million per month is significant, but the deleveraging under a chapter 11 plan that the EFIH Second Lien DIP Facility sets the stage for is even more vital.  And the EFIH Second Lien Repayment should be permitted even though the Prepetition EFIH Second Lien Creditors may argue that they are entitled to EFIH Second Lien Makewhole Claims.  The EFIH Debtors are confident that they will succeed in disallowing such claims and, in any event, they should not be forced to pay the above-market interest on the EFIH Second Lien Notes, and risk termination of the Investment Commitment and the Restructuring Support Agreement, while any dispute regarding any asserted EFIH Second Lien Makewhole Claim is determined.  Thus, under these circumstances, the EFIH Debtors should be authorized under sections 363(b) and 105(a) of the Bankruptcy Code to repay the EFIH Second Lien Notes.

## Notice

84.     The Debtors shall provide notice of this Motion on the date hereof via first class mail to: (a) the Office of the U.S. Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d) and proposed counsel thereto; (c) Wilmington Trust, N.A., in its capacity as administrative agent under the TCEH first lien credit agreement and collateral agent under the TCEH intercreditor agreements and counsel thereto; (d) Bank of New York Mellon Trust Company, N.A., in its capacity as indenture trustee under: (i) the TCEH unsecured pollution control revenue bonds; and (ii) the EFCH 2037 Notes due 2037, and counsel thereto; (e) American Stock Transfer & Trust Company, LLC, in its capacity as indenture trustee under: (i) the 9.75% EFH senior unsecured notes due 2019; (ii) the 10.0% EFH senior unsecured notes due 2020; (iii) the 10.875% EFH LBO senior unsecured notes due 2017; (iv) the 11.25%/12.0% EFH LBO toggle notes due 2017; (v) the 5.55% EFH legacy notes (series P) due 2014; (vi) the 6.50% EFH legacy notes (series Q) due 2024; and (vii) the 6.55% EFH legacy notes (series R) due 2034, and counsel thereto; (f) Computershare Trust Company, N.A. and Computershare Trust Company of Canada, in their capacities as indenture trustee under: (i) the 11.0% EFIH senior secured second lien notes due 2021; and (ii) the 11.75% EFIH senior secured second lien notes due 2022, and counsel thereto; (g) UMB Bank, N.A. in its capacity as indenture trustee under: (i) the 9.75% EFIH senior unsecured notes due 2019; and (ii) the 11.25%/12.25% EFIH senior toggle notes due 2018, and counsel thereto; (h) BOKF, NA, dba Bank of Arizona, in its capacity as indenture trustee under 11.50% TCEH senior secured notes due 2020, and counsel thereto; (i) CSC Trust Company of Delaware in its capacity as indenture trustee under: (i) the 6.875% EFIH senior secured notes due 2017; and (ii) the 10.0% EFIH senior secured notes due

2020, and counsel thereto; (j) Law Debenture Trust Company of New York in its capacity as indenture trustee under: (i) the 10.25% TCEH senior unsecured notes due 2015; and (ii) the 10.50%/11.25% TCEH senior toggle notes due 2016, and counsel thereto; (k) Wilmington Savings Fund Society, FSB in its capacity as indenture trustee under the 15.0% TCEH senior secured second lien notes due 2021, and counsel thereto; (l) counsel to certain holders of claims against the Debtors regarding each of the foregoing described in clauses (c) through (k); (m) the agent for the TCEH debtor-in-possession financing facility and counsel thereto; (n) the agent for the EFIH debtor-in-possession financing facility and counsel thereto; (o) counsel to certain holders of equity in Texas Energy Future Holdings Limited Partnership; (p) counsel to the Ad Hoc Committee of TCEH Unsecured Noteholders; (q) counsel to the Ad Hoc Committee of TCEH Second Lien Noteholders; (r) counsel to Oncor; (s) the Securities and Exchange Commission; (t) the Internal Revenue Service; (u) the Office of the United States Attorney for the District of Delaware; (v) the Office of the Texas Attorney General on behalf of the Public Utility Commission of Texas; (w) counsel to the Electric Reliability Council of Texas; and (x) counsel to Texas Transmission Investment LLC.

## **No Prior Request**

85.     No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the EFIH Debtors respectfully request that the Court enter the Order, substantially in the form attached hereto as **Exhibit A**.

Wilmington, Delaware
Dated:  May 15, 2014

/s/ Tyler D. Semmelman

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
Tyler D. Semmelman (No. 5386)
920 North King Street
Wilmington, Delaware 19801
Telephone:      (302) 651-7700
Facsimile:      (302) 651-7701
Email:          collins@rlf.com
                defranceschi@rlf.com
                madron@rlf.com
                semmelman@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
Richard M. Cieri (admitted *pro hac vice*)
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          richard.cieri@kirkland.com
                edward.sassower@kirkland.com
                stephen.hessler@kirkland.com
                brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          james.sprayregen@kirkland.com
                chad.husnick@kirkland.com
                steven.serajeddini@kirkland.com

Proposed Co-Counsel to the Debtors and Debtors in Possession