## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DECLARATION OF DAVID YING, SENIOR MANAGING DIRECTOR OF
EVERCORE GROUP L.L.C., IN SUPPORT OF THE MOTION OF ENERGY FUTURE
INTERMEDIATE HOLDING COMPANY LLC AND EFIH FINANCE INC. FOR
ENTRY OF AN ORDER (A) APPROVING POSTPETITION SECOND LIEN
FINANCING, (B) GRANTING LIENS AND PROVIDING SUPERPRIORITY
ADMINISTRATIVE EXPENSE CLAIMS, (C) AUTHORIZING THE USE OF CASH
COLLATERAL, (D) AUTHORIZING THE EFIH SECOND LIEN REPAYMENT, (E)
AUTHORIZING ENTRY INTO AND PAYMENT OF FEES UNDER THE
COMMITMENT LETTER, AND (F) MODIFYING THE AUTOMATIC STAY**

I, David Ying, declare as follows:

1.      I am a Senior Managing Director and Head of the Restructuring and Debt

Advisory Group at Evercore Group L.L.C. ("Evercore"), a financial advisory and investment

banking firm with offices around the world and financial advisor and investment banker to the

above-captioned debtors and debtors in possession (the "Debtors").  I submit this declaration

("Declaration") in support of the *Motion of Energy Future Intermediate Holding Company LLC

and EFIH Finance Inc. For Entry Of An Order (A) Approving Postpetition Second Lien

Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C)

Authorizing The Use of Cash Collateral, (D) Authorizing The EFIH Second Lien Repayment, (E)*

---

[1]      The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810.  The location of the
debtors' service address is 1601 Bryan Street, Dallas, Texas 75201.  Due to the large number of debtors in these
chapter 11 cases, a complete list of the debtors and the last four digits of their federal tax identification numbers
is not provided herein.  A complete list of such information may be obtained on the website of the debtors'
claims and noticing agent at http://www.efhcaseinfo.com.

*Authorizing Entry Into And Payment of Fees Under The Commitment Letter, and (F) Modifying The Automatic Stay* (the "EFIH Second Lien DIP Motion").[2]

2.      Except where specifically noted, the statements in this Declaration are based on my personal knowledge; information supplied or verified by the Evercore financial team that I supervise or the EFIH Debtors' personnel and third-party advisors; my review of relevant documents; or my experience and knowledge of the EFIH Debtors' operations and financial condition.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.  I am authorized to submit this Declaration on behalf of the EFIH Debtors.

**A.      Qualifications**

3.      Evercore is one of the world's leading independent investment banking groups, with more than 20 offices in 8 countries, including an office located at 55 East 52nd Street, New York, NY 10055.  Evercore has expertise in domestic and cross-border restructurings, mergers and acquisitions, debt and equity capital markets transactions, and other financial advisory services.  Evercore has served as an experienced bankruptcy and restructuring advisor to debtors, bondholders, creditors' committees, single creditor classes and secured creditors, shareholders, and boards of directors in a variety of industries.  Evercore is a member of the Financial Industry Regulatory Authority and the Securities Investor Protection Corporation.

4.      I joined Evercore in 2005 and am a co-founder and head of the firm's Restructuring and Debt Advisory Group.  I have over 30 years of experience in restructuring advisory, debt and equity financings, and private equity investing.  Prior to joining Evercore, I held partner-level positions at Miller Buckfire Ying & Co, JLL Partners, Donaldson, Lufkin & Jenrette, Smith Barney, and Drexel Burnham Lambert.  I have a B.S. from the Sloan School of

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the EFIH Second Lien DIP Motion.

Management at the Massachusetts Institute of Technology (1976) and an M.B.A. in Finance from the Wharton School at the University of Pennsylvania (1978).

5.      As a Senior Managing Director at Evercore, I specialize in advising both debtors and creditors in financial restructurings and distressed mergers and acquisitions; raising debt and equity capital, in both out-of-court and in bankruptcy proceedings.  Moreover, I have advised numerous public and private corporations in complex restructurings, and have advised distressed corporations in connection with obtaining postpetition financing (including DIP financing and confirmation financing), helped them to find sources of financing, and negotiated, on their behalf, the terms of such financing.

**B.      The EFIH Second Lien DIP Facility Is An Integral Component Of The Restructuring.**

6.      I believe that the EFIH Second Lien DIP Facility is an integral component of the comprehensive restructuring of EFH Corp. and the EFIH Debtors contemplated by the Restructuring Support Agreement and should be approved for three primary reasons.  *First*, the EFIH Second Lien DIP Facility will restore EFIH's ability to service its cash interest obligations. *Second*, the EFIH Second Lien DIP Facility provides the EFIH Debtors the ability to create a feasible capital structure to facilitate their emergence from chapter 11.  And, *third*, the EFIH Second Lien DIP Facility is a critical component of the tax-free restructuring contemplated by the Restructuring Support Agreement.

7.      *First*, the EFIH unlevered cash flows are insufficient to service the existing tranches of EFIH prepetition secured debt, which each bear above-market interest rates.  Those cash flows consist primarily of dividends from Oncor and tax payments from Oncor that are paid to EFH, a substantial portion of which have been paid to EFIH on a pre-petition basis under the Competitive TSA.  Prior to filing, EFIH was forecasted to run out of liquidity in the second

quarter of 2014, assuming that it continued to pay the above-market interest rates on its existing, prepetition debt.  Therefore, it is critical that the EFIH Debtors repay their existing secured debt with the proceeds from lower interest-rate debt currently available in the market and thereby help stabilize their cash position during the bankruptcy.[3]  The EFIH Second Lien DIP Facility, combined with additional proceeds from the EFIH First Lien DIP Financing, will allow the EFIH Debtors to repay the approximately $2.156 billion in principal outstanding on two series of EFIH Second Lien Notes:  (a) approximately $406 million in principal amount of 11.00% EFIH Second Lien Notes due October 1, 2021; and (b) approximately $1.750 billion in principal amount of 11.75% EFIH Second Lien Notes due March 1, 2022 (collectively, the "EFIH Prepetition Second Lien Notes").  The EFIH Second Lien DIP Facility and the portion of the EFIH First Lien DIP Financing being used to repay the EFIH Prepetition Second Lien Notes will have significantly lower interest rates than the EFIH Prepetition Second Lien Notes, thus saving the EFIH Debtors approximately $8 million in monthly cash interest expense (approximately $96 million per year), during the EFIH Debtors' chapter 11 cases, in addition to the interest savings of approximately $14 million per month (approximately $173 million per year) that the EFIH Debtors will obtain from repaying the EFIH First Lien Notes.

8.    ***Second***, the EFIH Debtors must deleverage to achieve a feasible and sustainable capital structure upon emergence.  EFIH is projected to have approximately $7.4 billion of secured debt prior to emergence, comprised of $5.4 billion in funding under the EFIH First Lien DIP Facility and approximately $2.0 billion in funding (including PIK fees) under the EFIH Second Lien DIP Facility.  The EFIH Debtors would likely have difficulty repaying all of their secured debt at emergence, given the constraints on their debt capacity imposed by the cash flow

---

[3]    EFIH's cash flows will still be negative, however, without the Oncor TSA Amendment.

profile of reorganized EFIH.  Therefore, the mandatory conversion of all obligations arising under the EFIH Second Lien DIP Facility into equity in reorganized EFH Corp. at emergence is a necessary component of the EFIH Second Lien DIP Facility.  It is also a significant element of the comprehensive restructuring of the Debtors contemplated by the Restructuring Support Agreement ("RSA").  The conversion of debt-to-equity provides EFH Corp. and the EFIH Debtors with a more feasible and sustainable capital structure at emergence.  Assuming the conversion of the EFIH Second Lien DIP Facility into EFH Corp. equity, EFIH should be able to repay the obligations remaining in connection with the First Lien DIP Facility on market terms, which I believe can be supported by EFIH post-emergence projected cash flows.

9.      ***Third,*** the EFIH Second Lien DIP Facility facilitates a tax-efficient restructuring of each of EFH and EFIH, which is a necessary condition for the contemplated tax-free spin-off of TCEH.  That restructuring is premised on avoiding the multi-billion dollar tax liability that would arise on a taxable deconsolidation of EFIH from EFH.  The taxable deconsolidation of EFIH from EFH would create a tax of more than $3 billion (which would also result in a $3 billion tax from the taxable deconsolidation of TCEH from EFH).  Both deconsolidation tax liabilities would likely be left impaired at EFH Corp.  Those liabilities would, in turn, create significant litigation and risk of liability for all Debtor estates.

10.      If the separation of EFIH resulted in a deconsolidation tax, EFH would have a potential unsecured claim against EFIH of more than $3 billion under the applicable tax sharing agreement, therefore potentially reducing the recovery of EFH's and EFIH's unsecured creditors.  Moreover, there is a possibility in those circumstances that EFH would attempt to make a so-called "check-the-box" election so that EFIH would be taxed as a corporation, become part of EFH's consolidated tax group, and thus become jointly and severally liable for any

deconsolidation tax.  In that circumstance, the IRS would have an administrative claim against EFIH for the full amount of the deconsolidation tax, which would likely eliminate any recovery for EFIH's unsecured creditors.

11.    A consensual restructuring among the EFH and EFIH Debtors and their respective unsecured creditors, in which all unsecured creditors become shareholders in a reorganized EFH, is a critical part of avoiding this deconsolidation tax.  If third parties who are not existing creditors at EFIH or EFH obtain a majority interest as a group in EFIH or EFH Corp. in connection with a restructuring of the Debtors, the tax free nature of the restructuring contemplated by the RSA would no longer be achievable.  The EFIH Second Lien DIP Facility, which involves the investment commitment of certain unsecured creditors at EFH and EFIH, allows the EFH and EFIH Debtors to pursue a tax-free restructuring.  It was the product of the Debtors' extensive negotiations with their key stakeholders and a thorough search for the best available financing alternatives.  Ultimately, the participation of the EFH and EFIH unsecured creditors in funding the EFIH Second Lien DIP Facility and the mandatory conversion into EFH equity at emergence are interrelated and integral parts of the consensual restructuring of EFIH and EFH.

**C.    The EFIH Second Lien DIP Facility Will Reduce Interest Expense, Reduce Litigation Risk, And Allow The EFIH Debtors To Substantially Deleverage Their Capital Structure.**

12.    As an initial matter, the EFIH Second Lien DIP Facility locks in financing at lower interest rates, thus saving the EFIH Debtors and their unsecured creditors substantial interest expense.  As mentioned above, the EFIH Debtors currently have outstanding approximately $406 million in principal amount of 11.0% EFIH Second Lien Notes, and approximately $1.750 billion in principal amount of 11.75% EFIH Second Lien Notes.  The EFIH Second Lien DIP Facility has a favorable cash interest rate of 8% per year—substantially

less than the interest rates under the existing pre-petition second lien debt.  The repayment of the EFIH Second Lien Notes with the proceeds from the EFIH Second Lien DIP Facility (plus with proceeds from the EFIH First Lien DIP and cash on hand) will result in significant interest savings.  The repayment of the EFIH Prepetition Second Lien Notes will result in interest savings of approximately $8 million per month during the course of these chapter 11 proceedings.  Moreover, any delay in consummating the EFIH Second Lien DIP Facility will reduce the assets available to fund the recovery available for EFH and EFIH unsecured creditors commensurately.  The EFIH Second Lien DIP Facility, in conjunction with proceeds from the EFIH First Lien DIP Facility, will allow the EFIH Debtors to fund the makewhole settlements at terms favorable to the EFIH Debtors, if they are approved by the Court.

13.     Furthermore, the EFIH Second Lien DIP Facility is critical to recapitalizing the EFIH Debtors at emergence.  Upon emergence, the EFIH Second Lien DIP Facility, which is expected to include the $1.9 billion of new money (the "Tranche A Notes") and a payment-in-kind closing fee of $95 million (the "Tranche B Notes"), will convert into approximately 64% of equity in reorganized EFH Corp.  Because of this mandatory conversion feature, the EFIH Second Lien DIP Facility provides a mechanism, at an early date in these chapter 11 cases, for EFIH to ensure that it can deleverage its capital structure.  This is vital to ensuring that the EFIH Debtors have a sustainable capital structure post-emergence, particularly given that current EFIH leverage is likely too great to be repaid entirely with debt.

14.     Furthermore, as described above, the EFIH Second Lien DIP Facility is an integral component of a consensual restructuring with the EFIH Debtors and EFH Corp.  At emergence, the participants in the EFIH Second Lien DIP Facility mandatorily convert into equity of reorganized EFH Corp. along with the EFIH unsecured creditors, EFH unsecured

creditors, and the EFH equityholders. This allocation of equity post-emergence among these different groups was a central part of the negotiations and a condition of their support for the RSA.

**D.** **The EFIH Second Lien DIP Facility Is The Best Available Financing Under The Circumstances.**

15.     I believe that the EFIH Second Lien DIP Facility is the best source of financing available to affect the EFIH Second Lien Repayment and to establish a feasible and sustainable capital structure for EFIH at confirmation. No facility that ranks junior to the proposed EFIH Second Lien DIP was available on terms that were comparable with the EFIH Second Lien DIP Facility.

16.     Both Fidelity, which held 73% of EFH Corp. unsecured debt as of the Petition Date, and the advisors to an ad hoc committee of holders of EFIH Second Lien Notes were aware of the EFIH Debtors' multiple constraints and objectives many months in advance of the Petition Date. Neither constituent offered a committed financing proposal that both met the EFIH Debtors' criteria and offered a valuation of the EFIH Debtors' enterprise that was superior to that implied by the EFIH Second Lien DIP Facility. Furthermore, EFIH's significant secured debt obligations and lack of material unencumbered assets precluded any appetite in the market to provide financing on terms more favorable to the estates than the EFIH Second Lien DIP Facility that would also satisfy the EFIH Debtors' goal of deleveraging the EFIH Debtors upon emergence. In addition, tax considerations constrained the EFIH Debtors' marketing efforts.

17.     Moreover, during the process of raising the EFIH First Lien DIP Financing, the lenders to that financing indicated that any junior DIP financing requiring repayment of principal in cash at emergence would be problematic. Any junior financing without the mandatory

conversion feature would adversely impact the Debtors' ability to obtain EFIH First Lien DIP Financing on favorable terms, due to concerns about debt capacity at emergence.

> **(1)** **Tax Considerations Limit The Number Of Potential Parties That Might Offer Financing On These Favorable Terms.**

18.     In early 2014, Fidelity and certain holders of EFIH Unsecured PIK Notes began to make progress on the terms of a consensual restructuring that would include an infusion of new equity at EFIH and EFH Corp. to facilitate a tax-efficient restructuring of each of the Debtors. The restructuring plan contemplated the tax free spin of TCEH from EFH.  It was clear from the start of negotiations that there was a limited universe of potential investors whose investment commitment would not preclude the proposed tax-free spin.  I understand that the tax-free nature of the restructuring contemplated by the RSA almost certainly would no longer be achievable if a third party or parties acting as a group—who are not existing creditors at EFIH or EFH—obtain a majority interest as a group in EFH Corp. in connection with the Debtors' restructuring.

19.     EFH and EFIH, however, may avoid a deconsolidation tax if existing unsecured creditors agree to accept EFH equity in return for compromising their claims.  For all of these reasons, the EFIH Debtors and Evercore came to believe that alternative financing that converted to equity was unavailable on an economically-feasible basis in the broader market—outside of existing creditors.

> **(2)** **No EFIH Second Lien DIP Facility Was Available To The Estates On More Favorable Terms.**

20.     EFH Corp. and the EFIH Debtors agreed to proceed with the EFIH Second Lien DIP Facility only after extensive negotiations with their key stakeholders regarding a consensual restructuring.  In light of the tax considerations, the EFIH Debtors did not engage in a traditional marketing process with respect to the EFIH Second Lien DIP Facility.  But they did receive one other, prepetition proposal in March 2014, for second lien DIP financing *pari passu* with the

EFIH Second Lien Notes from the advisors to an ad hoc committee of EFIH Second Lien Creditors.

21.    I believe that this March 2014 proposal was inferior to the EFIH Second Lien DIP Facility now before the Court for several reasons.  *First*, that proposal provided for the payment to Prepetition EFIH Second Lien Creditors of post-petition interest and an amount for their alleged makewhole claims of over $0.8 billion, or 39% of the existing Second Lien Notes outstanding prepetition principal of $2.156 billion.  *Second*, that proposal provided EFIH unsecured creditors with less than 12% of the pro forma equity in reorganized EFH, which they valued at $261 million—significantly less than the 36% contemplated in the RSA.  *Third*, that proposal provided less value to the unsecured creditors of EFH Corp., with a cash payment of approximately $200 million, and no right to participate in the pro forma equity of reorganized EFH Corp.

22.    The EFIH Debtors chose not to pursue the March 2014 proposal because they did not believe it was reasonably likely that (a) the proponents would be willing to offer a valuation of EFH Corp. or EFIH that maximized recoveries for unsecured creditors of those respective Debtors; (b) the proponents would agree to a less expensive settlement of their alleged makewhole claims; or (c) such negotiations would lead to a consensual global restructuring that preserved the tax advantages in the restructuring contemplated by the RSA.

23.    On May 12, 2014, the EFIH Debtors also received a four-page alternative Second Lien DIP term sheet (the "Alternative DIP") from the advisors to the ad hoc EFIH Second Lien committee, and engaged in discussions to understand their proposal.  Although some of the nominal terms may be more favorable to the EFIH Debtors from an economic perspective, the proposal was preliminary and incomplete.  None of the parties providing commitment financing

were identified.  Moreover, we understand that the proposal makes more difficult one of the necessary conditions for the tax-free spin of TCEH—to obtain a ruling from the Internal Revenue Service that the TCEH separation will in fact satisfy the continuity-of-interest doctrine and therefore be a tax-free transaction.  And—most importantly—the proposal did not address how this Alternative DIP could replace the current Investment Commitment and still retain the support of current signatories to the RSA.

24.    Based on my restructuring experience, participation in these negotiations, and review of the tax considerations of each alternative, I believe that the EFIH Second Lien DIP Facility is the best available in the circumstances.

**E.    The Terms Of The EFIH Second Lien DIP Facility And Investment Commitment Are Fair And Reasonable Under the Circumstances.**

25.    Apart from the lack of acceptable financing alternatives, the terms of the EFIH Second Lien DIP Facility are fair and reasonable.  Although I am not aware of any historical DIP financing agreement against which to compare the EFIH Second Lien DIP Facility's terms and conditions, I believe that the EFIH Second Lien DIP Facility was the only *viable* proposal to emerge from pre-filing negotiations.  Along with my colleagues at Evercore and the EFIH Debtors' senior management, I participated in the negotiations and evaluation of the EFIH Second Lien DIP Facility.  Based on my involvement in the process, I believe that the terms of the EFIH Second Lien DIP Facility were the product of extensive, virtually non-stop, good-faith negotiations.  I further believe that the interest rates, fees, terms, and conditions of the EFIH Second Lien DIP Facility, taken as a whole, (a) are reasonable given the complexity of the negotiation process, (b) reflect the most favorable terms available when viewed holistically, and (c) are in the best interests of the EFIH Debtors' estates and creditors.

26. *First*, the EFIH Second Lien DIP Facility provides for 8.0% cash interest on the Tranche A Notes and no interest on the Tranche B Notes, which are reasonable rates for these particular facilities.

27. *Second*, the Second Lien DIP Facility includes Postpetition DIP Commitment Fees, which amount to 2.24% of $1.9 billion ($42,500,000) to be paid in cash. The Total Second Lien DIP Commitment Fees, including the Execution Fee already paid in cash, and the Participation Fee, are 2.70% of $1.9 billion ($51,250,000). The Commitment Parties required the Second Lien DIP Commitment Fees as a condition to backstopping the EFIH Second Lien DIP Facility. The fees are comparable to debtor-in-possession commitment fees commonly paid in connection with postpetition financing commitments.

28. *Third*, the Second Lien DIP Facility includes Equity Conversion Fees, which the Commitment Parties requested as a condition of the investment commitment. Specifically, there is a Funding PIK Fee that is equal to 5.00% of $1.9 billion ($95 million) that is payable in Tranche B Notes. In my view, that fee is reasonable and comparable to a commitment fee paid in connection with an equity rights offering because it compensates the Commitment Parties for backstopping the Equity Conversion.

29. *Fourth*, the EFIH Second Lien DIP Facility provides for 4.0% PIK interest on Tranche A Notes, compounded quarterly, if the Oncor TSA Amendment is not approved within 90 days of the Petition Date and a one-time PIK fee of 10% on Tranche A Notes and Tranche B Notes, if the Oncor TSA Amendment is not approved by May 1, 2015. The Oncor TSA Amendment—which is being supported by a supermajority of the EFH unsecured creditors (i.e., Fidelity)—would provide significant additional cash flow to EFIH during and following the bankruptcy, if approved by the Court. This incremental value enhances EFIH's creditworthiness.

Without approval of the Oncor TSA Amendment, EFIH may not have sufficient cash to meet the minimum cash covenant requirement under the EFIH First Lien DIP credit agreement, if the chapter 11 cases run longer than anticipated by the RSA.  The incremental PIK interest and one-time PIK fee are thus justified because of the reduced creditworthiness of EFIH that would result from the EFIH Debtors' failure to obtain approval of the Oncor TSA Amendment.  Accordingly, in addition to being the product of extensive, hard-fought, and arm's-length negotiations, the incremental PIK interest and one-time PIK fee are reasonable under the circumstances.

30.    *Fifth*, the Second Lien DIP Facility entitles Commitment Parties to an alternative transaction fee equal to 3.0% of the $1.9 billion commitment ($57.0 million), solely in the event that, up to the funding of the EFIH Second Lien DIP Facility, EFIH enters into definitive documentation for an alternative transaction on equal or better terms, within five days of Court approval of such alternative transaction (the "Alternative Transaction Fee").  I believe that, given the unique nature of the EFIH Second Lien DIP, this Alternative Transaction Fee is reasonable under the circumstances and a critical element of the Investment Commitment.  The Second Lien DIP Facility's conversion structure is closely analogous to a rights offering, and the Alternative Transaction Fees are well within the range of fees payable in connection with rights offerings in chapter 11 cases.  Finally, since the fee is only payable in the event of an alternative transaction with equal or better terms than the EFIH Second Lien DIP Facility, the fee will only be paid in circumstances that create overall value for the EFH and EFIH Debtors.

31.    *Sixth*, the EFIH Second Lien DIP Facility includes a termination fee of $380 million in cash if the EFIH Second Lien DIP Facility is repaid in cash, other than after acceleration, without consent of certain noteholders (the "Termination Fee").  The Termination Fee was bargained for to protect the EFIH Second Lien DIP Purchasers from the loss of

ownership in reorganized EFH, which was a significant driver of their willingness to fund the EFIH Second Lien DIP Facility.  The Termination Fee is not payable in the event that the EFIH Second Lien DIP Agent accelerates the obligations under the EFIH Second Lien DIP loan documents upon an event of default.  If triggered, the Termination Fee would be payable to all EFIH Second Lien DIP Purchasers in proportion to their claims.

32.     Taken as a whole, these fees are competitive and well within the range of the fees found to be reasonable in other large DIP facilities in recent years.  They are, moreover, reasonable given the complexity of these transactions, especially when considered in the context of delivering more value to the unsecured creditors of EFIH and EFH Corp. than the alternative of not reaching the agreements encompassed in the RSA.

*Remainder of this page intentionally left blank.*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: May 15, 2014

David Ying
Senior Managing Director
Evercore Group L.L.C.