## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Hearing Date: June 6, 2014 at 9:30 a.m. (EDT)** |
| | ) | **Obj. Deadline: May 30, 2014 at 4:00 p.m. (EDT)** |

### MOTION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*,
### FOR ENTRY OF AN ORDER AUTHORIZING THE
### RSA DEBTORS TO ASSUME THE RESTRUCTURING
### SUPPORT AGREEMENT AND MODIFYING THE AUTOMATIC STAY

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file

this motion (this "Motion") for entry of an order, substantially in the form attached hereto as

**Exhibit A** (the "Order"), authorizing the Debtors that are party (the "RSA Debtors")[2] to that

certain Restructuring Support and Lock-Up Agreement, dated as of April 29, 2014, attached

hereto as **Exhibit 1** to **Exhibit A**, (including all exhibits and schedules attached thereto and as

may be amended or supplemented from time to time, the "Restructuring Support Agreement"),[3]

---

[1]　The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted on an interim basis, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

[2]　As used herein, the term "RSA Debtors" means, collectively, Energy Future Holdings Corp. ("EFH Corp."), Energy Future Intermediate Holding Company LLC ("EFIH"), EFH Corporate Services Company, EFIH Finance Inc. ("EFIH Finance"), Energy Future Competitive Holdings Company LLC, Texas Competitive Electric Holdings Company LLC ("TCEH"), TCEH Finance Inc. ("TCEH Finance") and each of TCEH's other direct and indirect subsidiaries listed on the signature pages to the Restructuring Support Agreement.

[3]　The Restructuring Support Agreement includes that certain (a) First Amendment to the Restructuring Support and Lock-Up Agreement dated as of May 7, 2014, and attached hereto as **Exhibit 2** to **Exhibit A**, and (b) Second Amendment to the Restructuring Support and Lock-Up Agreement dated as of May 16, 2014, and (Continued…)

to assume the Restructuring Support Agreement by and among the Restructuring Support Parties. In support of this Motion, the Debtors submit: (a) the *Declaration of Paul Keglevic, Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of Energy Future Holdings Corp., et al., in Support of First Day Motions* [D.I. 98] (the "First Day Declaration"):[4] (b) the *Declaration of Charles H. Cremens, Disinterested Board Member of Energy Future Intermediate Holding Company LLC, in Support of the Motion of Energy Future Holdings Corp., et al., for Entry of an Order Authorizing the RSA Debtors to Assume the Restructuring Support Agreement* (the "Cremens Declaration") attached hereto as **Exhibit B**; and (c) the *Declaration of Hugh E. Sawyer, Disinterested Board Member of Texas Competitive Electric Holdings Company LLC and Energy Future Competitive Holdings Company LLC, in Support of the Motion of Energy Future Holdings Corp., et al., for Entry of an Order Authorizing the RSA Debtors to Assume the Restructuring Support Agreement* (the "Sawyer Declaration") attached hereto as **Exhibit C**.  In further support of this Motion, the Debtors respectfully state as follows.

### Preliminary Statement

1.      With seven principal tranches of funded debt totaling approximately $42 billion, the Debtors are undertaking one of the most complex restructuring efforts in history. After good-faith, arm's-length negotiations, the RSA Debtors and many of their key stakeholders have reached an agreement on the terms of a restructuring that, if consummated, will maximize the value of the Debtors' estates. This comprehensive restructuring is memorialized in the Restructuring Support Agreement.

---

attached hereto as **Exhibit 3** to **Exhibit A**.  Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the Restructuring Support Agreement.

[4]      The Debtors filed an erratum to the First Day Declaration on May 6, 2014 [D.I. 362].

2

2.      The transactions contemplated by the Restructuring Support Agreement will provide many benefits to the RSA Debtors. First, the transactions described in the Restructuring Support Agreement will right-size the Debtors' balance sheets.  Second, the Restructuring Support Agreement will significantly reduce the time spent in chapter 11 and further reduce restructuring costs by eliminating potentially significant litigation with the Restructuring Support Parties.   Third, the transactions described in the Restructuring Support Agreement will eliminate potential tax liabilities that could prevent the Debtors from emerging from chapter 11 and eliminate all unsecured creditor recoveries.  Put simply, absent a pre-arranged deal, the Debtors could face disputes about nearly every aspect of their restructuring, from nearly every part of their capital structure, in a long, contentious, and value-destructive chapter 11 process.

3.      With these objectives in mind, the Debtors engaged certain of their key creditor constituencies in more than a year of hard fought negotiations that explored various alternatives and more recently coalesced in consensus around the transactions embodied in the Restructuring Support Agreement.  The signatories to the Restructuring Support Agreement include holders of claims across the Debtors' capital structure, including holders of approximately 43% of the TCEH First Lien Claims, approximately 34% of the EFIH First Lien Note Claims, approximately 35% of the EFIH Second Lien Note Claims, approximately 70% of the EFIH Unsecured Note Claims, approximately 73% of the EFH Note Claims, and approximately 99.36% of the equity interests in EFH Corp.  This broad support will help the Debtors expeditiously emerge from chapter 11.

4.      At EFIH, the Restructuring Support Agreement contemplates a substantial infusion of $1.9 billion in new money (in the form of the EFIH Second Lien DIP Financing, which is mandatorily convertible into equity in Reorganized EFH upon emergence from chapter

3

11).  This infusion will allow Reorganized EFH to retain ownership of Reorganized EFIH (and, indirectly, an approximately 80% interest in Oncor).  It will also allow the holders of secured claims at EFIH to be paid in full, with the issue of a makewhole to be settled or resolved by this Court.  At TCEH, the Restructuring Support Agreement contemplates that TCEH will separate into a stand-alone entity through a "tax-free" deconsolidation transaction that will avoid any of the Debtors incurring "deconsolidation" tax liability that could be as much as $6 billion.  Holders of the TCEH First Lien Secured Claims, who the Debtors believe are entitled to TCEH's value, will receive the equity in Reorganized TCEH.  At EFH Corp., the Restructuring Support Agreement contemplates a meaningful recovery to unsecured creditors.

5.     As discussed in detail in the Cremens Declaration and the Sawyer Declaration, the RSA Debtors entered into the Restructuring Support Agreement only after a robust review process that included the members of the board of directors and board of managers (each a "Board") at each of TCEH, EFIH, and EFH Corp., including the disinterested director at each of TCEH and EFIH and two disinterested directors at EFH Corp.  Based upon more than a year of negotiations around the various alternatives to the transactions embodied in the Restructuring Support Agreement, and based upon rigorous review of the Restructuring Support Agreement by the boards, the RSA Debtors' reasonable business judgment is that the terms of the Restructuring Support Agreement represent the best terms available for each of their respective restructuring. The RSA Debtors therefore respectfully submit that they have clearly satisfied the applicable business judgment standard for approval of the assumption of the Restructuring Support Agreement.[5]

---

[5]     *See*, *e.g.*, *In re Federated Dept. Stores, Inc.*, 131 B.R. 808, 811 (S.D. Ohio 1991) ("Courts traditionally have applied the business judgment standard in determining whether to authorize the rejection of executory contracts (Continued…)

6.     That said, the RSA Debtors are cognizant that while the Restructuring Support Agreement represents an enormous step toward a successful chapter 11 plan of reorganization (the "Plan"), much work remains.  Assuming the Restructuring Support Agreement at this point in the chapter 11 process will serve the limited purpose of allowing the RSA Debtors to commit—*as debtors and debtors in possession*—to achieving the transactions described in the Restructuring Support Agreement.  One purpose of this Motion is to ensure that the RSA Debtors maintain the agreed-upon timeframe set forth in the Restructuring Support Agreement and, to the extent they do not, to permit the Restructuring Support Parties to exercise their rights to terminate the Restructuring Support Agreement.

7.     In fact, it is important to emphasize what the RSA Debtors are **not** seeking pursuant to this Motion.  The RSA Debtors are not seeking to limit the rights of any party in interest with respect to any of the steps required to confirm the Plan.  If the Court enters the Order, the Debtors will still need to obtain approval of a disclosure statement, solicit votes on the Plan, and otherwise comply with all of the requirements with respect to confirmation of the Plan.

8.     In short, the relief that the RSA Debtors seek in this Motion is solely focused on protecting the carefully negotiated bargains reached in the Restructuring Support Agreement among the parties thereto with respect to a path forward in these chapter 11 cases.  All other disputes that may arise in the context of achieving confirmation of the Plan remain to be addressed by the parties and/or the Court at the appropriate time.

---

and unexpired leases"); *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (stating that once "the debtor articulates a reasonable basis for its business decisions…courts will generally not entertain objections to the debtor's conduct."); *In re Cent. Jersey Airport Servs., LLC*, 282 B.R. 176, 183 (Bankr. D.N.J. 2002) (holding that "the debtor can reasonably take…a business risk if in its sound business judgment, it is worth the risk").

9.      For these reasons, the RSA Debtors respectfully request that this Court enter the Order authorizing the RSA Debtors to assume the Restructuring Support Agreement.

### Jurisdiction and Venue

10.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

11.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

12.     The bases for the relief requested in this Motion are sections 363(b) and 365(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rules 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

### Relief Requested

13.     By this Motion, the Debtors seek entry of the Order, effective immediately upon entry, authorizing the RSA Debtors to assume the Restructuring Support Agreement and modifying the automatic stay provided in section 362 to the extent necessary to permit the relief requested in this Motion.

6

**Background**

14.     On April 29, 2014 (the "Petition Date"), each of the Debtors filed a voluntary petition with the Court under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Court has entered an interim order for joint administration of these chapter 11 cases.  The Court has not appointed a trustee.  The Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") formed an official committee of unsecured creditors in these chapter 11 cases on May 13, 2014 [D.I. 420].  Further information regarding the Debtors' business operations and capital structure is set forth in the First Day Declaration.

**I.      Overview of the Restructuring Support Agreement Negotiations.**

15.     Recognizing the need to build consensus around a long-term solution to address their substantial debt obligations, in early 2013, the Debtors began their restructuring negotiations with several key creditor groups and their respective advisors, focusing in the first instance on a consolidated transaction structure.  *See* First Day Decl. ¶ 159.  These efforts continued over the course of more than a year.  *Id.* ¶¶ 159-160.

16.     By November 2013, however, it became clear that a consolidated transaction was not possible, primarily because the parties were unable to agree on the respective value of the various Debtor entities.  *Id.* ¶ 161.  Consequently, the Debtors turned their focus to developing a consensual deconsolidation strategy as an alternative to the consolidated restructuring.  *Id.*  After the parties evaluated all restructuring alternatives, the parties considered two forms of deconsolidation strategies:  (a) a taxable transaction that would trigger a deconsolidation tax but would give the new owners of TCEH and EFIH a full "step-up" in tax basis; and (b) a transaction

7

that would not trigger a deconsolidation tax, but would give the new owners of TCEH only a partial "step-up" in tax basis. *Id.* ¶ 162.

17.    In early 2014, the deal began to solidify. *Id.* ¶¶ 164-166.  First, certain EFIH and EFH Corp. stakeholders, including unsecured creditors of EFIH and Fidelity, gained momentum around the terms of a restructuring transaction that was conditioned on a TCEH tax-free spin-off transaction.  *Id.*  The terms of the EFIH and EFH Corp. restructuring were intensely negotiated over several months, with the active participation not only of various creditors but also of representatives of EFH Corp.'s equity owners.  Second, in mid-March 2014, certain holders of the TCEH First Lien Claims, for the first time, informed the Debtors that they were willing to consider a tax-free deconsolidation transaction that separated TCEH from EFH Corp.  *Id.*  After yet further, good-faith negotiations on behalf of all participants, in April 2014 the Restructuring Support Parties reached an agreement on the key terms of a proposed plan of reorganization that implements a tax-free deconsolidation of the Debtors' businesses.  *Id.*

## II.    Board Approval.

18.    Since the close of the 2007 transaction, EFH Corp. has had numerous independent directors (*i.e.*, did not have an affiliation or relationship with the equity owners of EFH Corp.) Additionally, since July 23, 2012, EFIH has had at least one independent Board (as defined below) member, and since April 18, 2012, TCEH has had at least one independent Board member.

19.    Moreover, since the close of the 2007 transaction, EFH Corp. has had at least one disinterested Board member (*i.e.*, a member that did not sit on another Board within the corporate group or have other relationships among the other Debtors).  When the RSA Debtors entered into restructuring negotiations, they decided to supplement their Board membership by

8

providing that each board of directors and board of managers had at least one disinterested member.  To that end, Hugh E. Sawyer was appointed as a disinterested director at TCEH and EFCH in October 2013, and Charles H. Cremens was appointed as a disinterested director at EFIH in February 2014.  *See* Sawyer Decl. ¶ 5, 7-13; Cremens Decl. ¶ 5, 7-12.

20.     As described in detail in the Cremens Declaration and the Sawyer Declaration, the Debtors' management and advisors sought input and approval from Mr. Sawyer and Mr. Cremens throughout the negotiations on the Restructuring Support Agreement.  Specifically, in conjunction with the negotiation and finalization of the Restructuring Support Agreement, between March 21, 2014 and April 28, 2014 the Debtors held approximately 10 meetings of the boards of directors of certain entities (all of whom are RSA Debtors), including EFH Corp., EFIH, EFIH Finance, TCEH, and TCEH Finance, both separately and in joint meetings of the Boards.  Cremens Decl. ¶ 7; Sawyer Decl. ¶ 7.  These meetings allowed the RSA Debtors' management and advisors to keep the Boards apprised of the status of restructuring negotiations with each constituency and the key considerations surrounding entry into a prepetition restructuring support agreement.  *Id.*

21.     In a joint meeting of the Boards held on March 21, 2014, the RSA Debtors' advisors and management explained to the Boards that certain holders of TCEH first lien debt had, for the first time, expressed willingness to consider supporting a "tax-free" deconsolidation restructuring strategy.  Cremens Decl. ¶ 9; Sawyer Decl. ¶ 9.  Based on this indication of potential support, the Debtors and their advisors began the process of drafting the Restructuring Support Agreement.  *Id.*

22.     On April 1, 2014, TCEH and TCEH Finance were scheduled to make interest payments in an aggregate amount of approximately $119 million.    Sawyer Decl. ¶ 10.

Accordingly, on March 27, 2014, the Debtors and their advisors conducted several meetings of the Boards, including a meeting of the Boards of TCEH and TCEH Finance. *Id.* At these meetings, the TCEH and TCEH Finance Boards considered the risks and benefits of utilizing the 30-day grace period available under the applicable debt instruments. *Id.* Ultimately, the decision to utilize the grace period rested largely on the likelihood that the Debtors could reach a consensus with all or many of the Restructuring Support Parties during the grace period, thereby enabling the Debtors to gain the significant benefits associated with reaching agreement on the Restructuring Support Agreement. *Id.* At these meetings, each of the respective Boards discussed the terms of the Restructuring Support Agreement, including (with the appropriate subset of participants) all potential conflicts associated with the proposed transaction. *See* Sawyer Decl. ¶ 12; Cremens Decl. ¶ 11. Ultimately, the disinterested directors recommended to each of their respective Boards that each respective Board approve enter into the Restructuring Support Agreement. Sawyer Decl. ¶ 14; Cremens Decl. ¶ 14.

23.    During the grace period, the Boards continued to meet regularly and evaluate the proposed terms and key outstanding issues as restructuring negotiations advanced. *See* Cremens Decl. ¶ 10; Sawyer Decl. ¶ 11-12. On April 24, 2014 and April 25, 2014, the Debtors held separate special meetings of each of the Boards of EFH Corp., TCEH, and EFIH exclusively for the respective disinterested director(s) at each of those entities. Cremens Decl. ¶ 11; Sawyer Decl. ¶ 12. These meetings included detailed presentations regarding risks and benefits associated with the Restructuring Support Agreement, including the releases contemplated therein. *Id.* On April 28, 2014, the Debtors held a joint meeting of the Boards to determine whether to enter into the Restructuring Support Agreement. *See* Cremens Decl. ¶ 11; Sawyer Decl. ¶ 13. This meeting included a detailed evaluation of the final terms of the Restructuring

10

Support Agreement and the Board approvals required to consummate that agreement and commence chapter 11 proceedings. *Id*.

24.    In addition to formal Board meetings, both Mr. Cremens and Mr. Sawyer (along with the two disinterested directors at EFH Corp.) would typically follow scheduled Board meetings with break-out sessions during which they alone and without other Board members present would engage in discussion and dialogue with the Debtors' management and/or professionals. Moreover, both Mr. Cremens and Mr. Sawyer (along with the two disinterested directors at EFH Corp.) engaged in numerous one-off telephone conversations with various members of the Debtors' management team and/or the Debtors' advisors regarding the merits of the Restructuring Support Agreement throughout the negotiation process.

### III.    Material Terms of the Plan Term Sheet.

25.    As described in more detail in the First Day Declaration, the Term Sheet attached to the Restructuring Support Agreement has two pillars:  (a) a tax-free "spin-off" and concurrent deleveraging of TCEH (the "TCEH Tax-Free Spin") and (b) a substantial recapitalization of EFIH and EFH Corp. funded by $1.9 billion of new capital mandatorily convertible into equity in Reorganized EFH and conversion of $1.7 billion of EFIH unsecured debt into equity in Reorganized EFH. *See* First Day Decl. ¶¶ 168, 171.

26.    Put simply, the TCEH Tax-Free Spin and the various transactions contemplated under the recapitalization of EFIH and EFH Corp. represent a resolution of the Debtors' significant funded indebtedness that avoids the near-certainty of a highly contested, lengthy, and value-destructive restructuring that would accompany a fully-taxable transaction (which would result in the creation of at least $6 billion of deconsolidated tax liabilities).

27.     Under the TCEH Tax-Free Spin, the TCEH Debtors' prepetition first lien creditors will receive 100% of the equity in Reorganized TCEH, which will be spun off as a stand-alone entity.  *Id.* ¶ 169.  Reorganized TCEH will also issue new debt (in an amount to be determined) that will fund cash distributions to the holders of the TCEH First Lien Secured Claims.  *Id.* ¶ 170.  In addition to facilitating cash distributions, this debt issuance will allow for a partial "step-up" in the tax basis of TCEH's assets.  *Id.* ¶ 169.  The TCEH Tax-Free Spin will be conditioned on the receipt of a private letter ruling from the IRS that confirms, among other things, the tax-free nature of the TCEH Tax-Free Spin, and the execution of a "tax matters" agreement between Reorganized EFH and Reorganized TCEH, as of the Effective Date, to protect the status of the transaction post-emergence.  *Id.*  Finally, certain subsidiaries of EFH Corp. will transfer operating assets and liabilities to TCEH.  *Id.*

28.     The lynchpin of the recapitalization of EFIH and EFH Corp. is the $1.9 billion of new capital investment that is open to participation by all holders of EFIH Unsecured Notes, EFH LBO Notes (on account of their guaranty claims against EFIH), and Fidelity (in its capacity as a holder of EFH Unsecured Notes) and backstopped by certain holders of EFIH Unsecured Notes.  *Id.* ¶ 171.  This investment will initially be funded as a non-priming, second lien debtor in possession facility (the "EFIH Second Lien DIP Financing") that, together with a payment-in-kind funding fee, will mandatorily convert to approximately 64% of the equity in Reorganized EFH under the Plan.  The holders of EFIH Unsecured Notes and the EFH LBO Notes (on account of their guaranty claims against EFIH) will receive approximately 36% of the equity in Reorganized EFH, while the holders of EFH Unsecured Notes and current holders of equity in EFH Corp. will each receive less than 1% of the remaining equity.  As a result, billions of dollars of EFIH and EFH Corp. debt will be equitized.

12

29.     The EFIH Second Lien DIP Financing and a first lien debtor-in-possession financing (the "<u>EFIH First Lien DIP Financing</u>") will be used to repay the $3.985 billion of EFIH First Lien Notes  and the $2.156 billion of EFIH Second Lien Notes at favorable interest rates that will save the EFIH Debtors $24 million of interest expense each month during the cases and even more after emergence due to the conversion of the EFIH Second Lien DIP Financing into equity in Reorganized EFH.

30.     In addition, the EFIH First Lien DIP Financing and EFIH Second Lien DIP Financing will facilitate the settlement of asserted makewhole claims under the EFIH First Lien Notes (the "<u>EFIH First Lien Settlement</u>") and EFIH Second Lien Notes (the "<u>EFIH Second Lien Settlement</u>").  Under the EFIH First Lien Settlement, and as further set forth in the Approval Motion (as defined below), Restructuring Support Parties holding EFIH First Lien Notes will receive the greater of: (a) 105% of the principal amount of their notes, plus 101% of accrued but unpaid interest on such principal through consummation of the EFIH First Lien DIP Financing (deemed to include original issue discount paid in respect of the EFIH First Lien DIP Financing); and (b) 104% of the principal amount of their notes, plus accrued but unpaid interest on such principal through consummation of the EFIH First Lien DIP Financing, plus original issue discount, in the form of EFIH First Lien DIP Claims.  All other settling holders of the EFIH First Lien Notes will receive the terms set forth in (a) above, subject to the "step-down" contained in the relevant offer materials.

31.     Under the EFIH Second Lien Settlement, and as further set forth in the Approval Motion, Restructuring Support Parties holding EFIH Second Lien Notes will receive a cash payment equal to the principal and accrued but unpaid interest (including Additional Interest) on their notes through the consummation of the EFIH Second Lien DIP Financing, plus 50% of their

13

asserted makewhole claims calculated as of the date of consummation of the EFIH Second Lien Settlement (calculated without including Additional Interest). All other settling holders of EFIH Second Lien Notes will receive the same treatment, except that their asserted makewhole claims were calculated based on treasury rates existing at the time of the commencement of the settlement offering, subject to a "step-down" in consideration after 10 business days (consistent with other offers of this type). Additionally, Fidelity has the option to invest $500 million in loans under the EFIH First Lien DIP Financing, and certain anchor settling parties will receive cash settlement premiums totaling approximately $1.57 million.

32.     The EFIH Debtors have made the EFIH Second Lien Settlement available to all holders of EFIH Second Lien Notes, and will seek to disallow any alleged makewhole claims of non-settling creditors.

33.     Importantly, the relief sought in this Motion is will not effectuate these various transactions. Rather, the Debtors have already taken separate steps to achieve Court approval of these various transactions. To that end, the Debtors have filed the following three motions in respect of transactions contemplated by the Restructuring Support Agreement:

- **First**, the EFIH Debtors are seeking approval of the EFIH First Lien DIP Financing pursuant to the *Motion of Energy Future Intermediate Holding Company LLC and EFIH Finance, Inc. for Entry of (I) an Interim Order (A) Approving Certain Fees Related to Postpetition Financing and Granting Such Fees Administrative Expense Priority and (B) Scheduling a Final Hearing; and (II) a Final Order (A) Approving Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Authorizing the Use of Cash Collateral, (D) Authorizing the EFIH First Lien Refinancing, (E) Authorizing Issuance of Roll-Up Debt to the Extent Authorized by the Settlement Motion, (F) Determining the Value of Secured Claims, and (G) Modifying the Automatic Stay,* filed on April 29, 2014 [D.I. 74], the "EFIH First Lien DIP Motion");

- **Second,** the EFIH Debtors are seeking approval of the EFIH Second Lien DIP Financing pursuant to the *Motion of Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. for Entry of an Order (A) Approving*

14

*Postpetition Second Lien Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Authorizing the Use of Cash Collateral, (D) Authorizing the EFIH Second Lien Repayment, (E) Authorizing Entry Into and Payment of Fees Under the Commitment Letter, and (F) Modifying the Automatic Stay* (the "EFIH Second Lien DIP Motion"), filed on May 15, 2014 [D.I. 477]; and

- ***Third***, the Debtors are seeking approval of certain settlements contemplated under the Restructuring Support Agreement pursuant to the *Motion of Energy Future Holdings Corp.,* et al.*, for Entry of Orders Approving Certain EFIH Settlements and the Oncor TSA Amendment*, filed on May 15, 2014 [D.I. 472] (the "Approval Motion").[6]

## IV.   Material Terms of the Restructuring Support Agreement.

34.   The Restructuring Support Parties have agreed to support the restructuring contemplated by the Restructuring Support Agreement.  A summary of the material terms of the Restructuring Support Agreement is provided below.[7]

### A.   Milestones

35.   The Restructuring Support Agreement sets forth certain deadlines (as subsequently amended, the "Milestones") intended to facilitate the expeditious resolution of these chapter 11 cases, for the benefit of the Debtors' estates and creditors.  Those Milestones provide that certain of the Restructuring Support Parties may terminate that the Restructuring Support Agreement in the event that:

- the RSA Debtors have not have filed this RSA Assumption Motion by May 16, 2014;

---

6   Additionally, in furtherance of the relief sought in the Approval Motion, on May 7, 2014, the Debtors filed the *Notice of Initiation of Opt-In Period for Proposed EFIH First Lien Settlement* [D.I. 363].  Similarly, on May 9, 2014, the Debtors filed the *Notice of Initiation of Opt-In Period for Proposed EFIH Second Lien Settlement* [Docket No. 400].

7   The summaries set forth in this section are qualified in their entirety by specific terms and conditions of the Restructuring Support Agreement itself.  To the extent there exists any inconsistency between this summary and the Restructuring Support Agreement, the Restructuring Support Agreement shall govern.

15

- the Bankruptcy Court shall not have entered the RSA Assumption Order by June 13, 2014;

- the RSA Debtors shall not have submitted the Ruling Request in respect of the Private Letter Ruling or filed the Plan and Disclosure Statement by June 13, 2014;

- the Bankruptcy Court shall not have entered each of the Approval Order, the EFIH First Lien DIP Order, and the EFIH Second Lien DIP Order on or before July 13, 2014;

- the RSA Debtors shall not have consummated each of (i) the EFIH First Lien DIP Financing, (ii) the EFIH Second Lien DIP Financing, and (iii) the transactions and settlements contemplated by the Approval Order on or before the date that is five (5) business days after the date the EFIH First Lien DIP Order, the EFIH Second Lien DIP Order, and the Approval Order, respectively and as applicable, is entered;

- the Bankruptcy Court shall not have entered the Disclosure Statement Order on or before August 12, 2014;

- the Bankruptcy Court shall not have entered the Confirmation Order on or before January 29, 2015;

- the Plan Effective Date shall not have occurred on or before the date that is thirty (30) days after the date the Bankruptcy Court enters the Confirmation Order, subject to an automatic thirty (30) day extension under certain circumstances (such extended date, the "Extended Outside Date"); and

- the IRS shall not have issued a Private Letter Ruling acceptable to the Required Consenting Creditors on or prior to the Extended Outside Date.[8]

**B.    Professional Fees and Expenses.**

36.    The Restructuring Support Agreement provides that the Debtors shall pay or reimburse when due the reasonable and documented professional fees and expenses (collectively, the "Professional Fees") of certain advisors to certain of the Restructuring Support Parties, including the Consenting TCEH First Lien Creditors, the Consenting EFIH Unsecured

---

[8]    The Restructuring Support Agreement also required the RSA Debtors to file each of the EFIH First Lien DIP Motion, the EFIH Second Lien DIP Motion, and the Approval Motion on or before May 15, 2014.

16

Noteholders, the Consenting EFH Unsecured Noteholders, Consenting Fidelity EFIH First Lien Noteholders (in connection with EFH Unsecured Note Claims, EFIH First Lien Note Claims, and EFIH Second Lien Note Claims beneficially owned by Fidelity), and Consenting Non-Fidelity EFIH First Lien Noteholders.  *See* Restructuring Support Agreement at § 10.

37.    Importantly, as was the case during prepetition negotiations, each RSA Debtor will pay the Professional Fees associated with the groups that are relevant to its estate (*e.g.*, TCEH has paid or will pay the Professional Fees for Restructuring Support Parties who are creditors of TCEH; EFH Corp. has paid or will pay the Professional Fees for Restructuring Support Parties who are creditors or interest-holders of EFH Corp.; EFIH has paid or will pay the Professional Fees for Restructuring Support Parties who are creditors of EFIH).[9]

38.    Additionally, the RSA Debtors have agreed, in connection with the Restructuring Support Agreement, that any professional fees incurred by professionals retained by the Debtors (the "Debtors Professionals") shall be allocated to, and paid by, the applicable Debtors for whose direct benefit such professional fees were incurred (the "Direct Benefit Fees").  To the extent a professional fee is incurred for the collective benefit of the Debtors, such professional fees shall be allocated to each Debtor in the same proportion that the amount of Direct Benefit Fees incurred by such Debtor's Professional for such Debtor bears to the total amount of Direct Benefit Fees incurred by such Debtor's Professional for all of the Debtors, on a monthly basis in connection with the Debtor's Professional's fee application.

### C.    Other Termination Events.

39.    The Restructuring Support Agreement provides that, upon written notice, certain

---

[9]    In addition, as set forth in the Restructuring Term Sheet attached as **Exhibit A** to the Restructuring Support Agreement, on the Effective Date, the first $7.5 million of the Total Professional Fees that would have otherwise been allocated to the EFH Debtors shall instead be allocated to EFIH.

events will trigger the termination of the Restructuring Support Agreement.  Subject to the terms

and conditions provided therein, the Restructuring Support Agreement provides that certain of

the Restructuring Support Parties may terminate the Restructuring Support Agreement upon:

- the denial by the IRS of the Debtors' Ruling Request;

- the breach by any Party of any of the representations, warranties, or covenants set forth in the Restructuring Support Agreement that would have a material adverse effect on the Restructuring Transactions or the recovery of any Consenting Creditor;

- the appointment of an examiner (with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code), or a trustee or receiver;

- the conversion of one or more of these chapter 11 cases to a case under chapter 7 of the Bankruptcy Code;

- as to the Consenting TCEH First Lien Creditors, the occurrence and continuation of an "Event of Default" as defined under the TCEH Cash Collateral Order;

- as to an Individual Consenting Creditor, any changes to the terms of the TCEH Cash Collateral Order having a material, disproportionate, and adverse effect on such Consenting Creditor without such Consenting Creditor's prior written consent;

- the inclusion in the Plan of terms in respect of the TCEH Incremental 2012 Term Loans that provide for a material, disproportionate, and adverse effect on any Consenting Creditor that beneficially holds the TCEH Incremental 2012 Term Loans;

- as to Fidelity, if, ten (10) business days prior to the first day of the Disclosure Statement Hearing, the Debtors notify Fidelity at least 15 days prior to the Disclosure Statement Hearing that the Debtors have determined in good faith that the recovery for the EFH Non-Guaranteed Notes is expected to be less than 37.15% (the "EFH Minimum Recovery Notification"); and

- as to Fidelity, if, on the date that is ten (10) business days prior to the first day of the Confirmation Hearing, (i) the Debtors did not make the EFH Minimum Recovery Notification and (ii) Fidelity notifies all other Parties at least ten (10) business days prior to the first day of the Confirmation Hearing that Fidelity has determined in good faith that the recovery for the EFH Non-Guaranteed Notes is expected to be less than 37.15%.

18

40.     The Restructuring Support Agreement also, includes two fiduciary-related provisions, including section 4.03(c), which provides that nothing in the Restructuring Support Agreement will "require the board of directors, board of managers, or such similar governing body of a Debtor to take any action, or to refrain from taking any action, with respect to the Restructuring Transactions to the extent such board of directors, board of managers, or such similar governing body determines, based on the advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law."  Similarly, section 8.06 of the Restructuring Support Agreement provides for a "fiduciary out."[10]

### D.     Modification of the Automatic Stay.

41.     Section 8.12 of the Restructuring Support Agreements provides that the automatic stay applicable under section 362 of the Bankruptcy Code will not prohibit any Restructuring Support Party from taking any action necessary to effectuate the termination of the Restructuring Support Agreement pursuant to its terms.

### Basis for Relief

### I.     Assumption of the Restructuring Support Agreement.

42.     Section 365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the court's approval, may assume or reject an executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  Courts reviewing a debtor's decision to assume or reject an executory contract or unexpired lease apply a business judgment standard.  *See In re Caribbean*

---

[10]     "Any Debtor may terminate this Agreement as to all Parties upon five (5) business days' prior written notice, delivered in accordance with Section 11.11 hereof, upon the occurrence of any of the following events: …(c) the board of directors, board of managers, or such similar governing body of any Debtor determines based on advice of counsel that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties…"  *See* Restructuring Support Agreement, § 8.06(c).

19

*Petroleum Corp.,* 444 B.R. 263, 268 (Bankr. D. Del. 2010) ("Courts normally leave the decision to reject a contract to the debtor's sound business judgment."); *In re Armstrong World Indus., Inc.,* 348 B.R. 136, 162 (Bankr. D. Del. 2006) (explaining courts defer to a debtor's business judgment to reject a contract under 11 U.S.C. § 365(a)); *In re Federated Dept. Stores, Inc.*, 131 B.R. 808, 811 (S.D. Ohio 1991) ("Courts traditionally have applied the business judgment standard in determining whether to authorize the rejection of executory contracts and unexpired leases").  Debtors receive considerable discretion in determining whether to assume or reject an executory contract.  *Stanziale v. Machtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 238 (3d Cir. 2005).

43.    Once "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986); *see also Computer Sales Int'l v. Fed. Mogul (In re Fed. Mogul Global, Inc.)*, 293 B.R. 124, 126 (Bankr. D. Del 2003) (explaining that under the business judgment standard, a court should defer to debtor's contract rejection, "unless that decision is the product of bad faith or a gross abuse of discretion.").  Rather, there is "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  *Gantler v. Stephens*, 965 A.2d 695, 705-06 (Del. 2009); *In re Cent. Jersey Airport Servs., LLC*, 282 B.R. 176, 183 (Bankr. D.N.J. 2002) (holding that "the debtor can reasonably take . . . a business risk if in its sound business judgment, it is worth the risk").

20

44.     Indeed, the business judgment standard "embodies the deference that is accorded to managerial decisions of a board of directors."  *Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914, 928 (Del. 2003).   Accordingly, so long as a debtor exercises "reasonable" business judgment, a court should approve the proposed assumption or rejection.  *See*, *e.g.*, *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984);  *Group of Inst. Investors v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 318 U.S. 523, 550 (1943); *In re Mkt. Square Inn, Inc.*, 978 F. 2d 116, 121 (3d. Cir. 1992) (the "resolution of [the] issue of assumption or rejection will be a matter of business judgment by the bankruptcy court"); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib.*, 872 F.2d 36, 39-40 (3d Cir. 1989); *Glenstone Lodge, Inc. v. Buckhead Am. Corp. (In re Buckhead Am. Corp.)*, 180 B.R. 83, 88 (D. Del. 1995).

45.     The RSA Debtors' assumption of the Restructuring Support Agreement is an exercise of reasonable business judgment.  The agreement set forth in the Restructuring Support Agreement positions the Debtors to accomplish a crucial, massive deleveraging that will maximize the value of the Debtors' enterprise for the benefit of the Debtors' estates, creditors, and other parties in interest.   Furthermore, the contemplated restructuring accomplishes a deconsolidation transaction while sparing the Debtors over $6 billion in deconsolidation tax liabilities.

46.     The Restructuring Support Agreement is the product of extensive, arms-length negotiations among the Debtors and the Restructuring Support Parties, each of whom had separate, sophisticated legal counsel and financial advisors.  Each Restructuring Support Party's agreement to sign the Restructuring Support Agreement was carefully negotiated and, crucially, dependent upon the RSA Debtors obtaining agreements from the other key parties in interest that would support a comprehensive restructuring of the Debtors' estates and avoid a prolonged stay

21

in bankruptcy.   Collectively, the Restructuring Support Parties represent the majority of the Debtors' stakeholders, a significant accomplishment given the size and complexity of the Debtors' capital structure.

47.     Without the protections of the Restructuring Support Agreement, the Debtors would face a prolonged stay in bankruptcy.   Each of the non-Debtor Restructuring Support Parties would necessarily feel compelled to protect its respective interests at each step of the chapter 11 cases, leading to numerous objections and seemingly endless litigation even before the Debtors would be able to formulate and present a plan of reorganization for Court approval. Moreover, without the protection of the Restructuring Support Agreement, each Restructuring Support Party may seek to re-negotiate various terms of the restructuring, to the detriment of the Debtors' estates.   Finally, absent the transactions contemplated in the Restructuring Support Agreement, the Debtors would be presented with potential tax liabilities that could prevent the Debtors from emerging from chapter 11 and eliminate unsecured creditor recoveries at EFH Corp., EFIH, and TCEH.

48.     Furthermore, as discussed above, the obligations of the Debtors under the Restructuring Support Agreement are subject to a full "fiduciary out."   Thus, the Restructuring Support Agreement allows the Debtors to comply with their fiduciary duty to maximize the value of their estates.

49.     Courts in this and other districts have approved similar relief. *See*, *e.g.*, *In re Rural/Metro Corp.*, No. 13-11952 (KJC) (Bankr. D. Del. Sept. 5, 2013) (approving the debtors' assumption of a prepetition restructuring support agreement as a proper exercise of the debtors' business judgment); *In re Bicent Holdings, LLC*, No. 12-11304 (KG) (Bankr. D. Del. May 15, 2012) (same); *In re William Lyons Homes*, No. 11-14019 (CSS) (Bankr. D. Del. Dec. 29, 2011)

22

(same); *In re Satelites Mexicanos, S.A. de C.V.*, No. 11-11035 (CSS) (Bankr. D. Del. Apr. 13, 2011) (same); *In re HMP Servs. Holding Sub III, LLC*, No. 10-13618 (BLS) (Bankr. D. Del. Jan. 20, 2011) (same); *In re NextMedia Grp., Inc.*, No. 09-14463 (PJW) (Bankr. D. Del. Jan. 22, 2010) (same); *see also In re Genco Shipping & Trading Ltd.,* Case No. 14-11108 (SHL) (Bankr. S.D.N.Y. Apr. 24, 2014) (approving the debtors' assumption of a prepetition restructuring support agreement as a proper exercise of the debtors' business judgment).[11]

50.     Based on the foregoing, the RSA Debtors respectfully submit that they have exercised reasonable business judgment in deciding to assume the Restructuring Support Agreement.  Accordingly, the RSA Debtors request that the Court authorize the Debtors to assume the Restructuring Support Agreement.

## II.     Payment of Professional Fees is Warranted under Section 363(b) of the Bankruptcy Code.

51.     The Bankruptcy Code authorizes the use of property outside the ordinary course of business with court approval and given a valid business reason.  Specifically, the Bankruptcy Code authorizes a debtor in possession to "use, sell, or lease, other than in the ordinary course of business, property of the estate," after notice and a hearing.  11 U.S.C. § 363(b).  It is well established in this jurisdiction that a debtor may use property of the estate outside the ordinary course of business under this provision if there is a good business reason for doing so.  *See, e.g.*, *Martin*, 91 F.3d at 395; *In re Elpida Memory, Inc.*, No. 12-10947 (CSS), 2012 WL 6090194, at *5 (Bankr. D. Del. Nov. 20, 2012); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (Bankr. D. Del. 1999); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175 (Bankr. D. Del. 1991).

---

[11]     Because of the voluminous nature of the orders cited herein, such orders are not attached to this Motion.  Copies of these orders are available upon request to the Debtors' counsel.

This standard for approval of the use of property outside the ordinary course of business is a deferential one.  *See In re Filene's Basement, LLC*, No. 11-13511 (KJC) (Bankr. D. Del. Apr. 29, 2014) (stating that, under the business judgment standard, once the debtor presents "a reasonable basis for its business decisions…courts will generally not entertain objections to the debtor's conduct…").

52.    Here, each of the RSA Debtors has articulated a clear business justification for entering into the Restructuring Support Agreement.  By securing the support and cooperation of the Restructuring Support Parties, the Restructuring Support Agreement results in significant cost savings for the RSA Debtors, their estates, and creditors.  *See* Cremens Decl. ¶ 15-16; Sawyer Decl. ¶ 15-16.  In light of these substantial benefits, the RSA Debtors have determined the payment of the Professional Fees is appropriate.  Therefore, the RSA Debtors respectfully submit that payment of the Professional Fees is a proper exercise of their reasonable business judgment and should be approved.

**III.    The Debtors Seek a Waiver of the Automatic Stay to Effectuate the Relief Requested in this Motion.**

53.    Section 362(a) of the Bankruptcy Code operates to stay:

> the commencement or continuation, including the issuance or employment of process of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to receive a claim against the debtor that arose before the commencement of the case under this title . . . .

11 U.S.C. § 362(a)(1).  Section 362, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause."  *Id.* at § 362(d)(1).

54.    The Debtors seek authorization, under section 362(d) of the Bankruptcy Code, to modify the automatic stay to the extent necessary to permit the relief requested in this Motion

and, for the reasons described herein, believe this relief is appropriate in the context of assuming the Restructuring Support Agreement.

## **Waiver of Bankruptcy Rules 6004(h) and 6006(d)**

55.     To implement the foregoing successfully, the Debtors seek a waiver of the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(4) and, to the extent applicable, the 14-day stay of an order applicable to assignment of an unexpired executory contract under Bankruptcy Rule 6006(d).

## **Notice**

56.     The Debtors shall provide notice of this Motion on the date hereof via first class mail to:  (a) the Office of the U.S. Trustee for the District of Delaware; (b) the Official Committee of Unsecured Creditors and proposed counsel thereto, Morrison & Foerster LLP, 250 W. 55th Street, New York, NY 10019, Attn: Honorable James M. Peck, Brett H. Miller and Lorenzo Marinuzzi; (c) Wilmington Trust, N.A., in its capacity as administrative agent under the TCEH first lien credit agreement and collateral agent under the TCEH intercreditor agreements and counsel thereto; (d) Bank of New York Mellon Trust Company, N.A., in its capacity as indenture trustee under:  (i) the TCEH unsecured pollution control revenue bonds; and (ii) the EFCH 2037 Notes due 2037, and counsel thereto; (e) American Stock Transfer & Trust Company, LLC, in its capacity as indenture trustee under:  (i) the 9.75% EFH senior unsecured notes due 2019; (ii) the 10.0% EFH senior unsecured notes due 2020; (iii) the 10.875% EFH LBO senior unsecured notes due 2017; (iv) the 11.25%/12.0% EFH LBO toggle notes due 2017; (v) the 5.55% EFH legacy notes (series P) due 2014; (vi) the 6.50% EFH legacy notes (series Q) due 2024; and (vii) the 6.55% EFH legacy notes (series R) due 2034, and counsel thereto; (f) Computershare Trust Company, N.A. and Computershare Trust Company of Canada, in their

25

capacities as indenture trustee under:  (i) the 11.0% EFIH senior secured second lien notes due 2021; and (ii) the 11.75% EFIH senior secured second lien notes due 2022, and counsel thereto; (g) UMB Bank, N.A. in its capacity as indenture trustee under:  (i) the 9.75% EFIH senior unsecured notes due 2019; and (ii) the 11.25%/12.25% EFIH senior toggle notes due 2018, and counsel thereto; (h) BOKF, NA, dba Bank of Arizona, in its capacity as indenture trustee under 11.50% TCEH senior secured notes due 2020, and counsel thereto; (i) CSC Trust Company of Delaware in its capacity as indenture trustee under:  (i) the 6.875% EFIH senior secured notes due 2017; and (ii) the 10.0% EFIH senior secured notes due 2020, and counsel thereto; (j) Law Debenture Trust Company of New York in its capacity as indenture trustee under:  (i) the 10.25% TCEH senior unsecured notes due 2015; and (ii) the 10.50%/11.25% TCEH senior toggle notes due 2016, and counsel thereto; (k) Wilmington Savings Fund Society, FSB in its capacity as indenture trustee under the 15.0% TCEH senior secured second lien notes due 2021, and counsel thereto; (l) counsel to certain holders of claims against the Debtors regarding each of the foregoing described in clauses (c) through (k); (m) the agent for the TCEH debtor-in-possession financing facility and counsel thereto; (n) the agent for the EFIH debtor-in-possession financing facility and counsel thereto; (o) counsel to certain holders of equity in Texas Energy Future Holdings Limited Partnership; (p) counsel to the Ad Hoc Committee of TCEH Unsecured Noteholders; (q) counsel to the Ad Hoc Committee of TCEH Second Lien Noteholders; (r) counsel to Oncor Electric Delivery Holdings Company LLC; (s) the Securities and Exchange Commission; (t) the Internal Revenue Service; (u) the Office of the United States Attorney for the District of Delaware; (v) the Office of the Texas Attorney General on behalf of the Public Utility Commission of Texas; (w) counsel to the Electric Reliability Council of Texas; (x) proposed counsel to the official committee of unsecured creditors; and (y) the Restructuring

Support Parties.   The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

57.    No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Debtors respectfully request that the Court enter the Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Wilmington, Delaware
Dated:  May 16, 2014

/s/ *William A. Romanowicz*
**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
William A. Romanowicz (No. 5794)
920 North King Street
Wilmington, Delaware 19801
Telephone:       (302) 651-7700
Facsimile:       (302) 651-7701
Email:           collins@rlf.com
                 defranceschi@rlf.com
                 madron@rlf.com
                 romanowicz@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
Richard M. Cieri (admitted *pro hac vice*)
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:       (212) 446-4800
Facsimile:       (212) 446-4900
Email:           richard.cieri@kirkland.com
                 edward.sassower@kirkland.com
                 stephen.hessler@kirkland.com
                 brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:       (312) 862-2000
Facsimile:       (312) 862-2200
Email:           james.sprayregen@kirkland.com
                 chad.husnick@kirkland.com
                 steven.serajeddini@kirkland.com

Proposed Co-Counsel to the Debtors and Debtors in Possession

28