# EXHIBIT B

**Cremens Declaration**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) ) ) | Case No. 14-10979 (CSS) |
| Debtors. | ) ) ) | (Jointly Administered) |

**DECLARATION OF CHARLES H. CREMENS, DISINTERESTED
BOARD MEMBER OF ENERGY FUTURE INTERMEDIATE HOLDING
COMPANY LLC, IN SUPPORT OF THE MOTION OF ENERGY FUTURE
HOLDINGS CORP., *ET AL.*, FOR ENTRY OF AN ORDER AUTHORIZING
THE RSA DEBTORS TO ASSUME THE RESTRUCTURING SUPPORT AGREEMENT**

I, Charles H. Cremens, declare as follows:

1. Since February 2014, I have served as a disinterested board member of Energy Future Intermediate Holding Company LLC ("EFIH"). I submit this declaration (this "Declaration") in support of the *Motion of Energy Future Holdings Corp., et al., for Entry of an Order Authorizing the RSA Debtors to Assume the Restructuring Support Agreement* (the "Motion").[2]

2. The statements in this Declaration are based on my personal knowledge, my review of relevant documents, or my opinion based upon my experience and knowledge of the corporate governance procedures of EFIH. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted on an interim basis, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

**Qualifications**

3. I have more than thirty years of experience restructuring public and private companies. In that time, I have served as the President and/or Chief Executive Officer ("CEO") of several large and complex companies during their restructurings, including Spirit Finance Corporation, Conseco Finance Corporation, and WMF Group, Ltd. Prior to those assignments, I served as the Chief Investment Officer of Beacon Properties Corp., President of Real Estate Investments at Aetna Inc., and held various executive management positions at the Bank of Boston.

4. I currently serve on several boards as a disinterested director, including Capmark Financial Group Inc., Tactical Holdings, and Patriot Coal Corporation. Within the last five years, I have served as a director on the board of numerous distressed companies, including Conexant Systems, Inc., Kerzner International Resorts Inc., Intrawest Resorts Holdings, Inc., and General Growth Properties, Inc.

5. In February 2014, I was appointed as a disinterested director to the EFIH Board. It is my understanding that I was selected for this position based on my expertise in the distressed market and particularly due to my extensive personal experience as a disinterested director of complex companies contemplating or undergoing significant restructuring transactions, both in and out of court. Since my appointment to the EFIH Board, the RSA Debtors' management and advisors have actively sought my input and approval on material decisions.

6. As a disinterested director, I do not serve on any other boards at EFH or its subsidiaries and/or affiliates. I am aware that other members of the EFIH Board do sit on boards

at EFH and/or other EFH subsidiaries or affiliates, and are thus involved in decisionmaking as to those entities by virtue of their roles on those boards.

## Participation in the EFIH Board
## Process Regarding the Restructuring Support Agreement

7.  Between March 21, 2014 and April 28, 2014, I attended one meeting of the Boards of EFIH and EFIH Finance and four meetings of the joint Boards of TCEH, TCEH Finance, EFIH, EFIH Finance, and EFH. During these meetings, the RSA Debtors' management and advisors presented comprehensive summaries of negotiations as the Restructuring Support Agreement evolved. These presentations included regular updates regarding the status of negotiations with each constituency, including a description of the material open issues and an analysis of the risks and benefits associated with each. In addition, the RSA Debtors' management and advisors provided the members of the Boards with a comprehensive understanding of the advantages and downsides to entering into the Restructuring Support Agreement.

8.  In addition to these meetings, I also met on several occasions individually with the EFH CEO, CFO, and General Counsel, as well as with other members of the Debtors' management team, including from the finance, legal, human resources and treasury groups. I also engaged in numerous break-out meetings, discussions, and telephonic conversations with various members of the Debtors' management team and the Debtors' advisors regarding the merits of the Restructuring Support Agreement. During these meetings, I had the opportunity to, and did ask any questions that I had about the negotiations, status, or details of the Restructuring Support Agreement, and received all the information and advice I felt was necessary in order to reach my own determination about the propriety of entering into the Restructuring Support Agreement.

9. On March 21, 2014, I attended a joint meeting of the Boards. At this meeting, the RSA Debtors' advisors and management explained that certain holders of TCEH first lien debt had, for the first time, expressed willingness to consider support for a tax-free deconsolidation restructuring strategy. Based on this indication of potential support, the RSA Debtors' management and their advisors explained that they had begun the process of drafting the Restructuring Support Agreement.

10. In early April 2014, I understood that the Board and each of TCEH and TCEH Finance elected to utilize the 30-day grace period available to make the interest payments due under the applicable documents that govern TCEH's and TCEH Finance's first lien funded debt obligations. Subsequently, the Boards continued to meet regularly in order to evaluate the proposed terms and key outstanding issues as restructuring negotiations advanced. I attended all such meetings of the EFIH Board and the joint Boards.

11. On April 24, 2014, I attended a joint meeting of the boards. The following day, I attended a separate special meeting of the EFIH Board, which was held exclusively for me in my capacity as a disinterested director of the EFIH Board. At both of these meetings, certain of the RSA Debtors' advisors and management provided detailed presentations regarding the risks and benefits associated with the Restructuring Support Agreement, including the settlements contained therein. These presentations assisted me in evaluating the Restructuring Support Agreement.

12. On April 28, 2014, I attended a joint meeting of the Boards to determine whether to enter into the Restructuring Support Agreement. This meeting included a detailed evaluation of the final terms of the Restructuring Support Agreement and the Board approvals required to consummate that agreement and commence chapter 11 proceedings.

13. In addition to formal Board meetings, I would typically follow scheduled meetings with break-out sessions during which I alone and without other Board members present would engage in discussion and dialogue with the Debtors' management and/or professionals. These meetings were in addition to numerous discussions with EFIH's financial and legal advisors regarding the terms of the restructuring contemplated by the Restructuring Support Agreement.

**The EFIH Board's Decision to Enter Into the Restructuring Support Agreement**

14. Upon significant deliberation and considered analysis of the material terms of the Restructuring Support Agreement, I determined, along with the other members of the EFIH Board, that entry into the Restructuring Support Agreement was in the best interest of EFIH. I made this decision based on my over thirty years of experience with distressed companies, my understanding of the Debtors' financial position, the history of negotiations and efforts to develop a solution that is mutually agreeable to the various constituencies, and of the regular and in-depth explanation of the terms of the Restructuring Support Agreement as they evolved. During the April 28, 2014 meeting, I recommended to the full EFIH board that it should approve the Restructuring Support Agreement.

15. Specifically, as to the history of negotiations, there was a long runway to the Restructuring Support Agreement as a solution that was agreeable to both the Debtors and to multiple creditor constituencies, and this process provided valuable context as to the value of this potential solution. The degree of support from creditors in each class was a related indication of the potential success of this proposed solution, in my view.

16. Based on my experience and deliberation on the Restructuring Support Agreement, I believe that the terms of the restructuring contemplated by the Restructuring

Support Agreement will significantly benefit EFIH and its creditors. This is because the Restructuring Support Agreement presents a clear path forward to finalizing a plan and then having that plan confirmed and consummated. The Restructuring Support Agreement also represents a solution that received broad-based support after more than a year of negotiations exploring other alternatives that did not attract such support. The Restructuring Support Agreement thus also maximizes value to the estate by decreasing the amount that would have been spent on professional and other legal fees as a result of the protracted legal battle that would have resulted in the absence of such a plan.

17. The plan contemplated by the Restructuring Support Agreement enables EFIH to avoid the scenario in which EFIH likely would have been separated from EFH in a transaction that would trigger a tax of more than $3 billion at EFH (a "deconsolidation tax"), which tax, I understand, would almost certainly would have been impaired at EFH Corp. That tax liability would, in turn, have created significant litigation and risk of liability under a tax sharing agreement between EFH Corp. and EFIH, thereby reducing the recovery of EFH's and EFIH's unsecured creditors.

18. For all of these reasons, it was my business judgment that the Restructuring Support Agreement represented the best available restructuring alternative for EFIH.

[*Remainder of Page Intentionally Left Blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  May 16, 2014                              /s/ Charles H. Cremens
                                                                                    Charles H. Cremens
                                                                                    Disinterested Board Member
                                                                                    Energy Future Intermediate Holding Company LLC