## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: D.I. 441, 461** |

## DEBTORS' OBJECTION TO (A) EMERGENCY MOTION OF CSC TRUST COMPANY OF DELAWARE, AS INDENTURE TRUSTEE, TO COMPEL THE DEBTORS TO OBTAIN APPROVAL OF PROCEDURES GOVERNING THE EFIH FIRST LIEN TENDER OFFER AND (B) EMERGENCY MOTION OF EFIH 2ND LIEN NOTES INDENTURE TRUSTEE TO COMPEL DEBTORS TO OBTAIN PRIOR APPROVAL OF PROCEDURES GOVERNING THEIR EFIH 2ND LIEN TENDER OFFER

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, which are being jointly administered on an interim basis, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

## Table of Contents

Preliminary Statement ................................................................................................................1

Background .................................................................................................................................3

Legal Standard ...........................................................................................................................6

Argument ....................................................................................................................................7

I.  The Motions to Compel Are Improper Under Applicable Bankruptcy Law. .....................7

      A.  The Settlement Opt-Ins Do Not Require Preapproval by the Bankruptcy
         Court. ......................................................................................................................7

      B.  The Objections of the First and Second Lien Trustee to the EFIH First and
         Second Lien Settlements are Premature and Unwarranted. ...................................10

      C.  The Settlement Opt-Ins Are Not Solicitations Under Bankruptcy Rule
         3017 or Bankruptcy Code Section 1125. ...............................................................12

II.  The Settlement Opt-Ins Are Being Conducted in Accordance with Applicable
     Securities Laws. ................................................................................................................14

      A.  The Use of an Early Participation Premium (i.e., the 10 Business Day
         Consideration "Step Down") and Related Change in Consideration Is
         Permissible Under Applicable Securities Laws and is Common in Similar
         Capital Markets Transactions. ...............................................................................14

      B.  The Settlement Opt-Ins Satisfy All Disclosure Requirements under the
         Securities Laws. .....................................................................................................17

         i.  The Securities Laws Do Not Require the Disclosure of All Facts,
            But Only Material Facts ..............................................................................17

         ii.  Fidelity's Recoveries Under the Restructuring Support Agreement
            Are Adequately Disclosed in the EFIH Second Lien Opt-In ......................18

         iii.  The Remaining "Disclosure" Issues Raised by the Seconds Are
            Already Disclosed, Immaterial, or Incorrect ..............................................22

      C.  The EFIH First and Second Lien Settlements Are Not "Illusory Tenders." ..........24

## Table of Authorities

**Statutes**

11 U.S.C. § 105(a) ................................................................................................ 6

11 U.S.C. § 1123(a)(4) .......................................................................................... 11

11 U.S.C. § 1125 .............................................................................................. 12, 13

11 U.S.C. § 363(b) ......................................................................................... 7, 8, 9

15 U.S.C. § 78n(a) ................................................................................................ 18

15 U.S.C. § 78n(e) ........................................................................................... 18, 25

**Cases**

*Century Glove, Inc. v. First Am. Bank*, 860 F.2d 94, 101-02 (3d Cir. 1988).............................. 13

*Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000)............................................................. 25

*David v. Human Genome Servs., Inc.*, 2012 WL 3061029, at *4 (D. Del. July 26, 2012) ........... 17

*In re AMR Corp*, No. 11-15463 (SHL) (Bankr. S.D.N.Y. May 23, 2013) ..................................... 9

*In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 510-11 (Bankr. D. Del. 2010) ............................... 11

*In re Catholic Diocese of Wilmington, Inc.*, 437 B.R. 488, 492 n.19 (Bankr. D. Del. 2010) ......... 7

*In re Dana Corp.*, 412 B.R. 53, 62 (S.D.N.Y. 2008) ................................................................. 11

*In re Dow Corning Corp.*, 227 B.R. 111, 118 (Bankr. E.D. Mich. 1998) ................................... 13

*In re Dow Corning Corp.*, 255 B.R. 445, 472 (E.D. Mich. 2000) ............................................... 12

*In re Enron Corp.*, 341 B.R. 141, 168 (Bankr. S.D.N.Y. 2006) ................................................. 20

*In re Indianapolis Downs, LLC.*, 486 B.R. 286, 294 (Bankr. D. Del. 2013) ............................... 13

*In re Iridium Operating LLC.* 478 F.3d 452 (2d Cir. 2007) ..................................................... 10

*In re Journal Register Co.*, 407 B.R. 520, 533 (Bankr. S.D.N.Y. 2009)..................................... 11

*In re Texaco Inc.*, 81 B.R. 813 (Bankr. S.D.N.Y. 1988)............................................................. 9

*In re Washington Mut., Inc.*, 442 B.R. 314, 355-56 (Bankr. D. Del. 2011) ............................... 12

*In re Wedgwood Realty Grp., Ltd.*, 878 F.2d 693, 700-01 (3d Cir. 1989) ................................... 6

*Jevic Holding Corp.*, No. BR 08-11006(BLS), 2014 WL 268613, at *3 (D. Del. Jan. 24, 2014) 10

*Law Debenture Trust Co. v. Calpine Corp. (In re Calpine Corp.)*, 356 B.R. 585, 597 (S.D.N.Y. 2007) ........................................................................................................................ 11

*Rodriguez–Tevez v. AG of the United States*, 2010 WL 1936263, at *1, 2010 U.S. App. LEXIS 9967, at *3 n. 1 (3d Cir. May 14, 2010)............................................................................ 7

*TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) ...................................................... 18

*United States ex rel. Rural Electrification Admin. v. Wabash Valley Power Ass'n (In re Wabash Valley Power Ass'n)*, 167 B.R. 885, 889 (S.D. Ind. 1994) ............................................... 11

**Rules**

17 C.F.R. § 240.10b-5 ................................................................................................................... 18

17 C.F.R. § 240.13D-101 .............................................................................................................. 20

17 C.F.R. § 240.14d-1(a) .............................................................................................................. 21

17 C.F.R. § 240.14d-1(g)(3) ......................................................................................................... 14

17 C.F.R. § 240.14d-10(a)(2)........................................................................................................ 21

17 C.F.R. § 240.14e-1(a) .............................................................................................................. 14

17 C.F.R. § 240.14e-1(b) .............................................................................................................. 15

Bankruptcy Rule 3017 ................................................................................................................... 12

Bankruptcy Rule 7065 ..................................................................................................................... 6

Bankruptcy Rule 9019 ................................................................................................................... 10

**Other Authorities**

Charles T. Haag & Zachary A. Keller, *Honored in the Breach: Issues in the Regulation of Tender Offers for Debt Securities*, 9 N.Y.U. J. L. & Bus. 199, 246 (2012) .................... 15

Instruction to Item 1007(d), 64 F.R. 61408, 61446, Nov. 10, 1999 ............................................ 20

*John C. Hull, Options, Futures, and Other Derivatives* 7 (2d ed. 2009)...................................... 20

SEC Division of Corporation Finance, Manual of Publicly Available Telephone Interpretations, at Q.1 (July 1997) ................................................................................................................ 14

Securities Exchange Act Release No. 34-43069 ........................................................................... 25

*The Strategic Hotels & Resorts, Inc.*, SEC Comment Letter (May 19, 2010).............................. 25

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this objection (this "Objection")[1] to: (a) the *Emergency Motion of CSC Trust Company of Delaware, as Indenture Trustee, to Compel the Debtors to Obtain Approval of Procedures Governing the EFIH First Lien Tender Offer* [D.I. 461] (the "First Lien Motion") filed by the indenture trustee for the 10.00% EFIH First Lien Notes (the "First Lien Trustee") and (b) the *Emergency Motion of EFIH 2nd Lien Notes Indenture Trustee to Compel Debtors to Obtain Prior Approval of Procedures Governing Their EFIH 2nd Lien Tender Offer* [D.I. 441] (the "Second Lien Motion" and, together with the First Lien Motion, the "Motions") filed by the indenture trustee for the EFIH Second Lien Notes (the "Second Lien Trustee" and, together with the First Lien Trustee, the "Trustees").  In support of this Objection, the Debtors submit the *Declaration of Anthony R. Horton in Support of the Objection of Energy Future Holdings Corp., et al., to (A) Emergency Motion of CSC Trust Company of Delaware, as Indenture Trustee, to Compel the Debtors to Obtain Approval of Procedures Governing the EFIH First Lien Tender Offer and (B) Emergency Motion of EFIH 2nd Lien Notes Indenture Trustee to Compel Debtors to Obtain Prior Approval of Procedures Governing Their EFIH 2nd Lien Tender Offer*, filed contemporaneously herewith (the "Horton Declaration").  In further support of this Objection, the Debtors respectfully state as follows.

### Preliminary Statement

1.    The Court should deny the Motions.  A central component of the Debtors' restructuring is the expeditious repayment of the EFIH First Lien Notes and the EFIH Second Lien Notes that accelerated with the bankruptcy filing.  This repayment will spare the EFIH

---

[1]    Capitalized terms used but not defined in this Objection shall have the meanings set forth in the Declaration of Paul Keglevic, Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of Energy Future Holdings Corp., et al., in Support of First Day Motions [D.I. 98] (the "First Day Declaration").

estates tens of millions of dollars in interest expense on their prepetition debt and will serve as the foundation for a deleveraging transaction under the prearranged plan of reorganization contemplated under the Restructuring Support Agreement (as defined herein). To achieve this goal, the Debtors seek to disallow or otherwise obtain certainty regarding alleged makewhole claims related to this repayment.

2.    The Debtors contend that they owe no makewhole premium under the EFIH First Lien Notes and EFIH Second Lien Notes and are prepared to litigate accordingly. Nonetheless, to avoid litigation risk and to attempt to facilitate (if reasonably possible) a consensual restructuring, the Debtors reached prepetition settlements with certain of the parties to the Restructuring Support Agreement regarding their makewhole claims. Rather than stop there and force all other holders to litigate their makewhole claims, the Debtors thought it would be both fair and in the best interests of the estates to offer similar settlements to the remaining EFIH First and EFIH Second Lien Holders. This will give these holders an alternative to litigating, which the Debtors will do regardless of whether 1% or 99% of these holders settle their makewhole claims.

3.    The movants are the Trustees and ad hoc groups of the holders of EFIH First Lien Notes and EFIH Second Lien Notes who want to derail the tender settlement *process* because they are not satisfied with the proposed settlement *terms*. As a result, counter to their arguments set forth in their Motions, their ultimate objective is not additional "disclosure" or time based on concerns about creditor confusion. To the contrary, it is to thwart or delay this settlement process.

4.    Motivations aside, the Motions fail for a variety of reasons. While the EFIH First and Second Lien Trustees cry foul over procedure, the Motions themselves do not satisfy the

legal standard to obtain injunctive relief to "compel" the Debtors to take any action. And, even if the Trustees attempted to do so, there is no bankruptcy law requiring the Debtors to (a) seek "preapproval" to make settlement offers or (b) prolong the amount of time those settlement offers remain open. With respect to *consummation* of those offers, the Debtors will seek to satisfy all of the required elements for approval of the proposed settlements at the June 5 and 6 hearings. Thus, the objections to the propriety of the settlements themselves are premature and invalid. Finally, in their settlement offers to holders of EFIH First Lien Notes and Second Lien Notes, the Debtors are using an offer process that is commonplace in the capital markets (and for the Debtors). Additionally, the Debtors have complied with all applicable federal securities laws, including as to the length of time that the offers must be held open and the extent of the Debtors' disclosures in the offering materials.

5.    For the foregoing reasons, the Motions of the EFIH First and Second Lien Trustees should be denied.

## Background

6.    To provide context to the movants' allegations of surprise and undue haste, it bears noting that the Debtors have been in various stages of negotiation with counsel to both the First Lien Trustee and the Second Lien Trustee and their ad-hoc groups for *approximately nine months*. Specifically, the Debtors organized the EFIH Second Lien Holders in August 2013 and began paying their counsel fees that same month—and the Debtors organized the EFIH First Lien Holders in September 2013 and began paying their professionals' fess that same month. Since that time, the Debtors have engaged in numerous discussions with counsel and financial advisors for the Trustees, including regarding potential settlements of their Holders' alleged makewhole claims. But, with one very brief exception, these discussions never advanced to the

point where the EFIH First and Second Lien Holders were willing to get restricted from trading their securities in accordance with applicable securities laws and engage in a direct negotiation with the Debtors. To the contrary, counsel to the EFIH First and Second Lien Trustees consistently stated prepetition (and reiterated postpetition) that they oppose the proposed settlements. Accordingly, the Debtors determined it was a prudent and constructive step to initiate the Opt-In Periods to reach out to the First and Second Lien Holders directly, to invite their participation in the proposed settlement.

7.     The Debtors filed their petitions for relief under chapter 11 of title 11 of the United States Code on April 29, 2014 (the "Petition Date"), in the United States Bankruptcy Court for the District of Delaware. On the Petition Date, the Debtors filed the Restructuring Support and Lock-Up Agreement, dated as of April 29, 2014, as Exhibit D to the First Day Declaration (as amended from time to time, including the Restructuring Term Sheet and all other schedules and exhibits thereto, collectively, the "Restructuring Support Agreement"). As part of the Restructuring Support Agreement, certain holders of EFIH First Lien Notes entered into settlements with the Debtors of their alleged makewhole claims under those notes (the "EFIH First Lien Settlement"), as did certain holders of EFIH Second Lien Notes (the "EFIH Second Lien Settlement"). The Debtors have filed motions seeking approval of the EFIH First and Second Lien Settlements.[2]

---

[2]   See Motion of Energy Future Holdings Corp., et al., for Entry of Orders Approving Certain EFIH Settlements and the Oncor TSA Amendment [D.I. 472] (the "Settlement Motion"); Motion of Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. for Entry of an Order (A) Approving Postpetition Second Lien Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Authorizing the Use of Cash Collateral, (D) Authorizing the EFIH Second Lien Repayment, (E) Authorizing Entry Into and Payment of Fees Under the Commitment Letter, and (F) Modifying the Automatic Stay [D.I. 477] (the "EFIH Second Lien DIP Motion").

8.    In the interest of fairness, to give as many of their creditors as possible the opportunity to participate in these settlements, the Debtors initiated two settlement opt-in periods related to the proposed makewhole settlements with the EFIH First Lien Notes and EFIH Second Lien Notes shortly after the Petition Date.  On Wednesday, May 7, the Debtors filed with the Court a *Notice of Initiation of Opt-In Period for the Proposed EFIH First Lien Settlement* [D.I. 363] (such notice, the "First Lien Opt-In Notice" and, such opt-in period, the "First Lien Opt-In"), explaining that, subject to this Court's approval, the Debtors had initiated a process to make the EFIH First Lien Settlement available to holders of EFIH First Lien Notes (the "EFIH First Lien Holders").  Similarly, on Friday, May 9, the Debtors filed with the Court the *Notice of Initiation of Opt-In Period for Proposed EFIH Second Lien Settlement* [D.I. 400] (such notice, the "Second Lien Opt-In Notice" such opt-in period, the "Second Lien Opt-In," and, together with the First Lien Opt-In, the "Settlement Opt-Ins") regarding the initiation of a similar process with the holders of EFIH Second Lien Notes (the "EFIH Second Lien Holders").  Each of the Settlement Opt-Ins included an early participation premium only available to the extent holders opted into the settlement within the first 10 business days of the Settlement Opt-In period.  As described in the *Notice of Extension of Primary Opt-In Period for Proposed EFIH Second Lien Settlement*, filed contemporaneously herewith, the Debtors have extended the "step down" period for the Second Lien Opt-In from 10 business days to 15 business days from the date of commencement of the offers to accommodate scheduling of the hearing on the Motions.  The Settlement Opt-Ins are both currently scheduled to expire on June 6, 2014.

9.    In response, on May 13, 2014, the First Lien Trustee filed the *Preliminary Objection of CSC Trust Company of Delaware, as Indenture Trustee, to Debtors' Motion to Approve First-Lien Post-Petition Financing, Redeem First Lien and Second Lien Notes, and*

5

*Determine Secured Claim* [sic] [D.I. 421]. The First Lien Trustee challenged the Settlement Opt-Ins in this objection, but did not seek any relief. On May 14, 2014, the Second Lien Trustee filed the Second Lien Motion, which requests an order (a) setting June 6, 2014, as a hearing date for consideration of the procedures for, and adequacy of disclosure under, the Second Lien Opt-In and (b) extending until well after that hearing the period during which EFIH Second Lien Holders can receive an early participation premium under the Second Lien Opt-In. On May 15, 2014, on behalf of EFIH First Lien Holders, the First Lien Trustee filed the First Lien Motion, which seeks substantially the same relief with respect to the First Lien Opt-In and incorporates by reference the arguments set forth in the Second Lien Motion.[3]

10.    By this Objection, the Debtors request that the Court deny both Motions for the reasons set forth below.

## Legal Standard

11.    The Motions fail to plead, let alone satisfy, the heightened legal standard for the injunctive relief they seek. Both Motions, in substance, seek mandatory injunctions to: (a) force the Debtors to obtain preapproval of the Settlement Opt-In procedures, and (b) modify disclosures within the Settlement Opt-Ins. Under section 105(a) of the Bankruptcy Code and Bankruptcy Rule 7065, the movant "has the burden of demonstrating to the court the following: [a] substantial likelihood of success on the merits, [b] irreparable harm to the movant, [c] harm to the movant outweighs harm to the nonmovant, and [d] injunctive relief would not violate public interest." *In re Wedgewood Realty Grp., Ltd.*, 878 F.2d 693, 700-01 (3d Cir. 1989). This burden

---

[3]    Because the First Lien Motion incorporates by reference all of the arguments of the Second Lien Motion, this Objection assumes that the allegations and arguments set forth in the Second Lien Motion, to the extent relevant, were raised in the First Lien Motions. Regardless, all of the arguments set forth in this Objection apply, to the extent relevant, to both Motions.

is due to the fact that "relief under section 105(a) . . . is neither automatic nor may it be imposed *sua sponte* by the court. The movant must meet the standards for injunctive relief to which we have referred above." *Id.* at 701 (internal citation omitted).

12.    The Trustees have not even attempted to meet these standards. Nor should they be permitted to do so in reply or at the hearing on the motion. *In re Catholic Diocese of Wilmington, Inc.*, 437 B.R. 488, 492 n.19 (Bankr. D. Del. 2010) (Sontchi, J.) ("To the extent they are making this argument, it was raised for the first time in the reply brief. [Thus], it was not considered by the Court.") (citing *Rodriguez–Tevez v. AG of the United States*, 2010 WL 1936263, at *1, 2010 U.S. App. LEXIS 9967, at *3 n. 1 (3d Cir. May 14, 2010)).    On threshold procedural grounds alone, the Motions should be denied. But even if the Court were to hear the Motions, the relief requested should be assessed in light of this heightened standard.

## Argument

### I.    The Motions to Compel Are Improper Under Applicable Bankruptcy Law.

#### A.    The Settlement Opt-Ins Do Not Require Preapproval by the Bankruptcy Court.

13.    The Court should deny the Motions because they are substantively improper. Neither the First Lien Trustee nor the Second Lien Trustee has cited (and the Debtors are not aware of) any applicable law to support their assertions that the Debtors must have sought Court approval before making a settlement offer to the Debtors' creditors. Debtors routinely (if not universally) make settlement offers without Court approval.

14.    Preapproval of the Debtors' settlement offers is plainly required under the Bankruptcy Code for the straightforward reason that the Settlement Opt-Ins did not entail the "use" of the Debtors' property under section 363(b). Section 363(b) of the Bankruptcy Code provides that a debtor may only use property outside the ordinary course of business after notice

and a hearing.  11 U.S.C. § 363(b).  Here, the only action taken by the Debtors has been to make

settlement offers, *subject to Court approval*, to their noteholders.  The Debtors, in the interest of

fairness, sought to make this offer available to as many holders as possible, and not only to the

large constituencies that had been negotiating with the Debtors on a restricted basis prepetition.

15.    As a function of applicable securities law (and not bankruptcy law), the Debtors

used a tender offer process—a process the Debtors and their noteholders have used frequently in

the past—because of the large number of noteholders being invited to settle.  Unlike the Debtors'

past offers, in this case, the Debtors, as debtors in possession under the Bankruptcy Code, have

conditioned consummation of the offers on Court approval as required by applicable bankruptcy

law.  Thus, that the offers are subject to Court approval is highlighted throughout the Debtors'

offer documents numerous times and in their public statements.

16.    For example, the bankruptcy notices stated as follows:

> PLEASE TAKE NOTICE THAT, AS STATED IN THE RESTRUCTURING
> SUPPORT AGREEMENT, AND AS DISCUSSED AT THE FIRST DAY HEARINGS,
> BOTH OF THE PROPOSED EFIH FIRST LIEN SETTLEMENT TRANSACTIONAL
> STEPS—THE COMPROMISE OF THE EFIH FIRST LIEN NOTE CLAIMS AND THE
> SETTLING PARTIES' PARTICIPATION IN THE EFIH FIRST LIEN DIP
> FINANCING—ARE SUBJECT TO BANKRUPTCY COURT APPROVAL, AND WILL
> NOT BE CONSUMMATED UNLESS AND UNTIL THE BANKRUPTCY COURT
> PROVIDES SUCH AUTHORIZATION.[3]

First Lien Opt-In Notice, at 2 (highlighting added); *see also* Second Lien Opt-In Notice, at 2

(substantially similar).  And the disclosure documents provided to the noteholders were equally

clear:

The Offer (as defined below) will expire at 11:59 p.m., New York City time, on June 6, 2014, unless extended or earlier terminated by the Company (as defined below) in its sole discretion (the "*Expiration Date*"). Holders of EFIH Second Lien Notes (as defined below) must tender their EFIH Second Lien Notes on or prior to the Expiration Date in order to receive the Tender Consideration (as defined below). In order to receive the Total Consideration (as defined below), holders of EFIH Second Lien Notes must tender their EFIH Second Lien Notes on or prior to 5:00 p.m., New York City time, on May 23, 2014, unless extended at the sole discretion of the Company (the "*Early Participation Date*"). Tenders of EFIH Second Lien Notes may not be withdrawn, except in certain limited circumstances where withdrawal rights are required by law. The Offer is subject to, among other things, the approval of the Bankruptcy Court (as defined below), and the Company does not intend to permit the Offer to expire on or prior to the date the EFIH Second Lien Settlement (as defined below) is heard, and approved, by the Bankruptcy Court.

Second Lien Opt-In Notice, Ex. A, at cover page (highlighting added); *see also* First Lien Opt-In Notice, Ex. A, at cover page (substantially similar disclosure).

17.     On June 5 and 6, the Debtors will seek this Court's approval of its proposed makewhole settlements. Until the Court approves the settlements, however, the Debtors will not have "used" estate property or otherwise consummated these settlements. *See In re Texaco Inc.*, 81 B.R. 813 (Bankr. S.D.N.Y. 1988) (holding that entry into a postpetition agreement subject to court approval does not require preapproval under section 363(b) of the Bankruptcy Code). In fact, section 363(b) will not be implicated until the Court hears and approves the Settlement Motions.

18.     Besides the general allegation that the Debtors' process is "unprecedented," the only precedent cited in either Motion to support the premise that preapproval is necessary under section 363(b) of the Bankruptcy Code is a passing reference to *In re AMR Corp*, No. 11-15463 (SHL) (Bankr. S.D.N.Y. May 23, 2013). That case, however, is inapposite. The cited motion in *AMR* also sought approval of AMR's ability to *consummate* the purchase of securities and the settlement thereof (not what the Debtors are asking the Court for in this matter). *See Motion of Debtors for Order Pursuant to 11 U.S.C. §§ 105(a) and 363 and Fed. R. Bankr. P. 6004 (I) Authorizing Debtors to Purchase Prepetition Secured Notes and Enhanced Equipment Trust Certificates and (II) Granting Related Relief, In re AMR Corp.*, No. 11-15463 (SHL) (Bankr.

9

S.D.N.Y. May 23, 2013). Consummating a settlement in bankruptcy obviously requires preapproval by a bankruptcy court, and the Debtors filed the Settlement Motion on May 15, 2014, to seek that relief. Furthermore, *AMR* is distinguishable because the reason that AMR sought and obtained Bankruptcy Court approval was there was uncertainty around a pending appeal regarding the validity of certain makewhole claims, and the debtors were seeking to consummate a settlement that was not entirely consistent with the court's prior order. In any event, the fact that a debtor sought preapproval of a tender offer in a Bankruptcy Rule 9019 settlement motion in one case would not by itself mandate that course of action in all other cases.

**B.    The Objections of the First and Second Lien Trustee to the EFIH First and Second Lien Settlements are Premature and Unwarranted.**

19.    In the Motions, the First and Second Lien Trustees also assert premature and misplaced objections to the EFIH First and Second Lien Settlements themselves. As an initial matter, the settlements are not before the Court at the May 22 hearing, but, even if they were, the objections of the Trustees are not persuasive.

20.    For example, the Second Lien Trustee contends that the EFIH Second Lien Settlement fails to comply with the absolute priority rule under the principles set forth in *In re Iridium Operating LLC*. 478 F.3d 452 (2d Cir. 2007). But *Iridium* is not relevant to approval of the EFIH First or Second Lien Settlement. That Second Circuit case stands for the principle that junior stakeholders receiving cash payments to which they otherwise would not have been entitled under a plan may violate the absolute priority rule. *Id.* at 455. It is not binding (or, in this instance, persuasive) precedent. *See Jevic Holding Corp.*, No. BR 08-11006(BLS), 2014 WL 268613, at *3 (D. Del. Jan. 24, 2014) ("As discussed by the bankruptcy court, the settlement does not follow the absolute priority rule. This is not, however, a bar to the approval of the settlement as it is not a reorganization plan.").

21.    Even if *Iridium* were to be followed, the absolute priority rule is a protection for unsecured creditors—while, here, the Debtors are seeking to pay EFIH First and Second Lien Holders *in full*. Indeed, as this Court has held:

> There is no per se rule against paying pre-petition secured claims outside of a plan of reorganization. Indeed, such payments are routinely made in a number of different contexts. For example, post-petition refinancing of uneconomical secured debt through a DIP loan may be authorized by section 363(b) of the Bankruptcy Code as a use of estate property outside the ordinary course of business.

*In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 510-11 (Bankr. D. Del. 2010) (Sontchi, J.); *see also Law Debenture Trust Co. v. Calpine Corp. (In re Calpine Corp.)*, 356 B.R. 585, 597 (S.D.N.Y. 2007) (affirming order of bankruptcy court allowing use of DIP facility to repay prepetition secured debt under section 363(b)); *United States ex rel. Rural Electrification Admin. v. Wabash Valley Power Ass'n (In re Wabash Valley Power Ass'n)*, 167 B.R. 885, 889 (S.D. Ind. 1994) (affirming order of bankruptcy court granting debtor permission to refinance prepetition secured debt).

22.    Similarly, and contrary to the assertions of the Second Lien Trustee, section 1123(a)(4) of the Bankruptcy Code does not in any way preclude the proposed EFIH First and Second Lien Settlements. This is not a confirmation hearing. Section 1123(a)(4) of the Bankruptcy Code is not applicable to the proposed settlements. *See In re Dana Corp.*, 412 B.R. 53, 62 (S.D.N.Y. 2008) (finding the appropriate forum for the claimants' section 1123 arguments would be "appeal of the Confirmation Order . . . rather than [their] appeal of the Settlement Order before this Court"); *see also In re Journal Register Co.*, 407 B.R. 520, 533 (Bankr. S.D.N.Y. 2009) ("[T]he question under § 1123(a)(4) is whether the payment that creates the difference is provided 'under the Plan.'").

23.     The Debtors do not dispute that Fidelity's global settlement is on different terms to the makewhole settlements of other holders of EFIH First Lien Notes and Second Lien Notes. But Fidelity is not "similarly situated" to *any* other party in the Debtors' capital structure given its multiple cross-holdings of funded debt in various parts of the Debtors' capital structure. It is a given that Fidelity would settle on different terms. And each of the other parties to the Restructuring Support Agreement provided unique value—beyond their First and Second Lien claims—that made the Agreement possible. Moreover, certain of these parties, including Fidelity, are providing the Debtors with postpetition financing on favorable terms that will allow the Debtors to ultimately consummate their restructuring. This unique mix of rights and concessions was necessary to the Restructuring Support Agreement, absent which the Debtors could face lengthy, contentious, and costly chapter 11 cases. Regardless, even if section 1123(a)(4) did apply, it is black letter law that debtors are not required to enter into settlements on the same terms among all similarly situated creditors, both under Bankruptcy Rule 9019 or a chapter 11 plan of reorganization. *See In re Washington Mut., Inc.*, 442 B.R. 314, 355-56 (Bankr. D. Del. 2011) ("Providing different treatment to a creditor who agrees to settle instead of litigating is permitted by section 1123(a)(4)."); *In re Dow Corning Corp.*, 255 B.R. 445, 497-98 (E.D. Mich. 2000) (holding that a claimant who elects to settle instead of pursuing litigation and agrees to a less favorable treatment is in compliance with § 1123(a)(4)).

C.     **The Settlement Opt-Ins Are Not Solicitations Under Bankruptcy Rule 3017 or Bankruptcy Code Section 1125.**

24.     The Second Lien Trustee also suggests that the disclosure requirements of section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017 should be considered touchstones for disclosure and notice in the Settlement Opt-Ins (albeit while acknowledging that Rules are not "directly applicable"). (Second Lien Mot. ¶ 43). That body of law has no

relevance here because the Settlement Opt-Ins do not in any way constitute a solicitation of a plan of reorganization and the offering materials clearly state that fact.[4]

25.    Solicitation under section 1125 of the Bankruptcy Code "occur[s] only when a party in interest makes 'a specific request for an official vote either accepting or rejecting a plan of reorganization.'" *In re Dow Corning Corp.*, 227 B.R. 111, 118 (Bankr. E.D. Mich. 1998). The Third Circuit has held that "'solicitation' must be read narrowly. A broad reading of § 1125 can seriously inhibit free creditor negotiations . . . . We therefore reject any definition of solicitation which might cause creditors to limit their negotiations." *Century Glove, Inc. v. First Am. Bank*, 860 F.2d 94, 101-02 (3d Cir. 1988); *see also In re Indianapolis Downs, LLC*, 486 B.R. 286, 297 (Bankr. D. Del. 2013) ("[C]onsistent with the holding in *Century Glove*, courts must be wary of construing those disclosure and solicitation provisions in a way that chills or hamstrings the negotiation process that is at the heart of Chapter 11.").

26.    The Settlement Opt-Ins do not solicit votes for a plan of reorganization and clearly state that fact. The EFIH First and Second Lien Opt-Ins are simply claim settlement offers. The holders have a simple voluntary choice, as they would with any settlement offer from any chapter 11 debtor: they can either (1) accept the Debtors' offer to settle their claims; or (2) retain their rights to litigate with respect to such claims.

---

[4]    *See* Second Lien Opt-In Notice, Ex. A, at cover page ("**Nothing herein, or in any of the accompanying forms and letters, shall constitute or be deemed to constitute a solicitation by any party of votes to approve or reject a Chapter 11 plan of reorganization for any debtor (a "Chapter 11 Plan"). A solicitation with respect to votes to approve or reject a Chapter 11 Plan may only be commenced once a disclosure statement that complies with section 1125 of the Bankruptcy Code has been approved by the Bankruptcy Court.**") (emphasis in original); *see also* First Lien Opt-In Notice, Ex. A, at cover page (substantially similar disclosure).

II.     **The Settlement Opt-Ins Are Being Conducted in Accordance with Applicable Securities Laws.**

27.     The Debtors and their advisors have been careful to ensure that the Settlement Opt-Ins comply with applicable securities laws. Although the Motions urge that this Court review the Settlement Opt-Ins for violations of securities law, the Securities and Exchange Commission (the "SEC") itself does not require "preapproval" of disclosures in these circumstances. In general, only tender or exchange offers for registered equity and debt convertible into registered equity are subject to review and comment by the SEC. *See* SEC Division of Corporation Finance, Manual of Publicly Available Telephone Interpretations, at Q.1 (July 1997). Put simply, the movants are asking the Court to conduct a disclosure analysis that is neither conducted by the SEC nor required by securities law.

A.      **The Use of an Early Participation Premium (i.e., the 10 Business Day Consideration "Step Down") and Related Change in Consideration Is Permissible Under Applicable Securities Laws and is Common in Similar Capital Markets Transactions.**

28.     The Second Lien Trustee objects to the duration of the Settlement Opt-In Periods, especially the period during which EFIH Second Lien Holders may receive a premium for early participation in the tender offers, a concept commonly referred to as a "step down." This objection is without merit. *First*, the Settlement Opt-Ins are open for at least 20 business days, satisfying the requirement concerning the duration of tender offers under the securities laws. *See* Rule 14e-1(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 17 C.F.R. § 240.14e-1(a).[5] *Second*, early participation premiums are permissible so long as the offer remains open for at least 10 business days after the "step-down" period expires. *See* Exchange Act Rule 14e-1(b),

---

5    When counting the number of days in the period, under securities laws, the day the offer is initiated is included. Exchange Act Rule 14d-1(g)(3), 17 C.F.R. § 240.14d-1(g)(3).

17 C.F.R. § 240.14e-1(b) ("[N]o person who makes a tender offer shall . . . increase or decrease the . . . consideration offered . . . in a tender offer *unless such tender offer remains open for at least ten business days* from the date that notice of such increase or decrease is first published or sent or given to security holders." (emphasis added)).   Accordingly, the Settlement Opt-Ins extend for 10 business days after the disclosed expiration of the "step-down" period.

29.    Early participation premiums are commonplace in debt tender and exchange offers, both generally and with respect to the Debtors.   According to one commentator, the practice "is so uncontroversial (or perhaps simply pervasive)" that its legality has rarely if ever been challenged.   Charles T. Haag & Zachary A. Keller, *Honored in the Breach: Issues in the Regulation of Tender Offers for Debt Securities*, 9 N.Y.U. J. L. & Bus. 199, 246 (2012).   In fact, the Debtors have included early participation premiums in past offers to noteholders—including some of the existing EFIH First and Second Lien Holders—and have never *once* received a complaint or indication that such actions were impermissible under the securities laws or that they cause an insurmountable administrative burden for noteholders.   Specifically, since 2009, the Debtors have undertaken four exchange offers with a 20 or 21 business day tender period and an early participation premium made available in the first 10 business days.   Indeed, the SEC has previously reviewed and approved exchange offers by the Debtors that included 10-business-day step downs.   Moreover, the following chart lists several examples of step-down tender offers conducted by both the Debtors and other companies:

| Closing Date | Issuer | Amount | Early Participation Premium per $1,000 of Principal |
|---|---|---|---|
| May 2014[a] | Chesapeake Energy Corp. | $1,230,000,000 | $30 |
| March 2014[a] | Kellogg Company | $700,000,000 | $30 |
| February 2014[a] | NRG Energy, Inc. | $400,000,000 | $30 |
| September 2013[a] | BMC Software, Inc. | $800,000,000 | $25 |

| Closing Date | Issuer | Amount | Early Participation Premium per $1,000 of Principal |
|---|---|---|---|
| February 2013[a] | Staples Inc. | $750,000,000 | $30 |
| **January 2013[b]** | **EFH Corp./EFIH** | **$1,317,000,000** | **$50** |
| | | **$124,400,000** | **$50** |
| August 2012[c] | Ameren Illinois Company | Approx. $400,000,000 | $30 |
| June 2012[a] | Zayo Group, LLC | $350,000,000 | $30 |
| April 2012[c] | CenturyLink, Inc. | $575,000,000 | $30 |
| | | $308,000,000 | $30 |
| March 2012[a] | Dominion Resources, Inc. | $150,000,000 | $30 |
| February 2012[c] | Charter Communications, Inc. | $334,000,000 | $25 |
| July 2011[c] | CCS Corporation | $312,000,000 | $30 |
| **August 2010[b]** | **EFH Corp./EFIH** | **$4,490,000,000** | **$50** |
| **November 2009[b]** | **EFH Corp./EFIH** | **$12,150,000,000** | **$30** |
| April 2009[c] | Colonial Properties Trust | $250,000,000 | $30 |
| April 2009[c] | Ventas, Inc. | $310,000,000 | $30 |
| March 2009[c] | Cablevision Systems Corporation | $952,490,000 | $5-$27.63 |
| February 2009[c] | Isle of Capri Casinos, Inc. | $140,000,000 | $30 |
| November 2008[c] | Triad Financial Corporation | $90,000,000 | $50 |
| September 2008[c] | Broadridge Financial Solutions, Inc. | $125,000,000 | $30 |
| September 2008[c] | River Rocket Entertainment Authority | $150,000,000 | $30 |
| July 2008[c] | Pentair, Inc. | $250,000,000 | $30 |
| June 2008[c] | Visteon Corporation | $344,000,000 | $40 |
| May 2008[c] | Pulte Homes, Inc. | $312,863,000 | $30 |
| April 2008[c] | The McClatchy Company | $250,000,000 | $25 |
| March 2008[c] | Hillenbrand Industries, Inc. | $250,000,000 | $20 |

[a] Source: Press releases listed in **Schedule I** hereto.
[b] Source: Horton Declaration; *see also* press releases listed in **Schedule I** hereto.
[c] Source: Haag & Keller, *supra*, at Appendix E.

30.    Thus, the use of the early participation premium (*i.e.*, the 10 business day step down) incorporated in the Settlement Opt-Ins fully complies with all applicable securities laws and is common practice in similar capital markets transactions. *See also David v. Human*

*Genome Servs., Inc.*, 2012 WL 3061029, at *4 (D. Del. July 26, 2012) (noting that "courts are loathe to interfere in the dynamics of market transactions").

31.    The Second Lien Trustee also points to various other purported timing issues with the Settlement Opt-Ins.    To that end, at various points throughout its Motion to Compel, the Second Lien Trustee also suggests that it is somehow improper that the Settlement Opt-Ins do not provide withdrawal rights to tendering holders.    In equity tender offers, the securities laws do require that offerors provide certain withdrawal rights to tendering shareholders.    Exchange Act § 14(d)(5), 15 U.S.C. § 78n(d)(5).    But those withdrawal rights do not apply to nonconvertible debt tenders.    Exchange Act Rule 14d-1(a), 17 C.F.R. § 240.14d-1(a); *see also* SEC Division of Corporation Finance, Manual of Publicly Available Telephone Interpretations, at Q.13 (July 1997).    And, although there is nothing in applicable securities laws that limits the duration of a nonconvertible debt tender offer, the Debtors in any event plan to consummate the settlements as scheduled to the extent consistent with the objective terms of the Settlement Opt-Ins.    Similarly, the Second Lien Trustee emphasizes the logistical difficulties associated with receiving and submitting tender materials in a 10-business-day window.    This complaint is not consistent, however, with the numerous successful step-down tenders readily observable in the market.

**B.        The Settlement Opt-Ins Satisfy All Disclosure Requirements under the Securities Laws.**

**i.        The Securities Laws Do Not Require the Disclosure of All Facts, But Only Material Facts.**

32.    While the Second Lien Trustee contests the adequacy of the Debtors' disclosure, the settlement papers, in truth, satisfy the securities law requirement of disclosing all material facts.    Specifically, the securities laws provide that with respect to disclosure to investors "[i]t shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the

17

circumstances under which they are made, not misleading . . . in connection with any tender offer." Exchange Act § 14(e), 15 U.S.C. § 78n(e). The Exchange Act Rules mirror this language in their general antifraud provision. *See* Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5. The standard for materiality under the securities laws is whether "there is a substantial likelihood that a reasonable [investor] would consider [the omitted fact] important" or, put differently, whether there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) (construing Exchange Act § 14(a), 15 U.S.C. § 78n(a)). As set forth below, none of the disclosures or omissions about which the Second Lien Trustee complains comes anywhere close to meeting this standard.

        ii.      **Fidelity's Recoveries Under the Restructuring Support Agreement Are Adequately Disclosed in the EFIH Second Lien Opt-In.**

33. Notwithstanding the Debtors' lengthy disclosures and the high legal bar for contesting disclosure under the securities laws, the Second Lien Trustee asserts, among other things, that the Debtors have not adequately disclosed Fidelity's recoveries under the Restructuring Support Agreement. Specifically, the Second Lien Trustee claims that Fidelity is receiving extra consideration on account of its EFIH Second Lien makewhole claims in excess of $135 million. This calculation is incorrect, evidencing either a misunderstanding of the Restructuring Support Agreement or an attempt to muddy the waters. The tender offer materials are clear regarding the recoveries to Fidelity—the publicly available Restructuring Support Agreement itself is incorporated by reference in those documents—and Fidelity's rights and obligations across the capital structure are clearly disclosed in the offering materials and the Restructuring Support Agreement.

34.    Importantly, it is not useful to parse Fidelity's settlement position-by-position. Fidelity is a significant creditor with numerous positions in the Debtors' capital structure.  As with any settlement, both sides made various concessions that together constitute a fair compromise.  As a result, the Debtors' disclosures highlight each component of Fidelity's recovery on account of its positions.  That Fidelity is recovering amounts on account of its numerous positions does not make the disclosure inaccurate.

35.    For example, it is simply wrong to say, as the Second Lien Trustee does, that EFIH's release of its claims against EFH Corp.—which will occur *under the proposed plan or reorganization*—is in direct exchange for Fidelity's participation in the EFIH Second Lien Settlement.  In fact, the EFIH release is actually conditioned on approval of the Oncor TSA Amendment.  Put simply, in exchange for the rerouting of cash flows from EFH Corp. to EFIH as part of Oncor TSA Amendment, EFIH would agree, under the plan, to release its claims against EFH as well as pay EFIH $55 million.[6]  This settlement between EFH and EFIH reduces litigation risk for the benefit of all creditors at *both* estates, including but not limited to Fidelity.  Regardless, with respect to disclosure, the Restructuring Support Agreement is clear about the release of claims by EFIH against EFH Corp. pursuant to the proposed plan and so are the Debtors' proposed agreement to amend the Oncor TSA.  All of these facts are clearly disclosed in the offering materials and the Restructuring Support Agreement.

36.    Similarly, the Second Lien Trustee makes much of the fact that the parties backstopping the EFIH Second Lien DIP Facility have the right to purchase Fidelity's EFH

---

[6]    "Moreover, the Second Lien Trustee's reliance on the competitive tax sharing agreement (the "Competitive TSA") to discount the importance of the Oncor TSA Amendment to EFIH is also unfounded.  The Debtors have not sought authority to continue performing under the Competitive TSA except with respect to state law margin tax claims.  On the other hand, the Oncor TSA Amendment will result in real dollars going to EFIH in exchange for the ultimate release of claims of EFIH against EFH Corp.  It is absurd for an EFIH creditor—particularly one that is going to be paid in full—to take any exception to value coming to its estate during the case."

Corp. unsecured claims at 37.15% of par plus accrued interest. But the "call right" is *not* a benefit to Fidelity and again has nothing to do with whether other EFIH Second Lien Holders should choose to settle their makewhole claims. It is a straightforward economic principle that a call option is a valuable right of the holder, not the party granting the option. This was thus a *concession* by and a *cost* to Fidelity. *See In re Enron Corp.*, 341 B.R. 141, 168 (Bankr. S.D.N.Y. 2006) (indicating that a call option grants its holder the right to purchase at a certain price and may be sold on the open market); *see also John C. Hull, Options, Futures, and Other Derivatives* 7 (2d ed. 2009) ("It should be emphasized that an option gives the holder the right to do something. . . . [T]here is a cost to acquiring an option."). The "call right" is an intercreditor accommodation, not a right or obligation belonging to the estate.

37.    As for the other consideration that Fidelity is receiving under the Restructuring Support Agreement—(1) the "commitment fee" for any funding of the EFIH First Lien DIP Financing; (2) the $11.25 million fee for funding the EFIH Second Lien DIP Facility; and (3) the "most favored nations" clause—the Second Lien Trustee does not object to the disclosure except to say that the offering materials failed to name Fidelity as the recipient of the recoveries. But the Second Lien Trustee ignores that the Restructuring Support Agreement, which is explicitly incorporated by reference into the offering materials, discloses Fidelity's identity. In any event, Fidelity's identity should be irrelevant to the considerations of a party deciding whether to settle its own makewhole claim. It is standard practice not to identify specific holders by name in disclosure documents. Indeed, securities law guidance in some cases expressly provides as much. *See* Exchange Act Schedule 13D, Item 3, 17 C.F.R. § 240.13D-101 (providing that the name of a financing source is not required to be provided under certain circumstances); Instruction to Item 1007(d), 64 F.R. 61408, 61446, Nov. 10, 1999 (same).

38.    Even if such recoveries were solely on account of Fidelity's holdings of EFIH First or Second Lien Notes, which they are not, the Debtors are not required under securities laws to make the same offer available to each noteholder. It is true that, in equity tenders, the so-called "best-price rule" does require that all "security holders" receive the same consideration in a tender offer. Exchange Act Rule 14d-10(a)(2), 17 C.F.R. § 240.14d-10(a)(2). But that rule expressly does *not* apply to tender offers for debt securities. Exchange Act Rule 14d-1(a), 17 C.F.R. § 240.14d-1(a) (providing that Regulation 14D, which includes Exchange Act Rule 14d-10 and related provisions, only applies to any tender offer that is subject to section 14(d)(1) of the Exchange Act, which applies only to equity securities). In terms of disclosure, the Debtors expressly provided, on the cover of their offer materials, that certain holders were receiving greater consideration than others. Second Lien Opt-In Notice, Ex. A, at cover page ("Certain RSA EFIH Second Lien Note Parties will receive other consideration under the terms of the Restructuring Support Agreement that will not be available to holders that choose to participate in this Offer.").

39.    In addition, the Debtors dedicated an entire "risk factor" to the fact that certain settling parties under the Restructuring Support Agreement would be entitled to other consideration not available to Holders that choose to participate in the Settlement Opt-Ins. *See* First Lien Opt-In Notice, Ex. A, at 32-33; Second Lien Opt-In Notice, Ex. A, at 18-19.[7]

---

[7]    For example, the offering materials for the Second Lien Opt-In provided:

(Continued...)

Thus, the Debtors have more than adequately disclosed the both the consideration available in connection with the Settlement Opt-Ins and the fact that other settling parties would receive other consideration under the terms of the Restructuring Support Agreement that would not be available to holders that choose to participate in the Settlement Opt-Ins.   Moreover, while Fidelity was not specifically called out by name in the offering materials, all of Fidelity's recoveries under the Restructuring Support Agreement are public record and were incorporated by reference into the offering materials.

### iii.    The Remaining "Disclosure" Issues Raised by the Seconds Are Already Disclosed, Immaterial, or Incorrect.

40.    The Second Lien Trustee makes a number of further disclosure-related allegations.  *See* Dkt. 441 at 17-19.  They are all inapposite.  The Second Lien Trustee contends that the Debtors failed to disclose properly their calculation of the makewhole claims, especially as to the "additional interest" payable on the EFIH Second Lien Notes in connection with the registration rights agreement.  The Debtors are clear about the terms of the offers in the offering materials, which state the offered consideration in simple dollars and cents.  The Debtors are not obligated to provide mathematical calculations underpinning their offer (although they have with respect to the EFIH Second Lien Holders, who expressed no objection).  Moreover, the Debtors clearly disclose that they are not including the "additional interest" due to noteholders who own EFIH Second Lien Notes that have not been registered with the SEC in their calculation of 50%

---

Risks Related to Participating in the Offer

*The RSA EFIH Second Lien Note Parties may receive a different amount of consideration than the Holders who participate in the Offer and certain RSA EFIH Second Lien Note Parties will receive other consideration under the terms of the Restructuring Support Agreement.  Moreover, the RSA EFIH Second Lien Note Parties may be entitled to receive consideration and/or settlement amounts for other securities they hold in our and our affiliates' capital structure on account of such securities, including the EFIH First Lien Notes and the EFH Corp. Unsecured Notes.*

of the makewhole premium. It is perfectly appropriate for Debtors to state their assumptions in performing a complex makewhole calculation when they clearly disclose the total consideration to be paid to participating holders.

41.    The Second Lien Trustee also alleges that the Debtors have failed to disclose adequately the risk of delay in consummation—a risk that the Second Lien Trustee is *itself* creating. Irony aside, the offering materials and bankruptcy notices for the Settlement Opt-Ins are clear regarding the conditionality of the settlements, as set forth above.

42.    The Second Lien Trustee also raised a disclosure issue regarding the Debtors' Collateral Trust Agreement, dated November 16, 2009 (the "CTA"), and the Debtors' supposed inability to consummate the EFIH Second Lien Settlement while the EFIH First Liens Holders' makewhole claims are outstanding. *First*, both the EFIH First and Second Liens Notes are being paid in full, and any unproven, contingent claims for a makewhole premium provide no basis to recover under the CTA. *Second*, even assuming the first lien holdouts have valid claims, this reading of the CTA conflates the concepts of lien-subordination and payment-subordination. The CTA is a lien-subordination document, meaning it only provides for claw backs of payments made to EFIH Second Lien Holders using the proceeds of the "Collateral" securing the EFIH First Lien Notes and Second Lien Notes. *See* CTA § 2.3(b); § 2.4(c)-(d); § 3.4. The EFIH Second Lien Notes are being repaid upon acceleration from the proceeds of two debtor-in-possession financings, which are not proceeds of "Collateral" under the CTA such that any EFIH First Lien Holders would be able to claw back such amounts from the EFIH Second Lien Holders. *See* CTA § 2.4(c)-(d). There is thus no need to add these intercreditor allegations to the disclosure.

43.     Lastly, the Second Lien Trustee argues that the fact that important documents like the EFIH Second Lien DIP Motion, the Settlement Motion, and the motion to assume the Restructuring Support Agreement had not yet been filed when the Settlement Opt-Ins were initiated somehow creates a disclosure problem. But the filing of those motions does not require supplemental disclosures because they do not set forth additional material facts that are necessary to evaluate the Debtors' offers. Instead, all material disclosures have already been made in the offering materials. The Debtors' motions are legal pleadings to support bankruptcy court approval; they do not disclose additional material facts regarding the exchange and tender offers.[8] In sum, the disclosure deficiencies about which the Second Lien Trustee complains are nonexistent.

### C.     The EFIH First and Second Lien Settlements Are Not "Illusory Tenders."

44.     The Second Lien Trustee also argues that the Debtors' ability to terminate the Settlement Opt-Ins in their "[s]ole discretion" constitutes an impermissible "illusory offer" under the securities laws. As an initial matter, the Debtors have every intention of consummating the Settlement Opt-Ins to the extent the objective conditions in the offer materials are met, including, of course, that the Court approve the EFIH First and Second Lien Settlements. The Debtors have not undertaken the substantial efforts necessary to give all qualified holders of EFIH First Lien Notes and Second Lien Notes the opportunity to participate in the settlements only to rescind the Settlement Opt-Ins for a frivolous reason. To the contrary, the Debtors hope to achieve the maximum possible level of participation in the settlements and will make every effort close the Settlement Opt-Ins as scheduled subject to Court approval.

---

[8]   Furthermore, these documents are now filed and, therefore, to the extent the parties consider them relevant, the holders will have had a chance to review them.

45.    Moreover, the offers are not "illusory" because the Debtors' ability to terminate the offers in their "sole discretion" is qualified by the words "subject to applicable law," which limits the Debtors' discretion.    As a result, to the extent there is a prohibition on an issuer's ability to terminate an offer in its "sole discretion" under the securities laws,[9] any such limitation will restrict the Debtors' discretion to terminate.

46.    The Debtors' approach is ubiquitous in the marketplace.    For example, on the same day that the Debtors commenced the EFIH First Lien Opt-In, another large and presumably well-advised company commenced a roughly $1 billion exchange offer with a virtually identical "sole discretion" termination provision.[10]    Other companies have taken similar approaches.[11] Thus, the proposition that the Settlement Opt-Ins are "illusory" and violate the securities laws is unfounded and belied by the approach of other, sophisticated financial players in the broader market.

---

[9]    There is no statute or rule that prohibits termination of tender offers in the issuer's sole discretion, just a general prohibition on manipulative and deceptive practices in connection with tenders and exchanges.  Exchange Act § 14(e), 15 U.S.C. § 78n(e).  The SEC, however, has stated its view, in the form of an "SEC Interpretation," that tenders and exchanges terminable in the offerors' "sole" discretion contravene this prohibition.  Securities Exchange Act Release No. 34-43069; *see, e.g., The Strategic Hotels & Resorts, Inc.*, SEC Comment Letter (May 19, 2010).  As a general rule, agency interpretations of this type do not have the force of law and serve only as persuasive authority.  *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000).

[10]    *Caesars Entertainment Announces Tender Offers for Caesars Entertainment Operating Company, Inc.'s Debt Securities*, Press Release (May 6, 2014) ("[T]he Issuer has the right, in its sole discretion, to terminate any of the tender offers at any time, subject to applicable law.")  [available at http://investor.caesars.com/releasedetail.cfm?ReleaseID=845868].

[11]    *See, e.g., CFC Announces Refinancing of Debt through Exchange Offer*, Press Release (April 21, 2014) ("CFC expressly reserves the right, at its sole discretion, subject to applicable law, to terminate the Exchange Offer at any time prior to the Expiration Date.") [available at https://www.nrucfc.coop/content/cfc/news_analysis/news/press_release_04212014.html]; *Fibria Overseas Finance Ltd. Launches Tender Offer For Any And All Of Its Outstanding 6.750% Senior Notes Due 2021 And Related Consent Solicitation*, Press Release (May 1, 2014) ("The Offeror has the right, in its sole discretion, to amend or terminate the Tender Offer or the Consent Solicitation at any time.") [available at http://www.cnbc.com/id/101632626]; *Berry Plastics Group, Inc. Announces Tender Offer and Consent Solicitation for Any and All Outstanding 9½ Percent Second Priority Senior Secured Notes Due 2018 of Berry Plastics Corporation*, Press Release (April 28, 2014) ("[T]he Issuer has the right, in its sole discretion, to terminate the tender offer and/or the consent solicitation at any time, subject to applicable law.") [available at http://ir.berryplastics.com/phoenix.zhtml?c=192781&p=irol-news Article_print&ID=1923215&highlight=].

WHEREFORE, the Debtors respectfully request that the Court deny the Motions and grant such other relief as it deems necessary and proper under the circumstances.

Dated: May 20, 2014
Wilmington, Delaware

*/s/ Jason M. Madron*

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 651-7700
Facsimile:    (302) 651-7701
Email:    collins@rlf.com
    defranceschi@rlf.com
    madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
Richard M. Cieri (admitted *pro hac vice*)
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    richard.cieri@kirkland.com
    edward.sassower@kirkland.com
    stephen.hessler@kirkland.com
    brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    james.sprayregen@kirkland.com
    chad.husnick@kirkland.com
    steven.serajeddini@kirkland.com

Proposed Co-Counsel to the Debtors and Debtors in Possession

## SCHEDULE I

### Step Down Press Releases

*Chesapeake Energy Corporation Announces Cash Tender Offer for Senior Notes*, Press Release (April 10, 2014) [available at http://www.chk.com/News/Articles/Pages/1917538.aspx]

*Kellogg Company Announces Debt Tender Offer*, Press Release (February 24, 2014) [available at http://newsroom.kelloggcompany.com/2014-02-24-Kellogg-Company-Announces-Debt-Tender-Offer]

*NRG Energy, Inc. Announces Cash Tender Offer for up to $400 million in Aggregate Principal Amount of Its Outstanding 8.50% Senior Notes Due 2019 and 7.625% Senior Notes Due 2019*, Press Release (January 10, 2014) [available at http://phx.corporate-ir.net/phoenix.zhtml?c=121544&p=irol-newsArticle_Print&ID=1889877&highlight=]

*BMC Software Announces Cash Tender Offers and Consent Solicitations for its 4.25% Notes Due 2022 and 4.50% Notes Due 2022*, Press Release (July 18, 2013) [available at http://www.bmc.com/news/press-releases/2013/BMC-software-announces-cash-tender-offers-and-consent-solicitations-for-its-425-notes-due-2022-and-450-notes-due-2022.html]

*Staples, Inc. Announces Tender Offer for up to $750 Million of Its 9.750% Senior Notes due 2014*, Press Release (January 7, 2013) [available at http://investor.staples.com/phoenix.zhtml?c=96244&p=irol-newsArticle&ID=1771693&highlight=]

*Energy Future Holdings Corp., Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. Announce Private Exchange Offers for Debt Securities and Related Consent Solicitations*, Press Release (December 21, 2012) [available at http://www.energyfutureholdings.com/internal/newsdb/uploaded_images/EFH-Press-Release-12212012.pdf]

*Zayo Announces Cash Tender Offer and Consent Solicitation*, Press Release (June 4, 2012) [available at http://www.zayo.com/news/zayo-announces-cash-tender-offer-and-consent-solicitation]

*Dominion Announces Debt Tender Offer*, Press Release (February 27, 2012) [available at http://dom.mediaroom.com/index.php?s=26677&item=122645&printable]

*Energy Future Holdings Corp. and Energy Future Intermediate Holding Company LLC Announce Exchange Offers for 11.250%/12.000% Senior Toggle Notes due 2017 and 10.875% Senior Notes due 2017 of EFH Corp. and Related Consent Solicitation*, Press Release (July 16, 2013) [available at http://www.energyfutureholdings.com/news/newsrel/detail.aspx?prid=1344 ]

*Energy Future Holdings Corp. and Energy Future Intermediate Holding Company LLC Announce Exchange Offers for Debt Securities of Energy Future Holdings Corp. and Texas Competitive Electric Holdings Company LLC and Related Consent Solicitations*, Press Release (October 5, 2009) [available at http://www.energyfutureholdings.com/pdf/NautilusLaunchFINAL.pdf]