## Exhibit A

**Supplemental Ying Declaration**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | Re: Docket Nos. 74, 472 |
| | ) | |

## SUPPLEMENTAL DECLARATION OF DAVID YING, SENIOR MANAGING DIRECTOR OF EVERCORE GROUP L.L.C., IN SUPPORT OF (1) THE EFIH FIRST LIEN DIP MOTION AND (2) THE EFIH SETTLEMENT MOTION

I, David Ying, declare as follows:

1.     I am a Senior Managing Director and the Head of the Restructuring and Debt Advisory Group at Evercore Group L.L.C. ("Evercore"), a financial advisory and investment banking firm with offices around the world and financial advisor and investment banker to the above-captioned debtors and debtors in possession (the "Debtors"). I submit this declaration ("Declaration") in support of the *Motion of Energy Future Intermediate Holding Company LLC and EFIH Finance, Inc., for Entry of (I) An Interim Order (A) Approving Certain Fees Related to Postpetition Financing and Granting Such Fees Administrative Expense Priority and (B) Scheduling a Final Hearing; and (II) a Final Order (A) Approving Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Authorizing the Use of Cash Collateral, (D) Authorizing the EFIH First Lien DIP Refinancing, (E) Authorizing Issuance of Roll-Up Debt to the Extent Authorized by the Settlement Motion, (F) Determining the*

---

[1]     The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which the debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

*Value of Secured Claims, and (G) Modifying the Automatic Stay* (the "EFIH First Lien DIP

Motion"), and, specifically, in support of the final relief sought in part (II) of that motion.[2]  In

addition, this declaration addresses the portions of the settlement that I discussed in my earlier

submission to the Court that relate specifically to the settlement of the alleged EFIH First Lien

makewhole claims.

2.    Except where specifically noted, the statements in this Declaration are based on

my personal knowledge; information supplied or verified by the Evercore financial team that I

supervise or the EFIH Debtors' personnel and third-party advisors; my review of relevant

documents; or my opinion based upon my experience and knowledge of the EFIH Debtors'

operations and financial condition.  If I were called upon to testify, I could and would testify

competently to the facts set forth herein.  I am authorized to submit this Declaration on behalf of

the EFIH Debtors.

**A.    Qualifications**

3.    Evercore is one of the world's leading independent investment banking groups,

with more than 20 offices in 8 countries, including an office located at 55 East 52nd Street, New

York, NY 10055.  Evercore has expertise in domestic and cross border restructurings, mergers

and acquisitions, debt and equity capital markets transactions, and other financial advisory

services.  Evercore has served as an experienced bankruptcy and restructuring advisor to debtors,

bondholders, creditors' committees, single creditor classes and secured creditors, shareholders,

and boards of directors in a variety of industries.  Evercore is a member of the Financial Industry

Regulatory Authority and the Securities Investor Protection Corporation.

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the EFIH First Lien
DIP Motion.

4.      I joined Evercore in 2005 and am a co-founder and head of the firm's Restructuring and Debt Advisory Group.  I have over 30 years of experience in restructuring advisory, debt and equity financings, and private equity investing.  Prior to joining Evercore, I held partner-level positions at Miller Buckfire Ying & Co, JLL Partners, Donaldson, Lufkin & Jenrette, Smith Barney, and Drexel Burnham Lambert.  I have a B.S. from the Sloan School of Management at the Massachusetts Institute of Technology (1976) and an M.B.A. in Finance from the Wharton School at the University of Pennsylvania (1978).

5.      As a Senior Managing Director at Evercore, I specialize in advising both debtors and creditors in financial restructurings and distressed mergers and acquisitions and raising debt and equity capital in both out-of-court and in bankruptcy proceedings.  Moreover, I have advised numerous public and private corporations in complex restructurings, and have advised distressed corporations in connection with obtaining postpetition financing (including DIP financing and confirmation financing), helped them to find sources of financing, and negotiated, on their behalf, the terms of such financing.

**B.      Summary**

6.      I believe that the EFIH First Lien DIP Facility is in the best interests of the EFIH Debtors' estates.  The EFIH unlevered cash flows are insufficient to service the existing tranches of EFIH prepetition secured debt, which each bear above-market interest rates.  Those cash flows consist primarily of dividends from Oncor and tax payments from Oncor that are paid to EFH, a substantial portion of which would be paid to EFIH on a prepetition basis under the Competitive TSA.  Prior to filing, EFIH was forecasted to run out of liquidity in the second quarter of 2014, assuming that it continued to pay the above-market interest rates on its existing, prepetition debt. Therefore, it is critical that the EFIH Debtors repay their existing secured debt with the proceeds

from lower interest rate debt currently available in the market and thereby help stabilize their cash position during the bankruptcy.

7.      The EFIH First Lien DIP Facility will first be used to repay two series of first lien notes: (a) approximately $503 million in principal amount of 6.875% notes due August 15, 2017 ("EFIH First Lien 2017 Notes"); and (b) approximately $3.482 billion of 10.00% notes due December 1, 2020 ("EFIH First Lien 2020 Notes," and together with the EFIH First Lien 2017 Notes, the "EFIH First Lien Notes").  The replacement financing has an indicated interest rate of LIBOR plus 325 bps with a 1% LIBOR floor (*i.e.*, presently 4.25%) interest rate.  This will allow the Debtors to repay the high-interest EFIH First Lien Notes at much lower costs, resulting in substantial savings to the Debtors of approximately $14 million ***per month*** or $173 million ***per year*** during the course of these chapter 11 cases.

8.      In addition, I believe that the fees related to the First Lien DIP Facility—and their treatment as an administrative expense priority—are reasonable under the circumstances and integral to securing the support of critical parties to the restructuring and thus maximizing the value of the Debtors' estates.

9.      I also believe that the settlement of the alleged EFIH First Lien makewhole claims is in the best interests of the Debtors and their estates.  The settlement is at a meaningful premium to the First Lien noteholders' pre-petition claims, voluntary on the part of the EFIH First Noteholders, and presents an opportunity to avoid the uncertainty of litigation.

10.     Finally, I believe that the Backstop Fees (discussed below) that may be payable to PIMCO and WAMCO are reasonable under the circumstances, and integral to securing the support of critical parties to the restructuring and thus maximizing the value of the Debtors' estates.

**C.      The EFIH First Lien DIP Facility Will Reduce Interest Expense And Will Provide The EFIH Debtors With The Necessary Liquidity To Successfully Reorganize.**

11.      The EFIH First Lien DIP Facility (in a principal amount of $5.4 billion) will be used to (a) repay Settling Prepetition EFIH First Lien Creditors with EFIH First Lien DIP loans; (b) repay the EFIH First Lien Notes held by non-settling Prepetition EFIH First Lien Creditors; (c) satisfy a portion of the EFIH Debtors' obligations under the EFIH Second Lien Repayment and EFIH Second Lien Settlement; and (d) satisfy restructuring expenses and other costs.

12.      The EFIH Debtors currently have $3.985 billion in outstanding EFIH First Lien Notes.  The First Lien DIP Facility will pay cash interest at a favorable interest rate of LIBOR plus 325 with a 1% LIBOR floor (i.e., presently 4.25%)—less than the interest rates on the EFIH First Lien Notes that the First Lien DIP Facility will replace—resulting in interest savings of approximately $14 million per month or $173 million per year during the course of these chapter 11 cases.  Any delay in completing these repayments reduces recovery value to EFH and EFIH unsecured creditors.

13.      The EFIH First Lien DIP Facility therefore locks in financing at lower interest rates that may not otherwise be available to the EFIH Debtors at a later date, and also enhances the EFIH Debtors' liquidity, so that it can meet all of its cash interest payment obligations during the bankruptcy.

14.      The EFIH First Lien DIP Facility also allows the EFIH Debtors to fund settlement of the potential makewhole claims of the Settling Prepetition EFIH First Lien Creditors at favorable terms to the Debtors—if that settlement is approved by the Court.  Pursuant to the EFIH First Lien Settlement, Settling Prepetition EFIH First Lien Creditors will receive approximately $105 of claims (inclusive of applicable fees) under the EFIH First Lien DIP Facility (the "EFIH First Lien DIP Roll-Up Claims") in exchange for every $100 in principal

amount of EFIH First Lien Notes tendered into the settlement by the early tender date and 101% of accrued but unpaid interest.

15.    Furthermore, as set forth in my declarations in support of the EFIH Second Lien DIP Motion (Docket No. 478) and EFIH Settlement Motion (Docket No. 474), the EFIH First Lien DIP Facility, in conjunction with proceeds from the EFIH Second Lien DIP Facility, will fund settlement of the potential makewhole claims of the Settling Prepetition EFIH Second Lien Creditors at favorable terms to the Debtors, in conjunction with the EFIH Second Lien Repayment and EFIH Second Lien Settlement—if that settlement is approved by the Court.

**D.    The EFIH First Lien DIP Facility Is The Best Available Financing Under The Circumstances.**

16.    I believe that the EFIH First Lien DIP Facility is the best source of financing to effectuate the EFIH First Lien Repayments and establish a feasible and sustainable capital structure for EFIH at confirmation at this time.

17.    The EFIH Debtors' decision to proceed with the EFIH First Lien DIP Facility comes after a thorough search for the best available financing alternatives.  It is the product of extensive, virtually non-stop, good faith negotiations that spanned the first four months of 2014 between interested parties.  Along with my colleagues at Evercore and the EFIH Debtors' personnel, we solicited and evaluated the terms of available EFIH First Lien DIP Facilities.

18.    In January 2014, the EFIH Debtors and Evercore initiated a request for proposals (the "RFP") with respect to the EFIH First Lien DIP Facility.  During the initial stage of the RFP process, the EFIH Debtors approached seven large financial institutions with active involvement in the debtor-in-possession and syndicated finance markets.  The EFIH Debtors explained their goals and potential DIP financing structures to the participating banks, and invited those banks to submit term sheets that reflected pricing and structuring possibilities.  From February 3 through

February 7, the EFIH Debtors and Evercore hosted calls to discuss the RFP with each of the participating banks.

19.     Between February 7 and 11, six of the seven participating banks submitted written proposals to the EFIH Debtors.  The proposals varied significantly with respect to, among other things, key economic terms, the size of the DIP facility, whether there would be "last in/first out" participants or other junior components, and whether and on what terms the EFIH Debtors would be permitted to obtain additional junior financing.  The EFIH Debtors and their advisors evaluated the proposals and, in certain instances, posed follow-up questions to the participating banks in advance of in-person meetings on February 10 and 11.  About a week after those in-person meetings, the EFIH Debtors submitted a revised RFP to the six participating banks that reflected the EFIH Debtors' preferred structure for the EFIH First Lien DIP Facility.  The EFIH Debtors continued their discussions with the participating banks on February 19 and 20 and distributed a written term sheet to the participating banks on February 21.

20.     From February 26 through March 2, the EFIH Debtors selected lead bank roles and invited all of the participating banks to participate in the EFIH First Lien DIP Facility (subject to final negotiations).  On March 4, the EFIH Debtors distributed a draft commitment letter and fee letter to lead banks.  Throughout March and April, the EFIH Debtors continued negotiations with the lead banks, focusing on a variety of issues, including fee structures and structuring the EFIH First Lien DIP Facility to provide for the EFIH First Lien Settlement and EFIH Second Lien Settlement, and drafted definitive documents.  Finally, on April 28, 2014, the EFIH Debtors and arranging banks executed commitment papers relating to the EFIH First Lien DIP Facility.

**E.    The Terms Of The EFIH First Lien DIP Facility, Taken As A Whole, Reflect The Most Favorable Terms Available.**

21.    Based on extensive negotiations over the last four months and my experience, I believe that the interest rates, fees, terms, and conditions of the EFIH First Lien DIP Facility, taken as a whole, reflect the most favorable terms available in the market and are consistent with the terms of first lien DIP financing approved in other large chapter 11 cases.

22.    In particular, the fee structure from the banks was heavily negotiated to maximize flexibility for the amount of committed financing, while minimizing fees.  Prior to the Petition Date, EFIH needed to arrange committed DIP financing for its maximum funding requirements if no additional holders of EFIH First Lien Notes participated in the EFIH First Lien Settlement after the Petition Date.  However, EFIH also needed to minimize the cost of committed financing for lower funding requirements if additional holders of EFIH First Lien Notes opted into the EFIH First Lien Settlement after the Petition Date.  The flexible structure of the EFIH First Lien DIP Facility from the banks was developed in parallel with negotiations with major holders of EFIH First Lien Notes—specifically Fidelity (which also holds EFIH Second Lien Notes and unsecured debt at EFH Corp.) as well as PIMCO and WAMCO, who collectively held approximately 32% of EFIH First Lien Notes when they signed the Restructuring Support Agreement.  Accordingly, the EFIH First Lien DIP Facility is particularly favorable to the EFIH Debtors under the circumstances because it is extremely flexible, insofar as it allows the EFIH Debtors to scale back the committed banks' portion (and associated fees) of the EFIH First Lien DIP Facility to the extent additional Prepetition EFIH First Lien Creditors opt into the EFIH First Lien Settlement.

23.    I believe that the EFIH First Lien DIP Facility is the best source of financing at this time.  The EFIH Debtors and the EFIH First Lien DIP Lenders heavily negotiated the EFIH

First Lien DIP Facility at arm's length, on terms that are reasonable and that meet or beat the terms otherwise available in the market for this debt.

**(1)    No Facility That Was Junior To The Proposed EFIH First Lien DIP Facility Was Available On Competitive Terms.**

24.    The EFIH Debtors' discussions with various potential sources of EFIH First Lien DIP Facility revealed that such financing on a junior or unsecured basis was not available to the EFIH Debtors on terms that were competitive with the EFIH First Lien DIP Facility. Specifically, EFIH's significant secured debt obligations and its limited unencumbered assets preclude the EFIH Debtors from obtaining Postpetition financing in the amount they require on terms other than on a secured and superpriority basis.  The terms that the EFIH Debtors and Evercore negotiated for the First Lien DIP Facility, taken as a whole, represent the best terms available in the market.

**(2)    The Carve Out is a Reasonable Term of the EFIH First Lien DIP Facility.**

25.    The EFIH First Lien DIP Facility subjects the security interests and administrative expense claims of the EFIH First Lien DIP Lenders to a Carve Out.  I believe that the Carve Out is reasonable under the circumstances, as it is necessary to ensure that the Debtors' estates and any statutory committee can retain assistance from counsel.  Specifically, the EFIH First Lien DIP Carve Out is the sum of:

(i)      all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below);

(ii)     all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below);

(iii)    Allowed Professional Fees incurred by persons or firms retained by the Debtor Professionals and Committee Professionals at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice, whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and

(iv)    Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $25,000,000 incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise.

26.    I believe that the EFIH First Lien DIP Facility does not directly or indirectly deprive the EFIH Debtors' estates or other parties in interest of possible rights by restricting the services for which professionals may be paid in these cases.  I also believe that the terms of the Carve Out are reasonable in light of those typically found in restructuring cases.

**(3)    The Issuance of EFIH First Lien DIP Roll-Up Claims And Fidelity's Option To Fund $500 Million of The EFIH First Lien DIP Facility Are Both Appropriate Under The Circumstances.**

27.    In the event that the Court approves the EFIH makewhole settlements, the EFIH Debtors will need funds to satisfy those settlements.   Under the Restructuring Support Agreement, EFIH may fund a portion of the EFIH First Lien DIP Facility with monies from Fidelity—and not use the balance sheet of its other DIP lenders—for the same 1.75% fee that EFIH's DIP lenders would otherwise charge.  Moreover, EFIH may use the EFIH First Lien DIP Roll-Up Claims of all Settling Prepetition EFIH First Lien Creditors who participate in the EFH First Lien Makewhole Settlement, including Fidelity, to fund the EFIH First Lien DIP Facility.

28.    I believe that Fidelity's option to fund $500 million of the EFIH First Lien DIP Facility as well as the EFIH First Lien DIP Roll-Up Claims are both reasonable in the circumstances and in the Debtors' best interests.  These terms are the product of extensive,

virtually non-stop, good faith negotiations that spanned the first four months of 2014 between interested parties.

29.    Furthermore, the potential $500 million First Lien DIP Facility contribution and the EFIH First Lien DIP Roll-Up Claims helped the EFIH Debtors and EFH Corp. secure Fidelity's support for the Restructuring Support Agreement.    During the negotiations, Fidelity made clear that it would not settle certain of its claims against the Debtors while its remaining claims were the subject of costly and protracted litigation.    Accordingly, Fidelity endeavored to resolve each of its claims across the capital structure, including their alleged makewhole claims at EFIH, and the Debtors negotiated the makewhole settlements—along with the ad hoc committee of EFIH unsecured creditors[3]—at arm's length with Fidelity.    Fidelity's support is critical to confirming a plan at EFH Corp. and resolving significant inter-debtor disputes between EFH and EFIH, given its holdings, as of the Petition Date, of approximately 73% of the unsecured debt at EFH Corp., approximately 30% of the EFIH Second Lien Notes, and 11% of the EFIH First Lien Notes.

30.    Moreover, the opportunity to participate in the EFIH Makewhole Settlements for the EFIH First Lien Notes is being offered to all qualified holders of such notes.    Accordingly, as described above, all Settling Prepetition EFIH First Lien Creditors who participate in the EFIH First Lien Makewhole Settlement will receive EFIH First Lien DIP Roll-Up Claims that exchange into the EFIH First Lien DIP Facility.

31.    Finally, the EFIH First Lien DIP Roll-Up Claims are integral to the deal as a whole, as the creditors, who are parties to the Restructuring Support Agreement, may declare a termination event under the Restructuring Support Agreement, if the EFIH Makewhole

---

[3]    Given their position in the capital structure, the EFIH unsecured creditors had direct financial interest in minimizing the amount of any makewhole settlement.

Settlements and the EFIH First Lien DIP Facility are not approved.  Importantly, this could cause the EFIH Debtors to lose the opportunity to repay the EFIH Second Lien Notes with the proceeds of the EFIH Second Lien DIP Facility because a termination event under the Restructuring Support Agreement terminates all obligations with respect to funding the EFIH Second Lien DIP Facility.  As a result, the EFIH Debtors could lose the opportunity to enter into the EFIH Second Lien DIP Facility, which is an integral component of the Restructuring Support Agreement.

**F.      The Prepetition EFIH Secured Creditors Are Protected By An Equity Cushion.**

32.      The EFIH Debtors have commenced separate offers to holders of EFIH First and Second Lien Notes to participate in a voluntary settlement with respect to the EFIH Debtors' obligations under those notes—including with regard to an alleged makewhole claim.  For those Prepetition EFIH First Lien Creditors that elect not to participate in the settlements, the EFIH Debtors intend to repay the full principal and interest of the non-settling parties with the proceeds of the EFIH First Lien DIP Facility.  Those first lien holders assert that they will have a contingent claim for an alleged makewhole premium upon the debt's repayment.  In addition, the EFIH Debtors have agreed to postpone the hearing on repayment of the EFIH Second Lien Notes until June 30, 2014; those creditors contend that they have a contingent claim for an alleged makewhole premium as well.

33.      I believe that there is significant equity cushion for the Prepetition EFIH Second Lien creditors (on account of their claims relating to prepetition principal and accrued interest) and for the Prepetition EFIH First Lien and Second Lien Creditors who have not agreed or do not agree to settle their alleged makewhole claims—even if they are granted a full contingent makewhole claim.  While Evercore has not yet undertaken a comprehensive valuation of the EFIH Debtors, the Investment Commitment in the EFIH Second Lien DIP Facility represents a very substantial capital infusion into EFIH by sophisticated financial investors.  The valuation

implied by that commitment represents an objective third-party indication of EFIH's value, and a strong indication that there is an equity cushion beyond any EFIH First Lien makewhole claim or Prepetition EFIH Second Lien claim.

**G.    The Makewhole Settlements Are In The Debtors' Best Interests.**

34.    As I explained in my earlier declaration, the Settlement Motion seeks the approval of, among other things, the EFIH First Lien Makewhole Settlements.  I believe that this settlement is in the best interests of the Debtors' estates and well within the range of reasonableness.  The EFIH First Lien creditors allege that the repayment of their debt constitutes an optional redemption and thus entitles them to a so-called makewhole premium under the terms and conditions of the applicable debt agreements.  Although the Debtors do not believe that such premiums are owed, the EFIH First Lien creditors are likely to argue that they are entitled to the makewhole premiums set forth in the relevant indentures (despite that such language is not in either indenture).  If the EFIH Debtors litigated this issue and lost, the EFIH First Lien creditors would have significant makewhole claims, which could be calculated as follows:

| Debt Issuance | Applicable Premium[4] (as of June 11, 2014) $M |
|---|---|
| **First Lien Notes** | |
| **2017 Notes** (6.875% Senior Secured Notes due 2017) | $39 |
| **2020 Notes** (10% Senior Secured Notes due 2020) | $652 |

35.    The First Lien Makewhole Settlement resolves those claims for a fraction of those amounts:  52 cents on the dollar for the EFIH First Lien 2017 Notes; and 21 cents for the EFIH

---

[4]    The Applicable Premium is calculated based on Treasury rates as of May 7, 2014.  These aggregate amounts are all in millions of $.

First Lien 2020 Notes.[5]    This settlement helped the EFIH Debtors and EFH Corp. secure Fidelity's critical support for the Settlement and the Restructuring Support Agreement.

36.    In the wake of negotiations with Fidelity, other major holders of EFIH First Lien Notes have agreed to settle their makewhole claims.  Specifically, PIMCO and WAMCO, who collectively held approximately 21% of the outstanding principal amount of the EFIH First Lien Notes, have agreed to settle their makewhole claims.[6]    As of May 19, 2014, the Debtors have come to terms with holders of approximately 42% of EFIH First Lien Notes, including parties to the Restructuring Support Agreement and the EFIH First Lien exchange offer.

37.    The Makewhole Settlement will significantly reduce the Debtors' litigation exposure with respect to the alleged makewhole claims.  The settlement provides certainty with regard to the recovery of a significant portion of claims, which helps to ensure the success of the EFIH Debtors' restructuring.  Resolving the makewhole claims now, at the outset of the chapter 11 cases, permits Debtors to make informed assessments about their potential liabilities going forward.  These settlements may also allow the Debtors to reduce or avoid costly, protracted litigation that may drain the Debtors' estates and potentially prolong the chapter 11 process.

38.    I believe that the terms and fees associated with the Makewhole Settlement are both necessary and appropriate, and reflect attractive terms under the circumstances.  They are the product of extensive, virtually non-stop, good faith negotiations that spanned the course of months in early 2014.

---

[5]    Assuming a makewhole settlement of 104% of principal for the 2017 and 2020 Notes.

[6]    PIMCO's holdings were as of the Petition Date; and WAMCO's holdings were as of the date of its execution of the RSA.

**H.      The Backstop Fees Were Negotiated At Arm's Length And Are Reasonable Under The Circumstances.**

39.    In addition to agreeing to settle their alleged First Lien Makewhole Claims, PIMCO has committed, in the amount of $1.45 billion, and WAMCO, in the amount of $250 million (each, the "Backstop Amount," and together, the "Backstop Commitment," and such backstopping parties, the "Backstop Parties"), to backstop the EFIH First Lien DIP Facility (the "Backstop Financing") on the terms set forth in the current Restructuring Support Agreement. PIMCO and WAMCO may terminate the Backstop Commitment if the settlement opt-in period for the First Lien Settlement—which is conditioned on approval of the First Lien Settlement by the Court—does not conclude on or before June 9, 2014.

40.    Also in connection with any loans made under the Backstop Commitment, the Backstop Parties will be entitled to certain backstop fees (the "Backstop Fees"), upon entry of the final order approving the EFIH First Lien DIP Facility, in the following amounts: a commitment fee of up to 1.75% for PIMCO (which fee would vary depending on the amount of the funding of the Backstop Commitment) and 1.0% for WAMCO, which will only be payable in respect of any Backstop Financing that is funded by the Backstop Parties. The EFIH Debtors' benefit from the Backstop Financing arrangement with PIMCO and WAMCO because the fees are only payable if PIMCO and WAMCO *actually* fund the First Lien DIP.  Agreeing to this type of contingent DIP financing fee removes financing risk and is a good business decision for the EFIH Debtors.

41.    Moreover, the Debtors benefit from the participation of PIMCO and WAMCO in the First Lien Makewhole Settlement:  their doing so decreases the Debtors' litigation exposure.


*Remainder of this page intentionally left blank.*

15

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: May 25, 2014

David Ying
Senior Managing Director
Evercore Group L.L.C.