1  UNITED STATES BANKRUPTCY COURT

2  DISTRICT OF DELAWARE

3

4

5  In re:                    :

                            :      Chapter 11

6  ENERGY FUTURE HOLDINGS    :

   CORP.,  et al.,           :      Case No. 14-10979(CSS)

7                            :

              Debtors.       :      (Jointly Administration

8  _____:      Requested)

9

10                               United States Bankruptcy Court

11                               824 North Market Street

12                               Wilmington, Delaware

13                               May 22, 2014

14                               9:35 AM

15

16

17  B E F O R E :

18  HON CHRISTOPHER S. SONTCHI

19  U.S. BANKRUPTCY JUDGE

20

21

22

23

24  ECR OPERATOR:  LESLIE MURIN

25

Page 2

1   HEARING re Motion of Wilmington Savings Fund Society, FSB

2   Pursuant to 28 U.S.C. §§ 1408 & 1412 and Rule 1014 of the

3   Federal Rules of Bankruptcy Procedure to Transfer Cases to

4   the United States District Court for the Northern District

5   of Texas [D.I. 5; filed April 29, 2014]("Venue Change

6   Motion")

7

8   HEARING re Emergency Motion f EFIH 2nd Lien Notes Indenture

9   Trustee to Compel Debtors to Obtain Prior Approval of

10  Procedures Governing their EFIH 2nd Lien Tender Offer [D.I.

11  441; filed May 14, 2014]

12

13  HEARING re Emergency Motion of CSC Trust Company of

14  Delaware, as Indenture Trustee, to Compel the Debtors to

15  Obtain Approval of Procedures Governing the EFIH First Lien

16  Tender Offer [D.I. 461; filed May 15, 2014]

17

18  HEARING re Motion of Wilmington Savings Fund Society, FSB

19  for Leave to Conduct Discovery Pursuant to Rule 2004 of the

20  Federal Rules of Bankruptcy Procedure of Energy Future

21  Holdings Corporation, its Affiliates, and Certain Third

22  parties (the "2004 Motion")[D.I. 6; filed April 29, 2014]

23

24  HEARING re Motion of Wilmington Savings Fund Society, FSB

25  Pursuant to Rules 2002 and 9006 of the Federal Rules of

1    Bankruptcy Procedure and 11 U.S.C. Section 105(a) to Shorten

2    Notice of, and Schedule Hearings on, (I) Request to Transfer

3    Venue; and (II) Request to Conduct Discovery Under Rule 2004

4    [D.I. 8; filed April 29, 2014]

5

6    HEARING re Motion of Energy Future Intermediate Holding

7    Company LLC and EFIH Finance, Inc. for Entry of (I) an

8    Interim Order (A) Approving Certain Fees Related to

9    Postpetition Financing and Granting Such Fees Administrative

10   Expense Priority and (B) Scheduling a Final Hearing; and

11   (II) a Final Order (A) Approving Postpetition Financing, (B)

12   Granting Liens and Providing Superpriority Administrative

13   Expense Claims, (C) Authorizing the Use of Cash Collateral,

14   (D) Authorizing the EFIH First Lien Refinancing, (E)

15   Authorizing Issuance of Roll-Up Debt to the Extent

16   Authorized by the Settlement Motion, (F) Determining the

17   Value of Secured Claims, and (G) Modifying the Automatic

18   Stay [D.I. 74; filed April 29, 2014]

19

20   HEARING re Motion of Energy Future Intermediate Holding

21   Company LLC and EFIH Finance Inc. for Entry of an Order (A)

22   Approving Postpetition Second Lien Financing, (B) Granting

23   Liens and Providing Superpriority Administrative Expense

24   Claims, (C) Authorizing the Use of Cash Collateral, (D)

25   Authorizing the EFIH Second Lien Repayment, (E) Authorizing

1    Entry into Payment of Fees Under the Commitment Letter, and

2    (F) Modifying the Automatic Stay [D.I. 477, filed May 15,

3    2014]

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Transcribed by:  Dawn South, Jamie Gallagher, and Sherri

25    Breach

1   A P P E A R A N C E S :

2   RICHARDS, LAYTON & FINGER, P.A.

3        Attorney for the Debtors

4

5   BY:   DANIEL J. DEFRANCESCHI, ESQ.

6        MARK D. COLLINS, ESQ.

7        JASON M. MADRON, ESQ.

8

9   KIRKLAND & ELLIS

10        Attorney for the Debtors

11

12   BY:   ANDREW MCGAAN, ESQ.

13        DAVID DEMPSEY, ESQ.

14

15   PAUL, WEISS, RIFKIND, WHARTON & GARRISON

16        Attorneys for Ad Hoc Committee of TCEH First Lien

17        Creditors

18

19   BY:   BRIAN S. HERMANN, ESQ.

20        JACOB ADLESTEIN, ESQ.

21

22

23

24

25

1    YOUNG CONAWAY STARGATT & TAYLOR, LLP

2         Attorneys for Ad Hoc Committee of TCEH First Lien

3         Creditors

4

5    BY:  PAULINE K. MORGAN, ESQ.

6         RYAN M. BARTLEY, ESQ

7

8    BROWN RUDNICK

9         Attorneys for TCEH, Second Lien Trustee

10

11   BY:  JEFFREY L. JONAS, ESQ.

12        EDWARD S. WEISFELNER, ESQ.

13        JONATHAN D. MARSHALL, ESQ.

14        AARON B. LAUCHHEIMER, ESQ.

15

16   UNITED STATES DEPARTMENT OF JUSTICE

17        Attorney for the U.S. Trustee

18

19   BY:  RICHARD L. SCHEPACARTER, ESQ.

20

21   COZEN O'CONNOR

22        Attorney for J. Aron & Company

23

24   BY:  MARK FELGER, ESQ.

25

1  AKIN GUMP STRAUSS HAUER & FELT LLP

2       Attorney for Ad Hoc Committee of EFIH Unsecured

3       Noteholders

4

5  BY:  SCOTT ALBERINO, ESQ.

6

7  SHEARMAN & STERLING

8       Attorneys for Duetsche Bank AG New York Branch

9

10  BY:  FREDRIC SOSNICK, ESQ.

11       NED S. SCHODEK, ESQ.

12

13  POTTER ANDERSON & CORROON LLP

14       Attorneys for Deutsche Bank AG New York Branch

15

16  BY:  LAURIE SELBER SILVERSTEIN, ESQ.

17       R. STEPHEN MCNALL, ESQ.

18

19  COUSINS CHIPMAN & BROWN, LLP

20       Attorneys for Ad Hoc Committee of EFIH Unsecured

21       Noteholders

22

23  BY:  SCOTT D. COUSINS, ESQ.

24       ANN M. KASHISHIAN, ESQ.

25

1   ROPES & GRAY LLP

2        Attorneys for CSC Trust Company of Delaware

3

4   BY:  D. ROSS MARTIN, ESQ.

5        KEITH HOWARD WOFFORD, ESQ.

6

7   COLE SCHOTZ MEISEL FORMAN & LEONARD, PA

8        Attorney for CSC Trust Company of Delaware

9

10  BY:  WARREN A. USATINE, ESQ.

11

12  MORRIS, NICHOLS, ARSHT & TUNNELL, LLP

13       Attorney for Sponsors

14

15  BY:  DEREK ABBOTT, ESQ.

16

17  WACHTELL LIPTON ROSEN & KATZ

18       Attorney for Sponsors

19

20  BY:  EMIL A. KLEINHAUS, ESQ.

21

22  DRINKER BIDDLE & REATH LLP

23       Attorney for CSC

24

25  BY:  JAMES MILLAR, ESQ.

1   MILBANK, TWEE, HADLEY & MCCLOY LLP

2       Attorneys for Citibank, N.A.

3

4   BY:  DENNIS F. DUNNE, ESQ.

5       MATTHEW BROD, ESQ.

6

7   ASHBY & GEDDES

8       Attorneys for Wilmington Savings Fund Society

9

10  BY:  WILLIAM PIERCE BOWDEN, ESQ.

11      GREGORY A. TAYLOR, ESQ.

12      STACY NEWMAN, ESQ.

13      AARON STULMAN, ESQ.

14

15  FOLEY & LARDNER LLP

16      Attorneys for UMB Bank, N.A.

17

18  BY:  HAROLD L. KAPLAN, ESQ.

19      MARK F. HEBBELN, ESQ.

20

21  MORRIS JAMES LLP

22      Attorney for Law Debenture Trust Company of New York

23

24  BY:  CARL N. KUNZ, ESQ.

25

1   PACHULSKI STANG ZIEHL & JONES LLP

2        Attorneys for Computershare Trust Company, N.A., et

3        al. and Ad Hoc Second Lien Holder

4

5   BY:  LAURA DAVIS JONES, ESQ.

6        TIMOTHY CAIRNS, ESQ.

7

8   KRAMER LEVIN NAFTALIS & FRANKEL LLP

9        Attorneys for Computershare Trust Company, N.A., et

10       al. and Ad Hoc Second Lien Holder

11

12  BY:  THOMAS MAYER, ESQ.

13       JOSHUA BRODY, ESQ.

14       GREG HAROWITZ, ESQ.

15

16  BINGHAM MCCUTCHEN LLP

17       Attorneys for Pacific Investment Management Co. LLC

18

19  BY:  JEFFREY SABIN, ESQ.

20       JULIA FROST-DAVIES, ESQ.

21

22  CONNOLLY GALLAGHER LLP

23       Attorney for Pacific Investment Management Co. LLP

24

25  BY:  KAREN C. BIFFERATO, ESQ.

```
 1   FOX ROTHSCHILD LLP

 2        Attorney for Ad Hoc Group of Unsecured TCEH Noteholders

 3

 4   BY:  JEFFREY M. SCHLERF, ESQ.

 5

 6   WHITE & CASE LLP

 7        Attorney for Ad Hoc Group of TCEH Unsecured Noteholders

 8

 9   BY:  J. CHRISTOPHER SHORE, ESQ.

10        GREGORY M. STARNER, ESQ.

11

12   FRIED FRANK HARRIS SHRIVER & JACOBSON

13        Attorneys for Fidelity Management & Research Company

14

15   BY:  GARY L. KAPLAN, ESQ.

16        MATTHEW M. ROSSE, ESQ.

17

18   CROSS & SIMON, LLC

19        Attorney for Fidelity Management & Research Company

20

21   BY:  MICHAEL JOSEPH JOYCE, ESQ.

22        CHRISTOPHER P. SIMON, ESQ.

23

24

25
```

Page 12

1   BLANK ROME

2        Attorney for Wilmington Trust

3

4   BY:  BONNIE FATELL, ESQ.

5

6   SEWARD KISSEL

7        Attorneys for Wilmington Trust

8

9   BY:  JOHN ASHMEAD, ESQ.

10       ARLENE ALVES, ESQ.

11

12  NIXON PEADOBY

13       Attorney for American Stock Transfer Trustee

14

15  BY:  RICHARD C. PEDONE, ESQ.

16

17  SNR DENTONS

18       Attorney for WSFS, Trustee

19

20  BY:  LOUIS CURCIO, ESQ.

21

22

23

24

25

```
1    POLSINELLI

2          Attorneys for the Committee

3

4    BY:  CHRIS WARD, ESQ.

5    JUSTIN K. EDELSON, ESQ.

6

7    MORRISON & FORRESTER

8          Attorneys for the Committee

9

10   BY:  BRETT MILLER, ESQ.

11        LORENZO MARINUZZI, ESQ.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                  P R O C E E D I N G S

2              THE CLERK:  All rise.

3              THE COURT:  Please be seated.  Good morning.  Just

4      give me a minute to get situated.  All right, good morning.

5              MR. SASSOWER:  Good morning, Your Honor.  For the

6      record Edward Sassower of Kirkland & Ellis LLP, proposed

7      counsel to the debtors.

8              Your Honor, there are three primary items on

9      today's agenda.  The motion to transfer venue, the debtors'

10     tender offers with respect to the EFIH first and second lien

11     notes, and the status conference in connection with the Rule

12     2004 discovery motion.

13             However, before we delve into the agenda I'd like

14     to briefly update the Court on some events that have

15     transpired since the last hearing.

16             THE COURT:  Okay.

17             MR. SASSOWER:  Thank you, Your Honor.

18             First, on May 13th the U.S. Trustee's Office

19     appointed an official committee of unsecured creditors

20     composed of the PBGC, HCL America, Inc., Holt Texas Limited,

21     ADA Carbon Solutions, The Bank of New York Mellon, which is

22     the indenture trustee on certain pollution control TCEH

23     junior subordinated bonds, Law Debenture Trust Company of

24     New York, which is the indenture trustee for the unsecured

25     notes that Mr. Laurie and Mr. Shore's ad hoc committee

1    represents, and Wilmington Savings Fund Society, which is

2    the indenture trustee for the second lien notes that

3    Mr. Weisfelner represents.

4             In the notice of appointment the U.S. Trustee

5    noted that the committee represents the interests of the

6    unsecured creditors of only the TCH debtors and EFH

7    Corporate Services Company and no other debtors.

8             The official committee has hired Morrison &

9    Forrester as legal counsel.  Here today in court is Lorenzo

10   Marinuzzi and Brett Miller.  Lazard as investment banker.

11   Today in the court we have Tyler Kellin (ph).  And FTI

12   Consulting as financial advisors.

13            Your Honor, on behalf of the debtors and their

14   advisors we'd like to extend a warm welcome to the official

15   committee and their professionals and we look forward to

16   working with them in the coming weeks and months, and in

17   fact we've already met a couple of times since their

18   appointment.

19            Your Honor, as you well know we took a multi-

20   pronged approach with respect to our notice of commencement.

21   The traditional notice of commencement was mailed on May 9th

22   in the form approved by the court clerk's office, and on

23   May 15th we took the unusual step of mailing a separate

24   customer notice of commencement that included a customer

25   claims bar date and provided notice of the debtors' intent

1    to assume customer -- certain customer agreements, and we

2    used the form approved by Your Honor in the interim order on

3    the customer programs motion, which is docket entry 307.

4           The debtors also anticipate publishing a notice of

5    commencement in a host of national and regional publications

6    on May 27th.

7           Lastly, Your Honor, there have been some

8    discussions amongst the debtors and the official committee

9    and the RSA parties regarding the RSA milestones and when to

10   seek relief with respect to certain motions.

11          As I said at the first day hearing the RSA

12   milestones are the product of intense negotiations and the

13   debtors are committee to honoring them.  Having said that,

14   the debtors are cognizant of the fact that we negotiated

15   those milestones without your input and without the input of

16   the official committee.  As a result we are working hard to

17   accommodate the official committees' timing requests,

18   provided those requests do not impact the disclosure

19   statement, plan, and effective date milestones.

20          To that end the debtors and the RSA parties have

21   agreed to adjourn the RSA assumption motion which was

22   originally scheduled for the June 6th hearing to the

23   June 30th hearing.  And last night and this morning we've

24   also had conversations about possibly adjourning other

25   motions.  I will update the Court later in the hearing on

1    where those conversations come out so Your Honor will have a

2    sense coming out of today's hearing what will likely be on

3    for the June 5th and 6th hearings.

4           With that, Your Honor, unless you have any other

5    questions or comments, I will yield the podium.

6           THE COURT:  No questions.

7           MR. SASSOWER:  Thank you, Your Honor.

8           MR. JONAS:  Good morning, Your Honor.  Jeff Jonas

9    from Brown Rudnik on behalf of Wilmington Savings Fund

10   Society.  With me is Edward Weisfelner and Jonathan

11   Marshall, and our local counsel, Bill Bowden and Greg

12   Taylor.

13          Your Honor, with the Court's permission I'd like

14   to lay out how we see it best for the Court to take up WSF's

15   motion to transfer venue.  I've discussed this with

16   Mr. McGaan who you'll be hearing from, Your Honor, and I

17   think we've agreed at least on a number of points and we've

18   agreed as to one or two points procedurally where we do have

19   an issue and I think we'll need to take those to the Court,

20   but if I could lay out our agreement and how we best see

21   proceeding on this I think that would be helpful to the

22   Court.

23          THE COURT:  Okay.

24          MR. JONAS:  Your Honor, what we would suggest is

25   that the Court take up our motion to strike the debtors'

1    objection after taking up the motion to transfer

2    substantially, and the reasons for that are as follows, Your

3    Honor, some of which are particular to WSFS and some of

4    which are on a procedural basis.

5            First of all, Your Honor, we're prepared to go

6    forward and believe it is critically important that the

7    motion to transfer go forward as soon as possible.

8            Second, notwithstanding any prejudice to us based

9    on the debtors' conduct, which is the subject of the motion

10   to strike, we're confident we can meet our burden and

11   prevail on the motion to transfer right now.

12           And third, Your Honor, I think the Court will be

13   better served and better able to address the motion to

14   strike after seeing some of the testimony we intend to

15   present.

16           With that said, Your Honor, Mr. McGaan and I have

17   agreed, again, with the Court's permission, that we can make

18   some introductory remarks which I actually think will be

19   very helpful to frame up the witness testimony you will see.

20   We'd then like to present -- or I'd like to present two

21   witnesses, Ms. Dore, the debtors' general counsel and co-

22   chief restructuring officer and the debtors' 30(b)(6)

23   witness on venue matters, and Mr. Keglevic, the debtors' CFO

24   and other co-chief restructuring officer.

25           I think, Your Honor, we will need to take up the

1    reasons for and the mechanics of presenting Ms. Dore's

2    testimony by video with the Court prior to her testimony,

3    but I'd suggest we take that up at that time.

4               And with that, Your Honor, I have a few slides to

5    assist me in my introductory remarks if we could queue those

6    up.

7               MR. MCGAAN:  If we could --

8               THE COURT:  Okay.

9               MR. MCGAAN:  -- just a word on procedures?

10              THE COURT:  Okay.  Actually stay -- just stay

11   seated and we'll pick you up with the mic better.

12              MR. MCGAAN:  Sure.  Andrew McGaan for the debtors,

13   Your Honor.

14              We don't have a problem with taking up the motion

15   to strike that was filed yesterday afternoon, it could well

16   have been filed a week ago, we think will all due respect to

17   Mr. Jonas it's a stunt and it's frivolous, so I have no

18   problem addressing it at any time during this hearing.

19   There's been no prejudice to the movants here.

20              With respect to the presentation of Ms. Dore's

21   testimony, which is going to be put on by videotape, there's

22   not much magic to the dispute we have, and I'd like to just

23   lay it out for Your Honor.  What we had agreed to as

24   recently as yesterday in the middle of the day that we would

25   do what is typically done, certainly in my experience, I

1    don't know about Your Honor's experience, but when a

2    videotaped deposition is presented by designation and we

3    have some fairness or completeness designations to offer

4    they're played together, and that was the agreement

5    Mr. Jonas and I had informally.  Ninety-nine percent of what

6    you're going to hear are answers that Ms. Dore gave to

7    Mr. Jonas' questions.  Last night he's changed his mind and

8    said he wants to force us to segregate the designated

9    portions of her testimony that we would like the Court to

10   hear as part of our fairness or completeness designations

11   and play it separately and afterwards.  And I have two

12   responses to that, because I don't think this is a difficult

13   problem.

14              One is they're not entitled to do that under the

15   Federal Rules of Civil Procedure.  Rule 32(a)(6) is the

16   fairness rule, and it states, "If a party offers in

17   evidence" -- as they're doing here -- "only part of a

18   deposition an adverse party may require the offeror to

19   introduce other parts that in fairness should be considered

20   with the part introduced, and that's what we're doing.

21              But there's really a practical reason for this

22   too.  If you cleave out the next two questions asked of each

23   subject matter that Mr. Jonas turns to in this deposition,

24   which is what their designations do, then they're entitled

25   to do that, I don't quarrel with that.  It makes no sense.

1    So you'll hear a continuation of a line of questioning,

2    maybe a reference to an acronym and the Court won't have any

3    idea what it connects to, at least not going back and

4    reading the transcript.  So we simply ask that when it comes

5    time to put the video dep on it just be run -- the

6    designations together in their entirety so that it doesn't

7    come out nonsensically for the Court and so it complies with

8    the federal rules.

9              I can tell you the timing on this by the way.  The

10   movant's designations run about 46 minutes and the debtors'

11   designations run about 39 minutes.

12             THE COURT:  I said an hour -- I though I made it

13   very clear through my people that I would listen to video

14   depositions up to an hour, but if we're going to be more

15   than that I had a problem with it.

16             MR. MCGAAN:  There's an alternative that's readily

17   available to us.  As I've told Mr. Jonas before we don't

18   want to waste the Court's time, we don't want to go through

19   a show unnecessarily.  We could -- we've got a color-coded

20   highlighted transcript that shows what they designated and

21   what we did.  We can hand that up, Your Honor.  Mr. Jonas

22   can proffer and represent what the testimony shows and says,

23   I can too, I'm going to refer to just a little bit of it

24   during our argument, and I'm happy to proceed that way.  In

25   fact that would speed this up considerably if Your Honor

1    wants to go in that direction.

2            THE COURT:  All right.  Well on that issue let me

3    think about that.

4            MR. MCGAAN:  Okay.

5            THE COURT:  What about this issue of completeness?

6            MR. JONAS:  Your Honor, let me -- let me just back

7    up for a minute so you have it in context, and I'm not going

8    to respond to the he said, she said, I just don't think it's

9    practical and useful.  I will if the Court wants me to, but

10   let me get to the substance of it, which is we noticed a few

11   depositions as I thought was clear to the Court at our first

12   hearing, which was, go ahead do your discovery and then you

13   were going to have a trial in a few weeks.

14           We noticed depositions as follows.  Mr. Evans,

15   who's the CEO, Ms. Dore, who's the co-chief restructuring

16   officer, Mr. Keglevic, the other co-chief restructuring

17   officer, and a 30(b)(6) witness.

18           In response to that we were told that Mr. Evans

19   would be out of the country, we said, fine, we withdrew the

20   notice for Mr. Evans.

21           We were also told that our 30(b)(6) witness is

22   Ms. Dore.  We said, fine, as we have is two depositions,

23   that's great.  We deposed Ms. Dore last Thursday, and in

24   advance of that -- probably a few days in advance of that,

25   maybe a day or two -- we were told, well, you can have

1    Ms. Dore as a 30(b)(6) for deposition, but she's not going

2    to be at the trial.  To which I said, what do you mean she's

3    not going to be at the trial?  I agree it's our burden of

4    proof, we have two witnesses, they're your witnesses, you

5    filed in Delaware, you represented to the Court in their

6    papers numerous times we will bring people as necessary to

7    these proceedings.  That's my witness, I'd like her to be

8    there.  They said, nope, prior commitment, can't be there.

9    Which left me faced with what to do.

10              THE COURT:  Apparently your phone was broken.

11              MR. JONAS:  And how is that, Your Honor?

12              THE COURT:  You didn't call me.

13              MR. JONAS:  Well, Your Honor, we thought about

14   that.  We thought about what our options were, and our

15   options were we didn't have subpoena power so we were unable

16   -- we would like to have -- we would have subpoenaed her,

17   couldn't do that.  And we felt, Your Honor -- I agree, we

18   didn't think it was our burden or we shouldn't burden the

19   Court, if you will, with running in and seeing you about

20   that issue.

21              She was beyond subpoena power, we said, okay,

22   we'll do the best we can, we'll play by the cards we're

23   dealt.  We did videotape the deposition, we took the

24   deposition, and we moved on.  Being clear, as I was on

25   numerous occasions that we would like -- we continued to

1    request that she be there and were told she wouldn't be.

2           And that left us, Your Honor, I think your office

3    got the call shortly thereafter, it might have been Monday

4    of this week, that we're going to need introduce some video

5    testimony because we have a witness who is unable, and

6    that's how that came about, Your Honor.

7           Now let me just say, we don't have any problem,

8    and I don't want the Court to think that in anyway we're

9    trying to take away their rights under the rules to present,

10   if you will, a redirect, which they're entitled to.  And I

11   appreciate that in this context that redirect has to be, if

12   you will, by account or designation.  We've designated

13   portions of the transcript, if they're going to redirect

14   that's how they have to do it.

15          But, Your Honor, I don't think we should be

16   prejudiced in the manner in which they do that, and I don't

17   think the rule speaks to -- it is fairness and in fairness

18   we will let them present their counters, no problem, but I

19   don't think that -- and by the way we didn't understand the

20   magnitude of those counters, which I had no idea would be

21   almost as long, if you will, as ours, until we got that

22   information late yesterday.

23          In any event, I do think it absolutely prejudices

24   our case to not be able to present first video, Your Honor.

25   I don't think -- let me say this, I think we're entitled to

1    a live witness.  We didn't get that.  I think in absence of

2    that we're entitled to video testimony.  Granted it's still

3    prejudicial because it's deposition testimony, we hadn't --

4    at the time I was still hopeful or optimistic we would get

5    her here live.  I don't think it's going to be as effective

6    as effectively a cross-examination, but we'll live with

7    that, that's -- I'm not complaining to you about that.  But

8    I do think I get to put on the live testimony by video,

9    because I do think it would be prejudicial for you to have

10   to sit there and read it on a piece of paper.  So that's

11   number one.  I think we're entitled to put on live

12   testimony.

13          Number two, I don't think -- because I do think it

14   would be prejudicial for them to meld it all together and

15   just run -- run the whole tape, if you will.  I think I'm

16   entitled to my direct and then they can put on whatever they

17   want by redirect or by counter.  That's the way it should be

18   -- that's the way it should work, that's the way it would

19   minimize the prejudice we're already experience by the fact

20   that the witness isn't here.

21          MR. MCGAAN:  Judge, if I can speak to that

22   briefly.

23          First with respect to Ms. Dore's absence today.

24   Mr. Jonas is correct that in advance of the deposition he

25   noticed her by name.  We want to depose her, we didn't offer

1    her as a witness in support of our opposition.  We're happy

2    to rely on her testimony, but we didn't offer her.  He asked

3    for her by name, we told him in advance of the deposition

4    and she -- he asked her about it at the deposition but we

5    told him in advance long-standing family commitment on this

6    day that she made last fall to her children and that she

7    couldn't be here and as a matter of fact she couldn't have

8    shown up in Dallas if the case were being litigated in

9    Dallas, from what her testimony was.

10              So he knew which is why he set up a videotaped

11   deposition that he was perpetuating her testimony at the

12   time he examined her for this hearing.

13              After that he said we really want her live.  And

14   last Saturday by email I said to him, look, she's got this

15   commitment, you don't have to subpoena her, let's talk to

16   Judge Sontchi.  If he -- Ms. Dore has told me, and I have

17   this in this email to Mr. Jonas, if the judge wants her here

18   live notwithstanding the commitment she will be here.

19              She also testified, because he asked her, that she

20   could be here tomorrow if he'd prefer to approach the Court

21   and say, you know, she's got this issue and it would be

22   entirely in your hands, would you prefer to do the hearing

23   tomorrow, you had set two days for it.

24              THE COURT:  Right.

25              MR. MCGAAN:  He declined the invitation to go to

1    the Court, because I think he wanted to have this discussion

2    today instead.

3              And shortly, very briefly, with respect to the

4    rule this is exactly how the federal rules work, they have

5    to play our fairness designations under Rule 32 with their

6    designations.

7              I offer the transcript, Your Honor, solely as an

8    accommodation to the Court.  I'm not -- I don't quibble or

9    object to his right to show the video or any part of it he

10   wants.  Your Honor mentioned a concern about the length of

11   it, and it's an alternative that's available, but I'm not

12   objecting to the --

13             THE COURT:  Okay.  A couple points.

14             As to Ms. Dore not being here and the complaint

15   that the movant was put in a position where he had -- or it

16   had no choice other than to either subpoena her or just rely

17   on video deposition testimony, certainly that's a choice

18   that could have been made.  I'm at a loss as to why if it

19   was important you didn't pick up the phone and we didn't

20   have a conversation about it, because one of the

21   alternatives would have been for me to tell the debtor that

22   their general counsel was to be in court, and if not they

23   were going to have a problem, and I'm pretty sure that

24   anytime I say something to a debtor they're going to comply.

25             So -- and maybe this goes frankly a little bit if

1    not completely to the motion to strike, but you've said and

2    I hear you and I understand and I'm not drawing any negative

3    inference on the use of a video deposition, you've decided

4    to use the video deposition, that's your right, and that's

5    fine.

6              MR. JONAS:  Thank you, Your Honor.

7              THE COURT:  I'm a little frustrated because the

8    call I got on Monday was 22 minutes, and I thought I made it

9    very clear through my people that I didn't want to get

10   sucked into a lengthy period of watching video deposition in

11   open court.  I've done it before and it's very frustrating

12   and it gets to be a little bit long, so I thought I made it

13   pretty clear an hour.  You're under an hour and I didn't

14   think ahead as to whether that would also mean that I needed

15   to somehow have an aggregate number or whatnot.  It is what

16   it is, it's not overly onerous.  Hopefully we'll do it

17   before lunch and not after, but we'll see how it plays out.

18              As to the idea of completeness I want to see it

19   straight through, I don't want to get into this issue of,

20   you know, listening to yours and then listening to theirs.

21   Frankly if I had -- if I had gone through a deposition

22   designation that was in writing I would read it straight

23   through.  I would have the advantage of seeing the yellow

24   highlight of yours and the pink highlight of the other sides

25   and that would I think be helpful to a certain extent.

1            So I offer this.  Let's have the video, but can I

2    have a hard copy as well that'll indicate who's -- who's

3    testimony is whose?

4            MR. JONAS:  Absolutely, Your Honor.  We have that

5    available for you now.

6            THE COURT:  All right.  Well that's how we'll do

7    it then.

8            MR. JONAS:  Okay.  Thank you, Your Honor.

9            THE COURT:  All right.  So we took are of that

10   issue.

11           MR. JONAS:  Your Honor, can I move on to my --

12           THE COURT:  Absolutely.

13           MR. JONAS:  Thank you.

14           May I approach, Your Honor?

15           THE COURT:  Yes.  Thank you.

16       (Pause)

17           THE COURT:  All right.

18           MR. JONAS:  Thank you, Your Honor.

19           Your Honor, I'll start with the applicable

20   standard here, and I won't waste much time on it, I know

21   you're very familiar with it.

22           Your Honor, the Court may transfer these cases to

23   the Northern District of Texas if it determines that the

24   transfer is in the interest of justice or for the

25   convenience of the parties.

1          As this Court has said, Your Honor:

2          "There are 12 factor tests, there are 6 factor

3     tests, I think those types of tests are helpful to focus the

4     Court on the types of issues that really should be

5     considered."

6          That was in 2012 in your Allied Systems decision,

7     Your Honor.

8          Having read the cases, Your Honor, usually the

9     courts have used this type of test to consider the interest

10    of justice and the convenience of the parties standards

11    together, and I think we can do that today.

12          I appreciate, Your Honor, that using a test and

13    balancing factors is not in the nature of I think you said

14    in Allied a scorecard, but I think it is useful, a useful

15    way to present or frame the facts for the Court.

16          And with that, Your Honor, we can go to the next

17    slide, which is in -- and we'll be using the 12 factor test

18    often used by Bankruptcy Courts in this context.

19          Factor number one, Your Honor.  The plaintiff's

20    original choice of forum.

21          Obviously, Your Honor, the debtors have filed in

22    Delaware, and I acknowledge that their choice of venue is

23    given some deference.  Of course a transfer motion under

24    1412 requires balancing this factor with several others,

25    it's not absolute.

1              Here, Your Honor, I would ask the Court in

2    connection with thinking about the appropriate level of

3    deference given to the debtors' choice to ask who are the

4    debtors here?  I would suggest, Your Honor, that the debtors

5    here are out of the money equity and a management that's

6    beholden to certain large creditors with whom they've

7    purportedly done a fully baked prepetition deal, to turn

8    over the keys, obtain employment and equity for themselves,

9    and wipe billions of dollars of allegedly unsecured debt.

10             So with this factor, Your Honor, I simply ask --

11   we'll put it up on the screen and we're going to weigh this

12   factor on the debtors' side of the balance sheet -- but I

13   would ask the Court to do that with some questioning.

14             Next, Your Honor, the second factor, the defendant

15   or movant's forum preference.

16             WSFS on behalf of its holders and the joinders to

17   its motion prefers that these Chapter 11 cases be conducted

18   in the Northern District of Texas, I think that's fairly

19   straightforward.

20             We can move on to factor three.  Factor three,

21   Your Honor, whether the claim arose elsewhere.

22             Your Honor, I appreciate that the cases tell us

23   that the location of the underlying events isn't necessarily

24   relevant just in and of itself, the underlying event has to

25   be -- must be germane to the issue at hand.  And I would

1    suggest here, Your Honor, that all the underlying events

2    arise in Texas and are germane because all of the debtors'

3    operations are there, and the energy markets that determine

4    the value of the debtors' enterprise are in Texas.

5           So I appreciate many cases somewhat look askance

6    at this factor, but I think here it's particularly

7    appropriate and I think based on this, Your Honor, that

8    would have to weigh on the side of the movant.

9           Your Honor, factor four.  Location of books and

10   records.  And again, Your Honor, I acknowledge this isn't an

11   absolute because if it were there'd be no question about it.

12   All of the debtors' books and records -- and you'll hear

13   this in the testimony -- are in Texas.  There's no books and

14   records in Delaware.

15          So the -- however the fact there is limited in

16   that it has to be -- and it's only relevant -- the factor is

17   only relevant to the extent that there are non-electronic

18   records at issue.  To the extent there are electronic

19   records obviously they're available anywhere; not an issue.

20          Here, Your Honor, the debtors admit that there are

21   important books and records that are not available

22   electronically and they're scattered at the debtors'

23   multitude, up to 50, locations throughout Texas.

24          Also, Your Honor, and you'll hear this in

25   testimony today, the debtors own valuation experts,

1    Evercore, have spend significant time at the debtors'

2    Dallas, Texas headquarters, the debtors prior valuation

3    experts, Duff & Phelps, have spent significant time at the

4    debtors' Dallas, Texas headquarters and other locations, and

5    the debtors' auditors, Deloitte & Touche, spend significant

6    time at the debtors' Texas locations.

7            Your Honor, the intrinsic valuation of the debtors

8    electricity producing enterprise in this case will require

9    extensive work by multiple experts in Texas.  They'll be in

10   Texas, not just at the Dallas, Texas headquarters, they'll

11   be at the debtors' other locations.  They'll be there

12   reviewing books and records, they'll be doing on-site

13   inspections, they'll be doing interviews, because that's the

14   way -- that's what's required in order to conduct a full and

15   fair valuation.

16           So with that, Your Honor, and again, we'll hear it

17   in the testimony, but with that I suggest, Your Honor, that

18   on the balance of the factor it would balance on behalf of

19   the movant.

20           Your Honor, factor five.  Convenience of the

21   parties as indicated by their relative physical and

22   financial condition.

23           Here, Your Honor, the debtors' millions of

24   customers, thousands of employees and retirees, Texas

25   regulatory bodies, neighbors at risk of environmental harm,

1   numerous executory contract counterparties, litigation

2   adversaries, and trade creditors whose rights and claims are

3   undetermined and remain to be addressed in this bankruptcy

4   all are in Texas.

5          It's the convenience of these parties and not the

6   convenience of the professionals retained by the debtors,

7   the debtors' private equity owners, and hedge fund creditors

8   which the Court should consider.

9          In the debtors' papers, Your Honor, they make much

10  of the fact that most of the professionals in this case are

11  in the northeast and therefore it would be more convenient

12  to be in this court.  If that was the standard, Your Honor,

13  if the debtor represented by New York bankruptcy counsel and

14  are the debtors largest lenders and bondholders in New York

15  and represented by New York counsel then every major

16  bankruptcy case would be properly venued in New York or

17  Delaware.

18         Your Honor, I want to continue with this because I

19  think on this point there's a few other facts that are

20  relevant.

21         The debtors have testified, Your Honor, and you'll

22  see this in Ms. Dore's testimony, that the cash collateral

23  arrangements, the DIPs, two of them, and the RSA could be

24  implemented if this case were transferred to Texas, and

25  they've identified no real harm that they would suffer if

1       the cases are transferred.

2               I'd also point out, Your Honor, that the -- there

3       is no venue condition or predicate in the debtors' cash

4       collateral or DIP arrangements or in the RSA itself.

5               Therefore, Your Honor, the Court should focus on

6       the convenience of all the parties, especially those under

7       represented or under funded parties, almost all of whom are

8       in Texas and not the large sophisticated New York creditors

9       who have either settled with the debtors or are fighting

10      about their make-whole, some of whom have filed joinders in

11      the debtors' objection.

12              Last, Your Honor, on this point just to be clear,

13      because there is I think a plethora of supporting case

14      authority, the instruction is that the Court should not

15      focus on convenience of the debtors' or their creditors'

16      professionals.

17              And with that, Your Honor, I suggest that factor

18      five weights in favor of the movant.

19              Factor six, Your Honor.  Interesting topic in

20      light of the discussion we just had.  Convenience of

21      witnesses.  And again, Your Honor, this is not absolute,

22      because if it were all the witnesses or substantially all

23      the witnesses, at least on the debtors' side are in Texas,

24      but the relevance of this, what the cases tell us, is that

25      is there -- is it -- it has to be relevant that witnesses

1    could be rendered unavailable for trial in Delaware.

2              And while I appreciate, Your Honor, and you'll

3    never have to tell me again that we can come see you on an

4    issue like this, I appreciate that you might suggest to the

5    debtors that they bring Ms. Dore here.  With all due respect

6    I don't think you have the subpoena power certainly to do

7    that.  She's more than 100 miles away, and we were

8    frustrated by that, and I suggest we -- there is no way to

9    force a witness who doesn't want to be here who's more than

10   100 miles away -- I appreciate you can enter an order to

11   that effect -- but that the conundrum we face.

12             And I think that directly plays into factor number

13   six, which is we run the risk and other parties in this case

14   run the risk that they will not be able to compel attendance

15   of critical debtor witnesses who live and work in Texas.

16             And I won't say anymore about the Ms. Dore

17   situation.  Again, we're not complaining, we'll put on the

18   video testimony, but I do think, Your Honor, on that basis

19   alone as an evidentiary matter what we've experienced today

20   proves that this factor weighs in favor of the movant.

21             Your Honor, factor number seven.  Enforceability

22   of the judgment.  I don't think that has any relevance here.

23   I think your judgments could as equally be enforced here or

24   in Texas, and so I think this is a neutral factor.

25             Factor eight, Your Honor.  Practical

1    considerations that would make the case easy, expeditious,

2    or inexpensive.

3              Your Honor, you're going to hear some testimony

4    from both Ms. Dore and Mr. Keglevic that they did no

5    analysis whatsoever with respect to filing in Delaware

6    versus Texas.  Didn't look at what the costs might be,

7    didn't run out any numbers, didn't check travel costs, did

8    nothing.  In fact the testimony you'll hear, the sole basis

9    for a debtor in one of the largest bankruptcy cases in this

10   country's history, the sole basis was Ms. Dore's view of

11   common sense.  That's it.

12             Your Honor, we've cited a case here that basically

13   supports our view.  And again, I know you appreciate, Your

14   Honor, we're on the outside looking in, that's why we tired

15   to do as much discovery on this issue as we could.  And I'm

16   not complaining about the discovery we got, I am surprised

17   by the result, and I think the case supports the position,

18   Your Honor, that without any evidence with respect to costs

19   of where it in fact might be cheaper that really shouldn't

20   be held against us, Your Honor.

21             Next slide.  Your Honor, the debtors' constant

22   refrain for why these cases should be in Delaware, and

23   you'll hear this today, Your Honor, notwithstanding that

24   substantially, if not all, employees, operations, assets,

25   customers, trade creditors, counterparties, and regulators

1    are in Texas, none of which are in Delaware, the refrain is,

2    well, this is a balance sheet restructuring, not an

3    operational restructuring, so we needn't be concerned with

4    parties in Texas because they'll be unaffected.

5            But the debtors' obligation, Your Honor, is to

6    maximize value, and as a consequence many of the foregoing

7    parties, that is employees, customers, trade creditors,

8    counterparties, regulators, many of those parties are going

9    to have to appear and be heard somewhere.

10           For example, Your Honor, contract counterparties

11   will need to address either a cure amount if there's an

12   assumption or rejection damages claims.  Employees will need

13   to deal with the debtors' treatment of collective bargaining

14   agreements.

15           Your Honor, the debtors' list of 50 largest

16   creditors -- and you'll hear this from Ms. Dore, not from

17   me, you can take it from the witness -- the debtors' list of

18   50 largest unsecured creditors, 40 percent of whom are in

19   Texas, indicates every single creditors claim is

20   unliquidated.  Why should those creditors be put -- the

21   Texas creditors that is -- be put to the time and the

22   expense of coming to Delaware to get their claim

23   straightened out?

24           Contract that, Your Honor, against the debtors'

25   private equity owners and first lien and other hedge fund

1    bondholders who have purportedly already settled and are

2    expecting a full recovery.

3              Your Honor, last on this factor, and I think it's

4    a critically important consideration, and we cite the

5    Commonwealth Oil Refining case which supports the

6    contention, but frankly I think you'd get there on your own,

7    Your Honor, which is the location of senior management is

8    critical.  Why?  Because senior management has to remain

9    involved in day-to-day operations and business -- and the

10   business as much as possible so that the debtor is

11   maintained as a going enterprise and finances are put back

12   in order.

13             Whether or not this is a balance sheet

14   restructuring, Your Honor, if I were a stakeholder I'd want

15   my debtors' senior management in Texas managing this

16   business trying to maximize the value of the business, not

17   sitting in Delaware.  And as you'll hear from the testimony,

18   Your Honor, there were 11 senior management personnel in

19   this courtroom and who spent a week on the road for the

20   first day hearings and they expect -- because again you'll

21   hear in the testimony -- they expect they're going to do the

22   same thing again on June 5th and 6th.

23             So with that, Your Honor, I suggest that factor

24   eight balances on the movant side.

25             I'm going to wrap up, Your Honor, there's only 12

1    factors.

2              Factor nine.  Relative administrative difficulty

3    resulting from congestion of the court's dockets.  It's an

4    easy one, Your Honor.  Exhibit 19 is a publicly available

5    U.S. court document, and if you look at it you'll see, Your

6    Honor, that the Delaware Bankruptcy Court's Chapter 11

7    docket is approximately 350 percent more congested than the

8    Bankruptcy Court for the Northern District of Texas.

9              THE COURT:  Did you check out their Chapter 7 and

10   Chapter 13 docket?

11             MR. JONAS:  Your Honor, the debtors put forward

12   the Chapter 7 docket, which is busier than your docket.

13   With all due respect to the Chapter 7 process, Your Honor, I

14   respectfully suggest and you'll know better than anybody,

15   that those cases take nowhere the time or the effort of a

16   major Chapter 11 case.

17             THE COURT:  It depends on the district really --

18             MR. JONAS:  Understood.

19             THE COURT:  -- and how the local bar litigates and

20   what they litigate.  But I hear you.

21             MR. JONAS:  Your Honor, you're in the best

22   position of anyone to make that call so I'll leave that one

23   to you.

24             I would say, Your Honor, that the debtors

25   professed a need for speed can better be accommodated in

1    Texas.

2              And with that, Your Honor, our view is that this

3    factor weighs on the movant's side.

4              Your Honor, factor ten, public policy.  That

5    public policy consideration is to maximize recovery of

6    creditors and decrease cost of administration.

7              I think this is a neutral factor, Your Honor, I

8    think that this could be achieved equally, equally well, if

9    you will, in Dallas or in Texas -- I'm sorry -- in Delaware

10   or in Texas.

11             Your Honor, factor number 11.  Familiarity of the

12   judge with applicable state law.  Your Honor, you're going

13   to hear testimony from the debtors that there are critical

14   debtor contracts that are governed by Texas state law.  Just

15   to name one the TSA, the tax sharing agreement, which the

16   debtors will tell you is a critical document and has

17   critical relevance in this reorganization governed by Texas

18   law, and you'll see that again from the testimony so I won't

19   belabor the point, but there also will be Texas regulatory

20   approvals that are needed.

21             And I suggest to you, Your Honor, that the -- in

22   this case the overlay, if you will, of Texas state law is

23   compelling such that this factor weighs on balance, it

24   weighs for the movant.

25             Your Honor, last, factor number 12.  And I think

1    in some of the cases this is given short (indiscernible) so

2    I just want to spend a minute because I do think it's

3    critically important.  The local interest in deciding local

4    controversies at home.

5           Let me review, Your Honor.  All employees and

6    management live and work in Texas, none in Delaware.  All

7    assets, operations, and headquarters are in Texas, none in

8    Delaware.  All -- and that's millions -- of customers are in

9    Texas, none in Delaware.  All the non-federal regulators, of

10   course there's IRS, SEC, all the non-federal regulators,

11   that is PUTC, the Texas Reliability Entity, Inc., the

12   Railroad Commission of Texas, the Texas Commission of

13   Environmental Quality, they're all in Texas.  There are no

14   regulators in Delaware for the debtors.

15          And this I find fascinating, Your Honor.  The

16   debtors themselves, through Mr. Keglevic, testified that the

17   debtors are "an important part of the Texas economy" and the

18   debtors "operations are critical to serving customers and

19   maintaining electric service in northern Texas."

20          Your Honor, with that I think it's abundantly

21   clear that factor number 12 weighs in favor of the movant.

22          The last slide, Your Honor, and I won't speak to

23   it, the last slide is our summary of the 12 factors that I

24   just reviewed.

25          And before I close, Your Honor, I just wanted to

1    say we filed this motion -- and I know -- I think you

2    appreciate it, Your Honor -- when we filed this we didn't

3    know who the judge would be here and I don't want the Court

4    to think that our filing this motion was in any way a sign

5    of disrespect to the Court, it wasn't.  Win, lose, or draw

6    on the transfer motion we're always happy to be here, Your

7    Honor.

8            You know, there's been some discussion about

9    motivation both with respect to our filing the motion and

10   the debtors in filing the cases here.  Particularly, Your

11   Honor, there's been some -- some discussion around the fact

12   that the debtors might have filed here because it's

13   perceived to be easier or a better jurisdiction to get broad

14   releases for insiders as opposed to the Fifth Circuit.

15           And with that, Your Honor, I think the point is

16   that you can ignore motivations, whatever they might be.  I

17   think it's as simple as looking at the 12 factor test,

18   seeing on balance, you making the judgment where these

19   things come out, and if on balance -- again, without it

20   being a scorecard -- but if on balance or -- and I

21   understand we have -- our standard is a preponderance of the

22   evidence, I think we've demonstrated that.  Obviously you'll

23   make the call on that, Your Honor.

24           Thank you very much.

25           (Pause)

1                THE COURT:  Just give me a second.

2          (Pause)

3                THE COURT:  Yes.

4                MR. MCGAAN:  Thank you, Your Honor.  Andrew McGaan

5     for the debtors.

6                Mr. Jonas concluded by talking about motive and

7     his claims and the interest in debating motive for filing

8     the motions.  And at one level I agree with him.  Motive for

9     filing in Delaware or motive for wanting to transfer to

10    Texas is -- or any other jurisdiction is not identified in

11    the controlling cases as a factor.

12               But what's odd about Mr. Jonas disclaiming it is

13    that in the very front of their motion that they filed on

14    April 29th on page 2 they confess their motive in filing

15    this motion.  They say -- they express a fear that "this

16    Court would among other things adopt without significant

17    additional scrutiny" a particular valuation approach.

18               That's what motivates this motion, because they

19    said so.  We don't agree with that.  We do agree that that

20    doesn't play here.  It doesn't play here in the venue

21    consideration.  But what's interesting is the party making

22    that argument has zero ties to Texas.

23               I just have a couple observations about the motion

24    and then I want to save my comments for the end when we see

25    the evidence, Your Honor, but just in reaction to some of

1    the things Mr. Jonas said.

2            Let's get back to what the standard is.  The --

3    under Delaware law they -- the debtors choice to file here

4    -- which by the way as Your Honor sees from the papers not

5    in dispute, venue is proper here under 28 U.S.C. 1408 -- and

6    they bear the burden of proof of overcoming what the

7    Delaware courts have said here in this circuit, substantial

8    weight and deference given to the debtors' proper decision

9    to file for venue here.

10           So this isn't a debate about, and no case says,

11   that the debtor bears any burden of having done calculations

12   of costs.  It is their burden, and the reason they're

13   focusing on testimony that you're going to hear that the

14   debtors didn't sit down and say, well, how much are hotels

15   in Dallas and how much are hotels in Wilmington, they didn't

16   do that.  The reason that you won't hear testimony about it

17   is because they've got no argument that this case is going

18   to be less costly or more economically administered in

19   Dallas.

20           They don't -- they represent a client who's just

21   down the street.  We have Wilmington Savings Fund Society

22   represented by lawyers from New York, Hartford, and Boston

23   saying it's inconvenient and unjust to litigate this case

24   here.

25           So my observations are it's a lonely, lonely

1    motion.  Not only do they not identify any -- any

2    inconvenience to them whatsoever, in fact it's obvious that

3    it's more convenient for them to litigate it here based on

4    where they're present, where the creditors are that they

5    represent, where the lawyers are that they've hired, where

6    the financial advisors are that they've hired.  So there's

7    other reasons for the motion.

8              Their -- we take a look at what's happened in the

9    case so far.  Who showed up, who came to the podium on the

10   first day, and who's going to come to the podium today?

11   There's no Texas lawyers, there's no Texas interest standing

12   here saying this is unjust and inconvenient and we need to

13   be in Texas.  In fact it's just the opposite if we get

14   through this and we'll see.

15             Depositions of Mr. Keglevic and Ms. Dore, the only

16   two depositions taken in the case thus far in New York,

17   attended both in person and over the phone were people from

18   Texas, the under represented that Mr. Jonas is purporting to

19   be concerned about could join by phone.  Not a single person

20   outside of Boston, New York, or Chicago was present at those

21   depositions even on the phone.

22             You're going to hear testimony from Ms. Dore and

23   from Mr. Keglevic that they essentially in the two-year

24   period leading up to the filings here commuted from Dallas

25   to New York.  Monthly, and then as we approached the filing

1    date over a year ago it became almost every other week and

2    then every week.  Why to New York?  Entirely to negotiate

3    with the creditors whose interests are being debated in

4    these cases.  They were there.  They hardly had any meetings

5    in Dallas.  To go see the creditors, secured and unsecured,

6    to see their financial advisors they had to be in New York.

7              In fact you're going to hear that right before the

8    first day hearing the managers from the debtors who were

9    involved in restructuring negotiations were in New York

10   completing negotiations on the restructuring support

11   agreement, and had this case been filed in Dallas they would

12   have had to get on airplanes and fly back to Dallas to make

13   it to the first day hearing rather than just getting on a

14   train and coming down to Wilmington.

15             The only Texas interest at all that's supported

16   the motion to transfer venue is an advocacy group called

17   Neighbor for Neighbor.  I just saw their joinder yesterday,

18   maybe it was filed earlier than that.  Not a creditor, has

19   no claim, doesn't purport to have any claim in this case.

20   From reading their papers they don't purpose to represent --

21             THE COURT:  Are they a party to litigation?

22             MR. MCGAAN:  I don't believe they said they were.

23             THE COURT:  I think they did, but it may not be --

24   it may no longer be pending.  I think on a water -- on a

25   safe water issue.

1            MR. MCGAAN:  Yeah, they didn't identify any actual

2     environmental liability in Texas that the debtors

3     purportedly had to them or anybody that they purport to

4     speak for.  In fact they didn't even claim that this -- the

5     venue here was inconvenient to them, the person filing the

6     motion -- or the joinder I should say.

7            So the -- I think the motion to transfer venue

8     here faces two major problems that highlight the inability

9     of the movants to meet their burden, to overcome a

10    substantial weight and deference that is accorded under the

11    law to the debtors' choice of forum here.

12           Why haven't they met their burden or proof?  Well

13    there's the opposition motions, overwhelmingly the creditor

14    interest throughout the capital structure and the company

15    have filed joinders in the opposition to the motion to

16    transfer.  And like the clients of the movants they

17    represent creditor interests and indenture trustees, DIP

18    financing parties that are clustered in and around New York

19    City and the northeast, not in Texas.

20           Texas interest in this case that have spoken up

21    are the unions, the International Brotherhood of Electrical

22    Workers represents approximately 2,000 of the debtors'

23    employees all working in Texas at these mines and plants

24    that Mr. Jonas was talking about.  As Your Honor I believe

25    would have seen has filed a joinder opposing the transfer to

1   Texas.

2          Mr. Jonas talked about the significant interests

3   in the State of Texas having this case in Dallas because of

4   the presence of mines and operations and offices there, but

5   this is the other problem that their motion faces, which is

6   the overwhelming silence from people who would speak for

7   those interests.  There's a filing from the Texas Attorney

8   General who represents the Texas regulators that Mr. Jonas

9   purports to be concerned about saying he takes no position

10  on the transfer.

11         If it were such a vital interest to the State of

12  Texas, if Mr. Jonas were right in what he was saying

13  couldn't they have brought forth evidence from someone

14  actually representing those interests?  Not their clients,

15  not the New York lenders, but the people representing those

16  interests in Texas to come in here and say he's right?  They

17  said we take no position.  We'll be represented here, we'll

18  be represented there as Your Honor decides.  They fail --

19  they fail to meet the burden there.

20         The official committee, Mr. Jonas says that's

21  there's no one representing the small creditors.  They have

22  an official committee here.  It has not taken a position

23  supporting the motion to transfer venue.

24         There are serious problems with the motion, they

25  fail to meet their burden, they have not shown any evidence

1    and they won't show any evidence that this case should be

2    litigated in Dallas, that it overcomes the deference given

3    to the debtors' proper choice of forum here, or that the

4    administration of the estate would be more economic or

5    efficient if it were transferred to Dallas.

6            I think you'll see when the evidence is done and I

7    get a change to address Your Honor again that it's just the

8    opposite.  We don't have a burden to show it but I think

9    that the facts here show that it is in fact more convenient,

10   it is in fact more economically more efficient to keep the

11   case here where the debtors have chosen to be.

12           Thank you, Your Honor.

13           THE COURT:  You're welcome.

14           Anyone else before we turn to evidence?

15           All right.  Want your witness, we'll start with

16   Mr. Keglevic?

17           MR. JONAS:  Your Honor, actually we're going to,

18   and consistent with your suggestion, which I agree with and

19   in terms of a preference for order, we suggest and we're

20   ready -- it's queued up, it's ready to go --

21           THE COURT:  Okay.

22           MR. JONAS:  -- to play Ms. Dore's deposition

23   testimony.

24           THE COURT:  And it's on all the monitors?

25           MR. JONAS:  It should be, yes, Your Honor.

1          Thank you.

2          THE COURT:  Give me just a moment.  To play what I

3     am sure is something that's not on tape.  We're dating

4     ourselves when we talk about videotaped depositions.

5          (Pause)

6          THE COURT:  Okay.

7          (Video deposition of Stacey Dore begins)

8     BY UNIDENTIFIED SPEAKER:

9     Q    And since you graduated from Harvard Law School, could

10    you take me through your employment history?

11    A    Sure.  I was an attorney at Vinson & Elkins for 11

12    years, and then I've been with EFH for the last six years.

13    Q    And in connection with your employment at EFH, from the

14    beginning of that employment to now, can you take me through

15    the titles you've held and the jobs you've had?

16    A    I joined the company as associate general counsel in

17    charge of litigation.  I was then -- that was in 2008, July

18    of 2008.  I was then promoted to the chief legal officer of

19    Luminant, which is one of our subsidiaries.  I believe that

20    was in October or November of 2011.  I was only in that

21    position for a brief time before I was promoted to the

22    general counsel of EFH in March of 2012, the position that I

23    currently hold.

24    Q    And can you describe -- in your current position, what

25    are your job responsibilities?

1    A    I'm in charge of the legal department for EFH,

2    Luminant, and TFG Energy.  So, essentially our entire

3    company, which includes EFIH as well, excluding Oncor.

4    Q    And where is your office located?

5    A    In Dallas.

6    Q    Okay.  And is Dallas the location of the debtors'

7    headquarters?

8    A    Yes.

9    Q    In your role as general counsel, do you actually sit

10   with the legal group or is there another management group

11   that you sit with?

12   A    I sit on the floor with the rest of the executive team.

13   So, there are no other (indiscernible) -- in fact, there's

14   one other lawyer who sits up there now with me, but other

15   than the two of us, the rest of the individuals on that

16   floor are not legal.

17   Q    And who are the other -- when you say the executives,

18   who are you referring to?

19   A    Our CEO, our CFO, our head of public affairs, and our

20   head of human resources are the other members of the

21   executive team that are on the same floor as me.

22   Q    Okay.  Ms. Dore, your attorneys have advised that you

23   don't plan on being at the May 22nd venue trial, is that

24   correct?

25   A    That's correct.

```
1    Q    And why is that, that you don't plan on being there?

2    A    I have a long-standing family commitment that day.

3    Q    Is that family commitment (indiscernible)?

4    A    Yes.

5    Q    Okay, and is that at a certain time?

6    A    It's all day, actually.

7    Q    Would you be unable to attend if the venue trial were

8    to take place in Dallas?

9    A    I would be able to -- I would be unable to attend if it

10   were in Dallas.

11   Q    For the entire portion of the trial?

12   A    Yes.

13   Q    And how about May 23rd, would you be available in

14   Delaware on May 23rd?

15   A    I could be if I left the night of May 22nd, yes.  I

16   think there's a late flight out to Philly out of Dallas.

17   Q    And I don't -- I'll apologize in advance, it's -- I'm

18   not trying to pry --

19   A    No.

20   Q    -- but if you could, without disclosing for me the

21   exact nature of your family commitment, just generally

22   explain why it is, because I just need to know --

23   A    Sure.  No, no, it's no problem, and you're not prying,

24   sorry.  My two children attend a school in which the entire

25   lower school, grades K through 4, are going on an end of the
```

1    year school fieldtrip and I agreed, with the teachers, back

2    in September to chaperone that fieldtrip.  I made the

3    decision that we were going to file for bankruptcy, if we

4    filed for bankruptcy that we would file in Delaware and that

5    was likely in early 2013.

6    Q    So, what was the basis of that decision?

7              UNIDENTIFIED SPEAKER:  I'm going to object and

8    then struck out the answer.  It's calling for privileged

9    information.

10   BY UNIDENTIFIED SPEAKER:

11   Q    Are there business reasons underlying your decision to

12   have the debtors file bankruptcy in Delaware?

13   A    Yes.

14   Q    Okay, can you tell me what those business decisions

15   reasons are?

16   A    Business reasons?

17   Q    Business reasons, yes.

18   A    Well, in general, like I said in our response to your

19   motion, this restructuring is not about the company's

20   operations.  It is about the company's debt load.  And so,

21   in general, one of the business reasons underlying the

22   decision would have been the nature of the restructuring and

23   where we thought would be most efficient for the

24   restructuring to take place vis-à-vis the nature of the

25   restructuring.

1    Q    Okay, but for you as the general consult of the

2    company, wouldn't it be the case that it would be more

3    efficient for you to have the debtors file in Dallas?

4    A    No.

5    Q    Why not?

6    A    Because, again, the nature of our restructuring is

7    focused on the debt, which means that the primary interested

8    parties in this case are the creditors, as well as all their

9    advisors and our advisors.  And as far as I know, at least

10   none of the work that I've dealt with are located in Dallas.

11   Q    Okay.  But I just want to talk about you and your role

12   as general counsel.  Are you suggesting that it's more

13   efficient for you to get on a plane, fly to Philadelphia,

14   take a car to Delaware, stay in a hotel (indiscernible)

15   that's necessary and attend hearings, and then reverse that?

16   Are you suggesting that's more efficient for you as the

17   general counsel of these debtors than being able to walk

18   down the street to a Bankruptcy Court in Dallas?

19   A    For me personally and standing alone, sure, it is not.

20   Q    Okay -- strike that.  How about any of the other

21   executives of the debtors.  Do you think it's more efficient

22   for them to go to Delaware or to be in Dallas?

23   A    I think, for -- if you were looking only at the

24   personal interest of people with the company who have to

25   attend hearings and you were looking only at that issue, it

1   would be more efficient for them to be in Dallas.  But our

2   own personal interests did not go into the decision on

3   venue.

4   Q    And whose interest did go into that decision?

5   A    The company's.

6   Q    All right.  And when you say the company's, what are

7   you referring to?

8   A    The company -- all of the company's interests is what

9   I'm referring to.

10  Q    Okay.  And why do you think that's the case?

11  A    Well, as I stated earlier, because the companies -- all

12  of these companies, their primary -- in our view, their

13  primary interests is in having an efficient restructuring

14  process and it is more efficient, given the nature of this

15  particular restructuring, to be located in Delaware.

16  Q    Okay, and why do you say that?

17  A    Because, again, all of the interested parties, and I

18  think this was born out by who showed up at the first day

19  hearings, all of the interested parties are creditors, their

20  counsel, many of them are representing here today, and

21  that's the essence of the case is what to do about the debt

22  and the company, not what to do about our assets, and our

23  employees, and other (indiscernible).

24  Q    Okay, so you think it's more efficient for the

25  company's creditors that the bankruptcy take place in

1    Delaware?

2             UNIDENTIFIED SPEAKER:  (Indiscernible).

3             THE WITNESS:  Not of (indiscernible).  It is more

4    efficient for the company to have a bankruptcy in which all

5    of the people who need to be in a room to restructure the

6    company are closer to Delaware than they are in Texas.  That

7    will make the case overall for the company more efficient.

8    BY UNIDENTIFIED SPEAKER:

9    Q    And you said -- I think you said you made the decision

10   on venue, is that right?

11   A    Yes.

12   Q    Okay, did you consult with anyone else in making that

13   decision?

14   A    Yes.

15   Q    And who did you consult with?

16   A    I consulted with our counsel at Kirkland.  I consulted

17   with our -- well, I didn't consult -- I didn't -- I would

18   say I consulted with our counsel, primarily, before make the

19   decision.

20   Q    Okay, and did you consult with any other executives at

21   the debtors?

22   A    I informed them of my recommendation after I had

23   already arrived at my conclusion.

24   Q    Okay.  And how about the Board?  Did you have any

25   interaction with the Board relating to your decision on

1    venue?

2    A    I informed them of my recommendation as well.

3    Q    Okay, and was there a Board vote on the venue decision?

4    A    No.

5    Q    Was there a discussion at the Board level?

6    A    Yes.

7    Q    And what was the nature of that discussion?

8         UNIDENTIFIED SPEAKER:  Objection.  (Indiscernible)

9    grounds of privileges.

10   BY UNIDENTIFIED SPEAKER:

11   Q    And other than -- you've met -- strike that.  Insofar

12   you've mentioned efficiency as an important factor in your

13   decision to file bankruptcy in Delaware, correct?

14   A    Yes.

15   Q    Were there other important factors?

16   A    Yes.

17   Q    And what were those?

18        UNIDENTIFIED SPEAKER:  I'm going to object and

19   instruct you not to answer (indiscernible).

20   BY UNIDENTIFIED SPEAKER:

21   Q    Did you ever examine the costs related to a Delaware

22   filing versus a Texas filing?

23   A    I never examined the cost.

24   Q    Did you examine the costs of filing in Delaware versus

25   Texas?

1    A    Not -- no, not other than just my general common sense

2    about where the costs were going to reside.

3    Q    So, the cost of a filing in Delaware versus Texas was

4    not a factor in the decision to file in Delaware?

5    A    It was a factor.

6    Q    Well, if it was a factor -- how could be -- let me ask

7    you this, how could it have been relevant to your decision

8    if you never understood what the underlying cost was?

9    A    Because as I alluded to, I think it's -- you know, from

10   someone who is just a business person and understood what

11   the restructuring was going to be about, it was obvious to

12   me that it was going to be more expensive, in many ways, to

13   have the case in Texas?

14   Q    And why was it obvious to you?

15   A    Well, for example -- all of the -- as I stated earlier,

16   all of the parties who were going to be involved in the day

17   to day of this case primarily resides in the Northeast.  And

18   because the debtor -- as I found out about bankruptcy early

19   on, has to pay for a lot of those expenses, it was going to

20   be more expensive to have all of these people traveling to

21   Dallas than it would be to have it in Delaware.

22   Q    We'll talk a little bit more about that in a minute,

23   but you can't, as you sit here, tell me based on empirical

24   data or actual data that, in fact, the debtors filing in

25   Delaware is cheaper for the debtor than filing it in Texas,

1   can you?

2   A     I don't have any actual facts to provide you, but that

3   is my opinion.

4   Q     And that opinion is based on, I think you said, common

5   sense?

6   A     Yes.

7   Q     And that's really all it's based on?  Meaning there was

8   no additional analysis relating to costs.

9   A     Other than just the facts underlying the opinion being

10  the location of the parties who were going to be involved in

11  the case.

12  Q     And did you consider -- strike that.  In connection

13  with your decision to file bankruptcy in Texas, did you

14  consider the cost of many of the debtors' executives being

15  away from headquarters?

16  A     No.

17  Q     Okay.  Did you ever come to an understanding of who

18  from the debtors' management team would have to travel to

19  Delaware for -- in connection with the debtors' bankruptcy

20  case?

21  A     Sure.

22  Q     And who did you think would have to go up to Delaware

23  for the debtors' bankruptcy case?

24  A     Well, that depends on at what point in time, but I

25  assumed --

1          (Video testimony was paused)

2               THE COURT:  Pause for a minute.  I'm lost in the

3     transcript.

4               UNIDENTIFIED SPEAKER:  I am too, Your Honor.

5               UNIDENTIFIED SPEAKER:  One second, Your Honor, I'm

6     sorry.  Page 72, Your Honor.

7               THE COURT:  That's -- I don't see that testimony.

8               UNIDENTIFIED SPEAKER:  I don't either.

9               THE COURT:  Did you ever come to an understanding

10    of who from the management team would be -- is that where we

11    are?  That's not designated, my copy.  Is there any

12    objection to using it?

13              MR. JONAS:  No objection, Your Honor.

14              THE COURT:  Okay.

15              MR. JONAS:  Somehow we didn't get, but no

16    objection.  We'll clean that up.

17              THE COURT:  No, it's all right.  I mean, it --

18              UNIDENTIFIED SPEAKER:  I think what was asked

19    (indiscernible).

20              THE COURT:  Okay.

21              MR. MCGAAN:  I think he was asking me.  No, I

22    don't have any objection to this.

23              THE COURT:  Okay, you can continue, thank you.

24         (Video testimony resumes)

25              THE WITNESS:  And I know that (indiscernible)

1    would have to be in Delaware at times for the bankruptcy.

2    They're our -- a few members of our teams that from time to

3    time may have to be there and then, you know, to the extent

4    somebody is deposed or had to be a witness in something,

5    they would have to be there.  But I think it's primarily

6    myself, Paul, and a couple of members of each of our teams.

7    BY UNIDENTIFIED SPEAKER:

8    Q    In connection with your job, do you think it's

9    important that you be on site at headquarters?

10              UNIDENTIFIED SPEAKER:  (Indiscernible).

11              THE WITNESS:  Sure, I mean, I -- at times.

12   BY UNIDENTIFIED SPEAKER:

13   Q    What time?

14   A    Whenever I can be there.  It would not be appropriate

15   for me to never be in Dallas, but all of our executives,

16   even the ones who are not involved in restructuring travel

17   frequently for business.

18   Q    Okay, but historically, at least prior to

19   restructuring, your travel was fairly -- pretty much limited

20   to Texas travel, correct?

21   A    Mine was.

22   Q    And Mr. Keglevic, what is his role?

23   A    He's the chief financial officer and the co-chief

24   restructuring officer.

25   Q    And do you think it's important in connection with his

1    job responsibilities that Mr. Keglevic be on site at

2    headquarters?

3    A    I think it's important for him to be onsite as often as

4    he can be.

5    Q    You don't know whether venue was discussed in

6    connection with any of the consensual resolutions, or

7    restructurings that the debtors have reached a certain of

8    their creditor deficiencies?

9    A    I thought you were asking me about company personnel.

10   I think Kirkland has probably had discussions about venue

11   with debtor (indiscernible).

12   Q    And that's what I'm trying to get at.  I'm trying to

13   get at your understanding of frankly who had discussions

14   with any of your creditor constituencies relating to venue.

15   A    I'm sure that Kirkland must have had those discussions.

16   Q    As far as you know, no one at the debtors had those

17   discussions?

18   A    I don't recall the debtors having had those discussions

19   directly.

20   Q    Were -- at some point, were you told that your

21   creditors wanted the companies to file in Delaware?

22   A    No, I don't recall.  I don't recall ever being told

23   that.

24   Q    And in connection with your decision to file bankruptcy

25   in Delaware, did you consider what your creditors would

1    want?

2    A    I didn't consider what they would want.  Again, I

3    considered what I thought was most efficient for the

4    company.  I considered whether certain parties might object,

5    but I didn't consider what other people wanted as far as the

6    company?

7    Q    And in connection with your decision to file bankruptcy

8    in Delaware versus Texas, did you consider what

9    counterparties would want?

10   A    Counterparties to which contract?

11   Q    Any contract.

12   A    Any contract?  No.

13   Q    Okay, and in connection with your decision to file

14   bankruptcy in Delaware versus Texas, did you consider what

15   your customers would want?

16   A    Yes.

17   Q    And what was the conclusion of what your customers

18   would want in terms of venue for bankruptcy filing?

19   A    Our conclusion was that customers would not care where

20   we filed because they are not involved in the bankruptcy.

21   Q    And why do you say they're not involved in the

22   bankruptcy?

23   A    Because we aren't -- we are not changing any of our

24   customer programs, or any of our regular business dealings

25   with our customers.  In fact, one of the first day motions

1    that was very important to us, which has been granted on an

2    interim basis is to continue our customer programs

3    uninterrupted and assume our customer contracts.

4    Q    In connection with your decision to file bankruptcy in

5    Delaware, did you consider the interests of your employees?

6    A    Sure.

7    Q    And how -- what were your -- what was your thinking on

8    that?

9    A    Again, our consideration on that is that our employees

10   want what's best for the enterprise.  That they want a case

11   that is going to be as efficient and quick as possible so

12   that we can get out of bankruptcy.

13   Q    And I think we had the pending question

14   (indiscernible), so you can read the question, please.

15              UNIDENTIFIED SPEAKER:  Question is, did you review

16   that Kirkland's bankruptcy in Delaware was (indiscernible)

17   efficient (indiscernible) and what was the basis of that,

18   please?

19              UNIDENTIFIED SPEAKER:  I'm going to object

20   (indiscernible) to the extent it calls for privileged

21   information, otherwise, you can go ahead.

22              THE WITNESS:  I don't think I can answer that

23   question without reviewing the (indiscernible).

24   BY UNIDENTIFIED SPEAKER:

25   Q    And I want to ask you, Ms. Dore, a number of times

1   you've indicated that you couldn't answer a question because

2   of privilege, when you do that, at least to date, have you

3   -- is that because you got and relied on legal advice from

4   Kirkland and Ellis?

5   A    It's both because of that and it's my own legal advice

6   to our -- to my client.

7   Q    No, the question is whether you believe that the

8   debtors having filed in Delaware, as opposed to Texas,

9   promote the economic and efficient administration of the

10  estate?

11  A    Yes.

12  Q    Okay, and if you could, explain why that's the case.

13             UNIDENTIFIED SPEAKER:  It's the same instruction.

14  If you can discuss, if you can provide reasons from a non-

15  privileged source, you can go ahead and answer.

16             THE WITNESS:  Well, I think I discussed the

17  business reasons that we talked about earlier, that it's

18  more efficient for the case.  So, beyond what I've already

19  discussed as those business reasons, I think the remainder

20  would be privileged.

21             UNIDENTIFIED SPEAKER:  Okay, then I'll

22  (indiscernible).

23  BY UNIDENTIFIED SPEAKER:

24  Q    And do you know of any reason why the parties that

25  attended -- all of the parties that attended the first day

1    hearings in Delaware wouldn't have been able to attend first

2    day hearings had they been in Texas?

3    A     I don't know of any reason.

4    Q     (Indiscernible), other than my client, are you aware of

5    when -- whether any other party in interest in these cases

6    has expressed a view on your venue choice of Delaware over

7    Texas?

8    A     Has any other party expressed a view on venue?

9    Q     Yes.

10   A     I mean, I think in general, the creditors with which we

11   have an agreement are supportive of venue in Delaware, I

12   think.  I mean, they certainly haven't expressed an

13   objection to it.

14   Q     And are there any other party (indiscernible), whether

15   they be counterparties, creditors, employees, I just -- I

16   want to make sure we close this off.  Has anyone else or any

17   other party expressed a view to you of your choice to file

18   in Delaware versus Texas?

19   A     No.

20   Q     And you were at the -- both days of the "first day

21   hearings?"

22   A     I was.

23   Q     Okay.  And let's talk about that for a minute.  Who

24   else from the debtors in connection -- when I say who else,

25   I mean employees, officers, management, board, I don't mean

1    professionals --

2    A    Okay.

3    Q    -- who else from the debtors attended the first day

4    hearings?

5    A    Do you want me to give you a full list?

6    Q    As best you can.

7    A    Okay.  It was myself, Paul Keglevic, Carla Howard,

8    (indiscernible), Andy Wright, Greg Santos, Kelly Frazier,

9    Kris Moldovan, Michael Carter, Tony Horton, and I may be

10   missing someone, but that's all I can remember.

11   Q    Kris Moldovan?

12   A    Moldovan.

13   Q    Moldovan?

14   A    Uh-huh.

15   Q    And Terry Nutt?

16   A    Terry Nutt, yes.

17   Q    Do you think that's, as best you can recall, the

18   complete list?

19   A    That's as best as I can recall, yes.

20   Q    And Michael Carter, what does he do?

21   A    He is the head of our planning, senior vice-president

22   of planning, I think is his title.

23   Q    And Cecily Gooch, what does she do?

24   A    She's special counsel for restructuring.  She reports

25   to me.

1    Q    And Tony Horton, what is his position?

2    A    He's our treasurer.

3    Q    And Carla Howard?

4    A    Senior vice-president of tax.

5    Q    Paul -- I'm sorry, Paul Keglevic.

6    A    CFO and (indiscernible).

7    Q    Kris Moldovan?

8    A    Kris Moldovan.

9    Q    Moldovan.

10   A    He is the assistant treasurer.

11   Q    Okay, and Terry Nutt?

12   A    He's our vice-president of RISK.

13   Q    And Greg Santos?

14   A    He is a lawyer on my team, a securities lawyer.  He's

15   senior counsel, I think is his title.

16   Q    And Andy Wright?

17   A    He is deputy general counsel, reports to me.

18   Q    And do you think I missed anybody that you mentioned

19   were there on the first day hearings?

20   A    Kelly Frazier, another lawyer on my team.  She's

21   counsel with the company.

22   Q    Okay.

23   A    I can't think of anyone else.

24   Q    And let's just start with you, when did you head up to

25   Delaware for the first day hearing?

1    A    Well, I actually -- I think I headed down to Delaware

2    because I was in New York.

3    Q    Okay.

4    A    So, it was on the Wednesday night before the hearing.

5    Q    Okay, when did you head up to New York from Texas?

6    A    The Sunday before we filed.

7    Q    And were there meetings or something else going on in

8    New York?

9    A    Yes, yes.

10   Q    What were the nature of those meetings?

11   A    There were RSA negotiations.

12   Q    And I take it those were here at Kirkland's office?

13   A    They were.

14   Q    And to the extent you -- strike that.  Do you when the

15   -- any of these other folks that you mentioned, when they

16   traveled up to Delaware?

17   A    I think all of us were in New York, actually, for the

18   RSA negotiations, maybe with the exception of Terry Nutt.

19   No, he was here as well.  So, we all went down on Wednesday,

20   different time of the day.  I went -- I think all were in

21   the later trains, but we all went down on (indiscernible).

22   We actually had to fly back longer to get back to Dallas

23   because the first day hearing had been there, but --

24   Q    And so is it your testimony that this entire group of

25   people were in New York from roughly Sunday through the

1    Wednesday when they went to Delaware, and then through the

2    end of the hearings on Friday?

3    A    I believe so.  I can't remember for sure if Carla was

4    with us in New York.  She's the only one that might have

5    flown directly to Delaware.

6    Q    And the -- did you fly up -- was that coach or first

7    class or --

8    A    My flight?

9    Q    Yeah.

10   A    Was first class.

11   Q    And what hotel were you at?

12   A    The Plaza.

13   Q    And are there any policies at the company with respect

14   to cost of hotels or the like?

15   A    I don't know that we have a specific policy about it.

16   The reason a lot of us stay at the plaza is because we get a

17   special rate there.

18   Q    Okay.  And I take it you all were housed at the DuPont

19   in Delaware?

20   A    Yes.

21   Q    Okay.  And did you get a special rate there?

22   A    I think Kirkland actually did negotiate a special rate

23   there, but I don't remember what it was.

24   Q    And let's just take last week -- strike that.  Let's

25   take that week you were out of the office, how do you manage

1    your office work -- how did you manage your office work that

2    week while you were out of the office?

3    A    Well, when you say office work, I mean, I don't really

4    have the kind of work that you have to be in a particular

5    place to do.  I work at home.  I work in my office.  I work

6    on airplanes.  I work in New York.  I work on vacations.  I

7    work pretty much anywhere that I am.  So, it's not really --

8    I'm not confined to working in Dallas.  And the way that I

9    deal with my administrative duties as a manager of the legal

10   department is by staying in touch with the people in my

11   group by phone and e-mail.

12   Q    Let's (indiscernible) to the extent you can recall, how

13   many times were you in touch with the office, do you know

14   what I mean when I say the office?

15   A    Every day.

16   Q    Okay.  And that's by phone and e-mail?

17   A    Yes.

18   Q    And that's more than one time a day?

19   A    Probably.

20   Q    Have you ever given any consideration to what

21   particular matters or hearings in the bankruptcy case will

22   require personnel from the debtors who actually are here in

23   Delaware?

24   A    Well, I don't think we can predict, given the nature of

25   this proceeding, what all the various hearings are going to

1    be, but certainly, you know, I personally plan to be at as

2    many of them as I need to be.  I know that Paul will be, as

3    the first day declarant, he will need to be at

4    (indiscernible).  And then to the extent you have, you know,

5    subject matter witnesses, they will need to be there.  But

6    other than that, I don't think people from the company will

7    need to be at most hearings.

8    Q     There's some hearings coming up on June 5th and 6th,

9    correct?

10   A     Yes.

11   Q     Okay.  And those are final hearings -- strike that.

12   Among other things, you'll get final hearings on the

13   debtors' first day motions, right?

14   A     That's right.

15   Q     And do you have an understanding of who from the

16   debtors will be coming up to Delaware to appear at those

17   hearings?

18   A     Generally speaking, I think it'll be about the same

19   teams that we had before, but we will all be here in New

20   York before that getting ready, so --

21   Q     I'm sorry.  (Indiscernible), in this case, it could

22   take a number of weeks, and based on that assumption, my

23   question to you is, knowing that, and knowing that that may

24   require a team of the debtors' senior management to be away

25   from the office for an extended period of time, would that

1    lead you to conclude that that type of trial should take

2    place in Dallas versus Delaware?

3              UNIDENTIFIED SPEAKER:  Objection (indiscernible).

4              THE WITNESS:  It would not.

5    BY UNIDENTIFIED SPEAKER:

6    Q    Why not?

7    A    Because I think regardless of whether -- where the case

8    was, that whoever that team of management is that had to be

9    involved in evaluation trial would be right here in New York

10   preparing for that case with our advisors and

11   (indiscernible), who would -- know would be central to that

12   case.

13   Q    And you'll see at the bottom there, a bullet point,

14   this is truly a balance sheet restructure, do you see that?

15   A    Yes.

16   Q    And what is your understanding of what a balance sheet

17   restructuring is?

18   A    That we have an unsustainable level of debt across the

19   enterprise and we need to restructure that debt in a way

20   that it's sustainable.  And of course, (indiscernible)

21   arrived at the point where only Chapter 11 can do that.

22   Q    Okay.  Isn't every Chapter 11 case a balance sheet

23   restructuring?

24   A    I think there are probably a lot of Chapter 11 cases

25   came because of balance sheet restructuring, but they

1    typically evolve -- I shouldn't say typically.  Many of them

2    involve a lot more than balance sheet.  Things like union

3    contracts, and, you know, over a company that has expenses

4    that need to be reduced, regulatory problems, and marginal

5    cleanup issues, you know, whatever those kinds of things are

6    that are weighing down a company that we don't have in this

7    case.

8    Q    Well, you don't know that they won't arise in this

9    case, do you?

10   A    I know that we don't have those problems at our

11   company.

12   Q    You don't have those problems today?

13   A    We do not.

14   Q    Have the debtors looked at taking advantage of actions

15   that they can take in the bankruptcy case to -- on the

16   operational level?

17            UNIDENTIFIED SPEAKER:  Objection (indiscernible).

18   BY UNIDENTIFIED SPEAKER:

19   Q    Well, let me ask you, are you aware that in a

20   bankruptcy case, a debtor has the ability to reject

21   burdensome contracts?

22   A    Yes.

23   Q    Has the debtor done an analysis of its contracts and

24   determined if any of those are burdensome?

25            UNIDENTIFIED SPEAKER:  Objection (indiscernible).

1    BY UNIDENTIFIED SPEAKER:

2    Q    As you sit here today, is it your belief that all of

3    the debtors' contracts are in the money, to use your phrase?

4    A    I'm sure that is not the case.

5    Q    Don't you think it would be a good idea for someone at

6    the debtors to come up with that list and figure out whether

7    there's a way in bankruptcy they could take advantage of the

8    bankruptcy to reject those contracts?

9    A    Not necessarily.

10   Q    Why not?

11   A    Because a lot of factors go into whether to reject a

12   contract other than whether you're in the money or out of

13   the money.  So --

14   Q    (Indiscernible).  Have the debtors analyzed their

15   collective bargaining agreements to determine whether they

16   could get either some sort of relief from those in

17   bankruptcy?

18           UNIDENTIFIED SPEAKER:  Same instruction.

19   BY UNIDENTIFIED SPEAKER:

20   Q    Have the debtors looked at leases which are upside down

21   or out of the money to determine whether they'd get relief

22   from those in bankruptcy?

23           UNIDENTIFIED SPEAKER:  Same instruction.

24   BY ATTORNEY:

25   Q    Now, have the debtors looked at the retiree obligations

1    to determine if those could be addressed in the bankruptcy?

2              UNIDENTIFIED SPEAKER:  Same instruction.

3    BY UNIDENTIFIED SPEAKER:

4    Q    To the extent you know, where do each of these people

5    live?

6    A    Chairman Evans lives in Midland, Texas.

7    (Indiscernible) lives in (indiscernible).  Paul Keglevic

8    lives primarily in California, sometimes in Dallas.  Well,

9    during the week in Dallas, but he has a residence in

10   California.  That's where his wife lives.  I live in Dallas.

11   (Indiscernible) lives in Dallas.  And Jim Burke lives in

12   Dallas.

13   Q    And where do those Board meetings typically take place?

14   A    Typically Dallas.

15   Q    And what is your understanding of what the

16   restructuring support agreement is?

17   A    It's an agreement with various constituent -- various

18   creditor groups to support any particular kind of plan of

19   reorganization.

20   Q    Okay.  And how did that come into being?

21   A    Through a long process of negotiating with various

22   groups.

23   Q    And to the extent those -- strike that.  Were there in-

24   person negotiations with those groups?

25   A    Yes.

1    Q    And where did those take place?

2    A    New York.

3    Q    Were there -- over the last year, have you ever had

4    meetings with your constituent creditors in Dallas?

5    A    There have been a couple, not many, but I think there

6    were fewer than five, for sure, but maybe two or three.

7    Q    So, when you say fewer than five, that would be out of

8    how many total meetings in terms of meetings with

9    constituent creditors?

10   A    Are you including their advisors in that group as well?

11   Q    Sure.

12   A    Sometimes those were (indiscernible) of one or the

13   other.  Wow, out of the total of how many?  And you're

14   asking about year -- the calendar year 2013, is that right?

15   Q    Sure, we can -- well, let's -- how about just start

16   with 2014, and then we'll (indiscernible).

17   A    2014, I don't think we had any meetings in Dallas.

18   Q    Okay.  Let's go back to 2013.

19   A    Okay.

20   Q    That was when you thought you had maybe five creditor

21   meetings in Dallas?

22   A    Maybe five -- I think five is high.

23   Q    Okay.

24   A    I'm -- for sure it's no more than five.  I think it's

25   more like two or three.

1    Q    Okay.

2    A    I remember two specifically.  (Indiscernible), you

3    know, I'm hedging a little bit because I'm not positive, but

4    I remember two.

5    Q    And when you say two or five, or whatever the number is

6    that took place in Dallas, that would be out of how many

7    total creditor or constituency meetings, roughly?

8    A    Wow, a lot.  I mean, more than a dozen.

9    Q    Okay.

10   A    I don't know if it's more than 20.

11   Q    And did all of the meetings that didn't take place in

12   Dallas take place in New York?

13   A    Yes.

14   Q    Ms. Dore, I'm going to give you now what's been marked

15   as Exhibit 5 which is a binder which contains all of the

16   debtors' first day motions.  And you'll see there's an index

17   at the beginning and I have some questions about certain of

18   the (indiscernible).  So, if you could turn to tab 2, which

19   is titled -- the document there is titled motion of Energy

20   Future Holding Support, et al. for entry of interim and

21   final orders authorizing the debtors to pay certain

22   prepetition taxes and fees, do you see that?

23   A    I do.

24        (Video testimony was paused)

25            THE COURT:  Can we pause for a minute?  Let's take

1    a short recess, five or ten minutes.

2         (Recess at 11:06 a.m.)

3              THE COURT:  You guys.  I never got to use that

4    before.  Let's do that again.  All right.  Please be seated.

5    Just give everybody a second.  All right, you can -- you can

6    start again.  Thank you.

7         (Video Deposition resumed)

8    BY UNIDENTIFIED SPEAKER:

9    Q    Have the debtors ever had any disputes with the PEC

10   relating to the amount that these (indiscernible)?

11   A    Not that I'm aware of.

12   Q    How about Nuclear Agency, the same question?

13   A    Any disputes?

14   Q    Yes.

15   A    Not that I'm aware of.

16   Q    Have you ever had any litigation with the POP

17   (phonetic) or the Nuclear Agency?

18   A    Not court litigation.

19   Q    Okay.  What type of litigation?

20   A    Well, I mean, the PEC and most-regulatory

21   (indiscernible) from time to time will issue NOVs, Notice of

22   a Violation, but as far as I'm aware of those have always

23   been settled.

24   Q    How about the Nuclear Agency (indiscernible)?

25   A    Same, sorry, same answer.

1    Q     Same objection, same answer.

2    A     Yes.

3    Q     Take a look at -- it's an exhibit to this -- this

4    motion.  It's Exhibit C.  It says Taxing Authorities.

5    A     Okay.

6    Q     Do you understand this to be a list that's referenced

7    in a motion of the Taxing Authorities that taxed the

8    debtors?

9    A     It appears to be.

10   Q     Okay.  And I'll tell you that I've done the math but

11   I'll ask if it sounded right to you so you don't have to.

12   I'll -- I'll tell you or represent to you that there's

13   approximately 480 Taxing Authorities listed here with

14   respect to the debtor.  Does that sound about right to you?

15   A     I -- I don't really know but if you count it, I'll

16   accept your word for it.

17   Q     Okay.  And if I told you that only 35 of those Taxing

18   Authorities were not in Texas, does that sound about right

19   to you?

20   A     Again, I don't know but if you counted it I'm not going

21   to (indiscernible) that.

22   Q     And, to the extent that the debtors had a dispute with

23   any of these Texas Taxing Authorities, would you anticipate

24   the debtors would commence litigation in the bankruptcy

25   court?

1          UNIDENTIFIED SPEAKER:  Object.  Calls for

2     speculation.

3          THE WITNESS:  I don't anticipate any litigation

4     with our Taxing Authorities, and if we were to have it, I

5     don't know where (indiscernible.)

6     BY UNIDENTIFIED SPEAKER:

7     Q    The -- the -- the debtors do have some history of

8     disputes with Taxing Authorities.

9     A    That was settled out of court.

10    Q    Okay.  But you've also had litigation with Taxing

11    Authorities?

12    A    I can remember one lawsuit.

13    Q    And do you have any recollection of disputes that the

14    debtors have had with any of the regulators listed here?

15    A    The disputes -- the material disputes that we had with

16    any of these regulators I believe are primarily with the

17    federal regulators.

18    Q    Is it your understand that with respect to the disputes

19    which the debtors might have with either Taxing Authorities,

20    regulators, to the extent that the debtor felt compelled to

21    commence litigation -- is it your understanding that the

22    debtors could bring that litigation into bankruptcy court?

23         UNIDENTIFIED SPEAKER:  Object.  Calls for legal

24    and (indiscernible) not to answer.

25    BY UNDENTIFIED SPEAKER:

1    Q    I'd like you to turn to tab four which is Motion of

2    Energy Future Holdings Corp. for Entry of Interim and Final

3    Orders, A, Authorizing the Debtors to Pay One, sorry, Pay

4    Certain Prepetitioned Compensation (phonetic) Reimbursable

5    Employee Expenses to Pay an Honor (phonetic) Employee and

6    Retiree Medical and Similar Benefits and three, Continue

7    Employee and Retiree Benefit Programs and Modify the

8    Automatic Stay.  Do you see that?

9    A    Yes.

10   Q    And have you reviewed this motion before?

11   A    Yes.

12   Q    And continuing on page nine in paragraph 16, there's a

13   reference to the debtors employing approximately 5,700

14   people.  Do you see that?

15   A    Yes.

16   Q    As far as you know, is that correct?

17   A    Yes.

18   Q    And all of those employees work for the debtors in

19   Texas.  Correct?

20   A    I don't if I'd say all but certainly the vast majority

21   of them.  There could be immaterial exceptions.

22   Q    Are you aware of any employees that work outside of

23   Texas?

24   A    Well, not that work outside Texas, no.

25   Q    In paragraph 17, it indicates that there are

1    approximately 2,000 employees are represented by unions that

2    are party to 11 collective bargaining agreements.  Do you

3    see that?

4    A    I'm sorry, paragraph 17?

5    Q    Yes.

6    A    Yes, I see that.

7    Q    Okay.  Do you know if it's the debtor's intention to

8    assume the CBAs?

9    A    I -- yes, I think it is our intention to assume the

10   CBAs.

11   Q    And that's based on some analysis that the company has

12   done?

13   A    Yes.

14   Q    The debtors also provide certain retiree medical

15   benefits to approximately 4,600 retired employees and

16   Oncor's retired employees.  Is that right?

17   A    Are you --

18   Q    I'm looking at paragraph 92 of the (indiscernible).

19   A    Yes.

20   Q    And do you know if most of those retirees are located

21   in Texas?

22   A    I actually don't know because I know we actually pay

23   retiree medical for some employees who were with credit

24   (indiscernible) companies that were not even based in Texas?

25   Q    Okay.  And has --

1    A    I don't know the breakdown.  I'm sure many of them are

2    in Texas.

3    Q    Okay.  I think we had a question.

4         UNIDENTIFIED SPEAKER: -- repeat the question.

5    BY UNIDENTIFIED SPEAKER:

6    Q    Will you repeat it?

7         UNIDENTIFIED SPEAKER:  The question, have the

8    debtors done any analysis as to whether or not to assume

9    these obligations and (indiscernible) analysis

10   (indiscernible) medical benefits.  The question, what was

11   (indiscernible.)

12        THE COURT:  You can go ahead and answer.

13        THE WITNESS:  So the company's view is that we

14   would intend to assume full retiree medical obligations.

15   BY UNIDENTIFIED SPEAKER:

16   Q    Have any employees expressed interest in participating

17   in some way in the company's bankruptcy proceedings?

18   A    No.

19   Q    The -- your company's arrangements with Shipper's

20   Warehouse men -- materialmen are governed by Texas state

21   law.  Is that right?

22        UNIDENTIFIED SPEAKER:  (Indiscernible.)

23        THE WITNESS:  I -- I don't think it's that simple.

24   I'm sure in some respects that's true, but I don't -- I

25   couldn't make that blanket statement.

1    BY UNIDENTIFIED SPEAKER:

2    Q    Well, if you look at the motion, with respect to

3    Shipper's, Texas Business and Commercial Section 7.307,

4    "Providing that," I'm sorry, page six and seven, "Providing

5    that carriers have a lien on shipped goods." That's, at

6    least some Texas state law that covers -- governs the

7    debtor's arrangements with Shipper's.  Correct?

8    A    But it also cites 49 U.S.C. §80109, so there's federal

9    law that applies as well, so that's why I'm saying I'm sure

10   in some respects Texas law does apply but it's not

11   (indiscernible) blanket statement.

12   Q    Warehousemen is a representative Texas Business and

13   Commercial §7.209 providing for warehousemen liens even

14   where storage -- even where a storage agreement, that in

15   fact Texas law, at least in part, governs the company's

16   arrangements with warehousemen.  Correct?

17   A    At least in part, yes.

18   Q    And with respect to materialmen is the reference to

19   Texas Con (indiscernible) Article 16 §37 which is the self

20   effectuating constitutional lien in favor of mechanics,

21   artisans and materialmen.  It's also a reference to Texas

22   Property §70.001, Providing a certain possessory of

23   materialmen liens, so it's true is it not that Texas state

24   law, at least in part, governs the company's arrangements

25   with materialmen.

1    A    Yes, part.

2    Q    Thank you.  Now I'm going to come back to tab eight and

3    we're talking about outage vendors and to the extent that an

4    outage vendor of the company is not on a list that the

5    company has of outage vendors they're going to pay, if they

6    want to complain about that they're going to have to come to

7    a bankruptcy court in Texas.  Correct?

8              UNIDENTIFIED SPEAKER:  Objection.

9    BY UNIDENTIFIED SPEAKER:

10   Q    I'm sorry, in Delaware.  Correct?

11             UNIDENTIFIED SPEAKER:  Calls for speculation

12   answer.

13             THE WITNESS:  It -- they would have to at least

14   file something with the bankruptcy court in Delaware, yes.

15   BY UNIDENTIFIED SPEAKER:

16   Q    And if we turn to page -- page eight of the Critical

17   Vendor motion, at the top it says the "specialized and

18   integrated services vendors."  Can you tell me why there's

19   no list of specialized and integrated services vendors which

20   specifically indicates which of those the debtor's seek to

21   pay pursuant to this motion?

22             UNIDENTIFIED SPEAKER:  Objection.  (Indiscernible)

23   on the grounds of privilege.

24   BY UNIDENTIFIED SPEAKER:

25   Q    And if there was a specialized and integrated services

1    vendor who was not on the company's list to pay as a

2    critical vendor and was unhappy about that, that vendor

3    would have to come to Delaware to complain about it.  Right?

4                UNIDENTIFIED SPEAKER:  Same -- the same objection.

5    Calls for speculation.

6                THE WITNESS:  That vendor would have to least file

7    something with the bankruptcy court in Delaware.  I -- you

8    know, my understanding is that it would be unlikely that all

9    these kind of vendors personally would show up in the

10   Delaware court to file a proof of claim.  They would have

11   their lawyers who are probably in Delaware do.

12   BY UNIDENTIFIED SPEAKER:

13   Q    So you think that an outage vendor or a specialized and

14   integrated services vendor located in Texas has a lawyer in

15   Delaware?

16   A    I think they could hire one.

17   Q    Take a look at page nine.  This section is called

18   Critical Goods Vendors.  Do you see that?

19   A    Yes.

20   Q    And can you tell me why there's no list filed with the

21   motion listing Critical Goods Vendor that the company would

22   like to pay?

23                UNIDENTIFIED SPEAKER:  Objection.  Instruct not to

24   answer on the grounds of privilege.

25   BY UNIDENTIFIED SPEAKER:

1    Q    And can you tell me why there's no list of regulatory

2    compliant vendors the company seeks to pay pursuant to the

3    motion attached?

4              UNIDENTIFIED SPEAKER:  Objection.  Instruct not to

5    answer on the grounds of privilege.

6    BY UNIDENTIFIED SPEAKER

7    Q    And can you tell me why there's no list specifying the

8    nuclear plant vendors that the company seeks to pay pursuant

9    to this motion attached?

10             UNIDENTIFIED SPEAKER:  Objection.  Instruct not to

11   answer on the grounds of privilege.

12   BY UNIDENTIFIED SPEAKER:

13   Q    And what did the debtor do in connection with deciding

14   which -- which agreements to assume and not to assume?

15             UNIDENTIFIED SPEAKER:  Objection.  Instruct not to

16   answer on the grounds of privilege.

17   BY UNIDENTIFIED SPEAKER:

18   Q    So, is it true that all of the debtor's customers are

19   located in Texas?

20   A    Yes.

21   Q    And so the relief that the company sought in this

22   motion affects 1.7 million customers -- strike that.  The

23   relief that the company sought pursuant to this motion

24   affects customers, all of whom are located in Texas.

25   Correct?

1    A    Yes.

2    Q    And is it your understanding that in connection with

3    assuming an executory contract, the debtors will be

4    responsible for paying cure amounts?

5    A    If there are cure amounts due.

6    Q    And if there is a dispute with a customer with respect

7    to a cure amount, do you believe that that customer will

8    have to come to the bankruptcy court to deal with that

9    dispute?

10            UNIDENTIFIED SPEAKER:  Objection.  Calls for

11    speculation.

12            THE WITNESS:  No.

13    BY UNIDENTIFIED SPEAKER:

14    Q    Why not?

15    A    Because if the customer has a dispute they can call us

16    and we can resolve it.

17    Q    And if it's not resolved, it ultimately would have to

18    be addressed by the bankruptcy court.  Correct?

19            UNIDENTIFIED SPEAKER:  Same objection.

20            THE WITNESS:  I believe so, yes.

21    BY UNIDENTIFIED SPEAKER:

22    Q    And if we were to take a look at Exhibit 1 through

23    Exhibit B, that lists the various delivery agreements which

24    debtors seek to assume.  Correct?

25    A    Correct.

1    Q    Okay.  And is it Texas state law that governs these

2    delivery agreements?

3    A    I'd have to look at the agreement to know, but I would

4    assume so, I mean.

5    Q    Okay.  And the counterparties listed here.  Are they

6    all Texas -- are they all based in Texas?

7    A    I'm actually not sure because AEP (indiscernible) was

8    not based in Texas, so there are divisions, I don't know if

9    their headquarters are in Texas or not.

10   Q    So AEP Texas Central Company, you don't think that's

11   based in Texas?

12   A    I don't know.  I mean, it -- it may be.  I just know

13   that AEP, the parent company which is who we tend to deal

14   with have a lot of these issues and is based in Ohio.

15   Q    But this might be a subsidiary you deal with in Texas?

16   A    Well, clearly that's the counterparty.  I'm just saying

17   when we deal with him, I don't know if it's with someone in

18   Ohio or someone in Texas.

19   Q    Okay.  But -- but based on the names here, to the

20   extent that Texas is in the name, do you think that that

21   particular counterparty is based in Texas or --

22        UNIDENTIFIED SPEAKER:  Objection.  Calls for

23   speculation.

24        THE WITNESS:  I don't know.  I mean, I -- I -- I'm

25   not disputing that most of these counterparties are in

1    Texas.

2    BY UNIDENTIFIED SPEAKER:

3    Q    Okay.  Now, there's various cure amounts listed here,

4    right?

5    A    Yes.

6    Q    And are these cure amounts that are -- strike that.

7    Has the debtor negotiated and agreed with all these

8    counterparties in connection with the cure amounts that are

9    listed here?

10   A    I don't believe so.

11   Q    Okay.  So some of these counterparties might dispute

12   the cure amounts that are listed here?

13   A    I don't know whether they would or not.

14   Q    Okay.  But the debtors have to agree with the

15   counterparty.  Correct?

16            UNIDENTIFIED SPEAKER:  Objection.

17   BY UNIDENTIFIED SPEAKER:

18   Q    Okay.  Fair enough.  You don't know whether or not a

19   counterparty will dispute (indiscernible)?

20   A    Right.  I don't know.

21   Q    And if a counterparty does dispute the amount, is it

22   your understanding they'll have to appear before the

23   bankruptcy court in Delaware?

24            UNIDENTIFIED SPEAKER:  Objection.  Calls for

25   speculation.

1          THE WITNESS:  They will at a minimum have to have

2    their lawyer file something with the bankruptcy court of

3    Delaware.

4    BY UNIDENTIFIED SPEAKER:

5    Q    What -- we -- we talked about a few categories of

6    executory contracts, such as delivery agreements, customer

7    agreements, and my question to you is what other categories

8    of executory contracts did the debtors have -- if you

9    understand what I'm asking?

10   A    I do, but that's such a broad question.  I mean, we

11   have contracts for IT services, for office supplies.  We

12   have contracts with -- we have power purchase agreements

13   with Win (phonetic) companies.  We have lots of different

14   kinds of contracts.

15   Q    Okay.  And do you think it's fair to say that most of

16   the counterparties to those contracts are based in Texas?

17   A    Not necessarily.  I don't -- I mean I don't know.  I'm

18   sure a lot of them are but I -- I don't know if most is

19   accurate.

20   Q    What about transportation contracts?  Do you have any

21   of those?

22   A    We do.

23   Q    And what is -- what's the nature of those contracts?

24   A    We have contracts with BNSF railway as well as KCS and

25   some of the other railroads for transportation of coal to

1    our plants.

2         Q    And has the debtor made a decision as to whether

3    or not it is going to assume or reject those executory --

4    the

5    transportation executory contracts?

6    A    No, we haven't made a decision.

7    Q    Have the debtors done an analysis as to whether or not

8    those contracts, to use your term of -- of phrase are "out

9    of the money?"

10   A    Yes, we've done our analysis.

11   Q    And what was the conclusion?

12        UNIDENTIFIED SPEAKER:  Objection.  Instruct not to

13   answer on the grounds of privilege.

14   BY UNIDENTIFIED SPEAKER:

15   Q    Sure (indiscernible) that question.  We talked about

16   the assumption or rejection of contracts.  Is it your view

17   that a debtor -- that a debtor's actions to assume or reject

18   executory contracts, that would qualify as part of a balance

19   sheet restructuring, as you referred to it?

20   A    I think a decision to -- to reject or assume contracts

21   can be part of any Chapter 11 process but, as I stated

22   earlier, this case is not about whether our railway

23   contracts or our fuel contracts, or any of our other

24   contracts are "in the money" or "out of the money."  Our

25   operations are sound and absent the debt, profitable, and so

1    this -- what this case is about is creating a sustainable

2    debt level for our company.

3    Q    Are you aware of any reason why the cash collateral

4    arrangement evidenced by this motion could not be

5    implemented if the debtor's bankruptcy cases were

6    transferred to Dallas?

7    A    No.

8    Q    What is your understanding of (indiscernible) for the

9    record --

10            THE COURT:  Can you pause --

11   BY UNIDENTIFIED SPEAKER:

12   Q    -- what is -- when the debtor --

13            THE COURT:  -- pause it please.

14       (Audio deposition paused)

15            THE COURT:  We -- we -- we skipped a big chunk

16   here.  Page 192, line nine was where we should have been

17   after "sustainable debt level for our company" but we moved

18   somewhere else.  This is information about Arkive

19   (phonetic).  Did we just move on to railroad commission?  Is

20   that what -- I'm not sure where we were.

21            MR. JONAS:  It looks -- it looks like we lost page

22   193, Your Honor.  Let me just see if we have one minute, we

23   can pull it up.

24            THE COURT:  Okay.  We had jumped to cash

25   collateral, right?  That's where we had gone?

1            MR. JONAS:  Yes, we missed page 193.  Supposed to

2       be (indiscernible.)  Hold on a sec, let me just see

3       (indiscernible.)

4            MR. JONAS:  Your Honor, that was our designation.

5       We -- we don't -- we don't need it to run real time so we'll

6       just move on.

7            THE COURT:  All right.  You want me to read it?

8            MR. JONAS:  Sure.

9            THE COURT:  I'll read it, then we can continue on

10      where we were.

11           MR. JONAS:  Sorry about that.

12         (Video Deposition resumed)

13           THE COURT:  It's all right.  Hang on.  I'm not

14      that fast a reader.

15           THE COURT:  All right, I'm ready.  Go ahead.

16         (Pause)

17      BY UNIDENTIFIED SPEAKER:

18      Q    And what is the interaction between the debtors and the

19      FCT?

20      A    The Railroad Commission regulates our service mining

21      operations.

22      Q    And what is the nature of the debtors' mining

23      operations?

24      A    Limited mining, mines lignite coal at our mine melt

25      plants which are plants located right next to the mines.

1    Q    And I take it the Railroad Commission or the RCT is a

2    Texas state agency?

3    A    Correct.

4    Q    And they provide permits and the like; is that right?

5    A    They provide our mining permits.

6    Q    Not a good question.  The debtors are required to post

7    security to insure the reclamation of certain mining areas,

8    right?

9    A    Yes.  Uh-huh.

10   Q    And what is the -- do you know the magnitude of that

11   security?

12   A    Our current bonding obligation at the Railroad

13   Commission is approximately $1.009 billion.

14   Q    And when you say that dealing with that was part of

15   your both cash collateral and your DIP arrangements,

16   correct?

17   A    Yes.

18   Q    Okay.  And are those arrangements governed by Texas

19   state law?

20            UNIDENTIFIED SPEAKER:  Object as moot, commission

21   arrangements, does that --

22            UNIDENTIFIED SPEAKER:  The bonding that's required

23   with respect to reclamation of mining areas.

24            THE WITNESS:  Well, I'm not sure exactly what you

25   mean by the question.  I mean, the bonding requirement is

1    certainly a requirement of Texas state law.

2    BY UNIDENTIFIED SPEAKER:

3    Q    Okay.

4    A    I don't know for sure -- I would assume, I'd have to

5    look at the documents but the actual bonding documents are

6    also governed by Texas law but I don't know that for sure.

7    Q    Okay.  But you think that's the case?

8    A    Yes.  Uh-huh.

9    Q    Since you've been general counsel for the last couple

10   years, have the debtors had to deal with any environmental

11   emergencies on any of their properties?

12   A    No.

13   Q    And have there been any environmental claim  that

14   you're aware of with respect to any of the debtors'

15   obligation?

16   A    Yes.

17   Q    And can you just -- I don't know what the magnitude is

18   of those.  Maybe you can help me with that.

19   A    Well, when you say environmental claims, you know,

20   somebody think of those as claims for actual environmental

21   harms like things like spills or -- and we haven't had those

22   kinds of claims but EPA and CERCLA have filed lawsuits

23   against the company for what they claim are air emission

24   type violations.

25   Q    Well, let me ask you if the debtors were to have some

1    sort of environmental spill or I'll call it a catastrophe

2    even though I'm -- just for lack of a better term, the

3    effective parties would be in Texas based on where the

4    debtors' operations are, correct?

5    A    Yes.

6    Q    And with respect to the lawsuits you mention and one

7    was Sierra Club and one was --

8    A    There are two Sierra Club lawsuits and one EPA lawsuit

9    in Texas.

10   Q    And are those back currently active litigations

11   notwithstanding the bankruptcy?

12   A    Well, you mean the (indiscernible)?

13   Q    Yes.

14   A    The automatic stay.  I'm sorry.  Not exactly because

15   the -- what we call the NSR lawsuit filed by the EPA which

16   is in District Court in Dallas is stayed currently pending

17   the outcome of the Fifth Circuit appeal that we filed

18   against the EPA --

19   Q    Right.

20   A    -- and one of the Sierra Club lawsuits was tried in

21   February and we prevailed so the only thing that's left in

22   that case is our claim for attorneys' fees and the Sierra

23   Club's appeal to the Fifth Circuit and the results.  The

24   other case is -- absent the automatic stay would be active

25   but it's (indiscernible) stayed by the automatic stay.

1    Q    Are you aware of any reason why in the DIP that's

2    evident here, could it be implemented if the debtors'

3    bankruptcy case were moved to Memphis?

4    A    No.

5    Q    Are you aware of any harm that you believe would occur

6    if the debtors' bankruptcy cases were moved to Memphis?

7              UNIDENTIFIED SPEAKER:  Object, vague as to harm.

8              THE WITNESS:  I don't -- again, I mean, just going

9    back to my earlier testimony, I don't think it's a question

10   of harm, it's a question of which venue is most efficient

11   for the debtors and we believe that to be Delaware.

12   BY UNIDENTIFIED SPEAKER:

13   Q    And I'll ask you the same question here with respect to

14   this DIP, are you aware -- did you have or are you aware of

15   any communication with anyone that the debtors had with

16   these parties; that is, the lenders with respect to this

17   that -- relating to the venue of the debtors' bankruptcy

18   case?

19   A    No.

20   Q    Are you aware of any reason why the DIP that's referred

21   to here couldn't be put in place or implemented if the

22   debtors' bankruptcy cases were transferred to Texas?

23   A    No.

24   Q    The RSA that we talked about previously --

25   A    Uh-huh.

1    Q    -- are you aware of any communication, discussions,

2    negotiations in connection with the RSA with respect to the

3    debtors' bankruptcy debt?

4    A    No, not specifically negotiations.  I'm aware that in

5    connection with discussing the RSA with various groups that

6    we told them and I think actually in the RSA that we had

7    filed for venue -- for bankruptcy in Delaware.

8    Q    Are you aware of any reason why the RSA couldn't be

9    implemented if the debtors' bankruptcy cases were to

10   transfer to Texas?

11   A    No.

12   Q    That's Exhibit E.  That's the restructuring agreement.

13   A    Yeah.

14   Q    In the second paragraph, there is a reference to the

15   debtors implementing the restructuring and they would do so

16   pursuant to a plan under Chapter 11 of the Bankruptcy Code

17   and it says In the United States Bankruptcy Court for the

18   District of Delaware or another bankruptcy court of

19   competent jurisdiction with respect to the subject matter.

20   Do you see that?

21   A    Yes.

22   Q    Do you know why that reference to another bankruptcy

23   court was included here?

24              UNIDENTIFIED SPEAKER:  Objection, calls for -- if

25   you know, it calls for privileged information and

1    (indiscernible).

2    UNIDENTIFIED SPEAKER:

3    Q    I'll ask you if you know.  Was this term required by

4    the other parties to this crib sheet?

5    A    No.

6    Q    So this was something the debtors wanted put in here?

7    A    I don't recall who put it in there, I just know it

8    wasn't the subject of negotiations.

9    Q    Okay.

10   A    We had already determined to file in Delaware at the

11   time this document came to pass.

12   Q    And just to put a point on this topic, you don't

13   believe that any creditor of the debtors ever required that

14   the venue be in a certain jurisdiction?

15   A    Not that I'm aware of.  Certainly not in conversations

16   with me.

17   Q    Are you aware of whether any creditor indicated a

18   preference for a certain day over another?

19   A    I'm not aware they indicated a preference.  I think

20   when we informed them in response to their questions that we

21   were filing in Delaware, I think they were perfectly happy

22   to have it there.

23   Q    Okay.  Ms. Dore, I am showing you what's been marked as

24   Exhibit 6 which should be federal and state income tax

25   allocation agreement among the members for the Energy Future

1    Holdings Corp. Consolidated Group dated May 15, 2012.  Are

2    you familiar with this document?

3    A    Generally, yes.

4    Q    Okay.  Do you consider this to be a material and

5    important document in connection with the debtors'

6    restructuring?

7    A    Sure.  Yes.

8    Q    And just you don't have to cry, if you look at 6.9,

9    this agreement is governed by Texas law, right?

10   A    Well, it's governed by the laws of the State of Texas

11   and the United States of America because tax law, obviously,

12   is federal.

13   Q    Okay.  But in terms of what state law governs, it is

14   Texas?

15   A    Yes.

16   Q    And the other TSA's, does it have the same governing

17   law provisions?

18   A    I'm not sure but that would make sense --

19   Q    Okay.

20   A    -- and in the --

21   Q    Yeah, we can go back and monitor it.  With respect to

22   the operational regulatory framework for the debtors -- and

23   I'm trying to -- we can do this -- if you feel better after

24   I'm done asking my question, we can break it down but I'm

25   actually trying to move along a little more quickly.  Is it

1    your -- is it fair to say that in terms of the regulators

2    that regulate the debtors' operations, pure operations, it's

3    ERCOT, PUCT, the Texas Reliability Anthony A (ph) the

4    Railroad Commission which we talked about, the Texas

5    Commission for Environmental Quality and that's what I come

6    up with is kind of the main operational regulatory bodies

7    but do you think I missed any?

8    A    Yeah.

9              UNIDENTIFIED SPEAKER:  Object, mischaracterizes

10   this but go ahead.

11             UNIDENTIFIED SPEAKER:  Okay.

12   BY UNIDENTIFIED SPEAKER:

13   Q    Which ones have I missed?

14   A    You've missed the Nuclear Regulatory Commission, the

15   EPA, the Office of Surface Mining, the CFTC, the SEC, the

16   IRS -- that's a big one -- FERC and NERC.

17   Q    Okay.  And are there any Delaware regulators that

18   regulate the debtors' business?

19   A    Not that -- not -- I'm not aware of any Delaware

20   regulators but, obviously, a lot of our corporate formation

21   documents are based on Delaware laws to the extent that TCH

22   and EFIH, for example, are Delaware companies.  So a lot of

23   the law governing our forward process, our governance

24   process with the company is Delaware law.

25   Q    And you anticipate, do you not, that the debtors are

1   going to need certain regulatory approvals in connection

2   with their restructuring in bankruptcy?

3   A    Yes.

4   Q    And from which agencies do you anticipate regulatory --

5   needing regulatory approval?

6   A    On the T side for TCH, the primary one is going to be

7   at the NRC in Washington, D.C.  There will also be FERC and

8   SEC requirements but those are not really material, frankly.

9   On the E side, they will need PUC approval but TCH will not

10   and TCH will also need the Railroad Commission to approve

11   its new bonding instrument.

12   Q    Ms. Dore, I'm going to show you what's been marked as

13   Exhibit 7 which is the motion of WSFS that you transfer bank

14   -- the debtors' bankruptcy cases.  Have you see this before?

15   A    Yes, I have.

16   Q    Okay.  And I just want to go through this with you and

17   ask you a few questions.  On page 2, paragraph 2, there's a

18   statement "the debtors' only connection to Delaware is that

19   certain of the debtors were formed under Delaware law."  Do

20   you agree with that statement?

21   A    Well, as I stated earlier, I don't think that's our

22   only connection because the fact that we have debtors and,

23   in fact, the two principal debtors here, EFIH and TCH, are

24   formed under Delaware law.  What that means is that Delaware

25   law governs a lot of our most important governance and legal

1    issues of the company.  So I consider that to be a

2    connection as well that's a results of this but, other than

3    that, I don't know of any other connections to Delaware.

4    Q    And look at paragraph 3.

5              UNIDENTIFIED SPEAKER:  Number 3, you're numbers.

6              UNIDENTIFIED SPEAKER:  I'm sorry, numbered

7    paragraph 3?

8              UNIDENTIFIED SPEAKER:  Oh, okay.  I just track

9    along.

10             UNIDENTIFIED SPEAKER:  Yes.

11   BY UNIDENTIFIED SPEAKER:

12   Q    The statement "the facts and circumstance of these

13   cases make clear that transfer to the Northern District of

14   Texas would benefit substantially all parties and interests

15   other than perhaps professionals or senior vendors based in

16   the northeast who would incur modest additional travel

17   burdens."  Do you agree with that statement?

18   A    No.

19   Q    Why not?

20   A    Because, as I testified earlier, the legal E that is

21   the basis of our decision that having venue in Delaware

22   benefits substantially the debtors.

23   Q    I thought earlier your testimony was that the primary

24   reason or one of the primary reasons why it was efficient

25   for the debtors to be in Delaware was that many of the

1    debtors' creditors and their professionals were based nearer

2    to Delaware than Texas, if you will.  Was that not -- did I

3    misunderstand your testimony?

4              UNIDENTIFIED SPEAKER:  Object, it

5    mischaracterizes.  She said we're not going.

6              THE WITNESS:  I said that was one of the things

7    that makes it beneficial to the debtors, the fact that the

8    parties who really need to show up in this case -- and, by

9    the way, this sentence said senior lenders but all of our

10   lenders, not just the senior lenders including your client

11   who's in Wilmington are based in the Northeast and the fact

12   that those are the primary parties in interest in this case

13   and that Delaware is closer to them results in a benefit to

14   the debtors of having the case in Delaware.

15   BY UNIDENTIFIED SPEAKER:

16   Q    Okay.  And in the middle of this paragraph, there's a

17   statement if these case remain in Delaware, critical

18   management personnel will be required to spend extended

19   periods away from their offices.  Just that statement, do

20   you agree with it, the statement I just made?

21   A    I think it's incomplete because I believe that if the

22   case -- whether the cases were in Delaware or Texas,

23   management would be required to spend extended periods away

24   from their offices and in the bankruptcy court or in New

25   York negotiating with the creditors who are here.

1    Q    Well, but the fact of the matter is that the case being

2    in Delaware as opposed to Texas, the extended period of time

3    away from their offices will be greater than if it was in

4    Dallas, correct?

5    A    I don't necessarily agree because I believe again that

6    a lot of the out-of-court negotiations and matters which,

7    frankly, you know, in some cases we may spend more time

8    doing that than we are actually in the bankruptcy court and

9    those meetings are still going to take place away from

10   Dallas, unfortunately.

11   Q    If you look at paragraph -- and I'm not asking you to

12   look at the -- what's stated there.  I'm going to state it

13   but I just want to give you a reference point.  If I made

14   the statement to you that the debtors have substantially all

15   of their assets, employees, customers and trade creditors in

16   Texas, would you agree with it?

17   A    Yes.

18   Q    Okay.  And where are the debtors' books and records?

19   A    Primarily in Texas.

20   Q    And when I -- when you -- when I say books and records

21   -- strike that.  What is the nature of the debtors' books

22   and records?

23   A    Well, it would include, you know, all of our accounting

24   records, all of the documents that are being requested in

25   this case, any records, you know, related to the company or,

1    primarily, in Texas unless they're available electronically

2    like most of our -- all of our NCC (ph) filings.

3    Q    Right.  Other than public filings, either state or

4    federal, are any of your other books and records available

5    electronically?

6    A    I can't think of any right now but there could be.

7    Q    Okay.  And if I went down to the debtors' headquarters

8    and I said show me all the books and records, where would

9    you take me?

10   A    I don't think there would be one location I could take

11   you to.

12   Q    And how many multiple locations would there be?

13   A    As many locations as we have offices, individual

14   people's offices.  I would take you out to our Comanche

15   Peak, I would take you to Big Brown.  I would take you all

16   over East Texas, West Texas and Central Texas.

17   Q    And models that the debtors run with respect to pricing

18   or things like that would be located on the site?

19   A    Yes, but most of the things you're talking about -- I

20   mean, just to be clear, if you were looking for, you know, a

21   hard copy, you would have to go to Texas so a lot of that

22   stuff is available electronically.  I mean, models, for the

23   most part, don't even exist anymore in hard copy, they're

24   just a click of a mouse away.

25   Q    If you'd take a look at the back of Exhibit 7 which is

```
1    the WSF motion, you'll see an exhibit that was attached

2    there, Exhibit B, the debtors' legal proceedings since 2012.

3    A     Yes.

4    Q     Have you ever seen this document before?

5    A     No.

6    Q     And this -- oh, you haven't.  Okay.  And --

7    A     Not before seeing it attached to your motion.

8    Q     Okay.  Fair point.  And now that you -- or now -- when

9    you had a chance to look at it attached to their motion,

10   have you been able to form any opinion as to whether or not

11   it's accurate?

12   A     I don't know if it's an accurate representation of the

13   cases but I know it's inaccurate with respect to the

14   argument you're making.

15   Q     Okay.  How so?

16   A     Because the vast majority of the, let's see, 205 cases

17   that are listed here are not debtor cases, they're Encore

18   case and Encore is not a debtor.  There's only 26 cases on

19   this list that are debtor cases.

20   Q     Just to quickly -- and then we'll be done with this --

21   page forward to the Betty Cleshman (ph) declaration --

22   A     Yes?

23   Q     -- and in Paragraph 2, she indicates 21 of the 71

24   deadlines you're going to incorporate in Delaware?

25   A     Uh-huh.
```

1    Q    And I just want to confirm with you none of those

2    entities actually carry on any sort of operations or

3    business in Delaware, do they?

4    A    Not in Delaware, no.

5    Q    And now I'll ask you do you know where any of these

6    board members live?

7    A    Yes.  So Arcelia (ph) Costa lives in Dallas.  David

8    Bonderman, I think, splits his time between California and

9    Fort Worth.  Don Evans lives in Midland.  Tom Carterson (ph)

10   lives in Dallas.  Brandon Freeman lives in Canada.  Kot

11   Liebowicz (ph) lives in New York.  Michael McDingel lives in

12   Austin.  Kit Pomerelli (ph) lives in New York.  William

13   Riley lives in California.  Don Schmidt (ph) lives in New

14   York.  Billy Williamson lives in Dallas.  John Young lives

15   in Dallas and Leon Youngblood lives in Dallas.

16   Q    Okay.  Well, my question is was it common for the

17   company in the let's say year that you left the

18   restructuring to -- flying outside professionals for board

19   meetings in Dallas?

20   A    Yes.

21   Q    And was this representative of the professionals that

22   would be flown in, K&E, Evercore --

23   A    Yes.

24   Q    Thanks.  In the next page which is 283, you say -- it

25   says Dore then reported that the trial in the Sierra Club

litigation would take place the week of the board meetings. See that?
A Yes.
Q Now, is that the action that's been stayed?
A That's the action we won.
Q That's the action you won. Okay. And there's a remaining Sierra Club action.
A Well, they both remain because Sierra Club's appealing to the Fifth Circuit --
Q Okay.
A -- the one we prevailed in and the other one hasn't gone to trial yet.
Q Can you very, very briefly tell me what the litigation's about?
A Sure. The claims of the Sierra Club are that we have excess capacity emissions that violate both state and federal law.
Q Ms. Dore, Exhibit 10 is the voluntary petition for Texas Competitive Electrical Company, LLC --
A Uh-huh.
Q -- and you've seen this before, correct?
A I have, yes.
Q You know, if I look at the list, down at the list here, I see it lists the creditor, it lists the nature of the claim and then it had a column contingent, unliquidated,

1    disputed or subject to setup.  Do you see that?

2    A    Yes.

3    Q    And I think every single creditor's -- every single

4    creditor with -- in that column, it says it -- it may --

5    there may be something else there too but it certainly says

6    unliquidated.  Do you see that?

7    A    Yes.

8    Q    And when it says unliquidated, what do you understand

9    that to mean?

10   A    I think it just means that you have -- in the form

11   that's required to be used, if you just look at the top of

12   the column, you have to pick one, contingent, unliquidated,

13   disputed or subject to setoff and the unliquidated category

14   fits each of these the best out of those four choices.

15   Q    Well --

16   A    And that's why in some cases, they put unliquidated and

17   disputed but, you know, for example, PVCG, I think, is

18   listed as contingent and unliquidated.

19   Q    But my question was what do you understand -- what do

20   you -- in using the word unliquidated in this context, what

21   do you understand that to mean?

22   A    I think it means that they haven't necessarily -- the

23   counterparty hasn't necessarily said this is the amount that

24   we're owed.

25   Q    Right.  So, in fact, some of these counter-part -- all

1    of these counterparties could yet, if you will, dispute the

2    amount that the debtor has listed as their claim?

3    A    Yes, they could.

4    Q    Okay.  And to the extent they do dispute that claim,

5    they're going to have to come to the bankruptcy court in

6    Delaware and take a position, correct?

7    A    They're going to have to file something with the

8    bankruptcy court through their lawyers in Delaware.

9    Q    And it ultimately could require some litigation to

10   resolve.

11   A    It could.

12                     CROSS-EXAMINATION

13   BY UNIDENTIFIED SPEAKER:

14   Q    Ms. Dore, you testified earlier in this deposition

15   about traveling to New York.  Since the time you became

16   general counsel, you began to get involved in restructuring

17   efforts of the company, true?

18   A    Yes.

19   Q    Can you characterize in terms of how frequently from

20   2012 through 2013 and the first part of this year, 2014, you

21   traveled to New York?

22   A    Well, beginning of 2012 when it -- when I became

23   involved, I would say it was, you know, at first probably

24   once a month, sometimes twice a month but it grew with

25   increasing frequency over time and leading up to the -- you

1    know, I would say the last year almost.

2    Q    And in that last year, how frequently were you

3    traveling to New York?

4    A    At least a couple of times a month, you know, every

5    other week, sometimes every week.

6    Q    And what was the purpose of traveling to New York

7    during this time period?

8    A    We had meetings with creditors, with creditors'

9    advisors, with our equity holders, with our advisors all

10   related to the restructuring.

11   Q    So all of this travel to New York that you describe and

12   the frequency of it was to meet with different constituents

13   involved in the restructuring efforts and you have to file

14   them, true?

15   A    Correct.

16   Q    You testified earlier about where you were in the days

17   before April 29th when the filing occurred, true?

18   A    Yes.

19   Q    Where were you?

20   A    I was in New York.

21   Q    And what were you doing there?

22   A    I was participating in the negotiations at the RF site.

23   Q    You testified at length about the employees there in

24   Texas and the assets that are in Texas and the offices there

25   in Texas, correct?

1    A    Yeah.

2    Q    Why didn't all the meetings when they began the

3    restructuring happen in Dallas, do you know?

4    A    Because the meetings don't involve employees or

5    customers or any of the people who are in Texas, they

6    involve all the people who are in New York and they were not

7    eager to come to Dallas, typically, to meet with us and it

8    was just easier to see a number of people traveling to New

9    York to meet with sometimes, you know, 20 or 30 people who

10   were here in New York and there were only two or three of us

11   traveling.

12   Q    And all that involved issues with respect to the

13   restructuring, true?

14   A    Yes.

15   Q    In the meetings you had in the immediate days before

16   the filing that were in New York you talk about, right?

17   A    Yes.

18   Q    Had you made the decision to file in Dallas rather than

19   Wilmington, would those meetings have taken place in Dallas,

20   in your estimation?

21   A    No.

22   Q    So you would have had to fly from New York to Dallas to

23   be present for the first day of hearings if you filed there?

24   A    Yes, I would have.

25   Q    Okay.  I'm handing you what we've marked as Exhibit 12

1    just to keep the exhibit numbers in order here, Ms. Dore.

2    Do you recognize this document?

3    A    I do.

4    Q    What is it?

5    A    It's a list of all of -- active litigation for the

6    debtor companies.

7    Q    All right.  And is this one of the documents we've

8    produced to the movants in advance of this deposition?

9    A    Yes.

10   Q    All right.  And this represents Exhibit 12, does it

11   not, an accurate list of the companies pending litigation

12   including Barrett's pending?

13   A    It does, yes.

14   BY UNIDENTIFIED SPEAKER:

15   Q    You just testified that prior to the filing, you made a

16   lot of trips to New York.  The information was structuring

17   meetings and to meet with creditors constituencies, correct?

18   A    Correct.

19   Q    And that you weren't having meetings in Texas because

20   employees, counterparties, other parties in Texas, they

21   weren't the parties you had to negotiate with, correct?

22   A    That's true.

23   Q    All the parties you were meeting with in New York,

24   they're -- they've agreed to treatment in this bankruptcy

25   case; is that right?

1    A    Yes.

2              UNIDENTIFIED SPEAKER:   I'm sorry, treatment?   You

3    cite in here --

4    BY UNIDENTIFIED SPEAKER:

5    Q    Treatment?

6    A    Treatment of their claims?

7    Q.   Yes.

8    A.   Yes.   The ones you have signed over to RSO?

9    Q    Yes.

10   A    Yes.

11   Q    Okay.   So you're not going to have any more meetings in

12   New York in connection with negotiation of the RSA, the DIP

13   or anything of that nature, correct?

14   A    Oh, we will have a lot more meetings in New York, I

15   have a feeling, with all of the parties to the RSA in

16   addition to other parties who are not parties to the RSA but

17   who are here in New York.   There's a lot to be done to

18   effectuate that plan and it's -- so there will still have to

19   be a lot of coordination with the parties to the RSA to

20   actually implement what is a very complex case.

21   Q    Yeah, but the treatment that's going to be afforded to

22   those parties, their fate in that regard is sealed now,

23   isn't it, the parties that have agreed?

24   A    Well, not necessarily.   Just this week, someone filed

25   an alternative -- you know, an emergency motion --

1    Q.    Right.

2    A.    -- seeking to, essentially, undo part of our RSA.

3    Q    Yeah, and all litigation relating to that, that's going

4    to take place in a bankruptcy court, whether in Delaware or

5    Texas, correct?

6    A    The ultimate litigation will but not the negotiations

7    leading up to it.

8    Q    Okay.  But now the fate of all the Texas parties,

9    employees, counterparties, et cetera, those parties' fate

10   hasn't been resolved yet and is going to be subject to how

11   the bankruptcy case turns out; isn't that right?

12          UNIDENTIFIED SPEAKER:  Object as vague.  You can

13   answer the question.

14          THE WITNESS:  I don't agree with that one.

15   BY UNIDENTIFIED SPEAKER:

16   Q    Well, why don't you agree with that?

17   A    Because we have spent the better part of a year

18   insuring that we started this case with a series of motions

19   that protect to the maximum extent possible our employees,

20   our customers and our vendors and other stakeholders and we

21   have a very cooperative relationship with all of those

22   parties and I don't intend and the company doesn't intend

23   for them to become disputes or for those people to become

24   parties to the bankruptcy.

25   Q    But you haven't negotiated with those parties, have

1    you?

2    A    Yes, we have in some cases, with the Railroad

3    Commission about the alternative bonding requirements and

4    they got -- processed those smoothly, with the PUC about how

5    we were going to treat our customers.  We have negotiated

6    with them and we managed to enter into arrangements

7    reflected in our motions that is going to, in my opinion,

8    make it very unlikely that any of those folks from Texas

9    have to come to Delaware and talk to the bankruptcy court.

10   Q    Is the Railway bond -- is the Railroad Commission bond

11   issue now resolved?

12   A    No, the Commission still has to approve it.

13   Q    Okay.

14        (Whereupon the video deposition ended.)

15             UNIDENTIFIED SPEAKER:  Just a second.

16             UNNIDENTIFIED SPEAKER:  That's it for Ms. Dore's

17   testimony, Your Honor.

18             THE COURT:  Okay.  Next is Mr. Keglevic?

19             UNIDENTIFIED SPEAKER:  Yes, Your Honor.  I don't

20   know if you want to take a break now or --

21             THE COURT:  Yeah, let's break for lunch.  We'll

22   reconvene at 1:15.

23             UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

24             THE COURT:  We'll try to be ready to go at that

25   time.  You can leave your things.

```
 1          (Recessed at 12:09 p.m.)

 2               THE CLERK:  All rise.

 3               THE COURT:  Please be seated.  Mr. Jonas?

 4               MR. JONAS:  Thank you, Your Honor.

 5               I'd call Mr. Paul Keglevic to the stand.

 6               THE COURT:  Very good.

 7               THE CLERK:  Raise your right hand.

 8          (Witness Sworn)

 9               THE CLERK:  Can you state your full name, spelling

10   your last name for the record?

11               THE WITNESS:  It's Paul Keglevic, K-E-G-L-E-V-I-C.

12               THE COURT:  Good afternoon, Mr. Keglevic.

13               THE WITNESS:  Good afternoon, Your Honor.

14               MR. JONAS:  As set, Judge?

15               THE COURT:  Yes.

16                         IRECT EXAMINATION

17   BY MR. JONAS:

18   Q    Good afternoon, Mr. Keglevic.

19   A    Good afternoon.

20   Q    Mr. Keglevic, all of the debtors' customers are in

21   Texas, correct?

22   A    They are.

23   Q    That's approximately 1.75 million customers, correct?

24   A    Correct.

25   Q    All of the debtors' assets are in Texas, correct?
```

```
1    A    Correct.

2    Q    All of the debtors' operations are in Texas, correct?

3    A    Correct.

4    Q    All of the debtors' employees are in Texas, correct?

5    A    We have a small Washington, D.C. office for its

6    internal affairs, but of the 5700 virtually all of them are

7    in Texas except for those people.

8    Q    How many people do you think are in Washington?

9    A    Oh five to ten.

10   Q    Debtors don't have any operations in Delaware do they?

11   A    They do not.

12   Q    Debtors don't have any employees in Delaware do they?

13   A    We do not.

14   Q    Debtors don't have any books and records in Delaware do

15   they?

16   A    We do not.

17   Q    The debtors don't have any officers and directors in

18   Delaware do they?

19   A    We do not.

20   Q    The debtors don't have any -- the debtors don't have

21   any customers in Delaware do they?

22   A    We do not.

23   Q    Mr. Keglevic, you began to spend a significant amount

24   of your time relating to restructuring the debtors'

25   liabilities in mid-2012, correct?
```

1    A    Yes.

2    Q    Prior to that time you spent virtually all of your time

3    at the debtors' Dallas, Texas headquarters except for

4    visiting regulators or legislatures in Austin, Texas or

5    bankers and investors in New York, correct?

6    A    Correct, but I did spend not an insignificant time

7    because we were doing a lot of liability management program

8    and we issued a lot of debt and refinanced a lot of debt

9    prior to that time, but still the vast majority of my time

10   was spent in Dallas, Texas.

11   Q    I think at your deposition you said virtually all,

12   correct?

13   A    I don't recall, but virtually all.  The vast majority,

14   I'll accept that.

15   Q    Now you live in Dallas, right?

16   A    I do, contrary to Ms. Dore's testimony today.

17   Q    You're -- the trips you took to Austin on business,

18   those would be to update legislatures and regulators

19   regarding the debtors' financial profile, correct?

20   A    Yes, that was largely the focus of those visits.

21   Q    And you'd meet with the Public Utility Commission of

22   Texas or members of ERCOT, which is the reliability council

23   of Texas with schedules and dispatches power, correct?

24   A    That's correct.

25   Q    You'd also meet with the assistant governor or you've

1   met with the assistant governor and state senators, correct?

2   A     The lieutenant governor and some senators, yes.

3   Q     Okay.  Your office is at the debtors' headquarters in

4   Dallas, Texas, correct?

5   A     It is.

6   Q     The floor you're on at the debtors' headquarters in

7   Dallas is the 41st floor where there's also the office of

8   the CEO, the general counsel, head of HR, and the head of

9   external affairs, correct?

10  A     Correct.

11  Q     You agree that "face-to-face interaction with

12  colleagues and employees is always important," don't you?

13  A     I do.

14  Q     Okay.  And you think it's important in your job that

15  you interact with other employees at headquarters don't you?

16  A     Regardless, I just need to interact with them, it

17  doesn't have to be at any specific location.  But since most

18  of them are located in -- in or around Dallas, Texas that's

19  usually where the interaction occurs.

20  Q     That's because "at the end of the day people are

21  important, and your people are in Dallas, Texas," correct?

22  A     That's correct.

23  Q     When you're in Dallas --

24          THE COURT:  Counsel, I'm sorry, what are you

25  quoting from?

1          MR. JONAS:  I'm quoting from his deposition, Your

2     Honor.

3          THE COURT:  Okay, thank you.

4          MR. JONAS:  Sorry, I can make that clear.

5     BY MR. JONAS:

6     Q    Mr. Keglevic, when you're in Dallas -- your Dallas,

7     Texas office you spend at least two to three hours per day

8     meeting with other employees and talking face to face,

9     correct?

10    A    Yes.

11    Q    And you think you're more efficient when you are in the

12    office versus being on the road, correct?

13    A    Yes.

14    Q    You agree that these cases if -- you agree that if

15    these cases remain in Delaware critical management personnel

16    will be required to spend extended periods away from their

17    offices, correct?

18    A    During -- regardless of venue we would spend

19    significant portions of our time away from our office, but

20    it's a small number of the 5700 people, likely to be less

21    than 20.

22    Q    Sir, in connection with the debtors' decision to file

23    bankruptcy in Texas versus -- in Delaware versus Texas you

24    didn't do any sort of financial analysis as to the cost of

25    Delaware versus Texas did you?

1    A    I did not.

2    Q    You haven't seen any sort of analysis like that,

3    correct?

4    A    Correct.

5    Q    You're not aware of anybody else having done that type

6    of analysis, correct?

7    A    Correct.

8    Q    You haven't any discussions with anybody relating to

9    that type of analysis, correct?

10   A    I have not.

11   Q    In connection with the debtors' decision to file

12   bankruptcy in Delaware no consideration was given to the

13   convenience or the interests of the debtors' trade

14   creditors, correct?

15   A    I specifically did not have any discussions or analysis

16   around the impact on venue associated with trade creditors.

17   Q    Do you know if anybody else at the company did?

18   A    I don't know if anybody else did, but I can't speak as

19   to whether they did or did not.

20   Q    All right.  But you're in most senior executive

21   meetings at the company are you not?

22   A    Yes.

23   Q    And do you think as CFO you'd know if anybody was

24   talking about your trade creditors' interest in connection

25   with filing bankruptcy?

1    A    You know, we have a supply chain group with multiple

2    people and we have a lot of vendors so it's impossible to

3    speak as to the number of interactions with vendors.  I know

4    it was highly important to our vendors what our financial

5    condition was and what was going to happen in a

6    restructuring, et cetera, so who knows what those dialogues

7    were.  They were routine as our vendors tried to ascertain

8    the impact on them associated with restructuring.  So I

9    really just can't answer the scope of all of those

10   discussions given the thousands of vendors we do business

11   with.

12   Q    And in connection with the debtors' decision to file

13   bankruptcy in Delaware no consideration was given to the

14   convenience or the interests of the debtors' counterparties

15   to various contracts, correct?

16   A    I can just tell you I did not make any such analysis.

17   I don't know if anybody else at our company did.

18   Q    Okay.  In connection with the debtors' decision to file

19   bankruptcy in Delaware no consideration was given to the

20   convenience for the interests of the debtors' retirees,

21   correct?

22   A    Same answer, I did not personally.  I don't know if

23   anybody else did.

24   Q    And just to wrap up on this, you're not aware that the

25   debtors had any discussions with creditors, counterparties,

1    retirees, or employees about the bankruptcy, correct?

2    A    We had many discussions with those groups about the

3    bankruptcy, I don't think we had any discussions with those

4    groups that I'm aware of specifically about venue.

5    Q    Mr. Keglevic, you attended the first day hearings in

6    this case that took place on May 1st and 2nd, right?

7    A    Yes, sir.

8    Q    And at the hearing the debtors had, just let me see if

9    you agree with me I have this right, the debtors had you,

10   Ms. Dore, who's the GC and co-CRO.

11   A    Correct.

12   Q    Michael Carter, who's the SVP of planning, Tony Horton,

13   the SVP of tax, Terry Nutt, the VP of risk, Carla Howard,

14   Andy Wright, Cecily Gooch, Kris Moldovan, assistant

15   treasurer, Greg Santos, and Kelly Frazier, right?

16   A    Yes, I believe that was our contingent.

17   Q    And at least some of those people had come into New

18   York prior to the hearings here, correct?

19   A    Yeah, I believe virtually all of them.  In fact I'm

20   pretty sure it was all of them.

21   Q    Okay.  When exactly did you fly up from Texas prior to

22   them?

23   A    It's hard for me to recall, but I was in New York for

24   the -- most of the week preceding, I think I went somewhere

25   and came back on the Saturday preceding the hearings.  So I

1    was in New York and I believe I got back on Saturday but I

2    took a day or two off but had been previously there the week

3    before.

4    Q    For you and the work that you do at the debtors it

5    would be easier for you if the debtors' bankruptcy cases

6    were lodged in Dallas, Texas, correct?

7    A    Personally if I consider my own situation and my own

8    job, because primarily of the lack of travel I guess I would

9    say yes.

10   Q    David Ying and his team and Evercore act as the

11   debtors' financial advisors, correct?

12   A    Correct.

13   Q    Has Evercore undertaken a valuation of the debtors'

14   business?

15   A    You'd have to ask Mr. Ying, but I've not seen any

16   valuation report from Mr. Ying or his firm.

17   Q    Do you know whether Evercore has done a valuation?

18   A    I don't believe they have.

19   Q    Okay.  Did you or anyone else at the debtors consider

20   whether it would be appropriate to have Mr. Ying do a

21   valuation before entering into the RSA?

22             MR. MCGAAN:  Object, Your Honor, as to relevance.

23             MR. JONAS:  Relevance, counsel?  Your Honor, I'm

24   going to get to Evercore and the valuation work they did,

25   which I think a lot of it was done in -- not the valuation

1    work, the lead-up work -- which was done in Texas, and I

2    think it's relevant, but I'm about to move on in any event.

3              THE COURT:  Yeah, I don't think this question is

4    relevant.

5              MR. JONAS:  Fair enough.

6    BY MR. JONAS:

7    Q    Evercore has spent a lot of time at the debtors'

8    headquarters, correct?

9    A    Yes.

10   Q    Sometimes they're there and you don't even know they're

11   there, right?

12   A    That's probably true.

13   Q    Now you agree that face-to-face interaction with

14   experts that are valuing a business is important, correct?

15   A    If you would expand on that, I don't know what that

16   means.  I would like -- I would typically believe that if

17   they do a valuation I would like it presented to me face to

18   face, yes.

19   Q    And what about the work leading up to the ultimate

20   conclusion, is interaction important there face to face?

21   A    Well we do a lot of valuations that have very little

22   interaction with our companies, you know, that don't come

23   down to Dallas, Texas.  Rating agencies, there's all kinds

24   of public information that I've never met the people and I

25   don't think they've ever stepped foot in Dallas, Texas, but

1    they still publicly find out what our valuation is.

2    Q    Well let's talks about Duff & Phelps.  They would,

3    until recently, annually do a valuation, correct, for the

4    debtors?

5    A    They would.

6    Q    And Duff & Phelps would send people to Dallas in

7    connection with their valuation work, right?

8    A    Yes, they did.

9    Q    And generally they didn't need to visit other locations

10   outside of Dallas because their work wasn't -- I think you

11   said in your deposition -- for a court proceeding, correct?

12   A    Correct.  I think most of the work was done in Dallas,

13   but I think, you know, the relationship that we've had with

14   Duff & Phelps goes all the way back to the merger, so I

15   think at some point they may have done some plant visits or

16   other things outside of Dallas, that was before I got here,

17   but I know the majority of the work that they did in Dallas

18   since I've been with the company was done at our corporate

19   offices, but it wasn't the only work they did.  A lot of

20   work they did back in their offices, we sent them files,

21   information, they ran numbers, and then they came down to

22   Dallas.

23   Q    Well let me ask you, if someone knew were going come in

24   and do a valuation do you think it would be appropriate for

25   them to visit the debtors' various locations in Texas?

1   A    Sure.  I think they should have a general understanding

2   of the assets, and you know, the physical conditions and the

3   set up, but I'm not a valuation expert and I know practices

4   vary.

5   Q    Okay.  How about Deloitte & Touch, they're the debtors'

6   outside auditors, correct?

7   A    They are.

8   Q    And as the outside auditors do Deloitte and Touch spent

9   a lot of time at the debtors' Dallas, Texas headquarters?

10  A    Yes.

11  Q    Would you say they're there greater than half of each

12  year?

13  A    I think over half of their work is performed in -- you

14  know, on site at the Dallas office.

15  Q    And when they're there in Dallas, Texas at headquarters

16  they are talking to people, analyzing data, and pulling

17  together documents, correct?

18  A    Among other things, yes.

19  Q    And the debtors have more than 50 physical locations in

20  Texas, correct?

21  A    It's probably close to that number, yes.

22  Q    And there are source documents or records at each of

23  those locations, correct?

24  A    Yes, at some level whether it's compliance documents or

25  -- I'm sure at every location there is some level of records

1    at -- you know, that we possess and maintain.

2    Q    Well there's safety records, right?

3    A    Safety records would be one of them.

4    Q    There's environmental records, right?

5    A    Not so much at the corporate office, but certainly at

6    the (indiscernible) and the mines we have environmental and

7    safety records.  We have safety records even at the

8    corporate office, just not environmental.

9    Q    There's regulatory compliance records, right?

10   A    Yes.

11   Q    Okay.  The debtors have a substantial number of

12   executory contracts, correct?

13   A    Yes, we do.

14   Q    You have leases?

15   A    We do.

16   Q    You have equipment leases, right?

17   A    We do.

18   Q    You have railroad car leases, right?

19   A    We do.

20   Q    You have office building leases, right?

21   A    We do.

22   Q    In fact the debtors have leases that are not market,

23   correct?

24   A    I'm sure there is some lease somewhere that is not

25   market as we sit here today.

1    Q    Well do you know?

2    A    We haven't completed the full evaluation, and you know,

3    as you know market is always subjective.  So obviously we

4    would, you know, need to finalize that analysis as part of

5    this process.

6    Q    So as you sit here you don't know which executory

7    contracts are going to assume or which ones will be

8    rejected, right?

9    A    That's correct.  And we have not determined which

10   prepetition receivables to pay other than the ones that were

11   included in the first day motions.

12   Q    And in fact you don't have a timetable to decide

13   whether to assume or reject executory contracts, correct?

14   A    We don't, just during the course of this case.

15   Q    Okay.  The debtors have had disputes with taxing

16   authorities that turned into litigation, correct?

17   A    You know, it's hard for me to specifically point to one

18   litigation, but certainly we got -- we had heavy

19   negotiations and had at least threatened litigation in

20   connection with some of the taxing authorities.  The one

21   that comes to mind primarily is some of our real estate real

22   property taxes.

23   Q    Okay.  I'm going to -- I'm hoping to avoid having to

24   pull out the documents, so I'm going to try and do this real

25   quick.

1    A    Okay.

2    Q    At your deposition I showed you a document that listed

3    all of the taxing authorities.  You remember that, right?

4    A    I certainly do.

5    Q    Okay.  And that -- perhaps you recall, but let me ask

6    -- do you recall there were about roughly 500 taxing

7    authorities that taxed the debtors?

8    A    Yes, I remember and ten percent or so was outside of

9    Texas and I accepted your math.

10   Q    Okay.  And that -- you have no reason today to believe

11   that's any different?

12   A    No, similar to what Ms. Dore said, and I would accept

13   her answers.

14   Q    Okay.  Now you're not aware of any reason why the

15   debtors' cash collateral arrangement couldn't be implemented

16   if the debtors' bankruptcy cases were transferred to Texas,

17   correct?

18   A    None that I'm aware of as I sit here today.

19   Q    You're not aware of any reason why the debtors' DIP

20   financing arrangements in this case couldn't be implemented

21   if the debtors' bankruptcy cases were transferred to Texas,

22   correct?

23   A    Correct.

24   Q    You're not aware of any reason why the restructuring

25   end of the RSA couldn't be implemented if the debtors'

1    bankruptcy cases were transferred to Texas, correct?

2    A    Correct.

3    Q    In the past couple of years the debtors have invested a

4    substantial amount of money in Texas, correct?

5    A    Yes, since merger I think for the consolidated company

6    that would the debtors and Oncor I believe it's spend about

7    $10 billion.

8    Q    The debtors invested that money among other things to

9    build three new power plants, right?

10   A    That's right, three new coal plants.

11   Q    Open mines, right?

12   A    The open mines associated with those plants and opened

13   some other new deposits.

14   Q    Add environmental emission reduction equipment at power

15   plants, right?

16   A    Correct.

17   Q    Improve It capabilities and data centers in Texas,

18   right?

19   A    Correct.

20   Q    And on cyber security, right?

21   A    Specifically, yes.

22   Q    Okay.  You agree that the debtors are an important part

23   of the Texas economy, right?

24   A    Yes, I do.

25   Q    In fact the debtors are the largest generator in Texas

1    and ERCOT, correct?

2    A    That is correct.

3    Q    You agree that the debtors' operations are critical to

4    serving customers and maintaining orderly electric service

5    in northern Texas, correct?

6    A    Correct.

7    Q    You agree that Texas regulators and authorities have

8    significant interest in these bankruptcy cases don't you?

9    A    Yes.

10   Q    I do want to look at one exhibit with you, which is

11   Exhibit 8.

12            MR. JONAS:  Judge, I think you have a set of

13   binders, and I know the clerk does and the parties, but I

14   need to hand one up if I may.

15            THE COURT:  Are you talking about these big

16   things?

17            MR. JONAS:  Yeah, unfortunately.

18            THE COURT:  All right, go ahead.  Just give him

19   the one he needs.

20            MR. JONAS:  Yes, sir.  May I approach, Your Honor?

21            THE COURT:  Yes.

22   BY MR. JONAS:

23   Q    Mr. Keglevic, I'm showing you what's been marked as

24   Exhibit 8, which is the debtors' objection to our transfer

25   motion, and you've seen that before, right?

1   A    I have.

2   Q    And I'd like you to take a look -- excuse me one

3   second.  I'd like you to take a look at page 11 if you

4   would, and you'll see this is a list that the debtors or

5   their lawyers put together for purposes of this objection.

6   And if you look at the list you --

7              THE COURT:  I'm sorry which -- what are we on?

8              MR. JONAS:  It's at tab 8, Your Honor, which is

9   Exhibit 8, which hopefully is the debtors' objection.

10             THE COURT:  The critical vendor motion.

11             MR. JONAS:  Oh, you're in Exhibit 5, Your Honor.

12  If you look at the other binder.  My apologies.  Sorry about

13  that.

14             MR. WEISFELNER:  Judge, can I hand you a handheld

15  version?

16             THE COURT:  I got it, it's okay.  Thank you,

17  Mr. Weisfelner, I have it.

18             MR. JONAS:  Judge, if you look at tab 8.

19             THE COURT:  Yes, I have it.

20             MR. JONAS:  Page 11.

21             THE COURT:  Okay.  Sorry about that.

22             MR. JONAS:  it's okay.  Thank you.

23  BY MR. JONAS:

24  Q    Are you there, Mr. Keglevic?

25  A    I am.

1    Q    And this list, if you look at it, you agree that the

2    debtors had at least in substantial part settled with and

3    resolved or negotiated the restructuring with respect to the

4    TCEH first liens, correct?

5    A    To the ad hoc committee of the TCEH first liens, yes.

6    Q    Yes, sir.  And to various holders of the EFIH first

7    liens, correct?

8    A    Correct, various holders.

9    Q    And the EFIH unsecureds, correct?

10   A    Yes, their ad hoc group.

11   Q    And the equity owners, correct?

12   A    Correct.

13   Q    And you believe that the TCEH first liens have the

14   financial wherewithal to pay for professionals' expenses if

15   these cases were transferred to Texas, correct?

16   A    Yes, but we are paying their expenses.

17            THE COURT:  I was going to say, aren't you paying

18   those bills?

19            THE WITNESS:  We sure are, Your Honor.

20   BY MR. JONAS:

21   Q    You believe the TCEH unsecured have the financial

22   wherewithal to pay for professionals' expenses if these

23   cases were transferred to Texas, correct?

24   A    I would assume so given their participation.

25   Q    Okay.  Same for the EFIH first liens?

1    A    Same thing.  Well in the EFIH first liens we are paying

2    those fees.

3    Q    How about the equity owners?

4    A    The equity owners would have the financial wherewithal.

5    Q    Okay.  Mr. Keglevic, is it fair to say that the

6    prepetition negotiations around the RSA were concentrated

7    over the last three to four months prepetition?

8    A    Yes.

9    Q    Okay.  And was there -- let me put it this way.  Which

10   of the three equity sponsors were most actively involved in

11   those negotiations, if you know?

12   A    You know look, as bare numbers they were all involved,

13   individually they all provided some support at some level.

14   I don't know that I want to get into who did what, I wasn't

15   necessarily aware of all the conversations and discussions

16   they had, they had some individually with some of these

17   holders that I did not participate in.

18   Q    Well let me ask you this.  Was it difficult getting

19   those creditors in a room because they were concerned about

20   restricting their trading abilities?  Do you have any

21   knowledge about that?

22   A    Sure.  I mean when the discussions (indiscernible) be

23   only about material non-public information unless we had

24   signed a confidentiality agreement, and I know they and we

25   take that very seriously.

1   Q    And would you agree that absent agreement of the

2   debtors to publicly disclose -- ultimately publicly disclose

3   information those creditors wouldn't have come to any of

4   those meetings?

5   A    That's probably right, although, you know, you can have

6   a discussion based on -- we had a lot of material

7   information that was out in the public as we hit different

8   parts of the case, meaning we had very little information to

9   be shared that wasn't already in the public domain.  So I

10  think there were, you know, opportunities to have meaningful

11  discussions without signing confidentiality agreements.  At

12  certain points during the cases we filed 8-K's, et cetera.

13  Q    You heard Ms. Dore -- well, I'll ask you.  Did you hear

14  Ms. Dore explain that many of your major creditors'

15  treatment in this case is already agreed upon per the RSA?

16  A    Yes.

17  Q    Okay.  And sitting here today do you know if any of

18  your TCEH first lien creditors have agreed to become

19  restricted at this point?

20          MR. MCGAAN:  Object, relevance, Your Honor.

21          THE COURT:  Relevance?

22          MR. JONAS:  Your Honor, one of the focal points

23  here or one of Ms. Dore's testimony pieces was we're going

24  to have to come back to New York, we're going to have a ton

25  of meetings in New York, we need to see our creditors, and I

1    think in about three or four more questions I'm going to be

2    able to demonstrate that that's not true.

3              THE COURT:  All right, go ahead.

4    BY MR. JONAS:

5    Q    Want me to restate the questions?

6    A    Yes.

7    Q    Sitting here today are you aware if any of the TCEH

8    first lien creditors have agreed to become restricted at the

9    present time?

10   A    I know they were restricted, I'm sorry, I don't know if

11   they're restricted as we sit here today.

12   Q    Do you -- you don't know either way?

13   A    I knew they were, and when we filed the 8-K associated

14   with the RSA I don't think they are any longer, but I do not

15   know the answer.  I'm speculating.

16   Q    Okay.  How about the EFIH unsecured creditors?

17   A    Same answer.

18   Q    Okay.  Would it be the same answer for the EFIH second

19   lien creditors?

20   A    It would be.

21   Q    Okay.  Now until -- until the point -- strike that.

22        Do you believe that until those parties agree to become

23   restricted additional or further meetings with your creditor

24   constituencies will be among their professionals rather than

25   the actual creditors?

1    A    No, I don't.  You know, I've come to New York a lot to

2    speak to investors, you know, creditors, before the

3    bankruptcy, and you know, as long as you don't count on the

4    (indiscernible) public information you can have a dialogue

5    with those groups.

6    Q    Couldn't those types of meetings take place by phone?

7    A    They could, but as we talked about face to face is

8    usually more effective.

9    Q    Do you understand -- is it your understanding that the

10   RSA provides you and Ms. Dore with releases?

11   A    As officers of the company?

12   Q    Yes, sir.

13   A    Yes, that's my understanding.

14   Q    Okay.  And those releases were bargained for on both

15   your behalf and Ms. Dore's behalf and on behalf of TPG, KKR,

16   and Goldman Sachs, which are board members, correct?

17            MR. MCGAAN:  Object, relevance.

18            THE COURT:  Relevance?

19            MR. JONAS:  Your Honor, it's going to -- I've got

20   two more questions and I'll be done, and it goes to the

21   venue decision of where to file venue, whether there was a

22   direct personal interest in that filing.

23            THE COURT:  All right.

24   BY MR. JONAS:

25   Q    The question -- do you want me to repeat the question?

1              THE COURT:  I would.

2              MR. JONAS:  Thank you.  Sure.

3    BY MR. JONAS:

4    Q    Mr. Keglevic, the releases of you, Ms. Dore, officers

5    and board members, including TPG, KKR, and Goldman Sachs, we

6    just talked about that, you understand there to be releases

7    in the deal which has been reached pursuant to the RSA,

8    correct?

9    A    Subject to the Court approval.

10   Q    Correct.  But you agree with me that that deal that's

11   encompassed in the RSA contains those releases, right?

12   A    Yes, I believe it does.

13   Q    Okay.  My question is, was the choice of venue at all

14   dictated by whether -- by which of the Third of the Fifth

15   Circuits would most likely approve those insider non-debtor

16   releases?

17   A    I never had any discussion or dialogue about releases

18   and tying them to venue.

19             MR. JONA:  No further questions, Your Honor.

20             THE COURT:  Okay.

21             MR. MCGAAN:  May I proceed?

22             THE COURT:  Yes.

23                    CROSS-EXAMINATION

24   BY  MR. MCGAAN:

25   Q    Mr. Keglevic, just a few questions for you.

1    Mr. Jonas began by asking about the -- asking you about

2    the --

3            MR. MCGAAN:  I'm told I'm too far away from the

4    microphone, Your Honor.

5    BY MR. MCGAAN:

6    Q    Asking you about the customers and operations and

7    employees of the debtors in Texas.  Do you remember that?

8    A    Yes, sir.

9    Q    Did the debtors take actions with respect to their

10   first day motions to preserve relations with customers,

11   employees, and retirees?

12   A    Yes, in fact it was the focus of the first day motions,

13   and one of the key elements of maintaining and maximizing

14   enterprise value to make sure we did not disrupt customer,

15   employee, vendor, regulatory relationships, and we did

16   absolutely our best to focus on that, and in fact we're

17   thankful to the Court for supporting what we got in the

18   first day motion to make sure that that in fact to date has

19   been fairly successful.

20   Q    And was it a concern of yours to maintain uninterrupted

21   operations on the ground in Texas in connection with the

22   first day motions?

23   A    Absolutely for exactly the reasons Mr. Jonas asked me

24   about, that providing electricity to north Texas is a

25   critical part of the economy, and in fact the lives of the

1   people who live in north Texas.

2   Q    Do you believe that the relief the debtors are seeking

3   in this case will interrupt the debtors' ability to continue

4   to participate in the Texas economy?

5   A    I do not.

6   Q    Do you think that the -- in seeking the relief the

7   debtors have sought thus far or intend to seek in these

8   cases will interrupt the debtors' ability to continue to

9   generate, transmit, and sell electricity to its customers in

10  Texas?

11  A    I do not.  In fact that is always going to be something

12  --

13  Q    And why -- why is that?

14  A    Because we moved to assume the contracts with the

15  customers, we did not do anything with the unions, we did

16  not ask for any environmental relief or change, we did not

17  ask for any regulatory accommodation, save the work we had

18  to do at the Railroad Commission, because in fact we were in

19  violation of the rule, and in fact through the critical

20  vendor motions and cash collateral and other things we did

21  we -- I think the main support for all those motions is that

22  it would hurt the estate, which is my focus, and would

23  (indiscernible) enterprise value if we in fact did not do

24  everything to minimize any disruption associated with the

25  enterprise.

1    Q    Ms. Dore testified earlier today that this was in her

2    view a balance sheet restructuring.  Did you hear that

3    testimony?

4    A    I sure did.

5    Q    Does that have meaning to you?

6    A    Yes.

7    Q    Do you agree with her observation, number one?

8    A    Yes, I think what we're dealing with here is the

9    inability to service too large a debtor, too high a price,

10   and as a result have negative cash flow which brought the

11   company to a position where it could no longer operate

12   because we were running out of cash and we need to reduce

13   the amount of the debt, reduce the rate of the debt, and if

14   operations remain exactly as they are today we will have a

15   profitable healthy company going forward.

16   Q    As a result of that, Mr. Keglevic, are the debtors

17   seeking to rehabilitate, reorganize, alter in any material

18   way its operations on the ground in Texas in these cases?

19   A    No, and in fact it's been as -- as I said, a big

20   priority of managements and something that the regulators

21   through the attorney general and the PUC and ERCOT wanted to

22   make absolutely sure that those disruptions did not occur,

23   and I can similarly add the NRC and the EPA and any of the

24   other regulatory bodies that we talked about or that you

25   heard about in Ms. Dore's testimony.

```
1    Q    Ms. Dore also testified about the degree to which she

2    has had to travel in connection with her participation in

3    the restructuring process leading up to the filing.  You

4    heard that testimony?

5    A    I did.

6    Q    Would you describe for the Court -- you play a

7    different role in some respect than she does -- will you

8    describe for the Court the degree of your travel for

9    restructuring efforts leading up to the filing, and then

10   we'll turn to whether it's abated since that time?  But

11   let's do prior to the filing.

12   A    Yeah, I think I've probably traveled more because

13   generally speaking --

14   Q    More than --

15   A    More than Ms. Dore, because generally speaking this was

16   about the balance sheet and that's more my purview.  As we

17   got, you know, and looked at a structure that could work,

18   including one that was a tax free spin of TCH, that's an

19   Internal Revenue Service point, that's more in my court, and

20   obviously as we wanted to understand the willingness of

21   different creditors groups to entertain that transaction is

22   largely myself with a few members of my team and our

23   financial advisors that had meetings with creditors to

24   ascertain, you know, their desires for restructuring, their

25   willingness to support, you know, that type of agreement,
```

1   and that all lead up to, you know, finally getting enough

2   feedback that we thought there could be something here, this

3   could be real, and obviously at that point Ms. Dore had to

4   be involved closely because we started talking about

5   negotiating our arrangement and making sure we had, you

6   know, papered and documented the deal and that, you know,

7   legally had complied with all the appropriate aspects.

8   Q    Your office during this time period you're referring to

9   was in Dallas?

10  A    It has always been in Dallas, correct.

11  Q    Where were you traveling for all these meetings you

12  described?

13  A    I traveled to -- or I traveled from Dallas to New York

14  primarily because as I did the math it was -- it only cost

15  one person to travel if I went to New York versus all the

16  people I was meeting coming to Dallas to me, (indiscernible)

17  about their willingness to travel as well, but frankly it

18  was just a lot simpler to touch -- I could touch a lot of

19  people at a cheaper price and benefit the estate by doing

20  that than having them fly down to me.

21  Q    There was a suggestion in the questioning from

22  Mr. Jonas that now that the case has been filed and there's

23  been an agreement to an RSA that you don't need to travel to

24  meet with creditors, their advisors, their lawyers, and

25  other representatives to negotiate issues in this case.  Has

1    that been your experience since April 29th?

2    A    It has not.  In fact it has continued, you know, we've

3    added depositions to the mix, but as you know we have

4    various milestones in the RSA, we've already had to amend

5    the RSA a few times, and we have, you know, various dialogue

6    about (indiscernible) requests and data and other

7    information.  Obviously now we have a creditors' committee

8    that we have -- you know, that we're dealing with.  So I

9    think we will continue through -- you're probably better

10   able to access how long this will continue, but we're going

11   -- my guess is we'll spend a lot of time in New York here

12   over the coming months.

13   Q    Mr. Jonas asked some questions about -- both to you and

14   to Ms. Dore about who specifically attended the first day

15   hearings from management.  Do you recall that?

16   A    Yes.

17   Q    How many of those people were lawyers working with

18   Ms. Dore?  Give or take.  You don't have to get it right.

19   A    It's always easier for me to count the ones that

20   weren't.  Mr. Nutt, Mr. Carter, Mr. Horton, and Ms. Howard

21   were the four that were not, in addition to myself everybody

22   else was a lawyer.

23   Q    Okay.  Ms. Dore -- well let me ask you this.  Were

24   there any employees directly responsible for operations on

25   the ground in Texas that have traveled here for any of the

1    two hearings we've had in this case?

2     A    No, in fact, you know, you'll notice the CEO isn't

3    among the people we've named, the CEO of Energy Future

4    Holdings, the you know, CEO of Luminant who is their

5    generator, the CEO of TFG Energy, which is the retail

6    provider, nor the person who deals with our vendor, the guy

7    that runs the supply chain, nor the person who runs their IT

8    department, nor our controller.

9         You know, we've specifically made sure that we have

10   some key people in Dallas, Texas to make sure the business

11   is not disrupted while we spend the necessary time here to

12   go through an efficient process and get restructured.

13   Q    You were asked about where the company keeps its books

14   and records, correct?

15   A    I was.

16   Q    Are you aware of whether the company has the ability to

17   produce and share books and records electronically?

18   A    Yes, in fact obviously you can digitize any piece of

19   paper.  We have hundreds and thousands maybe millions of

20   pieces of paper in a data room that we've been sharing with

21   those groups, you know, when they were restricted or since

22   the case has been filed.  And in fact, you know, with

23   respect to our books and records if you gave me a computer

24   while I probably personally do it I know we could access our

25   general ledger and make a journal entry from the court if we

1    had Wi-Fi service.

2    Q    Okay.  And then when you were deposed in advance of

3    this hearing you were shown some records from the company

4    that were produced in this case, right?

5    A    I was.

6    Q    Are you aware of whether movant's counsel had to travel

7    down to Texas to review those in hardcopy form?

8    A    I do not believe they did.

9             MR. MCGAAN:  That's all I have.

10            THE COURT:  Redirect?

11            MR. JONAS:  Just a few questions, Your Honor.

12            THE COURT:  Yeah.

13                    REDIRECT EXAMINATION

14   BY MR. JONAS:

15   Q    Mr. Keglevic, I apologize because I'm confused about

16   all this talk of a balance sheet restructuring and I need a

17   little help.

18        Is it the debtors' intent to pay all of its trade

19   creditors in full?

20   A    We don't have an intent, we're going to analyze the

21   prepetitions receivable and make determinations as to

22   whether we can -- whether it makes sense to pay them or not

23   consistent with the requirements of the proceeding.

24   Q    How about counterparties, is it the debtors' intent to

25   pay all of their counterparties, all their contract

1    counterparties in full?

2    A    When you say counterparty you're differentiating them

3    from vendors?

4    Q    Yes.

5    A    So you're talking about people that we trade with?

6    Q    Okay, let's start with those people.

7    A    Yeah, those people had generally been fully

8    collateralize so they already had letters of credit or cash

9    that effectively we already had prepaid all those parties.

10   Q    Okay.  Let's talk now about the contracts that the

11   company has, what we call executory contracts, they're

12   contracts.

13   A    Yeah, vendors.

14   Q    Whoever they may be.

15   A    Okay.

16   Q    But you have building leases, right?

17   A    Sure.

18   Q    Okay.  Those contracts -- are any of those contracts

19   what we call out of the money?

20   A    We've not completed a full review of that, but

21   generally speaking the reason we don't believe it's an

22   operational restructuring is we are generally happy that

23   many of our contracts are at market.

24   Q    So is it the debtors' intent at this point to assume

25   every single contract they have?

1    A    I did not say that.  I just -- in the answer to your

2    question as to whether there were any out of the market I'm

3    sure there are.  Some out of the market, but we believe the,

4    you know, vast amount of the contracts as I remember, you

5    know, and I have not looked at them recently, all at fairly

6    reasonably market terms.

7    Q    Are you aware if anybody at the debtors have talked to

8    trade creditors and informed them that the debtors' belief

9    was that they were going to get paid in full?

10   A    No, in fact that's one of the reasons we didn't provide

11   the list of critical vendors, it would have provided a

12   roadmap for them to come with their hand out and get the

13   money.

14   Q    How about contact counterparties?  Have the debtors or

15   anybody that you're aware of at the debtors had discussions

16   with anybody -- with any contract counterparties and said,

17   don't worry, we're going to assume your contract?

18   A    No, we've left ourselves open to do the evaluation and

19   to go through the process and do what's right to maximize

20   the value of the estate.

21   Q    Okay.  And how about regulators, are you aware if

22   anybody at the debtors told -- have told any regulators

23   don't worry, we're just going to pass right through

24   bankruptcy, no harm, no foul?

25   A    Well in our discussion with the PUC and ERCOT with

1    respect to customers we certainly in the first day motions

2    asked to assume, you know, the customer contracts to avoid

3    disruption, which I think is a large portion of the yes to

4    that question, that we've said with respect to those

5    contracts we are -- it's business as usual and we're going

6    to continue to operate in that fashion.

7              MR. JONAS:  No further questions, Your Honor.

8              THE COURT:  All right.  Thank you, you may step

9    down.

10             THE WITNESS:  Thank you.

11             MR. JONAS:  Your Honor, one housekeeping matter if

12   I might?

13             We've agree that there is an exhibit list, it's

14   got 19 exhibits on it, we've agreed that they can all be

15   admitted, there's no -- many of them were used in the

16   deposition, regardless -- some of them are affidavits,

17   regardless of that, Your Honor, neither party has any

18   objection and would ask the Court if we can move all the

19   exhibits in, there's no debate, no discussion, no argument.

20             THE COURT:  Is that right?

21             MR. MCGAAN:  Agreed.

22             THE COURT:  Okay.  Let me just look real quick

23   here.

24        (Pause)

25             THE COURT:  Okay, so Exhibit's 1 through 19 are

1    admitted without objection.

2         (Exhibit Nos. 1 through 19 were admitted)

3              MR. JONAS:  Thank you, Your Honor.

4              THE COURT:  Any other testimony or evidence?

5              MR. JONAS:  No, sir.

6              THE COURT:  Any counter evidence?

7              MR. MCGAAN:  Your Honor, I just want to point out

8    we don't intend to call any witnesses, but I wanted to point

9    out that in the joint exhibit list you will find at

10   Exhibit 17 the declaration of Steven Kotarba with Alvarez &

11   Marsal, that was also submitted to the Court as an exhibit

12   to the -- our objection to the motion.  And Mr. Kotarba

13   addresses the identify and the location of the creditors and

14   their representatives, indenture trustees, and agents and

15   professionals in this case.  That's now in evidence so

16   there's no disagreement over those facts.

17              Exhibit 19 is the other declaration we've

18   submitted.

19              THE COURT:  Eighteen.

20              MR. MCGAAN:  I'm sorry, 18.  Thank you, Your

21   Honor, 18, by Ms. Betty Fleshman (ph), assistant secretary

22   of the company, and her declaration establishes which of the

23   debtors' companies, 22 of them, are incorporated in

24   Delaware.  So there's no dispute over that.

25              We've also put into evidence, I'm just drawing

1    your attention to it at this moment, the list of the

2    debtors' active litigation, which was referred to during

3    Ms. Dore's testimony and she described it as a complete and

4    accurate list, that's Exhibit 12 here.

5            And then lastly, Your Honor, a report off of the

6    website, USCourts.gov, that's Exhibit 19, and that contains

7    what we are is complete information about court congestion

8    in the Bankruptcy Court in the Northern District of Texas

9    and in the District of Delaware.

10           We don't offer anything further, Your Honor.

11           THE COURT:  Okay.  Is there any other party that

12   has any evidence they would like to submit in connection

13   with the motion?

14           Okay, I hear none, that'll close the record.

15           I'll hear argument.

16           MR. JONAS:  Your Honor, first a few things.

17           Mr. McGaan opened, Your Honor, and focused on the

18   fact that my client is based in Delaware, to which I say, so

19   what?

20           Judge, this case isn't about any particular

21   creditor or any particular party, it is about fundamental

22   fairness and justice, it doesn't really matter who's asking

23   for it in my view.

24           The case -- this case belongs in Texas based on

25   both convenience of the parties and the interest of justice

1    and frankly it seems to be the right thing.

2           Some facts real quick that I've put together in a

3    demonstrative -- two demonstratives we'll just put up on the

4    screen if we could put the screen on.

5           THE COURT:  Give me a moment.

6           MR. JONAS:  If I may approach, Your Honor?

7           THE COURT:  Sure.

8           THE COURT:  I don't know if we paid the cable

9    bill.  Where is it?  There we go.

10       (Pause)

11          MR. JONAS:  Your Honor, very, very briefly we'll

12   just run through these.

13          First, what we've done here, Your Honor, is just

14   depicted the location of the top 50 creditors off of the

15   list of 50 largest unsecured creditors, one of the exhibits

16   that's been admitted.  You'll see 40 percent of the top 50

17   unsecured creditors are based in Texas, there are others all

18   over the place, there are none in Delaware.

19          Next.  Next we've graphically depicted per the

20   Fleshman declaration which you just heard about where the

21   debtors are located in terms of incorporation.  Of the 71

22   debtors 22, 31 percent, are formed in Delaware and the rest

23   are somewhere else.

24          Next.  This slide, Your Honor, depicts the

25   location of all of the employees.  I learned today for the

1    first time, contrary to the deposition testimony, and I'm

2    not quibbling with it, that apparently there's a couple

3    employees in Dallas.  Wasn't able to -- I'm sorry, there's

4    more than a few employees in Dallas.  In D.C. and we weren't

5    able to quite get this corrected.

6            Next, Your Honor, location of assets which was per

7    the Dore and Keglevic testimony.  You'll see obviously all

8    the assets are in Dallas -- Dallas, Texas and Texas.

9            Last, Your Honor, you'll see the location of key

10   management, again, all in Texas.

11           With that, Your Honor, I want to just put up --

12   oh, I'm sorry, we have one more slide, the customer slide.

13   Again, all the customers in Texas.

14           With that, Your Honor, I just want to go back and

15   it'll be my last slide which was the summary slide we used

16   when I opened, and I don't -- I don't think anything has

17   changed.  I'll briefly review the points here, Your Honor,

18   because I think in the end again it all comes down to the

19   factors, how much weight they've given, and where they come

20   out.

21           Of course we've talked about the plaintiffs'

22   original choice of forum, Your Honor, and obviously the

23   debtors have chosen Delaware.  I've raised concern about

24   giving that full weight, but in any event we've -- we

25   understand that would be the debtors' selection.

1          The -- we believe, Your Honor, the case should be

2     in Texas.  In terms of whether the claim arose elsewhere,

3     we've talked about that, Your Honor.  There's no question

4     that all of the underlying facts -- the facts and events

5     arose in Texas, I think that's germane here and important.

6          Location of books and records.  We've had

7     testimony on that.  I think the only issue, I don't think

8     there's disagreement, the only issue is to what extent could

9     those books and records be available electronically?  The

10    fact of the matter is all the books and records are in Texas

11    for what's going to need to happen in this case, access to

12    those is going to be necessary, and even beyond books and

13    records in this case expert valuations are going to have to

14    be done likely and that's going to require a lot of travel

15    and a lot of visits, including to some, if not all, of the

16    debtors' 50 locations in Texas.

17         Your Honor, convenience of the parties as

18    indicated by their relative physical and financial

19    condition.

20         Your Honor, on the one hand we have customers in

21    Texas, we have employees and retirees in Texas, we have

22    regulatory bodies in Texas, we have neighbors at risk of

23    environmental harm in Texas, we have numerous executory

24    contract counterparties in Texas, we have litigants --

25    litigation adversaries in Texas, we have trade creditors in

Page 161

1    Texas.  I appreciate, Your Honor, that we've heard over and

2    over again from the debtors, don't worry about it.  We're

3    either going to assume all of our contracts, but not quite

4    all of the contracts because we haven't really looked at it

5    yet, but one way or the other those parties don't need to

6    show up because they will be largely unaffected by the

7    bankruptcy case.  Your Honor, I don't really buy that.

8              Long after the parties that have settled under the

9    RSA are gone some Bankruptcy Court for years to come is

10   going to be dealing with claims and other resolutions in

11   this bankruptcy base, and those parties will all be Texas

12   parties.

13             Also, Your Honor, I think you have to compare,

14   because that's what the standard is which is relative

15   financial condition, you have to compare those parties to

16   the parties who the debtor says support being here in

17   Delaware.

18             You've got well-funded lenders, bondholders, and

19   those are the people who the debtors ask we focus on,

20   because most of them are located in the northeast.

21             And I would again say, Your Honor, most of those

22   folks their claims are resolved in this case.  Yes, there'll

23   be activity going forward --

24             THE COURT:  That's naive at best.

25             MR. JONAS:  Well, I can look at the RSA and I can

1    reach a conclusion, Your Honor, that at least in substantial

2    part those parties have resolved their treatment in this

3    case.

4            THE COURT:  If that were the case there wouldn't

5    be items 2 through 7 on my agenda.

6        (Laughter)

7            MR. JONAS:  Your Honor, the -- the other point,

8    Your Honor, I think -- well, I won't spend much time on it.

9    The idea has been made that where the professionals are

10   located is important and relevant, and I don't think that's

11   the case.

12           In terms of convenience of witnesses.  We've

13   talked about that, Your Honor, and my position certainly

14   hasn't changed.  You can't compel witnesses to be here if

15   they live and work in Texas, and I think that remains the

16   case.

17           In terms of the enforceability of the judgment

18   it's a neutral factor.  Practical considerations that would

19   make the trial easy, expeditious, or inexpensive, and you

20   haven't seen any evidence on that, certainly from the

21   debtors.  I appreciate they tell us it's our burden, but the

22   fact of the matter is that for the Texas creditors who I've

23   mentioned, I won't go through the list again, it will be

24   more expensive if they need to come to Delaware than to be

25   in Texas.  And as I mentioned and I know there was an effort

1    to respond to it, but the fact of the matter is that you've

2    got the CFO and various other senior management members who

3    because this case is in Delaware need to spend significant

4    time away from their offices in Texas.  And I think that

5    needs to be rolled in, if you will, to consideration of

6    where this case should be.

7              Relative administration -- administrative

8    difficulty resulting from congestion.  We've talked about

9    it, I won't go over it again, the Court will reach its own

10   conclusion based on the statistics that have been presented.

11             Public policy I think is a wash.

12             Familiarity of the judge with applicable state law

13   we've talked about.  I think now there is evidence that

14   there are numerous issues relating to Texas state law, there

15   are Texas regulatory approvals at issue.

16             And last, Your Honor, the local interest in

17   deciding the controversies.  We've now had testimony on that

18   with respect to the critical importance of this debtor and

19   the results of this bankruptcy case and the impact on Texas,

20   the Texas economy, et cetera.

21             And I guess, Your Honor, Mr. McGaan also made the

22   point that we haven't heard from Texas regulators and we

23   haven't heard from the unsecured creditors' committee, and

24   the only conclusion I can reach, Your Honor, is that based

25   on the debtors' view of the world early in this case that

1   this is a quote/unquote balance sheet restructuring and not

2   an operational restructuring, whatever that means, that --

3   that that's what these parties have come to understand one

4   way or the other, and therefore if there's some sort of an

5   expectation that they're going to ride through this case and

6   not have to appeal, for example, that certainly support why

7   it is that we haven't heard from them.

8         I think you can draw your own inferences from the

9   fact that neither of them -- I don't think that it's

10  necessary an inference in the positive to be drawn that

11  neither of them are opposing the motion or supporting the

12  motion.

13        And with that, Your Honor, I think you go through

14  the factors and you consider them and you consider the

15  balance of those factors.  I think it's clear, Your Honor,

16  that this case should be transferred to the Northern

17  District of Texas.

18        Thank you, Your Honor.

19        THE COURT:  You're welcome.

20        MR. MCGAAN:  Your Honor, the movants have

21  confessed now what we knew to be the case at the beginning,

22  which is that venue in Wilmington is not inconvenient or

23  unjustice to them.  They're evidently litigating this motion

24  on behalf of others, and in fact the focus of the argument

25  has been on behalf of unsecured creditors in Texas or

1    potential unsecured creditors, creditors -- parties who may

2    have claims and become unsecured creditors.  And of course

3    as the Court knows there's a committee here that's

4    representing those interests, the debtor is paying their

5    fees, the New York lawyers are here representing these

6    people, and don't -- I say New York lawyers I mean as a

7    compliment.  My best friends are New York lawyers, and

8    they're here being spoken for.

9          So -- and they have not taken a position on the

10   motion, which I'm not going to speculate on what it means,

11   other than it provides no help whatsoever to the movants in

12   satisfying their burden.

13         There's no disagreement, at least I didn't hear

14   any, that under Delaware law we're properly here under

15   federal law, we're properly here in this case.  The venue is

16   properly lodged here, and that the debtors are entitled to

17   in the words of this Court in In re: PWS Holding

18   Corporation, substantial weight and deference with respect

19   to that choice.

20         So it isn't a question of whether the debtors did

21   homework and produced imperial data on relative costs for

22   people to travel from one place to another as I said at the

23   outset, that's the movant's burden to show that if we were

24   in Texas it would save money somehow.  The testimony however

25   -- and they haven't brought any of that evidence to you --

1    the testimony has been that it would not.  The testimony has

2    been that the key management officials involved in

3    negotiating the restructuring agreement, preparing for the

4    restructuring and the filing, and here to testify in these

5    cases and show up in New York at depositions and to manage

6    this restructuring spend all their time in New York meeting

7    with the key constituents.  There's no contrary evidence to

8    that that the Delaware courts have identified here.

9            It -- one can plow through the cases as Mr. Jonas

10   has done and find all sorts of factors that are mentioned,

11   but the ones that are regarded as the most significant are

12   the proximity of the (audio breaks off at 2:18:28 and

13   returns at 2:25:41).

14           THE COURT:  Just a general reminder if I could for

15   counsel that is above the bar or in front of the bar,

16   please, there's no use of electronic devices.  If you need

17   to email, text whatever you can go sit in the galley or

18   gallery or out in the hallway.  It's very distracting.

19           Go ahead.

20           MR. MCGAAN:  I thought I had to back up just a

21   step, but the point I was making was that the movants have

22   now conceded as they must that the creditors were provided

23   substantially all of the funded debt in this case are in the

24   New York area or at the minimum the northeast with some

25   exceptions scattered around the country, and there's no

1    evidence of any in Texas.

2           So I want to -- so in talking about proximity of

3    the court to the interest of parties, Your Honor, the case

4    law is clear that where the creditors are both in terms of

5    number and amount of debt matters, and it is overwhelmingly

6    not in Texas, but is more proximate to this court.

7           Now, Mr. Jonas pointed out a couple of times that

8    the location of the top 50 creditors based on files -- top

9    50 unsecured creditors based on filings made by the debtor

10   that something on the order of 20 of them are in Texas.

11   That's true, the remaining 30 are scattered throughout the

12   country as his demonstrative shows, but what he didn't

13   mention is the amount of debt held by the 20 on that list of

14   unsecured creditors is less than 9 percent of the total, and

15   the principal and largest unsecured creditors in this case

16   are much more proximate to this court.

17          Now moving along I mentioned at the outset that

18   there is a committee that represents unsecured creditors and

19   those who may become unsecured creditors.  It is here in

20   this court and has not taken a position on the motion.

21          Your Honor, we haven't heard anything from the

22   movants about the fact that over a third of the employees of

23   the debtors have filed a joinder in the opposition to the

24   motion to transfer, that is the approximately 2,000

25   unionized employees at the facilities in Texas have joined

Page 168

1    with the debtors and opposed the motion to transfer to

2    Texas.

3            Mr. Jonas suggested that one can't read anything

4    into the fact that the Texas Attorney General is also not

5    taking a position on this motion, but I think it's important

6    to say two things about that briefly.

7            One is that it provides them zero support in

8    meeting their burden that the Texas operations of this

9    company should drive the venue decision.  The chief

10   regulator of their principal operation is the representative

11   of the Public Utility Commission of Texas, the Railroad

12   Commission of Texas, and the Texas Commission on

13   Environmental Quality is at minimum not joined the motion.

14   It provides no help whatsoever, and it is at least

15   reflective that the concern expressed by Whitsey (ph) here

16   about staying in -- or going to Texas is apparently not at

17   least fully supported or joined by the Texas Attorney

18   General.  Something can be drawn from that.

19           Mr. Jonas I think mocking me says he doesn't know

20   what a balance sheet restructuring is.  The cases are

21   replete with decisions that talk about the difference

22   between a rehabilitation of debtor's financial statement or

23   balance sheet versus operational restructuring.  Again, the

24   Texas Attorney General in connection with the day one

25   filings put in a statement on behalf of and specifically the

1   Public Utility Commission of Texas, we quote this in our

2   opposition brief, they didn't have any trouble figuring it

3   out.  They said:

4            "The PUCT supports the debtors' general position

5   that these cases are designed to restructure the debtors'

6   balance sheets.  It should not affect day-to-day operations

7   and should have no affect on the debtors' existing wholesale

8   or retail customers."

9            So I would dare say the Court should rely more

10   heavily on the viewpoint of the regulators responsible for

11   those Texas operations than on the lawyers representing the

12   movants here, who again, are not inconvenienced by being in

13   Delaware in the least.

14            With respect to -- I want to move to the location

15   of debtors' assets, because there's no -- there's no debate

16   that they are clustered almost entirely in Texas.  Offices,

17   employees, operations, that's certainly the case, but what

18   the case law says, and I know Your Honor is certainly

19   familiar with, but what the case law says in looking at the

20   question of where the assets are, it depends on the

21   restructuring, it depends on the case.  It's not simply a

22   box you check that the assets are in one state so the Court

23   should exercise its equitable authority and transfer the

24   case out of here.  That's not what they say at all.  They

25   talk about the nature of the restructuring.  What role do

1      those operations, do those assets play in a restructuring?

2                 So a good example is In re: PWS Holding

3      Corporation in this district.  There was a restructuring

4      that was -- in which a motion to transfer venue was denied

5      here in Wilmington, and that involved a leading supermarket

6      retailer in Alabama and throughout states in the southeast

7      where if one goes and reads the opinion it sounds a lot like

8      Mr. Jonas' argument.  The employees were there, the assets

9      were there, the personal property, the books and the records

10     were all there, but there the Court recognized that the

11     operation on the ground in that case weren't going to be

12     implicated by the restructuring here and that operational

13     employees weren't going to be involved in the bankruptcy

14     proceedings and there was no justification for transferring

15     in that case.

16                Same is true in In re: Delaware and Hudson

17     Railway, a case out of this court in 1998.  Again, a case in

18     which a motion to transfer to Upstate New York was denied,

19     the company's headquarters, its assets, and the like were

20     all in the Albany area.  The Court recognized that creditors

21     and -- were scattered throughout the country and despite the

22     fact there were smaller creditors and local regulatory

23     agencies clustered in Upstate New York it was not

24     appropriate there given the nature of the restructuring to

25     transfer the case out of Wilmington.

1          And there's a more recent decision, I know

2     everyone in the room is familiar with it, the Enron case,

3     which sounds eerily like this one.  There the energy company

4     with assets clustered and employees and books and records

5     all in Houston and it the Southern District of New York the

6     Court applying the very same standards that are applied in

7     this district by in large said, "That the location" --

8     quoting, "The location of the assets is not as important

9     where the ultimate goal is rehabilitation rather than

10    liquidation."

11          There is no request in this case or no -- not even

12    a basis to speculate that this is going to turn into a

13    restructuring involving liquidation of assets in Texas, the

14    closing of factories, and the like.  And given that there's

15    none of that there the factor involving location of assets

16    fails completely to support the movants in meeting their

17    burden.

18          Lastly I just want to focus on what some courts

19    have said is one of the most important factors overall,

20    which is the economic -- efficient and economic

21    administration of the estate.  And again, I come back to

22    what I said at the outset, the movants haven't come forward

23    with any evidence about how the economic -- the efficient

24    and economic administration of this estate is improved by

25    transferring to Texas.  They -- their argument consists

1    entirely of speculation based on what might happen if

2    disputes arose with customers or counterparties or vendors

3    in Texas, but they haven't identified any actual disputes

4    and brought forth no evidence for Your Honor to evaluate

5    whether this restructuring is going to devolve into a battle

6    over relationships with customers in Texas, for example.

7            And again, one of the important constituencies in

8    this case that might have difficulty being -- attending

9    these hearings would be union workers in Texas, and they

10   have said that they agree with the debtors' decision to file

11   it here.

12           Now there's a series of other -- other factual

13   points, and I think Mr. Jonas clustered them under factors

14   that the Court should consider, and I just want to talk

15   about those briefly before I finish.

16           Litigation activity of the company.  The motion

17   that was filed here that Your Honor has had an attachment to

18   it that identified 205 cases, and Ms. Dore testified it was

19   at least an incomplete list.  Only 26 of those cases on the

20   list attached to the motion involved debtors, the rest were

21   on Oncor cases that are not in front of Your Honor.

22           What we submitted in Exhibit 12 was -- what

23   Ms. Dore testified was the accurate list, it identifies 412

24   total active cases involving the debtors, only 356 of them

25   are not in Texas.

1            Movants talked about court congestion.  Your Honor

2    raised that point earlier and we put into evidence the data

3    from -- from the U.S. Courts, that's in Exhibit 19, and it

4    shows the total bankruptcy filings in this district in 2013

5    number 3,424 while in the Northern District of Texas during

6    that same time period total bankruptcy filings were more

7    than four times greater, 14,585.

8            They are correct, there are more Chapter 11

9    filings here than in the Northern District, but they

10   completely ignore that the congestion argument overall

11   points the other way.

12           Mr. Jonas elevated among his factors location of

13   books and records, which in today's day and age we've got

14   people participating in this hearing by telephone.  It just

15   seems absurd to be concerned about where the books and

16   records are.  There's not been a single request thus far

17   that the debtors have received from anyone to visit books

18   and records in Texas.  We've produced as recently as this

19   weekend up to 100,000 pages with respect to piles of

20   discovery requests and they all have been done

21   electronically and we expect to continuing doing it that

22   way.  With all due respect it's an utter non-factor.

23           Mr. Jonas argued that the debtors had chosen a

24   forum -- I'm looking at factor one in his PowerPoint, and

25   referred to a fully baked prepetition deal for management to

1   obtain equity for themselves.  Mr. Keglevic's first day

2   declaration made clear that there had been no negotiations

3   over post-emergence equity for management at all today.  So

4   it's just not -- it's just not accurate.

5           Taken together, Your Honor, the question here is

6   whether the movants have come forward with evidence to

7   overcome the deference to the debtors' proper choice.  They

8   don't quarrel that under the law we're here probably, their

9   quarrel is that you should exercise your discretion in

10  equity to move this case for the convenience of other

11  parties, not their clients, about which they haven't come

12  forward with actual evidence showing how it makes the case

13  run better and more economically and efficiently and how

14  it's convenient to more constituents than it is if it stays

15  right here.

16          If we uproot the case and transfer it now we start

17  all over with new judges, a new judge in Texas.  And I

18  should say by the way, in opposing this transfer, Your Honor

19  -- in fact in the debtors' decision in filing here there's

20  no indication that they have anything but the utmost respect

21  for the judges in the Northern District of Texas.  I think

22  Mr. Jonas said the same thing about the judges in this

23  district.  So the parties aren't arguing over who the judges

24  are or the quality of the bench in either district.  I think

25  we're in agreement that the judges in both districts are

1    perfectly capable of handling a case like this.  That isn't

2    the issue, but it will set back a restructuring proposal

3    here that needs to move as swiftly as the debtors are

4    capable of making it move in order to emerge and maintain

5    its Texas operations.  So we ask that you deny the motion.

6            Thank you.

7            THE COURT:  Mr. Miller, Mr. Ward.

8            MR. WARD:  Good afternoon, Your Honor.  For the

9    record Chris Ward, Polsinelli, Delaware counsel to the

10   official committee of unsecured creditors.  Mr. Miller is

11   going to speak for the committee.  Him and several of his

12   colleagues have been admitted pro hac vice.

13           THE COURT:  Very good.  Thank you.

14           Mr. Miller, good afternoon.

15           MR. MILLER:  Thank you, Your Honor.  Brett Miller,

16   Morrison & Forrester, proposed counsel for the official

17   committee of unsecured creditors appointed a little over a

18   week ago by the United States Trustee.

19           There's been a little tug of war mentioning the

20   committee by both sides, but I just want to be clear the

21   committee has not filed a pleading and the committee did not

22   take a side in this battle.

23           The committee is prepared to fulfill its fiduciary

24   duties in this -- if the case is in this court or in the

25   Northern District of Texas.

1          There are approximately 600 docket entries to date

2     and we've spent the past week going through those docket

3     entries working on big picture issues like the DIPs, like

4     the RSA, like the TSA, and the discovery as you'll hear

5     later.

6          So the committee remains neutral on this motion.

7               THE COURT:  Thank you.

8               MR. MILLER:  You're welcome.

9               THE COURT:  Mr. Shore.

10              MR. SHORE:  Good afternoon, Your Honor.  Chris

11    Shore on behalf of the ad hoc group of TCH unsecured

12    noteholders.

13              I need to clean something up.  Our group had filed

14    the limited joinder to the motion on the first days of the

15    cases.  Our pleading only addressed a transfer request with

16    respect to the TCEH debtors.  It had originally been filed

17    in all the cases.  When I say TCEH debtors that's EFCH and

18    all of its direct and indirect subsidiaries.

19              Our pleading was intended at that point to make

20    sure that if any discovery was going on in the first days

21    over this before a committee was appointed there was at

22    least some unsecured creditors' voice in the room for that,

23    and I think Your Honor adjourned the hearing on this

24    specifically to get the voice of the committee.  They

25    participated, we participated in discovery, and you know,

1     kind of monitored what went on.

2            It now appears that the committee for whatever

3     reason is not going to take a position, it isn't going to

4     express the views of the smaller creditors.  I'm not here to

5     express the view of the smaller creditors.  When people who

6     talk about venue and proper venue, talk about

7     disenfranchised groups and minorities who need a voice in a

8     venue decision they're not talking about my clients -- my

9     clients or me or any of the other New York lawyers or the

10    big investment banks or the private equity funds or anybody

11    else like that.  That's not what we're looking for.

12           There really isn't a record that's been developed

13    with respect to the voice of those people who say need to be

14    heard in any -- in any venue decision.

15           But I do have a need to resolve my objection in an

16    easy way, I think we can do it.

17           The issue before the Court today is the

18    appropriate venue for these Chapter 11 cases.  Clearly no

19    one has requested that the Court adjudicate today the venue

20    of any adversary proceedings or ancillary proceedings which

21    would take place in this case, and Section 1409(c) would

22    allow anybody to bring a case related to or arising out of

23    the bankruptcy prepetition to bring an action wherever you

24    could have brought it.  But in a big case like this what

25    tends to happen is proceedings that get brought around the

1    country tend to get removed to the Bankruptcy Court and then

2    we get into a remand fight about what the interests of

3    justice are as far as transferring it.

4            As the Court knows the current RSA relegates

5    unsecured creditor recoveries at TCEH, all those TCEH

6    debtors to their pro rata share the concept of unencumbered

7    assets.  From pleadings you've seen I think and you'll see

8    from us unencumbered assets will include not only the cash,

9    but fraudulent conveyance claims, preference claims,

10   commercial tort claims, and other things that would not

11   properly be the subject of the first lien lenders' security

12   interests.

13           We don't need to debate that today, but if and

14   when the process of maximizing the value of what this

15   management team is leaving over for unsecured creditors

16   comes about and actions need to be brought we don't want our

17   withdrawal of an objection or the non-speaking of the

18   unsecured creditors' committee to be an acknowledgment on

19   anyone's part that it would be appropriate for someone to

20   say who got sued in Texas to seek to remove this action to

21   the court and have it remain here.

22           Early in this case at this time we do not see what

23   the Court is doing is adjudicating the issue of where the

24   proper venue is for any adversary proceeding that might be

25   brought, and with that clarification we don't need to press

1    our objection.

2              THE COURT:  Thank you.

3              MR. SHORE:  You're welcome.

4              THE COURT:  I would say that any ruling -- I agree

5    with Mr. Shore's comment that any ruling on transfer of

6    venue would be without prejudice to any parties' position at

7    any future hearing on transferring venue of an adversary

8    proceeding.

9              MR. DUNNE:  Good afternoon, Your Honor.

10             THE COURT:  Mr. Dunne.  Good afternoon.

11             MR. DUNNE:  Dennis Dunne from Milbank, Tweed,

12   Hadley, McCloy LLP.

13             As counsel to CitiBank, N.A. as administrative

14   agent on the TCEH DIP credit facility we filed a joinder in

15   the debtors' opposition to the venue transfer motion.

16             I rise only to make two points and that it'll be

17   brief and I'll sit back down and I'm not going to repeat

18   anything that's either in the papers or that have been ably

19   expressed by Kirkland & Ellis.

20             First point is that at no time did the DIP lenders

21   suggest or require that venue be posited here in Delaware,

22   nor did they ask the debtors to covenant, to maintain it

23   here.  As Mr. Shore said we're capable of representing the

24   DIP lender's interest either in Delaware or in Texas.

25             The second point, Your Honor, really goes to why

Page 180

1   is this motion being prosecuted and being prosecuted with

2   such vigor?  Wilmington Savings Fund is not acting

3   altruistically.  They're an indenture trustee, they're an

4   indenture trustee for second lien holders in certain of

5   these cases, so presumably they are moving to transfer venue

6   because they believe their constituents, the second lien

7   holders, would benefit by that transfer.  But how?  How

8   precisely?

9           It's not more convenient for Wilmington Savings

10  Fund, that's been -- that's been shown here today.  We've

11  seen no evidence that it's more convenient for their holders

12  who they represent as indenture trustee, and Wilmington is

13  based here.  So why is Wilmington moving to transfer venue?

14  I think -- I submit that they've showed their cards at the

15  hearing today by what they've chosen to focus on during

16  various parts of their questioning and arguments.

17          They asserted, though didn't prove, that the

18  debtors filed in Delaware because they thought that the law

19  on the releases in the Fifth Circuit was allegedly less

20  onerous than here in the Third Circuit.  I think the

21  testimony was pretty clear on the stand that the releases

22  did not play a role in the debtors' determination of venue,

23  but I submit it may be playing a role in the prosecution of

24  the motion.

25          If the case is transferred to Texas maybe they

1    believe they will gain leverage in any future plan or

2    settlement negotiation when the issue of releases is joined.

3           The Court should countenance that tactic, but it

4    doesn't have to because I believe that on the law here it's

5    a clear that a transfer of venue is unwarranted for all the

6    reasons that Kirkland & Ellis has gone through and I will

7    not repeat here.

8           Thank you, Your Honor.

9           THE COURT:  Thank you, Mr. Dunne.

10          MR. HERMANN:  Good afternoon, Your Honor.  Brian

11   Hermann from Paul, Weiss, Rifkind, Wharton & Garrison,

12   counsel to the ad hoc committee of TCEH first lien lenders

13   -- creditors.

14          Your Honor, my clients are owed approximately

15   $12 billion in first lien claims, we also hold a substantial

16   amount of second lien, as well as unsecured debt.

17          We filed a joinder in the opposition to the motion

18   to transfer venue.  We think the record is clear as well.

19          I would just point out that particularly in a case

20   as large as this where the debtor has properly established

21   venue and you've got one stakeholder, one party who is

22   opposing it for reasons that I'd rather not speculate.

23   Mr. Dunne has proffered one possible reason, I think there

24   are probably others, but it's clear it's not the convenience

25   or interest of justice to Wilmington, it's the convenience

1    of interest -- and interest of justice of others that they

2    seem to focus on, and the fact that the others either don't

3    take a position or take a position in support of venue here

4    I think speak volumes, and I think the arguments from

5    Wilmington ring hallow given their location.

6              And so we think based on the record it's very easy

7    for the Court to exercise discretion and keep venue here and

8    to deny the motion, and we would ask Your Honor to do that.

9              THE COURT:  Okay.  Thank you.

10             Anyone else?  Reply?  No?

11             MR. JONAS:  Your Honor, I don't want to belabor

12   everything that's already been said and the evidence that's

13   put on.  I do come back to the fact that -- and I think I'll

14   say it in close -- that who's moving is completely

15   irrelevant.  The law says very simply that either because it

16   is more convenient for the parties, and that's all parties,

17   or in the interest of justice the Court may move this case.

18             Whether you use the 12 factor test frankly I could

19   use the same test Mr. McGaan used.  I think when you apply

20   those facts to that law the result is that this case should

21   be moved to the Northern District of Texas.

22             And I'm not going to respond to the speculation

23   about motive because I just think as I mentioned at the

24   outset it is largely irrelevant, and I would just ask Your

25   Honor to review the evidence that I think we put on and

1   presented today and apply that in the way courts have

2   applied that, including in the way you've applied it in a

3   number of cases, and I think, Your Honor, you will reach the

4   conclusion that case belongs in the Northern District of

5   Texas.

6           Thank you, Your Honor.

7           THE COURT:  You're welcome.

8           Okay, I'm going to -- we're going to take a recess

9   til 4:00 and we'll come out at 4 o'clock and rule and then

10  we'll figure out where to go from there.

11          MR. JONAS:  Your Honor.

12          THE COURT:  Yes.

13          MR. JONAS:  If I may interrupt for one minute.

14          We did have pending --

15          THE COURT:  The motion to strike?

16          MR. JONAS:  -- the motion to strike, and I don't

17  know if I need to speak to it, if you want me to speak to

18  it, or how you want to address that.  I'm happy to do it

19  anyway you wish.

20          THE COURT:  Well why don't you just tell me what

21  you want to be heard on.

22          MR. JONAS:  Sure.

23          Judge, I promise to do it in less than two

24  minutes.

25          THE COURT:  Okay.

1           MR. JONAS:  And that's because I think you've

2    already seen much of my argument in terms of the -- you saw

3    some of them, there were more -- in terms of the

4    instructions not to answer that took place at Ms. Dore's

5    deposition.  That's just part if it, but nevertheless it's a

6    big part of it.

7           In their objection the debtors allege that we had

8    not sufficiently met our burden in terms of evidence

9    establishing justification for the venue transfer, and as

10   I've mentioned, Your Honor, we're on the outside looking in.

11   We sought discovery and in their objection the debtors also

12   asserted that the debtors and their officers chose Delaware

13   as their venue, we sought discovery on that topic, and in my

14   view, Your Honor, we were met with resistance that prevented

15   us from ultimately obtaining complete evidence on the topic.

16          We got what the debtors wanted to give us,

17   Ms. Dore testified in part, certainly not in whole with

18   respect to the reasons for the debtors' venue choice.

19   Again, I think the testimony as you sat through it, Your

20   Honor, speaks for itself, and we've cited in our papers the

21   law, Your Honor, in terms of the sword and shield argument,

22   which we think applies, and on that basis, Your Honor, the

23   motion requested that the debtors' objection be stricken.

24          THE COURT:  Thank you.

25          MR. MCGAAN:  Your Honor, the debtors -- we believe

1    this motion should be denied out of hand.  The entire basis

2    for it is what Mr. Jonas referred to in passing before he

3    sat down, the sword and shield argument, and it's just silly

4    here.

5         The debtors filed an objection to the motion to

6    transfer that doesn't assert reliance on attorney/client

7    privileged information or communications whatsoever.  We

8    didn't rely on our general counsel's testimony at all.  They

9    noticed her deposition by name and then proceeding as you

10   saw to ask question after question after question to elicit

11   privilege instructions when being asked the purposes and why

12   and privileged conversations she had with the board as a

13   general counsel about what is inherently at least in part,

14   if not in large part, a legal decision about where to file

15   in terms of venue.

16        But when -- and you saw this -- when they asked

17   what are the business reasons for your decision to file in

18   Delaware she testified to it.  What you didn't hear is what

19   is the information that is relevant to the factors that

20   govern the decision under Section 1412 if they were denied?

21        Your Honor pointed out earlier today as you said

22   on the record at the hearing on May 2nd, if there was any

23   issue over venue discovery pick up a phone and call me.

24   This deposition of Ms. Dore that he's complaining about

25   today took place a week ago.  All the drama about we're

1    going to play for the judge the privilege instructions when

2    I asked your general counsel about conferring with the board

3    of directors about a legal decision was a set up.  They

4    could have called you on any of the proceedings six days to

5    say we're not getting facts that go to the standards here.

6         What you did hear, Ms. Dore, Mr. Keglevic, both

7    testified at length about assets, books and records,

8    employees, offices, operations, meetings they had with

9    constituents, regulatory oversight.  Everything that bears

10   on any question over economic efficiency.  They haven't been

11   deprived of anything, that's why they waited until late

12   yesterday to file this motion.  It should be denied, there's

13   no sword or shield here.

14        MR. JONA:  All I'll say, Your Honor, I'll just

15   read from the transcript of Ms. Dore.  Mr. McGaan at the

16   beginning said her testimony today will be as a 30(b)(6)

17   witness on behalf of the debtors.

18        Thank you, Your Honor.

19        MR. MCGAAN:  I got to tell you, Your Honor, once

20   again that's just wrong.  I said that we were offering her

21   both in her individual capacity in response to the notice

22   they issued naming her and that she would offer 30(b)(6)

23   testimony on the 16 topics that they had noticed in their

24   30(b)(6) notice, but that's neither here nor there, it's

25   just again an inaccurate rendition of what happened.

1          THE COURT:  Okay.  All right.  I'm going to --

2     we're going to again take a recess til 4:00, at that time

3     we'll reconvene, I'll rule on the motion to strike as well

4     as the motion to transfer venue.

5          (Recess at 2:53 p.m.)

6          THE CLERK:  All rise.

7          THE COURT:  Please be seated.

8          Okay.   I'm going to read my ruling into the

9     record.  It's somewhat lengthy, and bear with me.  It's a

10    combination of some typed things, some handwritten things,

11    some Post-it notes, kind of all over the place.  So I'll do

12    my best to articulate it.

13         I am going to deny the motion to transfer venue to

14    the Northern District of Texas, and will state the obvious

15    location of assets, employees, operations, et cetera in

16    Texas at the end of day this is not a close call.

17    (Indiscernible) has not met its -- and that's how you

18    pronounce it, by the way.

19         (Laughter)

20         THE COURT:  (Indiscernible) has not met its burden

21    of proof.  But just as important as that is that movants are

22    making an argument on behalf of creditors that are

23    represented and either support the debtor or take no

24    position.  All levels of the debt structure, other than

25    movants, either support or take no position including the

Page 188

1   creditors' committee, the state regulators who are neutral,

2   (indiscernible) remain neutral as well, and the union of

3   2,000 members that are supportive for the debtors' position.

4          Also, of course, all of the various levels of the

5   first lien debt at the -- first and second lien debt at the

6   east side and the first lien debt at the T (sic) side as

7   it's become known.

8          I'm also going to deny the motion to strike, but

9   I'll deal with that at the very end.

10          Now we start with the fact that venue is proper in

11   Delaware and venue, of course, in a Chapter 11 case is

12   proper in any district in which the debtor is domiciled or

13   in any district in which an affiliate entity has filed for

14   Chapter 11.  And under 1408 the case can be commenced, as I

15   said, either in the domicile or if an affiliate has been --

16   has filed a case already.

17          In this case, (indiscernible) 20 -- I think 22 if

18   I remember correctly, of the 71 debtors including EFIC and

19   TCEH are Delaware limited liabilities companies and the

20   remaining debtors are affiliated entities.  Consequently,

21   venue is appropriate for all 71 cases pending in the

22   Bankruptcy Court.

23          Now Bankruptcy Rule 1014 provides that in cases

24   filed in a proper district, which this is, the Court, on the

25   timely motion of a party in interest or on its own motion,

1    and after hearing on notice to the petitioners, U.S.

2    Trustee, et cetera, may transfer the case to any other

3    district if the Court determines that the transfer is in the

4    interest of justice or for the convenience of the parties.

5            Also, Section 1412 of Title 28 provides that a

6    district court -- and this court acts as a district court at

7    -- well, effectively as a district court in this situation

8    because of the reference -- may transfer a case or

9    proceeding under Title XI to a district court for another

10   district in the interest of justice or for the convenience

11   of parties.

12           Now the test is (indiscernible) disjunctive and a

13   proceeding is subject to transfer upon a sufficient showing

14   that either the interest of justice or the convenience of

15   the parties is met and, importantly, transfers under this

16   section require a fact and case-specific analysis and,

17   ultimately, are subject to the Court's discretion.

18           Now at the outset (indiscernible) argues that the

19   debtors' only link with Delaware is a piece of paper

20   identifying some of the debtors as Delaware entities

21   inferring that filing cases such as this in Delaware based

22   solely on state of incorporation must be for improper

23   purpose or at least strategic behavior that should be

24   discouraged, if not actually disallowed.

25           Now this Court finds that state of incorporation

1    is not just an allowed basis for venue, but reliance on it

2    is wholly appropriate.  Corporations and other business

3    entities have legal rights and obligations.  And while they

4    are legal fictions -- while they are legal fictions, they

5    must exist somewhere.  For over 100 years the law in this

6    country has been that a corporation is a creature of state

7    law and exists in its state of corporation.  Bankruptcy

8    codes (indiscernible) provision simply follows that long-

9    standing law.

10          Now debtors had a number of possible venues to

11   choose from, including at least the northern and eastern

12   districts of Texas.  As with any entity that has a choice of

13   venue for instituting a legal proceeding, that entity will

14   choose which venue is to its advantage.  That is forum

15   shopping.  But in and of itself, forum shopping is not

16   improper.

17          I don't know why the debtors chose to file in

18   Delaware and I don't particularly care.  Venue here is

19   proper under the statute.  It is a choice that is neither

20   insidious nor entitled to great deference.  I'll speak on

21   that in a moment.  It simply is.  The question is whether a

22   movant can show that the cases should be transferred for the

23   convenience of the parties or in the interest of justice.

24          I'll talk a little bit about deference.

25          The case law that you generally see described as

1    basically the transfer of venue of a bankruptcy case should

2    not be undertaken lightly.  Where venue is proper as in this

3    case, debtors' choice of venue should be given great weight.

4    The debtors' choice of forum is entitled to deference and

5    where a transfer would merely shift the inconvenience from

6    one party to another, the case should stay where it was

7    filed.

8              Now the great weight or deference to debtor's

9    choice of venue, I think, is inconsistent with the

10   preponderance of evidence test and burden of proof.  And to

11   that end I disagree with Judge Robinson's ruling in PWS.

12             And just touching on this briefly, in that case

13   the judge states that courts (indiscernible) transfer of

14   venue statutes have predicated their analysis on the

15   principle that when venue is proper a debtor plaintiff's

16   choice of forum is to be accorded substantial weight and

17   deference.

18             And then she goes on to say, it is the movant's

19   burden, therefore, to demonstrate by a preponderance of the

20   evidence that a transfer of venue is necessary to achieve

21   the statutory purposes.  I'm not sure what, frankly, that

22   means.

23             She goes on to say, consideration as lofty as

24   justice and as mundane as convenience, which is a great turn

25   of a phrase, must be weighed by the court in determining

1    whether a balance of interest strongly favors transfer.  I

2    don't understand how a preponderance of evidence as to the

3    factors that are considered in venue transfer must somehow

4    strongly establish that transfers should occur.

5            Your own effect, by making that -- that ruling and

6    relying on that sort of deference, I think you're making the

7    preponderance of evidence into a higher test, a substantial

8    showing, a (indiscernible) without showing.  I don't know.

9    But something more than preponderance of evidence.

10           And I think that's important because when we go

11   back to what the Court's going to look into, (indiscernible)

12   start to think about, you know, whether the reasons why a

13   debtor chose to file a case in its state of incorporation,

14   if we approach it from a standpoint that doesn't give undue

15   deference to that choice, we really, in many ways, take the

16   blade out of the argument that there's something insidious

17   going on because we're not overly deferring to whatever the

18   reason may have been that the debtor chose to file the case,

19   in this case in Delaware.

20           Now having said that, there is a deference and the

21   deference is the fact that the burden of proof is shifted to

22   the movant to establish that the case should be transferred

23   for the convenience of parties or in the interest of

24   justice.  So that's the deference.  The deference is really

25   nothing more in my mind than the burden shift over to the

1    movants.

2         (Pause)

3              THE COURT:  All right.  So, again, the -- and I

4    will repeat myself a few times.  I apologize.  But, again,

5    that -- and I think this is true -- that ultimately the

6    decision to transfer or retain the case lies within the

7    sound discretion of the Court and that's an appropriate test

8    because, as I said, it's a highly factual inquiry.

9              And we're going to talk a little bit about some of

10   the cases as we -- as I go forward here and I think you'll

11   find that the way I talk about the cases is that they have

12   to be treated on a very fact by fact basis, and to a certain

13   extent they're of limited utility as precedence in a case

14   that's so factually driven is somewhat unhelpful to a

15   certain extent when it comes to applying that law and trying

16   to figure out how to go forward.  All right.

17             Now I'm going to run through the factors as I

18   considered them, and as counsel said, there are various

19   iterations of the standards as to what the Court should

20   consider in transferring venue.  And I haven't worked off

21   the exact list that movant worked off in its presentation.

22   But as I said in Allied, I think the point is simply to

23   focus the Court as to what facts and factors are important.

24   And it's not a scorecard.

25             So I think all I'm going to talk about are really,

1    for the most part -- or, actually, not for the most part --

2    are incorporated in the factors as they were laid out by

3    movant.

4            So just quickly, the interest of justice factor

5    under 1412 is generally:

6            One, whether transfer promotes the economic and

7    efficient administration of the bankruptcy estate;

8            Two, whether transfer facilities judicial

9    efficiency;

10           Three, whether the parties will receive a fair

11   trial in either venue;

12           Four, whether either forum has an interest in

13   deciding the controversy;

14           Five, whether transfer would affect enforceability

15   of any judgment rendered; and

16           Six, whether the plaintiff's original choice of

17   forum should be disturbed.

18           For convenience of parties, there are four factors

19   that I've identified:

20           One, the location of the plaintiff and defendant;

21           Two, the ease of access to necessary evidence;

22           Three, the convenience of the witnesses;

23           Four, the availability of the subpoena power; and

24           Five, the expense of obtaining unwilling

25   witnesses.

1           Now having set us on a scorecard, we're going to

2    run down the scorecard and we'll go factor by factor.

3           First factor, whether transfer promotes economic

4    and efficient administration of the bankruptcy estate.  In

5    this case, I think this is neutral.  And I'll touch on this

6    later.  Both Texas Bankruptcy Court and the Delaware

7    Bankruptcy Court are very busy.  Both are well able to

8    depose -- dispose of this case efficiently, (indiscernible)

9    with normal scheduling, et cetera issues.  And I would have

10   every confidence that either court would be able to promote

11   the economic and efficient administration of the estate.  So

12   I find that to be a neutral factor.

13          Whether transfer facilities judicial efficiency.

14   This to some extent goes to the learning curve argument and

15   the argument that it's already too late to transfer the

16   cases because this Court has held now it's first, I guess,

17   complete third day of trial and has become very -- has done

18   his best --

19       (Laughter)

20          THE COURT:  -- (indiscernible) convincing him of

21   facts.  And I find that to be, again, a neutral factor.

22   There's no question that whatever judge in the Northern

23   District of Texas got this case could get up to speed just

24   as fast if not faster than I did.  We are purposely early in

25   the case.  The motion was filed literally the second item on

1    the docket and I scheduled it for what I felt was the

2    earliest possible time after the appointment of a committee

3    which I felt was important.  And as a result, I think we're,

4    what, 22 or 23 days into the case.  So the learning curve,

5    really, is a neutral factor.

6              Whether parties will receive a fair trial in

7    either venue.  This kind of, I guess, goes to the state law

8    issue a little bit.  The argument that Texas state law

9    issues might dominate the case.  Clearly, Texas state law

10   issues will arise.  I don't believe they will predominate

11   the case and, in fact, many of the important documents are

12   specifically governed by New York law, and in the case of

13   the RSA by Delaware law.  And, of course, both Texas and

14   Delaware bankruptcy courts can efficiently apply the

15   bankruptcy law.

16             The -- if either forum has an interest in deciding

17   the controversy factor.  And I'll talk a lot more about

18   this.  But this is a financial restructuring and I know what

19   it means and I think, frankly, counsel knew what it meant.

20   But it's not a operational restructuring.  It's not a

21   company that's going to close down a division that's

22   unprofitable.  It's not a company that's going to sell

23   assets.  It's not a company that's going to try to get out

24   of a number of bad leases, downsize its retail operations.

25   It is, at this point, a financial restructuring.

1            And I'll touch on this also in a little bit.  That

2    may not be where it ends up.  But we have to deal with it as

3    it is and there's no indication that it will be anything

4    other than a balance sheet restructuring.  That could end up

5    not being the case and I certainly hope that's not the --

6    that doesn't happen.  But it's sufficiently vague or

7    unpredictable that -- unpredictable that you really can't

8    rely on it for purposes -- for -- that danger for purposes

9    of making the decision.

10            And given that it's a financing restructuring and

11    given that the professionals and the parties are close in

12    the northeast, I think that favors Delaware.

13            Both Delaware and Texas can enforce judgments.

14            I've already talked about whether plaintiffs'

15    original choice of forum should be disturbed.  I think that

16    is a neutral factor.

17            The interested parties here -- this goes to

18    location of plaintiff and defendant.  The interested

19    parties, the indentured trustees, the creditors, the

20    financial advisors, the professionals are all in the

21    northeast and I think that favors Delaware.

22            Ease of access to necessary evidence, the

23    technology is such that you can move documents and

24    information pretty much anywhere, so I think that's neutral.

25            As to the convenience of witnesses, I think

1   Delaware is more convenient.  The majority of the

2   professionals are in the northeast, and to the extent we're

3   going to have expert testimony or professional type

4   testimony it's going to come from here, albeit with probably

5   some supplement from Texas.

6           I think it's important and significant that the

7   debtors have basically created an operational team and a

8   restructuring team.  And the operational team is where

9   they're supposed to be, running the operations, including

10  the CEO of the various entities.  And we have co-CROs and a

11  restructuring team that will be able to travel more than

12  they probably want to, of course.  They're going to have to

13  travel no matter where this ends up.  So I think the

14  convenience favors Delaware.

15          The (indiscernible) power, obviously there is a

16  limitation to that and it favors Texas.  I think it's a

17  minor point, at best.

18          And the expense of obtaining or (indiscernible)

19  witnesses really I think is a neutral factor.

20          So I've gone through them sort of as a laundry

21  list.  I would like to back up now and talk a little more

22  fully about some of the things I just said, not everything,

23  and talk about the cases a little bit.

24          And, again, I apologize if I repeat myself.

25          All right.  The debtors have stated that they

1    filed these cases to restruct (sic) their balance sheet as

2    demonstrated by the restructuring support agreement and the

3    evidence that was put in front of the Court today.  And with

4    that goal in mind, the debtors filed motions to maintain TXU

5    Energy's customer programs, pay-related prepetition

6    obligations, assume customer contracts, prepetition employee

7    compensation, honor employee and retired benefits, sought

8    authority to continue deducting or remitting union dues,

9    continue honoring the collective bargaining agreements,

10   sought authority to assume the standard foreign market

11   participation agreements with ERCOT (sic), and have sought

12   to assume electric transmission of distribution service

13   provider agreements.

14          These motions, among others, and the debtors'

15   plans for its future (indiscernible) concern about employing

16   customer participation in a day to day process of the

17   bankruptcy cases.

18          Furthermore, the assumption of the limited

19   customer agreements, SFAs, and the electric transmission and

20   distribution service provider agreements indicate a

21   willingness to comply with all state and federal regulations

22   going forward.  Regardless, they've made repeated statements

23   that these cases will have no effect on the debtors'

24   existing wholesale or retail customers.

25          I want to talk a little bit about Corco (ph), the

1    Fifth Circuit case.

2         In Corco, the Fifth Circuit reversed the District

3    Court and agreed with the Bankruptcy Court regarding a

4    transferring of the case from Texas in San Antonio where the

5    corporate executive offices were and where the case was to

6    Puerto Rico where the operations were.  And to a certain

7    extent this case isn't particularly helpful because it deals

8    with the old Chapter XI under the old Bankruptcy Act where a

9    stayed corporation was actually not an allowed basis for

10   venue.  And the distinction is between location of assets in

11   Puerto Rico and the principle place in San Antonio.

12        But I think it's important for a couple of

13   reasons.

14        First, the Fifth Circuit held that, and I quote,

15   "The heart of a Chapter 11 proceeding is working up a

16   financial plan of arrangement acceptable to all relevant

17   parties."  And the Fifth Circuit continued that "the

18   creditors with the largest claims have either urged

19   retention of the proceeding in Delaware" -- excuse me -- "in

20   Texas or are located in Texas."

21        And I think the point there is, one, whether a

22   financial restructuring is relevant, and it is; and, two,

23   the size of the creditor body is relevant.  And by size of

24   creditor body I mean the size that the creditor body is

25   supporting keeping the case in Delaware.

1            Now size is not controlling, but it matters.  In

2      this case the fact -- excuse me -- in -- and -- I'm sorry.

3      To think of a -- the size of creditors supporting the case

4      is important.  This is consistent with the Bankruptcy Code.

5      Think about 1129 where if you want a class to accept a plan,

6      you have to have 50 percent by the number, but also 67

7      percent by amount.  The Court -- the code there, I think, is

8      making a specific statement that the size of the creditor

9      body, the amount of the debt, is important.

10           In this case -- and, again, this is an important

11     fact.  The vast majority of creditors, movant argues, it is

12     protecting have either opposed the motion or take no

13     position.  Creditors have voted with their feet in their

14     wallets.  And that matters.

15           Now -- told you it was a mess.

16      (Laughter)

17           THE COURT:  While the creditors such as the

18     official committee of unsecured creditors and Public Utility

19     Commission of Texas, Railroad Commission, Tax Commission on

20     Environmental Quality have taken no position on the motions,

21     and the Court appreciates that, understands it.  I'm not

22     speculating nor would I know what to speculate even if I

23     wanted to.  And I'm not drawing any negative inference from

24     it.

25           But counsel pointed this out.  There's a practical

1    effect on this motion in that movant has the burden of

2    proof.  And the lack of specific support means movant cannot

3    show that any significant creditor body other than it, other

4    than the junior lenders, after the TCEH ad hoc committee

5    withdrew its objection based on the clarifications and

6    reservations contained in the record.  Basically, there are

7    no other creditors that support the motion.  And, again, I

8    think that's important and I think that's consistent with

9    the law certainly as it's laid out in the Corco decision.

10        (Pause)

11             THE COURT:  All right.

12             I'm going to quickly talk about two cases that are

13   cited that I want to distinguish, and they are the LaCoda

14   (ph) Canyon Ranch Development case and the BL of Miami case.

15             And just quickly, in Lacoda the Court first found

16   that remaining in the Eastern District of North Carolina was

17   improper.  As such, the Court was determined whether to

18   transfer the case pursuant to 1412 or to dismiss the case

19   under 1014(a)(2).  It was in this context the Court

20   considered the location of the debtor's assets and the

21   location of the material witnesses when he determined to

22   transfer the cases to a proper venue as opposed to no venue

23   at all.

24             However, (indiscernible) considerations for

25   considering the venue transfer, the case is clearly

1   distinguishable from this.

2          There's also BL of Miami, Inc. that's cited for

3   the proposition that these cases would benefit from being in

4   a venue where the judge presiding would more likely have

5   active familiarity with the community and (indiscernible) in

6   which the debtors operate.  Such a judge would be in a much

7   better position to gage the likelihood of an effective

8   reorganization.

9          Importantly, though, in BL of Miami, the Court

10  raised the venue transfer sua sponte as the debtor's only

11  asset was a nightclub in Miami.  And a significant majority

12  of the creditors were located in Florida.

13         Furthermore, in BL of Miami, the administration of

14  the debtor's estate hinged in a large part on pending

15  litigation in Florida involving eviction of the debtor from

16  its leases premises.  And the leases contained a Florida

17  choice of law provision.

18         Here, the holders of the debtors funded

19  indebtedness are primarily located in the northeast with

20  only a small percentage in Texas.

21         Furthermore, a majority, if not all of the

22  litigation in these cases will result from the notes and

23  agreements such as the RSA which has a Delaware choice of

24  law provision, a collateral trust agreement between EFIH and

25  CSC, and successor first lien trustee has a New York choice

1    of law provision.  The (indiscernible) indenture between

2    EFIH, EFIH Finance and CSC as successor contains a New York

3    choice of law provision.

4          This is not a single asset case in which the Court

5    would need to analyze the potential Texas market in

6    evaluating reorganization possibilities.  Here, the debtors,

7    again, are restructuring their balance sheet and this Court

8    would need to be and is familiar with refinancing and

9    restructuring of debt, including the related financial

10   transaction.  As such, this case is distinguishable from BL

11   of Miami.

12         So, in conclusion on this point, just to

13   reiterate, (indiscernible) concern regarding customers,

14   employees, trade creditors, et cetera are unfounded based on

15   the facts of this case, the either neutrality or lack or

16   active support of those creditors and the type of case

17   that's in front of the Court, which is, again, a financial

18   restructuring.

19         Let's talk a little bit about interested parties.

20         (Indiscernible) raises concern about interested

21   parties being located in Texas.  They point out that those

22   parties include key members of management, state regulators,

23   employees, customers, and trade creditors.  And the debtors

24   have counted again that the interested parties who will be

25   heavily involved in the day to day activities relating to

1    Chapter 11 will be legal counsel, financial advisors, and

2    other professionals as well as the restructuring team.

3          The vast majority of the players in the financial

4    restructuring of the debtors are located in New York, and

5    the company needs to continue in the ordinary course of

6    business in Texas, thus leaving most employees, customer,

7    trade creditors, and state regulators unaffected.

8          Since the relevant players are professionals, the

9    need for the Court's subpoena power is generally not

10   necessary as the professionals receive payment for their

11   services and are thus inclined to want to testify, if

12   requested.

13         And, importantly, however, (indiscernible) points

14   out that the convenience of counsel is generally not

15   relevant in determining whether to transfer venue.  And that

16   is certainly the case, and Judge Walsh ruled that way in the

17   Centennial Cole (ph) case.

18         Now in this case I disagree.  The question is

19   whether transfer is appropriate for the convenience of the

20   parties.  And the movant, like I said, argues that parties

21   and not professionals matter.  But parties in a legal

22   proceeding can only act through lawyers and other

23   professionals, such as financial advisors, valuation

24   experts, investment bankers, et cetera.  The close proximity

25   of the majority of the professionals, in particular those

1    for whom the debtors are paying the freight, to Delaware as

2    opposed to Texas does matter, particularly in a financial

3    restructuring such as this.

4         It is not the controlling factor and it may not

5    often be relevant, but in this case, in this case, the

6    convenience of the professionals supports venue in Delaware.

7         All right.  Jumping to a slightly different point

8    and following up on the fact that, again, I said for about

9    the twelfth time this is a financial restructuring.

10        (Indiscernible) argues, I think, in effect, that

11   even a balance sheet reorganization is going to involve

12   substantive motions that will pull creditors, et cetera,

13   into Delaware court.  They're correct.  But the evidence

14   clearly shows that those types of motions will be the rare

15   exception rather than the rule in this case.  The creditors

16   and professionals that will be involved in the balance sheet

17   restructuring are located in the northeast, especially in

18   New York.

19        There is also the ability with specific adversary

20   proceedings, to the extent they arise, if appropriate, can

21   be transferred to an appropriate court other than this

22   court.

23        Now I want to cite to a couple of cases, the first

24   with some trepidation and the second with less concern.

25        And the first is the Enron decision.  And I have

1    issues with -- certainly with elements of the Enron

2    decision.  But the focus in that case on the fact that New

3    York was the critical center of what was going to occur and,

4    as a result, the case should be in New York I think is

5    somewhat relevant here.

6            Now, first of all, this isn't New York City,

7    obviously.  This isn't the Southern District of New York.

8    So there is some tangential disconnect there.  We could get

9    into a debate about whether a train ride is better than a

10   plane ride and expenses, et cetera, associated with it.  And

11   there isn't any hard evidence.  I can only rely on my own

12   experiences as a lawyer and a judge is that, you know, it is

13   easier to take the train than to fly.  It is cheaper.  It is

14   faster.

15           But, I mean, the reality is -- and I think Mr.

16   Keglevic talked about it -- how many people are you moving.

17   Are we moving 50 lawyers at an average billable rate of $800

18   an hour down to Texas or are we moving the Texas

19   restructuring team up to Delaware and putting a lot of

20   lawyers on trains.

21           You know, ultimately, maybe it will cost a million

22   dollars more, maybe it will cost a million dollars less.  In

23   a $40 billion restructuring, to a certain extent, what are

24   we talking about?  It's not a ton of money.

25           So for the limited purpose, I wanted to mention

1    that.

2            There's another case out of the Southern District

3    of New York which is Garden Manner Associates, and in that

4    case somewhat unusually the Southern District of New York

5    retained venue of a single asset real estate debtor whose

6    sole asset was located in Arizona.  And after taking into

7    consideration the fact that New York was the location where

8    the debtor could most successfully reorganize, which is the

9    ultimate purpose of Chapter 11, the Court kept the case in

10   New York.

11           Now the Court noted that the asset was relatively

12   new and not in need of capital improvement, found that the

13   case turned on debtor's ability to raise capital,

14   renegotiate loan terms, locate a potential purpose to serve

15   or execute a potential cramdown of its major secured

16   creditor.  And while the general partner and managing agent

17   were located in New York, the Court also found it relevant

18   that the parties most likely to be a source of capital were

19   located in New York.  And, therefore, the Court found that

20   efforts to reorganize could be carried forth in New York.

21           Again, here, as in Garden Manner, the debtors

22   aren't here to liquidate or sell their assets, but to

23   restructure their debt.  There have been no allegations of

24   disrepair, need for large capital improvements,

25   mismanagement or other similar complaints regarding the

1    physical assets of the debtors.  Indeed, the evidence is

2    directly to the contrary given the amount of infrastructure,

3    upkeep and funds that have been spent on capital

4    expenditures, I think $10 billion over the last several

5    years.

6              So, again, locating the case where the action is

7    going to be is consistent with the Garden Manner case.

8              I'll talk a little bit about the creditors.

9              Currently, the debt holders are located primarily

10   in the northeast.  The 50 largest potential unsecured

11   creditors are scattered throughout the country, although 20

12   of them are certainly in Texas.  Yet the top two potential

13   unsecured claims are held by or at least represented by

14   indenture trustees totaling $8 billion located in New York.

15             The majority of arrangers providing post-petition

16   financing to EFIH and TCEH are located in New York or the

17   northeast.

18             And, finally, while the indenture trustee for

19   debtors' notes are located throughout the country, over half

20   of them are found in the northeast.

21             And, again, as the case deals with restructuring

22   debt rather than operations, the location of these creditors

23   gravitates in favor of the case remaining in Delaware.

24             Now there is a concern raised about pending

25   litigation against the debtors in Texas such as employment,

1    commercial, environmental laws.  However, the case -- the

2    record that was actually developed at the hearing, I think,

3    makes this a red herring.  The evidence shows that the

4    debtors are parties to remarkably few lawsuits and that

5    those suits do not critically gravitate to one location.

6            In addition, the Standard Tank and Brown v. Wells

7    Fargo cases are distinguishable.  In Brown the Court granted

8    a motion to transfer litigation to the district where the

9    plaintiff's bankruptcy case was pending.  The Brown court

10   held there's presumption that the district hearing the

11   bankruptcy case is the proper venue.

12           Now if Brown were to have application to the case

13   here, it's the litigation against the debtors in the other

14   forums that would come to the debtor rather than the other

15   way around.

16           Also, in re: Standard Tank Cleaning is cited for

17   the proposition that the Court should transfer bankruptcy to

18   the forum where pending actions exist and that must be

19   particular -- that might be particularly acute where debtor

20   is subject to environmental liability in its own forum.

21           (Indiscernible) case discussed earlier, the first

22   finding is that the (indiscernible) New York was not proper

23   venue for the debtor because it's principal place was in New

24   Jersey and not New York.

25           So in considering whether to transfer the Standard

1   Tank case, which the Court must do, it considered the

2   location of the debtors' principal place of business where a

3   majority of its creditors resided including the New Jersey

4   EPA, who was the single largest creditor and the pending

5   environmental litigation pending against the debtors.

6           Bankruptcy Court held that if the case were to

7   stay in New York, which was not the proper venue, the Court

8   would likely have abstained from trying the environmental

9   lawsuit, lift the stay, et cetera and, as such, it made

10  sense to take the case where the litigation already was.

11          There's also the Doler (ph) Jarvis case cited for

12  the proposition that the existence of related litigation in

13  the transferee court strongly supports a motion to transfer.

14  However, in Doler Jarvis the Court transferred an

15  environmental pollution adversary action rather than the

16  entire bankruptcy case to a forum where five other related

17  actions were already pending.  And other than a nice sound

18  bite, Dolar Jarvis is completely inapplicable to the case in

19  front of the Court.

20          Let's talk a little bit about location of assets.

21          In regard to the location of the debtors' books

22  and records, this was mentioned several times that the

23  debtors' headquarters are located blocks from the Northern

24  District of Texas Bankruptcy Court.

25          However, both (indiscernible) debtors mention the

1    availability of computer technology and moving documents

2    from one location to another.  As this argument cuts both

3    ways, this is a neutral factor.

4           Moreover, where the goal of the Chapter 11 case is

5    financial rehabilitation, not liquidation, the Fifth Circuit

6    held in Corco that the location of the books, records and

7    assets is of little importance.  That Court continued to

8    state that Courts do not consider the need for ancillary

9    administration in the event that liquidation occurs because

10   anticipation of the failure of the proceeding is an

11   illogical basis upon which to predict -- predicate a

12   transfer.

13          And that reaches back or follows up on the

14   previous comment about the fact that while it's possible

15   this will ultimately be an operational case or a liquidation

16   case, it's not at all foreseeable at this time.  And to

17   decide whether or not to transfer the case now to Texas

18   based on something that in all likelihood won't occur

19   doesn't make any sense.

20          All right.  Almost done.

21      (Laughter)

22          THE COURT:  I'm going to back up a little bit on

23   the docket congestion and just make sure my ruling on that

24   is clear.

25          This Court does have more Chapter 11 cases per

1    judge than the Northern District of Texas and the Northern

2    District of Texas has many more Chapter 7, 12 and 13 cases

3    included -- and if you include that in the calculation and

4    look at straight cases, there are more cases per judge in

5    Texas than in Delaware.

6              Cases are different.  Some Chapter 11's are easy.

7    I've got sale cases that last 90 days and I've got Chapter

8    7's that have been pending for five years.  Cases are

9    different.  The reality is both courts are very, very busy.

10   But the reality is both courts are not known for -- I don't

11   believe -- known for unduly delaying matters.  And there's

12   no question in my mind that either court could handle the

13   demands of the case.

14             And I want to reiterate, and every party has said

15   it as they should have, and I don't think there is any

16   issue.  But as to competence there's no question that the

17   Texas Bankruptcy Court has the same expertise and

18   familiarity applying the Bankruptcy Code as this Court.  And

19   that is clearly a neutral argument.

20             And I've already touched on the learning curve

21   issue.

22             All right.  So, to conclude, the Court is going to

23   deny the venue motion for the following reasons:

24             (Indiscernible) has not met its burden or proof by

25   a preponderance of the evidence;

1            Venue in the case as here is proper;

2            Debtors' plan is a financial restructuring rather

3    than a liquidation or a sale case;

4            Relevant professionals are primarily located in

5    the northeast and, thus, Delaware is a more convenient

6    location;

7            The majority of witnesses that would be called on

8    to testify are easily available to debtor -- Delaware,

9    excuse me;

10           The subpoena power, I think, will be a non-factor;

11           The (indiscernible) Texas state law will not

12   predominate the cases; and

13           The documents that will create litigation in these

14   cases contain New York or Delaware choice of law provisions,

15   which this Court can efficiently handle.

16           So for all the foregoing reasons I'm going to deny

17   the motion to transfer venue.

18           On the motion to strike, first of all, I think

19   that most of the -- if not all of the questions were

20   irrelevant.  Now they're irrelevant, I think, based on

21   something the parties didn't know I was going to decide,

22   which is that I disagree with putting some sort of strong

23   deference or -- to a debtor's choice of forum.

24           That, I think, really does take the motivation

25   factor into a -- from -- for the most part puts it aside.

1    And I'm not speculating as to (indiscernible) motivations

2    and I'm not speculating as to the debtors' motivations.  I'm

3    relying on my reading of how the law should apply and the

4    facts I have in front of me.

5              So most of what's mentioned in the motion to

6    strike isn't relevant.

7              Also, I did not find the privilege as used -- I

8    don't find the privilege as being used offensively.  It's

9    the movants who have brought the motion.  They're the ones

10   that are putting the issue, to the extent they're putting

11   the issue, in -- before the Court or before the parties.

12   The way -- to allow an adversary to crack your

13   attorney/client privilege by bringing a claim that you can

14   only defend, in part, based on decisions that were made that

15   were privileged turns, I think, the whole issue on its head.

16   And counsel, very more eloquently than I am, pointed out

17   that that's simply not how the cases line up.

18             Also, having seen the test -- the deposition

19   testimony, I don't think the privilege was overly invoked at

20   all.  There was lots of evidence offered that were -- that

21   was requested or sought by (indiscernible).

22             And, finally, I will think -- I will say that I

23   think there was gamesmanship going on re: the unavailability

24   of the witness.  If there was a true motivation to have the

25   witness here, I think (indiscernible) would have acted

1    differently and they didn't.  They chose to make a point by

2    not seeking court assistance and using it as a point as to

3    the lack of subpoena power.

4              So for those reasons I will deny the motion to

5    strike.

6              I've already signed orders approving the motions

7    to shorten and the motion to file under seal.

8              So that's that.  Now what we're going to do is

9    adjourn until tomorrow at 9:30 and take up the rest of the

10   agenda.

11             MR. SASSOWER:  Edward Sassower from Kirkland &

12   Ellis.

13             Your Honor, first and foremost, thank you for your

14   ruling.

15             Regarding adjourning until tomorrow, we actually

16   think the rest of the agenda will go quite quick.  We think

17   we have a deal on the --

18             THE COURT:  Okay.

19             MR. SASSOWER:  -- emergency motion.  And we think

20   we have a deal on the -- enough of a deal on the 2004 status

21   conference that that should only take a few minutes.

22             THE COURT:  Okay.

23             MR. SASSOWER:  So we're happy to adjourn, but --

24             THE COURT:  Well, no.  I --

25             MR. SASSOWER:  -- we think --

1          THE COURT:  The reason I said that is I've been

2    focused on the venue transfer motion and although I've read

3    at least -- at least once the papers on the other issues

4    that -- and the two motions, the EFIH motions, I'm not

5    sufficiently on top of the issues to sort of preside over a

6    contested hearing on them.  And, of course, it's also 5:00.

7          But if we have something we can put on the record

8    and move through, let's do it.  We'll save everybody a lot

9    of effort and it will save the estate a lot of money.

10         MR. SASSOWER:  Okay.  Thank you, Your Honor.

11         And as I said, I think we have a deal.  Mr.

12   Hessler will present it in a minute and we'll find out if

13   anybody contradicts him, whether, in fact, the deal will

14   affect the case.

15         Now in my opening remarks, I mentioned --

16         THE COURT:  Does anybody have an amended -- second

17   amended agenda?  I would -- didn't bring it out because I

18   thought we were not going to move on.

19         UNIDENTIFIED SPEAKER:  I have --

20         MR. WEISFELNER:  May I approach?

21         THE COURT:  Yeah.  Please, Mr. Weisfelner.  Thank

22   you.  Thank you, sir.

23         Go ahead.

24         MR. SASSOWER:  Your Honor, before I yield the

25   podium to Mr. Hessler, I mentioned in my opening remarks

1    that I would work today to figure out what is on for the

2    June 5th and June 6th hearing, and I would like to go

3    through that because it is going to impact the deal that Mr.

4    Hessler believes he's got with the other professionals.

5             What was currently -- what was originally

6    scheduled for June 5th was the first day pleadings, a non-

7    insider comp motion, and the EFIH first lien DIP motion, the

8    EFIH first lien (indiscernible) settlement, the EFIH second

9    lien DIP, the EFIH second lien (indiscernible) settlement,

10   the TSA or the tax-sharing agreement amendment, and the

11   restructuring support agreement assumption motion.

12            Now three of those items -- the EFIH first lien

13   (indiscernible) settlement motion, the EFIH second lien

14   (indiscernible) settlement and the TSA amendment were the

15   subject of one motion.

16            THE COURT:  Okay.  Let me make sure I've got it

17   all down.

18            MR. SASSOWER:  That was what was originally

19   scheduled.

20            THE COURT:  Right.  Okay.  So --

21            MR. SASSOWER:  And I'm going to go through -- I'm

22   going to --

23            THE COURT:  Okay.

24            MR. SASSOWER:  I'll tell you what's moved and I'm

25   going to tell you what's still there, so I'm going to go

1    through --

2              THE COURT:  All right.

3              MR. SASSOWER:  -- it one more time.

4              We have agreed with the RSA parties to move the

5    RSA assumption motion to June 30th.  We've agreed to move

6    the second -- the EFIH second lien DIP motion to June 30th

7    with one piece that we're going to carve out.  I'll come

8    back to that in just a moment.  And we've agreed to move

9    part of what we call the settlement motion, the parts that

10   we're moving are the second lien (indiscernible) settlement

11   part and the TSA or tax-sharing agreement amendment part of

12   the settlement motion to June 30th.

13             So what remains on June 5th is as follows:  the

14   first days, the non-insider comp motion, the EFIH first lien

15   DIP, the EFIH first lien (indiscernible) settlement --

16   that's the remaining part of the settlement motion -- and

17   the part of the EFIH second lien DIP that requests a breakup

18   fee and expense reimbursement for the DIP provider.

19             The official committee has asked us to consider

20   moving, in addition to the items I've mentioned, the breakup

21   fee and expense reimbursement piece of the second lien DIP,

22   the non-insider comp motion as well as the TCEH cash

23   collateral motion.  They would like us to do a second

24   interim order and push the final hearing on that to June

25   30th.  Those three items we're still having an active

Page 220

1    dialogue on and we have not ended up in a -- we have not

2    reached a final resolution on those points.

3               So was that clear, Your Honor?

4               THE COURT:  Sure.

5               MR. SASSOWER:  Okay.

6          (Laughter)

7               MR. SASSOWER:  So with that, I will -- I'll yield

8    the podium to Mr. Hessler who will go over what we believe

9    is the settlement to the emergency motion.

10              THE COURT:  All right.

11              MR. HESSLER:  Good afternoon, Your Honor.  Steve

12   Hessler of Kirkland & Ellis on behalf of the debtors.

13              Your Honor, as Mr. Sassower previewed, we spent

14   the afternoon session of the venue hearing -- and we being

15   the professionals for the debtors as well as the EFIH first

16   and second lien trustees -- working on what we thought was a

17   very productive dialogue in the hallways and in the meeting

18   rooms to try and work out some resolution that, at a

19   minimum, obviated the need for the Court to have to issue

20   any rulings today on either the motions to compel as related

21   to the tender offers as well as there's a couple of

22   scheduling -- there's a scheduling pleading regarding the

23   (indiscernible) litigation that were filed by the first and

24   second lien trustees as well as the debtors.

25              With the Court's permission I'll bring up the --

1   I'll take up the motions to compel first and announce what I

2   believe is the agreement, and then I do think that counsel

3   for both the first and second lien trustees want an

4   opportunity to talk as well.

5           Just for the purposes of the record, this is Items

6   -- these are Items 2 and 3 on the agenda which were the

7   motions to compel.  Item 2 was filed actually by the second

8   lien trustee.  Item 3 was filed by the first lien trustee.

9           The resolution that we worked out, Your Honor --

10  well, first, let me get to where we are today.  The tender

11  are -- well, there's a first lien exchange offer and a

12  second lien tender offer.

13          As to the EFIH second lien opt-in period, so

14  related to the second lien tender offer, as originally

15  launched, the primary opt-in period -- there's a primary

16  opt-in period and a second opt-in period which affects the

17  consideration.  The primary opt-in period was originally

18  slated to expire tomorrow which would have been March 23rd.

19          In order to facilitate a hearing today and obviate

20  the need for an emergency hearing earlier in the week, the

21  debtors already had agreed to an additional five business

22  day extension of that deadline, which took it out to Friday,

23  May 30th and we, earlier this week, filed a notice of

24  extension on that front.

25          What we have worked out today is we are going to

1    agree to an additional eight business days for the

2    expiration of the primary opt-in period.  So with that eight

3    business days it will now expire on Wednesday, June 11th and

4    then the ultimate expiration of the second lien opt-in

5    period will be Thursday, July 3rd.  So that's the second

6    step-down period, Your Honor.  And, notably, that comes

7    after the hearing on Monday, June 30th.

8              The extensions that I've just described, we will

9    reflect those also in a notice of extension that we'll file

10   after today's hearing.  That's point one.

11             Point two is part of the resolution.  I am going

12   to make the following statement on the record for the

13   clarity of all parties in interest that during this extended

14   primary opt-in period, the debtors will engage in good faith

15   negotiations with the EFIH second lien indenture trustee and

16   certain holders of the EFIH second lien debt over the

17   alternative second lien DIP proposal made by members of that

18   group and other issues that they have raised in their

19   various challenges to date.

20             That also will be reflected in the notice of

21   extension that we would be filing with the Court, Your

22   Honor.

23             That procedural agreement that we had -- as I said

24   I believe obviates the need for any ruling on those -- on

25   both trustee's motions to compel, but I know they want an

1    opportunity to address the Court as well.

2            THE COURT:  Okay.

3        (Pause)

4            MR. MAYER:  Excuse me, Your Honor.  We are

5    experiencing a technical issue here which I think we do have

6    an agreement on, but my -- for the record, my name is Thomas

7    Morris Mayer.  I'm a partner at Kramer Levin and I represent

8    the second lien in EFIH second lien indenture trustee.

9            The technical issue relates to adjustment of the

10   pricing of the tender offer to reflect the fact that the

11   dates got moved and that's being worked out as we speak.

12   It's just a matter of interest gets adjusted and the tender

13   offer price gets adjusted the other way, so this is an

14   arithmetic matter that I believe is being agreed upon.  But

15   it is an economic matter.  And my understanding is it's part

16   of the deal.  Am I wrong?

17           We're good.

18           MR. HESSLER:  Yes.

19           MR. MAYER:  Okay.  All right.

20           Having clarified that on the record, based on the

21   debtors' agreements on the record, the second lien EFIH

22   indenture trustee is withdrawing our emergency motion and

23   our motion with respect to the scheduling of future

24   hearings.  We retain many of the concerns addressed in those

25   motions and we expect to raise them at the June 30 hearing

1    on the second lien DIP and on the second lien settlement in

2    the absence of a more comprehensive settlement.  More on

3    that later.

4            Our withdrawal of the emergency motion today is

5    without prejudice to our right to object to any of the

6    motions that are scheduled to be heard during the two

7    hearings in June, including the second lien DIP and the

8    second lien settlement.

9            We're relying not only on the debtors' further

10   extension of the tender offer deadlines and the

11   (indiscernible) pricing, but also on the debtors' commitment

12   to negotiate a competitive second lien DIP and other case

13   issues in good faith, and we expect to engage in serious

14   negotiations with respect to that competitive DIP and other

15   global issues with the debtors over the next few weeks.

16           Have I said anything in violence to our deal,

17   Steve?

18           MR. HESSLER:  That's good.

19           MR. MAYER:  That's all I have today, Your Honor.

20           THE COURT:  Thank you.

21           MR. MAYER:  Thank you.

22           THE COURT:  Could I just -- Counsel, if you could

23   file a notice of withdrawal with the Court I would

24   appreciate it.

25           MR. MAYER:  Certainly.

1              MR. WOFFORD:  Your Honor, Keith Wofford, from

2    Robes & Gray on behalf of CSC Trust Company, which is the

3    indentured trustee for the EFIH first lien notes as well as

4    the collateral trustee.

5              Your Honor, it is clear that this process has been

6    a moving target.  Up until yesterday's papers, the company's

7    position had been that all of the relief cited by

8    Mr. Sassower was moving forward on June 5th, including both

9    DIPs, the settlements, et cetera.

10             Now, the debtors appear to be pursuing a path of

11   bifurcation where the first lien settlement and DIP will go

12   forward in June and the remaining relief will go out -- be

13   put off at least until the end of June, if not later.  This

14   is an improvement, and it's consistent with what we wrote in

15   our statement a couple of days ago which you may not have

16   had a chance to read, but we do have a couple of concerns

17   with this format, although we are making progress and I

18   believe we're close to an agreement on a schedule

19   considering the make-whole litigation, which is the good

20   news.

21             But two concerns with the remaining relief they're

22   seeking on June 5th.  The first is with respect to the first

23   lien settlement motion that was referred to by the debtors'

24   counsel.  With respect to the timing, we believe there needs

25   to be a slight modification in scheduling, Your Honor.

1    Right now, what we have here is that the debtors do not have

2    a separate first lien settlement motion on file.  Consistent

3    with their position up through yesterday, the debtors only

4    have a combined settlement motion, a combined order, and

5    significantly a combined declaration from Mr. David Ying.

6              In other words, the rationale offered by the

7    debtors to support the first lien settlement is not as a

8    standalone, but rather as a global (indiscernible) now, and

9    I would refer you just to paragraph 6 of Mr. Ying's

10   affidavit which actually cites the settlements globally as

11   being in the best interest of the estates.

12             Clearly what the debtors are proposing to go

13   forward with now in early June is not a global settlement

14   but it's a standalone.  And so, the deal is being advocated

15   on the first lien side to be approved on its own, not

16   subject to subsequent approval of the other deals, not

17   subject to, you know, being recast, or regurgitated, or

18   rescinded in the event that those other settlements go

19   forward.

20             So, Your Honor, the trustee wants to be able to

21   see the relief being sought and the underlying support for

22   it on the first lien settlement on a standalone basis so we

23   can have a reasonable conference with our clients on whether

24   to continue to maintain our objections to it, or whether to

25   modify or potentially settle those objections.  And as

1    currently presented, we're not really in a position to do

2    that.

3            So, what we would like to do, Your Honor, what we

4    would like to request is that so we can make this sort of

5    final decision and streamline what is before the Court is

6    that the debtors prepare whatever is the final first lien

7    support and package that they intend to go for with early

8    June by some certain date, that we have some date and we're

9    not trying to delay this, but some reasonable date to

10   object, or resolve the objections or what have you, and then

11   following that date, if available sometime, I think June 5th

12   is probably too early, but sometime in the middle of June

13   subject to the Court's availability, then go forward with

14   the DIP and we can allow the debtors to achieve their goal,

15   which we really don't intend to stand in the way of, of

16   being able to refinance out the first lien debt.  So, that's

17   the first concern, Your Honor.

18           The second concern, since the debtors are not

19   proposing a second lien settlement to go forward on

20   June 5th, they still have a DIP financing that is asking for

21   in their request $5.4 billion, which according to our

22   financial advisor's math has roughly a billion dollars of

23   new debt that's relating to those second lien settlements

24   that won't even be before the Court.

25           And so, Your Honor, from an adequate protection

1    perspective, although we have not determined whether 5.4

2    would be ruled out as something that we could live with

3    being behind in terms of a priming, it would streamline and

4    simplify the trustee's decision if at that initial hearing

5    on June 5th, the only priming that was sought was with

6    respect to the actual $4 billion or so that they need to

7    take out the first lien debt.  It is unclear to us what is

8    the rationale for having potential hypothetical arguments

9    about the need to prime for a billion dollars that by the

10   debtors' initial rationale they are not going to have to use

11   until such time as the second lien settlement or second lien

12   DIP goes forward.

13           So, we'd like to address both of those issues,

14   Your Honor, as far as getting this done in June.

15           THE COURT:  Today or on June 5th?

16           MR. WOFFORD:  Well, with respect to the first lien

17   DIP and the first lien settlement issue and how that's going

18   forward, and actually having the debtors set forth exactly

19   the basis on which they're moving, I think that we would

20   like to have resolved today.  That is if the Court has a day

21   after June 5th in June and we can establish what the final

22   schedule is on that portion of the relief.  Because, again,

23   today is -- this is the first time that it's actually been

24   acknowledged that that's going to go ahead in that package.

25   That, I think, we need to resolve today.

1           I think ultimately it's up to the debtors, we just

2     want to know for sure whether they're going to go forward

3     for the full 5.4, notwithstanding that they don't need a

4     billion of it.  And if they're going to go forward with

5     that, then we'll just have to -- if they don't address that

6     voluntarily with the other RSA parties, just, you know, deal

7     with that appropriately on our own.  That is, I don't know

8     that that requires action, but it is something that begs the

9     question, if they don't need the billion dollars, why make

10    the decision and the calculus concerning objection that much

11    more complicated.

12           MR. HESSLER:  Again, for the record, Steve Hessler

13    of Kirkland & Ellis.

14           Your Honor, if we go to the first point, I

15    actually am relatively confident this is pretty easily

16    solvable.  Obviously, we put forth a declaration that was

17    intended to support all four elements of the settlement to

18    the extent that Mr. Wofford wants specificity as to which

19    sub-elements support the first lien settlement alone, I

20    think this is a conversation and we offered to have that

21    conversation as soon as the conclusion of this hearing.

22           So, I would like to think that we can work that

23    out and that doesn't require an additional hearing date.

24           With regard to the 5.4 billion, we're -- we'll

25    meet and confer on that and talk as well.  As we sit here

1    right now, our intention would be to go forward on the

2    entire amount of the DIP.  To the extent that they don't

3    agree with that proposed course of action, I think we're

4    just in the status quo, which is obviously they would then

5    object to the DIP on whatever grounds that they thought were

6    necessary.

7            We, of course, will do everything we can to

8    resolve all objections.  So, we'll -- you know, we'll do

9    what's necessary to provide, you know, Mr. Wofford with as

10   much access and transparency as to what we're doing.  But I

11   think that this is solvable without having to bring

12   everybody back before Your Honor and have an additional

13   court date in June.

14           MR. SABIN:  Good afternoon, Your Honor.  Jeffrey

15   Sabin from Bingham McCutchen on behalf of PIMCO.

16           PIMCO is a holder of a significant portion of EFIH

17   first lien debt.  They are a signatory to the RSA.  They are

18   also the largest backstop party of the proposed EFIH first

19   lien DIP in the amount of $1.45 billion, and that's in

20   addition to the hundreds of millions of dollars that they

21   are -- would be settling up as part of the make-whole

22   settlement on the first lien.

23           This is the first we're hearing of this proposed

24   settlement.  We certainly would like to go forward on

25   June 5th, even if it's a separation between the first and

1    the second lien relief.  But most importantly, I would

2    expect given the tenor of negotiations and the treatment

3    thus far by the debtors that issues that arise under our

4    rights under the RSA and other documents need to be hammered

5    out because the separation causes some questions, et cetera.

6              So, I rise now at the lightness of this hour

7    simply to reserve our rights.  We'll work with the debtor.

8    We assume that we're going to resolve our issues in terms of

9    how it could be affected, whether the DIP is smaller than

10   5.4, what our backstop rights are, and what the dates are.

11   Thank you very much, Your Honor.

12             THE COURT:  So, I'm confused.  What's the

13   agreement about what we're doing in connection with the CSC

14   motion?  And Mr. Shore wants to be heard.  So, don't worry,

15   I'll give you a chance.

16             MR. WOFFORD:  With respect to the (indiscernible)

17   docket item as to the tender offer motion, Your Honor, we

18   would defer that to the consideration of the first lien's

19   DIP settlement.

20             THE COURT:  Okay, so --

21             MR. WOFFORD:  Given the disclosure that's gone out

22   to this point, it's been very clear that de facto a number

23   of the issues have been addressed and Your Honor, pursuant

24   to the debtors' request for relief, will have the ultimate

25   decision making authority as to whether what they have done

Page 232

1    is enough.

2              THE COURT:  All right, so that's continued to

3    June 5th?

4              MR. WOFFORD:  Correct.

5              THE COURT:  All right, Mr. Shore?

6              MR. SHORE:  It's the word from the T-side.  We

7    filed a pleading that was a response.  I think the debtors,

8    because it was labeled a response and not an objection

9    didn't ask us whether to -- should adjourn anything or not,

10   but be it as it may, we're here about really two things:

11   imprecision and (indiscernible), which -- both of which we

12   lay out in our papers.

13             The imprecision going on here is something we

14   would like addressed today.  Throughout their papers, they

15   have said the debtors have launched the tender offers.  The

16   responses from the trustees have been the debtors are

17   committing securities law violations.  And the response from

18   the debtors is the debtors are not committing securities law

19   violations.  This can all be cleared up by a reservation

20   that we've asked that the debtors put on the record that the

21   TCEH debtors are not involved in the tender offers, nor are

22   they using TCH estate assets on the tender offers.  I think

23   as a matter of fact that is true, and we'd like them to

24   clarify that.

25             In addition, we're a little worried about the

1   (indiscernible) that's going on with respect to what's

2   happening with TCEH claims.  As we lay out in our papers, we

3   believe that the TCEH debtors have substantial claims over

4   to the E-side for all the money that's been coming up out of

5   the operations and moving over to the E-side and up to EFH,

6   and out to the sponsors.  Whatever those claims are were all

7   part of the 2004 that we'll talk about.  We'll address that.

8          But those claims are what they are right now.  The

9   deal is moving forward and we're locking in the E-side of

10  the equation with these DIPS, and second lien DIPs, and DIPS

11  convertible into equity.  And everything else, without

12  dealing with the TCEH claims that we believe exist.

13         At this point, we don't need to do anything other

14  than make clear our position on the record that nothing

15  going on here is affecting whatever those claims are, if and

16  when they try to settle and if -- when they try to deal with

17  some unsecured claims and not other unsecured claims, we can

18  deal with it.  But I'm concerned because even part of the

19  theme today was if you don't speak up immediately, we'll

20  take that as either a consent to what's going on, or a

21  waiver of your rights.

22         From our perspective, we don't believe they're

23  intending as part of any of this relief, or anything they're

24  doing up until we schedule these hearings, to prejudice any

25  rights of the TCEH debtors.  But if they think they are,

1    they should say that today.

2           MR. WEISFELNER:  Your Honor, I think, unless I'm

3    mistaken, that brings us to the last item on today's

4    agenda --

5           THE COURT:  No, we're not done.  We're not done.

6    Mr. Weisfelner, sit down.  I don't think we're done.

7           MR. HESSLER:  To the extent that you'd like to

8    hear from the debtors, I mean we'll certainly acknowledge

9    that.  Mr. Shore had originally filed -- requested a pretty

10   lengthy paragraph in order.  There's no order being entered

11   today, so I'm not quite sure how to respond to it, except

12   that to the extent that he's looking for an acknowledgment

13   of the obvious, which is that the first lien exchange and

14   the second lien tender are being conducted by EFH and not

15   TCEH, we certainly do acknowledge that.

16          We also would acknowledge that everybody's rights

17   are reserved to bring whatever challenges they need, at the

18   appropriate time, whenever the appropriate relief is to be

19   entered by the Court.

20          MR. SHORE:  And we have no objection to the

21   adjournment.

22          THE COURT:  Thank you.

23          MR. DEMSPEY:  Your Honor, briefly --

24          THE COURT:  Okay, yeah, go ahead.

25          MR. DEMSPEY:  David Dempsey for Kirkland & Ellis,

1    counsel for the -- proposed counsel to the debtors.

2            With regard to the EFIH first lien make-whole

3    litigation which includes two different contested matters in

4    an adversary proceeding.  As Mr. Wofford referenced, we're

5    in the process of negotiating a schedule, but we believe

6    we've brokered one in principle, which would see the

7    automatic stay motion kicked from the June 5th hearing and

8    address coincident with the adversary proceeding, hopefully

9    for trial, around the week of September 9th and 10th

10   subject, of course, to Your Honor's availability.

11           We'll hammer out a schedule that backfills from

12   the date, Your Honor, and propose something to the Court.

13   Of course, if September 9th and 10th works for Your Honor

14   now, we can make that clear in the order.

15           THE COURT:  Yeah, okay.  A couple things about

16   that real quick.  I saw the position paper of the debtors

17   that called or requested a trial in early August, and it had

18   built into the schedule a summary judgment motion deadline

19   of five days before trial, something along those -- that's

20   just not going to work.  There's no way the Court would be

21   in a position to approve a schedule that gave me five days

22   to decide summary judgment motions in something as complex

23   as this.

24           So, you can't -- whatever schedule you work back

25   from needs to be reasonable in connection with giving the

1    Court time to decide motions if you're going to have motions

2    practice.  It also had a -- reserved the ability to file

3    motions to dismiss or answer the complaint.  And again,

4    that's a whole other round of briefing that you'll be asking

5    the Court to do in -- over the summer and there will be

6    weeks in the summer when I'm not here.  So, there's only so

7    much I can do.

8              Having said all that, with a full reservation of

9    my rights, I can't give you the 9th, but I can -- let me

10   double check.  I can schedule you for, and I will pencil you

11   in for all day on the 10th, 11th, and 12th, if that works.

12             MR. DEMPSEY:  Your Honor, for the sake of clarify,

13   what the debtors were contemplating at least was with regard

14   to the trial, that that trial would both resolve the trial

15   as an evidentiary matter as well as the summary judgment

16   motions that would be before the Court.  So, in that regard,

17   the summary judgment motion would really be more pretrial

18   briefs than anything else.

19             THE COURT:  Well, you can't have a trial on the

20   summary --

21             MR. DEMPSEY:  It would be -- in other words, it

22   would be resolving the contested matter, which is already on

23   -- the debtors have already brought as well as the adversary

24   proceeding.  But Your Honor, we'll meet with the folks from

25   Ropes & Gray and work out a schedule that resolves this with

1    the September 10th to 12th dates in mind for trial.

2              THE COURT:  All right.  So, we'll reserve all

3    those -- we'll reserve those dates without -- for this

4    specific issue, not generally.

5              MR. WOFFORD:  Your Honor, briefly.  Keith Wofford

6    again from Ropes & Gray.

7              Obviously, having the make-whole discussion

8    bifurcated and separated from the pay down anticipated in

9    June is being done from the trustee's perspective with a

10   full reservation of rights such that nothing as a result of

11   the payout of the DIP order is relating that would affect or

12   impact the determinations, issues, decisions in the

13   make-whole trial.  And so that's part and parcel.

14             We're working out that reservation of rights

15   language.  We just wanted to be clear that by virtue of

16   doing this, whether it's moving the time of the trial out

17   past the redemption, or moving out the consideration of the

18   rescission to consolidate it, that all of our rights were

19   reserved and there's no prejudice by virtue of the trial

20   occurring later than the actual desired payout of the

21   debtors.

22             THE COURT:  Okay.

23             MR. BRODY:  Your Honor, Josh Brody from Kramer

24   Levin on behalf of Computershares as indentured trustee for

25   the EFIH second line notes.

1          And at the risk of complicating things, which is

2     probably already too late, we had an initial conversation

3     very brief with Kirkland about overlaying our make-whole

4     litigation, at the same time as they're litigating the

5     Make-whole on the first lien notes.  So, I just wanted to

6     raise for Your Honor that those discussions are just getting

7     started.  So, I just know that Your Honor reserved a couple

8     of dates just now, but it may be overlaid somewhat with our

9     make-whole litigation, as well.

10          THE COURT:  All right.  Like I said, I'm putting

11    the dates down on the calendar and it's nothing more than

12    that.  I'll have to wait and see what you're actually asking

13    me to do and whether the schedule makes sense, and whether

14    three days of trial will be sufficient, but I'll --

15          MR. BRODY:  No --

16          THE COURT:  But I appreciate the heads up very

17    much.

18          MR. BRODY:  Thank you, Your Honor.

19          THE COURT:  I think -- now we can talk to

20    Mr. Weisfelner.

21          MR. WEISFELNER:  Your Honor, I had some good news

22    and some bad news on the status conference matter, item 4,

23    our motion for entry of an order authorizing 2004 discovery.

24          Before I give you the good news and bad news, I

25    still promise to be done within the 10 minute timeframe.  I

1    wanted to let Your Honor know, first and foremost, that we

2    appreciate your careful consideration on the motion to

3    change venue.  I appreciate and respect your decision.  I

4    want to make it clear that there will be no appeals, no

5    request for stay pending appeal.  We're happy to be here

6    after the fact.

7              I told Jonas not to press this motion.

8         (Laughter)

9              THE COURT:  Blame Bowden, it was his fault.

10             MR. WEISFELNER:  Well, Your Honor, you touched on

11   the absolutely truth of the matter.  It was Bowden's fault.

12        (Laughter)

13             MR. WEISFELNER:  Your Honor, first the good news

14   on the status conference.  We are not here today asking for

15   either a response or objection deadline, or a hearing.  The

16   parties in interest, and just to identify them, they are

17   first, and perhaps foremost, the newly appointed official

18   creditors committee on which my client has -- is serving,

19   and is serving proudly and with all thanks to the Office of

20   the U.S. Trustee.

21             In addition to the unsecured creditors committee,

22   we are working with White & Case, Mr. Shore, representing

23   the ad hoc committee of bondholders, as well as obviously

24   the debtor in possession.  The three creditor parties, if

25   you will, met I think it was on Monday in our own meet and

1    confer.  We were able to then meet with the debtor the

2    following day.

3            I think -- at all parties agreement, the committee

4    then undertook the first draft of a protocol designed to

5    govern the parties subject to Your Honor's approval of

6    necessary discovery in this case, understanding that that

7    protocol is intended to focus its attention on general case

8    issues as opposed to discovery that may come up in a context

9    of either adversary proceedings or contested matters,

10   understanding that you aren't going to be capable of

11   drafting a protocol that was going to cover everything in

12   the case, not knowing what various parties might file.

13           I should also tell you that the issue that I think

14   we're starting to face with regard to a general protocol on

15   how to move the case forward, is sort of separating what

16   I'll call valuation from everything else, recognizing that

17   everything goes into ultimately what is the estate's value.

18   I guess a better way to distinguish between the two issues

19   is focusing on intrinsic value that may require expert

20   testimony and everything else which includes potential third

21   party claims and causes of action, either by the E-estate --

22   the T-estate against the E-estate, or various debtor estates

23   against non-debtor third parties that may include but not be

24   limited to the sponsors, officers and directors, members of

25   the first lien creditor group.

1          And I think we're clearly going to be able to work

2     together because we all have a collective interest in moving

3     forward in a timely fashion with regard to what I call in

4     the bucket of claims and causes of action against other

5     estates of third parties.

6          Where I think we're having an issue, and I think

7     if we continue to work on it collectively, we should be able

8     to overcome it, maybe at least among the three creditor

9     groups, perhaps ultimately not with the debtor, but the

10    issue is the timing of discovery with regard to valuation.

11    And I guess the tension that we have was first brought to

12    our attention with regard to the RSA.

13         As Your Honor knows, the restructuring support

14    agreement is predicated first and foremost on a valuation

15    assumption on the E side -- I'm sorry, on the T side of the

16    equation, to the effect that the first liens are

17    undersecured and undersecured to the tune of about 5 or 6

18    billion dollars.  And therefore, all of the unsecured debt

19    in this case, including the massive size of the first lien

20    deficiency, shares in the value if any of unencumbered

21    assets estimated by various parties during the first day

22    hearings to be about $150 million.

23         It's been our contention for a long time, by a

24    long time I mean prepetition going back to last April when

25    we first organized ourselves, although the only group, save

1    for Mr. Shore's group that wasn't recognized by the company,

2    had its professional fees paid for by the company or most

3    importantly for this purposes, afforded access to any due

4    diligence requests that we made, and we made a lot of them.

5              So, we've been shut out of the process but the

6    debtor has known for at least a year what information we

7    want.  Now, the tension comes, to a certain extent, among

8    the creditor groups.  If you view the total amount of the

9    first lien debt in this case at some 25 or 26 billion

10   dollars.

11             THE COURT:  But not the TCEH first lien debt?

12             MR. WEISFELNER:  Yeah.

13             THE COURT:  Or all first lien debt?

14             MR. WEISFELNER:  All first lien debt under the T

15   side of the equation, which includes the first lien debt and

16   I think some letters of credit that would --

17             THE COURT:  Okay.

18             MR. WEISFELNER:  -- count as first lien debt under

19   the appropriate documents.  That's the goalpost for us.  We

20   have to get over that goalpost in order to be in the money.

21             The goalpost for the general unsecured creditors

22   to get in the money has got to be moved further down field.

23   It's got to then include all of our debt and to make a

24   meaningful indent in the total amount of debt that's

25   outstanding, estimated to be 7 or 8 billion dollars

1    depending on rejection damage claims, or things that arise

2    in the future.  But you've got funded debt claims that are

3    close to $7 billion.  You've really got to move the goalpost

4    yet again in order to demonstrate that the unsecured

5    creditors, over and above the first and second lien debt

6    have a large valuation of entitlement.

7              There's a concern about, for lack of a better

8    term, rushing to judgment on valuation.  Least, for example,

9    the second liens be able to prove their value sufficient to

10   make them comfortable, but leave on the table the question

11   of what, if any, residual value is there available for

12   general unsecured creditors.  And we recognize that tension,

13   and we'd like to try and deal with it in a cooperative way

14   that makes sense.

15             What concerns us is, again, going back to the RSA.

16   And, Your Honor, I have to tell you that I found out about

17   the debtor's decision to adjourn the RSA this morning when I

18   came into Court.  Notwithstanding the fact that we've served

19   discovery on the debtors that contemplated that we were

20   taking depositions on Tuesday and Wednesday immediately

21   following the Memorial Day weekend, and notwithstanding the

22   fact that we had served massive -- reasonably massive --

23        (Laughter)

24             MR. WEISFELNER:  -- discovery requests that were

25   asked to be returnable in advance of those depositions.

1    When I say reasonably massive, they are massive.  They are

2    reasonable only because the debtor has seen our request

3    before, going back almost a year and because if I look at

4    the list of debtors' professionals, we know most of them on

5    the valuation side and we've all been through this same

6    drill before in other cases.  So, the request should not

7    have come and I'm sure did not come as a surprise.

8            If I've got an RSA that now is going to get heard

9    on June 30th and it's good that we found out about, that I

10   could put a lot of people out of the office and let them go

11   home for Memorial Day weekend, something we just found out

12   about this morning, that's great.  But I'm still stuck with

13   the conundrum of do I challenge, am I required to challenge

14   valuation since it's a predicate for the entire RSA.

15           And I ask yourself, well, so what?  I mean, do

16   they have to prove up their value on June 30th, or can they

17   just move forward on the RSA and commit themselves as

18   debtors in possession to whatever they're committing

19   themselves to?  On the one hand you can argue, what are they

20   really committing themselves to that require us to get to an

21   RSA in advance of confirmation?

22           Well, they're committing themselves to pay some 20

23   odd million dollars of professional fees that are not to

24   estate professionals.  It's actually 34.955 million to not

25   the indenture trustee for the first lien debt but the ad hoc

1    committee of first lien debtholders, to the FIH unsecureds,

2    to Fidelity, to the non-Fidelity EFIH first liens, and

3    within the $35 million, some $18.6 million to the out of the

4    money equity sponsors.  So, that's what they would be

5    committing themselves to if the RSA gets approved.  And

6    again, the underlying assumption of the RSA and why they're

7    telling you it ought to be approved has to do with their

8    assessment of value.

9            What I heard today, in addition to a whole lot of

10   disappointing efforts by Mr. Jonas, and we'll smack him

11   around later on, was the testimony that I heard from the

12   debtor's CFO, to the effect that Evercore, who's their only

13   valuation retained professional, and we've known Mr. Ying

14   for years, and we've seen him on the stand testifying as to

15   value, has not performed a valuation.  That Mr. Keglevic

16   doesn't know where they may stand in the process of

17   performing an evaluation.  Doesn't know if they started,

18   they're in the middle, or they're completed it.

19           So, I'm left with the conundrum of how did the

20   debtor take the position in its negotiations and as part of

21   the RSA that the first lien debt is 5 to 6 billion dollars

22   underwater, entitled to all sorts of adequate protection

23   because of the priming lien and all sort of other benefits

24   in an RSA if they don't have a valuation.

25           So, I guess what I'm telling Your Honor is the

1    2004 will get kicked.  No response dates, no objection

2    deadlines.  We'd probably like another opportunity to give

3    Your Honor a status conference.  We've only just exchanged

4    within the last 12 hours drafts of a protocol.  It won't be

5    a mystery to anybody.  Its origins probably come out of the

6    Lehman case I'm guessing, which we've all become familiar

7    with, but we do have this issue of a valuation, when does a

8    valuation hearing take place.

9           The debtor has suggested that I have no right to a

10   valuation hearing, except as part of confirmation.  And I

11   think they misread the applicable Rule and the applicable

12   Code statute, and they don't need to look any further than

13   Your Honor's decision in the Nutrical (ph) case where the

14   debtor filed a motion to determine the value of a secured

15   claim.  The opposition was, well, we don't have to decide

16   this until confirmation.  Your Honor scheduled the trial.  I

17   think he scheduled it for three or four days and it went

18   three or four weeks.

19          I was involved in a valuation trial of a merchant

20   generating facility that was supposed to last a couple of

21   days.  We went 28 trial days over the better part of 3

22   months.  I mention that because, look, as far as I'm

23   concerned, I don't necessarily want to try a case, forget

24   about Delaware, can you imagine having to try a case in the

25   summer in Dallas?  Thank God for your ruling.

1        (Laughter)

2              MR. WEISFELNER:  I don't care when we try

3    valuation so long as we get to try it.  What I don't want to

4    do is get jammed on a schedule that's consistent with their

5    milestones.  And I'm also worried about whether we're being

6    forced to try valuation early because valuation's the key to

7    their RSA.

8              Again, I think we ought to have another scheduling

9    conference.  The parties need to meet and confer to try and

10   work these very issues out, but I did want to let Your Honor

11   know that while progress is being made, we recognize that

12   the sorts of discovery issues that we highlighted in our

13   2004 are to a very large extent best pursued by those

14   entities -- that entity or entities that best represents the

15   interests of general unsecured creditors, the committee or

16   the committee in some combination with the ad hocs.  And

17   we're willing to defer to them so long as we're sure that we

18   get our day in Court to prove valuation, and that day in

19   Court is not jammed because of some milestone considerations

20   that the debtor has entered into with other parties.

21             I'm also concerned that we have a lot of Court

22   time, rightfully so, I understand their perspective, coming

23   from EFIH creditors who, they're getting paid in full.

24   Their whole debate is whether they get paid in full with or

25   without a make-whole premium.  We're sucking eggs over here

1    and we'd like to get some Court time to determine whether we

2    get a donut, let alone a make-whole premium.  And I would

3    just hope that the parties in interest keep that relative

4    balance in mind when we start collectively looking at the

5    way this schedule's going to play out in terms of parties

6    having an opportunity to prove their ultimate entitlements

7    before Your Honor.  Thank you.

8            THE COURT:  Thank you.  Okay, no, let me hear from

9    Mr. Shore.  I want to hear from Mr. Shore.  I always like

10   hearing from you.

11           MR. SHORE:  Well, thank you.  It's not like

12   Mr. Weisfelner to miss a detail because he's so detail-

13   oriented, but we would like, and we did discuss that we

14   would like to get the 2004 on the calendar for another

15   status conference.  Maybe we can do it on the 6th and let me

16   explain why.

17           From our perspective, there's been a bit of a

18   disconnect in this case with which the -- with the speed

19   with which the debtors want to move on the things they want

20   to get done, and the speed with which they want to respond

21   to things they don't want to deal with.  And everything,

22   every motion, the RSA, the DIPs, all that stuff that they

23   want, they're moving at a lightning pace.  We're trying to

24   keep up.  The Court's trying to keep up.

25           The issues that we care about, we have the

1    everything side and the totally nothing side.  The totally

2    nothing side has issues we want to focus on.  That's why the

3    2004 got filed.  That's why we joined in it.  We believe

4    those are issues that must get -- be resolved before the

5    debtors proceed with a plan that would relegate $7 billion

6    of funded debt claims plus a $6 billion deficiency claim

7    they say of the first lien lenders get a pro rata share of

8    $150 million.

9              They've got to get going on this.  We waited.  We

10   had the committee.  We're dealing with the protocol.

11   They're going to have no not only get back to us on the

12   protocol, but start producing documents.  We are not even 60

13   days into this case and I can give you three pages, I'm not

14   going to, of moments in the discovery where we're like,

15   they're really going to take that position?  This case is

16   going to take forever.

17             It keeps coming up.  So, we'd like a short

18   adjournment or carry the motion to the 6th and come back

19   with another status conference where hopefully we will have

20   a protocol that we can all agree on.  And we can start to

21   see the debtors not only showing facial willingness to

22   cooperate with the people who are getting nothing, but

23   actually start producing the documents and doing what

24   they're going to need to do if they want to get everything

25   they want to do done.

1              Thank you.

2              THE COURT:  I assume you don't have a problem with

3     another status conference?

4              MR. HESSLER:  I have no problem with another

5     status conference.  I have a problem with rhetoric and tone

6     because the debtors have been forthcoming to date, produced

7     over 100,000 pages, have been responding to discovery

8     requests, and this protocol which we encouraged and raised

9     on our own, separate and distinct from the committee, we're

10    all thinking that it needs to be coordinated isn't stuck on

11    our side.

12             We're happy to move it forward and to make the

13    record clear, we're not sitting on our hands.  We're not

14    just addressing the contested motions that are being raised

15    at -- today.  We are actively moving forward.  We know the

16    topics that they're asking for.  I think I completely agree

17    with Mr. Weisfelner, in a moment of admission, they are

18    massive requests they're asking for.

19             And to the extent that there will be a valuation

20    trial, we agree.  There will be a valuation trial.  I don't

21    think it's with the RSA assumption motion.  I think there's

22    some general recognition that for a number of variable

23    factors, they are out of the money.  I think we have to look

24    no further than the fact that Mr. Weisfelner's client is on

25    the unsecured creditors committee, that there's some

1    implicit acknowledgment that he has a deficiency claim, at

2    least until it's proven otherwise.

3            But I think the issues that they're raising in

4    regard to the RSA assumption motion are conversations we'll

5    have.  But to the ultimate issues that we are reporting on

6    today, we've engaged with a three -- with the official

7    committee.  We, in advance of that, we're dealing with the

8    ad hoc group and the second liens.  We have a general

9    understanding of what they're looking for, and we're not

10   sitting on our hands by any stretch of the imagination.

11           Now, as to the suggestion that there has been no

12   work done on valuation, that's not the testimony.  We can

13   all go back and look at the transcript.  Mr. Keglevic said

14   there has not been final valuation report.  There has

15   certainly been work done and I think that Mr. Ying would not

16   suggest otherwise.  He would acknowledge that he's been

17   working for a long period of time on this.

18           So, there's no question that we are moving forward

19   to a valuation trial, but that valuation trial will be with

20   confirmation and we'll coordinate and hopefully propose a

21   consensual schedule.  But all of that is far beyond what

22   we're talking about right now, which was supposed to be a

23   status report on the 2004 discovery, not a preview of

24   arguments relating to an RSA assumption motion that we

25   finally got a commitment so that we could move it last

1    night, and therefore, we reported it this morning.

2             THE COURT:  All right.

3             MR. HESSLER:  There's no game playing here.  We're

4    trying to move forward in a constructive fashion.

5             THE COURT:  Okay.

6             MR. HESSLER:  We appreciate the Court's time

7    hearing us out on this.

8             THE COURT:  Okay.  All right.  Let's do this then,

9    let's put status conference for both motions, right, no,

10   just item 4, right?  Item 5 is moot at this point, because

11   that dealt with transfer of venue motion.  All right, put it

12   on for the -- just put it at the end of the agenda for the

13   June 5/6 hearing.  If we get done early on the 5th, we can

14   deal with it then, otherwise, just put it at the end of the

15   agenda.  And the status conferences we've already dealt with

16   on the financing 6 and 7, so I think that completes the

17   agenda.

18            UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

19            THE COURT:  All right, very good.  Thank you.

20            ALL:  Thank you, Your Honor.

21            THE COURT:  We're adjourned.

22       (Whereupon these proceedings were concluded at 5:40 PM)

23

24

25                         * * * * *

1                        I N D E X

2                   E X H I B I T S

3    PARTY    NO   DESCRIPTION            ID.      EVID.

4    Joint    1    Unknown               --       156

5             2    Unknown               --       156

6             3    Unknown               --       156

7             4    Unknown               --       156

8             5    Unknown               --       156

9             6    Unknown               --       156

10            7    Unknown               --       156

11            8    Unknown               --       156

12            9    Unknown               --       156

13            10   Unknown               --       156

14            11   Unknown               --       156

15            12   List of Litigations   --       156

16            13   Unknown               --       156

17            14   Unknown               --       156

18            15   Unknown               --       156

19            16   Unknown               --       156

20            17   Declaration of Steven

21                 Kotarba               --       156

22            18   Declaration of Betty

23                 Fleshman              --       156

24            19   Document from Court

25                 Website               --       156

```
1                         I N D E X

2                     W I T N E S S E S

3    WITNESS                 BY                      PAGE

4    VIDEO DEPOSITION OF

5    STACEY DORE                                      51

6

7    PAUL KEGLEVIC          BY MR. JONAS             121

8                          BY MR. MCGAAN             144

9                          BY MR. JONAS             152

10

11                     R U L I N G S

12    DESCRIPTION                                   PAGE

13   Motion of Wilmington Savings Fund Society,      187

14   FSB Pursuant to 28 U.S.C. §§ 1408 & 1412 and

15   Rule 1014 of the Federal Rules of Bankruptcy

16   Procedure to Transfer Cases to the United States

17   District Court for the Northern District of Texas

18   [D.I. 5; filed April 29, 2014]("Venue Change Motion")

19

20   Motion to Strike                               188

21

22

23

24

25
```

```
1                  C E R T I F I C A T I O N

2

3    We, Dawn South, Jamie M. Gallagher, and Sherri L. Breach

4    certify that the foregoing transcript is a true and accurate

5    record of the proceedings.

6
```

**Dawn South**   Digitally signed by Dawn South
DN: cn=Dawn South, o=Veritext,
ou, email=digital@veritext.com,
c=US
Date: 2014.05.28 14:40:10 -04'00'

```
9    AAERT Certified Electronic Transcriber CET**D-408
```

**Jamie Gallagher**   Digitally signed by Jamie Gallagher
DN: cn=Jamie Gallagher, o=Veritext,
ou, email=digital@veritext.com, c=US
Date: 2014.05.28 14:51:28 -04'00'

**Sherri Breach**   Digitally signed by Sherri Breach
DN: cn=Sherri Breach, o=Veritext, ou,
email=digital@veritext.com, c=US
Date: 2014.05.28 14:56:39 -04'00'

```
15   SHERRI L. BREACH

16   AAERT Certified Electronic Reporter & Transcriber

17   CERT*D-397

18

19   Veritext

20   330 Old  Country Road

21   Suite 300

22   Mineola, NY 11501

23

24   Date:  May 23, 2014

25
```