## Exhibit A

## COMMITMENT LETTER

**DRAFT**

J.P. MORGAN SECURITIES LLC
383 Madison Avenue
New York, New York 10179

JPMORGAN CHASE BANK, N.A.
270 Park Avenue
New York, New York 10017

[  ], 2014

*PRIVILEGED AND CONFIDENTIAL*
*SUBJECT TO FRE 408*

Energy Future Holdings Corp.
Energy Future Intermediate Holdings Company LLC
Energy Plaza
1601 Bryan Street
Dallas, TX 75201

Commitment Letter

Ladies and Gentlemen:

You have advised JPMorgan Chase Bank, N.A. ("JPMorgan Chase Bank") and J.P. Morgan Securities LLC ("JPMorgan" and, together with JPMorgan Chase Bank, the "Commitment Parties", "us" or "we") that Energy Future Intermediate Holdings Company LLC ("EFIH"), a Delaware limited liability company and a debtor and debtor-in-possession in a case (together with the related cases of Energy Future Holdings Corp. ("EFH", together with EFIH ("you")) and of certain affiliates of EFIH, the "Chapter 11 Cases") under title 11 of the United States Code (the "Bankruptcy Code") pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), desire to a obtain a second lien subordinated secured debtor-in-possession term loan facility (the "Second Lien DIP Facility") which shall consist of (a) non-amortizing term loans in an amount up to $1,900,000,000 (the "Tranche A Term Loans") and (b) non-amortizing, non-interest-bearing term loans issued in full satisfaction of the Funding PIK Fee (as defined in the DIP Term Sheet) (the "Tranche B Term Loans" and, together with the Tranche A Term Loans, the "Second Lien Term Loans"), in accordance with and subject to the terms and conditions set forth herein, in the term sheet attached hereto as Exhibit A (the "DIP Term Sheet") and in the term sheet attached hereto as Exhibit B (the "Equity Conversion Term Sheet" and, together with this letter and the DIP Term Sheet, this "Commitment Letter").  Capitalized terms used in this Commitment Letter without definition have the meanings assigned to them in the DIP Term Sheet, including by reference to the Restructuring Support Agreement (as defined therein).

The cash proceeds of the Second Lien DIP Facility, together with other funds available to EFIH, shall be used to pay the outstanding principal of and accrued interest on (x) EFIH's 11.00% Second Lien Notes due October 1, 2021 and (y) EFIH's 11.75% Second Lien Notes due March 1, 2022 (collectively, the "EFIH Second Lien Notes") (as more particularly described in the DIP Facility Term Sheet, the "Second Lien Refinancing"), to the extent Holders of EFIH Second Lien Note Claims do not elect to exchange their EFIH Second Lien Note Claims for Tranche A Term Loans, as described in the DIP Term Sheet.  Upon the substantial consummation of a plan of reorganization in the Chapter 11 Cases, the Second Lien Term Loans shall be subject to conversion to common stock in the reorganized EFH ("Reorganized EFH") on the terms and subject to the conditions set forth in the Equity Conversion Term Sheet and the Conversion Agreement (as defined in the Equity Conversion Term Sheet).

As used herein, the term "Transactions" means, collectively, the entering into and funding of the Second Lien DIP Facility, the Second Lien Refinancing and all other related transactions, including the payment of fees and expenses in connection therewith.  The date on which the Second Lien DIP Facility becomes effective is referred to as the "Closing Date."  The provisions of this Commitment Letter (other than Sections 8, 9 and 10) shall be subject to entry of the DIP Order (as defined below).

1.  Commitments

In connection with the Transactions, JPMorgan Chase Bank is pleased to advise you of its commitment to provide 100% of the aggregate amount of the Second Lien DIP Facility, upon the terms and conditions set forth in this Commitment Letter; provided that JPMorgan Chase Bank's commitment will be reduced, dollar-for-dollar, by the aggregate amount of cash and EFIH Second Lien Notes (valued in manner set forth in the DIP Term Sheet) that are (x) delivered by Second Lien DIP Facility Rights Holders in exchange for Tranche A Term Loans pursuant to their exercise of their respective Participation Rights or (y) tendered into the EFIH Second Lien Tender Offer and in respect of which an election is made to receive Tranche A Term Loans in lieu of cash pursuant thereto (any such Second Lien DIP Facility Rights Holders, together with the Backstop Lenders, the "Lenders").  Notwithstanding anything to the contrary contained herein, in the DIP Term sheet or in the Fee Letter, neither the Commitment Parties nor the Backstop Lenders shall have any right to consent to any Second Lien DIP Facility Rights Holder's exercise of Participation Rights.

2.  Titles and Roles

It is agreed that (i) JPMorgan will act as sole lead arranger and sole bookrunner for the Second Lien DIP Facility (acting in such capacities, the "Lead Arranger") and (ii) JPMorgan Chase Bank will act as sole administrative agent for the Second Lien DIP Facility.

You agree that no other agents, co-agents, arrangers, co-arrangers, bookrunners, co-bookrunners, managers or co-managers will be appointed, no other titles will be awarded and no compensation (other than that expressly contemplated by this Commitment Letter and Fee Letter referred to below) will be paid in connection with the Second Lien DIP Facility.

3.  <u>Syndication</u>

We intend to syndicate the commitments in respect of the Second Lien DIP Facility to a group of lenders and other financial institutions (as more particularly described in the DIP Term Sheet, the "<u>Backstop Lenders</u>") in accordance with the provisions contained in the DIP Term Sheet, it being understood that such syndication shall be subject to rights of the Second Lien DIP Facility Rights Holders to exercise their Participation Rights.

4.  <u>Information</u>

You hereby represent and warrant that (a) all information (the "<u>Information</u>"), other than the Projections (as defined below) and information of a general economic or industry specific nature, that has been or will be made available to us by you or any of your representatives in connection with the transactions contemplated hereby, when taken as a whole, does not or will not, when furnished to us, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made and (b) the financial projections and other forward-looking information (the "<u>Projections</u>") that have been or will be made available to us by you or any of your representatives in connection with the transactions contemplated hereby have been or will be prepared in good faith based upon assumptions believed by you to be reasonable at the time furnished to us (it being recognized by the Commitment Parties that such Projections are not to be viewed as facts and that actual results during the period or periods covered by any such Projections may differ from the projected results, and such differences may be material). You agree that if, at any time prior to the Closing Date, you become aware that any of the representations in the preceding sentence is incorrect, in any material respect, then you will promptly supplement the Information and the Projections so that such representations are correct, in all material respects, under those circumstances. You understand that in arranging and syndicating the Second Lien DIP Facility we may use and rely on the Information and Projections without independent verification thereof.

5.  <u>Fees; Alternative Transaction</u>

As consideration for the commitments and agreements of the Commitment Parties hereunder, you agree to pay or cause to be paid the nonrefundable fees described in the DIP Term Sheet and in the Arranger Fee Letter dated the date hereof and delivered herewith (the "<u>Fee Letter</u>") on the terms and subject to the conditions set forth therein.

If EFIH enters into definitive documentation with respect to a reorganization, restructuring, merger, consolidation, share exchange, rights offering, equity investment, business combination, recapitalization or similar transaction (including the sale of all or substantially all of the assets of EFH, EFIH, or any other debtor in the Chapter 11 Cases) providing for an alternative to the Second Lien DIP Facility contemplated by this Commitment Letter, the DIP Term Sheet and the Equity Conversion Term Sheet (such transaction, an "<u>Alternative Transaction</u>"), the Debtors shall pay an amount in cash equal to 1.50% of $1,900,000,000 (the "<u>Alternative Transaction Fee</u>"), which Alternative Transaction Fee shall become due and be paid in full within 5 days Bankruptcy Court approval of such Alternative Transaction. The proceeds of the Alternative Transaction Fee shall be paid, *first*, to the Lead Arranger and the

Administrative Agent, in an amount equal to the Structuring Fee (as defined in the Fee Letter), any other fees payable under the Fee Letter and any unreimbursed fees and expenses covered by Section 7 of the Commitment Letter, and *second*, and the remainder to the Backstop Lenders pro rata based on their commitments in respect of the Second Lien DIP Facility as of the date on which such Alternative Transaction Fee is required to be paid. For the avoidance of doubt, the Alternative Transaction Fee shall not become due or be payable if EFIH consummates an Alternative Transaction because of the failure of the Commitment Parties or the Backstop Lenders to fulfill their obligations with respect to the Second Lien DIP Facility.

You agree that, once paid, the fees or any part thereof payable pursuant to this Commitment Letter shall not be refundable under any circumstances, except as otherwise agreed in writing. All fees payable pursuant to this Commitment Letter shall be paid in immediately available funds, except as expressly provided in the DIP Term Sheet with respect to the Funding PIK Fee. All fees payable hereunder shall be in addition to reimbursement of our out-of-pocket expenses as provided for herein. You agree that we may, in our sole discretion, share all or a portion of any of the fees payable pursuant to this Commitment Letter with the Backstop Lenders or any other Lenders.

6. Conditions Precedent

Each Commitment Party's commitments and agreements hereunder are subject only to (x) the execution and delivery by the parties thereto of the definitive financing documentation for the Second Lien DIP Facility (as more particularly described in the DIP Facility Term Sheet, the "DIP Documents") , and (y) the satisfaction of the conditions set forth in the DIP Term Sheet under the heading "Conditions Precedent to the Closing".

7. Indemnification and Expenses

Whether or not the transactions contemplated hereby are consummated, EFH and EFIH agree, on a joint and several basis, (a) to indemnify and hold harmless the Commitment Parties, the Backstop Lenders, their respective affiliates and their respective directors, officers, employees, advisors, agents and other representatives (each, an "indemnified person") from and against any and all losses, claims, damages, liabilities and expenses to which any such indemnified person may become subject arising out of or in connection with this Commitment Letter, the Fee Letter, the Second Lien DIP Facility, the use of the proceeds thereof , otherwise relating to the Chapter 11 Cases or the Transactions or any claim, litigation, investigation or proceeding (a "Proceeding") relating to any of the foregoing, regardless of whether any indemnified person is a party thereto, whether or not such Proceedings are brought by you, your equity holders, affiliates, creditors or any other person, and to reimburse each indemnified person upon demand for any reasonable legal or other expenses incurred in connection with investigating or defending any of the foregoing, provided that the foregoing indemnity will not, as to any indemnified person, apply to losses, claims, damages, liabilities or related expenses to the extent they are found by a final nonappealable judgment of a court of competent jurisdiction to arise from the bad faith or willful misconduct of such indemnified person or its affiliates, directors, officers, employees, advisors, agents or other representatives (collectively, the "Related Parties") and (b) regardless of whether the Closing Date occurs, to reimburse each Commitment Party, the Backstop Lenders and the indenture trustee for the EFIH Second Lien

4

Notes (the "<u>EFIH Second Lien Indenture Trustee</u>") and their respective affiliates for all reasonable and documented out-of-pocket expenses (including due diligence expenses, syndication expenses, travel expenses and the reasonable fees, charges and disbursements of counsel, financial advisors and other advisors) incurred in connection with the Second Lien DIP Facility and any related documentation (including this Commitment Letter and the DIP Documents (as defined below)) or the administration, amendment, modification or waiver thereof or otherwise relating to the Chapter 11 Cases, including without limitation, the fees and expenses of (i) Davis Polk & Wardwell LLP, (ii) Kramer Levin Naftalis & Frankel LLP (iii)Rothschild Inc. LLC, (iv) Pauchulski Stang Ziehl & Jones LLP and (v) Bryan Cave LLP. It is further agreed that each Commitment Party shall only have liability to you (as opposed to any other person). No indemnified person shall be liable for any damages arising from the use by others of Information or other materials obtained through electronic, telecommunications or other information transmission systems, except to the extent any such damages are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the bad faith or willful misconduct of such indemnified person (or any of its Related Parties). None of the indemnified persons or any of their Related Parties shall be liable for any indirect, special, punitive or consequential damages in connection with this Commitment Letter, the Fee Letter, the Second Lien DIP Facility or the transactions contemplated hereby.  Any provisions in this Commitment Letter relating to payment of the fees and expenses of the EFIH Second Lien Indenture Trustee and/or its advisors shall be in addition to, and shall not limit, any rights the EFIH Second Lien Indenture Trustee may have under the indenture governing the EFIH Second Lien Notes.

8.   <u>Sharing of Information, Absence of Fiduciary Relationship, Affiliate Activities</u>

You acknowledge that each Commitment Party (or an affiliate) is a full service securities firm and such person may from time to time effect transactions, for its own or its affiliates' account or the account of customers, and hold positions in loans, securities or options on loans or securities of you, or your affiliates. In addition, each Commitment Party and its affiliates will not use confidential information obtained from you or your affiliates or on your or their behalf by virtue of the transactions contemplated hereby in connection with the performance by such Commitment Party and its affiliates of services for other companies or persons and the Commitment Party and its affiliates will not furnish any such information to any of their other customers. You also acknowledge that the Commitment Parties and their respective affiliates have no obligation to use in connection with the transactions contemplated hereby, or to furnish to you, confidential information obtained from other companies or persons.

You further acknowledge and agree that (a) no fiduciary, advisory or agency relationship between you and the Commitment Parties is intended to be or has been created in respect of any of the transactions contemplated by this Commitment Letter, irrespective of whether the Commitment Parties have advised or are advising you on other matters, (b) the Commitment Parties, on the one hand, and you, on the other hand, have an arm's length business relationship that does not directly or indirectly give rise to, nor do you rely on, any fiduciary duty to you or your affiliates on the part of the Commitment Parties, (c) you are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated by this Commitment Letter, (d) you have been advised that the Commitment Parties are engaged in a broad range of transactions that may involve interests that differ from

your interests and that the Commitment Parties have no obligation to disclose such interests and transactions to you, (e) you have consulted your own legal, accounting, regulatory and tax advisors to the extent you have deemed appropriate, (f) each Commitment Party has been, is, and will be acting solely as a principal and, except as otherwise expressly agreed in writing by it and the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for you, any of your affiliates or any other person or entity and (g) none of the Commitment Parties has any obligation to you or your affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein or in any other express writing executed and delivered by such Commitment Party and you or any such affiliate.

9.  <u>Confidentiality</u>

This Commitment Letter is delivered to you on the understanding that neither this Commitment Letter nor the Fee Letter nor any of their terms or substance shall be disclosed by you, directly or indirectly, to any other person without our prior written consent except (a) to you and your officers, directors, employees, affiliates, members, partners, stockholders, attorneys, accountants, agents and advisors, (b) in any legal, judicial or administrative proceeding or as otherwise required by law or regulation or as requested by a governmental authority (in which case you agree, to the extent permitted by law, to inform us promptly in advance thereof and it being understood and agreed that you shall take such reasonable actions as shall be necessary to prevent the Fee Letter from becoming publicly available) and (c) upon notice to the Commitment Parties, this Commitment Letter and the existence and contents hereof (but not the Fee Letter or the contents thereof) may be disclosed in connection with any public filing requirement, including in connection with any filing seeking the DIP Order (as defined below), in connection with other filings in the Chapter 11 Cases, or as otherwise required by the Bankruptcy Court. Notwithstanding anything to the contrary in the foregoing, you shall be permitted to file the Fee Letter with the Bankruptcy Court under seal and provide an unredacted copy of the Fee Letter to (x) the Bankruptcy Court and the Office of the United States Trustee and (y) (i) the advisors to the official committee of unsecured creditors in the Chapter 11 Cases and (ii) Kramer Levin Naftalis & Frankel LLP and Rothschild Inc. LLC, in their respective capacities as advisors to certain potential Lenders, so long as, in the case of this clause (y), the disclosure to such advisors is on a confidential "professionals only" basis.

The Commitment Parties shall use all nonpublic information received by them in connection with the Transactions and the related transactions solely for the purposes of providing the services that are the subject of this Commitment Letter and shall treat confidentially all such nonpublic information; <u>provided</u>, <u>however</u>, that nothing herein shall prevent any Commitment Party from disclosing any such information (a) to rating agencies, (b) to any Lenders (including Backstop Lenders) or participants or prospective Lenders (including Backstop Lenders) or participants, and/or their respective counsel and other advisors, that agree in writing for the benefit of EFIH, to keep such information confidential on terms reasonably acceptable to EFIH (including pursuant to customary "click through" or similar electronic agreements), (c) in any legal, judicial, administrative proceeding or other compulsory process or as required by applicable law or regulations (in which case such Commitment Party shall promptly notify you, in advance, to the extent permitted by law), (d) upon the request or demand of any regulatory authority having jurisdiction over such Commitment Party or its affiliates, (e) to the employees, legal counsel, independent auditors, professionals and other experts or agents of such

Commitment Party (collectively, "Representatives") who are informed of the confidential nature of such information and are or have been advised of their obligation to keep information of this type confidential, (f) to any of its respective affiliates (provided that any such affiliate is advised of its obligation to retain such information as confidential, and such Commitment Party shall be responsible for its affiliates' compliance with this paragraph) solely in connection with the Transactions, (g) to the extent any such information becomes publicly available other than by reason of disclosure by such Commitment Party's affiliates or Representatives in breach of this Commitment Letter, (h) for purposes of establishing a "due diligence" defense and (i) to the extent that such information is received by the Commitment Parties from a third party that is not to the Commitment Parties' knowledge subject to confidentiality obligations to you; provided that the disclosure of any such information to any Lenders (including Backstop Lenders) or prospective Lenders (including Backstop Lenders) or participants or prospective participants referred to above shall be made subject to the acknowledgment and acceptance by such person that such information is being disseminated on a confidential basis in accordance with the standard syndication processes of such Commitment Party or customary market standards for dissemination of such type of information. The obligations of the Commitment Parties under this paragraph shall remain in effect until the earlier of (i) two years from the date hereof and (ii) the date the DIP Documents are entered into, at which point any confidentiality undertaking in the DIP Documents shall supersede the provisions of this paragraph.

10. Miscellaneous

    This Commitment Letter shall not be assignable by you without the prior written consent of each Commitment Party (and any purported assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto and the indemnified persons and is not intended to and does not confer any benefits upon, or create any rights in favor of, any person other than the parties hereto and the indemnified persons to the extent expressly set forth herein.  The Commitment Parties may assign their respective commitments hereunder to one or more prospective Backstop Lenders.  The Commitment Parties reserve the right to employ the services of their affiliates in providing services contemplated hereby and to allocate, in whole or in part, to their affiliates certain fees payable to the Commitment Parties in such manner as the Commitment Parties and their affiliates may agree in their sole discretion. This Commitment Letter may not be amended or waived except by an instrument in writing signed by you and each Commitment Party. This Commitment Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Commitment Letter by facsimile or electronic transmission (e.g., "pdf" or "tif") shall be effective as delivery of a manually executed counterpart hereof. This Commitment Letter and the Fee Letter are the only agreements that have been entered into among us and you with respect to the Second Lien DIP Facility and set forth the entire understanding of the parties with respect thereto. This Commitment Letter shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York.

    You and we hereby irrevocably and unconditionally submit to the exclusive jurisdiction of the Bankruptcy Court or, if such court does not have (or abstains from) jurisdiction, any state or Federal court sitting in the Borough of Manhattan in the City of New York over any suit, action or proceeding arising out of or relating to the Transactions or the other transactions

contemplated hereby, this Commitment Letter or the Fee Letter or the performance of services hereunder or thereunder. You and we agree that service of any process, summons, notice or document by registered mail addressed to you or us shall be effective service of process for any suit, action or proceeding brought in any such court. You and we hereby irrevocably and unconditionally waive any objection to the laying of venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in any inconvenient forum. You and we hereby irrevocably agree to waive trial by jury in any suit, action, proceeding, claim or counterclaim brought by or on behalf of any party related to or arising out of the Transactions, this Commitment Letter or the Fee Letter or the performance of services hereunder or thereunder.

Each of the Commitment Parties hereby notifies you that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "PATRIOT Act"), it is required to obtain, verify and record information that identifies each Borrower and each Guarantor, which information includes names, addresses, tax identification numbers and other information that will allow such Lender to identify each Borrower and each Guarantor in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act and is effective for the Commitment Parties and each Lender.

The indemnification, fee, expense, jurisdiction, syndication and confidentiality provisions contained herein and in the Fee Letter shall remain in full force and effect regardless of whether the DIP Documents shall be executed and delivered and notwithstanding the termination of this Commitment Letter or the commitments hereunder; provided that your obligations under this Commitment Letter (other than your obligations with respect to confidentiality of the Fee Letter and the contents thereof) shall automatically terminate and be superseded by the provisions of the DIP Documents upon the initial funding thereunder, and you shall automatically be released from all liability in connection therewith at such time, in each case to the extent the DIP Documents have comparable provisions with comparable coverage.

If the foregoing correctly sets forth our agreement, please indicate your acceptance of the terms of this Commitment Letter and the Fee Letter by returning to us executed counterparts of this Commitment Letter and the Fee Letter not later than 5:00 p.m., New York City time, on [ ], 2014. This offer and the commitments of the Commitment Parties hereunder will automatically terminate at such time if we have not received such executed counterparts in accordance with the preceding sentence.  This offer and the commitments of the Commitment Parties hereunder shall also automatically terminate at 12:00 noon, New York City time, on the date that is [30] calendar days from the date of this Commitment Letter if the Bankruptcy Court shall not have entered an order prior to that time, in form and substance satisfactory to the Commitment Parties, authorizing your entry into and performance under this Commitment Letter, the Fee Letter and all of the transactions contemplated hereby and thereby (the "DIP Order").  In the event that (i) the DIP Order has not been entered by July 13, 2014 or (ii) the Closing Date has not occurred by August 31, 2014, then this Commitment Letter and the commitments hereunder shall automatically terminate unless we shall, in our discretion, agree to an extension.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

We are pleased to have been given the opportunity to assist you in connection with this important financing.

Very truly yours,

JPMORGAN CHASE BANK, N.A.

By: _____
     Name:
     Title:

J.P. MORGAN SECURITIES LLC

By: _____
     Name:
     Title:

Accepted and agreed to as of the date first written above:

ENERGY FUTURE HOLDINGS CORP.

By: _____

    Name:

    Title:


ENERGY FUTURE INTERMEDIATE HOLDINGS
    COMPANY LLC

By: _____

    Name:

    Title:

EXHIBIT A TO COMMITMENT LETTER

**DRAFT**

**ENERGY FUTURE HOLDINGS CORP.**
**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC**

**SECOND LIEN SUBORDINATED**
**SECURED DEBTOR IN POSSESSION CREDIT FACILITY TERM SHEET**

*Capitalized terms used but not defined in this term sheet (this "DIP Term Sheet") shall have the meanings set forth in the letter agreement, dated as of [], 2014 (including the exhibits, annexes and schedules thereto, the "Commitment Letter"), to which this DIP Term Sheet is attached. Terms not defined herein or in the Commitment Letter shall have the meanings set forth in the Restructuring Support Agreement.[1]*

| | |
|---|---|
| Borrowers | Energy Future Intermediate Holding Company LLC, a Delaware limited liability company ("EFIH"), and EFIH Finance Inc., a Delaware corporation (collectively, the "Borrowers"). |
| Guarantors | All of the Borrowers' direct and indirect domestic restricted subsidiaries that guarantee the EFIH First Lien DIP Financing (collectively, the "Guarantors") in the Chapter 11 Cases. The Borrowers and the Guarantors are referred to herein as "Credit Parties" and each, a "Credit Party." All obligations of the Borrowers under the Second Lien DIP Facility (as defined below) will be unconditionally guaranteed by the Guarantors. |
| Backstop Lenders | A syndicate of banks, financial institutions and other entities arranged by the Lead Arranger (the "Backstop Lenders") that, subject to the Participation Rights described below, committed (such commitments the "Backstop Commitments") to fund the Tranche A Term Loans in an aggregate amount of $1.9 billion ($1,900,000,000) to the extent not funded by the exercise of Participation Rights. |
| Participation Rights | The Borrowers shall provide all Holders of EFIH Second Lien Note Claims (such persons, the "Second Lien DIP Facility Rights Holders") the right (such rights, the "Participation Rights") to commit to provide (on a pro rata basis based on their holdings of the EFIH Second Lien Note Claims) Tranche A Term Loans (as defined below), and shall receive their pro rata share (based on their holdings of the EFIH Second Lien Note Claims) of the |

---

[1] The "Restructuring Support Agreement" refers to the Restructuring Support and Lock-Up Agreement, dated as of April 28, 2014, as amended by the amendments thereto dated May 7, 2014 and May 16, 2014, among EFH, EFIH and certain of their affiliates, and the other parties thereto, as in effect as of the date hereof..

Participation Rights (the Holders of EFIH Second Lien Note Claims exercising such Participation Rights, together with the Backstop Lenders and the Commitment Parties, to the extent the Commitment Parties hold Second Lien Term Loans, the "Lenders").  Any such commitments provided pursuant to the exercise of Participation Rights shall reduce the commitments of the Backstop Lenders on a pro rata basis.  To the extent that the Second Lien DIP Facility Rights Holders do not commit to provide such Tranche A Term Loans by exercising their Participation Rights, the Backstop Lenders shall provide such Tranche A Term Loans on a pro rata basis, such that the aggregate amount of the commitments of the Backstop Lenders and the Second Lien DIP Facility Rights Holders shall be equal to $1,900,000,000.

Certain Funding Mechanics

Holders of EFIH Second Lien Note Claims (including, for the avoidance of doubt, Backstop Lenders that are Holders of EFIH Second Lien Note Claims) may fund the exercise of their commitments in respect of the Second Lien DIP Facility (whether those commitments are in their capacity as Backstop Lenders or pursuant to the exercise of Participation Rights):

(i)      in cash;

(ii)     by the delivery of EFIH Second Lien Notes (including by tendering into the EFIH Second Lien Tender Offer[2] and electing to receive Tranche A Term Loans (as defined below) in lieu of cash pursuant thereto);[3] or

(iii)    by a combination of cash and the delivery of EFIH Second Lien Notes;

in each case pursuant to procedures to be agreed (and subject to all applicable requirements of law).

If a holder of Second Lien Note Claims elects to deliver EFIH Second Lien Notes as described in the preceding clause (ii) (such notes, "Delivered Notes"), such Delivered Notes shall be valued either (i) at an amount equal to the principal amount thereof, plus accrued and

---

[2] "EFIH Second Lien Tender Offer" means the offer for EFIH Second Lien Notes as described in the Offer Memorandum (as amended) filed with the Bankruptcy Court.

[3] It is expected that Holders of EFIH Second Lien Notes will fund at least 21.9% of the Tranche A Term Loans through delivery or tender of EFIH Second Lien Notes.

unpaid interest on such principal at the contract non-default rate through the date of funding of the Second Lien DIP Facility or (ii) if such Delivered Notes have been tendered into the EFIH Second Lien Tender Offer, at an amount equal to the amount of cash which the holder thereof would be entitled to in respect of such Delivered Notes pursuant to the EFIH Second Lien Tender Offer.

Notwithstanding the delivery by a holder of EFIH Second Lien Note Claims of EFIH Second Lien Notes, provision shall be made so that any holder who elects to deliver such notes other than by tendering pursuant to the EFIH Second Lien Tender Offer retains all rights to the EFIH Second Lien Makewhole Claim, Additional Interest, interest on interest and any other residual rights in respect of the EFIH Second Lien Notes that are so delivered (the "Retained Claims").

By its execution of the Commitment Letter, the Borrowers agree to accept, in lieu of any cash funding otherwise required, Delivered Notes on the basis set forth above, and agrees to enter into any definitive documentation reasonably requested by the Commitment Parties necessary to effectuate the foregoing.

If the sum of the principal amount of the Tranche A Term Loans acquired upon exercise of the Participation Rights would exceed $1.9 billion, appropriate arrangements shall be made for the pro rata reduction of the principal amount of the Tranche A Term Loans to be acquired by the Holders of EFIH Second Lien Note Claims exercising Participation Rights, such that the total principal amount of Tranche A Term Loans shall equal $1.9 billion, and for the pro rata return of the consideration delivered upon exercise of the Participation Rights to the extent exceeding $1.9 billion.

For the avoidance of doubt, to the extent that the cash proceeds of the Second Lien DIP Facility are insufficient to repay in full all principal and accrued interest (excluding Retained Claims) on all EFIH Second Lien Notes that are not Delivered Notes, such deficiency shall be funded by the Borrowers substantially concurrently with the Closing so as to ensure repayment in full of all principal and accrued

interest on all EFIH Second Lien Notes (other than any Retained Claims).

For the avoidance of doubt, nothing herein shall limit the obligations of the Borrowers in respect of the EFIH Second Lien Note Claims to the extent otherwise due and owing, as determined in the Chapter 11 Cases.

| | |
|---|---|
| <u>Lead Arranger</u> | J.P. Morgan Securities LLC |
| <u>Administrative Agent</u> | JPMorgan Chase Bank, N.A. ("<u>JPMorgan Chase Bank</u>") |
| <u>Collateral Agent</u> | JPMorgan Chase Bank |
| <u>Second Lien DIP Facility</u> | A second lien subordinated secured debtor-in-possession term loan facility that consists of (a) non-amortizing term loans held by the Lenders), which will be available to be drawn in a single drawing on the Closing in an amount up to $1,900,000,000 to consummate the  Second Lien Refinancing (the "<u>Tranche A Term Loans</u>") and (b) non-amortizing, non-interest-bearing term loans issued in full satisfaction of the Funding PIK Fee (the "<u>Tranche B Term Loans</u>", and, together with the Tranche A Term Loans, the "<u>Second Lien Term Loans</u>"). |
| <u>Incremental Second Lien DIP Facility</u> | The Borrowers shall be entitled, subject to satisfaction of customary conditions, on a single occasion in an aggregate principal amount not less than an amount to be agreed, to incur additional term loans (the "<u>Additional Term Loans</u>") under the Second Lien DIP Facility in an aggregate principal amount of up to $300,000,000 to fund payment of other claims related to the EFIH Second Lien Notes.  Any such Additional Term Loans shall have the same guarantees as, and be secured on a *pari passu* basis by the same collateral securing, other loans under the Second Lien DIP Facility; *provided*, that the Additional Term Loans shall have the same terms and conditions as those applicable to the Tranche A Term Loans (*provided*, that any fees payable with respect thereto shall be as agreed between the Borrowers and the providers of such Additional Term Loans, subject to approval by the Bankruptcy Court).  If the Borrowers determine to seek commitments in respect of Additional Term Loans, they shall first offer the opportunity to participate in the loans to the Backstop Lenders, pro rata in accordance with their respective Backstop Commitments.  To the extent that the Backstop Lenders do not elect to participate in the |

Additional Term Loans, such participation may be offered, subject to the Administrative Agent's consent (not to be unreasonably withheld or delayed), to additional banks, financial institutions and other institutional lenders who will become Lenders in connection therewith. For the avoidance of doubt, the rights of the Backstop Lenders under this paragraph shall not be modified without the consent of the Required Backstop Lenders.

The incurrence of Additional Term Loans shall not be permitted if, in the reasonable business judgment of the Borrowers and their legal and tax advisors, in consultation with the Administrative Agent, such incurrence would adversely (a) affect or delay the Debtors' ability to obtain the Private Letter Ruling or violate the terms and conditions of the Private Letter Ruling or (b) affect or delay the Debtors' ability to obtain the regulatory consents or approval necessary to effectuate the Restructuring.[4]

|  |  |
|---|---|
| Second Lien DIP Procedures | The Borrowers shall offer Participation Rights to Second Lien DIP Facility Rights Holders in respect of the Second Lien DIP Facility on terms and conditions which are consistent with this DIP Term Sheet and otherwise satisfactory to JPMorgan Chase Bank, the Required Backstop Lenders (as defined below), EFH and EFIH (the "Second Lien DIP Procedures") in advance of the consummation of the Second Lien DIP Facility.

The record date that shall determine the parties entitled to Participation Rights shall be the date of the commencement of the offering to Second Lien DIP Facility Rights Holders, which shall be as soon as practicable following approval by the Bankruptcy Court of the Second Lien DIP Facility consistent with DIP Term Sheet. |
| Second Lien DIP Facility Termination Date | All Second Lien Term Loans shall become due and payable on the DIP Facility Termination Date (as defined below), |

---

[4] "Restructuring" means the restructuring of the existing liabilities of EFH and EFIH in accordance with the Chapter 11 of the United States Bankruptcy Code contemplated by the Restructuring Support Agreement (as defined in the DIP Term Sheet) and the term sheets and other documents attached thereto, except that (i) the term sheet attached as Exhibit H to the Restructuring Support Agreement (Second Lien DIP Notes Term Sheet) shall be replaced with this DIP Term Sheet; (ii) the term sheet attached as Exhibit J to the Restructuring Support Agreement (Equity Conversion Term Sheet) shall be replaced with Exhibit B to the Commitment Letter; and (iii) there shall be made such other changes and modifications as shall be necessary or appropriate to conform to the Commitment Letter.

subject to the Equity Conversion.

The "DIP Facility Termination Date" shall be the earliest of (a) the Scheduled Termination Date (as defined below), (b) the consummation of any Section 363 sale, (c) the effective date of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court or (d) the acceleration of the loans and the termination of the commitment with respect to the Second Lien DIP Facility in accordance with the DIP Documents (as defined below).

"Scheduled Termination Date" means the date that is 24 months from the date the Tranche A Term Loans and Tranche B Term Loans are funded.

Equity Conversion

Upon the Effective Date,[5] the Second Lien Term Loans shall be subject to conversion to Reorganized EFH Common Stock (as defined in the Equity Conversion Term Sheet), on the terms set forth in the Equity Conversion Term Sheet, and the Conversion Agreement (as defined in the Equity Conversion Term Sheet).

If the Equity Conversion does not occur, the Tranche B Term Loans shall convert to Tranche A Term Loans.

Use of Proceeds

Proceeds of the Second Lien DIP Facility will be used (together with cash on hand and proceeds of the EFIH First Lien DIP Financing) to (i) repay all outstanding principal plus accrued and unpaid interest at the non-default rate due and owing under the EFIH Second Lien Notes (other than Retained Claims) to Non-Settling EFIH Second Lien Note Holders and (ii) repay the EFIH Second Lien Notes held by Settling EFIH Second Lien Note Holders in accordance with the EFIH Second Lien Settlement (clauses (i) and (ii) collectively, the "Second Lien Refinancing").

DIP Documents

The Second Lien DIP Facility will be documented by a credit agreement (the "Credit Agreement") and other guarantee, security, intercreditor, and other relevant documentation (together with the Credit Agreement, collectively, the "DIP Documents") reflecting

---

[5] "Effective Date" refers to the effective date of the plan of reorganization (the "Plan" of EFIH and EFH under Chapter 11 of the United States Bankruptcy Code, providing for the "Restructuring").

the terms and provisions set forth in this DIP Term Sheet and otherwise in form and substance reasonably satisfactory to the Lead Arranger, the Required Backstop Lenders and the Borrowers; *provided, however*, that such DIP Documents will be drafted in form and substance consistent with the documents governing the EFIH First Lien DIP Financing in the form in which such documents are publicly available as of the date of the Commitment Letter (the "<u>First Lien DIP Documents</u>"), with adjustments made to reflect the Commitment Letter, including this DIP Term Sheet; *provided further* that the DIP Documents shall be consistent with the Commitment Letter, and in the event of any inconsistency between the Commitment Letter and the First Lien DIP Documents, the Commitment Letter (including this DIP Term Sheet) shall govern.  It is agreed that each "basket" or "cushion" set forth in the covenants and events of default contained in the DIP Documents shall be at least 15% more than the corresponding provision in the First Lien DIP Documents.

<u>Transferability of Participation Rights</u>

Subject to compliance with applicable laws, unless otherwise agreed by the Borrowers, the Participation Rights will only be transferable to affiliates of Second Lien DIP Facility Rights Holders and the Backstop Lenders; *provided, however*, the Participation Rights may not be transferred, and any such transfer shall be null and void *ab initio* if, assuming the Restructuring were to be consummated immediately upon such Transfer, the transferee and/or its affiliates of such transfer were to obtain or have beneficial ownership of, in the aggregate, fifty percent (50%) or more of the Reorganized EFH Common Stock.

For the avoidance of doubt, any transferee of the Participation Rights described above shall execute a joinder to the Conversion Agreement as a precondition to any transfer described above becoming effective.

<u>Transferability of Second Lien Term Loans</u>

Subject to compliance with all applicable laws, unless otherwise agreed by the Borrowers, the Second Lien Term Loans shall only be transferable to (i) affiliates of a Lender, (ii) other Lenders and their respective affiliates, and (iii) such other financial institutions that are Eligible Assignees (to be defined in a customary manner), *provided, however*, that such transfers of Second Lien Term Loans are not permitted if, in the reasonable business judgment of the Borrowers and their legal and tax advisors, in consultation

with the Administrative Agent, such transfers would adversely (a) affect or delay the Debtors' ability to obtain the Private Letter Ruling or violate the terms and conditions of the Private Letter Ruling or (b) affect or delay the Debtors' ability to obtain the regulatory consents or approval necessary to effectuate the Restructuring, *provided, further*, that, any transfer described above shall be null and void *ab initio*, if, assuming the Restructuring were to be consummated immediately upon such Transfer, the transferee of such transfer (other than affiliates transfers) was to obtain beneficial ownership of, in the aggregate, more than fifty percent (50%) or more of the Reorganized EFH Common Stock.

Interest Rates      The Tranche A Term Loans will bear interest at a fixed rate of 7% per annum, payable in cash on the final business day of each quarter beginning on the first such day after the Closing.

Default Interest      During the continuance of an event of default (as defined in the DIP Documents), overdue amounts on the Second Lien Term Loans will bear interest at an additional 2% per annum.

Funding Fees      Funding Cash Fee. The Borrowers shall pay to the Backstop Lenders a funding cash fee (the "Funding Cash Fee") in an amount equal to 1.00% of $1.9 billion.  The Funding Cash Fee will be for committing to provide the Second Lien Term Loans and shall be earned and due and payable in cash on the Closing Date simultaneously with the funding of the Second Lien DIP Facility.

Funding PIK Fee. The Borrowers shall pay to the Backstop Lenders a funding PIK fee (the "Funding PIK Fee") in an amount equal to 4.00% of $1.9 billion, paid in the form of Tranche B Term Loans on the Closing Date having an aggregate principal amount equal to the amount of the Funding PIK Fee.  The Funding PIK Fee will be for committing to provide the Second Lien Term Loans, shall be earned and due and payable on the Closing Date simultaneously with the funding of the Second Lien DIP Facility.

The Funding Cash Fee and the Funding PIK Fee shall be allocated among the Backstop Lenders pro rata in

accordance with their respective Backstop Commitments.

Prepayment Fee

If the Second Lien DIP Facility is repaid in cash prior to the Scheduled Termination Date other than by the Equity Conversion, the Borrowers shall pay a prepayment fee of 10% of the aggregate principal amount of the Second Lien DIP Facility (excluding the Tranche B Term Loans), allocated pro rata among the Lenders (excluding the Tranche B Term Loans) (which payment may be waived upon the written consent of the Required Lenders (as defined below) in their sole discretion.

Optional Prepayment

The Borrowers may prepay the Second Lien Term Loans (in whole and not in part) subject to customary notice periods and payment of breakage costs and the Prepayment Fee (which payment may be waived upon the written consent of the Required Lenders in their sole discretion).

Mandatory Prepayments

The DIP Documents will contain mandatory prepayment provisions found in the EFIH First Lien DIP Financing (subject to the principles set forth in "DIP Documents" above); provided that, (a) notwithstanding anything to the contrary herein, the Second Lien Term Loans shall not be mandatorily prepaid unless the EFIH First Lien DIP Financing is mandatorily prepaid first and in full and (b) application of mandatory prepayment amounts shall be subject to the provisions of the Intercreditor Agreement.

Security and Priority

All amounts owing by the Borrowers under the Second Lien DIP Facility and the obligations of the Guarantors in respect thereof will be secured, subject to (i) the Carve-Out (as defined in the First Lien DIP Documents), (ii) the liens granted to secure the EFIH First Lien DIP Financing and other liens and encumbrances permitted by the DIP Documents, (iii) liens securing the EFIH Second Lien Note Claims, including the Retained Claims and claims for fees and expenses of the indenture trustee for the EFIH Second Lien Notes (the "EFIH Second Lien Note Related Claims") and (iv) all other valid, perfected, enforceable and unavoidable liens as of the Closing (the "Permitted Liens"), by a second priority perfected security interest in all assets owned by the Credit Parties that secure the EFIH First Lien DIP Financing, including, without limitation, distributions pursuant to the Oncor TSA so long as the Oncor TSA Amendment is in effect (the "Collateral").

9

The liens granted under the Second Lien DIP Facility will be junior only to the (i) the Carve-Out, (ii) the liens granted to secure the EFIH First Lien DIP Financing and other liens and encumbrances permitted by the DIP Documents, (iii) liens securing the EFIH Second Lien Note Related Claims, and (iv) the Permitted Liens.

In the Chapter 11 Cases, the Lenders will be granted in the DIP Order (as defined below) a superpriority administrative claim under section 364(c)(1) of the Bankruptcy Code for the payment of the obligations under the Second Lien DIP Facility with priority above all other administrative claims, subject to (i) the Carve-Out, (ii) the liens granted under the EFIH First Lien DIP Financing, (iii) liens securing the EFIH Second Lien Note Related Claims, and (iv) Permitted Liens.

The Second Lien DIP Facility will be subject to an intercreditor agreement, which includes, among other things, customary payment block and standstill provisions (the "Intercreditor Agreement"), in form and substance reasonably acceptable to the lenders under the EFIH First Lien DIP Financing, the Borrowers, the Required Backstop Lenders and the Administrative Agent.

Conditions Precedent to the Closing

The closing date (the "Closing") under the Second Lien DIP Facility shall be subject to satisfaction (or waiver by the Administrative Agent and the Required Backstop Lenders) of the following conditions:

1. The DIP Documents (including the Conversion Agreement) shall be in form and substance consistent with the Commitment Letter and this DIP Term Sheet and otherwise reasonably satisfactory to the Administrative Agent, the Required Backstop Lenders, the Borrowers and each of their counsel.

2. The Borrowers and the Guarantors shall each be a debtor and a debtor in possession in the Chapter 11 Cases.

3. The Restructuring Support Agreement shall be in full force and effect and the Borrowers shall be in compliance with the Restructuring Support Agreement in all material respects as of the Closing, subject to such modifications as shall be

necessary or appropriate to conform to the
Commitment Letter.

4.  Substantially concurrently with the Closing, the
DIP Documents shall have been delivered, all
applicable fees and expenses shall have been paid, and
all applicable liens shall have been perfected.

5.  Substantially concurrently with the Closing,
proceeds of the EFIH First Lien DIP Financing, which
shall be on the terms consistent with the Restructuring
and the aggregate principal amount under the EFIH
First Lien DIP Financing shall not
exceed $5,400,000,000 (with such changes from the
EFIH First Lien DIP Financing Term Sheet that are
not materially adverse to the Lenders) shall have been
used (together with cash on hand) to (i) repay in full all
outstanding principal plus accrued and unpaid interest
at the non-default rate due and owing under the EFIH
First Lien Notes (which shall not include any alleged
premiums, fees or claims relating to the repayment of
such Claims) to Non-Settling EFIH First Lien Note
Holders and (ii) repay the EFIH First Lien Notes held
by Settling EFIH First Lien Noteholders in accordance
with the EFIH First Lien Settlement.

6.  Substantially concurrently with the Closing, the Second
Lien Refinancing shall have been consummated.

7.  The Administrative Agent shall have received a signed
copy of an order of the Bankruptcy Court in form and
substance satisfactory to the Administrative Agent, the
Required Backstop Lenders and the Borrowers (the
"DIP Order"), *inter alia*, authorizing and approving the
issuance of the Second Lien Term Loans, the granting
of the superpriority claims and liens and other liens
referred to above under the heading "Security and
Priority" and the payment of all fees and expenses of
the Commitment Parties, the Lenders and the indenture
trustee for the EFIH Second Lien Notes under the DIP
Documents and under the Commitment Letter
(including this DIP Term Sheet) and the Fee
Letter, which DIP Order shall have been entered by the
Bankruptcy Court, not have been vacated, reversed,
modified, amended or stayed, in a manner adverse to
the Lenders, without the consent of the Administrative

Agent and the Required Backstop Lenders.

8.   The Borrowers shall have complied in all material respects with the terms and conditions of the Second Lien DIP Procedures, and the Participation Rights shall have been allocated in accordance with the Second Lien DIP Procedures.

9.   No default (or any event which with the giving of notice or lapse of time or both would be a default) under the EFIH First Lien DIP Financing shall be then existing, after giving effect to applicable grace periods or waivers, which would permit the counterparty thereto to exercise remedies thereunder on a post-petition basis.

10.  The Administrative Agent shall have received a customary opinion of counsel to the Credit Parties, along with customary officer's certificates and evidence of corporate or limited liability company authority.

11.  There shall not have occurred any circumstance or conditions affecting the business, assets, operations, properties or financial condition of the Borrowers and their subsidiaries taken as a whole, that would individually or in the aggregate, materially adversely affect the ability of the Borrowers and their subsidiaries (taken as a whole) to perform their payment obligations under the DIP Documents to which they are a party, or the rights and remedies of the Administrative Agent, the Collateral Agent and the Lenders under the DIP Documents (other than, in each case, as a result of the events following commencement of a proceeding under Chapter 11 of the Bankruptcy Code and the continuation and prosecution thereof, including circumstances or conditions resulting from, or incidental to, such events, commencement, continuation and prosecution, which shall not individually or in the aggregate constitute a Material Adverse Event), and *provided* that nothing disclosed in any of the following filings by EFIH and/or EFH (1) the Annual Report on Form 10-K for the year ended December 31, 2013, as filed on April 30, 2014, (2) any filings on Form 8-K made through the date of the Commitment Letter and/or (3) any disclosure statement related to any plan of

reorganization or liquidation of the Borrowers provided to the Commitment Parties on or prior to the date of the Commitment Letter, shall, in any case, in and of itself and based solely on facts as disclosed therein (without giving effect to any developments not disclosed therein) be a Material Adverse Event (any of the foregoing being a "Material Adverse Event").

12. Any and all governmental consents and approvals necessary in connection with the Second Lien DIP Facility shall have been obtained and shall remain in effect.

13. To the extent requested at least 5 business days prior to Closing, each Lender who has requested the same shall have received "know your customer" and similar information.

14. The Lenders shall have a valid and perfected second priority lien on and security interest in the Collateral pursuant to the DIP Order.

15. (i) There shall exist no default under the DIP Documents, (ii) the representations and warranties of the Borrowers and each Guarantor therein shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects) immediately prior to, and after giving effect to, such funding and (iii) the borrowing of the Second Lien Term Loans shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently.

16. The Debtors shall have complied in all material respects with each of the covenants and agreements on <u>Annex A</u> hereto.

17. None of the conditions, circumstances or events listed on <u>Annex B</u> hereto shall have occurred and be continuing.

<u>Representations and Warranties</u>    The DIP Documents will contain representations and warranties consistent with those found in the EFIH First Lien DIP Financing (subject to the principles set forth in "DIP Documents" above) and shall include representations

13

and warranties with respect to: valid existence, compliance with law, requisite power, due authorization, approvals, no conflict with material post-petition agreements (to the extent enforceable post-petition) or applicable law, enforceability of the DIP Documents, ownership of subsidiaries and property, material accuracy of financial statements and certain other written information provided, litigation, absence of Material Adverse Event, taxes, margin regulations, no default under the DIP Documents, inapplicability of Investment Company Act, use of proceeds, insurance, labor matters, ERISA, environmental matters, security interests, necessary rights to intellectual property and ownership of properties, DIP Order, sanctioned persons, anti-corruption laws and Patriot Act.

<u>Affirmative Covenants</u>    The DIP Documents will contain affirmative covenants consistent with those found in the EFIH First Lien DIP Financing (subject to the principles set forth in "DIP Documents" above) and shall include affirmative covenants with respect to:

A.    Preservation of corporate existence.

B.    Compliance with applicable laws (including ERISA and environmental laws).

C.    Conduct of business.

D.    Payment of taxes.

E.    Maintenance of insurance.

F.    Access to books and records and visitation rights.

G.    Maintenance of books and records.

H.     Maintenance of properties.

I.    Use of proceeds.

J.    Provision of additional collateral and mortgages.

K.    Delivery of certain reports and information.

L.    Transactions with affiliates.

14

M.    Certain bankruptcy matters.

N.    Limitations on changes to fiscal year.

O.    Further assurances.

<u>Negative Covenants</u>    The DIP Documents will contain negative covenants consistent with those found in the EFIH First Lien DIP Financing (subject to the principles set forth in "DIP Documents" above), which include negative covenants with respect to:

A.    Limitations on debt and guarantees.

B.    Limitations on liens.

C.    Limitations on loans and investments.

D.    Limitations on asset dispositions, including, without limitation, the issuance and sale of capital stock of subsidiaries; *provided that*, no sales, dispositions, or other transfers of equity interests in Oncor Electric Delivery Holdings Company LLC shall be permitted.

E.    Limitations on dividends, redemptions and repurchases with respect to capital stock.

F.    Limitations on cancellation of debt and on prepayments, redemptions and repurchases of pre-petition debt, except as expressly provided for in the DIP Documents or pursuant to "first day" or other orders entered by the Bankruptcy Court.

G.    Limitations on fundamental changes.

H.    Limitations on material changes in business.

I.    Limitation on certain affiliate value transfers.

J.    Limitations on sale/leasebacks.

K.    Limitations on amendment of constituent documents except for modifications that could not reasonably be expected to materially and adversely affect the interests of the Lenders.

L.   Limitation on amending, modifying, or
terminating the Oncor TSA Amendment, to the extent
such agreement is effective without consent of
the Required Lenders.

M.   Certain other bankruptcy matters.

Financial Covenants

The DIP Documents will contain financial covenants
consistent with those found in the EFIH First Lien DIP
Financing (subject to the principles set forth in "DIP
Documents" above), subject to a 15% cushion.

Reporting Requirements

The DIP Documents will contain reporting requirements
consistent with those found in the EFIH First Lien DIP
Financing (subject to the principles set forth in "DIP
Documents" above).

Events of Default

The DIP Documents will contain events of
default consistent with those found in the EFIH First Lien
DIP Financing (subject to the principles set forth in "DIP
Documents" above) (which will be applicable to the
Borrowers, the Guarantors, and their respective restricted
subsidiaries), which (subject, where appropriate, to grace
periods and exceptions consistent with those in the EFIH
First Lien DIP Financing and to the principles set forth in
"DIP Documents" above) shall include events of default
with respect to:

A.   Failure to pay principal, interest or any other amount
when due.

B.   Representations and warranties incorrect in
any material respect when given.

C.   Failure to comply with covenants (with grace period
as appropriate).

D.   Cross-acceleration against post-petition indebtedness
in excess of an amount to be mutually agreed upon.

E.   Failure to satisfy or stay execution of
final postpetition judgments in excess of an amount
to be mutually agreed upon.

F.   The occurrence of certain ERISA events that result in
a Material Adverse Event.

16

G.    Actual or asserted (by any Credit Party or any affiliate thereof) invalidity or impairment of any DIP Document (including the failure of any lien to remain perfected).

H.    Change of ownership or control.

I.    (a) The entry of an order dismissing any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code,

(b)    the entry of an order appointing a chapter 11 trustee in any of the Chapter 11 Cases;

(c)    the entry of an order staying, reversing, vacating or otherwise modifying, in each case in a manner materially adverse to the Administrative Agent or the Lenders, without the prior consent of the Administrative Agent and the Required Lenders, the Second Lien DIP Facility or the DIP Order;

(d)    the entry of an order in any of the Chapter 11 Cases appointing an examiner having expanded powers (beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code);

(e)    the entry of an order in any of the Chapter 11 Cases denying or terminating use of cash collateral by the Borrowers and such order has not be stayed or superseded by an order granting use of cash collateral;

(f)    the filing of any pleading by any Debtor seeking, or otherwise consenting to, any of the matters set forth in clauses (a) through (e) above;

(g)    the entry of a final non-appealable order in the Chapter 11 Cases charging any of the Collateral under section 506(c) of the Bankruptcy Code against the Lenders or the commencement of other actions that is materially adverse to the Administrative Agent, the Lenders or their respective rights and remedies under the Second Lien DIP Facility in any of the Chapter 11 Cases or inconsistent with the DIP Documents;

(h)    the entry of an order granting relief from any stay of proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed against any material assets of the Credit Parties in excess of an amount to be mutually agreed upon in the aggregate;

(i)    existence of any claims or charges, other than in respect of the Carve-Out, the EFIH First Lien DIP Financing, the EFIH Second Lien Note Related Claims, the Second Lien DIP Facility, the Permitted Liens or as otherwise permitted under the DIP Documents, entitled to superpriority under Section 364(c)(1) of the Bankruptcy Code *pari passu* or senior to the Second Lien DIP Facility;

(j)    the Debtors or any of their subsidiaries, or any person claiming by or through the Debtors any of their subsidiaries, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against the Administrative Agent or any of the Lenders relating to the Second Lien DIP Facility; and

(k)    a plan shall be filed or confirmed in any of the Chapter 11 Cases that does not provide for either (i) the indefeasible payment in full in cash of the obligations (other than indemnities and other contingent obligations not then due and payable) on the effective date of such plan, as provided in this DIP Term Sheet, or (ii) conversion to Conversion Shares on terms pursuant to the Equity Conversion.

Expenses and Indemnification

The Borrowers will indemnify the Administrative Agent, the Lenders, their respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons and members of each of the foregoing (each, an "Indemnified Person") and hold them harmless from and against all costs, expenses (in the case of legal counsel, limited to reasonable and documented fees, disbursements and other charges) and liabilities of such Indemnified Person arising out of or relating to any claim or any litigation or other proceeding (regardless of whether such Indemnified Person is a party thereto and regardless of whether such matter is initiated by a third party or by the Borrowers or any of

its affiliates) that relates to the Second Lien DIP Facility or the transactions contemplated thereby; *provided* that no Indemnified Person will be indemnified for any cost, expense or liability to the extent determined in the final, non-appealable judgment of a court of competent jurisdiction to have resulted from its or its related parties' gross negligence, willful misconduct or bad-faith.

The Borrowers shall reimburse the Lead Arranger and the Administrative Agent for their reasonable and documented out-of-pocket expenses (including the legal expenses of Davis Polk & Wardwell LLP) incurred in connection with the negotiation, documentation, syndication and administration of the Second Lien DIP Facility, any amendments or waivers with respect thereto, any Event of Default in respect of the Second Lien DIP Facility and any exercise of remedies in respect thereof (including reasonable and documented out-of-pocket fees, charges and disbursements of legal counsel, financial advisors and third-party appraisers and consultants advising the Administrative Agent incurred in connection with the Agent's participation in the Chapter 11 Cases, limited in the case of legal counsel to one primary counsel (and (i) appropriate local counsel in applicable foreign and local jurisdictions, but limited to one local counsel in each such jurisdiction, (ii) appropriate regulatory counsel and (iii) solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to the affected indemnified persons similarly situated).

The Borrowers shall also reimburse the reasonable and documented out-of-pocket expenses of (i) Kramer Levin Naftalis & Frankel LLP, (ii) Pachulski Stang Ziehl & Jones LLP, (iii) Bryan Cave LLP, (iv) Rothschild Inc. and (v) such other advisors retained by the indenture trustee for the EFIH Second Lien Notes, including any regulatory counsel, during these cases (collectively, the "<u>Second Lien Notes Professionals</u>") incurred in connection with the negotiation, documentation, syndication and administration of the Second Lien DIP Facility, any amendments or waivers with respect thereto, any Event of Default in respect of the Second Lien DIP Facility and any exercise of remedies in respect thereof (including reasonable and documented out-of-pocket prepetition and post-petition fees, charges and disbursements of Second Lien Notes Professionals incurred in connection with their

participation in the Chapter 11 Cases).  The foregoing shall be in addition to, and shall not limit, any obligation of the Credit Parties under the indenture governing the EFIH Second Lien Notes to reimburse the fees and expenses and/or indemnify the indenture trustee for the EFIH Second Lien Notes or its advisors.

| | |
|---|---|
| <u>Required Parties</u> | "<u>Required Lenders</u>" means Lenders holding at least 50.1% of the outstanding principal amount of loans under the Second Lien DIP Facility;  *provided* that for matters affecting the amount of and circumstances under which the Prepayment Fee is to be paid, "Required Lenders" means Lenders holding at least 80% of the outstanding principal amount of loans under the Second Lien DIP Facility.<br><br>"Required Backstop Lenders" means Backstop Lenders who have made Backstop Commitments in excess of 50.1% of the total Backstop Commitments. |
| <u>Amendments</u> | All amendments to the Second Lien DIP Facility shall require the consent of the Administrative Agent and the Required Lenders, except for provisions customarily requiring approval by all directly and adversely affected Lenders or all Lenders, including the reduction of any portion of the principal amount of the Second Lien Term Loans, the reduction of the interest rate (other than as a result of a default, events of default, or default interest) or the extension of the final maturity date; *provided*, *however*, that the Required Lenders may waive the Prepayment Fee. |
| <u>Miscellaneous</u> | The DIP Documents will include (i) standard yield protection provisions (including, without limitation, provisions related to compliance with risk-based capital guidelines, increased costs and payments free and clear of withholding taxes (subject to customary qualifications)), (ii) waivers of consequential damages and jury trial, (iii) customary agency, set-off and sharing language and (iv) customary replacement of lender provisions. |
| <u>Governing Law and Submission to Non-Exclusive Jurisdiction</u> | State of New York. |
| <u>Counsel to Lead Arranger and Administrative Agent</u> | Davis Polk & Wardwell LLP. |

20

| | |
|---|---|
| Oncor TSA Amendment | The Debtors shall have the flexibility, based on their exercise of their business judgment and fiduciary duties, to seek approval of  the Oncor TSA Amendment or maintain the Oncor TSA as currently in place. |
| Reservation of Rights | Except as expressly provided in this DIP Term Sheet, the Backstop Lenders and other Lenders reserve all rights and challenges with respect to the Restructuring, including without limitation, with respect to the EFIH Second Lien Settlement, the EFIH Second Lien Note Related Claims and the Second Lien Refinancing and any other rights in respect of the EFIH Second Lien Notes.  Without limiting the foregoing, nothing in this DIP Term Sheet or in the Commitment Letter is intended to limit the rights of the indenture trustee for the EFIH Second Lien Notes. |

## ANNEXES TO THE 2ND LIEN TERM SHEET

## Annex A  to the DIP Term Sheet

From and after the date of the Commitment Letter,  the Debtors shall have complied with each of the following covenants and agreements, which derive from the indicated provisions of the Restructuring Support Agreement, in each case insofar, but only insofar, as they can reasonably be expected to materially affect, or as reasonably and materially pertaining to, the rights or obligations of the holders of the EFIH Second Lien Note Claims as prospective Lenders under the Second Lien DIP, or the benefits or value reasonably expected to accrue to them in their capacity as such (including in respect of the Equity Conversion and as holders of Conversion Shares following the Equity Conversion, whether or not disproportionate to any other holder of equity in Reorganized EFH).  Capitalized terms used herein which are not defined in the Commitment Letter (including the exhibits, annexes and schedules thereto) shall have the meanings assigned to them in the Restructuring Support Agreement with appropriate changes to such definitions to conform to the Commitment Letter.

1.    Corresponding to Section 3 of the Restructuring Support Agreement

The Debtors shall assure that the Plan Restructuring Documents shall be in form and substance reasonably satisfactory to counsel to the Administrative Agent and the Required Backstop Lenders.

2.    Corresponding to Section 4.03(b) of the Restructuring Support Agreement

If the Debtors make or receive a written proposal or expression of interest regarding an Alternative Proposal, the Debtors shall promptly notify counsel to the Administrative Agent and the Required Backstop Lenders of the receipt of any such proposal or expression of interest relating to such an Alternative Proposal, with such notice to include the material terms thereof, including (unless prohibited by a separate agreement) the identity of the person or group of persons involved.

The Debtors shall promptly furnish counsel to the Administrative Agent and the Required Backstop Lenders with copies of any written offer or other information that they make or receive relating to such an Alternative Proposal and shall keep counsel to the Administrative Agent and the Required Backstop Lenders fully informed of any material changes to such Alternative Proposal. The Debtors shall not enter into any confidentiality agreement with a party proposing such an Alternative Proposal unless such party consents to identifying and providing to counsel to the Administrative Agent and the Required Backstop Lenders (under a reasonably acceptable confidentiality agreement) the information contemplated under this clause 2.

3.    Corresponding to Section 7.01(a) of the Restructuring Support Agreement

The Debtors will use reasonable efforts to provide:

(i)    draft copies of all material motions, pleadings and other documents that the Debtors intend to file with any court or regulatory body (including, the Bankruptcy Court and the IRS) relating to the Chapter 11 Cases or the Restructuring to counsel to the Administrative Agent and the Required Backstop Lenders at least two (2) business days before the date on which Debtors intend to file any such document; and

(ii)    copies of all documents actually filed by the Debtors with any court or regulatory body (including the Bankruptcy Court and the IRS) relating to the Chapter 11 Cases or the Restructuring to counsel to the Administrative Agent and the Required Backstop Lenders

promptly but not later than two (2) business days after such motions, pleadings, and other documents are filed;

provided, however, that the Debtors will provide draft copies of all Plan Restructuring Documents to counsel to the Administrative Agent and the Required Backstop Lenders three (3) business days before the date on which the Debtors intend to file such documents.

To the extent such documents do not constitute Plan Restructuring Documents, the Debtors shall consult in good faith with counsel to the Required Backstop Lenders regarding the form and substance of those documents.

4.      Corresponding to Section 9 of the Restructuring Support Agreement

The Restructuring and the Plan may not be modified, amended or supplemented, except in a writing signed by the Required Backstop Lenders.

5.      Corresponding to Section 11.2 of the Restructuring Support Agreement

The Debtors will provide attorneys, consultants, accountants, and other authorized representatives of the Administrative Agent and the Required Backstop Lenders reasonable access, upon reasonable notice during normal business hours, to relevant properties, books, contracts, commitments, records, management personnel, lenders, and advisors of the Debtors; provided, however, that the Debtors' obligation hereunder shall be conditioned upon such representatives being party to an executed Confidentiality Agreement with the Debtors.

KL2 2847880.4
#85970091v4

**Annex B To the DIP Term Sheet**

      The Closing shall be conditioned on the absence of any of the following conditions, circumstances or events having occurred and been continuing, which derive from the indicated provisions of the Restructuring Support Agreement, in each case insofar, but only insofar, as they can reasonably be expected to materially affect, or as reasonably and materially pertaining to, the rights or obligations of the holders of the EFIH Second Lien Note Claims as prospective Lenders under the Second Lien DIP, or the benefits or value reasonably expected to accrue to them in their capacity as such (including in respect of the Equity Conversion and as holders of Conversion Shares following the Equity Conversion, whether or not disproportionate to any other holder of equity in Reorganized EFH).  Capitalized terms used herein which are not defined in the Commitment Letter (including the exhibits, annexes and schedules thereto) shall have the meanings assigned to them in the Restructuring Support Agreement with appropriate changes to such definitions to conform to the Commitment Letter.

1.    <u>Corresponding to Section 8.01 to the Restructuring Support Agreement</u>

(a)    [reserved]

(b)    [reserved]

(c)    [reserved]

(d)    [reserved]

(e)    [reserved]

(f)    [reserved]

(g)    [reserved]

(h)    The Bankruptcy Court otherwise grants relief that would have a material adverse effect on the Restructuring;

(i)    [reserved]

(j)    The IRS shall have denied the Debtors' Ruling Request or shall have informed the Debtors or their counsel, whether orally or in writing, of its decision not to issue one or more of the Required Rulings;

(k)    The breach by any Party to the Restructuring Support Agreement of any of the representations, warranties, or covenants of such breaching Party as set forth in the Restructuring Support Agreement that would have a material adverse effect on the Restructuring; <u>provided</u>, <u>however</u>, (i) that notice shall be transmitted  as provided in the Restructuring Support Agreement and, if such breach is capable of being cured, the breaching Party shall have twenty (20) business days after receiving such notice to cure any breach;

(l)    The issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any injunction, judgment, decree, charge, ruling or order enjoining, the consummation of a material portion of the Restructuring; <u>provided</u>, <u>however</u>, that the Debtors shall have ten (10) business days after issuance of such injunction, judgment, decree, charge,

ruling or order to obtain relief that would allow consummation of the Restructuring that (i) does not prevent or diminish in a material way the benefits or value of the Restructuring to the holders of the EFIH Second Lien Note Claims as prospective Lenders under the Second Lien DIP or prospective holders of Conversion Shares or (ii) is otherwise reasonably acceptable to the Administrative Agent and the Required Backstop Lenders;

(m)    An examiner (with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code), or a trustee or receiver shall have been appointed in one or more of the Chapter 11 Cases;

(n)    Any Party files any motion or pleading with the Bankruptcy Court that is not consistent in any material respect with the Restructuring, and such motion or pleading has not been withdrawn or is not otherwise denied by the Bankruptcy Court within twenty (20) business days of receipt of notice by such party that such motion or pleading is inconsistent with the Restructuring Support Agreement;

(o)    [reserved]

(p)    The entry of a ruling or order by the Bankruptcy Court or any other court with appropriate jurisdiction which, in each case, would have the effect of preventing consummation of the Restructuring; provided, however, that the Debtors shall have ten (10) business days after issuance of such ruling or order to obtain relief that would allow consummation of a material portion of the Restructuring and (i) does not prevent or diminish in a material way the benefits or value of the Restructuring to the holders of the EFIH Second Lien Note Claims as prospective Lenders under the Second Lien DIP or prospective holders of Conversion Shares, or (ii) is otherwise reasonably acceptable to the Administrative Agent and the Required Backstop Lenders;

(q)    The (i) conversion of one or more of the Chapter 11 Cases of EFH, EFIH, TCEH, EFCH or any Debtor entity obligated under the TCEH First Lien Secured Claims, TCEH Second Lien Note Claims, EFIH First Lien Note Claims, EFIH Second Lien Note Claims, EFIH Unsecured Note Claims, or EFH Unsecured Note Claims to a case under chapter 7 of the Bankruptcy Code or (ii) dismissal of one or more of the Chapter 11 Cases of EFH, EFIH, TCEH, EFCH or any Debtor entity obligated under the TCEH First Lien Secured Claims, TCEH Second Lien Note Claims, EFIH First Lien Note Claims, EFIH Second Lien Note Claims, EFIH Unsecured Note Claims, or EFH Unsecured Note Claims, unless such conversion or dismissal, as applicable, is made with the prior written consent of the Administrative Agent and the Required Backstop Lenders;

(r)    Any of the Plan Restructuring Documents shall have been modified in any material respect or withdrawn, without the prior written consent of the Administrative Agent and the Required Backstop Lenders; or

(s)    The Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any material assets of the Debtors that would have a material adverse effect on the Restructuring, without the prior written consent of the Administrative Agent and  the Required Backstop Lenders.

KL2 2847880.4
#85970091v4

## EXHIBIT B TO THE COMMITMENT LETTER

**DRAFT**

## ENERGY FUTURE HOLDINGS CORP.

<u>EQUITY CONVERSION TERM SHEET</u>

*Capitalized terms used but not defined herein shall have the meanings set forth in the letter agreement, dated as of [], 2014 (including the annexes, exhibits and schedules thereto, the "<u>Commitment Letter</u>"), to which this Equity Conversion Term Sheet is attached, including by reference to the DIP Term Sheet.*

| | |
|---|---|
| <u>Issuer</u> | Reorganized Energy Future Holdings Corp. ("<u>Reorganized EFH</u>"). |
| <u>Summary of Equity Conversion</u> | The newly issued common stock of Reorganized EFH shall consist of 100 million shares prior to the Equity Conversion and the issuance of shares under the Reorganized EFH/EFIH Management Incentive Plan (if any). In the Equity Conversion, the Second Lien DIP Term Loans shall be mandatorily converted to 163,157,895 Conversion Shares plus an additional 82,570 Conversion Shares for each million dollars of Second Lien DIP Term Loans (including Additional Term Loans, if any) in excess of $1,976 million, and less 82,570 shares of Conversion Shares for each million dollars of Second Lien DIP Term Loans of less than $1,976 million outstanding on the Effective Date, on the terms set forth herein (the "<u>Equity Conversion</u>"). |
| <u>Parties</u> | The parties entitled to participate in the Equity Conversion shall be limited to the Lenders under the Second Lien DIP Facility (the "<u>Conversion Parties</u>"). |
| <u>Conversion Agreement</u> | The parties acknowledge and agree that this Equity Conversion Term Sheet does not include all of the conditions, covenants, closing conditions, representations, warranties and other terms that would be contained in definitive documents for transactions of this type.  As such, the Required Backstop Lenders and EFH shall no later than 30 days after the date of execution of the Commitment Letter, enter into a conversion agreement (the "<u>Conversion Agreement</u>") containing the terms and conditions set forth in this Equity Conversion Term Sheet, the Commitment Letter and other customary terms and conditions for transactions of this type, and which must be consistent with the Restructuring and reasonably satisfactory to the Required Backstop Lenders and EFH, which Conversion Agreement shall be incorporated by reference into the Credit Agreement or shall be attached as an exhibit thereto. |
| <u>Organizational Documents</u> | Corporate governance for Reorganized EFH and Reorganized EFIH, including charters, bylaws, operating agreements, or other organization documents, as applicable (the "<u>Organizational Documents</u>"), shall be consistent with section 1123(a)(6) of the Bankruptcy Code (as applicable) and the Tax Matters Agreement, |

shall be determined by the Required Conversion Parties in consultation with (i) EFH, (ii) EFIH, and, (iii) as appropriate, with other Holders of EFIH Second Lien DIP Claims or EFIH Second Lien Note Claims that upon the Effective Date will receive greater than 15% of the Reorganized EFH Common Stock.

| | |
|---|---|
| <u>Registration Rights</u> | Reorganized EFH and any Conversion Parties that will constitute affiliates of Reorganized EFH under the Securities Act of 1933 after the Effective Date will enter into a registration rights agreement (the "<u>Registration Rights Agreement</u>"), which shall contain such terms and conditions reasonably satisfactory to the Required Backstop Lenders and as necessary to comply with the terms of the Private Letter Ruling and provide for registration rights, including demand, piggyback and shelf registration rights, with the number of long form demand registration rights to be determined by the Required Backstop Lenders. |
| <u>Transferability of Converted Shares</u> | The Conversion Shares will be transferable, subject to compliance with applicable securities laws (including the Securities Act of 1933, as amended) and the terms of the Private Letter Ruling. |
| <u>Representations and Warranties:</u> | The Conversion Agreement shall contain customary representations and warranties of EFH and the Commitment Parties for transactions of this type, consistent with the Second Lien DIP Facility. |
| <u>Covenants</u> | The Conversion Agreement will contain covenants and agreements of EFH and EFIH, consistent with the Restructuring, with necessary or appropriate modifications to conform to the provisions of the Commitment Letter, including the covenants and agreements on <u>Annex A</u> to this Equity Conversion Term Sheet. |
| <u>Conditions Precedent to Closing</u> | The Equity Conversion will be conditioned upon satisfaction of terms and conditions in the Conversion Agreement, as provided by, consistent with, the Restructuring, including, without limitation, the following: |

- The Restructuring Support Agreement shall be in full force and effect (subject to such modifications as shall be necessary to conform to the Commitment Letter) as of the closing of the Equity Conversion and shall not have been amended or modified without the prior consent of the Required Conversion Parties;

- The Bankruptcy Court shall have entered an order approving the Disclosure Statement and the other solicitation materials in respect of the Plan, and such order shall be in full force and effect and not subject to a stay;

2

- The Bankruptcy Court shall have entered an order confirming the Plan, and such order shall be in full force and effect and not subject to a stay;

- The Registration Rights Agreement shall be in form and substance reasonably satisfactory to the Required Backstop Lenders;

- Any and all governmental and third party consents and approvals necessary in connection with the Equity Conversion and the Restructuring shall have been obtained and shall remain in effect;

- The Private Letter Ruling shall have been obtained from the IRS;

- The Plan shall have become, or simultaneously with the issuance of the new stock in Reorganized EFH, will become, effective;

- The covenants and agreements to be performed by EFH and EFIH in the Conversion Agreement shall have been performed and complied with in all material respects on the closing date of the Equity Conversion; and

- There shall not have been a continuing default (or any event which with the giving of notice or lapse of time or both would be a default) under the Second Lien DIP Facility.

| | |
|---|---|
| Termination of Equity Conversion | All of the obligations of the Commitment Parties, Conversion Parties, EFH, and EFIH shall be of no further force or effect, upon the giving of written notice of termination by the Required Conversion Parties, in the event of: |

- a termination of the Restructuring Support Agreement by any party thereto, or the Commitment Letter;

- an event of default, cancellation and/or acceleration of the Second Lien DIP Facility; or

- EFH and EFIH shall fail to perform or comply with in all material respects any covenant or agreement under the Conversion Agreement, and such failure shall continue for a period of ten (10) business days after notice by the Required Conversion Parties; or

- one or more of the conditions, circumstances or events listed on Annex B shall have occurred and be continuing, and the Required Conversion Parties shall deliver a notice of termination

3

on account thereof to EFH and EFIH.

| | |
|---|---|
| Indemnification | EFH and EFIH shall, jointly and severally, indemnify and hold harmless each Conversion Party not indemnified under the Commitment Letter, and their respective affiliates, shareholders, members, partners, and other equity holders, general partners, managers and its and their respective Representatives, agents and controlling persons (each, an "Indemnified Person") from and against any and all losses, claims, damages, liabilities, and costs and expenses that any such Indemnified Person may incur or to which any such Indemnified Person may become subject arising out of or in connection with the Plan, the Restructuring, the Equity Conversion, or any matter relating to the foregoing. |
| Amendments | Amendments to the Conversion Agreement will require the consent of the Required Backstop prior to the funding of the Second Lien DIP Facility and of the Required Conversion Parties following the funding of the Second Lien DIP Facility; provided that, amendments relating to allocation percentages, fees, or otherwise disproportionately and materially adversely affecting a Conversion Party, shall require the consent such Conversion Party. |
| Required Parties | "Required Conversion Parties" means Conversion Parties having the right to receive at least 50.1% of the Conversion Equity; provided that for matters affecting (i) the percentage of the outstanding equity of Reorganized EFH to be owned by the Conversion Parties following the Equity Conversion, or (ii) the timing of the Equity Conversion or the circumstances under which the Equity Conversion will occur, "Required Conversion Parties" means Conversion Parties having the right to receive at least 80% of the Conversion Equity.<br><br>"Required Backstop Lenders" means Backstop Lenders who have made Backstop Commitments in excess of 50.1% of the total Backstop Commitments. |

4

**ANNEXES TO THE EQUITY CONVERSION TERM SHEET**

## Annex A  to the Equity Conversion Term Sheet

The Debtors shall have comply with each of the following covenants and agreements, which derive from the indicated provisions of the Restructuring Support Agreement, in each case insofar, but only insofar, as they can reasonably be expected to materially affect, or as reasonably and materially pertaining to, the rights or obligations of the Lenders under the Second Lien DIP as prospective holders of Conversion Shares following the Equity Conversion, or the benefits or value reasonably expected to accrue to them in their capacity as such (whether or not disproportionate to any other holder of equity in Reorganized EFH).  Capitalized terms used herein which are not defined in the Commitment Letter (including the exhibits, annexes and schedules thereto) shall have the meanings assigned to them in the Restructuring Support Agreement with appropriate changes to such definitions to conform to the Commitment Letter.

1.  Corresponding to Section 3 of the Restructuring Support Agreement

The Debtors shall assure that the Plan Restructuring Documents shall be in form and substance reasonably satisfactory to counsel to the Required Conversion Parties.

2.  Corresponding to Section 4.03(b) of the Restructuring Support Agreement

If the Debtors make or receive a written proposal or expression of interest regarding an Alternative Proposal, the Debtors shall promptly notify counsel to the Required Conversion Parties of the receipt of any such proposal or expression of interest relating to such an Alternative Proposal, with such notice to include the material terms thereof, including (unless prohibited by a separate agreement) the identity of the person or group of persons involved.

The Debtors shall promptly furnish counsel to the Required Conversion Parties with copies of any written offer or other information that they make or receive relating to such an Alternative Proposal and shall keep counsel to the Required Conversion Parties fully informed of any material changes to such Alternative Proposal. The Debtors shall not enter into any confidentiality agreement with a party proposing such an Alternative Proposal unless such party consents to identifying and providing to counsel to the Required Conversion Parties (under a reasonably acceptable confidentiality agreement) the information contemplated under this clause paragraph.

3.  Corresponding to Section 7.01(a) of the Restructuring Support Agreement

The Debtors will use reasonable efforts to provide:

(i)  draft copies of all material motions, pleadings and other documents that the Debtors intend to file with any court or regulatory body (including, the Bankruptcy Court and the IRS) relating to the  Chapter 11 Cases or the Restructuring to counsel to the Required Conversion Parties at least two (2) business days before the date on which Debtors intend to file any such document; and

(ii)  copies of all documents actually filed by the Debtors with any court or regulatory body (including the Bankruptcy Court and the IRS) relating to the Chapter 11 Cases or the Restructuring to counsel to the Required Conversion Parties promptly but not later than two (2) business days after such motions, pleadings, and other documents are filed;

provided, however, that the Debtors will provide draft copies of all Plan Restructuring Documents insofar as such documents materially affect the rights or obligations of the holders of loans under the Second Lien DIP Facility, to counsel to the Required Conversion Parties three (3) business days before the date on which the Debtors intend to file such documents.

To the extent such documents do not constitute Plan Restructuring Documents, the Debtors shall consult in good faith with counsel to the Required Conversion Parties regarding the form and substance of those documents.

4.    Corresponding to Section 9 of the Restructuring Support Agreement

The Restructuring and the Plan may not be modified, amended or supplemented, except in a writing signed by the Required Conversion Parties.

5.    Corresponding to Section 11.2 of the Restructuring Support Agreement

The Debtors will provide attorneys, consultants, accountants, and other authorized representatives of the Required Conversion Parties reasonable access, upon reasonable notice during normal business hours, to relevant properties, books, contracts, commitments, records, management personnel, lenders, and advisors of the Debtors; provided, however, that the Debtors' obligation hereunder shall be conditioned upon such representatives being party to an executed Confidentiality Agreement with the Debtors.

- 2 -

## Annex B To Equity Conversion Term Sheet

The Required Conversion Parties shall have the additional rights to terminate the Commitment Letter upon the occurrence of any of the following events, which derive from the indicated provisions of the Restructuring Support Agreement, in the case of clauses (h), (i), (k), (l), (m), (n) and (o) through (s) insofar, but only insofar, as they can reasonably be expected to materially affect, or as reasonably and materially pertaining to, the rights or obligations of the Lenders under the Second Lien DIP as prospective holders of Conversion Shares following the Equity Conversion, or the benefits or value reasonably expected to accrue to them in their capacity as such (whether or not disproportionate to any other holder of equity in Reorganized EFH).  Capitalized terms used herein which are not defined in the Commitment Letter (including the exhibits, annexes and schedules thereto) shall have the meanings assigned to them in the Restructuring Support Agreement with appropriate changes to such definitions to conform to the Commitment Letter.

Corresponding to Section 8.01 to the Restructuring Support Agreement

(a)      [reserved]

(b)      [reserved]

(c)      [reserved]

(d)      [reserved]

(e)      The Bankruptcy Court shall not have entered the Disclosure Statement Order on or before the date that is one-hundred and five (105) days from the Petition Date;

(f)      the Bankruptcy Court shall not have entered the Confirmation Order on or before the date that is two-hundred and seventy-five (275) days from the Petition Date;

(g)      the IRS shall not have issued a Private Letter Ruling acceptable to the Required Consenting Creditors on or prior to the Extended Outside Date;

(h)      The Bankruptcy Court otherwise grants relief that would have a material adverse effect on the Restructuring;

(i)      the Effective Date shall not have occurred on or before the date that is thirty (30) days after the date that is thirty (30) days after the date that the Bankruptcy Court enters the Confirmation Order, it being understood that if all conditions to the Effective Date other than receipt of any applicable regulatory approvals required to consummate the Plan and/or the Private Letter Ruling have been satisfied on or before such date, such date shall be automatically extended by an additional thirty (30) days;

(j)      The IRS shall have denied the Debtors' Ruling Request or shall have informed the Debtors or their counsel, whether orally or in writing, of its decision not to issue one or more of the Required Rulings;

(k)      The breach by any Party of any of the representations, warranties, or covenants of such breaching Party as set forth in the Restructuring Support Agreement that would have a material adverse effect on the Restructuring; provided, however, (i) that notice shall be transmitted  as provided in

- 3 -

the Restructuring Support Agreement and, if such breach is capable of being cured, the breaching Party shall have twenty (20) business days after receiving such notice to cure any breach;

(l)     The issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any injunction, judgment, decree, charge, ruling or order enjoining, the consummation of a material portion of the Restructuring; provided, however, that the Debtors shall have ten (10) business days after issuance of such injunction, judgment, decree, charge, ruling or order to obtain relief that would allow consummation of the Restructuring that (i) does not prevent or diminish in a material way the benefits or value of the Restructuring to the Lenders under the Second Lien DIP Facility as prospective holders of Conversion Shares or (ii) is otherwise reasonably acceptable to counsel to the Required Conversion Parties;

(m)    An examiner (with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code), or a trustee or receiver shall have been appointed in one or more of the Chapter 11 Cases;

(n)    Any Party files any motion or pleading with the Bankruptcy Court that is not consistent in any material respect with the Restructuring, and such motion or pleading has not been withdrawn or is not otherwise denied by the Bankruptcy Court within twenty (20) business days of receipt of notice by such party that such motion or pleading is inconsistent with the Restructuring Support Agreement;

(o)    [reserved]

(p)    The entry of a ruling or order by the Bankruptcy Court or any other court with appropriate jurisdiction which, in each case, would have the effect of preventing consummation of the Restructuring, insofar as they materially affect the rights or obligations of the holders of loans under the Second Lien DIP Facility; provided, however, that the Debtors shall have ten (10) business days after issuance of such ruling or order to obtain relief that would (i) allow consummation of a material portion of the Restructuring and does not prevent or diminish in a material way the benefits or value of the Restructuring to the Lenders under the Second Lien DIP as prospective holders of Conversion Shares, or (ii) is otherwise reasonably acceptable to the Required Conversion Parties;

(q)    The (i) conversion of one or more of the Chapter 11 Cases of EFH, EFIH, TCEH, EFCH or any Debtor entity obligated under the TCEH First Lien Secured Claims, TCEH Second Lien Note Claims, EFIH First Lien Note Claims, EFIH Second Lien Note Claims, EFIH Unsecured Note Claims, or EFH Unsecured Note Claims to a case under chapter 7 of the Bankruptcy Code or (ii) dismissal of one or more of the Chapter 11 Cases of EFH, EFIH, TCEH, EFCH or any Debtor entity obligated under the TCEH First Lien Secured Claims, TCEH Second Lien Note Claims, EFIH First Lien Note Claims, EFIH Second Lien Note Claims, EFIH Unsecured Note Claims, or EFH Unsecured Note Claims unless such conversion or dismissal, as applicable, is made with the prior written consent of the Required Conversion Parties;

(r)    Any of the Plan Restructuring Documents shall have been modified in any material respect or withdrawn, insofar as they materially affect the rights or obligations of the holders of loans under the Second Lien DIP Facility, without the prior written consent of the Required Conversion Parties; or

(s)    The Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any material assets of the Debtors

- 4 -

that would have a material adverse effect on the Restructuring, insofar as they materially affect the rights or obligations of the holders of loans under the Second Lien DIP Facility, without the prior written consent of the Required Conversion Parties.

KL2 2848045.4
#85975484v1