# **Exhibit D**

| | |
|---|---|
| Exhibit C | Form of Budget Notice |
| Exhibit D | [Reserved] |
| Exhibit E | [Reserved] |
| Exhibit F | Form of Security Agreement |
| Exhibit G | Form of Letter of Credit Request |
| Exhibit H | Form of Credit Party Closing Certificate |
| Exhibit I | Form of Assignment and Acceptance |
| Exhibit J-1 | Form of Promissory Note (Revolving Credit Loans) |
| Exhibit J-2 | Form of Promissory Note (Term Loans) |
| Exhibit J-3 | Form of Promissory Note (Delayed-Draw Term Loans) |
| Exhibit K | Form of Incremental Amendment |
| Exhibit L | Form of Non-U.S. Lender Certification |
| Exhibit M | Initial Budget |
| Exhibit N | Form of Interim Order |

-vi-

SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of May 5, 2014, among ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY LLC, a Delaware limited liability company and a debtor and debtor-in-possession ("**Parent Guarantor**"), TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC, a Delaware limited liability company and a debtor and debtor-in-possession ("**TCEH**" or the "**Borrower**") in a case pending under chapter 11 of the Bankruptcy Code ("**Chapter 11**"), the lending institutions from time to time parties hereto (each, a "**Lender**" and, collectively, the "**Lenders**"), CITIBANK, N.A., as Administrative Agent and Collateral Agent and CITIGROUP GLOBAL MARKETS INC., DEUTSCHE BANK SECURITIES INC., MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, MORGAN STANLEY SENIOR FUNDING, INC., BARCLAYS BANK PLC, RBC CAPITAL MARKETS and UNION BANK, N.A., as Joint Lead Arrangers and Joint Bookrunners.

**RECITALS**:

WHEREAS, capitalized terms used and not defined in the preamble and these recitals shall have the respective meanings set forth for such terms in Section 1.1 hereof;

WHEREAS, on April 29, 2014 (the "**Petition Date**"), the Borrower, Parent Guarantor and each of the other Guarantors (collectively, the "**TCEH Debtors**") filed voluntary petitions for relief under Chapter 11 in the United States Bankruptcy Court for the District of Delaware (such court, together with any other court having exclusive jurisdiction over any Case from time to time and any Federal appellate court thereof, the "**Bankruptcy Court**") and commenced cases numbered 14-10979 through 14-11048 respectively (each such case of a TCEH Debtor, a "**Case**" and, collectively, the "**Cases**"), and have continued in the possession and operation of their assets and in the management of their businesses pursuant to sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, in connection with the foregoing, the Borrower has requested that the Lenders and Letter of Credit Issuers extend credit to the Borrower in the form of (a) $1,425,000,000 in aggregate principal amount of Term Loans, (b) $1,950,000,000 in aggregate principal amount of Revolving Credit Commitments to be made available to the Borrower at any time and from time to time prior to the Revolving Credit Termination Date, (c) up to $1,100,000,000 in aggregate principal amount of Delayed-Draw Term Loan Commitments to be made available to the Borrower at any time and from time to time prior to the Delayed-Draw Termination Date, (d) $1,100,000,000 in RCT Letter of Credit Commitments for the issuance of RCT Letters of Credit to be made available to the Borrower from time to time prior to the RCT L/C Termination Date and (e) $800,000,000 in General Letter of Credit Commitments for the issuance of General Letters of Credit to be made available to the Borrower from time to time prior to the General L/C Termination Date, in each case subject to the terms and conditions set forth herein; and

WHEREAS, the Lenders and Letter of Credit Issuers are willing to make available to the Borrower such loans and facilities upon the terms and subject to the conditions set forth herein;

**AGREEMENT**:

NOW, THEREFORE, in consideration of the premises and the covenants and agreements contained herein, the parties hereto hereby agree as follows:

SECTION 1. Definitions.

1.1. Defined Terms.

(a) As used herein, the following terms shall have the meanings specified in this Section 1.1 unless the context otherwise requires:

"**ABR**" shall mean for any day a fluctuating rate per annum equal to the greatest of (a) the Federal Funds Effective Rate plus 1/2 of 1%, (b) the rate of interest in effect for such day as publicly announced from time to time by the Administrative Agent as its "prime rate" and (c) the LIBOR Rate for a one month Interest Period on such day (or if such day is not a Business Day, the immediately preceding Business Day) plus 1.00%; provided that, for the avoidance of doubt, for purposes of calculating the LIBOR Rate pursuant to clause (c), the LIBOR Rate for any day shall be based on the rate per annum determined by the Administrative Agent at approximately 11:00 a.m. (London time) on such day by reference to the ICE Benchmark Administration (or any successor organization) LIBOR Rate (the "**Relevant LIBOR Rate**") for deposits in Dollars (as published by Reuters or any other commonly available source providing quotations of the Relevant LIBOR Rate as designated by the Administrative Agent) for a period equal to one month. The "prime rate" is a rate set by the Administrative Agent based upon various factors including the Administrative Agent's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate. If the Administrative Agent is unable to ascertain the Federal Funds Effective Rate due to its inability to obtain sufficient quotations in accordance with the definition thereof, after notice is provided to the Borrower, the ABR shall be determined without regard to clause (a) above until the circumstances giving rise to such inability no longer exist. Any change in the ABR due to a change in such rate announced by the Administrative Agent or in the Federal Funds Effective Rate shall take effect at the opening of business on the day specified in the public announcement of such change or on the effective date of such change in the Federal Funds Effective Rate or the Relevant LIBOR Rate, as applicable.

"**ABR Loan**" shall mean each Loan bearing interest based on the ABR.

"**Acceptable Reinvestment Commitment**" shall mean a binding commitment of the Borrower or any Restricted Subsidiary entered into at any time prior to the end of

the Reinvestment Period to reinvest the proceeds of a Prepayment Event.

"**Acceptable Reorganization Plan**" shall mean a Reorganization Plan that ~~is in form and substance consistent in all material respects with, and as it may be amended in accordance with the terms of, the Restructuring Support Agreement and the Restructuring Term Sheet, and is in form and substance reasonably satisfactory to the Administrative Agent (provided, however, that with respect to provisions of the plan that relate to the payment of the Credit Facilities, such provisions must be in form and substance satisfactory to the Administrative Agent) and~~ provides for, among other things, the termination of the Revolving Credit Commitments and the payment in full in cash of the Obligations outstanding under the Credit Documents (other than Contingent Obligations) and, with respect to any Letter of Credit that does not become a letter of credit under the Exit Facilities, cash collateralization of such Letter of Credit, in each case, on or prior to the earlier of the Plan Effective Date or substantial consummation of such Reorganization Plan.

"**Accession Agreement**" shall mean an accession agreement substantially in the form attached to the Security Agreement as Exhibit B thereto.

-2-

"**Acquired EBITDA**" shall mean, with respect to any Acquired Entity or Business or any Converted Restricted Subsidiary (any of the foregoing, a "**Pro Forma Entity**") for any period, the amount for such period of Consolidated EBITDA of such Pro Forma Entity (determined using such definitions as if references to the Borrower and the Restricted Subsidiaries therein were to such Pro Forma Entity and its Restricted Subsidiaries), all as determined on a consolidated basis for such Pro Forma Entity in a manner not inconsistent with GAAP.

"**Acquired Entity or Business**" shall have the meaning provided in the definition of the term "Consolidated EBITDA".

"**Additional Lender**" shall mean, at any time, any Person (other than any such Person that is a Lender at such time) that agrees to provide any portion of an Incremental Term Loan, or Incremental Revolving Commitment Increase pursuant to an Incremental Amendment in accordance with Section 2.14(h).

"**Adequate Protection Payments**" shall have the meaning ascribed thereto in the Interim Cash Collateral Order.

"**Adjusted Available Delayed-Draw Term Loan Commitment**" shall mean at any time the Available Delayed-Draw Term Loan Commitment less the Available Delayed-Draw Term Loan Commitments of all Defaulting Lenders.

"**Adjusted Total Revolving Credit Commitment**" shall mean at any time the Total Revolving Credit Commitment less the aggregate Revolving Credit Commitments of all Defaulting Lenders.

"**Administrative Agent**" shall mean Citibank, N.A., as the administrative agent for the Lenders under this Agreement and the other Credit Documents, or any successor administrative agent pursuant to Section 12.

"**Administrative Agent's Office**" shall mean the Administrative Agent's address and, as appropriate, account as set forth on Schedule 13.2, or such other address or account as the Administrative Agent may from time to time notify to the Borrower and the Lenders.

"**Administrative Questionnaire**" shall have the meaning provided in Section 13.6(b)(ii)(D).

"**Advisors**" shall mean legal counsel, financial advisors and third-party appraisers and consultants advising the Agents, the Letter of Credit Issuers, the Lenders and their Related Parties in connection with their participation in the Cases, limited in the case of legal counsel to one primary counsel for the Agents (as of the Closing Date, Milbank, Tweed, Hadley & McCloy LLP) and, if necessary, one firm of regulatory counsel and/or one firm of local counsel in each appropriate jurisdiction (and, in the case of an actual or perceived conflict of interest where the Person affected by such conflict informs the Borrower of such conflict and thereafter, after receipt of the consent of the Borrower (which consent shall not be unreasonably withheld or delayed), retains its own counsel, of another firm of counsel for such affected Person).

"**Affiliate**" shall mean, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with such Person. A Person shall be deemed to control another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise. The terms "controlling" and "controlled" shall have meanings correlative thereto.

-3-

"**Affiliate Value Transfer**" shall mean any Investment made in reliance on Section 10.5(c), (g), (h), (i), (k), (l), (m), (p), (q), (t), (u), (v), (aa), (cc), (dd), (ee) or (ff) (including the issuance of Letters of Credit for the direct or indirect benefit of the Ultimate Parent and its Subsidiaries (other than the Borrower and the Restricted Subsidiaries)), any Disposition made in reliance on Section 10.4(b), (g) or (m) or any distribution made in reliance on Section 10.6(u), in each case made by the Borrower or any Restricted Subsidiary to an Affiliate thereof (other than the Borrower and the Restricted Subsidiaries), excluding payments, transfers or Dispositions to such Affiliates (including the issuance of Letters of Credit for the benefit of Ultimate Parent and its Subsidiaries) pursuant to the Shared Services Agreement or the Tax Sharing Agreement.

"**Agent Parties**" shall have the meaning provided in Section 13.17(d).

"**Agents**" shall mean the Administrative Agent, the Collateral Agent, the Co-Syndication Agents, each Joint Lead Arranger and the Co-Documentation Agents.

"**Aggregate Revolving Credit Outstandings**" shall have the meaning provided in Section 5.2(b).

"**Agreement**" shall mean this Senior Secured Superpriority Debtor-in-Possession Credit Agreement.

"**Annual Operating Forecast**" shall have the meaning provided in Section 9.1(d). For the avoidance of doubt, no Annual Operating Forecast shall constitute a cap or limitation on the amount of "Allowed Professional Fees" (as defined in the Orders) payable by the TCEH Debtors.

"**Anti-Corruption Laws**" shall have the meaning provided in Section 8.20.

"**Applicable ABR Margin**" shall mean at any date:

"**Disclosure Statement**" shall mean a ~~Disclosure Statement that is in form and substance consistent in all material respects with, and as it may be amended in accordance with the terms of, the Restructuring Support Agreement and the Restructuring Term Sheet, and is in form and substance~~ ~~reasonably satisfactory to the Administrative Agent (provided, however,~~ disclosure statement related to an Acceptable Reorganization Plan that with respect to provisions of the ~~Disclosure Statement~~ disclosure statement that relate to the payment of the Credit Facilities, such provisions must be in form and substance reasonably satisfactory to the Administrative Agent).

"**Disposed EBITDA**" shall mean, with respect to any Sold Entity or Business or any Converted Unrestricted Subsidiary for any period, the amount for such period of Consolidated EBITDA of such Sold Entity or Business or Converted Unrestricted Subsidiary (determined as if references to the Borrower and the Restricted Subsidiaries in the definition of Consolidated EBITDA were references to such Sold Entity or Business or Converted Unrestricted Subsidiary and its respective Subsidiaries), all as determined on a consolidated basis for such Sold Entity or Business or Converted Unrestricted Subsidiary, as the case may be.

"**Disposition**" shall have the meaning provided in Section 10.4.

"**Disqualified Institutions**" shall mean (a) any company engaged principally in the business of energy or power generation and/or transmission and identified in writing to the Administrative Agent by the Borrower from time to time, (b) any company whose principal business is that of an energy or power merchant and identified in writing to the Administrative Agent by the Borrower from time to time, (c) any Person identified in writing to the Administrative Agent by the Borrower on or prior to April 28, 2014 (including any such Person's affiliates that are clearly identifiable on the basis of such affiliates' names) and (d) any Defaulting Lender. The list of all Disqualified Institutions shall be made available to all Lenders by posting such list to the Platform. Upon the identification in writing by the Borrower to the Administrative Agent of any additional Disqualified Institutions pursuant to clause (a) or (b) above, the Administrative Agent shall promptly post such addition to the list to the Platform; provided that any additional Person so identified shall not be deemed a Disqualified Institution until such time as such addition to the list is posted to the Platform.

"**Disqualified Stock**" shall mean, with respect to any Person, any Stock or Stock Equivalents of such Person which, by its terms, or by the terms of any security into which it is convertible or for which it is putable or exchangeable, or upon the happening of any event, matures or is mandatorily redeemable (other than solely for Stock or Stock Equivalents that is not Disqualified Stock), other than as a result of a change of control, asset sale or similar event so long as any rights of the holders thereof upon the occurrence of such change of control, asset sale or similar event shall be subject to the prior repayment in full of the Loans and all other Obligations (other than Hedging Obligations under Secured Hedging Agreements and/or Secured Commodity Hedging Agreements, Cash Management Obligations under Secured Cash Management Agreements or Contingent Obligations and the termination of the Commitments), pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof (other than as a result of a change of control, asset sale or similar event so long as any rights of the holders thereof upon the occurrence of such change of control, asset sale or similar event shall be subject to the prior repayment in full of the Loans and all other Obligations (other than Hedging Obligations under Secured Hedging Agreements and/or Secured Commodity Hedging Agreements, Cash

-21-

Management Obligations under Secured Cash Management Agreements or Contingent Obligations and the termination of the Commitments), in whole or in part, in each case prior to the date that is ninety-one (91) days after the Latest Maturity Date; provided that if such Stock or Stock Equivalents are issued to any plan for the benefit of employees of the Borrower or any of its Subsidiaries or by any such plan to such employees, such Stock or Stock Equivalents shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Borrower (or any direct or indirect parent company thereof) or any of its Subsidiaries in order to satisfy applicable statutory or regulatory obligations; provided, further, that any Stock or Stock Equivalents held by any present or former employee, officer, director, manager or consultant, of the Borrower, any of its Subsidiaries or any of its direct or indirect parent companies or any other entity in which the Borrower or any Restricted Subsidiary has an Investment and is designated in good faith as an "affiliate" by the Board of Directors of the Borrower, in each case pursuant to any stockholders' agreement, management equity plan or stock incentive plan or any other management or employee benefit plan or agreement shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Borrower or any of its Subsidiaries.

"**dividends**" shall have the meaning provided in Section 10.6.

"**Dollars**" and "**$**" shall mean dollars in lawful currency of the United States of America.

"**Domestic Subsidiary**" shall mean each Subsidiary of the Borrower that is organized under the laws of the United States or any state thereof, or the District of Columbia.

"**Drawing**" shall have the meaning provided in Section 3.4(b).

"**EBITDA Lost as a Result of a Grid Outage**" shall mean, to the extent that any transmission or distribution lines go out of service, the revenue not actually earned by the Borrower and its Restricted Subsidiaries that would otherwise have been earned with respect to any Unit within the first 12 month period that such transmission or distribution lines were out of service had such transmission or distribution lines not been out of service during such period.

"**EBITDA Lost as a Result of a Unit Outage**" shall mean, to the extent that any Unit is out of service as a result of any unplanned outage or shut down, the revenue not actually earned by the Borrower and its Restricted Subsidiaries that would otherwise have been earned with respect to any such Unit during the first 12 month period of any such outage or shut down had such Unit not been out of service during such period.

"**EFIH**" shall mean Energy Future Intermediate Holding Company LLC, a Delaware limited liability company.

"**Employee Benefit Plan**" shall mean an employee benefit plan (as defined in Section 3(3) of ERISA), other than a Foreign Plan, that is maintained or contributed to by the Ultimate Parent, Parent Guarantor, Borrower or any Subsidiary (or, with respect to an employee benefit plan subject to Title IV of ERISA, any ERISA Affiliate).

"**Environmental CapEx**" shall mean Capital Expenditures deemed reasonably necessary by the Borrower or any Restricted Subsidiary or otherwise undertaken voluntarily by the Borrower or any Restricted Subsidiary, to comply with, or in anticipation of having to comply with, applicable Environmental Laws or Capital Expenditures otherwise undertaken voluntarily by the Borrower or any Restricted Subsidiary in connection with environmental matters.

-22-

"**Environmental Claims**" shall mean any and all actions, suits, proceedings, orders, decrees, demands, demand letters, claims, liens, notices of noncompliance,

the intercompany cash management systems with Specified Affiliates and subleases of property from any Specified Affiliate to the Borrower or any of the Restricted Subsidiaries, or as disclosed in any Budget approved by the Administrative Agent and the Joint Lead Arrangers, and

-107-

(m) transactions pursuant to permitted agreements in existence on the Closing Date and set forth on Schedule 9.9 or any amendment thereto to the extent such an amendment (together with any other amendment or supplemental agreements) is not adverse, taken as a whole, to the Lenders in any material respect.

9.10. End of Fiscal Years; Fiscal Quarters. The Borrower will, for financial reporting purposes, cause (a) each of its, and the Restricted Subsidiaries' fiscal years to end on December 31 of each year (each a "**Fiscal Year**") and (b) each of its, and the Restricted Subsidiaries', fiscal quarters to end on dates consistent with such fiscal year-end; provided, however, that the Borrower may, upon written notice to the Administrative Agent change the financial reporting convention specified above to any other financial reporting convention reasonably acceptable to the Administrative Agent, in which case the Borrower and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary in order to reflect such change in financial reporting.

9.11. Additional Guarantors and Grantors. Subject to any applicable limitations set forth in the Guarantee and the Security Documents, the Borrower will cause each direct or indirect Domestic Subsidiary of the Borrower (excluding any Excluded Subsidiary) formed or otherwise purchased or acquired after the Closing Date and each other Domestic Subsidiary of the Borrower that ceases to constitute an Excluded Subsidiary to, within 30 days from the date of such formation, acquisition or cessation, as applicable (or such longer period as the Administrative Agent may agree in its reasonable discretion), (i) become a Guarantor under the Guarantee and a grantor under the Security Agreement pursuant to (A) the Interim Order or (when applicable) the Final Order or (B) if reasonably requested by the Administrative Agent, a supplement to each of the Guarantee and the Security Agreement and (ii) if reasonably requested by the Administrative Agent, execute a joinder to the Intercompany Subordinated Note.

9.12. Pledge of Additional Stock and Evidence of Indebtedness.

(a) Subject to any applicable limitations set forth in the Security Documents, the Borrower will promptly notify the Administrative Agent in writing of any Stock or Stock Equivalents issued or otherwise purchased or acquired after the Closing Date and of any Indebtedness in excess of $10,000,000 that is owing to the Borrower or any Subsidiary Guarantor (or Person required to become a Subsidiary Guarantor pursuant to Section 9.11) incurred (individually or in a series of related transactions) after the Closing Date and, in each case, if reasonably requested by the Administrative Agent, will pledge, and, if applicable, will cause each other Subsidiary Guarantor (or Person required to become a Subsidiary Guarantor pursuant to Section 9.11), to pledge to the Collateral Agent for the benefit of the Secured Parties, (i) all such Stock and Stock Equivalents (other than any Excluded Stock and Stock Equivalents), pursuant to a Pledge Agreement or supplement thereto, and (ii) all evidences of such Indebtedness, pursuant to a Pledge Agreement or supplement thereto.

(a) The Borrower agrees that, at the reasonable request of the Administrative Agent, all Indebtedness of the Borrower and the Restricted Subsidiaries of the Borrower and that is owing to the Borrower or to any Subsidiary Guarantor (or Person required to become a Subsidiary Guarantor pursuant to Section 9.11) shall be evidenced by the Intercompany Subordinated Note.

9.13. [Reserved].

9.14. Further Assurances.

(a) Subject to the applicable limitations set forth in this Agreement and in the Security Documents, the Borrower will, and will cause each other Credit Party to, execute any and all

-108-

further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, and other documents) that may be required under any Applicable Law, or that the Collateral Agent or the Required Lenders may reasonably request, in order to grant, preserve, protect and perfect the validity and priority of the security interests created or intended to be created by the applicable Security Documents, all at the expense of Parent Guarantor, the Borrower and the other Guarantors; provided, however, that notwithstanding anything to the contrary contained in this Agreement or in any other Credit Document, but without limiting the grant of a Lien on and security interest in the Collateral pursuant to the Orders and the Security Documents, the TCEH Debtors will not be obligated to enter into any Mortgage, authorize any fixture filing, enter into any agreement providing "control" as defined in Section 9-104, 9-105, 9-106 and 9-107 of the UCC as in effect in any relevant jurisdiction) or to undertake any registration in respect of assets subject to a certificate of title.

(b) [Reserved].

(c) [Reserved].

(d) [Reserved].

(e) Notwithstanding anything herein to the contrary, if the Collateral Agent determines (taking into account the existence and effect of the Orders) in its reasonable judgment (confirmed in writing to the Borrower and the Administrative Agent) that the cost or other consequences (including adverse tax and accounting consequences) of creating or perfecting any Lien on any property is excessive in relation to the benefits afforded to the Secured Party thereby, then such property may be excluded from the Collateral for all purposes of the Credit Documents.

9.15. Bankruptcy Matters.

(a) The Borrower will deliver to the Administrative Agent and its legal counsel, at least two Business Days in advance of filing with the Bankruptcy Court, copies of all proposed First Day Orders and motions seeking approval of the First Day Orders, which shall be in form and substance reasonably satisfactory to the Administrative Agent (but in the case of the Cash Management Order, the Interim Cash Collateral Order, and the Interim Order, shall be satisfactory in form and substance to the Administrative Agent).

(b) The Borrower will deliver to the Administrative Agent, and in the case of (iii) below to its legal counsel, as soon as practicable in advance of filing with the Bankruptcy Court (i) the Final Order (which must be in form and substance satisfactory to the Administrative Agent), (ii) all other proposed material orders and pleadings related to the Credit Facilities ~~(which must be in form and substance reasonably satisfactory to the Administrative Agent)~~ and (iii) the Acceptable Reorganization Plan (or any other plan of reorganization or liquidation), the Disclosure Statement (or any other disclosure statements related to any such plan) and the Plan Restructuring Documents (as defined in the Restructuring Support Agreement) ~~and other material definitive documents with respect to the Cases (which shall be in form and substance reasonably satisfactory to the Administrative Agent~~; provided that <u>(i)</u> with respect to provisions of the Acceptable Reorganization Plan (or any other plan of reorganization) and/or the Disclosure Statement (or any other disclosure statements) that relate to the payment of the Credit Facilities, such provisions must be in form and substance <u>reasonably</u> satisfactory to the Administrative Agent)<u>, and (ii) the Borrower shall not be required to deliver any such documents to the extent that any such document is filed under seal and/or subject to confidentiality and other restrictions prohibiting disclosure to Administrative Agent, the Lenders or their counsel.</u>

(c) The Borrower shall maintain a cash management system in accordance with the Cash Management Order and the Orders each of which shall be in form and substance satisfactory to the Administrative Agent.

-109-

(d) The Borrower shall file with the Bankruptcy Court a plan of reorganization an Acceptable Plan of Reorganization and a disclosure statement Disclosure Statement relating thereto, each in form and substance reasonably satisfactory to the Administrative Agent, within 18 months after the Petition Date; provided, however, that with respect to provisions of the plan of reorganization and/or any disclosure statement that relate to payment of the Credit Facilities, such provisions must be in form and substance reasonably satisfactory to the Administrative Agent.

(e) The Borrower shall contest, if requested by the Administrative Agent, any motion seeking entry of an order, and entry of an order, that is materially adverse to the interests of the Administrative Agent or the Lenders or their respective material rights and remedies under the Credit Documents in any of the Cases;

9.16. Ratings. The Borrower shall use commercially reasonable efforts to obtain ratings from each of Moody's and S&P as soon as reasonably practicable after the Closing Date.

9.17. Use of Proceeds. Parent Guarantor and the Borrower shall not, and shall not permit any other Credit Party or any other Restricted Subsidiary to:

(a) use the proceeds of the Credit Facilities or any Letters of Credit issued hereunder for purposes other than those permitted under this Agreement and contained in the Interim Order or the Final Order, as applicable;

(b) use the proceeds of the Credit Facilities or any Letters of Credit issued hereunder for purposes that would violate the provisions of Regulation T, U or X of the Board;

(c) use the proceeds of any Revolving Credit Loan to fund any RCT L/C Collateral Account until (i) the earlier to occur of (x) the funding of the Delayed-Draw Term Loans in an amount equal to the aggregate amount of Delayed-Draw Term Loan Commitments as of the Closing Date and (y) the termination in full of the Delayed-Draw Term Loan Commitments and (ii) the funding of the Term Loans as of the Full Availability Date;

(d) use the proceeds of the Delayed-Draw Term Loans for purposes other than funding the RCT L/C Collateral Accounts; and

(e) use the proceeds of the Term Loans to fund the General L/C Collateral Accounts in an amount exceeding $800,000,000 in the aggregate.

SECTION 10. Negative Covenants.

The Borrower hereby covenants and agrees that on the Closing Date and thereafter, until all Commitments and all Letters of Credit have terminated (unless such Letters of Credit have been collateralized on terms and conditions reasonably satisfactory to the applicable Letter of Credit Issuer following the termination of the Revolving Credit Commitments) and the Loans and Unpaid Drawings, together with interest, fees and all other Obligations (other than Hedging Obligations under Secured Hedging Agreements and/or Secured Commodity Hedging Agreements, Cash Management Obligations under Secured Cash Management Agreement or Contingent Obligations) are paid in full:

10.1. Limitation on Indebtedness. The Borrower will not, and will not permit the Restricted Subsidiaries to, create, incur, assume or suffer to exist any Indebtedness.

Notwithstanding the foregoing, the limitations set forth in the immediately preceding paragraph shall not apply to any of the following items:

-110-

(a) Indebtedness arising under the Credit Documents (including any Indebtedness incurred pursuant to Section 2.14);

(b) subject to compliance with Section 10.5, Indebtedness of the Borrower or any Restricted Subsidiary owed to the Borrower or any Restricted Subsidiary; provided that all such Indebtedness of any Credit Party owed to any Person that is not a Credit Party shall be (x) evidenced by the Intercompany Subordinated Note or (y) otherwise be subject to subordination terms substantially identical to the subordination terms set forth in the Intercompany Subordinated Note or otherwise reasonably acceptable to the Administrative Agent;

(c) Indebtedness in respect of any bankers' acceptance, bank guarantees, letter of credit, warehouse receipt or similar facilities entered into in the ordinary course of business (including in respect of construction and restoration activities and in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims);

(d) subject to compliance with Section 10.5, Guarantee Obligations incurred by (i) Restricted Subsidiaries in respect of Indebtedness of the Borrower or any other Restricted Subsidiary that is permitted to be incurred under this Agreement (except that a Restricted Subsidiary that is not a Credit Party may not, by virtue of this Section 10.1(d) guarantee Indebtedness that such Restricted Subsidiary could not otherwise incur under this Section 10.1) and (ii) the Borrower in respect of Indebtedness of Restricted Subsidiaries that is permitted to be incurred under this Agreement; provided that (A) if the Indebtedness being guaranteed under this Section 10.1(d) is subordinated to the Obligations, such Guarantee Obligations shall be subordinated to the Guarantee of the Obligations on terms at least as favorable to the Lenders as those contained in the subordination of such Indebtedness, (B) [Reserved] and (C) the aggregate amount of Guarantee Obligations incurred by Restricted Subsidiaries that are not Subsidiary Guarantors under this clause (d), when combined with the total amount of Indebtedness incurred by Restricted Subsidiaries that are not Subsidiary Guarantors pursuant to Section 10.1(j) and Section 10.1(n), shall not exceed $200,000,000 at any time outstanding;

(e) Guarantee Obligations (i) incurred in the ordinary course of business (including in respect of construction or restoration activities) in respect of obligations of (or to) suppliers, customers, franchisees, lessors and licensees or (ii) otherwise constituting Investments permitted by Sections 10.5(d), 10.5(g), 10.5(i), 10.5(q), 10.5(t) and 10.5(v);

(f) (i) Indebtedness (including Indebtedness arising under Capital Leases) incurred to finance the purchase price, cost of design, acquisition, construction, repair, restoration, replacement, expansion, installation or improvement of fixed or capital assets or otherwise in respect of Capital Expenditures, so long as such Indebtedness, except in the case of Environmental CapEx or Necessary CapEx, is incurred within 270 days of the acquisition, construction, repair, restoration, replacement, expansion, installation or improvement of such fixed or capital assets or incurrence of such Capital Expenditure, (ii) Indebtedness arising under Capital Leases entered into in connection with Permitted Sale Leasebacks and (iii) Indebtedness arising under Capital Leases, other than Capital Leases in effect on the Closing Date and Capital Leases entered into pursuant to subclauses (i) and (ii) above; provided, that the aggregate amount of Indebtedness incurred pursuant to this clause (iii) at any time outstanding shall not exceed $400,000,000 and (iv) any modification, replacement, refinancing, refunding, renewal or extension of any Indebtedness specified in subclause (i), (ii) or (iii) above; provided that, except to the extent otherwise expressly permitted hereunder, the principal amount thereof does not exceed the principal amount thereof outstanding immediately prior to such modification, replacement,

10.12. <u>Affiliate Value Transfers</u>. The Borrower will not, and will not permit the Restricted Subsidiaries to, make any Affiliate Value Transfers in an aggregate amount in excess of $50,000,000 for all such Affiliate Value Transfers made from the Closing Date.

SECTION 11. <u>Events of Default</u>.

Upon the occurrence of any of the following specified events (each an "**Event of Default**"):

11.1. <u>Payments</u>. The Borrower shall (a) default in the payment when due of any principal of the Loans or any Unpaid Drawings or (b) default, and such default shall continue for five or more days, in the payment when due of any interest on the Loans or any Fees or any other amounts owing hereunder or under any other Credit Document; or

11.2. <u>Representations, Etc</u>. Any representation, warranty or statement made or deemed made by any Credit Party herein or in any other Credit Document or any certificate delivered or required to be delivered pursuant hereto or thereto shall prove to be untrue in any material respect on the date as of which made or deemed made; or

11.3. <u>Covenants</u>. Any Credit Party shall:

(a) default in the due performance or observance by it of any term, covenant or agreement contained in <u>Section 9.1(e)(i)</u>, <u>Section 9.5</u> (solely with respect to the Borrower), <u>Section 9.15</u> or <u>Section 10</u>; <u>provided</u> that an Event of Default under <u>Section 10.9</u> shall not constitute an Event of Default for purposes of any Term Loan or Delayed-Draw Term Loan, or result in the availability of any remedies for the Term Loan Lenders or Delayed-Draw Term Loan Lenders, unless and until the Required Revolving Credit Lenders have actually declared all Revolving Credit Loans and all related Obligations to be immediately due and payable in accordance with this Agreement and such declaration has not been rescinded on or before the date the Required Term Loan Lenders or Required Delayed-Draw Term Loan Lenders declare an Event of Default with respect to <u>Section 10.9</u>; or

-131-

(b) default in the due performance or observance by it of any term, covenant or agreement (other than those referred to in <u>Section 11.1</u> or <u>11.2</u> or clause (a) of this <u>Section 11.3</u>) contained in this Agreement or any other Credit Document and such default shall continue unremedied for a period of at least 30 days after receipt of written notice by the Borrower from the Administrative Agent or the Required Lenders; or

11.4. <u>Default Under Other Agreements</u>. (a) The Borrower or any Restricted Subsidiary shall (i) default in any payment with respect to any Indebtedness incurred after the Petition Date (other than any Indebtedness described in <u>Section 11.1</u>, Hedging Obligations or Indebtedness under any Permitted Receivables Financing) in excess of $150,000,000 in the aggregate for the Borrower and such Restricted Subsidiaries, beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness was created or (ii) default in the observance or performance of any agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist (other than any agreement or condition relating to, or provided in any instrument or agreement, under which such Hedging Obligations or such Permitted Receivables Financing was created), in each case, after giving effect to any applicable period of grace, the effect of which default or other event or condition is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause, any such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; or (b) without limiting the provisions of <u>clause (a)</u> above, any such Indebtedness shall be declared to be due and payable, or required to be prepaid other than by a regularly scheduled required prepayment (other than any Hedging Obligations or Indebtedness under any Permitted Receivables Financing) or as a mandatory prepayment, prior to the stated maturity thereof; <u>provided</u> that this <u>clause (b)</u> shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness; or

11.5. [Reserved].

11.6. <u>ERISA</u>. (a) Any Plan shall fail to satisfy the minimum funding standard required for any plan year or part thereof or a waiver of such standard or extension of any amortization period is sought or granted under Section 412 of the Code; any Plan is or shall have been terminated or is the subject of termination proceedings under ERISA (including the giving of written notice thereof); an event shall have occurred or a condition shall exist in either case entitling the PBGC to terminate any Plan or to appoint a trustee to administer any Plan (including the giving of written notice thereof); any Plan shall have an accumulated funding deficiency (whether or not waived); the Borrower or any ERISA Affiliate has incurred or is likely to incur a liability to or on account of a Plan under Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201 or 4204 of ERISA or Section 4971 or 4975 of the Code (including the giving of written notice thereof); (b) there could result from any event or events set forth in <u>clause (a)</u> of this <u>Section 11.6</u> the imposition of a Lien, the granting of a security interest, or a liability, or the reasonable likelihood of incurring a Lien, security interest or liability; and (c) such Lien, security interest or liability will or would be reasonably likely to have a Material Adverse Effect; or

11.7. <u>Credit Documents</u>. Any Credit Document or any material provision thereof shall cease to be in full force and effect (other than pursuant to the terms hereof or thereof); or

11.8. [Reserved].

-132-

11.9. [Reserved].

11.10. [Reserved].

11.11. <u>Judgments</u>. Any single judgment in excess of $150,000,000 as to any post-petition obligation, or any judgments that are in the aggregate in excess of $250,000,000 as to any one or more post-petition obligations, shall be rendered against the TCEH Debtors and the enforcement thereof shall not be stayed (by operation of law, the rules or orders of a court with jurisdiction over the matter or by consent of the party litigants, in each case, to the extent not paid or covered by insurance provided by a carrier not disputing coverage) or there shall be rendered against the TCEH Debtors a non-monetary judgment with respect to a post-petition event that causes or is reasonably expected to cause a Material Adverse Effect; <u>provided</u>, <u>however</u>, that this Section 11.11 shall not apply to any judgments as to any pre-petition obligation; or

11.12. <u>Hedging Agreements</u>. The Borrower or any of the Restricted Subsidiaries shall default (and have knowledge of such default) in any required payment obligation that is not being contested in good faith and by appropriate proceedings by the Borrower or any Restricted Subsidiary under any one or more Hedging Agreements entered into after the Petition Date and involving liabilities in the aggregate in excess of $150,000,000 and payable by the Borrower and the Restricted Subsidiaries, after giving effect to any grace periods, dispute resolution provisions or similar provisions contained in such Hedging Agreements; and such default shall not have been cured within 60 days after the date on

11.13. Change of Control. A Change of Control shall occur; or

11.14. Final Order. The Final Order Entry Date shall not have occurred within 45 days of the Interim Order Entry Date; or

11.15. Matters Related to the Cases.

(i) any of the Cases shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code; or

(ii) a trustee, receiver, interim receiver, or manager shall be appointed in any of the Cases, or a responsible officer or an examiner with enlarged powers shall be appointed in any of the Cases (having powers beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code); or

(iii) Any other Superpriority Claim (other than the Carve Out, the RCT Reclamation Support Carve Out or the Obligations) or any "claim" (as such word is defined in the Bankruptcy Code) that is pari passu with or senior to the claims of the Secured Parties or any lien that is pari passu with or senior to the liens of the Secured Parties shall be granted by order of the Bankruptcy Court in any of the Cases except (A) with the prior written consent of the Administrative Agent or (B) to the extent such lien constitutes a Permitted Lien securing Indebtedness or obligations not prohibited by this Agreement.

(iv) the Bankruptcy Court shall enter an order approving any claims for recovery of amounts under section 506(c) of the Bankruptcy Code or otherwise arising from the preservation of any Collateral; or

-133-

(v) any TCEH Debtor makes any material payments relating to prepetition obligations (including any "adequate protection" payments) other than in accordance with the First Day Orders, the Interim Order, the Final Order, Section 10.7 or as otherwise agreed to by the Administrative Agent; or

(vi) the use of cash collateral by the TCEH Debtors shall be terminated and the TCEH Debtors shall not have obtained use of cash collateral (consensually or non-consensually) pursuant to an order in form and substance acceptable to the Left Lead ArrangersAdministrative Agent; or

(vii) the Credit Parties or any of their Subsidiaries, or any person claiming by or through the Credit Parties or any of their Subsidiaries, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against any of the Administrative Agent or Lenders, in each case, relating to the Credit Facilities; or

(viii) (i) Any TCEH Debtor shall file a motion or pleading or commence a proceeding that could reasonably be expected to result in ana material impairment of the Administrative Agent's or any ofand the Lenders' material rights or interests (taken as a whole) in their capacities as such under the Credit Facilities or (ii) a determinationand such motion, pleading or proceeding shall not be withdrawn or dismissed within thirty (30) Business Days or (ii) a final non-appealable judgment by a court with respect to a motion, pleading or proceeding brought by another party that results in such an impairment; provided, however, that this subclause (viii) will not apply to the termination of use of cash collateral (which shall be exclusively governed by subclause (vi) above); or

(ix) the Bankruptcy Court shall enter a final non-appealable order that is adverse in any material respect to the interests (taken as a whole) of the Administrative Agent or the Lenders or their respective material rights and remedies in their capacity as such under the Credit Facilities in any of the Cases; provided, however, that this subclause (viii) will not apply to the termination of use of cash collateral (which shall be governed exclusively by subclause (vi) above); or

(x) any TCEH Debtor shall file with the Bankruptcy Court any pleading seeking, or otherwise consenting to, or shall support or acquiesce in any other person's motion as to any matter set forth in Section 11.11, this Section 11.15 (other than this subclause (x)), Section 11.16, Section 11.17(i) and (ii), or Section 11.18.11.18, without the prior written consent of the Administrative Agent.

11.16. Automatic Stay. The Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to any creditor or party in interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the TCEH Debtors that have an aggregate value in excess of $150,000,000; or

11.17. Status of Orders. (i) An order shall be entered by the Bankruptcy Court reversing, supplementing, staying for a period of five (5) Business Days or more, vacating or otherwise amending, supplementing or modifying the Interim Order or the Final Order in a manner that is materially adverse to the interests of the Administrative Agent orand the Lenders (taken as a whole), or the Borrower or any Guarantor shall apply for authority to do so, without the prior written consent of the Administrative Agent or the Required Lenders, (ii) except as otherwise agreed by the Administrative Agent, the Interim Order or Final Order shall cease to create a valid and perfected lien on a material portion of the Collateral or to be in full force and effect; or (iii) the Borrower or any Guarantor shall fail to comply with the Orders in any material respect and such default shall continue unremedied for a period of at least 30 days after receipt of written notice by the Borrower from the Administrative Agent or the Required Lenders; or

-134-

11.18. Confirmation of Plan. A planReorganization Plan shall be confirmed in any of the Cases that does not provide for termination of the Commitments hereunder and the indefeasible payment in full in cash of the Obligations (other than Contingent Obligations) on the effective date of such plan;

then, and in any such event, and at any time thereafter, if any Event of Default shall then be continuing, subject in each case to the terms and conditions of the Interim Order and (once entered) the Final Order, the Administrative Agent may and, upon the written request of the Required Lenders, shall, by five calendar days' written notice to the Borrower, take any or all of the following actions, without prejudice to the rights of the Administrative Agent or any Lender to enforce its claims against the Borrower, except as otherwise specifically provided for in this Agreement: (i) declare the Commitments terminated, whereupon the Commitments, if any, of each Lender and each Letter of Credit Issuer shall forthwith terminate immediately and any Fees theretofore accrued shall forthwith become due and payable without any other notice of any kind; (ii) declare the principal of and any accrued interest and Fees in respect of any or all Loans and any or all Obligations owing hereunder and under any other Credit Document to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; and/or (iii) terminate any Letter of Credit that may be terminated in accordance with its terms.

11.19. Application of Proceeds. Subject to the Carve Out and the RCT Reclamation Support Carve Out, during the existence of an Event of Default any Net Cash Proceeds received by the Collateral Agent, any distribution made in respect of any Collateral in any bankruptcy or insolvency proceeding of any Credit Party, all proceeds of any sale, collection or other liquidation of any Collateral, including all insurance proceeds received in respect thereof, and all proceeds of any such distribution, and any proceeds received by the Collateral Agent in respect of any sale of, collection from or other realization upon all or any part of the Collateral pursuant to the exercise by the Collateral Agent of its remedies shall be applied, in full or in part, together with any other sums then held by the Collateral Agent pursuant to this Agreement and/or any other Credit Document, promptly as follows:

(a) with respect to any Collateral other than the RCT L/C Collateral Accounts and the General L/C Collateral Accounts:

(i) First, to the payment of all reasonable costs and expenses, fees, commissions and taxes of such sale, collection or other realization including compensation to the Administrative Agent, Collateral Agent and their agents and counsel, and all expenses, liabilities and advances made or incurred by the Administrative Agent and Collateral

in this clause (c), collectively, the "**indemnified liabilities**") **(SUBJECT TO THE PROVISO BELOW, WHETHER OR NOT CAUSED BY OR ARISING IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE ORDINARY NEGLIGENCE OF THE INDEMNIFIED PERSON)**; provided that neither the Borrower nor any other Credit Party shall have any obligation hereunder to any Agent, any Letter of Credit Issuer or any Lender or any of their respective Related Parties with respect to indemnified liabilities to the extent they result from (A) the gross negligence, bad faith or willful misconduct of such indemnified Person or any of its Related Parties, as determined by a final non-appealable judgment of a court of competent jurisdiction, (B) a material breach of the obligations of such indemnified Person or any of its Related Parties under the Credit Documents, as determined by a final non-appealable judgment of a court of competent jurisdiction or (C) disputes not involving an act or omission of Parent Guarantor, the Borrower or any other Credit Party and that is brought by an indemnified Person against any other indemnified Person, other than any claims against any indemnified Person in its capacity or in fulfilling its role as an Agent or Joint Lead Arranger or any similar role under the Credit Facilities. The agreements in this Section 13.5 shall survive repayment of the Loans and all other amounts payable hereunder.

All amounts payable under this Section 13.5 shall be paid within ten days of receipt by the Borrower of an invoice relating thereto setting forth such expense in reasonable detail; provided, that the TCEH Debtors shall promptly provide copies of invoices received on account of fees and expenses of the professionals retained as provided for in the Credit Documents to counsel to the Ad Hoc TCEH Committee and the United States Trustee, and the Bankruptcy Court shall have exclusive jurisdiction over any objections raised to the invoiced amount of the fees and expenses proposed to be paid, which objections may only be raised within ten days after receipt thereof. In the event that within ten days from receipt of such invoices, the Credit Parties, the United States Trustee or counsel to the Ad Hoc TCEH Committee raise an objection to a particular invoice, and the parties are unable to resolve any dispute

-148-

regarding the fees and expenses included in such invoice, the Bankruptcy Court shall hear and determine such dispute; provided, that payment of invoices shall not be delayed based on any such objections and the relevant professional shall only be required to disgorge amounts objected to upon being "so ordered" pursuant to a final order of the Bankruptcy Court.

No Credit Party nor any indemnified Person shall have any liability for any special, punitive, indirect or consequential damages resulting from this Agreement or any other Credit Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date) (except, in the case of the Borrower's obligation hereunder to indemnify and hold harmless the indemnified Persons, to the extent any indemnified Persons is found liable for special, punitive, indirect or consequential damages to a third party). No indemnified Persons shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby, except to the extent that such damages have resulted from the willful misconduct, bad faith or gross negligence of any indemnified Person or any of its Related Parties (as determined by a final non-appealable judgment of a court of competent jurisdiction). This Section 13.5 shall not apply to Taxes.

13.6. Successors and Assigns; Participations and Assignments.

(a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate of a Letter of Credit Issuer that issues any Letter of Credit), except that (i) except as expressly permitted by Section 10.3, neither Parent Guarantor nor the Borrower may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender (and any attempted assignment or transfer by Parent Guarantor or the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 13.6. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby (including any Affiliate of a Letter of Credit Issuer that issues any Letter of Credit), Participants (to the extent provided in clause (c) of this Section 13.6), to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the Collateral Agent, the Letter of Credit Issuers and the Lenders and each other Person entitled to indemnification under Section 13.5 and, to the extent expressly contemplated by Section 13.20, the Oncor Subsidiaries) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b) (i) Subject to the conditions set forth in clause (b)(ii) below, any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans at the time owing to it) with the prior written consent (such consent not be unreasonably withheld or delayed; it being understood that, without limitation, the Borrower shall have the right to withhold or delay its consent to any assignment if in order for such assignment to comply with Applicable Law, the Borrower would be required to obtain the consent of, or make any filing or registration with, any Governmental Authority) of:

(A) the Borrower (which consent shall not be unreasonably withheld or delayed); provided that no consent of the Borrower shall be required for an assignment (1) to a Lender (other than in respect of an assignment of a Revolving Credit Commitment and Revolving Credit Loans), an Affiliate of a Lender (other than in respect of an assignment of a Revolving Credit Commitment and Revolving Credit Loans (except to an Affiliate of such Revolving Credit Lender having a combined capital and surplus of not less than the greater of (x) $100,000,000 and (y) an amount equal to twice the amount of Revolving Credit Commitments to be held by such

-149-

assignee after giving effect to such assignment, in which case no such Borrower consent shall be required) or an Approved Fund (other than in respect of an assignment of a Revolving Credit Commitment and Revolving Credit Loans) or (2) if Specified Default has occurred and is continuing with respect to the Borrower, to any other assignee; and

(B) the Administrative Agent (which consent shall not be unreasonably withheld or delayed); provided that no consent of the Administrative Agent shall be required for any assignment of any Term Loan to a Lender, an Affiliate of a Lender or an Approved Fund.

Notwithstanding the foregoing or any other term or condition herein to the contrary, no such assignment shall be made to (x) a natural person, (y) the Borrower or any Subsidiary or Affiliate thereof or (y) a Disqualified Institution. ~~Institution.~~

(ii) Assignments shall be subject to the following additional conditions:

(A) except (i) in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans of any Class, (ii) an assignment to a Federal Reserve Bank or (iii) in connection with the initial syndication of the Commitments or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent), shall not be less than, in the case of Loans and Commitments, $5,000,000 and increments of $1,000,000 in excess thereof unless each of the Borrower and the Administrative Agent otherwise consents (which consents shall not be unreasonably withheld or delayed); provided that no such consent of the Borrower shall be required if a Specified Default has occurred and is continuing with respect to Parent Guarantor or the Borrower; provided, further, that contemporaneous assignments to a single assignee made by Affiliates of Lenders and related Approved Funds shall be aggregated for purposes of meeting the minimum assignment amount requirements stated above;

(B) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement; provided that this clause shall not be construed to prohibit the assignment of a proportionate part of all the assigning Lender's rights and obligations in respect of one Class of Commitments or Loans;

(C) The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Acceptance, together with a processing and recordation fee in the amount of $3,500; provided that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment; and

(D) the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an administrative questionnaire in a form approved by the Administrative Agent (the "**Administrative Questionnaire**").

(iii) Subject to acceptance and recording thereof pursuant to clause (b)(iv) of this Section 13.6, from and after the effective date specified in each Assignment and Acceptance, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue

-150-

to be entitled to the benefits of Sections 2.10, 2.11, 3.5, 5.4 and 13.5). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 13.6 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with clause (c) of this Section 13.6.

(iv) The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amount of the Loans and any payment made by any Letter of Credit Issuer under any Letter of Credit owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**"). Further, each Register shall contain the name and address of the Administrative Agent and the lending office through which each such Person acts under this Agreement. The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent, the Collateral Agent, the Letter of Credit Issuers and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by Parent Guarantor, the Borrower, the Collateral Agent, the Letter of Credit Issuers and any Lender, at any reasonable time and from time to time upon reasonable prior notice. This Section shall be construed so that the Loans and Letters of Credit are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code.

(v) Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in clause (b) of this Section 13.6 (unless waived) and any written consent to such assignment required by clause (b) of this Section 13.6, the Administrative Agent shall accept such Assignment and Acceptance and record the information contained therein in the Register.

(c) (i) Any Lender may, without the consent of Parent Guarantor, the Borrower, the Administrative Agent or any Letter of Credit Issuer, sell participations to one or more banks or other entities that are not Disqualified Institutions or the Borrower or any Subsidiary or Affiliate of the Borrower (each, a "**Participant**") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) Parent Guarantor, the Borrower, the Administrative Agent, the Letter of Credit Issuers and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement or any other Credit Document; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any consent, amendment, modification, supplement or waiver described in clause (i) or (vii) of the second proviso of the first paragraph of Section 13.1 that affects such Participant. Subject to clause (c)(ii) of this Section 13.6, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.10, 2.11 and 5.4 to the same extent as if it were a Lender, and provided that such Participant agrees to be subject to the requirements of those Sections as though it were a Lender and had acquired its interest by assignment pursuant to clause (b) of this Section 13.6 To the extent permitted by Applicable Law, each Participant also shall be entitled to the benefits of Section 13.8(b) as though it were a Lender; provided such Participant agrees to be subject to Section 13.8(a) as though it were a Lender.

-151-

(ii) A Participant shall not be entitled to receive any greater payment under Section 2.10, 2.11, or 5.4 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent (which consent shall not be unreasonably withheld or delayed).

(iii) Each Lender that sells a participation shall, acting for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts of each participant's interest in the Loans (or other rights or obligations) held by it (the "**Participant Register**"). The entries in the Participant Register shall be conclusive, and such lender shall treat each Person whose name is recorded in the Participant Register as the owner of such Loan or other obligation hereunder as the owner thereof for all purposes of this Agreement notwithstanding any notice to the contrary. No Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Credit Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. This Section shall be construed so that the Loans are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code.

(d) Any Lender may, without the consent of Parent Guarantor, the Borrower, the Administrative Agent, at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section 13.6 shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto. In order to facilitate such pledge or assignment or for any other reason, the Borrower hereby agrees that, upon request of any Lender at any time and from time to time after any Borrower has made its initial borrowing hereunder, the Borrower shall provide to such Lender, at the Borrower's own expense, a promissory note, substantially in the form of Exhibit J-1, J-2 or J-3, evidencing the Revolving Credit Loans, Term Loans and Delayed-Draw Term Loans, respectively, owing to such Lender.

(e) Subject to this Section 13.16, the Borrower authorizes each Lender to disclose to any Participant, secured creditor of such Lender or assignee (each, a "**Transferee**"), any prospective Transferee and any prospective direct or indirect contractual counterparties to any swap or derivative transactions to be entered into in connection with or relating to Loans made hereunder any and all financial information in such Lender's possession concerning the Borrower and its Affiliates that has been delivered to such

13.18. USA PATRIOT Act. Each Lender hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Patriot Act**"), it is required to obtain, verify and record information that identifies each Credit Party, which information includes the name and address of each Credit Party and other information that will allow such Lender to identify each Credit Party in accordance with the Patriot Act.

13.19. Payments Set Aside. To the extent that any payment by or on behalf of the Borrower is made to any Agent or any Lender, or any Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by any Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Overnight Rate from time to time in effect.

13.20. Separateness.

(a) The Secured Parties hereby acknowledge (i) the legal separateness of Parent Guarantor, the Borrower and the Subsidiaries of the Borrower from the Oncor Subsidiaries, (ii) that the lenders under the Oncor Credit Facility and the noteholders under the Oncor Notes and under the transition bonds have likely advanced funds thereunder in reliance upon the separateness of the Oncor Subsidiaries from Parent Guarantor, the Borrower and the Subsidiaries of the Borrower, (iii) that the Oncor Subsidiaries have assets and liabilities that are separate from those of Parent Guarantor, the Borrower and the Subsidiaries of the Borrower, (iv) that the Obligations are obligations and liabilities of the Borrower and the other Credit Parties only, and are not the obligations or liabilities of any of the Oncor Subsidiaries, (v) that the Secured Parties shall look solely to the Borrower and the Guarantors and such Persons' assets, and not to any assets, or to the pledge of any assets, owned by any of the Oncor Subsidiaries, for the repayment of any amounts payable pursuant to this Agreement and for satisfaction of any other Obligations and (vi) that none of the Oncor Subsidiaries shall be personally liable to the Secured Parties for any amounts payable, or any other Obligation, under the Credit Documents.

-159-

(b) The Secured Parties hereby acknowledge and agree that the Secured Parties shall not (i) initiate any legal proceeding to procure the appointment of an administrative receiver, or (ii) institute any bankruptcy, reorganization, insolvency, winding up, liquidation, or any like proceeding under applicable law, against any of the Oncor Subsidiaries, or against any of the Oncor Subsidiaries' assets. The Secured Parties further acknowledge and agree that each of the Oncor Subsidiaries is a third party beneficiary of the foregoing covenant and shall have the right to specifically enforce such covenant in any proceeding at law or in equity.

13.21. Keepwell. Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Guarantor to honor all of its obligations under this Guarantee in respect of Swap Obligations (provided, however, that each Qualified ECP Guarantor shall only be liable for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 13.21, or otherwise under this Agreement, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). Each Qualified ECP Guarantor intends that this Section 13.21 constitute, and this Section 13.21 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Guarantor for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

SECTION 14. Security; Secured Commodity Hedging Agreements.

14.1. Security.

(a) Collateral; Grant of Lien and Security Interest.

(i) Pursuant to the Interim Order and (when applicable) the Final Order and in accordance with the terms thereof (and subject to the terms and conditions set forth therein), as security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration, or otherwise) of the Obligations, the Borrower hereby assigns, pledges, and grants to the Collateral Agent, for the benefit of the Secured Parties (subject, in each case, to the Carve Out and the RCT Reclamation Support Carve Out):

(A) a fully-perfected first priority senior security interest in and Lien upon, pursuant to section 364(c)(2) of the Bankruptcy Code, all prepetition and postpetition property of the Borrower, whether existing on the Petition Date or thereafter acquired that, on or as of the Petition Date, is not subject to valid, perfected, and non-avoidable Liens, including, without limitation, all real and personal property, inventory, plant, fixtures, machinery, equipment, the RCT L/C Collateral Accounts, the General L/C Collateral Accounts, cash, any investment of such cash, accounts receivable, other rights to payment whether arising before or after the Petition Date (including, without limitation, post-petition intercompany claims of the Borrower), deposit accounts, investment property, supporting obligations, minerals, oil, gas, and as-extracted collateral, causes of action (including those arising under section 549 of the Bankruptcy Code and any related action under section 550 of the Bankruptcy Code), royalty interests, chattel paper, contracts, general intangibles, documents, instruments, interests in leaseholds, letter of credit rights, patents, copyrights, trademarks, trade names, other intellectual property, Stock and Stock Equivalents of Subsidiaries, books and records pertaining to the foregoing, and to the extent not otherwise included, all proceeds, products, offspring, and profits of any and all of the foregoing (the "**Unencumbered Property**"); provided that the Unencumbered Property shall exclude the Borrower's Avoidance Actions, but subject only to, and effective upon, entry of the Final Order, shall include any proceeds or property recovered, unencumbered, or otherwise the subject of successful Avoidance Actions, whether by judgment, settlement, or otherwise;

-160-

(A) (B) a fully-perfected first priority senior priming security interest in and Lien upon, pursuant to section 364(d)(1) of the Bankruptcy Code, all prepetition and postpetition property of the Borrower, whether existing on the Petition Date or thereafter acquired, that is subject to valid, perfected, and non-avoidable Prepetition First Priority Liens and Prepetition Second Priority Liens currently held by any of the Prepetition Secured Creditors (as defined in the Interim Cash Collateral Order and (when applicable) the Final Cash Collateral Order), excluding the "Deposit L/C Loan Collateral Account" to the extent of the "Deposit L/C Obligations" (each as defined in the Prepetition Credit Agreement); provided that such security interests and Liens shall be senior in all respects to the interests in such property of any of the Prepetition Secured Creditors arising from current and future Prepetition First Priority Liens and Prepetition Second Priority Liens of any of the Prepetition Secured Creditors (including, without limitation, Adequate Protection Liens) (as defined in the Interim Cash Collateral Order and (when applicable) the Final Cash Collateral Order), but shall not be senior to any valid, perfected, and non-avoidable interests of other parties arising out of Liens, if any, on such property existing immediately prior to the Petition Date, including the Liens securing the Tex-La Indebtedness, or to any valid, perfected, and non-avoidable interests in such property arising out of Liens to which the Liens of any of the Prepetition Secured Creditors become subject subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, the Carve Out or the RCT Reclamation Support Carve Out; and

(B) (C) a fully-perfected junior security interest in and Lien upon, pursuant to section 364(c)(3) of the Bankruptcy Code, all prepetition and postpetition property of the Borrower (other than the property described in clauses (A) and (B) of this Section 14.1(a)(i), as to which the Liens and security interests in favor of the

Collateral Agent, for the benefit of the Secured Parties, will be as described in such clauses), whether existing on the Petition Date or thereafter acquired, that is subject to valid, perfected, and non-avoidable Liens in existence immediately prior to the Petition Date, or to any valid and non-avoidable Liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (in each case, other than the Adequate Protection Liens (as defined in the Interim Cash Collateral Order and (when applicable) the Final Cash Collateral Order));

provided, that notwithstanding anything to the contrary in this Section 14.1(a)(i), the Collateral shall exclude ~~Excluded Collateral.~~Unencumbered Property, Avoidance Actions and Excluded Collateral.  For purposes hereof, "**Unencumbered Property**") means all prepetition and postpetition property of the Borrower and its Subsidiaries, whether existing on the Petition Date or thereafter acquired that, on or as of the Petition Date, is not subject to valid, perfected, and non-avoidable Liens, including, without limitation, all real and personal property, inventory, plant, fixtures, machinery, equipment, cash, any investment of such cash, accounts receivable, other rights to payment whether arising before or after the Petition Date (including, without limitation, post-petition intercompany claims of the Borrower), deposit accounts, investment property, supporting obligations, minerals, oil, gas, and as-extracted collateral, causes of action (including those arising under section 549 of the Bankruptcy Code and any related action under section 550 of the Bankruptcy Code), royalty interests, chattel paper, contracts, general intangibles, documents, instruments, interests in leaseholds, letter of credit rights, patents, copyrights, trademarks, trade names, other intellectual property, Stock and Stock Equivalents of Subsidiaries, books and records pertaining to the foregoing, and to the extent not otherwise included, all proceeds, products, offspring, and profits of any and all of the foregoing.

(ii) The security interests and Liens in favor of the Collateral Agent in the Collateral shall be effective immediately upon the entry of the Interim Order and subject, only in the event of the occurrence and during the continuance of an Event of Default, to the Carve Out, the RCT Reclamation Support Carve Out and the terms and conditions set forth in the Interim Order and (when applicable) the Final Order. Such Liens and security interests and their priority shall remain in effect until the Obligations (except for Hedging Obligations in respect of any Secured Hedging Agreement and/or any Secured Commodity Hedging Agreement, Cash Management Obligations in respect of Secured Cash Management Agreements and Contingent Obligations) have been indefeasibly paid in full, in cash, all Commitments have been terminated, and all Letters of Credit have been cancelled (or all such Letters of Credit have been fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the applicable Letter of Credit Issuers).

(iii) Subject only to the prior payment of the Carve Out and the RCT Reclamation Support Carve Out, no costs or expenses of administration which have been or may be incurred in the Cases or any Successor Cases (as defined in the Orders) or in any other proceedings related thereto, and no priority claims, are or will be senior to, or pari passu with, any claim of any Secured Party or the Collateral Agent against any Credit Party.

-161-

(b) Administrative Priority. The Borrower agrees that its Obligations shall, pursuant to section 364(c)(1) of the Bankruptcy Code, constitute allowed superpriority administrative expense claims in the Cases or any Successor Cases, ranking on a parity with each other and having priority over all administrative expense claims, diminution claims, unsecured claims, and all other claims against the TCEH Debtors or their estates in any of the Cases and any Successor Cases, existing on the Petition Date or thereafter, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject only to, and upon entry of, the Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, subject only to the Carve Out and the RCT Reclamation Support Carve Out, to the extent specifically provided for in the Interim Order and (when applicable) the Final Order.

(c) Grants, Rights and Remedies. The Liens and security interests granted pursuant to Section 14.1(a)(i) hereof and the administrative priority granted pursuant to Section 14.1(b) hereof may be independently granted by the Credit Documents and by other Credit Documents hereafter entered into. This Agreement, the Interim Order and (when applicable) the Final Order, and such other Credit Documents supplement each other, and the grants, priorities, rights, and remedies of the Agents and the Secured Parties hereunder and thereunder are cumulative.

(d) No Filings Required. The Liens and security interests referred to in this Section 14 shall be deemed valid and perfected by entry of the Interim Order and (when applicable) the Final Order, and entry of the Interim Order shall have occurred on or before any Loan is made during the Interim Period and entry of the Final Order shall have occurred on or before any Loan is made after the Interim Period. The Collateral Agent shall not be required to file or record any financing statements, patent filings, trademark filings, mortgages, notices of Lien, or other instrument or document in any jurisdiction or filing office, take possession or control of any Collateral, or take any other action in order to validate or perfect the Liens and security interests granted by or pursuant to this Agreement, the Interim Order or (when applicable) the Final Order or any other Credit Document.

(e) Survival. The Liens, lien priority, administrative priorities and other rights and remedies granted to the Collateral Agent and the Secured Parties pursuant to this Agreement, the Interim Order and (when applicable) the Final Order, and the other Credit Documents (specifically including, but not limited to, the existence, perfection and priority of the Liens and security interests provided herein and therein, and the administrative priority provided herein and therein) shall not be modified, altered, or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by the TCEH Debtors (pursuant to section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of any of the Cases, or by any other act or omission whatsoever. Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(i) except to the extent of the Carve Out or the RCT Reclamation Support Carve Out, no fees, charges, disbursements, costs or expenses of administration which have been or may be incurred in the Cases or any Successor Cases, or in any other proceedings related thereto, and no priority claims, are or will be superior to or pari passu with any claim of the Collateral Agent and the Secured Parties against the TCEH Debtors;

(ii) subject to the Carve Out and the RCT Reclamation Support Carve Out and subject to the terms of the Interim Order and (when applicable) the Final Order, the Liens in favor of the Collateral Agent and the Secured Parties set forth in Section 14.1(a)(i) hereof shall

-162-

constitute valid and perfected first priority Liens and security interests, and shall be superior to all other Liens and security interests, existing as of the Petition Date or thereafter arising, in favor of any other creditor or any other Person whatsoever (subject to Permitted Liens); and

(iii) the Liens in favor of the Collateral Agent and the Secured Parties set forth herein and in the other Credit Documents shall continue to be valid and perfected without the necessity that the Collateral Agent files financing statements or mortgages, takes possession or control of any Collateral, or otherwise perfects its Lien under applicable non-bankruptcy law.

14.2. Secured Commodity Hedging Agreements.

(a) Subject to the limitations set forth in this Agreement, the Borrower and each Secured Party acknowledges and agrees that the Collateral may secure additional obligations of the Borrower and the other Credit Parties in respect of Secured Commodity Hedging Agreements, subject to compliance with this Section 14.2. Upon (x) execution and delivery to the Collateral Agent of an Accession Agreement and (y) compliance with the procedures set forth in Section 8.16 of the Security Agreement, such Person shall become a "Hedge Bank" under clause (i) of the definition thereof and a "Secured Party" hereunder and under the other Credit Documents, and the Credit Parties' obligations to such Person shall become "Obligations" hereunder and under the Credit Documents and "Secured Obligations" under the Security Agreement; provided that, for the avoidance of doubt, no such Person in such capacity shall have any consent or voting rights under this Agreement or any of the Credit Documents. Each Credit Party and each Secured Party agrees that this Agreement and the applicable Security Documents may be amended by the Credit Parties and the Collateral Agent without the consent of any Secured Party to the extent necessary or desirable to cause the Liens granted thereby to be in favor of such Persons (to the extent Liens in favor of such Persons are permitted by the terms of this Agreement).