**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Energy Future Holdings Corp., *et al.,*[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket No. 477** |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO
THE MOTION OF ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC
AND EFIH FINANCE INC. FOR ENTRY OF AN ORDER AUTHORIZING
PAYMENT OF FEES UNDER THE POSTPETITION SECOND LIEN
<u>FINANCING COMMITMENT LETTER</u>**

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810.  The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201.  Due to the large number of debtors in these chapter 11 cases, which are being jointly administered on an interim basis, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://efhcaseinfo.com.

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 4

    The Proposed EFIH Second Lien DIP Financing ............................................................. 4

    The Alternative Transaction Fee ...................................................................................... 6

    Potential Alternative Financing ........................................................................................ 7

ARGUMENT ..................................................................................................................... 8

I.     THE PROPOSED ALTERNATIVE TRANSACTION FEE IS UNNECESSARY
      AND HARMFUL TO THE DEBTORS .......................................................................... 8

    A.     The Commitment Letter Is Not Conditioned On An Alternative
           Transaction Fee So Approving The Fee Retroactively Serves No Purpose .......... 9

    B.     The Alternative Transaction Fee Is Improper Because It Is Designed To
           Stifle, Rather Than Encourage, Competitive Bids for Financing ........................ 10

CONCLUSION .................................................................................................................. 12

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Calpine Corp. v. O'Brien Envt'l Energy, Inc. (In re O'Brien Envt'l Energy, Inc.)*,
  181 F.3d 527 (3d Cir. 1999)...............................................................................passim

*In re Bidermann Indus., U.S.A., Inc.*,
  203 B.R. 547 (Bankr. S.D.N.Y. 1997)...................................................................11

*In re Los Angeles Dodgers LLC*,
  457 B.R. 308 (Bankr. D. Del. 2011) .......................................................................9

*In re Reliant Energy Channelview LP*,
  594 F.3d 200 (3d Cir. 2010).............................................................................8, 10

*Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*,
  147 B.R. 650 (S.D.N.Y. 1992)...............................................................................11

STATUTES

11 U.S.C. § 503(b) .......................................................................................................8

The Official Committee of Unsecured Creditors (the "Committee") of Energy Future Holdings Corp., et al. (collectively, the "Debtors"), by and through its undersigned counsel, hereby files this objection (the "Objection") to the Motion of Energy Future Immediate Holding Company LLC and EFIH Finance Inc. (together, the "EFIH Borrowers") for Entry of an Order Authorizing Payment of an Alternative Transaction Fee Under The Postpetition Second Lien Financing Commitment Letter (the "Motion").[2]  In support of the Objection, the Committee respectfully represents as follows:[3]

## INTRODUCTION

1.      Through these chapter 11 proceedings, the Debtors are seeking approval of a Restructuring Support Agreement ("RSA") that they negotiated with certain creditors to deleverage their balance sheet and restructure their existing debt.

2.      The Committee has just commenced its analysis of the RSA and related transactions and is not yet in a position to fully assess their impact on these estates or unsecured creditors generally.   However, it is clear at this time that the proposed RSA leaves virtually nothing to satisfy the billions of dollars of TCEH unsecured claims, while allowing the proponents of the RSA to capture the valuable equity interest in the Debtors' ongoing operations.[4]

---

[2] Docket No. 477 (as modified on the record at the May 22, 2014 Hearing, to seek immediate approval of only the Alternative Transaction Fee).

[3] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the proposed Final Order.

[4] The RSA reflects that holders of General Unsecured Claims against the TCEH Debtors are expected to receive under a plan of reorganization their pro rata share of the "TCEH Unsecured Claim Fund."   Pursuant to the Pre-Submission Memo, a copy of which was annexed as part of Exhibit D to the *Declaration of Paul Keglevic, Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of Energy Future Holdings Corp., et al., in Support of First Day Motions* [Docket No. 98] (the "First Day Declaration"), the General Unsecured Claims against the TCEH Debtors have a face amount of approximately $7.7 billion, and it is expected that such creditors will receive a recovery of less than $350 million in cash, which amount has apparently been reduced to approximately $175 million as a result of the Debtors' prepetition use of unencumbered cash.

3.      More immediately, this Objection concerns a proposed second lien debtor-in-possession financing (the "EFIH Second Lien DIP"), with respect to which the EFIH Borrowers seek immediate approval of a $57 million "break-up" fee (styled the "Alternative Transaction Fee").[5]   The EFIH Borrowers would be liable for that fee in the event that they elect to enter into an alternative financing or any restructuring other than that contemplated by the EFIH Second Lien DIP and the RSA.

4.      The Alternative Transaction Fee appears to be a costly and unnecessary step towards locking in the RSA and making an alternative restructuring nearly impossible.  As a preliminary matter, the Alternative Transaction Fee appears unnecessary because the proposed EFIH Second Lien DIP itself appears unnecessary and improper.  It provides no meaningful economic benefit and, as currently proposed, erects barriers to any alternative restructuring proposal, effectively committing the Debtors to the RSA before the Committee or the Court has an opportunity to evaluate the RSA.[6]  Thus, the Alternative Transaction Fee serves no proper purpose.  The Committee opposes any measure that might lock the Debtors into the RSA as a practical matter before the Committee and the Court have had the opportunity to assess whether the RSA is in the estates' best interest.

---

[5] The EFIH Borrowers initially sought to have a motion for approval of the EFIH Second Lien DIP heard on June 5, 2014 [Docket No. 477].  After preliminary discussion between the Committee and the Debtors, the Debtors agreed to postpone seeking approval of the EFIH Second Lien DIP until June 30, 2014.  The Committee will continue to discuss the EFIH Second Lien DIP with the Debtors in hopes of resolving its concerns in advance of that date, and therefore reserves all of its rights to later object to the EFIH Second Lien DIP and to the RSA.

[6] In particular, the EFIH Second Lien DIP contains a "Prepayment Fee" of $380 million.  The Prepayment Fee essentially functions as another break-up fee (of approximately 20% of the amount of the DIP Facility) payable to the EFIH Second Lien Lenders if they do not receive their bargained for equity under the RSA.  A fee of that size would, of course, make almost any alternative proposal completely uneconomical.  As the EFIH Borrowers are not seeking approval of the Prepayment Fee at this time, the Committee will reserve further discussion on the issue for the appropriate time.

ny-1144321

5.       Reserving the Committee's broader objections to the EFIH Second Lien DIP, the Alternative Transaction Fee presently before the Court is improper and should not be approved for two reasons:

6.       <u>First</u>, the Alternative Transaction Fee is wholly unnecessary, and thus wasteful for the Debtors, because the Initial Commitment Parties[7] committed to fund the EFIH Second Lien DIP without any requirement that the Alternative Transaction Fee be separately approved prior to approval of the EFIH Second Lien DIP itself, and thus they will remain committed even if the Court does not approve the fee at this time.  (*See* Commitment Letter).  In fact, the Commitment Letter only terminates upon termination of the RSA, and the relevant milestone in the RSA only requires approval of the EFIH Second Lien DIP within seventy-five (75) days of the Petition Date (July 13, 2014).  Thus, approving the Alternative Transaction Fee will accomplish nothing more than a give-away to the Initial Commitment Parties.  Approving a break-up fee in this context is improper.  *See Calpine Corp. v. O'Brien Envt'l Energy, Inc. (In re O'Brien Envt'l Energy, Inc.)*, 181 F.3d 527, 535 (3d Cir. 1999) (where the party will bid "whether or not break-up fees are offered . . . the award of a break-up fee cannot be characterized as necessary to preserve the value of the estate.").

7.       <u>Second</u>, the Alternative Transaction Fee is improper because it is designed to stifle, rather than encourage, competing bids for financing.  This is made clear by the fact that there already is a competing offer with more favorable terms (i.e. lower interest rate and fees), and the EFIH Borrowers' motion to approve the EFIH Second Lien DIP makes clear that they have little intent to solicit any further competing bids.  Moreover, the proposed $57 million

---

[7] The "<u>Initial Commitment Parties</u>" are Avenue Capital Management II, LP, York Capital Management Global Advisors, LLC, GSO Capital Partners LP, Third Avenue Management LLC, and P. Schoenfeld Asset Management LP. (*See* Mot. Ex. E, the "<u>Commitment Letter</u>".)

3

Alternative Transaction Fee swallows any potential savings of the EFIH Second Lien DIP.[8]

Indeed, the full refinancing of the existing EFIH Second Lien Notes, is projected to save only

"up to" $8 million per month for the projected one year duration of these proceedings, before

accounting for over $145 million in transaction costs.  In the face of what is at best something

less than $8 million per month in savings, it would be nearly impossible for any competing offer

to provide terms sufficiently better to make up for a $57 million break-up fee, thus locking in the

existing proposal as the only viable option (to the extent financing is needed at all).

## BACKGROUND

8.      Although the Debtors' operations are strong and will continue to be cash flow

positive before debt service, the Debtors maintain that it is impossible for the Debtors to support

their current debt load.  (First Day Declaration ¶ 11.)  Accordingly, Debtors commenced these

chapter 11 cases to begin the process of implementing the Global Restructuring as memorialized

in the RSA.  (Id.¶ 179.) The Debtors maintain that they are poised to exit chapter 11 within a

year. (*Id.* ¶ 178.)

9.      The Debtors assert that the EFIH Second Lien DIP is "a key component of" and

will "set the stage for" the RSA.  (Mot. ¶¶ 4, 8; *see also* First Day Declaration ¶ 171 (referring to

the EFIH Second Lien DIP as the "lynchpin of the recapitalization of EFIH and EFH Corp.").

***The Proposed EFIH Second Lien DIP Financing***

10.      Under the proposed EFIH Second Lien DIP, the EFIH estates would receive $1.9

billion in cash in exchange for issuing $1.9 billion of "Tranche A Notes" to the EFIH Second

Lien Lenders bearing an 8% interest rate, and $95 million in "Tranche B Notes" to the

---

[8] The Committee is still evaluating the EFIH Second Lien DIP, but it is not clear to the Committee that any savings
will ultimately be realized from the facility after taking into account applicable fees.

Commitment Parties[9] in satisfaction of a $95 million closing fee.  (Mot. at 14.)[10]   At maturity, the holders of the Tranche A Notes would receive 64% of the equity of restructured Energy Future Holdings.  (Mot. at 17.)

11.     The EFIH Second Lien DIP Facility will be used to partially repay outstanding EFIH Second Line Notes (which will be fully repaid with contributions from the EFIH First Lien DIP Financing and cash on hand), including: (a) approximately $406 million principal amount of 11.00% notes; and (b) approximately $1.750 billion principal amount of 11.75% notes.  (Mot. ¶ 27; Ying Declaration, dated May 15, 2014 ¶ 12.)  The Debtors assert that the EFIH Second Lien Notes refinancing will save interest expense and deleverage EFH Corp. and EFIH.  (First Day Declaration ¶ 172.)  They estimate the potential interest savings to be "up to" $8 million per month.  (Mot. ¶ 32.)  Thus, for the anticipated one-year duration of these proceedings, the total estimated savings would be "up to" $96 million, before consideration of any fees or other costs associated with the EFIH Second Lien DIP.

12.     In addition to the $95 million closing fee, the EFIH Second Lien DIP also provides for $40 million of various execution, approval, arranger, and funding cash fees, as well a potential $11.25 million participation fee.  (Mot. at 14 & Commitment Letter at 3.)  Moreover, if the Oncor TSA Amendment is not approved by April 29, 2015, then the EFIH Borrowers will also be liable for a "PIK Fee" of 10% of the outstanding balance on all outstanding Tranche A and Tranche B Notes—nearly $200 million.  If the EFIH Borrowers enter into an alternative transaction such that the holders of Tranche A Notes are repaid in cash rather than equity, the

---

[9] The "Commitment Parties" include the Initial Commitment Parties, the Selected Partners, and the Transferee Commitment Parties (each as defined in the Motion).

[10] The Tranche B Notes are initially interest free, but would increase to 4% if the Oncor TSA Amendment (which provides that Oncor will make payments directly to EFIH rather than to EFH) is not approved by July 27, 2014, and would increase to 10% if the Oncor TSA Amendment is not approved by April 29, 2015.  (Motion at 13.)

ny-1144321

EFIH Borrowers will further be liable for a Prepayment Fee of $380 million (20% of the total proposed financing amount). (*Id.*)

13.    The parties providing the funding for the EFIH Second Lien DIP are all current creditors of the Debtors—specifically, holders of EFIH Unsecured Notes and EFH Unsecured Notes—who have participation rights in the Investment Commitment (91% and 9%, respectively). (First Day Declaration ¶ 171.)[11]   The Debtors maintain that the bulk of the financing must come from existing creditors so that the proposed transactions do not trigger tax liability.   (Mot. ¶ 36 ("If any person or persons other than current creditors of the EFIH Borrowers were to obtain, as a group, a majority interest in EFIH or EFH Corp. in connection with a debt-restructuring deal, the tax-free nature of the restructuring contemplated by the restructuring support agreement would no longer be achievable.").)

*The Alternative Transaction Fee*

14.    The provision of the EFIH Second Lien DIP for which the Debtors are currently seeking immediate approval—and the subject of this Objection—is an "Alternative Transaction Fee" of $57 million that must be paid to the Initial Commitment Parties if, at any time before the Second Lien DIP is funded, the Debtors enter into definitive transaction with respect to any plan or transaction other than that contemplated by the RSA.   (Mot. at 14; Commitment Letter at 5.) While not clear from the Commitment Letter, the Committee understands, upon information and belief, that the Alternative Transaction Fee expires once the EFIH Second Lien DIP is funded (and then, any alternative transaction would result in the payment of the $380 million Prepayment Fee).   Thus, in this context, the Alternative Transaction Fee functions as a break-up fee with respect to any alternative financing.

---

[11] These participation rights are subject, in the case of the participation rights held by holders of EFIH Unsecured Notes, to pro rata reduction by certain investing partners selected by the Initial Commitment Parties.  First Day Declaration ¶ 171.

15.     While not surprising that the Initial Commitment Parties are now insisting on payment of the Alternative Transaction Fee, the Commitment Letter, itself does not condition the Initial Commitment Parties' obligations upon court approval of the Alternative Transaction Fee. (*See* Commitment Letter.)  Nor does the Commitment Letter provide the Initial Commitment Parties with a right to terminate the commitment if the Court declines to approve the Alternative Transaction Fee.  (*See id.*)  Rather, the Commitment Letter only terminates upon termination of the RSA.[12]  In other words, if the Alternative Transaction Fee is not approved at this time, the Initial Commitment Parties remain committed to fund the EFIH Second Lien DIP, and the EFIH Borrowers are free to consider alternatives.  If the Alternative Transaction Fee is approved, however, and the EFIH Borrowers ultimately decide to proceed with an alternative to the proposed EFIH Second Lien DIP, they will be forced to pay $57 million to the Initial Commitment Parties.[13]

***Potential Alternative Financing***

16.     The EFIH Borrowers received an alternative financing proposal from the advisors to an ad hoc committee of EFIH Second Lien Creditors in March 2014 that they admittedly decided not to pursue.  (Ying Declaration ¶¶ 20-22.)  The EFIH Borrowers then received another offer of alternative financing from the advisors to the ad hoc group of EFIH Second Lien Creditors on May 12, 2014, in the form of a four-page alternative Second Lien DIP term sheet (the "Alternative DIP").  The Alternative DIP provides substantially similar terms to the EFIH Second Lien DIP, except with lower interest rates and fees.  (*See* Emergency Motion of EFIH 2d

---

[12] As noted above, the relevant milestone in the RSA with respect to the EFIH Second Lien DIP only requires approval of the facility as a whole (but not the Alternative Transaction Fee separately) within 75 days of the Petition Date (July 13, 2014).  If the EFIH Second Lien DIP is approved and funded, the Alternative Transaction Fee will become irrelevant and replaced with the Prepayment Fee.

[13] Based on the provisions outlined above, if the EFIH Borrowers do enter into the EFIH Second Lien DIP but do not proceed with the RSA, they could be liable for at least the $380 million Prepayment Fee. The liability could increase to nearly $600 million if the Oncor TSA Amendment also does not go forward as planned.

ny-1144321

Lien Notes Indenture Trustee To Compel Debtors to Obtain Prior Approval Of Procedures

Governing Their EFIH 2d Lien Tender Offer, Ex. 2 [Docket No. 441-2] ("Alternative DIP Term

Sheet".)

17.     The EFIH Borrowers acknowledge that "the nominal terms of the Competing

Second Lien DIP Summary appear, in some ways, economically favorable compared to the EFIH

Second Lien DIP . . . ."  (Mot. ¶ 38; *see also* Ying Declaration ¶ 23.)  The EFIH Borrowers note,

however, that "most importantly," the proposal did not address how it would "retain the support

of current signatories to the RSA."  (Ying Declaration ¶ 23)  In other words, while the economic

terms of the deal on a standalone basis are more favorable to the EFIH Borrowers, the

downside—if it can be called that—is that the Alternative DIP apparently does not provide as

great of a financial benefit to that specific group of creditors that signed on to the RSA.[14]

## ARGUMENT

## I.    THE PROPOSED ALTERNATIVE TRANSACTION FEE IS UNNECESSARY AND HARMFUL TO THE DEBTORS

18.     The Third Circuit has found that the payment of a break-up fee is governed by

section 503(b) of the Bankruptcy Code, which, in relevant part, permits payment of post-petition

administrative expenses for the "'actual, necessary costs and expenses of preserving the estate.'"

*See In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) (citation omitted);

11 U.S.C. § 503(b).

19.     Therefore, to award a break-up fee, the court must determine that the break-up fee

was an actual and necessary cost and expense of preserving the estate.  *See In re O'Brien Envt'l*

---

[14]     Putting aside the terms of the competing Second Lien DIP proposals, it is not clear that the EFIH Borrowers need this Second Lien DIP financing at all.  The EFIH Borrowers never contend that the EFIH Second Lien DIP is necessary to continue operations or otherwise to preserve the estates' assets, and a comparison of the substantial fees to the relatively insubstantial savings calls into question why the financing is necessary.  To the extent not resolved prior to ultimate hearing on the EFIH Second Lien DIP, the Committee will address this issue in more detail in a subsequent objection.

ny-1144321

*Energy, Inc.*, 181 F.3d at 535 ("the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate.").[15]

20.     The burden is on the EFIH Borrowers to prove the necessity of, and benefit to the estates from, the proposed break-up fee. In addition, although "the considerations that underlie the debtor's judgment may be relevant to the bankruptcy court's determination on a request for break-up fees and expenses," "the business judgment rule should not be applied as such in the bankruptcy context." *Id.*

### A.     The Commitment Letter Is Not Conditioned On An Alternative Transaction Fee So Approving The Fee Retroactively Serves No Purpose

21.     The EFIH Borrowers cannot demonstrate that the Alternative Transaction Fee is necessary because the Commitment Letter is binding on the Initial Commitment Parties even if the Alternative Transaction Fee is not approved at this time.  (*See* Commitment Letter.)  Thus, even assuming the EFIH Second Lien DIP were itself necessary—which the Committee is concerned may not be the case at all—the Alternative Transaction Fee is not needed to secure the DIP and therefore provides no benefit.  As the *O'Brien* court noted:

> [E]ven if the purpose for the break-up fee is not impermissible, the break-up fee may not be needed to effectuate that purpose. For example, in some cases a potential purchaser *will bid whether or not break-up fees are offered* . . . . In such cases, the award of a break-up fee cannot be characterized as necessary to preserve the value of the estate.

---

[15] The same considerations will be relevant to the Court's analysis of the EFIH Second Lien DIP under Section 364(c) of the Bankruptcy Code.  To secure DIP financing under that provision, the EFIH Borrowers have the burden of proving: "(1) they are unable to obtain secured credit per 11 U.S.C. § 364(b) . . . (2) The credit transaction is necessary to preserve the assets of the estate; and (3) The terms of the transaction are fair, reasonable, and adequate, given the circumstances . . . ."  *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (denying motion to approve postpetition financing) (citations omitted).  The Committee does not believe that the EFIH Borrowers will be able to satisfy any element of that standard and reserves its right to object on those grounds, but the Alternative Transaction Fee presently before the Court, as a term of the EFIH Second Lien DIP, is not fair or reasonable for all the reasons set forth herein.

181 F.3d at 535 (emphasis added).  *See also Reliant*, 200 F.3d 208 (affirming disallowance of retroactive grant of break-up fee that was sought after the stalking horse bidder had bid for the assets).

22.      Moreover, as the Commitment Letter makes clear, the Initial Commitment Parties "had strong financial incentives to undertake the cost of submitting a bid . . . even in the absence of any promise for reimbursement." *In re O'Brien Envt'l Energy, Inc.*, 181 F.3d at 537.  Indeed, because the funding is (and according to the Debtors must) come from existing creditors of the Debtors' estates (*See* Mot. ¶ 36; First Day Declaration ¶ 171 (noting existing creditor participation rights)), there is no reason to think that any funding option available today will cease to exist before the Court has the opportunity to consider the motion to approve the EFIH Second Lien DIP.  Indeed, any attempt by the Initial Commitment Parties to terminate the EFIH Second Lien DIP as a result of a denial of the Alternative Transaction Fee at this time would appear to be a breach of the Commitment Letter.

### B.      The Alternative Transaction Fee Is Improper Because It Is Designed To Stifle, Rather Than Encourage, Competitive Bids for Financing

23.      While break-up fees can be appropriate when they are necessary to "induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely. . . . " (*In re O'Brien Env'tl Energy, Inc.*, 181 F.3d at 537), that is certainly not the case here.  Quite the opposite, the EFIH Borrowers have a competing offer on substantially similar terms to the EFIH Second Lien DIP, except with lower interest rates and fees.  (*See* Alternative DIP Term Sheet [Docket No. 441-2]; *see also* Mot. ¶ 38 (acknowledging competing offer); Ying Declaration ¶ 23 (same).)  It is not yet clear whether the EFIH Borrowers intend to pursue the Alternative DIP proposal, and there is no indication that they intend to encourage any further competing offers.

ny-1144321

24.     Here, as the *O'Brien* court warned, a break-up fee may "serve to advantage a favored purchaser over other bidders by increasing the cost of the acquisition to the other bidders (*an impermissible purpose*). . . ."  181 F.3d at 535 (emphasis added) (affirming rejection of bidding procedures that included a break-up fee on the grounds that it would "'not induce further bidding or bidding generally', but would 'unnecessarily chill[] bidding and potentially deplete[] assets that could be better utilized to help fund a plan of reorganization . . .'" (citation omitted); *see also In re Bidermann Indus., U.S.A., Inc.*, 203 B.R. 547, 551-53 (Bankr. S.D.N.Y. 1997) (rejecting proposed bidding procedures where "[t]he whole bidding arrangement [was] designed not to encourage but to stifle bidding."); *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("The usual rule is that if break-up fees encourage bidding, they are enforceable; if they stifle bidding they are not enforceable.")

25.     The Alternative Transaction Fee would serve exactly that impermissible purpose of stifling competing bids, because the $57 million fee would eradicate most, if not all of, the potential economic benefit of EFIH Second Lien DIP.  The EFIH Borrowers assert that the proposed refinancing of Second Lien Notes will provide interest savings of "up to" $8 million per month (Mot. ¶ 32.), and the Debtors anticipate these proceedings will take one year (First Day Declaration ¶ 178.)  If true, then the alleged savings from the Second Lien Notes refinancing is at most $96 million. However, this alleged benefit will be significantly reduced if the EFIH Borrowers end up having to pay the $57 million Alternative Transaction Fee.

26.     Moreover, any alleged benefit of the EFIH Second Lien DIP is illusory because the EFIH Second Lien DIP (which the EFIH Borrowers would effectively be locked into if the Alternative Transaction Fee is approved) provides for over $145 million in aggregate transaction fees (excluding the proposed Alternative Transaction Fee)—and these fees certainly will exceed

11

the alleged interest savings.  While $95 million of those fees are being satisfied in Tranche B Notes and ultimately will be converted to equity, in the event the Prepayment Fee or PIK Interest related to the Oncor TSA Amendment become payable, the EFIH Second Lien DIP becomes vastly more expensive than simply leaving the existing EFIH Second Lien Notes in place. Moreover, the refinancing will be accomplished not only with the proceeds of the EFIH Second Lien DIP, but also from "the EFIH First Lien DIP and cash on hand."  (Ying Declaration, dated May 15, 2014 ¶ 12.)   Therefore, only some portion of the potential $96 million savings can be attributable to the EFIH Second Lien DIP.

27.    In light of the narrow margin for potential savings from the EFIH Second Lien DIP, it is inconceivable that a competing offer can provide an incremental benefit sufficient to offset the $57 million Alternative Transaction Fee.  Therefore, the Alternative Transaction Fee effectively precludes any alternative financing, to the extent the EFIH Borrowers continue to believe that the financing is necessary at all.[16]

## CONCLUSION

28.    The Committee has been in discussions with the Debtors and is hopeful that they can agree to modifications that address some or all of the concerns with the EFIH Second Lien DIP.  However, in the interim, the Committee respectfully requests that the Court deny the EFIH Borrowers' request for approval of an Alternative Transaction Fee.

---

[16]  Arguably the Alternative Transaction Fee would even be payable if the EFIH Borrowers determine not to proceed with any re-financing of the existing EFIH Second Lien debt (or the Court refuses to approve the EFIH Second Lien DIP), thereby making any alternative restructuring other the RSA vastly more expensive for no obvious benefit to the estate.

ny-1144321

WHEREFORE, the Committee respectfully requests that the Court deny the EFIH

Borrowers' request for approval of an Alternative Transaction Fee and grant such other and

further relief as the Court may deem just and proper.

Dated: Wilmington, Delaware
      May 29, 2014

**MORRISON & FOERSTER LLP**
James M. Peck
Brett H. Miller
Lorenzo Marinuzzi
Todd M. Goren
Samantha Martin
250 West 55th Street
New York, New York 10019-9601
Telephone:  (212) 468-8000
Facsimile:  (212) 468-7900
E-mail:  jpeck@mofo.com
      brettmiller@mofo.com
      lmarinuzzi@mofo.com
      tgoren@mofo.com
      smartin@mofo.com

      -and-

*/s/ Christopher A. Ward*
Christopher A. Ward (Del. Bar No. 3877)
Justin K. Edelson (Del. Bar No. 5002)
Shanti M. Katona (Del. Bar No. 5352)
**POLSINELLI PC**
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile:  (302) 252-0921
E-mail:  cward@polsinelli.com
      jedelson@polsinelli.com
      skatona@polsinelli.com

*Proposed Counsel for The Official
Committee of Unsecured Creditors of
Energy Future Holdings Corp., et al.*