**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Energy Future Holdings Corp., *et al.,*[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket No. 71** |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO
THE MOTION OF TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC
AND CERTAIN OF ITS DEBTOR AFFILIATES FOR ENTRY OF INTERIM AND
FINAL ORDERS (A) AUTHORIZING USE OF CASH COLLATERAL, (B) GRANTING
ADEQUATE PROTECTION, (C) MODIFYING THE AUTOMATIC STAY,
AND (D) SCHEDULING A FINAL HEARING**

---

[1]    The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810.  The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201.  Due to the large number of debtors in these chapter 11 cases, which are being jointly administered on an interim basis, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://efhcaseinfo.com.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................... 1

BACKGROUND ................................................................................................... 6

ARGUMENT ........................................................................................................ 6

    I.      THE PROPOSED ADEQUATE PROTECTION IS EXCESSIVE AND DETRIMENTAL TO UNSECURED CREDITORS............................................ 6

           A.     Adequate Protection Should Be Limited Because There is No Evidence the Prepetition Collateral is Declining in Value ........................ 7

           B.     The Prepetition Secured Creditors Should Not Receive Adequate Protection Liens and Superpriority Claims on Unencumbered Assets .................................................................................................... 11

           C.     The Proposed Adequate Protection Payments are Excessive .................. 14

    II.     THE PROPOSED FINAL ORDER UNDULY RESTRICTS THE COMMITTEE'S ABILITY TO CONDUCT ITS INVESTIGATION............... 16

    III.    THE PROPOSED BANKRUPTCY SECTION 506(C) WAIVER IS INAPPROPRIATE ........................................................................................... 20

    IV.    OTHER PROVISIONS OF THE FINAL ORDER ARE UNREASONABLE ............................................................................................ 21

CONCLUSION.................................................................................................... 22

# TABLE OF AUTHORITIES

**Page**

CASES

*Buncher v. Official Comm. of Unsecured Creditors of GenFarm Ltd. Partnership IV*,
229 F.3d 245 (3d Cir. 2000)...................................................................................13

*Hartford Fire Ins. Co. v. Norwest Bank Minn., N.A. (In re Lockwood Corp.)*,
223 B.R. 170 (B.A.P. 8th Cir. 1998)........................................................................20

*In re 495 Cent. Park Ave. Corp.*,
136 B.R. 626 (Bankr. S.D.N.Y. 1992).......................................................................9

*In re Adams*,
275 B.R. 274 (Bankr. N.D. Ill. 2002) .......................................................................12

*In re Caccamise*,
No. 09-17165-SSM, 2009 Bankr. LEXIS 4174 (Bankr. E.D. Va. Dec. 22, 2009).................14

*In re Cont'l Airlines, Inc.*,
146 B.R. 536 (Bankr. D. Del. 1992) .........................................................................7

*In re Equalnet Commc'ns Corp.*,
258 B.R. 368 (Bankr. S.D. Tex. 2001) ....................................................................15

*In re Mullen*,
172 B.R. 473 (Bankr. D. Mass. 1994) .....................................................................9

*In re Newark Airport/Hotel Ltd. P'ship*,
156 B.R. 444 (Bankr. D.N.J.) *aff'd sub nom.*, *FGH Realty Corp. v. News
Airport/Hotel Ltd. P'ship*, 155 B.R.93 (D.N.J. 1993) .............................................10

*In re Salem Plaza Assocs.*,
135 B.R. 753 (Bankr. S.D.N.Y. 1992).......................................................................9

*Kivitz v. CIT Grp./Sales Fin., Inc.*,
272 B.R. 332 (D. Md. 2000) ....................................................................................20

*Majestic Star Casino, LLC v. Barden Dev., Inc. (In re the Majestic Star Casino, LLC)*,
716 F.3d 736 (3d Cir.2013)......................................................................................13

*McAlpine v. Comerica Bank-Detroit (In re Brown Bros., Inc.)*,
136 B.R. 470 (W.D. Mich. 1991) .............................................................................21

*McCarthy v. Navistar Fin. Corp. (In re Vogel Van & Storage, Inc.)*,
210 B.R. 27 (N.D.N.Y. 1997), *aff'd*, 142 F.3d 571 (2d Cir. 1998) ..........................12

# TABLE OF CONTENTS
(continued)

**Page**

*Mellon Bank v. Glick (In re Integrated Testing Products Corp.)*,
    69 B.R. 901 (D.N.J. 1987) ............................................................................12

*Official Comm. Of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re*
    *Cybergenics Corp.)*,
    226 F.3d 237 (3d Cir. 2000).........................................................................13

*Precision Steel Shearing, Inc. v. Fremont Fin. Corp. (In re Visual Indus., Inc.)*,
    57 F.3d 321 (3d Cir. 1995).........................................................................20

*Save Power Ltd. v. Pursuit Athletic Footwear, Inc. (In re Pursuit Athletic Footwear Inc.*,
    193 B.R. 713 (Bankr. D. Del. 1996) .............................................................8

*Shapiro v. Saybrook Mfg. Co. (In re Saybrook Mfg. Co.)*,
    963 F.2d 1490 (11th Cir. 1992) ...................................................................15

*United Savs. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*,
    484 U.S. 365 (1988)....................................................................................7

*Zink v. Vanmiddlesworth*,
    300 B.R. 394 (N.D.N.Y. 2003) ....................................................................7

**STATUTES**

11 U.S.C § 1103(c)(2)....................................................................................16

**OTHER AUTHORITIES**

Transcript of Hearing, *In re Future Holdings Corp.*, No. 14-10979 (CSS) (Bankr. D. Del.
    May 22, 2014).....................................................................................2, 9, 15

Transcript of Hearing, *In re Innkeepers USA Trust*,
    Case No. 10-13800 (SC), (Bankr. S.D.N.Y. Sept. 2, 2010)..............................12

The Official Committee of Unsecured Creditors (the "Committee") of Energy Future Holdings Corp., *et al.* (collectively, the "Debtors"), by and through its undersigned counsel, hereby files this objection ("Objection") to the *Motion of Texas Competitive Electric Holdings Company LLC and Certain of its Debtor Affiliates for Entry of Interim and Final Orders (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing* [Docket No. 71] (the "Motion"). In support of the Objection, the Committee respectfully represents as follows:[2]

## INTRODUCTION

1.    The Committee was formed on May 13, 2014 as a representative of the TCEH unsecured creditors.[3] Since the date of its formation, the Committee has been working hard to learn about and address the multitude of issues that characterize these enormously complicated chapter 11 cases. These bankruptcy cases follow the largest failed leverage buyout of all time, and it will take a great deal of effort and analysis to fully understand what went wrong and why and to determine the means by which creditor recoveries may be enhanced. Importantly, the Committee through its newly engaged professional advisors[4] will examine and test the assumptions that have yielded an inequitable and one-sided restructuring thesis—a thesis that is manifestly detrimental to the interests of the TCEH unsecured creditors, apparently without factual support.

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the proposed Final Order.

[3] The *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 420] reflects that the Committee represents the interests of the unsecured creditors only of Energy Future Competitive Holdings Company LLC ("EFCH"), TCEH, the direct and indirect subsidiaries of EFCH and TCEH, and EFH Corporate Services Company, and of no other debtors.

[4] The Committee has retained the following advisors: Morrison & Foerster LLP, as its lead counsel; Polsinelli PC, as its Delaware counsel; Lazard Freres & Co. LLC, as its investment banker; and FTI Consulting, Inc., as its financial advisors.

2.      The hypothetical aspects of the value proposition are now evident.  Evidence presented at the venue hearing on May 22, 2014 has revealed that the Debtors have proposed their restructuring without having conducted any accepted valuation of the TCEH assets.[5]  Thus, the valuation premise that purports to relegate the TCEH unsecured creditors to inferior and prejudicial treatment under the Restructuring Support Agreement (the "RSA") is not just suspect, it is entirely unsupported.

3.      This is not the first time that secured creditors in recent mega chapter 11 cases have aligned with the debtor in an effort to usurp control over the bankruptcy process by insisting on performance milestones that set aggressive deadlines to the disadvantage of junior creditors in a complex capital structure.  This is a self-interested strategy of presumptive entitlement designed to exert pressure on those who are not parties to the RSA and on the Court as well.  In this case, these deadlines for obtaining relief are based on invalid and unproven valuation premises that underlie the RSA itself.  These premises are no more than flawed assumptions as to value.

4.      The Motion for authority to use cash collateral, consistent with other motions filed by the EFH debtors (such as the motion to assume the RSA, the motions to approve second lien financing for the EFIH Debtors, and the motion to approve certain EFIH settlements and the amendment to the Oncor tax sharing agreement), is dependent on this unsupported value proposition.  The various procedural steps contemplated by the RSA threaten the rights of the constituency represented by the Committee, and the foregoing Motion is one of them.  The Motion is not benign.  If approved in its present form (as explained more fully in this Objection), excessive sums will be transferred to the Prepetition First Lien Creditors as adequate protection

---

[5] *See* Transcript of Hearing at 129:13-18, *In re Future Holdings Corp.*, No. 14-10979 (CSS) (Bankr. D. Del. May 22, 2014) (the relevant portions of which are annexed hereto as Exhibit A, the "May 22, 2014 Trans.")

payments to the potential detriment of TCEH unsecured creditors.  The relief requested also would unfairly constrain the rights of the Committee to investigate and challenge the claims of the Prepetition First Lien Creditors.  Other concerns of the Committee with respect to the Motion are listed below in this objection.

5.     Unless the proposed *Final Order (A) Authorizing Use of Cash Collateral for Texas Competitive Electric Holdings Company LLC and Certain of Its Debtor Affiliates, (B) Granting Adequate Protection, and (C) Modifying the Automatic Stay* [Docket No. 597] (the "Final Order") is modified in the manner described in this Objection, the Motion should not be granted.

6.     First, the adequate protection proposed to be granted to the Prepetition Secured Creditors[6] under the Motion is excessive.  The TCEH Debtors[7] propose to grant adequate protection liens and superpriority claims to Prepetition Secured Creditors on substantially all of their assets—including the TCEH Debtors' limited pool of unencumbered assets, which includes the proceeds of avoidance actions brought under chapter 5 of the Bankruptcy Code (the "Avoidance Actions", and together with the TCEH Debtors' other unencumbered assets, the "Unencumbered Assets").  The granting of liens and superpriority claims on Unencumbered Assets is particularly egregious here in light of the fact that substantially all of the TCEH Debtors' other assets are already encumbered, and these limited Unencumbered Assets are proposed to be the only assets available to unsecured creditors under the RSA.[8]

---

[6] The Prepetition Secured Creditors include Prepetition First Lien Creditors and the Prepetition Second Lien Creditors, each as defined in the Final Order.

[7] The "TCEH Debtors" include Texas Competitive Electric Holdings Company LLC and Energy Future Competitive Holdings Company LLC and each of the Subsidiary Guarantors (as defined in the Motion).

[8] The RSA reflects that holders of General Unsecured Claims against the TCEH Debtors are expected to receive under a plan of reorganization their pro rata share of the "TCEH Unsecured Claim Fund."  Pursuant to the Pre-Submission Memo, a copy of which was annexed as part of Exhibit D to the *Declaration of Paul Keglevic, Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of Energy Future Holdings Corp., et al., in Support of First Day Motions* [Docket No. 98] (the "First Day Declaration"), the General Unsecured

3

7.    In addition, the TCEH Debtors propose to use a significant portion of the DIP Facility (as defined in the Motion) to make monthly adequate protection payments to the Prepetition First Lien Creditors consisting of interest[9] plus professionals' fees and expenses, which, according to the DIP Budget[10] would result in payments to the Prepetition First Lien Creditors of approximately $105-137 million per month for the entirety of these chapter 11 cases.  Assuming the case continues through the entire 25-month period covered by the DIP Budget, this would result in aggregate adequate protection payments of nearly *$3 billion.*[11] These payments are proposed to be made notwithstanding the fact that the restructuring contemplated in the RSA is premised on the notion that the Prepetition First Lien Creditors are undersecured, and thus would not be entitled to post-petition interest and fees under Section 506(b) of the Bankruptcy Code.

8.    Second, the Final Order includes provisions that unduly restrain and obstruct the Committee's ability to fulfill its duties under section 1103(a)(2) of the Bankruptcy Code by, among other things, limiting the budget and time period for the Committee to undertake its investigation of the liens of, and any claims against, the Prepetition First Lien Creditors.  Where,

---

Claims against the TCEH Debtors have a face amount of approximately $7.7 billion, and it is expected that such creditors will receive a recovery of less than $350 million in cash, which amount has apparently been reduced to approximately $175 million as a result of the Debtors' prepetition use of unencumbered cash.

[9] The adequate protection payments will be made in an aggregate amount equal to LIBOR + 450 basis points multiplied by the aggregate outstanding amount of Prepetition First Lien Obligations as of the Petition Date in respect of such relevant periods ending after the Petition Date.  The Committee understands that this rate is intended to be an average of the various non-default interest rates provided for under the applicable First Lien Debt documents.

[10] See DIP Budget, a copy of which is annexed as Exhibit C to the *Motion of Texas Competitive Electric Holdings Company LLC and Certain of its Debtor Affiliates, for Entry of Interim and Final Orders (A) Approving Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing* [Docket No. 73].

[11] The Debtors maintain that they are poised to exit chapter 11 within a year (First Day Declaration ¶ 178), but the DIP Facility matures after approximately 24 months and the DIP Budget reflects a 25-month period.  If the TCEH Debtors are able to exit chapter 11 within a one-year period, the aggregate adequate protection payments would be approximately $1.3 billion.

as here, various parties have already raised issues[12] relating to the 2007 leveraged buy-out of TXU Corporation (the predecessor of the Debtors) and the Debtors' subsequent financing transactions, of which the First Lien Debt (as defined in the Motion) is a part, an investigation period of 60 days and a budget of $175,000 severely handicaps the Committee's ability to complete a full investigation of the extent and validity of the First Lien Debt to the detriment of all unsecured creditors.  Moreover, the proposed $175,000 budget is relatively insignificant when, in comparison to the other expenditures proposed in this case, it equals approximately 1.5 hours of adequate protection payable to the Prepetition First Lien Creditors under the proposed Final Order.  At a minimum, the Committee should be provided with no less than 120 days and a $1,500,000 budget to conduct its investigation and also should be granted standing in the Final Order to pursue any and all causes of action related to the First Lien Debt that the Committee deems appropriate.

9.     Third, the Final Order provides that the TCEH Debtors' estates are seeking to relinquish any rights to seek a surcharge against the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code.  The Committee submits that unsecured creditors should not be required to bear the cost of protecting collateral that belongs to the Prepetition Secured Creditors in a reorganization that, at this point, is designed to be solely for the benefit of such creditors and provides almost nothing to general unsecured creditors.

10.     Finally, certain other provisions of the Final Order are unreasonable and should be modified as described in Section IV below.

---

[12] See *Motion of Wilmington Savings Fund Society, FSB for Leave to Conduct Discovery Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure of Energy Future Holdings Corporation, its Affiliates, and Certain Third Parties* [Docket No. 6] (the "2004 Motion").

## BACKGROUND

11.     On April 29, 2014 (the "Petition Date"), the Debtors filed voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court, District of Delaware (the "Court").  On May 1, 2014, the Court entered an interim order directing joint administration of the Debtors' cases under Case Number 14-10979 [Doc. No. 287] and scheduled a further hearing on the matter for June 5, 2014 at 9:30 a.m. (Eastern).  No trustee or examiner has been appointed in these cases.

12.     On May 13, 2014, the United States Trustee for the District of Delaware appointed a seven (7) member Committee pursuant to section 1102(a)(1) of the Bankruptcy Code [Docket No. 420].[13]

13.     On the Petition Date, the Debtors filed the Motion, and on May 2, 2013, the Bankruptcy Court filed the *Interim Order (A) Authorizing Use of Cash Collateral for Texas Competitive Electric Holdings Company LLC and Certain of Its Debtor Affiliates, (B) Granting Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing* [Docket No. 324] (the "Interim Order").  A final hearing with respect to the Motion is scheduled for June 5, 2014 at 9:30 a.m. (Eastern Time).

## ARGUMENT

### I.     THE PROPOSED ADEQUATE PROTECTION IS EXCESSIVE AND DETRIMENTAL TO UNSECURED CREDITORS

14.     The TCEH Debtors propose to grant adequate protection to the Prepetition Secured Creditors to protect them from any diminution in the value of the Prepetition Collateral during these chapter 11 cases due to the Debtors' continued use of cash collateral and the alleged

---

[13] The Committee members include: (i) Pension Benefit Guaranty Corporation; (ii) HCL America, Inc.; (iii) The Bank of New York Mellon; (iv) Law Debenture Trust Company of New York; (v) Holt Texas LTD, d/b/a Holt Cat; (vi) ADA Carbon Solutions (Red River); and (vii) Wilmington Savings Fund Society.

ny-1144105

priming of the Prepetition Secured Creditors' liens by the liens granted under the DIP Facility. The proposed adequate protection includes, among other things, (i) adequate protection liens and superpriority claims on the Prepetition Collateral, as well as the Unencumbered Assets, which include the proceeds of Avoidance Actions, and (ii) adequate protection payments, solely to the Prepetition First Lien Creditors, consisting of interest plus professionals' fees and expenses, which, according to the DIP Budget, would result in payments of approximately $105-137 million per month and an aggregate amount of almost $3 billion if these chapter 11 cases continue for the full length of the DIP Budget. The proposed adequate protection is excessive because the Prepetition Secured Creditors are already adequately protected without these additional grants.

### A.    Adequate Protection Should Be Limited Because There is No Evidence the Prepetition Collateral is Declining in Value

The TCEH Debtors need <u>not</u> provide the Prepetition Secured Creditors with additional adequate protection beyond replacement liens on existing collateral where, as here, there is no evidence whatsoever that the Prepetition Collateral is declining in value. *See Zink v. Vanmiddlesworth*, 300 B.R. 394, 402-03 (N.D.N.Y. 2003) ("[T]he initial burden of showing the need for adequate protection [is] upon the creditor having an interest in the property being used by the debtor. In order to meet this burden, the secured creditor must demonstrate that such relief is required by showing a likelihood that the collateral will decrease in value or establishing some other basis for the relief. The burden then shifts to the debtor to show that adequate protection is not needed or can be provided in a different manner.") (internal citations omitted); *In re Cont'l Airlines, Inc.*, 146 B.R. 536 (Bankr. D. Del. 1992) ("Post-Timbers courts have uniformly required a movant seeking adequate protection to show a decline in value of its collateral.") (citing *United Savs. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 382 (1988)).

15.      There is no evidence that the Prepetition Collateral is expected to decrease in value during the chapter 11 cases.  Rather, the TCEH Debtors' post-petition use of cash collateral to fund working capital needs almost certainly <u>enhances</u> the value of the Prepetition Collateral.  Indeed, the TCEH Debtors' advisors noted that "the access to the capital provided by the DIP Facility and Cash Collateral will not only preserve the TCEH Debtors' liquidity but, as noted above, will only serve to enhance the value of the TCEH Debtors' estates."  *See* Goldstein Declaration, ¶ 30 [Docket No. 71, Exhibit B].  *See also* ¶ 26, 31.  A close review of the DIP Budget reflects that if the $105-137 million monthly adequate protection payments were not being made during the chapter 11 cases, the Debtors' cash flows before letter of credit activities would be positive—thus generating cash for the benefit of the Prepetition Secured Creditors (not diminishing the value of their collateral) during the pendency of these cases.  *See* Goldstein Declaration, ¶ 18.  In addition, the Chief Financial Officer and Co-Chief Restructuring Officer of Energy Future Holdings Corp., Paul Keglevic, noted in the First Day Declaration that "[o]nce the Debtors' balance sheet is de-levered, the Debtors expect that they will be able to operate their businesses profitably and aggressively pursue opportunities as they arise."  <u>See</u> First Day Declaration ¶ 144.

16.      Moreover, the Court's authorization of the use of the cash collateral to finance working capital needs and for other corporate purposes in and of itself constitutes a form of adequate protection.  *See* Goldstein Declaration, ¶ 26, 30.  The TCEH Debtors' use of cash collateral to continue the going concern of the TCEH Debtors' businesses will protect the Prepetition Secured Creditors' security interests by preserving the value of the Prepetition Collateral (thereby benefitting the Prepetition Secured Creditors).  *See Save Power Ltd. v. Pursuit Athletic Footwear*, Inc. (*In re Pursuit Athletic Footwear Inc.*, 193 B.R. 713 (Bankr. D. Del. 1996) (holding that a showing that the debtors could operate profitably postpetition

8

demonstrated adequate protection); *In re Mullen*, 172 B.R. 473, 478 (Bankr. D. Mass. 1994) ("If the rents were not used to pay for management, taxes and maintenance of the properties, the value of [the secured lender's] mortgage interest would rapidly decline."); *In re Salem Plaza Assocs.*, 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding that a secured creditor was adequately protected when cash collateral was used to pay necessary operating expenses); *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (holding that a prepetition secured creditor was adequately protected because "the value of the debtor's property [would] increase as a result of the renovations funded by the proposed financing.").

17.     Finally, the fact that the TCEH Debtors are proposing to enter into a senior DIP Facility in the aggregate principal amount of $4.475 billion does not provide a separate basis to provide the Prepetition Secured Lenders with additional adequate protection.  *See* Goldstein Declaration, ¶ 26 ("I believe the TCEH Debtors satisfy the requirements to obtain postpetition financing secured by a first priority priming lien, as I understand them, because the transaction will enhance the value of the TCEH Debtors' assets.").  Specifically, the DIP Facility, the use of cash collateral and the grant of adequate protection must be viewed in the context of this case—a balance sheet restructuring for a fundamentally healthy business that simply cannot handle its current debt load.  A liquidation is simply not a realistic possibility here.  *See* May 22, 2014 Trans. at 38:2-3 ("this is a balance sheet restructuring, not an operational restructuring. . . ."); *Id.* at 147:12-15 ("we need to reduce the amount of the debt, reduce the rate of the debt, and if operations remain exactly as they are today we will have a profitable healthy company going forward.").  As the TCEH Debtors' declarant acknowledges, if no adequate protection payments

were being made,[14] the Debtors' cash flows would be more than sufficient to cover the costs of doing business and of the Chapter 11 cases.  *See* Goldstein Declaration, ¶ 18.

18.    Beyond adequate protection payments, the primary other use of the DIP Facility is to provide new letters of credit to replace existing ones and other bonding requirements.[15] However, assuming the Debtors continue to satisfy their administrative obligations in the ordinary course (an assumption one must make considering the purpose of these Chapter 11 cases), the new postpetition letters of credit will not be drawn during the chapter 11 cases, and thus will not diminish the Prepetition Secured Creditors' position with respect to the Prepetition Collateral.[16]  Thus, even without making any adjustments to the TCEH Debtors' assumptions and DIP Budget, if the TCEH Debtors did not have to make the proposed adequate protection payments, they would be in a superior cash position at the end of the case.  Regardless, as even the TCEH Debtors' own declarant acknowledges, the DIP Facility and use of cash collateral in these cases will not diminish the Prepetition Secured Creditors' position with respect to the Prepetition Collateral and thus Prepetition Secured Creditors should not require any additional adequate protection.  *See* Goldstein Declaration, ¶ 31.  *See also In re Newark Airport/Hotel Ltd. P'ship*, 156 B.R. 444, 450 (Bankr. D.N.J.) *aff'd sub nom.*, *FGH Realty Corp. v. News Airport/Hotel Ltd. P'ship*, 155 B.R.93 (D.N.J. 1993) (after concluding that the collateral is "for the most part is likely increasing in value as time passes", holding that the secured creditor's

---

[14]  The aggregate "adequate protection payments" are expected to be approximately $1.242 billion over the initial 12-month period and $2.790 billion over the entire 25-month period.

[15] In total, the TCEH Debtors anticipate posting approximately $1.9 billion in postpetition letters of credit, including the $1.1 billion RCT Letters of Credit, during the chapter 11 cases (regardless of whether the case lasts 12 months or 25 months).

[16] Even with respect to postpetition letters of credit issued to support hedging obligations, if natural gas prices were to rise and such hedges became out-of-the-money, the Debtors would satisfy such obligations out of ordinary cash flows.  Moreover, if hedges moving out of the money resulted in unexpected cash use or the unlikely draw of a letter of credit, the resulting increase in power prices, EBITDA and the value of the Prepetition Collateral, would offset any impact from a draw on the postpetition letter of credit supporting such hedges.

ny-1144105

interest in the collateral "is being adequately protected, no adequate protection payments are necessary given the current situation, and [the secured creditor] is not entitled to relief from the automatic stay pursuant to § 362(d)(1).").

19.     Accordingly, there seems little doubt that the Prepetition Collateral is not declining in value and the Prepetition First Lien Creditors are not in need of the substantial adequate protection proposed in the Final Order.

> **B.     The Prepetition Secured Creditors Should Not Receive Adequate Protection Liens and Superpriority Claims on Unencumbered Assets**

20.     Because there is no evidence that the Prepetition Collateral is declining in value and the proposed use of cash collateral in and of itself preserves and enhances the value of such collateral, the Final Order should not grant adequate protection liens and superpriority claims to the Prepetition Secured Creditors on Unencumbered Assets, which include the proceeds of Avoidance Actions.

21.     While the Committee has not yet had the opportunity to investigate potential Avoidance Actions and the Debtors have not yet filed their schedules of assets and liabilities or statements of financial affairs, it appears, based on the Debtors' pleadings to date, that, other than (i) the approximately $150 million in Segregated Cash (as defined in the Motion), and (ii) some miscellaneous real estate and motor vehicles, substantially all of the TCEH Debtors' assets are encumbered.  Avoidance Actions may be one of the few assets available to unsecured creditors.  The TCEH Debtors' proposal to grant the Prepetition Secured Creditors adequate protection liens and superpriority claims on the Unencumbered Assets puts even the de minimis recoveries offered to unsecured creditors under the RSA precariously at risk.  Thus, to the extent any viable Avoidance Actions or other commercial tort claims (which are likewise unencumbered) exist, if the Motion is granted, the value of such assets (along with the

Unencumbered Assets) could inequitably shift from the Debtors' general unsecured creditors to the Prepetition Secured Creditors.

22.    Absent exigent circumstances or consent, avoidance actions should not be burdened by liens or super-priority lender claims.

> "Courts have refused to allow assignment or sale of avoidance claims by the Trustee because such transfers would run contrary to two primary policies underlying the Bankruptcy Code.  First, the Code allows only the trustee or debtor-in-possession to sue on a preference because only that trustee or debtor-in-possession represents the interests of all creditors in maximizing the value of the debtor's estate. . . . Second, permitting trustees alone to sue on a preference 'facilitate[s] the prime bankruptcy policy of equality…

*McCarthy v. Navistar Fin. Corp.* (*In re Vogel Van & Storage, Inc.*), 210 B.R. 27, 33 (N.D.N.Y. 1997), *aff'd*, 142 F.3d 571 (2d Cir. 1998) (citations omitted); *In re Adams*, 275 B.R. 274, 283 (Bankr. N.D. Ill. 2002) ("[T]he grant of a superpriority claim to a pre-petition secured creditor violates the Code's policy of equality of distribution, particularly where there is no showing that such a grant will benefit the debtors' bankruptcy estate.").  *See also* Transcript of Hearing at 14:22 – 15:4, *In re Innkeepers USA Trust*, Case No. 10-13800 (SC) (Bankr. S.D.N.Y. Sept. 2, 2010) (the relevant portions of which are annexed hereto as <u>Exhibit B</u>) ("Regarding the committee's objection to the granting of superpriority claims with respect to avoidance actions or the proceeds thereof, I agree with the committee's position and decline to grant the superpriority claims.  Even though their [re]quest for liens on the avoidance actions was withdrawn, I believe the committee's objection should be sustained as the withdrawal of the request for liens gives relatively empty protection if the superpriority claims still remain.");  *Mellon Bank v. Glick (In re Integrated Testing Products Corp.)*, 69 B.R. 901 (D.N.J. 1987) ("It is well settled that generally it is the trustee alone, acting on behalf of all the creditors, that has a right to recover payments made as preferences. And this right cannot be assigned.") (citations omitted); *Buncher*

*v. Official Comm. of Unsecured Creditors of GenFarm Ltd. Partnership IV*, 229 F.3d 245 (3d Cir. 2000) ("The purpose of fraudulent conveyance law is to make available to creditors those assets of the debtor that are rightfully part of the bankruptcy estate, even if they have been transferred away. When recovery is sought under section 544(b) of the Bankruptcy Code, any recovery is for the benefit of all unsecured creditors, including those who individually had no right to avoid the transfer.") (citations omitted); *Majestic Star Casino, LLC v. Barden Dev., Inc. (In re the Majestic Star Casino, LLC)*, 716 F.3d 736, 761 n.26 (3d Cir.2013) ("A debtor is not entitled to benefit from any avoidance, … and 'courts have limited a debtor's exercise of avoidance powers to circumstances in which such actions would in fact benefit the creditors, not the debtors themselves,'") (citing *Official Comm. Of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.),* 226 F.3d 237, 244 (3d Cir. 2000)).

23.     It appears evident from the proposed restructuring set forth in the RSA that the TCEH Debtors are running these chapter 11 cases primarily for the benefit of the Prepetition First Lien Creditors.  Unsecured creditors holding a face amount of approximately $7.7 billion in debt are expected to receive a recovery of less than $350 million in cash (which amount the Committee believes may have been reduced to approximately $175 million following the TCEH Debtors' use of certain unencumbered cash prepetition).  The Unencumbered Assets, including the proceeds of Avoidance Actions, may be the only source of recovery for unsecured creditors. As a result, the TCEH Debtors should not be permitted to dissipate these critical assets by granting adequate protection liens and superiority claims on Unencumbered Assets to the Prepetition Secured Creditors, particularly where the Prepetition Secured Creditors are already adequately protected for the reasons set forth above.[17]

---

[17] To the extent the Court overrules the Committee's objection and determines that the Prepetition Secured Lenders should receive a lien on the Unencumbered Assets and/or Avoidance Actions, the Committee submits that paragraph

### C.    The Proposed Adequate Protection Payments are Excessive

24.    As noted above, the TCEH Debtors propose to make adequate protection payments to the Prepetition First Lien Creditors consisting of interest plus professionals' fees and expenses in the amount of approximately $105-137 million per month.

25.    Not only are the proposed adequate protection payments excessive in light of the arguments above, but such payments are particularly inappropriate where, as here, the TCEH Debtors are borrowing funds under the DIP Facility in the aggregate principal amount of $4.475 billion, granting purported "priming" liens on the Prepetition Collateral to the lenders under the DIP Facility, and then simply using those funds to make the adequate protection payments. This situation, however, does not actually provide the Prepetition First Lien Creditors with any additional adequate protection.  Specifically, borrowing a dollar of senior debt, simply to pay these funds over to the prepetition (now junior) lenders does not adequately protect the prepetition lenders—it leaves them in exactly the same position with respect to the Prepetition Collateral.

26.    In addition, the TCEH Debtors' proposed payment of DIP Facility proceeds to the Prepetition First Lien Creditors effectively functions as a roll up of the prepetition debt— the DIP Facility is being used to satisfy the prepetition claims of the Prepetition First Lien Creditors. Postpetition financings that grant liens on additional collateral or provide for current payment of undersecured prepetition debt are generally disfavored.  *See In re Caccamise*, No. 09-17165-SSM, 2009 Bankr. LEXIS 4174 (Bankr. E.D. Va. Dec. 22, 2009) (acknowledging that roll up provisions generally are not favored); *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369 (Bankr. S.D. Tex. 2001) ("based on the Eleventh Circuit's ruling in the case of *Shapiro v.*

---

19, which provides that the Prepetition First Lien Creditors are not subject to the equitable doctrine of "marshaling," should be deleted, and additional language should be inserted to protect the unsecured creditors' interests in these assets.

*Saybrook Mfg. Co. (In re Saybrook Mfg. Co.)*, 963 F.2d 1490 (11th Cir. 1992), a secured creditor's prepetition loan balance could not be paid off and/or 'rolled into' a postpetition line of debtor-in-possession financing, with resultant enhancement of collateral position and administrative priority.").

27.     Moreover, the Debtors' pleadings and statements suggest that the Debtors believe the Prepetition First Lien Creditors are undersecured and thus would not be entitled to postpetition interest and attorneys' fees under Section 506(b) of the Bankruptcy Code.   For example, the RSA reflects that, under the proposed plan of reorganization, the holders of "TCEH First Lien Secured Claims" will receive their "Pro Rata share of: (a) 100% of the Reorganized TCEH Common Stock, subject to dilution only from the Reorganized TCEH Management Incentive Plan; and (b) 100% of the net cash proceeds from the issuance of the New Reorganized TCEH Debt." [Docket No. 98, Ex. D].  Further, each class junior to the TCEH First Lien Secured Claims will receive recoveries from the "TCEH Unsecured Claim Fund," or reinstated debt that may be canceled by agreement of the parties.   Making the proposed adequate protection payments would provide a windfall to the Prepetition Secured Creditors unless such payments are recharacterized as payments of principal upon a finding that the Prepetition Secured Creditors are undersecured.[18]

28.     Accordingly, the Committee respectfully submits that the proposed adequate protection payments are unnecessary and should not be approved.   Alternatively, the Committee recognizes the possibility that once sufficient valuation work is completed, it may be determined that the Prepetition First Lien Creditors are oversecured and entitled to postpetition interest and reasonable professionals' fees and expenses.  At a minimum, if the TCEH Debtors are permitted

---

[18] At this point in time, the Committee has not yet had the opportunity to independently value the Prepetition Collateral, and the Committee reserves all right to do so.  *See* May 22, 2014 Trans. at 129:13-18.

to make the proposed adequate protection payments of interest and fees, the Final Order should provide: (i) a revised amount of adequate protection payments that correspond to the value of the Prepetition First Lien Lenders' collateral, particularly in light of the fact that the RSA contemplates that the Prepetition First Lien Lenders are undersecured, [19] and (ii) that the Prepetition First Lien Creditors who receive adequate protection payments are deemed to waive their right to receive default contract rate interest in the event it is determined that they are oversecured.[20] Absent these protections, however, borrowing senior debt simply to make interest payments to the Prepetition First Lien Creditors that may ultimately not be due if the Debtors' proposed plan is confirmed and ultimately provides no additional adequate protection to the lenders, makes little sense.

## II. THE PROPOSED FINAL ORDER UNDULY RESTRICTS THE COMMITTEE'S ABILITY TO CONDUCT ITS INVESTIGATION

29.     Section 1103(c)(2) of the Bankruptcy Code provides that one of the duties of a Committee is to "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor . . . and any other matter relevant to the formulation of the plan." 11 U.S.C § 1103(c)(2). These statutory duties clearly include the investigation of the purported liens of, and potential claims against, the Prepetition Secured Creditors. The proposed Final Order, however, includes extensive restrictions that unduly restrain and obstruct the Committee's ability to fulfill their duties by limiting the budget and time period for the Committee to undertake its investigation.

---

[19] *See* footnote 8.

[20] Similar waivers have been utilized in recent chapter 11 cases. *See Interim Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3) and 364(c)(4) and (B) Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364, and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(B) and (C)* at 20, *In re Adelphia Commc'ns Corp.*, No. 02-41729 (MG) (Bankr. S.D.N.Y. July 1, 2002) [Docket No. 51], ¶ 11(c) (authorizing adequate protection payments "all at the non-default contract rates provided for under the Existing Agreements (with the right to receive default contract rate interest deemed expressly waived hereby to the extent interest is currently paid as provided above);").

30.    <u>First</u>, the Final Order limits the Committee to $175,000 of the Carve Out and collateral proceeds and loans under the DIP Documents (each as defined in the Motion) to investigate, but not pursue challenges to, the TCEH Debtors' stipulations regarding the liens of and any claims against the Prepetition First Lien Creditors relating to the Prepetition First Priority Liens and Prepetition First Lien Obligations (each as defined in the Motion) (any such claim, a "<u>Challenge</u>").[21]   In a case of this magnitude, it is patently unreasonable to attempt to handicap the ability of the Committee to complete a full investigation to the detriment of all unsecured creditors in this manner.    Accordingly, the Committee seeks to increase the investigation budget to $1,500,000 and further seeks to clarify in the Final Order that (i) any additional costs associated with the Committee's investigation or Challenge may be paid on a current basis from Segregated Cash, and (ii) the Investigation Fund does not impact the Committee's ability to investigate without limitation the leveraged buyout and the transactions related thereto, including, without limitation, the transactions that are referenced in the 2004 Motion and related filings.[22]

31.    <u>Second</u>, the proposed Final Order, however, is even more egregious as the Prepetition Secured Lenders have insisted on language that any claims by the Committee for fees

---

[21] In the proposed Final Order, the term "<u>Challenge</u>" appears to be limited to any challenge regarding the validity, enforceability, extent, priority, or perfection of the mortgages, security interests, and liens of the Prepetition First Lien Agent or Prepetition First Lien Creditors, as well as the validity, enforceability, allowability, priority, secured status, or amount of the Prepetition First Lien Obligations.   The Committee believes that the scope of the "Challenge" should be expanded in the Final Order to include any and all claims relating to the Prepetition First Priority Liens and Prepetition First Lien Obligations (such as, for example, the "lender liability" causes of action or other avoidance actions expressly released under the proposed Final Order).   Based on discussions with counsel to the Prepetition First Lien Lenders prior to the filing of this Objection, it appears that the Prepetition First Lien Lenders are willing to make changes to the Final Order consistent with the Committee's proposal to address this concern.   For purposes of this Objection, the term "Challenge" shall be any challenge relating to the Prepetition First Priority Liens and Prepetition First Lien Obligations, as proposed in this footnote.

[22] To the extent the Final Order is modified to provide some combination of the relief requested in this paragraph (i.e., relating to the Committee's use of Segregated Cash to fund the investigation and clarification that the investigation budget is not intended to cover the broader investigation being undertaken by the Committee), the Committee's request with respect to investigation budget could likely be modified.   The Committee is currently working on language with the Prepetition First Lien Creditors to address these issues as is hopeful that an acceptable resolution can be reached.

and expenses in excess of the amounts set forth therein (including amounts incurred in excess of the investigation fund) "shall not be allowed, treated, or payable as an administrative expense claim for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, and the non-payment of such fees and expenses shall not constitute grounds to deny confirmation of any plan of reorganization for any of the TCEH Debtors." See Final Order ¶ 14.  This egregious language further limits the Committee's ability to conduct a thorough investigation, completely eviscerates the Committee's ability to bring a Challenge, and should be stricken from the Final Order. Notwithstanding any limitation on the Committee's ability to use the Carve Out and collateral proceeds and loans under the DIP Documents to investigate the First Lien Debt, the Committee should undoubtedly be permitted to use unencumbered assets to conduct its investigation and pursue any Challenge that may provide a benefit for the Debtors' estates and unsecured creditors. The proposed Final Order should be amended accordingly.  Providing the Committee with the ability to bring a Challenge is completely meaningless if the Committee is not also provided with the funds necessary to pursue its claims.

32.    Third, the short sixty (60) day period by which the Committee must commence a Challenge (the "Challenge Deadline") is also unreasonably short.  This is not the typical case where the Committee must only conduct a limited perfection review to determine whether the lenders are properly perfected.  As noted in the Motion, the TCEH Debtors have a diverse and complex capital structure with approximately $24 billion of First Lien Debt outstanding, which was incurred over a series of transactions spanning a seven-year period, commencing with the 2007 leveraged buy-out of TXU Corporation (the predecessor of the Debtors).  The Committee and other parties in interest will be investigating many issues related to the Debtors' prepetition

transactions over the course of these chapter 11 cases,[23] and the investigation of the First Lien Debt is only one aspect of that effort. The Committee intends to engage in a thorough investigation of the Prepetition First Lien Creditors' liens and claims and will need additional time to determine which facts are germane to the investigation provided for in the Final Order. Given the already substantial issues raised by the 2004 Motion and other pressing issues in the Debtors' reorganization, the Challenge Deadline should be extended to at least 120 days from the date of Committee formation to complete a review and, if appropriate, commence a Challenge in respect of the Prepetition First Lien Creditors' liens and claims.

In addition, the sixty (60) day Challenge Deadline is insufficient because the Committee is not provided with standing in the Final Order to pursue any claims against the Prepetition Secured Creditors. See Final Order ¶ 13 ("Nothing in this Final Order vests or confers on . . . the Committee, standing or authority to pursue any cause of action belonging to the TCEH Debtors or their estates, including, without limitation, any Challenges with respect to the First Lien Facilities or the Prepetition First Lien Obligations, and an order of the Court (or any other court of competent jurisdiction) conferring such standing on a Committee or other party-in-interest shall be a prerequisite for the prosecution of a Challenge by the Committee or such other party-in-interest."). Without a grant of standing, all of the remaining time in the 60-day challenge period could likely be consumed in a fight with the Prepetition Secured Creditors over the Committee's right to commence an action.

33. In sum, the Committee requests that the Final Order be modified to provide (i) a Challenge Deadline of no less than 120 days from the date of Committee formation (with the proviso that the extension shall be without prejudice to the rights of the Committee to obtain further extensions of the Challenge Period by agreement of the parties or for cause shown),

---

[23] See, for example, the 2004 Motion.

(ii) that the Committee is granted standing to pursue and any all causes of action that the Committee deems appropriate to pursue,[24] (iii) a budget consisting of $1,500,000 of the Carve Out and collateral proceeds and loans under the DIP Documents that may be used in connection with such investigation, and (iv) an acknowledgement that any additional costs associated with the Committee's investigation or Challenge may be paid on a current basis from Segregated Cash.

### III.    THE PROPOSED BANKRUPTCY SECTION 506(C) WAIVER IS INAPPROPRIATE

The Motion also seeks to relinquish any rights to seek a surcharge against the Prepetition Collateral pursuant to Section 506(c) of the Bankruptcy Code.  Courts have routinely rejected the waiver of surcharge rights under Section 506(c) of the Bankruptcy Code.  *See*, *e.g.*, *Precision Steel Shearing, Inc. v. Fremont Fin. Corp. (In re Visual Indus., Inc.)*, 57 F.3d 321, 325 (3d Cir. 1995) ("Thus, like the equitable common law rule that preceded it, §506(c) is designed to prevent a windfall to the secured creditor at the expense of the claimant.  The rule understandably shifts to the secured party, who has benefited from the claimant's expenditure, the costs of preserving or disposing of the secured party's collateral, which costs might otherwise be paid from the unencumbered assets of the bankruptcy estate, providing that such unencumbered assets exist.") (citations omitted); *Hartford Fire Ins. Co. v. Norwest Bank Minn., N.A. (In re Lockwood Corp.)*, 223 B.R. 170, 176 (B.A.P. 8th Cir. 1998) (provision in financing order that purports to immunize postpetition lender from Bankruptcy Code Section 506(c) surcharge is unenforceable); *Kivitz v. CIT Grp./Sales Fin., Inc.*, 272 B.R. 332, 334 (D. Md. 2000) (Section 506(c) of the Bankruptcy Code exists so that unsecured creditors are not required to

---

[24] Alternatively, the Committee proposes that the 120 day Challenge Deadline be a deadline for the Committee to file a motion seeking standing to bring causes of action, and that the Challenge Deadline shall be tolled until five (5) business days after adjudication of such motion, which will be heard at the next omnibus hearing at least fourteen (14) calendar days following the filing of the motion or as determined by the Court.

bear the cost of protecting collateral that is not theirs and to require the secured party to bear the costs of preserving or disposing its own collateral); *McAlpine v. Comerica Bank-Detroit (In re Brown Bros., Inc.)*, 136 B.R. 470, 474 (W.D. Mich. 1991) (cash collateral order unenforceable to extent its provisions attempted to immunize postpetition lender from surcharge payment obligations pursuant to Section 506(c) of the Bankruptcy Code).

34.     In this case, a reservation of the rights afforded pursuant to section 506(c) of the Bankruptcy Code is particularly appropriate because, as discussed above, the TCEH Debtors' use of cash collateral is enhancing the value of the Prepetition Collateral in a reorganization that, at this point, is designed to be solely for the benefit of such creditors, and provides nothing to general unsecured creditors.   Considering this substantial benefit to the Prepetition Secured Creditors, the estate should retain the right to surcharge the Prepetition Collateral for the costs of providing such benefit.

### IV.     OTHER PROVISIONS OF THE FINAL ORDER ARE UNREASONABLE

35.     In addition to the objectionable provisions of the Final Order noted above, the Committee believes that certain other provisions must be modified in the Final Order to clarify the parties' rights.   A copy of the Final Order reflecting the Committee's proposed revisions is annexed hereto as <u>Exhibit C</u>.   Some of these proposed changes are highlighted below for the Court:

- <u>Credit Bid</u>.  Paragraph 8 of the Final Order, which permits the Prepetition First Lien Creditors to credit bid under section 363(k) of the Bankruptcy Code all or any portion of their respective claims in connection with a sale of the TCEH Debtors' assets under section 363 of the Bankruptcy Code or under a chapter 11 plan of reorganization should be stricken.  The Final Order should not limit the power of the Court granted in Section 363(k) to restrict credit bidding for cause.

- <u>Rights and Remedies upon Event of Default</u>.  In light of the magnitude of these cases and the importance of the TCEH Debtors' operations to the people of Texas, paragraph 10 of the Final Order, which addresses the Prepetition Secured Creditors' rights and remedies upon an Event of Default, should be revised to

21

(i) extend the Remedies Notice Period to ten (10) business days, (ii) require the Prepetition First Lien Creditors to provide notice of any such default to counsel to the Creditors' Committee, and (iii) limit the remedies of the Prepetition First Lien Creditors solely to terminating the TCEH Debtors' use of cash collateral.

- Section 552(b). Paragraph 20 of the Final Order should be revised to provide that only the TCEH Debtors are waiving the "equities of the case" exception under section 552(b) of the Bankruptcy Code with respect to the Prepetition First Lien Creditors.

## CONCLUSION

36.     The Committee has been in discussions with the Debtors and the Prepetition First Lien Creditors and has reached agreement on certain changes outlined in Exhibit C.   The Committee is hopeful that they can agree to further modifications that address the concerns identified above.   However, in the event that the Debtors and the Prepetition First Lien Creditors are unwilling to make acceptable modifications, the Committee respectfully requests that the Court condition approval of the Motion on changes being made to the proposed Final Order as set forth herein.

*[remainder of page intentionally left blank]*

ny-1144105

WHEREFORE, the Committee respectfully requests that the Court: (a) deny the Motion; (b) modify the proposed Final Order as set forth herein, or (c) grant such other and further relief as the Court may deem just and proper.

Dated: Wilmington, Delaware
   May 29, 2014

**MORRISON & FOERSTER LLP**
James M. Peck
Brett H. Miller
Lorenzo Marinuzzi
Todd M. Goren
Samantha Martin
250 West 55th Street
New York, New York 10019-9601
Telephone:  (212) 468-8000
Facsimile:  (212) 468-7900
E-mail:  jpeck@mofo.com
   brettmiller@mofo.com
   lmarinuzzi@mofo.com
   tgoren@mofo.com
   smartin@mofo.com

   -and-

*/s/ Christopher A. Ward*
Christopher A. Ward (Del. Bar No. 3877)
Justin K. Edelson (Del. Bar No. 5002)
Shanti M. Katona (Del. Bar No. 5352)
**POLSINELLI PC**
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile:  (302) 252-0921
E-mail:  cward@polsinelli.com
   jedelson@polsinelli.com
   skatona@polsinelli.com

*Proposed Counsel for The Official Committee of Unsecured Creditors of Energy Future Holdings Corp., et al.*

ny-1144105