## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------- x
In re:                                                   :    Chapter 11
                                                         :
Energy Future Holdings, Inc., et al.,                    :    Case No. 14-10978 (CSS)
                                                         :
                       Debtors.                          :    (Jointly Administered)
                                                         :
                                                         :    Related Docket Nos. 74, 472, 600
-------------------------------------------------------- x
```

## EFIH SECOND LIEN NOTES INDENTURE TRUSTEE'S
## (I) PRELIMINARY RESPONSE TO DEBTORS' SETTLEMENT MOTION
## AND (II) LIMITED OBJECTION AND RESERVATION OF RIGHTS TO
## DEBTORS' MOTION APPROVING FIRST LIEN DIP FINANCING

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..... 1

BACKGROUND ..... 2

ARGUMENT ..... 5

I. The Debtors' Second Lien Settlement Violates the Bankruptcy Code ..... 5

A. The Bankruptcy Code Requires Equal Treatment, Including Equal Settlement Offers, For Similarly-Situated Creditors ..... 5

B. The Second Lien Settlement Violates the Bankruptcy Code's Equal Treatment Principles by Offering More Favorable Settlements to RSA Signatories Than to Other Second Lien Noteholders ..... 10

C. The Second Lien Settlement Impermissibly Strips Creditors of Rights in Other Classes ..... 13

II. The Court Should Not Approve the Fidelity "Funding Fee" ..... 14

Computershare Trust Company, N.A. and Computershare Trust Company of Canada, as indenture trustee (the "**Indenture Trustee**") for $2,156,000,000 aggregate principal amount of second lien notes (the "**Second Lien Notes**" and the holders thereof, the "**Second Lien Noteholders**") issued by Energy Future Intermediate Holding Company LLC ("**EFIH**") and EFIH Finance Inc., by and through its undersigned counsel, hereby files this (I) preliminary response (the "**Preliminary Response**") to the motion of EFIH and its affiliated debtors (the "**Debtors**") to approve certain EFIH settlements (the "**Settlement Motion**") [Dkt. No. 472], including the settlement of certain issues related to the Second Lien Notes (the "**Second Lien Settlement**") and the First Lien Notes (the "**First Lien Settlement**"),[1] and (II) limited objection and reservation of rights to the Debtors' motion to approve the EFIH first lien financing (the "**First Lien DIP Motion**") [Dkt. No. 74].

## PRELIMINARY STATEMENT

The Indenture Trustee takes no position on approval of the First Lien Settlement, to the extent that settlement's approval turns on facts particular to the first lien notes (the "**First Lien Notes**"). However, the Settlement Motion seeks approval of the Second Lien Settlement, as well as the First Lien Settlement, and the legal issues raised by objections to the two settlements are likely to overlap in important respects. In particular, as part of its May 13, 2014 preliminary objection to the First Lien DIP Motion, the First Lien Trustee has already raised legal arguments – relating to the Debtors' obligation to provide equal treatment to similarly

---

[1] The Debtors have bifurcated the Settlement Motion, scheduling (i) approval of the First Lien Settlement to be heard on June 5, with objections due today, and (ii) approval of the Second Lien Settlement and the Oncor TSA Amendment to be heard on June 30, with objections due by June 20. Consequently, in this Preliminary Response to the Settlement Motion, the Indenture Trustee responds only to the Debtors' request for approval of the First Lien Settlement.

KL2 2847949.8

situated creditors – that go to the heart of the objections that the Indenture Trustee intends to raise to the Second Lien Settlement. The Indenture Trustee files this Preliminary Response to the Settlement Motion to apprise the Court of its views on these important legal issues and their application to the particular facts of the Second Lien Settlement.

In addition to the First Lien Settlement, the Debtors are also seeking approval of the First Lien DIP Motion. As a general matter, the Indenture Trustee does not take a position on the approval of the First Lien DIP. However, the proposed order approving the First Lien DIP, filed on May 22, 2014, [Dkt. No. 600], provides for approval to pay an additional "Funding Fee" to Fidelity, even though (i) this fee is not mentioned anywhere in the First Lien DIP Motion and (ii) the Debtors have already stated that this fee is a component of the Second Lien Settlement, approval of which has been adjourned to June 30. This being the case, there is no basis for seeking approval of this fee in connection with the First Lien DIP. Moreover, the Debtors have done nothing to justify payment of this fee on a standalone basis (i.e., apart from the Second Lien Settlement). Nor could they, since Fidelity has been promised this fee without having actually committed to do anything. Accordingly, to the extent that Debtors persist on seeking approval of the Funding Fee in connection with the First Lien DIP Motion, approval should be denied, because the fee provides no benefit to the estate.

## BACKGROUND

1. The Debtors commenced these chapter 11 cases with the stated goal of consummating a global restructuring under which they will refinance the First and Second Lien Notes, spin off TCEH from EFH, and provide specified treatment to holders of claims and equity interests against each Debtor. *See* Declaration of Paul Keglevic [Dkt. No. 98]. The proposed restructuring is reflected in a restructuring support agreement (the "**RSA**") between the Debtors

and various parties in their capital structure, including Fidelity and certain other holders of the Second Lien Notes (together with Fidelity, the "**Second Lien RSA Parties**").

2. In furtherance of their proposed restructuring, the Debtors have filed a series of motions, including the Settlement Motion, a motion to assume the RSA, and motions to approve debtor-in-possession financing to facilitate the First Lien Settlement (the "**First Lien DIP**") and the Second Lien Settlement (the "**Second Lien DIP**"). The Settlement Motion seeks three main forms of relief: approval of the First Lien Settlement, approval of the Second Lien Settlement, and approval of an amendment to a tax sharing agreement among EFH, Oncor and other parties. The First Lien DIP and First Lien Settlement are scheduled to be heard on June 5. The Second Lien DIP and Second Lien Settlement are scheduled to be heard on June 30.

3. Pursuant to the First Lien Settlement, the Debtors propose to settle all outstanding obligations under the First Lien Notes by entering into the First Lien DIP and using the proceeds thereof to refinance the First Lien Notes through a tender offer (the "**First Lien Tender Offer**"). The First Lien Tender Offer, which commenced on May 7, 2014, incorporates a purported settlement of make-whole claims of the First Lien Notes, offering $105 for every $100 of principal and $101 for every $100 of accrued and unpaid interest on the First Lien Notes tendered into the settlement, all in the form of First Lien DIP roll-up notes.

4. Similarly, pursuant to the Second Lien Settlement, the Debtors propose to settle all outstanding obligations under the Second Lien Notes by entering into the Second Lien DIP and using the proceeds thereof to refinance the Second Lien Notes through a tender offer (the "**Second Lien Tender Offer**"). Under the terms of the Second Lien Tender Offer, which commenced on May 9, 2014, holders of Second Lien Notes now have until June 11 (the "**Early Tender Deadline**") to opt into the tender in order to receive principal, interest and a fixed

amount with respect to their make-whole claim that the Debtors assert is equal to 50% thereof.[2] Holders of Second Lien Notes who do not opt into the tender by the Early Tender Deadline may still tender up until July 3 (the "**Final Tender Deadline**"), at a step-down in consideration – namely, principal, interest and, depending on the composition of their holdings, an amount equal to what the Debtors assert is between 29.7% and 35.0% of the value of their make-whole claim.

5. Holders of Second Lien Notes who do not opt into the tender offer (the "**Non-Participants**") will be forced to accept payment of their notes from the proceeds of the Second Lien DIP at par plus accrued interest at a lower rate than is being paid to holders that opt into the settlement. *See* Settlement Motion at ¶¶ 25-26. The Debtors will then litigate with the Non-Participants over whether they are entitled to a make-whole premium or any other amounts due under the Indenture, such as additional interest. The residual claims held by Non-Participants, including any make-whole claims and additional interest allowed with respect to their Second Lien Notes, will be impaired; they will receive either payment in full in cash or such other treatment as permitted under section 1129(b) of the Bankruptcy Code. RSA Term Sheet at 13-14.

6. Holders of Second Lien Notes who are parties to the RSA have committed to participate in the Second Lien Settlement. As discussed below, the Second Lien RSA Parties have been promised substantial additional consideration in excess of that promised to other Second Lien Noteholders that opt into the Second Lien Settlement, in violation of the Bankruptcy Code's requirement that the Debtors provide equal treatment to similarly-situated creditors.

---

[2] The Early Tender Deadline was originally May 30. At the May 22 hearing, the Debtors agreed to extend both the Early Tender Deadline and the Final Tender Deadline (as defined below).

## ARGUMENT

### I. The Second Lien Settlement Violates the Bankruptcy Code

7.      On May 13, CSC Trust Company of Delaware, as indenture trustee for the 10% First Lien Notes issued by EFIH and EFIH Finance (the "**First Lien Indenture Trustee**") filed a preliminary objection (the "**Preliminary Objection**") to the Debtors' motion to approve the First Lien DIP [Dkt No. 421]. The Preliminary Objection raises a host of issues with respect to not only the First Lien DIP, but also with the First Lien Settlement. Among other things, the First Lien Indenture Trustee objects to disparate treatment among different series of EFIH First Lien Notes as violating the Bankruptcy Code. *See* Preliminary Objection at ¶ 39. Although the Indenture Trustee does not take a position on the merits of the First Lien Settlement, the Indenture Trustee intends to object to the Second Lien Settlement on similar grounds – specifically, that the Second Lien Settlement discriminates against similarly situated creditors in violation of the Bankruptcy Code.

#### A. The Bankruptcy Code Requires Equal Treatment, Including Equal Settlement Offers, For Similarly-Situated Creditors

8.      As the Third Circuit has counseled, "[e]quality of distribution among creditors is a central policy of the Bankruptcy Code." *In re Combustion Engineering, Inc.*, 391 F.3d 190, 239 (3d Cir. 2005) (quoting *Begier v. IRS*, 496 U.S. 53, 58). This Court, too, has observed that "equality of distribution" to similarly-situated creditors is "[o]ne of the primary goals – if not the primary goal – of the Code." *Sass v. Barclays Bank PLC (In re American Home Mortgage Holdings, Inc.)*, 501 B.R. 44, 59 (Bankr. D. Del. 2013) (Sontchi, J.) (quoting *In re Semcrude, L.P.*, 399 B.R. 388, 399 (Bankr. D. Del. 2009)).

9.      This principle is set forth expressly in section 1123(a)(4) of the Bankruptcy Code, which provides that a plan shall "provide the same treatment for each claim or

5

interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment." 11 U.S.C. § 1123(a)(4). But this equal treatment principle is not limited to the plan confirmation context; it applies from the inception of the case. *See Combustion Eng'g*, 391 F.3d at 239 ("Several sections of the Code are designed to ensure equality of distribution *from the time the bankruptcy petition is filed*.") (emphasis added). Just as a chapter 11 plan cannot discriminate unfairly, actions taken outside of a plan – including settlements – must also comply with basic standards of equality of distribution among similarly situated creditors.

10. The Third Circuit's decision in *Combustion Engineering* is instructive. There, the debtor had entered into a prepetition "Master Settlement Agreement" and prepackaged plan with the vast majority of its current asbestos claimants, under which it contributed half of its assets to a prepetition settlement trust. *See Combustion Eng'g*, 391 F.3d at 204-06. Settling claimants were to receive various percentages of their recoveries from the prepetition trust (ranging up to 95%), with their remaining "stub claims" giving them the right to vote on the prepackaged plan and to participate in a postpetition trust. *Id.* The postpetition trust was to be funded with the debtor's remaining assets and would pay the stub claims and the claims of non-settling current claimants and future claimants. *Id.*

11. After the lower courts confirmed the prepackaged plan, a group of current claimants appealed, and the Third Circuit reversed confirmation. The court found numerous problems with the plan that required further examination, including whether the prepetition payments were voidable preferences and whether the claims of the settling parties had been artificially impaired. *See id.* at 240, 243. But its core holding regarding unequal treatment was much broader and relied on no particular provision of the Bankruptcy Code. Rather, the court "consider[ed] the bankruptcy scheme as an integrated whole," and in so doing determined that

"the pre-pack bankruptcy . . . may lack the requisite equality of distribution among creditors." *Id.* at 241-42. Although the prepetition transfer was outside of the context of a plan – indeed, prior to the debtor's bankruptcy filing – the Third Circuit determined that "[t]he pre-petition transfer . . . implicate[d] the fundamental bankruptcy policy of 'equality of distribution among creditors.'" *Id.* In language applicable here, the court held that the debtor's "pre-petition side arrangement with a privileged group of . . . claimants," *id.* at 244, appeared to give those claimants "a demonstrably unequal share" of the debtor's assets. *Id.* at 242.

12. In a case even more closely on point, *In re AOV Industries Inc.*, 792 F.2d 1140 (D.C. Cir. 1986), the D.C. Circuit condemned the practice of offering a more favorable settlement to certain creditors than to others. In *AOV*, the debtor had proposed a plan under which an unsecured creditor could receive a distribution only if it agreed to release its claims against two third parties who were funding the plan. *Id.* at 1150. A creditor objected on the ground that its claims against these third parties were much stronger than the claims of other creditors, yet it was being offered the exact same recovery, namely, its pro rata share of the settlement fund. *Id.* at 1151.

13. The D.C. Circuit held that, if one creditor in fact was being asked to release stronger claims in exchange for the same consideration, this would render the proposed settlement discriminatory and therefore unlawful. *Id.* at 1151-52. The court of appeals noted that "the most conspicuous inequality that § 1123(a)(4) prohibits is payment of different percentage settlements to co-class members." *Id.* at 1152. The court expressly rejected the argument (advanced by the Debtors here) that there was an "equality in the option" accorded to each settling claimant. Although the lower courts had found that each creditor had the option "either to tender a release in exchange for a 13% distribution, or to retain its claims and seek

7

KL2 2847949.8

more substantial recovery," *id.* at 1151, the D.C. Circuit recognized that the litigate-or-settle option provided each claimant was not, in fact, the same if certain creditors held stronger claims than others, *id.* Thus, even though in *AOV* – as here – parties that rejected the settlement retained their rights to litigate, the court held that the settlement violated section 1123(a)(4) because the settlement offers made to different parties were unequal.

14. These cases emphatically rebut the Debtors' assertion that it is "black letter law that debtors are not required to enter into settlements on the same terms among all similarly situated creditors." *See* Debtors' Obj. to Mot. to Compel ¶ 23 [Dkt. No. 552]. As *Combustion* and *AOV* make clear, the opposite is true. A debtor that offers to settle with a class of its creditors must do so in a non-discriminatory manner; it may not offer preferential treatment to favored creditors.

15. These principles are not limited to the plan confirmation context, as the Debtors have argued (*see* Debtors' Obj. to Mot. to Compel ¶ 22). To the contrary, as the Third Circuit held in *Combustion Engineering*, the requirement of "equality of distribution among creditors" applies "from the time the bankruptcy petition is filed." 391 F.3d at 239. This requirement is reflected in multiple provisions throughout the Bankruptcy Code, including sections 502(b), 547, and 726. *See Combustion Eng'g*, 391 F.3d at 239 ("Several sections of the Code are designed to ensure equality of distribution . . . .").[3]

---

[3] *See also, e.g., Morrison v. Champion Credit Corp. (In re Barefoot)*, 952 F.2d 795, 797-98 (4th Cir. 1991) (section 547 "promotes the 'prime bankruptcy policy of equality of distribution among creditors'") (quoting legislative history); *Dorroh v. Wurst (In re Warren)*, 2011 WL 3299819, *5 (9th Cir. B.A.P. Mar. 15, 2011) (section 726 "provides the textual basis for the fundamental principle that creditors of equal priority should receive pro rata shares of the debtor's property"); *Ames Merchandising Corp. v. Cellmark Paper, Inc. (In re Ames Department Stores, Inc.)*, 450 B.R. 24, 30 (Bankr. S.D.N.Y. 2011) (preferences "run contrary to the goal of equality of treatment amongst creditors – one of the longest standing, and fundamental, principles of American bankruptcy law"); *Leslie Fay Cos., Inc. v. Corporate Prop. Assocs. 3 (In re Leslie Fay Cos., Inc.)*, 166 B.R. 802, 808 (Bankr. S.D.N.Y. 1994) (section 502(b)(6) "grounded in principles of ratable distribution").

8

16. The Third Circuit is not alone in applying core bankruptcy principles, such as the equal-distribution requirement, to pre-plan settlements. Indeed, the Second Circuit and the Fifth Circuit have gone further, holding that pre-plan settlements must be reviewed for their compliance even with bankruptcy principles that (unlike equal-distribution principles, which appear throughout the Code) appear only in the Bankruptcy Code's confirmation provisions. *See Motorola, Inc. v. Off. Comm. of Uns. Creds. (In re Iridium Operating LLC)*, 478 F.3d 452, 455 (2d Cir. 2007) (reversing and remanding bankruptcy court's approval of pre-plan settlement for failure to consider whether it complied with absolute priority rule: "[W]hether a pre-plan settlement's distribution plan complies with the Bankruptcy Code's priority scheme will be the most important factor for a bankruptcy court to consider in approving a settlement under Bankruptcy Rule 9019."); *U.S. v. AWECO, Inc.*, 725 F.2d 293, 298 (5th Cir. 1984) (bankruptcy court abused its discretion by approving pre-plan settlement that violated absolute priority rule).

17. Many other courts have similarly held that pre-plan settlements, as well as other actions taken outside the context of a plan, must comport with the fundamental standard of equality of distribution among similarly situated creditors. *See, e.g., In re Allegheny Int'l, Inc.*, 118 B.R. 282, 295-96 (Bankr. W.D. Pa. 1990) (holding plan proponent's pre-plan tender offer to purchase claims "caused discriminatory treatment among members of the same class, in violation of 11 U.S.C. § 1123(a)(4)," because creditors who accepted tender offer received immediate cash while others would receive distributions at a later undetermined date); *In re AppliedTheory Corp.*, 2008 WL 1869770, *2 (Bankr. S.D.N.Y. Apr. 24, 2008) (denying approval of settlement provision on grounds of "discriminatory treatment" of certain professionals); *In re Flight Transportation Corp. Securities Litig.*, 730 F.2d 1128, 1138-39 (8th Cir. 1984) (denying in part settlement of estate's claims to disputed escrow funds because funds allocated to debtor's estate

would not be made available to certain creditors); *In re Kmart Corp.*, 359 F.3d 866, 872 (7th Cir. 2004) (denying critical vendors motion for non-compliance with equal-treatment and priority standards broadly applicable in bankruptcy; noting that "[m]any sections [of the Bankruptcy Code] require equal treatment"); *In re Warren*, 2011 WL 3299819 at *5 (reversing approval of settlement that "unequally distribut[ed] proceeds from the liquidation of an estate asset" in contravention of "fundamental concept of ratable distribution").

18.     Application of these principles to the Second Lien Settlement is particularly appropriate, since that settlement – like the pre-petition settlement reviewed by the Third Circuit in *Combustion Engineering* – is part of a comprehensive restructuring that is to be implemented through a pre-negotiated plan. Indeed, the RSA refers to the Second Lien Settlement documents as "Plan Restructuring Documents" (*see* RSA § 3), and one of the central items of enhanced consideration to be paid to Fidelity (the Legacy Notes Waiver) will be paid pursuant to the plan of reorganization.

### B. The Second Lien Settlement Violates the Bankruptcy Code's Equal Treatment Principles by Offering More Favorable Settlements to RSA Signatories Than to Other Second Lien Noteholders

19.     The Second Lien Settlement provides substantially greater consideration to RSA signatories than to other holders of Second Lien Notes that elect to accept the Second Lien Settlement. As described below, Fidelity is to receive 50% of its make-whole claim *plus* a number of side payments that, in the aggregate, may exceed $135 million. Similarly, certain holders of the PIK Notes are to receive 50% of their make-whole claims *plus* a "settlement premium" of $1.57 million. The other holders of the Second Lien Notes, in contrast, should they choose to settle, will receive what the Debtors assert is 50% of their make-whole claims – *and nothing else*.

20. Specifically, in addition to the Second Lien Settlement benefits being offered to all participating noteholders, Fidelity will receive:

- **An enhanced distribution on its Legacy Notes**. Fidelity will receive a greatly enhanced distribution on its EFH Legacy Notes – which could be worth $116 million or more – obtained by virtue of EFIH's agreement to cancel the EFH Legacy Notes that EFIH holds. *See* Settlement Motion at ¶ 33.[4]

- **A guaranteed minimum recovery on its Legacy Notes**. Fidelity has the right to terminate its support of the RSA if it receives less than 37.15% on its EFH Legacy Notes, unless certain of the "Commitment Parties" to the Second Lien DIP exercise a "call option" to buy out Fidelity's EFH Legacy Notes at 37.15% of par plus accrued interest. *See* RSA at § 8.10; RSA Term Sheet at 8. In other words, Fidelity can bring down the house of cards unless it gets 37.15% *either* from EFH *or* from other parties to the RSA. The 37.15% payment from EFH is made possible only by EFIH's waiver of its own EFH Legacy Notes. An exercise of the "call option' would terminate the "most favored nation" clause with respect to the Second Lien Settlement.

- **A "commitment fee" for uncommitted funds**. Fidelity has an option to convert up to $500 million of its aggregate recovery on the Second Lien Settlement into the $5.4 billion First Lien DIP and to receive a purported "commitment fee" equal to 1.75% of the amount it so converts – i.e., up to $8.75 million – even though it has not committed to fund any portion of this DIP facility. *See* Settlement Motion at ¶ 26.

- **A fixed DIP participation fee**. Under the DIP, Fidelity has an option to participate in up to 9% of the Second Lien DIP and to receive a fixed payment of $11.25 million upon the exercise of any of its participation rights under that DIP – i.e., regardless of how much of the Second Lien DIP it actually funds. *See* Second Lien DIP Motion at 14.

- **A "most favored nation" provision regarding the Make-Whole**. Fidelity has a "most favored nation" clause, which entitles Fidelity to a higher percentage recovery on its make-whole claim if the Debtors settle with any other Second Lien Noteholder for a higher percentage recovery than that offered in the Second Lien Tender Offer. *See* RSA Term Sheet at 7-8.

21. The other Second Lien RSA Parties will receive the following payments, in addition to the Second Lien Settlement benefits being offered to all participating noteholders:

---

[4] Approximately two-thirds of the Legacy Notes issued by EFH are held by EFIH. Fidelity holds 75% of the other third (approximately $471 million). The result of the cancellation of the $1.282 billion of Legacy Notes held by EFIH will be to approximately triple the cash and equity distributed to Fidelity on account of the EFH Legacy Notes – an incremental benefit of $116 million. While the Debtors have characterized this Legacy Notes waiver as consideration for EFH's amendment of the Oncor tax-sharing agreement so that payments under that agreement are made directly to EFIH, rather than to EFH, the Indenture Trustee believes, and expects to confirm through discovery, that the net benefits received by EFIH as a result of this amendment are likely to be *de minimis*.

11

- **"Settlement consideration" of $1.57 million**. GSO, York, and Avenue will receive an additional "settlement consideration" of $1.57 million in the aggregate, as part of the Second Lien Settlement. *See* Settlement Motion ¶ 26.

- **An "arranger fee" of $2 million**. GSO and Avenue will receive an "arranger fee" of $2 million in the aggregate. *See* Second Lien DIP Motion at 14.

22. As the foregoing makes clear, the holders of the Second Lien Notes do not all have the same opportunity for recovery. Fidelity and the holders of the PIK Notes have the opportunity to recover well in excess of 50% of their make-whole claims simply by participating in the Settlement. Other holders, in sharp contrast, have the opportunity to recover in excess of 50% of their make-whole claims only if they litigate.

23. The Debtors have previously suggested that Fidelity and the other Second Lien RSA Parties are not receiving any extra inducements on account their Second Lien Notes, but rather are receiving them on account of other interests. In the Settlement Motion, however, the Debtors appear to concede that this is not the case: They expressly acknowledge that the Second Lien DIP commitment fee is "part of the Second Lien Settlement," *see* Settlement Motion at ¶ 26, as is the additional "settlement consideration" provided to GSO, York and Avenue, *see id.* at ¶ 26(c). In addition, it is apparent from the RSA term sheet that the Legacy Notes Waiver and the "most favored nation" clause (entitling Fidelity to the benefit of any more favorable make-whole settlement) were also negotiated as integral parts of the Second Lien Settlement. In the first place, the RSA term sheet's description of that settlement *includes* Fidelity's most favored nation clause. RSA Term Sheet at 7-8. More substantively, the RSA term sheet expressly provides that Fidelity's most favored nation provision will terminate if and when any RSA party exercises its "call right" to buy Fidelity's EFH Unsecured Notes for 37.15%. *Id.* at 8. In other words, Fidelity has agreed to forego a key part of its Second Lien Settlement premium (the most favored nation clause allowing it to share in any subsequent more

12

favorable settlement) if – but only if – it receives a greatly enhanced payment on account of its EFH Legacy Notes.[5]

24. In light of the disparate settlement opportunities offered to holders, the Settlement cannot be defended on the grounds that any holder, if it is dissatisfied with the proposed Settlement, can simply choose not to settle. As *AOV* makes clear, the very act of providing Fidelity and holders of PIK Notes with one choice (settle or take 50%-*plus*) and the other holders of the Second Lien Notes with another (settle or take 50%-*and nothing more*), is itself discriminatory and violative of the Bankruptcy Code's policy of equality of treatment.[6]

### C. The First Lien and Second Lien Settlements Both Impermissibly Strip Creditors of Rights in OtherClasses

25. An independent legal infirmity of both the First Lien and the Second Lien Settlements is that each purports to require participants to give up their rights with respect to any First Lien *and* Second Lien Notes they hold. *See* Second Lien Offer Memorandum at 28 ("[T]he Holder, by tendering its EFIH Second Lien Notes in the Offer agrees . . . that it will not, directly or indirectly, object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the EFIH First Lien Settlement, the EFIH Second Lien Settlement, the EFIH First Lien DIP Facility or the EFIH Second Lien DIP Notes Financing in

---

[5] The Indenture Trustee is currently taking discovery and expects that such discovery will provide further evidence that the various inducements provided to the Second Lien RSA Parties were provided on account of their Second Lien Notes.

[6] The Debtors have previously cited to cases holding that a plan may properly provide a claimant with the opportunity of valuing its claim either through settlement or through litigation. *See* Debtors' Obj. to Mot. to Compel ¶ 23 (citing *In re Wash. Mutual, Inc.*, 442 B.R. 314 (Bankr D. Del. 2011) and *In re Dow Corning Corp.*, 255 B.R. 445 (E.D. Mich. 2000)). Such cases are inapposite, as the claimants in those cases were all provided with the identical choice – i.e., the "same opportunity to receive equal treatment." *See Wash. Mutual*, 442 B.R. at 355-56 (plan provision giving different distribution to creditors that gave releases did not violate section 1123(a)(4) because all creditors within class were offered same settlement opportunity). Here, Fidelity and the holders of the PIK Notes were provided one choice, and the other holders were provided another. The choice itself is the relevant treatment, and it is discriminatory.

13

the Bankruptcy Court or otherwise . . . .").[7] While the Debtors may have a legitimate interest in requiring participants in the Second Lien Tender Offer to consent to the Second Lien Settlement and the Second Lien DIP, both of which are conditions to consummation of the Second Lien Tender Offer, it is not proper to condition participation in this tender offer on a holder's relinquishment of its rights with respect to any *First Lien* Notes it may hold – or vice versa. The First Lien Settlement and the Second Lien Settlement are separate and distinct, and a creditor should not be required to agree to both in order to accept one.

## II. The Court Should Not Approve the Fidelity "Funding Fee"

26. As part of the Debtors' proposed order approving the First Lien DIP, the Debtors have included a provision approving the payment of a "Funding Fee" to Fidelity. This fee, however, is not specifically mentioned anywhere in the First Lien DIP Motion.[8] In fact, the only pleading in which this fee is described is the Debtors' Motion seeking approval of the First and Second Lien Settlements. See Settlement Motion at ¶26 ("In addition, as part of the Second Lien Settlement, Fidelity has the right to invest $500 million in loans under the EFIH First Lien DIP Facility, for which it will be entitled to receive...(c) a 1.75% commitment fee paid in respect of the EFIH First Lien DIP Facility.").

27. As an initial matter, there is no procedural basis for the Debtors to seek approval of this "Funding Fee" in connection with the First Lien DIP. The First Lien DIP

---

[7] Similar language appears in the Offer Memorandum for the First Lien Tender Offer. *See* Exhibit A to Notice of Initiation of EFIH 1st Lien Opt-In Period at 39 [Dkt. No. 363].

[8] The only reference in the First Lien DIP Motion to the payment of a fee to Fidelity in connection with the First Lien DIP is the statement that Fidelity "will have the right to receive up to $500 million *(plus fees)* of its payment under the EFIH Second Lien Settlement in the form of EFIH First Lien DIP Roll-Up Notes." First Lien DIP Motion, at ¶ 9 (emphasis added).

14

Motion does not ask for approval of such fee, and the one pleading that does seek approval of the fee (the Second Lien Settlement Motion) has been adjourned to June 30.

28. More important, there is no legal justification for the payment of this fee to Fidelity in connection with the First Lien DIP. Fidelity has not actually "committed" to do anything that would entitle it to a commitment fee. Both the Second Lien Settlement Motion and the term sheet attached to the RSA give Fidelity "the right" to receive up to $500 million of First Lien DIP in lieu of the cash it would otherwise receive under the Second Lien Settlement – but this is merely an option Fidelity is receiving, not an obligation it is undertaking. Fidelity has not undertaken any DIP financing obligations that would justify the payment of a "commitment fee."

29. Lastly, as described in Point I.B above, the Indenture Trustee believes that payment of the Funding Fee – which the Debtors have acknowledged is part of the Second Lien Settlement – violates the Bankruptcy Code and should not be approved.

30. Accordingly, the Indenture Trustee believes that approval of this fee should be denied or, alternatively, should be deferred until the hearing on the Second Lien Settlement.

Dated: May 29, 2014    PACHULSKI STANG ZIEHL & JONES LLP

    /s/ Laura Davis Jones
Laura Davis Jones
(Bar No. 2436)
Robert J. Feinstein
(NY Bar No. RF-2836)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@ pszjlaw.com
       rfeinstein@ pszjlaw.com

KL2 2847949.8

*- and -*

KRAMER LEVIN NAFTALIS & FRANKEL LLP

Thomas Moers Mayer
Philip Bentley
Joshua K. Brody
David E. Blabey, Jr.
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
Email: tmayer@kramerlevin.com
       pbentley@kramerlevin.com
       jbrody@kramerlevin.com
       dblabey@kramerlevin.com

*- and -*

BRYAN CAVE LLP

Stephanie Wickouski
1290 Avenue of the Americas
New York, New York 10104-3300
Tel: 212-541-1114
Fax: 212-904-0514
Email: stephanie.wickouski@bryancave.com

*Counsel to the Indenture Trustee*