## Exhibit C

**Engagement Letter**



**KPMG LLP**
Aon Center
Suite 5500
200 East Randolph Drive
Chicago, IL 60601-6436

Telephone  312 665 1000
Fax        312 665 6000
Internet   www.us.kpmg.com

**PRIVATE & CONFIDENTIAL**

April 9, 2013

Stacey Dore
EVP, General Counsel
Energy Future Competitive Holdings Company
1601 Bryan Street Suite 36060
Dallas, Texas 75201

Dear Ms. Dore':

We appreciate the opportunity for KPMG LLP ("KPMG" or "we") to assist Energy Future
Competitive Holdings Company, ("EFCH," the "Company," "you," or "your") with professional
services. This letter, which serves as our engagement letter, and the attached Standard Terms and
Conditions for Advisory and Tax Services (the "ST&C"), set forth the terms of our engagement.
Our engagement is subject to completion of our normal engagement acceptance process and
execution of this engagement letter. Any work performed in connection with this engagement
before the date of this letter is also governed by the terms and conditions contained in the letter.

<u>Scope</u>

KPMG's professional services will support management in addressing various bankruptcy and
fresh-start accounting and reporting, data management, and restructuring services for the
Company's possible Chapter 11 bankruptcy in accordance with the United States Bankruptcy
Code. KPMG will, at all times, work under the direction of management and provide services as
requested. To the extent those services requested are not included in the scope below, we will
discuss these with the Company and consider amending this engagement letter to reflect any
substantive changes.

**Bankruptcy Accounting and Fresh-Start Reporting**

- Provide advice, recommendations, and insight into leading practices to assist in the company's
  implementation of operational protocols for bankruptcy reporting, including the preparation of
  Statement of Financial Affairs (SOFA), a Schedule of Assets and Liabilities (SOAL) and a
  Monthly Operating Report (MOR) by debtor entity.

- Assist with debtor-in-possession (DIP) reporting, and assist EFCH management with
  identifying liabilities subject to compromise in the balance sheet, reorganization items in the
  P&L, and timing and classification of claim amounts.

- Assist in the preparation of the disclosure statement and plan of reorganization. Our assistance
  will depend upon your direction but tasks may include: preparation of detailed financial
  information, anticipated liquidity, best interest of creditors' test and plan feasibility.

KPMG LLP is a Delaware limited liability partnership,
the U.S. member firm of KPMG International Cooperative
("KPMG International"), a Swiss entity.



Stacy Dore'
Energy Future Competitive Holdings Company
April 9, 2013
Page 2

- Provide accounting considerations for specific transactions in each case which will relate to the applications of ASC 852, Reorganizations, ("ASC 852") or "Fresh Start" Accounting.

- Assist with general accounting considerations, including those associated with entering bankruptcy and potential deconsolidation of any subsidiaries. See Appendix 3: Accounting and Financial Reporting Support Services for examples of accounting services that can be provided at the request of EFCH.

- Assist EFCH with developing a planning summary that considers various alternative approaches to timing, effective date, valuation approach, extent of top side versus push down recognition of the new values and the benefits and implications of each for your consideration of the desired approach on each major asset category. Further, we will assist you with documenting your approach to identified assets and liabilities, including those where historical value represents fair value and are therefore not valued by a third party, such as certain working capital accounts, certain deferred or accrued expenses or other accounts that do not lend themselves to a valuation opinion but will require an alternate approach to justifying the basis of measurement in fresh start reporting.

- Provide tax consulting services with respect to such matters that may arise for which you seek our advice and consultation in connection with the accounting advisory work being performed in connection with this letter. This advice includes but is not limited to assistance with tax accounting analysis/calculations that may be necessary in connection with new valuations resulting from fresh start accounting and/or tax attribute changes resulting from a restructuring. However, we will not render any advice with respect to a federal or state "listed transaction" or any transaction that is substantially similar to a federal or state "listed transaction."

- Assist management with documentation of whitepapers for accounting issues, position papers, and accounting policies.

- Participation in discussions with auditors and other advisors to discuss accounting conclusions.

- Assist management with its analysis and documentation of financial reporting and disclosure requirements for Predecessor/Successor financial statements.

Our advice will generally be communicated to you via oral discussions, and, at your direction, supplemented by written materials to document/clarify salient matters and/or the results of our research. You acknowledge that your financial statements are your responsibility in conjunction with your external auditors.

The scope of our services involved in providing accounting and financial advisory services to management does not satisfy the requirements of an audit in accordance with generally accepted auditing standards, or a review in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants. Accordingly, we will not express an opinion or any other form of assurance on any of your financial statements.

During this engagement KPMG assumes no responsibility for auditing information provided by the Company or its advisors or for expressing an opinion, on any part, of the Company's financial statements, or for management's analysis or decision-making with respect to accounting positions taken, related financial statement disclosures or balance sheet accounts.



Stacy Dore'
Energy Future Competitive Holdings Company
April 9, 2013
Page 3

## Deliverables

KPMG will work as part of a collaborative team that will include EFCH personnel. The output from this collaborative team will be considered an internal EFCH work product for which management will take full responsibility. The collaboratively developed work product may be distributed as management determines to be appropriate for its needs. However, such work product will not be prepared on KPMG letterhead or contain the KPMG logo or other references to KPMG. The work product may be prepared by KPMG on EFCH letterhead or contain the EFCH logo, if so instructed by the project sponsor. KPMG may attach a transmittal letter to each work product, or provide a periodic transmittal letter referring to the work product that has been provided previously. Neither this KPMG transmittal letter, nor a copy thereof, should accompany any work product shared outside the Company. Should the Company attach its own transmittal letter when such collaboratively developed work product is shared externally, such transmittal letter may not indicate that the work product was prepared by KPMG or that the findings were based on input or test work provided by KPMG.

In addition, we will provide the Company with status updates as reasonably requested, in a format acceptable to and agreed upon by KPMG and EFCH.

## Key KPMG Resources

I will have overall responsibility for the conduct of the engagement. Francis Yogi, Michael Nesta and Cynthia Kielkucki will be actively involved in the performance of the engagement and will use such other staff for assistance as deemed necessary. Stacy Lyons will be responsible for assisting with tax accounting and financial reporting aspects of the engagement.

## Timing and Professional Fees

Our professional fees are based upon the skill level of the professionals providing the services and the amount of time and materials required to complete the engagement. Our fees and expenses are not contingent upon the final results, nor do we guarantee any result or resolution in the above referenced matter. The following table represents our hourly rates by level for this engagement.

| Resource | Hourly rate |
|---|---|
| Partner & Managing Director | $610 |
| Director | $500 |
| Manager | $375 |
| Senior Associate | $275 |
| Associate | $190 |



Stacy Dore'
Energy Future Competitive Holdings Company
April 9, 2013
Page 4

Billing will only include actual time spent and reasonable, documented expenses incurred in performing the work. In addition to professional fees, KPMG will be reimbursed for out-of-pocket expenses. We expect to issue invoices on a semi-monthly basis, and our invoices are due upon receipt.

KPMG's normal practice is to obtain a retainer, and KPMG is herewith requesting such a retainer of $350,000. The retainer will be held against the final invoice for the engagement; any unused retainer will be refunded.

**Appendices / Attachments**

The following appendices are considered an integral part of this letter:
Appendix 1: Standard Terms and Conditions for Advisory and Tax Services
Appendix 2: Other Matters
Appendix 3: Accounting and Financial Reporting Support Services
Appendix 4: Tax Support Services

**<u>Confirmation</u>**
Please indicate your acceptance of these arrangements by signing both copies of this letter in the space provided below and returning one signed copy of the letter. We look forward to working with you.

Very truly yours,

KPMG LLP

Neal McNamara, *Partner*

CC:    John Kunasek, KPMG
       Brian Heckler, KPMG

**ACCEPTED BY:  Energy Future Competitive Holdings Company.**

Andrew M. Wright                    4/10/13
VP & Deputy General Counsel         (Date)



**Appendix 2: Other Matters**

<u>**Conflicts**</u>

KPMG has performed an internal search in accordance with KPMG's internal procedures for potential client conflicts based upon the names of the parties that the Company has provided. The Company has represented to KPMG that this list represents all parties that EFCH considers material relative to the scope of services set forth above. No client conflicts were found with respect to any of the parties identified by EFCH and set forth in separate written communication. During the course of this engagement, the Company agrees that it will inform KPMG of additional parties in this matter or name changes for those parties provided.

As a large professional services organization, KPMG is engaged by new clients every day and cannot ensure that an engagement for the involved parties will not be accepted by KPMG. We take no responsibility for monitoring possible conflicts that could arise during the course of the engagement, although we will inform you promptly should any come to our attention. We reserve the right to resign from this engagement at any time if conflicts arise or become known to us that, in our judgment, would impair our ability to perform objectively.

In the event we become aware of a conflict of interest relating to any of our services to you, we will advise you and the other parties and, with the concurrence of all affected parties, take reasonable steps to provide appropriate separation between service teams.  Please note that in certain circumstances, we may be precluded from assisting you on a particular project due to the nature of the conflict.

<u>**Management's Roles & Responsibilities**</u>

While KPMG will make every attempt to gather the required data and coordinate data-gathering efforts, management is ultimately responsible for providing the necessary financial and tax information to KPMG.  EFCH's management is also responsible for establishing and supporting its income statement and balance sheet accounts and financial statement disclosures and maintaining adequate internal controls and procedures necessary to prepare such information.  In addition, EFCH will:

a)  Provide KPMG, on a timely basis, all information, documentation and materials relating to EFCH's operations necessary for KPMG to perform the services described in this letter;

b)  Establish that all information provided to KPMG is materially accurate and complete, and is updated on a timely basis.  KPMG will not be held responsible for EFCH information that has not been rendered in accordance with the provisions of paragraphs (a) and (b); and

c)  Provide KPMG with reasonable access to all employees and personnel necessary to assist in performing the services described in this letter and cooperate with KPMG in arranging meetings as appropriate.



**Reporting**

There are unique requirements when providing oral or written advice on the application of GAAP in the U.S. ("SAS 50" requirements).  The following are types of accounting services that we may provide to you that would generally not be within the scope of SAS 50:

- Researching and summarizing industry practice relating to the application of accounting principles for various types of transactions;

- Educational or training sessions regarding the content and potential ramifications of new accounting pronouncements;

- Summarizing and discussing the potential ramifications to companies relating to FASB or other accounting standard-setting bodies meetings as they pertain to proposed and existing accounting literature;

- Communications such as position papers prepared for the purpose of presenting views on a general issue (not related to a specific transaction or event that you request) involving the application of accounting principles.  Position papers include newsletters, articles, speeches and texts thereof, lectures and other forms of public presentations, and letters for the public record to professional and governmental standard-setting bodies.

However, if any of the services you request are to provide guidance on the application of accounting principles to a specific EFCH transaction or event, SAS 50 is applicable and we will be required to follow the protocols described below.

Should you ask KPMG to provide written or oral advice on the application of accounting principles to specific EFCH transactions involving facts and circumstances specific to EFCH or its related parties, any such request that would meet these criteria would fall within the scope of SAS 50 since we are not your audit firm. When you request advisory services that fall within the scope of SAS 50, we must consult with your audit firm to ascertain all the relevant available facts that are applicable to the specific request so as to form a professional judgment.  We recognize that there is room for legitimate disagreement between KPMG and your audit firm, as well as between EFCH and either your audit or another non-audit firm, but it is not our objective to challenge another accounting firm's professional judgment.

If you request a KPMG opinion letter to be written in accordance with SAS 50, we will issue a separate engagement letter to confirm the scope, extent and terms of that engagement.  Because of the requirements of SAS 50, SAS 97 and KPMG internal policies, we will follow our internal approval process for our involvement on specific transactions as they arise.  We may also meet with your independent auditors.  This communication will include the following:

> ➢ Obtaining information about the principals' involvement in each transaction and performing our engagement acceptance process;
> ➢ Communicating with the independent auditors' for one or more of the principals to discuss such matters as:



   o the substance of the transaction versus the form of the transaction;
   o whether there is a dispute between you and the continuing accountants; or
   o whether the continuing accountants have reached a conclusion that differs from ours.
  ➢ Obtaining indemnifications and/or hold harmless agreements from one or more of the principals or other third-party users; and,
  ➢ Internal investigations within KPMG to determine the presence of potential possible conflicts of interest.

KPMG may be requested, pursuant to subpoena or other legal process, to produce its documents relating to this engagement in judicial or administrative proceedings to which KPMG is not a party. We agree, if legally permitted, to provide you with prompt written notice of such request so that you may seek a protective order or other appropriate remedy.  If, in the absence of a protective order or other remedy or the receipt of waiver by EFCH, we are legally required to make a disclosure of such information, we will disclose only that information we are advised by legal counsel to disclose.  In that event, you agree to reimburse KPMG at standard billing rates for its professional time and expenses, including reasonable, out-of-pocket attorney fees, incurred in responding to such requests.

**<u>Tax Advice Standards</u>**

We do not anticipate that the written tax advice provided under this engagement letter will rise to the level of a Covered Opinion as defined in §10.35 of Circular 230 ("Covered Opinion"). Therefore, all the written tax advice provided under this engagement letter will contain the following legend:

   ANY TAX ADVICE IN THIS COMMUNICATION IS NOT INTENDED OR WRITTEN BY KPMG TO BE USED, AND CANNOT BE USED, BY A CLIENT OR ANY OTHER PERSON OR ENTITY FOR THE PURPOSE OF (i) AVOIDING PENALTIES THAT MAY BE IMPOSED ON ANY TAXPAYER OR (ii) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY MATTERS ADDRESSED HEREIN.

However, if our services will rise to the level of a Covered Opinion, we will issue a separate engagement letter.  We will also issue separate engagement letters for discrete tax services such as tax compliance, tax examination assistance, tax private letter ruling requests or tax opinion letters on completed or proposed transactions.



If KPMG is considered to be a tax return preparer under Treasury Regulation §301.7701-15, we will apply elevated standards in providing tax advice.  Under these standards, we must be able to determine that any return position on which we advise is "more likely than not" to be upheld (i.e., has a greater than 50 percent likelihood of success if challenged by the IRS) if the position does not involve a transaction designated by the IRS as a "listed transaction" within the meaning of Treas. Reg. §1.6011-4, or a transaction with the principal purpose of avoiding or evading any tax imposed by the Internal Revenue Code (a "principal purpose transaction").  If the advice relates to a "principal purpose transaction", we must arrive at a "should" confidence level (i.e., approximately a 70 percent or greater likelihood of success if challenged by the IRS) with respect to the position. In determining whether a position satisfies the "more likely than not" and "should" standards, we will not take into account the possibility that a tax return will not be audited, that an issue will not be raised on audit, or that an issue will be settled.  We will inform you as soon as possible if, during our analysis, we determine circumstances exist that prevent us from advising you under these standards.

**<u>Additional Other Matters</u>**

KPMG will provide our services in accordance with the terms of this letter, including the attached ST&C's except as modified as follows:

Paragraph 11(a)— the word "wrongful" is removed from proviso (2).

Insert the following paragraph 11(g):

"Each party acknowledges that remedies at law may be inadequate to protect against breach of this Paragraph 11 and hereby in advance agrees, without prejudice to any rights to judicial relief it may otherwise have, to the granting of equitable relief, including injunction, in the other party's favor without proof of actual damages.  Each party agrees not to seek, and agrees to waive any requirement for the securing or posting of, a bond in connection with a party seeking or obtaining such relief."

Paragraph 13. – the engagement letter and Standard Terms and Conditions shall be governed by the State of Texas.

The first two sentences of Paragrahph 14(c) will read as follows:

"Arbitration shall take place in Dallas, Texas.  The arbitration panel shall have no power to award non-monetary or equitable relief of any sort except for injunctive relief pursuant to paragraph 11(g) and as provided in IICPR Rule 13 (Interim Measures of Protection)."  Our engagement will be conducted under the consulting standards issued by the American Institute of Certified Public Accountants ("AICPA"). Such services are not intended to be an audit, examination, attestation, special report or agreed-upon procedures engagement as those services are defined in AICPA literature applicable to such engagements. Accordingly, these services will not result in the issuance of a written communication to third parties by KPMG directly reporting on financial data or internal control or expressing a conclusion or any other form of assurance.



The Scope may not be sufficient to address all EFCH's concerns or issues and may not result in the identification of all matters that may be of interest to EFCH.

As a part of this engagement, KPMG may be requested to assist EFCH (and its legal or other advisors) in discussions with EFCH's creditors and equity holders and with other interested parties. In the event that we participate in such discussions, the representations made and the positions advanced will be those of EFCH and its management, not KPMG, its partners or employees.



**Appendix 3: Example Accounting and Financial Reporting Support Services**

We will assist management with planning an approach, consideration of alternatives, research, analysis, implementation and documentation related to accounting and reporting upon entering into and the emergence from bankruptcy under fresh start. We will provide assistance and support to management in its consideration or evaluation of several topics including, but not limited to, the following:

- *Deconsolidation and reconsolidation.* Considering the accounting and reporting considerations under ASC 810 and related literature associated with entering bankruptcy and related loss of control of the equity owners of any entities that enter into bankruptcy.

- *Fresh start approach and work steps.* Considering the alternatives in approach, timing, order and adoption dates for fresh start reporting, the alternatives for on-going efficient processing of detailed accounting records, the potential approaches for updating detailed records to reflect changes in values and the new accounting requirements following emergence;

- *Change in ownership.* Evaluating whether the conditions in ASC 852 are met to justify adoption of a new, fresh start basis;

- *Issues & documentation.* Researching and documenting (memoranda, discussions with Deloitte LLP as required, etc.) to support EFCH's accounting and reporting conclusions reached in accordance with ASC 852;

- *Segregation of liabilities.* Identifying and segregating liabilities that arose before and after filing to reflect the liabilities subject to compromise under the bankruptcy process;

- *Claims.* Monitoring the bankruptcy proceedings to compare the claims filed, allowed, and existing debtor balances to (i) adjust the existing recorded liabilities to the allowed claims and (ii) reflect the Company's estimates of claims to be settled upon emergence;

- *Reporting classifications.* Identifying and segregating expenses, restructuring costs and losses for classification as "reorganization items" to properly portray amounts from activities to restructure the operations prior to emergence;

- *Top level reporting.* Assessing the degree to which aggregate adjustments and disclosures are utilized to report on a fresh start basis from the date of emergence until such amounts are recorded to your detailed accounting records;

- *Detailed accounting records.* Developing an approach to repopulating your detailed records with new FVs and asset lives and assisting with updating fixed asset and other detailed accounting records with the concluded FVs including assistance with creating and testing journal entry upload and Property Plant and Equipment ("PP&E") allocation;

- *Book vs. tax balances.* Assisting your tax team with identification of differences between book and tax balances that arise from the plan of emergence and fresh start accounting.



**Appendix 4: Tax Support Services**

Potential tax consulting services that we may be required to perform as part of the overall accounting advisory services engagement consist of the following:

- *Book vs. tax balances.*  Identification of differences between book and tax balances that arise from the plan of emergence and fresh start accounting;

- *Insolvent subsidiaries.*  Consideration of the deferred tax impact on the outside basis of investments in insolvent subsidiaries;

- *Tax elections.*  Assessment of the impact of available federal and state tax elections.

**KPMG LLP**
**Standard Terms and Conditions for Advisory and Tax Services**

1. **Services; Client Responsibilities.**

(a) References herein to Client shall refer to the addressee of the Proposal or Engagement Letter to which these Standard Terms and Conditions are attached or incorporated (the "Engagement Letter") and references herein to KPMG shall refer to KPMG LLP, a Delaware registered limited liability partnership and the United States member firm of the KPMG network of independent firms (the "KPMG Network"). Client, its parent company and their affiliates, and their respective directors, officers, employees, and agents are collectively referred to herein as the "Client Parties." KPMG, the other member firms of the KPMG Network and firms and entities controlled by, or under common control with, one or more such member firms (collectively, the "Member Firms"), and their affiliates, and their respective partners, principals, employees, and agents are collectively referred to herein as the "KPMG Parties."

(b) It is understood and agreed that KPMG's services may include advice and recommendations; but all decisions in connection with the implementation of such advice and recommendations shall be the responsibility of, and made by, Client. KPMG will not perform management functions or make management decisions for Client.

(c) If KPMG audits the financial statements of Client or provides any other attestation services to Client, the rules of the American Institute of Certified Public Accountants ("AICPA") require Client to agree to the following provisions of this Paragraph 1(c). In connection with KPMG's provision of services under the Engagement Letter, Client agrees that Client, and not KPMG, shall perform the following functions: (i) make all management decisions and perform all management functions; (ii) designate an individual who possesses suitable skill, knowledge and experience, preferably within senior management, to oversee such services, and to evaluate the adequacy and results of such services; (iii) accept responsibility for the results of such services; and (iv) establish and maintain internal controls over the processes with which such services are concerned, including monitoring on-going activities.

(d) Subsequent to the completion of this engagement, KPMG will not update its advice, recommendations or work product for changes or modifications to the law and regulations, or to the judicial and administrative interpretations thereof, or for subsequent events or transactions, unless Client separately engages KPMG to do so in writing after such changes or modifications, interpretations, events or transactions.

2. **Tax on Services.** All fees, charges and other amounts payable to KPMG under the Engagement Letter do not include any sales, use, excise, value added or other applicable taxes, tariffs or duties, payment of which shall be Client's sole responsibility, excluding any applicable taxes based on KPMG's net income or taxes arising from the employment or independent contractor relationship between KPMG and its personnel.

3. **Termination.** Either party may terminate the Engagement Letter at any time by giving written notice to the other party not less than 30 calendar days before the effective date of termination.

4. **Ownership and Use of Deliverables.**

(a) KPMG has created, acquired, owns or otherwise has rights in, and may, in connection with the performance of services under the Engagement Letter, use, provide, modify, create, acquire or otherwise obtain rights in, (i) concepts, ideas, methods, methodologies, procedures, processes, know-how, techniques, models, templates and software and (ii) the general elements of style, design, art work and graphics and content of general applicability included in KPMG's Deliverables (as defined below) or work product not specific to Client or the services under the engagement letter (collectively, the "KPMG Property"). KPMG retains all ownership and use rights in the KPMG Property. Client shall acquire no rights or interest in the KPMG Property, except as expressly provided in the next paragraph. KPMG acknowledges that KPMG Property shall not include any of Client's confidential information or tangible or intangible property, and KPMG shall have no ownership rights in such property.

(b) Except for KPMG Property, and upon full and final payment to KPMG under the Engagement Letter, the tangible items specified as deliverables or work product in the Engagement Letter including any intellectual property rights appurtenant thereto (the "Deliverables") will become the property of Client. If any KPMG Property is contained in any of the Deliverables, KPMG hereby grants Client a royalty-free, paid-up, non-exclusive, perpetual license to use such KPMG Property in connection with Client's use of the Deliverables. Client acknowledges and agrees that KPMG shall have the right to retain for its files copies of each of the Deliverables, subject to the provisions of Paragraph 11 below.

(c) Client acknowledges and agrees that any advice, recommendations, information, Deliverables or other work product provided to Client by KPMG in connection with the services under the Engagement Letter is intended for Client's sole benefit and KPMG does not authorize any other party to rely upon such advice, recommendations, information, Deliverables or other work product and any such reliance shall be at such party's sole risk. Client agrees that if it makes such advice, recommendations, information or work product available to any third party other than as expressly permitted by the Engagement Letter the provisions of Paragraph 8(b) shall apply unless Client provides the written notice to the third party in substantially the form of Appendix A hereto (the "Notice"), which Notice shall be acknowledged in writing by such third party and returned to Client. Upon request, Client shall provide KPMG with a copy of the foregoing Notice and acknowledgement and any notice and acknowledgement sent to Client by such third party as contemplated by the Notice. Client may only make a Deliverable bearing the "KPMG" name or logo available to a third party in its entirety. Notwithstanding the foregoing, (i) in the event of a disclosure made by Client that is required by law, that is made to a regulatory authority having jurisdiction over Client or that is made pursuant to Paragraph 18(a) below, no acknowledgement of the Notice shall be required and (ii) no Notice or acknowledgement shall be required with respect to disclosures expressly authorized by the Engagement Letter.

October 1, 2011 Release

# KPMG LLP
## Standard Terms and Conditions for Advisory and Tax Services

5.  **Warranties.**  KPMG's services under the Engagement Letter are subject to and will be performed in accordance with AICPA and other professional standards applicable to the services provided by KPMG under the Engagement Letter and in accordance with the terms thereof.  KPMG disclaims all other warranties, either express or implied.

6.  **Limitation on Damages.**    Except for the respective indemnification obligations of Client and KPMG set forth herein, the liability of the Client Parties and the KPMG Parties to one another, on account of any actions, damages, claims, liabilities, costs, expenses or losses in any way arising out of or relating to the services performed under the Engagement Letter shall be limited to the amount of fees paid or owing to KPMG under the Engagement Letter.  In no event shall any of the Client Parties or any of the KPMG Parties be liable for consequential, special, indirect, incidental, punitive or exemplary damages, costs, expenses, or losses (including, without limitation, lost profits and opportunity costs).    For avoidance of doubt, any damages awarded against any of the Client Parties or the KPMG Parties based on a third party claim subject to indemnification hereunder shall not be subject to the disclaimer in the previous sentence.  The provisions of this Paragraph shall apply regardless of the form of action, damage, claim, liability, cost, expense, or loss asserted, whether in contract, statute, tort (including but not limited to negligence) or otherwise.

7.  **Infringement.**

(a)  KPMG hereby agrees to indemnify, hold harmless and defend the Client Parties from and against any and all claims, liabilities, losses, expenses (including reasonable attorneys' fees), fines, penalties, taxes or damages (collectively "Liabilities") asserted by a third party against any of the Client Parties to the extent such Liabilities result from the infringement by the Deliverables (including any KPMG Property contained therein) of such third party's patents issued as of the date of the Engagement Letter, trade secrets, trademarks or copyrights.    The preceding indemnification shall not apply to any infringement to the extent arising out of (i) use of the Deliverables other than in accordance with applicable documentation or instructions supplied by KPMG or other than for Client's internal business purposes; (ii) any alteration, modification or revision of the Deliverables not expressly agreed to in writing by KPMG; or (iii) the combination of the Deliverables with materials not supplied or approved by KPMG.

(b)  In case any of the Deliverables (including any KPMG Property contained therein) or any portion thereof is held, or in KPMG's reasonable opinion is likely to be held, to constitute infringement, KPMG may, within a reasonable time, at its option either: (i) secure for Client the right to continue the use of such infringing item; or (ii) replace, at KPMG's sole expense, such item with a substantially equivalent non-infringing item or modify such item so that it becomes non-infringing.  In the event KPMG is, in its reasonable discretion, unable to perform either of the options described in clauses (i) or (ii) above, Client shall return the allegedly infringing item to KPMG, and KPMG's sole liability shall be to refund to Client the amount paid to KPMG for such item; provided that the foregoing shall not be construed to limit KPMG's indemnification obligation set forth in Paragraph 7(a) above.

(c)  The provisions of this Paragraph 7 state KPMG's entire liability and Client's sole and exclusive remedy with respect to any infringement or claim of infringement.

8.  **Indemnification.**

(a)  KPMG agrees to indemnify, hold harmless and defend the Client Parties from and against any and all Liabilities for physical injury to, or illness or death of, any person regardless of status, and damage to or destruction of any tangible property, which any of the Client Parties may sustain or incur, to the extent such Liabilities result from the negligence or willful misconduct of the KPMG Parties.  Client agrees to indemnify, hold harmless and defend the KPMG Parties from and against any and all Liabilities for physical injury to, or illness or death of, any person regardless of status, and damage to or destruction of any tangible property, which any of the KPMG Parties may sustain or incur, to the extent such Liabilities result from the negligence or willful misconduct of the Client Parties.

(b)  In accordance with Paragraph 4(c), Client agrees to indemnify, defend and hold harmless the KPMG Parties from and against any and all Liabilities incurred or suffered by or asserted against any of the KPMG Parties in connection with a third party claim to the extent resulting from such party's reliance upon KPMG's advice, recommendations, information, Deliverables or other work product as a result of Client's disclosure of such advice, recommendations, information or work product without adhering to the notice requirements of Paragraph 4(c) above.    The foregoing indemnification obligation shall apply regardless of whether the third party claim alleges a breach of contract, violation of statute or tort (including without limitation negligence) by KPMG.

(c)  The party entitled to indemnification (the "Indemnified Party") shall promptly notify the party obligated to provide such indemnification (the "Indemnifying Party") of any claim for which the Indemnified Party seeks indemnification.    The Indemnifying Party shall have the right to conduct the defense or settlement of any such claim at the Indemnifying Party's sole expense, and the Indemnified Party shall cooperate with the Indemnifying Party.    The party not conducting the defense shall nonetheless have the right to participate in such defense at its own expense.    The Indemnified Party shall have the right to approve the settlement of any claim that imposes any liability or obligation other than the payment of money damages for which the Indemnifying Party has accepted responsibility.

9.  **Cooperation; Use of Information.**

(a)  Client agrees to cooperate with KPMG in the performance of the services under the Engagement Letter and shall provide or arrange to provide KPMG with timely access to and use of the personnel, facilities, equipment, data and information necessary for KPMG to perform the services under the Engagement Letter.  The Engagement Letter may set forth additional details regarding KPMG's access to and use of personnel, facilities, equipment, data and information.

(b)  The Engagement Letter may set forth additional obligations of Client in connection with the services under the Engagement

October 1, 2011 Release

**KPMG LLP**
**Standard Terms and Conditions for Advisory and Tax Services**

Letter necessary for KPMG to perform its obligations under the Engagement Letter. Client acknowledges that its failure to satisfy these obligations could adversely affect KPMG's ability to provide the services under the Engagement Letter.

(c)    Client acknowledges and agrees that KPMG will, in performing the services under the Engagement Letter, base its conclusions on the facts and assumptions that Client furnishes and that KPMG may use data, material, and other information furnished by or at the request or direction of Client without any independent investigation or verification and that KMPG shall be entitled to rely upon the accuracy and completeness of such data, material and other information.   Inaccuracy or incompleteness of such data, material and other information furnished to KPMG could have a material adverse effect on KPMG's conclusions.

10.    **Independent Contractor.**  It is understood and agreed that each of the parties hereto is an independent contractor and that neither party is or shall be considered an agent, distributor or representative of the other.  Neither party shall act or represent itself, directly or by implication, as an agent of the other or in any manner assume or create any obligation on behalf of, or in the name of, the other.

11.    **Confidentiality.**

(a)    "Confidential Information" means all documents, software, reports, data, records, forms and other materials obtained by one party (the "Receiving Party") from the other party (the "Disclosing Party") or at the request or direction of the Disclosing Party in the course of performing the services under the Engagement Letter: (i) that have been marked as confidential; (ii) whose confidential nature has been made known by the Disclosing Party to the Receiving Party; or (iii) that due to their character and nature, a reasonable person under like circumstances would treat as confidential.  Notwithstanding the foregoing, Confidential Information does not include information which: (1) is already known to the Receiving Party at the time of disclosure by the Disclosing Party; (2) is or becomes publicly known through no wrongful act of the Receiving Party; (3) is independently developed by the Receiving Party without benefit of the Disclosing Party's Confidential Information; (4) relates to information provided by KPMG relating to the tax treatment or tax structure of any transaction; (5) the Receiving Party determines is required to be maintained or disclosed by the Receiving Party under sections 6011, 6111 or 6112 of the Internal Revenue Code ("IRC") or the regulations thereunder or under any similar or analogous provisions of the laws of a state or other jurisdiction; or (6) is received by the Receiving Party from a third party without restriction and without a breach of an obligation of confidentiality.

(b)    The Receiving Party will deliver to the Disclosing Party or destroy all Confidential Information of the Disclosing Party and all copies thereof when the Disclosing Party requests the same, except for copies retained in work paper files or records, anything that may be stored in back up media or other electronic data storage systems, latent data and metadata.  Except as otherwise set forth in this Paragraph 11 or Paragraph 15 below, the Receiving Party shall not disclose to any person, firm or entity any Confidential Information of the Disclosing Party without the Disclosing Party's express, prior written permission; provided,

however, that notwithstanding the foregoing, the Receiving Party may disclose Confidential Information to the extent that it is required or necessary to be disclosed pursuant to a statutory or regulatory provision or court or administrative order, or, subject to appropriate conditions of confidentiality, to fulfill professional obligations and standards (including quality and peer review) or to submit and process an insurance claim.

(c)    The KPMG Parties may aggregate Client information with information from other sources in connection with thought leadership projects, to improve the delivery of services to clients and to allow clients to evaluate various business transactions and opportunities.  The KPMG Parties will only use this information without attribution to Client and under circumstances where Client will not be identified as the source of the information.

(d)    KPMG may also use Client information and information relating to the services rendered under the Engagement Letter for the purpose of permitting the KPMG Parties to access and share knowledge and information solely among the KPMG Parties.  The KPMG Parties receiving this information will be obligated to comply with confidentiality obligations with respect to such information in accordance with this Paragraph 11.

(e)    Each party shall exercise the same level of care to protect the other's information as it exercises to protect its own confidential information but in no event less than reasonable care, except to the extent that applicable law or professional standards impose a higher requirement.

(f)    If the Receiving Party receives a subpoena or other validly issued administrative or judicial demand requiring it to disclose the Disclosing Party's Confidential Information, the Receiving Party shall, unless prohibited by law, provide prompt written notice to the Disclosing Party of such demand in order to permit it to seek a protective order.  So long as the Receiving Party gives notice as provided herein, the Receiving Party shall be entitled to comply with such demand to the extent required by law, subject to any protective order or the like that may have been entered in the matter.  In the event the Receiving Party is requested to testify or produce its documents relating to the services under the Engagement Letter pursuant to subpoena or other legal process in judicial or administrative proceedings to which it is not a party, or in connection with an informal inquiry or investigation with the consent of the Disclosing Party, the Disclosing Party shall reimburse the Receiving Party for its time and expenses, including reasonable attorney's fees, incurred in responding to such requests.

12.    **Assignment.**  Subject to Paragraph 15 below, neither party may assign, transfer or delegate any of its rights or obligations without the prior written consent of the other party, such consent not to be unreasonably withheld.

13.    **Governing Law; Severability.**  The Engagement Letter and these Standard Terms and Conditions shall be governed by and construed in accordance with the laws of the State of New York, without regard to its conflict of laws provisions.  In the event that any term or provision of the Engagement Letter or these terms shall be held to be invalid, void or unenforceable, then the remainder of the Engagement Letter and these terms shall not be

**KPMG LLP**
**Standard Terms and Conditions for Advisory and Tax Services**

affected, and each such term and provision shall be valid and enforceable to the fullest extent permitted by law.

14. **Alternative Dispute Resolution**.

(a)  Any dispute or claim arising out of or relating to the Engagement Letter between the parties or the services provided thereunder shall be submitted first to non-binding mediation (unless either party elects to forego mediation by initiating a written request for arbitration) and if mediation is not successful within 90 days after the issuance by one of the parties of a request for mediation then to binding arbitration in accordance with the Rules for Non-Administered Arbitration of the International Institute for Conflict Prevention and Resolution (the "IICPR"). Any issue concerning the extent to which any dispute is subject to arbitration, or any dispute concerning the applicability, interpretation, or enforceability of these dispute resolution procedures, including any contention that all or part of these procedures is invalid or unenforceable, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. By operation of this provision, the parties agree to forego litigation over such disputes in any court of competent jurisdiction.

(b)  Mediation, if selected, may take place at a location to be designated by the parties using the Mediation Procedures of the IICPR, with the exception of paragraph 2 (Selecting the Mediator).

(c)  Arbitration shall take place in New York, New York. The arbitration panel shall have no power to award non-monetary or equitable relief of any sort except as provided in IICPR Rule 13 (Interim Measures of Protection). Damages that are inconsistent with any applicable agreement between the parties, that are punitive in nature, or that are not measured by the prevailing party's actual damages shall be unavailable in arbitration or any other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitration panel have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction.

(d)  Either party may seek to enforce any written agreement reached by the parties during mediation, or to confirm and enforce any final award entered in arbitration, in any court of competent jurisdiction.

(e)  Notwithstanding the agreement to such procedures, either party may seek equitable relief to enforce its rights in any court of competent jurisdiction.

15  **Use of Member Firms and Third Party Service Providers**.

(a)  Client acknowledges and agrees that the services under the Engagement Letter, including any applicable tax advice, may be performed by a Member Firm located outside of the United States. Client understands that each Member Firm is a separate, distinct and independent legal entity and is not a partner, principal, agent or affiliate of KPMG and KPMG is not a partner, principal, agent or affiliate of any other Member Firm.

(b)  Client further acknowledges that in connection with the performance of services under the Engagement Letter, KPMG

and Member Firms, in their discretion or at Client's direction, may utilize the services of third party service providers within and without the United States to complete the services under the Engagement Letter.

(c)  KPMG uses third party service providers within and without the United States to provide administrative and clerical services to KPMG. These third party service providers may in the performance of such services have limited access to information, including but not limited to Confidential Information, received by KPMG from or at the request or direction of Client. KPMG represents to Client that each such third party service provider has agreed to conditions of confidentiality with respect to Client's information to the same or similar extent as KPMG has agreed to pursuant to Paragraph 11 above. KPMG has full responsibility to cause these third party service providers to comply with such conditions of confidentiality and KPMG shall be responsible for any consequences of their failure to comply.

(d)  Accordingly, Client consents to KPMG's disclosure to a Member Firm or third party service provider and the use by such Member Firm and third party service provider of data and information, including but not limited to Confidential Information, received from or at the request or direction of Client for the purposes set forth in Paragraph 11 and this Paragraph 15.

(e)  Any services performed by a Member Firm or third party service provider shall be performed in accordance with the terms of the Engagement Letter and these Standard Terms and Conditions, including Paragraph 11 (Confidentiality), but KPMG shall remain responsible to Client for the performance of such services. Client agrees that any claim relating to the services under the Engagement Letter may only be made against KPMG and not any other Member Firm or third party service provider referred to above.

16. **Miscellaneous**.

(a)  **Sarbanes-Oxley**. Except as otherwise set forth in the Engagement Letter, in accepting this engagement, Client acknowledges that completion of this engagement or acceptance of Deliverables resulting from this engagement will not constitute a basis for Client's assessment or evaluation of internal control over financial reporting and disclosure controls and procedures, or its compliance with its principal officer certification requirements under Section 302 of the Sarbanes-Oxley Act of 2002 (the "Act"). The services under the Engagement Letter shall not be construed to support Client's responsibilities under Section 404 of the Act requiring each annual report filed under Section 13(a) or 15(d) of the Securities Exchange Act of 1934 to contain an internal control report from management.

(b)  **Electronic Communications**. KPMG and Client may communicate with one another by electronic mail or otherwise transmit documents in electronic form during the course of this engagement. Each party accepts the inherent risks of these forms of communication (including the security risks of interception of or unauthorized access to such communications, the risks of corruption of such communications and the risks of viruses or other harmful devices). Client agrees that the final hardcopy version of a document, including a Deliverable, or other written

# KPMG LLP
## Standard Terms and Conditions for Advisory and Tax Services

communication that KPMG transmits to Client shall supersede any previous versions transmitted electronically by KPMG to Client unless no such hard copy is transmitted.

(c) **California Accountancy Act.** For engagements where services will be provided by KPMG through offices located in California, Client acknowledges that certain of KPMG's personnel who may be considered "owners" under the California Accountancy Act and implementing regulations (California Business and Professions Code section 5079(a); 16 Cal. Code Regs. sections 51 and 51.1) and who may provide services in connection with this engagement, may not be licensed as certified public accountants under the laws of any of the various states.

(d) **Volume Rebates.** Where KPMG is reimbursed for expenses, it is KPMG's policy to bill clients the amount incurred at the time the good or service is purchased. If KPMG subsequently receives a volume rebate or other incentive payment from a vendor relating to such expenses, KPMG does not credit such payment to Client. Instead, KPMG applies such payments to reduce its overhead costs, which costs are taken into account in determining KPMG's standard billing rates and certain transaction charges that may be charged to clients.

(e) **Use of Names and Logos.** Except as permitted by law or the terms of the Engagement Letter, neither party shall acquire hereunder any right to use the name or logo of the other party or any part thereof. Any such use shall require the express written consent of the owner party.

(f) **Privileged Communications.** Information relating to advice KPMG provides to Client, including communications between KPMG and Client and material KPMG creates in the course of providing advice, may be privileged and protected from disclosure to the IRS or other governmental authority in certain circumstances. As KPMG is not able to invoke the privilege on Client's behalf with respect to any communications for which privilege has been waived, Client agrees to promptly notify KPMG of any such waivers, whether resulting from communications with KPMG or third parties in the same or a related matter. Client also understands that privilege may not be available for communications with an audit client and that KPMG personnel providing audit and non-audit services will discuss matters that may affect the audit to the extent required by applicable professional standards. Client agrees that KPMG will not assert on Client's behalf any claim of privilege unless Client specifically instructs KPMG in writing to do so after discussing the specific request and the grounds on which such privilege claim would be made. Notwithstanding the foregoing, Client acknowledges that in no event will KPMG assert any claim of privilege that KPMG concludes, after exercising reasonable judgment, is not valid.

(g) **Active Spreadsheets and Electronic Files.** KPMG may use models, electronic files and spreadsheets with embedded macros created by KPMG to assist KPMG in providing the services under the Engagement Letter. If Client requests a working copy of any such model, electronic file or spreadsheet, KPMG may, at its discretion, make such item available to Client for its internal use only and such item shall be considered a Deliverable subject to Paragraph 4 above; provided that Client is responsible for

obtaining the right to use any third party products necessary to use or operate such item.

(h) **Non-Solicitation.** During the term of the Engagement Letter and for one year thereafter, neither party shall solicit for hire as an employee, consultant or otherwise any of the other party's personnel who have had direct involvement with the services under the Engagement Letter, without such other party's express written consent. This prohibition shall not apply to any offers of employment which result from a general solicitation for employment, including without limitation, through the Internet, newspapers, magazines and radio.

17. **Entire Agreement.** The Engagement Letter and these Standard Terms and Conditions, including the Exhibits and Appendices hereto and thereto, constitute the entire agreement between KPMG and Client with respect to the services under the Engagement Letter and supersede all other oral and written representations, understandings or agreements relating thereto.

18. **Additional Terms for Engagements Involving Tax Services.**

(a) Notwithstanding anything to the contrary set forth herein, no provision in the Engagement Letter or these Standard Terms and Conditions is or is intended to be construed as a condition of confidentiality within the meaning of IRC sections 6011, 6111, 6112 or the regulations thereunder, or under any similar or analogous provisions of the laws of a state or other jurisdiction. In particular, Client (and each employee, representative, or other agent of Client) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of any transaction within the scope of this engagement and all materials of any kind (including opinions and other tax analyses) that are provided to Client relating to such tax treatment and tax structure. Client also agrees to use commercially reasonable efforts to inform KPMG of any conditions of confidentiality imposed by third party advisors with respect to any transaction on which KPMG advice is requested. Such notification must occur prior to KPMG providing any advice with respect to the transaction.

(b) Treasury regulations under IRC section 6011 require taxpayers to disclose to the IRS their participation in reportable transactions and IRC section 6707A imposes strict penalties for noncompliance. Client agrees to use commercially reasonable efforts to inform KPMG if Client is required to disclose any transaction covered by the Engagement Letter as a reportable transaction to the IRS or to any state or other jurisdiction adopting similar or analogous provisions. IRC section 6111 requires a material advisor with respect to a reportable transaction to disclose information on the transaction to the IRS by a prescribed date, and IRC section 6112 requires the material advisor to maintain, and make available to the IRS upon request, a list of persons and other information with respect to the transaction. KPMG will use commercially reasonable efforts to inform Client if KPMG provides Client's identifying information to the IRS under IRC section 6111 or 6112, or to any state or other jurisdiction adopting similar or analogous provisions.

(c) Unless expressly provided for, KPMG's services do not include representing Client in the event of a challenge by the IRS or other tax or revenue authorities.

**KPMG LLP**
**Standard Terms and Conditions for Advisory and Tax Services**

(d)   In rendering tax advice, KPMG may consider, for example, the
applicable provisions of the Internal Revenue Code of 1986, and
the Employee Retirement Income Security Act of 1974, each as
amended, and the relevant state, local and foreign statutes, the
regulations thereunder, income tax treaties, and judicial and
administrative interpretations, thereof.   These authorities are
subject to change, retroactively or prospectively, and any such
changes could affect the validity of KPMG's advice.

October 1, 2011 Release

KE 27862520.20

**APPENDIX A**

**[FORM OF NOTICE AND ACKNOWLEDGEMENT]**

[Name of Third Party]
Address

The advice, recommendations and information in the document included with this notice were prepared for the sole benefit of [Name of Client], based on the specific facts and circumstances of [Name of Client], and its use is limited to the scope of KPMG's engagement for [Name of Client]. It has been provided to you for informational purposes only and you are not authorized by KPMG to rely upon it and any such reliance by you or anyone else shall be at your or their own risk. You acknowledge and agree that KPMG accepts no responsibility or liability in respect of the advice, recommendations or other information in such document to any person or organization other than [Name of Client]. You shall have no right to disclose the advice, recommendations or other information in such document to anyone else without including a copy of this notice and, unless disclosure is required by law or to fulfill a professional obligation required under applicable professional standards, obtaining a signed acknowledgement of this notice from the party to whom disclosure is made and you provide a copy thereof to [Name of Client]. You acknowledge and agree that you will be responsible for any damages suffered by KPMG as a result of your failure to comply with the terms of this notice.

Please acknowledge your acceptance of the foregoing by signing and returning to us a copy of this letter.*

Very truly yours,

[Name of Client]

By: _____
    Name:
    Title:

**Accepted and Agreed to on this ___ day of ____, 20__ by:***

[Name of Third Party]

By: _____
    Name:
    Title:

*Remove in the event of a disclosure made by Client that is required by law, that is made to a regulatory authority having jurisdiction over Client or that is made pursuant to Paragraph 18(a) of the Standard Terms and Conditions in which case an acknowledgement is not required by the terms of Paragraph 4(c).

October 1, 2011 Release

## Exhibit D

**MSA**

**MASTER SERVICES AGREEMENT**

**BY AND BETWEEN**

**KPMG LLP**

**AND**

**EFH CORPORATE SERVICES COMPANY**

**November 1, 2009**

**CONTRACT NO. C 0631124 C**

**MASTER CONSULTING AGREEMENT**

C 0631124 C

This Master Consulting Agreement (this "Agreement") is made and shall become effective as of November 1, 2009 (the "Effective Date"), by and between EFH Corporate Services Company, a Texas corporation ("COMPANY") and KPMG LLP, a Delaware registered limited liability partnership ("CONTRACTOR"), pursuant to which CONTRACTOR will provide to COMPANY the services described on the Schedule A(s) attached hereto and on future Schedule As that may be agreed to by the Parties.  COMPANY and CONTRACTOR may be referred to each as a "Party" or collectively as the "Parties."  Capitalized terms not defined within another section of this Agreement are defined below.  In consideration of the following obligations and mutual promises, the Parties hereby agree as follows:

## ARTICLE 1: DEFINITIONS

A.    <u>CLAIMS</u>
The term "Claims" means all claims, losses, expenses, damages (including reasonable attorneys fees), demands, judgments, causes of action, suits, and liability in tort, contract, product or strict liability or any other basis and of every kind and character whatsoever.

B.    <u>COMPANY</u>
The term "COMPANY" means COMPANY, its parent corporation, Energy Future Holdings Corp., and all subsidiaries and affiliates of Energy Future Holdings Corp., and all officers, directors and employees of COMPANY and each such subsidiary or affiliate.

C.    <u>Contract Administrator</u>
The term "Contract Administrator" means a representative(s) of each Party named in this Agreement, or in a subsequent written notice issued pursuant to this Agreement by such party from time to time, to act in matters relating to the revision of contract language, the adjustment of compensation or time, and the resolution of issues regarding the meaning of contract language.  Actions of COMPANY'S Contract Administrator include initiating, negotiating and issuing supplements or amendments to this Agreement, as required; receiving required notices and negotiating resolutions/settlements to disputes that may arise concerning this Agreement.

D.    <u>Contract Coordinator</u>
The term "Contract Coordinator" means a representative(s) of each Party named in this Agreement, or in a subsequent written notice issued pursuant to this Agreement by such party from time to time, to act in matters related to performance of this Agreement as it is written.  Actions of the Contract Coordinators regarding the day-to-day interaction between the operations of the Parties, the issuance and approval of invoices, the issuance and approval of procedures, drawings, Schedule As and documents of any type, and other decisions made in managing this Agreement will not operate as a waiver or compromise of any provision of this Agreement.

1

**MASTER CONSULTING AGREEMENT**

C 0631124 C

E.     CONTRACTOR

The term "CONTRACTOR" means CONTRACTOR, all subcontractors of any tier employed by CONTRACTOR, and all affiliated or related firms and entities of CONTRACTOR, and all officers, directors, partners, limited partners, shareholders, associates, employees, servants and agents of each.

F.     Deliverable

Except to the extent otherwise expressly provided for in a Schedule A, the term "Deliverable" means any tangible items, products, or deliverables, to be developed or prepared by CONTRACTOR for COMPANY as part of the Work, and as specified as work product in a Schedule A.

F.     Schedule A:

The term "Schedule A" and all future Schedules A means a written document issued pursuant to this Agreement, which shall be signed by the Parties, that identifies and authorizes Work to be performed. Schedule A may, however, contain Work instructions, specifications and specific billing advice.  As used herein, the term "Schedule A" shall have the same meaning as the term "Statement of Work," and the same shall be interchangeable.

G.     Work

The term "Work" means all services necessary to perform the Work described in any Schedule A, including, without limitation, the preparation and submission to COMPANY of any Deliverable.

H.     Work Site

The term "Work Site" means location(s) described in a Schedule A where the Work will be performed.

**ARTICLE 2: ASSIGNABLE SCOPE OF WORK AND DELIVERABLES**

COMPANY may, from time to time, identify any Work which COMPANY desires to be performed by CONTRACTOR, as specified in a Schedule A.  Except as otherwise specified by the Parties or as otherwise set forth herein or in the applicable Schedule A, CONTRACTOR will provide all materials, equipment, tools, supervision, and manpower resources necessary for the full and complete performance of the Work and the preparation of any Deliverables.

Each proposed Schedule A shall be approved by COMPANY and, when acceptable to both Parties, shall be executed by both Parties. Each Schedule A shall reference this Agreement by number and shall be deemed a part of this Agreement.  Nothing in this Agreement shall be deemed to authorize any Work, or constitute a commitment of either Party to accept or execute any particular Schedule A, and neither COMPANY nor CONTRACTOR will have any rights or obligations, for or with respect to any particular Work except as such Work is identified in a

2

## MASTER CONSULTING AGREEMENT

C 0631124 C

Schedule A executed by both Parties. At COMPANY'S Contract Coordinator's discretion, Work may be requested verbally, but shall not be authorized hereunder until such time as it is confirmed by a written Schedule A.

Notwithstanding anything herein to the contrary, the Work shall not include (unless specified in a Statement of Work) (i) the provision of expert testimony on behalf of Company or (ii) any service that would require Contractor to maintain independence from Company in accordance with then current applicable law, rule or regulation of any governmental entity or professional organization.

Company agrees to provide reasonable cooperation to Contractor in the performance of the Work and shall provide or arrange to provide Contractor with reasonable access to and use of the personnel, facilities, equipment, data and information to the extent reasonably necessary for Contractor to perform the Work. To the extent applicable to the Work, a Statement of Work shall set forth the obligations of Company in connection with such Work. Company agrees to make reasonable efforts to perform such obligations in accordance with, and subject to, such Statement of Work. Company acknowledges that its failure to meet such obligations may adversely affect CONTRACTOR'S ability to provide the Work in accordance with the terms of this Agreement and the applicable Statement of Work. Contractor agrees to notify Company in the event any such failure to perform by Company has, or may, affect the ability of Contractor to perform the Work.

Company acknowledges and agrees that Contractor will, in performing the Work, base its conclusions on the facts and assumptions that Company furnishes and that Contractor may use data, material, and other information furnished by or at the request or direction of Company without any independent investigation or verification and that Contractor shall be entitled to rely upon the accuracy and completeness of such data, material and other information. Inaccuracy or incompleteness of such data, material and other information furnished to Contractor could have a material effect on CONTRACTOR'S conclusions.

It is understood and agreed that CONTRACTOR'S services may include advice and recommendations; but all decisions in connection with the implementation of such advice and recommendations shall be the responsibility of, and made by, Company. Contractor will not perform management functions or make management decisions for Company. In connection with CONTRACTOR'S provision of Work under a Statement of Work, Company agrees that Company, and not Contractor, shall perform the following functions: (i) make all management decisions and perform all management functions, (ii) designate an individual who possesses suitable skill, knowledge and experience, preferably within senior management, to oversee such services, and to evaluate the adequacy and results of such services, and (iii) accept responsibility for implementation of the results of such services; and (iv) establish and maintain internal controls over the processes with which such services are concerned, including monitoring on-going activities..

Subsequent to the completion of the Work under a Statement of Work, Contractor will not update its advice, recommendations or work product for changes or modification to the law and regulations, or to the judicial and administrative interpretations thereof, or for subsequent events

3

C 0631124 C

## MASTER CONSULTING AGREEMENT

or transactions, unless Company separately engages Contractor to do so in writing after such changes or modifications, interpretations, events or transactions.

### ARTICLE 3: NON-EXCLUSIVE

COMPANY reserves the right to obtain the types of services provided by CONTRACTOR from other sources without obligation or liability to CONTRACTOR and, subject to Articles 23 ("Business Ethics") and 25 ("Conflict of Interest"), nothing herein shall be deemed to limit or prohibit CONTRACTOR from performing similar services for other clients.

### ARTICLE 4: TERM OF AGREEMENT

The term of this Agreement shall commence on the Effective Date and, unless this Agreement is terminated earlier, shall continue for a period of 3 years thereafter (the "Initial Term"). After the end of the Initial Term and each Renewal Term, this Agreement shall terminate unless at least 30 days prior to the end of the Initial Term or such Renewal Term, as the case may be, COMPANY provides CONTRACTOR written notice of COMPANY'S intent to extend the term of this Agreement, in which case this Agreement will continue in effect for successive one year terms (each, a "Renewal Term"). Notwithstanding any of the foregoing, in no event shall this Agreement continue in effect for longer than 10 years after the Effective Date, unless extended by a written agreement signed by both Parties.

### ARTICLE 5: COMPENSATION

Subject to the requirements of this Article 5, and as full compensation for the satisfactory performance by CONTRACTOR of the Work, COMPANY will compensate CONTRACTOR in accordance with the rate(s) or price(s) contained in the appropriate Schedule A issued under this Agreement.

    (a)    **Fees and Staffing**

        (i)    CONTRACTOR will only bill for hours spent performing Work for COMPANY.

        (ii)    Unless specifically authorized on Schedule A, COMPANY will not pay CONTRACTOR fees for time incurred in traveling; preparing or reviewing invoices, budgets, or status reports; or continuing professional education activities (including general background research and normal review of periodicals).

        (iii)    CONTRACTOR will identify to COMPANY, for its prior approval, the CONTRACTOR personnel who will be billing time to the Work authorized (pursuant to the applicable Schedule A) and their respective hourly rates, if applicable. COMPANY will not pay fees for time incurred by any person not previously identified and authorized to perform Work, pursuant to a Schedule A, except to the extent that the Work is reasonably necessary and

4

## MASTER CONSULTING AGREEMENT

C 0631124 C

appropriate and it is impractical under the circumstances to obtain prior authorization. In any event, COMPANY will not pay for time incurred as a result of staffing changes (in other words, for time incurred by replacement personnel in getting "up to speed" on authorized Work).

(b)    **Disbursements**

(i)    Subject to the following provisions of this Article 5, COMPANY will reimburse reasonable, documented, out-of-pocket expenses at actual cost. There shall be no fees, surcharges or other markup on actual cost. CONTRACTOR shall ensure that all members of CONTRACTOR are prudent in incurring reimbursable expenditures, and exercise reasonable diligence in minimizing reimbursable costs.

(ii)    Unless otherwise set forth in the Schedule A, COMPANY shall pay only unrestricted coach class fare, for any domestic air travel undertaken by any member of CONTRACTOR as part of or in connection with the Work. CONTRACTOR shall take advantage of any reasonably available travel discounts, and shall ensure that members of CONTRACTOR incur only reasonable hotel, transportation, and out-of-town meal expenses. The cost of any foreign air travel, undertaken by any member of CONTRACTOR as part of or in connection with the Work, shall be reimbursable in the manner agreed to by the Parties, on a case-by-case basis.

(iii)    Except as otherwise agreed in a Schedule A, COMPANY will not reimburse costs for overhead expenses, including, without limitation:

    A.    secretarial, clerical, and word processing services (whether normal, temporary, or overtime);
    B.    overtime meals, parking, or transportation (except for travel costs described above);
    C.    local telephone charges;
    D.    office or conference room rental or support services;
    E.    building services;
    F.    computer services;
    G.    equipment rental;
    H.    library services;
    I.    accounting and billing;
    J.    internal messenger service;
    K.    subscription or maintenance fees;
    L.    office supplies; or
    M.    document or file storage.

(iv)    COMPANY will not reimburse photocopying charges in excess of 10 cents per page. Except as otherwise authorized in advance by COMPANY Contract Coordinator, CONTRACTOR shall arrange to have any single copying job or project requirement, the photocopying cost of which is expected to exceed Five Hundred Dollars

5

## MASTER CONSULTING AGREEMENT

C 0631124 C

($500.00), performed by a third party copying or business service provider, if such copying by that third party will result in a lower copying cost for that project or job.

(v)    COMPANY will reimburse costs of outgoing facsimiles and electronic data transmissions at the actual cost of long-distance telephone charges.

(vi)    CONTRACTOR shall not engage other consultants and subcontractors to perform Work, or to otherwise undertake services on behalf of COMPANY except as specified and authorized with each Schedule A. CONTRACTOR shall ensure that all reimbursable fees and disbursements of such consultants are billed directly to COMPANY and according to "Reimbursable Expense Policy for Consultants" Attachment 5. CONTRACTOR shall continue to be primarily responsible for the services provided as if it had provided those services directly to the COMPANY. Moreover, any consultants and subcontractors engaged by CONTRACTOR shall also be directly responsible to COMPANY in the same manner as if those consultants had been engaged by COMPANY directly.

(vii)    COMPANY will not reimburse any fees or disbursements for which a deduction is disallowed under section 162(e) of the Internal Revenue Code (relating to lobbying expenses), unless COMPANY Contract Coordinator has granted advance written approval of such expenditures.

All fees, charges and other amounts payable to Contractor hereunder do not include any sale, use, excise, value added or other applicable taxes, tariffs or duties, payment of which shall be the sole responsibility of Company (excluding any applicable taxes based on CONTRACTOR'S net income or taxes arising from the employment or independent contractor relationship between Contractor and its personnel). In the event that such taxes, tariffs or duties are assessed against Contractor, Company shall reimburse Contractor for any such amounts paid by Contractor or provide Contractor with valid tax exemption certificates with respect thereto.

All compensation paid to CONTRACTOR excludes applicable State of Texas Sales and Use Taxes.

### ARTICLE 6: INVOICES AND PAYMENT

Invoices will be submitted at the end of each calendar month in which Work is performed. Such invoices will include a detailed description of the Work actually performed. Invoices will be accompanied by such documentation as COMPANY may require for verifying the propriety of any amounts billed. COMPANY may refuse to process any invoice that does not conform to the requirements of this Agreement, including, without limitation, the requirements of Article 5. COMPANY will promptly notify CONTRACTOR of any non-conforming invoice that must be resubmitted before payment.

Each invoice issued in connection with Work will reference this Agreement number. Detailed billing instructions will be set forth in the Schedule A.

6

## MASTER CONSULTING AGREEMENT

C 0631124 C

CONTRACTOR'S invoices, if in compliance with this Agreement, will be paid within forty-five (45) days of COMPANY'S receipt thereof; provided, however, that should COMPANY dispute any portion of an invoice, COMPANY may pay only the undisputed portion of the invoice within the time stated above and, at the same time, advise CONTRACTOR in writing of its reasons for withholding the disputed portion. COMPANY will thereafter pay such amounts to CONTRACTOR upon the resolution of such discrepancy or conflict to the Parties' mutual satisfaction.

### ARTICLE 7: ACCEPTANCE

Unless otherwise provided for in any applicable Schedule A, COMPANY will have a ten (10) day period to evaluate any Deliverable provided for, and described in any Schedule A, beginning on the date of COMPANY'S receipt of any such Deliverable from CONTRACTOR ("Acceptance Period"). At the conclusion of the Acceptance Period, COMPANY may: (a) accept such Deliverable ("Acceptance"); (b) not accept such Deliverable if Company reasonably believes that such Deliverable fails to comply, in any material respect, with any of the requirements set forth in the applicable Statement of Work; or (c) upon mutual agreement with CONTRACTOR, extend the Acceptance Period. The passage of ten (10) working days from the date when a Deliverable is received by COMPANY, without receipt by CONTRACTOR of notice of non-acceptance by COMPANY, or use by COMPANY of a Deliverable (other than for purposes of evaluating the acceptability of that Deliverable in accordance with this Article 10) will constitute Acceptance of that Deliverable by COMPANY.

In the event that COMPANY notifies CONTRACTOR of COMPANY'S decision not to accept a Deliverable, COMPANY and CONTRACTOR shall promptly undertake cooperative, good faith efforts for the purpose of: (a) allowing CONTRACTOR to correct or modify the Deliverable so as to provide for the Acceptance of that Deliverable (which Acceptance shall be based on COMPANY'S reasonable determination that the Deliverable conforms, in all material respects, to all standards or specifications applicable to the Deliverable, as provided for in this Agreement and the applicable Schedule A) (the "Acceptance Criteria"); or (b) agreeing to an appropriate adjustment in the compensation payable by COMPANY for that Deliverable, consistent with the nature and extent of the deficiencies in that Deliverable which resulted in COMPANY'S decision not to accept that Deliverable.

The Acceptance Criteria shall not address the substance of any recommendations or conclusions made by Consultant as a result of the provision of the Work. Company acknowledges and agrees that its review and comments shall not impede Consultant's professional judgment and applicable professional standards and practices when performing the Work and that the substance of the Deliverables, recommendations, advice or information provided by Consultant shall be determined solely by Consultant in the exercise of it professional judgment.

### ARTICLE 8: SALES/USE TAX

7

## MASTER CONSULTING AGREEMENT

C 0631124 C

In lieu of CONTRACTOR billing sales tax on taxable services, COMPANY may provide CONTRACTOR with a Direct Payment Exemption Certificate which will negate the necessity of CONTRACTOR'S collection of Texas Sales and Use Tax from COMPANY. A properly authorized Direct Payment Exemption Certificate is attached as Attachment 2 and made a part of this Agreement.

### ARTICLE 9: WORK SITE SAFETY, SECURITY, ALCOHOL, DRUGS AND WEAPONS

COMPANY'S Contract Coordinator may provide to CONTRACTOR prior to commencing Work the specific Work Site safety, security and other related rules and procedures, if any, applicable to those members of CONTRACTOR performing Work on COMPANY'S premises.

In addition to complying with those specific rules and procedures, CONTRACTOR agrees to comply with the rules and procedures contained in Attachment 3 to this Agreement, titled "Work Site Safety, Security, Alcohol, Drugs and Weapons."

### ARTICLE 10: INSURANCE

CONTRACTOR shall, at its sole cost and expense, carry and maintain during the term of this Agreement the minimum insurance coverages set forth on Attachment 4 hereof with substantial and sound insurers. The coverage limits are minimum limits and do not limit CONTRACTOR'S liability arising from this Agreement or otherwise and are not to be considered indications of the actual coverage limits and types of insurance necessary in connection with performance of the Work and CONTRACTOR'S obligations hereunder.

### ARTICLE 11: INDEPENDENT CONTRACTOR RELATIONSHIP

CONTRACTOR will act as and be deemed to be an independent contractor. Neither CONTRACTOR nor any of its employees, nor any other members of CONTRACTOR, will act as, nor be deemed to be, an agent or employee of COMPANY. CONTRACTOR does not undertake to perform any obligation of COMPANY, whether regulatory or contractual, or to assume any responsibility for COMPANY'S business or operations. CONTRACTOR has the sole right and obligation to contract for, direct, procure, perform or cause to be performed all Work, except as otherwise provided in this Agreement or any Schedule A. CONTRACTOR accepts full and exclusive liability for the payment of all employer contributions and taxes measured by the remuneration paid to CONTRACTOR employees as required by all applicable United States federal, state and local laws, rules and regulations.

### ARTICLE 12: ASSIGNMENT

Neither party may assign, transfer or otherwise dispose of any of its obligations or duties without the prior written approval of the other party, which approval shall not be unreasonably withheld, conditioned or delayed. Any assignment or transfer made without the express written approval of the other party will be null and void. Notwithstanding the foregoing, to the extent any of the

8

# MASTER CONSULTING AGREEMENT

C 0631124 C

Work will be performed in or relate to a jurisdiction outside of the United States, Company acknowledges and agrees that such Work, including any applicable tax advice, may be performed by the member firm of KPMG International practicing in such jurisdiction. Accordingly, Company consents to CONTRACTOR'S disclosure to a member firm and such member firm's use of data and information, including tax return information, received from or at the request or direction of Company for the purpose of completing the Work under the applicable Statement of Work.

## ARTICLE 13: SUBCONTRACTING

If duly authorized in an executed Schedule A, CONTRACTOR may use independent contractors to perform work under this Agreement; and upon the reasonable request of COMPANY, CONTRACTOR shall promptly remove from the Work any independent contractor not acceptable to COMPANY. CONTRACTOR will not be relieved of any duty or liability relating to any Work by reason of subcontracting. There will be no contractual relationship between COMPANY and any subcontractor by virtue of this Agreement.

## ARTICLE 14: BINDING ON SUCCESSORS AND ASSIGNS

This Agreement will inure to the benefit of and be binding upon the Parties and their respective legal representatives, successors and assigns and, except as expressly provided herein, nothing in this Agreement shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

## ARTICLE 15: STANDARDS AND CODES

Whenever reference is made in this Agreement to standards or codes in accordance with which Work is to be performed or tested, the edition or revision of the standards or codes current on the Effective Date will apply, unless otherwise expressly stated. In case of conflict between any referenced standards and codes and any documents attached to and incorporated into this Agreement, this Agreement will govern.

## ARTICLE 16: CHANGES IN WORK AND DELIVERABLES

COMPANY may, by written notice to CONTRACTOR, make changes in, additions to, or deletions from the Work. If any change increases the time required to perform the Work, an equitable adjustment will be made in the Schedule A for the performance and completion of the Work. If the Work is being performed on a fixed price basis, and if any change increases or decreases the cost to CONTRACTOR of performing the Work, then an equitable adjustment will be made in the price. The compensation rates for the Work will not be changed.

If Company requests such a change and, as a result of such change, Contractor believes that an adjustment in the scope of Work and price is appropriate, then Contractor shall promptly notify (in writing) Company of such belief within five (5) working days after receiving COMPANY'S notice of a change in the Work and the parties shall negotiate in good faith a reasonable and

9

## MASTER CONSULTING AGREEMENT

C 0631124 C

equitable adjustment in the applicable scope, fees or deadlines. Unless Company directs Contractor to stop work pending acceptance of such change, Contractor shall continue work pursuant to the existing Statement of Work, and shall not be bound by any change requested by Company, until Contractor has accepted such change in writing. In no event shall Company be responsible for any incremental fees as a result of such change request unless previously agreed to in writing by the Company.

To the extent necessary to achieve COMPANY'S objectives with respect to a particular Work engagement, or as such objectives are reflected in a particular Schedule A, CONTRACTOR may, to the extent expressly authorized in writing by COMPANY, make changes in, additions to, or deletions from the Work. Such changes, additions, or deletions will be specified in an amended or additional Schedule A to be executed by the Parties. If any change increases the time required to perform the Work, an equitable adjustment will be made in the Schedule A for the performance and completion of the Work. If the Work is being performed on a fixed price basis, and if any change increases or decreases the cost to CONTRACTOR of performing the Work, then an equitable adjustment will be made in the price. The compensation rates for the Work will not be changed.

### ARTICLE 17: EXTRA WORK

COMPANY may, at any time, request CONTRACTOR to perform Work outside the specific scope authorized by this Agreement ("Extra Work"), however notwithstanding anything to the contrary set forth herein, CONTRACTOR will not undertake any Work outside the scope of Work set forth on the applicable Schedule A unless authorized to do so in an amendment or supplement to this Agreement or to a Schedule A. Any Extra Work not authorized under this Agreement will be performed only through an amendment or supplement to this Agreement or to a Schedule A, and shall be governed by the terms set forth in this Agreement, as amended or supplemented, or in that Schedule A.

Compensation for Extra Work will be in accordance with the Extra Work Rates contained in the applicable amendment or supplement to this Agreement, or in the applicable Schedule A.

### ARTICLE 18: FORCE MAJEURE

If either Party becomes unable, either wholly or in part, by an event of Force Majeure, to fulfill its obligations under this Agreement, the obligations affected by the event of Force Majeure will be suspended only during the continuance of that inability. The Party so affected will exercise commercially reasonable efforts to give written notice of the existence, extent and nature of the event of Force Majeure to the other Party within a reasonable time after the occurrence of that event. The Party so affected will remedy its inability as soon as commercially practicable.

The term "Force Majeure" as used in this Agreement means acts of God (except as excluded herein), acts of public enemies, wars, blockades, insurrections, riots, epidemics, earthquakes, fires, restraints or prohibitions by any court, board, department, commission or agency of the

C 0631124 C

# MASTER CONSULTING AGREEMENT

United States or of any States, any arrests and restraints, civil disturbances, or explosions. Rain, snow, ice or other adverse weather conditions will not be considered events of Force Majeure.

## ARTICLE 19: SUSPENSION FOR CAUSE

In addition to the other remedies provided COMPANY in this Agreement, COMPANY has the right to order the temporary suspension of any Work, immediately upon written notice, when, in its reasonable discretion, performance is not being conducted in a safe manner, and upon 3 days prior written notice, when, in its reasonable discretion, the specified quality of the Work is not being met, or the Work is not otherwise being performed in accordance with the requirements of this Agreement.

If any unsatisfactory condition of a portion of any Work performed hereunder is brought to CONTRACTOR'S attention, and is corrected by CONTRACTOR to COMPANY'S complete satisfaction, COMPANY will authorize resumption of the Work.

If any suspension of Work increases the time required for the performance of the Work, an equitable adjustment may, in COMPANY'S reasonable discretion; be made in the performance obligations. In no event, however, will any suspension be the basis for any claim or cause of action by CONTRACTOR or CONTRACTOR'S employees, agents, or subcontractors against COMPANY.

## ARTICLE 20: TERMINATION

Notwithstanding the provisions of Article 4, Company may terminate this Agreement, in whole or in part, including any one or more Schedule A, at any time, at its sole discretion, by providing 30 days written notice of termination to Contractor. The notice of termination will specify the effective date of any termination, and the Work or any part of the Work to be terminated, or alternatively, that this Agreement is terminated in its entirety. Without limiting the foregoing, either party may terminate this Agreement or any outstanding Statement of Work upon thirty (30) days prior written notice to the other party in the event such other party breaches a material term of this Agreement or any Statement of Work and such breach remains uncured at the end of such thirty (30) day period. Contractor may terminate this Agreement if its performance of the Work becomes prohibited by a change in law or regulation, or if its relationship with Client or this Agreement causes KPMG to be in violation of the auditor independence laws, regulations, rules or guidelines of the Securities and Exchange Commission, the Public Company Accounting Oversight Board or any other governmental, administrative or self-regulatory body.

Contractor shall, as soon as reasonably practicable following receipt of a notice of termination, discontinue Work in accordance with COMPANY'S termination instructions. Upon receiving notice of termination, Contractor will place no further orders, or enter into further subcontracts for services, materials or equipment related to the terminated Work. In addition, Contractor will terminate all existing orders and subcontracts, insofar as those orders and subcontracts relate to the performance of the Work terminated.

11

## MASTER CONSULTING AGREEMENT

C 0631124 C

In the event this Agreement or the Work is terminated, Company shall pay Contractor the undisputed unpaid balance due Contractor for Work actually performed up through the termination date, including all undisputed fees and expenses that have been incurred or earned in connection with the performance of the Work through the effective date of such termination (and otherwise permitted hereunder). Any completed Deliverables will be promptly delivered to COMPANY.

### ARTICLE 21: WARRANTY

CONTRACTOR agrees and warrants that its employees, agents and subcontractors will perform the Work in accordance with American Institute of Certified Public Accountants ("AICPA") and other professional standards applicable to CONTRACTOR'S performance of the Work, and in accordance with this Agreement and such other or additional standards as may be expressly set forth in the applicable Schedule A.

CONTRACTOR warrants further that its employees, agents and subcontractors assigned to perform any part of the Work possess the education, experience and skills required for the satisfactory and professional performance of the Work.

Contractor warrants to Company that Contractor has full authority and sufficient rights, except for rights respecting programs, data and materials provided by Company or identified by Contractor as furnished to Company by third-party vendors, to grant and convey the rights granted to Company under Paragraph 32 hereof.

CONTRACTOR disclaims all other warranties, either express or implied.

If the parties agree that any of the Work performed by CONTRACTOR fails to conform to any of the above-specified warranties, CONTRACTOR will, at no additional cost to COMPANY, promptly remedy the failure and re-perform any Work necessary so that the Work conforms to those warranties. In the event Contractor disputes the Company's determination that any of the Work fails to conform to the above-specified warranties, such dispute will be submitted for resolution in accordance with procedures set forth in Section 32 hereof. Nothing herein will limit the rights and remedies that may be available to COMPANY at law or in equity.

### ARTICLE 22: RECORDS AND RIGHTS TO AUDIT

CONTRACTOR will keep accurate and complete records, documents and other evidence related to the charges for of any Work ("Records"), and of any change or modification to the charges. COMPANY or COMPANY'S Contract Coordinator may inspect those records upon prior request at any time during normal business hours.

All Records required for an audit and inspection will be made available at the offices of CONTRACTOR, at all reasonable times, for inspection, audit or reproduction, until three (3) years from date of final payment for any Work to which they pertain. Contractor shall cooperate in any audit of such records that Company may undertake; provided, however, that (i) no such audit may occur more than once in any six (6) month period (excluding any audits required by

12

C 0631124 C

## MASTER CONSULTING AGREEMENT

law or any regulatory authority) and (ii) Contractor shall have the right to approve the auditor used for any such audit, with such approval not to be unreasonably withheld. COMPANY will bear the expenses incurred by it in supporting any such inspection or audit; provided, however, that should any audit or investigation produce evidence that CONTRACTOR has overstated charges or units of measure upon which charges are based by three percent of more of the total of all invoices audited during that particular audit, or provided gifts, gratuities or other benefits to employees of COMPANY in violation of the Business Ethics provisions of this Agreement, CONTRACTOR will be liable to COMPANY for actual damages, including the cost of the audit and investigation.

### ARTICLE 23: BUSINESS ETHICS

CONTRACTOR shall not during the term of this Agreement provide or offer, any compensation or benefit of any type, including any gift or gratuity, other than advertising mementos or other tokens of nominal value or reasonable business meals and business entertainment, to any COMPANY employee.

If, during the term of this Agreement, CONTRACTOR knows or becomes aware of any facts or circumstances contrary to the covenants provided for in the preceding paragraph of this Article 23, CONTRACTOR will immediately notify COMPANY and provide sufficient information for COMPANY to take appropriate protective or corrective actions. CONTRACTOR further agrees to cooperate fully in any investigation undertaken by COMPANY.

### ARTICLE 24: CONTRACTOR'S RESPONSIBILITY FOR WORK

CONTRACTOR will care for and maintain both the partially completed and finished Work until final Acceptance by COMPANY.

### ARTICLE 25: CONFLICT OF INTEREST

CONTRACTOR will exercise reasonable efforts to ensure that those members of engagement team performing Work for COMPANY pursuant to a Schedule A will not engage in any activity that will prevent them from performing the Work in a professional manner during the term of the applicable Statement of Work.

If CONTRACTOR becomes aware during the course of an engagement under a particular Schedule A that those individuals performing Work under a Schedule A are actively advocating in another matter a position materially adverse to COMPANY'S interests in the engagement CONTRACTOR will promptly notify COMPANY of that matter and the conflict.

### ARTICLE 26: TAXES

CONTRACTOR will comply with all federal, state, or municipal laws, rules and regulations regarding taxes and the payment of taxes, until the Work has been completed, including, without limitation, social security, state unemployment insurance, gross receipts taxes, withholding

13

C 0631124 C

## MASTER CONSULTING AGREEMENT

taxes, and income tax. CONTRACTOR will furnish, upon request by COMPANY, satisfactory evidence of its compliance.

### ARTICLE 27: INDEMNIFICATION

Each party agrees to and will defend, protect, indemnify and hold harmless the other party from and against all Claims for physical injury to, illness or death of, any person or persons regardless of status, and damage to or destruction of any tangible property which the other party may sustain or incur to the extent such Claims result from the negligence or willful misconduct of the indemnifying party.

The party entitled to indemnification (the "Indemnified Party") shall promptly notify the party obligated to provide such indemnification (the "Indemnifying Party") of any claim for which the Indemnified Party seeks indemnification hereunder and the Indemnifying Party shall have the exclusive right and authority to conduct the defense or settlement of any such claim at the Indemnifying Party's sole expense and the Indemnified Party shall cooperate with the Indemnifying Party in connection therewith. The party not conducting the defense shall nonetheless have the right to participate in such defense at its own expense. The Indemnified Party shall have the right to approve the settlement of any claim that imposes any liability or obligation other than the payment of money damages.

EXCEPT WITH RESPECT TO EACH PARTY'S INDEMNIFICATION AND CONFIDENTIALITY OBLIGATIONS HEREIN AND EXCEPT FOR CLAIMS RESULTING FROM FRAUD, WILFUL MISCONDUCT, EACH PARTY'S MAXIMUM LIABILITY TO THE OTHER ARISING FOR ANY REASON RELATING TO THIS AGREEMENT SHALL BE LIMITED TO THE AMOUNT OF FEES PAID OR OWING TO CONTRACTOR FOR THE PERFORMANCE OF WORK UNDER THE APPLICABLE STATEMENT OF WORK.

EXCEPT FOR CLAIMS INVOLVING FRAUD OR WILFUL MISCONDUCT, NEITHER PARTY SHALL HAVE ANY LIABILITY TO THE OTHER FOR ANY LOST PROFITS OR SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

### ARTICLE 28: INTELLECTUAL PROPERTY

CONTRACTOR will obtain permission to use any and all third party intellectual property that may be required in order for CONTRACTOR to perform the Work. This permission will include all necessary licenses and governmental approvals.

CONTRACTOR will hold harmless and indemnify COMPANY from and against, and defend COMPANY against, any and all Claims, asserted by any third party against COMPANY to the extent such Claims result from infringement, misappropriation or violation by the Deliverables (including any Contractor Property included therein) of any third party's patent, copyright, trademark or trade secret. The foregoing provisions shall not apply to any infringement arising out of: (i) use of the Deliverables other than for the permitted purposes as set forth in the Statement of Work or this Agreement or in accordance with applicable documentation or

14

C 0631124 C

## MASTER CONSULTING AGREEMENT

instructions supplied by Contractor or for other than COMPANY'S internal purposes; (ii) any material alteration, modification or revision of the Deliverables not expressly authorized in writing by Contractor; or (iii) the combination of the Deliverables with materials not supplied by Contractor not expressly authorized in writing by Contractor.

In case any of the Deliverables or any portion thereof is held, or in CONTRACTOR'S reasonable opinion is likely to be held, in any such suit to constitute infringement, Contractor may within a reasonable time, at its option, either: (i) secure for Company the right to continue the use of such infringing item; or (ii) replace, at CONTRACTOR'S sole expense, such item with a substantially equivalent non-infringing item or modify such item so that it becomes non-infringing. In the event Contractor is, in CONTRACTOR'S reasonable discretion, unable to either procure the right to continued use of the allegedly infringing item or replace the allegedly infringing item as provided in clauses (i) and (ii) of the immediately preceding sentence, the allegedly infringing item shall be returned to Contractor, and CONTRACTOR'S sole liability shall be to refund to Company the amount paid to Contractor for such item; provided that the foregoing shall not be construed to limit CONTRACTOR'S indemnification obligation set forth above.

### ARTICLE 29: COMPLIANCE WITH LAWS

CONTRACTOR represents that, to its knowledge, it will comply with all federal, state, and local laws, rules, decrees, orders, regulations, by-laws, ordinances and codes applicable to the Work, including all environmental laws and all rules of the Texas Public Utility Commission. In particular but without limitation:

(a)    CONTRACTOR expressly agrees that it will comply with the Equal Employment Opportunity and Affirmative Action obligations of Executive Order 11246, as amended, the Rehabilitation Act of 1973, as amended, and the Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended, where applicable.

(b)    CONTRACTOR, with regard to its employees, assumes and retains sole and complete responsibility and liability for compliance with any federal, state, or local statutes relating to compensation or wage and hour considerations, including, but not limited to, the Federal Fair Labor Standards Act, and the Texas Minimum Wage Act of 1970, and the Texas Pay Act, as well as any and all other federal statutes impacting, directly or indirectly, CONTRACTOR'S employees.

### ARTICLE 30: CONFIDENTIAL AND PROPRIETARY INFORMATION

(a)    For purposes of this Article 30 and except as provided below, the term "Confidential Information" means this Agreement and all information concerning the business, operations, financial condition, projections, and/or assets (including historical information), documents, and electronic data that one party (the "Receiving Party") obtains in any manner from or on behalf of the other party (the "Disclosing Party"). The Receiving Party agrees not to disclose any Confidential Information to any person or entity (including, but not limited to, the

15

C 0631124 C

# MASTER CONSULTING AGREEMENT

media, any governmental representative, authority or tribunal, and any corporation, limited liability company, partnership, group, individual or other entity) except as set forth in this Article 30 and to treat any Confidential Information as confidential, whether oral, written, or electronic, and whether prepared by or on behalf of the Disclosing Party, the Receiving Party, its representatives, or otherwise, which has been or in the future is furnished by the Disclosing Party to the Receiving Party or its representatives. The Receiving Party hereby agrees that the Receiving Party and its representatives shall use the Confidential Information solely for the purposes set forth in this Agreement, and that the Confidential Information will be kept confidential, that the Receiving Party and its representatives will not disclose to any person or entity any of the Confidential Information.

(b)    Notwithstanding anything to the contrary herein, the Receiving Party and any of its representatives who have acquired Confidential Information may only disclose the Confidential Information to the Receiving Party representatives (including employees) who (1) need to know such information for the purpose contained in this Agreement and (2) are subject to restrictions on disclosure of Confidential Information that are at least as restrictive as the ones contained in this Agreement. The Receiving Party and any of its representatives who have acquired Confidential Information may only disclose Confidential Information to persons or entities other than those to which such disclosure is expressly permitted by this Article 30 or on terms other than those listed in this Article 30 with the written consent of the Disclosing Party. The Receiving Party further agrees to inform its representatives of the confidential nature of the Confidential and to be liable to the Disclosing Party for its or any of its representatives' acts or omissions with respect to the Confidential Information.

(c)    In the event that the Receiving Party or any of its representatives is requested or required (by oral questions, interrogatories, requests for information or documents in legal proceedings, or by the Securities and Exchange Commission, subpoena, civil investigative demand or other similar process) to disclose any Confidential Information, the Receiving Party shall provide the Disclosing Party with prompt written notice of any such request or requirement so that the Disclosing Party may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this Article 30. If, in the absence of a protective order or other remedy or the receipt of a waiver by the Disclosing Party, the Receiving Party or any of its representatives are nonetheless legally compelled to make any such disclosure of Confidential Information, CONTRACTOR and its representatives may without liability hereunder, disclose to such person only that portion of the Confidential Information that is legally required to be disclosed, provided that the Receiving Party will use reasonable efforts to assist the Disclosing Party in obtaining an appropriate protective order or other reliable assurance that confidential treatment will be accorded the Confidential Information. The Receiving Party may disclose Confidential Information of the Disclosing Party if required to do so under applicable law, rule or order, or by the standards of the AICPA, the Public Company Accounting Oversight Board and similar bodies with jurisdiction over Supplier or other professional self-regulatory authorities.

16

# MASTER CONSULTING AGREEMENT

C 0631124 C

(d)     At the Disclosing Party's written request, the Receiving Party will promptly deliver to the Disclosing Party all written or electronic Confidential Information that has been provided to or acquired by the Receiving Party or its representatives except for copies retained in work paper files that the Receiving Party may retain for its records or that may be reflected in back up tapes or other electronic data storage systems. Notwithstanding anything to the contrary herein, the Receiving Party may retain an archival copy of any document for its permanent records to the extent required by applicable law or regulation.  Notwithstanding the return, retention or destruction of the Confidential Information, The Receiving Party and its representatives will continue to be bound by the confidentiality obligations under this Agreement.

(e)     Notwithstanding the foregoing, Confidential Information does not include information which: (i) is already known to the Receiving Party at the time of disclosure by the Disclosing Party; (ii) is or becomes publicly known through no wrongful act of the Receiving Party; (iii) is independently developed by the Receiving Party without benefit of the Disclosing Party's Confidential Information; (iv) relates to the tax treatment or tax structure of any transaction; (v) the Receiving Party determines is required to be maintained or disclosed by the Receiving Party under sections 6011, 6111 and 6112 of the Internal Revenue Code ("IRC") and the regulations thereunder or similar or analogous provisions of a state or other jurisdiction or (vi) is received by the Receiving Party from a third party without restriction and without a breach of an obligation of confidentiality.

(f)     The Receiving Party recognizes and acknowledges the competitive and confidential nature of the Confidential Information and that irreparable damage will result to the Disclosing Party if Confidential Information is disclosed except as herein permitted.  It is further understood and agreed that money damages may not be a sufficient remedy for any breach of this Article 30.  Accordingly, it is agreed by the Receiving Party that the Disclosing Party shall be entitled to an injunction or injunctions (without the posting of any bond and without proof of actual damages) to prevent breaches or threatened breaches of this Article 30 .  Furthermore, the Receiving Party agrees to notify the Disclosing Party if the Receiving Party becomes aware of any unauthorized disclosure of any Confidential Information.  Each party shall be deemed to have met its nondisclosure obligations under this Paragraph 30 as long as it exercises the same level of care to protect the other's information as it exercises to protect its own confidential information but in no event less than reasonable care, except to the extent that applicable law or professional standards impose a higher requirement.

(g)     Notwithstanding anything to the contrary set forth herein, no provision in this Agreement or a Statement of Work is or is intended to be construed as a condition of confidentiality within the meaning of IRC sections 6011, 6111, 6112 or the regulations thereunder, or under any similar or analogous provisions of the laws of a state or other jurisdiction.  In particular, Company (and each employee, representative, or other agent of Company) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of any transaction within the scope of the Work under a Statement of Work and all materials of any kind (including opinions and other tax analyses) that are provided to Company relating to such tax treatment and tax structure.  Company also agrees to use

17

C 0631124 C

## MASTER CONSULTING AGREEMENT

commercially reasonable efforts to inform Contractor of any conditions of confidentiality imposed by third party advisors with respect to any transaction on which Contractor advice is requested. Such notification must occur prior to Contractor providing any advice with respect to the transaction.

(h)    Notwithstanding any other provision to the contrary in this Article, CONTRACTOR shall comply with the provisions of Attachment 7 (Privacy, Confidentiality and Information Security Provisions) in regard to Confidential Personal Information (as such term is defined in such Attachment).

### ARTICLE 31: RIGHTS TO DATA

(a)    Upon full and final payment to Contractor under the applicable Statement of Work, any Deliverable prepared for COMPANY and delivered to COMPANY, will become the property of COMPANY.

(b)    Company acknowledges and agrees that any advice, recommendations, information or work product provided to Company by Contractor in connection with the Work is for the sole use of Company and may not be relied upon by any third party. Company agrees that if it makes such advice, recommendations, information or work product available to any third party other than as expressly permitted by the applicable Statement of Work the provisions of Paragraph 31(c) shall apply unless Company provides the written notice to the third party in substantially the form of Attachment 6 hereto (the "Notice"), which Notice shall be acknowledged in writing by such third party and returned to Company. Upon request, Company shall provide Contractor with a copy of the foregoing Notice and acknowledgement and any notice and acknowledgement sent to Company by such third party as contemplated by the Notice. Notwithstanding the foregoing, (i) in the event of a disclosure made by Company that is required by law, that is made to a regulatory authority having jurisdiction over Company or that is made pursuant to Paragraph 30(g) above, no acknowledgement of the Notice shall be required and (ii) no Notice or acknowledgement shall be required with respect to disclosures expressly authorized by the terms of the applicable Statement of Work.

(c)    In accordance with Paragraph 31(b), Company will indemnify, defend and hold harmless Contractor from and against any and all Claims incurred or suffered by or asserted against Contractor in connection with a third party claim to the extent resulting from such party's use or possession of or reliance upon CONTRACTOR'S advice, recommendations, information or work product as a result of COMPANY'S disclosure of such advice, recommendations, information or work product  without adhering to the notice requirements of Paragraph 31(b) above.

(d)    Company acknowledges that Contractor provides professional services to other clients, and agrees that nothing in this Agreement shall be deemed or construed to prevent Contractor from carrying on such business. In particular, Company agrees that, notwithstanding anything in this Agreement to the contrary: (i) Contractor shall have the right to retain a copy of each of the Deliverables for its records; (ii) CONTRACTOR'S administrative communications, records, files and working papers relating to the Work and the generalized ideas, concepts,

18

## MASTER CONSULTING AGREEMENT

C 0631124 C

know-how, tools, models, methodologies and techniques utilized or developed by Contractor prior to the Effective Date or during the course of this Agreement (collectively, "CONTRACTOR'S Property") are not deemed to be Deliverables and belong to Contractor and (iii) Company hereby grants to Contractor a perpetual, royalty free, irrevocable, worldwide, non-exclusive license to use the Deliverables and to create and use derivative works derived from the Deliverables. To the extent that any of CONTRACTOR'S Property is contained in any of the Deliverables, Contractor hereby grants Company, upon full and final payment of all amounts due Contractor under the applicable Statement of Work, a royalty-free paid-up, non-exclusive license to use CONTRACTOR'S Property in connection with COMPANY'S use of the Deliverables.

### ARTICLE 32: GOVERNING LAW

THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH LAWS OF THE STATE OF TEXAS WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW PROVISION OR RULE (WHETHER THE STATE OF TEXAS OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF TEXAS.

### ARTICLE 33: DISPUTE RESOLUTION

(a)    Any dispute or claim arising out of or relating to the this Agreement or the services under a Statement of Work shall be submitted first to non-binding mediation (unless either party elects to forego mediation by initiating a written request for arbitration) and if mediation is not successful within 90 days after the issuance by one of the parties of a request for mediation then to binding arbitration in accordance with the Rules for Non-Administered Arbitration of the International Institute for Conflict Prevention and Resolution ("CPR Arbitration Rules"). By operation of this provision, the parties agree to forego litigation over such disputes in any court of competent jurisdiction.

(b)    Mediation, if selected, may take place at a location to be designated by the parties using the Mediation Procedures of the International Institute for Conflict Prevention and Resolution, with the exception of paragraph 2 (Selecting the Mediator).

(c)    Arbitration shall take place in Dallas, Texas. The arbitration panel shall have no power to award non-monetary or equitable relief of any sort except as provided in CPR Rule 13 (Interim Measures of Protection). Damages that are inconsistent with any applicable agreement between the parties, that are punitive in nature, or that are not measured by the prevailing party's actual damages shall be unavailable in arbitration or any other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitration panel have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction.

(d)    Either party may seek to enforce any written agreement reached by the parties during mediation, or to confirm and enforce any final award entered in arbitration, in any court of competent jurisdiction.

19

C 0631124 C

## MASTER CONSULTING AGREEMENT

(e)    Notwithstanding the agreement to such procedures, either party may seek equitable relief to enforce its rights in any court of competent jurisdiction.

### ARTICLE 34: NON-WAIVER OF RIGHTS

A waiver by either Party of any breach of this Agreement, or the failure of either Party to enforce any of the articles or other provisions of this Agreement, will not in any way affect, limit or waive that Party's right to enforce and compel strict compliance with the same or other articles or provisions.

### ARTICLE 35: SURVIVAL

No termination or cancellation of this Agreement will relieve either Party of any obligations under this Agreement that by their nature survive the termination of this Agreement, including, but not limited to, the obligations provided for in the Confidential and Proprietary Information, Rights to Data, Warranty, Intellectual Property, Indemnification and Compensation provisions of this Agreement.

### ARTICLE 36: SEVERABILITY

In the event any provision of this Agreement is held to be void, unlawful or otherwise unenforceable, that provision will be severed from the remainder of the Agreement and replaced automatically by a provision containing terms as nearly like the void, unlawful, or unenforceable provision as possible; and the Agreement, as so modified, will continue in full force and effect.

### ARTICLE 37: PUBLICITY

Except for internal presentations and client lists, neither party shall publicize its relationship with the other party, or the terms of this Agreement or any Schedule A, or use the other party's name or other trademarks or service marks in any advertisement or publication, without the other party's prior written approval.

### ARTICLE 38: IMMIGRATION

a.    CONTRACTOR agrees to comply with the Immigration Reform and Control Act of 1986 ("IRCA"), as well as all regulations issued pursuant to IRCA or otherwise enforced by the United States Immigration and Customs Enforcement, The Office of Special Counsel for Immigration-Related Unfair Employment Practices, or any other governmental agency for or with respect to any of CONTRACTOR'S employees, performing any work as part or in furtherance of any CONTRACTOR'S obligations pursuant to this Agreement. CONTRACTOR shall verify the social security numbers provided to CONTRACTOR by those employees.

b.    CONTRACTOR further agrees that, prior to any Person Subject to Background Checks (as defined below) performing Work for COMPANY, CONTRACTOR will conduct a

20

C 0631124 C

## MASTER CONSULTING AGREEMENT

seven (7) year, state, and county/local criminal history background check and federal criminal history background check, with respect to senior managers and higher level personnel, of court records (based on past locations of residence and employment) on each such Person Subject to Background Checks. "Person Subject to Background Checks" means each member of CONTRACTOR who performs Work as part of a Base Crew (as defined below) or as a Supervisor (as defined below), together with each member of CONTRACTOR responsible for, or involved with, updating, tracking, or otherwise accessing sensitive cost information, billing information, or COMPANY customer information (including, without limitation, names of COMPANY customers and the fact that such customers are COMPANY customers). For purposes of this provision, "Base Crew" means any member of CONTRACTOR who performs Work at COMPANY worksite, or for greater than four months (not necessarily consecutive) in a calendar year. "Supervisor" means anyone with a job classification which contains the title of Foreman, Engineer, Supervisor, Superintendent, or Manager. CONTRACTOR will not assign to perform Work for COMPANY any Persons Subject to Background Checks who have felony or misdemeanor convictions related in any way to theft, dishonesty, assault, any physical crimes against other persons or property (including any sex offenses), or the possession or trafficking of drugs. Upon request, CONTRACTOR agrees to provide COMPANY with written certification that all required background checks have been completed and all Persons Subject to Background Checks have successfully been screened.

       c.    CONTRACTOR, with regard to its employees, assumes and retains sole and complete responsibility and liability for compliance with all laws relating to immigration and work eligibility (including, but not limited to, IRCA) and all laws relating to the negligent hiring and/or supervision of any individual assigned by CONTRACTOR to perform Work under the Agreement.

d.    CONTRACTOR agrees that its obligations under this Section also apply to any subcontractors engaged by CONTRACTOR and approved by COMPANY to perform Work.

### ARTICLE 39: NOTICES

All notices from one Party to the other will be deemed to have been delivered if hand delivered, sent by nationally recognized overnight delivery service, sent by United States certified mail, return receipt requested, postage prepaid, as follows:

If to CONTRACTOR:

Donald Mailliard
Principal
717 Harwood , Ste 3100
Dallas, TX 75201

with a copy to:

    KPMG LLP
    Office of General Counsel

21

## MASTER CONSULTING AGREEMENT

C 0631124 C

757 Third Avenue
New York, New York 10017
Attention: General Counsel
Fax Number: 212-909-5485

If to COMPANY, to each of the following addresses:

EFH Corporate Services Company
1601 Bryan Street
Dallas, TX 75201
Attention: Contracts Administration
Tracy Dennis, Corporate Sourcing Mgr
Facsimile No.: (214) 812-5453

With a copy to: Robert C. Walters
Attention: Executive Vice President and General Counsel
Facsimile No.: (214) 812-6032

### ARTICLE 40: REPRESENTATIVES

COMPANY'S Contract Administrator is Tracy Dennis; phone 214.812.8013

CONTRACTOR'S Contract Administrator is Donald Mailliard; phone 214-840-2848

### ARTICLE 41: AMENDMENTS

No changes, modifications, amendments or supplements to this Agreement or any other provisions will be valid unless agreed to in writing and signed by the Parties.

### ARTICLE 42: ATTACHMENTS

The following attachments are incorporated into this Agreement:

1.  Example of Schedule A
2.  Direct Payment Exemption Certificate
3.  Work Site Safety, Security, Alcohol, Drugs and Weapons
4.  CONTRACTOR'S Insurance Requirements
5.  Reimbursable Expense Policy
6.  Form of Notice and Acknowledgement
7.  Privacy, Confidentiality and Information Security Provisions

### ARTICLE 43: MISCELLANEOUS

(a)    Except as otherwise set forth in the applicable Statement of Work, Company acknowledges that completion of the Work under a Statement of Work or acceptance of the Deliverables thereunder will not constitute a basis for COMPANY'S assessment or evaluation of

22

C 0631124 C

## MASTER CONSULTING AGREEMENT

internal control over financial reporting and disclosure controls and procedures, or its compliance with its principal officer certification requirements under Section 302 of the Sarbanes-Oxley Act of 2002 (the "Act"). The Work under a Statement of Work shall not be construed to support COMPANY'S responsibilities under Section 404 of the Act requiring each annual report filed under Section 13(a) or 15(d) of the Securities Exchange Act of 1934 to contain an internal control report from management.

(b)     Company acknowledges that certain of CONTRACTOR'S personnel who may be considered "owners" under the California Accountancy Act and implementing regulations (California Business and Professions Code section 5079(a); 16 Cal. Code Regs. sections 51 and 51.1) and who may provide Work under a Statement of Work may not be licensed as certified public accountants under the laws of any of the various states.

(c)     Where Contractor is reimbursed for expenses, it is CONTRACTOR'S policy to bill clients the amount incurred at the time the good or service is purchased.  If Contractor subsequently receives a volume rebate or other incentive payment from a vendor relating to such expenses, Contractor does not credit such payment to Company.  Instead, Contractor applies such payments to reduce its overhead costs, which costs are taken into account in determining CONTRACTOR'S standard billing rates and certain transaction charges that may be charged to clients.

(d)     Neither party shall, during the term of this Agreement and for three months after its termination, solicit for hire as an employee, consultant or otherwise any of the other party's personnel who have had direct involvement with the Work, without such other party's express written consent (not to be unreasonably withheld, conditioned or delayed); provided that the foregoing shall not prevent either party from ordinary course public solicitations (and hiring anyone that responds to such public solicitation) that do not directly target employees of the other party.

(e)     Each party may communicate with the other party by electronic mail or otherwise transmit documents in electronic form during the course of providing Work under this Agreement. Each party accepts the inherent risks of these forms of communication (including the security risks of interception of or unauthorized access to such communications, the risks of corruption of such communications and the risks of viruses or other harmful devices). Accordingly, Company agrees that it may rely only upon a final hardcopy version of a document or other communication that Contractor transmits to Company unless no such hardcopy is submitted by Contractor to Company.

## ARTICLE 44: COUNTERPARTS

This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or "PDF" transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

23

C 0631124 C

## MASTER CONSULTING AGREEMENT

### ARTICLE 45: ENTIRETY OF AGREEMENT

This Agreement, together with any and all attachments, constitutes the entire agreement between the Parties, and all prior negotiations, undertakings, understandings and agreements between the Parties relating to the Work are merged into this Agreement.

[Signature Page Follows]

24

C 0631124 C

## MASTER CONSULTING AGREEMENT

The Parties have signed this Agreement acknowledging their agreement to its provisions as of the Effective Date.

CONTRACTOR

By: _____
    Signature

Name: _____Don Maillord_____

Title: _____Partner_____

COMPANY

By: _____
    Signature

Name: _____Tracy Dennis_____

Title: _____Strategic Sourcing Manager_____

25

C 0631124 C

## ATTACHMENT 1

## EXAMPLE OF SCHEDULE A

Contract No. C 0631124 C

**SCHEDULE A**

Following the Parties' execution of this Schedule A, CONTRACTOR is authorized to perform the Work as identified below on behalf of COMPANY pursuant to the terms and conditions contained in the Agreement.

**SCOPE OF WORK AND DELIVERABLES**

The Work will be performed in accordance with the specifications and instructions, if any, attached hereto and identified in the List of Attachments. The Work will be scheduled at the direction of COMPANY'S Contract Coordinator as identified herein.

**SCOPE OF WORK**

**DELIVERABLES**

Contract Coordinator: _____    Phone Number: _____

**WORK SITE**

KE 27862520.20

C 0631124 C

## EXAMPLE OF SCHEDULE A

The Work Site will be the following location(s):_____.

### COMPENSATION, INVOICES AND PAYMENT

As full compensation for the satisfactory performance by CONTRACTOR of the Work authorized pursuant to this Schedule A, COMPANY will compensate CONTRACTOR as follows.

Estimated fees for this study will range between $X and $Y and this project is not authorized to exceed $Y. Any extension or increase in spend will require amendment to this Schedule A. This estimate assumes there will be no travel to the participant's site(s).

### Professional and Support Staff Fees Schedule

| | | |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

The rates specified in the Schedule A will remain in effect, with respect to and until completion of the Work authorized pursuant to this Schedule A.

All invoices shall be sent to:

       ********************
       ********************
       *******************
       Attention:********

### KEY PERSONNEL

CONTRACTOR agrees that the individuals listed below will be assigned to perform the Work authorized by this Schedule A. CONTRACTOR will employ all reasonable efforts to ensure that such individuals remain so assigned until such Work is accepted by COMPANY; provided, however, that in the event that any such individuals are reassigned by CONTRACTOR or otherwise become unavailable to perform such Work, CONTRACTOR will provide, by way of replacement, individuals with reasonably equivalent experience and expertise.

     Person 1: Title
     Person 2: Title
     Person 3: Title
     Person 4: Title

1

C 0631124 C

## EXAMPLE OF SCHEDULE A

CONTRACTOR PERSONNEL AUTHORIZED TO ATTEND MEETINGS WITH COMPANY
PERSONNEL PERTAINING TO THE WORK

Person 1, Title
Person 2, Title

PRIVILEGES CLAIMED BY COMPANY, WITH RESPECT TO DELIVERABLES OR
OTHER DOCUMENTS HEREAFTER DESIGNATED BY COMPANY

\_\_\_\_\_    ATTORNEY-CLIENT COMMUNICATION

\_\_\_\_\_    ATTORNEY WORK PRODUCT

\_\_\_\_\_    TAX ADVISOR

\_\_\_\_\_    OTHER:_____

### LIST OF ATTACHMENTS

COMPANY and CONTRACTOR agree that the following described attachments, if any, are incorporated herein in
their entirety as fully as completely rewritten herein.

1.    ****THIS COULD BE PROJECT PLANS,
2.    ****THIS COULD BE IMPLEMENTATION  SCHEDULES
3.    ****THIS COULD BE SOFTWARE LICENSING  ETC

Work not specified above may be authorized only through a separate Schedule A, or through an amendment or
supplement to this Schedule A.

CONTRACTOR                          COMPANY

By:                                 By:
        Signature                           Signature

Name:                               Name:

Title:                              Title:

Date:                               Date:

2

C 0631124 C

## ATTACHMENT 2

## DIRECT PAYMENT EXEMPTION CERTIFICATE

**State of Texas**
**Direct Payment Exemption Certificate**
**Limited Sales, Excise, and Use Tax**

Direct payment authorization number:    **1-75-0835281-6** EFH Corporate Services Company

EFH Corporate Services Company hereby claim exemption from the payment of state, city, county, SPD, MTA and/or CTD sales and/or use taxes upon its purchase of taxable items and/or services from:

**Seller:**                **KPMG, LLP**
**Address:**            **757 Third Ave**
**City, State, Zip Code:  New York, NY  10017**

Description of items and/or services purchased under Contract No. C 0631124 C:

        Consulting and Advisory Services.

This certificate will remain in effect until the seller is otherwise notified.

This certificate does not cover:

    (1) Purchases of taxable items to be resold.
    (2) Sales or rentals to any purchaser other than the permit holder.
    (3) Sales or rentals of motor vehicles subject to the motor vehicle sales and use tax
        (Chapter 152) and interstate motor carrier sales and use tax (Chapter 157).
    (4) Nontaxable services or materials/supplies used or consumed by a provider of a
        nontaxable service.
    (5) Lump-sum new construction projects to improve real property.

The permit holder agrees not to permit others (including its contractors and repairmen) to use the undersigned's direct payment authorization to purchase material tax free.

The undersigned agrees to accrue and pay the tax to the Comptroller of Public Accounts as required by statute.

Permit holder:    EFH Corporate Services Company

Authorized Signature: _____

                Contracts Representative  Tracy Dennis

C 0631124 C

## ATTACHMENT 3

### Work Site Safety, Security, Alcohol, Drugs and Weapons

**A.    SAFETY**

1.    CONTRACTOR agrees that any safety-related assistance or initiatives undertaken by COMPANY will not relieve CONTRACTOR from responsibility for the implementation of, and compliance with, safe working practices, as developed from their own experience, or as imposed by law or regulation, and will not in any way, affect the responsibilities resting with CONTRACTOR under the provisions of this Agreement and to meet all safety requirements as specified by the Occupational Safety & Health Administration (OSHA), the Mine Safety Health Administration (MSHA), the Department of Transportation (DOT), to the extent applicable to CONTRACTOR'S Work hereunder, and any other applicable state or federal safety and health laws or regulations.

2.    In the event that a material safety data sheet (hereinafter "MSDS"), warning label, or other documentation concerning the use of hazardous chemicals at the Work Site, applies to any materials or equipment provided by CONTRACTOR as an aspect of the Work, such documentation will be provided by CONTRACTOR to COMPANY'S Contract Coordinator prior to the commencement of any such Work.

3.    Intentionally Deleted

4.    Intentionally Deleted

5.    CONTRACTOR acknowledges and agrees that all members of CONTRACTOR performing Work at the Work Site are required to view COMPANY'S "CONTRACTOR/Visitor Safety Orientation" video, when applicable, and to read and adhere to COMPANY'S "CONTRACTOR/Visitor Safety Booklet" prior to performing any Work on the Work Site.

6.    CONTRACTOR acknowledges and agrees that, when expressly required in writing by COMPANY'S designated safety representative, appropriate protective equipment will be worn by any member of CONTRACTOR while on the Work Site.  In addition, when any member of CONTRACTOR is performing Work which may expose that person to potential hazards, CONTRACTOR acknowledges and agrees that such person will wear appropriate clothing specific to and adequate for that exposure.

7.    CONTRACTOR will take all reasonable precautions to prevent any accident in connection with the performance of Work, including, but not limited to, putting up and maintaining sufficient barriers and lights.

8.    CONTRACTOR will report to COMPANY all accidents involving personal injuries (including death) and damage to property occurring directly or indirectly as a result of the Work performed by CONTRACTOR hereunder immediately, but in no event, no later than twenty-four (24) hours after the occurrence of any such accident.

**B.    SECURITY**

1.    COMPANY may supply such site security as it deems necessary and may specify to CONTRACTOR such additional security precautions and procedures at the Work Site as, in COMPANY'S opinion, are reasonably necessary for the safety and security of COMPANY'S personnel and property.

Work Site security by COMPANY, if any, will not provide personal policing of the materials, tools and equipment of CONTRACTOR.  CONTRACTOR will assume sole responsibility for safeguarding such materials, tools and equipment.

C 0626338 C

2.   It will be the affirmative duty of CONTRACTOR to ensure that CONTRACTOR assists in carrying out all security measures, to include reporting all information or knowledge of matters adversely affecting security to COMPANY'S designated security personnel.

3.   COMPANY reserves the right to exclude any of CONTRACTOR'S employees from the Work Site by denial of access, suspension or revocation of access authorization, preemptory expulsion, or by any other means, without notice or cause.  Former COMPANY employees, and any of CONTRACTOR'S employees who previously have been excluded from any Work Site, may be brought onto COMPANY property or facilities only if prior approval from COMPANY'S Contract Coordinator is obtained.

4.   COMPANY measures may also include investigations, whether by COMPANY or law enforcement officials.   CONTRACTOR agrees to cooperate in such investigations and understands that COMPANY reserves the right to require anyone in CONTRACTOR to authorize appropriate agencies to release his or her criminal records to CONTRACTOR as a condition of either initial or continued permission for access to COMPANY property or facilities. Investigations may include searches of CONTRACTOR.  Such searches may include searches of facilities assigned to CONTRACTOR, search of all Work Site areas and property at such Work Site area, searches of including, but not limited to, offices, lockers, desks, lunch boxes, packages and motor vehicles (regardless of ownership).

5.   CONTRACTOR agrees to instruct its employees in the details of COMPANY'S Work Site security policies and measures, both as specified in the Agreement and as hereinafter provided by COMPANY to CONTRACTOR.

C.   **ALCOHOLIC BEVERAGES, DRUGS AND WEAPONS**

CONTRACTOR will inform all members of CONTRACTOR, who may be involved in the performance of any Work, of the following COMPANY rules, relating to alcoholic beverages, drugs and weapons, with which all employees are expected to comply:

1.   Bringing, attempting to bring, possessing, using or being under the influence of intoxicants, drugs, or narcotics while on COMPANY owned or controlled property, including, but not limited to parking areas, is prohibited.  Possessing alcoholic beverages in sealed containers is permitted, however, in designated parking areas owned or controlled by Oncor Electric Delivery Company LLC, Luminant Generation Company LLC, Oak Grove Management Company LLC, Generation Development Company LLC, Sandow Power Company LLC and EFH Corporate Services Company, but not parking areas owned or controlled by Luminant Mining Company LLC, Luminant Big Brown Mining Company LLC and Oak Grove Mining Company LLC.

2.   Drugs prescribed by a licensed physician, for an individual working on COMPANY owned or controlled property, which could affect the employee's job performance, or non-prescription drugs which could affect the employee's job performance, are allowed on COMPANY owned or controlled property only if they have been previously cleared by the employee's supervisor.  Any employee taking such medication must inform his or her supervisor of the medication and dosage being taken.

3.   Bringing, attempting to bring, possessing or using firearms, whether classified as legal or illegal, while on COMPANY-owned or controlled property, including but not limited to buildings, parking areas, recreation facilities, equipment and vehicles, is prohibited.  Use or possession of firearms for specific situations is permitted if approved by function or higher level management of COMPANY.

4.   Off-the-job involvement with intoxicants, drugs, or narcotics, which adversely affects COMPANY'S business, to include impairing the employee's ability to perform his job, or the public trust in the safe operation of COMPANY is prohibited.

C 0628338 C

5.  Any conduct on any Work Site which is in violation of any state or federal law or regulation is considered a violation of these rules and a breach of this Agreement.

6.  CONTRACTOR is responsible for the compliance of CONTRACTOR with the above specified rules.

7.  In order to enforce these rules, all individuals with access to any Work Site as well as the vehicles, offices, lockers and any personal belongings of such individuals on COMPANY property are subject to search by COMPANY and its agents, to include security representatives appointed or employed by COMPANY.  Individuals may be required to take a blood, urinalysis or Breathalyzer test, or submit to other recognized investigatory tests or procedures as are deemed appropriate or necessary by COMPANY in the investigation of a violation of these rules.

8.  The refusal, on the part of any of CONTRACTOR, to submit immediately to a search of his or her person and/or property, or to be tested, whether by blood test, urinalysis, Breathalyzer or other recognized investigatory test or procedure, after being requested to do so, will be considered a violation of COMPANY rules.

9.  Violations of these rules may be cause for denial of access to the Work Site.

C 0628338 C

# ATTACHMENT 4

### CONTRACTOR'S INSURANCE REQUIREMENTS

CONTRACTOR will, at its own expense, maintain in force throughout the period of this document or agreement, or as otherwise specified, the following minimum insurance coverages, with insurers acceptable to COMPANY:

1) Workers' Compensation and Employers' Liability Insurance, providing statutory benefits in accordance with the laws and regulations of the State of Texas or state of jurisdiction as applicable. The minimum limits for the employers' liability insurance will be five hundred thousand dollars ($500,000) bodily injury each accident, five hundred thousand ($500,000) each employee bodily injury by disease, five hundred thousand dollars ($500,000) policy limit bodily injury by disease.

2) Commercial General Liability Insurance, including bodily injury and property damage, personal and advertising injury, contractual liability, and including products and completed operations coverage [continuing for two (2) years after Final Acceptance, or completion of the Work, whichever is later], with minimum limits of one million dollars ($1,000,000) per occurrence for bodily injury, including death and property damage.

3) Automobile Liability Insurance for coverage of owned, non-owned and hired autos with a minimum combined single limit of one million dollars ($1,000,000) per accident for bodily injury, including death, and property damage.

4) Excess Liability Insurance over and above the employers' liability, commercial general liability and automobile liability insurance coverage, with a minimum limit of one million dollars ($1,000,000) per occurrence. Coverage must replace exhausted aggregate limits under the coverages referenced in #1 (employers' liability), and #2 above. Coverage must continue for two (2) years after Final Acceptance, or completion of the Work, whichever is later.

5) Professional Liability Insurance with a minimum limit of one million dollars ($1,000,000) per claim or occurrence and in the aggregate.

6) The required limits of insurance can be satisfied by any combination of excess coverage.

7) The commercial general liability insurance, automobile liability insurance and excess liability insurance policies are primary as regards coverage extending to Company as additional insured and will contain provisions that specify that the policies will apply without consideration for other policies separately carried and will state each insured is provided coverage as though a separate policy had been issued to each, except with respects to limits of insurance, and that only one deductible will apply per occurrence regardless of the number of insureds involved in the occurrence. CONTRACTOR will be responsible for any deductibles or retentions.

8) The commercial general liability insurance, automobile liability insurance, CONTRACTOR liability and excess liability insurance policies, if written on a claims-made basis, will be maintained in full force and effect for two (2) years after Final Acceptance or completion of the Work, whichever is later

9) All policies must be issued by carriers having an *A.M. Best's* rating of "A-" or better, and an *A.M. Best's* financial size category of "VIII", or better and/or *Standard & Poor Insurance Solvency Review* of "A-", or better.

The requirements contained herein as to the types and limits of all insurance to be maintained by CONTRACTOR are not intended to and will not, in any manner, limit or qualify the liabilities and obligations assumed by CONTRACTOR under this document or agreement.

Prior to commencement of Work, CONTRACTOR will provide to COMPANY certificates of insurance evidencing the coverage required herein. COMPANY'S review of certificates will not be construed as accepting any deficiencies in CONTRACTOR'S insurance or relieve CONTRACTOR of any obligations set forth herein. In addition, CONTRACTOR will require each of its subcontractors to provide adequate insurance. Any deficiencies in the insurance to be provided by subcontractors will be the responsibility of CONTRACTOR.

**Certificates of insurance must show Energy Future Holdings Corp. and its direct and indirect subsidiaries as the certificate holder, and as an additional insured on the Commercial General Liability and Excess Liability coverage Workers' compensation shall include Energy Future Holdings Corp. and its direct and indirect**

C 0628338 C

subsidiaries as an alternate employer and will provide a waiver of subrogation in favor of the certificate holder.  Certificates of insurance should also state that the certificate holder will receive thirty (30) days advance written notice prior to cancellation.

CONTRACTOR agrees to report to the manager of the claims department of the COMPANY in writing as soon as practical all instances of damage to the Work and all accidents or occurrences which may result in injuries to any person, including death, and any property damage, arising out of the performance of the Work.

If the insurance obligations required in this document or agreement exceed the maximum limits permitted by law or do not otherwise conform with any applicable law, then this agreement will be deemed amended so as to only require CONTRACTOR to provide insurance to the maximum extent allowed by law.

C 0628338 C

## ATTACHMENT 5
## REIMBURSABLE EXPENSE POLICY

- Reimbursable Expense Policy (Applicable only in the event that Work is performed on COMPANY site and with prior COMPANY approval):

1.   MEALS
     Reimbursement for meals and incidental expenses will be at the current rate referenced in the US General Services Administration Per Diem Table found at http://www.gsa.gov.

2.   RENTAL CAR
     Reimbursement for rental vehicles will be in accordance with Class C rental rates for mid-size vehicles. If a Class C vehicle is not available, a smaller vehicle will be used. If only a larger vehicle is available, it will be so noted on the rental receipt.

3.   FLIGHT ARRANGEMENTS
     Air travel will be reimbursable at economy class rates only. Air travel will be by the most direct route.

4.   MOTEL/HOTEL
     Reimbursement for lodging will be at the current rate referenced in the US General Services Administration Per Diem Table found at http://www.gsa.gov.

     CONTRACTOR may utilize COMPANY'S Preferred Hotel Program when traveling to a COMPANY location. EFH Contract Coordinator or Contract Administrator can provide a current list of properties.

5.   ENTERTAINMENT
     Not a reimbursable expense.

6.   PERSONAL OR A COMPANY CAR
     Mileage for personal or company vehicle will be reimbursable at a rate of $0.41 per mile. Mileage will be based on portal to portal using the most direct route.

7.   TELEPHONE CALLS
     All business related telephone calls will be reimbursable.

Proper documentation and receipts will be furnished for all expenses except meals and taxi expenses less than $25.00. Any expense $25.00 or over requires proper documentation.

C 0628338 C

## Attachment 6

### [FORM OF NOTICE AND ACKNOWLEDGEMENT]

[Name of Third Party]
Address

The advice, recommendations and information in the document included with this notice were prepared for the sole benefit of Energy Future Holdings Company, based on the specific facts and circumstances of Energy Future Holdings Company, and its use is limited to the scope of KPMG's engagement for Energy Future Holdings Company. It has been provided to you for informational purposes only and may not be relied upon by you or any other person or organization. You acknowledge and agree that KPMG accepts no responsibility or liability in respect of the advice, recommendations or other information in such document to any person or organization other than Energy Future Holdings Company. You shall have no right to disclose the advice, recommendations or other information in such document to anyone else without including a copy of this notice and obtaining a signed acknowledgement of this notice from the party to whom disclosure is made and you provide a copy thereof to Energy Future Holdings Company. You acknowledge and agree that you will be responsible for any damages suffered by KPMG as a result of your failure to comply with the terms of this notice.

*Please acknowledge your acceptance of the foregoing by signing and returning to us a copy of this letter.

Very truly yours,

Energy Future Holdings Company

By: _____
    Name:
    Title:

**\*Accepted and Agreed to on this ___ day of ____, 20__ by:**

[Name of Third Party

By: _____
    Name:
    Title:

\* Remove if a signed acknowledgement is not required by the terms of Paragraph 32(b).

C 0628338 C

## ATTACHMENT 7

### Privacy, Confidentiality and Information Security Provisions

For purposes of this Attachment, "**Personal Information**" means any data or information that (i) relates to an individual and (ii) identifies or can be used to identify the individual (such as an individual's name, postal address, e-mail address, telephone number, date of birth, Social Security number, driver's license number, account number, credit or debit card information (including without limitation card account number, personal identification number, card validation code or value, and magnetic stripe data), health or medical information or one or more factors specific to physical, psychological, mental, economic, cultural or social identity or any other unique identifier).

Representations and Warranties:

CONTRACTOR represents, warrants and covenants that:

(1)     CONTRACTOR and its employees, agents, consultants and subcontractors shall hold in strict confidence:

(a)     any and all Personal Information (whether in individual or aggregate form and regardless of the media in which it is contained) that may be disclosed at any time to CONTRACTOR or its employees, agents, consultants or subcontractors by COMPANY or its employees, agents, consultants or contractors in anticipation of, in connection with or incidental to the performance of services for or on behalf of COMPANY;

(b)     any and all Personal Information that may be disclosed at any time to CONTRACTOR or its employees, agents, consultants or subcontractors by COMPANY'S customers;

(c)     any and all Personal Information (whether in individual or aggregate form and regardless of the media in which it is contained) that may be created, obtained, procured, used or accessed at any time by CONTRACTOR or its employees, agents, consultants or subcontractors in connection with or incidental to the performance of services for or on behalf of COMPANY; and

(d)     any information derived from the information described in (a), (b) and (c) above ((a), (b), (c) and (d) collectively, "**Confidential Personal Information**").

(2)     CONTRACTOR shall only collect, process, store, use, disclose and dispose of Confidential Personal Information for the benefit of COMPANY and, except with the prior written consent of COMPANY, only for the purpose of performing services for or on behalf of COMPANY in compliance with COMPANY'S written instructions and for no other purpose.

(3)     CONTRACTOR shall comply with:

(a)     all applicable federal, state, and local laws, rules, regulations, and governmental requirements currently in effect and as they become effective relating in any way to the privacy, confidentiality or security of Confidential Personal Information;

(b)     applicable provisions of the COMPANY privacy notice posted on www.txu.com and any other COMPANY privacy policies, statements or notices that are provided to CONTRACTOR in writing, ((a), and (b) collectively, "**Privacy Laws**").

(4)     CONTRACTOR has obtained and shall maintain in full force and effect all licenses, consents, permits, approvals, authorizations and the like required to lawfully perform CONTRACTOR'S obligations pursuant to this Attachment. CONTRACTOR shall promptly notify COMPANY if CONTRACTOR receives

C 0628338 C

any notice, demand, summons or complaint from any governmental or regulatory authority, agency or other body relating to the CONTRACTOR'S performance in accordance with this Attachment, and shall take all actions, at CONTRACTOR'S expense, to remedy and resolve any issues raised therein as promptly as practicable.

(5)     Any Confidential Personal Information provided by COMPANY or its employees, agents, consultants or contractors to CONTRACTOR, or created, obtained, procured, used or accessed by CONTRACTOR in COMPANY'S name or on COMPANY'S behalf, shall at all times be and remain the sole property of COMPANY and CONTRACTOR shall not have or obtain any rights therein.

(6)     Except with the prior written consent of COMPANY, CONTRACTOR shall not share, transfer, disclose or otherwise provide access to any Confidential Personal Information (or any portion thereof) to any third party, except those of CONTRACTOR'S employees or agents who have a genuine need to know the Confidential Personal Information as a necessary condition to CONTRACTOR'S performance of services for or on behalf of COMPANY.  In the instances in which COMPANY consents in writing to any subcontracting of services, whether in whole or in part, CONTRACTOR shall cause the subcontractor to agree with CONTRACTOR to the same duties and obligations applicable to CONTRACTOR in this Attachment.  CONTRACTOR shall only contract with a subcontractor (if permitted under the Agreement) that CONTRACTOR reasonably can expect to be suitable and capable to perform the delegated obligation in accordance with this Attachment.  CONTRACTOR shall cause each of its employees, agents, consultants and subcontractors who has access to Confidential Personal Information to comply with the terms and conditions of this Attachment in the same manner as CONTRACTOR is bound hereby. In all events, CONTRACTOR agrees to remain fully responsible for and liable to COMPANY for any and all losses, uses or disclosures of, activities involving, or access to or acquisition of Confidential Personal Information by its employees, agents, consultants or subcontractors or other third parties.

Requirement to Maintain Information Security Program:

In addition to any other privacy, confidentiality or information security requirement set forth herein, CONTRACTOR shall, in accordance with industry leading practices and all applicable Privacy Laws, establish controls designed to ensure the confidentiality of Confidential Personal Information and that Confidential Personal Information is not disclosed contrary to the provisions of this Attachment or any applicable Privacy Laws.  CONTRACTOR shall develop, implement and maintain reasonable security procedures and practices to protect Confidential Personal Information from unauthorized access, destruction, use, modification and disclosure.  Without limiting the foregoing, CONTRACTOR shall maintain and implement a comprehensive written information security program, that includes appropriate administrative, technical and physical safeguards and other security measures (including but not limited to computer hardware and software programs, and Internet security systems with regard to collection, processing, storage, use, disclosure and disposal of Confidential Personal Information), designed to (i) ensure the security and confidentiality of Confidential Personal Information; (ii) protect against any anticipated threats or hazards to the security and integrity of Confidential Personal Information; and (iii) protect against unauthorized access to, or acquisition or use of, Confidential Personal Information. CONTRACTOR will implement training programs to ensure that its employees assigned to carry out its obligations under this Agreement are properly informed of and fully understand all applicable Privacy Laws.

Information Security Breach Notification:

CONTRACTOR agrees to notify COMPANY promptly in writing of any breach of the provisions of this Attachment or any loss or unauthorized use, disclosure, acquisition of or access to any Confidential Personal Information of which CONTRACTOR becomes aware.  Such notice shall summarize in reasonable detail the effect on COMPANY, if known, of the breach, loss or unauthorized use, disclosure or acquisition of, or access to, Confidential Personal Information and the corrective action taken or to be taken by CONTRACTOR.  CONTRACTOR shall promptly take all necessary and advisable corrective actions, and shall cooperate fully with COMPANY in all reasonable and lawful efforts to prevent, mitigate

C 0628338 C

or rectify such breach, loss or unauthorized use, disclosure, acquisition or access. In addition to the notice provision contained herein, CONTRACTOR will also promptly report any such breach, loss, unauthorized use, disclosure or acquisition of or access to Confidential Personal Information to COMPANY'S Legal Department at 972.868.2820.

Other Notifications:

CONTRACTOR agrees to notify COMPANY promptly in writing of any subpoena or other judicial or administrative order or proceeding seeking access to or disclosure of Confidential Personal Information. COMPANY shall have the right to defend such action in lieu of and on behalf of CONTRACTOR. COMPANY may, if it so chooses, seek a protective order. CONTRACTOR shall reasonably cooperate with COMPANY in such defense.

Inspection Rights:

Upon the reasonable request by COMPANY, CONTRACTOR agrees that it shall make available qualified individuals and/or a member of senior management responsible for security and data protection, for the purposes of discussing relevant information technology controls, including those policies, procedures and controls relevant to the provision of services and security obligations under this agreement. CONTRACTOR shall cooperate with reasonable requests to conduct onsite reviews of its controls infrastructure components relevant to the services being provided. To facilitate the review of documentation relevant to these controls that is generally not distributed these reviews would be conducted in-person, and at mutually agreed upon periods over the term of the contract or task order. No such inspection by COMPANY as set forth herein shall relieve CONTRACTOR of any of its obligations under this paragraph, all of which shall remain absolute.

Return of Information:

Promptly upon the expiration or earlier termination of the Agreement, or such earlier time as COMPANY reasonably requests, CONTRACTOR shall return to COMPANY or its designee, or render unreadable or undecipherable if return is not reasonably feasible or desirable to COMPANY (which decision shall be based solely on COMPANY'S written statement), each and every original and copy in every media of all Confidential Personal Information in the possession, custody or control of CONTRACTOR or CONTRACTOR'S employees, agents, consultants or subcontractors. However, if laws or professional standards applicable to CONTRACTOR do not permit such return or destruction, in whole or part, the CONTRACTOR shall retain such COMPANY data as required by such laws or professional standards, shall maintain the continued confidentiality and security of such COMPANY data in accordance with the requirements of this Agreement, and shall not actively process or use the COMPANY data for any purpose other than as required by the applicable laws or professional standards after termination of this Agreement.

Remedies for Information Security Breach:

CONTRACTOR agrees that any breach of the provisions of this Attachment or any loss or unauthorized collection, processing, use, disclosure, disposal or acquisition of or access to any Confidential Personal Information in violation of this Attachment or any applicable Privacy Law may cause immediate and irreparable harm to COMPANY for which money damages may not constitute an adequate remedy. Therefore, CONTRACTOR agrees that COMPANY may seek injunctive or other equitable relief for any such violation, in addition to its remedies at law.

Miscellaneous:

It is understood and agreed by CONTRACTOR and COMPANY that the proper, lawful and secure collection, processing, storage, use, disclosure and disposal of Confidential Personal Information pursuant to this Agreement is of the utmost importance to COMPANY and the individuals about whom

C 0628338 C

such Confidential Personal Information pertains.  CONTRACTOR and COMPANY further understand and agree that Confidential Personal Information is inherently valuable and therefore CONTRACTOR agrees to take all appropriate measures, whether spelled out in this Attachment or otherwise, to protect such Confidential Personal Information from improper, unauthorized or unlawful access, disclosure, use or disposal.

C 0631124 C

## SCHEDULE A-13

Following the Parties' execution of this Schedule A, CONTRACTOR is authorized to perform the Work as identified below on behalf of COMPANY pursuant to the terms and conditions contained in the Master Services Agreement C0631124C ("the Agreement") dated November 1, 2009 and any amendments thereto. Any work performed in connection with this engagement before the date of execution of this letter is also governed by the terms and conditions contained in the letter.

## SCOPE OF WORK

The Work will be performed in accordance with the specifications and instructions, if any, attached hereto and identified in the List of Attachments. The Work will be scheduled at the direction of COMPANY'S Contract Coordinator as identified herein.

CONTRACTOR will provide sales and use tax consulting services with respect to such matters that may arise for which COMPANY seeks CONTRACTORS advice, both written and oral, and that are not the subject of a separate statement of work. However, CONTRACTOR will not render any advice with respect to a federal or state "listed transaction" or any transaction that is substantially similar to a federal or state "listed transaction."

If matters exceed the scope of this statement of work, CONTRACTOR will issue a separate statement of work to confirm the scope and related terms of any additional engagements. Furthermore, a separate statement of work will be issued for each discrete tax consulting project not specified in this statement of work (e.g., transfer pricing study, corporate acquisition or disposition, etc.) and for tax controversy representation.

When, in the course of providing general tax consulting services, it is determined that the services would exceed the scope of this letter, preliminary engagement planning activities undertaken prior to the issuance of a separate statement of work for the discrete tax consulting project are intended to be covered by this statement of work.

To be of greatest assistance to COMPANY, CONTRACTOR should be advised in advance of proposed transactions.

CONTRACTOR does not anticipate that the written tax advice provided under this statement of work will be a Covered Opinion as defined in §10.35 of Circular 230 (Covered Opinion). Therefore, all the written tax advice provided under this statement of work will contain the following legend:

> ANY TAX ADVICE IN THIS COMMUNICATION IS NOT INTENDED OR WRITTEN BY KPMG TO BE USED, AND CANNOT BE USED, BY A CLIENT OR ANY OTHER PERSON OR ENTITY FOR THE PURPOSE OF (i) AVOIDING PENALTIES THAT MAY BE IMPOSED ON ANY TAXPAYER OR (ii) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY MATTERS ADDRESSED HEREIN.

However, if CONTRACTOR'S services will rise to the level of a Covered Opinion, CONTRACTOR will issue a separate statement of work for the issuance of a Covered Opinion.

C 0631124 C

## TAX ADVICE STANDARDS

If CONTRACTOR is considered to be a tax return preparer under Treasury Regulation §301.7701-15, CONTRACTOR will apply elevated standards in providing tax advice. These standards are dependent on certain characteristics of the entity to which CONTRACTOR'S services will be directed as follows:

1.  For U.S. public companies or "large private entities" (i.e., private entities with prior year gross revenues of $300 million or more reflected in audited financial statements prepared in accordance with U.S. generally accepted accounting principles): CONTRACTOR must be able to determine that (1) there is "substantial authority" for an undisclosed return position (i.e., the weight of authorities in support of a position is substantial in relation to the weight of authorities in opposition to the position) and (2) a disclosed return position has at least a "realistic possibility" of being sustained on its merits (i.e., approximately a one-in-three or greater likelihood of success if challenged by a tax authority). The laws of some states (e.g., New York) also may impose more stringent return preparation standards for state tax returns. For advice pertaining to a "Tax Shelter" (as defined in IRC §6662(d)(2)(C)(ii)) or a "reportable transaction" with a significant purpose of tax avoidance, tax practitioners must generally conclude their advice satisfies the "more likely than not" standard; if the taxpayer is advised regarding potential taxpayer penalties, tax practitioners may conclude at a "substantial authority" level.

2.  For "other private entities" (i.e., entities that do not fall within the definitions above as a U.S. public company or large private entity): CONTRACTOR must be able to determine that a return position is at least "more likely than not" to be upheld (i.e., has a greater than 50 percent likelihood of success if challenged by the taxing authorities).

3.  If a return position relates to a transaction that is a "principal purpose transaction," CONTRACTOR must arrive at a "should" confidence level (i.e., approximately a 70% or greater likelihood of success if challenged by the taxing authorities) with respect to the position.

4.  CONTRACTOR will not render any advice with respect to a federal or state "listed transaction" or any transaction that is substantially similar to a federal or state "listed transaction."

In determining whether a return position meets the appropriate standard, CONTRACTOR will not take into account the possibility that a tax return will not be audited, that an issue will not be raised on audit, or that an issue will be settled. CONTRACTOR will inform COMPANY as soon as possible if, during CONTRACTOR'S analysis, CONTRACTOR determines circumstances exist that prevent us from advising COMPANY under these standards.

## THIRD PARTY SERVICE PROVIDERS

CONTRACTOR uses third party service providers within and without the United States to provide at CONTRACTOR'S discretion administrative and clerical services to CONTRACTOR. Accordingly, COMPANY consents to CONTRACTOR'S disclosure to such third party service

C 0631124 C

CONTRACTOR will issue invoices on a bi-monthly basis. All invoices shall be sent to:

Ms. Meagan Horn
Tax Counsel
EFH Corporate Services Company
1601 Bryan St.
Dallas, TX 75201

### KEY PERSONNEL

CONTRACTOR agrees that the individuals listed below will be assigned to perform the Work authorized by this Schedule A. CONTRACTOR will employ all reasonable efforts to ensure that such individuals remain so assigned until such Work is accepted by COMPANY; provided, however, that in the event that and such individuals are reassigned by CONTRACTOR or otherwise become unavailable to perform such Work, CONTRACTOR will provide, by way of replacement, individuals with reasonably equivalent experience and expertise.

| | |
|---|---|
| **Brian Burdett:** | Tax Principal, State and Local Tax |
| **Brandon Fulmer:** | Tax Manager, State and Local Tax |
| **Emily Gauthier:** | Tax Manager, State and Local Tax |
| **Esmeralda Castro:** | Tax Senior Associate, State and Local Tax |

CONTRACTOR PERSONELL AUTHORIZED TO ATTEND MEETINGS WITH COMPANY PERSONELL PERTAINING TO THE WORK

| | |
|---|---|
| **Brian Burdett:** | Tax Principal, State and Local Tax |
| **Brandon Fulmer:** | Tax Manager, State and Local Tax |
| **Emily Gauthier:** | Tax Manager, State and Local Tax |
| **Esmeralda Castro:** | Tax Senior Associate, State and Local Tax |

PRIVILAGES CLAIMED BY COMPANY, WITH RESPECT TO DELIVERABLES OR OTHER DOCUMENTS HEREAFTER DESIGNATED BY COMPANY

_____ ATTORNEY-CLIENT COMMUNICATION

_____ ATTORNEY WORK PRODUCT

__✓__ TAX ADVISOR

OTHER: Prepared in anticipation of litigation

C 0631124 C

providers data and information received from or at the request or discretion of COMPANY for the foregoing purposes.

**DELIVERABLES**

Deliverables will be in the format requested by COMPANY depending on the specific tax services that are requested (i.e., oral, e-mail, memorandum, letter, Excel spreadsheet, etc.).

Contract Coordinator: Meagan Horn                Phone Number: 214.812.7821

**WORK SITE**

The Work Site will be the following location(s): CONTRACTOR &/or COMPANY offices located in Dallas, TX.

**COMPENSATION, INVOICES AND PAYMENT**

As full compensation for the satisfactory performance by CONTRACTOR of the Work authorized pursuant to this Schedule A, COMPANY will compensate CONTRACTOR as follows. CONTRACTORS fee for this engagement will be based on the actual time incurred to complete the work at 70% of CONTRACTORS standard hourly rates for the individuals involved in providing services.

Estimated fees for this work will range between $5,000 and $20,000 and this project is not authorized to exceed $20,000. Any extension or increase in spend will require an amendment to this Schedule A. This estimate assumes there will be no travel to the participant's site(s).

State and Local Tax Professional and Support Staff Standard Hourly Rates as of October 26, 2013:

| Title | Standard Hourly Rates | Project Hourly Rates |
|---|---|---|
| Partner/Principal | $975/hr | $682/hr |
| Manager | $625/hr | $437/hr |
| Senior Associate | $500/hr | $350/hr |
| Associate | $345/hr | $241/hr |
| Para-Professional | $200/hr | $140/hr |

KE 27862520.20

C 0631124 C

**LIST OF ATTACHMENTS**

COMPANY and CONTRACTOR agree that the following described attachments, if any, are incorporated herein in their entirety to this Schedule A.

Work not specified above may be authorized only through a separate Schedule A, or though an amendment or supplement to this Schedule A.

**KPMG LLP**

By: _____

Printed Name: Brian Burdett

Title: *Principal, Tax*

Date: _____November 12, 2013_____

**EFH Corporate Services Company**

By: _____

Printed Name: Meagan Horn

Title: *Tax Counsel*

Date: ___11/18/13___

## SCHEDULE A-14

Following the Parties' execution of this Schedule A-14 ("Schedule A-14"), CONTRACTOR is authorized to perform the Work as identified below on behalf of COMPANY pursuant to the terms and conditions contained in the Master Services Agreement C0631124C ("the Agreement") dated November 1, 2009, as amended. Any work performed in connection with this engagement before the date of execution of this Schedule A-14 is also governed by the terms and conditions contained in this Schedule A-14. All capitalized terms used but not defined herein shall have the meaning given to them in the Agreement.

## SCOPE OF WORK

CONTRACTOR will represent COMPANY in its Texas Sales and Use Tax and Miscellaneous Gross Receipts Tax examinations for the various taxing periods and legal entities outlined in the diagram below:

| Legal Entity Name | Audit Period |
|---|---|
| EFH Corporate Services Company (1-75-0835281-6) Sales and Use Tax | 01/08-09/11 |
| Generation Development Company LLC (1-20-4952060-9) Sales and Use Tax | 01/10-06/13 |
| Luminant Energy Company LLC (1-26-0022234-8) Sales and Use Tax | 09/07-09/11 |
| Luminant Generation Company LLC (1-75-2967820-7) Sales and Use Tax | 08/08-05-12 |
| Luminant Mining Company LLC (1-75-2967821-5) Sales and Use Tax | 06/08-05/12 |
| Sandow Power Company LLC (3-20-1997560-9) Sales and Use Tax | 01/07-12/10 |
| TXU Energy Retail Company LLC (1-26-0494257-8) Sales and Use Tax | 07/02-06/07 |
| TXU Energy Retail Company LLC (1-26-0494257-8) Sales and Use Tax | 07/07-12/11 |
| TXU Energy Retail Company LLC (1-26-0494257-8) Miscellaneous Gross Receipts Tax | 10/03-06/07 |
| TXU Energy Retail Company LLC (1-26-0494257-8) Miscellaneous Gross Receipts Tax | 07/07-06/11 |

As part of this representation, CONTRACTOR will work to resolve the examination in the most efficient and timely manner possible, and will work with COMPANY to develop an appropriate strategy for best handling the examination. CONTRACTOR will identify liabilities and overpayments of Sales and Use Tax and Miscellaneous Gross Receipts Tax, assist COMPANY in its dealings with the Texas Comptroller's Office examination team, and will meet with team members as appropriate and necessary. CONTRACTOR will assist COMPANY in preparing submissions in response to Comptroller's Office inquiries. If the case is not resolved at the examination level, CONTRACTOR may represent COMPANY at its request in the Texas Comptroller's Office Appeals process (or an equivalent reviewing body), or participate in an alternative dispute resolution program.

C 0631124 C

If matters exceed the scope of this Schedule A-14, we will issue a separate statement of work or clarifying addendum to confirm the scope and related terms. Furthermore, a separate statement of work will be issued for each discrete tax consulting project not specified in this Schedule A-14 (e.g., transfer pricing study, corporate acquisition or disposition, etc.). To be of greatest assistance to COMPANY, CONTRACTOR should be advised **in advance** of proposed transactions.

CONTRACTOR does not anticipate that the written tax advice provided under this Schedule A-14 will be a Covered Opinion as defined in §10.35 of Circular 230 (Covered Opinion). Therefore, all the written tax advice provided under this Schedule A-14 will contain the following legend:

> ANY TAX ADVICE IN THIS COMMUNICATION IS NOT INTENDED OR WRITTEN BY KPMG TO BE USED, AND CANNOT BE USED, BY A CLIENT OR ANY OTHER PERSON OR ENTITY FOR THE PURPOSE OF (i) AVOIDING PENALTIES THAT MAY BE IMPOSED ON ANY TAXPAYER OR (ii) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY MATTERS ADDRESSED HEREIN.

However, if CONTRACTOR's services will rise to the level of a Covered Opinion, CONTRACTOR will issue a separate statement of work for the issuance of a Covered Opinion.

## TAX ADVICE STANDARDS

CONTRACTOR applies elevated standards in providing tax controversy representation services. These standards are dependent on certain characteristics of the entity to which our services will be directed as follows:

1. For U.S. public companies or "large private entities" (i.e., private entities with prior year gross revenues of $300 million or more reflected in audited financial statements prepared in accordance with U.S. generally accepted accounting principles): We must be able to determine that (1) there is "substantial authority" for an undisclosed return position (i.e., the weight of authorities in support of a position is substantial in relation to the weight of authorities in opposition to the position) and (2) a disclosed return position has at least a "realistic possibility" of being sustained on its merits (i.e., approximately a one-in-three or greater likelihood of success if challenged by a tax authority). The laws of some states (e.g., New York) also may impose more stringent return preparation standards for state tax returns.

2. For "other private entities" (i.e., entities that do not fall within the definitions above as a U.S. public company or large private entity) or individuals: We must be able to determine that a return position is at least "more likely than not" to be upheld (i.e., has a greater than 50 percent likelihood of success if challenged by the taxing authorities).

C 0631124 C

3. If a return position relates to a transaction that is a "principal purpose transaction," we must arrive at a "should" confidence level (i.e., approximately a 70% or greater likelihood of success if challenged by the taxing authorities) with respect to the position.

4. We will not defend any transaction that is or becomes a transaction that the IRS or a state tax authority has identified as a "listed transaction."

## THIRD PARTY SERVICE PROVIDERS

CONTRACTOR uses third party service providers within and without the United States to provide at CONTRACTOR'S discretion administrative and clerical services to CONTRACTOR. Accordingly, COMPANY consents to CONTRACTOR'S disclosure to such third party service providers' data and information received from or at the request or discretion of COMPANY for the foregoing purposes; provided however, such third party service providers will protect any Confidential Information of the COMPANY pursuant to Article 30 of the Agreement and further provided that CONTRACTOR will be responsible for any breach of confidentiality by such third party service provider.

## DELIVERABLES:

Deliverables will be in the format requested by COMPANY (i.e., oral, e-mail, memorandum, letter, Excel spreadsheet, etc.).

Contract Coordinator: Meagan Horn                    Phone Number: 214.812.7821

## WORK SITE

The Work Site will be the following location(s): CONTRACTOR &/or COMPANY offices located in Dallas, TX.

## COMPENSATION, INVOICES AND PAYMENT

As full compensation for the satisfactory performance by CONTRACTOR of the Work authorized pursuant to this Schedule A-14, COMPANY will compensate CONTRACTOR as follows. CONTRACTORS' fee for this engagement will be based on the actual time incurred to complete the work at 70% of CONTRACTOR'S standard hourly rates for the individuals involved in providing services. In addition, we will bill you for our out-of-pocket expenses (e.g., travel, lodging, meals, etc.) in accordance with Article 5 of the Agreement. Our fees for tax consulting services will be billed as incurred.

State and Local Tax Professional and Support Staff Standard Hourly Rates as of December 9, 2013:

| Title | Standard Hourly Rates | Project Hourly Rates |
|---|---|---|
| Partner/Principal | $975/hr | $682/hr |

C 0631124 C

| Manager | $625/hr | $437/hr |
|---|---|---|
| Senior Associate | $500/hr | $350/hr |
| Associate | $345/hr | $241/hr |
| Para-Professional | $200/hr | $140/hr |

CONTRACTOR'S normal practice is to obtain a retainer, and CONTRACTOR is herewith requesting such a retainer of $100,000. The retainer will be held against the final invoice for the engagement; any unused retainer will be refunded.

CONTRACTOR will issue invoices on a bi-monthly basis. All invoices shall be sent to:

> Ms. Meagan Horn
> Tax Counsel
> EFH Corporate Services Company
> 1601 Bryan St.
> Dallas, TX 75201

**KEY PERSONNEL**

CONTRACTOR agrees that the individuals listed below will be assigned to perform the Work authorized by this Schedule A-14. CONTRACTOR will employ all reasonable efforts to ensure that such individuals remain so assigned until such Work is accepted by COMPANY; provided, however, that in the event that and such individuals are reassigned by CONTRACTOR or otherwise become unavailable to perform such Work, CONTRACTOR will provide, by way of replacement, individuals with reasonably equivalent experience and expertise.

| | |
|---|---|
| **Brian Burdett:** | Tax Principal, State and Local Tax |
| **Brandon Fulmer:** | Tax Manager, State and Local Tax |
| **Emily Gauthier:** | Tax Manager, State and Local Tax |
| **Esmeralda Castro:** | Tax Senior Associate, State and Local Tax |

CONTRACTOR PERSONELL AUTHORIZED TO ATTEND MEETINGS WITH COMPANY PERSONELL PERTAINING TO THE WORK

| | |
|---|---|
| **Brian Burdett:** | Tax Principal, State and Local Tax |
| **Brandon Fulmer:** | Tax Manager, State and Local Tax |
| **Emily Gauthier:** | Tax Manager, State and Local Tax |

C 0631124 C

**Esmeralda Castro:**    Tax Senior Associate, State and Local Tax

PRIVILAGES CLAIMED BY COMPANY, WITH RESPECT TO DELIVERABLES OR
OTHER DOCUMENTS HEREAFTER DESIGNATED BY COMPANY

_____ ATTORNEY-CLIENT COMMUNICATION

_x___ ATTORNEY WORK PRODUCT

_____ TAX ADVISOR

OTHER: _____

**LIST OF ATTACHMENTS**

COMPANY and CONTRACTOR agree that the following described attachments, if any, are
incorporated herein in their entirety to this Schedule A-14.

Work not specified above may be authorized only through a separate Schedule A, or though an
amendment or supplement to this Schedule A-14.

**KPMG LLP**                              **EFH Corporate Services Company**

By: _____               By: _____

Printed Name: Brian Burdett              Printed Name: Meagan Horn

Title: *Principal, Tax*                  Title: *Tax Counsel*

Date: ___1/13/14___                      Date: ___1/13/14___

C 0631124 C

## SCHEDULE A

Following the Parties' execution of this Schedule A, CONTRACTOR "also referred as KPMG" is authorized to perform the Work as identified below on behalf of COMPANY pursuant to the terms and conditions contained in the Master Services Agreement C0631124C ("the Agreement") dated November 11, 2009.

### SCOPE OF WORK AND DELIVERABLES

The Work will be performed in accordance with the specifications and instructions, if any, attached hereto and identified in the List of Attachments.  The Work will be scheduled at the direction of COMPANY'S "also referred as EFH Corporate Services Company" Contract Coordinator as identified herein.

### SCOPE OF WORK

CONTRACTOR will assist COMPANY personnel in supporting key activities to review invoices processed through Accounts Payable to determine the proper service period applicable to the invoice.  Some invoices are electronic, so access to COMPANY systems will be necessary to analyze.

### DELIVERABLES

Deliverables will be in the format requested by COMPANY depending on the specific services that are requested (i.e., oral, e-mail, memorandum, letter, Excel spreadsheet, etc.).

Contract Coordinator:  Ramon Leal                    Phone Number: (214) 812-4013

### WORK SITE

The Work Site will be the following location(s): CONTRACTOR &/or COMPANY offices located in the Dallas, TX area.

### TIMING

The engagement will commence on or around March 24, 2014 and conclude by June 20, 2014

### EMPLOYMENT CLAIMS

For purposes of this Schedule A, CONTRACTOR shall indemnify, defend, and hold harmless COMPANY from and against any claims that arise from or relate to any employment-related laws (including but not limited to discrimination, harassment, wage, benefit, and/or contractual claims under federal, state, or local statute or common law including but not limited to Title VII of the Civil Rights Act of 1964, as amended, the Americans with Disabilities Act, the Equal Pay Act of 1963, the Age Discrimination in Employment Act of 1967, the Civil Rights Act of 1866, the Older Workers Benefit Protection Act, the Family and Medical Leave Act, the Texas Labor Code, the Fair Labor Standards Act, and ERISA) based on an allegation that COMPANY is an employer or joint employer of any loaned KPMG staff. In addition, CONTRACTOR agrees that it is solely responsible for providing any reasonable accommodation required by any loaned KPMG staff under this Schedule A for a qualifying disability under the Americans with Disabilities Act or any state or local disabilities law; provided, however, that COMPANY will reimburse CONTRACTOR for any direct expenditures required for CONTRACTOR to fulfill such obligation, but only to the extent any such accommodation would require tangible modifications to the work environment

C 0631124 C

provided by COMPANY and is deemed by COMPANY based on applicable law to be a reasonable accommodation that does not cause undue hardship for COMPANY.

To the extent necessary to permit COMPANY to enforce this Agreement, COMPANY agrees that with respect to any employment claims brought against COMPANY, CONTRACTOR will and does hereby waive to COMPANY any defense it may have by virtue of the workers' compensation laws of any state.

## COMPENSATION, INVOICES AND PAYMENT

As full compensation for the satisfactory performance by CONTRACTOR of the Work authorized pursuant to this Schedule A, COMPANY will compensate CONTRACTOR as follows.

The estimated fees for this effort are $476,000 and this project is not authorized to exceed $480,000. The expected blended rate is $135/hr, and CONTRACTOR will bill only for hours spent performing substantive Work for COMPANY. Hours spent in anticipated 3-day training are not billable hours. Any extension or increase in spend will require amendment to this Schedule A. This estimate assumes there will be no travel to the participant's site(s). If travel is required, normal and reasonable travel expenses will be reimbursed in accordance with Article 5 and Attachment 5 of the Agreement (Reimbursable Expense Policy).

## PROFESSIONAL AND SUPPORT STAFF FEES SCHEDULE

| Role | Estimated Hours | Rate |
|------|-----------------|------|
| Manager | 276 | $250/hr |
| Associate | 3256 | $125/hr |

The rates specified in the Schedule A will remain in effect, with respect to and until completion of the Work authorized pursuant to this Schedule A.

All invoices shall be sent to:

Mr. Ramon Leal
Director – Corporate Controller
Energy Future Holdings Corp.
1601 Bryan St, 3rd floor
Dallas, TX  75201

## KEY PERSONNEL

CONTRACTOR agrees that the individuals listed below will be assigned to perform the Work authorized by this Schedule A. CONTRACTOR will employ all reasonable efforts to ensure that such individuals remain so assigned until such Work is accepted by COMPANY; provided, however, that in the event that any such individuals are reassigned by CONTRACTOR or otherwise become unavailable to perform such Work, CONTRACTOR will provide, by way of replacement, individuals with reasonably equivalent experience and expertise.

**Ramon Leal**: Director, Corporate Controller

**Trica Bennett:** Manager
**Jacqueline Kuo:** Associate
**Aamir Bhai:** Associate
**Aaron Milner:** Associate

2

C 0631124 C

Dan Le: Associate
Holly Waggoner: Associate
Josh Mah: Associate

CONTRACTOR PERSONNEL AUTHORIZED TO ATTEND MEETINGS WITH COMPANY PERSONNEL PERTAINING TO THE WORK

Ramon Leal: Director, Corporate Controller

John Kunasek: Partner
Francis Yogi: Managing Director
Kim Pham: Director

PRIVILEGES CLAIMED BY COMPANY, WITH RESPECT TO DELIVERABLES OR OTHER DOCUMENTS HEREAFTER DESIGNATED BY COMPANY

_____ ATTORNEY-CLIENT COMMUNICATION

_____ ATTORNEY WORK PRODUCT

_____ TAX ADVISOR

_____ OTHER:_____

## LIST OF ATTACHMENTS

COMPANY and CONTRACTOR agree that the following described attachments, if any, are incorporated herein in their entirety as fully as completely rewritten herein.

Work not specified above may be authorized only through a separate Schedule A, or through an amendment or supplement to this Schedule A.

**KPMG LLP**                                    **EFH CORPORATE SERVICES COMPANY**

By: _Francis K Yogi_                            By: _Molly Holloway_
    Signature                                        Signature

Name:  Francis Yogi                             Name:  MOLLY HOLLOWAY

Title:   Managing Director                      Title:   SOURCING MANAGER

Date:   February 27, 2014                       Date:  MARCH 4, 2014



| KPMG LLP | Telephone | +1 713 319 2000 |
|---|---|---|
| 811 Main Street, Suite 4400 | Fax | +1 713 319 2041 |
| Houston, Texas 77002 | Internet | www.us.kpmg.com |

## SCHEDULE A

Following the Parties' execution of this Schedule A, CONTRACTOR is authorized to perform the Work as identified below on behalf of COMPANY pursuant to the terms and conditions in the Master Services Agreement C0631124C ("the Agreement") dated November 1, 2009, as amended on December 16, 2013.

### SCOPE OF WORK AND DELIVERABLES

The Work will be performed in accordance with the specifications and instructions, if any, attached hereto and identified in the List of Attachments. The Work will be scheduled at the direction of COMPANY's Contract Coordinator as identified herein.

**SCOPE OF WORK:**

We will provide property tax consulting services with respect to such matters that may arise for which you seek our advice, both written and oral, and that are not the subject of a separate statement of work. However, we will not render any advice with respect to a federal or state "listed transaction" or any transaction that is substantially similar to a federal or state "listed transaction."

In addition, KPMG will provide property tax consulting services with respect to the following specific matters for tax year 2014:

- Assist with the processing and tracking of certain assessment notices, appeal notices, hearing notices for the Company's property tax accounts as such is requested by Company. KPMG will only perform these activities for those accounts as directed and requested by Company.

- Assist with review of the business personal property assets related to the mining segment of the business and help determine whether the cost for the business personal property accounts are reasonable when compared to the value of such assets

- We will also provide other property tax consulting and support as requested.

If matters exceed the scope of this statement of work, we will issue a separate statement of work to confirm the scope and related terms of any additional engagements. Furthermore, a separate statement of work will be issued for each discrete tax consulting project not specified in this statement of work (e.g., transfer pricing study, corporate acquisition or disposition, etc.) and for tax controversy representation.

When, in the course of providing general tax consulting services, it is determined that the services would exceed the scope of this letter, preliminary engagement planning activities undertaken prior to the issuance of an statement of work for the discrete tax consulting project are intended to be covered by this statement of work.

To be of greatest assistance to EFH, we should be advised in advance of proposed transactions.

KPMG LLP is a Delaware limited liability partnership,
the U. S. Member firm of KPMG International Cooperative
("KPMG International"), a Swiss Entity



*Schedule A*
*EFH Corporate Services Company*
*March 19, 2014*
*Page 2 of 4*

We do not anticipate that the written tax advice provided under this statement of work will be a Covered Opinion as defined in §10.35 of Circular 230 (Covered Opinion). Therefore, all the written tax advice provided under this statement of work will contain the following legend:

> ANY TAX ADVICE IN THIS COMMUNICATION IS NOT INTENDED OR WRITTEN BY KPMG TO BE USED, AND CANNOT BE USED, BY A CLIENT OR ANY OTHER PERSON OR ENTITY FOR THE PURPOSE OF (i) AVOIDING PENALTIES THAT MAY BE IMPOSED ON ANY TAXPAYER OR (ii) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY MATTERS ADDRESSED HEREIN.

However, if our services will rise to the level of a Covered Opinion, we will issue a separate statement of work for the issuance of a Covered Opinion.

**Tax Advice Standards**

If KPMG is considered to be a tax return preparer under Treasury Regulation §301.7701-15, we will apply elevated standards in providing tax advice. These standards are dependent on certain characteristics of the entity to which our services will be directed as follows:

1. For U.S. public companies or "large private entities" (i.e., private entities with prior year gross revenues of $300 million or more reflected in audited financial statements prepared in accordance with U.S. generally accepted accounting principles): We must be able to determine that (1) there is "substantial authority" for an undisclosed return position (i.e., the weight of authorities in support of a position is substantial in relation to the weight of authorities in opposition to the position) and (2) a disclosed return position has at least a "realistic possibility" of being sustained on its merits (i.e., approximately a one-in-three or greater likelihood of success if challenged by a tax authority). The laws of some states (e.g., New York) also may impose more stringent return preparation standards for state tax returns. For advice pertaining to a "Tax Shelter" (as defined in IRC §6662(d)(2)(C)(ii)) or a "reportable transaction" with a significant purpose of tax avoidance, tax practitioners must generally conclude their advice satisfies the "more likely than not" standard; if the taxpayer is advised regarding potential taxpayer penalties, tax practitioners may conclude at a "substantial authority" level.

2. For "other private entities" (i.e., entities that do not fall within the definitions above as a U.S. public company or large private entity): We must be able to determine that a return position is at least "more likely than not" to be upheld (i.e., has a greater than 50 percent likelihood of success if challenged by the taxing authorities).

3. If a return position relates to a transaction that is a "principal purpose transaction," we must arrive at a "should" confidence level (i.e., approximately a 70% or greater likelihood of success if challenged by the taxing authorities) with respect to the position.

4. We will not render any advice with respect to a federal or state "listed transaction" or any transaction that is substantially similar to a federal or state "listed transaction."



*Schedule A*
*EFH Corporate Services Company*
*March 19, 2014*
*Page 3 of 4*

In determining whether a return position meets the appropriate standard, we will not take into account the possibility that a tax return will not be audited, that an issue will not be raised on audit, or that an issue will be settled. We will inform you as soon as possible if, during our analysis, we determine circumstances exist that prevent us from advising you under these standards.

**Fees**

Our fee for this engagement will be based on the actual time incurred to complete the work at the hourly rates for the individuals involved in providing the services summarized in the table below.

| Professional | Hourly Rate |
|---|---|
| Partner/Director | $ 485 |
| Senior Manager | $ 425 |
| Manager | $ 310 |
| Senior Tax Associate | $ 250 |
| Tax Associate | $ 175 |

In addition, we will bill you for our out-of-pocket expenses (e.g., travel, lodging, meals, etc.).

We will endeavor to notify you if we encounter any circumstances that warrant additional time or expense. If such matters exceed the scope of this statement of work, we will issue an addendum or separate statement of work to confirm the scope and related terms of any additional engagements.\

We will render progress billing as work is performed.

All invoices shall be sent to:

Ms. Meagan Horn
Tax Counsel
Energy Future Holdings Corp.
1601 Bryan St, 3rd floor
Dallas, TX  75201

\* \* \* \* \* \* \*

KE 27862520.20



*Schedule A*
*EFH Corporate Services Company*
*March 19, 2014*
*Page 4 of 4*

Please sign the enclosed copy of this statement of work to confirm our agreement and return it to us as soon as possible so that we may begin work on this engagement. If you have any questions, please call me.

Unless otherwise terminated, modified, or superseded in writing, this statement of work is intended to apply for a period of 15 months from the date of signing by the client. In addition, effective as of the date of signing, this statement of work supersedes any and all previously issued statement of works pertaining to the services described above.

Work not specified above may be authorized only through a separate Schedule A, or through an amendment or supplement to this Schedule A.

**KPMG LLP**                                      **EFH CORPORATE SERVICES COMPANY**

By:  _____                By:  _____
         Signature                                        Signature

Name:  Josh Hennessey                        Name:  D. BOYD LOVELACE

Title:  Partner                                      Title:  VP TAX OPERATIONS

Date:  03/12/2014                              Date:  3/19/14