# **Exhibit C**

**MSA**

C 0638655 C.

# MASTER SERVICES AGREEMENT

**BY AND BETWEEN**

**PRICEWATERHOUSECOOPERS**

**AND**

**EFH CORPORATE SERVICES COMPANY**

**DECEMBER 14, 2009**

**CONTRACT NO. C 0638655 C.**

C 0638655 C.

TABLE OF CONTENTS


ARTICLE 1........................................................ DEFINITIONS
ARTICLE 2........................................................ ASSIGNABLE SCOPE OF WORK AND DELIVERABLES
ARTICLE 3........................................................ NON - EXCLUSIVE
ARTICLE 4........................................................ TERM OF AGREEMENT
ARTICLE 5........................................................ COMPENSATION
ARTICLE 6........................................................ INVOICES & PAYMENTS
ARTICLE 7........................................................ ACCEPTANCE
ARTICLE 8........................................................ SALES / USE TAX
ARTICLE 9........................................................ WORK SITE SAFETY SECURITY ALCOHOL, DRUGS AND WEAPONS
ARTICLE 10...................................................... INSURANCE
ARTICLE 11...................................................... INDEPENDENT CONTRACTOR RELATIONSHIP
ARTICLE 12...................................................... ASSIGNMENT
ARTICLE 13...................................................... SUBCONTRACTING
ARTICLE 14...................................................... BINDING ON SUCCESSORS AND ASSIGNS
ARTICLE 15...................................................... STANDARDS AND CODES
ARTICLE 16...................................................... CHANGES IN WORK AND DELIVERABLES
ARTICLE 17...................................................... EXTRA WORK
ARTICLE 18...................................................... FORCE MAJEURE
ARTICLE 19...................................................... SUSPENSION FOR CAUSE
ARTICLE 20...................................................... TERMINATION
ARTICLE 21...................................................... WARRANTY
ARTICLE 22...................................................... RECORDS AND RIGHT TO AUDIT
ARTICLE 23...................................................... BUSINESS ETHICS
ARTICLE 24...................................................... CONTRACTOR'S RESPONSIBILITY FOR WORK
ARTICLE 25...................................................... CONFLICT OF INTEREST
ARTICLE 26...................................................... TAXES
ARTICLE 27...................................................... INDEMNIFICATION
ARTICLE 28...................................................... INTELLECTUAL PROPERTY
ARTICLE 29...................................................... COMPLIANCE WITH LAWS
ARTICLE 30...................................................... CONFIDENTIAL AND PROPRIETARY INFORMATION
ARTICLE 31...................................................... RIGHTS TO DATA
ARTICLE 32...................................................... GOVERNING LAW; ARBITRATION
ARTICLE 33...................................................... NON-WAIVER OF RIGHTS
ARTICLE 34...................................................... SURVIVAL
ARTICLE 35...................................................... SEVERABILITY
ARTICLE 36...................................................... PUBLICITY
ARTICLE 37...................................................... IMMIGRATION
ARTICLE 38...................................................... NOTICES
ARTICLE.39...................................................... REPRESENTATIVES
ARTICLE 40...................................................... AMENDMENTS
ARTICLE 41...................................................... ATTACHMENTS
ARTICLE 42...................................................... MISCELLANEOUS
ARTICLE 43...................................................... COUNTERPARTS
ARTICLE 44...................................................... ENTIRETY OF AGREEMENT

**Master Services Agreement**

This Master Services Agreement (this "Agreement") is made and shall become effective as of December 14, 2009 (the "Effective Date"), by and between EFH Corporate Services Company, a Texas corporation ("COMPANY") and PricewaterhouseCoopers LLP, a New York registered limited liability partnership ("CONTRACTOR"), pursuant to which CONTRACTOR will provide to COMPANY the services described on the Schedule A(s) attached hereto and on future Schedule As that may be agreed to by the Parties. COMPANY and CONTRACTOR may be referred to each as a "Party" or collectively as the "Parties." Capitalized terms not defined within another section of this Agreement are defined below. In consideration of the following obligations and mutual promises, the Parties hereby agree as follows:

**ARTICLE 1: DEFINITIONS**

A. CLAIMS

The term "Claims" means all claims, losses, expenses, damages (including reasonable attorneys fees), demands, judgments, causes of action, suits, and liability in tort, contract, product or strict liability or any other basis and of every kind and character whatsoever.

B. COMPANY Group

The term "COMPANY Group" means COMPANY, its parent corporation, Energy Future Holdings Corp., and all controlled subsidiaries and affiliates of Energy Future Holdings Corp., and all officers, directors and employees of COMPANY, its parent corporation, Energy Future Holdings Corp., and each such subsidiary.

C. Contract Administrator

The term "Contract Administrator" means a representative(s) of each Party named in this Agreement, or in a subsequent written notice issued pursuant to this Agreement by such party from time to time, to act in matters relating to the revision of contract language, the adjustment of compensation or time, and the resolution of issues regarding the meaning of contract language. Actions of COMPANY'S Contract Administrator include initiating, negotiating and issuing supplements or amendments to this Agreement, as required; receiving required notices and negotiating resolutions/settlements to disputes that may arise concerning this Agreement.

D. Contract Coordinator

The term "Contract Coordinator" means a representative(s) of each Party named in this Agreement, or in a subsequent written notice issued pursuant to this Agreement by such party from time to time, to act in matters related to performance of this Agreement as it is written. Actions of the Contract Coordinators regarding the day-to-day interaction between the operations of the Parties, the issuance and approval of invoices, the issuance and approval of procedures, drawings, Schedule As and documents of any type, and other decisions made in managing this Agreement will not operate as a waiver or compromise of any provision of this Agreement.

E. CONTRACTOR Group

The term "CONTRACTOR Group" means CONTRACTOR, all subcontractors of any tier employed by CONTRACTOR, and all affiliated or related firms and entities of CONTRACTOR, and all officers, directors, partners, limited partners, shareholders, associates, employees, servants and agents of each.

F. Deliverable

Except to the extent otherwise expressly provided for in a Schedule A, the term "Deliverable" means any tangible items, products, or deliverables, to be developed or prepared by CONTRACTOR for COMPANY as part of the Work, and as specified in a Schedule A.

F. Schedule A:

The term "Schedule A" and all future Schedules A means a written document issued pursuant to this Agreement, which shall be signed by the Parties, that identifies and authorizes Work to be

performed. Schedule A may, however, contain Work instructions, specifications and specific billing advice. As used herein, the term "Schedule A" shall have the same meaning as the term "Statement of Work," and the same shall be interchangeable.

G. Work
The term "Work" means all services necessary to perform the activities and tasks described in any Schedule A, including, without limitation, the preparation and submission to COMPANY of any Deliverable.

H. Work Site
The term "Work Site" means location(s) described in a Schedule A where the Work will be performed.

## ARTICLE 2: ASSIGNABLE SCOPE OF WORK AND DELIVERABLES

COMPANY may, from time to time, identify any Work which COMPANY desires to be performed by CONTRACTOR, as specified in a Schedule A. Except as otherwise specified by the Parties or as otherwise set forth herein or in the applicable Schedule A, CONTRACTOR will provide all materials, equipment, tools, supervision, and manpower resources necessary for the full and complete performance of the Work and the preparation of any Deliverables.

Each proposed Schedule A shall be approved by COMPANY and, when acceptable to both Parties, shall be executed by both Parties. Each Schedule A shall reference this Agreement by number and shall be deemed a part of this Agreement. Nothing in this Agreement shall be deemed to authorize any Work, or constitute a commitment of either Party to accept or execute any particular Schedule A, and neither COMPANY nor CONTRACTOR will have any rights or obligations, for or with respect to any particular Work except as such Work is identified in a Schedule A executed by both Parties. At COMPANY'S Contract Coordinator's discretion, Work may be requested verbally, but shall not be authorized hereunder until such time as it is confirmed by a written Schedule A. COMPANY may procure Work under this Agreement for itself and for those entities in the COMPANY Group that COMPANY binds to this Agreement by its signature or which separately agree to the provisions of this Agreement by executing a Statement of Work.

Notwithstanding anything herein to the contrary, the Work shall not include (unless specified in a Statement of Work) (i) the provision of expert testimony on behalf of Company or (ii) any audit or attestation services or (iii) service that would require Contractor to maintain independence from Company in accordance with then current applicable law, rule or regulation of any governmental entity or professional organization. The provisions of Schedule B shall apply to any tax-related Work. Additionally, the provisions of Schedule C, as well as any relevant provisions of Schedule B, shall apply to any Transaction Services and Accounting Advisory Services, as those Services are defined in Schedule C.

Company agrees to provided reasonable cooperation to Contractor in the performance of the Work and shall provide or arrange to provide Contractor with reasonable access to and use of the personnel, facilities, equipment, data and information to the extent reasonably necessary for Contractor to perform the Work. To the extent applicable to the Work, a Statement of Work shall set forth the obligations of Company in connection with such Work. Company agrees to make reasonable efforts to perform such obligations in accordance with, and subject to, such Statement of Work. Company acknowledges that its failure to meet such obligations may adversely affect CONTRACTOR'S ability to provide the Work in accordance with the terms of this Agreement and the applicable Statement of Work. Contractor agrees to notify Company in the event any such failure to perform by Company has, or may, result in the inability of Contractor to perform the Work, and Contractor agrees to make reasonable efforts to take mitigating actions to perform the Work despite COMPANY'S failure to perform.

Company acknowledges and agrees that Contractor will, in performing the Work, base its conclusions on the facts and assumptions that Company furnishes and that Contractor may use data, material, and other

information furnished by or at the request or direction of Company without any independent investigation or verification and that Contractor shall be entitled to rely upon the accuracy and completeness of such data, material and other information. Inaccuracy or incompleteness of such data, material and other information furnished to Contractor could have a material effect on CONTRACTOR'S conclusions.

It is understood and agreed that CONTRACTOR'S services may include advice and recommendations; but all decisions in connection with the implementation of such advice and recommendations shall be the responsibility of, and made by, Company. Contractor will not perform management functions or make management decisions for Company. In connection with CONTRACTOR'S provision of Work under a Statement of Work, Company agrees that Company, and not Contractor, shall perform the following functions: (i) make all management decisions and perform all management functions, including without limitation, evaluation and acceptance of the adequacy of the scope of Work in addressing Company's needs and (ii) designate an individual who possesses suitable skill, knowledge and experience, preferably within senior management, to oversee such services, and to evaluate the adequacy and results of such services.

Subsequent to the completion of the Work under a Statement of Work, Contractor will not update its advice, recommendations or work product for changes or modification to the law and regulations, or to the judicial and administrative interpretations thereof, or for subsequent events or transactions, unless Company separately engages Contractor to do so in writing after such changes or modifications, interpretations, events or transactions.

**ARTICLE 3: NON-EXCLUSIVE**

COMPANY reserves the right to obtain the types of services provided by CONTRACTOR from other sources without obligation or liability to CONTRACTOR and, subject to Articles 23 ("Business Ethics") and 25 ("Conflict of Interest"), nothing herein shall be deemed to limit or prohibit CONTRACTOR from performing similar services for other clients.

**ARTICLE 4: TERM OF AGREEMENT**

The term of this Agreement shall commence on the Effective Date and, unless this Agreement is terminated earlier, shall continue for a period of 3 years thereafter (the "Initial Term"). After the end of the Initial Term and each Renewal Term, this Agreement shall terminate unless at least 30 days prior to the end of the Initial Term or such Renewal Term, as the case may be, COMPANY and CONTRACTOR mutually agree in writing to extend the term of this Agreement, in which case this Agreement will continue in effect for successive one year terms (each, a "Renewal Term").

**ARTICLE 5: COMPENSATION**

Subject to the requirements of this Article 5, and as full compensation for the satisfactory performance by CONTRACTOR of the Work, COMPANY will compensate CONTRACTOR in accordance with the rate(s) or price(s) contained in the appropriate Schedule A issued under this Agreement.

(a) **Fees and Staffing**

(i) CONTRACTOR will only bill for hours spent performing Work for COMPANY.

(ii) Unless specifically authorized on Schedule A, COMPANY will not pay CONTRACTOR fees for time incurred in traveling; or continuing professional education activities (including general background research and normal review of periodicals).

(iii) CONTRACTOR will identify to COMPANY, for its prior approval, the CONTRACTOR Group personnel who will be billing time to the Work authorized (pursuant to the applicable Schedule A) and their respective hourly rates, if applicable. COMPANY will not pay fees for

time incurred by any person not previously identified and authorized to perform Work, pursuant to a Schedule A, except to the extent that the Work is reasonably necessary and appropriate and it is impractical under the circumstances to obtain prior authorization. In any event, COMPANY will not pay for time incurred as a result of staffing changes (in other words, for time incurred by replacement personnel in getting "up to speed" on authorized Work).

(b) **Disbursements**

(i) Subject to the following provisions of this Article 5, COMPANY will reimburse reasonable, documented, out-of-pocket expenses at actual cost. Except with respect to permitted subcontractors, there shall be no fees, surcharges or other markup on actual cost. CONTRACTOR shall ensure that all members of CONTRACTOR Group are prudent in incurring reimbursable expenditures, and exercise reasonable diligence in minimizing reimbursable costs. Notwithstanding the foregoing, COMPANY will be invoiced for CONTRACTOR's standard internal per-ticket charge for booking travel.

(ii) Unless otherwise set forth in the Schedule A, COMPANY shall pay only unrestricted coach class fare, for any domestic air travel undertaken by any member of CONTRACTOR Group as part of or in connection with the Work. CONTRACTOR shall take advantage of any reasonably available travel discounts, and shall ensure that members of CONTRACTOR Group incur only reasonable hotel, transportation, and out-of-town meal expenses. The cost of any foreign air travel, undertaken by any member of CONTRACTOR Group as part of or in connection with the Work, shall be reimbursable in the manner agreed to by the Parties, on a case-by-case basis.

(iii) Except as otherwise agreed in a Schedule A, COMPANY will not reimburse costs for overhead expenses, including, without limitation:

A. secretarial, clerical, and word processing services (whether normal, temporary, or overtime);
B. overtime meals, parking, or transportation (except for travel costs described above);
C. local telephone charges;
D. office or conference room rental or support services;
E. building services;
F. computer services;
G. equipment rental;
H. library services;
I. accounting and billing;
J. internal messenger service;
K. subscription or maintenance fees;
L. office supplies; or
M. document or file storage.

(iv) COMPANY will not reimburse photocopying charges in excess of 10 cents per page. Except as otherwise authorized in advance by COMPANY Contract Coordinator, CONTRACTOR shall arrange to have any single copying job or project requirement, the photocopying cost of which is expected to exceed Five Hundred Dollars ($500.00), performed by a third party copying or business service provider, if such copying by that third party will result in a lower copying cost for that project or job.

(v) COMPANY will reimburse costs of outgoing facsimiles and electronic data transmissions at the actual cost of long-distance telephone charges.

(vi) CONTRACTOR shall not engage other consultants and subcontractors to perform Work, or to otherwise undertake services on behalf of COMPANY except as specified and authorized with each Schedule A or approved in writing by the COMPANY. CONTRACTOR shall continue to be primarily responsible for the services provided as if it had provided those services directly to the COMPANY.

(vii) COMPANY will not reimburse any fees or disbursements for which a deduction is disallowed under section 162(e) of the Internal Revenue Code (relating to lobbying expenses), unless COMPANY Contract Coordinator has granted advance written approval of such expenditures.

All fees, charges and other amounts payable to Contractor hereunder do not include any excise, value added or other applicable taxes, tariffs or duties, payment of which shall be the sole responsibility of Company (excluding any applicable taxes based on CONTRACTOR'S net income or taxes arising from the employment or independent contractor relationship between Contractor and its personnel). In the event that such taxes, tariffs or duties are assessed against Contractor, Company shall reimburse Contractor for any such amounts paid by Contractor or provide Contractor with valid tax exemption certificates with respect thereto.

All compensation paid to CONTRACTOR excludes applicable State of Texas Sales and Use Taxes.

**ARTICLE 6: INVOICES AND PAYMENT**

Invoices will be submitted at the end of each calendar month in which Work is performed. Such invoices will include a detailed description of the Work actually performed. Invoices will be accompanied by such documentation as COMPANY may reasonably require for verifying the propriety of any amounts billed. COMPANY may refuse to process any invoice that does not conform to the requirements of this Agreement, including, without limitation, the requirements of Article 5. COMPANY will promptly notify CONTRACTOR of any non-conforming invoice that must be resubmitted before payment.

Each invoice issued in connection with Work will reference this Agreement number. Detailed billing instructions will be set forth in the Schedule A.

CONTRACTOR'S invoices, if in compliance with this Agreement, will be paid within sixty (60) days of COMPANY'S receipt thereof; provided, however, that should COMPANY dispute any portion of an invoice, COMPANY may pay only the undisputed portion of the invoice within the time stated above and, at the same time, advise CONTRACTOR in writing of its reasons for withholding the disputed portion. COMPANY will thereafter pay such amounts to CONTRACTOR upon the resolution of such discrepancy or conflict to the Parties' mutual satisfaction.

**ARTICLE 7: ACCEPTANCE**

Unless otherwise provided for in any applicable Schedule A, COMPANY will have a ten (10) day period to evaluate any Deliverable provided for, and described in any Schedule A, beginning on the date of COMPANY'S receipt of any such Deliverable from CONTRACTOR ("Acceptance Period"). At the conclusion of the Acceptance Period, COMPANY may: (a) accept such Deliverable ("Acceptance"); (b) not accept such Deliverable if Company reasonably believes that such Deliverable fails to comply, in any material respect, with any of the requirements set forth in the applicable Statement of Work; or (c) upon mutual agreement with CONTRACTOR, extend the Acceptance Period. The passage of ten (10) working days from the date when a Deliverable is received by COMPANY, without receipt by CONTRACTOR of notice of non-acceptance by COMPANY, or use by COMPANY of a Deliverable (other than for purposes of evaluating the acceptability of that Deliverable in accordance with this Article 10) will constitute Acceptance of that Deliverable by COMPANY.

In the event that COMPANY notifies CONTRACTOR of COMPANY'S decision not to accept a Deliverable, COMPANY and CONTRACTOR shall promptly undertake cooperative, good faith efforts for the purpose of: (a) allowing CONTRACTOR to correct or modify the Deliverable so as to provide for the Acceptance of that Deliverable (which Acceptance shall be based on COMPANY'S reasonable determination that the Deliverable conforms, in all material respects, to all standards or specifications applicable to the Deliverable, as provided for in this Agreement and the applicable Schedule A); or (b) agreeing to an appropriate adjustment in the compensation payable by COMPANY for that Deliverable, consistent with

the nature and extent of the deficiencies in that Deliverable which resulted in COMPANY'S decision not to accept that Deliverable.

The Acceptance Criteria shall not address the substance of any recommendations or conclusions made by Consultant as a result of the provision of the Work. Company acknowledges and agrees that its review and comments shall not impede Consultant's professional judgment and applicable professional standards and practices when performing the Work and that the substance of the Deliverables, recommendations, advice or information provided by Consultant shall be determined solely by Consultant in the exercise of it professional judgment.

**ARTICLE 8: SALES/USE TAX**

In lieu of CONTRACTOR billing sales tax on taxable services, COMPANY may provide CONTRACTOR with a Direct Payment Exemption Certificate which will negate the necessity of CONTRACTOR'S collection of Texas Sales and Use Tax from COMPANY. A properly authorized Direct Payment Exemption Certificate is attached as Attachment 1 and made a part of this Agreement.

**ARTICLE 9: WORK SITE SAFETY, SECURITY ALCOHOL, DRUGS AND WEAPONS**

COMPANY'S Contract Coordinator may provide to CONTRACTOR prior to entering into a Schedule for Work, the specific Work Site safety, security and other related rules and procedures, if any, applicable to those members of CONTRACTOR Group performing Work on COMPANY'S premises.

In addition to complying with those specific rules and procedures, CONTRACTOR agrees to comply with the rules and procedures contained in Attachment 2 to this Agreement, titled "Work Place Safety, Security, Alcohol, Drugs and Weapons."

**ARTICLE 10: INSURANCE**

CONTRACTOR shall, at its sole cost and expense, carry and maintain during the term of this Agreement the minimum insurance coverages set forth on Attachment 3 hereof with substantial and sound insurers. The coverage limits are minimum limits and do not limit CONTRACTOR'S liability arising from this Agreement or otherwise and are not to be considered indications of the actual coverage limits and types of insurance necessary in connection with performance of the Work and CONTRACTOR'S obligations hereunder.

**ARTICLE 11: INDEPENDENT CONTRACTOR RELATIONSHIP**

CONTRACTOR will act as and be deemed to be an independent contractor. Neither CONTRACTOR nor any of its employees, nor any other members of CONTRACTOR Group, will act as, nor be deemed to be, an agent or employee of COMPANY. CONTRACTOR does not undertake to perform any obligation of COMPANY, whether regulatory or contractual, or to assume any responsibility for COMPANY'S business or operations. CONTRACTOR has the sole right and obligation to contract for, direct, procure, perform or cause to be performed all Work, except as otherwise provided in this Agreement or any Schedule A. CONTRACTOR accepts full and exclusive liability for the payment of all employer contributions and taxes measured by the remuneration paid to CONTRACTOR employees as required by all applicable United States federal, state and local laws, rules and regulations.

**ARTICLE 12: ASSIGNMENT**

Neither party may assign, transfer or otherwise dispose of any of its obligations or duties without the prior written approval of the other party, which approval shall not be unreasonably withheld, conditioned or

delayed. Any assignment or transfer made without the express written approval of the other party will be null and void.

## ARTICLE 13: SUBCONTRACTING

If duly authorized in an executed Schedule A, CONTRACTOR may use independent contractors to perform work under this Agreement; and upon the reasonable request of COMPANY, CONTRACTOR shall promptly remove from the Work any independent contractor not acceptable to COMPANY. CONTRACTOR will not be relieved of any duty or liability relating to any Work by reason of subcontracting. There will be no contractual relationship between COMPANY and any subcontractor by virtue of this Agreement. To the extent any of the Work will be performed in or relate to a jurisdiction outside of the United States, Company acknowledges and agrees that such Work, including any applicable tax advice, may, upon prior written consent of COMPANY, be performed by another member firm of the global network of separate and independent PricewaterhouseCoopers firms (exclusive of CONTRACTOR, the "Other Contractor Firms"). If, and only if, duly authorized in an executed Schedule A, CONTRACTOR may disclose to Other Contractor Firms (and such firms may use) data and information, including tax return information, received from or at the request or direction of Company solely for the purpose of completing the Work under the applicable Statement of Work. Except as otherwise provided in the applicable Schedule A, Contractor will be solely responsible for the provision of the Work by subcontractors or Other Contractor Firms, and such subcontractors and Other Contractor Firms, together with their and Contractor's respective partners, principals or employees (collectively the "Beneficiaries") shall have no liability or obligations arising out of this Agreement. Company agrees to: (a) bring any claim or other legal proceeding of any nature arising from the Work against CONTRACTOR and not against the Beneficiaries; and (b) ensure or procure that the COMPANY Group entities do not assert any such claim or other legal proceeding against CONTRACTOR or the Beneficiaries. If any of member of the COMPANY Group receives Work under this Agreement, Company agrees to provide a copy of this Agreement (and the applicable Schedule A, if any) to such entity, and Company will notify them that although subcontractors and Other Contractor Firms may interact with them, the delivery of the Work is governed by the terms of this Agreement (and the applicable Schedule A, if any), and members of the COMPANY Group should notify Company of any disputes or potential claims arising from the Work. While CONTRACTOR is entering into this Agreement on its own behalf, this section also is intended for the benefit of each subcontractor and Other Contractor Firm.

## ARTICLE 14: BINDING ON SUCCESSORS AND ASSIGNS

This Agreement will inure to the benefit of and be binding upon the Parties and their respective legal representatives, successors and assigns and, except as expressly provided herein, nothing in this Agreement shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

## ARTICLE 15: STANDARDS AND CODES

Whenever reference is made in this Agreement to standards or codes in accordance with which Work is to be performed or tested, the edition or revision of the standards or codes current on the Effective Date will apply, unless otherwise expressly stated. In case of conflict between any referenced standards and codes and any documents attached to and incorporated into this Agreement, this Agreement will govern.

## ARTICLE 16: CHANGES IN WORK AND DELIVERABLES

COMPANY may, by written notice to CONTRACTOR, make changes in, additions to, or deletions from the Work. If any change increases the time required to perform the Work, an equitable adjustment will be made in the Schedule A for the performance and completion of the Work. If the Work is being performed on a fixed price basis, and if any change demonstrably increases or decreases the cost to CONTRACTOR of performing the Work, then an equitable adjustment will be made in the price. If the Work is being

performed on an hourly rate basis, the hourly compensation rates for the Work under an existing Schedule A will not be changed without the prior written consent of COMPANY.

If Company requests such a change and, as a result of such change, Contractor believes that an adjustment in the scope of Work and price is appropriate, then Contractor shall promptly notify (in writing) Company of such belief within five (5) working days after receiving COMPANY'S notice of a change in the Work and the parties shall negotiate in good faith a reasonable and equitable adjustment in the applicable scope, fees or deadlines. Unless Company directs Contractor to stop work pending acceptance of such change, Contractor shall continue work pursuant to the existing Statement of Work, and shall not be bound by any change requested by Company, until Contractor has accepted such change in writing. In no event shall Company be responsible for any incremental fees as a result of such change request unless previously agreed to in writing by the Company.

To the extent necessary to achieve COMPANY'S objectives with respect to a particular Work engagement, or as such objectives are reflected in a particular Schedule A, CONTRACTOR may, to the extent expressly authorized in writing by COMPANY, make changes in, additions to, or deletions from the Work. Such changes, additions, or deletions will be specified in an amended or additional Schedule A to be executed by the Parties. If any change increases the time required to perform the Work, an equitable adjustment will be made in the Schedule A for the performance and completion of the Work. If the Work is being performed on a fixed price basis, and if any change demonstrably increases or decreases the cost to CONTRACTOR of performing the Work, then an equitable adjustment will be made in the price. If the Work is being performed on an hourly rate basis, the hourly compensation rates for the Work under an existing Schedule A will not be changed without the prior written consent of COMPANY.

**ARTICLE 17: EXTRA WORK**

COMPANY may, at any time, request CONTRACTOR to perform Work outside the specific scope authorized by this Agreement ("Extra Work"), however notwithstanding anything to the contrary set forth herein, CONTRACTOR will not undertake any Work outside the scope of Work set forth on the applicable Schedule A unless authorized to do so in an amendment or supplement to this Agreement or to a Schedule A. Any Extra Work not authorized under this Agreement will be performed only through an amendment or supplement to this Agreement or to a Schedule A, and shall be governed by the terms set forth in this Agreement, as amended or supplemented, or in that Schedule A.

Compensation for Extra Work will be in accordance with the Extra Work Rates contained in the applicable amendment or supplement to this Agreement, or in the applicable Schedule A.

**ARTICLE 18: FORCE MAJEURE**

If either Party becomes unable, either wholly or in part, by an event of Force Majeure, to fulfill its obligations under this Agreement (other than the obligation to pay money), the obligations affected by the event of Force Majeure will be suspended only during the continuance of that inability. The Party so affected will exercise commercially reasonable efforts to give written notice of the existence, extent and nature of the event of Force Majeure to the other Party within a reasonable time after the occurrence of that event. The Party so affected will remedy its inability as soon as commercially practicable.

The term "Force Majeure" as used in this Agreement means acts of God (except as excluded herein), acts of public enemies, wars, blockades, insurrections, riots, epidemics, earthquakes, fires, restraints or prohibitions by any court, board, department, commission or agency of the United States or of any States, any arrests and restraints, civil disturbances, or explosions. Rain, snow, ice or other adverse weather conditions will not be considered events of Force Majeure.

**ARTICLE 19: SUSPENSION FOR CAUSE**

In addition to the other remedies provided COMPANY in this Agreement, COMPANY has the right to order the temporary suspension of any Work, immediately upon written notice, when, in its reasonable discretion, performance is not being conducted in a safe manner, and upon 3 days prior written notice, when, in its reasonable discretion, the specified quality of the Work is not being met, or the Work is not otherwise being performed in accordance with the requirements of this Agreement.

If any unsatisfactory condition of a portion of any Work performed hereunder is brought to CONTRACTOR'S attention, and is corrected by CONTRACTOR to COMPANY'S reasonable satisfaction, COMPANY will authorize resumption of the Work.

If any suspension of Work increases the time required for the performance of the Work, an equitable adjustment may, in COMPANY'S reasonable discretion, be made in the performance obligations. In no event, however, will any suspension be the basis for any claim or cause of action by CONTRACTOR or CONTRACTOR'S employees, agents, or subcontractors against COMPANY.

**ARTICLE 20: TERMINATION**

Notwithstanding the provisions of Article 4, Company may terminate this Agreement, in whole or in part, including any one or more Schedule A, at any time, at its sole discretion, by providing 30 days written notice of termination to Contractor. The notice of termination will specify the effective date of any termination, and the Work or any part of the Work to be terminated, or alternatively, that this Agreement is terminated in its entirety. Without limiting the foregoing, either party may terminate this Agreement or any outstanding Statement of Work upon thirty (30) days prior written notice to the other party in the event such other party breaches a material term of this Agreement or any Statement of Work and such breach remains uncured at the end of such thirty (30) day period. Additionally, CONTRACTOR may terminate this Agreement with immediate effect upon written notice if circumstances arise such that the continued performance of Work hereunder would render CONTRACTOR unable to comply with professional independence standards to which CONTRACTOR adheres; provided, however, that if CONTRACTOR is aware of circumstances that would give rise to a termination right under this provision, CONTRACTOR will promptly undertake cooperative, good faith efforts to arrange an orderly termination of the Agreement and transition of the Work back to COMPANY or an alternative service provider chosen by COMPANY.

Contractor shall, as soon as reasonably practicable following receipt of a notice of termination, discontinue Work in accordance with COMPANY'S termination instructions. Upon receiving notice of termination, Contractor will place no further orders, or enter into further subcontracts for services, materials or equipment related to the terminated Work. In addition, Contractor will terminate all existing orders and subcontracts, insofar as those orders and subcontracts relate to the performance of the Work terminated.

In the event this Agreement or the Work is terminated, Company shall pay Contractor the undisputed unpaid balance due Contractor for Work actually performed up through the termination date, including all undisputed fees and expenses that have been incurred or earned in connection with the performance of the Work through the effective date of such termination (and otherwise permitted hereunder). Any Deliverables will be promptly delivered to COMPANY, in whatever form they exist at the time of such termination; provided, however, that if such Deliverables were not delivered to COMPANY prior to termination of the Agreement, such Deliverables, if any, will be delivered AS IS and COMPANY and CONTRACTOR shall promptly undertake cooperative, good faith efforts for the purpose of agreeing to an appropriate adjustment in the compensation payable by COMPANY for that Deliverable.

To the extent this Agreement or the Work is terminated by Company as a result of a material breach by Contractor, provided Company is not itself in material breach of the Agreement, there will be deducted

from any unpaid balance due Contractor the amounts of all claims of Company against Contractor, including, but not limited to, claims because of defect in materials and workmanship.

**ARTICLE 21: WARRANTY**

CONTRACTOR agrees and warrants that its employees, agents and subcontractors will perform the Work in accordance with American Institute of Certified Public Accountants ("AICPA") and other professional standards applicable to CONTRACTOR'S performance of the Work, and in accordance with this Agreement and such other or additional standards as may be expressly set forth in the applicable Schedule A.

CONTRACTOR warrants further that its employees, agents and subcontractors assigned to perform any part of the Work possess the education, experience and skills required for the satisfactory and professional performance of the Work.

Contractor warrants to Company that Contractor and each Other Contractor Firm that performs Work under this Agreement, if applicable, has full authority and sufficient rights, except for rights respecting programs, data and materials provided by Company or furnished to Company by third-party vendors (which term does not include Other Contractor Firms), to grant and convey the rights granted to Company under Paragraph 31 hereof.

CONTRACTOR disclaims all other warranties, either express or implied.

Upon oral or written notice from COMPANY that any of the Work performed by CONTRACTOR fails to conform to any of the above-specified warranties, CONTRACTOR will, at no additional cost to COMPANY, promptly remedy the failure and re-perform any Work necessary so that the Work conforms to those warranties. Nothing herein will limit the rights and remedies that may be available to COMPANY at law or in equity.

**ARTICLE 22: RECORDS AND RIGHT TO AUDIT**

CONTRACTOR will keep accurate and complete records, documents and other evidence related to the charges for of any Work ("Records"), and of any change or modification to the charges. COMPANY or COMPANY'S Contract Coordinator may inspect those records upon prior request at any time during normal business hours.

All Records required for an audit and inspection will be made available at the offices of CONTRACTOR, at all reasonable times, for inspection, audit or reproduction, until two (2) years from date of final payment for any Work to which they pertain. Contractor shall cooperate in any audit of such Records that Company may undertake; provided, however, that no such audit may occur more than once in any six (6) month period (excluding any audits required by law or any regulatory authority or that occurs during a period when CONTRACTOR is in material breach of this Agreement). COMPANY will bear the expenses incurred by it in supporting any such inspection or audit; provided, however, that should any audit or investigation demonstrate that CONTRACTOR has overstated charges or units of measure upon which charges are based by five percent of more of the total of all invoices audited during that particular audit, or provided gifts, gratuities or other benefits to employees of COMPANY in violation of the Business Ethics provisions of this Agreement, CONTRACTOR will refund the overstated charges and be liable to COMPANY for all costs associated with the audit and investigation.

**ARTICLE 23: BUSINESS ETHICS**

CONTRACTOR shall not during the term of this Agreement provide or offer, any compensation or benefit of any type, including any gift or gratuity, other than advertising mementos or other tokens of nominal value or reasonable business meals and business entertainment, to any COMPANY employee.

If, during the term of this Agreement, CONTRACTOR knows or becomes aware of any facts or circumstances contrary to the covenants provided for in the preceding paragraph of this Article 23, CONTRACTOR will immediately notify COMPANY and provide sufficient information for COMPANY to take appropriate protective or corrective actions. CONTRACTOR further agrees to cooperate fully in any investigation undertaken by COMPANY.

**ARTICLE 24: CONTRACTOR'S RESPONSIBILITY FOR WORK**

CONTRACTOR's role with respect to the Work performed under this Agreement is advisory only. Accordingly, CONRACTOR will not provide an audit or attest opinion or other form of assurance, and CONTRACTOR will not perform any of the functions of COMPANY'S independent public accounting firm with respect to any information provided to it pursuant to this Agreement. Nothing in this Article is intended to relieve CONTRACTOR of any obligations that it has undertaken, or will undertake, pursuant to a duly executed Schedule A. Because CONTRACTOR will provide the Work solely for Company's and/or its COMPANY GROUP use and benefit and pursuant to a relationship exclusively with Company, CONTRACTOR disclaims any contractual or other responsibility, liability or duty of care to persons other than the COMPANY or the COMPANY Group, as applicable, based upon the Work or upon any Deliverables or advice CONTRACTOR provides. Any spreadsheets, electronic materials or software tools that CONTRACTOR provides to Company that are not identified as Deliverables in the applicable Schedule A, are for Company's convenience and are provided AS IS. CONTRACTOR will not be responsible for results obtained by anyone other than CONTRACTOR from the use of those items.

**ARTICLE 25: CONFLICT OF INTEREST**

CONTRACTOR will exercise reasonable efforts to ensure that those members of engagement team performing Work for COMPANY pursuant to a Schedule A will not engage in any activity that will prevent them from performing the Work in a professional manner during the term of the applicable Statement of Work.

If CONTRACTOR becomes aware during the course of an engagement under a particular Schedule A that those individuals performing Work under a Schedule A are actively advocating in another matter a position materially adverse to COMPANY'S interests in the engagement CONTRACTOR will promptly notify COMPANY of that matter and the conflict.

**ARTICLE 26: TAXES**

CONTRACTOR will comply with all federal, state, or municipal laws, rules and regulations regarding taxes and the payment of taxes, until the Work has been completed, including, without limitation, social security, state unemployment insurance, gross receipts taxes, withholding taxes, and income tax.

**ARTICLE 27: INDEMNIFICATION**

Each party agrees to and will defend, protect, indemnify and hold harmless the other party from and against all Claims brought or suffered by any member of COMPANY Group or CONTRACTOR Group (as applicable) for death or bodily injury or the damage to or loss or destruction of any real or tangible personal property, arising out of, or incident to or related in any way to, directly or indirectly, performance of this Agreement, but only in proportion to, and to the extent that such Claims are caused by or result from a breach of this Agreement or the negligence or intentional acts or omissions of the other party. To the extent necessary to permit COMPANY to enforce the indemnity provided in the preceding sentence, CONTRACTOR agrees that with respect to any Claims brought against COMPANY Group, CONTRACTOR will and does hereby waive as to COMPANY Group any defense it may have by virtue of the workers' compensation laws of any state.

In accordance with Article 13, CONTRACTOR shall be responsible for all Work under this Agreement, including Work performed by Other Contractor Firms. Any and all Claims of any Other Contractor Firm

relating to the Work, Deliverables or this Agreement shall be brought by CONTRACTOR and not by any Other Contractor Firm. CONTRACTOR shall defend, protect, indemnify and hold harmless the COMPANY Group from and against any damages arising from a Claim asserted (in violation of the preceding sentence) directly by any of CONTRACTOR's direct or indirect subsidiaries or any Other Contractor Firm relating to the Work, Deliverables or this Agreement.

Without limiting CONTRACTOR's indemnity obligations hereunder, including CONTRACTOR's indemnity obligations in the preceding sentence, COMPANY shall defend, protect, indemnify and hold harmless CONTRACTOR and the Beneficiaries (defined in Article 13) from and against all third party claims and damages arising from or relating to the Work or Deliverables relating to engagements for tax; Transaction Services or Accounting Advisory Services, except to the extent finally determined to have resulted from CONTRACTOR's gross negligence or intentional misconduct relating to such Work and/or Deliverables.

The party entitled to indemnification (the "Indemnified Party") shall promptly notify the party obligated to provide such indemnification (the "Indemnifying Party") of any claim for which the Indemnified Party seeks indemnification hereunder and the Indemnifying Party shall have the exclusive right and authority to conduct the defense or settlement of any such claim at the Indemnifying Party's sole expense and the Indemnified Party shall cooperate with the Indemnifying Party in connection therewith. The party not conducting the defense shall nonetheless have the right to participate in such defense at its own expense. The Indemnified Party shall have the right to approve the settlement of any claim that imposes any liability or obligation other than the payment of money damages.

EXCEPT WITH RESPECT TO EACH PARTY'S INDEMNIFICATION OBLIGATIONS UNDER THIS AGREEMENT, AND EXCEPT FOR CLAIMS RELATED TO A BREACH OF ARTICLE 30 OF THIS AGREEMENT AND CLAIMS INVOLVING GROSS NEGLIGENCE, FRAUD, WILFUL MISCONDUCT, EACH PARTY'S MAXIMUM LIABILITY TO THE OTHER ARISING FOR ANY REASON RELATING TO THIS AGREEMENT SHALL BE LIMITED TO THE AMOUNT OF FEES PAID OR OWING TO CONTRACTOR FOR THE PERFORMANCE OF WORK UNDER THE RELEVANT SCHEDULE A UNDER THIS AGREEMENT.

NEITHER PARTY SHALL HAVE ANY LIABILITY TO THE OTHER FOR ANY LOST PROFITS OR SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**ARTICLE 28: INTELLECTUAL PROPERTY**

CONTRACTOR will obtain permission to use any and all third party intellectual property that may be required in order for CONTRACTOR to perform the Work. This permission will include all necessary licenses and governmental approvals.

CONTRACTOR will hold harmless and indemnify COMPANY GROUP from and against, and defend COMPANY Group against, any and all Claims, asserted by any third party against Company Group to the extent such Claims result from infringement, misappropriation or violation by the Deliverables (including any Contractor Property included therein) of any third party's patent, copyright, trademark or trade secret. The foregoing provisions shall not apply to any infringement arising out of: (i) use of the Deliverables other than for the permitted purposes as set forth in the Statement of Work or this Agreement or in accordance with applicable documentation or instructions supplied by Contractor or for other than COMPANY'S internal purposes; (ii) any material alteration, modification or revision of the Deliverables not expressly authorized in writing by Contractor; (iii) the combination of the Deliverables with materials not supplied by Contractor not expressly authorized in writing by Contractor or (iv) Deliverables based solely upon information, specifications or designs provided by or at Company's direction.

In case any of the Deliverables or any portion thereof is held, or in CONTRACTOR'S reasonable opinion is likely to be held, in any such suit to constitute infringement, Contractor may within a reasonable time, at its option, either: (i) secure for Company the right to continue the use of such infringing item; or (ii) replace, at

CONTRACTOR'S sole expense, such item with a substantially equivalent non-infringing item or modify such item so that it becomes non-infringing. In the event Contractor is, in CONTRACTOR'S reasonable discretion, unable to either procure the right to continued use of the allegedly infringing item or replace the allegedly infringing item on commercially reasonable terms as provided in clauses (i) and (ii) of the immediately preceding sentence, the allegedly infringing item shall be returned to Contractor, and CONTRACTOR'S sole liability shall be to refund to Company the amount paid to Contractor for such item; provided that the foregoing shall not be construed to limit CONTRACTOR'S indemnification obligation set forth above.

## ARTICLE 29: COMPLIANCE WITH LAWS

CONTRACTOR represents that it will comply with all federal, state, and local laws, rules, decrees, orders, regulations, by-laws, ordinances and codes that apply to Contractor's business of performing the Work, including all environmental laws and all rules of the Texas Public Utility Commission. In this regard, any conduct on the Work Site that is in violation of any federal, state, or local enactment, as specified above, is also a breach of this Agreement. In particular but without limitation:

(a) CONTRACTOR expressly agrees that it will comply with the Equal Employment Opportunity and Affirmative Action obligations of Executive Order 11246, as amended, the Rehabilitation Act of 1973, as amended, and the Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended, where applicable.

(b) CONTRACTOR, with regard to its employees, assumes and retains sole and complete responsibility and liability for compliance with any federal, state, or local statutes relating to compensation or wage and hour considerations, including, but not limited to, the Federal Fair Labor Standards Act, and the Texas Minimum Wage Act of 1970, and the Texas Pay Act, as well as any and all other federal statutes impacting, directly or indirectly, CONTRACTOR'S employees.

## ARTICLE 30: CONFIDENTIAL AND PROPRIETARY INFORMATION

(a) For purposes of this Article 30 and except as provided below, the term "Confidential Information" means this Agreement and all information concerning the business, operations, financial condition, projections, and/or assets (including historical information), documents, and electronic data that one party (the "Receiving Party") obtains in any manner from or on behalf of the other party (the "Disclosing Party"). The Receiving Party agrees not to disclose any Confidential Information to any person or entity (including, but not limited to, the media, any governmental representative, authority or tribunal, and any corporation, limited liability company, partnership, group, individual or other entity) except as set forth in this Article 30 and to treat any Confidential Information as confidential, whether oral, written, or electronic, and whether prepared by or on behalf of the Disclosing Party, the Receiving Party, its representatives, or otherwise, which has been or in the future is furnished by the Disclosing Party to the Receiving Party or its representatives. The Receiving Party hereby agrees that the Receiving Party and its representatives shall use the Confidential Information solely for the purposes set forth in this Agreement, and that the Confidential Information will be kept confidential, that the Receiving Party and its representatives will not disclose to any person or entity any of the Confidential Information.

(b) Notwithstanding anything to the contrary herein, the Receiving Party and any of its representatives who have acquired Confidential Information may only disclose the Confidential Information to the Receiving Party representatives (including employees) who (1) need to know such information for the purpose contained in this Agreement and (2) are subject to restrictions on disclosure of Confidential Information that are at least as restrictive as the ones contained in this Agreement. The Receiving Party and any of its representatives who have acquired Confidential Information may only disclose Confidential Information to persons or entities other than those to which such disclosure is expressly permitted by this Article 30 or on terms other than those listed in this Article 30 with the written consent of the Disclosing Party. The Receiving Party further agrees to inform its representatives of the confidential nature of the

Confidential Information and to be liable to the Disclosing Party for its or any of its representatives' acts or omissions with respect to the Confidential Information.

(c) In the event that the Receiving Party or any of its representatives is requested or required (by oral questions, interrogatories, requests for information or documents in legal proceedings, or by the Securities and Exchange Commission, subpoena, civil investigative demand or other similar process) to disclose any Confidential Information, the Receiving Party shall provide the Disclosing Party with prompt written notice of any such request or requirement so that the Disclosing Party may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this Article 30. If, in the absence of a protective order or other remedy or the receipt of a waiver by the Disclosing Party, the Receiving Party or any of its representatives are nonetheless legally compelled to make any such disclosure of Confidential Information, Receiving Party and its representatives may without liability hereunder, disclose to such person only that portion of the Confidential Information that is legally required to be disclosed, provided that the Receiving Party will use reasonable efforts to assist the Disclosing Party in obtaining an appropriate protective order or other reliable assurance that confidential treatment will be accorded the Confidential Information.

(d) At the Disclsoing Party's written request, the Receiving Party will promptly deliver to the Disclosing Party all written or electronic Confidential Information that has been provided to or acquired by the Receiving Party or its representatives except for copies retained in work paper files that the Receiving Party may retain for its records or that may be reflected in back up tapes or other electronic data storage systems. Notwithstanding anything to the contrary herein, the Receiving Party may retain an archival copy of any document for its permanent records. Notwithstanding the return, retention or destruction of the Confidential Information, The Receiving Party and its representatives will continue to be bound by the confidentiality obligations under this Agreement.

(e) Notwithstanding the foregoing, Confidential Information does not include information which: (i) is already known to the Receiving Party at the time of disclosure by the Disclosing Party; (ii) is or becomes publicly known through no wrongful act of the Receiving Party; (iii) is independently developed by the Receiving Party without benefit of the Disclosing Party's Confidential Information; (iv) relates to the tax treatment or tax structure of any transaction; (v) the Receiving Party determines is required to be maintained or disclosed by the Receiving Party under sections 6011, 6111 and 6112 of the Internal Revenue Code ("IRC") and the regulations thereunder or similar or analogous provisions of a state or other jurisdiction or (vi) is received by the Receiving Party from a third party without restriction and without a breach of an obligation of confidentiality.

(f) The Receiving Party recognizes and acknowledges the competitive and confidential nature of the Confidential Information and that irreparable damage will result to the Disclosing Party if Confidential Information is disclosed except as herein permitted. It is further understood and agreed that money damages may not be a sufficient remedy for any breach of this Article 30. Accordingly, it is agreed by the Receiving Party that the Disclosing Party shall be entitled to seek an injunction or injunctions (without the posting of any bond) to prevent breaches or threatened breaches of this Article 30 . Furthermore, the Receiving Party agrees to notify the Disclosing Party if the Receiving Party becomes aware of any unauthorized disclosure of any Confidential Information. Each party shall be deemed to have met its nondisclosure obligations under this Paragraph 30 as long as it exercises the same level of care to protect the other's information as it exercises to protect its own confidential information but in no event less than reasonable care, except to the extent that applicable law or professional standards impose a higher requirement.

(g) Notwithstanding anything to the contrary set forth herein, no provision in this Agreement or a Statement of Work is or is intended to be construed as a condition of confidentiality within the meaning of IRC sections 6011, 6111, 6112 or the regulations thereunder, or under any similar or analogous provisions of the laws of a state or other jurisdiction. In particular, Company (and each employee, representative, or other agent of Company) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of any transaction within the scope of the Work

under a Statement of Work and all materials of any kind (including opinions and other tax analyses) that are provided to Company relating to such tax treatment and tax structure. Company also agrees to use commercially reasonable efforts to inform Contractor of any conditions of confidentiality imposed by third party advisors with respect to any transaction on which Contractor advice is requested. Such notification must occur prior to Contractor providing any advice with respect to the transaction.

(h) Notwithstanding any other provision to the contrary in this Article or any other provision of this Agreement, in the event of a dispute concerning a breach of this Article, the prevailing party shall be reimbursed by the non-prevailing party for the prevailing party's reasonable legal fees and expenses incurred in connection with enforcing its rights hereunder, including the costs of any dispute resolution procedure.

**ARTICLE 31: RIGHTS TO DATA**

(a) Ownership. Upon full and final payment to Contractor under the applicable Statement of Work, any Deliverable prepared for COMPANY and delivered to COMPANY, will become the property of COMPANY.

(b) Use of Deliverables. Company acknowledges and agrees that any advice, recommendations, information or work product provided to Company by Contractor in connection with the Work is for the sole use of Company, and, if applicable, Company Group, and may not be relied upon by any third party. Company agrees that if it makes such advice, recommendations, information or work product available to any third party other than as expressly permitted by the applicable Statement of Work, the provisions of Paragraph 31(c) shall apply unless Company provides the written notice to the third party in substantially the form of Attachment 4 hereto (the "Notice"), which Notice shall be agreed to and acknowledged in writing by such third party and returned to Company. Upon request, Company shall provide Contractor with a copy of the foregoing Notice and acknowledgement and any notice and acknowledgement sent to Company by such third party as contemplated by the Notice. Notwithstanding the foregoing, (i) in the event of a disclosure made by Company that is required by law, that is made to a regulatory authority having jurisdiction over Company or that is made pursuant to Paragraph 30(g) above, no acknowledgement of the Notice shall be required and (ii) no Notice or acknowledgement shall be required with respect to disclosures expressly authorized by the terms of the applicable Statement of Work. Notwithstanding anything to the contrary, without the prior written consent of CONTRACTOR, Company shall not make such advice, recommendations, information or work product available to any third party that is providing or may provide insurance, financing, capital in any form, a fairness opinion, or selling or underwriting securities in connection with any transaction that is the subject of the Work or any counterparty to an anticipated transaction or dispute or any parties which have or may obtain a financial interest in Company or an anticipated transaction. The immediately preceding provision shall not limit COMPANY's ability to make any advice, recommendations, information or work product available to employees, officers or representatives of investment funds affiliated with Kohlberg Kravis Roberts & Co. L.P., TPG Capital, L.P. or Goldman Sachs & Co. who need to have access to such advice, recommendations, information or work product acting solely in their capacity as advisers or officers or directors of the COMPANY's parent corporation (the "Parent Representatives"); provided that COMPANY will indemnify, defend and hold harmless CONTRACTOR from and against any and all Claims of any third party which arise as a result of such Parent Representative's access to such advice, recommendations, information or work product.

(c) In accordance with Paragraph 31(b), Company will indemnify, defend and hold harmless Contractor from and against any and all Claims of a third party to the extent resulting from such party's use or possession of or reliance upon CONTRACTOR'S advice, recommendations, information or work product as a result of COMPANY'S disclosure of such advice, recommendations, information or work product without adhering to the notice requirements of Paragraph 31(b) above.

(d) Company acknowledges that Contractor provides professional services to other clients, and agrees that nothing in this Agreement shall be deemed or construed to prevent Contractor from

carrying on such business. In particular, Company agrees that, notwithstanding anything in this Agreement to the contrary: (i) Contractor shall have the right to retain a copy of each of the Deliverables for its records; (ii) CONTRACTOR'S administrative communications, records, files and working papers relating to the Work and the generalized ideas, concepts, know-how, tools, models, methodologies and techniques utilized or developed by Contractor prior to the Effective Date or during the course of this Agreement (collectively, "CONTRACTOR'S Property") are not deemed to be Deliverables and belong to Contractor and (iii) Company hereby grants to Contractor a perpetual, royalty free, irrevocable, worldwide, non-exclusive license to use the Deliverables and to create and use derivative works derived from the Deliverables. To the extent that any of CONTRACTOR'S Property is contained in any of the Deliverables, Contractor hereby grants Company, upon full and final payment of all amounts due Contractor under the applicable Statement of Work, a royalty-free paid-up, non-exclusive license to use CONTRACTOR'S Property in connection with COMPANY'S use of the Deliverables.

## ARTICLE 32: GOVERNING LAW; ARBITRATION

Choice of Law; Disputes. THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW PROVISION OR RULE (WHETHER OF THE STATE OF NEW YORK OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF NEW YORK. Any unresolved dispute relating in any way to the Work or this Agreement shall be resolved by arbitration, except that either Party is free to seek equitable relief in court. The arbitration will be conducted in accordance with the Rules for Non-Administered Arbitration of the International Institute for Conflict Prevention and Resolution then in effect. The arbitration will be conducted before a panel of three arbitrators selected using the screened process provided for in Rules 5, 6, 7 and 8 of the CPR Arbitration Rules. The arbitration shall take place in Houston, Texas. The arbitration panel shall have no power to award damages inconsistent with the Limitation of Liability provision above. Company accepts and acknowledges that any demand for arbitration by Company must be issued within one year from the date the party bringing the action became aware or should reasonably have become aware of the facts that give rise to the other party's alleged liability and in any event no later than two years after the cause of action accrued.

## ARTICLE 33: NON-WAIVER OF RIGHTS

A waiver by either Party of any breach of this Agreement, or the failure of either Party to enforce any of the articles or other provisions of this Agreement, will not in any way affect, limit or waive that Party's right to enforce and compel strict compliance with the same or other articles or provisions.

## ARTICLE 34: SURVIVAL

No termination or cancellation of this Agreement will relieve either Party of any obligations under this Agreement that by their nature survive the termination of this Agreement, including, but not limited to, the obligations provided for in the Confidential and Proprietary Information, Rights to Data, Warranty, Intellectual Property, Indemnification and Compensation provisions of this Agreement.

## ARTICLE 35: SEVERABILITY

In the event any provision of this Agreement is held to be void, unlawful or otherwise unenforceable, that provision will be severed from the remainder of the Agreement and replaced automatically by a provision containing terms as nearly like the void, unlawful, or unenforceable provision as possible; and the Agreement, as so modified, will continue in full force and effect.

**ARTICLE 36: PUBLICITY**

Except for internal presentations and client lists, neither party shall publicize its relationship with the other party, or the terms of this Agreement or any Schedule A, or use the other party's name or other trademarks or service marks in any advertisement or publication, without the other party's prior written approval.

**ARTICLE 37: IMMIGRATION**

a. CONTRACTOR agrees to comply with the Immigration Reform and Control Act of 1986 ("IRCA"), as well as all regulations issued pursuant to IRCA or otherwise enforced by the United States Immigration and Customs Enforcement, The Office of Special Counsel for Immigration-Related Unfair Employment Practices, or any other governmental agency for or with respect to any of CONTRACTOR'S employees, performing any work as part or in furtherance of any CONTRACTOR'S obligations pursuant to this Agreement. CONTRACTOR shall verify the social security numbers provided to CONTRACTOR by those employees.

b. CONTRACTOR, with regard to its employees, assumes and retains sole and complete responsibility and liability for compliance with all laws relating to immigration and work eligibility (including, but not limited to, IRCA) and all laws relating to the negligent hiring and/or supervision of any individual assigned by CONTRACTOR to perform Work under the Agreement.

**ARTICLE 38: NOTICES**

All notices from one Party to the other will be deemed to have been delivered if hand delivered, sent by nationally recognized overnight delivery service, sent by United States certified mail, return receipt requested, postage prepaid, as follows:

If to CONTRACTOR:

Tony Nissley
Principal
PricewaterhouseCoopers LLP
One North Wacker Drive
Chicago, IL 60606

with a copy to:

Office of General Counsel
PricewaterhouseCoopers LLP
300 Madison Avenue
New York, New York 10017

If to COMPANY, to each of the following addresses:

EFH Corporate Services Company
1601 Bryan Street
Dallas, TX 75201
Attention: Contracts Administration
Glenn Jones, Corporate Sourcing Mgr
Facsimile No.: (214) 812-5453

With a copy to: Robert C. Walters
Attention: Executive Vice President and General Counsel
Facsimile No.: (214) 812-6032

### ARTICLE 39: REPRESENTATIVES

COMPANY'S Contract Administrator is Glenn Jones; phone 214.812.4604

CONTRACTOR'S Contract Administrator is Tony Nissley; phone 312-298-3518

### ARTICLE 40: AMENDMENTS

No changes, modifications, amendments or supplements to this Agreement or any other provisions will be valid unless agreed to in writing and signed by the Parties.

### ARTICLE 41: ATTACHMENTS

The following schedules and attachments are incorporated into this Agreement:

Schedule A: Form of Statement of Work

Attachment 1: Direct Payment Exemption Certificate
Attachment 2: Work Place Safety, Security, Alcohol, Drugs and Weapons
Attachment 3: Contractor's Insurance Requirements
Attachment 4: Form of Notice and Acknowledgement

Schedule B: Additional Provisions Applicable to Tax Related Services

Schedule C: Additional Provisions Applicable to Transaction Services and Accounting Advisory Services

### ARTICLE 42: MISCELLANEOUS

(a) Except as otherwise set forth in the applicable Statement of Work, Company acknowledges that completion of the Work under a Statement of Work or acceptance of the Deliverables thereunder will not constitute a basis for COMPANY'S assessment or evaluation of internal control over financial reporting and disclosure controls and procedures, or its compliance with its principal officer certification requirements under Section 302 of the Sarbanes-Oxley Act of 2002 (the "Act"). The Work under a Statement of Work shall not be construed to support COMPANY'S responsibilities under Section 404 of the Act requiring each annual report filed under Section 13(a) or 15(d) of the Securities Exchange Act of 1934 to contain an internal control report from management.

(b) Company acknowledges that certain of CONTRACTOR'S personnel who may be considered "owners" under the California Accountancy Act and implementing regulations (California Business and Professions Code section 5079(a); 16 Cal. Code Regs. sections 51 and 51.1) and who may provide Work under a Statement of Work may not be licensed as certified public accountants under the laws of any of the various states.

(c) Where Contractor is reimbursed for expenses, it is CONTRACTOR'S policy to bill clients the amount incurred at the time the good or service is purchased. If Contractor subsequently receives a volume rebate or other incentive payment from a vendor relating to such expenses, Contractor does not credit such payment to Company. Instead, Contractor applies such payments to reduce its overhead costs, which costs are taken into account in determining CONTRACTOR'S standard billing rates and certain transaction charges that may be charged to clients.

(d) Neither party shall, during the term of this Agreement and for three months after its termination, solicit for hire as an employee, consultant or otherwise any of the other party's personnel who have had direct involvement with the Work, without such other party's express written consent (not to be unreasonably withheld, conditioned or delayed); provided that the foregoing shall not prevent either party from ordinary course public solicitations (and hiring anyone that responds to such public solicitation) that do not directly target employees of the other party.

**ARTICLE 43: COUNTERPARTS**

This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or "PDF" transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

**ARTICLE 44: ENTIRETY OF AGREEMENT**

This Agreement, together with any and all attachments, constitutes the entire agreement between the Parties, and all prior negotiations, undertakings, understandings and agreements between the Parties, including the Master Services Agreement between CONTRACTOR and COMPANY's parent corporation, Energy Future Holdings Corp., dated as of May 1, 2008 and the related Confidentiality Agreement between such parties dated May 7, 2008, relating to the Work are expressly superseded by the terms of this Agreement with respect to Work performed under a Schedule A under this Agreement.

[Signature Page Follows]

Dec 18 09 06:38p p.1

C 0638655 C.

The Parties have signed this Agreement acknowledging their agreement to its provisions as of the Effective Date. The COMPANY accepts and agrees to the provisions of this Agreement on behalf of itself and the entities listed below under the heading "COMPANY Group," but only insofar as a duly executed Schedule A requires that Work be performed for such entity and is signed by an authorized representative of such entity.

| CONTRACTOR | | COMPANY | |
|---|---|---|---|
| By: | [signature] Signature | By: | Ben L. Ezzell II Signature |
| Name: | P. Anthony Nissley | Name: | Ben L. Ezzell II |
| Title: | Partner 12/18/09 | Title: | Director - Supply Chain 12-18-09 |

COMPANY Group:

Energy Future Holdings Corp.Texas Competitive Electric Holdings Company LLC
Energy Future Competitive Holdings Company
Energy Future Intermediate Holding Company LLC
Luminant Mining
Luminant Generation Company LLC
TXU Energy Retail Company LLC

C 0638655 C.

**SCHEDULE A**

**FORM OF STATEMENT OF WORK**

This Statement of Work ("SOW") is governed by the provisions of the Master Services Agreement, dated December 14, 2009, (the "Agreement") between EFH Corporate Services Company ("Client" or "COMPANY") and PricewaterhouseCoopers LLP ("CONTRACTOR"). The term "Client" or "COMPANY" in the Agreement shall include the entity signing this SOW, and the entity signing below agrees to be bound by the terms and conditions of the Agreement. Any terms used in this SOW and not otherwise defined will have the same meaning as in the Agreement. If there is a conflict between the Agreement and the SOW, this SOW shall prevail but with respect to this SOW only. Following the Parties' execution of this Schedule A, CONTRACTOR is authorized to perform the Work as identified below on behalf of COMPANY pursuant to the terms and conditions contained in the Agreement.

The Work will be performed in accordance with the specifications and instructions, if any, attached hereto and identified in the List of Attachments. The Work will be scheduled at the direction of COMPANY'S Contract Coordinator as identified herein.

**SCOPE OF WORK**

Applicable AICPA Standards: The Work performed under this Statement of Work will be performed in accordance with the AICPA's [Indicate which of the following standards applies: Statements on Standards for Tax Services or Standards for Consulting Services or Standards for Valuation Services or Standards for Reports on the Application of Accounting Principles (as amended and interpreted).]

**DOES THE SCOPE OF WORK INCLUDE TAX, TRANSACTION SERVICES OR ACCOUNTING ADVISORY SERVICES**

**PwC and Client to confirm the following for each SOW:** [It is hereby acknowledged and agreed that the services performed pursuant to this SOW are not accounting advisory services, tax services or transaction services as the terms are defined in Schedule C of the Agreement.]

**DELIVERABLES**

**CONTRACT COORDINATOR:** _______________ Phone Number:_________________

**OTHER TERMS AND CONDITIONS**

**WORK SITE**

The Work Site will be the following location(s):______________________________.

**COMPENSATION, INVOICES AND PAYMENT**

As full compensation for the satisfactory performance by CONTRACTOR of the Work authorized pursuant to this Schedule A, COMPANY will compensate CONTRACTOR as follows.

Estimated fees for this study will range between $X and $Y and this project is not authorized to exceed $Y. Any extension or increase in spend will require amendment to this Schedule A. This estimate assumes there will be no travel to the participant's site(s).

**PROFESSIONAL AND SUPPORT STAFF FEES SCHEDULE**

C 0638655 C.

| | | |
|---|---|---|
| | | |
| | | |

The rates specified in the Schedule A will remain in effect, with respect to and until completion of the Work authorized pursuant to this Schedule A.

All invoices shall be sent to:

________________
________________
________________
Attn:

Copy To:

EFH Corporate Services Company
1601 Bryan Street
7th Floor
Dallas, TX 75201
Attention: Glenn Jones

**KEY PERSONNEL**

CONTRACTOR agrees that the individuals listed below will be assigned to perform the Work authorized by this Schedule A. CONTRACTOR will employ all reasonable efforts to ensure that such individuals remain so assigned until such Work is accepted by COMPANY; provided, however, that in the event that any such individuals are reassigned by CONTRACTOR or otherwise become unavailable to perform such Work, CONTRACTOR will provide, by way of replacement, individuals with reasonably equivalent experience and expertise.

Person 1: Title
Person 2: Title
Person 3: Title
Person 4: Title

CONTRACTOR PERSONNEL AUTHORIZED TO ATTEND MEETINGS WITH COMPANY PERSONNEL PERTAINING TO THE WORK

Person 1, Title
Person 2, Title

PRIVILEGES CLAIMED BY COMPANY, WITH RESPECT TO DELIVERABLES OR OTHER DOCUMENTS HEREAFTER DESIGNATED BY COMPANY

_____ ATTORNEY-CLIENT COMMUNICATION

_____ ATTORNEY WORK PRODUCT

_____ TAX ADVISOR

C 0638655 C.

_____ OTHER:_____________________________________________

**LIST OF ATTACHMENTS**

COMPANY and CONTRACTOR agree that the following described attachments, if any, are incorporated herein in their entirety as fully as completely rewritten herein.

***[Company and Contractor to confirm that the entity signing has authority to bind each entity that gains access to, uses or otherwise benefits from the Services and/or Deliverable under this SOW]***

Work not specified above may be authorized only through a separate Schedule A, or through an amendment or supplement to this Schedule A.

| CONTRACTOR | COMPANY |
|---|---|
| By: | By: |
| Signature | Signature |
| Name: | Name: |
| Title: | Title: |
| Date: | Date: |

C 0638655 C.

**ATTACHMENT 1**
**DIRECT PAYMENT EXEMPTION CERTIFICATE**

**State of Texas**
**Direct Payment Exemption Certificate**
**Limited Sales, Excise, and Use Tax**

Direct payment authorization number: **1-75-0835281-6** EFH Corporate Services Company

EFH Corporate Services Company hereby claim exemption from the payment of state, city, county, SPD, MTA and/or CTD sales and/or use taxes upon its purchase of taxable items and/or services from:

**Seller:**
**Address:**
**City, State, Zip Code:**

Description of items and/or services purchased under Contract No. C xxxxxxx C:

Consulting and Advisory Services.

This certificate will remain in effect until the seller is otherwise notified.

This certificate does not cover:

(1) Purchases of taxable items to be resold.
(2) Sales or rentals to any purchaser other than the permit holder.
(3) Sales or rentals of motor vehicles subject to the motor vehicle sales and use tax (Chapter 152) and interstate motor carrier sales and use tax (Chapter 157).
(4) Nontaxable services or materials/supplies used or consumed by a provider of a nontaxable service.
(5) Lump-sum new construction projects to improve real property.

The permit holder agrees not to permit others (including its contractors and repairmen) to use the undersigned's direct payment authorization to purchase material tax free.

The undersigned agrees to accrue and pay the tax to the Comptroller of Public Accounts as required by statute.

Permit holder: EFH Corporate Services Company

Authorized Signature: ______________________________

Contracts Representative Glenn Jones

**ATTACHMENT 2**
**WORK PLACE SAFETY, SECURITY, ALCOHOL, DRUGS AND WEAPONS**

**A. SAFETY**

1. CONTRACTOR will report to COMPANY all accidents involving personal injuries (including death) and damage to property occurring directly or indirectly as a result of the Work performed by CONTRACTOR hereunder immediately, but in no event, no later than twenty-four (24) hours after the occurrence of any such accident.

**B. SECURITY**

1. COMPANY may supply such site security as it deems necessary and may specify to CONTRACTOR such additional security precautions and procedures at the Work Site as, in COMPANY's opinion, are reasonably necessary for the safety and security of COMPANY's personnel and property. Work Site security by COMPANY, if any, will not provide personal policing of the materials, tools and equipment of CONTRACTOR Group. CONTRACTOR will assume sole responsibility for safeguarding such materials, tools and equipment.

2. It will be the affirmative duty of CONTRACTOR to ensure that CONTRACTOR Group assists in carrying out all security measures, to include reporting all information or knowledge of matters adversely affecting security to COMPANY's designated security personnel.

3. COMPANY reserves the right to exclude any of CONTRACTOR's employees from Company's work place or any of its property or facilities by denial of access, suspension or revocation of access authorization, preemptory expulsion, or by any other means, without notice or cause. Former COMPANY employees, and any of CONTRACTOR's employees who previously have been excluded from any Work Site, may be brought onto COMPANY property or facilities only if prior approval from COMPANY's Contract Coordinator is obtained.

4. COMPANY measures may also include investigations, whether by COMPANY or law enforcement officials. CONTRACTOR agrees to cooperate in such investigations and understands that COMPANY reserves the right to require anyone in CONTRACTOR Group to authorize appropriate agencies to release his or her criminal records to CONTRACTOR as a condition of either initial or continued permission for access to COMPANY property or facilities. Investigations may include searches of CONTRACTOR Group; provided that if any person refuses to submit to a search the only result is that COMPANY may demand that such person not be assigned to the Work of the COMPANY and denied access to the Work Site. Such searches may include searches of facilities assigned to CONTRACTOR Group, search of all work place areas and property located in such areas, searches of including, but not limited to, offices, lockers, desks, lunch boxes, packages and motor vehicles (regardless of ownership).

5. CONTRACTOR agrees to instruct its employees in the details of COMPANY's Work Site security policies and measures, both as specified in the Agreement and as hereinafter provided by COMPANY to CONTRACTOR.

**C. ALCOHOLIC BEVERAGES, DRUGS AND WEAPONS**

CONTRACTOR will inform all members of CONTRACTOR Group, who may be involved in the performance of any Work at the Work Site, of the following COMPANY rules, relating to alcoholic beverages, drugs and weapons, with which all employees are expected to comply:

1. Bringing, attempting to bring, possessing, using or being under the influence of intoxicants, drugs, or narcotics while on COMPANY owned or controlled property, including, but not limited to parking areas, is prohibited. Possessing alcoholic beverages in sealed containers is permitted, however, in designated parking areas owned or

controlled by Oncor Electric Delivery Company LLC, Luminant Generation Company LLC, Oak Grove Management Company LLC, Generation Development Company LLC, Sandow Power Company LLC and EFH Corporate Services Company, but not parking areas owned or controlled by Luminant Mining Company LLC, Luminant Big Brown Mining Company LLC and Oak Grove Mining Company LLC.

2. Drugs prescribed by a licensed physician, for an individual working on COMPANY owned or controlled property, which could affect the employee's job performance, or non-prescription drugs which could affect the employee's job performance, are allowed on COMPANY owned or controlled property only if they have been previously cleared by the employee's supervisor. Any employee taking such medication must inform his or her supervisor of the medication and dosage being taken.

3. Bringing, attempting to bring, possessing or using firearms, whether classified as legal or illegal, while on COMPANY-owned or controlled property, including but not limited to buildings, parking areas, recreation facilities, equipment and vehicles, is prohibited. Use or possession of firearms for specific situations is permitted if approved by function or higher level management of COMPANY.

4. Off-the-job involvement with intoxicants, drugs, or narcotics, which adversely affects COMPANY's business, to include impairing the employee's ability to perform his job, or the public trust in the safe operation of COMPANY is prohibited.

5. Any conduct on any Work Site which is in violation of any state or federal law or regulation is considered a violation of these rules and a breach of this Agreement.

6. CONTRACTOR is responsible for the compliance of CONTRACTOR Group with the above specified rules.

7. In order to enforce these rules, all individuals with access to any Work Site as well as the vehicles, offices, lockers and any personal belongings of such individuals on COMPANY property are subject to search by COMPANY and its agents, to include security representatives appointed or employed by COMPANY; provided that if any person refuses to submit to a search the only result is that COMPANY may demand that such person not be assigned to the Work of the COMPANY and denied access to the Work Site. Individuals may be required to take a blood, urinalysis or Breathalyzer test, or submit to other recognized investigatory tests or procedures as are deemed appropriate or necessary by COMPANY in the investigation of a violation of these rules; provided that if any person refuses to submit to a search the only result is that COMPANY may demand that such person not be assigned to the Work of the COMPANY and denied access to the Work Site.

8. The refusal, on the part of any of CONTRACTOR Group, to submit immediately to a search of his or her person and/or property, or to be tested, whether by blood test, urinalysis, Breathalyzer or other recognized investigatory test or procedure, after being requested to do so, will be considered a violation of COMPANY rules and will result in the dismissal of such person from the COMPANY Work Site.

9. Violations of these rules may be cause for denial of access to COMPANY's work place, facilities and/or property.



**ATTACHMENT 3**
**CONTRACTORS INSURANCE REQUIREMENTS**

CONTRACTOR will, at its own expense, maintain in force throughout the period of this document or agreement, or as otherwise specified, the following minimum insurance coverages, with insurers acceptable to COMPANY.

1) Workers' Compensation and Employers' Liability Insurance, providing statutory benefits in accordance with the laws and regulations of the State of Texas or state of jurisdiction as applicable. The minimum limits for the employers' liability insurance will be five hundred thousand dollars ($500,000) bodily injury each accident, five hundred thousand ($500,000) each employee bodily injury by disease, five hundred thousand dollars ($500,000) policy limit bodily injury by disease.

2) Commercial General Liability Insurance, including bodily injury and property damage, personal and advertising injury, contractual liability, and including products and completed operations coverage [continuing for two (2) years after Final Acceptance, or completion of the Work, whichever is later], with minimum limits of one million dollars ($1,000,000) per occurrence for bodily injury, including death and property damage.

3) Automobile Liability Insurance for coverage of non-owned and hired autos with a minimum combined single limit of one million dollars ($1,000,000) per accident for bodily injury, including death, and property damage.

4) Excess Liability Insurance over and above the employers' liability, commercial general liability and automobile liability insurance coverage, with a minimum limit of one million dollars ($1,000,000) per occurrence. Coverage must replace exhausted aggregate limits under the coverages referenced in #1 (employers' liability), and #2 above. Coverage must continue for two (2) years after Final Acceptance, or completion of the Work, whichever is later.

5) Professional Liability Insurance with a minimum limit of one million dollars ($1,000,000) per claim or occurrence.

6) The required limits of insurance can be satisfied by any combination of primary and excess coverage.

7) The commercial general liability insurance, automobile liability insurance and excess liability insurance policies will be primary with respect to CONTRACTOR's actions in the performance of this contract and will apply without consideration for other policies separately carried and will state each insured is provided coverage as though a separate policy had been issued to each, except with respects to limits of insurance, and that only one deductible will apply per occurrence regardless of the number of insureds involved in the occurrence. CONTRACTOR will be responsible for any deductibles or retentions.

8) The commercial general liability insurance, automobile liability insurance, CONTRACTOR liability and excess liability insurance policies, if written on a claims-made basis, will be maintained in full force and effect for two (2) years after Final Acceptance or completion of the Work, whichever is later

9) All policies must be issued by carriers having an *A.M. Best's* rating of "A-" or better, and an *A.M. Best's* financial size category of "VIII", or better and/or *Standard & Poor Insurance Solvency Review* of "A-", or better. .

The requirements contained herein as to the types and limits of all insurance to be maintained by CONTRACTOR are not intended to and will not, in any manner, limit or qualify the liabilities and obligations assumed by CONTRACTOR under this document or agreement.

Prior to commencement of Work, CONTRACTOR will provide to COMPANY certificates of insurance evidencing the coverage required herein. COMPANY's review of certificates will not be construed as accepting any deficiencies in CONTRACTOR's insurance or relieve CONTRACTOR of any obligations set forth herein. In addition, CONTRACTOR will require each of its subcontractors to provide adequate insurance. Any deficiencies in the insurance to be provided by subcontractors will be the responsibility of CONTRACTOR.

**Certificates of insurance must show Energy Future Holdings Corp. and its direct and indirect subsidiaries as the certificate holder, and as an additional insured (including completed operations) as respects all of the required coverages except workers' compensation and CONTRACTOR liability. Workers' compensation shall include Energy Future Holdings Corp. and its direct and indirect subsidiaries as an alternate employer. All of the required coverages must provide a waiver of subrogation in favor of the certificate holder. Certificates of insurance should also state that the certificate holder will receive thirty (30) days advance written notice prior to non-renewal or cancellation.**

CONTRACTOR agrees to report to the manager of the claims department of the COMPANY in writing as soon as practical all instances of damage to the Work and all accidents or occurrences which may result in injuries to any person, including death, and any property damage, arising out of the performance of the Work.

If the insurance obligations required in this document or agreement exceed the maximum limits permitted by law or do not otherwise conform with any applicable law, then this agreement will be deemed amended so as to only require CONTRACTOR to provide insurance to the maximum extent allowed by law.

C 0628338 C

**ATTACHMENT 4**
**FORM OF NOTICE AND ACKNOWLEDGEMENT**

[Name of Third Party]
Address

The advice, recommendations and information in the document that accompanies this letter agreement were prepared for the sole benefit of Energy Future Holdings Corp., based on the specific facts, circumstances and instructions of Energy Future Holdings Corp., and its use is limited to the scope of PwC's engagement for Energy Future Holdings Corp. It has been provided to you for informational purposes only and may not be relied upon by you or any other person or organization. You acknowledge and agree that this report was prepared at the direction of Energy Future Holdings Corp. and may not include all information and/or procedures deemed necessary for the purposes of You and that certain findings and information may have been communicated to Energy Future Holdings Corp. that is not reflected in the report. You acknowledge and agree that PwC accepts no duty, responsibility or liability in respect of the advice, recommendations or other information in such document to any person or organization other than Energy Future Holdings Corp. You shall have no right to disclose the advice, recommendations or other information in such document to anyone else without (1) obtaining the prior written consent of Energy Future Holdings Corp. and PwC and (2) including a copy of this notice and obtaining a signed acknowledgement of this notice from the party to whom disclosure is made and you provide a copy thereof to Energy Future Holdings Corp.

You acknowledge and agree that you will be responsible for any damages suffered by PwC and Energy Future Holdings Corp. as a result of your failure to comply with the terms of this letter agreement. You agree to release PwC, Energy Future Holdings Corp. and their respective personnel from any claim by You that arises as a result of Your access to the report or its contents. Further, You agree to indemnify and hold harmless PwC and Energy Future Holdings Corp. from and against any claim, liability, cost or expense (including but not limited to reasonable attorneys fees) arising from Your breach of the terms of this letter agreement.

*Please acknowledge your acceptance of the foregoing by signing and returning to us a copy of this letter agreement.

Very truly yours,

Energy Future Holdings Corp.

By: ______________
Name:
Title:

***Accepted and Agreed to on this ___ day of ____, 20__ by:**

[Name of Third Party

By: ______________
Name:
Title:

* Remove if a signed acknowledgement is not required by the terms of Paragraph 31(b).

## SCHEDULE B

## ADDITIONAL PROVISIONS APPLICABLE TO TAX RELATED SERVICES

I. **Applicable Performance Standards.** Contractor shall perform any tax Work in a manner consistent with this Agreement and the AICPA Statements on Standards for Tax Services.

II. **No Obligations of Confidentiality**. Notwithstanding Article 30 or Article 31 of the Agreement or any provisions to the contrary in this Agreement or any Statement of Work, Client has no obligation of confidentiality with respect to any portion of any materials or advice or Deliverables to the extent that they concern the tax structure or tax treatment of any transaction.

III. **Circular 230**. Unless agreed in a Statement of Work that Contractor will provide a Covered Opinion, as defined in U.S. Treasury Circular 230 ("Circular 230"), any written tax-related advice in connection with the Work will be Other Written Advice, as defined in Circular 230. Contractor's Other Written Advice is not intended to be used to avoid tax penalties and it must not be used to avoid tax penalties. If a Statement of Work states that Contractor will provide a Covered Opinion then, Company understands that its reliance on the Covered Opinion for the purposes of penalty protection will be limited to the issues expressly set forth in the final, written Covered Opinion delivered to Company.

IV. **Tax Return Disclosure and Tax Advisor Listing Requirements.** Certain federal and state regulations require Contractor to submit information returns and maintain lists of certain client engagements if Contractor is a material advisor to clients that have participated in a reportable transaction. Therefore, if Contractor determines, after consultation with Company, that Company has participated in a transaction causing Contractor to have a registration and/or list maintenance obligation, Contractor will place Company's name and other required information on a list. Contractor will make commercially reasonable efforts to obtain Company's concurrence and consent prior to providing Company's name to the U.S. Internal Revenue Service or any state in connection with any matter under this Agreement.

V. **Internal Revenue Code Section 6694 Preparer Standards**

**(a)** Federal law and certain state laws imposes obligations on tax return preparers with respect to a position reported on a tax return or claim for refund that does not meet certain standards regarding levels of confidence. If during the course of applicable Work Contractor identifies a position that does not meet these standards, Contractor will notify Company and if Company (or a member of Company Group) seeks Contractor's assistance, a Statement of Work will be issued and Contractor will advise Company about Company's penalty exposure and whether Company can avoid penalty through disclosure. If Contractor is preparing the return and it is concluded that disclosure is required, Contractor will prepare the disclosure and provide it to Company.

**(b)** If a Statement of Work has been issued requesting the Contractor to analyze a tax position of Company (or a member of Company Group), Contractor's work may require consultation with a Contractor subject matter specialist to reach and document the level of technical support for the position. Contractor will discuss with Company any additional fees that may be incurred as a result of complying with these requirements and the parties will work to execute a mutually agreeable supplement or amendment to the Statement of Work in accordance with Article 17 of the Agreement.

VI. **Additional Consents.** Company has the ability to request a more limited disclosure than that authorized by the consent below, as Company may direct. Company and Contractor agree that the consent provided below is valid for the term of this Agreement as stipulated in Article 4.

**(a)** As stated in Article 13 of the Agreement, Contractor may subcontract portions of the Work to Other Contractor Firms and/or other subcontractors. In order to disclose Company information, including Company's entire tax return information, to such Other Contractor Firms and/or other subcontractor involved in the provision of the Work, including any Other Contractor Firm and/or other subcontractor located outside of the United States Contractor must first obtain Company's written consent.

**(b)** Notwithstanding Article 30 of the Agreement, Company authorizes Contractor to participate in discussions with and to disclose Company information, including Company's tax return information, to Company's agents, representatives, administrators or professional advisors (including accountants, attorneys, financial and other professional advisors), their respective officers, directors or employees, and other parties as directed by the Company.

**VII. PCAOB Rule 3522.** Company has represented to Contractor, and by signing this Agreement, confirms that no other advisor providing advice or assistance with respect to the subject matter of this Agreement or any SOW hereunder has imposed any conditions of confidentiality, as defined by Public Company Accounting Oversight Board ("PCAOB") Rule 3522. In addition, Company agrees that if, after Contractor begins providing services covered by this Agreement any other advisor imposes conditions of confidentiality with respect to the matter that is subject to this Agreement, Company will notify Contractor immediately so that Contractor can cease work in order to avoid any impairment to independence under PCAOB Rule 3522.

C 0628338 C

**SCHEDULE C**

**ADDITIONAL PROVISIONS APPLICABLE TO TRANSACTION SERVICES AND ACCOUNTING ADVISORY SERVICES**

**Services.** The provisions in this Schedule C apply to Transaction Services and Accounting Advisory Services. "Transaction Services" means Contractor's financial, commercial, operational, and/or strategic due diligence, strategy consulting services, divestiture advisory Work and valuation Work. "Accounting Advisory Services" means advice and assistance Contractor may provide in connection with Company's evaluation of accounting, reporting and regulatory issues and assistance with the preparation of schedules, account analyses, reconciliations and data accumulation for accounting and financial reporting purposes, including tax related accounting and financial reporting Work.

**Applicable Performance Standards.** Contractor performs advisory services in accordance with the AICPA's Standards for Consulting Services. Contractor performs tax services in accordance with the AICPA Statements on Standards for Tax Services. Contractor performs accounting advisory services in accordance with the AICPA's Standards for Reports on the Application of Accounting Principles (as amended and interpreted). Contractor performs valuation services in accordance with the AICPA's Statement on Standards for Valuation Services ("Valuation Standards").

**Engagement Limitations.** Contractor performs Work on the basis that information provided is accurate and complete. The Work and Deliverables do not include the provision of legal or investment advice, a fairness or solvency opinion or a recommendation to buy or sell assets, securities or entities. Contractor is not a registered broker/dealer as defined by Federal securities laws. Contractor's fees are not contingent upon the consummation of a transaction, or any aspects of the Work and/or Deliverables. Contractor is an independent contractor, not a fiduciary or agent of Company, and shall not perform any obligation of Company, whether regulatory or contractual, nor shall Contractor negotiate on Company's behalf. The Work cannot provide assurance that matters of significance to Company will be disclosed and the Work are not intended or likely to reveal fraud or misrepresentation.

**Client Responsibilities.** In addition to Company's responsibilities in the Agreement, Company is responsible for the preparation of its financial statements and any offering memorandum, prospectus, registration statement, public filing, loan, other agreement or document and the Work and Deliverables, including any oral advice or comments, should not be associated with, referred to or quoted in any manner therein. Compay is responsible for any proposed acquisition, investment, transfer, disposal or divestment including the process of conducting and structuring any transaction and the information provided to third parties in connection therewith.

**Relationships with Other Parties.** If Contractor or Other Contractor Firm (the "Contractor Firms") is the auditor of the entity which is or may be the subject of the proposed transaction ("Target") or if the Contractor Firms provide services to Target related to Company's proposed transaction, Company agrees not to assert that such relationships cause any conflicts which preclude the Contractor Firms from performing services. Contractor will not disclose either Company's or Target's confidential information obtained from the Contractor Firms' relationships to either entity without prior consent, except that Contractor may disclose any such information obtained while performing Work for Company that may affect a Target audit opinion issued by the Contractor Firms to the Contractor Target audit engagement team as may be required by professional responsibilities. Other clients engage the Contractor Firms every day and the Contractor Firms may perform services for Company's competitors or other entities whose interests may conflict with Company's, including potential purchasers of an interest in Company. Subject to Contractor's confidentiality obligations, Company consents to the Contractor Firms providing services to such entities. The personnel performing the Work will not be the same personnel providing services to such other clients in connection with the specific transaction and there will be no sharing of information regarding the specific transaction between the respective teams, unless otherwise authorized by Company and the other client(s).

**Prospective Financial Information.** Contractor shall not develop or restate any prospective financial information ("PFI") or make any assumptions or projections relating to PFI, although Contractor may perform a sensitivity analysis on the PFI and any underlying assumptions. If PFI presented is of such poor quality that any suggested adjustments could be deemed to be re-preparation of PFI, Contractor will not propose adjustments. Events and circumstances frequently do not occur as expected, and therefore, there may be material differences between any PFI and actual results, Contractor disclaims liability for such results. Tables aggregating Contractor's comments and observations of quantified vulnerabilities and sensitivities of PFI do not represent restatements of or revisions to PFI; they are provided as a means of summarizing Contractor's comments and to assist Company with its evaluation of PFI.

**Market Surveys and Analyses.** Contractor may conduct market surveys and/or analyses of potential future trends in a particular product, market or geography. These deliverables are not a substitute for Company's assumptions or conclusions regarding any PFI or potential transaction and they may not address all matters of significance to Company in consideration thereof.

**Divestiture Services.** Branded deliverables will not be prepared or written from a buyer's perspective and are not intended to be shared with potential buyers. If Contractor consents to the disclosure of such deliverables to potential buyers, Company shall first assure Contractor that any potential buyer receiving Contractor's branded Deliverables will have an opportunity to perform its own due diligence and that Company will not assert to the potential buyer that the scope of their due diligence should be reduced because of Contractor's involvement.

**Valuation Services Performed under AICPA Valuation Standards.** Unless otherwise expressly set forth in the Statement of Work, the valuation Work are not intended to comply with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation. Contractor's Calculation or Estimate of Value (as defined in the Valuation Standards) will be subject to a Statement of Assumptions and Limiting Conditions and the Valuation Practitioner's Representation. Prior to issuing final Valuation Deliverables, Company shall provide Contractor with a representation letter confirming it has provided Contractor with all relevant information. Upon prior notice to Contractor, Company may disclose Valuation Deliverables to regulatory authorities with jurisdiction over Company to support Company's valuation conclusions in its regulatory filings. Contractor's Calculation or Estimate of Value may not be separated into parts. Valuation Deliverables may not be used for any purpose other than as forth in the applicable Statement of Work nor may they be used to set a price in a transaction or make decisions to purchase, sell or transfer an interest in an entity or any asset, as these are affected by facts and circumstances outside the scope of Work and each buyer's and seller's knowledge and motivations. Except for Work performed under the Valuation Standards, advice or deliverables relating to Company's consideration of the value of, or allocation of value to assets and/or liabilities, of an entity, do not represent Contractor's Calculation or Estimate of Value or any form of concurrence, conclusion or opinion and Company shall not use such advice or deliverables for accounting or regulatory purposes.

**Access Letters.** If Deliverables are to be distributed to or the Work discussed with any Company affiliate or subsidiary which is not bound to the Agreement or to third parties, Company shall first obtain Contractor's written consent, and an executed third party access letter in Contractor's standard form.

C 0638655 C.

# SCHEDULE A

## SCOPE OF WORK (SOW) AND DELIVERABLES

This Statement of Work ("SOW") is subject to all provisions of the Master Services Agreement, dated December 14, 2009, (the "Agreement") between Energy Future Holdings ("Client" or "COMPANY") and PricewaterhouseCoopers LLP ("CONTRACTOR"). The term "Client" or "COMPANY" in the Agreement shall include the entity signing this SOW. Any terms used in this SOW and not otherwise defined will have the same meaning as in the Agreement.

### ARTICLE 1. PURPOSE AND SCOPE

This SOW covers the internal audit services to be provided by the CONTRACTOR. The CONTRACTOR will provide COMPANY with a mix of resources and specialized subject matter experts who will provide internal audit services (the "Services") to COMPANY to assist in delivery of its annual internal audit plan (the "Plan"). The three areas where Services will be provided are Internal Audit Services, Internal Audit Advisory Services, and Sarbanes-Oxley Services.

It is hereby acknowledged and agreed that the services performed pursuant to this SOW are not accounting advisory services, tax services or transaction services as the terms are defined in Schedule C of the Agreement.

### ARTICLE 2. OVERVIEW

- Continued oversight and responsibility for all work will remain under the leadership of the VP of Internal Audit.
- CONTRACTOR will support the Internal Audit team providing IT leadership expertise and leading practices.
- The COMPANY Internal Audit Directors of the restructured team will be responsible for all internal audit work (including IT audits) performed in their assigned business units, irrespective of whether it is performed by Internal Audit staff or by the CONTRACTOR, and will issue all audit reports for their assigned business units and will continue to be the key interface with management in their assigned business units.
- The CONTRACTOR will document its work in the current Internal Audit work paper system, TeamMate and the COMPANY will own the audit work papers.

### ARTICLE 3. OBJECTIVES FOR THE CONTRACTOR CO-SOURCE TEAM

A. General

- Design and implement, in conjunction with COMPANY's Internal Audit group, a flexible co-sourcing program resulting in a highly collaborative working relationship.

CONFIDENTIAL

- Provide a Core Team of experienced utilities industry professionals to ensure effective coordination, consistency and quality control. The quality of leadership on this core team is important to COMPANY and substitutions to this core team must be approved by VP of Internal Audit.
- Compliment the Company's business by providing deep utility industry, audit and controls knowledge. Provide a broad resource base of functional and specialty skills.
- Work with the COMPANY sharing knowledge, training resources and gaining access to leading technology tools and methodologies.
- Provide a broad compliment of technical skills using the Hub and Spokes model to provide specialists when needed in the below areas as well as other areas so designated:

  - Energy trading and risk management
  - IT
  - Construction / Capital Projects
  - Customer care and billing
  - Tax
  - Financial Reporting and Compliance
  - Procurement & Sourcing; and
  - Utility regulation and Compliance

**ARTICLE 4. CONTRACTOR'S RESPONSIBILITIES**

A. Summary

- Provide resources to execute COMPANY's Internal Audit SOW that the COMPANY would have otherwise expended 11,620 hours annually.
- A schedule of indicative Internal Audit projects for 2010 is defined in Attachment 1. The COMPANY may change the indicative Internal Audit projects at its discretion with agreement of both parties. Indicative Internal Audit projects for 2011 and 2012 will be determined at a later date.
- Provide 1,000 hours of Senior Resource time over three (3) years at no cost to COMPANY.

B. Applicable AICPA Standards: The CONTRACTOR will perform the Services in accordance with the Standards for Consulting Services, established by the American Institute of Certified Public Accountants.

C. Additional provisions applicable to the Services:

The CONTRACTOR will conduct internal audit projects under the direction of the VP of Internal Audit in accordance with the COMPANY's internal audit charter and internal audit plan. In connection with these projects, the CONTRACTOR will assist COMPANY in the preparation of the annual internal audit risk assessment and the annual internal audit plan, and will recommend audit priorities for presentation, discussion and approval by management and the audit committee. Once the audit plan is approved, the CONTRACTOR will begin to perform auditing procedures on mutually agreed-upon projects and will report all associated findings to the COMPANY throughout the year in accordance with Internal Audit procedures. The CONTRACTOR understands that the CONTRACTOR'S team will work directly with the COMPANY'S internal audit directors and that they will remain as the key interface with management.

CONTRACTOR is responsible for performing internal audit procedures and reporting thereon in accordance with the terms of this SOW. The day-to-day performance of the internal audit procedures will be directed, reviewed, and supervised by the CONTRACTOR's personnel. It is important to recognize there are inherent limitations in the auditing process. For example, internal audits are generally based on the concept of selective testing of the data being examined and are, therefore, subject to the limitation that material errors or fraud or other illegal acts having a direct and material financial impact, if they exist, may not be detected. Also, because of the characteristics of fraud, particularly those involving concealment through collusion and falsified documentation, an internal audit may not detect a material fraud. The CONTRACTOR will, however, communicate to the COMPANY, as appropriate, any illegal act, material errors or evidence that fraud may be identified during the course of the CONTRACTOR's internal audit projects.

The CONTRACTOR recognizes that the COMPANY may request the CONTRACTOR to render additional services while CONTRACTOR is working with the COMPANY under this SOW. If the COMPANY requests services that are unrelated to the scope of the work of this engagement or significantly depart from the existing engagement, the CONTRACTOR will provide COMPANY with a scope of services description and fee estimate which will incorporate the terms of this Agreement for the COMPANY's approval and signature and will be included as part of the CONTRACTOR's Services.

**ARTICLE 5. DELIVERABLES**

A. Summary of Deliverables:

- Overall project plan to guide the CONTRACTOR's activities
- Status Meeting agendas that document progress of activities
- Support for key management and audit committee meetings as requested
- For internal audits, agreed upon scope and planning documents, work papers, issue tracking and draft internal audit reports. All work papers should be prepared in compliance with COMPANY'S Internal Audit work paper preparation procedures as they may be amended from time to time.
- Recommended Internal Audit Risk Assessment, IT Risk Assessment and 2011 Internal Audit Plan approaches based upon leading practices and input from COMPANY
- Documented SOX testing results templates

B. Use of Deliverables

- The CONTRACTOR is providing the Services and deliverables solely for the COMPANY's internal use and benefit. The Services and deliverables are not for a third party's use, benefit or reliance, and the CONTRACTOR disclaims any contractual or other responsibility or duty of care to others based upon these Services or deliverables.

**ARTICLE 6. COMPANY'S RESPONSIBILITIES**

A. Management of CONTRACTOR

- The CONTRACTOR's role is advisory only. The COMPANY is responsible for all management functions and decisions relating to the Services, including evaluating and accepting the adequacy of the scope of the Services in addressing the COMPANY's needs.
- The COMPANY is also responsible for the results achieved from using the Services or deliverables.
- Effective internal control reduces the likelihood that errors, fraud or other illegal acts will occur and remain undetected; however, it does not eliminate that possibility.
- The COMPANY will designate a member of the COMPANY's management to oversee the Services.
- It is the COMPANY's responsibility to establish and maintain its internal controls.
- The COMPANY will provide accurate and complete information and reasonable assistance, and the CONTRACTOR will perform the engagement on that basis.
- Final determination and assessment of audit risk and scope of internal audit activity will remain the responsibility of management and the audit committee.

B. Inquiries

- CONTRACTOR will make specific inquiries of management when performing the internal audit services. The CONTRACTOR will rely upon the results of the COMPANY's internal audit procedures, the responses to the CONTRACTOR's inquiries and the written representations, if any, in forming the CONTRACTOR's findings.

C. Sarbanes-Oxley

- The CONTRACTOR will not provide an opinion or other form of assurance with respect to the COMPANY's compliance with the Act, related SEC rules, or the COMPANY's procedures. The CONTRACTOR will not make any representation as to the sufficiency of the COMPANY's procedures for its own purposes. The Services should not be taken to supplant inquiries and procedures that COMPANY should undertake for purposes of obtaining and using the information necessary in connection with the COMPANY's compliance with the provisions of the Act and related SEC rules.

**ARTICLE 7. TIMING**

This engagement will commence in January 2010 and will carry a three year term. Scope and internal audit projects for subsequent years will be agreed upon and added as attachments to this statement of work.

**ARTICLE 8. CONTRACTOR RESOURCES ASSIGNED**

The CONTRACTOR's personnel assigned to the Core team in the Hub and Spokes model to provide Services and Deliverables under this Statement of Work are as follows:

A. Jim Hanlon will serve as Engagement Partner who will be responsible for the quality of the Services rendered and the COMPANY's overall satisfaction.

B. Lucie Hoch will serve as Engagement Director and will be responsible for the oversight of Services to COMPANY.

C. Amanda Herron will serve as Engagement Director and will be responsible for the day-to-day delivery of Services to COMPANY.

D. Chris Williams will serve as IT Audit Engagement partner who will be responsible for providing oversight and guidance to the IT Audit group

E. Holly Meyer will serve as IT Audit Engagement Director leadership who will be responsible for the day-to-day delivery of IT Audit Services to COMPANY.

F. Staff and specialists as specific projects require.

Contractor will employ all reasonable efforts to ensure that such individuals remain so assigned until this assignment is completed. In the event that such individuals become unavailable any substitutions or changes to this team must be reasonably equivalent and must have prior approval by the COMPANY VP of Internal Audit.

**ARTICLE 9. COMPENSATION**

A. Fees

Independently and not as an agent of the COMPANY the CONTRACTOR shall provide services described herein and shall do all that is necessary or incident to the satisfactory and timely performance of this SOW at the below firm fixed price:

- $1,093,647 in 2010 (including all fees and expenses). Any subsequent changes will be mutually agreed upon by both parties.

- Fee and expense reimbursement as it relates to this SOW only shall override the policy addressed in Article (5) of the Master Services Agreement.

CONTRACTOR will also provide Senior Resource Time over three years, 2010 - 2012 at no cost to COMPANY in the amount of 1,000 hours.

B. Terms

- In the performance of this SOW CONTRACTOR shall provide all the necessary resources to execute this SOW which is equivalent to 11,620 annual hours of Internal Audit work that the COMPANY would have otherwise expended.
- Entitlement to full payment is based on the determination by the COMPANY that the required level of effort and reports have been provided and are acceptable.

C. Billing

- The CONTRACTOR's invoices will be rendered on a monthly basis, and will include a pro-rated portion of the fixed fee arrangement (i.e., 1/12 of $1,093,647 each month).
- CONTRACTOR will provide on a monthly basis an analysis of allocation of dollars by business unit as identified by COMPANY Internal Audit.
- On a quarterly basis, CONTRACTOR will provide an updated Attachment 1 with hours incurred and projects completed to date.

D. Payment Terms
- Payment of the CONTRACTOR's invoices is expected to be received within 60 days of the invoice date.

**LIST OF ATTACHMENTS**

COMPANY and CONTRACTOR agree that the following described attachments, if any, are incorporated herein in their entirety as fully as completely rewritten herein.

1. 2010 Indicative Internal Audit Projects

Work not specified above may be authorized only through a separate Schedule A, or through an amendment or supplement to this Schedule A.

| Party | PricewaterhouseCoopers LLP | | Energy Future Holdings |
|---|---|---|---|
| By: | [signature] | By: | [signature] Drew Cameron |
| Name/Title: | James A. Hanlon, Partner | Name/Title: | DREW CAMERON, VP INTERNAL AUDIT |
| Date: | 12/24/09 | Date: | 12/28/09 |

(SEE APPROVAL BY PAUL KEGLEVIC, CFO, ON ATTACHED FORM)

**ATTACHMENT 1**
**2010 INDICATIVE AUDIT PROJECTS**
**(Representing 11,620 hours annually, revised regularly)**

**Energy Future Holdings**
**2010 Indicative Audit Projects**
**C 0638655 C.**

| Project title | Planned PwC Hours | Planned Execution |
|---|---|---|
| | | |
| **Luminant Power - Ricky** | | |
| Holt Caterpillar Contract Compliance Review - Mining | 0 | A |
| Shaw Contract Compliance | 0 | A |
| Broussard Freight Contract Compliance Review | 0 | A |
| ePeople Payroll Process Review | 0 | A |
| NRC Fit for Duty Rules Compliance Review | 0 | A |
| Carbon/Emissions Reporting Review | 0 | A |
| Rail Transportation Review | 0 | A |
| Siemens Contract Compliance | 0 | A |
| Sandow Separation Review (SA4/SA5) | 0 | A |
| Bucyrus Contract Compliance Review - Mining | 0 | A |
| Lignite / Coal Inventory Review | 0 | A |
| SAFETEAM Full Review - 2010 | 0 | A |
| M&S Inventory Review | 0 | A |
| Fuel Oil Inventory Review | 0 | A |
| Emerging Issues | 0 | A |
| Miscellaneous Time | 0 | A |
| Audit Committee Reporting | 0 | A |
| Budget Preparation | 0 | A |
| Diversity Committee | 0 | A |
| Outage Audit - SA4 (Feb 1 - Mar 28) | 120 | C |
| Coal Vendor Contract Review - Development | 40 | B |
| Outage Audit - MO1 (Apr 10 - May 20) | 140 | C |
| Environmental Compliance Review | 40 | C |
| Per Diem Expense Review | 20 | C |
| Follow Ups | 20 | C |
| Unidentified Projects | 120 | N/A |
| Sarbanes Oxley Process Audit - Quality Assurance | 80 | E |
| Audit Planning | 40 | E |
| **SUBTOTAL** | **620** | |
| **Luminant Construction - Ricky** | | |
| Reference Plant Material Inventory Audit | 0 | A |
| Oak Grove Project Review - Phase 3 (Q1) | 30 | C |
| Nuclear Joint Venture Controls Review | 240 | E |
| Sandow 5 Project Review - Closeout (Q2) | 40 | B |
| Retrofit Project Review - SA4 SCR - Closeout (Q3) | 40 | B |
| Turlington Mine Construction | 20 | B |
| Oak Grove Project Review - Closeout (Q4) | 40 | B |
| Minerals/Gas Royalties Review | 280 | E |
| Sarbanes Oxley Process Audit - Quality Assurance | 80 | E |
| **SUBTOTAL** | **770** | |
| **Luminant Energy - Nancy** | | |
| **Nodal Implementation Processes / Systems** | | |
| ERCOT Settlements | 0 | A |
| Day Ahead Market & Real Time / Nodal Market System Implementation (IT) | 340 | E |
| Pricing, Price Curves & Price Curve Validation | 392 | E |
| Risk Reporting | 155 | E |
| **Liquidity Management and Settlements** | | |
| Accounts Receivable | 0 | A |
| Financial Settlements | 0 | A |
| Tolling Agreement Settlements | 0 | A |
| **Trading Controls** | | |
| Deal Changes | 0 | A |
| **Data Management** | | |
| Off-system Data Repository | 185 | E |
| Contract Data Management | 180 | E |
| Cash Month P&L | 155 | E |
| **Legal & Regulatory Compliance** | | |
| Regulatory Controls Monitoring | 0 | A |
| Business Continuity Compliance | 0 | A |
| Green-e Compliance | 55 | E |
| **D&T Reliance** | | |
| SOX Process -- Quality Assurance / SOX Technical Application Testing Support (IT) | 160 | E |
| **Non-project billable time** | | |
| Audit Planning | 15 | B |
| Unidentified | 93 | C |
| Followup | 120 | C |
| **SUBTOTAL** | **1850** | |
| **TXU Energy - Lynn** | | |

| Project title | Planned PwC Hours | Planned Execution |
|---|---|---|
| | | |
| **EFH Business Services - Nancy** | | |
| **Liquidity Management** | | |
| Debt Covenant Compliance Oversight | 210 | D |
| Accounts Payable | 270 | E |
| Treasury Wire Payments | 0 | A |
| **New Processes/Systems** | | |
| Delegations of Authority (ePeople) | 160 | E |
| Annual Incentive Payments / Incentive Compensation System (IT) | 0 | A |
| Payroll Administration & Processing / Payroll System Application, .Interfaces, Security and General Controls (IT) | 0 | A |
| Planning Process : Hyperion Replacement | 15 | B |
| **Contracts** | | |
| Telecommunications Fees | 0 | A |
| Physical Security Contract Compliance | 0 | A |
| Property Management Contract Compliance | 0 | A |
| IT Leases/Licenses | 100 | E |
| **Outsourced Service Oversight** | | |
| F&A Services Oversight | 0 | A |
| Payroll & Benefits Administration Oversight | 0 | A |
| **Accounting / SOX** | | |
| Close Oversight | 255 | E |
| Account Reconciliations | 160 | E |
| SOX Support | 150 | E |
| **Governance** | | |
| Board Governance Review | 40 | B |
| Procurement Oversight | 15 | B |
| Enterprise Risk Management Program Design | 40 | B |
| Transaction Decision Program Assessment | 160 | E |
| **Other** | | |
| Lobbyist Expense & Reporting | 0 | A |
| Executive Compensation Disclosures | 210 | E |
| Employee Expenses (Tcard and Pcard) | 230 | E |
| Executive Expenses | 130 | E |
| Helpline | 45 | E |
| **Non-project billable time** | | |
| Audit Planning | 10 | B |
| Unidentified | 70 | C |
| Investigations - Corporate | 0 | A |
| Follow-up | 40 | C |
| **SUBTOTAL** | **2,310** | |
| **EFH - IT** | | |
| ePeople Payroll Process / Application Review (Integrated audit) | 120 | C |
| ePeople ITGC (SAS70 / Security) | 120 | C |
| ePeople interfaces | 160 | C |
| Incentive Compensation System Application or Implementation Review (Integrated audit) | 20 | A |
| EPM Implementation Assessment (Integrated Audit) | 240 | E |
| IT Strategy / Organization Development Support | 100 | E |
| Infrastructure Risk Assessment | 220 | E |
| IT Leases / Licenses (Integrated Audit) | 140 | D |
| XBRL Assessment (Integrated Audit) | 140 | E |
| Data Privacy Risk Assessment | 120 | D |
| **Luminent Energy - IT** | | |
| GCS Network Separation / Architecture Refresh | 60 | B |
| GasMaster Replacement (Integrated Audit) | 20 | A |
| Nodal Market Implementation Review (Integrated Audit) | 20 | A |
| ERCOT Digital Certificates | 0 | A |
| **Luminent Power - IT** | | |
| NERC - CIP | 30 | B |
| **TXUE - IT** | | |
| CARE - ITGC Follow-Up | 120 | C |
| CARE - User Access Roles / SOD (Integrated Audit with Post-Impl Reviews) | 180 | C |
| CARE - Interfaces | 120 | C |
| IT Strategy / Organization Development Support | 40 | E |
| CARE System Hardware Upgrade and Migration | 120 | C |
| PCI Program Assessment (Integrated Audit) | 140 | D |
| PCI Pre-Assessment | 30 | A |
| ERCOT Digital Certificates | 0 | A |
| Data Privacy Risk Assessment | 80 | D |
| **X-Business Unit** | | |
| IT Vendor Management Governance | 140 | D |

| Project title | Planned PwC Hours | Planned Execution | Project title | Planned PwC Hours | Planned Execution |
|---|---|---|---|---|---|
| | | | | | |
| **Managing Customer Relations** | | | HCL Transition Support | 80 | A |
| Unpostable Customer Payments | | A | Active Directory Security and Administration | 120 | C |
| Customer Enrollments – Residential | 60 | C | Audit Planning / Admin / Internal | 0 | A |
| Sales Taxes | 60 | C | Follow-up Tracking/Testing | 60 | A |
| **Managing Cash Inflows/Outflows** | | | Technical Support for Internal Audit | 0 | A |
| Vendor Payments | | A | Unidentified | 600 | D |
| Remittance Processing - Mail Payments (Regulus) | 60 | C | User Access Provisioning | 140 | C |
| Billing Adjustments, Customer Credits & Refunds | 60 | C | BCP / DRP Assessment (Integrated Audit) | 160 | D |
| **CARE** | | | SOX IT Controls Testing | 300 | D |
| CARE Post Implementation Review #1 - Metering, Billing & Validations | 223 | D | Network Attack & Penetration | 80 | C |
| CARE Post Implementation Review #2 - Cash Receipts & Customer Collections | 223 | D | IT Risk Assessment | 200 | D |
| CARE Post Implementation Review #3 - Transfer to the G/L & Reconciliation | 164 | D | **IT Total** | **4220** | |
| CARE User Access and Roles/Segregation of Duties | 40 | C | | | |
| Reporting Data Warehouse (BI) - integrate into post-implementation reviews | 60 | D | **TOTAL** | **11,620** | |
| **Manage Vendor Relationships** | | | | | |
| Vendor Monitoring & Contract Management | | A | | | |
| **Risk Management** | | | | | |
| Risk Reporting | 275 | E | **A- EFH led** | | |
| **Legal, Regulatory & Compliance** | | | **B - EFH led with SME assistance with planning** | | |
| PCI Support & Clean Desk Policy Compliance | | A | **C- EFH led with PwC involvement (Sme and/or staff)** | | |
| Follow-up on Customer Data Security Initiatives | 40 | C | **D- PwC led with EFH involvement** | | |
| Regulatory Compliance Program Review | 50 | C | **E - PwC only** | | |
| Green-e Energy Annual Verification | 50 | E | | | |
| **Accounting / SOX/Other** | | | | | |
| Sarbanes Oxley Testing Support | | A | | | |
| Operational & Financial Controls Follow-up | 40 | C | | | |
| **Other** | | | | | |
| Data Analytics | 125 | D | | | |
| Wrap up 2009 Projects | 0 | N/A | | | |
| Audit Planning | 40 | N/A | | | |
| Audit Follow-ups | 150 | N/A | | | |
| Unidentified | 130 | N/A | | | |
| Miscellaneous | 0 | N/A | | | |
| **SUBTOTAL** | **1850** | | | | |

C 0638655 C

**ATTACHMENT 6.a**
SARBANES-OXLEY SERVICES

This attachment amends the Statement of Work in Attachment 1 dated December 7, 2012 ("Schedule A-10"), between Energy Future Holdings Corp. ("Client" or "Company") and PricewaterhouseCoopers LLP ("CONTRACTOR"). Specifically, this agreement addresses an expanded scope of internal audit projects, increasing the scope of Sarbanes Oxley Testing – IT, referenced in the 2014 Indicative Internal Audit Projects in Attachment 6 to Schedule A-10. The parties agree that except as otherwise amended by this Attachment 6.a; the terms of the original Schedule A-10 and provisions of the Master Services Agreement dated December 14, 2009 ("Agreement"), and any amendments to the Agreement, shall apply to the services being provided hereunder.

**ARTICLE 9. COMPENSATION**

A. Amendments

- Article 9 of Schedule A-10, COMPENSATION, is amended as follows:
  - A. Fees – The CONTRACTOR shall provide additional Sarbanes Oxley Testing – IT services from April 2014 through January 2015 at the rates listed below, not to exceed $400,000.

| Resource | Rate per hour |
|---|---|
| Director | $330 |
| Manager | $217 |
| Senior Associate | $165 |
| Experienced Associate | $144 |
| Associate | $132 |

  - C. Billing – The CONTRACTOR's invoices will be rendered on a monthly basis and will include a pro-rated portion of the total estimated fee (i.e., 1/10 of $400,000 each month). CONTRACTOR will true-up fees at the completion of services, based on actual time incurred from April 2014 through January 2015 at the rates listed above in Article 9.a.

| Party | PricewaterhouseCoopers LLP | | Energy Future Holdings Corp. |
|---|---|---|---|
| By: | James A. Hanlon | By: | Drew Cameron |
| Name/Title: | James A. Hanlon/Partner | Name/Title: | DREW CAMERON/VP INTERNAL AUDIT |
| Date: | 2/26/14 | Date: | 3/5/14 |

## Consulting and Advisory Services Approval Form

*First level authorization requires a signature from a BU CEO if budgeted and aggregated amount exceeds $200K, a second level authorization is required from EFH CFO for non-budgeted agreements over $200K and all agreements >$500K*

**Company**
Energy Future Holdings

**Department**
Audit

Projected Scope of Work Description: *Overview of valuation and key financial metrics; Immediate and long range project goals; summary.*

In December 2012, IA executed a contract with PwC to provide 10,000 hours of IA co-sourcing services per year at an annual cost of $1.3 million for 2013, 2014 and 2015, and 2,500 hours of IA co-sourcing services for the three months ended March 31, 2016 at a cost of $325,000. Effective 2014, EFH IA is assuming additional responsibilities related to the testing of IT SOX controls, which will require an additional 2,250 hours of PwC resources for the 10 month period April 2014 through January 2015. This has been approved by the EFH CFO.

| | |
|---|---|
| Expected cost for this project? | $400,000 |
| Was this spend included in the budget? | Yes |
| Which Dept ID will incur the cost? | 600180 |
| Which expense code was budgeted/will be used? | 126 |
| Length of service engagement? | 10 Months |
| Are there resources within EFH with this expertise? | No |

If yes, Please provide explanation for requiring external resources:

What is the plan for knowledge transfer from the 3rd party to EFH resources:

| | |
|---|---|
| Is this an extension or amendment of services previously or currently performed by vendor? | Yes |
| If yes, how much has already been spent with this vendor? | $3,500,000 |
| Are additional services expected to be contracted for after this work? | Yes |
| Is this a capital expenditure, or could this project lead to a capitol expenditure ? | No |

Provide a summary of key milestones, timelines, and responsibilities, including post investment review:

| | |
|---|---|
| Is there a known or preferred vendor for this project? | Yes |
| If yes, who? | PwC |

**Request Submitted by:** Drew Cameron
Requestor/date: 3/3/14

**First Level Authorization:**
BU CEO/date:

**Reviewed by:**
Signature/date

**Second Level Authorization:**
EFH CFO/date : [signature] 3/4/14

*Forward executed form to Corporate Sourcing and Supply Chain (EP-13 Tracy Dennis or Ben Ezzell)*

**AMENDMENT NO. 10**

**DATED DECEMBER 03, 2012**

**TO**

**MASTER SERVICES AGREEMENT**

**C0638655C**

**BY AND BETWEEN**

**PRICEWATERHOUSECOOPERS LLP**

**AND**

**EFH CORPORATE SERVICES COMPANY**

**DATED DECEMBER 14, 2009**

Contract No. C0638655C

## AMENDMENT NO. 10

**EFFECTIVE DATE**

The Effective Date of this Amendment is December 15, 2012.

**PURPOSE**

This Amendment modifies, alters or changes specific terms and conditions of Contract No. C0638655C ("Agreement") that exists between the parties hereto. Except as modified in this Amendment or previous amendments, the Agreement will remain in full force and effect.

**MODIFICATIONS**

The Agreement is modified as follows:

**ARTICLE 4: TERM OF AGREEMENT**

The term of this Agreement is hereby extended to March 31, 2016.

**ARTICLE 13: SUBCONTRACTING**

Article 13, "Subcontracting" is hereby deleted and replaced with the following:

**"ARTICLE 13: OTHER CONTRACTOR FIRMS; SUBCONTRACTING**

CONTRACTOR is the U.S. firm of the global network of separate and independent PricewaterhouseCoopers firms (exclusive of CONTRACTOR, the "Other Contractor Firms"). CONTRACTOR may, in its discretion, draw on the resources of and/or subcontract to its subsidiaries, the Other Contractor Firms and/or third party contractors and subcontractors in each case within or outside of the United States (each a "PwC Subcontractor"), in connection with the provision of Services and/or for internal, administrative and/or regulatory compliance purposes. COMPANY agrees that CONTRACTOR may provide information CONTRACTOR receives in connection with this Agreement to the PwC Subcontractors for such purposes. CONTRACTOR will be solely responsible for the provision of the Services (including those performed by the PwC Subcontractors) and for the protection of the information provided to the PwC Subcontractors. The PwC Subcontractors, and theirs and CONTRACTOR'S respective partners, principals or employees (collectively the "Beneficiaries") shall have no liability or obligations arising out of this Agreement. COMPANY agrees to: (a) bring any claim or other legal proceeding of any nature arising from the Services against CONTRACTOR and not against the Beneficiaries; and (b) ensure or procure that COMPANY'S Subsidiaries do not assert any such claim or other legal proceeding against CONTRACTOR or the Beneficiaries. If any of COMPANY'S Subsidiaries receive Services under this Agreement, COMPANY agrees to provide a copy of this Agreement to such Subsidiaries, and COMPANY will notify them that although PwC Subcontractors may interact with them, the delivery of the Services is governed by the terms of this Agreement (including the liability limitations herein) and COMPANY'S Subsidiaries should notify COMPANY of any disputes or potential claims arising from the Services. CONTRACTOR disclaims any contractual or other responsibility or duty of care to any other subsidiaries or affiliates. While

Contract No. C0638655C

CONTRACTOR is entering into this Agreement on its own behalf, this section also is intended for the benefit of the Beneficiaries."

**ATTACHMENTS**

The following attachments are a part of this Amendment:

1. Attachment 1 - Schedule A-10
2. Attachment 2 - Direct Payment Exemption Certificate
3. Attachment 3 – Work Place Safety, Security, Alcohol, Drugs and Weapons
4. Attachment 4 – Contractor's Insurance Requirements

The parties have signed this Amendment acknowledging their agreement to its provisions as of the Effective Date.

| PRICEWATERHOUSECOOPERS LLP | | EFH CORPORATE SERVICES COMPANY | |
|---|---|---|---|
| By: | James R. Hanlon (Signature) | By: | Drew Cameron (Signature) |
| Name: | James R. Hanlon | Name: | DREW CAMERON |
| Title: | Partner | Title: | VP, INTERNAL AUDIT |
| Date: | 12/6/12 | Date: | 12/7/12 |

Contract No. C0638655C

**ATTACHMENT NO. 1**
**SCHEDULE A-10**

This Schedule A-10 is subject to all provisions of the Master Services Agreement No. C0638655C, dated December 14, 2009, (the "Agreement") between EFH Corporate Services Company, ("Client" or "Company") and PricewaterhouseCoopers LLP ("CONTRACTOR"), and the Agreement is incorporated herein by reference. The term "COMPANY" in the Agreement shall include the entity signing this Statement of Work ("SOW") and the entity signing below agrees to be bound by the terms and conditions of the Agreement. Any terms used in this SOW and not otherwise defined will have the same meaning as in the Agreement. If there is a conflict between the Agreement and the SOW, this SOW shall prevail but with respect to this SOW only.

**ARTICLE 1. PURPOSE AND SCOPE**

This SOW covers the internal audit services to be provided by the CONTRACTOR. The CONTRACTOR will provide COMPANY with a mix of resources and specialized subject matters experts who will provide internal audit services (the "Services") to COMPANY to assist in delivery of its annual internal audit plan (the "Plan"). The three areas where Services will be provided are Internal Audit Assurance Services, Internal Audit Consulting Services, and Sarbanes-Oxley Services.

It is hereby acknowledged and agreed that the services performed pursuant to this SOW are not accounting advisory services, tax services or transaction services as the terms are defined in Schedule C of the Agreement.

**ARTICLE 2. OVERVIEW**

- Continued oversight and responsibility for all work will remain under the leadership of the VP of Internal Audit.
- CONTRACTOR will support the Internal Audit team by providing IT leadership expertise and leading practices. CONTRACTOR will function as the IT Audit Director.
- The COMPANY Internal Audit Directors will be responsible for all internal audit work (including IT audits) performed in their assigned business units (except for IT audits in EFH Business Services), irrespective of whether it is performed by Internal Audit staff or by the CONTRACTOR, and will issue all audit reports for their assigned business units and will continue to be the key interface with management in their assigned business units. CONTRACTOR will be responsible for IT audit work in EFH Business Services and will draft IT audit reports for EFH Business Services (in COMPANY's standard format) and will be the key interface with IT management.
- The CONTRACTOR will document its work in the Internal Audit work paper system, currently TeamMate, following COMPANY's Internal Audit policies and work paper procedures. The COMPANY will own the audit work papers.

**ARTICLE 3. OBJECTIVES FOR THE CONTRACTOR CO-SOURCE TEAM**

A. General

- Design and implement, in conjunction with COMPANY's Internal Audit group, a flexible co-sourcing program resulting in a highly collaborative working relationship.

- Provide a Core Team of experienced utilities industry professionals to ensure effective coordination, consistency and quality control. The quality of leadership on this core team is important to COMPANY and substitutions to this core team must be approved by the VP of Internal Audit.

- As requested, provide biographies showing years of experience and level of expertise for:

    - Subject Matter Experts
    - Core Team personnel
    - IT auditors; and
    - Others, as requested by COMPANY

- Compliment the COMPANY's business by providing deep utility industry, audit and controls knowledge. Provide a broad resource base of functional and specialty skills.

- Work with the COMPANY by sharing knowledge, training resources and gaining access to leading technology tools and methodologies.

- Provide a broad compliment of technical skills using the Hub and Spokes model to provide specialists when needed in the below areas as well as other areas so designated:

    - IT
    - Energy trading and risk management
    - Environmental
    - Construction / Capital Projects
    - Customer Care and Billing
    - Tax
    - Financial Reporting and Compliance
    - Contract Compliance
    - Procurement & Sourcing; and
    - Utility regulation and Compliance

**ARTICLE 4. CONTRACTOR'S RESPONSIBILITIES**

A. Summary
- Provide resources to execute COMPANY's Internal Audit SOW that the COMPANY would have otherwise expended 10,000 hours annually for 2013 through 2015 and 2,500 hours for January 2016 through March 2016. Of these 10,000 hours, 1,000 hours each year for 2013 through 2015 and 250 hours for 2016, will be provided by Subject Matter experts ("SME") from the CONTRACTOR. Use of the SME hours will be approved in advance by the VP of Internal Audit. The SME hours will be tracked by the CONTRACTOR and reported in a format acceptable to the COMPANY as they are used.
- A schedule of indicative Internal Audit projects for 2013 is defined in Attachment 1. The COMPANY may change the indicative Internal Audit projects at its discretion with agreement of both parties. Indicative Internal Audit projects for 2014 through March 2016 will be determined at a later date.

B. Applicable AICPA Standards: The CONTRACTOR will perform the Services in accordance with the Standards for Consulting Services, established by the American Institute of Certified Public Accountants.

C. Organize and execute CONTRACTOR meetings with COMPANY as mutually agreed upon to pursue continuous process improvement, review performance metrics, provide status, and discuss value delivery by CONTRACTOR and other pertinent issues.

D. CONTRACTOR will provide ongoing review and evaluation of market trends, emerging issues and leading practice recommendations to COMPANY.

E. Additional provisions applicable to the Services:

The CONTRACTOR will conduct internal audit projects under the direction of the VP of Internal Audit in accordance with the COMPANY's internal audit charter and internal audit plan. In connection with these projects, the CONTRACTOR will assist COMPANY in the preparation of the annual internal audit risk assessment and the annual internal audit plan, and will recommend audit priorities for presentation, discussion and approval by management and the audit committee. CONTRACTOR will be responsible for preparing and providing thought leadership on the annual IT risk assessment and annual IT audit plan. Once the audit plan is approved, the CONTRACTOR will begin to perform auditing procedures on mutually agreed-upon projects and will report all associated findings to the COMPANY throughout the year in accordance with the Internal Audit procedures. The CONTRACTOR understands that the CONTRACTOR's team will work directly with the COMPANY's internal audit directors who will remain as the key interface with management.

CONTRACTOR is responsible for performing internal audit procedures and reporting thereon in accordance with the terms of this SOW. The day-to-day performance of the internal audit procedures will be directed, reviewed, and supervised by the CONTRACTOR's personnel. It is important to recognize there are inherent limitations in the auditing process. For example, internal audits are generally based on the concept of selective testing of the data being examined and are, therefore, subject to the limitation that material errors or fraud or illegal acts having a direct and material financial impact, if they exist, may not be detected. Also, because of the characteristics of fraud, particularly those involving concealment through collusion and falsified documentation, an internal audit may not detect a material fraud. The CONTRACTOR will, however, communicate to the COMPANY, as appropriate, any illegal act, material errors or evidence that fraud may be identified during the course of the CONTRACTOR's internal audit projects.

The CONTRACTOR recognizes that the COMPANY may request the CONTRACTOR to render additional services while CONTRACTOR is working with the COMANY under this SOW. If the COMPANY requests services that are unrelated to the scope of the work of this engagement or significantly depart from the existing engagement, the CONTRACTOR will provide COMPANY with a scope of services description and fee estimate which will incorporate the terms of this Agreement for the COMPANY's approval and signature and will be included as part of the CONTRACTOR's Services.

**ARTICLE 5. DELIVERABLES**

A. Summary of Deliverables:
- Overall project plan to guide the CONTRACTOR's activities
- Status Meeting agendas that document progress of activities
- Support for key management and audit committee meetings as requested
- For internal audits, agreed upon scope and planning documents, work papers, issue tracking and draft internal audit reports. All work papers should be prepared in compliance with COMPANY's Internal Audit policies and work paper preparation procedures as they may be amended from time to time.
- Prepare formal documented IT risk assessment to support development of the annual IT audit plan
- Recommend Internal Audit Risk Assessment, and Internal Audit Plan approaches based upon leading practices and input from COMPANY

- Documented SOX testing results templates

B. Use of Deliverables:
- The CONTRACTOR is providing the Services and deliverables solely for the COMPANY's internal use and benefit. The Services and deliverables are not for a third party's use, benefit or reliance, and the CONTRACTOR disclaims any contractual or other responsibility or duty of care to others based upon these Services or deliverables.

## ARTICLE 6. COMPANY'S RESPONSIBILITIES

A. Management of CONTRACTOR
- The CONTRACTOR's role is advisory only. The COMPANY is responsible for all management functions and decisions relating to the Services, including evaluating and accepting the adequacy of the scope of the Services in addressing the COMPANY's needs.
- The COMPANY is also responsible for the results achieved from using the Services or deliverables.
- Effective internal control reduces the likelihood that errors, fraud or other illegal acts will occur and remain undetected; however, it does not eliminate that possibility.
- The COMPANY will designate a member of the Company's management to oversee the Services.
- It is the COMPANY's responsibility to establish and maintain its internal controls.
- The COMPANY will provide accurate and complete information and reasonable assistance, and the CONTRACTOR will perform the engagement on that basis.
- Final determination and assessment of audit risk and scope of internal audit activity will remain the responsibility of management and the audit committee.

B. Inquiries
- CONTRACTOR will make specific inquiries of management when performing the internal audit services. The CONTRACTOR will rely upon the results of the COMPANY's internal audit procedures, the responses to the CONTRACTOR's inquiries and the written representations, if any, in forming the CONTRACTOR's findings.

C. Sarbanes-Oxley
- The CONTRACTOR will not provide an opinion or other form of assurance with respect to the COMPANY's compliance with the Act, related SEC rules, or the COMPANY's procedures. The CONTRACTOR will not make any representation as to the sufficiency of the COMPANY's procedures for its own purposes. The Services should not be taken to supplant inquiries and procedures that COMPANY should undertake for purposes of obtaining and using the information necessary in connection with the COMPANY's compliance with the provisions of the Act and related SEC rules.

## ARTICLE 7. TIMING

This engagement will commence on January 1, 2013 and will expire March 31, 2016. Scope and internal audit projects for subsequent years will be agreed upon and added as attachments to this Statement of Work.

## ARTICLE 8. CONTRACTOR RESOURCES ASSIGNED

The CONTRACTOR's personnel assigned to the Core team in the Hub and Spokes model to provide Services and Deliverables under this Statement of Work are as follows:

A. Jim Hanlon will serve as Engagement Partner who will be responsible for the quality of the Services rendered and the COMPANY's overall satisfaction.

B. Amanda Herron will serve as the Engagement Director and will be responsible for the oversight of Services to COMPANY.

C. Nicole Rodriguez will serve as Engagement Manager and will be responsible for the day-to-day delivery of Services to COMPANY.

D. Matt Wilson will serve as IT audit Engagement Director and will be responsible for the day-to-day delivery of IT Audit Services to COMPANY.

E. Staff and specialists as specific projects require.

Contractor will employ all reasonable efforts to ensure that the Core team remains so assigned until this assignment is completed. In the event that such individuals become unavailable any substitutions or changes to this team must be reasonably equivalent and must have prior approval by the COMPANY VP of Internal Audit.

**ARTICLE 9. COMPENSATION**

A. Fees

Independently and not as an agent of the COMPANY, the CONTRACTOR shall provide services described herein and shall do all that is necessary or incident to the satisfactory and timely performance of this SOW at the below firm fixed price:

- $1,300,000 per year (including all fees and expenses) for 2013 through 2015 and $325,000 (including all fees and expenses) for January 2016 through March 2016. Any subsequent changes will be mutually agreed upon in writing by both Parties.
- Fee and expense reimbursement as it relates to this SOW only shall override the policy addressed in Article 5 of the Master Services Agreement.

B. Terms

- In the performance of this SOW, CONTRACTOR shall provide all the necessary resources to execute this SOW which is equivalent to 10,000 annual hours of Internal Audit work that the COMPANY would have otherwise expended.
- Entitlement to full payment is based on the determination by the COMPANY that the required level of effort and reports have been provided and are acceptable.

C. Billing

- The CONTRACTOR's invoices will be rendered on a monthly basis, and will include a pro-rated portion of the fixed fee arrangement (i.e., 1/12 of $1,300,000 each month).

D. Payment Terms

- Payment of the CONTRACTOR's invoices is expected to be received within 60 days of the invoice date.

**LIST OF ATTACHMENTS**

COMPANY and CONTRACTOR agree that the following described attachments, if any, are incorporated herein in their entirety as fully as completely rewritten herein.

1. 2013 Indicative Internal Audit Projects
2. Direct Payment Exemption Certificate
3. Work Place Safety, Security, Alcohol, Drugs and Weapons
4. Contractor's Insurance Requirements

Services not specified above may be authorized only through a separate Statement of Work, or through an amendment or supplement to this Statement of Work.

| PRICEWATERHOUSECOOPERS LLP | EFH CORPORATE SERVICES COMPANY |
|---|---|
| By: James R. Hanlon<br>Signature | By: Drew Cameron<br>Signature |
| Name: James R. Hanlon | Name: DREW CAMERON |
| Title: Partner | Title: VP, INTERNAL AUDIT |
| Date: 12/6/12 | Date: 12/7/12 |

## 2013 Internal Audit Plan Hours

| Project title | Integrated | Total Project Hours | EFH Planned Hours | | | PwC Planned Hours | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | IT (Gary) | All other | Total | SME | IT | Core | Total |
| **Luminant Power - Ricky** | | | | | | | | | |
| Environmental Project Review | | 280 | | 280 | 280 | | | | 0 |
| Sandow 4 Outage Review | | 320 | | 320 | 320 | | | | 0 |
| Thermo Final Pit (G Area) Closure Project Review | | 320 | | 320 | 320 | | | | 0 |
| Liberty Mine Development Project Review | | 320 | | 320 | 320 | | | | 0 |
| SAFETEAM Process Full Review | | 300 | | 240 | 240 | | | 60 | 60 |
| Sales & Use Tax Review | | 340 | | 300 | 300 | 40 | | | 40 |
| Pollution Control Equipment Tax Credits Review | | 370 | | 330 | 330 | 40 | | | 40 |
| Dry Cask Storage DOE Settlement Review | | 240 | | 240 | 240 | | | | 0 |
| EBITDA Calculation (Outage Adjustment) Process Review | | 240 | | 240 | 240 | | | | 0 |
| Veolia Environmental Services Contract Compliance Review | | 290 | | 290 | 290 | | | | 0 |
| MineService Contract Compliance Review | | 280 | | | 0 | | | 280 | 280 |
| M&S, Fuel Oil, Coal Inventory Reviews | | 320 | | 260 | 260 | | | 60 | 60 |
| Martin Lake 2 Outage Review | | 320 | | 320 | 320 | | | | 0 |
| Fluor Contract Compliance Review | | 320 | | 320 | 320 | | | | 0 |
| Disaster Recovery/Business Continuity | | 100 | | | 0 | | 100 | | 100 |
| NRC Responsive Actions - Fukishima | | 240 | | 240 | 240 | | | | 0 |
| Operational Readiness | | 470 | | 330 | 330 | 140 | | | 140 |
| Risk Management Forum - Power | | 180 | | 180 | 180 | | | | 0 |
| Audit Planning - Power | | 240 | | 200 | 200 | | | 40 | 40 |
| Emerging Issues - Power | | 80 | 10 | 70 | 80 | | | | 0 |
| Follow Ups - Power | | 315 | 25 | 270 | 295 | | | 20 | 20 |
| Miscellaneous Time - Power | | 760 | 50 | 710 | 760 | | | | 0 |
| Audit Committee Reporting - Taylor | | 160 | 5 | 155 | 160 | | | | 0 |
| Auditor Orientation - Taylor | | 50 | | 50 | 50 | | | | 0 |
| Budget Preparation - Taylor | | 100 | | 100 | 100 | | | | 0 |
| Oversight Meetings | | 50 | | | 0 | | | 50 | 50 |
| Diversity Committee | | 160 | | 160 | 160 | | | | 0 |
| Benchmarking Surveys | | 100 | | 100 | 100 | | | | 0 |
| Unidentified Audit Projects | | 845 | 40 | 705 | 745 | | | 100 | 100 |
| **SUBTOTAL** | | **8,110** | **130** | **7,050** | **7,180** | **220** | **100** | **610** | **930** |
| **Luminant Energy - Nancy** | | | | | | | | | |
| Quarterly Procedures - Q1 | | 80 | | 80 | 80 | | | | 0 |
| Quarterly Procedures - Q2 | | 75 | | 75 | 75 | | | | 0 |
| Quarterly Procedures - Q3 | | 80 | | 80 | 80 | | | | 0 |
| Quarterly Procedures - Q4 | | 75 | | 75 | 75 | | | | 0 |
| Commercial Incentive Plan | | 310 | | 30 | 30 | 65 | | 215 | 280 |
| Credit Assessment & Monitoring | | 275 | | 270 | 270 | 5 | | | 5 |
| Long-term Hedge Program | | 335 | | 330 | 330 | 5 | | | 5 |
| Dodd-Frank Act Compliance Process | | 320 | | 30 | 30 | 175 | | 115 | 290 |
| Hyperion Implementation | X | 300 | 40 | 260 | 300 | | | | 0 |
| Nuclear Fuel Settlements | | 270 | | 30 | 30 | | | 240 | 240 |
| Position Limit Monitoring | | 265 | | 260 | 260 | 5 | | | 5 |
| Price Curve Upload | | 260 | | 40 | 40 | | 20 | 200 | 220 |
| Price Curve Validation | | 230 | | 40 | 40 | 15 | | 175 | 190 |
| CREP Settlements | X | 295 | | 270 | 270 | 5 | 20 | | 25 |
| Long-term Liquidity Forecast | | 265 | | 260 | 260 | 5 | | | 5 |
| Audit Committee Reporting - LUME | | 30 | | 30 | 30 | | | | 0 |
| Audit Follow-ups - LUME | | 20 | | 20 | 20 | | | | 0 |
| Audit Planning - LUME | | 170 | | 150 | 150 | | | 20 | 20 |
| Unidentified - LUME | | 0 | | | 0 | | | | 0 |
| Oversight Meetings - LUME | | 25 | | | 0 | | | 25 | 25 |
| **SUBTOTAL** | | **3,655** | **40** | **2,330** | **2,370** | **280** | **40** | **965** | **1,285** |
| **TXU Energy - Lynn** | | | | | | | | | |
| PCI Support & Clean Desk | | 290 | 100 | 190 | 290 | | | | 0 |
| Customer Data Security Initiatives | X | 260 | | 15 | 15 | 20 | 50 | 175 | 245 |

2013 Internal Audit Plan Hours

| Project title | Integrated | Total Project Hours | EFH Planned Hours | | | PwC Planned Hours | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | IT (Gary) | All other | Total | SME | IT | Core | Total |
| Qfiniti - Voice Recording Controls | X | 275 | | 160 | 160 | 10 | 105 | | 115 |
| Social Media - Strategy & Security | | 185 | | 165 | 165 | 20 | | | 20 |
| LCI Swing Billing | | 275 | | 275 | 275 | | | | 0 |
| Volume Reconciliation Process | | 275 | | 20 | 20 | | | 255 | 255 |
| Identification & Review of Key Models | | 170 | | 170 | 170 | | | | 0 |
| Vendor Monitoring Process Compliance | | 275 | | 20 | 20 | | | 255 | 255 |
| Door-to-Door QA/QC Policy Compliance | | 275 | | 275 | 275 | | | | 0 |
| Vendor BC/DR Plans | X | 235 | | 15 | 15 | | 100 | 120 | 220 |
| Mass Contract Management Follow-up | | 200 | | 10 | 10 | 10 | | 180 | 190 |
| LCI Contract Liquidations | | 275 | | 275 | 275 | | | | 0 |
| AMS Billing - Time of Use Products | | 275 | | 275 | 275 | | | | 0 |
| Campaign Management - Sales Forecasting (Residential) | | 275 | | 275 | 275 | | | | 0 |
| IT Spend | | 275 | | 275 | 275 | | | | 0 |
| Green-e Energy Annual Verification | | 265 | | 85 | 85 | | | 180 | 180 |
| Audit Committee Reporting - TXUE | | 60 | | 60 | 60 | | | | 0 |
| Audit Follow-ups - TXUE | | 550 | | 400 | 400 | | | 150 | 150 |
| Audit Planning - TXUE | | 260 | | 230 | 230 | | | 30 | 30 |
| Miscellaneous - TXUE | | 500 | | 500 | 500 | | | | 0 |
| Policy Reviews | | 60 | | 60 | 60 | | | | 0 |
| Oversight Meetings - TXUE | | 120 | | 70 | 70 | | | 50 | 50 |
| Wrap up 2011 Audits - TXUE | | 170 | | 170 | 170 | | | | 0 |
| Audit Committee Reporting - EFH Consolidated | | 160 | | 160 | 160 | | | | 0 |
| Unidentified - TXUE | | 475 | | 425 | 425 | | | 50 | 50 |
| **SUBTOTAL** | | **6,435** | **100** | **4,575** | **4,675** | **60** | **255** | **1,445** | **1,760** |
| **EFH Business Services - Nancy** | | | | | | | | | |
| Accounts Payable (PMMS) Replacement | X | 550 | 185 | 20 | 205 | 40 | 40 | 265 | 345 |
| Debt Accounting | | 330 | | 300 | 300 | 30 | | | 30 |
| Supplier Diversity Program | | 70 | | 70 | 70 | | | | 0 |
| Excess Cash Flow Calculation | | 325 | | 20 | 20 | 40 | | 265 | 305 |
| General Ledger (FIM) Upgrade | X | 520 | | 320 | 320 | | 200 | | 200 |
| Long-Range Liquidity Forecast | X | 350 | | 300 | 300 | 30 | 20 | | 50 |
| Tax Transaction Processing System (Sabrix) | X | 380 | 20 | 320 | 340 | 40 | | | 40 |
| Transaction Analysis & Authorization | | 240 | | 240 | 240 | | | | 0 |
| Executive Compensation Disclosure | | 310 | | 20 | 20 | 10 | | 280 | 290 |
| Executive Expense Reports | | 295 | | 20 | 20 | | | 275 | 275 |
| Executive Annual Incentive Payments | | 75 | | 20 | 20 | | | 55 | 55 |
| Supplier Payments Review (Revenew) | | 20 | | 20 | 20 | | | | 0 |
| Unidentified - Investigations | | 240 | | 240 | 240 | | | | 0 |
| Audit Committee Reporting - EFH Business Services | | 40 | | 40 | 40 | | | | 0 |
| Oversight Meetings | | 25 | | | 0 | | | 25 | 25 |
| Audit Follow-ups - EFH Business Services | | 20 | | 20 | 20 | | | | 0 |
| Audit Planning - EFH Business Services | | 170 | | 150 | 150 | | | 20 | 20 |
| Unidentified - EFH Business Services | | 0 | | | 0 | | | | 0 |
| **SUBTOTAL** | | **3,960** | **205** | **2,120** | **2,325** | **190** | **260** | **1,185** | **1,635** |
| **SOX - Nancy:** | | | | | | | | | |
| General Oversight | | 750 | | 750 | 750 | | | | 0 |
| Quarterly Reports & Meetings | | 700 | | 700 | 700 | | | | 0 |
| CMT Administration & BU Support | | 75 | | 75 | 75 | | | | 0 |
| Testing Coordination | | 150 | | 150 | 150 | | | | 0 |
| Key Controls Testing - EFH & LUME | | 1,225 | | 1,100 | 1,100 | | | 125 | 125 |
| Key Controls Testing - TXUE | | 100 | | 0 | 0 | | | 100 | 100 |
| Key Controls Testing - LUMP | | 100 | | 0 | 0 | | | 100 | 100 |
| Financial Statement Risk Assessment | | 200 | | 200 | 200 | | | | 0 |
| Control Selection | | 75 | | 75 | 75 | | | | 0 |
| Fraud Risk Assessment | | 290 | | 290 | 290 | | | | 0 |
| ELC Review | | 300 | | 300 | 300 | | | | 0 |
| SSAE16 Review | | 190 | | 190 | 190 | | | | 0 |
| Close Oversight | | 30 | | 30 | 30 | | | | 0 |
| Helpline Testing | | 40 | | 40 | 40 | | | | 0 |
| **SUBTOTAL** | | **4,225** | **0** | **3,900** | **3,900** | **0** | **0** | **325** | **325** |
| **IT - by Business Unit** | | | | | | | | | |
| **EFH Business Services - IT** | | | | | | | | | |

K:\INTAUD\TXU Power Audit\2013 Planning\Plan Hours - Schedule A\2013_Schedule_A - 12.03.12 - Final.for contract.xlsx

**2013 Internal Audit Plan Hours**

| Project title | Integrated | Total Project Hours | EFH Planned Hours | | | PwC Planned Hours | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | IT (Gary) | All other | Total | SME | IT | Core | Total |
| *See EFH Business Services - Nancy section above for IT hours* | | 0 | | | 0 | | | | 0 |
| **SUBTOTAL** | | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |
| **Luminant Energy - IT** | | | | | | | | | |
| *No projects* | | 0 | | | 0 | | | | 0 |
| **SUBTOTAL** | | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |
| **Luminant Power - IT** | | | | | | | | | |
| NERC CIP and LUMP CIP (Luminant-wide) | | 160 | 150 | | 150 | | 10 | | 10 |
| Maximo Implementation Review - Mining/CPNPP | | 310 | 310 | | 310 | | | | 0 |
| Cyber Security Review | | 200 | 200 | | 200 | | | | 0 |
| **SUBTOTAL** | | **670** | **660** | **0** | **660** | **0** | **10** | **0** | **10** |
| **TXUE - IT** | | | | | | | | | |
| PCI & NACHA Remediation | | 275 | | 25 | 25 | 80 | 170 | | 250 |
| User Access & SoD | | 275 | | 25 | 25 | 25 | 225 | | 250 |
| New Access Provisioning Tool | | 275 | | 25 | 25 | 40 | 210 | | 250 |
| Big Data Strategy | | 15 | | 0 | 0 | | 15 | | 15 |
| **SUBTOTAL** | | **840** | **0** | **75** | **75** | **145** | **620** | **0** | **765** |
| **X-Business Unit** | | | | | | | | | |
| Network Security | | 250 | | | 0 | | 250 | | 250 |
| Server Operating System Configurations | | 280 | | | 0 | | 280 | | 280 |
| Mainframe Replacement | | 280 | | | 0 | | 280 | | 280 |
| Oncor Systems Disentanglement Review | | 110 | 80 | | 80 | | 30 | | 30 |
| IT Asset / Contract Management | | 250 | | | 0 | | 250 | | 250 |
| IT Governance | | 250 | | | 0 | | 250 | | 250 |
| Business Continuity / Disaster Recovery | | 200 | | | 0 | | 200 | | 200 |
| Sarbanes Oxley Testing - IT | | 660 | | | 0 | | 660 | | 660 |
| IT SOX Quarterly RePerformance Testing | | 0 | | | 0 | | 140 | | 140 |
| SME Consulting for IA Projects | | 60 | | | 0 | | 60 | | 60 |
| CIO Request Hours | | 120 | | | 0 | | 120 | | 120 |
| Audit Planning - IT | | 120 | | | 0 | | 120 | | 120 |
| Teammate / Technical Support | | 500 | 500 | | 500 | | 0 | | 0 |
| IT Security / Change Committee Participation | | 40 | | | 0 | | 40 | | 40 |
| IT Strategy Input / Monitoring | | 75 | | | 0 | | 75 | | 75 |
| Status Updates / Practice Management | | 120 | | | 0 | | 120 | | 120 |
| Follow-ups - IT | | 135 | | | 0 | | 135 | | 135 |
| Oversight Meetings - IT | | 80 | | | 0 | | 80 | | 80 |
| Unidentified - IT | | 230 | 135 | | 135 | | 95 | | 95 |
| **SUBTOTAL** | | **3,900** | **715** | **0** | **715** | **0** | **3,185** | **0** | **3,185** |
| **IT Total** | | **5,410** | **1,375** | **75** | **1,450** | **145** | **3,815** | **0** | **3,960** |
| **Unidentified SME** | | **105** | | | **0** | **105** | | | **105** |
| **TOTAL** | | **31,900** | **1,850** | **20,050** | **21,900** | **1,000** | **4,470** | **4,530** | **10,000** |

Contract No. C0638655C

**ATTACHMENT NO. 2**
**DIRECT PAYMENT EXEMPTION CERTIFICATE**

**State of Texas**
**Direct Payment Exemption Certificate**
**Limited Sales, Excise, and Use Tax**

Direct payment authorization number: 1-75-0835281-6 EFH Corporate Services Company

EFH Corporate Services Company hereby claim exemption from the payment of state, city, county, SPD, MTA and/or CTD sales and/or use taxes upon its purchase of taxable items and/or services from:

CONTRACTOR: PricewaterhouseCoopers LLP
Address: 2001 Ross Avenue, Suite 1800
City, State, Zip: Dallas, Texas 75201-2997

Description of items and/or services purchased under Contract No. C0638655C

Internal Audit procedures and reporting

This certificate will remain in effect until the expiration date of the above contract.

This certificate does not cover:

A. Purchase of taxable items and/or services to be resold.
B. Sales or rental to any purchaser other than the permit holder.
C. Sales or rental of motor vehicles subject to the motor vehicle sales and use tax (Chapter 152) and interstate motor carrier sales and use tax (Chapter 157).
D. Nontaxable services or materials/supplies used or consumed by a provider of a nontaxable service.
E. Lump-sum new construction projects to improve real property.

CONTRACTOR agrees not to permit others (including its contractors and repairmen) to use this direct payment authorization to purchase material tax free.

COMPANY agrees to accrue and pay the tax to the Comptroller of Public Accounts as required by statute.

Permit holder: EFH Corporate Services Company

Authorized Signature/Date: Tamar Willis ________________

**ATTACHMENT NO. 3**
**WORK PLACE SAFETY, SECURITY, ALCOHOL, DRUGS AND WEAPONS**

A. SAFETY

1. CONTRACTOR agrees that any safety related assistance or initiatives undertaken by COMPANY will not relieve CONTRACTOR from responsibility for the implementation of, and compliance with, safe working practices, as developed from their own experience, or as imposed by law or regulation, and will not in any way, affect the responsibilities resting with CONTRACTOR under the provisions of any agreement to which these policies are attached and to meet all safety requirements as specified by the Occupational Safety & Health Administration (OSHA), the Mine Safety Health Administration (MSHA), the Department of Transportation (DOT) and any other applicable state or federal safety and health laws or regulations.

2. [Intentionally Deleted.]

3. [Intentionally Deleted.]

4. [Intentionally Deleted.]

5. CONTRACTOR acknowledges and agrees that all members of CONTRACTOR Group performing Work at any COMPANY Property are required to view COMPANY's "CONTRACTOR/Visitor Safety Orientation" video, when applicable, and to read and adhere to COMPANY's "CONTRACTOR/Visitor Safety Booklet" prior to performing any Work any COMPANY Property.

6. CONTRACTOR acknowledges and agrees that all members of the CONTRACTORS Group performing Work at the Work Site have received the required safety, health and environmental training in accordance with appropriate state and federal laws and regulations.

7. [Intentionally Deleted.]

8. CONTRACTOR acknowledges and agrees that, except as otherwise expressly authorized in writing by COMPANY's designated safety representative, appropriate protective equipment will be worn by any member of CONTRACTOR Group while on any COMPANY Property.

9. CONTRACTOR will take all reasonable precautions to prevent any accident in connection with the performance of Work.

10. CONTRACTOR will report to COMPANY all accidents involving personal injuries (including death) and damage to property occurring directly or indirectly as a result of the Work performed by CONTRACTOR hereunder immediately, but in no event, no later than 24 hours after the occurrence of any such accident. Any accident or incident occurring directly or indirectly as a result of the Work which CONTRACTOR must report to a regulatory agency (e.g. OSHA, MSHA, TCEQ) must also be reported to COMPANY immediately following notification to the regulatory agency.

**B. SECURITY**

1. COMPANY may supply such site security as it deems necessary and may specify to CONTRACTOR such additional security precautions and procedures at any COMPANY Property as, in

COMPANY's opinion, are reasonably necessary for the safety and security of COMPANY's personnel and property.

2. Security by COMPANY at COMPANY Properties, if any, will not provide personal policing of the materials, tools and equipment of CONTRACTOR Group. CONTRACTOR will assume sole responsibility for safeguarding such materials, tools and equipment.

3. It will be the affirmative duty of CONTRACTOR to ensure that CONTRACTOR Group assists in carrying out all security measures, to include reporting all information or knowledge of matters adversely affecting security to COMPANY's designated security personnel.

4. COMPANY reserves the right to exclude any of CONTRACTOR's employees from any COMPANY Property by denial of access, suspension or revocation of access authorization, preemptory expulsion, or by any other means, without notice or cause. Former COMPANY employees, and any of CONTRACTOR's employees who previously have been excluded from any COMPANY Property, may be brought onto COMPANY property or facilities only if prior approval from COMPANY is obtained.

5. COMPANY measures may also include investigations, whether by COMPANY or law enforcement officials. CONTRACTOR agrees to cooperate in such investigations and understands that COMPANY reserves the right to require anyone in CONTRACTOR Group to authorize appropriate agencies to release his or her criminal records to CONTRACTOR as a condition of either initial or continued permission for access to any COMPANY Property. Investigations may include searches of CONTRACTOR Group. Such searches may include searches of facilities assigned to CONTRACTOR Group, search of all COMPANY Property areas and property at such COMPANY Property areas, searches of including, but not limited to, offices, lockers, desks, lunch boxes, packages and motor vehicles (regardless of ownership). Without limiting the foregoing, CONTRACTOR acknowledges and agrees that all members of CONTRACTOR Group, to the extent that COMPANY reasonably determines that such members require security badge access prior to entering onto any COMPANY Property, shall be required to comply with COMPANY's standard security badge requirements, including without limitation a background check to be performed by COMPANY.

6. CONTRACTOR agrees to instruct its employees in the details of COMPANY's work site security policies and measures, both as specified herein and as hereinafter provided by COMPANY to CONTRACTOR.

C. **ALCOHOLIC BEVERAGES, DRUGS AND WEAPONS**

CONTRACTOR will inform all members of CONTRACTOR Group, who may be involved in the performance of any Work, of the following COMPANY rules, relating to alcoholic beverages, drugs and weapons, with which all employees are expected to comply:

1. Bringing, attempting to bring, possessing, using or being under the influence of intoxicants, drugs, or narcotics while on any COMPANY Property, including, but not limited to parking areas, is prohibited. Possessing alcoholic beverages in sealed containers is permitted, however, in designated parking areas owned or controlled by Oncor Electric Delivery Company LLC, Luminant Generation Company LLC, Oak Grove Management Company LLC, Generation Development Company LLC, Sandow Power Company LLC and EFH Corporate Services Company, but not parking areas owned or controlled by Luminant Mining Company LLC, Luminant Big Brown Mining Company LLC and Oak Grove Mining Company LLC.

2. Drugs prescribed by a licensed physician, for an individual working on any COMPANY Property, which could affect the employee's job performance, or non prescription drugs which could affect the

employee's job performance, are allowed on any COMPANY Property only if they have been previously cleared by the employee's supervisor. Any employee taking such medication must inform his or her supervisor of the medication and dosage being taken.

3. Bringing, attempting to bring, possessing or using firearms, whether classified as legal or illegal, while on any COMPANY Property, including but not limited to buildings, parking areas, recreation facilities, equipment and vehicles, is prohibited. Use or possession of firearms for specific situations is permitted if approved by function or higher level management of COMPANY.

4. Off the job involvement with intoxicants, drugs, or narcotics, which adversely affects COMPANY's business, to include impairing the employee's ability to perform his job, or the public trust in the safe operation of COMPANY is prohibited.

5. Any conduct on any COMPANY Property which is in violation of any state or federal law or regulation is considered a violation of these rules and a breach of any agreement to which these policies are attached.

6. CONTRACTOR is responsible for the compliance of CONTRACTOR Group with the above specified rules.

7. In order to enforce these rules, all individuals with access to any COMPANY Property as well as the vehicles, offices, lockers and any personal belongings of such individuals on any COMPANY Property are subject to search by COMPANY and its agents, to include security representatives appointed or employed by COMPANY. Individuals may be required to take a blood, urinalysis or Breathalyzer test, or submit to other recognized investigatory tests or procedures as are deemed appropriate or necessary by COMPANY in the investigation of a violation of these rules.

8. The refusal, on the part of any of CONTRACTOR Group, to submit immediately to a search of his or her person and/or property, or to be tested, whether by blood test, urinalysis, Breathalyzer or other recognized investigatory test or procedure, after being requested to do so, will be considered a violation of COMPANY rules.

9. Violations of these rules may be cause for denial of access to any COMPANY Property.

Contract No. C0638655C

**ATTACHMENT NO. 4**
**CONTRACTOR'S INSURANCE REQUIREMENTS**

CONTRACTOR will, at its own expense, maintain in force throughout the period of this document or agreement, or as otherwise specified, and until released by COMPANY the following minimum insurance coverages, with insurers acceptable to COMPANY.

1) Workers' Compensation and Employers' Liability Insurance, providing statutory benefits in accordance with the laws and regulations of the State of Texas or state of jurisdiction as applicable. The minimum limits for the employers' liability insurance will be one million dollars ($1,000,000) bodily injury each accident, one million dollars ($1,000,000) each employee bodily injury by disease, one million dollars ($1,000,000) policy limit bodily injury by disease.

2) Commercial General Liability Insurance, including bodily injury and property damage, personal and advertising injury, contractual liability, and including products and completed operations coverage continuing for three (3) years after Final Acceptance, or completion of the Work, whichever is later, with minimum limits of one million dollars ($1,000,000) per occurrence for bodily injury, including death and property damage.

3) Business Automobile Liability Insurance for coverage of non-owned and hired autos, with a minimum combined single limit of one million dollars ($1,000,000) per accident for bodily injury, including death, and third party property damage.

5) Professional Indemnity Insurance with a minimum limit of one million dollars ($1,000,000) per claim.

ADDITIONAL PROVISIONS:

A) The required limits of insurance can be satisfied by any combination of primary and excess coverage.

B) The commercial general liability insurance and business automobile liability insurance policies will contain provisions that specify that the policies are primary as respects to COMPANY and will apply without consideration for other policies separately carried by COMPANY, solely with regards to CONTRACTOR'S actions in the performance of this SOW. CONTRACTOR will be responsible for any deductibles or retentions.

C) The commercial general liability insurance and business automobile liability insurance policies, if written on a claims-made basis, will be maintained in full force and effect for three (3) years after Final Acceptance or completion of the Work, whichever is later.

D) All policies must be issued by carriers having an *A.M. Best's* rating of "A-" or better, and an *A.M. Best's* financial size category of "VIII" or better, or *Standard & Poor Insurance Solvency Review* of "A-" or better.

E) Prior to commencement of Work, CONTRACTOR will provide to COMPANY certificates of insurance evidencing the coverage required herein. COMPANY's review of certificates or policies will not be construed as accepting any deficiencies in CONTRACTOR's insurance or relieve CONTRACTOR of any obligations set forth herein.

F) **Certificates of insurance must show Energy Future Holdings Corp. and its subsidiaries as the certificate holder, and as an additional insured (including completed operations) as respects all of the required coverages except workers' compensation and professional indemnity. All of the required coverages, with the exception of professional indemnity must provide a waiver of subrogation in favor of the certificate holder. Waiver of subrogation shall be mutual.**

G) CONTRACTOR agrees to report to the manager of the claims department of the COMPANY in writing as soon as practical all instances of damage to the Work and all accidents or occurrences which may result in injuries to any person, including death, and any property damage, arising out of the performance of the Work.

H) If the insurance obligations or coverage required in this SOW exceed the maximum limits permitted by law or are determined to be invalid, illegal, unenforceable, or in conflict with the law of any court of competent jurisdiction, then this SOW will be deemed amended so as to conform with the applicable law, including, if the coverage exceeds legal limits, to only require CONTRACTOR to provide insurance to the maximum extent allowed by law. The validity, legality, and enforceability of the remaining obligations and terms of coverage required in this SOW shall not be affected or impaired, and will remain in full force and effect.

I) The requirements contained herein as to the types and limits of all insurance to be maintained by CONTRACTOR are not intended to and will not, in any manner, limit or qualify the liabilities and obligations assumed by CONTRACTOR under this SOW.

C0638655C

# SCHEDULE A-18
## STATEMENT OF WORK

This Statement of Work ("SOW" or "Schedule A") dated January 9, 2014 ("SOW Effective Date") is subject to all provisions of the Master Services Agreement, dated December 14, 2009, ("the Agreement") between EFH Corporate Services Company ("COMPANY") and PricewaterhouseCoopers LLP ("CONTRACTOR"). Any terms used in this SOW and not otherwise defined will have the same meaning as in the Agreement.

### ARTICLE 1. PURPOSE AND SCOPE

This SOW covers services to assist with remediation and mitigation of segregation of duties and sensitive access violations in the COMPANY production SAP systems. It is hereby acknowledged and agreed upon that the services performed pursuant to this SOW are not accounting advisory services, tax services, or transaction services as the terms are defined in Schedule C of the Agreement.

### ARTICLE 2. OVERVIEW

The CONTRACTOR will provide COMPANY with resources that will provide subject matter expertise to COMPANY to assist with analysis of the SOD and sensitive access violations, conduct workshops with business to review violations, provide suggestions on mitigating controls, and identify role changes to remediate issues.

### ARTICLE 3. OBJECTIVES

The overall objective of the work performed by CONTRACTOR is to assist COMPANY with remediation and mitigation of segregation of duties and sensitive access violations in the COMPANY production SAP systems. This includes the following objectives:

- CONTRACTOR will collaborate with COMPANY on remediation and mitigation strategy.
- CONTRACTOR will work with the COMPANY to reduce overall SOD violations.
- CONTRACTOR will provide feedback to COMPANY as part of its objective to identify and improve mitigating controls for outstanding SOD risks.

### ARTICLE 4. CONTRACTOR'S RESPONSIBILITIES

The CONTRACTOR will perform the Services in accordance with the Standards for Consulting Services, established by the Institute of Certified Public Accountants.

CONTRACTOR will complete the following services:

- CONTRACTOR will conduct a detailed analysis of the existing SOD violations by business and options for remediation.
- CONTRACTOR will provide options for approaching the remediation of the violations.
- CONTRACTOR will conduct workshops with COMPANY to determine updates to roles and users.
- CONTRACTOR will give feedback on mitigating controls design and mapping to risks.
- CONTRACTOR will provide guidance to the COMPANY's security team on role and user technical changes. .

The CONTRACTOR will not provide an opinion or other form of assurance with respect to the COMPANY's compliance with the Sarbanes-Oxley Act, related SEC rules, or the COMPANY's procedures. The CONTRACTOR will not make any representation as to the sufficiency of the COMPANY's procedures for its own purposes. The Services should not be taken to supplant inquiries and procedures that COMPANY should undertake for purposes of obtaining and using the information necessary in connection with the COMPANY's compliance with the provisions of the Act and related SEC rules.

C0638655C

**Assumptions**

- The CONTRACTOR will not perform technical SAP activities in the systems, including but not limited to role changes, user changes, and configuration changes.
- The CONTRACTOR is not responsible for complete remediation or mitigation of SOD or sensitive access risks. SOD violations will still exist following the timeline in this document.

**ARTICLE 5. DELIVERABLES**

CONTRACTOR will work with COMPANY around the following deliverables:

- Analysis of SOD violations
- Options to remediate SOD violations
- Feedback on mitigating controls defined by COMPANY
- Documented remediation decisions (user or role) by COMPANY

The CONTRACTOR is providing these Services and deliverables solely for the COMPANY's internal use and benefit. The Services and deliverables are not for third party's use, benefit or reliance, and the CONTRACTOR disclaims any contractual or other responsibility or duty of care to others based upon these Services or deliverables.

**ARTICLE 6. COMPANY'S RESPONSIBILITIES**

- The CONTRACTOR'S role is advisory only. The COMPANY is responsible for all management functions and decisions relating to the Services, including evaluating and accepting the adequacy of the scope of Services in addressing the COMPANY's needs.
- The COMPANY is responsible for the results achieved using the Services or deliverables.
- The COMPANY will designate a member of the COMPANY's management to oversee the Services.
- It is the COMPANY's responsibility to establish and maintain its internal controls. Effective internal control reduces the likelihood that errors, fraud, or other illegal acts will occur and remain undetected; however, it does not eliminate the possibility.
- The COMPANY will provide accurate and complete information as agreed upon in a timely manner and reasonable assistance, and CONTRACTOR will perform engagement on that basis.
- The COMPANY is responsible for technical SAP activities including role changes, user changes, and configuration changes.
- The COMPANY will dedicate the necessary time by appropriate resources to participate in remediation and mitigation activities.
- The COMPANY will define and update mitigating controls to be reviewed by CONTRACTOR.
- The COMPANY will be responsible for making all decisions on remediation or mitigation.
- The COMPANY will provide the CONTRACTOR with appropriate and timely access to systems required to support the landscape and promote-to-production path in order to facilitate project delivery based on the timeline.
- The COMPANY will be responsible for facilitating and conducting testing of changes in SAP related to remediation or mitigation.
- The COMPANY is responsible for the administration and support for the SAP GRC system.

**ARTICLE 7. TIMING**

Services will start January 13, 2013, and be complete September 30, 2014 OR as determined by COMPANY.

**ARTICLE 8. WORK SITE**

The Work Site will be the following location(s): CONTRACTOR and COMPANY’s Offices.

C0638655C

## ARTICLE 9. RESOURCES

The CONTRACTOR will provide the following resources for this engagement:

- Mickey Roach (Partner) & Langdon King (Director)
- SAP Security & Controls Manager – Khurram Anwar
- SAP Security & Controls Senior Associate – Edwin Karuga

CONTRACTOR will employ all reasonable efforts to ensure that such individuals remain so assigned until this engagement is completed.

## ARTICLE 10. COMPENSATION

In consideration of CONTRACTOR'S performance of services, COMPANY shall provide CONTRACTOR with an advanced payment retainer in the amount of $142,380 (the "Advance Payment Retainer") for the services to be completed January 13, 2014 through March 9, 2014 by CONTRACTOR for COMPANY in connection with this SOW, not including any expenses. CONTRACTOR will issue an invoice by January 31, 2014 for professional service fees for the period January 13, 2014-March 9, 2014 and COMPANY shall pay CONTRACTOR the Advance Payment Retainer by February 7, 2014. The total invoice breakdown is:

Fees: $157,380
10% Discount: ($15,000)

TOTAL ADVANCE PAYMENT RETAINER: $142,380

The purpose of this Advanced Payment Retainer is to serve as an advance payment against services to be rendered by CONTRACTOR to COMPANY in connection with the services provided pursuant to this SOW.

The Advanced Payment Retainer is earned by CONTRACTOR upon receipt. Upon receipt of this advanced payment, the Advanced Payment Retainer will become CONTRACTOR'S property and COMPANY shall have no interest in these funds. The Advanced Payment Retainer will be held in CONTRACTOR'S general account, will not be held in a separate account on COMPANY'S behalf, and COMPANY will not receive any interest on these monies.

In the event that this SOW or the Agreement is terminated prior to March 9, 2014 and the Advanced Payment Retainer amount exceeds CONTRACTOR'S fees, CONTRACTOR shall pay the difference to COMPANY promptly.

Starting March 10, 2014, CONTRACTOR's invoices will be paid within sixty (60) days of COMPANY's receipt thereof. Total compensation, including all travel, accommodation, transportation, meals and incidental costs shall not exceed $700,000. All invoices shall reflect the contract number. Independently and not as an agent of the COMPANY the CONTRACTOR shall provide services described herein and shall do all that is necessary or incident to the satisfactory and timely performance of this SOW. CONTRACTOR will bill actual hours at the rates in table 1 on a monthly basis. from March 10 through September 2014.

CONTRACTOR will also bill for reasonable travel expenses in accordance with COMPANY's Reimbursable Expense Policy. For these expenses, COMPANY shall reimburse CONTRACTOR within 10 days of receipt of invoice. CONTRACTOR will not undertake any Work outside the scope of Work set forth on this applicable Schedule A unless authorized to do so in an amendment or supplement to the Agreement or to this Schedule A.

C0638655C

Table 1

| Resource | Level | Project Hours | Rate |
|---|---|---|---|
| Mickey Roach, | Partner | 1-2 hrs/week | $515 |
| Langdon King | Director | 4 hrs/week | $335 |
| Khurram Anwar | Manager | Full-time | $250 |
| Edwin Karuga | Senior Associate | Full-time | $190 |

All invoices shall be sent to:

TXU ENERGY RETAIL CO LLC
6555 Sierra Dr
Irving, TX 75039
Attention: Adrienne Ball

| Party | PRICEWATERHOUSECOOPERS LLP | | EFH CORPORATE SERVICES COMPANY |
|---|---|---|---|
| By: | Mickey Roach | By: | Tamar Willis |
| Name/Title: | Mickey Roach | Name/Title: | Tamar Willis |
| Date: | 1/23/14 | Date: | January 28, 2014 |

C 0638655 C.



**Schedule A**

**Energy Future Holdings Corporation**

**STATEMENT OF WORK - Executive Personal Financial Services**

This Statement of Work ("SOW") is governed by the provisions of the Master Services Agreement, dated December 14, 2009, (the "Agreement") between EFH Corporate Services Company ("Client" or "COMPANY") and PricewaterhouseCoopers LLP ("CONTRACTOR"). The term "Client" or "COMPANY" in the Agreement shall include the entity signing this SOW, and the entity signing below agrees to be bound by the terms and conditions of the Agreement. Any terms used in this SOW and not otherwise defined will have the same meaning as in the Agreement. If there is a conflict between the Agreement and the SOW, this SOW shall prevail but with respect to this SOW only. Following the Parties' execution of this Schedule A, CONTRACTOR is authorized to perform the Work as identified below on behalf of COMPANY pursuant to the terms and conditions contained in the Agreement.

The Work will be performed in accordance with the specifications and instructions, if any, attached hereto and identified in the List of Attachments. The Work will be scheduled at the direction of COMPANY'S Contract Coordinator as identified herein.

**SCOPE OF WORK**

The Work performed under this Statement of Work will be performed in accordance with the AICPA's Statements on Standards for Tax Services (as amended and interpreted).

**DESCRIPTION OF SERVICES**

CONTRACTOR agrees to provide personal financial services to selected senior executives of the Company as outlined below.

Company will confirm to CONTRACTOR on an annual basis which executives are eligible for these services ("eligible executives"). Eligible executives will elect on an annual basis the level of service desired from CONTRACTOR.

CONTRACTOR agrees to offer eligible executives four Tiers of service from which they may choose the level of service they desire to receive:

- **Tier One: Tax Return Review.** CONTRACTOR will review the federal individual income tax return (Form 1040) of the executive, which has been prepared by the executive or by another tax advisor. The goal of Tier One is to provide an objective look at an executive's tax return to assure that items are properly reported on the return, high risk areas have been identified, and tax positions related to these areas are properly documented.

- **Tier Two: Tax Return Preparation.** CONTRACTOR will prepare and sign as paid preparer the federal and state individual income tax return(s) for the executive. Tier Two also includes an initial face-to-face meeting to review the executive's prior tax returns and prior tax positions taken, and a second face-to-face meeting to deliver and discuss the current year tax returns.

  **Tier Three: Proactive Tax Planning.** Under Tier Three, the executive will receive all of the services provided under Tier Two, plus access to tax planning services. This level of service is

distinguished by bi-annual meetings to review the individual's current tax situation, legislative updates, and to develop an action plan to implement strategies discussed. Tier three includes projections of the executive's current year tax liability, updated on a bi-annual basis, as a benchmark for tax planning and managing estimated payment obligations.

- **Tier Four: Comprehensive financial planning.** Tier Four includes all of the tax related services discussed above, plus financial planning advice on a comprehensive basis to assist the executive in meeting non-tax related goals and objectives. Tier Four includes access to our proprietary *Wealth Management System* technology platform, giving each executive a customized web page to manage his or her personal financial affairs.

If desired, access to the *Wealth Management System* technology platform may be added by the executive to Tiers One through Three at an additional annual cost.

CONTRACTOR and Company expect each eligible executive will be required by the Company to participate in the program. Thus, eligible executives must elect to receive from CONTRACTOR the services described under Tier One as a minimum level of service.

Each executive will be required to execute an engagement letter with CONTRACTOR to agree to the scope of services requested and various terms and conditions related to the provision of services. The engagement letter is attached as Exhibit 1 to this statement of work; amendments to the scope of services paragraphs of this illustrative engagement letter shall be permitted to correspond to the tier of service elected by the executive

**SCOPE OF WORK CONFIRMATION**

It is hereby acknowledged and agreed that the services performed pursuant to this SOW are not accounting advisory services, tax services or transaction services as the terms are defined in Schedule C of the Agreement.

**DELIVERABLES**

The deliverables to each eligible executive will be as stated above based on the Tier of service at which the executive elects to participate in the program.

Annually, after completion of the preparation or review of the federal income tax returns of all eligible executives, CONTRACTOR shall issue a letter to the Company affirming the following statements as true and correct to the best of CONTRACTOR's knowledge and belief:

- We affirm that the tax returns reviewed contained no reportable transactions, listed transactions (or substantially similar transactions) or transactions of interest as defined by the IRS, with the exception of reportable transactions that originated from a third-party investment (e.g. investment partnership) in which the executive is a passive investor.
- While CONTRACTOR did not audit or independently verify information, CONTRACTOR affirms that they made reasonable inquiries if any information provided seemed incorrect, incomplete, or inconsistent.
- Based upon CONTRACTOR'S preparation or review of the returns, CONTRACTOR did not become aware of any technical positions taken in the returns that did not meet at least the reasonable basis standard of confidence as defined under IRC Section 6694.
- Based upon a review of IRS transcripts of the taxpayer accounts for each eligible executive, CONTRACTOR affirms that the executive has filed his or her federal individual income tax return for the tax year and that the tax liability as reported on the return has been remitted in full to the IRS.

CONTRACTOR fully expects that the returns of Company's eligible executives will meet the requirements stated above and that CONTRACTOR will be in a position to make the above statements to the Company without exception. However, if during the performance of the services above, CONTRACTOR becomes aware of facts and circumstances under which CONTRACTOR would not be able to make one or more of the requested affirmations, the following protocol shall be followed:

- CONTRACTOR will discuss the facts and circumstances with the eligible executive(s) and his or her tax advisor. If applicable, the executive will have the opportunity to remediate the situation or to provide additional facts to CONTRACTOR such that the issue is thereafter resolved and CONTRACTOR is able to make the requested affirmations.
- If CONTRACTOR and the eligible executive(s) remain unable to resolve the matter in a manner such that CONTRACTOR is able to make the requested affirmations, CONTRACTOR will discuss the facts and circumstances related to this particular issue with the designee of Company's general counsel to determine a course of action.
- If CONTRACTOR and general counsel's designee are not able to resolve the matter in a manner that would allow CONTRACTOR to make the requested affirmations, CONTRACTOR shall amend the affected affirmation above to read "with the exception of [name of eligible executive]."

Each eligible executive will be made aware of Company's requirement that CONTRACTOR make the above requested affirmations, and will be asked to agree in writing to the disclosure of tax information to the Company as necessary to comply with the above protocols as part of the engagement letter executed with each executive.

**CONTRACT COORDINATOR:** Paul Keglevic Phone Number: 214-812-4032

**OTHER TERMS AND CONDITIONS**

**WORK SITE**

Generally, CONTRACTOR's services will be performed at CONTRACTOR's Dallas Office. Any meetings with executives as discussed under the Tiers of service shall take place at a location mutually convenient to CONTRACTOR and the executive.

**COMPENSATION, INVOICES AND PAYMENT**

As full compensation for the satisfactory performance by CONTRACTOR of the Work authorized pursuant to this Schedule A, COMPANY will compensate CONTRACTOR as follows. Any extension or increase in spend will require amendment to this Schedule A.

The fee detail is as follows:

If Tier 3 or Tier 4 is elected by any participant, a one-time, first year program administration fee of $10,000 to cover professional time in reviewing documentation and planning documents relative to all participants.

Tier 1 services will be provided at a fixed fee per participant per year of $3,000.

Tier 2 services will be provided at a fixed fee per participant per year of $6,000.

For Tiers 3 and 4, a fixed fee will be charged for tax compliance services, and an allowance will be charged for planning services. The planning allowance will be billed annually and reduced on a monthly basis as utilized based upon the hourly rates of the professionals providing planning services to the executive. Once the allowance is fully utilized for a calendar year, if additional services are desired, the executive may engage CONTRACTOR for additional planning services at his or her own personal expense at the same hourly rates stated below.

Any planning allowance not used during a calendar year may be carried over and utilized in the next calendar year, or if planning services will not be renewed by the executive for the next calendar year, such planning allowance shall be refunded to the Company.

| | | |
|---|---|---|
| Tier 3: | Fixed fee for compliance services | 6,000 |
| | Planning allowance | 3,000 |
| | Total annual cost per participant | 9,000 |
| Tier 4: | Fixed fee for compliance services | 6,000 |
| | Planning allowance | 6,000 |
| | Fixed fee for *Wealth Management System* access | 2,000 |
| | Total annual cost per participant | 14,000 |

*Wealth Management System* access may be added to Tiers 1 through 3 at an additional fixed fee of $3,000 per executive per year.

Utilization of the planning allowance provided to eligible executives participating in Tiers 3 and 4 shall take place based upon hourly rates. Hourly rates vary based upon the experience level and staff classification of the professional. The current fee schedule shall be as follows:

| | |
|---|---|
| Partner | $495 |
| Director/Senior Manager | $375 |
| Manager | $285 |
| Senior Associate | $190 |
| Associate | $130 |

The services described in this statement of work shall be renewable on an annual basis at the discretion of the Company and at the election of the executive, subject to acceptance by CONTRACTOR. This arrangement may be terminated at any time under the termination provisions provided in the Agreement, and all unused planning allowances shall be refunded to the Company at such time. CONTRACTOR and the Company agree to review the fixed fees and hourly rates on an annual basis. Any modification to the fees or rates shall be through an amendment or supplement to this Statement of Work.

For administrative ease, all fees will be billed annually in advance upon confirmation by the Company of the executives eligible to participate in the program for the coming year and upon the executives' election of the Tier of service at which they wish to participate. If additional executives are added to the program after the annual confirmation and billing, the fees for those executives will be invoiced at that time. If an executive joins the program after their tax return for that year has been completed by another provider, the annual fee for their initial year will not include the compliance component. Because the planning allowance under Tiers 3 and 4 is eligible for carryover to the following year, the planning allowance for the initial year of service to an executive will not be pro-rated.

In addition to the professional fees described above, CONTRACTOR will bill Company for reasonable, pre-approved out-of-pocket expenses. CONTRACTOR estimates out-of-pocket expenses related to this engagement will be minimal.

The amount of CONTRACTOR's fixed fees stated above is based on the assumption that CONTRACTOR will receive reasonable information and assistance as requested from the executive. In the event CONTRACTOR believes an additional fee is required as the result of the failure of the executive to meet any of these requests, CONTRACTOR must inform the Company and the executive promptly.

All invoices shall be sent to:

Energy Future Holdings Corporation
1601 Bryan Street

Dallas, TX 75201
Attn: Paul Keglevic

**KEY PERSONNEL**

CONTRACTOR agrees that the individuals listed below will be assigned to perform the Work authorized by this Schedule A. CONTRACTOR will employ all reasonable efforts to ensure that such individuals remain so assigned until such Work is accepted by COMPANY; provided, however, that in the event that any such individuals are reassigned by CONTRACTOR or otherwise become unavailable to perform such Work, CONTRACTOR will provide, by way of replacement, individuals with reasonably equivalent experience and expertise.

Mark Nash, Partner
Kami Majni, Manager
John Collins, Manager
Krystal Pickett, Senior Associate

CONTRACTOR PERSONNEL AUTHORIZED TO ATTEND MEETINGS WITH COMPANY PERSONNEL PERTAINING TO THE WORK

Mark Nash, Partner
Kami Majni, Manager
John Collins, Manager
Krystal Pickett, Senior Associate

PRIVILEGES CLAIMED BY COMPANY, WITH RESPECT TO DELIVERABLES OR OTHER DOCUMENTS HEREAFTER DESIGNATED BY COMPANY

_____ ATTORNEY-CLIENT COMMUNICATION

_____ ATTORNEY WORK PRODUCT

__X__ TAX ADVISOR

_____ OTHER:______________________________

**LIST OF ATTACHMENTS**

COMPANY and CONTRACTOR agree that the following described attachments, if any, are incorporated herein in their entirety as fully as completely rewritten herein:

Exhibit 1 – Sample Engagement Letter

Work not specified above may be authorized only through a separate Schedule A, or through an amendment or supplement to this Schedule A.

CONTRACTOR

By: [signature]
Signature

Name: Mark T Nash

COMPANY

By: [signature]
Signature

Name: MOLLY HOLLOWAY

Title: President

Date: 2/2/2011

Title: Supply Chain

Date: 2/3/11

C 0638655 C.

**Exhibit 1**

**Illustrative Tax Compliance Services Engagement Letter**

**Subject: Personal Financial Services for Energy Future Holdings Executives**

Dear __________

This letter contains certain terms and conditions relating to the tax services to be provided to ____________ ("you" or "Client") by PricewaterhouseCoopers LLP ("we" or "us" or "PwC") pursuant to an agreement between Energy Future Holdings ("EFH" or "Employer") and PwC.

**Scope of Our Services**

PwC has been engaged by Employer to provide the following services (the "Services") to you:

PricewaterhouseCoopers will prepare and sign as preparer your U.S. individual income tax return for tax years 2010 through 2012, as well as any applicable state individual income tax returns and other tax returns as listed in Exhibit I. You will be responsible for all other tax or information return(s) required to be filed with the authorities including, for example, city and county income or gross receipts filings, payroll tax filings, sales and use tax filings, information reporting filings, etc.

Most of the tax returns that we will prepare require your signatures, under the penalties of perjury, affirming that the tax return(s) and the accompanying schedules and statements are true, correct and complete to the best of your knowledge. You are responsible for understanding and agreeing with the various amounts, computations and statements made in the tax return(s) before they are filed with the taxing authorities.

As a reminder, you should also maintain documentation to support the tax return(s) as filed, as penalties can be imposed for failure to produce adequate documentation supporting the items included in a tax return.

**Completing and Returning the Organizer Booklet**

We will send each year an Organizer booklet to assist you in assembling your income tax information. Once you have completed your Organizer, please refer to the document checklist included with your Organizer before submission to us.

If you would like to prepare your Organizer electronically contact your tax representative and you will then be provided with a link to your personal electronic Organizer via e-mail.

If you made non-charitable gifts during the tax year, please complete a Gift Tax Questionnaire, which will be sent to you annually with your Organizer booklet. If you made gifts of more than $13,000 to any donee, the filing of a gift tax return will likely be required. Gifts made in trust may also generate a gift tax return filing requirement and should be listed on your Gift Tax Questionnaire.

Early consideration of your tax matters is necessary for us to have adequate time to prepare your tax return(s). If we have not received all of your information by March 1, we may request an extension of the filing date for your return(s); however, we will still need information to estimate your tax liabilities before doing so.

It is our understanding that you will file returns as prepared by PricewaterhouseCoopers unless you inform us otherwise.

You are required to maintain and retain adequate documentation to support the tax returns as filed as penalties can be imposed by taxing authorities for the failure to produce adequate documentation supporting the items included in a tax return.

**Electronic Filing**

The Internal Revenue Service and some states offer or require electronic filing for certain tax returns. As part of the services covered by this letter, PricewaterhouseCoopers will be the Electronic Return Originator (ERO) with respect to the returns indicated with an asterisk on Exhibit I. Your designation of PricewaterhouseCoopers as the ERO allows the taxing authorities to disclose to us the following: 1) any acknowledgement that return(s) have been accepted, 2) the reason(s) for any delay in processing a return or refund, and 3) information regarding any refund offset. If a particular return is ineligible or unable to be processed electronically after making reasonable efforts to do so pursuant to the procedures established by the appropriate tax authority, PricewaterhouseCoopers will provide you with a paper return that must be filed in accordance with the terms noted in this agreement.

**Additional Services**

From time to time, you may ask us to provide services outside the scope of these tax return services ("Additional Services"). Subject to our acceptance, PricewaterhouseCoopers will provide such Additional Services, which might include (1) providing advice, answers to questions and/or opinions on tax planning matters, including research, discussions, preparation of memoranda and attendance at meetings, or (2) providing advice and/or assistance with respect to matters involving the Internal Revenue Service or other tax authorities on an as-needed or as-requested basis.

We will keep you informed about the nature of any Additional Services we are providing under this agreement, and will discuss with you whether the fees for such services will be paid for by Employer or you.

**Other PricewaterhouseCoopers Firms and Subcontractors**

Subject to your Consent to Disclosure of Tax Return Information, we may subcontract portions of the Services to non-U.S. members of the PricewaterhouseCoopers international network of firms. We will be responsible for those subcontracted Services being performed in accordance with all of the requirements of this letter. Each member of the PricewaterhouseCoopers international network of firms is a separate and independent legal entity and you agree to bring any proceeding arising from the Services against us and not other member firms.

Subject to your Consent to Disclosure of Tax Return Information, we may engage (a) subcontractor(s), other than non-U.S. members of the PricewaterhouseCoopers international network of firms, to perform services in connection with this engagement. You agree that we shall be responsible for the fulfillment of our obligations under this agreement.

**Disclosures to Energy Future Holdings**

As part of the terms of our engagement with Employer, we are required to make certain affirmations and disclosures to Employer related to tax positions taken on your individual tax return. Please contact Employer if you would like further detail regarding the nature or content of the information we are required to disclose to

them. By signing this engagement letter and the attached Consent to Disclosure of Tax Return Information, you affirm that you are aware of this disclosure requirement and hereby consent to the disclosure of your personal information to Employer's designee as we deem necessary to comply with the terms of our engagement with Employer. This disclosure will be at our discretion, up to and including your entire individual income tax return.

**Ownership and Use**

We are providing these Services solely for your use and benefit and pursuant to a client relationship exclusively with you. We disclaim any contractual or other responsibility to others based upon these Services or upon any deliverables or advice we provide.

You will own all tangible written material delivered to you under this engagement letter, except as follows: PwC will own its working papers and preexisting materials and any general skills, know-how, processes, or other intellectual property (including a non-client specific version of any deliverables) which may have been discovered or created by PwC as a result of its provision of the Services. You will have a nonexclusive, non-transferable license to use such materials included in the deliverables for your own use as part of such deliverables.

**Our Responsibilities**

We will perform the Services in accordance with the Statements on Standards for Tax Services established by the American Institute of Certified Public Accountants. Accordingly, we will not provide an audit or attest opinion or other form of assurance, and we will not verify or audit any information provided to us. Any spreadsheets or software tools that PwC provides to Client are for Client's convenience and are provided as is. PwC will not be responsible for results obtained by anyone other than PwC from the use of those items.

**Your Responsibilities**

We will provide you with a document request of the information we will need to facilitate our work.

To be of greatest assistance to you, we should be advised in advance of any major transactions you propose to undertake. Unless you specifically seek our advice, we cannot assume responsibility for the tax consequences of transactions entered into or the possible effects of developments in the tax law.

We expect that you will provide timely, accurate and complete information and reasonable assistance, and we will perform the engagement on that basis.

**Financial Reporting Oversight Role Status**

As a firm which provides auditing services, PricewaterhouseCoopers and its people are subject to regulatory mandates, professional standards and internal policies governing our code of conduct. Certain of these rules require that we maintain independence from our audit clients and their affiliates. In this regard, the types of services we can provide to audit clients and certain other parties are restricted. In particular, we are not permitted to provide personal tax services to an individual in a financial reporting oversight role ("FROR") at certain of our audit clients.

Accordingly, before we can begin to provide you with personal tax services, we need confirmation from you that neither you nor your spouse (or spousal equivalent), serve in such a role. By signing this Agreement you confirm that you have read and understand the attached document entitled "Guidelines for Individual Tax Clients of PricewaterhouseCoopers," and that you have brought to our attention any facts that may have a bearing on PricewaterhouseCoopers' independence.

**Fees and Expenses**

Tax Return Preparation Services

Fees for Tax Return Preparation services will be paid to PwC directly by Employer pursuant to our agreement with Employer.

Additional Services

For any Additional Services covered by this agreement, unless we receive confirmation from Employer that they will pay for the additional services, Client will pay PricewaterhouseCoopers a fee based on agreed-upon rates.

The amount of our fee is based on the assumption that we will receive the information and assistance as detailed throughout this agreement. In the event we believe an additional fee is required as the result of the failure of Client to meet any of these requests or for any other reason, we will inform you promptly.

**Termination and Dispute Resolution**

Either party may terminate the Services by giving notice to that effect. In addition, Employer may terminate the Service by giving notice to that effect. Any dispute relating in any way to the Services or this letter shall be resolved by arbitration, except that either party shall be free to seek equitable relief in court. The arbitration will be conducted in accordance with the Rules for Non-Administered Arbitration of the International Institute for Conflict Prevention and Resolution then in effect. The arbitration will be conducted before a panel of three arbitrators. The arbitration panel shall have no power to award non-monetary or equitable relief of any sort. It shall also have no power to award damages inconsistent with the Limitations on Liability provisions below. You accept and acknowledge that any demand for arbitration arising from or in connection with the Services must be issued within one year from the date you became aware or should reasonably have become aware of the facts that give rise to our alleged liability and in any event no later than two years after any such cause of action accrued.

This engagement letter and any dispute relating to the Services will be governed by and construed, interpreted and enforced in accordance with the laws of the State of New York, without giving effect to any provisions relating to conflict of laws that would require the laws of another jurisdiction to apply.

**Limitations on Liability**

Except to the extent finally determined to have resulted from our gross negligence or intentional misconduct, our liability to pay damages for any losses incurred by you as a result of breach of contract, negligence or other tort committed by us, regardless of the theory of liability asserted, is limited to no more than the total amount of annual fees paid to us by you or Employer for the particular service provided under this engagement letter. In addition, we will not be liable in any event for lost profits or any consequential, indirect, punitive, exemplary or special damages. Also, we shall have no liability to you arising from or relating to any third party hardware, software, information or materials selected or supplied by you.

**Indemnification**

You agree to indemnify and hold us and other PricewaterhouseCoopers firms engaged as subcontractors hereunder, and our respective partners, principals and employees harmless from and against any and all third party claims resulting from any of the Services or Deliverables under this agreement, except to the extent determined to have resulted from our gross negligence or other intentional misconduct relating to such Services and/or Deliverables.

**Regulatory Matters**

Notwithstanding anything to the contrary in this agreement, you have no obligation of confidentiality with respect to any materials, advice or portions of Deliverables to the extent they concern the tax structure or tax treatment of any transaction.

**Other Written Advice**

Based on our discussions, it is anticipated that the written advice PricewaterhouseCoopers provides during the course of this engagement will be Other Written Advice as defined by Circular 230. Accordingly, unless otherwise prohibited or we agree to issue a Covered Opinion as defined by Circular 230, our written advice may include a disclosure stating that the advice was not intended or written to be used, and it cannot be used, for the purpose of avoiding tax penalties that may be imposed. Our advice will contain any other disclosures required by Circular 230.

**Tax Return Disclosure and Tax Advisor Listing Requirements.**

Treasury Regulations Section 1.6011-4 requires that taxpayers disclose to the IRS their participation in certain reportable transactions. Additionally, certain states have adopted rules with purposes similar to Treasury Regulations under Internal Revenue Code Section 6011. You agree to advise us if you determine that any matter covered by this agreement is a reportable transaction that is required to be disclosed under Section 1.6011-4, or is a transaction requiring disclosure to a particular state under such state's particular statutes or regulations.

Similar rules under Internal Revenue Code Sections 6111 and 6112 require that we submit information returns and maintain lists of certain client engagements if we are material advisors to clients that have participated in a reportable transaction. Additionally, certain states have adopted rules similar in scope to Internal Revenue Code Sections 6111 and 6112, thereby creating similar registration and list maintenance requirements in those states. Therefore, if we determine, after consultation with you, that you have participated in a transaction causing us to have a registration and/or list maintenance obligation, we will place your name and other required information on a list. We will contact you if we are required to provide your name to the IRS or any state in connection with any matter under this agreement.

**Federal (Internal Revenue Code Section 6694) and State Preparer Standards.**

Federal law and certain state laws impose obligations on tax return preparers with respect to a position reported on a tax return or claim for refund that does not meet certain standards regarding levels of confidence. If during the course of this engagement we identify a position that does not meet these standards, we will advise you about your penalty exposure and whether you can avoid penalty through disclosure. If we are preparing the return or claim for refund and it is concluded that disclosure is required, we will prepare the disclosure and provide it to you.

Our work may require consultation with a PricewaterhouseCoopers subject matter specialist to reach and document the level of technical support for the position. We will discuss with you any additional fees that may be incurred as a result of complying with these requirements.

**Other Matters**

This engagement letter supersedes any prior understandings, proposals or agreements with respect to the Services, and any changes must be agreed to in writing. However, this engagement letter does not supersede any terms and conditions contained in the Master Services Agreement ("MSA") between PwC and Employer dated December 14, 2009, and in the event of any conflict between this engagement letter and the MSA, the terms of the MSA shall control.

PwC is owned by professionals who hold CPA licenses as well as by professionals who are not licensed CPAs. Depending on the nature of the services we provide, non-CPA owners may be involved in providing services to you now or in the future.

* * * * *

We are pleased to have the opportunity to provide services to you. If you have any questions about the contents of this letter, please discuss them with the undersigned. If the Services and terms outlined in this letter are acceptable, please sign one copy of this letter in the space provided and return it to the undersigned. You may return the signed letter to PwC at 2001 Ross Avenue, Suite 1800, Dallas TX 75201, by facsimile to 813-741-5650, or by e-mail attachment to mark.t.nash@us.pwc.com.

Very truly yours,

PricewaterhouseCoopers LLP

By: ____________________________

Mark T. Nash, Partner

Attachment(s): Exhibit I – Listing of Returns to be Prepared
Personal Data Sheet
Privacy Policy Notice
Guidelines for Individual Tax Clients of PricewaterhouseCoopers
Consent to Disclosure of Tax Return Information

**ACKNOWLEDGED AND AGREED:**

**[Name of Client]**

**Signature:** ____________________________

**Date:** ____________________________