# EXHIBIT C

## MSA

# MASTER SERVICES AGREEMENT

## BY AND BETWEEN

## ERNST & YOUNG LLP

## AND

## EFH CORPORATE SERVICES COMPANY

### JUNE 10, 2010

### CONTRACT NO. C 0628215 C

C 0628215C

# MASTER SERVICES AGREEMENT

This Master Services Agreement (this "Agreement") is made and shall become effective as of June 10, 2010 (the "Effective Date"), by and between EFH Corporate Services Company, a Texas corporation ("COMPANY", "Client" or "you" ) and Ernst & Young LLP., a Delaware limited liability partnership ("CONTRACTOR", "EY" or "we"), pursuant to which CONTRACTOR will provide to COMPANY the services described on the Schedule A(s) attached hereto and on future Schedules, as that may be agreed to by the Parties. COMPANY and CONTRACTOR may be referred to each as a "Party" or collectively as the "Parties." Capitalized terms not defined within another section of this Agreement are defined below. In consideration of the following obligations and mutual promises, the Parties hereby agree as follows:

## ARTICLE 1: DEFINITIONS

A.  CLAIMS
    The term "Claims" means all third party claims, losses, expenses, damages (including reasonable attorneys fees), demands, judgments, causes of action, suits, and liability in tort, contract, product or strict liability or any other basis and of every kind and character whatsoever.

B.  COMPANY
    The term "COMPANY" means COMPANY and any subsidiaries and affiliates of Energy Future Holdings Corp. who enters into a Schedule A under this Agreement.

C.  Contract Administrator
    The term "Contract Administrator" means a representative(s) of each Party named in this Agreement, or in a subsequent written notice issued pursuant to this Agreement by such party from time to time, to act in matters relating to the revision of contract language, the adjustment of compensation or time, and the resolution of issues regarding the meaning of contract language.    Actions of COMPANY'S Contract Administrator include initiating, negotiating and issuing supplements or amendments to this Agreement, as required; receiving required notices and negotiating resolutions/settlements to disputes that may arise concerning this Agreement.

D.  Contract Coordinator
    The term "Contract Coordinator" means a representative(s) of each Party named in this Agreement, or in a subsequent written notice issued pursuant to this Agreement by such party from time to time, to act in matters related to performance of this Agreement as it is written.    Actions of the Contract Coordinators regarding the day-to-day interaction between the operations of the Parties, the issuance and approval of invoices, the issuance and approval of procedures, drawings, Schedule As and documents of any type, and other decisions made in managing this Agreement will not operate as a waiver or compromise of any provision of this Agreement.

C 0628215C

# MASTER SERVICES AGREEMENT

E.   CONTRACTOR
     The term "CONTRACTOR" means CONTRACTOR and all its partners, principals and
     employees.

F.   Deliverable or Report
     Except to the extent otherwise expressly provided for in a Schedule A, the term
     "Deliverable" means the tangible work product, content of any reports, presentations or
     other communications to be developed or prepared by CONTRACTOR for COMPANY
     as part of the Work, and as specified as work product in a Schedule A.

G.   Schedule A:
     The term "Schedule A" and all future Schedules A means a written document issued
     pursuant to this Agreement, which shall be signed by the Parties, that identifies and
     authorizes Work to be performed. Schedule A may, however, contain Work instructions,
     specifications and specific billing advice, as well as additional terms and conditions
     applicable to the specific Work to be performed. As used herein, the term "Schedule A"
     shall have the same meaning as the term "Statement of Work," and the same shall be
     interchangeable.

H.   Work
     The term "Work" means the services to be performed and described in any Schedule A,
     including, without limitation, the preparation and submission to COMPANY of any
     Deliverable. As used herein, the term "Work" shall have the same meaning as the term
     "Services", and the same shall be interchangeable.

I.   Work Site
     The term "Work Site" means location(s) described in a Schedule A where the Work will
     be performed.

## ARTICLE 2: ASSIGNABLE SCOPE OF WORK AND DELIVERABLES

COMPANY may, from time to time, identify any Work which COMPANY desires to be
performed by CONTRACTOR, as specified in a Schedule A. Except as otherwise specified by
the Parties or as otherwise set forth herein or in the applicable Schedule A, CONTRACTOR will
provide all materials, equipment, tools, supervision, and manpower resources necessary for the
full and complete performance of the Work and the preparation of any Deliverables.

Each proposed Schedule A shall be approved by COMPANY and, when acceptable to both
Parties, shall be executed by both Parties. Each Schedule A shall reference this Agreement by
number and shall be deemed a part of this Agreement. Nothing in this Agreement shall be
deemed to authorize any Work, or constitute a commitment of either Party to accept or execute
any particular Schedule A, and neither COMPANY nor CONTRACTOR will have any rights or
obligations, for or with respect to any particular Work except as such Work is identified in a

2

C 0628215C

# MASTER SERVICES AGREEMENT

Schedule A executed by both Parties. At COMPANY'S Contract Coordinator's discretion, Work may be requested verbally, and confirmed by a written Schedule A.

Notwithstanding anything herein to the contrary, the Work shall not include (unless specified in a Statement of Work) (i) COMPANY the provision of expert testimony on behalf of COMPANY or (ii) any service that would require CONTRACTOR to maintain independence from COMPANY in accordance with then current applicable law, rule or regulation of any governmental entity or professional organization.

COMPANY agrees to provide reasonable cooperation to CONTRACTOR in the performance of the Work and shall provide or arrange to provide CONTRACTOR with reasonable access to and use of the personnel, facilities, equipment, data and information to the extent reasonably necessary for CONTRACTOR to perform the Work. To the extent applicable to the Work, a Statement of Work shall set forth the obligations of COMPANY in connection with such Work. COMPANY agrees to make commercially reasonable efforts to perform such obligations in accordance with, and subject to, such Statement of Work. COMPANY acknowledges that its failure to meet such obligations may adversely affect CONTRACTOR'S ability to provide the Work in accordance with the terms of this Agreement and the applicable Statement of Work. CONTRACTOR agrees to notify COMPANY in the event any such failure to perform by COMPANY has, or may, affect the ability of CONTRACTOR to perform the Work.

COMPANY acknowledges and agrees that CONTRACTOR will, in performing the Work, base its conclusions on the facts and assumptions that COMPANY furnishes and that CONTRACTOR may use data, material, and other information furnished by or at the request or direction of COMPANY without any independent investigation or verification and that CONTRACTOR shall be entitled to rely upon the accuracy and completeness of such data, material and other information. Inaccuracy or incompleteness of such data, material and other information furnished to CONTRACTOR could have a material effect on CONTRACTOR'S conclusions.

It is understood and agreed that CONTRACTOR'S services may include advice and recommendations; but all decisions in connection with the implementation of such advice and recommendations shall be the responsibility of, and made by, COMPANY. CONTRACTOR will not perform management functions or make management decisions for COMPANY. In connection with CONTRACTOR'S provision of Work under a Statement of Work, COMPANY agrees that COMPANY, and not CONTRACTOR, shall perform the following functions: (i) make all management decisions and perform all management functions, (ii) designate an individual who possesses suitable skill, knowledge and experience, preferably within senior management, to oversee such services, and to evaluate the adequacy and results of such services, and (iii) accept responsibility for implementation of the results of such services; and (iv) establish and maintain internal controls over the processes with which such services are concerned, including monitoring on-going activities.

Subsequent to the completion of the Work under a Statement of Work, CONTRACTOR will not update its advice, recommendations or work product for changes or modification to the law and

3

C 0628215C

# MASTER SERVICES AGREEMENT

regulations, or to the judicial and administrative interpretations thereof, or for subsequent events or transactions, unless COMPANY separately engages CONTRACTOR to do so in writing after such changes or modifications, interpretations, events or transactions.

## ARTICLE 3: NON-EXCLUSIVE

COMPANY reserves the right to obtain the types of services provided by CONTRACTOR from other sources without obligation or liability to CONTRACTOR and, subject to Articles 23 ("Business Ethics") and 25 ("Conflict of Interest"), nothing herein shall be deemed to limit or prohibit CONTRACTOR from performing similar services for other clients.

## ARTICLE 4: TERM OF AGREEMENT

The term of this Agreement shall commence on the Effective Date and, unless this Agreement is terminated earlier, shall continue for a period of three (3) years thereafter (the "Initial Term"). After the end of the Initial Term and each Renewal Term, this Agreement shall terminate unless at least 30 days prior to the end of the Initial Term or such Renewal Term, as the case may be, COMPANY provides CONTRACTOR written notice of COMPANY'S intent to extend the term of this Agreement and CONTRACTOR'S agreement to extend the term, in which case this Agreement will continue in effect for successive one year terms (each, a "Renewal Term"). Notwithstanding any of the foregoing, in no event shall this Agreement continue in effect for longer than 10 years after the Effective Date, unless extended by a written agreement signed by both Parties.

## ARTICLE 5: COMPENSATION

Subject to the requirements of this Article 5, and as full compensation for the satisfactory performance by CONTRACTOR of the Work, COMPANY will compensate CONTRACTOR in accordance with the rate(s) or price(s) contained in the appropriate Schedule A issued under this Agreement.

    (a)    **Fees and Staffing**

        (i)    CONTRACTOR will only bill for hours spent performing Work for COMPANY.

        (ii)    Unless specifically authorized on Schedule A, COMPANY will not pay CONTRACTOR fees for time incurred in preparing or reviewing invoices, budgets, or continuing professional education activities (including general background research and normal review of periodicals).

        (iii)    CONTRACTOR will identify to COMPANY, for its prior approval, the CONTRACTOR personnel who will be billing time to the Work authorized (pursuant to the

4

C 0628215C

## MASTER SERVICES AGREEMENT

applicable Schedule A) and their respective hourly rates, if applicable. COMPANY will not pay fees for Work that is not previously authorized, pursuant to a duly executed Schedule A, except to the extent that the Work is reasonably necessary and appropriate and it is impractical under the circumstances to obtain prior authorization. In any event, COMPANY will not pay for time incurred as a result of staffing changes (in other words, for time incurred by replacement personnel in getting "up to speed" on authorized Work).

(b)    **Disbursements**

(i)    Subject to the following provisions of this Article 5, COMPANY will reimburse reasonable, documented, out-of-pocket expenses at actual cost. There shall be no fees, surcharges or other markup on actual cost. CONTRACTOR shall be prudent in incurring reimbursable expenditures, and exercise reasonable diligence in minimizing reimbursable costs.

(ii)    Unless otherwise set forth in the Schedule A, COMPANY shall pay only unrestricted coach class fare, for any domestic air travel undertaken by any member of CONTRACTOR as part of or in connection with the Work. CONTRACTOR shall take advantage of any reasonably available travel discounts, and shall incur only reasonable hotel, transportation, and out-of-town meal expenses. The cost of any foreign air travel, undertaken by any member of CONTRACTOR as part of or in connection with the Work, shall be reimbursable in the manner agreed to by the Parties, on a case-by-case basis. We may receive rebates in connection with certain purchases, which we use to reduce charges that we would otherwise pass on to you. If we are required by applicable law, legal process or government action to produce information or personnel as witnesses with respect to the Services or this Agreement, you shall reimburse us for any professional time and expenses (including reasonable external and internal legal costs) incurred to respond to the request, unless we are a party to the proceeding or the subject of the investigation.

(iii)    Except as otherwise agreed in a Schedule A, COMPANY will not reimburse costs for overhead expenses, including, without limitation:

A.    secretarial, clerical, and word processing services (whether normal, temporary, or overtime);
B.    overtime meals, parking, or transportation (except for travel costs described above);
C.    local telephone charges;
D.    office or conference room rental or support services;
E.    building services;
F.    computer services;
G.    equipment rental;
H.    library services;
I.    accounting and billing;
J.    internal messenger service;
K.    subscription or maintenance fees;

C 0628215C

# MASTER SERVICES AGREEMENT

L.    office supplies; or

M.    document or file storage.

(iv)    COMPANY will not reimburse photocopying charges in excess of 10 cents per page. Except as otherwise authorized in advance by COMPANY Contract Coordinator, CONTRACTOR shall arrange to have any single copying job or project requirement, the photocopying cost of which is expected to exceed Five Hundred Dollars ($500.00), performed by a third party copying or business service provider, if such copying by that third party will result in a lower copying cost for that project or job.

(v)    COMPANY will not reimburse costs of CONTRACTOR for facsimiles and electronic data transmissions. COMPANY will reimburse costs of outgoing facsimiles and electronic data transmissions at the actual cost of long-distance telephone charges.

(vi)    CONTRACTOR shall not engage other consultants and subcontractors (other than other EY Firms) to perform Work, or to otherwise undertake services on behalf of COMPANY except as specified and authorized with each Schedule A. CONTRACTOR shall bill all reimbursable fees and disbursements of such consultants directly to COMPANY and according to "Reimbursable Expense Policy for Consultants" Attachment 5. CONTRACTOR shall continue to be primarily responsible for the services provided by such consultants and subcontractors as if it had provided those services directly to the COMPANY.

(vii)    COMPANY will not reimburse any fees or disbursements for which a deduction is disallowed under section 162(e) of the Internal Revenue Code (relating to lobbying expenses), unless COMPANY Contract Coordinator has granted advance written approval of such expenditures.

All fees, charges and other amounts payable to CONTRACTOR hereunder do not include any sale, use, excise, value added or other applicable taxes, tariffs or duties, payment of which shall be the sole responsibility of COMPANY (excluding any applicable taxes based on CONTRACTOR'S net income or taxes arising from the employment or independent contractor relationship between CONTRACTOR and its personnel). In the event that such taxes, tariffs or duties are assessed against CONTRACTOR, COMPANY shall reimburse CONTRACTOR for any such amounts paid by CONTRACTOR or provide CONTRACTOR with valid tax exemption certificates with respect thereto.

All compensation paid to CONTRACTOR excludes applicable State of Texas Sales and Use Taxes.

## ARTICLE 6: INVOICES AND PAYMENT

Invoices will be submitted at the end of each calendar month in which Work is performed. Such invoices will include a detailed description of the Work actually performed. Invoices will be accompanied by such documentation as COMPANY may reasonably require for verifying the

C 0628215C

# MASTER SERVICES AGREEMENT

propriety of any amounts billed. COMPANY may refuse to process any invoice that does not conform to the requirements of this Agreement, including, without limitation, the requirements of Article 5. COMPANY will promptly notify CONTRACTOR of any non-conforming invoice that must be resubmitted before payment.

Each invoice issued in connection with Work will reference this Agreement number. Detailed billing instructions will be set forth in the Schedule A.

CONTRACTOR'S invoices will be paid within sixty (60) days of COMPANY'S receipt thereof; provided, however, that should COMPANY dispute any portion of an invoice in good faith, COMPANY may pay only the undisputed portion of the invoice within the time stated above and, at the same time, advise CONTRACTOR in writing of its reasons for withholding the disputed portion. COMPANY will thereafter pay such amounts to CONTRACTOR upon the resolution of such discrepancy or conflict to the Parties' mutual satisfaction.

## ARTICLE 7: ACCEPTANCE

Any required acceptance shall be as set forth in the applicable Schedule A.

## ARTICLE 8: SALES/USE TAX

COMPANY will provide CONTRACTOR with a Direct Payment Exemption Certificate which, in the event COMPANY entity receiving Services under this Agreement is listed on the Direct Payment Exemption Certificate, will negate the necessity of CONTRACTOR's collection of State of Texas Sales and Use Tax from COMPANY. A properly authorized Direct Payment Exemption Certificate is attached as Attachment 2 and made a part of this Agreement.

## ARTICLE 9: WORK SITE SAFETY, SECURITY, ALCOHOL, DRUGS AND WEAPONS

COMPANY'S Contract Coordinator may provide to CONTRACTOR prior to commencing Work the specific Work Site safety, security and other related rules and procedures, if any, applicable to those members of CONTRACTOR performing Work on COMPANY'S premises.

In addition to complying with those specific rules and procedures, CONTRACTOR agrees to comply with the rules and procedures contained in Attachment 3 to this Agreement, titled "Work Site Safety, Security, Alcohol, Drugs and Weapons."

## ARTICLE 10: INSURANCE

CONTRACTOR shall, at its sole cost and expense, carry and maintain during the term of this Agreement the minimum insurance coverages set forth on Attachment 4 hereof with substantial and sound insurers. The coverage limits are minimum limits and do not otherwise limit

C 0628215C

# MASTER SERVICES AGREEMENT

CONTRACTOR'S liability arising from this Agreement or otherwise and are not to be considered indications of the actual coverage limits and types of insurance necessary in connection with performance of the Work and CONTRACTOR'S obligations hereunder.

## ARTICLE 11: INDEPENDENT CONTRACTOR RELATIONSHIP

CONTRACTOR will act as and be deemed to be an independent contractor. Neither CONTRACTOR nor any of its employees, nor any other members of CONTRACTOR, will act as, nor be deemed to be, an agent or employee of COMPANY. CONTRACTOR will have the sole right to control and directly supervise the method, manner and details of the Work. CONTRACTOR does not undertake to perform any obligation of COMPANY, whether regulatory or contractual, or to assume any responsibility for COMPANY'S business or operations. CONTRACTOR has the sole right and obligation to contract for, direct, procure, perform or cause to be performed all Work, except as otherwise provided in this Agreement or any Schedule A. CONTRACTOR accepts full and exclusive liability for the payment of all employer contributions and taxes measured by the remuneration paid to CONTRACTOR employees as required by all applicable United States federal, state and local laws, rules and regulations. CONTRACTOR will indemnify and hold COMPANY harmless from any and all loss or liability arising from its failure to make such payments, withholdings and benefits, if any. In the event the Internal Revenue Service or any other governmental agency should question or challenge the independent contractor status of CONTRACTOR, the parties hereby agree that both CONTRACTOR and COMPANY shall have the right to participate in any discussion or negotiation occurring with such agency or agencies, regardless of with whom or by whom such discussions or negotiations are initiated.

## ARTICLE 12: ASSIGNMENT

Neither party may assign, transfer or otherwise dispose of any of its obligations or duties without the prior written approval of the other party, which approval shall not be unreasonably withheld, conditioned or delayed. Any assignment or transfer made without the express written approval of the other party will be null and void.

## ARTICLE 13: SUBCONTRACTING

We are a member of the global network of Ernst & Young firms ("**EY Firms**"), each of which is a separate legal entity. We may subcontract portions of the Services to other EY Firms, who may deal with you directly. Nevertheless, we alone will be responsible to you for the Reports, the performance of the Services, and our other obligations under this Agreement. From time to time, non-CPA personnel may perform the Services. Except for the foregoing, CONTRACTOR may only use third parties to perform work under this Agreement after obtaining Company's prior written consent; and upon request by COMPANY, CONTRACTOR shall promptly remove from the Work any subcontractor not acceptable to COMPANY. CONTRACTOR will not be relieved of any duty or liability relating to any Work by reason of subcontracting. There will be no contractual relationship between COMPANY and any subcontractor by virtue of this Agreement.

C 0628215C

# MASTER SERVICES AGREEMENT

## ARTICLE 14: BINDING ON SUCCESSORS AND ASSIGNS

This Agreement will inure to the benefit of and be binding upon the Parties and their respective legal representatives, successors and assigns and, except as expressly provided herein, nothing in this Agreement shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

## ARTICLE 15: STANDARDS AND CODES

Whenever reference is made in this Agreement to standards or codes in accordance with which Work is to be performed or tested, the edition or revision of the standards or codes current on the Effective Date will apply, unless otherwise expressly stated. In case of conflict between any referenced standards and codes and any documents attached to and incorporated into this Agreement, this Agreement will govern.

## ARTICLE 16: CHANGES IN WORK AND DELIVERABLES

COMPANY may, by written notice to CONTRACTOR, request changes in, additions to, or deletions from the Work and the parties will mutually agree to the change to the relevant Schedule A, including without limitation, any adjustment to the fees payable thereuder.

## ARTICLE 17: EXTRA WORK

COMPANY may, at any time, request CONTRACTOR to perform Work outside the specific scope authorized by this Agreement ("Extra Work"), however notwithstanding anything to the contrary set forth herein, CONTRACTOR will not undertake any Work outside the scope of Work set forth on the applicable Schedule A unless authorized to do so in an amendment or supplement to this Agreement or to a Schedule A, as agreed to by both parties. Any Extra Work not authorized under this Agreement will be performed only through an amendment or supplement to this Agreement or to a Schedule A, and shall be governed by the terms set forth in this Agreement, as amended or supplemented, or in that Schedule A.

Compensation for Extra Work will be in accordance with the applicable amendment or supplement to this Agreement, or in the applicable Schedule A.

## ARTICLE 18: FORCE MAJEURE

If either Party becomes unable, either wholly or in part, by an event of Force Majeure, to fulfill its obligations under this Agreement, the obligations affected by the event of Force Majeure will be suspended only during the continuance of that inability. The Party so affected will exercise commercially reasonable efforts to give written notice of the existence, extent and nature of the event of Force Majeure to the other Party within a reasonable time after the occurrence of that event. The Party so affected will remedy its inability as soon as commercially practicable.

9

C 0628215C

# MASTER SERVICES AGREEMENT

The term "Force Majeure" as used in this Agreement means acts of God (except as excluded herein), acts of public enemies, wars, blockades, insurrections, riots, epidemics, earthquakes, fires, restraints or prohibitions by any court, board, department, commission or agency of the United States or of any States, any arrests and restraints, civil disturbances, or explosions or other events beyond a party's reasonable control.

## ARTICLE 19: SUSPENSION FOR CAUSE

In addition to the other remedies provided COMPANY in this Agreement, COMPANY has the right to order the temporary suspension of any Work, immediately upon written notice, when, in its sole discretion, performance is not being conducted in a safe manner, and upon 3 days prior written notice, when, in its sole discretion, the specified quality of the Work is not being met, or the Work is not otherwise being performed in accordance with the requirements of this Agreement.

If any suspension of Work significantly increases the time required for the performance of the Work, an equitable adjustment may, upon mutual agreement of the Parties, be made in the performance obligations. In no event, however, will any suspension be the basis for any claim or cause of action by CONTRACTOR or CONTRACTOR'S employees, agents, or subcontractors against COMPANY.

## ARTICLE 20: TERMINATION

Notwithstanding the provisions of Article 4, COMPANY may terminate this Agreement, in whole or in part, including any one or more Schedule A, at any time, at its sole discretion, by providing thirty (30) days written notice of termination to CONTRACTOR. The notice of termination will specify the effective date of any termination, and the Work or any part of the Work to be terminated, or alternatively, that this Agreement is terminated in its entirety. Without limiting the foregoing, either party may terminate this Agreement or any outstanding Statement of Work upon thirty (30) days prior written notice to the other party in the event such other party breaches a material term of this Agreement or any Statement of Work and such breach remains uncured at the end of such thirty (30) day period. CONTRACTOR may terminate this Agreement if its performance of the Work becomes prohibited by a change in law or regulation, or if its relationship with COMPANY or this Agreement could cause CONTRACTOR to be in violation of the auditor independence laws, regulations, rules or guidelines of the Securities and Exchange Commission, the Public Company Accounting Oversight Board or any other governmental, administrative or self-regulatory body.

CONTRACTOR shall, as soon as reasonably practicable following receipt of a notice of termination, discontinue Work in accordance with COMPANY'S termination instructions. Upon receiving notice of termination, CONTRACTOR will place no further orders, or enter into further subcontracts for services, materials or equipment related to the terminated Work. In addition, CONTRACTOR will terminate all existing orders and subcontracts, insofar as those

C 0628215C

# MASTER SERVICES AGREEMENT

orders and subcontracts relate to the performance of the Work terminated. In addition, we may terminate this Agreement, or any particular Services, immediately upon written notice to you if we reasonably determine that we can no longer provide the Services in accordance with applicable law or professional obligations.

In the event this Agreement or the Work is terminated, COMPANY'S only liability will be to pay CONTRACTOR the undisputed unpaid balance due CONTRACTOR for Work actually performed up through the termination date, including all undisputed fees and expenses that have been incurred or earned in connection with the performance of the Work through the effective date of such termination (and otherwise permitted hereunder). Upon payment of all amounts validly due, any completed Deliverables will be promptly delivered to COMPANY.

Upon the termination of this Agreement, provided that all outstanding invoices have been issued and paid and CONTRACTOR has received a signed release from COMPANY and/or another service provider, CONTRACTOR will provide access to its working papers and relevant data associated with this engagement and allow COMPANY (or another service provider at COMPANY'S direction) to make copies of such working papers or data, as appropriate.

## ARTICLE 21: WARRANTY

CONTRACTOR agrees and warrants that its employees and those of the other EY Firms to which it has subcontracted portions of the Work, if any, will, to the extent applicable, perform the Work in accordance with American Institute of Certified Public Accountants ("AICPA") and other professional standards applicable to CONTRACTOR'S performance of the Work, and in accordance with this Agreement and such other or additional standards as may be expressly set forth in the applicable Schedule A.

CONTRACTOR warrants further that its employees, and those of the other EY Firms to which it has subcontracted portions of the Work, if any, assigned to perform any part of the Work possess the education, experience and skills appropriate for the satisfactory and professional performance of the Work.

CONTRACTOR warrants to COMPANY that CONTRACTOR has full authority and sufficient rights, except for rights respecting programs, data and materials provided by COMPANY or identified by CONTRACTOR as furnished to COMPANY by third-party vendors, to grant and convey the rights granted to COMPANY under Paragraph 32 hereof.

CONTRACTOR disclaims all other warranties, either express or implied.

If the parties agree that any of the Work performed by CONTRACTOR fails to conform to any of the above-specified warranties, CONTRACTOR will, at no additional cost to COMPANY, promptly remedy the failure and re-perform any Work necessary so that the Work conforms to those warranties. In the event CONTRACTOR disputes the COMPANY'S determination that any of the Work fails to conform to the above-specified warranties, such dispute will be

C 0628215C

# MASTER SERVICES AGREEMENT

submitted for resolution in accordance with procedures set forth in Section 32 hereof. Nothing herein will limit the rights and remedies that may be available to COMPANY at law or in equity.

## ARTICLE 22: RECORDS AND RIGHTS TO AUDIT

CONTRACTOR will keep accurate and complete books of accounts, records, documents and other evidence related to the charges for and performance of any Work ("Records"), and of any change or modification to the charges. COMPANY or COMPANY'S Contract Coordinator may inspect those records upon prior written request at any time during normal business hours.

All Records required for an audit and inspection will be made available at the offices of CONTRACTOR, at all reasonable times, for inspection, audit or reproduction, until three (3) years from date of final payment for any Work. COMPANY will bear the expenses incurred by it in supporting any such inspection or audit; provided, however, that should any audit or investigation produce evidence that CONTRACTOR has overstated charges or units of measure upon which charges are based by three percent of more of the total of all invoices audited during that particular audit, or provided gifts, gratuities or other benefits to employees of COMPANY in violation of the Business Ethics provisions of this Agreement, CONTRACTOR will be liable to COMPANY for the cost of the audit and investigation.

## ARTICLE 23: BUSINESS ETHICS

CONTRACTOR shall not during the term of this Agreement provide or offer, any compensation or benefit of any type, including any gift or gratuity, other than advertising mementos or other tokens of nominal value or reasonable business meals and business entertainment, to any COMPANY employee.

If, during the term of this Agreement, CONTRACTOR knows or becomes aware of any facts or circumstances contrary to the covenants provided for in the preceding paragraph of this Article 23, CONTRACTOR will promptly notify COMPANY and provide sufficient information for COMPANY to take appropriate protective or corrective actions. CONTRACTOR further agrees to reasonably cooperate in any investigation undertaken by COMPANY.

## ARTICLE 24: CONTRACTOR'S RESPONSIBILITY FOR WORK

CONTRACTOR will care for and maintain both the partially completed and finished Work until final Acceptance by COMPANY.

## ARTICLE 25: CONFLICT OF INTEREST

CONTRACTOR is not aware of any matter that would materially, adversely affect its ability to provide the Work hereunder.

C 0628215C

# MASTER SERVICES AGREEMENT

If CONTRACTOR becomes aware during the course of an engagement under a particular Schedule A that any individual performing Work under a Schedule A is engaged in activity that will impair their ability to perform the Work in a professional and reliable manner, CONTRACTOR will promptly notify COMPANY of that matter and the conflict.

## ARTICLE 26: TAXES

CONTRACTOR will comply with all federal, state, or municipal laws, rules and regulations regarding taxes and the payment of taxes, until the Work has been completed, including, without limitation, social security, state unemployment insurance, gross receipts taxes, withholding taxes, and income tax.

## ARTICLE 27: INDEMNIFICATION

Each party agrees to and will defend, protect, indemnify and hold harmless the other party from and against all Claims brought or suffered by COMPANY, its parent corporation, Energy Future Holdings Corp., and all controlled subsidiaries and affiliates of Energy Future Holdings Corp., and all officers, directors and employees of COMPANY, its parent corporation, Energy Future Holdings Corp., and each such subsidiary (collectively, "COMPANY Group") or CONTRACTOR, other EY Firms of which COMPANY has notice pursuant to Article 13, and all of the partners, principals and employees of each (collectively, "CONTRACTOR Group") (as applicable) for death or bodily injury or the damage to or loss or destruction of any real or tangible personal property, arising out of, or incident to or related in any way to, directly or indirectly, performance of this Agreement, but only in proportion to, and to the extent that such Claims are caused by or result from a breach of this Agreement or the negligence or intentional acts or omissions of the other party. To the extent necessary to permit COMPANY to enforce the indemnity provided in the preceding sentence, CONTRACTOR agrees that with respect to any Claims brought against COMPANY Group, CONTRACTOR will and does hereby waive as to COMPANY Group any defense it may have by virtue of the workers' compensation laws of any state.

CONTRACTOR shall be responsible for all Work under this Agreement, including Work performed by other EY Firms. Any and all Claims of any other EY Firm relating to the Work, Deliverables or this Agreement shall be brought by CONTRACTOR and not by any other EY Firm. CONTRACTOR shall defend, protect, indemnify and hold harmless the COMPANY Group from and against any damages arising from a Claim asserted (in violation of the preceding sentence) directly by any of CONTRACTOR's direct or indirect subsidiaries or any Other EY Firm relating to the Work, Deliverables or this Agreement.

Without limiting CONTRACTOR's indemnity obligations hereunder, including CONTRACTOR's indemnity obligations in the preceding sentence, COMPANY shall defend, protect, indemnify and hold harmless CONTRACTOR and the CONTRACTOR Group from and against all third party claims and damages arising from or relating to third party's use of, or reliance on, any Report (including Tax Advice) disclosed to such third party by, or at the request

C 0628215C

# MASTER SERVICES AGREEMENT

of, COMPANY, except to the extent finally determined to have resulted from CONTRACTOR's gross negligence or intentional misconduct relating to such Report.

The party entitled to indemnification (the "Indemnified Party") shall promptly notify the party obligated to provide such indemnification (the "Indemnifying Party") of any claims for which the Indemnified Party seeks indemnification hereunder and the Indemnifying Party shall have the exclusive right and authority to conduct the defense or settlement of any such claim at the Indemnifying Party's sole expense and the Indemnified Party shall cooperate with the Indemnifying Party in connection therewith. The party not conducting the defense shall nonetheless have the right to participate in such defense at its own expense. The Indemnified Party shall have the right to approve the settlement of any claim that exposes any liability or obligation other than the payment of money damages.

EXCEPT WITH RESPECT TO EACH PARTY'S INDEMNIFICATION AND CONFIDENTIALITY OBLIGATIONS HEREIN AND EXCEPT FOR CLAIMS RESULTING FROM FRAUD OR WILLFUL MISCONDUCT, EACH PARTY'S MAXIMUM LIABILITY TO THE OTHER ARISING, IN CONTRACT, TORT, UNDER STATUTE OR OTHERWISE, FOR ANY REASON RELATING TO DISAGREEMENT OR CLAIMS ARISING OUT OF THIS AGREEMENT OR OTHERWISE RELATING TO THE WORK,SHALL BE LIMITED TO THE AMOUNT OF FEES PAID OR OWING TO CONTRACTOR FOR THE PERFORMANCE OF WORK UNDER THE APPLICABLE STATEMENT OF WORK. This limitation will not apply to losses to the extent prohibited by applicable law or professional regulations.

NEITHER PARTY SHALL HAVE ANY LIABILITY TO THE OTHER (OR ANY OTHERS FOR WHOM WORK IS PROVIDED) FOR ANY LOST PROFITS OR SPECIAL, INCIDENTAL, INDIRECT, PUNITIVE OR CONSEQUENTIAL DAMAGES, IN CONNECTION WITH CLAIMS ARINSING OUT OF THIS AGREEMENT OR OTHERWISE RELATING TO THE WORK, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

COMPANY may not make a claim or bring proceedings relating to the Services or otherwise under this Agreement against any other EY Firm or any members, shareholders, directors, officers, partners, principals or employees of CONTRACTOR or such EY Firms ("**EY Persons**"). COMPANY agrees to make any such claims or bring any such proceedings only against CONTRACTOR.

## ARTICLE 28: INTELLECTUAL PROPERTY

CONTRACTOR will obtain permission to use any and all third party intellectual property that may be required in order for CONTRACTOR to perform the Work. This permission will include all necessary licenses and governmental approvals.

CONTRACTOR will hold harmless and indemnify COMPANY from and against, and at CONTRACTOR's option, defend COMPANY against, any and all Claims, arising out of or

C 0628215C

# MASTER SERVICES AGREEMENT

incurred as a result, directly and indirectly, of any alleged or actual infringement, misappropriation or violation of any intellectual property right, relating to the Work, including, but not limited to, patent, copyright, trademark or trade secret.

In addition, if any Claim is brought alleging infringement or the misappropriation or violation of any intellectual property right, CONTRACTOR will avoid any further possible infringement of the intellectual property right, and will seek to resolve the Claim either, in its discretion, by means of alternative arrangements for the Work, or by obtaining permission to use the intellectual property in question.

## ARTICLE 29: COMPLIANCE WITH LAWS

CONTRACTOR represents that it is knowledgeable of and will comply with all federal, state, and local laws, rules, decrees, orders, regulations, by-laws, ordinances and codes that may, in any manner, apply to its business.

If fines, penalties or legal costs are assessed against COMPANY by any court or governmental agency (including, without limitation, the Texas Public Utility Commission and any successor thereto) due to CONTRACTOR'S failure to comply with the requirements of this section, CONTRACTOR will, to the extent not otherwise accomplished pursuant to its obligations of indemnification and subject to the limitation on liability provisions as provided for in this Agreement, indemnify and hold harmless COMPANY from and against any and all fines, penalties, losses, liabilities, damages, claims, and costs (including reasonable attorneys' fees and court costs) arising out of or incurred as a result, directly or indirectly, of that failure.

## ARTICLE 30: CONFIDENTIAL AND PROPRIETARY INFORMATION

a.    For purposes of this Article 30 and except as provided below, the term "Confidential Information" means this Agreement and all information concerning the business, operations, financial condition, projections, and/or assets (including historical information), documents, and electronic data that one party (the "Receiving Party") obtains in any manner from or on behalf of the other party (the "Disclosing Party"). The Receiving Party agrees not to disclose any Confidential Information to any person or entity (including, but not limited to, the media, any governmental representative, authority or tribunal, and any corporation, limited liability company, partnership, group, individual or other entity) except as set forth in this Article 30 and to treat any Confidential Information as confidential, whether oral, written, or electronic, and whether prepared by or on behalf of the Disclosing Party, the Receiving Party, its representatives, or otherwise, which has been or in the future is furnished by the Disclosing Party to the Receiving Party or its representatives. The Receiving Party hereby agrees that the Receiving Party and its representatives shall use the Confidential Information solely for the purposes set forth in this Agreement, that the Confidential Information will be kept confidential, that the Receiving Party and its representatives will not disclose to any person or entity any of the Confidential Information, and the Confidential Information will not be used in any way

C 0628215C

# MASTER SERVICES AGREEMENT

detrimental to the Disclosing Party or its equity holders, including without limitation, to gain a competitive advantage with the businesses of the Disclosing Party.

b.     Notwithstanding anything to the contrary herein, the Receiving Party and any of its representatives who have acquired Confidential Information may only disclose the Confidential Information to the Receiving Party's representatives (including employees) who (1) need to know such information for the purpose contained in this Agreement and (2) are subject to restrictions on disclosure of Confidential Information that are at least as restrictive as the ones contained in this Agreement..  The Receiving Party and any of its representatives who have acquired Confidential Information may only disclose Confidential Information to persons or entities other than those to which such disclosure is expressly permitted by this Article 30 or on terms other than those listed in this Article 30 with the written consent of the Disclosing Party. The Receiving Party further agrees to inform its representatives of the confidential nature of the Confidential Information and to be liable to the Disclosing Party for its or any of its representatives' acts or omissions with respect to the Confidential Information.

c.     In the event that the Receiving Party or any of its representatives is requested or required (by oral questions, interrogatories, requests for information or documents in legal proceedings, or by the Securities and Exchange Commission, subpoena, civil investigative demand or other similar process) to disclose any Confidential Information, the Receiving Party shall provide the Disclosing Party with prompt written notice of any such request or requirement, if permitted by applicable law, so that the Disclosing Party may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this Article 30.  If, in the absence of a protective order or other remedy or the receipt of a waiver by the Disclosing Party, the Receiving Party or any of its representatives are nonetheless required to make any such disclosure of Confidential Information, CONTRACTOR and its representatives may without liability hereunder, disclose to such person only that portion of the Confidential Information that is legally required to be disclosed, provided that the Receiving Party will use reasonable efforts to assist the Disclosing Party in obtaining an appropriate protective order or other reliable assurance that confidential treatment will be accorded the Confidential Information.  The Receiving Party may disclose Confidential Information of the Disclosing Party if required to do so under applicable law, rule or order, or by the standards of the AICPA, the Public Company Accounting Oversight Board and similar bodies with jurisdiction over Supplier or other professional self-regulatory authorities.

d.     At the Disclosing Party's written request, the Receiving Party will promptly deliver to the Disclosing Party all written or electronic Confidential Information that has been provided to or acquired by the Receiving Party or its representatives except for copies retained in work paper files that the Receiving Party may retain for its records or that may be reflected in backup tapes or other electronic data storage systems.  Notwithstanding anything to the contrary herein, the Receiving Party may retain an archival copy of any document for its permanent records to the extent required by applicable law or regulation.  Notwithstanding the return, retention or destruction of the Confidential Information, the Receiving Party and its representatives will continue to be bound by the confidentiality obligations under this Agreement.

C 0628215C

# MASTER SERVICES AGREEMENT

e.     Notwithstanding the foregoing, the Confidential Information does not include information which; (i) is already known to the Receiving Party at the time of disclosure by the Disclosing Party; (ii) is or becomes publicly known through no wrongful act of the Receiving Party, including a breach of its obligations hereunder; (iii) is independently developed by the Receiving Party without benefit of the Disclosing Party's Confidential Information; (iv) relates to the tax treatment or tax structure of any transaction; (v) the Receiving Party determines is required to be maintained or disclosed by the Receiving Party under section 6011, 6111, and 6112 of the Internal Revenue Code [(IRC)] and the regulations thereunder or similar or analogous provisions of a state or other jurisdiction or (vi) is received by the Receiving Party from a third party without restriction and without a breach of an obligation of confidentiality.

f.     The Receiving Party recognizes and acknowledges the competitive and confidential nature of the Confidential Information and that irreparable damage will result to the Disclosing Party if Confidential Information is disclosed except as herein permitted. It is further understood and agreed that money damages may not be a sufficient remedy for any breach of this Article 30. Accordingly, it is agreed by the Receiving Party that the Disclosing Party shall be entitled to seek an injunction or injunctions (without the posting of any bond) to prevent breaches or threatened breaches of this Article 30. Furthermore, the Receiving Party agrees to notify the Disclosing Party if the Receiving Party becomes aware of any unauthorized disclosure of any Confidential Information. Each party shall be deemed to have met its nondisclosure obligation under this Article 30 as long as it exercises the same level of care to protect the other's information as it exercises to protect its own confidential information but in no event less than reasonable care, except to the extent that applicable law or professional standards impose a higher requirement.

g.     Notwithstanding anything to the contrary set forth herein, no provision in this Agreement or a Statement of Work is or is intended to be construed as a condition of confidentiality within the meaning of IRC sections 6011, 6111, 6112, or the regulations thereunder, or under any similar or analogous provisions of the laws of a state or other jurisdiction. In particular, COMPANY (and each employee, representative, or other agent of COMPANY) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of any transaction within the scope of Work under a Statement of Work and all materials of any kind (including opinion and other tax analyses) that are provided to COMPANY relating to such tax treatment and tax structure. COMPANY also agrees to use commercially reasonable efforts to inform Contractor of any conditions of confidentiality imposed by third party advisors with respect to any transaction on which Contractor advice is requested. Such notification must occur prior to Contractor providing any advice with respect to the transaction.

h.     Notwithstanding any other provision to the contrary in this Article, CONTRACTOR shall comply with the provisions of Attachment 7 (Privacy, Confidentiality and Information Security Provisions) in regard to Confidential Personal Information (as such term is defined in such Attachment).

C 0628215C

# MASTER SERVICES AGREEMENT

i.      Unless prohibited by applicable law, CONTRACTOR may disclose Client Information to other EY Firms and EY Persons to facilitate performance of the Services and to comply with regulatory requirements.

j.      CONTRACTOR may collect, use, transfer, store or otherwise process (collectively, "**Process**") Client Information that can be linked to specific individuals ("**Personal Data**"). CONTRACTOR may Process Personal Data in various jurisdictions in which CONTRACTOR and the other EY Firms operate (which are listed at www.ey.com). CONTRACTOR will Process Personal Data in accordance with applicable law and professional regulations, including, where applicable, the European Union Safe Harbor program of the U.S. Department of Commerce, in which EY participates. CONTRACTOR will require any service provider that Processes Personal Data on our behalf to adhere to such requirements. If any Client Information is protected health information under the Health Insurance Portability and Accountability Act, as amended, this Agreement is deemed to incorporate all of the terms otherwise required to be included in a business associate contract relating to such information. COMPANY warrants that it has the authority to provide the Personal Data to CONTRACTOR in connection with the performance of the Services and that the Personal Data has been Processed in accordance with applicable law.  If COMPANY becomes legally obligated to require CONTRACTOR to implement or maintain certain policies or practices relating to data privacy or data security in connection with our provision of particular Services ("Data Privacy Requirements"), COMPANY shall notify CONTRACTOR of the Data Privacy Requirements. CONTRACTOR shall either (i) comply with the Data Privacy Requirements or (ii) notify COMPANY of its determination that it is unable to do so, in which case either party may terminate CONTRACTOR's provision of the relevant Services.

## ARTICLE 31: RIGHTS TO DATA

(a)      Upon full and final payment to CONTRACTOR under the applicable Statement of Work, any Deliverable prepared for COMPANY and delivered to COMPANY, will become the property of COMPANY, subject to the terms and conditions of this Agreement and the applicable Statement of Work, including without limitation restrictions on use and distribution.

(b)      COMPANY acknowledges and agrees that any Report provided to COMPANY by CONTRACTOR in connection with the Work is for the sole use of COMPANY and may not be relied upon by any third party. You may not disclose a Report (or any portion or summary of a Report) externally (including to your affiliates) or refer to us or to any other EY Firm in connection with the Services, except:  (a) to your lawyers (subject to these disclosure restrictions), who may use it only to give you advice relating to the Services, (b) to the extent, and for the purposes, required by subpoena or similar legal process (of which you will promptly notify us), (c) to other persons (including your affiliates) with our prior written consent, who have executed an access letter substantially in the form prescribed by the applicable Statement of Work and who may use it only as we have specified in our consent, or  (d) to the extent it contains Tax Advice, as set forth herein.  If you are permitted to disclose a Report (or a portion thereof) externally, you shall not alter, edit or modify it from the form we provided.  You may

18

C 0628215C

# MASTER SERVICES AGREEMENT

disclose to anyone a Report (or a portion thereof) solely to the extent that it relates to tax matters, including tax advice, tax opinions, tax returns, or the tax treatment or tax structure of any transaction to which the Services relate ("**Tax Advice**"). With the exception of tax authorities, you shall inform those to whom you disclose Tax Advice that they may not rely on it for any purpose without our prior written consent. You may incorporate into documents that you intend to disclose externally EY summaries, calculations or tables based on Client Information contained in a Report, but not our recommendations, conclusions or findings. However, you must assume sole responsibility for the contents of those documents and not refer to us or any other EY Firm in connection with them. This provision does not affect your ability to circulate Reports internally.

(c)    COMPANY acknowledges that CONTRACTOR provides professional services to other clients, and agrees that nothing in this Agreement shall be deemed or construed to prevent CONTRACTOR from carrying on such business. In particular, COMPANY agrees that, notwithstanding anything in this Agreement to the contrary: (i) CONTRACTOR shall have the right to retain a copy of each of the Deliverables for its records; (ii) CONTRACTOR'S administrative communications, records, files and working papers relating to the Work and the generalized ideas, concepts, know-how, tools, models, methodologies and techniques utilized or developed by CONTRACTOR prior to the Effective Date or during the course of this Agreement (collectively, "CONTRACTOR'S Property") are not deemed to be Deliverables and belong to CONTRACTOR and (iii) COMPANY hereby grants to CONTRACTOR a perpetual, royalty free, irrevocable, worldwide, non-exclusive license to use the Deliverables and to create and use derivative works derived from the Deliverables. To the extent that any of CONTRACTOR'S Property is contained in any of the Deliverables, CONTRACTOR hereby grants COMPANY, upon full and final payment of all amounts due CONTRACTOR under the applicable Statement of Work, a royalty-free paid-up, non-exclusive license to use CONTRACTOR'S Property solely in connection with COMPANY'S use of the Deliverables.

## ARTICLE 32: GOVERNING LAW

Choice of Law; Arbitration. THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH LAWS OF THE STATE OF TEXAS WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW PROVISION OR RULE (WHETHER OF THE STATE OF TEXAS OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF TEXAS. Except for a claim seeking solely injunctive relief, any dispute or claim arising out of or relating to this Agreement, the Services or any other services provided by CONTRACTOR pursuant to a duly executed Schedule A shall be resolved by arbitration as set forth in Attachment 8 of this Agreement.

## ARTICLE 33: NON-WAIVER OF RIGHTS

A waiver by either Party of any breach of this Agreement, or the failure of either Party to enforce any of the articles or other provisions of this Agreement, will not in any way affect, limit or

C 0628215C

# MASTER SERVICES AGREEMENT

waive that Party's right to enforce and compel strict compliance with the same or other articles or provisions.

## ARTICLE 34: SURVIVAL

No termination or cancellation of this Agreement will relieve either Party of any obligations under this Agreement that by their nature survive the termination of this Agreement, including, but not limited to, the obligations provided for in the Confidential and Proprietary Information, Rights to Data, Warranty, Intellectual Property, Indemnification and Compensation provisions of this Agreement.

## ARTICLE 35: SEVERABILITY

In the event any provision of this Agreement is held to be void, unlawful or otherwise unenforceable, that provision will be severed from the remainder of the Agreement and replaced automatically by a provision containing terms as nearly like the void, unlawful, or unenforceable provision as possible; and the Agreement, as so modified, will continue in full force and effect.

## ARTICLE 36: PUBLICITY

Neither party shall publicize its relationship with the other, or the terms of this Agreement or any Schedule A, or use a party's name or other trademarks or service marks in any advertisement or publication, without such party's prior written approval.

## ARTICLE 37: IMMIGRATION

a.      CONTRACTOR agrees to comply with the Immigration Reform and Control Act of 1986 ("IRCA"), as well as all regulations issued pursuant to IRCA or otherwise enforced by the United States Immigration and Customs Enforcement, The Office of Special Counsel for Immigration-Related Unfair Employment Practices, or any other governmental agency for or with respect to any of CONTRACTOR'S employees, or other persons, performing any work as part or in furtherance of any CONTRACTOR'S obligations pursuant to this Agreement. CONTRACTOR shall verify the social security numbers provided to CONTRACTOR by those employees and persons. CONTRACTOR agrees that it will not knowingly, recklessly, or with constructive knowledge accept fraudulent employment verification documentation or hire or continue to employ anyone who is unauthorized to work in the United States.

b.      CONTRACTOR confirms that it performs background checks on its personnel.

c.      CONTRACTOR, with regard to its employees, assumes and retains sole and complete responsibility and liability for compliance with all laws relating to immigration and work eligibility (including, but not limited to, IRCA) and all laws relating to the negligent hiring and/or supervision of any individual assigned by CONTRACTOR to perform Work under the Agreement. If fines, penalties, or legal costs are assessed against COMPANY, by any court or

20

C 0628215C

# MASTER SERVICES AGREEMENT

governmental agency, related to CONTRACTOR's failure to so comply, CONTRACTOR will indemnify and hold harmless COMPANY from and against any and all fines, penalties, losses, liabilities, damages, claims, and costs (including reasonable attorneys' fees and court costs) arising out of or incurred as a result, directly or indirectly, of that failure.

d.    CONTRACTOR agrees that its obligations under this Section also apply to any subcontractors engaged by CONTRACTOR and approved by COMPANY to perform Work.

## ARTICLE 38: NOTICES

All notices from one Party to the other will be deemed to have been delivered if hand delivered, sent by nationally recognized overnight delivery service, sent by United States certified mail, return receipt requested, postage prepaid, as follows:

If to CONTRACTOR:

Ernst & Young LLP
2323 Victory Avenue
Suite 2000
Dallas, TX 75219
Attention: Chris Grasher

If to COMPANY, to the following addresses:

EFH Corporate Services Company
1601 Bryan Street
Dallas, TX  75201
Attention:  Contracts Administration
Molly Holloway, Supply Chain

## ARTICLE 39: REPRESENTATIVES

COMPANY'S Contract Administrator is Molly Holloway; phone 214.812.5764.

CONTRACTOR'S Contract Administrator is Chris Grasher; phone 214-969-0674

## ARTICLE 40: AMENDMENTS

No changes, modifications, amendments or supplements to this Agreement or any other provisions will be valid unless agreed to in writing and signed by the Parties.

## ARTICLE 41: ATTACHMENTS

The following attachments are incorporated into this Agreement:

C 0628215C

# MASTER SERVICES AGREEMENT

1. Schedule A
2. Direct Payment Exemption Certificate
3. Work Site Safety, Security, Alcohol, Drugs and Weapons
4. CONTRACTOR'S Insurance Requirements
5. Reimbursable Expense Policy
6. Form of Access Letter
7. Privacy, Confidentiality and Information Security Provisions
8. Dispute Resolution Procedures

## ARTICLE 42: MISCELLANEOUS

(a)     Any reports prepared by CONTRACTOR are valid only when presented in their entirety and only for the purpose stated. Except as otherwise set forth in the applicable Statement of Work, COMPANY acknowledges that completion of the Work under a Statement of Work or acceptance of the Deliverables thereunder will not constitute a basis for COMPANY'S assessment or evaluation of internal control over financial reporting and disclosure controls and procedures, or its compliance with its principal officer certification requirements under Section 302 of the Sarbanes-Oxley Act of 2002 (the "Act"). The Work under a Statement of Work shall not be construed to support COMPANY'S responsibilities under Section 404 of the Act requiring each annual report filed under Section 13(a) or 15(d) of the Securities Exchange Act of 1934 to contain an internal control report from management.

(b)     Each party may communicate with the other party by electronic mail or otherwise transmit documents in electronic form during the course of providing Work under this Agreement. Each party accepts the inherent risks of these forms of communication (including the security risks of interception of or unauthorized access to such communications, the risks of corruption of such communications and the risks of viruses or other harmful devices). Accordingly, Company agrees that it may rely only upon a final hardcopy version of a document or other communication that Contractor transmits to Company unless no such hardcopy is submitted by Contractor to Company.

## ARTICLE 43:  COUNTERPARTS

This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Agreement by facsimile transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

## ARTICLE 44: ENTIRETY OF AGREEMENT

This Agreement, together with any and all attachments, constitutes the entire agreement between the Parties, and all prior negotiations, undertakings, understandings and agreements between the Parties relating to the Work are merged into this Agreement.

C 0628215C

# MASTER SERVICES AGREEMENT

The Parties have signed this Agreement acknowledging their agreement to its provisions as of the Effective Date.

ERNST & YOUNG LLP

By: _Chris J Grasher_
    Signature

Name: _CHRIS J GRASHER_

Title: _PARTNER_

Date: _6/17/2010_

EFH CORPORATE SERVICES COMPANY

By: _Molly Holloway_
    Signature

Name: _MOLLY HOLLOWAY_

Title: _Supply Chain_

Date: _10 June 2010_

23

C 0628215 C

# ATTACHMENT 1
# SCHEDULE A

Contract No. C 0628215 C

## SCHEDULE A

Following the Parties' execution of this Schedule A, CONTRACTOR is authorized to perform the Work as identified below on behalf of COMPANY pursuant to the terms and conditions contained in the Agreement.

### SCOPE OF WORK AND DELIVERABLES

The Work will be performed in accordance with the specifications and instructions, if any, attached hereto and identified in the List of Attachments. The Work will be scheduled at the direction of COMPANY'S Contract Coordinator as identified herein.

**SCOPE OF WORK**

**[Description of Intent and use of work product.]**

**DELIVERABLES**

**[Description of work product contemplated to be issued, including milestones and expectations.]**

### WORK SITE

The Work Site will be the following location(s):_____.

### SCHEDULE

Work will start *****, and be complete ***** **OR** as determined by COMPANY.  The scheduling of Work will be coordinated with COMPANY's Contract Coordinator.

Contract Coordinator:*****   Phone Number:  *****

### COMPENSATION, INVOICES AND PAYMENT

As full compensation for the satisfactory performance by CONTRACTOR of the Work authorized pursuant to this Schedule A, COMPANY will compensate CONTRACTOR as follows.

C 0628215 C

# SCHEDULE A

This project is not authorized to exceed $***. Any extension or increase in spend will require amendment to this Schedule A. This estimate assumes there will be travel **OR** there will be no travel to the participant's site(s).

**Professional and Support Staff Fees Schedule**

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

The rates specified in the Schedule A will remain in effect, with respect to and until completion of the Work authorized pursuant to this Schedule A.

All invoices shall be sent to:

       *********************
       *******************
       ******************
       Attention:********

## KEY PERSONNEL

CONTRACTOR agrees that the individuals listed below will be assigned to perform the Work authorized by this Schedule A. CONTRACTOR will employ all reasonable efforts to ensure that such individuals remain so assigned until such Work is accepted by COMPANY; provided, however, that in the event that any such individuals are reassigned by CONTRACTOR or otherwise become unavailable to perform such Work, CONTRACTOR will provide, by way of replacement, individuals with reasonably equivalent experience and expertise.

       Person 1: Title
       Person 2: Title
       Person 3: Title
       Person 4: Title

C 0628215 C

# SCHEDULE A

CONTRACTOR PERSONNEL AUTHORIZED TO ATTEND MEETINGS WITH COMPANY PERSONNEL PERTAINING TO THE WORK

     Person 1, Title
     Person 2, Title

PRIVILEGES CLAIMED BY COMPANY, WITH RESPECT TO DELIVERABLES OR OTHER DOCUMENTS HEREAFTER DESIGNATED BY COMPANY

\_\_\_\_\_  ATTORNEY-CLIENT COMMUNICATION

\_\_\_\_\_  ATTORNEY WORK PRODUCT

\_\_\_\_\_  TAX ADVISOR

\_\_\_\_\_  OTHER:_____

## LIST OF ATTACHMENTS

COMPANY and CONTRACTOR agree that the following described attachments, if any, are incorporated herein in their entirety as fully as completely rewritten herein.

1.  \*\*\*\*THIS COULD BE PROJECT PLANS,
2.  \*\*\*\*THIS COULD BE IMPLEMENTATION SCHEDULES
3.  \*\*\*\*THIS COULD BE SOFTWARE LICENSING ETC

Work not specified above may be authorized only through a separate Schedule A, or through an amendment or supplement to this Schedule A.

## ACCEPTANCE CRITERIA AND ADDITIONAL TERMS AND CONDITIONS APPLICABLE TO THE WORK

CONTRACTOR                                   COMPANY


By: _____        By: _____
    Signature                              Signature

Name: _____        Name:_____

Title: _____        Title: _____

Date: _____        Date: _____

C 0628215 C

## ATTACHMENT 2
## DIRECT PAYMENT EXEMPTION CERTIFICATE

**State of Texas**
**Direct Payment Exemption Certificate**
**Limited Sales, Excise, and Use Tax**

Direct payment authorization number:       **1-75-0835281-6** EFH Corporate Services Company

EFH Corporate Services Company hereby claims exemption from the payment of state, city, county, SPD, MTA and/or CTD sales and/or use taxes upon its purchase of taxable items and/or services from:

| | |
|---|---|
| **Seller:** | **Ernst & Young LLP** |
| **Address:** | **2323 Victory Avenue, Suite 2000** |
| **City, State, Zip Code:** | **Dallas, TX 75219** |

Description of items and/or services purchased under Contract No. C 0628215 C:

Consulting and Advisory Services.

This certificate will remain in effect until the seller is otherwise notified.

This certificate does not cover:

(1) Purchases of taxable items to be resold.
(2) Sales or rentals to any purchaser other than the permit holder.
(3) Sales or rentals of motor vehicles subject to the motor vehicle sales and use tax (Chapter 152) and interstate motor carrier sales and use tax (Chapter 157).
(4) Nontaxable services or materials/supplies used or consumed by a provider of a nontaxable service.
(5) Lump-sum new construction projects to improve real property.

The permit holder agrees not to permit others (including its contractors and repairmen) to use the undersigned's direct payment authorization to purchase material tax free.

The undersigned agrees to accrue and pay the tax to the Comptroller of Public Accounts as required by statute.

Permit holder:       EFH Corporate Services Company

Authorized Signature: _____*Molly Holloway*_____
Contracts Representative Molly Holloway

C 0628215 C

# ATTACHMENT 3
# WORK SITE SAFETY, SECURITY, ALCOHOL, DRUGS AND WEAPONS

**A.   SAFETY**

1.   CONTRACTOR agrees that any safety-related assistance or initiatives undertaken by COMPANY will not relieve CONTRACTOR from responsibility for the implementation of, and compliance with, safe working practices, as developed from their own experience, or as imposed by law or regulation, and will not in any way, affect the responsibilities resting with CONTRACTOR under the provisions of this Agreement and to meet all safety requirements as specified by the Occupational Safety & Health Administration (OSHA), the Mine Safety Health Administration (MSHA), the Department of Transportation (DOT), to the extent applicable to CONTRACTOR'S Work hereunder, and any other applicable state or federal safety and health laws or regulations.

2.   In the event that a material safety data sheet (hereinafter "MSDS"), warning label, or other documentation concerning the use of hazardous chemicals at the Work Site, applies to any materials or equipment provided by CONTRACTOR as an aspect of the Work, such documentation will be provided by CONTRACTOR to COMPANY'S Contract Coordinator prior to the commencement of any such Work.

3.   Intentionally Deleted

4.   Intentionally Deleted

5.   CONTRACTOR acknowledges and agrees that all members of CONTRACTOR performing Work at the Work Site are required to view COMPANY'S "CONTRACTOR/Visitor Safety Orientation" video, when applicable, and to read and adhere to COMPANY'S "CONTRACTOR/Visitor Safety Booklet" prior to performing any Work on the Work Site.

6.   CONTRACTOR acknowledges and agrees that, when expressly required in writing by COMPANY'S designated safety representative, appropriate protective equipment will be worn by any member of CONTRACTOR while on the Work Site. In addition, when any member of CONTRACTOR is performing Work which may expose that person to potential hazards, CONTRACTOR acknowledges and agrees that such person will wear appropriate clothing specific to and adequate for that exposure.

7.   CONTRACTOR will take all reasonable precautions to prevent any accident in connection with the performance of Work, including, but not limited to, putting up and maintaining sufficient barriers and lights.

8.   CONTRACTOR will report to COMPANY all accidents involving personal injuries (including death) and damage to property occurring directly or indirectly as a result of the Work performed by CONTRACTOR hereunder promptly.

C 0628215 C

# ATTACHMENT 3
# WORK SITE SAFETY, SECURITY, ALCOHOL, DRUGS AND WEAPONS

**B.    SECURITY**

1.    COMPANY may supply such site security as it deems necessary and may specify to CONTRACTOR such additional security precautions and procedures at the Work Site as, in COMPANY'S opinion, are reasonably necessary for the safety and security of COMPANY'S personnel and property.

   Work Site security by COMPANY, if any, will not provide personal policing of the materials, tools and equipment of CONTRACTOR.    CONTRACTOR will assume sole responsibility for safeguarding such materials, tools and equipment.

2.    Intentionally Deleted.

3.    COMPANY reserves the right to exclude any of CONTRACTOR'S employees from the Work Site by denial of access, suspension or revocation of access authorization, preemptory expulsion, or by any other means, without notice or cause.    Former COMPANY employees, and any of CONTRACTOR'S employees who previously have been excluded from any Work Site, may be brought onto COMPANY property or facilities only if prior approval from COMPANY'S Contract Coordinator is obtained.

4.    Intentionally Deleted.

5.    CONTRACTOR agrees to instruct its employees in the details of COMPANY'S Work Site security policies and measures, both as specified in the Agreement and as hereinafter provided by COMPANY to CONTRACTOR.

**C.    ALCOHOLIC BEVERAGES, DRUGS AND WEAPONS**

CONTRACTOR will inform all members of CONTRACTOR, who may be involved in the performance of any Work, of the following COMPANY rules, relating to alcoholic beverages, drugs and weapons, with which all employees are expected to comply:

1.    Bringing, attempting to bring, possessing, using or being under the influence of intoxicants, drugs, or narcotics while on COMPANY owned or controlled property, including, but not limited to parking areas, is prohibited.    Possessing alcoholic beverages in sealed containers is permitted, however, in designated parking areas owned or controlled by Oncor Electric Delivery Company LLC, Luminant Generation Company LLC, Oak Grove Management Company LLC, Generation Development Company LLC, Sandow Power Company LLC and EFH Corporate Services Company, but not parking areas owned or controlled by Luminant Mining Company LLC, Luminant Big Brown Mining Company LLC and Oak Grove Mining Company LLC.

2.    Drugs prescribed by a licensed physician, for an individual working on COMPANY owned or controlled property, which could affect the employee's job performance, or non-prescription drugs which could affect the employee's job performance, are allowed on

C 0628215 C

# ATTACHMENT 3
# WORK SITE SAFETY, SECURITY, ALCOHOL, DRUGS AND WEAPONS

COMPANY owned or controlled property only if they have been previously cleared by the employee's supervisor. Any employee taking such medication must inform his or her supervisor of the medication and dosage being taken.

3. Bringing, attempting to bring, possessing or using firearms, whether classified as legal or illegal, while on COMPANY-owned or controlled property, including but not limited to buildings, parking areas, recreation facilities, equipment and vehicles, is prohibited. Use or possession of firearms for specific situations is permitted if approved by function or higher level management of COMPANY.

4. Off-the-job involvement with intoxicants, drugs, or narcotics, which adversely affects COMPANY'S business, to include impairing the employee's ability to perform his job, or the public trust in the safe operation of COMPANY is prohibited.

5. Any conduct on any Work Site which is in violation of any state or federal law or regulation is considered a violation of these rules and a breach of this Agreement.

6. CONTRACTOR is responsible for the compliance of CONTRACTOR with the above specified rules.

7. In order to enforce these rules, all individuals with access to any Work Site as well as the vehicles, offices, lockers and any personal belongings of such individuals on COMPANY property are subject to search by COMPANY and its agents, to include security representatives appointed or employed by COMPANY.

8. Intentionally Deleted.

9. Violations of these rules may be cause for denial of access to the Work Site.

C 0628215 C

# ATTACHMENT 4
## CONTRACTOR'S INSURANCE REQUIREMENTS

CONTRACTOR will, at its own expense, maintain in force throughout the period of this document or agreement, or as otherwise specified, the following minimum insurance coverages, with insurers acceptable to COMPANY.

1) Workers' Compensation and Employers' Liability Insurance, providing statutory benefits in accordance with the laws and regulations of the State of Texas or state of jurisdiction as applicable. The minimum limits for the employers' liability insurance will be five hundred thousand dollars ($500,000) bodily injury each accident, five hundred thousand ($500,000) each employee bodily injury by disease, five hundred thousand dollars ($500,000) policy limit bodily injury by disease.

2) Commercial General Liability Insurance, including bodily injury and property damage, personal and advertising injury, contractual liability, and including products and completed operations coverage [continuing for two (2) years after Final Acceptance, or completion of the Work, whichever is later], with minimum limits of one million dollars ($1,000,000) per occurrence for bodily injury, including death and property damage.

3) Automobile Liability Insurance for coverage of owned, non-owned and hired autos with a minimum combined single limit of one million dollars ($1,000,000) per accident for bodily injury, including death, and property damage.

4) Excess Liability Insurance over and above the employers' liability, commercial general liability and automobile liability insurance coverage, with a minimum limit of one million dollars ($1,000,000) per occurrence. Coverage must replace exhausted aggregate limits under the coverages referenced in #1 (employers' liability), and #2 above. Coverage must continue for two (2) years after Final Acceptance, or completion of the Work, whichever is later.

5) Professional Liability Insurance with a minimum limit of one million dollars ($1,000,000) per claim or occurrence and in the aggregate.

6) The required limits of insurance can be satisfied by any combination of excess coverage.

7) The commercial general liability insurance, automobile liability insurance and excess liability insurance policies are primary as regards coverage extending to Company as additional insured and will contain provisions that specify that the policies will apply without consideration for other policies separately carried and will state each insured is provided coverage as though a separate policy had been issued to each, except with respects to limits of insurance, and that only one deductible will apply per occurrence regardless of the number of insureds involved in the occurrence. CONTRACTOR will be responsible for any deductibles or retentions.

C 0628215 C

# ATTACHMENT 4
## CONTRACTOR'S INSURANCE REQUIREMENTS

8) The commercial general liability insurance, automobile liability insurance, CONTRACTOR liability and excess liability insurance policies, if written on a claims-made basis, will be maintained in full force and effect for two (2) years after Final Acceptance or completion of the Work, whichever is later

9) All policies must be issued by carriers having an *A.M. Best's* rating of "A-" or better, and an *A.M. Best's* financial size category of "VIII", or better and/or *Standard & Poor Insurance Solvency Review* of "A-", or better.

The requirements contained herein as to the types and limits of all insurance to be maintained by CONTRACTOR are not intended to and will not otherwise, in any manner, limit or qualify the liabilities and obligations assumed by CONTRACTOR under this document or agreement.

Prior to commencement of Work, CONTRACTOR will provide to COMPANY certificates of insurance evidencing the coverage required herein. COMPANY'S review of certificates will not be construed as accepting any deficiencies in CONTRACTOR'S insurance or relieve CONTRACTOR of any obligations set forth herein. In addition, CONTRACTOR will require each of its subcontractors to provide adequate insurance. Any deficiencies in the insurance to be provided by subcontractors will be the responsibility of CONTRACTOR.

**Certificates of insurance must show Energy Future Holdings Corp. and its direct and indirect subsidiaries as the certificate holder, and as an additional insured on the Commercial General Liability and Excess Liability coverage. Workers' compensation shall include Energy Future Holdings Corp. and its direct and indirect subsidiaries as an alternate employer and will provide a waiver of subrogation for Workers' Compensation coverage in favor of the certificate holder. Certificates of insurance should also state that the certificate holder will receive thirty (30) days advance written notice prior to cancellation.**

CONTRACTOR agrees to report to the manager of the claims department of the COMPANY in writing as soon as practical all instances of damage to the Work and all accidents or occurrences which may result in injuries to any person, including death, and any property damage, arising out of the performance of the Work.

If the insurance obligations required in this document or agreement exceed the maximum limits permitted by law or do not otherwise conform with any applicable law, then this agreement will be deemed amended so as to only require CONTRACTOR to provide insurance to the maximum extent allowed by law.

C 0628215 C

# ATTACHMENT 5
# REIMBURSABLE EXPENSE POLICY

- Reimbursable Expense Policy (Applicable only in the event that Work is performed on COMPANY site and with prior COMPANY approval):

1.    MEALS
      Reimbursement for meals will be reimbursed at actual cost but will not exceed $40.00 per person per day. Alcoholic beverages are not allowed as a reimbursable expense.

2.    RENTAL CAR
      Reimbursement for rental vehicles will be in accordance with Class C rental rates for mid-size vehicles. If a Class C vehicle is not available, a smaller vehicle will be used. If only a larger vehicle is available, it will be so noted on the rental receipt.

3.    FLIGHT ARRANGEMENTS
      Air travel will be reimbursable at economy class rates only. Air travel will be by the most direct route. Travel time will be billed at a rate of 0.6 time the straight time rate.

4.    MOTEL/HOTEL
      Lodging obtained will be reasonable and in line with the moderate priced Hotels/Motels for the area/town. CONTRACTOR may utilize COMPANY'S Preferred Hotel Program when traveling to a COMPANY location. EFH Contract Coordinator or Contract Administrator can provide a current list of properties.

5.    ENTERTAINMENT
      Not a reimbursable expense.

6.    PERSONAL OR A COMPANY CAR
      Mileage for personal or company vehicle will be reimbursable at a rate of $0.40 per mile. Mileage will be based on portal to portal using the most direct route.

7.    TELEPHONE CALLS
      All business related telephone calls will be reimbursable.

Proper documentation and receipts will be furnished for all expenses except meals and taxi expenses less than $25.00. Any expense $25.00 or over requires proper documentation.

**Consultants**
**This is the only number you need to make a travel reservation (available 24x7x365): 800.569.0390 Dedicated Phone Line. When calling for reservations, please identify yourself as an EFH consultant.**

By booking through CorpTrav you can receive EFH discounts on your air, car and hotel.

C 0628215 C

# ATTACHMENT 5
# REIMBURSABLE EXPENSE POLICY

www.corptrav.com provides online access to CorpTrav customer service, itineraries, traveler profiles, travel warnings, passport info, traveler surveys, destination information & much more.

C 0628215C

# ATTACHMENT 6
# FORM OF ACCESS LETTER

[Addressee (e.g., third party seeking access to EY Report)]          [Month XX, 20XX]
[Street Address]
[City, State  Zip]

Dear [_____] :

[Client] (the "Client") has informed Ernst & Young LLP ("EY") that it wishes to disclose to [party seeking access] (the "Recipient") EY's [describe report(s)] , dated [_____] , relating to [describe subject] (the "Report(s)"). EY has not placed any limitations on the Client's ability to disclose any contents of the Report relating to the tax aspects or structure of any transaction proposed by the Client.

EY performed advisory services only for the Client. EY did not undertake the services on behalf of, or to serve the needs of, the Recipient or any other third party. EY did not audit the Client's financial statements, nor did it perform any procedures with respect to its financial information, or otherwise for or relating to any period subsequent to the date(s) of the Report(s).

EY prepared the Report(s) solely for the Client. The Report(s) address[ es] only the issues identified by the Client, and [ is/are] based solely on information obtained by EY using the procedures specified by the Client or otherwise provided by or on behalf of the Client. The Report(s) [ is/are] subject to many limitations and [ do/does] not provide any form of assurance with respect to any of the information referred to therein. The Recipient understands and accepts the scope and limitations of the Report(s).

Except (1) where compelled by legal process (of which the Recipient will immediately notify EY and tender to EY, if it so elects, the defense thereof), (2) with respect to any contents of the Report relating to the tax treatment and tax structure of the proposed transaction (including any facts that may be relevant to understanding the proposed tax treatment of the proposed transaction), or (3) with EY's prior written consent, the Recipient will not, circulate, quote, disclose or distribute any of the Report(s) or any information contained therein, or any summary or abstract thereof, or make any reference thereto or to EY, to anyone other than the Recipient's directors, officers or employees or legal advisors who, in each case, need to know its contents in order to _____ , and who have agreed to be bound by the terms and conditions of this agreement to the same extent as the Recipient.

The Recipient further agrees that it will not, and will not permit others to, quote or refer to the Report, any portion, summary or abstract thereof, or to EY, in any document filed or distributed in connection with (a) a purchase or sale of securities to which the United States or state securities laws ("Securities Laws") are applicable or (b) periodic reporting obligations under Securities Laws. The Recipient will not contend that any provisions of Securities Laws could invalidate any provision of this agreement.

C 0628215 C

## ATTACHMENT 5
## REIMBURSABLE EXPENSE POLICY

In further consideration of EY allowing the Recipient access to the Report(s) and the information contained therein, the Recipient agrees that:

1. It does not acquire any rights against EY, and EY does not assume any duties or obligations to the Recipient or otherwise, as a result of such access.

2. It will not rely on the Report(s) or any portion thereof and will make no claim that it has done so.

3. It will make no claim against EY, its partners, employees or affiliates, or other members of the global Ernst & Young network (collectively, the "EY Parties" that relates in any way to the Report(s), any information contained therein, or the Recipient's access to the Report(s).

4. To the fullest extent permitted by applicable law, it will indemnify, defend and hold harmless the EY Parties from and against any claim or expense, including reasonable attorneys' fees, suffered or incurred by any EY Party relating to any breach by the Recipient of any of its representations or agreements contained herein or the use or disclosure of the Report(s) or any portion thereof by anyone who received it directly or indirectly from or at the request of the Recipient.

Very truly yours,

Ernst & Young LLP [replace with EY facsimile signature when final]

Accepted by:

[Addressee]

By:    _____

C 0628215 C

# ATTACHMENT 7
# PRIVACY, CONFIDENTIALITY AND INFORMATION SECURITY PROVISIONS

For purposes of this Attachment, "**Personal Information**" means any data or information that (i) relates to an individual and (ii) identifies or can be used to identify the individual (such as an individual's name, postal address, e-mail address, telephone number, date of birth, Social Security number, driver's license number, account number, credit or debit card information (including without limitation card account number, personal identification number, card validation code or value, and magnetic stripe data), health or medical information or one or more factors specific to physical, psychological, mental, economic, cultural or social identity or any other unique identifier).

Representations and Warranties:

CONTRACTOR represents, warrants and covenants that:

(1)     CONTRACTOR and its employees, agents, consultants and subcontractors shall hold in strict confidence:

    (a)     any and all Personal Information (whether in individual or aggregate form and regardless of the media in which it is contained) that may be disclosed at any time to CONTRACTOR or its employees, agents, consultants or subcontractors by COMPANY or its employees, agents, consultants or contractors in anticipation of, in connection with or incidental to the performance of Services for or on behalf of COMPANY;

    (b)     any and all Personal Information (whether in individual or aggregate form and regardless of the media in which it is contained) that may be created, obtained, procured, used or accessed at any time by CONTRACTOR or its employees, agents, consultants or subcontractors in connection with or incidental to the performance of Services for or on behalf of COMPANY; and

    (c)     any information derived from the information described in subparagraphs (a), (b) and (c) ((a), (b), and (c) collectively, "**Confidential Personal Information**").

(2)     CONTRACTOR shall only collect, process, store, use, disclose and dispose of Confidential Personal Information for the benefit of COMPANY and, except with the prior written consent of COMPANY, only for the purpose of performing Services for or on behalf of COMPANY in compliance with COMPANY'S written instructions and for no other purpose.

(3)     CONTRACTOR shall comply with:

    (a)     all applicable federal, state, and local laws, rules, regulations, and governmental requirements currently in effect and as they become effective relating in any way to the privacy, confidentiality or security of Confidential Personal Information;

    (b)     applicable provisions of the COMPANY privacy notice posted on www.txu.com and any other COMPANY privacy policies, statements or notices that are provided to CONTRACTOR in writing, ((a), and (b) collectively, "**Privacy Laws**").

C 0628215 C

# ATTACHMENT 7
# PRIVACY, CONFIDENTIALITY AND INFORMATION SECURITY PROVISIONS

(4)    CONTRACTOR has obtained and shall maintain in full force and effect all licenses, consents, permits, approvals, authorizations and the like required to lawfully perform CONTRACTOR'S obligations pursuant to this Attachment. CONTRACTOR shall promptly notify COMPANY if CONTRACTOR receives any notice, demand, summons or complaint from any governmental or regulatory authority, agency or other body relating to the CONTRACTOR'S performance in accordance with this Attachment, and shall take all actions, at CONTRACTOR'S expense, to remedy and resolve any issues raised therein as promptly as practicable.

(5)    Any Confidential Personal Information provided by COMPANY or its employees, agents, consultants or contractors to CONTRACTOR, or created, obtained, procured, used or accessed by CONTRACTOR in COMPANY'S name or on COMPANY'S behalf, shall at all times be and remain the sole property of COMPANY and CONTRACTOR shall not have or obtain any rights therein.

(6)    Except with the prior written consent of COMPANY, CONTRACTOR shall not share, transfer, disclose or otherwise provide access to any Confidential Personal Information (or any portion thereof) to any third party, except those of CONTRACTOR'S employees or agents who have a genuine need to know the Confidential Personal Information as a necessary condition to CONTRACTOR'S performance of services for or on behalf of COMPANY or as required by applicable law, regulation, governmental process or professional obligations. In the instances in which COMPANY consents in writing to any subcontracting of services, whether in whole or in part, CONTRACTOR shall cause the subcontractor to agree with CONTRACTOR to the same duties and obligations applicable to CONTRACTOR in this Attachment. CONTRACTOR shall only contract with a subcontractor (if permitted under the Agreement) that CONTRACTOR reasonably can expect to be suitable and capable to perform the delegated obligation in accordance with this Attachment. CONTRACTOR shall cause each of its employees, agents, consultants and subcontractors who has access to Confidential Personal Information to comply with the terms and conditions of this Attachment in the same manner as CONTRACTOR is bound hereby. In all events, CONTRACTOR agrees to remain fully responsible for and liable to COMPANY for any and all losses, uses or disclosures of, activities involving, or access to or acquisition of Confidential Personal Information by its employees, agents, consultants or subcontractors or other third parties.

Requirement to Maintain Information Security Program:

In addition to any other privacy, confidentiality or information security requirement set forth herein, CONTRACTOR shall, in accordance with industry leading practices and all applicable Privacy Laws, establish controls designed to ensure the confidentiality of Confidential Personal Information and that Confidential Personal Information is not disclosed contrary to the provisions of this Attachment or any applicable Privacy Laws. CONTRACTOR shall develop, implement and maintain reasonable security procedures and practices to protect Confidential Personal Information from unauthorized access, destruction, use, modification and disclosure. Without limiting the foregoing, CONTRACTOR shall maintain and implement a comprehensive

C 0628215 C

# ATTACHMENT 7
# PRIVACY, CONFIDENTIALITY AND INFORMATION SECURITY PROVISIONS

written information security program, that includes appropriate administrative, technical and physical safeguards and other security measures (including but not limited to computer hardware and software programs, and Internet security systems with regard to collection, processing, storage, use, disclosure and disposal of Confidential Personal Information), designed to (i) ensure the security and confidentiality of Confidential Personal Information; (ii) protect against any anticipated threats or hazards to the security and integrity of Confidential Personal Information; and (iii) protect against unauthorized access to, or acquisition or use of, Confidential Personal Information. CONTRACTOR will implement training programs to inform its employees assigned to carry out its obligations under this.

Information Security Breach Notification:

CONTRACTOR agrees to notify COMPANY promptly in writing of any breach of the provisions of this Attachment or any loss or unauthorized use, disclosure, acquisition of or access to any Confidential Personal Information of which CONTRACTOR becomes aware. Such notice shall summarize in reasonable detail the effect on COMPANY, if known, of the breach, loss or unauthorized use, disclosure or acquisition of, or access to, Confidential Personal Information and the corrective action taken or to be taken by CONTRACTOR. CONTRACTOR shall promptly take all necessary and advisable corrective actions, and shall reasonably cooperate with COMPANY in all reasonable and lawful efforts to prevent, mitigate or rectify such breach, loss or unauthorized use, disclosure, acquisition or access. In addition to the notice provision contained herein, CONTRACTOR will also promptly report any such breach, loss, unauthorized use, disclosure or acquisition of or access to Confidential Personal Information to COMPANY'S Legal Department at 972.868.2820.

Other Notifications:

CONTRACTOR agrees to notify COMPANY promptly in writing of any subpoena or other judicial or administrative order or proceeding seeking access to or disclosure of Confidential Personal Information. COMPANY shall have the right to defend such action in lieu of and on behalf of CONTRACTOR. COMPANY may, if it so chooses, seek a protective order. CONTRACTOR shall reasonably cooperate with COMPANY in such defense.

Inspection Rights:

Upon the reasonable request by COMPANY, CONTRACTOR agrees that it shall make available qualified individuals and/or a member of senior management responsible for security and data protection, for the purposes of discussing relevant information technology controls, including those policies, procedures and controls relevant to the provision of services and security obligations under this agreement. CONTRACTOR shall cooperate with reasonable requests to conduct onsite reviews of its controls infrastructure components relevant to the services being provided. To facilitate the review of documentation relevant to these controls that is generally not distributed these reviews would be conducted in-person, and at mutually agreed upon periods

C 0628215 C

# ATTACHMENT 7
# PRIVACY, CONFIDENTIALITY AND INFORMATION SECURITY PROVISIONS

over the term of the contract or task order. No such inspection by COMPANY as set forth herein shall relieve CONTRACTOR of any of its obligations under this paragraph, all of which shall remain absolute.

<u>Return of Information:</u>

Promptly upon the expiration or earlier termination of the Agreement, or such earlier time as COMPANY reasonably requests, CONTRACTOR shall return to COMPANY or its designee, or render unreadable or undecipherable if return is not reasonably feasible or desirable to COMPANY (which decision shall be based solely on COMPANY'S written statement), each and every original and copy in every media of all Confidential Personal Information in the possession, custody or control of CONTRACTOR or CONTRACTOR'S employees, agents, consultants or subcontractors. However, if laws or professional standards applicable to CONTRACTOR do not permit such return or destruction, in whole or part, the CONTRACTOR shall retain such COMPANY data as required by such laws or professional standards, shall maintain the continued confidentiality and security of such COMPANY data in accordance with the requirements of this Agreement, and shall not actively process or use the COMPANY data for any purpose other than as required by the applicable laws or professional standards after termination of this Agreement.

<u>Remedies for Information Security Breach:</u>

CONTRACTOR agrees that any breach of the provisions of this Attachment or any loss or unauthorized collection, processing, use, disclosure, disposal or acquisition of or access to any Confidential Personal Information in violation of this Attachment or any applicable Privacy Law may cause immediate and irreparable harm to COMPANY for which money damages may not constitute an adequate remedy. Therefore, CONTRACTOR agrees that COMPANY may seek injunctive or other equitable relief for any such violation, in addition to its remedies at law.

<u>Miscellaneous:</u>

It is understood and agreed by CONTRACTOR and COMPANY that the proper, lawful and secure collection, processing, storage, use, disclosure and disposal of Confidential Personal Information pursuant to this Agreement is of the utmost importance to COMPANY and the individuals about whom such Confidential Personal Information pertains. CONTRACTOR and COMPANY further understand and agree that Confidential Personal Information is inherently valuable and therefore CONTRACTOR agrees to take all appropriate measures, whether spelled out in this Attachment or otherwise, to protect such Confidential Personal Information from improper, unauthorized or unlawful access, disclosure, use or disposal.

C 0628215 C

# ATTACHMENT 8
# DISPUTE RESOLUTION PROCEDURES

**Arbitration**

The arbitration will be conducted in accordance with the procedures in this document and the International Institute for Conflict Prevention and Resolution's Rules for Non-Administered Arbitration ("Rules") as in effect on the date of the Agreement, or such other rules and procedures as the parties may agree to in writing. In the event of a conflict, the provisions of this document will control.

The arbitration will be conducted before a panel of three arbitrators, to be selected in accordance with the screened selection process provided in Rules 5, 6, 7 and 8 of the Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of any of these procedures, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator may be appointed unless he or she has agreed in writing to these procedures and has confirmed in writing that he or she is not, and will not become during the term of the arbitration, an employee, partner, executive officer, director, or substantial equity owner of EY or any EY audit client.

The arbitration panel shall have no power to award non-monetary or equitable relief of any sort or to make an award or impose a remedy that (i) is inconsistent with the agreement to which these procedures are attached, or (ii) could not be made or imposed by a court deciding the matter in the State of Texas.

Discovery shall be permitted in connection with the arbitration only to the extent, if any, expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery.

All aspects of the arbitration shall be treated as confidential. The parties and the arbitration panel may disclose the existence, content or results of the arbitration only in accordance with the Rules or applicable professional standards. Before making any such disclosure, a party shall give written notice to all other parties and shall afford them a reasonable opportunity to protect their interests, except to the extent such disclosure is necessary to comply with applicable law, regulatory requirements or professional standards.

The result of the arbitration shall be binding on the parties, and judgment on the arbitration award may be entered in any court having jurisdiction.

**AMENDMENT NO. 01**

**EFFECTIVE JULY 8, 2010**

**TO**

**MASTER SERVICES AGREEMENT**

**BY AND BETWEEN**

**ERNST & YOUNG LLP**

**AND**

**EFH CORPORATE SERVICES COMPANY**

**DATED JUNE 10, 2010**

**CONTRACT NO. C 0628215 C**

# AMENDMENT NO. 01

#C 0628215 C

This Amendment is entered into and effective as of July 8, 2010.

**EFFECTIVE DATE**

This Amendment modifies, alters or changes specific terms and conditions of Contract No. C 0628215 C ("Agreement") that exists between the parties hereto. Except as modified in this Amendment or previous amendments, the Agreement will remain in full force and effect. This Amendment is intended to be a clarification of the original contract intent.

**PURPOSE**

The Agreement is modified as follows:

**MODIFICATIONS**

The first paragraph of Article 5 "Compensation" is modified as follows:

**COMPENSATION**

Subject to the requirements of this Article 5, and as full compensation for the satisfactory performance by CONTRACTOR of the Work, COMPANY will compensate CONTRACTOR in accordance with the rate(s) or price(s) contained in the appropriate Schedule A. Such rate(s) or price(s) shall not exceed the rates agreed upon in Attachment 9 of this Agreement.

Attachment 9:  COMPANY RATE CARD is added in the Exhibit list as a reference and also an attachment with the following:

ATTACHMENT 9:  COMPANY RATE CARD

**ATTACHMENT 9**

The parties have signed this Amendment acknowledging their agreement to its provisions as of the Effective Date.

**ERNST & YOUNG LLP**

By: _Chris J Slasher_
Signature

Name: _CHRIS J GRASHER_

Title: _PARTNER_

Date: _7/12/2010_

**EFH CORPORATE SERVICES COMPANY**

By: _Molly Holloway_
Signature

Name: _MOLLY HOLLOWAY_

Title: _SUPPLY CHAIN_

Date: _7/13/10_

AMENDMENT NO. 01

#C 0628215 C

## ATTACHMENT 9
## COMPANY RATE CARD

**Tax Services Billing Rates**      Rates are effective July 1, 2009

| Partner/Principle | | Project Spend <$1 million | Project Spend >$1 million |
|---|---|---|---|
| Partner/Principle | 1st thru 5th years | 516 | 430 |
| | 6th thru 10th years | 543 | 453 |
| | More than 10 years | 582 | 485 |
| Executive Directors | All | 480 | 413 |
| Senior Managers | All | 470 | 405 |
| Managers | All | 360 | 325 |
| Senior 3 | S5 or higher | 285 | 258 |
| Senior 1/2 | S3 or S4 | 234 | 195 |
| Staff 2 | S2 | 183 | 153 |
| Staff 1 | S1 | 105 | 88 |
| CSA | All | 105 | 88 |
| Intern | All | 60 | 50 |

# AMENDMENT NO. 01

#C 0628215 C

## Advisory Rate Card — Project Spend <$2million

| | Risk | | IT Risk | Business Performance Improvement |
|---|---|---|---|---|
| | Risk Services | Energy Trading Services | | |
| **Staff** | | | | |
| 1st Year | 106 | 129 | 132 | 179 |
| 2nd Year | 129 | 162 | 152 | 179 |
| **Seniors** | | | | |
| 1st Year | 154 | 224 | 188 | 252 |
| 2nd Year | 178 | 242 | 218 | 252 |
| More than 2 years | 196 | 252 | 236 | 274 |
| **Managers** | | | | |
| 1st Year | 219 | 279 | 262 | 337 |
| 2nd Year | 246 | 299 | 274 | 337 |
| More than 2 years | 264 | 299 | 288 | 349 |
| **Senior Managers** | | | | |
| 1st Year | 282 | 329 | 304 | 405 |
| 2nd Year | 294 | 329 | 310 | 405 |
| 3rd Year | 294 | 329 | 334 | 427 |
| More than 3 years | 309 | 349 | 352 | 427 |
| **Partners** | | | | |
| 1st thru 5th years | 344 | 378 | 388 | 474 |
| 6th thru 10th years | 368 | 398 | 394 | 474 |
| More than 10 years | 379 | 406 | 408 | 474 |

## Advisory Rate Card — Project Spend $2million - $5million

| | Risk | | IT Risk | Business Performance Improvement |
|---|---|---|---|---|
| | Risk Services | Energy Trading Services | | |
| **Staff** | | | | |
| 1st Year | 93 | 113 | 114 | 159 |
| 2nd Year | 114 | 139 | 133 | 159 |
| **Seniors** | | | | |
| 1st Year | 134 | 196 | 164 | 224 |
| 2nd Year | 154 | 211 | 189 | 224 |
| More than 2 years | 169 | 219 | 206 | 244 |
| **Managers** | | | | |
| 1st Year | 192 | 245 | 229 | 299 |
| 2nd Year | 215 | 262 | 239 | 299 |
| More than 2 years | 229 | 262 | 252 | 312 |
| **Senior Managers** | | | | |
| 1st Year | 236 | 288 | 266 | 359 |
| 2nd Year | 257 | 288 | 279 | 359 |
| 3rd Year | 257 | 288 | 292 | 379 |
| More than 3 years | 269 | 306 | 308 | 379 |
| **Partners** | | | | |
| 1st thru 5th years | 299 | 329 | 339 | 422 |
| 6th thru 10th year | 322 | 348 | 344 | 422 |
| More than 10 year | 332 | 355 | 357 | 422 |

AMENDMENT NO. 01

#C 0628215 C

## Advisory Rate Card (continued)
### Project Spend > $5million

|  | Risk | | IT Risk | Business Performance Improvement |
|---|---|---|---|---|
|  | Risk Services | Energy Trading Services | | |
| **Staff** | | | | |
| 1st Year | 79 | 97 | 99 | 139 |
| 2nd Year | 97 | 119 | 114 | 139 |
| **Seniors** | | | | |
| 1st Year | 114 | 168 | 139 | 196 |
| 2nd Year | 133 | 179 | 163 | 196 |
| More than 2 years | 147 | 189 | 177 | 213 |
| **Managers** | | | | |
| 1st Year | 165 | 210 | 196 | 262 |
| 2nd Year | 184 | 225 | 205 | 262 |
| More than 2 years | 198 | 225 | 216 | 273 |
| **Senior Managers** | | | | |
| 1st Year | 211 | 247 | 228 | 315 |
| 2nd Year | 219 | 247 | 239 | 315 |
| 3rd Year | 219 | 247 | 249 | 332 |
| More than 3 years | 232 | 262 | 264 | 332 |
| **Partners** | | | | |
| 1st thru 5th years | 258 | 283 | 289 | 369 |
| 6th thru 10th years | 275 | 298 | 295 | 369 |
| More than 10 years | 285 | 304 | 306 | 369 |

# AMENDMENT NO. 01

Transaction Advisory Services Billing Rates

Rates are effective July 1, 2009

## Project Spend < $1 million

| | Transaction Support | Transaction Integration and Working Capital | Transaction Tax* | Valuation & Transaction Business Tax* Modeling* | Restructuring | Transaction Real Estate |
|---|---|---|---|---|---|---|
| Partner, Principals | | 603 | | 735 | 600 | 623 |
| 1st thru 5th years | 495 | | 579 | | | |
| 6th thru 10th years | 555 | | 615 | | | |
| More than 10 years | 585 | | 657 | | | |
| Executive Directors | 460 | 603 | 588 | 624 | 480 | 558 |
| Senior Managers | 435 | 570 | 525 | 599 | 435 | 499 |
| Managers | 357 | 468 | 465 | 479 | 323 | 397 |
| Senior 3 | 255 | 366 | 545 | 361 | 281 | 357 |
| Senior 1/2 | 255 | 366 | 0 | 324 | 281 | 289 |
| Staff 2 | 153 | 240 | 189 | 246 | 171 | 175 |
| Staff 1 | 150 | 240 | 183 | 197 | 171 | 175 |
| CSA / Intern | 150 | 240 | 126 | 53 | 171 | 113 |

## Project Spend > $1 million

| | Transaction Support | Transaction Integration and Working Capital | Transaction Tax* | Valuation & Transaction Business Tax* Modeling* | Restructuring | Transaction Real Estate |
|---|---|---|---|---|---|---|
| Partner, Principals | | 502 | | 612 | 500 | 519 |
| 1st thru 5th years | 413 | | 483 | | | |
| 6th thru 10th years | 463 | | 513 | | | |
| More than 10 years | 488 | | 548 | | | |
| Executive Directors | 400 | 502 | 490 | 520 | 400 | 465 |
| Senior Managers | 362 | 475 | 438 | 499 | 363 | 416 |
| Managers | 298 | 390 | 388 | 400 | 269 | 331 |
| Senior 3 | 212 | 305 | 288 | 301 | 218 | 263 |
| Senior 1/2 | 212 | 305 | 285 | 270 | 218 | 241 |
| Staff 2 | 125 | 200 | 158 | 205 | 143 | 146 |
| Staff 1 | 125 | 200 | 153 | 164 | 143 | 146 |
| CSA / Intern | 125 | 200 | 105 | 45 | 143 | 95 |

All rates are effective until July 1, 2011. Rates shall be reviewed by COMPANY and CONTRACTOR each July starting in July, 2011.
The rates are to be considered as "not to exceed", the maximum fees to be charged for services.
Specific projects may be eligible to receive additional discounts based on their size and scope.
Volume Discounts and other incentives can be applied.

9-4-Confidential

C 0628215 C

# SCHEDULE A

Contract No. C 0628215 C

## SCHEDULE A

Following the Parties' execution of this Schedule A, CONTRACTOR is authorized to perform the Work as identified below on behalf of COMPANY pursuant to the terms and conditions contained in the Agreement.

## SCOPE OF WORK AND DELIVERABLES

The Work will be performed in accordance with the specifications and instructions, if any, attached hereto and identified in the List of Attachments. The Work will be scheduled at the direction of COMPANY'S Contract Coordinator as identified herein.

## SCOPE OF WORK

CONTRACTOR will conduct a preliminary assessment of the current state of COMPANY's risk management capabilities. This will include:

- Executive workshop. This session will provide foundational education: what is enterprise risk management, why enterprise risk management, provide insights on leading practices, a brief self assessment of existing state, insights on what other companies are doing, key factors for success and common pitfalls. It will also be used to learn what is important to the participants in measuring success of the project.
- Current State Assessment. CONTRACTOR will interview approximately 15 executives (to be identified by COMPANY) to learn more about current risk management capabilities. CONTRACTOR will conduct research on a peer group of companies (to be identified by COMPANY, assumed to be approximately 6 companies). The current state assessment will consider risk management capabilities across a broad range of areas, including overall governance, strategic risk management, performance of independent monitoring functions and business-level risk management. The current state assessment will assess the current practices of COMPANY and peer group on a maturity model (five levels - basic, evolving, established, advanced and leading).
- Desired State. COMPANY will validate the overall current state assessment and reach consensus on the desired state. This will include the identification of any short-term / quick wins.
- Reporting. CONTRACTOR will summarize the overall results of the assessment and provide recommendations to COMPANY on next steps and guidance on the types of improvement opportunities that should be considered in a road map to be developed by COMPANY.

## DELIVERABLES

- Executive workshop material
- Findings and Recommendations report including guidance on the road map

CONTRACTOR expects to be able to complete the scope of services over a 6 week time period. However, CONTRACTOR recognizes the challenges in scheduling executive interviews and will use best efforts to be flexible in the use of resources to match the time periods in which executives are available.

## WORK SITE

The Work Site will be the following location(s):500 N. Akard, Dallas, TX 75201.

## SCHEDULE

Work will start 22 June 2010, and be complete by 13 August 2010. The scheduling of Work will be coordinated with COMPANY's Contract Coordinator.

Contract Coordinator: Shawnie McBride    Phone Number: 214-875-8148

## COMPENSATION, INVOICES AND PAYMENT

As full compensation for the satisfactory performance by CONTRACTOR of the Work authorized pursuant to this Schedule A, COMPANY will compensate CONTRACTOR as follows.

This project is not authorized to exceed $60,000 excluding pre-authorized direct expenses. Direct expenses include expenses such as travel, meals and accommodations incurred directly related to the services being provided. These direct expenses will be charged as incurred. Any extension or increase in spend will require amendment to this Schedule A. This estimate assumes there will be travel.

**Professional and Support Staff Fees Schedule**

| Name | Position | Hourly Rate |
|------|----------|-------------|
| Kevin Corbett | Partner – Risk Services | $379 |
| Matt Chambers | Senior Manager – Energy Trading Services | $349 |
| Rachel Gupta | Manager – Energy Trading Services | $299 |
| Brittany Durie | Staff – Energy Trading Services | $162 |

The rates specified in the Schedule A will remain in effect, with respect to and until completion of the Work authorized pursuant to this Schedule A.

All invoices shall be sent to:

> EFH Corporate Services Company
> 1601 Bryan Street
> Dallas, Texas 75201
> Attention: Shawnie McBride

## KEY PERSONNEL

CONTRACTOR agrees that the individuals listed below will be assigned to perform the Work authorized by this Schedule A. CONTRACTOR will employ all reasonable efforts to ensure that such individuals remain so assigned until such Work is accepted by COMPANY; provided, however, that in the event that any such individuals are reassigned by CONTRACTOR or otherwise become unavailable to perform such Work, CONTRACTOR will provide, by way of replacement, individuals with reasonably equivalent experience and expertise.

> Kevin Corbett, Partner
> Matt Chambers, Senior Manager
> Rachel Gupta, Manager
> Brittany Durie, Staff

CONTRACTOR PERSONNEL AUTHORIZED TO ATTEND MEETINGS WITH COMPANY PERSONNEL PERTAINING TO THE WORK

> Kevin Corbett, Partner
> Matt Chambers, Senior Manager
> Rachel Gupta, Manager
> Brittany Durie, Staff

PRIVILEGES CLAIMED BY COMPANY, WITH RESPECT TO DELIVERABLES OR OTHER DOCUMENTS HEREAFTER DESIGNATED BY COMPANY

\_\_\_\_\_ ATTORNEY-CLIENT COMMUNICATION

\_\_\_\_\_ ATTORNEY WORK PRODUCT

\_\_\_\_\_ TAX ADVISOR

\_\_\_\_\_ OTHER:_____

## LIST OF ATTACHMENTS

COMPANY and CONTRACTOR agree that the following described attachments, if any, are incorporated herein in their entirety as fully as completely rewritten herein.

1. Not used

Work not specified above may be authorized only through a separate Schedule A, or through an amendment or supplement to this Schedule A.

## ACCEPTANCE CRITERIA AND ADDITIONAL TERMS AND CONDITIONS APPLICABLE TO THE WORK

COMPANY will have a ten (10) day period to evaluate any Deliverable provided under this Schedule A, beginning on the date of COMPANY's receipt of any such Deliverable from CONTRACTOR ("Acceptance Period").   At the conclusion of the Acceptance Period, COMPANY may: (a) accept such Deliverable ("Acceptance"); (b) not accept such Deliverable if COMPANY reasonably believes that such Deliverable fails to comply, in any material respect, with any of the requirements set forth in this Schedule A; or (c) upon mutual agreement with CONTRACTOR, extend the Acceptance Period.  The passage of ten (10) working days from the date when a Deliverable is received by COMPANY, without receipt by CONTRACTOR of notice of non-acceptance by COMPANY, or use by COMPANY of a Deliverable (other than for purposes of evaluating the acceptability of that Deliverable) will constitute Acceptance of that Deliverable by COMPANY.

In the event that COMPANY notifies CONTRACTOR of COMPANY'S decision not to accept a Deliverable, COMPANY and CONTRACTOR shall promptly undertake cooperative, good faith efforts for the purpose of: (a) allowing CONTRACTOR to correct or modify the Deliverable so as to provide for the Acceptance of that Deliverable; or (b) agreeing to an appropriate adjustment in the compensation payable by COMPANY for that Deliverable, consistent with the nature and extent of the deficiencies in that Deliverable which resulted in COMPANY'S decision not to accept that Deliverable.

The Acceptance Criteria shall not address the substance of any recommendations or conclusions made by CONTRACTOR as a result of the provision of the Work.  COMPANY acknowledges and agrees that its review and comments shall not impede CONTRACTOR'S professional judgment and applicable professional standards and practices when performing the Work and that the substance of the Deliverables, recommendations, advice or information provided by CONTRACTOR shall be determined solely by CONTRACTOR in the exercise of its professional judgment.

[Signature on following page.]

ERNST & YOUNG LLP

EFH CORPORATE SERVICES COMPANY

By: _Chris J Grasher_
Signature

By: _Molly Holloway_
Signature

Name: _CHRIS J GRASHER_

Name: _MOLLY HOLLOWAY_

Title: _PARTNER_

Title: _Supply Chain_

Date: _6/18/2010_

Date: _10 June 2010_

AMENDMENT NO. 2

Contract No. C 0628215 C

## SCHEDULE A

Following the Parties' execution of this Schedule A, CONTRACTOR (Ernst & Young LLP) is authorized to perform the Work as identified below on behalf of COMPANY (EFH Corporate Services Company) pursuant to the terms and conditions contained in the Agreement between COMPANY and CONTRACTOR dated June 10, 2010.

## SCOPE OF WORK AND DELIVERABLES

The Work will be performed in accordance with the specifications and instructions, if any, attached hereto and identified in the List of Attachments. The Work will be scheduled at the direction of COMPANY'S Contract Coordinator as identified herein.

## SCOPE OF WORK

CONTRACTOR will provide the following tax advisory Services to COMPANY:

- CONTRACTOR will review the COMPANY's federal consolidated tax returns for the years 2003 through 2006 in order to identify possible favorable amended tax return positions. This work will be performed during the period March 31, 2011 to April 15, 2011. CONTRACTOR will discuss CONTRACTOR's findings with COMPANY orally.

The services are advisory in nature. CONTRACTOR will not render an assurance report of assurance opinion under the Schedule A, nor will the Services constitute an audit, review, examination, or other form of attestation as those terms are defined by the American Institute of Certified Public Accountants. CONTRACTOR will not conduct a review to detect fraud or illegal acts.

## DELIVERABLES

Deliverables provided by CONTRACTOR to the COMPANY may include written and/or oral comments related to items / issues identified by CONTRACTOR through the procedures performed above that CONTRACTOR believes merit further consideration by the COMPANY in connection with the scope of work outlined above.

## WORK SITE

The Work Site will be the following location(s):

## **CONTRACTOR Offices:**

2323 Victory Avenue
Suite 2000
Dallas, TX 75219

Contract No. C 0628215 C

## SCHEDULE A

### COMPANY Offices:

1601 Bryan Street
Dallas, Texas 75201

### SCHEDULE

Work will start on or about March 31, 2011, and field work will be complete on or about April 15, 2011. The scheduling of Work will be coordinated with COMPANY's Contract Coordinator.

Contract Coordinator: Mr. Kevin Ashby   Phone Number: 214.812.~~2212~~ 2117

## COMPENSATION, INVOICES AND PAYMENT

As full compensation for the satisfactory performance by CONTRACTOR of the Work authorized pursuant to this Schedule A, COMPANY will compensate CONTRACTOR as follows.

COMPANY shall pay fees for the Services based on the time that CONTRACTOR's professionals spend performing them, billed at the standard hourly rate referenced in our COMPANY rate card for each such individual, as adjusted annually while the Services under this Schedule A are being performed. COMPANY shall also pay any potential value-added taxes (VAT), sales taxes, and other indirect taxes incurred in connection with the delivery of the Services, including any such taxes and related administrative costs that result from billing arrangements specifically requested by COMPANY.

CONTRACTOR will bill COMPANY for CONTACTOR's fees, expenses, and applicable taxes or other charges, if any, on a monthly basis. Payment is due upon receipt of CONTRACTOR's invoice.

This project is not authorized to exceed $25,000, plus expenses, if any. Any extension or increase in spend will require an amendment to this Schedule A.

### Professional and Support Staff Fees Schedule

| | | |
|---|---|---|
| Christopher J. Grasher | Partner, Tax Services | $582/HR |
| J. Andrew Miller | Partner, Tax Services | $582/HR |
| Brian D. Taylor | Partner, Tax Services | $582/HR |

Any fee for the Services under this Schedule A assume that COMPANY will timely provide, or cause to be provided, to CONTRACTOR all appropriate information and assistance, and that the scope and complexity of such Services are consistent with our prior discussions, as well as the description thereof above. If, during the term of this Schedule A, CONTRACTOR determines that any additional work is necessary, whether at COMPANY's request or because the complexity of the project increases, CONTRACTOR

Contract No. C 0628215 C

## SCHEDULE A

will promptly contact COMPANY to discuss any adjustments to the scope of work or CONTRACTOR's fees.

All invoices shall be sent to:

> 1601 Bryan Street
> Dallas, Texas 75201

> Attention: Mr. Kevin Ashby

## KEY PERSONNEL

CONTRACTOR agrees that the individuals listed below will be assigned to perform the Work authorized by this Schedule A. CONTRACTOR will employ all reasonable efforts to ensure that such individuals remain so assigned until such Work is accepted by COMPANY; provided, however, that in the event that any such individuals are reassigned by CONTRACTOR or otherwise become unavailable to perform such Work, CONTRACTOR will provide, by way of replacement, individuals with reasonably equivalent experience and expertise.

> Person 1: Christopher J. Grasher, Partner
> Person 2: J. Andrew Miller, Partner
> Person 3: Brian Taylor, Partner

CONTRACTOR PERSONNEL AUTHORIZED TO ATTEND MEETINGS WITH COMPANY PERSONNEL PERTAINING TO THE WORK

> Person 1: Christopher J. Grasher, Partner
> Person 2: J. Andrew Miller, Partner
> Person 3: Brian Taylor, Partner

PRIVILEGES CLAIMED BY COMPANY, WITH RESPECT TO DELIVERABLES OR OTHER DOCUMENTS HEREAFTER DESIGNATED BY COMPANY

_____  ATTORNEY-CLIENT COMMUNICATION

_____  ATTORNEY WORK PRODUCT

_____  TAX ADVISOR

_____  OTHER: _____

Contract No. C 0628215 C

## SCHEDULE A

### LIST OF ATTACHMENTS

COMPANY and CONTRACTOR agree that the following described attachments, if any, are incorporated herein in their entirety as fully as completely rewritten herein.

    1.  N/A

Work not specified above may be authorized only through a separate Schedule A, or through an amendment or supplement to this Schedule A.

### ACCEPTANCE CRITERIA AND ADDITIONAL TERMS AND CONDITIONS APPLICABLE TO THE WORK

| CONTRACTOR | COMPANY |
|---|---|
| By: _____ | By: _____ |
| Signature | Signature |
| Name: CHRIS CRASNER | Name: Kevin M Ashby |
| Title: PARTNER | Title: Director, Tax |
| Date: 3/30/11 | Date: 3/31/11 |

Page 4

AMENDMENT NO. 3


DATED MAY 16, 2012

TO

MASTER SERVICES AGREEMENT


C0628215C

BY AND BETWEEN

ERNST & YOUNG LLP

AND

EFH CORPORATE SERVICES COMPANY

DATED JUNE 10, 2010

Contract No. C0628215C

## AMENDMENT NO. 3

## SCHEDULE A

Following the Parties' execution of this Schedule A, CONTRACTOR is authorized to perform the Work as identified below on behalf of COMPANY pursuant to the terms and conditions contained in the Agreement.

### SCOPE OF WORK AND DELIVERABLES

The Work will be performed in accordance with the specifications and instructions, if any, attached hereto and identified in the List of Attachments.  The Work will be scheduled at the direction of COMPANY's Contract Coordinator as identified herein.

**SCOPE OF WORK:**

- CONTRACTOR will provide assistance and oversight for the Texas Managed Audit projects covering Oak Grove Management Company LLC (Oak Grove) for the audit period May 1, 2006 through December 31, 2010 and Sandow Power Company LLC (Sandow) for the audit periods June 1, 2006 through December 31, 2010.

- CONTRACTOR will assist the COMPANY with the ongoing Texas sales and use tax managed audits for the entities listed above, including reviewing schedules, invoices and correspondence as requested by COMPANY.

- CONTRACTOR will also assist with compiling supporting documentation and replies for the auditor as requested by the COMPANY.

- CONTRACTOR will advise COMPANY regarding their penalty exposure with respect to CONTRACTOR's advice rendered and the disclosures that may avoid such penalties as determined by The Internal Revenue Code, related IRS guidance and professional standards.
    - **Deliverable:** CONTRACTOR will provide COMPANY with tax opinions, memoranda, and similar documents that will address disclosures CONTRACTOR believes are appropriate to comply with applicable taxpayer and tax advisor/return preparer obligations, including CONTRACTOR's views as to the level of support for the positions addressed therein in a manner designed to facilitate compliance with tax return disclosure requirements.

**DELIVERABLES:**

Deliverables provided by CONTRACTOR to the COMPANY may include written and/or oral comments related to items/issues identified by CONTRACTOR through the procedures performed above that CONTRACTOR believes merit further consideration by the COMPANY in connection with the scope of work outlined above.

Contract No. C0628215C

## WORK SITE

The Work Site will be the following location(s):

CONTRACTOR Offices:

2323 Victory Avenue
Suite 2000
Dallas, TX 75219


COMPANY Offices:

1601 Bryan Street
Dallas, Texas 75201


## SCHEDULE

Work will start on or about April 30, 2012 and be complete by October 31, 2012.   The scheduling of Work will be coordinated with COMPANY's Contract Coordinator.

Contract Coordinator:  Carol Miller                   Phone Number:  214-812-2212


## COMPENSATION, INVOICES AND PAYMENT

As full compensation for the satisfactory performance by CONTRACTOR of the Work authorized pursuant to this Schedule A, COMPANY will compensate CONTRACTOR as follows.

CONTRACTOR's professional fee will be as follows:

- Oak Grove – The fee will be 20% of the gross recovered savings (gross recovered savings is defined as refunds or credits for taxes previously paid as well as credits used to offset other audit liabilities and any associated penalty and interest savings) as approved by the Texas Comptroller of Public Accounts.

- Sandow - The fee will be $100,000 plus 15% of the gross recovered savings (gross recovered savings is defined as refunds or credits for taxes previously paid as well as credits used to offset other audit liabilities and any associated penalty and interest savings) as approved by the  Texas Comptroller of Public Accounts.  If gross refunds approved exceed $2 million the $100,000 flat fee will be waived.

Contract No. C0628215C

The CONTRACTOR fee is payable to CONTRACTOR within 60 days of COMPANY receiving the recovered savings from the State.

This project is not authorized to exceed $400,000, plus expenses, if any. Any extension or increase in spend will require an Amendment to this Schedule A.

Any fee for the Services under this Schedule A assume that COMPANY will timely provide, or cause to be provided, to CONTRACTOR all appropriate information and assistance, and that the scope and complexity of such Services are consistent with our prior discussions, as well as the description thereof above. If, during the term of this Schedule A, CONTRACTOR determines that any additional work is necessary, whether at COMPANY's request or because the complexity of the project increases, CONTRACTOR will promptly contact COMPANY to discuss any adjustments to the scope of work or CONTRACTOR's fees.

In managing the Project within the resource and time estimates outlined in this Schedule A, it is imperative that CONTRACTOR and COMPANY personnel work together to manage project scope and staffing.

All invoices shall be sent to:

> EFH Corporate Services
> 1601 Bryan Street
> Dallas, TX 75201
> Attention: Carla Howard

## KEY PERSONNEL

CONTRACTOR agrees that the individuals listed below will be assigned to perform the Work authorized by this Schedule A. CONTRACTOR will employ all reasonable efforts to ensure that such individuals remain so assigned until such Work is accepted by COMPANY; provided, however, that in the event that any such individuals are reassigned by CONTRACTOR or otherwise become unavailable to perform such Work, CONTRACTOR will provide, by way of replacement, individuals with reasonably equivalent experience and expertise.

> Person 1: Sandra Wells, Partner
> Person 2: Connie Metcalf, Senior Manager
> Person 3: Marcus Bitting, Senior

## CONTRACTOR PERSONNEL AUTHORIZED TO ATTEND MEETINGS WITH COMPANY PERSONNEL PERTAINING TO THE WORK

> Person 1: Sandra Wells, Partner
> Person 2: Connie Metcalf, Senior Manager

Contract No. C0628215C

Person 3: Marcus Bitting, Senior

## PRIVILEGES CLAIMED BY COMPANY, WITH RESPECT TO DELIVERABLES OR OTHER DOCUMENTS HEREAFTER DESIGNATED BY COMPANY

_____ ATTORNEY-CLIENT COMMUNICATION

_____ ATTORNEY WORK PRODUCT

__X__ TAX ADVISOR

_____ OTHER: _____

## LIST OF ATTACHMENTS

COMPANY and CONTRACTOR agree that the following described attachments, if any, are incorporated herein in their entirety as fully as completely rewritten herein.

1. None

Work not specified above may be authorized only through a separate Schedule A, or through an amendment or supplement to this Schedule A.

ACCEPTANCE CRITERIA AND ADDITIONAL TERMS AND CONDITIONS APPLICABLE TO THE WORK

Contract No. C0628215C

ERNST & YOUNG LLP

By: _____
    Signature

Name: _Connie Metcalf_

Title: _Executive Director_

Date: _5/21/12_


EFH CORPORATE SERVICES COMPANY

By: _____
    Signature

Name: _Kevin M. Ashby_

Title: _Director, Tax_

Date: _5/23/12_

AMENDMENT NO. 4

Contract No. C0628215C

## SCHEDULE A

Following the Parties' execution of this Schedule A, Ernst & Young LLP ("CONTRACTOR") is authorized to perform the Services as identified below on behalf of EFH Corporate Services Company ("COMPANY") pursuant to the terms and conditions contained in the Master Services Agreement dated June 10, 2010.

### SCOPE OF WORK AND DELIVERABLES

The Services will be performed in accordance with the specifications and instructions, if any, attached hereto and identified in the List of Attachments. The Services will be scheduled at the direction of COMPANY'S Contract Coordinator as identified herein.

### SCOPE OF WORK

CONTRACTOR will perform limited review procedures with respect to COMPANY'S U.S. federal income tax return for the taxable year ended December 31, 2011 (the "Services") specifically CONTRACTOR will perform the following review procedures on this return:

- CONTRACTOR will perform a high-level review of transactional data contained in the COMPANY's consolidated 2011 Form 10-K and compare with draft tax elections, statements and disclosures prepared by the COMPANY and included in the 2011 tax return. If CONTRACTOR identifies any potential additional tax elections or disclosures required based on the review performed, CONTRACTOR will present to the COMPANY for consideration and inclusion. COMPANY will provide a copy of the 2010 financial statements and the 2010 tax return for CONTRACTOR to review;

- CONTRACTOR will perform a high-level review of the trial balances for business units / legal entities within the consolidated group for items that may require disclosure within the 2011 consolidated federal income tax return;

- CONTRACTOR will consult with subject matter professionals regarding new tax developments relevant within the COMPANY's industry that may affect the COMPANY's 2011 consolidated federal income tax return. New tax developments identified by CONTRACTOR will be presented to the COMPANY for consideration;

- CONTRACTOR will perform an analytical review of the 2010 and 2011 Schedule M-3 entries to identify anomalies (e.g., new entries, non-recurring entries, or entries that change by more than 50%). Entries identified in connection with the analytical review will be presented to the COMPANY for verification and explanation, in order to gain an understanding of the reasons for these anomalies;

- CONTRACTOR will review a comparison of the 2010 tax return with draft current year return including elections, statements, and disclosures prepared by COMPANY. CONTRACTOR will identify any inconsistencies in the elections, statements, and disclosures, and gain an understanding of the reasons for these inconsistencies;

- The COMPANY will complete an AICPA Form 1120 checklist for CONTRACTOR's review for which CONTRACTOR will review for reasonableness; and

- Other specific tasks that may be involved in connection with the Services include participation in meetings and telephone calls with the COMPANY, participating in meetings and telephone calls

Contract No. C0628215C

with third parties and review of transactional and technical documentation beyond those documents noted above.

COMPANY shall prepare the tax return, supporting work papers and related documents, and provide copies to CONTRACTOR by no later than August 20, 2012. CONTRACTOR'S procedures are designed to evaluate the substantive correctness and mechanical accuracy of the tax return, however, CONTRACTOR will not independently verify COMPANY-prepared work papers and other supporting documents, the accuracy and completeness of which are the sole responsibility of COMPANY.

The review procedures that CONTRACTOR expects to perform on this engagement will not be significant enough for CONTRACTOR to be considered the "income tax return preparer" of the above-described tax returns, and, accordingly, CONTRACTOR does not anticipate signing any of these returns as the preparer. CONTRACTOR will communicate to COMPANY any revisions that CONTRACTOR considers necessary to make the material CONTRACTOR reviews substantively correct and mechanically accurate. CONTRACTOR'S review is not intended to provide COMPANY with any assurance that CONTRACTOR has identified all issues that could result in current or future controversies with taxing authorities or additional tax or penalties, that CONTRACTOR has identified all opportunities for minimizing tax liabilities, or that one or more items that CONTRACTOR may review cannot be successfully challenged by any of the taxing authorities.

Although this Schedule A refers to "review procedures," this engagement does not constitute a "review" within the scope of the American Institute of Certified Public Accountants' Standards for Accounting and Review Services.

This engagement does not include (1) an analysis of any shift in ownership of COMPANY stock, (2) the preparation of statements required by Internal Revenue Code §§382 and 383, or (3) a determination of whether such code sections limit the amount of taxable income or tax that can be offset by net operating loss carryforwards, certain recognized built-in losses, certain excess credits, or net capital loss carryovers. The limitations under these provisions may have a material adverse impact on COMPANY'S tax liability. CONTRACTOR will not prepare a return on which taxable income (or tax) is offset by such attributes unless an analysis is performed. If COMPANY would like CONTRACTOR to perform such an analysis, those services would be covered under a separate engagement letter.

This engagement does not include any advice or determinations regarding what expenses may be qualified research expenses under Internal Revenue Code §41.

This engagement does not include review of the Oncor Electric Delivery Co LLC 2011 partnership return.

Contract Coordinator: Kevin Ashby          Phone Number:  214-812-2117

## WORK SITE

The Work Site will be the following location(s):  COMPANY and CONTRACTOR offices.

Contract No. C0628215C

CONTRACTOR Offices:
2323 Victory Avenue Suite 2000
Dallas, TX 75219

COMPANY Offices:
Energy Future Holdings
1601 Bryan Street
Dallas, Texas 75201
Phone Number: 214-812-2117

## SCHEDULE

Work will start August 20, 2012, and be complete by September 15, 2012. The scheduling of Work will be coordinated with COMPANY's Contract Coordinator.

## COMPENSATION, INVOICES AND PAYMENT

As full compensation for the satisfactory performance by CONTRACTOR of the Services authorized pursuant to this Schedule A, COMPANY will compensate CONTRACTOR as follows:

COMPANY shall pay fees for the Services based on the time that CONTRACTOR's professionals spend performing them, billed at the standard hourly rates for each such individual listed below, as adjusted annually while the Services under this Schedule A are being performed. CONTRACTOR will bill COMPANY for CONTRACTOR'S fees, expenses, and applicable taxes or other charges, if any, on a monthly basis. Payment is due 60 days after receipt of CONTRACTOR'S invoice.

Total compensation, including all travel, accommodation, transportation, meals and incidental costs shall not exceed $65,000. This estimate assumes there will be travel to the participant's site. All invoices shall reflect the contract number.

### Professional and Support Staff Fees Schedule

| Name | | Fee per Hour |
|------|------|------|
| Christopher J. Grasher | Partner, Tax Services | $582/HR |
| J. Andrew Miller | Partner, Tax Services | $582/HR |
| David Coley | Partner, Tax Services | $582/HR |
| Kristi Poteet | Senior Manager – Tax Services | $470/HR |

The rates specified in the Schedule A will remain in effect, with respect to and until completion of the Services authorized pursuant to this Schedule A.

All invoices shall be sent to:

Energy Future Holdings
1601 Bryan St
Dallas, TX 75201
Attention: Mr. Kevin Ashby

Contract No. C0628215C

## KEY PERSONNEL

CONTRACTOR agrees that the individuals listed below will be assigned to perform the Services authorized by this Schedule A. CONTRACTOR will employ all reasonable efforts to ensure that such individuals remain so assigned until such Services are accepted by COMPANY; provided, however, that in the event that any such individuals are reassigned by CONTRACTOR or otherwise become unavailable to perform such Services, CONTRACTOR will provide, by way of replacement, individuals with reasonably equivalent experience and expertise.

> Person 1: Christopher J. Grasher, Partner
> Person 2: David M. Coley, Partner
> Person 3: J. Andrew Miller, Partner
> Person 4: Kristi Poteet, Senior Manager

CONTRACTOR PERSONNEL AUTHORIZED TO ATTEND MEETINGS WITH COMPANY PERSONNEL PERTAINING TO THE SERVICES

> Person 1: Christopher J. Grasher, Partner
> Person 2: David M. Coley, Partner
> Person 3: J. Andrew Miller, Partner
> Person 4: Kristi Poteet, Senior Manager

PRIVILEGES CLAIMED BY COMPANY, WITH RESPECT TO DELIVERABLES OR OTHER DOCUMENTS HEREAFTER DESIGNATED BY COMPANY

_____ ATTORNEY-CLIENT COMMUNICATION

_____ ATTORNEY WORK PRODUCT

___✓___ TAX ADVISOR

_____ OTHER:_____

Contract No. C0628215C

## LIST OF ATTACHMENTS

COMPANY and CONTRACTOR agree that the following described attachments, if any, are incorporated herein in their entirety as fully as completely rewritten herein.

1.   N/A

Services not specified above may be authorized only through a separate Schedule A, or through an amendment or supplement to this Schedule A.

## OTHER TERMS AND CONDITIONS

COMPANY authorizes CONTRACTOR, its affiliates, and other members of the global Ernst & Young network, including those located outside the United States, to disclose COMPANY's tax return information received or generated in connection with the Services described in this Schedule A, including prior year tax return information, to and among each other for the purpose of rendering the Services and to discuss and provide related services to COMPANY. COMPANY has the ability to request a more limited disclosure of tax return information than that described above. If, at any time, COMPANY would like CONTRACTOR to narrow the scope of the information to be disclosed, please contact CONTRACTOR in writing and CONTRACTOR will limit any disclosures that have not yet occurred. COMPANY acknowledges that this consent will be valid for three years from the date this Schedule A is signed by COMPANY below.

Treasury regulations require taxpayers to file disclosure statements relating to certain tax strategies/transactions that the Internal Revenue Service ("IRS") has identified as Listed Transactions or Transactions of Interest, any transaction that is substantially similar to a Listed Transaction or Transaction of Interest, and Other Reportable Transactions. The disclosure statements must be filed with the proper tax returns and also sent separately to the IRS. In addition, some states have enacted tax shelter legislation requiring taxpayers to file reportable transaction disclosure statements with the appropriate state income and franchise tax returns. Failure to disclose properly any of these transactions/strategies in which COMPANY directly or indirectly participated may result in the imposition of penalties.

During the process of reviewing COMPANY's tax return(s), CONTRACTOR requires COMPANY to complete a questionnaire about Listed Transactions, Transactions of Interest, and Other Reportable Transactions, which is attached to this Schedule A. If there is a particular person other than COMPANY'S Contract Coordinator who should respond to such questionnaire on behalf of COMPANY, please immediately provide to CONTRACTOR that person's name, position, and telephone number. CONTRACTOR shall not be liable for any penalties resulting from COMPANY'S failure to accurately and timely respond to the questionnaire or to file timely the required disclosure statement.

## ACCEPTANCE CRITERIA AND ADDITIONAL TERMS AND CONDITIONS APPLICABLE TO THE SERVICES

Contract No. C0628215C

**ERNST & YOUNG LLP**

By: *Chris Grasher*
    Signature

Name: *CHRIS GRASHER*

Title: *PARTNER*

Date: *8/20/12*

**EFH CORPORATE SERVICES COMPANY**

By: *Kevin M Amby*
    Signature

Name: *Kevin M Amby*

Title: *Director, Tax*

Date: *8/21/12*

AMENDMENT NO. 05

DATED MAY 9, 2013

TO

MASTER SERVICES AGREEMENT

C0628215C

BY AND BETWEEN

ERNST & YOUNG LLP

AND

EFH CORPORATE SERVICES COMPANY

DATED JUNE 10, 2010

Contract No. C0628215C

**AMENDMENT NO. 05**

**EFFECTIVE DATE**

The Effective Date of this Amendment is June 11, 2013.

**PURPOSE**

This Amendment modifies, alters or changes specific terms and conditions of Contract No. C0628215C ("Agreement") that exists between the parties hereto.  Except as modified in this Amendment or previous amendments, the Agreement will remain in full force and effect.

**MODIFICATIONS**

The Agreement is modified as follows:

> **TERM**
>
> The term of the agreement is hereby extended to June 10, 2014.

The parties have signed this Amendment acknowledging their agreement to its provisions as of the Effective Date.

| ERNST & YOUNG LLP | EFH CORPORATE SERVICES COMPANY |
|---|---|
| By: _Signature_ | By: _Signature_ |
| Name: Stephen A. Thiel | Name: Tamar Willis |
| Title: Coordinating Partner | Title: Procurement Specialist |
| Date: 5-15-13 | Date: May 21, 2013 |

AMENDMENT NO. 6

## STATEMENT OF WORK

### IT Cost Management and Service Catalog

This Statement of Work, dated May 17, 2013 (this "SOW") is made by Ernst & Young LLP ("we" or "EY") and EFH Corporate Service Company ("EFH", "you" or "Client"), pursuant to the Master Services Agreement, dated June 10, 2010 (the "Agreement") , between EY and EFH, as amended.

Except as otherwise set forth in this SOW, this SOW incorporates by reference, and is deemed to be a part of, the Agreement. The additional terms and conditions of this SOW shall apply only to the advisory Services covered by this SOW and not to Services covered by any other SOW pursuant to the Agreement. Capitalized terms used, but not otherwise defined, in this SOW shall have the meanings in the Agreement, and references in the Agreement to "you" or "Client" shall be deemed references to EFH.

## 1. Scope of Work

The engagement will consist of three workstreams:

- Project Management Support
- IT Cost Management Framework Definition
- Service Catalog Definition

The workstream specifications are as follows:

| Project Management Support Workstream | |
|---|---|
| **Workstream** | **Activities** |
| Project Management | • Conduct kickoff<br><br>• Provide project management and project plan detailing tasks for each of the workstreams below<br><br>    o Manage IT cost management and service catalog workstreams<br><br>    o Act as project liaison to EFH CMDB and AMDB clean up initiatives<br><br>    o Validate alignment with overall IT Cost Management framework<br><br>• Provide weekly status updates on project milestones and deliverables progress to plan |

| IT Cost Management Framework Definition Workstream | |
|---|---|
| **Workstream** | **Activities** |
| Assess IT Cost Management Framework & Processes | • Analyze current cost framework<br><br>• Analyze financial management processes. Evaluate the effectiveness and gaps that impact IT costing for the following processes: Reporting and analysis, cost accounting and chargeback, asset management, and configuration management. |
| Define Framework for Cost Buildup and Allocation | • Conduct workshops to identify data sources, understand cost buildup, define cost allocation<br><br>• Create cost framework definition document<br><br>• Document tool (Apptio) configuration requirements |
| Define IT Cost Management Processes | • Define process and governance for changes to buildup and allocation rules<br><br>• Agree on showback/chargeback process<br><br>• Define processes and reports for cost tracking and management<br><br>• Define processes to identify cost saving opportunities<br><br>• Create a deployment plan |
| Transition Ownership | • Provide input during tool configuration and deployment: clarify requirements, adjust requirements to accommodate tool limitations.<br><br>• Transfer document ownership to EFH |

IT Cost Management Framework Definition Workstream Assumptions:

- EY will conduct up to 15 interviews as part of the IT finance process gap assessment. Gap assessment will focus on the following IT Finance processes: reporting and analysis, cost accounting and chargeback, asset management, and configuration management.

- EY will conduct 2 process definition workshops to refine/adjust baseline processes. EY will create one draft and two revisions of the processes.

- EY will develop an action plan for closing the top 3 gaps, EFH resources will be responsible for executing those plans.

- EY will develop a deployment plan; EFH will be responsible for executing the deployment plan.

- EY will assume that all data provided by EFH is complete and accurate. EY will not validate and verify the completeness and accuracy of data provided as part of this project.

| Service Catalog Definition Workstream | |
|---|---|
| **Workstream** | **Activities** |
| Assess Current Services | • Collect and review existing service catalog materials<br><br>• Validate IT service strategy |
| Define Service Catalog | • Agree on goals, and constraints for the service catalog<br><br>• Define service portfolio<br>   o  Compare service portfolio with leading practices<br>   o  Agree on EFH service portfolio<br>• Define services within each portfolio |
| Define Service Catalog Management Processes | • Define processes and governance for maintaining service catalog; adding changing and removing services<br><br>• Create implementation plan |
| Transition Ownership | • Provide input during catalog implementation<br><br>• Transfer catalog ownership to EFH |

Service Catalog Definition Workstream Assumptions:

- EY will define the Service Catalog Portfolios and the IT Services that make up each Portfolio, and the service components that make up each service.

- EY will conduct 2 process definition workshops to refine/adjust baseline processes. EY will create one draft and two revisions of the processes.

- EY will develop a plan for implementing the service catalog. EFH resources will be responsible executing the plan and maturing the service catalog (creating detailed service descriptions, identifying technical components required to deliver services, and defining target service levels).

3

## 2.Deliverable Specifications

The following table contains the deliverable specifications:

| Workstream | Deliverable Specification |
|---|---|
| Project Management | • Project plan: Project plan with activities/tasks, milestones and progress for deliverables. |
| IT Cost Management Framework Definition | • IT Cost Management Assessment Report with prioritized findings and an action plan for closing top 3 findings.<br><br>• IT Cost Framework Description Document. Contains diagrams that describe the cost buildup and allocation process. It will include:<br><br>   o Cost pools, cost buildup rules, cost allocation rules<br><br>   o Conceptual models - diagram of cost buildup and allocation strategy for each service<br><br>   o Apptio configuration requirements<br><br>   o IT Cost Management Processes for: changes to buildup and allocation rules, showback/chargeback, identifying cost savings<br><br>   o Cost framework deployment plan |
| Service Catalog Definition | • Service Catalog Strawman and Service Strategy<br><br>   o Service strategy will include the goals of the services and any constraints<br><br>   o Service catalog the IT services that make up each portfolio category, and the service components that make up each service<br><br>   o Processes and governance for maintaining the service catalog<br><br>   o Service catalog implementation plan |

## 3.Responsibilities of the Parties

EY responsibilities:

- EY will provide weekly status reports to Ravi Malick, Christi Lane, Delana Nading and Rob Singleton. The weekly status will include progress to date for deliverables, issues with owners, planned dates and actions to resolve, risk, and changes to scope.

- EY will report directly to Ravi Malick, Christi Lane, Delana Nading and Rob Singleton issues, risk, and changes to scope. Related decisions will be mutually agreed to by both EY and EFH and EY will manage the plans.

4

EFH responsibilities:

- EFH will provide a qualified person to act as the EY point of contact for scheduling interviews and workshops, aggregating requested materials/documents, facilitating project execution needs and resolving or escalating issues.

- EFH will identify the appropriate personnel to participate in interviews and workshops and team members required for meetings will be available when scheduled with reasonable advanced notice. In the event of scheduling conflicts, backup interviews will be arranged by EFH to avoid timeline slippages.

- EFH will provide an Apptio subject matter expert that can attend the IT cost model definition workshops and help elicit and clarify Apptio requirements.
- EFH's core team will be available to provide guidance in workshops, facilitate buy-in from other relevant stakeholders and support issues resolution.

- EFH will provide access to existing/requested documentation within a reasonable timeframe (2 business days).
- EFH is responsible for the management and performance of EFH personnel.

## 4. Engagement Resources

Ravi Malick will be the EFH Project Sponsor and Rob Singleton will be the EFH day to day Project Lead.

The anticipated EY resources and engagement roles are listed below. EY is responsible for the management and any changes to EY resources to execute this Statement of Work.

| Name | Engagement Role |
|------|-----------------|
| Thear Suzuki | Quality Assurance Partner |
| Paul Webb | Engagement Partner |
| Paul Chabot | Engagement Manager |
| Chuong Thi | Project Lead |
| Steven Chen | Project Senior Analyst |
| Andrew Hill | Project Analyst |

## 5. Pricing and Payment

Professional fees are estimated to be $525,000, which is based upon an assumed 12 week effort. If the actual effort varies from the above assumptions, any variance to scope, schedule or cost will be presented to the EFH Project Sponsor for written approval. EY will notify EFH as soon

5

as reasonably practical prior to exceeding the fee estimate and will work with EFH to reach a mutual agreement, in writing, to changes to this Statement of Work.  Any change requests to this Statement of Work will follow the EFH change management processes and the rate card as defined in the Agreement.

In addition, EFH will reimburse EY for actual expenses incurred in connection with the performance of the Services, in accordance with  travel policy in the Agreement, including reasonable and customary out-of-pocket expenses such as travel, meals, accommodations and other expenses specifically related to this engagement.

EY will invoice EFH monthly as fees and expenses are incurred. All invoices for fees and expenses will be in accordance with the invoice and payment terms outlined in Article 6 of the Agreement..

## 6. Work Schedule

The engagement will be conducted over twelve weeks. See below for the engagement timeline:



## 7. Specific Additional Terms and Conditions

The Services are advisory in nature. EY will not render an assurance report or opinion under this Statement of Work, nor will the Services constitute an audit, review, examination, or other form of attestation as those terms are defined by the American Institute of Certified Public Accountants. None of the Services or any Reports will constitute any legal opinion or advice. We will not conduct a review to detect fraud or illegal acts.

Notwithstanding anything to the contrary in the Agreement or this Statement of Work, we do not assume any responsibility for any third-party products, programs or services, their performance or compliance with your specifications.

We will base any comments or recommendations as to the functional or technical capabilities of any products in use or being considered by you solely on information provided by your vendors, directly or through you. We are not responsible for the completeness or accuracy of any such information or for confirming any of it.

Unless prohibited by applicable law, we may provide Client Information to other EY Firms, EY Persons and external third parties, who may collect, use, transfer, store or otherwise process such information in various jurisdictions in which they operate in order to provide support services to any EY Firm and/or assist in the performance of the Services; provided

such recipients will maintain the confidentiality of such Client Information pursuant to Article 30 of the Agreement, and further provided that EY will be liable to EFH for any unauthorized disclosure of Client Information by any such recipient pursuant to Article 30 of the Agreement.

The Services may involve our review of, or advice relating to, agreements to which you are a party with, or products produced by, a third party (an "EY Client") for which EY (or another EY Firm) performs, or has performed, services unrelated to the agreements or products. On behalf of yourself and your affiliates, you acknowledge and consent to our performance of such services for any EY Client, and agree that neither you nor your affiliates will make a claim that these circumstances present a conflict of interest, real or perceived, for us or any other EY Firm. If, however, our services for an EY Client directly relate or related to the agreements or products, we will seek the consent of both you and the EY Client to the continued performance of the Services.  In any event, we confirm that, except as you and the EY Client otherwise agree in writing, your respective confidential or privileged information will remain confidential to that client in accordance with applicable professional standards.

Work not specified above may be authorized only through a separate Schedule A, or through an amendment or supplement to this Schedule A.

**ERNST & YOUNG LLP**

Signature

PAUL WEBB
Printed Name

PRINCIPAL
Printed Title

6/19/13
Date Signed

**EFH CORPORATE SERVICES COMPANY**

Signature

Kevin CHASE
Printed Name

CIO, SVP
Printed Title

6/19/13
Date Signed

**Energy Future Holdings**

1601 Bryan Street
Dallas, Texas 75201-3411

May 13, 2013                                   Affidavit

Affiant of Energy Future Holdings Corp., A. Ravi Malick, VP of IT Governance & Strategy
hereby affirms that the selection of Ernst & Young (E&Y) as the service provider for the IT Cost
Management Program (ITCM Program) was made without bias or preference.

EFH selected E&Y as the service provider for the ITCM Program based solely upon the
qualifications of E&Y and its ability to perform the program requirements established by EFH.
Program proposals were solicited from multiple vendors.


_____
A. RAVI MALICK
VP, IT Governance & Strategy
Energy Future Holdings Corp.


**<u>ACKNOWLEDGMENT</u>**

State of Texas County of Dallas

Before me, Sarah B. Chambers, on this day personally appeared A. RAVI MALICK, VP, IT
GOVERNANCE & STRATEGY, Energy Future Holdings Corp., known to me to be the
person whose name is subscribed to the foregoing instrument and acknowledged to me that
he executed the same for the purposes and consideration therein expressed.


Given under my hand and seal of office this  12Th  day of  June ,  2013 .


_____
SARAH B. CHAMBERS
Notary Public

NOTARY PUBLIC
SARAH B. CHAMBERS
Notary Public, State of Texas
My Comm. Expires 12/06/2016
STATE OF TEXAS

AMENDMENT NO. 7

<u>SCHEDULE A</u>

**STATEMENT OF WORK**

**IT Risk Management Framework**

This Statement of Work, dated September 20, 2013 (this "SOW") is made by Ernst & Young LLP ("we" or "EY") and EFH Corporate Services Company ("EFH", "you" or "Client"), pursuant to the Master Services Agreement, dated June 10, 2010 (the "Agreement"), between EY and EFH, as amended.  The parties hereto agree Amendment No. 5, dated May 9, 2013, between EY and EFH is hereby amended to reflect an Effective Date of June 9, 2013.

Except as otherwise set forth in this SOW, this SOW incorporates by reference, and is deemed to be a part of, the Agreement. The additional terms and conditions of this SOW shall apply only to the advisory Services covered by this SOW and not to Services covered by any other SOW pursuant to the Agreement. Capitalized terms used, but not otherwise defined, in this SOW shall have the meanings in the Agreement, and references in the Agreement to "you" or "Client" shall be deemed references to you.

1. <u>Scope of Work</u>

We will deliver an IT Risk Management Framework that provides sufficient detail to allow EFH to exercise on-going repeatable risk management activities that are aligned to the Enterprise Risk Management (ERM) program and which meet the objectives of stakeholders at various levels of the organization.

The EY team will leverage our IT Risk Management (ITRM) methodology, standards and framework to provide the structure for risk-based decision making.  We will combine our methodology with our knowledge and experience from working with large complex organizations and our institutional knowledge of EFH to deliver the following objectives:

1. Standardize on an IT Risk Management Framework tailored to the EFH organization
2. Link the IT Risk Management framework to the EFH ERM program
3. Build out an IT Risk dashboard
4. Develop supporting documents and forms to sustain the program (e.g., Risk Register, Risk Ranking methodology, templates and operating procedures)
5. Provide knowledge transfer throughout the engagement and deliver specialized training to EFH staff responsible for the IT Risk Management program sustainment.
6. Perform a targeted IT Risk assessment pilot using the new IT Risk Management Framework

To achieve these objectives, EY has tailored our approach into two distinct phases consisting of a 'Design/Customize' phase and an 'Implement/Pilot' phase. The activities and actions for these phases are included on the following page:

| IT Risk Framework Design/Customize | |
|---|---|
| **Phase I** | **Activities** |
| **Tasks** | **Mobilize, Kick-off and Report Status**<br>We will establish the high-level plan detailing the initial timing and scope as well as developing the processes and protocols that will be implemented related to our role, status reporting, issues management and other project logistical matters.<br><br>• Define project team and key stakeholders<br>• Identify interview schedule<br>• Finalize project plan<br>• Agree to project checkpoints<br>• Identify risk framework drivers<br>• Identify ERM integration considerations<br><br>**Understand Current State IT Risk Environment**<br>Understand the current state of the IT Risk program and processes through interviews with key stakeholders, questionnaires and review of existing risk policies and procedures. The outcome will be recommendations that will drive the development of the framework and associated processes. Key tasks include:<br><br>• Develop and validate current state knowledge<br>• Review applicable policies and procedures<br>• Perform stakeholder interviews to determine current state and future state needs<br>• Develop and present high-level observations and recommendations and ERM integration considerations for the risk framework |

| | |
|---|---|
| **Tasks (continued)** | **Design/Customize the Future State IT Risk Management Framework**<br>The project team will execute this phase to customize the draft IT Risk Management framework for EFH. The co-developed framework will be aligned to the internal ERM program to allow EFH to operationalize the framework to manage its risks. The outcomes of the Design phase will be the basis for the initial risk assessment cycle. Tasks to be completed in this phase include:<br><br>• Develop the IT Risk Management framework<br>• Develop assessment methodology and response strategies<br>• Develop the risk ranking criteria methodology for EFH and obtain stakeholder approval<br>• Develop exception and risk acceptance processes<br>• Validate and align IT risk elements to the ERM program<br>• Obtain EFH stakeholder input and revise framework where applicable<br>• Validate the risk appetite and risk tolerance of EFH<br>• Create risk assessment templates aligned to the IT Risk methodology<br>• Define Key Risk Indicators (KRI) and monitoring processes |
| **Work Products** | • IT Risk Management Framework<br>• IT Risk dashboard<br>• IT Risk ranking methodology |

| Implement/Pilot the IT Risk Management Framework | |
|---|---|
| **Phase II** | **Targeted IT Risk Management Activities** |
| **Tasks** | The project team will operationalize the risk framework and execute an initial cycle of the risk assessment during this phase. The operationalization of the risk framework will allow EFH to execute the risk framework on an ongoing basis. The initial risk assessment will be performed to assess the EFH risks and effectiveness of the controls over the risks, leveraging the newly developed risk framework to:<br><br>• Continued knowledge transfer activities through the duration of the pilot effort<br>• Facilitate risk-profiling assessments<br>• Schedule and conduct a risk assessment of 2-3 key applications and/or business processes scoped to fit the expected duration of this phase (4-6 weeks)<br>• Document assessments results and update documentation as needed<br>• Assess KRI monitoring effectiveness |

| Implement/Pilot the IT Risk Management Framework | |
|---|---|
| **Phase II** | **Targeted IT Risk Management Activities** |
| | • Validate assessment results with key stakeholders<br><br>**Transition the EFH  IT Risk Management Framework**<br>The project team will execute the transition plan and perform knowledge sharing with EFH resources. Supporting the transition of the IT Risk Management effort and the knowledge transfer necessary to sustain the program going forward, EY will:<br><br>• Develop the transition plan for EFH resources to perform ongoing assessments<br>• Develop training materials for staff executing future assessments and presentation materials for executive and Board of Directors discussions relating to Energy Future Holdings Corp.'s Cyber Incident Response Plan<br>• Initiate knowledge transfer with the EFH team by conducting training sessions |
| **Work Products** | • IT Risk Management operational playbook<br>• IT Risk pilot assessment results, including application heat maps and associated reporting<br>• KRI effectiveness assessment<br>• Transition plan for framework sustainability<br>• Training materials for on-going execution of the IT Risk Management framework<br>• Presentations for executives and the Energy Future Holdings Corp. Board of Directors regarding Energy Future Holdings Corp.'s Cyber Incident Response Plan |

## 2. Responsibilities of the Parties

EY responsibilities:

- EY will provide weekly status reports to EFH management. The weekly status will include progress to date, issues, risk, and changes to scope.
- EY will report directly to EFH management issues, risk, and changes to scope. Related decisions will be mutually agreed to by both EY and EFH.

EFH responsibilities:

- EFH will provide a qualified person to act as the EY point of contact for scheduling interviews and workshops, aggregating requested materials/documents, facilitating project execution needs and resolving or escalating issues.

- EFH will identify the appropriate personnel to participate in interviews and workshops and team members required for meetings will be available when scheduled. In the event of scheduling conflicts, backup interviews will be arranged by EFH to avoid timeline delays.

- EFH's core team will be available to provide guidance in workshops, facilitate buy-in from other relevant stakeholders and support issues resolution.

- EFH will provide access to existing/requested documentation within a reasonable timeframe (typically 2 business days unless otherwise agreed upon).

## 3. <u>Engagement Resources</u>

Craig Ingerto will be the EFH Project Sponsor and Nancy Heath will be the EFH day to day Project Lead.

EY is responsible for the management and any changes to EY resources to execute this Statement of Work.

## 4. <u>Pricing and Payment</u>

Professional fees are estimated to be in the range of $240,000 to $270,000, which is based upon an assumed 9-10 week effort.

If the actual effort varies from the above assumptions, the actual fee will be greater or lesser than that estimate. EY will notify EFH as soon as reasonably practical prior to exceeding the fee estimate and will work with EFH to reach a mutual agreement, in writing, to changes to this Statement of Work. Any change requests to this Statement of Work will follow the rate card as defined in the Agreement.

In addition, EFH will reimburse EY for expenses incurred in connection with the performance of the Services, in accordance with the terms of the Agreement.

EY will invoice EFH in accordance with the terms of the Agreement.

## 5. <u>Work Schedule</u>

See below for the estimated engagement timeline:



| Activities | Wk 1 | Wk 2 | Wk 3 | Wk 4 | Wk 5 | Wk 6 | Wk 7 | Wk 8 | Wk 9 | Wk 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| **IT Risk Management Framework Design/Customization** | | | | | | | | | | |
| Mobilize and Kick-off Project | | | | | | | | | | |
| Understand Current State IT Risk Environment | | | | | | | | | | |
| Co-develop the Future State IT Risk Framework | | | | | | | | | | |
| **IT Risk Management Framework Implementation/Pilot** | | | | | | | | | | |
| Framework Implementation & Pilot Assessment | | | | | | | | | | |
| Transition the EFH IT Risk Management Framework | | | | | | | | | | |

2-3 high risk applications scoped to fit the estimated pilot window

6. **Specific Additional Terms and Conditions**

The Services are advisory in nature. EY will not render an assurance report or opinion under this Statement of Work, nor will the Services constitute an audit, review, examination, or other form of attestation as those terms are defined by the American Institute of Certified Public Accountants. None of the Services or any Reports will constitute any legal opinion or advice. We will not conduct a review to detect fraud or illegal acts.

Notwithstanding anything to the contrary in the Agreement or this Statement of Work, we do not assume any responsibility for any third-party products, programs or services, their performance or compliance with your specifications or otherwise.

We will base any comments or recommendations as to the functional or technical capabilities of any products in use or being considered by you solely on information provided by your vendors, directly or through you. We are not responsible for the completeness or accuracy of any such information or for confirming any of it.

The Services may involve our review of, or advice relating to, agreements to which you are a party with, or products produced by, a third party (an "EY Client") for which EY (or another

6

EY Firm) performs, or has performed, services unrelated to the agreements or products. On behalf of yourself and your affiliates, you acknowledge and consent to our performance of such services for any EY Client, and agree that neither you nor your affiliates will make a claim that these circumstances present a conflict of interest, real or perceived, for us or any other EY Firm. If, however, our services for an EY Client directly relate or related to the agreements or products, we will seek the consent of both you and the EY Client to the continued performance of the Services.  In any event, we confirm that, except as you and the EY Client otherwise agree in writing, your respective confidential or privileged information will remain confidential to that client in accordance with applicable professional standards.

Work not specified above may be authorized only through a separate Schedule A, or through an amendment or supplement to this Schedule A.

**ERNST & YOUNG LLP**

_Thear Suzuki_
Signature

Thear Suzuki
Printed Name

Principle
Printed Title

10 - 11 - 2013
Date Signed

**EFH CORPORATE SERVICES COMPANY**

_Kevin Chase_
Signature

Kevin Chase
Printed Name

CIO : SVP
Printed Title

10 - 11 - 2013
Date Signed

Contract No. C0628215C

**AMENDMENT NO. 08A**

**DATED May 20, 2014**

**TO**

**MASTER SERVICES AGREEMENT**

**C0628215C**

**BY AND BETWEEN**

**ERNST & YOUNG LLP**

**AND**

**EFH CORPORATE SERVICES COMPANY**

**DATED JUNE 10, 2010**

Contract No. C0628215C

**AMENDMENT NO. 08**

**EFFECTIVE DATE**

The Effective Date of this Amendment is June 10, 2014.

**PURPOSE**

This Amendment modifies, alters or changes specific terms and conditions of Contract No. C0628215C ("Agreement") that exists between the parties hereto. Except as otherwise modified in this Amendment, all other provisions of the Agreement will remain in full force and effect.

**MODIFICATIONS**

The Agreement is modified as follows:

> **TERM**
>
> The term of the Agreement is hereby extended to June 8, 2016.

**RESERVATION OF RIGHTS**

Nothing in this Amendment shall constitute or be deemed (a) an allowance or disallowance of any claim, including administrative expense claims under section 503(b) of the Bankruptcy Code, (b) an assumption or rejection of the Agreement or any other executory contract or unexpired lease under section 365 of the Bankruptcy Code, (c) a waiver of any of the rights of the Company to dispute claims asserted against the Company in the chapter 11 cases commenced by the Company, or (d) change of any priority levels existing in the absence of this Amendment.

The parties have signed this Amendment acknowledging their agreement to its provisions as of the Effective Date.

| ERNST & YOUNG LLP | | EFH CORPORATE SERVICES COMPANY | |
|---|---|---|---|
| By: | _Signature_ | By: | _Tamar Willis_ Signature |
| Name: | Stephen Thiel | Name: | Tamar Willis |
| Title: | Coordinating Partner | Title: | Procurement Specialist |
| Date: | May 22, 2014 | Date: | May 22, 2014 |