# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | Case No. 14-10979 (CSS) |
| Debtors. | (Jointly Administered) |
| | Re: Docket Nos. 71, 73, 324, 325, 597, 598 & 599 |
| | Objection Deadline: May 30, 2014 at 4:00 p.m. |
| | Hearing Date and Time: June 5, 2014 at 9:30 a.m. |

## SUPPLEMENTAL OMNIBUS OBJECTION OF THE AD HOC GROUP OF TCEH UNSECURED NOTEHOLDERS TO (I) THE MOTION OF TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC AND CERTAIN OF ITS DEBTOR AFFILIATES FOR ENTRY OF INTERIM AND FINAL ORDERS (A) APPROVING POSTPETITION FINANCING, (B) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (C) MODIFYING THE AUTOMATIC STAY, AND (D) SCHEDULING A FINAL HEARING, AND (II) THE MOTION OF TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC AND CERTAIN OF ITS DEBTOR AFFILIATES FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING USE OF CASH COLLATERAL, (B) GRANTING ADEQUATE PROTECTION, (C) MODIFYING THE AUTOMATIC STAY, AND (D) SCHEDULING A FINAL HEARING

The ad hoc group of certain holders (the "Ad Hoc Group of TCEH Unsecured Noteholders") of approximately $2.7 billion aggregate principal amount of 10.25% Fixed Senior Notes due 2015 (including Series B) and 10.50%/11.25% Senior Toggle Notes due 2016 issued by Texas Competitive Electric Holdings Company LLC ("TCEH") and TCEH Finance, Inc., by and through its undersigned counsel, hereby files its supplemental omnibus objection (the "Objection") to (i) the Motion of Texas Competitive Electric Holdings Company LLC and Certain of its Debtor Affiliates for Entry of Interim and Final Orders (A) Approving Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims,

---

[1]    The last four digits of Energy Future Holdings Corp.'s federal tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which the debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

(C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing [Docket No. 73] (the

"DIP Motion"), and (ii) the Motion of Texas Competitive Electric Holdings Company LLC and

Certain of its Debtor Affiliates for Entry of Interim and Final Orders (A) Authorizing Use of

Cash Collateral, (B) Granting Adequate Protection, (C) Modifying the Automatic Stay, and

(D) Scheduling a Final Hearing [Docket No. 71] (the "Cash Collateral Motion").  In support of

the Objection, the Ad Hoc Group of TCEH Unsecured Noteholders respectfully represents as

follows:

## PRELIMINARY STATEMENT

1.      If one were to ask only the TCEH Debtors' management and advisors, the

postpetition financing (the "Proposed DIP Financing") proposed to be obtained by TCEH and

guaranteed by Energy Future Competitive Holdings Company LLC ("EFCH") and each of

TCEH's subsidiaries that is a Debtor (together with TCEH and EFCH, the "TCEH Debtors") and

the grant of adequate protection in exchange for the use of cash collateral by the TCEH Debtors

are a garden-variety means of holding the status quo while all parties in interest can negotiate

and formulate a consensual path out of these Cases.[2]  In actuality, the combined financing

proposals, if approved by the Court, will together act as a "Trojan horse" for the larger

transactions contemplated by the Debtors' Restructuring Support and Lock-Up Agreement, dated

April 29, 2014 (the "Restructuring Support Agreement"), and are premised inappropriately on

conflicted management's presupposition that the transactions they negotiated prepetition—

including the releases of their own liabilities along with those of affiliates and sponsors—will be

---

[2]        Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Interim
Order (A) Approving Postpetition Financing for Texas Competitive Electric Holdings Company LLC and Certain of
its Debtor Affiliates, (B) Granting Liens and Providing Superpriority Administrative Expense Claims,
(C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing [Docket No. 325] (the "Interim DIP Order")
and the Interim Order (A) Authorizing Use of Cash Collateral for Texas Competitive Electric Holdings Company
LLC and Certain of its Debtor Affiliates, (B) Granting Adequate Protection, (C) Modifying the Automatic Stay, and
(D) Scheduling a Final Hearing [Docket No. 324] (the "Interim Cash Collateral Order").

MIAMI 1015718

consummated in a global plan of reorganization. The Proposed DIP Financing and adequate

protection will, if approved, encumber all of the currently unencumbered property of the TCEH

Debtors, leaving nothing for any of the TCEH Debtors' unsecured creditors holding billions of

dollars of claims should these Cases deviate from management's proposed, and hoped for, rapid

"balance sheet restructuring." If the Court were ever to permit those grants, unsecured creditors

of the TCEH Debtors holding billions of dollars of claims will be left with a Hobson's choice of

either (i) accepting the deal on the table (i.e., a pro rata share of whatever unencumbered assets

are left over after the claims of secured lenders are satisfied), which releases material claims of

the TCEH Debtors against affiliates and insiders, or (ii) fighting the deal in order to preserve

released claims and risk being left with no unencumbered assets from which to recover following

the imposition of the DIP Liens and Adequate Protection Liens. For these reasons discussed in

the Limited Omnibus Objection of the Ad Hoc Group of TCEH Unsecured Noteholders to

(1) the Motion of Energy Future Holdings Corp., et al., for Entry of an Order (A) Authorizing

the Debtors to (I) Continue Using Their Existing Cash Management System, (II) Maintain

Existing Bank Accounts and Business Forms, and (III) Continue Using Certain Investment

Accounts; and (B) Authorizing Continued Intercompany Transactions and Netting of

Intercompany Claims; and (C) Granting Postpetition Intercompany Claims Administrative

Expense Priority; and (2) Certain Other of the Debtors' Operational First-Day Motions filed

contemporaneously herewith (and which is incorporated herein by reference), it is far too early in

these Cases for that type of choice to be imposed on creditors.

　　　　2.　　　At the very least, the Court should not permit the encumbrance of any

unencumbered assets, including any chapter 5 actions or commercial tort claims that are

presently unliened. As set forth below, the unsecured creditors of the TCEH Debtors would be

3

better off simply receiving their pro rata share of the TCEH Debtors' assets that were
unencumbered as of the Petition Date, rather than seeing those assets placed behind the DIP
Liens, Adequate Protection Liens, DIP Superpriority Claims and 507(b) Claims. In the absence
of the Proposed DIP Financing and provision of adequate protection to the Prepetition Secured
Creditors, unsecured creditors of the TCEH Debtors could at least expect to pursue vigorously
Avoidance Actions and any other unencumbered claims and causes of action, the recoveries on
which may be the primary source of recovery for unsecured creditors in the Cases in any event.

   3.  The Debtors' management and counsel will inevitably cry ruin over that
possibility and protest that no fiduciary could ever place their assets in such peril by standing up
to the DIP Lenders and Prepetition First Lien Creditors. As an initial matter, peril presupposes
that the DIP Lenders and Prepetition First Lien Creditors will refuse to lend or consent to cash
collateral usage if put to that choice. Moreover, the strategy employed by management—
essentially, "if we lien the assets now, at least unsecured bondholders might get something
later"—is premised on a fundamental misunderstanding of fiduciary duties. The TCEH Debtors'
management appears to view their duties as requiring them to maximize the value of all of the
TCEH Debtors' assets regardless of the TCEH Debtors' interests in those assets, notwithstanding
section 541(d) of the Bankruptcy Code. This misapprehension is how they justify borrowing
$4.475 billion of Proposed DIP Financing which will, after twenty-five months of these Cases,
produce no new unencumbered assets and, at the end of the Cases, will turn all of the TCEH
Debtors' assets over to prepetition secured lenders. As set forth below, and as we will
demonstrate at the hearing, management simply has it backwards, and they should never have
proposed this financing package that takes the last property that they believe they have,
something more than bare legal title, and transfers that away as well.

4

4.      The solution for this problem is not complicated.  The TCEH Debtors'
unencumbered assets should remain exempt from the DIP Liens and Adequate Protection Liens
and not a source of recovery for the DIP Superpriority Claims and 507(b) Claims.

5.      In addition, there are other aspects of the Proposed DIP Financing that
should not be approved.  First, the relief sought in connection with the Proposed DIP
Financing—access to $4.475 billion of financing—is excessive when compared to the legitimate
cash needs of the TCEH Debtors during these Cases.  Based upon the TCEH Debtors' own
projections at the time of DIP Motion, the Proposed DIP Financing is over-sized—even allowing
for the incurrence of the Delayed-Draw Term Facility, the proceeds of which, if funded, will be
applied to fund the RCT L/C Collateral Account—and thus, constitutes an unnecessary transfer
of value by the TCEH Debtors to the DIP Lenders and wasteful incurrence of debt by the TCEH
Debtors.

6.      Second, the adequate protection proposed to be paid to the Prepetition
First Lien Creditors is too rich.  Notwithstanding that (i) the TCEH Debtors assert that those
creditors are undersecured, (ii) there appear to be substantial unencumbered assets and (iii) the
Restructuring Support Agreement contemplates that, at the conclusion of the TCEH Debtors'
restructuring, the Prepetition First Lien Creditors will own all of the equity of the TCEH
Debtors, the Debtors have elected to borrow DIP funds to pay (on a current dollar-for-dollar
basis) the Prepetition First Lien Creditors' adequate protection payments in the form of
postpetition interest and fees.  Undersecured creditors are not entitled to accrue (let alone be
paid) interest during these Cases as a matter of law and, if the Debtors' view of the capital
structure is correct, the payments will therefore simply reduce the principal amount of the claims

that are expected to be exchanged for all of the equity in the reorganized TCEH Debtors at the end of these Cases.

7.    <u>Third</u>, the adequate protection proposed exceeds that which is necessary to protect the Prepetition Secured Creditors' interest in their Prepetition Collateral or to protect against any diminution in the value of that Prepetition Collateral resulting from the pendency of the Cases.[3]  Such excessive adequate protection should therefore be denied.

8.    <u>Finally</u>, as provided in the Interim DIP Order and Interim Cash Collateral Order, the proposed orders granting the DIP Motion on a final basis [Docket No. 598-1] (the "Proposed Final DIP Order") and granting the Cash Collateral Motion on a final basis [Docket No. 597-1] (the "Proposed Final Cash Collateral Order"), respectively, include numerous other offensive terms that would improperly strip value from and otherwise prejudice the TCEH Debtors' estates:

- •    The DIP Liens and Adequate Protection Liens shall encumber, and the DIP Superpriority Claims and 507(b) Claims shall be recoverable from, any proceeds of Avoidance Actions.   Proposed Final DIP Order ¶¶ 7(a), 9(a); Proposed Final Cash Collateral Order ¶¶ 5(a), 5(b).

- •    The Challenge Period and Investigation Fund are inadequate, and that inadequacy is exacerbated by the fact that the Committee is not automatically granted standing to pursue Challenges.  Proposed Final DIP Order ¶ 27; Proposed Final Cash Collateral Order ¶¶ 13, 14.

- •    The DIP Agent, DIP Lenders, DIP L/C Issuers, DIP Collateral, Prepetition First Lien Agents, Prepetition First Lien Creditors, Adequate Protection Liens and Prepetition Collateral shall not be subject to any surcharge under section 506(c) of the Bankruptcy Code.  Proposed Final DIP Order ¶ 31; Proposed Final Cash Collateral Order ¶¶ 5(a), 16.

---

[3]     To the extent there is diminution in value of the Prepetition Collateral, Adequate Protection Liens and 507(b) Claims should arise only to the extent there is a diminution in the value of the Prepetition Collateral <u>in the aggregate</u>, not simply with respect to "any diminution" (Proposed Final Cash Collateral Order (as defined below) ¶ G (defining "Diminution in Value")).   It should not be the case that additional liens or claims are incurred where diminution in value, if any, resulting from use of cash collateral is offset by an increase in the value of non-cash Prepetition Collateral.

- The First Lien Collateral Agent, for the benefit of the Prepetition First Lien Creditors, is authorized to credit bid under section 363(k) of the Bankruptcy Code in connection with a sale of the TCEH Debtors' assets or under a chapter 11 plan of reorganization, subject only to any successful Challenge that results in the amount of that credit bid being proscribed, as opposed to any showing of "cause" within the meaning of section 363(k) of the Bankruptcy Code. Proposed Final Cash Collateral Order ¶ 8.

- The DIP Agent, DIP Lenders, DIP L/C Issuer, Prepetition First Lien Agents and Prepetition First Lien Creditors shall not be subject to the equitable doctrine of marshaling or any similar doctrine with respect to any of the DIP Collateral or Prepetition Collateral. Proposed Final DIP Order ¶ 32; Proposed Final Cash Collateral Order ¶ 19.

Each of these provisions should be stricken or modified, as appropriate.

9.     For the reasons set forth above, and as more fully explained below, the DIP Financing Motion and the Cash Collateral Motion should be denied, unless modified to address the objections raised herein.

## OBJECTION

A.     **The Proposed DIP Financing Does Not Provide Benefits Commensurate To The Costs To The TCEH Debtors' Estates**

10.     In the absence of a commensurate benefit to the TCEH Debtors' estates, the TCEH Debtors cannot burden those estates—and, in particular, the unencumbered assets of those estates—with the Proposed DIP Financing, DIP Liens and DIP Superpriority Claims (as well as the Adequate Protection Liens and 507(b) Claims proposed to be provided as adequate protection against the priming resulting from the Proposed DIP Financing) that will eliminate any recovery otherwise available to stakeholders other than the DIP Lenders (and the Prepetition First Lien Creditors). Nor can the Proposed DIP Financing "be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate." In re Ames Dep't Stores, Inc., 115 B.R. 34, 39-40 (Bankr. S.D.N.Y. 1990). Here, the Proposed DIP Financing and the proposed adequate protection package, which include new liens on and claims recoverable

7

from unencumbered assets, do not provide proportionate benefit to the TCEH Debtors' estates and would benefit only the DIP Lenders and the Prepetition First Lien Creditors.  On the contrary, every dollar borrowed and every dollar spent pursuant to the Budget is, according to the Debtors, solely for the benefit of the Prepetition First Lien Creditors.  ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

      11.    In cases such as these, the TCEH Debtors' "estates" to be preserved are properly viewed as being comprised of the unencumbered interests in property available for distribution to creditors.  See 11 U.S.C. § 541(d) ("Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold."); Snyder v. Dewoskin (In re Mahendra), 131 F.3d 750, 755 (8th Cir. 1997) ("Pursuant to § 541, Debtor's legal and equitable interests in the real property became property of the estate as of the petition date.  Thus, the estate possessed the unencumbered portion, or Debtor's equity, in the property."); see also Cage v. Wyo-Ben, Inc. (In re Ramba, Inc.), 437 F.3d 457, 460 (5th Cir. 2006) ("[A] bankruptcy estate is made up of equity, as opposed to legal title alone.") (citing Mahendra, 131 F.3d at 755; United States v. Rauer, 963 F.2d 1332 (10th Cir. 1992)).

      12.    Absent Court approval of the Proposed DIP Financing and use of cash collateral, the TCEH Debtors' "estates" have significant value.  There are unencumbered assets

included in the TCEH Debtors' estates, including the $150 million of Segregated Cash,

Avoidance Actions, commercial tort claims and other unencumbered property, including, but not

limited to, assets of the TCEH Debtors specifically excluded from the Prepetition Secured

Creditors' liens and security interests.[4] As noted in other pleadings filed with the Court, the

Avoidance Actions alone constitute a major TCEH Debtor asset class.

13.    As proposed, however, the Proposed DIP Financing and use of cash

collateral would harm, rather than benefit, the TCEH Debtors' "estates." Most critically, the

unencumbered assets would be subject to new DIP Liens, DIP Superpriority Claims, Adequate

Protection Liens and 507(b) Claims of the DIP Lenders and Prepetition Secured Creditors. Thus,

---

[4]     For example, pursuant to Section 2 of Security Agreement, dated October 10, 2007, as amended and restated as of August 7, 2009, among TCEH and certain guarantors party thereto, as guarantors, and Citibank, N.A., as collateral agent (the "Security Agreement"), certain assets of the TCEH Debtors are expressly excluded from the Prepetition First Lien Creditors' collateral package, including:

> (A) Excluded Stock and Stock Equivalents or any other Stock or Stock Equivalents of any Person pledged (or specifically excluded from the pledge) pursuant to the Pledge Agreement, (B) Excluded Property, (C) motor vehicles and other assets subject to certificates of title, (D) Letter-of-Credit Rights, (E) Commercial Tort Claims, (F) Excluded Lease Rights, (G) assets specifically requiring perfection through control agreements (other than the Deposit L/C Loan Collateral Account), (H) property or assets subject to capital leases and purchase money obligations to the extent subject to a Lien, in each case permitted by the Credit Agreement and by each Additional First Lien Agreement, and the terms of the Indebtedness secured by such Lien prohibit assignment of, or granting of a security interest in, such Grantor's rights and interests therein (other than to the extent that any such prohibition would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the UCC (or any successor provision or provisions) of any relevant jurisdiction or any other applicable law), provided, that immediately upon the repayment of all Indebtedness secured by such Lien, such Grantor shall be deemed to have granted a Security Interest in all the rights and interests with respect to such property or assets, and (I) any assets as to which the Collateral Agent and the Company have determined that the costs or other consequences (including adverse tax consequences) of providing a security interest in is excessive in view of the benefits to be gained thereby by the Lenders and (y) none of the items included in clauses (i) through (xiv) above shall constitute Collateral to the extent (and only to the extent) that the grant of the Security Interest therein would violate any Requirement of Law applicable to such Collateral.

Starner Decl. Ex. 2 (Security Agreement) at § 2. ███████████████████████████████

9

these valuable assets could be swallowed up by those lenders and creditors to the detriment of the TCEH Debtors' unsecured creditors in any situation in which the TCEH Debtors' estates might fall into crisis.

14.    Pursuing a path that harms the TCEH Debtors' estates and increases their risk profile is at odds with the TCEH Debtors' obligation to maximize the value of the unencumbered assets of their estates.  See, e.g., Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery, 330 F.3d 548, 571-72 (3d Cir. 2003) (in granting creditors derivative standing , recognizing debtor-in-possession's duty to bring avoidance actions for the benefit of estate); In re Centaur, LLC, No. 10-10799 (KJC), 2010 WL 4624910, at *4, *7 (Bankr. D. Del. Nov. 5, 2010) (similarly, granting creditors' committee standing to seek to avoid liens and unencumber assets to confer value to the estate); In re Newcorn Enters. Ltd., 287 B.R. 744, 746, 750 (Bankr. D. Mo. 2002) (authorizing creditors' committee to bring marshaling claim against secured lender, and thereby increase pay-out to unsecured creditors, where debtor refused to do so); see also In re Quality Stores, Inc., 289 B.R. 324, 340 (Bankr. W.D. Mich. 2003) ("[I]f a trustee, or a party holding derivative rights from the trustee, recovered a surcharge [pursuant to section 506(c)], the recovery would be for all creditors . . . .") (citing Dock's Corner Assocs. v. Boyd (In re Great N. Forest Prods., Inc.), 135 B.R. 46, 66-69 (Bankr. W.D. Mich. 1991)).  The TCEH Debtors, therefore, cannot encumber their estates' unencumbered assets for the benefit of the DIP Lenders or the Prepetition Secured Creditors in the absence of a benefit being conferred upon all creditors that would otherwise be entitled to share in the value of those unencumbered assets.  See In re Berry Good, LLC, 400 B.R. 741, 747 (Bankr. D. Ariz. 2008) ("Thus, courts look to whether the proposed terms would prejudice the powers and rights that the Code confers for the benefit of all creditors, thereby

leveraging the chapter 11 process by granting a lender excessive control over the debtor or its assets to the prejudice of other parties in interest.") (emphasis added) (citing In re Tenney Vill. Co., 104 B.R. 562, 567-70 (Bankr. D.N.H. 1987)); Resolution Trust Corp. v. Official Unsecured Creditors Comm. (In re Defender Drug Stores, Inc.), 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992) ("[B]ankruptcy courts do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender.") (emphasis added); Ames Dep't Stores, 115 B.R. at 39 ("[A] proposed [postpetition] financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate.").

15.     Here, it is apparent that the TCEH Debtors, which are surrendering themselves to the Prepetition First Lien Creditors, focused on obtaining a consensual priming debtor-in-possession financing that comes at great expense to the unsecured creditors of the TCEH Debtors.







16.

MIAMI 1015718



17.     In sum, where no benefit—and, in fact, only harm—will flow to the estates' "property" from the TCEH Debtors' prosecution of these Cases solely for the benefit of the DIP Lenders and the Prepetition First Lien Creditors, the Cases should be recognized for what they are—a judicial foreclosure.  In the absence of removal of the request for liens on unencumbered assets, the Proposed DIP Financing and use of cash collateral should be denied, and the assets of the TCEH Debtors that were unencumbered as of the Petition Date should, consistent with the Bankruptcy Code, be preserved for eventual distribution to unsecured creditors.  See In re MSR Hotels & Resorts, Inc., No. 13011512 (SHL), 2013 WL 5716897, at *1 (Bankr. S.D.N.Y. Oct. 1, 2013) (concluding that a court's discretion in deciding whether to approve a financing that granted the debtor-in-possession lender, among other things, a perfected first priority lien on all of the pre- and postpetition unencumbered property of the debtor "is to be utilized on grounds that permit business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.") (citing Ames Dep't Store, 115 B.R. at 40); see also In re AMR Corp., 485 B.R. 279, 287 (Bankr. S.D.N.Y. 2013); Berry Good, 400 B.R. at 747.

MIAMI 1015718

**B.     The Proposed DIP Financing Is Over-Sized Relative To The Cash Needs
        Of The TCEH Debtors Resulting In Unnecessary Costs To Their Estates**

18.     The Proposed DIP Financing of $4.475 billion is excessive when
compared to the legitimate cash needs of the TCEH Debtors during these Cases. ███████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████ The TCEH Debtors' cash flow
forecast illustrated by the Budget—which, as a result of Ad Hoc Group of TCEH Unsecured
Noteholders' preliminary objections, was restated to reflect a net $268 million reduction in the
total First Lien Adequate Protection Payments and elimination of a $69 million payment to EFH
Corporate Services Company on account of a prepetition claim (see Exhibit 1 to Notice of Filing
of Budget in Connection with the TCEH Debtors' Postpetition Financing [Docket No. 599-1])—
is unduly conservative. ██████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

14

▬▬▬▬ That reduced spend provides additional basis to conclude that the total amount of the Proposed DIP Financing could be reduced. ▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬ While one can applaud less being spent, the TCEH Debtors maintain their affinity for more debt, and the TCEH Debtors' over-sizing of the Proposed DIP Financing comes at the price of larger fees and interest unnecessarily incurred. ▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬ Those fees are yet another example of value being transferred from the TCEH Debtors' estates, in this case to the DIP Lenders, at the expense of unsecured creditors. Accordingly, if the Proposed DIP Financing is to be approved, the total amount of the Proposed DIP Financing should be reduced to an amount equal to the actual cash needs of the TCEH Debtors as they represented to the Court in the original budget request.

19.    The planned uses for the Proposed DIP Financing, including the First Lien Adequate Protection Payments, are not necessary and reflect the true purpose of the Financing to benefit the Prepetition First Lien Creditors. As evidenced by the Budget, the TCEH Debtors propose to use approximately $2.79 billion of the Proposed DIP Financing to provide the Prepetition First Lien Creditors with adequate protection in the form of postpetition interest during the twenty-five months in which the Proposed DIP Financing is outstanding. However, if one accepts the Debtors' view as to the current enterprise value of the TCEH Debtors and that the Prepetition First Lien Creditors are currently undersecured, the Prepetition First Lien

15

Creditors are not entitled to accrue or be paid postpetition interest, and any First Lien Adequate Protection Payments will therefore ultimately have to be applied to reduce the principal amount of the Prepetition First Lien Creditors' claims at the conclusion of any restructuring of the TCEH Debtors.  See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 372-73 (1988) ("Since [§ 506(b)] permits postpetition interest to be paid only out of the 'security cushion,' the undersecured creditor, who has no such cushion, falls within the general rule disallowing postpetition interest"); In re Global Indus. Techs., Inc., 344 B.R. 382, 386 (Bankr. W.D. Pa. 2006) ("In Timbers of Inwood the Supreme Court found that only oversecured creditors, not undersecured creditors, were entitled to postpetition interest on their claims."). The TCEH Debtors should not be permitted to incur an excessive amount of financing (and related fees and costs) to make the First Lien Adequate Protection Payments that are wholly unjustified.

20.    This difference between the amount of debtor-in-possession financing actually needed and the amount of Proposed DIP Financing sought will, if the Proposed DIP Financing is approved, cost the TCEH Debtors several million dollars of additional fees (as well as additional interest).  The fee letter, dated April 28, 2014 (the "Fee Letter"), between TCEH and certain Commitment Parties (as defined in the Fee Letter) thereto contemplates the payment of several fees where the amount of such fees is dependent upon the amount of the financing commitments obtained, as opposed to the amounts actually drawn under the Proposed DIP Financing.  The following fees referenced in the Fee Letter are expressly tied to the size of the various components of the DIP Facility/commitments (i.e., where the size of the commitment or the facility clearly affects the amount of the fee):

MIAMI 1015718



iii.

MIAMI 1015718



MIAMI 1015718

████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████

e.    ████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████

MIAMI 1015718

21.     Under the Proposed DIP Financing as currently sized, the DIP Facilities Fees (the only fees certain to be paid at this time) would total approximately ███████. If that financing were right-sized (e.g., reduced from $4.475 billion to $2.150 billion as a result of the alterations to the Budget resulting from the first day hearings ($369 million) and elimination of the unnecessary First Lien Adequate Protection Payments ($2.79 billion), and even allowing for the incurrence of the Delayed-Draw Term Loan Facility,[7] the $800 million of General Letter of Credit Facility and a reduced Revolving Credit Facility of $250 million to ensure at least the minimum amount of liquidity reflected in the Budget (and without invading the Segregated Cash)), those fees alone could be reduced by approximately ███████. In addition, as much as $102 million of interest would not have to be paid (assuming the reduced financing remains outstanding for twenty-five months).

## C.     The Proposed Adequate Protection Is Not Necessary Or Proper

22.     It is well established that adequate protection is not a right to be granted without a showing of the requisite cause. The "focus [of adequate protection] is protection of the secured creditor from diminution in the value of its collateral during the reorganization process." In re First S. Sav. Ass'n, 820 F.2d 700, 710 (5th Cir. 1987) (quoting In re Becker Indus., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (citations omitted)). Said differently, "[t]he purpose of adequate protection is to assure that the [creditor's] economic position is not worsened because of the bankruptcy case." In re DeSardi, 340 B.R. 790, 804 (Bankr. S.D. Tex. 2006). "The secured creditor 'must, therefore, prove this decline in value-or the threat of a decline-in order to establish a *prima facie* case.'" In re Gunnison Ctr. Apartments, L.P., 320 B.R. 391, 396 (Bankr. D. Colo. 2005) (quoting In re Elmira Litho, Inc., 174 B.R. 892, 902 (Bankr. S.D.N.Y. 1994)).

---

[7]     It is unclear why, at this time, the TCEH Debtors are seeking final authority for a commitment to fund a transaction that may be obviated by a Railroad Commission of Texas meeting in six weeks.

Here, the TCEH Debtors and Prepetition First Lien Creditors have made no such showing, and thus, adequate protection is not warranted or required.

23.     The TCEH Debtors' attempt to use their estates' unencumbered assets, including, but not limited to, the Segregated Cash and proceeds of Avoidance Actions, for the benefit of the undersecured Prepetition First Lien Creditors is, similar to the grant of DIP Liens on, and DIP Superpriority Claims recoverable from, the Unencumbered Property, also improper. As courts have observed, certain provisions of the Bankruptcy Code, including those concerning adequate protection, "are premised on the equitable principle that the unencumbered assets of a debtor's estate will not be used to benefit one class of creditors at the expense of another class." United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.), 793 F.2d 1380, 1387 (5th Cir. 1986); see also In re W.R. Grace & Co., No. 01-1139-JKF, 2009 WL 1469831, at *5 (Bankr. D. Del. May 19, 2009) (noting, in connection with denial of postpetition interest to unsecured bank lenders, the "Congressional policy that one creditor group should not benefit at the expense of another."); In re Mid-State Raceway, Inc., 323 B.R. 40, 59 (Bankr. N.D.N.Y. 2005) ("[B]ankruptcy courts do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender.") (citing Defender Drug Stores, 145 B.R. at 317); Ames Dep't Stores, 115 B.R. at 40 (noting that "the Court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and power or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest"). Yet, that is exactly what the TCEH Debtors have proposed to do here by using their

21

unencumbered assets for the benefit of the Prepetition First Lien Creditors at the expense of the TCEH Debtors' estates.

24.    In any case, the scope of the proposed adequate protection far exceeds the Prepetition First Lien Creditors' interest in the TCEH Debtors' assets that comprise the Prepetition Collateral.  Where the requisite showing for adequate protection has been made, a secured creditor is entitled only to adequate protection up to the value of the collateral securing its claim; not for the full value of its claim.  See In re Weinstein, 227 B.R. 284, 296 n.14 (B.A.P. 9th Cir. 1998) (A secured creditor is "entitled to adequate protection only to the extent of the value of the collateral, and not to the extent of the creditor's total claim.").  By granting the Adequate Protection Liens on the unencumbered assets of the TCEH Debtors, the Cash Collateral Motion in essence seeks to secure more of the Prepetition First Lien Creditors' claims than are currently secured, and extends beyond the position bargained for by the Prepetition First Lien Creditors prior to bankruptcy.  See In re Yellowstone Mountain Club, LLC, No. 08-61570-11, 08-61571-11, 08-61572-11, 08-61573-11, 2008 WL 5875547, at *8 (Bankr. D. Mont. Dec. 17, 2008) ("The whole purpose in providing adequate protection for a creditor is to insure that the creditor receives the value for which the creditor bargained prebankruptcy.").  Accordingly, the Prepetition First Lien Creditors are simply not entitled to the overly broad adequate protection package proposed by the TCEH Debtors.

**D.    The Provision Of Liens On And Claims Against
Proceeds Of Avoidance Actions Is Improper And Deprives
Unsecured Creditors Of One Of Their Few Sources of Recovery**

25.    The Proposed Final DIP Order and Proposed Final Cash Collateral Order proposed by the TCEH Debtors will provide that the DIP Liens and Adequate Protection Liens extend to, among other things, the proceeds of Avoidance Actions.  Avoidance actions are

statutorily created powers that allow the debtor to recover property for the benefit of creditors; they are not property of the debtor's estate that can be offered as security.  See Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp v. Chinery (In re Cybergenics Corp.), 226 F.3d 237, 243-44 (3d Cir. 2000) (avoidance actions are not property of the estate and are not transferred to the debtor-in-possession, but are rights held by the estate for the benefit of all creditors); In re Sweetwater, 55 B.R. 724, 735 (D. Utah 1985) (avoiding powers are meant to benefit creditors generally and promote equitable distribution among all creditors). Indeed, the Bankruptcy Code creates such avoidance powers so that debtors may recover property for the benefit of creditors as part of their fiduciary duties.  Cybergenics Corp., 226 F.3d at 243.  Avoidance actions are simply a means by which a debtor can carry out its trustee-related duties to maximize value for the benefit of the debtor's estate and creditors.  Id.

26.    Because avoidance actions are not the TCEH Debtors' property, but rather rights that may be exercised for the benefit of the TCEH Debtors' creditors, the DIP Liens and Adequate Protection Liens on the proceeds of Avoidance Actions are inconsistent with the intent behind avoidance actions and the scope of a debtor-in-possession's avoidance powers.  See Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV, 229 F.3d 245, 250 (3d Cir. 2000); see also Cybergenics Corp., 226 F.3d at 243-44 (avoidance actions are not property of the debtor but rather are created by operation of bankruptcy law and belong to the debtors' creditors); In re Sapolin Paints, Inc., 11 B.R. 930, 937 (Bankr. E.D.N.Y. 1981) (recognizing "the well-settled principle that neither a trustee . . . nor a debtor-in-possession, can assign, sell, or otherwise transfer the right to maintain a suit to avoid preference").  To confine the recovery on account of Avoidance Actions to the DIP Lenders and Prepetition Secured Creditors distorts the very purpose of providing the debtor-in-possession with the avoidance

23

powers in the first place and promotes an unbalanced playing field in these Cases. See Buncher, 229 F.3d at 250 ("The purpose of fraudulent conveyance law is to make available to creditors those assets of the debtor that are rightfully a part of the bankruptcy estate, even if they have been transferred away."). If the DIP Lenders and Prepetition Secured Creditors are granted liens on and superpriority claims recoverable from the proceeds of Avoidance Actions, unsecured creditors—the intended beneficiaries of the Avoidance Actions—may be left with nothing in these Cases, as the TCEH Debtors would propose to grant DIP Liens and Adequate Protection Liens on, and DIP Superpriority Claims and 507(b) Claims recoverable from, all other unencumbered assets of the TCEH Debtors, including the Segregate Cash. This is particularly troubling when initial indications are that there may be significant value in such Avoidance Actions that would be available for unsecured creditors.

27.    As such, the TCEH Debtors should not be permitted to encumber the proceeds of Avoidance Actions with DIP Liens or Adequate Protection Liens or render them subject to DIP Superpriority Claims or 507(b) Claims. See Official Comm. of Unsecured Creditors v. Goold Elecs. Corp. (In re Goold Elecs. Corp.), Case No. 93 C 4196, 1993 WL 408366, at *4 (N.D. Ill. Sept. 22, 1993) (finding bankruptcy court order approving postpetition financing invalid "to the extent that the order assigns to the bank a security interest in the debtor's preference actions"); see also Hennessy v. Kennedy (In re Sun Island Foods), 125 B.R. 615, 619 (Bankr. D. Haw. 1991) ("Indeed, it is illogical to allow a secured creditor to attach the proceeds of recoveries, while at the same time preventing it from compelling a trustee to pursue a preference action."); In re Integrated Testing Prods. Corp., 69 B.R. 901, 905 (D.N.J. 1987) (holding that prepetition secured creditor was not entitled to proceeds of sale of collateral

recovered as preference because to allow the secured creditor to "claim these preferences would

frustrate the policy of equal treatment of creditors under the Code . . . .").

E.    **The Challenge Period And Investigation Fund Are Inadequate
      For These Cases, And That Inadequacy Is Exacerbated By The
      Failure To Grant The Committee Standing To Bring Challenges**

        28.    The Proposed Final DIP Order and Proposed Final Cash Collateral Order

would require that the Committee and other parties in interest obtain standing to sue and initiate

a Challenge on or before the later of (a) in the case of a party in interest other than the

Committee, seventy-five (75) calendar days after entry of the Interim Cash Collateral Order, or

July 16, 2014, and (b) in the case of the Committee, sixty (60) days after formation thereof, or

July 12, 2014, in each case subject to further extension with the agreement of the TCEH Debtors,

the Prepetition First Lien Agents, the TCEH First Lien Ad Hoc Committee and any individual

Prepetition First Lien Creditor that is the subject of a Challenge.  Proposed Final DIP Order ¶ 27;

Proposed Final Cash Collateral Order ¶ 13.  Notwithstanding that this comports with the

minimum challenge period contemplated by Local Bankruptcy Rule 4001-2(a)(i)(B), this

Challenge Period is inadequate in cases of this size.  The Debtors are the product of the largest

leveraged buy-out in U.S. history, a type of transaction often scrutinized.  See Declaration of

Paul Keglevic, Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring

Officer of Energy Future Holdings Corp., et al., in Support of First Day Motions [Docket No. 98]

(the "Keglevic Declaration") ¶ 10.  The Debtors' three distinct capital structures include

approximately $41.71 billion of funded debt.  Id.  The TCEH Debtors alone have approximately

$24.385 billion of first lien debt, $1.571 billion of second lien debt, and $6.112 billion of

unsecured funded debt.  Id.  The Prepetition Collateral package securing the TCEH Debtors' first

lien debt and second lien debt that must be scrutinized during the Challenge Period is large and

MIAMI 1015718

complex. See id. ¶ 69. Numerous issuances of new debt, exchanges of debt and amendments

and extensions of debt occurred in the four and one-half years preceding the Petition Date. See

id. ¶¶ 147-50. The Challenge Period must be extended both as to the Committee and other

parties in interest to allow proper investigation of those transactions, the Prepetition First Priority

Liens and the Prepetition Second Priority Liens to determine which Challenges should be

brought.

29.      The Proposed Final DIP Order and Proposed Final Cash Collateral Order

do not allocate a reasonable amount of proceeds of the Proposed DIP Financing or cash collateral

to the Committee's investigation of Challenges.  Providing only $175,000 in the aggregate for

any such Committee's professionals to investigate and challenge the Prepetition Secured

Obligations unnecessarily constrains the Committee's ability to determine whether the

Prepetition First Priority Liens and Prepetition Second Priority Liens securing the Prepetition

Secured Obligations are properly perfected and if there are potential estate claims against parties

holding such liens. See Proposed Final DIP Order ¶ 27; Proposed Final Cash Collateral Order

¶ 14.

30.      Further, the limitations prescribed by the Proposed Final DIP Order and

Proposed Final Cash Collateral Order on the uses of proceeds of the Proposed DIP Financing and

cash collateral proscribe the payment of fees and expenses incurred by the Committee's

professionals in initiating, asserting, joining, commencing, supporting or prosecuting any actions

or discovery with respect thereto.  Proposed Final DIP Order ¶ 27; Proposed Final Cash

Collateral Order ¶ 14.  At the same time, those orders would require that the Committee obtain

entry of an order granting it standing to bring any such action before commencing a Challenge

(and prior to the expiration of the Challenge Period).  Proposed Final DIP Order ¶ 27; Proposed

MIAMI 1015718

Final Cash Collateral Order ¶ 13.  Given that the orders require the Committee to satisfy this requirement but preclude the Committee's professionals from being compensated for any actions taken to meet that requirement, the requirement that the Committee obtain standing should be eliminated entirely, and any final orders should confer upon the Committee standing to assert Challenges.

**F.      The Section 506(c) Waiver Is Inappropriate And Should Be Denied**

31.      The Proposed Final DIP Order and Proposed Final Cash Collateral Order would also provide that the DIP Agent, DIP Lenders, DIP L/C Issuers, DIP Collateral, Prepetition First Lien Agents, Prepetition First Lien Creditors, Adequate Protection Liens and Prepetition Collateral shall not be subject to any surcharge under section 506(c) of the Bankruptcy Code.  Proposed Final DIP Order ¶ 31; Proposed Final Cash Collateral Order ¶¶ 5(a), 16.  Local Bankruptcy Rule 4001-2(a)(i)(C) requires that the TCEH Debtors justify a provision in which they waive the right to surcharge under section 506(c) of the Bankruptcy Code.  That justification has not been presented.  The TCEH Debtors' estates must retain the right to charge the DIP Lenders and Prepetition First Lien Creditors for the TCEH Debtors' efforts in preserving the Prepetition Collateral and DIP Collateral, and a waiver of these rights at this stage of the bankruptcy could ultimately lead to an unfair enrichment of the DIP Lenders and Prepetition First Lien Creditors at the expense of unsecured creditors.  Indeed, given the transfer of value to the Prepetition First Lien Creditors and the plan that they will become the new equity owners of the TCEH Debtors, it is inappropriate to further insulate them from liability to the TCEH Debtors' estates for the costs and expenses associated with preserving their collateral.

32.      As already explained above, and as evidenced by the Debtors' filings, the benefits of these Cases will likely run almost exclusively to the Prepetition First Lien Creditors.

As a result, it is imperative that the TCEH Debtors' estates retain the ability to force the Prepetition First Lien Creditors to shoulder the costs associated with preservation of their Prepetition Collateral and to preserve the value of unencumbered assets. See In re Afco Enters., Inc., 35 B.R. 512, 515 (Bankr. D. Utah 1983) (stating that "[w]hen the secured creditor is the only entity which is benefited by the trustee's work, it should be the one to bear the expense [and that it] would be unfair to require the estate to pay such costs where there is no corresponding benefit to unsecured creditors"); see also Equitable Gas Co. v. Equibank N.A. (In re McKeesport Steel Castings Co.), 799 F.2d 91, 94 (3d Cir. 1986) ("We choose to follow the broad interpretation of benefit used in *Afco Enterprises*."); Precision Steel Shearing, Inc. v. Fremont Fin. Corp. (In re Visual Indus., Inc.), 57 F.3d 321, 325 (3d Cir. 1995) ("[Section] 506(c) is designed to prevent a windfall to the secured creditor . . . [and] understandably shifts to the secured party . . . the costs of preserving or disposing of the secured party's collateral, which costs might otherwise be paid from the unencumbered assets of the bankruptcy estate . . . .") (internal citation omitted).

33.    Here, the costs of preserving the Prepetition Collateral and DIP Collateral may well include much, if not all, of the first day relief granted with respect to the TCEH Debtors. That relief will result in hundreds of millions of dollars of prepetition claims being paid in order to preserve the going concern value of the TCEH Debtors, which value is proposed to be conveyed exclusively to the Prepetition First Lien Creditors following satisfaction of the DIP Lenders' claims. The preservation of that value for the benefit of the Prepetition First Lien Creditors is sufficient basis for the TCEH Debtors to assert a section 506(c) surcharge claim. See McKeesport Steel Castings, 799 F.2d at 94-95 (adopting a broad interpretation of "benefit" and finding that preservation of the debtor's business as a going concern benefitted the debtor's

secured creditor for purposes of section 506(c) of the Bankruptcy Code); Midlantic Bank, N.A.,

v. PECO Energy Co., Civ. A. No. 94-7499, 1996 WL 135339, at *3 (E.D. Pa. Mar. 19, 1996)

(noting that the Third Circuit has adopted a broad definition for determining "direct benefit" to a

secured creditor under section 506(c) of the Bankruptcy Code, and stating that "a direct benefit

may be the increase in value of a debtor's assets in liquidation when a service preserves the

going concern value" of the debtor's business); Erie Hilton Joint Venture v. Prudential Ins. Co.

of Am. (In re Erie Hilton Joint Venture), 125 B.R. 140, 149 (Bankr. W.D. Pa. 1991); see also In

re Annett Ford, Inc., 62 B.R. 65, 67 (Bankr. D. Neb. 1985) (finding that "it would be of benefit

to the estate and to the secured creditor to continue the business as an ongoing concern" and that

"the continued operation of the business was of benefit to [the debtor's secured creditor]" for

purposes of section 506(c) of the Bankruptcy Code), rev'd on other grounds, 64 B.R. 946, 947

(Bankr. D. Neb. 1986).  In fact, courts on numerous occasions have granted section 506(c)

surcharge claims against a secured creditor's collateral on this basis.  See, e.g., In re Phoenix

Pipe and Tube, L.P., 174 B.R. 688, 691-92 (Bankr. E.D. Pa. 1994) (noting that "preservation of

the going concern value of a business can constitute a benefit to the secured creditor" and

concluding that wage payments for the debtor's CEO were proper surcharges under section

506(c) of the Bankruptcy Code because his management services were essential to continued

production that conferred a benefit to the secured creditor); In re Ascher, 146 B.R. 764, 771

(Bankr. N.D. Ill. 1992) ("Since the payments made . . . to fund the payroll and pay other

expenses were necessary for the preservation of the [debtor's laundry business] as a going entity,

Movants are entitled to recover these funds . . . under 11 U.S.C. § 506(c)."); Afco Enters., 35

B.R. at 515-16 (granting section 506(c) surcharge claim on the basis that the claimant's

preservation of the debtor's property and its going concern value benefited the debtor's secured

creditors); see also In re Lunan Family Rests. Ltd. P'ship, 192 B.R. 173,181 (Bankr. N.D. Ill.

1996) (finding that utility expenses, employment taxes and health insurance claims of employees

incurred during the continued operation of the debtor's business could be surcharged against

secured creditor's collateral because without such employees to continue the debtor's ongoing

operations, there would have been no benefit to the secured creditor).[8]  Given the outcome of

these Cases contemplated by the Debtors, the quid pro quo for the massive amount of first day

relief sought in these Cases must include the TCEH Debtors' estates' retention of their right to

surcharge the Prepetition Collateral and the DIP Collateral for the costs of preserving that

collateral through the prosecution of these Cases.

**G.      Inclusion Of Authorization For The First Lien Collateral Agent To Credit Bid In The Proposed Final Cash Collateral Order Is Inappropriate, As It Forecloses Any Later Inquiry As To Whether "Cause" Exists To Limit Or Proscribe A Credit Bid**

            34.      The inclusion of language in the Proposed Final Cash Collateral Order that

authorizes the First Lien Collateral Agent, for the benefit of the Prepetition First Lien Creditors,

to credit bid under section 363(b) of the Bankruptcy Code in connection with a sale of the TCEH

Debtors' assets or under a chapter 11 plan of reorganization (Proposed Final Cash Collateral

Order ¶ 8) is premature, inappropriate and inconsistent with section 363(k) of the Bankruptcy

Code.  Although that right is proposed to be limited in the event of a successful Challenge to the

validity, extent or allowability of all of any portion of the Prepetition First Lien Obligations (id.),

the proposed language is not otherwise qualified consistent with the language of section 363(k)

of the Bankruptcy Code itself.

---

[8]      Decisions holding otherwise have focused, at least in part, on the particular identity of the surcharge claimant.  See, e.g., Precision Steel Shearing, Inc. v. Fremont Fin. Corp. (In re Visual Indus., Inc.), 57 F.3d 321, 326 (3d Cir. 1995) (rejecting trade creditor's section 506(c) surcharge claim in part on the basis that "[w]e do not interpret § 506(c) or understand our precedents interpreting § 506(c) to protect ordinary trade creditors"); United Jersey Bank v. Miller (In re C.S. Assocs.), 29 F.3d 903, 906-07 (3d Cir. 1994) (denying municipality's surcharge claims for real estate taxes and other municipal obligations after finding that the municipality conferred only incidental benefits on the secured creditor and its collateral through its provision of general municipal services).

30

35.     Section 363(k) of the Bankruptcy Code provides:

> At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court <u>for cause</u> orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

11 U.S.C. § 363(k) (emphasis added).

36.     Credit bidding under section 363(k) of the Bankruptcy Code is not an absolute right.  See <u>In re Phila. Newspapers, LLC</u>, 599 F.3d 298, 315 (3d Cir. 2010) ("The most obvious example arises in the text of § 363(k), under which the right to credit bid is not absolute."); <u>see also</u> <u>Greenblatt v. Steinberg</u>, 339 B.R. 458, 463 (N.D. Ill. 2006); <u>In re Aloha Airlines</u>, No. 08-00337, 2009 WL 1371950, at *8 (Bankr. D. Haw. May 14, 2009); <u>In re Antaeus Technical Servs., Inc.</u>, 345 B.R. 556, 565 (Bankr. W.D. Va. 2005); <u>In re Theroux</u>, 169 B.R. 498, 499 n.3 (Bankr. D.R.I. 1994).  "The law is equally clear, as Section 363(k) provides, that the Court may 'for cause order[ ] otherwise.'"  <u>In re Fisker Auto. Holdings, Inc.</u>, Case No. 13-13087-KG, 2014 WL 210593, at *4 (Bankr. D. Del. Jan. 17, 2014); <u>see also</u> <u>Phila. Newspapers</u>, 599 F.3d at 315.

37.     "Cause" within the meaning of section 363(k) of the Bankruptcy Code has been interpreted to include:  (i) ensuring the success of the reorganization (<u>id.</u> at 316 n.14); (ii) fostering a competitive bidding environment or auction (<u>id.</u>, <u>Fisker Auto. Holdings</u>, 2014 WL 210593, at *4 (citing 3 COLLIER ON BANKRUPTCY ¶ 363.09[1])); <u>Antaeus Technical Servs.</u>, 345 B.R. at 565); (iii) an unproven lien (<u>Fisker Auto. Holdings</u>, 2014 WL 210593, at *5 (citing <u>In re Daufuskie Island Props.</u>, 441 B.R. 60, 64 (Bankr. D.S.C. 2010)); (iv) conduct "inconsistent with the notions of fairness" and designed "to short-circuit the bankruptcy process[ ]" (<u>Fisker Auto</u>

MIAMI 1015718

Holdings, 2014 WL 210593, at *5); and (v) where otherwise in the interest of any policy advanced by the Bankruptcy Code (id. at *4).

38.     It would be impossible for the Court to conclude, at this early stage of these Cases, that such "cause" does not—and will not at the time of any proposed sale of the TCEH Debtors' assets—exist.  Regardless of whether such "cause" may ultimately be shown, however, recognition of a right to credit bid without proper qualification for "cause" shown, is inconsistent with language of section 363(k) of the Bankruptcy Code, and thus, impermissible under the law.

## H.    Any "Marshaling" Waiver Is Inappropriate And Should Be Denied

39.     The Proposed Final DIP Order and Proposed Final Cash Collateral Order each provide for a waiver of the equitable doctrine of "marshaling" or any other similar doctrine with respect to the DIP Collateral and the Prepetition Collateral, respectively.  Proposed Final DIP Order ¶ 32; Proposed Final Cash Collateral Order ¶ 19.  While "marshaling" is generally an equitable remedy to be invoked only by junior secured or lien creditors (St. Paul Fire & Marine Ins. Co. v. Fort Vancouver Plywood Co. (In re Brazier Forest Prods., Inc.), 921 F.2d 221, 223 (9th Cir. 1990)), sections 544(a) and 1107 of the Bankruptcy Code confer upon the TCEH Debtors, as debtors-in-possession, the status of a trustee as a hypothetical lien creditor, and thus, the power to invoke marshaling.  Official Comm. of Unsecured Creditors of America's Hobby Ctr., Inc. v. Hudson United Bank (In re America's Hobby Ctr., Inc.), 223 B.R. 275, 287 (Bankr. S.D.N.Y. 1988).  Further, if a debtor-in-possession unjustifiably refuses to bring a colorable claim of marshaling, then an unsecured creditor may be granted derivative standing to do so. See, e.g., Newcorn Enters., 287 B.R. at 750 (granting unsecured creditors' committee derivative standing to bring marshaling claim against secured lender, and thereby increase pay-out to

32

unsecured creditors, where debtor refused to do so); Berman v. Green (In re Jack Green's Fashions for Men Big & Tall), 597 F.2d 130, 133 (8th Cir. 1979) ("Federal courts of bankruptcy are courts of equity and may apply the doctrine of marshaling in proper cases.  In this case it would be in the highest degree inequitable to allow the Bank to exhaust the business assets of the corporate bankrupt without first looking to the real estate mortgaged to it.  To permit such a course would leave the general creditors of the business with nothing.") (citation omitted), aff'd, 597 F.2d 130 (8th Cir. 1979).

40.    The proposed waiver of the equitable doctrine of "marshaling" and any other similar doctrine is inappropriate as it will allow the DIP Lenders and Prepetition First Lien Creditors to recover first from the TCEH Debtors' currently unencumbered assets, most particularly the Segregated Cash, destroying value otherwise distributable to their unsecured creditors.  Where, as here, this would result in no recovery by holders of approximately $6.1 billion of unsecured debt, this inequitable result should not be countenanced by the Court.  Id.

## RESERVATION OF RIGHTS

41.    The Ad Hoc Group of TCEH Unsecured Noteholders expressly reserves the right to supplement and amend this Objection, seek discovery with respect to the same and introduce evidence at any hearing relating to the DIP Financing Motion, the Cash Collateral Motion and this Objection.  Further, the Ad Hoc Group of TCEH Unsecured Noteholders reserves the right to respond, further object, join in or amend any objection herein with respect to any argument or objection made by any person relating to the DIP Financing Motion or the Cash Collateral Motion.  The Ad Hoc Group of TCEH Unsecured Noteholders also reserves the right to further object to any alternative financings if and when proposed by the TCEH Debtors.

## CONCLUSION

42.     Based on the foregoing, the Ad Hoc Group of TCEH Unsecured Noteholders respectfully requests that the Court deny the DIP Financing Motion and the Cash Collateral Motion, unless the relief requested therein is modified to address the objections raised herein.

*[Remainder of page intentionally left blank]*

34

Dated: May 30, 2014
      Wilmington, Delaware

FOX ROTHSCHILD LLP

By: _____

Jeffrey M. Schlerf (No. 3047)
John H. Strock (No. 4965)
L. John Bird (No. 5310)
919 North Market St., Suite 300
Wilmington, DE 19801
Telephone: (302) 654-7444
Facsimile: (302) 463-4971
jschlerf@foxrothschild.com
jstrock@foxrothschild.com
lbird@foxrothschild.com

and

WHITE & CASE LLP
Thomas E Lauria (admitted *pro hac vice*)
Matthew C. Brown (admitted *pro hac vice*)
Southeast Financial Center, Suite 4900
200 South Biscayne Blvd.
Miami, FL 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
tlauria@whitecase.com
mbrown@whitecase.com

J. Christopher Shore (admitted *pro hac vice*)
Gregory M. Starner (admitted *pro hac vice*)
1155 Avenue of the Americas
New York, NY 10036
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
cshore@whitecase.com
gstarner@whitecase.com

*Counsel to the Ad Hoc Group of*
*TCEH Unsecured Noteholders*

MIAMI 1015718