## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | Case No. 14-10979 (CSS) |
| Debtors. | (Jointly Administered) |
|  | Re: Docket Nos. 23, 25, 31, 37 & 38<br>Objection Deadline: May 30, 2014 at 8:00 p.m.<br>Hearing Date and Time: June 5, 2014 at 9:30 a.m. |

### LIMITED OMNIBUS OBJECTION OF THE AD HOC GROUP OF TCEH UNSECURED NOTEHOLDERS TO (1) THE MOTION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*, FOR ENTRY OF AN ORDER (A) AUTHORIZING THE DEBTORS TO (I) CONTINUE USING THEIR EXISTING CASH MANAGEMENT SYSTEM, (II) MAINTAIN EXISTING BANK ACCOUNTS AND BUSINESS FORMS, AND (III) CONTINUE USING CERTAIN INVESTMENT ACCOUNTS; (B) AUTHORIZING CONTINUED INTERCOMPANY TRANSACTIONS AND NETTING OF INTERCOMPANY CLAIMS; AND (C) GRANTING POSTPETITION INTERCOMPANY CLAIMS ADMINISTRATIVE EXPENSE PRIORITY; AND (2) CERTAIN OTHER OF THE DEBTORS' OPERATIONAL FIRST-DAY MOTIONS

The ad hoc group of certain holders (the "Ad Hoc Group of TCEH Unsecured Noteholders") of approximately $2.7 billion aggregate principal amount of 10.25% Fixed Senior Notes due 2015 (including Series B) and 10.50%/11.25% Senior Toggle Notes due 2016 issued by Texas Competitive Electric Holdings Company LLC ("TCEH") and TCEH Finance, Inc., by and through its undersigned counsel, and consistent with its objections raised at the first day hearings, hereby files its limited omnibus objection (the "Objection") to (1) the Motion of Energy Future Holdings Corp., *et al.*, for Entry of an Order (A) Authorizing the Debtors to (I) Continue Using Their Existing Cash Management System, (II) Maintain Existing Bank Accounts and Business Forms, and (III) Continue Using Certain Investment Accounts;

---

[1]     The last four digits of Energy Future Holdings Corp.'s federal tax identification number are 8810.  The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201.  Due to the large number of debtors in these chapter 11 cases, for which the debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

(B) Authorizing Continued Intercompany Transactions and Netting of Intercompany Claims; and

(C) Granting Postpetition Intercompany Claims Administrative Expense Priority [Docket No. 37] (the "Cash Management Motion"); and (2) the following additional motions (together with the Cash Management Motion, the "First-Day Motions") filed by the above-captioned debtors (the "Debtors"):

- Motion of Energy Future Holdings Corp., *et al.*, for Entry of Interim and Final Orders Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees [Docket No. 23] (the "Taxes Motion");

- Motion of Energy Future Holdings Corp., *et al.*, for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Pay Certain Prepetition Compensation and Reimbursable Employee Expenses, (II) Pay and Honor Employee and Retiree Medical and Similar Benefits, and (III) Continue Employee and Retiree Benefit Programs, and (B) Modifying the Automatic Stay [Docket No. 25] (the "Wages Motion");

- Motion of Energy Future Holdings Corp., *et al.*, for Entry of (A) an Order Authorizing the Debtors to (I) Maintain and Administer Customer Programs and Customer Agreements, (II) Honor Prepetition Obligations Related Thereto, (III) Pay Certain Expenses on Behalf of Certain Organizations, (IV) Fix the Deadline to File Proofs of Claim for Certain Customer Claims, and (V) Establish Procedures for Notifying Customers of Commencement of the Debtors' Chapter 11 Cases, Assumption of Customer Agreements, and the Bar Date for Customer Claims and (B) an Order Authorizing Certain of the Debtors to Assume the Customer Agreements [Docket No. 31] (the "Customer Programs Motion"); and

- Motion of Energy Future Holdings Corp., *et al.*, for Entry of (A) an Order Authorizing Certain of the Debtors to Pay Certain Prepetition Transition Charges and Delivery Charges and (B) an Order Authorizing Certain of the Debtors to Assume Transmission and Distribution Service Agreements [Docket No. 38] (the "TDSP Motion").[2]

---

[2]     The Ad Hoc Group of TCEH Unsecured Noteholders are filing concurrently herewith separate objections with respect to the (i) Motion of Energy Future Holdings Corp., *et al.*, for Entry of an Order Directing Joint Administration of the Debtors' Chapter 11 Cases [Docket No. 17]; (ii) Motion of Energy Future Holdings Corp., *et al.*, for Entry of Interim and Final Orders Authorizing the Debtors to Pay Prepetition Critical Vendor Claims [Docket No. 29] ("Critical Vendor Motion"); (iii) Motion of Texas Competitive Electric Holdings Company LLC

In support of the Objection, the Ad Hoc Group of TCEH Unsecured Noteholders respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      The chapter 11 cases of Energy Future Competitive Holdings Company LLC ("EFCH") and its direct and indirect subsidiaries (collectively with EFCH, the "TCEH Debtors") comprise on a stand-alone basis one of the largest and most complex business bankruptcies in U.S. history.  They include 45 separate Debtor[3] entities that own and operate 14 power plants in the State of Texas (including 2 nuclear power generating facilities), provide jobs to approximately 5,000 employees and have incurred over $32 billion in funded debt obligations.

2.      The fundamental chapter 11 exercise of valuing the TCEH Debtors' assets is sure to be difficult and controversial.  The TCEH Debtors' assets are notoriously difficult to value at any point in time because of the historic cyclicality and volatility of the U.S. energy markets.  The valuation exercise in these cases will be further complicated by the impact of recent market-changing events (i.e., fracking) and the prospect of future events (i.e., Russian/Eastern Block politics; increasing liquid natural gas exports to Europe and China) that market participants and experts believe will materially impact energy pricing.  The TCEH Debtors' assets are also subject to multiple Federal and State regulatory schemes, the application (or modification) of which will materially impact value.  In addition, these cases involve complex tax issues that could produce or eliminate billions of dollars of value for the TCEH

---

and Certain of Its Debtor Affiliates for Entry of Interim and Final Orders (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing [Docket No. 71] ("Cash Collateral Motion"); and (iv) Motion of Texas Competitive Electric Holdings Company LLC and Certain of Its Debtor Affiliates, for Entry of Interim and Final Orders (A) Approving Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Modifying the Automatic Stay, and (D) Scheduling A Final Hearing [Docket No. 73] ("TCEH DIP Motion").

[3]      Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the First-Day Motions.

Debtors' estates, depending on the structure of a plan transaction. The TCEH Debtors have also entered into layers of executory contracts in connection with the operation of their businesses, that, depending on a variety of variables, may be accretive or deleterious to value.

3.    Things are further complicated by the presence of significant potential litigation and avoidance issues. The businesses of the TCEH Debtors were the subject of the largest leveraged buy-out ("LBO") in history, with billions of dollars of secured debt being put on the assets to fund payments to the TCEH Debtors' former owners. The assets comprising the "Oncor" transmission and distribution network (which is now owned by subsidiaries of Energy Future Intermediate Holding Company LLC) were transferred away from the TCEH Debtors for no consideration to facilitate additional financings, the proceeds of which were not paid to or for the benefit of the TCEH Debtors. And, prior to the commencement of these cases, the TCEH Debtors made hundreds of millions, if not billions, of dollars of payments and transfers to or for the benefit of Debtor and non-Debtor affiliates, insiders and third parties, which may well be subject to attack or avoidance as fraudulent transfers or preferences.

4.    And yet, the Debtors (including the TCEH Debtors, who are fiduciaries for over $32 billion of TCEH debt) elected on the eve of bankruptcy, to bind themselves to a Restructuring Support and Lock-Up Agreement (the "RSA") under which they are obligated to file and pursue confirmation of a plan (the "RSA Plan") that would sweep all of the forgoing matters aside. Instead, the RSA contemplates that the TCEH Debtors will simply turn over their assets to the TCEH Debtors' Prepetition First Lien Creditors (possibly leaving them with what is projected at this time to be between a $5 and $6 billion deficiency), grant broad releases to a long list of affiliates (including the non-TCEH Debtors), insiders (including the Debtors' sponsors, who have taken hundreds of millions of dollars of fees and other payments since the LBO) and

third parties (including the TCEH Debtors' Prepetition First Lien Creditors), and effectively

wipe out $7 to $8 billion of second lien and unsecured claims.

5.      Making matters worse, the RSA contemplates a timeline for

implementation—approximately 9 months—that would make it effectively impossible to

properly diligence the myriad issues and matters the RSA Plan would purport to destroy, much

less take action to assert and liquidate them to cash.

6.      According to the Debtors, these cases have been filed to implement what

they characterize as a "balance sheet restructuring"—a case where there is no need to address

operational issues; but rather, the only thing needed is to delever the balance sheet by

"equitizing" or wiping out debt.

7.      The entry of the non-TCEH Debtors into the RSA, and their view that the

case is a "balance sheet restructuring", can be easily understood.  The non-TCEH Debtors are

holding companies that have no operations to reorganize and as to which all distributable value is

derived from their ownership interest in "Oncor", their ring-fenced, non-debtor subsidiary.

Based on that value, the RSA Plan provides for the satisfaction in full of over $7 billion of non-

TCEH claims and is supported by the vast majority of all non-TCEH creditors who aren't being

cashed out.

8.      Things couldn't be more different on the TCEH side.  As a preliminary

matter, all of the TCEH Debtors' distributable value derives from assets and operations of the

TCEH Debtors themselves, giving rise to hundreds of millions of dollars of prepetition

operational obligations.  As such, in order to shoe-horn their cases into the "balance sheet

restructuring" model of the non-TCEH Debtors, the TCEH Debtors appear to have used

approximately $150 million of unencumbered cash to prepay operational and other obligations

prior to filing the chapter 11 cases and now seek to pay substantially all of the rest of such prepetition obligations through the First-Day Motions.

9.      This massive pay-off of unsecured operational obligations is an essential first step to the "balance sheet restructuring" contemplated by the RSA.  Through it, the TCEH Debtors effectively seek to create two classes of unsecured creditors (which would never pass muster under a plan)—one comprised of hundreds of millions of operational claims that will be paid in full; and the other comprised of pari passu debt claims that will be wiped out.

10.      With this first step taken, the RSA Plan then provides for the partial satisfaction of the TCEH Debtors' first lien debt and the wipe-out of the billions of dollars of other claims that the TCEH Debtors haven't paid in full either prior to the commencement of these cases or thereafter pursuant to the First-Day Motions.  Notably, the RSA Plan is supported by only slightly more than 40% of the TCEH Debtors' first lien debt and not a single dollar of claims from any other class. In other words, the TCEH Debtors signed-up to the RSA even though it purports to distribute value equal to approximately half of the debt of the TCEH Debtors and is supported by less than 30% of the claims against the TCEH Debtors—without any assessment of the matters outlined above that ultimately drive value and recoveries.

11.      From the perspective of the TCEH Debtors, these cases need to slow down and one of the fundamental (but sometimes forgotten) purposes of chapter 11—the breathing spell—needs to be regarded.  The TCEH Debtors and their stakeholders need to take the time to investigate and properly assess the material matters that will drive recoveries.

12.      And while that task is being performed, the status quo ante as of the petition date needs to be preserved.  The payment of prepetition claims should be minimized. Cash should be conserved.  What is unencumbered should stay that way.

Case 14-10979-CSS    Doc 681    Filed 05/30/14    Page 7 of 16

13.     To that end, the Debtors' First-Day Motions should not be approved as currently proposed.[4]  To ensure that the final relief granted in connection with the First-Day Motions is solely in the best interest of the TCEH Debtors' estates and all creditors, including creditors holding funded debt, the Court should condition the relief requested in the Debtors' motions on the satisfaction of the various concerns raised herein.

## LIMITED OBJECTION

## I.      The Cash Management Motion

14.     As part of its objections raised at the first day hearing, the Ad Hoc Group of TCEH Unsecured Noteholders objected to the TCEH Debtors' proposal to pay $69.1 million in amounts purportedly outstanding as of the Petition Date under their shared services agreement (the "Shared Services Agreement") with EFH Corporate Services Company ("EFH Corporate Services").  Cash Management Motion ¶ 48.  The proposed payment was fraught with conflicts in that it would have allowed the TCEH Debtors to satisfy an affiliate's prepetition claim at 100 cents on the dollar without any articulable justification.  Presumably recognizing the ill-advised nature of precipitating a dispute over why an affiliate owned by the other side of the capital structure with its own creditor body should be paid ahead of tens of billions of dollars of secured and unsecured TCEH Debtor claims, "the Debtors" and their "CFO and Co-CRO" have apparently agreed on the one hand not to seek payment from themselves or to require themselves to pay that claim.

15.     That important concession, however, does not eliminate the conflicts.  Specifically, the Ad Hoc Group of TCEH Unsecured Noteholders objects to the TCEH Debtors' continued maintenance of their Bank Accounts in a manner that subjects the monies deposited in

---

[4]      The same holds true for the relief requested by the TCEH Debtors in the Critical Vendor Motion, Cash Collateral Motion and TCEH DIP Motion, which are the subject of separate objections being filed by the Ad Hoc Group of TCEH Unsecured Noteholders concurrently herewith.

those accounts to control by another Debtor, specifically EFH Corporate Services, without

adequate safeguards.  The Cash Management Motion describes the TCEH Debtors' Bank

Accounts as being controlled by "[t]he Debtors' treasury personnel."  Cash Management Motion

¶ 20. ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████  In the absence of an enforceable means

████████████████████████████████████████████████████████████

for the TCEH Debtors to control their own cash, the administration of the TCEH Debtors' Bank

Accounts by another Debtor is improper and subjects the monies held in those accounts—and the

TCEH Debtors' estates—to an unreasonable risk of loss.

16.     The Shared Service Agreement itself is problematic.  Pursuant to the Cash

Management Motion, "the Debtors" have sought authority to "continue entering into

Intercompany Transactions and settling Intercompany Claims related to the Shared Services on a

postpetition basis[.]"  Id. at ¶ 48.  The Ad Hoc Group of TCEH Unsecured Noteholders objects

to the relief sought by the Cash Management Motion to the extent it would prejudice the TCEH

Debtors or creditors thereof in challenging postpetition cost allocations made to the TCEH

Debtors pursuant to the Shared Services Agreement.[6]  Specifically, any relief, including, but not

limited to, authorization to continue entering into Intercompany Transactions or settling

Intercompany Claims, that would result in the TCEH Debtors continuing to operate pursuant to

the terms of the Shared Service Agreement should be without prejudice to the TCEH Debtors' or

their creditors' rights to challenge administrative expense priority for all claims arising under the

Shared Services Agreement.  For example, in the event the Shared Services Agreement is

rejected (as contemplated in the RSA, or otherwise), EFH Corporate Services would only be

entitled to assert an administrative expense claim for the reasonable value of postpetition

services which may or may not be the invoiced amounts.  Thus, the TCEH Debtors and the



creditors thereof should not be precluded from asserting that any postpetition payments pursuant to the Shared Services Agreement are subject to dispute and recharacterization at a later date.

## II.    The Taxes Motion

17.    In accordance with a certain tax sharing agreement (the "TSA") entered into among EFH, Energy Future Competitive Holdings Company LLC ("EFCH"), TCEH, certain of TCEH's subsidiaries and Energy Future Intermediate Holding Company LLC, the Debtors seek entry of a final order authorizing EFH to continue to pay certain taxes on behalf of the TCEH Debtors and to subsequently settle intercompany claims with the TCEH Debtors on account of such payments.  Taxes Motion ¶ 13 n.9.  The proposed final order with respect to the Taxes Motion, however, fails to implement any safeguards to ensure that value will not be stripped away from the TCEH Debtors to pay or reimburse any taxes incurred by other parties to the TSA.  To avoid any improper allocation of tax liabilities and intercompany claims to the TCEH Debtors, any final relief regarding the Taxes Motion should protect the TCEH Debtors from incurring any tax responsibilities for which they are not accountable.

18.    Accordingly, the Ad Hoc Group of TCEH Unsecured Noteholders requests that any final order entered by the Court with respect to the Taxes Motion provide that: (i) the TCEH Debtors are to only pay taxes and intercompany reimbursement claims to EFH if the TCEH Debtors are liable for the underlying taxes, (ii) the TCEH Debtors are not liable to reimburse EFH for any payments it makes on behalf of a non-TCEH Debtor that has paid (or will pay) the tax and (iii) the right of any party in interest to dispute any claim on any grounds is not being waived or prejudiced.  The Debtors will in no way be impaired by such requested relief.

19.    By the Taxes Motion, the Debtors further seek authority on a final basis to satisfy all prepetition obligations under the TSA, which the Debtors estimate to be approximately

$70 million. Id. at ¶ 15. Again, however, the TCEH Debtors have failed to establish that payment of purported prepetition obligations by the TCEH Debtors to EFH outside of a plan of reorganization will provide any benefit to the TCEH Debtors' estates or creditors. See In re Lehigh & New Eng. Ry. Co., 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court may authorize the payment of prepetition claims if such payment is essential to the continued operation of the debtor); Friedman's, Inc. v. Roth Staffing Cos. (In re Friedman's, Inc.), No. 09-50364 (CSS), 2011 WL 5975283, at *3 (Bankr. D. Del. Nov. 30, 2011) ("[T]he 'doctrine of necessity' stands for the proposition that a bankruptcy court may allow payment . . . of a prepetition obligation where such payment is critical to the reorganization process.") (citation omitted); In re Primary Health Sys., Inc., 275 B.R. 709, 710 (Bankr. D. Del. 2002) (allowing payment of claims upon a finding that such relief was "essential to the continued operation of the Debtors' businesses"). Nor have the TCEH Debtors articulated any sound business justification for such payment, which confers no benefit on the TCEH Debtors and is instead detrimental to the TCEH Debtors' estates. Furthermore, EFH projects having an ample amount of cash over the next twelve months, and there is no indication that EFH will suffer any immediate harm if the purported inter-Debtor obligations under the TSA are not satisfied at this time.[7] Like the previously proposed payment of prepetition inter-Debtor claims under the Cash Management Motion, the payment of this purported $70 million prepetition claim under the TSA simply is not necessary, under the doctrine of necessity, 11 U.S.C. § 363 or otherwise, and the Debtors' request with respect thereto should be denied.

---

[7]     Pursuant to the twelve-month cash flow projection for EFH set forth in the Debtors' initial monthly operating report, EFH will have an ending cash balance of $119 million at the end of a year even though the $69.1 million prepetition claim of EFH Corporate Services is not going to be paid. See Initial Monthly Operating Report [Docket No. 444], Ex. C.

MIAMI 1013591 (2K)

### III.    The Wages Motion

20.    The Debtors seek authority on a final basis to pay approximately $500,000 in prepetition Unpaid Staffing Provider Fees that accrued prior to the Petition Date against the TCEH Debtors.  Wages Motion ¶ 30.  A proposed recipient of such fees is Pinnacle Technical Resources, Inc. ("Pinnacle")—an affiliate of Kohlberg Kravis Roberts & Co., which holds a substantial equity interest in EFH.  Id. at ¶ 27 n.11.  Prior to the Petition Date, however, the TCEH Debtors provided Pinnacle with two letters of credit in the collective amount of approximately $3 million to secure any Unpaid Staffing Provider Fees owed to Pinnacle.  Id. Such letters of credit undercut the Debtors' suggestion that any payment made to Pinnacle pursuant to the Wages Motion is warranted under the doctrine of necessity.  See id. at ¶ 131.

21.    The Debtors have also failed to demonstrate that an immediate payment of Unpaid Staffing Provider Fees to Pinnacle under the Wages Motion confers any benefit to the Debtors' estates or its creditors other than Pinnacle.  Nor have the Debtors shown that immediate payment of Unpaid Staffing Provider Fees to Pinnacle pursuant to the Wages Motion is necessary to the TCEH Debtors' reorganization efforts or continued operation.  As such, the Debtors have failed to establish that the payment to Pinnacle is "necessary" under the doctrine of necessity.  See In re Lehigh, 657 F.2d at 581; In re Friedman's, Inc., 2011 WL 5975283, at *3; In re Primary Health, 275 B.R. at 710.  Thus, any final relief with respect to the Wages Motion should not include payment of any Unpaid Staffing Provider Fees to Pinnacle.

### IV.    The Customer Programs Motion

22.    The Debtors estimate that as of the Petition Date, they owed approximately $120 million to $135 million on account of their Customer Programs.  Customer Programs Motion ¶ 6.  The Debtors' proposed order, however, does not provide for a cap on the

amount the Debtors can expend to pay prepetition amounts owed on account of the Customer Programs.  The Debtors cannot be given a blank check to pay all such prepetition obligations. As such, any final order entered by the Court regarding the Customer Programs Motion should provide that the amount the Debtors are entitled to expend on such prepetition obligations shall not exceed $135 million, absent further order of the Court.

23.    Further, the Debtors seek authority to honor all prepetition obligations with respect to certain customer programs known as "Brighten Programs" in the ordinary course of business, and to continue the Brighten Programs on a postpetition basis. Id. at ¶ 37.  Through these Brighten Programs, the TCEH Debtors subsidize customers to purchase products from the Brighten Debtors.  See id. at ¶ 35-37.  The Brighten Debtors, however, are not TCEH Debtors— they are direct subsidiaries of EFH, not EFCH, and do not guarantee any of TCEH's funded debt. Thus, any payments made by the TCEH Debtors for the purpose of benefitting the Brighten Debtors appear not to provide the TCEH Debtors with any benefit at all.  Thus, prior to receiving authorization to continue participating in the Brighten Programs, the Debtors should be required to demonstrate that such programs provide a corresponding benefit to the TCEH Debtors' estates.

## V.    The TDSP Motion

24.    Pursuant to the TDSP Motion, the Debtors seek entry of a final order authorizing certain Debtors (the "REP Debtors") to assume twenty-three electricity transmission and distribution service provider agreements (the "Delivery Agreements") and to pay any outstanding cure amounts related thereto in accordance with section 365 of the Bankruptcy Code. TDSP Motion ¶ 4-6.  Some of these Delivery Agreements were entered into by the REP Debtors with Oncor Electric Delivery Company LLC ("Oncor"), a non-Debtor affiliate of the Debtors.

Id. at 4. The Debtors estimate that as of the Petition Date, they owed approximately $143.1 million to Oncor on account of such Delivery Agreements. Id.

25.     Notably, however, assumption of the Delivery Agreements could cause the REP Debtors' estates to forfeit any preference or fraudulent transfer claims that they may have on account of the inter-Debtor transactions under the Delivery Agreements. See Kimmelman v. Port Auth. of N.Y. and N.J. (In re Kiwi Int'l Air Lines, Inc.), 344 F.3d 311, 321 (3rd Cir. 2003) (finding that the debtor's assumption of an executory contract precluded the trustee's ability to bring a preference action to recover prepetition payments made by the debtor on account of such contract). Thus, prior to being granted authority to assume any Delivery Agreements with Oncor and to pay any cure amounts related thereto, the Debtors should be required to demonstrate that doing so will not relinquish valuable claims or causes of action that the REP Debtors may have against Oncor in connection with any prepetition transfers made under the Delivery Agreements. Further, the Ad Hoc Group of Unsecured Noteholders requests that any final order entered by the Court with respect to the TDSP Motion contain a reservation of rights that the relief granted therein will in no way prejudice any claims that the TCEH Debtors may have against Oncor with respect to any issues concerning the Delivery Agreements, including, but not limited to, the rates paid or transfers made thereunder.

## RESERVATION OF RIGHTS

26.     The Ad Hoc Group of TCEH Unsecured Noteholders expressly reserves the right to supplement and amend this Objection, seek further discovery with respect to the same and introduce evidence at any hearing relating to the First-Day Motions and this Objection. Further, the Ad Hoc Group of TCEH Unsecured Noteholders reserves the right to respond,

further object, join in or amend any objection herein with respect to any argument or objection made by any person relating to the First-Day Motions.

## **CONCLUSION**

27.    Based on the foregoing, the Ad Hoc Group of TCEH Unsecured Noteholders respectfully requests that the Court deny certain of the final relief requested in the First-Day Motions unless modified to address the objections raised herein.

Dated: May 30, 2014
      Wilmington, Delaware

              FOX ROTHSCHILD LLP

        By: _____

              Jeffrey M. Schlerf (No. 3047)
              John H. Strock (No. 4965)
              L. John Bird (No. 5310)
              919 North Market St., Suite 300
              Wilmington, DE 19801
              Telephone:  (302) 654-7444
              Facsimile:  (302) 463-4971
              jschlerf@foxrothschild.com
              jstrock@foxrothschild.com
              lbird@foxrothschild.com

              and

              WHITE & CASE LLP
              Thomas E Lauria (admitted *pro hac vice*)
              Matthew C. Brown (admitted *pro hac vice*)
              Southeast Financial Center, Suite 4900
              200 South Biscayne Blvd.
              Miami, FL 33131
              Telephone:  (305) 371-2700
              Facsimile:  (305) 358-5744
              tlauria@whitecase.com
              mbrown@whitecase.com

              and

J. Christopher Shore (admitted *pro hac vice*)
Gregory M. Starner (admitted *pro hac vice*)
1155 Avenue of the Americas
New York, NY 10036
Telephone:  (212) 819-8200
Facsimile:  (212) 354-8113
cshore@whitecase.com
gstarner@whitecase.com

*Counsel to the Ad Hoc Group of*
*TCEH Unsecured Noteholders*