**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>ENERGY FUTURE<br>HOLDINGS CORP., *et al.*,<br><br>*Debtors*. | ) Chapter 11<br>)<br>) Case No. 14-10979 (CSS)<br>)<br>) (Jointly Administered)<br>)<br>) Related to Docket No. 477<br>)<br>) Hearing Date: June 5, 2014 at 9:30 a.m.<br>) Objection Deadline: May 31, 2014 at 4:00<br>) p.m. (Extended on Consent) |

**OBJECTION OF CSC TRUST COMPANY OF DELAWARE,
AS INDENTURE TRUSTEE, TO DEBTORS' REQUEST
FOR APPROVAL OF ALTERNATIVE TRANSACTION FEE**

CSC Trust Company of Delaware ("CSC Trust"), as Indenture Trustee (the "10% Indenture Trustee") for the 10% Senior Secured Notes Due 2020 (the "10% First Lien Notes" or the "10% Notes") issued by Debtors under the Indenture dated as of August 17, 2010 (together with all supplements, amendments, and exhibits, the "10% Indenture") between Energy Future Intermediate Holdings LLC ("EFIH"), EFIH Finance Inc. ("EFIH Finance," and together with EFIH, the "EFIH Debtors") and CSC Trust (as successor to The Bank of New York Mellon Trust Company, N.A.), hereby objects to the Alternative Transaction Fee proposed in the Motion of Energy Future Intermediate Holdings Company LLC and EFIH Finance Inc. For Entry Of An Order (A) Approving Postpetition Second Lien Financing (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Authorizing the Use of Cash Collateral, (D) Authorizing the EFIH Second Lien Repayment, (E) Authorizing Entry Into And

1

Payment Of Fees Under the Commitment Letter, And (F) Modifying The Automatic Stay (the "EFIH Second Lien Financing Motion") [Dkt. No. 477].[1]

**PRELIMINARY STATEMENT**

1. The EFIH Debtors' initially attempted to seek approval of numerous complex transactions at a June 5 hearing (day 35 of the case). They now have instead purported to split their supposed "global" transaction and seek early approval of certain parts of it, deferring others. One of those supposedly severed portions still going forward on June 5 is the EFIH Debtors' request for approval of a $57 million "Alternative Transaction Fee" in connection with the Second Lien DIP Facility. The Alternative Transaction Fee is a break-up fee, payable to a self-selected subgroup of unsecured creditors in these cases. That subgroup has proposed to provide a backstop for the EFIH Second Lien DIP Facility (the "Commitment Parties," aka the "PIK Group").

2. The requested break-up fee has no legal or factual justification. The EFIH Debtors' own pleadings and the terms of the transaction itself all point against approval. In short, the PIK Group that is seeking the break-up fee are existing unsecured creditors of EFIH who have every incentive to propose this kind of transaction whether or not they receive early, separate approval of their break-up fee. In addition, there is clear interest by alternate financing parties. Finally, the proposed Second Lien DIP Facility itself does not require approval of the break-up fee before any final hearing, and therefore there is no benefit to the estate in seeking early approval when the Court can consider these matters together. This will avoid a $57 million administrative burden to the estate in the event

---

[1] Capitalized terms defined in the EFIH Second Lien Financing Motion and not otherwise defined herein are used herein with the meanings so defined.

that the Court does not approve the Second Lien DIP Facility but later approves some other transaction.

## BACKGROUND

3. The background set forth in (i) the 10% Indenture Trustee's Preliminary Objection to the EFIH First Lien DIP Financing Motion [Dkt. No. 421] (the "Preliminary EFIH First Lien DIP Financing Objection") and (ii) the 10% Indenture Trustee's Objection to the 6⅞% Settlement, filed contemporaneously herewith, are incorporated herein by reference, as are the allegations of the 10% Indenture Trustee's Complaint [Dkt. No. 470] in the adversary proceeding styled *CSC Trust Co. of Delaware v. Energy Futures Intermediate Holdings LLC (In re Energy Futures Holdings Corp.)*, 14-50363-CSS (Bankr. D. Del. May 15, 2014) (the "Adversary Proceeding"). The 10% Indenture Trustee has secured claims that could give rise to claims under Section 507(b) for failure of adequate protection, which would compete with the break-up fee claims. The Complaint alternatively asserts that even under less favorable decisions reached by some courts, at a minimum the 10% Indenture Trustee could have a significant unsecured claim in these cases.

4. The PIK Group consists of a supermajority (but not all) of the holders of EFIH's 11.25%/12.25% Toggle Notes Due 2018 (the "PIK Notes"). The PIK Notes are junior in priority to two tranches of secured EFIH creditors: nearly $4.0 billion of First Lien Notes (which includes the notes for which CSC Trust is indenture trustee) and over $2.0 billion of Second Lien notes. The First Lien Notes and the Second Lien Notes both have a substantial redemption premium.

5.      The purpose of the EFIH Second Lien DIP Financing is to refinance the second-lien notes, ostensibly to reduce interest payments.  The EFIH Debtors have carefully said that the refinancing will save "cash interest payments," but there are very significant fees and interest-rate escalators (some payable by issuance of additional post-petition debt and some in cash) that may eliminate any actual savings for the EFIH estates.[2]  The Second Lien DIP Financing is also mandatorily convertible into 64% of the equity of a reorganized debtor.

**ARGUMENT**

I.  <u>A Break Up Fee Must Be Necessary to Preserve Value of the Estate and the Debtors Must Show Actual and Demonstrated Benefit</u>

6.      The Alternative Transaction Fee, payable within 5 days of this Court's approval of an alternative transaction, would unquestionably be a postpetition administrative expense claim under section 503(b).  Any claim for the Alternative Transaction Fee is thus governed by Section 503(b) of the Bankruptcy Code.  *See* 11 U.S.C. § 503(b)(1)(A) ("After notice and a hearing, there shall be allowed administrative expenses . . . including . . . the actual, necessary costs and expenses of preserving the estate . . . .").

---

[2]     The base interest rate is 8%, but there are certain fees that aggregate $142.25 million, or another 7.64% of the principal amount of the loan.  The rate can increase substantially if the Oncor TSA Amendment is not approved by July 27, 2014.  *See* EFIH Second Lien Financing Motion, at 13; EFIH Second Lien DIP NPA (providing that Interest on the Tranche A Notes increases by 4%, payable in kind and compounded quarterly, if the Court does not approve the Oncor TSA Amendment by July 27, 2014).  The EFIH Debtors assert that these chapter 11 cases will be confirmed in less than 12 months, which means that the effective interest rate is 15.64%.  That is <u>higher</u> than the rate on the more expensive of the existing 11.25% second lien notes.

On top of the $57 million break-up fee, the EFIH Second Lien DIP Facility has <u>another $380 million fee</u> if another transaction is consummated after approval of the facility.  That fee raises an additional set of objections to be addressed at the hearing on substantive approval.

7. The Third Circuit law applicable to break-up fees is well settled:

> [T]he determination whether break-up fees or expenses are allowable under § 503(b) must be made in reference to general administrative expense jurisprudence. In other words, the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate.

*Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 535 (3d Cir. 1999). A claimant asserting an administrative expense bears the "heavy" burden to demonstrate that the expense, "(i) arose out of a postpetition transaction with the debtor-in-possession, and (ii) directly and substantially benefit[s] the estate." *In re Mid-Am. Waste Sys., Inc.*, 228 B.R. 816, 821 (Bankr. D. Del. 1999). Any benefit to the estate must be actual and demonstrated, not potential or speculative. *In re Bernard Techs., Inc.*, 342 B.R. 174, 180 (Bankr. D. Del. 2006).

8. The *O'Brien* court denied approval of a break-up fee for reasons directly applicable here. It concluded that the bidder seeking a break-up fee would have made its bid even without the assurance of a break-up fee. The record in that case showed that the bidder "had strong financial incentives to undertake the cost of submitting a bid," even in the absence of any promise of reimbursement. *See* 181 F.3d at 537. Thus, even a third-party bidder seeking the award of a break-up fee must demonstrate not only that there was a benefit to the estate from the third party's bid, but also that the break-up fee was necessary to induce the bid. *See, e.g., id.* at 533. As the Third Circuit held in *O'Brien*:

> [I]n some cases a potential purchaser will bid whether or not break-up fees are offered. . . . In such cases, the award of a break-up fee cannot be characterized as necessary to preserve the value of the estate.

181 F.3d at 535.

II. <u>The Transaction Documents Themselves Show that Early Approval of the Break-up Fee Is not Necessary</u>

9. The terms of the proposed Second Lien DIP Facility undermine the need for approval. The documents do not require approval of the break-up fee except at the time of final approval of the financing. There is no "walk-away" right for the PIK Group if the break-up fee is not approved.

10. The Third Circuit has applied the *O'Brien* standard to deny approval of a break-up fee in exactly this circumstance. In the *Reliant Energy Channelview LP* case the facts did not support the assertion that the break-up fee enticed the bidder to make its bid, because the bid was not conditioned on Bankruptcy Court approval of the break-up fee. 594 F.3d 200, 206 (3d Cir. 2006). That is precisely what has occurred here. This Court may deny approval of the Second Lien DIP Facility, and then approve some other, later transaction. There is no need to saddle these estates with a $57 million administrative expense.

III. <u>The PIK Group Did Not Need the Break-up Fee to Entice their Proposal</u>

11. The EFIH Debtors' only justification for the Alternative Transaction Fee consists of conclusory and generic statements, providing no evidence that the fee provides any actual or demonstrated benefit to the estate. Specifically, the EFIH Debtors state in the EFIH Second Lien Financing Motion that:

> i) The Alternative Transaction Fee is necessary and appropriate, was insisted upon by the Commitment Parties, and was necessary to the execution of the Commitment Letter and the Restructuring Support Agreement. EFIH Second Lien Financing Motion, at 32.
>
> ii) Other courts have approved fees similar to the Alternative Transaction Fee in other recent chapter 11 cases. *See id.* at 48-49.

iii) The EFIH Debtors have determined, "in a sound exercise of their reasonable business judgment, that payment of the Alternative Transaction Fee is an effective, commonplace, and necessary means to secure Commitment Parties' agreement to undertake the Equity Conversation and that the amounts contemplated are reasonable by market standards." *Id.* at 48-49.

iv) The Alternative Transaction Fee is reasonable in light of the "unprecedented nature of the EFIH Second Lien DIP Facility, the essential nature of the Investment Commitment to the EFIH Debtors' overall restructuring efforts, and the size and scope of the financing and the effective rights offering commitment." *Id.* at 7.

v) The fees were negotiated at arms' length. *Id.* at 29.

These statements in the moving papers contain no actual facts. They are "threadbare recitals of the elements [to be proved], supported by mere conclusory allegations," which courts reject even at the initial pleading stage in ordinary civil litigation. *In re American Home Mortgage Holdings, Inc.*, 501 B.R. 44, 54-55 (Bankr. D. Del. 2013); s*ee, e.g., Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 220-21 (3d Cir. 2011). They come nowhere near to meeting the evidentiary burden for an administrative claim.

12. The actual facts, as provided in the EFIH Debtors' own statements, make the case against approval of the break-up fee. The Second Lien DIP Financing is supposedly part of the integrated "global" transactions that the EFIH Debtors assert are necessary to deliver value to the unsecured creditors of EFIH, who they assert consists principally of the PIK Group. Thus the PIK Group had every incentive to propose a second lien DIP financing. As noted above, their own transaction documents did not make early approval of the break-up fee a precondition to the DIP loan commitment. This demonstrates that they know they need to make this DIP loan to protect their existing investment.

13. The EFIH Debtors make clear their belief (albeit a mistaken belief) that the RSA is the best opportunity to conclude these chapter 11 cases. They say that the Second Lien DIP Facility is a critical component that will "save interest expense and, more importantly, simultaneously deleverage EFH Corp. and EFIH while providing significant value to unsecured creditors" [which includes the PIK Holders]. *See* First Day Declaration, at 78. That all means that the PIK Group believes they needed to make the DIP proposal, with or without a break-up fee. They cannot also claim that the break-up fee was necessary as an incentive to have them make the proposal.

14. Break-up fees are atypical in circumstances where an existing stakeholder, such as a secured creditor submitting a credit bid or a secured creditor offering debtor-in-possession financing, already has an incentive to submit a bid or propose financing. This situation is no different. The PIK Group offered financing because it is in their interests to do so, and no Alternative Transaction Fee is necessary.

15. The EFIH Second Lien DIP Facility does not appear to have been negotiated at arms length. The parties to the negotiation were the Company and management, who under the terms of this financing will be working for the "lenders," the PIK Group, who are to become 64% equity owners via the conversion. The remainder of the equity also is to go to the PIK Group, in their supposed capacity as the bulk of the unsecured creditors. In other words, management negotiated the break fee with those purporting to be their future employers.

16. The other conceivable outside party to the negotiation was Fidelity, who holds first lien notes, second lien notes and a substantial amount of notes at the parent

company level (EFH). Fidelity could not possibly have provided an arms-length negotiator for the break-up fee, because Fidelity was given a participation of nearly 10% in the EFIH Second Lien DIP Facility as part of its overall settlement in that very same negotiation. Of course they would have agreed to the break-up fee.

IV. There Are Already Competing Proposals, So No Break-Up Fee Is Necessary

17. Beyond all of that, there is also a simple reality. There are now two competing proposals for a second lien DIP, both on better terms than are proposed. One is by the prepetition second lien noteholders, with whom the EFIH Debtors have publicly agreed to negotiate in good faith. The second is a new proposal that the holders of 10% First Lien Notes have put forward, together with a request to meet and negotiate with the EFIH Debtors.[3]

18. There is no justification for approval of the requested break-up fee.

WHEREFORE, this the 10% Indenture Trustee respectfully requests that this Court (i) not approve the Alternative Transaction Fee, and (ii) grant such other relief as is appropriate under the circumstances.

---

[3] *See* Declaration of Christopher J. Kearns, Executive Director of Capstone Advisory Group, LLC, attached hereto as Exhibit A; Letter Regarding Second Priority DIP Financing Proposal for Energy Future Intermediate Holdings Company LLC, attached hereto as Exhibit B.

Dated:  May 31, 2014

    COLE, SCHOTZ, MEISEL, FORMAN
    & LEONARD, P.A.

    */s/ Nicholas J. Brannick*
    Norman L. Pernick (DE No. 2290)
    J. Kate Stickles (DE No. 2917)
    Nicholas J. Brannick (DE No. 5721)
    500 Delaware Avenue, Suite 1410    Warren A. Usatine
    Wilmington, DE  19801    25 Main Street,
    Telephone: 302-652-3131    P.O. Box 800
    Facsimile:  302-652-3117    Hackensack, NJ 07602
    npernick@coleschotz.com    Telephone: 201-489-3000
    kstickles@coleschotz.com    Facsimile:  201-489-1536
    nbrannick@coleschotz.com    wusatine@coleschotz.com

    --and--

    ROPES & GRAY LLP
    Keith H. Wofford    D. Ross Martin
    Mark R. Somerstein    Andrew G. Devore
    1211 Avenue of the Americas    Prudential Tower
    New York, NY 10036-8704    800 Boylston Street
    Telephone: 212-596-9000    Boston, MA  02199-3600
    Facsimile:  212-596-9090    Telephone: 617-951-7000
    Keith.Wofford@ropesgray.com    Facsimile: 617-951-7050
    Mark.Somerstein@ropesgray.com    Ross.Martin@ropesgray.com
                                                                  Andrew.Devore@ropesgray.com

    --and--

    DRINKER BIDDLE & REATH LLP
    James H. Millar
    1177 Avenue of the Americas
    41st Floor
    New York, NY 10036-2714
    Telephone:  212-248-3264
    Facsimile:   212-248-3141
    James.Millar@dbr.com

    *Counsel for CSC Trust Company of Delaware,*
    *as successor indenture trustee*