**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**OMNIBUS REPLY OF THE AD HOC COMMITTEE OF TCEH FIRST
LIEN CREDITORS TO OBJECTIONS TO THE MOTION OF TEXAS COMPETITIVE
ELECTRIC HOLDINGS COMPANY LLC AND CERTAIN OF ITS
DEBTOR AFFILIATES FOR ENTRY OF INTERIM AND FINAL
ORDERS (A) AUTHORIZING USE OF CASH COLLATERAL,
(B) GRANTING ADEQUATE PROTECTION, (C) MODIFYING
THE AUTOMATIC STAY, AND (D) SCHEDULING A FINAL HEARING**

---

[1]   The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810.  The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201.  Due to the large number of debtors in these chapter 11 cases, which are being jointly administered on an interim basis, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT .................................................................................................2

REPLY .....................................................................................................................................6

I.  THE ADEQUATE PROTECTION PROVISIONS OF THE FINAL CASH
    COLLATERAL ORDER ARE REASONABLE AND CUSTOMARY AND SHOULD
    BE APPROVED. ..............................................................................................................6

    A.  The Prepetition First Lien Creditors Are Entitled to Adequate
        Protection. .............................................................................................................6

    B.  The Final Cash Collateral Order Appropriately Grants the
        Prepetition First Lien Creditors Adequate Protection Liens and
        Superpriority Claims on Unencumbered Assets. ..................................................12

II. THE TCEH DEBTORS' WAIVERS OF RIGHTS UNDER SECTIONS 506(C) AND
    552(B) OF THE BANKRUPTCY CODE ARE STANDARD AND PERMISSIBLE. ....16

    A.  The Waiver Under Section 506(c) of the Bankruptcy Code Is
        Appropriate and Should Be Approved...................................................................16

    B.  The Waiver Under Section 552(b) of the Bankruptcy Code Is
        Appropriate and Should Be Approved...................................................................18

III. THERE IS NO BASIS FOR THE COMMITTEE'S REQUEST THAT PREPETITION
     FIRST LIEN CREDITORS PROSPECTIVELY WAIVE THEIR ENTITLEMENT TO
     DEFAULT RATE INTEREST. .......................................................................................19

IV.  THE COMMITTEE'S INVESTIGATION BUDGET AND THE LIEN CHALLENGE
     PERIOD ARE MORE THAN SUFFICIENT AND SHOULD BE APPROVED.............20

V.   THE TCEH DEBTORS' WAIVER OF MARSHALLING RIGHTS IS STANDARD
     AND PERMISSIBLE. ....................................................................................................22

VI.  THE UNSECURED CREDITORS' OTHER MISCELLANEOUS OBJECTIONS
     SHOULD BE OVERRULED. .........................................................................................23

VII. AURELIUS' OBJECTION IS A TRANSPARENT ATTEMPT TO OBTAIN A
     DISPROPORTIONATE SHARE OF THE FIRST LIEN ADEQUATE PROTECTION
     PAYMENTS AND SHOULD BE OVERRULED...........................................................24

    A.  The Final Cash Collateral Order, as Modified, Will Reserve All
        Prepetition First Lien Creditors' Rights and Therefore the Aurelius
        Objection Is Moot. ...............................................................................................27

i

B.      If the Court Is Nevertheless Inclined to Consider the Merits of the
        Aurelius Objection, It Fails for a Variety of Reasons and Should
        Be Overruled. .................................................................................................28

CONCLUSION ...........................................................................................................................39

## Table of Authorities

**Page(s)**

**Cases**

*10 Ellicott Square Court Corp.* v. *Mountain Valley Indem. Co.*,
   634 F.3d 112 (2d Cir. 2011) ............................................................................. 34, 35

*In re 354 E. 66th St. Realty Corp.*,
   177 B.R. 776 (Bankr. E.D.N.Y. 1995) ....................................................................... 7

*In re Advanced Mktg. Servs., Inc.*,
   360 B.R. 421 (Bankr. D. Del. 2007) ........................................................................ 23

*In re Arlco, Inc.*,
   239 B.R. 261 (Bankr. S.D.N.Y. 1999) ..................................................................... 23

*Aurelius Capital Master, Ltd.* v. *Tousa Inc.*,
   Nos. 08-61317-CIV, 08-61335-CIV, 2009 WL 6453077 (S.D. Fla. Feb. 6,
   2009) ................................................................................................................ 29, 30

*Bank of N.Y.* v. *Epic Resorts-Palm Springs Marquis Villas, LLC (In re Epic
   Capital Corp.)*,
   290 B.R. 514 (Bankr. D. Del. 2003) .......................................................................... 8

*Becker* v. *North's Rests., Inc.*,
   967 P.2d 1246 (Or. Ct. App. 1998) .......................................................................... 37

*Chrzan* v. *Workers' Comp. Appeal Bd. (Allied Corp.)*,
   805 A.2d 42 (Pa. Commw. Ct. 2002) ....................................................................... 36

*In re Continental Airlines*, *Inc.*,
   146 B.R. 536 (Bankr. D. Del. 1992) ........................................................................... 7

*Crocker Nat'l Bank* v. *Am. Mariner Indus., Inc. (In re Am. Mariner Indus., Inc.)*,
   734 F.2d 426 (9th Cir. 1984) ................................................................................... 11

*In re Erickson Ret. Cmtys., LLC*,
   425 B.R. 309 (Bankr. N.D. Tex. 2010) ............................................................... 28, 30

*Furrow* v. *Commissioner of Internal Revenue*,
   292 F.2d 604 (10th Cir. 1961) ................................................................................. 36

*Galli* v. *Metz*,
   973 F.2d 145 (2d Cir. 1992) ..................................................................................... 35

*In re General Growth Props., Inc.*,
    412 B.R. 122 (Bankr. S.D.N.Y. 2010) ...................................................................19

*In re Gibson Grp., Inc.*,
    151 B.R. 133 (Bankr. S.D. Ohio 1993) .................................................................23

*Hartford Underwriters Ins. Co.* v. *Union Planters Bank, N.A.*,
    530 U.S. 1 (2000) ...................................................................................................16

*Ion Media Networks, Inc.* v. *Cyrus Select Opportunities Master Fund, Ltd. (In re Ion Media Networks, Inc.)*,
    419 B.R. 585 (Bankr. S.D.N.Y. 2009) .............................................................28, 29

*J.H. Streiker & Co.* v. *SeSide Co. (In re SeSide Co.)*,
    152 B.R. 878 (E.D. Pa. 1993) ..................................................................................7

*In re LTAP US, LLLP*,
    No. 10-14125 (KG), 2011 WL 671761 (Bankr. D. Del. Feb. 18, 2011) ..................12

*In re Muma Servs.*,
    322 B.R. 541 (Bankr. D. Del. 2005) .......................................................................18

*In re Pac. Lifestyle Homes, Inc.*,
    No. 08-45328, 2009 WL 688908 (Bankr. W.D. Wa. Mar. 16, 2009) ......................12

*Postlewaite* v. *McGraw-Hill, Inc.*,
    411 F.3d 63 (2d Cir. 2005) .....................................................................................34

*In re Residential Capital, LLC*,
    497 B.R. 403 (Bankr. S.D.N.Y. 2013) ....................................................................38

*Resolution Trust Corp.* v. *Swedeland Dev. Grp. (In re Swedeland Dev. Grp.)*,
    16 F.3d 552 (3d Cir. 1994) .......................................................................................7

*In re Satcon Tech. Corp.*,
    No. 12-12869 (KG), 2012 WL 6091160 (Bankr. D. Del. Dec. 7, 2012) ...................7

*U.S. Bank, N.A.* v. *Barclays Bank PLC*,
    No. 11 Civ. 9199 (WHP), 2013 WL 1180414 (S.D.N.Y. Mar. 12, 2013) ........34, 36, 37

*In re U.S. Lines, Inc.*,
    199 B.R. 476 (Bankr. S.D.N.Y. 1996) ....................................................................38

*United Sav. Ass'n of Tex.* v. *Timbers of Inwood Forest Assocs., Ltd.*,
    484 U.S. 365 (1988) .............................................................................................8, 38

*Vanston Bondholders Protective Comm.* v. *Green*,
    329 U.S. 156 (1946) ...........................................................................................37, 38

*In re Vest Assocs.*,
  217 B.R. 696 (Bankr. S.D.N.Y. 1998) ..................................................................38

*In re W. Texas Mktg. Corp.*,
  54 F.3d 1194 (5th Cir. 1995) ............................................................................37

**Statutes**

11 U.S.C. § 361 ..................................................................................................9

11 U.S.C. § 361(2) ............................................................................................12

11 U.S.C. § 363(e) ..............................................................................................7

11 U.S.C. § 506(b) ............................................................................................38

11 U.S.C. § 506(c) ......................................................................................16, 17

11 U.S.C. § 510(a) ............................................................................................28

11 U.S.C. § 552(b) ............................................................................................18

**Other Authorities**

Black's Law Dictionary (10th ed. 2014)..........................................................35

Del. Bankr. L.R. 4001-2(a)(i)(B) ....................................................................22

Merriam-Webster's Collegiate Dictionary (11th ed. 2003)..............................35

Webster's Third New International Dictionary (1993)......................................35

The ad hoc committee of certain unaffiliated holders of first lien senior secured claims against the TCEH Debtors[2] (the "Ad Hoc Committee of TCEH First Lien Creditors")[3] hereby files this omnibus reply (the "Reply") to the following objections (collectively, the "Objections"):

    (i)    *Objection of the Official Committee of Unsecured Creditors* (the "Committee") *to the Motion of Texas Competitive Electric Holdings Company LLC and Certain of Its Debtor Affiliates for Entry of Interim and Final Orders (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing* [Docket No. 641] (the "Committee Objection");

    (ii)    *Objection of Law Debenture Trust Company of New York, as Indenture Trustee* (the "Unsecured Creditor Trustee") *to (1) Motion of Texas Competitive Electric Holdings Company LLC and Certain of Its Debtor Affiliates for Entry of a Final Order (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection and (C) Modifying the Automatic Stay and (2) Motion of Texas Competitive Electric Holdings Company LLC and Certain of Its Debtor Affiliates, for Entry of a Final Order (A) Approving Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims and (C) Modifying the Automatic Stay* [Docket No. 648] (the "Unsecured Creditor Trustee Objection");

    (iii)    *Supplemental Omnibus Objection of the Ad Hoc Group of TCEH Unsecured Noteholders* (the "Ad Hoc Noteholder Group," and together with the Committee and the Unsecured Creditor Trustee, the "Unsecured Creditors") *to (I) the Motion of Texas Competitive Electric Holdings Company LLC and Certain of Its Debtor Affiliates for Entry of Interim and*

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the proposed *Final Order (A) Authorizing Use of Cash Collateral for Texas Competitive Electric Holdings Company LLC and Certain of its Debtor Affiliates, (B) Granting Adequate Protection, and (C) Modifying the Automatic Stay,* a copy of which was filed by the TCEH Debtors on May 22, 2014 [Docket No. 597] (the "Final Cash Collateral Order").

[3]    The composition of the Ad Hoc Committee of TCEH First Lien Creditors is set forth in the *Amended Verified Statement of the Ad Hoc Committee of TCEH First Lien Creditors Pursuant to Bankruptcy Rule 2019* [Docket No. 607]. The members of the Ad Hoc Committee of TCEH First Lien Creditors hold or manage, in the aggregate, approximately $12.3 billion of indebtedness incurred under the First Lien Facilities (which represents approximately 50.5% of the total indebtedness outstanding under such facilities as of the Petition Date).

*Final Orders (A) Approving Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing, and (II) the Motion of Texas Competitive Electric Holdings Company LLC and Certain of Its Debtor Affiliates for Entry of Interim and Final Orders (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing* [Docket No. 678] (the "Ad Hoc Noteholder Group Objection"); and

(iv)    *Aurelius Capital Management, LP's* ("Aurelius") *Limited Objection to the Motion of Texas Competitive Electric Holdings Company LLC and Certain of Its Debtor Affiliates for Entry of Interim and Final Orders (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing* [Docket No. 632] (the "Aurelius Objection").

In support of this Reply, the Ad Hoc Committee of TCEH First Lien Creditors respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      There already have been – and no doubt will continue to be – contentious issues in these Chapter 11 Cases.  Approval of the Final Cash Collateral Order should not be one of them.  Without the DIP Facility and use of the Prepetition First Lien Creditors' Cash Collateral, the TCEH Debtors cannot continue operating in the ordinary course of business.  To continue their operations in the ordinary course, which unquestionably benefits *all* of the TCEH Debtors' stakeholders, the TCEH Debtors, in the exercise of their sound business judgment, seek authority to incur *billions of dollars* of priming DIP loans and to use *billions of dollars* of the Prepetition First Lien Creditors' Cash Collateral throughout these Chapter 11 Cases.  In such circumstances, it is axiomatic that the Prepetition First Lien Creditors are entitled to adequate protection.

2.      The Final Cash Collateral Order is not complicated or unusual. Notwithstanding the Unsecured Creditors' hyperbolic rhetoric to the contrary, it includes standard and customary provisions (including a prototypical adequate protection package

providing for adequate protection payments, superpriority claims, replacement liens and the payment of professional fees and expenses) that this Court has approved on many occasions in the past, and that are entirely appropriate in light of the facts and circumstances of these Chapter 11 Cases.  What is perhaps most remarkable about the Final Cash Collateral Order is not what it provides, but rather what it omits.  Specifically, the Final Cash Collateral Order does not include (i) a single chapter 11 case milestone[4] or (ii) a cash collateral budget that tightly governs and controls the TCEH Debtors' expenditures of Cash Collateral.  The TCEH Debtors fought vigorously to keep these secured creditor protections out of the Final Cash Collateral Order.  Ultimately, as part of an integrated settlement and compromise on a host of issues, the Ad Hoc Committee of TCEH First Lien Creditors agreed to support entry of the Final Cash Collateral Order without these typical secured creditor protections, which unquestionably redounds to the benefit of all of the TCEH Debtors' junior creditors.  As a result, the Final Cash Collateral Order provides the TCEH Debtors with access to billions of dollars of Cash Collateral for up to eighteen months, and facilitates the TCEH Debtors' incurrence of up to nearly $4.5 billion of priming DIP loans, thereby ensuring that the TCEH Debtors will have sufficient liquidity (and access to critical letters of credit) to fund their operations during these Chapter 11 Cases.

---

[4]    Certain of the Unsecured Creditors conflate the case milestones in the Restructuring Support Agreement ("RSA") with the relief sought in the Final Cash Collateral Order.  *See, e.g.*, Committee Objection ¶ 3.  The Final Cash Collateral Order does not impose a single chapter 11 case milestone.  Moreover, termination of the RSA does not trigger an event of default under the Final Cash Collateral Order.  While the RSA itself includes certain case milestones (as almost all restructuring support agreements do), such milestones, and indeed the RSA in its entirety, are irrelevant to the Court's consideration of the Final Cash Collateral Order.  Put simply, regardless of whether the TCEH Debtors continue down the restructuring path envisioned by the RSA, including compliance with the various restructuring milestones set forth therein, the TCEH Debtors will continue to have access to *billions of dollars* of the Prepetition First Lien Creditors' Cash Collateral for up to eighteen months (subject only to the terms and conditions set forth in the Final Cash Collateral Order).  Far from serving as a "Trojan Horse," as the Ad Hoc Noteholder Group colorfully (but inaccurately) claims, the Final Cash Collateral Order provides an essential bedrock from which any number of potential restructuring alternatives can progress (whether pursuant to the RSA or otherwise).

3.      The Unsecured Creditors' two principal grievances are fundamentally at odds with one another.  On the one hand, they strenuously argue that the Prepetition First Lien Creditors are not entitled to receive adequate protection payments (or that such payments are "excessive") based upon the premise that there will be *no* diminution in the value of the Prepetition First Lien Creditors' interests in the Prepetition Collateral.  And yet, on the other hand, the Unsecured Creditors just as stridently oppose the imposition of adequate protection liens on unencumbered assets, claiming that such liens will dissipate the only remaining assets available for unsecured creditor recoveries.  Of course, the latter argument necessarily assumes that the extent of diminution will, in fact, be so dramatic that the Prepetition First Lien Creditors will have to resort to seeking recoveries from these previously unencumbered assets.

4.      The Unsecured Creditors cannot have it both ways, and the Ad Hoc Committee of TCEH First Lien Creditors submits that the proposed adequate protection package set forth in the Final Cash Collateral Order strikes the appropriate balance between these and other competing concerns. The Prepetition First Lien Creditors (who are potentially undersecured by billions of dollars) have both agreed to be primed by a $4.475 billion DIP Facility, and have also agreed to forgo many of the standard rights and powers that secured lenders typically exert through consensual cash collateral orders (such as case milestones and budget restrictions).  As described in greater detail below, each of the provisions of the Final Cash Collateral Order that the Unsecured Creditors attack is consistent with common practice within this District and is narrowly tailored and necessary under the circumstances to protect the Prepetition First Lien Creditors' interests in the Prepetition Collateral.

5.      Throughout their proverbial "everything but the kitchen sink" objections, the Unsecured Creditors include a panoply of miscellaneous comments and objections regarding

various standard provisions in the Final Cash Collateral Order.  In certain instances, the Ad Hoc

Committee of TCEH First Lien Creditors has expressed to the Committee's proposed counsel a

willingness to make concessions to accept these comments.  In all other instances, the Unsecured

Creditors' scattershot objections should be overruled.  The Final Cash Collateral Order is the

result of extensive and hard-fought negotiations between certain of the Prepetition First Lien

Creditors and the TCEH Debtors and reflects a package of integrated compromises and

settlements on a variety of critical case issues.  The Unsecured Creditors should not have a line

item veto enabling them to strike those provisions they dislike, while nevertheless benefiting

from the Prepetition First Lien Creditors' willingness to be primed by a multibillion dollar DIP

Facility, a $50 million professional fee Carve Out and the use of Cash Collateral for up to 18

months.  Approval of the Final Cash Collateral Order is critical to the TCEH Debtors' ability to

continue operating in the ordinary course of business, is fair and equitable in light of the

circumstances of these Chapter 11 Cases, and should be approved in its entirety.

6.      Finally, a lone Prepetition First Lien Creditor – Aurelius – objects to entry

of the Final Cash Collateral Order, ostensibly in the interests of ensuring an equitable allocation

of the First Lien Adequate Protection Payments.[5]  Of course, Aurelius' motives are anything but

altruistic, and it is clear that its proposed allocation mechanism, far from being equitable, would

result in holders of the First Lien Notes receiving a disproportionate share of the First Lien

Adequate Protection Payments.  Such an allocation is neither supported by the plain terms of the

---

[5]    While each member of the Ad Hoc Committee of TCEH First Lien Creditors supports entry of the Final Cash
Collateral Order, the sections of this Reply that address the merits of the arguments raised by Aurelius are
joined by all such members except Centerbridge Partners, L.P., Franklin Advisers, Inc., Franklin Mutual
Advisers, LLC and Paulson & Co., Inc, who join in the sections of this Reply that address the arguments raised
by Aurelius only to the extent they argue that Aurelius' Objection is moot.  Each member of the Ad Hoc
Committee of TCEH First Lien Creditors, in its individual capacity, reserves all rights with respect to the issues
raised by Aurelius and the related arguments set forth herein.

Interim or Final Cash Collateral Orders nor, to the extent it is relevant, the First Lien

Intercreditor Agreement.

7.      Nevertheless, in an effort to resolve the Aurelius Objection, the TCEH

Debtors, the First Lien Collateral Agent and the Ad Hoc Committee of TCEH First Lien

Creditors have agreed in principle to revise the Final Cash Collateral Order to both (i) fully

reserve all Prepetition First Lien Creditors' rights with respect to the two potential allocation

calculations for the First Lien Adequate Protection Payments discussed below and (ii) establish

an escrow account to hold back amounts equal to the difference between the two allocation

formulas, which escrow amount would only be distributed to Prepetition First Lien Creditors

upon entry of an order by this Court or another court of competent jurisdiction resolving the

allocation dispute.[6]  As a result of these modifications, the Court *does not now need to decide* the

issues raised in the Aurelius Objection, as these changes effectively render it moot.

## REPLY

**I.      The Adequate Protection Provisions of the Final Cash Collateral Order Are Reasonable and Customary and Should Be Approved.**

**A.      The Prepetition First Lien Creditors Are Entitled to Adequate Protection.**

8.      The TCEH Debtors seek final approval of a multibillion dollar priming

DIP Facility which, together with the concomitant use of the Prepetition First Lien Creditors'

Cash Collateral, are critical to the TCEH Debtors' continuing operations and will maximize the

value of the TCEH Debtors' estates for the benefit of all of their stakeholders.  *See* Goldstein

Declaration ¶ 14 [Docket No. 71] ("An inability to use [the Prepetition First Lien Creditors' Cash

Collateral] during these chapter 11 cases could cripple the TCEH Debtors' business operation.

---

[6]      The TCEH Debtors, the First Lien Collateral Agent and the Ad Hoc Committee of TCEH First Lien Creditors continue to discuss the precise modifications to the Final Cash Collateral Order necessary to effectuate these provisions.  The parties intend to submit a revised form of order reflecting such changes in advance of the hearing on June 5, 2014.

Indeed, the TCEH Debtors must use their cash to, among other things, continue the operation of their business in an orderly manner, maintain business relationships with vendors, suppliers, and customers, pay employees, fulfill regulatory obligations, and satisfy other working capital and operational needs—all of which are necessary to preserve and maintain the TCEH Debtors' going-concern value and, ultimately, effectuate a successful reorganization"). The Objections do not present any evidence that puts into question these basic facts.

9. It is also unquestionable that the Prepetition First Lien Creditors are entitled to adequate protection. *See* 11 U.S.C. § 363(e); *Resolution Trust Corp.* v. *Swedeland Dev. Grp. (In re Swedeland Dev. Grp.)*, 16 F.3d 552, 564-565 (3d Cir. 1994) ("[T]he whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy." (quoting *MBank Dallas, N.A.* v. *O'Conner (In re O'Connor)*, 808 F.2d 1393, 1396 (10th Cir. 1987))); *J.H. Streiker & Co.* v. *SeSide Co. (In re SeSide Co.)*, 152 B.R. 878, 881 (E.D. Pa. 1993) ("anyone holding an interest in cash collateral is entitled to adequate protection of that interest"); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012) ("The focus of [the adequate protection] requirement is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use by the debtor."); *In re 354 E. 66th St. Realty Corp.*, 177 B.R. 776, 782 (Bankr. E.D.N.Y. 1995) ("The purpose or intent of granting adequate protection payments are to maintain the status quo for that creditor and to protect the creditor from diminution or loss of the value of its collateral during the ongoing Chapter 11 case."); *In re Continental Airlines*, *Inc.*, 146 B.R. 536, 539-40 (Bankr. D. Del. 1992).

10. Indeed, this Court recognized as much at the first-day full blown evidentiary hearing. *See* Transcript of Hearing at 300, *In re Energy Future Holdings Corp.*, No.

14-10979 (CSS) (Bankr. D. Del. May 1, 2014) ("[The Prepetition First Lien Creditors] are entitled to adequate protection in – if they're being primed. I think they are arguably entitled to adequate protection that would take them from a current undersecured basis all the way topped up to a secured basis because until they get there, nobody is otherwise entitled to get in front of them").

11.      Nevertheless, the Unsecured Creditors persist in arguing that the Prepetition First Lien Creditors are not entitled to adequate protection payments (or that the contemplated payments are "excessive"), either because (i) the Prepetition First Lien Creditors are undersecured and therefore not entitled to postpetition interest, or (ii) there is purportedly no evidence *today* that the Prepetition Collateral is expected to or will actually decrease in value during the pendency of the Chapter 11 Cases. *See, e.g.*, Committee Objection ¶¶ 15, 27-28; Unsecured Creditor Trustee Objection ¶¶ 6-7; Ad Hoc Noteholder Group Objection ¶ 19. Both arguments are misplaced and fail as a matter of law.

12.      With respect to the first argument, courts (including the United States Supreme Court) have consistently held that undersecured creditors are entitled to adequate protection of their interests in collateral. *See, e.g.*, *United Sav. Ass'n of Tex.* v. *Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 370 (1988); *Bank of N.Y.* v. *Epic Resorts-Palm Springs Marquis Villas, LLC (In re Epic Capital Corp.)*, 290 B.R. 514, 526 (Bankr. D. Del. 2003). Whether a secured creditor is or remains undersecured or oversecured during a chapter 11 case is irrelevant to the determination of whether that secured creditor is entitled to adequate protection of its interest in collateral as it is consumed during the bankruptcy. Notably, the payments contemplated under the Final Cash Collateral Order are adequate protection payments, *not payments of postpetition interest*. Thus, all parties' rights with regard to reallocation of the

8

adequate protection payments later in the Chapter 11 Cases, if appropriate, are expressly reserved.  Final Cash Collateral Order ¶ 5(d).

13.    As to the second point, the Unsecured Creditors not only misstate the law, but they misstate the relief the TCEH Debtors seek.  *See* Committee Objection ¶ 7.  First, there is no requirement under section 361 of the Bankruptcy Code that a secured lender must make a *prima facie* showing of actual diminution in value at the outset of a case before a debtor can agree to provide prophylactic provisions designed to protect against the risk of future diminution in value.  *See* 11 U.S.C. § 361.  Moreover, the Final Cash Collateral Order explicitly provides that the TCEH Debtors' grant of adequate protection is *only to the extent of* Diminution in Value of the Prepetition First Lien Creditors' interest in the Prepetition Collateral.  If the Prepetition First Lien Creditors are determined at a later date to have not suffered diminution, then the Prepetition First Lien Creditors will not be entitled to a distribution on account of their Adequate Protection Liens or 507(b) Claims, and there will be no prejudice to unsecured creditors.

14.    In any event, there certainly is a material risk of there being future Diminution in Value of the Prepetition Collateral.  For example, the Committee concedes, as it must, that the TCEH Debtors anticipate posting as much as *$1.9 billion* in postpetition letters of credit, all of which must be cash collateralized under the DIP Facility.  *See* Committee Objection ¶ 18; Notice of Filing of Budget in Connection with the TCEH Debtors' Financing [Docket No. 599].  By definition, every dollar that is drawn on these letters of credit will prime the Prepetition First Lien Creditors by an equal amount.  While the Committee makes the convenient and unfounded assumption that these letters of credit will not be drawn, that is not a risk the Prepetition First Lien Creditors can – or are legally required – to underwrite.  In sum, the TCEH Debtors will require substantial borrowing capacity under the DIP Facility (irrespective of the

amounts used to fund the First Lien Adequate Protection Payments) to continue their operations in the ordinary course of business (including to address unanticipated bumps in the road ahead), and such borrowings present the real risk of Diminution in Value of the Prepetition First Lien Creditors' interests in their collateral.  As a result, the adequate protection afforded to the Prepetition First Lien Creditors under the Final Cash Collateral Order is entirely appropriate.

15.    Finally, the Unsecured Creditors decry the purportedly "excessive" nature of the First Lien Adequate Protection Payments.  *See, e.g.*, Committee Objection ¶¶ 24-28; Unsecured Creditor Trustee Objection ¶ 8; Ad Hoc Noteholder Group Objection ¶ 24.  This argument is a red herring and should be rejected by the Court, for at least three reasons.

16.    *First*, while the quantum of First Lien Adequate Protection Payments may seem high in absolute terms – as all dollar amounts in these Chapter 11 Cases seemingly do – the rate at which the TCEH Debtors are making adequate protection payments (LIBOR + 450bps *per annum*) reflects a blended rate of the prepetition non-default contract rates of interest on the TCEH Debtors' various tranches of prepetition first lien debt.  Courts in this District and elsewhere have routinely approved adequate protection payments that are calculated in a manner consistent with a secured creditor's prepetition rate of interest."  *See, e.g., In re SP Newsprint Holdings LLC*, Case No. 11-13649 (CSS) (Bankr. D. Del. Jan. 25, 2012) [Docket No. 388] (final order providing for periodic cash payments at non-default rate of interest as part of adequate protection package); *In re Xerium Techs.*, *Inc.*, Case No. 10-11031 (KJC) (Bankr. D. Del. Apr. 28, 2010) [Docket No. 156] (same); *In re Telogy, LLC*, Case No. 10-10206 (MFW) (Bankr. D. Del. Mar. 19, 2010) [Docket No. 195] (same); *In re Plumbing Holdings Corp.*, Case No. 09-14413 (CSS) (Bankr. D. Del. Jan. 26, 2010) [Docket No. 141] (final order providing for periodic cash payments to first lien lenders at default rate of interest as part of adequate protection

package); *In re Penn Traffic Co.*, Case No. 09-14078 (PJW) (Bankr. D. Del. Jan. 25, 2010)

[Docket No. 460] (final order providing for periodic cash payments to first lien lenders at default

rate of interest as part of adequate protection package); *In re Freedom Commcn's Holdings, Inc.*,

Case No. 09-13046 (BLS) (Bankr. D. Del. Oct. 15, 2009) [Docket No. 257] (final order

providing for periodic cash payments to lenders at rate of interest in effect immediately prior to

the petition date as part of adequate protection package).

17.    *Second*, regardless of the rate at which such adequate protection payments

are being calculated, no creditors are actually prejudiced by such payments.  This is because (i) if

the Prepetition First Lien Creditors prove to be oversecured at the conclusion of these Chapter 11

Cases, then they will be entitled to payment of postpetition interest pursuant to section 506(b) of

the Bankruptcy Code, which would likely be paid at an amount *equal to or greater than LIBOR*

*+ 450bps per annum,* and (ii) if the Prepetition First Lien Creditors prove to be undersecured at

the conclusion of these Chapter 11 Cases, then the Final Cash Collateral Order fully reserves all

rights to recharacterize or reallocate such prior payments (whether as payments of principal,

interest or otherwise) after payment, of course, of any amounts to compensate for any actual

Diminution in Value of the Prepetition Collateral.  *See* Final Cash Collateral Order ¶ 5(d).  Thus,

in either event, no parties in interest will be prejudiced by the amount of First Lien Adequate

Protection Payments.

18.    *Third,* the form of a secured creditor's adequate protection package is

firmly within the province of a debtor's business judgment.  *See, e.g.*, *Crocker Nat'l Bank* v. *Am.*

*Mariner Indus., Inc. (In re Am. Mariner Indus., Inc.)*, 734 F.2d 426, 435 (9th Cir. 1984)

("Consistent with the policies behind sections 361 and 362, the debtor should be permitted

maximum flexibility in structuring a proposal for adequate protection.").  Accordingly, it was

solely within the TCEH Debtors' – not the Unsecured Creditors' – business judgment to determine the magnitude of the First Lien Adequate Protection Payments, recognizing that without such payments the Prepetition First Lien Creditors would not have consented to the use of their Cash Collateral.

**B.     The Final Cash Collateral Order Appropriately Grants the Prepetition First Lien Creditors Adequate Protection Liens and Superpriority Claims on Unencumbered Assets.**

19.     The Unsecured Creditors strenuously object to providing the Prepetition First Lien Creditors with adequate protection liens on certain unencumbered assets, most notably the Segregated Cash[7] and avoidance action proceeds.  *See, e.g.*, Committee Objection ¶¶ 20-23; Unsecured Creditor Trustee Objection ¶¶ 4-5; Ad Hoc Noteholder Group Objection ¶¶ 23-27. The granting of adequate protection liens and superpriority claims on previously unencumbered assets (including the proceeds of Avoidance Actions) is a customary form of adequate protection that is specifically contemplated by section 361(2) of the Bankruptcy Code.  11 U.S.C. § 361(2) ("such adequate protection may be provided by . . . (2) providing . . . an *additional* or replacement lien . . . .") (emphasis added).  This makes perfect sense, as the granting of replacement liens on, and superpriority claims with recourse to, assets that are already subject to the Prepetition First Lien Creditors' existing prepetition liens does not provide any incremental protection to the Prepetition First Lien Creditors.[8]

---

[7]     The Ad Hoc Committee of TCEH First Lien Creditors reserves all rights, claims and defenses with respect to the Segregated Cash, including as to whether the Segregated Cash constitutes Cash Collateral.

[8]     Indeed, courts have recognized that such replacement liens are of little, if any, real value.  *See In re LTAP US, LLLP*, No. 10-14125 (KG), 2011 WL 671761, at *3 (Bankr. D. Del. Feb. 18, 2011) ("Providing [a secured creditor] with a replacement lien on assets against which it already has a lien is illusory."); *In re Pac. Lifestyle Homes, Inc.*, No. 08-45328, 2009 WL 688908, at *11 (Bankr. W.D. Wa. Mar. 16, 2009) (rejecting proposed replacement lien on proceeds of future sales as adequate protection where creditor already had liens on such proceeds).

20.     It is thus not surprising that courts in this District routinely approve the granting of adequate protection liens on unencumbered assets, including avoidance action proceeds.  *See, e.g.*, *In re Noble Logistics, Inc.*, Case No. 14-10442 (CSS) (Bankr. D. Del. Apr. 2, 2014) [Docket No. 117]; *In re Orchard Supply Hardware Stores Corp.*, Case No. 13-11565 (CSS) (Bankr. D. Del. July 19, 2013) [Docket No. 253]; *In re Coda Holdings, Inc.*, Case No. 13-11153 (CSS) (Bankr. D. Del. May 29, 2013) [Docket No. 187]; *In re Rotech Healthcare Inc.*, Case No. 13-10741 (PJW) (Bankr. D. Del. May 14, 2013) [Docket No. 147]; *In re Ormet Corp.*, Case No. 13-10334 (MFW) (Bankr. D. Del. Mar. 22, 2013) [Docket No. 147]; *In re School Specialty, Inc.*, Case No 13-10125 (KJC) (Bankr. D. Del. Feb. 26, 2013) [Docket No. 299]; *In re Contract Research Solutions Inc.*, Case No. 12-11004 (KJC) (Bankr. D. Del. May 9, 2012) [Docket No. 251]; *In re SP Newsprint Holdings LLC*, Case No. 11-13649 (CSS) (Bankr. D. Del. Jan. 25, 2012) [Docket No. 388]; *In re Evergreen Solar, Inc.*, Case No. 11-12590 (MFW) (Bankr. D. Del. Sept. 8, 2011) [Docket No. 171]; *In re Jevic Holding Corp.*, Case No. 08-11006 (BLS) (Bankr. D. Del. July 25, 2011) [Docket No. 1103]; *In re Xerium Techs., Inc.*, Case No. 10-11031 (KJC) (Bankr. D. Del. Apr. 28, 2010) [Docket No. 156]; *In re Atrium Corp.*, Case No. 10-10150 (BLS) (Bankr. D. Del. Mar. 17, 2010) [Docket No. 400]; *In re Visteon Corp.*, Case No. 09-11786 (CSS) (Bankr. D. Del. November 12, 2009) [Docket No. 1311].

21.     This routine form of adequate protection is especially appropriate in these Chapter 11 Cases.  As noted above, the Prepetition First Lien Creditors are potentially undersecured *by billions of dollars*, and have nevertheless agreed to be primed by another *$4.475 billion* pursuant to the DIP Facility and to the use of billions of dollars of their Cash Collateral. And while the Unsecured Creditors would like to portray the DIP Facility as effectively just rolling up the Prepetition First Lien Obligations, the facts belie any such argument.  The

Committee itself acknowledges that the TCEH Debtors may need to utilize the DIP Facility to post as much as $1.9 billion of postpetition letters of credit.  Committee Objection ¶ 18. Accordingly, substantial portions of the DIP Facility will be used for purposes wholly unrelated to adequate protection payments, and there is nothing unusual or unwarranted in providing secured creditors with replacement liens on unencumbered assets to adequately protect their interests in such circumstances.

22.     The Unsecured Creditors nevertheless contend that the TCEH Debtors' unencumbered assets should be locked away at the inception of these Chapter 11 Cases for the ultimate benefit exclusively of unsecured creditors, without any authority that truly supports this proposition.  Requiring the Debtors to maintain the Segregated Cash and the proceeds of Avoidance Actions solely for the benefit of unsecured creditors turns adequate protection on its head – in effect allocating all of the risk of a downturn in the TCEH Debtors' business to the Prepetition First Lien Creditors, while *crystallizing and guaranteeing* a certain recovery for unsecured creditors at the outset of these Chapter 11 Cases.

23.     The Unsecured Creditors further argue that if the Prepetition First Lien Creditors are granted adequate protection liens and superpriority claims with recourse to the TCEH Debtors' unencumbered assets, it will be a *fait accompli* that such assets will in fact be swept away from unsecured creditors.  However, in the very next breath, the Unsecured Creditors argue that the Prepetition First Lien Creditors are not entitled to adequate protection payments – or that such payments are "excessive" – because the Prepetition First Lien Creditors have not demonstrated actual Diminution in Value of their interests in the Prepetition Collateral. Again, the Unsecured Creditors cannot have it both ways.  If they truly believe that the Prepetition First Lien Creditors are not at risk of suffering Diminution in Value, then they can

rest assured knowing that any unencumbered assets will remain available for unsecured creditor recoveries.  However, if the Prepetition First Lien Creditors do, in fact, suffer Diminution in Value, then it is axiomatic that they are entitled to recover on account of such claims before any recoveries to unsecured creditors.

24.    Finally, the *proceeds* of Avoidance Actions, like other unencumbered assets, are property of the TCEH Debtors' estates that can be pledged as adequate protection.[9] The TCEH Debtors, in the exercise of their business judgment, determined that it was appropriate to pledge such assets to the Prepetition First Lien Creditors as part of their adequate protection package, and the Prepetition First Lien Creditors relied on that pledge when they consented to the imposition of priming liens to support the $4.475 billion DIP Facility and the use of their Cash Collateral for up to eighteen months without any budget or case milestone constraints.  The parties' integrated and heavily negotiated compromise on these issues should not be picked apart piecemeal.

25.    Accordingly, providing the Prepetition First Lien Creditors with liens on previously unencumbered assets, including the Segregated Cash and the proceeds of any Avoidance Actions, is permitted under section 361 of the Bankruptcy Code, customary in this District and appropriate under the circumstances and, therefore, should be approved.

---

[9]    The Unsecured Creditors assert that the TCEH Debtors should not be permitted to grant an adequate protection lien on the proceeds of avoidance actions, but cite only to cases that stand for the general proposition that avoidance actions themselves are not assets of the TCEH Debtors.  *See* Unsecured Creditor Trustee Objection ¶ 5; Ad Hoc Noteholder Group Objection ¶¶ 25-26.  These cases are inapposite, as the TCEH Debtors have granted a lien on the *proceeds* of avoidance actions, not the claims themselves.  The Unsecured Creditors cannot point to a single case that prohibits the grant of a lien on the *proceeds* of avoidance actions, as no such legal authority exists.

**II.     The TCEH Debtors' Waivers of Rights Under Sections 506(c) and 552(b) of the Bankruptcy Code Are Standard and Permissible.**

    **A.     The Waiver Under Section 506(c) of the Bankruptcy Code Is Appropriate and Should Be Approved.**

        26.     The Unsecured Creditors complain that the TCEH Debtors' section 506(c) waiver is inappropriate, citing a smattering of dated cases for the proposition that such waivers are "routinely rejected."  *See* Committee Objection ¶¶ 33-34; *see also* Ad Hoc Noteholder Group Objection ¶ 33.  To the contrary, section 506(c) waivers are commonplace in this District, and entirely appropriate in these Chapter 11 Cases.

        27.     As a threshold matter, the right to use section 506(c) to recover the costs of preserving or disposing of a secured creditor's collateral is expressly limited to a trustee or debtor-in-possession.  *See* 11 U.S.C. § 506(c) ("The *trustee* may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property . . . .") (emphasis added); *Hartford Underwriters Ins. Co.* v. *Union Planters Bank, N.A.*, 530 U.S. 1, 6, 13 (2000) (holding that "the trustee is the only party empowered to invoke [section 506(c)]," and stating that to allow creditors to exercise such rights "could make secured creditors less willing to provide postpetition financing").  Accordingly, it is entirely within the TCEH Debtors' business judgment to waive potential section 506(c) claims in exchange for the many essential benefits received under the Final Cash Collateral Order, including the Prepetition First Lien Creditors' consent to be primed by the DIP Facility and to use of their Cash Collateral.

        28.     Moreover, the 506(c) waiver is particularly appropriate here.  Pursuant to the Final Cash Collateral Order, the Prepetition First Lien Creditors have agreed to subordinate

their liens and claims to a *$50 million Carve Out*.[10]  Accordingly, the Prepetition First Lien

Creditors have effectively already agreed to a consensual surcharge against their collateral of

monumental size and scope and, thus, are unquestionably entitled to the protection and certainty

afforded by a section 506(c) waiver.

29.    For these and other reasons, waivers of a debtor's surcharge rights under

section 506(c) of the Bankruptcy Code are standard and routinely approved in cash collateral

orders in this District.  *See, e.g.*, *In re Noble Logistics, Inc.*, Case No. 14-10442 (CSS) (Bankr. D.

Del. Apr. 2, 2014) [Docket No. 117]; *In re Gatehouse Media, Inc.*, Case No. 13-12503 (MFW)

(Bankr. D. Del. Oct. 23, 2013) [Docket No. 101]; *In re MSD Performance, Inc.* Case No. 13-

12286 (PJW) (Bankr. D. Del. Oct. 1, 2013) [Docket No. 140]; *In re Orchard Supply Hardware*

*Stores Corp.*, Case No. 13-11565 (CSS) (Bankr. D. Del. July 19, 2013) [Docket No. 253]; *In re*

*Coda Holdings, Inc.*, Case No. 13-11153 (CSS) (Bankr. D. Del. May 29, 2013) [Docket No.

187]; *In re Rotech Healthcare Inc.*, Case No. 13-10741 (PJW) (Bankr. D. Del. May 14, 2013)

[Docket No. 147]; *In re Namco LLC*, Case No. 13-10610 (PJW) (Bankr. D. Del. May 7, 2013)

[Docket No. 197]; *In re Power wave Techs., Inc.*, Case No. 13-10134 (MFW) (Bankr. D. Del.

Apr. 23, 2013) [Docket No. 415]; *In re Conexant Systems, Inc.*, Case No. 13-10367 (MFW)

(Bankr. D. Del. Apr. 19, 2013) [Docket No. 203]; *In re THQ Inc.*, Case No. 12-13398 (MFW)

(Bankr. D. Del. Jan. 11, 2013) [Docket No. 143]; *In re Vertis Holding, Inc.*, Case No. 12-12821

(CSS) (Bankr. D. Del. Nov. 1, 2012) [Docket No. 203]; *In re Fluid Routing Solutions*

*Intermediate Holdings Corps.*, Case No. 09-10384 (CSS) (Bankr. D. Del. Mar. 16, 2010)

---

[10]    As the Court is likely aware, the Carve Out is effectively an additional form of priming lien.  Upon an Event of
Default under the Final Cash Collateral Order, the Prepetition First Lien Creditors have agreed that certain
allowed fees and expenses incurred by estate professionals will have a claim against the Prepetition Collateral
that is senior to the claims of the Prepetition First Lien Creditors to the extent of the Carve Out.  In the instant
case, the Carve Out includes, *inter alia*, up to *$50 million* of fees and expenses incurred by estate professionals
after the occurrence of an Event of Default.

[Docket No. 184]; *In re Badanco Acquisition, Inc.*, Case No. 09-11638 (CSS) (Bankr. D. Del. June 1, 2009) [Docket No. 107]; *In re Linens Holding Co.*, Case No. 08-10832 (CSS) (Bankr. D. Del. May 28, 2008) [Docket No. 476].

**B.    The Waiver Under Section 552(b) of the Bankruptcy Code Is Appropriate and Should Be Approved.**

30.    The Unsecured Creditors' attack against the proposed waiver of section 552(b)'s "equities of the case" exception is similarly misplaced and should be overruled.  *See* Committee Objection ¶ 35.  "The purpose of the equity exception is to prevent a secured creditor from reaping benefits from collateral that has appreciated in value as a result of the . . . debtor-in-possession's use of other assets of the estate (which normally would go to general creditors) to cause the appreciated value."  *In re Muma Servs.*, 322 B.R. 541, 558-559 (Bankr. D. Del. 2005) (quoting *Delbridge* v. *Prod. Credit Ass'n*, 104 B.R. 824, 826 (E.D. Mich. 1989)).

31.    In *Muma Services*, the court explained that the "equities of the case" doctrine was inapplicable because "neither the Debtors nor the Trustee invested any unencumbered funds available to the general unsecured creditors to enhance the value of the assets . . . . On the contrary, since all assets were the security of the [secured lenders], it was only through the use of the [secured lenders'] cash collateral (and the financing provided by [the DIP lender]) that the estate was able to continue to operate and maintain the value of the assets."  *Id.*

32.    Just as in *Muma Services*, the TCEH Debtors' continued operations, and the preservation of the value of their estates, hinges upon the use of the DIP Facility and the Prepetition First Lien Creditors' Cash Collateral, and therefore a waiver of the "equities of the case" exception is entirely appropriate here.  Moreover, courts have generally held that a section 552(b) waiver is appropriate when prepetition secured creditors agree to subordinate their claims to a professional fee carve-out, as the Prepetition First Lien Creditors have agreed to do here.

*See* Hr'g Tr. at 58-59, *In re Hostess Brands, Inc.*, Case No. 12-22052 (RDD) (Bankr. S.D.N.Y. Feb. 2, 2012) (secured creditors' "willingness to provide for a carve-out upfront as opposed to letting the professionals hang on that point" was a sufficient "tradeoff" to justify section 552(b) waiver); *In re General Growth Props., Inc.*, 412 B.R. 122, 127 (Bankr. S.D.N.Y. 2010) (same).

33.    Consistent with such reasoning, courts in this District routinely have approved waivers of the "equities of the case" exception as part of consensual adequate protection packages.  *See, e.g.*, *In re Noble Logistics, Inc.*, Case No. 14-10442 (CSS) (Bankr. D. Del. Apr. 2, 2014) [Docket No. 117]; *In re Orchard Supply Hardware Stores Corp.*, Case No. 13-11565 (CSS) (Bankr. D. Del. July 19, 2013) [Docket No. 253]; *In re Coda Holdings, Inc.*, Case No. 13-11153 (CSS) (Bankr. D. Del. May 29, 2013) [Docket No. 187]; *In re SP Newsprint Holdings LLC*, Case No. 11-13649 (CSS) (Bankr. D. Del. Jan. 25, 2012) [Docket No. 388]; *In re Evergreen Solar, Inc.*, Case No. 11-12590 (MFW) (Bankr. D. Del. Sept 8, 2011) [Docket No. 171]; *In re Urban Brands, Inc.*, Case No. 10-13005 (KJC) (Bankr. D. Del. Oct. 13, 2010) [Docket No. 188]; *In re Visteon Corp.*, Case No. 09-11786 (CSS) (Bankr. D. Del. Nov. 12, 2009) [Docket No. 1311].

34.    Here, the TCEH Debtors cannot operate their businesses without the use of the Prepetition First Lien Creditors' Cash Collateral, and the Prepetition First Lien Creditors have agreed to subordinate their claims to a $50 million Carve Out.  Accordingly, the waiver of the "equities of the case" exception in the Final Cash Collateral Order is more than appropriate, and should be approved.

**III.    There Is No Basis for the Committee's Request that Prepetition First Lien Creditors Prospectively Waive Their Entitlement to Default Rate Interest.**

35.    The Unsecured Creditors curiously argue that, as part of the adequate protection package that is meant to *protect and preserve* the Prepetition First Lien Creditors'

interests in the Prepetition Collateral, the Prepetition First Lien Creditors should prospectively

waive their contractual and legal entitlement to seek to collect default rate interest if, and to the

extent, they prove to be oversecured.   *See* Committee Objection ¶ 28; Unsecured Creditor

Trustee Objection ¶ 8.[11]  Whether the Prepetition First Lien Creditors are oversecured, and

therefore entitled to collect postpetition interest (whether at the default rate or otherwise), is not a

matter now before the Court, and all parties' rights with respect to this issue are fully reserved in

the Final Cash Collateral Order. There is no basis whatsoever to require the Prepetition First Lien

Creditors to give up their contractual right to default rate interest at the beginning of these

Chapter 11 Cases.

## IV.    The Committee's Investigation Budget and the Lien Challenge Period Are More Than Sufficient and Should Be Approved.

36.    The Unsecured Creditors allege that an investigation budget of $175,000

is "patently unreasonable" in a case of this magnitude.  Committee Objection ¶ 30; *see also*

Unsecured Creditor Trustee Objection ¶ 10; Ad Hoc Noteholder Group Objection ¶ 29.  The

Committee responds by asking the Court to increase its budget almost ten-fold to $1,500,000 –

an unprecedented amount in a case of *any size*.  The Committee is unable to cite a single

precedent that even approaches such a budget amount.  Rather, the Unsecured Creditors espouse

generic statements about the TCEH Debtors' quantum of debt and the need to investigate a

leveraged buyout which closed nearly seven years ago to justify their unwarranted and

unprecedented budget request.  The Investigation Budget set forth in the Final Cash Collateral

Order – $175,000 – is adequate to cover the work of conducting an investigation of prepetition

---

[11]    In support of its overblown assertion that "similar waivers have been utilized in recent chapter 11 cases," the Committee cites just one case from outside this District, where it appears that certain *oversecured* creditors may have agreed to forgo charging interest at the default rate.  Committee Objection ¶ 28 n.20.  The absence of any persuasive legal authority supporting the Unsecured Creditors' argument is striking.

liens and claims against the TCEH Debtors' estates and is consistent with budgets authorized for similar scopes of work in other cases in this District. *See, e.g.*, *In re Exide Techs.*, Case No. 13-11482 (KJC) (Bankr. D. Del. July 25, 2013) [Docket No. 427] ($125,000 budget); *In re School Specialty, Inc.*, Case No 13-10125 (KJC) (Bankr. D. Del. Feb. 26, 2013) [Docket No. 299] ($25,000 budget); *In re THQ Inc.*, Case No. 12-13398 (MFW) (Bankr. D. Del. Jan. 11, 2013) [Docket No. 143] ($50,000 budget); *In re Vertis Holding, Inc.*, Case No. 12-12821 (CSS) (Bankr. D. Del. Nov. 1, 2012) [Docket No. 203] ($50,000 budget); *In re Buffets Rests. Holdings, Inc.*, Case No. 12-10237 (MFW) (Bankr. D. Del. Feb. 14, 2012) [Docket No. 225] ($100,000 budget).

37.     Nevertheless, in an effort to resolve this (and other issues) with the Committee in a constructive and consensual manner, the Ad Hoc Committee of TCEH First Lien Creditors has expressed to the Committee's proposed counsel its willingness to modify the Final Cash Collateral Order to increase the investigation budget to $300,000, which would place it on the high end of *any* creditors' committee investigation budget that has been approved in this District. Such an investigation budget is reasonable and appropriate under the circumstances, and should be approved.

38.     Additionally, the Unsecured Creditors complain that the Challenge Period – 60 days for the Committee after the date of its formation and 75 days for any other party in interest after entry of the Interim Cash Collateral Order – also is inadequate. *See* Committee Objection ¶ 32; Unsecured Creditor Trustee Objection ¶ 9; Ad Hoc Noteholder Group Objection ¶ 28. However, 60 days should be ample time for the Committee to investigate potential Challenges, particularly given the expedited discovery that has already been taking place for weeks in connection with the *Motion of Wilmington Savings Fund Society, FSB for Leave to*

*Conduct Discovery Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure of Energy Future Holdings Corporation, Its Affiliates, and Certain Third Parties* [Docket No. 6].

39.     Notably, the Challenge Period is also entirely consistent with the Delaware local rules.  *See* Del. Bankr. L.R. 4001-2(a)(i)(B) (providing that cash collateral requests must include certain additional recitations unless they establish an investigation period of at least 60 days for a creditors' committee from the date of its formation and at least 75 days for other parties in interest from entry of the cash collateral).  Regardless, and again in an effort to narrow or resolve as many open issues with the Committee as possible, the Ad Hoc Committee of TCEH First Lien Creditors has also communicated its willingness to extend the Challenge Period by 30 days for both the Committee and all parties in interest.  As so modified, the Challenge Period would provide more than ample time for the Committee to discharge its duties and conduct any necessary investigations or initiate any Challenges that it deems meritorious.

**V.      The TCEH Debtors' Waiver of Marshalling Rights Is Standard and Permissible.**

40.     The Ad Hoc Noteholder Group argues that the TCEH Debtors' waiver of the equitable doctrine of marshalling is "inequitable" and should not be approved.  Ad Hoc Noteholder Group Objection ¶¶ 39-40.  Tellingly, all the Ad Hoc Noteholder Group can muster in support of its argument are vague and generalized assertions that such a waiver would harm unsecured creditors.  The Court should not substitute the Ad Hoc Noteholder Group's purported business judgment for that of the TCEH Debtors', who determined that it was in the best interests of the TCEH Debtors' estates to forego marshaling (if marshalling were even available) of the Prepetition First Lien Creditors' liens as part of the give-and-take required to obtain the consensual use of their Cash Collateral.  Such relief is not only reasonable – it is also frequently granted in this District.  *See, e.g.*, *In re Noble Logistics, Inc.*, Case No. 14-10442 (CSS) (Bankr.

D. Del. Apr. 2, 2014) [Docket No. 117]; *In re Orchard Supply Hardware Stores Corp.*, Case No.

13-11565 (CSS) (Bankr. D. Del. July 19, 2013) [Docket No. 253]; *In re Contract Research*

*Solutions Inc.*, Case No. 12-11004 (KJC) (Bankr. D. Del. May 9, 2012) [Docket No. 251]; *In re*

*SP Newsprint Holdings LLC*, Case No. 11-13649 (CSS) (Bankr. D. Del. Jan. 25, 2012) [Docket

No. 388]; *In re Urban Brands, Inc.*, Case No. 10-13005 (KJC) (Bankr. D. Del. Oct. 13, 2010)

[Docket No. 188]; *In re Visteon Corp.*, Case No. 09-11786 (CSS) (Bankr. D. Del. Nov. 12, 2009)

[Docket No. 1311]; *In re Pac. Energy Res. Ltd.*, Case No. 09-10785 (KJC) (Bankr. D. Del. June

4, 2009) [Docket No. 415]; *In re Linens Holding Co.*, Case No. 08-10832 (CSS) (Bankr. D. Del.

May 28, 2008) [Docket No. 476].

41.    Moreover, because unsecured creditors lack standing to invoke the

doctrine of marshaling, there is no need to preserve the Ad Hoc Noteholder Group's ability under

the Final Cash Collateral Order to seek such relief.  *See, e.g.*, *In re Advanced Mktg. Servs., Inc.*,

360 B.R. 421, 427 (Bankr. D. Del. 2007) ("[M]arshaling does not apply to an unsecured

creditor."); *In re Arlco, Inc.*, 239 B.R. 261, 274 (Bankr. S.D.N.Y. 1999) ("As a threshold matter,

marshaling is not applicable in this case because . . . Galey is not a secured creditor."); *In re*

*Gibson Grp., Inc.*, 151 B.R. 133, 134-35 (Bankr. S.D. Ohio 1993) (denying unsecured creditors'

committee standing to seek marshaling because it is "not appropriate for a party asserting a valid

security interest to be defeated in its expectations by a creditor, or creditors, having no such

interest").

## VI.    The Unsecured Creditors' Other Miscellaneous Objections Should Be Overruled.

42.    In addition to the Unsecured Creditors' objections described above, they

also assert myriad other concerns with various provisions in the Final Cash Collateral Order.  In

certain instances, the TCEH Debtors and the Prepetition First Lien Creditors have expressed a

willingness to make concessions to accept these comments, as described in greater detail above.

In all other instances, these miscellaneous objections should be overruled.  The Final Cash

Collateral Order is the product of numerous integrated compromises and settlements, and

attacking any of these provisions in isolation is fundamentally inconsistent with the parties'

expectations and the manner in which they reached agreement on the overall terms of the Final

Cash Collateral Order.  The Unsecured Creditors should not be permitted to reap the significant

benefits afforded by the Prepetition First Lien Creditors' agreement to be primed by the DIP

Facility and to allow for the consensual use of their Cash Collateral, while simultaneously

seeking to strike isolated provisions that they dislike.

## VII.   Aurelius' Objection Is a Transparent Attempt to Obtain a Disproportionate Share of the First Lien Adequate Protection Payments and Should Be Overruled.

43.     The First Lien Collateral Agent and Prepetition First Lien Creditors that

hold, in the aggregate, *more than $12 billion* of Prepetition First Lien Obligations (including

approximately 43% of the First Lien Notes), support entry of the Final Cash Collateral Order.

Moreover, of the dozens (if not hundreds) of Prepetition First Lien Creditors that together hold

the approximately $24 billion of Prepetition First Lien Obligations owing under the First Lien

Facilities, only *one* has filed an objection to entry of the Final Cash Collateral Order.   This

remarkable level of support and consensus in such a large and diverse creditor class reflects the

equitable and appropriate treatment of all Prepetition First Lien Creditors under the Final Cash

Collateral Order.

44.     Aurelius – the lone objector among Prepetition First Lien Creditors – is

seemingly not content with a mere equitable distribution, and objects to certain provisions of the

Final Cash Collateral Order that address the allocation of First Lien Adequate Protection

Payments among Prepetition First Lien Creditors.  As a threshold matter, pursuant to the First

Lien Intercreditor Agreement, Aurelius is prohibited from objecting to entry of the Final Cash

Collateral Order and its objection, filed in violation of the First Lien Intercreditor Agreement, should be ignored by the Court.

45.     Nevertheless, if the Court is inclined to consider the Aurelius Objection, it fails on the merits.  Under the Interim and proposed Final Cash Collateral Orders, First Lien Adequate Protection Payments are ratably allocated among the various tranches of first lien debt according to the amounts owing under such tranches *as of the Petition Date* (the "Petition Date Allocation Calculation").  This makes perfect sense, as the Prepetition First Lien Creditors' prepetition claims, like the claims of all other prepetition creditors, will be determined as of the Petition Date, and it is from such date that the Prepetition First Lien Creditors are entitled to adequate protection.  Aurelius, however, argues that the First Lien Adequate Protection Payments should instead be allocated among the Prepetition First Lien Creditors on a rolling basis and in a manner that takes into account the fictitious accrual of postpetition interest under the various tranches of prepetition first lien debt, with a recalculation each month to reflect each tranche's supposed variation in claim size (the "Postpetition Interest Allocation Calculation").

46.     Not surprisingly, the First Lien Notes that Aurelius claims to hold accrued interest prepetition at a far higher rate (11.50% *per annum*) than the other tranches of prepetition first lien debt (the vast majority of which accrued interest at LIBOR + 4.50% *per annum*).  Thus, Aurelius' parochial motivation for objecting to the Final Cash Collateral Order is self-evident – under the Postpetition Interest Allocation Calculation, Aurelius stands to recover a disproportionate share of the First Lien Adequate Protection Payments at the expense of other similarly situated Prepetition First Lien Creditors.  This inequitable result is neither supported by the Interim or Final Cash Collateral Orders nor the First Lien Intercreditor Agreement.

47.    Nevertheless, in an effort to resolve the Aurelius Objection, the Debtors, the First Lien Collateral Agent and the Ad Hoc Committee of TCEH First Lien Creditors have agreed in principle to amend the proposed Final Cash Collateral Order to (a) fully reserve all Prepetition First Lien Creditors' rights to dispute whether the Petition Date Allocation Calculation or Postpetition Interest Allocation Calculation should apply to the allocation of the First Lien Adequate Protection Payments and (b) create an escrow account, which the TCEH Debtors would fund (from ratable deductions of the First Lien Adequate Protection Payments) each month with an amount equal to the difference between (i) the amount of First Lien Adequate Protection Payments that the First Lien Notes Trustee would receive pursuant to the Petition Date Allocation Calculation (*i.e.*, the allocation set forth in the Interim and proposed Final Cash Collateral Orders) and (ii) the amount of First Lien Adequate Protection Payments that the First Lien Notes Trustee would receive pursuant to the Postpetition Interest Allocation Calculation (*i.e.*, the allocation that Aurelius requests) (such difference, the "Holdback Amount").[12]

48.    These proposed changes completely and fairly address Aurelius' concern. While, for the reasons set forth below, Aurelius' interpretation of the Interim Cash Collateral Order and the First Lien Intercreditor Agreement is incorrect, *the Court does not need to decide that issue today*.  Instead, pursuant to the Final Cash Collateral Order, as modified in the manner described above, the rights of holders of the First Lien Notes with respect to this allocation issue are fully protected and reserved.  As a result, Aurelius' Objection will be rendered moot and should therefore be overruled.

---

[12]    The TCEH Debtors, the First Lien Collateral Agent and the Ad Hoc Committee of TCEH First Lien Creditors continue to discuss these issues and the necessary modifications to the Final Cash Collateral Order to effectuate these changes.  The parties intend to submit a revised form of order reflecting such changes in advance of the hearing on June 5, 2014.

**A.    The Final Cash Collateral Order, as Modified, Will Reserve All Prepetition First Lien Creditors' Rights and Therefore the Aurelius Objection Is Moot.**

49.    As described above, Aurelius contends that the allocation of First Lien Adequate Protection Payments under the Final Cash Collateral Order violates the Collateral Proceeds Waterfall (as defined below) in the First Lien Intercreditor Agreement.  The Ad Hoc Committee of TCEH First Lien Creditors has attempted to work constructively with Aurelius, the TCEH Debtors and the First Lien Collateral Agent to seek a consensual resolution of this intercreditor dispute, and the Ad Hoc Committee of TCEH First Lien Creditors believes that the proposed changes to the Final Cash Collateral Order accomplishes this result.  The Ad Hoc Committee of TCEH First Lien Creditors believes that the proposed changes to the Final Cash Collateral Order accomplish such a result.

50.    As modified, the Final Cash Collateral Order will expressly reserve all rights and claims of the Prepetition First Lien Creditors with respect to whether the First Lien Adequate Protection Payments should be allocated pursuant to the Petition Date Allocation Calculation or the Postpetition Interest Allocation Calculation.  It will also require the TCEH Debtors to transfer funds into an escrow account that equal, on a monthly basis, the difference between the amount of First Lien Adequate Protection Payments that the First Lien Notes would receive under the (a) Petition Date Allocation Calculation versus (b) Postpetition Interest Allocation Calculation.  The Holdback Amount deposited in the escrow account would only be released upon a further order of this Court (or another court of competent jurisdiction) approving an allocation of such amount among the Prepetition First Lien Creditors.

51.    As a result, not only will all of the Prepetition First Lien Creditors' rights with respect to this allocation dispute be expressly reserved, but the actual cash difference between the two allocation mechanisms will be escrowed and immediately available for

distribution upon a court order approving an allocation formula.  The Ad Hoc Committee of TCEH First Lien Creditors submits that this is the most efficient, equitable and appropriate manner to address this intercreditor dispute under the circumstances, and that as a result of these protections, the Court need not decide the merits of this potential dispute in the context of considering approval of the Final Cash Collateral Order.   Accordingly, Aurelius' Objection will be rendered moot and should be overruled.

> **B.     If the Court Is Nevertheless Inclined to Consider the Merits of the Aurelius Objection, It Fails for a Variety of Reasons and Should Be Overruled.**

> **1.     Aurelius Lacks Standing to Object to the Final Cash Collateral Order.**

52.    As a threshold matter, under the express terms of the First Lien Intercreditor Agreement, once the First Lien Collateral Agent consents to the TCEH Debtors' use of cash collateral (which it has done), each Prepetition First Lien Creditor – including Aurelius – has waived its right to object to any such cash collateral order.  As the Aurelius Objection falls squarely within the scope of this enforceable waiver, Aurelius lacks standing to prosecute its objection.

53.    Section 510(a) of the Bankruptcy Code provides that intercreditor agreements are enforceable to the same extent that they are enforceable under applicable non-bankruptcy law.  11 U.S.C. § 510(a).  Relying on section 510(a), courts frequently enforce creditors' waivers of bankruptcy rights – such as the right to object to a debtor's use of cash collateral – reasoning that creditors' prepetition bargained-for rights and restrictions should not be disturbed.  *See, e.g.*, *In re Erickson Ret. Cmtys., LLC*, 425 B.R. 309, 315-16 (Bankr. N.D. Tex. 2010) (enforcing "stand still" provision of subordination agreement in denying  junior creditor's motion seeking appointment of examiner); *Ion Media Networks, Inc.* v. *Cyrus Select Opportunities Master Fund, Ltd. (In re Ion Media Networks, Inc.)*, 419 B.R. 585, 594-95 (Bankr.

S.D.N.Y. 2009) (overruling second lien creditors' objection to chapter 11 plan because such

creditors, under intercreditor agreement, waived their right to object to validity or perfection of

liens); *Aurelius Capital Master, Ltd.* v. *Tousa Inc.*, Nos. 08-61317-CIV, 08-61335-CIV, 2009

WL 6453077, at *8 (S.D. Fla. Feb. 6, 2009) (dismissing junior creditor's appeal of order granting

use of cash collateral because such creditor was deemed to have consented to the cash collateral

order pursuant to the terms of an intercreditor agreement).

   54. The First Lien Intercreditor Agreement restricts each Prepetition First Lien

Creditor's right to object to the TCEH Debtors' use of cash collateral as long as certain limited

conditions are satisfied.  Specifically, section 6.1 of the First Lien Intercreditor Agreement

provides, in relevant part:

> If the Borrower or any other Loan Party shall be subject to any
> Insolvency or Liquidation Proceeding and the Collateral Agent
> (acting at the direction of the Required Secured Parties) shall
> desire to permit the use of "Cash Collateral" (as such term is
> defined in Section 363(a) of the Bankruptcy Code), on which the
> Collateral Agent or any other creditor has a Lien (other than
> Deposit L/C Collateral) . . ., then . . . each [] Secured Party agrees
> that such Secured Party (a) will be deemed to have consented to,
> will raise no objection to, nor support any other Person objecting
> to, the use of such Cash Collateral . . . so long as (i) each Secured
> Party retains the right to object to such use of Cash Collateral or to
> the granting of any priming liens over any Collateral if the terms
> thereof, including the terms of adequate protection (if any) granted
> to the Secured Parties in connection therewith, do not provide for
> materially equal treatment to all Secured Parties, (ii) the DIP
> Financing does not expressly require the liquidation of any
> Collateral prior to a default under the DIP Financing
> documentation and (iii) if any Cash Collateral order contemplates
> the liquidation of Collateral, such order provides that the Liens of
> the Secured Parties will attach to the proceeds of such liquidation
> equally and ratably . . . .

First Lien Intercreditor Agreement § 6.1.

55.    Because the First Lien Collateral Agent has consented to the Final Cash Collateral Order, Aurelius has already agreed that it is "deemed to have consented" and "will raise no objection" to the TCEH Debtors' use of cash collateral, subject only to the satisfaction of sections 6.1(a)(i)-(iii) of the First Lien Intercreditor Agreement.  Each of these conditions is clearly satisfied here and, therefore, Aurelius has validly contracted away its right to object to the Final Cash Collateral Order.

56.    Indeed, the Final Cash Collateral Order does not merely provide for "materially equal treatment" of all Prepetition First Lien Creditors, but rather provides for *identical* treatment of all such creditors.  The First Lien Adequate Protection Payments are determined by applying a uniform *per annum* interest rate of LIBOR + 4.50% across all Prepetition First Lien Obligations regardless of the prepetition contract rates of interest set forth in the various Prepetition First Lien Documents.  Final Cash Collateral Order ¶ 5(d).  The reason for that is simple – adequate protection payments are not postpetition interest payments, and the rate at which a particular Prepetition First Lien Creditor accrued interest *prepetition* is irrelevant to such creditor's interest in the Prepetition Collateral that is entitled to adequate protection. These payments are then allocated among Prepetition First Lien Creditors pursuant to the Petition Date Allocation Calculation, which ensures that all Prepetition First Lien Creditors are treated equally in relation to their rights and claims as of the Petition Date.

57.    Accordingly, Aurelius' Objection falls squarely within section 6.1 of the First Lien Intercreditor Agreement and, thus, the Court should deny Aurelius' Objection for lack of standing.  *See Erickson Ret. Cmtys.*, 425 B.R. at 315-16 (denying junior creditor's motion for lack of standing); *Aurelius Capital*, 2009 WL 6453077, at *8 (same).

**2.** **The Interim and Final Cash Collateral Orders Adopt the Petition Date Allocation Calculation.**

58. Aurelius argues that the Interim Cash Collateral actually requires the Postpetition Interest Allocation Calculation. Aurelius Objection ¶ 19. However, Aurelius' argument ignores this Court's particular Finding of Fact/Conclusion of Law set forth in Paragraph G of the Interim Cash Collateral Order which provides, in relevant part:

> (ii) each of the First Lien Administrative Agent, the First Lien Notes Trustee, each Hedge Counterparty and each Swap Counterparty, for the benefit of themselves and the respective Prepetition First Lien Creditors for which they act as agent, will receive from the TCEH Debtors their ratable share (based on their respective Prepetition First Lien Obligations *owing as of the Petition Date*) of the aggregate amount of First Lien Adequate Protection Payments (as defined below).

Interim Cash Collateral Order ¶ G (emphasis added).

59. The Interim Cash Collateral Order thus adopts the Petition Date Allocation Calculation, as it provides in clear and express terms that the aggregate amount of First Lien Adequate Protection Payments shall be allocated among the Prepetition First Lien Creditors based upon the Prepetition First Lien Obligations under the various tranches of first lien debt "owing as of the Petition Date." By definition, this cannot include postpetition interest. This should end the Court's consideration of Aurelius' Objection.

60. Aurelius nevertheless points to certain provisions in Paragraph 5(d) of the Interim Cash Collateral Order that it believes support its Postpetition Interest Allocation Calculation. While the Ad Hoc Committee of TCEH First Lien Creditors disagrees with Aurelius' interpretation of Paragraph 5(d) and believes that such provisions are entirely consistent with Paragraph G and the Petition Date Allocation Calculation, the issue is academic at this point. As reflected in the proposed form of Final Cash Collateral Order that the Debtors filed on May 22, 2014 [Docket No. 597], the parties have already agreed to modify Paragraph

5(d) of the Final Cash Collateral Order to cure any arguable ambiguity as to the proper allocation

method.  And, as noted above, the parties further intend to modify the Final Cash Collateral

Order to escrow any difference between the two allocation mechanisms, effectively reserving for

a future date the ultimate determination of this intercreditor dispute.

**3.      The Collateral Proceeds Waterfall Is Consistent with the Interim and Final Cash Collateral Orders and Requires Application of the Petition Date Allocation Calculation.**

61.      Aurelius spends the bulk of its objection arguing that the Petition Date

Allocation Calculation violates section 4.1 of the First Lien Intercreditor Agreement.   The exact

opposite is true, as the Collateral Proceeds Waterfall (as defined below) is entirely consistent

with (and indeed embodies) the Petition Date Allocation Calculation.

62.      Section 4.1 of the First Lien Intercreditor Agreement sets forth a payment

waterfall (the "Collateral Proceeds Waterfall") that describes the order in which the Collateral

Agent must distribute, *inter alia*, the cash proceeds of Collateral.[13]  It provides, in relevant part:

> Regardless of any Insolvency or Liquidation Proceeding which has
> been commenced by or against the Borrower . . ., Collateral or any
> proceeds thereof received in connection with the sale or other
> disposition of, or collection on, such Collateral upon the exercise
> of remedies under the Security Documents by the Collateral Agent
> shall be applied in the following order . . .
>
> (a) with respect to all Collateral other than Deposit L/C Collateral:
>
> first, on a pro rata basis, to the payment of all amounts due to the
> Collateral Agent, any Agent, and the Issuing Lenders (in such
> capacities) (other than amounts constituting Interest Expenses)

_____

[13]    As an initial matter, the provisions of the First Lien Intercreditor Agreement relied upon by Aurelius do not
support the proposition that the Collateral Proceeds Waterfall applies to the distribution of First Lien Adequate
Protection Payments.  Section 4.1 of First Lien Intercreditor Agreement applies to proceeds of Collateral
received in connection with the sale or disposition of collateral upon the exercise of remedies by the Collateral
Agent, not to the allocation of adequate protection payments in bankruptcy.  Accordingly, the Ad Hoc
Committee of TCEH First Lien Creditors reserves all rights as to whether the Collateral Proceeds Waterfall
applies to such distributions.  The discussion that follows assumes *arguendo* that the Collateral Proceeds
Waterfall is applicable.

under any of the Financing Documents, excluding in the case of the Issuing Lenders, amounts payable in connection with any unreimbursed amount under any Letter of Credit;

second, on a pro rata basis to any Secured Party which has theretofore advanced or paid any fees to any Agent or Issuing Lender, other than amounts covered by priority first, an amount equal to the amount thereof so advanced or paid by such Secured Party and for which such Secured Party has not been previously reimbursed;

third, on a pro rata basis, to the payment of, without duplication, (a) all principal and other amounts *then due and payable in respect of the Secured Obligations*[14] (including Cash Collateralization of all outstanding Revolving Letters of Credit as required under the Credit Agreement or any other applicable Financing Document) and (b) the payment of Permitted Secured Hedge Amounts then due and payable to any Secured Commodity Hedge Counterparty under any Secured Commodity Hedge and Power Sales Agreement; and

last, the balance, if any, after all of the Secured Obligations have been indefeasibly paid in full in cash, to the Loan Parties or as otherwise required by applicable law.

First Lien Intercreditor Agreement § 4.1 (emphasis added).

63.    Aurelius' argument proceeds in two steps.  It first notes that postpetition interest (whether "allowed or allowable" in a chapter 11 case) is included within the definition of "Secured Obligations."  On this point, the parties agree.  Aurelius next contends, pursuant to the third priority of the Collateral Proceeds Waterfall, that the First Lien Adequate Protection Payments must be allocated ratably among the Prepetition First Lien Creditors on a rolling monthly basis, with Secured Obligations being recalculated each month to take into account the

---

[14]    Secured Obligations is defined to include, among other things, "interest *accruing* at the then applicable rate provided in the applicable Financing Document after the maturity of the relevant Secured Obligations and any Post-Petition Interest."  First Lien Intercreditor Agreement, Definition of Secured Obligations (emphasis added).  "Post-Petition Interest" means "any interest or entitlement to fees or expenses or other charges *that accrues* after the commencement of any Insolvency or Liquidation Proceeding, whether or not allowed or allowable in any such Insolvency or Liquidation Proceeding."  First Lien Intercreditor Agreement, Definition of Post-Petition Interest (emphasis added).

accrual of postpetition interest under the various tranches of first lien debt.  However, this

interpretation of the third priority of the Collateral Proceeds Waterfall ignores the critical words

that modify and immediately precede "Secured Obligations" – namely, that ratable distributions

must only be made on account of principal and other amounts "*then due and payable*" in respect

of the Secured Obligations.  For the reasons set forth below, postpetition interest on the First

Lien Notes is not currently, and will not be on a monthly basis during these Chapter 11 Cases,

"due and payable."  Indeed, postpetition interest would only become due and payable if the

Court determines that the Prepetition First Lien Creditors are oversecured (and even then, only to

the extent of their equity cushion in the Prepetition Collateral).  Accordingly, such amounts are

not properly included within the third priority of the Collateral Proceeds Payment Waterfall.

   64. The First Lien Intercreditor Agreement is governed by New York Law.

*See* First Lien Intercreditor Agreement § 9.10.  Under New York law, "[t]he best evidence of

what parties to a written agreement intend is what they say in their writing."  *Postlewaite* v.

*McGraw-Hill, Inc.,* 411 F.3d 63, 69 (2d Cir. 2005) (quoting *Greenfield* v. *Philles Records, Inc.*,

780 N.E.2d 166 (N.Y. 2002)).  "In interpreting a contract under New York law, words and

phrases should be given their plain meaning, and the contract should be construed so as to give

full meaning and effect to all of its provisions."  *U.S. Bank, N.A.* v. *Barclays Bank PLC*, No. 11

Civ. 9199 (WHP), 2013 WL 1180414, at *5 (S.D.N.Y. Mar. 12, 2013) (quoting *LaSalle Bank

Nat'l Ass'n* v. *Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005)).  When an

agreement fails to define certain operative terms, a court should construe such terms in

accordance with their "plain meaning."  *Id.*  In ascertaining the plain meaning of an undefined

contract term, "[i]t is common practice for the courts of [New York] to refer to the dictionary."

*10 Ellicott Square Court Corp.* v. *Mountain Valley Indem. Co.*, 634 F.3d 112, 120 (2d Cir. 2011)

(quoting *Mazzola* v. *Cnty. of Suffolk*, 143 A.D.2d 734, 735 (N.Y. App. Div. 1988)).

   65. Reference to any of a number of oft-utilized dictionaries makes clear that

an amount cannot be said to be "due and payable" unless the payor is both *obligated* and

*permitted* to make such payment.  For example, Merriam-Webster's Collegiate Dictionary

defines "payable" as an amount "that may, can, or must be paid."  Merriam-Webster's Collegiate

Dictionary 910 (11th ed. 2003).  Similarly, Webster's Third New International Dictionary

defines "payable" as an amount "requiring to be paid," or "capable of being paid."  Webster's

Third New International Dictionary 1659 (1993).  Finally, Black's Law Dictionary defines

"payable" as an amount "that is to be paid" and defines "due" as something that is "immediately

enforceable."  Black's Law Dictionary 609, 1309 (10th ed. 2014); *see also U.S. Bank*, 2013 WL

1180414, at *6 n.2.

   66. The common thread running through these definitions is that an amount is

not "due and payable" if there is merely an outstanding payment obligation.  Indeed, interpreting

"due and payable" in such a way would effectively render "payable" superfluous, as "due," on its

own, signifies the existence of a payment obligation.  It is well settled that in interpreting a

contractual provision, courts should strive to avoid an interpretation that has the effect of

rendering other provisions superfluous.  *See Galli* v. *Metz*, 973 F.2d 145, 149 (2d Cir. 1992)

("Under New York law an interpretation of a contract that has 'the effect of rendering at least

one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.'"

(quoting *Garza* v. *Marine Transp. Lines, Inc.*, 861 F.2d 23, 27 (2d Cir. 1988))).  Rather, the plain

meaning of "due and payable" requires the existence of a payment obligation (such that an

amount is "due") that the payor is also legally permitted to make (and thus the amount is also

"payable").  *See Furrow* v. *Commissioner of Internal Revenue*, 292 F.2d 604, 606-07 (10th Cir.

1961) (holding that "due" and "payable," when taken together, refers to a debt that is

"immediately payable"); *Chrzan* v. *Workers' Comp. Appeal Bd. (Allied Corp.)*, 805 A.2d 42, 46-

47 (Pa. Commw. Ct. 2002) ("[T]he meaning of something that is 'due and payable,' without

further modification, is something that is immediately and legally enforceable and payable at

once.").

       67.     *U.S. Bank, N.A.* v. *Barclays Bank PLC*, No. 11 Civ. 9199 (WHP), 2013

WL 1180414 (S.D.N.Y. Mar. 12, 2013) ("U.S. Bank") is highly instructive in this regard.  In that

case, Barclays, a holder of senior notes issued under an indenture, claimed that the indenture

trustee for the notes failed to make certain principal payments when such amounts were "due and

payable," thereby giving rise to an event of default.  *Id.* at *5-6.  Pursuant to the terms of the

indenture, the trustee was obligated to redeem certain of Barclays' notes upon the issuer's failure

to maintain a financial coverage ratio, and the parties agreed that the issuer had not maintained

compliance with such ratio.  Accordingly, it was clear that the trustee was *obligated* to redeem

Barclays' notes.  *Id.* at *2-3.  However, the indenture also provided that the indenture trustee

was only *permitted* to make distributions in accordance with a monthly "Payment Report," and

in the "Payment Report" at issue, the collateral manager erroneously failed to include a

redemption payment with respect to Barclays' notes.  As a result, the trustee did not make the

relevant distribution to Barclays.  *Id.*

       68.     Barclays argued that this failure constituted a default in the payment of

principal that was "due and payable."  While the court agreed that the trustee had failed to make

a payment of principal that was otherwise owing under the agreement, the court concluded that

"the Trustee's failure to pay 'any principal' triggers an event of default only when the Trustee

*has the ability to make principal payments but fails to do so*." *Id.* at *6 (emphasis added).  As

the trustee was only permitted to make payments in accordance with the Payment Reports, the

court held that this "failure[] to pay any principal" did not give rise to an event of default because

the payment was not yet "due and payable." *Id.* (internal quotation marks omitted).  *U.S. Bank*

thus holds, consistent with the dictionary definitions described above, that an amount that is

otherwise owing under a document is not "due and payable" if the payor is not permitted to make

such payment.

        69.    A similar result was reached in *Becker* v. *North's Restaurants, Inc.*, 967

P.2d 1246 (Or. Ct. App. 1998), where the court held that a required interest payment under a

subordinated indenture was not "due and payable" where the indenture's subordination

provisions prohibited such payment after a default under certain senior indebtedness.  *Id.* at

1249-52.  While there was no question that the payor was *obligated* to make the interest payment

under the indenture's relevant payment covenant, the payor was nevertheless *prohibited* from

making such payments pursuant to the subordination clause.  As a result, the court found that the

interest payment "may have been due, but it was not *payable*." *Id.* at 1251.[15]

        70.    Applying this plain meaning of "due and payable" to the instant case,

postpetition interest on the First Lien Notes is only "due and payable" to the extent the TCEH

Debtors are both obligated and permitted to make such payments.   However, the general rule in

bankruptcy is that "interest on the debtors' obligations ceases to accrue at the beginning of

---

[15]   *See also In re W. Texas Mktg. Corp.*, 155 B.R. 399, 404 (Bankr. N.D. Tex. 1993) (holding that claims for
postpetition interest arising under a state statute were not "due and payable" because, as a matter of bankruptcy
law, postpetition interest is only allowed on account of prepetition unsecured claims in a solvent debtor case),
*aff'd*, 1993 WL 610926, *aff'd sub nom.*, *Matter of W. Texas Mktg. Corp.*, 54 F.3d 1194 (5th Cir. 1995).  *West
Texas Marketing Corp.* thus adopts the same interpretation of "due and payable" as *U.S. Bank* and *Becker* – that
an amount is not "due and payable" if the payor is prohibited from making such payment – and applies it in the
context in which the legal prohibition on payment derives from applicable law (in that case, as in the instant
one, the provisions of the Bankruptcy Code), as opposed to the terms of the parties' governing agreement.

proceedings." *Vanston Bondholders Protective Comm.* v. *Green*, 329 U.S. 156, 163 (1946); *see also In re U.S. Lines, Inc.*, 199 B.R. 476, 481 (Bankr. S.D.N.Y. 1996) ("[A]s of the petition date, all debts are frozen and all interest ceases to accrue.").  Section 506(b) provides an exception to this general rule, as it allows an *oversecured* creditor (but not an unsecured or undersecured creditor) to include postpetition interest as part of its allowed claim.  *See generally* 11 U.S.C. § 506(b) ("To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim . . . ."); *Timbers*, 484 U.S. at 372-73 ("Since [section 506(b)] permits postpetition interest to be paid only out of the 'secured cushion,' the undersecured creditor, who has no such cushion, falls within the general rule disallowing postpetition interest."); *In re Vest Assocs.*, 217 B.R. 696, 701 (Bankr. S.D.N.Y. 1998) ("While the general rule in bankruptcy is that interest on debtors' obligations ceases to accrue at the beginning of the proceedings . . . postpetition interest continues to accrue on oversecured claims until payment of the claims or until the effective date of a confirmed plan.") (internal citations omitted).

71.     However, even section 506(b) of the Bankruptcy Code only permits payment of postpetition interest in respect of claims that are both allowed and oversecured.  A secured creditor bears the burden of proof to demonstrate that it has an allowed oversecured claim and is therefore entitled to postpetition interest under section 506(b).  *See In re Residential Capital, LLC*, 497 B.R. 403, 412 (Bankr. S.D.N.Y. 2013) ("The secured creditor bears the burden of proving, by a preponderance of the evidence, that it is oversecured.").  Only once such a showing has been made is a debtor permitted to make a distribution on account of postpetition interest.

72.    As even Aurelius must concede, no showing has been made that the Prepetition First Lien Creditors are oversecured.  Thus, much like the trustee in *U.S. Bank*, while the TCEH Debtors arguably have a contractual obligation to pay certain amounts (here, accrued postpetition interest), they are not permitted to do so.  As a result, such amounts are not currently "due and payable," and therefore must be excluded from the third priority of the Collateral Proceeds Payment Waterfall.  Accordingly, contrary to Aurelius' argument, the Collateral Proceeds Waterfall does not require the Postpetition Interest Allocation Calculation, and therefore Aurelius' argument that the Final Cash Collateral Order somehow violates the First Lien Intercreditor Agreement is without merit and should be overruled.

## CONCLUSION

To facilitate the TCEH Debtors' smooth transition into chapter 11 and to ensure that their operations can continue in the ordinary course (which will redound to the benefit of all stakeholders), the Prepetition First Lien Creditors have consented to be primed by the multibillion dollar DIP Facility and to the use of billions of dollars of their Cash Collateral during these Chapter 11 Cases.  Nonetheless, the Prepetition First Lien Creditors have not demanded onerous case milestones or compliance with a strict budget, protections that prepetition secured creditors typically require and receive.  Instead, they have given the TCEH Debtors eighteen months of consensual cash collateral usage with only minimal conditions and have agreed to an adequate protection package with components that have been approved in countless cases in this and other Districts.  The Unsecured Creditors' request to excise certain features of the Final Cash Collateral Order that are not to their liking, while retaining the obvious overall benefits of the Order, should not be countenanced, and their Objections should be overruled.

With respect to Aurelius, its attempt to obtain a disproportionate share of the First Lien Adequate Protection Payments to the detriment of all other similarly situated Prepetition First Lien Creditors is inconsistent with the provisions of the Interim and Final Cash Collateral Orders and the First Lien Intercreditor Agreement.  Nevertheless, in an effort to resolve the issue, the First Lien Collateral Agent and the Ad Hoc Committee of TCEH First Lien Creditors have agreed in principle to modify the proposed form of Final Cash Collateral Order in order to reserve all Prepetition First Lien Creditors' rights with respect to the allocation of First Lien Adequate Protection Payments and establish an escrow to ensure that no Prepetition First Lien Creditors' rights are prejudiced.  With these modifications, the Aurelius Objection, if not improper in the first place under the governing First Lien Intercreditor Agreement, will be rendered moot, and should be overruled.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Ad Hoc Committee of TCEH First Lien Creditors respectfully requests that the Court (i) overrule the Objections in their entirety, (ii) approve the Final Cash Collateral Order and (ii) grant such other relief as the Court deems just and proper.

Dated: June 2, 2014
       Wilmington, Delaware

/s/ Ryan M. Bartley

**YOUNG CONAWAY STARGATT & TAYLOR LLP**
Pauline K. Morgan (Bar No. 3650)
Ryan M .Bartley (Bar No. 4985)
Andrew L. Magaziner (Bar No. 5426)
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

-and-

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Alan W. Kornberg (admitted *pro hac vice*)
Kelley A. Cornish (admitted *pro hac vice*)
Brian S. Hermann (admitted *pro hac vice*)
Jacob A. Adlerstein (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York  10019
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

*Counsel to the Ad Hoc Committee of TCEH First Lien Creditors*