**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) |
| | )   Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | )   Case No. 14-10979 (CSS) |
| | ) |
| Debtors. | )   (Jointly Administered) |
| | ) |
| | )   **Re: D.I. 461, 472, 552, 694** |

**DEBTORS' REPLY TO OBJECTION OF CSC TRUST
COMPANY OF DELAWARE, AS INDENTURE TRUSTEE, TO THE
EFIH DEBTORS' MOTION TO APPROVE PROPOSED FIRST LIEN SETTLEMENT**

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, which are being jointly administered on an interim basis, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

## Table of Contents

Preliminary Statement ................................................................................................1

Background ................................................................................................................3

Argument ..................................................................................................................6

I.      The First Lien Settlement is Appropriate Under Bankruptcy Rule 9019. ..........6

      A.      The First Lien Settlement Satisfies Bankruptcy Rule 9019. ...................6

      B.      The First Lien Settlement Is Not a *Sub Rosa* Plan. ................................8

      C.      Section 1123(a)(4) of the Bankruptcy Code is Not Applicable in the Bankruptcy Rule 9019 Settlement Context. ..............................................9

      D.      Even If Section 1123(a)(4) Were Applicable, Which It Is Not, the First Lien Settlement Satisfies Its Requirements. ........................................11

II.      The First Lien Opt-In is Consistent With Applicable Law. .............................13

      A.      Section 1125 of Bankruptcy Code Does Not Apply to the First Lien Opt-In. ..................................................................................................14

      B.      The First Lien Opt-In Was a Settlement Offer by the Debtors Consistent with the Bankruptcy Code. ...................................................16

      C.      Any Argument that the First Lien Opt-In Violates Antifraud Provisions of the Securities Laws is Frivolous. ........................................................17

III.      Waiver of the Stay Under Bankruptcy Rule 6004(h) is Warranted. .................21

## Table of Authorities

**Statutes**

11 U.S.C. § 1123(a)(4)................................................................................................... 9

11 U.S.C. § 1125 ...................................................................................................... 14, 15

11 U.S.C. § 364(f) ........................................................................................................... 16

Exchange Act § 14(e), 15 U.S.C. § 78n(e) ............................................................... 17, 18

**Rules**

Bankruptcy Rule 6004(h)................................................................................................. 21

Bankruptcy Rule 9019 ..................................................................................... 6, 8, 11, 15

Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5 .................................................... 17, 18

**Cases**

*Century Glove, Inc. v. First Am. Bank*, 860 F.2d 94, 101-02 (3d Cir. 1988)................................ 14

*Doe v. Delie*, 257 F.3d 309, 313 (3d Cir. 2001) ................................................................ 17

*H. K. Porter Co., Inc. v. Nicholson File Co.*, 482 F.2d 421, 424 (1st Cir. 1973) ........................ 18

*In re AMR Corp.*, No. 11-15463 (SHL) (Bankr. S.D.N.Y. May 23, 2013) ................................. 16

*In re Borders Grp., Inc.*, 453 B.R. 477, 486 (Bankr. S.D.N.Y. 2011)........................................ 21

*In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 513 (Bankr. D. Del. 2010) (Sontchi, J.)............ 8, 15

*In re Columbia Gas Sys., Inc.*, 1995 WL 404892, at *2 (Bankr. D. Del. June 16, 1995)............. 10

*In re Coram Healthcare Corp.*, 315 B.R. 321, 330 (Bankr. D. Del. 2004) ................................. 7

*In re Dana Corp.*, 412 B.R. 53, 62 (S.D.N.Y. 2008) ................................................................ 10

*In re Dow Corning Corp.*, 227 B.R. 111, 118 (Bankr. E.D. Mich. 1998) ................................. 14

*In re Eastman Kodak Co.*, No. 12-10202 (ALG) (Bankr. S.D.N.Y. Dec. 19, 2012).................... 16

*In re Filene's Basement, LLC*, 11-13511 (KJC), 2014 WL 1713416, at *14 (Bankr. D. Del. Apr. 29, 2014) ................................................................................................................... 21

*In re FINOVA Grp., Inc.*, 304 B.R. 630 (D. Del. 2004) ............................................................. 10

*In re Indianapolis Downs, LLC*, 486 B.R. 286, 297 (Bankr. D. Del. 2013) ................................. 14

*In re Iridium Operating LLC*, 478 F.3d 452 (2d Cir. 2007) .......................................................... 10

*In re Journal Register Co.*, 407 B.R. 520, 533 (Bankr. S.D.N.Y. 2009) ....................................... 10

*In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996) .............................................................................. 6

*In re New Century TRS Holdings, Inc.*, 407 B.R. at 592 (D. Del. 2009) ...................................... 10

*In re Nutraquest, Inc.*, 434 F.3d 639, 645 (3d Cir. 2006) .............................................................. 6

*In re Pa. Truck Lines, Inc.*, 150 B.R. 595, 599 (E.D. Pa. 1992), *aff'd*, 8 F.3d 812 (3d Cir. 1993) . 6

*In re TCI 2 Holdings, LLC*, 428 B.R. 117, 133 (Bankr. D.N.J. 2010) ......................................... 12

*In re Texaco Inc.*, 81 B.R. 813 (Bankr. S.D.N.Y. 1988) ............................................................... 16

*Jevic Holding Corp.*, No. BR 08-11006(BLS), 2014 WL 268613, at *3 (D. Del. Jan. 24, 2014) 11

*Law Debenture Trust Co. v. Calpine Corp. (In re Calpine Corp.)*, 356 B.R. 585, 597 (S.D.N.Y. 2007) .......................................................................................................................................... 15

*Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1317 (2011) ......................................... 18

*Schreiber v. Burlington N., Inc.*, 472 U.S. 1, 10-11 (1985) .......................................................... 18

*Schroeder v. New Century Liquidating Trust (In re New Century TRS Holdings, Inc.)*, 407 B.R. 576, 592 (D. Del. 2009) .................................................................................................. 10

*TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) ..................................................... 18

*United States ex rel. Rural Electrification Admin. v. Wabash Valley Power Ass'n (In re Wabash Valley Power Ass'n)*, 167 B.R. 885, 889 (S.D. Ind. 1994) ................................................ 15

*Vaughn v. Teledyne, Inc.*, 628 F.2d 1214, 1219 (9th Cir. 1980) .................................................... 18

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this reply (this "Reply")[1] to the *Objection of CSC Trust Company of Delaware, as Indenture Trustee, to the EFIH Debtors' Motion to Approve the "First Lien Settlement"* [D.I. 694] (the "Settlement Objection") filed by the indenture trustee for the 10.00% EFIH First Lien Notes (the "First Lien Trustee").  In support of this Reply, the Debtors respectfully state as follows.

## Preliminary Statement

1.    The First Lien Settlement is of tremendous value to the Debtors' estates.  It allows the Debtors to limit litigation risk and significantly reduce interest expense and financing fees.  It has the support of—and was negotiated with significant input from—the unsecured creditors that bear the relevant economic risk.  And for the holders of over $1.6 billion in EFIH First Lien Notes that are voluntarily participating in the First Lien Settlement, it offers payment in full and certainty in their exit from these chapter 11 cases.  These benefits are undisputed.

2.    The First Lien Settlement is not being forced on any holder of EFIH First Lien Notes.  It is merely an offer.  Any holder that finds its terms insufficient preserves its right to litigate its makewhole claim.  The objecting parties here chose not to participate, and the Settlement does not affect their rights:  they intend to litigate their claims for full payment of their makewhole, and their ability to do so is fully preserved.  Yet, oddly, they are objecting to the rights of *other* holders to accept the Settlement.  Thus far, 42% of holders have done so.  The obvious motivation for the objections of non-settling parties is to frustrate consensual progress in the case, increase the Debtors' litigation costs, and coerce a higher offer.  Is there a better

---

[1]    Capitalized terms used but not defined in this Reply shall have the meanings set forth in the *Declaration of Paul Keglevic, Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of Energy Future Holdings Corp., et al., in Support of First Day Motions* [D.I. 98] (the "First Day Declaration").

endorsement for the reasonableness of the settlement for the Debtors' estates than the unhappiness of holders that wanted to extract more?

3.      The First Lien Trustee does not even address in its papers the governing legal standards under Bankruptcy Rule 9019 and section 363 of the Bankruptcy Code.  The standard flexibly permits debtors to settle claims within "the lowest point in the range of reasonableness" and evaluates settlements under the liberal "business judgment standard."  So while the Settlement Objection condemns the First Lien Settlement, it ignores the legal standard.  It provides no evidence of any different range of reasonableness, nor does it show that the Settlement was anything other than the Debtors' reasonable exercise of business judgment. There also is no dispute that the Settlement was heavily negotiated at arm's length.  To the contrary, through the testimony of David Ying, the Debtors' financial advisor, and Paul Keglevic, the Debtors' CFO and co-CRO, the Debtors have shown that the Settlement is a reasonable exercise of business judgment, minimizing litigation risk and the unnecessary expenditure of estate assets.

4.      Instead of applying the governing law, the First Lien Trustee tries to hold the First Lien Settlement to plan confirmation and disclosure statement standards.  But these standards simply do not apply.  The First Lien Settlement does not constitute a *sub rosa* plan—it is a claims settlement and roll-up of *one* oversecured tranche of creditors that does not limit plan voting rights.  Nor does the plan-related concept of "unequal treatment" within a class apply in this context.  The Debtors actually went to great lengths here to provide *equal treatment* by giving all holders of EFIH First Lien Notes—not just the significant holders that were party to the Restructuring Support Agreement—the opportunity to participate in the First Lien Settlement.  Regardless, even applying this inapposite standard, to the extent any holder of the

2

EFIH First Lien Notes received better economics in the overall deal than others, these benefits were justified under the circumstances and have been fully disclosed.

5.    The First Lien Trustee goes on to argue incorrectly that the First Lien Opt-In was an affront to bankruptcy and securities laws.  The Debtors have not commenced a solicitation for the purposes of section 1125 of the Bankruptcy Code and did not need preapproval to make a settlement offer, especially one expressly conditioned on Court approval.  As a result, the Debtors implemented an offer process that fully complies with federal securities laws—which has been used in various analogous cases—that, if anything, gave holders of EFIH First Lien Notes *greater* protection than they would have under a typical settlement offer.  At every point during the tender process, every settling holder has been on full and complete notice of the terms of the First Lien Settlement and has made its own voluntary decision to participate.  And despite the First Lien Trustee's best efforts, not a single holder that voluntarily decided to participate has attempted to withdraw or otherwise dispute its recovery.

6.    The First Lien Settlement is a reasonable exercise of the Debtors' business judgment that provides significant value to the Debtors' estates.  For these reasons, the Debtors respectfully request that the Court approve the First Lien Settlement.

## Background

7.    The Debtors filed their petitions for relief under chapter 11 of title 11 of the United States Code on April 29, 2014 (the "Petition Date"), in the United States Bankruptcy Court for the District of Delaware.  On the Petition Date, the Debtors filed the Restructuring Support and Lock-Up Agreement, dated as of April 29, 2014, as Exhibit D to the First Day Declaration (as amended from time to time, including the Restructuring Term Sheet and all other schedules and exhibits thereto, collectively, the "Restructuring Support Agreement").  As part of

the Restructuring Support Agreement, certain holders of EFIH First Lien Notes settled their alleged makewhole claims under those notes with the Debtors (the "First Lien Settlement"), as did certain holders of EFIH Second Lien Notes (the "Second Lien Settlement"). The Debtors have sought this Court's approval of both settlements in the *Motion of Energy Future Holdings Corp., et al., for Entry of Orders Approving Certain EFIH Settlements and the Oncor TSA Amendment* [D.I. 472] (the "Settlement Motion"). In support of the Settlement Motion, the Debtors submitted: (a) the First Day Declaration; and (b) two declarations of David Ying of Evercore Group, the Debtors' proposed financial advisor.[2]

8.      In the interest of fairness, to give as many of their creditors as possible the opportunity to voluntarily participate in these settlements, the Debtors initiated two settlement opt-in periods related to the proposed makewhole settlements with the EFIH First Lien Notes and EFIH Second Lien Notes shortly after the Petition Date. On Wednesday, May 7, the Debtors filed with the Court a *Notice of Initiation of Opt-In Period for the Proposed EFIH First Lien Settlement* [D.I. 363] (such opt-in notice, the "First Lien Opt-In Notice" and, such opt-in period, the "First Lien Opt-In"), explaining that, subject to this Court's approval, the Debtors had initiated a voluntary process to make the First Lien Settlement available to holders of EFIH First Lien Notes. The First Lien Opt-In included an early participation premium for holders that opted into the settlement within the first 10 business days of the First Lien Opt-In period. These

---

[2]     *See Declaration of David Ying, Senior Managing Director of Evercore Group L.L.C. in Support of the Motion of Energy Future Holdings Corp., et al., for Entry of Orders Approving Certain EFIH Settlements and the Oncor TSA Amendment* [D.I. 474] (the "Ying Declaration"); *Supplemental Declaration of David Ying, Senior Managing Director of Evercore Group L.L.C., in Support of (1) the EFIH First Lien DIP Motion and (2) the EFIH Settlement Motion* [D.I. 610] (the "Supplemental Ying Declaration"). The Debtors submitted the Supplemental Ying Declaration, at the request of the First Lien Trustee, to assist the First Lien Trustee in preparing its response to the First Lien Settlement.

premiums are consistent with previous, prepetition exchanges conducted by the Debtors. Objection to the Motions to Compel ¶ 29.

9.      As of the May 19, 2014 early participation deadline, the First Lien Settlement includes approximately 42% of EFIH First Lien Notes by principal amount.  No settling holder of the EFIH First Lien Notes has approached the Debtors with any concerns regarding the First Lien Opt-In or has requested to withdraw from the First Lien Settlement.

10.     In advance of the hearing before this Court on Thursday, May 22, 2014, the First Lien Trustee filed an emergency motion seeking to compel Court approval of the First Lien Opt-In and extend the 10-business-day early participation period (the "First Lien Motion to Compel").[3]  In response, the Debtors objected to that motion and rebutted its various unfounded allegations (the "Objection to the Motions to Compel").[4] The First Lien Trustee ultimately adjourned the First Lien Motion to Compel to the hearing on Thursday, June 5, 2014 (the "Second Day Hearing").  Separately, the Debtors adjourned portions of the Settlement Motion such that the only relief requested by the Settlement Motion at the Second Day Hearing is that the Court approve the First Lien Settlement and the First Lien Opt-In (as modified, the "First Lien Settlement Motion").

11.     In advance of the Second Day Hearing, the First Lien Trustee filed the Settlement Objection.[5]  In addition, the indenture trustee under the EFIH Second Lien Notes filed a

---

[3]     *See Emergency Motion of CSC Trust Company of Delaware, as Indenture Trustee, to Compel the Debtors to Obtain Approval of Procedures Governing the EFIH First Lien Tender Offer* [D.I. 461].

[4]     *See Debtors' Objection to (A) Emergency Motion of CSC Trust Company of Delaware, as Indenture Trustee, to Compel the Debtors to Obtain Approval of Procedures Governing the EFIH First Lien Tender Offer and (B) Emergency Motion of EFIH 2nd Lien Notes Indenture Trustee to Compel Debtors to Obtain Prior Approval of  Procedures Governing Their EFIH 2nd Lien Tender Offer* [D.I. 552].  The Debtors incorporate by reference in this Reply the Objection to the Motions to Compel.

[5]     Attached as Exhibit A to the Settlement Objection is the *Declaration of Christopher J. Kearns, Executive Director of Capstone Advisory Group, LLC Concerning First Lien Settlement* (the "Kearns Declaration")

preliminary response to the Second Lien Settlement (the "Second Lien Objection").[6]    The Second Lien Objection by its terms does not object to the First Lien Settlement and is not presently before the Court.[7]

12.    The Debtors now reply to the Settlement Objection and request that the Court approve the First Lien Settlement.  As part of the First Lien Settlement and as set forth in the First Lien Settlement Motion, the Debtors also request that the Court approve the First Lien Opt-In as part of a settlement offer under Bankruptcy Rule 9019.

## Argument

### I.    The First Lien Settlement is Appropriate Under Bankruptcy Rule 9019.

#### A.    The First Lien Settlement Satisfies Bankruptcy Rule 9019.

13.    Bankruptcy Rule 9019 governs a compromise entered into by a chapter 11 debtor and settling creditors.  *See e.g.*, *In re Nutraquest, Inc.*, 434 F.3d 639, 645 (3d Cir. 2006).  Under the Rule, four factors are to be assessed in determining whether to approve the First Lien Settlement:  (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation, and the expense, inconvenience, and delay accompanying it; and (4) the paramount interest of the creditors.  *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996).  This standard ensures that "settlements [are] moved through quickly to be sure that creditors can resolve claims without waiting for a full reorganization plan."  *In re Pa. Truck Lines, Inc.*, 150 B.R. 595, 599 (E.D. Pa. 1992), *aff'd*, 8 F.3d 812 (3d Cir. 1993).  Furthermore, it is well-settled

---

[6]    *See EFIH Second Lien Notes Indenture Trustee's (I) Preliminary Response to Debtors' Settlement Motion and (II) Limited Objection and Reservation of Rights to Debtors' Motion Approving First Lien DIP Financing* [D.I. 649].

[7]    Nonetheless, the Debtors dispute all of the allegations set forth in the Second Lien Objection and will respond to each of them in a timely manner when the Second Lien Settlement comes before the Court.  As to the pleading's allegations with respect to the EFIH First Lien DIP Facility, the Debtors respond in the *EFIH Debtors' Omnibus Reply to Objections to the EFIH Debtors' Motion for Approval of the EFIH First Lien DIP Financing, the EFIH First Lien Repayment, and the Fidelity Funding Fee*, filed contemporaneously herewith.

6

that a settlement or compromise need only be above "the lowest point in the range of reasonableness," and "the court should defer to a [debtor]'s judgment so long as there is a legitimate business justification for his action." *In re Coram Healthcare Corp.*, 315 B.R. 321, 330 (Bankr. D. Del. 2004).

14.    The First Lien Settlement satisfies this standard.  It allows the Debtors to resolve a significant portion of disputed makewhole claims related to the repayment of the EFIH First Lien Notes that would otherwise serve as a distraction and ongoing contingency in these chapter 11 cases.  Although the Debtors do not believe that any makewhole premium is owed, the First Lien Trustee has commenced an adversary proceeding to seek full payment of such amounts. The First Lien Settlement resolves the makewhole claims of settling holders for pennies on the dollar relative to the amount demanded by the First Lien Trustee.   Supplemental Ying Declaration ¶ 35.  It also permits the Debtors to make informed assessments about their potential liabilities going forward, by providing certainty with regard to the recovery of a significant portion of secured creditors.  *Id.* ¶ 37.  Importantly, the EFIH First Lien Settlement helped the EFIH Debtors and EFH Corp. secure Fidelity's critical support for the Restructuring Support Agreement, which avoids over $6 billion in deconsolidation tax.  And it has the support of the Debtors' creditor body and the true economic beneficiaries of the First Lien Settlement:  general unsecured creditors.   Indeed, the only parties that oppose the First Lien Settlement are oversecured holders that have opted ***not to join*** the settlement and are being ***paid in full***—subject to a ***full reservation of rights to litigate*** any arguments to the contrary.  These holders will suffer no damages whatsoever from consummation of the First Lien Settlement, while the Debtors' estates will derive significant benefit from it.

15.     But, in the 32 pages of its objection, the First Lien Trustee directed by these holders refers to Bankruptcy Rule 9019, the legal standard that governs this Court's review of the First Lien Settlement, just once.   The First Lien Trustee does not grapple with the Debtors' arguments about why the Settlement should be approved.   It never contests that the Settlement was heavily negotiated at arm's length.   It never argues that the Settlement fails to reach the "lowest point in the range of reasonableness," or somehow constitutes an abdication of the Debtors' business judgment.   And it never demonstrates how it might be harmed by the First Lien Settlement, because it is simply a litigation claimant seeking to leverage its aggressive, value-destructive tactics into a superior settlement offer.   As a result, the Court should overrule the Settlement Objection and approve the First Lien Settlement as a valid exercise of business judgment by the Debtors that is above the lowest point in the range of reasonableness.

**B.     The First Lien Settlement Is Not a *Sub Rosa* Plan.**

16.     Instead of applying the appropriate legal standard—Bankruptcy Rule 9019—the First Lien Trustee repeatedly seeks to equate the First Lien Settlement to a chapter 11 plan or otherwise hold it to standards that apply solely to approval of plans and disclosure statements.

17.     As an initial matter, the First Lien Settlement is not a *sub rosa* plan, or anything close.   As this Court has held, a settlement is a *sub rosa* plan only if it "either (i) dispose[s] of all claims against the estate or (ii) restrict[s] creditors' rights to vote."   *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 513 (Bankr. D. Del. 2010) (Sontchi, J.).

18.     Here, the First Lien Settlement does not satisfy either prong.   The First Lien Settlement does not dispose of *all* claims against the estate.   On the contrary, non-settling holders are free to continue litigating their makewhole claims, and the claims of other tranches of debt remain outstanding as well.   Likewise, the First Lien Settlement does not restrict voting rights.   If

8

the Court allows the makewhole claims of non-settling holders, nothing is to stop them from voting those claims against the Debtors' plan.

19. The First Lien Trustee apparently relies on this Court's decision in *Capmark* to support its argument. But *Capmark* only supports the Debtors' position. Specifically, like the First Lien Settlement, the debtors in *Capmark* sought to make a cash payment to their secured lenders under a Bankruptcy Rule 9019 settlement that would release the lenders' claims against the estates at a discount. *Id.* at 514. The Court held that the settlement did not fall under either of the categories of a *sub rosa* plan. *Id.*

20. Finally, despite the assertions of the First Lien Trustee to the contrary, the simple fact that the First Lien Settlement is a "stepping stone" and part of a "global settlement" does not render it a *sub rosa* plan. Complex chapter 11 cases like this one frequently advance in incremental steps toward confirmation. Short of satisfying the standard for a *sub rosa* plan, the fact that the First Lien Settlement is critical to these cases actually supports the reasons why it should be approved.

**C.      Section 1123(a)(4) of the Bankruptcy Code is Not Applicable in the Bankruptcy Rule 9019 Settlement Context.**

21. Next, the First Lien Trustee argues that the First Lien Settlement should not be approved because it does not satisfy the plan requirement set forth in section 1123(a)(4) of the Bankruptcy Code. Settlement Objection ¶ 21. Section 1123(a)(4) provides that "a *plan* shall . . . provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4) (emphasis added).

22. This statute, by its clear text, governs "a plan" of reorganization, not a Bankruptcy Rule 9019 settlement. And the First Lien Trustee fails to cite a single case that applies

section 1123(a)(4) to a Bankruptcy Rule 9019 settlement.[8]  This is unsurprising, because the law is the opposite.  Courts have repeatedly found that section 1123(a)(4) does not apply in this context.  *See In re Dana Corp.*, 412 B.R. 53, 62 (S.D.N.Y. 2008) ("[The language of 1123] is not addressed to the steps in a reorganization that occur before a plan is confirmed, such as the Settlement Order in this case."); *see also In re Journal Register Co.*, 407 B.R. 520, 533 (Bankr. S.D.N.Y. 2009) ("[T]he question under § 1123(a)(4) is whether the payment that creates the difference is provided 'under the Plan.'"); *In re New Century TRS Holdings, Inc.*, 407 B.R. 576, 592 (D. Del. 2009) (holding that section 1123(a)(4) is to be enforced "according to its plain language").  As this Court specifically held in *Columbia Gas*:  "If [the debtor] and a [creditor] ultimately do not settle a claim, the [creditor] retains its rights to seek the full amount of its filed proof of claim, which in each case is higher than any settlement offer.  As to the treatment of claims within the same class, that is a confirmation issue."  *In re Columbia Gas Sys., Inc.*, 1995 WL 404892, at *2 (Bankr. D. Del. June 16, 1995).  The same is true here—the First Lien Trustee's attempt to import section 1123(a)(4) standards to a Bankruptcy Rule 9019 settlement simply is not appropriate.

23.     The First Lien Trustee's reliance on *Iridium* does not support this logical leap.  *In re Iridium Operating LLC*, 478 F.3d 452 (2d Cir. 2007).  That Second Circuit case merely stands for the principle that making cash payments to junior stakeholders to which they otherwise would not have been entitled under a plan violates the absolute priority rule unless other Bankruptcy Rule 9019 factors "weigh heavily in favor of approving a settlement."  *Id.* at 455.

---

[8]     Instead, the First Lien Trustee relies on two confirmation opinions.  *See, e.g.*, *Schroeder v. New Century Liquidating Trust (In re New Century TRS Holdings, Inc.)*, 407 B.R. 576, 592 (D. Del. 2009) (applying section 1123(a)(4) to find that a plan was not confirmable); *In re FINOVA Grp., Inc.*, 304 B.R. 630 (D. Del. 2004) (analyzing bankruptcy court's decision regarding whether to hear testimony in connection with finding concerning whether the plan complied with the elements of section 1123).

As an initial matter, *Iridium*'s strict extension of the absolute priority rule is not the law of this jurisdiction.  *See Jevic Holding Corp.*, No. 08-11006 (BLS), 2014 WL 268613, at *3 (D. Del. Jan. 24, 2014) ("As discussed by the bankruptcy court, the settlement does not follow the absolute priority rule.  However, this is not a bar to the approval of the settlement as it is not a reorganization plan.").   Even if it were, that decision does not support the extension of section 1123(a)(4) to the claim settlement context—*Iridium* was focused on the absolute priority rule.  Here, there are no absolute priority issues because the holders of EFIH First Lien Notes are receiving payment in full of their allowed claims.

> **D.    Even If Section 1123(a)(4) Were Applicable, Which It Is Not, the First Lien Settlement Satisfies Its Requirements.**

24.    Even if the Debtors were required to provide the same settlement terms to all similarly situated parties, as section 1123(a)(4) would require under a plan, the First Lien Settlement could still be approved.  The First Lien Trustee incorrectly claims that the Debtors offered "undisclosed amounts of 'cross-subsidy'" to "overcompensate[]" Fidelity and PIMCO.  Settlement Objection ¶ 20.  But the Trustee offers no support for this claim—no document, no testimony, no example—despite the Debtors' production of tens of thousands of pages of materials and two witnesses for deposition.  The Trustee does little better when it makes baseless assertions that the Debtors agreed to "additional consideration in the form of side payments to the first lien holders induced to sign the restructuring support agreement," which supposedly "exacerbate the disparate treatment problems already present in the First Lien Settlement."  Settlement Objection ¶ 4.  There are no "side payments" or "undisclosed amounts" of consideration being paid to the first lien note holders who chose to sign the Restructuring Support Agreement.  The only so-called "additional consideration" that the Trustee cites is the fact that the Debtors negotiated for PIMCO and WAMCO to provide a $1.7 billion backstop of

the EFIH First Lien DIP Facility, and for Fidelity to provide an additional $500 million of financing under the EFIH First Lien DIP Facility.

25.     These parties, however, are providing additional consideration to the Debtors in return, and the economics of the transactions have been fully disclosed.  Indeed, the First Lien Trustee itself acknowledges that the PIMCO commitment "reduced [the Debtors'] costs by having them backstop at no fee, in certain situations."  Settlement Objection ¶ 4 n.6 (quoting P. Keglevic at 66:13-67:2); *see also* D. Ying 44:17-23 ("Because PIMCO and WAMCO's billion 450 and 250 million provided committed financing for which we did not have to pay an up front fee, we thereby were avoided paying extra fees in the event that additional first lien noteholders opted to roll into our first lien DIP.").  Moreover, the Debtors would have had to pay the same or greater fees to the EFIH First Lien DIP Agent for the over $1 billion in EFIH First Lien DIP Financing committed by Fidelity at the time of entry into the First Lien Settlement.  This treatment is entirely consistent with section 1123(a)(4) of the Bankruptcy Code.  *See In re TCI 2 Holdings, LLC*, 428 B.R. 117, 133 (Bankr. D.N.J. 2010) (holding that certain parties within a class that were providing a backstop were entitled to receive a backstop fee without violating section 1123(a)(4) of the Bankruptcy Code).

26.     The First Lien Trustee spills a great deal of ink attempting to impute some nefarious intent to the Debtors regarding PIMCO's holdings of the 6 7/8% EFIH First Lien Notes.  The Trustee asserts—without citing a single document or any testimony—that "the Debtors have *only* offered [a larger] settlement on the smaller 6 7/8% Notes issue because those bonds were highly concentrated in the hands of PIMCO, and this was a means of directing payment to PIMCO and gaining PIMCO's support for the Restructuring Support Agreement."  Settlement Objection ¶ 4 (emphasis in original).  These unsupported allegations

ignore the facts:  the uniform economics of the settlement across both tranches were negotiated before PIMCO became involved.  *See* D. Ying Dep. Tr. 120:13 - 121:25.  Ultimately, because PIMCO found the 6 7/8% settlement offer attractive, the Debtors were able to obtain favorable terms regarding PIMCO's $1.45 billion backstop commitment for the EFIH First Lien DIP Financing.  D. Ying Dep. Tr. at 119:7 - 120:12.[9]

27.    There are other important reasons that support offering a slightly larger settlement on a percentage recovery basis to the 6 7/8% holders:  the relatively small proportion of the notes and the benefit of simplicity in the Debtors' offer.  In fact, making the same 21% settlement offer to the 6 7/8% notes as the 10% notes—as the Trustee suggests the Debtors should have done— would have made little sense.  As Mr. Ying explained, the Debtors' cost of funding such an offer—in transaction costs associated with financing—would have actually exceeded the 21% settlement offer to the 6 7/8% Notes.  (D. Ying Dep. Tr. at 125:21 - 129:20.)  As a consequence, the 6 7/8% holders might not have viewed the settlement as a credible offer.  The settlement is thus consistent with both Bankruptcy Rule 9019 as well as the inapplicable standards espoused by the First Lien Trustee, including section 1123(a)(4) of the Bankruptcy Code.

## II.    The First Lien Opt-In is Consistent With Applicable Law.

28.    The First Lien Trustee argues that tender offers are impermissible under the Bankruptcy Code and that, in any event, the First Lien Opt-In violates applicable securities laws. But the First Lien Trustee has not cited a single statutory provision or case to demonstrate that tender or exchange offers are *per se* improper in chapter 11, notwithstanding contrary statutory

---

[9]    The Kearns Declaration focuses on the distinct methods of calculating the recovery to 6 7/8% EFIH First Lien Notes.  Kearns Declaration ¶¶ 8-10.  The Debtors maintain that the most appropriate calculation is set forth in the Supplemental Ying Declaration.  Regardless of the calculation—i.e., whether the settlement is 62.5% or 52% of the redemption period—the treatment of 6 7/8% EFIH First Lien Notes is permissible.

and judicial authority.  Simply put, the First Lien Opt-In is consistent with all applicable law, including the Bankruptcy Code and applicable securities laws.

29.     At its core, the First Lien Opt-In is nothing more than a settlement offer.  In the first instance, the Debtors negotiated the terms of the First Lien Settlement with Fidelity and PIMCO at arms' length as part of the Restructuring Support Agreement.  After the Restructuring Support Agreement became public, in the interest of fairness, the Debtors made the First Lien Settlement available to all holders of EFIH First Lien Notes on a voluntary basis.  To comply with applicable securities laws, the Debtors had to do so in the form of the First Lien Opt-In, with its dozens of pages of disclosures (including applicable risk factors).  This was a fair process with robust disclosures of the risks and benefits of the proposed exchange.

**A.     Section 1125 of Bankruptcy Code Does Not Apply to the First Lien Opt-In.**

30.     In the Settlement Objection, the First Lien Trustee, in the face of well-established case law, argues that section 1125 governs the EFIH First Lien Opt-In.  A solicitation under section 1125 of the Bankruptcy Code "occurs only when a party in interest makes a specific request for an official vote either accepting or rejecting a plan of reorganization." *In re Dow Corning Corp.*, 227 B.R. 111, 118 (Bankr. E.D. Mich. 1998) (internal citation omitted).  The Third Circuit has held that "'solicitation' must be read narrowly.  A broad reading of § 1125 can seriously inhibit free creditor negotiations . . . . We therefore reject any definition of solicitation which might cause creditors to limit their negotiations." *Century Glove, Inc. v. First Am. Bank*, 860 F.2d 94, 101-02 (3d Cir. 1988); *see also In re Indianapolis Downs, LLC*, 486 B.R. 286, 297 (Bankr. D. Del. 2013) ("[C]onsistent with the holding in *Century Glove*, courts must be chary of construing those disclosure and solicitation provisions in a way that chills or hamstrings the negotiation process that is at the heart of Chapter 11.").

14

31.    The First Lien Trustee ignores this well-settled case law and instead offers nothing but the unsubstantiated statement that "the congressionally-provided method to reduce the interest rate on the allowed amount of an oversecured claim, whether the allowed claim includes a redemption premium or otherwise."  Settlement Objection ¶ 39.  This is incorrect on multiple levels.  *First*, the First Lien Settlement is not solely about interest rates.  It also is an offer by the Debtors to resolve litigation asserted by the First Lien Trustee and certain holders of EFIH First Lien Notes.  This is more appropriately within the purview of Bankruptcy Rule 9019 and the claims determination and resolution process, not a plan of reorganization.

32.    *Second*, the *repayment* of the EFIH First Lien Notes is a means of saving the Debtors interest expense.  The Debtors' approach has been blessed by numerous courts, including this one:

> There is no *per se* rule against paying pre-petition secured claims outside of a plan of reorganization.  Indeed, such payments are routinely made in a number of different contexts.  For example, post-petition refinancing of uneconomical *secured* debt through a DIP loan may be authorized by section 363(b) of the Bankruptcy Code as a use of estate property outside the ordinary course of business. . . . .  The point is that there is ample authority for such a payment.

*In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 510-12 (Bankr. D. Del. 2010) (Sontchi, J.); *see also Law Debenture Trust Co. v. Calpine Corp. (In re Calpine Corp.)*, 356 B.R. 585, 597 (S.D.N.Y. 2007) (affirming order of bankruptcy court allowing use of DIP facility to repay prepetition secured debt under section 363(b)); *United States ex rel. Rural Electrification Admin. v. Wabash Valley Power Ass'n (In re Wabash Valley Power Ass'n)*, 167 B.R. 885, 889 (S.D. Ind. 1994) (affirming order of bankruptcy court granting debtor permission to refinance prepetition secured debt).  There is no credible argument that this is a "solicitation," and, as a result, section 1125 does not apply to the First Lien Opt-In.

**B.** **The First Lien Opt-In Was a Settlement Offer by the Debtors Consistent with the Bankruptcy Code.**

33.     The First Lien Trustee rehashes its earlier objection that the Debtors did not seek this Court's preapproval before commencing the First Lien Opt-In.  As explained at length in the Objection to the Motions to Compel, the Debtors were not required to seek such approval.  The Debtors sought to make the EFIH First Lien Settlement available to all holders of EFIH First Lien Notes—and therefore had to comply with all applicable securities laws.  But that simple fact does not somehow render the process improper.  Securities offerings outside of a chapter 11 solicitation have been conducted in bankruptcies.  *See, e.g., In re AMR Corp.*, No. 11-15463 (SHL) (Bankr. S.D.N.Y. May 23, 2013) (undertaking an offer to purchase in bankruptcy); *In re Eastman Kodak Co.*, No. 12-10202 (ALG) (Bankr. S.D.N.Y. Dec. 19, 2012) (undertaking an exchange offer in bankruptcy); *Standard Oil & Exploration of Delaware, Inc.*, 136 B.R. 141 (Bankr. W.D. Mich. 1992) (undertaking an offer to sell DIP notes in bankruptcy); *see also* 11 U.S.C. § 364(f) (contemplating offerings to participate in a debtor in possession financing).

34.     Although the First Lien Trustee suggests that *AMR* dictates that the Debtors should have the Court's approval before commencing the First Lien Opt-In, the debtors in that case and in *Kodak* were seeking preapproval to effectuate *settlements*.  Here, by contrast, the Debtors made a settlement *offer* that was expressly conditioned on Court approval prior to consummation of the settlement, which they made abundantly clear numerous times in the First Lien Opt-In materials distributed to holders.  Making a settlement offer is an integral part of the chapter 11 process and does not require court approval—only the consummation of those offers and agreements does.  *See In re Texaco Inc.*, 81 B.R. 813 (Bankr. S.D.N.Y. 1988) (holding that entry into a postpetition agreement subject to court approval does not require preapproval under section 363(b) of the Bankruptcy Code).  The First Lien Trustee has not explained why the fact

16

that this particular settlement offer was structured as an exchange offer should change this basic proposition.

35.     Further, the First Lien Trustee's lengthy sidebar on constitutional mootness standards is irrelevant.  The Debtors are here today seeking approval of the First Lien Settlement.  Any future settlements will similarly be subject to Court approval.  The First Lien Trustee's citation of cases regarding the civil rights of prison inmates does not inform this analysis. *See* Settlement Objection at ¶ 47 (citing *Doe v. Delie*, 257 F.3d 309, 313 (3d Cir. 2001) ("Doe is no longer an inmate at SCIP . . . .")).

### C.    Any Argument that the First Lien Opt-In Violates Antifraud Provisions of the Securities Laws is Frivolous.

36.     Even though the First Lien Trustee disclaims the applicability of securities laws— it goes on to make allegations that the exchange offer here somehow violated section 14(e) and Rule 10b-5 of the Exchange Act of 1934.  These allegations do not support any particular objection, but they are reckless and unsubstantiated and must be refuted.

37.     Section 14(e) and Rule 10b-5 are antifraud provisions of the federal securities laws.  The tender offer antifraud provision, section 14(e), makes it unlawful to "make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . . in connection with any tender offer."  Exchange Act § 14(e), 15 U.S.C. § 78n(e).  This language tracks the language in Rule 10b-5, the antifraud provision applicable to the sale of securities. *See* Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5.

38.     To state a claim under either provision, the movant must make a substantial showing.  Under Rule 10b-5, the movant must show "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or

omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1317 (2011). The elements of a claim under section 14(e) are the same, except that there is no purchase or sale requirement. *See H. K. Porter Co., Inc. v. Nicholson File Co.*, 482 F.2d 421, 424 (1st Cir. 1973); *see also Schreiber v. Burlington N., Inc.*, 472 U.S. 1, 10-11 (1985) (stating that section 14(e) is "modeled on . . . Rule 10b-5" and requires "disclosure more explicitly addressed to the tender offer context"); *Vaughn v. Teledyne, Inc.*, 628 F.2d 1214, 1219 (9th Cir. 1980) ("Section 14(e) is generally the same as . . . Rule 10b-5, but is applicable specifically to tender offers rather than other purchases or sales of securities.").

39.     The First Lien Trustee has failed to even plead the elements of section 14(e) or Rule 10b-5 of the Exchange Act, and there is nothing in the Settlement Objection or otherwise to support these elements. For example, there is no basis to argue that any misrepresentation or omission is occurring when the Restructuring Support Agreement—which memorializes the First Lien Settlement—is a publicly available document that the Debtors expressly incorporated by reference into the First Lien Opt-In materials. *Schreiber v. Burlington N., Inc.*, 472 U.S. 1, 12 (1985) ("Without misrepresentation or nondisclosure, § 14(e) has not been violated."). And even making the implausible assumption that there was a misrepresentation or relevant omission in the First Lien Opt-In materials, the standard for materiality is whether there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) (construing a similar antifraud provision in the context of an allegedly misleading proxy statement). Again, the First Lien Trustee did not plead, let alone make a showing that satisfies, this materiality standard.

18

40.    Specifically, the First Lien Trustee makes the following unfounded allegations as to disclosure deficiencies:

- The Trustee alleges that the Debtors failed to disclose their method of calculating the exchange consideration. But the Debtors offered a settlement expressed in fixed dollars: $1,050.00 per $1,000.00 of principal. The Trustee does not explain why investors would need to know how the Debtors arrived at this figure.

- The Trustee alleges that the Debtors failed to disclose the relative percentage of the makewhole claims that the First Lien Settlement represents as between the 10% notes and the 6 7/8% notes. But the fact that the 6 7/8% notes were receiving the same $1,050.00 as the 10% notes was plain on the face of the offering documents:

| Securities | CUSIP Numbers | Aggregate Principal Amount Outstanding | Exchange Consideration(1)(2) | Early Participation Consideration(1)(2) | Total Consideration(1)(2) |
|---|---|---|---|---|---|
| 6.875% Senior Secured Notes due 2017 | 29269QAE7 U29197AC1 | $502,714,000 | $1,032.50 | $17.50 | $1,050.00 |
| 10.00% Senior Secured Notes due 2020 | 29269QAA5 29269QAK3 U29197AG2 | $3,482,106,000 | $1,032.50 | $17.50 | $1,050.00 |

First Lien Opt-In Notice, Ex. A, at cover page (emphasis added).

- The Trustee alleges that the Debtors failed to disclose the amount of the 6 7/8% notes held by the parties to the Restructuring Support Agreement. But it is unclear why the Debtors would be obligated to disclose this information or why it would be relevant to the decision whether to participate in the exchange offer.

- The Trustee alleges that the Debtors failed to disclose the fees payable to various parties. But these fees, in addition to not being relevant to the First Lien Settlement, were fully disclosed in the publicly-available Restructuring Support Agreement (which was expressly incorporated by reference in the First Lien Opt-In materials). Their disclosure or nondisclosure thus could not have altered the total mix of publicly available information because they were already part of that body of information.

- The Trustee alleges that the Debtors failed to disclose the rights of the holders of EFIH First Lien Notes under the Collateral Trust Agreement. This is presumably a reference to their supposed right to claw back payments under the Second Lien Settlement. But the Trustee does not explain why the Debtors would be required to describe baseless intercreditor claims that the holders of EFIH First Lien Notes might assert. *See* Objection to the Motions to Compel ¶ 42. Even if these claims were not baseless, the Collateral Trust Agreement is a publicly available document.

19

- The Trustee alleges that the Debtors failed to disclose the terms of the First Lien Settlement itself.  But the Debtors circulated the Information Memorandum, a document dedicated to explaining and setting forth the terms of the First Lien Settlement.  *See* First Lien Opt-In Notice, Ex. A.

- The Trustee alleges that the Debtors failed to disclose that "PIMCO and Fidelity did not negotiate a 'standalone' first lien deal at the levels offered, but rather, they negotiated a more lucrative package of 'global' consideration with the Debtors." Settlement Objection ¶ 50.  But the fact the PIMCO and Fidelity were involved in other aspects of the Debtors' restructuring is irrelevant to the investment decision whether to participate in the First Lien Settlement—and, again, is plainly set forth in the Restructuring Support Agreement.   And the First Lien Opt-In materials included a risk factor that described the consideration received by PIMCO and Fidelity in depth, beginning with the following statement:

> *The RSA EFIH First Lien Note Parties may receive more consideration with respect to their EFIH First Lien Notes than the Holders participating in the Offer will receive with respect to their EFIH First Lien Notes. In addition, the RSA EFIH First Lien Note Parties may receive a commitment fee for acting as a new money lender under the EFIH First Lien DIP Facility, which will not be available to the Holders participating in the Offer. Moreover, the RSA EFIH First Lien Note Parties may be entitled to receive consideration and/or settlement amounts for other securities they hold in our and our affiliates' capital structure, including the EFIH Second Lien Notes and the EFH Corp. Unsecured Notes.*

First Lien Opt-In Notice, Ex. A, at 32-33 (emphasis added).

- Lastly, the Trustee alleges that the Debtors failed to disclose that they "knowingly agreed to allocate the global consideration to pockets where PIMCO and Fidelity did not have to share with others (i.e. the 6 7/8% Notes, EFH Notes, First Lien DIP Backstop, etc.)" and that the Debtors "obscured this fact."   Again, the consideration offered to the two series of notes was plain on the face of the First Lien Opt-In materials.  Most importantly, the terms of all of these transactions were in the public record (and expressly incorporated by reference into the First Lien Opt-In materials) at the time of the offer.

In sum, the First Lien Trustee quibbles with the Debtors' description of various aspects of the First Lien Settlement that were public knowledge at the time of the offering.  This does not comport with the serious allegations the First Lien Trustee is making.

41.      Regardless, the Debtors do not seek a finding from the Court that the First Lien Opt-In was consistent with applicable securities laws (even though it was).[10]   Instead, the Debtors are simply seeking the Court's approval of the First Lien Opt-In under bankruptcy laws as part of the First Lien Settlement.   For the reasons set forth in the Settlement Motion and this Reply, the Debtors have met this standard and the Court should approve the First Lien Opt-In as well as the First Lien Settlement.

**III.      Waiver of the Stay Under Bankruptcy Rule 6004(h) is Warranted.**

42.      Although the First Lien Trustee argues that the stay period of Bankruptcy Rule 6004(h) should not be waived, the record clearly supports waiver.

43.      Under Bankruptcy Rule 6004(h),

> if an objection has been filed and is being overruled, the court should eliminate or reduce the 14–day stay period only upon a showing that there is a sufficient business need to close the transaction within the 14–day period and that the interests of the objecting party, taking into account the likelihood of success on appeal, are sufficiently protected.  If the objecting party informs the court that it intends to appeal and seek a stay, then the stay period should not be reduced to less than an amount of time sufficient to allow the objecting party to seek a stay, unless the court determines that the need to proceed sooner outweighs the objecting party's interests.

*In re Filene's Basement, LLC*, 11-13511 (KJC), 2014 WL 1713416, at *14 (Bankr. D. Del. Apr. 29, 2014); *see also In re Borders Grp., Inc.*, 453 B.R. 477, 486 (Bankr. S.D.N.Y. 2011).

44.      Here, a waiver of the fourteen-day period is warranted.  The First Lien Settlement is a necessary component to the EFIH First Lien DIP Facility and repayment of the EFIH First Lien Notes, which were accelerated by EFIH's bankruptcy filing.  The Debtors' commitment

---

[10]   To the extent any party seeks to assert such a claim, there were, and remain, proper avenues to do so.  For example, the First Lien Trustee could have sought to enjoin the First Lien Opt-In when it filed the First Lien Motion to Compel or when it filed the Settlement Objection, but it did not, and neither has the SEC.

from the EFIH First Lien DIP Agent with respect to the EFIH First Lien DIP Facility expires five business days after the entry of the order approving the EFIH First Lien DIP Facility.  This will occur no sooner than June 11, 2014.  In addition, with each passing day, the Debtors are incurring additional interest expense on the EFIH First Lien Notes.  Therefore, a complete waiver of the fourteen-day period is necessary and appropriate and in no event should the Court allow the stay to extend beyond the expiration of the Debtors' financing commitment.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request that the Court (a) overrule the Settlement Objection, (b) grant the First Lien Settlement Motion, and (c) grant such other relief as it deems necessary and proper under the circumstances.

Dated:  June 3, 2014
        Wilmington, Delaware

*/s/ Jason M. Madron*

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 651-7700
Facsimile:    (302) 651-7701
Email:    collins@rlf.com
    defranceschi@rlf.com
    madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
Richard M. Cieri (admitted *pro hac vice*)
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    richard.cieri@kirkland.com
    edward.sassower@kirkland.com
    stephen.hessler@kirkland.com
    brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    james.sprayregen@kirkland.com
    chad.husnick@kirkland.com
    steven.serajeddini@kirkland.com

Proposed Co-Counsel to the Debtors and Debtors in Possession