## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | Case No. 14-10979 (CSS) |
| Debtors. | (Jointly Administered) |
|  | **Re: D.I. 73, 231** |

## DEBTORS' OMNIBUS REPLY IN SUPPORT
## OF THE TCEH DEBTORS' DIP MOTION AND CASH
## COLLATERAL MOTION AND IN RESPONSE TO THE OBJECTIONS THERETO

---

[1]   The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, which are being jointly administered on an interim basis, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

## TABLE OF CONTENTS

**Page**

I. The DIP Facility Is the Best Available Financing to the TCEH Debtors. .......................... 6

    A. The TCEH Debtors Have Duty To Maximize The Value Of Their Estates For All Those Having An Interest In Them. .......................................................... 6

    B. The TCEH Debtors Evaluated All Available Financing Options To Maximize the Value of the TCEH Debtors' Estates. ........................................... 10

    C. The Drop-Down Financing Is Not the Superior Financing Alternative. .............. 11

II. The TCEH Debtors' Need for the DIP Financing on a Final Basis is Appropriate. ......... 16

    A. The Size of The DIP Facility Is Appropriate Given Volatility in the TCEH Debtors' Business. ................................................................................. 16

    B. The TCEH Debtors Require the DIP Facility on a Final Basis Immediately. ................................................................................................... 18

III. The Adequate Protection Provided by the TCEH Debtors to the Prepetition Secured Creditors is Appropriate. ..................................................................... 19

    A. The TCEH Debtors Must Provide Adequate Protection and Do Not Need To Demonstrate That the Collateral Will Decrease In Value. .............................. 20

    B. Adequate Protection Payments At the Non-Default Contract Rate of Interest Are an Appropriate Proxy for Diminution in Value. ............................... 22

IV. Liens and Superpriority Claims on the Unencumbered Assets, Including the Proceeds to Avoidance Actions, are Appropriate. ........................................... 26

V. The Waivers Provided in the DIP and Cash Collateral Orders Are Appropriate. ............ 32

    A. The 506(c) Waiver is Appropriate. ...................................................... 32

    B. The 552(b) Waiver is Appropriate. ...................................................... 33

    C. The "Marshaling" or Any Similar Doctrine Should Not Apply. .......................... 34

VI. The Creditors' Committee's Challenge Rights Are Appropriate. .................................... 35

VII. The Debtors Have Either Addressed Other Objections Raised or Do Not Find Revisions Necessary or Appropriate. .............................................................. 35

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Begier v. I.R.S.,*
496 U.S. 53, 59 (1990) ................................................................................................................. 8

*Board of Trustees of Teamsters Local 863 Pension Fund v. Foodtown,*
296 F.3d 164 (3d Cir. 2002) ..................................................................................................... 5, 8

*Hartford Underwriters Ins. Co. v. Union Planters Bank,*
530 U.S. 1, 6 (2000) ................................................................................................................... 31

*In re Advanced Mktg. Servs., Inc.,*
360 B.R. 421, 427 (Bankr. D. Del. 2007) ................................................................................ 34

*In re Appleseed Intermediate Holdings LLC,*
No. 11-10160 (KG) (Bankr. D. Del. Feb. 23, 2011) ............................................................... 31

*In re AppliedTheory Corp.,*
No. 02-11868, 2008 WL 1869770, at *1 (Bankr. S.D.N.Y. April 24, 2008 ............................ 29

*In re Arlco, Inc.,*
239 B.R. 261, 274 (Bankr. S.D.N.Y. 1999) ............................................................................. 34

*In re Caccamise,*
No. 09-17165, 2009 Bankr. LEXIS 4174 (Bankr. E.D. Va. Dec. 22, 2009) ............................ 24

*In re Calpine Corp.,*
No. 05-60200 (BRL) (Bankr. S.D.N.Y. Jan. 26, 2006) ....................................................... 23, 30

*In re Conexant Systems, Inc.*
No. 13-10367 (MFW) (Bankr. D. Del. Apr. 19, 2013) ............................................................ 34

*In re Cont'l Airlines, Inc.,*
146 B.R. 536 (Bankr. D. Del. 1992) ........................................................................................ 21

*In re Cooper-Standard Holdings, Inc.,*
No. 09-12743 (PJW) (Bankr. D. Del. Sept. 2, 2009) ............................................................... 34

*In re Dex One Corp.,*
No. 13-10533 (KG) (Bankr. D. Del. April 10, 2013) .............................................................. 22

*In re Dolan Co.,*
14-10614 (BLS) (Bankr. D. Del. Apr. 17, 2014) .................................................................. 31, 33

*In re Ellingsen MacClean Oil, Inc.,*
834 F.2d 599, 603 (6th Cir. 1987) ........................................................................................... 26

**Page**

*In re Elmira Litho, Inc.*,
    174 B.R. 892 (Bankr. S.D.N.Y. 1994) ........................................................... 21

*In re Enserv Co.*,
    64 B.R. 519, 521 (B.A.P. 9th Cir. 1986) ......................................................... 30

*In re Equalnet Commc'ns Corp.*,
    258 B.R. 368, 369 (Bankr. S.D. Tex. 2001) ................................................... 24

*In re Fisker Automotive Holdings, Inc.*,
    No. 13-13087 (KG) (Bankr. D. Del. Jan. 24, 2014) ................................... 27, 31

*In re Fleming Packaging Corp.*,
    No. 03-82408, 2007 WL 4556985, at *6 (Bankr. C.D. Ill. 2007) ...................... 30

*In re Friendly Ice Cream Corp.*,
    No. 11-13167 (KG) (Bankr. D. Del. Nov. 2, 2011) .................................... 33, 34

*In re Hawker Beechcraft, Inc.*,
    No. 12-11873 (SMB) (Bankr. S.D.N.Y. June 4, 2012) ................................... 23

*In re Hayes Lemmerz International, Inc.*,
    No. 09-11655 (MFW) (Bankr. D. Del June 15, 2009) ................................. 33, 34

*In re L.A. Dodgers LLC*,
    457 B.R. 308, 313 (Bankr. D. Del. 2011) ....................................................... 15

*In re Longview Power, LLC*,
    No. 13-12211 (BLS) (Bankr. D. Del. Nov. 21, 2013) ................................. 27, 31

*In re LSP Energy Limited Partnership*,
    No. 12-10460 (MFW) (Bankr. D. Del. Feb. 27, 2012) ................................ 27, 33

*In re Markos Gurnee P'ship.*,
    252 B.R. 712, 717 (Bankr. N.D. Ill. 1997) ..................................................... 23

*In re Masonite Corp.*,
    No. 09-10844 (PJW) (Bankr. D. Del. Apr. 14, 2009) ...................................... 22

*In re Metavation, LLC*,
    No. 13-11831 (BLS) (Bankr. D. Del. Aug. 23, 2013) ................................. 33, 34

*In re Nebraska Book Co., Inc.*,
    No. 11-12005 (PJW) (Bankr. D. Del. July 7, 2011) ....................... 22, 27, 31, 34

*In re Newpage Corp.*,
    No. 11-12804 (KG) (Bankr. D. Del. Oct. 4, 2011) .......................................... 22

**Page**

*In re Residential Capital, LLC,*
    No. 12-12020 (MG) (Bankr. S.D.N.Y. June 25, 2012) ........................................................ 22

*In re Revel AC, Inc.,*
    No. 13-16253 (JHW) (Bankr. D.N.J. Apr. 22, 2013) ...................................................... 33, 34

*In re River Ctr. Holdings, LLC,*
    394 B.R. 704, 717 (Bankr. S.D.N.Y. 2008) .................................................................... 32

*In re Saybrook Mfg. Co.,*
    963 F.2d 1490 (11th Cir. 1992) .................................................................................... 24

*In re Smart World Techs., LLC,*
    423 F.3d 166, 181-82 (2d Cir. 2005) ............................................................................ 31

*In re Southern Air Holdings, Inc.*
    (Bankr. D. Del. Oct. 25, 2012) ................................................................................... 33

*In re Stallion Oilfield Servs. Ltd.,*
    No. 09-13562 (BLS) (Bankr. D. Del. Nov. 18, 2009) ..................................................... 22

*In re Swedeland Dev. Group, Inc.,*
    16 F.3d 552, 564 (3d Cir. 1994) .................................................................................. 27

*In re The Dolan Co.,*
    No. 14-10614 (Bankr. D. Del. Apr. 17, 2014) .............................................................. 27

*In re The Penn Traffic Co.,*
    No. 09-14078 (PJW), 2010 WL 2822043, at *16 (Bankr. D. Del. Jan. 25, 2010) .................... 32

*In re Visteon Corp.*
    No. 09-11786 (CSS) (Bankr. D. Del. Nov. 12, 2009) ................................................ 27, 31

*In re WestPoint Stevens, Inc.,*
    600 F.3d 231, 258 (2d Cir. 2010) ................................................................................ 27

*In re WorldSpace, Inc.,*
    No. 08-12412 (PJW), 2008 WL 8153638, at *8 (Bankr. D. Del. Nov. 10, 2008) .................... 32

*Mellon Bank, N.A. v. Dick Corp.,*
    351 F.3d 290, 293 (7th Cir. 2003) ............................................................................... 30

*N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla,*
    930 A.2d 92, 103 (Del. 2007) ...................................................................................... 7

*Snyder v. Dewoskin (In re Mahendra),*
    131 F.3d 750, 755 (8th Cir. 1997) ............................................................................... 8

**Page**

*U.S. v. Whiting Pools, Inc.,*
   462 U.S. 198 (1983) ............................................................................................ 5, 7

*United Sav. Ass'n of Tex. V. Timbers of Inwood Forest Ass'n, Ltd.,*
   484 U.S. 365 (1988) ............................................................................................ 23

*Zink v. Vanmiddlesworth,*
   300 B.R. 394 (N.D.N.Y. 2003) .......................................................................... 21

**Statutes**

11 U.S.C. § 1107 ...................................................................................................... 19

11 U.S.C. § 361(1) ................................................................................................... 22

11 U.S.C. § 363(2)(d)(1) ......................................................................................... 18

11 U.S.C. § 363(c)(2) ............................................................................ 4, 17, 18, 19

11 U.S.C. § 363(c)(2), 363(e) ................................................................................... 4

11 U.S.C. § 363(e) ............................................................................................ 18, 20

11 U.S.C. § 363(p) ............................................................................................ 19, 25

11 U.S.C. § 364(c)(2) ............................................................................................... 24

11 U.S.C. § 364(d) ...................................................................... 17, 19, 20, 25

11 U.S.C. § 364(d)(1) ....................................................................... 17, 19, 20

11 U.S.C. § 541(a)(1) ................................................................................................. 6

11 U.S.C. § 541(a)(3) ............................................................................................... 26

11 U.S.C. § 552(b)(1) ............................................................................................... 29

11 U.S.C. §§ 361(2) ................................................................................................. 27

11 U.S.C. §§ 550(a) ................................................................................................. 27

Texas Competitive Electric Holdings Company LLC (the "<u>Borrower</u>" or "<u>TCEH</u>"),

Energy Future Competitive Holdings Company LLC (the "<u>Parent Guarantor</u>" or "<u>EFCH</u>"), and

each of the Subsidiary Guarantors (as defined in the DIP Credit Agreement (as defined herein))

(the Subsidiary Guarantors, together with the Parent Guarantor, the "<u>Guarantors</u>"), each as a

debtor and debtor-in-possession (collectively, the "<u>TCEH Debtors</u>," and together with the other

above-captioned debtors and debtors-in-possession, the "<u>Debtors</u>"), hereby file this omnibus

reply (this "<u>Reply</u>") in support of the *Motion of Texas Competitive Electric Holdings Company*

*LLC and Certain of its Debtor Affiliates For Entry of Interim and Final Orders (A) Approving*

*Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense*

*Claims, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing* (the

"<u>DIP Motion</u>") and the *Motion of Texas Competitive Electric Holdings Company LLC and*

*Certain of its Debtor Affiliates For Entry of Interim and Final Orders (A) Authorizing Use of*

*Cash Collateral, (B) Granting Adequate Protection, (C) Modifying The Automatic Stay, and (D)*

*Scheduling a Final Hearing* (the "<u>Cash Collateral Motion</u>") and in response to the Objections[2]

---

[2]    *Omnibus Preliminary Objection Of The Ad Hoc Group Of TCEH Unsecured Noteholders To (I) The Motion Of Texas Competitive Electric Holdings Company LLC And Certain Of Its Debtor Affiliates For Entry Of Interim And Final Orders (A) Approving Postpetition Financing, (B) Granting Liens And Providing Superpriority Administrative Expense Claims, (C) Modifying The Automatic Stay, And (D) Scheduling A Final Hearing, And (II) The Motion Of Texas Competitive Electric Holdings Company LLC And Certain Of Its Debtor Affiliates For Entry Of Interim And Final Orders (A) Authorizing Use Of Cash Collateral, (B) Granting Adequate Protection, (C) Modifying The Automatic Stay, And (D) Scheduling A Final Hearing* [D.I. 231] (the "<u>Unsecured Ad Hoc Objection</u>"); *Objection of Law Debenture Trust Company of New York, as Indenture Trustee, to (1) Motion of Texas Competitive Electric Holdings Company LLC and Certain of Its Debtor Affiliates for Entry of a Final Order (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection and (C) Modifying the Automatic Stay and (2) Motion of Texas Competitive Electric Holdings LLC and Certain of Its Debtor Affiliates, for Entry of a Final Order (A) Approving Postpetition Financing, (B) Granting Liens and Provide Superpriority Administrative Expense Claims and (C) Modifying the Automatic Stay* [D.I. 648] (the "<u>Unsecured Trustee Objection</u>"); *Objection of the Official Committee of Unsecured Creditors to the Motion of Texas Competitive Electric Holdings Company LLC and Certain of its Debtor Affiliates, for Entry of Interim and Final Orders (A) Approving Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing* [D.I. 637] (the "<u>UCC DIP Objection</u>"); *Objection of the Official Committee of Unsecured Creditors to the Motion of Texas Competitive Electric Holdings Company LLC and Certain of its Debtor Affiliates for Entry of Interim and Final Orders (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing* [D.I. 641] (the "<u>UCC CC Objection</u>," and collectively

thereto.[3]  In support of this Reply and in further support of the DIP Motion and Cash Collateral

Motion, the Debtors respectfully submit as follows.

<u>**Preliminary Statement**</u>

1.      The DIP Facility and the use of Cash Collateral are critical to the continued

operation of the Debtors' businesses and to the success of these chapter 11 cases.  After months

of tireless negotiations, the TCEH Debtors made the informed business decision to seek entry

into the DIP Facility and obtained the consensual use of Cash Collateral.  The TCEH Debtors

negotiated with the DIP Lenders in good faith and at arm's length for a $4.475 billion DIP

Facility on extremely favorable financing terms—indeed, not a single Objector asserts otherwise.

Moreover, the TCEH Debtors successfully negotiated with the Prepetition First Lien Lenders for

**18 months** of consensual use of Cash Collateral with **no sale or other burdensome milestones**.

Importantly, neither the DIP Financing nor consensual use of Cash Collateral is conditioned

---

with the Unsecured Ad Hoc Objection, the Unsecured Trustee Objection, and the UCC DIP Objection, the "Objections," and the parties thereto, the "<u>Objectors</u>"); *Aurelius Capital Management, LP's Limited Objection to the Motion of Texas Competitive Electric Holdings Company LLC and Certain of its Debtor Affiliates for Entry of Interim and Final Orders (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing* [D.I. 632] (the "<u>Aurelius Objection</u>").

[3]     Capitalized terms used but not defined herein shall have the meanings ascribed to them in the DIP Motion or the Cash Collateral Motion, as applicable.  On May 2, 2014, the Court entered the *Interim Order (A) Approving Postpetition Financing For Texas Competitive Electric Holdings Company LLC and Certain of its Debtor Affiliates, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Modifying The Automatic Stay, and (D) Scheduling a Final Hearing* [D.I. 325] (the "<u>Interim DIP Order</u>") and the *Interim Order Authorizing Use Of Cash Collateral For Texas Competitive Electric Holdings Company LLC and Certain of its Debtor Affiliates, (B) Granting Adequate Protection, (C) Modifying The Automatic Stay, And (D) Scheduling A Final Hearing* [D.I. 324] (the "<u>Interim Cash Collateral Order</u>"), approving the relief requested in the DIP Motion and Cash Collateral Motion, respectively, on an interim basis and scheduling a final hearing for June 5, 2014, at 9:30 a.m. (prevailing Eastern Time).  On May 22, 2014, the Debtors filed the *Notice of Filing of Proposed Form of Final Order (A) Approving Postpetition Financing for Texas Competitive Electric Holdings Company LLC and Certain of Its Debtor Affiliates, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, and (C) Modifying the Automatic Stay* [D.I. 598] (the "<u>Proposed Final DIP Order</u>") and the *Notice of Filing of Proposed Form of "Final Order (A) Authorizing Use of Cash Collateral for Texas Competitive Electric Holdings Company LLC and Certain of Its Debtor Affiliates, (B) Granting Adequate Protection, and (C) Modifying the Automatic Stay* [D.I. 597] (the "<u>Proposed Final Cash Collateral Order</u>").

upon the transactions contemplated in the Restructuring Support Agreement (as defined below).[4]
The TCEH Debtors require the DIP Facility and continued use of Cash Collateral to operate their
businesses, fund the costs of administering these chapter 11 cases, including payment of
adequate protection, and to support an expeditious emergence from chapter 11, which is in the
best interests of maximizing the value of the Debtors' estates.

2.      Despite the TCEH Debtors' clearly delineated need for the DIP Financing and the
use of Cash Collateral, the ad hoc group of certain holders of TCEH unsecured notes (the
"Ad Hoc Unsecured Group"), the Creditors' Committee, and Law Debenture Trust Company of
New York, as trustee under the TCEH unsecured notes (the "Unsecured Trustee"), object to the
DIP Facility, the adequate protection provided to those secured creditors primed under the DIP
Financing, and the various other customary terms agreed to among the TCEH Debtors, the DIP
Lenders, and the Prepetition First Lien Creditors. The TCEH Debtors have made significant
progress in brokering a settlement among the parties regarding the Objectors' concerns. As part
of this effort, the TCEH Debtors, DIP Lenders, and Prepetition Secured Creditors have agreed to
various modifications to the final orders. While the TCEH Debtors are hopeful that the parties
will have resolved the majority of issues by the Final Hearing, they anticipate that some matters
are likely to remain open. It is therefore incumbent on the TCEH Debtors to defend the DIP
Facility and use of Cash Collateral as it stands today.

3.      The TCEH Debtors understand that the final orders contain certain provisions that
the Objectors do not particularly like, but the consequences of not providing adequate protection

---

[4]     The DIP Lenders have agreed to remove the provision in the DIP Credit Agreement that defines an Acceptable
Reorganization Plan as being consistent in form and substance with the Restructuring Support Agreement.

are much worse for their potential recoveries, possibly resulting in a lifting of the automatic stay, judicial foreclosure of the Collateral, and billions of dollars of deconsolidation tax liability landing at the feet of TCEH's creditors.

4.       The Objectors' arguments are generally based on two faulty premises. *First*, the Objectors suggest that a prerequisite to the provision of adequate protection by the TCEH Debtors is a showing by the Prepetition First Lien Creditors that the collateral is declining in value. The TCEH Debtors would certainly enjoy the leverage that would result from flipping the Bankruptcy Code on its head in this manner. Unfortunately, the Objectors' position is inconsistent with well-settled bankruptcy law. There is no question that the TCEH Debtors *must* provide adequate protection to their secured creditors in exchange for the use of Cash Collateral. *See* 11 U.S.C. §§ 363(c)(2), 363(e). And, as the Court held at the first day hearing, the fact that the Prepetition First Lien Creditors may be significantly undersecured does not alter their entitlement to adequate protection under the Bankruptcy Code. *See* Exhibit A to Declaration of Chad Husnick in support hereof (the "Husnick Decl.") (Trial Tr. 266, May 1, 2014).

5.       *Second*, certain of the Objectors incorrectly interpret fiduciary duty law to support their Objections to the Proposed Final DIP and Cash Collateral Orders, ignoring all of the TCEH Debtors' efforts to obtain the best available financing for the benefit of their estates. Specifically, the Objectors argue without any support under applicable federal or state law that the TCEH Debtors' duty is to maximize the value solely of the unencumbered assets for the benefit of only unsecured creditors. As discussed in detail below, the Objectors' incorrect reading of section 541 of the Bankruptcy Code is without merit and has been uniformly rejected by the Supreme Court and the Third Circuit. *See United States v. Whiting Pools, Inc.*, 462 U.S.

4

198, 203-04 (1983) (("[T]o facilitate the rehabilitation of the debtors' business, all the debtor's property must be included in the reorganization estate. ***This authorization extends even to property of the estate in which a creditor has a secured interest.***") (emphasis added); *Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 169 (3d Cir. 2002) (citing *Whiting Pools*).

6.      The TCEH Debtors' duty under both federal and state law is to maximize the value of the enterprise, including all of its assets, not just unencumbered assets, for all those having an interest in it.  The TCEH Debtors have done just that:  they negotiated for the best possible terms on the DIP Financing and use of cash collateral, reserved to a final hearing the purported controversial issues in the DIP and cash collateral orders, and continued post-filing to engage in good faith, arm's-length negotiations with the DIP Lenders and Prepetition First Lien Creditors to address the concerns raised by the Objectors, obtaining a host of concessions for the benefit of the Debtors' estates, including unsecured creditors.  At bottom, the TCEH Debtors have honored their fiduciary duties and then some and maximized the value of their estates.

7.      Although the Court has already stated that "the objections really sort of fade away" (*see* Husnick Decl. Ex. A (Trial Tr. 300)), and the Objectors have offered **no new arguments** to support the merits of their arguments, the Debtors file this Reply to further clarify that:  (a) the TCEH Debtors determined that the DIP Facility is the best source of available financing for the TCEH Debtors after considering all available alternatives, including the "drop-down financing" alternative; (b) the DIP Facility is appropriately sized given the nature of the TCEH Debtors' businesses; (c) the adequate protection provided to the Prepetition Secured Creditors is appropriate, including the Adequate Protection Payments to the Prepetition First

Lien Creditors; and (d) the liens on the Unencumbered Assets (including proceeds of Avoidance Actions), the 506(c) and 552(b) waivers, and the marshaling provision waiver are all necessary and appropriate to obtain the DIP Facility and the Prepetition First Lien Creditors' consent to priming thereunder and the use of Cash Collateral.

8.      Finally, as part of the modifications that the TCEH Debtors have made to the final orders, the TCEH Debtors have agreed to include additional protections responsive to the concerns raised in the Aurelius Objection, including a provision that requires the TCEH Debtors to escrow the disputed portion of the adequate protection payments pending a resolution of the intercreditor dispute between Aurelius Capital Management, L.P. and the rest of the Prepetition First Lien Creditors.  As such, the Aurelius Objection is moot and there is no need for the Court to address the intercreditor dispute.  Accordingly, the TCEH Debtors respectfully request that the Court enter the final orders granting the DIP and Cash Collateral Motions.

**Reply**

I.      **The DIP Facility Is the Best Available Financing to the TCEH Debtors.**

      A.      **The TCEH Debtors Have Duty To Maximize The Value Of Their Estates For All Those Having An Interest In Them.**

9.      The TCEH Debtors, with the assistance of their professional advisors, evaluated all available financing options before determining in their sound business judgment that consistent with their fiduciary duties, the DIP Facility was best available option to maximize the value of the TCEH Debtors' estates.

10.      Under Delaware law, TCEH has a "duty to maximize the value of the insolvent corporation for the benefit of all those having an interest in it." *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 103 (Del. 2007); *see also Shandler v.*

6

*DLJ Merchant Banking, Inc.*, No. 4797-VCS, 2010 WL 2929654, at *14 (Del. Ch. July 26, 2010) ("[I]t is critical to note that [the trustee] cannot base his fiduciary duty claim on the premise that the board did not do what was best for a particular class of [the debtor's] creditors.") (citing *Gheewalla*). Moreover, the TCEH Debtors' duty to maximize the value of their estates is with respect to all of the TCEH Debtors' assets, not just unencumbered assets. *See Whiting Pools*, 462 U.S. at 203-04; *Foodtown*, 296 F.3d at 169.

11.    The Ad Hoc Unsecured Group and the Unsecured Trustee each take a different tact, but both misstate the applicable law regarding the TCEH Debtors' fiduciary duties. For its part, the Ad Hoc Unsecured Group incorrectly transforms the Debtors' duty to maximize the value of their estates into a duty to preserve the value of the <u>unencumbered</u> property by suggesting that the Debtors' estate is comprised of only unencumbered assets. *See* Unsecured Ad Hoc Objection, ¶ 11. The Ad Hoc Unsecured Group either misunderstands or obfuscates clear law. Section 541(a)(1) of the Bankruptcy Code and its seminal cases make clear that property of the Debtors' estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case."[5]

---

[5]    11 U.S.C. § 541(a)(1). As the Supreme Court held in *United States v. Whiting Pools,*

> In proceedings under the reorganization provisions of the Bankruptcy Code, a troubled enterprise may be restructured to enable it to operate successfully in the future. Until the business can be reorganized pursuant to a plan under 11 U.S.C. §§ 1121-1129 (1976 ed., Supp. V), the trustee or debtor-in-possession is authorized to manage the property of the estate and to continue the operation of the business. See § 1108. By permitting reorganization, Congress anticipated that the business would continue to provide jobs, to satisfy creditors' claims, and to produce a return for its owners. H.R.Rep. No. 95-595, p. 220 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787. Congress presumed that the assets of the debtor would be more valuable if used in a rehabilitated business than if "sold for scrap." *Ibid.* The reorganization effort would have small chance of success, however, if property essential to running the business were excluded from the estate. See 6 J. Moore & L. King, Collier on Bankruptcy ¶ 3.05, p. 431 (14th ed. 1978). Thus, to facilitate the rehabilitation of the debtor's business, **<u>all the debtor's property must be included in the reorganization estate</u>**.

12.    The Ad Hoc Unsecured Group suggests that section 541(d) of the Bankruptcy Code and *Snyder v. Dewoskin (In re Mahendra)*, 131 F.3d 750, 755 (8th Cir. 1997), support its position that property of the estate excludes any portion of property that is encumbered by a lien. Neither, however, supports such a narrow definition of property of the estate.

13.    Section 541(d) addresses a narrow exception to section 541(a)(1) for property that a debtor holds in trust for the benefit of another. *See Begier v. I.R.S.*, 496 U.S. 53, 59 (1990) (explaining that section 541(d) applies to property held by the debtor in trust for another). Section 541(d) does nothing to exclude encumbered assets from property of the estate. Nor does the Eighth Circuit's *Mahendra* decision support the Ad Hoc Unsecured Group's unheard of application of section 541(d). The Eighth Circuit correctly held in *Mahendra* that the debtor's estate includes the unencumbered portion of the debtor's assets. Contrary to the Ad Hoc Unsecured Group's assertion, however, the Eighth Circuit stopped short of holding that the encumbered portion of the debtor's assets is excluded from the debtor's estate. *Mahendra*, 131 F.3d at 755. In fact, the Eighth Circuit only addressed the unencumbered portion in its opinion because the proceeds of the collateral had already been distributed to creditors, *i.e.*, the

---

*This authorization extends even to property of the estate in which a creditor has a secured interest.* § 363(b) and (c); see H.R.Rep. No. 95-595, p. 182 (1977). Although Congress might have safeguarded the interests of secured creditors outright by excluding from the estate any property subject to a secured interest, *it chose instead to include such property in the estate and to provide secured creditors with "adequate protection" for their interests.* § 363(e), . . . . At the secured creditor's insistence, the bankruptcy court must place such limits or conditions on the trustee's power to sell, use, or lease property as are necessary to protect the creditor. *The creditor with a secured interest in property included in the estate must look to this provision for protection, rather than to the nonbankruptcy remedy of possession.*

462 U.S. at 203-04 (emphasis added); *see also Foodtown*, 296 F.3d at 169 ("The Bankruptcy Code defines the 'estate' as 'all legal or equitable interests of the debtor in property as of the commencement of the case,'...as well as '[a]ny interest in property that the estate acquires after the commencement of the case.'...This definition is given broad application and includes 'all kinds of property, including ... causes of action....'") (citing *Whiting Pools*).

unencumbered portion of the assets were the only part of the debtor's estate left from which to seek recovery. *Id.* Put simply, the Ad Hoc Unsecured Group's interpretation of section 541(d) as excluding from property of the estate any interest in property that is subject to a lien is completely inconsistent with well-settled bankruptcy law. *See Begier*, 496 U.S. at 59 (541(d) applies to property in trust); *Whiting Pools*, 462 U.S. at 203-04 (section 541(a) of the Bankruptcy Code provides that debtor's estate includes property in which a creditor has a secured interest); *Foodtown*, 296 F.3d at 169 (section 541(a) of the Bankruptcy Code should be read broadly to include all kinds of property).[6]

14.    The Unsecured Trustee's attempt to narrowly redefine the TCEH Debtors' fiduciary duties suffers a similar fate. Relying on *In re High Strength Steel, Inc.*, 269 B.R. 560 (Bankr. D. Del. 2001), the Unsecured Trustee asserts that the Debtors' fiduciary duty is to maximize the value of estate assets for payment of unsecured creditors. *See* Unsecured Trustee Objection, ¶ 4 n.6. As previously noted, however, recent Delaware law is clear that TCEH has a "duty to maximize the value of the insolvent corporation for the benefit *of all those having an interest in it.*" *Gheewalla*, 930 A.2d at 103 (emphasis added); *see also Shandler*, 2010 WL 2929654, at *14.[7] To the extent that the conclusion in *High Strength Steel* was ever an accurate

---

[6]    Moreover, sections 363 and 364 of the Bankruptcy Code, which govern the use of property and acquisition of credit, including the adequate protection that must be provided with respect to secured interests, would be illogical if encumbered interests were not included in a debtor's property.

[7]    In *Gheewalla*, the Delaware Supreme Court held that individual creditors of an insolvent corporation may not assert direct claims for breach of fiduciary duty against corporate directors because this would "create uncertainty for directors who have a fiduciary duty to exercise their business judgment in the best interest of the insolvent corporation." 930 A.2d at 103. This interpretation is confirmed by *Shandler*, in which a creditor trustee brought a claim for breach of fiduciary duty against DLJ, which "held large amounts of senior debt [of the debtor] and was acting for the senior lenders." 2010 WL 2929654, at *14. The trustee alleged that "DLJ was placing its interest as a senior creditor ahead of the interests of other less-senior creditors, such as the unsecured creditors," *id.* at *7, by "siphon[ing] off benefits … at the expense of [the debtor's] entity value and therefore at the expense of [the debtor's] junior creditors," *id.* at *14. Vice Chancellor Strine dismissed that

9

statement of Delaware law, the Delaware Supreme Court's decision in *Gheewalla*, has made

clear it is no longer the law and the *High Strength Steel* decision has not been cited for this

proposition since by Delaware courts.

15.    In sum, the TCEH Debtors have a duty to determine which financing alternative

will maximize the value of their estates for all those having an interest in them and have

unquestionably satisfied that duty.

**B.    The TCEH Debtors Evaluated All Available Financing Options To Maximize
       the Value of the TCEH Debtors' Estates.**

16.    With the goal of maximizing the value of the TCEH Debtors' estates in mind, the

TCEH Debtors explored various financing options.  Husnick Decl. Ex. B (*Dec. of Paul Keglevic,*

*Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of Energy*

*Future Holdings Corp., et al., In Support of First Day Motions* ("Keglevic Dec."), ¶ 156).

17.    The TCEH Debtors and their professional advisors took into consideration the

TCEH Debtors' near-term projected financial performance, including demand for services and

the cost of supplying such services, to determine the appropriate need for DIP financing.  *See*

Husnick Decl. Ex. C (*Dec. of Stephen Goldstein in Support of (I) the Motion of Texas*

*Competitive Electric Holdings Company LLC and Certain of its Debtor Affiliates for Entry of*

*Interim and Final Orders (A) Approving Postpetition Financing, (B) Granting Liens and*

*Providing Superpriority Administrative Expense Claims, (C) Modifying the Automatic Stay, and*

*(D) Scheduling a Final Hearing, and (II) the Motion of Texas Competitive Electric Holdings*

---

argument, explaining that "it is critical to note that [the trustee] cannot base his fiduciary duty claim on the
premise that the board did not do what was best *for a particular class* of [the debtor's] creditors." *Id.* (emphasis
added).

*Company LLC And Certain of its Debtor Affiliates for Entry of Interim and Final Orders (A)*
*Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, (C) Modifying the*
*Automatic Stay, and (D) Scheduling a Final Hearing* ("Goldstein Dec."), ¶ 7).  The TCEH
Debtors' management also conferred with key operational decision-makers to understand key
business metrics that would factor into financing needs.  *Id.*

18.     In early September 2013, the TCEH Debtors and Evercore initiated a request for
DIP facility proposals and approached *five* global financial institutions that are actively involved
in the debtor-in-possession and syndicated finance markets.  Husnick Decl. Ex. B (Keglevic
Dec., Ex. A, ¶ 7).  After receiving and thoroughly analyzing the proposals, the TCEH Debtors
concluded that no single financial institution would be able to underwrite the entire amount of
DIP financing due to the size of the proposed revolving credit facility, and decided to take a
"club" approach.  Husnick Decl. Ex. C (Goldstein Dec., ¶ 20).  Negotiations continued through
October, and on October 25, 2013, Citigroup Global Markets Inc. and Deutsche Bank Securities
proposed the best possible combination of terms that could effectively address the Debtors'
liquidity needs.  Husnick Decl. Ex. B (Keglevic Dec., Ex. A, ¶ 7).  Negotiations with the
financing institutions continued in February 2014 and culminated on April 28, 2014 with signed
commitment letters from seven lenders for $4.475 billion of DIP financing on highly favorable
terms.  *Id.* ¶ 8.

### C.     The Drop-Down Financing Is Not the Superior Financing Alternative.

19.     Despite a clear record to the contrary, the Ad Hoc Unsecured Group continues to
assert that the Debtors have ignored an alternative financing proposal, whereby the TCEH
Debtors would essentially drop down assets into an unrestricted subsidiary and borrow against

11

the newly unencumbered assets (the "Drop-Down Financing").  *See* Unsecured Ad Hoc Objection, ¶ 15.  The Ad Hoc Unsecured Group's suggestion that the Drop-Down Financing is a superior and readily available financing alternative is incorrect on both counts.  Indeed, the Court has already found at the May 1, 2014 hearing that the TCEH's Debtors' decision not to pursue the Drop-Down Financing "was a reasonable exercise of the Debtors' business judgment."[8]  The Ad Hoc Unsecured Group has presented *no new evidence* to suggest that the Court's ruling was incorrect.

20.    As discussed at length on the record at the first day hearing, the TCEH Debtors, in consultation with their professional advisors, determined in their sound business judgment that the Drop-Down Financing was *not* the superior financing alternative because it would not maximize value for the TCEH Debtors' estates.  Given the TCEH Debtors' fiduciary duty to maximize the value of their estates, the relevant inquiry was whether the Drop-Down Financing would maximize the value of the TCEH Debtors' estates, regardless of whether the TCEH Debtors had the contractual right to pursue the Drop-Down Financing before the Petition Date. The Debtors found that it would not for numerous reasons, including litigation risks, timing and execution challenges, and pricing issues.  *See* Husnick Decl. Ex. A (Trial Tr. 178-80 (Testimony of Paul Keglevic)).

---

[8]    *See* Husnick Decl. Ex. A (Trial Tr. 301-02 ("[T]he bottom line was they calculated [the drop-down DIP financing] and they considered it, but it didn't provide them the liquidity they needed at a price that was affordable.  And [Keglevic] made this point several times and I don't think we need to, we can't lose sight of it is, there is a giant business risk associated with and there always is going forward but on a contested basis on cash collateral or a contested basis on the debt that doesn't bear the bank in mind. And this business is volatile in that the customers as was said, the customers are the click of a mouse away from changing….I think that Mr. Keglevic's testimony was…more than adequate, that it was a reasonable exercise of the debtor's business judgment not to pursue that course of action.")).

21.     *First*, the Drop-Down Financing would have been insufficient to support the TCEH Debtors' DIP financing needs. *See* Husnick Decl. Ex. A (Trial Tr. 179 (Testimony of Paul Keglevic)).  Even under the most aggressive assumptions—including that the TCEH Debtors could have avoided paying any adequate protection, avoided posting any replacement bond with the Railroad Commission of Texas to support its mining reclamation obligations, and succeeded in hotly contested litigation regarding the viability of the Drop-Down Financing, including the "recharge" strategy—the TCEH Debtors determined that the Drop-Down Financing still did not provide sufficient liquidity.[9]

22.     *Second*, the Drop-Down Financing presented significant litigation risks with respect to the Prepetition First Lien Creditors.  The TCEH Debtors were concerned that the Prepetition First Lien Creditors, either in their individual capacities or through their ad hoc committee (the "TCEH First Lien Ad Hoc Committee"), would likely bring various challenges against the Drop-Down Financing, including, among other things, breach of contract, breach of fiduciary duty, and fraudulent transfer causes of action. *See* Husnick Decl. Ex. E (Letter from Paul, Weiss, Rifkind, Wharton & Garrison LLP to Kirkland & Ellis LLP (Mar. 6, 2014)). Moreover, any "recharge" strategy would be subject to greater opposition (and litigation risk), given the higher amounts and additional steps required.  While the TCEH Debtors did not

---

[9]     *See* Husnick Decl. Ex. A (Trial Tr. 177 (Testimony of Paul Keglevic) ("Was one of the challenges that you identified in evaluating this, sufficient financing? A. Yes. So there really a couple; one, you know, was capacity. Because as I described this, we thought -- you know, our calculations indicated we needed more money that would be available through this process, even if the recharge, in fact, turned out to be something that was executable.; *see also* Husnick Decl. Ex. D (Goldstein Dep. 143:25-144:13, May 27, 2014 ("In a nonconsensual drop-down DIP, I don't know if this would be the budget or not, so I can't make a statement as to whether or not there would be diminution in value. We thought there would be significant business disruption. Q. Why? A. Because we would have inadequate liquidity to operate. Q. Inadequate liquidity why? A. Because the $1.4 billion that we've been talking about in the drop-down structure was inadequate to run the business."))).

believe that any such challenges would in the end be successful, these litigation risks were a major concern for the TCEH Debtors given the business risk involved with a contested fight over use of cash collateral and DIP financing.  Indeed, even if they succeeded in that initial fight, the TCEH Debtors recognized that they likely would have alienated this important constituency.  Thus, the TCEH Debtors concluded that it was not in their best interests to begin their chapter 11 cases with a contested cash collateral fight with their single largest secured creditor constituency.[10]

23.    *Third*, in addition to sizing issues and litigation risks, timing and execution considerations weighed against pursuing the Drop-Down Financing.  For example, the TCEH Debtors would have needed to, among other things, identify assets to be dropped down, request, receive, and evaluate financing proposals, negotiate definitive documentation, negotiate lien releases from their Prepetition Secured Creditors (the very creditors from whom they would have just taken billions of dollars in assets), and closed the Drop-Down Financing transaction in advance of the Petition Date.  Each of these steps made it incrementally more difficult, if not impossible, to ensure that the Drop-Down Financing was a viable source of postpetition financing that could be reasonably relied upon at this critical juncture in the TCEH Debtors' restructuring.

---

[10]    *See* Husnick Decl. Ex. F (Keglevic Dep. 381:9-16, May 28, 2014 ("Q. Let me be clear about this:  You have explained to me that the -- one of the reasons you had to agree to the terms of the cash collateral order is because that was necessary to get the consent of the first lien lenders, right?  A.  Yes.  With respect to the cash collateral.")); *Id.*  at 381:25-382:11 ("Q. Previously.  And wasn't it true that one of your avenues of leverage in connection with negotiating the cash collateral order, or -- sorry -- the people who negotiated the cash collateral order, was the possibility that if they didn't want to do it in a manner that the debtors thought appropriate, the debtors could just say take the assets?  Mr. McKane:  Objection to form.  A.  Our focus was to maximize and maintain the value of the estate, and incurring any tax would have hurt the estate."); Husnick Decl. Ex. A (Trial Tr. 302 ("I think that Mr. Keglevic's testimony was…more than adequate, that it was a reasonable exercise of the debtor's business judgment not to pursue that course of action.")).

24.     Not only did the Drop-Down Financing present myriad litigation risks, pricing issues, and timing and execution challenges (*see* Husnick Decl. Ex. A (Trial Tr. 178-80 (Testimony of Paul Keglevic))), but such a strategy would have inhibited the TCEH Debtors' ability to negotiate with the Prepetition First Lien Creditors toward a consensual transaction structure, which, despite the Ad Hoc Unsecured Group's contention (Unsecured Ad Hoc Objection, ¶¶ 15-16), is a wholly rational and appropriate factor for the TCEH Debtors to consider. In contrast, the TCEH Debtors have not only obtained the TCEH First Lien Ad Hoc Committee's consent to the use of Cash Collateral and the priming DIP liens, but the Debtors also succeeded in negotiating with the TCEH First Lien Ad Hoc Committee for a comprehensive restructuring, memorialized in the Restructuring Support and Lock-Up Agreement, dated as of April 29, 2014 [D.I. 505, Ex. A] (the "Restructuring Support Agreement"). The TCEH Debtors could not possibly justify sacrificing a consensual reorganization framework and gratuitously undermining their relationship with the Prepetition First Lien Creditors solely to pursue Drop-Down Financing that did not satisfy their needs.[11]

---

[11]    Counsel to the Ad Hoc Unsecured Group suggested at the May 1, 2014 hearing that the appropriate standard of review of the TCEH Debtors' decision not to pursue the Drop-Down Financing would be "overall fairness" (typically referred to as "entire fairness"), rather than business judgment. *See* Husnick Decl. Ex. A (Trial Tr. 291 (Statement of Thomas Lauria)). While the Ad Hoc Unsecured Group appears to have dropped this assertion, it is worth pointing out that the appropriate standard of review for the TCEH Debtors' selection of DIP Financing is one of business judgment.

Under the business judgment rule, courts will not second-guess a business decision, so long as corporate management exercised a minimum level of care in arriving at the decision. *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."). The business judgment rule "under Delaware law and the law of numerous other jurisdictions establishes a presumption that in making a business decision, the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company." *Id.*

Here, the TCEH Debtors' board decided not to pursue the Drop-Down Financing for a host of business reasons discussed at the first day hearing and in this reply. Counsel to the Ad Hoc Unsecured Group seemed to suggest

15

## II.    The TCEH Debtors' Need for the DIP Financing on a Final Basis is Appropriate.

25.    Although the Objectors question the TCEH Debtors' various necessary restructuring costs (mainly adequate protection payments), the TCEH Debtors carefully determined the amount of the $4.475 billion in DIP Financing that was necessary to fund their operational and restructuring costs in the chapter 11 cases, and the need for such DIP Financing is uncontroverted.

### A.    The Size of The DIP Facility Is Appropriate Given Volatility in the TCEH Debtors' Business.

26.    The Objectors point out that the DIP Facility is large and therefore "excessive" or "oversized." *See* Unsecured Ad Hoc Objection, ¶ 5; UCC DIP Objection, ¶ 3; Unsecured Trustee Objection, ¶ 2. While the DIP Facility is no doubt large, it is appropriate for a company of this size and in this industry. The TCEH Debtors require the DIP Financing to fund, among other things, the following: adequate protection payments; working capital (e.g., collateral for letters of credit); bankruptcy costs (e.g., business disruption and professional fees); and regulatory requirements (e.g., RCT mining reclamation obligations), all as set forth in the revised DIP budget [D.I. 599] (the "DIP Budget").

27.    Though the TCEH Debtors agreed to certain reductions to the interim borrowing at the May 1, 2014 hearing, they continue to believe that the full amount of the DIP Facility

---

at the first day hearing that the TCEH directors were not disinterested or independent in deciding not to pursue the Drop-Down Financing. *See* Husnick Decl. Ex. A (Trial Tr. 291). The record in this case, however, demonstrates that the directors were disinterested and independent. The DIP Lenders are not insiders of the Debtors. And, unlike in the *L.A. Dodgers* case cited by the Ad Hoc Unsecured Group, none of the reasons for the Debtors' decision not to pursue the Drop-Down Financing calls into question the disinterestedness or independence of the TCEH directors. *See L.A. Dodgers*, 457 B.R. at 313 (holding that where principal failed to seek approval of unsecured loan that would have caused him to be personally liable for $5 million, the existence of "potential personal liability clearly compromised Debtors'/[principal's] independent judgment").

remains appropriate given the volatility of the market, certain factors the TCEH Debtors did not account for, and the excellent terms on which the TCEH Debtors negotiated this financing. As noted at the May 1, 2014 hearing, the amount of adequate protection payments does <u>not</u> include $300 million in accrued and unpaid interest for Prepetition First Lien Creditors, which the TCEH Debtors will not pay during the pendency of the chapter 11 cases. *See* Husnick Decl. Ex. A (Trial Tr. 276 (Statement of Chad Husnick)). The interim borrowed amounts were revised to reflect the $300 million reduction, as well as a reduction for $69 million in payments owed by the TCEH Debtors to EFH Corporate Services Company. *See* Interim DIP Order, ¶ 4. The Ad Hoc Unsecured Group now has requested a permanent reduction in the DIP Facility size. *See* Unsecured Ad Hoc Objection, ¶ 18.

28.    The TCEH Debtors do not believe that a permanent reduction in the size of the DIP Facility is appropriate for several reasons. ***First***, the TCEH Debtors did not anticipate not having access to the $150 million of Segregated Cash when they sized the DIP Facility. ***Second***, the TCEH Debtors must take into account payment of adequate protection on the additional $300 million in accrued and unpaid interest during the chapter 11 cases, which is approximately $1.3 million per month or $32.5 million through the duration of the DIP Budget. *See* DIP Budget. Finally, the TCEH Debtors have determined in their business judgment that, given the volatility of the energy market and the highly favorable terms of the DIP Facility, it is in the best interests of the TCEH Debtors' estates to have access to the full amount of the DIP Facility. While the TCEH Debtors' initial DIP budget contemplated minimum liquidity of $150 million during certain months covered in the DIP budget, the TCEH Debtors believe that $250 million to $500 million of available liquidity is more appropriate for a company of this size operating in

this industry.[12]    As between having a reasonable amount of cushion for unanticipated occurrences and having none at all, the more responsible choice is obviously the former. Accordingly, the size of the DIP Facility is appropriate and should be approved on a final basis.

**B.      The TCEH Debtors Require the DIP Facility on a Final Basis Immediately.**

29.     The TCEH Debtors require the DIP Facility to be approved on a final basis immediately to ensure that they may obtain a ruling from the RCT regarding the RCT Reclamation Support Carve Out and avoid any unnecessary fees to the TCEH Debtors' estates. The Ad Hoc Unsecured Group suggests in a footnote that final approval of the DIP Facility could be delayed until after the RCT has ruled to avoid costs associated with the Delayed Draw Term Loan. *See* Unsecured Ad Hoc Objection, ¶ 21 n.7. This suggestion, however, is not viable and delayed approval will only increase the costs of the DIP Facility.

30.     The RCT has informed the TCEH Debtors that it will not consider the TCEH Debtors' application to submit the RCT Reclamation Support Carve Out in satisfaction of its reclamation bonding obligations until the RCT Reclamation Support Carve Out has been approved by the Bankruptcy Court in a final order.  Thus, it is critical that the TCEH Debtors have final approval of the DIP Facility on June 5 or 6.

---

[12]    *See* Husnick Decl. Ex. F (Keglevic Dep. 236:23-237:10 ("I have been, in various earnings calls and other public forums, quoted as saying based on analysis of the company we have done that we would like 250 to $500 million as kind of an operating liquidity.  And since this amount got slightly below the minimum, we're going to evaluate whether that 300 should be taken off or there's another good and supportive business reasons to keep it in to make sure we have adequate cash and don't have to dip into the unsubordinated -- excuse me -- the segregated cash.")); Husnick Decl. Ex. D (Goldstein Dep. 54:20-55:15 ("Q. Okay. And what are your reasons for not wanting to downsize the DIP? A. A couple of reasons. One, I do think that by the out months of the case, even in the updated budget we're down to $336 million of liquidity, you know, there's an incredible amount of variability in this forecast, it's a big company, it's a power company, there's a lot of factors that can change -- change this. So that's one point.  And the second point is it's -- the excess liquidity is off of a revolver, and that will not be drawn until needed, and it's very, very cheap financing. We worked very hard to get that revolver, it's very hard to get a revolver like that in today's market. So it's a great achievement for the debtors.")).

31.    Moreover, delaying final approval of the DIP Facility will not result in any cost savings for the TCEH Debtors and, in fact, increases the risk that the TCEH Debtors will have to use the Delayed Draw Term Loan to satisfy the RCT bonding requirement.  The DIP Lenders have already earned an upfront fee on the Delayed Draw Term Loan, although such fee is not payable until funding or termination of the Delayed Draw Term Loan.  In addition, the TCEH Debtors have already paid the Delayed Draw Term Loan DIP facilities fee.  The TCEH Debtors may receive a 50 percent refund of such fee if they terminate the Delayed Draw Term Loan Commitment before August 4, 2014.  Moreover, the TCEH Debtors must pay a per diem "ticking" fee to the extent the Delayed Draw Term Loan Commitment remains extant beyond July 4, 2014.  Termination of the Delayed Draw Term Loan Commitment requires that the RCT approve the RCT Reclamation Support Carve Out, which, as discussed above, the RCT will not consider until final approval of the DIP Facility.  Accordingly, the TCEH Debtors require final approval as soon as possible to ensure that they are in the best position possible to get a 50% refund and avoid the incurrence of any ticking fees on account of the Delayed Draw Term Loan.

III.    **The Adequate Protection Provided by the TCEH Debtors to the Prepetition Secured Creditors is Appropriate.**

32.    The adequate protection package provided by the TCEH Debtors to the Prepetition Secured Creditors is appropriate and was in exchange for the TCEH First Lien Ad Hoc Committee's consent to the priming liens (and other terms provided) under the DIP Motion and the TCEH Debtors' use of Cash Collateral.  After several months of good faith, arm's-length negotiations, the TCEH Debtors agreed to provide the Prepetition Secured Creditors with adequate protection, including replacement liens and superpriority claims.  In addition, the Prepetition First Lien Creditors will receive adequate protection payments, professional fees and

expenses, and the same financial covenant and access to books and records provided to the DIP

Lenders. As the Court noted, "even an undersecured creditor is entitled to adequate protection if

that undersecured creditor is primed." *See* Husnick Decl. Ex. A (Trial Tr. 266).

33.     Despite the Bankruptcy Code's and the Court's clear direction that secured

creditors are entitled to adequate protection, the Objectors assert that the grant of adequate

protection to the Prepetition Secured Creditors is unnecessary or improper for a variety of

reasons, each of which are incorrect and discussed in turn below.

> **A.      The TCEH Debtors Must Provide Adequate Protection and Do <u>Not</u> Need To Demonstrate That the Collateral Will Decrease In Value.**

34.     Sections 363(c)(2) and 364(d) of the Bankruptcy Code clearly provide that where

the debtor seeks to use cash collateral or impose priming liens, the debtor must either obtain the

consent of the secured creditor or demonstrate that the secured creditor is adequately protected.

*See* 11 U.S.C. §§ 363(c)(2), 364(d). It is also well-settled that the debtor, not the secured

creditor, bears the burden of proof on the issue of adequate protection. *See* 11 U.S.C. § 363(p)

("In any hearing under this section--(1) the trustee has the burden of proof on the issue of

adequate protection..."); 11 U.S.C. § 364(d)(2) ("In any hearing under this subsection, the

trustee has the burden of proof on the issue of adequate protection."); 11 U.S.C. § 1107 ("a

debtor in possession shall have all of the rights...and powers, and shall perform all the functions

and duties...of a trustee serving in a case under this chapter"). Put another way, in the absence

of secured lender consent, the debtor must demonstrate that the secured lender is adequately

protected. Failure to provide such adequate protection results in denial of access to cash

collateral and an inability to obtain postpetition financing on a priming lien basis—in these

cases, bringing the TCEH Debtors' operations to a halt. In addition, the Bankruptcy Code

20

provides that if the Prepetition First Lien Creditors do not receive adequate protection, they are entitled to relief from the automatic stay to foreclose on their collateral. *See* 11 U.S.C. § 362(d)(1) ("[T]he court shall grant relief from the automatic stay…(1) for cause, including the lack of adequate protection of an interest in property of such party in interest.").

35. For all of the Objectors' claims regarding the need to protect their potential recoveries and the TCEH Debtors' failure to do so throughout this process, it seems clear that the Objectors fail to grasp how much a foreclosure could hurt—and possibly eviscerate—these potential recoveries. If the Prepetition First Lien Creditors foreclosed on their collateral, triggering the multi-billion dollar deconsolidation tax, the IRS almost certainly would pursue those claims, among others, against the TCEH Debtors as well. This would undoubtedly create a much worse situation for the TCEH Debtors' unsecured creditors than simply allowing the TCEH Debtors to provide the Prepetition Secured Creditors with the adequate protection to which they are legally entitled.

36. Despite clear law to the contrary, certain of the Objectors assert that the Prepetition Secured Creditors must first offer evidence of a decline in the value of the Collateral before being entitled to adequate protection (*see* UCC CC Objection, ¶¶ 14-15; Unsecured Trustee Objection, ¶ 7). Such a reversal of the Bankruptcy Code's adequate protection requirement has no support in the law. Indeed, the cases cited in the Creditors' Committee's and Unsecured Trustee's Objections to support this argument are all inapplicable, insofar as such cases dealt with the situation where secured creditors moved for adequate protection under section 363(3) of the Bankruptcy Code, rather than where the debtor sough to use cash collateral or impose priming liens. *See Zink v. Vanmiddlesworth*, 300 B.R. 394 (N.D.N.Y. 2003) (creditor

seeking adequate protection where cattle securing creditor's claim had declined in value); *In re Cont'l Airlines, Inc.*, 146 B.R. 536 (Bankr. D. Del. 1992) (creditors moved for adequate protection of their interest in aircraft collateral); *In re Elmira Litho, Inc.*, 174 B.R. 892 (Bankr. S.D.N.Y. 1994) (secured equipment lender seeking relief from automatic stay, or, alternatively, adequate protection of interests).

37.    Accordingly, neither the Prepetition Secured Creditors nor the TCEH Debtors are affirmatively obligated to offer evidence of the decline in the value of the collateral for the Prepetition Secured Creditors to be entitled to adequate protection.  Instead, it is the TCEH Debtors' burden—a burden that they have satisfied—to demonstrate adequate protection.  Indeed, the Court already held that the Prepetition First Lien Creditors are "entitled to adequate protection in connection with the priming DIP Facility."  *See* Husnick Decl. Ex. A (Trial Tr. 300-301 ("I think that adequate protection is appropriate and I will approve that.")).

**B.      Adequate Protection Payments At the Non-Default Contract Rate of Interest Are an Appropriate Proxy for Diminution in Value.**

38.    As part of their adequate protection package, the Prepetition First Lien Creditors will receive monthly adequate protection payments at the LIBOR Rate + 450 basis points, which approximates a blended rate of the non-default contract rates of interest provided under the Prepetition First Lien Documents.  This blended non-default contract rate of interest is an appropriate, commonly used proxy for adequately protecting the Prepetition First Lien Creditors against any Diminution in Value, as required by sections 364(d)(1)(B) and 363(c)(2) of the Bankruptcy Code (as discussed above). *See* 11 U.S.C. §§ 364(d)(1)(B), 363(c)(2).

39.    Courts in this and other districts have ordered the payment of non-default rate interest as a proxy for adequate protection to prepetition undersecured creditors in other recent

22

chapter 11 cases. *See, e.g., In re Dex One Corp.*, No. 13-10533 (KG) (Bankr. D. Del. April 10, 2013) (providing adequate protection payments in the form of monthly interest at the non-default rate set forth in the prepetition documents); *In re Newpage Corp.*, No. 11-12804 (KG) (Bankr. D. Del. Oct. 4, 2011) (same); *In re Nebraska Book Co., Inc.*, No. 11-12005 (PJW) (Bankr. D. Del. July 7, 2011) (same); *In re Stallion Oilfield Servs. Ltd.*, No. 09-13562 (BLS) (Bankr. D. Del. Nov. 18, 2009) (same); *In re Masonite Corp.*, No. 09-10844 (PJW) (Bankr. D. Del. Apr. 14, 2009) (same); *see also In re Residential Capital, LLC*, No. 12-12020 (MG) (Bankr. S.D.N.Y. June 25, 2012); *In re Hawker Beechcraft, Inc.*, No. 12-11873 (SMB) (Bankr. S.D.N.Y. June 4, 2012) (same); *In re Calpine Corp.*, No. 05-60200 (BRL) (Bankr. S.D.N.Y. Jan. 26, 2006) (same).[13]

40.     As a clarifying point, adequate protection payments are not postpetition interest payments. The Unsecured Trustee, therefore, mischaracterizes *Timbers* when asserting that the adequate protection payments run afoul of that case. *See* Unsecured Trustee Objection, ¶¶ 6-7 (citing *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Ass'n, Ltd.*, 484 U.S. 365 (1988)). The Supreme Court in *Timbers* discussed secured creditors' entitlement to postpetition interest payments under section 506 of the Bankruptcy Code, which has nothing to do with adequate protection. 484 U.S. at 372. This dovetails with the Objectors' argument that the Prepetition First Lien Creditors should only receive adequate protection payments with regard to the value of their collateral, citing a case discussing the amount of a secured claim under section 506(a) of the Bankruptcy Code. *See* Unsecured Trustee Objection, ¶ 8 (citing *In re Markos Gurnee P'ship.*,

---

[13] Because of the voluminous nature of the orders cited herein, such orders have not been attached to the Reply. Copies of these orders are available upon request of the Debtors' proposed counsel.

252 B.R. 712, 717 (Bankr. N.D. Ill. 1997)).  Again, the adequate protection payments are meant to be a proxy for diminution in value, not interest on the Prepetition First Lien Creditors' secured claim, and are subject to reallocation as principal payments if found to be too much adequate protection.[14]  The Debtors do not believe it is either necessary or appropriate to litigate the amount of the Prepetition First Lien Creditors' claim through the Cash Collateral Motion. Indeed, the TCEH Debtors negotiated for consensual use of Cash Collateral to, among other things, avoid just such a fight in the early days of their chapter 11 cases.

41.    Nor are adequate protection payments a roll-up of prepetition debt, as the Creditors' Committee suggests. UCC CC Objection, ¶ 26.  Adequate protection payments are one of several forms of adequate protection expressly contemplated under section 361 of the Bankruptcy Code.  *See* 11 U.S.C. § 361 ("[A]dequate protection may be provided by (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the...use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property.").  The cases cited by the Creditors' Committee only refer to the term "roll-up" as it is conventionally used, i.e., when referring to a prepetition creditor providing postpetition financing in exchange for "rolling" all or a portion of its prepetition claim into postpetition priority status. *See In re Caccamise*, No. 09-17165, 2009 Bankr. LEXIS 4174 (Bankr. E.D. Va. Dec. 22, 2009) (discussing conventional postpetition financing roll-ups in context of chapter 13 case of a husband and wife); *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369 (Bankr. S.D. Tex. 2001)

---

[14]    The Court stated at the first day hearing, "I think they are arguably entitled to adequate protection that would take them from a current undersecured basis all the way topped up to a secured basis because until they get there, nobody is otherwise entitled to get in front of them."  *See* Husnick Decl. Ex. A (Trial Tr. 300).

24

(discussing ruling of *In re Saybrook Mfg. Co.*, 963 F.2d 1490 (11th Cir. 1992), against conventional postpetition financing roll-up). These cases are inapposite to the appropriateness of the TCEH Debtors' proposed adequate protection package for the Prepetition First Lien Creditors.

42.    The Creditors' Committee also expresses concern that making adequate protection payments to the Prepetition First Lien Creditors will result in a "windfall" to the Prepetition First Lien Creditors. *See* UCC CC Objection, ¶ 28. This is not possible given that the Adequate Protection Payments are subject to recharacterization, reallocation, and disgorgement to the extent that they exceed any Diminution in Value. *See* Proposed Final Cash Collateral Order, ¶ 5(d). Indeed, as previously explained to the Court, the TCEH Debtors insisted throughout their negotiations with the TCEH First Lien Ad Hoc Committee, that if the TCEH Debtors were going to pay adequate protection on the full amount of the Prepetition First Lien Creditors' claims, the TCEH Debtors would reserve the right to recharacterize, reallocate, and disgorge such amounts to the extent it is ever determined that the Prepetition First Lien Creditors received too much in Adequate Protection Payments. *See* Husnick Decl. Ex. A (Trial Tr. 186-88 (Testimony of Paul Keglevic)).

43.    Finally, the Creditors' Committee's and Unsecured Trustee's suggestion that the Prepetition First Lien Creditors should waive their right to seek default interest is inappropriate. *See* UCC CC Objection, ¶ 28; Unsecured Trustee Objection, ¶ 8. The Prepetition First Lien Creditors have told the TCEH Debtors that they are unwilling to waive default interest, and there is nothing in the Bankruptcy Code requiring such a waiver. It is not surprising that the Prepetition First Lien Creditors would refuse to consent to such a waiver when junior creditors

are arguing that the Prepetition First Lien Creditors are oversecured.[15]  If that were the case, the

Prepetition First Lien Creditors would undoubtedly assert that they are entitled to default interest.

44.     Accordingly, the TCEH Debtors submit that the adequate protection payments are

appropriate and necessary to adequately protect the Prepetition First Lien Creditors against any

diminution in value.[16]

## IV.    Liens and Superpriority Claims on the Unencumbered Assets, Including the Proceeds to Avoidance Actions, are Appropriate.

45.     After extensive negotiations, the TCEH Debtors agreed to provide the DIP

Lenders and Prepetition Secured Creditors with liens on the unencumbered assets, including the

proceeds of Avoidance Actions, in exchange for the DIP Facility, the priming liens thereunder,

and the consensual use of Cash Collateral.  The Objectors contend that liens on unencumbered

assets are improper (Unsecured Ad Hoc Objection, ¶ 12; UCC CC Objection, ¶¶ 20–23;

Unsecured Trustee Objection, ¶¶ 4–5), but these liens are part of the package agreed upon by the

DIP Lenders and the Prepetition Secured Creditors.  The DIP Facility is on the best terms

available to the TCEH Debtors under the circumstances, and the DIP Lenders conditioned the

extension of credit on obtaining liens on the unencumbered assets.  *See* Proposed Final DIP

Order, ¶ E(ii).  To secure the DIP Facility, it was also necessary to prime the Prepetition Secured

Creditors.  To prime the Prepetition Secured Creditors and obtain their consent to use the Cash

---

[15]   The Debtors reserve all rights with respect to any entitlement to default interest for any stakeholder in the chapter 11 cases.  The Debtors do not believe it is either necessary or appropriate to litigate the entitlement to default interest through the Cash Collateral Motion.

[16]   Again, although adequate protection payments are required to protect secured lenders against the risk of diminution in value, neither lenders nor debtors are required to establish that diminution in value will or will not occur, unless the secured lenders seek relief from the automatic stay, which is not the case here.

Collateral, they also required liens on the unencumbered assets. *See* Proposed Final Cash Collateral Order, ¶ G.

46.      Section 364(c)(2) specifically provides for the ability to secure postpetition financing with liens on unencumbered assets. *See* 11 U.S.C. § 364(c)(2). By enacting section 364 of the Bankruptcy Code, Congress recognized the natural reluctance of lenders to extend credit to a bankrupt company and fashioned section 364 of the Bankruptcy Code to provide "incentives to the creditor to extend post-petition credit." *In re Ellingsen MacLean Oil, Inc.*, 834 F.2d 599, 603 (6th Cir. 1987). A debtor's right to encumber otherwise unencumbered assets is one of those incentives. *See* 11 U.S.C. § 364(c)(2).

47.      Accordingly, courts in this District routinely authorize liens on unencumbered assets as part of an adequate protection package provided to debtor-in-possession lenders. *See, e.g., In re The Dolan Co.*, No. 14-10614 (Bankr. D. Del. Apr. 17, 2014) (approving debtor-in-possession liens secured by the debtors' unencumbered assets); *In re Fisker Automotive Holdings, Inc.*, No. 13-13087 (KG) (Bankr. D. Del. Jan. 24, 2014) (same); *In re Longview Power, LLC*, No. 13-12211 (BLS) (Bankr. D. Del. Nov. 21, 2013) (same); *In re LSP Energy Ltd. P'ship*, No. 12-10460 (MFW) (Bank. D. Del. Feb. 27, 2012) (same); *In re Nebraska Book Co., Inc.*, No. 11-12005 (PJW) (Bankr. D. Del. July 21, 2011) (same); *In re Visteon Corp.* No. 09-11786 (CSS) (Bankr. D. Del. Nov. 12, 2009) (same).

48.      With respect to the adequate protection liens on unencumbered assets, such liens were necessary to obtain the Prepetition Secured Creditors' consent to the priming liens and the use of Cash Collateral. But these adequate protection liens attach to the unencumbered assets *only* to the extent that there is any diminution in the value of their Prepetition Collateral that is

27

*not defrayed* by the Adequate Protection Payments discussed above. As previously noted by the TCEH Debtors, this is unlikely, given that the Debtors are operationally sound and generate significant positive cash flow before debt service. *See* DIP Motion, ¶ 5.

49.    More importantly, as the secured creditors allowing the TCEH Debtors to use the Cash Collateral to operate the businesses for all of the TCEH Debtors' stakeholders' benefit and giving the TCEH Debtors time to maximize the value of their estates, the Prepetition Secured Creditors should not bear the risk if the value of the assets were to decline during the chapter 11 cases. *See, e.g., In re WestPoint Stevens, Inc.*, 600 F.3d 231, 258 (2d Cir. 2010) (citing *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("[T]he whole purpose of adequate protection is to insure that the creditor receives the value for which he bargained prebankruptcy…[A] proposal depending upon a pre-petition lender having adequate protection…should as nearly as possible under the circumstances of the case provide the creditor with the value of his bargained for rights.")). To force the Prepetition Secured Creditors to bear this risk is incompatible with the clear mandate of the Bankruptcy Code. *See* 11 U.S.C. §§ 363(p), 364(d).

50.    At the end of the day, it is important to remember all of the TCEH Debtors' efforts to preserve the unencumbered assets. First, the TCEH Debtors negotiated for months to avoid liens on the unencumbered assets, but the DIP Lenders were unwilling to provide, and Prepetition Secured Creditors would not consent to being primed by, the DIP Facility without receiving liens on unencumbered assets. Second, the TCEH Debtors took action to preserve the Segregated Cash before the Petition Date, using encumbered cash first, and eventually using only a portion of the unencumbered cash as a last resort when the TCEH Debtors ran out of

liquidity.[17]  Finally, even after the Petition Date, the TCEH Debtors have agreed not to use the unencumbered assets to operate the TCEH Debtors' businesses.  The TCEH Debtors have agreed to maintain the Segregated Cash, the major component of the unencumbered assets, in a segregated account.  *See* Proposed Final Cash Collateral Order, ¶ F(i)(e).

51.     The Objectors also take specific issue with the liens on the proceeds of Avoidance Actions.  *See* Unsecured Ad Hoc Objection, ¶ 12; UCC CC Objection, ¶¶ 20-23; Unsecured Trustee Objection, ¶¶ 4-5.  As part of the unencumbered assets, the TCEH Debtors' rationale for providing the liens on the proceeds of Avoidance Actions is substantially the same as set forth above (the terms of the DIP Facility are the best terms available to the TCEH Debtors under the circumstances, the DIP Lenders conditioned the extension of credit on obtaining liens on the proceeds of the Avoidance Actions, and the Prepetition Secured Creditors conditioned their consent to being primed on the same).

52.     The Ad Hoc Unsecured Group states that the Avoidance Actions are not the Debtors' property.  *See* Unsecured Ad Hoc Objection, ¶ 26.  Without question, however, the proceeds of avoidance actions are property of the debtor's estate under section 541(a)(3) of the

---

[17]  *See* Husnick Decl. Ex. F (Keglevic Dep. 243:3-244:20 ("Q. Okay. And what do you understand to be the largest amount of cash that existed at TXU Receivables? Mr. McKane: Objection to form. A. I believe when we unwound the facility it approximated $250 million. Q. Okay. And what do you mean by 'unwound the facility'? A. We basically paid off the facility. Q. What was the facility? A. The facility was an accounts receivable secured financing with Citibank. Q. With Citibank. And that was not -- that -- was, as far as you understand it, TXU Receivables Company an obligor on the first lien notes? A. No, they were not. That's why the equity, and then ultimately the cash, was unencumbered. Q. Okay at the current time do you have an understanding of how much cash exists at TXU Receivables Company? A. My recollection is what I just testified to, approximately $150 million. Q. Okay, And where did the other $100 million go? A. It was used for general corporate purposes at TCEH. Q. When was that cash used? A. I would guess, I don't recall exactly when it was used, but I think it was 2014. The situation was that we were running out of cash, and it was the only available cash to use, I think our cash balance probably got as low as -- that virtually all of the cash was unencumbered cash, and it was a result of some margining requirements and weather and some things that hit us in the early part of 2014 that we used more cash than anticipated.")).

Bankruptcy Code. *See* 11 U.S.C. § 541(a)(3). And as with any estate asset, a debtor may grant

liens or superpriority claims on avoidance actions or their proceeds to secure postpetition

financing. *See* 11 U.S.C. §§ 361(2), 364(c)(2); *In re AppliedTheory Corp.*, No. 02-11868, 2008

WL 1869770, at *1 (Bankr. S.D.N.Y. Apr. 24, 2008) (Gerber, J.) ("Of course those assets started

out unencumbered. But those assets can thereafter be encumbered (or made available to satisfy

superpriority claims), if necessary to provide adequate protection. That's expressly authorized

under section 361(2)."). Such decisions are evaluated under the business judgment standard.

*See* 11 U.S.C. §§ 550(a) (preserving recoveries on avoidance actions "for the benefit of the

estate"), 541(a)(3), 541(a)(4). As recognized by the Seventh Circuit:

> Lest this way of resolving the issue be taken to assume that § 550(a) requires that
> some benefit flow to unsecured creditors, we add that the statute does not say this.
> Section 550(a) speaks of benefit to the estate—which in bankruptcy parlance
> denotes the set of all potentially interested parties—rather than to any particular
> class of creditors.

*Mellon Bank, N.A. v. Dick Corp.*, 351 F.3d 290, 293 (7th Cir. 2003) (Easterbrook, J.) (emphasis

omitted); *see In re Calpine Corp.*, 377 B.R. 808, 813 (Bankr. S.D.N.Y. 2007 ) (Lifland J.) (citing

*Mellon Bank* with approval); *In re Fleming Packaging Corp.*, No. 03-82408, 2007 WL 4556985,

at *6 (Bankr. C.D. Ill. Dec. 20, 2007) ("This Court does not consider Section 550(a)'s 'for the

benefit of the estate' phraseology as a statutory requirement that the unsecured creditors benefit

directly from the recovery of an avoided transfer, i.e., that the recovered funds end up in the

pockets of the unsecured creditors."); *see also In re Enserv Co.*, 64 B.R. 519, 522 (B.A.P. 9th

Cir. 1986) ("Section 547 specifically gives the debtor in possession the right to bring an action to

recover preferences. This is a decision subject to its discretion.").

53.    Given that the TCEH Debtors lack significant alternative, unencumbered assets to serve as collateral, the DIP Lenders and the Prepetition Secured Creditors required adequate protection in the form of liens on the proceeds of Avoidance Actions.  The TCEH Debtors, in consultation with their advisors, therefore determined that granting a lien on the proceeds of Avoidance Actions as provided under the DIP Facility was a reasonable exchange for the benefits provided under the DIP Facility. *See In re Metaldyne Corp.*, No. 09-13412, 2009 WL 2883045, at *4 (Bankr. S.D.N.Y. June 23, 2009) (approving grant of lien on proceeds of avoidance actions where, among other things, "[t]he Debtors have only limited unencumbered assets upon which replacement liens can be provided").

54.    Moreover, courts in this district regularly approve the encumbrance of avoidance actions or their proceeds under debtor-in-possession financing arrangements and in exchange for the priming provided thereunder.  *See e.g., In re Dolan Co.*, No. 14-10614 (BLS) (Bankr. D. Del. Apr. 17, 2014) (granting debtor-in-possession lenders a lien on proceeds of avoidance actions); *In re Fisker Automotive Holdings, Inc.*, No. 13-13087 (KG) (Bankr. D. Del. Jan. 24, 2014) (same and granting prepetition lenders lien on proceeds of avoidance action); *In re Longview Power, LLC*, No. 13-12211 (BLS) (Bankr. D. Del. Nov. 21, 2013) (same); *In re Appleseed Intermediate Holdings LLC*, No. 11-10160 (KG) (Bankr. D. Del. Feb. 23, 2011) (same); *In re Nebraska Book Company, Inc.*, No. 11-12005 (PJW) (Bankr. D. Del. July 21, 2011) (same); *In re Visteon Corp.*, No. 09-11786 (CSS) (Bankr. D. Del. Nov. 12, 2009) (same).

55.    Accordingly, the TCEH Debtors respectfully submit that providing liens on unencumbered assets as adequate protection for the Prepetition First Lien Creditors and collateral for the DIP Facility is necessary and appropriate.

31

## V.    The Waivers Provided in the DIP and Cash Collateral Orders Are Appropriate.

### A.    The 506(c) Waiver is Appropriate.

56.    The TCEH Debtors disagree with the Objectors' assertions that the section 506(c) waiver provided to the DIP Lenders and Prepetition First Lien Creditors is inappropriate. *See* UCC CC Objection, ¶ 33; Unsecured Trustee Objection, ¶ 11; Unsecured Ad Hoc Objection, ¶ 31. It is well-established that debtors have authority to waive their rights under section 506(c) of the Bankruptcy Code. *See Hartford Underwriters Ins. Co. v. Union Planters Bank N.A.*, 530 U.S. 1, 6 (2000) ("the trustee is the only party empowered to invoke" section 506(c)); *see also In re Smart World Techs., LLC*, 423 F.3d 166, 181-82 (2d Cir. 2005) ("Section 506(c) . . . allows only the 'trustee,' or debtor-in-possession, to take advantage of this exception . . . . We read *Hartford Underwriters* to stand for the proposition that § 1109(b) does not entitle parties in interest, such as Smart World's creditors, to usurp the debtor-in-possession's role as legal representative of the estate."); *In re River Ctr. Holdings, LLC*, 394 B.R. 704, 717 (Bankr. S.D.N.Y. 2008) ("The Supreme Court has made clear that only the trustee has the power, under the plain language of the Code, to assert a section 506(c) claim.").

57.    The TCEH Debtors' agreement to waive their right to surcharge under section 506(c) of the Bankruptcy Code is a reasonable and customary modification in light of the benefits provided by the DIP Facility—particularly the Carve Out—and the consent to priming by the Prepetition First Lien Creditors. Courts in this district and others regularly approve such waivers, especially when coupled with a professional fee carve out. *See, e.g., In re WorldSpace, Inc.*, No. 08-12412 (PJW), 2008 WL 8153638, at *8 (Bankr. D. Del. Nov. 10, 2008) (noting that the DIP lenders were entitled to a section 506(c) waiver after such lenders agreed to subordinate

their DIP claims to a professional fee carve out); *In re The Penn Traffic Co.*, No. 09-14078 (PJW), 2010 WL 2822043, at *16 (Bankr. D. Del. Jan. 25, 2010) (approving a section 506(c) waiver coupled with a professional fee carve out).

**B.      The 552(b) Waiver is Appropriate.**

58.      The TCEH Debtors submit that the section 552(b) waiver is reasonable and appropriate in light of the Prepetition First Lien Creditors' consent to priming and the use of Cash Collateral.  Section 552(b) generally ensures that an entity's prepetition security interest in the proceeds of collateral extends to such proceeds acquired postpetition.  *See* 11 U.S.C. § 552(b)(1).  However, section 552(b) contains a limited exception from this general rule to the extent that the "equities of the case" so require.  *See id.*  The TCEH Debtors have agreed to waive this exception (*see* Proposed Final Cash Collateral Order, ¶ 20), but the Creditors' Committee seeks to limit that waiver to only the TCEH Debtors' ability to invoke the exception. *See* UCC CC Objection, ¶ 35.  This is not the protection that the waiver was intended to provide to the Prepetition First Lien Creditors, and therefore the Prepetition First Lien Creditors are unwilling to consent to such a limited waiver.  *See* UCC CC Objection, ¶ 35.

59.      Secured creditors routinely request a waiver of section 552(b) "equities of the case" claims in connection DIP financing and the consensual use of their cash collateral, and courts regularly approve such waivers.  *See e.g.*, *In re Dolan Co.*, 14-10614 (BLS) (Bankr. D. Del. Apr. 17, 2014) (approving, on a final basis, a 552 waiver in connection with DIP financing and the consensual use of cash collateral); *In re Metavation, LLC*, No. 13-11831 (BLS) (Bankr. D. Del. Aug. 23, 2013) (same); *In re Revel AC, Inc.*, No. 13-16253 (JHW) (Bankr. D.N.J. Apr. 22, 2013) (same); *In re Southern Air Holdings, Inc.* (Bankr. D. Del. Oct. 25, 2012) (same); *In re*

33

*LSP Energy Limited Partnership*, No. 12-10460 (MFW) (Bankr. D. Del. Feb. 27, 2012) (same);

*In re Friendly Ice Cream Corp.*, No. 11-13167 (KG) (Bankr. D. Del. Nov. 2, 2011) (same); *In re*

*Hayes Lemmerz International, Inc.*, No. 09-11655 (MFW) (Bankr. D. Del June 15, 2009) (same).

Indeed, the TCEH First Lien Ad Hoc Committee conditioned its consent on the Prepetition First

Lien Creditors receiving such a waiver.

### C.   The "Marshaling" or Any Similar Doctrine Should Not Apply.

60.   The TCEH Debtors have also agreed to provide the DIP Lenders and Prepetition

Secured Creditors with a waiver of any "marshaling" or similar equitable doctrine.   The

Creditors' Committee and the Unsecured Trustee submit that if the TCEH Debtors are to be

granted authority to provide liens on the unencumbered assets and proceeds of Avoidance

Actions, that the DIP Lenders and Prepetition First Lien Creditors should not be entitled to this

waiver.   *See* UCC CC Objection, ¶ n.17; Unsecured Trustee Objection, ¶ n.7.   The Ad Hoc

Unsecured Group objects to the marshaling waiver altogether.   *See* Unsecured Ad Hoc

Objection, ¶ 39.

61.   Limiting the use of the marshaling doctrine does not strip the unsecured claimants

of any value.   While a junior **secured** creditor may invoke the equitable doctrine of marshaling

under certain limited and strictly construed conditions, "marshaling is not applied if either a

senior secured or other parties are prejudiced." *In re Arlco, Inc.*, 239 B.R. 261, 274 (Bankr.

S.D.N.Y. 1999) (denying creditors request for marshaling on other grounds).   Moreover,

"**unsecured** creditors cannot invoke the equitable doctrine of marshaling." *In re Advanced*

*Mktg. Servs., Inc.*, 360 B.R. 421, 427 (Bankr. D. Del. 2007) (emphasis added; internal quotations

omitted).

34

62.     Accordingly, to protect their rights, debtor-in-possession lenders and primed prepetition creditors routinely request entry of an order exempting their collateral from marshaling. Courts in this district regularly grant such requests. *See e.g.*, *In re Metavation, LLC*, No. 13-11831 (BLS) (Bankr. D. Del. Aug. 23, 2013); *In re Revel AC, Inc.*, No. 13-16253 (JHW) (Bankr. D.N.J. Apr. 22, 2013) (same); *In re Conexant Systems, Inc.* No. 13-10367 (MFW) (Bankr. D. Del. Apr. 19, 2013) (same); *In re Friendly Ice Cream Corp.*, No. 11-13167 (KG) (Bankr. D. Del. Nov. 2, 2011) (same); *In re Nebraska Book Company, Inc.*, No. 11-12005 (PJW) (Bankr. D. Del. July 21, 2011) (same); *In re Cooper-Standard Holdings, Inc.*, No. 09-12743 (PJW) (Bankr. D. Del. Sept. 2, 2009) (same); *In re Hayes Lemmerz International, Inc.*, No. 09-11655 (MFW) (Bankr. D. Del June 15, 2009) (same).

## VI.    The Creditors' Committee's Challenge Rights Are Appropriate.

63.     The TCEH Debtors, the DIP Lenders, and the Prepetition First Lien Creditors have agreed to certain modifications to the challenge rights, including increasing the Challenge Period from 60 days to 90 days and increasing the challenge budget from $175,000 to $300,000. As modified, these provisions should be sufficient to facilitate the Creditors' Committee's review of the Prepetition First Lien Creditors' liens and claims.

## VII.   The Debtors Have Either Addressed Other Objections Raised or Do Not Find Revisions Necessary or Appropriate.

64.     The TCEH Debtors believe that the additional objections will either be resolved by modifications to the final orders or should otherwise be overruled. The Debtors will file a modified order in advance of the Final Hearing reflecting such modifications.

## Conclusion

65.     The TCEH Debtors' business decision to enter into the DIP Facility represents one of several well-reasoned decisions that the TCEH Debtors have made thus far in these chapter 11 cases—indeed, the same reasoning that has led them to a proposed restructuring of the Debtors' over $42 billion in funded debt obligations.  The DIP Facility not only appropriately reflects the TCEH Debtors' capital needs for the chapter 11 cases, but the adequate protection provided to the Prepetition Secured Creditors in exchange for consent to both the priming liens and the use of Cash Collateral, including the adequate protection payments to the Prepetition First Lien Creditors, is reasonable and appropriate protection against any Diminution in Value. Despite the Objectors' insistence otherwise, the liens on proceeds of Avoidance Actions, the 506(c) and 552(b) waivers, and the marshaling doctrine limitation, are all customary terms that both the DIP Lenders and Prepetition First Lien Creditors required to provide the DIP Financing and the consent to the priming liens, respectively.  Because the terms of the DIP Facility are fair and reasonable, if not extremely favorable, and are the best financing option available to the TCEH Debtors, the Objections should be overruled and the DIP and Cash Collateral Motions should be granted on a final basis.

*[Remainder of page intentionally left blank.]*

WHEREFORE, for the foregoing reasons, the Debtors respectfully request that the Court

overrule the Objection on the merits and enter the Final Orders.

Dated:  June 3, 2014
       Wilmington, Delaware

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:     (302) 651-7700
Facsimile:     (302) 651-7701
Email:       collins@rlf.com
             defranceschi@rlf.com
             madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
Richard M. Cieri (admitted *pro hac vice*)
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:       richard.cieri@kirkland.com
             edward.sassower@kirkland.com
             stephen.hessler@kirkland.com
             brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle}
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:       james.sprayregen@kirkland.com
             chad.husnick@kirkland.com
             steven.serajeddini@kirkland.com

Proposed Co-Counsel to the Debtors and Debtors in Possession

37