**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: D.I. 17, 23, 25, 29, 31, 37, 38, 222,** |
| | ) | **287, 466, 635, 645, 679, 680, 681** |

**DEBTORS' OMNIBUS REPLY TO THE AD HOC GROUP
OF TCEH UNSECURED NOTEHOLDERS' REMAINING
OBJECTIONS TO CERTAIN FIRST-DAY AND SECOND-DAY MOTIONS**

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, which are being jointly administered on an interim basis, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

**Table of Contents**

Preliminary Statement................................................................................................................2

Reply….........................................................................................................................................4

I.  The Critical Vendor Motion...............................................................................................4

II.  The Schedules and Statements Extension Motion. ........................................................10

III.  The Joint Administration Motion. .................................................................................16

## Table of Authorities

**Rules**

Bankruptcy Rule 2019 ................................................................................................................ 6

**Cases**

*Global Home Products, LLC*, No. 06-10340 (KG) (Bankr. D. Del.  2006) .................................. 12

*In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) .................................... 12

*In re Penn Cent. Transp. Cor.*, 467 F.2d 100, 102 n.1 (3d Cir. 1972).......................................... 12

*In re Just For Feet, Inc.*, 242 B.R. 821, 826 (D. Del. 1999)......................................................... 12

*In re PTL Holdings LLC*, No. 11-12676 (BLS) (Bankr. D. Del. 2011) ........................................ 14

*In re Tribune Company*, No. 08-13141 (KJC) (Bankr. D. Del. 2009).......................................... 14

*In re Washington Mutual, Inc.*, No. 08-12229 (MFW) (Bankr. D. Del. 2008)............................. 14

*In re Mervyn's Holdings, LLC*, No. 08-11586 (KG) (Bankr. D. Del. 2008) ................................. 14

*In re Delphi Corp.*, No. 05-44481, *111 (Bankr. S.D.N.Y. 2007) ............................................... 16

*In re Genco Shipping & Trading Limited*, No. 14-11108 (SHL) (Bankr. S.D.N.Y. 2014) .......... 16

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file

this omnibus reply (the "Omnibus Reply")[1] to (a) the *Limited Omnibus Objection of the Ad Hoc*

*Group of TCEH Unsecured Noteholders to (1) the Motion of Energy Future Holdings Corp., et*

*al., for Entry of an Order (A) Authorizing the Debtors to (I) Continue Using Their Existing Cash*

*Management System, (II) Maintain Existing Bank Accounts and Business Forms, and (III)*

*Continue Using Certain Investment Accounts; (B) Authorizing Continued Intercompany*

*Transactions and Netting of Intercompany Claims; and (C) Granting Postpetition Intercompany*

*Claims Administrative Expense Priority; and (2) Certain Other of the Debtors' Operational*

*First-Day Motions* [D.I. 681] (the "Omnibus Objection") and (b) the remaining objections of the

Ad Hoc Group of TCEH Unsecured Noteholders (the "Ad Hoc Group") to the following first day

and second day motions:

- Critical Vendors [D.I. 29];[2]

- Schedules & Statements [D.I. 466];[3] and

- Joint Administration [D.I. 17].[4]

---

[1]  The facts and circumstances supporting the Motions addressed in this Omnibus Reply, along with a detailed discussion of the Debtors' business operations and capital structure, are set forth in the *Declaration of Paul Keglevic, Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of Energy Future Holdings Corp., et al., in Support of First Day Motions* [D.I. 98] (the "First Day Declaration"). Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the First Day Declaration.

[2]  See *Limited Objection of the Ad Hoc Group of TCEH Unsecured Noteholders to the Motion of Energy Future Holdings Corp.*, et al., *for Entry of a Final Order Authorizing the TCEH Debtors to Pay Prepetition Critical Vendor Claims* [D.I. 679] (the "Critical Vendor Objection").

[3]  See *Limited Objection of the Ad Hoc Group of TCEH Unsecured Noteholders to the Motion of Energy Future Holdings Corp.*, et al., *for Entry of an Order Extending the Debtors' Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs* [D.I. 645] (the "Schedules and Statements Objection").

[4]  See (a) the *Preliminary Objection of the Ad Hoc Group of TCEH Unsecured Noteholders to the Motion of the TCEH Debtors for Entry of an Order Directing Joint Administration of Their Chapter 11 Cases With Those of the Oncor Debtors* [D.I. 222] (the "Preliminary Joint Administration Objection") and (b) the *Supplemental Objection of the Ad Hoc Group of TCEH Unsecured Noteholders to the Motion of Energy Future Holdings Corp.*, et al., *for Entry of an Order Directing Joint Administration of the Debtors' Chapter 11 Cases* [D.I. 680] (Continued...)

## **Preliminary Statement**

1.      The Debtors have achieved a significant amount of consensus regarding the relief

that is scheduled for the June 5th hearing.  In fact, the Debtors have already filed or expect to file

certificates of counsel with respect to the following 11 motions on the agenda for the June 5th

hearing, all but two of which were not the subject of any objection:

- Ordinary Couse Professionals [D.I. 506];

- Customer Programs [D.I. 31];

- Hedging and Trading Arrangements [D.I. 41];[5]

- Transmission and Distribution Agreements [D.I. 38];

- Utilities [D.I. 26];

- Non-Insider Compensation [D.I. 468];[6]

- Wages & Benefits [D.I. 25];[7]

- Taxes & Fees [D.I. 23];

- De Minimis Asset Sales [D.I. 467];

- ERCOT Assumption [D.I. 40]; and

- Shippers, Warehousemen, and Materialmen [D.I. 27].

---

(the "Supplemental Joint Administration Objection," and, together with the Preliminary Joint Administration Objection, the "Joint Administration Objections").

[5]   The relief requested in the Hedging & Trading Arrangements Motion is resolved on a final basis except with respect to new, incremental proprietary trading transactions.  Relief with respect to that request will go forward at the June 30th hearing.

[6]   The relief requested in the Non-Insider Compensation Motion is resolved on a final basis solely with respect to limited payments to non-insiders that are scheduled to come due between now and June 30th.  The remainder of the relief requested in that Motion will go forward at the June 30th hearing.

[7]   The relief requested in the Wages & Benefits Motion is resolved on a final basis except with respect to (a) the Debtors' prepetition severance programs and (b) fees owed to the Debtors' independent directors.  Relief with respect to the foregoing described in (a) and (b) will go forward at the June 30th hearing.

2.    Of the remaining items on the agenda for the June 5th hearing, two relate to the contested refinancing and settlement of first lien claims against the EFIH Debtors and three relate to the TCEH Debtor's DIP facility, the TCEH Debtors' use of cash collateral, and the Debtors' cash management motion (to which both the official committee of unsecured creditors appointed in these chapter 11 cases (the "Creditors' Committee") and the Ad Hoc Group have objected).[8]

3.    The Debtors have filed separate replies with respect to these items contemporaneously herewith and will continue to work to resolve those objections to the extent possible in advance of the June 5th hearing.

4.    The three remaining contested motions are the Joint Administration Motion, the Schedules and Statements Extension Motion, and the Critical Vendors Motion.    The Ad Hoc Group is the only party that contests these three Motions.

5.    The Ad Hoc Group's strategy is clear:  to turn almost every pleading that the Debtors file in these chapter 11 cases into a mini-battle on alleged conflicts, valuation, and plan confirmation.  The Debtors will respond to these arguments at the appropriate time, but are not going to do so here because they are not relevant to these three particular Motions.

6.    In reviewing the Ad Hoc Group's remaining three objections, the Debtors are left wondering as to the role that the Ad Hoc Group believes it is playing in these chapter 11 cases. Statements from the Ad Hoc Group's counsel are illustrative:

> I'm not here to express the view of the smaller creditors.  When people who talk about venue and proper venue, talk about disenfranchised groups and minorities who need a voice in a venue decision they're **not talking about my clients**...

---

[8]    In fact, as of the time of the filing of this Reply, the Debtors believe they are close to resolution with both the Ad Hoc Group and the Creditors' Committee regarding the form of cash management order.

May 22, 2014 Hr'g Tr. at 177:4-8 (emphasis supplied).[9]

7.     Conversely, the Creditors' Committee — which is the sole fiduciary for unsecured creditors of the TCEH Debtors[10] — has not joined in the Ad Hoc Group's objections with respect to the Joint Administration Motion, the Schedules and Statements Extension Motion, and the Critical Vendors Motion.[11]  And, the Debtors are cognizant that they — and no one else — have a fiduciary duty to maximize value for all stakeholders in these chapter 11 cases.  Viewed from that perspective, it is not surprising that, although they may have differences of opinion over certain matters, the Debtors and the Creditors' Committee are aligned on these three Motions and in agreement that disputes regarding confirmation are best left for a later day.[12]

### Reply

## I.     The Critical Vendor Motion.

8.     In the Critical Vendor Motion the Debtors seek limited authority to pay the prepetition claims of certain vendors that are critical to their business operations (the "Critical Vendors").

---

9     *See also* May 2, 2014 Hr'g Tr. at 60:17-22 (counsel to the Ad Hoc Group expressing concern that "a large amount of money could be going out to other general unsecured creditors of the debtors").

10     On May 13, 2014, the U.S. Trustee for the District of Delaware appointed the Creditors' Committee [D.I. 420]. The Creditors' Committee has been appointed to represent the interests of the unsecured creditors of only the TCEH Debtors and EFH Corporate Services.

11     As described below, the Creditors' Committee did file a reservation of rights with respect to the Schedules and Statements and Extension Motion, but did not object to the Debtors' requested relief.  There is, of course, an important difference between a reservation of rights and an objection.

12     The Ad Hoc Group's efforts really are about one thing:  derailing the chapter 11 plan contemplated by the Restructuring Support Agreement.  The Debtors entered into the Restructuring Support Agreement because they believe that it will produce the most value-maximizing result given the facts and circumstances known at this time.  If those facts and circumstances change, the Debtors have reserved the right to opt out of the Restructuring Support Agreement—that is why the Restructuring Support Agreement contains two fiduciary-related provisions, including an unqualified fiduciary out.

9.      As the Court noted at the May 2nd hearing, the relief requested in the Critical Vendor Motion is "clearly focused on what are truly critical trade vendors" and is relatively limited in the context of these chapter 11 cases.  May 2, 2014 Hr'g Tr. at 65–66.  Moreover, the Debtors have diligently worked to minimize the amount of critical vendor funds that have been spent, notwithstanding a high volume of Critical Vendor requests and inquiries that have been addressed by the Debtors and their advisors.

10.     The Ad Hoc Group recognizes the need to make payments to Critical Vendors and generally does not object to the Debtors' request for Critical Vendor relief.  Critical Vendor Objection ¶ 3.  Yet, the Ad Hoc Group—who raised no similar objection at the interim hearing— argues that the Court should impose "sunset" procedures that would, among other things, force the Debtors or potential Critical Vendors to initiate discussions regarding critical vendor treatment within 30 days of the entry of the Final Order, and would require the Debtors to and make all critical vendor claims within 45 days (or file a motion in advance of any payment outside of that 45-day period).  Critical Vendor Objection, ¶ 5.  The Court should overrule the Critical Vendor Objection because such "sunset" provisions would have several adverse consequences on the Debtors and their estates and such provisions are otherwise inconsistent with the goal of obtaining Critical Vendor relief.

11.     *First*, the Ad Hoc Group misconstrues the nature of the Critical Vendor list that was shared with the U.S. Trustee and the advisors to the Creditors' Committee.  As in essentially all large chapter 11 cases with extremely complex supply chain and vendor arrangements, the Critical Vendor "list" does not necessarily capture all potential Critical Vendors, notwithstanding the Debtors' exacting identification process.  Moreover, simply appearing on the Critical Vendor list does not mean that the vendor will in fact be paid as a critical vendor — though, to be sure, if

a Critical Vendor were to know they were on a "list," that knowledge would likely result in a self-fulfilling prophecy in which the Critical Vendor digs in their heels and insists on payment. Several of the payments that the Debtors have made were to vendors that were not included on the "list" but were deemed critical after going through the Debtors' exhaustive review process, the Debtors have avoided the need to make payments to other vendors on the "list," and the Debtors are in active and ongoing discussions with vendors that may or may not be on the "list."

12.     Ultimately, there is nothing unusual about the Debtors' approach to dealing with Critical Vendors. The Debtors have over 6,000 active vendors and their supply chain is vast and complex. As a practical matter, it was simply impossible for the Debtors to identify with certainty each and every potential Critical Vendor in advance. Nor was it possible for the Debtors to know which of the vendors on the "list" would demand or receive payments, or on what terms. Indeed, the illustrative "list" shared with the U.S. Trustee included vendors that, in the aggregate, held prepetition claims in excess of the critical vendor relief the Debtors requested—further demonstrating the narrow scope of the relief requested in the Critical Vendor Motion, the illustrative nature of the "list," and highlighting the risk that the proposed procedures would lead to a "run on the bank" that the Debtors cannot countenance.

13.     Thus, the Ad Hoc Group's proposed procedures would unjustifiably constrain the exercise of the Debtors' business judgment and limit the Debtors' ability to ensure that their operations run smoothly and safely for the benefit of all of the Debtors' stakeholders, including creditors, customers, and employees. In short, the Ad Hoc Group's proposed procedures, which would likely make membership on the "list" more apparent, are completely misplaced.[13]

---

[13] *See, e.g., In re Global Home Products, LLC*, No. 06-10340 (KG), 2006 WL 3791955, *5 (Bankr. D. Del. Dec. 21, 2006) ("The decision on which vendors are critical to Debtors' reorganization was left to Debtors' business judgment.").

14. **Second**, restricting the Debtors' ability to access Critical Vendor funds in the manner advocated by the Ad Hoc Group ignores this Court's clear findings from the May 2nd hearing regarding the importance of the Debtors' ability to pay vendors to protect the health and safety of its customers and employees. The Court correctly observed "[critical vendor relief] is appropriate to ensure that a debtor that's involved in a dangerous business, if it's not done right, if the debtor doesn't get proper services from its vendors—it doesn't have the ability to run the company correctly, people could die. This is important." May 2, 2014 Hr'g Tr. at 65–66. The importance of the Critical Vendor relief does not fall away two or three months or even a year into the case. Indeed, there may be circumstances where a vendor that is only used periodically—but is vital at those times their goods or services are needed—may not be asked by the Debtors to provide goods or services that result in a demand for critical vendor treatment until long after the proposed sunset provision has concluded. As such, the proposed sunset provisions are antithetical to the underlying purpose of Critical Vendor relief. The inapposite cases cited by the Ad Hoc Group do not support a different conclusion.[14]

15. **Third**, the sunset provisions pose a serious risk to the efficacy of the Debtors' critical vendor process that may result in unnecessary expenditures of Critical Vendor funds and potential disruption in the Debtors' supply chain. To date, the Debtors have been diligent in their efforts to minimize the need to spend Critical Vendor funds. Deposition of Paul Keglevic, May 28, 2014, 15:20:20-15:20:30 ("I think our team is doing a very good job, and we're ultimately,

---

[14] Each of the cases cited by the Ad Hoc Group to support the proposition that critical vendor claims should be paid at the beginning of the case involved efforts to accelerate the payments of 503(b)(9) claimants that were not critical. *In re Arts Dairy LLC*, 414 B.R. 219, 222 n.1 (Bankr. N.D. Oh. 2009) (refusing to allow payment of non-critical 503(b)(9) claimant over objection of secured creditor); *In re Global Home Products*, 2006 WL 3791955 *3 (refusing to require debtors to immediately pay non-critical 503(b)(9) claimant). The Ad Hoc Group's reliance on these cases presents two logical errors and is simply disingenuous. "Immediate payment" does not need to mean payment at the beginning of the case, and the fact that a vendor must be critical to be paid immediately emphatically does not mean that a critical vendor must immediately be paid.

7

you know, hopeful to keep [critical vendor payments] below the number [the Debtors] are asking for."). In fact, the Debtors have authorized the payment of only approximately $4 million[15] under the terms of the Interim Order notwithstanding a high volume of requests that have been addressed by the Debtors and their advisors under various circumstances.[16] There is no justification to change the already-rigorous process that is in place and working well.

16. The Ad Hoc Group's requested procedures would flip the Debtors' critical vendor process on its head and increase the risk of a potential "run on the bank." The Debtors' vendors would be incentivized to rush to "initiate conversations" with the Debtors. Worse yet, the proposed procedures would force the Debtors to proactively contact Critical Vendors to preserve their ability to make payments if such vendors did not contact the Debtors. This would directly lead to vendors digging in their heels before such payments are even requested. Imposing a sunset provision on the use of Critical Vendor funds also could lead vendors and suppliers to take adverse action against the Debtors rather than engaging in constructive negotiations with the Debtor for fear of missing the deadline. Such a result would be counterproductive: the Debtors' employees and advisors would be buried with requests, the risk of business disruption would be materially increased, and the "run on the bank" would almost certainly lead to a faster, less effective depletion of critical vendor funds. Thus, contrary to the Ad Hoc Group's assertions that their proposed procedures would "avoid any confusion" regarding the Debtors' stated goal

---

[15]  This amount includes amounts that have been approved for payment by the Debtors' vendor review committee, some of which have not actually been paid as of the date hereof pending the execution of a vendor agreement or the actual payment of funds.

[16]  Mr. Keglevic's deposition testimony indicated a $6 million to $8 million figure, a discrepancy that can be explained by the fluid nature of the Debtors' ongoing review and consideration of various vendor and supplier requests. Deposition of Paul Keglevic, May 28, 2014, 15:14:49-15:15:04.

of ensuring a smooth transition into chapter 11, the procedures would almost certainly increase both disruption to the process and the disbursement of funds.

17.     *Fourth*, the Critical Vendor Objection is premised on a misunderstanding of the basis of critical vendor relief in this jurisdiction. The Ad Hoc Group states that Critical Vendor Payments should not be used to "entice creditors who are perceived as critical to the reorganization process." Critical Vendor Objection ¶ 10. Of course, that is not the law in Delaware. *See, e.g.*, *In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor); *In re Penn Cent. Transp. Cor.*, 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding that necessity of payment doctrine permits payment of prepetition claims where necessary to secure the provision of goods or services that are necessary to business operations); *In re Just For Feet, Inc.*, 242 B.R. 821, 826 (D. Del. 1999) ("To invoke the necessity of payment doctrine, a debtor must show that payment of the pre-petition claims is 'critical to the debtor's reorganization.'"). Critical vendor payments are obviously designed to "entice" creditors that are "critical to the reorganization process" to continue providing goods and services without the need to force such vendors to continue performing (when doing so would even be possible) in Court.

18.     Perhaps the Ad Hoc Group means to imply that a critical vendor basket that represents less than 0.1% of the unsecured claims against the TCEH Debtors could somehow be misused in an effort to "buy" vendors' support for the Debtors' broader restructuring framework. Such allegations, however, are pure speculation, have no evidentiary support, and should not be countenanced.

9

## II.    The Schedules and Statements Extension Motion.

19.    The Debtors seek an extension of the deadline to file their Schedules and Statements to Monday, June 30, 2014, a total of 62 days from the Petition Date. The Debtors seek this relief because preparing the Schedules and Statements is a monumental task due to the size of the Debtors' business operations, the large number of creditors, and the vast amounts of information that needs to be collected and analyzed by the Debtors' and their professionals. Although the Debtors started to prepare the Schedules and Statements before the Petition Date, the Debtors needed to wait until the Petition Date to actually close their books and finalize the data that is used to generate the Schedules and Statements.

20.    The Ad Hoc Group objects to the Schedules and Statements Extension Motion primarily in the context of the *Motion of Energy Future Holdings Corp., et al., for Entry of an Order Authorizing the RSA Debtors to Assume the Restructuring Support Agreement and Modifying the Automatic Stay* [D.I. 505] (the "RSA Assumption Motion"), which the Debtors filed on May 16, 2014. Schedules and Statements Objection, ¶ 4.

21.    At the same time, the Creditors' Committee filed a reservation of rights (but did not object) to the relief requested in the Schedules and Statements Extension Motion [D.I. 635] (the "Reservation"). In doing so, the Creditors' Committee recognized that "in cases of this size and complexity, it is not unusual for the Debtors to be granted a reasonable extension of the time in which they must file their Schedules and Statements." Reservation, ¶ 4.

22.    The Court should overrule the Schedules and Statements Objection for two reasons.

23.    *First*, the Debtors are seeking administrative relief that is granted in nearly every major chapter 11 case in this jurisdiction. The Ad Hoc Group asserts that the Debtors' need for the requested relief in the Motion is due to the Debtors focusing their efforts, among other things,

to pursue the transactions contemplated under Restructuring Support Agreement rather than on these Schedules and Statements. Schedules and Statements Objection, ¶ 1. Contrary to what the Ad Hoc Group would have the Court believe, preparing the Schedules and Statements is an enormous task requiring several hundred employee and professional manpower hours to complete. As such, it is reasonable, and expected, for the Debtors to request additional time to file its Schedules and Statements.

24.     In fact, this type of relief is routinely requested — *and granted* — in virtually all bankruptcy cases of significant size in this jurisdiction. *See, e.g., In re PTL Holdings LLC*, No. 11-12676 (BLS) (Bankr. D. Del. Nov. 18, 2011) (granting the debtors a 72-day extension to file schedules and statements); *In re Tribune Company*, No. 08-13141 (KJC) (Bankr. D. Del. Jan. 21, 2009) (granting the debtors an additional 60 days, for a total of 105 days from the petition date, to file their schedules and statements); *In re Washington Mutual, Inc.*, No. 08-12229 (MFW) (Bankr. D. Del. Dec. 2, 2008) (granting the debtors a total of 84 days to file their schedules and statements); *In re Mervyn's Holdings, LLC*, No. 08-11586 (KG) (Bankr. D. Del. Aug. 26, 2008) (granting the debtors an additional 60 days, for a total of 90 days from the petition date, to file their schedules and statements).

25.     Moreover, this Court has routinely granted debtors' requests to extend the deadline by which they must file their schedules and statements to *at least* 60 days from the petition date, even in cases that are *significantly* smaller:

| Case | Assets and Liabilities | | Extension |
|------|------------------------|------------------------|-----------|
| | Assets ($ mil) | Liabilities ($ mil) | |
| Capmark Financial Group Inc. No. 09-13684 | 20,100 | 21,000 | 60 days from petition date |
| American Home Mortgage Investment Corp. | 18,829 | 17,559 | 60 days from petition date |

11

| Case | Assets and Liabilities | | Extension |
|------|------------------------|---|-----------|
| | Assets ($ mil) | Liabilities ($ mil) | |
| No. 07-11047 | | | |
| Delta Financial Corporation No. 07-11880 | 6,589 | 6,440 | 90 days from petition date |
| Visteon Corporation No. 09-11786 | 5,248 | 6,135 | 90 days from petition date |
| Six Flags, Inc. No. 09-12019 | 3,031 | 2,758 | 60 days from petition date |
| Linens 'n Things, Inc. No. 08-10832 | 1,740 | 1,418 | 90 days from petition date |
| Pope & Talbot, Inc. No. 07-11738 | 662 | 542 | 60 days from petition date |
| Vertis, Inc. No. 08-11460 | 528 | 1,403 | 70 days from petition date |
| Constar International Inc. No. 11-10109 | 406 | 328 | 60 days from petition date |
| NE Opco, Inc. No. 13-11483 | 114 | 171 | 60 days from petition date |

26.    In short, the Schedules and Statements Extension Motion requests a reasonable extension of time by which the Debtors will file their Schedules and Statements and that extension is consistent with, if not less than, approved extensions in other cases in this jurisdiction.

27.    *Second*, the Schedules and Statements Extension Objection is an attempt to gain leverage in a brewing discovery dispute regarding the RSA Assumption Motion. The thrust of the Ad Hoc Group's argument is that extending the deadline by which the Debtors must file their Schedules and Statements will somehow impair the Ad Hoc Group's ability to evaluate and object to the relief that the Debtors seek in the RSA Assumption Motion. Schedules and

12

Statements Objection, ¶ 3. Viewed from a discovery perspective, however, the Schedules and Statements Objection is misguided for two reasons.

28.    For one, the Schedules and Statements have nothing to do with the requested relief in the RSA Assumption Motion. Time and again during the discovery process, the Ad Hoc Group and other creditors have sought to make the RSA Assumption Motion something it is not, a mini (or even full scale) confirmation trial. That simply is not the case — a fact that is well-recognized in the case law.[17]

29.    Moreover, the Debtors expressly made the same point in the RSA Assumption Motion itself, stating in the Preliminary Statement as follows:

> In fact, it is important to emphasize what the RSA Debtors are *not* seeking pursuant to this Motion. The RSA Debtors are not seeking to limit the rights of any party in interest with respect to any of the steps required to confirm the Plan. If the Court enters the Order [approving the relief sought in the RSA Assumption Motion], the Debtors will still need to obtain approval of a disclosure statement, solicit votes on the Plan, and otherwise comply with all of the requirements with respect to confirmation of the Plan.

RSA Assumption Motion, ¶ 7.

---

[17] Courts have repeatedly made clear that, in assessing the assumption of plan support agreements, the Court is not ruling on the underlying plan or its elements. For example, in *In re Delphi Corp.*, No. 05-44481, *111 (Bankr. S.D.N.Y. Jan. 12, 2007), in deciding to approve the assumption of the plan support agreement, the court specifically stated: "I'm not ruling today on the underlying plan or any elements of it." ¶¶ 18-19. Similarly, in assessing the proposed assumption of a restructuring support agreement in *In re Genco Shipping & Trading Limited*, No. 14-11108 (SHL) (Bankr. S.D.N.Y. Apr. 24, 2014), the court clarified that — consistent with the distinction Debtors are drawing as to the proposed document requests at issue here — "objection[s] to the RSA and to that plan resulting from the RSA can be appropriately raised an objection to plan confirmation. At this point, the Court is only being asked to approve the assumption of the RSA; that is, the agreement among most of the parties in this bankruptcy." As Judge Lane made clear in *Genco*, "*[i]n any event, the issue of valuation and any objection to valuation is an issue that is preserved for confirmation*, as Judge Glenn's ResCap decision makes clear." Hr'g Tr. at 18:25-19:2 (emphasis added). He further clarified that "[a] motion to assume should be considered a summary proceeding intended to efficiently review a trustee or debtor's decision to adhere to or reject a particular contract in the course of swift administration of the bankruptcy estate. *It is not the time or place for prolonged discovery or a lengthy trial with disputed issues.*" *Id.* at 21:23 - 22:3 (emphasis added). Copies of the transcripts and materials cited herein are available upon request of Debtors' counsel.

30.    For this reason, the Debtors take no issue with the Creditors' Committee's statement in the Reservation (and, presumably, for the same reason the Creditors' Committee does not object to the relief requested in the Motion).  Put another way, it goes without saying that nothing contained in the Debtors' *administrative* request to extend the deadline to file their Schedules and Statements is intended to impair any party-in-interest's *substantive* rights in these chapter 11 cases, whether under the Restructuring Support Agreement, the Debtors' proposed plan of reorganization, the treatment of intercompany claims, or otherwise.

31.    Additionally, even if the filing of the Schedules and Statements were relevant to the RSA Assumption Motion (and they are not), the Ad Hoc Group could obtain such information through the discovery process.  In fact, to date, the Ad Hoc Group has issued 96 separate document requests in tandem with the ad hoc group of TCEH second lien noteholders (the "Ad Hoc Second Lien Group"), which has issued six extremely broad categories of requests, all of which *purport* to relate to the RSA Assumption Motion.

32.    At the hearing held on May 22nd, 2014, even counsel to the Ad Hoc Second Lien Group recognized the dichotomy between the limited scope of the RSA Assumption Motion and the breadth of the discovery requests:

> On the one hand, you can argue, what are they really committing themselves to that requires us to get to an RSA in advance of confirmation?
>
> Well, they're committing themselves to pay some 20 odd million dollars of professional fees. It's actually 34.955 million to. . .the ad hoc committee of first lien debtholders, to the EFIH unsecureds, to Fidelity, to the non-Fidelity first liens, and within the $25 million, some $18.6 million to the out of the money equity sponsors. *So that's what they would be committing themselves to if the RSA gets approved*.

May 22, 2014 Hr'g Tr. at 243:18-2:44:4 (emphasis supplied).

14

33.     This statement followed an acknowledgment of the sheer size of the discovery

requests to which the Debtors are responding:

> Notwithstanding the fact that we've served discovery on the
> debtors that contemplated that we were taking depositions on
> Tuesday and Wednesday immediately following the Memorial Day
> weekend, and *notwithstanding the fact that we had served
> massive – reasonably massive – discovery requests* that were
> asked to be returnable in advance of those depositions.  *When I
> say reasonably massive, they are massive.*

May 22, 2014 Hr'g Tr. at 243:17-25 (emphasis supplied).

34.     This begs the question of why admittedly "massive" discovery requests are

necessary to investigate the scope of a motion that admittedly does little more than commit the

Debtors to perform a single task.  But, notwithstanding the narrow scope of the RSA Assumption

Motion, the Debtors have already produced or are currently compiling a number of documents

related to the RSA Assumption Motion in responsive to the admittedly "massive" discovery

requests:

- all of the final Board minutes and packages from October 31, 2013 through late-April 2014;

- communications between the Debtors and their proposed financial advisor (Evercore Group LLC) and proposed counsel (Kirkland & Ellis LLP), on the one hand, and counterparties to the Restructuring Support Agreement, on the other, concerning the Restructuring Support Agreement, including negotiation over its terms.

- non-privileged documents relating to the Restructuring Support Agreement itself (including drafts and term sheets regarding the Restructuring Support Agreement), communications and negotiations regarding the proposed Restructuring Support Agreement, the payment and fees under the proposed Restructuring Support Agreement and milestones and termination events under the proposed Restructuring Support Agreement.  and

- non-privileged documents relating to the Board discussion or consideration of and or decision-making regarding the Restructuring Support Agreement, including those relating to the tax implications of entering into the Restructuring Support Agreement (versus alternatives to doing so), the potential for TCEH to separate from EFH if the Restructuring Support

15

Agreement were not approved, and the value of the Restructuring Support Agreement to EFH Corp.

35.     In addition to the materials described above that have already been produced, the Debtors are currently reviewing materials in these categories and expect to complete the production of these materials by June 13, 2014.

36.     Simply put, the Court should see the Objection for what it is: a discovery dispute. And, as this Court noted at the May 2 and May 22nd hearings, there is an appropriate manner in which to raise discovery disputes.[18]   The Court should overrule the Schedules and Statements Objection and approve the extension requested by the Debtors.

## III.     The Joint Administration Motion.

37.     The Debtors believe the Court should deny the Joint Administration Objections and enter a final order granting joint administration for at least four reasons.

38.     *First*, the Debtors clearly satisfy the standard for joint administration of these chapter 11 cases, as requested in the Joint Administration Motion.  As described in detail in the Joint Administration Motion and the First Day Declaration, all of the Debtors are affiliates in a highly integrated business.   And, it is without question that joint administration of these chapter 11 cases will aid in expediting the cases, rendering the process less costly, and easing the administrative burden for the Court and parties-in-interest.  This is because joint administration will provide for one docket, one set of notice requirements, and a single judge to oversee this very large, interconnected, and complex case.

---

[18]   Specifically, the Court's noted the following "If there are any issues that arise in connection with not getting the discovery . . . that people think they are entitled to or should be getting, please don't hesitate to pick up the telephone and call and we'll figure it out." May 2, 2014 Hr'g Tr. at 115:14-18.  The Court further reinforced this noting by stating "I'm at a loss as to why if it was important you didn't pick up the phone and we didn't have a conversation about it." May 22, 2014 Hr'g Tr. at 27:18-20.

39.     Indeed, at the May 1st hearing, the Court took judicial notice of the administrative convenience of joint administration noting that:

> [A] large part of why this is an appropriate motion has to do with the administrative convenience and organization of the Court. I don't need evidence on that. I am more than capable of being sensitive to . . . the efficiencies that occur internally in the court system from joint administration.

May 1, 2014 Hr'g Tr. at 127:10-16.

40.     *Second*, the Ad Hoc Group was — and remains — the only party-in-interest to object to the Motion. This is important because the Court recognized at the May 1st hearing that it will, at the final hearing on the Joint Administration Motion, "have the input of whatever the Official Committee of Unsecured Creditors . . . position will be" to determine the appropriateness of the Motion on a final basis. *Id.* at 128:4-7. In fact, the Creditors' Committee has not objected to joint administration on the basis requested in the Joint Administration Motion.

41.     *Third*, although the Ad Hoc Group objected to joint administration altogether in its Preliminary Objection (and has not withdrawn the Preliminary Joint Administration Objection), the Ad Hoc Group now appears (through the Supplemental Joint Administration Objection) to accept that joint administration is appropriate, but requests the Court impose an expanded "check the box" caption (the "Expanded Caption"). In fact, the Court has already essentially considered and rejected this approach by acknowledging that conservative lawyers are unlikely to limit their pleading to a specific case, lest they be accused of identifying the wrong Debtors:

> I can't imagine any attorney in this room [will be] filing in the wrong case, so every filing is going to be duly captioned. So we're not saving any or drawing any distinctions by separating out the cases.

May 1, 2014 Hr'g Tr. at 127:3-9. By the same logic, even with the Extended Caption, it is likely that almost every attorney that files a pleading in these chapter 11 cases would check the box applicable to all Debtors.

42.    Indeed, the caption that the Court approved in the Interim Order has not created confusion among parties-in-interest since its first use on April 29, 2014. Parties-in-interest have determined which Debtors' estates are affected by the Debtors' pleading without confusion. And the *Ad Hoc Group itself* has filed several objections to the Debtors' pleadings that relate primarily to the EFIH Debtors but also affect the TCEH Debtors.[19] As there is appears to be no confusion or inefficiency with the current caption, the Expanded Caption is unnecessary at best, and misleading at worst.

43.    Of course, this outcome is unsurprising — it does not take a lengthy string cite to observe that these chapter 11 cases are not the first "mega" bankruptcy in Delaware to have a single caption applicable to all debtors. The Joint Administration Objections simply served as a vehicle for the Ad Hoc Group to once again grandstand to the Court. It is time to recognize joint administration for what it is and nothing more:   an administrative accommodation for the convenience of the Debtors, the Court, and other parties-in-interest.

---

[19]    *See Limited Response of the Ad Hoc Group of TCEH Unsecured Noteholders to (I) the Emergency Motion of EFIH 2nd Lien Notes Indenture Trustee to Compel Debtors to Obtain Prior Approval of Procedures Governing Their EFIH 2nd Lien Tender Offer and (II) the Emergency Motion of CSC Trust Company of Delaware, as Indenture Trustee, to Compel the Debtors to Obtain Approval of Procedures Governing the EFIH First Lien Tender Offer* [D.I. 559]; *Statement and Reservation of Rights of the Ad Hoc Group of TCEH Unsecured Noteholders with Respect to the Motion of Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. for Entry of an Order (A) Approving Postpetition Second Lien Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Authorizing the Use of Cash Collateral, (D) Authorizing the EFIH Second Lien Repayment, (E) Authorizing Entry Into and Payment of Fees Under the Commitment Letter, and (F) Modifying the Automatic Stay* [D.I. 643].

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that (a) the Court overrule each of the Critical Vendor Objection, the Joint Administration Objections, and the Schedules and Statements Objection, (b) approve the relief requested in each of the Critical Vendor Motion, the Joint Administration Motion, and the Schedules and Statements Extension Motion, and (c) grant such other relief as it deems necessary and proper under the circumstances.

*[Remainder of page intentionally left blank.]*

Dated:  June 3, 2014
           Wilmington, Delaware

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:        (302) 651-7700
Facsimile:         (302) 651-7701
Email:             collins@rlf.com
                        defranceschi@rlf.com
                        madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
Richard M. Cieri (admitted *pro hac vice*)
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:        (212) 446-4800
Facsimile:         (212) 446-4900
Email:             richard.cieri@kirkland.com
                        edward.sassower@kirkland.com
                        stephen.hessler@kirkland.com
                        brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:         (312) 862-2200
Email:             james.sprayregen@kirkland.com
                        chad.husnick@kirkland.com
                        steven.serajeddini@kirkland.com

Proposed Co-Counsel to the Debtors and Debtors in Possession