# EXHIBIT A

# FILED UNDER SEAL

**Page 1**

1  UNITED STATES BANKRUPTCY COURT
2  DISTRICT OF DELAWARE
3
4
5  In re:                              :    Chapter 11
                                        :
6  ENERGY FUTURE HOLDINGS              :    Case No. 14-10979(CSS)
   CORP., et al.,                      :
7                                      :    (Jointly Administration
                Debtors.               :
8  _____   :    Requested)
9
10                                          United States Bankruptcy Court
11                                          824 North Market Street
12                                          Wilmington, Delaware
13                                          May 1, 2014
14                                          9:53 AM
15
16
17  B E F O R E :
18  HON CHRISTOPHER S. SONTCHI
19  U.S. BANKRUPTCY JUDGE
20
21
22
23
24
25  ECR OPERATOR:  LESLIE MURIN

1     When we started looking at this as a potential
2  opportunity for the DIP, we had used already $100 million of
3  that capacity, so we had 1.4 billion available.  As we
4  looked at dropping that down, and then doing project
5  financing associated with that asset, the market rate that
6  we heard from our consultation with banks, and it's
7  generally the banks that are in the DIP facility that you
8  heard about earlier, Your Honor, would say that it's 50
9  percent is the traditional project financing percentage that
10 you could get.
11    So effectively dropping down assets, and in our case,
12 it would likely have to be generation plants that we would
13 drop those down into a structure, finance 50 percent, and
14 then have $700 million of available cash.
15    I think we also looked at that and said the 700 million
16 was woefully short of the amount of money we would need to
17 cover our operational needs as you'll hear about in a few
18 minutes under the DIP, and you can see that we're ultimately
19 asking for authority to borrow up to $4.75 billion, so the
20 700 million was very short.
21    We did consider a concept called recharge --
22 Q   Let me --
23 A   Would you like me to stop here so far?
24 Q   If you wouldn't mind, I just need to insert a question
25 every couple of minutes.

1        Could you -- you referenced that you were dropping down
2   $1.4 billion in assets, and based on the loan to value ratio
3   that you could get for project financing, you'd only be able
4   to get 700 million in additional financing.
5   A    Right.
6   Q    Does that include this recharging concept or is that
7   prior to the recharging concept?
8   A    That's prior to the recharging concept.
9   Q    So explain to the Court, if you can, how the recharging
10  concept works.
11  A    The recharging concept assumed that we would then take
12  the proceeds from the project financing and send those up to
13  TCEH, but put them in accounts that would not be subject to
14  lien package.  And by doing that, we would effectively have
15  recharged the amount of money that went up to TCEH and
16  effectively would've created another $700 million of
17  capacity that we then could drop down 700 million more of
18  assets and project finance those.
19       And you could --
20  Q    Go ahead.
21  A    -- assumingly continue that until ultimately you have
22  the law of diminishing returns and you have nothing left to
23  drop down.
24  Q    Was there concern within TCEH on the ability, under the
25  indentures and the financing documents to actually executive

1  a recharging strategy?

2  A    Yes.  You know, I would state that there was not only

3  concern about the recharge, but we had received letters from

4  the first lien lenders and certainly in comments that any

5  attempt to do a drop down structure to use the initial

6  basket this close to a bankruptcy proceeding would be

7  problematic, but certainly the recharge was also something

8  that at best is unclear, as to whether you have the ability

9  to do that, and would be the subject of litigation.

10 Q    In evaluating this drop down DIP strategy, what

11 challenges is this, just from a basic -- sufficient -- I'll

12 say it this way.  Was one of the challenges that you

13 identified in evaluating this, sufficient financing?

14 A    Yes.  So there really a couple; one, you know, was

15 capacity.  Because as I described this, we thought -- you

16 know, our calculations indicated we needed more money than

17 would be available through this process, even if the

18 recharge, in fact, turned out to be something that was

19 executable.

20     So capacity was an issue, execution was an issue, not

21 only because of the legal issues, but just the amount of

22 time it would take to do a transaction of this type, because

23 of course, these plants are tied to our system, we don't do

24 individual pricing and sales from individual plants.  We

25 have to allocate the associated fuel and fuel handling

1  facilities.  It's a very complex transaction.

2       And the third point was ultimately the cost at which we

3  could borrow that money if we were to enter into this

4  structure, which we would believe, and in fact, which the

5  market quoted us to be substantially higher than we were

6  able to accomplish at the 2.50 and live or plus 250 or 275

7  that you have in the documents.  In fact, it was closer to

8  almost double digit rates, high single digits or close to 10

9  percent.

10 Q    And ultimately who within TCEH and the advisory team

11 evaluated the drop down DIP and made a conclusion as to

12 whether to proceed forward with (indiscernible)?

13 A    My -- we had looked at this before we had any

14 consultation or meetings with the unsecured creditors.

15 Ultimately, my treasurer did meet with his team, some of the

16 unsecured creditors to make sure they didn't have any

17 additional wrinkles into the structure that we had looked

18 at.  We had routinely presented that to the TCEH board, and

19 to the EFH board, and based on the issues that I've

20 outlined, it was my recommendation to those boards that this

21 was not the appropriate way to proceed.

22           MR. HESSLER:  Thank you, Mr. Keglevic, we have no

23 further questions at this time.

24           THE COURT:  Okay.  Any further argument before I

25 turn it over?  Let's turn it over then.  Wait.

1  estate for the benefit of all creditors. But whether or not
2  at the date we get the confirmation, you know, today the
3  power curves would indicate that the power in the future is
4  higher than the power today. We hope we're able to retain
5  the customers, and we hope going through restructuring won't
6  have a negative other consequences to the estate, but it's a
7  difficult projection to make today until we see how that --
8  you know, how the interim year plays out in terms of power
9  markets and all the head winds we have associated with
10 protecting business value as we sit here today because of
11 the restructuring.
12 Q    From your perspective, and in your capacity as the co-
13 chief restructuring officer, do you have a view as to what
14 the purpose of adequate protection to the first lien holders
15 is?
16 A    Yes.
17 Q    What is the purpose?
18 A    It's basically to recognize that, you know, we are
19 going to pay them the value, you know, any diminution in
20 value associated with the bankruptcy, and they have the
21 right to liens and in some cases, payments of interest to
22 protect them from that diminution during that period of
23 time. But once again, I'm not a lawyer, but that's my
24 understanding.
25 Q    Okay. But from the financial point of view, do you

1  believe there will be any diminution in value to their

2  collateral?

3  A   As I indicated, it all depends on a lot of different

4  elements that are going to take place over the next 12

5  months.  I'm very hopeful that we're going to work very hard

6  that there is not, but there's no assurance that the head

7  winds associated with restructuring and the vagaries of the

8  power markets aren't going to have a negative impact in that

9  period of time.

10 Q   Have you attempted to quantify the potential diminution

11 in value of their collateral, with all of those factors

12 taken into account?

13 A   I have not, but I can, you know, off the top of my

14 head, I can generally translate power prices as you did

15 earlier into changes, but there's a lot of other variables,

16 Mr. Weisfelner, that you have to consider, including how our

17 retail business can operate; whether, in fact, if we don't

18 get the kind of customer motions we're asking for, or even

19 if we do that, you know, we have UBS out there saying that

20 the competitors are going to come and take a bunch of our

21 customers.  That would have a significant value diminution

22 to us during the case, which could offset the positives of

23 power markets.

24      We don't know if we're going to get a cash collateral

25 offer or this DIP, which we might not be able to trade and

1   lock in risk positions.  So it's a complex business, and
2   there's a lot of variables, as I sit here today, you know,
3   it's difficult to make that forecast with any degree of
4   certainty.
5   Q    Were you active in the negotiations of the terms of the
6   cash collateral protection being afforded to
7   (indiscernible)?
8   A    Yes.
9   Q    Are you familiar with the provision that has the Court
10  make certain finding with respect to the intercreditor
11  agreement that exists between the first and the second?
12  A    Yes, I'm aware generally of the intercreditor agreement
13  and what it says.
14  Q    Can you explain for us how it is that having the Court
15  make certain findings with regard to the intercreditor
16  agreement affords adequate protection to the first liens
17  with respect to the potential diminution in value of their
18  collateral?
19  A    While my understanding is the first liens will get
20  replacement liens, and they'll get payments of interest and
21  that should provide them adequate protection.  The second
22  liens will get also replacement liens, and they will not get
23  interest payments because the intercreditor agreement
24  provides that any amounts paid to the second liens could
25  ultimately be funneled to the first liens to assure that

1   though there's no evidence, the evidence that you did hear
2   was that the payments you heard from debtors' witness
3   approximated the interest.  It's not exactly the interest
4   because you also heard that some of the payments have more
5   than L plus 450, some of them have less than L plus 450.
6   They just averaged it out to L plus 450 in ways that the
7   record isn't clear on.  And they used to be payable
8   quarterly.  Now they're payable monthly.  So to that extent,
9   they don't match.
10           But my only point to raise is you can't say we're
11  entitled to these payments because the unsecured and second
12  liens say we're fully secured.
13           THE COURT:  Wouldn't you agree with me that even
14  an under-secured creditor is entitled to adequate protection
15  if that under-secured creditor is primed?
16           MR. WEISFELNER:  Absolutely.  But in the form of
17  pulled boat interest, pulled boat payment of all your
18  professional fees --
19           THE COURT:  Uh-huh.
20           MR. WEISFELNER:  -- and not just one set of
21  professionals, but we'll pay the ad hoc professionals and
22  they're investment banker, and we'll pay Apollo, and we'll
23  pay Center Bridge and we'll pay Oak Tree.
24           THE COURT:  Uh-huh.
25           MR. WEISFELNER:  And, understand, with a 506(c)

1  the back of the RSA Mr. Weisfelner was going through haven't
2  been paid.
3           MR. HUSNICK:  No.  They've -- they were paid --
4  some of -- most of them were paid prepetition.  What I'm
5  saying is during the case.  During the case we're not
6  contemplating payment of fees to advisors for Center Bridge
7  and Apollo under this cash collateral order.
8           THE COURT:  Oh, all right.
9           MR. HUSNICK:  Thank you, Your Honor.
10          THE COURT:  Okay.  Anyone else before I turn it
11 over to --
12      (Pause)
13          THE COURT:  All right.  Whoever's going to make
14 the argument for the noteholders.  Mr. Lauria.
15          MR. LAURIA:  Yes.
16          MR. HUSNICK:  Your Honor, I can represent that we
17 will reduce the interim ask for that 300.
18          THE COURT:  Okay.
19          MR. LAURIA:  Good afternoon, Your Honor.  Tom
20 Lauria with White & Case for the ad hoc group of TCEH
21 unsecured noteholders.
22          I had actually hoped to keep my pallet dry today,
23 but it became apparent with everything that was going on
24 that Mr. Shore and I were going to have to divide this up in
25 some fashion.  So I drew the short straw of arguing the DIP

1  case, or does the debtor have to establish the overall

2  fairness of the transaction?

3         And we all know from experience under Delaware law

4  if that standard applies generally, the decision of company

5  is not upheld.  I've been involved in a lot of cases.  One

6  case that I can think of in Delaware where the Court

7  determined that the overall fairness standard applied was

8  the Los Angeles Dodgers case.  Judge Gross there determined

9  that there were conflicts on the part of the decision-maker,

10 the overall fairness standard applied and the consequence

11 was the DIP was not approved.

12        I have a solution for tonight and that's let's

13 figure out how much they need to get to tomorrow, and we can

14 rejoin the debate.  But this is a toughy (sic).

15        Thank you.

16        THE COURT:  Thank you.

17        MR. LOWENTHAL:  Good afternoon, Your Honor.  Dan

18 Lowenthal, Patterson, Belknap, Webb & Tyler.  We represent

19 Law Debenture Trust Company of New York.  And I'm here today

20 with Steve Miller for the Morris James firm, our Delaware

21 counsel.  Law Debenture, Your Honor, is the Indenture

22 Trustee on the more than $5 billion worth of unsecured notes

23 at the TCEH level.  We're the successor trustee to Bank of

24 New York Mellon, so we're a recent newcomer to the case.

25 We've been plowing through the papers and drilling down into

1  that conflict with each other; they're in line for that as
2  well.
3        However, in the context of if I had a verdict
4  today, I think inferring that the testimony both at direct
5  and in cross of Mr. Keglevic as well as the other witnesses
6  establish that the DIP should be approved as modified.  And
7  by that I mean for example, the $300 million drop down on
8  what would go out as adequate protections.  So that lowers
9  the amount as well as not making the $67 million shared
10 services payment.  And also, I have when we get to it
11 comments, not many, to the order.
12       But I think that the objections really sort of
13 fade away.  As to adequate protection, I think, and as I
14 sort of previewed this in a lot of colloquy from
15 Mr. Weisfelner, that the issue here is adequate protection
16 to the first-line lenders in connection with the priming DIP
17 facility.  They are entitled to adequate protection in -- if
18 they're being primed.  I think they are arguably entitled to
19 adequate protection that would take them from a current
20 undersecured basis all the way topped up to a secured basis
21 because until they get there, nobody is otherwise entitled
22 to get in front of them.
23       Don't need to get to that because the Plan which
24 is also current by right of code of adequate protection, I
25 think those petition interests will approve a petition that

1  although it's a guess -- not guesstimate -- but a rough
2  estimate and it doesn't necessarily go to the actual dollar
3  amount but is roughly equivalent to what they were being
4  entitled to on a non (indiscernible) basis on post-petition
5  interests.  I think that adequate protection is appropriate
6  and I will approve that.
7           With regard to the ad protection and also
8  specifically this issue about the drop down DIP financing
9  which is fascinating, I think Mr. Keglevic's testimony on
10 that was comprehensive and made a lot of sense to me.  And
11 the bottom line was they calculated it and they considered
12 it, but it didn't provide them the liquidity they needed at
13 a price that was affordable.
14          And he made this point several times and I don't
15 think we need to, we can't lose sight of it is, there is a
16 giant business risk associated with and there always is
17 going forward but on a contested basis on cash collateral or
18 a contested basis on the debt that doesn't bear the bank in
19 mind.  And this business is volatile in that the customers
20 as was said, the customers are the click of a mouse away
21 from changing.  The price protectors up or down are hard to
22 predict.  I mean nobody except maybe the Farmer's Almanac
23 predicted, you know, the polar vortex of this winter and the
24 effect that had, you know, I don't know what the summer is
25 going to be like.  But, you know, the truth being there's a

1    lot of risk in this company.  And as a result, something
2    like the drop down DIP, I think will combine the limit of
3    what you could have actually gotten for it, the pricing on
4    it which is not insignificant, although it's certainly not
5    the most important point, as well as the business risk
6    associated with it.  I think that Mr. Keglevic's testimony
7    was, you know, more than adequate, that it was a reasonable
8    exercise of the debtor's business judgment not to pursue
9    that course of action.
10             In connection with what they're going to use the
11   money for, I think that the $1.1 million sort of set aside
12   for the Railroad Commission in connection with reclamation
13   of land.  It may or may not get paid in the next 30 days.
14   But the reality is that it has to be there in order to
15   protect the debtor from some sort of instantaneous or short
16   order action by the regulatory authority.  It could be
17   disastrous to the debtor's business if they can't mine the
18   coal, if they can't run the plant, and if they can't run the
19   plant, they can't make the electricity and it brings -- it
20   all follows from there.
21             In connection with the letters of credit, I don't
22   think that's unreasonable at all.  There are different ways
23   you can approach protecting the debtor from the downside of
24   walkaways under these types of hedging instruments.  One is
25   the (indiscernible) claim, that is the first act for money,