# EXHIBIT F

# FILED UNDER SEAL

**PAUL KEGLEVIC - 5/28/2014**

```
                                                          Page 152
 1   IN THE UNITED STATES BANKRUPTCY COURT
 2   FOR THE DISTRICT OF DELAWARE
 3   Chapter 11
     Case No. 14-10979 (CSS)
 4   Jointly Administered
     on an Interim Basis
 5   ------------------------------------x
     In re:
 6
     ENERGY FUTURE HOLDINGS CORPORATION,
 7   et al.,
 8              Debtors.
     ------------------------------------x
 9              May 28, 2014
10              10:17 a.m.
11              VOLUME II
12
13       Videotaped Rule 26, Rule 30 and Rule
14   30(b)(6) Deposition of PAUL KEGLEVIC, pursuant
15   to Notice, at the offices of WHITE & CASE,
16   LLP, 1155 Avenue of the Americas, New York,
17   New York, before Frank J. Bas, a Registered
18   Professional Reporter, Certified Realtime
19   Reporter and Notary Public within and for the
20   State of New York.
21
22
23
24
25
```

**PAUL KEGLEVIC - 5/28/2014**

|   |   | Page 236 |
|---|---|---|
| 1 | month one? | 11:53:23 |
| 2 | A. It was based on this schedule. | 11:53:24 |
| 3 | Q. Right. So this schedule would | 11:53:25 |
| 4 | reflect the amount of draws you needed to make | 11:53:27 |
| 5 | on the DIP throughout the projection period | 11:53:29 |
| 6 | were based upon the $300 million size? | 11:53:33 |
| 7 | A. That's correct. | 11:53:37 |
| 8 | Q. Oversize. Okay. | 11:53:37 |
| 9 | And has there been, as far as | 11:53:39 |
| 10 | you know, any consideration by the debtors of | 11:53:40 |
| 11 | downsizing the amount of the DIP to reflect | 11:53:42 |
| 12 | that the $300 million is now going to be | 11:53:44 |
| 13 | capitalized and not paid? | 11:53:46 |
| 14 | MR. McKANE: I instruct you not | 11:53:51 |
| 15 | to answer to the extent that you have to | 11:53:52 |
| 16 | disclose attorney-client privileges. But | 11:53:55 |
| 17 | since this is a yes-or-no answer, you can | 11:53:58 |
| 18 | answer it in that form. | 11:53:59 |
| 19 | A. Yes. | 11:54:02 |
| 20 | Q. And have the debtors made any | 11:54:03 |
| 21 | determination as to whether or not they are | 11:54:05 |
| 22 | going to downsize the DIP? | 11:54:06 |
| 23 | A. No. | 11:54:09 |
| 24 | Q. And can you explain why the | 11:54:10 |
| 25 | debtors would not downsize the DIP if there | 11:54:12 |

**PAUL KEGLEVIC - 5/28/2014**

Page 237

| | | |
|---|---|---|
| 1 | was a $300 million error in the sizing of | 11:54:15 |
| 2 | the DIP? | 11:54:17 |
| 3 |       MR. McKANE:  And I will | 11:54:17 |
| 4 | instruct you not to disclose attorney-client | 11:54:18 |
| 5 | communications, but if you can answer without | 11:54:20 |
| 6 | disclosing those communications, please do so. | 11:54:22 |
| 7 |       A.   We'll make that determination | 11:54:27 |
| 8 | based on all of the factors reflected in the | 11:54:29 |
| 9 | budget, including, and not limited to, the | 11:54:33 |
| 10 | amount of operating cash we think is | 11:54:36 |
| 11 | appropriate for the business. | 11:54:39 |
| 12 |       When we did the initial cash | 11:54:40 |
| 13 | budget we were, frankly, at a pretty low end | 11:54:41 |
| 14 | of 25-month cash balance, as you can see -- I | 11:54:46 |
| 15 | would say as you can see on the schedule, but | 11:54:51 |
| 16 | I actually can't.  I think it's around $183 | 11:54:53 |
| 17 | million.  Which included the segregated cash. | 11:54:58 |
| 18 |       And to make sure that we have | 11:55:04 |
| 19 | the appropriate amount of cash and we don't | 11:55:06 |
| 20 | dip into the segregated cash, upon further | 11:55:08 |
| 21 | review we might like to keep that capacity to | 11:55:12 |
| 22 | make sure we don't need it. | 11:55:15 |
| 23 |       I have been, in various | 11:55:17 |
| 24 | earnings calls and other public forums, quoted | 11:55:19 |
| 25 | as saying based on analysis of the company we | 11:55:23 |

**PAUL KEGLEVIC - 5/28/2014**

|  |  | Page 243 |
|---|---|---|
| 1 | lenders' claims? | 12:02:56 |
| 2 | A. Yes. | 12:02:57 |
| 3 | Q. Okay. And what do you | 12:02:58 |
| 4 | understand to be the largest amount of cash | 12:02:59 |
| 5 | that existed at TXU Receivables Company? | 12:03:03 |
| 6 | MR. McKANE: Objection to form. | 12:03:05 |
| 7 | A. I believe when we unwound the | 12:03:08 |
| 8 | facility it approximated $250 million. | 12:03:09 |
| 9 | Q. Okay. And what do you mean by | 12:03:14 |
| 10 | "unwound the facility"? | 12:03:18 |
| 11 | A. We basically paid off the | 12:03:19 |
| 12 | facility. | 12:03:22 |
| 13 | Q. What was the facility? | 12:03:23 |
| 14 | A. The facility was an accounts | 12:03:24 |
| 15 | receivable secured financing with Citibank. | 12:03:27 |
| 16 | Q. With Citibank. | 12:03:30 |
| 17 | And that was not -- that -- | 12:03:32 |
| 18 | was, as far as you understand it, TXU | 12:03:36 |
| 19 | Receivables Company an obligor on the first | 12:03:39 |
| 20 | lien notes? | 12:03:40 |
| 21 | A. No, they were not. That's why | 12:03:41 |
| 22 | the equity, and then ultimately the cash, was | 12:03:43 |
| 23 | unencumbered. | 12:03:46 |
| 24 | Q. Okay. At the current time do | 12:03:46 |
| 25 | you have an understanding of how much cash | 12:03:53 |

**PAUL KEGLEVIC - 5/28/2014**

Page 244

| | | |
|---|---|---|
| 1 | exists at TXU Receivables Company? | 12:03:54 |
| 2 |     A.   My recollection is what I just | 12:03:57 |
| 3 | testified to, approximately $150 million. | 12:03:58 |
| 4 |     Q.   Okay. And where did the other | 12:04:00 |
| 5 | $100 million go? | 12:04:01 |
| 6 |     A.   It was used for general | 12:04:03 |
| 7 | corporate purposes at TCEH. | 12:04:04 |
| 8 |     Q.   When was that cash used? | 12:04:07 |
| 9 |     A.   I would guess, I don't recall | 12:04:11 |
| 10 | exactly when it was used, but I think it was | 12:04:15 |
| 11 | 2014. | 12:04:18 |
| 12 | The situation was that we were | 12:04:19 |
| 13 | running out of cash, and it was the only | 12:04:21 |
| 14 | available cash to use, I think our cash | 12:04:23 |
| 15 | balance probably got as low as -- that | 12:04:27 |
| 16 | virtually all of the cash was unencumbered | 12:04:31 |
| 17 | cash, and it was as a result of some margining | 12:04:33 |
| 18 | requirements and weather and some things that | 12:04:37 |
| 19 | hit us in the early part of 2014 that we used | 12:04:40 |
| 20 | more cash than we had anticipated. | 12:04:44 |
| 21 |     Q.   Was any of that TXU Receivables | 12:04:45 |
| 22 | cash used to prepay any of the TCEH debtors' | 12:04:51 |
| 23 | vendors for services to be provided -- | 12:04:59 |
| 24 | services or goods to be provided | 12:05:01 |
| 25 | post-petition? | 12:05:03 |

**PAUL KEGLEVIC - 5/28/2014**

Page 381

| | | |
|---|---|---|
| 1 | to the extent necessary, and we can have the | 15:54:53 |
| 2 | dialogue on the record, or off the record. | 15:54:55 |
| 3 | I've identified when you've | 15:54:59 |
| 4 | gone beyond the notice, beyond the 30(b)(6), | 15:55:00 |
| 5 | beyond your representations to us previously | 15:55:02 |
| 6 | on what you were going to examine this witness | 15:55:05 |
| 7 | on at this time. | 15:55:07 |
| 8 | BY MR. SHORE: | 15:55:19 |
| 9 | Q.   Let me be clear about this: | 15:55:19 |
| 10 | You have explained to me that | 15:55:21 |
| 11 | the -- one of the reasons you had to agree to | 15:55:23 |
| 12 | the terms of the cash collateral order is | 15:55:27 |
| 13 | because that was necessary to get the consent | 15:55:32 |
| 14 | of the first lien lenders, right? | 15:55:35 |
| 15 | A.   Yes.  With respect to the use | 15:55:40 |
| 16 | of the cash collateral. | 15:55:42 |
| 17 | Q.   All right.  And the first lien | 15:55:43 |
| 18 | lenders have threatened to take the assets -- | 15:55:44 |
| 19 | MR. McKANE:  Objection to form. | 15:55:49 |
| 20 | Q.   -- in a 363 sale? | 15:55:51 |
| 21 | A.   Not necessarily in respect to | 15:55:55 |
| 22 | the cash collateral dialogue, but previously | 15:55:58 |
| 23 | in discussions with them, yes. | 15:56:00 |
| 24 | Q.   Previously. | 15:56:01 |
| 25 | And wasn't it true that one of | 15:56:02 |

**PAUL KEGLEVIC - 5/28/2014**

Page 382

| | | |
|---|---|---|
| 1 | your avenues of leverage in connection with | 15:56:04 |
| 2 | negotiating the cash collateral order, or -- | 15:56:07 |
| 3 | sorry -- the people who negotiated the cash | 15:56:10 |
| 4 | collateral order, was the possibility that if | 15:56:12 |
| 5 | they didn't want to do it in a manner that the | 15:56:14 |
| 6 | debtors thought appropriate, the debtors could | 15:56:17 |
| 7 | just say take the assets? | 15:56:18 |
| 8 | MR. McKANE: Objection to form. | 15:56:23 |
| 9 | A. Our focus was to maximize and | 15:56:31 |
| 10 | maintain the value of the estate, and | 15:56:33 |
| 11 | incurring any tax would have hurt the estate. | 15:56:35 |
| 12 | Q. Were you -- | 15:56:40 |
| 13 | A. And therefore we did whatever | 15:56:41 |
| 14 | we could to minimize that impact on the | 15:56:42 |
| 15 | estate, and that drove us to the tax-free spin | 15:56:44 |
| 16 | solution that we came to. | 15:56:48 |
| 17 | Q. All right. | 15:56:50 |
| 18 | And in connection with the -- | 15:56:51 |
| 19 | MS. SHORE: Oh, now I am off. | |
| 20 | How do I get back? | |
| 21 | THE COURT REPORTER: Scroll up. | |
| 22 | MR. SHORE: No, how do you get | 15:56:53 |
| 23 | down to the bottom? | |
| 24 | BY MR. SHORE: | 15:57:06 |
| 25 | Q. And when you say "maintain the | 15:57:06 |