## EXHIBIT A

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*, | Case No.: 14-10979 (CSS) |
| Debtors. | (Jointly Administered) |
| | Hearing Date: June 5, 2014 at 9:30 a.m. |
| | Re: D.I. 71, 632 and 725 |

### AURELIUS CAPITAL MANAGEMENT, LP'S SUR-REPLY TO

### THE CORRECTED REPLY OF SEVEN OF THE ELEVEN MEMBERS OF THE AD HOC COMMITTEE OF TCEH FIRST LIEN CREDITORS TO OBJECTIONS TO

### THE MOTION OF TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC AND CERTAIN OF ITS DEBTOR AFFILIATES FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING USE OF CASH COLLATERAL, (B) GRANTING ADEQUATE PROTECTION, (C) MODIFYING THE AUTOMATIC STAY, AND (D) SCHEDULING A FINAL HEARING

Aurelius Capital Management, LP ("Aurelius"), on behalf of itself and certain of its managed funds, has previously filed a limited objection (the "Objection")[1] to the Motion referenced above [D.I. 71] (the "Cash Collateral Motion"). In a corrected Reply filed yesterday [D.I. 725] (the "Reply"), seven (7) of the eleven (11) members of the Ad Hoc Committee of TCEH First Lien Creditors (the "Seven Lenders") replied to Aurelius's Objection.[2] *All of those seven members are First Lien Lenders that own no First Lien Notes.*[3] Aurelius respectfully submits this sur-reply in response.

---

[1] Reference is hereby made to the Objection and the terms thereof are incorporated herein by reference.

[2] *See* Reply at 5, n. 5 and 24-39. While the Seven Lenders assert that "approximately 43% of the First Lien Notes . . . support entry of the Final Cash Collateral Order[,]" none of the holders of the First Lien Notes (0%) have joined in the Seven Lenders' Reply or otherwise opposed Aurelius's request for the First Lien Adequate Protection Payments to be allocated in accordance with the terms of the First Lien Intercreditor Agreement.

[3] *See Amended Verified Statement of the Ad Hoc Committee of TCEH First Lien Creditors Pursuant to Bankruptcy Rule 2019* [D.I. 607]

## I.    Preliminary Statement

1.      Aurelius has undertaken the expense and effort to seek enforcement – for the benefit of all holders of First Lien Notes – of the contractual commitment the First Lien Lenders made to the holders of First Lien Notes concerning (i) how the Collateral[4] would be shared between them and (ii) how each payment resulting from the lien on that Collateral would be allocated between them.  That commitment should be enforced, and the Prepetition First Lien Creditors should be adequately protected on the basis of their respective shares of the Collateral, in both regards as determined by the contract among them and not by any other standard.  Just as the Prepetition First Lien Creditors correctly seek to hold the Prepetition Second Lien Creditors to the intercreditor agreement between them, so too should the Prepetition First Lien Creditors be held to their agreement inter se.

2.      Although Aurelius is content to entrust this issue to the Court for determination on the merits, the Seven Lenders exert much energy trying to avoid that.  First they accuse Aurelius of not acting altruistically.  Aurelius admits to this "sin" and harbors suspicions that even the Seven Lenders may be due for like confession.  Second, they criticize Aurelius for being alone in having the courage – and the faith in the rule of law – to hold the Seven Lenders to their bargain.  This criticism is best directed elsewhere.  Regardless, it is irrelevant to the merits.  Third, the Seven Lenders contend that Aurelius is not even allowed to have its Objection heard.  Then, they mischaracterize both Aurelius's arguments and the contract.  Having gotten that out of their system, the Seven Lenders seek to moot the Objection by indefinitely escrowing the money to which the holders of First Lien Notes are entitled.

## II.    The First Lien Intercreditor Agreement Does Not Prohibit Aurelius's Objection

3.      Contrary to the Reply, Section 6.1 of the First Lien Intercreditor Agreement does not

---

[4] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Objection.

waive Aurelius's right to contest the allocation of the First Lien Adequate Protection Payments.

Section 6.1 only prohibits the Prepetition First Lien Creditors from objecting to the use of cash

collateral:

> [E]ach . . . Secured Party agrees that such Secured Party (a) will be deemed to have consented to, will raise no objection to, nor support any other Person objecting to, the **use of such Cash Collateral** . . . so long as (i) **each Secured Party retains the right to object** to such use of Cash Collateral or to the granting of any priming liens over any Collateral **if the terms thereof**, including the terms of adequate protection (if any) granted to the Secured Parties in connection therewith, **do not provide for materially equal treatment to all Secured Parties**. . . .

First Lien Intercreditor Agreement at § 6.1 (emphasis added).

4.      Aurelius is not objecting to the use of Cash Collateral, or even to the amount of the

First Lien Adequate Protection Payments to be made by the Debtors. Aurelius objects solely to the

way in which the Debtors propose to <u>allocate</u> the First Lien Adequate Protection Payments among

the Prepetition First Lien Creditors. That objection is not restricted by Section 6.1 of the First Lien

Intercreditor Agreement.

5.      To read Section 6.1 otherwise would amount to allowing it to supersede numerous

other provisions of the First Lien Intercreditor Agreement prescribing how Collateral should be

allocated among Prepetition First Lien Lenders. If Aurelius's Objection is correct, surely Section

6.1 was not intended to alter the meaning of those sections.

6.      Even if Section 6.1 were otherwise applicable to the Objection, it would permit

Aurelius to submit its objection where, as is proposed here, the Prepetition First Lien Creditors

would not receive "materially equal treatment." Surely that equality of treatment is to be judged

from the perspective of the substantive provisions of the First Lien Intercreditor Agreement

governing the sharing of Collateral.[5]  Those provisions dictate that sharing among Prepetition First

Lien Creditors be proportional to the amounts they are due from time to time, not the amounts due

them at a static point in time.  And the materiality of this inequality is obvious from the Seven

Lenders' strenuous opposition to Aurelius's objection, as well as from the substantially different

interest rates among the various first lien debts.

III.    **The Proposed Reservation of Rights and Escrow Arrangement Improperly Defers Determination of a Matter Ripe For Review and Does Not "Moot" Aurelius's Objection**

7.      The Seven Lenders' proposed reservation of rights and escrow arrangement does not

"moot" the Objection or "completely and fairly address Aurelius'[s] concern . . . ."  To the contrary,

this proposed solution would indefinitely deprive Aurelius and other holders of First Lien Notes of

their full share of the First Lien Adequate Protection Payments.  Aurelius has a present right to

payment of its ratable share of the First Lien Adequate Protection Payments and the issue here is

ripe for review.  The Seven Lenders' exertion for indefinite delay of that which can be resolved

presently bespeaks a desire to end-run the First Lien Noteholders' entitlement.

8.      However, should the Court be disinclined to rule on the substance of this issue at this

juncture, Aurelius respectfully requests that it be heard at the next scheduled omnibus hearing or as

soon thereafter as the Court's calendar can accommodate.

IV.    **The First Lien Intercreditor Agreement Applies to the Distribution of First Lien Adequate Protection Payments**

9.      The Seven Lenders reserve the right to argue that Section 4.1 of the First Lien

Intercreditor Agreement does not apply to the allocation of the First Lien Adequate Protection

Payments because they are not "proceeds of Collateral received in connection with the sale or

---

[5] "Equality among creditors who have lawfully bargained for different treatment is not equity but its opposite." *Chem. Bank N.Y. Trust Co. v. Kheel*, 369 F.2d 845, 848 (2d Cir. 1966) (Friendly, J., concurring).

4

disposition upon[6] the exercise of remedies by the Collateral Agent." That argument fails because, among other things, the First Lien Adequate Protection Payments are payments to compensate the Prepetition First Lien Creditors for a diminution in value of their Collateral. In addition, Section 4.1 of the First Lien Intercreditor Agreement is triggered by the Collateral Agent's acquiescence in or agreement to the proposed allocation of the First Lien Adequate Protection Payments because, in doing so, the Collateral Agent is enforcing its rights, under Sections 5.5 and 8.3 of the Security Agreement, to adequate protection.[7]

## V.   Post-Petition Interest is Due and Payable for Purposes of Section 4.1

10.   The Seven Lenders argue that post-petition interest is not an allowable claim or "due and payable" by the Debtors and, as a result, cannot be considered in determining the Secured Obligations of the parties for purposes of the sharing formula in Section 4.1 of the First Lien Intercreditor Agreement. This is incorrect. First, the Seven Lenders completely ignore the fact that the First Lien Notes contain an automatic acceleration provision that has rendered all amounts (including post-petition interest) currently due and payable. While the automatic stay operates to preclude the holders of the First Lien Notes from enforcing their rights under the First Lien Notes Indenture, that does not change the fact that the principal and interest on the First Lien Notes is, by terms of the contract between the parties, "due and payable."[8]

---

[6] Notably, the Seven Lenders omitted key language from Section 4.1 of the First Lien Intercreditor Agreement, which provides that the sharing formula is triggered by payment of "Collateral or any proceeds thereof received in connection with the sale or other disposition of, or collection on, such Collateral . . . ." (emphasis added).

[7] The "Security Agreement" refers to that certain Amended and Restated Security Agreement, dated as of October 10, 2007, as amended and restated as of August 7, 2009, among TCEH, the Subsidiary Grantors, and Citibank, N.A., as Collateral Agent (the "Security Agreement"). A true and correct copy of the relevant pages of the Security Agreement is attached hereto as Exhibit A. Under Sections 5.5 and 8.3 of the Security Agreement, the Collateral Agent, as the secured party, has all rights with respect to the Collateral that are available to a secured party under any applicable law. Of course, "any applicable law" includes the Bankruptcy Code and, in particular, the enforcement of the rights of a secured party under sections 361 and 363 to adequate protection for the use of its collateral including cash collateral, and of the rights of a secured party to adequate protection when it is being primed under section 364.

[8] Because the Seven Lenders have conveniently ignored the fact that the First Lien Notes were automatically accelerated on the Petition Date, thereby making the post-petition interest due and payable by the Debtors, there is little need to play the "dictionary game" with the Seven Lenders on the so-called plain meaning of "due and payable." Nevertheless, The

11.    <u>Second</u>, even if the First Lien Notes were not due and payable by virtue of the automatic acceleration provision, the First Lien Intercreditor Agreement provides that post-petition interest continues to accrue and is included the sharing calculus <u>as among the Prepetition First Lien Creditors</u> – without regard to whether that interest is allowed or allowable or payable by the Debtors. In light of the fact that Section 4.1 of the First Lien Intercreditor is modified by the terms "[r]egardless of any Insolvency or Liquidation Proceeding[,]" and the definition of "Secured Obligations" includes post-petition interest that accrues after the commencement of a bankruptcy proceeding, whether matured or unmatured and whether or not allowed or allowable, the only logical reading of Section 4.1, as a whole, is that post-petition interest should be included in the pro rata calculation when determining how payments are allocated among Prepetition First Lien Creditors, regardless of whether such interest was allowed or allowable in any chapter 11 case. Any other reading would render the qualifying term "regardless of any Insolvency or Liquidation Proceeding" (and the inclusion of post-petition interest in the definition of "Secured Obligations") superfluous. As the Seven Lenders point out, such a result cannot stand. *See Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) ("Under New York law an interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.'") (quotation omitted).

12.    Had the parties intended for post-petition interest to be omitted from a pro rata determination during the pendency of a chapter 11 case, they would have clearly provided for such omission in the plain language of the First Lien Intercreditor Agreement. They did not. In contrast, the plain language of the First Lien Intercreditor Agreement states, in a myriad of different ways, that post-petition interest should be added to the debts owing to the Prepetition First Lien Creditors

---

World Book Dictionary (Millennium Edition), defines "due" as including "owed on a debt," " to be paid as a right looked for or expected," " set by agreement," "promised to come," "(of notes, bills and other obligations) becoming payable;" and defines "payable" as including "required to be paid," "that may be paid;" "capable of being discharged by delivering the value in money or goods."

when calculating a party's pro rata share under Section 4.1.

13.    _Third_, contrary to what the Seven Lenders argue, interest does not stop accruing on the Petition Date and then magically begin accruing again at some indeterminate point in the future that, according to the Seven Lenders, is the date on which a determination is made under Bankruptcy Code section 506(b) that the secured creditor is oversecured.  In fact, section 506(b) supports the contention that interest continues to accrue during the cases and the only question is whether that interest will constitute an allowable claim against the Debtors.  Likewise, under Bankruptcy Code section 502, although the amount of the claim is determined for purposes of allowance as of the Petition Date, and unmatured interest is not allowable, the statute does not suspend the running of interest; it merely limits the amount of the claim for purposes of allowance.  Using post-petition interest in the sharing formula under the First Lien Intercreditor Agreement is no different, conceptually, from an intercreditor and subordination agreement that permits a senior tranche to extract post-petition interest from a junior tranche even if the claim for such interest is not allowable against the debtor.

14.    _Finally_, the cases relied upon by the Seven Lenders are inapposite because they each deal with a situation in which the issue is whether payment in question (interest or otherwise) is "payable" under the terms of the underlying governing documents.  _See, e.g._, _U.S. Bank, N.A. v._ _Barclays Bank PLC_, No. 11 Civ. 9199 (WHP), 2013 WL 1180414 (S.D.N.Y. Mar. 12, 2013) (contract specifically rendered relevant debt not "due and payable"); _Becker v. North's Restaurants,_ _Inc._, 967 P.2d 1246 (Or. Ct. App. 1998) (same); _In re W. Texas Mktg. Corp._, 155 B.R. 399, 404 (Bankr. N.D. Tex. 1993) (determining whether post-petition interest was payable by the debtor under the Bankruptcy Code and Texas statute as opposed to whether the terms of any contract provided for such interest to be due and payable).  Here, by contrast, the governing documents clearly provide that post-petition interest continues to accrue for purposes of calculating each

Prepetition First Lien Creditor's pro rata share of any payments, regardless of any bankruptcy filing and whether a post-petition interest claim is allowed or allowable. Whether post-petition interest is currently "allowed" as a claim against the Debtors is not the issue here. The issue is whether interest continues to accrue post-petition and therefore is due and payable as between creditors for purposes of the ratable sharing formula in Section 4.1 of the First Lien Intercreditor Agreement – which, as described herein and in the Objection, it is.

## VI. The Language In Paragraph G of the Interim Order Is Irrelevant And Does Not "Moot" the Objection

15.    Paragraph G of the Interim Order – stating that the First Lien Adequate Protection Payments shall be allocated based upon the amounts of the parties' respective Prepetition First Lien Obligations owing as of the Petition Date – is not an adjudicated fact. Rather, it is an historical acknowledgment of what the Debtors and the Seven Lenders are attempting to do here – ignore the First Lien Intercreditor Agreement. The fact has no more probative value than if the Debtors and the Seven Lenders agreed the sky is green. While it might be historically correct to state that the parties made such an agreement, that agreement does not make the sky green.

16.    The proposed "Petition Date Allocation Calculation" contained in the Proposed Final Order is inconsistent with the terms of the First Lien Intercreditor Agreement and violates Aurelius's and the First Lien Noteholders' rights to receive their contractually-designated ratable share of the First Lien Adequate Protection Payments. That the proposed allocation was included as a "finding of fact/conclusion of law" in the Interim Order makes no difference. That same order also provides that the order is not intended to alter the rights of the parties to the First Lien Intercreditor Agreement. *See* Proposed Final Order at ¶ 17(a). The issue is joined: the proper allocation of the First Lien Adequate Protection Payments among the Prepetition First Lien Creditors is what is currently before the Court and ready to be adjudicated.

## CONCLUSION

Based upon the foregoing, Aurelius respectfully reiterates its requests that the Proposed Final Order, if approved by this Court, direct that the First Lien Adequate Protection Payments be remitted to the First Lien Collateral Agent to be shared with all Prepetition First Lien Creditors in accordance with the ratable sharing provision of Section 4.1 of the First Lien Intercreditor Agreement (which includes recognition of the ongoing accrual of post-petition interest), and that any prior distributions of First Lien Adequate Protection Payments that were inconsistent with Section 4.1 be remedied immediately.  Should the Court be disinclined to rule on the substance of this issue at this juncture, Aurelius respectfully requests that it be heard at the next scheduled omnibus hearing or as soon thereafter as the Court's calendar can accommodate.

**(PAGE INTENTIONALLY LEFT BLANK)**

Dated: June 3, 2014

Respectfully submitted,

**GELLERT SCALI BUSENKELL & BROWN, LLC**

/s/ Michael Busenkell
Michael Busenkell (Del. Bar No. 3933)
913 N. Market St.
Suite 1001
Wilmington, Delaware 19801
Tel.:  302.425.5812
Fax.:  302.425.5814
E-mail:  mbusenkell@gsbblaw.com

and

**GOODWIN PROCTER LLP**
William P. Weintraub
Kizzy L. Jarashow
The New York Times Building
620 Eighth Avenue
New York, New York  10018
Tel.:  212.813.8800
Fax.:  212.355.3333
E-mail:  wweintraub@goodwinprocter.com
          kjarashow@goodwinprocter.com

*Counsel to Aurelius Capital Management, LP*

## Exhibit A

**(Security Agreement)**

Exhibit 10.3

EXECUTION COPY

AMENDED AND RESTATED SECURITY AGREEMENT

THIS SECURITY AGREEMENT dated as of October 10, 2007, as amended and restated as of August 7, 2009, among Texas Competitive Electric Holdings Company LLC, a Delaware limited liability company (the "Company"), each of the Subsidiaries of the Company listed on the signature pages hereto or that becomes a party hereto pursuant to Section 8.13 (each such entity being a "Subsidiary Grantor" and, collectively, the "Subsidiary Grantors"; the Subsidiary Grantors and the Company are referred to collectively as the "Grantors") and Citibank, N.A., as Collateral Agent (in such capacity, the "Collateral Agent") under the Credit Agreement (as defined below) for the benefit of the First Lien Secured Parties (as defined below).

W I T N E S S E T H:

WHEREAS, the Company is party to the Credit Agreement, dated as of October 10, 2007 (as amended by Amendment No. 1 thereto, dated as of August 7, 2009 and as the same may be further amended, restated, supplemented or otherwise modified, refinanced or replaced from time to time, the "Credit Agreement") among US Holdings, the Company, the lending institutions from time to time parties thereto (the "Lenders"), Citibank, N.A., as Administrative Agent and as Collateral Agent, and the other agents and entities party thereto;

WHEREAS, (a) pursuant to the Credit Agreement, the Lenders have severally agreed to make Loans and Posting Advances to the Company and the Letter of Credit Issuers have agreed to issue Letters of Credit for the account of the Parent and its Subsidiaries upon the terms and subject to the conditions set forth therein, (b) one or more Cash Management Banks may from time to time enter into Secured Cash Management Agreements, (c) one or more Hedge Banks may from time to time enter into Secured Hedging Agreements and/or Secured Commodity Hedging Agreements and (d) the Loan Parties may incur Additional First Lien Obligations from time to time to the extent permitted by the Credit Agreement and each Additional First Lien Agreement (any extensions of credit to the Grantors as described in clauses (a), (b),(c) or (d), collectively, the "Extensions of Credit");

WHEREAS, pursuant to the Guarantee, dated as of October 10, 2007 (as the same may be amended, restated, supplemented or otherwise modified, refinanced or replaced from time to time, the "Guarantee"), Energy Future Competitive Holdings Company ("US Holdings") and each Subsidiary Grantor party thereto has unconditionally and irrevocably guaranteed, as primary obligor and not merely as surety, to the Collateral Agent for the benefit of the Secured Parties (as defined in the Credit Agreement) the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the Obligations (as such term is defined in the Credit Agreement);

WHEREAS, each Subsidiary Grantor may also unconditionally and irrevocably guaranty, as primary obligor and not merely as surety, for the benefit of the First Lien Secured Parties under any Additional First Lien Agreements, the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the Additional First Lien Obligations;

WHEREAS, each Subsidiary Grantor is a Guarantor and may be a guarantor of the Additional First Lien Obligations;

-1-

WHEREAS, the Grantors are similarly entering into on the date hereof, the Amended and Restated Pledge Agreement (the "Pledge Agreement") for the benefit of the First Lien Secured Parties, which agreement amends and restates the Pledge Agreement;

WHEREAS, the proceeds of the Extensions of Credit have been or will be, as the case may be, used in part to enable the Company to make valuable transfers to the Subsidiary Grantors in connection with the operation of their respective businesses;

WHEREAS, each Grantor acknowledges that it has derived or will derive, as the case may be, substantial direct and indirect benefit from the making of the Extensions of Credit;

WHEREAS, as a condition precedent to the obligation of the Lenders and the Letter of Credit Issuers to make their respective Extensions of Credit to the Company under the Credit Agreement, the Grantors executed and delivered a Security Agreement to the Collateral Agent for the benefit of the Secured Parties, dated as of October 10, 2007 (the "Original Security Agreement"); and

WHEREAS, it is a condition precedent to Amendment No. 1 to the Credit Agreement that the Grantors enter into this Amended and Restated Security Agreement for the benefit of the First Lien Secured Parties;

NOW, THEREFORE, in consideration of the premises and to induce the Administrative Agent, the Collateral Agent, the Lenders and the Letter of Credit Issuers to enter into Amendment No. 1 to the Credit Agreement and to induce the respective Lenders and the Letter of Credit Issuers to make their respective Extensions of Credit to the Company under the Credit Agreement, to induce each Cash Management Bank to enter into Secured Cash Management Agreements and to induce each Hedge Bank to enter into Secured Hedging Agreements and/or Secured Commodity Hedging Agreements with US Holdings, the Company and/or its Subsidiaries and to induce the holders of any Additional First Lien Obligations to make their respective Extensions of Credit thereunder, the Grantors hereby agree with the Collateral Agent, for the benefit of the First Lien Secured Parties, to amend and restate the Original Security Agreement as follows:

1. Defined Terms.

(a) Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

(b) Unless otherwise defined herein or in the Credit Agreement, terms defined in the Intercreditor Agreement shall have the meanings given to them in the Intercreditor Agreement

(c) Terms used herein without definition that are defined in the UCC have the meanings given to them in the UCC, including the following terms (which are capitalized herein): Account, As-Extracted Collateral, Certificated Securities, Chattel Paper, Commercial Tort Claim, Commodity Account, Commodity Contract, Documents, Fixtures, Instruments, Inventory, Letter-of-Credit Right, Securities, Securities Account, Security Entitlement, Supporting Obligation, and Tangible Chattel Paper.

(d) The following terms shall have the following meanings:

"Accession Agreement" shall have meaning provided to it in the Intercreditor Agreement.

-2-

agreement giving rise thereto), to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party thereunder, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

5.3. Proceeds to be Turned Over to Collateral Agent. In addition to the rights of the Collateral Agent and the First Lien Secured Parties specified in Section 5.1 with respect to payments of Subject Accounts, if an Event of Default shall occur and be continuing and the Collateral Agent so requires by notice in writing to the relevant Grantor (it being understood that the exercise of remedies by the First Lien Secured Parties pursuant to the Intercreditor Agreement in connection with an Event of Default under Section 11.5 of the Credit Agreement or the equivalent provisions of any Additional First Lien Agreement shall be deemed to constitute a request by the Collateral Agent for the purposes of this sentence and in such circumstances, no such written notice shall be required), all Proceeds received by any Grantor consisting of cash, checks and other near-cash items shall be held by such Grantor in trust for the Collateral Agent and the First Lien Secured Parties, segregated from other funds of such Grantor, and shall, forthwith upon receipt by such Grantor, be turned over to the Collateral Agent in the exact form received by such Grantor (duly endorsed by such Grantor to the Collateral Agent, if required). All Proceeds received by the Collateral Agent hereunder shall be held by the Collateral Agent in a Collateral Account maintained under its dominion and control and on terms and conditions reasonably satisfactory to the Collateral Agent. All Proceeds while held by the Collateral Agent in a Collateral Account (or by such Grantor in trust for the Collateral Agent and the First Lien Secured Parties) shall continue to be held as collateral security for all the First Lien Obligations and shall not constitute payment thereof until applied as provided in Section 5.4.

5.4. Application of Proceeds. The Collateral Agent shall apply the proceeds of any collection or sale of the Collateral as well as any Collateral consisting of cash, at any time after receipt in the order specified in Section 4.1 of the Intercreditor Agreement. Upon any sale of the Collateral by the Collateral Agent (including pursuant to a power of sale granted by statute or under a judicial proceeding), the receipt of the Collateral Agent or of the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to the Collateral Agent or such officer or be answerable in any way for the misapplication thereof.

5.5. Code and Other Remedies. If an Event of Default shall occur and be continuing, the Collateral Agent may exercise in respect of the Collateral, in addition to all other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party upon default under the UCC or any other applicable law and also may, with notice to the relevant Grantor, sell the Collateral or any part thereof in one or more parcels at one or more public or private sales, at any exchange, broker's board or office of the Collateral Agent or any Lender or elsewhere for cash or on credit or for future delivery at such price or prices and upon such other terms as are commercially reasonable irrespective of the impact of any such sales on the market price of the Collateral. The Collateral Agent shall be authorized at any such sale (if it deems it advisable to do so) to restrict the prospective bidders or purchasers of Collateral to Persons who will represent and agree that they are purchasing the Collateral for their own account for investment and not with a view to the distribution or sale thereof, and, upon consummation of any such sale, the Collateral Agent shall have the right to assign, transfer and deliver to the purchaser or purchasers thereof the Collateral so sold. Each purchaser at any such sale shall hold the property sold absolutely free from any claim or right on the part of any Grantor, and each Grantor hereby waives (to the extent permitted by law) all rights of redemption, stay and/or appraisal that it now has or

-17-

may at any time in the future have under any rule of law or statute now existing or hereafter enacted. The Collateral Agent and any First Lien Secured Party shall have the right upon any such public sale, and, to the extent permitted by law, upon any such private sale, to purchase the whole or any part of the Collateral so sold, and, subject to the terms of the Intercreditor Agreement, the Collateral Agent or such First Lien Secured Party may pay the purchase price by crediting the amount thereof against the First Lien Obligations. Each Grantor agrees that, to the extent notice of sale shall be required by law, at least ten days' notice to such Grantor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. The Collateral Agent shall not be obligated to make any sale of Collateral regardless of notice of sale having been given. The Collateral Agent may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned. To the extent permitted by law, each Grantor hereby waives any claim against the Collateral Agent arising by reason of the fact that the price at which any Collateral may have been sold at such a private sale was less than the price that might have been obtained at a public sale, even if the Collateral Agent accepts the first offer received and does not offer such Collateral to more than one offeree. Each Grantor further agrees, at the Collateral Agent's request to assemble the Collateral and make it available to the Collateral Agent, at places which the Collateral Agent shall reasonably select, whether at such Grantor's premises or elsewhere. The Collateral Agent shall apply the net proceeds of any action taken by it pursuant to this Section 5.5 in accordance with the provisions of Section 5.4.

5.6. Deficiency. Each Grantor shall remain liable for any deficiency if the proceeds of any sale or other disposition of the Collateral are insufficient to pay its First Lien Obligations and the reasonable and documented fees, disbursements and other charges of one firm of counsel and, if necessary, one firm of regulatory counsel and/or one firm of local counsel in each appropriate jurisdiction, to the Administrative Agent and Collateral Agent (and, in the case of an actual or perceived conflict of interest where the Person affected by such conflict informs the Company of such conflict and thereafter, after receipt of the consent of the Company (which consent shall not be unreasonably withheld or delayed), retains its own counsel, of another firm of counsel for such affected Person) to collect such deficiency.

5.7. Amendments, etc. with Respect to the First Lien Obligations; Waiver of Rights. Each Grantor shall remain obligated hereunder notwithstanding that, without any reservation of rights against any Grantor and without notice to or further assent by any Grantor, (a) any demand for payment of any of the First Lien Obligations made by the Collateral Agent or any other First Lien Secured Party may be rescinded by such party and any of the First Lien Obligations continued, (b) the First Lien Obligations, or the liability of any other party upon or for any part thereof, or any collateral security or guarantee therefor or right of offset with respect thereto, may, from time to time, in whole or in part, be renewed, extended, amended, modified, accelerated, compromised, waived, surrendered or released by the Collateral Agent or any other First Lien Secured Party, (c) the Credit Agreement, the other Credit Documents, the Letters of Credit, any Additional First Lien Agreement and any other documents executed and delivered in connection therewith and any Secured Cash Management Agreements, Secured Hedging Agreements, and Secured Commodity Hedging Agreement and any other documents executed and delivered in connection therewith may be amended, modified, supplemented or terminated, in whole or in part, as the Administrative Agent (or the Required Lenders, as the case may be, or, in the case of any Secured Cash Management Agreement, Secured Hedging Agreement or Secured Commodity Hedging Agreement, the applicable Cash Management Bank or Hedge Bank, or, in the case of any Additional First Lien Agreement, the trustee, agent or representative thereunder or the required lenders or holders thereunder) may deem advisable from time to time, and (d) any collateral security, guarantee or right of offset at any time held by the Collateral Agent or any other First Lien Secured Party for the payment of the First Lien Obligations may be sold, exchanged, waived, surrendered or released. Neither the Collateral Agent nor any

-18-

Agreement or Secured Hedging Agreement, it being agreed by the Collateral Agent that delivery of a duly executed Accession Agreement pursuant to the terms of the Intercreditor Agreement shall comply with the requirements of this clause (c).

8. Miscellaneous.

8.1. Amendments in Writing. None of the terms or provisions of this Security Agreement may be waived, amended, supplemented or otherwise modified except by a written instrument executed by the affected Grantor and the Collateral Agent in accordance with Section 13.1 of the Credit Agreement and by each other party to the extent required by (and in accordance with) the Intercreditor Agreement.

8.2. Notices. All notices, requests and demands pursuant hereto shall be made in accordance with Section 13.2 of the Credit Agreement (whether or not then in effect). All communications and notices hereunder to any Subsidiary Grantor shall be given to it in care of the Company at the Company's address set forth in Section 13.2 of the Credit Agreement (whether or not then in effect) and all notices to any holder of obligations under any Additional First Lien Agreements, at its address set forth in the Additional First Lien Secured Party Consent, as such address may be changed by written notice to the Collateral Agent and the Company.

8.3. No Waiver by Course of Conduct; Cumulative Remedies. Neither the Collateral Agent nor any First Lien Secured Party shall by any act (except by a written instrument pursuant to Section 8.1), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Default or Event of Default or in any breach of any of the terms and conditions hereof. No failure to exercise, nor any delay in exercising, on the part of the Collateral Agent or any other First Lien Secured Party, any right, power or privilege hereunder shall operate as a waiver thereof. No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege. A waiver by the Collateral Agent or any other First Lien Secured Party of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy that the Collateral Agent or such other First Lien Secured Party would otherwise have on any future occasion. The rights, remedies, powers and privileges herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any other rights or remedies provided by law.

8.4. Enforcement Expenses; Indemnification.

(a) Each Grantor agrees to pay any and all reasonable and documented out-of-pocket costs and expenses (including all reasonable and documented fees, disbursements and other charges of one firm of counsel, and, if necessary, one firm of regulatory counsel and/or one firm of local counsel in each appropriate jurisdiction, in each case to the Administrative Agent and Collateral Agent (and, in the case of an actual or perceived conflict of interest where the Person affected by such conflict informs the Company of such conflict and thereafter, after receipt of the consent of the Company (which consent shall not be unreasonably withheld or delayed), retains its own counsel, of another firm of counsel for such affected Person)) that may be paid or incurred by any First Lien Secured Party in enforcing, or obtaining advice of counsel in respect of, any rights with respect to, or collecting, any or all of the First Lien Obligations and/or enforcing any rights with respect to, or collecting against, such Grantor under this Security Agreement.

-24-