# EXHIBIT A

1

```
 1
 2  UNITED STATES BANKRUPTCY COURT
 3  SOUTHERN DISTRICT OF NEW YORK
 4  Case No. 14-11108-shl
 5  - - - - - - - - - - - - - - - - - - - - -x
 6  In the Matter of:
 7
 8  GENCO SHIPPING & TRADING LIMITED, et al.,
 9
10              Debtors.
11
12  - - - - - - - - - - - - - - - - - - - - -x
13
14              United States Bankruptcy Court
15              One Bowling Green
16              New York, New York
17
18              April 24, 2014
19              4:20 PM
20
21  B E F O R E:
22  HON. SEAN H. LANE
23  U.S. BANKRUPTCY JUDGE
24
25
```

1  in cases involving foreign creditors and activity.  In fact,
2  Genco does the vast majority of its shipping in foreign ports
3  of call.  And as evidenced by its motion to pay certain
4  vendors, most of its creditors are in fact foreign.
5         To avoid the pitfalls of its foreign overseas
6  operations and its foreign creditors, Genco has chosen, in the
7  exercise of its business judgment, to pursue a prepacked plan
8  with succinct milestones.  But those milestones are in fact
9  quite consistent with other prepacked cases in this court;
10 those cases were identified in a helpful chart provided by
11 Debtors' counsel comparing the precedent in prepackaged
12 bankruptcy cases, and identifies numerous cases in this court
13 and the time lines for resolution of those prepacked
14 bankruptcies; they're too numerous to mention here, but they
15 include Newland International Properties in front of Judge
16 Glenn in 2013, the Houghton Mifflin case in front of Judge
17 Gerber in 2012, the Jobson Medical Information case in front of
18 this Court in 2012, the American Roads case in front of Judge
19 Lifland in 2013, the LodgeNet Interactive Corporation case in
20 front of Judge Chapman in 2013, the TBS Shipping Services Inc.
21 case in front of Judge Drain in 2012, and the 205 East 45 LLC
22 case in front of Judge Gropper in 2012.
23         Genco and its many creditors negotiated the RSA, which
24 requires the parties to support a plan that does not impair
25 unsecured creditors, and even provides some recovery to old

1  equityholders.  To the extent that these recoveries to old
2  equityholders are not sufficient for their purposes, such an
3  objection to the RSA and to that plan resulting from the RSA
4  can be appropriately raised as an objection to plan
5  confirmation.  At this point, the Court is only being asked to
6  approve assumption of the RSA; that is, the agreement among
7  most of the parties in this bankruptcy.  As Judge Glenn
8  recognized in a recent ResCap decision, approval of an RSA does
9  not ensure that a plan embodying its terms will be confirmed.
10 See In re ResCap, 2013, Bankr. LEXIS 2601 (Bankr. S.D.N.Y.,
11 June 27, 2013).  In fact, the objectors retained their right to
12 object to the plan for any and all reasons, including those
13 based on valuation.  See Id.
14         What approval of the RSA does do, however, is to allow
15 the debtors' prepacked plan a chance to be considered.  Without
16 approval of the RSA now, the settlements embodied in the RSA
17 are not binding on those parties.  As such, the basis for the
18 prepacked case is effectively gone.  In that case, the parties
19 are left in a world of the so-called traditional freefall
20 bankruptcy.  That result would be anomalous, given that a key
21 goal of a mega Chapter 11 bankruptcy such as this would be for
22 creditors to negotiate to reach a consensus, which is exactly
23 the sort of thing that's embodied in this RSA and prepacked
24 plan here.
25         Och-Ziff's objections also fly in the face of the

1  facts here.  All parties, including Och-Ziff, agree that a
2  restructuring was necessary for Genco.  All parties agree that
3  the debtors are significantly overleveraged.  All parties agree
4  that the debtors are in need of a bankruptcy process.  All
5  parties agree that the debtors are facing near-term problems in
6  honoring their financial commitments.  See Wobensmith
7  declaration, at paragraph 62.
8          The RSA offers a consensual approach to these
9  problems.  The RSA was publicly disclosed several weeks prior
10 to the petition date, so the information was available to
11 equityholders at that point.  There's no evidence that any
12 other party or equityholder approached Genco with an
13 alternative transaction or any interest in an alternative
14 transaction.  Even with the RSA in effect, Genco can still
15 discuss alternative approaches if some other party proposes one
16 and wants to discuss it.
17         At the hearing, counsel for Och-Ziff expressed a
18 desire for more time to essentially find an alternative
19 transaction that provides more value, but they didn't identify
20 any reason why the RSA or the agreement before the Court was
21 unreasonable on that score.  In fact, counsel for Och-Ziff
22 admitted at one point that he didn't know if the RSA was any
23 worse than any alternative.
24         Counsel for Och-Ziff also complained about the lack of
25 due process for equityholders; that argument, however,

1  overlooks the fact that equityholders are represented by a
2  board of directors and it's that board of directors that chose
3  to enter into the RSA here.  This puts objecting equityholders
4  in a much different posture than, say, a creditor in a
5  bankruptcy case who's complained about a process because the
6  creditor has no access to the company and has not been
7  represented by anyone.
8         At the hearing, counsel for Och-Ziff also argued that
9  there was more value here that equity was not getting; however,
10 he didn't present any competent evidence to support this point.
11 The first thing Och-Ziff's counsel said during his objection
12 were that lenders were receiving 91.5 percent of their value in
13 this case, but that concession at the beginning of the argument
14 was inconsistent with the rest of his argument, where he
15 claimed that equity was entitled to seek more because the
16 credit facilities were getting paid more than in full.  And for
17 that proposition, he relied on trading prices.  But as was
18 referenced in Visteon and other cases, trading prices are not
19 in fact a reliable measure of value.  And this contention about
20 value is also belied by the present circumstances.  The dire
21 financial straits of the company have been known for some time,
22 as evidenced by numerous recent public SEC filings made by the
23 debtors.  And it's telling that no outsider or equityholder has
24 come forward at any point to make an offer or to even propose
25 discussions.  In any event, the issue of valuation and any

 1  objection to valuation is an issue that is preserved for
 2  confirmation, as Judge Glenn's ResCap decision makes clear.
 3          So turning to Och-Ziff's complaint about irreparable
 4  harm, Och-Ziff suggested that the applicable standard for this
 5  motion required the debtors to demonstrate immediate and
 6  irreparable harm because their request was made within twenty
 7  days of the petition date.  The record in fact clearly
 8  establishes immediate and irreparable harm if the motion is not
 9  granted.  If the Court does not approve assumption of the RSA,
10  the basic framework for this case, the prepacked case, will be
11  removed.  Termination of the RSA constitutes an event of
12  default also under the cash collateral order entered April
13  23rd.  Without that use of cash collateral, the debtors may be
14  unable to fund their continued operations.
15          The RSA also secures the support of the debtors' major
16  creditors.  Without the RSA, the secured creditors could demand
17  payment in full on their claims, leaving little or no money for
18  unsecured creditors such as vendors, or any recovery for old
19  equityholders such as the objectors.  Indeed, Och-Ziff's
20  interpretation of this requirement would appear to effectively
21  preclude the filing of a prepacked case.  The very notion of a
22  prepack is that parties will negotiate the terms of a plan
23  prior to the filing of a bankruptcy, with the hope that the
24  case will move quickly.
25          Turning to the second objector, that objector presents

1  a more narrow argument that focuses primarily on the
2  termination fee.  A discussion of that objection requires a
3  brief review of the applicable legal standards as applied to
4  the RSA itself and the termination fee.  Under Section 365(a),
5  a debtor-in-possession, subject to the court's approval, may
6  assume or reject an executory contract or an expired lease.  A
7  court will normally approve the assumption of an executory
8  contract upon a showing that the debtor's decision to take such
9  action will benefit the debtor's estate and is an exercise of
10 sound business judgment.  See In re MF Global Holdings Ltd.,
11 466 B.R. 239 at 242 (Bankr. S.D.N.Y. 2012).  See also NLRB v.
12 Bildisco and Bildisco, 465 U.S. 513 at 523, a 1984 case that
13 states that Section 365 is traditionally subject to the
14 business-judgment standard.  See also Orion Pictures
15 Corporation v. Showtime Networks, Inc., 4 F.3d 1095 at 1098-99,
16 Second Circuit case from 1993 which states that Section 365
17 "permits the trustee or debtor-in-possession, subject to the
18 approval of the bankruptcy court, to go through the inventory
19 of executory contracts of the debtor and decide which ones it
20 would be beneficial to adhere to and which ones it would be
21 beneficial to reject."
22         A court will not generally second-guess a debtor's
23 business judgment regarding the assumption of rejection of a
24 contract, whether the assumption or rejection of a contract
25 will benefit the debtor's estate.  See In re MF Global,

1  466 B.R. at 242.  See also In re Johns-Manville Corporation,
2  60 B.R. 612 at 615 and 616 (Bankr. S.D.N.Y. 1986), which states
3  the Code favors the continued operation of a business by a
4  debtor, and the presumption of reasonableness attaches to the
5  debtor's management decisions.  See also In re Balco Equities
6  Ltd., Inc., 323 B.R. 85 at 98 (Bankr. S.D.N.Y. 2005).  A court
7  "should defer to a debtor's decision that rejection of a
8  contract would be advantageous."  See also Phar-Mor, Inc. v.
9  Strouss Building Associates, 204 B.R. 948 at 951-52 (Bankr.
10 N.D. Ohio 1997), stating that whether an executory contract is
11 favorable or unfavorable is left to the sound business judgment
12 of the debtor, and courts should generally defer to debtors'
13 decisions whether to reject such executory contracts.
14         So under the business-judgment test, a debtor must
15 simply put forth a showing that assumption or rejection of the
16 executory contract or an expired lease will benefit the
17 debtors' estate.  See MF Global, 466 B.R. 242.  See also
18 Bregman v. Meehan, 59 B.R. 380, 385 (E.D.N.Y. 1986).
19         A debtor must support the motion with evidence,
20 usually in the form of a declaration or affidavit,
21 demonstrating the assumption of a contract falls under the
22 proper exercise of the debtor's business judgment.  In re MF
23 Global, 466 B.R. 242.  Yet, a motion to assume should be
24 considered a summary proceeding intended to efficiently review
25 a trustee or debtor's decision to adhere to or reject a

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

1  particular contract in the course of swift administration of
2  the bankruptcy estate.  It is not the time or place for
3  prolonged discovery or a lengthy trial with disputed issues.
4  See In re Orion Pictures, 4 F.3d 1098, 1099.
5           The debtors' decision here to assume the RSA clearly
6  meets the business-judgment standard.  It is supported by
7  evidence in the form of the declaration of John C. Wobensmith
8  at ECF number 3, and Mr. Wobensmith's proffer that was read
9  into the record at yesterday's hearing.
10          As previously noted, all parties, including the
11 objectors, agree that the debtors are overleveraged, that they
12 need to restructure their debt, and that a Chapter 11
13 proceeding is an appropriate context in which to do so.  The
14 RSA does exactly this, resulting in a comprehensive
15 restructuring of the debtors on a consensual basis, while
16 avoiding a long, drawn-out Chapter 11 process and the attendant
17 costs.
18          Additionally, the RSA results in an enhanced liquidity
19 through the secured lenders' consent to the use of cash
20 collateral without a protracted contested legal proceeding,
21 thereby preserving the debtors' going-concern value.
22 Furthermore, it provides for meaningful recovery of all of
23 debtors' stakeholders, including old equity holders and
24 unsecured creditors, through a voluntary agreement by secured
25 lenders to convert their debt to equity, as well as to fully