# EXHIBIT G

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| NELLSON NUTRACEUTICAL, INC.,[1] | ) | Case No. 06-10072 (CSS) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

Objection Deadline: May 16, 2006 at 4:00 p.m. prevailing Eastern time
Hearing Date: May 24, 2006 at 2:00 a.m. prevailing Eastern time

## MOTION TO DETERMINE: (1) ENTERPRISE VALUE OF DEBTORS, AND (2) SECURED CLAIMS OF PREPETITION SECURED LENDERS PURSUANT TO SECTION 506(a) OF THE BANKRUPTCY CODE; NOTICE OF STATUS CONFERENCE AND REQUEST THAT COURT ENTER PROPOSED SCHEDULING AND PROCEDURES ORDER IN RESPECT THEREON

The above-captioned debtors and debtors in possession (the "Debtors") hereby move the Court (the "Motion") for an order determining: (1) the "Enterprise Value" (as such term is defined below) of the Debtors, and (2) the value of the secured claims of the Debtors' prepetition lenders pursuant to section 506(a) of title 11 of the United States Code (the "Bankruptcy Code"). As further described below, the Debtors seek to use the May 15, 2006 omnibus hearing as a status and scheduling conference, pending an evidentiary hearing, and request that the Court issue a scheduling and procedures order at the May 15, 2006 hearing (the "Procedures Order"). Debtors also request that the Court include in the Procedures Order provisions establishing the extent of the preclusive effect of the Court's ultimate determination

---

[1] The Debtors and the last four digits of each of the Debtors' federal tax identification numbers are as follows: (a) Nellson Nutraceutical, Inc., a Delaware corporation, Fed. Tax Id. #5044; (b) Nellson Holdings, Inc., a Delaware corporation, Fed. Tax Id. #0642; (c) Nellson Intermediate Holdings, Inc., a Delaware corporation, Fed. Tax Id. #0653; (d) Nellson Northern Operating, Inc., a Delaware corporation, Fed. Tax Id. #7694, (e) Nellson Nutraceutical Eastern Division, Inc., a Delaware corporation, Fed. Tax Id. #8503; (f) Nellson Nutraceutical Powder Division, Inc., a Delaware corporation, Fed. Tax Id. #3670; and (g) Vitex Foods, Inc., a California corporation, Fed. Tax Id. #9218.

59903-001\DOCS_LA:152186.1

of Debtors' "Enterprise Value" on all parties in interest in these Cases, including those parties in interest that do not participate in the valuation process. In support of this Motion, the Debtors respectfully state as follows:

**Preliminary Statement**

1. The Debtors are highly profitable companies with in excess of $330 million in debt. Debtors believe that all creditor constituencies in these cases believe that the Debtors can and should be reorganized internally. The fundamental question in these cases — which indeed caused the filings to occur — is the ownership and capital structure of the Debtors. There is an enormous divergence of opinion on this issue. As such, the first step in effectuating a successful reorganization is a valuation of the Debtors' enterprise value.

2. Debtors commenced these cases on January 28, 2006. Debtors have stabilized operations and succeeded in a relatively seamless transition into chapter 11. Debtors have also engaged in preliminary discussions with their major constituencies concerning the framework of a consensual reorganization plan. As the Court has been advised, however, that litigation is necessary concerning Debtors' enterprise value.

3. Debtors therefore bring this motion for the purpose of valuing its secured lenders' collateral, the enterprise value of Debtors' business and establishing a reasonable schedule / protocol (the "Procedures Order" in the form of Exhibit "A" hereto) for litigating the single pivotal issue in this case. Debtors have spent a considerable amount of time attempting to

2

negotiate the Procedures Order consensually and believe it is generally supported by significant creditor constituencies in these cases.[2]

## Jurisdiction

4. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue of this proceeding and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

5. The statutory predicate for the relief sought herein is section 506(a) of the Bankruptcy Code.

## Statement of Facts

### A. Background

#### *Description of the Debtors*

6. The Debtors are leading formulators and manufacturers of functional nutrition bars and powders. The Debtors manufacture food bars and powders for weight loss, sports training and wellness and medical categories. The Debtors have approximately 425 employees in the United States and, through a non-debtor Canadian subsidiary, approximately 784 employees in Canada. The Debtors' headquarters and principal manufacturing facility is located in Irwindale, California. Specifically, the Debtors (and their non-debtor Canadian affiliate) operate three highly modern manufacturing facilities, which are located in Irwindale, California, Salt Lake City, Utah and Montreal, Canada.

---

[2] Prepetition Lenders, as defined below, has made clear to the Debtors that Procedures Order is unacceptable to Prepetition Agent because the Prepetition Agent desired the trial on the valuation issue in July. The Debtors believe that the Prepetition Agent's position is unreasonable. The Procedures Order is generally agreeable to the First Lien Lenders, as defined below. The Debtors have also spent considerable time negotiating the Procedures Order with counsel to the Committee, as defined below. As of the time the Motion is being filed, the Committee has not formally agreed to the Procedures Order. Both the First Lien Lenders and the Committee reserve their rights to object to the Procedures Order.

3

7.  The Debtors do not manufacture products under their own label, but produce for leading industry functional food marketers. As a result of such relationships, the Debtors are the clear market leader with over 50% of the functional bar market and over three times the sales of their next largest bar competitor.

8.  The Debtors typically provide the majority of the product lines of their customers under two to three-year exclusive contracts with pre-established pricing and have long-term contracts in place with certain key customers. Unique to this type of company, the Debtors own the rights to the majority of the formulations developed for customers and hold proprietary knowledge with regard to temperatures, mix times, order of addition and other preparation procedures around these formulations.

### *The Debtors' Corporate Structure And Financial Performance*

9.  Nellson is wholly-owned by Nellson Intermediate, which in turn, is owned by Nellson Holdings. Nellson is the direct parent and sole shareholder of Nellson Northern, Vitex and Nellson Eastern. Vitex is the sole shareholder of Nellson Powder. In 2003, Nellson acquired a Canadian manufacturer of nutritional bars and powders called Bariatrix Products International, Inc., which is now Nellson's wholly-owned, non-debtor operating subsidiary in Canada "Nellson Nutraceutical Canada, Inc." ("Nellson Canada"). Nellson is a privately held company. Its principal ultimate equity holder (by way of Nellson Holdings and Nellson Intermediate) is Fremont Investors VII, LLC ("Fremont"). Fremont is also a substantial creditor of Nellson Holdings, with $39.5 million of unsecured debt plus approximately $28.3 million of accrued interest.

10. Nellson consolidated revenues for all business segments (including Nellson Canada) for calendar year 2005 totaled $296.8 million. Nellson generated positive earnings for 2005 (before deductions for interest, taxes, depreciation and amortization) in the amount of $40.8 million (unaudited). Although Nellson realized a net consolidated loss for the year in the amount of $22.6 million, such loss is unrelated to the company's ordinary course operations and is tied primarily to interest expenses and non-cash items. For calendar year 2004, Nellson's consolidated revenues totaled approximately $350 million, with earnings (before deductions for interest, taxes, depreciation and amortization) in the amount of $53 million and net income in the amount of approximately $4 million. As of the Petition Date, the Debtors had $15.9 million in cash on hand (excluding Canada). Debtors currently have approximately $24 million in cash on hand (approximately $30 million including funds in Canada).

### *The Debtors' Principal Indebtedness*

11. The Debtors (with the exception of Nellson Holdings and Nellson Intermediate) have three tranches of principal indebtedness consisting of (1) first priority secured obligations to various lenders (the "First Lien Prepetition Lenders") under that certain Amended and Restated Credit Agreement dated as of July 3, 2003 (as amended, modified or supplemented, the "First Lien Credit Agreement"), pursuant to which UBS AG, Stamford Branch ("UBS") is the administrative agent and collateral agent ("First Lien Agent"); (2) second priority secured obligations to various lenders (the "Second Lien Prepetition Lenders" and collectively with the First Lien Prepetition Lenders, the "Prepetition Lenders") under that certain Second Lien Credit Agreement dated as of February 11, 2004 (as amended, modified or supplemented, the "Second Lien Credit Agreement"), pursuant to which UBS is also the administrative agent and collateral

5

agent (the "Second Lien Agent," and together with the First Lien Agent, the "Prepetition Agent"); and (3) unsecured obligations to trade vendors, lessors, and others.

12. Nellson is the borrower and the other Debtors (with the exception of Nellson Holdings and Nellson Intermediate) are guarantors under both the First Lien Credit Agreement and the Second Lien Credit Agreement (together, the "Credit Agreements"). The Debtors' obligations under the Credit Agreements are secured by first and second liens, respectively, on substantially all of the Debtors' assets. Nellson Intermediate Holdings has also pledged the stock of Nellson to further secure the obligations under the Credit Agreements.

13. As of the Petition Date, the Debtors' outstanding principal obligations under the First Lien Credit Agreement (the "First Priority Debt") total approximately $255 million. The Debtors' principal obligations under the Second Lien Credit Agreement total approximately $75 million as of the Petition Date.

14. The Debtors' remaining indebtedness consists of unsecured debt totaling approximately $7 million, exclusive of intercompany obligations or potential rejection damages claims. Nellson Holdings also has unsecured subordinated debt obligations to Fremont in the original principal amount of $39.5 million.

**B.    The Necessity of Filing These Cases**

15. Beginning in the latter part of 2004 and continuing through 2005, the Debtors' business was negatively impacted by a sequence of factors, including weaknesses in the market for nutritional bars and powders and challenges in the company's production processes. As a general matter, the market for nutritional bars and powders experienced a substantial downturn as a result of a waning low-carb diet trend and an overall softness in the weight-

6

management industry. Concurrently with such market fluctuation, the Debtors lost a significant customer and experienced productivity issues that reduced margins within the company's bar manufacturing facilities. The Debtors began to address these challenges pro-actively by expanding the company's marketing efforts to drive higher revenues and pursuing various initiatives, including cost-savings measures, to resolve any performance gaps. Through these initiatives, the Debtors expect to increase their profitability back to historic levels.

16. Nonetheless, in November 2004, the Debtors' operational performance triggered certain defaults of financial covenants in the Credit Agreements. As a result, the Prepetition Lenders and the Debtors commenced discussions regarding a restructuring of the company's debt and equity structure. On December 21, 2005, UBS sent notices of acceleration of the Debtors' obligations under the Credit Agreements to Nellson and Fremont. The Debtors, Fremont and the Prepetition Agent continued to engage in negotiations in an effort to reach a consensual restructuring, but were unable to reach a resolution. The Debtors therefore commenced these cases in order to reorganize the Debtors' affairs and prevent the Prepetition Agent from exercising its remedies against the Debtors' assets to the detriment of all constituents.

17. The Debtors' goal during these chapter 11 cases is to maintain and expand their cash flow positive operations while the issues relating to the restructuring of the Debtors' debt and equity structure are resolved in an orderly manner, thereby maximizing enterprise value for all stakeholders.

7

C. **Post-Petition Activity**

18. On January 28, 2006 (the "Petition Date"), the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. On the Petition Date, the Debtors also filed motions or applications seeking certain typical "first day" orders.

19. The Debtors have continued in the possession of their property and have continued to operate and manage their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

20. No trustee or examiner has been appointed in any of the Debtors' chapter 11 cases.

21. The Debtors have done everything possible since the Petition Date to minimize disruptions to their business. Specifically, the Debtors have (i) maintained and continued their employee programs, including paying their employees their prepetition wages up to $10,000, see Docket No. 37; (ii) maintained their prepetition cash management systems, see Docket No. 246; (iii) continued their customer practices and programs to make the transition into bankruptcy seamless for the customers, see Docket No. 32; (iv) established an escrow account to give their utility suppliers adequate assurance of future performance, see Docket No. 133; (v) received authority to use up to $2 million dollars to pay prepetition claims of certain critical vendors, see Docket No. 36; (vi) resolved claims pursuant to 11 U.S.C. §503(b)(9) and obtained Court approval of procedures to stream-line settlements of such claims, see Docket No. 259; and (vii) assumed the lease, as amended, relating to the Debtors' manufacturing facility, see Docket No. 261.

8

22. Debtors have been operating profitably in these cases and have exceeded their budgeted performance.

**D.   The Valuation Dispute**

23. During the pendency of this case, an "Ad Hoc Committee of First Lien Lenders" (the "First Lien Lenders") has regularly appeared. It is Debtors' understanding that the First Lien Lenders hold approximately 34% ($86 million) of the First Priority Debt. The First Lien Lenders have asserted that the Prepetition Agent has a conflict of interest in its simultaneous roles as agent for both branches of pre-petition debt.

24. Without divulging the details of confidential settlement negotiations, meaningful settlement negotiations with the Prepetition Agent have occurred both prior to and following the Petition Date. It has become increasingly apparent, however, that divergent opinions concerning the Debtors' enterprise value continue, albeit currently in the absence of actual, expert-prepared valuation reports. These divergent opinions exist even within various factions of the Pre-Petition Lenders. Debtors believe that all significant creditor constituencies agree that litigation of the "valuation issue" is a necessary predicate to a consensual plan of reorganization.

25. The Debtors, the Prepetition Agent, the Committee and the First Lien Lenders have all stated the intention of submitting valuations for the Court's consideration.

26. Debtors have urged the various constituencies to agree to a consensual "valuation protocol" (i.e., the "Procedures Order") whereby the valuation issue can be resolved as expeditiously as possible, without devolving into a litigation free-for-all. The Procedures Order attached hereto as Exhibit "A" is the product of those negotiations. Debtors believe that

9

the substance of the Procedures Order is generally acceptable to both the Committee and the First Lien Lenders.[3] The Procedures Order is not acceptable to the Prepetition Agent, as the Prepetition Agent believes that the valuation issue should be litigated on a far faster track than is acceptable to the Debtors and other constituencies.

### Relief Requested

27.  By this Motion, the Debtors seek to value the extent of the Prepetition Lenders' Claims pursuant to section 506(a) of the Bankruptcy Code, as well as the Debtors' Enterprise Value.

28.  The Debtors further request that the Court treat the May 15, 2006 hearing as a status conference and issue the Procedures Order, in the form of Exhibit "A" hereto, which incorporates the following key dates (as well as addressing other material issues as set forth therein):

| | |
|---|---|
| *June 22, 2006*: | Deadline for submitting appraisal reports; |
| *July 14, 2006*: | Deadline for submitting "rebuttal reports" that will frame the issues to be adjudicated at the evidentiary hearing; |
| *September 7-18, 2006*: | Period to conduct depositions; |
| *October 9-13, 2006*: | Evidentiary hearing. |

29.  The Procedures Order also provides that all parties in interest in these Cases (a) are welcome to participate in the valuation and (b) shall be bound by the Court's determination of Enterprise Value, irrespective of whether they participated in the valuation process.

---

[3] As this Motion is being filed, certain sub-issues are still being negotiated which will likely result in a revised consensual order being submitted to the Court at the hearing on this Motion.

10

### E. The Procedures Order Should Be Entered

30. Bankruptcy Code Section 506(a) ("Section 506(a)"), concerning the determination of the allowed amount of a secured claim, provides:

> "An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, in conjunction with any hearing on such disposition or use or upon a plan affecting such creditor's interest."

Pursuant to Rule 3012 of the Federal Rules of Civil Procedure, the valuation of a secured claim is to be determined by motion.

31. In *Associates Commercial Corporation v. Rash,* 520 U.S. 953, 117 S.Ct. 1879 (1997), the debtor sought to retain and use a secured creditor's collateral in a Chapter 13 plan. The issue was the proper method to value the collateral pursuant to Section 506(a) in order to determine the amount of the creditor's secured claim. The Supreme Court ruled that the proper valuation standard was the replacement value of the collateral, which meant "the price a willing buyer in the debtor's trade, business, or situation would pay a willing seller to obtain property of like age and condition." 520 U.S. at 960 fn 2. The Supreme Court also noted that its use of the term "replacement value" was consistent with the Ninth Circuit's understanding of the meaning of "fair market value" in *In re Taffi,* 96 F.3d 1190 (9th Cir. 1996) ("*Taffi*"). In *Taffi,* a case involving the valuation of a secured claim in the context of a Chapter 11 plan, the Ninth Circuit described market value as "the price which a willing seller under no compulsion to sell and a willing buyer under no compulsion to buy would agree upon after the property had been

11

exposed to the market for a reasonable time." 96 F.3d at 1192. *See also In re Thomas*, 246 B.R. 500 (D.Pa. 2000) (where the collateral to be valued under Section 506(a) was stock).

32. As indicated, the Debtors believe that all parties agree that a valuation of Debtors' enterprise value (i.e., the collateral for Prepetition Lenders' secured claim) pursuant to Section 506(a) is necessary to develop a consensual plan of reorganization. The valuation of Debtors' business represents the pivotal issue in these cases. Debtors respectfully submit that the proposed Procedures Order is reasonable and establishes a rational framework for litigating an issue of this importance. The process established by the Procedures Order culminates with an evidentiary hearing on October 9, 2006. Debtors believe that the First Lien Lenders generally concur that this is a reasonable timetable and the Committee is considering the timetable. To date, only the Prepetition Agent has voiced objection to the proposed timetable.

33. The Prepetition Agent's position, as articulated to Debtors, is that the evidentiary hearing should be concluded in July. Debtors believe that such as schedule is (a) unrealistic, and (b) unfair to the parties. It is, of course, theoretically possible to litigate any issue in a whirlwind fashion, if speed (rather than accuracy of outcome) is the only consideration. In this case, however, there is no reason why accuracy and careful, rational issue development must (or should) take a back seat to the Prepetition Agent's simple desire to be done. Debtors are operating profitably and in a stable manner. As such, there is no reason why the valuation issue should not be adjudicated on a normalized schedule commensurate with the critical importance of the issue.

12

## Notice

34. Notice of this Motion has been given by hand delivery or first class mail to the United States Trustee, counsel for the Committee, counsel to UBS, counsel to the First Lien Lenders, and all parties that have requested such notice pursuant to Bankruptcy Rule 2002. Notice has been given to all parties on the Debtors' master mailing list by regular mail. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

WHEREFORE, the Debtors respectfully request entry of the Procedures Order, substantially in the form attached hereto, granting the relief requested herein and such other and further relief as is just and proper.

Dated: April 28, 2006

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP

*Rachel F. Werkheiser*

Laura Davis Jones (Bar No. 2436)
Richard M. Pachulski (CA Bar No. 90073)
Brad R. Godshall (CA Bar No. 105438)
Maxim B. Litvak (CA Bar No. 215852)
Rachel Lowy Werkheiser (Bar No. 3753)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszyjw.com
      rpachulski@pszyjw.com
      bgodshall@pszyjw.com
      mlitvak@pszyjw.com
      rwerkheiser@pszyjw.com

Counsel for Debtors and Debtors in Possession

59903-001\DOCS_LA:152186.1