IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) ) ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) ) | **Objection Deadline: June 18, 2014 at 4:00 p.m. (EDT)** |
| | ) | **Hearing Date: June 30, 2014 at 9:30 a.m. (EDT)** |

MOTION OF FPL ENERGY PECOS WIND I, LP,
FPL ENERGY PECOS WIND II, LP, AND
NWP INDIAN MESA WIND FARM, L.P. FOR
A DETERMINATION THAT THE AUTOMATIC STAY DOES NOT
PREVENT TERMINATION OF POWER PURCHASE AGREEMENTS

FPL Energy Pecos Wind I, LP ("FPL I"), FPL Energy Pecos Wind II, LP ("FPL II"), and NWP Indian Mesa Wind Farm, L.P. ("NWP" and, together with FPL I and FPL II, the "Movants"), by and through their undersigned attorneys, hereby seek pursuant to Bankruptcy Code sections 105(a) and 556, a determination by this Court that the Movants are covered by the "safe harbor" provisions set forth in the Bankruptcy Code (the "Safe Harbor Provisions"), such that the automatic stay of Bankruptcy Code section 362(a) does not prevent the Movants from terminating their respective power purchase agreements (PPAs) with Luminant Energy Company LLC ("Luminant"), one of the above-captioned debtors. In support of the relief sought, the Movants respectfully submit as follows:

---

[1]   The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, which are being jointly administered on an interim basis, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

## PRELIMINARY STATEMENT

1. As part of its business, Luminant produces and purchases electricity for its wholesale electricity sales, commodity risk management and trading operations. Luminant's purchase contracts include long-term PPAs with the Movants, by which each Movant sells to Luminant electricity generated from wind farms it owns.

2. The Movants' PPAs are substantially similar and all three agreements provide that Luminant's bankruptcy filing gives rise to a contractual right to terminate the PPA. The Movants demonstrate below that the PPAs are "forward contracts" and that each Movant is a "forward contract merchant" as those terms are defined in the Bankruptcy Code. As a result, the Movants assert that the automatic stay of Bankruptcy Code section 362(a) does not apply to a termination of the PPAs, and that each Movant may terminate its respective PPA with Luminant without obtaining relief from the automatic stay. See 11 U.S.C. § 556. Having said this, the Movants do not wish to engage in after-the-fact disputes about whether they were entitled to terminate the PPAs without Court approval. The Movants accordingly seek a determination by this Court that the Safe Harbor Provisions direct the outcome of this dispute, that the automatic stay provisions of the Bankruptcy Code do not apply, and that the Movants can therefore terminate the PPAs without relief from the automatic stay.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). Venue is proper in this Court pursuant to 28 U.C.C. §§ 1408 and 1409.

## BACKGROUND

4. As part of its business, Luminant both generates and purchases electricity for

its wholesale electricity sales, commodity risk management and trading operations, through which Luminant supplies wholesale and retail counterparties with electricity and electricity-related services. It enters into both short-term and long-term electricity contracts, which enable it to manage variations in electricity generation and price risk related to generation output and changing consumer demand.[2] As part of Luminant's business, each Movant sells electricity, and the related renewable energy credits, to Luminant pursuant to a separate PPA.

A. FPL Facility PPAs

5. FPL I and FPL II together own a wind farm in McCamey, Texas (the "FPL Facility"), which has a total nameplate electrical generating capacity of 159.7 megawatts. See Declaration of Mark Tourangeau in support of the Motion, dated June 4, 2014 ("Decl.") at ¶4. In June 2000, before the FPL Facility was operational, each of FPL I and FPL II entered into a separate Renewable Energy Credits Purchase Agreement, each dated as of June 29, 2000, with TXU Electric Company (respectively, the "FPL I PPA" and the "FPLI II PPA"). The FPL I PPA and FPL II PP A are attached to the Declaration as Exhibits A and B, respectively. TXU Electric Company later assigned the FPL I PPA to Luminant. See Decl. at ¶5.

6. Pursuant to the FPL I PPA, Luminant purchases from FPL I all of the electric energy that is delivered to a "Connecting Entity" (the "Net Energy") as well as the renewable energy credits ("RECs") produced by the Net Energy. The FPL I PPA refers to the combination of RECs and Net Energy as "Renewable Energy" and requires Luminant to pay FPL I on a

---

[2] See Declaration of Paul Keglevic, Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of Energy Future Holdings Corp., et al., in Support of First Day Motions, Case No. 14-10979, Docket No. 98, ¶ 38.

monthly basis for the Renewable Energy delivered in the preceding calendar month. See FPL I PPA Section 4.02. While the FPL I PPA was executed in June 2000, the anticipated "Start Date" for FPL I to begin selling the Renewable Energy was not until July 1, 2001. See FPL I PPA Section 1.02(b). Notwithstanding the delay in time for sales and purchases of Renewable Energy to begin under the FPL I PPA, the purchase price for the Renewable Energy was locked in at the time of execution. See FPL I PPA Section 4.02 (setting the price for each MWh of Renewable Energy sold for the FPL I PPA's initial production term as well as the optional production term extension periods).

7. The FPL II PPA was entered into with TXU Electric Company on the same date as the FPL I PPA, and the FPL II PPA contains provisions substantially similar to those described above with respect to the FPL I PPA. See FPL I PPA Sections 1.02(b) and 4.02. As with the FPL I PPA, TXU Electric Company later assigned the FPL II PPA to Luminant. See Decl. at ¶5. All of the electric energy and related RECs produced by the FPL Facility is sold to Luminant pursuant to the FPL I PPA and FPL II PPA. See Decl. at ¶8.

B.     NWP Facility PPAs

8. NWP also owns a wind farm in McCamey, Texas (the "NWP Facility"), which has a total nameplate electrical generating capacity of 82.5 megawatts. See Decl. at ¶9. NWP sells all of the electric energy produced at the NWP Facility pursuant to two separate purchase agreements – one with Luminant and one with The Lower Colorado River Authority ("LCRA"), which is not affiliated with Luminant. Both purchase agreements were executed in August 2000, before the NWP Facility was operational. See Decl. at ¶9.

9. NWP and TXU Electric Company entered into that certain Renewable Energy Purchase Agreement, dated as of August 25, 2000 (the "NWP PPA" and, together with the FPL I

PPA and FPL II PPAs, the "Luminant PPAs"). TXU Electric Company later assigned the NWP PPA to Luminant. See Decl. at ¶5. Pursuant to the NWP PPA, Luminant purchases from NWP the "TXU Portion" of the Renewable Energy[3] produced by the NWP Facility. See NWP PPA Sections 1.03 and 4.02. Luminant pays NWP on a monthly basis for the Renewable Energy delivered in the preceding calendar month. See NWP PPA 4.02. Like the FPL PPAs, the rate paid for each MWh of Renewable Energy for the duration of the NWP PPA was locked in at the time the NWP PPA was executed, even though the anticipated "Start Date" of production under the NWP PPA was not until July 2001. See NWP PPA Sections 1.01(b) and 4.02 (setting the price for the initial production term as well as the optional production term extension periods). The NWP PPA did allow for NWP to begin delivering "Early Energy" to Luminant if the NWP Facility was able to deliver before July 2001, and NWP started doing so in April 2001. See Decl. at ¶11.

10.  NWP and LCRA are party to that certain Amended and Restated Power Purchase Agreement dated as of July 1, 2001, which amends and restates that certain Power Purchase Agreement, dated as of August 25, 2000 (the "LCRA PPA"). Under the LCRA PPA, NWP sells to LCRA electric energy produced by the NWP Facility up to a maximum of 51 megawatts and all RECs associated with that energy. See Decl. at ¶12.

11.  Luminant buys approximately 38% of the Renewable Energy produced by the NWP Facility, and LCRA purchases the rest. See Decl. at ¶13. Like the Luminant PPAs, the purchase price paid by LCRA for the electric energy and RECs is established for the duration of

---

[3] Like the FPL PPAs, the NWP PPA refers to the combination of renewable electric energy delivered to NWP along with the associated RECs as "Renewable Energy." See NWP PPA preamble.

the LCRA PPA. See Decl. at ¶13.

C. Termination of Luminant PPAs Upon Bankruptcy

12. Section 6.01 of each Luminant PPA is identical and permits a party to terminate the agreement immediately upon written notice to the other party (referred to in each Luminant PPA as the "insolvent party") without any liability or responsibility under the agreement if the insolvent party files a voluntary petition under the bankruptcy or insolvency laws. Section 6.01 of each Luminant PPA goes on to state that the agreement will not terminate if, within 10 days after the insolvent party receives written notice of the proposed termination, the insolvent party affirms (i.e., assumes) the agreement in writing and proves, to the terminating party's satisfaction, the ability to fulfill the insolvent party's obligations under the agreement. If Luminant seeks to assume the Luminant PPAs, the Movants will consider whether any proposed cure amount and adequate assurance of future performance offered is satisfactory. Luminant is in prepetition default with respect to all three Luminant PPAs. The aggregate cure amount with respect to these agreements is not less than $2,390,154.44. See Decl. at ¶15.

13. On April 29, 2014, Luminant and the other above-captioned Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

## REQUESTED RELIEF

14. By this Motion, the Movants respectfully request a determination by the Court that the automatic stay of Bankruptcy Code section 362(a) does not apply, so that the Movants may terminate the PPAs without relief from the automatic stay.

**BASIS FOR RELIEF REQUESTED**

I. **The Movants Are Permitted To Terminate
The PPAs Pursuant To The Safe Harbor Provisions**

15. The Movants demonstrate below that they fall within the Safe Harbor Provisions and that they may therefore terminate the Luminant PPAs without relief from the automatic stay. Nevertheless, the Movants do not wish to be subjected to after-the-fact disputes about whether they are entitled to terminate the Luminant PPAs without relief from the automatic stay. Accordingly, they seek a Court determination that the Safe Harbor Provisions apply.

16. The first of the Safe Harbor Provisions applicable to the Luminant PPAs is set forth in Bankruptcy Code section 556, which provides in relevant part as follows:

> The contractual right of a ... forward contract merchant to cause the liquidation, termination, or acceleration of a ... forward contract because of a condition of the kind specified in section 365(e)(1) of this title ... shall not be stayed, avoided, or otherwise limited by operation of any provision of this title...

11 U.S.C. § 556. Bankruptcy Code section 556 refers to Bankruptcy Code section 365(e)(1), which provides in relevant part that:

> Notwithstanding a provision in an executory contract ..., an executory contract ... of the debtor may not be terminated ... at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on ... (B) the commencement of a case under this title...

11 U.S.C.§ 365(e)(1).

17. Read together, Bankruptcy Code sections 556 and 365(e)(1) permit a forward contract merchant to terminate its forward contract with a debtor upon the debtor's bankruptcy filing, so long as the forward contract's terms include this termination right. Termination is not barred by the automatic stay and the bankruptcy-related event of default is not deemed invalid by Bankruptcy Code section 365(e)(1). As shown below, each Luminant PPA constitutes a

"forward contract" and each Movant is a "forward contract merchant" for purposes of Bankruptcy Code section 556.

B. The PPAs are Forward Contracts

18. Bankruptcy Code section 101(25) defines a forward contract in relevant part as:

> a contract (other than a commodity contract as defined in section 761) for the purchase, sale, or transfer of a commodity, as defined in section 761(8) of this title, or any similar good, article, service, right, or interest which is presently or in the future becomes the subject of dealing in the forward contract trade, or product or byproduct thereof, with a maturity date more than two days after the date the contract is entered into …

19. Bankruptcy Code section 761(8) incorporates the definition of "commodity" as provided in the Commodity Exchange Act. That definition provides that a commodity includes "all services, rights, and interests … in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a(9).

20. All three Luminant PPAs fall squarely within the definition of a "forward contract." First, each Luminant PPA is for the supply of electricity and RECs, both of which constitute commodities. Jurisprudence under the Commodity Exchange Act regularly treats electricity as a commodity and "no serious debate exists on the issue of electricity's status as a commodity." In re MBS Mgmt. Servs., Inc., 430 B.R. 750, 753 n. 8 (Bankr. E.D. La. 2010). RECs are byproducts of electricity, generated when renewable energy facilities produce electricity, and RECs are also tradable commodities.[4] Second, the first date of delivery under

---

[4] The Debtors refer to renewable energy credits among those commodities sold and purchased by the Debtors as part of their operations. See Motion of Energy Future Holdings Corp., et al., for Entry of Interim and Final Orders Authorizing the Debtors to (A) Continue Performing Under Prepetition

(Cont'd on following page)

each Luminant PPA occurred much more than two days after the PPAs were executed. Finally, the price of Renewable Energy in each Luminant PPA was locked in at the time of execution. Accordingly, each Luminant PPA constitutes a "forward contract" for purposes of Bankruptcy Code section 556.

### C. The Movants are Forward Contract Merchants

21. Bankruptcy Code section 101(26) defines a "forward contract merchant" in relevant part as:

> an entity the business of which consists in whole or in part of entering into forward contracts as or with merchants in a commodity (as defined in section 761) or any similar good, article, service, right, or interest which is presently or in the future becomes the subject of dealing in the forward contract trade.

11 U.S.C. § 101(26). The definition of a "forward contract merchant" is very broad, covering any entity that enters into forward contracts as or with merchants in a commodity business context.

22. Precedent within the Third Circuit on this issue is limited, but in another Bankruptcy Court decision, Judge Walsh, in holding that the counterparty qualified as a forward contract merchant under the Bankruptcy Code, highlighted the "in whole or in part" language of the definition. Judge Walsh referred to Collier's statement that "essentially any person that is in need of protection with respect to a forward contract in a business setting should be covered,

---

(Cont'd from preceding page)

Hedging and Trading Arrangements, (B) Pledge Collateral and Honor Obligations Thereunder, and (C) Enter Into and Perform Under Trading Continuation Agreements and New PostPetition Hedging and Trading Arrangements), Case No. 14-10979, Docket No. 41, ¶ 15 ("As of December 31, 2013, the Debtors' annual underlying notional value across all of their wholesale operations, based on energy prices for commodities sold and purchased in their operations, including natural gas, electricity, coal, fuel-oil, uranium, renewable energy credits and emission allowances, is approximately $3.8 billion.")

except in the unusual instance of a forward contract between two nonmerchants who do not enter into forward contracts with merchants." See In re Borden Chemicals and Plastics Operating Ltd. P'ship, et al., 336 B.R. 214, 224-225 (Bankr. D. Del. 2006) (citing 5 COLLIER ON BANKRUPTCY ¶ 556.03[2] at 556-6 (15th ed. rev. 2001); see also See In re Renew Energy LLC, 463 B.R. 475, 482 (Bankr. W.D. Wis. 2011) (holding that the counterparty had demonstrated it was a forward contract merchant simply by showing that the two contracts at issue qualified as forward contracts); 5 COLLIER ON BANKRUPTCY ¶ 556.03[2] at 556-6 (16th ed. 2014).

23.  In a more recent case with similar facts, a bankruptcy court stated that Clear Peak, an entity that owned a generating facility and sold all of the electric energy produced by the facility pursuant to a single PPA to Southern California Edison ("SCE"), qualified as a forward contract merchant under the Bankruptcy Code. See In re Clear Peak Energy, Inc., 488 B.R. 647, 661 (Bankr. D. Ariz. 2013). As part of its analysis, the court highlighted that SCE had entered into contracts with short- and long-term maturity dates for the future delivery of electricity. Clear Peak was the seller of electricity to SCE, which the evidence demonstrated qualified as a forward contract merchant, and therefore Clear Peak was also a forward contract merchant. See id. This analysis reflects the clear language of Bankruptcy Code section 101(26) that provides that an entity qualifies as a forward contract merchant for purposes of the Bankruptcy Code if it enters into forward contracts as *or with* merchants of a commodity.

24.  Under the broad definition of "forward contract merchant," each Movant qualifies on its own as a forward contract merchant. Even if that were not the case, however, each Movant would qualify as a forward contract merchant because each Luminant PPA is with Luminant, which is a forward contract merchant. Luminant's business includes entry into contracts with short- and long-term maturity dates for the future purchase of electricity. It

clearly is a forward contract merchant for purposes of Bankruptcy Code section 101(26) and, therefore, so is each of the Movants.[5] See 11 U.S.C. § 101(26) (providing that a forward contract merchant is an entity whose business consists in whole or in part of entering into forward contracts as *or with* merchants in a commodity).

## CONCLUSION

25. For the reasons set forth above, the Movants respectfully request a determination by the Court that the automatic stay of Bankruptcy Code section 362(a) does not apply, and that the Movants may terminate the PPAs without obtaining relief from the automatic stay.

## NOTICE

26. Notice of this Motion has been provided to (a) the United States Trustee for the District of Delaware; (b) the Debtors; (c) the Official Committee of Unsecured Creditors; and (d) those parties that have requested service pursuant to Bankruptcy Rule 2002, in accordance with Local Rule 2002-1. The Movants assert that no further notice of this Motion is required.

## NO PRIOR REQUEST

27. No prior application for the relief requested herein has been made by the Movants to this or any other court.

---

[5] Certain courts outside the Third Circuit have interpreted the definition of a "forward contract merchant" more narrowly, focusing on the words "business" and "merchant." See e.g., In re Magnesium Corp. of Am., 460 B.R. 360 (Bankr. S.D.N.Y. 2011); Mirant Americas Energy Marketing, L.P. v. Kern Oil & Refining Co. (In re Mirant Corp.), 310 B.R. 548 (Bankr. N. D. Tex. 2004); see also In re MBS Mgmt. Servs., Inc., 690 F.3d 352 (5th Cir. 2012). Even under a narrower interpretation, however, the Movants still qualify as forward contract merchants because they entered into the Luminant PPAs as part of their respective businesses to generate a profit. See In re Magnesium Corp. of Am., 460 B.R. at 375 (noting that an entity's "business" for purposes of the forward contract merchant definition was something that one engages in to generate a profit).

WHEREFORE, the Movants respectfully request that the Court enter an order substantially in the form annexed hereto as Exhibit A, (i) determining that the Movants may provide notices to Luminant substantially in the form annexed hereto as Exhibit B, terminating each of the Luminant PPAs without relief from the automatic stay and (ii) granting such other and further relief as may be just and proper.

Dated: June 4, 2014
Wilmington, Delaware

**LANDIS RATH & COBB LLP**

Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: landis@lrclaw.com
       mcguire@lrclaw.com

-and-

**CHADBOURNE & PARKE LLP**
Howard Seife
David M. LeMay
Christy Rivera
30 Rockefeller Plaza
New York, NY 10112
Telephone: (212) 408-5100
Facsimile: (212) 541-5369
Email: hseife@chadbourne.com
       dlemay@chadbourne.com
       crivera@chadbourne.com

*Counsel to FPL Energy Pecos Wind I, LP,*
*FPL Energy Pecos Wind II, LP, and*
*NWP Indian Mesa Wind Farm, L.P.*