# **EXHIBIT C**

**CONFIDENTIAL AND PROPRIETARY**



# Renewable Energy Purchase Agreement

## Between

## TXU Electric Company

## and

## NWP Indian Mesa Wind Farm, L.P.

# TABLE OF CONTENTS

Page

ARTICLE I.    TERM ..................................................................................... 1

    Section 1.01  Contract Term ........................................................................ 1

    Section 1.02  Production Term ..................................................................... 1

    Section 1.03  Early Energy ......................................................................... 2

    Section 1.04  Options to Extend Production Term ....................................... 2

ARTICLE II.    RENEWABLE RESOURCE FACILITY ....................................... 2

    Section 2.01  Renewable Resource Facility ................................................. 2

    Section 2.02  Interconnection ..................................................................... 3

    Section 2.03  Transmission ......................................................................... 3

    Section 2.04  Metering ............................................................................... 4

    Section 2.05  Communications and Telemetry ............................................. 4

    Section 2.06  Regulatory Compliance ......................................................... 5

    Section 2.07  Modifications to Renewable Resource Facility ...................... 5

    Section 2.08  Exclusion of Liability ........................................................... 6

ARTICLE III.    RENEWABLE RESOURCE FACILITY OPERATION ................. 6

    Section 3.01  General Requirements ............................................................ 6

    Section 3.02  Quarterly Meeting ................................................................. 7

    Section 3.03  Energy Delivery .................................................................... 7

    Section 3.04  No Interstate Operations ....................................................... 7

    Section 3.05  Access to Facility ................................................................. 8

ARTICLE IV.    PAYMENTS, RECORDS, AND BILLINGS .................................. 8

    Section 4.01  Quantity Sold ....................................................................... 8

    Section 4.02  Monthly Payments ................................................................ 8

    Section 4.03  Quarterly REC Reconciliation .............................................. 9

    Section 4.04  Annual REC Reconciliation .................................................. 9

    Section 4.05  Effect of Outages and Uncontrollable Force ...................... 11

    Section 4.06  Governmental Impositions .................................................. 12

    Section 4.07  Records ............................................................................... 12

    Section 4.08  Billing ................................................................................ 12

    Section 4.09  Interest on Past Due Amounts ............................................. 13

C:\NRPORTBL\Dallas\lovel\MH_99759_1.1
DRAFT

**TABLE OF CONTENTS**
(continued)

Page

Section 4.10  Corrections ........................................................................................... 13

ARTICLE V.       OUTAGES ........................................................................................ 13

Section 5.01  Outages ................................................................................................ 13

Section 5.02  No Liability .......................................................................................... 13

ARTICLE VI.      TERMINATION AND UNCONTROLLABLE FORCE ........................ 14

Section 6.01  Insolvency ............................................................................................ 14

Section 6.02  Uncontrollable Force .......................................................................... 14

Section 6.03  Termination ......................................................................................... 15

Section 6.04  No Consequential Damages ............................................................... 16

ARTICLE VII.     REPRESENTATIONS AND WARRANTIES ....................................... 16

Section 7.01  Representations and Warranties ........................................................ 16

ARTICLE VIII.    SECURITY ........................................................................................ 17

Section 8.01  Security Required ............................................................................... 17

Section 8.02  Security Amount ................................................................................. 17

Section 8.03  Form of Security ................................................................................. 17

Section 8.04  Renewal of Security ............................................................................ 17

Section 8.05  Notice of Termination ........................................................................ 17

Section 8.06  Access to Security .............................................................................. 17

Section 8.07  Protection of Security ......................................................................... 18

Section 8.08  Replacement of Applied Security ...................................................... 18

Section 8.09  Release of Security ............................................................................. 18

Section 8.10  Survival ................................................................................................ 18

ARTICLE IX.      CONFIDENTIALITY ......................................................................... 18

Section 9.01  Scope .................................................................................................... 18

Section 9.02  Confidential ........................................................................................ 18

Section 9.03  Exceptions ........................................................................................... 19

Section 9.04  Warranty ............................................................................................. 19

Section 9.05  Specific Performance ......................................................................... 19

ARTICLE X.       MISCELLANEOUS .......................................................................... 20

Section 10.01 Subject to Regulation ........................................................................ 20

C:\NRPORTBL\Dallas\love\MH_99759_1.1
DRAFT

## TABLE OF CONTENTS
### (continued)

|  |  | Page |
|---|---|---|
| Section 10.02 | Change in Law | 20 |
| Section 10.03 | Assignment | 20 |
| Section 10.04 | Time Is of Essence | 21 |
| Section 10.05 | Notices | 21 |
| Section 10.06 | No Rights of Third Parties | 22 |
| Section 10.07 | Subject to Applicable Laws | 22 |
| Section 10.08 | No Partnership | 22 |
| Section 10.09 | Amendment | 23 |
| Section 10.10 | No Waiver | 23 |
| Section 10.11 | Captions | 23 |
| Section 10.12 | Complete Agreement | 23 |
| Section 10.13 | Governing Law | 23 |
| Section 10.14 | Severability | 23 |
| Section 10.15 | Exhibits | 23 |
| Section 10.16 | Construction | 24 |
| Section 10.17 | Delivery of Copy of Agreement | 24 |
| EXHIBIT 2.01 – DESCRIPTION OF RENEWABLE RESOURCE FACILITY | | 25 |

C:\NRPORTBL\Dallas\love\MH_99759_1.1
DRAFT

CONFIDENTIAL AND PROPRIETARY

# Renewable Energy Purchase Agreement

This Renewable Energy Purchase Agreement ("Agreement") dated August 25, 2000, (the "Effective Date") is between **TXU Electric Company** ("TXU Electric"), a Texas corporation with offices in Dallas, Dallas County, Texas, and **NWP Indian Mesa Wind Farm, L.P.** ("Seller"), a Delaware limited partnership with offices in Oakland, California. TXU Electric and Seller are also referred to jointly as "Parties" and individually as a "Party." In consideration of the promises made in this Agreement, Seller agrees to produce, deliver, and sell to TXU Electric, and TXU Electric agrees to take and purchase from Seller, renewable electric energy, including without limitation any renewable energy credits under Public Utility Commission of Texas Substantive Rule §25.173 ("RECs") and other environmental credits or environmental attributes associated with that renewable electric energy, under this Agreement's provisions. Renewable electric energy, together with any associated RECs, environmental credits, and environmental attributes, is called "Renewable Energy."

## Article I.    Term

### Section 1.01   Contract Term

This Agreement is effective during the Contract Term. The "Contract Term" begins on the Effective Date and continues until the end of the Production Term.

### Section 1.02   Production Term

(a)     Production and delivery of Net Energy from the Renewable Resource Facility under this Agreement may begin at or after the start of the Production Term and must stop at the end of the Production Term. "Net Energy" for a period is the amount of electric energy in MWh produced by the Renewable Resource Facility and delivered to the Delivery Point in that period, as metered by the Metering Equipment. The "Production Term" starts at 12:00 midnight at the beginning of the Start Date and stops at 12:00 midnight at the end of December 31, 2011, unless it is terminated earlier under another provision of this Agreement or unless TXU Electric exercises one or both of the extension options set out in Section 1.04 below.

(b)     The "Start Date" may not be earlier than July 1, 2001, but, subject to that limitation, the Start Date is the first to occur of (i) the Certification Date, and (ii) January 1, 2002.

(c)     The "Certification Date" is the date that the Renewable Resource Facility has received certification by the Public Utility Commission of Texas ("PUCT") under PUCT Substantive Rule §25.173. Seller shall give TXU Electric prompt written notice of the PUCT's certification of the Renewable Resource Facility accompanied by a copy of the PUCT order granting such certification.

CONFIDENTIAL AND PROPRIETARY

**Section 1.03   Early Energy**

(a)   Despite the provisions of Section 1.02 above, Seller may, at its option, deliver Net Energy to TXU Electric before the Start Date, with such electric energy being called "Early Energy." Seller may exercise that option by written notice to TXU Electric given not less than fourteen days before the day that Seller starts the delivery of Early Energy. The day that such deliveries start is the "Early Start Date".

(b)   TXU may at its option, limit the purchase of Early Energy to the TXU Portion of the entire output of the Renewable Resource Facility. TXU Electric may exercise this option by written notice to Seller given no later than seven days after TXU Electric receives Seller's notice of the Early Start Date. The "TXU Portion" is a fraction of which the numerator is 31.5 MW and of which the denominator is the nameplate MW capacity of the Renewable Resource Facility, which is intended by the Parties initially to be 82.5 MW, but which Seller may change from time to time in accordance with Section 2.07 below.

(c)   The time from the Early Start Date until the Start Date is the "Early Production Term."

**Section 1.04   Options to Extend Production Term**

(a)   TXU Electric, at its option, may extend this Agreement's Production Term until December 31, 2015. TXU Electric may exercise this option by written notice to Seller given on or before June 30, 2011. If the option is not exercised by that date, then the option expires.

(b)   If TXU Electric has exercised the option to extend the Production Term to December 31, 2015, then TXU Electric, at its option, may further extend this Agreement's Production Term until December 31, 2019. TXU Electric may exercise this option by written notice to Seller given on or before June 30, 2015. If the option is not exercised by that date, then the option expires.

**Article II.    Renewable Resource Facility**

**Section 2.01   Renewable Resource Facility**

Seller intends, at its sole cost and expense, to design, construct, own, and operate, a wind-powered generation facility (the "Renewable Resource Facility"), initially with a total nameplate electrical generating capacity of 82.5 megawatts ("MW") and anticipated initial average net annual generation of approximately 300,000 megawatt-hours ("MWh"), located in Pecos County, Texas. Information about the Renewable Resource Facility—including specifications of, and pertinent data about, its equipment and protective features—is attached as Exhibit 2.01. Before the Early Start Date, Seller shall supplement Exhibit 2.01 with an updated description and a one-line diagram of the Renewable Resource Facility. Subject to the other provisions of this Agreement, including without limitation Section 2.07 below, Seller may from time to time modify the Renewable Resource Facility in ways that change the nameplate MW rating of the Renewable Resource Facility, except that Seller may never modify the Renewable Resource Facility such that the nameplate rating is less than 31.5 MW.

**CONFIDENTIAL AND PROPRIETARY**

In the event of any such allowed modifications, Seller and TXU Electric shall agree on a revised Exhibit 2.01 to reflect those changes.

### Section 2.02   Interconnection

Seller shall, at its own expense, make all arrangements, if any, necessary to interconnect the Renewable Resource Facility with a transmission or distribution system and to place the Renewable Resource Facility, if necessary, in a control area throughout the Contract Term. The entity that owns any transmission or distribution system with which the Renewable Resource Facility is interconnected is called the "Connecting Entity." If the Connecting Entity is TXU Electric, then an agreement separate from this Agreement is required to address interconnection issues. The "Delivery Point" is the high side of the 138 kV transformer in Seller's McKenzie Substation in Pecos County, Texas.

### Section 2.03   Transmission

(a)     During the Early Production Term, Seller shall provide, by purchasing or arranging for, all services, including without limitation Transmission Services, Ancillary Services, any control area services, line losses, and transaction fees, necessary to deliver any Early Energy to TXU Electric's load from the Renewable Resource Facility.

(b)     (i)     TXU Electric shall provide, by purchasing or arranging for, all services, including without limitation Transmission Services, Ancillary Services, any control area services, line losses except for line losses on Seller's side of the Delivery Point, and transaction fees, necessary to deliver the TXU Portion of the Net Energy to TXU Electric's load from the Renewable Resource Facility throughout the Production Term ("Required Transmission Services"). During the entire Production Term, Seller is responsible for line losses on Seller's side of the Delivery Point.

         (ii)    TXU Electric is not responsible for providing or paying for any Required Transmission Services necessary to deliver the Net Energy other than the TXU Portion of the Net Energy to the purchaser of that Net Energy from the Renewable Resource Facility throughout the Production Term.

(c)     "Transmission Service" is a service that allows a transmission service customer to use the transmission and distribution facilities of other electric and municipally owned utilities to efficiently and economically utilize generation resources to reliably serve its loads and to deliver energy to another transmission customer.

(d)     "Ancillary Service" is a service necessary to support the transmission of energy from resources to loads while maintaining reliable operation of transmission service providers' transmission systems in accordance with good utility practice.

CONFIDENTIAL AND PROPRIETARY

**Section 2.04    Metering**

(a)    Seller is responsible, at its expense, for providing meters to measure the Net Energy delivered from the Renewable Resource Facility to the Delivery Point ("Metering Equipment"). The Metering Equipment must:

   (i)    be of the accuracy class and construction described in ANSI Standard C12.20;

   (ii)    be metering accuracy class of 0.3 or better;

   (iii)    be constructed and maintained following good metering principles documented in ANSI Standard C12.1 and in the EEI Handbook for Electricity Metering; and

   (iv)    conform to the guidelines of the applicable reliability council (for the Electric Reliability Council of Texas ("ERCOT"), this would be the most recent version of a document titled, "Electric Reliability Council of Texas Operating Guidelines — Guide VI, Communication and Metering, Appendix VI.C, Inter-Control Area Metering Guidelines").

(b)    Seller shall patrol, maintain, and repair the Metering Equipment at its own expense. Seller shall inspect and test the Metering Equipment upon its installation, at least once every year after that at Seller's expense, and at any other reasonable time upon TXU Electric's request and at TXU Electric's expense. Seller may inspect, test, and read the Metering Equipment at any other time at its expense. Seller shall give TXU Electric reasonable advance notice of any test, and TXU Electric may observe the test and conduct its own tests, at TXU Electric's expense, to verify Seller's procedures and results.

(c)    If the Metering Equipment is not within the standards established by ANSI, Seller shall repair or replace it, at Seller's expense. If the Metering Equipment fails to register or, upon test, is not within the accuracy standards established in the latest revision of ANSI Standard C12.20, TXU Electric shall make an adjustment correcting all measurements made by the inaccurate portion of Metering Equipment for:

   (i)    the actual period during which inaccurate measurements were made, if the period can be identified; or, if not,

   (ii)    the period immediately preceding the test of Metering Equipment equal to one-half the time from the last previous test of Metering Equipment, except that the period covered by any correction may not exceed six months.

**Section 2.05    Communications and Telemetry**

Seller shall, at Seller's expense, design, install, own, maintain, and control the "Communications and Telemetry Equipment." The "Communications and Telemetry Equipment" is the telemetering, communications, and data acquisition equipment that are, or may be in the future, necessary for the effective operation of the Renewable Resource Facility with the guidelines of the applicable reliability council (in addition to those required by the Connecting Entity). TXU Electric may inspect and review Seller's Communications and Telemetry Equipment. The Communications and

CONFIDENTIAL AND PROPRIETARY

Telemetry Equipment may include communication and data transmission (telemetering) facilities operable from any single location designated by TXU Electric, from time to time (in addition to those required by the Connecting Entity). If any Communications and Telemetry Equipment needs to be added, modified, or changed to effectively operate Seller's power supply in accordance with this Section 2.05, then TXU Electric shall notify Seller in writing of those additions, modifications, or changes, and Seller shall make them, at Seller's expense. The Renewable Resource Facility must also include:

(a)    one full business voice circuit, which may be cellular, that terminates in the Metering Equipment to use in maintaining and operating the billing meter;

(b)    one full business voice circuit, which may be cellular, in the Renewable Resource Facility's control room, including facsimile capability compatible with the equipment used by TXU Electric; and

(c)    a facsimile machine in the Renewable Resource Facility's control room.

**Section 2.06    Regulatory Compliance**

Seller shall comply with all legal and regulatory requirements for it to fulfill its obligations under this Agreement, including but not limited to:

(a)    Completing the registration process with the PUCT's Program Administrator described in PUCT Substantive Rule §25.173(n);

(b)    Receiving and maintaining certification as a Renewable Energy Resource from the PUCT; and

(c)    Filing a report quarterly with the PUCT Program Administrator of the amount of Net Energy generated by the Renewable Resource Facility.

**Section 2.07    Modifications to Renewable Resource Facility**

After construction of the Renewable Resource Facility is complete, Seller shall provide advance written notice to TXU Electric of any plans to materially modify the Renewable Resource Facility that would reduce the TXU Portion of the Renewable Energy produced by the Renewable Resource Facility to less than the Annual Quantity, as defined in Section 4.02(b) and shall, at TXU Electric's written request, give TXU Electric a written description of the proposed modification and a written explanation of the effect of the proposed modification on the Renewable Resource Facility's generating capacity and reliability. Seller may not materially modify the Renewable Resource Facility in any way that would reduce the TXU Portion of the Renewable Energy produced to an amount less that the Annual Quantity, as defined in Section 4.02(b) without TXU Electric's prior written approval, which it may give or withhold in its sole discretion.

CONFIDENTIAL AND PROPRIETARY

**Section 2.08    Exclusion of Liability**

TXU Electric, by inspection of the Renewable Resource Facility or by its comment or failure to comment on, or by review of, plans for construction or modification of the Renewable Resource Facility, (1) is not responsible for strength of materials, design, adequacy, or compatibility of the Renewable Resource Facility, and (2) does not assume any responsibility or liability for damages or physical injury to:

(a)    either Party's real or personal property or electrical equipment;

(b)    the real or personal property of third persons or entities not a Party to this Agreement;

(c)    any persons who may come in contact with or upon either Party's facilities; or

(d)    any other persons or property, real or personal.

TXU Electric's inspection, review, comment, or failure to comment is not an endorsement or warranty of the Renewable Resource Facility.

**Article III.    Renewable Resource Facility Operation**

**Section 3.01    General Requirements**

(a)    Seller shall adequately staff the Renewable Resource Facility to monitor, operate, and maintain the equipment and shall staff the Renewable Resource Facility with a qualified operator during ordinary business hours.

(b)    Seller shall report to TXU Electric, on a timely basis, those items and/or conditions reasonably necessary for TXU Electric's internal planning. The information supplied must include, without limitation, the following:

(i)    daily plan for the next day, including capability released and available for operation; this daily plan for the next day must be received by TXU Electric generation controller by 9:00 a.m.;

(ii)    immediate notification to TXU Electric during normal working hours Monday through Friday (holidays excepted) if any event or circumstance causes 10% or more of the generating units in the Renewable Resource Facility to be not available for generation;

(iii)    overhaul or scheduled outage plans for the year (updated weekly); and

(iv)    any scheduled or planned transmission or switchyard clearances or maintenance plans for the next twelve (12) months (updated weekly).

Seller is responsible to see that the maintenance and operation of the Renewable Resource Facility and facilities interconnecting the Renewable Resource Facility to the Delivery Point are conducted in compliance with the applicable then-current guidelines of the applicable

CONFIDENTIAL AND PROPRIETARY

reliability council; if this Agreement conflicts with those reliability council guidelines, then this Agreement controls.

### Section 3.02   Quarterly Meeting

Seller shall cause one of its representatives to attend a quarterly meeting with TXU Electric in which (a) the production of the Renewable Resource Facility is discussed, (b) Seller shall provide TXU Electric with documentation that shows that the PUCT's Program Administrator has awarded RECs to the Renewable Resource Facility based on verified meter readings, and (c) the outlook for the current compliance period production of RECs is discussed.

### Section 3.03   Energy Delivery

Seller shall deliver all Net Energy generated by the Renewable Resource Facility, net of that required for operation of the Renewable Resource Facility, to the Delivery Point. Seller shall reasonably cooperate with TXU Electric in causing the TXU Portion of the Net Energy to be delivered to TXU Electric, but if such cooperation would require Seller to incur a Significant Expense, Seller is not required to provide such cooperation if TXU Electric refuses, upon request, to reimburse Seller for such expense. TXU Electric shall accept and receive the TXU Portion of the Net Energy at the Delivery Point, and title to the TXU Portion of the Net Energy passes from Seller to TXU Electric at the Delivery Point. For purposes of this Section 3.03 only, "Significant Expense" is defined as any expenses that are incurred that exceed $100 per month resulting from the cooperation called for in this Section 3.03.

### Section 3.04   No Interstate Operations

(a)     Seller agrees that, during the Contract Term:

    (i)     Seller shall not, directly or through connections with other entities, transmit, sell, or deliver electric energy generated at the Renewable Resource Facility in interstate commerce; and

    (ii)    Seller shall open, and shall keep open, all electrical connections controlled by it that are necessary to prevent transmission of electric energy generated at the Renewable Resource Facility in interstate commerce.

(b)     Nothing in this Section 3.04 precludes the use of connections for the transmission of electric energy in interstate commerce (i) under bona fide emergencies under Section 202(d) of the Federal Power Act or (ii) if such transmission in interstate commerce occurs because of the orders of the Federal Energy Regulatory Commission, applicable to TXU Electric, under Sections 210, 211, and 212 of the Federal Power Act requiring the establishment, maintenance, modification, or use of any connections that are involved. If Seller violates any of its obligations under Section 3.04(a), then TXU Electric may, besides any other remedies it may have, immediately suspend receipt of Renewable Energy from Seller.

(c)     It is impossible or very difficult to measure in money the damages that would accrue due to any breach of the representations and warranties made in this Section 3.04, or any failure in

CONFIDENTIAL AND PROPRIETARY

the performance of any of the obligations contained in this Section 3.04 and, for that reason, among others, the parties agree that TXU Electric is entitled to specific performance of this Section 3.04, besides any other remedies that may exist. Seller waives any claim or defense that an adequate remedy at law exists, if TXU Electric institutes any proceedings to enforce any provision of this Section 3.04.

**Section 3.05   Access to Facility**

TXU Electric may enter the Renewable Resource Facility at any reasonable time after giving Seller reasonable advance notice to inspect the Renewable Resource Facility. TXU Electric may enter the Metering Equipment at any time.

### Article IV.   Payments, Records, and Billings

**Section 4.01   Quantity Sold**

(a)   During the Early Production Term, if Seller exercises its option under Section 1.03 above to sell Renewable Energy to TXU Electric before the Start Date, Seller shall sell and deliver, and TXU Electric shall purchase and accept, at TXU Electric's option under Section 1.03 above, either (i) 100%, or (ii) the TXU Portion, of the Renewable Energy produced by the Renewable Resource Facility during the Early Production Term.

(b)   During the Production Term, Seller shall sell and deliver, and TXU Electric shall purchase and accept, the TXU Portion of the Renewable Energy produced by the Renewable Resource Facility during the Production Term.

**Section 4.02   Monthly Payments**

(a)   During the Early Production Term, TXU Electric shall pay Seller monthly for the Early Energy produced by the Renewable Resource Facility in the preceding calendar month. The price for each MWh of Early Energy is the lesser of (i) 85% of the rate specified in TXU Electric's Rate LPP, and (ii) the Full Price.

(b)   During the Production Term, TXU Electric shall pay Seller monthly for the TXU Portion of the Renewable Energy produced by the Renewable Resource Facility in the preceding calendar month. The price for each MWh of Renewable Energy produced in 2001 is the Full Price. For each calendar year of the Production Term after 2001, the price (a) for each MWh of Renewable Energy produced in a calendar year up to 105% of the Annual Quantity is the Full Price, and (b) for all of Renewable Energy produced in the calendar year in excess of 105% of the Annual Quantity is 50% of the Full Price, subject to a possible additional payment for those RECs as described in Section 4.04. The "Full Price" is $26.80 for the initial Production Term, $29.00 per MWh for the first optional extension of the Production Term under Section 1.04(a), and $34.00 per MWh for the second optional extension of the Production Term under Section 1.04(b). The "Annual Quantity" for each calendar year of the Production Term beginning with 2002 shall be determined by Seller no later than December 1, 2000 and must not be less than 105,000 MWh and may not exceed 115,000 MWh.

CONFIDENTIAL AND PROPRIETARY

**Section 4.03    Quarterly REC Reconciliation**

At the end of each calendar quarter, after the PUCT's program administrator of the REC trading program (the "Program Administrator") credits the account of the Renewable Resource Facility with RECs based upon the metered generation of the Renewable Resource Facility for the quarter, then the Seller shall immediately transfer the TXU Portion of those RECs to TXU Electric. To the extent that the TXU Portion of the RECs credited by the Program Administrator for that quarter are less than the MWh paid for under Section 4.02(b) for that quarter, then Seller shall pay TXU Electric an amount equal to the product of (a) the price for those MWh under Section 4.02(b), and (b) the difference between the MWh paid for under Section 4.02(b) and the MWh of RECs credited to the Renewable Resource Facility and transferred to TXU Electric for that quarter. To the extent that the TXU Portion of the RECs credited by the Program Administrator for that quarter are more than the MWh paid for under Section 4.02(b) for that quarter, then TXU Electric shall pay Seller an amount equal to the product of (a) the price for those MWh under Section 4.02(b), and (b) the difference between the MWh paid for under Section 4.02(b) and the MWh of RECs credited to the Renewable Resource Facility and transferred to TXU Electric for that quarter. Payment is due on the last day of the calendar month immediately following the calendar month in which the Program Administrator decides how many RECs to credit to the account of the Renewable Resource Facility.

**Section 4.04    Annual REC Reconciliation**

(a)    At the end of each calendar year, beginning at the end of 2002, the TXU Portion of the amount of RECs produced by the Renewable Resource Facility in that year is compared to the Annual Quantity. For the calendar year 2002 only, the comparison will be between the TXU Portion of the amount of RECs produced on or after July 1, 2001 through December 31, 2002 and the Annual Quantity.

(b)    If the TXU Portion of the amount of RECs produced by the Renewable Resource Facility in a year exceeds the Annual Quantity, the difference between the TXU Portion of the annual amount of RECs produced by the Renewable Resource Facility and the Annual Quantity is called the "Annual Excess" for that year.

    (i)    If the Annual Excess is 5% or less of the Annual Quantity, then the "Annual Full-Price Excess" equals the Annual Excess.

    (ii)    If the Annual Excess is greater than 5% of the Annual Quantity, then the "Annual Full-Price Excess" equals 5% of the Annual Quantity, and the "Annual Half-Price Excess" equals the difference between the Annual Excess and 5% of the Annual Quantity.

    (iii)    The Net Full-Price Excess for that year is the sum of the Annual Full-Price Excess for that year plus the Net Full-Price Excess for the previous year. The Net Half-Price Excess for that year is the sum of the Annual Half-Price Excess for that year plus the Net Half-Price Excess for the previous year.

(c)    If the TXU Portion of the amount of RECs produced by the Renewable Resource Facility in a year is less than the Annual Quantity, the difference is called the "Annual Deficiency."

CONFIDENTIAL AND PROPRIETARY

(i)    The Annual Deficiency is then compared to the Net Full-Price Excess for the previous year.

    (A)    If the Net Full-Price Excess for the previous year is greater than the Annual Deficiency, then the difference is the Net Full-Price Excess for that year, and the Net Half-Price Excess for that year is equal to the Net Half-Price Excess for the previous year.

    (B)    If the Net Full-Price Excess for the previous year is less than the Annual Deficiency, then the difference is the Annual Half-Price Deficiency for that year, and the Net Full-Price Excess for that year is zero. The Annual Half-Price Deficiency is then compared to the Net Half-Price Excess for the previous year.

        (1)    If the Net Half-Price Excess for the previous year is greater than the Annual Half-Price Deficiency for the current year, then the difference is the Net Half-Price Excess for the current year.

        (2)    If the Net Half-Price Excess for the previous year is less than the Annual Half-Price Deficiency for the current year, then the difference is the Net Deficiency for the current year, and the Net Half-Price Excess for the current year is zero.

        (3)    TXU Electric shall pay Seller one-half of the Full Price for each MWh by which the Net Half-Price Excess for the previous year is greater than the Net Half-Price Excess for the current year.

(d)    (i)    If there is a Net Deficiency for a year, then, subject to the limits set out in Section 4.04(d)(ii) below, then Seller may elect to obtain and transfer RECs to TXU Electric to completely or partially offset the Net Deficiency. Seller must make that transfer of RECs by no later than the last to occur of (A) 15 days after TXU Electric gives Seller written notice of the Net Deficiency for a year, and (B) March 15 of the year immediately following the year for which the Net Deficiency was incurred.

    (ii)    The limits referred to in Section 4.04(d)(i) above, are that the amount of RECs so obtained and transferred (the "Transferred RECs") for any one calendar year may not exceed the sum of (A) 20% of the Annual Quantity, and (B) the Uncontrollable Force Deficiency for that year. The "Uncontrollable Force Deficiency" for a year is the TXU Portion of the RECs not produced by the Renewable Resource Facility in a calendar year due to an event of Uncontrollable Force that reduces the output capacity of the Renewable Resource Facility by at least 10% of its nameplate capacity for at least 20 consecutive days.

(e)    After making any adjustments to the Net Deficiency under Section 4.04(d) above, Seller shall pay TXU Electric a Deficiency Payment equal to the product of (i) the difference in MWh between (A) the Net Deficiency, and (B) the MWh of Transferred RECs, times (ii) the

CONFIDENTIAL AND PROPRIETARY

Deficiency Rate. The Deficiency Payment is intended to be liquidated damages and not a penalty.

(f)    Any Deficiency Payment must be made in three equal monthly installments, beginning on the later of (i) April 1 immediately following the year for which the Net Deficiency occurred, and (ii) thirty days after TXU Electric gives Seller written notice of the Net Deficiency for a year. TXU Electric may offset the installment amount of any Deficiency Payment against any amounts otherwise owed by TXU Electric to Seller.

(g)    (i)    The initial Deficiency Rate is $50 per MWh, based upon the $50 per MWh number in PUCT Substantive Rule §25.173. If the $50 per MWh in that Rule is amended, then the Deficiency Rate is automatically adjusted to the amended number stated in that Rule. If PUCT Substantive Rule §25.173 is amended or repealed without replacement so that the $50 number is no longer in the PUCT Substantive Rules, then the Deficiency Rate is $50.

       (ii)   To the extent that the PUCT determines the annual average market value of RECs applicable to TXU Electric for a year, then the Deficiency Rate for that year will be the lesser of (i) the $50 per MWh (as it may be later amended), and (ii) twice the annual average market value of RECs applicable to TXU Electric as determined by the PUCT. If this determination is made for a year after Seller has made a Deficiency Payment for that year to TXU Electric under this Agreement, then TXU Electric shall recalculate the Deficiency Payment using the new Deficiency Rate, and TXU Electric shall promptly pay Seller any amounts necessary to true up the Deficiency Payment. For a year for which there is a Deficiency Payment due, TXU Electric shall make reasonable efforts to obtain a determination of the annual average market value of RECs by the PUCT, but nothing in this Section or in this Agreement obligates TXU Electric to turn in fewer RECs than are required of it by the PUCT program administrator in order to obtain such a determination.

(h)    Nothing in this Section 4.04 or in any other provision of this Agreement limits TXU Electric's right to recover actual damages from Seller if Seller breaches its obligation under Section 4.01(b) to sell the TXU Portion of the Net Energy produced by the Renewable Resource Facility to TXU Electric.

## Section 4.05   Effect of Outages and Uncontrollable Force

Except as provided below, the calculations under this Article IV are made based upon the actual amount of Net Energy and actual amount of RECs, whether or not the production of Net Energy or RECs is affected by (a) suspension of deliveries under this Agreement under Section 3.04(b), (b) forced or scheduled outages as described in Article V, or by (c) Uncontrollable Force as described in Article VI. The exception mentioned above is that the Annual Quantity for a year is decreased to the extent that TXU Electric is excused from paying a penalty by reason of any event under Section 25.173(o)(4) and (5) of the PUCT Substantive Rules that adversely affected the production of RECs by the Renewable Resource Facility in that year. TXU Electric shall make reasonable efforts to obtain an excuse from any penalty to the extent that it was due to any event under Section 25.173(o)(4) and (5) of the PUCT Substantive Rules that adversely affected the production of RECs

CONFIDENTIAL AND PROPRIETARY

by the Renewable Resource Facility, but nothing in this Section or in this Agreement obligates TXU Electric to turn in fewer RECs than are required of it by the PUCT program administrator in order to obtain such an excuse.

### Section 4.06   Governmental Impositions

If TXU Electric is required to pay any taxes, assessments, or other governmental impositions that are not in existence as of the Effective Date because of its purchase of RECs or Net Energy under this Agreement, then it shall give Seller written notice of that requirement. Seller shall then pay 50% of those taxes, assessments, or other governmental impositions as they are incurred by TXU Electric and then included in the billing under Section 4.08 below. Each Party shall, upon written request by the other Party, reasonably cooperate with each other in working to remove any such taxes, assessments, or other governmental impositions.

### Section 4.07   Records

(a)     TXU Electric shall create and keep (i) meter records and other records needed to show the amounts due from TXU Electric to Seller under this Agreement, and (ii) records of amounts due by Seller to TXU Electric under this Agreement.

(b)     Seller shall create and keep (i) meter records and other records needed to show the amount of RECs and Net Energy generated at the Renewable Resource Facility, and (ii) maintenance records and operating logs of the generating, control, and protective equipment at the Renewable Resource Facility.

(c)     Each Party shall maintain the records that it is required to create and keep under this Section 4.08 according to generally accepted accounting principles, consistently applied. Each Party shall keep and maintain those records for four years after the respective records are created, and the other Party may inspect and audit those records during normal business hours upon reasonable advance written notice.

### Section 4.08   Billing

(a)     TXU Electric shall read the meters in the Metering Equipment monthly. Within 30 days after the end of a month, TXU Electric shall send to Seller a statement detailing all amounts due from TXU Electric to Seller, based upon the meters in the Metering Equipment, and all amounts due from Seller to TXU Electric under this Agreement for the month. If the 30 days end on a day that is not a Business Day, then the period allowed for sending the above-described statement is extended to the end of the next day that is a Business Day. A "Business Day" is any day that is not a Saturday, Sunday, or a holiday observed by TXU Electric's Dallas office.

(b)     TXU Electric may offset payments due by Seller to TXU Electric against payments due by TXU Electric to Seller. Payment of any net amount shown to be due by TXU Electric to Seller must be included with the statement. If the statement shows a net amount due from Seller to TXU Electric, the payment is past due if not made within 20 days after the date the statement is sent.

CONFIDENTIAL AND PROPRIETARY

**Section 4.09    Interest on Past Due Amounts**

Any payments due by Seller to TXU Electric under this Agreement that are not paid when due and any payments due by TXU Electric to Seller that are not paid when due bear interest, compounded monthly, from the due date until paid, at the Commercial Paper Rate in effect on the first Business Day of each calendar month in which interest accrues. "Commercial Paper Rate" means the lesser of (i) the rate published weekly in the Federal Reserve Statistical Release for "one month commercial paper" plus 2% or (ii) the highest rate permitted by applicable law. If the Federal Reserve Statistical Release is not published or is otherwise not available, then a weekly average rate must be determined from the Wall Street Journal for high grade unsecured notes sold through dealers by major corporations or another recognized financial publication for similar instruments. In computing the highest rate allowed by applicable law, the weekly rate ceiling computed under Article 5069-1D.002 of the Texas Revised Civil Statutes applies.

**Section 4.10    Corrections**

If there are errors in billings or payments under this Agreement due to metering or billing errors or to errors or changes in the amount of RECs awarded by the REC Program Administrator, then the billings or payments must be corrected, provided that the Party asserting the error gives the other Party notice of the error within one year after the date of the bill or payment affected. Any corrections shall include interest at the Commercial Paper Rate from the date that the incorrect payment was made until the date of the corrected bill or corrected payment, as the case may be.

**Article V.    Outages**

**Section 5.01    Outages**

(a)    The Renewable Resource Facility, the Connecting Entity facilities, and TXU Electric's transmission and distribution system will suffer, from time to time, scheduled outages for construction, maintenance, repairs, or inspection.

(b)    The Renewable Resource Facility, the Connecting Entity facilities, and TXU Electric's transmission and distribution system will be subject, from time to time, to forced outages. "Forced outages" include any reduction or cessation of generation, transmission, or distribution caused by breakage or malfunction of equipment, machinery, and facilities, or by storm, casualty, emergency condition, or other unforeseen causes. Seller and TXU Electric shall promptly give notice to the other of any forced outage.

**Section 5.02    No Liability**

Neither Party violates this Agreement due to, or is liable to the other Party for, interruptions or curtailments of the delivery or receipt of energy generated at the Renewable Resource Facility due to either a scheduled outage or a forced outage described in Section 5.01, even if the interruption or curtailment is caused, in whole or in part, by a Party's negligence. This does not limit a Party's liability for intentional misconduct. A Party shall diligently perform scheduled maintenance on its facilities and shall diligently pursue correction of forced outages of its facilities.

**CONFIDENTIAL AND PROPRIETARY**

### Article VI.    Termination and Uncontrollable Force

**Section 6.01    Insolvency**

Besides the other causes for termination provided in this Agreement, a Party (the "terminating party") may terminate this Agreement immediately upon written notice to the other Party (the "insolvent party"), without any liability or responsibility under this Agreement, and without prejudice to any other power, right, or remedy that the Party may have under this Agreement, if (a) the insolvent party files a voluntary petition under the bankruptcy or insolvency laws, (b) an involuntary proceeding is initiated against the insolvent party under the bankruptcy or insolvency laws, which involuntary proceeding remains undismissed for 90 consecutive days, or (c) the insolvent party cannot meet its debts in the ordinary course of business. However, this Agreement does not terminate if, within 10 days after the insolvent party receives written notice of the proposed termination, the insolvent party, as debtor-in-possession, or the insolvent party's trustee, receiver, assignee, or custodian, whichever is obligee under this Agreement, in writing affirms this Agreement and proves, to the terminating party's satisfaction, the ability to fulfill the insolvent party's obligations under this Agreement.

**Section 6.02    Uncontrollable Force**

(a)    An "Uncontrollable Force" is an event or circumstance not within the reasonable control of a Party. Events or circumstances that are outside of a Party's reasonable control may include weather-related damage, mechanical failure, lack of transmission capacity or availability, strikes, lockouts, actions of a governmental authority that adversely affect the Party's ability to perform its obligations under this Agreement, including Seller's ability to produce or obtain generation, transmission, or distribution of electric energy from the Renewable Resource Facility.

(b)    If either party is wholly or partly unable to perform any of its obligations under this Agreement because of Uncontrollable Force (other than any obligation to make any payment under this Agreement), that party is excused to the extent that its performance is affected by the Uncontrollable Force if:

    (i)    the nonperforming party gives the other party, within 14 days after the Uncontrollable Force begins, written notice describing the particulars of the Uncontrollable Force, including the nonperforming party's position on whether the Uncontrollable Force constitutes an event under Section 25.173(o)(4) and (5) of the PUCT Substantive Rules that adversely affected the production of Renewable Energy by the Renewable Resource Facility;

    (ii)    the nonperforming party gives the other party, within 30 days after the Uncontrollable Force begins, a written explanation of the Uncontrollable Force and its effect on the nonperforming party's performance;

    (iii)    the suspension of performance is of no greater scope and of no longer duration than the Uncontrollable Force requires; and

**CONFIDENTIAL AND PROPRIETARY**

(iv) the nonperforming party uses its reasonable efforts to remedy its inability to perform.

(c) When the nonperforming party can resume performance of its obligations under this Agreement, that party shall give the other party written notice to that effect.

(d) No Uncontrollable Force condition extends this Agreement's term.

(e) Any excuse of non-performance due to an Uncontrollable Force condition cannot last longer than 180 days except upon the performing party's written consent, which the performing party may give or withhold in its sole discretion. If the Uncontrollable Force condition is not removed within 180 days, then Uncontrollable Force ceases to excuse non-performance.

(f) TXU Electric may exercise the rights granted in Section 3.04(b) if Seller violates Section 3.04(a), even though an Uncontrollable Force caused the violation.

**Section 6.03   Termination**

(a) If:

  (i) either party materially breaches any warranty it makes in this Agreement, or

  (ii) either party materially fails to fulfill any obligation it has under this Agreement, or

  (iii) if any representation either party makes in this Agreement becomes, after the date of this Agreement, materially inaccurate, or is discovered to have not been materially accurate when made,

then the party to whom the representation or warranty was made, or to whom the obligation was due, (the "Nondefaulting Party") may, besides any other remedies that may be available at law or in equity, terminate this Agreement upon 30 days advance written notice to the other party (the "Defaulting Party"), the 30 days commencing with the date of the other party's receipt of the notice. If, by the end of the 30-day period, the Defaulting Party has cured the breach, misrepresentation, or default, then the default ceases to exist, and this Agreement is not terminated. For any breach, misrepresentation, or default other than the payment of money, if breach, misrepresentation, or default cannot reasonably be cured within 30 days, and if the Defaulting Party begins work or other efforts to cure the breach, misrepresentation, or default within 30 days after receipt of the notice and then prosecutes the curative work with reasonable diligence until the curative work is completed, and if as a result the breach, misrepresentation, or default is cured within 90 days after the receipt of the notice, then the breach, misrepresentation, or default specified in the notice ceases to exist, and this Agreement is not terminated.

(b) The rights to terminate in this Section 6.03 are in addition to the rights to terminate this Agreement given in other Sections of this Agreement, and the rights of a party to cure a default under Section 6.03(a) do not apply to termination rights given in Section 6.01.

CONFIDENTIAL AND PROPRIETARY

(c)     A person that is providing debt or equity financing for Seller in connection with the Renewable Resource Facility may cure any of Seller's defaults under this Agreement, and the effect of that cure is the same as if Seller had cured the default.

## Section 6.04   No Consequential Damages

Neither party is liable to the other for any special, indirect, or consequential damages or injury that may occur, in whole or in part, as a result of the breach of any contract, a tort, or any other cause, whether or not a party had knowledge of the circumstances that resulted in the special, indirect, or consequential damages, or could have foreseen that such damages would occur. Special, indirect, or consequential damages include—as representative examples and without limiting the phrase—lost profits, lost production time, lost business, lost work-in-process, claims of customers, value of employees' lost time, delayed production of goods, loss of goodwill, increased costs, increased interest expense, and inability to make required payments.

### Article VII.    Representations and Warranties

## Section 7.01    Representations and Warranties

Besides the other representations, obligations, and warranties of Seller, Seller now represents and warrants unconditionally to TXU Electric that:

(a)     Seller is a limited partnership duly organized, validly existing, and in good standing under Delaware law and is duly authorized to do business in Texas.

(b)     Seller has full power and lawful authority to accomplish, execute, and fulfill all of its obligations and duties under this Agreement.

(c)     Seller shall provide minority-owned, women-owned, and small businesses equal opportunities to participate in its purchase of materials and services for, and its construction, operation, and maintenance of, the Renewable Resource Facility. Upon request by TXU Electric, Seller shall provide TXU Electric with documentation showing the steps that it has taken to provide such equal opportunities and the results of those steps.

(d)     The major items installed at the Renewable Resource Facility are newly manufactured and state-of-the-art technology.

(e)     Seller will use its reasonable efforts to assure that the Renewable Resource Facility is maintained in accordance with prudent industry utility practices for the same or similar facilities.

(f)     Seller shall, at its sole cost and expense, maintain the MW capacity of the Renewable Resource Facility at not less than 31.5 MW.

**CONFIDENTIAL AND PROPRIETARY**

## Article VIII.  Security

### Section 8.01    Security Required

To secure the payment of all amounts due by Seller to TXU Electric under this Agreement, Seller shall, simultaneously upon execution of this Agreement, give to TXU Electric, and maintain in effect continuously thereafter until it is released by TXU Electric, security under the provisions of this Article VIII (the "Security"). Seller shall provide written evidence satisfactory to TXU Electric that the Security is in effect, including without limitation the operative documents that create the Security (the "Security Documents").

### Section 8.02    Security Amount

The amount of the Security must be an amount not less than $575,000.

### Section 8.03    Form of Security

The Security must consist of one or more cash equivalents in favor of TXU Electric, including but not limited to an irrevocable letter of credit payable upon demand. The bank or other institution providing the Security (the "Security Provider") must be acceptable to TXU Electric. The Security must be in a form and substance acceptable to TXU Electric, consistent with this Article VIII, and maintained at Seller's expense.

### Section 8.04    Renewal of Security

Seller shall renew the Security, or obtain replacement Security, no later than 60 days before the current Security expires or is terminated.

### Section 8.05    Notice of Termination

The Security Documents must obligate the Security Provider to provide TXU Electric with no less than 60 days advance written notice before the Security may be terminated or modified.

### Section 8.06    Access to Security

TXU Electric may access the Security if:

(a)    Seller breaches any of its obligations under this Article VIII, including without limitation the obligation to renew the Security at least 60 days before its expiration;

(b)    TXU Electric receives a notice from the Security Provider that the Security is going to be terminated or modified;

(c)    Seller fails to pay, when due, any amounts that Seller owes to TXU Electric under this Agreement; or

(d)    This Agreement is terminated by TXU Electric under any provision of this Agreement.

**CONFIDENTIAL AND PROPRIETARY**

**Section 8.07    Protection of Security**

If Seller does not renew or replace the Security at least 60 days before it expires, or if TXU Electric receives a notice from the Security Provider that the Security will be terminated or modified, then TXU Electric may access the Security and hold the proceeds as Security under this Agreement. TXU Electric has a security interest in the proceeds. If Seller later provides replacement Security under this Agreement, then TXU Electric shall return those proceeds to Seller.

**Section 8.08    Replacement of Applied Security**

If TXU Electric accesses the Security and applies any of it to Seller's obligations, then Seller must, within 10 days after it receives a written notice from TXU Electric of such access and application, provide additional Security in an amount necessary to restore the amount of Security to the level required under this Agreement.

**Section 8.09    Release of Security**

TXU Electric shall release its interest in the Security promptly after this Agreement is terminated or expires and after Seller has paid to TXU Electric all amounts, if any, due to TXU Electric under this Agreement.

**Section 8.10    Survival**

This Article VIII survives the termination or expiration of this Agreement.

**Article IX.          Confidentiality**

**Section 9.01    Scope**

Each party agrees, for itself, its parent, subsidiary, and affiliated corporations, and its and their respective directors, officers, employees, and representatives, including, without limitation, attorneys, accountants, and consultants, to keep confidential (a) this Agreement, (b) all negotiations concerning this Agreement, and (c) all documents, data, drawings, studies, projections, plans and other information, whether written or oral, that relate to economic benefits to or amounts payable by either party under this Agreement. If this Agreement is terminated before January 1, 2006 for any reason, then this Article IX survives the termination of this Agreement until January 1, 2007.

**Section 9.02    Confidential**

"Confidential" means that information or a document—including the content, substance, or effect of the information or document—may not be disclosed, discovered, or distributed to any other person, corporation, or other entity, (a) except under the valid order of an administrative or judicial officer having jurisdiction, which order must be opposed unless opposition to it is waived in writing by each party to this Agreement, or (b) except as provided in Section 9.03. A party is not required to oppose any order requiring disclosure in any judicial or administrative proceeding by appeal, separate legal proceeding, or extraordinary measures if it gives the other party written notice of the order, and the other party does not, within 10 days after receiving the notice, agree to pay the reasonable costs of any opposition by appeal, separate legal proceeding, or extraordinary measures.

CONFIDENTIAL AND PROPRIETARY

**Section 9.03   Exceptions**

Either party may, without violating this Article IX, disclose matters that are made confidential by this Agreement:

(a)     to actual or prospective fuel suppliers, co-owners, lenders, underwriters, contractors, suppliers, and others involved in construction, operation, and financing transactions and arrangements for a party or its subsidiaries, affiliates, or parent, if the party making the disclosure obtains, as a condition precedent to the disclosure, a confidentiality agreement with the person, corporation, or other entity to whom the disclosure is being made with terms substantially the same as this Article IX;

(b)     to governmental officials and parties involved in any proceeding in which either party is seeking a permit, certificate, or other regulatory approval or order necessary or appropriate to carry out this Agreement, but the party making the disclosure must make reasonable efforts to restrict public access to the information disclosed, by protective order or otherwise; and

(c)     to governmental officials or the public as required by any law, regulation, or order, including without limitation laws or regulations requiring disclosure of financial information, information material to financial matters, and filing of financial reports, but the party making the disclosure must make reasonable efforts to restrict public access to the information disclosed, by protective order or otherwise.

TXU Electric may also disclose any documents or other information made confidential under this Agreement as it deems necessary or advisable to state and recover its costs through its rates from its customers or to obtain any other regulatory approval or action that it deems necessary or advisable, including without limitation the awarding of renewable energy credits, but TXU Electric shall make reasonable efforts to restrict public access to the information disclosed, by protective order or otherwise.

**Section 9.04   Public Information**

This Article IX does not apply to information which (a) is in, or which comes into, the public domain other than through a violation of this Article, (b) is already in a Party's possession before receiving it from the other Party, with no direct or indirect obligation, known to the Party receiving the information, to the other party with regard to said information, or (c) is at any time disclosed to a Party by a third party having the right to make the disclosure and having no direct or indirect obligation, known to the Party receiving the information, to the other Party to this Agreement concerning the disclosure.

**Section 9.05   Warranty**

Each Party warrants and represents that as of the date of this Agreement it has made no disclosures, to the best of its knowledge, that would violate that Confidentiality Agreement between the Parties dated March 24, 2000.

**CONFIDENTIAL AND PROPRIETARY**

### Section 9.06    Specific Performance

It will be impossible or very difficult to measure in terms of money the damages that would accrue due to any breach of this Article IX, or any failure to perform any obligation contained in this Article IX, and, for that reason, among others, each party is entitled to specific performance of this Article IX. If either party institutes any proceeding to enforce any part of this Article IX, the other party now waives any claim or defense that an adequate remedy at law exists.

### Article X.         Miscellaneous

### Section 10.01    Subject to Regulation

This Agreement may be subject to regulation by regulatory authorities having jurisdiction. The Parties do not intend by this Section 10.01 to confer or extend jurisdiction over this Agreement to any regulatory authority. Neither Party requires any governmental or regulatory approval for this Agreement to be in full force and effect.

### Section 10.02    Change in Law

The Parties intend for this Agreement to continue even if Section 39.904 of the Texas Utilities Code is repealed without replacement or if some other change in law or regulations abolishes or amends the REC Trading Program under PUCT Substantive Rule §25.173. If RECs cease to exist for any reason, then the provisions of this Agreement that deal with RECs are automatically deleted or amended, as appropriate, and this Agreement will continue as an agreement to buy and sell electric energy at the prices, and on the other terms and conditions, specified in this Agreement. Without limiting the foregoing provisions of this Section 10.02, if RECs cease to exist, then Section 4.03 and Section 4.04 of this Agreement will be automatically deleted.

### Section 10.03    Assignment

(a)    Seller may assign this Agreement for collateral security purposes, but Seller may not otherwise assign this Agreement or any of its rights, duties, or obligations under this Agreement without TXU Electric's prior written consent, which may not be unreasonably withheld or delayed. Any attempted assignment that violates this Section 10.03 is void and ineffective against TXU Electric. TXU Electric may assign this Agreement, in whole or in part, to any person or entity without obtaining Seller's consent.

(b)    No assignment of this Agreement releases the assignor from liability under this Agreement, except that (i) an assignment by Seller to an entity that is least as creditworthy as Seller is at the Effective Date, as reasonably determined by TXU Electric on an unconsolidated basis, does release the assignor from liability, except for any obligations incurred before the effective date of that assignment, and (ii) an "unbundling assignment" by TXU Electric does release the assignor from liability under this Agreement, except for any obligations incurred before Seller is notified of that assignment; an "unbundling assignment" can only be made with Seller's prior written consent, which consent Seller may not unreasonably withhold or delay, provided that the assignee is at least as creditworthy as TXU Electric at the time of such assignment; and is defined as an assignment to any directly or indirectly wholly-

CONFIDENTIAL AND PROPRIETARY

owned subsidiary of TXU Corp. that is made in unbundling its operations and reorganizing its corporate structure in preparation for the deregulation of Texas retail electricity markets under Senate Bill 7 of the 1999 Texas Legislature.

(c)    This Agreement inures to the benefit of and binds both (i) TXU Electric, its successors, and its assigns allowed under this Agreement, and (ii) Seller, its successors, and its assigns allowed under this Agreement.

### Section 10.04  Time Is of Essence

Time is of the essence with regard to performance of this Agreement.

### Section 10.05  Notices

(a)    Except as set forth otherwise below, any notices, demands, or requests required or authorized by this Agreement, or any other instrument or document required or authorized to be tendered or delivered by either Party, must be in writing and personally delivered or sent by certified mail, return receipt requested, postage prepaid to:

   (i)    All operational notices (including notices of forced outages) must be in writing (including by facsimile) except that routine operational notices and communications and notices during an emergency or other unforeseen event may be made in person or by telephone, and sent to:

| If to TXU Electric: | If to Seller: |
| --- | --- |
| Generation Coordinator<br>TXU Electric Company<br>1601 Bryan Street, 12th Floor<br>Dallas, Texas 75201<br>Telephone: (214) 812-6240<br>Facsimile: (214) 812-6294 | To be provided by Seller no later than 30 days before the earlier to occur of (A) the Start Date, or (B) the Early Start Date |

   (ii)    Notices for statement and billing purposes (billing statements may be sent by regular mail) must be sent to:

| If to TXU Electric: | If to Seller: |
| --- | --- |
| TXU Electric<br>Attn: Fuel Accounting Manager<br>1601 Bryan Street, 36th Floor<br>Dallas, Texas 75201-3411 | To be provided by Seller no later than 30 days before the earlier to occur of (A) the Start Date, or (B) the Early Start Date |

   (iii)    Information concerning electronic funds transfers:

**CONFIDENTIAL AND PROPRIETARY**

If to TXU Electric:                                      If to Seller:

Bank of America, N.A.                              To be provided by Seller no later than
Dallas, Texas                                            30 days before the earlier to occur of
ABA No. 111000012                               (A) the Start Date, or (B) the Early
for credit to                                              Start Date
    TXU Electric Company
Account No. 375041499

  (iv)    All other notices, including administrative notices, must be sent to:

If to TXU Electric:                                      If to Seller:

Manager, Power Supply & Marketing       To be provided by Seller no later than
TXU Electric Company                            30 days before the earlier to occur of
1601 Bryan Street, 12th Floor                  (A) the Start Date, or (B) the Early
Dallas, Texas 75201                                 Start Date
Facsimile: (214) 812-8177

(b)    The person to receive notices or the address for such notices may be changed by written
notice from one Party to the other Party under this Section 10.05. Any written notice,
demand, or request given under this Section 10.05 is deemed to be given upon the earlier of
(i) actual receipt, or (ii) deposit in the U.S. mail, properly addressed, and with adequate
postage. If a Party is required to take some action within a certain time, which period is
begun by a notice given by mail, then the time is extended by three business days. A
"business day" is any day that is not a Saturday, Sunday, or a holiday observed by TU
Electric's Dallas office.

### Section 10.06 No Rights of Third Parties

This Agreement is intended only for the parties' benefit. Nothing in this Agreement may be
construed to create any duty to, any standard of care concerning, or any liability to, any person not a
party to this Agreement.

### Section 10.07 Subject to Applicable Laws

This Agreement is subject to applicable federal, state, and local laws, ordinances, rules, and
regulations. Nothing in this Agreement may be construed as a waiver of any right to question or
contest any law, ordinance, rule, regulation, or asserted regulatory jurisdiction.

### Section 10.08 No Partnership

This Agreement is not intended to create and does not create an association, joint venture, or
partnership between the parties or to impose any partnership obligation or liability upon either
party. Neither party has any right, power, or authority to enter any agreement or undertaking for, or
act on behalf of, or to act as or be an agent or representative of, or to otherwise bind, the other party.

C:\NRPORTBL\Dallas\lovel\MH_99759_1.1                    22

**CONFIDENTIAL AND PROPRIETARY**

### Section 10.09  Amendment

This Agreement may be amended any time, but only by a written agreement signed by both parties to this Agreement.

### Section 10.10  No Waiver

The waiver of a breach of any provision of this Agreement does not waive any other breach of that provision or of any other provision.

### Section 10.11  Captions

The captions of the various articles and sections of this Agreement are for convenience and reference only and do not limit or define any terms and provisions of this Agreement.

### Section 10.12  Complete Agreement

This Agreement (with its Exhibits) represents the parties' final and mutual understanding concerning its subject matter. It replaces and supersedes any prior agreements or understandings, whether written or oral. No representations, inducements, promises, or agreements, oral or otherwise, have been relied upon or made by any party, or anyone on behalf of a party, that are not fully expressed in this Agreement. An agreement, statement, or promise not contained in this Agreement is not valid or binding.

### Section 10.13  Governing Law

This Agreement shall be governed by, construed and enforced in accordance with Texas law. The parties agree that the proper venue and jurisdiction for any cause of action relating to this Agreement is in Dallas County, Texas.

### Section 10.14  Severability

In the event any provision of this Agreement is held to be void, unlawful, or otherwise unenforceable, that provision will be severed from the remainder of the Agreement, and replaced automatically by a provision containing terms as nearly like the void, unlawful, or unenforceable provision as possible; and the Agreement, as so modified, will continue to be in full force and effect. If the application of any provision of this Agreement to any person or circumstance is held to be void, unlawful, or unenforceable, then that provision remains valid, lawful, and enforceable as applied to other persons and circumstances.

### Section 10.15  Exhibits

The Exhibits attached to this Agreement and listed in the Table of Contents are incorporated in this Agreement and made a part of this Agreement as if repeated verbatim in this Agreement.

**CONFIDENTIAL AND PROPRIETARY**

### Section 10.16 Construction

In this Agreement, the following rules of construction apply, unless expressly provided otherwise or unless the context clearly requires otherwise:

(a)     The singular includes the plural, and the plural includes the singular. The present tense includes the future tense, and the future tense includes the present tense. Words importing any gender include the other gender.

(b)     The word "shall" denotes a duty. The word "must" denotes a condition precedent or subsequent. The word "may" denotes a privilege or discretionary power. The phrase "may not" denotes a prohibition. References to "writing" include printing, typing, lithography, and other means of reproducing words in a tangible visible form. The words "including," "includes," and "include" are deemed to be followed by the words "without limitation."

(c)     References to Articles, Sections (or subdivisions of Sections), Exhibits, annexes, appendices, or schedules are to this Agreement, unless expressly stated otherwise. References to statutes, tariffs, or regulations include all statutes, tariffs, or regulations consolidating, amending, or replacing the statute, tariff, or regulation referred to. References to industry publications (such as IEEE 519) include all publications consolidating, amending, or replacing the publication referred to. References to agreements and other contractual instruments include all subsequent amendments and other modifications to the instruments, but only to the extent the amendments and other modifications are not prohibited by this Agreement. References to persons or entities include their respective successors and permitted assigns and, for governmental entities, entities succeeding to their respective functions and capacities.

### Section 10.17 Delivery of Copy of Agreement

TXU Electric has delivered a copy of this Agreement to Seller for its review; that delivery does not constitute an offer to Seller. This Agreement is not effective until a copy executed by Seller is delivered to and executed by TXU Electric.

Executed as of the date first stated above.

**NWP Indian Mesa Wind Farm, L.P.**            **TXU Electric Company**

By: _Acunoon_                                  By: _____

Title: _PRESIDENT_                             Title: _____

Date: _25/8/00_                                Date: _____

C:\NRPORTBL\Dallas\Nova\MH_99759_1.1                   24

**CONFIDENTIAL AND PROPRIETARY**

**Section 10.16  Construction**

In this Agreement, the following rules of construction apply, unless expressly provided otherwise or unless the context clearly requires otherwise:

(a)     The singular includes the plural, and the plural includes the singular. The present tense includes the future tense, and the future tense includes the present tense. Words importing any gender include the other gender.

(b)     The word "shall" denotes a duty. The word "must" denotes a condition precedent or subsequent. The word "may" denotes a privilege or discretionary power. The phrase "may not" denotes a prohibition. References to "writing" include printing, typing, lithography, and other means of reproducing words in a tangible visible form. The words "including," "includes," and "include" are deemed to be followed by the words "without limitation."

(c)     References to Articles, Sections (or subdivisions of Sections), Exhibits, annexes, appendices, or schedules are to this Agreement, unless expressly stated otherwise. References to statutes, tariffs, or regulations include all statutes, tariffs, or regulations consolidating, amending, or replacing the statute, tariff, or regulation referred to. References to industry publications (such as IEEE 519) include all publications consolidating, amending, or replacing the publication referred to. References to agreements and other contractual instruments include all subsequent amendments and other modifications to the instruments, but only to the extent the amendments and other modifications are not prohibited by this Agreement. References to persons or entities include their respective successors and permitted assigns and, for governmental entities, entities succeeding to their respective functions and capacities.

**Section 10.17  Delivery of Copy of Agreement**

TXU Electric has delivered a copy of this Agreement to Seller for its review; that delivery does not constitute an offer to Seller. This Agreement is not effective until a copy executed by Seller is delivered to and executed by TXU Electric.

Executed as of the date first stated above.

NWP Indian Mesa Wind Farm, L.P.                    TXU Electric Company

By: _____                    By: _____

Title: _____Pres.dent_____                         Title: ___VICE PRESIDENT___

Date: _____19/9/00_____                            Date: ___Aug 31, 2000___

**EXHIBIT 2.01 – Description of Renewable Resource Facility**

NWP Indian Mesa Wind Farm, L.P. plans a Renewable Resource Facility to be called Indian Mesa Wind Farm to be located on Indian Mesa in Pecos County, Texas. The Renewable Resource Facility will have a nameplate peak output of 82.5 Megawatts and will generate electric energy using wind turbine generators. The Renewable Resource Facility will have up to 125 wind turbines, with each individual wind turbine having a nameplate rating of 660 kW. The Renewable Resource Facility will be connected by a 138 kV circuit built by NWP Indian Mesa Wind Farm, L.P. to the new McKenzie substation to be build by NWP Indian Mesa Wind Farm, L.P. that is located in the 138 kV Rio Pecos to Fort Lancaster line operated by West Texas Utility Company.

C:\NRPORTBL\Dallas\love\MH_99759_1.1