**EXHIBIT 1**

Unredacted Objection of CSC Trust Company of Delaware,
as Indenture Trustee, to the EFIH Debtors' Motion to
Approve First Lien Settlement (Without Exhibits)

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ) | Chapter 11 |
| ) | |
| In re ) | Case No. 14-10979 (CSS) |
| ) | |
| ENERGY FUTURE ) | (Jointly Administered) |
| HOLDINGS CORP., *et al.,* ) | |
| ) | Related to Docket No. 472 |
| *Debtors.* ) | |
| ) | Hearing Date: June 5, 2014 at 9:30 a.m. |
| ) | Objection Deadline: May 31, 2014 at 4:00 p.m. |
| ) | (Extended on Consent) |

**OBJECTION OF CSC TRUST COMPANY OF DELAWARE,**
**AS INDENTURE TRUSTEE, TO THE EFIH DEBTORS'**
**MOTION TO APPROVE THE "FIRST LIEN SETTLEMENT"**

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT................................................................................1

BACKGROUND ......................................................................................................4

ARGUMENT..........................................................................................................10

I.    THE FIRST LIEN SETTLEMENT'S DISPARATE TREATMENT OF
      CREDITORS VIOLATES THE STATUTORY DISTRIBUTION
      SCHEME AND IS OTHERWISE IMPERMISSIBLE ..........................................10

      A.    The First Lien Settlement Is a Pre-Plan Settlement that Must
            Satisfy Section 1123(a)(4), but Cannot..........................................10

      B.    The First Lien Settlement, to the Extent It Is a "Stepping Stone" to
            the EFIH Debtors "Global" Settlement Under the RSA, Is a Sub
            Rosa Plan Under Capmark...........................................................14

            1.    The Global Settlement Is a Sub Rosa Plan...............................15

            2.    The Global Settlement Cannot Survive Plan Scrutiny, Even
                  on the Incomplete Record Created by the EFIH Debtors
                  Separation of the Other Motions.......................................17

II.   THE COURT SHOULD NOT APPROVE THE SETTLEMENT OFFER
      BECAUSE THE SEC TENDER PROCESS IS NOT AVAILABLE TO
      CHAPTER 11 DEBTORS.........................................................................19

      A.    Reorganization Plans Are the Exclusive Means to Implement
            "Tender" Transactions in Chapter 11..........................................19

      B.    The EFIH Debtors' "Tender" Process Is Capable of Repetition and
            Evading Review...........................................................................23

III.  EVEN IF TENDER OFFERS ARE PERMITTED IN BANKRUPTCY,
      THE TENDER OFFER SHOULD NOT BE PERMITTED HERE ......................26

IV.   THE EFIH DEBTORS' PROPOSED TIMING INFRINGES ON DUE
      PROCESS RIGHTS.................................................................................29

V.    ANY APPLICABLE STAY PENDING APPEAL SHOULD NOT BE
      WAIVED ................................................................................................30

i

# TABLE OF AUTHORITIES

**PAGE(S)**

CASES

*Armstrong v. Manzo,*
   380 U.S. 545 (1965) ................................................................................................. 29

*Belitskus v. Pizzingrilli,*
   343 F.3d 632 (3d Cir. 2003) ................................................................................... 25

*City of N.Y. v. N.Y., N.H. & H.R. Co.,*
   344 U.S. 293 (1953) ................................................................................................. 29

*Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),*
   722 F.2d 1063 (2d Cir. 1983) ........................................................................... 10, 15

*Doe v. Delie,*
   257 F.3d 309 (3d Cir. 2001) ................................................................................... 25

*Finova Grp., Inc. v. BNP Paribas (In re Finova Grp., Inc.),*
   304 B.R. 630 (D. Del. 2004) ................................................................................... 13

*In re AMR Corp.,*
   No. 11-15463 (SHL) (Bankr. S.D.N.Y. May 23, 2013) ......................................... 23

*In re Armstrong World Indus., Inc.*
   432 F.3d 507 (2005) ................................................................................................. 11

*In re Capmark Fin. Grp. Inc.,*
   438 B.R. 471 (Bankr. D. Del. 2010) ............................................... 14, 15, 17, 18

*In re Combustion Eng'g, Inc.,*
   391 F.3d 190 (3d Cir. 2004) ................................................................................... 24

*In re Filene's Basement, LLC,*
   2014 Bankr. LEXIS 2000 (Bankr. D. Del. Apr. 29, 2014) ................................... 31

*Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re*
   *Cont'l Air Lines, Inc.),*
   780 F.2d 1223 (5th Cir. 1986) ............................................................................... 15

*Law v. Siegel,*
   134 S. Ct. 1188 (2014) ............................................................................................ 18

*Martin,* 91 F.3d at 393 ............................................................................... 10, 11, 13

ii

*Morgan Olson L.L.C. v. Frederico (In re Grumman Olson Indus., Inc.)*,
   467 B.R. 694 (Bankr. S.D.N.Y. 2012) .................................................................... 29

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*,
   478 F.3d 452 (2d Cir. 2007) ............................................................... 10, 11, 12, 18

*Mullane v. Cent. Hanover Bank & Trust Co.*,
   339 U.S. 306 (1950) ................................................................................................ 30

*Nw. Bank Worthington v. Ahlers*,
   485 U.S. 197 (1998) ................................................................................................ 18

*PBGC v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*,
   700 F.2d 935 (5th Cir. 1983) .................................................................................. 15

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
   390 U.S. 414 (1968) ................................................................................................ 18

*Schroeder v. New Century Liquidating Trust (In re New Century TRS Holdings, Inc.)*,
   407 B.R. 576 (D. Del. 2009) ................................................................................... 13

*United States v. AWECO, Inc. (In re AWECO, Inc.)*,
   725 F.2d 293 (5th Cir. 1984) .................................................................................. 11

*W. Auto Supply Co. v. Savage Arms, Inc. (In re Savage Indus., Inc.)*,
   43 F.3d 714 (1st Cir. 1994) .................................................................................... 30

*Will v. Nw. Univ. (In re Nutraquest, Inc.)*,
   434 F.3d 639 (3d Cir. 2006) ............................................................................. 10, 13

**STATUTES**

11 U.S.C. § 102(1) ........................................................................................................ 30

11 U.S.C. § 105(a) .................................................................................................. 23, 24

11 U.S.C. § 363 ............................................................................................................ 23

11 U.S.C. § 364(f) ........................................................................................................ 20

11 U.S.C. § 1109(a) ..................................................................................................... 19

11 U.S.C. § 1122 .......................................................................................................... 18

11 U.S.C. § 1125 ..............................................................................................................17, 18, 20

11 U.S.C. § 1125(e) ................................................................................................................. 21

11 U.S.C. § 1129 ..................................................................................................................... 15

11 U.S.C. § 1145 ..................................................................................................................... 20

**OTHER AUTHORITIES**

10 COLLIER ON BANKRUPTCY ¶ 6004.11 (16th ed. 2014) .............................................................. 31

FED. R. BANKR. P. 6004 ......................................................................................................23, 30

S. Rep. No. 95-989, 2d Sess. (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787 ................................. 10

CSC Trust Company of Delaware, as successor indenture trustee (the "10% Indenture Trustee") for the 10% Senior Secured Notes Due 2020 (the "10% First Lien Notes" or the "10% Notes") issued by Energy Future Intermediate Holdings LLC ("EFIH LLC") and EFIH Finance Inc. ("EFIH Finance," and together with EFIH LLC, "EFIH" or the "EFIH Debtors") under that certain indenture dated as of August 17, 2010 (together with all supplements, amendments, and exhibits, the "10% Indenture") between EFIH and the 10% Indenture Trustee, hereby objects (the "Objection")[1] to the EFIH Debtors' motion to approve the "First Lien Settlement" set forth in the *Motion of Energy Future Holdings Corp., et al., for Entry of Orders Approving Certain EFIH Settlements and the Oncor TSA Amendment* [D.I. 472] (the "First Lien Settlement Motion" and the related settlement, the "First Lien Settlement").[2]

## PRELIMINARY STATEMENT

1.     The background set forth in the Preliminary Objection of CSC Trust Company of Delaware, as Indenture Trustee, to Debtors' Motion to Approve First-Lien Poste-Petition Financing, Redeem First Lien and Second Lien Notes, and Determine Secured Claim [D.I. 421] (the "Preliminary Objection") is incorporated herein by reference, as are the allegations of the Complaint for Declaratory Relief [D.I. 470], *CSC*

---

[1] This Objection also shall constitute the 10% Indenture Trustee's reply brief with respect to the Trustee's Tender Offer Motion [D.I. 461] and the EFIH Debtors' Response [D.I. 496].

[2] The 10% Indenture Trustee reserves all of its rights with respect to matters not scheduled to go forward at the June 5, 2014 hearing, including but not limited to: (1) any aspect of the EFIH Second Lien DIP Financing Motion [D.I. 477] (the "Second Lien DIP Motion"), other than the Alternative Transaction Fee (as defined in the Second Lien DIP Motion), (2) the "Second Lien Settlement" [D.I. 472], (3) the Restructuring Support and Lock-Up Agreement [D.I. 505] (the "RSA Agreement"), and (4) any dispute concerning any obligations under the EFIH First Lien Documents, including, without limitation, the amount (if any) of EFIH First Lien Makewhole Claims or any other claims for damages of the First Lien Notes Trustee or the EFIH First Lien Creditors due or that may become due.

*Trust Co. of Delaware v. Energy Future Intermediate Holding Co. LLC* et al. (*In re Energy Future Holdings Corp.*), Adv. Proc. N. 14-50363-CSS [Dkt. No. 1] (the "Complaint").

2.     The 10% Indenture Trustee makes this Objection at the written direction of holders with a majority in principal amount of the approximately $3.5 billion of 10% First Lien Notes.  The 10% Indenture Trustee objects to the First Lien Settlement for two reasons: (i) its substance and structure, which treat identical claims differently, violate the Bankruptcy Code[3]; (ii) the means used to reach the settlement, namely a tender offer purportedly conducted under SEC rules, is not permitted by the Bankruptcy Code, and even if allowed, has not been shown to be in compliance with applicable securities laws.

3.     The legal issue being "settled" by the First Lien Settlement is the entitlement of holders of the 10% First Lien Notes and holders of the 6⅞% Notes (as defined herein) to a redemption premium.  The 10% Indenture Trustee and majority holders have made clear, and maintain, that they do not consent to the Debtors' voluntary and optional redemption being financed through the First Lien DIP, and that the redemption premium under the 10% Indenture will become due and payable as a result. Yet despite the 10% Indenture and the 6⅞% Indenture (as defined herein) having identical redemption premium language, holders of 10% Notes are being offered substantially less tender consideration than holders of 6⅞% Notes as demonstrated in the chart below.  *See* Notice of Initiation of Opt-In Period for Proposed EFIH First Lien

---

[3] Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as amended (the "Bankruptcy Code" or the "Code").

Settlement [D.I. 363-1] (May 6, 2014); Notice of Initiation of Opt-In Period for Proposed EFIH Second-Lien Settlement [D.I. 400-1] (May 9, 2014).

| Securities | Redemption Premium (as % of principal) | Tender Consideration (as % of premium) |
|---|---|---|
| First Lien 6⅞% | 8.1% | 62% |
| First Lien 10% AA5 CUSIP | 18.8% | 27% |
| First Lien 10% AK3 CUSIP | 19.6% | 26% |

This lower payment for the 10% First Lien Notes (26.5% vs. 62%) has no explanation based upon the legal merits. The EFIH Debtors do not contest the different levels of payment, nor do they contest that the indentures have identical language and share the same collateral. Even without more, this disparity violates the applicable precedents with respect to pre-plan settlements.

       4.       Still, there is more. First, while there is no logical justification for the different payments, and the EFIH Debtors believe that 62.5% is a justified payment level to settle the makewhole claims, [4] the Debtors' have *only* offered that level of settlement on the smaller 6⅞% Notes issue because those bonds were highly concentrated in the hands of PIMCO, [5] and this was a means of directing payment to PIMCO and gaining PIMCO's support for the Restructuring Support Agreement (the "RSA"). Second, there

---

[4] The Debtors offered the 62.5% payment to all holders of the 6⅞% First Lien Notes, whether or not a holder held 10% notes. The Debtors have agreed to settle virtually all of the 6⅞% Notes at the 62.5% level and support that settlement level on the merits. 97% of the 6⅞% Notes have agreed to the settlement. Energy Future Intermediate Holding Company LLC, Form 8-K (May 22, 2014).

[5] PIMCO owns an extraordinary 70.5% of the 6⅞% Notes issue, with Fidelity owning another 4.0% of the 6⅞% Notes.

was additional consideration in the form of side payments to the first lien noteholders induced to sign the restructuring support agreement. Those payments exacerbate the disparate treatment problems already present in the First Lien Settlement.[6]

5.     The EFIH Debtors have begun this case in an unprecedented fashion. They have launched, without prior court approval, a tender and solicitation process to reset their entire multi-billion dollar capital structure and lock in creditors' recoveries. The EFIH Debtors seek not only the extraordinary relief of paying claims outside a plan, but also authority to pay equivalent claims on a differential and unequal basis. The manner in which they have chosen to do these things comports with neither bankruptcy nor securities law.

## BACKGROUND

6.     The chapter 11 case of EFIH is a holding-company case. EFIH has "no active business operations."[7] There is no threat to EFIH's utility-company operating subsidiary, Oncor, that is ring-fenced and not a debtor in these chapter 11 cases. The

---

[6] The EFIH Debtors' pleadings and evidentiary submissions bob and weave with respect to whether these payments to the "anchor tenants" are part of the settlement consideration. *See, e.g.,* First Lien Settlement Motion ¶ 49 ("To the extent any First Lien RSA Parties . . . are receiving superior settlement terms . . ., such terms were negotiated in the context of the unique value such parties provided . . ."). However, the sworn testimony of the EFIH Debtors' principals in charge of the settlement (discussed below) leaves no doubt that the side payments were additional settlement consideration for the RSA parties. Deposition of Paul Keglevic (May 29, 2014) at 66:13-67:2.

> Q: Did PIMCO insist on the opportunity to backstop the first lien financing as a condition to settling?
> A. I was not a party to it, so I don't know the word "insist." I mean, they can't insist us to do anything. We make our own decisions. But we believed, as I said, because it reduced our costs by having them backstop at no fee, in certain situations, and that it represented a settlement where we had a big name holder prior to the exchange, there was value in doing that to them, and we agreed there was value doing it to us; it was negotiated and we came to that conclusion.

[7] *See* Declaration of Paul Keglevic, Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of Energy Future Holdings Corp., *et al.,* in Support of First Day Motions [D.I. 98] at 26 ("Keglevic First Day Decl.").

disputes in these cases are entirely intercreditor disputes.  They are principally between, on the one hand, the two secured creditor constituencies (first lien and second lien notes) that the EFIH Debtors contend are currently oversecured, and on the other hand, the unsecured noteholders that only recently came to be creditors of EFIH in a series of exchange offers from December 2012 through early 2013.  These exchange offers moved them from a structurally subordinate position of being holders of bonds of the parent company, Energy Futures Holding Corp. ("EFH"), to unsecured creditors of EFIH.  Other intercreditor disputes exist because there are separate and structurally subordinated bonds, mostly held by Fidelity, at the parent-company EFH level.  Those EFH bonds made a choice not to exchange, and remain structurally junior.

7.    Ultimately the EFIH Debtors' chapter 11 cases are about these two junior creditor groups attempting to upset the contractual entitlements of the first lien and second lien notes to $1.4 billion.

8.    There are $3.985 billion of First Lien Notes: (i) $3.482 billion of 10% First Lien Notes and (ii) $503 million of 6⅞% notes due 2017 (the "6⅞% Notes" and, together with the 10% Notes, the "First Lien Notes" and the holders of such First Lien Notes, the "First Lien Noteholders") issued pursuant to that Indenture dated as of August 14, 2012 (the "6⅞% Indenture").  The 10% Notes and 6⅞% Notes are issued under two separate indentures that are, for purposes of these disputes, identical in their language.[8]

---

[8] In addition, the 10% First Lien Notes themselves are of two different types, issued under a single indenture.  CUSIP 29269QAA5 (the "AA5 10% Notes") consists of $2.2 billion of 10% Notes issued in 2010.  CUSIP 29269QAK3 (the "AK3 10% Notes") consists of $1.3 billion of 10% Notes issued in 2013. In the case of both the 6⅞% Notes and the 10% Notes there is an additional small CUSIP of bonds issued into the Canadian market.  They are included in the overall numbers presented for 6⅞% Notes and 10% Notes.  The 6⅞% Notes and the AK3 10% Notes were each issued with an associated registration rights

9.      The First Lien Notes have a combined redemption premium of $706,440,238.65.[9] The first call date for the 6⅞% Notes is February 2015, as compared to December 2015 for the 10% Notes. The difference in call dates, together with the difference in the interest rates, means that the redemption premium for the 10% Notes is a substantially greater percentage of principal (18.8% for the AA5 10% Notes and 19.6% for the AK3 10% Notes) than the redemption premium for the 6⅞% Notes (8.1%). The redemption premium for the 6⅞% Notes is $40,687,721.09, while the premium for the 10% Notes is $665,752,517.56.

10.      The EFIH Debtors have avoided scrutiny of the First Lien Settlement on its own merits, and have tended to obscure, then only reluctantly disclose, the First Lien Settlement consideration and terms.

11.      On May 6, the EFIH Debtors launched their first lien tender offer. The Information Memorandum memorializing the tender offer terms (the "Information Memorandum") described the "EFIH Second Lien Settlement,"[10] but contained no analogous description of the "EFIH First Lien Settlement." It did not discuss the redemption premium claims or the differential payments on such claims for the different classes of bonds.

---

agreement that provides that if such notes are not registered by a date certain, thereafter the notes pay "Additional Interest," first at 0.25% per annum for a period and thereafter at 0.5% per annum. EFIH did not register either of those issuances, and therefore Additional Interest is payable and accruing. These amounts also increase the redemption premium payable. The AA5 10% Notes have been registered securities at all times since their issuance in 2010.

[9] Assuming a redemption date of June 6, 2014.

[10] *See* Information Memorandum [D.I. 363-1] at 2.

12.    On May 13, the 10% Indenture Trustee sent a letter to counsel at the EFIH

Debtors discussing what the 10% Indenture Trustee viewed as certain disclosure

deficiencies in the Information Memorandum, but disclaiming any duty to fix the EFIH

Debtors' disclosure.[11] The Debtors did not supplement the Information Memorandum in

any way.

13.    On the afternoon of May 15, the 10% Indenture Trustee filed its

Emergency Motion with respect to the tender offer [D.I. 461] (the "Trustee's Tender

Offer Motion"), seeking that this Court rule on the propriety of the tender offer process

and the methods and substance of the disclosures in the tender offer.  This motion will be

heard on June 5 in connection with consideration of the Motion to Approve the First Lien

Settlement.

14.    Next, just prior to midnight on May 15, the EFIH Debtors moved for

approval of the First Lien Settlement, but only as part of a global "Settlements Motion"

that interwove the First Lien Settlement, the Second Lien Settlement and the "Oncor TSA

Amendment" (a massive EFH-EFIH settlement of intercompany claims).[12]

15.    The original Settlements Motion repeatedly tried to justify the First Lien

Settlement not on its own merits, but based on the overall benefit of the combination of

settlements, the overall restructuring plan, or both.  In fact, the Settlements Motion barely

---

[11] *See* D.I. 461-1.

[12] This motion was filed on May 15, nine days after the EFIH Debtors launched their tender offer.

described the "First Lien Settlement" and had no discussion of the merits of the makewhole premium claims.[13]

16.     The Declaration of David Ying filed in support of the Settlements Motion on May 15 [D.I. 474] ("Ying Decl.") noted the different payout levels for similar, and in some cases identical, redemption premium claims.  According to Mr. Ying, the payouts are 52 cents for the premium claims on the 6⅞% Notes, but only 21 cents for the premium claims on the 10% Notes.  Ying Decl. ¶ 11.  Even though the 10% Indenture Trustee's letter concerning the tender offer, the Preliminary Objection, and the Trustee's Tender Offer Motion all put the EFIH Debtors on notice that the disparity was both unsupported and objectionable, the EFIH Debtors chose to not explain the reasons for the difference.

17.     On May 16, shortly before this Court's May 22 status conference on the June 5 relief, the EFIH Debtors filed their response to the Trustee's Tender Offer Motion. This response claimed that there were no deficiencies in the EFIH Debtors' Tender Offer Documents, stating the EFIH Debtors were "fully compliant with securities law".  *See* Debtors' Response to EFIH First and Second Lien Trustees' Motions to Shorten [D.I. 496].

18.     At the May 22 hearing, the EFIH Debtors announced that they would move forward with only the First Lien DIP and First Lien Settlement on June 5 in order to seek consummation of the First Lien DIP and First Lien Settlement immediately after

---

[13] The EFIH Debtors qualified the description of the First Lien Settlement by reference to the Restructuring Support Agreement, saying that if the motion's description conflicted with the RSA, "the Restructuring Support Agreement shall govern."  Settlements Motion page 7, footnote 5.

such hearing. The EFIH Debtors thus severed the remainder of the requested relief (i.e. the Second Lien DIP, Second Lien Settlement, Oncor TSA Amendment and RSA Assumption) from the First Lien DIP and First Lien Settlement.[14]

19.    On May 24, the Saturday of Memorial Day Weekend, the EFIH Debtors filed a supplemental Declaration of David Ying [D.I. 610] (the "Supp. Ying Decl.").

20.    In fact, the only explanation of the terms of the First Lien Settlement appears in the RSA Term Sheet.  Those terms include two sets of terms: one offered to "regular" First Lien Noteholders, and a second set of superior terms offered to Fidelity and PIMCO.  The Fidelity/PIMCO terms include several additional types of consideration and protections not given to "regular" holders asked to participate in the First Lien Settlement.  These Fidelity/PIMCO benefits,[15] from which "regular" holders are excluded, include:

- "Backstop Fees" relating to the First Lien DIP Financing, up to $1.45 billion of such financing as well as mandatory OID and "ticking" fees;

- "Most Favored Nations" or "MFN" protection, allowing the preferred holders the benefit of settlements on the First Lien Notes later achieved by any other holders of such notes; and

- Undisclosed amounts of "cross-subsidy" from securities held and potentially overcompensated under the RSA.

---

[14] There is currently no motion seeking approval of the First Lien Settlement on a "standalone" basis. The Debtors clearly did not want to restart the clock by filing a proper motion, and the 10% Indenture Trustee objects to granting the First Lien Settlement approval absent such a motion. As of today, the EFIH Debtors still have not filed an order approving the First Lien Settlement separate from the Proposed EFIH Settlement Order [D.I.472-2], which purports to approve of the First Lien Settlement, Second Lien Settlement, and Oncor TSA Amendment collectively.

[15] A subset of these benefits were also given to WAMCO, which appears to have executed the RSA postpetition.

# ARGUMENT

## I.   THE FIRST LIEN SETTLEMENT'S DISPARATE TREATMENT OF CREDITORS VIOLATES THE STATUTORY DISTRIBUTION SCHEME AND IS OTHERWISE IMPERMISSIBLE

### A.   The First Lien Settlement Is a Pre-Plan Settlement that Must Satisfy Section 1123(a)(4), but Cannot.

21.     The First Lien Settlement improperly treats identically situated secured creditors in dramatically different ways. [16] As a result, the settlement fails to satisfy the primary requirement for approval of a settlement, that the settlement is "fair and equitable" and does not violate chapter 11 distribution priorities. *See Iridium*, 478 F.3d 452, 463 (2nd Cir. 2007).  In *Iridium*, the Second Circuit held that "a long-standing creditor protection – the Bankruptcy Code's priority scheme for reorganization plan distributions – applies to bankruptcy court approval of a settlement under Rule 9019." *Iridium*, 478 F.3d at 455; *Will v. Nw. Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006).  While settlements are favored in bankruptcy, "the unique nature of the bankruptcy process means that judges must carefully examine settlements before approving them." *Nutraquest*, 434 F.3d at 644 (citing *In re Martin*, 91 F.3d 389 at 393 (3d Cir. 1996)).

---

[16] The Bankruptcy Code does not permit that "one class of creditors may strong-arm the debtor-in-possession, and bypass the requirements of Chapter 11 to cash out quickly at the expense of other stakeholders, in a proceeding that amounts to a reorganization in all but name, achieved by stealth and momentum." *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 466 (2d Cir. 2007).  "[T]he natural tendency of a debtor in distress," as a Senate Judiciary Committee Report observed, is "to pacify large creditors with whom the debtor would expect to do business, at the expense of small and scattered public investors." *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (quoting S. Rep. No. 95-989, 2d Sess., at 10 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5796).

22.    The *Iridium* principle similarly requires that settlements comply with the equal treatment provisions of Section 1123(a)(4). The Second Circuit explicitly adopted the Fifth Circuit's rationale for requiring pre-plan settlements to comply with the statutory standards applicable to reorganization plans:

> As soon as the debtor files a petition for relief, fair and equitable settlement of creditors' claims becomes a goal of the proceedings. The goal does not suddenly appear during the process of approving a plan of compromise. Moreover, if the standard had no application before confirmation of a reorganization plan, then bankruptcy courts would have the discretion to favor junior classes of creditors so long as the approval of the settlement came before the plan. Regardless of when the compromise is approved, looking only to the fairness of the settlement as between the debtor and the settling claimant contravenes a basic notion of fairness. . . ..

*Id.* at 464 (citing *United States v. AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293, 298 (5th Cir. 1984)). Pre-plan settlements that ignore, or openly flout, 1123(a)(4) are prohibited as inconsistent with the statutory distribution scheme, in the same manner that a pre-plan settlement cannot violate Bankruptcy Code priorities.

23.    It is clear that there are two governing views of this law – but the settlement here fails both. The Fifth Circuit has a *per se* rule banning such settlements. The Third Circuit appears likely to follow this rule in protecting against end-runs around plan requirements. *See In re Armstrong World Indus., Inc.* 432 F.3d 507, 514 (2005) (strict rule against gifting plans violating absolute priority rule).

24.    The Second Circuit has a slightly more lenient standard. "The Fifth Circuit accurately captures the problem a pre-plan settlement can present for the rule of priority, but, in our view, employs too rigid a standard." *Iridium*, 478 F.3d at 464. Instead of a *per se* ban, the Second Circuit imposes a very strong presumption against

approval of such settlements, without ruling them out entirely.  A pre-plan settlement's

compliance with the Bankruptcy Code's distribution priority scheme is the "most

important factor" in approval of a settlement and will, in most cases, be dispositive.  *Id.*

The ability to defy the Code's statutory scheme in pre-plan settlements was limited by

*Iridium* to cases where "the remaining factors weigh heavily in favor of approving a

settlement" and the settlement "does not comply in some <u>minor</u> respects with the priority

rule."  *Id.* at 464-65 (emphasis added).

25.    Neither prong of even this less stringent test can be met in this case.  The

EFIH Debtors admit the deviations from the 1123(a)(4) scheme.  They explain them on

three grounds: (i) "simplicity,"[17] (ii) making an outsized payment to 6⅞% holders for the

express purpose of securing their assent,[18] and (iii) that, overall, it did not cost much.[19]

The EFIH Debtors calculate that the offer to settle the makewhole claim on the 6⅞%

Notes is 52 cents on the dollar; for the 10% Notes, the offer on the same makewhole

claim is roughly 21 cents.  Ying Decl. ¶ 11; Supp. Ying. Decl. ¶ 35.  In fact, the disparity

is even greater – 62 cents on the dollar for the 6⅞% Notes and 26.5 cents on the dollar for

the 10% Notes.  *See* Declaration of Christopher J. Kearns, Executive Director of

---

[17] *See, e.g.,* Deposition of Paul Keglevic (May 29, 2014) at 89:3-7 ("We thought 5 was – the 5 points was driven by simplicity.  We were aware that that resulted in a different make-whole percentage, for the groups that owned the 6-7/8s.").

[18] *See, e.g., id.* at 90:5-13. ("And we thought, at the end of the day, that the 5 points was a fair settlement to the 10 percent, and we recognized that there was a, you know, a slight enhancement to the 6.875, and given the value that the other parties were bringing to the table, we thought that net-net we were better off just offering everybody 5 percent, and that's how we thought about it internally.").

[19] *See* Deposition of David Ying (May 29, 2014) at 130:4-130:

> Q: So if I understand correctly, you had to have a higher percentage of the settlement for the 6-7/8 to bring the 6-7/8 to the table?
> A. That's correct.

Capstone Advisory Group, LLC, Concerning First Lien Settlement, attached hereto as

Exhibit A.  Courts in this District hold this sort of disparate treatment to violate

1123(a)(4).  *See Schroeder v. New Century Liquidating Trust (In re New Century TRS*

*Holdings, Inc.)*, 407 B.R. 576 (D. Del. 2009); *Finova Grp., Inc. v. BNP Paribas (In re*

*Finova Grp., Inc.)*, 304 B.R. 630 (D. Del. 2004).

26.    While settlements are favored in bankruptcy, "the unique nature of the

bankruptcy process means that judges must carefully examine settlements before

approving them."  *Will v. Nw. Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir.

2006)(citing *Martin*, 91 F.3d at 393). Whether a settlement passes the test of being "fair

and equitable" in this Circuit includes analysis of the "fairness of the settlement to . . .

parties who did not settle." *Nutraquest*, 91 F.3d at 645.

27.    Rather than "minor" deviations from the priority scheme of equal

distribution, the First Lien Settlement runs roughshod over that scheme. The developed

factual record tells us two things at a minimum: first, that the Debtors agree that a 62.5%

settlement on the redemption premium is justified on the merits;[20] and second, that the

Debtors have departed wildly from that level in the First Lien Settlement.

28.    There are at least <u>four</u> levels of settlement consideration on the redemption

premium claims, based on which type of First Lien Notes are held and whether or not you

are among the one of three "special" First Lien Note holders:

---

[20] Deposition of Paul Keglevic (May 29, 2014) at 89:15-22 ("So the fact that there was – you know, could be considered a slightly higher settlement, we thought there was good value associated with the overall agreement and deal, and instead of lowering the 6-7/8 we agreed to keep it at 5, recognizing the value and the fact that typically a simpler offer is always easier than a more complicated one."

| Securities | Consideration (as % of Premium) |
|---|---|
| 6⅞% Notes (PIMCO[21]) | 62.5%+ |
| 6⅞% Notes ("Regular" Holders) | 62.5% |
| 10% Notes (PIMCO/ Fidelity) | 27%+ |
| 10% notes ("Regular" Holders) | 27% |

These are not "minor" deviations from equal treatment: the 6⅞% Notes and 10% Notes are identical with respect to their legal entitlement to the redemption premium.

29.     It also bears noting that since the vast majority of 10% Note holders who did not receive the PIMCO/Fidelity First Lien Settlement consideration rejected the First Lien Settlement, the Debtors will save virtually nothing in litigation costs.  Estate resources would perhaps be better used by making a balanced offer to all First Lien Holders with available resources. Instead, the Debtors have limited the true value of the offer to a select few, and now pretend that only a subset of that consideration is what was agreed to as a settlement. The 10% Indenture Trustee maintains this course is both misleading and inequitable, and should be rejected by this Court.

**B.      The First Lien Settlement, to the Extent It Is a "Stepping Stone" to the EFIH Debtors "Global" Settlement Under the RSA, Is a *Sub Rosa* Plan Under *Capmark*.**

30.     The EFIH Debtors have proceeded with the First Lien Settlement as a standalone deal, not conditioned upon or dependent upon any of the Second Lien Settlement, the Oncor TSA Amendment (which would be better named the "EFH-EFIH

---

[21] Includes only backstop fees, not other side consideration, in addition to the redemption premium.

Intercompany Claims Settlement"), or the Second Lien DIP (mandatorily convertible to nearly two thirds of the indirect reorganized equity of EFIH). None of these items are before the Court on June 5 with the First Lien Settlement. Thus the First Lien Settlement must rise or fall strictly on its own merits. But the EFIH Debtors' repeated invocation of these other elements of their "global plan" also compels scrutiny of the First Lien Settlement under the case law applicable to *sub rosa* plans of reorganization. Such scrutiny, in turn, compels rejection of the First Lien Settlement. It cannot satisfy several of the Bankruptcy Code's plan requirements, including 1123(a)(4), 1125, and 1129(b).

### 1.      The Global Settlement Is a *Sub Rosa* Plan.

31.      In *Capmark*, this Court stated that a settlement would be an impermissible *sub rosa* plan if it either (i) disposes of all claims against the estate, or (ii) restricts creditors' rights to vote.[22] *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 513 (Bankr. D. Del. 2010).

32.      The undisputed record here shows that the "global settlement" meets this test:

- First Day Declarant, Executive Vice President, and Co-Chief Restructuring Officer Paul Keglevic justifies the First Lien Settlement in his First Day Declaration by repeatedly invoking the "Global Restructuring" deal. *See* Keglevic First Day Decl. at. 9, 76.

- In his declaration in support of the Settlements Motion, Senior Manager of Evercore Group, LLC David Ying similarly invoked the

---

[22] Under chapter 11 of the Bankruptcy Code, a debtor is not permitted to "short circuit the requirements of . . . a reorganization plan by establishing the terms of the plan *sub rosa* in connection" with a transaction approved by the bankruptcy court but without required disclosure to creditors, voting by creditors, distribution in accordance with statutory priorities, and other requirements of Bankruptcy Code § 1129. *PBGC v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 940 (5th Cir. 1983); *Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986); *In re Lionel Corp.*, 722 F.2d at 1071.

concept of a global deal, describing the Settlement as a "comprehensive agreement comprised of the makewhole settlements and the Oncor TSA Amendment" and supporting the makewhole settlements "taken as a whole." *See* Ying Decl. at 3, 6.

- Ying's supplemental affidavit, intended to support the "standalone" First Lien Settlement and First Lien DIP, nonetheless also invokes the "global" settlement, noting that the First Lien DIP will be used in part to satisfy obligations under the EFIH Second Lien Repayment and EFIH Second Lien Settlement. *See* Supp. Ying. Decl. at 5. Ying further supports the First Lien DIP by stating that if it is not approved, "the EFIH Debtors could lose the opportunity to enter into the EFIH Second Lien DIP Facility, which is an integral component of the Restructuring Support Agreement." *Id.* at 11-12.

- The global settlement here takes the ultimate step – it allocates for all time the reorganized equity of the EFIH Debtors.

33.    The sworn deposition testimony adduced in connection with this motion only enhances these themes. The EFIH Debtors' financial advisor repeatedly testified at deposition that the First Lien Settlement cannot be viewed in isolation. For example, Mr. Ying testified that the First Lien Settlement "is the first of a long series of steps which add up to the restructuring support agreement." Deposition of David Ying (May 29, 2014) at 156:5-8; *see also id.* at 90:3-9 ("Well that [whether the First Lien Settlement is in the best interests of the estates] goes back to the thesis behind the RSA. And that is the culmination of well over a year's worth of effort to try to find a consensual resolution to the entire restructuring of EFH and all $42 billion of debt at various entities."); *id.* at 162:21-25 ("These are all integrated, linked transactions with a method to the approach. It's like saying can I look at an elephant's trunk and ignore the elephant. It's not possible."). Indeed, Mr. Keglevic, the chief financial officer and co-chief restructuring officer, testified that he hadn't even thought about segregation of the transactions contemplated by the restructuring support agreement. Deposition of Paul Keglevic (May

29, 2014) at 76:11-13 ("I have not thought about segregation of the motion into its pieces and what is possible and what is not.").

34. In this case, EFIH is a holding company with a limited set of creditors. EFIH's proposed global settlement fails under the *Capmark* standard, because it addresses the vast majority of EFIH prepetition claims, including the First Lien Notes, Second Lien Notes, PIK debt, and intercompany claims and denies voting rights.

> **2.    The Global Settlement Cannot Survive Plan Scrutiny, Even on the Incomplete Record Created by the EFIH Debtors Separation of the Other Motions.**

35. In *Capmark*, this Court held that the settlement "test[ed] the limits" of the debtor's authority to pay prepetition secured creditors outside of the context of a plan. 438 B.R. at 476. That settlement was much more narrow than either the "global" settlement or even just the standalone First Lien Settlement. In this case, EFIH's proposed global settlement violates multiple Bankruptcy Code requirements and far exceeds what can be done through "settlements."

36. The EFIH Debtors' global settlement violates the statutory requirements for a plan of reorganization in at least four ways. First, as discussed above, the disparate treatment of the 6⅞% Notes and the 10% Notes violates Section 1123(a)(4). Second, as discussed below, the tender offer construct and its implementation here violates applicable securities laws, and in any event does not conform to Section 1125. Third, the global settlement with respect to the first lien debt violates Section 1126 requirements for class acceptance and thereby vitiates holders' voting rights. Fourth, the global settlement and DIP appear, even on this limited record, to make a final determination on the value of

EFIH (by allocating the equity to be granted upon conversion of the proposed second lien DIP financing), and potentially grants both unsecured PIK holders recoveries greater than par, while denying secured makewhole claims, in violation of the fair and equitable rule of 1129(b).[23] It is plain why the EFIH Debtors will resist *sub rosa* plan scrutiny – here, the global settlement would fail the foregoing tests relating to a chapter 11 plan.

37.    *Iridium* and *Capmark* are entirely consistent with the U.S. Supreme Court's consistent rulings that bankruptcy courts may only exercise jurisdiction within the confines of the Bankruptcy Code. *See Law v. Siegel*, 134 S. Ct. 1188 (2014); *Nw. Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1998). This is not surprising in the case of *Iridium* because that decision rests on the Supreme Court's decision in *TMT Trailer Ferry*, holding that a settlement pursuant to a reorganization plan must be "fair and equitable" and in compliance with the absolute priority rule and other statutory distribution priorities. *Iridium*, 478 F.3d at 463; *see Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968). And the Supreme Court held in a unanimous decision earlier this year:

> [a] bankruptcy court has statutory authority to issue any order, process or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code. ... But in exercising those statutory and inherent powers, a bankruptcy court may not contravene specific statutory provisions.

*Law v. Siegel*, 134 S. Ct. at 1194 (internal citations omitted).

---

[23] Among other Code provisions relative to voting and permitted distributions, the 6⅞% Settlement violates Bankruptcy Code § 1122, classification of claims or interests; § 1123(a)(4), providing for the "same treatment" of claims within a class; and § 1125, providing for court approval of a disclosure statement containing "adequate information." There is also no disclosure of payment for services rendered in connection with the plan, as the PIK Noteholders are entitled to direct hundreds of millions of dollars to unidentified partners and consultants.

II.    **THE COURT SHOULD NOT APPROVE THE SETTLEMENT OFFER BECAUSE THE SEC TENDER PROCESS IS NOT AVAILABLE TO CHAPTER 11 DEBTORS**

38.    The EFIH Debtors announced at the first day hearings that they would be conducting these tenders "entirely under SEC rules" and launched the tender offers without court approval.  Now with the First Lien Settlement Motion they seek retroactive bankruptcy court rulings as to their compliance with that entire separate body of law. This is the antithesis of how solicitation works in bankruptcy.  The chapter 11 process has multiple levels of notice and participation for the process of soliciting support from creditors and ensuring appropriate levels of payment.  The binary relationship between the debtors and individual creditors in a tender ignores a critical, and statutorily-protected, element – the role of prior notice, scrutiny and the opportunity to be heard and object, in advance of estate actions.

A.    **Reorganization Plans Are the Exclusive Means to Implement "Tender" Transactions in Chapter 11**

39.    Chapter 11 is not structured to permit tender offers in bankruptcy, as evidenced by the limited role of the SEC in bankruptcy.  Congress created a very specific and limited role in chapter 11 for the SEC and its disclosure and solicitation rules.  Under Section 1125(d), the SEC may object to disclosure statements in connection with plans of reorganization, which is the congressionally-provided method to reduce the interest rate on the allowed amount of an oversecured claim, whether the allowed claim includes a redemption premium or otherwise.  However, Congress also specifically provided that the SEC does not have binding authority with respect to process and disclosures in chapter 11: the SEC may not appeal <u>any</u> bankruptcy court ruling on disclosure.  *See* 11

U.S.C. § 1109(a). Thus Congress provided an exclusive method for conducting transactions in bankruptcy over which the SEC would normally have purview – the disclosure statement and plan process. *See id.* § 1125. The tender process as governed by SEC rules, therefore, is simply unavailable in chapter 11 proceedings.

40.     The use of tender offers by a debtor-in-possession forces the bankruptcy court to be the arbiter of compliance with the disclosure requirements of the securities laws and make such determinations without full information. That is not the province of bankruptcy – the disclosure requirements of section 1125 of the Bankruptcy Code is. The plan and disclosure statement process, including the adequate information regime of section 1125, replaces the securities law regime. Congress did not author the plan process to be merely one of several "menu choices" for debtors-in-possession seeking to reorganize.

41.     In fact, Congress specifically provided for only one instance in which the bankruptcy process incorporates the out-of-court securities law process – only in a true prepackaged bankruptcy where solicitation is done prior to filing: Section 1125(g). In the other circumstances in which securities law could come into play, the Bankruptcy Code exempts the issuer only in the context of court-approved disclosure statements and reorganization plans meeting all of the solicitation and voting requirements of chapter 11. 11 U.S.C. §§ 364(f), 1145; *cf. In re Board of Directors of Multicanal S.A.*, 340 B.R. 154, 164 (Bankr. S.D.N.Y. 2006) (prior court approval of disclosure, and confirmation requirements, were a comprehensive scheme to replace prior SEC involvement in corporate reorganizations).

42.     The EFIH Debtors' approach does not work in bankruptcy. The primary protections for securities law violations outside of bankruptcy – monetary damages – are not likely to be available for post-petition tender offers. Debtors may set administrative claim bar dates that are shorter than the applicable statutes of limitations and discharge such claims. Even if harmed investors timely assert claims, the debtor may be administratively insolvent. This, of course, is exactly why the Bankruptcy Code plan or *Iridium*-compliant settlement process provides for <u>prior</u> court approval of disclosure to security holders, after notice (including to the SEC) and hearing, coupled with an express statutory exculpation, thereby avoiding administrative-claim risk. *See* 11 U.S.C. § 1125(e). The SEC itself appears to recognize this structural limitation in chapter 11. *See Securities and Exchange Commission, What Every Investor Should Know About Corporate Bankruptcy*, http://www.sec.gov/answers/bankrup.htm (last visited May 29, 2014) ("Generally, the SEC's role is limited . . . . The SEC will . . . review the disclosure document to determine if the company is telling investors and creditors the important information they need to know."). Thus, the Congressionally circumscribed role of the SEC in bankruptcy renders SEC enforcement less rigorous.

43.     There should be no controversy about this. As this Court itself has discussed in detail, the Chandler Act of 1938 revised corporate reorganization practice to address precisely these concerns about unequal treatment and tender offers in the form of deposit arrangements. *In re Premier Int'l Holdings, Inc.*, 423 B.R. 58, 65-70 (2010).[24]

---

[24] The EFIH Debtors have gone one step further than the depositary arrangements of equity receiverships. Bondholders who tender are locked in without any ability to withdraw their bonds, no matter what happens. In contrast, the RSA-signatory bondholders, however, have the ability to withdraw their assent if any

Prior equity receivership practice saw solicitation of bonds at the outset of the receivership and "lining up 'deposits' before the bargaining began." *Id.* at 70. Instead, Chapter X "completely reversed the timing of the process . . . the new law required that the plan be proposed and approved by the court before anyone could commit to it." *Id.* In 1978 Congress enacted chapter 11 and did away with some Chapter X policies such as the mandatory trustee, but adopted many others. *Id.* at 71. Section 1125 is one of the concepts carried forward, as "the heart of the consolidation of the various reorganization chapters found in [pre-Code] law . . . . [i]t requires disclosure before solicitation of acceptances of a plan of reorganization." H. Rep. 95-595. The disclosure standards are part of substantive bankruptcy law for bankruptcy court determination, and are not even subject to the Supreme Court's rulemaking power, much less the SEC's. *Id.* SEC supervision of corporate reorganizations under Chapter X was one of the structures removed from Chapter 11.

44. The EFIH Debtors have cited no authority addressing the ability of a debtor-in-possession to commence a tender offer in bankruptcy or, even more troublesome, without prior court approval. The EFIH Debtors cite twenty-six examples of step-down tender offers, but not a single one was launched by a debtor-in-possession. Indeed, the only case cited in any of the papers filed to date – and the only case the EFIH Debtors' financial advisor can identify[25] – concerning a tender offer launched by debtors-

---

changes are made to the proposed reorganization and have most-favored-nations clauses governing situations in which nontendering holders actually do better.

[25] *See* Deposition of David Ying (May 29, 2014) at 151:10-152:4.

Q: In your professional experience, have you been involved in any other case in which a debtor in possession launched a tender offer for its own securities?

in-possession is *In re AMR Corp.*, No. 11-15463 (SHL) (Bankr. S.D.N.Y. May 23,

2013).[26]  In that case, the debtor sought *prior* approval of the tender offer and solicitation

materials.[27]  The EFIH Debtors seek to distinguish *AMR* on the grounds that the EFIH

Debtors' tender offer is expressly subject to *later* court approval.  EFIH Debtors

Opposition to Motion to Compel 9-10.  No party objected in *AMR*, and the bankruptcy

court there did not address the propriety of tender offers in bankruptcy.

### B.    The EFIH Debtors' "Tender" Process Is Capable of Repetition and Evading Review

45.    The potential for abuse of the tender offer process, including the coercive

nature in the context of disputed and litigated bankruptcy cases, cannot be understated.

As in this case with respect to the 6⅞% Notes and the 10% Notes, debtors could offer

creditors with identical legal rights different amounts of consideration depending upon

the negotiating leverage of the individual creditor or each creditor's relationship with or

support for the EFIH Debtors' management.  As here, debtors could attempt to coerce

---

A. No.
Q. Are you aware of any cases in which a debtor in possession launched a tender offer for its own securities?
A. I've been told that American Airlines recently did it.
Q. Other than American Airlines, are you aware of any such instance?
A. No.
Q. Okay. Are you aware of any case in which a tender offer was launched by a debtor in possession at the outset of a bankruptcy case?
A. No.

[26] *See* Debtors' Objection to (A) Emergency Motion of CSC Trust Company of Delaware, as Indenture Trustee, to Compel the Debtors to Obtain Approval of Procedures Governing the EFIH First Lien Tender Offer and (B) Emergency Motion of EFIH 2nd Lien Notes Indenture Trustee to Compel Debtors to Obtain Approval of Procedures Governing the 2nd Lien Tender Offer [D.I. 552] at 9-10, 15-16 (the "Debtors' Opposition to Motions to Compel").

[27] *See* Motion of Debtors for Order Pursuant to 11 U.S.C. §§ 105(a) and 363 and Fed. R. Bankr. P. 6004 (I) Authorizing Debtors to Purchase Prepetition Secured Notes and Enhanced Equipment Trust Certificates and (II) Granting Related Relief, *In re AMR Corp.*, No. 11-15463 (SHL) (Bankr. S.D.N.Y. May 23, 2013), D.I. 8268.

creditors to accept a settlement within a short, 10-day early tender deadline before being subjected to a step-down in consideration, while only providing selective and one-sided disclosure on the value and nature of claims being released. And debtors could send a case into administrative chaos to the detriment of creditors by launching tender offers at a strategic moment of advantage in a case or litigation (e.g., just after the filing of papers by the debtors concerning the merits of the litigation), attempting to "pick-off" unsuspecting creditors based upon allegations that are either subject to dispute or may be later shown to be false. This should not be allowed in bankruptcy, and certainly not under the thin authority of section 105(a) of the Bankruptcy Code. *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 236 (3d Cir. 2004) ("[T]he equitable powers authorized by § 105(a) are not without limitation, and courts have cautioned that this section does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity.") (citations omitted).

46.     Should the Court reject the First Lien Settlement Motion on grounds other than the availability of SEC tender offers in chapter 11, the Court should still decide whether it is permissible for the Debtor to issue tender offers during the pendency of the chapter 11 proceedings. If the Court does not address this issue, the EFIH Debtors are likely to issue additional tender offers, on short notice, further disrupting the orderly and efficient adjudication of these cases and the litigation concerning the redemption premium.

24

47.    Future review of additional tender offers launched by the EFIH Debtors may not be available.  For example, the EFIH Debtors could launch another tender offer in the midst of briefing the adversary proceeding in an attempt to drive down bond prices and gain a tactical advantage.  This situation is directly analogous to cases involving attempts to curtail the right to vote in the political process.  In those situations courts determine the rights of parties notwithstanding the mootness of the dispute because the injury is capable of repetition, yet would evade judicial review because of the ephemeral nature of the dispute.  If "(1) the challenged action was in its duration too short to be fully litigated to its cessation or expiration and (2) there is a reasonable likelihood that [he will] be subjected to the same action again" a court will adjudicate the dispute even if the voting period is over.  *Doe v. Delie*, 257 F.3d 309, 313 (3d Cir. 2001); *see, e.g.*, *Belitskus v. Pizzingrilli*, 343 F.3d 632, 648-49 (3d Cir. 2003).  Here the EFIH Debtors are using a tender scheme in a very short time frame to curtail the rights of creditors to vote in the reorganization process.

48.    Left unchecked, the door is open for the EFIH Debtors to subvert the chapter 11 scheme through "voluntary" tenders, coupled with bespoke side-deals that prefer large, strategically situated creditors.  In this manner, all that is left of the statutory chapter 11 plan process is a prearranged show of consensus of those who benefitted from the preferential deals.  The tender offer process launched by the EFIH Debtors threatens the very core of chapter 11.  If the EFIH Debtors rule, namely, that the minimum that is permissible outside of chapter 11 is permitted within a bankruptcy, is adopted by this Court, then debtors will be able, for example, to launch reverse Dutch auctions to modify

debt obligations without the scrutiny and protections of chapter 11.[28]  Similarly, debtors could also purchase trade claims at a discount for cash and, combined with tender offers for outstanding debt, entirely avoid the requirements of confirmation.  This Court should reject the use of tender offers and require that the EFIH Debtors pursue their restructuring in accordance with the chapter 11 plan as mandated by Congress.

## III.    EVEN IF TENDER OFFERS ARE PERMITTED IN BANKRUPTCY, THE TENDER OFFER SHOULD NOT BE PERMITTED HERE

49.    If the Court concludes that tender offers are permitted in bankruptcy, the tender offer pursued here should not be retroactively approved.  The EFIH Debtors have failed to make a showing of compliance with the disclosure standards of Rule 10b-5 and Section 14(e) of the Exchange Act[29], and the rules adopted thereunder.  The EFIH Debtors have not filed any evidence concerning their compliance – no declaration of any member of management or an expert, or any other evidence.  Accordingly, the EFIH Debtors have provided the Court with no basis to declare their compliance with the disclosure requirements of the securities laws.  And thus there is no support for the proposed finding in the proposed Order Approving Certain EFIH Settlements that the "First Lien Opt-In Materials, and the Second Lien Opt-In Materials, and the related Opt-In Procedures are approved."  Proposed EFIH Settlement Order [D.I. 472-2] at 2.

---

[28] *See, e.g.*, Ford Motor Co., Form 8-K (Mar. 4, 2009); Ford Motor Co., Form 8-K (Mar. 23, 2009); Ford Motor Co., Form 8-K (Apr. 6, 2009). In a reverse Dutch auction, creditors bid as to how much they will reduce their debt and the "low" bidders get the available consideration (cash or better-secured debt securities).

[29] Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder (the "Exchange Act").

50.    Even if the EFIH Debtors attempt to address this evidentiary deficiency, the EFIH Debtors will not be able to establish compliance with the disclosure requirements of the securities laws because the disclosures set forth in the Information Memorandum are incomplete, misleading, and inadequate.  The deficiencies include, among others, the absence of any disclosure of:

- The calculations of the proposed redemption premium settlement.

- That the settlement for the 6⅞% Notes is more than twice the settlement offered for the 10% Notes.  The redemption premium claims for the 10% Notes are being offered approximately 25% of their contractual entitlement, while the 6⅞% Notes are receiving approximately 62%.

- The amount of 6⅞% Notes held by the RSA parties.

- The amount of fees to be paid to the RSA parties that are holders of the First Lien Notes, how high the percentage settlement is for those RSA parties, or if some or all of such other RSA consideration is made in respect of the redemption premium settlement.

- The rights of the holders of the First Lien Notes under the applicable Collateral Trust Agreement.

- The terms of the "EFIH First Lien Settlement," to which the Letter of Transmittal binds tendering holders.

- That PIMCO and Fidelity did not negotiate a "standalone" first lien deal at the levels offered, but rather, they negotiated a more lucrative package of "global" consideration with the Debtors.

- That the Debtors, seeking to show "momentum"[30] for the deal to holders of 10% Notes other than PIMCO and Fidelity, knowingly agreed to allocate the global consideration to pockets where PIMCO and Fidelity did not have to share with others (i.e. the 6⅞% Notes, EFH Notes, First Lien DIP Backstop, etc.), and then obscured this fact.

---

[30] Deposition of Paul Keglevic (May 29, 2014) at 64:25.

51.     Apparently recognizing certain of the above insufficiencies previously identified by the 10% Indenture Trustee, the EFIH Debtors addressed some of these issues in the First Lien Settlement Motion and the Ying Declaration, including:

- As part of the First Lien Settlement, PIMCO and WAMCO are receiving backstop fees, and that PIMCO has an oversubscription right.  First Lien Settlement Motion 9-10.

- The calculation of the redemption premiums for the 6⅞% Notes and 10% Notes. Ying Decl. at 4.[31]

- The disparate treatment of more than twice the settlement percentage provided for the 6⅞% Notes as compared to the settlement offered to the 10% Notes.  *Id.* at 4-5.

- That Fidelity's settlement "is on different terms to the makewhole settlements of other holders of EFIH First Lien and Second Lien Notes."  Debtors' Objection to Motions to Compel 12.

52.     The EFIH Debtors have failed to point out to the court a critical distinction -- EFIH Debtors' "incorporation by reference" provision in the Information Memorandum does *not* reference any of the pleadings filed in these cases – it *only* references the EFIH Debtors' SEC filings.  *See* Information Memorandum at ix.[32]  These subsequent acknowledgements in pleadings thus do not "cure" the insufficiency of the disclosures in the tender offer materials.  Additionally, these pleadings were filed well after the start of the short 10-day period by which holders could tender before the "step-down" of the settlement consideration.  Accordingly, even if complete (which they are

---

[31] The 10% Indenture Trustee disputes the calculations set forth in the Ying Declaration and reserves all rights concerning the amount of the premiums.

[32] The 10% Indenture Trustee objects to any of its pleadings or other statements being used as a cure to the EFIH Debtors' disclosure deficiencies.  The 10% Indenture Trustee has no duty to correct the material misstatements and omissions set forth in the tender materials, and assumes no liability with respect to any aspect of the tender offer or tender materials.

not) these subsequent acknowledgments do not remedy the deficient disclosures set forth in the Information Memorandum.

53.     Lastly, there is still the problem that the Debtors' tender offer is illusory, because of the expansive right to withdraw the offer at any time. *See, e.g.*, Information Memorandum [D.I. 363-1] at 10 ("Subject to applicable law, the Offer is being made separately for each series of EFIH First Lien Notes and, subject to applicable law, the Company reserves the right to terminate, withdraw or amend the Offer with respect to either series of EFIH First Lien Notes."). The SEC frowns upon such withdrawal rights and repeatedly has cited such offers in negative written comments. *See* Exhibits B-D.

## IV.    THE EFIH DEBTORS' PROPOSED TIMING INFRINGES ON DUE PROCESS RIGHTS

54.     The notice requirements of bankruptcy law are "founded in fundamental notions of procedural due process." *Morgan Olson L.L.C. v. Frederico (In re Grumman Olson Indus., Inc.)*, 467 B.R. 694, 706 (Bankr. S.D.N.Y. 2012) (internal citation omitted); *see also Armstrong v. Manzo*, 380 U.S. 545, 550 (1965) (holding that failure to give proper notice violates "the rudimentary demands of due process of law"); *City of N.Y. v. N.Y., N.H. & H.R. Co.*, 344 U.S. 293, 297 (1953) (stating in the bankruptcy context that "[t]he statutory command for notice embodies a basic principle of justice—that a reasonable opportunity to be heard must precede judicial denial of a party's claimed rights").

55.     It is well settled that in order for any proceeding to satisfy due process, there must be "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present

their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *see also* 11 U.S.C. § 102(1) (defining "after notice and a hearing" as "after such notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances"); *W. Auto Supply Co. v. Savage Arms, Inc. (In re Savage Indus., Inc.)*, 43 F.3d 714, 720 (1st Cir. 1994) ("Under the Code . . . the debtor in possession or trustee must ensure 'parties in interest' adequate notice and opportunity to be heard before their interests may be adversely affected.").

56.    Through the First Lien Settlement, the EFIH Debtors seek to dictate significant portion of these chapter 11 cases, without abiding by the Bankruptcy Code's plan requirements – and to do so at break-neck speed.  The timeframe within which the Court is being asked to enter the requested relief is unjustifiably expedited.  In light of the EFIH Debtors' strong cash position, it is clear that an adjournment will cause no undue burden to the EFIH Debtors. Further, as noted above, the Debtors do not even come before the Court seeking approval of the First Lien Settlement as "standalone" relief or submitted a corresponding form of order. Thus, the 10% Indenture Trustee objects.

## V.    ANY APPLICABLE STAY PENDING APPEAL SHOULD NOT BE WAIVED

57.    The fourteen-day stay of Rule 6004(h), to the extent applicable, is necessary here to preserve the right of the 10% Indenture Trustee to seek a stay of any order approving the First Lien Settlement pending appeal. *See* FED. R. BANKR. P. 6004 advisory committee notes (explaining that the purpose of the automatic fourteen-day stay is to "to provide sufficient time for a party to request a stay pending appeal").  "A short period of time is often needed and essential to an objecting party intending to appeal

because, if the sale [or assignment] is closed in the absence of a stay, any appeal by an objecting party may well be moot.'" *In re Filene's Basement, LLC*, 2014 Bankr. LEXIS 2000, at *43 (Bankr. D. Del. Apr. 29, 2014) (citing 10 COLLIER ON BANKRUPTCY ¶ 6004.11 (16th ed. 2014)).

> If an objection has been filed and is being overruled, the court should eliminate or reduce the 14-day stay period only upon a showing that there is a sufficient business need to close the transaction within the 14-day period and that the interests of the objecting party, taking into account the likelihood of success on appeal, are sufficiently protected. If the objecting party informs the court that it intends to appeal and seek a stay, then the stay period should not be reduced to less than an amount of time sufficient to allow the objecting party to seek a stay, unless the court determines that the need to proceed sooner outweighs the objecting party's interests.

*Id.*

58.    The EFIH Debtors have not even addressed a request for a waiver of the stay in the First Lien Settlement Motion, and instead only included a waiver of the stay in the proposed order (which order as drafted applies to the earlier "global" settlements motion). The EFIH Debtors have made no showing as to why the brief stay should be waived. The brief stay would allow the 10% Indenture Trustee to seek a stay of closing of the First Lien Settlement. Even conceding the EFIH Debtors' alleged interest cost savings, given the importance of the issues in this case and the relatively minor interest accruing during the fourteen-day period, the alleged cost savings are insufficient to effectively deny the 10% Indenture Trustee's right to seek a stay. At a minimum, the relief should be denied because the Debtors have not sought it in their Settlements Motion and cannot seek it through reply papers.

31

59.    Accordingly, with respect to any order entered by this Court in connection with the First Lien Settlement and to the extent Bankruptcy Rule 6004(h) applies, the 10% Indenture Trustee objects to any waiver (by the EFIH Debtors' or otherwise) of the fourteen-day stay pending appeal.

WHEREFORE, the 10% Indenture Trustee respectfully requests that the Court (i) not approve the First Lien Settlement, and (ii) grant such other relief as is appropriate under the circumstances.

Dated: May 31, 2014

COLE, SCHOTZ, MEISEL, FORMAN
& LEONARD, P.A.

/s/ Nicholas J. Brannick

Norman L. Pernick (DE No. 2290)
J. Kate Stickles (DE No. 2917)
Nicholas J. Brannick (DE No. 5721)
500 Delaware Avenue, Suite 1410          Warren A. Usatine
Wilmington, DE  19801                    25 Main Street,
Telephone: 302-652-3131                  P.O. Box 800
Facsimile:  302-652-3117                 Hackensack, NJ 07602
npernick@coleschotz.com                  Telephone: 201-489-3000
kstickles@coleschotz.com                 Facsimile:  201-489-1536
nbrannick@coleschotz.com                 wusatine@coleschotz.com

   --and--

ROPES & GRAY LLP
Keith H. Wofford                         D. Ross Martin
Mark R. Somerstein                       Andrew G. Devore
1211 Avenue of the Americas              Prudential Tower
New York, NY 10036-8704                  800 Boylston Street
Telephone: 212-596-9000                  Boston, MA  02199-3600
Facsimile:  212-596-9090                 Telephone: 617-951-7000
Keith.Wofford@ropesgray.com              Facsimile: 617-951-7050
Mark.Somerstein@ropesgray.com            Ross.Martin@ropesgray.com
                                         Andrew.Devore@ropesgray.com

   --and--

DRINKER BIDDLE & REATH LLP
James H. Millar
1177 Avenue of the Americas
41st Floor
New York, NY 10036-2714
Telephone:  212-248-3264
Facsimile:   212-248-3141
James.Millar@dbr.com

*Counsel for CSC Trust Company of Delaware, as
successor indenture trustee*

33